# EXHIBIT A1

GALAPAGOS AREA LOOP SUBSEA PRODUCTION SYSTEM

CONSTRUCTION AND OPERATING AGREEMENT

FOR

MISSISSIPPI CANYON BLOCK 562 ("**ISABELA LEASE**")

AND

MISSISSIPPI CANYON BLOCK 519 UNIT ("**MC 519 UNIT LEASES**")

BY AND BETWEEN

BP EXPLORATION & PRODUCTION, INC. ("**LSPS OPERATOR**")

AND

NOBLE ENERGY, INC.

BP EXPLORATION & PRODUCTION, INC.

RED WILLOW OFFSHORE, LLC AND

HOUSTON ENERGY DEEPWATER VENTURES I, LLC

("**MC 519 UNIT LEASE OWNERS**")

AND

NOBLE ENERGY, INC. AND

BP EXPLORATION & PRODUCTION, INC.

("**ISABELA LEASE OWNERS**")

AND

NOBLE ENERGY, INC.

BP EXPLORATION & PRODUCTION, INC.

RED WILLOW OFFSHORE, LLC AND

HOUSTON ENERGY DEEPWATER VENTURES I, LLC

("**LSPS OWNERS**")

EFFECTIVE DECEMBER 1, 2011

Execution Version

## Table of Contents

Article I. DEFINITIONS AND CONTRACT APPLICATION.................................................................2

Article II. EXHIBITS ...........................................................................................................................14

Article III. SELECTION AND REMOVAL OF LSPS OPERATOR .....................................................14

Article IV. RIGHTS AND DUTIES OF OPERATOR...........................................................................16

Article V. LSPS BUILDING AFES .....................................................................................................22

Article VI. RIGHTS AND OBLIGATIONS OF THE LSPS OWNERS..................................................24

Article VII. RIGHTS AND OBLIGATIONS OF SATELLITE LEASES ................................................24

Article VIII. OPERATING EXPENDITURES AND ANNUAL OPERATING PLAN ...........................26

Article IX. RIGHTS OF USE OF THE LSPS .......................................................................................29

Article X. METERING AND ALLOCATION ......................................................................................29

Article XI. VOTING AND APPROVAL...............................................................................................31

Article XII. WITHDRAWAL...............................................................................................................34

Article XIII. OWNERSHIP AND CONFIDENTIALITY OF INFORMATION......................................38

Article XIV. INDEMNITIES ................................................................................................................40

Article XV. ABANDONMENT AND SALVAGE ................................................................................45

Article XVI. TAXES ...........................................................................................................................46

Article XVII. ASSIGNMENTS.............................................................................................................47

Article XVIII. INSURANCE AND LIMITATIONS OF INDEMNITY ..................................................47

Article XIX. FORCE MAJEURE..........................................................................................................48

Article XX. DEFAULT ........................................................................................................................48

Article XXI. SECURITY RIGHTS .......................................................................................................49

Article XXII. GENERAL PROVISIONS...............................................................................................49

Execution Version

**GALAPAGOS AREA**

**LOOP SUBSEA PRODUCTION SYSTEM**

**CONSTRUCTION AND OPERATING AGREEMENT**

### PREAMBLE

This Galapagos Area Loop Subsea Production System Construction and Operating Agreement together with its attached Exhibits ("**Agreement**") effective as of December 1, 2011 ("**Effective Date**"), between **BP Exploration & Production Inc.**, ("**BP**") hereinafter referred to as "**LSPS Operator**" in its capacity as operator of the "**Loop Subsea Production System**" or "**LSPS**" (as hereinafter defined) and "**Satellite Lease Operator**" in its capacity as operator of the Isabela Lease; and BP, Noble Energy, Inc., ("**Noble**") hereinafter referred to as "**Satellite Lease Operator**" in its capacity as operator of the MC 519 Unit Leases, Red Willow Offshore, LLC, ("**Red Willow**"), and Houston Energy Deepwater Ventures I, LLC ("**HEDV**") hereinafter referred to singularly as "**Satellite Lease Owner**" **and** collectively as "**Satellite Lease Owners**", in their respective capacities as co-owners of their respective "**Satellite Lease**" (as hereinafter defined) or "**Satellite Leases**" (as hereinafter defined); and BP, Noble, Red Willow and HEDV hereinafter referred to singularly as "**LSPS Owner**" or collectively as the "**LSPS Owners**" in their capacity as co-owners of the "**Loop Subsea Production System**" or "**LSPS**" (as hereinafter defined). Each signatory hereto is sometimes referred to singularly as a "**Party**" and collectively as the "**Parties**".

### RECITALS:

**WHEREAS**, the LSPS Owners desire to enter into an agreement concerning their joint participation in the "**Building**", "**Operation**" (as such terms are defined herein below), ownership and use of a common pipeline system known as the "**Loop Subsea Production System**" or "**LSPS**" (as hereinafter defined);

**WHEREAS**, BP, Noble, Red Willow and HEDV are the co-owners of the "**MC 519 Unit Leases**" (as hereinafter defined);

**WHEREAS**, BP and Noble are the co-owners of the "**Isabela Lease**" (as hereinafter defined);

**WHEREAS**, the "**MC 519 Unit Leases**" and the "**Isabela Lease**" are sometimes referred to herein singularly as a "**Satellite Lease**" or collectively as the "**Satellite Leases**";

**WHEREAS**, the LSPS Owners wish to Build and Operate the LSPS to gather "**Satellite Production**" (as hereinafter defined) from the Satellite Leases and deliver the Satellite Production (in a raw stream) to the "**Host**" (as hereinafter defined);

1

Execution Version

WHEREAS, the LSPS Owners commenced the Building of the LSPS pursuant to the terms and conditions of the "**Isabela JOA**" (as hereinafter defined) and will complete Building and Operating the LSPS pursuant to this Agreement;

WHEREAS, the Satellite Lease Owners have executed a "**PHA**" (as hereinafter defined) dated effective September 21, 2010 with BP, in its capacity as a co-owner of the Host;

WHEREAS, the LSPS Owners desire that BP, as LSPS Operator, Build and Operate the LSPS, all in accordance with the terms and conditions of this Agreement; and

WHEREAS, the LSPS Owners desire to set forth their agreements with respect to their respective rights, duties and obligations concerning the Building, Operating, ownership and use of the LSPS.

NOW THEREFORE, in consideration of the premises and of the mutual promises and covenants to be kept and performed by the Parties and contained in this Agreement, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereby agree as follows:

## Article I.   DEFINITIONS AND CONTRACT APPLICATION

1.01   <u>Definitions</u>.    For the purposes of this Agreement the following definitions shall be applicable:

"**Abandonment Costs**" has the meaning set forth in Section 15.01.

"**Adversely Impact**" or "**Adverse Impact**" means any event caused by any Satellite Lease or the operation or condition of the LSPS, other than those expressly excluded on Exhibit "J", which adversely impacts or is reasonably expected to adversely impact, as determined by the LSPS Operator, the Operation or condition of the LSPS or the Host.

"**AFE**" or "**Authorization for Expenditure**" means any written proposal made by a Party for the purpose of describing an operation being proposed and estimating the costs to be incurred.

"**Affiliate**" means any corporation, limited liability company or partnership (including a limited partnership) or other entity owned or controlled by a Party to this Agreement. The term "Affiliate" of a Party includes any parent corporation, partnership or other entity that directly or indirectly owns or controls fifty percent (50%) or more of the outstanding stock (or other interests) having the right to vote for directors of a Party to this Agreement, and also includes any other corporation, partnership or other entity in which such parent corporation directly or indirectly owns or controls fifty percent (50%) or more of the voting stock (or other interests) in the other corporation.

2

(a) Ownership or control by a Party is deemed to exist if a Party to this Agreement directly or indirectly owns or controls fifty percent (50%) or more of the outstanding stock of the corporation having the right to vote for directors of the corporation or fifty percent (50%) or more of the interests in the partnership, general partner of a limited partnership, or other entity.

(b) The stock (or interests in a partnership or other entity) owned or controlled by a Party includes all stock (or other interests) directly or indirectly owned or controlled by any other corporation, partnership or other entity owned or controlled by a Party to this Agreement.

"**Agreement**" has the meaning set forth in the Preamble.

"**ALARP**" means as low as reasonably possible.

"**Annual Operating Plan**" has the meaning set forth in Section 8.01(a).

"**Barrel Oil Equivalent**" or "**BOE**" means one (1) oil equivalent barrel determined by treating as one (1) BOE each; one (1) barrel of Oil or five and eight tenths (5.8) MSCF of gas.

"**BOEMRE**" means the United States Department of the Interior, Bureau of Ocean Energy Management, Regulation and Enforcement or any successor thereof with jurisdictional authority over the matters governed by this Agreement.

"**BP**" has the meaning set forth in the Preamble.

"**British Thermal Unit**" or "**Btu**" means the quantity of heat required to raise the temperature of one (1) pound in weight of pure water one degree Fahrenheit ($1°F$) from fifty-eight and five-tenths degrees ($59.5°$) Fahrenheit at a constant pressure of fourteen and seventy-three hundredths pounds per square inch absolute (14.73 psia at sea level) and determined on a gross, dry basis.

"**Build**" or "**Building**" means the operations and activities arising out of or in connection with the design, engineering, construction, installation and Commissioning through Completion of the LSPS.

"**Building AFEs**" means the AFEs attached as Exhibit "C" and further described in Section 5.01.

"**Business Day**" means any Day exclusive of Saturdays, Sundays and legal holidays.

"**Capital Expenditure**" means any expenditure, except for those made in connection with repair operations that are intended to put or return the LSPS to its normal use condition,

3

that: (a) is made in connection with the Building of the LSPS; (b) extends the useful life of the LSPS as it then exists (or any material portion thereof) beyond one (1) year; or (c) materially enhances the useful life of the LSPS as it then exists (or any material portion thereof).

"**Change Order AFE**" has the meaning set forth in Section 5.03(b).

"**Change Order Costs**" has the meaning set forth in Section 5.03(d).

"**Claim/Loss**" and "**Claims/Losses**" means all claims and losses of all kinds and descriptions concerning bodily injury, personal injury, illness, death, and property damage, regardless of how such claims and/or losses may be characterized. Included, without limitation, are damages of all kinds and descriptions, liabilities, liens, privileges, and other encumbrances, demands, suits, causes of action (including actions in rem or in personam, at law or in equity), obligations, judgments, interest, costs, expenses, fines, penalties, losses, assessments, judgments and awards whether created by law, equity, contract, tort, arbitration, voluntary settlement (to the extent authorized by the Indemnitor), or otherwise, and shall, except as otherwise expressly provided, include claims based on contractual indemnity, the unseaworthiness of any vessel, the unairworthiness of any aircraft or any condition or pre-existing condition (whether known or unknown). The terms also include reasonable attorneys' fees, court costs, and other reasonable costs of litigation resulting from the defense of any Claim/Loss or cause of action within the scope of the indemnities in this Agreement.

"**Commissioning**" shall mean all activities (including, without limitation, testing, line filling, producing, gathering, metering, and processing) necessary to be performed by the LSPS Operator, the Satellite Lease Owners or the Satellite Lease Operators hereunder after the LSPS is filled with Satellite Production in order to achieve Startup.

"**Completion**" means that certain condition and time after Startup when all work associated with the Building AFE's and Supplemental Building AFE's is complete.

"**Confidential Information**" means all proprietary geophysical, geological, geochemical, drilling, engineering data or other data owned or developed by the Parties relating to operations conducted within the Satellite Well System, Satellite Leases and the Building and Operation of the LSPS. The term shall also include, but not be limited to:

(a)     certain commercial, contractual or financial information;

(b)     analyses, compilations, maps, models, interpretations or other documents that reflect or incorporate Confidential Information;

(c)     both originals and copies of geological and geophysical data and well logs;

Execution Version

(d)     all other subsurface, seismic and related data acquired or derived from operations conducted pursuant to this Agreement, the MC 519 Unit Operating Agreement or the Isabela JOA;

(e)     Background Technology as described in Exhibit "K"; and

(f)     the terms and conditions of this Agreement.

"**Connected With**" shall be deemed to include and stand for "directly or indirectly arising out of, resulting from, or in any way connected with or related to". For avoidance of doubt, the indemnities in this Agreement are intended to be broad and cover all Claims/Losses in any way connected to the performance of this Agreement, including any Claims/Losses associated with any presence on any premises, including any Claims/Losses associated with any ingress, egress, loading, or unloading, and transportation to and from the LSPS, the Satellite Well System or the Host.

"**Day**" means a period of twenty-four (24) consecutive hours, beginning at 12:00 a.m. central time.

"**Defend**" or "**Defense**" shall include the obligation to pay reasonable attorneys' fees, court costs, expert fees, and other reasonable costs incurred by the Indemnitor or the Indemnitee as a result of defending against a Claim/Loss as required by this Agreement, or, at the election and cost of the obligor, the obligation to select and engage competent attorneys and experts to defend against a Claim/Loss as required by this Agreement.

"**Default**" means (a) non-payment of any charges authorized under this Agreement when due, after the LSPS Operator has given written notice to the non paying Party that payment must be made within sixty (60) days from delivery of the notice; (b) the continuation of a material breach or non-performance (other than matters covered by (a), above) under this Agreement for more than thirty (30) days after receipt of written notice thereof, by the LSPS Operator or an LSPS Owner; or (c) the LSPS Operator or any LSPS Owner becoming bankrupt or insolvent, committing or suffering any act of bankruptcy or insolvency, being placed in receivership, seeking debt or relief protection under any applicable legislation, the preceding of which are not rectified within thirty (30) Days of such event.

"**Default Date**" has the meaning set forth in Section 20.01.

"**Delivery Point(s)**" means:

(a)     for Gas, the point where the Gas departs the Host as set forth on Exhibit "A-1"; and

(b)     for Oil, the point where the Oil departs the Host as set forth on Exhibit "A-1".

Execution Version

"**Design Basis Document**" means the basis of design for the LSPS attached hereto as Exhibit "D".

"**Effective Date**" has the meaning set forth in the Preamble.

"**Enhanced Risk**" means that the overall level of risk of an Adverse Impact to the LSPS due to a proposed activity or occurrence is greater than the risk that would normally be assumed by an operator under similar circumstances.

"**Entry Point(s)**" means the point(s) at the outlet flange of the connection between the LSPS and the Host where Satellite Production enters the Host as set forth in Exhibit "A-1".

"**Equity Interest**" means with respect to each LSPS Owner, the interest set forth in Exhibit "B" for such LSPS Owner.

The phrases "**even if caused by the Negligence/Fault**" or "**even if contributed to by the joint or concurrent Negligence/Fault**" shall, except to the extent expressly otherwise provided, mean that the Parties intend for the indemnity and other obligations to apply whether or not the Claims/Losses are contributed to by, occasioned by, or are the result of the Negligence/Fault of the Indemnitee or any other Person, and that, except to the extent expressly otherwise provided, the Parties intend for the indemnity and other obligations to apply as follows:

(a)     without regard to any conflicting rules of liability under any applicable law or regulation;

(b)     without regard to any successful limitation or exoneration of liability proceeding filed by or on behalf of the indemnifying Party pursuant to the laws of any state or country or the provisions of any international convention; and

(c)     without regard to whether the Claims/Losses in question are sought directly or indirectly by way of recovery, tort or contractual indemnification, or contribution by a Person against the Indemnitee.

It is expressly provided, however, that the phrases "**even if caused by the Negligence/Fault**" or "**even if contributed to by the joint or concurrent Negligence/Fault**" shall not apply to or include the gross negligence or willful misconduct of any Indemnitee.

"**Facility Access Modifications**" means all facilities and equipment added to and located on the Host required for the production handling services provided pursuant to the PHA.

"**Force Majeure**" means events which are beyond the reasonable control of the Party claiming suspension and which, by the exercise of due diligence, such Party would not have been able to avoid or overcome, and only if such events materially affect a Party's ability to perform

6

its obligations hereunder, including but not limited to:

(a)  flood, storm, loop current, eddy, hurricane, earthquake, adverse weather conditions, high sea states, or other acts of God;

(b)  fire, explosion, loss of well control, oil spill, or other environmental catastrophe, natural or man made;

(c)  war, terrorist actions, actions of the public enemy, blockade, insurrection, civil disturbance, labor dispute, strike, lockout, or other industrial disturbance, compliance with any law, order rule, or regulation, governmental action or delay including the inability to secure permits or permit approvals as needed;

(d)  inability to secure materials or equipment; or

(e)  any other causes (other than a cause arising under a contract with a Third Party), whether similar or dissimilar.

"**Gas**" or "**gas**" means any mixture of gaseous hydrocarbons, consisting of methane and heavier liquefiable hydrocarbons and inert and noncombustible gases which are extracted from the subsurface of the earth, including any condensate recovered on the Host and re-injected in a down stream pipeline.

"**Gas Field Imbalance**" has the meaning set forth in Section 10.05(b).

"**HEDV**" has the meaning set forth in the Preamble.

"**Host**" means all equipment and facilities located between the Entry Point(s) and the Delivery Point, including the offshore semi-submersible floating platform located on Mississippi Canyon Block 474 and the Facility Access Modifications, but excluding the LSPS and Satellite Well System.

"**Host M&A**" means the measurement and allocation procedures and/or methodologies implemented by the Host Operator for the allocation of production to all inlet sources on the Host, as may be amended from time to time.

"**Host Operator**" means the operator of the Host named pursuant to the Na Kika Obligations which, as of the Effective Date, is BP or its successors or assigns.

"**Host Owner**" means any party who has an ownership interest in the Host.

"**Indemnify**" or "**Indemnification**" shall be deemed to include and stand for the following phrase: "release, protect, Defend, indemnify and hold harmless." For avoidance of

7                                    Execution Version

doubt, if gross negligence or willful misconduct is alleged along with Negligence/Fault, the term "Indemnify" or "Indemnification" includes the duty to provide a full Defense even though gross negligence or willful misconduct are alleged and even though the Indemnitor is not obligated to pay any portion of an award of damages allocated to the Indemnitee's gross negligence or willful misconduct. However, in the event that the Indemnitee is found by a final and unappealable decision of a court of competent jurisdiction to have been grossly negligent or to have acted with willful misconduct, then the Indemnitee shall refund all Defense costs attributable to the defense of the Indemnitee's gross negligence or willful misconduct.

"**Indemnitee**" means the Person seeking indemnity (or release) under this Agreement.

"**Indemnitor**" means the Party against whom indemnity (or release) is sought under this Agreement.

"**Isabela JOA**" means the Isabela Operating Agreement, Isabela Prospect, Mississippi Canyon Block 562, Gulf of Mexico, by and between BP and Noble dated effective as of April 2, 2007 and attached hereto as Exhibit "L".

"**Isabela Lease**" means the oil and gas lease OCS-G 19966 covering and affecting Mississippi Canyon Block 562 in the Gulf of Mexico.

"**Isabela Lease Owners**" mean the owners of the Isabela Lease, currently BP and Noble.

"**Isabela Lease Owners' Group**" means the following entities and Persons individually and collectively: each of the Isabela Lease Owners and their respective parent, subsidiaries and Affiliates (including any after acquired companies), co-lessees, co-owners, partners or joint venturers, other contractors, sub-contractors and vendors of any tier and their respective officers, directors, shareholders, employees, agents, invitees and representatives of all those entities.

"**Joint Operating Agreement**" means either the Isabela JOA or the MC 519 UOA, whichever is applicable.

"**Laws**" means any laws, rules and regulations of the United States of America or any duly constituted instrumentality thereof and all other governmental bodies, agencies and other authorities having jurisdiction over or affecting the provisions contained in or the transactions contemplated by this Agreement or the Parties or their operations, whether such Laws now exist or are hereafter amended, enacted, promulgated or issued.

"**Letter of Intent**" or "**LOI**" means that certain Letter of Intent for the Galapagos Area Loop Subsea Production System Construction and Operating Agreement dated September 21, 2010, by and among Noble Energy, Inc., Houston Energy Deepwater Ventures I, LLC, Red Willow Offshore, LLC, and BP Exploration & Production Inc.

"**Loop Subsea Production System**" or "**LSPS**" means the common production system

Execution Version

known as the Galapagos Area Loop Subsea Production System, the umbilical system from the topsides umbilical termination assembly to the infield umbilical termination assemblies and more particularly described in Exhibit "A", Exhibit "A-1" and Exhibit "A-2" hereto, additionally and any and all permits, Right-of-Ways, and other authorizations necessary for the Building and Operation thereof.

"**LSPS Delivery Points**" mean the points at the outlet flange of the connection between the LSPS and the Host where Satellite Production enters the Host as set forth on Exhibit "A-2".

"**LSPS Entry Points**" means the hubs located at the subsea PLEMs where the Satellite Well System connects to the LSPS as set forth on Exhibit "A-2".

"**LSPS Operating Guidelines and Standards**" means those included in Exhibit "J" as may be amended from time to time.

"**LSPS Operator**" means that Person designated as operator and identified in Section 3.01 or in any amendment to this Agreement.

"**LSPS Operator Group**" means the following entities and Persons individually and collectively:  the LSPS Operator and its respective parent, subsidiaries and Affiliates (including any after acquired companies), partners or joint venturers, other contractors, sub-contractors and vendors of any tier and their respective officers, directors, shareholders, employees, agents, invitees and representatives of all those entities.

"**LSPS Owner**" or "**LSPS Owners**" has the meaning set forth in the Preamble.

"**LSPS Owners Group**" means the following entities and Persons individually and collectively: each of the LSPS Owners and their respective parent, subsidiaries and Affiliates (including any after acquired companies), co-lessees, co-owners, partners or joint venturers, other contractors, sub-contractors and vendors of any tier and their respective officers, directors, shareholders, employees, agents, invitees and representatives of all those entities.

"**Major Modification**" means a modification to the Design Basis Document that:

(a)     changes the diameter of the flowlines by more than one-half inch (1/2");

(b)     changes the number of PLEMs;

(c)     is expected to increase the overall cost of the LSPS by more than fifteen percent (15%) of the aggregate of the Building AFEs attached as Exhibit "C";

(d)     changes the initial selection of the location of the LSPS by more than three thousand feet (3000') laterally in any direction; or

Execution Version

(e)     is expected to delay Startup of the LSPS by more than one (1) year from January 1, 2012.

"**Majority Interest**" means two (2) or more LSPS Owners which are not Affiliates of each other having among them more than fifty percent (50%) of the Equity Interests of all LSPS Owners entitled to vote (i.e., not in Default).

"**Major Non-Routine Expense**" means expenses for any repair or replacement activity associated with the LSPS as part of the Operation of the LSPS pursuant to the terms of this Agreement for which the total gross cost charged or chargeable to LSPS Owners is expected to exceed Five Million and No/100 Dollars ($5,000,000).

"**MC 519 Unit**" means the unit formed by that certain MC 519 Unit Operating Agreement.

"**MC 519 Unit Leases**" means the oil and gas leases OCS-G 27278 covering and affecting Mississippi Canyon Block 519 and OCS-G 21176 covering and affecting Mississippi Canyon Block 563 in the Gulf of Mexico.

"**MC 519 Unit Lease Owners**" means the owners of the MC 519 Unit Leases, currently, Noble, BP, Red Willow and HEDV.

"**MC 519 Unit Lease Owners' Group**" means the following entities and Persons individually and collectively: each of the MC 519 Unit Lease Owners and their respective parent, subsidiaries and Affiliates (including any after acquired companies), co-lessees, co-owners, partners or joint venturers, other contractors, sub-contractors and vendors of any tier and their respective officers, directors, shareholders, employees, agents, invitees and representatives of all those entities.

"**MC 519 Unit Operating Agreement**" or "**MC 519 UOA**" means that certain Unit Operating Agreement by and between BP, Noble, Red Willow and HE&D Offshore, L.P. covering the MC 519 Unit Leases dated effective January 1, 2009 and bearing BOEMRE Contract Number 754309001.

"**Minor Modification**" has the meaning set forth in Section 4.09.

"**MMBtu**" means one million (1,000,000) Btus.

"**MSCF**" means thousand standard cubic feet.

"**Na Kika HUA**" means that certain Guiding Principles for a Na Kika Host Utilization Agreement by and between BP and Shell Offshore Inc., effective as of May 17, 2004.

Execution Version

"**Na Kika JOA**" means that certain Na Kika Complex Joint Operating Agreement by and between Shell Deepwater Development Inc., predecessor-in-interest to Shell Offshore Inc., and Amoco Production Company, predecessor-in-interest to BP, effective as of April 30, 1998, as amended.

"**Na Kika Obligations**" means all rights, duties and obligations (existing or future) between Shell Offshore Inc. and BP (or their respective successors or assigns) related to, or in connection with, the Host, including without limitation the Na Kika JOA, the Na Kika HUA, the Host M&A, the Satellite Field Start-up Agreement (including exhibits), and any gas balancing procedures, oil quality bank, and/or natural gas liquids bank, which might be implemented by the Host Owner.

"**Noble**" has the meaning set forth in the Preamble.

"**Oil**" or "**oil**" means any mixture of hydrocarbons, regardless of gravity, originally and naturally occurring as liquids and includes all condensate, distillate and other liquid hydrocarbons recovered by use of conventional separators on the Host.

"**Operate**", "**Operating**" or "**Operation**" means the operations and activities arising out of or in connection with the operation, maintenance, use, repair, replacement, modification, enhancement, dismantlement, disposal, disconnection or abandonment of the LSPS.

"**Operating Expenses**" means the expenses and costs, other than Capital Expenditures, relating to the Operation of the LSPS. Notwithstanding the foregoing, Operating Expenses shall include: (a) any expenditures made to Operate the LSPS in or to its original condition or capacity; or (b) any item that is put into service that has an expected useful life of less than one (1) year.

"**Operating Standards and Guidelines**" has the meaning set forth in Exhibit "J".

"**Parties**" shall have the meaning ascribed to it in the Preamble.

"**Party**" shall have the meaning ascribed to it in the Preamble.

"**Person**" means any individual or entity, including, without limitation, any corporation, limited liability company, joint venture, joint stock company, general or limited partnership, trust, agency, association, organization, governmental authority, or other entity.

"**PHA**" means that certain Production Handling and Operating Services Agreement by and between BP, as Host Owner, the Satellite Lease Owners and the LSPS Owners covering the Satellite Leases dated effective September 21, 2010.

"**PLEM**" means pipeline end manifold.

11                                         Execution Version

"**Production**" means the stream of Oil, Gas, water and associated substances produced from a Satellite Lease wellbore.

"**Project Services**" has the meaning set forth Section 4.01(a).

"**Project Team**" means that certain Project Team formed pursuant to Exhibit "K".

"**Records**" means all contracts, agreements, data, charts, records, filings, accounting books, books or accounts, plans, designs, material documentation, studies, reports, operating and procedure manuals, procedures, plans and supporting documentation created or obtained by the LSPS Operator pursuant to this Agreement.

"**Remaining Owners**" has the meaning set forth in Section 12.03(a)(ii).

"**Remaining Parties**" has the meaning set forth in Section 12.02.

"**Rights-of-Way**" means those certain rights-of-way that have been or will be obtained by the LSPS Operator for the Building and Operation of the LSPS as set forth Exhibit "A".

"**Satellite Lease**" and "**Satellite Leases**" has the meaning set forth in the Recitals.

"**Satellite Lease Operator(s)**" means the operator of the Isabela Lease and the operator of the MC 519 Unit Leases or any successors thereof selected pursuant to the terms and provisions of the Isabela JOA and the MC 519 UOA respectively.

"**Satellite Lease Owner**" and "**Satellite Lease Owners**" has the meaning set forth in the Preamble.

"**Satellite Production**" means the stream of Oil, Gas, water and associated substances produced from the Satellite Leases.

"**Satellite Well System**" means the subsea system and any modifications thereto of a Satellite Lease which includes, but is not limited to all facilities and equipment upstream of the LSPS Entry Points.

"**Services**" means collectively the operational, management, and administrative services set forth in Section 4.01(b).

"**Single Satellite Lease Change Order**" has the meaning set forth in Section 5.03(a).

"**Sole Benefit Operation**" has the meaning set forth in Section 7.08.

12

"**Startup**" means that certain condition and time when the LSPS is ready for service and capable of receiving Satellite Production on a continued basis including the completion of any and all pre-commissioning and Commissioning activities performed by the LSPS Operator. Startup shall occur regardless of whether or not all billings, payments, and demands under this Agreement have been finally resolved.

"**Supplemental Building AFEs**" means any AFE which supplements any of the Building AFEs and is further described in Section 5.02.

"**Supplemental Change Order AFE**" means any AFE which supplements the Change Order AFE and is further described in Section 5.03(d).

"**Tax**" or "**Taxes**" means any federal, state, local, or non-U.S. income, gross receipts, license, payroll, employment, excise, severance, stamp, occupation, premium, windfall profits, environmental (including taxes under Code §59A), customs duties, capital stock, franchise, profits, withholding, social security (or similar), unemployment, disability, real property, personal property, sales, use, transfer, registration, value added, alternative or add-on minimum, estimated, or other tax of any kind whatsoever, whether computed on a separate or consolidated, unitary or combined basis or in any other manner, including any interest, penalty, or addition thereto, whether disputed or not and including any obligation to Indemnify or otherwise assume or succeed to the Tax liability of any other Person.

"**Third Party**" means any Person other than the Parties hereto.

"**Unanimity**" or "**Unanimous**" means the mutual agreement of all LSPS Owners, entitled to vote (i.e. not in Default).

"**Withdrawing Party**" has the meaning set forth in Section 12.02.

"**Withdrawal Interest**" has the meaning set forth in Section 12.02.

"**Withdrawal Notice**" has the meaning set forth in Section 12.02.

"**Work Product**" means all design, technical, scientific, analytical, and other information including, but not limited to plans, drawings, research data, design criteria, profile and alignment sheets, engineering studies and reports, cost studies, specifications, engineering diagrams, permit applications and other documents to be submitted to governmental agencies, records and documentation of construction and testing activities, and similar documents, whether preliminary or final, related to or necessary for Project Services or Services and other work product conceived, originated or prepared for or by the LSPS Operator for performance of the Project Services or Services, but excluding LSPS Operator's computer programs and other proprietary data which were not specifically prepared for the performance of Project Services or Services.

13

## Article II.  EXHIBITS

2.01    Exhibits.  All references in this Agreement to "Exhibits" without further qualification shall mean the Exhibits listed below and attached to this Agreement.  Each of the Exhibits listed below are made a part of this Agreement and shall be deemed incorporated into the body of this Agreement by this reference, as completely as if the full text of each Exhibit were contained within the text of this Agreement.  If the provisions of any of the Exhibits conflict with the body of this Agreement, the provisions of the body of this Agreement will prevail, except as to Exhibits "G", "H" and "J", each provision of which shall prevail over any provision of the body of this Agreement.

| | | |
|---|---|---|
| (a) | Exhibit "A": | Galapagos Area Loop Subsea Production System Description |
| | Exhibit "A-1": | Delivery Points |
| | Exhibit "A-1": | Entry Points |
| | Exhibit "A-2": | LSPS Delivery Points |
| | Exhibit "A-2": | LSPS Entry Points |
| (b) | Exhibit "B": | LSPS Equity Interests |
| (c) | Exhibit "C": | Building AFEs |
| (d) | Exhibit "D": | LSPS Design Basis Document |
| (e) | Exhibit "E": | LSPS Accounting Procedures |
| (f) | Exhibit "F": | Dispute Resolution Procedures |
| (g) | Exhibit "G": | Insurance |
| (h) | Exhibit "H": | Memorandum of Agreement and Financing Statement |
| (i) | Exhibit "I": | Certification of Non-Segregated Facilities |
| (j) | Exhibit "J": | Operating Guidelines and Standards |
| (k) | Exhibit "K": | Project Team and Technology Sharing |
| (l) | Exhibit "L": | Isabela JOA |

## Article III.  SELECTION AND REMOVAL OF LSPS OPERATOR

3.01    Designation of LSPS Operator.  The LSPS Owners hereby designate BP as LSPS Operator of the LSPS.

3.02    Resignation or Removal of LSPS Operator.  The LSPS Operator may resign or be removed subject to the following:

(a)    Removal for Cause.  The LSPS Operator may be removed without the necessity of a vote of the LSPS Owners upon written notice by any Party during the continuation of one (1) of the following circumstances: (i) the LSPS Operator has been found liable by a final judgment of a court of competent jurisdiction or an arbitration panel for an act of gross negligence or willful misconduct hereunder; (ii) the LSPS Operator is in Default hereunder or has been found to have committed a substantial breach of a material provision of this Agreement by a final judgment of a court of competent jurisdiction or an arbitration panel; or (iii) upon thirty (30) Days written notice by any Party if the LSPS Operator assigns all or a portion of its Equity Interest in the LSPS (excluding any Equity

Execution Version

Interest assigned to an Affiliate) which reduces the LSPS Operator's Equity Interest in the LSPS to less than the Equity Interest of the LSPS Owner owning the next largest Equity Interest owned on the effective date of the LSPS Operator's assignment, whether accomplished by single or multiple assignments; or

(b)     Resignation of LSPS Operator.  The LSPS Operator may resign at any time by giving at least sixty (60) Days prior written notice to the other LSPS Owners; provided, however, the LSPS Operator shall not resign during Force Majeure or an emergency which poses a threat to life, safety, property or the environment.  If the LSPS Operator ceases to own an interest in the LSPS or in all Satellite Leases, the LSPS Operator shall be deemed to have resigned without any action by the LSPS Owners. The withdrawal or deemed withdrawal from this Agreement pursuant to Article XII of an LSPS Owner which is the same Person as the LSPS Operator shall constitute the resignation of the LSPS Operator for purposes of this paragraph.

3.03     Selection of Successor LSPS Operator.  Upon the resignation or removal of the LSPS Operator, a successor LSPS Operator will be selected by vote of a Majority Interest of the LSPS Owners, provided, however, in the event the resigned or removed LSPS Operator fails to vote or votes only to succeed itself or an Affiliate, then the successor LSPS Operator will be selected after excluding the vote of the resigned or removed LSPS Operator or an Affiliate.  In the event that no Party receives a Majority Interest vote, the Party receiving the highest total Equity Interest vote will become the successor LSPS Operator.  It shall be the responsibility of the LSPS Owner with the greatest Equity Interest in the LSPS (other than the resigned or removed LSPS Operator) to administer the election of the new LSPS Operator.

3.04     Effective Date of Resignation or Removal.  The resignation or removal of the LSPS Operator will become effective as soon as practical but no later than 7:00 a.m. on the first Day of the month following a period of sixty (60) Days after said notice of resignation or removal.  The resignation or removal of the outgoing LSPS Operator will not prejudice any rights, obligations or liabilities resulting from its duties as LSPS Operator.  The successor LSPS Operator will be entitled to charge the LSPS Owners for the reasonable costs it incurs in connection with the change of LSPS Operator.

3.05     Delivery of Property.  On the effective date of resignation or removal of the LSPS Operator, the outgoing LSPS Operator shall deliver to the successor LSPS Operator possession of everything jointly owned by the LSPS Owners, including all funds relating to the LSPS, all joint equipment, materials and appurtenances used in conducting Project Services and Services, and all books, Records, Work Product and inventories relating to Project Services and Services other than those books, records and inventories maintained by the outgoing LSPS Operator in its capacity as the owner of its Equity Interest, or as a Satellite Lease Owner.  The outgoing LSPS Operator will further use its reasonable efforts to transfer to the successor LSPS Operator, as of the effective date of such resignation or removal, its rights as LSPS Operator under all contracts, Rights-of-Way, easements, licenses, permits and governmental approvals exclusively relating to Services or Project Services conducted pursuant to this Agreement, and the successor LSPS Operator will assume all obligations of the LSPS Operator thereunder. The LSPS Owners may

Execution Version

audit the books and conduct an inventory of all joint property, and such inventory shall be used in the return of and the accounting for the joint property by the outgoing LSPS Operator. Such inventory and audit shall be completed, if possible, no later than the effective date of the resignation or removal of the LSPS Operator. All costs incurred in connection with such audit, delivery and inventory shall be charged to the LSPS Owners. The LSPS Owners agree to promptly execute and file such documents as may be necessary to change operatorship.

## Article IV.   RIGHTS AND DUTIES OF OPERATOR

4.01    Duties and Responsibilities of the LSPS Operator. Subject to the terms and conditions of this Agreement, the LSPS Owners hereby engage and authorize the LSPS Operator to perform, and the LSPS Operator hereby accepts such engagement and authorization, and agrees to:

(a)    Build the LSPS. Build the LSPS in accordance with the Design Basis Document, for and on behalf of the LSPS Owners, including, but not limited to, the pre-lay route survey, engineering, planning, design, bidding of construction, permitting, inspections, installations, start-up operations, (including any Commissioning activities), acquisition of materials, pipe, meters and equipment and the management of all contractors involved in Building the LSPS ("**Project Services**"). The LSPS Operator shall manage and direct the Project Services in an efficient, safe and economical manner and in conformity with generally accepted industry practices and standards in the United States portion of the Gulf of Mexico utilizing personnel experienced in the applicable technical fields and in accordance with all valid and applicable laws, rules and regulations of governmental authorities and in accordance with the same business ethics and environmental policies the LSPS Operator adheres to in the conduct of its own business. Without limitation of the foregoing, and in addition to obligations contained in other provisions of this Agreement, as part of the Project Services the LSPS Operator shall be responsible for the following:

(i)    supervise, direct, oversee, coordinate, approve and obtain all design and engineering work necessary for the Completion of the LSPS;

(ii)    supervise, direct, oversee, coordinate, approve and obtain the procurement and purchase of, all materials, components and equipment, including line fill, required for Completion of the LSPS;

(iii)    supervise, direct, oversee, coordinate, approve, and obtain all construction, fabrication and installation of the LSPS to Completion;

(iv)    supervise, direct, oversee, coordinate, approve, and obtain all testing and calibration of the LSPS during construction and installation and/or necessary for Completion;

16                                  Execution Version

(v) provide or perform any and all support for pre-commissioning and Commissioning activities for the LSPS;

(vi) prepare and maintain on behalf of the LSPS Owners all appropriate Records related to the Building of the LSPS that a prudent operator would maintain regarding an offshore gathering system and related facilities similar to the LSPS, including, without limitation, "as built" survey, underwater surveys and engineering by Third Parties; and all operating and procedure manuals, procedures and plans, which Records shall be the property of the LSPS Owners and which Records or copies thereof shall be made available to each LSPS Owner upon reasonable request;

(vii) procure such Rights-of-Way, easements, licenses, permits and governmental approvals as are necessary for Building and Completion of the LSPS; and

(viii) perform such additional services not specifically enumerated herein necessary for the Building of the LSPS, including, without limitation, accounting services and coordination of all Project Services with Host Operator and the Satellite Lease Operators.

(b) Operate and Administer the LSPS.  Operate and administer the LSPS, for and on behalf of the LSPS Owners, including, but not limited to, execution of contracts, obtaining and maintaining all necessary Rights-of-Way, licenses, permits and governmental approvals and managing and directing such Operation of the LSPS ("Services").  Without limitation of the foregoing, and in addition to obligations contained in other provisions of this Agreement, as part of the Services the LSPS Operator shall be responsible for the following:

(i) management and administrative services of the LSPS, including: accounting; tax filings; cash management; review of significant operating and financial matters; contract administration services;

(ii) management of Third Party operations related to the LSPS;

(iii) coordinating with the Satellite Lease Operators and the Host Operator, the scheduling of Production from the Satellite Leases into and out of the LSPS, including, but not limited to, gathering Production from the Satellite Leases; transportation and delivery of Production from the Satellite Leases to the Host; metering and allocations; invoicing and furnishing daily production reports to each Satellite Lease Operator;

(iv) ordering, purchasing, receiving and verifying receipt of parts, materials, production chemicals (to the extent not otherwise provided under the

Execution Version

PHA), including line fill, spare parts, insurance (to the extent required by this Agreement), tools, supplies and services;

(v)   preparing and maintaining on behalf of the LSPS Owners all appropriate Records related to Operating the LSPS that a prudent operator would maintain regarding an offshore gathering system and related facilities similar to the LSPS, including, without limitation, "as built" survey, underwater surveys and engineering by Third Parties; and all operating and procedure manuals, procedures and plans, which Records shall be the property of the LSPS Owners and which Records or copies thereof shall be made available to each LSPS Owner upon reasonable request;

(vi)   preparing and maintaining on behalf of the LSPS Owners all necessary Records and filings with all governmental entities, including, but not limited to certification obligations required by the BOEMRE provided for under the Oil Pollution Act of 1990;

(vii)   management of all environmental and all other applicable statutory compliance for the LSPS;

(viii)   coordination of emergency response;

(ix)   operating and maintaining all communications, inspection, maintenance, surveillance, flow control, corrosion control, cathodic protection and monitoring systems of the LSPS, including, without limitation, the control system;

(x)   coordinating with the Host Operator and the Satellite Lease Operators all matters related to the operation, inspection and maintenance of the LSPS, including, but not limited to: (A) flow assurance procedures; (B) injection of chemicals and corrosion inhibitors; (C) pigging; (D) operation and maintenance of valves, and safety and safety shutdown devices and other controls and equipment; and (E) scheduling, performing and reporting all required tests on safety systems;

(xi)   shutting in of wells that Adversely Impact the LSPS;

(xii)   visually inspecting surface piping and equipment;

(xiii)   providing personnel;

(xiv)   providing consumables required for Production from the Satellite Leases;

Execution Version

(xv)     providing routine helicopter and boat transportation or coordinating same with the Host Operator;

(xvi)    conducting inspection of the LSPS;

(xvii)   surveillance and operation of the control system;

(xviii)  performing all routine maintenance of the LSPS, including pigging and corrosion control;

(xix)    perform such additional services not specifically enumerated herein, including accounting services and services relating to the PHA, including coordinating with the Host Operator and the Satellite Lease Operators in relation to the interface between the LSPS,  the Host and the Satellite Leases, which may be reasonably necessary for Operation of the LSPS; and

(xx)     such other operational, administrative, maintenance and repair services not described in this Section 4.01 as are required for Operating the LSPS;

4.02    Overhead Rates.  Notwithstanding anything to the contrary contained herein, the Satellite Lease Owners shall pay the LSPS Operator the overhead rates as provided under the accounting procedures attached as Exhibit "E".

4.03    Exclusive Rights.  In connection with its performance under Section 4.01, the LSPS Operator will have the exclusive right to: (a) enter into and administer all related contracts; (b) administer and direct all contractors and support personnel related to such performance; and (c) request that the Host Operator provide certain services pursuant to Exhibit "E" of the PHA and to direct the Host Operator with respect to such services.

4.04    Independent Contractor.  The LSPS Operator shall be an independent contractor and not an employee, agent or servant of the LSPS Owners.  This Agreement does not create any partnership or joint venture between the LSPS Operator and the LSPS Owners.  All actions of the LSPS Operator undertaken pursuant to this Agreement shall be subject to the general direction of the LSPS Owners in accordance with the provisions of this Agreement, but except as otherwise expressly provided in this Agreement, the LSPS Owners shall not have the right to supervise, direct or control the LSPS Operator's day-to-day performance of its duties and responsibilities under this Agreement or to exercise such general direction contrary to the provisions of this Agreement.

4.05    Performance of Services.  For the purposes of providing the Services or Project Services necessary in connection with the LSPS, the LSPS Operator may utilize its employees, employees of its Affiliates or leased employees.  It may also utilize independent subcontractors who are not employees to perform the Services or Project Services.  To the extent that some of the Services

<div align="center">19</div>

described in this Article IV are to be performed from time to time by the Host Operator in accordance with Exhibit "E" of the PHA, the LSPS Operator will oversee the supervision and administrative functions relating to these duties.

4.06   Workmanlike Conduct.   The LSPS Operator agrees to conduct all Services and Project Services in a proper and workmanlike manner in accordance with methods and practices customarily used in sound oil and gas field practice as would a reasonable and prudent operator under the same or similar circumstances. The LSPS Operator shall not be liable to the Parties for losses sustained or liabilities incurred in connection with the performance of the Services and Project Services, except as may result from its gross negligence or willful misconduct. Notwithstanding the foregoing, to the extent that the LSPS Operator conducts Services in accordance with the expressly applicable provisions of Exhibit "J", the LSPS Operator shall be deemed to have met the foregoing standard.

4.07   [Intentionally Omitted]

4.08   Major Non-Routine Expenses and Operations.

(a)   Major Non-Routine Expenses.   Subject to the provisions of Section 8.02, the LSPS Operator shall give the LSPS Owners notice, including the rationale for conducting the activity and a description of the LSPS Operator's planned method of repair, before incurring any Major Non-Routine Expenses, except for emergencies and necessary engineering costs required to develop the LSPS Operator's planned method of repair, other than those previously approved by an AFE. Within seven (7) Days after receipt of such notice in accordance with this Section 4.08 any LSPS Owner may request and the LSPS Operator shall schedule and hold a meeting of the LSPS Owners to discuss the proposed Major Non-Routine Expense. In the event that a Satellite Lease well, or group of Satellite Lease wells, is curtailed or shut-in and an unanticipated Major Non-Routine Expense is to be incurred, then the notice shall be given as soon as is reasonably practical. The Parties shall endeavor to meet to discuss same as soon thereafter as is reasonably practical and operations may begin subsequent to the meeting as soon as approval is obtained, if required pursuant to Article VIII.

(b)   Operations.   The LSPS Operator shall notify, seventy two (72) hours in advance, the applicable Satellite Lease Operator(s) when the LSPS Operator is going to be conducting operations in or within three thousand feet (3000') of any of the Satellite Well System. Such operations shall be conducted in compliance with Exhibit "J".

4.09   Minor Modifications to the Design Basis Document.   As additional information becomes available to the LSPS Operator, the LSPS Operator may, prior to the Completion of the LSPS, make Minor Modifications to the Design Basis Document without the approval of the LSPS Owners which such Minor Modification shall be binding on all the LSPS Owners. For purposes of this paragraph, a **"Minor Modification"** is:

Execution Version

(a) a modification which does not cause the estimated amount of any Building AFE (by itself or when added to other concurrent Minor Modifications) to increase by more than fifteen percent (15%) or Thirty Million Four Hundred Thousand and No/100 Dollars ($30,400,000), whichever is less, and is not a Major Modification;

(b) a modification that is necessary for health, safety, or environmental reasons or regulatory requirements and is not anticipated to exceed fifteen percent (15%) of the cumulative amounts set forth in Exhibit "C", even if that expenditure constitutes a Major Modification; or

(c) a modification that is not a Major Modification.

4.10 Major Modifications to the Design Basis Document. A Major Modification shall require the unanimous agreement of the LSPS Owners. When a Major Modification to the LSPS is proposed prior to the Completion of the LSPS, the LSPS Operator shall furnish the LSPS Owners with the proposed Major Modification to the LSPS (and associated AFEs). If a Major Modification to the Design Basis Document is approved, the Design Basis Document (and associated AFEs) shall be deemed modified, and the LSPS Operator shall carry out the modified Design Basis Document. If a Major Modification is not approved, the LSPS Operator shall continue to implement the Design Basis Document as it was before such proposed Major Modification.

4.11 Meetings. The LSPS Operator shall also be responsible for holding quarterly meetings with the LSPS Owners during Building and Operations (or such other frequency as agreed by a Majority Interest) and notifying each LSPS Owner of such meeting at least seven (7) Days prior to such meeting.

4.12 Liens and Encumbrances. The LSPS Operator shall use reasonable efforts to keep the LSPS free from all liens and encumbrances which might arise under the Building and Operation of the LSPS. In the event a lien is placed on the LSPS, the LSPS Operator shall make reasonable efforts to remove such lien.

4.13 Execute and Negotiate Agreements. The LSPS Operator will negotiate, prepare, and enter into all agreements in connection with authorized expenditures under this Agreement.

4.14 Authorization to Enter. Subject to any limitations or restrictions imposed by law or by the terms or conditions of any license or right granted by any governmental authority, the LSPS Owners hereby grant to LSPS Operator to the extent necessary for the purposes of this Agreement and allowed by law, the non-exclusive right to enter upon any portion of the Rights-of-Way and the Satellite Leases for the purposes of performing Project Services and Services pursuant to this Agreement.

4.15 Shutting-in Satellite Leases. In accordance with Exhibit "J" of this Agreement and Exhibit "E" of the PHA and this Section 4.15, the LSPS Operator has the right to shut-in any

Execution Version

Satellite Lease or Satellite Lease well as a prudent operator would have under the same or similar circumstances upon indication of a problem or operating condition that is having or could have an Adverse Impact on the LSPS or the Host. In so doing, the LSPS Operator will adhere to the Operating Guidelines and Standards set forth in Exhibit "J" of this Agreement. A Satellite Lease Operator intending a re-start of a shut-in Satellite Lease well or Satellite Lease must first demonstrate to the satisfaction of the LSPS Operator that such re-start is in compliance with the Exhibit "J".

4.16    Notice. The LSPS Operator shall promptly provide written notice to the LSPS Owners setting forth the estimated date of Completion.

<div align="center">

**Article V.   LSPS BUILDING AFES**

</div>

5.01    Building AFEs. The LSPS Operator has charged and invoiced, and will continue to charge and invoice, the LSPS Owners, as set forth in the Isabela JOA and Exhibit "C" (Accounting Procedure) of the Isabela JOA, for each LSPS Owner's Equity Interest share of costs and expenses for the Building and Completion of the LSPS. The LSPS Owners have approved the Building AFEs set forth in Exhibit "C" and paid a portion of the Building AFEs set forth in Exhibit "C."

5.02    Supplemental Building AFEs. Should the LSPS Operator anticipate that Building and Completion expenditures made pursuant to this Agreement will exceed any of the Building AFEs, exclusive of Change Order Costs, by more than fifteen percent (15%) or Thirty Million Five Hundred Thousand and No/100 Dollars ($30,500,000), whichever is less, the LSPS Operator shall submit a Supplemental Building AFE to the LSPS Owners in accordance with the Isabela JOA to make an election as to their further participation in the Building of the LSPS. Should less than all of the Parties approve the Supplemental Building AFE, the approving Parties will pay their proportionate share of the costs in excess of one hundred fifteen percent (115%) of the previously approved Building AFE in the proportion that the interest of each approving Party bears to the aggregate interest of all approving Parties. The non-approving Parties shall be deemed to have withdrawn from this Agreement, and the provisions of Article XII shall apply to such withdrawal. Any Supplemental Building AFE will be charged and invoiced in accordance with the Isabela JOA and Exhibit "C" (Accounting Procedure) of the Isabela JOA.

5.03    Single Satellite Lease Change Order Procedures During the Building and Through Completion of the LSPS.

(a)    Single Satellite Lease Change Orders.  If, during the Building and through Completion of the LSPS, the Satellite Lease Owners of a single Satellite Lease desire a change which may result in a change to the Design Basis Document for the benefit of that Single Satellite Lease ("Single Satellite Lease Change Order") then the Satellite Lease Operator of the Single Satellite Lease requesting the Single Satellite Lease Change Order shall notify the LSPS Operator of such Single Satellite Lease Change Order.

<div align="center">22</div>

(b)   Change Order AFE.  The LSPS Operator shall prepare a Single Satellite Lease Change Order AFE ("Change Order AFE") in accordance with Exhibit "C" (Accounting Procedure) of the Isabela JOA and submit it to such Satellite Lease Operator for approval.  The Satellite Lease Operator shall submit the Change Order AFE to the Satellite Lease Owners for approval pursuant to the Joint Operating Agreement governing operations of such single Satellite Lease.

(c)   Approval of Change Order AFE.

(i)    If the Change Order AFE is approved by the Satellite Lease Owners the Satellite Lease Operator shall notify the LSPS Operator of such approval and all Satellite Lease Owners shall be deemed to have approved the Change Order AFE.

(ii)   If the Change Order AFE is approved by the Satellite Lease Owners, LSPS Operator shall submit the Change Order AFE to the LSPS Owners for Majority Interest approval. If the LSPS Owners approve the Change Order AFE by a Majority Interest then the LSPS Operator shall conduct the activities approved pursuant to the Change Order AFE. If the Change Order AFE does not receive Majority Interest approval by the LSPS Owners then the LSPS Operator shall not conduct the activities set forth in the Change Order AFE.

(d)   Change Order Costs.  All Building and Completion costs and expenses relating to the Single Satellite Change Order and subsequent Change Order AFE ("Change Order Costs") shall be borne by the respective Satellite Lease Owners requesting the Single Satellite Lease Change Order.  Should the LSPS Operator anticipate that Change Order Costs will exceed the total estimated amount of the Change Order AFE by at least fifteen percent (15%), the LSPS Operator shall promptly prepare a revised cost estimate evidenced by a Supplemental Change Order AFE to be submitted to the Satellite Lease Operator for Satellite Lease Owner approval. Should the Supplemental Change Order AFE be approved by Satellite Lease Owners constituting more than fifty percent (50%) of the voting interest under the respective Joint Operating Agreement for the Satellite Lease, all such Satellite Lease Owners will be deemed to have approved the Supplemental Change Order AFE. Should less than such ownership interest approve the Supplemental Change Order the non-approving Parties shall be deemed to be approving Parties and shall be deemed to have approved the Supplemental Change Order. All Satellite Lease Owners in such Satellite Lease will pay their proportionate share of the costs in excess of one hundred fifteen percent (115%) of the Change Order AFE.

Execution Version

5.04   Other Costs.  All costs not otherwise allocated to specific LSPS Owner(s) pursuant to this Agreement shall be borne by all of the LSPS Owners based on their Equity Interests in the LSPS and such Equity Interests shall not be reallocated pursuant to any action taken in accordance with Section 5.03.

## Article VI.  RIGHTS AND OBLIGATIONS OF THE LSPS OWNERS

6.01   Allocation Costs and Expenses of the LSPS.  Except as expressly provided otherwise in this Agreement, all the costs and expenses connected with the Building of the LSPS shall be borne by the LSPS Owners in accordance with the Equity Interests.  All the costs and expenses connected with the Operation of the LSPS shall be borne by the LSPS Owners as provided by this Agreement.

6.02   Progress Reports and Inspections.

(a)   Work Product Review.  Upon request by any LSPS Owner, the LSPS Operator shall make available to such LSPS Owner for review any or all Work Product.

(b)   Progress Reports.  During Building operations, the LSPS Operator shall furnish written progress reports to the LSPS Owners on a monthly basis.

6.03   Access.  Subject to the provisions of the PHA with respect to access to the Host, during Building of any LSPS facilities, each LSPS Owner, at its sole cost, risk, and expense, shall have the right of access to the offshore Building site(s) and the right to inspect all phases of Building operations and all Records pertaining thereto at all such times and locations as to not unreasonably interfere with such Building operations and are within the logistic limitations of offshore sites. The LSPS Operator shall advise each LSPS Owner in writing when installation of all or a major portion of the LSPS has been completed and the date, time and place of any testing of the LSPS, or any portion thereof, sufficiently in advance to allow a LSPS Owner the option to be present and witness any and all such testing, within the logistic limitations of offshore sites. Further, upon written request to the LSPS Operator, any LSPS Owner will have the right to receive, without cost to the requesting LSPS Owner, "as built" drawings and data relating to engineering calculations, specifications, materials and equipment installation and testing of the LSPS and an itemized inventory and documentation of the LSPS.

## Article VII.  RIGHTS AND OBLIGATIONS OF SATELLITE LEASES

7.01   Rights and Obligations of the Satellite Leases.  Subject to the terms and conditions of this Agreement and Exhibit "J" attached hereto, the Satellite Lease Operators on behalf of the Satellite Lease Owners hereby agree to operate, maintain, use, repair, replace, modify, enhance, dismantle, dispose, disconnect and abandon the Satellite Well System so as to minimize any Adverse Impact to the LSPS and the Host.  Each Satellite Lease Operator shall make every reasonable effort to isolate any specific Satellite Well System problem thereby mitigating any Adverse Impact to the LSPS and the Host until the Satellite Lease Operator has performed the

Execution Version

work necessary to rectify the problem. All such work shall be performed in an efficient, safe manner and in conformity with the usual practices in the industry and in accordance with the Satellite Lease Operator's safety and environmental policies. Subject to the provisions of this Section 7.01, it is the intent of the LSPS Operator and the LSPS Owners to not unduly restrict, impede, or otherwise delay the activities of the Satellite Lease Operators with respect to operations conducted on the Satellite Leases.

7.02   Connection of a Satellite Well System to the LSPS.

(a)   Scheduling. The LSPS Operator shall determine the timing and scheduling of all activities and operations involving the connection of the Satellite Well System to the LSPS.

(b)   Specifications. Each Satellite Operator shall provide to the LSPS Operator, in a timely manner and as requested by the LSPS Operator, the design and specifications of its respective Satellite Well System. The LSPS Operator shall review the design and specifications of the respective Satellite Well System and, if necessary, shall submit LSPS Operator's required modifications to each Satellite Lease Operator within ninety (90) Days of its receipt of each Satellite Well System's design and specifications. Such required modifications shall be limited to those which are necessary to prevent Adverse Impacts or Enhanced Risk to the ongoing operations of the LSPS, in LSPS Operator's reasonable judgment. Each Satellite Operator shall revise its design and specifications to conform to the required modifications submitted by the LSPS Operator.

7.03   Authorization to Enter. Subject to any limitations or restrictions imposed by the PHA, by law or by the terms or conditions of any license or right granted by any governmental authority, the LSPS Operator hereby grants to the Satellite Lease Operators on behalf of the Satellite Lease Owners to the extent necessary for the purposes of this Agreement and allowed by law, the non-exclusive right upon reasonable prior written notice to enter upon any portion of the Rights-of-Way for the purposes of complying with their responsibilities pursuant to this Agreement. The Satellite Lease Operators agree to exercise these rights in a manner which is in compliance with: (a) this Agreement; (b) all applicable laws, rules, regulations, leases, licenses, permits; (c) the LSPS Operator's standard and reasonable safety procedures; and (d) the Satellite Lease Operator's standard and reasonable safety procedures.

7.04   [Intentionally Omitted]

7.05   [Intentionally Omitted]

7.06   Gathering, Handling and Transporting Production Downstream. Each Satellite Lease Owner will be responsible for all commercial terms and arrangements for the processing, handling, marketing, gathering and transporting of its respective Production downstream of the LSPS Delivery Point.

Execution Version

7.07    Modifications to the LSPS to Meet Regulatory Royalty Requirements.  Notwithstanding the provisions of Section 7.08 hereof, should any Satellite Lease(s) incur a royalty obligation when the other Satellite Lease(s) have no such obligation, the respective Satellite Lease Owners shall have the right to cause the LSPS Operator to implement modifications or additions to the LSPS necessary to meet BOEMRE and/or other regulatory requirements at the Satellite Lease Owners sole risk, cost and expense.

7.08    Sole Benefit Operation.  Subject to the other provisions of this Article VII, during Operation any LSPS Owner(s) shall have the right to request that the LSPS Operator conduct an Operation for the benefit of less than all Parties ("**Sole Benefit Operation**"), provided such Sole Benefit Operation does not have an Adverse Impact on the LSPS. The proposed Sole Benefit Operation request shall be submitted to the LSPS Operator for determination that such operation satisfies the following criteria: (a) such operation has mitigated the risk of an Adverse Impact to the LSPS to a level that is ALARP for such type of planned activity; (b) the planned activity is in compliance with the Exhibit "J"; and (c) such operation either: (i) poses no Enhanced Risk; or (ii) does pose an Enhanced Risk and the conduct of such operation is approved by a Majority Interest. The LSPS Operator shall undertake such Sole Benefit Operation, in accordance with the plans and procedures approved by both the LSPS Operator and the LSPS Owner(s) requesting the Sole Benefit Operation, as soon as reasonably practical unless such delay is occasioned by Force Majeure. The Sole Benefit Operation shall be at the sole risk, cost and expense (including, as applicable, the future cost of restoring the LSPS to its condition prior to the conduct of such Sole Benefit Operation unless otherwise agreed to pursuant to the terms hereof) of the LSPS Owner(s) requesting such Sole Benefit Operation. Any incidental operational benefit derived from such Sole Benefit Operation and ownership of any equipment and/or infrastructure installed as a result of such Sole Benefit Operation, shall be owned by all LSPS Owners on an Equity Interest basis.

## Article VIII.  OPERATING EXPENDITURES AND ANNUAL OPERATING PLAN

8.01    Annual Operating Plan and Forecasts.

    (a)    Annual Operating Plan.  Beginning on May 1, 2012 and continuing annually thereafter, the LSPS Operator will furnish the LSPS Owners with a draft of the annual operating plan for the next calendar year ("**Annual Operating Plan**"). The Annual Operating Plan shall include planned Operations and forecasts and other informational items, including but not limited to operational information (such as Production volumes as received from the Satellite Lease Operators) and be accompanied by a budget to carry out such Annual Operating Plan. The Annual Operating Plan will include the following budgetary information:

        (i)    Capital Expenditures anticipated for the next calendar year, which shall include an itemization of each capital project the cost of which is reasonably estimated to exceed Three Million  and No/100 Dollars ($3,000,000); and

Execution Version

(ii)    Operating Expenses anticipated for the next calendar year, which shall include an itemization of each Operating project the cost of which is reasonably estimated to exceed One Million and No/100 Dollars ($1,000,000), including Major Non-Routine Expenses, anticipated for the next calendar year.

(b)    <u>Suggested Revisions to Annual Operating Plan</u>.  The LSPS Owners may provide written suggested changes, additions, or deletions to the LSPS Operator's draft of the Annual Operating Plan by July 15th of each year.  The LSPS Operator will make the revisions it deems necessary and furnish the Annual Operating Plan to the LSPS Owners no later than October 1st of each year.

8.02    <u>Authority for Expenditures.</u>

(c)    <u>Operating and Capital Expenses</u>.

(i)    <u>AFE Approval</u>.  The LSPS Operator shall not incur any single expenditure costing One Million and No/100 Dollars ($1,000,000) or more, unless the LSPS Operator submits an AFE for prior approval by a Majority Interest of the LSPS Owners. For any single expenditure costing in excess of Fifty Thousand and No/100 Dollars ($50,000) and less than One Million and No/100 Dollars ($1,000,000), the LSPS Operator shall furnish written information describing the expenditure to each of the LSPS Owners and no approval from the LSPS Owners shall be required. Total costs associated with any single LSPS Owner approved AFE shall not exceed the budgeted amount by more than fifteen percent (15%) or Five Hundred Thousand and No/100 Dollars ($500,000), which ever is less, without prior approval of a Majority Interest of the LSPS Owners.

(ii)    <u>First Four Years</u>.  Not withstanding the above, during each of the first four (4) years (twelve-month periods, not calendar years) following the date of Startup of the LSPS, Operating Expenses up to Five Million and No/100 Dollars ($5,000,000) cumulative per year shall be borne by the LSPS Owners on an Equity Interest basis without further financial approval. Subsequent to said four (4) year-period, any Operating Expense must follow the approval process set forth in this Section 8.02(a).

(d)    <u>Emergencies</u>.  Notwithstanding anything to the contrary contained herein, no prior notice or approval by the LSPS Owners is required if any expenditures or costs related to the LSPS are required due to the urgency of the situation (based on threat to life, safety, property, or the environment).  In the case of such urgent situation, the LSPS Operator may make such commitments or expenditures as it deems to be necessary or appropriate and report to the LSPS Owners, as promptly as possible, the nature of the urgency and the action taken. All costs, risks and

27                    Execution Version

expenses related to such response shall be borne by the LSPS Owners in proportion to their respective Equity Interest.

8.03    Costs, Expenses, Expenditures, Revenues and Reimbursements.    The LSPS Operator shall conduct any and all necessary or appropriate activities to carry out its duties and responsibilities hereunder and is authorized to incur Capital Expenditures and Operating Expenses in connection therewith; provided that such expenditures are in accordance with Section 8.02.    In addition to the overhead compensation described in Section 4.02, the LSPS Operator shall be fully reimbursed on a monthly basis by the LSPS Owners (in accordance with the allocation set forth in Section 8.04 for all reasonable and proper actual costs, expenses and expenditures incurred or to be incurred by the LSPS Operator within the scope of its responsibilities under this Agreement in accordance with and pursuant to the procedures set forth in Exhibit "E".

8.04    Costs Responsibilities/Allocations.    Except with respect to those expenses and/or revenues which are expressly provided herein as applicable to only certain LSPS Owner(s), each LSPS Owner will be responsible for its Equity Interest share, as described below, of each of the following:

(a)    insurance (to the extent obtained for the benefit of all LSPS Owners), and other proceeds, shall be allocated based on Equity Interests;

(b)    Operating Expenses, including charges to the LSPS Operator from the Host Operator in accordance with the PHA, shall be allocated on an Equity Interest basis;

(c)    Capital Expenditures shall be allocated based on Equity Interests;

(d)    Major Non-Routine Expenses shall be allocated based on Equity Interests; and

(e)    the cost of replacement or refurbishment of primary or spare parts that are used for the LSPS, as needed, will be allocated on an Equity Interest basis.

8.05    Overhead.    Notwithstanding anything to the contrary in this Agreement, it is the intent of the Parties hereto that if any of the LSPS Owners are liable to the LSPS Operator for overhead on a cost or an expenditure incurred under the terms of this Agreement, then the LSPS Owners shall not be liable for overhead on such cost or expenditure under the terms of the PHA, the Isabela JOA, or the MC 519 UOA.

Execution Version

## Article IX.  RIGHTS OF USE OF THE LSPS

9.01    Rights of Use.  The LSPS Owners have the right to use the LSPS capacity to gather Satellite Lease Production based on the following:

(a)    capacity in the LSPS will be available only, and to the extent, that capacity for Satellite Lease Production is available at the Host ;

(b)    the LSPS Operator will endeavor to operate the LSPS so as to maximize production on a BOE basis;

(c)    provided that all legs of the LSPS are operational and are unconstrained, if any Satellite Lease Owner's Production is not, in their view, fully optimized, such Satellite Lease Owner may notify the other Parties and request a meeting to discuss the operational flow of Production on the LSPS.  If mutual agreement is not reached by all the Satellite Lease Owners and LSPS Owners with regard to the operational flow of production on the LSPS within thirty (30) Days of such meeting, then the LSPS Operator shall flow Production from the Isabela Lease up the westernmost leg of the LSPS and flow Production from the MC 519 Unit Leases up the easternmost leg of the LSPS; and

(d)    notwithstanding anything in this Agreement  to the contrary, if any leg of the LSPS is not operational or has impaired capacity which restricts the flow of one leg of the LSPS, regardless of the cause, then the LSPS Operator will endeavor to operate the LSPS so as to maximize production on a BOE basis, subject to endeavoring to ensure that the Isabela Lease and the MC 519 Unit Leases will each be afforded the opportunity to produce not less than "production in paying quantities"  as set forth in NTL No. 2010-G05 issued September 15, 2010 (or as subsequently amended) by the BOEMRE or any successor thereof.  The LSPS Operator will endeavor to place the LSPS back into full operational service as soon as practically possible.

## Article X.  METERING AND ALLOCATION

10.01  Measurement Standards.  The measurement of Production will be as recommended by, and in accordance with and in the following priority: (a) approved BOEMRE surface commingling permit; (b) the Host M&A, as such may be changed or amended from time to time; (c) requirements of this Agreement; (d) recommendations contained in the equipment manufacturers' installation and operation technical manuals to the extent practicable; and (e) API Manual of Petroleum Measurement Standards.  The LSPS Operator shall advise the Satellite Lease Operators should the Host M&A be materially changed or amended.

10.02  Production Allocation.  Subject to the provisions of this Article X, the LSPS Operator will, on a monthly basis, meter and allocate (or cause the Host Operator to have sampled,

Execution Version

metered, and allocated) Satellite Lease Production in compliance with the BOEMRE surface commingling permit. The LSPS Operator will on a monthly basis, make an allocation to each Satellite Lease of the total Production allocated to the Satellite Leases according to the Host M&A consistent with the measurement and allocation process as applied to all other production commingled upon the Host. The LSPS Operator will, or cause the Host Operator to, provide, within a reasonable time during the month following the month of production, an allocation statement and well test information, if any, to each Satellite Lease Operator, showing, at a minimum, the following information: (a) Production from all Satellite Lease processed and handled on the Host; (b) choke size; (c) flowing pressure; and (d) test duration. As to Sections 10.02 (b), (c), and (d), such information will be limited to the applicable Satellite Lease. The applicable Satellite Lease Owners will be responsible for all governmental and regulatory agency reporting and filing requirements for each Satellite Lease.

10.03   Btu Adjustments. The Parties recognize that the ultimate gas purchaser will compensate each of the Satellite Lease Owners for the amount of total Btu (units), attributable to and via the allocation process, allocated to their combined stream as an input to content of the common stream of gas passing through the LSPS and the Host, and further recognize that Production from a particular Satellite Lease may either dilute or enrich the Btu content of Production from the other Satellite Leases or other Production utilizing the Host. The LSPS Operator will cause a sample or samples of Production from each Satellite Lease stream to be taken to determine the Btu value thereof. The LSPS Operator will utilize the results of the analysis of the Btu sample for the purpose of adjusting the allocated volume set forth in this Article X. Such Btu analysis shall be the basis for an accounting adjustment which results in a MMBtu allocation of the Production from each of the Satellite Leases. In addition to the allocation of volumes of Production via the Host allocation process to the combined Satellite Leases stream, any allocation of Production will include adjustments in accordance with such Btu content based on such sampling and testing.

10.04   Oil Quality Bank and NGL Bank. In the event that an oil quality bank and/or an NGL bank is implemented by the Host Owners for Production handled on the Host, the LSPS Owners will utilize the same oil quality bank and NGL bank methodologies and procedures to handle oil and gas quality differences between the Satellite Leases.

10.05   Platform and Field Gas Imbalance Settlements.

(a)   Gas Field Imbalance. The Parties recognize that commingled Gas production from all leases processed on the Host will be allocated by the export pipeline company in accordance with its applicable tariff provisions based upon (i) allocation methodology selected by the Host Operator, acting in its capacity as the export pipeline's receipt point operator; and (ii) a party's nominations made in accordance with the applicable tariff. The Host Operator also performs an allocation of the "actual" entitlement Gas sales volumes of each lease based upon the methodology approved by the BOEMRE in the surface commingling permit and the terms and provisions of the PHA. It is the specific intent of the Parties that the imbalance between the two (2) above mentioned allocations be kept to a

30                                          Execution Version

minimum by all Parties diligently maintaining their Gas nominations in line with estimated lease Production on a daily and/or monthly basis.

(b)    Gas Balancing Procedures. The Parties also recognize that the Host Operator is endeavoring to implement Gas balancing procedures at the Host Facility to handle any Gas imbalances created between the Host Lease Production, Satellite Production, and Third Party Production (as such terms are defined in the PHA) and any such Gas imbalance herein referred to as "**Gas Field Imbalance**") on a commercially reasonable basis, and once this Gas balancing procedure is implemented, the Parties will implement a Gas balancing procedure for the LSPS to handle such Gas Field Imbalances between the Satellite Leases utilizing the same methods of allocation as well as the same methods for resolving such Gas Field Imbalances as those implemented by the Host Operator. Until such Gas balancing procedures are agreed to, the LSPS Operator will allocate any such Gas Field Imbalances between the Satellite Leases in the same manner that the Host Operator allocates the imbalances created between the Host Lease Production, Satellite Production, and Third Party Production (as such terms are defined in the PHA) and provide a monthly statement to the Parties of any Gas Field Imbalances. In regards to a Gas Field Imbalance between the Satellite Leases prior to the Host Operator's implementation of Gas balancing procedures, each Party taking Gas shall pay or cause to be paid all royalty to whom it is accountable based on the volume of Gas actually taken by such Party. The Parties will make a good faith effort to resolve any Gas Field Imbalances between the Satellite Leases for a month in the succeeding month either through in-kind balancing or cash balancing (in the case of any cash balancing the unit price will be the price received and reported to BOEMRE for royalty purposes by the Party taking Gas in excess of its entitlement). The Parties agree that working interest Gas imbalances occurring among the Satellite Lease Owners within a Satellite Lease shall be resolved in accordance with the applicable separately negotiated gas balancing agreement attached to the applicable Joint Operating Agreement.

(c)    Costs. The cost of installation, calibration, inspection and maintenance of any metering and sampling equipment for a particular Satellite Lease shall be borne solely by such Satellite Lease Owners. The cost of installation, calibration, inspection and maintenance of any metering and sampling equipment for the LSPS, as well as the costs of sampling and testing, will be an Operating Expense.

## Article XI.   VOTING AND APPROVAL

11.01  Voting. Unless in Default, each LSPS Owner will have a voting interest equal to its Equity Interest. Unless otherwise specifically provided in this Agreement, failure of an LSPS Owner (if entitled to vote) to respond within the period required is deemed to be a vote against the approval of any matter submitted for a vote. Except for matters specified in this Agreement expressly requiring Unanimity or those matters set forth in Section 5.02, all actions under this

Execution Version

Agreement require approval by a Majority Interest. Once a proposed action is approved by a Majority Interest, the proposed action is deemed to have been approved by all LSPS Owners.

    (a)    Majority Interest Approval. Actions requiring Majority Interest approval are as follows:

        (i)    approval of Operating and Capital Expense AFE's as set forth in Section 8.02(a);

        (ii)    selection of a new LSPS Operator;

        (iii)    approval of the disposition of surplus material with a value, less the cost of disposition, if any, of greater than Two Hundred Fifty Thousand and No/100 Dollars ($250,000);

        (iv)    approval of Change Order AFEs;

        (v)    approval of any settlement of any Claim in excess of One Hundred Fifty Thousand and No/100 Dollars ($150,000) (including attorneys' fees incurred);

        (vi)    approval of the engagement by the LSPS Operator of outside legal counsel to respond to any Claim to the extent such counsel's fees is expected to exceed Fifty Thousand and No/100 Dollars ($50,000);

        (vii)    [intentionally omitted]

        (viii)    approval to conduct a Sole Benefit Operation having been determined to pose an Enhanced Risk;

        (ix)    approval to re-start a shut-in well or Satellite Lease that has been determined by the LSPS Operator to pose an Enhanced Risk; and

        (x)    approval of the initiation of any lawsuit on behalf of the LSPS Owners.

    (b)    Unanimous Approval. Actions requiring Unanimous approval of the LSPS Owners are as follows:

        (i)    approval of any Major Modification;

        (ii)    any transfer or other alienation of any rights or interest under this Agreement not otherwise expressly permitted by Article XVII;

Execution Version

(iii)   abandonment of the LSPS;

(iv)   approval for accepting Production from any source other than a Satellite Lease; and

(v)   subsequent to Completion, approval of an expansion adding facilities or equipment to the LSPS.

11.02  <u>AFE Approval Procedure</u>.

(a)   For Article VIII AFEs, the response time to a proposed operation will depend upon the AFE gross expenditure amount. Response times will be as follows:

(i)   AFE of One Million and No/100 Dollars ($1,000,000) or more but less than Ten Million and No/100 Dollars ($10,000,000) response will be made within thirty (30) Days of receipt of said proposal;

(ii)   AFE of Ten Million and No/100 Dollars ($10,000,000) or more but less than Fifty Million and No/100 Dollars ($50,000,000) response will be made within sixty (60) Days of receipt of said proposal;

(iii)   AFE of Fifty Million and No/100 Dollars ($50,000,000) or more but less than One Hundred Million and No/100 Dollars ($100,000,000) response will be made within ninety (90) Days of receipt of said proposal; and

(iv)   AFE of One Hundred Million and No/100 Dollars ($100,000,000) or more response will be made within one hundred twenty (120) Days of receipt of said proposal.

(b)   For Article V AFEs, the response time to a proposed Supplemental Building AFE, Change Order AFE or Supplemental Change Order AFE shall be made within thirty (30) Days of receipt of such proposal.

11.03  <u>Procedure for LSPS Owners' Proposal</u>. Within fifteen (15) Days after the LSPS Operator proposes an AFE pursuant to Article VIII, an LSPS Owner may provide a written counter proposal (and AFE, if required under the terms of this Agreement) to the LSPS Operator and all other LSPS Owners. Within ten (10) Days of receiving such counter proposal, the LSPS Operator shall call a meeting of the Parties for the purpose of determining by Majority Interest approval, which proposal shall be approved.

Execution Version

## Article XII.  WITHDRAWAL

12.01  Right to Withdraw.

(a)     Prior to Completion, no Party shall have the right to withdraw from this Agreement, except that a Party shall be deemed to have withdrawn as provided for in Section 5.02. The non-approval by such Party of any approved Supplemental Building AFE under Section 5.02 shall be deemed to constitute a Withdrawal Notice for purposes of Section 12.01. If a Party is deemed to have withdrawn prior to Completion in accordance with the provisions of Section 5.02, such Party shall be a Withdrawing Party for the purposes of Section 12.03. If such Party is an owner in only one (1) Satellite Lease such Party shall be a Withdrawing Party in accordance with Section 12.03(a). If such Party is an owner in both Satellite Leases, such Party shall be a Withdrawing Party in accordance with Section 12.03(b).The non-approval by such Party of any approved Supplemental Building AFE under Section 5.02 shall be deemed to constitute a Withdrawal Notice in accordance with Section 12.02.

(b)     After Completion, any LSPS Owner may withdraw from this Agreement. If such LSPS Owner is withdrawing from only one (1) Satellite Lease, such withdrawal shall be carried out in accordance with Section 12.03(a). If such LSPS Owner is withdrawing from both Satellite Leases, such Party shall be a Withdrawing Party in accordance with Section 12.03(b).

(c)     The provisions of this Article XII do not apply to the LSPS Operator. The LSPS Operator, however, may resign in accordance with the provisions of Section 3.02(b).

12.02  Withdrawal Notice.   After Completion, and subject to the provisions of this Article XII, any Party may withdraw from this Agreement ("Withdrawing Party") by giving prior written notice to all other Parties stating its decision to withdraw ("Withdrawal Notice").   The Withdrawal Notice is an unconditional and irrevocable conveyance offer by the Withdrawing Party to convey to the applicable Parties that elect not to join in such withdrawal ("Remaining Parties"), for no consideration, in accordance with Section 12.03 below, the Withdrawing Party's entire: (a) Equity Interest in all of the LSPS and all other property and equipment owned under the terms of this Agreement; (b) interest in this Agreement; and (c) leasehold and ownership interest in the respective Satellite Lease, Satellite Well System, and Satellite Production (collectively, the "Withdrawal Interest").   The Withdrawal Notice shall specify an effective date of withdrawal which date shall be at least sixty (60) Days, but not more than one hundred eighty (180) Days after the delivery of the Withdrawal Notice described above.   If no effective date is specified, the withdrawal shall be effective sixty (60) Days after the delivery of the Withdrawal Notice.   Within thirty (30) Days of receipt of the Withdrawal Notice, each other applicable Party, as described in Section 12.03 below, may elect to join in the withdrawal, by providing written notice to the other Parties.   Failure to respond to a Withdrawal Notice within such thirty (30)

Execution Version

Days is deemed an election not to join in the withdrawal. The LSPS Operator shall immediately advise the Parties in writing of the elections made by the Parties under this Article XII.

12.03   Withdrawal From Single or Both Satellite Leases.

    (a)   Withdrawing Party Withdrawing its Interest from a Single Satellite Lease.

        (i)   If the Withdrawing Party elects to withdraw from this Agreement with respect to a single Satellite Lease, and one or more of the other Satellite Lease Owners in such Satellite Lease elect not to join in the withdrawal, then such Remaining Parties in the Satellite Lease must accept an assignment from the Withdrawing Party or Withdrawing Parties of the Withdrawal Interest(s) in proportion to the Remaining Party's leasehold interest in such Satellite Lease, and must assume all obligations with respect to such Withdrawing Interest(s).

        (ii)   If the Withdrawing Party elects to withdraw from this Agreement with respect to a single Satellite Lease, and all of the other Satellite Lease Owners in such Satellite Lease elect to join in the withdrawal and thus become Withdrawing Parties, then the Satellite Lease Owners of the other Satellite Lease ("**Remaining Owners**") shall have the election to assume all of the Withdrawal Interests of the Withdrawing Parties, in the proportion that the leasehold interest of each such Remaining Owner bears to the aggregate leasehold interests of all such Remaining Owners. The Remaining Owners shall have forty-eight (48) hours (exclusive of Saturdays, Sundays, and federal holidays) after delivery of the notice from the LSPS Operator of the elections made by the Withdrawing Parties under Section 12.02. Failure to timely make an election shall be deemed an election by a Remaining Owner not to assume its share of the Withdrawal Interests. In the event none of the Remaining Owners elect to assume all of the Withdrawal Interests, then the Withdrawing Parties shall disconnect their respective Satellite Lease from the LSPS under the direction and authority of the LSPS Operator, and such Withdrawing Parties shall remain liable for the abandonment of such Satellite Lease and Satellite Well System in accordance with the provisions of the respective Joint Operating Agreement, and the Remaining Owners shall only assume their share of the Withdrawal Interests described in Section 12.02(a) and Section 12.02(b) in the proportion that the leasehold interest of each such Remaining Owner bears to the aggregate leasehold interests of all such Remaining Owners.

    (b)   Withdrawing Party Withdrawing its Interest from Both Satellite Leases.

        (i)   If the Withdrawing Party elects to withdraw from this Agreement with respect to both Satellite Leases and one or more of the other Satellite

Execution Version

Lease Owners in either of the Satellite Leases elect not to join in the withdrawal, then such Remaining Parties in each Satellite Lease must accept an assignment from the Withdrawing Party or Withdrawing Parties of the Withdrawal Interest(s) in proportion to the Remaining Party's leasehold interest in each respective Satellite Lease, and must assume all obligations with respect to such Withdrawing Interest(s).

(ii)     If the Withdrawing Party elects to withdraw from this Agreement with respect to both Satellite Leases and one or more of the other Satellite Lease Owners in one of the Satellite Leases elect not to join in the withdrawal, but all of the Satellite Lease Owners in the other Satellite Lease elect to join in the withdrawal, then the Withdrawing Parties and the Remaining Owners shall proceed under Section 12.03(a)(ii) above.

(iii)    If the Withdrawing Party elects to withdraw from this Agreement with respect to both Satellite Leases and all the Satellite Lease Owners of both Satellite Leases elect to join in the withdrawal, then:

(A)     no assignment of the Withdrawal Interests shall take place;

(B)     no further proposals may be made under this Agreement unless agreed by all Parties;

(C)     the Parties shall abandon all operations on the LSPS; and

(D)     the LSPS Operator shall:

(I)     provide all Parties with a detailed abandonment plan, if applicable, and a detailed cost estimate for the abandonment within sixty (60) Days after receipt of the elections to withdraw; and

(II)    cease operations and begin to permanently abandon the LSPS in accordance with the abandonment plan.

12.04   Effects of Withdrawal. After giving its Withdrawal Notice, a Withdrawing Party is not entitled to make an election or vote on any matter, other than matters for which it retains a financial responsibility. A Withdrawing Party shall take all necessary steps to accomplish its withdrawal by the effective date referred to in Section 12.02 and shall execute and deliver to the Remaining Parties or Remaining Owners, as the case may be, all necessary instruments to assign its Withdrawal Interest to the Remaining Parties or Remaining Owners, as the case may be. A Withdrawing Party shall bear all expenses associated with its withdrawal and the transfer of its Withdrawal Interest. Upon delivery of the necessary instruments to assign its Withdrawal Interest and payment of the sums described in Section 12.05, the Withdrawing Party shall be

36                                    Execution Version

relieved of all obligations and liabilities associated with such assigned Withdrawal Interests, whether arising prior to or after the effective date of such withdrawal, and the Remaining Parties or Remaining Owners, as the case may be, shall assume such obligations and liabilities.

12.05   Limitation Upon and Conditions of Withdrawal.

    (a)    Prior Expenses. Subject to Section 12.04, a Withdrawing Party remains liable for its participating share of any costs of activities, operations, damages or other liability or expense accruing or relating to operations conducted pursuant to this Agreement prior to the effective date of the withdrawal or in which the Withdrawing Party elected or voted to participate prior to the effective date of the withdrawal. Prior to the effective date of the withdrawal, the LSPS Operator shall render a statement to each Withdrawing Party for: (A) its share of all identifiable expenses which it incurred or approved prior to the Withdrawal Notice or election to withdraw, whichever is applicable; (B) its Equity Interest share of the estimated current costs of abandoning the LSPS and (C) its Equity Interest share of the estimated current salvage value of the LSPS. Such expenses, costs and salvage value shall be prepared by the LSPS Operator in accordance with Exhibit "E". Prior to accomplishing its withdrawal, a Withdrawing Party shall either (Y) pay to the LSPS Operator for the benefit of the Remaining Parties or Remaining Owners, whichever is applicable, the sum of the amounts described in (A) and (B) less (C) above if the prior expenses and abandonment costs exceed the salvage value of the LSPS, or (Z) receive from the LSPS Operator the sum of (C) less (A) and (B) above if the salvage value exceeds the prior expenses and abandonment costs of the LSPS. Any liens, charges and other encumbrances which the Withdrawing Party placed (or caused to be placed) on its Withdrawal Interest shall be fully satisfied or released prior to the effective date of its withdrawal (unless the Remaining Parties or Remaining Owners, as the case may be, are willing to accept the Withdrawal Interest subject to such liens, charges and other encumbrances). The withdrawal provisions of the applicable Joint Operating Agreement shall apply in respect to the transfer of the Withdrawal Interest by a Satellite Lease Owner to the extent not in conflict with the provisions of this Article XII.

    (b)    Confidentiality. A Withdrawing Party will continue to be bound by the confidentiality provisions of Article XIII after the effective date of the withdrawal, but will have no further access to technical information relating to any operations hereunder. The Withdrawing Party is not required to return to the Remaining Parties, or Remaining Owners, as the case may be, Confidential Data acquired prior to the effective date of the withdrawal.

    (c)    Emergencies and Force Majeure. No Party may withdraw during a Force Majeure or emergency which poses a threat to life, safety, property or the environment but may withdraw from this Agreement in accordance with this Article XII after termination of the Force Majeure or emergency. A Withdrawing Party remains

Execution Version

liable for its share of all costs and liabilities arising from the Force Majeure or emergency, including but not limited to, the containment and cleanup of oil spills and pollution and all costs of debris removal made necessary by the Force Majeure or emergency.

## Article XIII.   OWNERSHIP AND CONFIDENTIALITY OF INFORMATION

13.01   Ownership.  All Records and Work Product, arising out of this Agreement, including that which is obtained pursuant to Exhibit "K" shall be and are the sole and exclusive property of the LSPS Owners.   Upon request of any LSPS Owner, the LSPS Operator shall furnish the requesting LSPS Owner, with copies of Records and Work Product.

13.02   Confidentiality.  Each Party (a) shall hold and maintain the Confidential Information in the strictest of confidence; and (b) without the prior written consent of the other Parties, shall not disclose any such information to any Third Party other than to the officers, employees, counsel, consultants, representatives or agents of such Party or its Affiliates. Additionally, Confidential Information acquired or obtained by any Party shall be kept confidential during the term of this Agreement for a confidentiality period commencing on the date of execution of this Agreement and extending through the later of two (2) years following the termination of the Project Team  or seven (7) years following the date of execution of this Agreement   and shall not be disclosed to any Third Party, unless disclosed under paragraph (a)   (an "exception to confidentiality") or under paragraph (b) (a "permitted disclosure") below.  Each Party shall maintain the secrecy of the Confidential Information, using the standard of care it normally uses in protecting its own confidential information and trade secrets.

(a)   Exceptions to Confidentiality.  The confidentiality obligation shall not apply to the extent that particular items of Confidential Information:

(i)   are now or later become part of the public domain (other than as a result of a wrongful act or omission by a Party hereunder); or

(ii)   are now or later become available to a Party on a non-confidential basis from a Third Party having, to the best knowledge of  the receiving Party, the legal right to do so; or

(iii)   were known to a Party on a non-confidential basis prior to the disclosure of the Confidential Information to it under the terms of this Agreement or to which such Party was otherwise entitled at the time of disclosure; or

(iv)   are independently developed by employees or contractors of a Party who have not had access to the Confidential Information.

(b)   Permitted Disclosures.  The LSPS Operator may disclose items of Confidential Information to such third parties as may be necessary in connection with this

38

Execution Version

Agreement, provided such Third Parties are bound by written agreement to keep secret the Confidential Information for a period of time not less than the later of two (2) years following the termination of the Project Team or seven (7) years following the date of execution of this Agreement. The LSPS Operator disclosing items of Confidential Information shall promptly inform the other Parties of the names of such third parties and list the items of Confidential Information disclosed. Notwithstanding anything contained herein to the contrary and subject to the restrictions that the Confidential Information shall not be removed from the custody and premises of the Party making such disclosure, and that such Third Party (except under sub-paragraph 13.02(b)(v) below) be bound by written agreement not to use or disclose the Confidential Information except for the express purpose for which such disclosure is to be made, any Party may disclose, in whole or in part, the Confidential Information:

(i)     to any Affiliate of such Party provided such Affiliate is bound by the confidentiality provisions contained herein; or

(ii)    to any bona fide, financially responsible, prospective assignee of any portion of such Party's Equity Interest (including but not limited to an entity with whom a Party or its Affiliate is conducting bona fide negotiations directed toward a merger, consolidation or a sale of a Party's or an Affiliate's shares or substantially all of its assets in the Gulf of Mexico), provided that the disclosing Party shall give all other Parties not less than fifteen (15) Days advance written notice specifying the extent to which that Party intends to disclose the Confidential Information to the prospective assignee and the name of such prospective assignee; or

(iii)   to any potential contractors, professional consultants, or outside legal counsel engaged by or on behalf of such Party and acting in a capacity where such disclosure is essential to such contractor's, consultant's, or outside legal counsel's work; or

(iv)    to any bank or other financial institution to the extent appropriate to a Party arranging financing for its obligations under this Agreement; or

(v)     to the extent required by the terms of any Satellite Lease, or by law, order, decree, regulation or rule (including without limitation, those of any regulatory agency, securities commission, stock exchange, judicial or administrative proceeding).   If a Party is so required to disclose Confidential Information, such Party shall promptly provide all other Parties to this Agreement written notice of such proceedings so that the non-disclosing Parties may seek a protective order or other remedy. A disclosing Party shall furnish only such Confidential Information as is legally required and will use its reasonable efforts to obtain confidential treatment for any Confidential Information disclosed.

39

    (c)    <u>Continuing Confidentiality Obligation</u>. Any Party who ceases to own an Equity Interest in the LSPS remains bound by the confidentiality and use obligations of this Agreement as to any Confidential Information obtained through this Agreement.

    (d)    <u>Ownership of Confidential Information</u>. Except as otherwise provided for in this Article XIII all Confidential Information produced as a result of or in connection with an operation under this Agreement shall be the property of all LSPS Owners bearing the cost of that operation.

## Article XIV.   INDEMNITIES

14.01  **LIABILITIES**. For purposes of this Article XIV, in the event that in addition to being a LSPS Owner, a Party is an Isabela Lease Owner and/or MC 519 Unit Lease Owner then all of said Party's actions in performing any of the functions contemplated in Section 14.01(a) are conclusively presumed to have been performed in the role of LSPS Owner. Similarly, all of said Party's actions in performing any of the functions contemplated in Section 14.01(b) are conclusively presumed to have been performed in the role of Isabela Lease Owner. Similarly, all of said Party's actions in performing any of the functions contemplated in Section 14.01(c) are conclusively presumed to have been performed in the role of MC 519 Unit Lease Owner. NOTWITHSTANDING ANYTHING TO THE CONTRARY CONTAINED IN THIS AGREEMENT, THIS ARTICLE XIV SHALL GOVERN THE INDEMNITY AND DEFENSE OBLIGATIONS OF THE PARTIES UNDER THIS AGREEMENT. NOTWITHSTANDING ANYTHING TO THE CONTRARY CONTAINED IN THIS AGREEMENT, THE INDEMNITY OBLIGATIONS OF THE LSPS OWNERS, THE ISABELA LEASE OWNERS, AND THE MC 519 UNIT LEASE OWNERS SHALL BE SEVERAL AND NOT JOINT OR COLLECTIVE.

    (a)    <u>LSPS OWNERS' INDEMNITY OBLIGATIONS</u>: THE LSPS OWNERS SHALL INDEMNIFY THE LSPS OPERATOR'S GROUP, THE ISABELA LEASE OWNERS' GROUP, AND THE MC 519 UNIT LEASE OWNERS' GROUP FROM AND AGAINST ALL CLAIMS/LOSSES FOR THE FOLLOWING WHEN CONNECTED WITH THIS AGREEMENT:

        (i)    all injuries to, deaths, or illnesses of any member of the LSPS Owners' Group; and

        (ii)    all damages to or losses of any property of any member of the LSPS Owners' Group,

EVEN IF CAUSED BY THE NEGLIGENCE/FAULT OF THE LSPS OPERATOR'S GROUP, THE ISABELA LEASE OWNERS' GROUP, THE MC 519 UNIT LEASE OWNERS' GROUP, OR ANY OTHER PERSON; EXCEPT TO THE EXTENT THAT SUCH LIABILITY RESULTS FROM

THE GROSS NEGLIGENCE OR WILLFUL MISCONDUCT OF SUCH INDEMNITEE, IN WHICH CASE, SUCH INDEMNITEE SHALL BE SOLELY RESPONSIBLE FOR SUCH DAMAGES AND LIABILITY.

(b)     ISABELA LEASE OWNERS' INDEMNITY OBLIGATIONS:     THE ISABELA LEASE OWNERS SHALL INDEMNIFY THE LSPS OPERATOR'S GROUP, THE LSPS OWNERS GROUP, AND THE MC 519 UNIT LEASE OWNERS' GROUP FROM AND AGAINST ALL CLAIMS/LOSSES FOR THE FOLLOWING WHEN CONNECTED WITH THIS AGREEMENT:

    (i)     all injuries to, deaths, or illnesses of any member of the Isabela Lease Owners' Group; and

    (ii)    all damages to or losses of any property of any member of the Isabela Lease Owners' Group,

EVEN IF CAUSED BY THE NEGLIGENCE/FAULT OF THE LSPS OPERATOR'S GROUP, THE LSPS OWNERS' GROUP, THE MC 519 UNIT LEASE OWNERS' GROUP OR ANY OTHER PERSON; EXCEPT TO THE EXTENT THAT SUCH LIABILITY RESULTS FROM THE GROSS NEGLIGENCE OR WILLFUL MISCONDUCT OF SUCH INDEMNITEE, IN WHICH CASE, SUCH INDEMNITEE SHALL BE SOLELY RESPONSIBLE FOR SUCH DAMAGES AND LIABILITY.

(c)     MC 519 UNIT LEASE OWNERS' INDEMNITY OBLIGATIONS:     THE MC 519 UNIT LEASE OWNERS SHALL INDEMNIFY THE LSPS OPERATOR'S GROUP, THE LSPS OWNERS GROUP, AND THE ISABELA LEASE OWNERS' GROUP FROM AND AGAINST ALL CLAIMS/LOSSES FOR THE FOLLOWING WHEN CONNECTED WITH THIS AGREEMENT:

    (i)     all injuries to, deaths, or illnesses of any member of the MC 519 Unit Lease Owners' Group; and

    (ii)    all damages to or losses of any property of any member of the MC 519 Unit Lease Owners' Group,

EVEN IF CAUSED BY THE NEGLIGENCE/FAULT OF THE LSPS OPERATOR'S GROUP, LSPS OWNERS' GROUP, THE ISABELA LEASE OWNERS' GROUP OR ANY OTHER PERSON; EXCEPT TO THE EXTENT THAT SUCH LIABILITY RESULTS FROM THE GROSS NEGLIGENCE OR WILLFUL MISCONDUCT OF SUCH INDEMNITEE, IN WHICH CASE, SUCH INDEMNITEE SHALL BE SOLELY RESPONSIBLE FOR SUCH DAMAGES AND LIABILITY.

Execution Version

    (d)    **LSPS Owners' Indemnity Obligations to the LSPS Operator Group for Third Parties:** The LSPS Owners shall Indemnify, LSPS Operator Group from and against all Claims/Losses for the following when Connected With this Agreement:

        (i)    all injuries to, deaths, or illnesses of any Third Party; and

        (ii)    all damages to or losses of any of property of any Third Party.

EVEN IF CAUSED BY THE NEGLIGENCE/FAULT OF LSPS OPERATOR GROUP OR ANY OTHER PERSON; EXCEPT TO THE EXTENT THAT SUCH LIABILITY RESULTS FROM THE GROSS NEGLIGENCE OR WILLFUL MISCONDUCT OF SUCH INDEMNITEE, IN WHICH SUCH CASE, SUCH INDEMNITEE SHALL BE SOLELY RESPONSIBLE FOR SUCH DAMAGES AND LIABILITY.

14.02  **Notice and Defense.**

    (a)    LSPS OPERATOR SHALL PROMPTLY GIVE TO THE OTHER PARTIES NOTICE IN WRITING OF (I) ANY CLAIM/LOSS THAT HAS BEEN MADE KNOWN TO THE REPRESENTATIVE OF LSPS OPERATOR, OR (II) PROCEEDINGS COMMENCED FOR WHICH INDEMNIFICATION IS CLAIMED. SUCH NOTICE SHALL STATE WITH AS MUCH DETAIL AS IS REASONABLY PRACTICABLE THE FACTS AND CIRCUMSTANCES GIVING RISE TO THE CLAIM/LOSS AGAINST THE INDEMNITEE. NOTWITHSTANDING THE FOREGOING, IF A PARTY IS OBLIGATED TO INDEMNIFY THE LSPS OPERATOR (OR ANY OTHER PERSON PURSUANT TO THIS AGREEMENT), LACK OF PROMPT NOTICE SHALL NOT BE A DEFENSE EXCEPT TO THE EXTENT PREJUDICE HAS RESULTED FROM SUCH LACK OF PROMPT NOTICE.

    (b)    THE INDEMNITOR SHALL CONFER WITH THE INDEMNITEE CONCERNING THE DEFENSE OF ANY SUCH CLAIM/LOSS PROCEEDINGS BUT, SUBJECT TO THE PROVISIONS OF THIS Article XIV. AND ANY OTHER APPLICABLE PROVISIONS OF THIS AGREEMENT, IF THE INDEMNITOR HAS ASSUMED THE FULL DEFENSE OF THE CLAIM/LOSS WITHOUT QUALIFICATION, THE INDEMNITOR OR ITS INSURER SHALL RETAIN CONTROL OF THE CONDUCT OF SUCH DEFENSE, INCLUDING BUT NOT LIMITED TO THE SELECTION AND MANAGEMENT OF COUNSEL. NOTWITHSTANDING THE FOREGOING, HOWEVER, EVEN IF THE INDEMNITOR HAS ASSUMED THE FULL DEFENSE OF THE CLAIM/LOSS WITHOUT QUALIFICATION, NEITHER PARTY SHALL EFFECT SETTLEMENT OF OR COMPROMISE ANY SUCH

Execution Version

CLAIM/LOSS PROCEEDINGS WITHOUT HAVING OBTAINED THE PRIOR WRITTEN CONSENT OF THE OTHER PARTY. IF THE INDEMNITEE DOES NOT CONSENT TO A SETTLEMENT THAT THE INDEMNITOR IS WILLING TO ACCEPT, THEN THE INDEMNITOR'S LIABILITY SHALL BE LIMITED TO THE AMOUNT FOR WHICH THE LAWSUIT COULD HAVE BEEN SETTLED. IF THE INDEMNITOR HAS ASSUMED THE FULL DEFENSE OF THE CLAIM/LOSS WITHOUT QUALIFICATION, THE INDEMNITEE MAY, UPON WRITTEN NOTICE TO THE INDEMNITOR AND AT THE INDEMNITEE'S SOLE COST AND EXPENSE, SELECT ITS OWN COUNSEL TO PARTICIPATE IN AND BE PRESENT FOR THE DEFENSE OF ANY SUCH CLAIM/LOSS PROCEEDING, PROVIDED SUCH COUNSEL SHALL NOT TAKE ANY ACTION IN THE COURSE OF SUCH CLAIM/LOSS PROCEEDING TO PREJUDICE THE INDEMNITOR'S DEFENSE OF SUCH CLAIM/LOSS PROCEEDING. WHERE THE INDEMNITOR'S PROFFERED DEFENSE IS LIMITED TO THE PROPORTIONATE NEGLIGENCE/FAULT OF THE INDEMNITOR, THE INDEMNITEE MAY ELECT TO DEFEND ITSELF AND OBTAIN REIMBURSEMENT OF ITS DEFENSE COSTS IN PROPORTION TO THE PROPORTIONATE FAULT OF THE INDEMNITOR AND ITS GROUP, OR REIMBURSEMENT OF ALL DEFENSE COSTS IF A FULL DEFENSE IS DETERMINED TO HAVE BEEN OWED.

14.03  LSPS OWNERS' OBLIGATIONS FOR CLAIMS: EACH LSPS OWNER SHALL CARRY INSURANCE OR QUALIFIED SELF-INSURANCE WITH MINIMUM LIMITS AS SET FORTH IN EXHIBIT "G". UNLESS SPECIFICALLY PROVIDED OTHERWISE IN THIS AGREEMENT, THE LIABILITY FOR ANY CLAIMS CONNECTED WITH THE LSPS, EVEN IF CONTRIBUTED TO BY THE JOINT OR CONCURRENT NEGLIGENCE/FAULT OF ANY LSPS OWNER OR THE LSPS OPERATOR, SHALL BE BORNE BY EACH LSPS OWNER ALLOCATED BASED ON EQUITY INTEREST, EXCEPT TO THE EXTENT THAT SUCH LIABILITY RESULTS FROM THE GROSS NEGLIGENCE OR WILLFUL MISCONDUCT OF AN LSPS OWNER IN WHICH CASE, SUCH LSPS OWNER SHALL BE SOLELY RESPONSIBLE FOR SUCH DAMAGES AND LIABILITY TO THE EXTENT OF SUCH GROSS NEGLIGENCE OR WILLFUL MISCONDUCT, AND THE OTHER LSPS OWNERS SHALL HAVE NO RESPONSIBILITY OR LIABILITY WHATSOEVER TO THE EXTENT OF SUCH GROSS NEGLIGENCE OR WILLFUL MISCONDUCT.

14.04  Spill Liability.    NOTWITHSTANDING ANYTHING HEREIN TO THE CONTRARY, INCLUDING SECTION 14.03, LIABILITY FOR CLAIMS IN CONNECTION WITH SPILLS FROM THE LSPS WILL BE BORNE BY THE LSPS OWNERS ON A THROUGHPUT BASIS (AVERAGE THROUGHPUT CALCULATED BASED UPON THE LESSER OF: (A) THE OPERATING LIFE OF THE LSPS OR (B) THREE HUNDRED SIXTY FIVE (365) DAYS BEFORE SPILL) EVEN IF CAUSED BY THE NEGLIGENCE/FAULT OF THE LSPS OPERATOR'S GROUP, EXCEPT TO THE EXTENT THAT SUCH LIABILITY RESULTS FROM THE GROSS NEGLIGENCE OR

Execution Version

WILLFUL MISCONDUCT OF THE LSPS OPERATOR'S GROUP, IN WHICH CASE, SUCH LSPS OPERATOR'S GROUP SHALL BE SOLELY RESPONSIBLE FOR SUCH DAMAGES AND LIABILITY.

14.05   Notice of Claim.   If, on account of any matter involving operations under this Agreement or in any way related to the LSPS, (a) a Claim is made against any LSPS Owner; (b) any Third Party brings a Claim against a LSPS Owner; (c) any LSPS Owner brings a Claim; or (d) a LSPS Owner receives notice of a Claim, such LSPS Owner shall give written notice of such Claim to all of the other LSPS Owners as soon as reasonably practicable.

14.06   Engaging Counsel.   LSPS Operator has the right and authority to engage the services of outside legal counsel for the purpose of answering or responding to any Claim brought by any Person, or to bring a Claim against any Person, so long as such counsel's fees do not exceed Fifty Thousand and No/100 Dollars ($50,000). The LSPS Operator shall provide prompt notice to the LSPS Owners of its retention of such counsel.   To the extent such counsel's services are reasonably expected to exceed Fifty Thousand and No/100 Dollars ($50,000) with respect to any individual Claim, the prior approval by a Majority Interest of the LSPS Owners is required.  The failure of any LSPS Owner to vote for approval or rejection of the retention of such counsel shall be deemed to be approval.  If the use of outside counsel is approved, the fees and expenses incurred as a result thereof shall be charged to the LSPS Owners allocated on an Equity Interest basis. Each LSPS Owner has the right to hire its own outside counsel at its sole cost with respect to its own defense.

14.07   Settlements.   The LSPS Operator may settle any single Claim or multiple Claims arising out of the same incident that involve operations under this Agreement, or that affect or relate to the LSPS if the aggregate expenditure (including attorneys' fees incurred) does not exceed One hundred Fifty Thousand and No/100 Dollars ($150,000) provided that the payment is in complete settlement of such Claim.   However any LSPS Owner shall have the right to independently settle any Claim or the portion of any Claim which is attributable to its interest alone as long as such settlement does not adversely affect the interest or rights of the other LSPS Owners.  No charge shall be made for services performed by the staff attorneys of any LSPS Owner or the LSPS Operator, but all other expenses incurred by the LSPS Operator in the prosecution or defense of Claims for the LSPS Owners or the LSPS, together with the amount paid to discharge any final judgment, are costs and shall be paid by the LSPS Owners allocated on an Equity Interest basis.  If the amount required for settlement exceeds such amount, the approval of a Majority Interest of the LSPS Owners is required.

14.08   Defense of Claims.   The LSPS Operator will supervise the handling, conduct, or prosecution of any Claims involving operations under this Agreement or which affect or in any way relate to the LSPS.

14.09   THE LSPS OWNERS AND SATELLITE LEASE OWNERS AGREE TO SUPPORT THEIR INDEMNITY OBLIGATIONS IN THIS ARTICLE XIV WITH INSURANCE OR QUALIFIED SELF-INSURANCE WITH MINIMUM LIMITS AS SET FORTH IN EXHIBIT "G" OBTAINED FOR THE BENEFIT OF THE INDEMNITEES.

Execution Version

EXCEPT AS OTHERWISE EXPRESSLY PROVIDED, OR OTHERWISE MANDATED BY APPLICABLE LAW, ALL INDEMNITY OBLIGATIONS OF THE LSPS OWNERS AND SATELLITE LEASE OWNERS AS SET OUT IN THIS ARTICLE XIV SHALL BE WITHOUT MONETARY LIMIT. MOREOVER, THE INDEMNITY OBLIGATIONS OF THE LSPS OWNERS AND SATELLITE LEASE OWNERS AS SET OUT IN THIS ARTICLE XIVARE INDEPENDENT OF ANY INSURANCE REQUIREMENTS SET OUT IN THIS ARTICLE XIV AND SUCH INDEMNITY OBLIGATIONS SHALL NOT BE LIMITED BY ANY INSURANCE REQUIREMENTS AND SHALL NOT BE LESSENED OR EXTINGUISHED BY REASON OF THE LSPS OWNERS AND SATELLITE LEASE OWNERS' FAILURE TO OBTAIN THE REQUIRED INSURANCE COVERAGE OR BY ANY DEFENSES ASSERTED BY THE LSPS OWNERS AND SATELLITE LEASE OWNERS ' INSURERS.

14.10   THE INDEMNITIES SET FORTH HEREIN SHALL NOT SUPERSEDE OR REPLACE ANY INDEMNITY PROVIDED FOR IN THE JOINT OPERATING AGREEMENTS WHICH ARE APPLICABLE TO THE PARTIES HERETO.

### Article XV.   ABANDONMENT AND SALVAGE

15.01   Abandonment of the LSPS.   Any LSPS Owner may propose the abandonment and disposition of the LSPS. Sixty (60) Days after all the LSPS Owners receive written notice of such proposal, the LSPS Operator shall provide the LSPS Owners with an estimate of the costs of abandonment less the estimated salvage value of the LSPS (no value for the ongoing nature of the LSPS shall be included in this calculation) ("Abandonment Costs"). Within thirty (30) Days of receipt of such estimate, the LSPS Owners will vote on such proposal of abandonment. If such proposal is approved by Unanimous vote, the LSPS Operator shall abandon and dispose of the LSPS at the cost and risk of the LSPS Owners based on a LSPS Owner's Equity Interest at the time of abandonment approval. If the proposed abandonment is not approved by a Unanimous vote of the LSPS Owners, then any LSPS Owner desiring to abandon the LSPS shall be deemed to be a Withdrawing Party under Article XII and such LSPS Owner shall convey its Withdrawal Interest in accordance with Article XII. In such event, the Remaining Parties or Remaining Owners, as the case may be, shall assume such Withdrawal Interest also in accordance with Article XII. If an abandoning LSPS Owner's respective share of the estimated salvage value is greater than its share of the estimated costs of abandonment, the LSPS Operator, on behalf of the non-abandoning LSPS Owners, shall pay to the abandoning LSPS Owner a sum equal to the abandoning LSPS Owners share of such excess.

15.02   Disposal of Surplus Material.   Material acquired under this Agreement may be classified as surplus by the LSPS Operator when deemed no longer needed in present or foreseeable operations. The LSPS Operator shall determine the value and cost of disposing of the materials in accordance with Exhibit "E". If the material is classified as junk or if the value, less cost of disposal, is less than or equal to Two Hundred Fifty Thousand and No/100 Dollars ($250,000), the LSPS Operator may dispose of the surplus materials in any manner it deems appropriate. If the value, less the cost of disposal of the surplus material, is greater than Two Hundred Fifty Thousand and No/100 Dollars ($250,000), the LSPS Operator shall give written notice thereof to

Execution Version

the LSPS Owners and the surplus material shall be disposed of in accordance with the method of disposal approved by a Majority Interest of the LSPS Owners. Proceeds from the sale or transfer of surplus material shall be promptly credited to each LSPS Owner based on its Equity Interest at the time of the retirement or disposition of the material.

15.03   Abandonment Operations Required by Governmental Authority.   The LSPS Operator shall conduct the abandonment of the LSPS as required by law and any governmental authority, and the Abandonment Costs, risks and net proceeds will be shared by the LSPS Owners based on the LSPS Owner's Equity Interest at the time of abandonment.

## Article XVI.   TAXES

16.01   Internal Revenue Provision.   It is not the intention of the LSPS Owners to create, nor shall this Agreement be construed as creating, a partnership, agency relationship or association, or to render the LSPS Owners liable as partner, co-venturers or principals. The liabilities of the LSPS Owners shall be several and not joint or collective, and each LSPS Owner shall be responsible for its own obligations. If for federal income tax purposes, this Agreement and the operations hereunder are regarded as a partnership, then for federal income tax purposes, each LSPS Owner elects to be excluded from the application of all the provisions of Subchapter K, Chapter 1, Subtitle A, Internal Revenue Code of 1986, as amended, as permitted and authorized by Article 761 of said Code and the regulations promulgated thereunder. The LSPS Operator is hereby authorized and directed to execute on behalf of each LSPS Owner such evidence of this election as may be required by the Federal Internal Revenue Service including specifically, but not by way of limitation, all the returns, statements and data required by Treasury Regulation Article 1.761-2. Should there be any requirement that each LSPS Owner further evidence this election, each LSPS Owner agrees to execute such documents and furnish such other evidence as may be required by the Federal Internal Revenue Service. Each LSPS Owner further agrees not to give any notices or take other action inconsistent with the election made hereby. If any present or future income tax law of the United States of America or any state contains provisions similar to those contained in Subchapter K, Chapter 1, Subtitle A of the Internal Revenue Code of 1986, as amended, under which an election similar to those provided by Article 761 of Subchapter K is permitted, each LSPS Owner will make such election as may be permitted by such laws. In making this election, each LSPS Owner states that the income derived by it from the Operations under this Agreement and related agreements, if any, can be adequately determined without the computation of partnership taxable income.

16.02   Other Taxes and Assessments.   The LSPS Operator shall file all tax returns and reports required by law that apply to the LSPS (other than income, franchise, and similar taxes) and shall pay the tax shown thereon with respect to Operations conducted pursuant to this Agreement. The LSPS Owners shall promptly furnish the LSPS Operator with copies of any notices, assessments or tax statements received pertaining to taxes to be paid by the LSPS Operator. The LSPS Operator shall charge each LSPS Owner its share (based on each LSPS Owner's Equity Interest) of all such taxes paid and, upon written request from a LSPS Owner, provide copies of all tax returns, reports, tax statements and receipt for such taxes. The LSPS Operator shall not allow any taxes to become delinquent, unless such non-payment is approved by the LSPS

Execution Version

Owners. Upon final determination of any audit or protest, the LSPS Operator shall pay the taxes and any interest, penalty, or cost accrued as a result of such audit or protest. The LSPS Operator shall timely and diligently protest to a final determination any valuation it deems unreasonable. Pending such determination, the LSPS Operator may elect to pay under protest. The LSPS Operator shall charge each LSPS Owner its Equity Interest share of tax payments including interest, penalties and all reasonable costs in accordance with Exhibit "E".

16.03   Property Taxes. The LSPS Operator shall render for ad valorem property tax purposes all personal property and/or real property covered by this Agreement as may be subject to such taxation and shall pay such property taxes for the benefit of each LSPS Owner. The LSPS Operator shall timely and diligently protest to a final determination any valuation it deems unreasonable. Pending such determination, the LSPS Operator may elect to pay under protest. Upon final determination, the LSPS Operator shall pay the taxes and any interest, penalty, or cost accrued as a result of such protest. The LSPS Operator shall charge each LSPS Owner its Equity Interest share of such tax payments including interest, penalties and all reasonable costs in accordance with Exhibit "E" attached hereto.

### Article XVII.  ASSIGNMENTS

17.01   Assignment. Any of the LSPS Owners shall have the right to freely assign all or any portion of their interest in a Satellite Lease and/or the LSPS without consent from the other LSPS Owners, provided, however, that an ownership interest in a Satellite Lease shall not be transferred without the simultaneous transfer of a proportionate interest in the LSPS. Notwithstanding the foregoing, any assignment of an interest in a Satellite Lease or an interest in the LSPS: (a) must be made to a party financially capable of assuming the obligations of the assignor under this Agreement; (b) must be expressly made subordinate and subject to this Agreement; (c) must expressly state the portion of the Equity Interest in the LSPS that is being transferred; (d) shall require that the assignee assume the performance of all of the assignor's obligations under this Agreement (to the extent of the interest assigned); and (e) shall be provided to the Parties within fifteen (15) Days after execution thereof. Any assignment not in compliance with this provision is voidable by the non-assigning LSPS Owners. No LSPS Owner assigning all or part of its Equity Interest in the LSPS is released from its obligations and liabilities created under this Agreement attributable to the period of time prior to the date of execution of the assignment (which obligations include liability for abandonment of the LSPS or that portion of the LSPS in existence as of the date of execution of the assignment).

### Article XVIII.  INSURANCE AND LIMITATIONS OF INDEMNITY

18.01   Insurance. Throughout the term of this Agreement, each Party hereto, at its sole cost and expense, will procure such insurance from insurers rated A- by Standard and Poors or A- by A M Best  (or self insure which is only allowed if the parent company of an original signatory Party hereto or an Affiliate of an original signatory hereto has a credit rating of S&P A- or the equivalent) as it deems necessary in discharging its obligations hereunder, including those necessary to protect against all claims for damages, risk of losses and contractual indemnities covered by this Agreement. All policies of insurance purchased which are intended to cover any damages, liabilities, expenses, losses, claims, costs (including attorneys' fees), suits and causes

47                                                              Execution Version

of action incurred by a Party hereunder will be properly endorsed to waive the insurer's rights of subrogation, under any such policies, against the other Parties hereto (or said Parties' respective insurers) when said Party is released from liability or loss or damages pursuant to this Agreement, and shall name the other Parties as an additional insured in the proportion that indemnity obligations are assumed hereunder. Each Party shall waive rights of recovery against the other Parties hereto.

18.02   Maintenance of Insurance Coverage.  The LSPS Owners, the Satellite Lease Owners, the Satellite Lease Operators, and the LSPS Operator will maintain the insurance coverage or self insurance provided in Exhibit "G" (*Insurance*) to this Agreement.

## Article XIX.  FORCE MAJEURE

19.01   Force Majeure.  If, as a result of Force Majeure, any Party is rendered unable, wholly or in part, to carry out its obligations under this Agreement (except for the payment of money), then the obligations of the Party giving the Force Majeure notice detailed in this Section 19.01, so far as and to the extent that the obligations are affected by such Force Majeure, shall be suspended during the continuance of any inability so caused, but for no longer period. For purposes of this agreement, the Party claiming Force Majeure shall promptly notify the other Parties in writing of the Force Majeure situation after the occurrence of the facts relied on, and shall keep all Parties informed of all significant developments. The notice of Force Majeure shall give full details of said Force Majeure, and also (if possible) estimate the period of time which said Party will require to remedy the Force Majeure or to resume performance of its obligations under this Agreement. The affected Party shall use all reasonable diligence to remove or overcome the Force Majeure situation, but shall not be obligated to settle any labor dispute except on terms acceptable to it and all such disputes shall be handled within the sole discretion of the affected Party.

## Article XX.  DEFAULT

20.01   Default.  So long as any LSPS Owner is in Default, it shall not be permitted to exercise any of its rights under this Agreement, including, without limitation, the right to vote or to access or utilize the LSPS to gather its Production. For purposes of this Article XX, the date in which a Default by any LSPS Owner occurs shall be referred to as the **"Default Date"**. Within thirty (30) Days after the Default Date, at the election of any non-defaulting LSPS Owner in the Satellite Lease in which the defaulting LSPS Owner owns an interest, such defaulting LSPS Owner shall be deemed to be a Withdrawing Party under Article XII and such defaulting LSPS Owner shall convey its Withdrawal Interest in accordance with Article XII.  In such event, the Remaining Parties or Remaining Owners, as the case may be, may assume such Withdrawal Interest in accordance with Article XII.  Upon receipt of such election, the defaulting LSPS Owner shall be deemed to have sent the unconditional and irrevocable conveyance offer set forth in Section 12.02.  The application of the foregoing withdrawal provisions shall be the exclusive remedy against a defaulting LSPS Owner.  If no non-defaulting LSPS Owner in the Satellite Lease in which the defaulting LSPS Owner has an interest elects to deem a defaulting LSPS Owner to be a Withdrawing Party within such thirty (30) Day period, the non-defaulting Parties may exercise

Execution Version

any and all remedies available hereunder against the defaulting LSPS Owner, whether in law or in equity. The LSPS Owners hereby agree that any such Default by one LSPS Owner shall not affect the validity or effectiveness of this Agreement as between the other non-defaulting LSPS Owners. In the event that a LSPS Owner is in Default for non-payment of any amounts due under this Agreement, and the defaulting LSPS Owner is not deemed to be a Withdrawing Party pursuant to the foregoing provisions, the other non-defaulting LSPS Owners shall pay their proportionate share (based on their respective Equity Interest) of the defaulting LSPS Owner's share of unpaid amounts upon receiving an invoice from the LSPS Operator. In the event any LSPS Owner believe that any statement of charges under this Agreement is incorrect, the LSPS Owner shall nevertheless pay the amounts due as provided herein, and the LSPS Operator shall attempt to resolve the issue as soon as practicable, but said attempt shall be made no later than ninety (90) Days after receiving notice from the LSPS Owner of such disputed charges.

## Article XXI.  SECURITY RIGHTS

21.01  Security Rights.  In addition to other security rights and remedies provided by law for services rendered, materials and equipment furnished, or the breach of obligations incurred under this Agreement, pursuant to the terms of Exhibit "H", each LSPS Owner grants to the other LSPS Owners a lien in, and mortgages, pledges, affects, and hypothecates all of its respective rights and interest in and to the LSPS, the Rights-of-Way and this Agreement. The LSPS Owners will execute as many originals of Exhibit "H" as required to file and record same in accordance with the terms of Exhibit "H".

21.02  Obligations upon Termination.  Notwithstanding the termination of this Agreement, each Party shall remain responsible for any accrued financial obligations of that Party with respect to another Party under the terms of this Agreement and shall promptly settle such obligations, including any unpaid invoices.

## Article XXII.  GENERAL PROVISIONS

22.01  Entire Agreement.

(a)      The terms of this Agreement, including the Exhibits attached hereto, express and constitute the entire agreement between the Parties with respect to the subject matter hereof and no implied covenants of any kind on the part of the Parties is created or shall arise by reason of anything contained in this Agreement. There are no warranties, representations, promises or other agreements (written or oral) between the Parties in connection with the subject matter hereof except as specifically set forth in this Agreement or in documents delivered pursuant to this Agreement.  This Agreement supersedes all prior or contemporaneous negotiations, communications, understandings, proposals, representations or agreements, whether oral or written, with respect to the subject matter hereof, including, but not limited to, the Letter of Intent. For the avoidance of doubt, this Agreement shall govern over any conflicting provisions in the operating agreements covering the Satellite Leases regarding the Building, Operation and ownership of the LSPS.

(b) Notwithstanding anything to the contrary herein, the Isabela JOA shall govern the rights, duties and obligations among the Isabela Lease Owners associated with: (i) operations on the Isabela Lease; (ii) those portions of the Satellite Well System located on the Isabela Lease; and (iii) the decision-making process between the Isabela Lease Owners related to this Agreement and the MC 519 UOA shall govern the rights, duties and obligations among the MC 519 Unit Lease Owners associated with: (i) operations on the MC 519 Unit Leases; (ii) those portions of the Satellite Well System located on the MC 519 Unit Leases; and (c) the decision-making process between the MC 519 Unit Lease Owners related to this Agreement.

22.02   Exclusive Purpose. The sole and exclusive purpose of the joint participation of the LSPS Owners in this Agreement is to Build, Operate and own the LSPS. The LSPS Owners and their Affiliates may engage, directly or indirectly, in other business opportunities, transactions, ventures or other arrangements of any nature or description, independently or with others, including, without limitation, business of a nature which may be competitive with or the same as or similar to the business of the LSPS, regardless of the geographic location of such business, and without any duty or obligation to account to the other LSPS Owners or the LSPS in connection therewith.

22.03   Waiver of Right to Partition. **Each Party waives the right to bring an action for partition of its interest in the LSPS and Satellite Well System held subject to this Agreement, and covenants that during the existence of this Agreement it shall not resort at any time to any action at law or in equity to partition any or all of the LSPS or Satellite Well System subject to this Agreement.**

22.04   Access to Books and Records. Upon reasonable request, each LSPS Owner will be permitted to have reasonable access to books and the records relating to the LSPS during normal business hours; provided that such access does not interfere with the operation of the LSPS. All such access is subject to such requesting LSPS Owner having executed and delivered to the Operator a full written release and indemnification covering itself and all of its employees with respect to the proposed access to the facilities.

22.05   Maintenance of Books and Records. The Operator shall keep accurate books, accounts and records of operations on the LSPS in compliance with the procedures contained in Exhibit "E" hereto.

22.06   Audit Rights. Each LSPS Owner shall have the right to inspect and audit the books and records in the custody and control of the LSPS Operator as provided in Exhibit "E" hereto.

22.07   Amendment, Modification and Waiver. This Agreement may be amended, modified, superseded or canceled, and any of the terms, covenants, representations, warranties or conditions hereof may be waived, only by a written instrument executed by all of the Parties, or, in the case of a waiver, by or on behalf of the Party waiving compliance. Neither action taken (including, without limitation, any investigation by or on behalf of a Party) nor inaction pursuant to this Agreement will be deemed to constitute a waiver of compliance with any representation, warranty, covenant or agreement contained herein by the Party not committing such action or

   Execution Version

inaction. The failure of any Party at any time or times to require performance of any provisions hereof shall in no manner affect the right at a later time to enforce the same. Any delay, excluding the expiration of any applicable statutory period of limitations, in asserting or enforcing any rights under this Agreement will not be deemed a waiver of such rights. Any waiver by any Party of any condition, or any waiver or failure of a Party to enforce any provisions of this Agreement or to require performance by another Party of any breach of any term, covenant, representation or warranty contained in this Agreement, in any one or more instances, shall not be deemed to be or construed:

    (a)    as a further or continuing waiver of any such condition or breach or a waiver of any other condition or of any breach of any other term, covenant, representation or warranty;

    (b)    to waive such provision, or to affect the validity of this Agreement or any part thereof, or the right of a Party thereafter to enforce each and every provision hereof.

22.08   Relationship of the Parties.   In performance of their obligations hereunder, the Parties will be completely independent and not employees or agents of any other Party. The duties, obligations and liabilities of the Parties are several and not joint or collective, and nothing herein contained will be construed to create a joint venture, association or partnership, duty, obligation or liability with respect to the Parties and shall not create fiduciary or quasi fiduciary duties or similar duties and obligations. No Party shall control the manner or method of accomplishing the obligations of the other Parties set forth herein.

22.09   Compliance with Laws and Regulations.   This Agreement and all of the terms and conditions contained herein, and the respective obligations of and the Operations and activities conducted by the Parties pursuant to this Agreement, are expressly subject to and will remain subject to and comply with all valid and applicable Laws, orders, rules, and regulations of any federal, state, or local governmental authority having jurisdiction. The Parties hereto will at all times maintain their respective facilities and Satellite Leases and conduct their operations thereon in accordance with all valid and applicable Laws. No Party will suffer a forfeiture or be liable in damages to the other Parties for any delays or damages or any failure to act, due, occasioned or caused by reason of Laws or regulations respecting the activities or Operations covered hereby, and such delays or damages will not be deemed to be a breach of or failure to perform under this Agreement. If any provision is found to conflict with said laws, orders, rules and regulations, such provision will be appropriately modified to adhere to said laws, orders, rules and regulations. Each of the Parties will notify the other Parties promptly upon discovery of any instance where the Party has failed to comply with this Section 22.09.

22.10   Non-Discrimination.   Each of the Parties is an Equal Opportunity Employer. To the extent that this Agreement may be subject to Executive Order 11246, as amended, the equal opportunity provisions (41C.F.R.60-1) are incorporated herein by reference. To the extent required by applicable laws and regulations, this Agreement also includes and is subject to the affirmative action clauses concerning disabled veterans and veterans of the Vietnam era

Execution Version

(41C.F.R.60-250) and the affirmative action clauses concerning employment of the handicapped (41C.F.R.60-741), which clauses are incorporated herein by reference. In the performance of work under this Agreement, the Parties agree to comply, and will require each independent contractor to comply, with the governmental requirements set forth in the attached Exhibit "I" pertaining to non-segregated facilities. This Agreement and the Parties hereto are also subject to any other applicable rules and regulations relating to non-discrimination which may be promulgated from time to time by any governmental body having jurisdiction over the subject matter of this Agreement.

22.11  Severability.  The Parties intend that every provision of this Agreement, the Exhibits attached hereto, and the documents incorporated herein by reference be severable. If any term or other provision of this Agreement is found to be invalid, illegal or incapable of being enforced by any rule of law or public policy, all other conditions and provisions of this Agreement will remain in full force and effect. The illegality, invalidity or unenforceability of any provisions hereof does not affect the legality, validity or enforceability of the remainder of this Agreement. In the case of conflict between the provisions of this Agreement and the provisions of any applicable Laws or regulations, the provisions of the Laws or regulations govern over the provisions of this Agreement. If, for any reason and for so long as, any clause or provision of this Agreement is held by a court of competent jurisdiction to be illegal, invalid, unenforceable or unconscionable under any present or future Law (or interpretation thereof), the remainder of this Agreement will not be affected by such illegality or invalidity. Any such invalid provision will be deemed severed from this Agreement as if this Agreement had been executed with the invalid provision eliminated. Any terms or provisions of this Agreement that are invalid or unenforceable in any jurisdiction are ineffective only as to such jurisdiction and then only to the extent of such invalidity or unenforceability, without rendering invalid or unenforceable the remaining terms and provisions of this Agreement or affecting the validity or enforceability of any terms and provisions of this Agreement in any other jurisdiction. If any provision of this Agreement is so broad as to be unenforceable, each provision will be interpreted to be only as broad as is enforceable. A bankruptcy or similar trustee must accept or, to the extent permitted by law, reject this Agreement in its entirety.

22.12  Jointly Drafted Agreement.  All Parties have contributed to the drafting of this Agreement. Each Party has had an adequate opportunity to review each and every provision of this Agreement and to submit the same to legal counsel for review and advice. Based on the foregoing, the rule of construction, if any, that a contract be construed against the drafter shall not apply to interpretation or construction of this Agreement. All Parties agree that it has been purposefully drawn and correctly reflects their understanding of the transaction that it contemplates. This Agreement will be considered for all purposes as prepared through the joint efforts of the Parties, and will not be construed unfairly, unreasonably, and/or more strictly against one Party or another Party as a result of the preparation. Each Party has had the benefit of independent representation with respect to the subject matter of this Agreement.

22.13  Notices. All notices and other communications required or desired to be given hereunder must be in writing and sent (properly addressed as set forth below) by: (a) certified or registered U.S. mail, return receipt requested, with all postage and other charges fully prepaid; (b) hand or courier delivery; or (c) facsimile transmission. Date of service by mail and delivery is the date

Execution Version

on which such notice is received by the addressee and by facsimile is the date sent (as evidenced by fax machine generated confirmation of transmission); provided, however, if such date received is not a Business Day, then date of receipt will be on the next date that is a Business Day. Each Party may change its address by notifying the other Parties in writing of such address change, and the change will be effective ten (10) Days after the other Parties receives such notification.

(i)  BP Exploration & Production Inc.
501 WestLake Park Blvd. 77079-2696
P.O. Box 3092
Houston, Texas 77253-3092
Attn: Mr. Kemper Howe
Telephone: 281-366-1278
Telecopy: 281-366-7569

(ii)  Noble Energy, Inc.
100 Glenborough Drive, Suite 100
Houston, Texas 77067
Attn: Mr. Dan Mills
Telephone: 281-874-6063
Telecopy: 281-876-6300

(iii)  Red Willow Offshore, LLC
1415 Louisiana Street, Suite 3650
Houston, Texas 77002
Attn: Mr. Rex Richardson
Telephone: 281-822-7509
Telecopy: 281-822-7501

(iv)  Houston Energy Deepwater Ventures I, LLC
1415 Louisiana Street, Suite 2400
Houston, Texas 77002
Attn: Mr. David Amend
Telephone: 713-586-5712
Telecopy: 713-650-8305

Or such other address or representative(s) as may be designated in writing, as provided above.

22.14  Further Assurances.  Subject to the terms and conditions set forth in this Agreement, each of the Parties agrees to use reasonable efforts to take, or to cause to be taken, all actions, and to do, or to cause to be done (without additional cost or charge to any other Party hereto), all things reasonably necessary, proper or advisable under applicable laws to consummate, implement and make effective the terms and conditions of this Agreement.  In case, at any time after the execution of this Agreement, any further action, deeds and documents are reasonably necessary or desirable to carry out its purposes, the Parties shall take or cause to be taken all such necessary action or execute and deliver such deeds and documents.

53                                    Execution Version

22.15  Waiver of Consequential Damages.

(a)     EACH PARTY: (i) AGREES THAT ONLY ACTUAL DAMAGES SHALL BE RECOVERABLE BY IT AGAINST ANY OTHER PARTY, OR ITS DIRECTORS, OFFICERS, EMPLOYEES, CONTRACTORS OR AGENTS, UNDER THIS AGREEMENT; AND (ii) HEREBY WAIVES ANY RIGHT TO RECOVER SPECIAL, PUNITIVE, CONSEQUENTIAL, INDIRECT, INCIDENTAL OR EXEMPLARY DAMAGES FOR CLAIMS/LOSSES ARISING UNDER THIS AGREEMENT, FROM OR AGAINST ANY OTHER PARTY OR ITS DIRECTORS, OFFICERS, EMPLOYEES, CONTRACTORS OR AGENTS, INCLUDING, WITHOUT LIMITATION, CLAIMS FOR LOST OR DEFERRED PRODUCTION OR LOST OR DEFERRED PROFITS OR BUSINESS INTERRUPTION, DAMAGE TO WELLS OR RESERVOIRS OR LOSS OF WELLS (WHETHER BASED ON STATUTE, CONTRACT, TORT OR OTHERWISE, AND WHETHER OR NOT ARISING FROM ANY PARTY'S SOLE, JOINT OR CONCURRENT NEGLIGENCE, STRICT LIABILITY OR OTHER FAULT, EVEN IF CAUSED BY A PARTY'S GROSS NEGLIGENCE OR WILLFUL MISCONDUCT.)

(b)     THE INDEMNITY OBLIGATIONS CONTAINED IN THIS AGREEMENT INCLUDE INDEMNIFICATION FOR CONSEQUENTIAL, INDIRECT, INCIDENTAL OR EXEMPLARY DAMAGES FOR CLAIMS/LOSSES ARISING UNDER THIS AGREEMENT SUFFERED BY AN UNAFFILIATED THIRD-PARTY AND SECTION 22.15(a)(i) AND SECTION 22.15(a)(ii), ABOVE, SHALL NOT APPLY TO THE EXTENT SUCH PARTY OWES SUCH DAMAGES TO AN UNAFFILIATED THIRD-PARTY IN CONNECTION WITH A THIRD-PARTY CLAIM, IN WHICH EVENT SUCH DAMAGES SHALL BE RECOVERABLE.

22.16  Headings.  All titles or headings to Articles, sub-articles or other divisions of this Agreement except Article I and Article II hereto are only for the convenience of the Parties and will not be construed to have any effect or meaning with respect to the other content of such Articles, sub-articles or other divisions, such other content being controlling as to the agreement between the Parties.

22.17  Article Reference.  Except as otherwise provided in this Agreement, each reference to an Article in this Agreement includes all of the Article including its subArticles.  Except as otherwise provided in this Agreement, each reference to an Exhibit in this Agreement includes the entire Exhibit including Articles and subArticles.

22.18  Number and Gender.  Whenever the singular or masculine or neuter is used in this Agreement, the same shall be construed as meaning plural or feminine or body politic or corporate and vice versa where the context so requires.

22.19  Requisite Authority.  Each Party represents and warrants to the other Parties that on and as of the Effective Date hereof:

Execution Version

(a)    it has the requisite capacity, power and authority to execute this Agreement and to perform the obligations to which it thereby becomes subject;

(b)    this Agreement is valid, binding and enforceable against it in accordance with its terms, subject to bankruptcy, moratorium, insolvency and other Laws generally affecting creditors' rights and general principles of equity (whether applied in a proceeding in a court of law or equity);

(c)    if any Party is a legal entity, including, but not limited to, an association, corporation, joint venture, limited partnership, partnership or trust, such Party further represents and warrants to the other Parties that:

        (i)    it is duly formed and validly existing and in good standing under the laws of its state or jurisdiction of formation, with power and authority to carry on the business in which it is engaged and to perform its respective obligations under this Agreement;

        (ii)    the execution and delivery of this Agreement and the completion of the transactions contemplated herein have been duly authorized and approved by all requisite corporate, limited liability company, partnership or similar action or have received all necessary management approvals;

        (iii)    it has the entire requisite corporate, limited liability company, partnership or similar power, capacity and authority to enter into this Agreement; and

        (iv)    the execution and delivery of this Agreement does not, and consummation of the transactions contemplated herein will not, violate any of the provisions of its organizational documents, any agreement pursuant to which it or its property is bound, or any applicable Laws.

22.20  <u>Terms Binding Upon Leases</u>.  All terms, covenants, provisions and conditions of this Agreement shall run with and be binding upon the Satellite Leases during the term hereof and each Party shall make any assignment, transfer or other disposition of any interest in the Satellite Leases expressly subject to this Agreement and shall provide to the other Parties an express written assumption of all of the assigning Party's obligations under this Agreement from the assignee or transferee.

22.21  <u>Remedies</u>.  The rights, obligations, and remedies created by this Agreement are cumulative and in addition to any other rights, obligations, or remedies otherwise available under the Laws or in equity.  Nothing herein will be considered an election of remedies

Execution Version

22.22  Counterpart Execution and Ratification.  This Agreement may be executed in counterparts and, when each Party has executed a counterpart, all counterparts taken together shall constitute one Agreement, provided however, that none of the said counterparts shall be effective until all Parties hereto have executed a counterpart hereof.  Facsimile signatures shall be considered the same as original signatures. This Agreement may also be ratified by separate instrument referring to this Agreement and adopting by reference all the provisions of this Agreement.  Ratification has the same effect as an execution of the original Agreement.

22.23  No Third Party Beneficiaries.  Any agreement herein contained, expressed or implied, will be only for the sole and exclusive benefit of the Parties and their respective legal representatives, heirs, successors, and assigns, and such agreements or assumptions will not inure to the benefit of any other Person whomsoever, it being the intention of the Parties that no Person will be deemed a Third Party beneficiary to this Agreement and nothing contained in this Agreement entitles anyone other than Parties or their authorized successors and assigns to any claim, cause of action, remedy or right of any kind whatsoever. The Parties expressly stipulate that neither the Host Operator nor the Host Owner shall be held to be a Third Party beneficiary under the terms of this Agreement.

22.24  Survival.  The confidentiality and indemnification obligations of the Parties in this Agreement shall survive the cancellation or termination of this Agreement without regard to any action taken pursuant to this Agreement.

22.25  Applicable Law.  TO THE MAXIMUM EXTENT PERMISSIBLE, THE GENERAL MARITIME LAWS OF THE UNITED STATES SHALL GOVERN THE VALIDITY, CONSTRUCTION, INTERPRETATION, AND EFFECT OF THIS AGREEMENT, EXCLUDING ANY CHOICE OF LAW RULES WHICH WOULD OTHERWISE REQUIRE THE APPLICATION OF LAWS OF ANY OTHER JURISDICTION.  IN THE EVENT MARITIME LAW IS HELD TO BE INAPPLICABLE BY A COURT OF COMPETENT JURISDICTION, THE LAWS OF THE ADJACENT STATE OF THE SATELLITE LEASES HEREUNDER SHALL APPLY UNLESS (i) OTHERWISE PROVIDED IN THIS AGREEMENT; OR (ii) APPLICATION OF SUCH LAW TO A PARTICULAR PROVISION WOULD PREVENT ENFORCEMENT OF SUCH PROVISION, IN WHICH CASE THE LAW APPLICABLE TO SUCH PROVISION SHALL BE ANY POTENTIALLY APPLICABLE LAW THAT WOULD ALLOW ENFORCEMENT OF SAID PROVISION AS WRITTEN.

22.26  Term.  This Agreement shall become effective upon as of the Effective Date and will remain in full force and effective until all of the LSPS is permanently abandoned and all costs, accounts and assets are settled and disposed of.

22.27  Successors and Assigns.  This Agreement shall be binding upon and inure to the benefit of the Parties hereto and their respective successors and assigns, except where otherwise noted.

22.28  Dispute Resolution.  Any claim, controversy or dispute arising out of, relating to or in connection with the interpretations of this Agreement or any activity or operation conducted or to be conducted hereunder, shall be resolved in accordance with the mediation and binding

Execution Version

arbitration provision set forth in Exhibit "F" (*Dispute Resolution Procedures*) to this Agreement. However, claims for Indemnification between or among the Parties shall be excluded from this provision when they arise out of or are related to a lawsuit filed by a Third Party. For economy of legal resources, the Parties' claims for Indemnification shall be resolved in conjunction with such judicial proceeding.

**[REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK]**

Execution Version

IN WITNESS WHEREOF, this instrument is executed as of the date first above written.

**LSPS OWNERS:**

**BP Exploration & Production Inc.**

By:_____

Print Name: _____

Title: _____

Date: _____

**Noble Energy, Inc.**

By: _John T. Lewis_

Print Name: ___John T. Lewis___

Title: ___Vice President___

Date: ___December 21, 2011___

**Red Willow Offshore, LLC**

By: _____

Print Name: _____

Title: _____

Date: _____

**Houston Energy Deepwater Ventures I, LLC**

By: _____

Print Name: _____

Title: _____

Date: _____

**SATELLITE LEASE OWNERS:**

**BP Exploration & Production Inc.**

By: _____

Print Name: _____

Title: _____

Date: _____

**Noble Energy, Inc.**

By: _John T. Lewis_

Print Name: ___John T. Lewis___

Title: ___Vice President___

Date: ___December 21, 2011___

58                    Execution Version

**Houston Energy Deepwater Ventures I, LLC**

By: _____

Print Name: _____

Title: _____

Date: _____

**Red Willow Offshore, LLC**

By: _____

Print Name: _____

Title: _____

Date: _____

**LSPS OPERATOR:**

**BP Exploration & Production Inc.**

By: _____

Print Name: _____

Title: _____

Date: _____

**SATELLITE LEASE OPERATOR:**

**BP Exploration & Production Inc.**

By: _____

Print Name: _____

Title: _____

Date: _____

**Noble Energy, Inc.**

By: _John T. Lewis_

Print Name: John T. Lewis

Title: Vice President

Date: December 21, 2011

59

Execution Version

IN WITNESS WHEREOF, this instrument is executed as of the date first above written.

**LSPS OWNERS:**

**BP Exploration & Production Inc.**

By:_____

Print Name:_____

Title:_____

Date:_____

**Noble Energy, Inc.**

By:_____

Print Name:_____

Title:_____

Date:_____

**Red Willow Offshore, LLC**

By: _____

Print Name Robert J. Voorhees

Title: President

Date: December 21, 2011

**Houston Energy Deepwater Ventures I, LLC**

By: _____

Print Name: _____

Title: _____

Date: _____

**SATELLITE LEASE OWNERS:**

**BP Exploration & Production Inc.**

By: _____

Print Name: _____

Title: _____

Date: _____

**Noble Energy, Inc.**

By: _____

Print Name: _____

Title: _____

Date: _____

Execution Version

IN WITNESS WHEREOF, this instrument is executed as of the date first above written.

**LSPS OWNERS:**

**BP Exploration & Production Inc.**

By: _____

Print Name: _KEMPER HOWE_

Title: _ATTORNEY-IN-FACT_

Date: _12/21/11_

**Noble Energy, Inc.**

By:_____

Print Name: _____

Title: _____

Date: _____


**Red Willow Offshore, LLC**

By: _____

Print Name: _____

Title: _____

Date: _____

**Houston Energy Deepwater Ventures I, LLC**

By: _____

Print Name: _____

Title: _____

Date: _____

**SATELLITE LEASE OWNERS:**

**BP Exploration & Production Inc.**

By: _____

Print Name: _KEMPER HOWE_

Title: _ATTORNEY-IN-FACT_

Date: _12/21/11_

**Noble Energy, Inc.**

By: _____

Print Name: _____

Title: _____

Date: _____

Execution Version

Houston Energy Deepwater Ventures I, LLC     Red Willow Offshore, LLC

By: _____                   By: _____

Print Name: _____                   Print Name: Robert J. Voorhees

Title: _____                    Title: President

Date: _____                    Date: December 21, 2011

**LSPS OPERATOR:**

**BP Exploration & Production Inc.**

By: _____

Print Name: _____

Title: _____

Date: _____

**SATELLITE LEASE OPERATOR:**

**BP Exploration & Production Inc.**          **Noble Energy, Inc.**

By: _____                   By: _____

Print Name: _____                   Print Name: _____

Title: _____                    Title: _____

Date: _____                    Date: _____

Execution Version

| Houston Energy Deepwater Ventures I, LLC | Red Willow Offshore, LLC |
|---|---|
| By: _____ | By: _____ |
| Print Name: _____ | Print Name: _____ |
| Title: _____ | Title: _____ |
| Date: _____ | Date: _____ |

**LSPS OPERATOR:**

BP Exploration & Production Inc.

By: _____

Print Name: _KEMPER HOUSE_

Title: _ATTORNEY-IN-FACT_

Date: _12/21/11_

**SATELLITE LEASE OPERATOR:**

| BP Exploration & Production Inc. | Noble Energy, Inc. |
|---|---|
| By: _____ | By: _____ |
| Print Name: _KEMPER HOUSE_ | Print Name: _____ |
| Title: _ATTORNEY-IN-FACT_ | Title: _____ |
| Date: _12/21/11_ | Date: _____ |

Execution Version

IN WITNESS WHEREOF, this instrument is executed as of the date first above written.

**LSPS OWNERS:**

**BP Exploration & Production Inc.**

By:_____

Print Name: _____

Title: _____

Date: _____

**Noble Energy, Inc.**

By:_____

Print Name: _____

Title: _____

Date: _____


**Red Willow Offshore, LLC**

By: _____

Print Name: _____

Title: _____

Date: _____

**Houston Energy Deepwater Ventures I, LLC**

By: _____

Print Name: P. David Amend a.w.

Title: Vice President, Land

Date: 12-21-11

**SATELLITE LEASE OWNERS:**

**BP Exploration & Production Inc.**

By: _____

Print Name: _____

Title: _____

Date: _____

**Noble Energy, Inc.**

By: _____

Print Name: _____

Title: _____

Date: _____

58                          Execution Version

**Houston Energy Deepwater Ventures I, LLC**

By: _____

Print Name: P. David Amend

Title: Vice President, Land

Date: 12-21-11

**Red Willow Offshore, LLC**

By: _____

Print Name: _____

Title: _____

Date: _____

**LSPS OPERATOR:**

**BP Exploration & Production Inc.**

By: _____

Print Name: _____

Title: _____

Date: _____

**SATELLITE LEASE OPERATOR:**

**BP Exploration & Production Inc.**

By: _____

Print Name: _____

Title: _____

Date: _____

**Noble Energy, Inc.**

By: _____

Print Name: _____

Title: _____

Date: _____

Execution Version

**EXHIBIT "A"**

Attached to and made a part of that certain Galapagos Area Loop Subsea Production System Construction and Operating Agreement dated effective December 1, 2011.

## GALAPAGOS AREA LOOP SUBSEA PRODUCTION SYSTEM DESCRIPTION

The LSPS shall initially service four (4) wells (two Isabela and two MC-519/563 Unit wells) and includes the following major components (reference Figure A):

1.  Subsea flowline loop (8x12 pipe-in-pipe, 11 ksi, 23 miles).

2.  Subsea structures and flowline jumpers (six PLEMs, two ILS, three jumpers).

3.  Two (2) production risers (8" wet insulated with titanium stress joints).

4.  One (1) gas lift umbilical, distribution unit and jumpers to each riser base.

5.  One (1) main umbilical (22 tubes).

6.  Three (3) in-field umbilicals (1x15 tubes, 2x12 tubes).

7.  One (1) Subsea Distribution Unit (SDU) and seven (7) umbilical termination assemblies (UTAs) required to support the main and the in-field umbilicals.

**EXHIBIT "A-1"**
**Delivery Point(s)**

Attached to and made part of that certain Galapagos Area Loop Subsea Production System Construction
and Operating Agreement dated effective December 1, 2011.

### (a) Gas export

**Gas departs Host as export production at riser basket flange**

P&ID:
565A-00-661AQ



[Remainder of this page intentionally left blank]

## EXHIBIT "A-1"
### Delivery Point(s)

Attached to and made part of that certain Galapagos Area Loop Subsea Production System Construction and Operating Agreement dated effective December 1, 2011.

### (b) Oil export

**Oil departs Host as export production at riser basket flange**

P&ID:
565A—00—661X



[Remainder of this page intentionally left blank]



**EXHIBIT "A-2"**
**LSPS Delivery Point(s)**

Attached to and made part of that certain Galapagos Area Loop Subsea Production System Construction
and Operating Agreement dated effective December 1, 2011.

### Satellite Production enters Host at boarding valves

P&ID:
565A–00–661K3

Isabela boarding valve

P&ID:
565A–00–661K3

Santiago/Santa Cruz boarding valve





[Remainder of this page intentionally left blank]

Exhibit "A-2" Execution Version

**EXHIBIT "B"**

Attached to and made a part of that certain Galapagos Area Loop Subsea Production System Construction
and Operating Agreement dated effective December 1, 2011.

GALAPAGOS AREA LOOP SUBSEA PRODUCTION SYSTEM EQUITY INTEREST

| | |
|---|---|
| BP Exploration & Production Inc. | 0.5597833 |
| Noble Energy, Inc. | 0.2798917 |
| Red Willow Offshore, LLC | 0.1073250 |
| Houston Energy Deepwater Ventures I, LLC | 0.0530000 |
| | 1.0000000 |

Exhibit "B" Execution Version

## EXHIBIT "C"

Attached to and made a part of that certain Galapagos Area Loop Subsea Production System construction and Operating Agreement dated effective December 1, 2011.

## GALAPAGOS AREA LOOP SUBSEA PRODUCTION SYSTEM AFEs

| Operator AFE No. | Description | Approximate Gross Amount ($MM) |
|---|---|---|
| Z1-007TV | Galapagos – Long Leads | $ 24.4 |
| Z1-007V7 | Integrated Project Mgmt. | $ 14.1 |
| Z1-007V9 | Integrated Project Mgmt | $ 4.7 |
| Z1-007VD | Long Leads | $ 14.0 |
| Z1-007VF | Pipe Material | $ 5.0 |
| Z1-007VG | Fabrication | $ 111.3 |
| Z1-007VJ | Fabrication | $ 237.9 |

Exhibit "C" Execution Version





**EXHIBIT "D"**
**LSPS Design Basis Document**

Attached to and made part of that certain Galapagos Area Loop Subsea Production System Construction and Operating Agreement dated effective December 1, 2011.

# Galapagos Area Development

# Basis of Design
# Level 1: Subsea and Topsides Facilities

## BP Document No: ISAB1-10-PM-DC-000001

| Rev. | Date | Description | Prepared By | Checked By | Approved By | BP Reviewed | BP Approved |
|------|------|-------------|-------------|------------|-------------|-------------|-------------|
| | | | | | | | |
| 0 | 09/24/2009 | Updated | GZ | AH | | SR | MV |
| A | 04/05/2009 | Initial Document for Review | DH | | | | |

| Document Control String | Project Abbreviations | Location Designation | Discipline Code | Document Class | Sequential Number | Document Revision |
|-------------------------|----------------------|---------------------|-----------------|----------------|-------------------|-------------------|
| | ISAB1 | 10 | PM | DC | 000001 | 0 |

Exhibit "D" Execution Version



| Project Title: | Galapagos Area Development | ISAB1-10-PM-DC-000001 |
|---|---|---|
| Project Description: | Subsea Tie-back to Na Kika | Revision 0 |
| Document Title: | Basis of Design Level 1: Subsea and Topside Facilities | Page 2 of 42 |

This document is valid only at time of printing. Copies printed from this site are considered uncontrolled.

## TABLE OF CONTENTS

**1.0 INTRODUCTION** ................................................................. **6**
1.1 Purpose ............................................................................ 6
1.2 Scope and Structure ......................................................... 6
1.3 Document Control ............................................................. 8

**2.0 GALAPAGOS ARE DEVELOPMENT OVERVIEW** ...................................... **8**

**3.0 SPECIFICATIONS, STANDARDS, AND REGULATORY REQUIREMENTS ..... 10**
3.1 Galapagos Project Level 2 Design Basis Documents and Functional Design Specifications10
3.2 BP Standards and Practices .............................................. 11
3.3 Industry Standards and Specifications ................................ 12

**4.0 HSSE AND PROCESS SAFETY** ..................................................... **12**
4.1 HSSE ............................................................................. 12
4.2 Safety in Design .............................................................. 13

**5.0 FIELD ARCHITECTURE** ............................................................ **14**

**6.0 RESERVOIR AND WELL INFORMATION** ........................................... **15**
6.1 Isabela MC 562 Reservoir Information ............................... 15
    6.1.1 Isabela Well Site Location ..................................... 16
    6.1.2 Isabela Well Conditions ........................................ 16
    6.1.3 Isabela Production Profiles .................................... 17
    6.1.4 Isabela Produced Fluid Composition ...................... 20
6.2 MC 519 (Santa Cruz and Santiago) Reservoir Data ............ 23

**7.0 OPERATING AND DESIGN PHILOSOPHIES** ...................................... **23**
7.1 Production Availability Goal ............................................... 23
7.2 Production Measurement and Allocation .............................. 23
7.3 Dead Oil Circulation for Flowline Flow Assurance ............... 24
7.4 No HIPPS required ........................................................... 24
7.5 Dual Redundant Subsea Control System ............................ 24
7.6 Flowline Condition Monitoring ........................................... 24

**8.0 FLOW ASSURANCE AND PRODUCTION CHEMISTRY** ......................... **24**
8.1 Flow Assurance Reports ................................................... 24

**9.0 GENERAL FACILITY REQUIREMENTS** ............................................ **25**
9.1 Design Life of Facilities .................................................... 25
9.2 Production Rates .............................................................. 25
9.3 Produced Fluid Service ..................................................... 26
9.4 Pressure Ratings ............................................................. 26
    *see ISAB1-30-FL-RP-000001 for basis of flowline and riser pressure rating ............ 26
9.5 Temperature Ratings ........................................................ 26
9.6 Thermal Insulation Requirements ...................................... 27
9.7 Subsea Chemical Injection Requirements ........................... 27

**10.0 SUBSEA FACILITIES** ............................................................. **27**
10.1 Well Completion .............................................................. 27

Exhibit "D" Execution Version

| Project Title: | Galapagos Area Development | ISAB1-10-PM-DC-000001 | bp |
| Project Description: | Subsea Tie-back to Na Kika | Revision 0 | |
| Document Title: | Basis of Design Level 1: Subsea and Topside Facilities | Page 3 of 42 | |

This document is valid only at time of printing. Copies printed from this site are considered uncontrolled.

| 10.2 | Subsea Tree ................................................................ | 28 |
| 10.3 | Well Jumpers ............................................................... | 29 |
| 10.4 | Flowline Jumpers .......................................................... | 29 |
| 10.5 | Flowline Terminations (PLETS/PLEMS) ...................................... | 29 |
| 10.6 | Subsea Control System .................................................... | 30 |
| 10.7 | Subsea Control Umbilicals ................................................ | 32 |
| | 10.7.1 Main Umbilical ..................................................... | 34 |
| | 10.7.2 In-Field Umbilicals ............................................... | 34 |
| | 10.7.3 Wall Thickness of the Tubes ....................................... | 36 |
| | 10.7.4 Tube Material ..................................................... | 36 |
| | 10.7.5 Electrical Conductor Sizing ....................................... | 36 |
| | 10.7.6 Fiber Optic Cable ................................................. | 36 |
| | 10.7.7 Design life ....................................................... | 36 |
| | 10.7.8 Clashing .......................................................... | 36 |
| | 10.7.9 BP GoM Umbilical Specifications ................................... | 36 |
| | 10.7.10 Industry Umbilical Specifications ............................... | 36 |
| 10.8 | Subsea Distribution System ............................................... | 37 |
| 10.9 | Subsea Intervention ...................................................... | 37 |
| 10.10 | Subsea Well Work-Over ................................................... | 37 |
| | | |
| **11.0** | **SUBSEA FLOWLINES**.................................................... | **38** |
| | | |
| **12.0** | **PRODUCTION RISERS** ................................................. | **38** |
| | | |
| **13.0** | **RISER BASE GAS LIFT SYSTEM** ....................................... | **39** |
| | | |
| **14.0** | **TOPSIDES FACILITIES** .............................................. | **39** |
| 14.1 | Topside Facilities Dedicated to Nakika Phase 3 Development Project ........ | 40 |
| 14.2 | Production Process System ................................................ | 41 |
| 14.3 | Production Chemicals and Distribution System ............................. | 41 |
| 14.4 | Hydraulic Supply ......................................................... | 41 |
| 14.5 | Utility Systems .......................................................... | 41 |
| 14.6 | Power .................................................................... | 41 |
| 14.7 | Riser Baskets ............................................................ | 41 |
| 14.8 | Umbilical I-Tube ......................................................... | 42 |
| | | |
| **15.0** | **ENVIRONMENTAL DATA** ............................................... | **42** |
| | | |
| **16.0** | **GEOTECHNICAL DATA** ................................................ | **42** |

Exhibit "D" Execution Version

| Project Title: | Galapagos Area Development | ISAB1-10-PM-DC-000001 | bp |
|---|---|---|---|
| Project Description: | Subsea Tie-back to Na Kika | Revision 0 | |
| Document Title: | Basis of Design Level 1: Subsea and Topside Facilities | Page 4 of 42 | |



This document is valid only at time of printing. Copies printed from this site are considered uncontrolled.

## LIST OF TABLES

Table 6-1: Reservoir Fluid Properties ............................................................. 15
Table 6-2: Isabela Well Site Location Information ............................................ 16
Table 6-3: Isabela Well Conditions ................................................................. 17
Table 6-4: Low Production Case: OWC at 18,759 feet..................................... 18
Table 6-5: Middle Production Case: OWC at 18,830 feet.................................. 19
Table 6-6: High Production Case: OWC at 18,950 feet..................................... 20
Table 6-7: Produced Fluid Composition........................................................... 21
Table 9-1: Subsea Equipment Pressure Ratings .............................................. 26
Table 9-2: Subsea Equipment Temperature Ratings ........................................ 26
Table 9-3: Subsea Thermal Insulation Requirements ...................................... 27
Table 9-4: Subsea Chemical Injection Requirements ....................................... 27
Table 10-1: Main Umbilical Components .......................................................... 34
Table 10-2: Isabela In-Field Umbilical Components .......................................... 35
Table 14-1: Greater Galapagos Topsides Facilities Description and Functional Requirements
          Summary.................................................................................... 39
Table 14-2: Na Kika Phase 3 Topsides Facilities Description and Functional Requirements Summary
          .................................................................................................. 40

## LIST OF FIGURES

Figure 2-1: Na Kika Area Infrastructure .......................................................... 8
Figure 2-2: Galapagos Area Development Location Map .................................... 9
Figure 2-3: Graphic Representation of Galapagos Area Development ................ 10
Figure 5-1: Galapagos Area Development Field Architecture ............................ 15
Figure 10-1: Subsea Control System Block Diagram ......................................... 31
Figure 10-2: Concept Cross-Sections of Galapagos Umbilicals.......................... 32

| Project Title: | Galapagos Area Development | ISAB1-10-PM-DC-000001 | bp |
| Project Description: | Subsea Tie-back to Na Kika | Revision 0 | |
| Document Title: | Basis of Design Level 1: Subsea and Topside Facilities | Page 5 of 42 | |



This document is valid only at time of printing.  Copies printed from this site are considered uncontrolled.

## REVISION HISTORY

This Level 1 Basis of Design document is a living document that will be updated as necessary to reflect any changes to the Galapagos Development Plan regarding scope of work, or other major design parameters. It is a controlled document, and all revisions will be subject to the Project Management of Change (PMOC) process.  The initial Drafts will begin with the letter A and increment until approved, then the first approved version will begin at Rev 0 and increment with changes.

### REVISION HISTORY TABLE

| Revision | Date | Description of Change |
|---|---|---|
| A | 04/05/2009 | Issued For Review |
| 0 | 09/08/2009 | Issued for Define |
| 1 | 09/24/2009 | Updated during Define |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

Exhibit "D" Execution Version

| Project Title: | Galapagos Area Development | ISAB1-10-PM-DC-000001 | bp |
|---|---|---|---|
| Project Description: | Subsea Tie-back to Na Kika | Revision 0 | |
| Document Title: | Basis of Design Level 1: Subsea and Topside Facilities | Page 6 of 42 | |

This document is valid only at time of printing. Copies printed from this site are considered uncontrolled.

## 1.0   INTRODUCTION

### 1.1   Purpose

This Basis of Design (BoD) - Level 1 consolidates the general objectives and requirements of the Galapagos Area Development Project. BoD Level 2 documents include detailed specifications and design requirements. This BoD Level 1 provides a means for the Project Team to be informed of and approve system requirements. This document will be updated regularly through the Select and Define Stages of the project to reflect major design changes and decisions made by the project team. By the end of the Define Stage, the BoD will be frozen, and can then only be be changed by a PMOC.

(a)   This Level 1 BoD is intended to:

- Clarify system objectives;

- Define general requirements at system level, i.e. what the system must be able to do or perform;

- Present principal design data which form a common basis for engineering;

- Present major operating and design philosophies;

- Include basic/general design features/requirements that have a significant influence on system configuration.

(b)   The BoD is not intended to:

- Present technical/functional requirements at equipment/component level (it is not a technical specification);

- Present equipment specifications, dimensions, cross-sections, etc.;

- Be overly restrictive in allowing the project team to design the least cost, fit for purpose system.

### 1.2   Scope and Structure

The Project design basis system is composed of several separate design basis documents arranged in a hierarchical format. The objective of using this format is to provide a comprehensive, well-organized design reference system in which information is easy to locate and/or update. The design basis hierarchy is as follows:

**Level 1: Project**

This Level 1 Basis of Design document contains design criteria, specifications, standards and regulatory requirements pertinent to the overall project design. Information included in this document includes the following:

- Design Life;

- Reservoir and Well Information

- Production (field production profiles, well rates, inflow performance, wellhead pressures and temperatures);

- Operation and Design Philosophies;

Exhibit "D" Execution Version

| Project Title: | Galapagos Area Development | ISAB1-10-PM-DC-000001 | bp |
| Project Description: | Subsea Tie-back to Na Kika | Revision 0 | |
| Document Title: | Basis of Design Level 1: Subsea and Topside Facilities | Page 7 of 42 | |

This document is valid only at time of printing. Copies printed from this site are considered uncontrolled.

- Flow Assurance and Production Chemistry;

- Subsea Facilities (design philosophies, system descriptions):
  - Well Completion;
  - Subsea Tree;
  - Flowline and Well Tie-In Jumpers;
  - Subsea PLETS/PLEMS;
  - Subsea Production Control System;
  - Subsea Production Control Umbilical;
- Subsea Flowlines;
- Riser Base Gas Lift System;
- Topsides (Host) Facilities:
  - Production Process System;
  - Production Chemicals and Distribution System;
  - Hydraulic Supply;
  - Utility Systems;
  - Power Systems;
  - Riser Baskets;
  - Umbilical Infrastructure;
- Metocean;
- Geotechnical.

### Level 2: Sub-Systems

The Level 2 design basis documents include design criteria pertinent to the various project sub-systems and equipment packages:

- Subsea Tree;
- Subsea PLET/PLEMS;
- Flowlines;
- Flowline and Well Jumpers;
- Production Risers;
- Subsea Production Control System;
- Chemical Injection
- Production Control Umbilical;
- Riser Base Gas Lift System;
- Topsides Facilities.
- Flow Assurance

Exhibit "D" Execution Version

| Project Title: | Galapagos Area Development | ISAB1-10-PM-DC-000001 | bp |
|---|---|---|---|
| Project Description: | Subsea Tie-back to Na Kika | Revision 0 | |
| Document Title: | Basis of Design Level 1: Subsea and Topside Facilities | Page 8 of 42 | |

This document is valid only at time of printing. Copies printed from this site are considered uncontrolled.

In general, the Level 2 BoD's do not repeat information already available in the Level 1 DBD. Therefore, the Level 2 BoD's must be used in conjunction with the Level 1 BoD for a complete set of system design criteria.

## 1.3   Document Control

This Level 1 BoD is a controlled document. All changes to this document, as well as designs that deviate from the established requirements will be justified and approved by the Project Engineering Authority. After any approved changes, the Level 1 BoD will be re-issued per Project documentation control procedures.

## 2.0   GALAPAGOS ARE DEVELOPMENT OVERVIEW

The Isabela Field will be a subsea tieback to the Na Kika Platform.

Na Kika is a semi submersible platform, located in 6340 feet of water, 140 miles southeast of New Orleans, LA in Mississippi Canyon Block 474. BP and Shell each have an interest in the platform facilities and the Ariel, Fourier, Kepler, East Anstey, and Herschel oil and gas fields. Shell also holds majority interest of the Coulomb gas field with Petrobras holding the minority.



Figure 2-1:  Na Kika Area Infrastructure

Although the facilities were designed specifically for the initial five Na Kika fields, flexibility was included in the design to accept future production from exploration potentials and new developments. To accommodate these future opportunities, additional riser baskets, hull capacity, deck space, and umbilicals were incorporated into

Exhibit "D" Execution Version

| Project Title: | Galapagos Area Development | ISAB1-10-PM-DC-000001 |
|---|---|---|
| Project Description: | Subsea Tie-back to Na Kika | Revision 0 |
| Document Title: | Basis of Design Level 1: Subsea and Topside Facilities | Page 9 of 42 |

This document is valid only at time of printing. Copies printed from this site are considered uncontrolled.

the original design. BP and Shell executed a Host Utilization Agreement (HUA) which allocates the spare equipment and deck space between the companies.

The Isabela field is approximately five miles south of Na Kika at an approximate water depth of 6,450 feet. The MC 562 No. 1 exploratory well (OCS-G-1996 #1) at Isabela was drilled in 2Q 2007. The well has been evaluated as a low-GOR oil well capable of initial production rates of 22,500 boepd. Figure 2-2 shows the location of the Isabela, Santa Cruz and Santiago Fields which form the Galapagos Area Development, which will be tied back to Na Kika.



**Figure 2-2: Galapagos Area Development Location Map**

The basis for initial project development includes completion of the MC 562 No. 1 exploratory well in the M55 oil reservoir at Isabela with a subsea tie back to the Na Kika platform via a looped PIP flowline system. Two additional wells in MC 519 (Noble Operated), Santa Cruz and Santiago will also be drilled and completed, and tied in to the subsea infrastructure. The Santa Cruz well has been drilled, and the Santiago well will be drilled in March 2010. Both Santa Cruz and Santiago will be completed following the drilling of Santiago. Existing and future wells will tie-in to PLEMS at each of the three drill centers in the Galapagos area (Isabela, Santa Cruz, and Santiago). Figure 2.3 shows a graphic representation of the selected development concept for Galapagos.

Exhibit "D" Execution Version



| Project Title: | Galapagos Area Development | ISAB1-10-PM-DC-000001 | bp |
| Project Description: | Subsea Tie-back to Na Kika | Revision 0 | |
| Document Title: | Basis of Design Level 1: Subsea and Topside Facilities | Page 10 of 42 | |

This document is valid only at time of printing.  Copies printed from this site are considered uncontrolled.



**Figure 2-3: Graphic Representation of Galapagos Area Development**

## 3.0 SPECIFICATIONS, STANDARDS, AND REGULATORY REQUIREMENTS

The Galapagos facilities shall conform to the requirements of the standards and specifications included in the following tables.

### 3.1 Galapagos Project Level 2 Design Basis Documents and Functional Design Specifications

| Document Number | Document Title |
| --- | --- |
| ISAB130-RI-DC-000001 | Galapagos Riser Design Basis Document: Level 2 |
| ISAB1-30-FL-DC-000001 | Galapagos Flowline Design Basis Document: Level 2 |
| ISAB1-30-UM-DC-000003 | Galapagos Riser Base Gas Lift System Design Basis Document: Level 2 |
| See Section 10 Subsea Facilities below. | Primary SPS FDS's are listed in the respective technical sections. |
| ISAB1-20-GE-DC-000001 | Galapagos Topsides Facilities Design Basis Document: Level 2 |
| ISAB1-30-CT-DC-000001 | Subsea Chemical Injection System Basis of Design |
| ISAB1-30-FA-DC-000002 | Isabela Flow Assurance Analysis: Define Stage - Basis of Design |

Exhibit "D" Execution Version

| Project Title: | Galapagos Area Development | ISAB1-10-PM-DC-000001 |
| Project Description: | Subsea Tie-back to Na Kika | Revision 0 |
| Document Title: | Basis of Design Level 1: Subsea and Topside Facilities | Page 11 of 42 |

This document is valid only at time of printing. Copies printed from this site are considered uncontrolled.



### 3.2    BP Standards and Practices

Industry standards and specifications, BP Group Practices (GPs), Engineering Technical Practices (ETPs), and Site Technical Practices (STPs) applicable to the Galapagos project are listed in the following tables. These documents will be followed in the design and development of the Galapagos production system, and departures from these requirements shall be according to an approved MOC.

| Document Number | Document Title |
|---|---|
| **System Level** | |
| MPCP E&P Guideline | Engineering and Quality Management Guideline |
| DWGOM GP 86-0020 | Major Projects Integrity Management Requirements |
| GP 01-01 | Group Defined Engineering Technical Practices |
| **HSSE and Process Safety** | |
| GP 48-01 | Guidance on Practice for HSSE Reviews of Projects |
| GP 48-02 | Guidance on Practice for Hazard and Operability (HAZOP) Study |
| GP 48-03 | Guidance on Practice for Layer of Protection Analysis (LOPA) |
| GP 48-04 | Concept Selection for Inherently Safer Design |
| GP 48-50 | Guidance on Practice for Major Accident Risk (MAR) Process |
| DWGOM GP 48-0005 | Guidance on Practice for Hazard Identification (HAZID) Studies |
| DWGOM GP 48-02-1 | Guidance on Practice for HAZOP and LOPA |
| DWGOM GP 76-0099 | Development of Hazard and Risk Registers |

| Document Number | Document Title |
|---|---|
| **Materials Selection** | |
| GP 36-10 | Metallic Materials Selection |
| DWGOM GP 36-10-1 | Offshore Structural Materials |
| GIS 36-102 | Guidance on Industry Standard for Hardness Testing, Post Weld Heat Treat, Stress Relief and Pickling for Pressure Vessels, Piping and other components |
| GIS 36-103 | Guidance on Industry Standard for Positive Material Identification for Pressure Vessels, Piping, and Other Components |
| GP 36-20 | Guidance on Practice for Materials Selection and Specification for Subsea Equipment |

| Document Number | Document Title |
|---|---|
| **Subsea Systems** | |
| Reliability Implementation Manual | Implementing Subsea Reliability Improvement in Projects |
| GP78-00 | Guidance on Practice for Principles of Subsea Design and Execution |
| DWGOM GP 78-03 | Subsea Production Operations - Integrity Management |

Exhibit "D" Execution Version

| Project Title: | Galapagos Area Development | ISAB1-10-PM-DC-000001 |  |
|---|---|---|---|
| Project Description: | Subsea Tie-back to Na Kika | Revision 0 | |
| Document Title: | Basis of Design Level 1: Subsea and Topside Facilities | Page 12 of 42 | |

This document is valid only at time of printing. Copies printed from this site are considered uncontrolled.

| Document Number | Document Title |
|---|---|
| GP 78-03 | Guidance on Practice for Achieving Reliability in Subsea Projects |
| GP 78-04 | Guidance on Practice for Reliability Techniques for Subsea Projects |
| GP 78-05 | Testing Guidelines for FAT, EFAT, and SIT |
| GP 78-06 | Guidance on Practice for Qualification of Technology for Subsea Projects |
| GP 78-09 | Guidance on Practice for Subsea Safety Instrumented Systems |
| GP 78-10 | Guidance on Practice for Subsea Electrical, Optical Connectors and Cable Assemblies |
| GP 78-12 | Well Jumpers and Flowline Connectors |
| GP 78-14 | Subsea Isolations |
| GP 78-18 | Design and Operation of Subsea Production Control Systems |
| GP 78-20 | Guidance on Practice for Subsea Control Fluid Selection |
| GP 78-21 | Subsea Electrical and Optical Connectors, Terminations, and Assemblies |
| DWGOM GP 78-29-1 | Dropped Object Risk Management Guidelines for Subsea Systems and Projects |

| Document Number | Document Title |
|---|---|
| **Flowlines** | |
| GP 78-26 | Guidance on Practice for Pipeline Systems (Overview Document) |
| Note: Other BP Standards and Practices for flowlines are listed in the Level 2 Design Basis Document for the Galapagos Flowlines | |
| **Risers** | |
| GP 65-73 | Design of Steel Catenary Risers |
| Note: Other BP Standards and Practices for production risers are listed in the Level 2 Design Basis Document for the Galapagos Risers | |
| **Topsides Facilities** | |
| Note: BP Standards and Practices for the topsides facilities are listed in the Level 2 Design Basis Document for the Galapagos Topsides Facilities. | |

### 3.3 Industry Standards and Specifications

| Document Number | Document Title |
|---|---|
| See Level 2 BODs | |

## 4.0 HSSE AND PROCESS SAFETY

### 4.1 HSSE

Health, Safety, Security and Environment (HSSE) are the primary considerations of the Galapagos Project Leadership Team, and an HSSE Management Plan has been developed specifically for the Project to provide guidance in the design and operation of project-related equipments and activities through all the various phases of design,

Exhibit "D" Execution Version

| Project Title: | Galapagos Area Development | ISAB1-10-PM-DC-000001 | bp |
|---|---|---|---|
| Project Description: | Subsea Tie-back to Na Kika | Revision 0 | |
| Document Title: | Basis of Design Level 1: Subsea and Topside Facilities | Page 13 of 42 | |

This document is valid only at time of printing. Copies printed from this site are considered uncontrolled.



construction, testing, commissioning and transition to the Na Kika Asset Performance Unit.

| Document Number | Document Title |
|---|---|
| ISAB1-10-HS-PR-000004 | Galapagos Project HSSE Management Plan |

The document specifically addresses the Galapagos Project, and is directly bridged to Na Kika's HSSE management system with the specific intent to minimize impact of project activities on the asset. The Galapagos Leadership Team will review and update this HSSE Management Plan as appropriate throughout the project's lifecycle until handed-over to the asset.

The primary objectives of the HSSE Management Plan are to:

- Clearly state the Galapagos Project HSSE goals, objectives and expectations;

- Provide a tool for the Project Team to use in achieving these objectives and expectations;

- Detail the Project organization, responsibilities and management regarding HSSE;

- Identify the required HSSE-related plans, registers and other deliverables;

- Specify the HSSE-related studies, reviews and audits to be performed and their timing.

This HSSE Plan, along with the Design Hazard Management (DHM) Plan provide the guidance and structure needed to enable the Galapagos Project Team, including all contractors, partners and interested outside parties, to understand how HSSE will be managed and delivered throughout the life of the Project, and how accountabilities are set out at various levels of management.

### 4.2    Safety in Design

The Galapagos Team shall utilize the MPcp Guidelines to achieve excellence in design safety by employing Design Hazard Management (DHM) principles. These principles require continual identification and evaluation of risks, feeding back results and recommendations into the design. From the earliest stages, adopting this approach essentially guarantees that hazards will be managed properly.

The primary project documents defining design safety engineering requirements for Galapagos are listed in the following table.

| Document Number | Document Title |
|---|---|
| ISAB1-10-IM-PR-000001 | Design Hazard Management Plan |
| ISAB1-10-IM-RP-000004 | Design Case For Safety |
| ISAB1-10-IM-RP-000002 | Hazard Registers and SCDM (Safety Critical Design Measure) |
| ISAB1-10-IM-RP-000001 | Select Stage HAZID Report |
| ISAB1-10-IM-RP-000007 | Galapagos Area Development Subsea HAZOP Study |
| ISAB1-10-IM-RP-000009 | Galapagos Area Development Topsides HAZOP Study and LOPA |

Exhibit "D" Execution Version

| Project Title: | Galapagos Area Development | ISAB1-10-PM-DC-000001 |  |
|---|---|---|---|
| Project Description: | Subsea Tie-back to Na Kika | Revision 0 | |
| Document Title: | Basis of Design Level 1: Subsea and Topside Facilities | Page 14 of 42 | |

This document is valid only at time of printing.  Copies printed from this site are considered uncontrolled.

The primary objective of the Design Hazard Management (DHM) Plan is to describe the activities and deliverables, including approximate timing, so that major hazards are appropriately managed.

Management of these hazards shall be achieved by:

- Major hazard identification;
- Major hazard evaluation;
- Continual risk reduction through inherently safer design (ISD) and implementation of design safety measures.

Design decisions made during the early stages of a project have the greatest opportunity to reduce the project HSSE risk.  Design reviews and risk assessments will focus on the elimination and reduction of hazards.  Inherently safe design includes considerations such as dropped object risk, minimizing storage of combustible chemicals, and performance of Risk Assessments as early as practical.

## 5.0   FIELD ARCHITECTURE

The basis for the initial project development includes completion of the MC 562 No. 1 exploratory well in the M55 oil reservoir at Isabela with a subsea tie back to the Na Kika platform via a looped PIP flowline system.  Two additional wells in MC 519 (Noble Operated), Santa Cruz and Santiago will also be drilled and completed, and tied in to the subsea infrastructure.  The Santa Cruz well has been drilled, and the Santiago well will be drilled in March 2010.  Both Santa Cruz and Santiago will be completed following the drilling of Santiago.  Existing and future wells will tie-in to PLEMS at each of the three drill centers in the Galapagos area (Isabela, Santa Cruz, and Santiago).  Figure 5.1 shows a simplified sketch of the Galapagos Area Development field architecture.  Note that the second Isabela well is shown for reference only and is not included in the initial Galapagos Area Development.

| Project Title: | Galapagos Area Development | ISAB1-10-PM-DC-000001 | bp |
|---|---|---|---|
| Project Description: | Subsea Tie-back to Na Kika | Revision 0 | |
| Document Title: | Basis of Design Level 1: Subsea and Topside Facilities | Page 15 of 42 | |
| This document is valid only at time of printing.  Copies printed from this site are considered uncontrolled. | | | |



**Figure 5-1:  Galapagos Area Development Field Architecture**

The Isabela Development Plan, (see Documentum No. ISAB1-10-PM-PR-000008), defines the rationale for selecting this field architecture.

## 6.0   RESERVOIR AND WELL INFORMATION

### 6.1   Isabela MC 562 Reservoir Information

The Isabela MC Block 562 No. 1 was drilled by ILX in 2Q, 2007 and found oil pay in the M55 sand and gas pay in the M56 sand.

**Table 6-1:  Reservoir Fluid Properties**

| | M55 | M56 | |
|---|---|---|---|
| **Fluid** | Oil | Gas | M55 Low Bubble Point |
| **Depth** | 18,881' | 18,200' | M55 Low GOR |
| **BHP** | 12,203 psi | 11,838 psi | M55 Fluid Sample unusable for |
| **BHT** | 209 deg F | 200 def F | relative permeability testing |
| **BP** | 3962 psi | 9990 psi | M56 HP gas leads to 15K equipment |
| **API** | 32.2 | 41.3 | |
| **GOR** | 728 | 11,009 | Gas condensate yield = 90 bbls/mm |

The M55 reservoir has an under-saturated sweet crude of 32 degrees API with a low GOR of 728 SCF/BBL and low bubble point of 3962 psi. With a high initial pressure of 12,203 psi, it is unlikely that a secondary gas cap will form in the reservoir. However, gas will evolve out of solution as it is produced to the host platform.

Exhibit "D" Execution Version

| Project Title: | Galapagos Area Development | ISAB1-10-PM-DC-000001 |
| Project Description: | Subsea Tie-back to Na Kika | Revision 0 |
| Document Title: | Basis of Design Level 1: Subsea and Topside Facilities | Page 16 of 42 |

This document is valid only at time of printing. Copies printed from this site are considered uncontrolled.



The M56 reservoir is a retrograde condensate with a high condensate yield of 90 bbls/mmscf. With the high reservoir pressure of 11,838 psi it the shut in tubing pressure will be approximately 10,000 psi which will require equipment with a working pressure rating of higher than 10,000 psi. The high dew point of 9990 psi means that if the reservoir pressure drops during production that condensate will condense in the reservoir which could lead to lower gas condensate yield as the reservoir is produced.

The Isabela M55 reservoir is planned to be the initial completion while the shallower Isabela M56 reservoir may be rig re-completed at a later date. The M55 oil reservoir has a relatively flat structure with an original hydrocarbons-in-place of 92 mmbo and 67 bcf assuming the water contact is at the lowest know oil of 18,759 feet SSTVD. The expected cumulative recovery of 25 mmbo and 18.3 bcf results in a recovery factor of 27%.

Since the original well was drilled near the top of the structure and the oil-water contact was not logged the exact location of the OWC is unknown. If the OWC is at 18,830 feet SSTVD then the original hydrocarbons-in-place increases to 152 mmbo and 111 bcf with an expected recovery of 49 mmbo and 36 bcf for recovery factor of 32%. If the OWC is at 18,950 feet SSTVD (the structural spill point) then the original hydrocarbons-in-place increases to 211 mmbo and 154 bcf with an expected recovery of 62 mmbo and 45 bcf for recovery factor of 30%. Since the OWC is unknown the probability is higher that it is closer to the lowest know oil than it is to the deeper spill point.

### 6.1.1   Isabela Well Site Location

The site information for the existing Isabela MC 562 No. 1 well is included in the following tables.

Table 6-2:  Isabela Well Site Location Information

| Field: | Isabela |
|---|---|
| Lease: | OCS-G-19966 No. 1 |
| Well #: | Mississippi Canyon 562 #1 |
| Latitude: | 28° 26' 38.608" N |
| Longitude: | 88° 16' 37.9271" E |
| API #: | 60-817-4111600 |
| Surface Location | X (ft E): 1,230,091<br>Y (ft N): 10,203,091, UTM Zone 16N, feet, NAD 1927, Clarke 1866 |
| Bottom Hole Location | X (ft E): 1,230,092<br>Y (ft N): 10,323,773, UTM Zone 16N, feet, NAD 1927, Clarke 1866 |

### 6.1.2   Isabela Well Conditions

Table 6-3 summarizes well conditions from the MC 562 No. 1 exploratory well.

Exhibit "D" Execution Version

| Project Title: | Galapagos Area Development | ISAB1-10-PM-DC-000001 |  |
|---|---|---|---|
| Project Description: | Subsea Tie-back to Na Kika | Revsion 0 | |
| Document Title: | Basis of Design Level 1: Subsea and Topside Facilities | Page 17 of 42 | |

This document is valid only at time of printing. Copies printed from this site are considered uncontrolled.

**Table 6-3: Isabela Well Conditions**

| Description | Value |
|---|---|
| Bottom Hole Pressure | |
| M55 oil (initial), psig | 12,203 |
| M56 gas (initial), psig | 11,838 |
| Bottom Hole Temperature | |
| M55 oil, oF | 209 |
| M56 gas, oF | 200 |
| Shut-in Tubing Pressure at Wellhead (SITP) | |
| M55 oil (initial), psig | 9,800 |
| M56 gas (initial), psig | 10,400 |
| Max Oil (bopd) | 22,500 |
| Max Gas (mmscfd) | 20 |
| Max Water cut, % | 60 |

### 6.1.3   Isabela Production Profiles

The production profiles shown in the following tables will be used for design. The information is presented for three cases of estimated production depending on the water-oil contact depth in the M55 reservoir: Low: 18759 feet, Middle: 18,830 feet, High: 18,950 feet.

Exhibit "D" Execution Version

| Project Title: | Galapagos Area Development | ISAB1-10-PM-DC-000001 | bp |
| Project Description: | Subsea Tie-back to Na Kika | Revision 0 | |
| Document Title: | Basis of Design Level 1: Subsea and Topside Facilities | Page 18 of 42 | |

This document is valid only at time of printing.  Copies printed from this site are considered uncontrolled.



**Table 6-4:  Low Production Case: OWC at 18,759 feet**

**Isabela Separator Wet Volumes**
**First Oil April 2011**
**Average Yearly Production with a 90% Ops Eff**

| (18759) LOW CASE Year | Gross Oil MBOPD | Gross Gas MMSCFPD | Gross Water MBWPD | Gross Equivalent MBOE | Net Equivalent MBOE |
|---|---|---|---|---|---|
| IP | 11.19 | 8.19 | 2.16 | 12.60 | 7.35 |
| 2011 | 7.09 | 5.18 | 2.29 | 7.98 | 4.66 |
| 2012 | 8.7 | 6.36 | 4.54 | 9.80 | 5.71 |
| 2013 | 7.46 | 5.45 | 5.26 | 8.40 | 4.90 |
| 2014 | 6.87 | 5.03 | 5.74 | 7.74 | 4.51 |
| 2015 | 6.44 | 4.71 | 5.98 | 7.25 | 4.23 |
| 2016 | 5.93 | 4.34 | 6.14 | 6.68 | 3.90 |
| 2017 | 5.01 | 3.66 | 5.91 | 5.64 | 3.29 |
| 2018 | 4.19 | 3.06 | 5.5 | 4.72 | 2.75 |
| 2019 | 3.56 | 2.6 | 5.03 | 4.01 | 2.34 |
| 2020 | 3.06 | 2.24 | 4.57 | 3.45 | 2.01 |
| 2021 | 2.65 | 1.94 | 4.13 | 2.98 | 1.74 |
| 2022 | 2.3 | 1.68 | 3.72 | 2.59 | 1.51 |
| 2023 | 2.01 | 1.47 | 3.33 | 2.26 | 1.32 |
| 2024 | 1.75 | 1.28 | 2.97 | 1.97 | 1.15 |
| 2025 | 0.78 | 0.57 | 1.35 | 1.71 | 1.00 |
| 2026 | 0 | 0 | 0 | 0.52 | 0.30 |
| | MBO | MMSCF | MBW | MBOE | MBOE |
| Total | 24969 | 18262 | 24272 | 28117 | 16403 |

Exhibit "D" Execution Version

Project Title: Galapagos Area Development
Project Description: Subsea Tie-back to Na Kika
Document Title: Basis of Design Level 1: Subsea and Topside Facilities
This document is valid only at time of printing. Copies printed from this site are considered uncontrolled.

ISAB1-10-PM-DC-000001
Revision 0
Page 19 of 42



### Table 6-5:  Middle Production Case: OWC at 18,830 feet

| 18830 Mid Case Year | Gross Oil MBOPD | Gross Gas MMSCFPD | Gross Water MBWPD | Gross Equivalent MBOE | Net Equivalent NBOE |
|---|---|---|---|---|---|
| IP | 20.98 | 15.34 | 0.00 | 23.62 | 13.78 |
| 2011 | 15.52 | 11.35 | 0 | 17.48 | 10.20 |
| 2012 | 19.98 | 14.61 | 0.03 | 22.50 | 13.13 |
| 2013 | 15.1 | 11.04 | 0.4 | 17.00 | 9.92 |
| 2014 | 11.92 | 8.72 | 0.75 | 13.42 | 7.83 |
| 2015 | 9.95 | 7.28 | 0.94 | 11.21 | 6.54 |
| 2016 | 8.63 | 6.31 | 1 | 9.72 | 5.67 |
| 2017 | 7.51 | 5.49 | 1.03 | 8.46 | 4.93 |
| 2018 | 6.55 | 4.79 | 1.04 | 7.38 | 4.30 |
| 2019 | 5.68 | 4.15 | 1.04 | 6.40 | 3.73 |
| 2020 | 4.87 | 3.56 | 1.05 | 5.48 | 3.20 |
| 2021 | 4.19 | 3.06 | 1.05 | 4.72 | 2.75 |
| 2022 | 3.66 | 2.68 | 1.03 | 4.12 | 2.40 |
| 2023 | 3.2 | 2.34 | 1.01 | 3.60 | 2.10 |
| 2024 | 2.75 | 2.01 | 0.98 | 3.10 | 1.81 |
| 2025 | 2.43 | 1.78 | 0.95 | 2.74 | 1.60 |
| 2026 | 2.22 | 1.62 | 0.91 | 2.50 | 1.46 |
| 2027 | 2.05 | 1.5 | 0.86 | 2.31 | 1.35 |
| 2028 | 1.89 | 1.38 | 0.82 | 2.13 | 1.24 |
| 2029 | 1.73 | 1.26 | 0.77 | 1.95 | 1.14 |
| 2030 | 1.58 | 1.16 | 0.72 | 1.78 | 1.04 |
| 2031 | 1.46 | 1.07 | 0.68 | 1.64 | 0.96 |
| 2032 | 0.8 | 0.59 | 0.38 | 0.90 | 0.53 |
| | MBO | MMSCF | MBW | MBOE | MBOE |
| Total | 49085 | 35902 | 6359 | 55275 | 32245 |

Exhibit "D" Execution Version

Project Title:        Galapagos Area Development
Project Description:  Isabela Tie-back to Na Kika
Document Title:       Basis of Design Level 1: Subsea and Topside Facilities
This document is valid only at time of printing.  Copies printed from this site are considered uncontrolled.

ISAB1-10-PM-DC-000001
Revision 0
Page 20 of 42



### Table 6-6: High Production Case: OWC at 18,950 feet

| 18950 High Case Year | Gross Oil MBOPD | Gross Gas MMSCFPD | Gross Water MBWPD | Gross Equivalent MBOE | Net Equivalent MBOE |
|---|---|---|---|---|---|
| IP | 20.97 | 15.34 | 0.00 | 23.62 | 13.78 |
| 2011 | 15.51 | 11.35 | 0 | 17.47 | 10.19 |
| 2012 | 20.52 | 15.01 | 0 | 23.11 | 13.48 |
| 2013 | 20.54 | 15.02 | 0 | 23.13 | 13.49 |
| 2014 | 16.38 | 11.98 | 0 | 18.45 | 10.76 |
| 2015 | 12.97 | 9.49 | 0 | 14.61 | 8.52 |
| 2016 | 10.66 | 7.8 | 0 | 12.00 | 7.00 |
| 2017 | 8.96 | 6.56 | 0 | 10.09 | 5.89 |
| 2018 | 7.66 | 5.61 | 0 | 8.63 | 5.03 |
| 2019 | 6.58 | 4.81 | 0 | 7.41 | 4.32 |
| 2020 | 5.67 | 4.14 | 0 | 6.38 | 3.72 |
| 2021 | 4.93 | 3.6 | 0 | 5.55 | 3.24 |
| 2022 | 4.33 | 3.17 | 0 | 4.88 | 2.84 |
| 2023 | 3.47 | 2.54 | 0 | 3.91 | 2.28 |
| 2024 | 3.22 | 2.35 | 0 | 3.63 | 2.11 |
| 2025 | 2.96 | 2.14 | 0 | 3.33 | 1.94 |
| 2026 | 2.78 | 1.99 | 0 | 3.12 | 1.82 |
| 2027 | 2.65 | 1.88 | 0 | 2.97 | 1.74 |
| 2028 | 2.53 | 1.78 | 0 | 2.84 | 1.65 |
| 2029 | 2.41 | 1.69 | 0 | 2.70 | 1.58 |
| 2030 | 2.3 | 1.6 | 0 | 2.58 | 1.50 |
| 2031 | 2.19 | 1.51 | 0 | 2.45 | 1.43 |
| 2032 | 2.07 | 1.43 | 0 | 2.32 | 1.35 |
| 2033 | 1.95 | 1.34 | 0.01 | 2.18 | 1.27 |
| 2034 | 1.82 | 1.24 | 0.02 | 2.03 | 1.19 |
| 2035 | 1.7 | 1.16 | 0.03 | 1.90 | 1.11 |
| 2036 | 1.58 | 1.07 | 0.02 | 1.76 | 1.03 |
| 2037 | 1.46 | 0.98 | 0 | 1.63 | 0.95 |
| 2038 | 1.42 | 0.95 | 0 | 1.58 | 0.92 |
| 2039 | 1.39 | 0.93 | 0 | 1.55 | 0.90 |
| 2040 | 1.37 | 0.92 | 0 | 1.53 | 0.89 |
| 2041 | 0.91 | 0.61 | 0 | 1.02 | 0.59 |
| | MBO | MMSCF | MBW | MBOE | MBOE |
| Total | 62416 | 45311 | 73 | 70228 | 40969 |

### 6.1.4   Isabela Produced Fluid Composition

Table 6-7 includes the composition of the produced fluids from the Isabela M55 reservoir.

| Project Title: | Galapagos Area Development | ISAB1-10-PM-DC-000001 | bp |
|---|---|---|---|
| Project Description: | Subsea Tie-back to Na Kika | Revision 0 | |
| Document Title: | Basis of Design Level 1: Subsea and Topside Facilities | Page 21 of 42 | |

This document is valid only at time of printing. Copies printed from this site are considered uncontrolled.

**Table 6-7: Produced Fluid Composition**

Exhibit "D" Execution Version

| Project Title: | Galapagos Area Development | ISAB1-10-PM-DC-000001 |  |
|---|---|---|---|
| Project Description: | Subsea Tie-back to Na Kika | Revision 0 | |
| Document Title: | Basis of Design Level 1: Subsea and Topside Facilities | Page 22 of 42 | |

This document is valid only at time of printing. Copies printed from this site are considered uncontrolled.

**Isabela M55 Reservoir Fluid Composition**

Flash Summary (8000 psia and 209 °F to 15,925 psia and 80 °F)

| Gas-Oil Ratio | 790 | scf/stb | Vapor Gravity | 0.872 | (Air = 1.00) | | |
|---|---|---|---|---|---|---|---|
| FVF | 1.454 | Vstb/Vstd | API Gravity | 30.8 | °API @ 60 °F (Water Free) | | |

| Symbol | Component Name | Atmospheric Vapor (mole%) | Atmospheric Liquid (mole %) | Atmospheric Liquid (wt %) | Molecular Weight | Specific Gravity (Water = 1.0) | Reservoir Fluid (mole %) | Reservoir Fluid (wt %) |
|---|---|---|---|---|---|---|---|---|
| N2 | Nitrogen | 0.51 | 0 | 0 | 28.01 | 0.809 | 0.321 | 0.085 |
| CO2 | Carbon Dioxide | 0.403 | 0 | 0 | 44.01 | 0.818 | 0.254 | 0.105 |
| H2S | Hydrogen Sulfide | 0 | 0 | 0 | 34.08 | 0.801 | 0 | 0 |
| C1 | Methane | 75.491 | 0.099 | 0.007 | 16.04 | 0.3 | 47.558 | 7.192 |
| C2 | Ethane | 5.692 | 0.12 | 0.016 | 30.07 | 0.356 | 3.528 | 1.029 |
| C3 | Propane | 6.954 | 0.538 | 0.097 | 44.1 | 0.507 | 4.407 | 1.830 |
| iC4 | i-Butane | 1.268 | 0.276 | 0.066 | 58.12 | 0.563 | 0.9 | 0.493 |
| nC4 | n-Butane | 3.812 | 1.198 | 0.286 | 58.12 | 0.584 | 2.843 | 1.558 |
| iC5 | i-Pentane | 1.332 | 1.022 | 0.303 | 72.15 | 0.624 | 1.217 | 0.828 |
| nC5 | n-Pentane | 1.714 | 1.874 | 0.555 | 72.15 | 0.631 | 1.773 | 1.206 |
| C6 | Hexanes | 1.443 | 4.351 | 1.538 | 86.18 | 0.664 | 2.52 | 2.047 |
| C7 | Heptanes | 1.04 | 6.934 | 2.761 | 84.78 | 0.706 | 3.224 | 2.88 |
| C8 | Octane | 0.442 | 8.261 | 3.703 | 108.69 | 0.728 | 3.346 | 3.429 |
| C9 | Nonanes | 0.132 | 6.799 | 3.43 | 122.84 | 0.748 | 2.602 | 3.019 |
| C10 | Decanes | 0.037 | 6.439 | 3.542 | 134.16 | 0.778 | 2.409 | 3.046 |
| C11 | Undecanes | | 5.024 | 3.032 | 147 | 0.79 | 1.861 | 2.579 |
| C12 | Dodecanes | | 4.281 | 2.825 | 161 | 0.801 | 1.586 | 2.407 |
| C13 | Tridecanes | | 4.311 | 3.057 | 176 | 0.812 | 1.597 | 2.636 |
| C14 | Tetradecanes | | 3.931 | 3.066 | 190 | 0.823 | 1.456 | 2.628 |
| C15 | Pentadecanes | | 3.883 | 3.283 | 206 | 0.830 | 1.439 | 2.754 |
| C16 | Hexadecanes | | 5.045 | 4.597 | 222 | 0.84 | 1.869 | 3.911 |
| C17 | Heptadecanes | | 3.266 | 3.197 | 237 | 0.848 | 1.217 | 2.72 |
| C18 | Octadecanes | | 3.734 | 3.847 | 251 | 0.853 | 1.383 | 3.272 |
| C19 | Nonadecanes | | 2.401 | 2.685 | 263 | 0.858 | 0.923 | 2.268 |
| C20 | Eicosanes | | 2.036 | 2.295 | 275 | 0.863 | 0.754 | 1.955 |
| C21 | Heneicosanes | | 1.633 | 1.96 | 291 | 0.868 | 0.655 | 1.68 |
| C22 | Docosanes | | 1.5 | 1.878 | 305 | 0.873 | 0.556 | 1.598 |
| C23 | Tricosanes | | 1.372 | 1.791 | 318 | 0.878 | 0.508 | 1.604 |
| C24 | Tetracosanes | | 1.29 | 1.752 | 331 | 0.882 | 0.478 | 1.491 |
| C25 | Pentacosanes | | 1.16 | 1.629 | 345 | 0.886 | 0.426 | 1.366 |
| C26 | Hexacosanes | | 1.065 | 1.588 | 359 | 0.89 | 0.402 | 1.36 |
| C27 | Heptacosanes | | 1.011 | 1.662 | 374 | 0.894 | 0.375 | 1.321 |
| C28 | Octacosanes | | 1.02 | 1.629 | 388 | 0.897 | 0.378 | 1.382 |
| C29 | Nonacosanes | | 0.869 | 1.417 | 402 | 0.9 | 0.318 | 1.206 |
| C30 | Triacontanes | | 0.814 | 1.389 | 416 | 0.903 | 0.302 | 1.183 |
| C31 | Hentriacontanes | | 0.712 | 1.256 | 430 | 0.907 | 0.264 | 1.069 |
| C32 | Dotriacontanes | | 0.656 | 1.156 | 444 | 0.91 | 0.243 | 1.017 |
| C33 | Tritriacontanes | | 0.557 | 1.049 | 458 | 0.913 | 0.206 | 0.931 |
| C34 | Tetratriacontanes | | 0.563 | 1.09 | 472 | 0.915 | 0.209 | 0.928 |
| C35 | Pentatriacontanes | | 0.5 | 0.997 | 486 | 0.918 | 0.185 | 0.849 |
| C36 | Hexatriacontanes | | 0.463 | 0.949 | 500 | 0.92 | 0.172 | 0.808 |
| C37 | Heptatriacontanes | | 0.386 | 0.833 | 514 | 0.923 | 0.146 | 0.709 |
| C38 | Octatriacontanes | | 0.383 | 0.83 | 528 | 0.925 | 0.142 | 0.706 |
| C39 | Nonatriacontanes | | 0.371 | 0.825 | 542 | 0.927 | 0.137 | 0.702 |
| C40 | Tetracontanes | | 0.36 | 0.802 | 556 | 0.925 | 0.133 | 0.659 |
| C41 | Hentetracontanes | | 0.31 | 0.725 | 570 | 0.931 | 0.116 | 0.617 |
| C42 | Dohentracontanes | | 0.285 | 0.683 | 584 | 0.932 | 0.106 | 0.581 |
| C43 | Tritriacontanes | | 0.222 | 0.546 | 598 | 0.934 | 0.080 | 0.464 |
| C44 | Tetratetracontanes | | 0.252 | 0.634 | 612 | 0.936 | 0.093 | 0.539 |
| C45 | Pentatetracontanes | | 0.231 | 0.593 | 626 | 0.938 | 0.086 | 0.505 |
| C46 | Hexatetracontanes | | 0.228 | 0.6 | 640 | 0.941 | 0.084 | 0.51 |
| C47 | Heptatetracontanes | | 0.213 | 0.572 | 654 | 0.942 | 0.079 | 0.487 |
| C48 | Octactetracontanes | | 0.206 | 0.561 | 668 | 0.944 | 0.076 | 0.478 |
| C49 | Nonatetracontanes | | 0.201 | 0.564 | 682 | 0.946 | 0.074 | 0.479 |
| C50+ | Pentacontanes Plus | | 5.207 | 19.916 | 931.49 | 1.077 | 1.929 | 16.539 |
| Total | | 100 | 100 | 100 | | | 100 | 100 |
| Molecular Weight | | 25.15 | 243.61 | | | | 106.09 | |

**Compositional Groupings of Reservoir Fluid**

| Group | Mole % | Weight % | MW | SG | Tb |
|---|---|---|---|---|---|
| Total Fluid | 100 | 100 | 106.09 | 0.737 | N/A |
| C7+ | 34.579 | 83.026 | 258.57 | 0.879 | 1115 |
| C10+ | 25.406 | 74.304 | 310.27 | 0.902 | 1219 |
| C20+ | 9.664 | 46.042 | 505.42 | 0.969 | 1486 |
| C30+ | 4.864 | 31.16 | 675.63 | 1.001 | 1651 |
| C50+ | 1.929 | 16.939 | 931.49 | 1.077 | 1555 |

**Notes:**
1. Compositional groupings based on normal to normal carbon distribution.
2. Tb is by correlation.

Exhibit "D" Execution Version

| Project Title: | Galapagos Area Development | ISAB1-10-PM-DC-000001 |
|---|---|---|
| Project Description: | Subsea Tie-back to Na Kika | Revision 0 |
| Document Title: | Basis of Design Level 1: Subsea and Topside Facilities | Page 23 of 42 |

This document is valid only at time of printing. Copies printed from this site are considered uncontrolled.

## 6.2 MC 519 (Santa Cruz and Santiago) Reservoir Data

The Santa Cruz-1 well, drilled in first quarter of 2009 in Mississippi Canyon block MC519, encountered hydrocarbons in M55 and M56 (Lower and Upper) reservoirs. The M55 reservoir tested low GOR oil (very similar to M55 in Isabela) while the M56L tested higher GOR oil and M56U tested gas. The M55 reservoir contains an under saturated sweet crude of 32.7 degree API oil with a GOR of 731 SCF/STB and bubble point of 3709 psi at initial reservoir pressure of 12,203 psi. The M56L reservoir contains an under saturated lighter sweet crude of 35.9 degree API with a GOR of 1146 SCF/STB and a bubble point of 5362 psi. The M56U reservoir is a lean gas condensate reservoir with a condensate yield of 20 bbl/MMSCF and a dew point pressure of 10545 psi.

The Santiago field has not been penetrated yet. Noble, as Operator of MC519 Unit, plan to drill Santiago-1 well in 1Q 2010. Based on seismic the well is expected to encounter M55 and M56U reservoirs with similar fluid properties as in Santa Cruz-1 well.

The Santa Cruz-1 well will be completed in M55 and M56L while the Santiago well will be completed in M55 and M56U reservoirs and will be produced as a commingled stream. The initial oil rate from Santa Cruz and Santiago combined is expected to be around 35,000 bopd. The expected cumulative recovery from Santa Cruz-1 well is 19.6 mmbo of oil and 17.5 bcf of gas and from Santiago-1 well is 8.7 mmbo of oil and 78.8 bcf of gas. The Santa Cruz-1 well may cut water as early as in the first month of production.

## 7.0 OPERATING AND DESIGN PHILOSOPHIES

### 7.1 Production Availability Goal

The Galapagos facilities shall be designed for maximum production availability.

### 7.2 Production Measurement and Allocation

In the base case operating scenario, production from the Galapagos shall be measured and allocated using the same methods that Na Kika operations currently employ: dedicated measurement at the outflow of the separators for each production riser. The current model used for nodal analysis will be expanded to include the production from Galapagos. Na Kika currently performs measurement by subtraction well tests every 6 months to prove the nodal analysis. This is done by shutting in a well, allowing the system to stabilize, and then recording the difference in overall production. Nodal analysis has been very accurate in establishing the production rates on Na Kika and the measurement by subtraction well tests have proved its accuracy. The same accuracy is expected for Galapagos.

In the event that production from Isabela and MC 519 is co-mingled subsea, multiphase flowmeters will be used for M&A. Noble Energy and BP both intend to install subsea multiphase flowmeters at each well, since this is an MMS prerequisite for co-mingling.

These SS MPFMs will also be used to prove the nodal analysis, assist with reservoir management, and develop the well curves that will be used in the event of meter failure (recognizing that the MTBF for these meters is short).

The Galapagos team is committed to developing a retrievable meter solution.

Exhibit "D" Execution Version

| Project Title: | Galapagos Area Development | ISAB1-10-PM-DC-000001 |
| Project Description: | Subsea Tie-back to Na Kika | Revision 0 |
| Document Title: | Basis of Design Level 1: Subsea and Topside Facilities | Page 24 of 42 |

This document is valid only at time of printing. Copies printed from this site are considered uncontrolled.



### 7.3 Dead Oil Circulation for Flowline Flow Assurance

The Galapagos field architecture shall be configured for round trip oil circulation for flow assuring the system for long term shutdown and cold well start-up.

### 7.4 No HIPPS required

The pressure containing components of the Galapagos production system shall not be designed to rely on HIPPS for pressure integrity.

### 7.5 Dual Redundant Subsea Control System

The Galapagos Subsea Control System shall be configured as a dual redundant system. This includes topsides controls equipment, electrical power and communication circuits, hydraulic supply circuits, Subsea Control Module electronics, and subsea sensors. Failure of one set of this redundant equipment shall have no effect on the other set of equipment.

### 7.6 Flowline Condition Monitoring

The Galapagos Subsea System shall be configured for round trip pigging from Na Kika using intelligent pigs designed for flowline condition monitoring.

## 8.0 FLOW ASSURANCE AND PRODUCTION CHEMISTRY

### 8.1 Flow Assurance Reports

The results of the flow assurance and production chemistry analysis work for Galapagos are included in the following reports.

| Document Number | Document Title |
| --- | --- |
| ISAB1-30-FA-ST-000007 | Galapagos Flow Assurance Strategy report |
| ISAB1-30-FA-DC-000002 | Galapagos Level 2: Flow Assurance Basis of Design |

**Flow Assurance Strategy**

The goal of the Galapagos Flow Assurance Strategy is to assure that production fluids are reliably, efficiently, and safely delivered from the reservoirs to the production facilities. Issues of operability, if wells from surrounding leases are added to the system, will be taken into consideration as part of the flow assurance strategy development.

The hydrate management strategy for Galapagos shall be to develop the system with a looped flowline to allow dead oil circulation for hydrate management in an operation consistent with the existing subsea fields tied back to Na Kika.

The strategy identifies the major flow assurance and production chemistry risks and lays the ground work to mitigate or manage those risks.

The subsea system will be designed to accommodate the forecasted production rates from the Galapagos Fields throughout the expected lives. These flow assurance studies will evaluate flowline route and sizing, scale, wax and hydrate inhibition for normal production, start-up and shutdown cases, including contingency hydrate remediation.

Exhibit "D" Execution Version

| Project Title: | Galapagos Area Development | ISAB1-10-PM-DC-000001 | bp |
| Project Description: | Subsea Tie-back to Na Kika | Revision 0 | |
| Document Title: | Basis of Design Level 1: Subsea and Topside Facilities | Page 25 of 42 | |

This document is valid only at time of printing. Copies printed from this site are considered uncontrolled.

The flowline will be sufficiently insulated to maintain steady state operating temperatures above hydrate formation temperature and the wax appearance temperature.

The subsea tree, flowline, PLETs, and jumpers shall be sufficiently insulated to allow a reasonable 'no-touch' time and adequate time for injection of methanol to stabilize the subsea components for prevention of hydrate formation.

The flow assurance strategy will address the following issues for steady state, transient and upset conditions:

- Hydraulics;
- Slugging;
- Hydrate Control;
- Paraffin Control;
- Asphaltene Control;
- Scale Control;
- Corrosion Control;
- Sand/Erosion Control.

The subsea wells shall be supplied with individual high flow methanol circuits for hydrate inhibition during well start-up and shutdown.

Individual circuits shall be provided to continuously supply corrosion/scale inhibitor and asphaltene inhibitor to each well.

A utility methanol circuit will be used for annulus monitoring, annulus pressure control, and barrier testing. This circuit is shared among all wells serviced by the common umbilical.

## 9.0 GENERAL FACILITY REQUIREMENTS

### 9.1 Design Life of Facilities

The design life of the subsea components shall be the same as the BP SPS Program (equal to 20-years currently).

Riser systems shall be designed to survive the impact of a 100-year storm condition, and prevailing metocean conditions for the remaining life of the facility.

Because it is anticipated that potential production from the field could now exceed the stated design life of the facilities, studies into extending facility life will be required after the depletions plans have been developed.

### 9.2 Production Rates

The Galapagos production facilities will be designed to accommodate the forecasted production rates from Isabela throughout the life of the field. The objective of the design is to strike a balance between peak production rates and late life operability to maximize the value of the resource and the utility of the equipment.

Exhibit "D" Execution Version

| Project Title: | Galapagos Area Development | ISAB1-10-PM-DC-000001 |
| Project Description: | Subsea Tie-back to Na Kika | Revision 0 |
| Document Title: | Basis of Design Level 1: Subsea and Topside Facilities | Page 26 of 42 |

This document is valid only at time of printing. Copies printed from this site are considered uncontrolled.



Production from the initial Isabela well is predicted to be 22,500 boepd. The hydraulic capacity of the flowline is approximately 33,000 bopd, and slugging is predicted to occur (with gas lift) at a rate of 4000 bopd (0% water cut).

### 9.3 Produced Fluid Service

The Galapagos production facilities shall be designed for sweet crude service consistent with the existing Na Kika production facility.

### 9.4 Pressure Ratings

The Galapagos subsea production facilities shall be designed according to the pressure ratings given in Table 9-1.

**Table 9-1: Subsea Equipment Pressure Ratings**

| Facility Component | Pressure Rating | Design Code |
|---|---|---|
| Subsea Tree | 15,000 psia | API 17H |
| Well Jumpers | 11,000 psia | ANSI B31.8 |
| Flowlines | 10,400 psia* | ANSI B31.8 |
| PLEMS, ILS, and Flowline Jumpers | 11,000 psia | ANSI B31.8 |
| Production Risers (top of riser) | 10,000 psia* | ANSI B31.8 |
| Gas Lift Umbilical Gas Injection Circuits | 11,000 psia | ANSI B31.8 |
| Subsea Chemical Injection Circuits | 15,000 psia | ANSI B31.3 |
| Subsea Hydraulic Supply Circuits | 10,000 psia | ANSI B31.3 |

*see ISAB1-30-FL-RP-000001 for basis of flowline and riser pressure rating

### 9.5 Temperature Ratings

The Galapagos subsea production facilities shall be designed according to the temperature ratings given in Table 9-2.

**Table 9-2: Subsea Equipment Temperature Ratings**

| Facility Component | Max Temp (°F) | Min Temp (°F) |
|---|---|---|
| Subsea Tree (u/s of choke) | 250 | 35 |
| Subsea Tree (d/s of choke) | 250 | -20 |
| Well Jumpers | 250 | -20 |
| Flowlines | 235 | 39 |
| Production Risers | 235 | 39 |
| Gas Lift Umbilical | 130 (from compressor) | 35 |
| Gas Lift Jumper and Connectors | 130 | -30 |
| PLEMS, ILS, and Flowline Jumpers | 235 | varies |
| Subsea Chemical Injection Circuits | 250 (at the tree) | -20 |
| Subsea Hydraulic Supply Circuits | 120 | -20 |
| SCSSV Hydraulic Control Circuits | 235 | 35 |

| Project Title: | Galapagos Area Development | ISAB1-10-PM-DC-000001 |  |
| Project Description: | Subsea Tie-back to Na Kika | Revision 0 | |
| Document Title: | Basis of Design Level 1: Subsea and Topside Facilities | Page 27 of 42 | |

This document is valid only at time of printing. Copies printed from this site are considered uncontrolled.

## 9.6    Thermal Insulation Requirements

The Galapagos subsea production facilities shall be thermally insulated to conserve heat in the produced fluid. The insulation requirements are included in Table 9-3, and expressed as the time for the produced fluid to cool from a steady state flowing temperature to hydrate formation temperature after a production shutdown.

**Table 9-3:  Subsea Thermal Insulation Requirements**

| Facility Component | Minimum Cool-Down Time |
|---|---|
| Subsea Tree | 8 hours |
| Well Jumpers | 8 hours |
| Flowlines | 24 hours |
| PLETS, PLEMS, ILS, and Flowline Jumpers | 16 hours |
| Production Risers | 16 hours |

## 9.7    Subsea Chemical Injection Requirements

The Galapagos subsea production facilities shall be supplied with treating chemicals according to the requirements listed in Table 9-4.

**Table 9-4:  Subsea Chemical Injection Requirements**

| Chemical | Injection Point | Designation | Injection Rate | Notes |
|---|---|---|---|---|
| Methanol | Subsea Tree (u/s of choke) (CT1, CT2) | MEOH1 | 5 gpm | Dedicated circuit for each well for hydrate inhibition |
| Methanol | Subsea Tree XO Circuit (CD1) and Downhole above SCSSV (CT4) | MEOH2 | 5 gpm | Same umbilical delivery circuit as MEOH1. For downhole hydrate inhibition and tree utility functions |
| Methanol | Subsea Tree (AW) | AMON | 5 gpm | Shared umbilical delivery circuit among all subsea wells. For Annulus and TreeCap Cavity Pressure Management |
| Corrosion Inhibitor | Subsea Tree (d/s of choke) (CT3) | CI | 20 gpd | Used primarily to treat the dead leg. |
| Scale and Corrosion Inhibitor Blend | Downhole above Packer (D3) | SI/CI | 20 gpd | For scale and corrosion inhibition |
| Asphaltene Inhibitor | Downhole above Packer (CD2) | AI | 20 gpd | For asphaltene inhibition |

## 10.0    SUBSEA FACILITIES

## 10.1    Well Completion

The Isabela MC 562 No. 1 exploratory well shall be completed as a single zone frac-pack in the M55 oil reservoir with target skin value of ≤ 4.

The completion shall be designed for a maximum sustained production rate of 30,000 BOPD.

The completion strategy shall include access to the M56 gas sand as a future re-completion opportunity.

Exhibit "D" Execution Version

Project Title:        Galapagos Area Development                                    ISAB1-10-PM-DC-000001
Project Description:  Subsea Tie-back to Na Kka                                                   Revision 0
Document Title:       Basis of Design Level 1: Subsea and Topside Facilities                     Page 28 of 42
This document is valid only at time of printing. Copies printed from this site are considered uncontrolled.

The completion strategy shall maximize wellbore integrity for long life production, including formation pressure depletion.

The completion design life is 20 years.

The completion design shall include primary DHPT gauges for reservoir surveillance.

The completion design shall include three chemical injection mandrels: one above the SCSSV for methanol, and two below the SCSSV - one for scale/corrosion inhibition and one for asphaltene inhibition.

The SCSSV design shall incorporate redundancy necessary to assure reliable subsea operation. The SCSSV shall be sized for the required production and injection rates and facilitate through tubing intervention access. The SCSSV shall be positioned below hydrate formation point.

The completion operation strategy shall define rig and subsea equipment requirements for tubing hanger running, horizontal tree installation, landing string requirements, etc.

The frac pack design shall include scale inhibitor to treat the 1st 100,000 bbls of produced water

## 10.2   Subsea Tree

The subsea tree will be supplied by the BP SPS standardization program. Detailed specifications for the subsea tree are included in the following SPS documents.

| Document Number | Document Title |
| --- | --- |
| ssst1-30-TR-SP-000007 | Subsea Tree Functional Design Specification |
| ssst1-30-TR-SD-000006 | Subsea Tree Schematic Drawing |
| ssst1-30-TR-SP-000003 | Subsea Choke Function Design Specification |

The subsea tree system for Isabela will be a 5-inch X 2-inch horizontal tree. The tree is manufactured for a design life of 20 years, and can be used for producing gas as well as oil.

Pressure and temperature ratings for the subsea tree equipment are included in Section 9.4 and 9.5.

The subsea tree will be thermally insulated to retained heat in the produced fluid. Insulation requirements are included in Section 9.6.

The subsea trees are rated for an operating water depth of 3,000-10,000 feet.

The trees will be rated to PSL level 3G, the production trim level is HH while the annulus trim class is EE.

The wetted areas of the tree will be fully clad with Inconel 625 in order to comply with the requirements of ETP GP 36-20.



| Project Title: | Galapagos Area Development | ISAB1-10-PM-DC-000001 |
| Project Description: | Subsea Tie-back to Na Kika | Revision 0 |
| Document Title: | Basis of Design Level 1: Subsea and Topside Facilities | Page 29 of 42 |

This document is valid only at time of printing. Copies printed from this site are considered uncontrolled.

The subsea tree will include a dedicated Subsea Control Module (SCM) for hydraulic control of tree valves, choke and SCSSV, and remote monitor of the tree and downhole pressure and temperature sensors.

All pressure and temperature sensors on the subsea tree shall be dual redundant.

The tree hub will use the Cameron Vertical Connector (CVC) for the well jumper.

### 10.3   Well Jumpers

The well jumpers will be supplied by the BP SPS standardization program. Detailed specifications for the well jumpers are included in the following SPS documents.

| Document Number | Document Title |
| --- | --- |
| ssst1-30-JU-SP-000005 | Jumper Functional Design Specification |
| ssst1-30-JU-SP-000004 | Jumper Connector Functional Design Specification |

The well jumpers shall be either an M-shaped or Z-shaped configuration, and constructed of 8-inch nominal carbon steel pipe. The jumper pipe shall be internally clad with Inconel 625 according to the requirements of ETP GP 36-20.

Pressure ratings, temperature ratings, and thermal insulation requirements for the well jumper equipment are included in Section 9.4, 9.5 and 9.6.

The well jumper shall include an acoustic sand detector as a back-up to the primary intrusive sand detector installed on the subsea tree.

### 10.4   Flowline Jumpers

The flowline jumpers will be supplied by the BP SPS standardization program. Detailed specifications for the well jumpers are included in the following SPS documents.

| Document Number | Document Title |
| --- | --- |
| ssst1-30-JU-SP-000005 | Jumper Functional Design Specification |
| ssst1-30-JU-SP-000004 | Jumper Connector Functional Design Specification |

The flowline jumpers shall be either an M-shaped or Z-shaped configuration, and constructed of 10-inch nominal carbon steel pipe. The jumper pipe shall be internally clad with Inconel 625 according to the requirements of ETP GP 36-20.

Pressure ratings, temperature ratings, and thermal insulation requirements for the flowline jumper equipment are included in Section 9.4, 9.5 and 9.6.

### 10.5   Flowline Terminations (PLETS/PLEMS)

The flowline terminations, (PLETS/PLEMs), will be supplied by the BP SPS standardization program. The flowline terminations shall be constructed of 10-inch nominal carbon steel pipe. All pipe and fittings shall be internally clad with Inconel 625 according to the requirements of ETP GP 36-20.

The flowline termination piping shall include 3D minimum bends in piggable sections.

Exhibit "D" Execution Version

Project Title:       Galapagos Area Development                                    ISAB1-10-PM-DC-000001
Project Description: Subsea Tie-back to Na Kika                                              Revision 0
Document Title:      Basis of Design Level 1: Subsea and Topside Facilities              Page 30 of 42
This document is valid only at time of printing. Copies printed from this site are considered uncontrolled.



Pressure ratings, temperature ratings, and thermal insulation requirements for the flowline termination equipment are included in Section 9.4, 9.5 and 9.6.

All valves on the flowline terminations shall be ROV operable. Automated valves shall be fail-open.

The flowline terminations shall be configured with a mudmat foundation.

## 10.6    Subsea Control System

The subsea control system will be supplied by the BP SPS standardization program. Detailed specifications for the subsea control system are included in the following SPS documents.

| Document Number | Document Title |
|---|---|
| ssst1-30-CT-DD-000001 | Scope of Supply Subsea Control System |
| ssst1-30-CT-SP-000006 | Subsea Control Module Functional Design Specification |

The subsea control system is a multiplexed electro-hydraulic control system suitable for long offset multi-well remote control and monitoring of the subsea facilities from the existing operator stations on the Na Kika platform.

A Subsea Control Module (SCM) shall be installed on each subsea tree. The Cameron SCM can operate hydraulic functions including gate valves, choke, SCSSV, and off tree gate valves.

The subsea tree is configured to accept another control module; the Downhole Control Module (DCM), which can be added to the tree if downhole flow control is included in later project stages.

The topsides equipment for the Cameron subsea control system shall be housed in two equipment racks to be installed in the subsea equipment room on Na Kika. These racks include the redundant subsea PCs, system monitoring PLCs, subsea power conditioning and distribution equipment, and subsea communication equipment.

The Cameron subsea control system (PCU) shall interface directly to the Honeywell Subsea Control Unit (SCU) via Ethernet. The SCU is connected directly to the PLCs for the Saftey, Process , Emergency, and HPU along with a direct Ethernet connection to the Experion HMI system. This configuration bypasses the Simrad system as used for the existing subsea control system interface on Na Kika.

The existing Na Kika process control and safety systems shall be upgraded to include the additional control capacity needed to operate the Galapagos equipment.

The Galapagos subsea system shall be operated via the Honeywell HMI as the existing Na Kika subsea facilities. The PCU and 3rd party servers (FRAMO, Roxar, and Schlumberger) will provide additional engineering and maintenance functions.

A block diagram of the Galapagos subsea control system is shown in Figure 10-1.

Exhibit "D" Execution Version

| Project Title: | Galapagos Area Development | ISAB1-10-PM-DC-000001 |
|---|---|---|
| Project Description: | Subsea Tie-back to Na Kika | Revision 0 |
| Document Title: | Basis of Design Level 1: Subsea and Topside Facilities | Page 31 of 42 |

This document is valid only at time of printing. Copies printed from this site are considered uncontrolled.



**Figure 10-1: Subsea Control System Block Diagram**

Exhibit "D" Execution Version



| Project Title: | Galapagos Area Development | ISAB1-10-PM-DC-000001 |
|---|---|---|
| Project Description: | Subsea Tie-back to Na Kika | Revision 0 |
| Document Title: | Basis of Design Level 1: Subsea and Topside Facilities | Page 32 of 42 |

This document is valid only at time of printing. Copies printed from this site are considered uncontrolled.



### 10.7   Subsea Control Umbilicals

The Subsea Control Umbilicals for Galapagos shall be designed to transmit hydraulic control fluid, chemicals, electrical power and communication signal from the Na Kika platform to the Galapagos Fields. The subsea umbilical architecture selected for Isabela includes 4 separate subsea umbilicals; a Main Umbilical and three In-Field Umbilicals.

The Main Umbilical will be suspended from the Na Kika platform in lazy wave configuration, then continuously laid on the seabed and terminated at a seabed location just South of Na Kika. Separate In-Field Umbilicals will extend from this location to the Isabela, Santa Cruz and Santiago Fields. Figure 10.2 shows cross-sections of the Isabela umbilicals. These layouts will evolve as detailed umbilical requirements are optimized.



**Figure 10-2:  Concept Cross-Sections of Galapagos Umbilicals**

Exhibit "D" Execution Version



| Project Title: | Galapagos Area Development | ISAB1-10-PM-DC-000001 |
|---|---|---|
| Project Description: | Subsea Tie-back to Na Kika | Revision 0 |
| Document Title: | Basis of Design Level 1: Subsea and Topside Facilities | Page 33 of 42 |

This document is valid only at time of printing.  Copies printed from this site are considered uncontrolled.



Figure 10-3 – Galapagos Umbilical Layout

Exhibit "D" Execution Version



| Project Title: | Galapagos Area Development | ISAB1-10-PM-DC-000001 |
|---|---|---|
| Project Description: | Subsea Tie-back to Na Kika | Revision 0 |
| Document Title: | Basis of Design Level 1: Subsea and Topside Facilities | Page 34 of 42 |

This document is valid only at time of printing.  Copies printed from this site are considered uncontrolled.



### 10.7.1 Main Umbilical

The Galapagos Main Umbilical will be suspended from the existing 18-inch ID pull in I-tube mounted on south west column of Na Kika platform designated as UW-2.   The same umbilical cross-sectional design shall be used for both dynamic and static portion of the Main Umbilical.  The route of the umbilical will be optimized to follow the flowline route.

The length of the Main Umbilical is approximately 15,000 feet, but this length will be optimized to allow the umbilical to be transported and installed from a standard installation reel, rather than a large umbilical installation carousel.

The Main Umbilical for Galapagos is designed to service four subsea wells. Table 10.1 below shows the function of Main Umbilical components.

**Table 10-1:  Main Umbilical Components**

| Description | Qty | Size | Rating | Note |
|---|---|---|---|---|
| LP Hydraulic Control Line | 2 | ½-inch | 10 K | Shared all wells |
| HP Hydraulic Control Line | 2 | ½-inch | 10 K | Shared all wells |
| Methanol | 4 | ¾-inch | 15 K | One/Well |
| Annulus Monitor | 1 | ¾-inch | 15 K | Shared all wells |
| Annulus Monitor Spare | 1 | ¾-inch | 15 K | Shared all wells |
| Corrosion Inhibitor (ChemSP3) | 1 | ¾-inch | 15 K | Shared with all Isabela wells |
| Scale / Corrosion Inhibitor | 4 | ½-inch | 15 K | One/Well |
| Asphaltene inhibitor | 4 | ½-inch | 15 K | One/Well |
| Hydraulic Spare | 1 | ½-inch | 15 K | Shared all wells |
| Corrosion Inhibitor (Chem SP2) | 1 | ¾-inch | 15 K | Shared with all Noble Fields |
| Chemical Spare (Chem SP1) | 1 | ½-inch | 15 K | Shared all wells |
| Quad Power Cable | 3 | 10 sqmm | 3.6 KV | |
| Fiber Optic Cable | 2 | 24 Fiber | | Single Mode Fiber |

### 10.7.2 In-Field Umbilical

The Isabela in-field umbilical is configured to operate up to two subsea wells.

The Isabela in-field umbilical will initiate adjacent to the SDU and will extend along the seabed some 28,000' to the Isabela Field.

Table 10-2 and Table 10-4 below shows the function of in-field umbilical components.

Exhibit "D" Execution Version



| Project Title: | Galapagos Area Development | ISAB1-10-PM-DC-000001 |  |
|---|---|---|---|
| Project Description: | Subsea Tie-back to Na Kika | Revision 0 | |
| Document Title: | Basis of Design Level 1: Subsea and Topside Facilities | Page 35 of 42 | |

This document is valid only at time of printing. Copies printed from this site are considered uncontrolled.

### Table 10-2: Isabela In-Field Umbilical Components

| Description | Qty | Size | Rating | Note |
|---|---|---|---|---|
| LP Hydraulic Control Line | 2 | ½-inch | 10 K | Shared all wells |
| HP Hydraulic Control Line | 2 | ½-inch | 10 K | Shared all wells |
| Methanol | 2 | ¾-inch | 15 K | One/Well |
| Annulus Monitor | 2 | ¾-inch | 15 K | Shared all wells |
| Annulus Monitor Spare | 2 | ¾-inch | 15 K | Shared all wells |
| Scale / Corrosion Inhibitor | 2 | ½-inch | 15 K | One/Well |
| Asphaltene inhibitor | 2 | ½-inch | 15 K | One/Well |
| Hydraulic Spare | 1 | ½-inch | 15 K | Shared all wells |
| Chemical Spare (Chem SP1) | 1 | ½-inch | 15 K | Shared all wells |
| Corrosion Inhibitor (Chem SP3) | 1 | ¾-inch | 15 K | Shared with all Isabela wells |
| Pair Power Cable | 2 | 10 sqmm | 3.6 KV | |
| Fiber Optic Cable | 2 | 24 Fiber | | Single Mode Fiber |
| DSL Comms Quad Cables | 6 | 4 sqmm | | |

### Table 10-4: SC/SA In-Field Umbilical Components

| Description | Qty | Size | Rating | Note |
|---|---|---|---|---|
| LP Hydraulic Control Line | 2 | ½-inch | 10 K | Shared all wells |
| HP Hydraulic Control Line | 2 | ½-inch | 10 K | Shared all wells |
| Methanol | 2 | ¾-inch | 15 K | One/Well |
| Annulus Monitor | 1 | ¾-inch | 15 K | Shared all wells |
| Annulus Monitor Spare | 1 | ¾-inch | 15 K | Shared all wells |
| Scale / Corrosion Inhibitor | 2 | ½-inch | 15 K | One/Well |
| Asphaltene inhibitor | 2 | ½-inch | 15 K | One/Well |
| Hydraulic Spare | 1 | ½-inch | 15 K | Shared all wells |
| Chemical Spare (Chem SP1) | 1 | ½-inch | 15 K | Shared all wells |
| Corrosion Inhibitor (Chem SP2) | 1 | ¾-inch | 15 K | Shared with all Noble Fields |
| Pair Power Cable | 2 | 10 sqmm | 3.6 KV | |
| Fiber Optic Cable | 2 | 24 Fiber | | Single Mode Fiber |
| DSL Comms Quad Cables | 6 | 4 sqmm | | |

Exhibit "D" Execution Version



| Project Title: | Galapagos Area Development | ISAB1-10-PM-DC-000001 |
|---|---|---|
| Project Description: | Subsea Tie-back to Na Kika | Revision 0 |
| Document Title: | Basis of Design Level 1: Subsea and Topside Facilities | Page 36 of 42 |

This document is valid only at time of printing. Copies printed from this site are considered uncontrolled.



### 10.7.3 Wall Thickness of the Tubes

The wall thickness of the umbilical tubes shall be determined per ISO 13628-5 to contain the pressure and to maintain the required ID.

### 10.7.4 Tube Material

The material of the tubes will be super duplex which meet the requirements of ASTM 789 for either UNS S32750 or S39274 chemistries.

### 10.7.5 Electrical Conductor Sizing

The conductors in the electrical power and communication cables shall be sized according to the requirements of the Cameron subsea control system.

### 10.7.6 Fiber Optic Cable

The optical fibers used for controls communication shall be integrated into dual redundant armored cables. Each cable shall include a set of (24) optic fibers encapsulated in a protective metallic tube. Optical fibers will be 125 micron single mode.

### 10.7.7 Design life

The fatigue life of dynamic portion of the umbilical considering all sources of damage shall meet or exceed the required design life of 20 years.

### 10.7.8 Clashing

Adjacent risers, umbilicals, mooring lines, and other objects shall have sufficient clearances to prevent clashing. Clashing analyses shall be performed for both operation and installation cases.

### 10.7.9 BP GoM Umbilical Specifications

The BP GoM Specifications covering subsea umbilicals are listed below.

| Document Number | Document Title |
|---|---|
| ssst1-30-UM-SP-000001 | GoM Development Umbilical Manufacturing Specifications |
| ssst1-30-UM-SP-000002 | GoM Development Super Duplex Stainless Tube Procurement Specifications |
| ssst1-30-UM-SP-000003 | GoM Development Electric and Fiber Optic Cable Procurement Specifications |

### 10.7.10 Industry Umbilical Specifications

Industry specifications applicable to the subsea umbilicals are listed below.

| Document Number | Document Title |
|---|---|
| ISO 13628-5 | Petroleum and Natural Gas Industries - Design and |

Exhibit "D" Execution Version



| Project Title: | Galapagos Area Development | ISAB1-10-PM-DC-000001 |
| Project Description: | Subsea Tie-back to Na Kika | Revision 0 |
| Document Title: | Basis of Design Level 1: Subsea and Topside Facilities | Page 37 of 42 |

This document is valid only at time of printing.  Copies printed from this site are considered uncontrolled.

| | Operation of Subsea Production Systems – Subsea Umbilicals |
|---|---|
| ASME B31.3 | Code for Chemical Plant and Refinery Piping |
| ASTM A789 | Standard Specification for Seamless and Welded Ferritic Austenitic Stainless Steel Tubing for General Service |
| IEC 60502-1 | Power Cables with Extruded Insulation and Their Accessories for Rated Voltages from 1 kV (Um=1.2kV) up to 30 kV (Um=36kV) – Part 1: Cables for rated Voltages of 1kV (Um=1.2kV) and 3kV (Um=3.6) – Edition 2: 042004 |
| IEC 60793-1 | Optical Fiber: Generic Specification |
| IEC 60794-1 | Fiber Optic Cables, Part 1: Generic Specification |
| ITU-T G.650 | Definition and Test Methods for the Relevant Parameters of Single Mode Fibers |
| ITU-T G.650 | Characteristic of Single Mode Optical Fiber Cable |

### 10.8   Subsea Distribution System

The subsea distribution system consists of all equipment used to terminate the subsea umbilicals and to distribute the various umbilical services to the subsea facilities.

The subsea distribution system will be supplied by the BP SPS standardization program. Detailed specifications for the subsea distribution system are included in the following SPS documents.

| Document Number | Document Title |
|---|---|
| ssst1-30-CT-DD-000001 | Scope of Supply Subsea Control System |

A Subsea Distribution Unit (SDU) will be installed on the seabed adjacent to the Main Subsea Umbilical Termination Assembly (Main UTA).  ROV installed flying leads will connect the various main umbilical circuits between the Main UTA and the SDU. The SDU includes the equipment, circuits, and connections necessary for interconnection of the Isabela, Santa Cruz, and Santiago In-field umbilical circuits.

The in-field umbilical is terminated, at either end, to an in-field Subsea Umbilical Termination Assembly (In-Field UTA).  These UTAs include the connection and termination hardware necessary to complete the umbilical circuits to the Isabela Field. ROV installed flying leads will connect the various in-field umbilical circuits between the In-Field UTA and the subsea trees.

### 10.9   Subsea Intervention

The use of BP Standard Equipment allows for common tooling and spares with other BP projects.  The BP SPS equipment offer has been designed with input from SS Operations.

### 10.10  Subsea Well Work-Over

The design of the BP SPS equipment such as the tree and well jumper systems has taken into account the requirements for landing a BOP stack on the tree.  For example, the height of the well jumper has been controlled to avoid interference with the BP



Project Title:          Galapagos Area Development                                        ISAB1-10-PM-DC-000001
Project Description:  Subsea Tie-back to Na Kika                                          Revision 0
Document Title:        Basis of Design Level 1: Subsea and Topside Facilities    Page 38 of 42
This document is valid only at time of printing. Copies printed from this site are considered uncontrolled.

frame. In addition, the retrievable MPFM system currently under design is being designed so as not to interfere with the BOP stack.

## 11.0   SUBSEA FLOWLINES

The subsea flowlines for Galapagos shall be an insulated pipe-in-pipe design. The production fluid will flow through an internal nominal 8-inch pipe. The exterior pipe will be nominal 12-inch. The pipe-in-pipe flowlines will have insulation in the annulus in order to extend to system cool-down to meet flow assurance and operational requirements.

Detailed design requirements for the Galapagos subsea flowlines are included in the following project documents.

| Document Number | Document Title |
| --- | --- |
| ISAB1-30-FL-DC-000001 | Galapagos Flowline Design Basis Document, Level 2 |
| ISAB1-30-FL-LD-000004 | Route Centerline and Survey Area Layout |

The governing codes for the flowline design shall be:

| Document Number | Document Title |
| --- | --- |
| ANSI B31.8 | Gas Transmission and Distribution Piping Systems |
| 30 CFR Part 250 | Oil and Gas and Sulfur Operations in the Outer Continental Shelf - Pipelines and Pipeline Rights-of-Way |

Operating pressure, temperature, and thermal insulation requirements for the subsea flowlines are given in Section 9.4, 9.5 and 9.6.

The primary BP practices that govern the design of the flowline are listed below.

| Document Number | Document Title |
| --- | --- |
| GP 43-07 | Selection of the Design Basis for Pipelines |
| DWGOM GP 43-08-01 | Selection and Use of Pipeline Codes and Standards |
| GP 43-17 | Pipeline Risk Management |
| DWGOM GP 43-21-01 | Offshore Pipeline System Design and Construction |
| GP 43-33 | Welding of Pipelines |
| GP 43-35 | Valves for Pipelines |
| GP 43-49 | Pipeline Integrity Management Systems (PIMS) |
| GP 43-50 | Pigging, Pig Launchers, and Receivers |
| GP 43-52 | Inspection and Integrity Assessment of Pipeline Systems |

## 12.0   PRODUCTION RISERS

The Galapagos production risers shall be insulated steel catenary risers (SCRs) suspended from existing riser baskets on the southwest side of the platform.

The risers shall be 8-inch nominal pipe for production flow.



| Project Title: | Galapagos Area Development | ISAB1-10-PM-DC-000001 |
| Project Description: | Subsea Tie-back to Na Kika | Revision 0 |
| Document Title: | Basis of Design Level 1: Subsea and Topside Facilities | Page 39 of 42 |

This document is valid only at time of printing. Copies printed from this site are considered uncontrolled.



Design requirements for the Galapagos production risers are included in the following document.

Additional information about the riser hang-off baskets is included in Section 14.7.

| Document Number | Document Title |
| --- | --- |
| ISAB1-30-RI-DC-000001 | Galapagos Riser Design Basis Document: Level 2 |
| GP 65-73 | Design of Steel Catenary Risers |

Operating pressure, temperature, and thermal insulation requirements for the production risers are given in Section 9.4, 9.5 and 9.6.

## 13.0   RISER BASE GAS LIFT SYSTEM

The subsea gas lift system shall be designed for riser base gas lift for each of the Galapagos production risers.

The system shall be sized to provide up to 10 mmscfd dry gas to each production flowline riser.

Operating pressure and temperature requirements for the production risers are given in Section 9.4 and 9.6.

Design requirements for the Galapagos riser base gas lift system are included in the following document.

| Document Number | Document Title |
| --- | --- |
| ISAB1-30-RI-DC-000002 | Galapagos Riser Base Gas Lift System Design Basis Document: Level 2 |

## 14.0   TOPSIDES FACILITIES

Design requirements for the Galapagos and Na Kika Phase 3 topsides facilities are included in the following document.

| Document Number | Document Title |
| --- | --- |
| ISAB1-20-GE-DC-000001 | Galapagos Topsides Facilities Design Basis Document: Level 2 |

The following table summarizes the topside facilities and functional requirements to be installed on Na Kika for the Galapagos production system.

**Table 14-1:  Greater Galapagos Topsides Facilities Description and Functional Requirements Summary**

| System | Design | Comments |
| --- | --- | --- |
| Launcher/Receiver | Dual unit as currently used on Na Kika<br>10 ksi design pressure<br>8-inch x 12-inch - length sized for launch and receipt of intelligent pigging tools. | Design pressure to be further evaluated. |
| Production Coolers | May be upstream or downstream of | Aerial Coolers |

Exhibit "D" Execution Version



| Project Title: | Galapagos Area Development | ISAB1-10-PM-DC-000001 |
|---|---|---|
| Project Description: | Subsea Tie-back to Na Kika | Revision 0 |
| Document Title: | Basis of Design Level 1: Subsea and Topside Facilities | Page 40 of 42 |

This document is valid only at time of printing.  Copies printed from this site are considered uncontrolled.



| | separators, Will size to enable Na Kika to operate at 100% Galapagos production with full sales flexjoint temperatures not to exceed 135F. | One for each separator Liquid cooling only |
|---|---|---|
| Separator | Dual separators – one per production riser. ASME 600 class design pressure for oil separator. ASME 900 class design pressure for gas / oil separator. 300 – 800 psig operating pressure for oil system. Two phase separation Sizing basis - 35 kbopd oil and 5 kbopd water at 725 GOR | Confirm GOR and water sizing basis. Slug sizing to be evaluated. Optimum operating pressure to be evaluated. |
| Electrical Distribution Upgrade | 4160V Transformers New 480V Bus and Switchgear New MCC New Subsea DC Control Battery Room. | |
| Gas Lift Compressor | Additional gas lift compressor to be installed on Na Kika. Galapagos sizing basis - 30 mmscfd minimum, 1,300 psig suction, 3,500 maximum psig discharge | Existing compressor has insufficient reserve capacity for Galapagos gas lift. |
| Chemical Injection | The topsides facility will be upgraded with additional methanol pumps and distribution equipment, and new pumps for other inhibitor chemicals (CI, SI, AI, Defoamer, and Demulsifier) used for Galapagos. | The pumps will be installed as two full modules that will be set on support beams that extend off of the East side of the platform |
| TUTA | The topsides umbilical termination equipment shall be configured as the existing Na Kika umbilical termination and tie-in systems. | The umbilical manifold skid may be eliminated to reduce footprint for this Project. |

### 14.1 Topside Facilities Dedicated to Nakika Phase 3 Development Project

Table 14.2 below summarizes the topside facilities and functional requirements to be installed on the Host for the Na Kika Phase 3 production system.

Table 14-2:  Na Kika Phase 3 Topsides Facilities Description and Functional Requirements Summary

| System | Design | Comments |
|---|---|---|
| Chemical Injection | The topsides facility will be upgraded with additional methanol pumps and distribution equipment, and new pumps for other inhibitor chemicals (CI, SI, AI, Defoamer, and Demulsifier) used for Na Kika Phase 3. | Very similar to Galapagos' design and delivery systems. |
| TUTA | The topsides umbilical termination equipment shall be configured as | Very similar to Galapagos' design and delivery systems. The umbilical |

Exhibit "D" Execution Version



| Project Title: | Galapagos Area Development | ISAB1-10-PM-DC-000001 |
| Project Description: | Subsea Tie-back to Na Kika | Revision 0 |
| Document Title: | Basis of Design Level 1: Subsea and Topside Facilities | Page 41 of 42 |

This document is valid only at time of printing. Copies printed from this site are considered uncontrolled.



| | | the existing Na Kika umbilical termination and tie-in systems. | manifold skid may be eliminated to reduce footprint for this Project. |

## 14.2  Production Process System

Utilization of the existing production facilities has declined as the initial fields have depleted and sufficient ullage exists for the expected maximum Isabela production rate.

Keeping with a similar configuration as the other oil fields, a dedicated 2 phase oil separator train will be installed for each Galapagos production flowline. From the Galapagos Production Separators, the process fluids will tie-in to the existing process facilities. Liquids will be routed to the Bulk Production Heat Exchanger, HBG-135, and the Freewater Knockout vessel, NAM-140.

Wet gas will be routed to the 1st stage of the Field Gas Compressors, CBA-1021, and CBA-1022.

## 14.3  Production Chemicals and Distribution System

Chemical injection pumps will be installed to inject the production chemicals required for flow assurance including corrosion and scale inhibitors. Additional chemical storage is not planned.

Additional distribution panels will be installed for the (7) additional methanol supply circuits to the subsea wells.

## 14.4  Hydraulic Supply

Additional distribution panels will be installed for LP and HP hydraulic supplies to the Isabela subsea umbilical. The high well temperatures at Galapagos will require that the existing subsea hydraulic fluid (HW-540) currently used on Na Kika be changed to a different fluid (Castrol TransAqua HT) with a higher temperature rating.

## 14.5  Utility Systems

All utility requirements will be supplied from the existing Na Kika facility.

## 14.6  Power

All electrical power requirements for Galapagos development will be supplied by the existing Na Kika power system.

## 14.7  Riser Baskets

The Galapagos production risers will be installed in existing riser baskets on the west pontoon. The existing baskets are configured for a west riser departure and are located on the inside of the pontoon.

The baskets were originally designed for maximum pipe size of 10-inch x 16-inch PiP using flex joints at the hang-off. In addition, the baskets (and the whole platform) were designed to meet the requirements of the old hurricane criteria.

Exhibit "D" Execution Version



| Project Title: | Galapagos Area Development | ISAB1-10-PM-DC-000001 |
| Project Description: | Subsea Tie-back to Na Kika | Revision 0 |
| Document Title: | Basis of Design Level 1: Subsea and Topside Facilities | Page 42 of 42 |

This document is valid only at time of printing. Copies printed from this site are considered uncontrolled.



The Galapagos application requires that the existing riser baskets support 8-inch wet insulated risers using stress joints at the surface hang-off. The existing baskets are now required to meet the loading imposed by the latest hurricane criteria in the recently updated design code. This loading is significantly higher than the conditions defined in the original design code.

### 14.8 Umbilical I-Tube

The Galapagos main umbilical will be installed through the existing 18-inch I-tube on the northwest corner of the southwest column.

An additional umbilical I-Tube may be used for the gas lift umbilical (IPU) riser.

### 15.0 ENVIRONMENTAL DATA

Environment design data for the Na Kika area are included in the following document.

| Document Number | Document Title |
|---|---|
| BP Document No. MC474-57-GE-RP-0001 | BP Gulf of Mexico Marine Team, "Na Kika Oceanographic and Meteorological Design Data Summary" |

### 16.0 GEOTECHNICAL DATA

Geotechnical design data for the Na Kika area are included in the following document.

| Document Number | Document Title |
|---|---|
| ISAB1-30-RI-DR-000001 | Shell Deepwater Services, Interoffice Memorandum, Subject: "Na Kika Soil Properties for Pipelines, Riser and Umbilical Design" |

**EXHIBIT "E"**

Attached to and made part of that certain Galapagos Area Loop Subsea Production System Construction and Operating Agreement dated effective December 1, 2011.

**ACCOUNTING PROCEDURE**

**I. GENERAL PROVISIONS**

1.    **Definitions**

All terms used in this accounting procedure ("Accounting Procedure"), if not otherwise defined below, shall have the same meaning as in the Galapagos Area Loop Subsea Production System Construction and Operating Agreement ("LSPSCOA") to which this Accounting Procedure is attached.

"**Affiliate**" as defined in the LSPSCOA and includes Affiliates as specified herein. Affiliates of the LSPS Operator, LSPS Owners and Satellite Lease Owners shall include, but not be limited to, those entities or groups listed on Appendix A to this Exhibit "E" or their successors.

"**Catastrophe**" is defined as a sudden calamitous event bringing damage, loss, or destruction to property or the environment, such as an oil spill, blowout, explosion, fire, storm, hurricane, or other disaster.

"**Controllable Material**" means Material which at the time of acquisition or disposition is so classified in the Material Classification Manual as most recently recommended by the Council of Petroleum Accountants Societies.

"**First Level Supervision**" means those employees whose primary function in Joint LSPS Operations is the direct oversight of the LSPS Operator's employees and/or contract labor directly employed On-site in a field operating capacity.  First Level Supervision functions may include, but are not limited to:

- responsibility for field employees and contract labor engaged in activities that can include field operations, maintenance, construction, well remedial work, equipment movement and drilling;
- responsibility for day-to-day direct oversight of rig operations;
- responsibility for day-to-day direct oversight of construction operations;
- coordination of job priorities and approval of work procedures;
- responsibility for optimal resource utilization (equipment, Materials, personnel);
- responsibility for meeting production and field operating expense targets;

- representation of the Parties in local matters involving community, vendors, regulatory agents and landowners, as an incidental part of the supervisor's operating responsibilities;
- responsibility for all emergency responses with field staff;
- responsibility for implementing safety and environmental practices;
- responsibility for field adherence to company policy;
- responsibility for employment decisions and performance appraisals for field personnel; and
- oversight of sub-groups for field functions such as electrical, safety, environmental, telecommunications, which may have group or team leaders.

"**Joint LSPS Account**" means the account showing the charges paid and credits received in the conduct of the Joint LSPS Operations and which are to be shared by the Parties.

"**Joint LSPS Operations**" means all operations necessary or proper for the development, operation, protection, maintenance, repair, abandonment and restoration of the Joint LSPS Property.

"**Joint LSPS Property**" means the real and personal property subject to the LSPSCOA to which this Accounting Procedure is attached.

"**Major Construction**" shall mean the construction and installation of fixed assets, the expansion of fixed assets, and any other project clearly discernible as a fixed asset required for the development and operation of the Joint Property, or in the dismantlement, abandonment, removal, and restoration of platforms, production equipment, and other operating facilities.

"**Material**" means personal property, equipment, supplies, or consumables acquired or held for use by the Joint LSPS Property.

"**Non-LSPS Operators**" means one (1) or more of the following (exclusive of the LSPS Operator): (a) Satellite Lease Operator(s), on behalf of its Satellite Lease Owners, and/or (b) LSPS Owners, as applicable and as stipulated in the LSPSCOA.

"**Offshore Facilities**" means the LSPS, platforms and support systems such as oil and gas handling facilities, living quarters, offices, shops, cranes, electrical supply equipment and systems, fuel and water storage and piping, heliport, marine docking installations, communication facilities, navigation aids, and other similar facilities necessary in the conduct of offshore operations.

"**Off-site**" means any location that is not considered On-site as defined in this Accounting Procedure.

"**On-site**" means on the Joint LSPS Property when in direct conduct of Joint LSPS Operations. The term "On-site" shall also include, but not be limited to a platform, the

2

LSPS, that portion of Offshore Facilities, Shore Base Facilities, fabrication yards, Material storage facilities, staging areas from which Joint LSPS Operations are conducted, and other facilities, such as Remote Technology Centers, regardless of its location and whether the facility or equipment is owned by the Joint LSPS Account.

"**Personal Expenses**" means travel, transportation, meals, accommodations, temporary living expenses, relocation costs, and other reimbursable expenses of LSPS Operator's employees, employees of Affiliates, or of Third Parties performing chargeable functions.

"**Remote Technology Center (RTC)**" means a facility, regardless of whether located On-site or Off-site, having dedicated technical and/or operations staffing, that directly monitors and/or controls Joint LSPS Operations on a real-time basis.

"**Shore Base Facilities**" means onshore support facilities that during development, maintenance and producing operations provide such services to the Joint LSPS Property as receiving and transshipment point for supplies, Materials and equipment; debarkation point for production personnel and services,; communication, scheduling and dispatching center; other associated functions benefiting the Joint LSPS Property.

"**Technical Employees**" means those employees having special and specific engineering, geological or other professional skills, and whose primary function in Joint LSPS Operations is the handling of specific operating conditions and problems for the benefit of the Joint LSPS Property.  Technical Employees include employees of the Parties, Affiliates and Third Parties providing services in support of Joint LSPS Operations.

2.   **Statements and Billings**

    A.   The LSPS Operator shall bill the appropriate Non-LSPS Operators on or before the last day of the month for their proportionate share of the Joint LSPS Account for the preceding month.  Such bills shall be accompanied by statements which identify the authority for expenditure, lease or facility, and all charges and credits summarized by appropriate categories of investment and expense.  Controllable Material may be summarized by major Material classification.  Audit exceptions shall be separately and clearly identified.

3.   **Advances and Payments by Non-LSPS Operators**

    A.

        Unless otherwise provided in the LSPSCOA, the LSPS Operator may require the Non-LSPS Operator to advance their share of estimated cash outlay for the succeeding month's operation. Any billing for such advance

shall be payable within thirty (30) days after receipt of the advance request or by the first day of the month for which the advance is required, whichever is later. The LSPS Operator shall adjust each monthly billing to reflect advances received from the Non-LSPS Operators for such month.

B.    Each LSPS Owner shall pay its Equity Interest share of all bills, except those expenses and/or revenues which are expressly provided in the LSPSCOA as applicable to only certain LSPS Owners within thirty (30) days of receipt date. Each Satellite Lease Operator on behalf of its Satellite Lease Owners shall pay its proportionate share of all bills within thirty (30) days of receipt date. If the payment due date for such bill falls on a weekend or on a statutory holiday, the payment will be due on the preceding business day. If payment is not made within such time, the unpaid balance shall bear interest compounded monthly at the prime rate published by the Wall Street Journal on the first day of each month the payment is delinquent, plus three percent (3%), per annum, or the maximum contract rate permitted by the applicable usury Laws governing LSPSCOA whichever is the lesser. In addition, the delinquent Party shall bear attorney's fees, court costs, and other costs in connection with the collection of unpaid amounts. If the Wall Street Journal ceases to be published or discontinues publishing a prime rate, the unpaid balance shall bear interest compounded monthly at the prime rate published by the Federal Reserve plus three percent (3%), per annum. Interest shall begin accruing on the first day of the month in which the payment was due. Payment shall not be reduced or delayed as a result of inquiries or anticipated credits unless the LSPS Operator has agreed.

4.    **Adjustments**

A.    Payment of any such bills shall not prejudice the right of any Party to protest or question the correctness thereof, provided, however, all bills and statements (including payout status statements) related to expenditures rendered during any calendar year shall conclusively be presumed to be true and correct after twenty-four (24) months following the end of any such calendar year, unless within the said period a Party takes specific detailed written exception thereto and makes claim for adjustment.

B.    All adjustments initiated by the Parties except those described in (1) through (5) below are limited to the twenty-four (24) month period following the end of the calendar year in which the original charge appeared or should have appeared on the Joint LSPS Account statement or payout status statement. Adjustments made beyond the twenty-four (24) month period are limited to the following:

4

      (1)  a physical inventory of Controllable Material as provided for in Section V;

      (2)  an offsetting entry (whether in whole or in part) which is the direct result of a specific joint interest audit exception granted by the Party relating to another property;

      (3)  a government/regulatory audit;

      (4)  changes in working interest ownership; and

      (5)  volume or value reallocation pursuant to the terms or procedures of the LSPSCOA which may impact the volume or value used to calculate billings and/or payments for the Joint LSPS Account.

## 5.   Expenditure Audits

A.   A Non-LSPS Operator, upon notice in writing to LSPS Operator, LSPS Owners, and other Non-LSPS Operators, shall have the right to audit the LSPS Operator's accounts and records relating to the Joint LSPS Account for any calendar year within the twenty-four (24) month period following the end of such calendar year, provided, however, conducting an audit shall not extend the time for the taking of written exception to and the adjustment of accounts as provided for in Paragraph 4 of this Section I. Where there are two (2) or more Non-LPSP Operators, such Non-LSPS Operators shall make every reasonable effort to conduct a joint audit in a manner which will result in a minimum of inconvenience to LSPS Operator. The LSPS Owners and LSPS Operator shall bear no portion of the Non- LSPS Operator's audit costs incurred under this paragraph unless agreed to by the LSPS Owners and/or LSPS Operator. The audits shall not be conducted more than once each year without prior approval of the LSPS Owners and/or LSPS Operator, whichever is applicable, except upon the resignation or removal of the LSPS Operator, and shall be made at the expense of those Non-LSPS Operators approving such audit. The lead audit company's audit report shall be issued within one hundred and eighty (180) days after completion of the audit field work provided, however, the one hundred and eighty (180) day time period shall not extend the twenty-four (24) month requirement for taking specific detailed written exception as required by Paragraph 4.A. above. All claims shall be supported with sufficient documentation. Failure to issue the report within the prescribed time or to take specific written exception within the twenty-four (24) month period will preclude the Non-LSPS Operator from taking exception to any charge billed within the time period audited.

B.   A timely filed audit report or any timely submitted response thereto shall suspend the running of any applicable statute of limitations regarding claims made in the audit report. While any audit claim is being resolved, the applicable statute of limitations will be suspended. Failure, however, to comply with the deadlines provided herein shall cause the statue to commence running again.

Exhibit "E" Execution Version

The LSPS Owners and/or LSPS Operator, whichever is applicable, shall allow or deny all exceptions in writing to an audit report within one hundred and eighty (180) days after receipt of such report. Denied exceptions should be accompanied by a substantive response.

C.  The lead audit company shall reply to the LSPS Owners and/or LSPS Operator's response to an audit report within ninety (90) days of receipt, and the LSPS Owners and/or LSPS Operator shall reply to the lead audit company's follow-up response within ninety (90) days of receipt.

D.  The lead audit company or LSPS Owners and/or LSPS Operator may call an audit resolution conference for the purpose of resolving audit issues/exceptions that are outstanding at least eighteen (18) months after the date of the audit report. The meeting will require one (1) month's written notice to the LSPS Owners and/or LSPS Operator and all audit participants, be held at the LSPS Owners and/or LSPS Operator's office or other mutually agreed upon location, and require the attendance of representatives of the LSPS Owners and/or LSPS Operator and each audit participant responsible for the area(s) in which the exceptions are based and who have authority to resolve issues on behalf of their company. The lead audit company will coordinate the response/position of the Non-LSPS Operators and continue to maintain its traditional role throughout the audit resolution process.

Attendees will make reasonable efforts to resolve outstanding issues, and each Party will be required to present substantive information supporting its position. An audit resolution conference may be held as often as agreed to by the Parties. Issues unresolved at one conference can be discussed at subsequent conferences until each such issue is resolved.

E.  Non-LSPS Operators' charges shall be subject to the above audit requirements.

F.  The preceding provisions shall not preclude the Parties from conducting revenue audits.

6.  **Approval by Parties**

Where an approval or other agreement of the Parties is expressly required under other sections of this Accounting Procedure and if the LSPSCOA to which this Accounting Procedure is attached contains no contrary provisions in regard thereto, LSPS Operator shall notify all Parties of the proposal, and the agreement or approval of a Majority in Interest of the Parties shall be controlling.

6

## II. DIRECT CHARGES

The LSPS Operator shall directly charge the Joint LSPS Account with the following items in accordance with the LSPSCOA:

**1.   Rentals and Royalties**

Lease rentals, royalties, rights of use and easements paid by the Lease Operator, on behalf of Joint LSPS Operations.

**2.   Labor**

A.   Salaries and wages, including incentive compensation programs as set forth in COPAS MFI-37 (Chargeability of Incentive Compensation Programs), for:

   (1)   LSPS Operator's field employees directly employed in the conduct of Joint LSPS Operations;

   (2)   LSPS Operator's employees directly employed on Shore Base Facilities, Offshore Facilities, Remote Technology Centers, warehouses or other facilities serving the Joint LSPS Property if such costs are not included in rates charged under Section II.6 (Equipment and Facilities Furnished by LSPS Operator);

   (3)   LSPS Operator's employees providing First Level Supervision; and

   (4)   Salaries and wages of Technical Employees providing On-site and Off-site technical services for Joint LSPS Operations.

B.   Cost of holiday, vacation, sickness and disability benefits and other customary allowances paid to employees whose salaries and wages are chargeable to the Joint LSPS Account under Paragraph 2 of this Section II, excluding severance payments or other termination allowances.   Such costs under this Paragraph 2.B. may be charged on a "when and as paid basis" or by "percentage assessment" on the amount of salaries and wages chargeable to the Joint LSPS Account under Paragraph 2 of this Section II. If percentage assessment is used, the rate shall be based on the LSPS Operator's cost experience.

C.   Expenditures or contributions made pursuant to assessments imposed by governmental authority that are applicable to costs chargeable to the Joint LSPS Account under Section II.2.

D.   Personal Expenses of personnel whose salaries and wages are chargeable to the Joint LSPS Account under Paragraph 2 of this Section 2.

E. Relocation costs incurred in transferring to the Joint LSPS Property personnel whose salaries and wages are chargeable to the Joint LSPS Account under Section II.2. Relocation costs may only be charged for a domestic employee transferred within the United States and assigned to the Joint LSPS Property full-time for a minimum of twelve (12) months.

F. Training costs as specified in COPAS MFI-35 (Charging of Training Costs to the Joint LSPS Account) for personnel whose salaries and wages are chargeable under Section II.2. This training charge shall include the wages, salaries, training course cost, and Personal Expenses incurred during the training. The training cost shall be charged or allocated to the property or properties directly benefiting from the training. The cost of the training course shall not exceed prevailing commercial rates, where such rates are available.

G. Current cost of established plans for employee benefits, as described in COPAS MFI-27 (Employee Benefits Chargeable to Joint LSPS Operations and Subject to Percentage Limitation), applicable to the LSPS Operator's or LSPS Owners' labor costs chargeable to the Joint LSPS Account under Sections II.2, based on the LSPS Operator's or LSPS Owners actual cost not to exceed the employee benefits limitation percentage most recently recommended by COPAS.

H. Award payments to employees, whose salaries and wages are chargeable under Section II.2 to the extent such awards pertain to services provided for activities or operations conducted under the LSPSCOA.

3. **Material**
Material purchased or furnished by the LSPS Operator for Joint LSPS Operations as provided under Section IV. Only such Material shall be purchased for or transferred to the Joint LSPS Property as may be required for immediate use or is reasonably practical and consistent with efficient and economical operations. The accumulation of surplus stocks shall be avoided.

4. **Transportation**
Transportation of the LSPS Operator or LSPS Owners' employees, Affiliates, or contractor personnel necessary for Joint LSPS Operations. Transportation of Material between the Joint LSPS Property and another property, or from LSPS Operator's or LSPS Owners' warehouse or other storage point to the Joint LSPS Property, shall be charged to the receiving property, and transportation of Material from the Joint LSPS Property to LSPS Operator's or LSPS Owners' warehouse or other storage point shall be paid for by the Joint LSPS Property using the methods in Section IV.1 for freight associated with Direct Purchases and Section IV.2.B for freight associated with transfers.

Exhibit "E" Execution Version

5. **Services**

The cost of goods, services, equipment and utilities provided by Third Parties except for goods and services covered by Section III (Overhead), or Section II.7 (Affiliates), or Section II.9 (Legal Expense). Awards paid to contractors shall be chargeable to the extent such awards pertain to services provided for activities or operations conducted under this LSPSCOA.

6. **Equipment and Facilities Furnished by LSPS Operator**

In the absence of a separately negotiated agreement, equipment and facilities furnished by the LSPS Operator or LSPS Owners will be charged as follows and / or as indicated in Appendix B to this Exhibit E:

A.   Operator shall charge the Joint LSPS Account for use of LSPS Operator-owned equipment and facilities, including but not limited to Shore Base Facilities, Offshore Facilities, Remote Technology Centers, warehouses used to store Joint LSPS Property, or other facilities at rates commensurate with the costs of ownership and operation. Equipment and facilities owned by the LSPS Operator will be charged to the Joint LSPS Account at the LSPS Operator's actual cost. Such costs may include all expenses which would be chargeable pursuant to this Section II if such equipment were jointly owned, depreciation using straight line depreciation method, interest on investment (less gross accumulated depreciation) not to exceed twelve percent (12%) per annum. In addition, for platforms, subsea production systems, and production facilities the rate may include an element of the estimated cost of abandonment, reclamation and dismantlement. Charges for depreciation will no longer be allowable once the equipment has been fully depreciated. Actual cost shall not exceed the average prevailing commercial rate.

B.   In lieu of charges in Paragraph 6.A. above, equipment and facilities, including Shore Base and Offshore Facilities, owned by the LSPS Operator may be charged to the Joint LSPS Account at the average prevailing commercial rate for such equipment or facility. If an average commercial rate is used to bill the Joint LSPS Account, the LSPS Operator shall adequately document and support such rate and periodically review and update the rate.

C.   When applicable for LSPS Operator owned or leased motor vehicles, the LSPS Operator shall use rates published by the Petroleum Motor Transport Association or such other organization recognized by COPAS as the official source of such rates. When such rates are not available, the LSPS Operator shall comply with the provisions of Paragraph 6.A. or 6.B. above.

## 7. Affiliates

Affiliate Materials, facilities, and services provided for the Joint LSPS Operations shall be chargeable to the Joint LSPS Account as herein provided.

A. An Affiliate of the LSPS Operator providing services for Joint LSPS Operations regardless of work location, shall be chargeable to the Joint LSPS Account at the rate and/or amount that the Affiliate customarily charges the LSPS Operator for its services.

B. The Parties agree that Affiliate records relating to Materials, facilities or services provided by an Affiliate are not subject to and will not be made available for audit. However, if Affiliate charges are based on rates, the audit of the Affiliate charges shall be limited to verification that the units or basis to which the rates were applied are correct. Upon request by any Party, the LSPS Operator or LSPS Owners shall furnish a certificate of its independent accounting firm confirming that rates or amounts charged by an Affiliate reflect actual cost and do not include any element of profit.

## 8. Damages and Losses To Joint LSPS Property

Costs or expenses necessary to repair, replace or abandon the Joint LSPS Property resulting from damages or losses incurred, except to the extent such costs result from a Party's gross negligence or willful misconduct.

## 9. Legal Expense

The LSPS Operator may not charge for services of the LSPS Operator's legal staff or fees and expenses of outside attorneys unless approved by the Parties, except that title examinations and curative work shall be chargeable, unless otherwise provided for in the LSPSCOA. Other types of legal expense, other than attorney fees, such as recording fees and handling, settling, or otherwise discharging litigation, claims, and liens necessary to protect or recover the Joint LSPS Property shall be chargeable

## 10. Taxes and Permits

All taxes and permits of every kind and nature, assessed or levied upon or in connection with the Joint LSPS Property, or the production therefrom, and which have been paid by the LSPS Operator for the benefit of the Parties, including penalties and interest, except to the extent the penalties and interest result from the LSPS Operator's gross negligence or willful misconduct

If ad valorem taxes paid by the LSPS Operator are based in whole or in part upon separate valuations of each Party's working interest, then notwithstanding any

contrary provisions, the charges to Parties will be made in accordance with the tax value generated by each Party's working interest.

**11.  Insurance**

Net premiums paid for insurance required to be carried for Joint LSPS Operations for the protection of the Parties.  If Joint LSPS Operations are conducted at locations where the LSPS Operator acts as self-insurer in regard to its worker's compensation and employer's liability insurance obligation, the LSPS Operator shall charge the Joint LSPS Account manual rates for the risk assumed in its self-insurance program as regulated by the jurisdiction governing the Joint LSPS Property.  In the case of offshore operations in federal waters, the manual rates of the adjacent state shall be used for personnel performing work On-site, and such rates shall be adjusted for offshore operations by the U.S. Longshoreman and Harbor Workers (USL&H) or Jones Act surcharge, as appropriate.

**12.  Communications**

Costs of acquiring, leasing, installing, operating, repairing, maintaining dismantling or abandoning communication facilities or systems including radio, microwave, satellite and fiber optics cable systems / facilities between the Joint LSPS Property and the LSPS Operator's offices.  In the event communication facilities systems serving the Joint LSPS Property are LSPS Operator-owned, charges to the Joint LSPS Account shall be made as provided in Paragraph 6 of this Section II.

**13.  Computer Systems**

Costs of purchasing, leasing, installing, operating, repairing, maintaining, dismantling or abandoning computer systems including hardware, software, system support and personnel in direct support of Joint LSPS Operations.  If the computer systems serving the Joint LSPS Property are LSPS Operator-owned, charges to the Joint LSPS Account shall be made as provided in Section II.6 (Equipment and Facilities Furnished by LSPS Operator

**14.  Ecological, Environmental and Safety**

A.  Costs incurred for technical services, engineering and drafting to comply with ecological, environmental and safety Laws or standards recommended by Occupational Safety Hazards Act (OSHA) or other regulatory authorities.

Ecological and Environmental costs incurred for the benefit of the Joint LSPS Property resulting from laws, rules, regulations, or orders for archaeological and geophysical surveys relative to identification and

11                                                     Exhibit "E" Execution Version

protection of cultural resources and/or other environmental or ecological surveys as may be required by the BOEMRE or other regulatory authority.

Also, costs to provide or have available pollution containment and removal equipment plus actual costs of control and cleanup and resulting responsibilities of oil and other spills as well as discharges from permitted outfalls as required by applicable laws and regulations are chargeable. Ecological and environmental costs incurred by the LSPS Operator as deemed by the LSPS Operator to be appropriate for prudent operations are also chargeable to the extent such costs directly benefit Joint LSPS Operations.

B.    Safety costs incurred for the benefit of the Joint LSPS Property to conduct and/or implement safe operational practices/guidelines as a result of laws, rules, regulations, or orders or as recommended for voluntary compliance. Examples are the requirements mandated by the Occupational Safety and Hazards Act (OSHA), Safety and Environmental Management Program (SEMP), Process Safety Management (PSM), and/or requirements which may be mandated/recommended by similar programs or by other current or successor regulatory agencies. Safety costs incurred by the LSPS Operator as deemed by the LSPS Operator to be appropriate for prudent operations are also chargeable to the extent such costs directly benefit Joint LSPS Operations.

C.    Environmental, ecological, and safety training costs for personnel whose time would otherwise be chargeable under Paragraph 14.A or B above, regardless of whether training is mandated by statute or regulatory agency, is chargeable to the Joint LSPS Account.

D.    Safety and other team accomplishment awards for personnel chargeable to the Joint LSPS Account shall be chargeable to the Joint LSPS Account.

In the event of a conflict between the provisions of this Section II, Paragraph 14 and Section III, Paragraphs i. and ii., Section II, Paragraph 14 shall prevail.

15.    **Abandonment and Reclamation**

Costs incurred for abandonment and reclamation of the Joint LSPS Property, including costs required by governmental, regulatory, or judicial authority.

16.    **Other Expenditures**

Any other expenditure not covered or dealt with in the foregoing provisions of this Section II, or in Section III and which is of direct benefit to the Joint LSPS Property and is incurred by the LSPS Operator in the necessary and proper conduct of the Joint LSPS Operations.

Exhibit "E" Execution Version

# III. OVERHEAD

As compensation for administrative, supervision, office services and warehousing costs, the LSPS Operator shall charge the Joint LSPS Account in accordance with this Section III.

Unless otherwise agreed to by the LSPS Owners, such charge shall be in lieu of costs and expenses of all offices and salaries or wages plus applicable burdens and expenses of all personnel, except those directly chargeable under Section II. The cost and expense of services from outside sources in connection with matters of taxation, traffic, accounting or matters before or involving governmental agencies shall be considered as included in the overhead rates provided for in this Section III unless directly chargeable under Section II or such costs are agreed to by the Parties as a direct charge to the Joint LSPS Account.

    i.    Except as otherwise provided in Paragraph 1 of this Section III, the salaries, wages and Personal Expenses of Technical Employees and/or the cost of professional consultant services and contract services of technical personnel directly employed on the Joint LSPS Property:
            ( ) shall be covered by the overhead rates.
            (X) shall not be covered by the overhead rates.

    ii.    Except as otherwise provided in Paragraph 1 of this Section III, the salaries, wages and Personal Expenses of Technical Employees and/or costs of professional consultant services and contract services of technical personnel either temporarily or permanently assigned to or directly employed in the operation of the Joint LSPS Property:
            ( ) shall be covered by the overhead rates.
            (X) shall not be covered by the overhead rates.

1. **Overhead – Operating, Major Construction and Catastrophe**

As compensation for overhead in connection with Operating, Major Construction and Catastrophe operations, the LSPS Operator shall charge on a:

(X) Percentage Basis as follows:

2. **Overhead - Operating**

An Operating rate of thirteen percent (13%) shall be applied to all Operating Expenses in connection with Joint LSPS Operations, except those Operating Expenses in connection with Major Construction and Catastrophes.

All salvage credits, the value of injected substances purchased for secondary recovery and all taxes and assessments which are levied, assessed and paid upon

         Exhibit "E" Execution Version

the mineral interest in and to the Joint LSPS Property shall be excluded from the calculation of overhead.

**3.     Overhead - Major Construction and Capital Expenditures**

To compensate the LSPS Operator for overhead costs incurred in the construction and installation of  fixed assets, the expansion of fixed assets, and any other project clearly discernible as a fixed asset required for the development and operation of the Joint LSPS Property, or in the dismantling for abandonment of platforms and related production facilities, the LSPS Operator shall either negotiate a rate prior to the beginning of construction, or shall charge the Joint LSPS Account for overhead for any Major Construction project and Capital Expenditures.

The LSPS Operator will charge engineering, design and drafting costs related to the project directly to the Joint LSPS Account. The Major Construction and Capital Expenditures overhead rate shall be four percent (4 %) of total costs.

Total cost shall mean the gross cost of any one project.  For the purpose of this paragraph, the component parts of a single project shall not be treated separately.

In the event of any conflict between the provisions of this Section III and any of the provisions under Section II, the provisions of Section III shall govern.

**4.     Overhead - Catastrophe**

To compensate LSPS Operator for overhead costs incurred in the event of expenditures resulting from a single occurrence due to oil spill, blowout, explosion, fire, storm, hurricane, or other catastrophes as agreed to by the Parties, which are necessary to restore the Joint LSPS Property to the equivalent condition that existed prior to the event causing the expenditures, LSPS Operator shall either negotiate a rate prior to charging the Joint LSPS Account or shall charge the Joint LSPS Account for overhead based on the following:

Catastrophe overhead will be charged at the same applicable rates and terms as Section III, Paragraph 3 (Major Construction and Capital Expenditures).

Expenditures subject to the overheads above will not be reduced by insurance recoveries, and no other overhead provisions of this Section III shall apply.

**5.     Amendment of Rates**

The Overhead rates provided for in this Section III may be amended from time to time only by mutual agreement between the Parties hereto, if in practice, the rates are found to be insufficient or excessive.

## IV. MATERIAL PURCHASES, TRANSFERS AND DISPOSITION

The LSPS Operator is responsible for Joint LSPS Account Material and shall make proper and timely charges and credits for direct purchases, transfers, and dispositions. The LSPS Operator normally provides all Material for use on the Joint LSPS Property but does not warrant the Material furnished. At the LSPS Operator's option, Material may be supplied by Non-LSPS Operators.

**1.    Direct Purchases**

Direct purchases shall be charged to the Joint LSPS Account at the price paid by the LSPS Operator after deduction of all discounts received. A direct purchase is determined to occur when an agreement is made between the LSPS Operator and a Third Party for the acquisition of Materials for a specific well site or location. Material provided by the LSPS Operator under "vendor stocking programs," where the initial use if for a Joint LSPS Property and title of the Material does not pass from the vendor until usage, is considered a direct purchase. If Material is found to be defective or is returned to the vendor for any other reason, credit shall be passed to the Joint LSPS Account when adjustments have been received by the LSPS Operator from the manufacturer, distributor, or agent.

**2.    Transfers**

A transfer is determined to occur when the LSPS Operator furnishes Material from its storage facility or from another operated property. Additionally, the LSPS Operator has assumed liability for the storage costs and changes in value and has previously secured and held title to the transferred Material. Similarly, the removal of Material from a Joint LSPS Property to the LSPS Operator's facility or to another operated property is also considered a transfer. Material that is moved from the Joint LSPS Property to a temporary storage location pending disposition may remain charged to the Joint LSPS Account and is not considered a transfer.

A.    Pricing

The value of Material transferred to/from the Joint LSPS Property should generally reflect the market value on the date of transfer. Transfers of new Material will be priced using one of the following new Material bases:

(1)    Published prices in effect on date of movement as adjusted by the appropriate COPAS Historical Price Multiplier (HPM) or prices provided by the COPAS Computerized Equipment Pricing System (CEPS). The HPMs and the associated date of published price to

which they should be applied will be published by COPAS periodically.

    (a)    For oil country tubulars and line pipe, the published price shall be based upon eastern mill (Houston for special end) carload base prices effective as of date of movement, plus transportation cost as defined in Section IV, Paragraph 2.B.

    (b)    For other Material, the published price shall be the published list price in effect at date of movement, as listed by a supply store nearest the Joint LSPS Property (where Material is normally available) capable of supplying the Material, or point of manufacture, plus transportation costs as defined in Section IV, Paragraph 2.B.

    (2)    A price quotation that reflects a current realistic acquisition cost may be obtained from a supplier/manufacturer.

    (3)    Historical purchase price may be used, providing it reflects a current realistic acquisition cost on date of movement. Sufficient price documents should be available to Non-operators for purposes of verifying Material transfer valuation.

    (4)    As agreed to by the Parties.

    (5)    When higher than specification grade or size tubulars from LSPS Operator's inventory are used on the Joint LSPS Property, LSPS Operator shall charge the Joint LSPS Account at the equivalent price for well design specification tubulars.

**B.**    Freight

Transportation costs should be added to the Material transfer price based on one of the following:

    (1)    Transportation costs for oil country tubulars and line pipe shall be calculated using the distance from eastern mill to the railway receiving point nearest the Joint LSPS Property based on the carload weight basis as recommended by COPAS in Bulletin 21 and current interpretations.

    (2)    Transportation costs for special mill items shall be calculated from that mill's shipping point to the railway receiving point nearest the Joint LSPS Property. For transportation costs from other than eastern mills, the thirty thousand (30,000) pound Specialized Motor Carriers interstate truck rate shall be used. Transportation

costs for macaroni tubing shall be calculated based on the Specialized Motor Carriers rate per weight of tubing transferred to the railway receiving point nearest the Joint LSPS Property.

(3)   Transportation costs for special end tubular goods shall be calculated using the thirty thousand (30,000) pound Specialized Motor Carriers interstate truck rate from Houston, Texas, to the railway receiving point nearest the Joint LSPS Property.

(4)   Transportation costs for Material other than that described in Section IV, Paragraphs 2.B(1) through (3), if applicable, shall be calculated from the supply store or point of manufacture, whichever is appropriate, to the railway receiving point nearest the Joint LSPS Property.

C.   Condition

(1)   Condition "A" - New and unused Material in sound and serviceable condition shall be charged at one hundred percent of the price as determined in Section IV, Paragraphs 2.A and B. Material transferred from the Joint LSPS Property that was not placed in service on the Joint LSPS Property shall be credited as charged without gain or loss.  Any unused Material that was charged to the Joint LSPS Account through a direct purchase will be credited to the Joint LSPS Account at the original cost paid less restocking charge. All refurbishing costs required or necessary to return the Material to original condition, or to correct handling or transportation damages and other related costs will be born by the divesting property.  The Joint LSPS Account is responsible for Material preparation, handling and transportation costs for new and unused Material charged to the property either through a direct purchase or transfer. Any preparation costs performed, including any internal or external coating and wrapping, will be credited on new Material provided these costs were not repeated for the receiving property.

(2)   Condition "B" - Used Material in sound and serviceable condition and suitable for reuse without reconditioning shall be priced at the condition percentage most recently recommended by COPAS times the price determined by the pricing guidelines in Section IV, Paragraphs 2.A and B.  All refurbishing costs required or necessary to return the Material to Condition B, or to correct handling or transportation damages and other related costs will be born by the divesting property.

Exhibit "E" Execution Version

If the Material was originally charged to the Joint Account as used Material and placed in service on the Joint LSPS Property, the Material will be credited at the condition percentage most recently recommended by COPAS times the price as determined in Section IV, Paragraphs 2.A and B.

Used Material transferred from the Joint LSPS Property that was not placed in service on the property shall be credited as charged without gain or loss.

(3) Condition "C" - Material that is not in sound and serviceable condition and not suitable for its original function until after reconditioning shall be priced at the condition percentage most recently recommended by COPAS times the price determined in Section IV, Paragraphs 2.A and B. The cost of reconditioning shall be charged to the receiving property provided Condition C value, plus cost of recondition, does not exceed Condition B value.

(4) Condition "D" - Other Material that is no longer suitable for its original purpose but usable for some other purpose is considered Condition D Material. Included under Condition "D" are also obsolete items or Material that does not meet original specifications but still has value and can be used in other services as a substitute for items with different specifications. Due to the condition or value of other used and obsolete items, it is not possible to price these items under Section IV, Paragraph 2.A. The price used should result in the Joint LSPS Account being charged or credited with the value of the service rendered or use of the Material. In some instances, it may be necessary or desirable to have the Material specially priced as agreed to by the Parties.

(5) Condition "E" - Junk shall be priced at prevailing scrap value prices.

D.    Other Pricing Provisions

(1) Preparations Costs

Costs incurred by the LSPS Operator in making Material serviceable including inspection, Third Party surveillance services, and other similar services will be charged to the Joint LSPS Account at prices reflective of the LSPS Operator's actual costs of the services. Documentation must be retained to support the cost of service. New coating and/or wrapping may be charged per Section IV, Paragraph 2.A.

18                            Exhibit "E" Execution Version

(2) Loading and Unloading Costs

Loading and unloading costs related to the movement of the Material to the Joint LSPS Property shall be charged in accordance with the methods specified in COPAS Bulletin 21.

3. **Disposition of Surplus**

Surplus Material is that Material, whether new or used, that is no longer required for Joint LSPS Operations. The LSPS Operator may purchase, but shall be under no obligation to purchase, the interest of Non-operator in surplus Material.

Dispositions for the purpose of this procedure are considered to be the relinquishment of title of the Material from the Joint LSPS Property to either a Third Party, a Non- LSPS Operator, or to the LSPS Operator. To avoid the accumulation of surplus Materials, the LSPS Operator should make good faith efforts to dispose of surplus within twelve (12) months through buy/sale agreements, trade, sale to a Third Party, division in-kind, or other dispositions as agreed to by the Parties.

The LSPS Operator may, through a sale to an unrelated Third Party or entity, dispose of surplus Material having a gross sale value that is less than or equal to the LSPS Operator's expenditure limit as set forth in the LSPSCOA to which this Accounting Procedure is attached without the prior approval of the Non-LSPS Operator. If the gross sale value exceeds the LSPSCOA expenditure limit, the disposal must be agreed to by the Parties.

The LSPS Operator may dispose of Condition D and E Material under procedures normally utilized by the LSPS Operator without prior approval.

4. **Special Pricing Provisions**

A. Premium Pricing

Whenever Material is not readily replaceable due to national emergencies, strikes, or other unusual causes over which the LSPS Operator has no control, the LSPS Operator may charge the Joint LSPS Account for the required Material at the LSPS Operator's actual cost incurred in providing such Material, in making it suitable for use, and in moving it to the Joint LSPS Property provided notice in writing is furnished to Non-LSPS Operators of the proposed charge prior to use and to billing Non-LSPS Operators for such Material. During premium pricing periods, each Non-LSPS Operator shall have the right to furnish in-kind all or part of his share of such Material suitable for use and acceptable to the LSPS Operator by so electing and notifying the LSPS Operator within ten (10) days after receiving notice from the LSPS Operator.

Exhibit "E" Execution Version

B.   Shop-Made Items

Shop-made items may be priced using the value of the Material used to construct the item plus labor costs.  If the Material is from a scrap or junk account, the Material may be priced at either twenty-five percent of the current price as determined in Section IV, Paragraph 2A, or scrap value, whichever is higher, plus costs to fabricate the item.

C.   Mill Rejects

Mill rejects purchased as "limited service" casing or tubing shall be priced at eighty percent of K-55/J-55 price as determined in Section IV, Paragraphs 2.A and B.  Line pipe converted to casing or tubing with casing or tubing couplings attached shall be priced as K-55/J-55 casing or tubing at the nearest size and weight.

## V. INVENTORIES OF CONTROLLABLE MATERIAL

The LSPS Operator shall maintain records of Controllable Material charged to the Joint LSPS Account, as defined in the COPAS Material Classification Manual, with sufficient detail to perform the physical inventories requested unless directed otherwise by the Non-LSPS Operators.

Adjustments to the Joint LSPS Account by the LSPS Operator resulting from a physical inventory of jointly owned Controllable Material are limited to the six months following the taking of the inventory.  Charges and credits for overages or shortages will be valued for the Joint LSPS Account based on condition B prices in effect on the date of physical inventory and determined in accordance with Section IV, Paragraphs 2.A and B unless the inventorying Parties can prove another Material condition applies.

1.   **Directed Inventories**

With an interval of not less than five (5) years, physical inventories shall be performed by the LSPS Operator upon written request of a majority in working interests of the LSPS Owners.

Expenses of directed inventories will be borne by the Joint LSPS Account and may include the following:

A.   Audit per diem rate for each inventory person in line with the auditor rates determined, adjusted, and published each April by COPAS.  The per diem should also be applied to a reasonable number of days for pre-inventory work and for report preparation.  The amount of time required for this additional work may vary from inventory to inventory.

Exhibit "E" Execution Version

B.   Actual travel including LSPS Operator-provided transportation and personal expenses for the inventory team.

C.   Reasonable charges for report typing and processing.

The LSPS Operator is expected to exercise judgment in keeping expenses within reasonable limits. Unless otherwise agreed, costs in connection with any post-report follow-up work in settling the inventory will be absorbed by the Non-LSPS Operator incurring such costs. Any anticipated disproportionate costs should be discussed and agreed upon prior to commencement of the inventory.

When directed inventories are performed, all Parties shall be governed by such inventory.

2.   **Non-Directed Inventories**

A.   LSPS Operator Inventories

Periodic physical inventories that are not requested by the LSPS Owners may be performed by the LSPS Operator at the LSPS Operator's discretion. The expenses of conducting such LSPS Operator inventories shall not be charged to the Joint LSPS Account.

B.   LSPS Owners Inventories

Any LSPS Owner may conduct an inventory at reasonable times, at their sole cost and risk with prior notification to the LSPS Operator of at least thirty (30) days.

C.   Other Inventories

Other inventories may be taken whenever there is any sale or change of interest. When possible, the selling LSPS Owner should notify all other LSPS Owners thirty (30) days prior to the anticipated closing date. When there is a change in LSPS Operator of the Joint LSPS Property, an inventory by the former and new LSPS Operator should be taken.

The expenses of conducting such other inventories shall be charged to the Joint LSPS Account.

Exhibit "E" Execution Version

# APPENDIX A

Attached to and Made a Part of Exhibit "E" – Accounting Procedure to that certain Galapagos Area Loop
Subsea Production System Construction and Operating Agreement.

## AFFILIATES

1)     BP Exploration and Production Technology (EPT) Group or successor

2)     BP Central Development Organization (CDO) or successor

**[Remainder of this page intentionally left blank]**

Exhibit "E" Execution Version

**APPENDIX B**

Attached to and Made a Part of Exhibit "E" – Accounting Procedure to that certain
Galapagos Area Loop Subsea Production System Construction and Operating Agreement.

## EQUIPMENT AND FACILITIES FURNISHED BY OPERATOR

A.   Host Operator may charge the Joint Account an allocated portion of the cost of the Preservation and Maintenance Facility (PMF) or successor.  The PMF will be used to secure, preserve and maintain Gulf of Mexico materials for drilling and completions, wells, operations and subsea projects.  The PMF costs will be charged pursuant to the provisions of Section II, Paragraph 6 of this Accounting Procedure.

B.   Host Operator may charge the Joint Account an allocated portion of the cost of the Houma Learning Center (HLC) or successor.  The HLC is used to provide training to the Host Operator's personnel.  The HLC costs will be charged pursuant to the provisions of Section II, Paragraph 6 of this Accounting Procedure.

C.   Host Operator may charge the Joint Account an allocated portion of the cost of the Advanced Collaborative Environments Facility (ACE) or successor.  This Remote Technology Center is located offsite of the Joint Property with technology for communicating with field operations and optimizing well performance and reducing field operating expenses on a real time/on-line basis.  The ACE costs to be charged shall include all costs (regardless of location) incurred by the Host Operator to operate the ACE and will be charged pursuant to the provisions of Section II.6 of this Accounting Procedure.  Such charges shall include, but are not limited, to the following:  facilities, communications, computers, software, system support, and ACE personnel provided by the Operator, contract services or Affiliates.

**[Remainder of this page intentionally left blank]**

**EXHIBIT "F"**

Attached to and made a part of that certain Galapagos Area Loop Subsea Production System
Construction and Operating Agreement dated effective December 1, 2011.

## DISPUTE RESOLUTION PROCEDURE

I.     **OVERVIEW**

A.     **Description and Goals.**   Arbitration as used in this statement is a procedure whereby an Arbitrator resolves any claim(s), controversy(ies) or dispute(s) (the "Dispute") between the Parties arising out of, relating to or in connection with the Agreement, including the interpretation, validity, termination or breach thereof.

(i)     Binding:   The arbitration process is binding on the Parties and this arbitration is intended to be a final resolution of any Dispute between the Parties as described above, to the same extent as a final judgment of a court of competent jurisdiction.   Each Party hereby expressly covenants that it shall not resort to court remedies except as provided for herein, and for preliminary relief in aid of arbitration.

(ii)     Violation:   A non-prevailing Party shall pay all legal and court costs incurred by the other Party in connection with the enforcement of the final resolution of any Dispute under this Dispute Resolution Procedure.   Suits, actions or proceedings in connection with such enforcement shall be instituted in the United States District Court for the Southern District of Texas, and pursuant to Title IX of the United States Code.   Each Party waives any option or objection which it may now or hereafter have to the laying of the venue in any such suit, action or proceeding and irrevocably submits to the jurisdiction of such court in any such suit, action or proceeding.

B.     **Duty to Negotiate:**   The Parties shall inform one another promptly following the occurrence or discovery of any item or event which might reasonably be expected to result in a Dispute in connection with the Agreement.   The Parties will attempt to resolve satisfactorily any such matters.

C.     **Notice of Unresolved Dispute:**   Should a Dispute arise which the Parties cannot resolve satisfactorily, either Party may deliver to the other Party a written notice of the Dispute with supporting documentation as to the circumstances leading to the Dispute (the "Notice of Dispute").   The Parties, within ten (10) Days from delivery of such notice, shall then each appoint a management representative ("Management Representative") who has no prior direct involvement with the subject matter of the Notice of Dispute and who is duly authorized to investigate, negotiate and settle the Dispute.   The Management Representative for each Party

1                                   Exhibit "F" Execution Version

shall meet and confer as often as they deem reasonably necessary for a period not exceeding thirty (30) Days following the delivery of the Notice of Dispute in good faith negotiations to resolve the Dispute amicably. The parties in their sole discretion may also agree to utilize the service of a mediator pursuant to a joint engagement. Unless otherwise provided herein, all such notices shall be served in accordance with the provisions of the Agreement.

## II.   ARBITRATION PROCESS

**A.**   **Arbitration:**  If the Parties are unable to resolve the Dispute within forty (40) Days following the receipt of the Notice of Dispute, or such additional time as may be mutually agreed, the matter shall be submitted to arbitration in accordance with the procedures set forth below.

**B.**   **Initiation of Arbitration:**  The arbitration shall be initiated by either party delivering to the other a Notice of Intention to Arbitrate.

**C.**   **Governing Procedures:**  Except as expressly provided herein, the arbitration shall be conducted in accordance with procedures that are mutually acceptable to the Parties, including limited depositionless discovery.

     (i)   Governing Law: The Arbitrator shall apply the governing substantive law of the state chosen by the Parties to the Agreement.

**D.**   **Arbitrator:**  There shall be one Arbitrator, who shall be independent, impartial and experienced in arbitration proceedings. Arbitrator shall be experienced in the oil and gas industry and knowledgeable or specializing as to the subject matter involved in the Dispute. The Arbitrator shall be chosen as follows:  the Parties shall have thirty (30) Days from the delivery of a Notice of Intention to Arbitrate to mutually agree on an Arbitrator. If the Parties cannot mutually agree within said thirty (30) Day period, then the Parties shall, within three (3) Days after expiration of the thirty (30) Day period, apply to the American Arbitration Association as the Appointing Authority, for the appointment of an Arbitrator for or on behalf of the Parties, and in such case the Arbitrator appointed by the Appointing Authority shall meet the criteria set forth in this Section II.D. and shall act as if mutually agreed to by the Parties.

     (i)   Conflicts: Any Arbitrator, prior to his or her appointment, shall disclose to the Parties all actual or perceived conflicts of interest and business relationships involving the Dispute or the Parties, including but not limited to, any professional or social relationships, present or past, with any Party (or its affiliates), including any Party's (or its affiliates) directors, officers and supervisory personnel and counsel. Any Party may challenge in writing the appointment or continued service of any Arbitrator for lack of independence, partiality or any other cause likely to impair such Arbitrator's ability to effectively participate in the proceedings or render a

fair and equitable decision.   Where such challenge is made, the Appointing Authority shall uphold or dismiss the challenge. In the event a challenge is upheld, the Arbitrator shall be replaced.  A replacement will be selected in the same manner as the original Arbitrator was selected.  If an Arbitrator resigns or becomes unable or unwilling to continue to serve as the Arbitrator, a replacement shall be selected in the same manner as that Arbitrator was chosen.

(ii)     Multi-Party Arbitrations: Where more than two Parties are involved in the Dispute ("Multi-Party Arbitration"), all Parties shall jointly name and agree as the appointment of the Arbitrator meeting the criteria set forth in Section II.D. above.  If the Parties cannot agree as to the choice of the Arbitrator within the said thirty (30) Days, any of the Parties hereto may in like manner, within three (3) Days after written notice to the other Parties, apply to the Appointing Authority for the appointment of an Arbitrator meeting the criteria set forth in Section II.D. above.

(iii)    Management of the Arbitration: The Arbitrator shall actively manage the proceedings as he or she deems best so as to make the same expeditious, economical and less burdensome and adversarial than litigation.

E.     **Confidentiality:**  All documents, briefs, testimony, transcripts, as well as, all Arbitrator decisions shall be confidential. Likewise, the views, suggestions, admissions, proposals and other information exchanged in the arbitration are confidential and are inadmissible in any other proceeding.

F.     **Costs and Expenses:**  The Parties involved in the dispute shall be equally responsible for all costs, fees and expenses incurred by the Arbitrator and any other incidental costs incurred in connection with the arbitration proceeding shall also be borne equally by the Parties. Each Party is solely responsible for its own attorneys' fees and expenses incurred in the Arbitration.  In the event of a Multi-Party Arbitration, all costs and expenses shall be borne equally by all Parties.

G.     **Submissions:**  Within thirty (30) Days after the selection of the Arbitrator, each Party shall provide the Arbitrator with a short and plain submission defining the issues to be decided and the nature of the relief that the Arbitrator may award (the "Submission").  This Submission shall explicitly authorize the Arbitrator to decide these issues.  This authorization shall stay in force for period no longer than nine (9) months from this Submission. If the Parties are unable to reach consensus as to the issues involved, the Arbitrator in his or her sole discretion shall frame the issues through a reasonable procedure.  The Arbitrator will render decisions on the specific issues established and shall fashion any remedy that the Arbitrator deems appropriate so long as that remedy is consistent with the Parties' Submissions hereunder.  Any money judgment entered by the Arbitrator shall be payable in U.S. dollars.

Exhibit "F" Execution Version

**H.**    **Transcriptions:** The presentations and argument will be transcribed for the benefit of the Arbitrator and the Parties.

**I.**    **Discovery:** Commencing thirty (30) Days after the receipt of the opposing Party's Submission, each Party may serve upon the other Party up to ten (10) requests for the production of documents, including subparts. The requests shall be made in good faith and not be served for the purpose of delay or harassment. Each request shall describe the type of document(s) sought and each request shall be limited to documents that are relevant to a claim or defense in the Arbitration proceeding, or reasonably calculated to lead to the discovery of admissible evidence. The requests need not be served all at once but may be served in stages.

     (i)    The Party served with a request under this provision shall provide the adverse Party with copies of the requested documents, and identify the request to which each document is responsive, within twenty (20) Days of the receipt of the request. If the Party served with a request objects to the production of any of the requested documents, it shall nevertheless produce within the permitted time all documents responsive to any request that is not objected to by that Party.

     (ii)    A Party that is served with a request may challenge the propriety of the request within the time permitted for response by a short written objection which shall be forwarded to the adverse Party and to the Arbitrator. The adverse Party shall submit its response, if any, to the objecting Party and the Arbitrator within five (5) Days of receipt of the objection. The Arbitrator shall consider the request, the objection and the response, if any, and decide whether the production shall be allowed or denied or whether the request should be modified within ten (10) Days after the submission of the adverse Party's response.

**J.**    **Presentations:** No later than twenty-five (25) Days prior to the date that presentations to the Arbitrator are to begin, each Party will submit to the Arbitrator and serve on the other Party a written position statement. The original statement of each Party shall not exceed thirty-five (35) typewritten letter-size pages. Each Party shall have the right to submit reply statements no later than fifteen (15) Days prior to the date of the presentation. Such reply statements shall not exceed fifteen (15) typewritten letter-size pages.

     (i)    All documents and affidavits that a Party intends to use during its presentation shall be submitted to the Arbitrator and served on the other Party with the position and reply statements. All demonstrative exhibits shall be exchanged five (5) Days in advance of the presentations.

     (ii)    The presentations to the Arbitrator shall extend for such time as the Arbitrator agrees to be appropriate. In the absence of any agreement, the presentations for both Parties shall extend for no longer than two (2) Days

Exhibit "F" Execution Version

and shall be concluded within six (6) months after selection of the Arbitrator. Presentations of each Party shall occur successively with no intervening delay.

(iii)   Each Party shall make an oral and/or documentary presentation of its position in such order and in accordance with the time schedule established by the Arbitrator. The Arbitrator may question each of the presenters during or following any and all presentations.

The Arbitrator shall determine a reasonable time and location for the presentations.

K.   **Decision and Award:** The Arbitrator shall promptly (within sixty (60) Days of conclusion of the presentations or such longer period as the Parties may mutually agree) determine the claims of the Parties and render a final decision in writing. The decision shall state with specificity the findings of fact and conclusions of law on which it rests. The decision rendered by the Arbitrator may be enforced in accordance with Section I.A.(ii), above, and may only be appealed pursuant to Section L below. The decision shall be served upon each of the Parties by facsimile transmission and by first class mail.

(i)   If applicable law allows pre-award interest, the Arbitrator may, in his or her discretion, grant pre-award interest and, if so, such interest may be at commercial rates in the state chosen by the Parties pursuant to Section II.C.(i) during the relevant period. Each Party shall be responsible for its own attorney's fees and costs of arbitration. The Arbitrator shall not award consequential, punitive, indirect or other noncompensatory damages.

(ii)   Within ten (10) Days of receipt of the award either side may submit a Motion to Modify the award. A response shall be due within fifteen (15) Days thereafter and the Arbitrator shall rule thereon within fifteen (15) Days after receipt of the response.

(iii)   Judgment on the award may be entered in a United States District Court for the Eastern District of Louisiana at any time within one year after the decision is made.

L.   **Vacation of Award and Appeal:** An appeal from an order or judgment pursuant to this Section II.L. shall be instituted in the United States District Court for the Eastern District of Louisiana. The court may vacate the award only if the award was procured by or through fraud or corruption. Each Party waives any option or objection which it may now or thereafter have to the laying of the venue of any such suit, action or proceeding and irrevocably submits to the jurisdiction of the court in any such suit, action or proceeding. Each Party agrees that a remedy at law for a violation of this Section II.L. may not be adequate and therefore agrees

that the remedies of specific performance and injunctive relief shall be available in the event of any violation in addition to any other right or remedy at law or in equity to which any Party may be entitled.

**M.**   <u>Res Judicata</u>:  To the extent permitted by law, any decision of the Arbitrator shall not be res judicata or have any binding effect in any other litigation or arbitration where any Party to this Agreement may also be a party.

**[Remainder of this page intentionally left blank]**

6                                    Exhibit "F" Execution Version

## EXHIBIT "G"

Attached to and made a part of that certain Galapagos Area Loop Subsea Production System
Construction and Operating Agreement dated effective December 1, 2011.

## INSURANCE

The LSPS Owners, the Satellite Lease Owners, the Satellite Lease Operators and the LSPS Operator shall, at all times during the term of this Agreement, carry and pay for the following types and amounts of insurance, as specified herein, or self insurance as allowed with the exception of Worker's Compensation insurance which shall only be required to be carried by and paid for by the LSPS Operator and Satellite Lease Operators. Required limits and coverages may be met through any combination of layers and policy forms. The Satellite Lease Owners and LSPS Owners obligation to carry and pay for the insurance described herein can be met solely by a Satellite Lease Operator and/or the LSPS Operator or in the aggregate by the associated Satellite Lease Owners and LSPS Owners (limits shown herein are on a gross basis). Less and except the Worker's Compensation insurance described in section 1 of this exhibit, the Satellite Lease Operator and/or the LSPS Operators will only purchase insurance on behalf of the Satellite Lease Owners and/or the LSPS Owners if the Satellite Lease Owners and/or the LSPS Owners  fail to obtain the insurance described herein

## REQUIRED INSURANCE COVERAGES

1. Worker's Compensation insurance in statutory limits as prescribed by applicable law, covering all liabilities owed for compensation and other benefits under applicable state or federal worker's compensation laws, and Coverage B Employer's Liability Insurance in the amount of Ten Million and No/100 Dollars ($10,000,000); both the aforementioned statuary coverage and  Coverage B shall contain endorsements with Satellite Lease Operator naming LSPS Operator as "alternate employer"  and LSPS Operator naming Satellite Lease Operator as "alternate employer" and providing coverages for voluntary compensation and occupational disease; and Maritime Coverage B for all of the above coverages and including transportation, wages, maintenance and cure, covering liability under the Longshore and Harbor Worker's Compensation Act, the Jones Act, the Outer Continental Shelf Lands Act, the General Maritime Law, and specifically including coverage for claims of masters and members of crews of vessels and claims under 33 U.S.C.A. § 905(b) against any vessel.  All policies required by this paragraph 1 shall provide that claims "in rem" shall be treated the same as claims "in personam".

2. Commercial General Liability (Bodily Injury and Property Damage) Insurance including the following supplementary coverages: (i) contractual liability coverage; (ii) Products and Completed Operations; (iii) Broad Form Property Damage Liability;(iv) Coverage for explosion, collapse and underground hazards; (v) sudden and accidental pollution; and (vi) marine liability.  The limit of liability for all such insurance required under this paragraph 2 shall not be less than One Hundred

Million and No/100 Dollars ($100,000,000) combined single limit per occurrence. All policies required by this paragraph 2 shall provide that claims "in rem" shall be treated the same as claims "in personam". If coverage is on a "claims made" basis, such coverage shall be maintained for at least three (3) years and / or tail coverage or extended reporting provision provided for same period, with retroactive date at least from inception of interest. Such required coverage shall have territorial coverage that extends to the locations of all sites under this Agreement.

3. **Automobile Bodily Injury and Property Damage Liability Insurance.** Such insurance shall extend to owned, non-owned and hired automobiles used by Satellite Owners in connection with its operations. The limits of liability of such insurance shall be not less than Two Million and No/100 Dollars ($2,000,000) combined single limit per occurrence.

4. If vessels and barges are used in connection with this Agreement, the Party using or contracting for the use of such vessels or barges shall carry or cause to be carried Hull and Machinery Insurance, including collision liability and tower's liability on all vessels and barges used in connection with work related to this Agreement with a limit equal to or greater than the fair market value of each such vessel and barge.

5. If vessels or barges are used in connection with this Agreement, the Party using or contracting for the use of such vessels or barges shall carry or cause to be carried Protection and Indemnity Insurance on all vessels and barges used in connection with work related to this Agreement including coverage for; injuries to or death of masters, mates and crews, collision liabilities not covered under the vessel's H&M insurance, excess collision liabilities and pollution liabilities. All policies required by this paragraph 5. shall have deleted therefrom the phrase "as required by contract" and the phrase "as owners of the vessel named herein" and all similar phrases purporting to limit the underwriter liability to that of an owner. The limit of such insurance shall not be less than the value of the vessel or Twenty Million and No/100 Dollars ($20,000,000) per occurrence, whichever is less. All policies required by this paragraph 5 shall provide that claims "in rem" shall be treated the same as claims "in personam".

6. If aircraft, including but not limited to helicopters, are used in connection with this Agreement, the Party using or contracting for the use of such aircraft shall carry or cause to be carried Aircraft Liability (Bodily Injury – including liability to passengers – and Property Damage) insurance with an overall combined single limit per occurrence of not less than One Hundred Million and No/100 Dollars ($100,000,000).

2

7. The Satellite Owners, individually for their interest, or Satellite Operators, on behalf of the associated Satellite Owners, shall carry Operator's Extra Expense insurance including, but not limited to: coverage for control of well (including underground control of well); seepage, pollution, clean-up and contamination; evacuation expense; deliberate well firing, redrilling expenses and making wells safe. The limit for such insurance shall not be less than Two Hundred Fifty Million and No/100 Dollars ($250,000,000) combined single limit per occurrence.

[Remainder of this page intentionally left blank]

3                                              Exhibit "G" Execution Version

**EXHIBIT "H"**

Attached to and made a part of that certain Galapagos Area Loop Subsea Production System Construction and Operating Agreement dated effective December 1, 2011.

**MEMORANDUM OF AGREEMENT**
**AND FINANCING STATEMENT**

1.0    This Memorandum of Agreement and Financing Statement ( **"Memorandum"**) is effective as of the Effective Date of the LSPSCOA referred to in Paragraph 2.0 below and is executed by the undersigned, duly authorized representative of **BP Exploration & Production, Inc.**, a Delaware corporation, whose taxpayer identification number is 34-1835527 whose address is 501 WestLake Park Boulevard, Houston, Texas 77079, **Noble Energy, Inc.**, a Delaware corporation, whose taxpayer identification number is 73-0785597, and whose address is 100 Glenborough Drive, Suite 100, Houston, Texas 77067, **Red Willow Offshore, LLC**, a Colorado limited liability company, whose taxpayer identification number is 87-0689056, and whose address is 1415 Louisiana Street, Suite 3650, Houston, Texas 77002, and **Houston Energy Deepwater Ventures I, LLC**, a Texas limited liability company, whose taxpayer identification number is 27-1814418, and whose address is 1415 Louisiana Street, Suite 2400, Houston, Texas 77002, each of which is hereinafter called **"LSPS Owner"** and all of which are hereinafter called **"LSPS Owners"**. **BP Exploration & Production, Inc.**, also intervenes herein in its capacity of LSPS Operator for the limited purposes expressly provided herein. Capitalized terms used and not otherwise defined herein shall have the meaning ascribed to them in the LSPSCOA.

2.0    The Parties have entered into that certain Galapagos Area Loop Subsea Production System Construction and Operating Agreement dated effective December 1, 2011 ("LSPSCOA"), which LSPSCOA provides for the Building and Operation of a common pipeline system known as the "**Loop Subsea Production  System**" or "**LSPS**", to be located on certain easements and rights-of-way ("**Rights-of-Way**"), all which are more particularly described in Attachment "1" to this Memorandum and which designates BP Exploration & Production, Inc., as the LSPS Operator, to conduct the Building and Operation of the LSPS for the Parties.

3.0    This Memorandum (a) provides for certain liens, mortgages, pledges and security interests to secure payment by the Parties of their respective share of costs and performance of other obligations under the LSPSCOA; and (b) the LSPSCOA contains accounting procedures set forth on Exhibit "E" to the LSPSCOA, which establishes, among other things, interest to be charged on indebtedness, certain costs, and other expenses under the LSPSCOA at the rate set forth in Exhibit "E" to the LSPSCOA.

4.0    The LSPS Operator hereby certifies that a true and correct copy of the LSPSCOA is on file and is available for inspection by Third Parties at the offices of the LSPS Operator at the address set forth in this Memorandum.

1

Exhibit "H" Execution Version

5.0    In addition to any other security rights and remedies provided for by law with respect to services rendered or materials and equipment furnished under the LSPSCOA, for and in consideration of the covenants and mutual undertakings of the Parties set forth in the LSPSCOA, the Parties hereby agree as follows:

5.01    Each Party hereby grants to the other Parties a mortgage, hypothec, and pledge of and over all of its rights, titles, and interests in and to the LSPS and Rights-of-Way.

5.02    Each Party hereby grants to the other Parties a continuing security interest in and to all of its rights, titles, interests, claims, general intangibles, proceeds, and products thereof, whether now existing or hereafter acquired, in and to the LSPS, whether now or hereafter placed on the offshore blocks covered by the Rights-of-Way and other surface and sub-surface equipment of any kind or character located on the Rights-of-Way or attributable to the LSPS, and the cash or other proceeds realized from any sale, transfer, disposition or conversion thereof.  To the extent susceptible under applicable law, the security interest granted by each Party hereunder covers: (a) all substitutions, replacements, and accessions to the property of such Party  described herein and is intended to cover all of the rights, titles, and interests of such Party in all movable property now or hereafter located upon the Rights-of-Way or used in connection with the LSPS, whether corporeal or incorporeal; and (b) all rights, claims, general intangibles, and proceeds, whether now existing or hereafter acquired, of such Party in and to the contracts, agreements, permits, licenses, rights-of-way, and similar rights and privileges that relate to or are appurtenant to the Rights-of-Way and LSPS, including the following:

    (i)    all of its rights, titles, and interests, whether now owned and existing or hereafter acquired or arising, in, to, and under or derived from all existing and future permits, licenses, and similar rights and privileges that relate to or are appurtenant to the LSPS or the Rights-of-Way.

5.03    To the extent susceptible under applicable law, the mortgage and the security interest granted by each Party in this Memorandum shall secure: (a) the complete and timely performance of and payment by such Party to the other Parties of all of its obligations and indebtedness of every kind and nature, whether now owed by such Party or hereafter arising pursuant to the LSPSCOA and this Memorandum: and (b) the payment of all expenses incurred by the LSPS Operator for any and all operations conducted pursuant to the LSPSCOA and other expenses properly charged to such Party.

5.04    This Memorandum (including a carbon, photographic, or other reproduction thereof and hereof) shall constitute a non-standard form of financing statement under the terms of Chapter 9 of the Louisiana Commercial Laws, La. R.S. 10:9-101 et seq. ("**Uniform Commercial Code**," as adopted in the State of Louisiana) and, as such, for the purposes of the security interest, may be filed for record in the office of the Clerk of Court of any parish in the State of Louisiana, with each of the Parties being a secured party and a debtor with respect to such filing.

2

**5.05**    The maximum amount for which the mortgage herein granted by each Party shall be deemed to secure the obligations and indebtedness of such Party to the other Parties as stipulated herein is hereby fixed in an amount equal to the product of a Party's Equity Interest times $500,000,000 ("**Limit of the Mortgage of each Party**").   Except as provided in the previous sentence (and then only to the extent such limitations are required by law), the entire amount of obligations and indebtedness of each Party is secured hereby without limitation.  Notwithstanding the foregoing Limit of the Mortgage of each Party, the liability of each Party under this Memorandum and the mortgage and security interest granted hereby shall be limited to the actual obligations and indebtedness (including all interest charges, costs, attorneys' fees, and other charges provided for in this Memorandum or in the LSPSCOA) outstanding and unpaid and that are attributable to or charged against the interest of such Party pursuant to the LSPSCOA or this Memorandum.

**5.06**    The liability of the Parties under the LSPSCOA and this Memorandum shall be several, not joint or collective. Each Party shall be responsible only for its obligations and shall be liable only for its proportionate share of costs under the LSPSCOA and this Memorandum.

**6.0**    To serve as notice of the existence of the LSPSCOA as a burden on the title of the Parties to their interests in and to the Rights-of-Way and the LSPS and for purposes of satisfying otherwise relevant recording and filing requirements of applicable law, this Memorandum is to be filed or recorded, as the case may be, in: (a) the conveyance records of the parish or parishes in which the Rights-of-Way and the LSPS are located or adjacent pursuant to La. R.S. 31:216 et seq.; (b) the mortgage records of such parish or parishes; and (c) the appropriate Uniform Commercial Code records.  All Parties to the LSPSCOA are identified on Attachment "1" hereto.

**7.0**    If performance of any obligation under the LSPSCOA or payment of any indebtedness created thereunder does not occur or is not made when due under the LSPSCOA or upon default of any covenant or condition of the LSPSCOA, in addition to any other remedy afforded by law, each Party to the LSPSCOA and any successor to such Party by assignment, operation of law, or otherwise, shall have, and is hereby given and vested with, the power and authority to foreclose the mortgage, pledge, and security interest established in its favor herein in the manner provided by law and to exercise all rights of a secured party under the Uniform Commercial Code.

**8.0**    Upon termination of the LSPSCOA and the satisfaction of all obligations and indebtedness arising thereunder, the LSPS Operator, on behalf of all Parties to the LSPSCOA, shall file of record an appropriate release and termination of all security and other rights created under this Memorandum executed by all Parties to the LSPSCOA. Upon the filing of such release and termination instrument, all benefits and obligations under this Memorandum shall terminate as to all Parties who have executed or ratified this Memorandum.  In addition, at any time prior to the filing of such release and termination instrument, each Party shall have the right to (a) file a continuation statement pursuant to the Uniform Commercial Code with respect to any financing statement filed in their favor under the terms of this Memorandum; and (b) reinscribe this act in the appropriate mortgage records.

Exhibit "H" Execution Version

9.0     It is understood and agreed by the Parties hereto that if any part, term, or provision of this Memorandum is held by the courts to be illegal or in conflict with any law of the state where made, the validity of the remaining portions or provisions shall not be affected, and the rights and obligations of the Parties shall be construed and enforced as if the Memorandum did not contain the particular part, term, or provision held to be invalid.

10.0    This Memorandum shall be binding upon and shall inure to the benefit of the Parties hereto and their respective legal representatives, successors and permitted assigns.

11.0    A party having an interest in the LSPS and Rights-of-Way may ratify this Memorandum by execution and delivery of an instrument of ratification, adopting and entering into this Memorandum, and such ratification shall have the same effect as if the ratifying party had executed this Memorandum or a counterpart thereof. By execution or ratification of this Memorandum, such party hereby consents to its ratification and adoption by any party who acquires or may acquire any interest in the LSPS and Rights-of-Way.

12.0    This Memorandum may be executed or ratified in one or more counterparts and all of the executed or ratified counterparts shall together constitute one instrument. For purposes of recording in each of the records described in Paragraph 6 above, duplicate copies of this Memorandum with individual signature pages attached thereto may be filed of record, and duplicate copies of this Memorandum with individual signature pages attached thereto may be filed in the appropriate Uniform Commercial Code records.

13.0    The Parties hereby agree to execute, acknowledge and deliver or cause to be executed, acknowledged and delivered, any instrument or take any action necessary or appropriate to effectuate the terms of the LSPSCOA or any exhibit, instrument, certificate or other document pursuant thereto.

14.0    Whenever the context requires, reference herein made to the single number shall be understood to include the plural, and the plural shall likewise be understood to include the singular, and specific enumeration shall not exclude the general, but shall be construed as cumulative.

4

Exhibit "H" Execution Version

EXECUTED on the dates set forth below each signature but effective as of the _____ day of _____, 20__.

WITNESSES:                                    BP EXPLORATION & PRODUCTION, INC.

_____              By: _____
(Printed Name of Witness)                     Printed Name: _____
                                              Title: _____
_____              Date: _____
(Printed Name of Witness)

                                              NOBLE ENERGY, INC.

_____              By: _____
(Printed Name of Witness)                     Printed Name: _____
                                              Title: _____
_____              Date: _____
(Printed Name of Witness)

                                              RED WILLOW OFFSHORE, LLC

_____              By: _____
(Printed Name of Witness)                     Printed Name: _____
                                              Title: _____
_____              Date: _____
(Printed Name of Witness)

                                              HOUSTON ENERGY DEEPWATER VENTURES I,
                                              LLC

_____
(Printed Name of Witness)
                                              By: _____
                                              Printed Name: _____
_____              Title: _____
(Printed Name of Witness)                     Date: _____

Exhibit "H" Execution Version

## ACKNOWLEDGMENT

STATE OF TEXAS      §
                                     §
COUNTY OF HARRIS     §

On this _____ day of _____, 20__, before me, appeared _____, to me personally known, who, being by me duly sworn, did say that he is the _____ of **BP Exploration & Production, Inc.**, a Delaware corporation, and that the foregoing instrument was signed on behalf of the corporation by authority of its Board of Directors and that _____ acknowledged the instrument to be the free act and deed of the corporation.

 

                                      _____
                                      NOTARY PUBLIC in and for
                                      the State of Texas

My Commission expires:

STATE OF TEXAS      §
                                     §
COUNTY OF HARRIS     §

On this _____ day of _____ 20__, before me, appeared _____, to me personally known, who, being by me duly sworn, did say that he is the _____ of **Noble Energy, Inc.**, a Delaware corporation, and that the foregoing instrument was signed on behalf of the corporation by authority of its Board of Directors and that _____ acknowledged the instrument to be the free act and deed of the corporation.

 

                                      _____
                                      NOTARY PUBLIC in and for
                                      the State of Texas

My Commission expires:

6                                                        Exhibit "H" Execution Version

## ATTACHMENT "1" TO EXHIBIT "H"

Attached to and made a part of the Memorandum of Agreement and Financing Statement
dated effective _____, 20___

## I.   DESCRIPTION OF LSPS AND RIGHTS-OF-WAY

**OCS-G 28973**

A 200-foot wide right-of-way to install, operate, and maintain a 8 5/8-inch (SN 16269) by 12 3/4-inch (SN 16279) pipe-in-pipe pipeline 8.10 miles in length, with associated 5-inch Isabela in-field electro-hydraulic umbilical (SN 16280) and 6-inch Isabela main electro-hydraulic umbilical (SN 16287), to transport bulk oil from Subsea Well No. I-1 through an 8 5/8-inch jumper to PLEM #2, through a 10 3/4-inch jumper to PLEM #1, through a 12 3/4-inch X 8 5/8-inch pipe-in-pipe pipeline, in Block 562, through Blocks 518, 517 and 473, through in-line sled #1, to the A-NaKika FPDS in Block 474, all located in Mississippi Canyon Area.

**OCS-G 28974**

A 200-foot wide right-of-way to install, operate, and maintain a 8 5/8-inch (SN 16270) by 12 3/4-inch (SN 16276) pipe-in-pipe pipeline 7.83 miles in length, with associated 5-inch Santiago in-field electro-hydraulic umbilical (SN 16288) and 5-inch Santa Cruz in-field electro-hydraulic umbilical (SN 16277), to transport bulk oil from the SA PLEM #2 in Block 519, through Blocks 518, 517 and 473, through in-line sled #2, to the A-NaKika FPDS in Block 474, all located in Mississippi Canyon Area.

| Segment Number | Size (inches) | Length (feet) | Service | From | To |
|---|---|---|---|---|---|
| 16281 | 08 | 11316 | Bulk Oil | SC PLEM #1 Mississippi Canyon Block 519 OCS-G 27278 | PLEM #2 Mississippi Canyon Block 562 OCS-G 19966 |
| 16282 | 12 | 11316 | Casing | SC PLEM #1 Mississippi Canyon Block 519 OCS-G 27278 | PLEM #2 Mississippi Canyon Block 562 OCS-G 19966 |
| 16283 | 08 | 3927 | Bulk Oil | SC PLEM #2 Mississippi Canyon Block 519 OCS-G 27278 | SA PLEM #1 Mississippi Canyon Block 519 OCS-G 27278 |

| Segment Number | Size (inches) | Length (feet) | Service | From | To |
|---|---|---|---|---|---|
| 16284 | 12 | 3927 | Casing | SC PLEM #2 Mississippi Canyon Block 519 OCS-G 27278 | SA PLEM #1 Mississippi Canyon Block 519 OCS-G 27278 |
| 16285 | 10 | 128 | Bulk Oil | SC PLEM #2 Mississippi Canyon Block 519 OCS-G 27278 | SA PLEM #1 Mississippi Canyon Block 519 OCS-G 27278 |
| 16286 | 10 | 128 | Bulk Oil | SC PLEM #2 Mississippi Canyon Block 519 OCS-G 27278 | SA PLEM #1 Mississippi Canyon Block 519 OCS-G 27278 |

## II.   **OPERATOR**

BP Exploration & Production, Inc.

## III.   **PARTIES AND EQUITY INTERESTS**

| | |
|---|---|
| BP Exploration & Production, Inc. | 55.97833% |
| Noble Energy, Inc. | 27.98917% |
| Red Willow Offshore, LLC | 10.73250% |
| Houston Energy Deepwater Ventures I, LLC | 5.30000% |

Exhibit "H" Execution Version

## EXHIBIT "I"

Attached to and made a part of that certain Galapagos Area Loop Subsea Production System
Construction and Operating Agreement dated effective December 1, 2011.

## NON-SEGREGATION

Contractor certifies that it does not maintain or provide for its employees any segregated facilities at any of its establishments and that it does not permit its employees to perform their services at any location under its control, where segregated facilities are maintained. Contractor certifies further that it will not maintain or provide for its employees any segregated facilities at any of its establishments and that it will not permit its employees to perform their services at any location, under its control, where segregated facilities are maintained. Contractor agrees that a breach of this certification is a violation of the Equal Opportunity Clause in any Government contract between Contractor and Operator. As used in this certification, the term "segregated facilities" means any waiting rooms, work areas, rest rooms and other storage or dressing areas, parking lots, drinking fountains, recreation or entertainment areas, transportation, and housing facilities provided for employees which are segregated by explicit directive or are in fact segregated on the basis of race, color, religion, or national origin because of habit, local custom or otherwise. Contractor further agrees that (except where it has obtained identical certifications from proposed subcontractors) prior to the award of subcontracts exceeding $10,000 which are not exempt from the provisions of the Equal Opportunity Clause; that it will retain such certifications in its files; and that it will forward the following notice to such proposed subcontractors (except where the proposed subcontractors have submitted identical certifications for specific time periods):

NOTICE TO PROSPECTIVE SUBCONTRACTORS OF REQUIREMENT FOR CERTIFICATIONS OF NONSEGREGATED FACILITIES. A Certification of Non-segregated Facilities, as required by the May 9, 1967 order on Elimination of Segregated Facilities, by the Secretary of Labor (32 Fed. Reg. 7439, May 19, 1967), must be submitted prior to the award of a subcontract exceeding $10,000 which is not exempt from the provisions of the Equal Opportunity Clause. The certification may be submitted either for each subcontract or for all subcontracts during a period (i. e., quarterly, semi-annually or annually). (1968 MAR.) (Note: The penalty for making false statements in offers is prescribed in 18. U.S.C. 1001.) Whenever used in the foregoing Section, the term "contractor" refers to each party to this agreement.

## EXHIBIT "J"

Attached to and made a part of that certain Galapagos Area Loop Subsea Production System Construction and
Operating Agreement dated effective December 1, 2011.

## OPERATING GUIDELINES AND STANDARDS

### Article I.    Definitions

1.01    "**LSPS Order**" has the meaning set forth in Section 5.02 of this Exhibit "J".

1.02    "**Production Occurrence**" shall mean any deviation from normal operating conditions
for the LSPS or a Satellite Lease during either steady state, start-up or shut down phases
in the LSPS or a Satellite Lease, which in the opinion of the LSPS Operator may lead to
an Adverse Impact on the LSPS, or may impair the ability to operate the LSPS in a safe
and prudent manner. Production Occurrences shall include, but not be limited to:

    (a)    indication of sand production from a sand probe and other production data;

    (b)    indication of wax deposition;

    (c)    indication of hydrate blockages;

    (d)    suspected or confirmed failure of any piece of equipment in the Satellite Well
System or the LSPS;

    (e)    any significant unplanned deviation of Satellite Lease well operating parameter(s)
from its trend for the thirty (30) days preceding the deviation. Such parameter(s)
shall include, but not be limited to, pressure, temperature, flow rate, chemical or
methanol injection rate;

    (f)    problems related to LSPS flowline liquid inventory management; or

    (g)    production shutdowns on the Host, either planned or unplanned.

1.03    "**Satellite Lease Order**" has the meaning set forth in Section 5.03 of this Exhibit "J".

1.04    "**Single Point of Contact**" or "**SPOC**" is the person designated by the LSPS Operator to
act as the single point of contact for communications between the LSPS Operator and
each Satellite Lease Operator. The initial representative is identified in Article VII of this
Exhibit "J". The LSPS Operator shall provide written notification to each Satellite Lease
Operator in the event that a subsequent person is designated the SPOC.

1.05    "**Satellite Lease Operator Representative**" shall mean the person designated by a
Satellite Lease Operator to act as the single point of contact for communications
concerning operational issues between the LSPS Operator and such Satellite Lease

<div align="center">1</div>

Operator. The initial representative is identified in Article VII of this Exhibit "J". Each Satellite Lease Operator shall provide written notification to the LSPS Operator and the other Satellite Lease Operators in the event that a subsequent person is designated as that Satellite Lease Operator's Representative.

## Article II.    Production Occurrences and Adverse Impacts

2.01   Production Occurrence. The LSPS Operator shall be responsible for assessing the level of risk associated with any Production Occurrence that causes or is suspected to lead to an Adverse Impact to the LSPS. If the LSPS Operator concludes that a Production Occurrence may cause an Adverse Impact, the LSPS Operator shall give full particulars thereof to the Satellite Lease Operator and will instruct the Host Operator to shut-in a Satellite Lease well or suspend the operation causing the Production Occurrence temporarily until a review by the applicable Satellite Lease Operator has been completed. The LSPS Operator shall use reasonable efforts to inform the Satellite Lease Operator Representative in writing or electronically of the shut-in or suspension within twelve (12) hours of the shut-in or suspension. Should the Satellite Lease Operator determine pursuant to its review that the Production Occurrence is suspected to lead to an Adverse Impact to the LSPS, then the Satellite Lease well or operation causing the Production Occurrence will remain shut-in or suspended.    After evaluating the Production Occurrence and taking steps and/or conducting operations to mitigate the Adverse Impact, if necessary, the Satellite Lease Operator may request the LSPS Operator to re-start the operation or Satellite Lease well. If the LSPS Operator determines that a re-start of the operation or Satellite Lease well will not create an Adverse Impact to the LSPS, the LSPS Operator will then instruct the Host Operator to re-start the operation or Satellite Lease well. If the LSPS Operator determines that the risk of an Adverse Impact to the LSPS is not mitigated to a level that is ALARP, the LSPS Operator will advise the Satellite Lease Operator Representative, within twelve (12) hours from receipt of such request for re-start, of its objection to re-starting the operation or Satellite Lease well, with supporting reasons for such rejection. Within twenty-four (24) hours after receipt by the Satellite Lease Operator of the LSPS Operator's objection to the Satellite Lease Operator's request for re-start, the LSPS Operator and such Satellite Lease Operator shall meet to discuss and mutually agree upon a plan to re-start such Satellite Lease production.

2.02   Activities and Production Occurrences that have Acceptable Risk and are Deemed not to have an Adverse Impact on the LSPS. The following activities shall not be deemed to be Production Occurrences and shall be allowed:

   (a)   LSPS subsea interventions implemented according to plans and procedures approved by the LSPS Operator;

   (b)   Satellite Well System subsea interventions implemented according to the Satellite Lease Operator's plans and procedures, or as mutually agreed upon by the LSPS Operator and the Satellite Lease Operator;

(c)     use of umbilical spare tube/wire by necessity and subject to the umbilical priorities;

(d)     routine operations performed from the Host;

(e)     activities that are temporary in nature at the time of the intervention or occurrence (for example, a LSPS shut-in upon request of the Satellite Lease Operator under Section 6.01 of this Exhibit "J");

(f)     activities that do not prevent the unaffected Satellite Lease from flowing its Satellite Production or the impact of the activity or Production Occurrence can be reversed within a reasonable time and at a reasonable cost (for example, the temporary use of a spare tube in the umbilical);

(g)     Production Occurrence(s) related to production operations if the risk of a potential Adverse Impact to the LSPS is considered ALARP by the LSPS Operator for such type of Production Occurrence;

(h)     an indication of sand production from a sand probe, without an indication(s) of sand production from other production data, is not an Adverse Impact and a Satellite Lease well will not be shut-in solely on this basis; and

(i)     malfunction of a subsea flowmeter, pursuant to the conditions and time limits described in Article V of this Exhibit "J".

### Article III.     Simultaneous Operations.

3.01    Simultaneous Operations.  Simultaneous operations are concurrent activities on the Host, the LSPS or within a Satellite Well System which may lead to an Adverse Impact to the LSPS, Satellite Well System and/or the Host. These operations shall always be conducted in accordance with the applicable provisions of this Agreement, the Host Operator's field simultaneous operations plan, the Satellite Operator's plans and procedures, the LSPS Orders, as defined in Article V of this Exhibit "J", and their associated procedures.

### Article IV.     Chemical Injection & Methanol Handling Capacity

4.01    Chemical Injection and Methanol Handling Capacity at the Host.  Each Satellite Lease will have the right, on an equal basis, to: (a) the methanol handling capacity in order to mitigate hydrate formation due to produced water; and (b) any unused methanol capacity.

### Article V.     LSPS Orders, Satellite Lease Orders and Operating Procedures

5.01    LSPS Operations.  The way in which the LSPS and Satellite Leases shall be operated, plus the roles and responsibilities of Host's operations personnel in their operation of the LSPS and Satellite Leases shall be detailed in two (2) sets of instructions known as "LSPS Orders" and "Satellite Lease Orders":

5.02 <u>LSPS Order.</u> An LSPS Order is an operating instruction to the Host that relates to the LSPS only, and is issued by the LSPS Operator. The LSPS Orders shall generally describe actions that are to be taken under certain circumstances consistent with the operating standards set forth in Section 4.06 of the Agreement. The LSPS Orders shall, if applicable, make reference to the appropriate operating procedures or HSE manuals of the LSPS Operator that contain detailed information on how a task is to be performed.

5.03 <u>Satellite Lease Order.</u> A Satellite Lease Order is an operating instruction that affects a single Satellite Lease only, and is issued periodically by a Satellite Lease Operator to the LSPS Operator. The LSPS Operator will verify that the instructions contained within are not likely to cause a potential Adverse Impact to the LSPS. The Satellite Lease Orders shall generally describe control system set-points and actions that are to be taken under certain circumstances on a Satellite Lease; these orders shall, if applicable, make reference to the appropriate operating procedures or HSE manuals of the Satellite Lease Operator that contain detailed information on how a task is to be performed. All Satellite Lease Orders and confirmations of receipt of such Satellite Lease Orders shall be sent via facsimile or electronic mail.

### Article VI.  Planned Shut-In of the LSPS.

6.01 <u>Planned Shut-In.</u> In order to minimize the number and duration of shut-ins of the LSPS, a Satellite Lease Operator wanting to conduct an activity for which it desires a shut-in of the LSPS must first demonstrate to the LSPS Operator that: (a) the planned activity requires a shut-in of the LSPS, in the LSPS Operator's sole discretion; (b) the planned activity is in compliance with this Exhibit "J"; (c) the Satellite Lease Operator has mitigated the risk of an Adverse Impact to the LSPS to a level that is ALARP; (d) there is no reasonably practical way to avoid a shut-in of the LSPS; and (e) the Satellite Lease Operator has planned the activity so as to minimize the length of the shut-in period. In the event the Satellite Lease Operator demonstrates the foregoing to the satisfaction of the LSPS Operator, the LSPS Operator shall approve and conduct the LSPS shutdown and the Satellite Lease Operator shall be allowed to proceed with the proposed activity. Such approval shall not be unreasonably delayed. Approval from the LSPS Operator to conduct the LSPS shutdown and allow the Satellite Lease Operator to proceed with the proposed activity may be withheld only if the LSPS Operator reasonably determines that such activity does not satisfy all of the criteria set forth in clauses (a) through (e) above.

6.02 <u>Satellite Lease Operator Activities</u>

    (a) **Satellite Lease Operator Activities Further Than Three Thousand Feet (3000') From the LSPS.** A Satellite Lease Operator shall have the exclusive right to conduct any activity: (i) for which it does not desire a shut-in of the LSPS; (ii) that presents no risk of an Adverse Impact to the LSPS; and (iii) that is to be conducted three thousand feet (3000') or further from the LSPS. Any Satellite Lease Operator conducting the activities set forth in clauses (i) through (iii) above shall notify the LSPS Operator prior to conducting such activity.

(b) **Satellite Lease Operator Activities Within Three Thousand Feet (3000') of the LSPS.** A Satellite Lease Operator shall have the exclusive right to conduct any activity: (i) for which it notifies the LSPS Operator in writing at least seventy two (72) hours in advance of such activity; (ii) that presents no risk of an Adverse Impact to the LSPS; and (iii) that will be conducted within three thousand feet (3000') of the LSPS.

6.03   Notice of the Planned Shutting in of the LSPS. The LSPS Operator shall give the

Satellite Lease Operators at least sixty (60) Days written notice, except for emergencies, prior to

the planned shutting in of the LSPS.

**Article VII.   Satellite Lease Operator Representatives and Alternates**

The following persons are the Satellite Lease Operators' Representatives and their Alternates:
Isabela Lease Operator Representative:
Name: Neil Crammond
Title: Na Kika Area Operations Manager
Company: BP Exploration & Production Inc.
Address: 200 WestLake Park Boulevard, PO Box 3092, Houston, TX 77253-3092
Office Phone: 281-366-3790
Office Fax: 281-366-0799
Cell Phone: 832-434-5263
Email: neil.crammond@bp.com

Isabela Lease Operator Representative Alternate 1:
Name: Leonard Linn
Title: Area Engineering Support Team Leader – Na Kika
Company: BP Exploration & Production Inc.
Address: 200 WestLake Park Blvd, PO Box 3092, Houston, TX 77253-3092
Office Phone: 281-366-5896
Office Fax: 281-366-0799
Cell Phone: 713-594-6185
Email: leonard.linn@bp.com

Exhibit "J" Execution Version

MC 519 Unit Operator Representative:
Name: Charles Hutto
Title: Deepwater Production Manager
Company: Noble Energy, Inc.
Address: 100 Glenborough Drive, Suite 100, Houston, Texas 77067
Office Phone: 281-876-6277
Office Fax: 281-876-6327
Cell Phone: 281-414-1576
Email: chutto@nobleenergyinc.com

MC 519 Unit Operator Representative Alternate 1:
Name: Jim Hebert
Title:   Deepwater Production Superintendent
Company: Noble Energy, Inc.
Address: 100 Glenborough Drive, Suite 100, Houston, Texas 77067
Office Phone: 281-876-6008
Office Fax: 281-876-6327
Cell Phone:281-785-2948
Email: jhebert@nobleenergyinc.com

LSPS Operator Single Point of Contact ("SPOC"):
Name: Neil Crammond
Title: Na Kika Area Operations Manager
Company: BP Exploration & Production Inc.
Address: 200 WestLake Park Boulevard, PO Box 3092, Houston, TX 77253-3092
Office Phone: 281-366-3790
Office Fax: 281-366-0799
Cell Phone: 832-434-5263
Email: neil.crammond@bp.com

Operator SPOC alternate contact:
Name: Leonard Linn
Title: Area Engineering Support Team Leader – Na Kika
Company: BP Exploration & Production Inc.
Address: 200 WestLake Park Blvd, PO Box 3092, Houston, TX 77253-3092
Office Phone: 281-366-5896
Office Fax: 281-366-0799
Cell Phone: 713-594-6185
Email: leonard.linn@bp.com

Exhibit "J" Execution Version

LSPS Operator Operations Manager:
Name: Neil Crammond
Title:   Na Kika Area Operations Manager
Company: BP Exploration & Production Inc.
Address: 200 WestLake Park Boulevard, PO Box 3092, Houston, TX 77253-3092
Office Phone: 281-366-3790
Office Fax: 281-366-0799
Cell Phone: 832-434-5263
Email: neil.crammond@bp.com

7

## EXHIBIT "K"

Attached to and made a part of that certain Galapagos Area Loop Subsea Production System
Construction and Operating Agreement dated effective December 1, 2011.

### PROJECT TEAM AND TECHNOLOGY SHARING

**WHEREAS,** the LSPS Owners, desire to further provide for the formation and operation of a Project Team for the purpose of assisting the LSPS Operator with the Building, Startup, and Completion of the LSPS;

**WHEREAS,** an Integrated Project Team was formed under the terms of Exhibit "G" to the Isabela JOA to assist the LSPS Operator with the Building, Startup, and Completion of the LSPS, and certain charges associated with such Integrated Project Team have been included in the Building AFE's;

**WHEREAS,** the LSPS Owners wish to replace the Integrated Project Team that was formed pursuant to Exhibit "G" of the Isabela JOA with a Project Team formed pursuant to this Exhibit "K" to the LSPSCOA; and

**WHEREAS,** the LSPS Owners have agreed that (a) the costs and expenses of the Project Team will be charged to Building AFE's or Supplemental Building AFE's and the method in which such costs and expenses shall be shared; (b) the overall operation, administration and management of the Project Team; and (c) the exchange, development and use of technology collected or developed by or through the Project Team.

**NOW, THEREFORE,** in consideration of the premises and of the mutual promises exchanged and contained within this Exhibit "K", the Parties have reached the following agreement concerning the formation and operation of the Project Team.

### ARTICLE 1.0 DEFINITIONS

**1.01    Definitions.**   For the purposes of this Exhibit "K" the following definitions will be applicable:

1

**Background Technology** shall mean any proprietary geophysical, geochemical, drilling, engineering or other similar technical data, information, reports, studies, analyses, models or similar data and documents developed or obtained by a Party outside of the scope of the LSPSCOA and this Exhibit "K" that is disclosed by a Party or exchanged by the Parties for use by the Project Team.

**Confidential Information** shall mean all proprietary geophysical, geological, geochemical, drilling, engineering data or other data owned or developed by the Parties relating to operations conducted within the Satellite Well System and the Building and Operation of the LSPS. The term shall also include, but not be limited to:

    (1)   certain commercial, contractual or financial information;

    (2)   analyses, compilations, maps, models, interpretations or other documents that reflect or incorporate Confidential Information;

    (3)   both originals and copies of geological and geophysical data and well logs;

    (4)   all other subsurface, seismic and related data acquired or derived from operations conducted pursuant to the LSPSCOA, MC 519 Unit Operating Agreement or the Isabela JOA;

    (5)   Background Technology; and

   the terms and conditions of this Exhibit "K" and the LSPSCOA.

**Employees** shall mean any individual under the employment of any Party to the LSPSCOA including any Affiliate or contractor which may represent any Party hereunder.

**LSPSCOA** shall mean that certain Galapagos Area Loop Subsea Production System Construction and Operating Agreement dated effective December 1, 2011, by and between BP Exploration & Production, Inc., Noble Energy, Inc., Red Willow Offshore, LLC and Houston Energy Deepwater Ventures I, LLC.

**Party or Parties** shall mean a LSPS Owner or the LSPS Owners.

**Project Manager** shall mean the representative designated by the LSPS Operator who will direct, supervise and oversee the work of the Project Team.

Exhibit "K" Execution Version

**Project Team ("PT")** shall mean the group of management, supervisory, technical and support personnel from the Parties assigned to assist the LSPS Operator with the Building and Completion of the LSPS as further provided for in this Exhibit "K".

1.02    All words capitalized herein but not defined in Section 1.01 shall have the meaning ascribed to them in the LSPSCOA.

## ARTICLE 2.0 PROJECT TEAM FORMATION

**2.01    Formation and Staffing of the Project Team:**  A Project Team of project, technical and support personnel is hereby established pursuant to the terms of this Exhibit "K" of the LSPSCOA. Each Party may nominate representatives possessing specific backgrounds as identified by the Project Manager to progress the Building, Startup, and Completion of the LSPS.  The Project Manager must approve actual participation of any individual nominated by a Party for participation on the Project Team, and such approval shall not be unreasonably withheld.

**2.02    Status of Team Members:**  Each Employee member of the PT shall remain an employee of its respective Party and each Party shall remain responsible for their employees' salaries and benefits as well as maintaining worker's compensation insurance on their Employees.  Accordingly, each Party will continue to administer the compensation, benefits, allowances and staff planning of its Employees on the PT. Each Party retains the right to ultimately direct the details and means by which their representatives participate on the PT. However, Employees who participate on the PT will receive team assignments and general supervision from the Project Manager in connection with their day to day work.  An individual selected to the PT shall, insofar as possible, and consistent with the needs of the PT and the individual's employer, serve on the PT for the duration of the PT.  Notwithstanding the above, some PT members may be selected for specific tasks or phases of PT work, and upon the conclusion of such tasks or phases these team members may be dismissed by the Project Manager.

**2.03    Project Manager:**  The PT shall operate under the direction of the Project Manager, who shall be designated by the LSPS Operator.  The Project Manager shall be responsible for the following:  (a) overall management and supervision of specific work tasks for the PT and making PT assignments; (b) determining at whose offices the PT work is to be undertaken; (c) selecting team members from the nominations provided by the Parties; (d) selecting contractors to perform certain PT activities; (e) acquiring supplies and services needed by the PT; (f) instituting rules and procedures for maintaining Confidential Information; and (g) making presentations on the LSPS and associated documentation at meetings which are conducted under the LSPSCOA.

Exhibit "K" Execution Version

**2.04** **Work Scope of the Project Team:** The primary objective for forming the PT is to pool the talents of the Parties to assist in Building, Startup, and Completing the LSPS.

**2.05** **Liability of Project Team Members.** Each Party agrees to release, defend, hold harmless and indemnify the other Parties from and against any loss, damage, claim suit, liability, judgment and expense (including attorney fees and other costs of litigation) for any personal injury (including death) of its employees on the PT.

**2.06** **Reports by the PT.** The PT shall review the progress of its work with all Parties at least quarterly, and present the results of any studies or planning upon their conclusion. The time and place of the meetings of the PT and location for conducting PT activities shall be determined by the Project Manager.

**2.07** **Project Team Costs.** The costs and expenses of the PT shall be charged to the Building AFE's or Supplemental Building AFE's in accordance with the LSPSCOA.

## ARTICLE 3.0 Security Provisions

**3.01** **Security Policies:** All LSPS Operator and non-operator Employees with the PT shall honor the LSPS Operator's security system and shall treat all information directly or indirectly learned or received by virtue of its participation on the PT as confidential in accordance with the provisions of the LSPS Operator's security manual, and all revisions thereto which are made prior to termination of this Exhibit "K". A copy of the security manual and any revisions thereto shall be made available to non-operator Employees by the Project Manager for their use during the project. This obligation of confidentiality shall also apply to any other proprietary and confidential information which may relate to matters other than the LSPS to which PT members are exposed by virtue of working in the LSPS Operator's offices. LSPS Operator will use reasonable efforts to minimize the exposure of the non-operator's personnel to the LSPS Operator's Confidential Information or any other proprietary or confidential information. In no event shall Confidential Information or any other proprietary or confidential information be disclosed to a Third Party without the prior written consent of the LSPS Operator and the non-operators, except as may be provided in the LSPSCOA.

## ARTICLE 4.0  Confidentiality

**4.01**        **Confidentiality Term**:  Each Party agrees to maintain as confidential and not to use or disclose to any Third Party the Confidential Information, except as expressly provided in Article 13 of the LSPSCOA.

**4.02**   **Background Technology**:   The Parties shall use reasonable efforts to declare and list Background Technology and information which will be utilized by the PT prior to establishment of the PT. However a Party may declare and list additional Background Technology after establishment of the PT if it deems such technology will be beneficial to the PT.   Prior to disclosing any Background Technology to the PT, Parties shall agree to exempt the Background Technology from the terms of this Agreement and the LSPSCOA.  If such agreement is not obtained, such Background Technology need not be disclosed to the PT.  The receiving Party shall maintain any Background Technology received as Confidential Information under this Agreement.  In no event will Background Technology be disclosed to a Third Party without the prior written consent of the Party providing the Background Technology to the PT. Any Background Technology presently owned and developed by a Party prior to the formation of the PT shall remain the sole property of that Party.

**4.03**   **Consultant Agreements**:  The Project Manager and each Party soliciting work from Third Party contractors and consultants (or from Affiliates) in connection with the PT shall use reasonable efforts to secure contract terms with such Third Party which contain applicable confidentiality terms and which support rights to the Parties consistent with this Agreement.

**4.04**   **Exceptions and Permitted Disclosures**:  Any Party may disclose Confidential Information to Third Parties if such disclosure is an exception to the confidentiality obligation pursuant to the LSPSCOA.

**4.05**   **Patent Application Disclosures:**  Notwithstanding the foregoing, each Party may use such Confidential Information under Section 5.02 as reasonably necessary or appropriate to file patent applications pursuant to Article 6.  Prompt notice will be provided to the other Parties of any such filing.

**4.06**   **Subsequent Disclosures**:  Following the expiration of the period of confidentiality set forth in Section 4.01 above, each Party may freely use and disclose the Confidential Information without accounting to any other Party, subject only to whatever patent rights, copyright restrictions or confidentiality obligations owed to Third Parties.  Subject to the obligations of confidentiality set forth herein, each Party has the right to copy, display, publish, distribute and prepare derivative works of all

5                                        Exhibit "K" Execution Version

documents, drawings or other writings or materials created or conveyed under this Exhibit "K", including the rights to license, sell or otherwise transfer such rights.

**4.07   Supporting Agreements:** Each Party shall be responsible for insuring that its respective representatives fully abide by all obligations associated with the Confidential Information learned as a result of their participation on the PT and agree to convey such information to others in their company on a "need-to-know" basis only and there shall be limited reproduction of PT generated data. Upon the Project Manager's request, each Party shall require its respective Employees participating on the PT to execute a confidentiality agreement consistent with the confidentiality obligations specified in the LSPSCOA and this Exhibit "K" and shall furnish the other Parties with a copy of same upon request. The LSPS Operator shall be responsible for securing confidentiality agreements from outside contract services.

## ARTICLE 5.0 USE OF CONFIDENTIAL WORK PRODUCT

**5.01   Receipt of Confidential Information:** Each Party will be entitled to receive the full reports of all technical studies, detail reports, general conclusions, numerical results, and design drawings from all engineering services that are charged to the Building AFE's or Supplemental Building AFE's whether those engineering services are performed by a Party participating in the PT, an Affiliate or by a Third Party.

**5.02   Right to use Confidential Information:** Each Party may use for its own account (and free of cost) all Confidential Information received or developed by the PT which is (a) Background Technology; or (b) developed by the PT under this Exhibit "K" the cost of which is charged to the Building AFE's or Supplemental Building AFE's. Each Party may disclose Confidential Information to other members of joint ventures or production sharing arrangements in which the Party or Affiliate has an ownership interest provided the other members agree to hold the Confidential Information in confidence and use it only for the benefit of that joint venture or production sharing arrangement.

**5.03   Third Party Limitations:** The Parties acknowledge that various Background Technology may have been received from Third Parties under pre-existing restrictions (e.g., that the Party may disclose the Third Party source information to a co-venturer in a joint venture only under obligations of confidentiality and under restriction to use the information only in connection with the joint venture). Each delivering Party agrees to identify, in writing, any Background Technology subject to Third Party restrictions and disclose the nature of the restriction to the receiving Party prior to disclosure of the Background Technology. The delivering Party shall secure the receiving Party's acknowledgment of such restrictions

6

prior to transmittal of such Background Technology. The receiving Party's acknowledgment constitutes its acceptance of such obligations and restrictions imposed upon disclosure and use of the Background Technology.

**5.04    Proprietary Software:** During the term of the PT, a Party may be authorized to use various computer software and programs which are identified as being proprietary to one of the other Parties. Such proprietary computer software and programs shall not be considered joint property of the Parties and such computer software and programs are not a deliverable under this Agreement. Use of such proprietary software and programs is not a grant of license of any rights outside of this Agreement and the Parties retain all rights to such property. Computer software and programs which are not proprietary to one of the Parties, but which were developed jointly by the PT, shall be considered Confidential Information and joint property of the Parties.

## ARTICLE 6.0   INVENTIONS, PATENTS AND COPYRIGHTS

**6.01    Patent Assignment with Right to License and Sublicense:** Patents on inventions which are (a) conceived solely by outside contractors or consultants employed for the Building AFE's or Supplemental Building AFE's or conceived jointly among the Parties (each including its respective Affiliates) while working on the PT; and (b) from work which has been funded by the Building AFE's or Supplemental Building AFE's will be assigned to the LSPS Operator. The LSPS Operator agrees to grant each Party an irrevocable, non-exclusive, worldwide, royalty-free license to practice under all such patents, including the right to grant sublicenses under such patents to any Third Party or Affiliate on such other terms and conditions that such Party deems appropriate, without accounting to any other Party.

**6.02      Patent Assignment and License With Limited Right to Sublicense:** Patents on inventions not covered in Section 6.01, which are conceived or first reduced to practice (actual or constructive), by a Party or its Affiliate, either alone or jointly with any outside contractors or consultants, and as a direct result of work which has been funded by the Building AFE's or Supplemental Building AFE's, will be owned by that Party. The Party owning any such patent agrees to grant each other Party an irrevocable, non-exclusive, worldwide, royalty-free license under all such patents to make, have made, use and have used such invention for such other Party's own business, including any joint venture or production sharing arrangement in which such other Party has an ownership interest. Further, each such other Party has the right to extend these rights to its Affiliates.

7

**6.03**   **No Commitment to Disclose Technology:**  Except as expressly set forth above, nothing in this Exhibit "K" will be deemed to require any Party or Affiliate to grant any licenses under any patents to any Party or Third Party.  The scope and content of any Background Technology disclosed under this Exhibit "K" will be determined in the sole discretion of the disclosing Party.

## ARTICLE 7.0  WARRANTIES AND INDEMNITIES

**7.01**   **Disclaimer of Warranties:**  ALL INFORMATION DISCLOSED OR RECEIVED BY THE PARTIES HEREUNDER SHALL BE PROVIDED ON AN "AS IS" BASIS WITHOUT WARRANTIES, EITHER EXPRESS OR IMPLIED, AS TO THE ACCURACY, VALIDITY OR UTILITY OF SUCH INFORMATION OR THAT IT CAN BE USED WITHOUT INFRINGING ANY THIRD PARTY PATENT, COPYRIGHT, OR OTHER PROPRIETARY RIGHT. WITHOUT LIMITING THE PRECEDING, ANY EXPRESS, IMPLIED OR STATUTORY WARRANTY OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE ARE EXPRESSLY EXCLUDED FROM THIS EXHIBIT "K". IN NO EVENT SHALL A PARTY CONVEYING OR DISCLOSING INFORMATION BE LIABLE FOR ANY INCIDENTAL, CONSEQUENTIAL OR OTHER DAMAGES ARISING OUT OF OR RESULTING FROM THE USE OF INFORMATION CONVEYED OR DISCLOSED UNDER THIS EXHIBIT "K".

**7.02**   **Indemnities:**  Each Party agrees to release, defend, hold harmless and indemnify the other Parties from and against any loss, damage, claim, suit, liability, judgment and expense (including attorney fees and other costs of litigation) related to or in connection with its use (including use by others which it authorizes) of any Confidential Information or other information or technology disclosed, exchanged under or developed pursuant to this Exhibit "K".

## ARTICLE 8.0 MISCELLANEOUS PROVISIONS

**8.01**   **Export Controls:**  Each Party agrees to abide by the United States Department of Commerce regulations concerning the export or re-export of United States source technical data, or the direct product thereof, to unauthorized destinations and regulations in respect of information supplied by or on behalf of any other Party hereunder.

**8.02**   **Independent Research.**  Nothing herein shall in any way restrict or impair the right of any Party to conduct its own independent research, development, or design activities relating to the evaluation of alternate deepwater development systems even though such activities may parallel or overlap the activities of the PT.  Any such Party conducting such independent research activities shall be under no

Exhibit "K" Execution Version

obligation pursuant to the LSPSCOA or this Exhibit "K" to disclose results of independent research to the other Party(ies) or with respect to the use or disposition of the results of independent research, including but not limited to all information and data resulting therefrom.

**8.03**   **Duration of the Project Team:**   The PT shall remain in place until (a) the Building, Startup, and Completion of the LSPS; or (b) PT work has been terminated by Majority Interest approval of the Parties, whichever is the earlier event.   Upon dissolution of the PT, the LSPS Operator shall conduct any further work required for the Startup of the LSPS.   Any Building AFE or Supplemental Building AFE in progress at the time of the PT's dissolution shall continue to be accounted for under Exhibit "C" of the Isabela JOA.

**8.04**   **Assignability:**   A Third Party who acquires an interest in the LSPS may join the PT upon the Majority Interest approval of the Parties.   A new Party joining the PT must agree, in writing, to undertake all obligations set forth for a Party under this Exhibit "K".   Such new Party will have all rights, duties and obligations under this Exhibit "K" regarding the use of all Confidential Information exchanged or developed prior to the date such new Party joins the PT and during its participation thereunder.   However, patent rights received by such new Party hereunder pursuant to Article 6.0 of this Exhibit "K" shall be limited to patents based on developments after the date such Party joins the PT.   In the event that a Party assigns its entire interest in the LSPS, the assigning Party shall have all the rights specified in this Exhibit "K", including patent rights and license rights thereunder, based on developments and exchanges prior to the effective date of such assignment and shall continue to have all obligations and duties with respect thereto as set forth in this Exhibit "K" relating to the confidentiality, restrictions on use, patents, indemnity, and as applicable, duties to license the other Parties.

**8.05**   **Re-instatement of Project Team:**   The PT may be reinstated by the LSPS Operator to assist in further work on the LSPS. Any reinstated PT shall utilize the procedures of this Agreement, with any applicable time periods contained in the LSPSCOA running from the date of reinstatement of the PT.

Exhibit "K" Execution Version

**EXHIBIT "L"**

Attached to and made a part of that certain Galapagos Area Loop Subsea Production System Construction
and Operating Agreement dated effective December 1, 2011.

## ISABELA JOINT OPERATING AGREEMENT

Exhibit "L" Execution Version



### FIRST AMENDMENT OF THE
### GALAPAGOS AREA LOOP SUBSEA PRODUCTION SYSTEM
### CONSTRUCTION AND OPERATING AGREEMENT

This First Amendment of the Galapagos Area Loop Subsea Production System Construction and Operating Agreement ("First Amendment") is made effective as of October 10, 2014 (the **"Effective Date"**), by and among Noble Energy, Inc. (**"Noble"**), BP Exploration & Production Inc. (**"BP"**), Red Willow Offshore, LLC (**"RWO"**), and Houston Energy Deepwater Ventures I, LLC (**"HEDV"**). Noble, BP, RWO, and HEDV may each be referred to herein as **"Party"** or collectively as **"Parties."**

### WITNESSETH

WHEREAS, reference is herein made to that certain Galapagos Area Loop Subsea Production System Construction and Operating Agreement dated effective December 1, 2011, by and among BP, as LSPS Operator, and Noble, BP, RWO, and HEDV, as LSPS Owners; and Noble, BP, RWO, and HEDV, as MC 519 Unit Lease Owners; and Noble and BP, as Isabela Lease Owners (the **"LSPS COA"**);

WHEREAS, the following described Oil and Gas Leases are defined in the LSPS COA as being the MC 519 Unit Leases,

Oil and Gas Lease bearing Serial Number OCS-G 27278, dated effective July 1, 2005, granted by the United States of America, as Lessor, in favor of Houston Energy, L.P., et al., as Lessee, covering all of Block 519, Mississippi Canyon, OCS Official Protraction Diagram NH 16-10; and

Oil and Gas Lease bearing Serial Number OCS-G 21176, dated effective July 1, 1999, granted by the United States of America, as Lessor, in favor of Elf Exploration, Inc., as Lessee, covering all of Block 563, Mississippi Canyon, OCS Official Protraction Diagram NH 16-10 (the **"MC 563 Lease"**).

WHEREAS, the MC 519 Unit Leases are included under the definition of Satellite Leases under the LSPS COA;

WHEREAS, pursuant to the terms of that certain MC 563 Assignment Agreement dated effective October 10, 2014, by and among BP, Noble, and HEDV (**"MC 563 Assignment Agreement"**), Noble and BP conveyed to HEDV all of their record title and operating rights interests in and to the MC 563 Lease, with Noble and BP each reserving (i) a 2% of 8/8ths proportionately reduced overriding royalty interest from the surface to 19,000' TVDSS in the MC 563 Lease, and (ii) the right to acquire the operating rights in the MC 563 Lease as to depths from 19,001' to 99,999' TVDSS (**"MC 563 Deep Rights"**);

WHEREAS, HEDV and RWO subsequently conveyed to Deep Gulf Energy III, LLC (**"DGE"**), Ridgewood South Santa Cruz, LLC (**"Ridgewood"**), and ILX Prospect South Santa Cruz, LLC (**"ILX"**) certain undivided record title and operating rights interests in and to the MC 563 Lease;

1

WHEREAS, the LSPS COA states that any conveyance of an interest in a Satellite Lease shall require the simultaneous transfer of a proportionate interest in the Loop Subsea Production System ("LSPS"), as such term is defined in the LSPS COA; and

WHEREAS, the Parties desire to amend the LSPS COA to (i) remove the MC 563 Lease from being a Satellite Lease, and (ii) provide that the conveyances of the MC 563 Lease described above did not require a simultaneous transfer of a proportionate interest in the LSPS.

NOW, THEREFORE, in consideration of the promises, mutual covenants and conditions herein contained, the receipt and sufficiency of which are hereby acknowledged, the Parties hereby agree as follows:

1. Under Section 1.01 (Definitions), the definitions listed below are revised as follows:

   "**MC 519 Unit Leases**" means the oil and gas lease OCS-G 27278 covering and affecting Mississippi Canyon Block 519 in the Gulf of Mexico.

   "**MC 519 Unit Operating Agreement**" or "**MC 519 UOA**" means that certain Unit Operating Agreement by and between BP, Noble, Red Willow and HE&D Offshore, L.P., covering the MC 519 Unit Leases dated effective January 1, 2009, as amended by First Amendment dated effective October 10, 2014.

2. The following assignments (collectively, the "**Assignments**") did not have to comply with Section 17.01 (Assignment) of the LSPS COA, including, but not limited to, the requirement that a transfer of an ownership interest in a Satellite Lease shall include the simultaneous transfer of a proportionate interest in the LSPS:

   a. Assignment of Record Title Interest in Federal OCS Oil and Gas Lease dated effective October 10, 2014, whereby BP conveyed to HEDV an undivided 46.50% record title interest in and to the MC 563 Lease;

   b. Assignment of Operating Rights Interest in Federal OCS Oil and Gas Lease dated effective October 10, 2014, whereby BP conveyed to HEDV an undivided 46.50% operating rights interest in and to the MC 563 Lease, limited to the N/2NW/4 of Block 563, Mississippi Canyon, as to all depths from the surface down to 19,000' TVDSS ("**MC 563 Shallow Rights**");

   c. Assignment of Record Title Interest in Federal OCS Oil and Gas Lease dated effective October 10, 2014, whereby Noble conveyed to HEDV an undivided 23.25% record title interest in and to the MC 563 Lease;

   d. Assignment of Operating Rights Interest in Federal OCS Oil and Gas Lease dated effective October 10, 2014, whereby Noble conveyed to HEDV an undivided 23.25% operating rights interest in and to the MC 563 Shallow Rights;

    e. Assignment of Record Title Interest in Federal OCS Oil and Gas Lease dated effective February 1, 2015, whereby HEDV conveyed to DGE, Ridgewood, and ILX a collective 69.75% record title interest in and to the MC 563 Lease;

    f. Assignment of Operating Rights Interest in Federal OCS Oil and Gas Lease dated effective February 1, 2015, whereby HEDV conveyed to DGE, Ridgewood, and ILX a collective 69.75% operating rights interest in and to the MC 563 Shallow Rights;

    g. Assignment of Record Title Interest in Federal OCS Oil and Gas Lease dated effective February 1, 2015, whereby RWO conveyed to DGE, Ridgewood, and ILX a collective 11.25% record title interest in and to the MC 563 Lease; and

    h. Assignment of Operating Rights Interest in Federal OCS Oil and Gas Lease dated effective February 1, 2015, whereby RWO conveyed to DGE, Ridgewood, and ILX a collective 11.25% operating rights interest in and to the MC 563 Shallow Rights.

3. For clarification, if Noble or BP exercise their individual rights to reacquire the MC 563 Deep Rights under the terms of the MC 563 Assignment Agreement, then the MC 563 Lease, limited to the MC 563 Deep Rights, shall automatically be included as a Satellite Lease under the LSPS COA. The Parties shall thereafter execute the necessary amendment to the LSPS COA.

4. Notwithstanding anything to the contrary in the Assignments, the record title and operating rights interests held by HEDV, RWO, DGE, Ridgewood and ILX in the MC 563 Lease and the MC 563 Shallow Rights are not subject to, nor burdened by, any obligations, rights or liabilities arising under, or connected with the LSPS COA. DGE, Ridgewood and ILX join in the execution of this First Amendment for the limited purpose of acknowledging this Section 4 of the First Amendment.

5. Notwithstanding anything to the contrary in this First Amendment, the Equity Interest, as defined in the LSPS COA, of each of the MC 519 Unit Lease Owners and the Isabela Lease Owners is not amended and shall remain as stated in the LSPS COA.

6. All other terms and provisions of the LSPS COA shall remain in full force and effect.

    This First Amendment may be executed in multiple counterparts, each of which when so executed shall be given the effect of execution of the original instrument. When so executed, the signatures of the parties as attached hereto may be combined in, and treated, and given effect, for all purposes, as a single instrument.

    This First Amendment shall be binding on the signatory parties hereto, their successors and assigns forever.

IN WITNESS WHEREOF, this First Amendment of the Galapagos Area Loop Subsea Production System Construction and Operating Agreement is executed by each party as of the date set forth below each party's signature, but made effective as of the date hereinabove written.

**BP Exploration & Production Inc.**

By: _____

Name: <u>David G. Peterson</u>

Title: <u>Attorney-in-Fact</u>

Date: <u>November 3, 2015</u>

**Noble Energy, Inc.**

By: _____

Name: <u>T. Hodge Walker</u>

Title: <u>Vice President</u>

Date: _____

**Deep Gulf Energy III, LLC**

By: _____

Name: Thomas E. Young

Title: Vice President – Land and Business Development and Secretary

Date: _____

**Houston Energy Deepwater Ventures I, LLC**

By: _____

Name: P. David Amend

Title: Vice President, Land

Date: _____

IN WITNESS WHEREOF, this First Amendment of the Galapagos Area Loop Subsea Production System Construction and Operating Agreement is executed by each party as of the date set forth below each party's signature, but made effective as of the date hereinabove written.

**BP Exploration & Production Inc.**

By:_____

Name: David G. Peterson

Title: Attorney-in-Fact

Date: _____

**Noble Energy, Inc.**

By: _____

Name: T. Hodge Walker

Title: Vice President

Date: _____11-04-2015_____

**Deep Gulf Energy III, LLC**

By:_____

Name: Thomas E. Young

Title: Vice President – Land and Business Development and Secretary

Date: _____11-10-15_____

**Houston Energy Deepwater Ventures I, LLC**

By:_____

Name: P. David Amend

Title: Vice President, Land

Date: _____

IN WITNESS WHEREOF, this First Amendment of the Galapagos Area Loop Subsea Production System Construction and Operating Agreement is executed by each party as of the date set forth below each party's signature, but made effective as of the date hereinabove written.

**BP Exploration & Production Inc.**

By: _____

Name: David G. Peterson

Title: Attorney-in-Fact

Date: _____

**Noble Energy, Inc.**

By: _____

Name: T. Hodge Walker

Title: Vice President

Date: 11-04-2015

**Deep Gulf Energy III, LLC**

By: _____

Name: Thomas E. Young

Title: Vice President – Land and Business Development and Secretary

Date: _____

**Houston Energy Deepwater Ventures I, LLC**

By: _____

Name: P. David Amend

Title: Vice President, Land

Date: 11 - 6 - 15

**Red Willow Offshore, LLC**

By: _Richard L Smith_

Name: _Richard L. Smith_

Title: _Executive Vice President - Offshore_

Date: _11/09/2015_

**Ridgewood South Santa Cruz, LLC**

By: _W. Greg Tabor_

Name: W. Greg Tabor

Title: Executive Vice President

Date: _11-17-2015_

**ILX Prospect South Santa Cruz, LLC**
By: Ridgewood Energy Corporation, Attorney-in-Fact

By: _W. Greg Tabor_

Name: W. Greg Tabor

Title: Executive Vice President

Date: _11-17-2015_

**SECOND AMENDMENT TO**
**GALAPAGOS AREA LOOP SUBSEA PRODUCTION SYSTEM CONSTRUCTION AND**
**OPERATING AGREEMENT**

This Second Amendment to the Galapagos Area Loop Subsea Production System Construction and Operating Agreement (this "**Agreement**") is made effective as of October 15, 2018 (the "**Effective Date**") by and among BP Exploration & Production Inc. ("**BP**"), Fieldwood Energy LLC ("**Fieldwood**"), Red Willow Offshore, LLC ("**Red Willow**") and Houston Energy Deepwater Ventures I, LLC ("**HEDV**").  BP, Fieldwood, Red Willow and HEDV may each be referred to herein as a "**Party**" or collectively as "**Parties**".

<u>WITNESSETH</u>

WHEREAS, reference is made to that certain Galapagos Area Loop Subsea Production System Construction and Operating Agreement dated effective as of December 1, 2011, by and among BP, Noble Energy, Inc., Red Willow and HEDV, as amended by that certain First Amendment of the Galapagos Area Loop Subsea Production System Construction and Operating Agreement dated effective as of October 10, 2014, by and among Noble Energy, Inc., BP, Red Willow and HEDV (the "**LSPS Agreement**"); and

WHEREAS, the Parties desire to amend the definitions of MC 519 Unit Operating Agreement and MC 519 UOA of the LSPS Agreement to reflect a newly contemplated joint operating agreement;

NOW, THEREFORE, in consideration of the promises, mutual covenants and conditions herein contained, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

1.  As of the Effective Date, the definitions of MC 519 Unit Operating Agreement and MC 519 UOA appearing in Section 1.01 of the LSPS Agreement shall be deleted in their entirety and replaced with the following:

    "**MC 519 Unit Operating Agreement**" or "**MC 519 UOA**" means that certain (a) Joint Operating Agreement dated October 15, 2018, by and between BP, Fieldwood Energy LLC, Red Willow and HEDV, covering the Operating Rights Interest in the SW4 and S2 NW4 from 0 – 14,000' TVDSS (the "**CPN Prospect**") and (b) Unit Operating Agreement originally by and between BP, Noble, Red Willow and HE&D Offshore, L.P., and bearing BOEMRE Contract Number 754309001, dated effective January 1, 2009 as amended by that certain First Amendment of the Unit Operating Agreement and Establishment of Lease Offshore Operating Agreements, dated effective as of October 10, 2014, by and among BP, Red Willow, HEDV, Noble Energy, Inc., Deep Gulf Energy III, LLC, Ridgewood South Santa Cruz, LLC and ILX Prospect South Santa Cruz, LLC, as the same may be further amended from time to time, which covers that portion of the MC 519 Unit Leases that does not include the CPN Prospect.

2.  The Parties hereby ratify Fieldwood as the successor in interest to Noble Energy, Inc. and agree that all references in the LSPS Agreement to "Noble Energy, Inc." or "Noble" or similar references shall refer to Fieldwood as of the date Fieldwood was assigned its interest in the LSPS Agreement. All other terms and provisions of the LSPS Agreement shall remain in full force and effect.

3.  This Agreement may be executed in multiple counterparts, each of which when so executed shall be given the effect of execution of the original instrument. When so executed, the signatures of the Parties as attached hereto may be combined in, and treated, and given effect, for all purposes as a single instrument. The execution of this Agreement by electronic means shall have the same force

and effect as delivery of an original document with original signatures and each Party may use such signatures as evidence of the execution and delivery of this Agreement by the Parties.

4.  This Agreement shall be binding on the Parties, their successors and assigns forever.

*[Signature page to follow.]*

IN WITNESS WHEREOF, this Agreement is executed by each Party as of the date set forth below each Party's signature, but made effective as of the Effective Date.

**BP Exploration & Production Inc.**

By: *Danielle Scott*
Name: Danielle Scott
Title: Authorized Person
Date: December 10, 2018

**Fieldwood Energy LLC**

By: _____
Name: _____
Title: _____
Date: _____

**Red Willow Offshore, LLC**

By: _____
Name: _____
Title: _____
Date: _____

**Houston Energy Deepwater Ventures I, LLC**

By: _____
Name: _____
Title: _____
Date: _____

*[Signature Page to the Second Amendment to the LSPS Agreement]*

IN WITNESS WHEREOF, this Agreement is executed by each Party as of the date set forth below each Party's signature, but made effective as of the Effective Date.

**BP Exploration & Production Inc.**

By:_____
Name:_____
Title:_____
Date:_____


**Fieldwood Energy LLC**

By: _____
Name: _John H. Smith_
Title: _Senior Vice President - Land & Business Development_
Date: _December 6, 2018_


**Red Willow Offshore, LLC**

By: _____
Name:  Richard L. Smith
Title:  Executive Vice President - Offshore
Date:  12\4\2018


**Houston Energy Deepwater Ventures I, LLC**

By:_____
Name:_____
Title:_____
Date:_____


*[Signature Page to the Second Amendment to the LSPS Agreement]*

IN WITNESS WHEREOF, this Agreement is executed by each Party as of the date set forth below each Party's signature, but made effective as of the Effective Date.

**BP Exploration & Production Inc.**

By:_____
Name:_____
Title:_____
Date:_____

**Fieldwood Energy LLC**

By:_____
Name: _John H. Smith_____
Title: _Senior Vice President – Land & Business Development_
Date: _December 6, 2018_

**Red Willow Offshore, LLC**

By:_____
Name:_____
Title:_____
Date:_____

**Houston Energy Deepwater Ventures I, LLC**

By:_____
Name: _P. David Amend_____
Title: _Vice President, Land_
Date: _November 28, 2018_

[*Signature Page to the Second Amendment to the LSPS Agreement*]

*Execution Version*

**THIRD AMENDMENT TO**
**GALAPAGOS AREA LOOP SUBSEA PRODUCTION SYSTEM CONSTRUCTION AND**
**OPERATING AGREEMENT**

This Third Amendment to the Galapagos Area Loop Subsea Production System Construction and Operating Agreement (this "**Agreement**") is made effective as of May 1, 2019 (the "**Effective Date**") by and among BP Exploration & Production Inc. ("**BP**"), Fieldwood Energy LLC ("**Fieldwood**"), Red Willow Offshore, LLC ("**Red Willow**") and Houston Energy Deepwater Ventures I, LLC ("**HEDV**"). BP, Fieldwood, Red Willow and HEDV may each be referred to herein as a "**Party**" or collectively as "**Parties**".

<u>WITNESSETH</u>

WHEREAS, reference is made to that certain Galapagos Area Loop Subsea Production System Construction and Operating Agreement dated effective as of December 1, 2011, by and among BP, Noble Energy, Inc. (as predecessor in interest of Fieldwood), Red Willow and HEDV, as amended by that certain First Amendment of the Galapagos Area Loop Subsea Production System Construction and Operating Agreement dated effective as of October 10, 2014, by and among Noble Energy, Inc. (as predecessor in interest of Fieldwood), BP, Red Willow and HEDV and by that certain Second Amendment of the Galapagos Area Loop Subsea Production System Construction and Operating Agreement dated effective as of October 15, 2018, by and among BP, Fieldwood, Red Willow and HEDV (the "**LSPS Agreement**"); and

WHEREAS, the Parties desire to amend the definitions of MC 519 Unit Operating Agreement and MC 519 UOA of the LSPS Agreement to reflect a newly contemplated joint operating agreement;

NOW, THEREFORE, in consideration of the promises, mutual covenants and conditions herein contained, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

1. As of the Effective Date, the definitions of MC 519 Unit Operating Agreement and MC 519 UOA appearing in Section 1.01 of the LSPS Agreement shall be deleted in their entirety and replaced with the following:

   "**MC 519 Unit Operating Agreement**" or "**MC 519 UOA**" means that certain (a) Unit Operating Agreement originally by and between BP, Noble Energy, Inc. (as predecessor interest of Fieldwood Energy LLC), Red Willow and HE&D Offshore, L.P., and bearing BOEMRE Contract Number 754309001, dated effective January 1, 2009 as amended by that certain First Amendment of the Unit Operating Agreement and Establishment of Lease Offshore Operating Agreements, dated effective as of October 10, 2014, by and among BP, Red Willow, HEDV, Noble Energy, Inc., Deep Gulf Energy III, LLC, Ridgewood South Santa Cruz, LLC and ILX Prospect South Santa Cruz, LLC, as the same may be further amended from time to time, which covers the Record Title Interest in and to the Mississippi Canyon Block 519 and the Operating Rights Interest in oil and gas lease OCS-G 27278 covering and affecting the Mississippi Canyon Block 519 insofar and only insofar as such lease covers the operating rights interest in the SE/4 and S/2 SE/4 NE/4 of Mississippi Canyon Block 519 from 0 – 19,300' True Vertical Depth Subsea; (b) CPN Joint Operating Agreement effective as of October 15, 2018 by and among BP, Fieldwood Energy LLC, Red Willow and HEDV, as the same may be further amended from time to time, which covers the Operating Rights Interest in oil and gas lease OCS-G 27278 covering and affecting the Mississippi Canyon Block 519 insofar and only insofar as such lease covers the operating rights interest in the SW/4 and S/2 NW/4 of the Mississippi Canyon Block 519 from 0 – 14,000' True Vertical Depth Subsea, (c) Retained Operating Rights Joint

Operating Agreement effective as of May 1, 2019 by and among BP, Fieldwood Energy LLC, Red Willow and HEDV, as the same may be further amended from time to time, which covers the Operating Rights Interest in oil and gas lease OCS-G 27278 covering and affecting the Mississippi Canyon Block 519 insofar and only insofar as such lease covers the operating rights interest in (i) the N/2 NE/4, SW/4 NE/4, N/2 SE/4 NE/4 and N/2 NW/4 of Mississippi Canyon Block 519 and depths extending from the surface to 99,999' True Vertical Depth Subsea, (ii) the S/2 NW/4 of Mississippi Canyon Block 519 and depths extending from 14,000' to 99,999' True Vertical Depth Subsea, and (iii) the S/2 and S/2 SE/4 NE/4 of Mississippi Canyon Block 519 and depths extending from 19,300' to 99,999' True Vertical Depth Subsea and (d) SASC Joint Operating Agreement effective as of May 1, 2019 by and among BP, Fieldwood Energy LLC, Red Willow and HEDV, as the same may be further amended from time to time, which covers the Operating Rights Interest in oil and gas lease OCS-G 27278 covering and affecting the Mississippi Canyon Block 519 insofar and only insofar as such lease covers the operating rights interest in the SW/4 of Mississippi Canyon Block 519 and from depths extending from 14,000 – 19,300' True Vertical Depth Subsea.

2. All other terms and provisions of the LSPS Agreement shall remain in full force and effect.

3. This Agreement may be executed in multiple counterparts, each of which when so executed shall be given the effect of execution of the original instrument. When so executed, the signatures of the Parties as attached hereto may be combined in, and treated, and given effect, for all purposes as a single instrument.  The execution of this Agreement by electronic means shall have the same force and effect as delivery of an original document with original signatures and each Party may use such signatures as evidence of the execution and delivery of this Agreement by the Parties.

4. This Agreement shall be binding on the Parties, their successors and assigns forever.

[*Signature page to follow.*]

IN WITNESS WHEREOF, this Agreement is executed by each Party as of the date set forth below each Party's signature, but made effective as of the Effective Date.

**BP Exploration & Production Inc.**

By: _Danielle Scott_
Name: _Danielle Scott_
Title: _Authorized Person_
Date: _5/16/2019_

**Fieldwood Energy LLC**

By: _____
Name: _____
Title: _____
Date: _____

**Red Willow Offshore, LLC**

By: _____
Name: _____
Title: _____
Date: _____

**Houston Energy Deepwater Ventures I, LLC**

By: _____
Name: _____
Title: _____
Date: _____

*[Signature Page to Third Amendment to Galapagos Area Loop Subsea Production System Construction and Operating Agreement]*

IN WITNESS WHEREOF, this Agreement is executed by each Party as of the date set forth below each Party's signature, but made effective as of the Effective Date.

**BP Exploration & Production Inc.**

By: _____
Name: _____
Title: _____
Date: _____


**Fieldwood Energy LLC**

By: _____ *[signature]* _____
Name: _____ John H. Smith _____
Title: _____ Sr. Vice President _____
Date: _____ 16 May 2019 _____


**Red Willow Offshore, LLC**

By: _____
Name: _____
Title: _____
Date: _____


**Houston Energy Deepwater Ventures I, LLC**

By: _____
Name: _____
Title: _____
Date: _____


*[Signature Page to Third Amendment to Galapagos Area Loop Subsea Production System Construction and Operating Agreement]*

IN WITNESS WHEREOF, this Agreement is executed by each Party as of the date set forth below each Party's signature, but made effective as of the Effective Date.

**BP Exploration & Production Inc.**

By:_____
Name:_____
Title:_____
Date:_____


**Fieldwood Energy LLC**

By:_____
Name:_____
Title:_____
Date:_____


**Red Willow Offshore, LLC**

By: _____
Name: Richard L. Smith
Title: Executive Vice President - Offshore
Date: 5/16/2019


**Houston Energy Deepwater Ventures I, LLC**

By:_____
Name:_____
Title:_____
Date:_____

IN WITNESS WHEREOF, this Agreement is executed by each Party as of the date set forth below each Party's signature, but made effective as of the Effective Date.

**BP Exploration & Production Inc.**

By:_____
Name:_____
Title:_____
Date:_____

**Fieldwood Energy LLC**

By:_____
Name:_____
Title:_____
Date:_____

**Red Willow Offshore, LLC**

By:_____
Name:_____
Title:_____
Date:_____

**Houston Energy Deepwater Ventures I, LLC**

By:_____
Name: P. David Amen
Title: Vice President, Land
Date: 5/16/2019

*[Signature Page to Third Amendment to Galapagos Area Loop Subsea Production System Construction and Operating Agreement]*