```
                  UNITED STATES BANKRUPTCY COURT
                SOUTHERN DISTRICT OF TEXAS (HOUSTON)


                              .    Case No. 20-33948
IN RE:                        .    Chapter 11
                              .    (Jointly administered)_
FIELDWOOD ENERGY, LLC,        .
et al.,                       .    515 Rusk Street
                              .    Houston, TX  77002
              Debtors.        .
                              .    Monday, January 25, 2021
. . . . . . . . . . . . . . . .    8:59 a.m.
```

     TRANSCRIPT OF MOTION FOR RELIEF FROM STAY, FEE AMOUNT $188,
       FILED BY CREDITOR LLOG EXPLORATION COMPANY, LLC [683];
          MOTION FOR ADEQUATE PROTECTION FILED BY CREDITOR
                LLOG EXPLORATION  COMPANY, LLC[684]
       **BEFORE THE HONORABLE MARVIN ISGUR (VIA VIDEO CONFERENCE)**
             **UNITED STATES BANKRUPTCY COURT JUDGE**


TELEPHONIC APPEARANCES:

For the Debtors:          Weil, Gotshal & Manges LLP
                          By:  ALFREDO R. PEREZ, ESQ.
                               CLIFFORD W. CARLSON, ESQ.
                          700 Louisiana, Suite 1700
                          Houston, TX 77002
                          (713) 546-5040

                          Weil, Gotshal & Manges LLP
                          By:  MATTHEW S. BARR, ESQ.
                          767 Fifth Avenue
                          New York, NY 10153-0119
                          (212) 310-8010

                          Weil, Gotshal & Manges LLP
                          By:  ERIN MARIE CHOI, ESQ.
                          200 Crescent Court, Suite 300
                          Dallas, TX 75201-6950
                          (214) 746-8184

TELEPHONIC APPEARANCES.

Audio Operator:           Courtroom ECRO Personnel

Transcription Company:    Access Transcripts, LLC
                          10110 Youngwood Lane
                          Fishers, IN 46038
                          (855) 873-2223
                          www.accesstranscripts.com


Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

TELEPHONIC APPEARANCES (Continued):                          2

For LLOG Exploration        Looper Goodwine, P.C.
Offshore, L.L.C.:           By:  PAUL J. GOODWINE, ESQ.
                                 LINDSEY M. JOHNSON, ESQ.
                            650 Poydras Street, Suite 2400
                            New Orleans, LA 70130
                            (504) 503-1500

For the Ad Hoc Group        Haynes and Boone, LLP
of Secured Lenders:         By:  CHARLES A. BECKHAM, JR., ESQ.
                                 DAVID TRAUSCH, ESQ.
                            1221 McKinney Street, Suite 4000
                            Houston, TX 77010
                            (713) 547-2000

                            Davis Polk & Wardwell LLP
                            By:  JOSHUA STURM, ESQ.
                                 NATASHA TSIOURIS, ESQ.
                            450 Lexington Avenue
                            New York, NY  10017
                            (212) 450-4000

For the Official            Pachulski Stang Ziehl & Jones LLP
Committee of Unsecured      By:  MICHAEL D. WARNER, ESQ.
Creditors:                  440 Louisiana Street, Suite 900
                            Houston, TX 77002
                            (713) 691-9385

**I N D E X**
**1/25/21**

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| FOR THE MOVANT: | | | | |
| Michael T. Dane | 52 | -- | -- | -- |
| FOR THE DEBTORS: | | | | |
| Michael T. Dane | 76 | 78 | -- | -- |

| EXHIBITS | ADMITTED |
|---|---|
| ECF 774-1 | 21 |
| ECF 774-2 | 27 |
| ECF 774-4 through 774-10 | 50 |
| ECF 774-11 | 16 |
| ECF 774-12 through 774-13 | 50 |
| ECF 774-14 through 774-18 | 16 |
| ECF 774-19 | 14 |
| ECF 774-20 through 26 | 50 |
| ECF 774-27 through 774-35 | 15 |
| ECF 774-36 through 774-37 | 50 |
| ECF 774-38 through 774-39 | 25 |
| ECF 775-1 through 775-26 | 33 |
| ECF 784-1 | 11 |

4

1          (Proceedings commence at 8:59 a.m.)

2          THE COURT:  All right.  Good morning.  We're here in

3    the Fieldwood Energy case.  It's 20-33948.  Let me get a status

4    report as to where we are from Mr. Goodwine and Mr. Perez.

5          Mr. Goodwine, I found Mr. Perez's phone number.

6    Could you go ahead and press "five star" on your line so I can

7    find yours as well.  I think you pressed it twice.  If you

8    could press it just one -- there we go.  Thank you.  Calling

9    from a different number than usual.

10          All right, Mr. Perez, Mr. Goodwine.  Tell me where we

11    are.

12          MR. GOODWINE:  Good morning, Your Honor.

13    P.J. Goodwine.  Can you hear me, Your Honor?

14          THE COURT:  I can.  Thank you.

15          MR. GOODWINE:  We do not have an agreement, and I

16    think both parties are prepared to proceed.  We did talk on

17    Friday afternoon about witness and exhibit lists to try to keep

18    things as organized as possible.  But I think that both

19    motions, with the concentration on the adequate (audio

20    interference) this morning.

21          THE COURT:  All right.  Let's move ahead.

22          MR. GOODWINE:  Okay.  Your Honor, my client, LLOG

23    Exploration, is the movant, so what I was proposing to do is

24    give kind of an opening statement and an argument, and then

25    proceed on to direct examination of Mr. Dane, as appropriate.

1  If you want me to pause before that to hear from the debtor,

2  I'm more than happy to proceed in that regard.  The main

3  point --

4          THE COURT:  Yeah.  If you want to do an opening

5  statement, let's give them a chance to do an opening statement,

6  and then we'll move into the evidentiary record.

7          MR. GOODWINE:  Okay.  Thank you, Your Honor.

8          The main point of LLOG's motion practice is to secure

9  adequate protection for its secured claim.  The same motion

10  component is an actual appendix to that because the relief

11  requested would require us to go to a third party to seek

12  relief in the escrow of production.  From a 30,000-foot view,

13  what we need to be cognizant of is what Fieldwood is ultimately

14  attempting to do.  And this became clear, quite frankly, after

15  we filed our motion.  Due to their plan filings, they're

16  seeking to abandon their plugging and abandonment obligations

17  in both Green Canyon 157 and Green Canyon 201 to LLOG and to

18  other parties while stripping out from their obligations an

19  overriding royalty interest they have in the exact same

20  contract area.

21          LLOG was patient through the opening stages of the

22  bankruptcy, but certainly became concerned as to the ultimate

23  (audio interference) reorganization.  And with the collateral

24  that we're specifically talking about today, which is not the

25  mortgage in the underlying override, which we obviously believe

1  we have and reserve rights to that.  But it's the daily ongoing

2  production and the proceeds therefrom that are our collateral

3  and are presently going to simply fund the bankruptcy case

4  without prospects of ultimate resolution at the end of the day.

5           At the end of the day -- then the proceeds, just to

6  be clear, so we can talk about it from the correct legal terms,

7  we're talking about cash proceeds received from the sale of

8  produced oil and gas attributable to Fieldwood's overrides on

9  Green Canyon 201, and ultimately the plan is for them to

10 extinguish the underlying override and therefore, you know,

11 under 363, we'll be back arguing about that, I'm sure.  But

12 between now and then, the only recourse we have is to the

13 production (audio interference) proceeds.

14           Keep in mind the limited nature of what LLOG is

15 requesting in its motions.  We are only seeking to have the

16 production proceeds escrowed pending the claims objection

17 process.  We are not seeking that the funds be paid to LLOG at

18 this point.  We're taking a very measured and limited approach

19 in order to ensure that the only potential collateral available

20 as the bankruptcy proceeds is the cash collateral associated

21 with the as-extracted collateral from the override.

22           We're not attempting to recharacterize or even get a

23 court ruling or to weigh in on whether or not P&A is an

24 administrative expense or not, even though the focus of our

25 unpaid claims is P&A.  We're not trying to challenge what the

1  scope of an overriding royalty interest traditionally covers.

2  We understand that they're traditionally non-cost-bearing

3  interest.  The request for relief exclusively with LLOG's

4  ability to protect its rights in collateral here just so

5  happens to be as-extracted collateral from an override, which

6  is provided for under the applicable operating agreements and

7  various acknowledgments and rights created under public records

8  filing.

9         Adequate protection obviously emanates from 363 of

10  the Bankruptcy Code, specifically 363(e).  The focus of the

11  requirement is protection to be provided as a condition to the

12  use of lost property during the bankruptcy case.  To establish

13  a prima facie case for lack of adequate protection, the movant,

14  LLOG, must show that it holds a claim secured by a valid,

15  protected lien upon estate property, and that there's a decline

16  in the value of the collateral or a threat associated therewith

17  against which we're precluded from taking action due to the

18  automatic stay.

19         We believe that all of those factors are met in this

20  case.  Once we establish that prima facie showing, then the

21  debtor must show how or why adequate protection is already

22  provided without there being further order of the Court.

23         Overrides are declining, by their nature, in value.

24  That's particularly true in this case for a few reasons.

25  Number one, the present cash flow associated with the

1  production associated with the override in this case is solely

2  dependent upon operations of LLOG, as Fieldwood is now non-

3  consent.  And secondly, Fieldwood (audio interference) not take

4  any action under the operating agreement or otherwise due to

5  their non-consent status in order to increase production or to

6  propose activities that would protect or enhance (audio

7  interference).

8            The oil and gas industry is in a precarious state at

9  the moment, as I think you know.  There was -- and we uploaded

10  this last night, and we'd like the Court to take judicial

11  notice of it.  It was filed as Exhibit 46 by LLOG and it's

12  (audio interference) order by the Acting Secretary of the

13  Department of the Interior, which has basically created a

14  moratorium on the issuance of new drilling permits.  So any

15  activity in Green Canyon 201 to sustain or to extend production

16  is presently precluded by the Secretarial order.

17            And if I may, Your Honor, I think this is the first

18  hearing I've done since the COVID protocols were put into

19  effect.  Do I or Ms. Johnson need to upload the specific

20  document, or are people doing that on their own if I call out

21  the appropriate CM/ECF record?

22            THE COURT:  Oh, that's really up to you.  You can

23  either broadcast it, if you wish, or people can look at it on

24  their own.

25            MR. GOODWINE:  Okay.  What I'd like to call your

1  attention to, Your Honor -- and this will be under Document

2  784-1, which was uploaded last night, which is a Secretarial

3  order issued mid-last week that basically in Paragraph G

4  indicates that there will be a moratorium on issuance of new

5  leases and also permits to drill.  And that's important because

6  to sidetrack a well or to develop reserves further, a permit to

7  drill would need to be issued.

8          Now, I don't want to overstate the argument.  I

9  always try to keep it in the appropriate perspective --

10          THE COURT:  So, Mr. Goodwine, this is the first time

11  I've seen this order.  My quick glance at it says it transfers

12  the authority from some subordinate positions to senior

13  positions to approve drilling, not that it suspends the

14  authority to approve drilling.

15          It just says from now on we're not going to do it at

16  a junior level, we're going to do it at a "Secretary, Deputy

17  Secretary, Solicitor, Assistant Secretary, Assistant Secretary,

18  Assistant Secretary, Assistant Secretary, Assistant Secretary,

19  or Assistant Secretary" level.

20          Are you telling me that -- and I haven't read it

21  carefully.  But are you telling me that this actually suspends

22  the authority altogether, or does it simply transfer the

23  individual within the Department who would have the authority

24  to grant the permit?

25          MR. GOODWINE:  For all practical purposes, we believe

1  it is an effective moratorium because the people that approve

2  permits within the Bureau of Safety and Environmental

3  Enforcement are significantly junior to anyone on this list.

4  And they bypass even the Regional Director for BSEE, which is

5  the direct supervisor of those that handle the types of permits

6  we're talking about.  And even bypasses that individual's boss,

7  which is the ultimate director of BSEE in Washington, D.C.

8         So I seriously doubt that anyone on this list -- and

9  most of the ones that have the Assistant Secretary titles do

10  not deal with offshore Gulf of Mexico operations.  So, from a

11  practical standpoint, until this order is listed, I don't think

12  that you're going to see a drilling permit issued within the

13  Gulf of Mexico, which obviously creates some consternation --

14         THE COURT:  And it's a 60-day order.  Did y'all have

15  drilling planned in the next 60 days?

16         MR. GOODWINE:  Not to my knowledge, Your Honor.  But

17  it's an indication not to prove that there will not forevermore

18  be no further activities, but the ability to continue to

19  protect the viability of production in the Gulf of Mexico is

20  called into question, and be an additional reason beyond what

21  we put in our memos and what we'll be talking about today.

22         THE COURT:  All right.  And are you moving me to take

23  notice of this memo?

24         MR. GOODWINE:  That is correct, Your Honor.  We would

25  move that the Court take judicial notice of CM/ECF 784-1.

