IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | § § | Chapter 11 |
| FIELDWOOD ENERGY LLC, *et al.*, | § § | Case No. 20-33948 (MI) |
| Debtors. | § § | (Jointly Administered) |

**OBJECTION OF THE HANOVER INSURANCE COMPANY; LIBERTY MUTUAL INSURANCE COMPANY; TRAVELERS CASUALTY & SURETY COMPANY OF AMERICA; AND XL SPECIALTY INSURANCE COMPANY TO CONFIRMATION OF THE FOURTH AMENDED JOINT CHAPTER 11 PLAN OF THE DEBTORS**

"A bankruptcy petition is not a grant of immunity. Bankruptcy debtors are not different from any citizen in that they must comply with state and federal laws." Hon. Marvin J. Isgur *In re American Coastal Energy Inc.* 399 B.R. 805, 810 (Bankr. S. D. Tex. 2009)

The Hanover Insurance Company ("Hanover"), Liberty Mutual Insurance Company ("Liberty"), Travelers Casualty & Surety Company of America ("Travelers"), and XL Specialty Insurance Company ("XL") (collectively the "Sureties") file this their Objection to the Fourth Amended Joint Chapter 11 Plan[1] (the "Plan") of the Debtors.[2] In support, the Sureties respectfully state as follows:

## SUMMARY

1. The Debtors are asking this Court to permit the following scenario:

   - Despite signing up as an operator of oil wells in the Gulf of Mexico and taking on the environmental responsibilities that flow, the Debtors want to walk away and have someone else clean up their mess (both literally and figuratively).

---

[1] Dkt. 1252

[2] The Debtors, each of which have filed a separate voluntary petition, are: Dynamic Offshore Resources NS, LLC; Fieldwood Energy LLC; Fieldwood Energy Inc.; Fieldwood Energy Offshore LLC; Fieldwood Onshore LLC; Fieldwood SD Offshore LLC; Fieldwood Offshore LLC; FW GOM Pipeline, Inc.; GOM Shelf LLC; Bandon Oil and Gas GP, LLC; Bandon Oil and Gas, LP; Fieldwood Energy SP LLC; Galveston Bay Pipeline LLC; and Galveston Bay Processing LLC.

**OBJECTION TO THE FOURTH AMENDED JOINT CHAPTER 11 PLAN**

- The Debtors' solution is that any impacted parties – whether predecessors in the chain of title, the federal government, or the public at large – simply look to surety bonds for recourse. This is despite the fact that there appears to be plugging and abandonment ("P&A") liability that exceeds bonds in place.[3]

- This means that the Debtors expect $1 billion + in surety credit for free. Not only do they not want to pay for these products, but they are asking the Court to strip indemnity rights of all sureties and toss the indemnity agreements into the waste basket.

2.  The Bankruptcy Code is not a sword. It also is not a tool for avoiding state and federal laws, and most notably, the obligation to manage environmental hazards in the same way that would be required outside of bankruptcy. This is not a Chapter 7 liquidation where there is no available capital to address the situation. Rather, the Debtors seek to use a Chapter 11 reorganization to cherry pick the good assets from the bad and then contribute no capital towards honoring the environmental obligations for the assets that are proposed to be abandoned.[4] The Court should not permit the Debtors to avoid their environmental responsibilities based on not only the requirements of the Bankruptcy Code, but also the line of authority pursuant to *Midlantic National Bank* and its progeny (which the Court knows well).

3.  In addition, with respect to the oil and gas interests that fall into the "bad" category, the Plan seeks to "abandon to" certain entities, which is inconsistent with Section 554 of the Bankruptcy Code. Even if the Debtors could select who they would like to abandon assets to, they seek to impermissibly "slice and dice" assets covered by various PSAs and surety bonds (by abandoning some, transferring others, etc). Such items are not divisible and cannot be torn apart

---

[3] *See e.g.,* Dkt. 759

[4] While the Bankruptcy Code is designed to protect the honest but unfortunate debtor, as one commentator notes, it is an open question as to "what extent a debtor, who has not adequately provided for the cleanup and removal of the toxic and hazardous waste, is honest and merely unfortunate." Leonard J. Long, *Burdensome Property, Onerous Laws, and Abandonment: Revisiting Midlantic National Bank v. New Jersey Department of Environmental Protection*, 21 Hofstra L. Rev. 63, 65 n.10 (1992).

