## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| IN RE: | ) | **CHAPTER 11** |
| | ) | |
| **FIELDWOOD ENERGY LLC, *et al.*,**[1] | ) | **CASE NO. 20-33948 (MI)** |
| | ) | |
| **DEBTORS.** | ) | **JOINTLY ADMINISTERED** |
| | ) | |

### PHILADELPHIA INDEMNITY INSURANCE COMPANY'S OMNIBUS OBJECTION TO THE FOURTH AMENDED JOINT CHAPTER 11 PLAN OF FIELDWOOD ENERGY LLC AND ITS AFFILIATED DEBTORS AND NOTICE TO CONTRACT PARTIES TO EXECUTORY CONTRACTS AND UNEXPIRED LEASES OF THE SCHEDULE OF ASSUMED CONTRACTS AND CURE AMOUNTS

Comes now, Philadelphia Indemnity Insurance Company ("Philadelphia"), by and through its undersigned counsel, and objects to the *Fourth Amended Joint Chapter 11 Plan of Fieldwood Energy LLC and Its Affiliated Debtors* (the "Plan") [Dkt Entry No. 1284] and the accompanying *Notice to Contract Parties to Executory Contracts and Unexpired Leases of the Schedule of Assumed Contracts and Cure Amounts* (the "Executory Contract Notice") [Dkt Entry No. 1395]. In support of its objection, Philadelphia respectfully states as follows:

### PRELIMINARY STATEMENT

1.      Once an entity files for bankruptcy and particularly when the entity is seeking to confirm a chapter 11 plan, the Bankruptcy Code erects certain standards to ensure the fair treatment of stakeholders.  For instance, a debtor cannot assume or allocate the benefits of a contract without

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are: Dynamic Offshore Resources NS, LLC (0158); Fieldwood Energy LLC (6778); Fieldwood Energy Inc. (4991); Fieldwood Energy Offshore LLC (4494); Fieldwood Onshore LLC (3489); Fieldwood SD Offshore LLC (8786); Fieldwood Offshore LLC (2930); FW GOM Pipeline, Inc. (8440); GOM Shelf LLC (8107); Bandon Oil and Gas GP, LLC (9172); Bandon Oil and Gas, LP (9266); Fieldwood Energy SP LLC (1971); Galveston Bay Pipeline LLC (5703); and Galveston Bay Processing LLC (0422). The Debtors' primary mailing address is 2000 W. Sam Houston Parkway S., Suite 1200, Houston, TX 77042.

its burdens, a debtor cannot assume a financial accommodation, a debtor cannot treat similarly situated creditors disparately under a chapter 11 plan, a reorganized debtor's corporate governance and management must be fair to its stakeholders and be intended to maximize value, the chapter 11 plan cannot non-consensually resolve a third party's claims, and the plan itself must be intended to maximize value. Each of these protections are implicated by the Plan's treatment of Philadelphia's: (i) claim against the bankruptcy estate, (ii) status as an executory contract counterparty, and (iii) status as a creditor of FWE I[2]. This treatment violates 11 U.S.C. 1129(a)(2) and the other applicable provisions of the Bankruptcy Code, more specifically, 11 U.S.C. §§ 1123(a)(4), 1123(a)(5); 1123(a)(6), 1123(a)(7), 1123(b)(2), and 11 U.S.C. § 1141). The Plan's non-consensual exculpation provisions violate 11 U.S.C. § 524, while the Debtors' failure to maximize the value of FWE I during the case and pursuant to the Apache Implementation Documents means that the Plan is not proposed in good faith and violates 11 U.S.C. § 1129(a)(3). Lastly, the Plan is not feasible and violates 11 U.S.C. § 1129(a)(11) as FWE I appears destined for a near-term chapter 33 or chapter 29, given its projected cash flow problems.

      2. The Decommissioning Agreement (defined below), the Bond (defined below), and the Indemnity Agreement (defined below) are one agreement under Texas law. The three contracts are, and were intended to be, interdependent. They cannot function independently. This means the Debtors cannot pick and choose which benefits and burdens in this agreement to allocate to FWE I, FWE III, or seek to discharge. If the three agreements can be assumed, they could only be assumed *cum onere* and then allocated to FWE I. In spite of this fact, the Plan and associated documents contemplate treating the Decommissioning Agreement, the Bond, and the Indemnity Agreement separately. The Debtors seek to assume the Decommissioning Agreement and then

---

[2] All capitalized terms that are not defined in this Objection have the meanings ascribed them in the Disclosure Statement.

allocate it to FWE I, *see* Executory Contract Notice, allocate the Bond to FWE I pursuant to the Divisive Merger, and discharge all indemnification obligations (including the Indemnity Agreement) prior to the Divisive Merger. Thus, FWE I (and Apache) will get the benefit of the Bonds and Decommissioning Agreement while jettisoning the interrelated indemnification burdens. Fifth Circuit precedent uniformly precludes this result. *E.g.*, *Century Indemnity Co. v. Nat'l Gysum Co. Settlement Trust (In re Nat'l Gypsum Co.)*, 208 F.3d 498, 506-07 (5th Cir. 2000). Just because the Debtors are attempting this maneuver in the confirmation context does not alter the result as 11 U.S.C. § 1123(b)(2) makes 11 U.S.C. § 365 applicable to plan confirmation. Thus, to the extent the Debtors can assume the Decommissioning Agreement, they must also assume the Bond and the Indemnity Agreement, and cure all defaults, including payment of Philadelphia's costs and expenses as well as premiums that the Debtors owe.

3.     The Bond issued by Philadelphia on behalf of the Debtor and the Indemnity Agreement (defined below) executed by the Debtors in favor of Philadelphia constitute a single non-assumable financial accommodation. Section 365(c)(2), as applicable to the Plan under 11 U.S.C. § 1123(b)(2), precludes the assumption of financial accommodations. The Debtors must come to a consensual agreement with Philadelphia for the extension of surety credit under 11 U.S.C. § 364 if the Debtors want the Bond to cover FWE I. To the extent such treatment is not agreed (and the Debtors have not made any proposal to Philadelphia), the Bond cannot cover FWE I. Upon information and belief, the Debtors are seeking to evade this result by simply allocating the Bond to FWE I. The Bankruptcy Code precludes this result. While an executory contract must be assumed, assigned, or rejected, a financial accommodation, like the Bond and the Indemnity Agreement, must be rejected.

4.     Even if the Bond is not an executory contract and it can be treated separately from the Decommissioning Agreement, it can only be allocated to FWE I *cum onere* with the Indemnity

3

Agreement.  In spite of this fact, the Plan and associated documents contemplate treating the three agreements separately by retaining the benefits and shedding the burdens.  Precedent uniformly precludes this result.  *E.g.*, *Folger Adam Sec., Inc. v. DeMatteis/MacGregor JV*, 209 F.3d 252, 264 (3d Cir. 2000).  Non-executory contracts, just like their executory brethren, must be treated *cum onere*.  The Debtors cannot allocate the Bond to FWE I while jettisoning the interrelated indemnification obligations.  This treatment would shorn the Plan of adequate means for implementation (11 U.S.C § 1123(a)(5)) and expand the discharge available under a confirmed chapter 11 plan (11 U.S.C. § 1141).

5.     Were the Court to find that the Debtors can assume the Decommissioning Agreement and discharge their prepetition indemnification obligations, FWE I will still be prospectively obligated to indemnify Philadelphia.  The Indemnity Agreement and the Bond are one agreement.  They cannot be separated.  If the Bond is allocated to FWE I, the Indemnity Agreement must be as well.  Moreover, Philadelphia's common law surety rights (including indemnification) will remain obligations of FWE I because they cannot be severed from the Bond; they are part and parcel of the Bond itself.  Thus, even if its prepetition claims are discharged and the Bond and Indemnity Agreement are not rejected as financial accommodations, Philadelphia, along with other Legacy Apache Sureties (as defined below) will, along with Apache, be the primary creditors of FWE I.

6.     Corporate governance and selection of management can be wielded as a tool to protect relevant stakeholders or a weapon to benefit chosen constituencies.  The proposed corporate governance and management for FWE I do not reflect its capital structure and are not intended to maximize the value of FWE I for all stakeholders.  When an entity is projected to winddown and is insolvent, its creditors should control the corporate governance and management. The equity interests in FWE I are distributed to the unsecured creditors' committee while Apache

4

is granted significant control over the governance and operations of FWE I.  Notably absent are the Legacy Apache Sureties, whose position as unsecured creditors of FWE I with a lower priority than Apache (who is also secured by the Recharacterized Mortgages), should have at least the same control rights as Apache.  Congress enacted 11 U.S.C. §§ 1123(a)(6) and (a)(7) to forestall exactly this type of inequitable treatment.  As a result, the Plan cannot be confirmed unless FWE I's corporate governance and management reflect its capital structure and the Legacy Apache Sureties are granted governance and management rights consistent with their status as creditors of FWE I.

7.      Next, consider the Plan's treatment of Philadelphia's status as a prepetition creditor. Although Apache and Philadelphia are similarly situated creditors (unsecured creditors with contingent liability on the Legacy Apache Assets), Apache receives unique consideration, in the form of *defacto* control over FWE I and related option value, which is not available to other unsecured creditors, including Philadelphia.  Apache's relationship to the Debtors, as a party to the RSA and a consent party under Plan, only magnifies the inequity of Apache's preferred treatment.  Section 1123(a)(4) and the Supreme Court's teachings in *Bank of Am. Nat'l Tr. & Sav. Ass'n v. 203 N. LaSalle St. P'ship*, 526 U.S. 434 (1999) confirm the commonsense conclusion that such disparate treatment precludes confirmation.

8.      The Plan is not proposed in good faith because the operational rights of FWE I are not designed to maximize the value of FWE I and the Debtors have failed to market the FWE I Assets (the bulk of the Debtors' assets) for sale.  On the Petition Date, the failure to market the FWE I Assets may have been defensible.  It certainly is not today with WTI prices increasing and many oil field service providers carrying idle equipment.  ███████████████████████ ███████████████████████████████████████████████████████████  Going forward, the FWE I LLC Agreement provides a generous expense reimbursement to Apache while

the FWE I TSA and FWE I Farmout Agreement subsidize the Credit Bid Purchaser. Even for a going concern, these agreements would be difficult to reconcile but for a winddown entity they constitute an inexcusable value extraction that prejudices the Legacy Apache Sureties as creditors of FWE I. The primary goal of the Bankruptcy Code in a liquidation or a winddown is maximizing the value of a debtor's estate for its creditors. This objective is reflected in the good faith inquiry under 11 U.S.C. § 1124(a)(3). The failure to maximize the value of FWE I, through either a sale or its contemplated operations after the Effective Date, undermines any assertion that the Plan is proposed in good faith and confirmable.

9. The Plan treats the third-party releases differently from third-party exculpations. The former are subject to an opt-out while the latter are not. Not only does this distinction violate Fifth Circuit precedent but it also defies commonsense. The distinction between releases and exculpations is simply a question of timing and scope, no legal difference exists. Both immunize the beneficiaries from a certain set of claims. Regardless of whether they are characterized as releases or exculpations, the same reasons support only allowing them on a consensual opt-out basis. Looking beyond the Fifth Circuit's clear prohibition on non-consensual exculpation, a lack of subject matter jurisdiction, the loss of due process rights, and the prohibition on applying exculpatory clauses to non-parties outside of bankruptcy, all strongly support requiring consent. As a result, the Plan's non-consensual exculpation provisions violate 11 U.S.C. § 524.

10. The Plan is not feasible ████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████ FWE I lacks realistic options to plug this shortfall. Absent Apache's consent, FWE I cannot draw on the Standby Facility. Although the newest iteration of the Apache Implementation Documents

provides the Debtors the option of obtaining a revolving credit facility, this option is illusory as finding a lender willing to agree to the required terms (the loan must be subordinated to the Reclassified Mortgages that secure the Standby Facility and only $50 million can be repaid prior to satisfaction of the $45 million owed under the Standby Facility) is improbable.  Given the possible terms available under the Apache Implementation Documents for obtaining a loan, this option is unrealistic.  That would leave drawing on the Legacy Apache Bonds once Trust A is exhausted.  This will trigger FWE I's indemnification obligations, and it will be forced to file for bankruptcy again. The Plan is not feasible as to FWE I and violates 11 U.S.C. § 1129(a)(11).

