IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

|  |  |  |
|---|---|---|
| | § | |
| In re: | § | Chapter 11 |
| | § | |
| FIELDWOOD ENERGY LLC, *et al.*,[1] | § | Case No. 20-33948 (MI) |
| | § | |
| Debtors. | § | (Jointly Administered) |
| | § | |

OBJECTION OF ASPEN AMERICAN INSURANCE COMPANY, BERKLEY
INSURANCE COMPANY, EVEREST REINSURANCE COMPANY, AND
SIRIUS AMERICA INSURANCE COMPANY TO THE FOURTH
<u>AMENDED CHAPTER 11 PLAN</u>
(Relates to Docket No. 1284)

---

[1] The Debtors, each of which have filed a separate voluntary petition, are: Dynamic Offshore Resources NS, LLC; Fieldwood Energy LLC; Fieldwood Energy Inc.; Fieldwood Energy Offshore LLC; Fieldwood Onshore LLC; Fieldwood SD Offshore LLC; Fieldwood Offshore LLC; FW GOM Pipeline, Inc.; GOM Shelf LLC; Bandon Oil and Gas GP, LLC; Bandon Oil and Gas, LP; Fieldwood Energy SP LLC; Galveston Bay Pipeline LLC; and Galveston Bay Processing LLC.

## <u>TABLE OF CONTENTS</u>

I.  SUMMARY OF OBJECTION ....................................................................................... 2

II. BACKGROUND ........................................................................................................... 6
    A.  Procedural Background................................................................................... 6
    B.  Factual Background ........................................................................................ 7
        i.   The Nature of the Debtors' Operations.............................................. 7
        ii.  Regulation of the Company's Businesses........................................... 8
        iii. The Surety Bond Program .................................................................. 8
        iv.  The Surety Bonds Issued on Behalf of the Debtors by the Sureties .......... 9

III. OBJECTIONS................................................................................................................ 10
    A.  The Fourth Amended Chapter 11 Plan is Unconfirmable because FWE I is
        Not Feasible ..................................................................................................... 10
    B.  The Plan is Unconfirmable because the Debtors Provide No Set Aside
        Funding for Decommissioning for NewCo, and Intend to Spend a Nominal
        Amount of Money on Decommissioning in Years 1-5, and therefore the
        Plan is Not Proposed in Good Faith and Violates Public Policy ..................... 13
    C.  The Plan is Unconfirmable because the Debtors have No "Plan" with
        Respect to Obtaining/Funding Surety Bonds/Financial Assurance for FWE
        I and therefore FWE I is Not Feasible ............................................................. 15
        i.   The Debtors Admit in their Responses to Discovery Requests that
             the Only Communication the Debtors have had with the
             Government Regarding Bonding for FWE I or Credit Bid
             Purchaser is a Single E-mail the Debtors Sent to the Government
             on April 29, 2021, to which the Government Never Responded............. 19
        ii.  The Debtors Cannot "Allocate" the Existing Surety Bonds to FWE
             I because No Surety has Consented to Such Allocation; because
             the Bonds are Not Property of the Estate; and because the
             "Allocation" would Involve an Impermissible Substitution of
             Principal ............................................................................................... 21
        iii. There is No Provision in the Plan Documents Identifying Who
             Will be Responsible for Funding the Bonding/Financial Assurance
             for FWE I, which Renders FWE I Not Feasible ...................................... 22
    D.  The Plan is Unconfirmable because the Plan has No Provisions with
        Respect to Funding New Surety Bonds/Financial Assurance for Credit Bid
        Purchaser and therefore Credit Bid Purchaser is Not Feasible ....................... 24
        i.   The Debtors Admit in their Answers to Interrogatories that the
             Plan does not Purport to Assume, Assign or Transfer any Existing
             Surety Bonds....................................................................................... 24
        ii.  This Plan has been Pending Since January 1 and the Debtors are
             Just Now Concerning themselves with this Critical Piece of the
             Puzzle—New Bonding............................................................................ 25
    E.  The Plan is Unconfirmable because, Notwithstanding their Assertions to
        the Contrary, the Debtors are Attempting to Assume and Assign the Surety

i

Bonds, which they Cannot Do because the Surety Bonds are Non-Assumable Financial Accommodations ................................................................... 25

F.     The Plan is Unconfirmable because the Debtors are Attempting to Reincorporate in Texas to Avoid Delaware Fraudulent Conveyance Laws with Respect to the Indemnity Agreements for FWE I and therefore the Plan is Proposed in Bad Faith ...................................................................... 27

G.     The Plan is Unconfirmable because, in the Alternative to the Foregoing, the Sureties believe that the Debtors' Attempt to Transfer the Indemnity Obligations to FWE III Constitutes a Fraudulent Conveyance under Texas' Uniform Fraudulent Transfer Act ............................................................ 32

H.     The Plan is Unconfirmable because the Debtors Cannot Assume the Decommissioning Agreement and Reject the Associated Indemnity Agreements .......................................................................................................... 33

I.     The Plan is Unconfirmable because Apache is Being Treated Differently than Similarly Situated Creditors in Violation of Section 1123(a)(4), and because the Organizational Documents for FWE I Violate Section 1123(a)(6) and (7) ................................................................................................ 35

J.     The Plan is Unconfirmable because the Debtors have Not Marketed the FWE I Assets, and there is No Sale Provision in the Fieldwood I LLC Agreement, and therefore the Plan is Not Proposed in Good Faith ..................... 39

K.     The Plan is Unconfirmable because the Exculpation Provisions Violate Fifth Circuit Precedent and 11 U.S.C. § 524 ...................................................... 41

IV.     JOINDER OF OTHER SURETIES' OBJECTIONS ...................................................... 46

V.     RESERVATION OF RIGHTS ........................................................................................ 46

VI.     CONCLUSION ............................................................................................................... 46

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*In re Acequia, Inc.*,
    787 F.2d 1352 (9th Cir. 1986) ...................................................................39

*In re Adana Mortgage Bankers, Inc.*,
    12 B.R. 977 (Bankr. N.D. Ga. 1980) .........................................................27

*In re Adelphia Commc'ns Corp.*,
    441 B.R. 6 (Bankr. S.D.N.Y. 2010) ...........................................................15

*In re Ahead Commc'ns Sys., Inc.*,
    395 B.R. 512 (D. Conn. 2008) ....................................................................40

*In re B & L Oil Co.*,
    782 F.2d 155 (10th Cir. 1986) ....................................................................35

*Matter of Bergman*,
    585 F.2d 1171 (2d Cir. 1978)......................................................................15

*In re Bigler LP*,
    442 B.R. 537 (Bankr. S.D. Tex. 2010) .......................................................43

*Castro v. Peck*,
    CVA97-003, 1998 WL 689645 (Guam Apr. 7, 1998) .................................35

*Chambliss/Jenkins Associates v. Forster*,
    650 P.2d 1315 (Colo. App. 1982) ...............................................................35

*In re Charrington Worldwide Enterprises, Inc.*,
    98 B.R. 65 (Bankr. M.D. Fla. 1989), *aff'd sub nom. In re Charrington
    Worldwide Enter., Inc.*, 110 B.R. 973 (M.D. Fla. 1990) ...........................27

*In re CSC Indus., Inc.*,
    232 F.3d 505 (6th Cir. 2000) ......................................................................36

*Matter of Edwards Mobile Home Sales, Inc.*,
    119 B.R. 857 (Bankr. M.D. Fla. 1990) .......................................................26

*In re Energy Future Holdings Corp.*,
    648 Fed. Appx. 277 (3d Cir. 2016).............................................................36

*In re Falcon V, L.L.C.*,
    620 B.R. 256 (Bankr. M.D. La. 2020) ........................................................27

*In re Fifth Taste Concepts Las Olas, LLC*,
    325 B.R. 42 (Bankr. S.D. Fla. 2005)...........................................................35

*Fintel v. Oregon (In re Fintel)*,
    10 B.R. 50 (Bankr. D. Or. 1981).................................................................22

*In re Food City, Inc.*,
    110 B.R. 808 (Bankr. W.D. Tex. 1990).......................................................28

*In re Heritage Org., L.L.C.*,
    375 B.R. 230 (Bankr. N.D. Tex. 2007)........................................................10

*Liberty Mut. Ins. Co. v. Aventura Eng'g & Const. Corp.*,
    534 F. Supp. 2d 1290 (S.D. Fla. 2008) .......................................................34

*In re M & S Associates, Ltd.*,
    138 B.R. 845 (Bankr. W.D. Tex. 1992).................................................15, 24

*Mayer v. Transnation Title Ins. Co.*,
    B147731, 2002 WL 1503080 (Cal. Ct. App. July 15, 2002)......................35

*McLean Trucking Company v. Dept. of Industrial Relations (In re McLean
    Trucking Co.)*,
    74 B.R. 820 (Bankr. W.D.N.C. 1987)..........................................................................22

*O'Malley Lumber Co. v. Lockard (In re Lockard)*,
    884 F. 2d 1171 (9th Cir. 1989) ................................................................................22

*Ohio v. Mansfield Tire and Rubber Co. (In re Mansfield Tire and Rubber Co.)*,
    660 F. 2d 1108 (6th Cir. 1981) ................................................................................22

*In re Pac. Lumber Co.*,
    584 F.3d 229 (5th Cir. 2009) ..............................................................................42, 43

*In re Patriot Place, Ltd.*,
    486 B.R. 773 (Bankr. W.D. Tex. 2013).....................................................................43

*In re Petroleum Piping Contractors, Inc.*,
    211 B.R. 290 (Bankr. N.D. Ind. 1997).......................................................................22

*In re Pilgrim's Pride Corp.*,
    No. 08-45664-DML-11, 2010 WL 200000 (Bankr. N.D. Tex. Jan. 14, 2010).......................43

*In re Prescription Home Health Care, Inc.*,
    316 F.3d 542 (5th Cir. 2002) ..................................................................................14

*In re Prime, Inc.*,
    15 B.R. 216 (Bankr. W.D. Mo. 1981).........................................................................27

*In re Quigley Co., Inc.*,
    676 F.3d 45 (2d Cir. 2012).......................................................................................45

*Ret. Sys. of Ala. v. J.P. Morgan Chase & Co.*,
    386 F.3d 419 (2d Cir. 2004).....................................................................................45

*In re Southern Foods Group, LLC*,
    Case No. 19-36313, Dkt. No. 3400..............................................................................43

*St. Paul Fire & Marine Ins. Co. v. Tennefos Const. Co.*,
    396 F.2d 623 (8th Cir. 1968) ...................................................................................35

*Stewart Title Guar. Co. v. Old Republic Nat. Title Ins. Co.*,
    83 F.3d 735 (5th Cir. 1996) ....................................................................................35

*In re Sun Runner Marine, Inc.*,
    945 F.2d 1089 (9th Cir. 1991) .................................................................................27

*In re SunEdison, Inc.*,
    576 B.R. 453 (Bankr. S.D.N.Y. 2017)........................................................................46

*Matter of T-H New Orleans Ltd. Partnership*,
    116 F.3d 790 (5th Cir. 1997) ...................................................................................28

*In re Texas Star Refreshments, LLC*,
    494 B.R. 684 (Bankr. N.D. Tex. 2013)........................................................................28

*In re Thomas B. Hamilton Co., Inc.*,
    969 F.2d 1013 (11th Cir. 1992) ................................................................................27

*Travelers Cas. & Sur. Co. v. Chubb Indem. Ins. Co. (In re Johns-Manville Corp.)*,
    517 F.3d 52 (2d Cir. 2008)...................................................................................45, 46

*Trustees of Carpenters & Millwrights Health Benefit Tr. Fund v. Kipco Co.*,
    567 F.2d 951 (10th Cir. 1977) ...............................................................................18, 22

*In re TS Indus., Inc.*,
    117 B.R. 682 (Bankr. D. Utah 1990) ..........................................................................27

