**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| FIELDWOOD ENERGY, LLC, *et al.*,[1] | ) | Case No. 20-33948 (MI) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

**RIDGEWOOD KATMAI, LLC AND ILX PROSPECT KATMAI, LLC'S
OBJECTION TO DEBTORS' JOINT CHAPTER 11 PLAN OF REORGANIZATION
AND SCHEDULE OF ASSUMED CONTRACTS AND CURE AMOUNTS**

Ridgewood Katmai, LLC ("Ridgewood") and ILX Prospect Katmai, LLC ("ILX Prospect," and together with Ridgewood Katmai, the "Non-Op WIOs"), by and through their counsel, respectfully submit this objection (the "Objection") to confirmation of the *Fourth Amended Joint Chapter 11 of Plan of Fieldwood Energy LLC and its Affiliated Debtors* [Docket No. 1284] (as amended, modified, or supplemented from time to time hereafter, the "Plan") and to the *Notice to Contract Parties to Executory Contracts and Unexpired Leases of the Schedule of Assumed Contracts and Cure Amounts* [Docket No. 1395] (the "Cure Schedule").[2]   In support of the Objection, the Non-Op WIOs incorporate the Declaration of Edward Viterbo (the "Viterbo Declaration"), which is being filed concurrently herewith.  This Objection is limited in light of the undisputed facts and Debtors' admissions:

---

[1] The debtors in these chapter 11 cases, along with the last four digits of each debtor's federal tax identification number, are: Dynamic Offshore Resources NS, LLC (0158); Fieldwood Energy LLC (6778); Fieldwood Energy Inc. (4991); Fieldwood Energy Offshore LLC (4494); Fieldwood Onshore LLC (3489); Fieldwood SD Offshore LLC (8786); Fieldwood Offshore LLC (2930); FW GOM Pipeline, Inc. (8440); GOM Shelf LLC (8107); Bandon Oil and Gas GP, LLC (9172); Bandon Oil and Gas, LP (9266); Fieldwood Energy SP LLC (1971); Galveston Bay Pipeline LLC (5703); and Galveston Bay Processing LLC (0422). The Debtors' primary mailing address is 2000 W. Sam Houston Parkway S., Suite 1200, Houston, TX 77042.

[2] Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Plan or in the *Disclosure Statement for Fourth Amended Joint Chapter 11 Plan of Fieldwood Energy LLC and its Affiliated Debtors* [Docket No. 1285] (the "Disclosure Statement"), respectively.

- The Non-Op WIOs are secured creditors under the unit operating agreement discussed herein (defined below as the UOA);

- Pursuant to the UOA, Fieldwood Energy LLC ("Fieldwood") is obligated to, among other things, keep the leases free from liens, defend the Non-Op WIOs from any litigation or liens filed against the leases, and indemnify the Non-Op WIOs for any breaches by Fieldwood relating to the foregoing, and such indemnification obligations are secured under the UOA;

- The Atlantic Litigation (as such term is defined below) triggered Fieldwood's duty to defend and indemnify the Non-Op WIOs;

- As a result of this duty, Fieldwood bears liability for all expenses and costs incurred by the Non-Op WIOs on account of the Atlantic Litigation;

- The UOA is being assumed and assigned to the Credit Bid Purchaser under the Credit Bid Purchase Agreement (the "CBPA");

- In connection with the assumption and assignment, the Debtors are required to cure any existing breaches of the UOA, including those relating to Fieldwood's liability for costs and expenses incurred by the Non-Op WIOs on account of the Atlantic Litigation; and

- The amount of the Non-Op WIOs cure claims will be determined, at least in part, by this Court's ruling in the Atlantic Adversary (as such term is defined below).

*See Fieldwood Energy LLC v. Atlantic Maritime Services, LLC*, Adv. P. 20-03476 (May 25, 2021) at ECF No. 36, ¶¶ 3, 8, 23, 29, 31, 35, 37–38 (hereinafter "Fieldwood's Response to Atlantic's MTD").[3]

The Non-Op WIOs have proposed confirmation order language to the Debtors that would protect the Non-Op WIOs' contractual rights, cure the existing contract defaults, and provide adequate assurance of future performance under the UOA. The Debtors have not responded on whether they will include the language requested, however, necessitating this filing.

---

[3] The Debtors' statements constitute judicial admissions. *See Martinez v. Bally's Louisiana, Inc.*, 244 F.3d 474, 476–77 (5th Cir. 2001) ("A judicial admission is a formal concession in the pleadings or stipulations by a party or counsel that is binding on the party making them. Although a judicial admission is not itself evidence, it has the effect of withdrawing a fact from contention.").

## PRELIMINARY STATEMENT

1.      The Non-Op WIOs' objection is neither novel nor complicated—to the extent a party assumes the benefits of a contract, they must take the corresponding obligations and cure all monetary and non-monetary defaults.  Fieldwood has already explicitly acknowledged these obligations as well as their requirement to cure, making their attempts to limit or eliminate the contractual obligations assumed and assigned to the Credit Bid Purchaser and $0.00 cure estimate incomplete.   Moreover, the Non-Op WIOs have already paid their participating share of the obligations at issue; they should not be forced to now bear the Debtors' burden as well.

2.      The Debtors have identified certain oil and gas leases, along with the operational contracts relating thereto, for assumption and assignment under the Plan.  The Non-Op WIOs have held up their end of these agreements, paying every penny requested by Fieldwood in connection with their participating share of costs for work done on the oil and gas leases covered.  Nonetheless, third-party vendors have filed liens against the leases and, in the case of Atlantic Maritime Services, LLC ("Atlantic"), a lawsuit directly against the Non-Op WIOs.  As the Debtors explain, they are contractually bound to indemnify the Non-Op WIOs for "all expenses and costs incurred" in defending such liens and lawsuits, and the costs must be paid as part of their cure.

