# EXHIBIT A

**UNIT OPERATING AGREEMENT**



**GC 40 Unit**

# UNIT OPERATING AGREEMENT

## by and between

## Fieldwood Energy LLC

## and

## Ridgewood Katmai, LLC

## and

## ILX Prospect Katmai, LLC

## Outer Continental Shelf – Gulf of Mexico

Green Canyon Block 39 (NE/4NE/4 & N/2SE/4NE/4)-OCS-G 34966
Green Canyon Block 40 (SE/4SW/4NW/4, N/2SW/4NW/4, NW/4NW/4, E/2NW/4, E/2,
E/2SW/4 & E/2W/2SW/4)-OCS-G 34536
All of Green Canyon Block 41-OCS-G 34537
Ewing Bank Block 1009 (SE/4SE/4)-OCS-G 34878
Ewing Bank Block 1010 (S/2)-OCS-G 34879
Ewing Bank Block 1011 (S/2)-OCS-G 34880

# Dated Effective April 1, 2018

# Contents

**ARTICLE 1 – CONTRACT APPLICATION** ...............................................................................**0**

    **1.1**    **Application in General** ...........................................................................**0**
    **1.2**    **Application to the Unit Area** ................................................................**0**

**ARTICLE 2 – DEFINITIONS** ..............................................................................................**1**

    **2.1**    **Additional Testing, Logging, or Sidewall Coring** .............................**1**
    **2.2**    **Affiliate** ................................................................................................**1**
    **2.3**    **Agreement** ............................................................................................**1**
    **2.4**    **Annual Operating Plan** .......................................................................**1**
    **2.5**    **Appraisal Operation** ...........................................................................**1**
    **2.6**    **Appraisal Well** .....................................................................................**2**
    **2.7**    **Authorization for Expenditure (AFE)** ..............................................**2**
    **2.8**    **Claim** ....................................................................................................**2**
    **2.9**    **Complete Recoupment** ........................................................................**2**
    **2.10**   **Complete, Completion, Completed, Completing** ..............................**2**
    **2.11**   **Confidential Data** ................................................................................**2**
    **2.12**   **Unit Area** .............................................................................................**3**
    **2.13**   **Costs** .....................................................................................................**3**
    **2.14**   **Deepen or Deepening** ..........................................................................**3**
    **2.15**   **Deeper Drilling** ...................................................................................**3**
    **2.16**   **Deepest Producible Reservoir** ...........................................................**3**
    **2.17**   **Define AFE** ..........................................................................................**3**
    **2.18**   **Define Stage** .........................................................................................**3**
    **2.19**   **Development Operation** .......................................................................**3**
    **2.20**   **Development Phase** ..............................................................................**4**
    **2.21**   **Development Plan** ................................................................................**4**
    **2.22**   **Development System** ...........................................................................**4**
    **2.23**   **Development Well** ................................................................................**4**
    **2.24**   **Disproportionate Spending** ................................................................**4**
    **2.25**   **DOI** .......................................................................................................**4**
    **2.26**   **Election, Elect, Elects, Elected, Electing** ..........................................**4**
    **2.27**   **Enhanced Recovery Project Team AFE** ............................................**4**
    **2.28**   **Execution AFE** ....................................................................................**5**
    **2.29**   **Execution Stage** ...................................................................................**5**
    **2.30**   **Exploratory Operation** .......................................................................**5**
    **2.31**   **Exploratory Well** .................................................................................**5**
    **2.32**   **Export Pipelines** .................................................................................**5**
    **2.33**   **Facilities** ..............................................................................................**5**
    **2.34**   **Feasibility AFE** ...................................................................................**5**
    **2.35**   **Feasibility Stage** ..................................................................................**6**
    **2.36**   **Feasibility Team** ..................................................................................**6**
    **2.37**   **Force Majeure** .....................................................................................**6**
    **2.38**   **Gross Negligence** .................................................................................**6**
    **2.39**   **HSE** ......................................................................................................**6**
    **2.40**   **Hydrocarbon Recoupment** .................................................................**6**
    **2.41**   **Hydrocarbons** ......................................................................................**6**
    **2.42**   **Joint Account** .......................................................................................**7**

2.43    Lease ....................................................................................................... 7
2.44    News Release ............................................................................................. 7
2.45    Non-Consent Operation ............................................................................ 7
2.46    Non-Operating Party ................................................................................. 7
2.47    Non-Participating Party ............................................................................ 7
2.48    Non-Participating Interest Share ............................................................. 7
2.49    Objective Depth ........................................................................................ 7
2.50    OCS ............................................................................................................ 8
2.51    Offsite Host Facilities ............................................................................... 8
2.52    Operator ..................................................................................................... 8
2.53    Overinvested Party .................................................................................... 8
2.54    Package Sale .............................................................................................. 8
2.55    Participating Interest Share, Participating Interest ................................ 8
2.56    Participating Party .................................................................................... 9
2.57    Post-Production Project Team AFE .......................................................... 9
2.58    Producible Reservoir ................................................................................. 9
2.59    Producible Well ......................................................................................... 9
2.60    Production System ...................................................................................... 9
2.61    Production Testing ................................................................................... 10
2.62    Project Team ............................................................................................ 10
2.63    Receipt ..................................................................................................... 10
2.64    Recompletion ............................................................................................ 11
2.65    Selection AFE ........................................................................................... 11
2.66    Selection Stage ......................................................................................... 11
2.67    Sidetrack, Sidetracks, Sidetracked, Sidetracking ................................ 11
2.68    Standby Charges ...................................................................................... 11
2.69    Transfer of Interest ................................................................................. 11
2.70    Transfer Notice ........................................................................................ 12
2.71    Underinvested Party ................................................................................. 12
2.72    Underinvestment ...................................................................................... 12
2.73    Vote .......................................................................................................... 12
2.74    Well Control and Containment Requirements ...................................... 12
        The requirements imposed by the Bureau of Ocean Energy Management, Regulation
        and Enforcement's Notice to Lessees and Operators of Federal Oil and Gas
        Leases, Outer Continental Shelf No. 2010-N10 (*Statement of Compliance with
        Applicable Regulations and Evaluation of Information Demonstrating Adequate
        Spill Response and Well Containment Resources*) as from time to time amended,
        and those requirements imposed by any similar laws, orders, rules, or regulations
        pertaining to well control and containment in the OCS. ...................................... 12
2.75    Well Plan .................................................................................................. 13
2.76    Willful Misconduct ................................................................................... 13
2.77    Working Interest ...................................................................................... 13
2.78    Workover ................................................................................................. 14

ARTICLE 3 – EXHIBITS ................................................................................ 14
3.1     Exhibits ..................................................................................................... 14

ARTICLE 4 – SELECTION OF OPERATOR .............................................. 15
4.1     Designation of the Operator .................................................................... 15

| | | | |
|---|---|---|---|
| **4.2** | **Substitute Operator** | | **15** |
| | 4.2.1 | Substitute Operator if Operator is a Non-Participating Party | 15 |
| | 4.2.2 | Substitute Operator if Operator Fails to Commence Operations | 16 |
| | 4.2.3 | Circumstances Under Which the Operator Must Conduct a Non-Consent Operation | 16 |
| | 4.2.4 | Operator's Conduct of a Non-Consent Operation in Which it is a Non-Participating Party | 17 |
| | 4.2.5 | Appointment of a Substitute Operator | 18 |
| | 4.2.6 | Redesignation of Operator | 18 |
| **4.3** | **Resignation of Operator** | | **18** |
| **4.4** | **Removal of Operator** | | **18** |
| | 4.4.1 | Removal Upon Assignment | 19 |
| | 4.4.2 | Removal for Cause by Vote | 19 |
| | 4.4.3 | Timing of Vote to Remove Operator | 20 |
| **4.5** | **Selection of Successor Operator** | | **20** |
| **4.6** | **Effective Date of Resignation or Removal** | | **20** |
| **4.7** | **Delivery of Property** | | **21** |

**ARTICLE 5 – RIGHTS AND DUTIES OF OPERATOR** .......................................... **21**

| | | |
|---|---|---|
| **5.1** | **Exclusive Right to Operate** | **21** |
| **5.2** | **Workmanlike Conduct** | **22** |
| **5.3** | **Operations** | **22** |
| **5.4** | **Liens and Encumbrances** | **22** |
| **5.5** | **Records** | **23** |
| **5.6** | **Reports to Government Agencies** | **23** |
| **5.7** | **Information to Participating Parties** | **23** |
| **5.8** | **Completed Well Information** | **25** |
| **5.9** | **Information to Non-Participating Parties** | **26** |
| **5.10** | **Health, Safety, and Environment:** | **26** |

**ARTICLE 6 – EXPENDITURES AND ANNUAL OPERATING PLAN** ....................... **26**

| | | | |
|---|---|---|---|
| **6.1** | **Basis of Charges to the Parties** | | **26** |
| **6.2** | **AFEs** | | **27** |
| | 6.2.1 | AFE Overrun Notice | 28 |
| | 6.2.2 | Supplemental AFEs | 28 |
| | 6.2.3 | Further Operations During a Force Majeure | 30 |
| | 6.2.4 | Long Lead Well Operation AFEs | 31 |
| | 6.2.5 | Unit Area Assessment and Permitting AFEs | 33 |
| **6.3** | **Security Rights** | | **35** |
| **6.4** | **Annual Operating Plan** | | **35** |
| | 6.4.1 | Effect and Content of Annual Operating Plan | 35 |
| | 6.4.2 | Submission of Draft Annual Operating Plan | 37 |
| | 6.4.3 | Review of Draft Annual Operating Plan | 37 |

**ARTICLE 7 – CONFIDENTIALITY OF DATA** ...................................................... **37**

| | | | |
|---|---|---|---|
| **7.1** | **Confidentiality Obligation** | | **37** |
| | 7.1.1 | Exceptions to Confidentiality | 38 |
| | 7.1.2 | Permitted Disclosures | 38 |
| | 7.1.3 | Limited Releases to Offshore Scout Association | 40 |

| | | 7.1.4 | Continuing Confidentiality Obligation | 40 |
| **7.2** | | **Ownership of Confidential Data** | | **40** |
| | | 7.2.1 | Trades of Confidential Data | 40 |
| | | 7.2.2 | Ownership of Non-Consent Data | 41 |
| **7.3** | | **Access to the Lease and Rig** | | **41** |
| **7.4** | | **Development of Proprietary Information and/or Technology** | | **41** |

**ARTICLE 8 – APPROVALS AND NOTICES** ........................................................ **42**

| **8.1** | | **Classes of Matters** | | **42** |
| | | 8.1.1 | Voting and Electing Interest | 42 |
| **8.2** | | **Voting and Election Procedures** | | **42** |
| | | 8.2.1 | Approval by Vote | 43 |
| | | 8.2.2 | Approval by Election | 43 |
| **8.3** | | **Second Opportunity to Participate** | | **43** |
| **8.4** | | **Participation by Fewer Than All Parties** | | **44** |
| **8.5** | | **Approval by Unanimous Agreement** | | **44** |
| **8.6** | | **Response Time for Notices** | | **45** |
| | | 8.6.1 | Well, Well Operations, or Supplemental AFEs for a Well or Well Operation Proposals | 45 |
| | | 8.6.2 | Execution AFE | 46 |
| | | 8.6.3 | Other AFE Related Operations | 46 |
| | | 8.6.4 | Other Proposals | 46 |
| | | 8.6.5 | Failure to Vote or Make an Election | 46 |
| | | 8.6.6 | Suspensions of Operations and Suspensions of Production | 47 |
| | | 8.6.7 | Standby Charges Associated with Immediate Substitute Wells, Subsequent Operations, and/or Supplemental AFE Proposals | 47 |
| **8.7** | | **Giving and Receiving Notices and Responses** | | **48** |
| **8.8** | | **Content of Notices** | | **48** |
| **8.9** | | **Designation of Representatives** | | **49** |
| **8.10** | | **Meetings** | | **50** |
| **8.11** | | **Obligations of Participation Election** | | **50** |
| | | 8.11.1 | Mobilization Charges | 50 |

**ARTICLE 9 – NEWS RELEASES** ........................................................ **50**

| **9.1** | | **Proposal of News Releases** | | **50** |
| | | 9.1.1 | Operator's News Release | 51 |
| | | 9.1.2 | Non-Operating Party's News Release | 52 |
| **9.2** | | **Emergency New Releases** | | **52** |
| **9.3** | | **Mandatory News Releases** | | **52** |

**ARTICLE 10 – EXPLORATORY OPERATIONS** ........................................................ **53**

| **10.1** | | **Proposal of Exploratory Wells** | | **53** |
| | | 10.1.1 | Pre-Exploratory Well AFE Meeting | 53 |
| | | 10.1.2 | Revision of Well Plan | 53 |
| | | 10.1.3 | Automatic Revision of the Well Plan | 55 |
| | | 10.1.4 | Timely Operations | 55 |
| | | 10.1.5 | AFE Overruns and Substitute Well | 56 |
| **10.2** | | **Exploratory Operations at Objective Depth** | | **57** |
| | | 10.2.1 | Response to Operator's Proposal | 58 |

10.2.2   Response to Highest Priority Proposal .................................. 59
10.2.3   Response on Next Highest Priority Proposal ......................... 60
10.2.4   Non-Participating Parties in Exploratory Operations at Objective Depth ........ 60
10.2.5   Participation in a Sidetrack or Deepening by a Non-Participating Party in an Exploratory Well at Initial Objective Depth ............................. 61
**10.3   Permanent Plugging and Abandonment and Cost Allocation ........ 61**
**10.4   Conclusion of Exploratory Operations ............................... 62**

**ARTICLE 11 – APPRAISAL OPERATIONS ................................. 63**
**11.1   Proposal of Appraisal Wells ...................................... 63**
11.1.1   Pre-Appraisal Well AFE Meeting ................................ 63
11.1.2   Revision of Well Plan ........................................... 63
11.1.3   Automatic Revision of the Well Plan ............................ 63
11.1.4   Timely Operations ............................................. 64
11.1.5   AFE Overruns and Substitute Well .............................. 64
**11.2   Appraisal Operations at Objective Depth ........................ 65**
11.2.1   Response to Operator's Proposal ................................ 67
11.2.2   Response to Highest Priority Proposal .......................... 68
11.2.3   Response on Next Highest Priority Proposal ..................... 68
11.2.4   Non-Participating Parties in Appraisal Operations at Objective Depth ........... 69
11.2.5   Participation in a Sidetrack or Deepening by a Non-Participating Party in an Appraisal Well at Objective Depth ............................... 69
**11.3   Appraisal Well Proposals That Include Drilling Below the Deepest Producible Reservoir ........................................................ 70**
**11.4   Permanent Plugging and Abandonment and Cost Allocation ........ 70**
**11.5   Conclusion of Appraisal Operations ............................. 71**
**11.6   Operations Before the Approval of the Development Plan ......... 72**

**ARTICLE 12 – DEVELOPMENT PHASES ................................ 72**
**12.1   Phased Development ............................................. 72**
**12.2   Feasibility Team Proposal ...................................... 72**
12.2.1   Feasibility AFE Approval ...................................... 74
12.2.2   Feasibility Team and Feasibility Stage Conclusion .............. 74
**12.3   Commencement of the Selection Stage ............................ 74**
12.3.1   Proposal of a Project Team .................................... 74
12.3.2   Selection AFE Approval ........................................ 76
**12.4   Proposal of a Development Plan ................................. 76**
12.4.1   Content of the Development Plan ............................... 77
**12.5   Development Plan Approval ...................................... 80**
12.5.1   Unanimous Approval of a Development Plan ....................... 80
12.5.2   Approval of a Development Plan by Vote ......................... 80
12.5.3   Approval of a Development Plan if One is Not Approved by Vote ... 81
12.5.4   Approved Development Plan ..................................... 82
**12.6.1   Long Lead Development System AFEs ............................ 82**
**12.7   Define Stage and Execution Stage ............................... 84**
12.7.1   Execution AFE ................................................. 84
12.7.2   Approval of an Execution AFE and Commencement of the Execution Stage . 84
12.7.3   Minor Modifications to Development Plans ....................... 85
12.7.4   Major Modifications to Development Plans ....................... 85

12.7.5    Major Modifications to Development Plans Prior to the Approval of the Execution AFE ................................................................................. 87

12.7.6    Major Modifications to Development Plans After the Approval of the Execution AFE ................................................................................. 87

12.7.7    Approval of Major Modifications ......................................... 88

12.7.8    Termination of a Development Plan ...................................... 88

12.7.9    Timely Operations for Development Systems ........................ 89

**12.8    Post-Production Project Team AFEs** ........................................... **89**

**12.9    Subsequent Development Phases** ................................................. **90**

12.9.1    Proposal of a Subsequent Development Phase ..................... 90

12.9.2    Execution AFE in a Subsequent Development Phase ............ 90

**12.10    Access to Existing Facilities** ....................................................... **91**

**12.11    Enhanced Recovery and/or Pressure Maintenance Program Proposals** .................. **91**

**ARTICLE 13 – DEVELOPMENT OPERATIONS** ................................... **92**

**13.1    Proposal of Development Wells and Development Operations** ........ **92**

13.1.1    Proposal of Development Wells Included in a Development Plan .................. 92

13.1.2    Proposal of Development Operations Not Included in a Development Plan .... 93

13.1.3    Pre-Development Well AFE Meeting ................................... 93

13.1.4    Timely Operations ............................................................ 93

13.1.5    AFE Overruns and Substitute Well .................................... 94

**13.2    Development Operations at Objective Depth** ............................... **95**

13.2.1    Response to Operator's Proposal ........................................ 96

13.2.2    Response to Highest Priority Proposal ............................... 97

13.2.3    Response on Next Highest Priority Proposal ....................... 97

13.2.4    Non-Participating Parties in Development Operations at Objective Depth ...... 98

13.2.5    Participation in a Subsequent Development Operation by a Non-Participating Party in a Development Well at Objective Depth ...... 98

**13.3    Development Well Proposals That Include Drilling Below the Deepest Producible Reservoir** .............. **99**

13.3.1    Multiple Completion Alternatives Above and Below the Deepest Producible Reservoir ...... 99

13.3.2    Completion Attempts At or Above the Deepest Producible Reservoir ........ 100

**13.4    Recompletions and Workovers** ................................................. **101**

**13.5    Permanent Plugging and Abandonment and Cost Allocation** .......... **101**

**ARTICLE 14 – FACILITIES AND GATHERING SYSTEMS** ................... **102**

**14.1    Facilities as a Part of Development Plan** ................................... **102**

**14.2    Use of Offsite Host Facilities** ................................................... **103**

**14.3    Use of Development Systems** .................................................... **103**

**14.4    Processing Priorities** ................................................................ **103**

**14.5    Approval of Additional Facilities** .............................................. **104**

**14.6    Expansion or Modification of Existing Production System** ............. **105**

**14.7    Additions, Expansion, or Modification of Production System or Facilities for Health, Safety, or Environmental Reasons** .............. **105**

**14.8    Repairs of Production System or Facilities** .................................. **106**

**ARTICLE 15 – DISPOSITION OF HYDROCARBON PRODUCTION** ........... **106**

**15.1    Duty to Take in Kind** ............................................................... **106**

15.2    Facilities to Take in Kind.................................................................106
15.3    Failure to Take Oil and/or Condensate in Kind ...........................106
15.4    Gas Balancing Provision .................................................................107
15.5    Expenses of Delivery in Kind .........................................................107

ARTICLE 16 – NON-CONSENT OPERATIONS ...........................................107
16.1    Conduct of Non-Consent Operations ............................................107
        16.1.1    Costs.................................................................................107
        16.1.2    Multiple Completions ....................................................108
16.2    NOTE: It is hereby agreed amongst the signatories of this Unit Operating
        Agreement that the Acreage Forfeiture Provisions for the First Exploratory Well
        and Substitute Wells(s) for the First Exploratory Well are not applicable to this
        Unit Agreement. ..............................................................................109
        Acreage Forfeiture Provisions .......................................................109
        16.2.1    First Exploratory Well & Substitute Well(s) for the First Exploratory Well..109
        16.2.2    Execution AFE ................................................................110
16.3    Costs and Liabilities of Prior Operations .....................................111
16.4    Non-Consent Operations to Maintain Unit Area ..........................111
        16.4.1    Acreage Forfeiture in the Entire Unit Area....................112
        16.4.2    Acreage Forfeiture in a Portion of a Unit Area...............112
        16.4.3    Limitations on Acreage Forfeiture .................................113
16.5    Percentage Hydrocarbon Recoupment for Non-Consent Operations ......114
        16.5.1    Non-Consent Exploratory Operations down to Objective Depth in the First
                  Exploratory Well..............................................................114
        16.5.2    Non-Consent Appraisal Operations ................................115
        16.5.3    Non-Consent Proprietary Geophysical Operations, Feasibility AFEs,
                  Selection AFEs, Define AFEs, Long Lead Development System AFEs,
                  Post-Production Project Team AFEs, Enhanced Recovery Project Team
                  AFEs or Long Lead Well Operation AFEs.......................115
        16.5.4    Non-Consent Development Operations ..........................115
        16.5.5    Non-Consent Subsequent Development System and Additional Facilities ....116
        16.5.6    Additional Hydrocarbon Recoupment ...........................116
        16.5.7    Hydrocarbon Recoupment From Production ..................116
16.6    Restoration of Interests to Non-Participating Party .....................118
        16.6.1    Dry Hole Reversion ........................................................118
        16.6.2    Sidetracking or Deepening a Non-Consent Well ...........119
16.7    Operations From a Subsequent Non-Consent Development System ............119
16.8    Allocation of Development System Costs to Non-Consent Operations ..........120
        16.8.1    Investment Charges.........................................................120
        16.8.2    Payments.........................................................................121
        16.8.3    Operating and Maintenance Charges .............................121
16.9    Settlement of Underinvestments .....................................................122
        16.9.1    Cash Settlement of Underinvestment..............................123

ARTICLE 17 – WITHDRAWAL FROM AGREEMENT ..................................123
17.1    Right to Withdraw ...........................................................................123
17.2    Response to Withdrawal Notice ......................................................124
        17.2.1    Unanimous Withdrawal .................................................124
        17.2.2    No Additional Withdrawing Parties................................124

17.2.3    Acceptance of the Withdrawing Parties' Interests ......................... 125
17.2.4    Effects of Withdrawal ................................................................ 125
**17.3    Limitation Upon and Conditions of Withdrawal** ........................... **125**
17.3.1    Prior Expenses ......................................................................... 125
17.3.2    Confidentiality ......................................................................... 126
17.3.3    Emergencies and Force Majeure .............................................. 127

**ARTICLE 18 – ABANDONMENT AND SALVAGE** ........................................ **127**
**18.1    Abandonment of Wells** ................................................................ **127**
**18.2    Abandonment of Equipment** ....................................................... **128**
**18.3    Disposal of Surplus Materiel** ...................................................... **129**
**18.4    Abandonment Operations Required by Governmental Authority** ............ **129**

**ARTICLE 19 – RENTALS, ROYALTIES, AND MINIMUM ROYALTIES** ........ **129**
**19.1    Burdens on Hydrocarbon Production** ........................................... **129**
19.1.1    Subsequently Created Lease Burdens ....................................... 130
**19.2    Payment of Rentals and Royalties** ............................................... **130**
19.2.1    Non-Participation in Payments ................................................ 131
19.2.2    Royalty Payments .................................................................... 131

**ARTICLE 20 – TAXES** ..................................................................................... **131**
**20.1    Internal Revenue Provision** ........................................................ **131**
**20.2    Other Taxes and Assessments** ..................................................... **131**
20.2.1    Property Taxes ........................................................................ 132
20.2.2    Production and Severance Taxes .............................................. 132

**ARTICLE 21 – INSURANCE AND BONDS** .................................................... **132**
**21.1    Insurance** .................................................................................... **132**
**21.2    Bonds** .......................................................................................... **133**

**ARTICLE 22 – LIABILITY, CLAIMS, AND LAWSUITS** ............................... **133**
**22.1    Individual Obligations** ................................................................ **133**
**22.2    Notice of Claim** ........................................................................... **133**
**22.3    Settlements** .................................................................................. **133**
**22.4    Defense of Claims** ....................................................................... **133**
**22.5    Liability for Damages** .................................................................. **134**
**22.6    Indemnification for Non-Consent Operations** ............................. **135**
**22.7    Damage to Reservoir and Loss of Reserves** ................................. **135**
**22.8    Non-Essential Personnel** ............................................................. **135**
**22.9    Dispute Resolution Procedure** .................................................... **136**

**ARTICLE 23 – CONTRIBUTIONS** ................................................................. **137**
**23.1    Contributions from Third Parties** ............................................... **137**
**23.2    Methods of Obtaining Contributions** .......................................... **137**
**23.3    Counteroffers** .............................................................................. **137**
**23.4    Approval of Contributions** .......................................................... **138**
**23.5    Cash Contributions** ..................................................................... **138**
**23.6    Acreage Contributions** ................................................................ **138**

      23.6.1   Two or More Parties Own One Hundred Percent of the Acreage
             Contribution ................................................................................. 138
      23.6.2   Two or More Parties Own Less Than One Hundred Percent of the Acreage
             Contribution ................................................................................. 139

**ARTICLE 24 – TRANSFER OF INTEREST AND PREFERENTIAL RIGHT TO
PURCHASE** ........................................................................................................... **139**

**24.1**    **Transfer of Interest** ................................................................................ **139**
      24.1.1   Exceptions to Transfer Notice ..................................................... 140
      24.1.2   Effective Date of Transfer of Interest .......................................... 140
      24.1.3   Maintenance of Uniform Interest and Minimum Transfer of Interest ........... 141
      24.1.4   Form of Transfer of Interest ......................................................... 141
      24.1.5   Warranty ...................................................................................... 141
**24.2**    **Preferential Right to Purchase** .............................................................. **141**
      24.2.1   Notice of Proposed Transfer of Interest ....................................... 141
      24.2.2   Exercise of Preferential Right to Purchase ................................... 142
      24.2.3   Transfer of Interest Not Affected by the Preferential Right to Purchase ........ 143
      24.2.4   Completion of Transfer of Interest. .............................................. 144

**ARTICLE 25 – FORCE MAJEURE** ...................................................................... **144**

**25.1**    **Force Majeure** ........................................................................................ **144**

**ARTICLE 26 – ADMINISTRATIVE PROVISIONS** ........................................... **145**

**26.1**    **Term** ......................................................................................................... **145**
**26.2**    **Waiver** ..................................................................................................... **145**
**26.3**    **Waiver of Right to Partition** ................................................................... **145**
**26.4**    **Compliance With Laws and Regulations** ............................................... **145**
      26.4.1   Applicable Law ............................................................................ 146
      26.4.2   Severance of Invalid Provisions ................................................... 146
      26.4.3   Fair and Equal Employment ......................................................... 146
**26.5**    **Construction and Interpretation of this Agreement** ............................... **147**
      26.5.1   Headings for Convenience ........................................................... 147
      26.5.2   Article References ........................................................................ 147
      26.5.3   Gender and Number ..................................................................... 147
      26.5.4   Joint Preparation ......................................................................... 147
      26.5.5   Integrated Agreement ................................................................... 147
      26.5.6   Binding Effect ............................................................................. 147
      26.5.7   Further Assurances. ...................................................................... 148
      26.5.8   Counterpart Execution .................................................................. 148
      26.5.9   Currency ...................................................................................... 148
      26.5.10  Future References ......................................................................... 148
**26.6**    **Restricted Bidding** ................................................................................. **148**

**EXHIBIT "C"** ......................................................................................................... **155**

   **I. GENERAL PROVISIONS** ........................................................................... **155**

**EXHIBIT "D"** ................................................................................................................ **171**

**EXHIBIT "E"** ................................................................................................................ **177**

**EXHIBIT "F"** ................................................................................................................ **178**

**EXHIBIT "G"** ............................................................................................................... **184**

**EXHIBIT "H"** ............................................................................................................... **193**

    **DISPUTE RESOLUTION PROCEDURE** ................................................................ **193**

**EXHIBIT "I"** ................................................................................................................. **195**

**EXHIBIT "J"** ................................................................................................................. **207**

**EXHIBIT "K"** ............................................................................................................... **209**

    **MEMORANDUM OF UNIT OPERATING AGREEMENT** ................................... **209**

## UNIT OPERATING AGREEMENT
## OUTER CONTINENTAL SHELF – GULF OF MEXICO

This Unit Operating Agreement (this "Agreement"), effective as of April 1, 2018 (the "Effective Date"), is between Fieldwood Energy LLC. (referred to herein as "Fieldwood or Operator "), Ridgewood Katmai, LLC ("Ridgewood", and ILX Prospect Katmai, LLC, ("ILX"), the signers of this Agreement. The companies named above, and their respective successors and assignees (if any), are referred to individually as a "Party" and collectively as the "Parties."

**WHEREAS,** the Parties own the Lease(s) identified on Exhibit "A" (*Unit Area, Description of, the Lease(s), Working Interest of the Parties, Operator and Company Representatives and Notification Information*) located in the Unit Area, and desire to jointly explore, appraise, develop, and operate the Lease(s) lying within the Unit Area for the production of Hydrocarbons.

**NOW, THEREFORE,** in consideration of the premises and mutual promises in this Agreement, the Parties agree to explore, appraise, develop, and operate the Lease(s) in the Unit Area under the following provisions:

## ARTICLE 1 – CONTRACT APPLICATION

**1.1    Application in General**

This Agreement governs the rights and obligations of the Parties relating, without limitation, to the joint exploration, appraisal, development, and operation, of the Unit Area for the production of Hydrocarbons there from and the transportation of same by pipeline(s) or otherwise from the Unit Area. As of the Effective Date, this Agreement supercedes and cancels all previously entered into operating agreements, insofar as these agreements affect any Lease, or portion(s), thereof contributing to the Unit Area.

**1.2    Application to the Unit Area**

This Agreement applies to the entire Unit Area described in Exhibit "A". Unless otherwise provided in this Agreement, all the rights and obligations in and under the Lease(s) comprising the Unit Area (encompassing the Unit Area), all joint property and all Hydrocarbons produced from the Unit Area shall be owned jointly by the Parties according to their respective Working Interest in the Unit Area.

# ARTICLE 2 – DEFINITIONS

As used in this Agreement (or in the Exhibits attached hereto), the following capitalized terms shall have the meaning ascribed to them below in this Article 2 *(Definitions)*:

**2.1** **Additional Testing, Logging, or Sidewall Coring**

Testing (excluding Production Testing), logging, or sidewall coring that is in addition to that approved by virtue of a previously approved well or subsequent operation.

**2.2** **Affiliate**

A corporation, company, limited liability company, partnership, or other legal entity that:

(a) is owned or controlled by a Party,

(b) is owned or controlled by another corporation, company, limited liability company, partnership, or other legal entity that is owned or controlled by a Party,

(c) owns or controls a Party, or

(d) is owned or controlled by a corporation, company, limited liability company, partnership, or other legal entity that owns or controls a Party.

For the purposes of this definition, ownership or control means (i) the ownership, directly or indirectly, of fifty percent (50%) or more of the shares, voting rights, or interest in a corporation, company, limited liability company, partnership, or other legal entity; or (ii) any entity managed and/or controlled by a Party whether by contract or otherwise.

**2.3** **Agreement**

This Unit Operating Agreement, together with its attached Exhibits, and any extension, renewal, or amendment agreed to in writing by the Parties.

**2.4** **Annual Operating Plan**

The operational plan and estimate of Costs for activities and operations, as described in Article 6.4 *(Annual Operating Plan)*.

**2.5** **Appraisal Operation**

Any operation within the Unit Area proposed and conducted under Article 11 *(Appraisal Operations)*.

**2.6**    **Appraisal Well**

A well proposed and drilled as an Appraisal Operation [including, but not limited to, a substitute well for an Appraisal Well abandoned under Article 11.1.5 *(AFE Overruns and Substitute Well)*].

**2.7**    **Authorization for Expenditure (AFE)**

An authorization for expenditure consisting of a written description and Cost estimate of a proposed activity or operation accompanying a proposal for that activity or operation.

**2.8**    **Claim**

Any claim, lawsuit, hearing (administrative or judicial) or other proceeding made against a Party or other person or entity on account of a matter involving activities or operations under this Agreement or affecting the Lease(s) or the Unit Area.

**2.9**    **Complete Recoupment**

The point in time when the Participating Parties have been reimbursed, through Hydrocarbon Recoupment, through Disproportionate Spending, or through a lump sum cash settlement, an amount equal to the Non-Participating Party's Non-Participating Interest Share of the Costs of the Non-Consent Operation multiplied by the applicable percentage provided in Article 16 (Non-Consent Operations).

**2.10**    **Complete, Completion, Completed, Completing**

An operation intended to complete a well for the production of Hydrocarbons in one or more geological horizons or zones, including, not limited to, the setting of production casing, perforating, well stimulation and production testing conducted in such operation.

**2.11**    **Confidential Data**

All proprietary geophysical, geological, geochemical, drilling, or engineering data acquired or derived from joint operations conducted within the Unit Area pursuant to this Agreement and all analyses, compilations, maps, models, interpretations, and other documents that reflect or incorporate that data.  The term also includes, but is not limited to:

(a)    the provisions of this Agreement, subject to Exhibit "I"; and

(b)    commercial, contractual, and financial information acquired or derived from activities or operations conducted under this Agreement;

however, the term does not include the fact that the Operator has let a contract for an activity or operation to be conducted under this Agreement.  The term excludes "Confidential Information" as that term is defined in Exhibit "G."

**2.12**   **Unit Area**

The OCS Lease(s), or portions thereof, listed on Exhibit "A."

**2.13**   **Costs**

The monetary amount of all expenditures (or indebtedness), including any fines or penalties (except to the extent such fines or penalties are attributable to a Party's Gross Negligence or Willful Misconduct), incurred by the Operator and the Participating Parties in the conduct of activities and operations, determined under this Agreement.

**2.14**   **Deepen or Deepening**

An operation to drill an existing well (including sidetracking a well) deeper than the stratigraphic equivalent of the Objective Depth of any prior operation conducted in the well.

**2.15**   **Deeper Drilling**

The drilling of an Appraisal Well or Development Well below the Deepest Producible Reservoir in existence when the well is proposed.

**2.16**   **Deepest Producible Reservoir**

The deepest Producible Reservoir in existence when a drilling or Deeper Drilling proposal is made.

**2.17**   **Define AFE**

The AFE for the Define Stage.

**2.18**   **Define Stage**

The stage of a Development Phase during which the Operator, with the assistance of the Project Team, if applicable, will (a) commence the implementation of a Development Plan, (b) complete enough of the detailed design of the Development System to enable contractors to formulate their bids on the components of the Development System, and (c) submit an Execution AFE to the Parties for their review and approval.

**2.19**   **Development Operation**

Any operation within the Unit Area other than an Exploratory Operation or an Appraisal Operation conducted pursuant to an approved Development Plan.

**2.20** **Development Phase**

The proposals, activities, and operations associated with determining the feasibility of development and the design, fabrication or acquisition, and installation of a Development System within the Unit Area.

**2.21** **Development Plan**

The plan for a Development Phase, and developing and producing Hydrocarbons from the Unit Area as described in Article 12 *(Development Phases)*.

**2.22** **Development System**

A Production System and its associated Facilities.

**2.23** **Development Well**

A well proposed and drilled as a Development Operation [including, but not limited to, a substitute well for a Development Well abandoned under Article 13.1.4 *(AFE Overruns and Substitute Well)*].

**2.24** **Disproportionate Spending**

The payment of the Costs of an activity or operation by a Participating Party in excess of its Participating Interest Share of the Costs of that activity or operation in order to settle an Underinvestment previously incurred by that Participating Party.

**2.25** **DOI**

The United States Department of Interior and the various agencies thereunder responsible for the department's management of energy resources on the Outer Continental Shelf, including (a) Bureau of Ocean Energy Management, (b) Bureau of Safety and Environmental Enforcement, and (c) Office of Natural Resources Revenue, and any predecessor or successor agencies thereto.

**2.26** **Election, Elect, Elects, Elected, Electing**

A response or deemed response by a Party to a proposal requiring approval under Article 8.2.2 *(Approval by Election)*, or the act by a Party of responding to a proposal requiring approval under Article 8.2.2 *(Approval by Election)*.

**2.27** **Enhanced Recovery Project Team AFE**

The AFE that is to accompany a proposal for the formation of a Project Team whose sole scope of work is the design of an enhanced recovery and/or pressure maintenance program.

**2.28**   **Execution AFE**

A collection of AFEs, which, according to the submitting Party's estimates, will cover all of the Costs of the Execution Stage (which do not include the Costs of Development Wells), and which shall be deemed by the Parties to have been submitted as one AFE.

**2.29**   **Execution Stage**

The final stage of a Development Phase during which the Operator, with the assistance of the Project Team, if applicable, will complete the implementation of the Development Plan, implement the Execution AFE, and commence the first production of Hydrocarbons for that particular Development Phase.

**2.30**   **Exploratory Operation**

Any operation within the Unit Area proposed and conducted under Article 10 *(Exploratory Operations)*.

**2.31**   **Exploratory Well**

A well proposed and drilled as an Exploratory Operation [including, but not limited to, a substitute well for an Exploratory Well abandoned under Article 10.1.5 *(AFE Overruns and Substitute Well)*].

**2.32**   **Export Pipelines**

Pipelines to which a gathering line or lateral line downstream of the Development System is connected and which are used to transport Hydrocarbons or produced water to shore.

**2.33**   **Facilities**

Production equipment located downstream of the wellhead connections, which is installed on or outside the Unit Area in order to enhance, handle, or process Hydrocarbon production or transport Hydrocarbons to processing facilities. Facilities include, but are not limited to, control umbilicals, disposal wells and their associated components, flowlines, and gathering lines or lateral lines and their associated components that are paid for by the Joint Account. Facilities exclude (1) Production Systems, (2) Export Pipelines, (3) the equipment procured and utilized for an enhanced recovery and pressure maintenance program described in Article 12.11 *(Enhanced Recovery and/or Pressure Maintenance Program Proposals)*, and (4) the facilities referred to in Article 15.2 *(Facilities to Take in Kind)*.

**2.34**   **Feasibility AFE**

The AFE for the Feasibility Stage.

**2.35**    **Feasibility Stage**

The stage of a Development Phase during which the Operator, with the assistance of the Feasibility Team, will attempt to find at least one scenario for the development of Hydrocarbons, which is technologically and economically feasible.

**2.36**    **Feasibility Team**

A group of employees, contractors, and/or consultants of the Participating Parties or their respective Affiliates that assists the Operator during the Feasibility Stage.

**2.37**    **Force Majeure**

An event or cause that is reasonably beyond the control of the Party claiming the existence of such event or cause, which includes, but is not limited to, a flood, storm, hurricane, loop current/eddy, or other act of God; a fire, loss of well control, oil spill, or other environmental catastrophe; a war, a civil disturbance, a terrorist act, a labor dispute, a strike, a lockout; an inability to immediately comply with a law, order, rule, or regulation; a governmental action or delay in granting necessary permits or permit approvals; the inability to secure materials or a rig; or the inability to anchor up a rig due to the presence of other rigs or vessels on or around the Unit Area.

**2.38**    **Gross Negligence**

With respect to a Party, shall mean any act or failure to act by any person or entity which constitutes gross negligence as defined by applicable law.

**2.39**    **HSE**

Health, safety, and environment.

**2.40**    **Hydrocarbon Recoupment**

An amount to be recovered by the Participating Parties from all or part of the Non-Participating Interest Share of the proceeds from the sale of future Hydrocarbon production equal to the Non-Participating Interest Share of the Costs of the Non-Consent Operation multiplied by the applicable percentage in Article 16 *(Non-Consent Operations)*.

**2.41**    **Hydrocarbons**

The oil, gas, and associated liquid and gaseous by-products (except helium) that may be produced from a well bore on the Unit Area.

**2.42** **Joint Account**

The account maintained by the Operator under this Agreement, showing the charges paid and credits received in connection with the joint activities and joint operations conducted under this Agreement.

**2.43** **Lease**

Each OCS federal oil and gas lease (or portion thereof) identified in Exhibit "A."

**2.44** **News Release**

A press release or other public announcement or disclosure by a Party containing a reference, either directly or by implication, to this Agreement or the activities or operations herein contemplated, including, but not limited to, any public release via print media, broadcast news, internet, extranet, public networks or service providers, and discussions with journalists.

**2.45** **Non-Consent Operation**

An activity or operation proposed and approved under this Agreement in which one or more Parties, having the contractual right to do so, Elect or Vote not to participate, except when an activity or operation is approved by Vote and the approval binds all Parties.

**2.46** **Non-Operating Party**

A Party other than the Operator.

**2.47** **Non-Participating Party**

A Party who, having the contractual right to do so, makes or is deemed to have made, an Election or Vote not to participate in sharing the Costs, risks, and benefits (including the rights to Hydrocarbons) of an activity or operation proposed and approved under this Agreement, except when an activity or operation is approved by Vote and the approval binds all Parties.

**2.48** **Non-Participating Interest Share**

The percentage of participation in the Costs, risks, and benefits (including rights to Hydrocarbons) that a Non-Participating Party would have had in a proposed activity or operation if all Parties had participated in that proposed activity or operation.

**2.49** **Objective Depth**

For each well, the shallower of (a) the total footage to be drilled by that well (as measured in true vertical subsea depth), or (b) the penetration by the drill bit to the base of the deepest target formation or interval in that well, as that depth or target formation or interval is stated

in the AFE for the well, or (c) a shallower depth than either (a) or (b) above, if agreed to by all Parties.

**2.50   OCS**

The Outer Continental Shelf of the Gulf of Mexico.

**2.51   Offsite Host Facilities**

Production equipment that is (a) used to process or handle Hydrocarbon production and (b) owned by one or more third parties or by one or more Participating Parties in an Execution AFE (under which that production equipment is to be utilized for Hydrocarbon production), whose respective ownership interests in the production equipment are not exactly the same as their respective Participating Interest Shares in the Execution AFE.

**2.52   Operator**

The Party designated in Article 4.1 *(Designation of the Operator)*, a successor Operator selected under Article 4.5 *(Selection of Successor Operator)*, and, if applicable, a substitute Operator selected under Article 4.2 *(Substitute Operator)*.

**2.53   Overinvested Party**

A Party entitled to receive its Participating Interest Share of an Underinvestment.

**2.54   Package Sale**

Any Transfer of Interest that includes any non-cash asset(s) (including, but not limited to properties) situated outside of the Unit Area and not related to the activities or operations conducted under this Agreement.

**2.55   Participating Interest Share, Participating Interest**

A Participating Party's percentage of participation in:

(a)   the Costs, risks, and benefits (including rights to Hydrocarbons) of an approved activity or operation; or,

(b)   if applicable, interests to be assigned to the Parties.

A Participating Party's percentage of participation is either the proportion, expressed as a percentage, that the Participating Party's Working Interest bears to the total Working Interests of all Participating Parties, or such different basis for Cost sharing or assignment as the Participating Parties agree upon.

**2.56**   **Participating Party**

A Party who, having the contractual right to do so, participates in the sharing of:

(a)   the Costs, risks, and benefits (including rights to Hydrocarbons) of an approved activity or operation; or,

(b)   if applicable, the interests to be assigned to the Parties.

The term includes a Party who does not Vote to participate in a proposed activity or operation, but is nonetheless bound to participate in that proposed activity or operation if it is approved by Vote.

**2.57**   **Post-Production Project Team AFE**

An AFE submitted in association with the continuance of the Project Team under Article 12.8 *(Post-Production Project Team AFEs)*.

**2.58**   **Producible Reservoir**

An underground accumulation of Hydrocarbons (a) separate from and not in Hydrocarbon communication with another accumulation of Hydrocarbons, and (b) into which a Producible Well has been drilled.

**2.59**   **Producible Well**

A well on the Unit Area that:

(a)   produces Hydrocarbons;

(b)   meets the "well producibility criteria" in Title 30 CFR 250.116 or any succeeding order or regulation issued by an appropriate governmental authority; or

(c)   the Participating Parties in the subject well unanimously agree is a Producible Well.

**2.60**   **Production System**

A system or combination of systems on or outside the Unit Area to develop, produce, store, distribute, and initiate the transportation of Hydrocarbons.  The term includes:

(a)   an offshore surface structure, whether fixed, compliant, or floating;

(b)   a subsea structure or template designed as a guide to or to provide structural rigidity to one or more wells;

(c)   any combination of the items mentioned in clauses (a) and (b);

(d)    any other type of structure designed to develop and produce Hydrocarbons; and

(e)    all associated components of the items mentioned above, including, but not limited to, a drilling rig, mooring lines, and anchor piles.

Production System excludes Facilities, mobile offshore drilling units, and the facilities referred to in Article 15.2 *(Facilities to Take in Kind)*.

**2.61    Production Testing**

Operations for the controlled flow of Hydrocarbons to the surface for the purpose of measuring flow rates or flowing pressures, or gaining other subsurface data.

**2.62    Project Team**

A group of employees, contractors, and/or consultants of the Participating Parties or their respective Affiliates, who assists the Operator in carrying out the scope of work for the Selection Stage, Define Stage, and Execution Stage and the scope of work under Articles 12.8 *(Post-Production Project Team AFEs)* and 12.11 *(Enhanced Recovery and/or Pressure Maintenance Program Proposals)*.

**2.63    Receipt**

Receipt of a notice or a response to a notice shall mean the following, as applicable, for:

(a)    a written notice or response to a notice (excluding facsimiles and electronic mails), actual delivery of the notice to the Party's address; and

(b)    a facsimile transmission; actual delivery to the Party's facsimile number, and requires:

    (i)    verbal or written confirmation of its successful delivery to such Party; or

    (ii)    electronic confirmation of delivery to the  designated facsimile number.

(c)    an electronic mail, actual delivery to the Party's e-mail address, and requires verbal or written confirmation of its successful delivery to such Party;

All notices or responses to notices shall be directed to the Party's representatives as set forth on Exhibit "A."

**2.64** **Recompletion**

A Development Operation in a single well bore in which a Completion in one Producible Reservoir is abandoned in order to attempt a Completion in a different Producible Reservoir. To "Recomplete" means to conduct a Recompletion.

**2.65** **Selection AFE**

The AFE for the Selection Stage.

**2.66** **Selection Stage**

The stage of a Development Phase during which the Operator, with the assistance of the Project Team, if applicable, will recommend to either:

(a)    install a Development System on the Unit Area, or

(b)    tie-back to, and utilize,

  (i)    a Development System resulting from a previous Development Phase or

  (ii)    a Development System and/or Facilities located outside the Unit Area

in order to produce Hydrocarbons.

**2.67** **Sidetrack, Sidetracks, Sidetracked, Sidetracking**

An operation to directionally control or intentionally deviate a well to change the bottomhole location to another bottomhole location not deeper than the stratigraphic equivalent of the Objective Depth of an operation previously conducted in the well, excluding the intentional deviation that is done to straighten the hole, drill around junk, or overcome other mechanical difficulties. To "Sidetrack" means to conduct a Sidetracking.

**2.68** **Standby Charges**

The charges incurred under the applicable drilling and/or service contract in order to maintain a rig and/or any other support equipment (including, but not limited to, any vessels or helicopters) on standby and available to perform an operation in the Unit Area, while that operation is not able to be performed.

**2.69** **Transfer of Interest**

Any sale, conveyance, assignment, transfer, farmout, exchange, or other disposition of all or part of a Party's undivided Working Interest and a Party's rights and obligations under this Agreement.

**2.70**   **Transfer Notice**

A written notice from the transferring Party to the non-transferring Parties informing the non-transferring Parties that the transferring Party entered into a binding agreement for a Transfer of Interest.  A Transfer Notice shall contain:

(i)     the transferee's name and address,

(ii)    the nature or type of transfer,

(iii)   the Working Interest being transferred, and

(iv)    the effective date of such transfer,

(v)     a copy of the executed binding agreement for the proposed Transfer of Interest, including exhibits, but excluding any provisions not relevant to the proposed Transfer of Interest,

(vi)    the cash consideration, if applicable, and

(vii)   identification of any non-cash consideration and its Equivalent Cash Value, as determined in accordance with Article 24.2.1 (*Notice of Proposed Transfer of Interest*).

**2.71**   **Underinvested Party**

A Party with an Underinvestment.

**2.72**   **Underinvestment**

A monetary obligation incurred under this Agreement to be settled under Article 16.9 (*Settlement of Underinvestments*).

**2.73**   **Vote**

As a noun, a response or deemed response by a Party to a proposal requiring approval under Article 8.2.1 (*Approval by Vote*); as a verb, to respond to a proposal requiring approval under Article 8.2.1 (*Approval by Vote*).

**2.74**   **Well Control and Containment Requirements**

The requirements imposed by the Bureau of Ocean Energy Management, Regulation and Enforcement's Notice to Lessees and Operators of Federal Oil and Gas Leases, Outer Continental Shelf No. 2010-N10 (*Statement of Compliance with Applicable Regulations and Evaluation of Information Demonstrating Adequate Spill Response and Well Containment Resources*) as from time to time amended, and those requirements imposed

by any similar laws, orders, rules, or regulations pertaining to well control and containment in the OCS.

**2.75** **Well Plan**

A detailed written description accompanying a proposal to drill an Exploratory Well, Appraisal Well, or Development Well, or to conduct a Workover, Recompletion, well repair, or subsequent operation at Objective Depth, which must include, at a minimum but only to the extent applicable to the proposed operation:

(a) the surface and target bottomhole locations of the operation;

(b) the expected commencement date of the operation and the anticipated time necessary to conclude the operation;

(c) the total vertical subsea depth to be drilled, along with the specified Objective Depth (and the target zones to be penetrated);

(d) the proposed drilling and/or completion plan, inclusive of casing and/or liner sizes, anticipated days v. depth graph, estimated depth settings, pore pressure frac gradient curve, estimated mud weights, temperature profile, listing of wells used for pore pressure prediction and well trajectory and directional drilling details;

(e) details of all coring, logging, and other evaluation operations to be conducted; and

(f) information about the type of drilling rig to be used, including day rates, water depth rating, and any other rig related capabilities relevant to the proposed operation(s).

**2.76** **Willful Misconduct**

With respect to a Party, shall mean any act or failure to act by any person or entity which constitutes willful misconduct as defined by applicable law.

**2.77** **Working Interest**

The record title leasehold interest or, where applicable, the operating rights of each Party in and to each Lease (expressed as the percentage provided in Exhibit "A"). If a Party's record title interest is different from its operating rights, the Working Interest of each Party is the interest provided in Exhibit "A."

**2.78**  **Workover**

A Development Operation conducted in an existing well after the well has been completed in one or more Producible Reservoirs to restore, maintain, or improve production from one or more of those Producible Reservoirs.

## ARTICLE 3 – EXHIBITS

**3.1**  **Exhibits**

All references in this Agreement to "Exhibits" without further qualification mean the Exhibits listed below and attached to this Agreement.  Each Exhibit is made a part of this Agreement and is incorporated into this Agreement by this reference.  If any provision of an Exhibit conflicts with any provision of the body of this Agreement, the provision of the body of this Agreement shall prevail, with the exception of Exhibits "C," "D," and "G" each provision of which shall prevail over any provision of the body of this Agreement, except as provided in Article 6.2.4 *(Long Lead Well Operation AFEs)*.  If any provision of Exhibit "C" conflicts with any provision of Exhibit "G," the provision of Exhibit "G" shall prevail.  If any provision of Exhibit "C" conflicts with any provision of Exhibit "D," the provision of Exhibit "C" shall prevail.

| | |
|---|---|
| **Exhibit "A"** | Unit Area, Description of the Lease(s), Working Interests of the Parties, Operator and Company Representatives, and Notification Information |
| **Exhibit "B"** | Insurance Provisions |
| **Exhibit "C"** | Accounting Procedure |
| **Exhibit "D"** | Gas Balancing Agreement |
| **Exhibit "E"** | Certification of Non-Segregated Facilities |
| **Exhibit "F"** | Security Interest Provisions |
| **Exhibit "G"** | Project Team and Technology Sharing |
| **Exhibit "H"** | Dispute Resolution Procedure |
| **Exhibit "I"** | Well Data Trade and Confidentiality Agreement |
| **Exhibit "J"** | Health, Safety and Environment |
| **Exhibit "K"** | Memorandum of Unit Operating Agreement |

## ARTICLE 4 – SELECTION OF OPERATOR

### 4.1    Designation of the Operator

Fieldwood Energy, LLC is designated as the Operator of the Unit Area.  The Parties shall promptly execute and file all documents required by the DOI in connection with the designation of Fieldwood Energy, LLC as Operator or with the designation of any other Party as a substitute or successor Operator.  Unless agreed otherwise by all the Parties, the Operator shall be classified as the designated applicant for oil spill financial responsibility purposes, and each Non-Operating Party shall promptly execute the appropriate documentation reflecting that classification and promptly provide that documentation to the Operator for filing with the DOI.

### 4.2    Substitute Operator

#### 4.2.1    Substitute Operator if Operator is a Non-Participating Party

Except as otherwise provided in Article 4.2.3 *(Circumstances Under Which the Operator Must Conduct a Non-Consent Operation)*, if the Operator is a Non-Participating Party in a Non-Consent Operation, the Participating Parties may approve by Vote the designation of any Participating Party as the substitute Operator.

The substitute Operator shall serve as the Operator only:

(a)  for the Non-Consent Operation (if the Non-Consent Operation is the drilling of a well, through the release of the drilling rig for that well),

(b)  of the Lease affected by the Non-Consent Operation, and

(c)  with the same authority, rights, obligations, and duties as the Operator, subject to the limitations in (a) and (b).

If a Non-Operating Party is the only Participating Party in a Non-Consent Operation, then the Non-Operating Party shall be designated as the substitute Operator for that Non-Consent Operation, with no Vote required, unless the Non-Operating Party elects not to accept the designation. A Non-Operating Party, who is a Participating Party, shall not be designated as a substitute Operator against its will. If a substitute Operator is not designated under the foregoing procedures, the Operator shall, upon the unanimous agreement of the Participating Parties and with the consent of the Operator, conduct the Non-

Consent Operation on behalf of the Participating Parties and at the Participating Parties' sole Cost and risk under Article 16 *(Non-Consent Operations)*.

If the Participating Parties (i) do not approve by Vote a substitute Operator to conduct the Non-Consent Operation; or (ii) do not unanimously agree that the Operator shall conduct the Non-Consent Operation on behalf of the Participating Parties; or (iii) unanimously agree that the Operator shall conduct the Non-Consent Operation on behalf of the Participating Parties, however, the Operator does not consent; then the proposal of the Non-Consent Operation shall be deemed withdrawn, with the effect as if the proposal for the Non-Consent Operation had never been proposed and approved, except as otherwise provided in Article 4.2.3 *(Circumstances Under Which the Operator Must Conduct a Non-Consent Operation)*.

**4.2.2    Substitute Operator if Operator Fails to Commence Operations**

If the Operator fails to timely commence an Exploratory Operation in accordance with Article 10.1.4 *(Timely Operations),* an Appraisal Operation in accordance with Article 11.1.4 *(Timely Operations)* or a Development Operation in accordance with Article 13.1.3 *(Timely Operations)*, the non-operating Participating Parties may select a substitute Operator in the same manner as the selection of a successor Operator under Article 4.5 *(Selection of Successor Operator)*, and the substitute Operator shall serve as the Operator only:

(a)    for such operation and through the release of the rig if such operation is the drilling of a well,

(b)    of the Lease on which the operation is conducted, and

(c)    with the same authority, rights, obligations, and duties as the Operator,

subject to the limitations in (a) and (b).

**4.2.3    Circumstances Under Which the Operator Must Conduct a Non-Consent Operation**

If:

(a)    a rig is on location and the Operator becomes a Non-Participating Party:

(i)      in a supplemental AFE pursuant to the terms of Article 6.2.2 (*Supplemental AFEs*), or

(ii)     after reaching Objective Depth as provided in Article 10.2 (*Exploratory Operations at Objective Depth*), Article 11.2 (*Appraisal Operations at Objective Depth*), or Article 13.2 (*Development Operations at Objective Depth*), or

(b)    the Operator becomes a Non-Participating Party in an operation; however, the rig and/or other contracts for equipment and Facilities to be utilized on the Non-Consent Operation are non-assignable,

(c)    the Operator becomes a Non-Participating Party in an operation to be conducted on or from a Development System operated by the Operator,

the Operator, as a Non-Participating Party, shall conduct the Non-Consent Operation on behalf of the Participating Parties and at the Participating Parties' sole Cost and risk under Article 16 (*Non-Consent Operations*), subject to the Participating Parties' control, supervision and direction, and the other provisions of this Agreement, including, but not limited to, Articles 4.2.4 (*Operator's Conduct of a Non-Consent Operation in Which it is a Non-Participating Party*) and 5.2 (*Workmanlike Conduct*).

Notwithstanding the above, with respect to Operator's contracts for a drilling rig, equipment and other Facilities which could be utilized in a Non-Consent Operation by a substitute Operator, the Operator may, at its discretion, make reasonable attempts to cause such non-assignable rig and/or other contracts to be assignable to any substitute Operator under this Agreement as to such operation.

**4.2.4**    **<u>Operator's Conduct of a Non-Consent Operation in Which it is a Non-Participating Party</u>**

When, under Article 4.2.1 (*Substitute Operator if Operator is a Non-Participating Party*) or Article 4.2.3 (*Circumstances Under Which the Operator Must Conduct a Non-Consent Operation*), the Operator conducts a Non-Consent Operation in which it is a Non-Participating Party:

(a)    The Operator shall follow the practices and standards in Article 5 (*Rights and Duties of Operator*). The Operator shall not be required to proceed with the Non-Consent Operation until the Participating Parties have

advanced the Costs of the Non-Consent Operation to the Operator. The Operator shall never be obligated to expend any of its own funds for the Non-Consent Operation.

(b)     The limitations contained in Article 5.2 *(Workmanlike Conduct),* and the Participating Parties' indemnity to a Non-Participating Party as set forth in Article 22.6 (*Indemnification for Non-Consent Operations*) shall be applicable and extend to the Operator while acting on behalf of the Participating Parties.

**4.2.5     Appointment of a Substitute Operator**

After expiration of all applicable response periods for the Non-Consent Operation and selection of a substitute Operator, each Party shall promptly provide the substitute Operator with the appropriate DOI designation of operator forms and certification of oil spill financial responsibility forms.  The Operator and the substitute Operator shall coordinate the change of operatorship to avoid interfering with ongoing activities and operations, if any, including but not limited to, lease maintenance activities and operations.

**4.2.6     Redesignation of Operator**

Within fifteen (15) days after conclusion of the Non-Consent Operation, all Parties shall execute and provide the Operator with the appropriate DOI designation of operator forms and certification of oil spill financial responsibility forms to return operatorship to the Operator, thereby superseding the Parties' designation of the substitute Operator under Article 4.2.5 *(Appointment of a Substitute Operator).*

**4.3     Resignation of Operator**

Subject to Article 4.5 *(Selection of Successor Operator)*, the Operator may resign at any time by giving written notice to the Parties, except that the Operator may not resign during a Force Majeure or an emergency that poses a threat to life, safety, property, or the environment.  If the Operator ceases to own a Working Interest, the Operator automatically shall be deemed to have resigned as the Operator without any action by the Non-Operating Parties.

**4.4     Removal of Operator**

The Operator may be removed under the following circumstances:

### 4.4.1   **Removal Upon Assignment**

If the Operator assigns part of its Working Interest (excluding an interest assigned to an Affiliate) and the assignment reduces the Operator's Working Interest to less than the Working Interest of a Non-Operating Party, whether accomplished by one or more assignments, then the removal of the Operator requires approval by Vote.

### 4.4.2   **Removal for Cause by Vote**

The Operator may be removed for cause if approved by Vote of the Parties after excluding the Vote of the Operator and the Vote of the Operator's Affiliates (if any) under the following circumstances:

(a)   the Operator is found liable by a final judicial decision or a final decision under binding arbitration for an act of Gross Negligence or Willful Misconduct regarding the Unit Area;

(b)   the Operator commits a substantial breach of a material provision of this Agreement and fails to cure the breach within thirty (30) days after Receipt of written notice of the breach from a Non-Operating Party.  If the breach specified in the notice reasonably cannot be corrected within the thirty (30) day period, but the Operator within said period begins action to correct the breach and thereafter diligently carries the corrective action to completion, the Operator shall not be removed.  The Operator shall not be removed under this Article 4.4.2 if the Operator is able to prove the non-existence of the alleged breach within thirty (30) days after Receipt of written notice of the alleged breach;

(c)   the Operator becomes insolvent or unable to pay its debts as they mature, makes an assignment for the benefit of its creditors, commits an act of bankruptcy, or seeks relief under laws providing for the relief of debtors;

(d)   a receiver is appointed for the Operator or for substantially all of its property or affairs;

(e)   the Operator fails to timely commence the fabrication or acquisition of the Development System in accordance with Article 12.7.9 *(Timely Operations for Development Systems)*; or

(f)    the Operator fails or is unable to meet the standards of operation contained in Articles 5.2 (*Workmanlike Conduct*), 5.3 (*Operations*), 5.4 (*Liens and Encumbrances*) and/or 5.6 (*Reports to Government Agencies*).

### 4.4.3    Timing of Vote to Remove Operator

A Vote to remove the Operator for cause as provided in this Article 4.4 shall be taken within ninety (90) days after the Non-Operating Party's actual knowledge of the cause.

## 4.5    Selection of Successor Operator

Upon the resignation or removal of the Operator, a successor Operator shall be approved by Vote, subject to this limitation on the Voting right of Operator:  if the resigned or removed Operator is not entitled to Vote, fails to Vote, or Votes only to succeed itself, then the successor Operator shall be approved by Vote after excluding the Vote of the resigned or removed Operator.  If the Operator assigns all or a part of its Working Interest, then under Article 4.3 *(Resignation of Operator)* or Article 4.4.1 *(Removal Upon Assignment)* the Party who acquired all or a part of the former Operator's Working Interest shall not be excluded from Voting for a successor Operator.  If there are only two Parties to this Agreement when the Operator resigns or is removed, then the Non-Operating Party automatically has the right, but not the obligation, to become the Operator.  If no Party is willing to become the Operator, this Agreement shall terminate under Article 26.1 *(Term)*.

## 4.6    Effective Date of Resignation or Removal

The resignation or removal of the Operator shall become effective as of 7:00 a.m. on the first day of the month following a period of ninety (90) days from, and inclusive of, the day of the Parties' Receipt of the applicable notice, unless a longer period is required for the Parties to obtain approval of the designation of the successor Operator, and certification for oil spill financial responsibility purposes by the DOI, in which case the resignation or removal of the Operator shall become effective at 7:00 a.m. on the day immediately following DOI approval. The resignation or removal of the outgoing Operator shall not prejudice any rights, obligations, or liabilities of the outgoing Operator which accrued during its tenure.  The outgoing Operator and the successor Operator may charge the Joint Account for the reasonable Costs incurred in connection with the change of operatorship, except when the change of operatorship results from a merger, consolidation, reorganization, or sale or transfer to an Affiliate of the Operator.

## 4.7    Delivery of Property

On the effective date of resignation or removal of the Operator, the outgoing Operator shall deliver to the successor Operator custodianship of the Joint Account and possession of all items purchased for the Joint Account under this Agreement; all Hydrocarbons that are not the separate property of a Party; all equipment, materials, and appurtenances purchased for the Joint Account under this Agreement; and all books, records, and inventories relating to the Joint Account (other than those books, records, and inventories maintained by the outgoing Operator as the owner of a Working Interest).  The outgoing Operator shall further use its reasonable efforts to transfer to the successor Operator, as of the effective date of the resignation or removal, its rights as Operator under all contracts exclusively relating to the activities or operations conducted under this Agreement, and the successor Operator shall assume all obligations of the Operator that are assignable under the contracts.  The Parties may audit the Joint Account and conduct an inventory of all property and all Hydrocarbons that are not the separate property of a Party, and the inventory shall be used in the return of, and the accounting by the outgoing Operator of, the property and the Hydrocarbons that are not the separate property of a Party.  The inventory and audit shall be conducted under Exhibit "C," and all Costs incurred in connection with such audit and inventory shall be charged to the Joint Account.

## ARTICLE 5 – RIGHTS AND DUTIES OF OPERATOR

## 5.1    Exclusive Right to Operate

Except as otherwise provided, the Operator has the exclusive right and duty to conduct (or cause to be conducted) all activities or operations under this Agreement.  In performing services under this Agreement for the Non-Operating Parties, the Operator is an independent contractor, not subject to the control or direction of Non-Operating Parties, except as provided in Article 4.2.3 (*Circumstances Under Which the Operator Must Conduct a Non-Consent Operation*), Article 8.2 *(Voting and Election Procedures)* or Article 8.5 *(Approval by Unanimous Agreement)*.  The Operator is not the agent or fiduciary of the Non-Operating Parties.  With the exception of any Feasibility Team or Project Team formed under this Agreement, the Operator shall select and determine the number of employees, Affiliates, contractors, and/or consultants used in conducting activities or operations under this Agreement and the hours of labor and the compensation for those employees, Affiliates, contractors, and/or consultants.  All of those employees, Affiliates, contractors, and/or consultants shall be the employees, Affiliates, contractors, and/or consultants of the Operator.  The Operator shall contract for and employ any drilling rigs, tools, machinery, equipment, materials, supplies, and personnel reasonably necessary

for the Operator to conduct the activities or operations provided for in this Agreement; however, if a substitute Operator is designated to drill a well, the substitute Operator may utilize a rig, which it owns or has under contract, for the drilling of that well.

**5.2**    **Workmanlike Conduct**

The Operator shall timely commence and conduct all activities or operations in a good and workmanlike manner, as would a prudent operator under the same or similar circumstances. All Costs, damages, losses or liabilities arising out of the activities and operations conducted pursuant to this Agreement shall be shared by the Participating Parties as provided in Article 22.5 (*Liability for Damages*) of this Agreement. The Operator shall never be required to conduct an activity or operation under this Agreement that it, as a reasonable and prudent operator in similar circumstances, believes would be unsafe or would endanger persons, property, or the environment.

**5.3**    **Operations**

The Operator may have operations conducted by qualified and responsible independent contractors who are not an Affiliate of the Operator and are employed under competitive contracts. A competitive contract is a contract (a) that was entered into within five (5) years before the commencement of the operations and (b) that contains terms, rates, and provisions that, when the contract was entered into, did not exceed those generally prevailing on the OCS for operations involving rigs of an equivalent type, operating in similar environments and water depths, equipped to the Operator's standard conditions, and capable of conducting required operations within the schedule in the well AFE. The Operator may employ its own or its Affiliate's equipment, personnel, rig, Workover rig, and snubbing unit in the conduct of those operations, either under Exhibit "C" or under a written agreement among the Participating Parties. If the Operator's or its Affiliate's equipment, personnel, rig, Workover rig, or snubbing unit is employed in conducting operations under this Agreement, the terms, conditions, and rates for that employment shall be consistent with those currently prevailing in competitive contracts for the deepwater OCS.

**5.4**    **Liens and Encumbrances**

The Operator shall endeavor to keep the Leases, Production Systems, Facilities, and other equipment purchased for the Joint Account under this Agreement and the Hydrocarbons free from liens and encumbrances (except those provided in Exhibit "F") that might arise by reason of the activities or operations conducted under this Agreement. If a lien is placed

on the Leases, Production Systems, Facilities, other equipment, or any Hydrocarbons, the Operator shall make reasonable efforts to remove the lien.

**5.5** **Records**

The Operator shall keep accurate books, accounts, and records of activities or operations under this Agreement in compliance with the Accounting Procedure in Exhibit "C." Unless otherwise provided in this Agreement, all records of the Joint Account shall be available to a Non-Operating Party following reasonable notice during the Operator's normal office hours under Exhibit "C." The Operator shall use good-faith efforts to ensure the settlements, billings, and reports rendered to each Party under this Agreement are complete and accurate. The Operator shall notify the other Parties promptly upon the discovery of any error or omission pertaining to the settlements, billings, and reports rendered to each Party. This provision does not affect a Party's audit rights under this Agreement. This provision shall also apply to each Non-Operating Party's books, accounts, and records kept supporting its charges to a Project Team.

**5.6** **Reports to Government Agencies**

The Operator shall make timely reports to all governmental authorities to whom it has a duty to make reports and shall furnish copies of the reports to the Participating Parties. As soon as reasonably practicable, the Operator shall provide each Non-Operating Party with a copy of each notice, order, and directive received from the DOI. As soon as reasonably practicable, each Party shall give written notice to the other Parties before each meeting with government authorities of which it has notice and that affect the Unit Area.

**5.7** **Information to Participating Parties**

The Operator shall, as soon as reasonably practicable and to the extent that the information has then been obtained or received by the Operator, furnish each Participating Party the following information about well operations:

(a) a complete copy of each approved permit to drill and all amendments thereto excluding any proprietary information. For purposes of this Article 5.7(a), "Proprietary information" shall mean information that is owned or controlled by a Party that is not in the public domain and has been developed, created or licenses for the specific and private use by a Party;

(b) drilling and Workover reports, which shall include, but not be limited to, the current depth, the corresponding lithological information, data on drilling fluid characteristics, information about drilling difficulties or delays (if any), mud checks,

mud logs, and Hydrocarbon information, casing and cementation tallies, BOP tests, and estimated cumulative Costs, to be sent by facsimile or electronic transmission within twelve (12) hours (exclusive of Saturdays, Sundays, and federal holidays) of well operations conducted in the preceding twenty-four (24) hour period; provided, however, the information and data set forth in this Article 5.7(b) shall be provided in "real time" if it is available to the Operator in "real time" and a Participating Party has contractual rights to utilize the "real time" system that the Operator is utilizing and has agreed to pay any incremental expenses associated with its accessing that information and data from that "real time system";

(c)  a complete report of all core data and analyses;

(d)  copies of logs and surveys as run, including all digitally recorded data;

(e)  copies of well test results, bottomhole pressure surveys, Hydrocarbon analyses, and other similar information, including PVT analyses;

(f)  copies of relevant well specific written correspondence, plans, permits, and reports made to regulatory agencies, including, but not limited to, relevant well specific containment plan and screening tools used for permitting the well, filings, casing and cementing design certifications from a professional engineer, lease suspensions of operations and/or suspensions of production and plans required under current and future applicable Notices to Lessees (NTL) and the Drilling Safety and Workplace Safety Rule announced by the DOI on September 30, 2010, and any rules derived therefrom;

(g)  forty-eight (48) hours advance notice of logging, coring, or testing operations (or, if conditions do not permit that much advance notice, as much advance notice as is reasonably possible);

(h)  upon written request, and if sufficient quantities are available, samples of cutting and sidewall cores, marked as to depth, to be packaged and shipped at the expense of the requesting Party;

(i)  copies of drilling prognoses;

(j)  if conventional cores are taken, a Participating Party may be allowed access to the rig to inspect and evaluate said cores;

(k)    samples of Hydrocarbons, if sufficient quantities are available, after performing routine tests;

(l)    well specific risk assessment (as per SEMS) with planned mitigations;

(m)   detailed drilling program which indicates a step by step process on how the well is going to be drilled, at a level equivalent to what the rig personnel are utilizing; and

(n)    real time drilling data, including but not limited to LWD, drilling and mudlog data.

Upon written request, the Operator shall use reasonable efforts to furnish to a requesting Participating Party any additional available information (including a complete slabbed section of all recovered cores, if requested and available), acquired by the Operator for the Participating Parties, not otherwise furnished under this Article (not including any derivative information independently developed at Operator's sole cost and risk).   The Costs of gathering and furnishing the additional available information shall be charged to the Participating Party that requested it.

**5.8**    **Completed Well Information**

Operator shall, as soon as reasonably practicable, furnish to each Participating Party the following information pertaining to each Completed well; provided, however, the following information shall be provided in "real time" if it is available to the Operator in "real time" and a Participating Party has contractual rights to utilize the "real time" system that the Operator is utilizing and has agreed to pay any incremental expenses associated with its accessing that information from that "real time system":

(a)    monthly report of production and injection;

(b)    copies of routine reports made to regulatory agencies;

(c)    report on the status of wells not producing and not abandoned;

(d)    report on Hydrocarbons produced during Production Testing;

(e)    bottomhole pressure data and surface pressure data; and

(f)    composite of all logs run (for example, TDT, Carbon-Oxygen, Spinner Surveys, and Casing Collar).

**5.9** **Information to Non-Participating Parties**

The Operator shall furnish to each Non-Participating Party:

(a) as soon as reasonably practicable, copies of all non-confidential reports made to regulatory agencies, and

(b) if applicable, after Complete Recoupment, the information specified in Articles 5.7 *(Information to Participating Parties)* and 5.8 *(Completed Well Information)*.

**5.10** **Health, Safety, and Environment:**

With the goal of achieving safe and reliable activities and operations in compliance with all applicable laws and regulations, including avoiding significant and unintended impact on (i) the health or safety of people, (ii) property, or (iii) the environment, the Operator shall, with the support and cooperation of the Non-Operators, while it conducts activities or operations under this Agreement:

(a) design and manage activities or operations to standards intended to achieve sustained reliability and promote the effective management of HSE risks;

(b) apply structured HSE management systems and procedures consistent with those generally applied in the petroleum industry to effectively manage HSE risks and pursue sustained reliability of operations under this Agreement; and

(c) comply with all laws, orders, rules and regulations of any federal, state, or local government authority having jurisdiction over the Unit Area.

In fulfilling its duties and obligations hereunder, the Operator shall act in accordance with the provisions of Exhibit "J."

## ARTICLE 6 – EXPENDITURES AND ANNUAL OPERATING PLAN

**6.1** **Basis of Charges to the Parties**

Except as otherwise provided in this Agreement, the Operator shall pay all Costs of all activities and operations under this Agreement, and each Participating Party shall reimburse the Operator in proportion to its Participating Interest Share for the Costs of these activities and operations. All charges, credits, and accounting for expenditures shall be made under Exhibit "C." Funds received by the Operator under this Agreement may be commingled with the Operator's own funds.

## 6.2   AFEs

The Operator shall not undertake an activity or operation whose Costs are five hundred thousand dollars ($500,000) or more, unless an AFE has been included in a proposal for an activity or operation and the proposal has been approved by Vote, Election, or unanimous agreement, whichever is applicable, or the Operator is exercising one of its discretionary powers under this Agreement.  An approved proposal grants the Operator authority to commit or expend funds on the approved proposal for the account of the Participating Parties.  For an activity or operation whose Costs are in excess of two hundred and fifty dollars ($250,000), but less than five hundred thousand dollars ($500,000), the Operator shall furnish the Participating Parties with an AFE for information purposes only. Notwithstanding the foregoing, in the event of an emergency, or if in the sole discretion of the Operator a perceived emergency exists that poses an imminent threat to life, safety, property, or the environment, the Operator may immediately make those expenditures for the Joint Account as, in its opinion as a reasonable and prudent operator, are necessary to deal with the emergency, but only to the extent necessary to stabilize the situation and alleviate the imminent threat.  The Operator shall report to the Participating Parties, as promptly as possible, the nature of the emergency, the action taken, and the Costs incurred.

Notwithstanding anything in this Article 6.2 to the contrary, if less than all the Participating Parties in an operation elect to approve the supplemental AFE for such operation and if there is not an agreement among the Parties desiring to continue such operation to each bear their revised proportionate share of one hundred percent (100%) of the liability and Costs of the continued operation, the Operator shall, unless such Parties otherwise agreed to allocate such liability and Costs, terminate the operation.  If the Operator terminates the operation, each of the original Participating Parties shall be obligated to bear and pay their proportionate share of all the liabilities and Costs incurred by the Operator up to and including the termination of the operation, including, if applicable, all Costs associated with any plugging and abandonment of a well, whether or not such Costs exceed the currently approved AFE by greater than the permitted over-expenditure amount. Additionally, notwithstanding a Party's Election pursuant to Article 6.2.2 (*Supplemental AFEs for Cost Overruns for Wells*) to become a Non-Participating Party once the permitted over-expenditure has been exceeded, if at the conclusion of such drilling operation the well is plugged and abandoned, each Participating Party in the original drilling operation shall continue to be obligated to pay for its respective share of all Costs of plugging and abandoning the well (except for any increased plugging and abandonment Costs associated with any subsequent well operations conducted as a Non-Consent Operation).

### 6.2.1    **AFE Overrun Notice**

For informational purposes only, the Operator shall provide an AFE overrun notice to all the Participating Parties if it appears (based upon Operator's reasonable estimate) that the actual total Costs associated with an original AFE will exceed the estimated total expenditures in that original AFE by more than ten percent (10%), but will not require the submission of a supplemental AFE under Article 6.2.2 (*Supplemental AFEs*).

### 6.2.2    **Supplemental AFEs**

Except as provided in Article 6.2.3 (*Further Operations During a Force Majeure)*, if it appears (based upon the Operator's reasonable estimate) that the actual Costs associated with an original AFE or the latest approved supplemental AFE will exceed the relevant permitted over-expenditure set forth below, the Operator shall promptly submit a supplemental AFE to the Participating Parties. A supplemental AFE shall include the dollar amount of the permitted over-expenditure from the previously approved AFE as part of the dollar amount of that supplemental AFE. After Receipt of a supplemental AFE each Participating Party has the right to make an Election, in accordance with Article 8 (*Approvals and Notices),* as to its further participation in the approved activity or operation. If a proposed supplemental AFE is approved by Election, the Operator shall continue to conduct the approved activity or operation associated with the supplemental AFE at the sole Cost and risk of the Participating Parties in the supplemental AFE.    Any Participating Party making an Election not to participate in an approved supplemental AFE becomes a Non-Participating Party in the activity or operation associated with the original AFE once the actual Costs expended on the activity or operation exceed the permitted over-expenditure amount of the last AFE in which the Non-Participating Party Elected to participate, without regard to whether all the activities or operations in the original AFE have been conducted at the time of its Election not to participate. A Non-Participating Party in a supplemental AFE is subject to the Hydrocarbon Recoupment or Underinvestment provisions of Article 16 *(Non-Consent Operations)* for the:

     i.   Costs expended; and

     ii.   depths drilled in such well bore, if applicable,

after exceeding the permitted over-expenditure amount of the latest approved AFE (i.e., the original AFE or the latest supplemental AFE, if any, whichever is the latest), for that operation in which the Non-Participating Party elected to participate, unless the acreage forfeiture provisions of Article 16.4 (*Non-Consent Operations to Maintain Unit Area*) is applicable and Article 16.4.3 (*Limitations on Acreage Forfeiture*) is not applicable.

If a supplemental AFE is not approved by an Election or Vote, the Operator shall conclude the activity or operation as soon as practical, and each Participating Party will be responsible for its Participating Interest Share of the Costs of the activity or operation, including Costs in excess of the permitted over-expenditure amount.

**6.2.2.1    Permitted Over-expenditures on Well Operations**

The permitted over-expenditure for an Exploratory Operation, an Appraisal Operation, or a Development Operation is an amount equal to ten percent (10%) of the estimated Costs of the latest approved AFE for that operation, including the original AFE or a supplemental AFEs or ten million dollars ($10,000,000), whichever is less.

**6.2.2.2    Permitted Over-expenditures on the Feasibility AFE, a Post-Production Project Team AFE, or an Enhanced Recovery Project Team AFE**

The permitted over-expenditure for the Feasibility AFE, a Post-Production Project Team AFE, or an Enhanced Recovery Project Team AFE is an amount equal to ten percent (10%) of the estimated total Costs of the latest approved AFE, including the original AFE or a supplemental AFEs or five million dollars ($5,000,000), whichever is less.

**6.2.2.3    Permitted Over-expenditures on a Selection AFE or Define AFE**

The permitted over-expenditure for the Selection AFE or the Define AFE is an amount equal to ten percent (10%) of the estimated total Costs of the latest approved AFE, including the original AFE or a supplemental AFEs or eight dollars ($8,000,000), whichever is less.

**6.2.2.4    Permitted Over-expenditures on an Execution AFE**

The permitted over-expenditure for the Execution AFE is an amount equal to ten percent (10%) of the estimated total Costs of the latest approved AFE, including the original AFE or a supplemental AFEs or twenty million dollars ($20,000,000), whichever is less.

**6.2.2.5    Permitted Over-expenditures on All Other AFEs**

The permitted over-expenditure for all other AFEs is an amount equal to ten percent (10%) of the estimated total Costs in the latest approved AFE, including the original AFE  or a supplemental AFEs or three million dollars ($3,000,000), whichever is less.

**6.2.3    Further Operations During a Force Majeure**

No Party is permitted to make an Election not to participate in further activities or operations under Article 6.2.2 *(Supplemental AFEs)* during a Force Majeure or during an emergency that poses a threat to life, safety, property, or the environment, but may make an Election not to participate in further activities or operations that are to be conducted after the termination of the Force Majeure or emergency.  Notwithstanding any contrary provision of this Agreement, if Costs arising as a result of Force Majeure or emergency cause the amount of an original AFE and its approved supplemental AFEs to exceed their permitted over-expenditure in Article 6.2.2 *(Supplemental AFEs)*, no supplemental AFE will be required; however, once stabilization takes place and Force Majeure or emergency expenditures are no longer being incurred, the Operator shall submit to the Participating Parties a supplemental AFE for the activities or operations that are to be conducted after termination of the Force Majeure or emergency in order for them to make an Election under Article 6.2.2 *(Supplemental AFEs)* as to their participation in those activities or operations. Notwithstanding any contrary provision of this Agreement, the Participating Parties in the operation, which is affected by a Force Majeure event, shall be responsible for all Standby Charges, if any, accruing from when such event affects the operation until the earlier of the following:

(a)  the Force Majeure event is remedied and the Operator is able to resume the operation; or

(b)  the Participating Parties unanimously agree to terminate the operation.

Notwithstanding the foregoing, in the event the Operator has not received the necessary governmental approval(s) and/or permit(s) to commence an approved operation within fifteen (15) days after the last applicable Election or Vote approving the operation, then the Operator, at its sole discretion, may release the rig from location. In any event, however, and unless otherwise mutually agreed by the then Participating Parties, the Operator shall not keep the rig on location for more than thirty (30) days from the last applicable Election or Vote approving the operation while awaiting the necessary governmental approval(s) and/or permit(s). In the event the Operator releases the rig as provided for above, the Costs of plugging and abandoning (whether temporary or permanent) the well in its then current condition shall be borne by the Participating Parties in proportion to their Participating Interest in the last well operation.

**6.2.4**  **Long Lead Well Operation AFEs**

In addition to the Operator's right under Article 12.6 *(Long Lead Development System AFEs)* to submit Long Lead Development System AFEs for long lead-time items prior to the submission of the Execution AFE, the Operator may submit an AFE to the Parties, which will allow the Operator to make advance commitments for or purchases of equipment, materials or services, which are commercially reasonable and necessary to facilitate the early and orderly commencement of any kind of well or well operation  ("Long Lead Well Operation Items") (a "Long Lead Well Operation AFE").

**6.2.4.1**  **Proposal and Approval of a Long Lead Well Operation AFE**

A Long Lead Well Operation AFE proposal shall include a description of the equipment, materials, or services to be purchased, an estimate of any cancellation fees, and the description and estimated timing for the well or well operation that will utilize such long lead equipment, materials, or services.  Each Long Lead Well Operation AFE proposal requires approval by Vote of the Parties.   If the Long Lead Well Operation AFE is not approved by Vote, then the Long Lead Well Operation AFE proposal shall be deemed withdrawn.

Approval of a Long Lead Well Operation AFE shall not be deemed an affirmative Vote or Election to participate in any subsequently proposed wells or well operations for which such long lead equipment, material or services are procured.

**6.2.4.2**     **Non-Participating Parties in the Long Lead Well Operation AFE**

A Party who Votes not to participate in an approved Long Lead Well Operation AFE shall become a Non-Participating Party as to the costs of the Long Lead Well Operation AFE, and is subject to Article 16.5.3 *(Non-Consent Proprietary Geophysical Operations, Feasibility AFEs, Selection AFEs, Define AFEs, Long Lead Development System AFEs, Post-Production Project Team AFEs, Enhanced Recovery Project Team AFE, or Long Lead Well Operation AFEs)*. Each Non-Participating Party in a Long Lead Well Operation AFE retains the right to participate in a subsequently proposed well or well operation described in the Long Lead Well Operation AFE proposal, subject to its reimbursement to the Participating Parties in the Long Lead Well Operation AFE of an amount equal to that set forth in Article 16.5.3 *(Non-Consent Proprietary Geophysical Operations, Feasibility AFEs, Selection AFEs, Define AFEs, Long Lead Development System AFEs, Post-Production Project Team AFEs, Enhanced Recovery Project Team AFE, or Long Lead Well Operation AFEs)*. If a Non-Participating Party in a Long Lead Well Operation AFE Elects or Votes not to participate in the subsequently proposed well or well operation described in the Long Lead Well Operation AFE proposal, Article 16.5.3 *(Non-Consent Proprietary Geophysical Operations, Feasibility AFEs, Selection AFEs, Define AFEs, Long Lead Development System AFEs, Post-Production Project Team AFEs, Enhanced Recovery Project Team AFE, or Long Lead Well Operation AFEs)* shall not apply, but the Costs incurred pursuant to the Long Lead Well Operation AFE shall be included in the calculations of the applicable Hydrocarbon Recoupment or Underinvestment, whichever is applicable, in such well or well operation as set forth in Article 16 *(Non-Consent Operations)*. If the Long Lead Well Operation AFE benefits more than one well or well operation, the Cost will be allocated, as appropriate, to each well or well operation conducted.

**6.2.4.3**     **Non-Participating Parties in the Operations Associated with a Long Lead Well Operation AFE**

If a Party, who participated in a Long Lead Well Operation AFE, does not participate in an approved well or well operation, for which Long Lead Well Operation Items were procured under that AFE, the Operator shall reimburse that Party its Participating Interest Share of the Costs of those Long Lead Well Operation Items within thirty (30) days of the approval of such well or well operation; provided, however, that Party's share of those Costs shall be included in the calculation of any Hydrocarbon Recoupment to which it is subject as a result of such well or well operation.  The Operator shall invoice the Participating Parties in that well or well operation for their proportionate share of the reimbursement under this Article 6.2.4.3 and in accordance with Exhibit "C."

6.2.4.4   **Disposition of Items Associated with the Long Lead Well Operation AFE**

Notwithstanding the provisions of Exhibit "C" and Article 3.1 (*Exhibits*), the Participating Parties in an approved well or well operation for which Long Lead Well Operation Items were procured shall approve by Vote the disposition of those Long Lead Well Operation Items if they are not utilized for the approved well or well operation.  If the disposition is approved, the disposition will be binding on all Participating Parties in that well or well operation.  The disbursement of the proceeds realized from the disposition of those Long Lead Well Operation Items shall take place in accordance with Exhibit "C."

6.2.5   **Unit Area Assessment and Permitting AFEs**

Subject to Article 6.2 (*AFEs*), the Operator may submit an AFE (an "Assessment/Permitting AFE") to the Parties, which will allow the Operator to conduct operations, including, but not limited to, shallow hazard surveys, archeological surveys and shallow water flow assessments that are necessary or reasonable to:

(a)   assess the Unit Area for potential Exploration Operations, Appraisal Operations and/or Development Operations; and/or

(b) prepare Exploration Plans, Applications for Permit to Drill, Development Plans, Development Operation Coordination Documents, and other requisite government filings.

### 6.2.5.1   Proposal and Approval of a Assessment/Permitting AFE

An Assessment/Permitting AFE proposal shall include a description of the services to be performed and the description and estimated timing for the well or well operation that will utilize such services. Each Assessment/Permitting AFE proposal requires approval by Election of the Parties.   If the Assessment/Permitting AFE is not approved by Election, then the Assessment/Permitting AFE proposal shall be deemed withdrawn.

Approval of an Assessment/Permitting AFE shall not be deemed an affirmative Vote or Election to participate in any subsequently proposed wells or well operations for which such services are performed.

### 6.2.5.2   Non-Participating Parties in the Assessment/Permitting AFE

A Party who Elects not to participate in an approved Assessment/Permitting AFE shall become a Non-Participating Party as to the Costs of the Assessment/Permitting AFE, and is subject to same non-consent penalty under Article 16 (*Non-Consent Operations*), as if the Party Elected not to participate in underlying well or well operation. For example, if the Assessment/Permitting AFE relates to the first Exploratory Well drilled upon the Unit Area, the acreage forfeiture provisions of Article 16.2.1 (*First Exploratory Well*) would apply. With the exception of Assessment/Permitting AFEs relating to the first Exploratory Well and/or an operation required to maintain the Unit Area, each Non-Participating Party in an Assessment/Permitting AFE retains the right to participate in a subsequently proposed well or well operation described in the Assessment/Permitting AFE proposal, subject to its reimbursement to the Participating Parties in the Assessment/Permitting AFE of an amount equal to that set forth in the corresponding non-consent provision for such well or well operation. If a Non-Participating Party in an Assessment/Permitting AFE Elects or Votes not to participate

in the subsequently proposed, corresponding well or well operation described in the Assessment/Permitting AFE proposal, the Costs incurred pursuant to the Assessment/Permitting AFE shall be included in the calculations of the Hydrocarbon Recoupment or Underinvestment, if applicable, in such well or well operation as set forth in Article 16 (*Non-Consent Operations*).    If the Assessment/Permitting AFE relates to more than one well or well operation, the Cost will be allocated, as appropriate, to each well or well operation conducted.

### 6.2.5.3    Non-Participating Parties in the Operations Associated with an Assessment/Permitting AFE

If a Party, who participated in an Assessment/Permitting AFE, does not participate in an approved well or well operation, for which services were performed under that AFE, the Operator, on behalf of the Participating Parties in such well or well operation, shall reimburse that Party its Participating Interest Share of the Costs of the same within thirty (30) days of the approval of such well or well operation; provided, however, that Party's share of those Costs shall be included in the calculation of any Hydrocarbon Recoupment to which it is subject as a result of such well or well operation.    The Operator shall invoice the Participating Parties in that well or well operation for their proportionate share of the reimbursement under this Article 6.2.5.3 and in accordance with Exhibit "C."

## 6.3    Security Rights

Exhibit "F" (LOUISIANA) applies.

## 6.4    Annual Operating Plan

### 6.4.1    Effect and Content of Annual Operating Plan

The Annual Operating Plan is for informational and planning purposes and does not obligate any Party to any course of action or expenditures or constitute a Vote, Election, or unanimous agreement to participate in any specific activity or operation.    To the extent known on the date of submission of the Annual Operating Plan, the Annual Operating Plan shall include the following items, without limitation:

### 6.4.1.1   Capital Budget

(a)   a list of proposed wells to be drilled including their anticipated order, drilling time, depths, surface and bottomhole locations, objective sands, type of well (Development, Appraisal), purpose of well (production, injection), and estimated Costs;

(b)   capital well operations listed by well, with their estimated Cost;

(c)   capital projects that have estimated gross Costs greater than two million dollars ($2,000,000).   The term "capital project" includes addition of new equipment and expansion or upgrades of existing equipment; and

(d)   an estimated total amount (in aggregate) for capital projects.

### 6.4.1.2   Expense Budget

(a)   expense well operations listed by well, with their estimated Cost;

(b)   expense projects that have estimated gross Costs greater than two million dollars ($2,000,000).  The term "expense project" includes repair, replacement, inspection, and maintenance of existing equipment;

(c)   an estimated total amount (in aggregate) for expense projects; and

(d)   estimated Operations and Maintenance (O&M) expenditures for the year may be shown in the aggregate.  O&M expenses include the ongoing, everyday expenditures necessary to operate the field.

### 6.4.1.3   Operator Forecasts and Informational Items

(a)   production forecasts;

(b)   injection forecasts;

(c)   fuel gas forecasts;

(d)    scheduled or planned downtime exceeding three (3) days;

(e)    data collection programs;

(f)    Facility constraint and ullage forecast;

(g)    geochemical or geophysical survey(s) or special test(s) that might be contemplated; and

(h)    other areas deemed of significance by the Operator.

**6.4.2**    **Submission of Draft Annual Operating Plan**

Beginning in the year in which a Development Plan is approved, and in each subsequent year, the Operator shall develop and submit to the Non-Operating Parties, by July 1, a draft Annual Operating Plan for the next calendar year.  The Annual Operating Plan process will be used (a) as a reporting mechanism by which the Operator will inform the Non-Operating Parties of results of the previous year's activities and operations, (b) to review ongoing activities and operations, and (c) for the remainder of the current year and the next succeeding calendar year, to forecast and plan activities and operations and to forecast anticipated Hydrocarbon production volumes, operating expenses, and capital expenditures.

**6.4.3**    **Review of Draft Annual Operating Plan**

The Non-Operating Parties may provide suggested changes, additions, or deletions to the Annual Operating Plan to the Operator and all other Parties in writing before September 1 of each year.  The Operator will then make changes that it deems necessary (if any) and submit the final Annual Operating Plan to the Non-Operating Parties no later than November 1 of each year, at which time the Annual Operating Plan is deemed adopted by all Parties.

## ARTICLE 7 – CONFIDENTIALITY OF DATA

**7.1**    **Confidentiality Obligation**

Confidential Data acquired or obtained by a Party shall be kept confidential during the term of this Agreement, and shall not be disclosed to a third party, unless it is disclosed under Article 7.1.1 *(Exceptions to Confidentiality)* or 7.1.2 *(Permitted Disclosures)*.  Each Party shall maintain the secrecy of the Confidential Data, using the standard of care it normally uses in protecting its own confidential information and trade secrets.

### 7.1.1    Exceptions to Confidentiality

The confidentiality obligation shall not apply to Confidential Data that is:

(a)    now or later becomes part of the public domain (other than as a result of a wrongful act or omission by a Party);

(b)    now or later becomes available to a Party on a non-confidential basis from a source, other than a Party, that is legally permitted to disclose the item of Confidential Data;

(c)    known to a Party on a non-confidential basis before disclosure of the Confidential Data to it under this Agreement or to which that Party was otherwise entitled at the time of disclosure; or

(d)    independently developed by employees, Affiliates, contractors, and/or consultants of a Party who have not had access to the Confidential Data.

### 7.1.2    Permitted Disclosures

#### 7.1.2.1    Operator's Permitted Disclosures

The Operator may disclose items of Confidential Data to those third parties as may be necessary to conduct activities and operations under this Agreement, if the third parties are bound by written agreement to keep the Confidential Data secret for:

(a)    the period of time set forth in the Operator's service agreement with those third parties; or

(b)    two (2) years from commencement of services if a service agreement does not exist with those third parties.

Notwithstanding the foregoing, should the Operator disclose Confidential Data to an Affiliate, then the Operator shall require its Affiliate to handle, hold, and protect the Confidential Data as if it were a Party to this Agreement.

#### 7.1.2.2    All Parties' Permitted Disclosures

Subject to the restriction that a third party shall be bound by written agreement not to use or disclose the Confidential Data for a period of two (2) years from Receipt by such third party, except for the express

purpose for which the disclosure is made to such third party, all Parties may disclose, in whole or in part, the Confidential Data to the following receiving parties, who may remove the Confidential Data from the custody and premises of the Party making such disclosure:

(a)   to its Affiliate;

(b)   to a bona fide, financially responsible, prospective assignee of any portion of:

   i.   the Party's Working Interest; or

   ii.   a Non-Consenting Party's Working Interest,

   (including but not limited to an entity with whom a Party or its Affiliates is conducting bona fide negotiations directed toward a merger, consolidation or a sale of a Party's or an Affiliate's shares or substantially all of its assets on the OCS);

(c)   to potential contractors, professional consultants, or outside legal counsel engaged by or on behalf of the Party and acting in a capacity where that disclosure is essential to the contractor's, consultant's, or outside legal counsel's work;

(d)   to an insurance broker or underwriter, bank or other financial institution to the extent appropriate to a Party arranging financing or insurance for its obligations under this Agreement;

(e)   to the extent required by a Lease, or by law, order, decree, regulation, or rule (including, without limitation, those of any regulatory agency, securities commission, stock exchange, judicial, or administrative proceeding). If a Party is required to disclose Confidential Data under this Article 7.1.2.2(e), the Party shall promptly provide all other Parties to this Agreement written notice of those proceedings so that the non-disclosing Parties may seek a protective order or other remedy.   A disclosing Party shall furnish only such Confidential Data as is legally required and will use its reasonable efforts to obtain confidential treatment for any Confidential Data disclosed;

(f)    to an entity allocating or desiring to transport, process, or purchase Hydrocarbons produced under this Agreement for the purpose of making Hydrocarbon reserve estimates or other technical evaluations or allocating Hydrocarbon products to source points;

(g)    to third parties for benchmarking studies and industry performance reviews; provided that the Confidential Data disclosed does not include competitive information or data and the studies blind the identities of the participants and the origin of the Confidential Data; and

(h)    to a contractor for the purpose of offsite storage of Confidential Data.

### 7.1.3    Limited Releases to Offshore Scout Association

The Operator may disclose Confidential Data to the Offshore Oil Scouts Association at their weekly meetings.  The Confidential Data that may be disclosed is limited to information concerning well locations, well operations, and well Completions to the extent reasonable and customary in industry practice or required under the by-laws of the Offshore Oil Scouts Association.

### 7.1.4    Continuing Confidentiality Obligation

A Party who ceases to own a Working Interest remains bound by the confidentiality and use obligations of this Agreement as to Confidential Data obtained through this Agreement under Article 7.1 *(Confidentiality Obligation)*.

## 7.2    Ownership of Confidential Data

Except as otherwise provided for in this Article 7, all Confidential Data produced as a result of an activity or operation conducted hereunder shall be the property of all Participating Parties in that activity or operation.  A Non-Participating Party has no rights in or access to Confidential Data produced or derived from a Non-Consent Operation unless and until Complete Recoupment has taken place.

### 7.2.1    Trades of Confidential Data

Any Participating Party may propose the exchange or trade of any Confidential Data or other similar data and information owned by a third party.  Upon approval of said exchange or trade by unanimous agreement of the Participating

Parties, that approval shall bind all Participating Parties, and the Operator shall utilize the Well Data Trade and Confidentiality Agreement in Exhibit "I" in order to consummate that exchange or trade with the third party. The Operator shall promptly provide all Participating Parties copies of the third party data obtained along with copies of any agreement relating to that exchange or trade.

### 7.2.2    Ownership of Non-Consent Data

After Complete Recoupment has taken place and a Non-Participating Party has become a Participating Party in an activity or operation, that Non-Participating Party shall become an owner of the Confidential Data and information resulting from that activity or operation.   Within fifteen (15) days after Complete Recoupment, the Operator shall furnish that Confidential Data and information to the former Non-Participating Party.

### 7.3    Access to the Lease and Rig

Except as provided in Article 6.3(b) *(Default)* in Exhibit "F," each Participating Party may attend meetings between the Operator and any contractors constructing the Production System or Facilities specified in the Execution AFE as well as access to the construction sites.   Except as otherwise provided in Article 6.3(b) *(Default)* in Exhibit "F," each Participating Party shall have access to all drilling rigs, Production Systems, and Facilities to observe and inspect operations and wells in which it participates (and the pertinent records and other data).   Access by the Participating Party to a drilling rig, Production System, or Facility serving a Unit Area shall be scheduled through the Operator at least forty-eight (48) hours in advance (or, if conditions do not permit that much advance scheduling, with as much advance scheduling as is reasonably possible).   Each Party's access will be at reasonable times and may not unreasonably interfere with operations at the site, and shall be subject to the provisions of Article 22.8.

### 7.4    Development of Proprietary Information and/or Technology

The ownership, use, treatment, and disclosure of proprietary information or technology, including, but not limited to, drilling technology, production technology, production systems and facilities, and their transportation and installation, pipelines, flowlines, and offshore oil and gas transportation that are charged to the Joint Account shall be handled under Exhibit "G."

# ARTICLE 8 -- APPROVALS AND NOTICES

## 8.1    Classes of Matters

Action will be taken on a proposed activity or operation only after the procedures and approval requirements in this Agreement have been satisfied. There are four general classes of activities or operations under this Agreement: (a) those requiring approval by Vote, (b) those requiring approval by Election, (c) those requiring approval by unanimous agreement, and (d) those within the discretion of the Operator.

### 8.1.1    Voting and Electing Interest

If all Parties are entitled to make an Election or Vote, each Party has an Electing interest or a Voting interest equal to its Working Interest or its Participating Interest Share, as applicable. If a Party does not have a right to make an Election or Vote, each of the other Parties has an Electing interest or a Voting interest, as applicable, equal to its Working Interest or its Participating Interest Share, as applicable, divided by the total Working Interest or Participating Interest, as applicable, of those Parties who have a right to make an Election or Vote.

## 8.2    Voting and Election Procedures

The Parties shall Vote or make an Election on proposals requiring a Vote or Election in the order in which those proposals are submitted, except as specified in Articles 10.2 *(Exploratory Operations at Objective Depth)*, 11.2 *(Appraisal Operations at Objective Depth)*, and 13.2 *(Development Operations at Objective Depth)*. Subject to Article 6.2 *(AFEs)*, after Receipt of a notice properly given for an activity or operation requiring a Vote or Election, the Parties entitled to make that Vote or Election (a) may Vote or make an Election in accordance with this Article 8.2 *(Voting and Election Procedures)* and Article 8.7 *(Giving and Receiving Notices and Responses)* or (b) shall be deemed to have Voted or made an Election as provided in Article 8.6.5 *(Failure to Vote or Make an Election)*.

A Vote or Election to participate in a proposal is evidenced by a Party making a written affirmative response to the proposal or by a Party's execution of the AFE associated with the proposal. Except as otherwise provided in this Agreement, a Vote or Election not to participate in a proposal is evidenced by a Party's written negative response to the proposal, a Party's failure to make a timely written affirmative response to the proposal or to timely execute the AFE associated with the proposal, or a Party's failure to timely make a subsequent Vote or Election under Article 8.3 *(Second Opportunity to Participate)*. For the purposes of this Agreement, a Party's approval of an AFE for a well proposal shall be

deemed an approval of the Well Plan associated therewith, including any automatic revisions to the Well Plan as set forth in Article 10.1.2 (*Revision of Well Plan*).

**8.2.1**     <u>Approval by Vote</u>

Approval by Vote shall be decided by a Vote of the Parties as follows:

(a)    when one (1) Party or two (2) Parties are entitled to Vote, approval by Vote shall require an affirmative Vote of one (1) or more Parties with a Voting interest of greater than fifty percent (50%), or if the two (2) Parties entitled to Vote have the same Voting interest, the affirmative Vote of all Parties entitled to Vote; and

(b)    when more than two (2) Parties are entitled to Vote, approval by Vote shall require an affirmative Vote of two (2) or more Parties entitled to Vote with a combined Voting interest of greater than fifty percent (50%).

**8.2.2**     <u>Approval by Election</u>

Approval by Election shall be decided by an affirmative Election by one (1) or more Parties, entitled to make an Election, with a combined Electing interest of twenty-five percent (25%) or more.

**8.3**     <u>Second Opportunity to Participate</u>

Unless otherwise provided to the contrary in this Agreement, if an activity or operation is approved by Vote or Election but is not approved by all of the Parties, a Party who Voted or Elected not to participate in the approved activity or operation may make a subsequent Vote or Election to participate in the approved activity or operation within forty-eight (48) hours (exclusive of Saturdays, Sundays, and federal holidays) of its Receipt of the original Voting or Election results from the Operator; provided, however, if a drilling rig is on location then the response time shall be within twenty-four (24) hours (exclusive of Saturdays, Sundays and federal holidays) after its Receipt of the original Voting or Election results. If a Party does not exercise its right to make a subsequent Vote or Election to participate, it shall become a Non-Participating Party in the approved activity or operation. If (a) all the Parties entitled to do so make an original Vote or Election or a subsequent Vote or Election to participate in a proposed activity or operation or (b) an approval by Vote is binding on all Parties, then the Operator shall commence the activity or operation in accordance with the applicable timely operations provisions of this Agreement.

**8.4** **Participation by Fewer Than All Parties**

If, after the period in which a Party may make a subsequent Vote or Election to participate, there is at least one Non-Participating Party in the approved activity or operation, each Party who made an original or a subsequent Vote or Election to participate in the approved activity or operation shall, within forty-eight (48) hours (exclusive of Saturdays, Sundays, and federal holidays) of its Receipt of the subsequent Voting or Election results, or, if a rig is on location, within twenty-four (24) hours (exclusive of Saturdays, Sundays and federal holidays) of its Receipt of the subsequent Voting or Election results,

(a)     limit its participation in the approved activity or operation to its Working Interest share, or

(b)     agree to bear its Participating Interest Share of the approved activity or operation

by written correspondence to the Operator.  Failure to submit that written correspondence shall be deemed a written correspondence under (a).  If a Party, who made an original or a subsequent Vote or Election to participate in the approved activity or operation, submits or is deemed to have submitted a written correspondence under (a) and the other Parties who made an original or a subsequent Vote or Election to participate in the approved activity or operation do not agree to bear all of the remaining Costs of the approved activity or operation within fifteen (15) days after the written correspondence period (or twenty-four (24) hours -exclusive of Saturdays, Sundays and federal holidays- if a rig is on location), the proposal of the approved activity or operation and all Votes and Elections in regard to the approved activity or operation shall be deemed withdrawn.  Once the Parties, who made an original or a subsequent Vote or Election to participate in an approved activity or operation in which there is a Non-Participating Party, agree to bear all of the Costs of the approved activity or operation, the Operator shall commence the activity or operation at the sole Cost and risk of the Participating Parties in accordance with the applicable timely operations provisions of this Agreement. Notwithstanding the foregoing, the election periods in Articles 10.2 *(Exploratory Operations at Objective Depth)*, 11.2 *(Appraisal Operations at Objective Depth)*, and 13.2 *(Development Operations at Objective Depth)* shall govern in the event of a conflict.

**8.5** **Approval by Unanimous Agreement**

After Receipt of a notice for a proposal that requires unanimous agreement, each Party entitled to approve (or disapprove) that activity or operation may indicate its approval or disapproval by providing a written statement in a response.  Unless otherwise specifically provided, failure of a Party to make such a response is deemed its disapproval.

**8.6**    **Response Time for Notices**

After Receipt of an AFE or notice under this Article 8, the Parties may:

(a) submit their Vote,

(b) make an Election,

(c) submit a written statement, or

(d) submit a counter-proposal,

whichever is applicable.  If requested in writing by a Party entitled to (a) submit their Vote, (b) make an Election, (c) submit a written statement, or (d) submit a counter-proposal, as applicable, on an AFE or notice , the Operator shall give prompt notice of the results of those Votes, Elections or written statements to each Party entitled to (a) submit their Vote, (b) make an Election, (c) submit a written statement, (d) submit a counter-proposal, as applicable.  Except as otherwise provided in this Agreement, the response times for each type of proposal shall be as follows:

**8.6.1**    **Well, Well Operations, or Supplemental AFEs for a Well or Well Operation Proposals**

When a well or well operation is proposed, each Party entitled to Vote or make an Election or submit a written statement, whichever is applicable, has, except as provided below, thirty (30) days after Receipt of the proposal (inclusive of Saturdays, Sundays, and federal holidays) to respond to it.  With the exception of proposals for new wells (other than a substitute well) proposed under Articles 10.1 (*Proposal of Exploratory Wells*), 11.1 (*Proposal of Appraisal Wells),* 13.1 (*Proposal of Development Wells),* if a drilling rig is on location when a well or well operation is proposed, then a Party entitled to Vote or make an Election or submit a written statement has forty-eight (48) hours (exclusive of Saturdays, Sundays, and federal holidays) following the latter of:

(a)    Receipt of the proposal; or

(b)    the commencement of Standby Charges,

to respond to it. The response times for subsequent operations at Objective Depth are provided in Article 10.2 (*Exploratory Operations at Objective Depth),*

Article 11.2 *(Appraisal Operations at Objective Depth)*, and Article 13.2 *(Development Operations at Objective Depth)*.

**8.6.2**    **Execution AFE**

Each Party entitled to make an Election on an Execution AFE has one hundred and twenty (120) days after the date of its Receipt of the Execution AFE to make that Election.

**8.6.3**    **Other AFE Related Operations**

Except as otherwise provided in Articles 8.6.1 *(Well, Well Operations, or Supplemental AFEs for a Well or Well Operation Proposals)* and 8.6.2 *(Execution AFE)*, the response time to a proposed AFE, activity, or operation will depend upon the gross AFE amount.  Response times will be as follows:

(a)    AFE of five hundred thousand dollars ($500,000) or more but less than twenty-five million dollars ($25,000,000); response will be made within thirty (30) days after Receipt of said proposal;

(b)    AFE of twenty-five million dollars ($25,000,000) or more but less than one hundred million dollars ($100,000,000); response will be made within ninety (90) days after Receipt of said proposal; and

(c)    AFE of one hundred million dollars ($100,000,000) or more; response will be made within one hundred twenty (120) days after Receipt of said proposal.

**8.6.4**    **Other Proposals**

For all other proposals requiring notice, and all supplemental AFEs other than those subject to Article 8.6.1 *(Well, Well Operations, or Supplemental AFEs for a Well or Well Operation Proposals)*, each Party has thirty (30) days after Receipt of the proposal to respond to it.

**8.6.5**    **Failure to Vote or Make an Election**

Unless otherwise specifically provided, failure of a Party to Vote or make an Election, whichever is applicable, within the period required by this Agreement is deemed to be a Vote or Election not to participate.

### 8.6.6     Suspensions of Operations and Suspensions of Production

Notwithstanding any contrary provision in Article 8.6 *(Response Time for Notices)*, if the DOI grants a Suspension of Production ("SOP"), a Suspension of Operations ("SOO"), or similar regulatory grant for all or part of the Unit Area, and if the SOP, SOO, or grant requires the commencement of an activity or operation before the expiration of the period for Voting, making an Election, or submitting a written statement, as provided in Article 8.5 *(Approval by Unanimous Agreement)* for that activity or operation, the Parties shall cast their Votes, make their Elections, or submit their written statement on the activity or operation at least sixty (60) days (inclusive of Saturdays, Sundays and federal holidays) before the commencement date required in the SOO, SOP, or grant.

### 8.6.7     Standby Charges Associated with Immediate Substitute Wells, Subsequent Operations, and/or Supplemental AFE Proposals

The Participating Parties in a well or well operation conducted immediately prior to the Receipt of a:

(a)   proposal for an immediate substitute well or a subsequent operation in a well, or

(b)   supplemental AFE,

are responsible for charges associated with the well or well operation that accrue before that Receipt.

All charges, which accrue after that Receipt, are the responsibility of the Participating Parties in the immediate substitute well, subsequent operation, or supplemental AFE.

If the proposal of:

(a) an immediate substitute well or subsequent operation, or

(b) a supplemental AFE

is not approved, the Participating Parties in the well or well operation conducted immediately prior to the Receipt of that proposal or supplemental AFE are responsible for the charges that accrue after that Receipt.

**8.7**   **Giving and Receiving Notices and Responses**

Except as otherwise provided in this Agreement, all notices and responses required or permitted by this Agreement shall be in writing and shall be delivered in person or by mail, courier service, electronic mail, or facsimile transmission, with postage and charges prepaid, addressed to the Parties at the addresses in Exhibit "A." A notice shall be deemed delivered upon Receipt.

**8.8**   **Content of Notices**

A notice requiring a response shall indicate the appropriate response time specified in Article 8.6 *(Response Time for Notices)*.  A well proposal notice shall include the type of well being proposed, (for example, Exploratory Well, Appraisal Well, or Development Well), a Well Plan, and an AFE that includes the Costs of permanently plugging and abandoning the well.  If a proposed activity or operation is subject to Article 16.4 *(Non-Consent Operations to Maintain Unit Area)*, the notice shall specify that the proposal is a Unit Area maintenance activity or operation.

Upon written request and if available, the Operator shall endeavor to provide the following documents to the Non-Operators; however, (i) such documents requested are not required for a valid Well Plan under Article 2.75 (*Well Plan*) and (ii) the Operator is under no obligation to provide such documents to a Party once such Party has elected not to participate in the Well Plan and AFE:

    (a) final detailed operational procedure document with associated well design technical documents, *e.g.* drilling fluids, BHA design;

    (b) wellhead bending load analysis (for DP mobile offshore drilling unit ["MODU"] only);

    (c) well control and spill containment document for deep water wells drilled in the OCS waters or other complex type wells, including the following information:

        i.    relief well planning and equipment availability;

        ii.    spill response and containment method;

        iii.    well control competency assurance process in place;

        iv.    blow out contingency plan; and

     v.     well control bridging document for contracted specific DP MODU with regard to drilling, completion, and or well testing or well flow back operations;

(d) QA/QC processes for acceptance of critical material or equipment:

     i.     detailed well completion design basis document, including:

- proposed detailed well completion schematics (lower and upper completion drawings with all completions equipment identified);

- Completion operational procedure document (upper and lower completion); and

- well control plan during upper completion (tubing string installation operations), and or well flow-back operations;

     ii.     in addition, for proposed well workover, recompletion, or sidetracking (if applicable):

- description of proposed work scope, including proposed outcome;

- diagram of proposed well after workover, recompletion, or sidetrack;

- detailed operational procedure, including plans for well bore cleanout procedure and fluid loss mitigation method;

- proposed well completion schematics (lower and upper completion drawings with all down hole completions equipment identified by name and dimensions); and

- well control plan during well intervention operations.

**8.9**    **Designation of Representatives**

The names, addresses, e-mail addresses and telephone and facsimile numbers of a designated representative and alternate for each Party to whom notices or responses shall be directed, are provided in Exhibit "A." The designated representative and the alternate may be changed by written notice to the other Parties.

**8.10**    <u>Meetings</u>

Any Party may call a meeting. Except in an emergency, no meeting shall be called on less than five (5) days' advance notice (inclusive of Saturdays, Sundays, and federal holidays), and the notice shall include a proposed agenda. The Operator shall be chairman of each meeting and take minutes of each meeting. Only matters included in the agenda may be considered at a meeting unless unanimously agreed to by the Parties.

**8.11**    <u>Obligations of Participation Election</u>

Subject to Article 6.2 *(AFEs)*, a Participating Party in an Exploratory Operation, an Appraisal Operation, or a Development Operation is responsible for its Participating Interest Share of:

(a) all necessary Costs for such operation as set forth in the approved proposal for such operation,

(b) plugging and abandonment, if applicable;

(c) mobilization charges as set forth in Article 8.11.2; and

(d) well control and containment charges but excluding any Costs incurred by the Operator to acquire an ownership interest in such well control and containment company.

**8.11.1**    <u>Mobilization Charges</u>

A Participating Party in an Exploratory Operation, Appraisal Operation, or Development Operation is responsible for its Participating Interest Share of the reasonable allocated Costs to mobilize the rig approved in the Well Plan to location. However, the Operator shall only be entitled to charge Participating Parties for mobilizing such rig within the OCS. Unless otherwise unanimously agreed to by the Participating Parties, in no event shall the Participating Parties be obligated to pay for such rig's mobilization from or to a location outside the OCS.

<u>**ARTICLE 9 – NEWS RELEASES**</u>

**9.1**    <u>**Proposal of News Releases**</u>

Any Party may propose for the issuance of a News Release about the activities or operations covered by this Agreement by submitting the text of the News Release to the

Parties.  A News Release proposal requires the unanimous agreement of the Parties, except as otherwise provided below. The Parties shall respond to a News Release proposal within forty-eight (48) hours of their Receipt of it by agreeing or disagreeing with the text of the proposed News Release, or by submitting alternative text for the News Release.  If a Party submits alternative text for the News Release, the Parties shall have twenty-four (24) hours to agree or disagree with any of the proposed texts of the News Release.  If a Party fails to respond within the appropriate time frame, the Party shall be deemed to have not approved such proposed News Release.

### 9.1.1    Operator's News Release

If the Parties do not unanimously agree to any of the texts of a proposed News Release within the time period set forth in Article 9.1 *(Proposal of News Releases)*, the Operator has the exclusive right for twenty-four (24) hours, following the last response under Article 9.1 *(Proposal of News Releases)*, to submit a News Release on the subject matter of the original proposal to the Parties in accordance with this Article 9.1.1.  If the News Release pertains to a well or an operation in a well, the Operator must limit the content of the News Release to the following information:

(a) the name of the well or operation and the water depth;

(b) the location of the well by protraction area, block, and adjacent state;

(c) the lease bonus paid and the lease acquisition date;

(d) additional drilling / appraisal plans;

(e) the participants in, and their Working Interest in, the well or operation; and

(f)  the surrounding acreage controlled by the participants.

If the News Release does not pertain to a well or an operation in a well, it may only contain information that is not Confidential Data or Confidential Information (as defined in Exhibit "G") and does not substantially undermine the Parties' competitive advantage in the area surrounding, or trend or play pertaining to, the Unit Area. The Operator shall transmit the News Release to the Non-Operating Parties not less than twenty-four (24) hours (exclusive of Saturdays, Sundays, and federal holidays) before the time at which the Operator wishes to issue it.  Any Party may have its name excluded from the News

Release by notifying the Operator of that desire within twenty (20) hours of that Party's Receipt of the News Release.

### 9.1.2   Non-Operating Party's News Release

If the Operator issues the News Release within its twenty-four (24) hour period referred to in Article 9.1.1 *(Operator's News Release),* thereafter, any Participating Party may issue its own News Release subject to the content guidelines and procedures provided in Article 9.1.1 *(Operator's News Release).* If the Operator does not issue the News Release within its twenty-four (24) hour period referred to in Article 9.1.1 *(Operator's News Release),* thereafter, any Participating Party may issue its own News Release subject to the content guidelines and procedures provided in Article 9.1.1 *(Operator's News Release).*

### 9.2   Emergency New Releases

In an emergency involving extensive property damage, loss of human life, or other clear emergency and where there is insufficient time to obtain approval from the other Parties, the Operator may furnish factual information necessary to satisfy legitimate public interest or governmental authorities having jurisdiction. The Operator shall immediately notify the Parties of the information furnished in response to the emergency.

### 9.3   Mandatory News Releases

Each Party has the right to issue a News Release which contains information not otherwise permitted under Article 9 *(News Releases)* in order to comply with the laws, orders, rules, or regulations of the country in which its parent company is incorporated; provided, however, prior to issuing that News Release, that Party must submit, not less than forty-eight (48) hours (exclusive of Saturdays, Sundays, and federal holidays) before issuance of the News Release:

(i)    the text of that News Release to the other Parties, and

(ii)   if a News Release (including its content) is required under the laws, orders, rules, or regulations of a country other than the United States of America, an explanatory statement from a licensed attorney in such country.

### 9.4.   News Release Necessitated by Publication or Announcement by Governmental or Regulatory Authority

Each Party has the right to issue a News Release that contains information not otherwise permitted under Article 9 *(News Releases)* in a situation where a governmental or

regulatory authority publishes or announces information regarding any activities or operations affected by this Agreement, and for which the Party reasonably believes needs to be clarified, further detailed or otherwise commented on to satisfy the legitimate public interest in such information. In such a situation, a Party may furnish the minimum, strictly factual, information necessary and shall then promptly advise the other Parties of the information furnished in response to the publication or announcement.

## ARTICLE 10 – EXPLORATORY OPERATIONS

### 10.1   Proposal of Exploratory Wells

Any Party may propose drilling an Exploratory Well within the Unit Area by giving notice of the proposal (along with the associated AFE and Well Plan) to the other Parties. Each proposed Exploratory Well requires approval by Election.

Each Non-Participating Party in an Exploratory Well will be subject to either an acreage forfeiture or Hydrocarbon Recoupment as provided in Article 16 *(Non-Consent Operations)*.

#### 10.1.1   Pre-Exploratory Well AFE Meeting

Prior to submitting an AFE for a new Exploratory Well (including any substitute well, except for a substitute well proposed while a rig is on the Unit Area), the Operator shall call a meeting of the Parties entitled to an Election as to the contemplated new Exploratory Well or its substitute, if applicable, to share with said Parties the preliminary scope of the contemplated new Exploratory Well. Although the Operator may change, modify or alter the preliminary scope of the contemplated new Exploratory Well subsequent to the meeting but prior to submission of the AFE associated therewith, as contemplated herein, the general items the Operator will address at the meeting, shall consist of a preliminary well design, a preliminary rig selection/type and timing, a preliminary total estimated depth of the well, a preliminary Objective Depth criteria, a preliminary surface and bottomhole location(s), and a preliminary zone(s) of interest. Should a Non-Operator contemplate proposing an AFE for a new Exploratory Well (or its substitute, if applicable), said Non-Operator shall call a meeting as provided in this Article 10.1.1 *(Pre-Exploratory Well AFE Meeting)*.

#### 10.1.2   Revision of Well Plan

Except as provided in Article 10.1.3 *(Automatic Revision of the Well Plan)*, a revision to an approved well proposal, Well Plan, or AFE prior to the

commencement of actual drilling operations on an Exploratory Well requires the unanimous agreement of the Participating Parties. In the absence of such unanimous agreement on a proposed revision to the well proposal, Well Plan or AFE, the well proposal, Well Plan, or AFE will stand as approved, except as provided in Article 10.1.3 (*Automatic Revision of the Well Plan*). Only a major revision to an approved well proposal, Well Plan or AFE prior to the commencement of actual drilling operations will give a Non-Participating Party an additional opportunity to participate in the Exploratory Well. A revision is deemed a major revision only if the Objective Depth of an Exploratory Well is changed or the bottomhole location is moved either vertically or horizontally more than five hundred feet (500'); in which case each Non-Participating Party in the well may, for a period of ten (10) days after Receipt of the revised well proposal, Well Plan, or AFE, notify the Operator in writing that it will participate in the revised Exploratory Well. It is understood, however, in no event shall a Non-Participating Party in a Non-Consent Exploratory Well that is abandoned due to mechanical reasons have the right to participate in a substitute Exploratory Well for such abandoned well by virtue of a major revision to such substitute Exploratory Well's Well Plan.

A Non-Participating Party timely submitting its participation notification under this Agreement due to a major revision in a Well Plan (a) shall become an Underinvested Party for Costs incurred (if any) on the Exploratory Well prior to the approved major revision and (b) with regard to that well, shall no longer be subject to Article 16 (*Non-Consent Operation*s) as to said Costs. The Non-Participating Party's Underinvestment obligation, resulting from its participation decision, shall be calculated as follows: actual Costs expended on that Exploratory Well multiplied by the Non-Participating Party's percentage Participating Interest Share in the modified Exploratory Well. In the event the Non-Participating Party forfeited and assigned its right, title, and interest in the Unit Area by not participating in that Exploratory Well, then within thirty (30) days after the Operator's Receipt of the Non-Participating Party's participation notification under this Agreement, the Participating Parties in the Exploratory Well proposal that assumed the Non-Consent interest or any portion thereof shall proportionately assign to the Non-Participating Party one hundred percent (100%) of the Non-Participating Party's former Working Interest in the Unit Area.

### 10.1.3   Automatic Revision of the Well Plan

Prior to or during the drilling of an Exploratory Well, the Well Plan may be revised by the Operator as is necessary for it to employ prudent oilfield practices to conduct safe operations, or as directed, required, mandated and/or advised by the DOI or any other governmental authority having jurisdiction over such operations and those revisions will not require the approval of the Participating Parties as long as the Operator's revisions carry out the scope and intent of the approved Well Plan and AFE, except as provided in Article 6.2.2 (*Supplemental AFEs*). Moreover, and notwithstanding anything to the contrary in Article 10.1.2, any such automatic revisions made by the Operator prescribed in this Article 10.1.3 prior to the commencement of drilling operations shall not be considered a major revision.

### 10.1.4   Timely Operations

Except as provided below, drilling operations on an Exploratory Well shall be commenced within two hundred and seventy (270) days after the end of the period for the approval of an Exploratory Well. If the Operator, except for an occurrence of Force Majeure, does not commence drilling operations on an Exploratory Well within that two hundred and seventy (270) day period, the approved Exploratory Well proposal shall be deemed withdrawn, with the effect as if the Exploratory Well had never been proposed and approved, and the Non-Operating Parties may then select a substitute Operator under Article 4.2.2 (*Substitute Operator if Operator Fails to Commence Drilling Operations*). Within thirty (30) days of the selection of the substitute Operator, the substitute Operator may propose the drilling of an identical Exploratory Well (except for any necessary modifications resulting from a change in the drilling rig to be utilized by the substitute Operator), and it may commence drilling operations on that well within two hundred and seventy (270) days after the end of the period for the approval of that Well.

If an approved Exploratory Well proposal is deemed withdrawn due to a failure to timely commence drilling operations on that well, all Costs incurred, which are attributable to the preparation for, or in furtherance of, the Exploratory Well, will be chargeable to the Participating Parties. Drilling operations for an Exploratory Well under this Article 10.1.4 shall be deemed to have commenced on the date the rig arrives on location or, if the rig is already on location, the date

when actual drilling operations for the approved Exploratory Well are undertaken.

**10.1.5**    **AFE Overruns and Substitute Well**

Once an Exploratory Well is commenced, the Operator shall drill the well with due diligence to its Objective Depth, subject to:

(a)    all supplemental AFEs required under Article 6.2.2 *(Supplemental AFEs)*,

(b)    the Operator encountering mechanical difficulties, uncontrolled influx of subsurface water, loss of well control, abnormal well or formation pressures, pressured or heaving shale, granite or other practicably impenetrable substances, or other similar conditions in the well bore or damage to the well bore that, in the Operator's sole opinion, render further well operations impractical, and

(c)    the unanimous agreement of the Participating Parties to cease drilling an Exploratory Well before reaching Objective Depth.

If an Exploratory Well is abandoned due to the conditions described under Article 10.1.5(b), then any Participating Party in the abandoned Exploratory Well may, within sixty (60) days after abandonment of the Exploratory Well, propose the drilling of a substitute well for the abandoned Exploratory Well by giving notice of the proposal (along with the associated AFE and Well Plan) to all other Participating Parties in the abandoned Exploratory Well, and that proposal requires approval by Election of the Participating Parties in the abandoned Exploratory Well. Notwithstanding any contrary provision of Article 10.4 *(Conclusion of Exploratory Operations)*, the substitute well shall be deemed as an Exploratory Well. The Well Plan for the substitute Exploratory Well shall be substantially the same as the Well Plan for the abandoned Exploratory Well and shall also take into account the conditions that rendered further drilling of the abandoned Exploratory Well impractical. Each Non-Participating Party in a substitute Exploratory Well or an approved supplemental AFE for an Exploratory Well will be subject to either an acreage forfeiture or Hydrocarbon Recoupment, as provided in Article 16 *(Non-Consent Operations)*.

## 10.2 **Exploratory Operations at Objective Depth**

After an Exploratory Well has been drilled to such Objective Depth and all operations in the controlling AFE have been conducted or terminated (except temporary abandonment and permanent plugging and abandonment) and all logs and test results have been distributed to the Participating Parties, the Operator shall promptly notify the Parties entitled to Vote or make an Election (i.e., the Participating Parties) of its proposal to conduct subsequent operations in the well. Except for a proposal to permanently plug and abandon the well, the Operator's proposal shall include an associated AFE and a plan for the operation.

If the Participating Parties have secured the requisite approval to either:

(i)     Sidetrack said well, or

(ii)    Deepen said well,

and, provided that Article 16.2 *(Acreage Forfeiture Provisions)* was not applicable to the drilling of that Exploratory Well, then, contingent upon the unanimous approval of the Participating Parties in the approved Sidetrack or Deepening Operation, the Operator shall notify each former Non-Participating Party of the proposal. Each former Non-Participating Party may respond with an Election regarding such a proposal by notifying the Operator of its Election within forty-eight (48) hours (exclusive of Saturdays, Sundays, and federal holiday) after receiving the Operator's notice. Any former Non-Participating Party making an Election to participate in the Deepening or Sidetracking of an Exploratory Well shall be subject to Article 10.2.5.

The Operator's proposal shall be for one (1) of the following operations:

(a)     conduct Additional Testing, Sidewall Coring, or Logging of the formations encountered prior to setting production casing;

(b)     Sidetrack the well bore to conventionally core the formations encountered;

(c)     Deepen the well to a new Objective Depth; provided, however, if in the Operator's sole opinion a casing string is required to Deepen the well, then option "d" shall have priority over Deepening the well to a new Objective Depth;

(d)     Sidetrack the well, including the requisite plug back operations related thereto;

(e)     conduct Production Testing;

(f)     Complete the well;

(g)     conduct other operations on the well not listed;

(h)     temporarily abandon the well; or

(i)     permanently plug and abandon the well.

Notwithstanding any contrary provision in this Agreement, the Completion of an Exploratory Well as a Subsequent Exploratory Operation shall require approval by the Vote of the Participating Parties, and a Non-Participating Party in a Completion conducted of an Exploratory Well after it has reached its Objective Depth is:

(i)     subject to a Hydrocarbon Recoupment amount equal to its Non-Participating Interest Share of the Costs of the Completion Operation multiplied by four hundred percent (400%) in lieu of the Hydrocarbon Recoupment penalty set forth in Article 16.5.1.1 (*Non-Consent Exploratory Operations at Objective Depth*), and

(ii)    relieved of the Costs and risks of such Completion Operation, but remains responsible for its Participating Interest Share of the Costs of plugging and abandoning the Exploratory Well less and except the extra Costs of plugging and abandoning associated solely with the Completion in which it was a Non-Participating Party.

If an Exploratory Well is temporarily abandoned under (h), then any additional operation in that well shall be proposed as a new well operation, and shall be deemed an Exploratory Operation, Appraisal Operation, or Development Operation proposal, as applicable in accordance with the definitions set forth herein.

If the Operator fails to submit its proposal to the Participating Parties within twenty-four (24) hours (exclusive of Saturdays, Sundays, and federal holidays) after receipt of all logs and test results from an Exploratory Well by the Participating Parties, then any Participating Party may make a proposal.  In that event, the procedures in this Article 10.2 shall apply to that proposal, and any reference in this Article 10.2 to the "Operator's proposal" shall include a proposal made by a Participating Party.

### 10.2.1    Response to Operator's Proposal

A Participating Party may, within twenty-four (24) hours (exclusive of Saturdays, Sundays, and federal holidays) of its Receipt of the Operator's

proposal, make a separate proposal (along with an associated AFE and a plan for the operation, except if the proposal is to permanently plug and abandon the well) for one of the operations in Article 10.2 *(Exploratory Operations at Objective Depth)*, and the Operator, immediately after the expiration of the twenty-four (24) hour period for making a separate proposal shall provide the Parties entitled to make an Election with a copy of all separate proposals so made.  If no separate proposal is made, the Parties entitled to make an Election shall, within forty-eight (48) hours (exclusive of Saturdays, Sundays, and federal holidays) following the latter of:

(a)    Receipt of the Operator's proposal; or

(b)    the commencement of Standby Charges,

make an Election on the Operator's proposal (except for a proposal to permanently plug and abandon).  If a separate proposal is made, the Parties entitled to make an Election shall make an Election under the procedure in Article 10.2.2 *(Response to Highest Priority Proposal)*.  If a proposal to permanently plug and abandon the well is the only operation proposed, then the approval and Cost allocation provisions of Article 10.3 (*Permanent Plugging and Abandonment and Cost Allocation*) shall apply to that proposal.  If Article 8.3 *(Second Opportunity to Participate)* or Article 8.4 *(Participation by Fewer Than All Parties)*, or both, apply to any Election in Article 10.2 *(Exploratory Operations at Objective Depth)*, then the response period in those articles shall be twenty-four (24) hours (exclusive of Saturdays, Sundays, and federal holidays) instead of forty-eight (48) hours (exclusive of Saturdays, Sundays, and federal holidays). Notwithstanding any contrary provision of this Agreement, if one or more operations are proposed before the distribution of information resulting from the previously approved operation, then the response periods set forth above shall not commence until the Parties entitled to make an Election have received the information from the previously approved operation.

### 10.2.2    Response to Highest Priority Proposal

If a separate proposal is made, each Party entitled to make an Election shall, within twenty-four (24) hours (exclusive of Saturdays, Sundays, and federal holidays) following the latter of:

(a)   Receipt from the Operator of a complete copy of all separate proposals; or

(b)   the commencement of Standby Charges,

make its Election on the highest priority proposal (except a proposal to permanently plug and abandon the well). Article 10.2(a) has the highest priority, and Article 10.2(i) has the lowest priority. If different depths or locations are proposed for the same type of operation, preference shall be given to the shallowest depth, or the location nearest to the existing well bore, as applicable. If the proposal with the highest priority is approved, then the lower priority proposals shall be deemed withdrawn. Once the approved operation is completed, the Parties shall follow the procedure provided in this Article 10.2 *(Exploratory Operations at Objective Depth)* for all other proposals for operations in the well bore until such time as the well is Completed, temporarily abandoned or permanently abandoned.

### 10.2.3   <u>Response on Next Highest Priority Proposal</u>

If the proposal with the highest priority is not approved, then the next highest priority proposal shall be deemed the highest priority proposal and it shall be subject to the approval procedure in Article 10.2.2 *(Response to Highest Priority Proposal)*. This process will continue until a proposal is approved to either Complete, temporarily abandon or permanently plug and abandon the Exploratory Well.

### 10.2.4   <u>Non-Participating Parties in Exploratory Operations at Objective Depth</u>

A Non-Participating Party in an Exploratory Operation conducted on an Exploratory Well after it has reached its Objective Depth [except as provided for in this Article 10.2 *(Exploratory Operations at Objective Depth)*] is subject to Article 16.5.1.1 *(Non-Consent Exploratory Operations at Objective Depth)* and is relieved of the Costs and risks of that Exploratory Operation, except that a Non-Participating Party in that Exploratory Operation remains responsible for its Participating Interest Share of the Costs of plugging and abandoning the Exploratory Well, less and except all Costs of plugging and abandoning associated solely with the subsequent Exploratory Operation in which it was a Non-Participating Party.

**10.2.5** **Participation in a Sidetrack or Deepening by a Non-Participating Party in an Exploratory Well at Initial Objective Depth**

If an Exploratory Well is drilled to its initial Objective Depth and a Non-Participating Party in that Exploratory Well becomes a Participating Party in an approved Sidetracking or Deepening under Article 10.2(c) or Article 10.2(d), that former Non-Participating Party shall become an Underinvested Party in an amount equal to its Non-Participating Interest Share of the Costs of that Exploratory Well prior to that Sidetracking or Deepening. The original Participating Parties in an Exploratory Well are Overinvested Parties in that amount. A former Non-Participating Party in an Exploratory Well that becomes a Participating Party in an approved Sidetracking or Deepening remains a Non-Participating Party in that Exploratory Well to initial Objective Depth until (a) its Underinvestment is eliminated under Article 16.9 *(Settlement of Underinvestments)*, and (b) the Hydrocarbon Recoupment recoverable under Article 16.5.1 *(Non-Consent Exploratory Operations down to Objective Depth in the First Exploratory Well)*, less the amount of the Underinvestment, has been recovered by the original Participating Parties. If a former Non-Participating Party becomes a Participating Party in more than one approved Sidetracking or Deepening in the same Exploratory Well, that former Non-Participating Party shall become an Underinvested Party only with regard to the first Sidetracking or Deepening it approves; however, that Underinvestment shall not be relieved by an Underinvested Party's subsequent participation.

**10.3** **Permanent Plugging and Abandonment and Cost Allocation**

Except as otherwise provided in this Agreement, the permanent plugging and abandonment of an Exploratory Well that is located on an active lease and:

(a) is to be plugged due to mechanical difficulties or impenetrable conditions before the well has been drilled to its Objective Depth under Article 10.1.5 (b),

(b) is to be plugged under Article 10.2 *(Exploratory Operations at Objective Depth)*, or

(c) has been previously temporarily abandoned under Article 10.2 *(Exploratory Operations at Objective Depth)*

and has not produced Hydrocarbons (other than as a result of Production Testing), requires the unanimous agreement of the Participating Parties. Approval to plug and abandon an Exploratory Well that has produced Hydrocarbons (other than as a result of Production

Testing) shall be governed by Article 18.1 (*Abandonment of Wells*). If a proposal to plug and abandon an Exploratory Well receives the unanimous agreement of the Participating Parties, the approved proposal binds all Parties. If any Participating Party fails to respond within the applicable response period for a proposal to plug and abandon an Exploratory Well, that Participating Party shall be deemed to have approved the plugging and abandonment of that Exploratory Well. If a rig is on location, a proposal to plug and abandon an Exploratory Well under either Article 10.3(a) or 10.3(b) does not receive unanimous agreement, and if within twenty-four (24) hours (exclusive of Saturdays, Sundays, and federal holidays) after Receipt of that proposal no other operation is proposed (and subsequently approved) for the well by a Party entitled to make a proposal, the Operator may nevertheless proceed to plug and abandon the Exploratory Well, and shall give each Participating Party notice of that fact. If the proposal to plug and abandon an Exploratory Well that has not produced Hydrocarbons (other than as a result of Production Testing) does not receive approval by unanimous agreement, but the Operator, in its sole opinion, deems the well bore not to be safe or in sound enough condition for it to perform further operations, the Operator may nevertheless proceed to plug and abandon the Exploratory Well, and shall give each Participating Party notice of that fact.

The Participating Parties in an Exploratory Well proposal shall pay all Costs of plugging and abandoning the Exploratory Well, except all increased plugging and abandoning Costs associated solely with a Non-Consent Operation approved under Article 10.2 *(Exploratory Operations at Objective Depth)* or Article 6.2.2 *(Supplemental AFEs)*. The Participating Parties in that Non-Consent Operation are responsible for the increased plugging and abandoning Costs attributable to that Non-Consent Operation.

### 10.4 <u>Conclusion of Exploratory Operations</u>

Except as provided in Article 10.1.5 *(AFE Overruns and Substitute Well)* after the earlier of the Completion, temporary abandonment or permanent plugging and abandonment of the first Producible Well and the release of the drilling rig from that Producible Well, Exploratory Operations conclude, and all subsequent operations in the Unit Area are either Appraisal Operations or Development Operations.

# ARTICLE 11 – APPRAISAL OPERATIONS

**11.1**   **Proposal of Appraisal Wells**

After the conclusion of Exploratory Operations, any Party may propose drilling an Appraisal Well by giving notice of the proposal (along with the associated AFE and Well Plan) to the other Parties. Each proposed Appraisal Well requires approval by Election.

Each Non-Participating Party in an Appraisal Well will be subject to either an acreage forfeiture or Hydrocarbon Recoupment as provided in Article 16 *(Non-Consent Operations)*.

**11.1.1**   **Pre-Appraisal Well AFE Meeting**

Prior to submitting an AFE for a new Appraisal Well (including any substitute well, except for a substitute well proposed while a rig is on the Unit Area), Operator shall call a meeting of the Parties entitled to an Election as to the contemplated new Appraisal Well or its substitute, if applicable, to share with said Parties the preliminary scope of the contemplated new Appraisal Well. Although Operator may change, modify or alter the preliminary scope of the contemplated new Appraisal Well subsequent to the meeting but prior to submission of the AFE associated therewith, as contemplated herein, the general items Operator will address at the meeting, at a minimum, shall consist of a preliminary well design, a preliminary rig selection/type and timing, a preliminary total estimated depth of the well, a preliminary Objective Depth criteria, a preliminary surface and bottomhole location(s) and a preliminary zone(s) of interest.  Should a Non-Operator contemplate proposing an AFE for a new Appraisal Well (or its substitute, if applicable), said Non-Operator shall call a meeting consistent herewith.

**11.1.2**   **Revision of Well Plan**

Except as provided in Article 11.1.3 *(Automatic Revision of a Well Plan)*, any revisions of the Well Plan or AFE for an Appraisal Well shall take place under the same terms and conditions as those set forth for an Exploratory Well in Article 10.1.2 *(Revision of Well Plan)*.

**11.1.3**   **Automatic Revision of the Well Plan**

The Well Plan for an Appraisal Well shall automatically be revised under the same terms and conditions as those set forth for an Exploratory Well in Article 10.1.3 *(Automatic Revision of the Well Plan)*.

### 11.1.4   <u>Timely Operations</u>

Except as provided below, drilling operations on an Appraisal Well shall be commenced within two hundred and seventy (270) days after the end of the period for the approval of the Appraisal Well.  If the Operator, except for an occurrence of Force Majeure, does not commence drilling operations on the Appraisal Well within that two hundred and seventy (270) day period, the approved Appraisal Well proposal shall be deemed withdrawn, with the effect as if the Appraisal Well had never been proposed and approved, and then the Non-Operating Parties may then select a substitute Operator under Article 4.2.2 *(Substitute Operator if Operator Fails to Commence Drilling Operations)*. Within thirty (30) days of the selection of the substitute Operator, the substitute Operator shall propose the drilling of an identical Appraisal Well (except for any necessary modifications resulting from a change in the drilling rig to be utilized by the substitute Operator), and it shall commence drilling operations on that well within two hundred and seventy (270) days after the end of the period for the approval of that Well.

If an approved original or identical Appraisal Well proposal is deemed withdrawn due to a failure to timely commence drilling operations on that well, all Costs incurred, which are attributable to the preparation for, or in furtherance of, that Appraisal Well, will be chargeable to the Participating Parties.  Drilling operations for an Appraisal Well under this Article 11.1.4 shall be deemed to have commenced on the date the rig arrives on location or, if the rig is already on location, the date when actual drilling operations for the approved Appraisal Well are undertaken.

### 11.1.5   <u>AFE Overruns and Substitute Well</u>

Once an Appraisal Well is commenced, the Operator shall drill the well with due diligence to its Objective Depth, subject to:

(a)   all supplemental AFEs required under Article 6.2.2 *(Supplemental AFEs)*;

(b)   the Operator encountering mechanical difficulties, uncontrolled influx of subsurface water, loss of well control, abnormal well or formation pressures, pressured or heaving shale, granite or other practicably impenetrable substances, or other similar conditions in the well bore or damage to the well bore that, in the Operator's sole opinion, render further well operations impractical; and

(c)   the unanimous agreement of the Participating Parties to cease drilling an Appraisal Well before reaching Objective Depth.

If an Appraisal Well is abandoned due to the conditions described under Article 11.1.5(b), then any Participating Party in the abandoned Appraisal Well may, within sixty (60) days after abandonment of that Appraisal Well, propose the drilling of a substitute well for the abandoned Appraisal Well by giving notice of the proposal (along with the associated AFE and Well Plan) to all other Participating Parties in the abandoned Appraisal Well, and that proposal requires approval by Election of the Participating Parties in the abandoned Appraisal Well.  Notwithstanding any contrary provision of Article 11.5 *(Conclusion of Appraisal Operations)*, the substitute well shall be an Appraisal Well.  The Well Plan for the substitute Appraisal Well shall be substantially the same as the abandoned Appraisal Well's Well Plan and shall also take into account the conditions that rendered further drilling of the abandoned Appraisal Well impractical.

Each Non-Participating Party in a substitute Appraisal Well or an approved supplemental AFE for an Appraisal Well will be subject to either an acreage forfeiture or Hydrocarbon Recoupment, as provided in Article 16 *(Non-Consent Operations)*.

**11.2**   **Appraisal Operations at Objective Depth**

After an Appraisal Well has been drilled to such Objective Depth and all operations in the controlling AFE have been conducted or terminated (except temporary abandonment and permanent plugging and abandonment) and all logs and test results have been distributed to the Participating Parties, the Operator shall promptly notify the Parties entitled to Vote or make an Election (i.e., the Participating Parties) of its proposal to conduct subsequent operations in the well.  Except for a proposal to permanently plug and abandon the well, the Operator's proposal shall include an associated AFE and a plan for the operation.

If the Participating Parties have secured the requisite approval to either:

(i)   Sidetrack said well, or

(ii)   Deepen said well,

and, provided that Article 16.4 *(Non-Consent Operations to Maintain Unit Area)* was not applicable to the drilling of that Appraisal Well, then, contingent upon the unanimous

approval of the Participating Parties in the approved Sidetrack or Deepening Operation, the Operator shall notify each former Non-Participating Party of the proposal. Each former Non-Participating Party may respond with an Election regarding such a proposal by notifying the Operator of its Election within forty-eight (48) hours (exclusive of Saturdays, Sundays, and federal holiday) after receiving the Operator's notice. Any former Non-Participating Party making an Election to participate in the Deepening or Sidetracking of an Appraisal Well shall be subject to Article 11.2.5.

The Operator's proposal shall be for one of the following operations:

(a)  conduct Additional Testing, Sidewall Coring, or Logging of the formations encountered prior to setting production casing;

(b)  Sidetrack the well bore to core the formations encountered;

(c)  Deepen the well to a new Objective Depth; provided, however, if in the Operator's sole reasonable opinion a casing string is required to Deepen the well, then option "d" shall have priority over Deepening the well to a new Objective Depth;

(d)  Sidetrack the well, including the requisite plug back operations related thereto;

(e)  conduct Production Testing;

(f)  Complete the well

(g)  conduct other operations on the well not listed;

(h)  temporarily abandon the well; or

(i)  permanently plug and abandon the well.

Notwithstanding any contrary provision in this Agreement, the Completion of an Appraisal Well as a Subsequent Appraisal Operation shall require approval by the Vote of the Participating Parties, and a Non-Participating Party in a Completion conducted on an Appraisal Well after it has reached its Objective Depth is:

(i)  subject to a Hydrocarbon Recoupment amount equal to its Non-Participating Interest Share of the Costs of the Completion Operation multiplied by four hundred percent (400%) in lieu of the Hydrocarbon Recoupment penalty set forth in Article 16.5.2 (*Non-Consent Appraisal Operations*), and

(ii)     relieved of the Costs and risks of such Completion Operation, but remains responsible for its Participating Interest Share of the Costs of plugging and abandoning the Appraisal Well less and except the extra Costs of plugging and abandoning associated solely with the Completion in which it was a Non-Participating Party.

If the Appraisal Well is temporarily abandoned under (h), then any additional operation in that well shall be proposed as a new well operation, and shall be deemed an Appraisal Operation or Development Operation proposal, as applicable in accordance with the definitions set forth herein. If the Operator fails to submit its proposal to the Participating Parties within twenty-four (24) hours (exclusive of Saturdays, Sundays, and federal holidays) after receipt by the Participating Parties of all logs and test results from an Appraisal Well, then any Participating Party may make a proposal.  In that event, the procedures in this Article 11.2 shall apply to that proposal, and any reference in this Article 11.2 to the "Operator's proposal" shall include a proposal made by a Participating Party.

### 11.2.1     Response to Operator's Proposal

A Participating Party may, within twenty-four (24) hours (exclusive of Saturdays, Sundays, and federal holidays) of its Receipt of the Operator's proposal, make a separate proposal (along with an associated AFE and a plan for the operation, except if the proposal is to permanently plug and abandon the well) for one of the operations in Article 11.2 *(Appraisal Operations at Objective Depth)*, and the Operator, immediately after the expiration of the twenty-four (24) hour period for making a separate proposal shall provide the Parties entitled to make an Election with a copy of all separate proposals so made. If no separate proposal is made, the Parties entitled to make an Election shall, within forty-eight (48) hours (exclusive of Saturdays, Sundays, and federal holidays) following the latter of:

(a)     Receipt of the Operator's proposal; or

(b)     the commencement of Standby Charges,

make an Election on the Operator's proposal (except for a proposal to permanently plug and abandon).  If a separate proposal is made, the Parties entitled to make an Election shall make an Election under the procedure in Article 11.2.2 *(Response to Highest Priority Proposal)*.  If a proposal to permanently plug and abandon the well is the only operation proposed, then the

approval and Cost allocation provisions of Article 11.4 (*Permanent Plugging and Abandonment and Cost Allocation*) shall apply to that proposal. If Article 8.3 *(Second Opportunity to Participate)* or Article 8.4 *(Participation by Fewer Than All Parties)*, or both, apply to any Election in Article 11.2 *(Appraisal Operations at Objective Depth)*, then the response period in those articles shall be twenty-four (24) hours (exclusive of Saturdays, Sundays, and federal holidays) instead of forty-eight (48) hours (exclusive of Saturdays, Sundays, and federal holidays). Notwithstanding any contrary provision of this Agreement, if one or more operations are proposed before the distribution of information from the previously approved operation, then the response periods provided above shall not begin until the Parties entitled to make an Election have received the information from the previously approved operation.

**11.2.2**   **Response to Highest Priority Proposal**

If a separate proposal is made, each Party entitled to make an Election shall, within twenty-four (24) hours (exclusive of Saturdays, Sundays, and federal holidays) following the latter of:

(a)   Receipt from the Operator of a complete copy of all separate proposals;

(b)   the commencement of Standby Charges,

make its Election on the highest priority proposal (except a proposal to permanently plug and abandon the well). Article 11.2(a) has the highest priority, and Article 11.2(i) has the lowest priority. If different depths or locations are proposed for the same type of operation, preference shall be given to the shallowest depth, or the location nearest to the existing well bore, as applicable. If the proposal with the highest priority is approved, then the lower priority proposals shall be deemed withdrawn. Once the approved operation is completed, the Parties shall follow the procedure provided in Article 11.2 *(Appraisal Operations at Objective Depth)* for all other proposals for operations in the well bore until such time as the well is Completed, temporarily abandoned or permanently abandoned.

**11.2.3**   **Response on Next Highest Priority Proposal**

If the proposal with the highest priority is not approved, then the next highest priority proposal shall be deemed the highest priority proposal and it shall be subject to the approval procedure in Article 11.2.2 (*Response to Highest Priority*

*Proposal*).  This process will continue until a proposal is approved to either temporarily abandon or permanently plug and abandon an Appraisal Well.

### 11.2.4   Non-Participating Parties in Appraisal Operations at Objective Depth

A Non-Participating Party in an Appraisal Operation conducted on an Appraisal Well after it has reached its Objective Depth [except as provided for in this Article 11.2 *(Appraisal Operations at Objective Depth)*] is subject to Article 16.5.2 *(Non-Consent Appraisal Operations)* and is relieved of the Costs and risks of that Appraisal Operation, except that a Non-Participating Party in that Appraisal Operation remains responsible for its Participating Interest Share of the Costs of plugging and abandoning an Appraisal Well, less and except all Costs of plugging and abandoning associated solely with the subsequent Appraisal Operation in which it was a Non-Participating Party.

### 11.2.5   Participation in a Sidetrack or Deepening by a Non-Participating Party in an Appraisal Well at Objective Depth

If an Appraisal Well is drilled to its Objective Depth and a Non-Participating Party in that Appraisal Well becomes a Participating Party in an approved Sidetracking or Deepening under Article 11.2(c) or Article 11.2(d), that former Non-Participating Party shall become an Underinvested Party in an amount equal to its Non-Participating Interest Share of the Costs of that Appraisal Well to its Objective Depth prior to that Sidetracking or Deepening.  The original Participating Parties in that Appraisal Well are Overinvested Parties in that amount.  A former Non-Participating Party in an Appraisal Well that becomes a Participating Party in an approved Sidetracking or Deepening, remains a Non-Participating Party in the Appraisal Well to initial Objective Depth until (a) its Underinvestment is eliminated under Article 16.9 *(Settlement of Underinvestments)*, and (b) the Hydrocarbon Recoupment recoverable under Article 16.5.2 *(Non-Consent Appraisal Operations)* less the Underinvestment, has been recovered by the original Participating Parties.  If a former Non-Participating Party becomes a Participating Party in more than one approved Sidetracking or Deepening in the same Appraisal Well, that former Non-Participating Party shall become an Underinvested Party only with regard to the first Sidetracking or Deepening it approves; however, that Underinvestment shall not be relieved by an Underinvested Party's subsequent participation.

**11.3** **Appraisal Well Proposals That Include Drilling Below the Deepest Producible Reservoir**

Any Party may propose an Appraisal Well with an Objective Depth below the Deepest Producible Reservoir, and in response to that well proposal each Party may in writing limit its participation in the drilling of that Appraisal Well to the base of the Deepest Producible Reservoir to be penetrated by that Appraisal Well. A Party who limits its participation in an Appraisal Well to the base of the Deepest Producible Reservoir shall bear its Participating Interest Share of the Cost and risk of drilling that Appraisal Well to the base of the Deepest Producible Reservoir (including abandonment), and it shall be a Non-Participating Party for the Deeper Drilling and shall be subject to Article 16.5.2 *(Non-Consent Appraisal Operations)* in regard to drilling between those depths.

**11.4** **Permanent Plugging and Abandonment and Cost Allocation**

Except as otherwise provided in this Agreement, the permanent plugging and abandonment of an Appraisal Well that is located on an active lease and:

(a)  is to be plugged due to mechanical difficulties or impenetrable conditions before the well has been drilled to its Objective Depth under Article 11.1.5 (b),

(b)  is to be plugged under Article 11.2 *(Appraisal Operations at Objective Depth)*, or

(c)  has been previously temporarily abandoned under Article 11.2 *(Appraisal Operations at Objective Depth)*

and has not produced Hydrocarbons (other than as a result of Production Testing) requires the unanimous agreement of the Participating Parties. Approval to plug and abandon an Appraisal Well that has produced Hydrocarbons (other than as a result of Production Testing) shall be governed by Article 18.1 *(Abandonment of Wells)*. If a proposal to plug and abandon an Appraisal Well receives approval by unanimous agreement, the approved proposal binds all Parties. If any Participating Party fails to respond within the applicable response period for a proposal to plug and abandon an Appraisal Well, that Participating Party shall be deemed to have approved the plugging and abandonment of that Appraisal Well. If a rig is on location and a proposal to plug and abandon an Appraisal Well under either Article 11.4(a) or 11.4(b) does not receive approval by unanimous agreement, and if within twenty-four (24) hours (exclusive of Saturdays, Sundays, and federal holidays) from Receipt of that proposal no other operation is proposed (and subsequently approved) for the well by a Party entitled to make a proposal, the Operator may nevertheless proceed to plug and abandon that Appraisal Well, and shall give each Participating Party notice of that

fact.  If the proposal to plug and abandon an Appraisal Well that has not produced Hydrocarbons (other than as a result of Production Testing) does not receive approval by unanimous agreement, but the Operator, in its sole opinion, deems the well bore not to be safe or in sound enough condition for it to perform further operations, the Operator may nevertheless proceed to plug and abandon that Appraisal Well, and shall give each Participating Party notice of that fact.

The Participating Parties in an Appraisal Well proposal shall pay all Costs of plugging and abandoning that Appraisal Well, except all increased plugging and abandoning Costs associated solely with a Non-Consent Operation approved under Article 11.2 *(Appraisal Operations at Objective Depth)* or Article 6.2.2 *(Supplemental AFEs)*.  The Participating Parties in that Non-Consent Operation are responsible for the increased plugging and abandoning Costs attributable to that Non-Consent Operation.

**11.5**   **Conclusion of Appraisal Operations**

Upon the earlier of:

(a)   the approval of the conclusion of Appraisal Operations by Vote regardless of whether Appraisal Operations actually commenced; or

(b)   the point in time when no Appraisal Operation has been approved within a period of twelve (12) months from the rig release (or cessation of operations) from the previous operation, whether an Exploratory Operation or an Appraisal Operation; or

(c)   the Completion or abandonment whether permanent or temporary, of the first (1st) Appraisal        Well        which        would        qualify        as        a Producible Well,  and the release of the rig from that Appraisal Well (including any substitute well for that Appraisal Well),

Appraisal Operations for this Development Phase shall conclude and all subsequent operations for:

(i)    this Development Phase, including operations on temporarily abandoned Exploratory Wells and/or Appraisal Wells, and

(ii)   any subsequent Development Phase, will be Development Operations.

However, if an Appraisal Operation is being conducted at the occurrence of either (a) or (b) above, Appraisal Operations for this Development Phase shall conclude when the well

bore in which the Appraisal Operation is being conducted is either Completed or abandoned, whether temporarily or permanently.

**11.6**   **Operations Before the Approval of the Development Plan**

After the occurrence of (a), (b), or (c) in Article 11.5 *(Conclusion of Appraisal Operations)* but before the approval of a Development Plan for this Development Phase, any Party may propose the drilling of an additional well as an Appraisal Well.

Unless Article 16.4 *(Non-Consent Operations to Maintain Unit Area)* applies to the proposal of that well, that proposal shall require the unanimous agreement of the Parties. Any substitute well for, and all operations at Objective Depth conducted in or through the well bore of that well shall be deemed Appraisal Operations, and shall be proposed, approved, and conducted accordingly.

## ARTICLE 12 – DEVELOPMENT PHASES

**12.1**   **Phased Development**

In view of the Costs and scope of developing and producing Hydrocarbons from the Unit Area, a Party(ies) may undertake an initial Development Phase and one or more subsequent Development Phases in accordance with the procedures set forth herein.   A separate Development Plan shall be prepared for each Development Phase, and each Development Plan shall be generated, approved, and implemented under this Article 12 *(Development Phases)*.   Each Development Phase may be comprised of as many as four stages – the Feasibility Stage, the Selection Stage, the Define Stage, and the Execution Stage.   For each stage undertaken, subject to the provisions this Article 12 *(Development Phases),* any Party may submit a proposal and an associated AFE for the Parties' approval.   Each stage AFE shall cover all of the estimated Costs to be incurred during that stage, except for the Costs of drilling wells, including those of the Feasibility Team or Project Team.

**12.2**   **Feasibility Team Proposal**

The Feasibility Stage commences upon the approval of a proposal for the formation of a Feasibility Team and the Feasibility AFE.   No Party may propose the formation of a Feasibility Team for a Development Phase until such time as any previously formed Feasibility Team for that Development Phase has terminated.   For a period of three hundred and sixty-five (365) days from the conclusion of Exploratory Operations, the Operator has the exclusive right to propose the formation of a Feasibility Team and submit to the Parties a Feasibility AFE accompanied by a memorandum describing in detail the anticipated

scope of work to be undertaken by the Feasibility Team and third party contractors and/or consultants during the Feasibility Stage, the estimated type and number of staff required to complete that scope of work, the estimated duration of the Feasibility Stage, and the estimated Costs of the Feasibility Stage. If the Operator does not propose the formation of a Feasibility Team and submit the Feasibility AFE during its exclusive period, any Party may propose the formation of a Feasibility Team and submit a Feasibility AFE.

The Feasibility Team will operate under the direction of the Operator. The employees of the Operator and Non-Operators and the contractors and/or consultants, set forth in the Feasibility AFE, shall initially compose the Feasibility Team. The Operator may, from time to time, revise the membership of the Feasibility Team, at its sole discretion, as long as the revisions are necessary to accomplish the scope of work set forth in the Feasibility AFE. The Operator shall charge the Joint Account for the labor of the Feasibility Team members in the same manner in which it charges the Joint Account for the labor of the Project Team members.

Each Feasibility Team member remains an employee of its respective employer, and each employer remains responsible for its employee's salaries and benefits, as well as maintaining worker's compensation insurance for its employee. Accordingly, each employer will continue to administer the compensation, benefits, allowances, and careers of its employees on the Feasibility Team. However, Feasibility Team members will receive team assignments and general supervision from the Operator in connection with their day-to-day work. An individual on a Feasibility Team will, insofar as it is possible and consistent with the needs of his or her employer, serve on the Feasibility Team for the duration of the Feasibility Team, unless that individual is designated a temporary Feasibility Team member by his or her employer or the Operator. If a Feasibility Team member is designated a temporary Feasibility Team member by his or her employer or the Operator, that Feasibility Team member will leave the Feasibility Team upon completion of (a) the term designated by his or her employer for his or her service on the team or (b) the specific task or portion of the Feasibility Team's work assigned to that member by the Operator.

The Feasibility Team shall prepare an in-depth report containing its analyses of all of the development scenarios it considered and its findings as to the existence of at least one development scenario for a Producible Well on the Unit Area, which is technologically and

economically feasible, and shall present a copy of that report to each of the Participating Parties as soon as it is completed.

### 12.2.1    Feasibility AFE Approval

A Feasibility AFE requires approval by Election.

A Non-Participating Party in the Feasibility AFE is subject to Article 16.5.3 *(Non-Consent Proprietary Geophysical Operations, Feasibility AFEs, Selection AFEs, Define AFEs, Long Lead Development System AFEs, Post-Production Project Team AFEs, Enhanced Recovery Project Team AFEs or Long Lead Well Operation AFEs).*

### 12.2.2    Feasibility Team and Feasibility Stage Conclusion

The Feasibility Team and the Feasibility Stage terminate immediately after (a) the Feasibility Team has (i) completed the scope of work in the Feasibility AFE and its supplemental AFEs and (ii) presented to the Participating Parties the report referred to in Article 12.2 *(Feasibility Team Proposal)* or (b) the Participating Parties Vote to terminate the Feasibility Team prior to the occurrence of both of those events.

## 12.3    Commencement of the Selection Stage

The Selection Stage commences upon the approval of the Selection AFE.

### 12.3.1    Proposal of a Project Team

If a Feasibility AFE is approved, the Operator has an exclusive right to submit a Selection AFE for the Parties' review and approval for a period of one hundred and twenty (120) days from the later of:

(i)   the conclusion of the Feasibility Stage; or

(ii)  the earlier of rig release from the first (1st) Appraisal Well which would qualify as a Producible Well or the conclusion of Appraisal Operations.

If a Feasibility AFE is not approved, the Operator has an exclusive right to submit a Selection AFE for a period of one hundred and eighty (180) days from the earlier of:

(i)   rig release from the first (1st) Appraisal Well which would qualify as a Producible Well; or

(ii)  the conclusion of Appraisal Operations.

The Selection AFE may call for the formation of a Project Team.  It shall be accompanied by a memorandum describing in detail the anticipated scope of work to be undertaken during the Selection Stage, the estimated type and number of staff required to complete that scope of work, the estimated duration of the Selection Stage, and the estimated Costs of the Selection Stage.  If the Operator does not submit a Selection AFE during its exclusive period referred to in this paragraph, any Party may submit a Selection AFE.

If the Operator does not submit a Selection AFE during its exclusive period referred to in this paragraph, any Party may submit a Selection AFE.  .

If the Selection AFE proposes the formation of a Project Team, the formation and administration of that Project Team shall be handled under Exhibit "G."

The Operator shall directly charge the Joint Account for all Costs associated with the Project Team, including those of Affiliates, for which the Operator is internally billed.   The components of those Costs may include, but are not limited to:

a)   Digital Business

b)   Accounting

c)   Building Services and Building and Grounds Maintenance

d)   Human Resources

e)   Procurement

f)   Government and Public Affairs

g)   Health, Safety and Environment

h)   Security

i)   Audit

j)   Tax

k)  Crisis Management

l)   Environmental Compliance

n)  Marketing of Oil and Gas Production

All other Project Team Costs shall be handled under Exhibit "C."

No Party may propose the formation of a Project Team for a Development Phase until such time as a previously formed Project Team for that Development Phase has terminated.

**12.3.2   Selection AFE Approval**

A Selection AFE requires approval by Election.

A Non-Participating Party in a Selection AFE is subject to Article 16.5.3 *(Non-Consent Proprietary Geophysical Operations, Feasibility AFEs, Selection AFEs, Define AFEs, Long Lead Development System AFEs, Post-Production Project Team AFEs, Enhanced Recovery Project Team AFEs or Long Lead Well Operation AFEs)*.

**12.4   Proposal of a Development Plan**

The Operator has the exclusive right to submit a Development Plan for the Parties' review and approval for a period of three hundred and sixty-five (365) days from the later of:

(i)      commencement of the Selection Stage; or

(ii)     conclusion of Appraisal Operations.

If the Operator has begun preparation of a Development Plan during the first two hundred and seventy (270) days of such three hundred and sixty-five (365) day period, but the Development Plan will not be completed and submitted by the end of the Operator's exclusive period, then the Operator may request an extension of the exclusive period to allow completion of the work in progress. Any request for extension shall include a report of the progress to date and specify a date for submission of the Development Plan not more than three (3) months from the expiration of the exclusive submission period. The Parties shall not arbitrarily or unreasonably refuse a request for extension of the Operator's submission.

### 12.4.1    <u>Content of the Development Plan</u>

A Development Plan shall contain at a minimum the following information:

(a) **Development System**: Description of the Development System including:

    (i) the type of Production System proposed, for example, tension leg well jacket, floating production system, including the Production System's location, configuration (number of well slots or subsea tiebacks), and production capacity;

    (ii) the Facilities and their daily processing capacity for Hydrocarbon production and the gathering system necessary to transport the Hydrocarbons from the well heads to one or more interconnects with the pipeline or offtake point servicing the Unit Area;

    (iii) a projected time schedule for designing, contracting, fabricating, constructing, or otherwise acquiring, transporting, and installing the Development System;

    (iv) the estimated date of initial Hydrocarbon production and the estimated initial daily rate of Hydrocarbon production;

    (v) the estimated Costs (not in the form of an AFE) of the Development System;

    (vi) all proposed hydrate or paraffin control systems or techniques, method of pressure maintenance, or enhanced recovery plan;

    (vii) a description of the proposed well Completion techniques, that is, dual versus single; and

    (viii) The equipment and space on, and the weight and the buoyancy of, the Development System, which are required to make the enhanced recovery and pressure maintenance plans and objectives referred to in Article 12.4.1(j)(iii)(D) possible;

(b) **Producible Reservoirs:** A description of the Hydrocarbon- bearing geological formations expected to be developed under the Development Plan along with the area and depth of sands or reservoirs to be developed by the Production System;

(c) **Recoverable Reserves and Production Profile:**  An estimate of recoverable reserves for the proposed Development Plan and a schedule of the estimated daily rate of Hydrocarbon production thereafter;

(d) **Pre-drilling Operations:**  A description of pre-drilling operations, if any, planned in support of later development, including an estimate of the timing, Cost, and location of each pre-drilling operation;

(e) **Development Wells:**  A description of drilling plans for all Development Wells in the Development Plan and the Completion plans for all temporarily abandoned Exploratory Wells or temporarily abandoned Appraisal Wells that are to be completed and all Development Wells in the Development Plan, including an estimate of the timing, Cost, and surface and bottomhole location of each well;

(f) **Tieback Operations:**  If the Development Plan requires the tieback or use of Offsite Host Facilities, a commitment from the owner of that Offsite Host Facilities to handle or process Hydrocarbons, the amount of all tariffs, processing or other fees the owner of that Offsite Host Facilities will charge the Participating Parties to handle or process Hydrocarbons, and the guaranteed capacity on the Offsite Host Facilities for the Hydrocarbons;

(g) **Define AFE:**  An AFE containing the estimated Costs of the Define Stage, accompanied by a memorandum describing in detail the anticipated scope of work to be undertaken during the Define Stage, the estimated type and number of staff required to complete that scope of work, the estimated duration of the Define Stage, and the estimated Costs of the Define Stage; if a Project Team was not formed during the Selection Stage, the proposing Party may submit, along with the Define AFE, a proposal for the formation of a Project Team accompanied by a memorandum similar to the one referred to in Article 12.3.1 *(Proposal of a Project Team)*;

(h) **Field Operating Scheme:**  A description of the field operating scheme, its method, requirements, expected frequencies of intervention, and Costs;

(i) **Field Abandonment:**  A description of field abandonment plan (if applicable);

(j)   **Reservoir Plan:**  A reservoir plan that provides strategies, objectives, and methods for developing, managing, and depleting each Producible Reservoir during its producible life and that includes, but is not limited to:

(i)   an estimate of the number of wells slots dedicated to each reservoir, including the planned number of producers and injectors;

(ii)   the planned bottomhole locations and timing of each anticipated well for each Producible Reservoir;

(iii)   a reservoir management and depletion strategy for each Producible Reservoir addressing issues that include, but are not limited to:

(A)   estimates of oil and gas in place;

(B)   reservoir rock and fluid characteristics;

(C)   depletion mechanism;

(D)   enhanced recovery and pressure maintenance plans and objectives;

(E)   reservoir surveillance programs (for example, cased-hole logging, static pressures) and their objectives;

(F)   well performance goals (for example, target production rates, target injection rates, maximum rates or drawdown limits, maximum GOR, maximum water cut, gas-lift targets);

(G)   reservoir performance goals (for example, target pressures or pressure profiles, target voidage replacement ratios, gas cap maintenance goals); and

(H)   other relevant information;

(k)   **Disposal Wells:**  The estimated Cost of disposal wells, if applicable;

(l) **Hydrocarbon Transmission System:**   The type of Hydrocarbon transmission system to be made available to the Participating Parties (for example, pipeline versus barge); and

(m) **Other Data:**   Provided such information is available, any other information reasonably necessary to perform an evaluation of the technical and economic feasibility of the Development System provided for in the Development Plan.

## 12.5   Development Plan Approval

### 12.5.1   Unanimous Approval of a Development Plan

The Operator has ninety (90) days after submittal of its Development Plan to obtain the unanimous agreement of the Parties on:

(a) the Development Plan submitted during its exclusive period set forth in Article 12.4 (*Proposal of a Development Plan*); or

(b) the latest amended version of that plan which has been the result of comments by, or discussions among, the other Parties or the Project Team, if one exists, and the Operator (the "Latest Amended Version").   A "Latest Amended Version" shall also include the latest amended version of another Party's plan which has been the result of comments by, or discussions among, the other Parties or the Project Team, if one exists.

### 12.5.2   Approval of a Development Plan by Vote

For the purposes of this Article 12.5.2, if more than one (1) Party submits a Development Plan, each Development Plan shall be considered for approval by the Parties in the order in which they were received by the Parties. If:

(a) the Operator fails within the ninety (90) day period in Article 12.5.1 *(Unanimous Approval of a Development Plan)* to gain the unanimous agreement of the Parties on its Development Plan or its Latest Amended Version, whichever is applicable; or

(b) the Operator fails to submit a Development Plan during its exclusive period set forth in Article 12.4 (*Proposal of a Development Plan*),

any Party may submit a Development Plan and an AFE for the actual Costs it incurred in order to generate that Development Plan, and the Parties have ninety (90) days in which to approve by Vote:

(i) the Operator's Development Plan or its Latest Amended Version, whichever is applicable if any, or

(ii) another Party's Development Plan or its Latest Amended Version, whichever is applicable if any, and its associated AFE.

No new proposed Development Plan may be submitted during the last sixty (60) days of the ninety (90) day period to approve a Development Plan by Vote.

**12.5.3**   **Approval of a Development Plan if One is Not Approved by Vote**

For the purposes of this Article 12.5.3, Development Plans shall be Voted on by the Parties simultaneously. If no Development Plan, or its Latest Amended Version, whichever is applicable, is approved by Vote during the ninety (90) day period in Article 12.5.2 *(Approval of a Development Plan by Vote)*, and if:

(a)   there is only one (1) Development Plan, or its Latest Amended Version, whichever is applicable, submitted, then that Development Plan, or its Latest Amended Version, whichever is applicable, shall be deemed approved;

(b)   there are two (2) or more Development Plans, or Latest Amended Version(s), whichever is applicable, submitted, then the Development Plan, or the Latest Amended Version, whichever is applicable, that receives the largest affirmative Voting interest shall be deemed approved; or

(c)   two (2) or more competing Development Plans, or Latest Amended Version(s), whichever is applicable, , but two (2) or more competing Development Plans, or Latest Amended Version receive an equal largest affirmative Voting Interest, then:

(i)   the Development Plan, or its Latest Amended Version, whichever is applicable, that receives an equal largest affirmative Voting interest, and for which the Operator affirmatively Votes of shall be deemed approved; or

(ii)　　if no Development Plan, or its Latest Amended Version,

whichever is applicable, with an equal largest affirmative Voting interest receive the affirmative Vote of the Operator, then such Development Plan, or such Latest Amended Version, whichever is applicable, first submitted, and which received such equal largest affirmative Voting interest shall be deemed approved.

### 12.5.4    Approved Development Plan

Each Participating Party in an approved Development Plan also agrees or Votes to participate in its Define AFE, the AFE referred to in Article 12.5.2 *(Approval of a Development Plan by Vote)*, if applicable, and the formation of a Project Team during the Define Stage, if applicable.  If the Parties do not approve a Selection AFE and do not form a Project Team during the Selection Stage and if the Operator's Development Plan or Latest Amended Version, whichever is applicable, is approved, the Operator shall directly charge the Joint Account the actual Costs it incurred in order to generate and submit the Operator's Development Plan or Latest Amended Version.  If Appraisal Operations have not previously concluded, then, upon the approval of the Development Plan or Latest Amended Version, whichever is applicable, the Selection Stage concludes and Appraisal Operations are deemed concluded; provided, however, if an Appraisal Operation is being conducted when the Development Plan is approved, Appraisal Operations shall be deemed concluded when the well bore in which the Appraisal Operation is being conducted is either temporarily or permanently abandoned. Any Non-Participating Party in the approved Development Plan's Define AFE is subject to Article 16.5.3 *(Non-Consent Proprietary Geophysical Operations, Feasibility AFEs, Selection AFEs, Define AFEs, Long Lead Development System AFEs, Post-Production Project Team AFEs, Enhanced Recovery Project Team AFEs or Long Lead Well Operation AFEs)*.

### 12.6.1  Long Lead Development System AFEs

After the conclusion of the Selection Stage, in order to facilitate the early and orderly commencement of the Execution Stage, the Operator has the right, prior to the approval of the Execution AFE, to submit AFEs ("Long Lead Development System AFEs") for:

(a)　　the acquisition of long lead-time items for the Development System ("Long Lead Development System Items");

(b)     preliminary activities related to the fabrication, transportation or installation of the Development System; or

(c)     any other activity necessary to assist the Operator in the implementation of the Development Plan.

A Long Lead Development System AFE, whose total estimated Cost when combined with the estimated Cost of all approved Long Lead Development System AFEs, does not exceed fifty million dollars ($50,000,000), requires approval by Vote of the Participating Parties in the Development Plan.  A Long Lead Development System AFE, whose total estimated Cost when combined with the estimated Cost of all approved Long Lead Development System AFEs exceeds fifty million dollars ($50,000,000), requires approval by the unanimous agreement of the Participating Parties in the Development Plan.  Any Non-Participating Party in a Long Lead Development System AFE is subject to Article 16.5.3 *(Non-Consent Proprietary Geophysical Operations, Feasibility AFEs, Selection AFEs, Define AFEs, Long Lead Development System AFEs, Post-Production Project Team AFEs, Enhanced Recovery Project Team AFEs or Long Lead Well Operation AFEs)*.

**12.6.2**    <u>**Non-Participating Parties in the Execution AFE Who Have Previously Approved Long Lead Development System AFEs**</u>

If a Party, who had Voted for or was in unanimous agreement with the other Participating Parties in a Long Lead Development System AFE, does not approve the Execution AFE for which such Long Lead Development System Items were procured, the Operator shall reimburse that Party its Participating Interest Share of the Costs of those Long Lead Development System Items within thirty (30) days following the approval of the Execution AFE; provided, however, that Party's share of those Costs shall be included in the calculation of any Hydrocarbon Recoupment, if applicable, to which it is subject to in accordance with Article 16 *(Non-Consent Operations)*.  The Operator shall invoice the Participating Parties in the Execution AFE for their proportionate share of the reimbursement under this Article 12.6.1 in accordance with Exhibit "C."

**12.6.2**    <u>**Disposition of Long Lead Development System Items**</u>

Notwithstanding the provisions of Exhibit "C" or Article 3.1 *(Exhibits)* to the contrary, the Participating Parties in the Execution AFE, for which Long Lead Development System Items were procured, shall approve by Vote the disposition of such Long Lead Development System Items if they are not

utilized for the Development System.  If the disposition is approved, the disposition will be binding on all Participating Parties in the Execution AFE. The disbursement of the proceeds realized from the disposition of those Long Lead Development System Items shall take place in accordance with Exhibit "C."

**12.7** **Define Stage and Execution Stage**

The Define Stage commences upon the approval of the Development Plan.

**12.7.1** **Execution AFE**

The Operator has an exclusive period of one hundred and eighty (180) days from the commencement of the Define Stage to submit an Execution AFE, which conforms with the Development Plan approved during the Selection Stage to all Parties for approval by Election.  The Execution AFE shall not include any Cost estimates or AFEs for Development Wells.  If the Operator does not submit the Execution AFE during its exclusive period, any Party may submit an Execution AFE, which conforms with the approved Development Plan, and an AFE for the actual Costs it has incurred to generate the Execution AFE.  If a Project Team was not formed during the Selection Stage or the Define Stage, the proposing Party may submit as a part of the Execution AFE a proposal for the formation of a Project Team accompanied by a memorandum similar to the one referred to in Article 12.3.1 *(Proposal of a Project Team)*.

**12.7.2** **Approval of an Execution AFE and Commencement of the Execution Stage**

By Electing to participate in an Execution AFE, each Participating Party in an approved Execution AFE also Elects to participate in (a) the AFE for the actual Costs incurred by the proposing Party in order to generate the approved Execution AFE, referred to in Article 12.7.1 *(Execution AFE)*, if applicable, and (b) the formation of a Project Team during the Execution Stage, if applicable.  If the Parties do not form a Project Team during the Selection Stage or the Define Stage and if the Operator's Execution AFE is approved, the Operator shall directly charge the Joint Account the actual Costs it incurred in order to generate and submit the Execution AFE.  The Define Stage concludes and the Execution Stage commences upon the approval of the Execution AFE.  A Non-Participating Party in the Execution AFE for the initial Development System is subject to Article 16.2 *(Acreage Forfeiture Provisions)*.

### 12.7.3    Minor Modifications to Development Plans

In implementing a Development Plan, the Operator shall advise the Participating Parties of its own progress and that of the Project Team, if one exists.  As additional information becomes available, the Operator may, prior to the installation of the Development System, make minor modifications to the Development Plan without the approval of the Participating Parties if those minor modifications are both reasonable and prudent.  For purposes of this paragraph, a minor modification is

(a)    a modification, which (i) (A) is proposed prior to the commencement of the Execution Stage and does not cause the estimated Cost of the Define AFE to increase by more than ten percent (10%), or (B) is proposed after the commencement of the Execution Stage and does not cause the estimated Cost of the Execution AFE to increase by more than ten percent (10%), and (ii) is not a major modification as defined in Article 12.7.4 *(Major Modifications to Development Plans)*; or

(b)    a modification that is necessary for health, safety, or environmental reasons or regulatory requirements and does not cause the estimated Cost of the Execution AFE to increase by more than ten percent (10%), even if that modification constitutes a major modification as defined in Article 12.7.4 *(Major Modifications to Development Plans)*.

The "estimated Cost of the Execution AFE" is the total dollar amount of the Execution AFE and all approved Long Lead Development System AFEs.  If the Operator exercises its discretionary right to make a minor modification for health, safety, or environmental reasons or regulatory requirements, the Operator shall give each Participating Party in the Development Plan written notice of that fact.  A minor modification shall not materially change the risk or timing of the Development Plan and is binding on all the Participating Parties in the Development Plan.

### 12.7.4    Major Modifications to Development Plans

A major modification shall be deemed to have occurred when:

(a)    the type of Production System, for example, tension leg well, jacket floating production system, is to be changed; or

(b)    the number of well slots of the Production System is to be changed by at least twenty-five percent (25%);

(c)    the type of Hydrocarbon transmission system is changed (for example, pipeline versus barge);

(d)    the overall Cost of the Development System is to be increased or decreased by twenty percent (20%) or more;

(e)    the initial selection of the location of the Production System is to be changed and the corresponding difference in water depth changes by more than five thousand feet (5,000') laterally in any direction;

(f)    the initial daily production processing capacity of the Facilities is to be changed by at least twenty-five percent (25%);

(g)    the number of Development Wells is to be increased or decreased by at least twenty percent (20%);

(h)    the proposed hydrate or paraffin control system or technique, pressure maintenance system, or enhanced recovery plan is to be changed;

(i)    the proposed number of well Completions per wellbore, that is, dual versus single, is to be changed;

(j)    the timing of the installation of the Production System or the timing of initial Hydrocarbon production from the Production System is to be changed by more than one hundred and fifty (150) days;

(k)    in the case of a tieback to an Offsite Host Facility or a pre-existing Development System, the gathering and pipeline system necessary to transport the Hydrocarbons from the wellheads to an Offsite Host Facility or a pre-existing Development System, as provided in the Development Plan, is to be changed;

(l)    the estimated capital expenditures in any calendar year are to be increased by at least thirty percent (30%) of the project's estimated total gross capital expenditures; or

(m)    the Operator proposes not to complete a Development Plan.

The "overall Cost of the Development System" is the total dollar amount of the Execution AFE and all approved Long Lead Development System AFEs.

### 12.7.5 Major Modifications to Development Plans Prior to the Approval of the Execution AFE

Whenever a major modification to a Development Plan is proposed during the Define Stage (prior to the approval of the Execution AFE), the Operator shall furnish the Participating Parties in the Development Plan with the proposed modification to the Development Plan (and associated AFEs). That major modification shall require approval by unanimous agreement of the Participating Parties in the Development Plan. If that major modification is approved, the Operator shall immediately provide the modified Development Plan (and associated AFEs) to each Non-Participating Party in the Development Plan. That Non-Participating Party has the right for a period of thirty (30) days, after Receipt of the modified Development Plan (and associated AFEs), in which to notify the Operator in writing that it will participate in the modified Development Plan (and associated AFEs). If that Non-Participating Party participates in the modified Development Plan, it shall be an Underinvested Party in an amount equal to its Non-Participating Interest Share of the actual Costs incurred on activities associated with the original Development Plan (and associated AFEs).

### 12.7.6 Major Modifications to Development Plans After the Approval of the Execution AFE

Whenever a major modification to a Development Plan is proposed during the Execution Stage (after the approval of an Execution AFE) and prior to the installation of the Development System, the Operator shall furnish the Participating Parties in the Execution AFE with the proposed modification to the Development Plan (and associated AFEs). That major modification shall require unanimous agreement of the Participating Parties in the Execution AFE. If that major modification is as provided in Article 12.7.4 (a), (c), (d), (f), (g), (j), (k) or (m), and is approved, the Operator shall immediately provide the modified Development Plan (and associated AFEs) to each Non-Participating Party in the Execution AFE. For a period of thirty (30) days after Receipt of the modified Development Plan (and associated AFEs), the Non-Participating Party may notify the Operator in writing that it will participate in the modified Development Plan (and associated AFEs). If that Non-Participating Party participates in the

modified Development Plan, it shall be an Underinvested Party in an amount equal to its Non-Participating Interest Share of the actual Costs incurred on activities associated with (a) the Execution AFE and (b) the original Development Plan (and associated AFEs) if it did not participate in that Development Plan. Within thirty (30) days of the elimination of the Underinvestment, the Participating Parties in the Execution AFE for the initial Development Phase shall deliver to that Non-Participating Party an assignment of one hundred percent (100%) of its former Working Interest in the Unit Area, the wells therein and production therefrom.  If the Execution AFE was for a subsequent Development Phase, the Non-Participating Party shall not be subject to Article 16.5.5 *(Non-Consent Subsequent Development System and Additional Facilities)* in regard to that AFE.

### 12.7.7   Approval of Major Modifications

If the major modification of the Development Plan is approved, the Development Plan (and associated AFEs) shall be deemed modified, and the Operator shall carry out the modified Development Plan.  If a major modification is not approved, the Operator shall continue to implement the Development Plan as it was before the proposed major modification.

### 12.7.8   Termination of a Development Plan

A Development Plan terminates if (a) the Execution AFE for that Development Plan is not approved by Election, (b) the Participating Parties in the Define Stage or in the Execution AFE unanimously agree to terminate the Development Plan, or (c) the fabrication or acquisition of the Development System is not commenced within the time frame provided in Article 12.7.9 *(Timely Operations for Development Systems)*.

#### 12.7.8.1   Termination Prior to Execution AFE Approval

The Costs, risks, and liabilities of generating and implementing a Development Plan that is terminated before its associated Execution AFE has been approved by Election shall be borne by the Parties who participated in the Define AFE and its supplemental AFEs, if any.

#### 12.7.8.2   Termination After Execution AFE Approval

The Costs, risks, and liabilities of generating and implementing a Development Plan that is terminated after its associated Execution AFE has been approved by Election shall be borne by the

Participating Parties in the Execution AFE and its supplemental AFEs, if any.

### 12.7.9   <u>Timely Operations for Development Systems</u>

The Operator shall commence or cause to be commenced the fabrication or acquisition of a Development System (a) one hundred and eighty (180) days after the end of the period for Elections of the Execution AFE or (b) ninety (90) days prior to the date the Operator is required to commence that fabrication or acquisition under an SOP or Unit Plan of Operations, whichever is earlier.  If the Operator, except for an occurrence of Force Majeure, fails to commence the fabrication or acquisition of a Development System within the applicable time period set forth above in this Article 12.7.9, the Non-Operating Parties may then select a successor Operator under Article 4.5 *(Selection of Successor Operator)*. Within ninety (90) days of the selection of the successor Operator, the successor Operator shall commence the fabrication or acquisition of a Development System in the approved Development Plan.  The fabrication or acquisition of a Development System commences on the date the first major fabrication contract for the Development System is awarded or the date the purchase contract for a Development System is executed.

## 12.8 Post-Production Project Team AFEs

The Execution Stage concludes upon the first production of Hydrocarbons from the Development System.  At least sixty (60) days, but not more than one hundred and twenty (120) days, prior to the first production of Hydrocarbons from the Development System, the Operator may propose for approval by Vote the continuance of the Project Team, if one exists, on a much smaller scale, or the formation of the Project Team, if one does not exist, in order to assist the Operator in the drilling of additional Development Wells approved by the Parties, de-bottlenecking the Development System, ramping up Hydrocarbon production, maximizing the recovery of Hydrocarbons during the Development Phase and activities related thereto.  With its proposal, the Operator shall include an initial Post-Production Project Team AFE accompanied by a memorandum similar to the one described in Article 12.3.1 *(Proposal of Project Team)*.

At least forty-five (45) days, but not more than  ninety (90) days, prior to the date on which the Operator anticipates the scope of work set forth in its original proposal for the continuance or formation of the Project Team and its associated AFE and memorandum to be completed, the Operator may propose for approval by Vote of the Parties the further

continuance of the Project Team to assist the Operator in reservoir management and production optimizing activities other than contemplated under Article 12.11 *(Enhanced Recovery and/or Pressure Maintenance Program Proposals)*.  With that proposal, the Operator shall include a second Post-Production Project Team AFE accompanied by a memorandum similar to the one described in Article 12.3.1 *(Proposal of Project Team)*. The administration of the Project Team during the period that it carries out the scope of work referred to in this Article 12.8 shall be handled under Exhibit "G."  The Costs of the Project Team will be handled as they are under Article 12.3.1 *(Proposal of Project Team)*. A Non-Participating Party in either or both of the two Post-Production Project Team AFEs is subject to Article 16.5.3 *(Non-Consent Proprietary Geophysical Operations, Feasibility AFEs, Selection AFEs, Define AFEs, Long Lead Development System AFEs, Post-Production Project Team AFEs, Enhanced Recovery Project Team AFEs or Long Lead Well Operation AFEs)*.

**12.9    Subsequent Development Phases**

At any time after the installation of the initial Development System for the initial Development Phase, any Participating Party may pursue a subsequent Development Phase and the installation of a subsequent Development System, as set forth herein.

**12.9.1    Proposal of a Subsequent Development Phase**

If a subsequent Development Phase is approved, the procedures specified in this Article 12 *(Development Phases)* shall apply to the proposal of the subsequent Development Phase.

**12.9.2    Execution AFE in a Subsequent Development Phase**

Each Non-Participating Party in an Execution AFE for a subsequent Development Phase is subject to the non-consent provisions in Article 16.5.5 *(Non-Consent Subsequent Development System and Additional Facilities) or Article 16.4 (Non-Consent Operations to Maintain Unit Area)*, but not Article 16.2.2 *(Execution AFE)*.  Although a Non-Participating Party in an Execution AFE for a subsequent Development Phase may retain its Working Interest in the Unit Area, that Party will only be entitled to Hydrocarbon production from the subsequent Development Phase, in which it did not participate, after it has satisfied the non-consent provisions in Article 16.5.5 *(Non-Consent Subsequent Development System and Additional Facilities)*.  A Non-Participating Party in a subsequent Development Phase shall not unreasonably interfere with any activities or operations in that subsequent Development Phase.  In all events, the

Participating Parties in the Execution AFE for a subsequent Development Phase shall control the sequence of, and shall conduct, all activities and operations in that subsequent Development Phase.

**12.10  Access to Existing Facilities**

A Participating Party in a subsequent Development Phase may propose to access the Facilities installed for a previous Development Phase in accordance with Article 14 *(Facilities and Gathering Systems)*.  The proposal shall require approval by Vote of the Participating Parties in the previous Development Phase and shall include the basic terms under which the access is to be granted.  If the proposal is approved, it shall be incorporated into a formal "Facilities Use and Production Handling Agreement" and shall bind all Parties.

**12.11  Enhanced Recovery and/or Pressure Maintenance Program Proposals**

Any Party may propose the formation of a Project Team separate and apart from any Project Team already in existence for the purpose of assisting the Operator in designing an enhanced recovery and/or pressure maintenance program for a particular Development Phase by submitting to the Parties for approval by Election an Enhanced Recovery Project Team AFE accompanied by a memorandum similar to the one described in Article 12.3.1 *(Proposal of Project Team)*.  Any Non-Participating Party in that Enhanced Recovery Project Team AFE is subject to Article 16.5.3 *(Non-Consent Proprietary Geophysical Operations, Feasibility AFEs, Selection AFEs, Define AFEs, Long Lead Development System AFEs, Post-Production Project Team AFEs, Enhanced Recovery Project Team AFEs or Long Lead Well Operation AFEs)*.  The formation and administration of a Project Team for an enhanced recovery and/or pressure maintenance program will be handled under Exhibit "G."  The Costs of the Project Team will be handled as they are under Article 12.3.1 *(Proposal of Project Team)*.  After the Operator has designed the enhanced recovery and/or pressure maintenance program with the assistance of that Project Team, the Operator may submit an enhanced recovery and/or pressure maintenance program proposal and AFE to the Parties for approval by Vote.  The program proposal and AFE shall contain sufficient detail to allow the Parties to adequately evaluate the scope, timing, Costs, and benefits of the proposed program and AFE.  If approved, that proposal and AFE will be binding on all of the Participating Parties in the Execution AFE for that Development Phase, and the Operator shall commence the program at the Cost and risk of those Parties.

## ARTICLE 13 – DEVELOPMENT OPERATIONS

**13.1   Proposal of Development Wells and Development Operations**

It is the intent of the Parties to proceed with the development of the Unit Area under an approved Development Plan.  Development Wells shall be subject to separate AFEs.

Once a Development Well has been completed and placed on production, the Participating Parties in that well must unanimously agree to allow any Party to conduct a Non-Consent Operation in that well, unless that well becomes incapable of producing in paying quantities.  A proposal to conduct Development Operations in a Producible Reservoir requires the unanimous agreement of the Parties, unless the proposing Party designates the Producible Reservoir as an Objective Depth or Completion zone in the proposal.

**13.1.1   Proposal of Development Wells Included in a Development Plan**

Subject to Article 13.1 *(Proposal of Development Wells and Development Operations)*, any Participating Party in a Development Plan and Execution AFE may propose drilling a Development Well that was included in the Development Plan by giving notice of the proposal (along with the associated AFE and Well Plan) to the other Parties.  Each proposed Development Well that was included in the Development Plan requires approval by Election.

Each Non-Participating Party in a Development Well will be subject to either acreage forfeiture or Hydrocarbon Recoupment as provided in Article 16 *(Non-Consent Operations)*.

**13.1.1.1   Revision of Well Plan**

Unless otherwise provided for in the Development Well proposal and AFE, any revisions of the Well Plan or AFE for a Development Well shall take place under the same terms and conditions as those set forth for an Exploratory Well in Article 10.1.2 *(Revision of Well Plan)*.

**13.1.1.2   Automatic Revision of the Well Plan**

The Well Plan for a Development Well shall automatically be revised under the same terms and conditions as those set forth for an Exploratory Well in Article 10.1.3 *(Automatic Revision of the Well Plan)*.

### 13.1.2 Proposal of Development Operations Not Included in a Development Plan

Subject to Article 13.1 *(Proposal of Development Wells and Development Operations)*, any Participating Party in an Execution AFE may propose drilling a Development Well that was not included in the Development Plan associated with that Execution AFE by giving notice of the proposal (along with the associated AFE and Well Plan) to the other Parties. The proposal shall specify that the well was not included in the Development Plan. Each proposed Development Well that was not included in the Development Plan requires approval by Election.

Each Non-Participating Party in a Development Well will be subject to either acreage forfeiture or Hydrocarbon Recoupment, as provided in Article 16 *(Non-Consent Operations)*.

### 13.1.3 Pre-Development Well AFE Meeting

Prior to submitting an AFE for a new Development Well under Article 13.1.2 *(Proposal of Development Operations Not Included in a Development Plan)* (including any substitute well, except for a substitute well proposed while a rig is on the Unit Area), Operator shall call a meeting of the Parties entitled to an Election as to the contemplated new Development Well or its substitute, if applicable, to share with said Parties the preliminary scope of the contemplated new Development Well. Although Operator may change, modify or alter the preliminary scope of the contemplated new Development Well subsequent to the meeting but prior to submission of the AFE associated therewith, as contemplated herein, the general items Operator will address at the meeting, at a minimum, shall consist of a preliminary well design, a preliminary rig selection/type and timing, a preliminary total estimated depth of the well, a preliminary Objective Depth criteria, a preliminary surface and bottomhole location(s) and a preliminary zone(s) of interest. Should a Non-Operator contemplate proposing an AFE for a new Development Well (or its substitute, if applicable), said Non-Operator shall call a meeting consistent herewith.

### 13.1.4 Timely Operations

Except as provided below, drilling operations on a Development Well shall be commenced within one-hundred and eighty (180) days after the end of the period for the approval of the Development Well. If the Operator, except for an occurrence of Force Majeure, does not commence drilling operations on the

Development Well within that one-hundred and eighty (180) day period, the approved Development Well proposal shall be deemed withdrawn, with the effect as if the Development Well had never been proposed and approved.

If an approved original or identical Development Well proposal is deemed withdrawn due to a failure to timely commence drilling operations on that well, all Costs incurred, which are attributable to the preparation for, or in furtherance of, that Development Well, will be chargeable to the Participating Parties. Drilling operations for a Development Well under this Article 13.1.3 shall be deemed to have commenced on the date the rig arrives on location or, if the rig is already on location, the date when actual drilling operations for the approved Development Well are undertaken.

**13.1.5**   **AFE Overruns and Substitute Well**

Once a Development Well is commenced, the Operator shall drill the well with due diligence to its Objective Depth, subject to:

(a)   all supplemental AFEs required under Article 6.2.2 *(Supplemental AFEs)*,

(b)   the Operator encountering mechanical difficulties, uncontrolled influx of subsurface water, loss of well control, abnormal well or formation pressures, pressured or heaving shale, granite or other practicably impenetrable substances, or other similar conditions in the well bore or damage to the well bore that render, in the Operator's sole opinion, further well operations impractical, and

(c)   the unanimous agreement of the Participating Parties to cease drilling a Development Well before reaching Objective Depth.

If a Development Well is abandoned due to the conditions described under Article 13.1.4(b), then any Participating Party in the abandoned Development Well may, within sixty (60) days after abandonment of that Development Well, propose the drilling of a substitute well for the abandoned Development Well by giving notice of the proposal (along with the associated AFE and Well Plan) to all other Participating Parties in the abandoned Development Well, and that proposal requires approval by Election of the Participating Parties in the abandoned Development Well.  The Well Plan for the substitute Development Well shall be substantially the same as the abandoned Development Well's Well

Plan and shall also take into account those conditions that rendered further drilling of the abandoned Development Well impractical.

Each Non-Participating Party in a substitute Development Well or an approved supplemental AFE for a Development Well will be subject to either an acreage forfeiture or Hydrocarbon Recoupment, as provided in Article 16 *(Non-Consent Operations)*.

**13.2**   **Development Operations at Objective Depth**

After a Development Well has been drilled to such Objective Depth and all operations in the controlling AFE have been conducted or terminated (except temporary abandonment and permanent plugging and abandonment) and all logs and test results have been distributed to the Participating Parties, the Operator shall promptly notify the Parties entitled to Vote or make an Election (i.e., the Participating Parties) of its proposal to conduct subsequent operations in the well.  Except for a proposal to permanently plug and abandon the well, the Operator's proposal shall include an associated AFE and a plan for the operation.

If the Participating Parties have secured the requisite approval to perform a subsequent Development Operation, and, provided that Article 16.4 *(Non-Consent Operations to Maintain Unit Area)* was not applicable to the drilling of that Development Well, then, contingent upon the unanimous approval of the Participating Parties in the approved subsequent Development Operation, the Operator shall notify each former Non-Participating Party of the proposal. Each former Non-Participating Party may respond with an Election regarding such a proposal by notifying the Operator of its Election within forty-eight (48) hours (exclusive of Saturdays, Sundays, and federal holiday) after receiving the Operator's notice. Any former Non-Participating Party making an Election to participate in the subsequent Development Operation shall be subject to Article 13.2.5.

The Operator's proposal shall be for one of the following operations:

(a)   conduct Additional Testing, Sidewall Coring, or Logging of the formations encountered prior to setting production casing;

(b)   Complete the well at the Objective Depth in the objective zone or formation;

(c)   Sidetrack the well, including the requisite plug back operations;

(d)   plug back the well and attempt a Completion in a shallower zone or formation;

(e)   Deepen the well to a new Objective Depth;

(f)   conduct other operations on the well not listed;

(g)   temporarily abandon the well; or

(h)   permanently plug and abandon the well.

If the Operator fails to submit its proposal to the Participating Parties within twenty-four (24) hours (exclusive of Saturdays, Sundays, and federal holidays) after receipt of all logs and test results from a Development Well, then any Participating Party may make a proposal.  In that event, the procedures in this Article 13.2 *(Development Operations at Objective Depth)* shall apply to that proposal, and any reference in this Article 13.2 to the "Operator's proposal" shall include a proposal made by a Participating Party.

13.2.1   **Response to Operator's Proposal**

A Participating Party may, within twenty-four (24) hours (exclusive of Saturdays, Sundays, and federal holidays) of its Receipt of the Operator's proposal, make a separate proposal (along with an associated AFE and a plan for the operation), except if the proposal is to permanently plug and abandon the well) for one of the operations in Article 13.2 *(Development Operations at Objective Depth)*, and the Operator, immediately after the expiration of the twenty-four (24) hour period for making a separate proposal shall provide the Parties entitled to make an Election with a copy of all separate proposals so made.  If no separate proposal is made, the Parties entitled to make an Election shall, within forty-eight (48) hours (exclusive of Saturdays, Sundays, and federal holidays) following the latter of:

(a) Receipt of the Operator's proposal; or

(b) the commencement of Standby Charges,

make an Election on the Operator's proposal (except for a proposal to permanently plug and abandon).  If a separate proposal is made, the Parties entitled to make an Election shall make an Election under the procedure in Article 13.2.2 *(Response to Highest Priority Proposal)*.  If a proposal to permanently plug and abandon the well is the only operation proposed, then the approval and Cost allocation provisions of Article 13.5 *(Permanent Plugging and Abandonment and Cost Allocation)* shall apply to the proposal. If Article

8.3 *(Second Opportunity to Participate)* or Article 8.4 *(Participation by Fewer Than All Parties)*, or both, apply to an Election, then the response period in those articles shall be twenty-four (24) hours (exclusive of Saturdays, Sundays, and federal holidays) instead of forty-eight (48) hours (exclusive of Saturdays, Sundays, and federal holidays). Notwithstanding any contrary provision of this Agreement, if one or more operations are proposed before the distribution of information from the previous approved operation, then the response periods provided above shall not begin until the Parties entitled to make an Election in Article 13.2 *(Development Operations at Objective Depth)* have received the information from the previous approved operation.

**13.2.2**   **Response to Highest Priority Proposal**

If a separate proposal is made, each Party entitled to make an Election shall, within twenty-four (24) hours (exclusive of Saturdays, Sundays, and federal holidays) following the latter of:

(a) Receipt from the Operator of a complete copy of all separate proposals; or

(b) the commencement of Standby Charges,

make its Election on the highest priority proposal (except a proposal to permanently plug and abandon the well). Article 13.2(a) has the highest priority, and Article 13.2(h) has the lowest priority. If different depths or locations are proposed for the same type of operation, preference shall be given to the shallowest depth, or the location nearest to the existing well bore, as applicable. If the proposal with the highest priority is approved, then the lower priority proposals shall be deemed withdrawn. Once the approved operation is completed, the Parties shall follow the procedure provided in this Article 13.2 *(Development Operations at Objective Depth)* for all other proposals for operations in the well bore until such time as the well is Completed, temporarily abandoned or permanently abandoned.

**13.2.3**   **Response on Next Highest Priority Proposal**

If the proposal with the highest priority is not approved, then the next highest priority proposal shall be deemed the highest priority proposal, and it shall be subject to the approval procedure in Article 13.2.2 *(Response to Highest Priority Proposal)*. This process will continue until a proposal is approved to complete

the Development Well, temporarily plug and abandon the Development Well, or permanently plug and abandon a Development Well.

### 13.2.4     Non-Participating Parties in Development Operations at Objective Depth

A Non-Participating Party in a Development Operation conducted on a Development Well after it has reached its Objective Depth [except as provided for in this Article 13.2 *(Development Operations at Objective Depth)*] is subject to Article 16.5.4 *(Non-Consent Development Operations)* and is relieved of the Costs and risks of that Development Operation, except that a Non-Participating Party in that Development Operation remains responsible for its Participating Interest Share of the Costs of plugging and abandoning a Development Well, less and except all Costs of plugging and abandoning associated solely with the subsequent Development Operation in which it was a Non-Participating Party.

### 13.2.5     Participation in a Subsequent Development Operation by a Non-Participating Party in a Development Well at Objective Depth

If a Development Well is drilled to its Objective Depth and a Non-Participating Party in that Development Well becomes a Participating Party in an approved subsequent Development Operation under Article 13.2, that former Non-Participating Party shall become an Underinvested Party in an amount equal to its Non-Participating Interest Share of the Costs of that Development Well to its Objective Depth prior to that subsequent Development Operation.  The original Participating Parties in a Development Well are Overinvested Parties in that amount.  A former Non-Participating Party in a Development Well that becomes a Participating Party in an approved subsequent Development Operation remains a Non-Participating Party in that Development Well to initial Objective Depth until (a) its Underinvestment is eliminated under Article 16.9 *(Settlement of Underinvestments)* and (b) the Hydrocarbon Recoupment recoverable under Article 16.5.4 *(Non-Consent Development Operations)* less the Underinvestment, has been recovered by the original Participating Parties. If a former Non-Participating Party becomes a Participating Party in more than one approved subsequent Development Operation in the same Development Well, that former Non-Participating Party shall become an Underinvested Party only with regard to the first subsequent Development Operation it approves; however, that Underinvestment shall not be relieved by an Underinvested Party's subsequent participation.

**13.3** **Development Well Proposals That Include Drilling Below the Deepest Producible Reservoir**

Any Party may propose a Development Well with an Objective Depth below the Deepest Producible Reservoir, and in response to that well proposal each Party may, in writing, limit its participation in the drilling of that Development Well to the base of the Deepest Producible Reservoir to be penetrated by that Development Well. A Party who limits its participation in a Development Well to the base of the Deepest Producible Reservoir shall bear its Participating Interest Share of the Cost and risk of drilling that Development Well to the base of the Deepest Producible Reservoir (including abandonment), and it shall be a Non-Participating Party for the Deeper Drilling and shall be subject to Article 16.5.4 (*Non-Consent Development Operations*) in regard to the Deeper Drilling.

**13.3.1** **Multiple Completion Alternatives Above and Below the Deepest Producible Reservoir**

If a Party Electing to limit its participation in a well to the base of the Deepest Producible Reservoir to be penetrated by the well under Article 11.3 *(Appraisal Well Proposals That Include Drilling Below the Deepest Producible Reservoir)* or Article 13.3 *(Development Well Proposals That Include Drilling Below the Deepest Producible Reservoir)* considers the well to be capable of producing at or above the Deepest Producible Reservoir and has notified the Participating Parties down to Objective Depth of its desire to complete the well at or above the Deepest Producible Reservoir, the well will be drilled subject to the following provisions:

(a) **Multiple Completion:** If before drilling of the well commences, all Participating Parties in the well agree that multiple well Completions are possible and practicable and that those Completions will involve (i) a Completion at or above the Deepest Producible Reservoir and (ii) a Completion below the Deepest Producible Reservoir, the Participating Parties in the Deeper Drilling will bear one hundred percent (100%) of the Costs of drilling the well to an Objective Depth below the Deepest Producible Reservoir that are in excess of the original Costs to drill and complete the well in the Deepest Producible Reservoir.

(b) **Single Completions:** If prior to the commencement of the drilling of the well, the Participating Parties do not unanimously agree that multiple well Completions are possible, then the first Completion shall be at the

objective deeper than the Deepest Producible Reservoir. A Non-Participating Party in the Deeper Drilling is an Overinvested Party in the well in an amount equal to its Participating Interest Share of the Costs of drilling the well to the Deepest Producible Reservoir, and the Participating Parties in the Deeper Drilling on the well are Underinvested Parties for that amount upon the first of the following events to occur:

(i) the well is not a Producible Well at a depth deeper than the Deepest Producible Reservoir and the well is plugged back to a zone at or above the Deepest Producible Reservoir;

(ii) the well is completed as a Producible Well at a depth deeper than Deepest Producible Reservoir, but Hydrocarbon production from that depth is later depleted prior to Complete Recoupment (in regard to Deeper Drilling) and the well is plugged back to a zone at or above the Deepest Producible Reservoir;

(iii) the well is completed as a Producible Well at a depth deeper than the Deepest Producible Reservoir and the Participating Parties have achieved Complete Recoupment (in regard to the Deeper Drilling) from Hydrocarbon production from a zone deeper than the Deepest Producible Reservoir;

(iv) the well is plugged and abandoned prior to an attempted Completion at or above the Deepest Producible Reservoir.

The Underinvestment will be depreciated at the rate of one-half of one percent (0.50%) per month from the date the Deeper Drilling commences to the date the Non-Participating Party is entitled to share in the Hydrocarbon production from zones deeper than Deepest Producible Reservoir, but that depreciation will not reduce the Underinvestment below seventy-five percent (75%) of the original Underinvestment.

**13.3.2** **Completion Attempts At or Above the Deepest Producible Reservoir**

If a Development Well in which Deeper Drilling is conducted is not completed for production below the Deepest Producible Reservoir, then the Participating Parties in that well down to the Deepest Producible Reservoir may use the well for Completion in a zone at or above the Deepest Producible Reservoir. The

Parties who paid their proportionate share of the drilling Costs to the base of the Deepest Producible Reservoir under Article 13.3 *(Development Well Proposals That Include Drilling Below the Deepest Producible Reservoir)* may participate in the Completion attempt in the zone at or above the Deepest Producible Reservoir. The Participating Parties in the Deeper Drilling operation shall bear the Costs (including plugging back Costs) necessary to place the well in proper condition for its Completion in the zone at or above the Deepest Producible Reservoir. If a well drilled below the Deepest Producible Reservoir is damaged to the extent that it is rendered incapable of being completed and produced at or above the Deepest Producible Reservoir, the Participating Parties in the Deeper Drilling are obligated to reimburse the Non-Participating Parties in the Deeper Drilling for their Participating Interest Share of the Costs of drilling the well to the base of the Deepest Producible Reservoir.

**13.4    Recompletions and Workovers**

Any of the Participating Parties in the subsequent Development Operation, Recompletion, or Workover that resulted in the most recent Hydrocarbon production from a Development Well may propose a Recompletion in or Workover of that Development Well. Each Recompletion or Workover, including the permanent plugging and abandonment of a Producible Reservoir, requires approval by Vote of those Participating Parties. A Non-Participating Party in a Recompletion or Workover is subject to Article 16.5.4 *(Non-Consent Development Operations)* and is relieved of the Costs and risks of the Recompletion or Workover but remains responsible for its Participating Interest Share of the Costs of plugging and abandoning the Development Well, less and except any Costs of plugging and abandoning associated solely with a Recompletion or Workover in which it is a Non-Participating Party.

**13.5    Permanent Plugging and Abandonment and Cost Allocation**

Except as otherwise provided in this Agreement, the permanent plugging and abandonment of a Development Well that is located on active lease and:

  (a)   is to be plugged due to mechanical difficulties or impenetrable conditions before the well has been drilled to its Objective Depth under Article 13.1.4 (b),

  (b)   is to be plugged under Article 13.2 *(Development Operations at Objective Depth)*, or

(c)   has been previously temporarily abandoned under Article 13.2 (*Development Operations at Objective Depth*)

and has not produced Hydrocarbons (other than as a result of Production Testing), requires the approval of the Participating Parties by unanimous agreement.  Approval to plug and abandon a Development Well that has produced Hydrocarbons (other than as a result of Production Testing) shall be governed by Article 18.1 (*Abandonment of Wells*).  If a proposal to plug and abandon a Development Well receives approval by unanimous agreement, the approved proposal binds all Parties.  If any Participating Party fails to respond within the applicable response period for a proposal to plug and abandon a Development Well, that Participating Party shall be deemed to have approved the plugging and abandonment of that Development Well.  If a rig is on location and a proposal to plug and abandon a Development Well under either Article 13.5 (a) or 13.5 (b) does not receive approval by unanimous agreement, and if within twenty-four (24) hours (exclusive of Saturdays, Sundays, and federal holidays) after Receipt of that proposal no other operation is proposed (and subsequently approved) for the well by a Party entitled to make a proposal, the Operator may nevertheless proceed to plug and abandon the Development Well, and shall give each Participating Party notice of that fact. If the proposal to plug and abandon a Development Well that has not produced Hydrocarbons (other than as a result of Production Testing) does not receive approval by unanimous agreement, but the Operator, in its sole and reasonable opinion, deems the well bore not to be safe or in sound enough condition for it to perform further operations, the Operator may nevertheless proceed to plug and abandon that Development Well and shall give each Participating Party notice of that fact.

The Participating Parties in a Development Well proposal shall pay all Costs of plugging and abandoning that Development Well, except all increased plugging and abandoning Costs associated solely with a Non-Consent Operation approved under Article 13.2 (*Development Operations at Objective Depth)* or Article 6.2.2 (*Supplemental AFEs)*.  The Participating Parties in that Non-Consent Operation are responsible for the increased plugging and abandoning Costs attributable to that Non-Consent Operation.

## ARTICLE 14 – FACILITIES AND GATHERING SYSTEMS

### 14.1   Facilities as a Part of Development Plan

The Development Plan shall provide for the installation of all Facilities necessary to handle or service Hydrocarbons produced pursuant to that Development Plan.  If the approved

Development Plan provides that Hydrocarbon production can most efficiently be processed and handled by Offsite Host Facilities, the Development Plan shall provide for a Development System designed to use Offsite Host Facilities.

**14.2**   **Use of Offsite Host Facilities**

In the event the approved Development Plan provides that Hydrocarbon production can most efficiently be processed and handled by Offsite Host Facilities, the Participating Parties shall use reasonable efforts to secure a formal "Facilities Use and Production Handling Agreement" from the owners of the Offsite Host Facilities under the terms submitted to the Parties by the Operator under Article 12.4.1 (f) *(Tieback Operations)*, but no Participating Party shall have a duty (fiduciary or otherwise) to secure capacity in the Offsite Host Facilities on behalf of any other Participating Party.  However, any capacity secured by that "Facilities Use and Production Handling Agreement" to Offsite Host Facilities shall be shared proportionately by the Participating Parties, who executed the "Facilities Use and Production Handling Agreement," on the basis of their Participating Interest Share in the Development System, unless those Parties agree to a different proportionate share of the capacity.  This Agreement shall govern all operations and activities regarding Hydrocarbon production, which are not specifically addressed in the "Facilities Use and Production Handling Agreement." This Article 14.2 shall not constitute a limit on a Party's right to install its own facilities under Article 15 *(Disposition of Hydrocarbon Production)*.

**14.3**   **Use of Development Systems**

The Participating Parties in a Development System have priority access to and utilization of the Facilities associated with the Development System in order to operate and develop the Unit Area under an approved Development Plan.

**14.4**   **Processing Priorities**

The Participating Parties in a Development System jointly own all processing and handling capacity associated with that Development System.  The use of excess processing or handling capacity in that Development System is subject to the following priority of usage:

(a)   First priority to Hydrocarbon production from the Development Phase during which the existing processing Facilities were fabricated and installed;

(b)   Second priority to Hydrocarbon production from a Development Phase during which the existing processing Facilities were not fabricated and installed;

(c)     Third priority to hydrocarbon production from outside the Unit Area that is owned one hundred percent (100%) by all Participating Parties in the Development System in the same percentage as their ownership in that Development System;

(d)     Fourth priority to hydrocarbon production from outside the Unit Area that is owned one hundred percent (100%) by all of the Participating Parties in the Development System but not in the same percentage as their ownership in the Development System;

(e)     Fifth priority to hydrocarbon production from outside the Unit Area that is owned by all Participating Parties in the Development System and a third party;

(f)     Sixth priority to hydrocarbon production from outside the Unit Area that is owned by one or more Participating Parties in the Development System, but not by all of them, and a third party; and

(g)     Seventh priority to hydrocarbon production from outside the Unit Area that is owned one hundred percent (100%) by a third party.

Any hydrocarbon production processing and handling capacity offered to parties under (d), (e), (f), and (g) of this Article 14.4 shall be processed and handled under a "Facilities Use and Production Handling Agreement" unanimously agreed to by the Participating Parties in the Execution AFE for that Development System and, if applicable, the Participating Parties in any additional Facilities which are to be used for the processing or handling of those hydrocarbons.

**14.5     <u>Approval of Additional Facilities</u>**

This Article 14.5 shall only apply to Facilities that were not included in an approved Development Plan and are to be utilized for Hydrocarbon production.  Any Participating Party in an Execution AFE for a Development System may propose the installation of additional Facilities beyond those specified in the Development Plan associated with that Development System by giving notice to the other Participating Parties (along with an associated AFE), together with information adequate to describe the proposed Facilities. Except as provided in Article 15.2 *(Facilities to Take In Kind)*, the installation of additional Facilities beyond the scope of a Development Plan requires the approval by Vote of the Participating Parties in the Execution AFE (and all supplemental AFEs) for the Development System that is to receive the additional Facilities.  Upon approval of such a proposal, the Operator shall proceed to install the additional Facilities, provided that, in the

judgment of the Operator, the additional Facilities do not interfere with continuing operations on the Unit Area and there is sufficient deck space and buoyancy available to support the proposed additional Facilities. A Non-Participating Party in a proposal for additional Facilities shall be subject to Article 16.5.5 *(Non-Consent Subsequent Development System and Additional Facilities)*. If the Facilities proposal is for a disposal well, that Facilities proposal shall contain the same information provided in a Development Well proposal.

**14.6   Expansion or Modification of Existing Production System**

This Article 14.6 shall only apply to expansions or modifications of a Production System that are to be utilized for activities or operations on the Unit Area.  After installation of a Production System described and approved in a Development Plan, any Participating Party in that Production System may propose the expansion or modification of that Production System by written notice (along with its associated AFE) to the other Participating Parties in that Production System.  That proposal requires the approval by Vote of the Participating Parties in that Production System.   If approved, that proposal will be binding on all Participating Parties in that Production System, and the Operator shall commence that expansion or modification at the sole Cost and risk of all of the Participating Parties in that Production System unless otherwise agreed.

**14.7   Additions, Expansion, or Modification of Production System or Facilities for Health, Safety, or Environmental Reasons**

If a proposal for additional Facilities or a proposal for the expansion or modification of a Production System does not receive approval by Vote of the Participating Parties in the Execution AFE (and all supplemental AFEs) for the Development System that is to receive additional Facilities or have its Production System expanded or modified, whichever is applicable, and that proposal is necessary for health, safety, or environmental reasons and has been mandated by governmental authority or judicial process, the Operator may, at its discretion, install those additional Facilities or make those expansions or modifications to the Production System.  If the Operator elects to exercise its discretionary right to make those installations, modifications, or expansions, the Operator shall provide written notice of its decision to each Participating Party in the Execution AFE (and all supplemental AFEs) for the Development System that is to receive additional Facilities or have its Production System expanded or modified, whichever applies.

**14.8**  **Repairs of Production System or Facilities**

Subject to Article 6.2 (*AFEs),* the Operator may make repairs to the Production System and/or Facilities as needed to keep the Production System and/or Facilities in good working order, as approved by Election.  A Non-Participating Party as to the Costs to repair the Production System and/or Facilities shall be subject to Article 16.4 (*Non-Consent Operations to Maintain Unit Area*) or 16.5.3 (*Non-Consent Proprietary Geophysical Operations, Feasibility AFEs, Selection AFEs, Define AFEs, Long Lead Development System AFEs, Post-Production Project Team AFEs, Enhanced Recovery Project Team AFEs, or Long Lead Well Operation AFEs*), as applicable.

## ARTICLE 15 – DISPOSITION OF HYDROCARBON PRODUCTION

**15.1**  **Duty to Take in Kind**

Each Party has the right and duty to take in kind or separately dispose of its share of the Hydrocarbons produced and saved from the Unit Area, excluding (i) Hydrocarbons that are unavoidably lost and (ii) Hydrocarbon production that the Operator uses in production or Development Operations or in preparing and treating Hydrocarbons for marketing or transportation in an Export Pipeline.

**15.2**  **Facilities to Take in Kind**

Each Participating Party in the Execution AFE for a Development System has the right, at its sole cost and risk, to construct and install facilities on and connect pipelines to the Development System for purposes of taking its share of Hydrocarbon production in kind, provided that, in the judgment of the Operator, the installation and operation of those facilities and pipelines will not unreasonably interfere with continuing operations on the Development System or the Unit Area.

**15.3**  **Failure to Take Oil and/or Condensate in Kind**

If a Party fails to take in kind or dispose of its share of the oil and/or condensate produced from the Unit Area, the Operator shall have the right, but never the obligation, to purchase for its own account, sell to others, or otherwise dispose of all or part of that oil or condensate to others at the prevailing price in the area for oil or condensate of the same kind, gravity, and quality reasonably obtained by the Operator under the circumstances, subject to revocation by the non-taking Party upon thirty (30) days written notice to the Operator but shall not take effect until the Operator's sales contract with a third party terminates.  The Operator is not obligated to obtain a price equal to the price at which its oil or condensate is sold.  The Operator's right to take in kind or dispose of a non-taking

Party's share of the oil or condensate is subject to the non-taking Party's right, at any time and from time to time, to take in kind or dispose of its share of the oil or condensate.  All contracts of sale by the Operator for another Party's oil or condensate shall be only for such reasonable periods not to exceed one hundred and eighty (180) days.  Proceeds of all sales by the Operator under this Article 15.3 shall be paid to the Party entitled thereto once in each calendar month. The Operator shall pay all lessor royalties for oil and/or condensate not taken in kind by the non-taking Party.

Unless required by governmental authority or judicial process, no Party shall be forced to share an available market with a non-taking Party.

**15.4**   **Gas Balancing Provision**

If for any reason a Party fails to take or market its full share of gas as produced, the gas balancing and accounting between the Parties shall be handled under Exhibit "D."

**15.5**   **Expenses of Delivery in Kind**

All Costs incurred by the Operator in making delivery of a Party's share of Hydrocarbon production or disposing of same shall be borne by that Party.

## ARTICLE 16 – NON-CONSENT OPERATIONS

**16.1**   **Conduct of Non-Consent Operations**

Any activity or operation that invokes this Article 16 *(Non-Consent Operations)* must be proposed by a Party in good faith, using Cost estimates and Objective Depths that are reasonable for the Unit Area.  Non-Consent Operations shall not unreasonably interfere with activities or operations conducted by all Parties, unless the Non-Consent activity or operation will maintain all or a portion of the Unit Area under Article 16.4 *(Non-Consent Operations to Maintain Unit Area)*.

**16.1.1**   **Costs**

The Costs of a Non-Consent Operation shall be borne by the Participating Parties in accordance with their Participating Interest Share in the Non-Consent Operation (unless otherwise agreed by the Participating Parties).  Within ninety (90) days after a Non-Consent Operation has been conducted, the Operator shall furnish all other Parties with either (a) an itemized statement of the Cost of the Non-Consent Operation and an inventory of the pertinent equipment or (b) a detailed statement of monthly billings.  The Operator shall furnish to the Parties a monthly statement showing operating, maintenance, and other expenses

attributable to the Non-Consent Operation together with a statement of the quantity of Hydrocarbons produced, and the revenues from the sale of Hydrocarbon production for the preceding month from operations subject to Hydrocarbon Recoupment under this Article 16.  In accounting for the revenues from Non-Consent Operations, Hydrocarbon production need not be separately metered, but may be determined upon the basis of monthly well tests, or as otherwise permitted in the DOI Surface or Subsurface Commingling Approval. Operating expenses shall be allocated under Article 16.8.3 *(Operating and Maintenance Charges)*.  If a Party takes its share of production in kind under Article 15 *(Disposition of Hydrocarbon Production)*, that Party shall advise the Operator (in writing on or before the tenth day of the month following the month in which the Hydrocarbon production is sold or used off the premises) of the volumes of Hydrocarbons sold or used off the premises and the prices received for those Hydrocarbons so that the Operator may calculate the balance of any Hydrocarbon Recoupment amounts.

The calculation of the balance of Hydrocarbon Recoupment shall be accomplished as follows:

The Operator shall prepare the monthly statement of the quantities of oil and gas produced and the amounts of the proceeds from the sale of all Non-Participating Parties' relinquished production based on the proceeds received for the Operator's share of production.  When Operator's payout calculation indicates that payout has occurred, the Operator shall promptly notify all Parties.  The Participating Parties shall then provide the Operator all information pertaining to the cumulative proceeds received from the sale of the Non-Participating Parties' relinquished production.  The Operator shall revise the payout date using the actual proceeds from the sale of the Non-Participating Party's relinquished production and administer subsequent adjustments between the Parties.

### 16.1.2    <u>Multiple Completions</u>

Non-Consent Operations shall not be conducted in a well having multiple Completions unless:

(a)    each of the multiple Completions are owned by the same Parties in the same proportion;

(b)     none of the previous well Completions are capable of producing in paying quantities; or

(c)     the Participating Parties in the well containing the multiple Completions unanimously agree to those Non-Consent Operations.

For the purposes of this Article 16, each Completion is a separate well.

**16.2     NOTE: It is hereby agreed amongst the signatories of this Unit Operating Agreement that the Acreage Forfeiture Provisions for the First Exploratory Well and Substitute Wells(s) for the First Exploratory Well are not applicable to this Unit Agreement.**

~~Acreage Forfeiture Provisions~~

~~In view of the significantly greater risks associated with the first Exploratory Well and the Execution AFE for the initial Development System, the Participating Parties in the first Exploratory Well or that Execution AFE are entitled to an assignment of all of the right, title, and interest (including operating rights) in the Unit Area of the Non-Participating Parties in that well or AFE as provided below.~~

~~16.2.1     First Exploratory Well & Substitute Well(s) for the First Exploratory Well~~

~~16.2.1.1     First Exploratory Well~~

~~If a Participating Party proceeds with the timely commencement of the drilling of the first Exploratory Well as a Non-Consent Operation and~~

~~(a)     the first Exploratory Well is drilled to its Objective Depth; or~~

~~(b)     the first Exploratory Well is drilled to a depth shallower than its Objective Depth and one hundred percent (100%) or more of the total amount of the AFE for that Exploratory Well is expended,~~

~~then within thirty (30) days after notice of the occurrence of an event described in clause (a) or (b), a Non-Participating Party in the first Exploratory Well shall execute and deliver an assignment of all of its right, title, and interest in the Unit Area, free of all Lease Burdens as defined in Article 19.1 *(Burdens on Hydrocarbon Production)*, effective on the date actual drilling operations for the well are commenced, to the Participating Parties in the first Exploratory Well or its substitute well, as applicable, with no reimbursement by and at no Cost to those Participating Parties. If an assignment is made under this Article 16.2.1.1,~~

then each Participating Party shall accept its Participating Interest Share, as determined under Article 8.4 *(Participation by Fewer Than All Parties)*, of the Non-Participating Party's assigned interest.   The Non-Participating Party's Election not to participate in the first Exploratory Well shall be deemed a withdrawal under Article 17 *(Withdrawal From Agreement)*, and the Parties shall be subject to Article 17 *(Withdrawal From Agreement)*.   After the satisfaction of Article 16.2.1.1(a), a Non-Consent Operation performed in the first Exploratory Well's well bore or its substitute's well bore, as applicable, shall not be subject to this Article 16.2.1.1 but shall be subject to the Hydrocarbon Recoupment premium provided in Article 16.5.1.1 *(Non-Consent Exploratory Operations at Objective Depth)*, except as provided in Article 16.4 *(Non-Consent Operations to Maintain Unit Area)*.

**16.2.1.2   Substitute Well(s) for First Exploratory Well**

If all Parties Elect to participate in the First Exploratory Well, and such well is commenced and abandoned under Article 10.1.5 (*AFE Overruns and Substitute Well*) prior to reaching its Objective Depth, and then a Party proposes the drilling of a substitute well for such first Exploratory Well, then any Party that Elects not to participate in such substitute well shall be subject to acreage forfeiture or Hydrocarbon Recoupment as provided in this Article 16.2.1.2.   If, upon abandoning the first Exploratory Well under Article 10.1.4 (*AFE Overruns and Substitute Well*), the Parties have expended an amount equal to or more than fifty percent (50%) of the AFE for such first Exploratory Well, then a Party that Elects not to participate in a substitute well for such first Exploratory Well, shall be subject to the Hydrocarbon Recoupment as provided in Article 16.5.1.2 (*Non-Consent Exploratory Operations for a Substitute Well(s) for the First Exploratory Well*). If, upon abandoning the first Exploratory Well under Article 10.1.5 (*AFE Overruns and Substitute Well*), the Parties have expended an amount less than fifty percent (50%) of the AFE for such first Exploratory Well, then a Party that Elects not to participate in a substitute well for such first Exploratory Well, shall be subject to acreage forfeiture as provided in Article 16.2.1.1 (*First Exploratory Well*).

**16.2.2   Execution AFE**

Within thirty (30) days of notice of the timely commencement of the activities or operations associated with the Execution AFE for the initial Development System, a Non-Participating Party in that Execution AFE shall execute and

deliver an assignment of all of its right, title, and interest in the Unit Area to the Participating Parties in that Execution AFE, free of all Lease Burdens as defined in Article 19.1 *(Burdens on Hydrocarbon Production)*, effective on the date the construction or acquisition of the initial Development System is commenced, with no reimbursement by and at no Cost to those Participating Parties.  If an assignment is made under this Article 16.2.2, then each Participating Party shall accept its Participating Interest Share, as determined under Article 8.4 *(Participation by Fewer Than All Parties)*, of the Non-Participating Party's assigned interest.  The Non-Participating Party's Election not to participate in the Execution AFE for the initial Development System shall be deemed a withdrawal under Article 17 *(Withdrawal From Agreement),* and the Parties shall be subject to Article 17 *(Withdrawal From Agreement).*

**16.3   Costs and Liabilities of Prior Operations**

Subject to Article 6.2.2 *(Supplemental AFEs)*, a Non-Participating Party subject to a non-consent provision remains liable for its share of previously incurred Costs and liabilities for activities and operations in which it was a Participating Party, and there shall be no re-allocation of Costs for activities and operations in which it was a Participating Party, except as provided in Article 13.3.1 *(Multiple Completion Alternatives Above and Below the Deepest Producible Reservoir)*.

**16.4   Non-Consent Operations to Maintain Unit Area**

If a proposal is made for

(a)   an activity or operation required under a governmental agency order, notice, regulation, or Lease to maintain all or part of the Unit Area; or

(b)   an activity or operation

  (i)   within the final three hundred and sixty-five (365) days of the primary term of a Lease, and if the Lease is not held by any means and will expire under its own terms, or

  (ii)   within ninety (90) days prior to the deadline for an activity or operation required under an SOO or SOP activity schedule or a unit plan of operation,

and the proposal requires approval by Vote, Election or unanimous agreement and that approval or agreement is not obtained within the applicable response period, then, notwithstanding any contrary provision of Article 8 *(Approvals and Notices)*, the proposed

activity or operation shall be deemed to have been approved, and all Parties that Voted or Elected or agreed by written statement to participate in the proposed activity or operation may proceed with the proposed activity or operation at their sole Cost and risk. However, before those Parties commence that activity or operation, they shall give written notice to the other Parties of their intention to commence that activity or operation. The other Parties shall have a second opportunity to participate in that activity or operation, under Article 8.3 *(Second Opportunity to Participate)*.

### 16.4.1   Acreage Forfeiture in the Entire Unit Area

If it is necessary to conduct an activity or operation referred to in Article 16.4 *(Non-Consent Operations to Maintain Unit Area)* in order to maintain the entire Unit Area, then each Non-Participating Party in that activity or operation shall relinquish and permanently assign, effective on the date the operation is commenced, to the Participating Parties one hundred percent (100%) of the Non-Participating Party's Working Interest in the entire Unit Area, including property and equipment acquired under this Agreement, within thirty (30) days of the commencement of that activity or operation. Failure to participate in that activity or operation is deemed a withdrawal, and the Parties will be subject to Article 17 *(Withdrawal From Agreement)*.

### 16.4.2   Acreage Forfeiture in a Portion of a Unit Area

If it is necessary to conduct an activity or operation referred to in Article 16.4 *(Non-Consent Operations to Maintain Unit Area)* in order to maintain a portion of the Unit Area, then each Non-Participating Party in that activity or operation shall relinquish and permanently assign, effective on the date the operation is commenced, to the Participating Parties one hundred percent (100%) of the Non-Participating Party's Working Interest in the affected portion of the Unit Area, including property and equipment acquired under this Agreement, within thirty (30) days of the commencement of that activity or operation. That assignment shall be conveyed to the Participating Parties in proportion to their Participating Interest Share in that activity or operation. The Non-Participating Party shall bear all expenses associated with that assignment and shall be subject to Article 17.3.1 (*Prior Expenses*), Article 17.3.2 (*Confidentiality*) and Article 17.3.3 (*Emergencies and Force Majeure*) with respect to the assigned acreage. If a Development System does not exist at the time of the forfeiture assignment or if the Non-Participating Party, who forfeited its interest under this Article 16.4, was a Non-Participating Party in the Development System which is located in

the non-forfeited portion of the Unit Area, upon DOI approval of that assignment, the assigned acreage shall be expunged from Exhibit "A," and it shall no longer be included in the Unit Area.  If that assignment is to two or more Participating Parties in that activity or operation, then (a) the assigned acreage shall be deemed to be governed by an operating agreement incorporating identical provisions as the provisions in this Agreement, except to the extent they are clearly inappropriate, (b) the execution of the operating agreement by those Participating Parties shall be considered a mere formality only, (c) the Operator of the assigned acreage shall promptly prepare that operating agreement, and (d) the Participating Parties shall promptly execute it.  If a Development System is located on the non-forfeited portion of the Unit Area and if the Participating Parties in the operation or activity, which were conducted in order to save the forfeited portion of the Unit Area, are Participating Parties in that Development System, the Parties shall amend this Agreement to provide for a separate operational area for the forfeited portion of the Unit Area and a separate operational area for the non-forfeited portion of the Unit Area, and this Agreement shall apply separately to each operational area; provided however, the Participating Parties in the Development System located on the non-forfeited portion of the Unit Area, who participated in the operation or activity, which were conducted in order to save the forfeited portion of the Unit Area, shall have the same priority of access to that Development System as the Parties in the separate operational area for the non-forfeited portion of the Unit Area.

### 16.4.3    Limitations on Acreage Forfeiture

Notwithstanding the foregoing, if more than one activity or operation is conducted under Article 16.4 *(Non-Consent Operations to Maintain Unit Area)*, any one of which would maintain the entire Unit Area or the affected portion of the Unit Area, a Participating Party in any one of those activities or operations shall not be required to make an assignment under Article 16.4 *(Non-Consent Operations to Maintain Unit Area)*.  In addition, no Party is required to relinquish or assign all or any portion of its Working Interest in the Unit Area if a governmental agency order, notice, regulation, Lease provision, SOO or SOP activity schedule, or unit plan of operation requiring the activity or operation is appealed and successfully overturned.

**16.5    Percentage Hydrocarbon Recoupment for Non-Consent Operations**

Except as provided in Articles 16.2 *(Acreage Forfeiture Provisions)* and 16.4 *(Non-Consent Operations to Maintain Unit Area)*, upon the timely commencement of a Non-Consent Operation, each Non-Participating Party's Working Interest and leasehold operating rights in the Non-Consent Operation along with its title to that portion of future Hydrocarbon production provided in this Article 16.5, if any, shall be owned by and vested in each Participating Party in accordance with its Participating Party Interest Share in the Non-Consent Operation under Article 8.4 *(Participation by Fewer Than All Parties)*. A third-party cash contribution made for Confidential Data from a Non-Consent Operation shall be deducted from the Non-Participating Interest Share of the Costs of the well operation or of drilling and completing the well, as applicable, prior to computation of the Hydrocarbon Recoupment amount.

16.5.1    ~~Non-Consent Exploratory Operations down to Objective Depth in the First Exploratory Well~~

~~Except for the Hydrocarbon Recoupment provided in Articles 16.2.1.2 *(Substitute Well(s) for the First Exploratory Well)* and 16.5.1.2 *(Non-Consent Exploratory Operations for a Substitute Well(s) for the First Exploratory Well)* Since the Participating Parties in the first Exploratory Well are entitled to an assignment of all of the right, title, and interest (including operating rights) in the Unit Area of the Non-Participating Parties in that well as provided in Article 16.2.1.1 *(First Exploratory Well)*, there is no Hydrocarbon Recoupment for Non-Consent Exploratory Operations conducted in the first Exploratory Well down to its Objective Depth.~~

**16.5.1.1    Non-Consent Exploratory Operations at Objective Depth**

The Hydrocarbon Recoupment amount for all non-consent Exploratory Operations conducted after the first Exploratory Well has reached its Objective Depth, be they non-consent Exploratory Wells other than the first Exploratory Well or operations conducted subsequent to an Exploratory Well, including the first Exploratory Well, reaching its Objective Depth, is the Non-Participating Interest Share of the Costs of that Non-consent Operation multiplied by eight hundred percent (800%).

**16.5.1.2    Non-Consent Exploratory Operations for a Substitute Well(s) for the First Exploratory Well**

The Hydrocarbon Recoupment amount for all non-consent Exploratory Operations down to Objective Depth conducted in a substitute well for the first Exploratory Well, be they non-consent substitute Exploratory Wells other than a substitute well for the first Exploratory Well, is the Non-Participating Interest Share of the Costs of that Non-consent Operation multiplied by eight percent (800%).

### 16.5.2    Non-Consent Appraisal Operations

The Hydrocarbon Recoupment amount for all Appraisal Operations conducted as Non-Consent Operations is the Non-Participating Interest Share of the Costs of the Appraisal Operation multiplied by six hundred percent (600%).

### 16.5.3    Non-Consent Proprietary Geophysical Operations, Feasibility AFEs, Selection AFEs, Define AFEs, Long Lead Development System AFEs, Post-Production Project Team AFEs, Enhanced Recovery Project Team AFEs or Long Lead Well Operation AFEs

If a Non-Participating Party in a Proprietary Geophysical Operation, Feasibility AFE, Post-Production Project Team AFE, Enhanced Recovery Project Team AFE takes, or is deemed to have taken, the steps set forth in Article 16.9 *(Settlement of Underinvestments)*, that Party is an Underinvested Party in an amount equal to one hundred and fifty percent (150%) of the amount it would have paid had it participated in that activity, operation, or AFE until the Underinvestment is eliminated under Article 16.9 *(Settlement of Underinvestments)*. If a Non-Participating Party in a Selection AFE, Define AFE, Long Lead Development System AFE or Long Lead Well Operation AFE takes, or is deemed to have taken, the steps set forth in Article 16.9 *(Settlement of Underinvestments)*, that Party is an Underinvested Party in an amount equal to two hundred percent (200%) of the amount that the it would have paid had it participated in that AFE until the Underinvestment is eliminated under Article 16.9 *(Settlement of Underinvestments)*.

### 16.5.4    Non-Consent Development Operations

The Hydrocarbon Recoupment amount for all Development Operations conducted as Non-Consent Operations is the Non-Participating Interest Share of

the Costs of the Development Operation multiplied by four hundred percent (400%).

### 16.5.5   Non-Consent Subsequent Development System and Additional Facilities

The Hydrocarbon Recoupment amount for a non-consent Execution AFE for a subsequent Development System or additional Facilities not included in an Execution AFE is the Non-Participating Interest Share of the Cost incurred with respect to that Execution AFE or those additional Facilities not included in an Execution AFE multiplied by three hundred percent (300%).

### 16.5.6   Additional Hydrocarbon Recoupment

In addition to the percentage Hydrocarbon Recoupment for the various Non-Consent Operations set forth above, the Participating Parties are entitled to recoup:

(a)     one hundred and ten percent (110%) of the Non-Participating Interest Share of the Cost of using an existing Development System that is needed to serve a Production System or Facilities installed as a Non-Consent Operation, in which the Non-Participating Party has a Participating Interest; plus

(b)     one hundred and ten percent (110%) of the Non-Participating Interest Share of the Cost of operating expenses, maintenance Costs, royalties, and severance, gathering, and production taxes and other governmental fees based on production.

### 16.5.7   Hydrocarbon Recoupment From Production

Hydrocarbon Recoupment for a Non-Consent Operation shall be made from the Hydrocarbon production as follows:

#### 16.5.7.1   Non-Consent Exploratory Operations, Non-Consent Appraisal Operations, and Non-Consent Development Operations That Discover or Extend a Producible Reservoir

For

(a)     an Exploratory Operation,

(b)     an Appraisal Operation, or

(c)    a Development Operation,

that is conducted as a Non-Consent Operation and discovers a new Producible Reservoir or extends an existing Producible Reservoir (as the Producible Reservoirs existed at the time the Development Operation was proposed), each Non-Participating Party shall satisfy Hydrocarbon Recoupment from

(i)    one hundred percent (100%) of its Non-Participating Interest Share of all Hydrocarbons produced and saved from the Non-Consent Operation, if the Non-Consent Operation results in Hydrocarbon production, and

(ii)    fifty percent (50%) of its Participating Interest Share of all Hydrocarbons produced and saved from operations conducted after the Non-Consent Operation that result in Hydrocarbon production from the same Producible Reservoir discovered or extended by the Non-Consent Operation.

### 16.5.7.2    Non-Consent Development Operations in an Existing Producible Reservoir

If a Development Operation is conducted as a Non-Consent Operation and does not discover a new Producible Reservoir and also does not extend an existing Producible Reservoir (as the Producible Reservoirs existed at the time the Development Operation was proposed), each Non-Participating Party shall satisfy Hydrocarbon Recoupment from one hundred percent (100%) of its Non-Participating Interest Share of Hydrocarbons produced and saved from the Non-Consent Operation, if the Non-Consent Operation results in Hydrocarbon production.

### 16.5.7.3    Non-Consent Subsequent Development Systems

If the construction and installation of a subsequent Development System is conducted as a Non-Consent Operation, each Non-Participating Party shall satisfy Hydrocarbon Recoupment from:

(a)    one hundred percent (100%) of its Non-Participating Interest Share or its Participating Interest Share (whichever applies) of Hydrocarbons produced and saved from all Development

Operations that are conducted from that subsequent Development System, and

(b)    one hundred percent (100%) of its Non-Participating Interest Share or its Participating Interest Share (whichever applies) of Hydrocarbons produced and saved from all wells that benefit from injection or disposal wells drilled and/or operated from that subsequent Development System.

**16.6    Restoration of Interests to Non-Participating Party**

Except as provided in Articles 16.2 *(Acreage Forfeiture Provisions)* and 16.4 *(Non-Consent Operations to Maintain Unit Area)*, a Non-Participating Party's Working Interest and leasehold operating rights revert to the Non-Participating Party, effective at 7:00 a.m. of the day after the occurrence of the first of the following events:

(a)    the well bore of the Non-Consent Operation is not a Producible Well on the date the permanent plugging and abandonment of the well concludes;

(b)    Hydrocarbon production recouped under Article 16.5.7 *(Hydrocarbon Recoupment From Production)* as result of a Non-Consent Operation ceases prior to Complete Recoupment;

(c)    the Participating Parties Sidetrack or Deepen an Exploratory Well, Appraisal Well, or Development Well and that well does not qualify as a Producible Well; or

(d)    upon Complete Recoupment.

However, only upon Complete Recoupment does a former Non-Participating Party become a Participating Party in the Non-Consent Operation.

**16.6.1    Dry Hole Reversion**

If a Non-Consent Operation, other than a Non-Consent Operation under Articles 16.2 *(Acreage Forfeiture Provisions)* and 16.4 *(Non-Consent Operations to Maintain Unit Area)*, results in an event provided in Article 16.6 (a) or (b) and a Non-Participating Party's Working Interest and leasehold operating rights revert back to the Non-Participating Party, all well equipment in place as a result of that Non-Consent Operation and all Development Systems fabricated and installed as a result of that Non-Consent Operation and rights to future Hydrocarbon production from a Producible Reservoir discovered or extended by

that Non-Consent Operation as described in Article 16.5.7 *(Hydrocarbon Recoupment From Production)* remain vested in the Participating Parties. Any salvage value in excess of Complete Recoupment will be credited to all Parties according to their Working Interest and without regard to their participation status.

**16.6.2**    **Sidetracking or Deepening a Non-Consent Well**

If a Non-Participating Party participates in a Sidetracking or Deepening as provided in Article 10.2.5 *(Participation in Sidetrack or Deepening by a Non-Participating Party in an Exploratory Well at Initial Objective Depth)*, Article 11.2.5 *(Participation in Sidetrack or Deepening by a Non-Participating Party in an Appraisal Well at Objective Depth)*, or Article 13.2.5 *(Participation in Sidetrack or Deepening by a Non-Participating Party in a Development Well at Objective Depth)*, and if the Participating Parties have recouped the Cost of the original well down to its Objective Depth at the time the Sidetrack or Deepening is approved by Election, then the Non-Participating Party shall not be an Underinvested Party in the Sidetracking or Deepening of that well, and the Participating Parties in the original well shall achieve Complete Recoupment under Article 16.5.7.1 *(Non-Consent Exploratory Operations, Non-Consent Appraisal Operations, and Non-Consent Development Operations That Discover or Extend a Producible Reservoir)* or Article 16.5.7.2 *(Non-Consent Development Operations in an Existing Producible Reservoir)*, whichever applies.

**16.7**    **Operations From a Subsequent Non-Consent Development System**

A Party who Elected not to participate in a subsequent Development System may participate in Development Operations from that subsequent Development System. If that Non-Participating Party participates in such a Development Operation, then the Non-Participating Party shall make to the Operator a lump sum payment of any remaining Hydrocarbon Recoupment and Underinvestment under Article 16 *(Non-Consent Operations)* for which it is still liable. The Operator shall then distribute to the Participating Parties in the subsequent Development System their Participating Interest Share of the payment. Upon that payment, the Non-Participating Party will become an owner and a Participating Party in the subsequent Development System.

**16.8**   **Allocation of Development System Costs to Non-Consent Operations**

In the event a well is drilled from or produced through a Production System or is produced through Facilities whose Participating Parties are different from the Participating Parties in that well or if the Participating Parties' Participating Interest Shares in that Production System or Facilities are different from their Participating Interest Shares in that well, the rights of the Participating Parties in that well and the Costs to use the Production System or Facilities for that well shall be determined as follows:

**16.8.1**   **Investment Charges**

(a)   The Participating Parties in that well shall pay to the Operator a one-time slot usage fee for the use of a slot on the Production System equal to two percent (2%) of the Cost of the Production System; provided, however, each Non-Participating Party's share of the slot usage fee shall be included in the calculation of any Hydrocarbon Recoupment to which it is subject as a result of the Non-Consent Operation's utilizing that slot.  Within fifteen (15) days of its receipt of that fee, the Operator shall distribute to the Participating Parties in the Production System their Participating Interest Share of that payment.  For purposes of calculating the slot usage fee, the total Cost of the Production System shall be reduced by .416667 percent per month, commencing on the date the Production System was installed and continuing every month thereafter until the month actual drilling operations on that well is commenced; however, the total Cost of the Production System shall not be reduced by more than twenty-five percent (25%) of the total Production System's costs.  The Cost of additions to the Production System shall be reduced in the same manner commencing the first month after the addition is installed.

If that well is abandoned, having never produced Hydrocarbons, the right of the Participating Parties in that well to use the Production System slot through which the well was drilled shall terminate unless those Parties commence drilling a substitute well for the abandoned well through the same slot within ninety (90) days of the abandonment.  If that substitute well is abandoned, having never produced Hydrocarbons, the right of the Participating Parties in that well to use the Production System slot through which the well was drilled shall terminate.

The slot usage fee shall not apply to a slot deemed to be "surplus." A slot may be deemed surplus only by the unanimous agreement of the owners of the Production System.

(b) The Participating Parties in that well shall pay to the owners of the Facilities a sum equal to that portion of the total Cost of those Facilities that the throughput volume of the Non-Consent Operation bears to the total design throughput volume of the Facilities. Throughput volume shall be estimated by the Operator in barrels produced per day (5.8 mcf of gas determined at a pressure of 14.73 pounds per square inch atmospheric and a temperature of sixty (60) degrees Fahrenheit equaling one barrel of oil and one barrel of water equaling one barrel of oil), using an average daily volume of the first three months of Hydrocarbon and water production from the Non-Consent Operation. For purposes of calculating the Facilities usage fee, the total Cost of the Facilities shall be reduced by .41667 percent per month, commencing from the date when the Facilities were installed and continuing every month thereafter until the first month during which production from the Non-Consent Operation commences, but the total Cost of the Facilities shall not be reduced more than twenty-five percent (25%) of the total Facilities' Cost. If a modification, expansion, or addition to the Facilities is made after commencing first production and before connection of the Non-Consent Operation to the Facilities, the Facilities investment shall be reduced in the same manner described above, from the month in which the Facilities modification, expansion, or addition is completed until the first month during which production from the Non-Consent Operation is commenced.

**16.8.2    <u>Payments</u>**

Payment of a usage fee shall not be deemed to be a purchase by the Participating Parties of an additional interest in the Production System or Facilities. Payments under Article 16.8.1 *(Investment Charges)* shall be due and payable on commencement of initial production from the Non-Consent Operation.

**16.8.3    <u>Operating and Maintenance Charges</u>**

The Participating Parties in a well drilled as a Non-Consent Operation shall pay all Costs necessary to connect the well to the Production System. The Costs of operating and maintaining the Facilities and the Production System shall be

allocated equally among all active Completions served.  Subsea Production System operating and maintenance Costs shall be allocated equally among all subsea well Completions served by the Subsea Production System.  Operating and maintenance Costs for the Facilities shall be allocated to each well served in the proportion that the volume throughput of the well bears to the total volume throughput of all wells handled by the Facilities.

**16.9**    **Settlement of Underinvestments**

A Non-Participating Party shall become an Underinvested Party and become liable for settling an Underinvestment if it (a) makes a revised Election or Vote to become a Participating Party in an AFE, activity, or operation in which it originally Elected or Voted not to participate, (b) Elects to participate (i) in the Sidetracking or Deepening of a wellbore in which it did not participate to Objective Depth or (ii) in a Sidetracking or Deepening thereafter, (c) Elects to participate in a Development Plan after a Major Modification of that plan has been approved, or (d) Elects to participate in Development Operations from a subsequent Development System in which it did not participate.  A Non-Participating Party in a Feasibility AFE, who elects to participate in the Selection AFE, shall automatically be deemed to have submitted to the Operator a written statement memorializing its subsequent Election to (a) participate in that Feasibility AFE, in which it originally Elected not to participate, and (b) become an Underinvested Party in regard to that AFE. A Non-Participating Party in a Selection AFE, who elects to participate in the Define AFE, which follows it, shall automatically be deemed to have submitted to the Operator a written statement memorializing its subsequent Election to (a) participate in that Selection AFE, in which it originally Elected not to participate, and (b) become an Underinvested Party in regard to that AFE.  A Non-Participating Party in a Define AFE, who elects to participate in the Execution AFE, which follows it, shall automatically be deemed to have submitted to the Operator a written statement memorializing its subsequent Election to (a) participate in the Define AFE in which it originally Elected not to participate and (b) become an Underinvested Party in regard to that AFE.  A Non-Participating Party in a Long Lead Development System AFE, who elects to participate in the activity or operation for which the long lead item in the Long Lead Development System AFE was procured, shall automatically be deemed to have submitted to the Operator a written statement memorializing its subsequent Election to (a) participate in that Long Lead Development System AFE, in which it originally Elected not to participate, and (b) become an Underinvested Party in regard to that AFE.  Except as provided in Article 16.9.1 *(Cash Settlement of Underinvestment)*, an Underinvested Party shall settle its Underinvestment through Disproportionate Spending.  The Underinvested Party shall be responsible for and

pay one hundred percent (100%) of the Overinvested Parties' share of the Costs (or if there are two or more Underinvested Parties, a proportion of those Costs based on each Party's Underinvestment) in subsequent activities or operations or AFEs under this Agreement in which that Underinvested Party and one or more Overinvested Parties participate until the amount of the Underinvestment is eliminated, except under Article 13.3.1 *(Multiple Completion Alternatives Above and Below the Deepest Producible Reservoir)* the Underinvested Party shall be responsible for and pay one hundred percent (100%) of the Overinvested Parties' share of the Costs (or if there are two or more Underinvested Parties, a proportion of those Costs based on each Party's Underinvestment) in subsequent activities or operations or AFEs within the Unit Area in which one or more Overinvested Parties participate until the amount of the Underinvestment is eliminated.

### 16.9.1    Cash Settlement of Underinvestment

If the Parties do not plan or propose further activities or operations under this Agreement (for which Costs would be allocated to the elimination of an Underinvestment), the Underinvested Party shall pay the Overinvested Parties the remaining Underinvestment amount in cash under Exhibit "C." If Disproportionate Spending in the Unit Area does not eliminate an Underinvestment within two (2) years after the date the Underinvestment is incurred, or upon final accounting and settlement under this Agreement, or before the Underinvested Party withdraws from the Unit Area under Article 17 *(Withdrawal From Agreement)*, whichever comes first, the Underinvested Party shall pay the Overinvested Parties the remaining Underinvestment in cash under Article 17 *(Withdrawal From Agreement)* and Exhibit "C."

### ARTICLE 17 – WITHDRAWAL FROM AGREEMENT

### 17.1    Right to Withdraw

Subject to this Article 17.1, any Party may withdraw from this Agreement (the "Withdrawing Party") by giving prior written notice to all other Parties stating its decision to withdraw ("the withdrawal notice"). The withdrawal notice shall specify an effective date of withdrawal that is at least sixty (60) days, but not more than ninety (90) days, after the date of the withdrawal notice. Within thirty (30) days of Receipt of the withdrawal notice, the other Parties may join in the withdrawal by giving written notice of that fact to the Operator ("written notice to join in the withdrawal") and upon giving written notice to join in the withdrawal are "Other Withdrawing Parties." The withdrawal notice and the written notice to join in the withdrawal are unconditional and irrevocable offers by the

Withdrawing Party and the Other Withdrawing Parties to convey to the Parties who do not join in the withdrawal (the "Remaining Parties") the Withdrawing Party's and the Other Withdrawing Parties' entire Working Interest in all of the Leases, Hydrocarbon production, and other property and equipment owned under this Agreement.

**17.2     Response to Withdrawal Notice**

Failure to respond to a withdrawal notice is deemed a decision not to join in the withdrawal.

**17.2.1     Unanimous Withdrawal**

If all the other Parties join in the withdrawal,

(a)     no assignment of Working Interests shall take place;

(b)     subject to Article 18.4 *(Abandonment Operations Required by Governmental Authority)*, no further operations may be conducted under this Agreement unless agreed to by all Parties;

(c)     the Parties shall abandon all activities and operations within the Unit Area and relinquish all of their Working Interests to the DOI within fifteen (15) days of the conclusion of the thirty (30) day joining period; and

(d)     notwithstanding anything to the contrary in Article 18 *(Abandonment and Salvage)*, the Operator shall:

(i)     furnish all Parties a detailed abandonment plan, if applicable, and a detailed cost estimate for the abandonment within sixty (60) days after the conclusion of the thirty (30) day joining period; and

(ii)     cease operations and begin to permanently plug and abandon all wells and remove all Production Systems and Facilities in accordance with the abandonment plan.

**17.2.2     No Additional Withdrawing Parties**

If none of the other Parties join in the withdrawal, then the Remaining Parties must accept an assignment of their Participating Interest Share of the Withdrawing Party's Working Interest, unless the Remaining Parties agree to share of the Withdrawing Party's Working Interest in a different percentage.

### 17.2.3   Acceptance of the Withdrawing Parties' Interests

If one or more but not all of the other Parties join in the withdrawal and become Other Withdrawing Parties, then within forty-eight (48) hours (exclusive of Saturdays, Sundays, and federal holidays) of the conclusion of the thirty (30) day joining period, each of the Remaining Parties shall submit to the Operator a written rejection or acceptance of its Participating Interest Share of the Withdrawing Party's and Other Withdrawing Parties' Working Interest. Failure to make that written rejection or acceptance shall be deemed a written acceptance. If the Remaining Parties are unable to select a successor Operator, if applicable, or if a Remaining Party submits a written rejection and the other Remaining Parties do not agree to accept one hundred percent (100%) of the Withdrawing Party's and Other Withdrawing Parties' Working Interest within thirty (30) days of the conclusion of the forty-eight (48) hour period to submit a written rejection or acceptance, the Remaining Parties will be deemed to have joined in the withdrawal, and Article 17.2.1 *(Unanimous Withdrawal)* will apply.

### 17.2.4   Effects of Withdrawal

Except as otherwise provided in this Agreement, after giving a withdrawal notice or a written notice to join in the withdrawal, the Withdrawing Party and Other Withdrawing Parties are not entitled to approve or participate in any activity or operation in the Unit Area, other than those activities or operations for which they retain a financial responsibility. The Withdrawing Party and Other Withdrawing Parties shall take all necessary steps to accomplish their withdrawal by the effective date referred to in Article 17.1 *(Right to Withdraw)* and shall execute and deliver to the Remaining Parties all necessary instruments to assign their Working Interest to the Remaining Parties. A Withdrawing Party and Other Withdrawing Parties shall bear all expenses associated with their withdrawal and the transfer of their Working Interest.

## 17.3   Limitation Upon and Conditions of Withdrawal

### 17.3.1   Prior Expenses

The Withdrawing Party and Other Withdrawing Parties remain liable for their remaining Underinvestments and their Participating Interest Share of the Costs of activities, operations, rentals, royalties, taxes, damages, Hydrocarbon imbalances, or other liability or expense accruing or relating to (i) obligations existing as of the effective date of the withdrawal, (ii) activities or operations

conducted before the effective date of the withdrawal, (iii) activities or operations approved by the Withdrawing Party and Other Withdrawing Parties before the effective date of the withdrawal, or (iv) activities or operations commenced by the Operator under one of its discretionary powers under this Agreement before the effective date of the withdrawal.  Before the effective date of the withdrawal, the Operator shall render a statement to the Withdrawing Party and Other Withdrawing Parties for (1) their respective shares of all identifiable Costs under this Article 17.3.1 and (2) their respective Participating Interest Shares of the estimated current Costs of plugging and abandoning all wells and removing all Production Systems, Facilities, and other materiel and equipment serving the Unit Area, less their respective Participating Interest Shares of the estimated salvage value of the assets at the time of abandonment, as approved by Vote.  This statement of expenses, Costs, and salvage value shall be prepared by the Operator under Exhibit "C."  Before withdrawing, the Withdrawing Party and Other Withdrawing Parties shall either pay the Operator, for the benefit of the Remaining Parties, the amounts allocated to them in the statement or provide security satisfactory to the Remaining Parties for all obligations and liabilities they have incurred and all obligations and liabilities attributable to them before the effective date of the withdrawal.  All liens, charges, and other encumbrances, including but not limited to overriding royalties, net profits interest, and production payments, which the Withdrawing Party and Other Withdrawing Parties placed (or caused to be placed) on their Working Interest shall be fully satisfied or released prior to the effective date of its withdrawal (unless the Remaining Parties are willing to accept the Working Interest subject to those liens, charges, and other encumbrances).

**17.3.2**     **Confidentiality**

The Withdrawing Party and Other Withdrawing Parties will continue to be bound by the confidentiality provisions of Article 7 *(Confidentiality of Data)* after the effective date of the withdrawal but will have no further access to technical information relating to activities or operations under this Agreement. The Withdrawing Party and Other Withdrawing Parties are not required to return to the Remaining Parties Confidential Data acquired prior to the effective date of the withdrawal.

### 17.3.3    Emergencies and Force Majeure

No Party may withdraw during a Force Majeure or emergency that poses a threat to life, safety, property, or the environment but may withdraw from this Agreement after termination of the Force Majeure or emergency.  The Withdrawing Party and Other Withdrawing Parties remain liable for their share of all Costs and liabilities arising from the Force Majeure or emergency, including but not limited to the drilling of relief wells, containment and cleanup of oil spills and pollution, and all Costs of debris removal made necessary by the Force Majeure or emergency.

## ARTICLE 18 – ABANDONMENT AND SALVAGE

### 18.1    Abandonment of Wells

Any Participating Party may propose the permanent plugging and abandonment of a well that has produced Hydrocarbons (other than as a result of Production Testing) by notifying the other Participating Parties.  Any Participating Party that fails to respond within the applicable response period shall be deemed to have approved the permanent plugging and abandonment of the well.  If the permanent plugging and abandonment proposal is unanimously agreed to by the Participating Parties in that well, the well shall be permanently plugged and abandoned under the applicable regulations at the Cost and risk of the Participating Parties.  If the Participating Parties do not unanimously agree to permanently plug and abandon the well, the Operator shall prepare an estimate of the Costs of the permanent plugging and abandonment of the well less the estimated salvage value of the well, as determined under Exhibit "C," and the Participating Party desiring to permanently plug and abandon the well shall pay the Operator, for the benefit of the non-abandoning Participating Parties, its share of that estimate within thirty (30) days of its Receipt of the estimate.  If an abandoning Participating Party's respective share of the estimated salvage value is greater than its share of the estimated Costs of the permanent plugging and abandonment, the Operator, on behalf of the non-abandoning Participating Parties, shall pay to the abandoning Participating Party a sum equal to the deficiency within thirty (30) days of the abandoning Participating Party's Receipt of the estimate.  Each Participating Party desiring to abandon a well shall assign to each non-abandoning Participating Party in that well a portion of its Working Interest in that well and the equipment therein and the Hydrocarbon production therefrom equal to the non-abandoning Party's Participating Interests in that well divided by the entire Participating Interests of the non-abandoning Parties in that well.  That assignment shall be effective as of the date of the abandoning Party's response to the well abandonment proposal.  The abandoning

Party shall assume and be liable for all obligations pertaining to that well, except liability for payments under this Article 18.1, prior to the effective date of its assignment to the non-abandoning Parties. The abandoning Party shall not assume and be liable for any obligations pertaining to that well, except liability for payments under this Article 18.1, as of the effective date of its assignment to the non-abandoning Parties.

**18.2    Abandonment of Equipment**

Any Participating Party in a Production System or Facilities or an enhanced recovery and/or pressure maintenance program described in Article 12.11 *(Enhanced Recovery and/or Pressure Maintenance Program Proposals)* (the "Equipment") may propose the abandonment and disposition of that Equipment.  If that proposal is unanimously agreed to by the Participating Parties, the Operator shall abandon and dispose of that Equipment at the Cost and risk of the Participating Parties.  If a Participating Party fails to respond within the applicable response period, that Participating Party shall be deemed to have approved the abandonment and disposal of the Equipment.  If all Participating Parties do not approve abandoning and disposing of the Equipment, the Operator shall prepare an estimate of the Costs of abandonment, removal, site clearance, and disposition of the Equipment, less the estimated salvage value of the Equipment, as determined under Exhibit "C," and the Participating Party desiring to abandon and dispose of the Equipment shall pay the Operator, for the benefit of the non-abandoning Participating Parties, its share of that estimate within thirty (30) days of its Receipt of the estimate.   If an abandoning Participating Party's respective share of the estimated salvage value is greater than its share of the estimated costs, the Operator, on behalf of the non-abandoning Participating Parties, shall pay to the abandoning Participating Party a sum equal to the surplus within thirty (30) days of the abandoning Participating Party's Receipt of the estimate.  Each Participating Party desiring to abandon the Equipment shall assign to each non-abandoning Participating Party in the Equipment a portion of its Working Interest in the Equipment equal to the non-abandoning Party's Participating Interests in the Equipment divided by the entire Participating Interests of the non-abandoning Parties in the Equipment.  That assignment shall be effective as of the date of the abandoning Party's response to the Equipment abandonment proposal.  The abandoning Party shall assume and be liable for all obligations pertaining to the Equipment, except liability for payments under this Article 18.2, prior to the effective date of its assignment to the non-abandoning Parties.  The abandoning Party shall not assume and be liable for any obligations pertaining to the Equipment, except liability for payments under this Article 18.2, as of the effective date of its assignment to the non-abandoning Parties.

**18.3**    **Disposal of Surplus Materiel**

The Operator may classify materiel acquired under this Agreement as surplus when the Operator deems it is no longer needed in present or foreseeable activities or operations. The Operator shall determine the value and Cost of disposing of the materiel under Exhibit "C." If the materiel is classified as junk or if the value, less the Cost of disposal, is less than or equal to five hundred thousand dollars ($500,000), the Operator may dispose of the surplus materiel in a manner it deems appropriate. If the value, less the Cost of disposal of the surplus materiel, is greater than five hundred thousand dollars ($500,000), the Operator shall give written notice thereof to the Parties owning the materiel, and the surplus materiel shall be disposed of in accordance with the method of disposal approved by the Parties owning the materiel. Proceeds from the sale or transfer of surplus materiel shall be promptly credited to each Party in proportion to its ownership of the materiel at the time of the retirement or disposition of the materiel.

**18.4**    **Abandonment Operations Required by Governmental Authority**

The Operator shall conduct the abandonment and removal of any Equipment [as defined in Article 18.2 *(Abandonment of Equipment)*] required by a governmental authority, and the Costs, risks, and net proceeds of that abandonment and removal will be shared by the Participating Parties in that Equipment [as defined in Article 18.2 *(Abandonment of Equipment)*] according to their Participating Interest Share.

## ARTICLE 19 – RENTALS, ROYALTIES, AND MINIMUM ROYALTIES

**19.1**    **Burdens on Hydrocarbon Production**

If a Party has previously created or hereafter creates an overriding royalty, production payment, carried or reversionary working interest, net profits interest, mortgage, lien, security interest, or other type of burden on Hydrocarbon production, including, but not limited to, agreements affecting the marketing, processing, or transportation of Hydrocarbon Production, other than the lessor's royalty stipulated in a Lease (a "Lease Burden"), the Party creating the Lease Burden shall assume and bear all liabilities and obligations of the Lease Burden regardless of that Party's participation status and notwithstanding an assignment under this Agreement of all or part of that Party's Working Interest to another party. The Party creating the Lease Burden shall indemnify, release, defend, and hold all other Parties harmless from all Claims and demands for payment asserted by the owners of the Lease Burden.

### 19.1.1 Subsequently Created Lease Burdens

Notwithstanding any contrary provision of this Agreement, if a Party, after executing this Agreement, creates a Lease Burden, that Lease Burden shall be made specifically subject to this Agreement.  If the Party owning the Working Interest from which a Lease Burden is created (a) fails to pay when due its share of Costs, (b) withdraws from this Agreement, or (c) Elects to abandon a well under Article 18.1 *(Abandonment of Wells)*, then the beneficiary of the Lease Burden will be chargeable with Costs equal to its fractional interest in gross production and the security rights created in Exhibit "F" will be applicable against that Lease Burden.  The Operator has the right to enforce the security rights (and all other rights granted under this Agreement) against the beneficiary of a Lease Burden for the purpose of collecting Costs chargeable to the Lease Burden.  The rights of the beneficiary of a Lease Burden are subordinate to the rights of the Parties granted by Exhibit "F."

## 19.2 Payment of Rentals and Royalties

The Operator shall make all rental payments for the Leases on behalf of the Parties.  The Operator shall use reasonable care to make proper and timely payment of the rental payments, all minimum royalties, and all other similar payments accruing under the Leases.  Upon Receipt of proper evidence of those payments and the Operator's invoice for its proportionate share of those payments, each Non-Operating Party shall reimburse the Operator for the Non-Operating Party's Working Interest share of those payments.  In the event the Operator fails to make proper payment of a rental, minimum royalty, or other similar payment accruing under a Lease through mistake or oversight where that payment is required to continue that Lease in force and effect, the Operator will not be liable to the other Parties for any resulting damages or any loss that results from the non-payment, unless that non-payment is due to the Operator's Gross Negligence or Willful Misconduct, as determined by a final judicial decision or a final decision under binding arbitration. The loss of a Lease or interest therein that results from the Operator's failure to pay, or the Operator's erroneous payment of, a rental, minimum royalty, or other similar payments is a joint loss, and there will be no readjustment of Working Interests as a consequence thereof.  For production delivered in-kind by the Operator to a Non-Operating Party or to a third party for the account of a Non-Operating Party, the Non-Operating Party shall provide the Operator with information about the proceeds or value of the production in order for the Operator to make payments of all minimum royalties due.

### 19.2.1   Non-Participation in Payments

If a Party notifies the other Parties, in writing at least sixty (60) days before the date the payment is due of its intention not to pay its share of a rental, minimum royalty, or other similar payment, that Party shall be deemed to have given a withdrawal notice under Article 17 *(Withdrawal From Agreement)*, and must withdraw from the entire Unit Area, not just the Lease on which the payment is due.  Upon this occurrence, the Operator shall make the payment solely for the benefit of the Remaining Parties, as defined in Article 17 *(Withdrawal From Agreement)*, and the Remaining Parties shall reimburse the Operator for their respective shares of the payment, based on the procedures in Article 17.2 *(Response to Withdrawal Notice)*.

### 19.2.2   Royalty Payments

Each Party shall pay or cause to be paid all royalty and other amounts payable, which are based on its share of Hydrocarbon production. Adjustments to those payments shall be made among the Parties in accordance with Exhibit "D" (Gas Balancing Agreement).  When the Participating Parties are recouping their Costs from a Non-Consent Operation and an applicable premium under Article 16.5 *(Percentage Hydrocarbon Recoupment for Non-Consent Operations)*, each of the Participating Parties shall pay or cause to be paid the Lease royalty on the portion of the Hydrocarbon Recoupment to which it is entitled.

## ARTICLE 20 – TAXES

## 20.1   Internal Revenue Provision

Notwithstanding any provision in this Agreement to the effect that the rights and liabilities of the Parties are several, not joint or collective, and that the Agreement and the activities and operations under this Agreement do not constitute a partnership under state law, each Party elects to be excluded from the application of all or any part of the provisions of Subchapter K, Chapter 1, Subtitle A, of the Internal Revenue Code of 1986, as amended, or similar provisions of applicable state laws regardless of whether for federal income tax purposes this Agreement and the activities and operations under this Agreement are regarded as a partnership.

## 20.2   Other Taxes and Assessments

The Operator shall file all tax returns and reports required by law and pay all applicable taxes [other than income or other taxes provided in Article 20.2.2 *(Production and*

*Severance Taxes)*] and assessments levied with respect to activities and operations conducted under this Agreement. The Parties shall promptly furnish the Operator with copies of all notices, assessments, and statements received pertaining to taxes to be paid by the Operator. The Operator will charge each Party its Working Interest share of all taxes and assessments paid [other than income or other taxes provided in Article 20.2.2 *(Production and Severance Taxes)*] and, upon written request from a Non-Operating Party, provide copies of all tax returns, reports, tax statements, and receipts for the taxes. The Operator shall not allow any taxes to become delinquent unless unanimously agreed to by the Parties.

### 20.2.1   **Property Taxes**

The Operator shall render for ad valorem property tax purposes all personal property and/or real property covered by this Agreement as may be subject to that taxation and shall pay those property taxes for the benefit of each Party. The Operator shall timely and diligently protest a valuation of the Leases for tax purposes it deems unreasonable. Pending final determination of the valuation of the Leases for tax purposes, unless unanimously agreed to by the Parties to the contrary under Article 20.2 *(Other Taxes and Assessments)*, the Operator shall, on or before the due date, pay under protest taxes on the Leases at the assessed value of the Leases. If upon final determination, additional taxes are due or if interest or a penalty has accrued as a result of the protest, the Operator shall pay the taxes, interest, and penalty and shall charge each Party its Working Interest share of the taxes, interest, and penalty under Exhibit "C."

### 20.2.2   **Production and Severance Taxes**

Each Party shall pay, or cause to be paid, all production, excise, severance, and other similar taxes due on its share of Hydrocarbon production. Each Party shall, upon a written request from the Operator, provide evidence that those taxes have been paid.

## ARTICLE 21 – INSURANCE AND BONDS

### 21.1   **Insurance**

The Parties shall maintain the insurance coverage specified in Exhibit "B." Insurance purchased by the Operator pursuant to Article I of Exhibit "B" shall be charged to the Joint Account. No other insurance shall be carried for the benefit of the Parties under this Agreement unless otherwise agreed by the Parties.

**21.2    Bonds**

The Costs of those bonds or financial guarantees acquired exclusively for the conduct of activities and operations under this Agreement shall be charged to the Joint Account, including an amount equivalent to the reasonable cost of that bond or financial guarantee if the Operator provides that bond or guarantee itself and does not engage a third party to do so.  The Operator shall require all contractors to obtain and maintain all bonds required by an applicable law, regulation, or rule.

## ARTICLE 22 – LIABILITY, CLAIMS, AND LAWSUITS

**22.1    Individual Obligations**

The obligations, duties, and liabilities of the Parties under this Agreement are several, but limited in proportion to each Party's Participating Interest Share, and not joint and several or collective; and, except as otherwise provided in Article 20 *(Taxes)*, nothing in this Agreement shall be construed to create a partnership, joint venture, association, or other form of business entity recognizable in law for any purpose.  In their relations with each other under this Agreement, the Parties are not fiduciaries, but rather are free to act at arm's length in accordance with their own respective interests.

**22.2    Notice of Claim**

If a Claim is made against or by a Party, that Party shall give written notice of the Claim to the other Parties as soon as reasonably practicable.

**22.3    Settlements**

The Operator may settle a Claim, or multiple Claims, arising out of the same incident, involving activities or operations under this Agreement or affecting the Leases or the Unit Area, if the aggregate expenditure does not exceed one million dollars ($1,000,000) and if the payment is in complete settlement of these Claims.  If the amount required for settlement exceeds this amount, the Parties shall determine the further handling of the Claims under Article 22.4 (*Defense of Claims*).

**22.4    Defense of Claims**

The Operator shall supervise the handling, conduct, and prosecution of all Claims involving activities or operations under this Agreement or affecting the Leases or the Unit Area.  Claims may be settled in excess of the amount specified in Article 22.3 (*Settlements*) as follows: (i) if the aggregate expenditure of the settlement is below three million dollars ($3,000,000) it must be approved by Vote; and (ii) if the aggregate expenditure of the settlement is at or above three million dollars ($3,000,000) it must receive unanimous

approval of the Participating Parties in the activity or operation out of which the Claim arose, but a Party may independently settle a Claim or the portion of a Claim which is attributable to its Participating Interest Share alone as long as that settlement does not directly and adversely affect the interest or rights of the other Participating Parties.  No charge shall be made for services performed by the staff attorneys of a Party, but all other expenses incurred by the Operator in the prosecution or defense of Claims for the Parties, together with the amount paid to discharge a final judgment or other final adjudication or determination of the Claim, are Costs and shall be paid by the Parties in proportion to their Participating Interest Share in the activity or operation out of which the Claim arose.  The employment of outside counsel, but not the selection of that counsel, requires approval by Vote of the Participating Parties in the activity or operation out of which the Claim arose. If the use of outside counsel is approved, the fees and expenses incurred as a result thereof shall be charged to the Parties in proportion to their Participating Interest Share in the activity or operation out of which that Claim arose.  Each Party has the right to hire its own outside counsel at its sole cost with respect to its own defense.

**22.5**   **Liability for Damages**

Unless specifically provided otherwise in this Agreement, liability for losses, damages, Costs, expenses or Claims involving activities or operations under this Agreement or affecting the Leases or the Unit Area which are not covered by or in excess of the insurance carried for the Joint Account shall be borne by each Party in proportion to its Participating Interest Share in the activity or operation out of which such liability arises, except that when liability results from the Gross Negligence or Willful Misconduct of a Party, such Party shall be solely responsible for liability resulting from its Gross Negligence or Willful Misconduct.

In no event shall an assertion or allegation of Gross Negligence or Willful Misconduct of a Party constitute a defense to the other Parties' obligations to timely reimburse the Operator for its proportionate share of losses, damages, Costs, expenses and Claims in accordance with the provisions of Exhibit "C" (*Accounting Procedure*) to this Agreement. To the contrary, all Parties shall timely pay their proportionate share of such losses, damages, Costs, expenses and Claims until such assertion or allegation results in a final, non-appealable judgment or final determination of the arbitrators pursuant to Exhibit "H" (*Dispute Resolution Procedure*), subject to reimbursement or other adjustment for amounts paid upon such final judgment or arbitration determination, if appropriate. **UNDER NO CIRCUMSTANCES WILL A PARTY BE LIABLE TO ANOTHER PARTY FOR PUNITIVE DAMAGES, CONSEQUENTIAL, INDIRECT, UNFORSEEN, LOSS OF**

PROFIT, OR OTHER INDIRECT OR PENALTY DAMAGES EITHER IN LAW OR EQUITY.

**22.6** **Indemnification for Non-Consent Operations**

TO THE EXTENT ALLOWED BY LAW, THE PARTICIPATING PARTIES WILL HOLD THE NON-PARTICIPATING PARTIES (AND THEIR AFFILIATES, AGENTS, INSURERS, DIRECTORS, OFFICERS, AND EMPLOYEES) HARMLESS AND RELEASE, DEFEND, AND INDEMNIFY THEM AGAINST ALL CLAIMS, DEMANDS, LIABILITIES, REGULATORY DECREES, AND LIENS FOR ENVIRONMENTAL POLLUTION AND PROPERTY DAMAGE OR PERSONAL INJURY, INCLUDING SICKNESS AND DEATH, CAUSED BY OR OTHERWISE ARISING OUT OF NON-CONSENT OPERATIONS, AND ANY LOSS AND COST SUFFERED BY A NON-PARTICIPATING PARTY AS AN INCIDENT THEREOF. IF AN INDEMNITY IN THIS AGREEMENT IS DETERMINED TO VIOLATE LAW OR PUBLIC POLICY, THAT INDEMNITY SHALL THEN BE ENFORCEABLE ONLY TO THE MAXIMUM EXTENT ALLOWED BY LAW.

**22.7** **Damage to Reservoir and Loss of Reserves**

NOTWITHSTANDING ANY CONTRARY PROVISION OF THIS AGREEMENT, NO PARTY IS LIABLE TO ANY OTHER PARTY FOR DAMAGE TO A RESERVOIR OR LOSS OF HYDROCARBONS, NOR DOES A PARTY INDEMNIFY ANY OTHER PARTY FOR THAT DAMAGE OR LOSS, EXCEPT IF THAT DAMAGE OR LOSS ARISES FROM A PARTY'S GROSS NEGLIGENCE OR WILLFUL MISCONDUCT.

**22.8** **Non-Essential Personnel**

UNLESS OTHERWISE MUTUALLY AGREED BY THE PARTIES IN WRITING, IN THE EVENT A PARTY REQUESTS TRANSPORTATION OR ACCESS TO ANY DRILLING RIG, PRODUCTION SYSTEM, VESSEL, OR OTHER FACILITY USED FOR ACTIVITIES OR OPERATIONS UNDER THIS AGREEMENT FOR ANY PERSON WHO IS NOT EMPLOYED BY, CONTRACTED BY, OR REPRESENTING SUCH PARTY IN CONNECTION WITH AN ACTIVITY OR OPERATION CONDUCTED PURSUANT TO THIS AGREEMENT, OTHER THAN GOVERNMENTAL OFFICIALS OR REPRESENTATIVES OF GOVERNMENTAL OR REGULATORY AGENCIES ("NON-ESSENTIAL PERSONNEL"), THE PARTY REQUESTING SUCH

**TRANSPORTATION OR ACCESS AGREES TO PROTECT, INDEMNIFY, RELEASE, DEFEND, AND HOLD HARMLESS THE OTHER PARTIES AND THEIR RESPECTIVE OFFICERS, DIRECTORS, MANAGERS, EMPLOYEES, AGENTS, CONTRACTORS, SUBCONTRACTORS, INVITEES, INSURERS, AND REPRESENTATIVES FROM AND AGAINST ALL CLAIMS, DEMANDS, CAUSES OF ACTION, JUDGMENTS, LIABILITIES, CONTRACTUAL LIABILITIES, AND OTHER COSTS (INCLUDING, WITHOUT LIMITATION, COURT COSTS, JUDICIAL INTEREST, FINES AND PENALTIES OTHER THAN FOR CRIMINAL ACTS, LITIGATION EXPENSES, AND REASONABLE ATTORNEYS' FEES) FOR DAMAGE TO, DESTRUCTION OR LOSS OF PROPERTY, AND FOR PERSONAL INJURY OR DEATH OF PERSONS, AND FOR DAMAGE OR HARM TO THE ENVIRONMENT (INCLUDING WITHOUT LIMITATION, SPILL RESPONSE, ENVIRONMENTAL POLLUTION AND CONTAMINATION AND CLEAN-UP COSTS) ARISING OUT OF OR RELATED IN ANY WAY TO THE NEGLIGENCE, FAULT, OR LIABILITY WITHOUT FAULT OF THE NON-ESSENTIAL PERSONNEL BROUGHT BY OR ON BEHALF OF ANY PARTY WHOMSOEVER (INCLUDING, WITHOUT LIMITATION, ALL THIRD PARTIES AND GOVERNMENTAL AGENCIES), WITHOUT REGARD TO THE CAUSES THEREOF, INCLUDING PRE-EXISTING CONDITIONS, THE UNSEAWORTHINESS OF ANY VESSEL, THE STRICT LIABILITY, NEGLIGENCE, OR OTHER FAULT OF ANY PARTY, REGARDLESS OF WHETHER THE NEGLIGENCE BE SOLE, JOINT, OR CONCURRENT, ACTIVE OR PASSIVE, EXCEPT IF CAUSED BY THE GROSS NEGLIGENCE OR WILLFUL MISCONDUCT OF THE PARTY SO INDEMNIFIED AND PROTECTED, AS FOUND BY A FINAL JUDICIAL DECISION OR A FINAL DECISION UNDER BINDING ARBITRATION.**

**22.9    Dispute Resolution Procedure**

Any claim, controversy, or dispute arising out of, relating to, or in connection with this Agreement or an activity or operation conducted under this Agreement shall be resolved under the Dispute Resolution Procedure in Exhibit "H" to this Agreement.

# ARTICLE 23 – CONTRIBUTIONS

**23.1   Contributions from Third Parties**

A "Contribution" means a bottom hole cash contribution, dry hole cash contribution, or acreage contribution from third parties as consideration for data from wells or well operations on the Unit Area.  This Article 23 does not apply to the following:

(a)   Trades of Confidential Data for other similar geophysical, geological, geochemical, drilling, or engineering data from third parties.  Those trades of Confidential Data are subject to Article 7.2.1 *(Trades of Confidential Data)*;

(b)   Contributions received as consideration for entering into a contract for the sale of Hydrocarbon production, as proceeds of loans, or as proceeds of other financial arrangements;

(c)   A farmout of all or a portion of a Party's Working Interest, which is subject to Article 24 *(Transfer of Interest and Preferential Right to Purchase)*.

**23.2   Methods of Obtaining Contributions**

The Operator shall negotiate all Contributions on behalf of the Participating Parties in the well or well operation.  A Contribution may be obtained in the following ways:

(a)   Any Participating Party in a well or well operation may propose that the Participating Parties in that well or well operation seek a Contribution from a third party towards that well or well operation.

(b)   If a Participating Party in a well or well operation receives a Contribution offer for that well or well operation from a third party, that Party shall notify all other Participating Parties in that well or well operation of the terms of that offer within five (5) days of its Receipt of that offer.

**23.3   Counteroffers**

If a third party makes a Contribution counteroffer to the Participating Parties' Contribution offer, or if a Participating Party proposes to make a Contribution counteroffer to a third party Contribution offer, the Operator shall submit the Contribution counteroffer to the other Participating Parties.

**23.4** **Approval of Contributions**

A Contribution proposal, a Contribution counteroffer to a third party Contribution offer, an acceptance of a Contribution offer from a third party, or a Contribution counteroffer from a third party requires the unanimous agreement of the Participating Parties in the well or well operation affected by the Contribution. Within fifteen (15) days of their Receipt of a notice of a Contribution proposal, Contribution offer, or Contribution counteroffer, those Participating Parties shall respond to the Operator.

**23.5** **Cash Contributions**

If a bottom hole or dry hole cash Contribution is offered and accepted, that cash Contribution shall be paid to the Operator, and the Operator shall credit the amount of the cash Contribution against the Costs of that well or well operation to each Participating Party in proportion to its Participating Interest Share.

**23.6** **Acreage Contributions**

Any acreage Contribution, which is offered and accepted under this Article 23 *(Contributions)*, shall be conveyed to the Participating Parties in the well or well operation in proportion to their Participating Interest Share therein. The leases or portions of leases included in the acreage Contribution shall not be added to Exhibit "A" or included in the Unit Area.

**23.6.1** **Two or More Parties Own One Hundred Percent of the Acreage Contribution**

If two or more Parties participate in the acreage Contribution and the conveyances to effectuate it, and if, after the conveyances are approved by the DOI, those Parties own one hundred percent (100%) of the ownership interest in the contributed acreage, then (a) the contributed acreage shall be deemed to be governed by an operating agreement incorporating identical provisions as the provisions in this Agreement, except to the extent they are clearly inappropriate, (b) the execution of the operating agreement by the Parties participating in the acreage Contribution shall be considered a mere formality only, (c) the designated operator shall promptly prepare the operating agreement, and (d) the Parties participating in the acreage Contribution shall promptly execute the operating agreement once it is prepared.

**23.6.2** **Two or More Parties Own Less Than One Hundred Percent of the Acreage Contribution**

If two or more Parties participate in the acreage Contribution and the conveyances to effectuate it, and if, after the conveyances are approved by the DOI, those Parties own less than one hundred percent (100%) of the ownership interest in the contributed acreage, then those Parties shall use reasonable efforts to negotiate and execute with the other Working Interest owners in the contributed acreage an operating agreement covering the contributed acreage, which is as close in form to this Agreement as possible.

## ARTICLE 24 – TRANSFER OF INTEREST AND PREFERENTIAL RIGHT TO PURCHASE

**24.1** **Transfer of Interest**

Each Party may make a Transfer of Interest of all or part of its Working Interest and its rights and obligations under this Agreement either to a third party or to another Party in accordance with this Agreement, provided that:

(a) except for the conditions set forth in (i) and (ii) of Article 24.1.1 *(Exceptions to Transfer Notice)*, any Transfer of Interest shall be preceded by a Transfer Notice, and

(b) made to a party that is financially responsible and capable of assuming the corresponding obligations under this Agreement unless:

(i) the Transfer of Interest is made pursuant to Articles 16 (*Non-Consent Operations*), 17 (*Withdrawal From Agreement*), 18 (*Abandonment and Salvage*), or 24.2.2 (*Exercise of Preferential Right to Purchase*).

No Transfer of Interest shall release a Party from its obligations and liabilities under this Agreement, including its payment obligations, which are incurred or have accrued prior to the effective date of that Transfer of Interest and the security rights under Article 6.3 *(Security Rights)* shall continue to burden the Working Interest transferred and to secure the payment of any retained obligations and liabilities. Once a Transfer of Interest becomes effective under Article 24.1.2 *(Effective Date of Transfer of Interest)*, except for a Transfer of Interest as a result of a merger, reorganization or consolidation or to an Affiliate, the transferor shall not be responsible for any obligations, debts, or liabilities under this

Agreement, which accrue or are incurred by the Parties on or after the effective date of that Transfer of Interest.

### 24.1.1   Exceptions to Transfer Notice

Notwithstanding any contrary provision of this Agreement, the Transfer Notice is not required: (i) when a Party proposes to mortgage, pledge, hypothecate, or grant a security interest in all or a portion of its Working Interest (including assignments of Hydrocarbon production executed as further security for the debt secured by that security device), and/or its Participating Interest Share of any Production Systems, Facilities, or equipment; or (ii) when any interest is conveyed in accordance with Articles 16 *(Non-Consent Operations)*, 17 *(Withdrawal From Agreement)*, or 18 *(Abandonment and Salvage)*. However, the Party creating an encumbrance under (i) above remains liable for all obligations under and pursuant to such encumbrance and an encumbrance arising from the financing transaction shall be expressly made subject and subordinated to this Agreement.

### 24.1.2   Effective Date of Transfer of Interest

The effective date of a Transfer of Interest shall not be more than one hundred eighty (180) days prior to the date of receipt of the Transfer Notice nor more than one hundred eighty (180) days, after the date of receipt of the Transfer Notice, unless such requirement is waived by the Parties in writing. A Transfer of Interest, other than those provided in Article 17.1 (*Right to Withdrawal*) and Article 24.1.1 *(Exceptions to Transfer Notice)*, is effective and shall be binding upon the Parties at the latest date of occurrence of all of the following: (i) the transferor or transferee provides all remaining Parties with a photocopy of the fully executed documents evidencing the Transfer of Interest and an executed DOI Form 1123, "Designation of Operator," and an "Application for Certification of Oil Spill Responsibility" form and (ii) evidence of receipt of all necessary approvals by the DOI. The Parties shall promptly undertake all reasonable actions necessary to secure those approvals and shall execute and deliver all documents necessary to effectuate that Transfer of Interest. All costs attributable to a Transfer of Interest are the sole obligation of the transferring Party.

### 24.1.3   Maintenance of Uniform Interest and Minimum Transfer of Interest

Except as otherwise provided in this Agreement, a Transfer of Interest shall cover an undivided Working Interest in the entire Unit Area, including such undivided interest of the Party in all leases, wells, equipment, Production and Development Systems, Facilities, Hydrocarbons and other property, both real and personal within the Unit Area.  Prior to the approval of the Execution AFE for the initial Development System, no Transfer of Interest shall be made that is not at least an undivided ten percent (10%) Working Interest, unless the Parties unanimously agree to a different minimum Transfer of Interest. After the Execution AFE Election on the initial Development System, a Transfer of Interest to a third party shall be limited to a minimum Working Interest of ten percent (10%), unless the Parties unanimously agree to a different minimum Transfer of Interest.

### 24.1.4   Form of Transfer of Interest

Any Transfer of Interest shall incorporate provisions that the Transfer of Interest is subordinate to and made expressly subject to this Agreement and provide for the assumption by the transferee of the performance of all of the transferring Party's obligations under this Agreement, except as to any obligation that the transferring Party may remain liable for, if applicable, in accordance with Article 24.1.  Any Transfer of Interest not in compliance with this Article 24.1.4 is voidable by the non-transferring Parties.

### 24.1.5   Warranty

Any Transfer of Interest, vesting, or relinquishment of Working Interest between the Parties under this Agreement shall be made without warranty of title, except as to person claiming by, through or under the transferor, but not otherwise.

## 24.2   Preferential Right to Purchase

Any Transfer of Interest shall be subject to the following provisions:

### 24.2.1   Notice of Proposed Transfer of Interest

Subject to Article 24.2.3 (Transfer of Interest Not Affected by the Preferential Right to Purchase), when a Party and a prospective transferee execute a binding agreement for a proposed Transfer of Interest, the transferring Party shall provide to the other Parties a Transfer Notice. In the case of a Package Sale of oil and gas interests that includes all or part of the assigning Party's Working Interest, and if the proposed Transfer of Interest does not meet the criteria set

forth in Article 24.2.3.(c)(i), the Working Interest that is subject to the Transfer of Interest shall be separately valued and the transfer notice shall state the monetary value attributed to the Working Interest by that prospective assignee. Article 24.2 *(Preferential Right to Purchase)* shall apply only to the Working Interest that is subject to the Transfer of Interest.

**24.2.2**   **Exercise of Preferential Right to Purchase**

For a period of thirty (30) days from receipt of the Transfer Notice ("PRP Period"), each non-transferring Party may exercise its preferential right to purchase its Participating Interest Share of the Working Interest offered (on the same terms and conditions, or on equivalent terms for a non-cash transaction as stated in the Transfer Notice) without reservations or conditions by written notice of that fact to all of the Parties. No Party has a right or obligation under this Article 24.2 to acquire any asset other than a Working Interest (including a corresponding interest in its Participating Interest Share of any Facilities, Production Systems, wells, equipment, and/or other property located on the Unit Area or governed by this Agreement), regardless of whether the proposed transaction is a Package Sale.

Upon expiration of the PRP Period, if:

(i)    none of the non-transferring Parties elects to exercise its preferential right to purchase its Participating Interest Share of the Working Interest offered or the non-transferring Parties, who wish to exercise their preferential right to purchase, do not agree to pay the full consideration (either the stipulated cash consideration or the equivalent cash value) for the Transfer of Interest and accept all of the other terms of the third party offer as provided in the Transfer Notice, then the transferring Party shall be free to complete the proposed Transfer of Interest on the terms disclosed in the Transfer Notice; or

(ii)   all of the non-transferring Parties agree to pay the full consideration, either the stipulated cash consideration or the equivalent cash value determined pursuant to Article 24.2.1 (*Notice of Proposed Transfer of Interest*), if applicable, for the Transfer of Interest and accept all of the other terms of the third party offer as it pertains to the Transfer of Interest only, the transferring Party shall transfer the Working Interest to the non-

transferring Parties who exercised their preferential right to purchase in accordance with this Article 24; or

(iii)   one or more, but not all, of the non-transferring Parties elect to exercise its[their] preferential right to purchase the Working Interest offered, such electing Party(ies) shall determine amongst themselves the sharing of the Working Interest offered that is attributable to the non-electing Party(ies), with each electing Party having the right to its proportionate share, in an effort to fully subscribe the Working Interest offered.  In such an instance, the electing Parties shall have an additional ten (10) days after the expiration of the PRP Period to jointly provide written notice to all non-electing Parties and the transferring Party stating that (i) all of the Working Interest offered has been fully subscribed stating the breakdown by Party as to the Working Interest to be acquired by each Party or (ii) the electing Parties have failed to fully subscribe the Working Interest offered and therefore the preferential right to purchase will not be exercised.  Failure to provide such notice within the ten (10) day period shall be considered a withdrawal of a non-transferring Party's election or failure of such written notices to collectively fully subscribe the Working Interest offered shall be considered a withdrawal of all non-transferring Parties' election.

The Transfer of Interest shall be concluded within a reasonable time, but no later than one hundred and twenty (120) days after the PRP Period.

**24.2.3**   **Transfer of Interest Not Affected by the Preferential Right to Purchase**

Subject to Article 24.1 (*Transfer of Interest*), Article 24.2 *(Preferential Right to Purchase)* shall not apply when:

Any Party proposes to:

(a) mortgage, pledge, hypothecate, or grant a security interest in all or a portion of its Working Interest (including assignments of Hydrocarbon production executed as further security for the debt secured by that security device), or

(b) grant an overriding royalty, a net profits interest, or a production payment, or

(c) dispose of a portion or all of its Working Interest by:

> (i) an exchange of properties of similar value; or

> (ii) merger, reorganization, or consolidation; or

> (iii) a Transfer of Interest of all or substantially all of a Party's exploration and production properties in the Gulf of Mexico; or

> (iv) a Transfer of Interest to an Affiliate; or

> (v) a Transfer of Interest pursuant to Articles 16 *(Non-Consent Operations)*, 17 *(Withdrawal From Agreement)*, and/or 18 *(Abandonment and Salvage)*; or

> (vi) conveys an interest to another Party in satisfaction of said other Party's security rights under Article 6.3 (Security Rights) of this Agreement, if applicable.

### 24.2.4    Completion of Transfer of Interest

If the proposed Transfer of Interest is not executed and filed of record with the DOI within ninety (90) days after Receipt of the transfer notice by the non-assigning Parties, or if the terms of the proposed Transfer of Interest conveyance are materially altered, the proposed Transfer of Interest shall be deemed withdrawn, and the Working Interest included in the proposed Transfer of Interest shall again be governed by this Article 24.2 *(Preferential Right to Purchase)*.

## ARTICLE 25 – FORCE MAJEURE

### 25.1    Force Majeure

If a Party is unable, wholly or in part because of a Force Majeure, to carry out its obligations under this Agreement, other than the obligation to make money payments, that Party shall give the other Parties prompt written notice of the Force Majeure with full particulars about it. Effective upon the date notice is given, the obligations of the Party, so far as they are affected by the Force Majeure, shall be suspended during, but no longer than, the continuance of the Force Majeure. Time is of the essence in the performance of this Agreement, and every reasonable effort will be made by the Party to avoid delay or suspension of any work or acts to be performed under this Agreement. The requirement

that the Force Majeure be remedied with all reasonable dispatch shall not require a Party to settle strikes or other labor difficulties.

## ARTICLE 26 – ADMINISTRATIVE PROVISIONS

### 26.1   Term

This Agreement shall remain in effect so long as a Lease remains in effect and thereafter until (a) all wells have been abandoned and plugged or turned over to the Parties owning an interest in the Lease on which the wells are located; (b) all Production Systems, Facilities, and equipment have been disposed by the Operator in accordance Article 18 (*Abandonment and Salvage*); (c) all Claims as defined in Article 22 (*Liability, Claims, and Lawsuits*) have been settled or otherwise disposed of; and (d) there has been a final accounting and settlement.   In accordance with Article 4.5 (*Selection of Successor Operator*), this Agreement will also terminate if no Party is willing to become Operator, effective after all conditions in clauses (a) through (d) above have been completed. Termination of this Agreement shall not relieve a Party of a liability or obligation accrued or incurred before termination and is without prejudice to all continuing confidentiality obligations or other obligations in this Agreement.

### 26.2   Waiver

A term, provision, covenant, representation, warranty, or condition of this Agreement may be waived only by written instrument executed by the Party waiving compliance.   The failure or delay of a Party in the enforcement or exercise of the rights granted under this Agreement shall not constitute a waiver of said rights nor shall it be considered as a basis for estoppel.   Time is of the essence in the performance of this Agreement, and all time limits shall be strictly construed and enforced.

### 26.3   Waiver of Right to Partition

Each Party waives the right to bring an action for partition of its interest in the Unit Area, Production System, Facilities, and equipment held under this Agreement, and covenants that during the existence of this Agreement it shall not resort at any time to an action at law or in equity to partition any or all of the Leases and lands or personal property subject to this Agreement.

### 26.4   Compliance With Laws and Regulations

This Agreement, and all activities or operations conducted by the Parties under this Agreement, are expressly subject to, and shall comply with, all laws, orders, rules, and regulations of all federal, state, and local governmental authorities having jurisdiction over

the Unit Area. No Party shall suffer a forfeiture or be liable in damages for failure to comply with any of the provisions of this Agreement if such compliance is prevented by or if such failure results from compliance with any applicable law, order, rule, or regulation.

### 26.4.1   Applicable Law

**THIS AGREEMENT AND THE RELATIONSHIP OF THE PARTIES UNDER THIS AGREEMENT SHALL BE GOVERNED BY AND INTERPRETED UNDER FEDERAL LAWS AND LAWS OF THE STATE OF TEXAS, WITHOUT REGARD TO PRINCIPLES OF CONFLICTS OF LAWS THAT WOULD OTHERWISE REFER THE MATTER TO THE LAWS OF ANOTHER JURISDICTION. NOTWITHSTANDING THE FOREGOING, THE PARTIES ACKNOWLEDGE THAT THE LAW OF THE ADJACENT STATE SHALL APPLY TO THE EXTENT REQUIRED BY THE OUTER CONTINENTAL LANDS SHELF ACT.**

### 26.4.2   Severance of Invalid Provisions

If, for any reason and for so long as, a clause or provision of this Agreement is held by a court of competent jurisdiction to be illegal, invalid, unenforceable, or unconscionable under a present or future law (or interpretation thereof), the remainder of this Agreement will not be affected by that illegality or invalidity. An illegal or invalid provision will be deemed severed from this Agreement, as if this Agreement had been executed without the illegal or invalid provision. The surviving provisions of this Agreement will remain in full force and effect unless the removal of the illegal or invalid provision destroys the legitimate purposes of this Agreement, in which event this Agreement shall be null and void.

### 26.4.3   Fair and Equal Employment

Each of the Parties is an Equal Opportunity Employer, and the equal opportunity provisions of 30 CFR 270 and 41 CFR 60-1 are incorporated in this Agreement by reference. The affirmative action clauses concerning disabled veterans and veterans of the Vietnam era (41 CFR 60-250) and the affirmative action clauses concerning employment of the handicapped (41 CFR 60-741) are also incorporated in this Agreement by reference. In performing work under this Agreement, the Parties shall comply with (and the Operator shall require each

independent contractor to comply with) the governmental requirements in Exhibit "E" that pertain to non-segregated facilities.

## 26.5    Construction and Interpretation of this Agreement

### 26.5.1    Headings for Convenience

Except for the definition headings in Article 2 *(Definitions)*, all the table of contents, captions, numbering sequences, and paragraph headings in this Agreement are inserted for convenience only and do not define, expand, or limit the scope, meaning, or intent of this Agreement.

### 26.5.2    Article References

Except as otherwise provided in this Agreement, each reference to an article of this Agreement includes all of the referenced article and its sub-articles.

### 26.5.3    Gender and Number

The use of pronouns in whatever gender or number is a proper reference to the Parties to this Agreement though the Parties may be individuals, business entities, or groups thereof. Reference in this Agreement to the singular of a noun or pronoun includes the plural and vice versa.

### 26.5.4    Joint Preparation

This Agreement shall be deemed for all purposes to have been prepared through the joint efforts of the Parties and shall not be construed for or against one Party or the other as a result of the preparation, submittal, drafting, execution, or other event of negotiation hereof.

### 26.5.5    Integrated Agreement

This Agreement contains the final and entire agreement of the Parties for the matters covered by this Agreement and, as such, supersedes all prior written or oral communications and agreements. This Agreement may not be modified or changed except by written amendment signed by the Parties.

### 26.5.6    Binding Effect

To the extent it is assignable, this Agreement shall bind and inure to the benefit of the Parties and their respective successors and assigns, and shall constitute a covenant running with the land comprising the Unit Area. This Agreement does not benefit or create any rights in a person or entity that is not a Party to this Agreement.

### 26.5.7  Further Assurances

Each Party will take all actions necessary and will sign all documents necessary to implement this Agreement.  Except as otherwise provided in this Agreement, within (30) days after their Receipt of a valid written request for those documents from a Party, all other Parties shall prepare and execute the documents.

### 26.5.8  Counterpart Execution

This Agreement may be executed by signing the original or a counterpart.  If this Agreement is executed in counterparts, all counterparts taken together shall have the same effect as if all Parties had signed the same agreement. No Party shall be bound to this Agreement until all Parties have executed a counterpart or the original of this Agreement.  A facsimile or electronic transmission of a signed original of this Agreement, and the transmission or re-transmission of a signed facsimile or electronic transmission, shall be deemed to be the same as delivery of a signed original of this Agreement.  This Agreement may also be ratified by a separate instrument that refers to this Agreement and adopts by reference all provisions of this Agreement.  A ratification shall have the same effect as an execution of this Agreement.

### 26.5.9  Currency

Any amounts due or payable under this Agreement shall be paid in United States currency.

### 26.5.10  Future References

A reference to a Party includes such Party's successors and assigns and, in the case of governmental bodies, persons succeeding to their respective functions and capacities.

## 26.6  Restricted Bidding

If more than one Party is ever on the list of restricted joint bidders for OCS lease sales, as issued by the DOI under 30 CFR 256.44, as amended, the Parties shall comply with all statutes and regulations regarding restricted joint bidders on the OCS.

**[Signatures follow on next page]**

**IN WITNESS WHEREOF,** each Party, through its duly authorized agent or representative, has executed this Agreement as of the Effective Date.

WITNESSES:                          *Fieldwood Energy LLC*

_____           By: _____

_____           Title: Sr. Vice President


WITNESSES:                          *Ridgewood Katmai, LLC*

_____           By: _____

_____           Title: Executive Vice President


WITNESSES:                          *ILX Prospect Katmai, LLC*

_____           By: _____

_____           Title: Director

# EXHIBIT "A"

**Attached to and made a part of that certain  Unit Operating Agreement Effective  April 1, 2018 (the "Katmai UOA") by and between Fieldwood Energy LLC, Ridgewood Katmai, LLC and ILX Prospect Katmai, LLC**

## DESCRIPTION OF UNIT AREA, LEASES, WORKING INTEREST OF THE PARTIES,  COMPANY REPRESENTATIVES and NOTIFICATION INFORMATION

I.      **DESCRIPTION OF UNIT AREA AND ASSOCIATED LEASES:**

| Area/Block | OCS No. | Effective Date | Unit Acres | Royalty | Lease ORRIs | Depths | Aliquot Portions |
|---|---|---|---|---|---|---|---|
| Green Canyon 39 | G 34966 | 09/01/2013 | 540.00 | 18.75% (R21) | *.945% | All | NE/4NE/4 & N/2SE/4NE/4 |
| Green Canyon 40 | G 34536 | 11/01/2012 | 5310.00 | 18.75% (RS19) | *.945% | All | SE/4SW/4NW/4, N/2SW/4NW/4, NW/4NW/4, E/2NW/4, E/2, E/2SW/4 & E/2W/2SW/4 |
| Green Canyon 41 | G 34537 | 10/01/2012 | 1782.23 | 18.75% (R22) | *.945% | All | |
| Ewing Bank 1009 | G 34878 | 08/01/2013 | 360.000 | 18.75% (R21) | *.945% | All | SE/4SE4 |
| Ewing Bank 1010 | G 34879 | 08/01/2013 | 2,880.000 | 18.75% (R21) | *.945% | All | S/2 |
| Ewing Bank 1011 | G 34880 | 08/01/2013 | 799.256 | 18.75% (R21) | *.945% | All | S/2 |

*Created by that certain Lease Assignment Agreement listed in Article V. below.

**WORKING INTEREST OF THE PARTIES:**

| | |
|---|---|
| Fieldwood Energy LLC: | 50% |
| Ridgewood Katmai, LLC: | 25% |
| ILX Prospect Katmai, LLC: | 25% |

II.     **OPERATOR:**

Fieldwood Energy LLC

IV.     **ADDRESSES/NAMES OF REPRESENTATIVES**:

**Fieldwood Energy LLC**                        **Ridgewood Katmai, LLC**
2000 W Sam Houston Parkway S, Suite 1200        1254 Enclave Parkway, Suite 600
Houston, Texas 77067-3610                       Houston, Texas 77077

**Main Contact**                                **Main Contact**
John H. Smith – Sr. Vice President, Business Development   W. Greg Tabor – Executive Vice President
Telephone:       (713) 969-1249                 Telephone:       (281) 293-8449
Facsimile:       (713) 969-1299                 Facsimile:       (281) 293-8488
Email:           jsmith@fwellc.com              Email:           gtabor@ridgewoodenergy.com

V.      **Contracts**

Lease Assignment Agreement dated April 1, 2018, by and between Fieldwood Energy, LLC, Ridgewood Katmai, LLC and ILX Prospect Katmai, LLC ("Katmai Owners"( and LLOG Bluewater Holdings, L.L.C. , LLOG Exploration Offshore, L.L.C., Ridgewood Rockefeller, LLC, ILX Prospect Rockefeller, LLC, Red Willow Offshore, LLC and Houston Energy Deepwater Ventures, XV, LLC ("Rockefeller Owners").

*END OF EXHIBIT "A*

## EXHIBIT "B

**Attached to and made a part of that certain Unit Operating Agreement Effective  April 1, 2018 (the "Katmai UOA") by and between Fieldwood Energy LLC, Ridgewood Katmai, LLC and ILX Prospect Katmai, LLC**

### OFFSHORE INSURANCE PROVISIONS

### I.  INSURANCE OBTAINED BY OPERATOR AND CHARGED TO JOINT ACCOUNT

At all times during the conduct of operations hereunder, Operator shall carry all insurance required by contract or law, unless such insurance is otherwise provided individually by the Parties to this Agreement.  The Operator shall also carry the following:

1.       Automobile Liability Insurance covering all owned, non-owned and leased vehicles with combined single limits of at least $1,000,000 per occurrence.

2.       Workers Compensation insurance in compliance with all State and Federal Regulations in the jurisdiction where any of the work under this agreement shall be performed; and Coverage B, Employer's Liability Insurance with limited of not less than $1,000,000 per accident, including the following special coverage extensions:

   A.       U.S. Longshoremen and Harbor Workers' Act and Outer Continental Shelf Lands Act coverage.

   B.       Coverage for liability under the Merchant Marine Act of 1920, commonly known as the Jones Act, the Admiralty Extension Act of 1948 and the Death on the High Seas Act.

   C.       "In Rem" endorsement providing that a claim "In Rem" shall be treated as a claim against the Operator.

   D.       Protection against liability of the employer to provide transportation, wages, maintenance, cure and found to maritime employees.

3.       Commercial General Liability Insurance with combined single limits of at least $1,000,000 per occurrence.

The coverage specified above will be endorsed to waive the insurers' rights to subrogation against all of the Parties to this Agreement.  Premiums for the insurance provided by the Operator for the benefit of the Parties shall be charged to the Joint Account, provided, however, that if the Operator either self-insures or effectively self-insures the insurance required in 2 above, the Operator shall charge to the joint account, in lieu of any premiums for such insurance, an amount not to exceed the workers compensation manual rates times the payroll.

Except as provided above, Operator shall not be obligated to obtain or cause to be carried insurance for the benefit of the joint account, such insurance includes, but is not limited to, control of well or seepage and pollution, insurance against the hazards of fire, windstorm, explosion, blowout, cratering, reservoir damage, or insurance other than specified above.

### II. INSURANCE NOT CHARGED TO THE JOINT ACCOUNT

At all times while the Agreement is in effect, each Party to the Agreement shall insure for their share of any liabilities assumed under the Agreement.  The cost of these insurance programs shall be the individual responsibilities of each of the parties and none of the cost associated with these programs shall be charged to

the Joint Account.  Each party shall insure their share of the following coverage for the minimum limits stated. The following limits are at one-hundred percent (100%) project.

1.  Excess Liability insurance covering offshore oil pollution and consequential damages with limits of at least $300,000,000 per occurrence or per policy.

2.  Physical Damage insurance and coverage for Wreck Removal for Facilities covered by the Agreement, with limits not less than the Parties share of the replacement cost of the facility.

3.  Operator's Extra Expense insurance covering Control of Well, Redrill, Restoration and Seepage and Pollution incidents with a combined single limit of $500,000,000 per occurrence.

4.  Not used.

5.  Charterer's Legal  Liability insurance in the amount of $5,000,000 per occurrence covering liability arising out of any chartered vessels used in connection with the work to be performed under the Agreement.

All of the above coverages shall be endorsed to waive the insurers' rights of subrogation against Operator and all other Parties to the Agreement.  Upon request, a Party will provide all other Parties to the Joint Operating Agreement with a certificate of insurance evidencing that all of the above insurance and special insuring provisions are in place.

If a Party is unable to meet the aforementioned insurance requirements, the other Parties to the Agreement may, but are not required to do so, purchase any or all of the insurance that the Party failed to secure.  The cost of said insurance shall be for the individual account of the Party on whose behalf the insurance was purchased.

Neither the minimum policy limits of insurance required of the Parties nor the actual amounts of insurance maintained by the Parties under their insurance program limit or reduce the Parties' liability or indemnity obligations in this Agreement.

## III. ADDITIONAL INSURANCE

The insurance coverages described in Sections I and II above will be carried by the specified Parties during the complete term of the Agreement.  Additional insurance coverages may be required of the Parties to cover additional risks during any Exploratory, Appraisal or Development Operations or projects approved by the Parties.  Such additional coverages will be determined and communicated as part of the project proposal and all Participating Parties will be required to insure such exposures per the terms of this Section II.

## IV. CONTRACTORS INSURANCE

Operator (including any Party conducting Non-Consent Operations) shall use its best efforts to require each contractor who performs work on behalf of the Agreement to procure and maintain insurance as may be required by Law or as the Operator may consider necessary and such coverages shall contain endorsements waiving the insured's rights of subrogation against Operator and all other Parties to the Agreement and shall be primary and non-contributory to any insurance carried by Operator and all other parties to the Agreement.

Operator shall make a good faith effort to obtain the insurance considered necessary and to obtain endorsements naming the Operator as an Additional Insured on the policies of insurance where appropriate and to provide that the word 'Insured' also includes any Party, Co-Owner or Joint Venturer.  However, Operator shall not be liable to non-operators or to their parent companies, subsidiaries or any affiliated companies for failure to do any of the above.  It is recognized in the industry that there are certain contractors and service companies whose services are necessary to operations contemplated by the Parties, who as a matter of their policy refuse contractually to indemnify working interest owners or to carry any insurance indemnifying Working Interest owners.  As to those entities, Operator may waive any requirement of contractual indemnity or any or all of the insurance or special insurance provisions required above.

## V.  NOTICE

All losses which are not covered and all losses in excess of insurance coverage shall be borne by the Parties in accordance with the terms of the Agreement under which said operations are being conducted by the Parties.  All parties shall continue to be responsible for any "cash calls" under this Agreement, irrespective of whether there may be insurance in place for the liability, claims and losses that may be covered by insurance provided by the Operator or by any other Party to this Agreement.

## *END OF EXHIBIT "B"*

# EXHIBIT "C"

**Attached to and made a part of that certain Unit Operating Agreement Effective  April 1, 2018 (the "Katmai UOA") by and between Fieldwood  Energy LLC, Ridgewood Katmai, LLC and ILX Prospect Katmai, LLC**

**ACCOUNTING PROCEDURE**
**OFFSHORE JOINT OPERATIONS**

## I.  GENERAL PROVISIONS

1.      **Definitions**

All terms used in this Accounting Procedure, if not otherwise defined below, shall have the same meaning as in the Agreement to which this is attached.

*"Joint Property"* shall mean the real and personal property subject to the Agreement to which this Accounting Procedure is attached.

*"Joint Operations"* shall mean all operations necessary or proper for the development, operation, protection and maintenance of the Joint Property.

*"Joint Account"* shall mean the account showing the charges paid and credits received in the conduct of the Joint Operations and which are to be shared by the Parties.

*"Operator"* shall mean the Party designated to conduct the Joint Operations.

*"Non-Operators"* shall mean the Parties to this agreement other than the Operator.

*"Parties"* shall mean legal entities signatory to the Agreement, or their successors or assigns, to which this Accounting Procedure is attached.

*"Supervisors"* shall mean those employees whose primary function in Joint Operations is the direct supervision of other employees and/or contract labor directly employed on the Joint Property in a field operating capacity.

*"Technical Employees"* shall mean those employees having special and specific engineering, geological or other professional skills, and whose primary function in Joint Operations is the handling of specific operating conditions and problems for the benefit of the Joint Property.

*"Personal Expenses"* shall mean travel, temporary living expenses, relocation costs, and other reimbursable expenses of Operator's employees as well as Non-Operator's employees utilized for a Project Team.

*"Material"* shall mean personal property, equipment, supplies, or consumables acquired or held for use on the Joint Property.

*"Controllable Material"* shall mean Material which at the time is so classified in the Material Classification Manual as most recently recommended by the Council of Petroleum Accountants Societies.

**"Shore Base Facilities"** shall mean onshore support facilities that during drilling, development, maintenance and producing operations provide such services to the Joint Property as receiving and transshipment point for supplies, materials and equipment; debarkation point for drilling and production personnel and services,; communication, scheduling and dispatching center; other associated functions benefiting the Joint Property.

**"Offshore Facilities"** shall mean platforms and support systems such as oil and gas handling facilities, living quarters, offices, shops, cranes, electrical supply equipment and systems, fuel and water storage and piping, heliport, marine docking installations, communication facilities, navigation aids, and other similar facilities necessary in the conduct of offshore operations.

**"Project Team"** shall mean employees of the Parties directly assigned to perform work and/or studies as defined under the terms of the Agreement.

**"Affiliate"** shall mean, with respect to the Parties, any party directly or indirectly controlling, or controlled by or under common control with the Parties.

2.      **Statements and Billings**

A.      Operator shall bill Non-Operators on or before the last day of the month for their proportionate share of the Joint Account for the preceding month. Such bills shall be accompanied by statements which identify the authority for expenditure, lease or facility, and all charges and credits summarized by appropriate categories of investment and expense. Controllable Material shall be summarized by major Material classification. Intangible drilling costs and audit exceptions shall be separately and clearly identified.

B.      Project Team costs incurred by Non-Operators shall be billed to the Operator, on a monthly basis, in accordance with the provisions contained herein. Operator shall reimburse Non-Operators in accordance with Section I, Paragraph 3.

3.      **Advances and Payments by Non-Operators**

A.      If gross expenditures for the Joint Account are expected to exceed $1,000,000 in the next succeeding month's operations, the Operator may require the Non-Operators to advance their share of the estimated cash outlay for the month's operations. Unless otherwise provided in the agreement, any billing for such advance shall be payable within thirty (30) days after receipt of the advance request or by the first day of the month for which the advance is required, whichever is later. Operator shall adjust each monthly billing to reflect advances received from the Non-Operators for such month.

B.      Each Non-Operator shall pay its proportion of all bills within thirty (30) days of receipt date. If payment is not made within such time, the unpaid balance shall bear interest compounded monthly using the prime rate in effect at Chase Manhattan Bank plus 3% in effect on the first day of the month for each month that the payment is delinquent or the maximum contract rate permitted by the applicable usury laws in the jurisdiction in which the Joint Property is located, whichever is the lesser, plus attorney's fees, court costs, and other costs in connection with the collection of unpaid amounts. Interest shall begin accruing on the first day of the month in which the payment was due.

4.      **Adjustments**

A.      Payment of any such bills shall not prejudice the right of any Party to protest or question the correctness thereof, provided, however, all bills and statements (including payout status statements) related to expenditures rendered during any calendar year shall conclusively be presumed to be true and correct after twenty-four (24) months following the end of any such calendar year, unless within the said period a Party takes specific detailed written exception thereto and makes claim for adjustment.

B.     All adjustments initiated by the Parties except those described in (1) through (4) below are limited to the twenty-four month period following the end of the calendar year in which the original charge appeared or should have appeared on the Joint Account statement or payout status statement.  Adjustments made beyond the twenty-four month period are limited to the following:

(1)  a physical inventory of Controllable Material as provided for in Section V.

(2)  an offsetting entry (whether  in whole or in part) which is the direct result of a specific joint interest audit exception granted by the Party relating to another property.

(3)  a government/regulatory audit.

(4)  working interest ownership adjustments.

**5.     Expenditure Audits**

A.     A Non-Operator, upon notice in writing to Operator and other Non-Operators, shall have the right to audit Operator's accounts and records relating to the Joint Account for any calendar year within the twenty-four (24) month period following the end of such calendar year, provided, however, conducting an audit shall not extend the time for the taking of written exception to and the adjustment of accounts as provided for in Paragraph 4 of this Section I.  Where there are two or more Non-Operators, the Non-Operators shall make every reasonable effort to conduct a joint audit in a manner which will result in a minimum of inconvenience to the Operator.  Operator shall bear no portion of the Non-Operator's audit cost incurred under this paragraph unless agreed to by the Operator.  The audits shall not be conducted more than once each year without prior approval of Operator, except upon the resignation or removal of the Operator, and shall be made at the expense of those Non-Operators approving such audit.  The lead audit company's audit report shall be issued within 180 days after completion of the audit field work provided, however, the 180 day time period shall not extend the 24 month requirement for taking specific detailed written exception as required by Paragraph 4.A. above.  All claims shall be supported with sufficient documentation.  Failure to issue the report within the prescribed time or to take specific written exception within 24 month period will preclude the Non-Operator from taking exception to any charge billed within the time period audited.

A timely filed audit report or any timely submitted response thereto shall suspend the running of any applicable statute of limitations regarding claims made in the audit report.  While any audit claim is being resolved, the applicable statute of limitations will be suspended.  Failure, however, to comply with the deadlines provided herein shall cause the statue to commence running again.

B.     The Operator shall allow or deny all exceptions in writing to an audit report within 180 days after receipt of such report.  Denied exceptions should be accompanied by a substantive response.  Failure to respond to an exception with substantive information on denials within the time provided will result in the Operator paying interest on that exception, if ultimately granted, from the date of the audit report.  The interest charged shall be calculated in the same manner as used in Section I, Paragraph 3.B.

C.     The lead audit company shall reply to the Operator's response to an audit report within 90 days of receipt, and the Operator shall reply to the lead audit company's follow-up response within 90 days of receipt.  If the lead audit company does not provide a substantive response to an exception within 90 days, that unresolved audit exception will be disallowed.  If the Operator does not provide a substantive response to lead auditor's follow-up response within 90 days, that unresolved audit exception will be allowed and credit given the Joint Account.

D.   The lead audit company or Operator may call an audit resolution conference for the purpose of resolving audit issues/exceptions that are outstanding at least eighteen (18) months after the date of the audit report.  The meeting will require one month's written notice to Operator and all audit participants, be held at the Operator's office or other mutually agreed upon location, and require the attendance of representatives of Operator and each audit participant responsible for the area(s) in which the exceptions are based and who have authority to resolve issues on behalf of their company.  Any Party who fails to attend the resolution conference shall be bound by any resolution reached at the conference.  The lead audit company will coordinate the response/position of the Non-Operators and continue to maintain its traditional role throughout the audit resolution process.

Attendees will make good faith efforts to resolve outstanding issues, and each Party will be required to present substantive information supporting its position.  An audit resolution conference may be held as often as agreed to by the Parties.  Issues unresolved at one conference can be discussed at subsequent conferences until each such issue is resolved.

E.   Non-Operator charges shall be subject to the above audit requirements.

F.   The preceding provisions shall not preclude the Parties from conducting revenue audits.

**6.   Approval by Parties**

Where an approval or other agreement of the Parties is expressly required under other sections of this Accounting Procedure and if the agreement to which this Accounting Procedure is attached contains no contrary provisions in regard thereto, Operator shall notify all Parties of the proposal, and the agreement or approval of a majority in interest of the Parties shall be controlling.

## II.  DIRECT CHARGES

Operator shall charge the Joint Account with the following items:

**1.   Rentals and Royalties**
Lease rentals and royalties paid by Operator for the Joint Operations.

**2.   Labor**

A. (1) Project Team
All salaries and wages, including incentive compensation programs as set forth in COPAS Interpretation 30, for Operator's employees and/or Non-Operator's employees assigned to the Project Team on a full time/part-time basis shall be considered a direct cost and shall be charged to the Joint Account.  Such employees shall include personnel who are directly engaged in project management, evaluation, design, construction and installation activities regardless of location.  Part time Project Team employees (excluding Technical employees not assigned to the Project Team, but working under the direction of the Project Team) shall be charged to the Joint Account, based on actual days worked, only when such time involves at least one (1) day equivalent or more per month that is devoted to the projects.  Contractor charges for personnel assigned to the Project Team are chargeable pursuant to Section II, Paragraph 5.  All such charges must be reviewed and agreed to by the Project Team prior to the first meeting based on current salary and benefits.

(2) Labor - Other Operations
The following salaries and wages shall be charged, when employees are not assigned to a Project Team.

(a)   Salaries and wages of Operator's field employees directly employed on the Joint Property in the conduct of Joint Operations.

(b) Salaries and wages of Operator's employees directly employed on Shore Base Facilities and other Offshore Facilities serving the Joint Property if such costs are not charged under Paragraph 6 of this Section II.

(c) Salaries of first level Supervisors in the field.

(d) Salaries and wages of Technical Employees directly employed on the Joint Property if such charges are excluded from the Overhead rates.

(e) Salaries and wages of Technical Employees either temporarily or permanently assigned to and directly employed in the operation of the Joint Property if such charges are excluded from the overhead rates.

B. Cost of holiday, vacation, sickness and disability benefits and other customary allowances paid to employees whose salaries and wages are chargeable to the Joint Account under Paragraph 2.A. of this Section II. Such costs under this Paragraph 2.B. may be charged on a "when and as paid basis" or by "percentage assessment" on the amount of salaries and wages chargeable to the Joint Account under Paragraph 2.A. of this Section II. If percentage assessment is used, the rate shall be based on the Operator's or Non-Operator's cost experience, as appropriate.

C. Expenditures or contributions made pursuant to assessments imposed by governmental authority which are applicable to costs chargeable to the Joint Account under Paragraphs 2.A .and B. of this Section II.

D. Personal Expenses of those employees whose salaries and wages are chargeable to the Joint Account under Paragraph 2.A .of this Section II. Relocation costs may only be charged for a domestic employee transferred within the lower forty-eight (48) states of the United States and assigned to the Project Team full-time for a minimum of twelve (12) months.

E. Government mandated training charges shall include the wages, salaries, training course cost, and reimbursable travel, meals, and lodging incurred during the training session. The cost of the training course will be limited to prevailing commercial rates.

F. Cost of established plans for employees' benefits as described in COPAS Interpretation No. 11 determined by applying the employee benefits percent most recently published by COPAS to the chargeable salaries and wages.

**3.     Material**

Material purchased or furnished by Operator for use on the Joint Property as provided under Section IV. Only such Material shall be purchased for or transferred to the Joint Property as may be required for immediate use or is reasonably practical and consistent with efficient and economical operations. The accumulation of surplus stocks shall be avoided.

**4.     Transportation**

Transportation of company labor, contract personnel, and Material necessary for the Joint Operations but subject to the following limitations:

A. If Material is moved to the Joint Property from the Operator's warehouse or other properties, no charge shall be made to the Joint Account for a distance greater than the distance from the nearest reliable supply store where like Material is normally available or railway receiving point nearest the Joint Property unless agreed to by the Parties.

B. If surplus Material is moved to Operator's warehouse or other storage point, no charge shall be made to the Joint Account for a distance greater than the distance to the nearest reliable supply store where like Material is normally available, or railway receiving point

nearest the Joint Property unless agreed to by the Parties.  No charge shall be made to the Joint Account for moving Material to other properties, unless agreed to by the Parties.

C.   In the application of subparagraphs A and B above, the option to equalize or charge actual trucking cost is available when the actual charge is less than the amount most recently recommended by COPAS, excluding accessorial charges.  Examples of accessorial charges are listed in COPAS Bulletin 21.

**5.   Services**

The cost of contract services, equipment and utilities provided by sources other than the Parties, except for those services covered by the Section III overhead provisions and excluded under Paragraph 9 of Section II.  Notwithstanding anything to contrary, the cost of contract personnel assigned to the Project Team are directly chargeable to the Joint Account.

**6.   Equipment and Facilities Furnished by Operator**

A   Equipment and facilities, including Shore Base and/or Offshore Facilities owned by the Operator shall be charged to the Joint Account at the average prevailing commercial rate for such equipment.  If an average commercial rate is used to bill the Joint Account, Operator shall adequately document and support such rate and periodically review and update the rate.

B.   In lieu of charges in Paragraph 6.A. above, or if a prevailing commercial rate is not available, equipment and facilities, including Shore Base and/or Offshore Facilities owned by the Operator, will be charged to the Joint Account at the Operator's actual cost.  Such costs may include all expenses which would be chargeable pursuant to this Section II if such equipment were jointly owned, depreciation using straight line depreciation method, interest on investment (less gross accumulated depreciation) not to exceed twelve percent (12%) per annum.  In addition, for platforms, subsea production systems, and production facilities the rate may include an element of the estimated cost of abandonment, reclamation and dismantlement.  Charges for depreciation will no longer be allowable once the equipment has been fully depreciated.  Actual cost shall not exceed the average prevailing commercial rate.

C.   When applicable for Operator owned or leased motor vehicles, Operator  shall use rates published by the Petroleum Motor Transport Association or such other organization recognized by COPAS as the official source of such rates.  When such rates are not available, Operator  shall comply with the provisions of Paragraph A or B above.

**7.   Affiliates**

The use of Affiliate equipment, facilities and services provided for the benefit of the Joint Property shall be charged to the Joint Account, if allowed under the provisions of this Section II using the method(s) below.  Operator shall maintain auditable records to support all Affiliates charges to the Joint Account.  Such charges shall be subject to the same audit requirements provided for Operator's charges in Section I, Paragraph 5.

~~(   )   Cost Basis~~

~~Affiliate services may be charged on a standard hourly/daily rate or actual cost basis and include any services or materials procured for services rendered as well as charges for any specialized Affiliate-owned equipment and facilities utilized for the benefit of the Joint Property.  Parties shall charge the Joint Account for the use of Affiliate-owned equipment and facilities at rates commensurate with costs of ownership and operations, in accordance with Section II, Paragraph 6.~~

~~Charges to the Joint Account for any services or materials procured for services rendered by an Affiliate shall not exceed average commercial rates, when such rates are available.  In the event a Party determines such charges to be excessive compared with third party rates, that Party shall~~

~~provide sufficient documentation to support all audit claims in accordance with Section I, Paragraph 5.~~

**(X)  AFE/Project Basis**
Prior to the commencement of each AFE/Project, Operator shall submit an AFE which details Affiliate services, equipment and facilities to be provided and the rates charged by the Affiliate. Such AFE shall require the agreement and written approval of the Parties in accordance with the Agreement to which this is attached.  Once agreed to, such Affiliate costs shall remain in effect for the duration of the AFE/Project, unless amended by the Parties.

The Parties may request adjustments to Affiliate costs or rates at any time it deems appropriate.  The Parties shall respond to proposals for increased Affiliate costs or rates within thirty (30) days of receipt of the request.  Approval of proposed Affiliate costs or rates shall not be unreasonably withheld by the Parties.

**( )  Fixed Rate Basis**
~~Affiliate equipment, facilities and services shall be charged on an all inclusive standard hourly/daily rate.  Such rate shall be commensurate with the equipment, facilities and services provided. Approval of the rates shall require the agreement of the Parties and written approval of the rate is required, in accordance with the Agreement to which this is attached, to support charges to the Joint Account.  Once established, rates shall be subject to annual adjustment as of the first day of April each year following the effective day of the standard hourly rate agreement.  The adjustment shall be computed by multiplying the rate currently in use by the percentage increase or decrease recommended by COPAS each year.  The adjusted rate shall be the rates currently in use, plus or minus the computed adjustment.~~

~~The Parties may request adjustments to the rates at any time it deems appropriate, but not more than once per year.  The Parties shall respond to proposals for revised rates within thirty (30) days of receipt of the request.  Approval of proposed rates shall only occur by the agreement and written approval of the Parties, in accordance with the Agreement to which this is attached.  Approval of proposed rates shall not be unreasonably withheld by the Parties.~~

**8.      Damages and Losses to Joint Property**
All costs or expenses necessary for the repair or replacement of Joint Property resulting because of damages or losses incurred, except those resulting from the Operator being found liable by a final judicial decision or a final decision under binding arbitration for an act of gross negligence or willful misconduct

**9.      Legal Expenses**
Expense of handling, investigating and settling litigation or claims, discharging of liens, payments of judgments and amounts paid for settlement of claims incurred in or resulting from operations under the Agreement or necessary to protect or recover the Joint Property, except that no charge for services of Operator's legal staff or fees or expense of outside attorneys shall be made unless previously agreed to by the Parties.  All other legal expense is considered to be covered by the overhead provisions of Section III unless otherwise agreed to by the Parties.

**10.     Taxes and Permits**
All taxes and permits of every kind and nature assessed or levied upon or in connection with the Joint Property or production therefrom and which have been paid by the Operator for the benefit of the Parties, including penalties and interest, unless the penalties and interest resulting from the Operator being found liable by a final judicial decision or a final decision under binding arbitration for an act of gross negligence or willful misconduct.

If ad valorem taxes paid by the Operator are based in whole or in part upon separate valuations of each Party's working interest, then notwithstanding any contrary provisions, the charges to Parties will be made in accordance with the tax value generated by each Party's working interest.

11.     **Insurance**

Coverage(s) required to be procured by Operator for the protection of the Parties herein shall be billed to the Joint Account.  For Workers' Compensation and Employer's Liability, where Joint Operations are conducted in jurisdictions that permit self-insurance, Operator shall charge Joint Account manual or advisory rates (whichever is applicable) if Operator meets the self-insurance requirements in such jurisdiction.  Such rate shall be adjusted for offshore operations by the U.S. Longshoreman and Harbor Workers (USL&H) or Jones Act surcharge, as appropriate.  In no circumstance shall Operator charge in excess of manual or advisory rates.

12.     **Communications**

Costs of acquiring, leasing, installing, operating, repairing and maintaining communication systems including radio and microwave facilities between the Joint Property and the Operator's office.  In the event communication facilities systems serving the Joint Property are Operator-owned, charges to the Joint Account shall be made as provided  in Paragraph 6 of this Section II.

13.     **Ecological, Environmental and Safety**

(A)     Costs incurred
         (X)  for the benefit of the Joint Property, or
         ( ~~ )  on the Joint Property~~

         resulting from statutory regulations for archaeological and geophysical surveys relative to identification and protection of cultural resources and/or other environmental or ecological surveys as may be required by the Minerals Management Service or other regulatory authority.  Also costs to provide or have available pollution containment and removal equipment plus costs of actual control and cleanup and resulting responsibilities of oil and other spills as well as discharges from permitted outfalls as required by applicable laws and regulations.

(B)     Costs incurred
         (X)  for the benefit of the Joint Property, or
         ( ~~ )  on the Joint Property~~

         to conduct and/or implement safe operational practices/guidelines as a result of statutory regulations, or as recommended for voluntary compliance.  Examples are the requirements mandated by the Occupational Safety and Hazards Act (OSHA), Safety and Environmental Management Program (SEMP), Process Safety Management (PSM), and/or requirements which may be mandated/recommended by similar programs or by other current or successor regulatory agencies.

(C)     Technical training costs for employees whose time is chargeable under (A) or (B) above regardless of whether training is mandated by statute or regulatory agency is chargeable to the Joint Account.

(D)     Safety awards in the conduct of Joint Operations

         (X)  shall be chargeable to the Joint Account.
         ( ~~ ) shall not be chargeable to the Joint Account.~~

14.     **Abandonment and Reclamation**

Costs incurred for abandonment and reclamation of the Joint Property, including costs required by governmental or other regulatory authority.

15.     **Other Expenditures**

Any other expenditure not covered or dealt with in the foregoing provisions of this Section II, or in Section III and which is of direct benefit to the Joint Property and is incurred by the Operator in the necessary and proper conduct of the Joint Operations.

### III.  OVERHEAD

A.    As compensation for administrative, supervision, office services and warehousing costs, Operator shall charge the Joint Account in accordance with this Section III.

Unless otherwise agreed to by the Parties, such charge shall be in lieu of costs and expenses of all offices and salaries or wages plus applicable burdens and expenses of all personnel, except those directly chargeable under Section II.  The cost and expense of services from outside sources in connection with matters of taxation, traffic, accounting or matters before or involving governmental agencies shall be considered as included in the overhead rates provided for in this Section III unless directly chargeable under Section II or such costs are agreed to by the Parties as a direct charge to the Joint Account.

i.    Except as otherwise provided in Paragraph 2 of this Section III, the salaries, wages and Personal Expenses of Technical Employees and/or the cost of professional consultant services and contract services of technical personnel directly employed on the Joint Property:
( ~~ ) shall be covered by the overhead rates.~~
(X) shall not be covered by the overhead rates.

ii.    Except as otherwise provided in Paragraph 2 of this Section III, the salaries, wages and Personal Expenses of Technical Employees and/or costs of professional consultant services and contract services of technical personnel either temporarily or permanently assigned to and directly employed in the operation of the Joint Property:
( ~~ ) shall be covered by the overhead rates~~
(X) shall not be covered by the overhead rates.

1.    **Overhead - Project Team**
To compensate the Operator for overhead costs incurred in support of a Project Team defined herein, Operator shall charge a rate of  _two and one-half_  Percent ( _2.5_ %) of the total cost of the Project Team as defined in Section II, Paragraph 2.A(1).  Where a Non-Operator(s) provides office support for its member(s) of the Project Team, the Non-Operator(s) shall likewise be compensated at the same rate(s) as the Operator for its overhead.  Such overhead costs shall include, but shall not be limited to:  support staff not directly assigned to the Project Team, computer equipment and supplies, office space, utilities, office furniture and equipment, cleaning and general housekeeping, office supplies, conference room facilities, facsimile machines, copy machines, telephones and other general costs supporting the Project Team.

2.    **Overhead - Development and Operating**

As compensation for overhead in connection with drilling and producing operations, Operator shall charge on either:

( ~~) Fixed Rate Basis,  Paragraph 2.A., or~~
(X)  Percentage Basis,  Paragraph 2.B.

~~A.      Overhead - Fixed Rate Basis~~

~~(1)      Operator shall charge the Joint Account at the following rates per well per month:~~
~~Drilling Well Rate per month  $_____(Prorated for less than a full month)~~
~~Producing Well Rate per month $ _____~~

~~(2)      Application of Overhead - Drilling Well Rate shall be as follows:~~
~~(a)      Charges for drilling wells shall begin on the date drilling or completion equipment arrives on location and terminate on the date the drilling or completion equipment~~

~~moves off location or rig is released, whichever occurs first. No charge shall be made during suspension of drilling or completion operations for fifteen (15) or more consecutive calendar days.~~

~~(b)    Charges for wells undergoing any type of workover, recompletion, or abandonment for a period of five (5) consecutive work days or more shall be made at the drilling well rate. Such charges shall be applied for the period from date workover operations, with rig or other units used in workover, commence through date of rig or other unit release, except that no charges shall be made during suspension of operations for fifteen (15) or more consecutive calendar days.~~

~~(3)    Application of Overhead - Producing Well Rate shall be as follows:~~

~~(a)    An active well completion for any portion of the month shall qualify for a one-well charge for the entire month. An active completion is one which is~~

~~(1)    produced,~~

~~(2)    injected into for recovery or disposal,~~

~~(3)    used to obtain water supply to support production operations,~~

~~(4)    used to maintain pressure in the producing zone, or~~

~~(5)    shut-in oil or gas wells not capable of producing against line pressure or due to market conditions.~~

~~(b)    Each active completion in a multi-completed well in which production is not commingled downhole shall qualify for a one-well charge providing each completion is considered a separate well by the governing regulatory authority.~~

~~(c)    A one-well charge shall be made for the month in which plugging and abandonment operations are completed on any well. This one-well charge shall be made whether or not the well has produced except when the drilling well rate applies.~~

~~(d)    All wells not meeting the criteria set forth in the Paragraph A.(3) (a), (b), or (c) shall not quality for a producing overhead charge.~~

~~(4)    The well rates shall be adjusted on the first day of April each year following the effective date of the agreement to which this Accounting Procedure is attached. The adjustment shall be computed by multiplying the rate currently in use by the percentage increase or decrease recommended by COPAS each year. The adjusted rates shall be the rates currently in use, plus or minus the computed adjustment.~~

B.    *Overhead -Percentage Basis (exclusive of Project Team costs)*

(1)    Operator shall charge the Joint Account at the following rates;

(a)    Development Rate two and one-half percent (2.5%) of the cost of development of the Joint Property exclusive of costs provided under Paragraph 9 of Section II and all salvage credits.

(b)    Operating Rate thirteen percent (13%) of the cost of operating the Joint Property exclusive of costs provided under Paragraphs 1 and 9 of Section II, all salvage credits, the value of injected substances purchased for secondary recovery, all taxes and assessments which are levied, assessed and paid upon the mineral interest in and to the Joint Property, payments to third parties in settlement of claims, production handling fees, infrastructure access fees, and/or operating and maintenance expenses fees paid to owners or operators of Offsite Host Facilities, and insurance acquired for the Joint Account other than workers' compensation and employer's liability insurance.

(2)    Application of Overhead - Percentage Basis shall be as follows:

(a)    Development shall include all costs in connection with

[1]    drilling, redrilling, plugging back or deepening of any or all wells,

[2]     workover operations requiring a period of five (5) consecutive work days or more on any or all wells,

[3]     preliminary expenditures necessary in preparation for drilling,

[4]     expenditures incurred in abandoning when the well is not completed as a producer,

[5]     original construction or installation of fixed assets, expansion of fixed assets and any other project clearly discernible as a fixed asset, except Major Construction as defined in Paragraph 3 of Section III.

(b)     Operating shall include all other costs in connection with Joint Operations except that catastrophe costs shall be assessed overhead as provided in Paragraph 3 of Section III.

**3.     Overhead - Major Construction**

To compensate Operator for overhead costs incurred in the construction and installation of fixed assets, the expansion of fixed assets, and any other project clearly discernible as a fixed asset required for the development and operation of the Joint Property, or in the dismantling for abandonment of platforms and related production facilities, Operator shall either negotiate a rate prior to the beginning of construction, or shall charge the Joint Account for Overhead based on the following rates for any Major Construction project in excess of $100,000.

A. *If the Operator absorbs the engineering, design and drafting costs related to the project:*
  (1) 5 % of total costs if such costs are more than $100,000 but less than $500,000; plus
  (2) 4 % of total costs in excess of $500,000 but less than $1,000,000; plus
  (3) 3 % of total costs in excess of $1,000,000.

B. *If the Operator charges engineering, design and drafting costs related to the project directly to the Joint Account:*

  (1) 4 % of total costs if such costs are more than $100,000 but less than $500,000; plus
  (2) 3 % of total costs in excess of $500,000 but less than $1,000,000; plus
  (3) 2 % of total costs in excess of $1,000,000.

C. *If Operator charges engineering, design and drafting costs associated with a Major Construction project AFE to a Project Team AFE, the overhead assessment shall be as defined in the preceding paragraph B.*

  Total cost shall mean the gross cost of any one project. For the purpose of this paragraph, the component parts of a single project shall not be treated separately and the cost of drilling and workover wells and artificial lift equipment shall be excluded.

  On each project, Operator shall advise Non-Operator(s) in advance which of the above options shall apply. In the event of any conflict between the provisions of this paragraph and those provisions under Section II, Paragraph 2 or Paragraph 5, the provisions of this paragraph shall govern.

**4.     Overhead – Catastrophe**

To compensate Operator for overhead costs incurred in the event of expenditures resulting from a single occurrence due to oil spill, blowout, explosion, fire, storm, hurricane, or other catastrophes as agreed to by the Parties, which are necessary to restore the Joint Property to the equivalent condition that existed prior to the event causing the expenditures, Operator shall either negotiate a rate prior to charging the Joint Account or shall charge the Joint Account for overhead based on the following rates:

(1) <u>4</u> % of total costs  through  $500,000; plus
(2) <u>3</u> % of total costs in excess of $500,000 but less than $1,000,000; plus
(3) <u>2</u> % of total costs in excess of $1,000,000.

Expenditures subject to the overheads above will not be reduced by insurance recoveries, and no other overhead provisions of this Section III shall apply.

**5.**      **Amendment of Rates**

The Overhead rates provided for in this Section III may be amended from time to time only by mutual agreement between the Parties hereto, if in practice, the rates are found to be insufficient or excessive.

## IV.  MATERIAL PURCHASES, TRANSFERS AND DISPOSITION

The Operator is responsible for Joint Account Material and shall make proper and timely charges and credits for direct purchases, transfers, and dispositions.  The Operator normally provides all Material for use on the Joint Property but does not warrant the Material furnished.  At the Operator's option, Material may be supplied by Non-Operators.

**1.**      **Direct Purchases**

Direct purchases shall be charged to the Joint Account at the price paid by the Operator after deduction of all discounts received.  A direct purchase is determined to occur when an agreement is made between an Operator and a third party  for the acquisition of Materials for a specific well site or location.  Material provided by the Operator under "vendor stocking programs," where the initial use if for a Joint Property and title of the Material does not pass from the vendor until usage, is considered a direct purchase.  If Material is found to be defective or is returned to the vendor for any other reason, credit shall be passed to the Joint Account when adjustments have been received by the Operator from the manufacturer, distributor, or agent.

**2.**      **Transfers**

A transfer is determined to occur when the Operator furnishes Material from its storage facility or from another operated property.  Additionally, the Operator has assumed liability for the storage costs and changes in value and has previously secured and held title to the transferred Material.  Similarly, the removal of Material from a Joint Property to the Operator's facility or to another operated property is also considered a transfer.  Material that is moved from the Joint Property to a temporary storage location pending disposition may remain charged to the Joint Account and is not considered a transfer.

A.      *Pricing*

The value of Material transferred to/from the Joint Property should generally reflect the market value on the date of transfer.  Transfers of new Material will be priced using one of the following new Material bases:

(1)      Published prices in effect on date of movement as adjusted by the appropriate COPAS Historical Price Multiplier (HPM) or prices provided by the COPAS Computerized Equipment Pricing System (CEPS).  The HPMs and the associated date of published price to which they should be applied will be published by COPAS periodically.

(a)      For oil country tubulars and line pipe, the published price shall be based upon eastern mill (Houston for special end) carload base prices effective as of date of movement, plus transportation cost as defined in Section IV, Paragraph 2.B.

(b)      For other Material, the published price shall be the published list price in effect at date of movement, as listed by a supply store nearest the Joint Property (where material is normally available) capable of supplying the

material, or point of manufacture, plus transportation costs as defined in Section IV, Paragraph 2.B.

(2)     A price quotation that reflects a current realistic acquisition cost may be obtained from a supplier/manufacturer.

(3)     Historical purchase price may be used, providing it reflects a current realistic acquisition cost on date of movement.  Sufficient price documents should be available to Non-operators for purposes of verifying Material transfer valuation.

(4)     As agreed to by the Parties.

(5)     When higher than specification grade or size tubulars from Operator's inventory are used on the Joint Property, Operator shall charge the Joint Account at the equivalent price for well design specification tubulars.

B.     *Freight*

Transportation costs should be added to the Material transfer price based on one of the following:

(1)     Transportation costs for oil country tubulars and line pipe shall be calculated using the distance from eastern mill to the railway receiving point nearest the Joint Property based on the carload weight basis as recommended by COPAS in Bulletin 21 and current interpretations.

(2)     Transportation costs for special mill items shall be calculated from that mill's shipping point to the railway receiving point nearest the Joint Property.  For transportation costs from other than eastern mills, the 30,000-pound Specialized Motor Carriers interstate truck rate shall be used.  Transportation costs for macaroni tubing shall be calculated based on the Specialized Motor Carriers rate per weight of tubing transferred to the railway receiving point nearest the Joint Property.

(3)     Transportation costs for special end tubular goods shall be calculated using the 30,000-pound Specialized Motor Carriers interstate truck rate from Houston, Texas, to the railway receiving point nearest the Joint Property.

(4)     Transportation costs for Material other than that described in Section IV, Paragraphs 2.B(1) through (3), if applicable, shall be calculated from the supply store or point of manufacture, whichever is appropriate, to the railway receiving point nearest the Joint Property.

C.     *Condition*

(1)     Condition "A" - New and unused Material in sound and serviceable condition shall be charged at one hundred percent of the price as determined in Section IV, Paragraphs 2.A and B.  Material transferred from the Joint Property that was not placed in service on the Joint Property shall be credited as charged without gain or loss.  Any unused Material that was charged to the Joint Account through a direct purchase will be credited to the Joint Account at the original cost paid less restocking charge.  All refurbishing costs required or necessary to return the material to original condition, or to correct handling or transportation damages and other related costs will be born by the divesting property.  The Joint Account is responsible for Material preparation, handling and transportation costs for new and unused Material charged to the property either through a direct purchase or transfer.  Any preparation costs performed, including any internal or external

coating and wrapping, will be credited on new Material provided these costs were not repeated for the receiving property.

(2)    Condition "B" - Used Material in sound and serviceable condition and suitable for reuse without reconditioning shall be priced at the condition percentage most recently recommended by COPAS times the price determined by the pricing guidelines in Section IV, Paragraphs 2.A and B. All refurbishing costs required or necessary to return the material to Condition B, or to correct handling or transportation damages and other related costs will be born by the divesting property.

If the Material was originally charged to the joint Account as used Material and placed in service on the Joint Property, the Material will be credited at the condition percentage most recently recommended by COPAS times the price as determined in Section IV, Paragraphs 2.A and B.

Used Material transferred from the Joint Property that was not placed in service on the property shall be credited as charged without gain or loss.

(3)    Condition "C" - Material that is not in sound and serviceable condition and not suitable for its original function until after reconditioning shall be priced at the condition percentage most recently recommended by COPAS times the price determined in Section IV, Paragraphs 2.A and B. The cost of reconditioning shall be charged to the receiving property provided Condition C value, plus cost of recondition, does not exceed Condition B value.

(4)    Condition "D" - Other Material that is no longer suitable for its original purpose but usable for some other purpose is considered Condition D Material. Included under Condition "D" are also obsolete items or Material that does not meet original specifications but still has value and can be used in other services as a substitute for items with different specifications. Due to the condition or value of other used and obsolete items, it is not possible to price these items under Section IV, Paragraph 2.A. The price used should result in the Joint Account being charged or credited with the value of the service rendered or use of the Material. In some instances, it may be necessary or desirable to have the Material specially priced as agreed to by the Parties.

(5)    Condition "E" - Junk shall be priced at prevailing scrap value prices.

D.    *Other Pricing Provisions*

(1)    Preparations Costs
Costs incurred by the Operator in making Material serviceable including inspection, third party surveillance services, and other similar services will be charged to the Joint Account at prices reflective of the Operator's actual costs of the services. Documentation must be retained to support the cost of service. New coating and/or wrapping may be charged per Section IV, Paragraph 2.A.

(2)    Loading and Unloading Costs
Loading and unloading costs related to the movement of the Material to the Joint Property shall be charged in accordance with the methods specified in COPAS Bulletin 21.

**3.**    **Disposition Of Surplus**
Surplus Material is that Material, whether new or used, that is no longer required for Joint Operations. The Operator may purchase, but shall be under no obligation to purchase, the interest of Non-operator in surplus Material.

Dispositions for the purpose of this procedure are considered to be the relinquishment of title of the Material from the Joint Property to either a third party, a Non-Operator, or to the Operator. To avoid the accumulation of surplus materials, the Operator should make good faith efforts to dispose of surplus within 12 months through buy/sale agreements, trade, sale to a third party, division in-kind, or other dispositions as agreed to by the Parties.

An Operator may, through a sale to an unrelated third party or entity, dispose of surplus Material having a gross sale value that is less than or equal to the Operator's expenditure limit as set forth in the Operating Agreement to which this Accounting Procedure is attached without the prior approval of the Non-Operator. If the gross sale value exceeds the Operating Agreement expenditure limit, the disposal must be agreed to by the Parties.

The Operator may dispose of Condition D and E Material under procedures normally utilized by the Operator without prior approval.

4.      **Special Pricing Provisions**

A.      *Premium Pricing*
Whenever Material is not readily replaceable due to national emergencies, strikes, or other unusual causes over which the Operator has no control, the Operator may charge the Joint Account for the required Material at the Operator's actual cost incurred in providing such Material, in making it suitable for use, and in moving it to the Joint Property provided notice in writing is furnished to Non-Operators of the proposed charge prior to use and to billing Non-Operators for such Material. During premium pricing periods, each Non-Operator shall have the right to furnish in-kind all or part of his share of such Material suitable for use and acceptable to the Operator by so electing and notifying the Operator within ten days after receiving notice from the Operator.

B.      *Shop-Made Items*
Shop-made items may be priced using the value of the Material used to construct the item plus labor costs. If the Material is from a scrap or junk account, the Material may be priced at either twenty-five percent of the current price as determined in Section IV, Paragraph 2A, or scrap value, whichever is higher, plus costs to fabricate the item.

C.      *Mill Rejects*
Mill rejects purchased as "limited service" casing or tubing shall be priced at eighty percent of K-55/J-55 price as determined in Section IV, Paragraphs 2.A and B. Line pipe converted to casing or tubing with casing or tubing couplings attached shall be priced as K-55/J-55 casing or tubing at the nearest size and weight.

## V.  INVENTORIES OF CONTROLLABLE MATERIAL

The Operator shall maintain records of Controllable Material charged to the Joint Account, as defined in the COPAS Material Classification Manual, with sufficient detail to perform the physical inventories requested unless directed otherwise by the Non-Operators.

Adjustments to the Joint Account by the Operator resulting from a physical inventory of jointly owned Controllable Material are limited to the six months following the taking of the inventory. Charges and credits for overages or shortages will be valued for the Joint Account based on condition B prices in effect on the date of physical inventory and determined in accordance with Section IV, Paragraphs 2.A and B unless the inventorying Parties can prove another Material condition applies.

1.      **Directed Inventories**
With an interval of not less than five years, physical inventories shall be performed by the Operator upon written request of a majority in working interests of the Non-Operators.

Expenses of directed inventories will be borne by the Joint Account and may include the following:

A.   Audit per diem rate for each inventory person in line with the auditor rates determined, adjusted, and published each April by COPAS.  The per diem should also be applied to a reasonable number of days for pre-inventory work and for report preparation.  The amount of time required for this additional work may vary from inventory to inventory.

B.   Actual travel including Operator-provided transportation and personal expenses for the inventory team.

C.   Reasonable charges for report typing and processing.

The Operator is expected to exercise judgment in keeping expenses within reasonable limits.  Unless otherwise agreed, costs in connection with any post-report follow-up work in settling the inventory will be absorbed by the Non-Operator incurring such costs.   Any anticipated disproportionate costs should be discussed and agreed upon prior to commencement of the inventory.

When directed inventories are performed, all Parties shall be governed by such inventory.

**2.   Non-Directed Inventories**

A.   *Operator Inventories*
Periodic physical inventories that are not requested by the Non-Operator may be performed by the Operator at the Operator's discretion.  The expenses of conducting such Operator inventories shall not be charged to the Joint Account.

B.   *Non-Operator Inventories*
Any Non-Operator(s) may conduct an inventory at reasonable times, at their sole cost and risk with prior notification to the Operator of at least thirty (30) days.

C.   *Other Inventories*
Other inventories may be taken whenever there is any sale or change of interest.  When possible, the selling Party should notify all other owners 30 days prior to the anticipated closing date.  When there is a change in Operator of the Joint Property, an inventory by the former and new Operator should be taken.

The expenses of conducting such other inventories shall be charged to the Joint Account.

### END OF EXHIBIT "C"

# EXHIBIT "D"

**Attached to and made a part of that certain Unit Operating Agreement Effective  April 1, 2018 (the "Katmai UOA") by and between Fieldwood Energy LLC, Ridgewood Katmai, LLC and ILX Prospect Katmai, LLC**

**GAS BALANCING AGREEMENT (this "GBA")**

1.   **Ownership of Gas Production**

  (a)   It is the intent of the parties that each party shall have the right to take in kind and separately dispose of its proportionate share of gas (including casinghead gas) produced from each well located on acreage ("Unit Area") covered by the Operating Agreement to which this Exhibit is attached ("Operating Agreement").

  (b)   Operator shall control the gas production and be responsible for administering the provisions of this GBA and shall make reasonable efforts to deliver, on a daily basis, each party's gas entitlement quantities or cause to be delivered each party's gas entitlement quantities to the parties' gas purchasers as may be required in order to balance the accounts of the parties in accordance with the provisions herein contained. For purposes of this GBA, Operator shall maintain production accounts of the parties based upon the number of Mcfs, including the Btu factor actually contained in the gas produced from a particular well and delivered at the outlet of lease equipment and sold or otherwise disposed of for each party's account regardless of whether sales of such gas are made on a volumetric or thermal basis or on a wet or dry basis.

2.   **Balancing of Production Accounts**

  (a)   Any time a party, or such party's purchaser, is not taking or marketing its full share of gas produced from a particular well (the "Non-Marketing" Party), the remaining parties (the "Marketing Parties") shall have the right, but not the obligation, to produce, take, sell and deliver for such Marketing Parties' accounts, in addition to the full share of gas to which the Marketing Parties are otherwise entitled, all or any portion of the gas attributable to a Non-Marketing Party. (Gas attributable to a Non-Marketing Party, taken by a Marketing Party, is referred to in this GBA as "Overproduction"). If there is more than one Marketing Party taking gas attributable to a Non-Marketing Party, each Marketing Party shall be entitled to take a Non-Marketing Party's gas in the ratio that such Marketing Party's interest in production bears to the total interest in production of all Marketing Parties.

  (b)   A party that has not taken its proportionate share of gas produced from a well (the "Underproduced Party") shall be credited with a volume of gas equal to its share of gas produced but not taken, less its share of gas used in lease operations, vented or lost ("Underproduction"). Such Underproduced Party, upon giving timely thirty (30) days' prior written notice to Operator, shall be entitled, on a monthly basis beginning the first day of the next succeeding production month following receipt of notice, to produce, take, sell and deliver the full share of gas to which such party is entitled, provided, that such Underproduced Party  nominates such volumes, or have such volumes nominated on its behalf, by the nomination deadline applicable to deliveries at the beginning of such month.  In addition to its full share of gas, such Underproduced Party, upon giving timely written notice as stated in this Section 2(b), to Operator, shall be entitled, on a monthly basis to produce, take, sell and deliver a quantity of gas ("Make-Up Gas") equal to twenty-five percent (25%) of the total share of gas attributable to all parties having cumulative Overproduction (individually called an "Overproduced Party").  Such Make-Up Gas shall be credited against such Underproduced Party's accrued Underproduction in order of accrual and shall also be subtracted from each contributing

Overproduced Party's accrued Overproduction in the order of accrual. Notwithstanding the foregoing and subject to subsection (e) below: (i) an Overproduced Party shall never be obligated to reduce its takes to less than seventy-five percent (75%) of the quantity to which such party is otherwise entitled and (ii) an Underproduced Party shall not be allowed to make up Underproduction during the months of December, January, February and March if such Underproduced Party has not sold or requested to sell Make-Up Gas during the preceding months of April through November.

(c)   If there is more than one Underproduced Party desiring to Make-Up Gas, each such Underproduced Party shall be entitled to Make-Up Gas in the ratio that such party's interest in the production bears to the total interest in production of all parties then desiring Make-Up Gas. Any portion of the Make-Up Gas to which an Underproduced Party is entitled and which is not taken by such Underproduced Party may be taken by any other Underproduced Party(ies).

(d)   If there is more than one Overproduced Party required to furnish Make-Up Gas, each such Overproduced Party shall furnish Make-Up Gas in the ratio that such party's interest in production bears to the total interest in production of all parties then required to furnish Make-Up Gas. Except as provided in (e) below, each Overproduced Party in a well shall be entitled, on a monthly basis, to take its full share of gas less its share of the Make-Up Gas then being produced from the particular completion in the well in which it is Overproduced.

(e)   If during any current calendar month, Operator in good faith believes that an Overproduced Party has recovered one hundred percent (100%) of such Overproduced Party's share of the recoverable reserves from a particular completion in a well, such Overproduced Party, upon being notified in writing of such fact by Operator, shall, commencing the first day of the next succeeding production month, cease taking gas from such well and the remaining parties shall be entitled to take one hundred percent (100%) of such production until the accounts of the parties are balanced. Thereafter, such Overproduced Party shall again have the right to take its share of the remaining production, if any, in accordance with the provisions herein contained. Notwithstanding anything to the contrary herein, after an Overproduced Party has recovered one hundred percent (100%) of its full share of the recoverable reserves as so determined by Operator from a particular well, such Overproduced Party may continue to produce if such continued production is (i) necessary for lease maintenance purposes or (ii) permitted by a majority of interest of the parties who have not produced one hundred percent (100%) of their recoverable reserves from such completion in such well after written ballot conducted by Operator.

**3.1   Periodic Cash Balancing**

(a)   Upon the closing of the accounting settlement of wells in the Unit Area for each calendar year, the Parties shall cash balance, with December 31 of each calendar year being the "Balancing Date". As of the Balancing Date, The Operator shall determine whether any party has either unrecouped Overproduction or unrecouped Underproduction, and if so, Operator shall distribute, within ninety (90) days after the Balancing Date, an interim accounting, similar to the final accounting described in paragraph 3.3 (a) and (b) described below, showing such information as of said Balancing Date (as defined in paragraph 3.3(a) below)).

(b)   Within fifteen (15) days of receipt of the interim accounting, each Underproduced Party shall inform the Operator and all Overproduced Parties in writing if the Underproduced Party desires to waive the requirement for the Overproduced Parties to make a cash settlement to the Operator to be disbursed to the such Underproduced Party. If an Underproduced Party does not elect to waive the requirement for the Overproduced Parties to cash settle with the Underproduced Party, then within thirty (30) days of receipt of such interim accounting, each Overproduced Party shall remit to Operator for disbursement to each of the Underproduced Parties, a sum of money and statement as described in paragraph 3.3 (b) below, calculated as of the Balancing Date. The provisions of paragraphs 3.3(c), (d), (e), and (f) shall apply to Periodic Cash Balancing pursuant to this subsection 3.1.

**3.2   Cash Balancing Upon Assignment**

(a)   If an Underproduced Party or an Overproduced Party sells, assigns, exchanges or otherwise transfers any of its working interest in the Unit Area, the assigning party shall notify the Operator in writing within ten (10) days after such assignment. Within thirty (30) days after receipt of written notice of such transfer, the Operator shall distribute an "interim accounting", similar to the final accounting described in subsection 3.3(a) below, showing such information as of the first calendar day of the month in which the assignment was effective ("Assignment Balancing Date").

(b)

    i.   Within thirty (30) days of such interim accounting, if the assigning party is an Underproduced Party, each Overproduced Party shall remit to Operator for disbursement to the assignee of said Underproduced Party, a sum of money and statement as described in paragraph 3.3 (b) below, calculated as of the Assignment Balancing Date, but only as to the portion of such Overproduced Party's unrecouped Overproduction attributable to the assigning Underproduced Party's interest, based on the ratio that such assigning Underproduced Party's cumulative unrecouped Underproduction bears to the cumulative unrecouped Underproduction of all Underproduced Parties.

    ii.   Within thirty (30) days of such interim accounting, if the assigning party is an Overproduced Party, such assigning party shall remit or cause to be remitted to Operator for disbursement to the Underproduced Parties, a sum of money and statement as described in paragraph 3.3 (b) below, calculated as of the Assignment Balancing Date.   The provisions of paragraphs 3.3 (c), (d), (e), and (f) shall apply to Cash Balancing Upon Assignment pursuant to this subsection 3.2, except that, with respect to money that Operator receives that is to be disbursed to the assignee of an Underproduced Party, Operator shall disburse such money to such assignee and not to the other Underproduced Parties.

    iii.   Notwithstanding the foregoing, the assignee of an Overproduced Party shall be and remain liable for furnishing Make-Up Gas and for remitting cash balancing payments described herein to the extent such payments are not remitted by the assigning Overproduced Party.

(c)   The provisions of this subsection 3.2 shall not be applicable in the event any party mortgages its interest or disposes of its interest by merger, reorganization, consolidation or sale of substantially all of its assets to a subsidiary or parent company, or to any company in which any parent or subsidiary of such party owns a majority of the stock of such company.

**3.3    Cash Balancing Upon Depletion**

(a)   If gas production from a particular well ceases and no attempt is made to restore production (or substitute therefor) within one hundred eighty (180) days, Operator shall distribute, within two hundred ten (210) days of the date the well last produced gas from such well, a statement of net unrecouped Underproduction and Overproduction and the months and years in which such unrecouped production accrued ("final accounting").

(b)   Within thirty (30) days of receipt of such final accounting, each Overproduced Party shall remit to Operator for disbursement to the Underproduced Parties, a sum of money (which sum shall not include interest) equal to the amount actually received or constructively received by Overproduced Party for sales during the month(s) of unrecouped Overproduction, calculated in order of accrual and less applicable transportation fee(s), and plus or minus any natural gas liquid ("NGL") processing proceeds (in $/MMBtu) after adjusting for plant thermal reduction ("PTR"), and plant settlement fees.  Such remittance shall be based on the number of Mcfs and Btu factor of unrecouped Overproduction and shall be accompanied by a statement showing volumes in Mcfs and Btu factor and prices for each month with accrued unrecouped Overproduction.

(c)   Within thirty (30) days of receipt of any such remittance by Operator from an Overproduced Party, Operator shall disburse such funds to the Underproduced Party(ies) in the ratio of the cumulative

unrecouped Underproduction of the Underproduced Parties, in accordance with the final accounting. Operator assumes no liability with respect to any such payment (unless such payment is attributable to Operator's Overproduction), it being the intent of the parties that each Overproduced Party shall be solely responsible for reimbursing each Underproduced Party for such Underproduced Party's respective share of Overproduction taken by such Overproduced Party in accordance with the provisions herein contained. If any party fails to pay any sum due under the terms hereof after demand therefor by the Operator, the Operator may turn responsibility for the collection of such sum to the party or parties to whom it is owed, and Operator shall have no further responsibility for collection.

(d)     In determining the amount of Overproduction for which settlement is due, the amount by which production taken during any month by an Overproduced Party is less than such Overproduced Party's share shall be treated as make-up and shall be applied to reduce prior Overproduction in the order of accrual of such Overproduction.

(e)     An Overproduced Party that took gas in kind for its own use, sold gas to an affiliate, or otherwise disposed of gas in other than a cash sale, shall pay for such gas at "Market Value" (as hereinafter defined) at the time it was produced, even if the Overproduced Party sold such gas to an affiliate at a price greater or lesser than "Market Value". For purposes of this Section 3.3 (e), the term "Market Value" shall be determined by using an Index price per MMBtu as published in the first issue of the month of Inside F.E.R.C.'s Gas Market Report (the "Report") in the table entitled "Prices of Spot Gas Delivered to Pipelines" under the heading that represents either: (i) the gas pipeline directly connected to the gas production, or in the event that there is not a heading that represents such pipeline, then, (ii) the first pipeline interconnected to the pipeline directly connected to the gas production for which an Index price is published for each month subject to this Section 3.3 (e), or (iii) if applicable, a mutually agreeable pipelines index or basket of pipeline indices that are at the tailgate of the applicable gas processing plant(s), less applicable transportation fee(s), and plus or minus any NGL processing proceeds (in $/MMBtu) after adjusting for PTR, and plant settlement fees. All NGL proceeds will be settled based on the settlement terms of the processing agreement terms pursuant to which an OverProduced Party's Gas is processed.

(f)     If refunds are later required by any governmental authority, each party shall be accountable for its respective share of such refunds as finally balanced hereunder.

## 4.     Nominations

Each party shall, on a monthly basis, give Operator sufficient time and data either to nominate such party's respective share of gas to the transporting pipeline(s) or, if Operator is not nominating such party's gas, to inform Operator of the manner in which to confirm dispatch of such party's gas. Except as resulting from the Operator being found liable by a final non-appealable judicial determination or a final decision under binding arbitration for an act of gross negligence or willful misconduct, the Operator shall not be responsible for any fees and/or penalties associated with imbalances charged by any pipeline to any Underproduced or Overproduced Party(ies).

## 5.     Statements

If the Unit Area is located on the Outer Continental Shelf or on an offshore state lease, then on or before the last day of the second month following the production month, Operator shall furnish to each party hereto a statement of gas taken by each party, expressed in terms of Mcfs, including the Btu factor. If actual volume information sufficient to prepare such statement is not made available to the Operator in sufficient time to prepare it, the Operator shall nevertheless furnish a statement of its good faith estimate of volumes taken. Such statement shall show the gas balance among the parties and the total quantity delivered for each party's account. Any error or discrepancy in Operator's monthly statement shall be promptly reported to Operator and Operator shall make a proper adjustment thereof within thirty (30) days after final determination of the correct quantities involved; provided, however, that if no errors or discrepancies are reported to the Operator within two (2) years from the date of any such statement, such statement shall be conclusively deemed to be correct.

**6.      Payment of Taxes**

Each party taking gas shall pay or cause to be paid any and all production, severance, utility, sales, excise, or other taxes due on such taken gas.  Each party agrees to release, defend, indemnify and hold harmless each other party from any and all claims relating thereto.

**7.      Operating Expenses**

The operating expenses are to be borne as provided in the Operating Agreement, regardless of whether all parties are selling or using gas or whether the sales and use of each are in proportion to their respective interests in such gas.

**8.      Overproducing Allowable**

Each party shall give Operator sufficient time and data to enable Operator to make appropriate nominations, forecasts and/or filings with the regulatory bodies having jurisdiction to establish allowables.  Each party shall at all times regulate its takes and deliveries from the Unit Area so that the well(s) covered hereby shall not be curtailed and/or shut-in for overproducing the allowable production assigned thereto by the regulatory body having jurisdiction.  Upon written request by non-operator, Operator agrees to provide to the Parties copies of regulatory reports (such as 2014's and any revisions thereto) within a reasonable period.

**9.      Payment of Leasehold Burdens**

At all times while gas is produced from the Unit Area, except to the extent otherwise provided by state or federal regulation, each party agrees to make appropriate settlement of all royalties, overriding royalties and other payments out of actual production taken by such party, and such party's full share only, of such gas production exclusive of gas used in operations, vented or lost, and each party agrees to defend, release, indemnify and hold harmless each other party from and all claims relating thereto.  If further commingling situations occur that require alternative methods of payment, they will be addressed and amendments made hereto as needed.

**10.    Application of GBA**

The provisions of this GBA shall be separately applicable and shall constitute a separate agreement with respect to gas produced from all wells located on the Unit Area.

**11.    Term**

This GBA shall terminate when gas production under the Operating Agreement permanently ceases and the accounts of the parties are finally settled in accordance with the provisions herein contained.

**12.    Operator's Liability**

Except as otherwise provided herein, Operator is authorized to administer the provisions of this GBA, but shall have no liability to the other parties for losses sustained or liability incurred which arise out of or in connection with the performance of Operator's duties hereunder except such as may result from the Operator being found liable by a final non-appealable judicial determination or a final decision under binding arbitration for an act of gross negligence or willful misconduct.

**13.    Audits**

Any Underproduced Party shall have the right for a period of two (2) years after receipt of payment pursuant to a final or interim accounting and after giving written notice to all parties, to audit an Overproduced Party's accounts and records relating to such payment.  Any Overproduced Party shall have the right for a period of two (2) years after tender of payment for unrecouped volumes and upon giving written notice to all parties, to audit an Underproduced Party's records as to volumes.  The party conducting such audit shall bear its costs of the audit.

**14.    Successors and Assigns**

The terms, covenants, and conditions of this GBA shall be binding upon and shall inure to the benefit of the parties and to their respective successors and assigns.

**15.    Liquid Hydrocarbons Not Covered Under the GBA**

The parties shall share proportionately in and own all liquid hydrocarbons recovered from the gas by lease separation equipment in accordance with their respective interests.

**16.    Waiver**

No waiver by any party hereto of any one or more defaults in the performance of any provision of this GBA shall operate or be construed as a waiver of any future default, whether of a like or a different character.

**17.    Conflict**

If there is a conflict between the terms of this GBA and the terms of any gas sales contract covering the Unit Area entered into by any party, the terms of this GBA shall govern.

*END OF EXHIBIT "D"*

# EXHIBIT "E"

**Attached to and made a part of that certain Unit Operating Agreement Effective April 1, 2018 (the "Katmai UOA") by and between Fieldwood Energy LLC, Ridgewood Katmai, LLC and ILX Prospect Katmai, LLC**

## CERTIFICATION OF NON-SEGREGATED FACILITIES

Contractor certifies that it does not maintain or provide for its employees any segregated facilities at any of its establishments and that it does not permit its employees to perform their services at any location under its control, where segregated facilities are maintained. Contractor certifies further that it will not maintain or provide for its employees any segregated facilities at any of its establishments and that it will not permit its employees to perform their services at any location, under its control, where segregated facilities are maintained. Contractor agrees that a breach of this certification is a violation of the Equal Opportunity Clause in any government contract between Contractor and Operator. As used in this certification, the term "segregated facilities" means any waiting rooms, work areas, rest rooms and other storage or dressing areas, parking lots, drinking fountains, recreation or entertainment areas, transportation, and housing facilities provided for employees which are segregated by explicit directive or are in fact segregated on the basis of race, color, religion, or national origin because of habit, local custom or otherwise. Contractor further agrees that (except where it has obtained identical certifications from proposed subcontractors) prior to the award of subcontracts exceeding $100,000 that are not exempt from the provisions of the Equal Opportunity Clause; that it will retain such certifications in its files; and that it will forward the following notice to such proposed subcontractors (except where the proposed subcontractors have submitted identical certifications for specific time periods):

NOTICE TO PROSPECTIVE SUBCONTRACTORS OF REQUIREMENT FOR CERTIFICATIONS OF NONSEGREGATED FACILITIES. A Certification of Nonsegregated Facilities, as required by the May 9, 1967 order on Elimination of Segregated Facilities, by the Secretary of Labor (32 Fed. Reg. 7439, May 19, 1967), must be submitted prior to the award of a subcontract exceeding $100,000 that is not exempt from the provisions of the Equal Opportunity Clause. The certification may be submitted either for each subcontract or for all subcontracts during a period (i. e., quarterly, semi-annually or annually). (1968 NLAR) (Note: The penalty for making false statements in offers is prescribed in 18. U.S.C. 1001.) Whenever used in the foregoing Exhibit, the term "Contractor" refers to each Party to this Agreement.

## *END OF EXHIBIT "E"*

# EXHIBIT "F"

**Attached to and made a part of that certain Unit Operating Agreement Effective  April 1, 2018 (the "Katmai UOA") by and between Fieldwood Energy LLC, Ridgewood Katmai, LLC and ILX Prospect Katmai, LLC**

## ARTICLE 6.3 ET SEQ.

## DEEPWATER UNIT OPERATING AGREEMENT (Louisiana)

Security Rights; Default; Unpaid Charges; Carved-out Interests.

**6.3      Security Rights.**

a.   Security Rights - Properties Located Offshore Adjacent to the State of Louisiana.  In addition to any other security rights and remedies provided by law with respect to services rendered or materials and equipment furnished under this Agreement, for and in consideration of the covenants and mutual undertakings of Fieldwood Energy LLC (the "Operator") and Ridgewood Katmai, LLC and ILX Prospect Katmai, LLC,  (the "Non-Operating Parties"), shall have the following security rights:

(i)   Mortgage in Favor of the Operator and the other Non-Operating Party(s).   Each Non-Operating Party hereby grants to the Operator and to each of the other Non-Operating Party(s), as applicable, a mortgage, hypothecate, and pledge of and over all of its rights, titles, and interests in and to (a) the Leases, (b) the oil and gas in, on, under, and that may be produced from the lands within the Unit Area, and (c) all other immovable property susceptible of mortgage situated within the Unit Area.

This mortgage is given to secure the complete and timely performance of and payment by each Non-Operating Party of all obligations and indebtedness of every kind and nature, whether now owed by such Non-Operating Party or hereafter arising, pursuant to this Agreement.  To the extent susceptible under applicable law, this mortgage and the security interests granted in favor of the Operator and to each of the other Non-Operating Party(s), as applicable, herein shall secure the payment of all Costs and other expenses properly charged to such Party, together with (A) interest on such indebtedness, Costs, and other expenses at the rate set forth in Exhibit "C" attached hereto (the "Accounting Procedure") or the maximum rate allowed by law, whichever is the lesser, (B) reasonable attorneys' fees, (C) court costs, and (D) other directly related collection costs.  If any Non-Operating Party does not pay such Costs and other expenses or perform its obligations under this Agreement when due, the Operator shall have the additional right to notify the purchaser or purchasers of the defaulting Non-Operating Party's Hydrocarbon production and collect such Costs and other expenses out of the proceeds from the sale of the defaulting Non-Operating Party's share of Hydrocarbon production until the amount owed has been paid.  The Operator shall have the right to offset the amount owed against the proceeds from the sale of such defaulting Non-Operating Party's share of Hydrocarbon production.  Any purchaser of such production shall be entitled to rely on the Operator's statement concerning the amount of Costs and other expenses owed by the defaulting Non-Operating Party and payment made to the Operator by any purchaser shall be binding and conclusive as between such purchaser and such defaulting Non-Operating Party.

The maximum amount for which the mortgage herein granted by each Non-Operating Party shall be deemed to secure the obligations and indebtedness of such Non-Operating Party to the Operator and to each of the other Non-Operating Party(s), as applicable, as stipulated herein is hereby fixed in an amount equal to $500,000,000.00 outstanding at any time or from time to time (the "Limit of the Mortgage of each Non-Operating Party").  Except as

provided in the previous sentence (and then only to the extent such limitations are required by law), the entire amount of obligations and indebtedness of each Non-Operating Party to the Operator and to each of the other Non-Operating Party(s), as applicable, is secured hereby without limitation. Notwithstanding the foregoing Limit of the Mortgage of each Non-Operating Party, the liability of each Non-Operating Party under this Agreement and the mortgage and security interest granted hereby shall be limited to (and the Operator and each of the other Non-Operating Party(s), as applicable, shall not be entitled to enforce the same against such Non-Operating Party for, an amount exceeding) the actual obligations and indebtedness (including all interest charges, costs, attorneys' fees, and other charges provided for in this Agreement or in the Memorandum of Operating Agreement and Financing Statement (Louisiana), as such term is defined in Section 6.3.b.(v) hereof) outstanding and unpaid and that are attributable to or charged against the interest of such Non-Operating Party pursuant to this Agreement.

(ii)  <u>Security Interest in Favor of the Operator and the other Non-Operating Party(s)</u>.  To secure the complete and timely performance of and payment by each Non-Operating Party of all obligations and indebtedness of every kind and nature, whether now owed by such Non-Operating Party or hereafter arising, pursuant to this Agreement, each Non-Operating Party hereby grants to the Operator and to each of the other Non-Operating Party(s), as applicable, a continuing security interest in and to all of its rights, titles, interests, claims, general intangibles, proceeds, and products thereof, whether now existing or hereafter acquired, in and to (a) all oil and gas and as-extracted collateral produced from the lands or offshore blocks covered by the Leases or the Unit Area or attributable to the Leases or the Unit Area when produced, (b) all accounts receivable and as-extracted collateral accruing or arising as a result of the sale of such oil and gas (including, without limitation, accounts arising from gas imbalances or from the sale of oil and gas at the wellhead), (c) all cash or other proceeds from the sale of such oil and gas once produced and as-extracted collateral, and (d) all Development Systems, wells, facilities, fixtures, other corporeal property, whether movable or immovable, whether now or hereafter placed on the lands or offshore blocks covered by the Leases or the Unit Area or maintained or used in connection with the ownership, use or exploitation of the Leases or the Unit Area, and other surface and sub-surface equipment of any kind or character located on or attributable to the Leases or the Unit Area and the cash or other proceeds realized from the sale, transfer, disposition or conversion thereof.  The interest of the Non-Operating Parties in and to the oil and gas produced from or attributable to the Leases or the Unit Area when extracted and the accounts receivable accruing or arising as the result of the sale thereof shall be financed at the wellhead of the well or wells located on the Leases or the Unit Area.  To the extent susceptible under applicable law, the security interest granted by each Non-Operating Party hereunder covers: (A) all substitutions, replacements, and accessions to the property of such Non-Operating Party described herein and is intended to cover all of the rights, titles and interests of such Non-Operating Party in all movable property now or hereafter located upon or used in connection with the Unit Area, whether corporeal or incorporeal; (B) all rights under any gas balancing agreement, farmout rights, option farmout rights, acreage and cash contributions, and conversion rights of such Non-Operating Party in connection with the Leases or the Unit Area, or the oil and gas produced from or attributable to the Leases or the Unit Area, whether now owned and existing or hereafter acquired or arising, including, without limitation, all interests of each Non-Operating Party in any partnership, tax partnership, limited partnership, association, joint venture, or other entity or enterprise that holds, owns, or controls any interest in the Unit Area; and (C) all rights, claims, general intangibles, and proceeds, whether now existing or hereafter acquired, of each Non-Operating Party in and to the contracts, agreements, permits, licenses, rights-of-way, and similar rights and privileges that relate to or are appurtenant to the Leases or the Unit Area, including the following:

(1)  all of its rights, titles, and interests, whether now owned and existing or hereafter acquired or arising, in, to, and under or derived from any present or future operating, farmout, bidding, pooling, unitization, and communitization agreements, assignments,

and subleases, whether or not described in Exhibit "A," to the extent, and only to the extent, that such agreements, assignments, and subleases cover or include any of its rights, titles, and interests, whether now owned and existing or hereafter acquired or arising, in and to all or any portion of the Leases or the Unit Area, and all units created by any such pooling, unitization, and communitization agreements and all units formed under orders, regulations, rules, or other official acts of any governmental authority having jurisdiction, to the extent and only to the extent that such units cover or include all or any portion of the Leases or the Unit Area;

(2) all of its rights, titles, and interests, whether now owned and existing or hereafter acquired or arising, in, to, and under or derived from all presently existing and future advance payment agreements, and oil, casinghead gas, and gas sales, exchange, and processing contracts and agreements, including, without limitation, those contracts and agreements that are described on Exhibit "A," to the extent, and only to the extent, those contracts and agreements cover or include all or any portion of the Leases or the Unit Area; and

(3) all of its rights, titles, and interests, whether now owned and existing or hereafter acquired or arising, in, to, and under or derived from all existing and future permits, licenses, rights-of-way, and similar rights and privileges that relate to or are appurtenant to the Leases or the Unit Area.

(iii) <u>Mortgage in Favor of the Non-Operating Parties</u>.  The Operator hereby grants to each Non-Operating Party a mortgage, hypothecate, and pledge of and over all of its rights, titles, and interests in and to (a) the Leases; (b) the oil and gas in, on, under, and that my be produced from the lands within the Unit Area; and (c) all other immovable property or other property susceptible of mortgage situated within the Unit Area.

This mortgage is given to secure the complete and timely performance of and payment by the Operator of all obligations and indebtedness of every kind and nature, whether now owed by the Operator or hereafter arising, pursuant to this Agreement.  To the extent susceptible under applicable law, this mortgage and the security interests granted in favor of each Non-Operating Party herein shall secure the payment of all Costs and other expenses properly charged to the Operator, together with (A) interest on such indebtedness, Costs, and other expenses at the rate set forth in the Accounting Procedure or the maximum rate allowed by law, whichever is the lesser, (B) reasonable attorneys' fees, (C) court costs, and (D) other directly related collection costs.  If the Operator does not pay such Costs and other expenses or perform its obligations under this Agreement when due, the Non-Operating Parties shall have the additional right to notify the purchaser or purchasers of the Operator's Hydrocarbon production and collect such Costs and other expenses out of the proceeds from the sale of the Operator's share of Hydrocarbon production until the amount owed has been paid.  The Non-Operating Parties shall have the right to offset the amount owed against the proceeds from the sale of the Operator's share of Hydrocarbon production.  Any purchaser of such production shall be entitled to rely on the Non-Operating Parties' statement concerning the amount of Costs and other expenses owed by the Operator and payment made to the Non-Operating Parties by any purchaser shall be binding and conclusive as between such purchaser and the Operator.

The maximum amount for which the mortgage herein granted by the Operator shall be deemed to secure the obligations and indebtedness of the Operator to all Non-Operating Parties as stipulated herein is hereby fixed in an amount equal to $500,000,000.00 in the aggregate amount outstanding at any time or from time to time (the "Limit of the Mortgage of the Operator").  Except as provided in the previous sentence (and then only to the extent such limitations are required by law), the entire amount of obligations and indebtedness of the Operator to the Non-Operating Parties is secured hereby without limitation.  Notwithstanding the foregoing Limit of the Mortgage of the Operator, the liability of the Operator under this Agreement and the mortgage and security interest granted hereby shall

be limited to (and the Non-Operating Parties shall not be entitled to enforce the same against the Operator for, an amount exceeding) the actual obligations and indebtedness (including all interest charges, costs, attorneys' fees, and other charges provided for in this Agreement or in the Memorandum of Operating Agreement and Financing Statement (Louisiana), as such term is defined in Section 6.3.b.(v) hereof) outstanding and unpaid and that are attributable to or charged against the interest of the Operator pursuant to this Agreement.

(iv) Security Interest in Favor of the Non-Operating Parties.  To secure the complete and timely performance of and payment by the Operator of all obligations and indebtedness of every kind and nature, whether now owed by the Operator or hereafter arising, pursuant to this Agreement, the Operator hereby grants to each Non-Operating Party a continuing security interest in and to all of its rights, titles, interests, claims, general intangibles, proceeds, and products thereof, whether now existing or hereafter acquired, in and to (a) all oil and gas and as-extracted collateral produced from the lands or offshore blocks covered by the Leases or included within the Unit Area or attributable to the Leases or the Unit Area when produced, (b) all accounts receivable and as-extracted collateral accruing or arising as a result of the sale of such oil and gas (including, without limitation, accounts arising from gas imbalances or from the sale of oil and gas at the wellhead), (c) all cash or other proceeds from the sale of such oil and gas once produced and as-extracted collateral, and (d) all Development Systems, wells, facilities, fixtures, other corporeal property whether movable or immovable, whether now or hereafter placed on the offshore blocks covered by the Leases or the Unit Area or maintained or used in connection with the ownership, use or exploitation of the Leases or the Unit Area, and other surface and sub-surface equipment of any kind or character located on or attributable to the Leases or the Unit Area and the cash or other proceeds realized from the sale, transfer, disposition or conversion thereof. The interest of the Operator in and to the oil and gas produced from or attributable to the Leases when extracted and the accounts receivable accruing or arising as the result of the sale thereof shall be financed at the wellhead of the well or wells located on the Leases or the Unit Area. To the extent susceptible under applicable law, the security interest granted by the Operator hereunder covers: (A) all substitutions, replacements, and accessions to the property of the Operator described herein and is intended to cover all of the rights, titles and interests of the Operator in all movable property now or hereafter located upon or used in connection with the Unit Area, whether corporeal or incorporeal; (B) all rights under any gas balancing agreement, farmout rights, option farmout rights, acreage and cash contributions, and conversion rights of the Operator in connection with the Leases or the Unit Area, the oil and gas produced from or attributable to the Leases or the Unit Area, whether now owned and existing or hereafter acquired or arising, including, without limitation, all interests of the Operator in any partnership, tax partnership, limited partnership, association, joint venture, or other entity or enterprise that holds, owns, or controls any interest in the Unit Area; and (C) all rights, claims, general intangibles, and proceeds, whether now existing or hereafter acquired, of the Operator in and to the contracts, agreements, permits, licenses, rights-of-way, and similar rights and privileges that relate to or are appurtenant to the Leases or the Unit Area, including the following:

(1) all of its rights, titles, and interests, whether now owned and existing or hereafter acquired or arising, in, to, and under or derived from any present or future operating, farmout, bidding, pooling, unitization, and communitization agreements, assignments, and subleases, whether or not described in Exhibit "A," to the extent, and only to the extent, that such agreements, assignments, and subleases cover or include any of its rights, titles, and interests, whether now owned and existing or hereafter acquired or arising, in and to all or any portion of the Leases or the Unit Area, and all units created by any such pooling, unitization, and communitization agreements and all units formed under orders, regulations, rules, or other official acts of any governmental authority having jurisdiction, to the extent and only to the extent that such units cover or include all or any portion of the Leases or the Unit Area;

(2) all of its rights, titles, and interests, whether now owned and existing or hereafter acquired or arising, in, to, and under or derived from all presently existing and future advance payment agreements, and oil, casinghead gas, and gas sales, exchange, and processing contracts and agreements, including, without limitation, those contracts and agreements that are described on Exhibit "A," to the extent, and only to the extent, those contracts and agreements cover or include all or any portion of the Leases or the Unit Area; and

(3) all of its rights, titles, and interests, whether now owned and existing or hereafter acquired or arising, in, to, and under or derived from all existing and future permits, licenses, rights-of-way, and similar rights and privileges that relate to or are appurtenant to any of the Leases or the Unit Area

b. <u>Default.</u> If any Party does not pay its share of the charges authorized under this Agreement when due, the Operator may give the defaulting Party notice that unless payment is made within thirty (30) days from delivery of the notice, the non-paying Party shall be in default. A Party in default shall have no further access to the rig, Production System, Facilities, any Confidential Data or other maps, records, data, interpretations, or other information obtained in connection with activities or operations hereunder or be allowed to participate in meetings. A Party in default shall not be entitled to Vote or to make an Election until such time as the defaulting Party is no longer in default. The voting interest of each non-defaulting Party shall be counted in the proportion its Working Interest bears to the total non-defaulting Working Interests. As to any operation approved during the time a Party is in default, such defaulting Party shall be deemed to be a Non-Participating Party, except where such approval is binding on all Parties or Participating Parties, as applicable. In the event a Party believes that such statement of charges is incorrect, the Party shall nevertheless pay the amounts due as provided herein, and the Operator shall attempt to resolve the issue as soon as practicable, but said attempt shall be made no later than sixty (60) days after receiving notice from the Party of such disputed charges.

c. <u>Unpaid Charges.</u> If any Participating Party fails to pay its share of the Costs and other expenses authorized under this Agreement within thirty (30) days after receipt of an invoice therefor or to otherwise perform any of its obligations under this Agreement when due, the Party to whom such payment is due, in order to take advantage of the provisions of this Section 6.3, shall notify the other Party by certified or registered U.S. Mail that it is in default and has thirty (30) days from the receipt of such notice to pay. If such payment is not made timely by the non-paying Party after the issuance of such notice to pay, the Party requesting such payment may take immediate steps to diligently pursue collection of the unpaid Costs and other expenses owed by such Participating Party, to collect consequential damages as a result of the default, and to exercise the mortgage and security rights granted by this Agreement. The bringing of a suit and the obtaining of a judgment by any Party for the secured indebtedness shall not be deemed an election of remedies or otherwise affect the security rights granted herein. In addition to any other remedy afforded by law, each Party shall have, and is hereby given and vested with, the power and authority to foreclose the lien, mortgage, pledge, and security interest established hereby in its favor in the manner provided by law, to exercise the Power of Sale provided for herein, if applicable, and to exercise all rights of a secured party under the Uniform Commercial Code as adopted by the state in which the Unit Area is located or such other states as such Party may deem appropriate. The Operator shall keep an accurate account of amounts owed by the nonperforming Party (plus interest and collection costs) and any amounts collected with respect to amounts owed by the nonperforming Party. In the event there become three or more Parties to this Agreement, then if any nonperforming Party's share of Costs remains delinquent for a period of sixty (60) days, each other Participating Party shall, upon the Operator's request, pay the unpaid amount of Costs in the proportion that its Working Interest bears to the total non-defaulting Working Interests. Each Participating Party paying its share of the unpaid amounts of a nonperforming Party shall be subrogated to the Operator's mortgage and security rights to the extent of the payment made by such Participating Party.

d.  <u>Carved-out Interests.</u>  Any agreements creating any overriding royalty, production payment, net proceeds interest, net profits interest, carried interest or any other interest carved out of a Working Interest in the Leases or the Unit Area shall specifically make such interests inferior to the rights of the Parties to this Agreement. If any Party whose Working Interest is so encumbered does not pay its share of Costs and other expenses authorized under this Agreement, and the proceeds from the sale of its Hydrocarbon production pursuant to this Section are insufficient to pay such Costs and expenses, the security rights provided for in this Section may be applied against the carved-out interests with which the defaulting or non-performing Party's interest in the Leases or the Unit Area is burdened. In such event, the rights of the owner of such carved-out interest shall be subordinated to the security rights granted by this Section.

e.  Each Party represents and warrants that it has the financial capacity and sources of funds available to meet its obligations under this Agreement and to pay its share of the Costs and other expenses authorized under this Agreement in a timely manner.

### *END OF EXHIBIT "F"*

# EXHIBIT "G"

**Attached to and made a part of that certain Unit Operating Agreement Effective  April 1, 2018 (the "Katmai UOA") by and between Fieldwood Energy LLC Ridgewood Katmai, LLC and ILX Prospect Katmai, LLC**

**PROJECT TEAM EXHIBIT**
**(with Technology Sharing Provisions)**

**SECTION 1**
**DEFINITIONS**

1.1   Background Technology and Information
Any Participating Party's proprietary geophysical, geochemical, drilling, engineering, or other similar technical information or technology, along with information, reports, studies, analyses, models, or similar data and documents incorporating such information, that is (a) developed, acquired, owned, or controlled by an individual Participating Party as a result of activities outside the scope of both this Exhibit and the Unit Operating Agreement, or (b) developed, acquired, owned, or controlled by an individual Participating Party as result of activities that are within the scope of either this Exhibit or the Unit Operating Agreement, but where such activities were conducted as a Non-Consent Operation, and (c) identified and declared as Background Technology and Information prior to its submission to the Project Team pursuant to the terms of this Exhibit.

1.2   Confidential Information
All Project Technology and Information and Background Technology and Information.  Confidential Information does not include "Confidential Data", as that term is defined in the Unit Operating Agreement. To the extent that "Confidential Data" is submitted by a Participating Party for use by the Project Team, such "Confidential Data" continues to be governed solely by the terms of the Unit Operating Agreement.

1.3   Project Manager
The Operator's designated representative who will direct, supervise, and oversee the work of the Project Team.

1.4   Project Technology and Information
All engineering or other similar technical data, along with all information, reports, studies, analyses, models, or similar data and documents incorporating such data, that (a) are acquired or developed by the Project Team, or provided to the Project Team by one or more of the Participating Parties and (b) are charged to the Joint Account.

1.5   Unit Operating Agreement
That certain Unit Operating Agreement effective  April 1, 2018, by and between Fieldwood Energy, LLC., Ridgewood Katmai, LLC and ILX Prospect Katmai, LLC covering the Unit Area.

1.6   Other Terms
Except as defined in this Exhibit, capitalized terms used herein have the same meaning as defined in the Unit Operating Agreement.

**SECTION 2**
**INTEGRATED PROJECT TEAM FORMATION AND ADMINISTRATION**

2.1   Formation and Staffing of the Project Team

A Project Team shall be proposed pursuant to the terms of Article 12 of the Unit Operating Agreement.  The Project Team will be composed of representatives nominated by each Participating Party.  The individuals

nominated for participation by the Participating Parties must have experience commensurate with the needs and objectives of the Project Team as described in the Project Team AFE and scope of work prepared in accordance with Section 3.1 of this Exhibit.

The Project Manager shall staff the Project Team from the pool of nominated representatives designated by each Participating Party; provided, however, if the Project Manager has not staffed a position from the pool of representatives, the Project Manager may request additional representatives be nominated for consideration.

These nominated representatives must be employees or contractors (as used in this Exhibit, "contractors" includes "consultants") of either the Participating Party or its Affiliates. The Project Manager must approve actual participation of any individual nominated by a Participating Party for participation on the Project Team, but such approval shall not be unreasonably withheld. In selecting team members, the Project Manager will give Participating Party or Affiliate employees preference over contractors, and contractors may not displace qualified employees as a team member. Contractors may not be placed in supervisory positions on a Project Team unless there are no employee team members available for such supervisory positions. Each Participating Party has the right, but not the obligation, to have percentage representation on the Project Team up to its respective Participating Interest Share of the total number of personnel to be assigned to the Project Team. In the event any Participating Party nominates less than its full Participating Interest Share of Project Team members or later withdraws some or all of its members, the number of Project Team members that the other Participating Parties are entitled to have on the Project Team will be increased proportionately.

The Project Team may utilize the resources of the Participating Parties, their Affiliates, and contractors to carry out the work of the Project Team.

Subject to Article 12.2 of the Unit Operating Agreement, the Project Manager will determine the make-up and size of the Project Team and the qualifications of its members and must notify the Participating Parties of the initial positions that may be available on the Project Team within sixty (60) days of the formation of the Project Team. The size of the Project Team may be no larger than is reasonably necessary to accomplish the Project Team's tasks. If the Project Manager decides that a Project Team member should be replaced, the Participating Party whose representative is to be replaced must make arrangements to effect a reassignment of the member in question. That Participating Party is then entitled to nominate another person to fill the vacant position on the Project Team.

2.2    <u>Status of Project Team Participants</u>

Each employee Project Team member (i.e., a Project Team member who is an employee of a Participating Party or its Affiliate) remains an employee of its respective company, and each company remains responsible for their employee's salaries and benefits, as well as maintaining worker's compensation insurance on their employees. Accordingly, each employer company will continue to administer the compensation, benefits, allowances, and careers of its employees on the Project Team. However, employee Project Team members will receive team assignments and general supervision from the Project Manager in connection with their day to day work. An individual selected to the Project Team will, insofar as possible, and consistent with the needs of the individual's employer, serve on the Project Team for the duration of the Project Team, unless such individual is designated a temporary Project Team member by his or her employer or the Project Manager. Notwithstanding the above, if a Project Team member is designated a temporary Project Team member by his or her employer or the Project Manager, such Project Team member will leave the Project Team upon completion of the specific task or phase of the Project Team's work to which such member was assigned by the Project Manager.

In the event a contractor of a Participating Party or its Affiliate is an Project Team member, such Participating Party or Affiliate will remain responsible for and will administer such contractor's compensation, unless agreed otherwise by the Project Manager. The Project Manager will administer the compensation of contractors whose services are secured directly by the Project Team.

2.3    <u>Project Manager</u>

The Project Team will operate under the direction of the Project Manager, who will be selected by the Operator. The Operator is responsible for ensuring that the Project Manager acts in accordance with this Exhibit and the Unit Operating Agreement.

The Project Manager is responsible for:

a.  the overall management and supervision of the Project Team work;

b.  making team assignments;

c.  determining the time and place for Project Team meetings and the location or locations where Project Team activities and work will be conducted;

d.  selecting team members from the nominations provided by the Participating Parties;

e.  determining the need for and selecting contractors to perform Integrated Project Team activities

f.  acquiring supplies and services needed by the Project Team

g.  instituting procedures for maintaining Confidential Information; and

h.  making presentations on the work of the Project Team and associated documentation at meetings conducted under the Unit Operating Agreement.

2.4  Withdrawal From Project Team

Any Participating Party may withdraw one or more of its representatives from the Project Team at any time; however, such a withdrawal will not cause the Project Team to terminate or otherwise affect the obligations of such withdrawing Participating Party to pay its share of the costs and expenses associated with the approved Project Team AFE and any approved supplemental AFE's thereto. Likewise, the withdrawal of one or more representatives by a Participating Party will not affect the other rights and obligations of such Participating Party under this Exhibit. In the event a Participating Party withdraws one or more representatives from a Project Team, then the Participating Parties must follow the provisions of Sub Section 2.1 for the selection of substitute Project Team members.

If all but one of the Participating Parties withdraw all their employees or contractors from participation in the Project Team, then at its sole option, the remaining Participating Party may either (1) allow the Project Team to continue to work under the approved Project Team AFE, and any approved supplemental AFE's thereto, with all Participating Parties remaining liable for and paying their share of Project Team costs under such AFE's or (2) terminate the Project Team. Upon such termination of the Project Team under (2) above; any further work on the Development System will be conducted pursuant to the terms of the Unit Operating Agreement. Any expenditure under an approved Project Team AFE, and any approved supplemental AFE's thereto, which have not been accounted for at the time the Project Team terminates will continue to be accounted for under the Project Team provisions of Exhibit "C" (Accounting Procedure).

**SECTION 3.0**
**WORK SCOPE AND DURATION OF INTEGRATED PROJECT TEAM**

3.1  Work Scope of the Project Team

The primary objective for forming any Project Team is to pool the talents of the Parties in preparing the Development Plan and provide each Participating Party the opportunity to have input regarding the planning, design, engineering, fabrication, transportation and installation of any Development System. The proposal of the Development Plan (including the Initial Production System) and commitment of funds thereto shall be handled in accordance with Article 12 of the Unit Operating Agreement. For any project undertaken by the Project Team, the Operator shall provide: (1) a memo describing the anticipated scope of the team's work to be undertaken in reasonable detail such that the Non-Operator may make an informed decision concerning

its participation in the Project Team; (2) a memo describing the type and number of staff required to complete the assignment, and (3) an AFE itemizing the Operator's estimate of the Cost of the Project Team, (4) the proposed locations where the Project Team representatives will serve, and (5) the estimated duration of the Project Team.

3.2     Reports by the Project Team
The Project Team shall review the progress of its work with all Participating Parties at least quarterly, and present the results of any studies or planning upon their conclusion. The time and place of the meetings of the Project Team and location for conducting Project Team activities shall be determined by the Project Manager.

3.3     Duration of the Project Team
The Project Team shall remain in place until (1) the team has completed the work described in the Project Team AFE and scoping memo, or (2) the planning, design, construction, installation and start-up phase of any Development System has been completed, or (3) Project Team work has been terminated by approval of the Participating Parties as a General Matter, whichever is the earlier event. Upon dissolution of the Project Team, the Operator shall conduct any further work required for the installation of the Development System. Any AFE in progress at the time of the Project Team's dissolution shall continue to be accounted for under the Project Team provisions of Exhibit "C", except as otherwise agreed.

3.4     Re-instatement of Project Team
The Project Team created for planning and designing the Initial Production System may be reinstated by the Operator to assist in further work on the Initial Production System or planning and designing any Subsequent Production System. Any reinstated Project Team shall utilize the procedures of this Exhibit, with any applicable time periods in Article 12 of the Unit Operating Agreement running from the date of reinstatement of the Project Team.

**SECTION 4.0**
**COSTS AND ADMINISTATRATION OF THE INTEGRATED PROJECT TEAM**

4.1     Integrated Project Team Costs
The costs and expenses for the Project Team shall be charged to the Joint Account pursuant to Exhibit "C", (Accounting Procedures) of the Unit Operating Agreement. Each Participating Party in the Project Team shall be responsible for its Participating Interest Share of the Project Team expenses, regardless of its level of employee or contractor participation on the Project Team.

4.1.1   **Employee Charges:**  Each Participating Party in a Project Team shall recover the Costs of employees and independent contractors, including expatriates, assigned to or working under the direction of the Project Team through direct charges to the Joint Account under Exhibit "C" (Accounting Procedure) of the Unit Operating Agreement.

4.1.2   **Contractors and Consultants:**  The Project Manager may retain the services of such consultants and contractors as is reasonably necessary to carry out the studies and tasks assigned to the Project Team. Costs of consultants and contractors assigned to the Project Team shall be recovered by Operator through direct charges to the Joint Account under Exhibit "C" (Accounting Procedure) of the Unit Operating Agreement. So long as the Costs of the consultant or contractor are within the scope of an approved AFE, the Project Manager's retention of consultants shall not require additional approval by the Participating Parties.

**SECTION 5**
**CONFIDENTIALITY**

5.1 **Obligation of Confidentiality and Restrictions on Use**

Each Participating Party must maintain as confidential all Confidential Information and not disclose to any third party or use such Confidential Information, except as expressly provided hereunder, for a confidentiality period commencing on the date of execution of the Unit Operating Agreement and extending through the earlier of (a) two (2) years following the termination of the Project team work in accordance with the terms of the Unit Operating Agreement or (b) one (1) year following the date the Unit Operating Agreement expires by its terms. After expiration of the confidentiality period, the disclosing Participating Party's obligations of confidentiality and restrictions on use regarding the Confidential Information with be determined in accordance with Sub-Sections 6.4, 6.5 and 6.6. Each Participating Party must treat the disclosure of the Confidential Information in the same manner as it treats its own similar data and information.

5.2 **Exceptions**

Any Participating Party may disclose Confidential Information to third parties if such disclosure is either subject to an exception to the confidentiality obligation or ceases to be confidential in nature as listed below:

a.      The provisions of Sub-Section 5.1 do not apply to Confidential Information that:

1.      was in the public knowledge or literature at the time of development or receipt hereunder, or

2.      was already in the receiving Participating Party's (or its Affiliate's) possession without obligation of confidentiality, at the time of development or receipt by the receiving Participating Party.

b.      The provisions of Sub-Section 5.1 cease to apply to Confidential Information that:

1.      becomes part of the public knowledge subsequent to its development or receipt hereunder and without fault of the receiving Participating Party;

2.      is disclosed to the receiving Participating Party without obligation of confidentiality by a third party having legal right to do so;

3.      is independently developed by or for the receiving Participating Party; or

4.      is required to be disclosed pursuant to applicable law or order of a court of competent jurisdiction, provided the disclosing Participating Party gives the other Participating Parties notice of such disclosure prior to such disclosure.

**SECTION 6**
**CONFIDENTIAL INFORMATION**

6.1 **Right to Receive Project Technology and Information**

Each Participating Party has the right to receive all Project Technology and Information, whether such information is developed by a Participating Party, an Affiliate, or by a third party.

6.2 **Right to Use Confidential Information**

Subject to the obligation of confidentiality of Section 5 and the obligation of Sub-Sections 6.5 and 6.6, and subject to the patent rights of the Participating Parties, each Participating Party may use all Confidential Information, without otherwise accounting to any other Participating Party, including, subject to Sub-Section 6.3.d., use by or for a joint venture or production sharing arrangement in which a Participating Party has an ownership interest.

6.3 **Right to Disclose**

Subject to the foregoing, each Participating Party may disclose Confidential Information during the period of confidentiality set forth in Sub-Section 5.1 upon the following conditions:

a.  Each Participating Party may disclose and extend the rights to use Confidential Information to each of its Affiliates who accepts and agrees in writing to obligations of confidentiality and restrictions on use at least as restrictive as those set forth in this Exhibit. The rights to use and disclose provided herein are subject to whatever patents may apply.

b.  Each Participating Party and its Affiliates may disclose Confidential Information to contractors who agree in writing to hold such Confidential Information in confidence, in terms at least as restrictive as those set forth herein, and to use it only for the benefit of a Participating Party or its Affiliates.

c.  Each Participating Party and its Affiliates may disclose Confidential Information to governmental agencies and insurance companies as such Participating Parties or its Affiliates deem necessary, either in confidence or not in confidence if the Participating Party or its Affiliates has made a reasonable but unsuccessful attempt to obtain a confidentiality agreement.

d.  Each Participating Party and its Affiliates may disclose Confidential Information to other members of joint ventures or production sharing arrangements, outside the Unit Area, in which the Participating Party or its Affiliates has an ownership interest, provided the other members agree in writing to hold the Confidential Information in confidence, in terms at least as restrictive as those set forth herein, and to use it only for the benefit of that joint venture or production sharing arrangement.

e.  Each Participating Party may disclose Confidential Information that is specifically related to the Unit Area to any potential purchaser of all or any portion of such Participating Party's interest therein, provided that such potential purchaser agrees in writing to hold the Confidential Information in confidence, in terms at least as restrictive as those set forth herein, and to use it only for the purposes for which it was disclosed.

f.  Each Participating Party may use Confidential Information as reasonably necessary or appropriate to file patent applications pursuant to Section 7 below. Prompt notice will be provided to the other Participating Parties of any such filing.

g.  With unanimous approval, the Participating Parties may authorize the early publication, or release from confidentiality, of any Project Technology and Information covered by this Agreement.

6.4  Rights under Copyright and Following Expiration of Confidentiality

Following the expiration of the period of confidentiality set forth in Sub-Section 5.1 above, each Participating Party may freely use and disclose the Confidential Information identified in Sub-Section 6.2 without accounting to any other Participating Party, subject only to whatever patent rights may apply to the technology and, where applicable, to the obligations of Sub-Sections 6.5 and 6.6. Subject to the obligations of confidentiality set forth in this Exhibit, each Participating Party has the right to copy, display, publish, distribute and prepare derivative works of all documents, drawings or other writings or materials created or conveyed under this Exhibit, including the rights to license, sell or otherwise transfer such rights.

6.5  Notice of Third Party Limitations

6.5.1  Notwithstanding the provisions of Sub-Sections 6.2, 6.3 and 6.4 the Participating Parties acknowledge that Background Technology and Information may have been received from third parties under pre-existing restrictions, e.g., that the Participating Party may disclose the third party source technology or information to a co-venturer in a joint venture only under obligations of confidentiality and under the restriction that the co-venturer use the information only in connection with the joint venture. Each Participating Party must identify, in writing, any such restrictions in effect and secure the receiving Participating Party's acknowledgment prior to transmittal of such third party source technology or information. The receiving Participating Party's acknowledgement constitutes its acceptance of such obligations and restriction.

6.5.2  The Project Manager and each Participating Party soliciting work from contractors or from Affiliates

must use its best efforts to secure contract terms with such contractor or Affiliate that contain applicable confidentiality terms and that support the rights of the Participating Parties consistent with the provisions of this Exhibit. Unless otherwise agreed to in writing by all Participating Parties, any contract with a contractor or an Affiliate for the acquisition or development of Project Technology and Information must, with respect to the use, disclosure and intellectual property rights as to such Project Technology and Information, grant the same rights to and impose the same obligations on each Participating Party. Furthermore, if the use, disclosure, and intellectual property rights provisions of any contract related to the acquisition or development of Project Technology and Information are inconsistent with the use, disclosure, and intellectual property rights provisions of this Exhibit, those provisions must be submitted to each Participating Party in substantially final form for review and comment not less than thirty (30) days prior to contract execution.

6.6    Software

During the duration of the Project Team, a Participating Party or its Affiliate may authorize the other Participating Parties to use computer software proprietary to the authorizing Participating Party. Such proprietary software is not Project Technology and Information. Any authorization to use such proprietary software is not a license of any rights as to the proprietary software, which rights are retained by the authorizing Participating Party. Use of any such proprietary software is only for the purposes and duration of the Project Team; each Participating Party must destroy or return to the authorizing Participating Party all copies of any such proprietary software no later than the completion date of the Project Team's activities. Computer software and programs that are not proprietary to one of the Participating Parties or its Affiliate, but that are developed jointly by the Project Team, are Project Technology and Information.

6.7    Identification, Declaration, and Use of Background Technology and Information

Background Technology and Information must be identified and declared in writing before it is submitted to the Project Team. The decision to identify, declare, and submit Background Technology and Information to the Project Team is at the sole and absolute discretion of the individual Participating Party possessing such technology or Information. A Participating Party designating data as Background Technology and Information is not subject to the confidentiality obligation of this Exhibit or the Unit Operating Agreement as to the identified Background Technology and Information. The Project Manager is responsible for maintaining a list describing all Background Technology and Information (and its ownership). This list will be updated from time to time as the Participating Parties submit such Background Technology and Information.

Nothing in the Unit Operating Agreement or this Exhibit impairs the right of any owner of Background Technology and Information to use, exchange, disclose, or otherwise freely deal with its own Background Technology and Information.

## SECTION 7
## PATENTS AND PROJECT TEAM INVENTIONS

7.1    Patent Assignment with Right to License and Sub-License

All inventions, whether patentable or not, that (1) are conceived by contractors of the Project Team, or conceived jointly by the Participating Parties (each including its respective Affiliates) while working on the Project Team and (2) result from work that has been charged to the Joint Account, are assigned to the Operator, who may seek patent(s) on same. The Operator hereby grants to each other Participating Party an irrevocable, non-exclusive, worldwide, royalty-free license to all such inventions and patents. Such license includes the right to make, have made, use, have used, and sell apparatus, and to use and have used methods, covered by such inventions and patents, and includes the right to grant sublicenses to such inventions and patents to any third party or Affiliate on such other terms and conditions that such Party deems appropriate, without accounting to any other Party.

7.2    Patent Assignment and License with Limited Right to Sub-License

Patents on inventions not covered in Sub-Section 7.1 that (1) are conceived or first reduced to practice (actual or constructive) by a Participating Party or its Affiliate, including contractors of a Participating Party or its Affiliate, and (2) result from work that has been charged to the Joint Account, will be owned by that Participating Party. The Participating Party owning any such patent hereby grants to each other Participating

Party an irrevocable, non-exclusive, worldwide, royalty-free license, under all such patents and inventions, to make, have made, use, have used, and sell apparatus, and to use and have used methods, for such other Participating Party's own business, including any joint venture or production sharing arrangement in which such other Participating Party has the right to extend these rights to its Affiliates, and to any joint venture or production sharing arrangement in which any such Affiliates have an ownership interest, but may not otherwise sub-license any such patent.

7.3   <u>No Other Commitment to License or Disclose</u>
Except as expressly set forth above, nothing in this Exhibit will be deemed to require any Participating Party or Affiliate to grant any licenses under any patents to anyone.

7.4   <u>Patent Immunity</u>
Each Participating Party hereby grants each other Participating Party an immunity from infringement of any patent of such Participating Party provided to the other Participating Party in connection with any and all activities conducted under the Unit Operating Agreement, including preparation of Development Plans for the Unit Area and planning, designing, engineering, fabrication, transportation, installation, and subsequent operation of any Development System for the Unit Area. This immunity applies only to those patents of a Participating Party where such Participating Party has a right to grant such immunity without accounting to any third party.

**SECTION 8**
**DISCLAIMER OR WARRANTIES; RELEASE; INDEMNITIES**

8.1   **DISCLAIMER OF WARRANTIES**
**ALL INFORMATION OR TECHNOLOGY RECEIVED BY THE PARTICIPATING PARTIES HEREUNDER IS PROVIDED ON AN "AS IS" BASIS WITHOUT ANY WARRANTIES EITHER EXPRESS OR IMPLIED AS TO THE ACCURACY, VALIDITY OR UTILITY OF SUCH INFORMATION OR THAT IT CAN BE USED WITHOUT INFRINGING ANY THIRD PARTY PATENT, COPYRIGHT OR OTHER PROPRIETARY RIGHT. WITHOUT LIMITING THE PRECEDING, ANY IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE ARE EXPRESSLY DISCLAIMED AND EXCLUDED FROM THIS AGREEMENT. IN NO EVENT IS A PARTICIPATING PARTY CONVEYING INFORMATION OR TECHNOLOGY LIABLE FOR ANY INCIDENTAL, CONSEQUENTIAL OR OTHER DAMAGES ARISING OUT OF OR RESULTING FROM THE USE OF THE INFORMATION OR TECHNOLOGY CONVEYED UNDER THIS EXHIBIT.**

8.2   **RELEASES**
**EACH PARTICIPATING PARTY RELEASES THE OTHER PARTICIPATING PARTIES FROM ANY LOSS, DAMAGE, CLAIM, SUIT, LIABILITY, JUDGMENT, AND EXPENSE THAT IT MAY INCUR RELATED TO OR IN CONNECTION WITH ITS USE (INCLUDING USE BY OTHERS WHICH IT AUTHORIZES) OUTSIDE OF THE UNIT AREA OF ANY INFORMATION OR TECHNOLOGY EXCHANGED UNDER OR DEVELOPED PURSUANT TO THIS EXHIBIT.**

8.3   **INDEMNITIES**
**EACH PARTICIPATING PARTY WILL DEFEND, HOLD HARMLESS, AND INDEMNIFY THE OTHER PARTICIPATING PARTIES FROM AND AGAINST ANY LOSS, DAMAGE, CLAIM, SUIT, LIABILITY, JUDGEMENT, AND EXPENSE INCLUDING ATTORNEYS FEES AND OTHER COSTS OF LITIGATION) RELATED TO OR IN CONNECTION WITH ITS USE (INCLUDING USE BY OTHERS WHICH IT AUTHORIZES) OUTSIDE OF THE UNIT AREA OF ANY INFORMATION OR TECHNOLOGY EXCHANGED UNDER OR DEVELOPED PURSUANT TO THIS EXHIBIT.**

**SECTION 9**
**MISCELLANEOUS**

9.1   Export Controls

Each Participating Party must abide by the United States Department of Commerce regulations concerning the export or re-export of United States source technical data, or the direct product thereof, to unauthorized destinations and regulations in respect of information supplied by or on behalf of any other Participating Party hereunder.

9.2   Independent Research

Nothing herein in any way restricts or impairs the right of any Participating Party to conduct its own independent research, development or design activities even though such activities may parallel or overlap the activities provided for herein. A Participating Party conducting such independent activities has no obligation arising therefrom with respect to the use or disposition of the results thereof, including but not limited to all information and data resulting therefrom.

9.3   Assignability

A third party (not currently a Party to this Agreement) who acquires a Working Interest in the Unit Area may join the Project Team upon the approval of the Participating Parties as a General Matter.  A new Party joining the Project Team must agree, in writing, to undertake all obligations set forth for a Party under this Exhibit. Such new party will have all rights, duties and obligations under this Exhibit regarding the use of all Confidential Information exchanged or developed prior to the date it joins the Project Team and during its participation thereunder. However, patent rights received by such new Party hereunder pursuant to Section 7.0 of this Exhibit shall be limited to patents based on developments after the date such Party joins the Project Team. In the event that a Party assigns its entire interest in the Leases, the assigning Party shall have all the rights specified in this Exhibit, including patent rights and license rights thereunder, based on developments and exchanges prior to the effective date of such assignment and shall continue to have all obligations and duties with respect thereto as set forth in this Exhibit relating to the confidentiality, restrictions on use, patents, indemnity, and as applicable, duties to license the other Parties.

9.4   Confidential Information to a Non-Participating Party

Any Party that elected not to participate in a Project Team, but that receives, upon the satisfaction of the applicable non-consent provisions of Article 16.5.3 of the Unit Operating Agreement, Confidential Information resulting from that Project Team, is subject to all obligations and duties, and has all the rights, set forth in this Exhibit with respect to confidentiality, restrictions on use, patents, licensing and sub-licensing, indemnity, and export controls.

9.5   Section and Sub-Section References

All references in this Exhibit to a "Section" or "Sub-Section", either in the singular or plural, mean a "Section" or "Sub-Section" of this Exhibit.

9.6   Survival of Certain Provisions

All provisions of this Exhibit related to the confidentiality and use of information, patents, licensing and sub-licensing, export controls, and indemnity will survive the termination of this Exhibit or the Unit Operating Agreement or both.

9.7   Development System Proposals

The proposal of any Development System and commitment of funds thereto will be handled in accordance with the provisions of the Unit Operating Agreement. The final decision on the selection of any Development System to be designed, fabricated and installed, and the election to participate in funding of that Development System, will be made in accordance with the terms and conditions of the Unit Operating Agreement.

*END OF EXHIBIT "G"*

# EXHIBIT "H"

**Attached to and made a part of that certain Unit Operating Agreement Effective  April 1, 2018 (the "Katmai UOA") by and between Fieldwood Energy LLC, Ridgewood Katmai, LLC and ILX Prospect Katmai, LLC**

## DISPUTE RESOLUTION PROCEDURE

Any dispute arising out of or relating to this Agreement (whether in tort, contract, under statute or otherwise), between or among any of the contracting parties, including any question regarding the existence, validity, interpretation, breach, performance or termination of this Agreement ("Dispute") shall be resolved in accordance with the procedures specified in this Exhibit "H", which shall be the sole and exclusive procedures for the resolution of any such Dispute.

**(A) Negotiation**
Upon written notice of any Dispute ("Notice"), the parties shall attempt to resolve any Dispute promptly by negotiation between executives who have authority to settle the Dispute and who are at a higher level of management than the persons with direct responsibility for administration or performance of this Agreement.

**(B) Arbitration**
All Disputes not resolved through negotiation in accordance with paragraph (A) shall be finally resolved by arbitration administered by the American Arbitration Association in accordance with its Commercial Arbitration Rules before a panel of three arbitrators.  The place of the arbitration shall be Houston, Texas.

**Appointment of the arbitrators.**
*Two-party arbitration*:  In the event that no more than a single claimant and a single respondent are named in the request for arbitration, the claimant shall nominate one arbitrator and the respondent shall nominate another arbitrator. If either side fails to nominate an arbitrator within 30 days of receipt of the request for arbitration, then that arbitrator shall be appointed by the AAA in accordance with its Rules. The first two arbitrators nominated in accordance with this provision shall nominate a third arbitrator within 30 days after the appointment of the later-nominated of those two arbitrators. If the first two arbitrators fail to nominate a third arbitrator within the time period prescribed above or if the nominated third arbitrator fails within 10 days after the time period prescribed above to accept his or her nomination, then the third arbitrator shall be appointed by the AAA in accordance with its Rules. The third arbitrator shall act as chairman of the tribunal.

*Multi-party arbitration*:  In the event that more than two parties are named in the request for arbitration, the multiple claimants shall jointly nominate an arbitrator and the multiple respondents shall jointly nominate an arbitrator within 30 days of receipt of the request for arbitration and the two arbitrators so named shall appoint a third within 30 days of acceptance of the appointment by the later to be appointed; the third arbitrator shall act as chairman. If either or both of the claimant or respondent parties fails to make a joint nomination within the time allotted and all parties to the arbitration are unable to agree on a method for the selection of the arbitrators, and notwithstanding that one or more arbitrators may already have been nominated, the three arbitrators shall be appointed and the chairman designated by the AAA in accordance with its Rules.

**Procedure.**
The Arbitral Tribunal shall have the power to dismiss at the outset of the proceeding any claim or defense if, taking all of the pleaded allegations of the non-moving party as true, it appears to the Tribunal that there is no state of facts that would entitle the non-moving party to prevail on its claim or defense as a matter of applicable Law.

The parties shall be entitled to reasonable production of relevant, non-privileged documents that are material to the outcome of the case, carried out expeditiously. If the parties are unable to agree on production, the arbitral tribunal shall have the power, upon application of any party, to make all appropriate orders for production and for the limitation of production of documents by any party.

There shall be no discovery depositions except for good cause shown.  In the interests of efficiency and in lieu of depositions, the arbitrators may require the submission of the direct testimony of all witnesses, fact and expert, in the form of written statements in advance of the hearing, provided that the statement of any witness who fails to appear at the hearing for cross-examination shall be disregarded.

**Confidentiality.**
All aspects of the arbitration, including, without limitation, all written and oral submissions and proceedings, documentary evidence and testimony as well as interim and final awards shall be treated as confidential.

**Powers of the arbitrators.**
Except as agreed by the parties, the Arbitral Tribunal shall have no power to alter or modify any terms or provisions of this Agreement, or to render any award which, by its terms or effects, would alter or modify any term or provision of this Agreement.

The Arbitral Tribunal shall allocate the costs of the proceedings, including attorney's and expert fees and expenses, as it may deem fair and appropriate under the circumstances.  The award shall include interest from the date of any breach or violation of this Agreement, as determined by the Arbitral Tribunal, until paid in full, at the interest rate established in the award.

Any award of the Tribunal shall be made in writing, shall state the reasons for its conclusions and shall be final and binding on the parties.  The parties undertake to carry out the award without delay. Judgment may be entered on the award by any court of competent jurisdiction.

### *END OF EXHIBIT "H"*

# EXHIBIT "I"

**Attached to and made a part of that certain Unit Operating Agreement Effective April 1, 2018 (the "Katmai UOA") by and between Fieldwood Energy LLC Ridgewood Katmai, LLC and ILX Prospect Katmai, LLC**

### Well Data Trade and Confidentiality Agreement (Example Only)

This Agreement ("Agreement") is made effective _____, 2018_ (the "Effective Date") between _____ ("_____") and _____ (collectively "the _____ Parties") and _____ ("_____"), and _____ (collectively "the _____ Parties"). In this Agreement, the _____ Parties and the _____ Parties may be sometimes referred to individually as a "Party" or collectively as the "Parties."

### Recitals

The _____ Parties are the owners of the well data from the *Operator's Name*, *Protraction Area Name Block #*, OCS-G _____ No. 1 Well, identified on Exhibit "A" attached to and made a part of this Agreement (the "*Insert Prospect Name* Well Data").

The _____ Parties are the owners of the well data from the *Operator's Name*, *Protraction Area Name Block #*, OCS-G _____ No. 1, No. 1 ST and No.1 ST2 Wells, identified on Exhibit "B" attached to and made a part of this Agreement (the "*Insert Prospect Name* Well Data").

The Parties have agreed to exchange all of the *Insert Prospect Name* Well Data for all of the *Insert Prospect Name* Well Data, unless otherwise specified in this agreement.

The Parties desire, by their execution of this Agreement, to set forth the terms and provisions of the well data exchange, and further desire to set forth the Parties' confidentiality obligations in regard to the well data received by each Party.

Accordingly, in consideration of the mutual advantages and benefits accruing to the Parties, and other valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties agree as follows:

### ARTICLE 1 - Definitions

**Affiliate:**
"Affiliate," means any corporation, company, limited liability company, partnership, or other legal entity that:
- is owned or controlled by a Party, or
- is owned or controlled by any other corporation, company, limited liability company, partnership, or other legal entity that is owned or controlled by a Party, or
- owns or controls a Party, or
- is owned or controlled by a corporation, company, limited liability company, partnership, or other legal entity that owns or controls a Party.

For the purposes of this definition, ownership or control means the ownership, directly or indirectly, of fifty percent (50%) or more of the shares, voting rights, or interest in a corporation, company, limited liability company, partnership, or other legal entity.

**Confidential Information:**
"Confidential Information" means (i) as to the _____ Parties, the *Insert Prospect Name* Well Data and any copies and reproductions thereof, and (ii) as to the _____ Parties, the *Insert Prospect Name* Well Data and any copies and reproductions thereof.

**Consultant:**

"Consultant" means an individual, corporation, company, limited liability company, partnership, financial analyst/institution, auditor or other legal entity that is engaged by a Party to evaluate, interpret, reprocess or make other technical studies of the well data received by that Party under the provisions of this Agreement, but shall not include one who is primarily engaged in the business of exploring for oil, gas, or other hydrocarbons.

**Disclose or Disclosure:**

"Disclose" or "Disclosure" means to display, show, reveal, or give access to, or permit to be viewed or accessed, the Confidential Information or any part thereof.

**Transfer:**

"Transfer" means a sale, assignment, trade, loan, conveyance, exchange, encumbrance, license, or other disposition of the Confidential Information.

### ARTICLE 2 - *(Insert Prospect Name)* Well Data

**2.1**   **Grant of the *(Insert Prospect Name)* Well Data Use to the _____ Parties**

The _____ Parties grant to the _____ Parties the non-exclusive, non-transferable (except as provided herein), perpetual right to use the _____ Well Data under the terms and conditions of this Agreement.

**2.2**   ***(Insert Prospect Name)* Well Data Ownership**

The *Insert Prospect Name* Parties represent and warrant that they hold full ownership rights in and to the _____ Well Data. The _____ Well Data is proprietary to the _____ Parties and the _____ Parties maintain all trade secret and copyright interests in such data. Except as provided herein, the _____ Parties retain the exclusive right to Disclose or Transfer the _____ Well Data to other parties at any time and under whatever terms and conditions they consider acceptable, subject to the terms of the joint operating agreement between the _____ Parties.

**2.3**   **The _____ Parties' Obligation of Confidentiality and Restriction on Disclosure and Transfer**

The _____ Parties agree to treat the _____ Well Data, and any copies and reproductions thereof, as confidential, agree to use the _____ Well Data only for their internal business purposes and the internal business purposes of their Affiliates, and agree not to Disclose or Transfer the _____ Well Data, except as specifically permitted under this Agreement and shall exercise the same degree of care to safeguard the _____ Well Data as they would for their own Confidential Information of a similar nature.

**2.4**   **Exceptions to the _____ Parties' Obligation of Confidentiality and Restriction on Disclosure and Transfer**

A.   The _____ Parties, or each of them, may Disclose or Transfer the _____ Well Data to their Affiliate(s) provided that such Affiliate(s) agrees to the obligations of confidentiality and restrictions on Disclosure or Transfer set forth in this Agreement.

B.   The _____ Parties, or each of them, may Disclose the _____ Well Data, including providing copies of the _____ Well Data, to a Consultant retained by such Party ("the Disclosing *Insert Prospect Name* Party") to evaluate, reprocess, or interpret the _____ Well Data, provided that before any such Disclosure occurs, the Consultant must agree in writing that: (1) any evaluation, reprocessing or interpretation of the _____ Well Data is for the sole benefit of the Disclosing *Insert Prospect Name* Party, or its Affiliate, making the Disclosure, (2) the _____ Well Data will be maintained in accordance with Section 2.3 above and will not be Disclosed to any third party without the prior written permission of the _____ Parties, and (3) upon completion of its work, all copies of the _____ Well Data will be returned to the Disclosing _____ Party, or its Affiliate, making the Disclosure.

C.    The _____ Parties' obligation of confidentiality and restriction on Disclosure does not apply to the extent any portion of the _____ Well Data: (1) comes legally into the possession of the _____ Parties, or any of them, or the possession of an Affiliate, independent of this Agreement, or is legally divulged to the _____ Parties, or any of them, or an Affiliate, by a third party without limitation on disclosure, or (2) becomes part of the public domain through no fault or neglect of the _____ Parties, or any of them, or an Affiliate, or (3) must be disclosed to third parties under requirement of law, including, but not limited to, the regulations of the DOI.  In the event the _____ Parties are required by any rule, law or court order to disclose _____ Well Data, the _____ Parties shall immediately notify the _____ Parties and make good faith efforts to cooperate in the _____ Parties' efforts to obtain any injunctive or protective orders that the _____ Parties may unilaterally deem desirable or necessary.

**2.5**    **Responsibility for Unauthorized Disclosure or Transfer**

The _____ Parties shall be responsible for ensuring that all persons to whom it Discloses or Transfers the _____ Well Data keep such Well Data confidential and not Disclose or Transfer such Well Data to any unauthorized person, and comply with the use restrictions set forth in this Agreement. No _____ Party shall be liable for any breach of this Agreement by any other _____ Party, and the _____ Parties agree to hold all such non-breaching _____ Party harmless for any breach of this Agreement by a breaching _____ Party.

**2.6**    **Paleo.  Samples and Preparation**

The _____ Parties agree to make reasonably available to the _____ Parties raw cutting samples for all depths collected in the respective borehole(s) corresponding to the _____ Well Data.  Raw cuttings should be in quantities sufficient to conduct standard preparations for foraminifera and nannofossil analyses. In the event that the quantity of raw cuttings are insufficient to conduct standard paleo analyses, the _____ Parties are each entitled to borrow the previously prepared foraminifera wash and nannofossil slides used for the _____ Parties' paleontological analyses. After the _____ Parties have completed the biostratigraphic analyses, the _____ Parties each agree to return all previously prepared foraminifera wash and nannofossil slide materials that were borrowed.  Any unused, unprocessed raw materials provided to any of the _____ Parties will be returned after sample preparation is complete.  Materials and residues resulting from sample processing (foram wash, nanno slurries, etc.) will become the property of the _____ Parties.  All such furnished material shall be deemed to constitute a part of the _____ Well Data for all purposes.

**2.7**    **Summary Reports**

The _____ Parties agree to provide original paleontologic data in digital format, where possible, and to make reasonably available to the _____ Parties paleontological and biostratigraphic interpretations equivalent to or more detailed than what is provided to the DOI.  The interpretations provided by the _____ Parties will be in the form of a summary of foraminiferal and nannofossil species events or "tops" and paleoenvironmental interpretations.  All such furnished material shall be deemed to constitute a part of the _____ Well Data for all purposes.

**2.8**    **Conventional Core**

The _____ Parties agree to make reasonably available to the _____ Parties all conventional core data taken from all depths in the wellbore(s) which is part of the _____ Well Data.  The _____ Parties shall be allowed to look at the conventional core photographs, as well as, physically inspect the conventional core at _____ Labs.  The _____ Parties, individually, shall be allowed up to three physical inspection(s) of the conventional core within a period of one year from the date on which the last Party has executed this Agreement.  Any costs associated with viewing the conventional core shall be at the sole cost of the viewing company.  The _____ Parties shall also be allowed access to thin section samples made from conventional core and rotary cores, as well as petrographic (point count) data derived from the thin sections, and scanning electron microscopy (SEM) and X-Ray diffraction (XRD) data.

(Optional)

**2.9**    **Data Being Withheld From *Prospect Name/Prospect Name* Trade**

It is understood and agreed to between the _____ Parties and the _____ Parties that the <u>Conventional</u>

Core data and the Palynostratigraphic Analysis from the *Insert Prospect Name* Well will not be made a part of this data exchange.

## ARTICLE 3 - *(Insert Prospect Name)* Well Data

**3.1**     **Grant of the *(Insert Prospect Name)* Well Data Use to the _____ Parties**

The _____ Parties grant to the _____ Parties the non-exclusive, non-transferable (except as provided herein), perpetual right to use the _____ Well Data under the terms and conditions of this Agreement.

**3.2**     ***(Insert Prospect Name)* Well Data Ownership**

The *Insert Prospect Name* Parties represent and warrant that they hold full ownership rights in and to the _____ Well Data. The _____ Well Data is proprietary to the _____ Parties and the _____ Parties maintain all trade secret and copyright interests in such data.  Except as provided herein, the _____ Parties retain the exclusive right to Disclose or Transfer the _____ Well Data to other parties at any time and under whatever terms and conditions they consider acceptable, subject to the terms of the joint operating agreement between the _____ Parties.

**3.3**     **The _____ Parties' Obligation of Confidentiality and Restriction on Disclosure and Transfer**

The _____ Parties agree to treat the _____ Well Data, and any copies and reproductions thereof, as confidential, agree to use the _____ Well Data only for their internal business purposes and the internal business purposes of their Affiliates, and agree not to Disclose or Transfer the _____ Well Data, except as specifically permitted under this Agreement and shall exercise the same degree of care to safeguard the _____ Well Data as they would for their own Confidential Information of a similar nature.

**3.4**     **Exceptions to the _____ Parties' Obligation of Confidentiality and Restriction on Disclosure and Transfer**

A.     The _____ Parties, or each of them, may Disclose or Transfer the _____ Well Data to their Affiliate(s) provided that such Affiliate(s) agrees to the obligations of confidentiality and restrictions on Disclosure or Transfer set forth in this Agreement.

B.     The _____ Parties, or each of them, may Disclose the _____ Well Data, including providing copies of such _____ Well Data, to a Consultant retained by such Party ("the Disclosing *Insert Prospect Name* Party") to evaluate, reprocess, or interpret the _____ Well Data, provided that before any such Disclosure occurs, the Consultant must agree in writing that: (1) any evaluation, reprocessing, or interpretation of the _____ Well Data is for the sole benefit of the Disclosing _____ Party, or its Affiliate, making the Disclosure, (2) the _____ Well Data will be maintained in accordance with Section 3.3 above and will not be Disclosed to any third party without the prior written permission of the _____ Parties, and (3) upon completion of its work, all copies of the _____ Well Data will be returned to the Disclosing _____ Party, or its Affiliate, making the Disclosure.

C.     The _____ Parties' obligation of confidentiality and restriction on disclosure does not apply to the extent any portion of the _____ Well Data: (1) comes legally into the possession of the _____ Parties, or any of them, or the possession of an Affiliate, independent of this Agreement, or is legally divulged to the _____ Parties, or any of them, or an Affiliate, by a third party without limitation on disclosure, or (2) becomes part of the public domain through no fault or neglect of the _____ Parties, or any of them, or an Affiliate, or (3) must be disclosed to third parties under requirement of law, including, but not limited to, the regulations of the DOI.  In the event the _____ Parties are required by any rule, law or court order to disclose _____ Well Data, the _____ Parties shall immediately notify the _____ Parties and make good faith efforts to cooperate in the _____ Parties' efforts to obtain any injunctive or protective orders that the _____ Parties may unilaterally deem desirable or necessary.

**3.5**     **Responsibility for Unauthorized Disclosure or Transfer**

The _____ Parties shall be responsible for ensuring that all persons to whom it Discloses or Transfers

the _____ Well Data keep such Well Data confidential and not Disclose or Transfer such Well Data to any unauthorized person, and comply with the use restrictions set forth in this Agreement. No _____ Party shall be liable for any breach of this Agreement by any other _____ Party, and the _____ Parties agree to hold all such non-breaching _____ Party harmless for any breach of this Agreement by a breaching _____ Party.

**3.6** **Paleo, Samples and Preparation**

The _____ Parties agree to make reasonably available to the _____ Parties raw cutting samples for all depths collected in the respective borehole(s) corresponding to the _____ Well Data. Raw cuttings should be in quantities sufficient to conduct standard preparations for foraminifera and nannofossil analyses. In the event that the quantity of raw cuttings are insufficient to conduct standard paleo analyses, the _____ Parties are each entitled to borrow the previously prepared foraminifera wash and nannofossil slides used for the _____ Parties paleontological analyses. After the _____ Parties have completed the biostratigraphic analyses, the _____ Parties each agree to return all previously prepared foraminifera wash and nannofossil slide materials that were borrowed. Any unused, unprocessed raw materials provided to any of the _____ Parties will be returned after sample preparation is complete. Materials and residues resulting from sample processing (foram wash, nanno slurries, etc.) will become the property of the _____ Parties. All such furnished material shall be deemed to constitute a part of the _____ Well Data for all purposes.

**3.7** **Summary Reports**

The _____ Parties agree to provide original paleontologic data in digital format, where possible, and to make reasonably available to the _____ Parties paleontological and biostratigraphic interpretations equivalent to or more detailed than what is provided to the DOI. The interpretations provided by the _____ Parties will be in the form of a summary of foraminiferal and nannofossil species events or "tops" and paleoenvironmental interpretations. All such furnished material shall be deemed to constitute a part of the _____ Well Data for all purposes.

**3.8** **Conventional Core**

The _____ Parties agree to make reasonably available to the _____ Parties all conventional core data taken from all depths in the wellbore(s) which is part of the _____ Well Data. The _____ Parties shall be allowed to look at the conventional core photographs, as well as, physically inspect the conventional core at _____ Labs. The _____ Parties, individually, shall be allowed up to three physical inspection(s) of the conventional core within a period of one year from the date on which the last Party has executed this Agreement. Any costs associated with viewing the conventional core shall be at the sole cost of the viewing company. The _____ Parties shall also be allowed access to thin section samples made from conventional core and rotary cores, as well as petrographic (point count) data derived from the thin sections, and scanning electron microscopy (SEM) and X-Ray diffraction (XRD) data.

(Optional)

**3.8** **Data Being Withheld From *Prospect Name/Prospect Name* Trade**

It is understood and agreed to between the _____ Parties and the _____ Parties that the Conventional Core data and the Palynostratigraphic Analysis from the _____ Well will not be made a part of this data exchange.

**ARTICLE 4 - General Provisions**

**4.1** **Waiver of Representations and Warranties**

**THE _____ WELL DATA AND THE _____ WELL DATA ARE PROVIDED "AS IS" AND EACH PARTY RECEIVING SUCH DATA ACKNOWLEDGES THAT IT IS ACCEPTING THE DATA "AS IS." SUBJECT TO ARTICLES 2.2 AND 3.2 CONTAINED HEREIN, THE RESPECTIVE OWNERS OF SUCH DATA MAKE NO REPRESENTATION OR WARRANTY, EXPRESS OR IMPLIED, OF ANY KIND OR DESCRIPTION IN RESPECT THERETO AND SUCH DATA IS DELIVERED HEREUNDER WITH THE EXPLICIT UNDERSTANDING AND AGREEMENT THAT ANY ACTION A PARTY MAY TAKE BASED ON SUCH DATA RECEIVED**

**SHALL BE AT THE PARTY'S OWN RISK AND RESPONSIBILITY AND SUCH PARTY SHALL HAVE NO CLAIM AGAINST THE OWNER OF SUCH DATA AS A CONSEQUENCE THEREOF.**

4.2     **Grant of Well Data under Articles 2 and 3**

The well data to be granted pursuant to Articles 2 and 3 is of equal value. The Parties will identify the data to be granted, to the extent that it is not already identified in this Agreement before forty-five (45) days after the date of the first delivery of data, and the Parties will complete the grant of well data so that all Parties have received all data to be granted subject to this agreement prior to the earlier of (1) one hundred and eighty (180) days after the date of the first delivery of data, or (2) the due date, including any extensions thereof, for any Parties' tax return for the year in which data is first delivered.

4.3     **Delivery of Well Data**

Except for [set forth reciprocal data not now available by both Parties], within _____ (__) days from the date on which the last Party hereto has executed this Agreement, the *Insert Prospect Name* Operator shall deliver to each of the _____ Parties the _____ Well Data, and the *Insert Prospect Name* Operator shall deliver to each of the _____ Parties the _____ Well Data.  The contacts for purposes of arranging for delivery and receipt of the well data are set forth below:

*(INSERT PROSPECT NAME)* **PARTIES:**              *(INSERTPROSPECT NAME)* **PARTIES:**

Each of the following items:

        [set forth reciprocal data not now available by both Parties]

shall be delivered within _____ (__) days of the day on which the _____ Operator notifies the _____ Operator in writing that it is in possession of these items in the quantities required in this Section 4.3.

4.4     **Term**

This Agreement shall remain in effect in perpetuity, however, the confidentiality obligations and disclosure restrictions of this Agreement, as to each referenced set of well data, are effective for a period of ____ (__) years from the Effective Date of this Agreement, or until the Confidential Information becomes publicly available through the DOI, whichever event occurs first.  Following expiration of such confidentiality obligations and disclosure restrictions each Party may keep and use the well data received from the other Party hereunder without such obligations or restrictions.

4.5     **Assignment**

Each Party may Transfer this Agreement to an Affiliate.  Except as otherwise provided herein, this Agreement may not be Transferred.

4.6     **Headings for Convenience**

Except for the definition headings contained in Article 1, all paragraph headings used in this Agreement are for convenience only and in no way define, limit, or describe the scope or intent of this Agreement or any part thereof; nor do the paragraph headings have any legal effect other than to aid in the reasonable interpretation of this Agreement.

4.7     **Entire Agreement**

This Agreement supersedes and replaces all oral or written communication between the Parties regarding their exchange and use of the _____ Well Data and the _____ Well Data.

4.8     **Selection of Law**

This Agreement will be construed under the laws of the State of Texas, without regard to choice of law rules of any jurisdiction.

**4.9**     **Drafting of Agreement and Construction**

The Parties each declare that they have contributed to the drafting of this Agreement or have had it reviewed by its counsel before signing it. Each agrees that this Agreement has been purposefully drawn and correctly reflects the understanding of the Parties regarding the subject transaction. In the event of a dispute between the Parties concerning the application or construction of this Agreement, the Parties agree that this Agreement will be construed fairly and reasonably and neither more strongly in favor or against any Party.

**4.10**    **Waiver**

A.     The rights of each Party may be exercised from time to time, by the Parties individually or jointly, and singularly or in combination with other rights.

B.     No waiver of any breach of a term, provision or condition of this Agreement by one Party shall be deemed to have been made by another Party hereto unless such waiver is in writing and signed by an authorized representative of such other Party. The failure of a Party to insist upon the strict performance of any term, provision or condition of this Agreement shall not be construed as a waiver or relinquishment in the future of the same or any other term, provision or condition.

**4.11**    **Relationship of the Parties**

This Agreement is not intended to be nor shall it be construed as a joint venture, association, partnership or other form of a business organization or agency relationship between the Parties.

**4.12**    **Severability**

If any term or other provision of this Agreement is determined by any court or other governmental agency of competent jurisdiction to be invalid, illegal or unenforceable, all other conditions and provisions of this Agreement will nevertheless remain in full force and effect.

**4.13**    **Equitable Relief**

The Parties agree that the respective owners of the _____ Well Data and the _____ Well Data may be irreparably injured by a breach of this Agreement by a Party, and that the respective owners of such data will be entitled to seek equitable relief, including injunctive relief and specific performance, in the event of any breach of the provisions of this Agreement by a Party receiving such data. Such remedies will not be deemed to be the exclusive remedies for a breach of this Agreement, but will be in addition to all other remedies available to each respective owner of such data at law or equity.

Each Party waives the right to claim or recover incidental, consequential, indirect and punitive damages against all other Parties.

**4.14**    **Counterparts**

This Agreement may be executed by signing the original or a counterpart thereof. If this Agreement is executed in counterparts, all counterparts taken together will have the same effect as if all the Parties had signed the same instrument.

**4.15**    **Successors and Assigns**

This Agreement shall be binding upon and inure to the benefit of the Parties, their Affiliates, and their successors and permitted assigns.

This Agreement is executed by each Party on the dates indicated below, but is effective for all purposes as of the Effective Date.

*(INSERT PROSPECT NAME)* **PARTIES**          *(INSERT PROSPECT NAME)* **PARTIES**

*COMPANY NAME*                         *COMPANY NAME*

1   **By:** _____       **By:** _____

4   **Title:** _____      **Title:** _____

6   **Date:** _____      **Date:** _____

*COMPANY NAME*            *COMPANY NAME*

**By:** _____       **By:** _____

**Title:** _____      **Title:** _____

**Date:** _____      **Date:** _____

**Exhibit "A" (Example Only)**

**Attached to and made a part of that certain Well Data Trade and Confidentiality Agreement between** _____ **and** _____ **and** _____ **and** _____ **, dated effective** _____ **, 200_.**

**(*Insert Prospect Name*) Well Data**

***Insert Prospect Name*** **Well Data includes all data obtained from the (1)** ***Insert Protraction Area Name Insert Block*** **# #1** _____ **Prospect,** *INSERT API #* **, OCSG-**_____ **1, unless specifically excluded on this Exhibit "A".**

**Data Summary**

| Type | Format | File name | Depth Range |
|---|---|---|---|
| LOGS | | | |
| **LWD**<br>**Digits** | **LAS** | | |
| **Prints** | **PDS** | | |
| **Wireline** | | | |
| **Mud**<br>**Digits** | **LAS** | | |
| **Image** | **EMF/CGM** | | |
| **MDT** | **PDF** | | |
| SURVEYS | | | |
| **Directional Survey** | **TXT** | | |
| **VSP/Checkshot** | | | |
| REPORTS | | | |
| **Show Reports** | **PDF** | | |
| **Drilling Reports** | **(viii) PDF** | | |
| **PALEO** | **DIGITAL** | | |
| DATA | | | |
| **Geochemical Data** | | | |

Data Summary
***Insert Protraction Area Name Block*** # #1 _____ Prospect
***Insert API #***
OCSG-_____ 1

| Type | Format | File name | Depth Range |
|---|---|---|---|
| LOGS | | | |
| **LWD** **Digits** | **LAS** | | |
| **Prints** | **PDS** | | |
| **Wireline** | | | |
| **Mud** **Digits** | **LAS** | | |
| **Image** | **EMF/CGM** | | |
| **MDT** | **PDF** | | |
| SURVEYS | | | |
| **Directional Survey** | **TXT** | | |
| **VSP/Checkshot** | | | |
| REPORTS | | | |
| **Show Reports** | **PDF** | | |
| **Drilling Reports** | **PDF** | | |
| **PALEO** | **DIGITAL** | | |
| DATA | | | |
| **Geochemical Data** | | | |

**\*\*\*\* END OF EXHIBIT "A" \*\*\*\***

<b>Exhibit "B" (Example Only)</b>

<b>Attached to and made a part of that certain Well Data Trade and Confidentiality Agreement between</b>

and _____ and _____ and _____ , dated effective _____, 200_.

<b><i>(Insert Prospect Name)</i> Well Data</b>

<b><i>Insert Prospect Name</i></b> Well Data includes all data obtained from the <b><i>Insert Protraction Area Name Insert Block # #1 OCS-G</i></b> _____, unless specifically excluded on this Exhibit "B".

| Data Type | | ST01 | ST02 |
|---|---|---|---|
| | | *CD # label in bold* | |
| **Daily Reports and Surveys** | **(ix)** | **CD #, CD #** | |
| Drilling Reports, Directional Surveys, Mudlogging Reports, Geologic reports, Mud reports | | | |
| **LWD Digits and Graphics** | **(x)** **P00 -** **BP01 -** **BP02 -** | **D#, CD#** | **D#, CD#** |
| (xiii)    ARC, iSONIC, APWD, DIR (xiv)    End of Well Report-Schlumberger | **(xv)** __' to ____' MD | __'  to __' MD | __'  to __' MD |
| **Mudlog Digits and Graphics** | **(xviii)** **D#** | **D#** | **D#** |
| (xxi)    Lithology, Gas Chromatograph (xxii)    End of Well Report-Sperry Sun Combo, Pressure, Show logs | **(xxiii)** __' to ____' MD | __'  to __' MD | __'  to __' MD |
| **Wireline Digits and Graphics** | **(xxvi)** **D#** | **D#** | **D#** |
| GR, AIT, DEN, NEUT, CMR, DSI, OBMI, MDT | **(xxvii)** __' to ____' MD | /A | __'  to __' MD |
| **Paleo Data** | **(xxx)** **D#** | | |
| (xxxi)    Final Paleo Biostratigraphic Summary (Nanno and Foram) Reports | **(xxxii)** __' to ____' MD BP00 ____' to ____' MD BP02 | __'  to __' MD | __'  to __' MD |
| **Geochemical Data** | **(xxxv)** | **Isotech CD#, Baseline CD#** | |
| (xxxvi)    Mud Gas Isotube Analysis-Isotech Headspace Gas Analysis-Baseline MDT oil and Gas Data | **(xxxvii)** __' to ____' MD | __'  to __' MD | __'  to __' MD |
| **MDT oil and Gas Data** | **(xl)** **D#** | | |
| (xli) analysis | **(xlii)** __' to ____' MD | /A | __' MD |
| **Side Wall Cores** | **(xlv)** **P00 – CD#,** **BP02 – CD#** | | |
| (xlvi)    ____ Labs - cuttings & SWC | **(xlvii)** __' to _____' cuttings from BP00, ____' to ____' MD SWC's from BP02 | /A | /A |
| **Seismic** | | | **D#** |

| Walk-away VSP raw data | | | (lii) | | ( | |
| (li) | Walk-away | /A | | /A | | to |
| | VSP processed image | | | | | ' MD |

1

*END OF EXHIBIT "I"*

2

3

# EXHIBIT "J"

**Attached to and made a part of that certain Unit Operating Agreement Effective April 1, 2018 (the "Katmai UOA") by and between Fieldwood Energy LLC, Ridgewood Katmai, LLC and ILX Prospect Katmai, LLC**

### HEALTH, SAFETY AND ENVIRONMENT ("HSE")

#### Health, Safety and Environmental Management Systems

Plan Requirements for Operator: Operator shall have an effective Health, Safety & Environmental Management Plan or Plans, in accordance with API RP75, or an equivalent standard, including Operator's internal policies, for all operations conducted under the Unit Operating Agreement to which this Exhibit is attached.

Overview of Plan for Non-Operators: Upon the written request of any Non-Operator, the Operator will present to the Non-Operators, at a meeting called in accordance with the Unit Operating Agreement, a sufficient overview of its Health, Safety and Environmental Management systems to evidence compliance with Paragraph 1 herein.

Operator's HSE Performance as an Agenda Item: Upon written request, Operator's HSE performance shall be an agenda item for all meetings of the Parties where past HSE statistical performance as well as ongoing and future HSE improvement initiatives are presented and discussed.

#### Health, Safety and Environmental Reporting

Operator's Obligation to Notify Non-Operators: The Operator shall notify the Non-Operators in a timely manner after any of the following incidents occur:

(a)     well blow-out,
(b)     a fatality associated with operators operations
(c)     multiple serious injuries
(d)     significant adverse reaction from authorities, media, NGO's or the general public
(e)     cost of accidental damage exceeding US $500,000
(f)     oil spill of more than five (5) barrels
(g)     release of more than ten tones of a classified chemical such notification will be followed by a written report.

HSE Audits: Upon request of the Non-Operators, the Operator shall provide the copies of any HSE audits conducted of the drilling operations on the subject well.

Maintenance and Non-Operator's Review of HSE Statistics: HSE statistics for activities and operations conducted under the Unit Operating Agreement will be maintained and be reported to Non-Operators on a monthly basis in a format to be mutually agreed to by the Parties.  HSE statistics are defined as: Recordable Injuries, Lost Time Injuries, Lost Time Injury Frequency, Reportable Spills, Fines or Incidents of Non-compliance [all as defined by the Occupational Safety and Health Administration (OSHA), DOI, or United States Coast Guard (USGC), whichever is applicable]. In addition to opportunities to review data through audits, Operator will, upon request, furnish HSE performance information upon the completion of the well and be amenable to a timely meeting with Non-Operators specifically to review and discuss HSE performance applicable to this Unit Operating Agreement.

#### Health, Safety  and Environmental Inspections

<u>Non-Operator's Right of Access:</u> For purposes of conducting health, safety and environmental inspection, the Non-Operators shall have the right of access to activities and operations and shall have access to Operator's HSE files as provided for in this Unit Operating Agreement. The notable exceptions are a) may implicate privacy issues, b) is covered by an enforceable legal privilege, or c) can otherwise be protected under laws and legal principles involving confidentiality or secrecy. Operator will cooperate fully in these health, safety and environmental inspections.

*END OF EXHIBIT "J"*

# EXHIBIT "K"

### Attached to and made a part of that certain Unit Operating Agreement Effective April 1, 2018 (the "Katmai UOA") by and between Fieldwood Energy LLC, Ridgewood Katmai, LLC and ILX Prospect Katmai, LLC

## MEMORANDUM OF UNIT OPERATING AGREEMENT

1.0 This Memorandum of Unit Operating Agreement (this "Memorandum") is effective as of _____1, 2018. Fieldwood Energy LLC (the "Operator"), Ridgewood Katmai, LLC and ILX Prospect Katmai, LLc (the "Non-Operator") have entered into a Unit Operating Agreement effective April 1, 2018 (the "Unit Operating Agreement") providing for the exploration, appraisal, development, operation and production of crude oil, natural gas and associated substances from the lands and oil and gas leases described in Exhibit "A" of the Unit Operating Agreement and as described in Attachment "1" hereto (the "Unit Area"), and designating Fieldwood Energy, LLC as the Operator to conduct such operations for itself and the Non-Operators.

2.0 The Unit Operating Agreement provides for certain liens, mortgages, pledges and/or security interests to secure payment by the parties of their respective share of the costs under the Unit Operating Agreement. The Unit Operating Agreement contains an Accounting Procedure, along with other provisions, which supplement the lien, mortgage, pledge and/or security interest provisions, including non-consent clauses which provide that parties who elect not to participate in certain operations shall be subject to certain non-consent penalties, including, but not limited to, hydrocarbon recoupment, underinvestment or being deemed to have relinquished their interest in the Unit Area entirely or until the carrying consenting parties are able to recover their costs of such operations through disproportionate rights to production, plus a specified amount. Should any person or firm desire additional information regarding the Unit Operating Agreement, said person or firm should contact the Operator at:

> Fieldwood Energy LLC
> 2000 W Sam Houston Parkway S, Suite 1200
> Houston, Texas 77042
> Attn: Deepwater Land Manager

3.0 The purpose of this Memorandum is to put all interested parties on notice of the terms and provisions of the Unit Operating Agreement, including, but not limited to, (i) the liens, mortgages, pledges and/or security interests provided therein; and (ii) the existence of a preferential right to purchase provision.

4.0 In consideration of the mutual rights and obligations of the parties hereunder, the parties to the Unit Operating Agreement have agreed as follows:

4.1 The Operator shall conduct, direct and have full control of all operations on the Unit Area as permitted and required by, and within the limits of the Unit Operating Agreement.

4.2 The liability of the parties shall be several, but limited in proportion to each party's proportionate share, and not joint, joint and several or collective. Each party shall be responsible only for its proportionate share of the obligations and shall be liable only for its proportionate share of costs.

4.3 Each Non-Operator grants to the Operator and to each of the other Non-Operating Party(s), as applicable, a lien and mortgage upon all of its rights, title and interest in the oil, gas and mineral leases and other real property, in the Unit Area, and a pledge and security interest in its share of the oil and gas when extracted and its interest in all equipment and property whether movable or immovable, corporeal or incorporeal attached thereon, all such property being more fully described in Paragraph 5.0, to secure payment of its share of expenses and charges up to a limit of $500,000,000.00, arising out of the Unit Operating Agreement, together with interest thereon at the

rate provided in the Accounting Procedure referred to in Paragraph 2.0 above. To the extent that the Operator has a security interest under the Uniform Commercial Code of the state, Operator shall be entitled to exercise the rights and remedies of a secured party under the Code. The bringing of a suit and the obtaining of judgment by the Operator for the secured indebtedness shall not be deemed an election of remedies or otherwise affect the rights or security interest for the payment thereof.

4.4   If any Non-Operator fails to pay its share of costs when due, Operator may require other Non-Operators to pay their proportionate part of the unpaid share, whereupon the other Non-Operators shall be subrogated to Operator's lien and security interest.

4.5   The Operator hereby grants to the Non-Operator a lien, mortgage, pledge and security interest equivalent to that granted to Operator as described in Paragraph 4.3 above, to secure payment by Operator of its own share of costs when due and all rights as a secured party pursuant to this grant and the Uniform Commercial code shall inure to the benefit of the Non-Operators as well as the Operator. To the extent that the Non-Operator has a security interest under the Uniform Commercial Code of the state, Non-Operator shall be entitled to exercise the rights and remedies of a secured party under the Code. The bringing of a suit and the obtaining of judgment by the Non-Operator for the secured indebtedness shall not be deemed an election of remedies or otherwise affect the rights or security interest for the payment thereof.

5.0   For purposes of protecting said liens, mortgages, pledges and security interests, the parties hereto agree that the mutual lien, mortgage, pledge, security interest, and this Memorandum shall cover all right, title and interest of the debtor(s) in:

5.1   Property Subject to Liens, Pledges, and Security Interests:

(A)   All personal property located upon or used in connection with the Unit Area.

(B)   All equipment, fixtures, and appurtenances upon or used in connection with the Unit Area, whether movable or immovable, corporeal or incorporeal.

(C)   All oil, gas and associated substances of value in, on or under the Unit Area which may be extracted therefrom.

(D)   All accounts and revenues resulting from the sale of the items described in subparagraph (C) at the wellhead of every well located on the Unit Area

(E)   All items used, useful, or purchased for the production, treatment, storage, transportation, manufacture, or sale of the items described in subparagraph (C). All accounts, contract rights, rights under any gas balancing agreement, general intangibles, equipment, inventory, farmout rights, option farmout rights, acreage and or cash contributions, and conversion rights, whether now owned or existing or hereafter acquired or arising, including but not limited to all interest in any partnership, tax partnership, limited partnership, association, joint venture, or other entity or enterprise that holds, owns, or controls any interest in the Unit Area or in any property encumbered by this Memorandum.

(G)   All severed and extracted oil, gas, and associated substances now or hereafter produced from or attributable to the Unit Area, including without limitation oil, gas and associated substances in tanks or pipelines or otherwise held for treatment, transportation, manufacture, processing or sale.

(H)   All the proceeds and products of the items described in the foregoing paragraphs now existing or hereafter arising, and all substitutions therefor, replacements thereof, or accessions thereto.

(I)     All personal property and fixtures now and hereafter acquired in furtherance of the purposes of the Unit Operating Agreement. Certain of the above-described items are or are to become fixtures on the Unit Area.

(J)     The proceeds and products of collateral are also covered.

5.2     Property Subject to Liens and Mortgages

(A)     All real property and oil and gas leases within the Unit Area, including all oil, gas and associated substances of value in, on or under the Unit Area which may be extracted therefrom,

(B)     All equipment, fixtures, and appurtenances upon or used in connection with the Unit Area, whether movable or immovable, corporeal or incorporeal.

(C)     All real property and fixtures now and hereafter acquired in furtherance of the purposes of the Unit Operating Agreement, including any easement, right-of-way, surface leases, and fee acreage.

6.0     The property described in Paragraphs 5.1 and 5.2 will be financed at the wellhead of the well or wells located on the Unit Area, and this Memorandum is to be filed for record in the real estate records of the county or parish in which the Unit Area is located, or, in the case of offshore leases, in the county or parish adjacent thereto and in the appropriate Uniform Commercial Code records. All parties who have executed the Unit Operating Agreement are identified on Attachment "1".

7.0     Upon default of any covenant or condition of the Unit Operating Agreement, in addition to any other remedy afforded by law, each party to the Unit Operating Agreement and any successor to such party by assignment, operation of law, or otherwise, shall have, and is hereby given and vested with, the power and authority to take possession of and sell any interest which the defaulting party has in the property described in Paragraphs 5.1 and 5.2 and to foreclose this lien, mortgage, pledge, and security interest in the manner provided by law.

8.0     Upon expiration or termination of the Unit Operating Agreement, and the satisfaction of all debts, the Operator shall file of record a release and termination on behalf of all parties concerned. Upon the filing of such release and termination, all benefits and obligations under this Memorandum shall terminate as to all parties who have executed or ratified this Memorandum. In addition, the Operator shall have the right to file a continuation statement on behalf of all parties who have executed or ratified this Memorandum.

9.0     It is understood and agreed by the parties hereto that if any part, term, or provision of this Memorandum is by the courts held to be illegal, against public policy or otherwise in conflict with any law of the state where made, the validity of the remaining portions or provisions shall not be affected, and the rights and obligations of the parties shall be construed and enforced as if the Memorandum did not contain the particular part, term or provision held to be invalid.

10.0     This Memorandum shall be binding upon and shall inure to the benefit of the parties hereto and to their respective heirs, devisees, legal representatives, successors and assigns. The failure of one or more persons owning an interest in the Unit Area to execute this Memorandum shall not in any manner affect the validity of the Memorandum as to those persons who have executed this Memorandum.

11.0     A party having an interest in the Unit Area can ratify this Memorandum by execution and delivery of an instrument of ratification, adopting and entering into this Memorandum, and such ratification shall have the same effect as if the ratifying party had executed this Memorandum or a counterpart thereof. By execution or ratification of this Memorandum, such party hereby consents to its ratification and adoption by any party who may have or may acquire any interest in the Unit Area.

12.0   This Memorandum may be executed or ratified in one or more counterparts and all of the executed or ratified counterparts shall together constitute one instrument. For purposes of recording, only one copy of this Memorandum with individual signature pages attached thereto needs to be filed of record.

13.0   **THE TOTAL AMOUNT OF OBLIGATIONS AND ADVANCES SECURED BY THE OPERATING AGREEMENT MORTGAGE MAY INCREASE OR DECREASE FROM TIME TO TIME, BUT AT NO TIME SHALL THE TOTAL MAXIMUM AMOUNT OF OBLIGATIONS AND ADVANCES SO SECURED EXCEED THE SUM OF $500,000,000.00, TOGETHER WITH INTEREST THEREON AT THE RATE PROVIDED IN THE ACCOUNTING PROCEDURE REFERRED TO IN PARAGRAPH 2.0 ABOVE, WITH RESPECT TO EACH PARTY IN ITS CAPACITY AS DEBTOR MORTGAGOR.**

**Operator**

WITNESSES                              **FIELDWOODENERGY LLC**

_____                BY: _____
                                       NAME: _____
_____                TITLE: _____
                                       DATE: _____

**Non-Operator**

**Ridgewood Katmai, LLC**

_____                BY: _____
                                       NAME: _____
_____                TITLE: _____
                                       DATE: _____

**ILX Prospect Katmai, LLC**

_____                BY: _____
                                       NAME: _____
_____                TITLE: _____
                                       DATE: _____

## ACKNOWLEDGMENTS

STATE OF TEXAS                    §
                                  §
COUNTY OF HARRIS                  §

On this ____ day of _____, 20__ before me, appeared_____, to me personally known, who, being by me duly sworn, did say that he is the _____of **Fieldwood Energy LLC**, a Delaware corporation, and that the foregoing instrument was signed in behalf of that corporation.

_____
Notary Public – State of Texas

STATE OF TEXAS                    §
                                  §
COUNTY OF HARRIS                  §

On this ____ day of _____, 20__ before me, appeared_____, to me personally known, who, being by me duly sworn, did say that he is the _____of **Ridgewood Katmai, LLC,** a Delaware Corporation, and that the foregoing instrument was signed in behalf of that corporation.

_____
Notary Public – State of Texas

STATE OF TEXAS                    §
                                  §
COUNTY OF HARRIS                  §

On this ____ day of _____, 20__ before me, appeared_____, to me personally known, who, being by me duly sworn, did say that he is the _____of **ILX Prospect Katmai, LLC,** a Delaware Corporation, and that the foregoing instrument was signed in behalf of that corporation.

_____
Notary Public – State of Texas

Attachment "1"

**Attached to and made a part of that certain Memorandum of Unit Operating Agreement Effective _____ 1, 2018 (the "Katmai UOA") by and between Fieldwood Energy LLC, Ridgewood Katmai, LLC and ILX Prospect Katmai, LLC**

## DESCRIPTION OF UNIT AREA, LEASES, WORKING INTEREST OF THE PARTIES, COMPANY REPRESENTATIVES AND NOTIFICATION INFORMATION

**I.    DESCRIPTION OF UNIT AREA AND ASSOCIATED LEASES:**

| Area/Block | OCS No. | Effective Date | Unit Acres | Royalty | Lease ORRIs | Depths | Aliquot Portions |
|---|---|---|---|---|---|---|---|
| Green Canyon 39 | G 34966 | 09/01/2013 | 540.00 | 18.75% (R21) | *.945% | All | NE/4NE/4 & N/2SE/4NE/4 |
| Green Canyon 40 | G 34536 | 11/01/2012 | 5310.00 | 18.75% (RS19) | *.945% | All | SE/4SW/4NW/4, N/2SW/4NW/4, NW/4NW/4, E/2NW/4, E/2, E/2SW/4 & E/2W/2SW/4 |
| Green Canyon 41 | G 34537 | 10/01/2012 | 1782.23 | 18.75% (R22) | *.945% | All | |
| Ewing Bank 1009 | G 34878 | 08/01/2013 | 360.000 | 18.75% (R21) | *.945% | All | SE/4SE4 |
| Ewing Bank 1010 | G 34879 | 08/01/2013 | 2,880.000 | 18.75% (R21) | *.945% | All | S/2 |
| Ewing Bank 1011 | G 34880 | 08/01/2013 | 799.256 | 18.75% (R21) | *.945% | All | S/2 |

*Created by that certain Lease Assignment Agreement listed in Article V. below.

**II.    WORKING INTEREST OF THE PARTIES:**

| | |
|---|---|
| Fieldwood Energy LLC | 50% |
| Ridgewood Katmai, LLC: | 25% |
| ILX Prospect Katmai, LLC: | 25% |

**III.    OPERATOR:**

Fieldwood Energy LLC

**IV.    ADDRESSES/NAMES OF REPRESENTATIVES:**

**Fieldwood Energy, LLC**
2000 W Sam Houston Parkway S, Suite 1200
Houston, Texas 77042

**Main Contact**
John H. Smith – Sr. Vice President, Business Development
Telephone: (713) 969-1249
Facsimile: (713) 969-1299
Email:        jsmith@fwellc.com

**Ridgewood Katmai, LLC**
1254 Enclave Parkway, Suite 600
Houston, Texas 77077

**Main Contact**
W. Greg Tabor – Executive Vice President
Telephone:        (281) 293-8449
Facsimile:        (281) 293-8488
Email:        gtabor@ridgewoodenergy.com

**V.    Contracts**

Lease Assignment Agreement dated April 1, 2018, by and between Fieldwood Energy LLC, Ridgewood Katmai, LLC, ILX Prospect Katmai, LLC ("Katmai Owners") and LLOG Bluewater Holdings, L.L.C., LLOG Exploration Offshore, L.L.C., Ridgewood Rockefeller, LLC, ILX Prospect Rockefeller, LLC, Red Willow Offshore, LLC and Houston Energy Deepwater Ventures XV, LLC ("Rockefeller Owners").

*END OF ATTACHMENT "1"*

## *END OF EXHIBIT "K"*