**<u>EXHIBIT 1</u>**

**UNIT AGREEMENT**

## CERTIFICATION-DETERMINATION

Pursuant to the authority vested in the Secretary of the Interior under the Outer Continental Shelf Lands Act, approved August 7, 1953, 67 Stat. 462, 43 U.S.C. 1331 et seq., as amended, and delegated to the Regional Supervisor of the Bureau of Safety and Environmental Enforcement, I do hereby:

A.   Approve the attached Agreement for the development and operation of the Green Canyon Block 40 Unit, Gulf of Mexico Outer Continental Shelf, offshore Louisiana.

B.   Certify and determine that the Unit Plan of Development and Operation contemplated in the attached Agreement is in the interest of conservation.

DATED:

July 31, 2018

Regional  Superviscor
Production and Development
Bureau of Safety and Environmental Enforcement
Gulf of Mexico OCS Region

Contract No. 754318002

# UNIT AGREEMENT FOR OUTER CONTINENTAL SHELF EXPLORATION, DEVELOPMENT, AND PRODUCTION OPERATIONS

## ON THE GREEN CANYON BLOCK 40 UNIT

### BLOCKS 39 (NE/4NE/4 & N/2SE/4NE/4), 40 (SE/4SW/4NW/4, N/2SW/4NW/4, NW/4NW/4, E/2NW/4, E/2, E/2SW/4 & E/2W/2SW/4) AND 41

### GREEN CANYON

### AND

### BLOCKS 1009 (SE/4SE/4), 1010 (S/2) AND 1011 (S/2)

### EWING BANK

### OFFSHORE LOUISIANA

### CONTRACT NO.



1

## Table of Contents

Article I----------Definitions
Article II---------Incorporation
Article III--------Unit Area and Exhibits
Article IV--------Designation of Unit Operator
Article V---------Resignation or Removal of Unit Operator
Article VI--------Successor Unit Operator
Article VII-------Unit Operating Agreement
Article VIII------Appearances and Notices
Article IX--------Unit Plan of Operation
Article X---------Revision of Unit Area
Article XI--------Participating Areas
Article XII-------Allocation of Production
Article XIII------Automatic Adjustment of Unit Area
Article XIV------Relinquishment of Leases
Article XV-------Rentals and Minimum Royalties
Article XVI------Effective Date and Termination
Article XVII-----Leases and Contracts Conformed and Extended
Article XVIII----Counterparts
Article XIX------Subsequent Joinder
Article XX-------Remedies
Article XXI------No Waiver of Certain Rights
Article XXII-----Covenants Run With the Land

## Witnesseth:

**WHEREAS**, Section 5(a) of the Act authorizes the Secretary of the Interior (Secretary) to prescribe rules and regulations which shall provide for unitization, pooling, and drilling agreements;

**WHEREAS,** pursuant to the rules and regulations of the Secretary, 30 CFR 250.1300, et seq., it is deemed to be in the interest of expeditious exploration and development, conservation, prevention of waste, or the protection of correlative rights to unitize the oil and gas interest in the unit area; and

**WHEREAS,** it is deemed to be necessary in the interest of expeditious exploration and development, conservation, for the prevention of waste, or for the protection of correlative rights to conduct exploration, development, and production operations in the unit area as though the area were subject to a single lease;

**NOW, THEREFORE,** in consideration of the premises and promises contained herein, it is   agreed that:

## Article I------<u>Definitions</u>

The following definitions of terms shall apply to this Agreement:

ACT means the OCS Lands Act of 1953, as amended, 43 U.S.C. 1331, <u>et seq.</u>

AGREEMENT means this Unit Agreement, approved by the Regional Supervisor for conducting exploration, development, and production operations within the unit area.

BLOCK means an area designated as a block on a U.S. Official Leasing Protraction Diagram  for an area of the OCS.

OCS means the Outer Continental Shelf as defined in 43 U.S.C. 1331 (a).

PARTICIPATING AREA is that part of the unit area that is reasonably proven by drilling and completion of producible wells, geological and geophysical information, and engineering data to be capable of producing hydrocarbons in paying quantities.

PAYING QUANTITIES means the production of oil and/or gas in quantities  sufficient to yield a return in excess of operating costs.

