## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | § | **Chapter 11** |
| | § | |
| **FIELDWOOD ENERGY LLC,** *et al.*, | § | **Case No. 20-33948 (MI)** |
| | § | |
| Debtors.[1] | § | **(Jointly Administered)** |

### BP EXPLORATION & PRODUCTION INC.'S OBJECTION TO CONFIRMATION OF THE FOURTH AMENDED JOINT CHAPTER 11 PLAN OF FIELDWOOD ENERGY LLC AND ITS AFFILIATED DEBTORS
[Relates to Docket No. 1284]

BP Exploration & Production Inc. ("BP") hereby objects (the "Objection") to confirmation of the *Fourth Amended Joint Chapter 11 Plan of Fieldwood Energy LLC and its Affiliated Debtors* [Docket No. 1284] (as may be amended, revised, or supplemented, the "Plan")[2] filed by the above-captioned debtors (collectively, the "Debtors"). In support of this Objection, BP respectfully states as follows:

### PRELIMINARY STATEMENT

1.     Confirmation should be denied.  The keystone of the Debtors' plan is the untenable transfer of leases subject to non-dischargeable plugging and abandonment and decommissioning obligations ("P&A Obligations") to a series of entities that cannot satisfy these obligations. FWE III will fail.  FWE III is being formed to accept all of the Debtors' Predecessor Obligations, and will be unable to satisfy the non-dischargeable decommissioning obligations to the U.S.

---

[1]  The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are: Fieldwood Energy LLC (6778), Fieldwood Energy Inc. (4991), Fieldwood Onshore LLC (3489), Fieldwood SD Offshore LLC (8786), Fieldwood Energy Offshore LLC (4494), Fieldwood Offshore LLC (2930), GOM Shelf LLC (8107), FW GOM Pipeline, Inc. (8440), Galveston Bay Procession LLC (5703), Galveston Bay Procession LLC (0422), Fieldwood Energy SP LLC (1971), Dynamic Offshore Resources NS, LLC (0158), Bandon Oil and Gas, LP (9266), and Bandon Oil and Gas GP, LLC (9172). The Debtors' primary mailing address is 2000 W. Sam Houston Parkway S., Suite 1200, Houston, TX 77042.

[2]  Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Plan.

Government.  BP, in turn, will seek recovery of any post-Effective Date costs it expends to satisfy the Predecessor Obligations from FWE III based upon subrogation rights it will acquire upon its satisfaction of such obligations.[3]  For BP alone, these costs are estimated to exceed $300 million. Similarly, FWE IV will fail because it does not have sufficient funds to satisfy the P&A Obligations that are not otherwise attributable to interests it acquired from Chevron.  These costs are estimated at over $40 million.

2.      Indeed, despite receiving assignment of the "good assets," NewCo will have insufficient funds to demonstrate feasibility and adequate assurance of future performance on the contracts and leases it is being assigned.  The Plan provides for the assignment of leases and joint operating agreements to NewCo without adequate assurance of NewCo's ability to satisfy its P&A Obligations under such agreements.  The Debtors have not designated any expert to testify on feasibility.  Instead, the Debtors rely on the same management team that (a) guided Fieldwood into two bankruptcy cases in the last three years, (b)  now seeks to abandon all of its undesirable properties subject to unresolved environmental liabilities, and (c) requests the Court's approval of a new business plan that creates new environmental liabilities that NewCo cannot satisfy.

3.      NewCo's viability is premised on unattainable Financial Projections that will require the Debtors' successor to achieve nearly 100% of its projections to avoid further restructuring in the near future.  The NewCo projections include revenues from six *unpermitted* deepwater wells that the Plan assumes NewCo will drill and develop at or under budget.  Notably, the P&A Obligations resulting from these proposed wells (and the five other deep water wells that Fieldwood drilled and that NewCo desires to operate post-confirmation, namely Katmai 1, Orlov,

---

[3] As explained in Section B *supra*, to the extent the Debtors' attempt to eliminate these subrogation rights – through the improper *de facto* discharge of their performance obligations to the U.S. Government – such attempt should be rejected.

Troika 1, Troika 2, and Genovesa) are conveniently assumed to arise after the five-year projection period, when NewCo, with declining production revenues, will likely be unable to fund such costs. Because NewCo will have no predecessor to fall back on, feasibility is critical not only for demonstrating adequate assurance of future performance but for assuring that U.S. taxpayers are not forced to pay for the cleanup in yet another Fieldwood chapter 11 case.

4.      The Debtors' prior chapter 11 plan was effective a mere 28 months before they returned to this Court having failed to achieve their original financial projections. Nothing in the current Plan suggests that the Debtors will achieve success this time around. Given management's historical failure to meet short-term financial projections and having left little margin for error here, it is probable that the projections will not be met, and the parties will be back before this Court for a third restructuring—or liquidation.

5.      Additionally, the Plan fails to satisfy other confirmation requirements under Section 1129(a) of the Bankruptcy Code. Specifically, the Plan:

- contains conflicting language that the Debtors may argue limits the Post-Effective Date performance obligations to the U.S. Government claims regarding the Non-Dischargeable P&A Obligations (defined below), and thus the subrogation rights that BP otherwise would have, as a *de facto* discharge of such rights;

- impermissibly seeks to transfer assets and contract rights to NewCo free and clear of BP's secured setoff rights, without providing any adequate protection to BP; and

- includes overly broad and impermissible third-party releases in favor of various non-debtor, non-committee individuals and entities, without adequate justification or demonstration of contributions to the Plan by any of the beneficiaries of such releases.

6.      Finally, the Plan improperly seeks to abandon oil and gas properties without adequately addressing the most basic health and safety concerns and/or requirements. The Plan does not seek to resolve INCs before properties are abandoned. The Plan also contains no

3

requirement(s) that platforms/structures be accessible via helicopter or boat, nor does it require that all navigation aids be repaired and in good working order.  And most troublesome, while hurricane season approaches, the Plan has no performance obligations to make the abandoned properties hurricane safe by deploying required hurricane-safe-protocols, as set forth in more detail below.

7.      For these reasons, as well as the inability of the Debtors to demonstrate feasibility, the Court should deny confirmation of the Plan.

**RELEVANT BACKGROUND**

**A.  Prepetition Relationship Between BP and the Debtors**

8.      From approximately 1996 through 2008, pursuant to several purchase and sale agreements, BP or its affiliates sold their right, title, and interest in and to numerous OCS leases to the Debtors (or a predecessor of the Debtors).  The Plan (as modified by the Plan Supplement) proposes to abandon under the Plan 13 of these leases, which collectively encompass 196 wells, 8 structures and 30 pipelines (such interests collectively, the "BP Predecessor Properties").

9.      Based upon publicly available information derived from the BOEM/BSEE Data Center, BP estimates that P&A Obligations associated with the BP Predecessor Properties, including the wells, platforms, structures, and pipelines associated therewith, will exceed $300 million.[4]

10.      In addition, BP is a contract counterparty to the Debtors on various agreements affecting properties being transferred under the Plan to multiple entities and has other contractual relationships related to numerous leases in the Gulf of Mexico.

---

[4]  This figure represents the total estimated P90 joint and several liability across all assets associated with the BP Predecessor Properties.  BP does not admit to any liability on these leases nor the accuracy of the estimate.

4

**B. The Debtors' Plan**

11.     As described in the Disclosure Statement, the Debtors propose a "restructuring" through two primary transactions: (i) a "Credit Bid Transaction" and (ii) a divisive merger:

- Pursuant to the Credit Bid Transaction, the Debtors propose to sell certain deep water and shelf assets to NewCo for aggregate consideration with a purported value of $1.03 billion comprised of (a) a credit bid of the Allowed FLTL Claims (up to the allowed amount of such claims) (b) cash in an amount up to approximately $105 million,[5] (c) GUC Warrants for 3.5% of new equity interests, and (d) the assumption of certain liabilities under the Credit Bid Purchase Agreement.

- After consummation of the Credit Bid Transaction, the Plan contemplates that the Debtors will implement a divisive merger pursuant to which Fieldwood Energy LLC will be divided into FWE I, FWE III, and FWE IV (collectively with FWE I, FWE III, and any subsequent entity created in connection with the proposed divisive merger, the "Successor FWE Entities"), and the Debtors will (i) transfer to FWE I certain assets the Debtors acquired from Apache, which FWE I will own, operate, plug and abandon, and decommission, and (ii) transfer to FWE III all Predecessor Obligations, as well as certain other oil and gas leases, which FWE III will own, operate, plug and abandon, and decommission, and (iii) transfer to FWE IV certain oil and gas leases assigned previously to the Debtors by Chevron U.S.A. Inc., which the Credit Bid Purchaser will decommission.

