# EXHIBIT 1

# PRODUCTION HANDLING AGREEMENT

Effective as of the 1st day of January, 2008

BETWEEN:

## APACHE CORPORATION, HUNT OIL COMPANY, HUNT PETROLEUM CORPORATION, LAMAR HUNT TRUST ESTATE, THE GEORGE R. BROWN PARTNERSHIP, L.P. AND OPEX ENERGY, L.L.C.

## AS PROCESSOR

## AND

## HELIS OIL & GAS COMPANY, L.L.C., HOUSTON ENERGY, L.P., RED WILLOW OFFSHORE, L.L.C., CL&F RESOURCES, LP AND NEXEN PETROLEUM OFFSHORE U.S.A. INC.

## AS PRODUCER

# TABLE OF CONTENTS

# PRODUCTION HANDLING AGREEMENT

Article I. GATHERING AND DELIVERY .................................................................................. 1

Article II. SATELLITE WELL FACILITIES ........................................................................... 2

Article III. OPERATION OF THE SATELLITE WELL ......................................................... 3

Article IV. FACILITY CAPACITY UTILIZATION ................................................................ 4

Article V. PRODUCTION HANDLING FEES ........................................................................ 5

Article VI. MONTHLY PRODUCTION CALCULATION AND ALLOCATION ..................... 6

Article VII. GAS ADJUSTMENT ........................................................................................... 10

Article VIII. PRODUCTION COMPATIBILITY .................................................................. 10

Article IX. INSPECTION ........................................................................................................ 11

Article X. TRANSPORTATION/DISPOSITION OF  GAS AND OIL/CONDENSATE ........... 11

Article XI. ROYALTY AND TAX PAYMENTS ..................................................................... 12

Article XII. TERMINATION ................................................................................................... 13

Article XIII. QUALITY SPECIFICATIONS .......................................................................... 14

Article XIV. FORCE MAJEURE ............................................................................................ 14

Article XV. ABANDONMENT OF PRODUCER OWNED EQUIPMENT ............................... 15

Article XVI. INDEMNITY AND INSURANCE ...................................................................... 16

Article XVII. INDEPENDENT CONTRACTOR .................................................................... 17

Article XVIII. ACCOUNTING PROVISIONS ....................................................................... 17

Article XIX. NON-DISCRIMINATION ................................................................................... 18

Article XX. SUCCESSORS AND ASSIGNS .......................................................................... 19

Article XXI. NOTICES ............................................................................................................ 19

Article XXII. GENERAL PROVISIONS ................................................................................ 21

# PRODUCTION HANDLING AGREEMENT

This Production Handling Agreement, ("**Agreement**"), is made and entered into this 1st day of January, 2008 (the "**Effective Date**"), by and between Apache Corporation, Hunt Oil Company, Hunt Petroleum Corporation, Lamar Hunt Trust Estate, The George R. Brown Partnership L.P. and OPEX Energy, L.L.C. ("**Processor**") and Helis Oil & Gas Company, L.L.C. ("Helis"), Houston Energy, L.P., Red Willow Offshore, L.L.C., CL&F Resources L.L.C. and Nexen Petroleum Offshore U.S.A. Inc. **("Producer")**, sometimes referred to individually as a "**Party**" or collectively as the "**Parties**".

## WITNESSETH:

WHEREAS, Processor is the owner and operator of the South Marsh Island Block 268 "A" Platform (OCS-G 02310), sometimes hereinafter referred to as the "**Host Facility**", which is situated in the Outer Continental Shelf, Offshore Louisiana; and

WHEREAS, Producer owns and operates one or more wells located on South Marsh Island Block 257 (OCS-G 24881) (the "**Satellite Block**"), offshore Louisiana, including, OCS-G 24881 Well No.1, hereinafter collectively referred to as the "**Satellite Wells**"; and

WHEREAS, Producer has available oil/condensate, gas and water production from the Satellite Wells, hereinafter referred to as "**Satellite Well Production**"; and

WHEREAS, Producer wishes to produce and transport Satellite Well Production for handling/processing at the Host Facility; and

WHEREAS, Processor wishes to handle/process Satellite Well Production at the Host Facility for the mutual benefit of Processor and Producer under the terms and conditions hereinafter set out;

NOW, THEREFORE, for and in consideration of the mutual covenants and agreements herein contained, it is agreed by and between the Parties hereto as follows:

## Article I.
## GATHERING AND DELIVERY

1.01    Receipt Point.  Processor agrees to receive and handle Satellite Well Production that is transported to the Host Facility through the four inch (4) flowline interconnecting the Satellite Wells to the Host Facility.  The delivery point of Satellite Well Production from Producer to Processor will occur at the first flange connection above the lower deck elevation of Producer's incoming four inch (4") riser located on the Host Facility (hereinafter sometimes referred to as the "**Receipt Point**").

Page 1

1.02    Gas Redelivery Point.    After Producer's gas production has been processed, it will be redelivered by Processor to the gas export sales pipeline serving the Host Facility. The redelivery point of Producer's gas production from Processor to Producer will be the inlet flange connection of the gas export pipeline's gas measurement equipment located on the Host Facility (the "**Gas Redelivery Point**").

1.03    Oil Redelivery Point.    After processing, oil/condensate production allocated to Producer will be delivered by Processor to the oil export sales pipeline(s) serving the Host Facility. The redelivery point of Producer's oil/condensate production from Processor to Producer will be the inlet flange connection of the oil export pipeline's product measurement equipment located on the Host Facility (the "**Oil Redelivery Point**").

1.04    Redelivery Points.    The Gas Redelivery Point and the Oil Redelivery Point may be referred to collectively in this Agreement as the "**Redelivery Point**."

1.05    Regulatory Permits.    Producer shall timely prepare and Processor will file, at Producer's cost and expense, an application with the Minerals Management Service ("**MMS**") for surface commingling of Satellite Well Production with other production handled/processed at the Host Facility in accordance with all applicable laws, rules and regulations of governing bodies having jurisdictional authority. Producer and Processor, as applicable, shall also timely obtain all other required approvals, permits, consents, orders or other documents, without limitation, from all appropriate jurisdictional authorities to produce the Satellite Well, transport production therefrom to the Host Facility, and dispose of Satellite Well Production.

## Article II.
## SATELLITE WELL FACILITIES

2.01    Flowlines and Risers.    Satellite Well Production will be transported by Producer via flowline and riser to the Receipt Point. Processor has granted Producer the right to tie-in the existing gathering line and riser from the Satellite Wells to the Host Facility. The Parties confirm that Processor specified the location of the riser and approved the installation work plans, schedules, pipeline specifications, and contractors conducting operations for installation of existing gathering line and riser at the Host Facility. The existing gathering line and riser are equipped with an automatic shut-down valve tied to the safety shut-down system on the Host Facility. The riser and shut-down valve will be inspected, maintained and abandoned by Producer per the requirements of Part 250 of Title 30 of the Code of Federal Regulations and per Processor's specifications.

2.02    Facility Equipment.    Producer shall, subject to Processor's prior written consent and approval, construct and install, at its sole cost, risk, liability and expense, additional equipment necessary to process Satellite Well Production at the Host Facility, hereinafter "**Facility Equipment**," in accordance with prudent and customary standards in the industry and MMS requirements. Such Facility Equipment may include, but is not limited to, separator(s), meters, proportional-to flow sampler (to be located downstream of the separator), associated flanges and piping, pig receiver, chemical injection equipment,

automation equipment and emergency shut-down devices. If, in the reasonable discretion of Processor, a change in the quality or quantity of Satellite Well Production necessitates the installation of additional Facility Equipment, then such equipment shall be installed by Producer at its sole cost, risk, liability and expense, subject to the prior written consent and approval of Processor.

2.03   Processor Equipment.   All equipment installed on the Host Facility under the terms and conditions of this Agreement for the handling/processing of Satellite Well Production located downstream of the Receipt Point and upstream of the Redelivery Point shall be owned by Processor.   Processor shall be responsible for the maintenance, repair, operation and abandonment of all such equipment.

2.04   Producer's Equipment.   All equipment installed on South Marsh 257, which shall include without limitation, the Satellite Wells, jacket/structure, associated facilities, and pipeline interconnecting the Satellite Wells and Host Facility, shall be owned by Producer. Furthermore, Producer shall own all equipment installed at the Host Facility associated with the performance of this Agreement which is located upstream of the Receipt Point, including without limitation the incoming four inch (4") riser.   Producer shall be responsible for the maintenance, repair, operation and abandonment of all such equipment owned by Producer as described herein.

2.05   Payment Default.   Producer covenants and agrees to timely pay all bills and invoices associated with its obligations under this Agreement and to timely pay its contractors and subcontractors for work performed by such in association with this Agreement. Processors reserve the right to shut-in all Satellite Well Production, and such other production as Processor may handle or process for or on behalf of Producer pursuant to any other agreement, and discontinue all services contemplated herein, for Producer's failure to timely pay all fees associated with this Agreement. Producer covenants and agrees to not permit any liens or other encumbrances be filed against the Host Facility or any part thereof as a result of Producer's failure to timely pay any bill or invoice, and further agrees to indemnify and hold harmless Processor from any such liens or encumbrances that may arise as a result of Producer's acts or omissions in association with this Agreement.