1           THE COURT:  Any objection to taking notice of 784-1

2 as an action of the United States?

3           MR. PEREZ:  No objection, Your Honor.

4           THE COURT:  All right.  784-1 is actually admitted as

5 a document.  That will make it easier that way.

6      (ECF 784-1 admitted into evidence)

7           MR. GOODWINE:  Thank you.  And so with that, you

8 know, especially as we're talking about what hopefully for the

9 estate and everyone involved is a short-term (audio

10 interference) get to a plan confirmation, which is not

11 guaranteed obviously for a lot of different reasons, that it's

12 during this period that we're seeking to have the (audio

13 interference) production proceeds segregated and escrowed so

14 that LLOG's secured claim can be protected as we move through

15 the bankruptcy case.

16           THE COURT:  How much is that a month --

17           MR. GOODWINE:  The last --

18           THE COURT:  How much is that on a monthly basis,

19 Mr. Goodwine?  Roughly.  I don't know if I'm talking $10,000 or

20 $10 million, so --

21           MR. GOODWINE:  Well, it's between the two.  I think

22 it's about $50,000.  And that is with an appropriate caveat a

23 lawyer gets without direct input from client.  And don't want

24 to put Mr. Dane on the spot too much when we go through some

25 examination.  But if he may know from a recipient standpoint,

1  we may get clarity on it.

2          THE COURT:  Okay.  But in the range of $50,000 is at

3  least what your opening position would be.

4          MR. GOODWINE:  That is correct, Your Honor.

5          THE COURT:  All right.  Thank you.

6          MR. GOODWINE:  Okay.  And then lastly, Your Honor --

7  just, again, from a global dynamic standpoint, and we're here

8  to talk about the 363 issues, but the ultimate concern by LLOG

9  is also forward thinking, which is if their plan is confirmed,

10  they plan to take the P&A on these properties and abandon them

11  to LLOG and others, predecessors, and then take the override

12  and strip it out and deliver it to the lienholders as a part of

13  the ultimate package of what will go with the credit bid and/or

14  the purchase.

15          Now, from our perspective, it's got to be a part of

16  the purchase, not the credit bid, because the public records do

17  not reflect any filing by the lenders as to a mortgage or a

18  security interest against the override or the as-extracted

19  collateral that we're talking about today.  So the only lien

20  claimant from LLOG's perspective is LLOG, at the end of the

21  day.

22          So LLOG asserted through its proof of claim a claim

23  for $902,490.92, and this specifically relates to unpaid joint

24  interest billings for plugging and abandonment on Green Canyon

25  157, which is an expired lease.  But it's a part of the same

1  operating agreement that Green Canyon 201 is covered by.  The

2  two aliquots and depths from those two blocks for what is at

3  stake today are all defined collectively as the contract area

4  under the operating agreement.

5         So an unpaid expense on Green Canyon 157 would be

6  covered by security interest encumbering whatever property that

7  Fieldwood would have on Green Canyon 201.  I'd like to call

8  your attention to LLOG Exhibit L-19, which can be found at

9  CM/ECF 774-19.  And this is also at Debtors' Exhibit 12, which

10 CM/ECF 775 (audio interference).

11        And this is -- Your Honor, again, we'd like you to

12 take judicial notice of it only.  If you want to admit it as

13 you did the prior document, that would be acceptable to us, but

14 we want the Court (audio interference) the fact that LLOG has

15 filed a claim for roughly 20 million total dollars (audio

16 interference) for future P&A work.

17        The only thing at stake today is the 902,000 secured

18 claim as asserted, and we believe that that demonstrates prima

19 facie evidence of its validity for purposes of today only.  I'm

20 sure we'll talk about some offsets that Fieldwood believes they

21 have to it later on in the process, and we'll reserve comment

22 until we get to that point in time.  So we'd like the Court to

23 take judicial notice of either -- I don't think it matters --

24 CM/ECF 774-19 or Debtors' Exhibit 12, which is CM/ECF 775-13.

25        THE COURT:  Mr. Perez.

1          MR. PEREZ:  Your Honor, no objection.  We had talked

2    to Mr. Goodwine about basically admitting most of the exhibits,

3    so we don't have -- we don't have an issue with that.

4          THE COURT:  All right.  774-19 is admitted.

5       (ECF 774-19 admitted into evidence)

6          MR. GOODWINE:  Okay.  We also have, Your Honor, just

7    to I guess complete the record on it -- and I'll let Mr. Perez

8    speak up if he has an objection, but we also have the backup

9    joint interest billing statements that have (audio

10   interference) that appear at LLOG Exhibits L-27 through L-35,

11   which are CM/ECF 774-27 through 35.

12         THE COURT:  Any objection to 774-27 through 774-35?

13         MR. PEREZ:  Your Honor, we do not object as to the

14   authenticity of these documents or that they were submitted.

15   We do object to whether they're owed.  We don't agree that

16   that's the amounts owed, but we do agree that these are the

17   invoices that were given to us.

18         THE COURT:  Is that the basis --

19         MR. PEREZ:  But we have no objection --

20         THE COURT:  -- on which they're offered,

21   Mr. Goodwine?

22         MR. GOODWINE:  I'm sorry, Your Honor?

23         THE COURT:  Is that the basis on which you're

24   offering them?

25         MR. GOODWINE:  That is correct, Your Honor.

1          THE COURT:  They're admitted --

2          MR. PEREZ:  We understand --

3          THE COURT:  Sorry.  They're admitted for the purpose

4   of showing that these are invoices delivered by LLOG to debtor,

5   774-27 to 35, but not for the purpose of showing that the

6   amounts submitted were appropriate, or due and owing.

7          (ECF 774-27 through 774-35 admitted into evidence)

8          MR. GOODWINE:  Thank you, Your Honor.  What I'd like

9   to talk about next -- again, from just an overview perspective,

10  is that one of the reasons (audio interference) was when we got

11  the response from Fieldwood, it seemed to be clear that we were

12  talking past each other on what UCCs were actually -- that LLOG

13  was relying upon to satisfy its lien -- or the perfection

14  aspect of its lien claim.  And so we hit the pause button so we

15  could make sure that everyone was looking at the same document.

16         So we have gone through that process and what I want

17  to talk, you know, to a certain extent about is how those --

18  the documents of public record create the perfection aspect of

19  LLOG's claim, and then we'll loop back to the underlying grant

20  of a security interest in order to kind of close the loop on

21  the fact that we believe that we have a secured claim that

22  requires adequate protection.

23         Now, the (audio interference) of UCC filings that are

24  in play can be found at -- in both the debtors' and also LLOG's

25  exhibit list.  From LLOG's exhibit list, it would be L-11, and

1  L-14 through L-18.  And I'd like to offer those into evidence

2  as they're all certified copies of records (audio interference)

3  parish public records.

4          THE COURT:  Any objection to the admission of 774-11,

5  14, 15, 16, 17, and 18?

6          MR. PEREZ:  No, Your Honor.

7          THE COURT:  Those are admitted.

8      (ECF 774-11 and 774-14 through 774-18 admitted into

9  evidence)

10         MR. GOODWINE:  And Your Honor, what we'd like to do

11  is demonstrate that under L-11, which is a UCC originally filed

12  between LLOG and the predecessor to Fieldwood, a company by the

13  name of Davis Offshore, LP, includes within it the actual grant

14  of security interest in Section 5.2.

15         And so from a roadmap standpoint as to where we may

16  be going, under CM/ECF 774-11, I'm looking specifically at

17  Page 6 of 18.  And it's Paragraph 5.2 which is the non-

18  operating party grant of a continuing security interest in and

19  to (audio interference).  And we believe this is a grant, that

20  the key for (audio interference) purposes -- again, there's

21  some timing issues in the fifth, that in the -- one, two, three

22  -- third line (audio interference) it captures after acquired

23  title.  It says, "Whether now existing or hereafter acquired."

24         And so it's important when Fieldwood obtained title

25  to the override within Green Canyon 201 (audio interference).

1  In addition, the laundry list of what is covered by the grants,

2  without qualification, says all oil and gas produced, all

3  accounts receivable, and all cash proceeds.  Therefore (audio

4  interference) limitation -- and I'm sure you'll hear from

5  Fieldwood -- that this override is outside the scope of what

6  was (audio interference) from a security interest standpoint.

7          Now, I'm not going to go through --

8          THE COURT:  Actually, for what it's worth, that's not

9  what I read them saying.  I read them saying that there was a

10 carveout in the agreement that carved out the ORRI, not that

11 they weren't -- they had some UCC problems, but not that the

12 original UCC wouldn't have covered overrides.  But rather that

13 the overrides were later carved out, is what I read them to

14 say.

15         Is that different than what you read them to say?

16         MR. GOODWINE:  It is, and I'm working towards that.

17 I'm just trying to get the record established because we don't

18 have an actual stipulation as to the perfection, et cetera.

19 And if that happens during this actual hearing, that would be,

20 you know, helpful for not only today but future purposes.  But

21 I think the L-11 and L-14 through 18, you know, create the

22 perfection aspect, and also L-18 is a continuation statement

23 filed (audio interference) appropriate window to keep it alive

24 through today.

25         So we'll move on from the perfection issue and (audio

1  interference) but for the time being we'll assume that we're

2  not going to have an issue with the actual grant of the

3  security interest in the first place or the -- not the

4  perfection, the attachment thereof, and it's -- the argument's

5  going to be limited to whether or not the override is captured

6  within that collateral package.

7          Now, to get to, I think, the issue that you just

8  pulled me to, Your Honor, I think we need to look at Exhibits

9  13, 14, and 16.  So these are going to be LLOG's Exhibits 13,

10  14, and 16.  (Audio interference) through Exhibit 13 first,

11  which is (audio interference) by Fieldwood itself, along with

12  LLOG as operator, in which they -- on Page 2 of 8 -- so this

13  would be under CM/ECF 774-13, Page 2 and 3 of 8 are what we're

14  going to cover.

15          It basically says that Fieldwood and LLOG, each of

16  which own portions in the contract area, which through other

17  public records filings, which I don't think are in dispute,

18  clearly encompass both Green Canyon 157 and the northeast

19  quarter of 201 where the override is.  "In consideration of

20  mutual covenants in the MOA as amended and ratified," they do

21  "hereby agree to the recitals stated above," and do "hereby, by

22  amending the Attachment 1 thereto, as stated in Exhibit A" --

23  "hereby fully ratify the MOA, as hereby amended."

24          That MOA was the original MOA filed between the

25  predecessor to Fieldwood, Davis, and LLOG, which is found at

1  LLOG Exhibit (audio interference).  So, in other words,

2  Fieldwood stepped into whatever was granted under the

3  memorandum of operating agreement as previously filed by and

4  between LLOG and Davis.

5          In addition to that, on Page 3 of 8 -- and I'm

6  speaking from the ribbon there, the amendment ratification is

7  to be recorded -- and it was; we're looking at a certified copy

8  -- in both the Terrebonne Parish records and UCC -- I think we

9  checked both those boxes -- are "providing notice of the mutual

10 liens and security interests now held by the parties to the

11 MOA."

12          (Audio interference) the fact that Fieldwood (audio

13 interference) a grant of a security interest that includes

14 after-acquired title, which the override is.  And we'll look at

15 the operating agreement in (audio interference) that works and

16 plays, but the override is for the exact same aliquots and

17 depths in the northeast quarter of Green Canyon Block 201 that

18 is covered by the operating agreement and these memoranda of

19 operating agreement as filed of public record.

20          (Audio interference) I'd like to talk about next is a

21 couple of things, and that's where we'll get into, I think, the

22 operating agreement provisions, you know, in play, is the first

23 argument raised by Fieldwood is that (audio interference)

24 itself contains the traditional language that it will not be a

25 cost-bearing interest.  (Audio interference) it says what it

1  says.  We agree with that.  Almost override says that.

2           What I think they're missing is that we're not trying

3  to convert the override into a cost-bearing interest.  We're

4  trying to say the override -- and for purposes of today, the

5  as-extracted collateral, our collateral for defaults that may

6  occur, which include the non-payment of P&A prepetition that

7  are $902,000.

8           So we're not trying to change the characterization of

9  an override.  We're simply trying to say that this override is

10  collateral for an obligation that just so happens to be unpaid

11  P&A --

12           THE COURT:  Well, let me --

13           MR. GOODWINE:  -- and therefore we're --

14           THE COURT:  Let me see if I understand where some of

15  this confusion might come.  You're telling me you have an

16  interest in the oil and gas, but you don't have an interest in

17  the override, a collateral interest in the override contract

18  itself?  Is that right?

19           MR. GOODWINE:  (Audio interference) the exact

20  opposite, that --

21           THE COURT:  Show me where --

22           MR. GOODWINE:  -- we have --

23           THE COURT:  Show me where you have -- if you have a

24  collateral interest in the oil and gas, but the override isn't

25  subject to cost bearing, then your collateral interest in the

1  oil and gas may not help you.  The question is do you have a

2  collateral interest in the override and whatever it gets.  And

3  I haven't yet seen that document.

4          MR. GOODWINE:  That's where I think, Your Honor, if

5  we go back to -- we can look at it in a few different places.