**OBJECTION TO THE FOURTH AMENDED JOINT CHAPTER 11 PLAN**

Page 2

piecemeal, with a bond continuing in force to cover some assets that are sold and/or assumed and others that are now abandoned to a separate entity. Rather, and this goes to nearly every aspect of the Plan, if there are going to be continued operations – whether by a third-party, a reorganized debtor, or a predecessor in the chain of title – that entity must post new bonds where it is the bond principal liable for the bonded obligation. As with any new bond issuance, prior to issuing any bonds the sureties would have the opportunity to perform financial underwriting of the new principal, obtain an acceptable indemnity agreement and set the overall terms for bond program including payment of premiums, posting of adequate collateral, etc.

4. Nothing in the Plan addresses how existing surety bonds will be treated or what security the new purchaser will post to address plugging and abandonment liabilities for the assets it proposes to acquire. As surety bonds are financial accommodations that cannot be assumed and assigned, there must be a mechanism for replacement of existing bonds and the issuance of new bonds on behalf of any phoenix that arises from these ashes pursuant to normal underwriting standards of whatever surety elects to take on such risk.

5. Confirmation of the Plan would set a dangerous precedent for bonding in the Gulf. If sureties have no reasonable expectation that the purchaser of a debtor's valuable assets in a bankruptcy case will be required to post its own replacement bonds in order to acquire and operate oil and gas assets but instead can leave the debtor's surety bonds in place post-confirmation, effectively leaving the surety on the hook while stripping them of their bargained for indemnity rights, it is likely that surety capacity for such bonding will be severely constrained going forward. It will not only directly result in a chilling of the surety marketplace but will cause serious detrimental impact to the oil and gas upstream sector, which heavily relies on surety bonding to operate.

<u>**OBJECTION TO THE FOURTH AMENDED JOINT CHAPTER 11 PLAN**</u>

6. In the interest of time and economy, the Sureties also join the objections by other interested sureties filed concurrently and incorporate herein the arguments, exhibits, authority provided in those objections. Thus, for the reasons briefed herein, as well as the reasons in those joined objections, the Plan should not be confirmed by this Court.

## BACKGROUND AND PROCEDURAL HISTORY

7. In order to operate their business, the Debtors were required under state and/or federal laws to post surety bonds to secure their P&A responsibilities. The Sureties issued the following bonds on behalf of the Debtors (or some combination of the Debtors and its affiliates):

- A $100 million performance bond issued by Liberty, Hanover, and Travelers in favor of Noble Energy, Inc. ("Noble") tied to the Neptune Spar, wells, and associated subsea equipment.

- A $90 million performance bond issued by Travelers and XL in favor of Noble tied to the PSA between the Debtors and Noble dated February 14, 2018. Upon information and belief, this bond (along with a companion bond issued by two other sureties) covered all Noble assets other than the Neptune Spar, wells, and associated subsea equipment.

- A $55 million performance bond issued by Liberty and another surety (Sirius America Insurance Company, who has objected to the Disclosure Statement) in favor of Marathon Oil relating to the Troika Field, including wells, pipelines and subsea infrastructure.

- A $1.9 million performance bond issued by Liberty in favor of XH, LLC (and Apache is related as well) tied to the East Cameron Field.

- A $1.7 million right-of-way bond issued by Hanover in favor of Marathon and BOEM related to Troika.

8. In connection with these bonds, the Debtors and/or affiliates executed various contractual agreements of indemnity in favor of each surety and are obligated to each surety as a principal under applicable state surety common law. These indemnity agreements are collectively attached as Exhibit 1.