## **BACKGROUND**

11.     On August 3, 2020 (the "Petition Date"), the Debtors filed voluntary petitions in the United States Bankruptcy Court for the Southern District of Texas (the "Court") commencing cases for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").

12.     The Debtors continue to manage and operate their businesses as debtors in possession pursuant to 11 U.S.C. § 1107 and 1108.

13.     The Debtors' cases are being jointly administered for procedural purposes pursuant to Federal Rule of Bankruptcy Procedure 1015(b).

14.     On August 18, 2020, the U.S. Trustee appointed the Creditor's Committee pursuant to 11 U.S.C. § 1102.  No trustee or examiner has been appointed in these chapter 11 cases.

15.     The Debtors, together with the non-debtor affiliates, are an independent exploration and production company with operations primarily located in the Gulf of Mexico.  Additional information regarding the Debtors' business and the circumstances leading to the commencement of these chapter 11 cases is set forth in the *Declaration of Michael Dane in Support of Debtors' Chapter 11 Petitions and First Day Relief* (the "Dane Declaration") [Dkt Entry No. 29].

16. On January 1, 2021, the Debtors filed the first version of their chapter 11 plan, *Joint Chapter 11 Plan of Fieldwood Energy LLC and Its Affiliated Debtors* [Dkt Entry No. 722] and first version of their disclosure statement, *Disclosure Statement for Joint Chapter 11 Plan of Fieldwood Energy LLC and Its Affiliated Debtors* [Dkt Entry No. 723], which included the first version of the *Apache Term Sheet Implementation Agreement and Certain Revised Apache Definitive Documents*.

17. On April 9, 2021, the Debtors filed the *Fourth Amended Joint Chapter 11 Plan of Fieldwood Energy LLC and Its Affiliated Debtors* (the "Plan") [Dkt Entry No. 1252] and the *Disclosure Statement for Fourth Amended Joint Chapter 11 Plan of Fieldwood Energy LLC and Its Affiliated Debtors* (the "Disclosure Statement") [Dkt Entry No. 1254], which included the *First Amended Apache Term Sheet Implementation Agreement and Certain Revised Apache Definitive Documents*.

18. On May 11, 2021, the Debtors filed the *Second Amended Apache Term Sheet Implementation Agreement and Further Revised Apache Definitive Documents* (the "Apache Definitive Documents") [Docket Entry No. 1365].

19. On May 27, 2021, the Debtors filed the *Notice of Filing of Plan Supplement in Connection with Fourth Amended Joint Chapter 11 Plan of Fieldwood Energy LLC and Its Affiliated Debtors* (the "Plan Supplement") [Dkt Entry No. 1394].

### PHILADELPHIA'S BOND AND INDEMNITY AGREEMENT

20. In 2013, the Debtors purchased certain properties from Apache Corporation (the "Legacy Apache Properties") and agreed to assume the decommissioning liabilities (also known as P&A obligations or "P&A Obligations") associated with the Legacy Apache Properties. These P&A Obligations are overseen by the Regulators. The Debtors' P&A Obligations with respect to the Legacy Apache Properties are governed by a decommissioning agreement between, on the one

8

hand, certain of the Debtors and on the other hand, Apache (the "2013 Decommissioning Agreement").[3]  If the Debtors were unable or unwilling to satisfy their P&A Obligations under the 2013 Decommissioning Agreement, and Apache satisfies the associated P&A Obligations, Apache can reimburse itself from certain trust funds ("Trust A"),[4] and upon the exhaustion of Trust A, draw upon letters of credit, which the Debtors were required to provide.

21.     On February 15, 2018, the Debtors filed voluntary chapter 11 bankruptcy cases (the "2018 Bankruptcy Cases") in the Court.  The Debtors commenced their 2018 Bankruptcy Cases with a pre-negotiated chapter 11 plan (the "2018 Chapter 11 Plan").  The 2018 Chapter 11 Plan was confirmed by the beginning of April 2018.  As part of the 2018 Chapter 11 Plan, the Debtors entered into the Fifth Amendment to the Decommissioning Agreement (the "Fifth Amendment"). Under the Fifth Amendment, the Debtors were authorized to replace up to $148.7 million of letters of credit under the Decommissioning Agreement with an equivalent amount of surety bonds in a form and substance acceptable to Apache.  A form surety bond was attached as Exhibit B-1 to the Fifth Amendment.[5]  These surety bonds are treated *pari passu* with the remaining letters of credit. However, the waterfall of priority among the sources of funds available to Apache in the event of a default by the Debtors under the 2013 Decommissioning Agreement remained unchanged (*i.e.* Trust A must be exhausted before Apache can draw upon any surety bonds or letters of credit).  A conformed version of 2013 Decommissioning Agreement and the Fifth Amendment (the "Decommissioning Agreement") is attached as **Exhibit C**.

22.     On September 27, 2018, Philadelphia issued Bond No. PB03251500040 (the "Bond") in the penal sum of $73,000,000 on behalf of Debtor-Fieldwood Energy, LLC, in favor

---

[3] A true and accurate copy of the Decommissioning Agreement, without exhibits, with the exception of Exhibit A "Definitions" is attached as **Exhibit A**.

[4] Originally, a Trust B also existed but it was combined with Trust A under the Fifth Amendment (as defined below).

[5] A true and accurate copy of the form surety bond is attached as **Exhibit B**.

of Apache as obligee.[6]   The Bond assures the Debtors' P&A Obligations under the Decommissioning Agreement, as amended by the Fifth Amendment.  Philadelphia issued the Bond as consideration for the execution by Debtor-Fieldwood Energy, LLC of a General Indemnity Agreement on September 26, 2018 (the "Indemnity Agreement").[7]   Among other things, the Indemnity Agreement obligates the Debtors to: (a) indemnify and hold harmless Philadelphia from and against any claim or liability arising as a result of having issued the Bond, (b) procure the discharge and release of the Bond, and (c) post collateral for the Bond and for any unreleased liability.  The other sureties who issued bonds (collectively, with the Bond, the "Legacy Apache Bonds") related to the Legacy Apache Assets are Everest Reinsurance Company, HCC International Insurance Company and Zurich American Insurance Company (collectively, the "Other Legacy Apache Sureties" and together with Philadelphia, the "Legacy Apache Sureties").

23.     Apache has filed proofs of claim against the Debtors' estates asserting that it is partially secured by Trust A and the Legacy Apache Bonds in amounts of approximately $736,000,000, with an unsecured deficiency claim of $546,750,000.  *See, e.g.*, [Proof of Claim Nos. 230, 238, 236, 238].  Philadelphia filed a proof of claim against the Debtor-Fieldwood Energy LLC's estate asserting an unsecured claim in the amount of $73,000,000.00. [Proof of Claim No. 710].  The Other Legacy Apache Sureties have also filed unsecured proofs of claim against the Debtors' estates.  *E.g.*, [Proof of Claim Nos. 639, 658, 791].

## PLAN AND DISCLOSURE STATEMENT

24.     The Plan contemplates dividing the Debtors' assets and liabilities into four categories.  The Purchased Oil & Gas Lease Interests will be purchased by the Credit Bid Purchaser (an entity owned and controlled by the Consenting FLTL Lenders) pursuant to credit bid and cash

---

[6] A true and accurate copy of the Bond is attached as **Exhibit D**.
[7] A true and accurate, redacted copy of the Indemnity Agreement is attached as **Exhibit E**.

consideration.  The Credit Bid Purchaser will assume certain liabilities set forth in the Credit Bid Purchase Agreement but will be otherwise free from all other liabilities owed by the Debtors.  FWE I and FWE III will be organized as new stand-alone entities pursuant to a divisive merger.  FWE I will be allocated and vested with the Legacy Apache Properties and related liabilities and obligations, including the Decommissioning Agreement, which will have been assumed as an executory contract by the Debtors, with a $0 cure.  *See* Executory Contract Notice.  FWE I will be capitalized with approximately $28 million by the Debtors.[8] The Plan also contemplates the abandonment of certain Abandoned Properties to Predecessors under 11 U.S.C. § 554.

25.     In conjunction with the divisive merger and establishment of FWE I, the Plan contemplates various agreements as part of the Apache Term Sheet Implementation Agreement. Among these agreements are: (i) new limited liability company operating agreement for FWE I (the "FWE I LLC Agreement"), (ii) a transition services agreement between FWE I and the Credit Bid Purchaser (the "FWE I TSA"), and (iii) a farmout agreement between Credit Bid Purchaser and FWE I (the "FWE I Farmout Agreement").

26.     Under the FWE I Operating Agreement, FWE I will only have one officer, the Sole Manager, and no employees.  It will rely on access to employees of the Credit Bid Purchaser pursuant to the FWE I TSA in order to conduct operations.

27.     The FWE I Operating Agreement grants Apache *defacto* control over FWE I.  More specifically, Section 7 and Section 10 of the FWE I Operating Agreement grant Apache:

   a.   Veto rights over the selection of the independent director of FWE I,

        who cannot be removed with Apache's consent [Section 7.02],

---

[8] This amount reflects a maximum capitalization of $50 million minus the accrual of post-petition decommissioning spend by the Debtors on the Legacy Apache Properties of $22 million.

4831-3211-6717, v. 2

b.  Consent rights over removal of the sole manager of FWE I [Section 7.03],

c.  Consent and information rights for bids for service providers to conduct P&A operations [Section 7.04],

d.  Consent rights as to sales, fundamental business transactions, or farmins [Section 7.06],

e.  Consent rights as to farmouts [Section 7.06],

f.  Consent rights with regard to any development activities, including those with positive or accretive investment profile [Section 7.06],

g.  Consent rights over incurring indebtedness other than provided under the Standby Facility with the sole exception of a revolving line of credit that can only be secured on a subordinated basis and can only be establish, drawn, or repaid if there is no event of default under the Standby Facility Documentation [Section 7.06],

h.  Payment or reimbursement of Apache's costs and expenses, including "costs of compensation and benefits of officers and employees of Apache and its Affiliates …which costs shall be determined in good faith by Apache", even when "such costs are not direct, out-of-pocket costs incurred by Apache under the Decommissioning Agreement." [Section 7.06],

i.  Right of first refusal and information rights for the funding of capital expenditures [Section 7.09],

j.  Information rights as to monthly operating data and operating budget [Section 10.01], and

12

k.   Inspection rights [Section 10.01]

Additionally, Apache enjoys consent rights over the selection of P&A service providers under the FWE I TSA and rights under the FWE I Farmout Agreement.  Moreover, as collateral for the backstop loan facility described in the Plan as a Standby Facility, Apache is granted a security interest in the assets of FWE I.

28.      The Plan does not separately classify Apache, Philadelphia, or the Other Legacy Apache Sureties.  They all hold unsecured claims in Class 6.

29.      The sequence of transactions contemplated by the Plan is also relevant.  Following confirmation, the discharge and release provisions of the Plan operate to eliminate certain liabilities.  Thereafter, Credit Bid Transaction will be consummated, FWE will convert from a Delaware limited liability company to Texas limited liability company.  FWE will then be divided into FWE I, FWE III, and FWE IV, pursuant to the Initial Plan of Merger.

30.      As explained below, the value and feasibility of FWE I are also relevant to which parties should receive governance, management, and operational rights.  Projections for FWE I were produced by: (i) the Debtors' (both internally for Exhibit N to the Disclosure Statement and John-Paul Hansen of Houlihan Lockey ("Mr. Hansen") for Exhibit O to the Disclosure Statement), (ii) Philadelphia's expert, Lily Cheung of Netherland of Sewell & Associates, Inc. ("Ms. Cheung"), and (iii) BP Exploration & Production Inc.'s ("BP") expert Geoffrey G. Roberts of Alvarez and Marsal ("Mr. Roberts").