*In re Wegner Farms Co.*,
49 B.R. 440 (Bankr. N.D. Iowa 1985) ................................................................26

## Statutes

6 Del. C. § 18-217(l)(5) ...........................................................................32, 33
6 Del. C. § 1304(a)(2)(a) ..........................................................................31, 33
11 U.S.C. 365(c)(2) ........................................................................................26
11 U.S.C. 1123(b)(6) ......................................................................................15
11 U.S.C. §§ 105(a) and 1123 (b)(6) ...............................................................15
11 U.S.C. § 365(c)(2) ...............................................................................4, 27
11 U.S.C. § 524 ..............................................................................................42
11 U.S.C. § 524(g) ..........................................................................................46
United States Code title 11 chapter 11, 11 U.S.C. §§ 101-1532 ....................... *passim*
Bankruptcy Act ...............................................................................................22
Bankruptcy Code Section 524(e) ......................................................................42
Bankruptcy Code section 554 ........................................................................7, 8
Bankruptcy Code section 1102(a)(1) ...................................................................6
Bankruptcy Code sections 1107(a) and 1108 .......................................................6
Bankruptcy Code Section 1123(a)(4) ...........................................................36, 39
Bankruptcy Code sections 1123(a)(6) and (7) ...............................................36, 39
Bankruptcy Code Section 1129(a)(3) ...........................................................28, 42
Bankruptcy Code Section 1129(a)(11) ..........................................................10, 15
Debtors' Attempt to Transfer the Indemnity Obligations to FWE III Constitutes a
Fraudulent Conveyance under Texas' Uniform Fraudulent Transfer Act ...............32
Delaware Act ..........................................................................................31, 32
Delaware Fraudulent Conveyance Laws .............................................................28
Delaware Limited Liability Company Act section 18-217......................................29
Delaware Uniform Fraudulent Transfer Act (6 Del. C. § 1301, *et seq.*) .....................33
TBOC .................................................................................29, 32, 33, 34
Texas Business Organizations Code (the "TBOC") ...............................................29
Texas UFTA ....................................................................................................33
Texas Uniform Fraudulent Transfer Act..............................................................33
UFTA ......................................................................................................33, 34
Uniform Fraudulent Transfer Act ........................................................................5

## Other Authorities

30 C.F.R. § 556.900.......................................................................14, 15, 18, 25
30 C.F.R. § 556.901 .......................................................................14, 16, 25
30 C.F.R. § 556.901(d) ...............................................................14, 17, 18, 24
74 Am. Jur. 2d Suretyship § 66.................................................................18, 22
*Black's Law Dictionary* 929, 930 (9th ed. 2009) ..............................................45
Byron F. Egan, *Alternative Structures for Transfers of Businesses*, n.10 (2016)..........34
Federal Rule of Civil Procedure 26(e)(1) ...........................................................21
Restatement (Second) of Judgments § 2 cmt. ....................................................45

Aspen American Insurance Company ("Aspen"), Berkley Insurance Company ("Berkley"), Everest Reinsurance Company ("Everest"), and Sirius America Insurance Company ("Sirius" and together with Aspen, Berkley and Everest, the "Sureties"), by and through their undersigned counsel, hereby file this *Objection to the Fourth Amended Chapter 11 Plan* (the "Objection").[2]  In support of the Objection, the Sureties respectfully submit as follows:

## I.    SUMMARY OF OBJECTION

1.      The Debtors' Fourth Amended Chapter 11 Plan (the "Plan"), as it is currently constructed, cannot be confirmed for many reasons, which are set forth in detail in this Objection. For the Court's ease of reference, the Sureties submit this short summary of the objections contained herein.

2.      The Plan is not confirmable because FWE I is not feasible.  As part of their Plan, the Debtors produced financial projections for FWE I.  The Debtors did not retain any expert to formulate the projections, but rather relied on their management team.  The financial projections are based on what is known as the "FWE I Model."  The financial projections and the FWE I Model are inconsistent with each other.  ███████████████████████████████ ██████████████████████████████.  The Debtors' representative, Mike Dane,[3] danced around questions in his deposition related to the issue, and ultimately suggested that if the financial projections were inaccurate, there would be surety bonds and letters of credit to backstop the decommissioning for FWE I.

---

[2] Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Amended Disclosure Statement and Exhibits attached thereto. [Dkt. No. 1285].

[3] Mike Dane is the Chief Financial Officer for Fieldwood Energy, LLC, and is anticipated to be Chief Executive Officer ("CEO") for NewCo.

3.      Not only are the financial projections inaccurate with regard to the projected annual decommissioning obligations, but they are also inaccurate with respect to projected production. The Debtors' management team projects that FWE I will produce 28 mboe/d for the balance of 2021.  When asked both informally and then formally at Mike Dane's deposition[4] what the current production was for the FWE I Assets, the Debtors stated that they were currently producing in the low 20s's.  And when you look at the Debtors' financial projections and the funding for FWE I under the Plan, there is very little capital to invest in the FWE I Assets.  Additionally, hurricane season just began and will last through the end of November.  Thus, it is highly improbable that FWE I will be able to attain 28 mboe/d for the balance of 2021, and the Sureties' expert, ███

████████████████████████████████████████████████████████████

███████████████████████████████

4.      The Plan is also unconfirmable because there is no set aside funding for decommissioning the NewCo assets.  The lenders intend to take the good assets and deplete them for their own benefit, and rely on sureties, predecessors and taxpayers to pay for the ultimate decommissioning.  This is more than obvious from the Debtors' financial projections which have a nominal amount of money being spent for decommissioning the NewCo assets in years 1-5.  The secured lenders have no interest in running NewCo indefinitely as a going concern.  NewCo is a limited life company that will deplete the good assets, and then leave the liabilities to others.  This is not a Plan proposed in good faith, and this Court should not permit such a course of action because it goes against public policy.

_____

[4] The deposition of Mike Dane was taken on May 13, 2021.

5.      Nor do the Debtors have a "plan" for obtaining/funding surety bonds for FWE I, which will be required in order for FWE I to operate.  There are no funds in the financial projections for such bonding.  The Bureau of Ocean Energy Management ("BOEM") regulations are clear that FWE I must obtain its own (new) bonding.  It cannot pledge a predecessor's bonds. And the amount of the bonding required could be significant.  What happens when BOEM requires FWE I to post $20, $30, $40 million in bonds?  FWE I will be right back in bankruptcy.  If FWE I is to be feasible, at the very least Credit Bid Purchaser should have to fund the bonding just like Credit Bid Purchaser is doing with FWE III and FWE IV.

6.      ███████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████   And any such "allocation," without the consent of the surety, would result in the impermissible substitution of principal on a bond, which would give rise to suretyship defenses to the sureties.  Nor can the Debtors assume and assign any of the surety bonds because they are non-assumable financial accommodations under 11 U.S.C. § 365(c)(2).

7.      For the same reason the Plan is not feasible because there is no allocation of funding for bonds for FWE I, the Plan is also not feasible because there is no allocation of funding for new bonds for Credit Bid Purchaser.  The bonding for Credit Bid Purchaser could be many hundreds of millions of dollars.  The current bonds in place for the NewCo assets will not be usable by NewCo to operate on a go-forward basis.  The current bonds are issued in the name of Fieldwood Energy, LLC, as principal, who will be a predecessor owner post-Effective Date.  NewCo cannot pledge a predecessor's bonds under the BOEM regulations.  Just like Shell Corp. cannot pledge

bonds in the name of Chevron Corp., NewCo cannot pledge bonds in the name of Fieldwood Energy, LLC.

8.    The Plan also impermissibly attempts to separate the bonds from their indemnity agreements.  The Debtors' Plan allocates surety bonds to FWE I under the divisive merger, but allocates the associated indemnity agreements to FWE III.  FWE III has a mid-point enterprise value of negative $28 million, and will own assets that generate *de minimis,* if any production prior to decommissioning.  This constitutes a fraudulent transfer under the Uniform Fraudulent Transfer Act ("UFTA"), because FWE III is not receiving reasonably equivalent value in exchange for the transfer.

9.    The Debtors are also attempting to separate the Apache Decommissioning Agreement and its surety bonds from the indemnity agreements.  The Fifth Circuit is clear that a debtor cannot assume and assign only part of a contract.  It either must reject the contract, or assume both the benefits and the burdens of the contract.  Case law is clear that a surety bond, its bonded contract and any associated indemnity agreement are parts of a single contract.

10.    Additionally, the Plan treats similarly situated creditors differently.  Apache Corp. ("Apache") and the sureties that issued bonds in favor of Apache (the "Apache Sureties") are similarly situated creditors.  Both of them are responsible for decommissioning obligations for the FWE I Assets and both of them rise and fall with the ultimate success of FWE I.  Yet Apache is receiving significant benefits under the Plan that are not being provided to, and were never offered to the Apache Sureties.  Under the organizational documents for FWE I, Apache obtains many benefits, and exercises *de facto* control over FWE I.  Under the organizational documents Apache and the Debtors have taken Apache's joint and several obligation as a predecessor owner, termed it a "loan," and are providing Apache with a significant interest rate for making its "loan"; granting

Apache a security interest in all of the FWE I Assets for making its "loan"; and permitting Apache to avoid having to make any "loan" until after all of the Decommissioning Security is exhausted, including all of the surety bonds and letters of credit. These significant benefits Apache is obtaining under the Plan, which were not offered to the Apache Sureties as similarly situated creditors, are impermissible.

11.     Finally, the Plan's exculpation provision attempts to exculpate many different third-party entities, and does not include an ability for creditors to opt-out, which violates well established Fifth Circuit precedent.

## II.     BACKGROUND

### A.     PROCEDURAL BACKGROUND

12.     On August 3, 2020 (the "Petition Date"), each of the Debtors (collectively, the "Debtors" or "Fieldwood") filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (as amended, the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of Texas, Houston Division, thereby commencing the above-styled and jointly administered bankruptcy case.

13.     The Debtors are operating their businesses and managing their properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No trustee or examiner has been appointed in these chapter 11 cases.

14.     On August 18, 2020, pursuant to section 1102(a)(1) of the Bankruptcy Code, the Office of the United States Trustee for Region 7, Southern and Western Districts of Texas appointed the Official Committee of Unsecured Creditors. [Dkt. No. 183].

15.     On January 1, 2021, the Debtors filed their initial Chapter 11 Plan, along with the initial Disclosure Statement. [Dkt. Nos. 722, 723].

16.     On April 15, 2021, the Debtors filed the Fourth Amended Chapter 11 Plan (the "Plan"). [Dkt. No. 1284].

17.     On that same date, the Debtors filed an Amended Disclosure Statement (the "Disclosure Statement"). [Dkt. No. 1285].

18.     On that same date, this Court entered an Amended Order Approving the Disclosure Statement. [Dkt. No. 1286].

19.     On May 26, 2021, the Debtors filed a Plan Supplement in connection with the Fourth Amended Chapter 11 Plan. [Dkt. No. 1394].

20.     The proposed Plan contemplates a series of transactions whereby the Debtors' assets will either be (i) transferred to one of four newly created entities (*i.e.*, FWE I, FWE III, FWE IV or the Credit Bid Purchaser), or (ii) abandoned. [Dkt. No. 1284, p. 48].  In effect, the Debtors seek to ringfence their good assets for the benefit of their secured creditors and to divest their bad assets into FWE I, FWE III, FWE IV, or abandon them altogether, pursuant to section 554 of the Bankruptcy Code.

## B.     Factual Background

### i.   *The Nature of the Debtors' Operations*

21.     The Debtors, together with their non-debtor affiliates (collectively, the "Company"), comprise one of the largest independent oil and gas exploration and production ("E&P") companies operating in the Gulf of Mexico (the "GOM"). [Dkt. No. 29, ¶¶ 5 and 17]. The Company is focused on the acquisition, exploration and development of offshore assets located in the shallow water and deepwater GOM and Gulf Coast Regions of the United States. *Id.* at ¶ 5.