3.      The fundamental indemnification rights take on even greater significance in light of Atlantic's ongoing claims and litigation against Fieldwood and, among others, the Non-Op WIOs in both this Bankruptcy Court and the United States District Court for the Eastern District of Louisiana for the fees Fieldwood is alleged to have failed to pay.  In sum, Atlantic is suing the Non-Op WIOs for a double-dip payment rather than solely pursuing its claim in this Court against Fieldwood, who is the operator and the only party in privity with Atlantic.

4.      Given the Non-Op WIOs' mounting expenses, damages, and rights of indemnification against the Debtors, as well as Atlantic's inequitable attempt to end-run around the Bankruptcy Code and recover amounts owed by the Debtors from parties who have no privity or guaranty obligation to them, it is imperative that the Debtors include language in the Confirmation Order that preserves the Non-Op WIOs' indemnification rights against the Debtors and/or the Credit Bid Purchasers.  The inclusion of such language is consistent with the admissions by the Debtors in their pleadings to date, including the Adversary Complaint, Fieldwood's Response to Atlantic's MTD, and Fieldwood's MSJ.[4]

5.      The Non-Op WIOs cannot support a Plan that would strip them of their contractually provided protections and transfer to another a watered-down version of their operating agreement.   Notwithstanding the foregoing, the Non-Op WIOs support the reorganization set forth in the Debtors' Plan and have no objection to the assignment of the leases, provided that, proper cure and/or adequate assurance is provided.  If the Non-Op WIOs are to be held to all of their obligations under such contract or lease, then so must the transferee.

6.      In an effort to consensually resolve their concerns without the need for a formal objection, the Non-Op WIOs submitted to Debtors' counsel the paragraphs below for inclusion in the Confirmation Order (should the Court ultimately confirm the Plan), which would solve each of the issues identified herein.

> Notwithstanding anything to the contrary contained in this Order or in the RSA, the Disclosure Statement, the Plan, the Credit Bid Purchase Agreement, the Apache Term Sheet Implementation Agreement, or any document relating to the foregoing, the Credit Bid Purchaser has agreed to pay such amounts, in full, as would be necessary to completely indemnify and reimburse Ridgewood Katmai, LLC and ILX Prospect Katmai, LLC for all costs and reasonable expenses incurred in connection with the satisfaction of the statutory vendor liens filed against the

---

[4] *See Fieldwood Energy LLC v. Atlantic Maritime Services, LLC*, Adversary Proceeding 20-03476 (Nov. 24, 2020) at ECF Nos. 1 and 32  (hereinafter the "Adversary Complaint" and "Fieldwood's MSJ," respectively).

Acquired Interests (the "Lien Filings"), including, but not limited to, Atlantic Maritime Services, LLC's claims and litigation against Fieldwood Energy LLC ("Fieldwood") and, among others, Ridgewood Katmai, LLC and ILX Prospect Katmai, LLC in this Bankruptcy Court and the United States District Court for the Eastern District of Louisiana (collectively, the "Atlantic Litigation").

Notwithstanding anything to the contrary contained either herein or in the RSA, the Disclosure Statement, the Plan, the Credit Bid Purchase Agreement, the Apache Term Sheet Implementation Agreement, or any document relating to the foregoing, the transfer of leases OSC-G 34966, OSC-G 34536, OSC-G 34537, OSC-G 34878, OSC-G 34879, and OSC-G 34880 to the Credit Bid Purchaser shall be deemed to include all of transferor's interest in the Subject Unit Agreements, Easements, Wells, Inventory, Platforms, Facilities, Hydrocarbons, Permits, and/or Operating Agreements relating thereto, and the transferee shall take transferor's interest in each of the foregoing subject to the existing rights and obligations of the transferor as such existed immediately prior to the Petition Date, including any indemnity obligations or obligations relating to environmental condition, plugging, abandonment, and/or decommissioning operations.

Consistent with the foregoing, the security interests granted by Fieldwood to Ridgewood Katmai, LLC and ILX Prospect Katmai, LLC under Section 6.3 of the Unit Operating Agreement, dated effective April 1, 2018, shall continue to burden the working interest transferred to the Credit Bid Purchaser and shall continue to secure the payment of any obligations or liabilities relating thereto. Perfection of the liens and security interests granted to Ridgewood Katmai, LLC and ILX Prospect Katmai, LLC (or any related Ridgewood entity) shall occur automatically by virtue of the entry of this Confirmation Order, and any filings, recordings, approvals, or consents required by applicable state law shall not be required. Perfection of such interests shall relate back to the date in which such interests were perfected as against Fieldwood.

7.      If the Debtors accept the proposed language, pay the cure amounts as determined by this Court, and provide adequate assurance that the Debtors and/or the Credit Bid Purchaser will abide by *all* the indemnification obligations in the contracts on the assumed list, the Non-Op WIOs shall have no further objection to confirmation of the Plan.

## II.    BACKGROUND

### A.    Fieldwood and the Non-Op WIOs Enter Into Various Prepetition Agreements.

*1.    Unit Operating Agreement and the Operating Leases.*

8.      The Non-Op WIOs are the non-operating working interest owners in several oil and gas leases covering submerged lands on the Outer Continental Shelf situated in the Green Canyon area, blocks 39, 40, and 41, and the Ewing Bank area, blocks 1009, 1010, and 1011 (collectively, the "Operating Leases").[5]  Fieldwood serves as the operator for each of the Operating Leases, with the parties' relationship governed by the terms of a Unit Operating Agreement, dated effective April 1, 2018, by and between the Non-Op WIOs and Fieldwood (inclusive of all exhibits, attachments, and related agreements and as each of the foregoing may be amended, modified, or supplemented from time to time, the "UOA").  *See* UOA, § 4.1, attached as **Ex. A**.