REGIONAL SUPERVISOR means the Regional Supervisor of the Office of Production and Development of the Bureau of Safety and Environmental Enforcement, Department of the Interior (DOI), or a designee, authorized and empowered to regulate and approve unit operations.

REGULATIONS means all rules prescribed or adopted pursuant to the Act.  They include all regulations prescribed or amended at any time to provide for the prevention of waste, conservation of natural resources of the OCS, and the protection of correlative rights therein.

RESERVOIR means an underground porous, permeable medium containing an accumulation of oil or gas or both.  Each zone of a general structure containing such an

3

accumulation that is separated from any other accumulation of oil or gas or both in the structure is a separate "reservoir."

UNIT AREA means the area of the OCS which is made subject to this Agreement and described in Article III.

UNIT OPERATING AGREEMENT means an agreement made between the working-interest owners and the Unit Operator providing for the apportionment of costs and liabilities incurred in conducting operations pursuant to this Agreement and the establishment of such other rights and obligations as they deem appropriate.

UNIT OPERATOR means the person, association, partnership, corporation, or other business entity designated by the working-interest owners and approved by the Regional Supervisor to conduct unit operations within the unit area in accordance with a plan of operation approved pursuant to the Act, applicable regulations, and this Agreement.

UNITIZED SUBSTANCES means oil and/or gas within the reservoir(s) that underlie the unitized lands and which are recovered or produced by operations pursuant to this Agreement.

WORKING INTEREST means an interest in the unit area held by virtue of a lease, operating agreement, or other contractual arrangement under which, except as otherwise provided in this Agreement, the rights or authority to explore for, develop, and produce oil and gas are conferred.  The right delegated to the Unit Operator by this Agreement is not a working interest.

WORKING-INTEREST OWNER means a party to this Agreement that owns a working interest.

## Article II-----Incorporation

All provisions of the Act, the regulations, other applicable laws, and the leases covering OCS lands within the unit area are made part of this Agreement.

4

**Article III----<u>Unit Area and Exhibits</u>**

3.1  The following described offshore area as shown on the U.S. Official Leasing Protraction  Diagram is subject to valid leases and constitutes the unit area.

3.2  Exhibit "A," which is attached to this Agreement and made a part hereof, is a plat identifying the unit area and component blocks and leases.

3.3  Exhibit "B," which is attached to this Agreement and made a part hereof, is a schedule listing the component leases and the ownership of each.

3.4  Exhibit "C," which will be submitted in accordance with the provisions of this Agreement and will be made a part hereof, is a schedule listing the component parts of the participating area(s) by lease and the percentage of oil or gas, or both, that is to be allocated to each lease.

3.5  Exhibits "A," "B," and "C" shall be revised by the Unit Operator whenever changes in the unit area, changes in the participating area, changes in the ownership of one or more leases, or changes in the percentages of oil or gas, or both, allocated to the individual leases render such changes necessary.  Two copies of the revised exhibits shall be submitted to the Regional Supervisor for approval.

**Article IV----<u>Designation of Unit Operator</u>**

4.1  Fieldwood Energy LLC is designated as the Unit Operator and agrees to accept the rights and obligations of the Unit Operator to explore for, develop, and produce oil and/or gas as provided in this Agreement.

4.2  Except as otherwise provided in this Agreement and subject to the terms and conditions of approved plans of operations, the exclusive rights and obligations of the owners of working interests to conduct unit operations to explore for, develop, and produce oil and/or gas in the unit area are delegated to and shall be exercised by the Unit Operator.  This delegation neither

relieves a lessee of the obligation to comply with all lease terms nor transfers title to any lease or operating agreement.

4.3  The unit operator shall comply with the Department of the Interior's nonprocurement debarment and suspension regulations as required by Subpart B of 2 CFR Part 1400 and shall communicate the requirement to comply with these regulations to persons with whom it does business related to this unit by including this term in its contracts and transactions.