12.     Immediately as of the Effective Date, the Debtors' rights and interests in all remaining leasehold interests (the "Abandoned Properties") will be abandoned.  *See* Plan § 5.13. Although the Plan purports to preserve the United States' right to assert a claim against the Debtors and the Post-Effective Date Debtors (defined to include FWE III) for any P&A Obligations, NewCo[6] is excluded from any such exposure, despite taking an assignment of the beneficial interests under certain of the same leases that are being partially abandoned.  The United States may—and likely will—also seek performance from the respective co-lessees or predecessors in interest, including BP, on the Abandoned Properties. Plan § 5.13. All parties, including the

---

[5]  The Disclosure Statement further notes that the Credit Bid Purchase Agreement caps the total cash consideration to be paid by the Credit Bid Purchaser at (i) the proceeds of the $185 million Second Lien Exit Facility, plus (ii) the proceeds of the approximately $20 million Equity Rights Offering, minus (iii) $100 million.

[6] FWE I and IV are also excluded from liability.

Debtors, anticipate that BSEE will issue orders compelling predecessors to perform the Debtors'

P&A Obligations with respect to the Abandoned Properties.  Disclosure Statement, at p. 13.

13.     In addition to the transactions discussed above, the Plan provides for broad

nonconsensual releases by third parties of certain non-debtor "Released Parties", which includes,

collectively:

> the Debtors, (b) the Post-Effective Date Debtors, (c) the DIP Agent and DIP
> Lenders under the DIP Facility, (d) the Prepetition FLFO Secured Parties, (e) the
> Consenting Creditors, (f) the Prepetition FLFO Collateral Agent, (g) the Prepetition
> FLTL Agents, (h) the Prepetition SLTL Agent, (i) the Creditors' Committee and
> the current and former members of the Creditors' Committee (solely in their
> capacities as such), (j) NewCo and all of its subsidiaries (including the Credit Bid
> Purchaser), (k) the Exit Facility Agents, (l) the Exit Facility Lenders, (m) the
> Second Lien Backstop Parties, (n) the ERO Backstop Parties, (o) the Apache PSA
> Parties, and (p) with respect to each of the foregoing Persons in clauses (a) through
> (o), each of their current and former affiliates, and each such Entity's and its current
> and former affiliates' current and former directors, managers, officers, equity
> holders (regardless of whether such interests are held directly or indirectly),
> predecessors, successors, and assigns, subsidiaries, and each of their current and
> former officers, members, managers, directors, equity holders (regardless of
> whether such interests are held directly or indirectly), principals, members,
> employees, agents, managed accounts or funds, management companies, fund
> advisors, investment advisors, advisory board members, financial advisors, partners
> (including both general and limited partners), attorneys, accountants, investment
> bankers, consultants, representatives and other professionals, such Persons'
> respective heirs, executors, estates, and nominees, in each case in their capacity as
> such, and any and all other persons or entities that may purport to assert any cause
> of action derivatively, by or through the foregoing entities.

Plan, § 1.1, at pp. 20-21.  In addition to the extensive list of Released Parties, the embedded terms,

such as Prepetition FLFO Secured Parties include various parties that have traded in and out of the

Debtors capital structure making any actual identification of the underlying parties being released

impossible to determine through reference to the Plan, the Disclosure Statement or any Plan Supplement documents.

### C. The Debtors' Estimated P&A Obligations

14.     On February 1, 2021, BSEE filed Claim Nos. 895–902 (collectively the "BSEE Claims"), which assert claims against each of the Debtors for, among other things, the Debtors' P&A Obligations.  The BSEE Claims are as follows:

| Claim No. | Date | Debtor | Amount | |
|-----------|------|--------|--------|--|
| 895 | 2/1/2021 | Fieldwood Energy Offshore LLC | $ | 2,540,284,825 |
| 896 | 2/1/2021 | Fieldwood Energy, LLC | $ | 4,743,032,968 |
| 897 | 2/1/2021 | Dynamic Offshore Resources NS, LLC | $ | 482,578,864 |
| 898 | 2/1/2021 | Fieldwood SD Offshore LLC | $ | 60,395,886 |
| 899 | 2/1/2021 | Bandon Oil and Gas, LP | $ | 320,321,445 |
| 900 | 2/1/2021 | Fieldwood Energy SP LLC | $ | 475,553,110 |
| 901 | 2/1/2021 | FW GOM Pipeline, Inc. | $ | 3,490,370 |
| 902 | 2/1/2021 | GOM Shelf LLC | $ | 705,084,607 |
| | | **Total** | $ | 9,330,742,075 |

15.     Specifically, BSEE asserts that, pursuant to 30 C.F.R. Part 250 and other applicable regulations, "the Debtor is obligated to protect health, safety, property, and the environment by conducting operations in a manner which protects the mineral resources, other natural resources and environmental quality."  *See, e.g.,* BSEE Claim No. 895, Attachment, at p. 1.  Notably, the BSEE Claims specifically note that the "regulatory obligations of the Debtor ***are mandatory injunctive obligations*.**"  (emphasis added).  To the extent BSEE's Claims are determined to be "claims" (rather than injunctive obligations), however, each BSEE Claim reflects BSEE's estimated cost for each Debtor to comply with its decommissioning obligations for the applicable leases for such Debtor.  *Id*. at p. 2.  Each BSEE Claim includes a schedule of applicable leases and an estimated "Decommissioning Liability" for each of the applicable properties and expressly states that it "does not include post-petition penalties for Debtor's failure to comply with its obligations pursuant to federal statutes and regulations, nor does it include any other post-petition

obligations, all of which are expressly reserved. The United States reserves all rights to file an application for applicable administrative expenses in connection with such related liabilities at the appropriate time." *Id.*

## OBJECTION

**A. The Plan Fails to Satisfy Section 1129(a)(11) of the Bankruptcy Code Because FWE III, FWE IV and NewCo Are Not Feasible**

16.    The Plan does not sufficiently capitalize FWE III and FWE IV to meet their obligations under the Plan, and is based upon faulty financial projections for NewCo, and as such the Plan is not feasible and cannot be confirmed. Section 1129(a)(11) provides that the court shall confirm a plan only if "[c]onfirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan." 11 U.S.C. § 1129(a)(11). "To obtain confirmation of its reorganization plan, a debtor must show by a preponderance of the evidence that its plan is feasible . . . .'" *In re Save Our Springs (S.O.S.) All., Inc.*, 632 F.3d 168, 172 (5th Cir. 2011) (affirming bankruptcy court's ruling that the debtor failed to establish that the plan had a reasonable assurance of success).

17.    In determining whether a plan is feasible, courts consider "the earning power of the business, its capital structure, the economic conditions of the business, the continuation of present management, and the efficiency of management in control of the business after confirmation." *In re Star Ambulance Servs., LLC*, 540 B.R. 251, 266 (Bankr. S.D. Tex. 2015) (denying confirmation of plan and finding that plan was not feasible where debtor failed to satisfy any of the enumerated factors); *see also In re Swiftco, Inc.*, Case No. 85-07083-H1-5 1988 Bankr. LEXIS 2251, at *16 (Bankr. S.D. Tex. Oct. 5, 1988) (applying factors and finding plan was not feasible where it was "visionary" and based upon "unrealistic and speculative financial projections").

8

18.     Moreover, with respect to leases and operating agreements being assumed, the Debtors must provide adequate assurance of future performance. To determine whether a debtor has provided adequate assurance of future performance, bankruptcy courts have considered the following factors: "(1) whether the debtor's financial data indicates its ability to generate an income stream sufficient to meet its obligations; (2) the general economic outlook in the debtor's industry; and (3) the presence of a guaranty." *In re Patriot Place, Ltd*., 486 B.R. 773, 801 (Bankr. W.D. Tex. 2013) (*citing In re Texas Health Enters, Inc*., 72 Fed. App'x 122, 126 (5th Cir 2003)). Additional factors courts have considered include: "(1) the debtor's payment history; (2) presence of a security deposit; (3) evidence of profitability; (4) plan that would earmark money exclusively for the [obligee]; and (5) whether the unexpired lease is at, or below, the prevailing rate." *Patriot Place*, 486 B.R. at 801.  "Speculative, conjectural, or unrealistic projections cannot support a debtor's prediction of future performance." *Id.*    The burden of proof is on the debtor in possession to show it gave "adequate assurance." *Tex. Health Enters.*, 72 F. App'x at 126. The fact that the assumption of the contract would benefit the estate does not automatically approve the assumption if the debtor in possession does not give adequate assurance of future performance. *Id.*