## Article III.
## OPERATION OF THE SATELLITE WELLS

3.01   No Operating Services.   Operating services for the Satellite Wells and all equipment upstream of the Receipt Point are not included in this Agreement.   The fees paid by Producer to Processor under the terms of this Agreement are for production handling/processing services provided by Processor for Satellite Well Production commencing at the Receipt Point and terminating at the Redelivery Point; and, therefore, do not include any services rendered by Processor or by third parties upstream of the Receipt Point and/or downstream of the Redelivery Point.

## Article IV.
## FACILITY CAPACITY UTILIZATION

4.01   Curtailment of Satellite Well Production.   Processor shall retain the right to use all production handling capacity of the Host Facility on such terms and conditions as it deems appropriate without any approval of Producer.  However, Processor will use best efforts to provide production handling capacity to the Producer, under the terms and conditions of this Agreement, for seven and one-half million standard cubic feet per day (7.5MMSCFPD), two thousand five hundred barrels of condensate per day (2,500BCPD) and two thousand barrels of water per day (2,000BWPD).  If Producer is utilizing handling and processing capacity at the Host Facility and Processor wants or needs that excess capacity for Processor's production,, Processor will use best efforts to provide Producer with sufficient notice of such need so that Producer can attempt to find another facility to handle and process its excess production. However, Processor will not have an obligation to provide Producer with prior written notice of such capacity curtailment, and actual curtailment will be at Processor's discretion.

4.02   Compression Capacity.   Producer shall have the right, from time to time, to use excess existing and available compression capacity at the Host Facility for the compression of gas produced from the Satellite Wells to the extent such compression capacity is not being utilized for Processor's production or such other production as may be processed at the Host Facility pursuant to agreements that were entered into prior to this Agreement.  Should Producer, with Processor's prior written consent, purchase and install a new or additional compressor on the Host Facility at Producer's sole cost and expense, Producer shall have priority use of that compressor capacity.

4.03   NGL's.   Producer retains the right, in its sole discretion, to extract natural gas liquids (NGL's) from its gas and condensate production stream at an onshore plant. Producer does not relinquish title to Satellite Well Production, or any portion thereof, to Processor at any time as a result of handling and processing under this Agreement or for any other purpose. The risk of loss of Satellite Well Production, or any part thereof, shall remain with Producer at all times.

4.04   Continued Processing.   To the extent reasonably possible, Processor will continue to handle Satellite Well Production even when Processor's well(s) may be shut-in for market or operational reasons.

4.05   Priority Capacity Usage.   Production of oil, gas and water from the Processor's wells and other production being handled and processed by Processor at the Host Facility at the time of the execution of this Agreement shall have first priority usage with regard to the capacity of the Host Facility.   Producer expressly agrees that Processor's production shall not be curtailed as a result of the addition of the Satellite Well Production.   Subject to the aforementioned priority and the Processor's right to curtail Producer's production pursuant to Article 4.01, the Satellite Well Production shall have priority usage of the Host Facility with regard to other third party production to be handled at the Host Facility pursuant to production handling agreements entered into by Processor and any such third party

subsequent to the execution of this Agreement.  Producer's priority rights as described in this Article 4.05 shall include and apply to the Satellite Well Production from any Satellite Well covered by this Agreement, regardless of whether such Satellite Well was drilled before or after the Processor entered into any subsequent third part production handling agreements.

## Article V.
## PRODUCTION HANDLING FEES

5.01  Processing Fees.  Handling of Satellite Well Production at the Host Facility will consist of bulk separation, well testing, treatment of water for overboard disposal, re-injection of associated oil/condensate into the gas sales line or into the oil sales line, and metering. Processor shall charge Producer the following production handling fees monthly on the basis of allocated production delivered, handled and processed at the Host Facility from the Satellite Wells:

|  |  |
|---|---|
| Gas Handling Fee: | $0.15/MCF |
| Oil/Condensate Handling Fee: | $1.00/BBL |
| Water Handling Fee: | $1.00/BBL |

5.02  Compression Fees.  In addition to the processing/handling fees provided for in Article 5.01 above, Producer will pay Processor the following fee on the basis of total monthly gas compressed by the existing Host Facility compression equipment:

| | |
|---|---|
| Gas Compression Fee: | $0.075/MCF/Stage |

5.03  Water Handling Fee Adjustments.  The production handling fee for water provided for in Article 5.01 above shall be increased to reflect future increased costs associated with modifications due to government regulations affecting discharge requirements of treated produced water into the Gulf of Mexico, which are verifiable and attributable to the Satellite Well Production.  Such modifications could involve monitoring, testing, or treating the produced water.  Processor shall provide justification and rationale for any cost increase for Producer's review.

5.04  Minimum Processing Fee.  Unless Processor has curtailed Producer under Article 4.01, if production handling fees do not equal or exceed Ten Thousand Dollars ($10,000) in any calendar month, then a minimum fee of Ten Thousand Dollars ($10,000) shall be charged to Producer for such calendar month in lieu of handling fees based upon throughput for such month, regardless of actual throughput.  This provision shall become effective the first day of the first calendar month following the month during which Producer's initially delivers Satellite Well Production to the Host Facility under this Agreement.

5.05  Annual Fee Adjustments.  It is agreed by the Parties hereto that the production handling fees stated in this Article V (including the minimum fee set forth in Article 5.04) shall be revised at Processor's option on the first day of April of each year, beginning April 1, 2009, by the relevant increases (but not decreases) in the Overhead Adjustment Index as such is published by the Council of Petroleum Accountant Societies or COPAS (commonly referred to as the **"COPAS Index"**).

5.06   Suspension of Minimum Processing Fee.   Producer's obligation to pay Processor the minimum monthly processing/handling fee provided for in Article 5.04 hereof shall be suspended in the event the Host Facility is incapable of processing/handling Satellite Well Production for a period of fifteen (15) consecutive days, or such longer period of consecutive days, as a result of problems occurring at the Host Facility.   The minimum monthly processing/handling fee provided for in Article 5.04 hereof shall only be suspended for such calendar month(s) in which such period of consecutive days of downtime incurred in such calendar month is greater than fifteen (15) days of such calendar month.

5.07   Downtime Fee.   At any time should the Host Facility incur downtime associated with Producer's activities ("**Downtime**") such as but not limited to installation, construction, repair or maintenance, Processor shall apply the following calculation to determine a "**Downtime Fee**":

The Downtime Fee is to be calculated according to the number of hours of Downtime per Downtime event on the basis of Processor's average daily net working interest production for the previous 45 days, and on the basis of the average published commodity price, for like kind and grade of product, which Processor would have received during such Downtime period, as follows:

$$\text{Total Downtime Fee} = \frac{(A \times B) \times (C)}{45 \times 24}$$

Where:

A = number of hours of Downtime per Downtime event
B = Processor's total daily net working interest production in mcf for
       previous 45 days
C = Processor's average commodity sale price during the period of any Downtime

### Article VI.
### MONTHLY PRODUCTION ALLOCATION

6.01   Production Allocation.   Satellite Well Production will be commingled with other oil/condensate, gas and water production handled/processed at the Host Facility ("**Other Production**") and Total Facility Production shall be metered at the appropriate Gas Redelivery Point or Oil Redelivery Point, as applicable. "**Total Facility Production**" shall mean the aggregate of Satellite Well Production and Other Production. Monthly oil, gas and condensate production will be measured, calculated and allocated as follows:

OIL/CONDENSATE PRODUCTION:

(a)   Total oil/condensate production metered for allocation purposes ("**Total Oil Production**") will be determined from the export oil/condensate sales meter on the Host Facility. The Total Oil Production will be adjusted for BS&W, meter factor, flash factor and temperature correction factor to obtain net standard barrels based on sampling taken at least once monthly by Processor ("**Total Net Oil Production**").

(b)     Producer's oil/condensate production for allocation purposes ("**Producer's Theoretical Oil**") will be determined based on production information obtained from the meter located on Producer's dedicated separator on the Host Facility prior to Satellite Well Production being commingled with Other Production. Producer's Theoretical Oil will be adjusted for BS&W, meter factor, temperature correction factor and flash factor to obtain net standard barrels ("**Producer's Net Theoretical Oil**").

(c)     Allocation for oil/condensate production associated with Other Production ("**Other Production Theoretical Oil**") will be determined based on production information obtained from well tests performed utilizing the test separator located on the Host Facility prior to such Other Production being commingled with Satellite Well Production. Other Production Theoretical Oil will be adjusted for BS&W, meter factor, temperature correction factor and flash factor to obtain net standard barrels ("**Other Production Net Theoretical Oil**").