6  Let's start with -- let's start with the operating agreement

7  itself.  Then we'll kind of layer into that.  So if we go to

8  LLOG Exhibit 1, which I'll move into evidence now, which I

9  don't think there'll be an objection to --

10          THE COURT:  Any objection to 774-1?

11          MR. PEREZ:  No, Your Honor.

12          THE COURT:  All right.  It's admitted.

13      (ECF 774-1 admitted into evidence)

14          MR. GOODWINE:  And specifically Exhibit I thereto,

15  which starts on Page 178.  So, for the record and for position,

16  we're talking about Document 774-1.  And we're going to start

17  on Page 178 of 185 from the ECF ribbon at the top.

18          Under this operating agreement, the security rights

19  provisions happen to be an exhibit as opposed to the body of

20  the agreement.  With all of the agreement review you've done

21  over the years, Your Honor, I think you've seen security

22  interest provisions where the operator and non-operator have

23  their security rights, mortgages, in the contract area property

24  in order to ensure that there's a (audio interference) for

25  unpaid, you know, joint interest billings and other

1  liabilities.  And it traditionally protects the operator, not

2  the non-operator, because that's normally where the obligations

3  are due and owing.

4          In this instance, like in most, there's a separate

5  mortgage component, which is in Exhibit I, Part A, Subpart (I),

6  and then on Page 179 you get into the security interest aspect,

7  which gets you into the oil and gas, the as-extracted

8  collateral, the proceeds of production, and the accounts, et

9  cetera.  The key is that the grant of the mortgage and security

10 interest is (audio interference) contract area, and what the

11 parties own in the contract area.

12         Now, it's true when -- everything we've looked at so

13 far, and we haven't gotten to the point in time within the time

14 line as to when Fieldwood acquired the actual override, that

15 the contract area was primarily the working interest only of

16 LLOG and Fieldwood in Green Canyon 157 and 201.

17         Now, in Subpart (ii), which is Page 179 of 185, there

18 is a -- here there's an after acquired title component that

19 allows the operator -- in this case, LLOG, to acquire a

20 security interest in property that's subject to a security

21 interest, and also on the mortgage side, for what is acquired

22 down the road.  And that would include, our argument is, the

23 overriding royalty interest because there have been various

24 opportunities, which we'll talk about in a second, to carve out

25 or to directly discuss the limitations on the scope of the

1 security interest to not include the overrides, and that has

2 not been done.

3          And so our argument, in a nutshell, to be very

4 precise on it, is that under Operating Agreement Exhibit I,

5 Part A, Subpart (ii), there is "after acquired title," which

6 allows LLOG security interest to attach to (audio interference)

7 the as-extracted collateral of the override when it was

8 acquired.

9          THE COURT:  Right.  Does the ORRI under Louisiana law

10 constitute an interest in the oil and gas, or is it merely a

11 contractual financing arrangement?

12          MR. GOODWINE:  It's an interest in the oil and gas

13 by, I think, fairly clear black letter law under the civil code

14 and otherwise.

15          THE COURT:  The ORRI itself is an interest in the oil

16 and gas?

17          MR. GOODWINE:  Yes.

18          THE COURT:  Okay.

19          MR. GOODWINE:  Yeah.

20          THE COURT:  Where would I find that?

21          MR. GOODWINE:  Yes.  Going to be in the Mineral

22 Codes.  By the time the hearing is over, we'll have an exact

23 cite for you.  But it's going to be Louisiana Revised Statute

24 31 colon something, which we will find and deliver as a part of

25 the --

1           THE COURT:  Because as I'm looking at this, what

2   you're telling me is it's going to be (ii)(a), right?  "All oil

3   and gas produced from the lands or offshore blocks."  And

4   you're telling me that --

5           MR. GOODWINE:  Correct.

6           THE COURT:  -- that the ORRI is an interest in the

7   oil and gas produced?

8           MR. GOODWINE:  We're saying two things.  The answer

9   is a definite yes and (audio interference) purposes that we

10  also have the interest in the oil and gas produced and also in

11  -- go down to (c) -- "all cash or other proceeds from the sale

12  of such oil and gas once produced."

13          And so it's not just the oil and gas.  It also then

14  converts itself into the security interest against what is then

15  converted from being molecules and minerals into the (audio

16  interference) paid Fieldwood for such minerals at the end of

17  the day.

18          THE COURT:  All right.

19          MR. GOODWINE:  And so that's the argument.  We'll get

20  you the Mineral Code cite as we move through the hearing.

21          In addition to that, Your Honor, the same (audio

22  interference) for what it's worth, is also in LLOG's Exhibit

23  (audio interference) which is the stand-alone unfiled version

24  of the memorandum of operating agreement and financing

25  statement that was originally executed by Davis and LLOG -- and

1  Davis is the predecessor to Fieldwood.  And it's –– so, for the

2  record, 774-38.  I'm on Page 2 of 11.  It's basically (audio

3  interference) same concept (audio interference) in a stand-

4  alone fashion that also includes, as we discussed, the

5  hereafter acquired title concept.

6          And the reason why it's important is that neither

7  Davis nor Fieldwood owned this override until Fieldwood

8  acquired it after they became a working interest partner within

9  the field.  Now ––

10          MR. PEREZ:  Your Honor, I missed what exhibit number

11 that was.  I apologize.

12          THE COURT:  774-38 is what I wrote down.

13          MR. GOODWINE:  And for the record, we'd like to also

14 just make reference to 39, which is a correction to 38.  And

15 all it did was change the exact property description from

16 "Garden Banks 201" to "Green Canyon 201."  So at this point,

17 I'd like to offer into evidence 774-38 and 774-39.

18          THE COURT:  Any objections?

19          MR. PEREZ:  No objection, Your Honor.

20          THE COURT:  They're admitted.

21     (ECF 774-38 and 774-39 admitted into evidence)

22          MR. GOODWINE:  Thank you.  Now to lean to Exhibit 2,

23 Your Honor, which is now a Ratification and First Amendment to

24 Operating Agreement, and this is where Fieldwood shows up in

25 2014 after they acquire Davis's interest in the property.  So

1  this is going to be Document 774-2 from the CM/ECF.

2          And on Page 2 of 5, in Paragraph 1, it basically says

3  "LLOG Energy and Fieldwood hereby ratify, adopt, and confirm

4  the terms and provisions of the operating agreement, become

5  parties to and now bound by the terms and provisions of the

6  operating agreement to the same extent as if they were original

7  signatory parties."

8          So they're going back to Day 1 from an effectiveness

9  standpoint, and the ratification itself is effective December

10 12th, 2002, the original date on the operating (audio

11 interference).

12         In Section 4 -- and if I need to do, you know, chase

13 and define terms, I will, but Paragraph 4 says, "Fieldwood

14 hereby agree that Farmor's override" -- and that's the override

15 we're talking about here.  And again, if we need to chase the

16 defined terms, we can.  But "Farmor's override is not to be

17 considered a subsequently created" (audio interference) because

18 Fieldwood is misapplying what that concept means from an

19 operating agreement standpoint.  And quite frankly, they have

20 gotten the benefit of that provision directly when they went

21 non-consent and created the situation we're in today.

22         Now, in addition to -- I'll move to -- in case I

23 didn't, I'd like to move to admit 774-2.

24         THE COURT:  Any objections?

25         MR. PEREZ:  No objection, Your Honor.

1          THE COURT:  774-2 is admitted.

2      (ECF 774-2 admitted into evidence)

3          THE COURT:  When preparing for the hearing, I believe

4  -- I may have this wrong -- that Fieldwood said that the term

5  "subsequently created interest," although capitalized in this

6  document, isn't defined anywhere.  Is that right or do you

7  disagree with that?  And I may have my memory wrong.

8          MR. GOODWINE:  That is correct, but it's also, I

9  think, a fairly well-understood concept.  And even though it's

10  not defined, the context around it does very specifically

11  appear in 19.1, which both parties I'm sure are prepared to

12  talk about today.

13          THE COURT:  And let's go back and let me look at 19.1

14  then.

15          MR. GOODWINE:  Okay.  That would be 774 (audio

16  interference) 132 of 185 (audio interference) wanted to find it

17  through the ribbon.

18          THE COURT:  You said 132?

19          MR. GOODWINE:  Correct.  774 dash (audio

20  interference) --

21          THE COURT:  I'm there.

22          MR. GOODWINE:  Okay.  This deals with "Overriding

23  Royalties and Burdens on Production."  Let me give you the high

24  level first, then we'll look at the words.

25          THE COURT:  Yeah.  Why don't you just hold on and let

1 | me read this.

2 |           MR. GOODWINE:  Okay.

3 |      (Pause)

4 |           THE COURT:  All right.  Go ahead, please.

5 |           MR. GOODWINE:  First of all, I think you'll notice

6 | that the words "subsequently created override" aren't used in

7 | there, but I think we'll all agree that it doesn't have an

8 | independent definition anywhere within the agreement.  I think

9 | we've all scoured for it, and it's not there.

10 |           But the concepts in 19.1, before we talk about the

11 | exception to the carve-outs that the parties made, specifically

12 | agreed to, is probably best explained through an example.  And

13 | that would be if you, I, and Mr. Perez were three owners under

14 | this operating agreement, and I granted an override in favor of

15 | Mr. Clifford or Mr. Carlson, and I go non-consent, that

16 | subsequently created interest I would remain bound to pay, and

17 | the obligation would not pass to you and Mr. Perez as the

18 | participating parties when I go non-consent.  That's the

19 | general application of the concept.

20 |           When you look at the treatment of the Davis override,

21 | which has nothing to do with our dispute, they're basically

22 | saying specifically that we're not going to treat that override

23 | that way, such that if I go non-consent in our example, you and

24 | Mr. Perez as the participating parties would pick up the

25 | obligation to cover that override.

1          Now, when we looked previously at Exhibit 2 and saw

2    that Farmor's override is not to be considered a subsequently

3    created interest, it's basically saying it's going to be

4    treated as an exception to the general rule under 19.1.  And

5    that's exactly what happened.  We can get into the weeds and

6    the nuances, that Fieldwood, you know, bought the overriding

7    question from Shell.  It was also a non-operating working

8    interest owner to the tune of 15 percent, so it was both a

9    recipient and an obligor under the override.

10          When they went non-consent, LLOG picked up that

11   15 percent from an obligation perspective and is now paying

12   100 percent of the override, not what used to be its 85

13   percent.  So, to be blunt, 19.1 worked for the parties exactly

14   like it was supposed to based upon Section or Paragraph 4 in

15   Exhibit 2.

16          Now what's my main point?  19.1 has nothing to do

17   with collateral.  It has nothing to do with the grant of a

18   security interest.  It has nothing to do, to the rights of

19   parties under Exhibit I if they need to take action to protect

20   their interest.  It's simply a regulator on who has to pay an

21   override in a non-consent scenario.  And so their reference to

22   the fact that the subsequent created interest creates a viable

23   argument to defeat the attachment of LLOG's security interest

24   to the override, it's just a red herring.  It just doesn't

25   match up.

1         What I would like to call your attention to is that

2    19.1.1, which does not use the words "subsequently created

3    interest," it just refers more generically to an override

4    subsequently created, at the end of the day in the last two

5    lines, all those overrides -- and this shall override that

6    Fieldwood now owns squarely fits into this -- were "made

7    specifically subject to all the terms and provisions of this

8    agreement and shall be subordinate to the rights of the other

9    parties to this agreement."

10         Now we don't win or lose because that language is in

11   19.1.1, but it clearly indicates that when parties create

12   overrides after this agreement is effective, and the shall

13   override was certainly one of those that Fieldwood now owns,

14   that the override interest is going to be subordinate to the

15   other rights of the parties under the agreement, and from

16   LLOG's perspective, that includes their obligation to pay for

17   plugging and abandonment, and that also induces the security

18   interest that we're asserting today.

19         So -- and Your Honor, we can look at, I think, other

20   places in which the records indicate that LLOG has basically

21   ratified the grant of the security interest, and the key

22   component is the after acquired title, and it's basically

23   dealing with all of their interests within the contract area.

24   And since the override squarely is to the exact same aliquots

25   and depths associated with the Green Canyon Block 201, that the

1 security interest encompasses the override.

2          So with that, Your Honor, I think I've hit the high

3 points, obviously, and we may go through some cross-examination

4 of Mr. Dane in a bit.  But do you have any questions about the

5 theory or the argument that allows LLOG to go from being the

6 only remaining working interest owner due to Fieldwood's

7 non-consent, and then at the end of the day having a grant and

8 attachment and a perfection of the security interest against

9 the override?  And again, we wouldn't be here arguing if there

10 weren't "after acquired title" within the security interest

11 grant, because that's what's important at the end of the day.

12          THE COURT:  Thank you, Mr. Goodwine.

13          Mr. Perez, are you going to make your opening or is

14 someone else from your team going to make the opening?