9. On August 3, 2020, the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code.

10. On September 14, 2020, the Court entered the *Final Order (I) Authorizing Debtors to (A) Continue Insurance Programs, and Surety Bond Program, and (B) Pay Obligations with Respect Thereto; (II) Granting Relief from Automatic Stay with Respect to Workers' Compensation Claims; and (III) Granting Related Relief*.[5]

11. On April 9, 2021, the Debtors filed the *Fourth Amended Joint Chapter 11 Plan of Fieldwood Energy LLC and its Affiliated Debtors*.[6]

12. The Debtors intend to abandon in full all assets covered by the $100 million Neptune Spar bond, as well as selected assets covered by the $90 million Noble bond (e.g., Swordfish G15441 and G15445) without the provision of funds or other support for P&A responsibilities. The two bonds related to Troika would be in the bucket of assets sold to the credit bid purchaser. The final bond related to East Cameron would be divested into FWE I.

## ARGUMENTS AND AUTHORITIES

**A.   Standard of Review**

13. Section 1129 of the Bankruptcy Code governs confirmation of a plan of reorganization and sets forth the requirements that the plan proponent must satisfy in order for a reorganization plan to be confirmed. The plan proponent bears the burden of establishing the satisfaction of each and every one of these confirmation requirements. *In re PWS Holding Corp.*, 228 F.3d 224, 248 (3d Cir. 2000); *In re Lernout & Hauspie Speech Prods., N.V.*, 301 B.R. 651,

---

[5] Dkt. 340

[6] Dkt. 1252

**OBJECTION TO THE FOURTH AMENDED JOINT CHAPTER 11 PLAN**

Page 5

656 (Bankr. D. Del. 2003). If a plan fails to meet any requirements of Section 1129, the plan cannot be confirmed.

14. A confirmation plan must be "fair and equitable." *In re Trenton Ridge Investors, LLC*, 461 B.R. 440, 503 (Bankr. S.D. Ohio 2011); *see also In re Kennedy*, 158 B.R. 589, 600 (Bankr.D.N.J.1993) (holding that 20–year repayment period provided for in Chapter 11 plan did not provide creditor fair and equitable treatment and stating that "[a]mong the factors considered in each case to determine whether a particular plan is fair and equitable have been the debtor's demonstration of feasibility, the protections and risks to the secured creditors, and the general reasonableness of the proposals in light of the circumstances posed.").

**B.  Summary of Objection**

15. The Plan is deficient in several respects:

   a. "Abandonment" of assets burdened by outstanding P&A liabilities in contravention of the Debtors' obligations under state and/or federal law.

   b. The notion that the Debtors can "abandon to" under Section 554, which is impermissible.

   c. Lack of a surety bond program for any reorganized entity, including the lender credit bid purchaser.  As bonds are financial accommodations that cannot be assumed and assigned, the credit bid purchaser should obtain new bonds that would replace any existing Debtor obligations, and this would involve execution of indemnity agreements, payment of premiums, etc. The Debtors and/or the lenders cannot avoid indemnity obligations tied to P&A liability and essentially get surety credit for free.

d. An intention of the Debtors to slice and dice obligations – including PSAs and bonds – with some assets to be sold to a credit bid purchaser and some assets to be abandoned.

## C. Abandonment of Environmental Obligations

16. As a threshold matter, the Sureties have standing to raise environmental, *Midlantic* objections. As noted in a leading bankruptcy treatise, a party-in-interest, such as "owners of property affected by the abandonment should have standing to bring . . . environmental issues to the court's attention." 10 COLLIER ON BANKRUPTCY ¶ 6007.04 n.1 (16th ed. 2015). Courts looking at this narrow issue have concluded the same. *See In re Howard,* 533 B.R. 532, 543 (Bankr. S.D. Miss. 2015) ("In Rule 6007 of the Federal Rules of Bankruptcy Procedure, Congress has extended standing to the full extent permitted by Article III by allowing any 'party-in-interest' to object to a proposed abandonment of property." (citing *In re C–Power Prods., Inc.,* 230 B.R. 800, 804 (Bankr. N.D. Tex. 1998)). "[T]he Fifth Circuit Court of Appeals has broadly interpreted the term to include any creditor of the debtor 'as well as any other person with a sufficient stake in [the] outcome of a [bankruptcy] proceeding so as to require representation.'" *Id.* (quoting *Int'l Transactions, Ltd. v. Embotelladora Agral Regiomontana, S.A. de C.V.*, 347 F.3d 589, 595 (5th Cir. 2003)) (citing *Johnson v. Deutsche Bank Nat'l Trust Co.*, No. 3:12–CV–3542–L, 2013 WL 3810715, at *6 (N.D. Tex. 2013); *In re Presto*, 376 B.R. 554, 564 (Bankr. S.D. Tex. 2007)). Clearly, here, the Sureties have an interest in the abandonment of oil and gas assets with environmental liabilities that they have bonded.