31.      The Debtors' perspective on feasibility and cash flow of FWE I during the projection period (through 2025) is that the Debtors will only expend $44 million of Trust A and the Legacy Apache Bonds will be untouched. *Disclosure Statement*, Ex. N. ████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████  The

membership interests of FWE I are also estimated to have no inherent value, only option value. *Id.*

32. ███████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
████████████████████████████████████████ Why this is so important is that the Debtors are counting on the cash balance from prior years to fund subsequent capital expenditures, which will both increase production and extend the life of fields, thereby spreading the P&A spend over longer time horizon.  Without any money to expend on capital expenditures, FWE I will fall into a vicious cycle where its revenue is falling, and P&A will come due sooner as

lease terminations/expirations/relinquishments accelerate.  This vicious cycle means that it is much more likely that Trust A will be exhausted sooner, and the Legacy Apache Bonds will be drawn.

**OBJECTION**

35.     In order to confirm a chapter 11 plan, the plan proponent must establish by a preponderance of the evidence that the plan satisfies all the requirements of 11 U.S.C. § 1129.  *In re Star Ambulance Serv., LLC*, 540 B.R. 251, 259 (Bankr. S.D. Tex. 2015) (citing *Heartland Fed. Sav. & Loan Ass'n v. Briscoe Enters. (In re Briscoe Enters.)*, 994 F.2d 1160, 1165 (5th Cir. 1993)). The Plan violates 11 U.S.C. § 1129(a)(1), which requires compliance with the other appliecable provisions of the Bankruptcy Code.  Section 1129(a)(1) "is an 'umbrella' statutory section that ensures compliance with other more specific sections of the Code.  In particular, Section

15

1129(a)(1) is predominantly aimed at ensuring compliance with Section 1122 and Section 1123 .

. . which address classification of claims and contents of the plan." *In re W.R. Grace & Co.*, 475

B.R. 34, 173 (D. Del. 2012).  As a result, the Plan's violations of 11 U.S.C. §§ 524, 1123(a)(4),

1123(a)(5), 1123(a)(6), 1123(a)(7), 1123(b)(2) and 1141 constitute violations of 11 U.S.C. §

1129(a)(1).  The Plan also violates 11 U.S.C. §§ 1129(a)(3) and 1129(a)(11).

36.     As an initial matter, the Decommissioning Agreement, the Bond, the Indemnity

Agreement constitute one agreement under Texas law.  The intent of the parties, the conduct of

each of the parties, and the subject matter of the three contracts all strongly support the conclusion

that they are one entire agreement.  Under the familiar *cum onere* principle, all the benefits and

the burdens of the agreement must be assumed.  Thus, the Debtors must cure their default of their

indemnity obligations under the Indemnity Agreement and Bond to Philadelphia, including all

premiums, costs, and expenses.

37.     Were the Court to determine that the Decommissioning Agreement is not part of

the same agreement as the Bond and the Indemnity Agreement, the Bonds and the Indemnity

Agreement clearly comprise one agreement.  This result has important implications for how these

contracts must be treated under the Plan, as they are: (i) a single financial accommodation that

must be rejected by the Debtors and cannot be allocated to FWE I or (ii) a single non-executory

contract that must be allocated to FWE I *cum onere*.

38.     At bottom, the Bond and the Indemnity Agreement are a single non-assumable

financial accommodation pursuant to 11 U.S.C. § 365(c)(2).  The Bond is clear example of a

financial accommodation and because it comprises a single agreement with the Indemnity

Agreement, it cannot be assumed.  Because 11 U.S.C. § 365(c)(2), as made applicable to the Plan

by 11 U.S.C. § 1123(b)(2), precludes the Bond and the Indemnity Agreement from being assumed,

the Debtors must reach a consensual agreement for the extension of surety credit under 11 U.S.C.

§ 364. Absent such an agreement with Philadelphia, the Bond and the Indemnity Agreement must be rejected.

39.     Even if the Court were to categorize the Bond and the Indemnity Agreement as a non-executory contract, all the benefits and burdens must be allocated to FWE I *cum onere*. The Debtors seeks to cherry-pick the benefits (at least to Apache) of the Bonds and Decommissioning Agreement while discharging or releasing the associated indemnity obligations. Section 1123(a)(5) does not enable a debtor to obtain the benefits of the contract while discharging or releasing the burdens. The Plan cannot expand the discharge granted by 11 U.S.C. § 1141.

40.     Even if the Court determines Philadelphia's prepetition indemnification claims are discharged (they should not be), the allocation of the Bond to FWE I confirms that FWE I will have prospective indemnification obligations to Philadelphia. A discharge under 11 U.S.C. § 1141 is not a release of future obligations arising post-confirmation. Bifurcated by confirmation, the former operates retroactively while the latter operates prospectively. Philadelphia has opted-out of the Releases in the Plan.[9] Because the indemnification obligations (both the Indemnity Agreement and common law) are part of one integrated agreement with the Bond, allocating them to FWE I also allocates the indemnity obligations going-forward and they are not released. Accordingly, the Legacy Apache Sureties will be, along with Apache, the principal creditors of FWE I.

41.     Control of an entity's corporate governance and management should reflect an entity's capital structure and financial projections. ███████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████     ███████████████

████████████████████████████████████████████████████████

---

[9] For the avoidance of doubt, this Objection further constitutes Philadelphia's election to opt-out of the Releases.

██████████████████████████████████████████████████

██████████████████████████████████████████████████

███████████████████████████████████████ Because FWE I is a winddown entity, its corporate governance structure and management should grant its creditors significant control and protections.   These protections must be drafted into the operative agreements, as fiduciary duties and control do not shift automatically upon a Texas limited liability company's insolvency.  Indeed, this is the reasoning for including the control provisions in favor of Apache.  In contrast, the Legacy Apache Sureties have none of these rights, even though FWE I's obligations to the Legacy Apache Sureties are of lower priority than those of Apache. Moreover, Apache was the only party invited by the Debtors to participate in the selection of the Sole Manager of FWE I.   Indeed, Apache's preferred selection was chosen instead of the alternatives put forth by the Debtors.  Sections 1123(a)(6) and (a)(7) ensure that the corporate governance and management of the reorganized debtor is fair and reflects the financial reality of the entity.  Unless and until the Legacy Apache Sureties are granted control substantially the same to that of Apache, the Plan violates 11 U.S.C. §§ 1123(a)(6) and (a)(7).

42.     The Debtors' preferred treatment of Apache, to the detriment of similarly situated creditors like Philadelphia, violates 11 U.S.C. § 1123(a)(4).  Both Apache and Philadelphia are unsecured creditors of the Debtors with contingent liability associated with the Legacy Apache Assets.  Yet, under the Apache Term Sheet Implementation Agreement, Apache enjoys *de facto* control over FWE I.  This control is valuable consideration that Apache receives on account of its claim without such value being tested by the market.  Because Philadelphia does not receive this consideration, the Plan impermissibly treats similarly situated creditors differently and cannot be confirmed.

43.     The Debtors' failure to maximize the value of FWE I, either during the case or under the Apache Implementation Documents, undermines any assertion that the Plan is proposed in good faith as required by 11 U.S.C. § 1129(a)(3).  The FWE I LLC Agreement, the FWE TSA, and the FWE I Farmout Agreement all extract value from FWE I and transfer it to Apache and the Credit Bid Purchaser, respectively.  ███████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████  Given the primacy of maximizing distributions as a goal of the Bankruptcy Code and the good faith inquiry's focus on the Bankruptcy Code's objectives, the Plan was not proposed in good faith.

44.     The Plan's non-consensual Exculpation provisions violate established Fifth Circuit precedent, due process, and are patently unfair.  Contrary to the Plan's divergent treatment, an exculpation is legally equivalent to a release.  Distinctions in scope and timing do not make a legal difference.  The Exculpations must be altered to allow for opt-out to make them consensual.

45.     The Plan is not feasible because ██████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

███████

    a)     ***The Plan's and the Executory Contract Notice's Treatment of the Decommissioning Agreement, the Bond, and the Indemnity Agreement Violate 11 U.S.C. §§ 1123(b)(2) and 365***

        (i)     *The Decommissioning Agreement, the Bond, and the Indemnity Agreement are One Agreement*

46.     Whether multiple contracts are one single agreement or separate agreements is a question determined under state law.  *Tarbox v. John Q. Hammons Co. (In re Ferguson)*, 183 B.R. 122, 124-25 (Bankr. N.D. Tex. 1995).  Texas choice of law principles, which apply here based on

the location of this forum, provide that if the contract contains an express choice of law provision, it will govern the choice of law. *Winspear v. Coca-Cola Refreshments, USA, Inc.*, No. 05-13-00712-CV, 2014 WL 2396142, at *3 (Tex. App. Apr. 9, 2014) (relying on Restatement (Second) Conflict of Laws § 188(1)). Neither the Bond nor the Indemnity Agreement have an express choice of law provision while the Decommissioning Agreement is governed by Texas law. As a result, Texas law will govern whether the three contracts constitute one Agreement.

47. Although no one test for divisibility of an agreement under Texas law exists, courts have focused their inquiries on the subject matter of the agreement, the intention of the parties, and the conduct of the parties. *Johnson v. Walker*, 824 S.W.2d 184, 187 (Tex. App. 1991), *writ denied* (Jan. 29, 1992). All three of the factors favor construing the Decommissioning Agreement, the Bond, and the Indemnity Agreement as one contract.

48. The subject matter of the three contracts strongly supports evaluating them as one agreement. Surety bonds create a three-party relationship among: (1) the principal who is the primary obligor (the applicable Debtor in this case); (2) the party to whom the principal and surety owe a duty is the obligee (Apache); and (3) the surety (Philadelphia), which is the secondary obligor. As a result, a surety bond is a three-party contract. *See, e.g.,* Restatement (Third) of Suretyship & Guarantee § 1 (1996); *Great Am. Ins. Co. v. North Austin Mun. Util. Dist No, 7*, 908 S.W.2d 415, 419 (Tex. 1995). Surety bonds are often required by obligees (as it was here) to protect their interests by providing financial assurances that the underlying obligations of the principal will be performed. *Beard Family Partnership v. Commercial Indem. Ins. Co.*, 116 S. W.3d 839, 845 (Tex. App.—Austin 2003, no. pet.). Upon principal's default, the surety is answerable to the obligee to perform the bonded obligation if the conditions of the bond are otherwise satisfied. *See A.J. Kellos Constr. Co. v. Balboa Ins. Co.*, 495 F. Supp. 408, 412 (S.D. Ga. 1980) (citing Restatement of Security § 82 (1941)).

20

49.     Upon the issuance of a surety bond, the surety is protected by its common law rights.  The common law right of indemnification from the principal arises from the bond itself. *Old Republic Sur. Co. v. Palmer*, 5 S.W.3d 357, 362 (Tex. App. 1999).  Bond principals also have common law duties of exoneration (*i.e.,* discharge the surety's debt) and *quia timet* (*i.e.*, provide funds sufficient to prevent anticipated future losses).  *Ins. Co. of the West v. H & G Contractors, Inc.*, No. C–10–390, 2011 WL 4738197 at *1 n.1 (S.D. Tex. Oct. 5, 2011).  A surety who pays the debt of its principal also acquires the common law right of equitable subrogation.  "Subrogation arises by operation of law where a person has been compelled to pay off . . . the debt of another in such circumstances that equity will afford him the security or obligation held by the creditor whose claim has been paid." *Tex. Co. v. Miller*, 165 F.2d 111, 116 (5th Cir. 1947) (internal citations omitted) (applying Texas law).  The doctrine of equitable subrogation is often applied when the surety satisfies the principal's obligations to the obligee, which are assured by the surety bond. *Interfirst Bank Dallas, N.A. v. U.S. Fid. & Guar. Co.*, 774 S.W.2d 391, 397 (Tex. App.—Dallas 1989, writ denied) (citing *Pearlman v. Reliance Ins. Co.*, 371 U.S. 132, 141 (1962)).  An indemnity agreement expands on the common law rights to provide the surety with greater protections.  *See Old Republic Sur. Co.*, 5 S.W.3d at 361-62.  As a practical matter, surety bonds are issued in exchange for the execution of the indemnity agreement and often required by an obligee.  *E.g.*, *Transamerica Ins. Co. v. Avenell,* 66 F.3d 715, 717 (5th Cir. 1995) (applying Texas law).