22.     The Company's assets include, among other things: (a) more than 350 oil and gas leases (the "O&G Leases"); (b) hundreds of wells; (c) more than 300 operated platforms spread

over 1.5 million gross acres; (d) pipelines; (e) facilities; and (f) rights of way (collectively, the "GOM Assets"). Additionally, the Company is party to hundreds of farmout, unitization and joint operating agreements that govern the operations of the GOM Assets. *Id.* at ¶¶ 19 and 23.

### ii.   *Regulation of the Company's Businesses*

23.     As the operator of the GOM Assets, the Company is subject to local, state and federal laws and regulations in each jurisdiction in which it operates. *Id.* at ¶22. Such laws and regulations address, among other things, the operation of wells and facilities, environmental protection, and exploration and development activities. *Id.* Among the obligations imposed on E&P companies by such laws and regulations is the duty to provide for the plugging and abandonment ("P&A") of wells and decommissioning of assets (*i.e.*, platforms, facilities, pipelines, etc.) associated with their E&P operations (collectively, the "P&A Obligations"). *Id.* at ¶¶ 22, 24.

24.     A substantial number of the O&G Leases were issued by the U.S. Department of the Interior and cover real property situated in federal waters. *Id.* at ¶23. Such leases are subject to oversight and regulation by the Bureau of Ocean Energy Management ("BOEM") and the Bureau of Safety and Environmental Enforcement ("BSEE"), including, but not limited to (a) BOEM's approval of exploration, development and production plans and (b) BSEE's permitting process, which regulates, among other things, engineering and construction plans, safety procedures, P&A and removal of infrastructure. *Id.* at ¶ 23.

### iii.   *The Surety Bond Program*

25.     In order to secure certain of its obligations (including P&A Obligations) to third parties, the Debtors in the ordinary course of business provide surety bonds to such third parties, including, but not limited to, certain agencies of the U.S. Government (the "Surety Bond Program"). [Dkt. No. 4, ¶ 28]. The Surety Bond Program generally covers two categories of third

parties: (1) federal and state governmental units and other public agencies and (2) contract counterparties to whom the Debtors have obligations related to various plugging, abandonment and decommissioning activities. *Id.* at ¶ 28. In conjunction with providing a surety bond, the Debtors either (a) enter into an indemnity agreement with the surety that issues the bond or (b) provide full cash collateralization of the surety bond. *Id.* at ¶ 29. The failure to maintain surety bonds in favor of the federal government and states adjacent to the GOM would result in the revocation of the necessary approvals for the Company to continue its operations in the GOM. *Id.* at ¶ 34.

### iv.    *The Surety Bonds Issued on Behalf of the Debtors by the Sureties*

26.    Prior to the Petition Date, the Sureties issued several surety bonds on behalf of the Debtors to assure their payment and/or performance obligations in connection with the GOM Assets, as well as certain other obligations. As of the Petition Date, Aspen has issued approximately $19.2 million in surety bonds; Berkley has issued approximately $74 million in surety bonds; Everest has issued approximately $45.5 million in surety bonds; and Sirius has issued approximately $46.5 million in surety bonds (each a "Surety Bond" and collectively the "Surety Bonds").[5] The majority of the Surety Bonds were issued to assure the P&A Obligations associated with the GOM Assets.

27.    The Sureties issued their respective Surety Bonds as consideration for the execution by the Debtors of certain indemnity agreements (each an "Indemnity Agreement" and collectively, the "Indemnity Agreements") that, among other things, obligate the Debtors to: (a) exonerate, indemnify and hold harmless the Sureties from and against any claim or liability arising as a result

---

[5] A spreadsheet of the Surety Bonds and corresponding obligations is attached hereto as **Exhibit A**. True and correct copies of the Surety Bonds are attached hereto as **Exhibit B**.

of having issued the Surety Bonds; (b) procure the discharge and release of the Surety Bonds; and (c) post collateral for any such Surety Bonds upon demand by the Sureties for any unreleased liability.[6]

28.     An indemnity agreement running from the principal to the surety is a standard condition for the execution of bonds by sureties for principals, such as Debtors, and is a critical component of the surety and principal relationship.

## III.     OBJECTIONS

### A.     THE FOURTH AMENDED CHAPTER 11 PLAN IS UNCONFIRMABLE BECAUSE FWE I IS NOT FEASIBLE

29.     Section 1129(a)(11) of the Bankruptcy Code provides that "[t]he Court shall confirm a plan only if . . . [c]onfirmation of the plan is not likely to be followed by the liquidation, or further need for financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan."

30.     The Debtors' maintain the burden of proof in establishing feasibility of the entities being created under the Plan. *In re Heritage Org., L.L.C.*, 375 B.R. 230, n.10 (Bankr. N.D. Tex. 2007) ("The burden of proof to establish feasibility is on the Plan Proponents . . . ."); *see also* 7 *Collier On Bankruptcy* ¶ 1129.02[4] (15th ed. rev. 2004) ("[T]he proponent bears the burdens of both introduction of evidence and persuasion that each subsection of section 1129(a) has been satisfied . . . the plan proponent bears the burden of proof by a preponderance of the evidence.").

31.     The Debtors did not retain any outside experts for purposes of establishing feasibility of the entities being formed under the Plan.  Instead, the Debtors intend to rely upon their management team as their "experts" for establishing feasibility.  The management team

---

[6] True and correct copies of the Indemnity Agreements are attached hereto as **Exhibit C**.

created the financial projections for each of the entities being formed under the Plan, including FWE I. [Dkt. No. 1285-2, p. 440].  The Debtors have stated more than once that the financial projections for FWE I are based on the "FWE I Model," ███████████████████████████████████████ ████████████████████████████████████████████████. *See, e.g.*, **Exhibit D**, Mike Dane Deposition Transcript, 135:12-25; **Exhibit E**, Debtors' Response to Request for Production of Documents No. 19.

32.     However, a review of the FWE I Model and the Debtors' financial projections reveals that the figures in the model and the projections are not consistent.  For example, with respect to the estimated costs for decommissioning the FWE I Assets, the financial projections for FWE I state that expected decommissioning costs from May to December 2021 are $70,000,000. [Dkt. No. 1285-2, p. 448]. ████████████████████████████████████████ ██████████████████████████████████████. **Exhibit F**, FWE I Model, Annual Forecast Tab.  Similarly, the FWE I financial projections for year 2 state that the estimated decommissioning costs for FWE I are $80,000,000. [Dkt. No. 1285-2, p. 448]. ████████████████ ████████████████████████████████████████████████████████. FWE I Model, Annual Forecast Tab. ████████████████████████████████████ ████████████████████████████████████████ ████████████████████ [Dkt. No. 1285-2, p. 448, FWE I Model, Annual Forecast Tab].

33.     When asked about the discrepancies, the Debtors' representative, Mike Dane, would not provide a straight-forward answer. Mike Dane Deposition Transcript, 130:19-148:16. Mike Dane simply suggested that if the financial projections were inaccurate, there would be Decommissioning Security available to cover the delta. *See* Mike Dane Transcript, 145:13-148:16.

34.     The Debtors are hiding the ball from both the Court and the Sureties with respect to the true extent of the projected decommissioning liabilities for FWE I.   The expected decommissioning costs for year 1 are not $70,000,000 as suggested in the financial projections, but much higher as reflected in the FWE I Model, and the same is true for years 2, 3, 4 and 5.   The Debtors fully expect FWE I to breach the Decommissioning Agreement in year 1, and be unable to perform its decommissioning obligations thereunder.   Yet the Debtors do not reflect this in their financial projections for FWE I. ██████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

**Exhibit G**, Lily Cheung, P.E. Expert Report, p. 9.

35.     Not only are the decommissioning numbers in the Debtors' financial projections wholly inaccurate, but so are the production numbers.   In their FWE I financial projections, the Debtors project FWE I producing 28 mboe/d on average per day from May to December of 2021. [Dkt. No. 1285-2, p. 448].   Based upon the current production levels, it is highly unlikely that such an average will be achieved.   The Sureties have asked the Debtors twice, once informally, and once formally in the Mike Dane deposition, about the current production levels of the FWE I Assets.   Both times the Sureties were advised that the FWE I Assets are currently producing in the "low 20s." Mike Dane Deposition Transcript, 124:12-17.   With the very small amount of capital available to invest in the FWE I Assets under the Debtors' financial projections, and with hurricane season having just begun, it is unclear how the Debtors could possibly project that they will reach 28 mboe/d average for the balance of 2021. ████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████.

36.     Thus, the Sureties submit that because the decommissioning and production estimates in the Debtors' financial projections for FWE I are significantly inaccurate, and because FWE I will not have the funds to sustain itself without breaching the Decommissioning Agreement in year 1, almost immediately after its assumption, and because there will be no capital whatsoever in FWE I to fund capital projects, FWE I is not a feasible entity.

**B.     THE PLAN IS UNCONFIRMABLE BECAUSE THE DEBTORS PROVIDE NO SET ASIDE FUNDING FOR DECOMMISSIONING FOR NEWCO, AND INTEND TO SPEND A NOMINAL AMOUNT OF MONEY ON DECOMMISSIONING IN YEARS 1-5, AND THEREFORE THE PLAN IS NOT PROPOSED IN GOOD FAITH AND VIOLATES PUBLIC POLICY**

37.     The secured lenders in this bankruptcy are taking the good assets and moving them into NewCo to deplete them for the lenders' benefit, and are taking all of the bad assets and shifting them to other entities and/or abandoning them and forcing predecessor owners, sureties and/or taxpayers to foot the bill for the associated liabilities.  There is nothing preventing this precise scenario from happening all over again when the NewCo assets age and are no longer profitable to the secured lenders. ████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████  And the Debtors' financial projections for NewCo reflect woefully inadequate decommissioning spend in years 1-5. [Dkt. No. 1285-2, p. 447] (Year 1 - $5 million, Year 2 - $6 million, Year 3 - $6 million, Year 4 - $6 million, Year 5 - $6 million).

38.     This is not a plan proposed in good faith.  It appears that the secured lenders intend to deplete the assets and expect the predecessor owners, sureties and taxpayers to, once again, foot the bill for the ultimate decommissioning of all the assets they deplete—assuming any surety is willing to issue bonds to NewCo in order for NewCo to operate, which at this point appears unlikely.   And to the extent the government fails to require NewCo to obtain its own bonds/financial assurance as required under applicable federal regulations (30 C.F.R. § 556.900, 901), in an amount sufficient to ensure compliance with obligations under all of NewCo's leases (30 C.F.R. § 556.901(d)), then it is possible there could be significant litigation between the sureties and the government with respect to payment on any of the BOEM bonds.  Should the sureties prevail in that litigation, the taxpayers will then be footing the bill for the decommissioning of the assets that the secured lenders depleted.

39.     This Court should not permit the secured lenders to deplete the assets without setting aside funding for decommissioning.  Such a scenario would have significant adverse effects on the availability of bonding for oil and gas assets in the GOM.  Sureties will exit the GOM bonding market, or at the very least they will only bond the biggest players who will effectively have a monopoly on the GOM oil and gas market because the barrier to entry will be too high because no one can obtain bonding.  The failure by the Debtors to include set aside funding for decommissioning NewCo's assets not only suggests bad faith by the Debtors, and the secured lenders who control them, but it also goes against public policy and should be proscribed by this Court.  The secured lenders, by and through the special purpose entity being created under the Plan, should not be able to deplete the assets over the next 10-15 years, knowing that they have non-cancellable surety bonds in place, and then by file bankruptcy and expect the sureties, predecessors and taxpayers to step in and perform.  That is an abuse of the bankruptcy process,

and it is precisely what the secured lenders intend to do. *See In re Prescription Home Health Care, Inc.*, 316 F.3d 542, 549 (5th Cir. 2002) (discussing a bankruptcy court's broad equitable powers under 11 U.S.C. §§ 105(a) and 1123 (b)(6)); *In re Adelphia Commc'ns Corp.*, 441 B.R. 6, 19 (Bankr. S.D.N.Y. 2010) (discussing a court's broad authority under 11 U.S.C. 1123(b)(6) and its ability to consider public policy in determining whether to approve or deny a chapter 11 plan).