9.      As the non-operators, the Non-Op WIOs' liability for any actions or debts incurred by Fieldwood is explicitly limited by the UOA, with the parties agreeing that any liability "shall be several, but limited in proportion to each party's proportionate share, and not joint, joint and several or collective." *Id.*, Ex. K to UOA, § 4.2.  Specifically, the UOA provides that each party "shall be responsible only for its proportionate share of the obligations" and "shall be liable only for its proportionate share of costs" incurred in connection with the UOA.  *Id.*

10.     Fieldwood and the Non-Op WIOs agreed on a method to establish their "proportionate share" of obligations and costs, specifying that such obligations and costs would be satisfied pursuant to a joint account maintained by Fieldwood through which all charges paid and credits received in connection with the joint activities and operations of the Operating Leases would pass (the "Joint Account").  *Id.*, § 6; *see also* Viterbo Declaration, ¶ 26.  In sum, the UOA

---

[5] The Operating Leases are more specifically identified as Lease Number OCS-G 34966, OCS-G 34536, OSC-G 34537, OSC-G 34878, OSC-G 34879, and OSC-G 34880.

sets up accounting procedures for the maintenance of the Joint Account and provides guidance for billing, reimbursement, and payment by Fieldwood and the Non-Op WIOs, as applicable, for certain labor, insurance, and overhead expenditures incurred over the course of operations. *Id.*, Ex. C to UOA.

11.     The UOA also imposes the burden on Fieldwood to, among other things "(i) keep the [Operating] Leases free and clear of all liens and encumbrances, (ii) defend the [Non-Op] WIOs in any litigation on the leases, and (iii) indemnify each of the [Non-Op] WIOs." *See* Fieldwood's Response to Atlantic's MTD, ¶ 8; UOA, § 5.4.  To the extent Fieldwood fails to satisfy any of these contractual obligations, the Non-Op WIOs will have a secured indemnification claim against Fieldwood for the amounts forced to pay.  *See* Fieldwood Response to Atlantic's MTD, ¶ 14 ("certain Debtors must indemnify the [Non-Op] WIOs under [the] joint operating agreement[]"); ¶ 23 (describing the Non-OP WIOs "secured indemnification claims"); ¶ 38 (describing the Debtors' duty to "defend and indemnify" the Non-Op WIOs).

12.     Under the UOA, Fieldwood grants the Non-Op WIOs a security interest in all of Fieldwood's right, title, and interest in all real and personal property in the area covered by the Operating Leases, which secures all amounts owed under the UOA, including any indemnification or contribution obligations, up to a maximum sum of $500 million, together with any interest, costs, and expenses thereon.  UOA, § 19.1 ("The Party creating the Lease Burden shall indemnify, release, defend, and hold all other Parties harmless from all Claims and demands for payment asserted by the owners of the Lease Burden."); Ex. F to UOA, § 6.3(a)(iii)–(iv).  The Non-Op WIOs perfected their security interest by filing a Memorandum of Unit Operating Agreement in the real property records of Jefferson and Plaquemines Parishes, Louisiana and Baldwin and

Mobile Counties, Alabama on March 23, 2020, and Terrebonne Parish, Louisiana on March 24, 2020 (the "Perfection Documents").  *See* Perfection Documents attached hereto as **Ex. B**.

13.     The Non-Op WIOs' perfected security interest is not extinguished upon the transfer of Fieldwood's interests under the UOA to a third party, but will instead continue to burden the working interest transferred and secure the payment of any retained obligations and liabilities. UOA, § 24.1, 24.1.4; *see also* Fieldwood's Response to Atlantic's MTD, ¶ 38.  Accordingly, the Non-Op WIOs are secured parties with respect to the Operating Leases.  *See* Fieldwood's Response to Atlantic's MTD, ¶ 32.

        *2.      Non-Payment of Amounts Due under Operating Leases.*

14.     Consistent with the UOA, Fieldwood is responsible for paying the monetary amount of all expenditures (or indebtedness) incurred by itself, as operator, or the Non-Op WIOs, as the non-operating participating parties, in the conduct operations on the Operating Leases. Additionally, Fieldwood is responsible for reimbursing the Non-Op WIOs for all "project team" costs incurred by the Non-Op WIOs in connection with operations. Ex. C to UOA.

15.     Beginning in June 2020, Fieldwood ceased paying the Non-Op WIOs some or all of the amounts due under various cash out or project team invoices.  In addition, beginning on or around July 2020, Fieldwood ceased paying certain third parties responsible for furnishing labor, equipment, machinery, materials, and related services to the Operating Leases in support of the development and exploration occurring thereon.  The Non-Op WIOs have already paid their participating share for these costs and expenses to Fieldwood through the Joint Account.  *See id.*, ¶ 4.[6]  Notwithstanding the Non-Op WIOs' payment to the Joint Account, Fieldwood's failure

---

[6] The Viterbo Declaration details the cash advance requests and Joint Account invoices made by Fieldwood to the Non-Op WIOs in connection with Atlantic costs and expenses.  Detailed descriptions of the accounting relating to any other of the Lien Filings can be made available upon request.  The Non-Op WIOs have not included detailed

to remit payment as operator has resulted in the certain third parties filing Lien Affidavits, Notice of Claim of Lien, and Statements of Privilege (collectively, the "Lien Filings") in the real property records for the various parishes in Louisiana adjacent to the Operating Leases.