**Article V-----Resignation or Removal of Unit Operator**

5.1  The Unit Operator shall have the right to resign at any time.  Such resignation shall not become effective until 60 days after written notice of an intention to resign has been delivered by the Unit Operator to the working-interest owners and the Regional Supervisor and until all platforms, artificial islands, installations, and other devices, including wells used for conducting operations in the unit area, are placed in a condition satisfactory to the Regional Supervisor for the transfer of operations, or, if no successor Unit Operator has been designated, for suspension or abandonment of operations.  If a successor Unit Operator is designated and approved as provided in Article VI, the resignation shall be effective upon the designation and approval of the successor Unit Operator.

5.2  The Unit Operator may be subject to removal by the same percentage vote of the owners of working interests as provided by Article VI for the designation of a successor Unit Operator.  This removal shall not be effective until the working-interest owners notify the Regional Supervisor and the Unit Operator and until the Regional Supervisor approves the designation of a successor Unit Operator.

5.3  The resignation or removal of the Unit Operator shall not release the Unit Operator from liability for any failure to meet any obligations which accrued before the effective date of resignation or removal.

5.4  The resignation or removal of the Unit Operator shall not terminate any right, title, or interest as the owner of a working interest or other interest in the unit area.  However, when the

6

resignation or removal of the Unit Operator becomes effective, the Unit Operator shall relinquish to the successor Unit Operator all wells, platforms, artificial islands, installations, devices, records, and any other assets all owned solely by the unit joint account.

## Article VI----Successor Unit Operator

6.1   Whenever the Unit Operator tenders its resignation as Unit Operator or is removed as provided in Article V, a successor Unit Operator may be designated by (a) an affirmative vote of the owner(s) of a majority of the working interests, based on their decision pursuant to the Unit Operating Agreements, and (b) the successor Unit Operator's acceptance in writing of the rights and obligations of the Unit Operator.  The successor Unit Operator shall file with the Regional Supervisor an executed copy of the designation of successor.  However, the designation shall not become effective until approved by the Regional Supervisor.

6.2   If no successor Unit Operator is designated as herein provided within 60 days following notice to the Regional Supervisor of the Unit Operator's intent to resign or removal of a Unit Operator, the Regional Supervisor may elect to designate one of the working-interest owners other than the Unit Operator as successor Unit Operator or may declare this Agreement terminated.

## Article VII---Unit Operating Agreement

7.1   The owners of working interests and the Unit Operator shall enter into a Unit Operating Agreement which shall describe how all costs and liabilities incurred in maintaining or conducting operations pursuant to this Agreement shall be apportioned and assumed.  The Unit Operating Agreement shall also describe how the benefits which may accrue from operations conducted on the unit area shall be apportioned.

7.2   The owners of working interests and the Unit Operator may establish by means of one or more Unit Operating Agreements such other rights and obligations as they deem necessary or appropriate.  However, no provision of the Unit Operating Agreement shall be deemed to modify the terms and conditions of this Agreement or to relieve the working-interest owners or the Unit Operator of any obligation set forth in this Agreement.  In case of any inconsistency or conflict

between this Agreement and the Unit Operating Agreement, the terms of this Agreement shall prevail.

7.3  Two copies of the Unit Operating Agreement executed in conjunction with the first section of this Article shall be attached to this Agreement when it is filed with the Regional Supervisor with a request for approval.  Two copies of all other Unit Operating Agreements and any amendments thereto also shall be filed with the Regional Supervisor within 30 days of final execution.

**Article VIII--<u>Appearances and Notices</u>**

8.1  The Unit Operator shall, after notice to other parties affected, have the right to appear on behalf of all working-interest owners before the DOI or any other body legally empowered to issue decisions concerning orders or regulations of the DOI and to appeal from these decisions. The expense of these appearances shall be paid and apportioned as provided in the Unit Operating Agreement.  However, any affected working-interest owners shall have the right at their own expense to be heard in any proceeding.

8.2 Any order or notice relating to this Agreement which is given to the Unit Operator by the Regional Supervisor shall be deemed given to all working-interest owners of the unit area.  All notices required by this Agreement to be given to the Unit Operator or the owners of working interests shall be deemed properly given if given in writing and delivered personally or sent by prepaid registered or certified mail to the addresses set forth below or to such other addresses as may have been furnished in writing to the party sending the notice.