### (1) FWE III is Not Feasible

19.     FWE III is a critical component of the Debtors' Plan. It will retain all of the non-dischargeable residual liabilities of the Debtors,[7] retain ownership of and decommission the properties subject to the Hunt term sheet and operate the Wind Down Oil & Gas Properties and Wind Down Leases.  *See* Disclosure Statement, p. 3; Plan Supplement, Fieldwood/Hunt term sheet [Docket No. 1394, Ex. N]. FWE III is not feasible because it will not be able to satisfy the

---

[7] While the Debtors may argue that certain provisions of the Plan draft away their responsibility for the Non-Dischargeable P&A Obligations, any insistence on such an interpretation of the Plan provisions renders the Plan non-confirmable.  *See Infra* § B.

significant Predecessor Obligations that are being allocated to it by the Plan of Merger, including the non-dischargeable P&A Obligations of the Debtors. Pursuant to the authorities cited below, upon any predecessor's (including BP) satisfaction of the Debtors' P&A Obligations, such predecessor will be subrogated to the government's non-dischargeable claims as against FWE III. Completion of these obligations are estimated by BSEE at over $300 million – solely with respect to the BP Predecessor Properties – and will undoubtedly exceed the $27 million of initial capitalization for FWE III under the Plan and the "de minimis, if any, production" admitted to by the Debtors valuation expert. Disclosure Statement, at Ex. N (emphasis added).

20.      Pursuant to the Agreement and Plan of Merger of Fieldwood Energy LLC (the "Plan of Merger"), "[a]t the Effective Time: FWE shall be divisionally merged in accordance with the TBOC with . . . FWE continuing as a surviving business entity of the Merger as to all assets and liabilities of FWE (other than the FWE I Assets, the FWE I Obligations, the Credit Bid Acquired Assets, and the Credit Bid Assumed Liabilities) in accordance with the TBOC under the name "Fieldwood Energy III LLC." *See* Plan Supplement, Docket No. 1394, Ex. H, at p. 313 of 678. The Plan of Merger further provides:

> All of the liabilities and obligations of FWE other than the FWE I Obligations and the Credit Bid Assumed Liabilities (collectively, the "FWE III Obligations"), including (i) all liabilities and obligations to the extent relating to the Wind Down Assets and all liabilities and obligations described in Part B of Schedule II attached hereto (collectively, the "Wind Down Obligations"), (ii) all of the liabilities and obligations of FWE retained by FWE upon consummation of the Credit Bid Transaction, as well as (except as provided in Section 3(b)(i)) obligations of FWE under the Credit Bid Purchase Agreement, and (iii) **all liabilities and obligations relating to the Predecessor Assets and all liabilities and obligations described in Part B of Schedule III attached hereto (collectively, the "Predecessor Obligations")**, shall be allocated to and shall vest in, and shall constitute liabilities and obligations of, FWE III.

*Id.* at p. 59 (emphasis added).

21.      Schedule III Part B of the Plan of Merger provides:

"Predecessor Obligations" means: all of the obligations and liabilities (contractual or otherwise) of FWE of any kind, character or description (whether know or unknown, accrued, absolute, contingent, or otherwise) relating to, arising out of, or with respect to any of the Predecessor Assets, **including** (i) obligations and liabilities of FWE: (a) relating to the furnishing of makeup gas according to the terms of applicable gas sales, gathering, or transportation Predecessor Contracts and all obligations with respect to Imbalances attributable to FWE III's ownership interests in any of the **Predecessor Oil and Gas Properties**; (b) with respect to Royalties arising out of, related to, or attributable to any of the Predecessor Oil and Gas Properties and the Predecessor Suspense Funds, including any reporting and/or mis-reporting, and payment and/or mis-payment of such Royalties or the Predecessor Suspense Funds; (c) constituting or related to **Environmental Liabilities** arising out of, related to, or attributable to any of the **Predecessor Assets**; (d) applicable to or imposed on the lessee, owner, operator, holder, responsible party, payor or designated applicant under or with respect to any of the **Predecessor Assets**, or as required by **applicable Laws**; (e) constituting or relating to **any and all P&A Obligations** related to FWE III's ownership interests in, or operation of, any of the **Predecessor Assets**; and (f) any and all liabilities and obligations of FWE not expressly included in the FWE I Obligations or the Wind Down Obligations; and (ii) the obligations and liabilities of FWE III specified in Section 6 of the Plan of Merger to the extent attributable to use of the Joint Use Properties with respect to the Predecessor Assets; provided, however, that the Predecessor Obligations do not include any claims, liabilities or obligations satisfied, compromised, settled, released or discharged pursuant to the Plan of Reorganization and Confirmation Order.

*Id*. at p. 89 (emphasis added).

22.    The term "Predecessor Assets" is defined as follows:

"Predecessor Assets" means all of FWE's right, title, and interest in, to, or under the following, subject to Section 6 of the Plan of Merger:"

(i) the oil, gas, other Hydrocarbon, and mineral leases, subleases, operating rights, record title interests, carried interests, royalties, overriding royalty interests, net profits interests, production payments, reversionary interests, and other rights or interests of any kind or character in or to Hydrocarbons in place and mineral interests or servitudes of every nature, in, on, under, and that may be produced from or attributable to any of the lands covered by the leases, subleases, interests, and rights described on __Exhibit III-A__ attached hereto, whether legal or equitable, vested or contingent, and regardless of whether the same are expired or terminated (collectively, the "Predecessor Leases"), together with all pooled, communitized, or unitized acreage that includes all or part of any of the Predecessor Leases (the "Predecessor Units"), and all tenements, hereditaments, and appurtenances belonging to the Predecessor Leases and the Predecessor Units (collectively with the Predecessor Leases and Predecessor Units, the "Predecessor Lands") . . . .

*Id.*

23.     The Debtors are completing a divisive merger in which all assets and all liabilities must be apportioned between the surviving entities.[8]  While many obligations are being resolved under the Plan, the P&A Obligations are performance obligations to the U.S. Government that may not be discharged ("Non-Dischargeable P&A Obligations").  *See* Plan § 5.13 ("Nothing in this Plan or the Confirmation Order shall be construed as barring, waiving, or limiting the United States' right to assert a claim against the Debtors, the Post-Effective Date Debtors [defined to include FWE III] or any co-lessees or predecessors in interest with respect to the Abandoned Properties for any decommissioning obligations for the Abandoned Properties.");  *see also United States v. Apex Oil Co.*, 579 F.3d 734, 737-38 (7th Cir. 2009) (equitable remedy under Resource Conservation and Recovery Act was not dischargeable); *Torwico Elecs., Inc. v. State of New Jersey, Dep't of Envtl. Prot. (In re Torwico Elecs., Inc.)*, 8 F.3d 146, 151 (3d Cir. 1993) (equitable remedy compelling cleanup of environmental hazard was not a "claim" under the Code where no option to pay in lieu of cleanup); *United States v. LTV Corp. (In re Chateaugay Corp.)*, 944 F.2d 997, 1008 (2d Cir. 1991) ("any order that to any extent ends or ameliorates continued pollution is . . . not a 'claim'"); *The New Mexico Envtl. Dep't v. Mark IV Indus., Inc. (In re Mark IV Indus., Inc.)*, 438 B.R. 460, 467–68 (Bankr. S.D.N.Y. 2010) (setting forth factors to determine "whether a cleanup obligation is dischargeable").

---

[8] *See* Tex. Bus. Org. Code §§ 10.008(a)(3) ("When a merger takes effect . . . all liabilities and obligations of each organization that is a party to the merger are allocated to one or more of the surviving or new organizations in the manner provided by the plan of merger . . . .": and 10.008(b) ("If the plan of merger does not provide for the allocation and vesting of the right, title, and interest in any particular real estate or other property or for the allocation of any liability or obligation of any party to the merger, the unallocated property is owned in undivided interest by, or the liability or obligation is the joint and several liability and obligation of, each of the surviving and new organizations, pro rata to the total number of surviving and new organizations resulting from the merger.").