(d)     Actual oil sales volumes allocated to Producer for any given month shall be determined by dividing the Producer's Net Theoretical Oil by the sum of Producer's Net Theoretical Oil plus Other Production Net Theoretical Oil ("**Total Net Theoretical Oil**") and multiplying that quotient by the Total Net Oil Sales, as such calculation is depicted below:

$$\frac{\text{(Producer's Net Theoretical Oil)}}{\text{(Total Net Theoretical Oil)}} \ \text{X} \ \text{(Total Net Oil Sales)}$$

(e)     Actual oil sales volumes allocated to Other Production for any given month shall be determined by dividing the Other Production Net Theoretical Oil by the Total Net Theoretical Oil and multiplying that quotient by the Total Net Oil Sales, as such calculation is depicted below:

$$\frac{\text{(Other Production Net Theoretical Oil)}}{\text{(Total Net Theoretical Oil)}} \ \text{X} \ \text{(Total Net Oil Sales)}$$

GAS PRODUCTION:

(a)     Total gas sold from the Host Facility will be based upon the gas sales meter located on the Host Facility. The gas sales volume (mcf) as measured by the gas sales meter will be adjusted to a MMBTU basis for allocation purposes ("**Total Gas Sales**") based on gas analyses conducted by an independent third party.

(b)     Producer's gas production for allocation purposes ("**Producer's Theoretical Gas**") will be determined based on production information obtained from the meter located on Producer's dedicated separator on the Host Facility prior to Satellite Well Production being commingled with Other Production. Producer's Theoretical Gas will be adjusted to a MMBTU basis ("**Producer's Theoretical MMBTU**") based on gas analyses conducted by an independent third party.

Page 7

(c)     Allocation for gas production associated with Other Production ("**Other Production Theoretical Gas**") will be determined based on production information obtained from well tests performed utilizing the test separator located on the Host Facility prior to such Other Production being commingled with the Satellite Well Production. Other Production gas volume will be adjusted to a MMBTU basis ("**Other Production Theoretical MMBTU**") based on gas analyses conducted by an independent third party.

(d)     Actual gas sales volumes allocated to Producer for any given month shall be determined by dividing the Producer's Theoretical MMBTU by the sum of Producer's Theoretical MMBTU plus Other Production Theoretical MMBTU ("**Total Theoretical MMBTU**") and multiplying that quotient by the Total Sales MMBTU, as such calculation is depicted below:

$$\frac{\text{(Producer's Theoretical MMBTU)}}{\text{(Total Theoretical MMBTU)}} \ \text{X} \ \ \text{(Total Gas Sales MMBTU)}$$

(e)     Actual gas sales volumes allocated to Other Production for any given month shall be determined by dividing the Other Production Theoretical MMBTU by the Total Theoretical MMBTU and multiplying that quotient by the Total Gas Sales MMBTU, as such calculation is depicted below:

$$\frac{\text{(Other Production Theoretical MMBTU)}}{\text{(Total Theoretical MMBTU)}} \ \text{X} \ \ \text{(Total Gas Sales MMBTU)}$$

(f)     The term "gas" as here employed means those hydrocarbons which remain in a gaseous or vaporized state after being subjected to normal atmospheric pressure and shall include both sales of natural gas and condensate flash gas, as well as any consumption of fuel gas or loss of flare or vent gas.

(g)     Processor shall maintain BTU measurements for audit purposes and use its best efforts to provide Producer with a monthly allocation statement by the thirtieth (30th) workday of the month following the production month.

6.02   Volume Adjustments.  Producer's monthly liquid hydrocarbon volumes shall be adjusted for shrinkage as determined by an independent third party. Processor, or personnel designated by Processor, shall obtain samples monthly, for the differential flash vaporization test run to determine the shrinkage factor. Producer shall be notified 48-hours in advance and shall have the right to witness all liquid sampling.

6.03   Water Allocation.: Producer's water production volume will be allocated based on production information obtained from Producer's dedicated separator on the Host Facility prior to Other Production being commingled with Satellite Well Production.]

6.04   MMS Approvals. It is mutually understood that the gas, condensate, oil and water produced from the Satellite Wells will be commingled with other gas, condensate, oil and water under conditions which will require the approval of the MMS; therefore, before said gas,

Page 8

condensate, oil and water can be accepted by Processor, Producer must obtain, or have in place, appropriate commingling authority from the MMS. Processor and Producer agree to assist each other by providing all information required in order to obtain such approval.

6.05   Fluid Turbine Meters.  Fluid turbine meters, if any, shall be installed and maintained in accordance with standards contained in the most recent API Manual of Petroleum Measurement Standards (MPMS) for recording lease liquid hydrocarbon production. The liquid meters shall be proven monthly by Processor or its designated personnel using an industry-standard prover at the sole cost and expense of Producer. Producer shall have the right to witness all liquid meter calibrations. Processor's personnel or designee will make repairs to all meters as necessary. No accounting adjustment will be made for allocation meters with a factor change of 2% or less since such meters were last proven. The meters will be calibrated before being placed back into service and appropriate meter factors will be applied to correct for meter inaccuracy. Allocation meters with a factor change of more than 2% will be subject to an accounting adjustment. The volumes will be adjusted by averaging the current factor with the previous factor. The average factor will be applied to all volumes metered during the time period since the previous test. Such meter will be recalibrated before placing it back into service. Allocation meters with a factor change of 7% or greater shall be repaired and re-proven prior to being placed back into service.

6.06   Meter Calibrations.   Orifice meters, electronic flow meters, temperature recorder or temperature probe, and other related equipment shall be installed and maintained as per Processor's standards, and the volume calculated in accordance with the MPMS/Chapter 14 Natural Gas Fluids Measurement, latest edition. Processor's personnel or designee shall calibrate the gas meters at least once per month and immediately following a meter repair or replacement, per 30 CFR Part 250, Subpart L; and shall send the appropriate documentation to each Party's designated personnel by the fifth (5th) business day of the following month. If the gas meter equipment calibration reveals a deviation of less than 2%, then all of the previous volumes measured by such equipment shall be deemed correct. The meter will be calibrated to 0% deviation prior to being placed back into operation. When the deviation exceeds 2%, the volumes delivered during such period since the previous test shall be considered inaccurate. If the Parties can determine the exact time at which the meter began to read inaccurately, then the volumes will be adjusted to correct for the total error from that point. If the Parties cannot agree on the exact time at which the meters began to record inaccurately, then for accounting purposes, subject to Producer's audit rights, the volumes will be adjusted for the last one half of the period since the last calibrations not to exceed 15 days. In the event of a meter breakdown, Processor shall notify Producer as soon as possible and adjustments will be made based on most recent accurately measured flow records as agreed to by the Parties.

6.07   Consistent Treatment.  All of Processor's and Producer's meter calibrations and volume allocations for hydrocarbon volumes flowing to the Facility will be treated in a consistent and equitable manner and as necessary, all documentation will be forwarded to the appropriate designated personnel for each of the Parties.

6.08   Processor Tasks.  Processor shall perform or cause to be performed well tests, meter provings (allocation and sales) and samplings (at or after the Re-delivery Point) on a monthly basis,

and shall provide Producer with advance notice of same.

6.09   Producer's Right to Observe.  Producer, or its designee, may witness any and all well tests, meter calibrations, meter provings and samplings at its sole cost and risk. Processor shall perform, or cause to be performed, oil/condensate and/or gas sampling and analysis upon the request of Producer and at Producer's sole risk.  Producer shall reimburse Processor for actual costs incurred.  Producer shall be limited to four (4) requests for sampling and analysis per calendar year and no more than once in any calendar month.

6.10   Regulatory Compliance.  All volumes of gas and/or condensate measured at the Host Facility which are used to allocate hydrocarbon production handled/processed at the Host Facility shall be adjusted in accordance with 30 CFR 250.1202 and 30 CFR 250.1203, as appropriate.

## Article VII.
## GAS ADJUSTMENT

7.01   Flare and Vent Gas.  Producer shall be allocated its proportional share of flare and vent gas based upon the ratio that its gas production bears to the total gas production on an MMBTU basis.

7.02   Fuel Gas.  The fuel requirements for the Satellite Wells will be allocated monthly based upon the ratio of total gas production from the Satellite Wells to the total gas from all wells handled/processed at the Host Facility (on an MMBTU basis); provided, however, that fuel requirements for the Satellite Wells will not be burdened with fuel for compression until such time that the Satellite Wells gas production requires compression and is provided such pursuant to this Agreement.  In the event any or all gas produced from the Satellite Wells is compressed, fuel utilized for compression will be allocated monthly based upon the ratio of gas production from the Satellite Wells requiring compression to the total gas from all wells requiring compression (on an MMBTU basis).

## Article VIII.
## PRODUCTION COMPATIBILITY

8.01   Production Changes.  Processor agrees to promptly notify Producer of Satellite Well Production changes that may affect the Host Facility.  Producer also agrees to immediately notify Processor of production changes that may affect the Host Facility.  Such production changes include, but are not limited to, shutting in a well, re-opening a well, unloading a well, severe well heading problems, and production of acid, sand, excessive concentrations of $H_2S$ or $CO_2$ inhibitors or other chemicals.