15          I can't hear you, Mr. Perez.

16          MR. PEREZ:  Your Honor, I'm going to make the

17 opening.

18          THE COURT:  All right.

19          MR. PEREZ:  Would you mind making Erin Choi the

20 presenter?

21          THE COURT:  Of course.  All right.  Ms. Choi is the

22 presenter.

23          MR. PEREZ:  Thank you, Your Honor.  I have a couple

24 of slides that would aid in our argument this morning, Your

25 Honor.  And I believe in discussions with Mr. Goodwine we had

1  Exhibits 1 through 25 that he had agreed to admit.  I think

2  they're largely pretty much the same exhibits as he had, except

3  for the plan and disclosure statement.

4         We did file last night at 778-1 what is basically our

5  Exhibit 26, which is a -- it's similar to one of their

6  exhibits, but it has the amounts that we believe are set-offs.

7  We haven't had a chance to talk to Mr. Goodwine about whether

8  he is okay with that.  But at least with respect to Exhibits 1

9  through 25, we would move for their admission.

10        THE COURT:  Is there any objection to the admission

11  of 775-1 through 775-26, which encompasses 1 to 25?

12        MR. GOODWINE:  No, Your Honor, with the caveat that

13  we were going to loop back at the end and try to get the

14  balance of ours admitted also.  The only caveat I'd throw out

15  -- and I'm not trying to play games with it obviously, but if

16  we're going to agree to the admittance of what they filed last

17  night, which I think is more in the form of a demonstrative

18  than it is, quote unquote, "evidence," we would ask for the

19  same treatment of our Exhibit 26, which is something (audio

20  interference) --

21        THE COURT:  So he hasn't offered 26 yet.  He's only

22  offered 1 to 25.

23        MR. GOODWINE:  I'm talking about our 26.  LLOG's 26.

24        THE COURT:  I know, but he's not offering his -- he

25  hasn't yet.  I think he may in a moment.  He's offered 775-1

1  through 26, which is actually his Exhibits 1 through 25.

2          MR. GOODWINE:  My apologies.  I thought he had picked

3  up what he filed last night.

4          THE COURT:  I did not.  So do you have any objection

5  to the ones he filed at 775?

6          MR. GOODWINE:  No.  No objection.

7          THE COURT:  775-1 through 775-26, which are Exhibits

8  1 through 25, are admitted.

9      (ECF 775-1 through 775-26 admitted into evidence)

10          MR. PEREZ:  Thank you, Your Honor.  So, Your Honor,

11  we have a few slides to kind of set forth our position, but let

12  me just make a couple of preliminary comments before I get

13  started, in response to Mr. Goodwine.

14          Number one, I don't believe that they have a grant of

15  this interest in the override.  That's basically point number

16  one.  Point number two, even if they do have that, I don't

17  think it's properly perfected.  And then, Your Honor, we get to

18  the point of the amount of -- that is owed, and I'll address

19  that.

20          But Ms. Choi, if you could turn to the first slide,

21  please.

22          And then, Your Honor, I assume we're handling both

23  motions together, that we're not separating them, so I'll treat

24  them both together.  I believe that's the way Mr. Goodwine

25  treated them.

1          THE COURT:  I agree.  I think that's what he did.

2          MR. PEREZ:  Okay, Your Honor.  So, Your Honor, this

3  slide just asks for what their relief is.  And I think

4  Mr. Goodwine has articulated, so I think we could move to the

5  next slide, please.

6          So, Your Honor, just to be clear, it's their burden

7  with respect to showing that they have a claim, that it's

8  secured by a validly perfected lien, and that there's a decline

9  in value.  In addition -- and that's their burden, both with

10  respect to the motion to lift stay and the motion for adequate

11  protection.

12          Next slide.

13          So, Your Honor, in their brief -- in their reply, I'm

14  sorry -- they clarified that the relief they requested was as

15  to the as-extracted collateral.  We don't believe, Your Honor,

16  that there is any mortgage on the override itself, number one.

17  Number two, that attaching a description to the UCC doesn't

18  create a mortgage interest with respect to the collateral.

19          And then, Your Honor, there are a couple of technical

20  arguments that even if they do have a UCC that covers this,

21  that it is -- that these are actually rents, and that rents

22  have to be -- because of the nature of the override, which was

23  kind of -- it was assigned to LLOG and then assigned back, and

24  that made it a sublease, and therefore that they would have to

25  have an actual mortgage to be perfected with respect to that.

1  But again, we'll go forward.

2            But we should go to the next slide.

3            Your Honor asked what the definition of an ORRI is,

4  so from the ATP case, which the Court may remember, this was

5  what -- this is what the Fifth Circuit said, an overriding

6  interest is a royalty interest.  It's an interest in gas

7  produced free of expenses of production, and moreover it's a

8  real right, albeit non-possessory.  So I don't know if that

9  answers the Court's question as to what the definition for an

10 override is.

11           So, Your Honor, if we go to the next page, this is, I

12 believe, kind of the most important thing.  And we need to look

13 at the time line.  First of all, there are two leases here.

14 Green Canyon 157, Green Canyon 2000 -- 201.  So in 2002, LLOG

15 and Davis entered into an operating agreement, and that

16 operating agreement did grant a security interest, and we'll

17 look at that language in a minute.

18           In October of 2008, Shell and Marathon -- Shell and

19 Marathon assigned its working interest to LLOG and Davis in the

20 -- and the 2001 agreement is as to the 157, Green Canyon 157

21 block.  In 2008, Shell and Marathon assigned to LLOG and Davis

22 its interest in the 201 block.  And at that point, they

23 reserved an override in the 2001 [sic] block.

24           And so, Your Honor, Exhibit 4 is the farmout pursuant

25 to which this happened.  Exhibit 5 is the actual assignment of

1  the working interest pursuant to which Marathon and Shell

2  assigned it to LLOG and Davis.  And then Exhibit 6 is the

3  assignment of the ORRI back to Shell and Marathon at the time.

4           So in 2014, Fieldwood acquired Davis's interest, and

5  Fieldwood and LLOG entered into an operating agreement.  So in

6  August of 2014, Fieldwood acquired Davis's 15 percent interest

7  in Block 2005.  In December, LLOG and Fieldwood agreed to

8  ratify the operating agreement -- that's the operating

9  agreement that we've been referring to above us from 2002, that

10 was amended to include Lease 201.

11          That agreement we specifically agree that the ORRI

12 was not to be considered subsequently created interest.  And

13 that's important.  And so later in 2015, Fieldwood acquired

14 from Shell the assets, and Shell assigned the ORRI, which

15 basically had been carved out in 2014, at that time, and they

16 acquired that in 2015.  So after that agreement.

17          So if you turn to the next page, Your Honor -- I mean

18 Ms. Choi.

19          So here's what we have.  And the top line is the

20 ownership of the working interest in 2000 -- in Field 201, and

21 the ownership of the ORRI.  So in 2002, they entered into the

22 operating agreement for Lease 157.  In 2008, Marathon and Shell

23 each owned a 50 percent interest in Lease 201.  In 2008, they

24 did a farmout to LLOG and Davis.  And in 2014, Fieldwood

25 acquired Davis's working interest in 2001 [sic].  So that's

1  the working interest.

2         So at the bottom you see has the ownership of the

3  ORRI.  So at the time of the farmout, the ORRI was created.  In

4  December of 2014, LLOG and Fieldwood ratified the prior

5  operating agreement that -- to include Green Canyon 201,

6  specifically agreeing that that -- that the ORRI that had been

7  created in favor of Shell and Marathon would be -- would not be

8  considered "subsequently created interest" under 19.1.

9         And then in 2001 -- in 2015, Shell assigned the

10 interest, and Marathon still owns the 4.875 interest in it, and

11 Fieldwood has the other interest.

12             THE COURT:  So, Mr. Perez --

13             MR. PEREZ:  If you turn the page --

14             THE COURT:  Just to understand your argument better,

15 are you telling me that because it is not a "subsequently

16 created interest" that it's also not an "after acquired

17 interest," and therefore doesn't come into their security

18 agreement?  Or is there another reason it doesn't come into

19 their security agreement?

20             MR. PEREZ:  No.  I think that's correct, Your Honor.

21 Because --

22             THE COURT:  Sorry.  You said no, you think it's

23 correct.  So I don't understand that.

24             MR. PEREZ:  Apologize, Your Honor.  I said that we

25 believe that because it was not a "subsequently acquired

38

1  interest," and was specifically carved out, that -- and

2  confirmed that it was a cost-free interest, that even if we

3  subsequently acquired it, it would not be part of the

4  collateral grant.  There was no grant for that to begin with --

5           THE COURT:  But is that -- is there no grant because

6  it is not a subsequently acquired interest?  Meaning that -- or

7  an after acquired interest?  Meaning that you are telling me to

8  treat the term "subsequently created" undefined the same as I

9  was treat the term "after acquired"?  Or are you telling me

10 something different than --

11          MR. PEREZ:  Yes, Your Honor.  Yes, Your Honor.

12 That's exactly what I'm saying.  Because otherwise, then you

13 would have to read out both 19.1 and 19.1.1 out of the

14 operating agreement as it reacted to the Davis ORRI, not to the

15 one we're talking about.

16          THE COURT:  Right.  So hold on a minute.  So if there

17 was not the exclusion of subsequently created interests in the

18 agreement, in the ratification, are you telling me they would

19 have otherwise had a valid security interest?  In other words,

20 are you challenging that they had a security interest in an

21 after-acquired ORRI, but the reason they don't have one in this

22 one is because of the subsequently created interest provision?

23          MR. PEREZ:  Your Honor, I'm actually saying both

24 things, but for different reasons.

25          THE COURT:  Okay.  Divorcing it then from the

1  subsequently created interest, why does there after-acquired

2  property interest not capture the ORRI?  Some independent

3  reason --

4          MR. PEREZ:  Well -- so, Your Honor, there's a couple

5  of them.  Number one, because there is no mortgage filing as to

6  the ORRI that we're aware of.  And there's no pledge of the

7  ORRI itself.  There's a subsequently acquired interest.

8          So to the extent that you view this as a sublease, if

9  you will, because they -- we assigned -- Shell assigned it to

10 LLOG, LLOG assigned it back to Shell -- so if you look at that

11 as a sublease and treat this as rent, under Louisiana law, the

12 UCC doesn't cover rent and there is no pledge of the rents

13 under Louisiana law.  So that's one reason, Your Honor.

14         Second reason, Your Honor, we don't -- to the extent

15 these are real property interests or real interests, there is

16 no mortgage that we believe covers these interests.  We do have

17 the UCC that has a memorandum attached, and Mr. Goodwine was

18 kind enough to send us the UCCs that were not originally

19 attached to his motion.  But again, only to the extent that

20 these are personal (audio interference) and only to the extent

21 that these would be covered as after-acquired property, would

22 there be a -- would there be a lien upon them.

23         THE COURT:  So is it your position that under

24 Louisiana law, to have a lien on an ORRI, you must have a real

25 property filing?

1          MR. PEREZ:  For a lien on an ORRI, absolutely, Your

2   Honor.  I think that's correct.  They don't claim a lien on the

3   ORRI.  They only claim a lien -- at least by, you know, their

4   reply, upon the as-extracted collateral.

5          THE COURT:  No, I think Mr. Goodwine's argument is

6   they have a lien on the ORRI itself.  Because he says that that

7   is an interest in real property, and therefore their subsequent

8   acquired property provision applies to the ORRI itself.

9          Because that was the question I asked him, is do you

10  have a lien on proceeds underlying it, or do you have a lien on

11  the amounts received under the ORRI itself?  And he said no,

12  our lien is on the ORRI itself.  I thought --

13         MR. PEREZ:  So, Your Honor, if that's the case, then

14  I haven't seen a pledge or a grant of -- there's a real

15  property interest, I haven't seen that there is a mortgage

16  covering this real property interest.

17         THE COURT:  Right.

18         MR. PEREZ:  With a definition.

19         THE COURT:  Thank you.

20         MR. PEREZ:  So, Your Honor, the bottom part of this,

21  you know, basically shows we believe that it was specifically

22  excluded in the December agreement -- the amended, and that

23  afterwards, when Shell assigned the ORRI to Fieldwood, that it

24  would not be covered.

25         So if you turn to the next page, so this is where

1  Mr. Goodwine seeks to impose his security interest and -- in
2  favor of the operator.  And this is -- we're talking about a
3  security interest here.  We're not talking about a mortgage.
4  And it's a security interest in all the gas -- oil and gas
5  produced, as well as the cash proceeds therefrom.  This was
6  with respect to Contract Area 157.  I don't think that we
7  dispute that.  That's Exhibit Number 5.

8         And then we get into, Your Honor -- on the next slide
9  -- so they specifically -- they talk about carved out interest,
10 and that has to have some meaning, Your Honor.  Again, in
11 Exhibit I, carved out from what.  And we don't believe that
12 it's just a carveout from going non-consent.  It's -- I mean,
13 you have to give it some effect.  Otherwise, it wouldn't have
14 any effect that, you know, shall specifically make them
15 inferior to the rights of the parties to this agreement.