17. This Court has held that "[a] bankruptcy petition is not a grant of immunity. Bankruptcy debtors are not different from any citizen in that they must comply with state and federal laws." *In re American Coastal*, 399 B.R. at 810; *see also Matter of H.L.S. Energy Co., Inc.*,

151 F.3d 434, 438 (5th Cir. 1998) ("Thus, a combination of Texas and federal law placed on the trustee an inescapable obligation to plug the unproductive wells, an obligation that arose during the chapter 11 proceedings.").

18. Thus, the Debtor and, while the case remains open, its Trustee has the duty pursuant to 28 U.S.C. § 959(b) to comply with state and federal laws, including the plugging and abandonment and decommissioning requirements regulated by the United States Department of the Interior. *In re American Coastal*, 399 B.R. at 811 ("The fact that the debtor does not intend to operate the property does not diminish its duty under § 959 to manage the property in accordance with state law."). The rationale for this lies in the U.S. Supreme Court's seminal opinion of *Midlantic Nat. Bank v. N.J. Dept. of Envtl. Prot.*, 474 U.S. 494, 502, 106 S.Ct. 755, 88 L.Ed.2d 859 (1986).

19. In analyzing a proposed abandonment under Section 554, the Supreme Court noted "[i]n codifying the judicially developed rule of abandonment, Congress also presumably included the established corollary that a trustee could not exercise his abandonment power in violation of certain state and federal laws." *Id* at 501. Accordingly, the Court went on to hold that "[n]either the Court nor Congress has granted a trustee in bankruptcy powers that would lend support to a right to abandon property in contravention of state or local laws designed to protect public health or safety." *Id.* at 502; *see also In re Peerless Plating Co.,* 70 B.R. 943 (Bankr. W.D. Mich. 1987) (implicit duty on the trustee to remediate by expending **all of the estate's unencumbered funds**) (emphasis added); *In re Wall Tube & Metal Prods. Co.*, 831 F.2d 118, 122 (6th Cir. 1987) (holding that a Chapter 7 trustee was not permitted to abandon or to possess property "in continuous violation of that same law.")

20. Importantly, the presence of predecessors in the chain of title or any surety bonds does not impact this analysis or otherwise relieve the Debtors of their primary responsibility to address environmental issues, including P&A obligations. This Court has held that "a debtor's obligation to expend funds to bring the estate into compliance with a state health and safety law does not change just because another entity has the same obligation." *In re ATP Oil & Gas Corp.*, 2014 WL 1047818, at *7 (Bankr. S.D. Tex. Mar. 18, 2014); *see also H.L.S. Energy Co., Inc.*, 151 F.3d 434 at 436. Thus, the Debtors cannot use the Bankruptcy Code to escape such an obligation.

21. This is not a Chapter 7 liquidation, and as such, the Debtors are required to set aside capital to address their P&A responsibilities. The Plan does not indicate that the Debtors could not meet these obligations; to the contrary, they could be satisfied, but the Debtors believe it would be strategically advantageous to abandon the bad assets and walk away from that liability. Indeed, there has not been any sort of market bid process to determine the value that could be achieved through a competitive sale of various assets. While the Debtors point to a confidential offer process, they have not revealed who any interested parties were, and more importantly, never even attempted to counter any offer that was received. Thus, given that the lenders had consent rights to any sale, it shows that the lenders might be motivated to credit bid the best assets at a far discounted price, which is ultimately to the detriment of the creditors. This reflects the inability of the Debtors to establish that the Plan is in the best interests of the creditors versus a Chapter 7 liquidation. *See* § 1129(a)(7). If assets were sold and value is generated, money could be realized to not only address any secured obligations, but also outstanding environmental obligations of the Debtors under *Midtlantic*.