50.     The intent of the parties is best illustrated by the plain language of the agreements. *Tarbox v. John Q. Hammons Co. (In re Ferguson)*, 183 B.R. 122, 125 (Bankr. N.D. Tex. 1995). Here, the inseparable links among the three agreements illustrate the intent that they be considered one agreement.  The Bond functions as a bridge between the Decommissioning Agreement and the Indemnity Agreement.  ████████████████████████████████████

████████████████████████████████████████████████████

4831-3211-6717, v. 2

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████ The Legacy Apache

Bonds are simply a substitute for the original letters of credit and were also required to be in a

form acceptable to Apache, in its sole discretion.  The Decommissioning Agreement even included

a form surety bond as an exhibit.  The Bond and the Indemnity Agreement are similarly connected.

The first paragraph explains that the Indemnity Agreement is made "for the purpose of

collateralizing, exonerating, and indemnifying [Philadelphia] for any Bonds issued pursuant to this

Agreement."  The recitals are consistent with this intent as the "[Philadelphia] has been requested

to execute, or has executed, Bonds on behalf of the Principals with the express understanding

Indemnitors execute this Agreement."  The Indemnity Agreement then sets forth Philadelphia's

rights.[10]

51.      The parties' conduct evidences the interrelatedness of the three contracts.  The

efforts expended by the Debtors to ensure the Legacy Apache Bonds and the Decommissioning

Agreement remain in place is only matched by the efforts of the Legacy Apache Sureties to assert

their indemnification rights.  One only need review the Plan and its legion of references to both

the Decommissioning Security (which include the Legacy Apache Bonds) and the

Decommissioning Agreement.  Of particular note is the provision in the Releases that they will

not operate to jeopardize the Decommissioning Security.  As the Court is aware, carveouts from

Releases are rare and the explicit employment of one in the Plan signals the importance of the

Legacy Apache Bonds.  Meanwhile, the Legacy Apache Sureties have expended countless hours

and extensive sums to protect their interests under the Legacy Apache Bonds and the associated

---

[10] Of note, the term "Bond" is used 32 times in the seven substantive pages of the Indemnity Agreement.

Indemnity Agreements.   The parties' actions speak even louder than the words of the three contracts.

52.    As explained by the Texas Supreme Court, multiple agreements among different parties should be considered one agreement when "[a]ll of the instruments were a necessary part of the same transaction, without any one of which the transaction was not complete." *Jones v. Kelley*, 614 S.W.2d 95, 98 (Tex. 1981) (quoting *Board of Insurance Commissioners v. Great Southern Life Ins. Co.*, 239 S.W.2d 803 (Tex. 1951)); *see also Safer v. Nelson Financial Group, Inc.*, 422 F.3d 289, 296 (5th Cir. 2005).   This conclusion applies even when the contracts are executed at different times.   *Great Southern*, 239 S.W.2d at 809 (citations omitted).   Here, all three contracts are necessary parts of one transaction, they should be considered one agreement under Texas law.

(ii)    *The Decommissioning Agreement, the Bond, and the Indemnity Agreement Must Be Assumed, if at all, Cum Onere*

53.    The principle of *cum onere* is the familiar rule applied to contracts in bankruptcy. *E.g., Thompson v. Texas Mexican Ry. Co.*, 328 U.S. 134, 141 (1946); *Century Indemnity Co. v. Nat'l Gysum Co. Settlement Trust (In re Nat'l Gypsum Co.)*, 208 F.3d 498, 506 (5th Cir. 2000).   In other words, "the debtor accepts both the obligations and the benefits." *Id*.   Moreover, assumption requires the satisfaction of all defaults under the agreement. *See* 11 U.S.C. § 365(b).

54.    Because the Decommissioning Agreement, the Bond, and the Indemnity Agreement all constitute one executory contract, which the Debtors must assume *cum onere*, if at all, the Debtors must cure all defaults under the Indemnity Agreement, including the payment of all premiums and expenses owed to Philadelphia.   This is the price of assumption; it cannot be evaded through the Debtors' attempts to discharge the Indemnity Agreement or allocate it to FWE III.

23

(iii)    *The Bond and the Indemnity Agreement are One Agreement*

55.    Texas choice of law principles provide that the law of the state with the most significant relationship to the parties will apply, if the contract does not contain an express choice of law provision.  *Winspear v. Coca-Cola Refreshments, USA, Inc.*, No. 05-13-00712-CV, 2014 WL 2396142, at *3 (Tex. App. Apr. 9, 2014) (relying on Restatement (Second) Conflict of Laws § 188(2)).  Neither the Bond nor the Indemnity Agreement have an express choice of law provision. Meanwhile, Texas clearly has the most significant relationship to the Bond and Indemnity Agreement because the Decommissioning Agreement, which is the bonded contract, is expressly governed by Texas law and the Debtors' as well as Apache's (the obligee) primary places of business are in Texas.  Applying Texas law, the subject matter of the agreement, the intention of the parties, and the conduct of the parties all support considering the Bond and the Indemnity Agreement as one agreement.  *E.g.*, *Castro v. Peck*, CVA97-003, 1998 WL 689645, *5 (Guam Apr. 7, 1998) (finding that a construction contract, performance guaranty and indemnity agreement together constituted a single contract); *St. Paul Fire & Marine Ins. Co. v. Tennefos Const. Co.*, 396 F.2d 623, 628 (8th Cir. 1968) (holding that a surety bond and all related instruments, including the bonded contract, are to be construed as a single contract).

56.    As explained above, the subject matter of the agreements, surety bonds and associated indemnification, support construing the Bond and the Indemnity Agreement as one agreement.  They work together hand in glove.  *See Great Am. Indem. Co. v. Beverly*, 150 F. Supp. 134, 136 (M.D. Ga. 1956) (holding that bond and indemnity agreement "were obviously intended as, and constituted a part of, the same transaction and must be construed together").

57.    The conduct of the parties is best illustrated by the fact that the Bond was issued one day after the Indemnity Agreement.  This fact strongly supports construing the Bond and the Indemnity Agreement as one contract.  *See Vince Hagen Co. v. Eighty-Eighty Cent. Partners, Ltd.*,

24

No. CIV.A. CA3-87-1043-G, 1989 WL 136870, at *3 (N.D. Tex. Nov. 7, 1989) (applying Washington law but noting that Texas law would come to same conclusion, in holding that indemnification agreement executed at same time as associated agreement would constitute one agreement).

58.     As the Supreme Court of Texas summarized, "[t]he general rule is that separate instruments or contracts executed at the same time, for the same purpose, and in the course of the same transaction are to be considered as one instrument, and are to be read and construed together." *Jones v. Kelley*, 614 S.W.2d 95, 98 (Tex. 1981).  This is true regarding the Bond and Indemnity Agreement.  Moreover, pursuant to the intent of the Debtors and Philadelphia, their conduct, and the subject matter, the Indemnity Agreement and the Bond should be considered as one agreement under Texas law.

(iv)     <em>The Bond and the Indemnity Agreement Are a Single Financial Accommodation</em>

59.     Pursuant to 11 U.S.C. § 365, a debtor or trustee may generally assume or assign an executory contract.  Under Fifth Circuit precedent, a contract is executory if "performance remains due to some extent on both sides" and if "at the time of the bankruptcy filing, the failure of either party to complete performance would constitute a material breach of the contract, thereby excusing the performance of the other party." *RPD Holdings, L.L.C v. Tech Pharmacy Servs (In re Provider Meds, L.L.C.)*, 907 F.3d 845, 851 (5th Cir. 2018).  The inquiry is thus, "whether both sides [] owed additional performance under the [contract] and whether any party's failure to perform would constitute a material breach excusing the other side's performance." *Id.* at 852.

60.     A principal's performance obligations under both the bonded obligation as well as the indemnification agreement, including the duty to indemnity and pay premium, are sufficient to constitute remaining performance obligations within the meaning of an executory contract. *In re Evans Prod. Co.*, 91 B.R. 1003, 1005 (Bankr. S.D. Fla. 1988).  Meanwhile, a surety's obligation

25

to maintain the bond in force and act in good faith with respect to any bond claims similarly constitute remaining performance obligations.  *Id.*; *see Lubrizol Enterprises, Inc. v. Richmond Metal Finishers, Inc.*, 756 F.2d 1043, 1046 (4th Cir. 1985) (contingency of indemnification does not prevent a contract from being executory).  Moreover, under Texas law, a surety's failure to undertake a good faith investigation of a bond claim under an indemnity agreement (a material breach) excuses the indemnitor from performing under the indemnity agreement.  *E.g.*, *Associated Indem. Corp. v. CAT Contracting, Inc.*, 964 S.W.2d 276, 285 (Tex. 1998) (addressing surety's contractual good faith obligation); *Park v. Universal Sur. of Am.*, 25 S.W.3d 738, 740 (Tex. App. 2000).[11]

61.     Here, considering both the Bond and the Indemnity Agreement together, performance obligations remain on both sides and a material breach by Philadelphia will excuse the Debtors from performing under the Indemnity Agreement.  The Debtors are obligated to pay premiums, provide access to the Debtors' books and records, and perform under the Decommissioning Agreement.  Philadelphia is obligated to assure the Debtors' performance under the Decommissioning Agreement and evaluate claims in good faith.  Accordingly, the Bond and Indemnity Agreement constitute an executory contract.

62.     However, 11 U.S.C. § 365(c)(2) precludes the assumption or assignment of an executory contract that constitutes a financial accommodation. More specifically:

(c)     The trustee may not assume or assign an executory contract or unexpired lease of the debtor, whether or not such contract or lease prohibits or restricts assignment of rights or delegation of duties, if-

---

[11] A few courts, who were neither applying Texas law nor evaluating the indemnity agreement and the surety bond as a single contract, have at least suggested that a non-cancellable surety bond is not an executory contract.  *See In re Falcon V, L.L.C.*, 620 B.R. 256, 265 (Bankr. M.D. La. 2020); *Clarendon Nat'l Ins. Co. v. Coal Stripping, Inc. (In re Coal Stripping, Inc.)*, 215 B.R. 500, 502-03 (Bankr. W.D. Pa. 1997).  Regardless of the propriety of these decisions under applicable law, the good faith standard for actions by a surety under an indemnity agreement and the accompanying defense under Texas law means that a surety's material breach of the indemnity agreement excuses an indemnitor from performance, thereby satisfying the requirement of a party's material breach establishing an excuse for performance.

4831-3211-6717, v. 2

\* \* \*

> (2)    such a contract is a contract to make a loan, or extend other debt financing or financial accommodations, to or for the benefit of the debtor, or to issue a security of the debtor; . . . .