**C.   THE PLAN IS UNCONFIRMABLE BECAUSE THE DEBTORS HAVE NO "PLAN" WITH RESPECT TO OBTAINING/FUNDING SURETY BONDS/FINANCIAL ASSURANCE FOR FWE I AND THEREFORE FWE I IS NOT FEASIBLE**

40.   As stated previously, section 1129(a)(11) of the Bankruptcy Code provides that "[t]he Court shall confirm a plan only if . . . [c]onfirmation of the plan is not likely to be followed by the liquidation, or further need for financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan." "The feasibility test contemplates the probability of actual performance of the provisions of the plan, and whether the things to be done under the plan can be done as a practical matter under the facts." *In re M & S Associates, Ltd.*, 138 B.R. 845, 849 (Bankr. W.D. Tex. 1992) (citing *In re Clarkson*, 767 F.2d 417, 420 (8th Cir. 1985)); *see also Matter of Bergman*, 585 F.2d 1171, 1179 (2d Cir. 1978) (same) (citing 9 *Collier on Bankruptcy*, at 1139).

41.   30 C.F.R. § 556.900 provides the base bonding requirements necessary to obtain BOEM approval of the assignment of a lease in the GOM.  It states in relevant part:

> This section establishes bond requirements for the lessee of an OCS oil and gas or sulfur lease.
>
> (a) Before BOEM will issue a new lease or approve the assignment of an existing lease to you as lessee, you or another record title owner for the lease must:
>
> (1) Maintain with the Regional Director a $50,000 lease bond that guarantees compliance with all terms and conditions of the lease; or

(2) Maintain a $300,000 area-wide bond that guarantees compliance with all the terms and conditions of all your oil and gas and sulfur leases in the area where the lease is located; or

(3) Maintain a lease or area-wide bond in the amount required in § 556.901(a) or (b).

. . .

(g) You may pledge alternative types of security instruments instead of providing a bond if the Regional Director determines that the alternative security protects the interests of the United States to the same extent as the required bond.

(1) If you pledge an alternative type of security under this paragraph, you must monitor the security's value.  If its market value falls below the level of bond coverage required under this subpart, you must pledge additional securities to raise the value of the securities pledged to the required amount.

(2) If you pledge an alternative type of security, you must include authority for the Regional Director to sell the security and use the proceeds when the Regional Director determines that you failed to satisfy any lease obligation.

42.     30 C.F.R. § 556.901(b) provides the base bonding requirements before a lessee may conduct any development or production activities on a lease.  It states in relevant part:

(b) This paragraph explains what bonds you (the lessee) must provide before lease development and production activities commence.

(1)(i) You must furnish the Regional Director a $500,000 bond that guarantees compliance with all the terms and conditions of the lease by the earliest of:

(A) The date you submit a proposed development and production plan (DPP) or development operations coordination document (DOCD) for approval; or

(B) The date you submit a request for approval of the assignment of a lease on which a DPP or DOCD has been approved.
. . .

> (iii) You may satisfy the bond requirement of this paragraph by providing a new bond or by increasing the amount of your existing bond.
>
> . . .

43.     30 C.F.R. § 556.901(d) provides the additional bonding requirements for lessees in the GOM.  It states in relevant part:

> (d) The Regional Director may determine that additional security (i.e., security above the amounts prescribed in § 556.900(a) and paragraphs (a) and (b) of this section) is necessary to ensure compliance with the obligations under your lease, the regulations in this chapter, and the regulations in 30 CFR chapters II and XII.
>
> (1) The Regional Director's determination will be based on his/her evaluation of your ability to carry out present and future financial obligations demonstrated by:
>
> > (i) Financial capacity substantially in excess of existing and anticipated lease and other obligations, as evidenced by audited financial statements (including auditor's certificate, balance sheet, and profit and loss sheet).
> >
> > (ii) Projected financial strength significantly in excess of existing and future lease obligations based on the estimated value of your existing OCS lease production and proven reserves for future production.
> >
> > (iii) Business stability based on five years of continuous operation and production of oil and gas or sulfur in the OCS or in the onshore oil and gas industry.
> >
> > (iv) Reliability in meeting obligations based on:
> >
> > > (A) Credit rating; or
> > >
> > > (B) Trade references, including names and addresses of other lessees, drilling contractors, and suppliers with whom you have dealt; and
> >
> > (v) Record of compliance with laws, regulations, and lease terms.
>
> (e) The Regional Director will determine the amount of additional bond required to guarantee compliance.  The Regional Director will consider

17

potential underpayment of royalty and cumulative decommissioning obligations.

. . .

44.     As set forth in the regulations above, FWE I will require new bonds/financial assurance be pledged to BOEM to meet its decommissioning obligations upon emergence.  The bonds/financial assurance pledged must be in an amount sufficient to "ensure compliance with obligations under [the] lease." 30 C.F.R. § 556.901(d).  The regulations are not permissive, and do not provide BOEM any flexibility in requiring that the bonds/financial assurance be provided.

45.     FWE I cannot rely upon existing bonds to satisfy its bonding obligations.  FWE I cannot "pledge" bonds that do not belong to it and in which it does not have any interest.  The provisions in the regulations could not logically be interpreted in any manner so as to permit FWE I to rely upon another entity's bonds, unless that entity is a co-working interest owner. *See* 30 C.F.R. § 556.900(a).  Even if the existing bonds are not cancellable and must remain in effect for the benefit of BOEM, those bonds have Fieldwood as the named principal, not FWE I—just like Shell Corp. cannot "pledge" bonds in the name of Chevron Corp., neither can FWE I pledge bonds in the name of Fieldwood.  Nor can the principal on the bonds be substituted without a surety's consent. 74 Am. Jur. 2d Suretyship § 66 (noting that a substitution of principal not assented to by the surety discharges the surety from liability); *Trustees of Carpenters & Millwrights Health Benefit Tr. Fund v. Kipco Co.*, 567 F.2d 951, 954 (10th Cir. 1977) (noting that "generally, a surety will not be liable for the default of a new principal to whose substitution it has not consented").

46.     The bonding required for FWE I could be significant—potentially in the hundreds of millions of dollars, and the Debtors have no plan whatsoever with respect to (1) paying for those bonds, and (2) who (FWE I or Credit Bid Purchaser) is going to pay for those bonds.



47. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮. This fact alone renders the Plan not feasible. How can the Debtors consummate a plan that will require a significant amount of new bonding, when the Debtors have no plan with respect to obtaining that bonding and have had no communications with the Government about the bonding, including the amount that will be required.

48. The Sureties asked in their Discovery Requests as follows:

INTERROGATORY NO. 21

Please set forth the Debtors' position on whether the surviving entities (FWE I, FWE III, FWE IV) under the divisive merger(s) will need to or will obtain their own (new) surety bonds.

RESPONSE:

The Debtors' position is that these entities may require area-wide operator bonds.

INTERROGATORY NO. 22

Please set forth the substance of any and all communications with any governmental entity with respect to the obtaining of financial assurance/bonding for FWE I, FWE III, FWE IV and Credit Bid Purchaser. In your answer please include (1) the date of the communication, (2) the time of the communication, (3) the parties to the communication and individuals with knowledge of the communication, and (4) the substance of the communication.

RESPONSE:

None.

. . .

REQUEST FOR PRODUCTION NO. 20

A copy of all documents reflecting communications between the Debtors and any governmental entity regarding new bonding/financial assurance for FWE I, FWE III, FWE IV or Credit Bid Purchaser.

RESPONSE:

The Debtors object to this Request to the extent it requests documents beyond those sufficient to respond to this Request as overbroad, unduly burdensome, and not proportional to the needs of this case.

Notwithstanding the foregoing objections, the Debtors are hereby producing the only responsive email, with subject line "BOEM Questions" (FWE-0045280).

**Exhibit I**, Debtors' Responses to Interrogatories No. 21 and 22, and Request for Production No. 20.

49. ███████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████ ███

██████████████████████

██

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

████████████████

. . .

**Exhibit J**, April 29, 2021 Fieldwood E-mail to Government Bates Stamp FWE-0045280.

50.     Federal Rule of Civil Procedure 26(e)(1) imposes a duty upon parties to supplement their discovery responses if that party learns "that in some material respect the disclosure or response is incomplete or incorrect." Fed. R. Civ. P. 26(e)(1).   Additionally, the Sureties specifically advised Fieldwood's counsel on May 11, 2021 that:

> With respect to [FWE-0045280], the sureties expect that the Debtors will produce any subsequent e-mails to the sureties as soon as they are received/sent.  To the extent any further e-mails have been exchanged between the Debtors and the government related to this e-mail and/or otherwise within the scope of our discovery requests, please provide them as soon as possible.

**Exhibit K**, May 11, 2021 E-mail from Sureties to Debtors Advising Debtors of Obligation to Supplement.

51.     The Debtors never responded to this e-mail or supplemented their discovery responses.   Accordingly, the Debtors, to date, have had only one e-mail exchange with the Government regarding bonding for FWE I (and Credit Bid Purchaser) and the Government never responded.

**ii.**     ***The Debtors Cannot "Allocate" the Existing Surety Bonds to FWE I because No Surety has Consented to Such Allocation; because the Bonds are Not Property of the Estate; and because the "Allocation" would Involve an Impermissible Substitution of Principal***

████  ████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████     As an initial matter, and upon information and belief, no surety has consented to have its bonds allocated to FWE I, nor would any surety ever agree to such an allocation.

53.     Additionally, Fieldwood cannot "allocate" the existing surety bonds to FWE I because the surety bonds are not property of the estate, and Fieldwood maintains no interest in the

bonds. *O'Malley Lumber Co. v. Lockard (In re Lockard)*, 884 F. 2d 1171, 1177 (9th Cir. 1989) ("[T]he 'overwhelming weight of authority,' under both the Bankruptcy Act and Code holds that a contractor [principal] has no property interest in a surety bond issued by a third-party [surety] to guarantee the contractor's performance on its commercial or personal services contracts."); *see also Ohio v. Mansfield Tire and Rubber Co. (In re Mansfield Tire and Rubber Co.)*, 660 F. 2d 1108, 1115 (6th Cir. 1981) (the debtor could not claim any legal or equitable interest in the surety bonds); *In re Petroleum Piping Contractors, Inc.*, 211 B.R. 290, 312 (Bankr. N.D. Ind. 1997) (surety bonds are not property of debtor's estate and the automatic stay does not apply to any proceeding by supplier to enforce its claims against sureties); *McLean Trucking Company v. Dept. of Industrial Relations (In re McLean Trucking Co.)*, 74 B.R. 820, 826 (Bankr. W.D.N.C. 1987) (surety bond is not property of the estate); *Fintel v. Oregon (In re Fintel)*, 10 B.R. 50, 51 (Bankr. D. Or. 1981) (surety bond was not property of a bankrupt debtor's estate).

54.     Furthermore, the surety bonds cannot be "allocated" to FWE I because that would involve an impermissible substitution of principal on the bonds. 74 Am. Jur. 2d Suretyship § 66 (noting that a substitution of principal not assented to by the surety discharges the surety from liability); *Trustees of Carpenters & Millwrights Health Benefit Tr. Fund v. Kipco Co.*, 567 F.2d 951, 954 (10th Cir. 1977) (noting that "generally, a surety will not be liable for the default of a new principal to whose substitution it has not consented").  To the extent the Government permitted any such "allocation," it would create affirmative defenses by the sureties to any attempts by the Government to draw on the surety bonds.