3.    *Atlantic Maritime Lawsuit and Adversary Proceeding.*

16.    On November 13, 2020, Atlantic filed an *in rem* complaint against each of the Non-Op WIOs in the United States District Court for the Eastern District of Louisiana, seeking to enforce its alleged liens on certain of the Operating Leases and to collect just over $7 million from the Non-Op WIOs through the sequestration and sale of such Operating Leases.  *See Atlantic Maritime Services, LLC v. Ridgewood Katmai, LLC and ILX Prospect Katmai, LLC¸* Case No. 2:20-cv-03099 (JTM-JVM) at ECF No. 1, (E.D. La. Nov. 13, 2020) (the "Atlantic Lawsuit").

17.    Notably, at the time Atlantic commenced the Atlantic Lawsuit, the Non-Op WIOs had already paid Fieldwood in full for their proportionate share of Atlantic-billed costs. *See* Viterbo Declaration, ¶¶ 4, 39–42; *see also* Fieldwood's Response to Atlantic's MTD, ¶¶ 62, 64, 66.  The Debtors have admitted they are contractually obligated to indemnify the Non-Op WIOs for any costs paid in connection with both the Lien Filings and the Atlantic Lawsuit.  *See* Automatic Stay Motion at ECF No. 563, at ¶¶ 3, 18, 24–26 and Ex. 1; *see also* Fieldwood's Response to Atlantic's MTD, ¶ 38 (admitting duty to indemnify).  The Debtors have also admitted that the amount of the Non-Op WIOs cure claim depends on the resolution of this dispute.  *See* Fieldwood's Response to Atlantic's  MTD, ¶ 37.

18.    The Debtors filed an adversary proceeding against Atlantic on November 24, 2020 (the "Atlantic Adversary," and together with the Atlantic Lawsuit, the "Atlantic Litigation"),

---

accounting descriptions for each Lien Filing as they are unaware of (and the Debtors are unwilling to provide information on) which Lien Filings remain outstanding and which have been satisfied and released.

requesting the Court extend the automatic stay to the Non-Op WIOs and enjoin Atlantic from continuing its efforts to collect.  Pursuant to the Court's scheduling order, the Atlantic Adversary will proceed to summary judgment on a contested basis, with argument on the competing summary judgment motions set for June 8, 2021 at 1:30 p.m. (CT)—a day prior to the confirmation hearing.

**B.**      **The Debtors File Their Plan of Reorganization and Cure Schedule.**

19.      The Debtors filed their Fourth Amended Joint Chapter 11 Plan of Reorganization on April 15, 2021.  In sum, the Plan proposes a three-part restructuring, which will divide the Debtors' assets and liabilities into one of five buckets, including an acquisition by the Credit Bid Purchaser.  Pursuant to the CBPA, the Debtors propose to sell certain identified leases, wells, platforms, pipelines, easements, inventory, and other specified assets (the "Acquired Interests") to a purchaser formed at the direction of the lenders (the "Credit Bid Purchaser").  In connection with this sale, the Debtors also propose to assign the various contracts and operating agreements relating to the Acquired Interests, so that the Credit Bid Purchaser can enjoy all of the rights and benefits granted thereunder.  *See* CBPA § 1.2; *see also* Cure Schedule.  The sale of the Acquired Interests is proposed to be free from all liens and encumbrances other than the "Permitted Encumbrances," which is restrictively defined.  *See id.*, Annex 1, Permitted Encumbrances.  Notably, certain of the liabilities not assumed by the Credit Bid Purchaser arise out of contracts and/or operating agreements designated by the Debtors for assumption and assignment to the Credit Bid Purchaser. The Cure Schedule lists a cure amount of $0 for all of the Non-OP WIOs' executory contracts and unexpired leases.

### III.      OBJECTION

**A.**      **Legal Standard for Confirmation**

20.      Section 1129 of the Bankruptcy Code sets forth the legal requirements for confirmation of a chapter 11 plan.  *See* 11 U.S.C. § 1129(a)–(b).  The Debtors bear the burden of

establishing that the Plan complies with all of the elements of section 1129. *In re Cresswood Land Partners, I*, 409 B.R. 396, 422 (Bankr. S.D. Tex. 2009) (stating that the debtor, as proponent of the plan, has the burden of proving that each of the elements of section 1129(a) are satisfied). Such burden must be satisfied by a preponderance of the evidence. *In re T-H New Orleans Ltd. P'ship*, 116 F.3d 790, 801 (5th Cir. 1997).

**B.    The Plan Improperly Bifurcates the UOA in Violation of Section 1129(a)(1) of the Bankruptcy Code.**

21.    The Debtors have admitted that that they are contractually obligated to "(i) keep the [Operating] Leases free and clear of all liens and encumbrances, (ii) defend the [Non-Op] WIOs in any litigation on the leases, and (iii) indemnify each of the [Non-Op] WIOs" for amounts paid in connection with the Lien Filings or the Atlantic Litigation.  *See* Fieldwood's Response to Atlantic's MTD, ¶ 8.  To date, the Debtors have stated:

- "The Debtors' contractual obligations include the duty to keep the Leases free and clear of liens and encumbrances, the duty to defend the WIOs, and the duty to indemnify the WIOs." *Id.*, ¶ 3; *see also id.* at ¶ 29.