**Article IX----<u>Unit Plan of Operation</u>**

9.1  The Unit Operator shall submit plans of operation which are consistent with the requirements for Exploration Plans or Development and Production Plans as required by the Act, Subpart B of 30 CFR Part 550, and other sections of the regulations.  All operations within the unit area shall be conducted in accordance with an approved plan.

9.2  When no oil or gas is being produced in paying quantities from the unit area and when all or part of the area is subject to one or more leases beyond the primary term, a continuous drilling or well-reworking program shall be maintained with lapses of no more than one year per lapse between such operations unless a suspension of production or other operation has been ordered or approved by the Regional Supervisor or unless extended pursuant to 30 CFR 250.180(e). Plans may call for a cessation of drilling operations for a reasonable period of time after the discovery and delineation of a reservoir when such a pause in drilling activities is warranted to permit the design, fabrication, and erection of platforms and other installations needed for development and production operations, provided a suspension of production or other operation has been ordered or approved by the Regional Supervisor.

9.3  An acceptable initial plan of operation shall be submitted at the time this Agreement is filed for the Regional Supervisor's approval. Each plan of operation shall expire on the date specified in the plan. At least 60 days before the scheduled expiration of any plan, unless the Regional Supervisor grants an extension for good cause, the Unit Operator shall file an acceptable subsequent plan of operation for approval in accordance with this Article.

## Article X-----Revision of Unit Area

10.1  The unit area may be further revised by additions necessary for unit operations or for the inclusion of an area capable of producing oil and/or gas in paying quantities whenever such action appears proper to include additional lands or may be further revised by the contraction of the unit area when such contraction is necessary or advisable to conform with the purposes of this Agreement. Such additions or contractions shall be effected by the Unit Operator on its own motion after preliminary concurrence of the Regional Supervisor or on demand of the Regional Supervisor. The effective date of any expansion or contraction of the unit area shall be the first of the month following the date of approval of the expansion or contraction by the Regional Supervisor provided, however, that a more appropriate effective date may be used if justified by the Unit Operator and approved by the Regional Supervisor.

10.2  The unit area shall not be reduced on account of the depletion of the unitized substances for which it was established, but the unit area established under the provisions of this Article shall terminate automatically whenever operations are permanently abandoned in the unit.

## Article XI----**Participating Areas**

11.1  Prior to commencement of production of unitized substances, or as soon thereafter as required by the Regional Supervisor, the Unit Operator shall submit to the Regional Supervisor, as Exhibit "C," a schedule by lease of (a) all land reasonably proven to be productive of unitized substances in paying quantities by the drilling and completion of producible wells, geological and geophysical information, and engineering data, and (b) the percentage of unitized substances to be allocated as provided in Article XII to each lease.  In order to protect Federal royalty interests and pursuant to 30 CFR 250.205, at the Regional Supervisor's discretion, lands with higher royalty rate leases or leases with a different royalty suspension volume may be included in the participating area, if the producing or injection wells could intersect or drain those leases.  All lands in said schedule, upon approval thereof by the Regional Supervisor, shall constitute the initial participating area, effective as of the date such production commences.  The participating area shall be described in  parcels no smaller than 1/4 x 1/4 x 1/4 blocks.

11.2  Subject to approval of the Regional Supervisor, the participating area(s) so established shall be revised from time to time to include additional land reasonably proven to be productive in the same manner as provided in Section 11.1 of this Article, or lands proven not to be productive to be excluded in the same manner, and Exhibit "C" shall be revised accordingly. The effective date of any revision shall be the first of the month in which the information is obtained which provides the basis for the approval of the revision by the Regional Supervisor provided, however, that a more appropriate effective date may be used if justified by the Unit Operator and approved by the Regional Supervisor.  No land shall be excluded from the participating area(s) on account of depletion of the unitized substances.

11.3  A separate participating area may be established for each accumulation of unitized substances or for any group thereof which is produced as a single pool or zone and any two or more participating areas so established may be combined into one, all subject to approval of the Regional Supervisor.

11.4  Nothing herein contained shall be construed as requiring any retroactive adjustment for production obtained prior to the effective date of the revision of the participating area.