24.     Pursuant to 30 C.F.R. § 250.1701, predecessors are jointly and severally liable for the Debtors' Non-Dischargeable P&A Obligations.  As such, the performance of such obligations by a predecessor subrogates the predecessor to the claims of the U.S. Government under Section 509(a) of the Bankruptcy Code and applicable state law.   11 U.S.C. § 509(a); *Sojitz Energy Venture, Inc. v. Union Oil Co. of Cal.*, 394 F. Supp. 3d 687 (S.D. Tex. 2019) (finding predecessor subrogated to rights of BSEE based on satisfaction of decommissioning obligations of successor); *In re ATP Oil & Gas Corp.*, Case No. 12-36187, 2013 WL 3157567, at *8 (Bankr. S.D. Tex. June 20, 2013) ("The Court has previously held that a party paying decommissioning costs may be subrogated to the economic rights of the United States."); *In re Tri Union Dev.*, 314 B.R. 611 (Bankr. S.D. Tex. 2004) (holding that, although predecessors-in-title and sureties are not subrogated to the police powers of the government agency, such entities "are . . . subrogated to the priority and claims" of the government agency); *see also Tax Ease Funding, L.P. v. Thompson (In re Kizzee-Jordan)*, 626 F.3d 239, 242-46 (5th Cir. 2010) (applying Texas law and holding that third-party creditor that paid property taxes on debtor's behalf was subrogated to the taxing authorities claim); *In re Fields*, 926 F.2d 501, 504 (5th Cir. 1991) (applying provision of the Texas Business and Commerce Code and holding that the surety, having paid the debtor's taxes, would be subrogated to all of the rights of the creditor, the State of Texas, including its right to assert nondischargeability).

25.     Section 5.13 of the Plan preserves the right of the U.S. Government to pursue claims for decommissioning costs against FWE III, as the Post-Effective Date Debtor to which the Predecessor Obligations are allocated.  As such, upon BP's performance of the P&A Obligations, BP will be subrogated to the position of the U.S. Government, and will be entitled to pursue recovery for these Non-Dischargeable P&A Obligations from FWE III.

26.     The Debtors indicate that "FWE III will be capitalized with approximately $27 million of capital," (Disclosure Statement, at p. 82), far short of the amounts needed to satisfy the Non-Dischargeable P&A Obligations, based solely upon the $300 million in P&A Obligations relating to the BP Predecessor Properties (not to mention additional obligations to other predecessors incurring decommissioning costs).  Notwithstanding these significant obligations, the "Debtors have not prepared separate financial projections relating to FWE III" (Disclosure Statement, at Ex. O), but the Houlihan Lokey valuation analysis offered in support of the Plan "estimated the enterprise value of FWE III to be approximately *negative* $31 million to *negative* $25 million, with a mid-point of *negative* $28 million."  *Id*. at Ex. N (emphasis added).  The valuation analysis notes: "The valuation range reflected Houlihan Lokey's determination that substantially all of the FWE III properties were shut-in as of April 8, 2021 and were forecasted to generate *de minimis*, if any, production prior to decommissioning," *Id*.  As such, FWE III is grossly undercapitalized, and will fail as predecessors such as BP seek to exercise rights to collect on the Non-Dischargeable P&A Obligations.

### (2) FWE IV is Not Feasible

27.     FWE IV will fail because it will not have sufficient funds to pay at least $40 million in estimated decommissioning liabilities associated with the non-Chevron portion of the leases being transferred to FWE IV.  Two of these non-Chevron leases concern the East Breaks 160 and 161, with respect to which 100% of the working interests are being transferred to FWE IV.[9]  With respect to these leases, only a 33% working interest was previously owned by Chevron and the remaining 67% is alleged to have been previously owned by BP.  The BSEE P90 estimate for EB

---

[9] *Notice of Filing of Redlines of (I) Credit Bid Purchase Agreement and (II) Oil and Gas Schedules*, Docket No. 1396, Ex. D.

160 is $48,704,249.  The BSEE P90 estimate for EB 161 is $ 9,569,330. As such, the aggregate FWE IV BSEE estimated decommissioning cost is approximately $60 million.

28.     Upon being transferred the leases, FWE IV will be liable to plug and abandon the wells and decommission the associated infrastructure (*i.e.*, pipelines, platforms, etc.).  *See Sojitz Energy*, 394 F. Supp. 3d at 698.  Under the proposed term sheet with Chevron, however, Chevron is only required to pay its share of the decommissioning costs (*i.e.*, 33% of the $60 million).  *See* Plan Supplement, Ex. N1, Chevron Term Sheet, at p. 6 ("CUSA shall only be required to pay **its predecessor-in-interest share of the FWE IV working interest percentage share of the applicable turnkey amount**.") (emphasis added).  Accordingly, considering only the EB 160 and 161 leases, FWE IV lacks any commitment for the additional $40 million in decommissioning costs (over and above the $20 million being funded by Chevron) for these two leases.  Because this amount exceeds the entirety of the $5 million cash contribution to FWE IV, the entity is patently not feasible as currently capitalized.

29.     Moreover, the Debtors have acknowledged that they "have not prepared separate financial projections relating to FWE IV," and have thus failed to establish feasibility for FWE IV. Disclosure Statement, at Ex. O.  In addition, the Debtors state: "As of April 8, 2021, the FWE IV properties had immaterial production and were forecasted to generate *de mimimis*, if any, cash flow prior to their decommissioning."  *Id*.  The Debtors assert that the "costs to maintain, safe-out, and decommission the FWE IV properties are to be addressed by (i) the Debtors' $5 million cash contribution to FWE IV pursuant to the Chevron Term Sheet and (ii) CUSA funds."  *Id*.  As noted above, however, these amounts are grossly insufficient to cover the aggregate FWE IV BSEE estimated decommissioning cost of approximately $60 million related to East Breaks 160 and 161. Moreover, the Houlihan Lokey valuation analysis "estimated the enterprise value of FWE IV to

be approximately *negative* $38 million to *negative* $25 million, with a mid-point of *negative* $31 million." Disclosure Statement, at Ex. N (emphasis added).   As such, the Debtors' own Disclosure Statement concedes that FWE IV is not feasible, and will have insufficient funds to meet its known obligations.

### (3) NewCo is Not Feasible, and is Unable to Provide Adequate Assurance

30.     The Debtors are also unable to demonstrate that the Plan is feasible with respect to NewCo because NewCo's success is based upon unrealistic financial projections.   Moreover, NewCo is unable to provide adequate assurance of future performance with respect to the leases and joint operating agreements being assigned to it, particularly NewCo's ability to satisfy the P&A Obligations that will arise under those leases and agreements.   Exhibit O to the Disclosure Statement sets forth the Debtors' financial projections (the "Financial Projections"), including projections for NewCo.  The Financial Projections provide that over the first five years of the Plan (the "Projection Period"), NewCo will have cash of approximately $876 million, reduce its first lien debt by approximately $96 million, incur additional drilling and completion costs of $390 million to complete six additional deepwater drilling projects, and have cash of over $550 million in excess of the outstanding first lien debt and estimated P&A Obligations. These projections, however, do not account for the full impact of costs of the P&A Obligations, assume substantially lower P&A Obligations compared to BSEE estimates, are inconsistent with the Debtors' historical performance, and provide no cushion for the risk of the Debtors not achieving the projected results. Notably, the Debtors/NewCo do not have permitting in place for any of the six new deepwater wells, creating immediate uncertainty at the inception of the Projection Period.   Because the Financial Projections are not reasonable and based upon faulty assumptions, the Plan is not feasible and cannot be confirmed.

31.     First, the Financial Projections do not differentiate between the existing wells ("Existing Wells") and proposed new development programs (the "New Wells") for NewCo. When the projections for the Existing Wells and New Wells are segregated, it becomes clear that the Existing Wells will have negative cash flow by 2025, and the New Wells will therefore need to generate sufficient cash flow to satisfy not only their own P&A Obligations, but also the significant P&A Obligations of Existing Wells.

32.     Additionally, the Debtors substantially underestimate costs of P&A Obligations of NewCo when compared to BSEE estimates.[10]   Specifically, the Debtors' estimated cost of NewCo's P&A Obligations in the Financial Projections attached to the Debtors' expert valuation report, which does not account for New Wells,[11] is a fraction of the $1.227 billion of Existing Well P&A as estimated by BSEE.[12]   After adjusting the Financial Projections to account for the New Wells and BSEE estimates of P&A Obligations, NewCo is projected to have very little excess cash at the end of the Projection Period.  Even this adjusted projection is premised on NewCo achieving almost 100% of its projected results and does not account for future P&A Obligations related to state leases for which data is not available to BP.  Thus, to cover the BSEE estimate for NewCo's P&A Obligations, NewCo would be required to achieve projected results nearly to the dollar through the Projection Period, which is unreasonable and highly speculative.

33.     While the Financial Projections leave no room for error, the failure of the Debtors and their management team to achieve historical near-term projections calls into question the accuracy and reliability of the Debtors' Financial Projections.  For example, the Debtors filed

---

[10] Notably, the Debtors' Disclosure Statement identifies "significant decommissioning costs" as a reason for the failed 2018 Restructuring.  Disclosure Statement, at p. 24.

[11] The valuation rebuttal materials outlining Fieldwood's P&A calculations do not include P&A liabilities for the six New Wells contemplated in the Debtors' projections.