8.02   Corrective Measures.  In the event emulsion or processing problems (including corrosion due to the presence of $CO_2$ or $H_2S$ at the Host Facility is suspected or determined to be caused by Satellite Well Production, or chemicals, detergents or fluid added to the Satellite Well Production stream, then Producer shall be responsible for all direct costs incurred by

Processor in confirming and/or correcting such problems at the Host Facility. Processor shall promptly notify Producer in writing of the occurrence of any such problems which, in Processor's opinion, might require corrective action occur. Processor will notify Producer in writing if the costs to correct such production related problems are reasonably expected to exceed Ten Thousand Dollars ($10,000.00) during any single calendar month. Producer also agrees to pay or reimburse Processor for all charges which are attributable to Satellite Well Production as a result of changes in federal, state or industry regulations, rules, or codes which require Processor to add additional chemicals to further treat the Satellite Well Production stream.

### Article IX.
### INSPECTION

9.01    Inspection Rights.  Producer, or its designee, shall have the right to inspect Processor's processing activities conducted at the Host Facility; provided Producer gives at least twenty-four (24) hours oral notice to Processor of its intent to inspect such activities. Any inspection or boarding of the Host Facility by Producer shall be at the sole cost, risk, and expense of Producer.

### Article X.
### TRANSPORTATION/DISPOSITION OF
### GAS AND OIL/CONDENSATE

10.01    Disposition Responsibility.  Producer shall take in kind or remain individually responsible for the sale and disposition of its allocated share of gas and oil/condensate production. Processor shall have no liability for the cost of production, transportation and associated costs which are attributable and allocated to Satellite Well Production.

10.02    Gas Nominations.  Producer is responsible for making or causing to be made all gas nominations to the gas transporter for its gas. Processor shall not be responsible for, or subject to, any transporter pipeline scheduling problems or monthly balancing provisions imposed on Satellite Wells gas transportation contracts by the gas transporter pursuant to its tariff, being caused by nominations, or lack of nominations, for which Producer is responsible. In addition, any penalties incurred by Processor and/or its shippers under its transportation contracts as a result of gas pipeline imbalances with the transporter, and which are caused by, and can be attributed to Producer's gas nominations or lack thereof, shall be borne by the Parties in the proportion that each individual Party's over/under deliveries may have caused such penalty to be imposed on Processor. For the purposes of this Article, gas pipeline imbalances shall be defined as the difference between monthly gas nominations accepted by the gas transporter and the actual monthly volumes allocated by the transporter and recognized as a pipeline receipt for each Party's account in accordance with the pipeline's predetermined allocation methods.

10.03    Imbalances.  The Parties recognize that gas sales attributed to the Satellite Wells by the provisions of Article VI of this Agreement may differ from the volumes recognized as

Satellite Wells receipts by the gas transporter. The difference between gas sales in MMBTU allocated to the Satellite Wells by Processor pursuant to this Agreement and the gas sales in MMBTU recognized by the transporter as receipts for each Party's account shall be referred to as a "**Field Imbalance**." Additionally, Producer recognizes that production from several natural gas fields may be processed at the Host Facility, and as a result thereof, it is likely that operational imbalances between the Satellite Wells and other fields may occur due to the transporter's nomination/allocation requirements. In order to resolve a Field Imbalance, the Parties agree to cash settle any Field Imbalance existing at the end of each calendar quarter. Such settlement shall consist of a cash payment to the net under-delivered Party (the net under-delivered Party is the Party who is in a net under-delivered position for the period being settled; the net over-delivered Party is the Party who is in a net over-delivered position for the period being settled) based on the valuation described below:

Each quarter, Processor shall convert the monthly Field Imbalance to a dollar value by multiplying the monthly Field Imbalance by the weighted average sales price received for all sales of production from the Host Facility less all transportation, gathering and other marketing costs or deductions incurred (the "**Settlement Price**"). This value shall be determined by applying the Settlement Price of the over-delivered Party to the corresponding monthly over-delivery or under-delivery in MMBTU occurring during each month and subtracting the cumulative over-delivered value from the cumulative under-delivered value for the period being settled. The realized price is the Settlement Price less royalties, severance and other production taxes which have been paid. For purposes of this Agreement, Processor agrees to maintain an MMBTU accounting of the Field Imbalance. The quarterly settlement value shall be determined by aggregating the dollar values of the monthly Field Imbalances determined in accordance with the foregoing. Both Parties agree to maintain appropriate records sufficient to document the value of the quarterly settlement. Payment shall be made by the over-delivered Party within thirty (30) days of such over-delivered Party's receipt of Processor's statement. Processor shall deliver quarterly statements to Producer.

10.04  Transportation of Satellite Well Production.  Producer is responsible for arranging transportation for Satellite Well Production to shore from the Host Facility. Any and all transportation costs and/or processing costs for, or attributable to, Satellite Well Production are the sole responsibility of Producer. Producer shall be responsible for entering into its own separate agreements for such transportation and/or processing.

10.05  Oil Nominations.  Producer is responsible for making or causing to be made all oil/condensate nominations for its oil/condensate to the oil transporter. Processor shall not be responsible for, or subject to, any transporter pipeline scheduling problems caused by nominations, or lack of nominations, for which Producer, or their designated marketer, is responsible.

## Article XI.
## ROYALTY AND TAX PAYMENTS

11.01  Royalty and Tax Payments.  At all times while gas and condensate are produced from any lease or well which is subject to this Agreement, Producer and Processor shall each pay or

cause to be paid all royalty and taxes due and payable for all gas and condensate attributed to its respective interest in any such lease along with any interest or penalties due. The "**royalty**" shall include owners of royalty, overriding royalty, production payments, and similar interests. The term "**taxes**" shall include production, windfall profits, severance and other similar taxes and shall be exclusive of any income taxes.

## Article XII.
## TERMINATION

12.01  Term. This Agreement, when executed, shall be effective as of the Effective Date and shall extend to and be binding upon the Parties hereto and their respective successors, representatives and assigns. This Agreement will continue in effect for so long as the Satellite Wells, or any of them, is producing to the Host Facility; provided, however, that Processor or Producer may terminate this Agreement, for any reason, upon ninety (90) days written notice to the other Party.

12.02  Partial Loss of Host Facility. Upon partial loss of the Host Facility resulting from fire, hurricane, explosion, or other incidents, including, without limitation, those as may be described in Article 14.02, Processor shall have no obligation to repair the Host Facility. Upon total loss of the Host Facility, Processor shall have no obligation to replace the platform or the facilities. Processor shall give Producer sixty (60) days written notice to terminate this Agreement under such conditions. Producer's obligation to pay the fees set forth in this Agreement will terminate upon the total loss of the Host Facility.

12.03  Uneconomic Operation. If Processor determines in its sole judgment that its continued operation of the Host Facility would be uneconomic to Processor, and Processor therefore decides to salvage and abandon the Host Facility, Processor will provide Producer with written notice of such decision. Producer will then have sixty (60) days to reach a mutual agreement with Processor on a future course of action which may include, among other options, the following:

        A.    Termination of this Agreement;

        B.    Enter into a mutually agreed upon leasing agreement; or

        C.    Assignment of the Host Facility to Producer, which will include net abandonment liability compensation (re-use value minus salvage cost).

Except as provided in this Article XII, if Processor and Producer fail to reach agreement on a future course of action within sixty (60) days after Processor's notice to Producer hereunder, either Party, may on written notice to the other Party, immediately terminate this Agreement, without further notice.

12.04  Abandonment Agreement. Notwithstanding the provisions of Article 12.03 above, any abandonment arrangement agreed to by Processor and Producer pursuant to the provisions of this Agreement shall be subject to the agreement and acceptance of the MMS and the working interest owners of the Host Facility. In the event less than all of the working interest owners in the Host Facility are in agreement to accept any such abandonment arrangement

agreed to by Processor and Producer pursuant to the provisions of Article 12.03, then Processor and Producer agree to terminate this Agreement as soon as reasonably practicable and Processor shall have no further obligations to Producer.

12.05 <u>Processor Option to Reacquire.</u>  In the event Producer takes ownership of the Host Facility pursuant to Article 12.03(C) above, Processor shall have the option to regain ownership of the Host Facility upon Producer's subsequent delivery to Processor of a declaration of its intent to abandon the Host Facility.  In the event Processor elects to regain ownership of the Host Facility pursuant to this Article 12.05, Processor shall take ownership of the Host Facility under the terms of a similar re-determination of net abandonment liability as provided for in Article 12.03 when Producer took ownership of the Host Facility.