16        So -- but -- and when you go to -- this is the
17 exhibit to the agreement, Exhibit 5.  And then when you go back
18 to the operating agreement, when you go back to the actual
19 language, on the next slide, there the 19.1 and 19.1.1, you
20 know, specifically carves it out.

21        And the way we read this, Your Honor, is we read this
22 to say in a situation where you have multiple -- where you have
23 multiple working interests that -- and you acquire additional
24 working interests, then your working interests would become a
25 subject to it, to this -- basically to the subsequently

1  acquired.  So there's no question that subsequently acquired.

2        If you then create -- and the situation -- this is a

3  little different than the situation in ATP.  In ATP, a working

4  interest was subsequently created, and based on Louisiana oil

5  lien statute, it was cut off because it was a bona fide

6  purchaser.  We don't have that situation here.  But I think

7  what this is saying is you can't use an override to get out of

8  your obligations under, you know, your working interest.  You

9  can't use that to do it.  But in this case, they specifically

10  carved out the Davis override which existed, and that was the

11  same thing that was done pursuant to the farmout with Shell.

12        So next, Your Honor -- so this is all back in 2002.

13  In 2008 -- and if you go to the next page, yeah.  You have the

14  farmout with Shell.  And so it's important that it was -- the

15  farmout conveyed all of the working interests to LLOG and

16  Davis.  And then LLOG and Davis conveyed the work -- the

17  override back to Shell and Marathon and -- pursuant to Exhibit

18  6.  And you know, the ORRI created was free and clear of all

19  costs of exploring, operating, developing, producing,

20  maintaining, in force and effect, and abandoning the contract

21  area and all costs of compression.  So it was clear that it was

22  intended to be cost-free.

23        If you go to the next page, Your Honor, the operating

24  agreement -- the assignment of the operating rights was --

25  expressly required LLOG to reconvey this back and to reconvey

1  it the way they did, which was cost-free.  And this is the

2  terms of the assignment.  And sometimes, you know, LLOG and

3  Davis are referred to as J. Bellis, and Shell and Marathon are

4  referred to as -- Troika.

5          And when you look at -- you go to the next page, in

6  the actual assignment, which is Exhibit 7, Your Honor, it says

7  that that assignment is -- that that assignment was made -- it

8  was not assigned -- the operating rights were not assigned

9  subject to the operating agreement.

10          So if you go to the next page, Your Honor, there is

11  no -- there was an integration clause which said that there was

12  really -- there were no other agreements and that the ORRI and

13  the conveyances superseded and replaced all other prior

14  agreements, whether written or oral, between the parties.

15          So in August of 2014 -- if you go to the next page,

16  Your Honor, we -- Fieldwood purchased Davis's 15 percent

17  interest in Green Canyon 201.  That's Exhibit 9.  And these are

18  the subject lands.  Then -- and here, I think, is kind of the

19  important -- this is the important language.  In 2014,

20  Fieldwood acquired Davis and Fieldwood and LLOG amended the

21  operating agreement.

22          So at the time, in Exhibit Number 11, we -- it was

23  amended to include Green Canyon 2001 [sic] lease to the

24  contract area.  So this is the first time that the operating

25  agreement in connection with -- in connection with the Green

44

1  Canyon 157 becomes applicable to this.  And so in Paragraph 2

2  it adds it.

3         But in Paragraph 4, they specifically say that the

4  LLOG and Fieldwood ORRI is not to be considered a "subsequently

5  created interest" for purposes of 19.01.  So it carves out that

6  from -- continues -- it continues to be a cost-free.  Then

7  subsequently, Your Honor, in 2015, after the fact on the next

8  page, Fieldwood acquired the -- all of Shell's interest

9  including the override at the time in July of 2015.

10         So if you go to the next slide, Your Honor, if we go

11 to the next slide, the ownership interest, I think, is in --

12 the working interest, I think, it's pretty clear, but I think

13 the key aspect of it is that at least as late as December and

14 -- of 2014 when the -- when, for the first time, the 2001 --

15 the -- I'm sorry.  I keep saying 2001, but I mean 201, the

16 Green Canyon 201 lease was added to the December 2002 operating

17 agreement on Green Canyon 157, they confirmed that it was not a

18 subsequently created interest, and then Fieldwood purchased it

19 later in 2015.

20         So, Your Honor, if you go to the next slide, you

21 know, we don't believe that they have a valid security interest

22 in it, because by its expressed terms, it would -- you know,

23 basically, it was the intent of the parties that that be

24 excluded.  There's certainly plenty of written evidence to that

25 effect, that even if -- even if valid, we -- even if they did

1  have a -- if they did have a security interest, we don't

2  believe that it's properly perfected based on the documents.

3  And in any event, we don't believe that adequate protection is

4  necessary and appropriate in this circumstance.

5          THE COURT:  Mr. Goodwine, before we proceed with the

6  evidence, I want you to respond to one of the arguments that

7  Mr. Perez makes.  He makes this out of the assignment and

8  conveyance of the ORRI and he says that the assignment and

9  conveyance was free and clear of all the costs.  But then he

10 points out Subparagraph (vii) of the agreement, (vii) says

11 "there are no further understandings, representations,

12 warranties, or obligations pertaining to the ORRIs, and this

13 conveyance supersedes and replaces any and all prior

14 agreements, whether written or oral, between the parties."

15         Tell me how your lien interest, however it might come

16 about, wasn't obliterated by that provision.

17         MR. GOODWINE:  Which exhibit is that, Your Honor?

18         THE COURT:  It's his 775-8, his Exhibit 6.  You

19 showed me the same one, but I wrote down his number when he was

20 going through it.

21         MR. GOODWINE:  Okay.  So it's -- you said Paragraph

22 (vii)?

23         THE COURT:  Well, it starts with "free and clear"

24 language, but then Paragraph (vii) seems to have an integration

25 clause that he argues anyway, and I don't understand why he's

1 not right, eliminates any other agreement pertaining to the

2 ORRIs.

3          MR. GOODWINE:  Well, what I think you need to

4 understand, Your Honor, is that this agreement, or this

5 paragraph, or actually this conveyance and override at the time

6 was between Davis and LLOG, who were bound by the operating

7 agreement as owners of what they call the J. Bellis aspect of

8 156 (audio interference) 201 --

9          THE COURT:  Right.

10          MR. GOODWINE:  -- and Shell and Marathon did not --

11 were not a party to that agreement.  So the original parties

12 could say that there are no other agreements (audio

13 interference) later on and impact a party that so happens to

14 acquire the override on a completely separate transaction.  So

15 again --

16          THE COURT:  Wait a minute.  Well, hold on.  This

17 agreement is -- your client is a party to the agreement.

18          MR. GOODWINE:  Correct.

19          THE COURT:  So it's bound by this, right?

20          MR. GOODWINE:  Again, Your Honor, the expectation is

21 -- how do I say it?  At the time that this was done -- I'm

22 going to just make the assumption or -- for argument's sake,

23 that Fieldwood's a party, even though Davis on it, because

24 Davis is the predecessor to Fieldwood.

25          So when Fieldwood and LLOG assigned this interest to,

1  at the time, Shell and Marathon who were basically reserving
2  the override as they conveyed the interest in the northeast
3  quarter of Green Canyon 201, at the end of the day, that
4  interest was then added to the operating agreement from a
5  working interest perspective only.  And so the parties that
6  were the recipient of the overrides at the time were completely
7  non-parties to the operating agreement.  There was no
8  connection between the two.

9          So in 2015 when Fieldwood comes in and in a
10 completely separate transaction, you know, it wasn't they only
11 thing they bought.  They bought a few other overrides -- and we
12 haven't looked at -- it's under seal, but there are, you know,
13 major purchase agreements for Troika and Hickory, which I think
14 are their Exhibits 10 and 11.  It's just by coincidence that
15 Fieldwood ends up being an owner at the end of the day.

16         So Fieldwood wearing its hat as an override owner is
17 not the same as Fieldwood is working interest owner that's
18 created all these obligations under the operating agreement.
19 It's apples and oranges.

20         THE COURT:  So are you agreeing, though, that the
21 assignees under the assignment and conveyance of the ORRI took
22 it free of your previously filed liens on the proceeds?

23         MR. GOODWINE:  You can't answer that question because
24 they were not parties to the operating agreement.

25         THE COURT:  Did they take it free of any lien that

1  you had on the proceeds?

2          MR. GOODWINE:  At the time, because they did -- they

3  weren't under a security arrangement or mortgage at that time.

4          THE COURT:  Well, no, but you --

5          MR. GOODWINE:  And again, Shell --

6          THE COURT:  -- had a previous -- you had a previously

7  filed -- I thought you had a previously filed agreement that

8  would've given you a lien on all of the proceeds.

9          MR. GOODWINE:  Not until --

10          THE COURT:  And I just want to be sure that your

11  position is that the assignees under this agreement would not

12  have been subject to any lien you had on the proceeds, or maybe

13  that's not your position.  I just want to know do you think

14  they were bound or not bound by any liens on proceeds?

15          MR. GOODWINE:  Shell and Marathon were not, because

16  they were not parties to the operating agreement.  The lien

17  through after-acquired title came into effect vis-a-vis the

18  override in 2015.

19          THE COURT:  So you agree --

20          MR. GOODWINE:  So this --

21          THE COURT:  -- that the assignees under this

22  agreement did not have -- they took it free of any rights you

23  had in the proceeds?

24          MR. GOODWINE:  As to the override, yes.

25          THE COURT:  Okay.

1          MR. GOODWINE:  At that time.

2          THE COURT:  I do understand your answer.  I'm just

3  trying to get this one step at a time.  You've got to

4  acknowledge, this is a pretty confusing issue.  So why don't we

5  go ahead with your evidence, in addition to the --

6          MR. GOODWINE:  Okay.  Well --

7          THE COURT:  -- documentary evidence that you have.

8  What type of other evidence do you have?

9          MR. GOODWINE:  Well, a couple of issues, some

10  housekeeping, some in reply to questions you had asked before.

11          Number one, just I had a note on my screen the entire

12  time to at the end move to introduce all of our exhibits.  I'd

13  like to do that now because in response to something Mr. Perez

14  had said in some of your Q and A, I'm going to refer to a

15  document we haven't referred to yet.  So I move to admit, if

16  they weren't previously admitted, L-1 through -- I guess it's

17  L-41, although none of us have talked about the plan or

18  disclosure statement yet.

19          THE COURT:  774, I've got 1 to 39.  I don't see 40

20  and 41 yet.  They may be subsequently filed.

21          MR. GOODWINE:  774-1, I'm looking at and I go through

22  -- 41.  40 and 41 are the debtors' plan and 41 is the

23  disclosure statement.

24          THE COURT:  774 only has 39 attachments.

25          MR. GOODWINE:  Okay.  Then I'll cut it off at 39.

1          THE COURT:  All right.  Any objection to 774-1 to 39?

2          MR. PEREZ:  Your Honor, with respect to Exhibit

3    Number 3, 774-3, that appears to be, you know, a letter that is

4    prepared by a land title -- I'm not sure I understand the

5    purpose of why it's being admitted, but it's hearsay.

6          THE COURT:  Okay.  What other ones do you object to?

7          MR. PEREZ:  And then, Your Honor, the only other ones

8    -- I don't have any objections to any of the other exhibits,

9    Your Honor.

10          THE COURT:  All right.  77 -- to the extent not

11    previously admitted, 774-1 and 2, and 4 through 39, are

12    admitted.  774-3 may be offered during the course of the

13    proceedings when you can prove it up.

14      (ECF 774-1 and 774-2 and 774-4 through 774-39 admitted

15    into evidence)

16          THE COURT:  Let's go ahead and do the rest of the

17    evidence.  We'll close the evidence, and then I'm going to let

18    you make closing arguments.

19          MR. GOODWINE:  Okay.  Do you want an answer to your

20    question that was posed directly to us on the Mineral Code, or

21    do you want me to save that for --

22          THE COURT:  Whichever way you want to go on that.

23          MR. GOODWINE:  Okay.  No, I'd just like to step you

24    through it, and we appreciate what Mr. Perez put on the screen.

25    (Audio interference) perspective, I think that what you need to

1  do is step through a couple of different provisions of the
2  Mineral Code.

3          It's the Louisiana Revised Statute 31:16, which
4  establishes that a mineral lease itself is a mineral right
5  which is "immovable," as we call it, or a "real right."

6          31:18 is what makes the mineral right an immovable.

7          31:126 is what pulls you into override land, and
8  pursuant to 31:126, that provides an interest created out of a
9  mineral lessee's interest is dependent on the continual
10  existence of the mineral lease.  And under the comments, what
11  you'll find is that they tie that back to overrides which
12  creates the override being an immovable interest, also, which
13  makes it susceptible to mortgage.  And so that's the answer to
14  your question.