D. **The Debtors Cannot "Abandon To"**

22. The Debtors intend to abandon property to predecessors in the chain of title, purportedly pursuant to Section 554 of the Bankruptcy Code.[7] "[U]pon abandonment . . . the trustee is . . . divested of control of the property because it is no longer part of the estate . . . . Property abandoned under [Section] 554 reverts to the debtor, and the debtor's rights to the property are treated as if no bankruptcy petition was filed." *Kane v. Nat'l Union Fire Ins. Co.*, 535 F.3d 380, 385 (5th Cir. 2008) (quoting 5 COLLIER ON BANKRUPTCY § 554.02[3]) (citing 11 U.S.C. § 554; *In re Lair*, 235 B.R. 1, 22 (Bankr. M.D. La. 1999)). This is why a sister court in this District has found:

> Property may not be abandoned by the Debtor's estate directly to Amegy because the Code contemplates that property is either (a) "abandoned to the debtor" when the case is closed; See 11 U.S.C. § 554(c); or, if the case is not yet closed, (b) abandoned to no one in particular, leaving anyone who claims to have any interest in the property to take whatever action under applicable law they deem appropriate to protect their interest. Here, because the case is not closed, the Property can only be abandoned to no one in particular.

*In re Perry*, 394 B.R. 852, 856–57 (Bankr. S.D. Tex. 2008) (Bohn, J.).

E. **The Plan Does Not Adequately Address the Current or Future Surety Program**

   i. *Principles of Suretyship and the Current Bond Program*

23. Unlike insurance, which is a two-party relationship, surety bonds are tripartite agreements in which the named principal is the primary obligor and the surety is the secondary obligor on the bonded obligation owing to the obligee. *Nat'l Am. Ins. Co. v. Boh Bros. Const. Co., Inc.*, 700 So. 2d 1363, 1366 (Ala. 1997) (citing *Balboa Ins. Co. v. United States*, 775 F.2d 1158, 1160 (Fed. Cir. 1985)); *A.J. Kellos Constr. Co. v. Balboa Ins. Co.*, 495 F. Supp. 408, 412 (S.D.

---

[7] *See* Dkt. 1252, § 5.13

**OBJECTION TO THE FOURTH AMENDED JOINT CHAPTER 11 PLAN**

Page 10

Ga. 1980) (citing RESTATEMENT OF SECURITY § 82 (1941)); *Pearlman v. Reliance Ins. Co.*, 371 U.S. 132, 139 n.19, 83 S. Ct. 232, 236, 9 L. Ed. 2d 190 (1962) ("Suretyship is not insurance.").

24. As a result, "[while a]n insurer expects losses, and they are actually predicted . . . [i]n contrast, a surety bond is written based on an evaluation of a particular contractor and the capacity to perform a given contract. Compensation for the issuance of a surety bond is based on fact specific evaluation of the risks involved in each individual case. **No losses are expected**." *Buck Run Baptist Church v. Cumberland Surety Insurance Co., Inc.*, 983 S.W. 2d 501, 504-05 (Ky. 1998) (emphasis added). This is the primary reason why indemnity is at the very heart of suretyship. ROBERT F. CUSHMAN ET. AL, HANDLING FIDELITY SURETY, AND FINANCIAL RISK CLAIMS 162 (2nd ed., Wiley 1990).

25. As a requirement of bonding, the Debtors executed multiple contractual agreements of indemnity in favor of each of the Sureties. Generally, these indemnity agreements obligate the Debtors to: (a) pay all premiums due; (b) indemnify and hold harmless the Sureties from and against any claim or liability arising as a result of having issued any bond, (c) procure the discharge and release of any bond, and/or (d) post collateral as determined by a surety to be necessary to protect against possible loss. In large part, these indemnity agreements simply reiterate what is already the common law. *See* Lawrence Lerner and Peter Karney, *Ch. 13, Salvage/Subrogation Rights, in* BOND DEFAULT MANUAL 449, 453-56 (Duncan L. Clore et al. eds., 3rd ed., Am. Bar. Ass'n 2005).