11 U.S.C. § 365(c)(2).  According to the legislative history of 11 U.S.C. § 365(c)(2), "[t]he purpose of this section is to make clear that a party to a transaction which is based upon the financial strength of a debtor should not be required to extend new credit to the debtor …"  S. Rep. No. 95–989, 95th Cong. 2nd Sess. (1978) 58–59 5 U.S. Code & Admin. News (1978) p. 5844–45.  Although undefined by the Bankruptcy Code, courts have categorized financial accommodations as "contracts the principal purpose of which is to extend financing to or guarantee the financial obligations of the debtor."  *See Citizens and S. Nat'l Bank v. Thomas B. Hamilton, Inc. (In re Thomas B. Hamilton Co., Inc.,* 969 F.2d 1013, 1020 (11th Cir. 1992); *see also Huntington Nat'l Bank Co. v. Alix (In re Cardinal Indus., Inc.)*, 146 B.R. 720, 731 (Bankr. S.D. Ohio 1992) ("Courts have defined the term 'financial accommodation' as the extension of money or credit to accommodate another.").  Surety bonds are directly based upon the financial strength of the debtor and obligate the surety "to make good on certain financial liabilities of the debtor in the event the debtor does not or cannot pay."  *Wegner Farms v. Merchants Bonding Co. (In re Wegner Farms Co.),* 49 B.R. 440, 444 (Bankr. D. Iowa 1985); *c.f. Gov't Nat'l Mort. Corp. v. Adana Mort. Bankers, Inc. (In re Adana Mort. Bankers, Inc.)*, 12 B.R. 977, 987 (Bankr. N.D. Ga. 1980) ("[t]he obligation to pay money on the obligation of another is a financial accommodation"). Given that surety bonds guarantee the financial obligations of a debtor-principal, courts have roundly categorized surety bonds as contracts of financial accommodation under 11 U.S.C. § 365(c)(2).  *See Thomas B. Hamilton Co., Inc.,* 969 F.2d at 1020; *Wegner Farms*, 49 B.R. at 444; *see also Edwards Mobile Home Sales, Inc. v. Ohio Casualty Ins. Co. (In re Edwards Mobile Home Sales, Inc.)*, 119 B.R. 857, 860 (Bankr. M.D. Fla. 1990); *Whinnery v. Bank of Onalaska (In re Taggatz)*,

106 B.R. 983, 992 n.11 (Bankr. W.D. Wis. 1989) (noting surety bond as type of financial accommodation and citing *Wegner Farms*); *In re Placid Oil Co.*, 72 B.R. 135, 139 (Bankr. N.D. Tex. 1987) (requirement in indemnification contract for obtaining letter of credit or surety bond rendered it a financial accommodation).

63.     As a financial accommodation, the Bond is not assumable by the Debtors pursuant to 11 U.S.C. § 365(c)(2), as made applicable to the Plan by 11 U.S.C. § 1123(b)(2).  The Bond, and the Indemnity Agreement together, must be rejected as they cannot be assumed or assigned.[12] There is no other option for a financial accommodation.[13]  Consistent with this fact, 11 U.S.C. § 365(g) confirms that an executory contract that is not assumed prior to confirmation deemed to have been rejected on the petition date.  Thus, in order for the debtor to agree to a financial accommodation with a counterparty, the requirements for obtaining post-petition credit under 11 U.S.C. § 364 must be followed.  *See Transamerica Commercial Fin. Corp. v. Citibank, N.A. (In re Sun Runner Marine, Inc.)*, 945 F.2d 1089, 1093 (9th Cir. 1991).  The Debtors have not provided any offer for post-petition extensions of surety credit under 11 U.S.C. § 364.

64.     The rejection of the Bond and Indemnity agreement will cause a default under the Decommissioning Agreement.  Thus, the Debtors will be unable to assume the Decommissioning Agreement and allocate it to FWE I, unless Apache consents.  Given the centrality of the Bond to the Decommissioning Agreement, Apache's consent appears very unlikely.

---

[12] Because assumption is a precondition for assignment, *e.g., Refco Inc. v. Cargill Inc. (In re Refco Inc.)*, No. 05-60006 (RDD), 2006 WL 2664215, at *2 (S.D.N.Y. Sept. 13, 2006), surety bonds' status as financial accommodations make them unassignable.

[13] To the extent the Debtors may argue that a failure to treat the Bond and Indemnity Agreement mean that they "ride through" and can be allocated to FWE I, *e.g. Texaco Inc. v. Bd of Commissioners of LaFourche Basin Levee District (In re Texaco Inc.)*, 254 B.R. 536, 557 (Bankr. S.D.N.Y. 2000), Philadelphia asserts that the fact that the Bond and Indemnity Agreement constitute a financial accommodation that cannot be assumed precludes ride-through treatment.

(v)     *Even if the Court does not categorize the Bond and Indemnity Agreement as Executory Contracts, They Both Must be Allocated to FWE I*

65.     Philadelphia anticipates that the Debtors will rely upon the cases that erroneously fail to categorize surety bonds as executory contracts in suggesting that the Bond can be allocated to FWE I after the discharge of the Indemnity Agreement.  As explained above, the Bond and the Indemnity Agreement are one agreement under Texas law.  As a single contract, they must be construed *cum onere*, meaning the Debtors must take the benefits and burdens.  The "executoriness" of the contract is immaterial to the *cum onere* rule.

66.     Although the *cum onere* rule is often applied to executory contracts under 11 U.S.C. § 365, this rule also applies to the treatment of non-executory contracts.  In *Folger Adam Security, Inc. v. DeMatteis/MacGregor, JV*, the Third Circuit explained that a debtor could not evade the *cum onere* rule by attempting to categorize contracts as non-executory contracts and sell them under 11 U.S.C. § 363.  209 F.3d 252, 264 (3d Cir. 2000); *see also DB Structured Prods. Inc. v. Am. Home Mort. Holdings, Inc. (In re Am. Home Mortg. Holdings, Inc.),* 402 B.R. 87, 94 (Bankr. D. Del. 2009).

67.     Under the Plan, it appears that the Debtors are attempting to allocate the Bonds without the Indemnity Agreements pursuant to 11 U.S.C. § 1123(a)(5)(C).  This is functionally the same situation as the debtor in *Folger* when it attempted to use 11 U.S.C. § 363 in order to eliminate burdens associated with the non-executory contracts.  The same result should apply.  *See In re Congoleum Corp.*, No. 03-51524, 2008 WL 4186899, at *7 (Bankr. D.N.J. Sept. 2, 2008) (transfer of non-executory insurance contracts *cum onere* to plan trust allowed under 11 U.S.C. 1123(a)(5)).  Indeed, if the Debtors could ignore the *cum onere* rule in the context of non-executory contracts by relying upon 1123(a)(5)(C), they could ignore it for executory contracts under 11 U.S.C. § 1123(b)(2).  It is unsurprising that no authority appears to exist for such a reading.  *See*

29

*U.S., Dep't of Air Force v. Carolina Parachute Corp.*, 907 F.2d 1469, 1472 (4th Cir. 1990) (recognizing *cum onere* rule applies under 11 U.S.C. § 1123(b)(2)); *In re S. Canaan Cellular Invs., LLC*, No. BR 09-10473BF, 2011 WL 52558, at *8 (Bankr. E.D. Pa. Jan. 6, 2011) (same).

> (vi)  *Even if the Prepetition Indemnification Claims are Discharged, the Indemnity Agreement and the Common Law Indemnity Obligations will be Prospective Obligations of FWE I*

68.     A discharge under 11 U.S.C. § 1141 is not equivalent to a release of future obligations.  Even if the prepetition claims associated with the Indemnity Agreement and the common law are discharged, the allocation of the Bond to FWE I means that the prospective indemnification obligations travel with them.  Again, as stated above, under Texas law the Indemnity Agreement and the Bond must be construed together and the allocation of the Bond to FWE I means that the Indemnity Agreement must be allocated to FWE I as well.

69.     This argument is even stronger for common law indemnification obligations.  The District of Maryland made this point in *Am. S. Ins. Co. v. DLM, LLC*, No. CV GLR-16-3628, 2017 WL 2930464 (D. Md. July 10, 2017).  In that case, the debtor discharged an indemnity agreement under a chapter 11 plan but assumed the surety bonds and bonded contracts.  The surety sought to invoke its common law subrogation rights post-confirmation.  Although the court held that the subrogation rights under the indemnity agreement did not survive confirmation, the court relied upon the *cum onere* rule in holding that the assumption of the bonds also required the assumption of the related liabilities associated with the bonds, including the surety's subrogation rights.  *Id.* at *6; *see Int'l Fid. Ins. Co. v. Sweet Little Mexico Corp.*, 665 F.3d 671, 680-81 (5th Cir. 2011) (recognizing surety's common law indemnification rights arise from bond under Texas law).  Even if the prepetition claims (and even the Indemnity Agreement) are discharged, the same result will occur under the Plan as Philadelphia's common law rights (including indemnification, subrogation,

*quia timet*, and exoneration) will also survive as they cannot be eliminated if the Debtors seek to retain the benefits of the Bond.

70.     In summary, the Bond and the Indemnity Agreement are either unassumable financial accommodations, which must be rejected by the Debtors, or the Bond (with the accompanying common law rights) and the Indemnity Agreement will be allocated to FWE I and Philadelphia, along with the similarly situated Legacy Apache Sureties, will be the most significant creditors, along with Apache, of FWE I.

      **b)**      ***The Plan Provisions for FWE I's Corporate Governance and Management violate 11 U.S.C. §§ 1223(a)(6) and (a)(7)***

71.     Sections 1123(a)(6) and (a)(7) of the Bankruptcy Code work together to ensure that the governance rights and management of a new entity formed under a chapter 11 plan are fair and equitable.   In other words, the governance rights and management should reflect the capital structure of the new entity and facilitate value maximization.   FWE I is winddown entity, which means that the governance rights and management should be controlled by its creditors.   Here, the governance rights and management of FWE I are controlled primarily by Apache (a creditor of FWE I) and secondarily by the Liquidating Trustee.   The Legacy Apache Sureties, who are unsecured creditors of FWE I and whose interests are more imperiled than Apache's, are left empty-handed.   Moreover, Apache's ability to control FWE I while it holds a first priority security interest in all of FWE I's assets opens opportunities for value extraction at the expense of other stakeholders.   Fundamental fairness cautions against such a result while 11 U.S.C. §§ 1123(a)(6) and (a)(7) preclude it.

72.     Together, 11 U.S.C. § 1123(a)(6) and (a)(7) ensure that the voting rights and management of a new entity are fair and equitable.   *Acequia, Inc. v. Clinton (In re Acequia, Inc.)*, 787 F.2d 1352, 1362 (9th Cir. 1986).   Pursuant to 11 U.S.C. § 1123,

(a) a plan shall…

> (6) provide for the inclusion in the charter of the debtor, if the debtor is a corporation, or of any corporation referred to in paragraph (5)(B) or (5)(C) of this subsection, of a provision prohibiting the issuance of nonvoting equity securities, and providing, as to the several classes of securities possessing voting power, an appropriate distribution of such power among such classes, including, in the case of any class of equity securities having a preference over another class of equity securities with respect to dividends, adequate provisions for the election of directors representing such preferred class in the event of default in the payment of such dividends;

> (7) contain only provisions that are consistent with the interests of creditors and equity security holders and with public policy with respect to the manner of selection of any officer, director, or trustee under the plan and any successor to such officer, director, or trustee.

The stakes for ensuring fairness and equity are high. Indeed, "[t]he drafters of section 1123(a)(6) expressed concern with ensuring 'fair and equitable reorganization,' which 'is literally the last chance to conserve for [the creditors'] values that corporate financial stress or insolvency have placed in jeopardy.'" *In re Ahead Commc'ns Sys., Inc.* 395 B.R. 512, 518 (D. Conn. 2008) (quoting S.Rep. No. 989, 95th Cong., 2d Sess. 11 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5787, 5797)). The concerns motivated the enactment of the predecessors of 11 U.S.C. §§ 1123(a)(6) and (a)(7), as part of the Chandler Amendments to the Bankruptcy Act of 1898. *See* S. REP. NO. 1916, 75th Cong., 2d Sess. 7 (1938).[14]

73.    Fair and equitable distribution of voting power and management requires that

> the securities must be distributed so that the allocation of voting power—i.e., the control of the company—properly recognizes the respective position of the claimants and stockholders according to their rank and the rights they surrender. Consequently, creditors who are forced to take stock in the new company, or whose rights as creditors are modified or altered so they assume some risk of the success of the reorganized corporation, are entitled to an allocation

---

[14] Due to the lack of caselaw interpreting these provisions under the Bankruptcy Code, recent precedent has relied upon precedent under the 1898 Act due to the similarities between Section 216(11) and (12) of Chapter X of the 1898 Bankruptcy Act and 11 U.S.C. §§ 1123(a)(6) and (a)(7). *See, e.g.*, *In re Ahead Commc'ns Sys., Inc.*, 395 B.R. 512, 518 (D. Conn. 2008) (citing cases).