### iii.   *There is No Provision in the Plan Documents Identifying Who Will be Responsible for Funding the Bonding/Financial Assurance for FWE I, which Renders FWE I Not Feasible*

55.     The Debtors' financial projections do not include funding for FWE I for new bonding. [Dkt. No. 1285-2 p. 448].  Nor do any of the Plan documents identify who will pay for

the new bonding.  As clearly set forth previously in the feasibility section above, FWE I cannot afford the new bonds which will be required in order for it to operate.  The amount of the new bonding will likely be significant.  ████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████.  If this Court is inclined to confirm the Plan, it should not do so with this significant open item remaining.  What happens when FWE I is required to post $20, $30, $50 million in BOEM bonds post-confirmation?  Who is going to pay for that?  There is no money in FWE I to pay for that.  There is little money in FWE I to begin with, but even moreso because of the Debtors' severe overestimation of the production levels, and the severe underestimation of its decommissioning obligations.  FWE I is going to be right back in bankruptcy court when BOEM requires it to post new bonds.

56.     The Sureties submitting this Objection alone have approximately $38.2 million in surety bonds issued in favor of BOEM for the FWE I Assets.  Those bonds cannot be allocated to FWE I, so where is the funding for the new bonding going to come from?  This Court cannot confirm a plan with this question unanswered.  There is a significant risk post-bankruptcy that FWE I will be right back in bankruptcy court.  There must be funding in the Plan for bonding for FWE I and the Plan must set forth who is going to pay for that bonding.  Otherwise, the Plan is not feasible because the Debtors cannot show that "whether the things to be done under the plan can be done as a practical matter under the facts." *In re M & S Associates, Ltd.*, 138 B.R. 845, 849 (Bankr. W.D. Tex. 1992) (citing *In re Clarkson*, 767 F.2d 417, 420 (8th Cir. 1985)).  The Debtors' complete lack of concern for communicating with the Government and attempting to determine how it will obtain the requisite bonding in order to operate post-confirmation demonstrates that the Plan is not feasible.  Until the Debtors have established with the Government what will be

required with respect to new bonding, or until the Credit Bid Purchaser has agreed to fund the new bonding for FWE I, like it has done for the other entities being formed under the divisive merger, the Plan is not feasible.

**D.** **THE PLAN IS UNCONFIRMABLE BECAUSE THE PLAN HAS NO PROVISIONS WITH RESPECT TO FUNDING NEW SURETY BONDS/FINANCIAL ASSURANCE FOR CREDIT BID PURCHASER AND THEREFORE CREDIT BID PURCHASER IS NOT FEASIBLE**

57.    In addition to the Debtors' Plan failing to provide funding for FWE I bonding, the Plan also fails to provide funding for bonds that Credit Bid Purchaser will require in order to operate.   Credit Bid Purchaser is estimated to have hundreds of millions of dollars in decommissioning liabilities over the next 5-10 years. BP Feasibility Expert Report, pp. 8-9.  As already established, the BOEM regulations require bonding in an amount sufficient to "ensure compliance with obligations under [the] lease." *See* 30 C.F.R. § 556.901(d).  Thus, the new bonding for Credit Bid Purchaser could be significant, but there is no funding in the Plan for such bonding. [Dkt. No. 1285-2, p. 447].

*i.* *The Debtors Admit in their Answers to Interrogatories that the Plan does not Purport to Assume, Assign or Transfer any Existing Surety Bonds*

58.    In their Answers to Interrogatories, the Debtors admit as follows:

INTERROGATORY NO. 20

Please set forth whether the Debtors intend to assume and assign any of the existing surety bonds. . . .

RESPONSE:

Neither the Plan nor Disclosure Statement provides that any bonds will be split, assumed, assigned, or otherwise transferred.  To the extent a surety has any claims against the Debtors that become allowed, such claims will be treated in accordance with the Plan.

59.     Existing bonds, assuming they are non-cancellable, will cover Fieldwood Energy, LLC, which will now be a predecessor.  Credit Bid Purchaser cannot pledge a predecessor's bonds in which it has no interest based upon the plain language of the BOEM regulations. See 30 C.F.R. §§ 556.900, 901  If the Government attempted to permit such pledging by Credit Bid Purchaser of the predecessor bonds, the sureties would maintain suretyship defenses against the Government if the Government ever attempted to draw on those bonds for failing to enforce its regulations.

ii.     ***This Plan has been Pending Since January 1 and the Debtors are Just Now Concerning themselves with this Critical Piece of the Puzzle—New Bonding***

60.     The Debtors filed their initial Plan of Reorganization [Dkt. No. 722] and Disclosure Statement [Dkt. No. 723] on January 1, 2021.  Since that time, the Debtors have had no communications with the Government regarding bonding for the companies being formed under the Plan, █████████████████████████████████████████████████████████ ████████████

61.     As with FWE I, this Plan is not feasible without an allocation of funding for the new bonding required for Credit Bid Purchaser to operate.

E.     **THE PLAN IS UNCONFIRMABLE BECAUSE, NOTWITHSTANDING THEIR ASSERTIONS TO THE CONTRARY, THE DEBTORS ARE ATTEMPTING TO ASSUME AND ASSIGN THE SURETY BONDS, WHICH THEY CANNOT DO BECAUSE THE SURETY BONDS ARE NON-ASSUMABLE FINANCIAL ACCOMMODATIONS**

62.     As set forth previously, the Debtors stated in their Answers to Discovery that the Plan does not contemplate the assumption or assignment of any surety bonds.[8]  But that is precisely what they are attempting to do.  The Debtors hope to be able to use the existing surety bonds to

---

[7] *See infra* Section E(i).

[8] *See infra* Section D(i).

satisfy their regulatory requirements with BOEM, in order to operate on a go-forward basis. ████

██████████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████████

████████ It is also clear because the Debtors have had no communications with the Government

regarding bonding for Credit Bid Purchaser.

63.    What the Debtors are attempting to do is circumvent the Bankruptcy Code's

prohibition on the assumption of financial accommodations. 11 U.S.C. 365(c)(2) ("[a debtor] may

not assume or assign any executory contract . . ., if-- . . . (2) such contract is a contract to make a

loan, or extend other debt financing or financial accommodations.").

64.    Surety bonds are financial accommodations. *Matter of Edwards Mobile Home

Sales, Inc.*, 119 B.R. 857, 859 (Bankr. M.D. Fla. 1990); *In re Wegner Farms Co.*, 49 B.R. 440,

446 (Bankr. N.D. Iowa 1985); *In re Thomas B. Hamilton Co., Inc.*, 969 F.2d 1013, 1019-20 (11th

Cir. 1992); Michael L. Cook & Gerald F. Munitz, Bankruptcy Litigation Manual, Assumption of

Executory Contracts § 6.03 (2021).

65.    The only exception to the inability of a debtor to assume financial accommodations

is when the counterparty to the contract consents to such assumption. *In re Charrington Worldwide

Enterprises, Inc.*, 98 B.R. 65, 68 (Bankr. M.D. Fla. 1989), *aff'd sub nom. In re Charrington

Worldwide Enter., Inc.*, 110 B.R. 973 (M.D. Fla. 1990) ("The legislative history of [365(c)(2)]

leaves no doubt that this exception to the assumability of executory contracts was drafted for the

purpose of assuring that contracts to extend credit which involves always a trust and confidence

akin to personal contracts should not be assumable without the consent of the other party to the

contract."); *In re TS Indus., Inc.*, 117 B.R. 682, 687-88 (Bankr. D. Utah 1990) (finding that

financial accommodations contracts can be assumed with consent); *In re Prime, Inc.*, 15 B.R. 216,

218 (Bankr. W.D. Mo. 1981) (noting that although the plain language of 365(c)(2) states that a financial accommodation contract cannot be assumed, "[t]he court is satisfied that, read in the context of the statutory powers given the trustee to operate a business, Section 365(c)(2) does permit assumption of a debt financing arrangement."); *In re Adana Mortgage Bankers, Inc.*, 12 B.R. 977, 988 (Bankr. N.D. Ga. 1980) (noting that financial accommodation contracts can be assumed with consent); *but see In re Sun Runner Marine, Inc.*, 945 F.2d 1089, 1092-94 (9th Cir. 1991) (finding that plain language of § 365(c)(2) does not permit assumption even with consent); *In re Falcon V, L.L.C.*, 620 B.R. 256, 266-67 (Bankr. M.D. La. 2020) (same).

66.     The Sureties have not consented to the assumption of their bonds and have no obligation to extend surety credit for any entity other than the principal for whom they issued bonds.

67.     Thus, because the surety bonds are non-assumable financial accommodations and because the Plan relies on the use of the surety bonds to satisfy regulatory requirements to operate, including the plugging and abandonment obligations, the Plan is unconfirmable.

**F.      THE PLAN IS UNCONFIRMABLE BECAUSE THE DEBTORS ARE ATTEMPTING TO REINCORPORATE IN TEXAS TO AVOID DELAWARE FRAUDULENT CONVEYANCE LAWS WITH RESPECT TO THE INDEMNITY AGREEMENTS FOR FWE I AND THEREFORE THE PLAN IS PROPOSED IN BAD FAITH**

68.     Section 1129(a)(3) of the Bankruptcy Code requires that a plan of reorganization be "proposed in good faith and not by any means forbidden by law." 11 U.S.C. § 1129(a)(3).  The requirement of good faith must be viewed "in light of the totality of the circumstances surrounding establishment of a Chapter 11 plan, keeping in mind the purpose of the Bankruptcy Code is to give debtors a reasonable opportunity to make a fresh start." *Matter of T-H New Orleans Ltd. Partnership*, 116 F.3d 790, 802 (5th Cir. 1997).  The inquiry of whether a plan of reorganization was proposed in good faith is "whether the plan represents a legitimate pursuit of reorganization

and not an attempt to abuse the confirmation process to achieve some improper purpose." *In re Food City, Inc.*, 110 B.R. 808, 814 (Bankr. W.D. Tex. 1990).  In determining whether a plan is proposed in good faith, the court "considers circumstances surrounding the plan to assess the subjective motive of debtors and plan proponents." *In re Texas Star Refreshments, LLC*, 494 B.R. 684, 694 (Bankr. N.D. Tex. 2013) (internal quotation marks omitted).  The debtor has the burden of proof, by a preponderance of the evidence, to prove that a plan of reorganization was proposed in good faith. *See Matter of T-H New Orleans Ltd. Partnership*, 116 F.3d at 801.

69.     The Sureties submit that the Plan proposed by the Debtors has not been proposed in good faith as required under section 1129(a)(3) of the Bankruptcy Code, because the conversion and divisive merger of Fieldwood from a Delaware limited liability company into several different Texas limited liability companies, including FWE I, as proposed under the Plan, impairs the rights and claims of the Sureties by effecting a fraudulent transfer.

70.     Under the Plan, the Debtors propose to split what remains of Fieldwood after the consummation of the Credit Bid Transaction, into three different limited liability companies—FWE I, FWE III and FWE IV (the "Divisive Merger"). [Dkt. No. 1285, p. 14].  However, even though Fieldwood is a Delaware limited liability company, which is allowed under section 18-217 of the Delaware Limited Liability Company Act (the "Delaware Act") to undergo a divisive merger governed by Delaware law, the Debtors propose to implement the Divisive Merger only after Fieldwood undertakes the extra step of converting from a Delaware limited liability company to a Texas limited liability company, subject to the Texas Business Organizations Code (the "TBOC"), and immediately following such conversion, implement the Divisive Merger under section 10.003 of the TBOC which permits a Texas business organization to undergo a merger that results in more

than one organization surviving the merger. *See* Tex. Bus. Org. § 10.003; *see also* Tex. Bus. Org. § 1.002(15).