- "[*T]he Debtors bear liability for all expenses and costs incurred by the [Non-OP] WIOs* on account of Atlantic's attempt to seek a recovery from the [Non-Op] WIOs to satisfy the Debtors' debt to Atlantic." *Id.*, ¶ 35 (emphasis added).

- "Importantly, the *Debtors must indemnify the [Non-Op] WIOs under joint operating agreements* that Debtors have with the [Non-Op] WIOs." *See* Adversary Complaint ¶ 3 (emphasis added); *see also id.* at ¶ 19.

- "[G]iven that the Debtors seek to assume the Joint Operating Agreements, the Court will be required to adjudicate these counts in determining the amount of the [Non-Op] WIOs' cure claims," and ". . . the *Debtors are required to cure any and all existing breaches under the Joint Operating Agreements*." Fieldwood's Response to Atlantic's MTD, ¶¶ 3, 23 (emphasis added)."

- "Consequently, *the Debtors are required to cure any existing breaches*, including the alleged breaches under the Joint Operating Agreement relating to the Debtors' failure to keep the Leases free and clear of liens, its duty to defend, and its duty to indemnify." *Id.*, ¶ 31 (emphasis added); *see also id.* at ¶¶ 34, 38.

- "The amount of the [Non-Op] WIOs' cure claims will be determined, at least in part, on this Court ruling regarding whether treatment of Atlantic's claims under the Plan extinguishes any valid privileges held by Atlantic." *Id.* ¶ 37.

- "If Atlantic's alleged liens against the [Non-Op] WIOs' working interests survive confirmation of the Debtors' chapter 11 plan, the Debtors will likely be forced to satisfy the same obligation multiple times: first through treatment under the Plan and then against as future indemnity claims asserted by the [Non-Op] WIOs to the extent Atlantic successfully exercises its alleged *in rem* rights against the [Non-Op] WIOs' working interests." Fieldwood's MSJ, ¶ 34.

22.    Notwithstanding the lack of dispute around the Debtors' obligation to cure and indemnify before assumption and assignment, the Plan and the CBPA purport to do the exact opposite, carving out from the transfer certain indemnity obligations required by the UOA. If anything, however, the Lien Filings and the Atlantic Litigation highlight how crucial these indemnification provisions are to the operating / non-operating parties' contractual relationship. Without these provisions, the Non-Op WIOs could be forced to pay for the costs of operation several times over, first through their remission to the operator of their participating share of costs, then again to the third party directly when the operator fails to turn over the funds.[7]   The UOA prevents such an inequitable result, and the Debtors must not be allowed to strip this agreement of the Non-Op WIOs contractually provided for protections under the guise of an assignment or transfer.

     *1.    The Debtors Seek to Assume and Assign Certain Contracts and Leases in Part, Rather than in Whole.*

23.    The Non-Op WIOs have no objection to the assumption and assignment of the UOA, provided the Debtors comply with all of the requirements of section 365(b). To the extent the UOA is assumed the entire agreement must be assumed, including all indemnification

---

[7] Noting that, as here, payments to the third party directly can require the Non-Op WIOs to pay several times their share of operational costs, as they are not only forced to duplicate payments already made to the operator, but also to foot the operator's portion of the bill for their participating share of costs and expenses.

obligations, uniform maintenance provisions, and security rights that the Credit Bid Purchaser would rather avoid. Unless language is added to this effect, approval of the CBPA, along with the underlying Plan, should be denied.

24.      In order to assume and assign an executory contract, a debtor is required to (a) cure any existing default under the contract or provide "adequate assurance" of a prompt cure; (b) compensate or provide adequate assurance that the debtor will compensate the other party for any actual pecuniary loss arising from the debtor's default thereunder; and (c) provide "adequate assurance of future performance" under the contract to the other party. 11 U.S.C. § 365(b). These requirements apply to all defaults that occur under an executory contract either before or after the commencement of the case. *In re Luce Indus., Inc.*, 8 B.R. 100, 104 (Bankr. S.D.N.Y. 1980), *rev'd on other grounds*, 14 B.R. 529 (S.D.N.Y. 1981).

25.      Contracts must be also be assumed and assigned in whole. "[I]t is well established that as a general proposition an executory contract must be assumed or rejected in its entirety." *In re Mirant Corp.*, 197 Fed. App'x 285, 288 (5th Cir. 2006) (citing *Stewart Title Guaranty Co. v. Old Republic Nat'l Title Ins. Co.*, 83 F.3d 735, 741 (5th Cir. 1996) (internal quotations omitted). This means "that the debtor cannot chose to accept the benefits of the contract and reject its burdens to the detriment of the other party to the agreement." *Id.* at 288–89 (stating an executory contract must be assumed or rejected *in toto* to prevent a debtor from picking through an agreement and "accepting the benefits while sloughing the burdens") (internal quotations omitted).

26.      The Debtors have designated, among other things, both the Operating Leases and the UOA for assumption and assignment via the CBPA. Notwithstanding this designation, the CBPA attempts to effect a one-sided modification of the UOA, transferring over the benefits while limiting or eliminating the reciprocal obligations. For example, the CBPA purports to transfer

13

all of the Acquired Interests, including Fieldwood's working interests in the Operating Leases and the UOA, free and clear of all liens or encumbrances other than the "Permitted Encumbrances," which is defined to exclude (1) the Non-Op WIOs' existing security rights with respect to the obligations and liabilities retained by Fieldwood; and (2) the maintenance of a uniform interest provision in the UOA, unless the Non-Op WIOs agree to waive their right to enforce such provision (whether such waiver is limited just to the CBPA or in general is unclear). *See* CBPA, Permitted Encumbrance, §§ (h), (j), (m).