## Article XII---<u>Allocation of Production</u>

12.1 The Unit Operator shall measure unit production and pay all production royalties and make deliveries of oil and gas which are payments of royalties taken-in-kind or which, pursuant to the Act, are purchased by the United States.  Unitized substances shall be allocated within the participating area(s) on a volumetric basis of oil and gas in place under original reservoir conditions, and proportionally credited to the respective leases committed hereto.  The Unit Operator shall furnish the Regional Supervisor geological and engineering maps and data sufficient to support the net-acre feet determination for volumetric allocation between leases.  Oil and gas produced from the unit area prior to the effective date of this Agreement shall not be allocated under this Agreement.  The royalty payments under leases subject hereto shall be based and calculated upon the production allocated to the leases as specifically provided herein.  The oil and gas saved, removed, or sold from the unit area shall be allocated in this manner, regardless of where any well is drilled and produced in the unit area.

12.2 For the purpose of determining royalty obligations, unitized substances on which royalty has been paid and which are used for repressuring, stimulation of production, or increasing ultimate recovery from the unit area, in conformity with an approved plan of operation, may be deemed to be a portion of the gas and liquid-hydrocarbon substances subsequently saved, removed, or sold from the unit area.  In such instances, a like amount of gas and liquid-hydrocarbon substances similar to that previously used may be saved, removed, or sold from the unit area without paying a royalty thereon.  However, as to dry gas, only dry gas and not products extracted therefrom may be saved, removed, or sold royalty free.  The royalty-free withdrawal shall be accomplished in  accordance with an approved plan of operation and the amounts of gas and liquid-hydrocarbon substances withdrawn that are to be recognized as free of royalty charges shall be computed in accordance with a formula approved or prescribed by the Regional Supervisor. Any withdrawal of royalty-free gas or liquid-hydrocarbon substances shall terminate upon the

termination of this Agreement, unless otherwise permitted.  For the purposes of this paragraph, liquid-hydrocarbon substances include natural gasoline and liquid-petroleum gas fractions.

## Article XIII--Automatic Adjustment of Unit Area

13.1  Any lease(s) not entitled to receive an allocation of unit production on the third anniversary of the effective date of the initial participating area established under this Agreement shall be eliminated automatically from the unit area as of said third anniversary, and thereafter, the unit area shall only be comprised of the participating area(s) subject to the provisions of Articles X and XVII.

13.2  If a lease is no longer subject to this Agreement in accordance with the provisions of this Article, that lease shall only be maintained and continued in force and effect in accordance with the terms and provisions contained in the Act, regulations, and the lease.

## Article XIV--Relinquishment of Leases

Pursuant to the provisions of the leases and applicable regulations, a lessee of record shall, subject to the provisions of the Unit Operating Agreement, have the right to relinquish any of its interests committed hereto, in whole or in part, provided that no relinquishment shall be made of any interests within a participating area without the prior approval of the Regional Supervisor.  In the event such relinquishments result in the leasehold interest of only one lease remaining committed hereto, this Agreement shall terminate automatically effective as of the date that only one  lease remains subject to the Agreement.

## Article XV---Rentals and Minimum Royalties

15.1  Rentals or minimum royalties due on leases committed hereto shall be paid by the working-interest owners responsible therefor at the time and rate(s) specified in their respective lease from the United States unless such rental or minimum royalty is suspended or reduced by law or by approval of the Secretary.

15.2  If there is production from the unit area during the lease year, the amount of royalty paid for production allocated to a lease during the lease year shall be credited against the minimum royalty obligation of the lease.

## Article XVI--**Effective Date and Termination**

16.1 This Agreement shall be effective on April 1, 2018  and shall  terminate when oil or gas is no longer being produced from the unit area and drilling or well-  reworking operations are no longer being conducted in accordance with the provisions of Article IX of this Agreement. If the Regional Supervisor has ordered or approved a suspension of operations or production on all or part of the unit area pursuant to the regulations, this Agreement shall be continued in force and effect for a period of time equal to the length of the authorized suspension and thereafter so long as operations are being conducted in accordance with the provisions of Article IX herein.