[12] The $1.227 billion number represents the BSEE estimates for NewCo Existing Well P&A (PV-9 of $575 million). Total nominal dollars for NewCo P&A liabilities is $1.353 billion (PV-9 of $608 million).

financial projections in their prior chapter 11 cases in 2018, Case No. 18-30648, Docket No. 34, Ex. E (the "2018 Projections").  Comparing the 2018 Projections to actual results, the Debtors fell short of revenue projections for 2018 and 2019 by 9% and 16%, respectively, based primarily upon significantly lower production.  Likewise, the Debtors fell well short of projected EBITDA in 2018 and 2019 by 21% and 47%, respectively, due to both lower than projected revenue and higher costs.

34.     To satisfy the BSEE estimated NewCo P&A Obligations, NewCo would be required to achieve nearly perfect results through the Projection Period, which is unlikely.  With such little or no room for error, the Financial Projections are highly sensitive to even minor variances in price, production, and cost.  Given the historic failure of the Debtors and their management team to achieve even near-term projections, as evidenced by the 2018 Projections and actual performance, it is more likely than not that NewCo will miss its targeted projections and require further restructuring or reorganization.  As such, the Plan is not feasible and confirmation should be denied.

**B.  The Plan Should be Rejected to the Extent it Improperly Discharges the Debtors' Performance Obligations to the United States and the Resulting Subrogation Claims in Favor of BP**

35.     Confirmation should also be denied to the extent the Plan improperly removes the Debtors' performance obligations to the U.S. Government to plug and abandon the Abandoned Properties through a *de facto* discharge of the Non-Dischargeable P&A Obligations and the resulting subrogation claims to predecessors such as BP.

36.     The Plan, on the one hand, expressly preserves the U.S. Government's claims against the Debtors and Post-Effective Date Debtors for decommissioning obligations related to the Abandoned Properties.  *See* Plan § 5.13 ("Nothing in this Plan or the Confirmation Order shall be construed as barring, waiving, or limiting the United States' right to assert a claim against the

18

Debtors, the Post-Effective Date Debtors [defined to include FWE III] or any co-lessees or predecessors in interest with respect to the Abandoned Properties for any decommissioning obligations for the Abandoned Properties."). At the same time, there are other provisions of the Plan that the Debtors may argue, inconsistently and improperly, create a *de facto* discharge of these preserved obligations. *See id.* ("Except as otherwise provided in this Plan or the Confirmation Order, the Debtors, their Estates, and the Post-Effective Date Debtors shall not be liable for any obligations whatsoever arising from or relating to the post-Effective Date period with regards to the Abandoned Properties.").

37. Section 5.13 of the Plan and the Plan of Merger provide that the Abandoned Properties do not vest in any entity and that no entity will have liability for the resulting P&A Obligations under the Plan. The Plan of Merger also excludes the allocation of any obligations to any entity created under the Plan of Merger for any "claims, liabilities or obligations satisfied, compromised, settled, released or discharged pursuant to the Plan of Reorganization and Confirmation Order." *See, e.g.,* Plan of Merger, Docket No. 1394-1, § 11 (Rejected Contracts) at pg. 325 of 678, and Schedule 3 (definition of Predecessor Obligation 343 of 678)]. This circular drafting, to the extent interpreted to constitute a *de facto* discharge of the Debtors' Non-Dischargeable P&A Obligations, would improperly render meaningless and worthless the preserved rights of the United States under Section 5.13 of the Plan to assert claims relating to the Abandoned Properties.

38. In explaining the provisions to the Court at the Disclosure Statement Hearing, Counsel for the Debtor stated: "I'm not sure that the word 'discharge' is the right word. At that point, there simply will be no Fieldwood to be able to do the work. That's it." Discl. Statement Hr'g Tr. 14:14-15 (Mar. 24, 2021). Yet, under the Plan of Merger, FWE III has been allocated the

Predecessor Obligations. The fact that the entity has not been sufficiently funded to meet those obligations, including obligations owed to BP and other parties subrogated to the U.S. Government upon satisfaction of the P&A Obligations, renders that entity not feasible, but the Debtors cannot properly discharge the Non-Dischargeable P&A Obligations. Whatever word the Debtors think best describes the treatment afforded the Non-Dischargeable P&A Obligations under the Plan, to the extent the culmination of these provisions amount to a *de facto* discharge of the obligations to the U.S. Government, as well as BP's and other Predecessors' subrogation rights under the Plan, the Plan is unconfirmable, and the result should not be countenanced by this Court.

39.     As set forth herein, *supra*, pursuant to 30 C.F.R. § 250.1701, predecessors are jointly and severally liable for the Debtors' Non-Dischargeable P&A Obligations and, as such, the performance of the Reorganized Debtors' Non-Dischargeable P&A Obligations by a predecessor subrogates the predecessor to the claims of the U.S. Government under Section 509(a) of the Bankruptcy Code and applicable state law. Because the U.S. Government's claims cannot be discharged, it follows that BP's subrogation claims are also not subject to discharge. There is a well-established body of analogous case law in this Circuit and others to support this common-sense proposition.

40.     For example, in *Gilbert v. United States Fidelity & Guaranty Co.*, a defendant issued surety bonds on behalf of the plaintiff, the principal, to secure plaintiff's payment of taxes to the State of Georgia, the obligee. 180 F.Supp. 794 (M.D.Ga. 1959), *aff'd*, 274 F.2d 823 (5th Cir. 1960) (per curiam). When the plaintiff failed to pay his taxes, the defendant paid them on the plaintiff's behalf. *Id.* at 794-95. Shortly thereafter, the plaintiff received a bankruptcy discharge. *Id.* at 795. The plaintiff then sued the defendant, seeking a declaration that his discharge barred the defendant from pursuing a subrogation claim for reimbursement of the tax payment. *Id*. The

district court held that not only was the plaintiff's tax debt to the State of Georgia non-dischargeable under 11 U.S.C. § 35 (the precursor to Section 523) but also that the defendant retained the right of subrogation and could pursue, as a subrogee, plaintiff's tax debt as if defendant never paid the State. *Id.* at 796. The United States Court of Appeals for the Fifth Circuit summarily affirmed. *Gilbert,* 274 F.2d at 823.

41.     Thereafter, in *In re Waite*, the United States Court of Appeals for the Eleventh Circuit adopted the reasoning in *Gilbert*, holding that a plaintiff surety was entitled to subrogate itself to the rights of the State of Tennessee, the obligee, to attempt to collect the defendant's non-dischargeable tax debt for unpaid liquor sales taxes. 698 F.2d 1177, 1178 (11th Cir. 1983). Then, in *In re Fields*, the Fifth Circuit followed *Waite* and *Gilbert* to hold that that a surety, having paid a chapter 7 debtor's taxes to the State of Texas, was entitled to subrogate itself to the State of Texas's right to pursue collection of the non-dischargeable tax debt. 926 F.2d 501, 504-05 (5th Cir. 1991). The Fifth Circuit underscored that at that time, the majority of courts that had addressed the issue of whether a surety's right to pursue collection of non-dischargeable debts as a subrogee survived a bankruptcy discharge had "likewise held that a surety is entitled to subrogation." *Id.* at 504; *id.* at 504 n.8 (collecting cases).

42.     Following *Fields*, the United States District Court for the Eastern District of Virginia in *In re Miller* likewise held that a plaintiff debtor's bankruptcy discharge did not preclude an insurance company, with whom the debtor had an automobile policy, from asserting a subrogation claim against the plaintiff to attempt to recover a debt for causing injury while driving intoxicated. No. 92-3189-S, 1993 WL 13152206, at *3, 4 (E.D.Va. May 24, 1993). The district court concluded that because Section 523 of the Bankruptcy Code excepts from discharge "any

debt" arising under that section, neither the debt to the victim of the automobile accident nor the insurance company's subrogation claim was discharged. *Id.* at *3-4.

43.     These Chapter 11 cases present the same issues and require a similar result as in the aforementioned cases. It is undeniable that the Non-Dischargeable P&A Obligations to the U.S. Government in these (or any) Chapter 11 cases are non-dischargeable performance obligations. Therefore, BP's subrogation claims cannot be discharged, demonstrating a further fundamental flaw with the Plan, rendering it unconfirmable. If, however, this Court is inclined to confirm the Plan – which, for the reasons set forth herein, BP respectfully submits would be in error– the Confirmation Order must expressly provide for the preservation of the U.S. Government's claims along with subrogation claims of BP and similarly-situated Predecessors.