### Article XIII.
### QUALITY SPECIFICATIONS

13.01 <u>Quality Requirements.</u>  Satellite Well Production shall be subject to and shall meet the hydrocarbon quality specifications of the applicable transporting pipeline(s) and/or any other party or parties taking custody of Satellite Well Production at or downstream of the Redelivery Point.  Any additional processing facilities, chemicals or services required in order for Satellite Well Production to meet such specifications shall be the sole responsibility of and installed at the sole cost of Producer, but only after Producer has obtained the written consent of Processor.  In the event Satellite Well Production does not meet applicable hydrocarbon quality specifications, Processor may suspend handling/processing service at the Host Facility for Satellite Well Production.

13.02 <u>Transporter Penalties.</u>  Producer agrees to pay or reimburse Processor for charges, fees and/or costs of penalties incurred by Processor from the transporter/gas pipeline company which are attributable to gas delivered from the Satellite Wells and which fails to meet the specifications which the transporter/gas pipeline company requires for gas delivered from the Host Facility.

13.03 <u>Processor's Right to Shut-In.</u>  In addition, should any of these conditions occur, Processor may elect upon a reasonable basis either to shut-in or otherwise restrict Satellite Well Production for such reasonable periods of time as appropriate to correct the condition that occurs without incurring any liability to Processor.  Producer will be notified promptly upon the need of such action.

### Article XIV.
### FORCE MAJEURE

14.01 <u>Suspension of Services.</u>  Processor reserves the right to suspend the service provided under this Agreement during the existence of conditions which render the platform or facilities unsafe or during the existence of a Force Majeure condition.  Processor may shut down the platform and/or facilities and temporarily discontinue the services contemplated by this Agreement to make any necessary changes or repairs to the facilities or to conduct drilling

and/or workover operations. Processor will use its best efforts to give prior verbal notice to Producer of such occurrences and advise Producer of Processor's decision to shut-in or restrict Satellite Well Production. As a follow-up, Processor will provide written documentation to Producer for such occurrences. If the Force Majeure condition lasts thirty (30) days or more, then Producer may terminate this Agreement by providing written notice to Processor of its decision to terminate this Agreement.

14.02   Force Majeure Events.   For the purposes of this Agreement "**Force Majeure**" shall be defined as acts of God, strikes, lockouts or other industrial disturbances, acts of the public enemy, wars, terrorist acts, blockades, insurrections, riots, epidemic, lightning, earthquakes, fires, storms, floods, washouts, arrests and restraints of government and people, civil disturbances, explosions, breakage or accident to machinery or lines of pipe, freezing of wells or lines of pipe, partial or entire failure of natural gas wells or any other causes, whether of the kind herein enumerated, not reasonably within the control of the party claiming suspension. Force Majeure shall also include those instances for the purposes of constructing or maintaining facilities to enable the Party to fulfill its obligations hereunder, the inability of the Party to acquire or the delays on the part of the Party in acquiring, at reasonable costs and after the exercise of reasonable diligence, the materials and supplies required for such construction or maintenance, and the inability of the Party to secure or the delays in securing, after the exercise of reasonable diligence, permission from any governmental agency to use materials and supplies which the Party may have in its possession. It is understood and agreed that the settlement of strikes and lockouts shall be entirely within the discretion of the Party having the difficulty. The remedy of any Force Majeure event shall not include the settlement of strikes or lockouts by acceding to the demands of opposing parties when such course is inadvisable in the discretion of the Party having the difficulty.

### Article XV.
### ABANDONMENT OF PRODUCER'S EQUIPMENT

15.01   Producer's Abandonment.   Abandonment, and liability associated therewith, of any production facilities located at or in the Satellite Block associated with the Satellite Wells shall be the obligation of and shall be borne solely by Producer. Abandonment of Producer's equipment or property occurring on or adjacent to the Host Facility (including Producer's pipeline and riser up to the first flange connection above the lower deck elevation (i.e., Receipt Point)) are subject to advance approval by Processor, which approval shall not be unreasonably withheld. Abandonment of Producer's equipment or property adjacent to the Host Facility shall be completed by Producer: (i) within such time required by applicable law or regulation; (ii) if upon termination of this Agreement by Producer for cause within six (6) months subsequent to the termination of this Agreement; or (iii) if Processor is abandoning the Host Facility, within six (6) months written notice by Processor to Producer, whichever is sooner.

15.02   Host Facility Abandonment.   Except as expressly set forth in Article 15.01 and subject to any agreement mentioned in Section 12.03, Producer shall have no plugging and abandonment or

clean-up liability for the Host Facility and any related production equipment located thereon.

### Article XVI.
### INDEMNITY AND INSURANCE

16.01   **GENERAL INDEMNITY.  Producer shall protect, defend, release, indemnify and hold Processor, its parent, subsidiary and affiliated companies, and its and their respective co-lessees, partners, contractors, joint venturers, co-owners, agents, officers, directors, employees and representatives (hereinafter referred to collectively as "Processor Group") harmless from and against all claims, causes of action, suits, judgments, demands, damages, fines, penalties, liabilities, debts, costs, expenses and losses of whatsoever nature or character, including, without limitation, court costs and attorneys' fees (collectively "Claims"), whether arising out of contract, tort, strict liability, or unseaworthiness of any vessel, to the extent that they are attributable to the Satellite Well Production or the handling and processing services to be conducted hereunder (including Producer's and its contractors' ingress, egress or presence on any premises, whether land, buildings, platforms, aircraft, vessels or otherwise in connection with this Agreement) due to bodily injury, death or loss or damage of property or any cause whatsoever, INCLUDING, WITHOUT LIMITATION, ANY SUCH CLAIMS ARISING OUT OF THE SOLE OR CONCURRENT NEGLIGENCE, STRICT LIABILITY, CONTRACTUAL LIABILITY OR OTHER LEGAL FAULT OF ANY MEMBER OF THE PROCESSOR GROUP OR THE UNSEAWORTHINESS OF ANY VESSEL OWNED, OPERATED OR CONTRACTED BY ANY MEMBER OF THE PROCESSOR GROUP.**

16.02   **POLLUTION INDEMNITY.  Producer shall further indemnify, defend and hold harmless the Processor Group from and against all Claims arising out of or related to pollution, blowout, pipeline rupture, uncontrolled flow of oil, gas, water or any other substance from the Satellite Wells up to and including the Receipt Point, fire or explosion, costs of regaining control of a Satellite Well and any incident at the Satellite Block, its facilities or its associated pipelines, INCLUDING, WITHOUT LIMITATION, ANY SUCH CLAIMS ARISING OUT OF THE SOLE OR CONCURRENT NEGLIGENCE, STRICT LIABILITY, CONTRACTUAL LIABILITY OR OTHER LEGAL FAULT OF ANY MEMBER OF THE PROCESSOR GROUP OR THE UNSEAWORTHINESS OF ANY VESSEL OWNED, OPERATOR OR CONTRACTED BY ANY MEMBER OF THE PROCESSOR GROUP.**

16.03   Insurance Required.  At all times while this Agreement is in effect, each Party which constitutes Producer shall provide insurance in support of its several liabilities hereunder in accordance with Exhibit "A", attached hereto and incorporated herein by reference. Each such Party which constitutes Producer shall use commercially reasonable efforts to require its

contractors and subcontractors or third parties performing work on the Host Facility to provide such insurance as Processor deems reasonable and consistent with requirements set forth in Exhibit "A" in relation to the work to be performed by said contractors, subcontractors or third parties. The extent of the liability of the Parties to this Agreement shall not be limited to any amounts of insurance required under the terms and conditions of this Agreement or by any pre-existing condition present prior to the date of this Agreement.

## Article XVII.
## INDEPENDENT CONTRACTOR

17.01   Independent Contractor. Processor shall be an independent contractor with respect to the performance of all work hereunder, and neither Processor, nor anyone employed by it shall be deemed for any purpose to be the employees, agents, servants or representatives of Producer in the performance of any work or service or part thereof in any manner dealt with hereunder. Producer shall have no direction or control of Processor, its employees and agents in Processor's performance under this Agreement.

## Article XVIII.
## ACCOUNTING PROVISIONS

18.01   Invoices. Processor will invoice Producer on or before the last day of each month for the processing fees and any other charges required by this Agreement for the preceding month. Statements that identify the nature of all charges or credits will accompany such invoices. Unusual charges and credits shall be separately identified and described in detail.

18.02   Payment Terms. Producer shall pay all invoices within sixty (60) days after receipt. If payment is not made as required, the unpaid balance shall bear interest monthly at the prime rate in effect at the JP Morgan Chase Bank, New York, New York, on the first day of the month in which delinquency occurs plus one percent (1%), or the maximum contract rate permitted by the applicable usury laws, whichever is the lesser, plus attorneys' fees, court costs and other costs incurred in connection with the collection of unpaid amounts. If Producer fails to pay the full amount due (including interest) within fifteen (15) days after delivery of written notice of such delinquency, then Processor may (in its sole discretion) terminate this Agreement.