15          Also, 31:203 specifically says that mineral rights,
16  pursuant to 126, includes overrides, are also susceptible to
17  mortgage.

18          Now, we can go through the various places where we
19  believe there's an (audio interference) grant of the security
20  interest -- an underlying mortgage and security interest --
21  actually covers both.  We've already plowed the ground on
22  Exhibit 38, but from a public records filing perspective, we'd
23  like to call your attention to Exhibit 4, which also includes
24  the grant language.  So both from an underlying override and
25  the as-extracted collateral, we believe we have both.

1        The reason why we're concentrating today on

2   as-extracted collateral is simply because that's what (audio

3   interference) relief is centered around.  We're not asking to

4   take the override.  You know, that may happen as a part of the

5   plan process or what happens under (audio interference).  From

6   the standpoint of what we wanted to do in a measured way, it

7   was simply targeted to escrowing the proceeds which puts you

8   into security interest land (indiscernible).

9        So we do have some other comments we'll save for

10  closing arguments, but I'd like to call Mike Dane.

11        THE COURT:  All right.  Mr. Dane, would you raise

12  your right hand, please, sir.  Let me go ahead and get your

13  phone activated, as well.  If you'd press "five star."

14        Good morning, Mr. Dane.  Would you raise your right

15  hand, please.

16    MICHAEL T. DANE, LLOG EXPLORATION COMPANY'S WITNESS, SWORN

17        THE COURT:  Thank you, Mr. Dane.

18        Go ahead, please, Mr. Goodwine.

19                    DIRECT EXAMINATION

20  BY MR. GOODWINE:

21  Q    Good morning, Mr. Dane.  Can you please state your name

22  and title with Fieldwood Energy Offshore for the record?

23  A    It's Michael T. Dane, Senior Vice President and Chief

24  Financial Officer of Fieldwood.

25  Q    How long have you been active in the oil and gas industry?

Dane - Direct/Goodwine                    53

1  A    Since 2006.

2  Q    Okay.  Who did you work for before Fieldwood?

3  A    Dynamic Offshore Resource.

4  Q    Anyone before that?

5  A    SunTrust Robinson Humphrey.

6  Q    I'm sorry.  Can you please repeat that?

7  A    Sorry.  SunTrust Robinson Humphrey.

8  Q    Okay.  Would it be fair to say that during the span of

9  time between 2006 and today, your career's been focused on oil

10 and gas?

11 A    That's correct.

12 Q    And what percent of that is offshore oil and gas?

13 A    Since I've been involved, on the industry side, my -- most

14 of my career, since 2008.

15 Q    Are you familiar with the standard -- or I guess -- strike

16 that.

17     Are you familiar with the concept of offshore drilling

18 operating agreements?

19 A    Yes, sir.

20 Q    All right.  And you're the spokesperson for Fieldwood

21 today.  Is that correct?

22 A    Yes.

23 Q    And are you, with your job responsibilities, plugged into

24 the investment decisions for Fieldwood?

25          MR. PEREZ:  Object to the form of the question.

Dane – Direct/Goodwine                          54

1  Vague.

2              THE COURT:  Sustained.

3  BY MR. GOODWINE:

4  Q    Do you participate in the various investment decisions

5  that Fieldwood has made since the beginning of 2020?

6              MR. PEREZ:  Same objection, Your Honor.

7              THE COURT:  Sustained.

8  BY MR. GOODWINE:

9  Q    Can you please tell the Court how Fieldwood goes about

10  making decisions whether to consent or non-consent to

11  operations proposed by operators on properties in which

12  Fieldwood is a non-operating working interest owner?

13             MR. PEREZ:  Objection to the question, Your Honor.

14  Relevance.

15             THE COURT:  How is this relevant to the adequate

16  protection question that you're posing?

17             MR. GOODWINE:  At the end of the day, Your Honor,

18  we're going to be talking about their decision to go

19  non-consent, and I want to make sure that Mr. Dane was plugged

20  into that decision.

21             THE COURT:  Sustain the objection.  I don't see how

22  that's relevant to the adequate protection question.

23  BY MR. GOODWINE:

24  Q    Is it true that Fieldwood went non-consent as to

25  operations on Green Canyon Block 201 in early 2020?

1  A    Yeah, that's correct.

2  Q    Is it true that companies go non-consent when they do not

3  believe further operations are a good investment?

4           MR. PEREZ:  Object to the form of the question.

5  Calls for speculation.

6           THE COURT:  Sustained.

7  BY MR. GOODWINE:

8  Q    Can you tell me why Fieldwood decided to go non-consent on

9  Green Canyon 201 operations?

10          MR. PEREZ:  Objection.  Relevance.

11          THE COURT:  Overruled.

12          THE WITNESS:  We evaluated the economic merits of

13 this project and we thought about our capital availability at

14 the time.  And between those factors, we determined it was best

15 for Fieldwood to go non-consent.

16 BY MR. GOODWINE:

17 Q    Okay.  And by going non-consent, you did not have to

18 participate in the risk of future production.  Is that correct?

19 A    That's correct.

20 Q    (Audio interference).

21 A    I think that's partially correct.  I mean, joint operating

22 agreements have certain back-end rights with respect to

23 non-consent.  And so there is the potential to benefit and to

24 have risk, even if it's not immediate.

25 Q    Understood.  But you decided that further participation as

Dane – Direct/Goodwine                        56

1   a non-working interest partner in Green Canyon 201 was not

2   worth the risk as the operations were proposed by LLOG.  Is

3   that correct?

4           MR. PEREZ:  Object to the question.  Misstates his

5   testimony.

6           THE COURT:  I think that question is asked and

7   answered.  You asked him why.  He gave multiple reasons.  Now

8   you're focusing only on one of the reasons.  I don't think it's

9   a fair way to go about it.

10  BY MR. GOODWINE:

11  Q   Okay.  Isn't it true that Fieldwood plans to abandon Green

12  Canyon 157 and the northeast quarter of Green Canyon 201

13  pursuant to the procedures in this bankruptcy?

14  A   The disclosure statement that we recently filed, it does

15  have -- it currently does have those interests as abandoned

16  properties.

17  Q   Okay.

18  A   With respect to the working interest.

19  Q   Who will be paying for that plugging and abandonment on

20  Green Canyon 157 and Green Canyon 201 on a go-forward basis?

21          MR. PEREZ:  Object to the question, Your Honor.

22  Again, I don't know that that's relevant to this -- to the

23  adequate protection question.

24          MR. GOODWINE:  If I may, Your Honor, it has

25  everything to do with it, because it's --

Dane - Direct/Goodwine                    57

1          THE COURT:  Overruled.  Overruled.

2          THE WITNESS:  If it becomes an abandoned property,

3   then predecessors and co-working interest owners would have to

4   satisfy the financial responsibility for plugging and

5   abandonment.

6   BY MR. GOODWINE:

7   Q    Okay.  I'd like to call your attention to Debtors' Exhibit

8   6.

9          MR. GOODWINE:  Ms. Johnson, can you call that up on

10  the screen?

11         Or Mr. Dane, if you're comfortable being able to call

12  it up, that will work, too.

13         THE COURT:  Let me make Ms. Johnson the presenter,

14  and she can pull it up on the screen.  She's now the presenter.

15         MR. GOODWINE:  Debtors' Exhibit 6.  And for the

16  record (audio interference) be 775-8.

17         Apologies, Your Honor.  This is the first time we're

18  going through this with your --

19         THE COURT:  I've told a lot of people that the only

20  thing I've really learned well through COVID is patience with

21  technology, Mr. Goodwine, so we'll take a minute to get there.

22         MR. PEREZ:  I think Ms. Johnson must be related to

23  Mr. Carlson.

24         THE COURT:  Ms. Johnson, if you'll put that in

25  full-screen mode, it's going to show up a little better.

ACCESS TRANSCRIPTS, LLC        ⚖        1-855-USE-ACCESS (873-2223)

Dane – Direct/Goodwine                    58

1      (Pause)

2           MR. GOODWINE:  I think -- and Your Honor, we're only

3  going to talk about one specific portion of this, and it's

4  almost on the screen already.  If we scroll, we might be able

5  to --

6           THE COURT:  All right.

7           MR. GOODWINE:  -- (audio interference) issue and move

8  on.

9  BY MR. GOODWINE:

10  Q    First of all, Mr. Dane, are you familiar with this

11  document?

12  A    I believe this is the assignment and conveyance of the

13  override that we've been discussing.

14  Q    Yeah, correct.  And it is that -- for context, this is the

15  original assignment between LLOG and Davis in favor of Shell

16  and Marathon Oil.  Is that correct?  If you look at the first

17  paragraph?

18  A    That's -- that's what it appears to be.

19  Q    Okay.  And then if you look at the third recital or the

20  third "whereas" paragraph.

21           MR. GOODWINE:  So, Lindsey, if you can scroll down

22  literally, just like three or four lines.

23      (Pause)

24           THE COURT:  Ms. Johnson, I just saw that you had your

25  hand raised and wanted to speak.  Go ahead, please.

Dane - Direct/Goodwine                    59

1          MS. JOHNSON:  Yeah, and I apologize, Judge.  I'm just

2    having some technical difficulties over here making my screen

3    -- sharing my screen and making it larger.

4          THE COURT:  So I think if you'll just pull the slide

5    bar down, we'll be able to get to where you want to be.

6          MR. GOODWINE:  Yeah, can you do that on the right-

7    hand side, Lindsey?  Just literally slide down the document

8    about five lines?

9          MS. JOHNSON:  Unfortunately, it just won't let me

10   grab it.

11         MR. GOODWINE:  Okay.

12         MS. JOHNSON:  I'm going to try again.

13         MR. GOODWINE:  We'll come back to it -- to that.

14   BY MR. GOODWINE:

15   Q    And I'll ask the question -- and Mr. Dane, I'm not trying

16   to set you up or trick you or anything, but do you see

17   literally right at the bottom of the screen, what's on there

18   now, there's a reference to the contract area associated with

19   this conveyance of overriding royalty interest.  Do you see

20   that?  It's --

21         MR. GOODWINE:  I'm sorry, Lindsey.  Go back up.  It

22   was the third "whereas" paragraph, right before the "Now

23   therefore."

24         THE WITNESS:  Yes, sir.

25   BY MR. GOODWINE:

1  Q    Okay.  Is that the same contract area or -- strike that.

2       Is the contract area as defined with this conveyance of

3  overriding royalty interest the same northeast quarter of Green

4  Canyon Block 201 that's governed by the operating agreement?

5  A    The operating agreement --

6            MR. PEREZ:  Object to the question.  Calls for a

7  legal conclusion, Your Honor.

8            THE COURT:  Overruled.

9            THE WITNESS:  Yeah, I believe it generally covers

10 that part of the contract area, in addition to other parts.

11           MR. GOODWINE:  Okay.  Let's see how we do in Round 2,

12 Ms. Johnson.  Can we please call up Debtors' Exhibit (audio

13 interference) 6, which I think we're using as a demonstrative.

14           MS. JOHNSON:  Debtors' Exhibit 6?

15           MR. GOODWINE:  46.  Four-six.  It's what they

16 uploaded last night.

17           I'm sorry.  26.  I'm confusing ours and theirs.

18           MS. JOHNSON:  Okay.

19 BY MR. GOODWINE:

20 Q    Mr. Dane, this is the spreadsheet that y'all opened up

21 last night.  We'll see it on the screen in a second.  But are

22 you familiar with the spreadsheet that your attorneys uploaded

23 last night?

24 A    Yes, I am.

25 Q    Okay.  And you see that there's an offset that you're

Dane – Direct/Goodwine                          61

1  trying to articulate in the amount of $229,117.00, and that

2  relates to "ST 59#1 audit exception."  Do you see that?

3  A     Yes, I do.

4  Q     Does ST –– what does "ST 59" stand for?

5  A     It does sound familiar.

6  Q     Does that have anything to do with these Green Canyon

7  properties or the operating agreement in question?

8  A     No, it doesn't.

9  Q     Has Fieldwood actually submitted itself an audit exception

10  to LLOG or was it asserted by Fieldwood's predecessors?

11  A     There is a long history of communication that Fieldwood

12  submitted directly to LLOG on this issue.

13  Q     And do you know whether or not the predecessor of

14  Fieldwood actually asserted an audit claim prior to its

15  assignment of South Timbalier 59 to Fieldwood?

16  A     I'm aware that, like I mentioned, there is a long history

17  of communication, both with Apache, the predecessor I believe

18  you're referring to, and Fieldwood on this particular audit

19  exception.

20  Q     Okay.  Let me ask the question again, because I'm looking

21  for as clear of a direct answer as possible.  Are you aware

22  that the predecessor, Apache, to Fieldwood and South Timbalier

23  59, asserted an audit claim consistent with the offset you're

24  looking for here?

25  A     I'm not aware if they did or did not.  No, I'm not aware.

Dane – Direct/Goodwine                      62

1  Q    Okay.  Is that then also true that you're not aware of

2  whether or not Apache had affirmatively compromised this claim

3  for the benefit of LLOG?