26. A leading treatise on suretyship explains:

> A promisor in suretyship is entitled to full indemnity from the principal for all loss occasioned by the default of the latter, and may call upon him for reimbursement, not only for what he is required to pay in satisfaction of the debt, but also for all reasonable expenses incurred in the matter of the adjustment of his liability. If the surety is sued he may recover the costs of litigation from the principal. Where a

> joint action is brought against the principal and surety there is additional justification for the rule that the surety may recover costs of the principal.

ARTHUR STEARNS AND NATHAN P. FEINSINGER, THE LAW OF SURETYSHIP 512 (4th ed., The W.H. Anderson Company 1934); *see also* RESTATEMENT (THIRD) OF SURETYSHIP AND GUAR. § 22 (1996) ("when the principal obligor is charged with notice of the secondary obligation it is the duty of the principal obligor to reimburse the secondary obligor. . . .").

27. Common law indemnity has been continually enforced by Texas courts since at least 1931. *Fox v. Kroeger*, 35 S.W.2d 679, 681 (1931); *see also Felker v. Thomas*, 83 S.W.2d 1055, 1058-59 (Tex. Civ. App.—El Paso 1935, no writ); *Texas Constr. Associates, Inc. v. Balli*, 558 S.W.2d 513, 519-20 (Tex. Civ. App.—Corpus Christi 1977, no writ); *Am. Alloy Steel, Inc. v. Armco, Inc.*, 777 S.W.2d 173, 175 (Tex. App.—Hous. [14th Dist.] 1989, no writ); *Old Republic Sur. Co. v. Palmer*, 5 S.W.3d 357, 362 (Tex. App.—Texarkana 1999, no pet.).

28. Accordingly, the Debtors have not only a contractual obligation, but a common-law obligation, to honor their principal responsibilities under any surety bond, and in the event of a loss by the surety, an unmistakable obligation to indemnify all losses that are incurred. The Debtors should not be permitted to use the Bankruptcy Code as an end around these responsibilities. Moreover, as addressed *infra*, as surety bonds are financial accommodations that cannot be assigned, the Debtors must address their ongoing responsibilities as part of any proposed reorganization and/or liquidation.

29. Notably, this is <u>*not*</u> a case where the Debtors are simply going out of business and will cease to exist. They very much will continue to exist and have made clear (with apparently the input of the lenders) an intention to strategically select the best assets. Indemnity, however, must flow and continue, and as noted, bankruptcy is not a tool for allowing a party to get credit for free – particularly surety credit.

<u>**OBJECTION TO THE FOURTH AMENDED JOINT CHAPTER 11 PLAN**</u>

  *ii.*  *Future Surety Program*

30. Surety bonds are financial accommodations. *Matter of Edwards Mobile Home Sales, Inc.*, 119 B.R. 857, 859 (Bankr. M.D. Fla. 1990); *In re Wegner Farms Co.*, 49 B.R. 440, 446 (Bankr. N.D. Iowa 1985); *In re Thomas B. Hamilton Co., Inc.*, 969 F.2d 1013, 1019-20 (11th Cir. 1992); Michael L. Cook & Gerald F. Munitz, BANKRUPTCY LITIGATION MANUAL, *Assumption of Executory Contracts* § 6.03 (2021).

31. Accordingly, because a surety bond is necessarily an extension of credit tied to underwriting standards for each issuing surety, a surety is never under an obligation to extend surety credit on a go forward basis or to an entity that has not been approved by underwriting. For this reason, bonds issued by a surety (whether pre-petition or post-petition) cannot be transferred to a new entity (whether it be a reorganized entity, a purchaser, or any other party) as principal without the surety's consent.  A bankruptcy filing by the bond principal does not change that.  The Sureties rely on this aspect of surety bonding when underwriting surety bonds and changing the non-assignability of the surety bonds would fundamentally alter the risk underwritten by each Surety. The Plan, however, does not recognize this feature of surety bonding, whether dealing with the assets that are proposed to be abandoned or the assets that would be purchased by the credit bid lender group (or, for that matter, any assets that would ultimately be divested to FWE I).