> of voting power and a voice in the selection of management that will
> protect their interests.

*In re Ahead Commc'ns Sys., Inc.*, 395 B.R. 512, 518 (D. Conn. 2008) (quoting 7 Collier on

Bankruptcy P.1123.01).  Synthesizing the case law interpreting 11 U.S.C. §§ 1123(a)(6) and (a)(7)

and their predecessors, the Ninth Circuit has identified three relevant factors: "the shareholders'

interest in participating in the corporation, the desire to preserve the debtor's reorganization, and

the overall fairness of the provisions." *Acequia, Inc. v. Clinton (In re Acequia, Inc.)*, 787 F.2d

1352, 1362 (9th Cir. 1986); *see also Ahead Commc'ns*, 395 B.R. at 519 (quoting *Acequia*).  This

flexible standard recognizes that the plan provisions cannot be analyzed without context and the

parties' relationship to the provisions is equally relevant.  *See Acequia*, 787 F.2d at 1362.

74.     Put another way, the levers of control and corporate governance (voting and

management) should reflect the corporate structure of the reorganized debtor and be intended to

maximize its value.  The *Ahead Communications* case confirms this commonsense conclusion.  In

that case, the debtor proposed a chapter 11 plan whereby the secured creditor's claim would be

converted into an unsecured note with a balloon after three years and it would receive the common

stock of the debtor.  *Id.* at 515.  However, the voting rights would be held in trust and could not be

exercised unless the debtor defaulted.  *Id.*  On appeal of the confirmed plan, the district court

reversed because the plan violated 11 U.S.C. § 1123(a)(6) by disenfranchising the reorganized

debtor's sole secured creditor and failing to protect the entity's interests through control over

management. *Id.* at 519-20. In summarizing its conclusions, the district court confirmed that the

plan did not "adequately protect the interests of the secured creditor in maintaining some control

over the business on which it would depend for repayment of its claim. Instead, it served to convert

the secured claim of GDC into an unsecured note without any mitigating control over the

management of the company charged with repaying that note." *Id.* at 519.  Prior case law, which

*Ahead* relied upon, is consistent with its conclusions. *See In re Quaker City Cold Storage Co.*, 71 F. Supp. 124, 131 (E.D. Pa. 1947) (authorizing voting trust "to exercise an effective check or [sic] management in the interest of securing a maximum return to the investors" when collective action problems and apathy of new shareholders existed); *In re Lower Broadway Properties*, 58 F. Supp. 615, 619 (S.D.N.Y. 1945) (observing that "[l]ike any other instrument in the arsenal of corporate management [a voting trust] may be intended as a tool or a weapon" and holding that the voting trust would benefit shareholders due to collective action problem). *In re Tharp Ice Cream Co.*, 25 F. Supp. 417, 418 (E.D. Pa. 1938) (denying confirmation of reorganization plan that granted voting rights to former equity holders and requiring that they be granted to creditors).

75.     The Apache Control Rights grant Apache control over FWE I at the expense of its other stakeholders, particularly the Legacy Apache Sureties. This treatment is neither fair nor value maximizing. The Plan classifies both Apache and the Legacy Apache Sureties as holders of General Unsecured Claims in Class 6B of the Plan. Yet, Apache enjoys the Apache Control Rights while the Sureties are left without any control of the voting or management of FWE I. This contrast is further amplified by the fact that both Apache and the Legacy Apache Sureties will be creditors of FWE I following the divisive merger based on liabilities associated with the Legacy Apache Properties. Moreover, under the terms of the Standby Facility, FWE I must exhaust the Decommissioning Security (the Bonds and Trust A) prior to drawing on the Standby Facility. Apache is also a secured creditor pursuant to the Recharacterization Mortgages granted to secure the Standby Facility. Meanwhile, the Legacy Apache Sureties will be unsecured creditors. *Ahead Communications* teaches that creditors' interests in an entity formed under a plan must be protected. Apache's interests are protected by the Apache Control Rights while the Legacy Apache Sureties, who are not granted a security interest under the Plan, enjoy no equivalent protections.

34

76.     FWE I's status as a winddown entity exacerbates the need for protection of creditors interests.   Thus, it is creditors rights, not membership rights holders, who should be primarily represented in the corporate governance, management, and operation control.   This is particularly true for FWE I, as it is contemplated that it will be a limited liability company organized under Texas law.   Upon insolvency, the fiduciary duties of management in a Texas LLC do not automatically shift to creditors.   *E.g.*, *Tow v. Bulmahn (In re ATP Oil & Gas Corp.*), 711 F. App'x 216, 221 (5th Cir. 2017).   This likely is why Apache, as a go-forward creditor of FWE I under the Decommissioning Agreement, just like the Sureties, bargained for the Apache Control Rights.   The HL's valuation and A&M's valuation of FWE I, confirm that the total enterprise value of FWE I is negative.   Depending upon the exact valuation, the Legacy Apache Sureties may be the fulcrum security.   This is because, when an entity is a winddown entity[15], like FWE I, and its value is negative, the fulcrum security is where the last dollar is used to satisfy liabilities.   The reasoning for this conclusion is common sense.   The entity whose funds are marginally affect by the entity operations (whether one dollar more is gained or lost), should control the governance and management rights.   FWE I's projected revenue is overstated while the projected P&A spend is understated.   The Debtors even tacitly admit this fact in a footnote where they confirm that P&A spend is really a function of lease termination/expiration/relinquishment, not available cash flow. Accordingly, the Legacy Apache Bonds are highly at risk of being called and until the last of the funds are exhausted and FWE I is entitled to draw on the Standby Facility, the Legacy Apache Sureties should possess <u>greater</u> corporate governance rights than Apache.   Moreover, because the only value of the FWE I equity will be option value, the corporate governance should reflect this reality.   Accordingly, the equity interests should be distributed to the go-forward creditors of FWE

---

[15] Unlike an organized entity that has positive value and/or is intended to operate in perpetuity, a winddown entity is has as its main purpose the divestment of its assets and cessation of its business.   *See In re Hercules Offshore, Inc.,* 565 B.R. 732, 752 (Bankr. D. Del. 2016).

4831-3211-6717, v. 2

I, and if the P&A Obligations under the Decommissioning Agreement are satisfied, they should then shift to the Liquidating Trust.  The proposed voting and management rights are unfair and do reflect the capital structure of FWE I.

77.     The selection of the Sole Manager and Independent Director, as well as the process for the selection of their successors, does not reflect the capital structure of FWE I, it reflects Apache's control of FWE I.  The importance of the Sole Manager is hard to understate as he or she is the only officer of FWE I, which will have no employees.  Apache was the only party consulted by the Debtors in the selection of the Sole Manager, Jon Graham, a former Apache employee.  Michael Dane Deposition Transcript, 103-09 and 251: 1-11.  He was chosen over two alternatives suggested by the Debtors.  *See id.* He may not be removed without Apache's discretionary consent.  Any successors to the Sole Manager are selected by the Independent Director from persons put forth by Apache and the Independent Director (after having solicited input from the Credit Bid Purchaser).  Although these procedures unfairly favor Apache over the Legacy Apache Sureties, at least Apache will be a creditor of FWE I, unlike the Credit Bid Purchaser.  Although the Independent Director has not been selected, his or her selection is subject to Apache's discretionary consent after initial selection by either the Debtors, or after the Divisive Merger, the Credit Bid Purchaser.  The Legacy Apache Sureties are completely omitted from the selection of the management of FWE I.

78.     The Apache Control Rights, together with the Standby Facility, are not designed to maximize the value of FWE I, they are designed to protect and enrich Apache to the detriment of the Legacy Apache Sureties.  Under the original iterations of the Standby Facility and FWE I LLC Agreement, FWE I was precluded from incurring indebtedness other pursuant to the Standby Facility.  Upon information and belief, Apache and the Debtors realized that the FWE's cash flows would not be able to sustain operations.  In tacit recognition of this fact, the newest iteration of the

36

FWE I LLC Agreement includes the option for a revolving line of credit. The utility of this option is largely illusory as it can only be secured by a mortgage subordinate to the Standby Facility. Who would lend on these terms? Recall that this is a winddown entity. This loan is the equivalent to a DIP loan on a subordinated basis without the sweeteners that are usually granted to priming liens. To categorize that fact pattern as rare is an understatement. One potential lender is Apache. However, Apache can provide these funds <u>after</u> all the Legacy Apache Bonds are exhausted. Apache has every incentive to follow this strategy. Money is fungible and so long as leases are not terminated, the proven undeveloped reserves are not going away. Thus, it is in Apache's best interest to accelerate P&A of the Legacy Apache Assets in order to leave a much healthier balance sheet for a subsequent loan in order to facilitate development. Even more Machiavellian, if FWE 1 defaults on the Standby Facility, which is virtually a given consider its financial status, Apache could time a foreclosure to occur after all the Legacy Apache Bonds are exhausted and inherit assets shorn of hundreds of millions of dollars in P&A Obligations.

79.      It bears repeating, this "is literally the last chance to conserve for the creditors' values that corporate financial stress or insolvency have placed in jeopardy." S.Rep. No. 989, 95th Cong., 2d Sess. 11 (1978), reprinted in 1978 U.S.C.C.A.N. 5787, 5797). If the Plan is confirmed, the corporate governance and management of FWE I will be wielded as a weapon for Apache's benefit rather than as a tool for benefit of all stakeholders. Sections 1123(a)(6) and (a)(7) were enacted to prevent exactly this result.

### c)      *The Plan's Preferred Treatment of Apache Violates 11 U.S.C. § 1123(a)(4)*

80.      Equality of treatment for claims in the same class is "a central policy of the Bankruptcy Code." *Begier v. IRS*, 496 U.S. 53, 58 (1990). The Bankruptcy Code, and specifically § 1123(a)(4), requires that a plan "provide the same treatment for each claim or interest of a

particular class, unless the holder of a particular claim or interest agrees to a less favorable treatment."

81.     Section 1123(a)(4) "guarantees that each [claim] will be treated equally." *See, e.g., ACC Bondholder Grp. v. Adelphia Commc'ns Corp. (In re Adelphia Commc'ns Corp.)*, 361 B.R. 337, 363 (S.D.N.Y. 2007).  For instance, when a creditor was required to "release a unique, direct claim in order to participate in the $3 million Fund [with other creditors]," the treatment violated 11 U.S.C. § 1123(a)(4).  *In re AOV Indus., Inc.*, 792 F.2d 1140, 1152 (D.C. Cir. 1986).

82.     A plan's treatment for a claim or interest includes the property or opportunities received by the holder thereof on account of that claim or interest, not just cash distributions.  *In re TCI 2 Holdings, LLC*, 428 B.R. 117, 133 (Bankr. D.N.J. 2010) (analyzing whether an opportunity to backstop a rights offering was treatment under the plan by determining whether the opportunity was provided to its recipients on account of their claims).  Control of an enterprise and its governance is valuable property irrespective of the value of the underlying assets.  *Norwest Bank Worthington v. Ahlers*, 485 U.S. 197, 208 (1988) ("[i]ndeed, even in a sole proprietorship, where 'going concern' value may be minimal, there may still be some value in the control of the enterprise").