71.     Under the terms of the Divisive Merger as between FWE I and FWE III, as set forth in the Agreement and Plan of Merger (the "Merger Agreement"), FWE I will be vested with the "FWE I Assets" (as defined in the Merger Agreement), consisting of certain assets of Fieldwood acquired from Apache. *See* Merger Agreement, Section 2(d) and Schedule I, Part A [Dkt. No. 1394-1, pp. 313, 329 – 334].  FWE I will also assume the "FWE I Obligations." *See* Merger Agreement, Schedule I, Part B [Dkt. No. 1394-1, pp. 334 – 335].

72.     With respect to FWE III, however, sections 2(f) and (g) of the Merger Agreement provide that FWE III will be vested with the remaining assets of Fieldwood (defined as "FWE III Assets" under the Merger Agreement), and assume the remaining obligations and liabilities of Fieldwood (defined as "FWE III Obligations" under the Merger Agreement), in each case after giving effect to the vesting of the "FWE I Assets" and assumption of the "FWE I Obligations" by FWE I.  In other words, if any obligation or liability of Fieldwood is not specifically assumed by FWE I as a "FWE I Obligation," such obligation or liability becomes the obligation or liability of FWE III.

73.     The definition of "FWE I Assets" specifically includes "surety bonds . . . and other forms of credit assurances or credit support provided by a third party for the benefit of Fieldwood for financial assurance for the obligations and liabilities arising out of or related to the FWE I Assets." *See* Merger Agreement, Schedule I, Part A, paragraph (xiv) [Dkt. No. 1394-1, p. 342]. However, the Merger Agreement fails to allocate to FWE I the indemnity obligations of Fieldwood under the various indemnity agreements with the Sureties.  Therefore, the Debtors, through the Merger Agreement, separate the benefits of the bonds issued by the Sureties from the correlative

obligation to make the Sureties whole, by allocating the surety bonds to FWE I and the indemnity obligations to FWE III.

74.     Putting aside the fact that the surety bonds are not property of the Debtors' bankruptcy estates; the principal on the bonds cannot be substituted; and no surety has consented to have its surety bonds "allocated" to FWE I or FWE III,[9] the allocation of assets and liabilities proposed by the Debtors in the Merger Agreement yields the following absurd result: FWE I bears responsibility for performing the decommissioning obligations for the FWE I Assets, and if it fails to do so, it is protected by the bonds issued by the Sureties; however, once the Sureties seek to collect on their indemnity obligations under their respective indemnity agreements for the liabilities they incurred on their bonds, their recourse will be limited to FWE III only.  Under the terms of the Merger Agreement, FWE III, after the Divisive Merger, will not have any interest in the assets currently owned by Fieldwood that are being assigned to FWE I and to which the Sureties' bonds relate.  In addition, FWE III is expected to be insolvent, having an estimated mid-point enterprise value of negative $28 million[10] and owning assets that will "generate *de minimis*, if any, production prior to decommissioning," per the valuation analysis undertaken by the Debtors' own financial advisor Houlihan Lokey. *See* Disclosure Statement, Exhibit N [Dkt. No. 1285-2, p. 437].

75.     Under Delaware law, the vesting of assets and allocation of obligations and liabilities as proposed by the Debtors in the Merger Agreement would constitute a fraudulent transfer, as FWE III would not receive "reasonably equivalent value in exchange for the transfer

---

[9] *See infra* section C(ii)

[10] *See* Disclosure Statement, Exhibit N [Dkt. No. 1285-2, p. 437].

or obligation," and FWE III would "engage in a business or a transaction for which the remaining assets of [FWE III] were unreasonably small in relation to the business or transaction." 6 Del. C. § 1304(a)(2)(a). In fact, FWE III would stand to receive little to no value in the Divisive Merger, despite being the sole party in the Divisive Merger who assumes the Sureties' indemnity obligations, which obligations could ultimately be in the hundreds of millions of dollars.

76. The vesting of assets and allocation of obligations and liabilities as proposed by the Debtors in the Merger Agreement is expressly precluded under Delaware law. The Delaware Act provides that "in the event that any allocation of assets, debts, liabilities and duties to division companies in accordance with a plan of division is determined by a court of competent jurisdiction to constitute a fraudulent transfer, each division company shall be jointly and severally liable on account of such fraudulent transfer notwithstanding the allocations made in the plan of division." 6 Del. C. § 18-217(l)(5). In other words, the Delaware Act does not tolerate or respect an allocation of liabilities in a divisive merger that results in a fraudulent transfer with respect to any of the entities that result from a divisive merger.

77. To date, the Debtors have not advanced any justification for why they seek to convert Fieldwood into a Texas limited liability company and effect the Divisive Merger under the TBOC, as opposed to a divisive merger of Fieldwood under the Delaware Act. There is nothing in the Delaware Act that would prohibit Fieldwood, which already exists as a Delaware limited liability company, from splitting itself into three different Delaware limited liability companies under the Delaware Act. In the absence of any justification for this extra step, the Sureties submit that by converting Fieldwood into a Texas limited liability company immediately prior to the Divisive Merger, the Debtors are seeking to use the bankruptcy confirmation process to escape the strictures of the Delaware Act and its prohibition of fraudulent transfers through a divisive merger,

and avail themselves of the statutory scheme established by the TBOC which does not expressly preclude such fraudulent transfers.[11]  This attempted fraudulent transfer is to the detriment of the Sureties whose recourse with respect to indemnity obligations under their bonds will be limited to the assets of an insolvent company.

G.     **THE PLAN IS UNCONFIRMABLE BECAUSE, IN THE ALTERNATIVE TO THE FOREGOING, THE SURETIES BELIEVE THAT THE DEBTORS' ATTEMPT TO TRANSFER THE INDEMNITY OBLIGATIONS TO FWE III CONSTITUTES A FRAUDULENT CONVEYANCE UNDER TEXAS' UNIFORM FRAUDULENT TRANSFER ACT**

78.     In the alternative to the foregoing argument, the Sureties believe that the Debtors' attempt to transfer the Sureties' indemnity obligations to FWE III under the Divisive Merger constitutes a fraudulent transfer under Texas law.

79.     The Texas Uniform Fraudulent Transfer Act (Tex. Bus. Org. § 24.001, *et seq.*) is, for all intents and purposes, identical to the Delaware Uniform Fraudulent Transfer Act (6 Del. C. § 1301, *et seq.*).  Both prohibit a transfer or the incurrence of an obligation if the debtor made the transfer or incurred the obligation while insolvent and (1) "with actual intent to hinder, delay, or defraud any creditor; or (2) without receiving a reasonably equivalent value in exchange for the transfer or obligation." *See* Tex. Bus. Org. § 24.005; 6 Del. C. § 1304(a)(2)(a).

80.     The only difference between Texas and Delaware is that Texas' statutory scheme does not include the same express prohibition of fraudulent transfers in the context of divisive mergers that Delaware does at 6 Del. C. § 18-217(l)(5).  The TBOC also provides that a merger under the TBOC does not result in "any transfer or assignment having occurred."  Thus, it could

---

[11] As discussed in the next section, the Sureties believe that even under Texas law, the transfer of the indemnity obligations to FWE III would constitute a fraudulent transfer and be void.

be argued that the Texas UFTA cannot apply to allocations under a divisive merger, because there is no "transfer" taking place.

81.     The Sureties believe that such a position would be without merit, and it is unclear whether the Debtors would take such a position.  However, certainly the Texas Legislature did not intend to create a loophole whereby an entity can engage in fraudulent transfers under the UFTA, so long as they do so within the context of a divisive merger.  And in fact, to the Sureties' knowledge, the only author or other authority to have ever addressed the issue specifically stated that he expects that the UFTA would be found by a court to apply in the context of a Texas divisive merger, notwithstanding that the TBOC says that no "transfer" occurs in a merger. *See* Byron F. Egan, *Alternative Structures for Transfers of Businesses*, n.10 (2016) ("Although a merger will not involve a 'transfer' of assets in the traditional sense, and in fact TBOC § 10.008(a)(2)(C) of the TBOC provides that the allocation of assets in a merger occurs "without a transfer having occurred," the allocation of assets and liabilities in a merger likely constitutes both a 'transfer' and 'conveyance' of assets under both the letter and spirit of the UFTA and the Bankruptcy Code.").

82.     Thus, the Sureties submit that under either Delaware or Texas law, the Debtors' attempt to allocate the indemnity agreements to FWE III and the surety bonds to FWE I constitutes an impermissible fraudulent transfer.

**H.    THE PLAN IS UNCONFIRMABLE BECAUSE THE DEBTORS CANNOT ASSUME THE DECOMMISSIONING AGREEMENT AND REJECT THE ASSOCIATED INDEMNITY AGREEMENTS**

83.     The Plan documents contemplate that the Debtors will be assuming the Decommissioning Agreement as part of the Plan, and in fact the Debtors just moved before this Court on May 27, 2021 to assume the Decommissioning Agreement. [Dkt. No. 1395, p.10].  The Decommissioning Agreement was executed alongside the surety bonds in favor of Apache, as well as the indemnity agreements in favor of the sureties.   These three documents (the

Decommissioning Agreement, the surety bonds and the indemnity agreements) were part of a single, tripartite transaction between Fieldwood, the sureties and Apache. Restatement (Third) of Suretyship & Guaranty § 1 (1996) (discussing the tripartite contractual relationship between a surety, its principal and the obligee); *see also Liberty Mut. Ins. Co. v. Aventura Eng'g & Const. Corp.*, 534 F. Supp. 2d 1290, 1304 (S.D. Fla. 2008) (discussing the tripartite contractual relationship between a surety, its principal and the obligee) (citing *Dadeland Depot, Inc. v. St. Paul Fire & Marine Ins. Co.*, 945 So. 2d 1216, 1226 (Fla. 2006)).

84.     These three documents, which were executed as part of the same transaction, constitute a single contract. *See Castro v. Peck*, CVA97-003, 1998 WL 689645, *5 (Guam Apr. 7, 1998) (finding that a construction contract, performance guaranty and indemnity agreement together constituted a single contract) (citing *Boteler v. Conway*, 56 P.2d 587, 588 (Cal. Ct. App. 1936)); *Mayer v. Transnation Title Ins. Co.*, B147731, 2002 WL 1503080, *5 (Cal. Ct. App. July 15, 2002) (holding that an insurance agreement and associated indemnity agreement constituted a single contract); *St. Paul Fire & Marine Ins. Co. v. Tennefos Const. Co.*, 396 F.2d 623, 628 (8th Cir. 1968) (holding that a surety bond and all related instruments, including the bonded contract, are to be construed as a single contract); *Chambliss/Jenkins Associates v. Forster*, 650 P.2d 1315, 1318 (Colo. App. 1982) ("When an agreement between parties is contained in more than one instrument, those instruments must be construed together as though they comprise[] a single document.") (citing *Fuller & Co. v. Mountain States Investment Builders*, 546 P.2d 977 (Colo. App. 1975)).

85.     "It is well established that as a general proposition an executory contract must be assumed or rejected in its entirety." *Stewart Title Guar. Co. v. Old Republic Nat. Title Ins. Co.*, 83 F.3d 735, 741 (5th Cir. 1996). "When an executory contract contains several agreements, the

debtor may not choose to reject some agreements within the contract and not others." *Id.* A "debtor seeking to assume a contract must assume the contract warts and all." *In re Fifth Taste Concepts Las Olas, LLC*, 325 B.R. 42, 48 (Bankr. S.D. Fla. 2005) (citing *In re St. Johns Home Health Agency, Inc.*, 173 B.R. 238, 246 (Bankr. S.D. Fla. 1994)); *see also In re B & L Oil Co.*, 782 F.2d 155, 159 (10th Cir. 1986) (holding that a party assuming a contract in bankruptcy may not assume the benefits of an executory contract and not the burdens).