27.     The definition attempts to carveout from the Non-Op WIOs' existing security interest in the Acquired Interests amounts relating to the Lien Filings and the Atlantic Litigation (each a Retained Liability as such term is used in the CBPA), in contradiction of the plain language of the UOA.  UOA § 24.1 ("[T]he security rights under Article 6.3 (*Security Rights*) shall continue to burden the Working Interest transferred and to secure the payment of any retained obligations and liabilities.").  Moreover, it attempts to unilaterally modify the Non-Op WIOs' rights under the UOA, violating section 24.1.4 and making such transfer voidable by the Non-OP WIOs under the UOA's terms.[8] *Id.*

28.     Confusingly, the CBPA also attempts to delineate what indemnification obligations the Credit Bid Purchaser shall assume, although such attempts are contradictory at best and violative of the UOA at worst.  For instance, the CBPA states the purchaser shall assume all indemnities of Fieldwood for, among other things, the assumed and assigned contracts. *See* CBPA § 11.1(k).  Immediately following, it then says that "[n]otwithstanding anything to the contrary set forth in this Agreement" Fieldwood shall retain all liabilities for "all indebtedness, whether or not encumbering all or any portion of the Acquired Interests . . . all Liabilities arising out of or relating

---

[8] Separately, the Exit Facility Documents must clarify that the Non-Op WIOs' security interest in Fieldwood's working interests associated with the UOA is not primed or otherwise impacted by the exit financing facilities..

to any Claim with respect to facts and circumstances existing prior to the Closing" regardless of whether such claim has come due or been asserted prior to closing, and all "[l]iabilities satisfied, compromised, settled, released or discharged pursuant to the Plan and the Confirmation Order." *Id.* § 11.2(g), (p), and (r).

29.     These statements contradict each other as, for example, a liability could arise at time a contractor begins work on a well site, which would be a fact or circumstance existing prior to closing. *See* La. Rev. Stat. § 9:4864(A)(1).  If the Credit Bid Purchaser then failed to pay for the ongoing work, including the work taking place post-closing, the contractor could file a lien on the Operating Lease and seek to enforce payment on such lien from the Non-Op WIOs.  The CBPA purports to eliminate the Non-Op WIOs' contractual rights to seek indemnity from the Credit Bid Purchaser for this liability, notwithstanding the fact that indemnification rights are a critical component of the UOA and the obligations themselves were not asserted until after the date of closing.

30.     The Debtors have no right to independently modify the UOA without the Non-Op WIOs' consent.  The UOA imposes ongoing obligations on each of the Non-Op WIOs and the Debtors, including obligations relating to operations and payment of ongoing costs.  *See, e.g.*, UOA § 5.2–5.10 (obligations of operator); § 19.2 (obligation of non-operating party).  As a result, the UOA falls within definition of an "executory contract" and must be assumed and assigned in whole, not in part. *See NLRB v. Bildisco & Bildisco*, 465 US. 513, 522 n.6 (1984); *In re Murexco Petrol., Inc.*, 15 F.3d 60, 62–63 (5th Cir. 1994); *see also In re Panaco, Inc.*, Case No. 02-37911-H3-11, 2002 WL 31990368, at *5 (Bankr. S.D. Tex. Dec. 10, 2002) (granting motion to compel debtors to assume or reject operating agreements with join working interest owners).

2.      *The Plan Fails to Provide for Sufficient Cure Costs and/or Adequate Assurance of Future Performance in Violation of Section 365(b).*

31.      The Non-Op WIOs appreciate and support Fieldwood prosecuting a declaratory judgment from this Court seeking a determination that the Atlantic Lawsuit (and by implication the other Lien Filings) will be extinguished upon the discharge of Atlantic's (and by implication the other Lien Filing claimants') claims pursuant to the Plan.  *See* Fieldwood's Response to Atlantic's MTD, ¶¶ 30, 35.  Until such ruling has occurred, however, Fieldwood and/or the Credit Bid Purchaser should be required to bear the risk of an adverse outcome and should affirmatively agree to indemnify the Non-Op WIOs for any loss incurred, if found liable, in removing the encumbrances from the Operating Leases.[9]

32.      Before a debtor may assume and assign a contract under section 365(b), it must cure all monetary and nonmonetary defaults thereunder and provide the counterparty with adequate assurance of future performance.  11 U.S.C. § 365(b)(1).  The requirement that a debtor cure all defaults has been construed as requiring cash or collateral that is non-speculative, positive, and sufficiently substantial so as to assure the counterparty to the contract that it will realize the amount of the default.  *In re Bronx-Westchester Mack Corp.*, 4 B.R. 730, 734–35 (Bankr. S.D.N.Y. 1980); *see also In re Truffles of Sarasota, Inc.*, 30 B.R. 666, 670 (Bankr. M.D. Fla. 1983) (finding a simple promise to cure in the future insufficient).  Additionally, "the court must ensure adequate assurance of future performance under the contract, i.e., whether the debtor [or assignee] can actually deliver what it has promised."  *In re Panaco, Inc.*, 2002 WL 31990368, at *1.

---

[9] Unfortunately, the Non-Op WIOs cannot state with specificity the total amount of their indemnification claims as they are not privy to which Lien Filings have been released and which remain in place.  The Non-Op WIOs have requested this information from the Debtors several times over the prior couple of months, but the Debtors have been unwilling to provide it to date.