16.2  This Agreement may be terminated, with the approval of the Regional Supervisor, at any time by an affirmative vote of the owner(s) of  a majority of the working interests in each lease or portion thereof committed to this Agreement or as otherwise specified in the Unit Operating Agreement.

## Article XVII--**Leases and Contracts Conformed and Extended**

17.1  The terms, conditions, and provisions of all leases, subleases, and other contracts relating to exploration, drilling, development, or production operations for oil or gas on lands committed to this Agreement are hereby modified and amended only to the extent necessary to make  the same conform to the provisions hereof but otherwise shall remain in force and effect.

17.2  The Regional Supervisor, by the approval hereof, does hereby establish, alter, suspend, change, or revoke the drilling, production, rental, minimum royalty, and royalty requirements of the Federal leases committed hereto, to conform said requirements to the provisions of this Agreement, and without limiting the generality of the foregoing, all leases, subleases, and contracts are  particularly modified in accordance with the following:

13

(a)  Drilling and/or producing operations performed hereunder upon any unitized lease will be accepted and deemed to be performed upon and for the benefit of each and every unitized lease, and no lease committed to this Agreement shall be deemed to expire by reason of failure to drill or produce a well thereon.

(b)  Suspension of drilling or producing operations on all unitized lands, pursuant to direction or consent of the Secretary or a duly authorized representative, shall be deemed to constitute such suspension pursuant to such direction or consent as to each and every unitized lease.

(c)  Suspension of drilling or producing operations on less than all unitized lands, pursuant to direction or consent of the Secretary or a duly authorized representative, shall be deemed to constitute such suspension pursuant to such direction or consent only as to unitized lands specified in the document providing direction or consent.

(d)  Each lease committed hereto shall continue in force as to all lands covered thereby for the term so provided therein, or as extended by law, and so long thereafter as gas or oil and/or condensate is produced from a unit well in paying quantities, drilling or well-reworking operations pursuant to the regulations are conducted within the unit area, or operations are suspended hereunder as provided herein and operations are being conducted pursuant to the provisions of Article IX of this Agreement.  This subsection shall not operate to continue in force any whole lease excluded from the unit area by adjustment pursuant to Articles X or XIII.

17.3 Upon termination of this Agreement, the leases committed hereto may be continued in force and effect in accordance with the terms and conditions contained in the Act, the regulations, and the leases.


## Article XVIII--<u>Counterparts</u>

This Agreement may be executed in any number of counterparts, no one of which needs to be executed by all parties.  If this Agreement is executed in counterparts, all counterparts taken together shall have the same effect as if all parties had signed the same instrument.

14

## Article XIX---<u>Subsequent Joinder</u>

The Regional Supervisor may order or, upon request, approve a subsequent joinder to this Agreement pursuant to the expansion provisions of Article X. A request for a subsequent joinder shall be accompanied by a signed counterpart to this Agreement and shall be submitted by the Unit Operator at the time a notice of proposed expansion is submitted pursuant to Article X. A subsequent joinder shall be subject to the requirements which may be contained in the Unit Operating Agreement, if any, except that the Regional Supervisor may require modifications of any provision in a Unit Operating Agreement which would prevent a subsequent joinder.

## Article XX---<u>Remedies</u>

20.1   The failure of the Unit Operator to conduct operations in accordance with an approved unit plan of operation, to timely submit an acceptable unit plan of operation for approval by the Regional Supervisor, or to comply with any other requirement of this Agreement in a timely manner shall, after notice of default to the Unit Operator with copies to all working-interest owners by the Regional Supervisor and after failure of the Unit Operator to remedy any default within a reasonable time as determined by the Regional Supervisor, result in automatic termination of this Agreement effective as of the first day of the default.

20.2   This remedy is in addition to any remedy which is prescribed in the Act, the regulations, or a lease committed to this Agreement or any action which may be brought by the United States to compel compliance with the provisions thereof.

## Article XXI--<u>No Waiver of Certain Rights</u>

Nothing contained in this Agreement shall be construed as a waiver by any party hereto of the right to assert any legal or constitutional right or defense pertaining to the validity or invalidity of any law of the United States, or regulations issued thereunder, in any way affecting such party or as a waiver by any such party of any right beyond such party's authority to waive.