## C.  The Debtors Cannot Sell Assets Free and Clear of BP's Secured Setoff Rights

44.     Debtor Fieldwood Energy LLC ("Fieldwood") is indebted to BP in the amount of $30 million on account of unpaid acquisition costs pursuant to that certain Purchase and Sale Agreement in respect of Mississippi Canyon Block 519 (the "MC519 PSA"), which BP is entitled to setoff against obligations that BP owes to Fieldwood under various acquisitions agreements and joint operating agreements, including approximately $12.7 million BP owes to Fieldwood under that certain Cash Consideration Exchange Agreement by and between Fieldwood and BP in respect of Mississippi Canyon Block 562. Under the terms of the MC519 PSA, Fieldwood agreed, among other things, to pay BP $30 million, which becomes payable and owing to BP upon the successful completion of the Genovesa well and shall be due and paid within the first 180 days of production from the well. (MC519 PSA § 3.1(b).)   As acknowledged by the Debtors, "Genovesa was successfully brought online as planned on March 27, 2021."  Disclosure Statement, at p. 49.  Thus, the $30 million obligation became payable and owing on March 27, 2021.  The Debtors have not included the MC519 PSA in their recent Plan Supplement as a contract to be assumed and assigned,

and therefore the MC519 PSA will be deemed rejected under the Plan (Plan § 8.1(a)); BP has a rejection damages claim for at least the amount that Fieldwood owes to BP. At the same time, BP is indebted to Fieldwood in the amount of approximately $12.7 million under the Cash Consideration Agreement, as well as other amounts that may be due under the various acquisition agreements and joint operating agreements. Accordingly, under applicable state law and subject to the automatic stay, BP may set off its obligations to Fieldwood against the amounts that Fieldwood owes to BP under the MC519 PSA.

45.       Section 553 of the Bankruptcy Code expressly preserves BP's setoff rights in these chapter 11 cases. 11 U.S.C. § 553 ("Except as otherwise provided in this section and in section 362 and 363 of this title, this title does not affect any right of a creditor to offset a mutual debt owing by such creditor to the debtor that arose before the commencement of the case under this title against a claim of such creditor against the debtor that arose before the commencement of the case[.]"). Additionally, because BP has a right of setoff, BP is a secured creditor to the extent of such setoff rights. 11 U.S.C. § 506(a) (providing that a claim "that is subject to setoff under section 553 "is a secured claim . . . to the extent of the amount subject to setoff"); *see also In re Corp. Res. Servs., Inc.*, 564 B.R. 196, 204 (Bankr. S.D.N.Y. 2017) (recognizing that "section 506(a) provides that the existence of a right of setoff under nonbankruptcy law establishes the existence of a secured claim for purposes of the section"); *Szymanski v. Wachovia Bank, N.A. (In re Szymanski)*, 413 B.R. 232, 242 (Bankr. E.D. Pa. 2009) (holding that "a setoff right gives rise to an allowed secured claim" and that such right must be adequately protected); *In re Rehab Project, Inc.*, 238 B.R. 363, 375 (Bankr. N.D. Ohio 1999) ("Congress bestowed upon creditors having a valid right of setoff, the status of an allowed secured claim, thus giving that creditor the highest priority under the Bankruptcy Code."). Indeed, the express provisions of the Plan acknowledge that a right of

setoff constitutes a "Secured" claim. Plan, Art. I, § 1.1, at p. 24 ("Secured means, when referring to a Claim[,] . . . secured by the amount of any right of setoff of the holder thereof in accordance with section 553 of the Bankruptcy Code.").

46.     Although the Plan does not expressly disallow or discharge setoff rights generally, the Plan provides for the sale of certain assets to the Credit Bid Purchaser under Sections 363 and 1141(c) of the Bankruptcy Code free and clear of liens, claims, charges, interests, or other encumbrances. Plan § 5.2(a). To the extent the Debtors seek to sell such assets free and clear of BP's secured setoff rights, the Debtors have failed to establish any basis for selling assets free and clear of BP's secured setoff rights under Section 363 of the Bankruptcy Code. Additionally, setoff rights under Section 553 take precedence over Section 1141. Accordingly, any order confirming the Plan or otherwise approving the transfer of assets to the Credit Bid Purchaser must expressly provide that the transfer is subject to BP's setoff rights. Alternatively, if the Court approves the sale free and clear of BP's secured setoff rights, the Debtors must provide adequate protection of such rights.

**(1) The Debtors Have Not Met Their Burden Under Section 363(f)**

47.     A debtor in possession may sell property of the estate under Section 363 of the Bankruptcy Code free and clear of liens and other interests of an entity in such property only if one of five requirements is met. 11 U.S.C. § 363(f). *In re Sherwin Alumina Co*., L.L.C., 952 F.3d 229, 238 (5th Cir. 2020) ("Section 363(f) . . . limits a debtor's right to sell free and clear of others' interests in property."); *In re Ricco, Inc*., No. 10-23, 2014 Bankr. LEXIS 1265 at *12 (Bankr. N.D. W. Va. Apr. 1, 2014) (recognizing that the sale proponent bears the burden of proving they have satisfied one of the provisions of Section 363(f) of the Bankruptcy Code with respect to each lien

or interest from which the sale is to be free and clear) (*citing In re Daufuskie Island Props., LLC*, 431 B.R. 626, 637 (Bankr. D.S.C. 2010)).

48.     Here, the Debtors have failed to meet their burden under Section 363(f). BP does not consent to the transfer of the Debtors' assets free and clear of its setoff rights, and the Debtors have not asserted, much less demonstrated, how any other provisions of Section 363(f) of the Bankruptcy Code are satisfied. Accordingly, the Debtors cannot sell assets to the Credit Bid Purchaser free and clear of BP's secured setoff rights under Section 363(f), and any order confirming the Plan or otherwise approving the transfer of assets and assignment of contracts must expressly provide that the sale is subject to such rights.

### (2) Setoff Rights Under Section 553 Take Precedence Over Section 1141

49.     Section 1141(c) of the Bankruptcy Code provides that "the property dealt with by the plan is free and clear of all claims and interests of creditors . . . ." 11 U.S.C. § 1141(c). Recognizing an apparent conflict between setoff rights under Section 553, which are not affected by any other provision of the Bankruptcy Code, and Section 1141(c), courts hold that Section 553 takes precedence over 1141 and find that setoff rights are otherwise preserved notwithstanding confirmation of a plan. *See, e.g., In re De Laurentiis Entm't Grp., Inc.*, 963 F.2d 1269, 1276 (9th Cir. 1992) (concluding that Section 553 controls "notwithstanding any other provision of the Bankruptcy Code" including Section 1141 and recognizing that to hold otherwise would require setoff to be written into a plan of reorganization); *cf. Davidovich v. Welton (In re Davidovich)*, 901 F.2d 1533, 1538-39 (10th Cir. 1990) (recognizing that "the right to assert a setoff against a mutual,

prepetition debt owed the bankrupt estate survives even the Bankruptcy Court's discharge of the bankrupt's debts").

50.     Thus, even if the Court approves the sale of the Debtors' assets to the Credit Bid Purchaser under Section 1141(c) free and clear of claims, the sale is not free and clear of BP's secured setoff rights.  Accordingly, BP respectfully requests that any order confirming the Plan or otherwise approving the sale of the assets to the Credit Bid Purchaser provide that the sale is subject to BP's secured setoff rights.

### (3) The Debtors Must Provide Adequate Protection of BP's Setoff Rights

51.     If the Court approves the sale of the Debtors' assets to the Credit Bid Purchaser free and clear of BP's setoff rights, BP is entitled to adequate protection under Section 363(e) of the Bankruptcy Code. Section 363(e) provides, in relevant part:

> Notwithstanding any other provision of this section, at any time, on request of an entity that has an interest in property used, sold, or leased, or proposed to be used, sold, or leased, by the trustee, the court . . . shall prohibit or condition such use, sale, or lease as is necessary to provide adequate protection of such interest."