18.03   Contestation of Invoices. Producer's payment of any such invoices shall not prejudice its right to protest, contest or question the correctness thereof; provided, however, all invoices and statements rendered to Producer by Processor during the calendar year shall be presumed to be conclusively true and correct after twenty-four (24) months following the end of any such calendar year, unless within the said twenty-four (24) month period Producer makes a written exception thereto and makes claim on Processor for adjustment. No adjustment favorable to Processor shall be made unless it is made within the same prescribed period.

18.04   Audit Rights. Upon written notice to Processor, Producer, it auditors, contractors and representatives shall have the right to audit Processor's accounts and records relating to the

allocation of production and all billings rendered hereunder for any calendar year within the twenty-four (24) month period following the end of such calendar year. Processor agrees to retain all pertinent records relating to the allocation of production, results of tests, and any billing rendered pursuant to this Agreement for the twenty-four (24) month period described above (and for any additional period as may be necessary to permit Producer to complete any audit commenced within such twenty-four (24) month period); provided, however, the making of an audit shall not extend the time for taking written exception to and the adjustments of accounts as provided for in Article 18.03 of this Agreement. Producer shall have access at all reasonable times to the above records maintained by Processor in connection with or related to this Agreement. In this regard, Producer shall make every reasonable effort to conduct its audits in a manner that will result in a minimum of inconvenience to Processor. Processor shall bear no portion of Producer's audit costs incurred under this Article 18.04 unless otherwise agreed to by Processor.

## Article XIX.
## NON-DISCRIMINATION

19.01   Non-Discrimination Policies. In connection with the performance of work under this Agreement, the Parties hereto (herein referred to as "**Contractors**" in this Article XIX) agree as follows:

(a)   Equal Opportunity Clause. If the value of any contract or purchase order is $10,000 or more, Contractors agree and certify that they are and will remain in compliance with the equal opportunity clauses set forth in Executive Order 11246.1 and 41 CFR 60-1 and incorporated herein by reference.

(b)   Standard Form 100 (EEO-1) and Affirmative Action Program. Contractors agree and certify that if the value of any contract or purchase order with them of $50,000 or more and that Contractors have fifty (50) or more employees, Contractors:

(i)   Agree to file a complete and accurate report of Standard Form (EEO-1) within thirty (30) days of the date of contract or purchase order award unless such a report has been filed in the last twelve (12) months and agrees to file such report annually, as required by Section 60-1.40 Title 41 of Code of Federal Regulations.

(ii)   Affirm that they have developed and are maintaining current an affirmative action program at each of their establishments as prescribed in Section 60-1.40 Title 41 of Code of Federal Regulations or that if such a program has not been established, that it will be within 120 days of receipt of any contract or purchase order of $50,000 or more.

(c)   The Vietnam Era Veterans Readjustment Assistance Act of 1974. If the value of any contract or purchase order is $10,000 or more, Contractors agree that they are and will remain in compliance with the affirmative action clause set forth in 41 CFR 50.250.3, to promote affirmative action in the employment and advancement of

qualified disabled veterans of the Vietnam Era.  The contract clause is incorporated herein by reference.

(d)      The Rehabilitation Act of 1973.  If the value of any contract or purchase order is $2,500 or more, Contractors agree and certify that they are and will remain in compliance with the affirmative action clause set forth in 20 CFR 741.3 and incorporated herein by reference.

## Article XX.
## SUCCESSORS AND ASSIGNS

20.01   Assignments by Producer.  Producer shall not assign, convey, transfer, or hypothecate any of its rights, privileges, duties and/or obligations, in whole or part, under this Agreement without the prior written consent of Processor, which consent shall not be unreasonably withheld.  Notwithstanding the foregoing, should Producer assign less than all of its interest in the lease for the Satellite Wells, it shall be entitled to assign corresponding rights and obligations under this Agreement with written notice to Processor but without the need for obtaining Processor's consent.  The written notice to Processor shall include the name(s) of the assignee(s), pertinent details of the transaction, and state the percentage interest of Satellite Well Production being conveyed.  Producer shall have no right whatsoever to sub-lease Host Facility capacity, or any other provisions of this Agreement to any third parties.

20.02   Assignments by Processor.  Processor may assign, convey or transfer all or part of its interest in the Host Facility and this Agreement, without the consent of Producer.  Processor shall, however, provide Producer with written notice of such assignment or transfer.  Any such transfer or assignment by Processor shall be made subject to this Agreement.

20.03   Binding on Successors.  Subject to Article 20.01 hereof, this Agreement and the rights, duties and obligations hereunder shall be binding upon and inure to the benefit of the Parties hereto and its and their respective successors, representatives and assigns.  Notwithstanding the permitted assignment of its rights and obligations under this Agreement, each Party shall remain responsible for any costs incurred by that Party under the terms of this Agreement prior to the date of such assignment and the assignee's acceptance of the terms hereof.

## Article XXI.
## NOTICES

21.01   Notices.  All notices and communications required or permitted under this Agreement shall be in writing sent by facsimile or overnight delivery to the individual indicated below, and any communication or delivery hereunder shall be deemed to have been duly made when (a) if delivered by facsimile transmission, then on the day of transmission if received during business hours or on the next business day after transmission if received after business hours, or (b) if sent by overnight delivery, when received.  Addresses for all such notices and communication shall be as follows:

As to Processor:
Apache Corporation
2000 Post Oak Blvd, Suite 100,
Houston, Texas 77056
Attention: Kenny McMinn
Telephone: (713) 296-7150
Fax: (713) 296-6299

As to Producer:
Helis Oil & Gas Company, L.L.C.
228 St. Charles Avenue, Suite 912
New Orleans, Louisiana 70130
Attention: Mr. Michael F. Schott
Telephone: (504) 523-1831
Fax: (504) 522-6486

Houston Energy, L.P.
1415 Louisiana, Suite 2400
Houston, Texas 77002
Attention: Mr. P. David Amend
Telephone: (713) 650-8008
Fax: (713) 650-8305

CL&F Resources, LP
450 Gears Road, Suite 700
Houston, Texas 77067-4534
Attention: Mr. Gary A. Dobbs
Telephone: (281) 873-2312 Ext. 212
Fax: (281) 872-4398

Red Willow Offshore, L.L.C.
P.O. Box 369 14933 Highway 172
Ignacio, Colorado 81137
Attention: Mr. Jim Lynn
Telephone: (970) 563-5100
Fax: (970) 563-5241

Nexen Petroleum Offshore U.S.A. Inc.
12790 Merit Drive, Suite 800
Dallas, TX 75251-1270
Attn: Mr. Steven McMillan
Telephone – 972-450-4672
Facsimile – 972-450-4749

Any Party may, by written notice so delivered to the other Party, change the address or individual to which delivery shall thereafter be made.

## Article XXII.
## GENERAL PROVISIONS

22.01   Survival.  All provisions of this Agreement relating to audit, abandonment, indemnity and regulatory compliance shall survive termination of this Agreement.

22.02   Entire Agreement.  The terms of this Agreement express and constitute the entire agreement between the Parties with respect to the subject matter hereof and no implied covenants or liability of any kind on the part of the Parties is created or shall arise by reason of anything contained in this Agreement.  This Agreement supersedes all prior or contemporaneous negotiations, communications, understandings, proposals, representations or agreements, whether oral or written, with respect to the subject matter hereof.

22.03   Amendment, Modification and Waiver.  This Agreement may be amended, modified, superseded or canceled, and any of the terms, covenants, representations, warranties or conditions hereof may be waived, only by a written instrument executed by all of the Parties, or, in the case of a waiver, by or on behalf of the Party waiving compliance.  The failure of any Party at any time or times to require performance of any provisions hereof shall in no manner affect the right at a later time to enforce the same.  No waiver by any Party of any condition, or of any breach of any term, covenant, representation or warranty contained in this Agreement, in any one or more instances, shall be deemed to be or construed as a further or continuing waiver of any such condition or breach or a waiver of any other condition or of any breach of any other term, covenant, representation or warranty.

22.04   Severability.  Any term or provision of this Agreement that is invalid or unenforceable in any jurisdiction shall be ineffective, as to such jurisdiction, to the extent of such invalidity or unenforceability, without rendering invalid or unenforceable the remaining terms and provisions of this Agreement or affecting the validity or enforceability of any terms and provisions of this Agreement in any other jurisdiction.  If any provision of this Agreement is so broad as to be unenforceable, each provision shall be interpreted to be only so broad as is enforceable.

22.05   Not to be Construed Against Drafter.  Each Party has had an adequate opportunity to review each and every provision of this Agreement and to submit the same to legal counsel for review and advice.  Based on the foregoing, the rule of construction, if any, that a contract be construed against the drafter shall not apply to the interpretation or construction of this Agreement.