4  A    As I mentioned, I know there was a long history of

5  communication on this issue, and I know that there was various

6  claims asserted at the beginning of the process, and that those

7  opinions changed over time as the parties understood what their

8  actual economic interest in this particular issue was.

9        So I apologize for not being more clear, but this was a --

10  this was an issue that dates back many, many years that was

11  unresolved.

12  Q    Wholly understood.  But you can confirm that Fieldwood

13  itself has not asserted an audit claim in favor -- or excuse

14  me, an audit claim against the operator LLOG.  Is that correct?

15  A    Fieldwood has -- has provided an audit exception here.

16  Q    Okay.  Do you know when that was provided?

17  A    That would go back to 2013/'14.

18  Q    When did Fieldwood acquire South Timbalier 59?

19  A    It would have acquired that interest in the 2013

20  acquisition from Apache.

21  Q    Okay.  Is production from Green Canyon 157 and Green

22  Canyon 201 covered by the production handling agreement?

23  A    Yes, I believe it is.

24  Q    Okay.  Can you explain -- is it the J. Bellis Production

25  Handling Agreement?

Dane – Direct/Goodwine                        63

1  A    Yes, I believe that's correct.

2  Q    Okay.  Can you explain the relationship between that

3  J. Bellis Production Handling Agreement and the operating

4  agreement -- and before Mr. Perez objects to that being

5  confusing, all I'm trying to do is to get you to explain to the

6  Court how production is processed and handled off-site under a

7  separate contract from the operating agreement.

8  A    You're asking -- sorry.  You mind clarifying?  You're

9  asking for the relationship between those agreements?

10 Q    Is production from Green Canyon 157 and 201 processed on a

11 third-party platform?

12 A    I believe so.

13 Q    Okay.  And that is covered by the J. Bellis Production

14 Handling Agreement.  Is that correct?

15 A    Correct.

16 Q    And under the operating agreement which is Exhibit 1 --

17         MR. GOODWINE:  So 774-1, if we can call that up,

18 Ms. Johnson.

19 BY MR. GOODWINE:

20 Q    So Exhibit C, I just want you to identify it before we

21 jump into the specifics.  But Exhibit C starts on Page 159.

22 Are you familiar with Exhibit C and COPAS?

23 A    No.  No, I'm not.  I'm familiar with COPAS generally.  I

24 haven't read this as part of the operating agreement.

25 Q    Okay.  Are the COPAS provisions fairly standard in



Dane – Direct/Goodwine                    64

1  accounting procedures for oil and gas offshore operating

2  agreements?

3  A    That is -- COPAS is generally the baseline that most

4  agreements start with.

5  Q    Okay.  And does COPAS include an overhead component?

6  A    For certain charges, COPAS usually includes an overhead

7  component, but there are many specific excluded charges that

8  overhead is specifically disallowed.

9  Q    Generally, overhead is an issue addressed by the COPAS

10  attachment to offshore operating agreements, including the one

11  in dispute here, correct?

12  A    With respect to specific charges, overhead is something

13  that COPAS contemplates.

14  Q    Okay.  And on your Exhibit 26, which is Docket 782-1, you

15  have a couple of suggested offsets for the PHA fees associated

16  with that J. Bellis PHA.  Is that correct?

17  A    That's correct.

18  Q    Do you know when you first raised those as potential

19  offsets with LLOG?

20  A    I'm not aware.

21  Q    I'm going to go LLOG Exhibit 2.  (Audio interference) Page

22  3 (audio interference) Mr. Dane to confirm that LLOG is a

23  partner to this Ratification and First Amendment to Operating

24  Agreement.

25  A    That is correct.

Dane – Direct/Goodwine                    65

1   Q    Okay.  And when Fieldwood came in and ratified this

2   agreement pursuant to Paragraph (audio interference) -- which

3   is the previous page, Ms. Johnson -- they ratified it as if

4   they were original signatory parties thereto.  Is that correct?

5              MR. PEREZ:  Object to the form of the question.  Asks

6   for a legal conclusion.

7              THE COURT:  Sustained.

8   BY MR. GOODWINE:

9   Q    Could you read the Paragraph 1 on Page 2 for the Court,

10  please.

11  A         "LLOG Energy and Fieldwood hereby ratify, adopt, and

12            confirm the terms and provisions of the OA and become

13            parties to and are now bound by the terms and

14            provisions of the OA to the same terms as if they

15            were original signatory parties to the OA.  Fieldwood

16            further confirms that it hereby replaces Davis as a

17            party to the OA."

18  Q    Okay.  And if you go back to Page 1, if you can confirm

19  for all of us, please, what the effective date is in the

20  opening lines of the agreement.

21  A    Dated effective December 12, 2002.

22  Q    Okay.  So the agreements by Fieldwood go all the way back

23  and are bound -- binding on Fieldwood from 2002 forward.  Is

24  that correct?

25  A    I'm not -- I don't know the answer to that question.  The

Dane – Direct/Goodwine                          66

1 document says that it's dated effective December 12th.

2 Q    Okay.  I'd like to call your attention to LLOG Exhibit 38.

3 Are you familiar with this document?

4 A    No, I'm not familiar with this document.

5 Q    Okay.  Let's go to Exhibit 13, please.  This is LLOG

6 Exhibit 13.

7        MR. GOODWINE:  I'd like to go to Page 2, Ms. Johnson.

8 And if you can blow it up, please.  I think everyone may have a

9 hard time seeing -- okay.  So Page 2, the "now therefore"

10 paragraph.

11        Actually, I apologize.  If you can scroll up to the

12 introductory paragraph, please.

13 BY MR. GOODWINE:

14 Q    Do you see a reference in the defined term "Memorandum of

15 Operating Agreement and Financing Statement" defined as "MOA"

16 in that first paragraph?

17 A    Yes, I do.

18 Q    And you can confirm that that was actually filed on public

19 record in Terrebonne Parish and in the UCC records.  Is that

20 correct?

21        MR. PEREZ:  I object to the form of the question,

22 Your Honor.  I think the document speaks for itself.  And I

23 don't know if he has any independent knowledge as to whether it

24 was filed or not.

25        THE COURT:  Sustained.

Dane – Direct/Goodwine                          67

1          MR. GOODWINE:  Okay.  Please scroll down,

2   Ms. Johnson, to the "now therefore" paragraph.

3   BY MR. GOODWINE:

4   Q    Can you please read that; then I'll ask you a question

5   about it, Mr. Dane.

6   A    "Now therefore, the undersigned, each of which has an

7   interest in portions of the contract area, in consideration for

8   the mutual covenants in the MOA, as amended and ratified, does

9   hereby agree to the recitals stated above and does hereby, by

10  amending the Attachment 1 thereto, as stated in Exhibit A

11  hereto, and does hereby fully ratify the MOA, as hereby

12  amended."

13  Q    Okay.  Based upon your position as a senior executive with

14  Fieldwood, do you believe that that makes Fieldwood bound by

15  what's defined as the MOA filed on public record previously by

16  Davis and LLOG?

17          MR. PEREZ:  Object to the question, Your Honor.

18  Calls for a legal conclusion.

19          THE COURT:  Sustained.

20  BY MR. GOODWINE:

21  Q    I'd like to call your attention to Page 3.

22          MR. GOODWINE:  So one more Page, Lindsey.

23  BY MR. GOODWINE:

24  Q    And you previously confirmed that Fieldwood has signed

25  this agreement.  Is that correct?



Dane - Direct/Goodwine                    68

1  A     I don't recall.

2  Q     Okay.

3  A     I don't recall if --

4  Q     My apologies for speaking over you.  Can you confirm that

5  -- tell me who John Smith is.

6  A     John Smith is our Senior Vice President of Land and

7  Business Development.

8  Q     Okay.  Is he authorized to sign -- to execute documents

9  such as this that end up being filed on public record?

10 A     Yes, sir.

11 Q     Okay.  So based upon this being a certified copy of a

12 public records filing, you would agree with me, would you not,

13 that John Smith signed this on behalf of Fieldwood Energy LLC

14 -- excuse me, Fieldwood Energy Offshore LLC.

15       MR. PEREZ:  Again, Your Honor, I think it -- I'm not

16 sure what -- the document is in evidence and it kind of speaks

17 for itself.  I'm not sure what this is intended to do.

18       MR. GOODWINE:  I --

19       MR. PEREZ:  And it calls for a legal conclusion.

20       THE COURT:  I'm going to overrule.  I think it's a

21 routine, you know, "did he have the authority to bind you" kind

22 of question.  I'm going to allow it.

23       MR. GOODWINE:  (Audio interference)

24       THE WITNESS:  I'm sorry.  Can you --

25       MR. GOODWINE:  Yeah, and I'll try to streamline it.

ACCESS TRANSCRIPTS, LLC          ⚖          1-855-USE-ACCESS (873-2223)

Dane – Direct/Goodwine                    69

1  BY MR. GOODWINE:

2  Q    Did John Smith execute this agreement on behalf of

3  Fieldwood Energy Offshore LLC, and bound the company in

4  conjunction therewith?

5           MR. PEREZ:  Same objection, Your Honor.

6           THE COURT:  I'm going to sustain, given the addition

7  of the last six words to the question.

8           MR. GOODWINE:  Okay.  Then I'll go back.

9  BY MR. GOODWINE:

10 Q    Was this document executed by John Smith on behalf of

11 Fieldwood Energy Offshore LLC?

12 A    Yes, sir, it is -- I believe -- it appears that way.

13 Q    Okay.

14          MR. GOODWINE:  And if you scroll up, Lindsey, to Page

15 3 of 8, the last sentence.

16 BY MR. GOODWINE:

17 Q    Is there an acknowledgment by Fieldwood that they're bound

18 by the mutual liens and security interests as previously

19 confirmed under the memorandum of operating agreement?

20          MR. PEREZ:  Again, Your Honor, calls for a legal

21 conclusion.  I think the document speaks for itself.

22          THE COURT:  Sustained, given the wording of it -- of

23 the question.

24 BY MR. GOODWINE:

25 Q    We're going to move on to the operating agreement, so LLOG



Dane – Direct/Goodwine                    70

 1  Exhibit 1.

 2          THE COURT:  Tell you what.  Mr. Goodwine, I have an

 3  11 o'clock hearing.  I didn't realize we would be here quite

 4  this long.

 5          MR. GOODWINE:  Okay.

 6          THE COURT:  How much longer do you need with

 7  Mr. Dane?

 8          MR. GOODWINE:  Not long.  Five minutes.

 9          THE COURT:  And then who's going to be your next

10  witness?

11          MR. GOODWINE:  There are no other witnesses.

12          THE COURT:  And how long are you going to need with

13  Mr. Dane, Mr. Perez?

14          MR. PEREZ:  Fifteen minutes, Your Honor.

15          THE COURT:  Okay.  We'll come back at 11:20.  I do

16  have a hard stop at noon, but we can come back then at 1:30, if

17  we need to.  Or if y'all prefer, we'll just come back at 1:30.

18  What would y'all like to do?

19          MR. GOODWINE:  I think we can wrap it up before noon.

20          THE COURT:  See y'all at 11:20.  Thank you.

21          MR. PEREZ:  Thank you.

22      (Recess taken at 10:54 a.m.)

23      (Proceedings resumed at 11:19 a.m.)

24          THE COURT:  All right, Mr. Dane.  You remain under

25  oath.

Dane – Direct/Goodwine                          71

1          Mr. Goodwine.

2          MR. GOODWINE:  Am I coming through loud and clear?

3          THE COURT:  You are, Mr. Goodwine.

4          MR. GOODWINE:  Okay.

5                    DIRECT EXAMINATION CONTINUED

6   BY MR. GOODWINE:

7   Q    Mr. Dane, where -- okay, there you are.  I'd like to call

8   your attention to Exhibit 1, which is the operating agreement,

9   and go to Section 19.1, which I think we all now know is on

10  Page 132.

11         MR. GOODWINE:  Ms. Johnson, if you can call that up,

12  please.

13         MS. JOHNSON:  Your Honor, I think I may have lost the

14  -- my "presenter" privileges, if you wouldn't mind giving those

15  back to me.

16         THE COURT:  Oh, sorry.  I don't know what happened to

17  that, but they are back to you now.  Thank you.

18         MS. JOHNSON:  Thank you.

19      (Pause)

20         MR. GOODWINE:  That's our super secret case that --

21  I'm sure I haven't read.

22         Okay.  Page 132, please, Ms. Johnson.

23  BY MR. GOODWINE:

24  Q    Okay.  Mr. Dane, you were paying attention when we went

25  through this article before.  Is that correct?

Dane – Direct/Goodwine                          72

1  A    Yes.

2  Q    Okay.  You testified before that Fieldwood has gone non-

3  consent on operations in Green Canyon Block 201.  Is that

4  correct?