32. If the credit bid purchasing group has a desire to operate wells on a go forward basis, and thereby take on P&A obligations, that necessarily will require bonding pursuant to federal and/or state laws.  The current bonds issued on behalf of the Debtors (and/or any affiliates) will not transfer to any purchasing entity. The Government has oversight when it comes to the transfer of a permit or lease. Indeed, the CFR specifically contemplates a new bond being provided in the case of a transfer. *See* 43 C.F.R. § 3453.2-4 (". . . the transferee shall submit either a written

consent from the surety to the substitution of the transferee as principal or a new bond with the transferee as principal.).

33. To the extent that the credit bid group believes it can simply have the current bonds ride through the bankruptcy, that is improper and would make the Plan unconfirmable. The same is true with respect to any assets that flow into FWE I. As the Debtors contemplate a divestiture of assets and formation of a new entity, that entity necessarily must go through the rigors of the normal underwriting process. Thus, although the Sureties are hopeful that FWE I will be properly capitalized (although this is disputed) to honor P&A obligations, the very fact that there is a new entity handling those obligations requires replacement of any existing bonds. This most readily relates to the Liberty bond relating to the East Cameron Field that is identified above.

**F.     Bonds and the Underlying Assets are not Divisible**

34. As noted, bonds – like other lines of credit – are not, by their very nature, transferable, assignable, or assumable without the consent of the issuing surety and a cure of all defaults. The same rationale applies in the sense that they are not divisible. In the present case, bonds were issued to address the P&A obligations of the Debtors in connection with purchase of assets from predecessor entities – in the case of the Sureties, Noble and Marathon. The Debtors have indicated a plan to pick certain assets purchased as part of a single PSA with Noble and bonded by Travelers and XL, abandon the assets they do not like (i.e., Swordfish leases), and then try and sell the assets they do like to the credit bid group of lenders (presumably this was also part of negotiating more favorable purchase by these lenders). Bonds, however, do not work that way.

35. For instance, the Debtors envision a scenario where certain assets will be abandoned, thus giving rise the possibility of liability to a surety, yet other assets on the same bond will be operated by the NewCo lender group. The Plan, however, does not adequately provide for

how this bond obligation will be addressed, including the extent to which indemnity is required not only on a go forward basis, but to cover any liability that does exist. To the extent the Debtors believe that the bond can simply roll through, this goes back to the notion detailed above that there needs to be a principal on the bond that is the primary obligor. Otherwise, we are no longer talking about a bond at all, but rather a different product that is separate and apart from suretyship.

36. As noted, if there is any permutation of the underlying asset base, that involves replacement of the bond. While there is a separate question as to whether or not the Sureties should have any liability if any sort of abandonment is approved by this Court, certainly bonds cannot be chopped up and apportioned to various buckets. This goes back to the idea that there needs to be new bonds on behalf of any operator on a go forward basis.

## **RESERVATION OF RIGHTS AND PRAYER**

37. The Sureties reserve all of their rights, claims, defenses, and remedies with respect to the proposed Plan, including the right to amend or supplement this Objection, submit additional briefing, participate in any discovery or be heard in any hearing or trial related to the Plan. The Sureties further reserve any and all rights under any bond, contract, indemnity agreement, or applicable law.

38. For the foregoing reasons, the Sureties request that the Court decline to confirm the Plan, as well as grant such other relief as may be just and proper.

Dated: June 1, 2021

Respectfully submitted,

**LANGLEY LLP**

*/s/ Brandon K. Bains*
   Keith A. Langley
   State Bar No. 11919500
   Brandon K. Bains
   State Bar No. 24050126
   P.O. Box 94075
   Southlake, TX  76092
   Telephone: 214.722.7160
   klangley@l-llp.com
   bbains@l-llp.com

**ATTORNEYS FOR THE HANOVER INSURANCE COMPANY, LIBERTY MUTUAL INSURANCE COMPANY, TRAVELERS CASUALTY & SURETY COMPANY OF AMERICA, AND XL SPECIALTY INSURANCE COMPANY**

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the foregoing was served on all parties receiving electronic notification in this case from the Court ECF system on this the 1st of June 2021.

*/s/ Brandon K. Bains*
Brandon K. Bains