83.     The Supreme Court's teachings in *Bank of Am. Nat'l Tr. & Sav. Ass'n v. 203 N. LaSalle St. P'ship* instruct that where a claim holder receives value because it holds that claim, the holder receives that value as treatment under a plan of reorganization.  526 U.S. 434, 441 (1999). In a context that cannot be meaningfully distinguished from the consideration received by Apache, the Supreme Court held that a "new value" plan that sold the reorganized debtor's equity to the debtor's prepetition interest-holders "without extending an opportunity to anyone else either to compete for that equity or to propose a competing reorganization plan" violated 11 U.S.C. §1129(b)(2)(B)(ii), which governs permissible distributions under a chapter 11 plan, codifying the

38

"absolute priority rule." *Id.* at 436.  "[T]he exclusiveness of the opportunity, with its protection against the market's scrutiny," rendered the prepetition interest holders' right to purchase the equity a property interest extended "on account of" those interests and thus, the plan could not be confirmed. *Id.* at 456.

84.     In *LaSalle*, the Supreme Court explained that a holder of a claim or interest receives property solely on account of "new money" - rather than as treatment under a plan of reorganization - only if the holder has paid "top dollar" for that property. *Id.*  If a holder of a claim or interest has paid less than "top dollar" for property, there is a loss of value on the part of the debtor and a corresponding gain on the part of the holder, to the unjustifiable detriment of the debtor's estate and its stakeholders. *Id.* at 456-57.

85.     *LaSalle* is clear, an exclusive right provided to a claim holder and the corresponding unjustified loss of value to the debtor cannot be assumed away as part of a larger transaction.  *Id.* at 456.

> It is no answer to this to say that the exclusive opportunity should be treated merely as a detail of the broader transaction that would follow its exercise, and that in this wider perspective no favoritism may be inferred, since the old equity partners would pay something, whereas no one else would pay anything.

In other words, the transfer of value on account of a claim cannot be cleansed by incorporating it into transactions contemplated by a chapter 11 plan.

86.     Two factors demonstrated the "causal relationship" between the claim and the consideration: first, the exclusivity of the offer (in *LaSalle*, the opportunity to invest in new equity was offered exclusively to old equity), and second, the lack of a market test (in *LaSalle* there was no market test of the new equity investment).  *Id.* at 454-57.  The combination of these factors— limiting access to certain stakeholders and shielding the terms of the investment from a market test— were problematic:

39

> If the price to be paid for the equity interest is the best obtainable, old equity does not need the protection of exclusiveness (unless to trump an equal offer from someone else); if it is not the best, there is no apparent reason for giving old equity a bargain. There is no reason, that is, unless the very purpose of the whole transaction is, at least in part, to do old equity a favor. And that, of course, is to say that old equity would obtain its opportunity, and the resulting benefit, because of old equity's prior interest within the meaning of subsection (b)(2)(B)(ii).

*Id*. at 456 (emphasis added). Accordingly, when the rights granted by the chapter 11 plan are both exclusive to prior holders (*i.e.,* unavailable to similarly situated parties) and shielded from a market test (*i.e.,* not sold at "top dollar"), such a right is received "because of [such claim holder's] prior interest." *Id.*

87.     Apache's control over FWE I triggers both requirements identified by *LaSalle*. First, it is an exclusive valuable property right that Apache receives under the Plan.  No other unsecured creditors receive these rights.  Irrespective of the going-concern value of FWE I (which, as detailed below, Philadelphia believes is positive and sellable), the control of FWE I is valuable as it will allow Apache to manipulate FWE I's operations to ensure that the Legacy Apache Bonds are called as soon as possible while residual value remains that Apache can capture to limit the draw under the Standby Facility or allow Apache to foreclose on its Reclassified Mortgages and then operate FWE I profitably.  In sum, this control is very valuable, otherwise Philadelphia would not be asserting the prejudice caused by Apache's receipt of it.  *Norwest Bank Worthington v. Ahlers*, 485 U.S. 197, 209 (1988) ("there is great common sense in petitioners' contention that 'obviously, there is some going concern value here, or the parties would not have been litigating over it for the last three years.'").  Apache's status as an entity that is co-liable with the Debtors on the Legacy Apache Assets is analogous to the old equity in *LaSalle*.  It is a "favor" to Apache at the expense of other similarly situated creditors.

40

88.     Apache's claims are classified as General Unsecured Claims in Class 6B of the Plan, just like the Legacy Apache Sureties.  Apache's preferred treatment is not fair to other unsecured creditors – it is the contrapositive of *AOV* – here the creditor is receiving a unique benefit rather than unique discrimination.  Either way, 11 U.S.C. § 1123(a)(4) is violated and the chapter 11 plan cannot be confirmed.

89.     Apache may suggest its *in rem* decommissioning obligations on the Legacy Apache Assets distinguish it from other unsecured creditors, irrespective of its classification.  That argument may differentiate it from other unsecured creditors, but it does not create any daylight between Apache and the Legacy Apache Sureties, which also have the obligation to assure the Debtors' decommissioning of the Legacy Apache Assets under the Decommissioning Agreement.

90.     Second, the control granted to Apache over FWE I was never marketed (similar to FWE I itself).  The control was granted to an entity with a relationship with the Debtors not unlike the insiders in *LaSalle* as Apache is the largest predecessor of the Debtors, a party of the RSA, a consent party for Plan, and a party receiving a release under the Plan.  In sum, Apache is treated like an insider under the Plan and it should not receive the benefit of that treatment to the detriment of other unsecured creditors.

91.     Apache will likely argue that it received *de facto* control over FWE I in consideration for providing the Standby Facility, not on account of its claims against the Debtors' estates.  This argument is untenable.  The Standby Facility simply reflects Apache's attempt to best leverage its status as a predecessor on the Legacy Apache Assets and its liability to United States Government and the Regulators.  If Trust A is exhausted and the Legacy Apache Bonds are fully drawn and depleted, Apache, as predecessor to the Debtors, would be next in line for meeting the P&A Obligations under the Legacy Apache Assets.  Instead of stepping up to pay (like many of the Debtors' other predecessors are being asked to do), Apache can obtain the benefit of the

Standby Facility or potentially use it as vehicle to foreclose on FWE I's assets.  The benefit to the

Debtors' estates of the Standby Facility is illusory.  The transfer of control rights over FWE I

violates 11 U.S.C. § 1123(a)(4).

> **d)** ***The Debtors' Failure to Market the FWE I Assets or Propose Value-Maximizing Operational Agreements Means the Plan is Not Proposed in Good Faith***

92. Section 1129(a)(3) of the Bankruptcy Code requires that a plan be proposed in good

faith and not by any means forbidden by law.  11 U.S.C. § 1129(a)(3).  The term "good faith" is

not defined in the Bankruptcy Code, but the requirement of good faith is generally interpreted as

meaning that there is "a reasonable likelihood that the plan will achieve a result consistent with

the objectives and purposes of the Bankruptcy Code."  *In re Madison Hotel Assocs.*, 749 F.2d 410,

424-425 (7th Cir. 1984) (internal quotation marks omitted).  Section 1129(a)(3) "speaks more to

the process of plan development than to the content of the plan."  *In re Bush Indus., Inc.*, 315 B.R.

292, 304 (Bankr. W.D.N.Y. 2004) (emphasis added).  Courts must consider "the totality of the

circumstances" surrounding the plan's development and proposal.  *In re Madison Hotel Assocs.*,

749 F.2d at 425.

93. The primary objective of the Bankruptcy Code is to maximize the value of a

debtor's estate and distribute that value to holders of claims and interests on account of those

claims and interests.  *See e.g.*, *203 N. LaSalle St. P'ship, 526 U.S. at 453* (citing *Toibb v. Radloff*,

501 U.S. 157, 163 (1991)) (observing that the Bankruptcy Code's recognized policy is

"maximizing property available to satisfy creditors"); *Four B. Corp. v. Food Barn Stores, Inc. (In

re Food Barn Stores, Inc.)*, 107 F.3d 558, 564-65 (8th Cir. 1997) ("[A] primary objective of the

[Bankruptcy] Code [is] to enhance the value of the estate at hand."); *Tenn-Fla Partners v. First

Union Nat'l Bank of Fla.*, 229 B.R. 720, 736 (W.D. Tenn. 1999), *aff'd*, 226 F.3d 746 (6th Cir.

2000) (denying confirmation of a plan on the basis that debtor had failed to maximize value of the

estate for the benefit of creditors by not obtaining the highest available price for property to be sold upon confirmation).  Section 1129(a)(3) of the Bankruptcy Code requires plan proponents to satisfy this primary objective.

94.     The failure to market the FWE I Assets violates 11 U.S.C. § 1129(a)(3) because it does not maximize the value of the Debtors' estates.  As the Court and all parties in interest know, the price for WTI has increased markedly in last few months. ███████████████████████

███████████████████████████████████████████████████████████████

████████████████████████ Without a true good faith attempt to market FWE I Assets, or any portion thereof, there is no ability to compare value received from an arm's length sale of the FWE I Assets versus the winddown under FWE I.  The FWE I Assets also have potential production value (especially as WTI prices rise) and incremental capital projects could be valuable to another party or could alleviate future P&A Obligations via investment and generate incremental cash flows and extend the life of the properties.  This is potential value accretion that could offset surety liability, but any effort in this regard can be prematurely forfeited by Apache through its control of FWE I's governance and operations.

95.     Future capital investments are structured to benefit Apache and/or the Credit Bid Purchaser and prejudice FWE I's other creditors, including Philadelphia.  The self-serving nature of the FWE I structure is most obvious in the allocation of P&A Obligations for any proposed farmout wells.  Under the Farmout Agreement, FWE I will incur 100% of the P&A liability for unsuccessful wells.  But for successful wells, FWE I will receive only a 50% working interest, which applies only after all capital investment costs have been recovered in full by Credit Bid Purchaser.  This structure is fundamentally unfair to FWE I and suppresses its going concern value.  Alternatively, a third-party sale, which has not been attempted by the Debtors, could yield significantly better value.

96.     Under the Farmout Agreement, future FWE I capital projects are proposed as a right, but not an obligation, accruing solely to Credit Bid Purchaser.  Based on the deposition of Michael Dane, no capital projects for FWE I have been selected.  *See* Michael Dane Deposition Transcript, 93: 20-25, 94:1-25.  In the absence of a planned capital projects analysis, it is improper for rights associated with the Farmout Agreement to block any attempt by FWE I to develop capital projects that prospectively reduce the Legacy Apache Sureties' contingent and unliquidated liabilities.  The reimbursement and compensation schemes proposed under the FWE I TSA (for the Credit Bid Purchaser's benefit) and the FWE I LLC Agreement (for Apache's benefit) are too generous for a winddown entity.  They are another example of the Plan benefiting the RSA parties at the expense of other stakeholders.

e)      ***The Exculpation Provisions Violate Fifth Circuit Precedent and 11 U.S.C. § 524***

97.     The release and exculpation provisions proposed in the Plan apply to a broad range of parties, including, the Debtors, the Post-Effective Date Debtors, the Apache PSA Parties, and each of their respective affiliates, predecessors, successors, and assigns.  *See* Plan Art. I. 1.1 "Released Parties".  While the releases are consensual (or at least contain an opt-out), the exculpatory provisions and the associated injunctions are not subject to opt-out.

98.     Exculpation is simply a release by another name.  *Bank of New York Trust Company, N.A. v. Official Committee of Unsecured Creditors (In re Pac. Lumber Co.)*, 584 F.3d 229, 240 (5th Cir. 2009) (using exculpation and release terminology interchangeably).  When applied as intended, they yield equivalent results.  The only distinctions is temporal.  Releases apply to causes of action arising prepetition while exculpation applies to causes of action that arise post-petition or relate to post-petition conduct and transaction.  How they operate is equivalent.  Both eliminate a non-debtor's claim against a non-debtor.  Do not be fooled by the supposed "narrow scope" of the exculpation proposed by the Plan, which allows claims for intentional fraud,

44

willful misconduct, or gross negligence.  What is left unsaid is, of course, that claims for negligence are exculpated.  In other words, the claims for negligence arising from the bankruptcy case held by non-debtors against non-debtors are released.