86.     Here, the Debtors are assuming the Decommissioning Agreement but have not moved to assume the associated indemnity agreements.  That is not permissible.  If the Debtors are going to assume the Decommissioning Agreement, they must assume all of its benefits, as well as its burdens.  The Decommissioning Agreement was executed as part of the same transaction as the surety bonds and the indemnity agreements.  They are all part of one transaction, and constitute a single contract.  Thus, the Debtors (via FWE I) must assume the indemnity obligations under the indemnity agreements if they are going to assume the Decommissioning Agreement.

I.      **THE PLAN IS UNCONFIRMABLE BECAUSE APACHE IS BEING TREATED DIFFERENTLY THAN SIMILARLY SITUATED CREDITORS IN VIOLATION OF SECTION 1123(A)(4), AND BECAUSE THE ORGANIZATIONAL DOCUMENTS FOR FWE I VIOLATE SECTION 1123(A)(6) AND (7)**

87.     Apache is a class 6B unsecured creditor under the Plan. **Exhibit L**, Debtors' Answer to Interrogatory No. 26.  The sureties with FWE I bonds running in favor of Apache are also class 6B unsecured creditors (the "Apache Sureties").

88.     Section 1123(a)(4) of the Bankruptcy Code provides that "[n]otwithstanding any otherwise applicable nonbankruptcy law, a plan shall . . . provide the same treatment for each claim or interest of a particular class, unless the holder of a particular claim or interest agrees to less favorable treatment of such claim or interest." 11 U.S.C. § 1123(a)(4); *see also In re Energy Future Holdings Corp.*, 648 Fed. Appx. 277, 283 (3d Cir. 2016) ("Section 1123(a)(4) embodies the

principle that all similarly situated creditors in bankruptcy are entitled to equal treatment."); *In re CSC Indus., Inc.*, 232 F.3d 505, 508 (6th Cir. 2000) ("[A] fundamental objective of the Bankruptcy Code is to treat similarly situated creditors equally.").

89.     The rise or fall of FWE I affects both the Apache Sureties and Apache.  Yet, under the organizational documents the Apache Sureties have no voice or control over the operation of FWE I, but Apache obtains significant control over the company, as well as other valuable benefits.

90.     The organizational documents for FWE I include: (a) a new limited liability company operating agreement for FWE I (the "FWE I LLC Agreement") [Dkt. No. 1394-1, p.7], (b) a transition services agreement between FWE I and Credit Bid Purchaser (the "FWE I TSA") [Dkt. No. 1394-1, p. 63], (iii) a farmout agreement between FWE I and Credit Bid Purchaser (the "FWE I Farmout Agreement") [Dkt. No. 1394-2, p. 109], and (iv) a standby loan agreement under which Apache will make "loans" to FWE I (the "Standby Facility") [Dkt. No. 1394-1, p. 602].

91.     Under the FWE I LLC Agreement, FWE I will have one officer, the Sole Manager, and no employees. [Dkt. No. 1394-1, p. 37].  FWE I will rely on the use of employees from NewCo under the FWE I TSA to conduct its operations. [Dkt. No. 1394-1, p. 38].

92.     The FWE I LLC Agreement grants Apache *de facto* control over FWE I. Specifically, sections 7 and 10 of the FWE I LLC Agreement grant Apache:

a.  Veto rights over the selection of the independent director of FWE I, who cannot be removed without Apache's consent [Section 7.02];

b.  Consent rights over the removal of the Sole Manager of FWE I [Section 7.03];

c.  Consent and information rights for bids for service providers to conduct P&A operations [Section 7.04];

36

d.  Consent rights as to sales, fundamental business transactions, or farm-ins [Section 7.06];

e.  Consent rights as to farmouts [Section 7.06];

f.  Consent rights with regard to any development activities, including those with positive or accretive investment profiles [Section 7.06];

g.  Consent rights over incurring indebtedness other than provided under the Standby facility with the sole exception of a revolving line of credit that can only be secured on a subordinated basis to the Standby Facility and can only be established, drawn, or repaid if there is no event of default under the Standby Facility [Section 7.06];

h.  Payment or reimbursement of Apache's costs and expenses, including "costs of compensation and benefits of officers and employees of Apache and its Affiliates . . . which costs shall be determined in good faith by Apache," even when "such costs are not direct, out-of-pocket costs incurred by Apache under the Decommissioning Agreement." [Section 7.06];

i.  Right of first refusal and information rights for the funding of capital expenditures [Section 7.09];

j.  Information rights as to monthly operating data and operating budget [Section 10.01]; and

k.  Inspection rights [Section 10.01].

93.     Apache also enjoys consent rights over the selection of P&A service providers under the FWE I TSA [Dkt. No. 1394-1, p. 63] and rights under the FWE I Farmout Agreement Dkt. No. 1394-2, p. 109.

94.     Additionally, and as already discussed, there is little-to-no capital in FWE I to fund any projects.  Capital is not injected into the company unless it comes from the Standby Facility or the Farmout Agreement.  Under the organizational documents, the Standby Facility is termed a "loan" from Apache in the amount of $400 million, but it is not a "loan" at all.  Apache is a predecessor on the FWE I Assets and is already legally responsible for backstopping FWE I.  All the Debtors have done under their Plan is put lipstick on a pig by taking Apache's joint and several obligation as a predecessor and labeling it as a "loan," so that they can provide Apache with favorable treatment.  The Apache Sureties were never given an opportunity to participate in the funding or control of FWE I, and were never given an opportunity to obtain the same benefits given to Apache.

95.     Under the Standby Facility, the funds cannot be accessed until all of the Decommissioning Security (including the letters of credit and surety bonds) is exhausted. [Dkt. No. 1394-1, p. 628-29]  Then Apache gets to use its "loan" to inject capital into the assets and extract all of the value for itself.  Not only does Apache get to use its Standby Facility to inject capital into the assets and extract value for itself, but the Standby Facility has to be paid back at a significant interest rate by FWE I [Dkt. No. 1394-1, p. 622], and it gives Apache a security interest on all of the FWE I Assets [Dkt. No. 1394-1, p. 659].  Moreover, the Farmout Agreement, assuming it is utilized,[12] takes value out of FWE I and gives it to the secured creditors by permitting Credit Bid Purchaser to fund certain capital projects, and then after it gets paid back for its expenses, splitting the profits with FWE I. [Dkt. No. 1394-2, pp. 122-125].  This entire

---

[12] There are presently no projects anticipated to be capitalized under the Farmout Agreement according to the Debtors. *See* **Exhibit M**, Debtors' Response to Request for Production No. 2.

arrangement between the Debtors, the secured lenders and unsecured creditor Apache was done behind closed doors and with no involvement of the Apache Sureties.

96.     Because of the significant benefits bestowed upon unsecured creditor Apache under the Plan, and because those benefits were not offered to the Apache Sureties, the Plan violates section 1123(a)(4) of the Bankruptcy Code because it treats similarly situated creditors differently.

97.     For the same reasons, the Plan also violates Bankruptcy Code sections 1123(a)(6) and (7). These provisions "require that the court scrutinize *any* plan which alters voting rights or establishes management in connection with a plan of reorganization, whether or not the plan provides for the issuance of new securities." *In re Acequia, Inc.*, 787 F.2d 1352, 1361 (9th Cir. 1986) (emphasis in original); *see also In re Ahead Commc'ns Sys., Inc.*, 395 B.R. 512, 518 (D. Conn. 2008) (noting that section 1123(a)(6) "codifies a position long supported by the Securities and Exchange Commission that participation in, and control of, the selection of management of a reorganized debtor must be considered as part of a fair and equitable plan and provided for accordingly") (citing 7 *Collier on Bankruptcy*, p.1123.01). "The drafters of 1123(a)(6) expressed concern with ensuring 'fair and equitable reorganization,' which 'is literally the last chance to conserve for [the creditors] values that corporate financial stress or insolvency have placed in jeopardy.'" *Id.* (citing S. Rep. No. 989, 95th Cong., 2d Sess. 11 (1978), *as reprinted in* 1978 U.S.C.C.A.N 5787, 5797).

**J.     THE PLAN IS UNCONFIRMABLE BECAUSE THE DEBTORS HAVE NOT MARKETED THE FWE I ASSETS, AND THERE IS NO SALE PROVISION IN THE FIELDWOOD I LLC AGREEMENT, AND THEREFORE THE PLAN IS NOT PROPOSED IN GOOD FAITH**

98.     Upon information and belief, there is significant value to be extracted from the Legacy Apache Properties, and there are potential buyers in the market for these assets. ██████

████████████████████████████████████████████████████████

████████████████████████████████████  ████████████████████.

Mike Dane Deposition Transcript, 72:1-81:3.  And the Debtors have also failed to market any of the FWE I Assets. **Exhibit O**, Debtors' Answer to Interrogatory No. 5.

99.      Even if a purchaser of the assets provided no monetary consideration for the assets, and simply agreed to assume the liabilities, that could provide significant value to the estate—and specifically the sureties, predecessor owners and Apache.  The way the reorganization is currently structured provides little capital to invest in the FWE I Assets, thereby greatly reducing the return on those assets.  All of the free cash flow of FWE I (after operating expenses) is to be used solely to fund decommissioning. [Dkt. No. 1394-1, p. 40] ("Without the prior written consent of Apache . . . the Company shall not do . . . any of the of the following: . . . use its free cash flow (after operating expenses) for any purposes other than fulfilling its obligations to Apache under the Decommissioning Agreement and the Standby Facility Documentation . . ."). It cannot be invested back into the company. *See id.*

100.      The only way for FWE I to maximize the value of its assets is to either (1) farm out the assets to the Credit Bid Purchaser (with Apache consent), in which circumstance the Credit Bid Purchaser retains a significant amount of the profits [Dkt. No. 1394-2, pp. 122-125], or (2) use capital loaned from Apache under its Standby Facility to capitalize the assets and maximize their value [Dkt. No. 1394-1, p. 602].

101.      The sole beneficiaries of this scheme are Apache and the Credit Bid Purchaser.  The Standby Facility does not come into play until after all of the Decommissioning Security (*i.e.*, Trust A and the surety bonds in Trust A) has been exhausted. [Dkt. No. 1394-1, p. 628-29] ("The obligation of the Lender to make each Loan . . . is subject to the satisfaction of the following conditions: . . . (c) All amounts in the Trust A Account, the Letters of Credit, and the Permitted Surety Bonds have been fully exhausted or are not available to pay or reimburse Lender for

Decommissioning.").  In other words, there is no capital to invest in the FWE I Assets until the sureties are completely out of the picture and their surety bonds have been exhausted.

102.    This is patently unfair to the sureties who bonded these assets in reliance on the strength of the assets, which assets will have their value maximized and depleted solely in favor of the Credit Bid Purchaser and unsecured creditor Apache.  As stated previously, not only does unsecured creditor Apache receive the benefit of maximizing and depleting the assets in its favor for purposes of completing the decommissioning, but it also receives a high interest rate from FWE I for all of the "loans" it makes under its Standby Facility. [1394-1, p. 622].  And it receives a security interest in all of the FWE I Assets. [Dkt. No. 1394-1, p. 626].

103.    It is clear that the parties to the Restructuring Support Agreement have creatively crafted this Plan so as to extract all of the value associated with the Legacy Apache Properties solely for their benefit—which parties include unsecured creditor Apache.  The Debtors have made no attempt to market and sell the Legacy Apache Properties for this reason.  Nor do the provisions of the Fieldwood I LLC Agreement provide for the sale of the assets in the event a purchaser is found, which further protects the Restructuring Support Agreement parties' arrangement.

104.    This lack of marketing efforts to sell the Legacy Apache Properties, and the lack of a provision in the Fieldwood I LLC Agreement permitting the sale of the Legacy Apache Properties does not comport with the good faith requirement of section 1129(a)(3) of the Bankruptcy Code and thus the Plan is unconfirmable.