33.     Fieldwood has defaulted under the UOA by, among other things, failing to keep the Operating Leases free of liens and encumbrances, failing to reimburse the Non-Op WIOs for amounts due from the Joint Account, and failing to provide for its participating interest share of plugging and abandonment obligations ("P&A Obligations") incurred in the exploration, development, or operation of the Operating Lease. *See, e.g.*, UOA §§ 5.4, 8.11, 10.3, 11.4, 13.5, 18.1, and Ex. C.  Each of these monetary and non-monetary defaults must be cured before the UOA may be assumed or assigned under the Plan.

34.     As to the P&A Obligations, Fieldwood should either be required to set aside funds sufficient to satisfy its participating share of existing obligations, or the Credit Bid Purchaser should be required to assume such obligations, regardless of whether they accrued prior to closing. Under federal regulations, a party's P&A Obligations accrue either at the time drilling commences or, when a well is already in existence that has not yet been permanently plugged, at the time the party becomes a lessee or owner of operating rights on the lease.  30 C.F.R. §§ 250.1701, 250.1702.; *see also Total E&P USA, Inc. v. Marubeni Oil & Gas (USA), Inc.*, 824 Fed. App'x 197, 206 (5th Cir. 2020).  From the Plan, it does not appear that Fieldwood has reserved funds sufficient to satisfy these P&A Obligations in violation of requirements of the UOA.  Accordingly, to cure its default, Fieldwood must either provide the Non-Op WIOs with the amount the Non-Op WIOs will be forced to satisfy in P&A Obligations on Fieldwood's behalf or have the obligation be expressly assumed by the new operator of the Operating Leases—the Credit Bid Purchaser.

35.     Absent both immediate cure and adequate assurance that the Credit Bid Purchaser, as transferee, can deliver what was promised under the contract, the assumption and assignment of the UOA cannot occur.[10]

---

[10] The Non-Op WIOs object to the mechanism by which the Debtors and Credit Bid Purchaser attempt to give themselves a year to litigate a dispute as to assumption and/or cure and, if such litigation is unsuccessful, reject the

C.    **The Plan Fails to Properly Provide for the Non-Op WIOs' Interests in Violation of Section 1129(a)(3) of the Bankruptcy Code.**

36.    Despite admitting to the contrary in their briefing, the Debtors' plan purports to extinguish the Non-Op WIO's indemnification rights in the UOA as detailed above.  Section 1129(a)(3) of the Bankruptcy Code provides that a plan must be proposed "in good faith and not by any means forbidden by law."  11 U.S.C. § 1129(a)(3).  "[F]or purposes of determining good faith under section 1129(a)(3) . . . the important point of inquiry is the plan itself and whether such a plan will fairly achieve a result consistent with the objectives and purposes of the Bankruptcy Code."  *In re Madison Hotel Assoc.*, 749 F.2d 410, 425 (7th Cir. 1984); *see also In re Block Shim Dev. Co.-Irving*, 939 F.2d 289, 292 (5th Cir. 1991) (citing favorably to *In re Madison Hotel Assoc.* for what constitutes good faith in a plan).  One of the key objectives of the Bankruptcy Code is to maximize the value of recovery to all creditor groups on a fair and equitable basis.  *See Bank of Am. Nat'l Tr. & Sav. Ass'n v. 203 N. LaSalle St. P'ship*, 526 U.S. 434, 453 (1999).

37.    Under the UOA, any "sale, conveyance, assignment, transfer, farmout, exchange, or other disposition of all or part of a Party's undivided Working Interest and a Party's rights and obligations under this Agreement" is defined as a "Transfer of Interest."  *See* UOA, § 2.69.  "No Transfer of Interest shall release a Party from its obligations and liabilities under [the UOA], including its payment obligations**,** which are incurred or have accrued prior to the effective date of that Transfer of Interest and the security rights under Article 6.3 (Security Rights) shall continue to burden the Working Interest transferred and to secure the payment of any retained obligations and liabilities.  *Id.*, § 24.1.  Accordingly, under the UOA, any transfer, whether in the form of a pledge of a security interest, a sale, or otherwise, is subordinate and expressly subject to the UOA.

---

lease or agreement at that time.  *See* CBPA § 2.3(d); Plan § 8.3(c).  A production delay of this length while the parties litigate their dispute would be operationally irresponsible and cause economic hard to all holders of an interest in the Operating Leases, including the Non-Op WIOs.

38.     Under Louisiana law, a co-owner may not enjoy the profits realized from an oil and gas venture without first participating in the expenses incurred in producing those profits.  *See Grace-Cajun Oil Co. No. 3 v. Fed. Dep. Ins. Corp.*, 882 F.2d 1008, 1010 (5th Cir. 1989).[11]  "To allow otherwise would violate the moral maxim that no one ought to be enriched at the expense of another."  *Id.* (citing *Huckabay v. Texas Co.*, 78 So. 2d 829, 831 (La. 1955)).

39.     Typically, this issue arises in the context of an unrecorded or late recorded security interest granted under an operating agreement.  For example, in *Grace Cajun*, the Fifth Circuit considered the rights of a non-operating working interest holder vis-à-vis a secured lender in the production proceeds of a debtor.  882 F.2d at 1010.  There, the debtor failed to pay its share of production costs, resulting in the filing of protective liens on the lease.  The non-operating working interest holder paid the debtor's share of the costs to remove the liens, then sued the secured lender, who had since foreclosed, for reimbursement of the amounts it paid on behalf of the debtor.  *Id.* The Fifth Circuit held that, even though the security interest granted under the operating agreement was unrecorded and the secured lender had a first priority lien in the proceeds, the lender could not take the interest free from of its encumbrances.  *Id.* at 1011–12 ("A debtor may give in pledge whatever belongs to him. But with regard to those things in which he has an ownership which may be divested or which is subject to incumbrance, he cannot confer on the creditor, by the pledge, any further right than he had himself.");  *see also* La. Rev. Stat. § 31:204 (stating a mortgage may only be provided in minerals to the extent of the mortgagor's interest thereon);  *First Guaranty Bank v. Alford*, 359 So. 2d 700, 702 (La. App. Ct. 1978) ("[I]t is fundamental that one cannot