## Article XXII--<u>Covenants Run With the Land</u>

22.1 The covenants herein shall be construed to be covenants running with the land with respect to the interest of the parties hereto and their successors in interest until this Agreement

15

terminates, and any grant, transfer, or conveyance of interest in land or leases subject hereto shall be and hereby is conditioned upon the assumption of all privileges and obligations hereunder by the grantee, transferee, or other successor in interest.

22.2 No assignment or transfer of any working interest or other interest subject hereto shall be binding upon the Unit Operator until the first day of the calendar month after the Unit Operator is furnished with the original, photostatic, or certified copy of the instrument of transfer.

**In Witness Whereof**, the working-interest owners and the Unit Operator have caused this Agreement to be executed as follows:

### ACCEPTANCE OF RIGHTS AND OBLIGATIONS BY UNIT OPERATOR

I hereby accept and assume all rights and obligations of the Unit Operator as set forth above.

Dated: 6/28/18

Authorized Signature: _____

Name: **John H. Smith**

Title: **Senior Vice President -- Land and Business Development**

Corporation: **Fieldwood Energy LLC**

Address: **2000 West Sam Houston Parkway South, Suite 1200, Houston, Texas 77042**

Subscribed and sworn to me this 28 day of June, 2018

Notary Public: Maegen Sinclair

My Commission Expires: 2/28/22

MAEGEN SINCLAIR
Notary Public, State of Texas
Comm. Expires 02-28-2022
Notary ID 131468883

16

## APPROVAL BY WORKING-INTEREST OWNER(S)

As an owner of a working interest in the unitized area, I hereby agree to the terms and conditions as set forth in this Agreement.

Dated:

Authorized Signature: _____

Name: **John H. Smith**

Title: **Senior Vice President – Land and Business Development**

Corporation: **Fieldwood Energy LLC**

Address: **2000 West Sam Houston Parkway South, Suite 1200, Houston, Texas 77042**

Subscribed and sworn to me this _28_ day of _June_, 2018

Notary Public: _Maegen Sinclair_

My Commission Expires: _2/24/22_

> MAEGEN SINCLAIR
> Notary Public, State of Texas
> Comm. Expires 02-28-2022
> Notary ID 131468883

As an owner of a working interest in the unitized area, I hereby agree to the terms and conditions as set forth in this Agreement.

Dated: _June 28, 2018_

Authorized Signature: _____

Name: **W. Greg Tabor**

Title: **Executive Vice President**

Corporation: **Ridgewood Katmai, LLC**

Address: **14 Philips Parkway, Montvale, New Jersey 07645**

Subscribed and sworn to me this _28th_ day of _June_, 2018

Notary Public: _Ann M. Hebert_

My Commission Expires: _7-16-2018_

> ANN M. HEBERT
> Notary Public, State of Texas
> Comm. Expires 07 16-2018
> Notary ID 1103820-9

17

As an owner of a working interest in the unitized area, I hereby agree to the terms and conditions as set forth in this Agreement.

Dated: *June 28, 2018*

Authorized Signature: _____

Name: **Fritz L. Spencer, III**

Title: **Director**

Corporation: **ILX Prospect Katmai, LLC**

Address: **712 Fifth Avenue, 36th Floor, New York, New York 10019**

Subscribed and sworn to me this *28th* day of *June*, 2018

Notary Public: _____

My Commission Expires: *7-16-2018*

ANN M. HEBERT
Notary Public, State of Texas
Comm. Expires 07-16-2018
Notary ID 1103820-9