11 U.S.C. § 363(e). *See also Szymanski*, 413 B.R. at 242 (recognizing that a right of setoff must be adequately protected). Section 361 of the Bankruptcy Code sets forth a nonexclusive list of forms of adequate protection, including relief "as will result in the realization by such entity of the indubitable equivalent of such entity's interest in such property." 11 U.S.C. § 361(3). Here, as noted above, BP's setoff rights constitute a secured claim to the extent of the amount subject to setoff (*i.e.*, up the $30 million that Fieldwood owes to BP). The Plan, however, does not provide for satisfaction of this secured setoff claim, nor do the Debtors propose any manner of adequate protection of BP's interests. Accordingly, the Debtors cannot sell assets to the Credit Bid Purchaser free and clear of BP's secured setoff rights unless they provide for BP to receive the "indubitable

equivalent" of such interest. If the Debtors cannot provide such adequate protection, then the sale must be subject to BP's secured setoff rights

### D.  The Plan Includes Improper Third-Party Releases

52.     The Court should deny confirmation because Section 10.7(b) of the Plan contains an overbroad, non-consensual third-party release of non-debtors in violation of Section 524(e) of the Bankruptcy Code and Fifth Circuit law.  Section 524(e) addresses the scope of a bankruptcy discharge and provides, in relevant part, that the "discharge of a debt of the debtor does not affect the liability of any other entity on, or property of any other entity for, such debt."  11 U.S.C. § 524(e).  The Fifth Circuit has flatly rejected non-debtor releases because they contravene Section 524(e).  In numerous cases, the Fifth Circuit has made clear that Section 524(e) releases only the debtor, not co-liable third parties, and prohibits non-debtor releases.  *See, e.g.*, *In re Zale Corp.*, 62 F.3d 746, 760 (5th Cir. 1995) ("Section 524(e) prohibits the discharge of debts of nondebtors"); *Hall v. Nat'l. Gypsum Co.*, 105 F.3d 225, 229 (5th Cir. 1997), (citing *In re Edgeworth*, 993 F.2d 51, 53-54 (5th Cir. 1993) (Section 524(e) "specifies that the debt still exists and can be collected from any other entity that might be liable"); *In re Vitro S.A.B. de C.V.*, 701 F.3d 1031, 1062 (5th Cir. 2012) (stating the Fifth Circuit has "firmly pronounced its opposition to such releases").[13] Bankruptcy courts in Texas have noted that "[t]he Fifth Circuit takes a very restrictive approach to non-debtor releases in bankruptcy cases . . . [N]on-consensual, non-debtor releases in bankruptcy proceedings in this circuit have been 'explicitly prohibited,' this circuit has 'firmly pronounced its opposition to such releases,' and the Bankruptcy Code precludes nonconsensual,

---

[13] In *Pacific Lumber*, the Fifth Circuit found that substantial consummation of a confirmed plan of reorganization did not equitably moot consideration of non-debtor releases because such releases are "consequential to the integrity and transparency of the Chapter 11 process." *Bank of N.Y. Trust Co., NA v. Official Unsecured Creditors' Comm. (In re Pac. Lumber Co.)*, 584 F.3d 229, 251 (5th Cir. 2009).

non-debtor releases.'"  *In re Patriot Place, Ltd.*, 486 B.R. 773, 822 (Bankr. W.D. Tex. 2013) (*quoting In re Vitro*, 701 F.3d at 1051-55, 1058-59 (5th Cir. 2012)).

53.    Notably, courts in the Fifth Circuit have declined to follow other circuits that have taken a more lenient view toward non-debtor releases under certain "extraordinary circumstances." *Id.*, 486 B.R. at 822-23.  A release may be consensual where it is a valid settlement of claims. Specifically, bankruptcy courts in the Fifth Circuit have found third party releases valid and consensual where (a) the releasing party votes in favor of the plan, (b) the releasing party receives consideration in exchange for the release, or (c) the release is integral to the plan.  *See In re Bigler LP*, 442 B.R. 537, 543-44 (Bankr. S.D. Tex. 2010) (holding that third party releases "must satisfy the requirements of a valid settlement of claim" and requires "consent and consideration by each participant in the agreement to be valid."); *In re Wool Growers Cent, Storage Co.*, 371 B.R. 768, 775-76 (Bankr. N.D. Tex. 2007) ("Consensual nondebtor releases that are specific in language, integral to the plan, a condition of the settlement, and given for consideration do not violate section 524(e).").  The Plan defines the scope of "Releasing Parties" to include creditors who are deemed to reject the Plan, abstain from voting on the Plan, vote to reject the Plan but do not affirmatively opt out of the releases, or, if not entitled to vote on the Plan but were given notice of the opportunity to opt out of the releases and failed to do so,[14] even though they may not have manifested any intent to release third parties.  Silence is not consent.  As the Fifth Circuit has made clear, there is no duty on creditors to speak.[15]  Other courts have voiced similar concerns, observing that calling

---

[14] "Releasing Parties means collectively, (a) the holders of all Claims or Interests that vote to accept the Plan, (b) the holders of all Claims or Interests whose vote to accept or reject the Plan is solicited but that do not vote either to accept or to reject the Plan, (c) the holders of all Claims or Interests that vote, or are deemed, to reject the Plan but do not opt out of granting the releases set forth herein, (d) the holders of all Claims and Interests that were given notice of the opportunity to opt out of granting the releases set forth herein but did not opt out, and (e) the Released Parties (even if such Released Party purports to opt out of the releases set forth herein)."  Plan § 1.1, at p. 21.

[15] The Fifth Circuit applies the principles of contract interpretation when interpreting provisions of a bankruptcy plan of reorganization. *Hernandez v. Larry Miller Roofing, Inc.*, 628 F. App'x 281, 286-88 (5th Cir. 2016) (citing *Compton*

"opt-out" releases "consensual," "would stretch the meaning of 'consent' beyond the breaking point." *SunEdison*, 576 B.R. at 460 (*citing In re Chassix Holdings*, 533 B.R. 64, 81 (Bankr. S.D.N.Y. 2015)); *see also In re Wash. Mut. Inc.*, 442 B.R. 314, 355 (Bankr. D. Del. 2011) (holding that "inaction" was not a sufficient manifestation of consent to support a release). Although similar provisions have been approved in this Court (generally without meaningful objection), the proposed third party releases in the Plan should not be approved in these Chapter 11 cases after numerous parties have objected to the overbroad releases proposed by these Debtors. For the avoidance of doubt, although BP does not fit within the definition of "Releasing Parties" under the Plan, BP does not consent to, affirmatively opts out of, and elects not to grant the third-party releases and related injunction contained in the Plan, as reflected by BP's submission of its opt-out notice and its Notice of Election to Opt Out of Releases, Docket No. 1437.

## E. The Plan Includes an Improper Exculpation Clause

54.     The Court should also deny confirmation because the Plan's exculpation provision (Plan §10.8) exculpates parties other than estate fiduciaries in violation of Fifth Circuit law.[16] In

---

*v. Anderson (In re MPF Holdings U.S.)*, 701 F.3d 449, 457 (5th Cir. 2012). "Courts generally apply contract principles in deciding whether a creditor consents to a third-party release." *In re SunEdison, Inc.*, 576 B.R.   453, 458 (Bankr. S.D.N.Y. 2017) (finding that Plan was governed by New York law and, under New York law, absent a duty to speak, silence does not constitute consent); *Karlin v. Avis*, 457 F.2d 57, 62 (2d Cir. 1972) ("An offeror has no power to transform an offeree's silence into acceptance when the offeree does not intend to accept the offer[.]"); *Bronner v. Park Place Entm't Corp.*, 137 F. Supp. 2d 306, 312 (S.D.N.Y. 2001) ("[A]bsent a duty to speak, a party's silence cannot be translated into acceptance of an offer to contract."); *Albrecht Chem. Co. v. Anderson Trading Corp.*, 298 N. Y. 437, 84 N.E. 2d 625, 626 (N.Y. 1949) ("[W]here the recipient of an offer is under no duty to speak, silence, when not misleading, may not be translated into acceptance merely because the offer purports to attach that effect to it").

[16] "Exculpated Parties means collectively, and in each case in their capacities as such during the Chapter 11 Cases (a) the Debtors, (b) the Post-Effective Date Debtors, (c) FWE I, (d) the DIP Agent and DIP Lenders under the DIP Facility, (e) the Prepetition FLFO Secured Parties, (f) the Consenting Creditors, (g) the Prepetition FLFO Collateral Agent, (h) the Prepetition FLTL Agents, (i) the Prepetition SLTL Agent, (j) the Creditors' Committee and the current and former members of the Creditors' Committee (solely in their capacities as such), (k) NewCo and all of its subsidiaries (including the Credit Bid Purchaser), (l) the Exit Facility Agents, (m) the Exit Facility Lenders, (n) the Second Lien Backstop Parties, (o) the ERO Backstop Parties, (p) the Apache PSA Parties, and (q) with respect to each of the foregoing Persons in clauses (a) through (p) each of their current and former affiliates, and each such Entity's and its current and former affiliates' current and former directors, managers, officers, equity holders (regardless of whether such interests are held directly or indirectly), predecessors, successors, and assigns, subsidiaries, and each of their current and former officers, members, managers, directors, equity holders (regardless of whether such interests are held directly or indirectly), principals, members, employees, agents, managed accounts or funds, management

29

*Pacific Lumber*, the Fifth Circuit struck exculpation provisions for the plan co-proponents/equity sponsors and directors and officers, permitting exculpation only for the creditors' committee and its members. 584 F.3d at 252-53.  In these Chapter 11 cases, the exculpation provision exculpates a laundry list of individuals and entities who are not estate fiduciaries, including non-debtors' current and former directors and officers, financial advisors, fund advisors, consultants, and even future entities of the Exculpated Parties.  Such broad language strays far from the narrow exculpation *Pacific Lumber* allows.  The exculpation provision of the Plan violates that binding precedent and thus the Plan should not be confirmed.