**22.06   No Consequential Damages.  EACH PARTY (I) AGREES THAT ONLY ACTUAL DAMAGES SHALL BE RECOVERABLE BY IT AGAINST ANY OTHER PARTY, OR ITS DIRECTORS, OFFICERS, EMPLOYEES, CONTRACTORS OR AGENTS, UNDER THIS AGREEMENT AND (II) HEREBY WAIVES ANY RIGHT TO RECOVER SPECIAL, PUNITIVE, CONSEQUENTIAL, INCIDENTAL OR EXEMPLARY DAMAGES, LOSS OF PRODUCTION OR LOST PROFITS (WHETHER BASED ON STATUTE, CONTRACT, TORT OR OTHERWISE, AND WHETHER OR NOT ARISING FROM ANY PARTY'S SOLE, JOINT OR**

**CONCURRENT NEGLIGENCE, STRICT LIABILITY OR OTHER FAULT) FROM OR AGAINST ANY OTHER PARTY, OR ITS DIRECTORS, OFFICERS, EMPLOYEES, CONTRACTORS OR AGENTS, EXCEPT TO THE EXTENT SUCH PARTY SUFFERS SUCH DAMAGES TO AN UNAFFILIATED THIRD-PARTY IN CONNECTION WITH A THIRD-PARTY CLAIM FOR WHICH INDEMNIFICATION IS PROVIDED IN THIS AGREEMENT, IN WHICH EVENT SUCH DAMAGES SHALL BE RECOVERABLE.**

22.07   Headings.  Titles and headings in this Agreement have been included solely for ease of reference and shall not be considered in the interpretation or construction of this Agreement.

22.08   Number and Gender.  Whenever the singular or masculine or neuter is used in this Agreement, the same shall be construed as meaning plural or feminine or body politic or corporate and vice versa where the context so requires, and the expression "person" shall refer to a body corporate and to a governmental body, agency or department as well as to a natural person.

22.09   Requisite Authority.  Each Party represents and warrants that:

    (a)    It has the requisite capacity, power and authority to enter into this Agreement and to perform the obligations to which it thereby becomes subject, without the necessity of obtaining any consent, approval, authorization or waiver or given any notice or otherwise; and

    (b)    This Agreement has been duly authorized, executed and delivered by such Party and constitutes the legal, valid and binding obligation of such Party.

22.10   Counterpart Execution.  This Agreement may be executed in any number of original counterparts, each of which shall constitute an original hereof; and, when each Party has executed a counterpart, all counterparts taken together shall constitute one Agreement, provided however, that none of the said counterparts shall be effective until all Parties hereto have executed a counterpart hereof.

22.11   Governing Law.

    (a)    This Agreement, the relationship of the Parties, and all issues and other matters arising directly or indirectly out of this Agreement shall, to the fullest extent possible, be construed pursuant to and governed by the General Maritime Laws of the United States.  If the General Maritime Laws of the United States are held to be inapplicable to this Agreement or any or all issues or other matters arising herefrom, then Articles 22.11(b) and 22.11(c) shall apply, as appropriate, but only to the extent that United States Maritime Law is held to be inapplicable.

    (b)    If any court of competent jurisdiction determines that the General Maritime Laws of the United States are not applicable to any relevant part of this Agreement or the activities to be conducted hereunder, then such part of this Agreement and/or such activities shall, to the fullest extent enforceable under applicable law, be interpreted

and enforced exclusively in accordance with the laws of the state of Texas.

(c)     If any court of competent jurisdiction determines that neither United States Maritime Law nor the laws and regulations of the state of Texas are applicable to any relevant part of this Agreement or the activities to be conducted hereunder, then, such part of this Agreement and/or such activities, shall, to the fullest extent enforceable under applicable law, be interpreted and enforced exclusively in accordance with the laws of the state in which the Host Facility is located or to which the Host Facility is subject in the absence of an enforceable choice of law provision.

(d)     Notwithstanding the choice of law provisions contained in this Article 22.11, no conflicts of law principles that would require the application of any law other than that expressly set forth in Articles 22.11(a), (b) or (c), as appropriate, shall be applicable to this Agreement or the enforcement. **FURTHER, NO LAW, THEORY OR PUBLIC POLICY, WHETHER SET FORTH IN THIS ARTICLE 22.11 OR OTHERWISE, SHALL BE GIVEN EFFECT WHICH WOULD UNDERMINE, DIMINISH OR REDUCE THE EFFECTIVENESS OF THE WAIVER OF CONSEQUENTIAL DAMAGES PROVIDED IN ARTICLE 22.06, IT BEING THE EXPRESS INTENT, UNDERSTANDING AND AGREEMENT OF THE PARTIES THAT SUCH WAIVER IS TO BE GIVEN THE FULLEST EFFECT, NOTWITHSTANDING A PRE-EXISTING DEFECT OR THE NEGLIGENCE (WHETHER SOLE, JOINT OR CONCURRENT), GROSS NEGLIGENCE, WILLFUL MISCONDUCT, STRICT LIABILITY OR OTHER LEGAL FAULT OF ANY PARTY OR OTHERWISE.**

22.12   Choice of Venue. The Parties agree that all disputes in any way arising out of or resulting from this Agreement shall be litigated, if at all, exclusively in the state or federal courts venued in Harris County, Texas. The Parties accordingly hereby submit to the jurisdiction and venue of such courts for all purposes.

22.13   Individual Obligations. The obligations, duties and liabilities of each entity that constitutes Producer and each entity that comprises Processor shall be individual and several and not joint or collective; and nothing contained herein shall ever be construed as creating a partnership of any kind, joint venture, association, or other character of business entity recognizable in law for any purpose.

The remainder of this page intentionally left blank.

SIGNATURE PAGE

to Production Handling Agreement covering South Marsh Island 257 dated effective January 1, 2008, by and between Apache
Corporation and Helis Oil & Gas Company, L.L.C. et al.

IN WITNESS WHEREOF, this Agreement is executed as of the date first above written.

**Helis Oil & Gas Company, L.L.C.**
**By: Helis Energy, Inc., Manager**

By: _[signature]_
Name:  Daniel G. McKnight
Title:   Production Manager

**CL&F Resources L.P.**
**By: Piquant, Inc., its General Partner**

By: _____
Name:  C.O. Bolt
Title:   President

**Houston Energy, L.P.**
By: Sewanee Investments, LLC, its General Partner

By: _____
Name:  P. David Amend
Title:   Vice President, Land

**Nexen Petroleum Offshore U.S.A. Inc.**

By: _____
Name:
Title:

**Red Willow Offshore, L.L.C.**

By: _____
Name:  Barbara Wickman
Title:   President

SIGNATURE PAGE

to Production Handling Agreement covering South Marsh Island 257 dated effective January 1, 2008, by and between Apache
Corporation and Helis Oil & Gas Company, L.L.C. et al.

IN WITNESS WHEREOF, this Agreement is executed as of the date first above written.

**Helis Oil & Gas Company, L.L.C.**
**By: Helis Energy, Inc., Manager**

By: _____
Name:  Daniel G. McKnight
Title:   Production Manager

**CL&F Resources L.P.**
**By: Piquant, Inc., its General Partner**

By: _____
Name:  C.O. Bolt
Title:   President

**Houston Energy, L.P.**
By: Sewanee Investments, LLC, its General Partner

By: _____
Name:  P. David Amend
Title:   Vice President, Land

**Nexen Petroleum Offshore U.S.A. Inc.**

By: _____
Name:
Title:

**Red Willow Offshore, L.L.C.**

By: _____
Name:  Barbara Wickman
Title:   President

**SIGNATURE PAGE**

to Production Handling Agreement covering South Marsh Island 257 dated effective January 1, 2008, by and between Apache
Corporation and Helis Oil & Gas Company, L.L.C. et al.

IN WITNESS WHEREOF, this Agreement is executed as of the date first above written.

**Helis Oil & Gas Company, L.L.C.**
**By: Helis Energy, Inc., Manager**

By: _____
Name: Daniel G. McKnight
Title:   Production Manager

**CL&F Resources L.P.**
**By: Piquant, Inc., its General Partner**

By: _____
Name: C.O. Bolt
Title:   President

**Houston Energy, L.P.**
By: Sewanee Investments, LLC, its General Partner

By: _____
Name: P. David Amend
Title:   Vice President, Land

**Nexen Petroleum Offshore U.S.A. Inc.**

By: _____
Name:
Title:

**Red Willow Offshore, L.L.C.**

By: _____
Name: Barbara Wickman
Title:   President

SIGNATURE PAGE

to Production Handling Agreement covering South Marsh Island 257 dated effective January 1, 2008, by and between Apache
Corporation and Helis Oil & Gas Company, L.L.C. et al.

IN WITNESS WHEREOF, this Agreement is executed as of the date first above written.