5  A    Correct.

6  Q    And is Fieldwood now receiving 100 percent of the override

7  proceeds as originally assigned to Shell?  Obviously not the

8  Marathon portion, but the Shell portion that were conveyed by

9  Davis and LLOG previously?

10 A    Yes.  Fieldwood's -- Fieldwood's receiving the benefit of

11 the override.

12 Q    Okay.  Before Fieldwood went non-consent, was it only

13 receiving an 85 percent share?

14 A    To my knowledge, I believe before we went non-consent we

15 had a working interest, which was a 15 percent share, and we

16 also owned an override, and we got the benefit and the burden

17 of each of those together -- or separately, but both of them.

18 Q    Okay.  So if you were a 15 percent working interest owner,

19 that would equate to -- based upon how you set it, an 85

20 percent receipt of the override production.  Is that correct?

21 A    I don't follow that statement.

22 Q    Okay.  In other words, Fieldwood purchased an override

23 from Shell.  Is that correct?

24 A    Correct.

25 Q    And Fieldwood was a 15 percent obligor of that override.



Dane – Direct/Goodwine                        73

1  Is that correct?

2  A    Correct.

3  Q    Okay.  Presently, is Fieldwood receiving 85 percent or 100

4  percent of the proceeds of the override?

5  A    Fieldwood is receiving the amount that the override

6  specifies in the conveyance.  And I don't understand your

7  question about the 85 percent or 15 percent.  The percentage

8  (audio interference) with the override, irrespective of our

9  working interest.

10  Q    Okay.  But Fieldwood itself is not contributing any

11  portion to the payment of that override after the non-consent.

12  Is that correct?

13           MR. PEREZ:  Object to the form of the question.

14  Vague.

15           THE COURT:  Sustained.

16           MR. GOODWINE:  Okay.

17  BY MR. GOODWINE:

18  Q    Is it true that Fieldwood is receiving 100 percent of the

19  override as originally assigned to Shell by Davis and LLOG

20  previously?

21  A    Fieldwood's receiving the percentage of the actual

22  override, in its full amount.

23  Q    As articulated in the original override.  Is that correct?

24  A    Correct.

25  Q    Prior to going non-consent, did Fieldwood bear 15 percent

ACCESS TRANSCRIPTS, LLC            ⚖            1-855-USE-ACCESS (873-2223)

1  of the payment obligation under that portion of the override to

2  Shell?

3          MR. PEREZ:  Object to the form of the question, Your

4  Honor.

5          THE COURT:  Sustained.

6          MR. PEREZ:  I don't --

7          THE COURT:  Sustained.

8          MR. GOODWINE:  I'm sorry, Judge.  Did you rule?

9          THE COURT:  I sustained the objection.

10          MR. GOODWINE:  We'll move on.

11  BY MR. GOODWINE:

12  Q    If I could call your attention to LLOG Exhibit 46, which

13  is at 784-1.  Are you familiar with this document, Mr. Dane?

14  A    Yes, I am.

15  Q    Okay.  Is this good news for the oil and gas industry

16  offshore?

17          MR. PEREZ:  Object to the form of the question, Your

18  Honor, as vague.

19          THE COURT:  Sustained.

20          MR. GOODWINE:  Okay.

21  BY MR. GOODWINE:

22  Q    Has Fieldwood analyzed the impacts of this Secretarial

23  order?

24          MR. PEREZ:  Your Honor, relevance.

25          THE COURT:  Overruled.

Dane – Direct/Goodwine                    75

 1            THE WITNESS:  Yes, we have.

 2  BY MR. GOODWINE:

 3  Q    Okay.  And what's your conclusion?

 4  A    My conclusion is that this document has a number of points

 5  in it that are problematic, but it's very ambiguous and vague,

 6  and I think the entire industry in general is looking to get

 7  more clarity on what exactly the effect of this document is.

 8  Q    Okay.

 9            MR. GOODWINE:  Tender the witness, Your Honor.

10            THE COURT:  I just -- I couldn't hear you,

11  Mr. Goodwine.

12            MR. GOODWINE:  Tender the witness, Your Honor.

13            THE COURT:  Thank you.

14            Mr. Perez.

15            MR. GOODWINE:  I'm sorry, Your Honor, with one

16  caveat.  We obviously called Mr. Dane.  We would like to

17  reserve the right to cross-examine briefly depending on the

18  scope of the direct examination by Mr. Perez.

19            THE COURT:  You're passing him as to all of your

20  direct examination.  Is that right?

21            MR. GOODWINE:  As to all of his -- correct.

22            THE COURT:  Yeah.  Thank you.

23            Mr. Perez, do you have any questions for Mr. Dane?

24            MR. PEREZ:  Yes, Your Honor.  I just -- yes, I just

25  have a few questions.

1      MICHAEL T. DANE, DEBTORS' WITNESS, PREVIOUSLY SWORN

2                DIRECT-EXAMINATION

3  BY MR. PEREZ:

4  Q    Mr. Dane, do you believe -- does Fieldwood believe that it

5  owes LLOG $900,000?

6  A    No, we dispute that amount.

7  Q    And as it relates to the amounts that are in dispute, how

8  much is that?

9  A    The amount that we believe that is an actual undisputed

10  amount, subject to it being prepetition and how it would be

11  treated by our plan, and in these agreements, is closer to

12  $257,000.

13  Q    Okay.  Now, are you familiar with the override that we've

14  been discussing?

15  A    Yes, I am.

16  Q    All right.  And has Fieldwood ever paid any costs of

17  production or any other cost related to that override?

18  A    No.  The override is meant to be cost-free, as is typical

19  with overrides, and so we have not.

20  Q    And why do you say that?  Why do you believe that?

21  A    The conveyance and assignment document itself that

22  establishes the terms of the override specifically exclude any

23  costs being attributable to the override itself.

24  Q    Now, if the stay were to be lifted and the first purchaser

25  be put on notice, would that create a hardship for Fieldwood?

1  A    Yes.  We're -- right now we're in the middle of our

2  restructuring.  It's an important -- we're at a pretty critical

3  juncture in our restructuring.  We are trying to progress it by

4  getting our disclosure statement approved, ultimately getting

5  our plan confirmed over the next several months.  So this is

6  taking up a good bit of time.

7       In addition to that, it's started having a liquidity

8  impact on the company, which would be detrimental.  Liquidity

9  is very important to the company right now.  And I believe we'd

10 probably have to continue litigating this issue, which would

11 cause a distraction to us and our counsel and advisors.

12 Q    And just by way of background, how many trade agreements

13 has the company entered into as of today?

14 A    I believe we've entered into around 150 trade agreements.

15      MR. GOODWINE:  Objection, Your Honor.  Objection.

16 Relevance.

17      THE COURT:  How is that relevant?

18      MR. PEREZ:  Your Honor, just in terms of the demands

19 on management, then the fact that they've been negotiating with

20 other parties.  Balance of the harms.

21      THE COURT:  Is your objection, Mr. Goodwine, that it

22 isn't relevant to anything we have to consider today, or that

23 it isn't relevant to the scope of what you asked questions

24 about?

25      MR. GOODWINE:  No, it's just not relevant to anything

Dane – Cross/Goodwine                          78

1  today.  But my calling Mr. Dane, I think we called him as a --

2  kind of an out-of-order hostile witness, where this is more

3  akin to direct examination.  So --

4           THE COURT:  Yeah, that's my question is are you

5  objecting to it as part of their direct, or are you objecting

6  to it as part of their cross?

7           MR. GOODWINE:  Part of their direct.

8           THE COURT:  I'm going to overrule then.  I think it

9  is relevant to their direct.  It's not relevant to their cross.

10  And I'll accept the answer as given.

11           MR. PEREZ:  Your Honor, I don't think I have any

12  further questions.

13           THE COURT:  Thank you.

14           Mr. Goodwine, any cross?

15           MR. GOODWINE:  Two quick questions, I believe.

16                        CROSS-EXAMINATION

17  BY MR. GOODWINE:

18  Q    Number one, Mr. Dane.  In your experience in the oil and

19  gas industries, have you seen overriding royalty interest

20  provided as collateral for loans or other obligations?

21  A    Yes.

22  Q    Okay.  Does that automatically make them cost-bearing

23  instruments?

24  A    No, it does not.

25  Q    Okay.

1          MR. GOODWINE:  No further questions, Your Honor.

2          THE COURT:  Thank you.

3     (Witness excused)

4          THE COURT:  Any further evidence --

5          MR. GOODWINE:  We have some --

6          THE COURT:  Any further evidence by any party?  Both

7  sides --

8          MR. GOODWINE:  Not from LLOG as to --

9          THE COURT:  Sorry.  Go ahead.

10          MR. GOODWINE:  Not from LLOG as (audio interference).

11          THE COURT:  Mr. Perez.

12          MR. PEREZ:  No.  Nothing further, Your Honor.  We

13  rest.

14          THE COURT:  Anyone else have any evidence with

15  respect to today's proceeding?

16          All right.  Mr. Goodwine, unless it's in the

17  exhibits, I didn't hear any oral testimony that would meet your

18  Timbers of Inwood Forest burden with respect to showing that

19  what we have is collateral of diminishing value, such that

20  diminishment would impair your client's rights.

21          Is that in the evidentiary record somewhere that I

22  missed?

23          MR. GOODWINE:  Your Honor, I think by their very

24  nature, overriding royalty interest in oil and gas are

25  depleting in nature.  And especially with the headwinds that

80

1  you've taken a degree of judicial notice on through the

2  Secretarial order, that the ability to have the requisite

3  comfort level that the production is going to be sufficient to

4  cover the claim is a very big open question.

5          In addition to that, the current plan is to assign

6  the override to a third party --

7          THE COURT:  Yeah, I'm not worried about --

8          MR. GOODWINE:  -- and through the plan --

9          THE COURT:  I'm not worried about the -- I don't

10 understand how a plan not yet approved goes towards a Timbers

11 of Inwood Forest issue.

12         MR. GOODWINE:  I understand.  Then what -- the

13 argument I will make for you, Your Honor, at the end of the

14 day, is that due to the declining nature of oil and gas in

15 general, especially now with the Secretarial order, admittedly

16 when we filed these motions that order wasn't out there, but we

17 also didn't have a plan on file.  And our biggest concern at

18 that point was that we were just going to be going on without

19 any clear guidance as to when we'd be able to analyze things

20 from a plan of reorganization.

21         But the balance of the harms for approximately

22 $50,000 a month we think is appropriate to set aside to cover

23 what we believe is clearly a fully secured claim to 902.  And

24 at the end of the day, that's the best argument we can put

25 forward to you.

1          THE COURT:  Thank you.  I'm going to assume without
2   finding every other factor and find that the movant has failed
3   to demonstrate an absence of adequate protection, even if it
4   has a collateral interest in the ORRI, a finding that I am not
5   making that they do.  But the burden under <u>Timbers</u> has to
6   demonstrate that any decline has an adverse effect.  And I have
7   zero evidence before me as to what the current value is of this
8   ORRI.  It could be worth a billion dollars, for all I know.  I
9   don't know what it's worth.  I have zero evidence on that.

10          It's the burden of the movant to show me they need
11  adequate protection.  And the fact that oil and gas is a
12  depleting asset, you need to say from the beginning what's it
13  depleting, under <u>Timbers</u>.  If you have a massively oversecured
14  creditor, for example, then they don't need adequate
15  protection.

16          I find there's simply a lack of evidence to support
17  the claim.  I'm also ruling pretty narrowly today -- this is
18  really hard, and there's no way I'm going to rule from the
19  bench as to whether or not there is a lien, whether it's
20  required to be a mortgage or is a personal property interest on
21  the ORRI without really taking the trouble to go through this.
22  I think it's important.  I don't think it's an obvious first-
23  blush call one way or the other.  And so I'm, to some extent,
24  cowardly ruling on that absence of evidence and not going into
25  the hard stuff.  I think we'll get there at confirmation.

82

1          I, frankly, very much appreciate the preview.  It
2     gives me a lot to work on and think about.  But on a narrow
3     basis, everybody agrees what the burden is on a party seeking
4     this, and I find that the evidentiary burden hasn't been met.
5     So I am denying the motion, but I'm denying it without
6     prejudice, and I am not ruling on the actual lien questions one
7     way or the other.

8          Thank y'all.  Y'all have continued discussions, I
9     know, about how to handle this, and we'll deal with it at the
10    plan confirmation.  We're in adjournment.  Thank you.

11          MR. PEREZ:  Thank you, Your Honor.

12          MS. JOHNSON:  Thank you, Your Honor.

13          MR. GOODWINE:  Thank you, Your Honor.

14       (Proceedings concluded at 11:35 a.m.)

15                    *  *  *  *  *

16

17

18

19

20

21

22

23

24

25

83

# **C E R T I F I C A T I O N**

        I, Alicia Jarrett, court-approved transcriber, hereby

certify that the foregoing is a correct transcript from the

official electronic sound recording of the proceedings in the

above-entitled matter, and to the best of my ability.

ALICIA JARRETT, AAERT NO. 428     DATE:  June 1, 2021

ACCESS TRANSCRIPTS, LLC