99.     It is clear that non-consensual releases and injunctions are forbidden by Fifth Circuit case law.  *E.g.*, *Bank of New York Trust Company, N.A. v. Official Committee of Unsecured Creditors (In re Pac. Lumber Co.)*, 584 F.3d 229, 240 (5th Cir. 2009) (citing *Chapman v. Bituminous Ins. Co. (In re Coho Res., Inc.)*, 345 F.3d 338 (5th Cir. 2003); *Hall v. Nat'l Gypsum Co.*, 105 F.3d 225 (5th Cir. 1997); *Feld v. Zale Corporation (In re Zale Corporation)*, 62 F.3d 746, 760 (5th Cir. 1995); *Houston v. Edgeworth (In re Edgeworth)*, 993 F.2d 51 (5th Cir. 1993)); *Dropbox, Inc. v. Thru, Inc. (In re Thru, Inc.)*, No. 3:17-CV-1958-G, 2018 WL 5113124, at *21 (N.D. Tex. Oct. 19, 2018), *aff'd sub nom. on other grounds*, 782 F. App'x 339 (5th Cir. 2019). Given the equivalence between releases and exculpations, *Pacific Lumber* takes this logic to its natural conclusion and confirms that a bankruptcy court cannot authorize a non-consensual exculpation by a third party.

100.     Besides its holding, which governs this case, *Pacific Lumber* eviscerates several of the usual arguments in favor of exculpations.  The Court explained how the plain language of the Bankruptcy Code undermines the viability of non-debtor exculpations outside of the mass tort context.  On the one hand, 11 U.S.C. § 524(e) confirms the general rule that the grant of a discharge to a debtor does not alter the liability of another entity on the discharged debt.  On the other hand, 11 U.S.C. § 524(g) permits the imposition of a non-debtor injunction concerning certain third-party asbestos claims. *Pac. Lumber*, 584 F.3d at 252.  Congress's decision to select a narrow scope for 11 U.S.C. § 524(g) while leaving the default rule under 11 U.S.C. § 524(e) largely unchanged, suggests third party releases and exculpations should not be authorized outside the scope of 11

U.SC. § 524(g). *E.g.*, *Id.*; *In re Washington Mut., Inc.*, 442 B.R. 314, 352 (Bankr. D. Del. 2011) (citing cases); *In re Digital Impact, Inc.*, 223 B.R. 1, 9 (Bankr. N.D. Okla. 1998).

101.    *Pacific Lumber* recognized the different function between releases and exculpation. The Court recognized that joint liability with a debtor, specifically in the mass tort context, could be sufficient to support a release when the claim is channeled to a specific pool of asset. *Pac. Lumber*, 584 F.3d at 229. Meanwhile, "the essential function of the exculpation clause proposed here is to absolve the released parties from any negligent conduct that occurred during the course of the bankruptcy. The fresh start § 524(e) provides to debtors is not intended to serve this purpose." *Id.* at 252-53. In other words, an exculpation is even further outside the scope of permissible relief than a release, which is at least contemplated under certain circumstances and finds some indirect support in the discharge itself.

102.    Looking beyond *Pacific Lumber*, a number of other reasons exist for prohibiting third party non-consensual exculpations, including the loss of due process rights and the prohibition on applying exculpatory clauses to non-parties outside of bankruptcy. A bankruptcy court exercises *in rem* jurisdiction over claims being made against the estate while it exercises *in personam* jurisdiction over claims against third parties or among third parties. *Johns-Manville Corp. v. Chubb Indemnity Ins. Co. (In re Johns-Manville Corp.)*, 600 F.3d 135, 152-54 & n.13 (2d Cir. 2010). Third party exculpations involve the exercise of *in personam* jurisdiction. *Id.*; *Campos v. Aegis Realty Mgmt. Corp.*, No. 19 CIV. 2856 (KPF), 2020 WL 433356, at *6 n.7 (S.D.N.Y. Jan. 28, 2020). When a bankruptcy court's *in personam* jurisdiction is implicated, formal service of process must be followed pursuant to the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") governing adversary proceedings. *Feld v. Zale Corporation (In re Zale Corporation)*, 62 F.3d 746, 762-63 (5th Cir. 1995). However, an exculpation is a request to take a third party's property (a negligence claim), without any hearing on the merits or discovery. *See id.* at 764-65

46

(5th Cir. 1995); *In re Digital Impact, Inc.*, 223 B.R. 1, 13 n. 6 (Bankr. N.D. Okla. 1998) (noting that a third-party release has "the effect of a judgment – a judgment against the claimant and in favor of the non-debtor, accomplished without due process."). As the Fifth Circuit explained, the standards for obtaining an injunction (the remedy for enforcing the exculpation) must be followed in order to satisfy due process. *Zale Corporation*, 62 F.3d at 765-66.

103.    The exculpation of Apache's (a third-party non-debtor) conduct, which releases the negligence claims of all parties in interest, including Philadelphia (a third-party non-debtor), invokes this Court's *in personam* jurisdiction. As a result, the standards and requirements for obtaining a permanent injunction under the Bankruptcy Rules and applicable case law must be satisfied. A permanent injunction requires "(1) success on the merits; (2) that a failure to grant the injunction will result in irreparable injury; (3) that said injury outweighs any damage that the injunction will cause the opposing party; and (4) that the injunction will not disserve the public interest." *VRC LLC v. City of Dallas*, 460 F.3d 607, 611 (5th Cir. 2006); *see Amoco Prod. Co. v. Village of Gambell*, 480 U.S. 531, 546 n.12 (1987). The Plan does not assert that there is an actual determination on the merits that no claims for negligence exist against the Exculpated Parties. The Debtors fail to provide any explanation of the reasoning for the Exculpation or any alleged consideration provided by the Exculpated Parties. This failure to meet their burden of production is fatal. *C.f, Behrmann v. Nat'l Heritage Found.*, 663 F.3d 704, 713 (4th Cir. 2011) (simply listing the factors for releases is "meaningless in the absence of specific factual findings explaining why this is so."). Moreover, the scope of the Exculpation includes events that are intended to occur after confirmation but before or on the Effective Date (*i.e.,* events that have not occurred as of the confirmation hearing). It violates due process to exculpate non-debtors' claims against non-debtors under any circumstance without a determination on the merits; it only adds insult to exculpate claims that have not even arisen.

104.     Lastly, any federal court, including this Court, lacks the power to grant an exculpation on the merits.  A court lacks the power dictate settlement terms or to force parties to involuntarily release their claims.  *See United States v. Ward Baking Co.*, 376 U.S. 327, 334 (1964) (confirming that a court lacked authority to enter a "consent judgment" to which the Government did not consent, and that in the absence of the parties' agreement the court's power was limited to the resolution of the case on the merits).  Similarly, two parties cannot, by agreement, dispose of claims that belong to a third party. *Local No. 93, Int'l Ass'n of Firefighters, AFL-CIO C.L.C. v. City of Cleveland*, 478 U.S. 501, 529 (1986).  Indeed, an agreement between two parties cannot bind a non-party.  *Equal Employment Opportunity Comm'n v. Waffle House, Inc.*, 534 U.S. 279, 295 (2002) (holding that "a contract cannot bind a nonparty.").  This rule applies to bar exculpation against a non-party's claims.  *Miles v. Naval Aviation Museum Found., Inc.*, 289 F.3d 715, 720 (11th Cir. 2002).  In sum, a claim that belongs to a third party may only be resolved through litigation on the merits, or on terms to which the third party agrees. *Local No. 93*, 478 U.S. at 529. The Exculpation would effectuate a non-party involuntary release.  To be sure, the Debtors and other parties are free to agree to settlements, provided that they meet the standards under the Bankruptcy Code and the Bankruptcy Rules.  This power does not authorize an exculpation of claims held by third-parties, including Philadelphia.

f)     ***FWE I is Not Feasible***

105.     "To obtain confirmation of its reorganization plan, a debtor must show by a preponderance of the evidence that its plan is feasible, which means that it is 'not likely to be followed by ... liquidation, or the need for further financial reorganization.'" *Save Our Springs (S.O.S.) All., Inc. v. WSI (II)-COS, L.L.C. (In re Save Our Springs (S.O.S.) All., Inc.)*, 632 F.3d 168, 172 (5th Cir. 2011) (quoting 11 U.S.C. § 1129(a)(11)).  To meet this burden, a debtor must show "a reasonable assurance of commercial viability." *Save Our Springs*, 632 F.3d at 172

(quoting *Heartland Fed. Sav. & Loan Ass'n v. Briscoe Enters., Ltd., II (In re Briscoe Enter., Ltd., II)*, 994 F.2d 1160, 1166 (5th Cir. 1993)).  Although feasibility is a fact-specific inquiry, courts in the Fifth Circuit generally consider six factors (to the extent they are relevant):

> (1) the adequacy of the debtor's capital structure; (2) the earning power of the debtor's business; (3) economic conditions; (4) the ability of the debtor's management; (5) the probability of the continuation of the same management; and (6) and [sic] any other related matter which determines the prospects of a sufficiently successful operation to enable performance of the provisions of the plan.

*Save Our Springs*, 632 F.3d at 173 n.6 (citing *In re M & S Assocs., Ltd.*, 138 B.R. 845, 849 (Bankr. W.D. Tex. 1992)).   When considering a debtor's projections in support of feasibility, "[s]peculative, conjectural or unrealistic projections by Debtor cannot support Debtor's predictions of future performance." *Canal Place Ltd. P'ship v. Aetna Life Ins. Co. (In re Canal Place Ltd. P'ship)*, 921 F.2d 569, 579 (5th Cir. 1991).

106.    When considering FWE I, which comprises the majority of the Debtors' assets, the most relevant factors (adequacy of capital structure, earning power, economic conditions) favor finding that the Debtors' Plan is infeasible.  The adequacy of FWE I's capital structure must viewed in the context of financial projections for its future performance.  ████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████  To meet this shortfall, FWE I could attempt to borrow but its potential capital structure is hamstrung by the protection for Apache in the Standby Agreement and the FWE I LLC Agreement.  Although the FWE I LLC Agreement contemplates FWE I having the option of entering into a revolving credit facility, this option is extremely restricted: (i) any liens security the facility must be subordinated to the Reclassified Mortgages that secure the Standby Facility, (ii) only $50 million can be paid back in

49

the ordinary course of business, and (iii) it cannot be paid back if the Standby Facility is in default. Obtaining a loan on these terms seems impractical but FWE I will need significant funds to operate. The Debtors will likely point to the Decommissioning Security (Trust A and the Legacy Apache Bonds) as a source of funds. However, once the $280 million in Trust A is exhausted, a properly requested draw on the Legacy Apache Bonds will trigger FWE I's indemnification obligations, which will put FWE I back in bankruptcy again, as a chapter 33 or 29.

## **JOINDER**

107.    To the extent not contradicted by the arguments contained herein, Philadelphia joins in the arguments and authorities in the objections set forth by all other sureties and filed with this Court in response to the issues that are similar to Philadelphia.

## **CONCLUSION**

108.    Philadelphia remains hopeful that a solution for FWE I that is fair to all stakeholders can be developed. However, the Plan as currently proposed is unconfirmable. Philadelphia reserves all rights to amend this Objection up to and at the hearing on the confirmation of the Plan.


                            Respectfully submitted,

                            MANIER & HEROD, P.C.

                            /s/ Michael E. Collins
                            Michael E. Collins (TX Bar No. 24029006)
                            Robert W. Miller (admitted *pro hac vice*)
                            1201 Demonbreun St., Suite 900
                            Nashville, TN  37203
                            Telephone:     (615) 742-9350
                            Facsimile:     (615) 242-4203
                            E-mail:        mcollins@manierherod.com
                                           rmiller@manierherod.com

                            *Attorneys for Philadelphia Indemnity Insurance Company*

4831-3211-6717, v. 2

## **CERTIFICATE OF SERVICE**

The undersigned hereby certifies that the foregoing was electronically filed with the Clerk of the Court using the CM/ECF system and served upon all parties receiving notice pursuant to the CM/ECF system on June 2, 2021.

/s/ Michael E. Collins
Michael E. Collins

4831-3211-6717, v. 2