## K.    THE PLAN IS UNCONFIRMABLE BECAUSE THE EXCULPATION PROVISIONS VIOLATE FIFTH CIRCUIT PRECEDENT AND 11 U.S.C. § 524

105.    Section 524(e) of the Bankruptcy Code states, in relevant part, that the "discharge of a debt of a debtor does not affect the liability of any other entity on . . . such debt." 11 U.S.C. § 524(e). The Fifth Circuit in the matter of *In re Pac. Lumber Co.* relied on section 524(e) when it

held that non-consensual third party releases and exculpations were not permitted in a chapter 11 plan of reorganization, except for a committee of unsecured creditors and its members. *In re Pac. Lumber Co.*, 584 F.3d 229, 251-253 (5th Cir. 2009). The court in *Pacific Lumber Co.* dealt with an exculpation clause which released the debtor's asset purchaser, the debtor, the unsecured creditors committee, and committee's personnel from any liability other than willful and gross negligence relating to the plan. *Id.* at 251.  The court in *Pacific Lumber Co.* used exculpation and non-debtor release interchangeably, as they essentially serve the same purpose—*i.e.*, the exculpation applies to post-petition conduct while the release applies to pre-petition conduct.  The court stated that:

> We see little equitable about protecting the released non-debtors from negligence suits arising out of the reorganization . . . the essential function of the exculpation clause proposed here is to absolve the released parties from any negligent conduct that occurred during the course of the bankruptcy. The fresh start § 524(e) provides to debtors is not intended to serve this purpose.

*Id.* at 252-253.

106.    Since the decision in *Pacific Lumber Co.*, courts in the Fifth Circuit have soundly rejected non-consensual third-party releases and exculpations. *See, e.g.*, *In re Pilgrim's Pride Corp.*, No. 08-45664-DML-11, 2010 WL 200000, at *5 (Bankr. N.D. Tex. Jan. 14, 2010) (holding that "because *Pacific Lumber* is binding precedent, the court may not, over objection, approve through confirmation of the Plan third-party protections, other than those provided to the Committees, members of the Committees, and the Committees' Professionals"); *see also In re Patriot Place, Ltd.*, 486 B.R. 773, 824 (Bankr. W.D. Tex. 2013) ("[T]he Court must conclude that the Non–Debtor Releases/Exculpations proposed in the PPL Plan are vague, overbroad, and do not comply with Fifth Circuit precedent and the Bankruptcy Code because they are non-consensual. Confirmation of the PPL Plan must therefore be denied for this reason as well."); *In re Bigler LP*,

42

442 B.R. 537, 543 (Bankr. S.D. Tex. 2010) (finding that overly broad release/exculpation provisions were impermissible, except those provisions which gave parties the opportunity to opt-out of them); *In re Southern Foods Group, LLC*, Case No. 19-36313, Dkt. No. 3400, p. 19 (Bankr. S.D. Tex. March 4, 2021) (although the exculpation provisions in the plan applied to parties other than the unsecured creditors' committee, the court overruled the United States Trustee's objection to the exculpation provisions because parties had the opportunity to opt-out of them).

107.    In the instant case, the Plan has both Release and Exculpation provisions. [Dkt. No. 1284, pp. 77-82].  The creditors which are entitled to vote on the Plan are given the opportunity to op-out of the Release provisions, which renders the Release provisions non-binding on such creditors and consensual to any creditors who choose not to opt-out.  As such, the Release provisions of the Plan do not violate the holding in *Pacific Lumber Co.*, even though they release more parties than just a creditors' committee and its members.

108.    Conversely, the Plan does not give voting creditors the opportunity to opt out of the Exculpation provision.  Moreover, the Exculpation provision in the Plan, just as the Release provision, purports to exculpate significantly more parties than just the unsecured creditors' committee and its members.  The Plan defines "Exculpated Parties" as:

> (a) the Debtors, (b) the Post-Effective Date Debtors, (c) FWE I, (d) the DIP Agent and DIP Lenders under the DIP Facility, (e) the Prepetition FLFO Secured Parties, (f) the Consenting Creditors, (g) the Prepetition FLFO Collateral Agent, (h) the Prepetition FLTL Agents, (i) the Prepetition SLTL Agent, (j) the Creditors' Committee and the current and former members of the Creditors' Committee (solely in their capacities as such), (k) NewCo and all of its subsidiaries (including the Credit Bid Purchaser), (l) the Exit Facility Agents, (m) the Exit Facility Lenders, (n) the Second Lien Backstop Parties, (o) the ERO Backstop Parties, (p) the Apache PSA Parties, and (q) with respect to each of the foregoing Persons in clauses (a) through (p) each of their current and former affiliates, and each such Entity's and its current and former affiliates' current and former directors, managers, officers, equity holders (regardless

of whether such interests are held directly or indirectly), predecessors, successors, and assigns, subsidiaries, and each of their current and former officers, members, managers, directors, equity holders (regardless of whether such interests are held directly or indirectly), principals, members, employees, agents, managed accounts or funds, management companies, fund advisors, investment advisors, advisory board members, financial advisors, partners (including both general and limited partners), attorneys, accountants, investment bankers, consultants, representatives and other professionals, such Persons' respective heirs, executors, estates, and nominees, in each case in their capacity as such, and any and all other persons or entities that may purport to assert any cause of action derivatively, by or through the foregoing entities.

[Dkt. No. 1284, p. 14].

109.    Such an extensive list of exculpated parties violates the holding in *Pacific Lumber Co.* Further, the Plan's Exculpation provision is extremely overbroad, as it applies to almost *any* claim in connection with or arising from an extensive list of over twenty topics, beginning with administration of these Chapter 11 Cases.  Moreover, similarly to *Pacific Lumber Co.,* the Plan does allow claims for *gross* negligence and willful misconduct against the Released and Exculpated Parties, and the Plan also allows claims for fraud.  However, the court in *Pacific Lumber Co.* expressly held that exculpation against plain negligence claims as to third parties is wholly inequitable, which is precisely what the Debtors' Plan proposes to accomplish.

110.    Additionally, the question of whether the bankruptcy court has jurisdiction to approve third party releases and exculpations has long been the subject of contention.  "One of the central purposes—perhaps *the* central purpose—of extending bankruptcy jurisdiction to actions against certain third parties . . . is to 'protect the assets of the estate' so as to ensure a fair distribution of those assets at a later point in time. *In re Quigley Co., Inc.*, 676 F.3d 45, 57 (2d Cir. 2012).  "When a court exercises *in personam* authority, it addresses a claim for liability, such as one involving a claim for money damages, against a particular party." *See* Restatement (Second)

of Judgments § 2 cmt. b, at 36–37; *Black's Law Dictionary* 930 (9th ed. 2009) (defining "personal jurisdiction"); *see also Ret. Sys. of Ala. v. J.P. Morgan Chase & Co.*, 386 F.3d 419, 426 (2d Cir. 2004) ("[A]n *in personam* action involves a controversy over liability rather than over possession of a thing.").   In contrast, the bankruptcy court's *in rem* authority is, for the most part, limited to the resolution of claims against the property in the bankruptcy estate. *See* Restatement (Second) of Judgments § 2 cmt. b, at 37; *see also Black's Law Dictionary* 929 (9th ed. f2009) (defining *in rem* jurisdiction as "[a] court's power to adjudicate the rights to a given piece of property").

111.    Further, the court in the matter of *In re Johns-Manville Corp* held that "a bankruptcy court only has jurisdiction to enjoin third-party non-debtor claims that directly affect the *res* of the bankruptcy estate." *Travelers Cas. & Sur. Co. v. Chubb Indem. Ins. Co. (In re Johns-Manville Corp.)*, 517 F.3d 52, 66 (2d Cir. 2008).   "Even where the court has jurisdiction, third party releases are proper only in rare and unique circumstances . . . [because] the Bankruptcy Code does not expressly authorize third party releases except under 11 U.S.C. § 524(g) . . . [and because] a third party release is a 'device that lends itself to abuse' because it effectively operates as a bankruptcy discharge without the necessity to file a bankruptcy." *In re SunEdison, Inc.*, 576 B.R. 453, 461-62 (Bankr. S.D.N.Y. 2017) (citing *Deutsche Bank AG v. Metromedia Fiber Network, Inc. (In re Metromedia Fiber Network, Inc.)*, 416 F.3d 136, 142 (2d Cir. 2005).

112.    In the instant case, the Plan's Exculpation provision purports to exculpate various third parties from liability for a broad variety of potential claims, including negligence. Consequently, the Exculpation provision seeks to implicate the court's *in personam* jurisdiction, rather than *in rem* jurisdiction, which is impermissible as set forth in *In re Johns-Manville Corp*. Further, the fact that voting creditors are unable to opt-out of the Exculpation provision in the Plan as to third parties renders such provision as non-consensual, which is prohibited by *Pacific Lumber*

*Co.* Moreover, the non-consensual Exculpation provision is overly broad, and exculpates more than just an unsecured creditors' committee and its members, which has long been prohibited in the Fifth Circuit. As such, the Exculpation provision in the Plan cannot be approved.

## IV. JOINDER OF OTHER SURETIES' OBJECTIONS

113. Upon information and belief, several other sureties that bonded certain obligations of the Debtors will also be filing objections to confirmation of the Plan. Those objections are expected to be substantially similar in nature to this Objection. To the extent the other sureties' objections do not conflict with the objections contained herein, the Sureties hereby join and incorporate by reference all objections and arguments made by the other sureties in objecting to the Plan.

## V. RESERVATION OF RIGHTS

114. The Sureties reserve all rights, claims, defenses, and remedies, including, without limitation, to supplement and amend this Objection,[13] to raise further and other objections, to introduce evidence prior to or at any hearing regarding Plan confirmation in the event the Sureties' objections are not resolved prior to such hearing, or to seek to introduce documents or other relevant information in support of the positions set forth in this Objection.

## VI. CONCLUSION

115. For the reasons stated herein, the Sureties respectfully submit that the Court should deny confirmation of the Plan.

---

[13] The Sureties specifically reserve the right to supplement with respect to issues raised/discussed in the Jon Graham or Apache 30(b)(6) depositions, which through no fault of the Sureties, and by agreement of the parties, are scheduled to take place on June 2 and June 3, respectively.

Dated: June 2, 2021

Respectfully submitted,

HUSCH BLACKWELL LLP

By:  _/s/ Randall A. Rios_____
     Randall A. Rios
     State Bar No. 16935865
     Timothy A. Million
     State Bar No. 24051055
     600 Travis, Suite 2350
     Houston, Texas 77002
     Tel:  713-525-6226
     Fax:  713-647-6884
     Email:  randy.rios@huschblackwell.com
     Email:  tim.million@huschblackwell.com

**CO-COUNSEL FOR ASPEN AMERICAN INSURANCE COMPANY, BERKLEY INSURANCE COMPANY, EVEREST REINSURANCE COMPANY AND SIRIUS AMERICA INSURANCE COMPANY**

-AND-

Armen Shahinian, Esq. (admitted _pro hac vice_)
(ashahinian@csglaw.com)
Scott A. Zuber, Esq. (admitted _pro hac vice_)
(szuber@csglaw.com)
Darren Grzyb, Esq. (admitted _pro hac vice_)
(dgrzyb@csglaw.com)
Jase A. Brown, Esq. (admitted _pro hac vice_)
(jbrown@csglaw.com)

Chiesa Shahinian & Giantomasi PC
One Boland Drive
West Orange New Jersey 07052

**ATTORNEYS FOR ASPEN AMERICAN INSURANCE COMPANY, BERKLEY INSURANCE COMPANY, EVEREST REINSURANCE COMPANY AND SIRIUS AMERICA INSURANCE COMPANY**

## <u>CERTIFICATE OF SERVICE</u>

I certify that on June 2, 2021, a copy of this document was served by electronic service on all counsel of record via the Court's CM/ECF system.

*/s/ Randall A. Rios*
Randall A. Ríos