---

[11] The Operating Leases are located in federal waters in the Gulf of Mexico off the coast of, and adjacent to, Louisiana. Thus, to the extent applicable and not otherwise inconsistent with federal law, Louisiana law applies to issues involving the nature or extent of Fieldwood's property interest.  *See* 43 U.S.C. § 1333(a)(2)(A); *Cutting Underwater Technologies USA, Inc. v. ENI U.S. Operating Co.*, 671 F.3d 512, 517 (5th Cir. 2012); *see also Butner v. United States*, 440 U.S. 48, 55 (1979) ("Property interests are created and defined by state law.").

pledge something he does not own, unless with the owner's consent."). Under applicable law, the debtor would have had no rights to the proceeds of production until it paid its proportionate share of the drilling and completion costs, and neither would the lender. *Id.*

40. In this case, Fieldwood has not participated in the expenses incurred in production, at least with respect to the amounts owed for the Lien Filings and the Atlantic Litigation. Accordingly, Fieldwood's interest is burdened under applicable law by its obligation to pay its proportionate share of the costs of production. Fieldwood can only transfer the rights it has, meaning that the Credit Bid Purchaser, as transferee, will take only those rights that Fieldwood had in the Operating Lease—production proceeds encumbered by the obligation to pay well costs.

41. The Non-Op WIOs recognize that this issue may be decided on June 8, mooting the necessity of this portion of the Objection. But, until such time as the issue is resolved, the Non-Op WIOs must protect their rights under the UOA. The Non-Op WIOs have paid their share of the expenses for both the Lien Filings and the Atlantic Litigation. Fieldwood has not – despite obtaining Court authority to do so. *See* Final JIB Order, at ECF No. 342. Accordingly, any transfer of Fieldwood's working interest in the Operating Leases subject to such liens and lawsuits will be encumbered under Louisiana law, and the transferee's right to share in the proceeds of production from the lease will be conditioned upon its payment of the proportionate share of the well costs.

42. Given the encumbrance and the uncertainty of resolution prior to confirmation, the Non-Op WIOs would request that the proposed language be added to any order confirming the Plan, and as adequate assurance of future performance, the Credit Bid Purchaser must explicitly agree to be bound by all of the terms of the UOA. To the extent that the Non-Op WIOs are forced to pay these costs, they have an absolute right to production proceeds allocable to Fieldwood's transferred interest until the costs are recouped.

**D.    The Plan Provides for Neither Payment in Full Nor the Indubitable Equivalent of the Non-Op WIOs' Secured Claim in Violation of Section 1129(b).**

43.    If the Debtors decide not to cure the UOA, the Non-Op WIOs will have a fully secured claim against Fieldwood for, among other things, damages relating to the amount of misappropriated Joint Account funds, the Lien Filings, the Atlantic Litigation, the Non-Op WIOs' unaccounted for P&A Obligations, and the rejection damages arising from the lack of indemnity protections that would occur upon rejection of the UOA.

44.    In the event of rejection, the Non-Op WIOs' secured claim will be far in excess of the amount allocated to pay "Other Secured Claims."  Given that Plan payments are being funded, in large part, through the cash portion of the CBPA payment (which is capped at no more than $125 million) and the size of the various other Effective Date Cash Obligations (as such term is defined in the CBPA), it appears that the Non-Op WIOs would not be paid in full in cash, given the "indubitable equivalent" of their claim, or provided such other treatment so as to render their claim unimpaired.  *See* Plan § 4.1(a).  As a result, the Debtors would not be able to satisfy section 1129(b) of the Bankruptcy Code and denial of confirmation would be required.

## IV.    <u>RESERVATION OF RIGHTS</u>

45.    The Non-Op WIOs reserve their right to supplement or modify this Objection at or prior to the hearing to confirm the Plan, including the right to file a supplement to this Objection in the event the Debtors or the Credit Bid Purchaser, as applicable, change the treatment of one or more of the Operating Leases or the UOA under the Plan.

## V.    <u>CONCLUSION</u>

**WHEREFORE**, for all of the foregoing reasons, the Non-Op WIOs respectfully request that the Court not approve the Plan without the Debtors first (a) revising the Plan and Cure

Schedule to account for the Lien Filings, the Atlantic Litigation, and the UOA Provisions, and (b) revising the CBPA to permit the UOA to be assumed and assigned to the Credit Bid Purchaser.

Dated: June 2, 2021

**SIDLEY AUSTIN LLP**

By: */s/ Michael Fishel*
Duston K. McFaul (TX Bar No. 24003309)
Michael Fishel (TX Bar No. 24082998)
Jeri Leigh Miller (TX Bar No. 24102176)
SIDLEY AUSTIN LLP
1000 Louisiana St., Suite 5900
Houston, Texas 77002
Telephone: (713) 495-4500
Facsimile:  (713) 495-7799
Email:   dmcfaul@sidley.com
             mfishel@sidley.com
             jeri.miller@sidley.com

**ATTORNEYS FOR RIDGEWOOD KATMAI, LLC AND ILX PROSPECT KATMAI, LLC**

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on June 2, 2021, a true and correct copy of the foregoing has been served on all counsel and parties in interest who have consented to service via this Court's ECF filing system at the time of filing.


*/s/ Michael Fishel*
Michael Fishel