18

# EXHIBIT A

## GREEN CANYON BLOCK 40 UNIT

## OFFSHORE LOUISIANA

## LEASE PLAT



**OCS-G 34966 (Green Canyon Block 39 NE/4NE/4 & N/2SE/4NE/4)**

**OCS-G 34536 (Green Canyon Block 40 SE/4SW/4NW/4, N/2SW/4NW/4, NW/4NW/4, E/2NW/4, E/2, E/2SW/4 & E/2W/2SW/4)**

**OCS-G 34537 (Green Canyon Block 41)**

**OCS-G 34878 (Ewing Bank Block 1009 SE/4SE/4)**

**OCS-G 34879 (Ewing Bank Block 1010 S/2)**

**OCS-G 34880 (Ewing Bank Block 1011 S/2)**

19

**EXHIBIT B**

**COMPONENT LEASES AND OWNERSHIP**

**GREEN CANYON BLOCK 40 UNIT**

**OFFSHORE LOUISIANA**

| LEASE NUMBER | AREA/ BLOCK NUMBER | LEASE EFFECTIVE DATE | EXPECTED EXPIRY DATE | LEASE ACREAGE | ROYALTY RATE & RSV | RECORD TITLE & PERCENT | | OPERATING RIGHTS & PERCENT |
|---|---|---|---|---|---|---|---|---|
| OCS-G 34966 | Green Canyon 39 (NE/4NE4 & N/2SE/4NE/4) | 09/01/2013 | 08/31/2021 | 540.000 | 18.75% R21 | Fieldwood Energy LLC<br>Ridgewood Katmai, LLC<br>ILX Prospect Katmai LLC | 50.00%<br>25.00%<br>25.00% | N/A |
| OCS-G 34536 | Green Canyon 40 (SE/4SW/4NW/4, N/2SW/4NW4, NW/4NW/4, E/2NW4, E/2, E/2SW/4 & E/2W/2SW/4) | 11/01/2012 | 10/31/2022 | 5,310.000 | 18.75% R22 | Fieldwood Energy LLC<br>Ridgewood Katmai, LLC<br>ILX Prospect Katmai LLC | 50.00%<br>25.00%<br>25.00% | N/A |
| OCS-G 34537 | Green Canyon 41 | 10/01/2012 | 09/30/2019 | 1,783.230 | 18.75% R22 | Fieldwood Energy LLC<br>Ridgewood Katmai, LLC<br>ILX Prospect Katmai LLC | 50.00%<br>25.00%<br>25.00% | N/A |
| OCS-G 34878 | Ewing Bank 1009 (SE/4SE/4) | 08/01/2013 | 07/31/2018 | 360.000 | 18.75% R21 | Fieldwood Energy LLC<br>Ridgewood Katmai, LLC<br>ILX Prospect Katmai LLC | 50.00%<br>25.00%<br>25.00% | N/A |
| OCS-G 34879 | Ewing Bank 1010 (S/2) | 08/01/2013 | 07/31/2018 | 2,880.000 | 18.75% R21 | Fieldwood Energy LLC<br>Ridgewood Katmai, LLC<br>ILX Prospect Katmai LLC | 50.00%<br>25.00%<br>25.00% | N/A |
| OCS-G 34880 | Ewing Bank 1011 (S/2) | 08/01/2013 | 07/31/2018 | 799.256 | 18.75% R21 | Fieldwood Energy LLC<br>Ridgewood Katmai, LLC<br>ILX Prospect Katmai LLC | 50.00%<br>25.00%<br>25.00% | N/A |
| | | | **TOTAL** | 11,672.49 | | | | |

# EXHIBIT C

## LEASE PARTICIPATION AND ALLOCATION

### GREEN CANYON BLOCK 40 UNIT OFFSHORE LOUISIANA

| LEASE NUMBER | NUMBER OF PARTICIPATING ACRES | NUMBER OF ORIGINAL EQUIVALENT ACRE FEET ALLOCATED | | | PERCENT UNIT ALLOCATION |
|---|---|---|---|---|---|
| | | OIL | GAS | TOTAL | |
| OCS-G 34966 Green Canyon Block 39 (NE/4NE4 & N/2SE/4NE/4) | | | | | |
| OCS-G 34536 Green Canyon Block 40 (SE/4SW/4NW/4, N/2SW/4NW4, NW/4NW/4, E/2NW4, E/2, E/2SW/4 & E/2W/2SW/4) | | | | | |
| OCS-G 34537 Green Canyon Block 41 | | | | | |
| OCS-G 34878 Ewing Bank Block 1009 (SE/4SE/4) | | | | | |
| OCS-G 34879 Ewing Bank Block 1010 (S/2) | | | | | |
| OCS-G 34880 Ewing Bank Block 1011 (S/2) | | | | | |
| **TOTALS** | | | | | |