### F.  The Plan Contains an Inappropriate Plan Injunction

55.     Section 10.6 of the Plan contains an overly broad injunction, preventing all Persons who have held, hold or may hold Claims from pursuing such Claims against numerous parties including a Debtor, a Post-Effective Date Debtor, or any successor, including Claims subject to arbitration.  At a minimum, the term "Claims," as used in Section 10.6 of the Plan, should be limited to pre-petition unsecured claims against the Debtors, and should not apply to (a) any claim based upon ongoing relationships BP has with the Debtors, NewCo or any of the divisive merger entities, (b) any claims for contribution or subrogation relating to the Non-Dischargeable P&A Obligations, and (c) any claims for contractual setoff or recoupment.  Additionally, the Plan Injunction should not limit any claims identified by BP in the Reservation of Rights below.  Among other things, BP has ongoing contractual relationships with certain Debtors, including under the LSPS OA, as to which there is a pending dispute regarding the efforts to remove BP as operator,

---

companies, fund advisors, investment advisors, advisory board members, financial advisors, partners (including both general and limited partners), attorneys, accountants, investment bankers, consultants, representatives and other professionals, such Persons' respective heirs, executors, estates, and nominees, in each case in their capacity as such, and any and all other persons or entities that may purport to assert any cause of action derivatively, by or through the foregoing entities." Plan § 1.1, at p. 9.

which is subject to arbitration under the LSPS OA, pursuant to the parties' contractual agreement. None of these claims should be limited by the Plan Injunction.

**G.  The Plan Fails to Satisfy Section 1129(a)(1) of the Bankruptcy Code Because Section 554(a) of the Bankruptcy Code Prohibits the Debtors' Abandonment of P&A Obligations Under These Circumstances**

56.     While BP understands that the Court will defer to the position of the U.S. Government with respect to any *Midlantic* issues, BP asserts that there are significant public health and safety issues that should be considered and addressed by the U.S. Government and the Court. The Plan makes no provision for ensuring that the Abandoned Properties are in full compliance with all applicable state and federal environmental regulations.  Because hurricane season in the Gulf of Mexico begins at the same time as the Debtors seek to abandon substantial P&A Obligations, it is critical and of utmost importance that any abandoned wells and platforms and related assets meet all necessary regulatory requirements to avoid or (at a minimum) reduce the risk of an environmental disaster.  The Plan fails to formulate any such conditions to ensure the protection of the public's health and safety, and instead seeks to shift such responsibility to predecessors in interest or the public. Accordingly, abandonment of the Abandoned Properties does not comply with Section 554(a) of the Bankruptcy Code, and the Plan therefore fails to satisfy Section 1129(a)(1).

57.     At a minimum, to the extent the Debtors are permitted to abandon such massive and extensive interests in the Abandoned Properties, the Debtors should be required to comply with the following:

- All assets operational and in full compliance with BSEE safety and operational requirements outlined in Title 30 CFR PART 250—OIL AND GAS AND SULPHUR OPERATIONS IN THE OUTER CONTINENTAL SHELF.

  - All BSEE INC's resolved and accepted via BSEE inspector

- o All access/egress routes (boatlandings, helidecks, stairs, etc.) in compliance with BSEE safety plans approved per CFR 250

- o All fire detection and protection equipment (fire pumps, deluge, etc) in compliance with BSEE safety plans approved per CFR 250

- o All open & closed drain systems operational and in compliance with BSEE safety plans

- All Aids to Navigational in full working order in compliance with U.S. Coast Guard (USCG) navigational requirements for the structures

- Prior to handover, in person on asset handover between FWE asset operation crew and new operator of record operations crew such that the new operator crew will observe FWE operations crew for one full rotation for the back-to-back crews. A structured MoC (Management of Change) from FWE to new operator will occur at the end of each crew rotation.

- At handover,

  - o If asset operational, in person, from FWE operation crew to new operator crew, at the conclusion of the last MoC

  - o If asset shut in, the facility shall be secured as per FWE-SWP F-4-3 Hurricane Preparedness and Evacuation Plan. FWE will comply with 30 CFR 250.720 for well securing requirements

- Provide all paper and digital documents for assets.

### F. BP's Reservation of Rights

58.     Nothing contained in this Objection shall be deemed an admission by BP of liability on any alleged claims against it, and BP does not waive any rights against any party or Person. BP reserves all rights, including, without limitation: (a) the right to amend, modify, or supplement this Objection and to bring further and separate objections to the Plan, including any amended Plan, modification to the Plan or any other alternative transaction now or hereafter asserted; (b) all rights against the Debtors, the entities created under the Plan, or other potentially liable or responsible parties; and (c) all rights with respect to the United States, its respective departments and subdivisions, and all governmental units (as defined in 11 U.S.C. § 101(27)) concerning any

government lease interests, law or regulation, including, without limitation, such laws and regulations concerning the P&A Obligations related to the Debtors' interests in state or federal oil and/or gas leases.

59.     BP hereby reserves and preserves any and all rights to seek and assert claims and defenses, against all parties and Persons for any plugging and abandonment and decommissioning expenses including without limitation: subrogation to the U.S. Government's economic rights (*e.g.,* under applicable state law as surrogate federal law under OCSLA), waiver, estoppel, laches, and novation.  BP reserves and preserves the right to assert claims for the recovery of the Debtors' share of the costs to satisfy any decommissioning obligations incurred after the filing of this Objection based on the theory of equitable subrogation to the U.S. Government's economic rights against any entity created under the Plan in a court with original jurisdiction over such claims.

60.     BP hereby reserves and preserves and does not waive any rights at law or equity or any rights or causes of action that it has or may have against any Person(s), including, but not limited to, the Debtors and their affiliates, or any non-Debtor party related to the Plan.  The filing of this Objection is not intended to be, and shall not be construed as: (i) an election of remedies; (ii) a waiver of any defaults; (iii) an admission as to the jurisdiction of this Court or a waiver to contest the jurisdiction of this Court; (iv) a waiver of the right to trial by jury in this Court or any other court in any proceeding, notwithstanding the designation or not of any matter as a "core proceeding" pursuant to 28 U.S.C. §157(b)(2), and whether such jury trial right is pursuant to statute or the United States Constitution; (v) a waiver of the contractual right to arbitration; (vi) a release of BP's right to have any and all final orders in any and all non-core matters or proceedings entered only after a de novo review by a United States District Court judge; (vii) a waiver of the right to withdraw the reference with respect to the subject matter of any claim it may file, any

objection thereto or other proceeding which may be commenced in these cases against or otherwise involving BP; or (viii) a waiver or limitation of any rights, remedies, claims, or interests of BP.

**WHEREFORE**, BP respectfully requests that this Court deny confirmation of the Plan.

Date:   June 2, 2021                     Respectfully submitted,

                                                **GREENBERG TRAURIG, LLP**

                   By: */s/ Shari L. Heyen*
                          Shari L. Heyen (SBN 09564750)
                          HeyenS@gtlaw.com
                          Karl D. Burrer (SBN 24043584)
                          BurrerK@gtlaw.com
                          1000 Louisiana Street, Suite 1700
                          Houston, Texas 77002
                          Telephone: (713) 374-3500
                          Facsimile: (713) 374-3505

                          – and –

                          Craig A. Duewall (admitted *pro hac vice*)
                          Texas State Bar Number 24025334
                          DuewallC@gtlaw.com
                          300 West 6th Street, Suite 2050
                          Austin, Texas 78701
                          Telephone: (512) 320-7200
                          Facsimile: (512) 320-7210

                          – and –

                          **GREENBERG TRAURIG, P.A.**

                          John B. Hutton (*admitted pro hac vice*)
                          HuttonJ@gtlaw.com
                          333 SE 2nd Avenue, Suite 4400
                          Miami, Florida 33131
                          Telephone: (305) 579-0500
                          Facsimile: (305) 579-0717

                          ***Counsel for BP Exploration & Production Inc.***

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that on June 2, 2021, I caused a copy of the foregoing to be served on all parties eligible to receive service through the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas by electronic mail.

By: <u>*/s/ Karl D. Burrer*</u>
Karl D. Burrer