**Helis Oil & Gas Company, L.L.C.**
**By: Helis Energy, Inc., Manager**

By: _____
Name: Daniel G. McKnight
Title:   Production Manager

**CL&F Resources L.P.**
**By: Piquant, Inc., its General Partner**

By: _____
Name: C.O. Bolt
Title:   President

**Houston Energy, L.P.**
By: Sewanee Investments, LLC, its General Partner

By: _____
Name: P. David Amend
Title:   Vice President, Land

**Nexen Petroleum Offshore U.S.A. Inc.**

By: _____
Name:   Gregg E. Radetsky
Title:   Vice President

**Red Willow Offshore, L.L.C.**

By: _____
Name: Barbara Wickman
Title:   President

SIGNATURE PAGE

to Production Handling Agreement covering South Marsh Island 257 dated effective January 1, 2008, by and between Apache
Corporation and Helis Oil & Gas Company, L.L.C. et al.

IN WITNESS WHEREOF, this Agreement is executed as of the date first above written.

**Helis Oil & Gas Company, L.L.C.**
**By: Helis Energy, Inc., Manager**

By: _____
Name: Daniel G. McKnight
Title:   Production Manager

**CL&F Resources L.P.**
**By: Piquant, Inc., its General Partner**

By: _____
Name: C.O. Bolt
Title:   President

**Houston Energy, L.P.**
**By: Sewanee Investments, LLC, its General Partner**

By: _____
Name: P. David Amend
Title:   Vice President, Land

**Nexen Petroleum Offshore U.S.A. Inc.**

By: _____
Name:
Title:

**Red Willow Offshore, L.L.C.**

By: _____
Name: Barbara Wickman
Title:   President

SIGNATURE PAGE

to Production Handling Agreement covering South Marsh Island 257 dated effective January 1, 2008, by and between Apache
Corporation and Helis Oil & Gas Company, L.L.C. et al.

## PROCESSOR GROUP

**Apache Corporation**

By: *Kenneth McMinn* 4-16-08
Name: Kenneth McMinn
Title: Production Manager Gulf Coast Region

**Hunt Petroleum Corporation**

By: _____
Name: _____
Title: _____



**Hunt Oil Company**

By: *Jess B. Nunnelee*
Name: ~~JESS B. NUNNELEE~~
Title: ~~Vice President~~
    Production
    HUNT OIL COMPANY

**The George R. Brown Partnership**

By: _____
Name: _____
Title: _____

**Lamar Hunt Trust Estate**

By: _____
Name: _____
Title: _____

**OPEX Energy LLC**

By: _____
Name: _____
Title: _____

SIGNATURE PAGE

to Production Handling Agreement covering South Marsh Island 257 dated effective January 1, 2008, by and between Apache
Corporation and Helis Oil & Gas Company, L.L.C. et al.

## PROCESSOR GROUP

**Apache Corporation**

By: _____
Name: Kenneth McMinn
Title:Production Manager Gulf Coast Region

**Hunt Petroleum Corporation**

By: _____
Name: _____
Title: _____

**Hunt Oil Company**

By: _____
Name: _____
Title: _____

**The George R. Brown Partnership**

By: _____
Name: _____
Title: _____

**Lamar Hunt Trust Estate**

By: _____
Name: _____
Title: _____

**OPEX Energy LLC**

By: _____
Name: STEVE CRUSE
Title: MARKETING MANAGER

Page25

## PROCESSOR GROUP

**Apache Corporation**

By: _____
Name: Kenneth McMinn
Title:Production Manager Gulf Coast Region

**Hunt Petroleum Corporation**

By: _____
Name: _____
Title:

**Hunt Oil Company**

By: _____
Name: _____
Title: _____

**The George R. Brown Partnership**

By: _____
Name: _____
Title: _____

**Lamar Hunt Trust Estate**

By: _____
Name: _____
Title: _____

**OPEX Energy LLC**

By: _____
Name: _____
Title: _____

## EXHIBIT "A"

## INSURANCE SCHEDULE

As required by the Agreement to which this Exhibit is attached, Producer shall carry and maintain the following minimum insurance coverages with policy territory sufficient to cover the work and operations hereunder. For the avoidance of doubt, the coverage to be provided by a Party may be provided either (a) by the operator of the Party constituting the Processor group, or Producer group, for the joint account of that group, or (b) proportionately by each entity which is a member of that group, with evidence of such coverage (or self-insurance) being provided to the operator of that group, and supplied to the operator of the other group:

1.  Workmen's Compensation Insurance with statutory limits in accordance with all applicable state, federal and maritime laws, and Employer's Liability Insurance of $1,000,000 per accident/occurrence, including but not limited to an "Alternate Employer" or "Borrowed Servant: endorsement in favor of Processor, whichever is applicable. If the operations are over water or where the laws hereinafter mentioned apply, Producer shall carry the following additional insurance as applicable:

    a.  U.S. Longshoremen's and Harbor Worker's Compensation Act Liability for statutory limits; and

    b.  Maritime Employer's Liability of $1,000,000 per accident/occurrence (including but not limited to coverage for Jones Act, General Maritime Laws and Death on the High Seas Act; Transportation, Wages, Maintenance and Cure; Voluntary Compensation; Alternative Employer/Borrowed Servant endorsement in favor of Processor, whichever is applicable; and "In rem" endorsement).

2.  General Liability Insurance with limits of $1,000,000 combined single limit per occurrence, including but not limited to coverage for public liability including bodily injury and property damage liability, personal/advertising injury, contractual liability and severability of interest, liability for removal of wreck/debris, liability for pollution and cleanup on a sudden and accidental basis, products and completed operations, protective liability/independent contractors/work sublet.

3.  Automotive Liability Insurance with limits of $1,000,000 combined single limit per accident/occurrence for bodily/personal injury and property damage, including but not limited to coverage for all owned, hired and non-owned vehicles or automotive equipment used by or for the party and contractual liability for those liabilities assumed by Producer.

4.  Property Insurance covering Processor's machinery and equipment for its replacement value and including removal of wreck/debris coverage, or Producer may self-insure for these items.

5.  For all vessels owned, operated, chartered or brokered by or for Producer in connection with its work under the Agreement, Producer shall carry or require the owner or operator of such vessels to carry:

Page 1

a.  Hull Insurance for replacement cost value, including but not limited to coverage for Collision and Tower's Liability, Removal of Wreck on a voluntary basis or where required by law, regulation or contract. The insurer shall waive its right to limit to the value of the vessel but only with respect to Processor. The phrase "as owner of vessel named herein" and all similar phrases purporting to limit the insurer's liability to that of an owner shall be deleted.

b.  Protection and Indemnity Insurance with limits of $1,000,000 combined single limit per occurrence, including but not limited to coverage for contractual liability for those liabilities as per WQIS policy form or equivalent, full crew coverage, Collision and Tower's Liability, and Cargo Legal Liability. The insurer shall waive its right to limit its liability to the value of the vessel but only with respect to Processor. The phrase "as to owner of vessel named herein" and all similar phrases purporting to limit the insurer's liability to that of an owner shall be deleted.

c.  Charter's Legal Liability Insurance with limits of $1,000,000 combined single limit per occurrence.

The policies listed in subparagraphs 5(a) and (b) above shall provide that seaworthiness of vessels used to perform services under this Agreement is accepted by insurers (or that insurers shall waive in favor of Processor the vessel owner's and/or Producer's warranty of seaworthiness).

Producer shall delete the "watercraft exclusion" under the General Liability Insurance above.

6.  For all aircraft owned, operated, chartered, or brokered by or for Producer in connection with its work under the Agreement, Producer shall carry or require the owner or operator of such aircraft to carry:

a.  All Risks Hull Insurance for replacement cost value, including but not limited to coverage for collision liability.

b.  Aircraft Liability Insurance with limits of $1,000,000 combined single limit per occurrence, including but not limited to coverage for bodily injury, death and property damage, Passenger Liability, and contractual liability for those liabilities assumed by Producer.

7.  Umbrella Excess Liability Insurance with limits of $50,000,000 per accident/occurrence in excess of primary liability coverages and limits above.

To the extent of the liabilities assumed by Producer herein, all of the above insurance policies shall be endorsed to provide that:

(i)  Producer's insurers waive their right to subrogation (equitable or by assignment,

Page 2

express or implied, loan receipt or otherwise) against Processor, but only to the extent of the liability and indemnity obligations assumed by Producer.

(ii)   Producer's insurers name Processor as additional insured (except for Worker's Compensation and Property Insurance) with the owners Limitation Clause removed as respect Processor's interests.

(ii)   Such insurance coverage is primary over any insurance coverage maintained by Processor.

At the inception of the Agreement, annually thereafter, and whenever requested, Producer shall furnish insurance certificates to Processor to evidence the insurance required herein; however, receipt of such certificates shall not relieve Producer's insurance obligations herein. Producer's insurance shall be carried with reputable insurance companies and shall contain endorsements stating that insurer will give thirty (30) days' written notice to Processor of material change, non-renewal or cancellation. All self-insured amounts, deductible amounts, premiums, franchise amounts or other charges due with respect to Producer's required insurance herein shall be the sole obligation of Producer. Maintaining the prescribed insurance shall not relieve Producer of any other obligations under this Agreement. Producer will require and assure that each of its subcontractors shall carry and pay for insurance in amounts and on terms necessary to cover the work and the obligations of the particular subcontractor.