**Exhibit A**
**Plan**

## IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| **FIELDWOOD ENERGY LLC**, *et al.*, | § | Case No. 20-33948 (MI) |
| | § | |
| Debtors.[1] | § | (Jointly Administered) |
| | § | |
| | § | |

## FOURTH AMENDED JOINT CHAPTER 11 PLAN OF
## FIELDWOOD ENERGY LLC AND ITS AFFILIATED DEBTORS

**WEIL, GOTSHAL & MANGES LLP**
Alfredo R. Pérez
Clifford W. Carlson
700 Louisiana Street, Suite 1700
Houston, Texas  77002
Telephone: (713) 546-5000
Facsimile:  (713) 224-9511

**WEIL, GOTSHAL & MANGES LLP**
Matthew S. Barr (admitted *pro hac vice*)
Jessica Liou (admitted *pro hac vice*)
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

*Attorneys for Debtors*
*and Debtors in Possession*

Dated:  April 15, 2021
          Houston, Texas

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are:  Dynamic Offshore Resources NS, LLC (0158); Fieldwood Energy LLC (6778); Fieldwood Energy Inc. (4991); Fieldwood Energy Offshore LLC (4494); Fieldwood Onshore LLC (3489); Fieldwood SD Offshore LLC (8786); Fieldwood Offshore LLC (2930); FW GOM Pipeline, Inc. (8440); GOM Shelf LLC (8107); Bandon Oil and Gas GP, LLC (9172); Bandon Oil and Gas, LP (9266); Fieldwood Energy SP LLC (1971); Galveston Bay Pipeline LLC (5703); and Galveston Bay Processing LLC (0422).  The Debtors' primary mailing address is 2000 W. Sam Houston Parkway S., Suite 1200, Houston, TX  77042.

# Table of Contents

ARTICLE I.     Definitions and Interpretation. ........................................................................... 1
    1.1     Definitions. ................................................................................................................. 1
    1.2     Interpretation; Application of Definitions; Rules of Construction. ......................... 28
    1.3     Reference to Monetary Figures. ............................................................................... 28
    1.4     Controlling Document. ............................................................................................. 29
    1.5     Certain Consent Rights ............................................................................................ 29

ARTICLE II.    Administrative Expense Claims, Fee Claims, DIP Claims, and
                   Priority Tax Claims. .............................................................................. 29
    2.1     Treatment of Administrative Expense Claims. ........................................................ 29
    2.2     Treatment of Fee Claims. ......................................................................................... 30
    2.3     Treatment of DIP Claims. ........................................................................................ 31
    2.4     Payment of Fees and Expenses Under DIP Order. .................................................. 31
    2.5     Treatment of Priority Tax Claims. ........................................................................... 31
    2.6     Restructuring Expenses. ........................................................................................... 32
    2.7     Postpetition Hedge Claims. ...................................................................................... 32

ARTICLE III.   Classification of Claims and Interests. ............................................................ 33
    3.1     Classification in General. ......................................................................................... 33
    3.2     Formation of Debtor Groups for Convenience Only. .............................................. 33
    3.3     Summary of Classification of Claims and Interests. ............................................... 33
    3.4     Special Provision Governing Unimpaired Claims. .................................................. 34
    3.5     Separate Classification of Other Secured Claims. ................................................... 34
    3.6     Elimination of Vacant Classes. ................................................................................ 34
    3.7     Voting Classes; Presumed Acceptance by Non-Voting Classes. ............................. 34
    3.8     Voting; Presumptions; Solicitation. ......................................................................... 34
    3.9     Cramdown. ................................................................................................................ 35
    3.10    No Waiver. ................................................................................................................ 35

ARTICLE IV.   Treatment of Claims and Interests. ................................................................. 35
    4.1     Class 1: Other Secured Claims. ............................................................................... 35
    4.2     Class 2: Priority Non-Tax Claims. ........................................................................... 35
    4.3     Class 3: FLFO Claims. ............................................................................................. 36
    4.4     Class 4: FLTL Claims. .............................................................................................. 36
    4.5     Class 5: SLTL Claims. .............................................................................................. 37
    4.6     Class 6A: Unsecured Trade Claims. ........................................................................ 37
    4.7     Class 6B: General Unsecured Claims. ..................................................................... 37
    4.8     Class 7: Intercompany Claims. ................................................................................ 38
    4.9     Class 8: Subordinated Securities Claims. ................................................................ 38
    4.10    Class 9: Intercompany Interests. .............................................................................. 38
    4.11    Class 10: Existing Equity Interests. ......................................................................... 38
    4.12    Treatment of Vacant Classes. ................................................................................... 39

ARTICLE V.    Means for Implementation. .............................................................................. 39
    5.1     Plan Settlement; Compromise and Settlement of Claims, Interests, and
           Controversies. .......................................................................................................... 39
    5.2     Credit Bid Transaction; Confirmation Outside Date. .............................................. 39

| | | |
|---|---|---|
| 5.3 | Equity Rights Offerings. | 42 |
| 5.4 | New Equity Interests. | 42 |
| 5.5 | NewCo Organizational Documents | 43 |
| 5.6 | New Money Warrants, SLTL Warrants and GUC Warrants | 43 |
| 5.7 | Plan of Merger | 43 |
| 5.8 | Single Share | 44 |
| 5.9 | Plan Administrator | 44 |
| 5.10 | Plan Funding. | 47 |
| 5.11 | The Exit Facilities | 47 |
| 5.12 | Apache Definitive Documents. | 48 |
| 5.13 | Abandonment of Certain Properties. | 49 |
| 5.14 | Establishment of Claims Reserve. | 50 |
| 5.15 | Plan Administrator Expense Reserve. | 50 |
| 5.16 | Continued Corporate Existence; Effectuating Documents; Further Transactions. | 50 |
| 5.17 | Corporate Action. | 51 |
| 5.18 | Cancellation of Existing Securities and Agreements. | 52 |
| 5.19 | Cancellation of Certain Existing Security Interests. | 53 |
| 5.20 | Intercompany Interests; Corporate Reorganization. | 53 |
| 5.21 | Restructuring Transactions. | 53 |
| 5.22 | Liquidating Trust. | 53 |
| 5.23 | Securities Exemptions. | 54 |
| 5.24 | Closing of Chapter 11 Cases. | 56 |
| **ARTICLE VI.** | **Distributions.** | 56 |
| 6.1 | Distributions Generally. | 56 |
| 6.2 | No Postpetition Interest on Claims. | 56 |
| 6.3 | Date of Distributions. | 56 |
| 6.4 | Distribution Record Date. | 56 |
| 6.5 | Distributions after Effective Date | 57 |
| 6.6 | Delivery of Distributions. | 57 |
| 6.7 | Unclaimed Property. | 57 |
| 6.8 | Satisfaction of Claims. | 57 |
| 6.9 | Manner of Payment under Plan. | 57 |
| 6.10 | De Minimis Cash Distributions. | 58 |
| 6.11 | No Distribution in Excess of Amount of Allowed Claim. | 58 |
| 6.12 | Allocation of Distributions Between Principal and Interest. | 58 |
| 6.13 | Setoffs and Recoupments. | 58 |
| 6.14 | Withholding and Reporting Requirements. | 59 |
| 6.15 | Claims Paid by Third Parties. | 59 |
| 6.16 | Claims Payable by Third Parties. | 60 |
| **ARTICLE VII.** | **Procedures for Disputed Claims.** | 60 |
| 7.1 | Allowance of Claims. | 60 |
| 7.2 | Claims Objections. | 60 |
| 7.3 | Estimation of Claims. | 60 |
| 7.4 | Adjustment to Claims Register Without Objection. | 61 |
| 7.5 | Time to File Objections to Claims. | 61 |

| | | |
|---|---|---|
| 7.6 | Disallowance of Claims. | 61 |
| 7.7 | Amendments to Claims. | 61 |
| 7.8 | No Distributions Pending Allowance. | 62 |
| 7.9 | Distributions After Allowance. | 62 |
| 7.10 | Claims Resolution Procedures Cumulative. | 62 |

**ARTICLE VIII. Executory Contracts and Unexpired Leases** ......... 62

| | | |
|---|---|---|
| 8.1 | General Treatment. | 62 |
| 8.2 | Determination of Cure Amounts and Deemed Consent. | 63 |
| 8.3 | Rejection Damages Claims. | 65 |
| 8.4 | Survival of the Debtors' Indemnification Obligations. | 65 |
| 8.5 | Insurance Policies. | 65 |
| 8.6 | Modifications, Amendments, Supplements, Restatements, or Other Agreements. | 66 |
| 8.7 | Reservation of Rights. | 66 |

**ARTICLE IX. Conditions Precedent to Occurrence of Effective Date.** ......... 66

| | | |
|---|---|---|
| 9.1 | Conditions Precedent to Effective Date. | 66 |
| 9.2 | Waiver of Conditions Precedent. | 68 |
| 9.3 | Effect of Failure of a Condition. | 69 |

**ARTICLE X. Effect of Confirmation** ......... 69

| | | |
|---|---|---|
| 10.1 | Binding Effect. | 69 |
| 10.2 | Vesting of Assets. | 69 |
| 10.3 | Discharge of Claims Against and Interests in Debtors. | 70 |
| 10.4 | Pre-Confirmation Injunctions and Stays. | 71 |
| 10.5 | Injunction Against Interference With Plan. | 71 |
| 10.6 | Plan Injunction. | 71 |
| 10.7 | Releases. | 72 |
| 10.8 | Exculpation. | 76 |
| 10.9 | Injunction Related to Releases and Exculpation. | 77 |
| 10.10 | Subordinated Securities Claims. | 77 |
| 10.11 | Retention of Causes of Action and Reservation of Rights. | 77 |
| 10.12 | Ipso Facto and Similar Provisions Ineffective. | 77 |
| 10.13 | Indemnification and Reimbursement Obligations. | 78 |

**ARTICLE XI. Retention of Jurisdiction.** ......... 78

| | | |
|---|---|---|
| 11.1 | Retention of Jurisdiction. | 78 |

**ARTICLE XII. Miscellaneous Provisions.** ......... 80

| | | |
|---|---|---|
| 12.1 | Payment of Statutory Fees | 80 |
| 12.2 | Exemption from Certain Transfer Taxes. | 80 |
| 12.3 | Request for Expedited Determination of Taxes. | 81 |
| 12.4 | Dates of Actions to Implement Plan. | 81 |
| 12.5 | Amendments. | 81 |
| 12.6 | Revocation or Withdrawal of Plan. | 82 |
| 12.7 | Severability. | 82 |
| 12.8 | Governing Law. | 82 |
| 12.9 | Immediate Binding Effect. | 83 |

12.10   Successors and Assigns. ................................................................. 83
12.11   Entire Agreement. .......................................................................... 83
12.12   Computing Time. ............................................................................ 83
12.13   Exhibits to Plan. ............................................................................. 83
12.14   Notices. .......................................................................................... 83
12.15   Reservation of Rights. .................................................................... 85
12.16   Dissolution of Creditors' Committee. ............................................. 85

Each of Fieldwood Energy LLC; Fieldwood Energy Inc.; Dynamic Offshore Resources NS, LLC; Fieldwood Energy Offshore LLC; Fieldwood Onshore LLC; Fieldwood SD Offshore LLC; Fieldwood Offshore LLC; FW GOM Pipeline, Inc.; GOM Shelf LLC; Bandon Oil and Gas GP, LLC; Bandon Oil and Gas, LP; Fieldwood Energy SP LLC; Galveston Bay Pipeline LLC; and Galveston Bay Processing LLC (each, a "*Debtor*" and collectively, the "*Debtors*") proposes the following joint chapter 11 plan of reorganization pursuant to section 1121(a) of the Bankruptcy Code. Capitalized terms used herein shall have the meanings set forth in Section 1.1 below.

## ARTICLE I.      DEFINITIONS AND INTERPRETATION.

### 1.1      *Definitions*.

The following terms shall have the respective meanings specified below:

*363 Credit Bid Transaction* means the sale of the Credit Bid Acquired Interests to the Credit Bid Purchaser pursuant to section 363 of the Bankruptcy Code on substantially the same terms as provided in the Credit Bid Purchase Agreement in accordance with Section 5.2(c) of this Plan.

*Abandoned Properties* means the Debtors' rights to and interests in executory contracts and unexpired federal leases, rights-of-way, and right-of-use-and-easements listed on the Schedule of Abandoned Properties (as amended, supplemented, or otherwise modified from time to time).

*Accepting Class* means a class of Claims or Interests that votes to accept this Plan in accordance with section 1126 of the Bankruptcy Code.

*Ad Hoc Group of Secured Lenders* means the ad hoc group of holders of Prepetition FLTL Loans and Prepetition SLTL Loans that is represented by the Ad Hoc Group of Secured Lenders Advisors.

*Ad Hoc Group of Secured Lenders Advisors* means Davis Polk & Wardwell LLP, Haynes and Boone LLP, Gordon, Arata, Montgomery, Barnett, McCollam, Duplantis & Eagan, LLC, Rothschild & Co US Inc. and Intrepid Financial Partners, LLC and any local or foreign advisors.

*Ad Hoc Group of Prepetition SLTL Lenders* means that certain ad hoc group of holders of Prepetition SLTL Loans that is represented by the Ad Hoc Group of Prepetition SLTL Advisors.

*Ad Hoc Group of Prepetition SLTL Lenders Advisors* means only Kasowitz Benson Torres LLP.

**Additional Predecessor Agreement** means any consensual agreement that the Debtors may enter into prior to the Confirmation Date with any entity or entities in the chain of title, co-working interest owner(s), or other related party for any of the Abandoned Properties.

**Additional Predecessor Agreement Documents** means any agreements or documents contemplated by and necessary to the consummation of an Additional Predecessor Agreement.

**Administrative Expense Claim** means any Claim constituting a cost or expense of administration incurred during the Chapter 11 Cases of a kind specified under section 503(b) of the Bankruptcy Code and entitled to priority under sections 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code (other than DIP Claims and Postpetition Hedge Claims), including (a) the actual and necessary costs and expenses incurred after the Petition Date and through the Effective Date of preserving the Estates and operating the businesses of the Debtors (such as wages, salaries, or commissions for services and payments for goods and other services and leased premises), and (b) Fee Claims.

**Allowed** means, with respect to any Claim against or Interest in a Debtor, (a) (i) that is timely filed by the bar dates established in the Chapter 11 Cases, or (ii) as to which there exists no requirement for the holder of a Claim to file such Claim under the Plan, the Bankruptcy Code, the Bankruptcy Rules or a Final Order, (b) (i) that is listed in the Schedules as not contingent, not unliquidated, and not disputed, and (ii) for which no contrary proof of claim has been timely filed, or (c) allowed under the Plan or by a Final Order (including the DIP Order). With respect to any Claim described in clause (a) above, such Claim will be considered allowed only if, and to the extent that, (A) no objection to the allowance of such Claim has been asserted, or may be asserted, on or before the time period set forth in the Plan, and no request for estimation or other challenge, including pursuant to section 502(d) of the Bankruptcy Code or otherwise, has been interposed and not withdrawn within the applicable period fixed by the Plan or applicable law, (B) an objection to such Claim is asserted and such Claim is subsequently allowed pursuant to a Final Order, (C) such Claim is settled pursuant to an order of the Bankruptcy Court, or (D) such Claim is allowed pursuant to the Plan or any agreements related thereto and such allowance is approved and authorized by the Bankruptcy Court; *provided*, *however*, that notwithstanding the foregoing, the Post-Effective Date Debtors shall retain all claims and defenses with respect to Allowed Claims that are reinstated or otherwise unimpaired pursuant to the Plan. If a Claim is Allowed only in part, any provisions hereunder with respect to Allowed Claims are applicable solely to the Allowed portion of such Claim. Notwithstanding the foregoing, unless expressly waived herein, the Allowed amount of Claims or Interests shall be subject to and shall not exceed the limitations or maximum amounts permitted by the Bankruptcy Code, including sections 502 or 503 of the Bankruptcy Code, to the extent applicable.

**Amended Organizational Documents** means the certificates of incorporation, certificates of formation, bylaws, limited liability company agreements, stockholders agreement, and the operating agreements or other similar organizational or formation documents, as applicable, of the Post-Effective Date Debtors.

**Apache** means Apache Corporation.

**Apache Definitive Documents** has the meaning set forth in the Apache Implementation Agreement.

**Apache Fees and Expenses** has the meaning set forth in the Apache Implementation Agreement.

**Apache Implementation Agreement** means that certain Implementation Agreement, dated January 1, 2021, by and among Debtor Fieldwood Energy LLC and Debtor GOM Shelf LLC, on the one hand, and the Apache PSA Parties on the other hand, as may be amended, restated, or otherwise modified pursuant to the terms thereof; *provided* that such amendment, restatement, or other modification is reasonably acceptable to the Debtors, the Apache PSA Parties, the Required DIP Lenders and Requisite FLTL Lenders.

**Apache Implementation Costs** has the meaning ascribed to "Implementation Costs" in the Apache Implementation Agreement.

**Apache PSA Parties** means, collectively, Apache, Apache Shelf, Inc., Apache Deepwater LLC, and Apache Shelf Exploration LLC.

**Apache Term Sheet** has the meaning set forth in the Restructuring Support Agreement.

**Asset** means all of the rights, title, and interests of a Debtor in and to property of whatever type or nature (including real, personal, mixed, intellectual, tangible, and intangible property).

**Assumption Dispute** means an unresolved objection regarding assumption or assumption and assignment of an executory contract or unexpired lease pursuant to section 365 of the Bankruptcy Code, including objections based on the appropriate Cure Amount or "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code).

**Avoidance Actions** means all claims and causes of action that may be commenced by or on behalf of the Debtors pursuant to sections 544, 545, 547, 548, 549, 550 and 551 of the Bankruptcy Code or similar nonbankruptcy law, including similar or related state or federal statute and common law.

**Backstop Commitment Premium Equity Interests** means the Second Lien Backstop Commitment Premium Equity Interests, the FLTL ERO Backstop Commitment Premium Equity Interests, and the SLTL ERO Backstop Commitment Premium Equity Interests.

**Bankruptcy Code** means title 11 of the United States Code, 11 U.S.C. §§ 101-1532, as amended from time to time, as applicable to these Chapter 11 Cases.

**Bankruptcy Court** means the United States Bankruptcy Court for the Southern District of Texas having jurisdiction over the Chapter 11 Cases and, to the extent of any reference made under section 157 of title 28 of the United States Code or the Bankruptcy Court

is determined not to have authority to enter a Final Order on an issue, the District Court having jurisdiction over the Chapter 11 Cases under section 151 of title 28 of the United States Code.

**Bankruptcy Rules** means the Federal Rules of Bankruptcy Procedure as promulgated by the Supreme Court of the United States under section 2075 of title 28 of the United States Code, as amended from time to time, applicable to the Chapter 11 Cases, and any local rules of the Bankruptcy Court.

**Business Day** means any day other than a Saturday, a Sunday or any other day on which banking institutions in New York, New York are authorized or required by law or executive order to close.

**Cash** means legal tender of the United States of America.

**Cause of Action** means any action, claim, cross-claim, third-party claim, cause of action, controversy, dispute, demand, right, Lien, indemnity, contribution, guaranty, suit, obligation, liability, loss, debt, fee or expense, damage, interest, judgment, cost, account, defense, remedy, offset, power, privilege, proceeding, license, and franchise of any kind or character whatsoever, known, unknown, foreseen or unforeseen, existing or hereafter arising, contingent or non-contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, secured or unsecured, assertable directly or derivatively (including any alter ego theories), whether arising before, on, or after the Petition Date, in contract or in tort, in law or in equity or pursuant to any other theory of law (including under any state or federal securities laws).  For the avoidance of doubt, Cause of Action also includes (a) any right of setoff, counterclaim, or recoupment and any claim for breach of contract or for breach of duties imposed by law or in equity, (b) the right to object to Claims or Interests, (c) any claim pursuant to section 362 or chapter 5 of the Bankruptcy Code (including claims and causes of action arising under section 544, 545, 547, 548, 549, 550, and 551 of the Bankruptcy Code), (d) any claim or defense, including fraud, mistake, duress, and usury and any other defenses set forth in section 558 of the Bankruptcy Code, and (e) any state law fraudulent transfer or preferential transfer claim.

**Chapter 11 Case(s)** means, with respect to a Debtor, such Debtor's case under chapter 11 of the Bankruptcy Code commenced on the Petition Date in the Bankruptcy Court, jointly administered with all other Debtors' cases under chapter 11 of the Bankruptcy Code.

**Claim** means a "claim," as defined in section 101(5) of the Bankruptcy Code, against any Debtor.

**Claims Reserve** means one or more segregated accounts not subject to the Liens of the Prepetition Agents or DIP Agent, which shall be established on or immediately before the Effective Date and funded on the Effective Date with Cash to pay (or reserve for payment of) any (i) Allowed Administrative Expense Claims, (ii) Allowed Priority Tax Claims, (iii) Allowed Priority Non-Tax Claims, (iv) Allowed Other Secured Claims, (v) Allowed Unsecured Trade Claims, and (vi) Cure Amounts; *provided*, *however*, that all Cash remaining in the Claims Reserve after payment of all relevant Allowed Claims and Cure Amounts in accordance with the terms of this Plan shall constitute Residual Distributable Value; *provided further* that the funding

of the Claims Reserve shall be consistent with the terms of the Second Lien Backstop Commitment Letter.

> ***Claims Reserve Amount*** means the aggregate amount of Cash, as determined by the Debtors with (i) the consent of the Required DIP Lenders and Requisite FLTL Lenders and (ii) the reasonable consent of the Creditors' Committee solely with respect to the amount of the Claims Reserve on account of Allowed Unsecured Trade Claims, necessary to satisfy all (a) Allowed Administrative Expense Claims, (b) Allowed Priority Tax Claims, (c) Allowed Priority Non-Tax Claims, (d) Allowed Other Secured Claims, (e) Allowed Unsecured Trade Claims, and (f) Cure Amounts, which aggregate amount shall be funded into the Claims Reserve on the Effective Date.

> ***Class*** means any group of Claims or Interests classified under the Plan pursuant to section 1122 and 1123(a)(1) of the Bankruptcy Code.

> ***Collateral*** means any Asset of an Estate that is subject to a Lien securing the payment or performance of a Claim, which Lien is not invalid, is properly perfected as of the Petition Date, and is not subject to avoidance under the Bankruptcy Code or applicable nonbankruptcy law.

> ***Confirmation Date*** means the date on which the Clerk of the Bankruptcy Court enters the Confirmation Order.

> ***Confirmation Hearing*** means the hearing to be held by the Bankruptcy Court regarding confirmation of the Plan, as such hearing may be adjourned or continued from time to time.

> ***Confirmation Order*** means the order of the Bankruptcy Court, in form and substance acceptable to the Debtors, the Required DIP Lenders, the Requisite FLTL Lenders, the Prepetition FLFO Administrative Agent, and the Creditors' Committee, confirming the Plan pursuant to section 1129 of the Bankruptcy Code.

> ***Confirmation Outside Date*** means June 16, 2021 or such later date as may be mutually agreed between the Debtors, the Required DIP Lenders, and the Requisite FLTL Lenders.

> ***Consenting Creditors*** means the Prepetition FLTL Lenders, together with their respective successors and permitted assigns, and the Prepetition SLTL Lenders, together with their respective successors and permitted assigns, that are party to, or have executed a joinder to, the Restructuring Support Agreement.

> ***Credit Bid Acquired Interests*** has the meaning ascribed to "Acquired Interests" set forth in the Credit Bid Purchase Agreement.

> ***Credit Bid Assumed Liabilities*** has the meaning ascribed to "Assumed Liabilities" set forth in the Credit Bid Purchase Agreement.

**Credit Bid Consent Rights** means any right of consent, notice, and other similar rights, if any, that are applicable to the sale of the Credit Bid Acquired Interests in connection with the Credit Bid Purchase Agreement.

**Credit Bid Permitted Encumbrances** has the meaning ascribed to "Permitted Encumbrances" set forth in the Credit Bid Purchase Agreement.

**Credit Bid Purchase Agreement** means that certain Purchase and Sale Agreement, by and between Fieldwood Energy LLC, the other seller parties, and the Credit Bid Purchaser and NewCo, together with any and all related agreements, annexes, exhibits and schedules in connection therewith, as amended, supplemented or otherwise modified from time to time, which shall be in form and substance acceptable to the Debtors, the Requisite FLTL Lenders, and the Required DIP Lenders; *provided* that any modifications to the Credit Bid Purchase Agreement from the version attached to the draft of the Disclosure Statement at Docket No. 1022 shall require the consent of the Prepetition FLFO Administrative Agent (not to be unreasonably withheld with respect to the following clauses (b) and (e)) to the extent that such modification (a) individually or in the aggregate, results in a reduction of 10% or more of the total PV-10 of total 2P reserves comprising the assets acquired by the Credit Bid Purchaser (which shall be calculated by reference to the FWE YE2020 Internal Reserve Report (as of 5.1.21)), (b) results in any contract rights constituting material assets not being acquired by the Credit Bid Purchaser, (c) individually or in the aggregate, results in an increase by $40.0 million or more (which, for the avoidance of doubt, in the case of plugging and abandonment liabilities, shall be calculated on a present value basis) in liabilities assumed by the Credit Bid Purchaser, (d) relates to any change in treatment of the Prepetition FLFO Credit Agreement or First Lien Exit Facility, or (e) provide for any differences from the draft of the Disclosure Statement at Docket No. 1022 that are materially adverse to the interests of the First Lien Exit Facility Agent and the First Lien Exit Facility Lenders.

**Credit Bid Purchaser** means [●], a newly formed special purpose bidding entity, as purchaser of certain of the Debtors' assets pursuant to and in accordance with the Credit Bid Purchase Agreement.

**Credit Bid Preferential Purchase Rights** has the meaning ascribed to "Preferential Right" set forth in the Credit Bid Purchase Agreement.

**Credit Bid Transaction** means the sale of the Credit Bid Acquired Interests to the Credit Bid Purchaser pursuant to the Credit Bid Purchase Agreement.

**Credit Bid Transaction Closing** means "Closing" as defined in the Credit Bid Purchase Agreement.

**Creditors' Committee** means the Official Committee of Unsecured Creditors appointed by the U.S. Trustee in these Chapter 11 Cases pursuant to section 1102 of the Bankruptcy Code as it may be reconstituted from time to time.

**Cure Amount** means the payment of Cash or the distribution of other property (as the parties may agree or the Bankruptcy Court may order) necessary to (a) cure a monetary default by the Debtors in accordance with the terms of an executory contract or unexpired lease

and (b) permit the Debtors to assume such executory contract or unexpired lease under section 365(a) of the Bankruptcy Code.

*Cure Notice* means the notice of proposed Cure Amount to be paid in connection with an executory contract or unexpired lease of the Debtors that may be assumed or assumed and assigned under the Plan pursuant to section 365 of the Bankruptcy Code, which shall include (a) procedures for objecting to proposed assumptions or assumptions and assignments of executory contracts and unexpired leases, (b) any Cure Amount to be paid in connection therewith, and (c) procedures for resolution by the Bankruptcy Court of any related disputes.

*D&O Policy* means any insurance policy, including tail insurance policies, for directors', members', trustees', and officers' liability providing coverage to the Debtors and in effect or purchased as of the Petition Date.

*Debtor(s)* has the meaning set forth in the introductory paragraph of the Plan.

*Debtor in Possession* means, with respect to a Debtor, that Debtor in its capacity as a debtor in possession pursuant to sections 1101, 1107(a), and 1108 of the Bankruptcy Code.

*Decommissioning Agreement* means that Decommissioning Agreement, dated as of September 30, 2013, by and among the Apache PSA Parties, Fieldwood Energy LLC, and the other parties thereto.

*Decommissioning Security* has the meaning set forth in the Apache Implementation Agreement.

*Definitive Documents* has the meaning set forth in the Restructuring Support Agreement.

*DIP Agent* means Cantor Fitzgerald Securities, solely in its capacity as administrative agent and collateral agent under the DIP Facility Credit Agreement, its successors, assigns, or any replacement agent appointed pursuant to the terms of the DIP Facility Credit Agreement.

*DIP Claim* means any Claim held by the DIP Lenders or the DIP Agent arising under or relating to the DIP Facility Credit Agreement or the DIP Order, including any and all fees, interests, and accrued but unpaid interest and fees arising under the DIP Facility Credit Agreement.

*DIP Documents* has the meaning set forth in the DIP Order.

*DIP Facility* means the postpetition senior secured debtor-in-possession term loan credit facility approved by the DIP Order.

*DIP Facility Credit Agreement* means the credit agreement governing the terms of the DIP Facility, dated as of August 24, 2020, by and among Fieldwood Energy LLC, as borrower, FWE Parent, as holdings, the DIP Agent, and the DIP Lenders, with any amendments,

restatements, amendments and restatements, modifications or supplements thereto as permitted by the DIP Order.

**DIP Lenders** means the lenders from time to time party to the DIP Facility Credit Agreement.

**DIP Order** means the *Final Order (I) Authorizing Debtors (A) to Obtain Postpetition Financing Pursuant to 11 U.S.C. §§ 105, 361, 362, 363(b), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1) and 364(e) and (B) to Utilize Cash Collateral Pursuant to 11 U.S.C. § 363 and (II) Granting Adequate Protection to Prepetition Secured Parties Pursuant to 11 U.S.C. §§ 361, 362, 363, 364 and 507(b)* [Docket No. 346], authorizing the Debtors to enter into the DIP Facility Credit Agreement and access the DIP Facility, as may be amended, supplemented or modified from time to time.

**Disclosure Statement** means the disclosure statement in support of the Plan, in form and substance (i) acceptable to the Debtors, the Required DIP Lenders, the Requisite FLTL Lenders, (ii) reasonably acceptable to the Creditors' Committee solely for matters relating to the treatment of holders of General Unsecured Claims or Unsecured Trade Claims, and (iii) reasonably acceptable to the Prepetition FLFO Administrative Agent, which is prepared and distributed in accordance with sections 1125, 1126(b), or 1145 of the Bankruptcy Code, Bankruptcy Rules 3016 and 3018, or other applicable law, and all exhibits, schedules, supplements, modifications, amendments, annexes, and attachments to such disclosure statement.

**Disputed** means, with respect to a Claim, (a) any Claim, which Claim is disputed under this Plan (including pursuant to section 7.1 of this Plan) or otherwise or as to which the Debtors, the Post-Effective Date Debtors, or the Plan Administrator, as applicable, have interposed and not withdrawn an objection or request for estimation that has not been determined by a Final Order; (b) any Claim, proof of which was required to be filed by order of the Bankruptcy Court but as to which a proof of claim was not timely or properly filed; (c) any Claim that is listed in the Schedules, if any are filed, as unliquidated, contingent, disputed or undetermined, and as to which no request for payment or proof of claim has been filed; or (d) any Claim that is otherwise disputed by any of the Debtors or the Post-Effective Date Debtors in accordance with applicable law or contract, which dispute has not been withdrawn, resolved or overruled by a Final Order.  To the extent the Debtors dispute only the amount of a Claim, such Claim shall be deemed Allowed in the amount the Debtors do not dispute, if any, and Disputed as to the balance of such Claim.

**Distribution Date** means the date or dates, including the Initial Distribution Date, as determined by the Plan Administrator in accordance with the terms of this Plan, on which the Plan Administrator makes a Distribution to holders of Allowed Claims.

**Distribution Record Date** means, except as otherwise provided in the Plan, the date that is two business days before the Effective Date or such other date as is designated by the Debtors with the consent of the Requisite FLTL Lenders and the Required DIP Lenders.

**Divisive Merger** means a divisive merger pursuant to Sections 10.001, 10.002, 10.008 and 10.302 of the Texas Business Organizations Code.

**Effective Date** means the date which is the first Business Day on which (a) all conditions to the effectiveness of the Plan set forth in Section 9.1 of the Plan have been satisfied or waived in accordance with the terms of the Plan, and (b) no stay of the Confirmation Order is in effect.

**Entity** means an "entity," as defined in section 101(15) of the Bankruptcy Code.

**Equity Rights Offerings** means, collectively, the FLTL Equity Rights Offering and the SLTL Equity Rights Offering.

**ERO Backstop Agreements** means, collectively, the FLTL ERO Backstop Agreement and the SLTL ERO Backstop Agreement.

**ERO Backstop Parties** means, collectively, the FLTL ERO Backstop Parties and the SLTL ERO Backstop Parties.

**Estate(s)** means individually or collectively, the estate or estates of the Debtors created under section 541 of the Bankruptcy Code.

**Exculpated Parties** means collectively, and in each case in their capacities as such during the Chapter 11 Cases (a) the Debtors, (b) the Post-Effective Date Debtors, (c) FWE I, (d) the DIP Agent and DIP Lenders under the DIP Facility, (e) the Prepetition FLFO Secured Parties, (f) the Consenting Creditors, (g) the Prepetition FLFO Collateral Agent, (h) the Prepetition FLTL Agents, (i) the Prepetition SLTL Agent, (j) the Creditors' Committee and the current and former members of the Creditors' Committee (solely in their capacities as such), (k) NewCo and all of its subsidiaries (including the Credit Bid Purchaser), (l) the Exit Facility Agents, (m) the Exit Facility Lenders, (n) the Second Lien Backstop Parties, (o) the ERO Backstop Parties, (p) the Apache PSA Parties, and (q) with respect to each of the foregoing Persons in clauses (a) through (p) each of their current and former affiliates, and each such Entity's and its current and former affiliates' current and former directors, managers, officers, equity holders (regardless of whether such interests are held directly or indirectly), predecessors, successors, and assigns, subsidiaries, and each of their current and former officers, members, managers, directors, equity holders (regardless of whether such interests are held directly or indirectly), principals, members, employees, agents, managed accounts or funds, management companies, fund advisors, investment advisors, advisory board members, financial advisors, partners (including both general and limited partners), attorneys, accountants, investment bankers, consultants, representatives and other professionals, such Persons' respective heirs, executors, estates, and nominees, in each case in their capacity as such, and any and all other persons or entities that may purport to assert any cause of action derivatively, by or through the foregoing entities.

**Existing Equity Interests** means shares of common stock of FWE Parent that existed immediately before the Effective Date.

**Exit Facilities** means the First Lien Exit Facility and the Second Lien Exit Facility.

**Exit Facility Agents** means the First Lien Exit Facility Agent and the Second Lien Exit Facility Agent.

**Exit Facility Documents** means the First Lien Exit Facility Documents and the Second Lien Exit Facility Documents.

**Exit Facility Lenders** means the First Lien Exit Facility Lenders and the Second Lien Exit Facility Lenders.

**Fee Claim** means a Claim for professional services rendered or costs incurred on or after the Petition Date through the Effective Date by Professional Persons retained by an order of the Bankruptcy Court pursuant to sections 327, 328, 329, 330, 331, 503(b), or 1103 of the Bankruptcy Code in the Chapter 11 Cases.

**Fieldwood U.A. Interests** has the meaning ascribed to such term in the Credit Bid Purchase Agreement.

**Final Order** means an order or judgment of the Bankruptcy Court or other court of competent jurisdiction with respect to the relevant subject matter which has: (a) not been reversed, stayed, modified or amended, as to which the time to appeal, petition for certiorari or move for reargument, reconsideration or rehearing has expired and no appeal, petition for certiorari or motion for reargument, reconsideration or rehearing has been timely filed; or (b) as to which any appeal, petition for certiorari or motion for reargument, reconsideration or rehearing that has been or may be filed has been resolved by the highest court to which the order or judgment was appealed or from which certiorari, reargument, reconsideration or rehearing was sought; *provided*, *however*, that the possibility that a motion under Rules 59 or 60 of the Federal Rules of Civil Procedure or any analogous Bankruptcy Rule (or any analogous rules applicable in such other court of competent jurisdiction) may be filed relating to such order or judgment shall not cause such order or judgment not to be a Final Order.

**First Lien Exit Facility** means the facility under the First Lien Exit Facility Credit Agreement.

**First Lien Exit Facility Agent** means the administrative agent under the First Lien Exit Facility Credit Agreement.

**First Lien Exit Facility Commitment Letter** means that certain commitment letter, in form and substance acceptable to the Required DIP Lenders, the Requisite FLTL Lenders, the Debtors, the Prepetition FLFO Administrative Agent, and the First Lien Exit Facility Agent, to be entered into by and among Fieldwood Energy LLC and the First Lien Exit Facility Agent, as may be amended, supplemented, or modified from time to time, pursuant and subject to the terms thereof, pursuant to which, among other things, GS Bank (as defined therein) agreed to act as the sole arranger, administrative agent and collateral agent in connection with the First Lien Exit Facility and to commit to provide First Lien Exit Facility in accordance with the terms and conditions set forth therein.

**First Lien Exit Facility Credit Agreement** means that certain credit agreement to be entered by the Credit Bid Purchaser, the First Lien Exit Facility Agent and the First Lien Exit Facility Lenders on the Effective Date that shall govern the First Lien Exit Facility which shall reflect and contain terms, conditions, representations, warranties, and covenants consistent with the First Lien Exit Facility Term Sheet and otherwise be in form and substance acceptable to the Prepetition FLFO Administrative Agent, the First Lien Exit Facility Agent, the Debtors, the Required DIP Lenders, and Requisite FLTL Lenders.

**First Lien Exit Facility Documents** means, collectively, the First Lien Exit Facility Credit Agreement, and any and all other agreements, documents, and instruments delivered or to be entered into in connection therewith, including any guarantee agreements, pledge and collateral agreements, intercreditor agreements, and other security documents, the terms of which documents shall be in form and substance acceptable to the Prepetition FLFO Administrative Agent, the First Lien Exit Facility Agent, the Debtors, the Required DIP Lenders, and Requisite FLTL Lenders.

**First Lien Exit Facility Lenders** means the lenders party to the First Lien Exit Facility Credit Agreement.

**First Lien Exit Facility Term Sheet** means a term sheet attached to the First Lien Exit Facility Commitment Letter and to be attached to the Disclosure Statement, as may be amended, supplemented or modified from time to time with the consent of the Prepetition FLFO Administrative Agent, the First Lien Exit Facility Agent, the Debtors, the Required DIP Lenders, and Requisite FLTL Lenders.

**FLFO Claims** means all Claims arising from or based upon the Prepetition FLFO Credit Agreement.

**FLFO Claims Allowed Amount** means the aggregate principal amount of $138,599,082.31 plus any accrued and unpaid interest (accruing at the default rate to the extent provided under the Prepetition FLFO Credit Agreement), fees, costs, and other expenses arising under, and payable pursuant to, the Prepetition FLFO Credit Agreement on or before the Effective Date, which shall not be subject to any avoidance, reduction, setoff, offset, recharacterization, subordination, counterclaims, cross claims, defenses, disallowance, impairments, or any other challenges under applicable law or regulation by any Entity. Notwithstanding the foregoing, on the Effective Date any amount accrued pursuant to Section 2.08(b) of the Prepetition FLFO Credit Agreement and any amounts accrued in respect of Yield Maintenance Premium or any Prepayment Fee (each as defined in the Prepetition FLFO Credit Agreement), if any, shall be deemed discharged, released, and waived by all holders of Allowed FLFO Claims and the FLFO Claims Allowed Amount shall not be increased on account of such amounts as a result of such discharge, release, and waiver.

**FLFO Distribution Amount** means Cash in the amount of the FLFO Claims Allowed Amount *less* the initial aggregate principal amount of the First Lien Exit Facility, as set forth in the First Lien Exit Facility Commitment Letter.

**FLTL Claims** means all Claims, other than Claims subject to subordination in accordance with section 510(b) of the Bankruptcy Code, arising from or based upon the Prepetition FLTL Credit Agreement.

**FLTL Claims Allowed Amount** means $1,142,688,815.28 in principal plus any accrued but unpaid interest or fees due under the Prepetition FLTL Credit Agreement as of the Petition Date.

**FLTL Deficiency Claim** means any FLTL Claim or portion thereof that is not Secured, if any.

**FLTL Equity Rights Offering** means that certain rights offering pursuant to which each holder of Allowed FLTL Claims is entitled to receive FLTL Subscription Rights to acquire New Equity Interests in the aggregate amount of the FLTL Equity Rights Offering Amount in accordance with the FLTL Equity Rights Offering Procedures, the terms and conditions of which shall be (i) acceptable to the Debtors, Required DIP Lenders, and Requisite FLTL Lenders, (ii) reasonably acceptable to the Prepetition FLFO Administrative Agent and the First Lien Exit Facility Agent, and (iii) reasonably acceptable to the Requisite SLTL Lenders solely to the extent that it directly and adversely impacts the holders of Allowed SLTL Claims.

**FLTL Equity Rights Offering Amount** means $20,000,000.

**FLTL Equity Rights Offering Procedures** means the procedures for the implementation of the FLTL Equity Rights Offering to be approved by the Bankruptcy Court.

**FLTL ERO Backstop Agreement** means that certain [Equity Backstop Commitment Agreement], in form and substance (i) acceptable to the Debtors, the Required DIP Lenders, and Requisite FLTL Lenders and (ii) reasonably acceptable to the Prepetition FLFO Administrative Agent and the First Lien Exit Facility Agent, to be entered into by and among Fieldwood Energy LLC, NewCo, and the FLTL ERO Backstop Parties, as may be amended, supplemented, or modified from time to time, pursuant to which the FLTL ERO Backstop Parties agreed to, among other things, backstop the FLTL Equity Rights Offering with the terms and conditions set forth therein.

[**FLTL ERO Backstop Commitment Percentage** has the meaning set forth in the FLTL ERO Backstop Agreement.]

[**FLTL ERO Backstop Commitment Premium** means a premium equal to 8% of the FLTL Equity Rights Offering Amount payable to the FLTL ERO Backstop Parties with the FLTL ERO Backstop Commitment Premium Equity Interests in accordance with the terms set forth in the FLTL ERO Backstop Agreement.]

[**FLTL ERO Backstop Commitment Premium Equity Interests** means an amount of New Equity Interests equal to the value of the FLTL ERO Backstop Commitment Premium as further set forth in the FLTL ERO Backstop Agreement; *provided that* such New Equity Interests shall be issued at a 30% discount to the equity value of NewCo on the Effective Date.

12

**FLTL ERO Backstop Parties** means those parties that agree to backstop the FLTL Equity Rights Offering pursuant to the FLTL ERO Backstop Agreement, each in its respective capacity as such.

**FLTL Subscription Rights** means the subscription right to acquire New Equity Interests with an aggregate value equal to the FLTL Rights Offering Amount offered in accordance with the FLTL Equity Rights Offering Procedures; *provided, however*, that such New Equity Interests shall be issued at a 30% discount to the equity value of NewCo on the Effective Date.

[**FLTL Unsubscribed Shares** has the meaning set forth in the FLTL ERO Backstop Agreement].

**FWE I** means an entity formed on the Effective Date by a Divisive Merger under the name Fieldwood Energy I LLC pursuant to the Initial Plan of Merger.

**FWE I LLC Agreement** means the limited liability company agreement of FWE I, which shall be in substantially the form attached to the Apache Implementation Agreement.

**FWE I Assets** has the meaning set forth in the Initial Plan of Merger.

**FWE I Obligations** has the meaning set forth in the Initial Plan of Merger.

**FWE I Sole Manager** has the meaning ascribed to the term "Sole Manager" in the FWE I LLC Agreement, and shall include the sole manager appointed to FWE I upon the Effective Date and any successor thereto.

**FWE III** means the surviving entity under the name Fieldwood Energy III LLC following a Divisive Merger pursuant to the Initial Plan of Merger.

**FWE III LLC Agreement** means the limited liability company agreement of FWE III, a form of which shall be included in the Plan Supplement.

**FWE III Assets** has the meaning set forth in the Initial Plan of Merger, as such meaning may be modified by any Plan of Merger, other than the Initial Plan of Merger.

**FWE III Obligations** has the meaning set forth in the Initial Plan of Merger, as such meaning may be modified by any Plan of Merger, other than the Initial Plan of Merger.

**FWE Additional Entity** means any entity, other than FWE I and FWE III, formed on the Effective Date by a Divisive Merger involving FWE III (but not FWE I) pursuant to a Plan of Merger.

**FWE Assets** means, collectively, the FWE I Assets, FWE III Assets, and any assets allocated to an FWE Additional Entity from FWE III.

**FWE Parent** means Debtor Fieldwood Energy Inc.

**General Unsecured Claim** means any Claim against a Debtor, other than a DIP Claim, Postpetition Hedge Claim, Administrative Expense Claim (including a Fee Claim), FLFO Claim, FLTL Claim, SLTL Claim, Other Secured Claim, Priority Tax Claim, Priority Non-Tax Claim, Unsecured Trade Claim, Subordinated Securities Claim, or Intercompany Claim that is not entitled to priority under the Bankruptcy Code or any Final Order of the Bankruptcy Court. For the avoidance of doubt, General Unsecured Claims shall not include FLTL Deficiency Claims or SLTL Deficiency Claims.

**GUC Warrant Agreement** means a warrant agreement to be entered into by and among NewCo and the warrant agent named therein that shall govern the terms of the GUC Warrants, the form of which shall be acceptable to the Debtors, Required DIP Lenders, Requisite FLTL Lenders, the Requisite SLTL Lenders and the Creditors' Committee and which shall contain provisions as favorable as the provisions in the SLTL Tranche 1 Warrant Agreement or SLTL Tranche 2 Warrant Agreement.

**GUC Warrants** means 8-year warrants for 3.5% of the New Equity Interests (calculated on a fully diluted basis giving effect to the New Equity Interests to be issued pursuant to Section 4.4(a)(i) of this Plan, the New Equity Interests issuable upon the exercise of the Subscription Rights, the Backstop Commitment Premium Equity Interests, and the New Equity Interests issuable upon the exercise of the New Money Warrants and SLTL Tranche 1 Warrants, but excluding the effect of any New Equity Interests issuable in connection with the Management Incentive Plan), with a strike price set at an equity value equal to $1,321,000,000, the terms of which shall be set forth in the GUC Warrant Agreement; *provided*, that if the SLTL Tranche 2 Warrants are exercised, the GUC Warrants shall be subject to adjustment or true-up as necessary to retain such percentage after giving effect to the exercise of the SLTL Tranche 2 Warrants.

**Governmental Unit** has the meaning set forth in section 101(27) of the Bankruptcy Code.

**Impaired** means, with respect to a Claim, Interest, or a Class of Claims or Interests, "impaired" within the meaning of such term in section 1124 of the Bankruptcy Code.

**Indemnification Obligation** means any existing or future obligation of any Debtor to indemnify current and former directors, officers, members, managers, agents or employees of any of the Debtors who served in such capacity, with respect to or based upon such service or any act or omission taken or not taken in any of such capacities, or for or on behalf of any Debtor, whether pursuant to agreement, the Debtors' respective memoranda, articles or certificates of incorporation, corporate charters, bylaws, operating agreements, limited liability company agreements, or similar corporate or organizational documents or other applicable contract or law in effect as of the Effective Date.

**Initial Distribution** means the first Distribution that the Plan Administrator makes to holders of Allowed Claims.

*Initial Distribution Date* means the date on which the Plan Administrator shall make the Initial Distribution, which shall not be less than five Business Days after the Effective Date.

*Initial Plan of Merger* means any Divisive Merger(s) to be effectuated pursuant to that certain Agreement and Plan of Merger, which shall be in substantially the form attached to the Apache Implementation Agreement.

*Intercompany Claim* means any Claim against a Debtor held by another Debtor.

*Intercompany Interest* means an Interest in a Debtor other than any Existing Equity Interest.

*Interest* means any common stock, limited liability company interest, equity security (as defined in section 101(16) of the Bankruptcy Code), equity, ownership, profit interests, unit, or share in any Debtor (including all options, warrants, rights, or other securities or agreements to obtain such an interest or share in such Debtor), whether or not arising under or in connection with any employment agreement and whether or not certificated, transferable, preferred, common, voting, or denominated "stock" or a similar security.

*Lien* has the meaning set forth in section 101(37) of the Bankruptcy Code.

*Management Incentive Plan* means the post-Effective Date management incentive plan of NewCo which shall provide for [up to] 10% of New Equity Interests on a fully diluted basis or other equity or similar interests in NewCo to be reserved for directors, managers, officers, and employees of NewCo or a subsidiary of NewCo (including the Credit Bid Purchaser) to be distributed on terms to be determined by the board of directors of NewCo.

*New Equity Interests* means the equity interests of NewCo to be issued (i) on the Effective Date (including the Backstop Commitment Premium Equity Interests and upon the exercise of the Subscription Rights), (ii) upon exercise of the New Money Warrants, the SLTL Warrants, or the GUC Warrants, (iii) under the Management Incentive Plan, or (iv) on or after the Effective Date as otherwise permitted pursuant to the NewCo Organizational Documents.

*New Intercreditor Agreement* means that certain Intercreditor Agreement, to be dated as of the Effective Date, by and among the First Lien Exit Facility Agent and the Second Lien Exit Facility Agent and the Credit Bid Purchaser, the form of which shall be contained in the Plan Supplement, acceptable to the Prepetition FLFO Administrative Agent, the First Lien Exit Facility Agent, the Requisite FLFO Lenders, the Debtors, the Required DIP Lenders, and the Requisite FLTL Lenders.

*NewCo* means [•], which is the direct or indirect owner of 100% of the equity interests of the Credit Bid Purchaser.

*NewCo Entities* means, collectively, NewCo and each of its direct and indirect subsidiaries.

**NewCo Organizational Documents** means the form of certificate of formation, limited liability company agreement, agreement of limited partnership, articles of incorporation, bylaws, trust agreements, or such other applicable formation documents of the NewCo and any of its subsidiaries, including any shareholders' or stockholders' agreement, which shall be (i) acceptable to the Debtors, the Requisite FLTL Lenders, and the Required DIP Lenders and (ii) (a) if NewCo or any of its subsidiaries are to be formed in a jurisdiction outside of the United States, reasonably acceptable to the Prepetition FLFO Administrative Agent or (b) if NewCo or any of its subsidiaries are to be formed in a jurisdiction within the United States, reasonably acceptable to the Prepetition FLFO Administrative Agent solely to the extent that it directly and adversely impacts the holders of Allowed FLFO Claims or First Lien Exit Facility Lenders.

**New Money Consideration** means, in the aggregate, the amount of Cash provided to the Debtors by the Credit Bid Purchaser pursuant to the Credit Bid Purchase Agreement.

**New Money Investment** means the investment of up to $85 million in Cash into Credit Bid Purchaser by the New Money Second Lien Exit Facility Lenders in connection with, and upon consummation of, the Second Lien Exit Facility, subject to the terms of the Second Lien Backstop Commitment Letter.

**New Money Second Lien Exit Facility Lenders** means the lenders party to the Second Lien Exit Facility Credit Agreement participating in the New Money Investment.

**New Money Warrant Agreement** means a warrant agreement to be entered into by and among NewCo and the warrant agent named therein that shall govern the terms of the New Money Warrants, the form of which shall be acceptable to the Debtors, Required DIP Lenders and Requisite FLTL Lenders.

**New Money Warrants** means 7-year warrants for up to 24% of the New Equity Interests (calculated on a fully diluted basis giving effect to the New Equity Interests to be issued pursuant to Section 4.4(a)(i) of this Plan, the Backstop Commitment Premium Equity Interests, and the New Equity Interests issuable upon the exercise of the Subscription Rights, but excluding the effect of any New Equity Interests issuable upon exercise of the SLTL Warrants and GUC Warrants and any New Equity Interest issuable pursuant to the Management Incentive Plan), with a strike price of $0.01, the terms of which shall be set forth in the New Money Warrant Agreement and which shall be issued and allocated in a manner consistent with the Second Lien Backstop Commitment Letter.

**Other Secured Claim** means any Secured Claim against a Debtor other than a Priority Tax Claim, FLFO Claim, FLTL Claim, and SLTL Claim.

**Person** means an individual, corporation, partnership, joint venture, association, joint stock company, limited liability company, limited liability partnership, trust, estate, unincorporated organization, governmental unit (as defined in section 101(27) of the Bankruptcy Code), or other Entity.

**Petition Date** means, with respect to a Debtor, the date on which such Debtor commenced its Chapter 11 Case.

16

*Plan* means this joint chapter 11 plan, including all appendices, exhibits, schedules, and supplements hereto (including any appendices, schedules, and supplements to the Plan contained in the Plan Supplement), as may be amended, supplemented or modified from time to time in accordance with the Bankruptcy Code and the terms hereof.

*Plan Administrator* means a person or entity selected by the Creditors' Committee, subject to the consent of the Debtors, Required DIP Lenders, and Requisite FLTL Lenders, with such consent not to be unreasonably withheld, that is charged with overseeing the tasks outlined in Section 5.9 of this Plan, or any successor thereto. The identity of the Plan Administrator shall be disclosed to the Bankruptcy Court before the Confirmation Hearing.

*Plan Administrator Agreement* means an agreement setting forth the economic arrangement and terms pursuant to which the Plan Administrator will perform its duties under this Plan.

*Plan Administrator Expense Reserve* means a segregated account not subject to the Liens of the Prepetition Agents or DIP Agent established by the Plan Administrator in accordance with Section 5.15 of this Plan.

*Plan Administrator Expense Reserve Amount* means Cash in an amount equal to $8,000,000 to be funded into the Plan Administrator Expense Reserve on the Effective Date.

*Plan Distribution* means any initial or periodic payment or transfer of consideration to holders of Allowed Claims made under the Plan.

*Plan of Merger* means, collectively, (a) the Initial Plan of Merger and (b) any Divisive Merger(s) involving any Debtor or any successor to any Debtor (including FWE III but excluding FWE I) to be effectuated on the Effective Date subsequent to the effective time of the Initial Plan of Merger.

*Plan of Merger Consent Rights* means any right of consent, notice, and other similar rights, if any, that are applicable to the vesting of assets in connection with the Plan of Merger.

*Plan of Merger Preferential Purchase Rights* means any preferential right to purchase, right of first refusal, right of first offer, drag-along rights, tag-along rights, and similar right the operation of which is triggered by the vesting of the FWE Assets in connection with the Plan of Merger.

*Plan Settlement* means the settlement of certain Claims and controversies pursuant to Section 5.1 of the Plan.

*Plan Supplement* means a supplement or supplements to the Plan containing certain documents and forms of documents, schedules, and exhibits relevant to the implementation of the Plan, which shall include: (a) the Amended Organizational Documents (if any), (b) information regarding the sole manager and independent director to be appointed at FWE I to the extent known and determined and other information required to be disclosed in accordance with section 1129(a)(5) of the Bankruptcy Code, (c) a schedule of retained Causes of

Action, (d) the Schedule of Assumed Contracts, (e) the Plan Administrator Agreement; (f) the Credit Bid Purchase Agreement; (g) the NewCo Organizational Documents; (h) the Apache Definitive Documents; (i) the First Lien Exit Facility Agreement; (j) the Second Lien Exit Facility Agreement; (k) the New Intercreditor Agreement; (l) the New Money Warrant Agreements; (m) the GUC Warrant Agreement; and (n) any Additional Predecessor Agreement; *provided*, *however*, that the Debtors shall have the right to amend documents contained in, and exhibits thereto, the Plan Supplement in accordance with the terms of this Plan and the Restructuring Support Agreement (including the consent rights set forth therein).

*Postpetition Hedging Agreements* has the meaning set forth in that certain *Emergency Order (I) Authorizing Debtors to (A) Enter Into and Perform Under New Postpetition Hedging Agreements and (B) Grant Related Liens and Superiority Claims, (II) Modifying Automatic Stay, and (III) Granting Related Relief* entered on August 24, 2020 (ECF No. 242).

*Postpetition Hedge Claim* means a Claim arising pursuant to any Postpetition Hedging Agreement.

*Post-Effective Date Debtors* means the Debtors, as reorganized as of the Effective Date in accordance with this Plan, including FWE III and any FWE Additional Entities solely to the extent consistent with the applicable Additional Predecessor Agreement Document.  For the avoidance of doubt, the Post-Effective Date Debtors does not include NewCo or its subsidiaries (including the Credit Bid Purchaser), or FWE I.

*Post-Effective Date FWE Parent* means FWE Parent, as reorganized on the Effective Date in accordance with this Plan.

*Prepetition Agents* means, collectively, the Prepetition FLFO Administrative Agent, the Prepetition FLFO Collateral Agent, the Prepetition FLTL Administrative Agent, Prepetition FLTL Subagent, and the Prepetition SLTL Agent.

*Prepetition FLFO Administrative Agent* means Goldman Sachs Bank USA, solely in its capacity as administrative agent under the Prepetition FLFO Credit Agreement.

*Prepetition FLFO Advisors* means Vinson & Elkins, LLP, Shipman & Goodwin LLP (in its capacity as counsel to the Prepetition FLFO Collateral Agent), Opportune LLP, and any local or foreign advisors.

*Prepetition FLFO Collateral Agent* means Cantor Fitzgerald Securities, solely in its capacity as collateral agent under the Prepetition FLFO Credit Agreement.

*Prepetition FLFO Credit Agreement* means that certain *Second Amended and Restated Credit Agreement- First Out*, dated as of June 28, 2019, by and among Fieldwood Energy LLC, as borrower, Fieldwood Energy Inc., as holdings, the Prepetition FLFO Administrative Agent, the Prepetition FLFO Collateral Agent, and the Prepetition FLFO Lenders, and the other parties thereto, as in effect immediately before the Effective Date.

**Prepetition FLFO Lenders** means the Lenders (as defined in the Prepetition FLFO Credit Agreement) holding Prepetition FLFO Loans immediately before the Effective Date.

**Prepetition FLFO Loans** means the Loans (under and as defined in the Prepetition FLFO Credit Agreement) outstanding immediately before the Effective Date.

**Prepetition FLFO Secured Parties** means, collectively, the Prepetition FLFO Administrative Agent, the Prepetition FLFO Lenders, and the other Secured Parties (as defined in the Prepetition FLFO Credit Agreement) under the Prepetition FLFO Credit Agreement.

**Prepetition FLTL Administrative Agent** means Cantor Fitzgerald Securities, solely in its capacity as administrative agent and collateral agent under the Prepetition FLTL Credit Agreement.

**Prepetition FLTL Agents** means the Prepetition FLTL Administrative Agent and the Prepetition FLTL Subagent.

**Prepetition FLTL Agents Advisors** means Shipman & Goodwin LLP (in its capacity as counsel to the Prepetition FLTL Administrative Agent) and Seward & Kissel LLP (in its capacity as counsel to the Prepetition Subagent).

**Prepetition FLTL Subagent** means Drivetrain Agency Services, LLC, solely in its capacity as a subagent to the Prepetition FLTL Administrative Agent under the Prepetition FLTL Credit Agreement and the Loan Documents (as such term is defined in the Prepetition FLTL Credit Agreement).

**Prepetition FLTL Credit Agreement** means that certain *Amended and Restated First Lien Term Loan Agreement*, dated as of April 11, 2018, by and among Fieldwood Energy LLC, as borrower, Fieldwood Energy Inc., as holdings, the Prepetition FLTL Administrative Agent, and the Prepetition FLTL Lenders, and the other parties thereto, as in effect immediately before the Effective Date.

**Prepetition FLTL Lenders** means the Lenders (as defined in the Prepetition FLTL Credit Agreement) holding Prepetition FLTL Loans immediately before the Effective Date.

**Prepetition FLTL Loans** means the Loans (under and as defined in the Prepetition FLTL Credit Agreement) outstanding immediately before the Effective Date.

**Prepetition SLTL Administrative Agent** means Cortland Capital Market Services LLC, solely in its capacity as administrative agent and collateral agent under the Prepetition SLTL Credit Agreement.

**Prepetition SLTL Credit Agreement** means that certain *Amended and Restated Second Lien Term Loan Agreement*, dated as of April 11, 2018, by and among Fieldwood Energy LLC, as borrower, Fieldwood Energy Inc., as holdings, the Prepetition SLTL Administrative

Agent, and the Prepetition SLTL Lenders, and the other parties thereto, as in effect immediately before the Effective Date.

*Prepetition SLTL Lenders* means the Lenders (as defined in the Prepetition SLTL Credit Agreement) holding Prepetition SLTL Loans immediately before the Effective Date.

*Prepetition SLTL Loans* means the Loans (under and as defined in the Prepetition SLTL Credit Agreement) outstanding immediately before the Effective Date.

*Principal FLFO Amount* has the meaning set forth in Section 4.3.

*Priority Non-Tax Claim* means any Claim other than an Administrative Expense Claim, or a Priority Tax Claim that is entitled to priority of payment as specified in section 507(a) of the Bankruptcy Code.

*Priority Tax Claim* means any Secured Claim or unsecured Claim of a Governmental Unit of the kind entitled to priority of payment as specified in sections 502(i) and 507(a)(8) of the Bankruptcy Code.

*Pro Rata Share* means the proportion that an Allowed Claim or Interest in a particular Class bears to the aggregate amount of all Allowed Claims or Interests in that Class.

*Professional Person(s)* means any Person retained by order of the Bankruptcy Court in connection with these Chapter 11 Cases pursuant to sections 327, 328, 330, 331, 503(b), or 1103 of the Bankruptcy Code, excluding any ordinary course professional retained pursuant to an order of the Bankruptcy Court.

*Professional Fee Escrow* means an escrow account established and funded pursuant to section 2.2 of the Plan.

*Professional Fee Escrow Amount* means the aggregate unpaid Fee Claims through the Effective Date as estimated in accordance with section 2.2 of the Plan.

*Released Parties* means, collectively, (a) the Debtors, (b) the Post-Effective Date Debtors, (c) the DIP Agent and DIP Lenders under the DIP Facility, (d) the Prepetition FLFO Secured Parties, (e) the Consenting Creditors, (f) the Prepetition FLFO Collateral Agent, (g) the Prepetition FLTL Agents, (h) the Prepetition SLTL Agent, (i) the Creditors' Committee and the current and former members of the Creditors' Committee (solely in their capacities as such), (j) NewCo and all of its subsidiaries (including the Credit Bid Purchaser), (k) the Exit Facility Agents, (l) the Exit Facility Lenders, (m) the Second Lien Backstop Parties, (n) the ERO Backstop Parties, (o) the Apache PSA Parties, and (p) with respect to each of the foregoing Persons in clauses (a) through (o), each of their current and former affiliates, and each such Entity's and its current and former affiliates' current and former directors, managers, officers, equity holders (regardless of whether such interests are held directly or indirectly), predecessors, successors, and assigns, subsidiaries, and each of their current and former officers, members, managers, directors, equity holders (regardless of whether such interests are held directly or indirectly), principals, members, employees, agents, managed accounts or funds, management companies, fund advisors, investment advisors, advisory board members, financial advisors,

20

partners (including both general and limited partners), attorneys, accountants, investment bankers, consultants, representatives and other professionals, such Persons' respective heirs, executors, estates, and nominees, in each case in their capacity as such, and any and all other persons or entities that may purport to assert any cause of action derivatively, by or through the foregoing entities.

*Releasing Parties* means collectively, (a) the holders of all Claims or Interests that vote to accept the Plan, (b) the holders of all Claims or Interests whose vote to accept or reject the Plan is solicited but that do not vote either to accept or to reject the Plan, (c) the holders of all Claims or Interests that vote, or are deemed, to reject the Plan but do not opt out of granting the releases set forth herein, (d) the holders of all Claims and Interests that were given notice of the opportunity to opt out of granting the releases set forth herein but did not opt out, and (e) the Released Parties (even if such Released Party purports to opt out of the releases set forth herein).

*Required DIP Lenders* has the meaning set forth in the Restructuring Support Agreement.

*Requisite FLFO Lenders* means, as of the date of determination, Prepetition FLFO Lenders holding at least a majority of the outstanding Prepetition FLFO Loans (inclusive of validly executed but unsettled trades) held by the Prepetition FLFO Lenders as of such date.

*Requisite FLTL Lenders* has the meaning set forth in the Restructuring Support Agreement.

*Requisite SLTL Lenders* has the meaning set forth in the Restructuring Support Agreement.

*Residual Distributable Value* means any distributable value of the Single Share of Post-Effective Date FWE Parent held by the Plan Administrator (a) after satisfaction of Allowed Administrative Expense Claims, Allowed Other Secured Claims, Allowed Priority Tax Claims, Allowed Priority Non-Tax Claims, all Cure Amounts and (b) after satisfaction of all fees, expenses, costs and other amounts pursuant to the Plan and incurred by the Post-Effective Date Debtors in connection with post-Effective Date operations and wind-down.

*Restructuring* means the restructuring of the Debtors, the principal terms of which are set forth in this Plan and the Plan Supplement.

*Restructuring Expenses* means the reasonable and documented fees and expenses incurred by (i) the Ad Hoc Group of Secured Lenders, (ii) the Prepetition FLFO Secured Parties, (iii) the Prepetition FLTL Agents, and (iv) the Ad Hoc Group of Prepetition SLTL Lenders in connection with the Chapter 11 Cases, including the fees and expenses of the Ad Hoc Group of Secured Lenders Advisors, the Prepetition FLTL Agents Advisors, the Prepetition FLFO Advisors, and Ad Hoc Group of Prepetition SLTL Lenders Advisors, in each case payable in accordance with the terms of any applicable agreements, engagement letters or fee letters executed with such parties or pursuant to the terms of the DIP Order and without the requirement for the filing of retention applications, fee applications, or any other application in the Chapter 11 Cases, which shall not be subject to any offset, defense, counterclaim, reduction, or creditor

credit and, to the extent incurred prior to the Effective Date, shall be Allowed as Administrative Expense Claims upon incurrence; *provided*, *however*, Restructuring Expenses of the Ad Hoc Group of Prepetition SLTL Lenders shall be limited to and consist solely of the reasonable fees and expenses incurred by the Ad Hoc Group of Prepetition SLTL Lenders Advisors in their capacity as counsel to the Ad Hoc Group of Prepetition SLTL Lenders, and solely to the extent such fees and expenses have been incurred in support of the Restructuring Transactions and so long as the Ad Hoc Group of Prepetition SLTL Lenders are parties to the Restructuring Support Agreement.

**Restructuring Support Agreement** means that certain *Restructuring Support Agreement*, dated as of August 4, 2020, by and among Debtor Fieldwood Energy LLC, certain of its affiliates specified therein, the Consenting Creditors, and Apache, as the same may be amended, restated, or otherwise modified in accordance with its terms.

**Restructuring Transactions** means one or more transactions pursuant to section 1123(a)(5) of the Bankruptcy Code to occur on the Effective Date or as soon as reasonably practicable thereafter, that may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan and the Credit Bid Transaction, including (a) the consummation of the transactions provided for under or contemplated by the Plan and any mergers, divisive mergers, amalgamations, consolidations, arrangements, continuances, transfers, conversions, sales, dispositions, or other corporate transactions necessary or appropriate to implement the Plan, (b) the execution and delivery of appropriate agreements or other documents containing terms that are consistent with or reasonably necessary to implement the terms of the Plan or the Credit Bid Transaction and that satisfy the requirements of applicable law, (c) the Equity Rights Offerings, (d) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any property, right, liability, duty, or obligation on terms consistent with the terms of the Plan, and (d) all other actions that the Debtors, the Post-Effective Date Debtors or NewCo (or any of its subsidiaries, including the Credit Bid Purchaser), as applicable, determine are necessary or appropriate and consistent with the Plan or the Credit Bid Transaction.  For the avoidance of doubt, Restructuring Transactions includes the Credit Bid Transaction and the Divisive Merger(s) effectuated pursuant to the Plan of Merger.

**Schedule of Abandoned Properties** means a schedule (as may be amended, modified, or supplemented from time to time) of the Debtors' rights to and interests in executory contracts and unexpired federal leases, rights-of-way, and right-of-use-and-easements to be abandoned pursuant to Section 5.14 of this Plan, a copy of which shall be filed with the Disclosure Statement and included in the Plan Supplement.

**Schedule of Assumed Contracts** means the schedule of executory contracts and unexpired leases to be assumed by the Debtors pursuant to this Plan, if any, as the same may be amended, modified, or supplemented from time to time.

**Schedule of FWE I Oil & Gas Lease Interests** means a schedule (as may be amended, modified, or supplemented from time to time) of the Debtors' interests in the oil and gas leases that shall constitute FWE I Assets, a copy of which shall be filed with the Disclosure Statement and included in the Plan Supplement.

**Schedule of FWE III Oil & Gas Lease Interests** means a schedule (as may be amended, modified, or supplemented from time to time) of the Debtors' interests in the oil and gas leases that shall constitute FWE III Assets, a copy of which shall be filed with the Disclosure Statement and included in the Plan Supplement.

**Schedule of FWE IV Oil & Gas Lease Interests** means a schedule (as may be amended, modified, or supplemented from time to time) of the Debtors' interests in the oil and gas leases that shall constitute assets of the FWE Additional Entity to be formed under the name Fieldwood Energy IV LLC, a copy of which shall be filed with the Disclosure Statement and included in the Plan Supplement.

**Schedule of FWE Additional Entity Oil & Gas Lease Interests** means a schedule (as may be amended, modified, or supplemented from time to time) of the Debtors' interests in the oil and gas leases that shall constitute assets of any FWE Additional Entity, a copy of which shall be included in the Plan Supplement.

**Schedule of Purchased Oil & Gas Lease Interests** means a schedule (as may be amended, modified, or supplemented from time to time) of the Debtors' interests in the oil and gas leases that will be acquired by the Credit Bid Purchaser pursuant to the Credit Bid Purchase Agreement, a copy of which shall be filed with the Disclosure Statement and included in the Plan Supplement.

**Schedules** means any schedules of assets and liabilities, schedules of executory contracts and unexpired leases, and statements of financial affairs filed by the Debtors pursuant to section 521 of the Bankruptcy Code.

**Second Lien Backstop Commitment Letter** means that certain backstop commitment letter, in form and substance (i) acceptable to the Debtors, the Required DIP Lenders, and Requisite FLTL Lenders and (ii) reasonably acceptable to the Prepetition FLFO Administrative Agent and the First Lien Exit Facility Agent, to be entered into by and among Fieldwood Energy LLC, the Credit Bid Purchaser and the Backstop Parties, as may be amended, supplemented, or modified from time to time, pursuant to the terms thereof and consistent with the Restructuring Support Agreement, pursuant to which the Backstop Parties agreed to, among other things, backstop the Second Lien Exit Facility in accordance with the terms and conditions set forth therein.

**Second Lien Backstop Commitment Premium** means a premium equal to 8% of the maximum principal amount of the Second Lien Exit Facility (*i.e.* $185,000,000) payable to the Backstop Parties with the Second Lien Backstop Commitment Premium Equity Interests in accordance with the terms set forth in the Second Lien Backstop Commitment Letter.

**Second Lien Backstop Commitment Premium Equity Interests** means an amount of New Equity Interests equal to the value of the Second Lien Backstop Commitment Premium as further set forth in the Second Lien Backstop Commitment Letter; *provided that* such New Equity Interests shall be issued at a 30% discount to the equity value of NewCo on the Effective Date.

**Second Lien Backstop Party** has the meaning set forth in the Second Lien Backstop Commitment Letter.

**Second Lien Exit Facility** means the facility under the Second Lien Exit Facility Credit Agreement.

**Second Lien Exit Facility Agent** means the administrative agent under the Second Lien Exit Facility Credit Agreement.

**Second Lien Exit Facility Credit Agreement** means that certain credit agreement to be entered by the Credit Bid Purchaser, the Second Lien Exit Facility Agent and the Second Lien Exit Facility Lenders on the Effective Date that shall govern the Second Lien Exit Facility, which shall reflect and contain terms, conditions, representations, warranties, and covenants consistent with the Second Lien Exit Facility Term Sheet and otherwise be in form and substance (i) acceptable to the Debtors, the Required DIP Lenders, and Requisite FLTL Lenders and (ii) reasonably acceptable to the Prepetition FLFO Administrative Agent and the First Lien Exit Facility Agent.

**Second Lien Exit Facility Documents** means, collectively, the Second Lien Exit Facility Credit Agreement, and any and all other agreements, documents, and instruments delivered or to be entered into in connection therewith, including any guarantee agreements, pledge and collateral agreements, intercreditor agreements, and other security documents, the terms of which documents shall be (i) acceptable to the Debtors, the Required DIP Lenders, and Requisite FLTL Lenders and (ii) reasonably acceptable to the Prepetition FLFO Administrative Agent and the First Lien Exit Facility Agent.

**Second Lien Exit Facility Lenders** means the lenders party to the Second Lien Exit Facility Credit Agreement.

**Second Lien Exit Facility Term Sheet** means the term sheet filed with the Disclosure Statement, as may be amended from time to time with (i) the consent of the Required DIP Lenders and Requisite FLTL Lenders and (ii) the reasonable consent of the Prepetition FLFO Administrative Agent and First Lien Exit Facility Agent.

**Secured** means, when referring to a Claim: (a) secured by a Lien on property of a Debtor's Estate, the amount of which is equal to or less than the value of such property as (i) set forth in the Plan, (ii) agreed to by the holder of such Claim and the Debtors, or (iii) determined by a Final Order in accordance with section 506(a) of the Bankruptcy Code, or (b) secured by the amount of any right of setoff of the holder thereof in accordance with section 553 of the Bankruptcy Code.

**Security** means any "security" as such term is defined in section 101(49) of the Bankruptcy Code.

**SLTL Claims** means all Claims, other than Claims subject to subordination in accordance with section 510(b) of the Bankruptcy Code, arising from or based upon the Prepetition SLTL Credit Agreement.

**SLTL Claims Allowed Amount** means $517,500,000.00 in principal, plus any accrued but unpaid interest or fees due under the Prepetition SLTL Credit Agreement as of the Petition Date.

**SLTL Deficiency Claim** means any SLTL Claim or portion thereof that is not Secured, if any.

**SLTL Equity Rights Offering** means that certain rights offering pursuant to which each holder of Allowed SLTL Claims is entitled to receive SLTL Subscription Rights to acquire New Equity Interests in the aggregate amount of the SLTL Equity Rights Offering Amount in accordance with the SLTL Equity Rights Offering Procedures, the terms and conditions of which shall be reasonably acceptable to the Debtors, Required DIP Lenders, Requisite FLTL Lenders, Requisite SLTL Lenders, the Prepetition FLFO Administrative Agent, and the First Lien Exit Facility Agent.

**SLTL Equity Rights Offering Amount** means $20,000,000.

**SLTL Equity Rights Offering Procedures** means the procedures for the implementation of the SLTL Equity Rights Offering to be approved by the Bankruptcy Court.

**SLTL ERO Backstop Agreement** means that certain [Equity Backstop Commitment Agreement], in form and substance reasonably acceptable to the Debtors, the Required DIP Lenders, the Requisite FLTL Lenders, the Requisite SLTL Lenders, the Prepetition FLFO Administrative Agent, and the First Lien Exit Facility Agent, to be entered into by and among Fieldwood Energy LLC, NewCo, and the SLTL ERO Backstop Parties, as may be amended, supplemented, or modified from time to time, pursuant to which the SLTL ERO Backstop Parties agreed to, among other things, backstop the SLTL Equity Rights Offering with the terms and conditions set forth therein[; *provided that*, the form of the [Equity Backstop Commitment Agreement] attached hereto as Exhibit [•] shall be deemed acceptable to the Debtors, the Required DIP Lenders, Requisite FLTL Lenders and Requisite SLTL Lenders [and reasonably acceptable to the Prepetition FLFO Administrative Agent and the First Lien Exit Facility Agent].]

[**SLTL ERO Backstop Commitment Percentage** has the meaning set forth in the SLTL ERO Backstop Agreement.]

[**SLTL ERO Backstop Commitment Premium** means a premium equal to 8% of the SLTL Equity Rights Offering Amount payable to the SLTL ERO Backstop Parties with the SLTL ERO Backstop Commitment Premium Equity Interests in accordance with the terms set forth in the SLTL ERO Backstop Agreement.]

[**SLTL ERO Backstop Commitment Premium Equity Interests** means an amount of New Equity Interests equal to the value of the SLTL ERO Backstop Commitment Premium as further set forth in the SLTL ERO Backstop Agreement; *provided that* such New Equity Interests shall be issued at a 30% discount to the equity value of NewCo on the Effective Date.

25

**SLTL ERO Backstop Parties** means those parties that agree to backstop the SLTL Equity Rights Offering pursuant to the SLTL ERO Backstop Agreement, each in its respective capacity as such.

**SLTL Subscription Rights** means the subscription right to acquire New Equity Interests with an aggregate value equal to the SLTL Rights Offering Amount offered in accordance with the SLTL Equity Rights Offering Procedures; *provided, however*, that such New Equity Interests shall be issued at a 30% discount to the equity value of NewCo on the Effective Date.

**SLTL Tranche 1 Warrant Agreement** means a warrant agreement to be entered into by and among NewCo and the warrant agent named therein that shall govern the terms of the SLTL Tranche 1 Warrants, the form of which shall be acceptable to the Debtors, Required DIP Lenders, Requisite FLTL Lenders, the Creditors' Committee, and the Requisite SLTL Lenders.

**SLTL Tranche 1 Warrants** means 8-year warrants for 25% of the New Equity Interests (calculated on a fully diluted basis giving effect to the New Equity Interests to be issued pursuant to Section 4.4(a)(i) of this Plan, the New Equity Interests issuable upon the exercise of the Subscription Rights, the Backstop Commitment Premium Equity Interests, and the New Equity Interests issuable upon the exercise of the New Money Warrants and GUC Warrants, but excluding the effect of any New Equity Interests issuable upon exercise of the SLTL Tranche 2 Warrants and any New Equity Interests issuable in connection with the Management Incentive Plan), with a strike price set at an equity value equal to $1,321,000,000, the terms of which shall be set forth in the SLTL Tranche 1 Warrant Agreement.

**SLTL Tranche 2 Warrant Agreement** means a warrant agreement to be entered into by and among NewCo and the warrant agent named therein that shall govern the terms of the SLTL Tranche 2 Warrants, the form of which shall be acceptable to the Debtors, Required DIP Lenders, Requisite FLTL Lenders, the Creditors' Committee, and the Requisite SLTL Lenders.

**SLTL Tranche 2 Warrants** means 8-year warrants for 32.50% of the New Equity Interests (calculated on a fully diluted basis giving effect to the New Equity Interests to be issued pursuant to Section 4.4(a)(i) of this Plan, the New Equity Interests issuable upon the exercise of the Subscription Rights, the Backstop Commitment Premium Equity Interests, and the New Equity Interests issuable upon the exercise of the New Money Warrants, the SLTL Tranche 1 Warrants, and the GUC Warrants (excluding any adjustment or true-up of the GUC Warrants as described in the definition thereof), but excluding the effect of any New Equity Interests issuable in connection with the Management Incentive Plan), with a strike price set at an equity value equal to $1,585,200,000, the terms of which shall be set forth in the SLTL Tranche 2 Warrant Agreement.

[**SLTL Unsubscribed Shares** has the meaning set forth in the SLTL ERO Backstop Agreement].

**SLTL Warrants** means, collectively, the SLTL Tranche 1 Warrants and the SLTL Tranche 2 Warrants.

**Specified Administrative Expense Claims** means Administrative Expense Claims other than (a) Administrative Expense Claims that are to be assumed by the Credit Bid Purchaser pursuant to the Credit Bid Purchase Agreement; (b) Cure Amounts; and (c) Fee Claims, Restructuring Expenses, any fees and expenses payable pursuant to sections 2.3 and 2.4 of this Plan, any fees and expenses payable or reimbursable by the Debtors or Post-Effective Date Debtors pursuant to the Second Lien Backstop Commitment Letter, Credit Bid Purchase Agreement, or First Lien Exit Facility Commitment Letter (including termination fees, if any), Apache Fees and Expenses and Apache Implementation Costs, and Statutory Fees.

**Standby Loan Agreement** has the meaning set forth in the Apache Implementation Agreement.

**Standby Credit Facility Documents** has the meaning set forth in the Apache Implementation Agreement.

**Statutory Fees** means all fees and charges assessed against the Estates pursuant to sections 1911 through 1930 of chapter 123 of title 28 of the United States Code.

**Subordinated Securities Claim** means a Claim that is subject to subordination in accordance with sections 510(b) of the Bankruptcy Code or otherwise.

**Subscription Rights** means, collectively, the FLTL Subscription Rights and SLTL Subscription Rights.

**Tax Code** means the Internal Revenue Code of 1986, as amended from time to time.

**Toggle Amount** means $35,000,000 or such higher amount as may be mutually agreed between the Debtors, the Required DIP Lenders, and the Requisite FLTL Lenders.

**Toggle Date** has the meaning set forth in Section 5.2(c).

**Toggle Motion** has the meaning set forth in Section 5.2(c)(i).

**Trade Agreement** means a trade agreement entered into or to be entered into between the Debtors, [a NewCo Entity], and a Trade Creditor that will be provided by the Debtors to each Trade Creditor and that provides for, among other things, waiver of any and all liens against the Debtors, their assets and any co-owned assets, or any other affiliated person or entity (including any co-working interest owner of the Debtors), or any such person's or entity's respective assets or property (real or personal), regardless of the statute or other legal authority upon which the lien is asserted, held or asserted by the Trade Creditor relating to the Unsecured Trade Claim, and an agreement by such Trade Creditor to continue to provide post-Effective Date trade terms that are no less favorable than the terms provided to the Debtors prior to the Petition Date

*Trade Creditor* means a third-party provider of goods or services to the Debtors that holds an Unsecured Trade Claim against the Debtors arising from the provision of such goods and services.

*Unimpaired* means, with respect to a Claim, Interest, or Class of Claims or Interests, not "impaired" within the meaning of sections 1123(a)(4) and 1124(2) of the Bankruptcy Code.

*Unsecured Trade Claim* means any unsecured claim (or secured claim that becomes unsecured by agreement, settlement, or order of the Bankruptcy Court) of a Trade Creditor that is held by a Trade Creditor that has elected such claim to be treated as an Unsecured Trade Claim under this Plan and enters into or agrees to enter into a Trade Agreement; *provided*, *however*, that in no event shall any claim against the Debtors that arises in connection with a joint interest billing arrangement constitute an Unsecured Trade Claim.

*U.S. Trustee* means the United States Trustee for Region 7.

*Voting Deadline* means June 2, 2021 at 4:00 p.m. (Prevailing Central Time), or such date and time as may be set by the Bankruptcy Court.

### 1.2    *Interpretation; Application of Definitions; Rules of Construction.*

Unless otherwise specified, all section or exhibit references in the Plan are to the respective section in or exhibit to the Plan, as the same may be amended, waived, or modified from time to time in accordance with the terms hereof.  The words "herein," "hereof," "hereto," "hereunder," and other words of similar import refer to the Plan as a whole and not to any particular section, subsection, or clause contained therein and have the same meaning as "in the Plan," "of the Plan," "to the Plan," and "under the Plan," respectively.  The words "includes" and "including" are not limiting.  The headings in the Plan are for convenience of reference only and shall not limit or otherwise affect the provisions hereof.   For purposes herein: (a) in the appropriate context, each term, whether stated in the singular or plural, shall include both the singular and plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (b) any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document shall be substantially in that form or substantially on those terms and conditions; (c) the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; and (d) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be.

### 1.3    *Reference to Monetary Figures.*

All references in the Plan to monetary figures shall refer to the legal tender of the United States of America unless otherwise expressly provided.

### 1.4 *Controlling Document.*

In the event of an inconsistency between the Plan and the Plan Supplement, the terms of the relevant document in the Plan Supplement shall control unless otherwise specified in such Plan Supplement document. In the event of an inconsistency between the Plan and the First Lien Exit Facility Commitment Letter, the First Lien Exit Facility Commitment Letter shall control. In the event of an inconsistency between the Plan and the Second Lien Backstop Commitment Letter, the Second Lien Backstop Commitment Letter shall control. The provisions of the Plan, the First Lien Exit Facility Commitment Letter, the Second Lien Backstop Commitment Letter, and of the Confirmation Order shall be construed in a manner consistent with each other so as to effectuate the purposes of each; *provided*, that if there is determined to be any inconsistency between (a) any provision of the Plan, the First Lien Exit Facility Commitment Letter, and any provision of the Confirmation Order that cannot be so reconciled, or (b) any provision of the Plan, the Second Lien Backstop Commitment Letter, and any provision of the Confirmation Order that cannot be so reconciled, then, solely to the extent of such inconsistency, the provisions of the Confirmation Order shall govern.

### 1.5 *Certain Consent Rights*

Notwithstanding anything herein to the contrary, and without limiting the Debtors' fiduciary duties, any and all consent rights of any party set forth in the Restructuring Support Agreement with respect to the form and substance of this Plan, the Plan Supplement, any supplement to the Disclosure Statement, any other Definitive Documents and any agreements or documents referenced in this Plan or the Plan Supplement, including any amendments, restatements, supplements, or other modifications to such documents, and any consents, waivers, or other deviations under or from any such documents, shall be incorporated herein by this reference and fully enforceable as if stated in full herein until such time as the Restructuring Support Agreement is terminated in accordance with its terms.

## ARTICLE II.     ADMINISTRATIVE EXPENSE CLAIMS, FEE CLAIMS, DIP CLAIMS, AND PRIORITY TAX CLAIMS.

### 2.1 *Treatment of Administrative Expense Claims.*

On (or as soon thereafter as is reasonably practicable) the later of (a) the Effective Date and (b) the first Business Day after the date that is thirty (30) calendar days after the date each Administrative Expense Claim becomes an Allowed Administrative Expense Claim, each holder of an Allowed Administrative Expense Claim (other than a Fee Claim) shall receive in full and final settlement of such Claim, either (x) Cash in an amount equal to the Allowed amount of such Claim or such other treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code or (y) such other treatment as to which the Debtors, the Post-Effective Date Debtors, or NewCo and its subsidiaries (including the Credit Bid Purchaser), as applicable, and the holder of such Allowed Administrative Expense Claim will have agreed upon in writing; *provided*, that Allowed Administrative Expense Claims representing liabilities incurred in the ordinary course of business by the Debtors, as Debtors in Possession, shall be paid by the Debtors or the Post-Effective Date Debtors, as applicable, in the ordinary course of

business, consistent with past practice and in accordance with the terms and subject to the conditions of any orders or agreements governing, instruments evidencing, or other documents establishing, such liabilities; *provided, further*, that any Allowed Administrative Expense Claim assumed by the Credit Bid Purchaser pursuant to the Credit Bid Purchase Agreement shall be solely an obligation of the Credit Bid Purchaser and the holder of such assumed Claim shall have no recourse to or Claim against the Debtors or Post-Effective Date Debtors or their assets and properties.

## 2.2 *Treatment of Fee Claims.*

(a)     Final Fee Applications.  All final requests for the allowance and payment of Fee Claims shall be filed no later than 45 days after the Effective Date unless such date is extended by order of the Bankruptcy Court.

(b)     Professional Fee Escrow Amount.  All Professional Persons shall estimate in good faith their unpaid Fee Claims before and as of the Effective Date and shall deliver such estimate to the Debtors at least three (3) calendar days before the Effective Date; *provided, however*, that such estimate shall not limit or be deemed to limit the amount of the fees and expenses that are the subject of the Professional Person's final request for payment of Fee Claims. If a Professional Person does not provide such estimate, the Debtors and Post-Effective Date Debtors may estimate the unbilled fees and expenses of such Professional Person; *provided, however*, that such estimate shall not be considered an admission or limitation with respect to the fees and expenses incurred by, or payable to, such Professional Person.  The total amount so estimated as of the Effective Date shall comprise the Professional Fee Escrow Amount.

(c)     Professional Fee Escrow.  If the Professional Fee Escrow Amount is greater than zero, then as soon as reasonably practicable after the Confirmation Date and no later than the Effective Date, the Debtors will establish and fund the Professional Fee Escrow with cash equal to the Professional Fee Escrow Amount and no Liens, Claims, or interests will encumber the Professional Fee Escrow in any way. The Professional Fee Escrow (including funds held in the Professional Fee Escrow) will (i) not be and will not be deemed to be property of the Debtors or the Post-Effective Date Debtors and (ii) will be held in trust for the Professional Persons; *provided, however*, that funds remaining in the Professional Fee Escrow after all Allowed Fee Claims have been irrevocably paid in full will revert to the Post-Effective Date Debtors.  Allowed Fee Claims will be paid in cash to such Professional Persons from funds held in the Professional Fee Escrow as soon as reasonably practicable after such Claims are Allowed by an order of the Bankruptcy Court; *provided, however*, that the Debtors' obligations with respect to Fee Claims will not be limited nor deemed to be limited in any way to the balance of funds held in the Professional Fee Escrow.

If the amount of funds in the Professional Fee Escrow is insufficient to fund payment in full of all Allowed Fee Claims and any other Allowed amounts owed to Professional Persons, the deficiency will be promptly funded to the Professional Fee Escrow from the Debtors' estates and/or by Post-Effective Date Debtors without any further action or order of the Bankruptcy Court.

(d)     _Post-Effective Date Fees and Expenses._  On and after the Effective Date, the Debtors and the Post-Effective Date Debtors, as applicable, will pay in cash in the ordinary course of business and without any further action or order of the Bankruptcy Court, the reasonable legal, professional, or other fees and expenses that are (i) related to implementation of the Plan and (ii) incurred by the Debtors or Post-Effective Date Debtors, as applicable, on and after the Effective Date.

On the Effective Date, any requirement that Professional Persons comply with sections 327 through 331 and 1103 of the Bankruptcy Code in seeking retention or compensation for services provided after such date shall terminate, and the Debtors or Post-Effective Date Debtors may employ and pay any post-Effective Date fees and expenses of any Professional Person without any further notice to or action, order, or approval of the Bankruptcy Court.

## 2.3     _**Treatment of DIP Claims.**_

As of the Effective Date, the DIP Claims shall be Allowed in the full amount outstanding under the DIP Credit Agreement, including principal, interest, fees, costs, other charges, and expenses provided for thereunder.  In full and final satisfaction, settlement, release, and discharge of each Allowed DIP Claim, on the Effective Date, each holder of such Allowed DIP Claim shall receive either (a) payment in full in Cash or (b) such other treatment as to which the Debtors or the Post-Effective Date Debtors, as applicable, and the holder of such Allowed DIP Claims will have agreed upon in writing.  On the Effective Date, all Liens granted to secure the Allowed DIP Claims shall be terminated and of no further force and effect.

## 2.4     _**Payment of Fees and Expenses Under DIP Order.**_

On the later of (a) the Effective Date and (b) the date on which such fees, expenses, or disbursements would be required to be paid under the terms of the DIP Order, the Debtors or the Post-Effective Date Debtors (as applicable) shall pay all fees, expenses, and disbursements of the DIP Agent, DIP Lenders, and Prepetition FLTL Agents, in each case that have accrued and are unpaid as of the Effective Date and are required to be paid under or pursuant to the DIP Order. After the Effective Date, the Post-Effective Date Debtors shall continue to reimburse the DIP Agent and the DIP Lenders for the reasonable fees and expenses (including reasonable and documented legal fees and expenses) incurred by the DIP Agent and the DIP Lenders after the Effective Date in accordance with the terms of the DIP Documents. The Post-Effective Date Debtors shall pay all of the amounts that may become payable to the DIP Agent or any of the DIP Lenders in accordance with the terms of the DIP Documents and the DIP Order.

## 2.5     _**Treatment of Priority Tax Claims.**_

On the Effective Date or as soon thereafter as is reasonably practicable (but in no event later than 30 days after the Effective Date), each holder of an Allowed Priority Tax Claim shall receive in full and final satisfaction of such Claim, either (a) Cash in an amount equal to the Allowed amount of such Claim or such other treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code or (b) or such other treatment as to which the Debtors, the Post-Effective Date Debtors or NewCo and its subsidiaries (including the Credit Bid Purchaser)

as applicable, and the holder of such Allowed Priority Tax Claim will have agreed upon in writing; *provided*, that Allowed Priority Tax Claims representing liabilities incurred in the ordinary course of business by the Debtors, as Debtors in Possession, shall be paid by the Debtors or the Post-Effective Date Debtors, as applicable, in the ordinary course of business, consistent with past practice and in accordance with the terms and subject to the conditions of any orders or agreements governing, instruments evidencing, or other documents establishing, such liabilities; *provided, further*, that any Allowed Priority Tax Claim assumed by the Credit Bid Purchaser pursuant to the Credit Bid Purchase Agreement shall be solely an obligation of the Credit Bid Purchaser and the holder of such assumed Claim shall have no recourse to or Claim against the Debtors or Post-Effective Date Debtors or their assets and properties.

### 2.6 *Restructuring Expenses.*

On the Effective Date, or as soon as reasonably practicable thereafter, the Debtors or the Post-Effective Date Debtors, as applicable, shall pay in full in Cash (to the extent not previously paid during the course of the Chapter 11 Cases) all outstanding Restructuring Expenses billed through the Effective Date, in accordance with the terms of the applicable orders, engagement letters, or other applicable contractual arrangements. All parties entitled to payment pursuant to this Section 2.6 shall estimate their accrued Restructuring Expenses before and as of the Effective Date and shall deliver such estimates to the Debtors at least three Business Days before the Effective Date; *provided,* that such estimate shall not be considered an admission or limitation with respect to the fees and expenses of such parties. On the Effective Date, final invoices for all Restructuring Expenses incurred before and as of the Effective Date shall be submitted to the Debtors. In addition, the Debtors and the Post-Effective Date Debtors (as applicable) shall continue to pay post-Effective Date, when due and payable in the ordinary course, Restructuring Expenses related to implementation, consummation and defense of the Plan.

### 2.7 *Postpetition Hedge Claims.*

On (or as soon thereafter as is reasonably practicable) the later of (a) the Effective Date and (b) the first Business Day on which the Allowed Postpetition Hedge Claim becomes due and owing in accordance with the terms of and subject to the conditions of any orders or agreements governing, instruments evidencing, or other documents establishing, such liabilities, each holder of an Allowed Postpetition Hedge Claim shall receive in full and final satisfaction of such Claim, either (x) Cash in an amount equal to the Allowed amount of such Claim or such other treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code or (y) such other treatment as to which the Debtors, the Post-Effective Date Debtors, or NewCo and its subsidiaries (including the Credit Bid Purchaser), as applicable, and the holder of such Allowed Postpetition Hedge Claim will have agreed upon in writing; *provided*, that any Allowed Postpetition Hedge Claim assumed by the Credit Bid Purchaser in accordance with the foregoing clause (y) pursuant to the Credit Bid Purchase Agreement shall be solely an obligation of the Credit Bid Purchaser and the holder of such assumed Claim shall have no recourse to or Claim against the Debtors or Post-Effective Date Debtors or their assets and properties. Nothing herein shall modify any of the contractual rights under a Postpetition Hedging Agreement of a holder of an Allowed Postpetition Hedge Claim in their capacity as a holder of an Allowed Postpetition Hedge Claim.

# ARTICLE III.  CLASSIFICATION OF CLAIMS AND INTERESTS.

### 3.1  *Classification in General.*

A Claim or Interest is placed in a particular Class for all purposes, including voting, confirmation, and distribution under the Plan and under sections 1122 and 1123(a)(1) of the Bankruptcy Code; *provided*, *however*, that a Claim or Interest is placed in a particular Class for the purpose of receiving distributions pursuant to the Plan only to the extent that such Claim or Interest is an Allowed Claim or Allowed Interest in that Class and such Claim or Interest has not been satisfied, released, or otherwise settled before the Effective Date.

### 3.2  *Formation of Debtor Groups for Convenience Only.*

The Plan groups the Debtors together solely for the purpose of describing treatment under the Plan, confirmation of the Plan, and making Plan Distributions in respect of Claims against and Interests in the Debtors under the Plan.  Such groupings shall not affect any Debtor's status as a separate legal entity, change the organizational structure of the Debtors' business enterprise, constitute a change of control of any Debtor for any purpose, cause a merger of consolidation of any legal entities, or cause the transfer of any Assets; and, except as otherwise provided by or permitted under the Plan, all Debtors shall continue to exist as separate legal entities.

### 3.3  *Summary of Classification of Claims and Interests.*

The following table designates the Classes of Claims against and Interests in the Debtors and specifies which Classes are:  (a) Impaired and Unimpaired under the Plan; (b) entitled to vote to accept or reject the Plan in accordance with section 1126 of the Bankruptcy Code; and (c) presumed to accept or deemed to reject the Plan.  In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims and Priority Tax Claims have not been classified.  The classification of Claims and Interests set forth herein shall apply separately to each Debtor.

| **Class** | **Type of Claim or Interest** | **Impairment** | **Entitled to Vote** |
|---|---|---|---|
| Class 1 | Other Secured Claims | Impaired | Yes |
| Class 2 | Priority Non-Tax Claims | Unimpaired | No (Presumed to accept) |
| Class 3 | FLFO Claims | Impaired | Yes |
| Class 4 | FLTL Claims | Impaired | Yes |
| Class 5 | SLTL Claims | Impaired | Yes |
| Class 6A | Unsecured Trade Claims | Impaired | Yes |
| Class 6B | General Unsecured Claims | Impaired | Yes |
| Class 7 | Intercompany Claims | Unimpaired | No (Presumed to accept) |
| Class 8 | Subordinated Securities Claims | Impaired | No (Deemed to reject) |
| Class 9 | Intercompany Interests | Unimpaired | No (Presumed to accept) |
| Class 10 | Existing Equity Interests | Impaired | No (Deemed to reject) |

### 3.4     *Special Provision Governing Unimpaired Claims.*

Except as otherwise provided in this Plan, nothing under this Plan shall affect the rights of the Debtors or the Post-Effective Date Debtors, as applicable, in respect of any Unimpaired Claims, including all rights in respect of legal and equitable defenses to, or setoffs or recoupments against, any such Unimpaired Claims.

### 3.5     *Separate Classification of Other Secured Claims.*

Although all Other Secured Claims have been placed in one Class for purposes of nomenclature within the Plan, each Other Secured Claim, to the extent secured by a Lien on Collateral different from the Collateral securing a different Other Secured Claim, shall be treated as being in a separate sub-Class for the purposes of voting to accept or reject the Plan and receiving Plan Distributions.

### 3.6     *Elimination of Vacant Classes.*

Any Class that, as of the commencement of the Confirmation Hearing, does not have at least one holder of a Claim or Interest that is Allowed in an amount greater than zero for voting purposes that votes on the Plan shall be considered vacant, deemed eliminated from the Plan for purposes of voting to accept or reject the Plan, and disregarded for purposes of determining whether the Plan satisfies section 1129(a)(8) of the Bankruptcy Code with respect to such Class.

### 3.7     *Voting Classes; Presumed Acceptance by Non-Voting Classes.*

With respect to each Debtor, if a Class contained Claims eligible to vote and no holder of Claims eligible to vote in such Class votes to accept or reject the Plan, the Plan shall be presumed accepted by the holders of such Claims in such Class.

### 3.8     *Voting; Presumptions; Solicitation.*

(a)     **Acceptance by Certain Impaired Classes**.  Only holders of Allowed Claims in Classes 1, 3, 4, 5, 6A, and 6B are entitled to vote to accept or reject the Plan.  An Impaired Class of Claims shall have accepted the Plan if (i) the holders of at least two-thirds (2/3) in amount of the Allowed Claims actually voting in such Class have voted to accept the Plan and (ii) the holders of more than one-half (1/2) in number of the Allowed Claims actually voting in such Class have voted to accept the Plan.

(b)     **Presumed Acceptance by Unimpaired Classes**.  Holders of Claims and Interests in Classes 2, 7 and 9 are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Accordingly, such holders are not entitled to vote to accept or reject the Plan.

(c)     **Deemed Rejection by Certain Impaired Classes**.  Holders of Claims in Class 8 and Class 10 are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Accordingly, such holders are not entitled to vote to accept or reject the Plan.

### 3.9 *Cramdown.*

If any Class is deemed to reject the Plan or is entitled to vote on the Plan and does not vote to accept the Plan, the Debtors may (a) seek confirmation of the Plan under section 1129(b) of the Bankruptcy Code or (b) amend or modify the Plan in accordance with the terms hereof and the Bankruptcy Code. If a controversy arises as to whether any Claims or Interests, or any class of Claims or Interests, are impaired, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Date.

### 3.10 *No Waiver.*

Nothing contained in the Plan shall be construed to waive a Debtor's or other Person's right to object on any basis to any Disputed Claim.

## ARTICLE IV.    TREATMENT OF CLAIMS AND INTERESTS.

### 4.1 *Class 1: Other Secured Claims.*

(a)    **Treatment**:  Except to the extent that a holder of an Allowed Other Secured Claim agrees to a less favorable treatment, in full and final satisfaction of such Allowed Other Secured Claim, at the option of the Debtors or the Post-Effective Date Debtors, such holder shall receive either (i) payment in full in Cash, payable on the later of the Effective Date and the date that is ten (10) Business Days after the date on which such Other Secured Claim becomes an Allowed Other Secured Claim, in each case, or as soon as reasonably practicable thereafter, (ii) such other treatment so as to render such holder's Allowed Other Secured Claim Unimpaired, or (iii) any other treatment consistent with the provisions of section 1129 of the Bankruptcy Code, including by providing such holder with the "indubitable equivalent" of their Allowed Other Secured Claim (which, for the avoidance of doubt, may be in the form of a multi-year promissory note or other financial instrument); *provided,* that any Allowed Other Secured Claim assumed by the Credit Bid Purchaser pursuant to the Credit Bid Purchase Agreement shall be solely an obligation of the Credit Bid Purchaser and the holder of such assumed Claim shall have no recourse to or Claim against the Debtors or Post-Effective Date Debtors or their assets and properties.

(b)    **Impairment and Voting**:  Allowed Other Secured Claims are Impaired. Holders of Allowed Other Secured Claims are entitled to vote on the Plan.

### 4.2 *Class 2:  Priority Non-Tax Claims.*

(a)    **Treatment**:  Except to the extent that a holder of an Allowed Priority Non-Tax Claim agrees to a less favorable treatment, in full and final satisfaction of such Allowed Priority Non-Tax Claim, each holder of an Allowed Priority Non-Tax Claim shall, at the option of the Debtors or the Post-Effective Date Debtors (i) be paid in full in Cash or (ii) otherwise receive treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code, payable on the later of the Effective Date and the date that is ten (10) Business Days after the date on which such Priority Non-Tax Claim becomes an Allowed Priority Non-Tax Claim, in

each case, or as soon as reasonably practicable thereafter; *provided,* that any Allowed Priority Non-Tax Claim assumed by the Credit Bid Purchaser pursuant to the Credit Bid Purchase Agreement shall be solely an obligation of the Credit Bid Purchaser and the holder of such assumed Claim shall have no recourse to or Claim against the Debtors or Post-Effective Date Debtors or their assets and properties.

(b)    **Impairment and Voting**:  Allowed Priority Non-Tax Claims are Unimpaired.  In accordance with section 1126(f) of the Bankruptcy Code, the holders of Allowed Priority Non-Tax Claims are conclusively presumed to accept the Plan and are not entitled to vote to accept or reject the Plan, and the votes of such holders shall not be solicited with respect to such Allowed Priority Non-Tax Claims.

### 4.3    *Class 3:  FLFO Claims.*

(a)    **Treatment**:  Except to the extent that a holder of an Allowed FLFO Claim agrees to less favorable treatment, on the Effective Date, in full and final satisfaction of such Allowed FLFO Claim, (a) each holder of an Allowed FLFO Claim shall receive its Pro Rata Share of the FLFO Distribution Amount and (b) all remaining Allowed FLFO Claims shall be assumed by the NewCo Entities as modified to the extent set forth in the First Lien Exit Facility Documents.  The Liens securing the FLFO Claims that attach to the Credit Bid Acquired Interests shall be retained and deemed assigned to the First Lien Exit Facility Agent upon the Effective Date to secure the obligations under the First Lien Exit Facility.

(b)    **Impairment and Voting**:  FLFO Claims are Impaired.  Holders of Allowed FLFO Claims are entitled to vote on the Plan.

(c)    **Allowance**:  The FLFO Claims shall be deemed Allowed on the Effective Date in the FLFO Claims Allowed Amount.

### 4.4    *Class 4:  FLTL Claims.*

(a)    **Treatment:** Except to the extent that a holder of an Allowed FLTL Claim agrees to less favorable treatment, on the Effective Date, in full and final satisfaction of and in exchange for such Allowed FLTL Claim and in consideration for the Credit Bid Transaction, each holder of an Allowed FLTL Claim shall receive its Pro Rata Share of:

(i)    100% of the New Equity Interests, subject to dilution by (w) the Backstop Commitment Equity Premium Interests, (x) the New Equity Interests issued upon exercise of the Subscription Rights, (y) any New Equity Interests issued upon the exercise of the New Money Warrants, SLTL Warrants, or the GUC Warrants, and (z) any New Equity Interests issued pursuant to the Management Incentive Plan; and

(ii)    the FLTL Subscription Rights.

(b)    **Impairment and Voting**:  FLTL Claims are Impaired.  Holders of Allowed FLTL Claims are entitled to vote on the Plan.

(c)    **Allowance**: The FLTL Claims shall be deemed Allowed on the Effective Date in the aggregate amount of the FLTL Claims Allowed Amount.

### 4.5    *Class 5:  SLTL Claims.*

(d)    **Treatment:** Except to the extent that a holder of an Allowed SLTL Claim agrees to less favorable treatment, on the Effective Date, in full and final satisfaction of and in exchange for such Allowed SLTL Claim, each holder of an Allowed SLTL Claim shall receive its Pro Rata Share of:

    (iii)    the SLTL Warrants; and

    (iv)    the SLTL Subscription Rights.

(e)    **Impairment and Voting**:  SLTL Claims are Impaired.  Holders of Allowed SLTL Claims are entitled to vote on the Plan.

(f)    **Allowance**: The SLTL Claims shall be deemed Allowed on the Effective Date in the aggregate amount of the SLTL Claims Allowed Amount.

### 4.6    *Class 6A:  Unsecured Trade Claims.*

(a)    **Treatment:** Except to the extent that a holder of an Allowed Unsecured Trade Claim agrees to less favorable treatment, on the Effective Date, in full and final satisfaction of and in exchange for such Allowed Unsecured Trade Claim, each holder of an Allowed Unsecured Trade Claim that has executed a Trade Agreement shall receive:

    (i)    if 14% of the aggregate amount of all Allowed Unsecured Trade Claims is less than or equal to $8,000,000, Cash in an amount equal to 14% of the Allowed amount of such holder's Allowed Unsecured Trade Claim; or

    (ii)    if 14% of the aggregate amount of Allowed Unsecured Trade Claims is greater than $8,000,000, its Pro Rata share of $8,000,000.

(b)    **Impairment and Voting**: Unsecured Trade Claims are Impaired.  Holders of Unsecured Trade Claims are entitled to vote on the Plan.

### 4.7    *Class 6B: General Unsecured Claims.*

(c)    **Treatment:** Except to the extent that a holder of an Allowed General Unsecured Claim agrees to less favorable treatment, on or after the Effective Date, in full and final satisfaction of and in exchange for such Allowed General Unsecured Claim, each holder of an Allowed General Unsecured Claim shall receive, up to the full amount of such holder's Allowed General Unsecured Claim, its Pro Rata Share of:

    (i)    the GUC Warrants; and

(ii)        any Residual Distributable Value.

(b)        **Impairment and Voting**: General Unsecured Claims are Impaired. Holders of General Unsecured Claims are entitled to vote on the Plan.

### 4.8     *Class 7:  Intercompany Claims.*

(a)        **Treatment**:  On or after the Effective Date, all Intercompany Claims shall be adjusted, reinstated, or discharged in the Debtors' or Post-Effective Date Debtors' discretion.

(b)        **Impairment and Voting**:  All Allowed Intercompany Claims are deemed Unimpaired.  In accordance with section 1126(f) of the Bankruptcy Code, the holders of Allowed Intercompany Claims are conclusively presumed to accept the Plan and are not entitled to vote to accept or reject the Plan, and the votes of such holders shall not be solicited with respect to such Allowed Intercompany Claims.

### 4.9     *Class 8:  Subordinated Securities Claims.*

(a)        **Treatment**:    All Subordinated Securities Claims, if any, shall be discharged, cancelled, released, and extinguished as of the Effective Date, and will be of no further force or effect, and holders of Allowed Subordinated Securities Claims will not receive any distribution on account of such Allowed Subordinated Securities Claims.

(b)        **Impairment and Voting**:  Allowed Subordinated Securities Claims are Impaired.  In accordance with section 1126(g) of the Bankruptcy Code, holders of Subordinated Securities Claims are conclusively presumed to reject the Plan and are not entitled to vote to accept or reject the Plan, and the votes of such holders shall not be solicited with respect to Subordinated Securities Claims.

### 4.10    *Class 9:  Intercompany Interests.*

(a)        **Treatment**:  On the Effective Date, all Intercompany Interests, in the Debtors' or the Post-Effective Date Debtors' discretion, shall be adjusted, reinstated, cancelled, or discharged in the Debtors' or Post-Effective Date Debtors' discretion.

(b)        **Impairment and Voting:**  Intercompany Interests are Unimpaired.  In accordance with section 1126(f) of the Bankruptcy Code, the holders of Allowed Intercompany Interests are conclusively presumed to accept the Plan and are not entitled to vote to accept or reject the Plan, and the votes of such holders shall not be solicited with respect to such Allowed Intercompany Interests.

### 4.11    *Class 10:  Existing Equity Interests.*

(a)        **Treatment**:  On the Effective Date, all Existing Equity Interests shall be canceled, released, and extinguished, and will be of no further force or effect.

(b)        **Impairment and Voting**:    Allowed Existing Equity Interests are Impaired.  Holders of Existing Equity Interests are not entitled to vote on the Plan.

### 4.12 _Treatment of Vacant Classes._

Any Claim or Interest in a Class that is considered vacant under Section 3.6 of the Plan shall receive no Plan Distribution.

## ARTICLE V.    MEANS FOR IMPLEMENTATION.

### 5.1 _Plan Settlement; Compromise and Settlement of Claims, Interests, and Controversies._

Subject to approval by the Bankruptcy Court in connection with confirmation of the Plan, the provisions of the Plan and other documents entered into in connection with the Plan constitute a good faith compromise and settlement among the Debtors, the Consenting Creditors and the Creditors' Committee of claims, Causes of Action and controversies among such parties, including all potential claims, Causes of Action and controversies related to the Challenge Period (as defined in the DIP Order) and any Challenge under the DIP Order, and are in consideration of the value provided to the Estates by the Consenting Creditors, including the value being provided to holders of Unsecured Trade Claims and General Unsecured Claims pursuant to Sections 4.6 and 4.7 hereof. The Plan shall be deemed a motion to approve the Plan Settlement and the good faith compromise and settlement of all of the claims, Causes of Action and controversies described in the foregoing sentence pursuant to sections 363 and 1123(b)(3) of the Bankruptcy Code and Bankruptcy Rule 9019. Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the Plan Settlement, as well as a finding by the Bankruptcy Court that the Plan Settlement is fair, equitable, reasonable, and in the best interests of the Debtors and their Estates.  For the avoidance of doubt, nothing in this Plan or the Disclosure Statement shall require the Creditors' Committee to take or refrain from taking any action that it determines in good faith would be inconsistent with its fiduciary duties under applicable law. Notwithstanding the foregoing, the Creditors' Committee acknowledges that its entry into the Plan Settlement and its support for this Plan is consistent with its fiduciary duties.

Further, pursuant to sections 363 and 1123(b)(3) of the Bankruptcy Code and Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided pursuant to the Plan, the provisions of the Plan shall constitute a good faith compromise of Claims, Interests, and controversies relating to the contractual, legal, and subordination rights that a creditor or an Interest holder may have with respect to any Allowed Claim or Allowed Interest or any distribution to be made on account of such Allowed Claim or Allowed Interest. Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Allowed Claims, Allowed Interests, and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtors, their Estates, and holders of such Allowed Claims and Allowed Interests, and is fair, equitable, and reasonable.

### 5.2 _Credit Bid Transaction; Confirmation Outside Date._

(a)    If the Confirmation Date occurs on or before the Confirmation Outside Date or the Debtors, the Required DIP Lenders, and Requisite FLTL Lenders do not otherwise

elect to pursue a 363 Credit Bid Transaction pursuant to Section 5.2(c) of the Plan, then, on the Effective Date, pursuant to sections 363, 1123, 1141(b) and 1141(c) of the Bankruptcy Code, in accordance with the Credit Bid Purchase Agreement, subject to the satisfaction or waiver of all applicable closing conditions under the Credit Bid Purchase Agreement, (i) all Credit Bid Acquired Interests shall be transferred to, and the Credit Bid Acquired Interests owned by the Debtors shall vest free and clear of all Liens[2] (other than (i) any and all Liens securing the FLFO Claim or the obligations under the First Lien Exit Facility or (ii) Credit Bid Permitted Encumbrances except in the case of Fieldwood U.A. Interests, which shall vest free and clear of all Liens other than Liens described in clause (i) above to the extent contemplated by the First Lien Exit Facility Documents), Claims, charges, Interests, or other encumbrances, including the Credit Bid Consent Rights and the Credit Bid Preferential Purchase Rights, and (ii) all Credit Bid Assumed Liabilities shall be assumed by the Credit Bid Purchaser.

(b)    In the event that the transaction pursuant to Section 5.2(a) of the Plan is consummated and in the event of any conflict whatsoever between the terms of the Plan and the Credit Bid Purchase Agreement with respect to the Credit Bid Transaction, the terms of the Credit Bid Purchase Agreement shall control, and the Plan shall be deemed to incorporate in their entirety the terms, provisions, and conditions of the Credit Bid Purchase Agreement.

(c)    (x) If the Confirmation Date does not occur before the Confirmation Outside Date or (y) if the estimated amount of Allowed Specified Administrative Expense Claims to be satisfied under the Plan on or after the Effective Date is projected at any time prior to the Confirmation Date to exceed the Toggle Amount (the next Business Day after the occurrence of (x) or (y), the ("**Toggle Date**"), then, with the consent of the Required DIP Lenders and Requisite FLTL Lenders, the Debtors shall:

(i)    within 7 days of the Toggle Date, file a motion (the "**Toggle Motion**"), in form and substance acceptable to the Debtors, the Required DIP Lenders and Requisite FLTL Lenders, seeking entry of an order of the Bankruptcy Court approving a credit bid sale transaction to the Credit Bid Purchaser (or another special purpose bidding entity formed by or at the direction of the Prepetition FLTL Lenders) pursuant to section 363 of the Bankruptcy Code on substantially the same terms as provided in the Credit Bid Purchase Agreement (which terms shall be acceptable to the Debtors, the Requisite FLTL Lenders, and Required DIP Lenders), free and clear of all Liens (other than (i) any and all Liens securing the FLFO Claim or the First Lien Exit Facility or (ii) Credit Bid Permitted Encumbrances except in the case of Fieldwood U.A. Interests, which shall vest free and clear of all Liens other than Liens described in clause (i) above to the extent contemplated by the First Lien Exit Facility Documents), Claims, charges, Interests, or other encumbrances, the Credit Bid Consent Rights and the

---

[2] Provided that the Retained Properties (as defined in the Apache Implementation Agreement) shall be transferred in accordance with the Decommissioning Agreement.

Credit Bid Preferential Purchase Rights that are applicable to the Credit Bid Acquired Interests;

(ii)     within 15 days of the Toggle Date and subject to the reasonable consent of Apache, the Requisite FLTL Lenders, the Required DIP Lenders and the Debtors, amend the Apache Definitive Documents as reasonably required to effectuate the 363 Credit Bid Transaction to the Credit Bid Purchaser (or another special purpose bidding entity formed by or at the direction of the Prepetition FLTL Lenders); provided that no such actions shall require the Apache PSA Parties to alter the economics of the Apache Definitive Documents without the Apache PSA Parties' express written consent; and

(iii)     within 35 days of the Toggle Date, obtain entry of an order of the Bankruptcy Court approving the 363 Credit Bid Transaction to the Credit Bid Purchaser (or another special purpose bidding entity formed by or at the direction of the Prepetition FLTL Lenders).

(d)     Notwithstanding anything herein to the contrary, upon the occurrence of the Toggle Date, if the transactions under the Toggle Motion (i) (a) individually or in the aggregate, results in a reduction of 10% or more of the total PV-10 of total 2P reserves comprising the assets acquired by the Credit Bid Purchaser (which shall be calculated by reference to the FWE YE2020 Internal Reserve Report (as of 5.1.21)), (b) results in any contract rights constituting material assets not being acquired by the Credit Bid Purchaser, (c) individually or in the aggregate, results in an increase by $40.0 million or more (which, for the avoidance of doubt, in the case of plugging and abandonment liabilities, shall be calculated on a present value basis) in liabilities assumed by the Credit Bid Purchaser, (d) relates to any change in treatment or recovery of the Prepetition FLFO Credit Agreement or First Lien Exit Facility, or (e) provide for any differences from the transaction under this Plan that are materially adverse to the interests of the First Lien Exit Facility Agent and the First Lien Exit Facility Lenders, and (ii) are not (a) reasonably acceptable to the Prepetition FLFO Agent with respect to the foregoing clause (i)(b) or (e), or (ii) acceptable to the Prepetition FLFO Agent with respect to the foregoing clause (i)(a),(c), or (d), then all rights of the Prepetition FLFO Secured Parties set forth in the Prepetition FLFO Credit Agreement and related documents to object to the Toggle Motion on any grounds are expressly preserved, and all of the Prepetition FLFO Secured Parties' claims, rights, and remedies are reserved for all purposes, including the right to obtain treatment and transaction structure different than as set forth in the Toggle Motion.

(e)     Notwithstanding anything in the Credit Bid Purchase Agreement or any agreement entered into pursuant to Section 5.2(c) of the Plan to the contrary, the Credit Bid Purchaser shall not be liable for any liability or obligation on account of any Claim or Interest that is compromised, settled, released or discharged pursuant to this Plan.

### 5.3 *Equity Rights Offerings.*

(a)     On the Effective Date, the Debtors shall consummate the Equity Rights Offerings.

(b)     [FLTL Equity Rights Offering. The FLTL Equity Rights Offering shall be fully backstopped by the FLTL ERO Backstop Parties in accordance with and subject to the terms and conditions of the FLTL ERO Backstop Agreement. The right to participate in the FLTL Equity Rights Offering may not be sold, transferred, or assigned, except in the circumstances described in the FLTL ERO Backstop Agreement. In accordance with the FLTL ERO Backstop Agreement and subject to the terms and conditions thereof, each of the FLTL ERO Backstop Parties, among other things, has agreed, severally but not jointly, to purchase, on or prior to the Effective Date, its respective [FLTL ERO Backstop Commitment Percentage] of the [FLTL Unsubscribed Shares]. In exchange for providing the backstop commitment for the Equity Rights Offering, the FLTL ERO Backstop Parties shall receive, among other things, the FLTL ERO Backstop Commitment Premium Equity Interests payable in accordance with the terms of the FLTL ERO Backstop Agreement.]

(c)     [SLTL Equity Rights Offering. The SLTL Equity Rights Offering shall be fully backstopped by the SLTL ERO Backstop Parties in accordance with and subject to the terms and conditions of the SLTL ERO Backstop Agreement. The right to participate in the SLTL Equity Rights Offering may not be sold, transferred, or assigned, except in the circumstances described in the SLTL ERO Backstop Agreement. In accordance with the SLTL ERO Backstop Agreement and subject to the terms and conditions thereof, each of the SLTL ERO Backstop Parties, among other things, has agreed, severally but not jointly, to purchase, on or prior to the Effective Date, its respective [SLTL ERO Backstop Commitment Percentage] of the [SLTL Unsubscribed Shares]. In exchange for providing the backstop commitment for the SLTL Equity Rights Offering, the SLTL ERO Backstop Parties shall receive, among other things, the SLTL ERO Backstop Commitment Premium Equity Interests payable in accordance with the terms of the SLTL ERO Backstop Agreement.]

### 5.4 *New Equity Interests.*

(a)     On the Effective Date, NewCo is authorized to issue or cause to be issued and shall, issue the New Equity Interests for eventual distribution in accordance with the terms of this Plan without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule, or the vote, consent, authorization, or approval of any Person. The New Equity Interests shall be issued and distributed free and clear of all Liens, Claims, and other Interests. All of the New Equity Interests issued pursuant to the Plan shall be duly authorized and validly issued.

(b)     On the Effective Date, NewCo and all holders of the New Equity Interests then outstanding shall be deemed to be parties to the NewCo Organizational Documents, where applicable, substantially in the form, or consistent with the term sheets, contained in the Plan Supplement, without the need for execution by any such holder. The NewCo Organizational Documents shall be binding on NewCo and its subsidiaries (including the Credit Bid Purchaser) and all parties receiving, and all holders of, New Equity Interests.

### 5.5    *NewCo Organizational Documents*

The NewCo Organizational Documents will be in form and substance acceptable to the Debtors, Requisite FLTL Lenders, and the Required DIP Lenders. After the Effective Date, the NewCo Organizational Documents may be amended or restated as permitted by such documents and the laws of their respective states, provinces, or countries of incorporation or organization.

### 5.6    *New Money Warrants, SLTL Warrants and GUC Warrants*

On or after the Effective Date, NewCo is authorized to issue or cause to be issued and shall, as provided for in this Plan, issue (i) the New Money Warrants for distribution to the New Money Second Lien Exit Facility Lenders, the SLTL Warrants to the holders of Allowed SLTL Claims, and the GUC Warrants to the holders of Allowed General Unsecured Claims, in each case in accordance with the terms of the Plan and Confirmation Order without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule, or the vote, consent, authorization, or approval of any Person and (ii) upon exercise of the New Money Warrants, New Equity Interests issuable upon exercise of the New Money Warrants.  The New Money Warrants, the SLTL Warrants, and GUC Warrants shall be issued and distributed free and clear of all Liens, Claims, and other Interests.  All of the New Money Warrants, the SLTL Warrants, and GUC Warrants issued pursuant to the Plan, including as contemplated by the Credit Bid Transaction and the Second Lien Exit Facility Term Sheet, and all New Equity Interests issued upon exercise of the New Money Warrants, the SLTL Warrants, and the GUC Warrants shall be duly authorized and validly issued.

### 5.7    *Plan of Merger*

(a)    On the Effective Date, but after the consummation of the transactions contemplated by the Credit Bid Purchase Agreement, Fieldwood Energy LLC shall adopt the Plan of Merger and, in accordance with the terms thereof and solely to the extent therein, upon the effective time of the Divisional Merger as provided for in the Plan of Merger, the (i) FWE Assets will be allocated to and vest in FWE I, FWE III, and any FWE Additional Entity pursuant to the terms of the applicable Plan of Merger, in each case, free and clear of all Plan of Merger Consent Rights and Plan of Merger Preferential Purchase Rights; and (ii) (x) the FWE I Obligations shall be allocated to and shall vest in, and shall constitute liabilities and obligations of, FWE I, (y) the FWE III Obligations shall be allocated to and shall vest in, and shall constitute liabilities and obligations of, FWE III (except as provided in any Plan of Merger other than the Initial Plan of Merger), and (z) any obligations allocated to an FWE Additional Entity pursuant to the Plan of Merger shall be allocated to and shall vest in, and shall constitute liabilities and obligations of, such applicable FWE Additional Entity.  Immediately after the effective time of the Divisive Merger as provided in the Initial Plan of Merger, the only assets, properties and rights of, and the only liabilities and obligations of, (i) FWE I will be the FWE I Assets and FWE I Obligations, and (ii) FWE III will be the FWE III Assets and FWE III Obligations, and (iii) any FWE Additional Entity will be those assets and obligations allocated to such entity pursuant to the Plan of Merger.  Immediately after the effective time of any Divisive Merger as provided in a Plan of Merger other than the Initial Plan of Merger, the only assets, properties and rights of, and the only liabilities and obligations of, FWE III (if a party to such Plan of Merger) and any FWE

Additional Entity will be those assets and obligations allocated to such entity pursuant to such Plan of Merger.

(b)     All of the membership interests (or other equity interests, as applicable) of FWE I, FWE III, and any FWE Additional Entity shall be owned by Post-Effective Date FWE Parent.

(c)     Notwithstanding anything to the contrary in the Plan of Merger, any claim or interest that is satisfied, compromised, settled, released or discharged pursuant to the Plan shall not constitute an FWE I Obligation, FWE III Obligation, or an obligation of any FWE Additional Entity, as applicable.

### 5.8     *Single Share*

(a)     On the Effective Date, one share of Post-Effective Date FWE Parent common stock (the "**Single Share**") shall be issued to the Plan Administrator to hold in trust as custodian for the benefit of the holders of Allowed General Unsecured Claims and the Single Share shall be recorded on the books and records maintained by the Plan Administrator.

(b)     On the date that FWE Parent's Chapter 11 Case is closed in accordance with Section 5.25 of this Plan, the Single Share issued on the Effective Date pursuant to the Plan shall be deemed cancelled and of no further force and effect, provided that such cancellation does not adversely impact the Debtors' Estates.

### 5.9     *Plan Administrator*

(a)     *Appointment*.  The Plan Administrator's retention shall commence on the Effective Date and shall continue until: (i) the Bankruptcy Court has entered an order or orders closing each of the Chapter 11 Cases; (ii) the Bankruptcy Court enters an order removing the Plan Administrator for cause; or (iii) the Plan Administrator voluntarily resigns, upon notice filed with the Bankruptcy Court, and a successor Plan Administrator is appointed in accordance with this Plan.

(b)     *Authority*.  Subject to Section 5.9(c) of this Plan, the Plan Administrator shall have all the rights, powers, authority, and duties on behalf of each of the Debtors and Post-Effective Date Debtors, without the need for Bankruptcy Court approval (unless otherwise indicated), to carry out and implement all provisions of the Plan, including, without limitation, to:

> (i)     subject to Section 7 of the Plan, except to the extent Claims have been previously Allowed, control and effectuate the Claims reconciliation process in accordance with the terms of this Plan, including to object to, seek to subordinate, compromise or settle any and all Claims against the Debtors;

> (ii)     make Distributions to holders of Allowed Claims and Interests in accordance with this Plan, including distributions from the Claims

Reserve, Professional Fee Escrow and Plan Administrator Expense Reserve;

(iii)    exercise its reasonable business judgment to direct and control the Debtors or Post-Effective Date Debtors under this Plan and in accordance with applicable law as necessary to maximize Distributions to holders of Allowed Claims;

(iv)    prepare, file, and prosecute any necessary filings or pleadings with the Bankruptcy Court to carry out the duties of the Plan Administrator as described herein;

(v)    engage in the ownership, operation, plugging and abandonment, and decommissioning of the (y) FWE III Assets, including the FWE III Oil & Gas Lease Interests and (z) except as otherwise agreed pursuant to an Additional Predecessor Agreement, any assets of any FWE Additional Entity, including the FWE IV Oil & Gas Lease Interests and any FWE Additional Entity Oil & Gas Lease Interests;

(vi)    abandon any property determined by the Plan Administrator to be of *de minimis* value or burdensome to the Estates;

(vii)    other than any Causes of Action released by the Debtors pursuant to this Plan or otherwise, prosecute all Causes of Action on behalf of the Debtors, elect not to pursue any Causes of Action, and determine whether and when to compromise, settle, abandon, dismiss, or otherwise dispose of any such Causes of Action, as the Plan Administrator may determine is in the best interests of the Debtors and their Estates;

(viii)    retain, employ, terminate, or replace professionals to assist or represent it in performing its duties under this Plan;

(ix)    pay all fees, expenses, debts, charges, and liabilities of the Post-Effective Date Debtors, including any Restructuring Expenses, from the Plan Administrator Expense Reserve or otherwise;

(x)    comply with, and cause the Debtors and Post-Effective Date Debtors to comply with, the Debtors' or Post-Effective Date Debtors' continuing obligations under the Credit Bid Purchase Agreement;

(xi)    maintain the books and records and accounts of the Debtors and Post-Effective Date Debtors;

(xii)    establish and maintain bank accounts in the name of the Post-Effective Date Debtors;

(xiii)    incur and pay reasonable and necessary expenses in connection with the performance of duties under this Plan, including the reasonable fees and expenses of professionals retained by the Plan Administrator;

(xiv)    following the Effective Date, pay any fees and expenses in Cash in accordance with Section 2.4 of this Plan;

(xv)    administer each Debtor's and Post-Effective Date Debtors' tax obligations, including (i) filing tax returns and paying tax obligations and (ii) representing the interest and account of each Debtor, each Debtor's estate, or each Post-Effective Date Debtor before any taxing authority in all matters including, without limitation, any action, suit, proceeding or audit;

(xvi)    prepare and file any and all informational returns, reports, statements, returns or disclosures relating to the Debtors or Post-Effective Date Debtor that are required hereunder, by any Governmental Unit or applicable law;

(xvii)    pay statutory fees in accordance with Section 12.1 of this Plan;

(xviii)    perform other duties and functions that are consistent with the implementation of the Plan or as the Plan Administrator reasonably deems to be necessary and proper to carry out the provisions of this Plan; and

(xix)    close the Chapter 11 Cases pursuant to Section 5.25 of this Plan.

(c)    *Board of Directors and Officers.*

(i)    The officers and directors of the Debtors existing before the Effective Date shall be relieved of any and all duties with the respect to the Debtors as of the Effective Date.

(ii)    Upon the Effective Date, the Plan Administrator shall serve as the sole officer, director, or manager of each Post-Effective Date Debtor.  The Plan Administrator may also elect such additional managers(s) and officer(s) of each Post-Effective Date Debtor as the Plan Administrator deems necessary to implement this Plan and the actions contemplated herein.  The Plan Administrator shall also have the power to act by written consent to remove any officer or manager of any Post-Effective Date Debtor at any time with or without cause.

(d)    *Post-Effective Date Operations.*  After the Effective Date, pursuant to this Plan, the Plan Administrator shall operate the Post-Effective Date Debtors without any further

approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

(e)     *Post-Effective Date Expenses*.  On and after the Effective Date, all costs, expenses and obligations incurred by the Plan Administrator in administering this Plan, the Post-Effective Date Debtors, or in any manner connected, incidental, or related thereto, in effecting distributions from the Post-Effective Date Debtors thereunder (including the reimbursement of reasonable expenses) shall be incurred and paid from the Plan Administrator Expense Reserve.

(f)     *Indemnification*.  Each of the Estates and the Post-Effective Date Debtors shall indemnify and hold harmless the Plan Administrator solely in its capacity as such for any losses incurred in such capacity, except to the extent such losses were the result of the Plan Administrator's gross negligence or willful misconduct.

(g)     *Cooperation*.  The Debtors, the Post-Effective Date Debtors, the Plan Administrator, the FWE I Sole Manager, and NewCo and its subsidiaries (including the Credit Bid Purchaser) and their respective professionals, as appropriate, shall cooperate with each other in relation to their respective activities and obligations in respect of this Plan, including objecting to, settling or otherwise reconciling claims as provided herein, and by providing reasonable, good-faith access to personnel, systems, and books and records and their respective personnel and consulting with each other to avoid duplication of effort; *provided*, *however*, that the Debtors, the Post-Effective Date Debtors, the Plan Administrator, the FWE I Sole Manager, and NewCo and its subsidiaries (including the Credit Bid Purchaser) and including its advisors, if any) shall enter into a confidentiality agreement before sharing of any such documents and/or information to the extent deemed reasonably necessary by the Post-Effective Date Debtors, the Credit Bid Purchaser, or Plan Administrator, as applicable.

## 5.10     *Plan Funding.*

Plan Distributions of Cash shall be funded from, among other things, the Debtors' Cash on hand (including the proceeds of the DIP Facility), the New Money Consideration, and the proceeds of the Equity Rights Offerings.

## 5.11     *The Exit Facilities*

(a)     On the Effective Date, the Credit Bid Purchaser shall execute and deliver the Exit Facility Documents and such documents shall become effective in accordance with their terms.  On and after the Effective Date, the Exit Facility Documents shall constitute legal, valid, and binding obligations of the Credit Bid Purchaser and be enforceable in accordance with their respective terms and such obligations shall not be enjoined or subject to discharge, impairment, release, avoidance, recharacterization, or subordination under applicable law, the Plan or the Confirmation Order, and the Credit Bid Purchaser shall be authorized to incur the loans under the Exit Facilities and use the proceeds of such loans, in each case, in accordance with the terms of this Plan and the Exit Facility Documents without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule, or the vote, consent, authorization, or approval of any Person.   The terms and conditions of the Exit Facility

Documents shall bind the Credit Bid Purchaser and each other Entity that enters into the Exit Facility Documents.

(b)     Confirmation shall be deemed approval of the Exit Facility Documents (including the transactions and related agreements contemplated thereby, and all actions to be taken, undertakings to be made, and obligations to be incurred and fees and expenses to be paid by the Debtors or Post-Effective Date Debtors, as applicable, in connection therewith), the First Lien Exit Facility Commitment Letter (including the transactions contemplated thereby, and all actions to be taken, undertakings to be made, and obligations and guarantees to be incurred and fees paid in connection therewith (including any payments under the First Lien Exit Facility Commitment Letter)), and the Second Lien Backstop Commitment Letter (including the transactions contemplated thereby, and all actions to be taken, undertakings to be made, and obligations and guarantees to be incurred and fees paid in connection therewith (including the Second Lien Backstop Commitment Premium and any other payments under the Backstop Agreement)), and, to the extent not approved by the Bankruptcy Court previously, the Credit Bid Purchaser will be authorized to, without further notice to the Bankruptcy Court, (i) execute and deliver those documents necessary or appropriate to obtain the Exit Facilities, including the Exit Facility Documents, each as applicable, and incur and pay any fees and expenses in connection therewith, and (ii) make any act or take any action under applicable law, regulation, order or rule or vote, consent, authorization, or approval of any Person, subject to such modifications as the Credit Bid Purchaser may deem to be necessary to enter into the Exit Facility Documents.

(c)     On the Effective Date, all of the claims, liens, and security interests to be granted in accordance with the terms of the Exit Facility Documents (i) shall be legal, binding, and enforceable liens on, and security interests in, the collateral granted thereunder in accordance with the terms of the Exit Facility Documents, (ii) shall be deemed automatically attached and perfected on the Effective Date, subject only to such liens and security interests as may be permitted under the Exit Facility Documents with the priorities established in respect thereof under applicable non-bankruptcy law and the New Intercreditor Agreement, and (iii) shall not be subject to avoidance, recharacterization, or subordination (including equitable subordination) for any purposes whatsoever and shall not constitute preferential transfers, fraudulent conveyances, or other voidable transfers under the Bankruptcy Code, this Plan, the Confirmation Order or applicable non-bankruptcy law.  To the extent provided in the Exit Facility Documents, the Exit Facility Agents are authorized, but not required, to file with the appropriate authorities mortgages, financing statements and other documents, and to take any other action in order to evidence, validate, and perfect such liens or security interests.

(d)     On the Effective Date, the Credit Bid Purchaser, the First Lien Exit Facility Agent and the Second Lien Exit Facility Agent shall enter into the New Intercreditor Agreement substantially in the form contained in the Plan Supplement.

### 5.12   *Apache Definitive Documents.*

(a)     On the Effective Date following the consummation of the Plan of Merger and the Effective Time (as defined in the Initial Plan of Merger), FWE I shall be authorized to execute, deliver, and enter into the Apache Definitive Documents, including the Standby Credit Facility Documents, without further (i) notice to or order or other approval of the Bankruptcy

Court, (ii) act or omission under applicable law, regulation, order, or rule, (iii) vote, consent, authorization, or approval of any Person, or (iv) action by the holders of Claims or Interests. The Standby Loan Agreement shall constitute a legal, valid, binding and authorized obligation of FWE I, enforceable in accordance with its terms and such obligations shall not be enjoined or subject to discharge, impairment, release, avoidance, recharacterization, or subordination under applicable law, the Plan or the Confirmation Order. The financial accommodations to be extended pursuant to the Standby Loan Agreement (and other definitive documentation related thereto) are reasonable and are being extended, and shall be deemed to have been extended, in good faith and for legitimate business purposes.

     (b)    <u>FWE I Sole Manager</u>

        (i)    Upon the Effective Date, the FWE I Sole Manager shall be appointed. Upon the Effective Date, the new governance structure of FWE I will be set forth in the FWE I LLC Agreement.

        (ii)    On and after the Effective Date, the FWE I Sole Manager and Plan Administrator shall mutually cooperate to establish any procedures and protocols as they deem necessary to carry out their respective duties; *provided*, *however*, that any such procedures and protocols shall be consistent with the terms of this Plan and the Sole Manager Agreement (as defined in the Apache Implementation Agreement).

        (iii)    FWE I shall indemnify and hold harmless the FWE I Sole Manager solely in its capacity as such for any losses incurred in such capacity, except to the extent such losses were the result of the FWE I Sole Manager's gross negligence or willful misconduct.

### 5.13 *Abandonment of Certain Properties*

     Immediately upon the occurrence of the Effective Date, the Debtors' rights to and interests in executory contracts and unexpired federal leases, rights-of-way, and right-of-use-and-easements listed on the Schedule of Abandoned Properties are abandoned pursuant to the Plan without further notice to or order of the Bankruptcy Court pursuant to Sections 105(a) and 554(a) of the Bankruptcy Code and/or deemed rejected pursuant to Section 365 of the Bankruptcy Code, as applicable. The Abandoned Properties shall not be allocated to nor vest in the Post-Effective Date Debtors or NewCo and its subsidiaries, including the Credit Bid Purchaser. Except as otherwise provided in this Plan or the Confirmation Order, the Debtors, their Estates, and the Post-Effective Date Debtors shall not be liable for any obligations whatsoever arising from or relating to the post-Effective Date period with regards to the Abandoned Properties. Nothing in this Plan or the Confirmation Order shall be construed as barring, waiving, or limiting the United States' rights to assert a claim against the Debtors, the Post-Effective Date Debtors or any co-lessees or predecessors in interest with respect to the Abandoned Properties for any decommissioning obligations for the Abandoned Properties.

### 5.14    *Establishment of Claims Reserve.*

On the Effective Date, the Debtors shall, with the consent of the Requisite FLTL Lenders and the DIP Lenders, establish and fund the Claims Reserve by depositing Cash, in the amount of the Claims Reserve Amount into the Claims Reserve. The Claims Reserve shall be used to pay Allowed Administrative Expense Claims, Allowed Priority Tax Claims, Allowed Priority Non-Tax Claims, Allowed Other Secured Claims (to the extent such Claims do not receive other treatment), Allowed Unsecured Trade Claims, and Cure Amounts in accordance with the terms of this Plan. Any amounts remaining in the Claims Reserve after satisfaction of all Allowed Administrative Expense Claims, Allowed Priority Tax Claims, Allowed Priority Non-Tax Claims, Allowed Other Secured Claims, Allowed Unsecured Trade Claims, and Cure Amounts shall constitute Residual Distributable Value.

### 5.15    *Plan Administrator Expense Reserve.*

On or before the Effective Date, the Plan Administrator shall establish the Plan Administrator Expense Reserve. On the Effective Date, the Plan Administrator shall deposit Cash in the Plan Administrator Expense Reserve Amount into the Plan Administrator Expense Reserve. The Plan Administrator Expense Reserve shall be used by the Plan Administrator solely to satisfy the expenses of the Plan Administrator and the Post-Effective Date Debtors as set forth in this Plan. Any amount remaining in the Plan Administrator Expense Reserve after the dissolution of all the Post-Effective Date Debtors shall constitute Residual Distributable Value. In no event shall the Plan Administrator be required or permitted to use its personal funds or assets for the purposes of carrying out its duties under this Plan.

### 5.16    *Continued Corporate Existence; Effectuating Documents; Further Transactions.*

(a)    Except as otherwise provided in the Plan, the Debtors shall continue to exist after the Effective Date as Post-Effective Date Debtors in accordance with the applicable laws of the respective jurisdictions in which they are incorporated or organized and pursuant to the Amended Organizational Documents.

(b)    On or after the Effective Date (in any case, following the consummation of the Credit Bid Transaction), but subsequent to the consummation of the transactions contemplated by the Credit Bid Purchase Agreement if the Credit Bid Transaction occurs, without prejudice to the rights of any party to a contract or other agreement with any Post-Effective Date Debtor, each Post-Effective Date Debtor may, in the sole discretion of the Plan Administrator, take such action as permitted by applicable law, the applicable Amended Organizational Documents or other applicable corporate governance documents, the Apache Definitive Documents, any Additional Predecessor Agreement Documents, as such Post-Effective Date Debtor may determine is reasonable and appropriate, including, causing: (i) the consummation of a Divisional Merger(s) as contemplated by the Plan of Merger, (ii) the taking of any action contemplated by any Additional Predecessor Agreement Documents and the consummation thereof (including the formation of a new entity or consummation of a divisional merger), (iii) a Post-Effective Date Debtor to be merged into another Post-Effective Date Debtor or an affiliate of a Post-Effective Date Debtor; (iv) a Post-Effective Date Debtor to be dissolved;

(v) the legal name of a Post-Effective Date Debtor to be changed; (vi) a Post-Effective Date Debtor to convert its form of entity; or (vii) the closure of a Post-Effective Date Debtor's Chapter 11 Case on the Effective Date or any time thereafter, and such action and documents are deemed to require no further action or approval (other than any requisite filings required under the applicable state, provincial and federal or foreign law).

(c)     On the Effective Date or as soon thereafter as is reasonably practicable (in any case, following the consummation of the Credit Bid Transaction), but subsequent to the consummation of the transactions contemplated by the Credit Bid Purchase Agreement if the Credit Bid Transaction occurs,  the Post-Effective Date Debtors, acting through the Plan Administrator, may take all actions as may be necessary or appropriate to effect any transaction described in, approved by, or necessary or appropriate to effectuate the Plan, including,  (i) the execution and delivery of appropriate agreements or other documents of merger, consolidation, restructuring, conversion, disposition, transfer, dissolution, or liquidation containing terms that are consistent with the terms of the Plan and the Plan Supplement and that satisfy the requirements of applicable law and any other terms to which the applicable entities may agree; (ii) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any Asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan and having other terms to which the applicable parties agree; (iii) the filing of appropriate organizational documents governing the Post-Effective Date Debtors, including the Post-Effective Date Debtors' respective Amended Organizational Documents, and any amendments or restatements thereto, or any documents governing any Post-Effective Date Debtor's reincorporation, merger, consolidation, conversion, or dissolution pursuant to applicable law and, as necessary, other constituent documents, including, without limitation, the organizational documents governing non-Debtor subsidiaries, as permitted by the laws of their respective states of incorporation; (iv) the Restructuring Transactions; and (v) all other actions that the applicable entities determine to be necessary or appropriate, including, making filings or recordings that may be required by applicable law.

### 5.17   *Corporate Action.*

(a)     Upon the Effective Date, all actions contemplated by this Plan shall be deemed authorized and approved in all respects, including (i) entry into or execution of the Credit Bid Purchase Agreement and consummation of the transactions contemplated therein, (ii) the assumption and assumption and assignment of executory contracts and unexpired leases as provided herein, (iii) the appointment of the Plan Administrator and the FWE I Sole Manager, (iv) the entry into or execution of the Apache Definitive Documents and all documentation relating thereto, including the Initial Plan of Merger and Standby Credit Facility Documents, (v) the entry into or execution of any Additional Predecessor Agreement Documents and all documentation relating thereto, including any plan of merger, divisional merger, or the creation of a new entity, (vi) entry into or execution of the Exit Facility Documents (and any other documentation related thereto, including the New Intercreditor Agreement), (vii) any other Restructuring Transaction, and (viii) all other actions contemplated by the Plan (whether to occur before, on, or after the Effective Date), in each case in accordance with and subject to the terms hereof.  All matters provided for in this Plan involving the corporate or limited liability company structure of the Debtors or the Post-Effective Date Debtors, and any corporate or limited liability company action required by the Debtors or the Post-Effective Date Debtors in connection with

this Plan shall be deemed to have occurred and shall be in effect, without any requirement of further action by the security holders, directors, managers, or officers of the Debtors or the Post-Effective Date Debtors.

(b)     On or before (as applicable) the Effective Date, the appropriate directors, officers, and managers of the Debtors, the Plan Administrator, or the FWE I Sole Manager, as applicable, shall be authorized and directed to issue, execute, and deliver the agreements, documents, securities, and instruments contemplated by this Plan (or necessary or desirable to effect the transactions contemplated by this Plan).     The authorizations and approvals contemplated by this Section 5.17 shall be effective notwithstanding any requirements under nonbankruptcy law.

### 5.18     *Cancellation of Existing Securities and Agreements.*

Except for the purpose of evidencing a right to and allowing holders of Claims to receive a distribution under this Plan, and except as otherwise set forth in the Plan, or in the Plan Supplement or any related agreement, instrument, or document, on the Effective Date, all agreements, instruments, notes, certificates, indentures, mortgages, security documents, reimbursement obligations, and other instruments or documents evidencing or creating any prepetition Claim or Interest (collectively, the "**Cancelled Agreements**") (except that the following shall not be Cancelled Agreements: (i) the agreements, instruments, notes, certificates, indentures, mortgages, security documents, and other instruments or documents governing, relating to and/or evidencing certain Intercompany Interests not modified by the Plan and any rights of any holder in respect thereof and (ii) the Decommissioning Agreement, and any and all bonds and letters of credit constituting Decommissioning Security) shall be deemed cancelled and of no force or effect and the Debtors shall not have any continuing obligations thereunder; *provided*, *however*, that each of the Cancelled Agreements shall continue in effect solely for the purposes of, (x) allowing holders of Claims or Interests to receive distributions under the Plan on account of such Claims or Interests and (y) allowing and preserving the rights of the Prepetition FLFO Administrative Agent, the Prepetition FLFO Collateral Agent, the Prepetition FLTL Agents, the Prepetition SLTL Administrative Agent, and the DIP Agent, as applicable, to (1) make distributions on account of such Claims or Interests; (2) maintain, enforce, and exercise their respective liens, including any charging liens, as applicable, under the terms of the applicable agreements, or any related or ancillary document, instrument, agreement, or principle of law, against any money or property distributed or allocable on account of such Claims, as applicable; (3) seek compensation and reimbursement for any reasonable and documented fees and expenses incurred in connection with the implementation of the Plan required to be paid pursuant to the applicable agreement; (4) maintain, enforce, and exercise any right or obligation to compensation, indemnification, expense reimbursement, or contribution, or any other claim or entitlement that the Prepetition FLFO Administrative Agent, the Prepetition FLFO Collateral Agent, the Prepetition FLTL Agents, the Prepetition SLTL Administrative Agent, and the DIP Agent may have under this Plan, the applicable credit agreements, collateral agreements, pledge agreements, direction letters or other related documents; and (5) appear and raise issues in these Chapter 11 Cases or in any proceeding in the Bankruptcy Court or any other court after the Effective Date on matters relating to this Plan or the applicable credit agreements; *provided*, *further*, that the Prepetition FLFO Administrative Agent, the Prepetition FLFO Collateral Agent, the Prepetition FLTL Agents, the Prepetition SLTL Administrative Agent, and the DIP Agent

may take such further action to implement the terms of the Plan, including the Restructuring Transactions, as agreed to with the Debtors or the Post-Effective Date Debtors, as applicable to the extent not inconsistent with the Confirmation Order or this Plan.

### 5.19 *Cancellation of Certain Existing Security Interests.*

Upon the full payment or other satisfaction of an Allowed Other Secured Claim, or promptly thereafter, the holder of such Allowed Other Secured Claim shall deliver to the Debtors or the Post-Effective Date Debtors, as applicable, any Collateral or other property of a Debtor held by such holder, together with any termination statements, instruments of satisfaction, or releases of all security interests with respect to its Allowed Other Secured Claim that may be reasonably required to terminate any related financing statements, mortgages, mechanics' or other statutory Liens, or lis pendens, or similar interests or documents.

Except, for the avoidance of doubt, with respect to any mortgages, deeds of trust, Liens, pledges, and any other security interests of the Prepetition FLFO Administrative Agent or the Exit Facility Agents, after the Effective Date and in accordance with the terms of the Confirmation Order, the Debtors or the Post-Effective Date Debtors, at their expense, may, in their sole discretion, take any action necessary to terminate, cancel, extinguish, and/or evidence the release of any and all mortgages, deeds of trust, Liens, pledges, and other security interests with respect to any Claim or Interest, including, without limitation, the preparation and filing of any and all documents necessary to terminate, satisfy, or release any mortgages, deeds of trust, Liens, pledges, and other security interests held by the Prepetition Agents, including, without limitation, UCC-3 termination statements and mortgage release documentation.

### 5.20 *Intercompany Interests; Corporate Reorganization.*

To the extent reinstated under the Plan, on the Effective Date, the Intercompany Interests (a) shall be reinstated for the ultimate benefit of the holders of Claims and Interests as set forth in the Plan (b) without the need for any further corporate action or approval of any board of directors, board of managers, managers, management, or stockholders of any Debtor or Post-Effective Date Debtor, as applicable, the certificates and all other documents representing the Intercompany Interests shall be deemed to be in full force and effect.

### 5.21 *Restructuring Transactions.*

On the Effective Date or as soon as reasonably practicable thereafter, the Debtors or the Post-Effective Date Debtors, acting through the Plan Administrator, or the FWE I Sole Manager, as applicable, may take all actions consistent with the Plan and the Confirmation Order, as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Restructuring Transactions under and in connection with the Plan.

### 5.22 *Liquidating Trust.*

In the event the Plan Administrator determines, in its discretion, that to carry out and implement the provisions of this Plan certain assets should be transferred to a liquidating trust for the benefit of one or more classes of Claims, (1) the terms of the liquidating trust shall

be set forth in a liquidating trust agreement, (2) the liquidating trust shall be structured to qualify as a "liquidating trust" within the meaning of Treasury Regulations section 301.7701-4(d) and in compliance with Revenue Procedure 94-45, 1994-2 C.B. 684, and, thus, as a "grantor trust" within the meaning of sections 671 through 679 of the Tax Code of which the holders of Claims who become the liquidating trust beneficiaries (as determined for U.S. federal income tax purposes) are the owners and grantors, consistent with the terms of the Plan, (3) the sole purpose of the liquidating trust shall be the liquidation and distribution of the assets transferred to the liquidating trust in accordance with Treasury Regulations section 301.7701-4(d), including the resolution of Claims, with no objective to continue or engage in the conduct of a trade or business, (4) all parties (including the Debtors, holders of Claims, and the trustee of the liquidating trust) shall report consistently with such treatment (including the deemed receipt of the underlying assets, subject to applicable liabilities and obligations, by the holders of Allowed Claims, as applicable, followed by the deemed transfer of such assets to the liquidating trust), (5) all parties shall report consistently with the valuation of the assets transferred to the liquidating trust as determined by the trustee of the liquidating trust (or its designee), (6) the trustee of the liquidating trust shall be responsible for filing returns for the trust as a grantor trust pursuant to Treasury Regulations section 1.671-4(a), and (7) the trustee of the liquidating trust shall annually send to each holder of an interest in the liquidating trust a separate statement regarding the receipts and expenditures of the trust as relevant for U.S. federal income tax purposes. Subject to definitive guidance from the Internal Revenue Service or a court of competent jurisdiction to the contrary (including the receipt by the trustee of the liquidating trust of a private letter ruling if the trustee so requests one, or the receipt of an adverse determination by the Internal Revenue Service upon audit if not contested by the trustee), the trustee of the liquidating trust may timely elect to (y) treat any portion of the liquidating trust allocable to Disputed Claims as a "disputed ownership fund" governed by Treasury Regulations section 1.468B-9 (and make any appropriate elections) and (z) to the extent permitted by applicable law, report consistently with the foregoing for state and local income tax purposes. If a "disputed ownership fund" election is made, (i) all parties (including the Debtors, holders of Claims, and the trustee of the liquidating trust) shall report for U.S. federal, state, and local income tax purposes consistently with the foregoing, and (ii) any tax imposed on the liquidating trust with respect to assets allocable to Disputed Claims (including any earnings thereon and any gain recognized upon the actual or deemed disposition of such assets) will be payable out of such assets and, in the event of insufficient Cash to pay any such taxes, the trustee of the liquidating trust may sell all or part of such assets to pay the taxes. The trustee of the liquidating trust may request an expedited determination of taxes of the liquidating trust, including any reserve for Disputed Claims, under section 505(b) of the Bankruptcy Code for all tax returns filed for, or on behalf of, the liquidating trust for all taxable periods through the dissolution of the liquidating trust.

### 5.23   *Securities Exemptions.*

(a)     The offer, issuance, and distribution of the New Equity Interests (other than the Backstop Commitment Premium Equity Interests, the New Money Warrants, or any New Equity Interests issued upon exercise of the New Money Warrants or under the Management Incentive Plan), the Subscription Rights, the SLTL Warrants, and the GUC Warrants to holders of Allowed FLTL Claims, Allowed SLTL Claims, and General Unsecured Claims, as applicable, under Article IV of this Plan, and the New Equity Interests issued upon exercise of the Subscription Rights, the SLTL Warrants, or the GUC Warrants, shall be exempt,

pursuant to section 1145 of the Bankruptcy Code, without further act or actions by any Person, from registration under the Securities Act, and all rules and regulations promulgated thereunder, and any other applicable securities laws, to the fullest extent permitted by section 1145 of the Bankruptcy Code. The New Equity Interests, the Subscription Rights, the SLTL Warrants, and GUC Warrants issued pursuant to section 1145(a) of the Bankruptcy Code may be resold without registration under the Securities Act or other federal securities laws pursuant to the exemption provided by section 4(a)(1) of the Securities Act, unless the holder is an "underwriter" with respect to such Securities, as that term is defined in section 1145(b) of the Bankruptcy Code. In addition, such section 1145 exempt Securities generally may be resold without registration under state securities laws pursuant to various exemptions provided by the respective laws of the several states.

(b)     The issuance and sale of the Backstop Commitment Premium Equity Interests, and the New Money Warrants (including any New Equity Interests issued upon exercise of the New Money Warrants) under this Plan shall be exempt from registration under the Securities Act or any other applicable securities laws to the fullest extent permitted by section 4(a)(2) of the Securities Act and/or Regulation D thereunder. The Backstop Commitment Premium Equity Interests, and the New Money Warrants (including any New Equity Interests issued upon exercise of the New Money Warrants) issued in reliance on the exemption from registration set forth in section 4(a)(2) of the Securities Act and/or Regulation D thereunder, will be considered "restricted securities" and may not be transferred except pursuant to an effective registration statement or under an available exemption from the registration requirements of the Securities Act, such as, under certain conditions, the resale provisions of Rule 144 of the Securities Act.

(c)     None of the Debtors, NewCo and its subsidiaries (including the Credit Bid Purchaser), or any other Person shall be required to provide any further evidence other than the Plan or the Confirmation Order with respect to the treatment of the New Equity Interests (including any New Equity Interests issued upon exercise of the Subscription Rights, the New Money Warrants, the SLTL Warrants or the GUC Warrants), the Subscription Rights, the New Money Warrants, the SLTL Warrants, or the GUC Warrants, under applicable securities laws. DTC and any transfer agent (as applicable) shall be required to accept and conclusively rely upon the Plan or Confirmation Order in lieu of a legal opinion regarding whether the New Equity Interests (including any New Equity Interests issued upon exercise of the Subscription Rights, the New Money Warrants, the SLTL Warrants or the GUC Warrants), the Subscription Rights, the New Money Warrants, the SLTL Warrants, or the GUC Warrants are exempt from registration and/or eligible for DTC book-entry delivery, settlement, and depository services (to the extent applicable).

(d)     Notwithstanding anything to the contrary in this Plan, no Person (including DTC and any transfer agent) shall be entitled to require a legal opinion regarding the validity of any transaction contemplated by the Plan, including whether the New Equity Interests (including any New Equity Interests issued upon exercise of the Subscription Rights, the New Money Warrants, the SLTL Warrants or the GUC Warrants), the Subscription Rights, the New Money Warrants, the SLTL Warrants, or the GUC Warrants are exempt from registration and/or eligible for DTC book-entry delivery, settlement, and depository services.

**5.24** *Closing of Chapter 11 Cases.*

After the Effective Date, the Plan Administrator shall be authorized, but not directed, to submit an order to Bankruptcy Court under certification of counsel that is in form and substance acceptable to the U.S. Trustee that closes and issues a final decree for each of the Chapter 11 Cases.

## ARTICLE VI.    DISTRIBUTIONS.

**6.1** *Distributions Generally.*

The Plan Administrator shall make all Distributions to the appropriate holders of Allowed Claims in accordance with the terms of this Plan.

**6.2** *No Postpetition Interest on Claims.*

Except with respect to the FLFO Claims of the Prepetition FLFO Secured Parties or as otherwise specifically provided for in the Plan, the Confirmation Order, or another order of the Bankruptcy Court, postpetition interest shall not accrue or be paid on any Claims, and no holder of a Claim shall be entitled to interest accruing on such Claim on or after the Petition Date.

**6.3** *Date of Distributions.*

Except as otherwise provided in this Plan, the Plan Administrator shall make Plan Distributions to holders of Allowed Claims after (a) funding of the Professional Fee Escrow and (b) satisfaction in full or establishment of reserves sufficient to pay claims in the Claims Reserve, as soon as reasonably practicable after the Effective Date and thereafter, the Plan Administrator shall from time to time determine the subsequent Distribution Dates.

**6.4** *Distribution Record Date.*

As of the close of business on the Distribution Record Date, the various lists of holders of Claims in each Class as maintained by the Debtors or their agents, shall be deemed closed, and there shall be no further changes in the record holders of any Claims after the Distribution Record Date. Neither the Debtors nor the Plan Administrator shall have any obligation to recognize any transfer of a Claim occurring after the close of business on the Distribution Record Date. In addition, with respect to payment of any Cure Amounts or disputes over any Cure Amounts, neither the Debtors nor the Plan Administrator shall have any obligation to recognize or deal with any party other than the non-Debtor party to the applicable executory contract or unexpired lease, even if such non-Debtor party has sold, assigned, or otherwise transferred its Claim for a Cure Amount.

### 6.5    *Distributions after Effective Date*

Distributions made after the Effective Date to holders of Disputed Claims that are not Allowed Claims as of the Effective Date but which later become Allowed Claims shall be deemed to have been made on the Effective Date.

### 6.6    *Delivery of Distributions.*

Subject to Bankruptcy Rule 9010, the Plan Administrator shall make all Distributions to any holder of an Allowed Claim as and when required by this Plan at (a) the address of such holder on the books and records of the Debtors or their agents or (b) at the address in any written notice of address change delivered to the Debtors or the Plan Administrator, including any addresses included on any transfers of Claim filed pursuant to Bankruptcy Rule 3001.  In the event that any Distribution to any holder is returned as undeliverable, no Distribution or payment to such holder shall be made unless and until the Plan Administrator has been notified of the then-current address of such holder, at which time or as soon thereafter as reasonably practicable such Distribution shall be made to such holder without interest.

### 6.7    *Unclaimed Property.*

One year from the later of: (a) the Effective Date and (b) the date that is ten (10) Business Days after the date a Claim is first Allowed, all distributions that remain payable on account of such Claim shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code and shall revert to the Post-Effective Date Debtors or their successors or assigns, and all claims of any other Person (including the holder of a Claim in the same Class) to such distribution shall be discharged and forever barred.  The Post-Effective Date Debtors and the Plan Administrator shall have no obligation to attempt to locate any holder of an Allowed Claim other than by reviewing the Debtors' books and records and the Bankruptcy Court's filings.

For the avoidance of doubt, a distribution shall be deemed unclaimed if a holder has not: (a) accepted a particular distribution or, in the case of distributions made by check, negotiated such check; (b) given notice to the Post-Effective Date Debtors or the Plan Administrator of an intent to accept a particular distribution; (c) responded to the Debtors', the Post-Effective Date Debtors', or the Plan Administrator's requests for information necessary to facilitate a particular distribution; or (d) taken any other action necessary to facilitate such distribution.

### 6.8    *Satisfaction of Claims.*

Unless otherwise provided herein, any distributions and deliveries to be made on account of Allowed Claims under the Plan shall be in complete and final satisfaction, settlement, and discharge of and exchange for such Allowed Claims.

### 6.9    *Manner of Payment under Plan.*

Except as specifically provided herein, at the option of the Debtors, the Post-Effective Date Debtors, or the Plan Administrator, as applicable, any Cash payment to be made

under the Plan may be made by a check or wire transfer or as otherwise required or provided in applicable agreements or customary practices of the Debtors.

### 6.10 *De Minimis Cash Distributions.*

The Plan Administrator shall not be required to make any payment to any holder of an Allowed Claim on any Distribution Date of Cash in an amount less than one-hundred dollars ($100); *provided*, *however*, that if any Plan Distribution is not made pursuant to this Section 6.10, such Distribution shall be added to any subsequent Plan Distribution to be made on behalf of the holder's Allowed Claim. The Plan Administrator shall not be required to make any final Plan Distributions of Cash in an amount less than fifty dollars ($50) to any holder of an Allowed Claim. If the amount of any final Plan Distributions to holders of Allowed Claims would be fifty dollars ($50) or less, then no further Plan Distribution shall be made by the Plan Administrator and any surplus Cash shall be donated and distributed to a Tax Code § 501(c)(3) tax-exempt organization selected by the Plan Administrator.

### 6.11 *No Distribution in Excess of Amount of Allowed Claim.*

Notwithstanding anything to the contrary in this Plan, no holder of an Allowed Claim shall receive, on account of such Allowed Claim, Plan Distributions in excess of the Allowed amount of such Claim.

### 6.12 *Allocation of Distributions Between Principal and Interest.*

Except with respect to the FLFO Claims of the Prepetition FLFO Secured Parties or as otherwise required by law, consideration received in respect of an Allowed Claim is allocable first to the principal amount of the Claim (as determined for U.S. federal income tax purposes) and then, to the extent of any excess, to the remainder of the Claim, including any Claim for accrued but unpaid interest.

### 6.13 *Setoffs and Recoupments.*

Each Post-Effective Date Debtor, or such entity's designee as instructed by such Post-Effective Date Debtor or the Plan Administrator, may, pursuant to section 553 of the Bankruptcy Code or applicable nonbankruptcy law, offset or recoup against any Allowed Claim, and the distributions to be made pursuant to the Plan on account of such Allowed Claim any and all claims, rights, and Causes of Action that a Post-Effective Date Debtor or its successors may hold against the holder of such Allowed Claim after the Effective Date to the extent such setoff or recoupment is either (a) agreed in amount among the relevant Post-Effective Date Debtor(s), and holder of the Allowed Claim or (b) otherwise adjudicated by the Bankruptcy Court or another court of competent jurisdiction; *provided*, that neither the failure to effect a setoff or recoupment nor the allowance of any Claim hereunder shall constitute a waiver or release by a Post-Effective Date Debtor or its successor of any claims, rights, or Causes of Action that a Post-Effective Date Debtor or its successor or assign may possess against such holder.

### 6.14   _Withholding and Reporting Requirements._

(a)      _Withholding Rights._  In connection with this Plan, any party issuing any instrument or making any Plan Distribution described in this Plan shall comply with all applicable tax withholding and reporting requirements imposed by any Governmental Unit, and all Plan Distributions pursuant to this Plan and all related agreements shall be subject to any such withholding or reporting requirements.  Notwithstanding the foregoing, each holder of an Allowed Claim or any other Person that receives a Plan Distribution pursuant to this Plan shall have responsibility for any taxes imposed by any Governmental Unit, including, income, withholding, and other taxes, on account of such Plan Distribution.  Any party issuing any instrument or making any Plan Distribution pursuant to this Plan has the right, but not the obligation, to not make a Plan Distribution until such holder has made arrangements satisfactory to such issuing or disbursing party for payment of any such tax obligations.  Notwithstanding any provision in the Plan to the contrary, any party issuing any instrument or making any Plan Distribution pursuant to this Plan shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions or establishing any other mechanisms they believe are reasonable and appropriate.

(b)      _Forms._ Any party entitled to receive any property as an issuance or Plan Distribution under this Plan shall, upon reasonable request, deliver to the Plan Administrator or such other Person designated by the Plan Administrator (which entity shall subsequently deliver to the Plan Administrator or such other Person any applicable IRS Form W-8 or Form W-9 received) an appropriate Form W-9 or (if the payee is a non-U.S. Person) Form W-8, unless such Person is exempt under the Tax Code and so notifies the Plan Administrator or such other Person.  If such request is made by the Plan Administrator or such other Person designated by the Plan Administrator and the holder fails to comply before the date that is 210 days after the request is made, the amount of such Plan Distribution shall irrevocably revert to the Debtors and any Claim in respect of such Plan Distribution shall be discharged and forever barred from assertion against any Debtor and its respective property.

### 6.15   _Claims Paid by Third Parties._

The Plan Administrator shall reduce in full a Claim, and such Claim shall be Disallowed without a Claims objection having to be filed and without any further notice to or action, order, or approval of the Bankruptcy Court, to the extent that the holder of such Claim receives payment in full on account of such Claim from a party that is not the Debtors or the Post-Effective Date Debtors.  If a holder of a Claim receives a Distribution from the Debtors or the Post-Effective Date Debtors on account of such Claim and also receives payment from a third party on account of such Claim, such holder shall, within fourteen (14) days of receipt thereof, repay or return the Plan Distribution to the Debtors or the Post-Effective Date Debtors, to the extent the holder's total recovery on account of such Claim from the third party and under this Plan exceeds the total Allowed amount of such Claim as of the date of any such Plan Distribution under this Plan.  The failure of such holder to timely repay or return such Distribution shall result in the holder owing the Post-Effective Date Debtors interest on such

amount owed for each Business Day after the 14-day grace period specified above until the amount is repaid.

### 6.16  *Claims Payable by Third Parties.*

No Distributions shall be made on account of an Allowed Claim that is payable pursuant to one of the insurance policies to which the Debtors' are a beneficiary until the holder of such Allowed Claim has exhausted all remedies with respect to such insurance policy; *provided*, *however*, that this Section 6.16 shall not restrict Plan Distributions on an Allowed Claim that is Allowed in an amount that does not exceed an applicable self-insured retention or deductible amount under one or more such insurance policies.  To the extent that one or more of the insurers agrees to satisfy a Claim in whole or in part, then immediately upon such insurers' satisfaction, such Claim may be expunged to the extent of any agreed upon satisfaction on the Claims register by the Plan Administrator without a Claims objection having to be filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

## ARTICLE VII.  PROCEDURES FOR DISPUTED CLAIMS.

### 7.1  *Allowance of Claims.*

Except as expressly provided in the Plan or in any order entered in the Chapter 11 Cases before the Effective Date (including the Confirmation Order), no Claim shall become an Allowed Claim unless and until such Claim is deemed Allowed pursuant to the Plan or a Final Order, including the Confirmation Order (when it becomes a Final Order), Allowing such Claim. On and after the Effective Date, each of the Debtors or the Post-Effective Date Debtors shall have and retain any and all rights and defenses such Debtor had with respect to any Claim immediately before the Effective Date.

### 7.2  *Claims Objections.*

Except insofar as a Claim is Allowed under the Plan, the Debtors or the Post-Effective Date Debtors (acting through the Plan Administrator), as applicable, shall be entitled to object to Claims.  Except as otherwise expressly provided in the Plan and notwithstanding any requirements that may be imposed pursuant to Bankruptcy Rule 9019, after the Effective Date, the Post-Effective Date Debtors and the Plan Administrator shall have the authority (a) to file, withdraw, or litigate to judgment objections to Claims; (b) to settle or compromise any Disputed Claim without any further notice to or action, order, or approval by the Bankruptcy Court; and (c) to administer and adjust the Debtors' claims register to reflect any such settlements or compromises without any further notice to or action, order, or approval by the Bankruptcy Court.

### 7.3  *Estimation of Claims.*

Before or after the Effective Date, the Debtors, the Post-Effective Date Debtors, and the Plan Administrator may at any time request that the Bankruptcy Court estimate any Disputed Claim that is contingent or unliquidated pursuant to section 502(c) of the Bankruptcy Code for any reason, regardless of whether any party previously has objected to such Claim or

whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction to estimate any such Claim, including during the litigation of any objection to any Claim or during the appeal relating to such objection. In the event that the Bankruptcy Court estimates any Disputed, contingent, or unliquidated Claim, that estimated amount shall constitute either the Allowed amount of such Claim or a maximum limitation on such Claim for all purposes under the Plan (including for purposes of distributions), as determined by the Bankruptcy Court. If the estimated amount constitutes a maximum limitation of the amount of such Claim, the Debtors, the Post-Effective Date Debtors, or the Plan Administrator, as applicable, may elect to pursue any supplemental proceedings to object to any ultimate distribution on such Claim. Notwithstanding section 502(j) of the Bankruptcy Code, in no event shall any holder of a Claim that has been estimated pursuant to section 502(c) of the Bankruptcy Code or otherwise be entitled to seek reconsideration of such estimation unless such holder has filed a motion requesting the right to seek such reconsideration on or before 21 days after the date on which such Claim is estimated.

### 7.4    *Adjustment to Claims Register Without Objection.*

Any duplicate Claim or Interest or any Claim or Interest that has been paid or satisfied, or any Claim that has been amended or superseded, may be adjusted or expunged on the claims register by the Debtors or the Post-Effective Date Debtors (at the direction of the Plan Administrator) upon stipulation between the parties in interest without a Claims objection having to be filed and without any further notice or action, order, or approval of the Bankruptcy Court.

### 7.5    *Time to File Objections to Claims.*

Any objections to a Claim shall be filed on or before the date that is the later of (a) 180 days after the Effective Date and (b) such later date as may be fixed by the Bankruptcy Court, after notice and a hearing, upon a motion by the Post-Effective Date Debtors, as such deadline may be extended from time to time.

### 7.6    *Disallowance of Claims.*

Any Claims held by Entities from which property is recoverable under sections 542, 543, 550, or 553 of the Bankruptcy Code or that is a transferee of a transfer avoidable under sections 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code, shall be deemed Disallowed pursuant to section 502(d) of the Bankruptcy Code, and holders of such Claims may not receive any distributions on account of such Claims until such time as such Causes of Action against that Entity have been settled or a Bankruptcy Court order with respect thereto has been entered and all sums due, if any, to the Debtors by that Entity have been turned over or paid to the Debtors or the Post-Effective Date Debtors.

### 7.7    *Amendments to Claims.*

On or after the Effective Date, except as provided in the Plan or the Confirmation Order, a Claim may not be filed or amended without the prior authorization of the Bankruptcy Court, and the Post-Effective Date Debtors.

### 7.8 *No Distributions Pending Allowance.*

If an objection, motion to estimate, or other challenge to a Claim is filed, no payment or distribution provided under the Plan shall be made on account of such Claim unless and until (and only to the extent that) such Claim becomes an Allowed Claim.

### 7.9 *Distributions After Allowance.*

To the extent that a Disputed Claim ultimately becomes an Allowed Claim, distributions (if any) shall be made to the holder of such Allowed Claim in accordance with the provisions of the Plan. As soon as practicable after the date on which the order or judgment of the Bankruptcy Court allowing any Disputed Claim becomes a Final Order, the Plan Administrator shall provide to the holder of such Allowed Claim the distribution (if any) to which such holder is entitled under the Plan as of the Effective Date, without any interest to be paid on account of such Claim unless required by the Bankruptcy Code.

### 7.10 *Claims Resolution Procedures Cumulative.*

All of the Claims and objection, estimation, and resolution procedures are cumulative and not exclusive of one another. Claims may be estimated and subsequently compromised, settled, withdrawn, or resolved in accordance with the Plan or any mechanism approved by the Bankruptcy Court.

## ARTICLE VIII.    EXECUTORY CONTRACTS AND UNEXPIRED LEASES.

### 8.1 *General Treatment.*

(a)     As of and subject to the occurrence of the Effective Date, all executory contracts and unexpired leases to which any of the Debtors are parties shall be deemed rejected, unless such contract or lease (i) was previously assumed or rejected by the Debtors pursuant to an order of the Bankruptcy Court; (ii) previously expired or terminated pursuant to its own terms or by agreement of the parties thereto; (iii) is the subject of a motion to assume filed by the Debtors on or before the Confirmation Date; (iv) is identified in Sections 8.4 or 8.5 of the Plan; or (v) is identified for assumption on the Schedule of Assumed Contracts included in the Plan Supplement, which Schedule of Assumed Contracts will identify executory contracts or unexpired leases for assumption and assignment to the Credit Bid Purchaser in accordance with the Credit Bid Purchase Agreement. To the extent the Decommissioning Agreement is an executory contract, it will be assumed and become the obligation of FWE I under the Initial Plan of Merger.

(b)     Subject to the occurrence of the Effective Date, entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of the assumptions, assumptions and assignments, or rejections provided for in the Plan pursuant to sections 365(a) and 1123 of the Bankruptcy Code and a determination by the Bankruptcy Court that the Credit Bid Purchaser or Post-Effective Date Debtors, as applicable, have provided adequate assurance of future performance under such assumed executory contracts and unexpired leases. Each executory

contract and unexpired lease assumed or assumed and assigned pursuant to the Plan shall vest in and be fully enforceable by the Credit Bid Purchaser or Post-Effective Date Debtors, as applicable, in accordance with its terms, except as modified by the provisions of the Plan, any order of the Bankruptcy Court authorizing and providing for its assumption, or applicable law.

(c)     To the maximum extent permitted by law, to the extent any provision in any executory contract or unexpired lease assumed pursuant to the Plan restricts or prevents, or purports to restrict or prevent, or is breached or deemed breached by, the assumption of such executory contract or unexpired lease (including any "change of control" provision), then such provision shall be deemed modified such that the transactions contemplated by the Plan shall not entitle the non-Debtor party thereto to terminate such executory contract or unexpired lease or to exercise any other default-related rights with respect thereto.

(d)     Subject to the terms of the Credit Bid Purchase Agreement, the Debtors reserve the right, on or before 5:00 p.m. (prevailing Central Time) on the date that is seven (7) days before the Confirmation Hearing, or such other time as may be agreed in writing between the Debtors and the applicable counterparty, to amend the Schedule of Assumed Contracts to add or remove any executory contract or unexpired lease; *provided* that if the Confirmation Hearing is adjourned or continued, such amendment right shall be extended to 5:00 p.m. (prevailing Central Time) on the date that is seven (7) days before the rescheduled or continued Confirmation Hearing, and this provision shall apply in the case of any and all subsequent adjournments and continuances of the Confirmation Hearing; *provided*, *further* that, subject to the terms of the Credit Bid Purchase Agreement, the Debtors may amend the Schedule of Assumed Contracts to add or delete any executory contracts or unexpired leases after such date to the extent agreed with the relevant counterparties and entry of an order of the Bankruptcy Court.

## 8.2     *Determination of Cure Amounts and Deemed Consent.*

(a)     Any Cure Amount shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the Cure Amount, as reflected in the applicable cure notice, in Cash on the Effective Date in accordance with the terms of the Credit Bid Purchase Agreement or on such other terms as the parties to such executory contracts or unexpired leases and the Debtors may otherwise agree.

(b)     The Debtors shall file, as part of the Plan Supplement, the Schedule of Assumed Contracts.  At least ten (10) days before the Confirmation Hearing, the Debtors shall serve a notice on parties to executory contracts or unexpired leases to be assumed or assumed and assigned reflecting the Debtors' intention to potentially assume or assume and assign to the Credit Bid Purchaser in accordance with the terms of the Credit Bid Purchase Agreement the contract or lease in connection with this Plan or the Credit Bid Purchase Agreement and, where applicable, setting forth the proposed Cure Amount (if any).  **Any objection by a counterparty to an executory contract or unexpired lease to the proposed assumption, assumption and assignment, or related Cure Amount must be filed, served, and actually received by the Debtors within ten (10) days of the service of the assumption notice, or such shorter period as agreed to by the parties or authorized by the Bankruptcy Court.**  Any counterparty to an executory contract or unexpired lease that does not timely object to the notice of the proposed

assumption of such executory contract or unexpired lease shall be deemed to have assented to assumption of the applicable executory contract or unexpired lease notwithstanding any provision thereof that purports to (i) prohibit, restrict, or condition the transfer or assignment of such contract or lease; (ii) terminate or modify, or permit the termination or modification of, a contract or lease as a result of any direct or indirect transfer or assignment of the rights of any Debtor under such contract or lease or a change, if any, in the ownership or control to the extent contemplated by the Plan; (iii) increase, accelerate, or otherwise alter any obligations or liabilities of any Debtor, or any Post-Effective Date Debtor, under such executory contract or unexpired lease; or (iv) create or impose a Lien upon any property or Asset of any Debtor, or Post-Effective Date Debtor, as applicable. Each such provision shall be deemed to not apply to the assumption of such executory contract or unexpired lease pursuant to the Plan and counterparties to assumed executory contracts or unexpired leases that fail to object to the proposed assumption in accordance with the terms set forth in this Section 8.2(b), shall forever be barred and enjoined from objecting to the proposed assumption or to the validity of such assumption (including with respect to any Cure Amounts or the provision of adequate assurance of future performance), or taking actions prohibited by the foregoing or the Bankruptcy Code on account of transactions contemplated by the Plan.

(c)     If there is an Assumption Dispute pertaining to assumption of an executory contract or unexpired lease (other than a dispute pertaining to a Cure Amount), such dispute shall be heard by the Bankruptcy Court before such assumption being effective; provided, that, subject to the terms of the Credit Bid Purchase Agreement, the Debtors or Post-Effective Date Debtors, as applicable, may settle any Assumption Dispute without any further notice to any party or any action, order, or approval of the Bankruptcy Court.

(d)     To the extent an Assumption Dispute relates solely to the Cure Amount, subject to the terms of the Credit Bid Purchase Agreement, the Debtors may assume and/or assume and assign the applicable executory contract or unexpired lease before the resolution of the Assumption Dispute; *provided*, that the Post-Effective Date Debtors or Credit Bid Purchaser, as applicable shall be responsible to pay the determined amount to be Allowed by the Bankruptcy Court or otherwise agreed to by such non-Debtor party. The Debtors or Post-Effective Date Debtors, as applicable, subject to the terms of the Credit Bid Purchase Agreement, may settle any dispute regarding the Cure Amount or the nature thereof without any further notice to any party or any action, order, or approval of the Bankruptcy Court.

(e)     Assumption or assumption and assignment of any executory contract or unexpired lease pursuant to the Plan or otherwise shall result in the full release and satisfaction of any Claims against any Debtor or defaults by any Debtor, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed executory contract or unexpired lease at any time before the date that the Debtors assume or assume and assign such executory contract or unexpired lease. Any proofs of Claim filed with respect to an executory contract or unexpired lease that has been assumed or assumed and assigned shall be deemed Disallowed and expunged, without further notice to or action, order, or approval of the Bankruptcy Court or any other Person, upon the assumption of such executory contract or unexpired leases.

### 8.3    *Rejection Damages Claims.*

In the event that the rejection of an executory contract or unexpired lease hereunder results in damages to the other party or parties to such contract or lease, any Claim for such damages shall be classified and treated in Class 6B (General Unsecured Claims).  A proof of such Claim must be filed with the Bankruptcy Court and served upon counsel for the Debtors, Post-Effective Date Debtor, or the Plan Administrator, as applicable, by the later of (i) thirty (30) days after the filing and service of the notice of the occurrence of the Effective Date; and (ii) thirty (30) days after entry of an Order rejecting such contract or lease if such contract or lease is the subject of a pending Assumption Dispute.

### 8.4    *Survival of the Debtors' Indemnification Obligations.*

Notwithstanding anything in the Plan (including Section 10.3 of the Plan), any Indemnification Obligation to indemnify current and former officers, directors, members, managers, agents, or employees with respect to all present and future actions, suits, and proceedings against the Debtors or such officers, directors, members, managers, agents, or employees based upon any act or omission for or on behalf of the Debtors shall (a) remain in full force and effect, (b) not be discharged, impaired, or otherwise affected in any way, including by the Plan, the Plan Supplement, or the Confirmation Order, (c) not be limited, reduced or terminated after the Effective Date, and (d) survive unimpaired and unaffected irrespective of whether such Indemnification Obligation is owed for an act or event occurring before, on or after the Petition Date, *provided*, that the Post-Effective Date Debtors shall not indemnify officers, directors, members, or managers, as applicable, of the Debtors for any claims or Causes of Action that are not indemnified by such Indemnification Obligation.  All such obligations shall be deemed and treated as executory contracts to be assumed by the Debtors under the Plan and shall continue as obligations of the Post-Effective Date Debtors.  Any claim based on the Debtors' obligations under the Plan shall not be a Disputed Claim or subject to any objection, in either case, by reason of section 502(e)(1)(B) of the Bankruptcy Code.

### 8.5    *Insurance Policies.*

(a)    All insurance policies to which any Debtor is a party as of the Effective Date, including any D&O Policy, shall be deemed to be and treated as executory contracts and shall be assumed by and vest in the applicable Debtors or the Post-Effective Date Debtors and shall continue in full force and effect thereafter in accordance with their respective terms. Coverage for defense and indemnity under the D&O Policy shall remain available to all individuals within the definition of "Insured" in any D&O Policy.

(b)    In addition, after the Effective Date, the Post-Effective Date Debtors or Plan Administrator shall not terminate or otherwise reduce the coverage under any D&O Policy (including any "tail policy") in effect as of the Petition Date, and any current and former directors, officers, members, managers, agents or employees of any of the Debtors who served in such capacity at any time before the Effective Date shall be entitled to the full benefits of any such D&O Policy for the full term of such policy regardless of whether such members,

managers, directors, and/or officers remain in such positions after the Effective Date to the extent set forth in such policies.

**8.6** _**Modifications, Amendments, Supplements, Restatements, or Other Agreements.**_

Unless otherwise provided herein or by separate order of the Bankruptcy Court, each executory contract and unexpired lease that is assumed shall include any and all modifications, amendments, supplements, restatements, or other agreements made directly or indirectly by any agreement, instrument, or other document that in any manner affects such executory contract or unexpired lease, without regard to whether such agreement, instruments, or other document is listed in any notices of assumed contracts.

**8.7** _**Reservation of Rights.**_

(a) Neither the exclusion nor the inclusion by the Debtors of any contract or lease on any exhibit, schedule, or other annex to the Plan or in the Plan Supplement, nor anything contained in the Plan, shall constitute an admission by the Debtors that any such contract or lease is or is not an executory contract or unexpired lease or that the Debtors or the Post-Effective Date Debtors or their respective affiliates has any liability thereunder.

(b) Except as explicitly provided in the Plan, nothing in the Plan shall waive, excuse, limit, diminish, or otherwise alter any of the defenses, claims, Causes of Action, or other rights of the Debtors or the Post-Effective Date Debtors under any executory or non-executory contract or unexpired or expired lease.

(c) Nothing in the Plan shall increase, augment, or add to any of the duties, obligations, responsibilities, or liabilities of the Debtors or the Post-Effective Date Debtors, as applicable, under any executory or non-executory contract or unexpired or expired lease.

(a) If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of its assumption under the Plan, the Debtors or the Post-Effective Date Debtors, as applicable, shall have thirty (30) days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease.

**ARTICLE IX.**     **CONDITIONS PRECEDENT TO OCCURRENCE OF EFFECTIVE DATE.**

**9.1** _**Conditions Precedent to Effective Date.**_

The Effective Date shall not occur unless all of the following conditions precedent have been satisfied or waived in accordance with the Plan:

(a) the Plan Supplement has been filed;

(b)    the Bankruptcy Court shall have entered the Confirmation Order, which order shall be a Final Order;

(c)    the Definitive Documents shall be (i) consistent with the Restructuring Support Agreement and otherwise acceptable to the parties thereto consistent with their respective consent and approval rights as set forth in the Restructuring Support Agreement [and (ii) acceptable to the Prepetition FLFO Administrative Agent and the First Lien Exit Facility Agent solely to the extent provided and consistent with their consent and approval rights as set forth in this Plan;

(d)    the Restructuring Support Agreement shall not have been terminated and shall remain in full force and effect;

(e)    all conditions precedent to the effectiveness of the Apache Definitive Documents shall have been satisfied or waived by the party having the right to waive the same;

(f)    the Debtors shall have implemented the Restructuring Transactions and all other transactions contemplated by the Plan and the Restructuring Support Agreement in a manner consistent in all respects with the Plan and Restructuring Support Agreement;

(g)    the Amended Organizational Documents shall become effective and in full force and effect as of the Effective Date;

(h)    the NewCo Organizational Documents shall become effective and in full force and effect as of the Effective Date;

(i)    the conditions precedent to the effectiveness of the First Lien Exit Facility Commitment Letter shall have been satisfied or duly waived in writing;

(j)    the conditions precedent to the effectiveness of the Second Lien Backstop Commitment Letter shall have been satisfied or duly waived in writing;

(k)    the conditions precedent to the effectiveness of the FLTL ERO Backstop Agreement shall have been satisfied or duly waived in writing;

(l)    the conditions precedent to the effectiveness of the SLTL ERO Backstop Agreement shall have been satisfied or duly waived in writing

(m)    the conditions precedent to the effectiveness of the First Lien Exit Facility (as determined in the First Lien Exit Facility Documents and the First Lien Exit Facility Commitment Letter) shall have been satisfied or duly waived in writing and the First Lien Exit Facility Lenders and the First Lien Exit Facility shall have closed substantially simultaneously with the effectiveness of the Plan;

(n)    the conditions precedent to the effectiveness of the Second Lien Exit Facility (as determined in the Second Lien Exit Facility Documents and the Second Lien Backstop Commitment Letter) shall have been satisfied or duly waived in writing and the Second

Lien Exit Facility Lenders and the Second Lien Exit Facility shall have closed substantially simultaneously with the effectiveness of the Plan;

(o)     the New Intercreditor Agreement shall have been executed and delivered by each of the parties thereto;

(p)     the Equity Rights Offerings shall have been consummated;

(q)     the conditions precedent to the effectiveness of the Credit Bid Purchase Agreement shall have been satisfied or duly waived in writing in accordance with the terms of the Credit Bid Purchase Agreement and the Credit Bid Transaction Closing shall have occurred or will occur simultaneously with the effectiveness of the Plan, including, without limitation, payment of the New Money Consideration by Buyers to Sellers at Closing pursuant to the terms thereof;

(r)     the Debtors shall have obtained all authorizations, consents, regulatory approvals, rulings, or documents (other than any such authorization, consent, regulatory approval, ruling, or document that is customarily obtained or completed after assignment, conveyance or vesting of an applicable Asset) that, after giving effect to the entry of the Confirmation Order, are necessary to implement and effectuate the Plan, including Bankruptcy Court approval, and each of the other transactions contemplated by the Restructuring, and such authorizations, consents, regulatory approvals, rulings, or documents shall not be subject to unfulfilled conditions and shall be in full force and effect, and all applicable regulatory waiting periods shall have expired;

(s)     no event of default under the DIP Documents shall have occurred or be continuing and an acceleration of the obligations or termination of the DIP Lenders' commitments under the DIP Documents shall not have occurred; and

(t)     all Restructuring Expenses shall have been indefeasibly paid in full in accordance with Section 2.6.

**9.2     _Waiver of Conditions Precedent._**

(a)     With the prior written consent of the Required DIP Lenders, the Requisite FLTL Lenders, the conditions precedent to the occurrence of the Effective Date set forth in Section 9.1 of the Plan may be waived, in whole or in part, by the Debtors, without leave of or order of the Bankruptcy Court; _provided that_, a waiver of the conditions precedent to the occurrence of the Effective Date set forth in Sections 9.1(c), (d), (e), and (f) of the Plan shall also require the prior written consent of the Apache PSA Parties; _provided_, _further_, that a waiver of any of the conditions precedent to the occurrence of the Effective Date in Section 9.1 above shall also require the prior written (i) consent of the Prepetition FLFO Administrative Agent and the Exit First Lien Agent for all conditions precedent other than Section 9.1(d),(r), and (s) and (ii) reasonable consent for the conditions precedent in Section 9.1(r) and (s); _provided_, _further_, that a waiver of the conditions precedent to the occurrence of the Effective Date set forth in Sections 9.1(l), (p) and (t) shall also require the prior written consent of the Requisite SLTL Lenders. If any such condition precedent is waived pursuant to this section and the Effective Date occurs, each party agreeing to waive such condition precedent shall be estopped from withdrawing such

waiver after the Effective Date or otherwise challenging the occurrence of the Effective Date on the basis that such condition was not satisfied, the waiver of such condition precedent shall benefit from the "equitable mootness" doctrine, and the occurrence of the Effective Date shall foreclose any ability to challenge the Plan in any court. If the Plan is confirmed for fewer than all of the Debtors, only the conditions applicable to the Debtor or Debtors for which the Plan is confirmed must be satisfied or waived for the Effective Date to occur.

(b)     Except as otherwise provided herein, all actions required to be taken on the Effective Date shall take place and shall be deemed to have occurred simultaneously and no such action shall be deemed to have occurred before the taking of any other such action.

(c)     The stay of the Confirmation Order pursuant to Bankruptcy Rule 3020(e) shall be deemed waived by and upon the entry of the Confirmation Order, and the Confirmation Order shall take effect immediately upon its entry.

### 9.3     *Effect of Failure of a Condition.*

If the conditions listed in Section 9.1 of the Plan are not satisfied or waived in accordance with Section 9.2 of the Plan on or before the Effective Date, the Plan shall be null and void in all respects and nothing contained in the Plan or the Disclosure Statement shall (a) constitute a waiver or release of any Claims by or against or any Interests in the Debtors, (b) prejudice in any manner the rights of any Person, or (c) constitute an admission, acknowledgement, offer, or undertaking by the Debtors, any Consenting Creditors, or any other Person.

## ARTICLE X.     EFFECT OF CONFIRMATION.

### 10.1     *Binding Effect.*

Except as otherwise provided in section 1141(d)(3) of the Bankruptcy Code, and subject to the occurrence of the Effective Date, on and after the entry of the Confirmation Order, the provisions of the Plan shall bind every holder of a Claim against or Interest in any Debtor and inure to the benefit of and be binding on such holder's respective successors and assigns, regardless of whether the Claim or Interest of such holder is Impaired under the Plan and whether such holder has accepted the Plan.

### 10.2     *Vesting of Assets.*

Except as otherwise provided in the Plan, the Confirmation Order, or any Plan Supplement, on and after the Effective Date, pursuant to sections 1141(b) and (c) of the Bankruptcy Code, all Assets of the Estates, including all claims, rights, and Causes of Action and any property acquired by the Debtors or the Post-Effective Date Debtors during the Chapter 11 Cases or under or in connection with the Plan shall vest in each respective Post-Effective Date Debtor free and clear of all Claims, Liens, charges, other encumbrances, and interests (other than any and all Liens securing the FLFO Claims or the obligations under the First Lien Exit Facility). Subject to the terms of the Plan, on and after the Effective Date, the Post-Effective Date Debtors

and Plan Administrator may operate their businesses and may use, acquire, and dispose of property and prosecute, compromise, or settle any Claims (including any Administrative Expense Claims) and Causes of Action without notice to, supervision of or approval by the Bankruptcy Court and free and clear of any restrictions of the Bankruptcy Code or the Bankruptcy Rules other than restrictions expressly imposed by the Plan or the Confirmation Order. Without limiting the foregoing, the Post-Effective Date Debtors may pay the charges that they incur on or after the Confirmation Date for Professional Persons' fees, disbursements, expenses, or related support services without application to the Bankruptcy Court.

### 10.3 *Discharge of Claims Against and Interests in Debtors.*

Upon the Effective Date, except as otherwise expressly provided in the Plan or in the Confirmation Order, the distributions, rights and treatment to be made under the Plan, shall be in complete satisfaction, discharge, and release, effective as of the Effective Date, of Claims, Interests, and Causes of Action of any nature whatsoever, including any interest accrued on Claims or Interests from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against, and Interests in, the Debtors or any of their Assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims and Interests, including demands, liabilities, and Causes of Action that arose before the Effective Date, any liability (including withdrawal liability) to the extent such Claims or Interests relate to services performed by employees of the Debtors before the Effective Date and that arise from a termination of employment, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, any obligations incurred in connection with or related to bonds and letters of credit (and any related agreements) issued before the Petition Date on behalf of the Debtors, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not: (a) a proof of claim based upon such debt or right is filed or deemed filed pursuant to section 501 of the Bankruptcy Code; (b) a Claim or Interest based upon such debt, right, or Interest is Allowed pursuant to section 502 of the Bankruptcy Code; or (c) the holder of such a Claim or Interest has accepted the Plan. Any default or "event of default" by the Debtors or affiliates with respect to any Claim or Interest that existed immediately before or on account of the filing of the Chapter 11 Cases shall be deemed cured (and no longer continuing) as of the Effective Date. The Confirmation Order shall be a judicial determination of the discharge of all Claims and Interests subject to the Effective Date occurring.

Each holder (as well as any trustee or agent on behalf of such holder) of a Claim or Interest, and any affiliate of such holder, shall be deemed to have forever waived, released, and discharged the Debtors, to the fullest extent permitted by section 1141 of the Bankruptcy Code, of and from any and all Claims, Interests, rights, and liabilities that arose before the Effective Date. Except as otherwise provided in the Plan, upon the Effective Date, all such holders of Claims and Interests and their affiliates shall be forever precluded and enjoined, pursuant to sections 105, 524, and 1141 of the Bankruptcy Code, from prosecuting or asserting any such discharged Claim against or terminated Interest in any Debtor or any Post-Effective Date Debtor

### 10.4    *Pre-Confirmation Injunctions and Stays.*

Unless otherwise provided in the Plan or a Final Order of the Bankruptcy Court, all injunctions and stays arising under or entered during the Chapter 11 Cases, whether under sections 105 or 362 of the Bankruptcy Code or otherwise, and in existence on the date of entry of the Confirmation Order, shall remain in full force and effect until the later of the Effective Date and the date indicated in the order providing for such injunction or stay.

### 10.5    *Injunction Against Interference With Plan.*

Except as otherwise provided in the Plan or in the Confirmation Order, upon the entry of the Confirmation Order, all holders of Claims and Interests and all other parties in interest, along with their respective present and former affiliates, employees, agents, officers, directors, and principals, shall be enjoined from taking any action to interfere with the implementation or the occurrence of the Effective Date.

### 10.6    *Plan Injunction.*

(a)    Except as otherwise provided in the Plan or in the Confirmation Order, from and after the Effective Date, all Persons who have held, hold, or may hold Claims or Interests, and other parties in interest, along with their respective present or former employees, agents, officers, directors, principals, and affiliates, are, with respect to any such Claim or Interest, permanently enjoined after the entry of the Confirmation Order from: (i) commencing, conducting, or continuing in any manner, directly or indirectly, any suit, action, or other proceeding of any kind (including any proceeding in a judicial, arbitral, administrative, or other forum) against or affecting, directly or indirectly, a Debtor, a Post-Effective Date Debtor, or an Estate or the property of any of the foregoing, or any direct or indirect transferee of any property of, or direct or indirect successor in interest to, any of the foregoing Persons mentioned in this subsection (i) or any property of any such transferee or successor; (ii) enforcing, levying, attaching (including any prejudgment attachment), collecting, or otherwise recovering in any manner or by any means, whether directly or indirectly, any judgment, award, decree, or order against a Debtor, a Post-Effective Date Debtor, or an Estate or its property, or any direct or indirect transferee of any property of, or direct or indirect successor in interest to, any of the foregoing Persons mentioned in this subsection (ii) or any property of any such transferee or successor; (iii) creating, perfecting, or otherwise enforcing in any manner, directly or indirectly, any encumbrance of any kind against a Debtor, a Post-Effective Date Debtor, or an Estate or any of its property, or any direct or indirect transferee of any property of, or successor in interest to, any of the foregoing Persons mentioned in this subsection (iii) or any property of any such transferee or successor; (iv) acting or proceeding in any manner, in any place whatsoever, that does not conform to or comply with the provisions of the Plan to the full extent permitted by applicable law; and (v) commencing or continuing, in any manner or in any place, any action that does not comply with or is inconsistent with the provisions of the Plan; *provided*, that nothing contained in the Plan shall preclude such Persons who have held, hold, or may hold Claims against, or Interests in, a Debtor, a Post-Effective Date Debtor, or an Estate from exercising their rights and remedies, or obtaining benefits, pursuant to and consistent with the terms of the Plan.

(b)     By accepting distributions pursuant to the Plan, each holder of an Allowed Claim or Interest shall be deemed to have affirmatively and specifically consented to be bound by the Plan, including the injunctions set forth in Section 10.6 of the Plan.

### 10.7    *Releases.*

(a)     **RELEASES BY THE DEBTORS. AS OF THE EFFECTIVE DATE, EXCEPT FOR THE RIGHTS AND REMEDIES THAT REMAIN IN EFFECT FROM AND AFTER THE EFFECTIVE DATE TO ENFORCE THE PLAN, THE CONFIRMATION ORDER, THE OBLIGATIONS CONTEMPLATED BY THE DOCUMENTS IN THE PLAN SUPPLEMENT, THE APACHE DEFINITIVE DOCUMENTS, ANY ADDITIONAL PREDECESSOR AGREEMENT DOCUMENTS, THE CREDIT BID PURCHASE AGREEMENT, THE FIRST LIEN EXIT FACILITY COMMITMENT LETTER, THE SECOND LIEN BACKSTOP COMMITMENT LETTER, THE EQUITY RIGHTS OFFERINGS, THE ERO BACKSTOP AGREEMENTS, THE EXIT FACILITY DOCUMENTS, AND THE RESTRUCTURING TRANSACTIONS, ON AND AFTER THE EFFECTIVE DATE, THE RELEASED PARTIES WILL BE DEEMED CONCLUSIVELY, ABSOLUTELY, UNCONDITIONALLY, IRREVOCABLY, AND FOREVER RELEASED AND DISCHARGED, BY THE DEBTORS, THE POST-EFFECTIVE DATE DEBTORS, AND THE ESTATES, IN EACH CASE ON BEHALF OF THEMSELVES AND THEIR RESPECTIVE SUCCESSORS, ASSIGNS, AND REPRESENTATIVES AND ANY AND ALL OTHER PERSONS THAT MAY PURPORT TO ASSERT ANY CAUSE OF ACTION DERIVATIVELY, BY OR THROUGH THE FOREGOING PERSONS, FROM ANY AND ALL CLAIMS, INTERESTS, OBLIGATIONS, SUITS, JUDGMENTS, DAMAGES, DEMANDS, DEBTS, RIGHTS, AND CAUSES OF ACTION, LOSSES, REMEDIES, OR LIABILITIES WHATSOEVER (INCLUDING ANY DERIVATIVE CLAIMS, ASSERTED OR ASSERTABLE ON BEHALF OF THE DEBTORS, THE POST-EFFECTIVE DATE DEBTORS, OR THE ESTATES), WHETHER LIQUIDATED OR UNLIQUIDATED, FIXED OR CONTINGENT, MATURED OR UNMATURED, KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, ACCRUED OR UNACCRUED, EXISTING OR HEREINAFTER ARISING, WHETHER IN LAW OR EQUITY, WHETHER SOUNDING IN TORT OR CONTRACT, WHETHER ARISING UNDER FEDERAL OR STATE STATUTORY OR COMMON LAW, OR ANY OTHER APPLICABLE INTERNATIONAL, FOREIGN, OR DOMESTIC LAW, RULE, STATUTE, REGULATION, TREATY, RIGHT, DUTY, REQUIREMENTS OR OTHERWISE THAT THE DEBTORS, THE POST-EFFECTIVE DATE DEBTORS, THE ESTATES, OR THEIR AFFILIATES WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT IN THEIR OWN RIGHT (WHETHER INDIVIDUALLY OR COLLECTIVELY) OR ON BEHALF OF THE HOLDER OF ANY CLAIM OR INTEREST OR OTHER PERSON, BASED ON OR RELATING TO, OR IN ANY MANNER ARISING FROM, IN WHOLE OR IN PART, THE DEBTORS, THE CHAPTER 11 CASES, THE RESTRUCTURING, THE PURCHASE, SALE, OR RESCISSION OF THE PURCHASE OR SALE OF ANY SECURITY OF THE DEBTORS OR THE POST-EFFECTIVE DATE DEBTORS, THE SUBJECT MATTER OF, OR THE TRANSACTIONS OR EVENTS GIVING RISE TO, ANY CLAIM OR INTEREST THAT IS TREATED IN THE PLAN, THE BUSINESS OR CONTRACTUAL**

ARRANGEMENTS BETWEEN ANY DEBTOR AND ANY RELEASED PARTY, THE RESTRUCTURING OF CLAIMS AND INTERESTS BEFORE OR DURING THE CHAPTER 11 CASES, THE NEGOTIATION, FORMULATION, PREPARATION, OR CONSUMMATION OF THE PLAN, THE DOCUMENTS IN THE PLAN SUPPLEMENT, THE CREDIT BID PURCHASE AGREEMENT, THE EXIT FACILITY DOCUMENTS, THE APACHE DEFINITIVE DOCUMENTS, ANY ADDITIONAL PREDECESSOR AGREEMENT DOCUMENTS, THE FIRST LIEN EXIT FACILITY COMMITMENT LETTER, THE SECOND LIEN BACKSTOP COMMITMENT LETTER, THE EQUITY RIGHTS OFFERINGS, THE ERO BACKSTOP AGREEMENTS, THE DECOMMISSIONING AGREEMENT, OR RELATED AGREEMENTS, INSTRUMENTS, OR OTHER DOCUMENTS RELATING THERETO, OR THE SOLICITATION OF VOTES WITH RESPECT TO THE PLAN, IN ALL CASES BASED UPON ANY ACT OR OMISSION, TRANSACTION, AGREEMENT, EVENT, OR OTHER OCCURRENCE TAKING PLACE ON OR BEFORE THE EFFECTIVE DATE.

ENTRY OF THE CONFIRMATION ORDER BY THE BANKRUPTCY COURT SHALL CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL, PURSUANT TO BANKRUPTCY RULE 9019, OF THE RELEASES IN SECTION 10.7(a) OF THE PLAN (the "<u>DEBTOR RELEASES</u>"), WHICH INCLUDES BY REFERENCE EACH OF THE RELATED PROVISIONS AND DEFINITIONS UNDER THE PLAN, AND FURTHER, SHALL CONSTITUTE THE BANKRUPTCY COURT'S FINDING THAT THE DEBTOR RELEASES ARE: (I) IN EXCHANGE FOR THE GOOD, VALUABLE AND ADEQUATE CONSIDERATION PROVIDED BY THE RELEASED PARTIES, (II) ESSENTIAL TO THE CONFIRMATION OF THE PLAN, (III) A GOOD FAITH SETTLEMENT AND COMPROMISE OF THE RELEASED CLAIMS RELEASED BY THE DEBTORS, THE POST-EFFECTIVE DATE DEBTORS AND THE ESTATES, (IV) IN THE BEST INTERESTS OF THE DEBTORS, THE ESTATES AND ALL HOLDERS OF CLAIMS AND INTERESTS, (IV) FAIR, EQUITABLE AND REASONABLE, (V) GIVEN AND MADE AFTER DUE NOTICE AND OPPORTUNITY FOR HEARING, AND (VII) A BAR TO ANY OF THE DEBTORS, THE POST-EFFECTIVE DATE DEBTORS, OR THE ESTATES ASSERTING ANY CLAIM OR CAUSE OF ACTION RELEASED PURSUANT TO THE DEBTOR RELEASE.

(b) <u>RELEASES BY HOLDERS OF CLAIMS AND INTERESTS</u>. AS OF THE EFFECTIVE DATE, EXCEPT FOR THE RIGHTS AND REMEDIES THAT REMAIN IN EFFECT FROM AND AFTER THE EFFECTIVE DATE TO ENFORCE THE PLAN, THE CONFIRMATION ORDER, THE OBLIGATIONS CONTEMPLATED BY THE DOCUMENTS IN THE PLAN SUPPLEMENT, THE APACHE DEFINITIVE DOCUMENTS, ANY ADDITIONAL PREDECESSOR AGREEMENT DOCUMENTS, THE FIRST LIEN EXIT FACILITY COMMITMENT LETTER, THE CREDIT BID PURCHASE AGREEMENT, THE SECOND LIEN BACKSTOP COMMITMENT LETTER, THE EQUITY RIGHTS OFFERINGS, THE ERO BACKSTOP AGREEMENTS, THE EXIT FACILITY DOCUMENTS, AND THE RESTRUCTURING TRANSACTIONS, ON AND AFTER THE EFFECTIVE DATE, THE RELEASED PARTIES WILL BE DEEMED CONCLUSIVELY, ABSOLUTELY, UNCONDITIONALLY, IRREVOCABLY, AND FOREVER RELEASED AND

DISCHARGED BY THE RELEASING PARTIES, TO THE MAXIMUM EXTENT PERMITTED BY LAW, AS SUCH LAW MAY BE EXTENDED SUBSEQUENT TO THE EFFECTIVE DATE BY THE RELEASING PARTIES, FROM ANY AND ALL CLAIMS AND CAUSES OF ACTION WHATSOEVER (INCLUDING ANY DERIVATIVE CLAIMS, ASSERTED OR ASSERTABLE ON BEHALF OF THE DEBTORS, THE POST-EFFECTIVE DATE DEBTORS, OR THEIR ESTATES, INCLUDING ANY CAUSES OF ACTION ARISING UNDER CHAPTER 5 OF THE BANKRUPTCY CODE), WHETHER LIQUIDATED OR UNLIQUIDATED, FIXED OR CONTINGENT, MATURED OR UNMATURED, KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, ASSERTED OR UNASSERTED, ACCRUED OR UNACCRUED, EXISTING OR HEREINAFTER ARISING, IN LAW, EQUITY, CONTRACT, TORT, OR OTHERWISE BY STATUTE, WHETHER ARISING UNDER FEDERAL OR STATE, STATUTORY OR COMMON LAW, VIOLATIONS OF FEDERAL OR STATE SECURITIES LAWS, OR ANY OTHER APPLICABLE INTERNATIONAL, FOREIGN, OR DOMESTIC LAW, RULE STATUTE, REGULATION, TREATY, RIGHT, DUTY, REQUIREMENT OR OTHERWISE, THAT THE RELEASING PARTIES OR THEIR ESTATES, AFFILIATES, HEIRS, EXECUTORS, ADMINISTRATORS, SUCCESSORS, ASSIGNS, MANAGERS, ACCOUNTANTS, ATTORNEYS, REPRESENTATIVES, CONSULTANTS, AGENTS, AND ANY OTHER PERSONS CLAIMING UNDER OR THROUGH THEM WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT IN THEIR OWN RIGHT (WHETHER INDIVIDUALLY OR COLLECTIVELY) OR ON BEHALF OF THE HOLDER OF ANY CLAIM OR INTEREST OR OTHER PERSON, BASED ON OR RELATING TO, OR IN ANY MANNER ARISING FROM, IN WHOLE OR IN PART, THE DEBTORS, THE POST-EFFECTIVE DATE DEBTORS, OR THEIR ESTATES, THE CHAPTER 11 CASES, THE RESTRUCTURING, THE PURCHASE, SALE, OR RESCISSION OF THE PURCHASE OR SALE OF ANY SECURITY OF THE DEBTORS OR THE POST-EFFECTIVE DATE DEBTORS, THE SUBJECT MATTER OF, OR THE TRANSACTIONS OR EVENTS GIVING RISE TO, ANY CLAIM OR INTEREST THAT IS TREATED IN THE PLAN, THE BUSINESS OR CONTRACTUAL ARRANGEMENTS OR INTERACTIONS BETWEEN ANY DEBTOR AND ANY RELEASED PARTY, THE RESTRUCTURING, THE RESTRUCTURING OF ANY CLAIMS OR INTERESTS BEFORE OR DURING THE CHAPTER 11 CASES, THE NEGOTIATION, FORMULATION, PREPARATION, OR CONSUMMATION OF THE PLAN, THE DOCUMENTS IN THE PLAN SUPPLEMENT, THE CREDIT BID PURCHASE AGREEMENT, THE EXIT FACILITY DOCUMENTS, THE APACHE DEFINITIVE DOCUMENTS, ANY ADDITIONAL PREDECESSOR AGREEMENT DOCUMENTS, THE FIRST LIEN EXIT FACILITY COMMITMENT LETTER, THE SECOND LIEN BACKSTOP COMMITMENT LETTER, THE EQUITY RIGHTS OFFERINGS, THE ERO BACKSTOP AGREEMENTS, THE DECOMMISSIONING AGREEMENT OR RELATED AGREEMENTS, INSTRUMENTS, OR OTHER DOCUMENTS, RELATING THERETO, OR THE SOLICITATION OF VOTES WITH RESPECT TO THE PLAN, IN ALL CASES BASED UPON ANY ACT OR OMISSION, TRANSACTION, AGREEMENT, EVENT, OR OTHER OCCURRENCES TAKING PLACE ON OR BEFORE THE EFFECTIVE DATE.

ENTRY OF THE CONFIRMATION ORDER BY THE BANKRUPTCY COURT SHALL CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL,

PURSUANT TO BANKRUPTCY RULE 9019, OF THE RELEASES IN SECTION 10.7(B) OF THE PLAN (THE "THIRD-PARTY RELEASE"), WHICH INCLUDES, BY REFERENCE, EACH OF THE RELATED PROVISIONS AND DEFINITIONS UNDER THE PLAN, AND, FURTHERMORE, SHALL CONSTITUTE THE BANKRUPTCY COURT'S FINDING THAT THE THIRD-PARTY RELEASE IS (I) CONSENSUAL, (II) ESSENTIAL TO THE CONFIRMATION OF THE PLAN, (III) GIVEN IN EXCHANGE FOR THE GOOD, VALUABLE AND ADEQUATE CONSIDERATION PROVIDED BY THE RELEASED PARTIES, (IV) A GOOD FAITH SETTLEMENT AND COMPROMISE OF THE CLAIMS RELEASED BY THE THIRD-PARTY RELEASE, (V) IN THE BEST INTERESTS OF THE DEBTORS AND THEIR ESTATES, (VI) FAIR, EQUITABLE AND REASONABLE, (VII) GIVEN AND MADE AFTER DUE NOTICE AND OPPORTUNITY FOR HEARING, AND (VIII) A BAR TO ANY OF THE RELEASING PARTIES ASSERTING ANY CLAIM OR CAUSE OF ACTION RELEASED PURSUANT TO THE THIRD-PARTY RELEASE.

NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THIS SECTION 10.7(B) OF THE PLAN, NO PARTY SHALL BE RELEASED TO THE EXTENT SUCH RELEASE WOULD IMPAIR THE DECOMMISSIONING SECURITY OR THE APACHE PSA PARTIES' ABILITY TO DRAW ON THE DECOMMISSIONING SECURITY, IN ANY RESPECT. FOR THE AVOIDANCE OF DOUBT, ANY AND ALL CLAIMS THE APACHE PSA PARTIES MAY HAVE AGAINST FWE I RELATED TO THE DECOMMISSIONING AGREEMENT ARISING POST-EFFECTIVE DATE AND ANY SECURITY OBTAINED, PROVIDED, OR PLEDGED IN CONNECTION WITH THE DECOMMISSIONING AGREEMENT WILL BE PRESERVED AND ANY AND ALL CLAIMS FWE I MAY HAVE AGAINST THE APACHE PSA PARTIES RELATED TO THE DECOMMISSIONING AGREEMENT ARISING POST-EFFECTIVE DATE AND THE DECOMMISSIONING SECURITY WILL BE PRESERVED.

(c) *Release of Liens*. Except as otherwise specifically provided in the Plan (including all Liens securing the FLFO Claims or the First Lien Exit Facility) or in any contract, instrument, release, or other agreement or document contemplated under or executed in connection with the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan and, in the case of a Secured Claim, satisfaction in full of the portion of the Secured Claim that is secured and Allowed as of the Effective Date, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the estates shall be fully released and discharged, and all of the right, title, and interest of any holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the Post-Effective Date Debtors and their successors and assigns, in each case, without any further approval or order of the Bankruptcy Court and without any action or filing being required to be made by the Debtors. For the avoidance of doubt, all liens and encumbrances on, interests in, and claims against the Legacy Apache Properties (as defined in the Apache Term Sheet) and the other FWE I Assets (as defined in Part A of Schedule I of the Initial Plan of Merger) held by the Prepetition FLFO Secured Parties, Prepetition FLTL Lenders, and Prepetition SLTL Lenders shall be released, discharged, and of no further force or effect as of the Effective Date.

### 10.8 *Exculpation.*

TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, EXCEPT FOR THE RIGHTS THAT REMAIN IN EFFECT FROM AND AFTER THE EFFECTIVE DATE TO ENFORCE THE PLAN, THE CONFIRMATION ORDER AND THE OBLIGATIONS CONTEMPLATED BY THE DOCUMENTS IN THE PLAN SUPPLEMENT, THE APACHE DEFINITIVE DOCUMENTS, ANY ADDITIONAL PREDECESSOR AGREEMENT DOCUMENTS, THE FIRST LIEN EXIT FACILITY COMMITMENT LETTER, THE CREDIT BID PURCHASE AGREEMENT, THE SECOND LIEN BACKSTOP COMMITMENT LETTER, THE EXIT FACILITY DOCUMENTS, THE EQUITY RIGHTS OFFERINGS, THE ERO BACKSTOP AGREEMENTS, AND THE RESTRUCTURING TRANSACTIONS, NO EXCULPATED PARTY WILL HAVE OR INCUR, AND EACH EXCULPATED PARTY WILL BE RELEASED AND EXCULPATED FROM, ANY CLAIM, OBLIGATION, SUIT, JUDGMENT, DAMAGE, DEMAND, DEBT, RIGHT, REMEDY LOSS, LIABILITY AND CAUSE OF ACTION IN CONNECTION WITH OR ARISING OUT OF THE ADMINISTRATION OF THE CHAPTER 11 CASES; THE NEGOTIATION AND PURSUIT OF THE DIP FACILITY, THE CREDIT BID PURCHASE AGREEMENT, THE NEW MONEY INVESTMENT, THE EXIT FACILITY DOCUMENTS, THE FIRST LIEN EXIT FACILITY COMMITMENT LETTER, THE SECOND LIEN BACKSTOP COMMITMENT LETTER, THE EQUITY RIGHTS OFFERINGS, THE ERO BACKSTOP AGREEMENTS, THE APACHE DEFINITIVE DOCUMENTS, ANY ADDITIONAL PREDECESSOR AGREEMENT DOCUMENTS, THE DISCLOSURE STATEMENT, THE RESTRUCTURING, THE PLAN (INCLUDING THE PLAN SUPPLEMENT), AND ALL DOCUMENTS RELATING TO THE FOREGOING, OR THE SOLICITATION OF VOTES FOR, OR CONFIRMATION OF, THE PLAN; THE FUNDING OF THE PLAN; THE OCCURRENCE OF THE EFFECTIVE DATE; THE ADMINISTRATION OF THE PLAN OR THE PROPERTY TO BE DISTRIBUTED UNDER THE PLAN; THE ISSUANCE OF SECURITIES UNDER OR IN CONNECTION WITH THE PLAN; THE PURCHASE, SALE, OR RESCISSION OF THE PURCHASE OR SALE OF ANY SECURITY OF THE DEBTORS OR THE POST-EFFECTIVE DATE DEBTORS; OR THE TRANSACTIONS IN FURTHERANCE OF ANY OF THE FOREGOING; OTHER THAN CLAIMS OR CAUSES OF ACTION ARISING OUT OF OR RELATED TO ANY ACT OR OMISSION OF AN EXCULPATED PARTY THAT CONSTITUTES INTENTIONAL FRAUD, WILLFUL MISCONDUCT, OR GROSS NEGLIGENCE AS DETERMINED BY A FINAL ORDER, BUT IN ALL RESPECTS SUCH PERSONS WILL BE ENTITLED TO REASONABLY RELY UPON THE ADVICE OF COUNSEL WITH RESPECT TO THEIR DUTIES AND RESPONSIBILITIES PURSUANT TO THE PLAN. THE EXCULPATED PARTIES HAVE ACTED IN COMPLIANCE WITH THE APPLICABLE PROVISIONS OF THE BANKRUPTCY CODE WITH REGARD TO THE SOLICITATION OF THE PLAN AND, THEREFORE, ARE NOT, AND ON ACCOUNT OF SUCH DISTRIBUTIONS WILL NOT BE, LIABLE AT ANY TIME FOR THE VIOLATION OF ANY APPLICABLE LAW, RULE, OR REGULATION GOVERNING THE SOLICITATION OF ACCEPTANCES OR REJECTIONS OF THE PLAN OR SUCH DISTRIBUTIONS MADE PURSUANT TO THE PLAN. THE EXCULPATION WILL BE IN ADDITION TO, AND NOT IN LIMITATION OF, ALL OTHER RELEASES, INDEMNITIES,

EXCULPATIONS, AND ANY OTHER APPLICABLE LAW OR RULES PROTECTING SUCH EXCULPATED PARTIES FROM LIABILITY.

### 10.9 *Injunction Related to Releases and Exculpation.*

The Confirmation Order shall permanently enjoin the commencement or prosecution by any Person or entity, whether directly, derivatively, or otherwise, of any Claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, losses, or liabilities released pursuant to the Plan, including the claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, and liabilities released or exculpated in the Plan or the Confirmation Order.

### 10.10 *Subordinated Securities Claims.*

The allowance, classification, and treatment of all Allowed Claims and Interests and the respective distributions and treatments thereof under the Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, sections 510(a), 510(b), or 510(c) of the Bankruptcy Code, or otherwise. Pursuant to section 510 of the Bankruptcy Code, the Debtors reserve the right to reclassify any Allowed Claim or Interest in accordance with any contractual, legal, or equitable subordination relating thereto.

### 10.11 *Retention of Causes of Action and Reservation of Rights.*

(a)    Except as otherwise provided in the DIP Order or Plan, including Sections 10.5, 10.6, 10.7, 10.8 and 10.9, nothing contained in the Plan or the Confirmation Order shall be deemed to be a waiver or relinquishment of any rights, claims, Causes of Action, rights of setoff or recoupment, or other legal or equitable defenses that the Debtors had immediately before the Effective Date on behalf of the Estates or of themselves in accordance with any provision of the Bankruptcy Code or any applicable nonbankruptcy law. The Post-Effective Date Debtors shall have, retain, reserve, and be entitled to assert all such claims, Causes of Action, rights of setoff or recoupment, and other legal or equitable defenses as fully as if the Chapter 11 Cases had not been commenced, and all of the Debtors' legal and equitable rights in respect of any Unimpaired Claim may be asserted after the Confirmation Date and Effective Date to the same extent as if the Chapter 11 Cases had not been commenced.

(b)    Notwithstanding Section 10.11(a), on the Effective Date, the Post-Effective Date Debtors shall be deemed to have released all preference actions pursuant to section 547 of the Bankruptcy Code against the holders of Unsecured Trade Claims and General Unsecured Claims (in each case, solely in their capacity as holders of Unsecured Trade Claims and General Unsecured Claims, as applicable).

### 10.12 *Ipso Facto and Similar Provisions Ineffective.*

Any term of any prepetition policy, prepetition contract, or other prepetition obligation applicable to a Debtor shall be void and of no further force or effect with respect to any Debtor to the extent that such policy, contract, or other obligation is conditioned on, creates

an obligation of the Debtor as a result of, or gives rise to a right of any entity based on any of the following: (a) the insolvency or financial condition of a Debtor; (b) the commencement of the Chapter 11 Cases; (c) the confirmation or consummation of the Plan, including any change of control that shall occur as a result of such consummation; or (d) the Restructuring.

### 10.13   *Indemnification and Reimbursement Obligations.*

For purposes of the Plan, (a) Indemnification Obligations to current and former directors, officers, members, managers, agents or employees of any of the Debtors who served in such capacity before, on or subsequent to the Petition Date shall be assumed by the Post-Effective Date Debtors and (b) Indemnification Obligations of the Debtors arising from services as current and former directors, officers, members, managers, agents or employees of any of the Debtors who served in such capacity during the period from and after the Petition Date shall be Administrative Expense Claims.  In addition, after the Effective Date, the Post-Effective Date Debtors shall not terminate or otherwise reduce the coverage under any current and former directors', officers', members', managers', agents' or employees' insurance policies (including any "tail policy") in effect as of the Petition Date, and all current and former directors, officers, members, managers, agents or employees of any of the Debtors who served in such capacity at any time before the Effective Date shall be entitled to the full benefits of any such policy for the full term of such policy regardless of whether such members, managers, directors, and/or officers remain in such positions after the Effective Date to the extent set forth in such policies.

## ARTICLE XI.   RETENTION OF JURISDICTION.

### 11.1   *Retention of Jurisdiction.*

Pursuant to sections 105(c) and 1142 of the Bankruptcy Code and notwithstanding entry of the Confirmation Order and the occurrence of the Effective Date, on and after the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction, pursuant to 28 U.S.C. §§ 1334 and 157, over all matters arising in or related to the Chapter 11 Cases for, among other things, the following purposes:

(a) to hear and determine motions and/or applications for the assumption or rejection of executory contracts or unexpired leases and any disputes over Cure Amounts resulting therefrom;

(b) to determine any motion, adversary proceeding, application, contested matter, and other litigated matter pending on or commenced after the entry of the Confirmation Order;

(c) to hear and resolve any disputes arising from or related to (i) any orders of the Bankruptcy Court granting relief under Bankruptcy Rule 2004 or (ii) any protective orders entered by the Bankruptcy Court in connection with the foregoing;

(d)    to ensure that distributions to holders of Allowed Claims are accomplished as provided in the Plan and the Confirmation Order and to adjudicate any and all disputes arising from or relating to distributions under the Plan;

(e)    to consider Claims or the allowance, classification, priority, compromise, estimation, or payment of any Claim, including any Administrative Expense Claim;

(f)    to enter, implement, or enforce such orders as may be appropriate in the event that the Confirmation Order is for any reason stayed, reversed, revoked, modified, or vacated;

(g)    to issue and enforce injunctions, enter and implement other orders, and take such other actions as may be necessary or appropriate to restrain interference by any Person or other Entity with the consummation, implementation, or enforcement of the Plan, the Confirmation Order, or any other order of the Bankruptcy Court;

(h)    to hear and determine any application to modify the Plan in accordance with section 1127 of the Bankruptcy Code to remedy any defect or omission or reconcile any inconsistency in the Plan, the Disclosure Statement, or any order of the Bankruptcy Court, including the Confirmation Order, in such a manner as may be necessary to carry out the purposes and effects thereof;

(i)    to hear and determine all Fee Claims;

(j)    to resolve disputes concerning any reserves with respect to Disputed Claims or the administration thereof;

(k)    to hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan, the Confirmation Order, any transactions or payments in furtherance of either, or any agreement, instrument, or other document governing or related to any of the foregoing;

(l)    to take any action and issue such orders, including any such action or orders as may be necessary after entry of the Confirmation Order or the occurrence of the Effective Date, as may be necessary to construe, enforce, implement, execute, and consummate the Plan, including any release, exculpation, or injunction provisions set forth in the Plan, following the occurrence of the Effective Date;

(m)    to determine such other matters and for such other purposes as may be provided in the Confirmation Order;

(n)    to hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code (including any requests for expedited determinations under section 505(b) of the Bankruptcy Code);

(o)    to hear and determine any other matters related to the Chapter 11 Cases and not inconsistent with the Bankruptcy Code or title 28 of the United States Code;

(p)      to resolve any disputes concerning whether a Person or entity had sufficient notice of the Chapter 11 Cases, the Disclosure Statement, any solicitation conducted in connection with the Chapter 11 Cases, any bar date established in the Chapter 11 Cases, or any deadline for responding or objecting to a Cure Amount, in each case, for the purpose for determining whether a Claim or Interest is discharged hereunder or for any other purpose;

(q)      to hear and determine any rights, Claims, or Causes of Action held by or accruing to the Debtors pursuant to the Bankruptcy Code or pursuant to any federal statute or legal theory;

(r)      to recover all Assets of the Debtors and property of the Estates, wherever located;

(s)      to hear and determine matters related to the DIP Facility and the DIP Order; and

(t)      to enter a final decree closing each of the Chapter 11 Cases.

Notwithstanding anything in this Article XI to the contrary, as of the Effective Date, the Exit Facility Documents and any other documents related thereto, including the New Intercreditor Agreement, shall be governed by the jurisdictional provisions therein and the Bankruptcy Court shall not retain jurisdiction with respect thereto.

## ARTICLE XII.      MISCELLANEOUS PROVISIONS.

### 12.1      *Payment of Statutory Fees*

On the Effective Date and thereafter as may be required, the Debtors or the Post-Effective Date Debtors, as applicable, shall pay all Statutory Fees that are due and payable, together with interest, if any, pursuant to § 3717 of title 31 of the United States Code for each Debtor's case.  The obligations under this Section 12.1 shall remain for each Debtor until such time as a final decree is entered closing the Chapter 11 Case for such Debtor, a Final Order converting such Debtor's Chapter 11 Case to a case under chapter 7 of the Bankruptcy Code is entered, or a Final Order dismissing such Debtor's Chapter 11 Case is entered.

### 12.2      *Exemption from Certain Transfer Taxes.*

Pursuant to and to the fullest extent permitted by section 1146 of the Bankruptcy Code, (a) the issuance, transfer or exchange of any securities, instruments or documents, (b) the creation of any Lien, mortgage, deed of trust or other security interest, (c) all sale transactions consummated by the Debtors and approved by the Bankruptcy Court on and after the Confirmation Date through and including the Effective Date, including any transfers effectuated under the Plan, (d) any assumption, assignment, or sale by the Debtors of their interests in unexpired leases of nonresidential real property or executory contracts pursuant to section 365(a) of the Bankruptcy Code, (e) the grant of collateral under the Standby Loan Agreement and (f) the issuance, renewal, modification or securing of indebtedness by such means, and the making,

delivery or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including the Confirmation Order, shall not be subject to any document recording tax, stamp tax, conveyance fee or other similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, sales tax, use tax or other similar tax or governmental assessment. Consistent with the foregoing, each recorder of deeds or similar official for any county, parish, city or Governmental Unit in which any instrument hereunder is to be recorded shall, pursuant to the Confirmation Order, be ordered and directed to accept such instrument without requiring the payment of any filing fees, documentary stamp tax, deed stamps, stamp tax, transfer tax, intangible tax or similar tax.

### 12.3 _Request for Expedited Determination of Taxes._

The Debtors shall have the right to request an expedited determination under section 505(b) of the Bankruptcy Code with respect to tax returns filed, or to be filed, for any and all taxable periods ending after the Petition Date through the Effective Date.

### 12.4 _Dates of Actions to Implement Plan._

In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on or as soon as reasonably practicable after the next succeeding Business Day but shall be deemed to have been completed as of the required date.

### 12.5 _Amendments._

(a) Plan Modifications. Subject to (i) the consent rights set forth in the Restructuring Support Agreement, (ii) the reasonable consent of the Creditors' Committee solely to the extent that it adversely impacts the holders of General Unsecured Claims or Unsecured Trade Claims and (iii) the reasonable consent of the Prepetition FLFO Administrative Agent, the Plan may be amended, modified, or supplemented by the Debtors in the manner provided for by section 1127 of the Bankruptcy Code or as otherwise permitted by law, without additional disclosure pursuant to section 1125 of the Bankruptcy Code, except as otherwise ordered by the Bankruptcy Court. In addition, after the Confirmation Date, so long as such action does not materially and adversely affect the treatment of holders of Allowed Claims pursuant to the Plan, the Debtors, with (i) the consent of the Required DIP Lenders, and the Requisite FLTL Lenders, (ii) the reasonable consent of the Creditors' Committee solely to the extent that it adversely impacts the holders of General Unsecured Claims or Unsecured Trade Claims, and (iii) the reasonable consent of the Prepetition FLFO Administrative Agent, may remedy any defect or omission or reconcile any inconsistencies in the Plan or the Confirmation Order with respect to such matters as may be necessary to carry out the purposes of effects of the Plan, and any holder of a Claim or Interest that has accepted the Plan shall be deemed to have accepted the Plan as amended, modified, or supplemented. The Debtors, subject to (i) the consent of the Required DIP Lenders and the Requisite FLTL Lenders and (ii) the applicable consent rights of the Prepetition FLFO Administrative Agent, shall have the right to amend the documents contained in, and exhibits to, the Plan Supplement in accordance with the terms of the Plan and the

Restructuring Support Agreement or the First Lien Exit Facility Commitment Letter, as applicable, through the Effective Date.

(b)     Certain Technical Amendments.  Before the Effective Date, the Debtors, subject to the consent rights set forth in the Restructuring Support Agreement, may make appropriate technical adjustments and modifications to the Plan without further order or approval of the Bankruptcy Court.

### 12.6     *Revocation or Withdrawal of Plan.*

The Debtors reserve the right to revoke or withdraw the Plan before the Effective Date as to any or all of the Debtors.  If, with respect to a Debtor, the Plan has been revoked or withdrawn before the Effective Date, or if confirmation or the occurrence of the Effective Date as to such Debtor does not occur on the Effective Date, then, with respect to such Debtor: (a) the Plan shall be null and void in all respects; (b) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount any Claim or Interest or Class of Claims or Interests), assumption or rejection of executory contracts or unexpired leases affected by the Plan, and any document or agreement executed pursuant to the Plan shall be deemed null and void; and (c) nothing contained in the Plan shall (i) constitute a waiver or release of any Claim by or against, or any Interest in, such Debtor or any other Person; (ii) prejudice in any manner the rights of such Debtor or any other Person; or (iii) constitute an admission of any sort by any Debtor or any other Person.

### 12.7     *Severability.*

If, before the entry of the Confirmation Order, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court, at the request of the Debtors shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted.  Notwithstanding any such holding, alteration, or interpretation by the Bankruptcy Court, the remainder of the terms and provisions of the Plan shall remain in full force and effect and shall in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation.  The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with this section, is (a) valid and enforceable pursuant to its terms, (b) integral to the Plan and may not be deleted or modified without the consent of the Debtors or the Post-Effective Date Debtors (as the case may be) and (c) nonseverable and mutually dependent.

### 12.8     *Governing Law.*

Except to the extent that the Bankruptcy Code or other federal law is applicable or to the extent that a Plan Supplement document provides otherwise, the rights, duties, and obligations arising under the Plan shall be governed by, and construed and enforced in accordance with, the internal laws of the State of Texas, without giving effect to the principles of conflicts of laws thereof.

### 12.9    *Immediate Binding Effect.*

Notwithstanding Bankruptcy Rules 3020(e), 6004(h), 7062, or otherwise, upon the occurrence of the Effective Date, the terms of the Plan shall be immediately effective and enforceable and deemed binding upon and inure to the benefit of the Debtors, the Post-Effective Date Debtors, the holders of Claims and Interests, the Released Parties, and each of their respective successors and assigns.

### 12.10    *Successors and Assigns.*

The rights, benefits, and obligations of any Person named or referred to in the Plan shall be binding on and shall inure to the benefit of any heir, executor, administrator, successor, or permitted assign, if any, of each such Person.

### 12.11    *Entire Agreement.*

On the Effective Date, the Plan, the Plan Supplement, and the Confirmation Order shall supersede all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.

### 12.12    *Computing Time.*

In computing any period of time prescribed or allowed by the Plan, unless otherwise set forth in the Plan or determined by the Bankruptcy Court, the provisions of Bankruptcy Rule 9006 shall apply.

### 12.13    *Exhibits to Plan.*

All exhibits, schedules, supplements, and appendices to the Plan (including any other documents to be executed, delivered, assumed, or performed in connection with the occurrence of the Effective Date) are incorporated into and are a part of the Plan as if set forth in full in the Plan.

### 12.14    *Notices.*

All notices, requests, and demands hereunder shall be in writing (including by facsimile or email transmission) and, unless otherwise provided herein, shall be deemed to have been duly given or made only when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

(a)    If to the Debtors:

Fieldwood Energy LLC
2000 W. Sam Houston Parkway, S. Suite 1200
Houston, Texas 77042
Attention:  Michael Dane and Thomas R. Lamme

– and –

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Attn: Matthew S. Barr, Esq., Alfredo R. Pérez, Esq., and Jessica Liou, Esq.
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

*Attorneys for the Debtors*

(b)     If to the DIP Lenders or FLTL Lenders:

DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, NY 10017
Attn: Damian Schaible, Esq. and Natasha Tsiouris, Esq.
Telephone: (212) 450-4000
Facsimile: (212) 701-5800

(c)     If to the Post-Effective Date Debtors:

[Plan Administrator]
[Plan Administrator Address]

 – and –

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Attn: Matthew S. Barr, Esq., Alfredo R. Pérez, Esq., and Jessica Liou, Esq.
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

*Attorneys for Post-Effective Date Debtors*

A notice is deemed to be given and received (a) if sent by first-class mail, personal delivery, or courier, on the date of delivery if it is a Business Day and the delivery was made before 4:00 p.m. (local time in place of receipt) and otherwise on the next Business Day, or (b) if sent by electronic mail, when the sender receives an email from the recipient acknowledging receipt; *provided* that an automatic "read receipt" does not constitute acknowledgment of an email for purposes of this Section. Any party may change its address for service from time to time by providing a notice in accordance with the foregoing. Any element of a party's address that is not specifically changed in a notice will be assumed not to be changed.

After the occurrence of the Effective Date, the Post-Effective Date Debtors and Plan Administrator have authority to send a notice to entities that to continue to receive

documents pursuant to Bankruptcy Rule 2002, such entities must file a renewed request to receive documents pursuant to Bankruptcy Rule 2002; *provided*, that the U.S. Trustee need not file such a renewed request and shall continue to receive documents without any further action being necessary. After the occurrence of the Effective Date, the Post-Effective Date Debtors are authorized to limit the list of entities receiving documents pursuant to Bankruptcy Rule 2002 to the U.S. Trustee and those entities that have filed such renewed requests.

### 12.15 *Reservation of Rights.*

Except as otherwise provided herein, the Plan shall be of no force or effect unless the Bankruptcy Court enters the Confirmation Order. None of the filing of the Plan, any statement or provision of the Plan, or the taking of any action by the Debtors with respect to the Plan shall be or shall be deemed to be an admission or waiver of any rights of (a) the Debtors with respect to any Claims or Interests before the Effective Date or (b) any holder of a Claim or Interest or other entity before the Effective Date.

### 12.16 *Dissolution of Creditors' Committee.*

On the Effective Date, the Creditors' Committee shall dissolve, and the members thereof shall be released and discharged from all rights and duties arising from, or related to, the Chapter 11 Cases, provided that following the Effective Date, the Creditors' Committee shall continue in existence and have standing and a right to be heard for the following limited purposes: (a) Claims and/or applications, and any relief related thereto, for compensation by Professional Persons retained in the Chapter 11 Cases pursuant to sections 327, 328, 329, 330, 331, 503(b), or 1103 of the Bankruptcy Code and requests for allowance of Administrative Expense Claims for substantial contribution pursuant to section 503(b)(3)(D) of the Bankruptcy Code; and (b) any appeals of the Confirmation Order or other appeals to which the Creditors' Committee is a party.

*[Remainder of Page Intentionally Left Blank]*

Dated: April 15, 2021
      Houston, Texas

Respectfully submitted,

**FIELDWOOD ENERGY LLC**

By: Fieldwood Energy Inc., its managing member

By: _____
Name:  Thomas R. Lamme
Title:    Senior Vice President and General Counsel

**FIELDWOOD ENERGY INC.**

By: _____
Name:  Thomas R. Lamme
Title:    Senior Vice President and General Counsel

**FIELDWOOD ENERGY OFFSHORE LLC**

By: _____
Name:  Thomas R. Lamme
Title:    Vice President

**FIELDWOOD ONSHORE LLC**

By: _____
Name:  Thomas R. Lamme
Title:    Vice President

**FIELDWOOD SD OFFSHORE LLC**

By: _____
Name:  Thomas R. Lamme
Title:    Vice President

*[Signature Page to Fourth Amended Joint Chapter 11 Plan of Fieldwood Energy LLC and its Affiliated Debtors]*

**FIELDWOOD OFFSHORE LLC**

By: Fieldwood Energy LLC, its managing member

By: Fieldwood Energy Inc., its managing member

By: _____
Name:  Thomas R. Lamme
Title:    Senior Vice President and General Counsel

**DYNAMIC OFFSHORE RESOURCES NS, LLC**

By: _____
Name:  Thomas R. Lamme
Title:    Vice President

**FW GOM PIPELINE, INC.**

By: _____
Name:  Thomas R. Lamme
Title:    Vice President

**GOM SHELF LLC**

By: Fieldwood Energy LLC, its managing member

By: Fieldwood Energy Inc., it managing member

By: _____
Name:  Thomas R. Lamme
Title:    Senior Vice President and General Counsel

**BANDON OIL AND GAS GP, LLC**

By: _____
Name:  Thomas R. Lamme
Title:    Vice President

**BANDON OIL AND GAS, LP**

By: Bandon Oil and Gas, LLC, its general partner

By: _____
Name:  Thomas R. Lamme
Title:   Vice President

**FIELDWOOD ENERGY SP LLC**

By: _____
Name:  Thomas R. Lamme
Title:   Vice President

**GALVESTON BAY PIPELINE LLC**

By: Fieldwood Onshore LLC, its managing member

By: _____
Name:  Thomas R. Lamme
Title:   Vice President

**GALVESTON BAY PROCESSING LLC**

By: Fieldwood Onshore LLC, its managing member

By: _____
Name:  Thomas R. Lamme
Title:   Vice President

*[Signature Page to Fourth Amended Joint Chapter 11 Plan of Fieldwood Energy LLC and its Affiliated Debtors]*

**Exhibit B**
**Leases, Rights of Way and Rights of Use and Easement Related to**
**Purchased Oil & Gas Lease Interests**

Case 20-33948   Document 1285-1   Filed in TXSB on 04/15/21   Page 96 of 1032

## Purchased Oil & Gas Lease Interests*

| Block | Lease | Type | Rights | Date Le Eff | Le Cur Acres (Ac) | Operator | WI | Lease Status | Note† |
|-------|-------|------|--------|-------------|-------------------|----------|-----|--------------|-------|
| AT 023 | G35015 | Federal | RT | 8/1/2013 | 5,760 | Murphy E&P USA | 8% | PRIMARY | |
| BS 25 | G31442 | Federal | RT | 2/1/2008 | 2,079 | Tana Exp | 25% | UNIT | |
| BS 25 | SL19718 | SL-LA | WI | 7/9/2008 | 154 | Tana Exp | 25% | Active | |
| BS 45 | SL15683 | SL-LA | WI A | 4/14/1997 | – | Southern Oil of Louisiana | 38% | UNIT | [2] |
| BS 52 | SL17675 | SL-LA | WI A | 12/16/2002 | – | Southern Oil of Louisiana | 38% | UNIT | [3] |
| BS 52 | SL17860 | SL-LA | WI | 8/18/2003 | – | Southern Oil of Louisiana | 15% | UNIT | |
| EC 345 | G15156 | Federal | ORRI | 8/1/1995 | 2,500 | Talos ERT | 1% | PROD (production | |

---

* The Debtors and the Consenting FLTL Lenders reserve the right to amend, modify, or supplement this schedule subject to any consent rights under the Restructuring Support Agreement.

[1] Represents leases in which the Credit Bid Purchaser is to acquire all of the Debtors' right, title and interest in such lease (less and except the right, title and interest acquired by FWE from Apache and/or held by GOM Shelf); as to all remaining leases on this schedule (except those referenced in footnotes [5]-[7] below), the Credit Bid Purchaser is to obtain all of the Debtors' right, title and interest in such leases.

[2] This lease has different ownership in 4 different portions, and a Seller (Fieldwood Offshore) has a working interest (37.5%) in only one of these 4 portions.

[3] This lease has different ownership in 3 different portions, and a Seller (Fieldwood Offshore) has a working interest (37.5%) in only one of these 3 portions.

[4] Fieldwood Energy Offshore has two ORRIs: a 1.225% ORRI from assignment filed with BOEM 2/09/2015 and another 3.43% (or 49% of 7%) ORRI that is granted each year. However, as to the SS 005 ST01 well, its combined ORRI is only 3.92% until 5.8 million barrels of oil equivalent from this well.

[5] The Credit Bid Purchaser to acquire record title solely as to the W/2 and SE/4 of the block. The record title and the Debtors' operating rights solely as to the NE/4 of the block are to be abandoned.

[6] FWE 1 is to acquire solely the operating rights as to the NE/4 of this block; the Credit Bid Purchaser is to obtain the Debtors' overriding royalty interest in this lease; and the Debtors' remaining interests in this lease are to be abandoned.

[7] Represents leases where the Credit Bid Purchaser is to acquire solely the Debtors' overriding royalty interests; the Debtors' remaining interests in these leases are to be abandoned.

**Legend**: OP 1 - Operating Rights 1; OP 2 - Operating Rights 2; OP 3 - Operating Rights 3; OP 4 - Operating Rights 4; OP 5 - Operating Rights 5; OP 6 - Operating Rights 6; ORRI - Overriding Royalty Interest; RT A - Record Title A; RT B - Record Title B; WI - Working Interest; WI A - Working Interest A

Case 20-33948   Document 1285-1   Filed in TXSB on 04/15/21   Page 97 of 1032

| Block | Lease | Type | Rights | Date Le Eff | Le Cur Acres (Ac) | Operator | WI | Lease Status ceased 4/28/20 | Note[1] |
|---|---|---|---|---|---|---|---|---|---|
| EW 1009 | G34878 | Federal | RT | 8/1/2013 | 5,760 | Fieldwood En | 50% | UNIT | |
| EW 1010 | G34879 | Federal | RT | 8/1/2013 | 5,760 | Fieldwood En | 50% | UNIT | |
| EW 1011 | G34880 | Federal | RT | 8/1/2013 | 1,500 | Fieldwood En | 50% | UNIT | |
| EW 789 | G35805 | Federal | ORRI | 7/1/2016 | 5,760 | Walter O&G | 1% | UNIT | |
| EW 790 | G33140 | Federal | OP 1 | 7/1/2009 | 5,753 | Fieldwood En | 100% | UNIT | |
| EW 790 | G33140 | Federal | OP 2 | 7/1/2009 | 5,753 | Fieldwood En | 100% | UNIT | |
| EW 790 | G33140 | Federal | ORRI | 7/1/2009 | 5,753 | Walter O&G | 1% | UNIT | |
| EW 790 | G33140 | Federal | ORRI | 7/1/2009 | 5,753 | Walter O&G | 1% | UNIT | |
| EW 828 | G35806 | Federal | RT | 6/1/2016 | 3,731 | Fieldwood En Off | 100% | PRIMARY | |
| EW 834 | G27982 | Federal | ORRI | 7/1/2006 | 5,760 | Walter O&G | 1% | UNIT | |
| EW 835 | G33707 | Federal | ORRI | 5/1/2010 | 364 | Walter O&G | 1% | PRIMARY | |
| GC 039 B | G36476 | Federal | RT | 9/1/2013 | 450 | Fieldwood En | 50% | PRIMARY | |
| GC 040 | G34536 | Federal | RT | 11/1/2012 | 5,760 | Fieldwood En | 50% | UNIT | |
| GC 041 | G34537 | Federal | RT | 10/1/2012 | 1,783 | Fieldwood En | 50% | UNIT | |
| GC 064 | G34539 | Federal | RT | 8/1/2012 | 5,760 | Fieldwood En Off | 49% | PROD | |
| GC 065 | G05889 | Federal | OP | 7/1/1983 | 5,760 | Fieldwood En Off | 49% | UNIT | |
| GC 108 | G14668 | Federal | OP | 7/1/1994 | 5,760 | Fieldwood En Off | 49% | UNIT | |
| GC 109 | G05900 | Federal | OP | 7/1/1983 | 5,760 | Fieldwood En Off | 49% | UNIT | |
| GC 153 | G36814 | Federal | RT | 11/1/2019 | 5,760 | Fieldwood En | 100% | PRIMARY | |
| GC 198 | G36021 | Federal | RT | 6/1/2017 | 5,760 | Fieldwood En Off | 100% | PRIMARY | |
| GC 200 | G12209 | Federal | OP | 5/1/1990 | 5,760 | Fieldwood En Off | 53% | UNIT | |
| GC 200 | G12209 | Federal | RT | 5/1/1990 | 5,760 | Fieldwood En Off | 100% | UNIT | |
| GC 201 | G12210 | Federal | ORRI | 5/1/1990 | 5,760 | LLOG Exp Off | 5% | UNIT | |
| GC 201 | G12210 | Federal | RT | 5/1/1990 | 5,760 | Fieldwood En Off | 100% | UNIT | [5] |

2

Case 20-33948   Document 1285-1   Filed in TXSB on 04/15/21   Page 98 of 1032

| Block | Lease | Type | Rights | Date Le Eff | Le Cur Acres (Ac) | Operator | WI | Lease Status | Note[†] |
|---|---|---|---|---|---|---|---|---|---|
| GC 238 | G26302 | Federal | ORRI | 7/1/2004 | 5,760 | Talos ERT | 3% | PROD | |
| GC 238 | G26302 | Federal | OP | 7/1/2004 | 5,760 | BHP Billiton Pet GOM | 40% | PROD | |
| GC 243 | G20051 | Federal | ORRI | 7/1/1998 | 5,760 | Walter O&G | 5% | PROD | [4] |
| GC 244 | G11043 | Federal | RT | 5/1/1989 | 5,760 | Fieldwood En Offshore | 100% | UNIT | |
| GC 282 | G16727 | Federal | OP | 9/1/1996 | 5,760 | BHP Billiton Pet GOM | 25% | PROD | |
| GC 282 | G16727 | Federal | ORRI | 9/1/1996 | 5,760 | Talos ERT | 2% | PROD | |
| GC 39 A | G34966 | Federal | RT | 9/1/2013 | 540 | Fieldwood En | 50% | UNIT | |
| GC 39 A | G34966 | Federal | OP | 9/1/2013 | 540 | Fieldwood En | 50% | UNIT | |
| GC 679 | G21811 | Federal | OP 2 | 7/1/2000 | 5,760 | Fieldwood En | 43% | PROD | |
| GC 679 | G21811 | Federal | RT | 7/1/2000 | 5,760 | Fieldwood En | 38% | PROD | |
| GC 768 | G21817 | Federal | OP 1 | 6/1/2000 | 5,760 | Anadarko Pet | 50% | PROD | |
| GC 768 | G21817 | Federal | OP 2 | 6/1/2000 | 5,760 | Fieldwood En | 43% | PROD | |
| GC 768 | G21817 | Federal | RT | 6/1/2000 | 5,760 | Fieldwood En | 100% | PROD | |
| GI 110 | G13943 | Federal | RT | 8/1/1993 | 5,000 | Fieldwood En | 50% | UNIT | [1] |
| GI 116 | G13944 | Federal | RT | 7/1/1993 | 5,000 | Fieldwood En | 50% | UNIT | [1] |
| GI 116 | G13944 | Federal | OP | 7/1/1993 | 5,000 | Fieldwood En | 50% | UNIT | [1] |
| S/2 GI 32 | 00174 | Federal | RT | 7/17/1948 | 2,500 | GOM Shelf | 25% | UNIT | [1] |
| S/2 GI 32 | 00174 | Federal | OP 1 | 7/17/1948 | 2,500 | BP E&P | 25% | UNIT | [1] |
| S/2 GI 32 | 00174 | Federal | OP 2 | 7/17/1948 | 2,500 | GOM Shelf | 25% | UNIT | [1] |
| E/2 GI 39 | 00126 | Federal | RT | 4/21/1947 | 2,500 | GOM Shelf | 25% | UNIT | [1] |
| E/2 GI 39 | 00126 | Federal | OP 1 | 4/21/1947 | 2,500 | BP E&P | 25% | UNIT | [1] |
| E/2 GI 39 | 00126 | Federal | OP 2 | 4/21/1947 | 2,500 | GOM Shelf | 25% | UNIT | [1] |
| W/2 GI 39 | 00127 | Federal | RT | 4/21/1947 | 2,500 | GOM Shelf | 25% | UNIT | [1] |
| W/2 GI 39 | 00127 | Federal | OP 1 | 4/21/1947 | 2,500 | BP E&P | 25% | UNIT | [1] |
| W/2 GI 39 | 00127 | Federal | OP 2 | 4/21/1947 | 2,500 | GOM Shelf | 25% | UNIT | [1] |
| E/2 GI 40 | 00128 | Federal | RT | 4/21/1947 | 5,000 | GOM Shelf | 25% | UNIT | [1] |
| GI 40 | 00128 | Federal | OP 1 | 4/21/1947 | 5,000 | BP E&P | 25% | UNIT | [1] |
| GI 40 | 00128 | Federal | OP 2 | 4/21/1947 | 5,000 | GOM Shelf | 25% | UNIT | [1] |

3

| Block | Lease | Type | Rights | Date Le Eff | Le Cur Acres (Ac) | Operator | WI | Lease Status | Note[1] |
|---|---|---|---|---|---|---|---|---|---|
| E/2 GI 41 | 00129 | Federal | RT | 4/21/1947 | 2,500 | GOM Shelf | 25% | UNIT | [1] |
| E/2 GI 41 | 00129 | Federal | OP 1 | 4/21/1947 | 2,500 | BP E&P | 25% | UNIT | [1] |
| E/2 GI 41 | 00129 | Federal | OP 2 | 4/21/1947 | 2,500 | GOM Shelf | 25% | UNIT | [1] |
| W/2 GI 41 | 00130 | Federal | OP 1 | 4/21/1947 | 2,500 | BP E&P | 25% | UNIT | [1] |
| W/2 GI 41 | 00130 | Federal | OP 2 | 4/21/1947 | 2,500 | GOM Shelf | 25% | UNIT | [1] |
| W/2 GI 41 | 00130 | Federal | RT | 4/21/1947 | 2,500 | GOM Shelf | 25% | UNIT | [1] |
| GI 42 | 00131 | Federal | OP 1 | 4/21/1947 | 5,000 | BP E&P | 25% | UNIT | [1] |
| GI 42 | 00131 | Federal | OP 2 | 4/21/1947 | 5,000 | GOM Shelf | 25% | UNIT | [1] |
| GI 42 | 00131 | Federal | RT | 4/21/1947 | 5,000 | GOM Shelf | 25% | UNIT | [1] |
| GI 43 | 00175 | Federal | OP 1 | 7/17/1948 | 5,000 | BP E&P | 25% | UNIT | [1] |
| GI 43 | 00175 | Federal | OP 2 | 7/17/1948 | 5,000 | GOM Shelf | 25% | UNIT | [1] |
| GI 43 | 00175 | Federal | RT | 7/17/1948 | 2,500 | GOM Shelf | 25% | UNIT | [1] |
| N/2 GI 44 | 00176 | Federal | OP 1 | 7/17/1948 | 2,500 | BP E&P | 25% | UNIT | [1] |
| N/2 GI 44 | 00176 | Federal | OP 2 | 7/17/1948 | 2,500 | GOM Shelf | 25% | UNIT | [1] |
| N/2 GI 44 | 00176 | Federal | RT | 4/21/1947 | 5,000 | GOM Shelf | 25% | UNIT | [1] |
| GI 46 | 00132 | Federal | OP 1 | 4/21/1947 | 5,000 | BP E&P | 25% | UNIT | [1] |
| GI 46 | 00132 | Federal | OP 2 | 4/21/1947 | 5,000 | GOM Shelf | 25% | UNIT | [1] |
| GI 47 | 00133 | Federal | RT | 4/21/1947 | 5,000 | GOM Shelf | 25% | UNIT | [1] |
| GI 47 | 00133 | Federal | OP 1 | 4/21/1947 | 5,000 | BP E&P | 25% | UNIT | [1] |
| GI 47 | 00133 | Federal | OP 2 | 4/21/1947 | 5,000 | GOM Shelf | 25% | UNIT | [1] |
| GI 48 | 00134 | Federal | RT | 4/21/1947 | 5,000 | GOM Shelf | 25% | UNIT | [1] |
| GI 48 | 00134 | Federal | OP 1 | 4/21/1947 | 5,000 | BP E&P | 25% | UNIT | [1] |
| GI 48 | 00134 | Federal | OP 2 | 4/21/1947 | 5,000 | GOM Shelf | 25% | UNIT | [1] |
| N/2 GI 52 | 00177 | Federal | RT | 7/17/1948 | 2,500 | GOM Shelf | 25% | UNIT | [1] |
| N/2 GI 52 | 00177 | Federal | OP 2 | 7/17/1948 | 2,500 | BP E&P | 25% | UNIT | [1] |
| HI 176 | G27509 | Federal | ORRI | 1/1/2006 | 5,760 | Castex Off | 3% | PROD | |
| MC 110 | G18192 | Federal | RT | 8/1/1997 | 5,760 | Talos | 8% | PROD | [1] |
| MC 110 | G18192 | Federal | OP | 8/1/1997 | 5,760 | Talos | 8% | PROD | [1] |
| MC 118 | G35963 | Federal | RT | 8/1/2017 | 5,760 | Chevron USA | 5% | PRIMARY | |
| MC 119 | G36537 | Federal | RT | 7/1/2019 | 5,760 | Chevron USA | 5% | PRIMARY | |

4

Case 20-33948   Document 1487-2   Filed in TXSB on 06/04/21   Page 100 of 250

| Block | Lease | Type | Rights | Date Le Eff | Le Cur Acres (Ac) | Operator | WI | Lease Status | Note[1] |
|-------|-------|------|--------|-------------|-------------------|----------|-----|--------------|---------|
| MC 162 | G36880 | Federal | RT | 8/1/2020 | 5,760 | Chevron USA | 5% | PRIMARY | |
| MC 163 | G36538 | Federal | RT | 7/1/2019 | 5,760 | Chevron USA | 5% | PRIMARY | |
| MC 171 | G34428 | Federal | RT | 12/1/2012 | 5,760 | Fieldwood En | 100% | PRIMARY | |
| MC 172 | G34429 | Federal | RT | 12/1/2012 | 5,760 | Fieldwood En | 100% | PRIMARY | |
| MC 206 | G36540 | Federal | RT | 7/1/2019 | 5,760 | Chevron USA | 5% | PRIMARY | |
| MC 297 | G34434 | Federal | RT | 11/1/2012 | 5,760 | Fieldwood En | 70% | PRIMARY | |
| MC 380 | G36544 | Federal | RT | 7/1/2019 | 5,760 | Fieldwood En | 100% | PRIMARY | |
| MC 424 | G36545 | Federal | RT | 7/1/2019 | 5,760 | Fieldwood En | 100% | PRIMARY | |
| MC 435 | G36772 | Federal | RT | 11/1/2019 | 5,760 | Fieldwood En | 100% | PRIMARY | |
| MC 436 | G36773 | Federal | RT | 11/1/2019 | 5,760 | Fieldwood En | 100% | PRIMARY | |
| MC 474 | G35825 | Federal | RT | 7/1/2016 | 5,760 | BP E&P | 24% | PRIMARY | |
| MC 474 | G35825 | Federal | OP | 7/1/2016 | 5,760 | BP E&P | 13% | PRIMARY | |
| MC 518 | G35828 | Federal | RT | 7/1/2016 | 5,760 | BP E&P | 24% | PRIMARY | |
| MC 518 | G35828 | Federal | OP | 7/1/2016 | 5,760 | BP E&P | 13% | PRIMARY | |
| MC 519 | G27278 | Federal | RT | 7/1/2005 | 5,760 | BP E&P | 65% | PROD | |
| MC 519 | G27278 | Federal | OP 2 | 7/1/2005 | 5,760 | Fieldwood En | 49% | PROD | |
| MC 519 | G27278 | Federal | OP 3 | 7/1/2005 | 5,760 | Fieldwood En | 49% | PROD | |
| MC 519 | G27278 | Federal | OP 4 | 7/1/2005 | 5,760 | BP E&P | 26% | PROD | |
| MC 519 | G27278 | Federal | OP 5 | 7/1/2005 | 5,760 | BP E&P | 26% | PROD | |
| MC 519 | G27278 | Federal | OP 6 | 7/1/2005 | 5,760 | BP E&P | 26% | PROD | |
| MC 562 | G19966 | Federal | RT | 7/1/1998 | 5,760 | BP E&P | 13% | PROD | |
| MC 562 | G19966 | Federal | OP 2 | 7/1/1998 | 5,760 | BP E&P | 13% | PROD | |
| MC 562 | G19966 | Federal | OP 3 | 7/1/1998 | 5,760 | BP E&P | 13% | PROD | |
| MC 563 | G21176 | Federal | OP 2 | 7/1/1999 | 5,760 | Fieldwood En | 23% | PROD | |
| MC 563 | G21176 | Federal | ORRI | 3/17/1999 | 5,760 | Kosmos En GOM Op | 0% | PROD | |
| MC 691 | G36400 | Federal | RT | 12/1/2018 | 5,760 | Fieldwood En | 50% | PRIMARY | |
| MC 697 | G28021 | Federal | RT | 4/1/2006 | 540 | Fieldwood En | 54% | UNIT | |
| MC 698 | G28022 | Federal | RT | 7/1/2006 | 5,760 | Fieldwood En | 54% | UNIT | |
| MC 742 | G32343 | Federal | RT B | 9/1/2008 | 1,440 | Fieldwood En | 54% | UNIT | |
| MC 742 | G32343 | Federal | RT A | 9/1/2008 | 4,320 | Fieldwood En | 100% | UNIT | |
| MC 743 | G36401 | Federal | RT | 11/1/2018 | 5,760 | Chevron USA | 25% | PRIMARY | |
| MC 782 | G33757 | Federal | RT | 7/1/2010 | 5,760 | Fieldwood En | 45% | PROD | |
| MC 789 | G36557 | Federal | RT | 7/1/2019 | 5,760 | Fieldwood En | 100% | PRIMARY | |

5

Case 20-33948   Document 1487-2   Filed in TXSB on 06/04/21   Page 101 of 250

| Block | Lease | Type | Rights | Date Le Eff | Le Cur Acres (Ac) | Operator | WI | Lease Status | Note[1] |
|---|---|---|---|---|---|---|---|---|---|
| MC 793 | G33177 | Federal | ORRI | 7/1/2009 | 5,760 | Walter O&G | 1% | UNIT | |
| MC 904 | G36566 | Federal | RT | 7/1/2019 | 5,760 | Fieldwood En | 59% | PRIMARY | |
| MC 905 | G36405 | Federal | RT | 11/1/2018 | 5,760 | Fieldwood En | 59% | PRIMARY | |
| MC 948 | G28030 | Federal | RT | 7/1/2006 | 5,760 | Fieldwood En | 59% | UNIT | |
| MC 949 | G32363 | Federal | RT | 7/1/2008 | 5,760 | Fieldwood En | 59% | UNIT | |
| MC 992 | G24133 | Federal | RT A | 7/1/2002 | 5,760 | Fieldwood En | 53% | UNIT | |
| MC 992 | G24133 | Federal | RT B | 7/1/2002 | 5,760 | Fieldwood En | 59% | UNIT | |
| MC 993 | G24134 | Federal | RT A | 7/1/2002 | 5,760 | Fieldwood En | 45% | UNIT | |
| MC 993 | G24134 | Federal | RT B | 7/1/2002 | 5,760 | Fieldwood En | 59% | UNIT | |
| SM 149 | G02592 | Federal | RT | 5/1/1974 | 2,500 | Fieldwood En | 50% | PROD | [1] |
| SM 149 | G02592 | Federal | OP | 5/1/1974 | 2,500 | Fieldwood En | 50% | PROD | [1] |
| SM 149 | G02592 | Federal | ORRI | 5/1/1974 | 2,500 | Fieldwood En | 4% | PROD | [1] |
| SM 40 | G13607 | Federal | RT | 8/1/1992 | 5,000 | Fieldwood En Off | 100% | TERMIN | |
| SM 41 | G01192 | Federal | OP 1 | 6/1/1962 | 5,000 | Fieldwood En Off | 100% | PROD | [1] |
| SM 48 | O0786 | Federal | ORRI | 2/24/1960 | 5,000 | Fieldwood En | 3% | PROD (production ceased 8/16/20) | [1] |
| SP 61 | G01609 | Federal | ORRI | 7/1/1967 | 5,000 | Fieldwood En | 19% | UNIT | [6] |
| SS 301 | G10794 | Federal | RT | 5/1/1989 | 5,000 | Fieldwood En Off | 65% | SOP extension request pending | [1] |
| SS 301 | G10794 | Federal | OP 1 | 5/1/1989 | 5,000 | Fieldwood En Off | 100% | SOP extension request pending | [1] |
| SS 79 | G15277 | Federal | RT | 8/1/1995 | 5,000 | Fieldwood En Off | 33% | PROD | [1] |
| SS 79 | G15277 | Federal | OP 1 | 8/1/1995 | 5,000 | Fieldwood En Off | 51% | PROD | |
| ST 287 | G24987 | Federal | RT | 5/1/2003 | 5,000 | Fieldwood En | 100% | PROD | |
| ST 287 | G24987 | Federal | OP 1 | 5/1/2003 | 5,000 | Fieldwood En | 100% | PROD | |

9

Case 20-33948   Document 1487-2   Filed in TXSB on 06/04/21   Page 102 of 250

| Block | Lease | Type | Rights | Date Le Eff | Le Cur Acres (Ac) | Operator | WI | Lease Status | Note[1] |
|---|---|---|---|---|---|---|---|---|---|
| ST 287 | G24987 | Federal | OP 2 | 5/1/2003 | 5,000 | Fieldwood En | 50% | PROD | |
| ST 308 | G21685 | Federal | RT | 6/1/2000 | 5,000 | Fieldwood En | 100% | PROD | |
| ST 308 | G21685 | Federal | OP 1 | 6/1/2000 | 5,000 | Fieldwood En | 100% | PROD | |
| ST 308 | G21685 | Federal | OP 2 | 6/1/2000 | 5,000 | Fieldwood En | 50% | PROD | |
| ST 53 | G04000 | Federal | RT | 3/1/1979 | 5,000 | Fieldwood En | 50% | PROD | [1] |
| ST 53 | G04000 | Federal | OP 1 | 3/1/1979 | 5,000 | Fieldwood En | 50% | PROD | [1] |
| ST 53 | G04000 | Federal | OP 2 | 3/1/1979 | 5,000 | Fieldwood En | 50% | PROD | [1] |
| ST 67 | 00020 | Federal | CONT | 4/25/1947 | 5,000 | Fieldwood En | 20% | UNIT | [1] |
| VR 229 | G27070 | Federal | RT A | 5/1/2005 | 1,250 | Fieldwood En Off | 50% | PROD | |
| VR 229 | G27070 | Federal | RT B | 5/1/2005 | 3,750 | Fieldwood En Off | 50% | PROD | |
| VR 362 | G10687 | Federal | RT | 6/1/1989 | 5,000 | Fieldwood En Off | 100% | UNIT (production ceased 8/22/20) | |
| VR 362 | G10687 | Federal | OP | 6/1/1989 | 5,000 | Fieldwood En Off | 83% | UNIT (production ceased 8/22/20) | |
| VR 363 | G09522 | Federal | RT | 5/1/1988 | 5,000 | Fieldwood En | 100% | UNIT (production ceased 8/22/20) | |
| VR 363 | G09522 | Federal | OP 1 | 5/1/1988 | 5,000 | Fieldwood En Off | 100% | UNIT (production ceased 8/22/20) | |
| VR 363 | G09522 | Federal | OP 2 | 5/1/1988 | 5,000 | Fieldwood En | 100% | UNIT (production ceased 8/22/20) | |
| VR 363 | G09522 | Federal | OP 3 | 5/1/1988 | 5,000 | Fieldwood En | 50% | UNIT (production | |

7

| Block | Lease | Type | Rights | Date Le Eff | Le Cur Acres (Ac) | Operator | WI | Lease Status ceased 8/22/20 | Note[†] |
|---|---|---|---|---|---|---|---|---|---|
| VR 371 | G09524 | Federal | RT | 7/1/1988 | 5,000 | Fieldwood En Off | 100% | PROD | |
| VR 371 | G09524 | Federal | OP | 7/1/1988 | 5,000 | Fieldwood En Off | 83% | PROD | |
| VR 78 | G04421 | Federal | RT | 11/1/1980 | 5,000 | Fieldwood En | 100% | PROD | |
| VR 78 | G04421 | Federal | OP | 11/1/1980 | 5,000 | Fieldwood En | 81% | PROD | |
| WD 57, WD 79, WD 80 | G01449 | Federal | ORRI | 5/1/1966 | 3,125 | Fieldwood En Off | 3% | UNIT | [7] |
| S/2 WD 67 | 00179 | Federal | RT | 7/17/1948 | 2,500 | GOM Shelf | 25% | UNIT | [1] |
| S/2 WD 67 | 00179 | Federal | OP 1 | 7/17/1948 | 2,500 | BP E&P | 25% | UNIT | [1] |
| S/2 WD 67 | 00179 | Federal | OP 2 | 7/17/1948 | 2,500 | GOM Shelf | 25% | UNIT | [1] |
| S/2 WD 68 | 00180 | Federal | RT | 7/17/1948 | 1,833 | GOM Shelf | 25% | UNIT | [1] |
| S/2 WD 68 | 00180 | Federal | OP 1 | 7/17/1948 | 1,833 | BP E&P | 25% | UNIT | [1] |
| S/2 WD 68 | 00180 | Federal | OP 2 | 7/17/1948 | 1,833 | GOM Shelf | 25% | UNIT | [1] |
| WD 69 | 00181 | Federal | RT | 7/17/1948 | 3,665 | GOM Shelf | 25% | UNIT | [1] |
| WD 69 | 00181 | Federal | OP 1 | 7/17/1948 | 3,665 | BP E&P | 25% | UNIT | [1] |
| WD 69 | 00181 | Federal | OP 2 | 7/17/1948 | 3,665 | GOM Shelf | 25% | UNIT | [1] |
| WD 70 | 00182 | Federal | RT | 7/17/1948 | 5,000 | GOM Shelf | 25% | UNIT | [1] |
| WD 70 | 00182 | Federal | OP 1 | 7/17/1948 | 5,000 | BP E&P | 25% | UNIT | [1] |
| WD 70 | 00182 | Federal | OP 2 | 7/17/1948 | 5,000 | GOM Shelf | 25% | UNIT | [1] |
| WD 71 | 00838 | Federal | RT | 4/1/1960 | 5,000 | GOM Shelf | 25% | UNIT | [1] |
| WD 71 | 00838 | Federal | OP 1 | 4/1/1960 | 5,000 | BP E&P | 25% | UNIT | [1] |
| WD 71 | 00838 | Federal | OP 2 | 4/1/1960 | 5,000 | GOM Shelf | 25% | UNIT | [1] |
| WD 79, WD 80 | G01874 | Federal | ORRI | 12/1/1968 | 3,438 | Fieldwood En Off | 3% | UNIT | [7] |

8

Case 20-33948   Document 1487-2   Filed in TXSB on 06/04/21   Page 104 of 250

| Block | Lease | Type | Rights | Date Le Eff | Le Cur Acres (Ac) | Operator | WI | Lease Status | Note[†] |
|---|---|---|---|---|---|---|---|---|---|
| WD 80 | G01989 | Federal | ORRI | 8/1/1970 | 1,875 | Fieldwood En Off | 3% | UNIT | [7] |
| WD 80 | G02136 | Federal | ORRI | 1/1/1972 | 938 | Fieldwood En Off | 3% | UNIT | [7] |
| WD 94 | 00839 | Federal | RT | 5/1/1960 | 5,000 | GOM Shelf | 25% | PROD | [1] |
| WD 94 | 00839 | Federal | OP 1 | 5/1/1960 | 5,000 | GOM Shelf | 25% | PROD | [1] |
| WD 95 | G01497 | Federal | RT | 12/1/1966 | 5,000 | GOM Shelf | 25% | PROD | [1] |
| WD 95 | G01497 | Federal | OP 1 | 12/1/1966 | 5,000 | GOM Shelf | 25% | PROD | [1] |
| WD 95 | G01497 | Federal | OP 2 | 12/1/1966 | 5,000 | GOM Shelf | 25% | PROD | [1] |
| WD 96 | G01498 | Federal | RT | 12/1/1966 | 3,665 | GOM Shelf | 25% | PROD | [1] |
| WD 96 | G01498 | Federal | OP 1 | 12/1/1966 | 3,665 | BP E&P | 25% | PROD | [1] |
| WD 96 | G01498 | Federal | OP 2 | 12/1/1966 | 3,665 | GOM Shelf | 25% | PROD | [1] |
| - | 5749 | SL-TX | WI | - | - | Fieldwood SD Offshore | 100% | UNIT | |
| - | 5797 | SL-TX | WI | - | - | Fieldwood SD Offshore | 100% | TERMIN | |
| | 23017 | SL-MS | ORRI | - | - | Tellus Operating Group LLC | 1% | UNIT | |
| | 24318 | SL-TX | WI | - | - | Fieldwood Onshore | 100% | TERMINATED | |
| - | 106158 | SL-TX | WI | - | - | Fieldwood Energy Offshore LLC | 100% | TERMIN | |
| - | 106159 | SL-TX | WI | - | - | Fieldwood Energy Offshore LLC | 100% | TERMIN | |
| - | 114921 | SL-TX | WI | - | - | Fieldwood Energy Offshore LLC | 100% | TERMIN | |
| - | 170650 | SL-MS | ORRI | - | - | Whiting Oil & Gas | 1% | UNIT | |
| - | 172915 | SL-TX | WI | - | - | Fieldwood SD Offshore | 100% | ACTIVE | |

Case 20-33948   Document 1487-2   Filed in TXSB on 06/04/21   Page 105 of 250

| Block | Lease | Type | Rights | Date Le Eff | Le Cur Acres (Ac) | Operator | WI | Lease Status | Note[1] |
|---|---|---|---|---|---|---|---|---|---|
| - | 172916 | SL-TX | WI | - | - | Fieldwood SD Offshore | 100% | ACTIVE | |
| - | 178537 | SL-TX | WI | - | - | Fieldwood | 100% | TERMINATED | |
| - | 183756 | SL-TX | WI | - | - | Fieldwood | 100% | TERMINATED | |
| - | 185633 | SL-TX | WI | - | - | Fieldwood Onshore | 100% | TERMINATED | |
| - | 186891 | SL-TX | WI | - | - | Fieldwood Onshore | 100% | ACTIVE | |
| - | 191681 | SL-TX | WI | - | - | Fieldwood SD Offshore | 100% | ACTIVE | |
| - | 207398 | SL-TX | WI | - | - | Fieldwood | 90% | ACTIVE | |
| - | 227360 | SL-TX | WI | - | - | Fieldwood Onshore | 74% | ACTIVE | |
| - | 230140 | SL-MS | ORRI | | | Black Jack Oil Co Inc | 1% | UNIT | |
| - | 230150 | SL-MS | ORRI | | | Wilcox Energy Co | 1% | UNIT | |
| - | 231240 | SL-MS | ORRI | | | Wilcox Energy Co | 1% | UNIT | |
| - | 234082 | SL-TX | WI | - | - | Fieldwood Onshore | 100% | TERMINATED | |
| - | 255675 | SL-TX | WI | - | - | Fieldwood Onshore | 100% | TERMINATED | |
| - | 5752 | SL-TX | WI | - | - | Fieldwood Onshore | 100% | TERMINATED | |
| - | 140960 | SL-TX | WI | - | - | Fieldwood SD Offshore | 100% | TERMINATED | |
| - | 165888 | SL-TX | WI | - | - | Fieldwood Onshore | 100% | TERMINATED | |
| - | 186892 | SL-TX | WI | - | - | Fieldwood Onshore | 100% | TERMINATED | |
| - | 176012 | SL-TX | WI | - | - | Fieldwood Onshore | 100% | TERMINATED | |

10

Case 20-33948 Document 1487-2 Filed in TXSB on 06/04/21 Page 106 of 250

| Block | Lease | Type | Rights | Date Le Eff | Le Cur Acres (Ac) | Operator | WI | Lease Status | Note[†] |
|---|---|---|---|---|---|---|---|---|---|
| - | 179673 | SL-TX | WI | - | - | Fieldwood Onshore | 100% | TERMINATED | |
| - | 188919 | SL-TX | WI | - | - | Fieldwood Onshore | 100% | TERMINATED | |
| - | 188921 | SL-TX | WI | - | - | Fieldwood Onshore | 100% | TERMINATED | |
| - | 269151 | SL-TX | WI | - | - | Fieldwood Onshore | 100% | TERMINATED | |

11

## Credit Bid Purchaser ROW

| SEGMENT NUMBER | COMPANY NAME | ORG AREA | ORG BLOCK | ORG NAME | REC AREA | REC BLOCK | REC NAME | SIZE | PRODUCT | STATUS | ROW NUMBER | FW LEASE | NOTE |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 20200 | Fieldwood Energy, LLC | GC | 39 | K2 SUTA | GC | 40 | K1 SUTA | 5 | UBEH | Active | G29427 | G34966 | |
| 20202 | Fieldwood Energy, LLC | GC | 40 | K1 PLET | ST | 308 | A | 8 | BLKO | Proposed | G29427 | G34966 | |
| 20203 | Fieldwood Energy, LLC | GC | 40 | K1 PLET | ST | 308 | Start Up Flange | 12 | CSNG | Proposed | G29427 | G34966 | |
| 8255 | Fieldwood Energy Offshore LLC | GC | 65 | A | GC | 19 | A | 12 | OIL | Out of Service | G09349 | G05889 | |
| 11260 | Fieldwood Energy Offshore LLC | GC | 65 | A | GC | 19 | A | 16 | OIL | Out of Service | G17685 | G05889 | |
| 20195 | Fieldwood Energy Offshore LLC | GC | 65 | A | GC | 200 | SUTA | 3 | UMB | Proposed | G29424 | G12209 | |
| 20221 | Fieldwood Energy Offshore LLC | GC | 156 | Mid-Line PLET A-1 | GC | 156 | Mid-Line PLET A-2 | 8 | BLKO | Proposed | G29417 | G12209 | |
| 20197 | Fieldwood Energy Offshore LLC | GC | 156 | PLET 2 | GC | 156 | A-2 PLET | 8 | BLKO | Out of Service | G28820 | G12209 | |
| 20155 | Fieldwood Energy Offshore LLC | GC | 156 | Mid-Line PLET A-2 | GC | 65 | A | 8 | BLKO | Out of Service | G29417 | G12209 | |
| 20183 | Fieldwood Energy Offshore LLC | GC | 200 | SUTA | GC | 244 | TROIKA SUTA | 5 | UMB | Proposed | G29420 | G11043 | |
| 11393 | Fieldwood Energy, LLC | GC | 200 | SS Manifold | GC | 65 | A | 10 | BLKO | Out of Service | G17737 | G12210 | |
| 11394 | Fieldwood Energy, LLC | GC | 200 | SSMANIFO | GC | 65 | A | 24 | CSNG | Out of Service | G17737 | G12210 | |
| 11395 | Fieldwood Energy, LLC | GC | 200 | SSMANIFO | GC | 65 | A | 5 | UMB | Out of Service | G17737 | G12210 | |
| 11396 | Fieldwood Energy, LLC | GC | 200 | SSMANIFO | GC | 65 | A | 10 | BLKG | Out of Service | G17738 | G12210 | |
| 11397 | Fieldwood Energy, LLC | GC | 200 | SSMANIFO | GC | 65 | A | 24 | CSNG | Out of Service | G17738 | G12210 | |
| 11410 | Fieldwood Energy, LLC | GC | 200 | SSMANIFO | GC | 65 | A | 5 | UMB | Out of Service | G17738 | G12210 | |
| 11959 | Fieldwood Energy Offshore LLC | GC | 200 | SSMANIFO | GC | 65 | A | 2 | UMB | Out of Service | G17737 | G12210 | |
| 12141 | Fieldwood Energy Offshore LLC | GC | 200 | SSMANIFO | GC | 65 | A | 5 | UMB | Out of Service | G17738 | G12210 | |
| 20196 | Fieldwood Energy Offshore LLC | GC | 200 | PLET-1 | GC | 156 | PLET-2 | 8 | BLKO | Proposed | G29425 | G12210 | |
| 20222 | Fieldwood Energy Offshore LLC | GC | 244 | PLEM A | GC | 156 | Mid-Line PLET A-1 | 8 | BLKO | Proposed | G28809 | G11043 | |
| 9084 | GOM Shelf, LLC | GI | 43 | AS | GI | 19 | F/S | 10 | OIL | Active | G12304 | 00175 | [1] |
| 19097 | Fieldwood Energy, LLC | MC | 698 | RGL PLET 1 | MC | 736 | A Thunderhawk | 8 | BLKO | Out of Service | G29295 | G28022 | |

12

[1]  FWE I is to obtain 75% of the Debtors' interests in Segment 9084, 50% of the Debtors' interest in Segments 4647 and 5890 and 79.666% of the Debtors' interest in Segment 17265, and the Credit Bid Purchaser is to obtain the Debtors' remaining interests in those four pipeline segments.

Case 20-33948   Document 1285-1   Filed in TXSB on 04/15/21   Page 108 of 1032

| SEGMENT NUMBER | COMPANY NAME | ORG AREA | ORG BLOCK | ORG NAME | REC AREA | REC BLOCK | REC NAME | SIZE | PRODUCT | STATUS | ROW NUMBER | FW LEASE | NOTE |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 19149 | Fieldwood Energy, LLC | MC | 698 | RGL PLET 1 | MC | 736 | A Thunderhawk | 8 | BLKO | Out of Service | G29295 | G28022 | |
| 19296 | Fieldwood Energy, LLC | MC | 698 | RGL PLET 1 | MC | 736 | A Thunderhawk | 12 | CSNG | Out of Service | G29294 | G28022 | |
| 19364 | Fieldwood Energy, LLC | MC | 698 | RGL PLET 1 | MC | 736 | A | 12 | CSNG | Out of Service | G29295 | G28022 | |
| 19362 | Fieldwood Energy, LLC | MC | 724 | Gulfstar 1 Spar | MC | 948 | UTA1 | 8 | UMB | Out of Service | G29287 | G28030 | |
| 19334 | Fieldwood Energy, LLC | MC | 736 | A Thunderhawk | MC | 692 | SUTA | 5 | UMBH | Out of Service | G29299 | G28022 | |
| 19283 | Fieldwood Energy, LLC | MC | 736 | A Thunderhawk | MC | 698 | BBD SUTA | 6 | UMB | Out of Service | G29295 | G28022 | |
| 19297 | Fieldwood Energy, LLC | MC | 736 | A Thunderhawk | MC | 692 | North Plet | 1 | LIFT | Out of Service | G29299 | G28022 | |
| 19282 | Fieldwood Energy, LLC | MC | 736 | A Thunderhawk | MC | 782 | Dan 1 STUA 1 | 6 | UBEH | Out of Service | G29294 | G33757 | |
| 19154 | Fieldwood Energy, LLC | MC | 948 | PLET NPL3 HUB | MC | 724 | Gulfstar 1 SPAR | 8 | BLKO | Out of Service | G28736 | G28030 | |
| 19155 | Fieldwood Energy, LLC | MC | 948 | PLET SPL2 HUB | MC | 724 | Gulfstar 1 SPAR | 8 | BLKO | Out of Service | G29287 | G28030 | |
| 19365 | Fieldwood Energy, LLC | MC | 948 | PLET NPL3 HUB | MC | 767 | ILS NPL1 | 12 | CSNG | Out of Service | G28736 | G28030 | |
| 19374 | Fieldwood Energy, LLC | MC | 948 | PLET NPL3 HUB | MC | 948 | PLET SPL2 HUB | 8 | BLKO | Out of Service | G28736 | G28030 | |
| 19432 | Fieldwood Energy, LLC | MC | 948 | PLET SPL2 | MC | 768 | ILS SPL1 | 12 | CSNG | Out of Service | G29287 | G28030 | |
| 14292 | Fieldwood Energy, LLC | SM | 40 | JA | SM | 40 | 10"SSTI | 6 | OIL | Out of Service | G28816 | G13607 | |
| 14293 | Fieldwood Energy, LLC | SM | 40 | B | SM | 40 | JA | 6 | BLKO | Out of Service | G28817 | G13607 | |
| 14294 | Fieldwood Energy, LLC | SM | 40 | B | SM | 40 | JA | 6 | BLKO | Out of Service | G28818 | G13607 | |
| 14295 | Fieldwood Energy, LLC | SM | 40 | JA | SM | 40 | B | 2 | LIFT | Out of Service | G28819 | G13607 | |
| 4647 | Fieldwood Energy, LLC | SM | 149 | 6"SSTI | SM | 132 | B | 6 | BLKO | Out of Service | G03432 | G02592 | [1] |
| 13736 | Fieldwood Energy, LLC | SS | 79 | #2 | SS | 80 | A | 4 | BLKO | Out of Service | G23712 | G15277 | |
| 13737 | Fieldwood Energy, LLC | SS | 79 | #2 | SS | 80 | A | 4 | BLKO | Out of Service | G23713 | G15277 | |
| 8204 | Fieldwood Energy Offshore LLC | SS | 80 | A | EI | 125 | 30 SSTI | 6 | G/C | Out of Service | G09330 | G15277 | |
| 11050 | Fieldwood Energy Offshore LLC | SS | 301 | A | SS | 300 | B | 8 | BLKO | Out of Service | G16055 | G10794 | |
| 5890 | Fieldwood Energy, LLC | ST | 53 | A | ST | 52 | A | 6 | OIL | Out of Service | G09319 | G04000 | [1] |
| 17265 | Fieldwood Energy, LLC | ST | 68 | Caisson No. 1 | ST | 53 | A | 6 | BLKO | Out of Service | G28385 | G04000 | [1] |
| 20278 | Fieldwood Energy, LLC | ST | 308 | A | GC | 39 | K2 SUTA | 5 | UBEH | Proposed | G29427 | G34966 | |
| 10675 | Bandon Oil and Gas, LP | VR | 371 | A | VR | 350 | 08 SSTI | 6 | OIL | Out of Service | G15047 | G09524 | |

13

## Credit Bid Purchaser RUE

| Area | Block No. | Structure | Complex ID No. | Authority No. | FW Lease | Operator | Approval Date | Associated Assets | Note |
|------|-----------|-----------|----------------|---------------|----------|----------|---------------|-------------------|------|
| MC | 736 | A (Thunder Hawk) | 2045 | G30354 | G28022 | Fieldwood Energy LLC | 07/03/18 | MC 698 001, MC 734 SS002, SS004, SS005, SS006, MC 782 001 & 002 | |
| SM | 40 | B | 1266 | G30342 | G13607 | Fieldwood Energy Offshore LLC | 06/21/18 | SM 41 B2, B3, B4, B6 & SM 40 B5 | |
| SM | 40 | JA | 27017 | G30352 | G13607 | Fieldwood Energy Offshore | | SM 41 B PF and wells | |
| SS | 80 | A | 23548 | G30201 | G15277 | Fieldwood Energy Offshore LLC | 02/07/13 | SS 79 A002 | |
| ST | 68 | CAISS. #1 | 24108 | G30267 | 00020 | Fieldwood Energy LLC | 03/09/18 | ST 67 #6 | [1] |

14

**Exhibit C**
**Leases, Rights of Way and Rights of Use and Easement Related to**
**FWE I Oil & Gas Lease Interests**

Case 20-33948   Document 1285-1   Filed in TXSB on 04/15/21   Page 111 of 1032

## Leases Related to FWE I Oil & Gas Lease Interests[*]

| Block | Lease | Type | Rights | Date Le Eff | Le Cur Acres | Operator | WI | Lease Status | Notes[†] |
|---|---|---|---|---|---|---|---|---|---|
| BA 491 | G06069 | Federal | RT | 10/1/1983 | 5,760 | Fieldwood En | 100.0% | TERMIN | [6] |
| BA A-105 | G01757 | Federal | RT | 7/1/1968 | 5,760 | Fieldwood En | 12.5% | PROD | [6] |
| BA A-105 | G01757 | Federal | RT A | 7/1/1968 | 5,760 | Fieldwood En | 12.5% | PROD | [6] |
| BA A-105 | G01757 | Federal | OP 1 | 7/1/1968 | 5,760 | Fieldwood En | 6.3% | PROD | [6] |
| BA 133 | G02665 | Federal | OP | 7/1/1974 | 5,760 | GOM Shelf | 12.5% | PROD | [11], [6] |
| BA A-133 | G02665 | Federal | RT | 7/1/1974 | 5,760 | GOM Shelf | 25.0% | PROD | [11], [6] |
| BA 19 | G33399 | Federal | RT | 1/1/2010 | 5,760 | Apache Shelf Exp | 100.0% | EXPIR | |
| BA A47 | G03940 | Federal | RT | 3/1/1979 | 5,760 | Fieldwood En | 33.3% | TERMIN | |
| BA A47 | G03940 | Federal | OP | 3/1/1979 | 5,760 | Fieldwood En | 100.0% | TERMIN | |
| BA A69 | G32733 | Federal | RT | 11/1/2008 | 5,760 | Apache Shelf Exp | 100.0% | EXPIR | |
| BS 39 | G33683 | Federal | RT | 7/1/2010 | 1,237 | Petsec En | 18.8% | RELINQ | |
| BS 41 | G21142 | Federal | OP 2 | 5/1/1999 | 4,995 | Fieldwood En Off | 13.1% | TERMIN | [3] |
| BS 41 | G21142 | Federal | Contractual | 5/1/1999 | 4,995 | Fieldwood En Off | TBD | TERMIN | [3] |

[*]    The Debtors reserve the right to amend, modify, or supplement this schedule in accordance with the terms of the Plan and subject to any consent rights under the Restructuring Support Agreement.

[1]    Represents leases owned by GOM Shelf LLC.

[2]    Represents leases in which FWE I is to acquire solely the right, title and interest acquired by FWE from Apache; the Credit Bid Purchaser will acquire the Debtors' remaining right, title and interest in such leases. As to all remaining leases on this schedule (except the leases referenced in footnotes [3]-[7] below), FWE I is to obtain all of FWE's right, title and interest in such leases.

[3]    Represents leases in which FWE I is to acquire solely the right, title and interest acquired by FWE from Apache. FWE III will acquire the Debtors' remaining right, title and interest in such leases.

[4]    Represents leases in which FWE I is to acquire solely the right, title and interest acquired by FWE from Apache. The Debtors' remaining right, title and interest in such leases are to be abandoned.

[5]    FWE I is to acquire solely the operating rights as to the NE/4 of this block; the Credit Bid Purchaser is to obtain the Debtors' overriding royalty interest in this lease; and the Debtors' remaining interests in the lease are to be abandoned.

[6]    Represents leases in which FWE I is to acquire solely the right, title and interest acquired by FWE from Apache. The Debtors' remaining right, title and interest in such leases are to be acquired by Chevron.

[7]    Represents leases in which (i) FWE I is to acquire solely the right, title and interest acquired by FWE from Apache and (ii) FWE IV is to acquire solely the right, title and interest acquired by FWE from Chevron. The Debtors' remaining right, title and interest in such leases are to be abandoned.

**Legend:**   CONT - Contractual; OP - Operating Rights: OP 1- Operating Rights 1; OP 2 - Operating Rights 2; OP 3 - Operating Rights 3; OP 4 - Operating Rights 4; OP 5 - Operating Rights 5; OP 6 - Operating Rights 6; OP 7 - Operating Rights 7; OP 10 - Operating Rights 10; OP 11 - Operating Rights 11; OP 12 - Operating Rights 12; OPRTS - Operating Rights; OPRTS Cont - Operating Rights / Contractual; ORRI - Overriding Royalty Interest; RT - Record Title: RT A - Record Title A; RT B - Record Title B; WI - Working Interest

Case 20-33948   Document 1285-1   Filed in TXSB on 04/15/21   Page 112 of 1032

| Block | Lease | Type | Rights | Date Le Eff | Le Cur Acres | Operator | WI | Lease Status | Notes[†] |
|---|---|---|---|---|---|---|---|---|---|
| BS 42 | G33684 | Federal | RT | 7/1/2010 | 4,552 | Apache Shelf Exp | 37.5% | RELINQ | |
| CA 42 | G32267 | Federal | OP 1 | 7/1/2008 | 5,000 | Fieldwood En | 50.0% | RELINQ | |
| CA 43 | G32268 | Federal | OP 1 | 7/1/2008 | 5,000 | Fieldwood En | 50.0% | PROD | |
| CS 71 | SL06618 | SL-LA | ORRI | - | - | - | 5.2% | | |
| CS 71 | SL12503 | SL-LA | ORRI | - | - | - | 0.6% | TERMIN | |
| DD 253 | G10426 | Federal | RT | 6/1/1990 | 5,760 | Apache Shelf Exp | 100.0% | EXPIR | |
| DD 297 | G10427 | Federal | RT | 6/1/1990 | 5,760 | Apache Shelf Exp | 100.0% | EXPIR | |
| EB 128 | G34034 | Federal | RT | 4/1/2012 | 165 | Apache Shelf Exp | 100.0% | RELINQ | |
| EB 172 | G34035 | Federal | RT | 4/1/2012 | 5,760 | Apache Shelf Exp | 100.0% | RELINQ | |
| EC 12 | G34220 | Federal | RT | 8/1/2012 | 5,000 | Apache Shelf Exp | 100.0% | RELINQ | |
| EC 14 | G13572 | Federal | RT | 7/1/1992 | 2,544 | Fieldwood En | 100.0% | TERMIN | |
| EC 171 | G34228 | Federal | RT | 9/1/2012 | 5,000 | Apache Shelf Exp | 100.0% | RELINQ | |
| EC 172 | G17858 | Federal | RT | 7/1/1997 | 5,000 | Fieldwood En | 100.0% | TERMIN | |
| EC 178 | G34229 | Federal | RT | 10/1/2012 | 5,000 | Apache Shelf Exp | 100.0% | RELINQ | |
| EC 179 | G34230 | Federal | RT | 10/1/2012 | 5,000 | Apache Shelf Exp | 100.0% | RELINQ | |
| EC 185 | G34796 | Federal | RT | 6/1/2013 | 5,000 | Fieldwood En | 100.0% | RELINQ | |
| EC 2 | SL16473 | SL-LA | WI | 7/13/1999 | 148 | Apache | 89.1% | RELINQ | |
| EC 2 | SL16475 | SL-LA | WI | 7/19/1999 | 135 | Apache | 89.1% | ACTIVE | |
| EC 2 | SL18121 | SL-LA | WI | 5/12/2004 | 220 | Fieldwood | 50.0% | ACTIVE | |
| EC 222 | G02037 | Federal | OP 1 | 2/1/1971 | 5,000 | Talos | 17.9% | TERMIN | |
| EC 222 | G02037 | Federal | OP 2 | 2/1/1971 | 5,000 | Talos | 17.9% | TERMIN | |
| EC 229 | G34232 | Federal | RT | 10/1/2012 | 5,000 | Apache Shelf Exp | 100.0% | RELINQ | |
| EC 230 | G34233 | Federal | RT | 10/1/2012 | 5,000 | Apache Shelf Exp | 100.0% | RELINQ | |
| EC 24 | G04098 | Federal | RT | 10/1/1979 | 5,000 | Apex O&G | 18.0% | TERMIN | |
| EC 24 | G04098 | Federal | OP 2 | 10/1/1979 | 5,000 | Apex O&G | 31.3% | TERMIN | |
| EC 24 | G04098 | Federal | OP 3 | 10/1/1979 | 5,000 | Apex O&G | 30.3% | TERMIN | |
| EC 242 | G34234 | Federal | RT | 10/1/2012 | 5,000 | Apache Shelf Exp | 100.0% | RELINQ | |
| EC 243 | G34235 | Federal | RT | 10/1/2012 | 5,000 | Apache Shelf Exp | 100.0% | RELINQ | |
| EC 261 | G00971 | Federal | RT | 6/1/1962 | 5,000 | Fieldwood En | 100.0% | TERMIN | |
| EC 263 | G33072 | Federal | RT | 6/1/2009 | 5,000 | Apache Shelf Exp | 100.0% | EXPIR | |
| EC 264 | G01880 | Federal | RT | 3/1/1969 | 5,000 | Fieldwood En | 100.0% | TERMIN | |
| EC 265 | G00972 | Federal | RT | 6/1/1962 | 5,000 | Fieldwood En | 100.0% | RELINQ | |
| EC 270 | G02045 | Federal | RT | 1/1/1971 | 2,500 | Apache | 70.0% | TERMIN | |
| EC 278 | G00974 | Federal | RT | 6/1/1962 | 5,000 | Fieldwood En | 50.0% | TERMIN | |

2

Case 20-33948   Document 1487-2   Filed in TXSB on 06/04/21   Page 113 of 250

| Block | Lease | Type | Rights | Date Le Eff | Le Cur Acres | Operator | WI | Lease Status | Notes[†] |
|---|---|---|---|---|---|---|---|---|---|
| EC 292 | G34237 | Federal | RT | 9/1/2012 | 5,000 | Apache Shelf Exp | 100.0% | RELINQ | |
| EC 293 | G34238 | Federal | RT | 9/1/2012 | 5,000 | Apache Shelf Exp | 100.0% | RELINQ | |
| EC 294 | G34239 | Federal | RT | 9/1/2012 | 5,000 | Apache Shelf Exp | 100.0% | RELINQ | |
| EC 310 | G34240 | Federal | RT | 11/1/2012 | 5,000 | Apache Shelf Exp | 100.0% | RELINQ | |
| EC 328 | G10638 | Federal | RT | 5/1/1989 | 5,000 | Arena Off | 100.0% | PROD | |
| EC 33 | G01972 | Federal | OP | 9/1/1970 | 1,250 | Merit En | 15.6% | TERMIN | |
| EC 335 | G02439 | Federal | OP | 8/1/1973 | 5,000 | Energy XXI GOM | 14.0% | TERMIN | |
| EC 338 | G02063 | Federal | RT | 2/1/1971 | 5,000 | Anadarko US Off | 15.7% | PROD | |
| EC 37 | G25933 | Federal | RT | 5/1/2004 | 2,608 | Probe Res US | 100.0% | TERMIN | |
| EC 370 | G33073 | Federal | RT | 6/1/2009 | 5,000 | Apache Shelf Exp | 100.0% | EXPIR | |
| EC 71 | G13576 | Federal | RT | 9/1/1992 | 5,000 | EC Off Prop | 100.0% | SOP | |
| EC 9/14 | G01440 | Federal | RT | 4/1/1966 | 3,152 | Fieldwood En | 100.0% | PROD | |
| EC 9/14 | G01440 | Federal | OP 1 | 4/1/1966 | 3,152 | Fieldwood En | 100.0% | PROD | |
| EI 10 | G23851 | Federal | RT | 7/1/2002 | 2,303 | Contango Op | 50.0% | PROD | |
| EI 10 | G23851 | Federal | OP 2 | 7/1/2002 | 2,303 | Contango Op | 50.0% | PROD | |
| EI 105 | 00797 | Federal | RT | 5/1/1960 | 5,000 | Fieldwood En | 100.0% | TERMIN | |
| EI 106 | G17966 | Federal | RT A | 7/1/1997 | 5,000 | Apache | 50.0% | TERMIN | |
| EI 106 | G17966 | Federal | RT B | 7/1/1997 | 5,000 | Apache | 100.0% | TERMIN | |
| EI 107 | G15241 | Federal | RT | 9/1/1995 | 5,000 | Apache | 75.0% | TERMIN | |
| EI 108 | G03811 | Federal | OP 1 | 6/1/1978 | 5,000 | Fieldwood En | 60.0% | TERMIN | |
| EI 108 | G03811 | Federal | RT A | 6/1/1978 | 5,000 | Fieldwood En | 60.0% | TERMIN | |
| EI 108 | G03811 | Federal | RT B | 6/1/1978 | 5,000 | Fieldwood En | 71.3% | TERMIN | |
| EI 116 | G34292 | Federal | RT | 9/1/2012 | 5,000 | Apache Shelf Exp | 100.0% | EXPIR | |
| EI 117 | G34293 | Federal | RT | 10/1/2012 | 5,000 | Apache Shelf Exp | 100.0% | RELINQ | |
| EI 118 | G15242 | Federal | RT A | 7/1/1995 | 5,000 | Black Elk En Off Op | 25.0% | TERMIN | |
| EI 118 | G15242 | Federal | RT B | 7/1/1995 | 5,000 | Fieldwood En | 75.0% | TERMIN | |
| EI 119 | 00049 | Federal | RT A | 8/28/1945 | 5,000 | Fieldwood En | 50.0% | PROD | |
| EI 119 | 00049 | Federal | RT B | 8/28/1945 | 5,000 | Fieldwood En | 100.0% | PROD | |
| EI 120 | 00050 | Federal | RT | 8/28/1945 | 5,000 | Fieldwood En | 100.0% | PROD | |
| EI 125 | 00051 | Federal | RT | 8/28/1945 | 5,000 | Fieldwood En | 100.0% | OPERNS | |
| EI 126 | 00052 | Federal | RT | 8/28/1945 | 5,000 | Fieldwood En | 100.0% | PROD | |
| EI 126 | 00052 | Federal | OP | 8/28/1945 | 5,000 | Fieldwood En | 75.0% | PROD | |
| EI 128 | G34294 | Federal | RT | 10/1/2012 | 3,427 | Apache Shelf Exp | 100.0% | RELINQ | |
| EI 131 | G33625 | Federal | RT | 6/1/2010 | 5,000 | Apache Shelf Exp | 100.0% | RELINQ | |

3

| Block | Lease | Type | Rights | Date Le Eff | Le Cur Acres | Operator | WI | Lease Status | Notes† |
|---|---|---|---|---|---|---|---|---|---|
| EI 132 | G33626 | Federal | RT | 6/1/2010 | 5,000 | Apache Shelf Exp | 100.0% | RELINQ | |
| EI 135 | G34296 | Federal | RT | 10/1/2012 | 5,000 | Apache Shelf Exp | 100.0% | RELINQ | |
| EI 136 | G03152 | Federal | RT | 7/1/1975 | 5,000 | Fieldwood En | 100.0% | PROD | |
| EI 156 | G16353 | Federal | OP | 6/1/1996 | 5,000 | Black Elk En Off Op | 50.0% | TERMIN | |
| EI 158 | G01220 | Federal | RT | 6/1/1962 | 5,000 | Fieldwood En | 100.0% | PROD | |
| EI 173 | G13622 | Federal | RT | 7/1/1992 | 5,000 | Fieldwood En | 100.0% | PROD | |
| EI 174 | G03782 | Federal | RT | 6/1/1978 | 5,000 | Arena Off | 100.0% | PROD | |
| EI 174 | G03782 | Federal | OP | 6/1/1978 | 5,000 | Arena Off | 30.0% | PROD | |
| EI 175 | 00438 | Federal | OP 1 | 12/1/1954 | 5,000 | Fieldwood En | 75.0% | PROD | [4] |
| EI 187 | G10736 | Federal | RT | 7/1/1989 | 5,000 | Fieldwood En | 100.0% | PROD | |
| EI 188 | 00443 | Federal | RT | 1/1/1955 | 5,000 | Apache | 100.0% | TERMIN | |
| EI 189 | 00423 | Federal | RT | 12/1/1954 | 3,750 | Fieldwood En | 100.0% | PROD | |
| EI 196 | 00802 | Federal | RT | 5/1/1960 | 3,516 | Fieldwood En | 50.0% | RELINQ | |
| EI 196 | 00802 | Federal | OP | 5/1/1960 | 3,516 | Fieldwood En | 100.0% | RELINQ | |
| EI 196 | G13821 | Federal | OP 2 | 5/1/1960 | 1,484 | Arena Off | 100.0% | RELINQ | |
| EI 196 | G13821 | Federal | OP 4 | 5/1/1960 | 1,484 | Arena Off | 100.0% | RELINQ | |
| EI 20 | G34286 | Federal | RT | 10/1/2012 | 3,582 | Castex Off | 50.0% | RELINQ | |
| EI 207 | G34301 | Federal | RT | 8/1/2012 | 5,000 | Apache Shelf Exp | 100.0% | RELINQ | |
| EI 208 | 00577 | Federal | OP | 9/1/1955 | 2,500 | ANKOR En | 100.0% | PROD | |
| EI 211 | G05502 | Federal | RT B | 7/1/1983 | 5,000 | Fieldwood En | 66.7% | UNIT | |
| EI 211 | G05502 | Federal | OP | 7/1/1983 | 5,000 | Chevron USA | 66.7% | UNIT | |
| EI 212 | G05503 | Federal | RT B | 7/1/1983 | 5,000 | Fieldwood En | 66.7% | UNIT | |
| EI 212 | G05503 | Federal | OP | 7/1/1983 | 5,000 | Chevron USA | 66.7% | UNIT | |
| EI 216 | G34303 | Federal | RT | 8/1/2012 | 5,000 | Apache Shelf Exp | 100.0% | RELINQ | |
| EI 217 | G00978 | Federal | RT | 5/1/1962 | 5,000 | Arena Off | 25.0% | RELINQ | |
| EI 224 | G05504 | Federal | ORRI | 7/1/1983 | 5,000 | Castex Off | 10.0% | PROD | |
| EI 224 | G05504 | Federal | RT | 7/1/1983 | 5,000 | Castex Off | 100.0% | PROD | |
| EI 227 | 00809 | Federal | RT | 5/1/1960 | 5,000 | Arena Off | 50.0% | RELINQ | |
| EI 227 | G36745 | Federal | ORRI | 11/1/2019 | 5,000 | Arena Off | 6.25% | PRIMRY | |
| EI 227 | G36745 | Federal | ORRI | 11/1/2019 | 5,000 | Arena Off | 4.17% | PRIMRY | |
| EI 246 | 00810 | Federal | OP 1 | 5/1/1960 | 5,000 | Fieldwood En | 25.0% | UNIT | |
| EI 246 | 00810 | Federal | OP 2 | 5/1/1960 | 5,000 | Fieldwood En | 75.0% | UNIT | |
| EI 246 | 00810 | Federal | RT | 5/1/1960 | 5,000 | Fieldwood En | 75.0% | UNIT | |
| EI 246 | 00810 | Federal | ORRI | 5/1/1960 | 5,000 | Sanare En Part | 6.3% | UNIT | |

4

| Block | Lease | Type | Rights | Date Le Eff | Le Cur Acres | Operator | WI | Lease Status | Notes† |
|---|---|---|---|---|---|---|---|---|---|
| EI 255 | G01958 | Federal | RT | 1/1/1970 | 2,500 | Cox Op | 2.0% | PROD | |
| EI 255 | G01958 | Federal | OP 3 | 1/1/1970 | 2,500 | Cox Op | 77.2% | PROD | |
| EI 255 | G01958 | Federal | OP 4 | 1/1/1970 | 2,500 | Cox Op | 38.6% | PROD | |
| EI 266 | 00811 | Federal | OP 1 | 5/1/1960 | 5,000 | Fieldwood En | 25.0% | UNIT | |
| EI 266 | 00811 | Federal | OP 2 | 5/1/1960 | 5,000 | Fieldwood En | 75.0% | UNIT | |
| EI 266 | 00811 | Federal | RT | 5/1/1960 | 5,000 | Fieldwood En | 75.0% | UNIT | |
| EI 267 | 00812 | Federal | OP | 5/1/1960 | 5,000 | Fieldwood En | 25.0% | UNIT | |
| EI 267 | 00812 | Federal | OP 2 | 5/1/1960 | 5,000 | Fieldwood En | 75.0% | UNIT | |
| EI 267 | 00812 | Federal | RT | 5/1/1960 | 5,000 | Fieldwood En | 75.0% | UNIT | |
| EI 269 | 00813 | Federal | OP 1 | 5/1/1960 | 5,000 | Fieldwood En | 25.0% | UNIT | |
| EI 269 | 00813 | Federal | OP 2 | 5/1/1960 | 5,000 | Fieldwood En | 75.0% | UNIT | |
| EI 269 | 00813 | Federal | RT | 5/1/1960 | 5,000 | Fieldwood En | 75.0% | UNIT | |
| EI 280 | G23876 | Federal | RT | 5/1/2002 | 5,000 | Energy XXI GOM | 18.8% | TERMIN | |
| EI 281 | G09591 | Federal | RT | 5/1/1988 | 5,000 | Bennu O&G | 90.5% | TERMIN | |
| EI 281 | G09591 | Federal | OP 1 | 5/1/1988 | 5,000 | Bennu O&G | 45.3% | TERMIN | |
| EI 281 | G09591 | Federal | OP 2 | 5/1/1988 | 5,000 | Bennu O&G | 45.3% | TERMIN | |
| EI 281 | G09591 | Federal | OP 3 | 5/1/1988 | 5,000 | Bennu O&G | 45.3% | TERMIN | |
| EI 282 | G09592 | Federal | RT | 6/1/1988 | 5,000 | Apache | 75.0% | TERMIN | |
| EI 282 | G09592 | Federal | OP 1 | 6/1/1988 | 5,000 | Apache | 75.0% | TERMIN | |
| EI 282 | G09592 | Federal | OP 2 | 6/1/1988 | 5,000 | Apache | 75.0% | TERMIN | |
| EI 29 | G34287 | Federal | RT | 12/1/2012 | 5,000 | Apache Shelf Exp | 50.0% | RELINQ | |
| EI 307 | G02110 | Federal | OP | 2/1/1971 | 2,500 | Fieldwood En Off | 25.0% | TERMIN | [4] |
| EI 312 | G22679 | Federal | RT | 6/1/2001 | 5,000 | Fieldwood En | 100.0% | TERMIN | [4] |
| EI 312 | G22679 | Federal | ORRI | 6/1/2001 | 5,000 | Fieldwood En | 8.3% | TERMIN | [4] |
| EI 313 | G02608 | Federal | RT | 5/1/1974 | 5,000 | Arena Off | 50.0% | TERMIN | |
| EI 313 | G02608 | Federal | OP 1 | 5/1/1974 | 5,000 | Arena Off | 50.0% | TERMIN | |
| EI 313 | G02608 | Federal | OP 2 | 5/1/1974 | 5,000 | Arena Off | 50.0% | TERMIN | |
| EI 315 | G02112 | Federal | RT | 8/1/1974 | 2,500 | Fieldwood En | 50.0% | TERMIN | |
| EI 315 | G02112 | Federal | OP | 8/1/1974 | 2,500 | Fieldwood En | 50.0% | TERMIN | |
| EI 315 | G24912 | Federal | RT | 5/1/2003 | 2,500 | Fieldwood En | 100.0% | PROD | |
| EI 316 | G05040 | Federal | RT | 4/1/1982 | 5,000 | Fieldwood En | 100.0% | PROD | |
| EI 329 | G02912 | Federal | RT | 12/1/1974 | 5,000 | Fieldwood En | 100.0% | TERMIN | |
| EI 330 | G02115 | Federal | Contractual | 1/1/1971 | 5,000 | Fieldwood En | 63.0% | UNIT | [4] |
| EI 330 | G02115 | Federal | OP 7 | 1/1/1971 | 5,000 | Fieldwood En | 47.0% | UNIT | [4] |

| Block | Lease | Type | Rights | Date Le Eff | Le Cur Acres | Operator | WI | Lease Status | Notes† |
|-------|-------|------|--------|-------------|--------------|----------|-----|--------------|--------|
| EI 330 | G02115 | Federal | OP 6 | 1/1/1971 | 5,000 | Fieldwood En | 47.0% | UNIT | [4] |
| EI 330 | G02115 | Federal | OP 5 | 1/1/1971 | 5,000 | Fieldwood En | 47.0% | UNIT | [4] |
| EI 330 | G02115 | Federal | OP 4 | 1/1/1971 | 5,000 | Fieldwood En | 47.0% | UNIT | [4] |
| EI 330 | G02115 | Federal | OP 3 | 1/1/1971 | 5,000 | Fieldwood En | 47.0% | UNIT | [4] |
| EI 330 | G02115 | Federal | OP 2 | 1/1/1971 | 5,000 | Fieldwood En | 47.0% | UNIT | [4] |
| EI 330 | G02115 | Federal | RT | 1/1/1971 | 5,000 | Fieldwood En | 42.0% | UNIT | [4] |
| EI 330 | G02115 | Federal | OP 7 | 1/1/1971 | 5,000 | Fieldwood En | 23.0% | UNIT | [1], [4] |
| EI 330 | G02115 | Federal | OP 6 | 1/1/1971 | 5,000 | Fieldwood En | 23.0% | UNIT | [1], [4] |
| EI 330 | G02115 | Federal | OP 5 | 1/1/1971 | 5,000 | Fieldwood En | 23.0% | UNIT | [1], [4] |
| EI 330 | G02115 | Federal | OP 4 | 1/1/1971 | 5,000 | Fieldwood En | 23.0% | UNIT | [1], [4] |
| EI 330 | G02115 | Federal | OP 3 | 1/1/1971 | 5,000 | Fieldwood En | 23.0% | UNIT | [1], [4] |
| EI 330 | G02115 | Federal | OP 2 | 1/1/1971 | 5,000 | Fieldwood En | 23.0% | UNIT | [1], [4] |
| EI 333 | G02317 | Federal | RT | 2/1/1973 | 5,000 | Fieldwood En | 100.0% | TERMIN | |
| EI 334 | G15263 | Federal | RT | 7/1/1995 | 5,000 | Fieldwood En | 100.0% | TERMIN | |
| EI 337 | G03332 | Federal | RT | 3/1/1976 | 5,000 | Fieldwood En | 100.0% | UNIT | |
| EI 337 | G03332 | Federal | OP 4 | 3/1/1976 | 5,000 | Fieldwood En | 98.0% | UNIT | |
| EI 337 | G03332 | Federal | OP 1 | 3/1/1976 | 5,000 | Fieldwood En | 100.0% | UNIT | |
| EI 337 | G03332 | Federal | OP 3 | 3/1/1976 | 5,000 | Fieldwood En | 100.0% | UNIT | |
| EI 337 | G03332 | Federal | ORRI | 3/1/1976 | | Fieldwood En | 0.1% | UNIT | |
| EI 342 | G02319 | Federal | RT A | 2/1/1973 | 5,000 | Fieldwood En | 50.0% | TERMIN | [6] |
| EI 342 | G02319 | Federal | RT B | 2/1/1973 | 5,000 | Fieldwood En | 75.0% | TERMIN | [6] |
| EI 342 | G02319 | Federal | OP 1 | 2/1/1973 | 5,000 | Fieldwood En | 75.0% | TERMIN | [6] |
| EI 342 | G02319 | Federal | OP 2 | 2/1/1973 | 5,000 | Fieldwood En | 61.8% | TERMIN | [6] |
| EI 345 | G21647 | Federal | RT | 7/1/2000 | 5,000 | Fieldwood En | 50.0% | TERMIN | |
| EI 346 | G14482 | Federal | RT | 6/1/1994 | 5,000 | Arena Off | 100.0% | PROD | |
| EI 353 | G03783 | Federal | OP | 6/1/1978 | 5,000 | Fieldwood En | 100.0% | TERMIN | |
| EI 354 | G10752 | Federal | RT | 5/1/1989 | 5,000 | Fieldwood En | 100.0% | PROD | |
| EI 354 | G10752 | Federal | OP | 5/1/1989 | 5,000 | Fieldwood En | 67.0% | PROD | |
| EI 361 | G02324 | Federal | RT | 2/1/1973 | 5,000 | Cox Op | 12.4% | PROD | |
| EI 53 | 00479 | Federal | OP 1 | 12/1/1954 | 5,000 | EnVen En Vent | 66.7% | PROD | [4] |
| EI 53 | 00479 | Federal | OP | 12/1/1954 | 5,000 | EnVen En Vent | 100.0% | PROD | [4] |
| EI 57 | G02601 | Federal | OP 2 | 5/1/1974 | 5,000 | Talos | 31.7% | TERMIN | |
| EI 57 | G02601 | Federal | OP 4 | 5/1/1974 | 5,000 | ANKOR En | 15.8% | TERMIN | |

| Block | Lease | Type | Rights | Date Le Eff | Le Cur Acres | Operator | WI | Lease Status | Notes[†] |
|---|---|---|---|---|---|---|---|---|---|
| EI 88 | G10721 | Federal | OP | 7/1/1989 | 5,000 | Fieldwood En | 75.0% | TERMIN | |
| EI 89 | 00044 | Federal | OP | 8/28/1945 | 5,000 | Fieldwood En | 75.0% | TERMIN | |
| EI 89 | 00044 | Federal | OP 2 | 8/28/1945 | 5,000 | Fieldwood En | 75.0% | TERMIN | |
| EI 90 | 00229 | Federal | OP | 11/19/1948 | 1,250 | Fieldwood En | 75.0% | TERMIN | |
| EI 93 | 00228 | Federal | OP | 11/19/1948 | 2,500 | Fieldwood En | 75.0% | TERMIN | |
| EI 94 | G05488 | Federal | OP | 7/1/1983 | 5,000 | Fieldwood En | 75.0% | TERMIN | |
| EI 95 | 00046 | Federal | OP | 8/28/1945 | 5,000 | Fieldwood En | 75.0% | TERMIN | |
| EW 525 | G33704 | Federal | RT | 7/1/2010 | 2,420 | Apache Shelf Exp | 46.9% | RELINQ | |
| EW 526 | G33134 | Federal | RT | 6/1/2009 | 3,517 | Apache Shelf Exp | 100.0% | EXPIR | |
| EW 781 | G33137 | Federal | RT | 6/1/2009 | 309 | Apache Shelf Exp | 100.0% | EXPIR | |
| EW 782 | G31470 | Federal | RT | 12/1/2007 | 1,093 | Fieldwood En | 100.0% | PROD | [4] |
| EW 789 | G33139 | Federal | RT | 7/1/2009 | 5,760 | Apache Shelf Exp | 100.0% | RELINQ | |
| EW 826 | G05800 | Federal | RT | 7/1/1983 | 5,760 | BP E&P | 100.0% | PROD | |
| EW 905 | G34415 | Federal | RT | 8/1/2012 | 1,007 | Apache Shelf Exp | 100.0% | RELINQ | |
| EW 906 | G33708 | Federal | RT | 6/1/2010 | 1,084 | Apache Shelf Exp | 100.0% | RELINQ | |
| EW 949 | G34877 | Federal | RT | 8/1/2013 | 5,760 | Apache Shelf Exp | 100.0% | RELINQ | |
| EW 950 | G33709 | Federal | RT | 6/1/2010 | 5,760 | Apache Shelf Exp | 100.0% | RELINQ | |
| FM 411 | G08361 | Federal | RT | 8/1/1986 | 5,760 | Chevron USA | 24.3% | EXPIR | |
| FM 412 | G08362 | Federal | RT | 8/1/1986 | 5,760 | Chevron USA | 16.0% | EXPIR | |
| FM 455 | G08363 | Federal | RT | 8/1/1986 | 5,760 | Chevron USA | 24.2% | EXPIR | |
| FM 456 | G08364 | Federal | RT | 8/1/1986 | 5,760 | Chevron USA | 24.3% | EXPIR | |
| FM 499 | G08365 | Federal | RT | 8/1/1986 | 5,760 | Chevron USA | 24.3% | EXPIR | |
| FM 500 | G08366 | Federal | RT | 8/1/1986 | 5,760 | Chevron USA | 16.0% | EXPIR | |
| FM 543 | G08367 | Federal | RT | 8/1/1986 | 5,760 | Chevron USA | 24.3% | EXPIR | |
| FM 587 | G08368 | Federal | RT | 8/1/1986 | 5,760 | Chevron USA | 24.3% | EXPIR | |
| GA 151 | G15740 | Federal | RT | 11/1/1995 | 4,804 | Fieldwood En | 33.3% | TERMIN | [4] |
| GA 180 | G03228 | Federal | RT | 9/1/1975 | 5,760 | Fieldwood En | 100.0% | UNIT | |
| GA 192 | G03229 | Federal | CONT | 9/1/1975 | 5,760 | Arena Off | 90.0% | UNIT | |
| GA 210 | G25524 | Federal | OP 1 | 12/1/2003 | 5,760 | Fieldwood En | 83.3% | PROD | [4] |
| GA 210 | G25524 | Federal | OP 3 | 12/1/2003 | 5,760 | Fieldwood En | 66.7% | PROD | [4] |
| GA 210 | G25524 | Federal | RT | 12/1/2003 | 5,760 | Fieldwood En | 66.7% | PROD | [4] |
| GA 210 | G25524 | Federal | OP | 12/1/2003 | 5,760 | Fieldwood En | 83.3% | PROD | [4] |
| GA 343 | G06105 | Federal | RT | 10/1/1983 | 5,760 | Black Elk En Off Op | 12.5% | TERMIN | |
| GA 343 | G06105 | Federal | OP | 10/1/1983 | 5,760 | Black Elk En Off Op | 37.5% | TERMIN | |

7

| Block | Lease | Type | Rights | Date Le Eff | Le Cur Acres | Operator | WI | Lease Status | Notes[†] |
|---|---|---|---|---|---|---|---|---|---|
| GB 85 | G34515 | Federal | RT | 8/1/2012 | 4,450 | Apache Shelf Exp | 100.0% | RELINQ | |
| GI 104 | G33671 | Federal | RT | 7/1/2010 | 5,000 | Apache Shelf Exp | 46.9% | RELINQ | |
| GI 110 | G13943 | Federal | RT | 8/1/1993 | 5,000 | Fieldwood En | 50.0% | UNIT | [2] |
| GI 116 | G13944 | Federal | RT | 7/1/1993 | 5,000 | Fieldwood En | 50.0% | UNIT | [2] |
| GI 116 | G13944 | Federal | OP | 7/1/1993 | 5,000 | Fieldwood En | 25.0% | UNIT | [2] |
| GI 117 | G32232 | Federal | RT | 8/1/2008 | 4,540 | Apache | 100.0% | EXPIR | |
| GI 32 | 00174 | Federal | RT | 7/17/1948 | 2,500 | GOM Shelf | 75.0% | UNIT | [1], [2] |
| GI 32 | 00174 | Federal | OP 1 | 7/17/1948 | 2,500 | BP E&P | 18.8% | UNIT | [1], [2] |
| GI 32 | 00174 | Federal | OP 2 | 7/17/1948 | 2,500 | GOM Shelf | 37.5% | UNIT | [1], [2] |
| GI 32 | G01580 | Federal | RT | 7/1/1967 | 2,500 | BP Am Prod | 75.0% | TERMIN | [1] |
| GI 32 | G01580 | Federal | OP | 7/1/1967 | 2,500 | BP Am Prod | 37.5% | TERMIN | [1] |
| GI 33 | G04002 | Federal | RT | 3/1/1979 | 5,000 | Fieldwood En | 100.0% | RELINQ | |
| GI 39 | 00126 | Federal | RT | 4/21/1947 | 2,500 | GOM Shelf | 75.0% | UNIT | [1], [2] |
| GI 39 | 00126 | Federal | OP 1 | 4/21/1947 | 2,500 | BP E&P | 18.8% | UNIT | [1], [2] |
| GI 39 | 00126 | Federal | OP 2 | 4/21/1947 | 2,500 | GOM Shelf | 37.5% | UNIT | [1], [2] |
| GI 39 | 00127 | Federal | RT | 4/21/1947 | 2,500 | GOM Shelf | 75.0% | UNIT | [1], [2] |
| GI 39 | 00127 | Federal | OP 1 | 4/21/1947 | 2,500 | BP E&P | 18.8% | UNIT | [1], [2] |
| GI 39 | 00127 | Federal | OP 2 | 4/21/1947 | 2,500 | GOM Shelf | 37.5% | UNIT | [1], [2] |
| GI 40 | 00128 | Federal | RT | 4/21/1947 | 5,000 | GOM Shelf | 75.0% | UNIT | [1], [2] |
| GI 40 | 00128 | Federal | OP 1 | 4/21/1947 | 5,000 | BP E&P | 18.8% | UNIT | [1], [2] |
| GI 40 | 00128 | Federal | OP 2 | 4/21/1947 | 5,000 | GOM Shelf | 37.5% | UNIT | [1], [2] |
| GI 41 | 00129 | Federal | RT | 4/21/1947 | 2,500 | GOM Shelf | 75.0% | UNIT | [1], [2] |
| GI 41 | 00129 | Federal | OP 1 | 4/21/1947 | 2,500 | BP E&P | 18.8% | UNIT | [1], [2] |
| GI 41 | 00129 | Federal | OP 2 | 4/21/1947 | 2,500 | GOM Shelf | 37.5% | UNIT | [1], [2] |
| GI 41 | 00130 | Federal | RT | 4/21/1947 | 2,500 | GOM Shelf | 75.0% | UNIT | [1], [2] |
| GI 41 | 00130 | Federal | OP 1 | 4/21/1947 | 2,500 | BP E&P | 18.8% | UNIT | [1], [2] |
| GI 41 | 00130 | Federal | OP 2 | 4/21/1947 | 2,500 | GOM Shelf | 37.5% | UNIT | [1], [2] |
| GI 42 | 00131 | Federal | RT | 4/21/1947 | 5,000 | GOM Shelf | 75.0% | UNIT | [1], [2] |
| GI 42 | 00131 | Federal | OP 1 | 4/21/1947 | 5,000 | BP E&P | 18.8% | UNIT | [1], [2] |
| GI 42 | 00131 | Federal | OP 2 | 4/21/1947 | 5,000 | GOM Shelf | 37.5% | UNIT | [1], [2] |
| GI 43 | 00175 | Federal | RT | 7/17/1948 | 5,000 | GOM Shelf | 75.0% | UNIT | [1], [2] |
| GI 43 | 00175 | Federal | OP 1 | 7/17/1948 | 5,000 | BP E&P | 18.8% | UNIT | [1], [2] |
| GI 43 | 00175 | Federal | OP 2 | 7/17/1948 | 5,000 | GOM Shelf | 37.5% | UNIT | [1], [2] |
| GI 44 | 00176 | Federal | RT | 7/17/1948 | 2,500 | GOM Shelf | 75.0% | UNIT | [1], [2] |

8

| Block | Lease | Type | Rights | Date Le Eff | Le Cur Acres | Operator | WI | Lease Status | Notes[†] |
|---|---|---|---|---|---|---|---|---|---|
| GI 44 | 00176 | Federal | OP 1 | 7/17/1948 | 2,500 | BP E&P | 18.8% | UNIT | [1], [2] |
| GI 44 | 00176 | Federal | OP 2 | 7/17/1948 | 2,500 | GOM Shelf | 37.5% | UNIT | [1], [2] |
| GI 46 | 00132 | Federal | RT | 4/21/1947 | 5,000 | GOM Shelf | 75.0% | UNIT | [1], [2] |
| GI 46 | 00132 | Federal | OP 1 | 4/21/1947 | 5,000 | BP E&P | 18.8% | UNIT | [1], [2] |
| GI 46 | 00132 | Federal | OP 2 | 4/21/1947 | 5,000 | GOM Shelf | 37.5% | UNIT | [1], [2] |
| GI 47 | 00133 | Federal | RT | 4/21/1947 | 5,000 | GOM Shelf | 75.0% | UNIT | [1], [2] |
| GI 47 | 00133 | Federal | OP 1 | 4/21/1947 | 5,000 | BP E&P | 18.8% | UNIT | [1], [2] |
| GI 47 | 00133 | Federal | OP 2 | 4/21/1947 | 5,000 | GOM Shelf | 37.5% | UNIT | [1], [2] |
| GI 48 | 00134 | Federal | RT | 4/21/1947 | 5,000 | GOM Shelf | 75.0% | UNIT | [1], [2] |
| GI 48 | 00134 | Federal | OP 1 | 4/21/1947 | 5,000 | BP E&P | 18.8% | UNIT | [1], [2] |
| GI 48 | 00134 | Federal | OP 2 | 4/21/1947 | 5,000 | GOM Shelf | 37.5% | UNIT | [1], [2] |
| GI 52 | 00177 | Federal | RT | 7/17/1948 | 2,500 | GOM Shelf | 75.0% | UNIT | [1], [2] |
| GI 52 | 00177 | Federal | OP 1 | 7/17/1948 | 2,500 | GOM Shelf | 100.0% | UNIT | [1], [2] |
| GI 52 | 00177 | Federal | OP 2 | 7/17/1948 | 2,500 | BP E&P | 18.8% | UNIT | [1], [2] |
| GI 54 | G27173 | Federal | RT | 7/1/2005 | 5,000 | Fieldwood En | 50.0% | TERMIN | |
| GI 76 | G02161 | Federal | RT | 10/1/1972 | 5,000 | Fieldwood En | 95.8% | RELINQ | |
| GI 90 | G04003 | Federal | RT | 3/1/1979 | 5,000 | Fieldwood En | 100.0% | TERMIN | |
| GI 90 | G04003 | Federal | OP 1 | 3/1/1979 | 5,000 | Fieldwood En | 50.0% | TERMIN | |
| GI 90 | G04003 | Federal | OP 2 | 3/1/1979 | 5,000 | Fieldwood En | 50.0% | TERMIN | |
| GI 90 | G04003 | Federal | OP 4 | 3/1/1979 | 5,000 | Fieldwood En | 50.0% | TERMIN | |
| GI 90 | G04003 | Federal | OP 5 | 3/1/1979 | 5,000 | Fieldwood En | 100.0% | TERMIN | |
| GI 90 | G04003 | Federal | OP 6 | 3/1/1979 | 5,000 | Fieldwood En | 100.0% | TERMIN | |
| GI 93 | G02628 | Federal | RT | 5/1/1974 | 5,000 | BP E&P | 100.0% | TERMIN | |
| GI 93 | G02628 | Federal | OP | 5/1/1974 | 5,000 | BP E&P | 100.0% | TERMIN | |
| GI 94 | G02163 | Federal | RT | 11/1/1972 | 4,540 | Fieldwood En | 100.0% | RELINQ | |
| GI 94 | G02163 | Federal | OP | 11/1/1972 | 4,540 | Fieldwood En | 100.0% | RELINQ | |
| GI 98 | G34354 | Federal | RT | 8/1/2012 | 5,000 | Apache Shelf Exp | 100.0% | RELINQ | |
| HI 110 | G02353 | Federal | RT | 8/1/1973 | 5,760 | W & T Off | 20.0% | TERMIN | [1] |
| HI 111 | G02354 | Federal | RT | 8/1/1973 | 5,760 | W & T Off | 20.0% | TERMIN | [1] |
| HI 114 | G32747 | Federal | RT | 12/1/2008 | 5,760 | Apache Shelf Exp | 100.0% | EXPIR | |
| HI 116 | G06156 | Federal | RT | 10/1/1983 | 5,760 | Fieldwood En | 100.0% | TERMIN | |
| HI 129 | G01848 | Federal | RT | 6/1/1968 | 5,760 | Fieldwood En | 90.0% | PROD | |
| HI 129 | G01848 | Federal | ORRI | 6/1/1968 | | Fieldwood En | 10.4% | PROD | |
| HI 132 | G32748 | Federal | RT | 12/1/2008 | 5,760 | Apache Shelf Exp | 100.0% | EXPIR | |

Case 20-33948 Document 1487-2 Filed in TXSB on 06/04/21 Page 120 of 250

| Block | Lease | Type | Rights | Date Le Eff | Le Cur Acres | Operator | WI | Lease Status | Notes[†] |
|---|---|---|---|---|---|---|---|---|---|
| HI 140 | 00518 | Federal | OP | 1/1/1955 | 5,760 | Black Elk En Off Op | 50.0% | TERMIN | |
| HI 163 | G22236 | Federal | RT | 12/1/2000 | 5,760 | Fieldwood En | 70.0% | TERMIN | |
| HI 176 | G06164 | Federal | OPRTS Cont | 10/1/1983 | 5,760 | Apache | 49.5% | TERMIN | |
| HI 179 | G03236 | Federal | RT | 9/1/1975 | 5,760 | Cox Op | 100.0% | UNIT | |
| HI 193 | G03237 | Federal | CONT | 9/1/1975 | 5,760 | Arena Off | 90.0% | UNIT | |
| HI 194 | G06166 | Federal | RT | 10/1/1983 | 5,760 | Apache | 100.0% | TERMIN | |
| HI 194 | G06166 | Federal | OP | 10/1/1983 | 5,760 | Apache | 45.0% | TERMIN | |
| HI 201 | G23199 | Federal | OP | 12/1/2001 | 5,760 | Apache Shelf | 37.6% | TERMIN | |
| HI 206 | G20660 | Federal | RT | 1/1/1999 | 5,760 | Fieldwood En | 100.0% | PROD | |
| HI 45 | G12564 | Federal | RT | 10/1/1990 | 4,367 | Fieldwood En | 16.7% | TERMIN | |
| HI 45 | G12564 | Federal | OP 1 | 10/1/1990 | 4,367 | Fieldwood En | 15.0% | TERMIN | |
| HI 45 | G12564 | Federal | OP 2 | 10/1/1990 | 4,367 | Fieldwood En | 33.3% | TERMIN | |
| HI 52 | 00508 | Federal | RT | 1/1/1955 | 1,440 | SandRidge En Off | 75.0% | TERMIN | |
| HI 52 | 00509 | Federal | RT | 1/1/1955 | 1,440 | Apache | 75.0% | TERMIN | |
| HI 52 | 00511 | Federal | RT | 1/1/1955 | 1,440 | Apache | 75.0% | TERMIN | |
| HI 53 | 00513 | Federal | RT | 1/1/1955 | 180 | Phoenix Exp | 75.0% | TERMIN | |
| HI 53 | 00740 | Federal | RT | 4/1/1960 | 1,440 | Apache | 75.0% | TERMIN | |
| HI A-133 | G32760 | Federal | RT | 11/1/2008 | 5,760 | Apache | 100.0% | EXPIR | |
| HI A-145 | G32761 | Federal | RT | 11/1/2008 | 5,760 | Apache | 100.0% | EXPIR | |
| HI A-146 | G32762 | Federal | RT | 11/1/2008 | 5,760 | Apache Shelf Exp | 100.0% | EXPIR | |
| HI A-148 | G32763 | Federal | RT | 11/1/2008 | 5,760 | Apache | 100.0% | EXPIR | |
| HI A-160 | G32764 | Federal | RT | 11/1/2008 | 5,760 | Apache | 100.0% | EXPIR | |
| HI A-171 | G30679 | Federal | RT | 12/1/2006 | 5,760 | Walter O&G | 33.3% | TERMIN | |
| HI A-326 | G32777 | Federal | RT | 11/1/2008 | 5,760 | Apache | 100.0% | EXPIR | |
| HI A-334 | G02423 | Federal | RT | 8/1/1973 | 5,760 | Fieldwood En | 38.9% | TERMIN | |
| HI A-341 | G25605 | Federal | RT | 12/1/2003 | 5,760 | Fieldwood En | 60.0% | PROD | [4] |
| HI A-350 | G02428 | Federal | RT | 8/1/1973 | 4,345 | Apache | 100.0% | RELINQ | |
| HI A360 | G34677 | Federal | RT | 3/1/2013 | 5,760 | Apache Shelf Exp | 100.0% | RELINQ | |
| HI A361 | G34678 | Federal | RT | 3/1/2013 | 5,760 | Fieldwood En | 100.0% | RELINQ | |
| HI A363 | G33413 | Federal | RT | 10/1/2009 | 5,760 | Apache Shelf Exp | 100.0% | EXPIR | |
| HI A-365 | G02750 | Federal | RT | 7/1/1974 | 5,760 | Fieldwood En | 53.1% | PROD | [4] |
| HI A-376 | G02754 | Federal | OP 1 | 7/1/1974 | 5,760 | Fieldwood En | 100.0% | PROD | [4] |
| HI A-376 | G02754 | Federal | RT | 7/1/1974 | 5,760 | Fieldwood En | 44.4% | PROD | [4] |

10

| Block | Lease | Type | Rights | Date Le Eff | Le Cur Acres | Operator | WI | Lease Status | Notes[†] |
|---|---|---|---|---|---|---|---|---|---|
| HI A-376 | G02754 | Federal | ORRI | 7/1/1974 | | Fieldwood En | 1.2% | PROD | [4] |
| HI A-376 | G02754 | Federal | ORRI | 7/1/1974 | | Fieldwood En | 6.0% | PROD | [4] |
| HI A-382 | G02757 | Federal | RT | 7/1/1974 | | Fieldwood En | 72.4% | PROD | [4] |
| HI A406 | G32767 | Federal | RT | 11/1/2008 | 5,760 | Apache | 100.0% | EXPIR | |
| HI A430 | G33412 | Federal | RT | 10/1/2009 | 5,760 | Apache Shelf Exp | 100.0% | EXPIR | |
| HI A442 | G11383 | Federal | OP | 11/1/1989 | 5,760 | Northstar Off Grp | 22.7% | TERMIN | |
| HI A454 | G32769 | Federal | RT | 11/1/2008 | 5,760 | Apache | 100.0% | EXPIR | |
| HI A457 | G32770 | Federal | RT | 11/1/2008 | 5,760 | Apache | 100.0% | EXPIR | |
| HI A-474 | G02366 | Federal | RT | 8/1/1973 | 5,760 | McMoRan O&G | 10.0% | TERMIN | [4] |
| HI A-475 | G02367 | Federal | CONT | 8/1/1973 | 5,760 | McMoRan O&G | 10.0% | TERMIN | [4] |
| HI A-489 | G02372 | Federal | RT | 8/1/1973 | 5,760 | McMoRan O&G | 8.5% | TERMIN | [4] |
| HI A537 | G02698 | Federal | CONT | 5/29/1974 | | McMoRan O&G | | TERMIN | |
| HI A545 | G17199 | Federal | OP | 1/1/1997 | 5,760 | Fieldwood En | 60.0% | TERMIN | |
| HI A-572 | G02392 | Federal | RT | 8/1/1973 | 5,760 | Apache | 72.4% | TERMIN | [4] |
| HI A-573 | G02393 | Federal | RT | 8/1/1973 | 5,760 | Fieldwood En | 72.4% | PROD | [4] |
| HI A-581 | G18959 | Federal | CONT | 8/27/1997 | | Cox Op | 24.7% | TERMIN | [4] |
| HI A582 | G02719 | Federal | RT | 7/1/1974 | 5,760 | Cox Op | 24.7% | PROD | [4] |
| HI A-582 | G02719 | Federal | OP 1 | 7/1/1974 | 5,760 | Cox Op | 15.5% | PROD | [4] |
| HI A-595 | G02721 | Federal | RT | 7/1/1974 | 5,760 | Fieldwood En | 72.4% | PROD | [4] |
| HI A-596 | G02722 | Federal | RT | 7/1/1974 | 5,760 | Fieldwood En | 72.4% | PROD | [4] |
| MC 108 | G09777 | Federal | RT | 7/1/1988 | 5,760 | BP E&P | 75.2% | PROD | |
| MC 108 | G09777 | Federal | OP | 7/1/1988 | 5,760 | BP E&P | 75.2% | PROD | |
| MC 110 | G18192 | Federal | RT | 8/1/1997 | 5,760 | Fieldwood En | 50.0% | PROD | [2] |
| MC 110 | G18192 | Federal | OP | 8/1/1997 | 5,760 | Fieldwood En | 25.0% | PROD | [2] |
| MC 110 | G18192 | Federal | ORRI | 8/1/1997 | | Fieldwood En | 3.9% | PROD | [2] |
| MC 21 | G28351 | Federal | ORRI | 7/1/1995 | 4,445 | ANKOR En | 3.0% | PROD | |
| MC 311 | G02968 | Federal | RT | 12/1/1974 | 5,760 | Fieldwood En | 100.0% | PROD | |
| MC 65 | G21742 | Federal | RT | 6/1/2000 | 5,760 | ANKOR En | 100.0% | PROD | |
| MC 65 | G21742 | Federal | ORRI | 6/1/2000 | | ANKOR En | 13.0% | PROD | |
| MI 486 | MF-88560 | SL - TX | WI | 10/5/1982 | 1,440 | Fieldwood | 100.0% | EXPIRED | |
| MI 487 | MF-88562 | SL - TX | WI | 10/5/1982 | 1,305 | Fieldwood | 100.0% | SI | |
| MI 518 | G05169 | Federal | RT | 1/1/1983 | 5,675 | Fieldwood En | 100.0% | TERMIN | |
| MI 518 | MF80522 | SL - TX | WI | 10/2/1979 | 85 | Fieldwood | 100.0% | EXPIRED | |
| MI 519 | MF-79413 | SL - TX | WI | 2/6/1979 | 739 | Fieldwood | 100.0% | SI | |

11

Case 20-33948   Document 1285-1   Filed in TXSB on 04/15/21   Page 122 of 1032

| Block | Lease | Type | Rights | Date Le Eff | Le Cur Acres | Operator | WI | Lease Status | Notes[†] |
|-------|-------|------|--------|-------------|--------------|----------|-----|--------------|----------|
| MI 622 | G05000 | Federal | RT | 4/1/1982 | 5,760 | Fieldwood En | 81.0% | TERMIN | |
| MI 622 | G05000 | Federal | OP | 4/1/1982 | 5,760 | BP E&P | 37.5% | TERMIN | |
| MI 623 | G03088 | Federal | RT | 4/1/1975 | 5,760 | Fieldwood En | 81.0% | TERMIN | |
| MI 623 | G03088 | Federal | OP | 4/1/1975 | 5,760 | BP E&P | 37.5% | TERMIN | |
| MI 635 | G06043 | Federal | RT | 10/1/1983 | 5,760 | Fieldwood En | 81.0% | TERMIN | |
| MI 635 | G06043 | Federal | OP | 10/1/1983 | 5,760 | BP E&P | 37.5% | TERMIN | |
| MI 636 | G34670 | Federal | RT | 4/1/2013 | 5,760 | Apache Shelf Exp | 100.0% | RELINQ | |
| MI 652 | G34022 | Federal | RT | 2/1/2012 | 5,760 | Apache Shelf Exp | 100.0% | EXPIR | |
| MI 681 | G04703 | Federal | RT | 9/1/1981 | 5,760 | Fieldwood En | 100.0% | TERMIN | |
| MI 685 | G04548 | Federal | RT | 1/1/1981 | 5,760 | EOG Res | 50.0% | TERMIN | |
| MI 685 | G04548 | Federal | OP | 1/1/1981 | 5,760 | EOG Res | 2.5% | TERMIN | |
| MI 703 | G03733 | Federal | RT | 6/1/1978 | 5,760 | Fieldwood En | 100.0% | TERMIN | |
| MI 703 | G03733 | Federal | OP 1 | 6/1/1978 | 5,760 | Fieldwood En | 100.0% | TERMIN | |
| MI 703 | G03733 | Federal | OP 2 | 6/1/1978 | 5,760 | Fieldwood En | 100.0% | TERMIN | |
| MI 772 | MF93351 | SL - TX | WI | 2/7/1989 | 704 | Fieldwood | 100.0% | TERMINATED | |
| MO 820 | G34403 | Federal | RT | 8/1/2012 | 3,347 | Apache Shelf Exp | 100.0% | RELINQ | |
| MO 821 | G05058 | Federal | RT | 4/1/1982 | 4,028 | Fieldwood En | 100.0% | TERMIN | |
| MO 821 | STATE OF ALABAMA 627 | SL - AL | WI | 8/14/1984 | 2,511 | Fieldwood | 100.0% | TERMINATED | |
| MO 826 | G26176 | Federal | RT | 7/1/2004 | 1,430 | Fieldwood En | 75.0% | PROD | |
| MO 871 | G32272 | Federal | RT | 8/1/2008 | 5,760 | Apache | 100.0% | EXPIR | |
| MO 913 | G33131 | Federal | RT | 6/1/2009 | 5,760 | Apache Shelf Exp | 75.0% | EXPIR | |
| MO 914 | G33132 | Federal | RT | 6/1/2009 | 5,760 | Apache Shelf Exp | 75.0% | EXPIR | |
| MP 120 | G03197 | Federal | ORRI | 5/28/1975 | | Arena Off | 2.0% | PROD | |
| MP 120 | G03197 | Federal | ORRI | 7/1/1975 | | Arena Off | 2.0% | PROD | |
| MP 134 | G34375 | Federal | RT | 10/1/2012 | 4,995 | Apache Shelf Exp | 100.0% | RELINQ | |
| MP 135 | G34376 | Federal | RT | 10/1/2012 | 4,995 | Apache Shelf Exp | 100.0% | RELINQ | |
| MP 136 | G34377 | Federal | RT | 10/1/2012 | 4,995 | Apache Shelf Exp | 100.0% | RELINQ | |
| MP 137 | G34378 | Federal | RT | 10/1/2012 | 4,995 | Apache Shelf Exp | 100.0% | RELINQ | |
| MP 140 | G02193 | Federal | RT | 10/1/1972 | 4,995 | Fieldwood En | 65.0% | PROD | |
| MP 143 | G34380 | Federal | RT | 10/1/2012 | 4,995 | Apache Shelf Exp | 100.0% | RELINQ | |
| MP 146 | G34860 | Federal | RT | 7/1/2013 | 4,561 | Apache Shelf Exp | 75.0% | RELINQ | |
| MP 147 | G34861 | Federal | RT | 7/1/2013 | 4,561 | Apache Shelf Exp | 75.0% | RELINQ | |

12

Case 20-33948   Document 1285-1   Filed in TXSB on 04/15/21   Page 123 of 1032

| Block | Lease | Type | Rights | Date Le Eff | Le Cur Acres | Operator | WI | Lease Status | Notes[†] |
|---|---|---|---|---|---|---|---|---|---|
| MP 148 | G34381 | Federal | RT | 11/1/2012 | 5,000 | Apache Shelf Exp | 100.0% | RELINQ | |
| MP 149 | G34382 | Federal | RT | 11/1/2012 | 5,000 | Apache Shelf Exp | 100.0% | RELINQ | |
| MP 150 | G34862 | Federal | RT | 7/1/2013 | 5,000 | Apache Shelf Exp | 75.0% | RELINQ | |
| MP 152 | G01966 | Federal | RT | 1/1/1970 | 4,978 | Fieldwood En | 50.0% | UNIT | |
| MP 152 | G01966 | Federal | OP | 1/1/1970 | 4,978 | Fieldwood En | 75.0% | UNIT | |
| MP 153 | G01967 | Federal | RT | 1/1/1970 | 5,000 | Fieldwood En | 50.0% | UNIT | |
| MP 153 | G01967 | Federal | OP | 1/1/1970 | 5,000 | Fieldwood En | 75.0% | UNIT | |
| MP 166 | G26152 | Federal | RT | 7/1/2004 | 4,995 | Fieldwood En | 100.0% | TERMIN | |
| MP 175 | G08753 | Federal | OP | 8/1/1987 | 4,995 | Tana Exp | 21.2% | TERMIN | |
| MP 255 | G07825 | Federal | RT | 8/1/1985 | 4,995 | Fieldwood En | 52.4% | TERMIN | |
| MP 259 | G07827 | Federal | RT | 9/1/1985 | 4,995 | Fieldwood En | 56.9% | TERMIN | |
| MP 260 | G07828 | Federal | RT | 9/1/1985 | 4,995 | Fieldwood En | 56.9% | TERMIN | |
| MP 270 | G22812 | Federal | ORRI | 7/1/2001 | 4,995 | Castex Off | 1.0% | UNIT | |
| MP 271 | G34388 | Federal | RT | 10/1/2012 | 4,995 | Apache Shelf Exp | 100.0% | EXPIR | |
| MP 272 | G34865 | Federal | RT | 7/1/2013 | 4,995 | Apache Shelf Exp | 75.0% | RELINQ | |
| MP 273 | G33690 | Federal | RT | 7/1/2010 | 4,995 | Castex Off | 37.5% | UNIT | |
| MP 274 | G33691 | Federal | RT | 7/1/2010 | 4,995 | Castex Off | 37.5% | EXPIR | |
| MP 275 | G15395 | Federal | RT | 9/1/1995 | 4,995 | Fieldwood En | 100.0% | PROD | |
| MP 275 | G15395 | Federal | ORRI | 9/1/1995 | 4,995 | Fieldwood En | 8.3% | PROD | |
| MP 281 | G10910 | Federal | RT | 7/1/1989 | 4,995 | EnVen En Vent | 50.0% | PROD | |
| MP 281 | G10910 | Federal | OP | 7/1/1989 | 4,995 | EnVen En Vent | 30.0% | PROD | |
| MP 281 | G10910 | Federal | ORRI | 7/1/1989 | | EnVen En Vent | 3.1% | PROD | |
| MP 289 | G01666 | Federal | RT | 7/1/1967 | 4,561 | Fieldwood En | 100.0% | PROD | |
| MP 290 | G01667 | Federal | RT | 7/1/1967 | 4,561 | Apache | 100.0% | TERMIN | |
| MP 290 | G34866 | Federal | RT | 7/1/2013 | 4,561 | Apache Shelf Exp | 75.0% | RELINQ | |
| MP 291 | G34391 | Federal | RT | 11/1/2012 | 4,561 | Apache Shelf Exp | 100.0% | EXPIR | |
| MP 292 | G34392 | Federal | RT | 11/1/2012 | 4,561 | Apache Shelf Exp | 100.0% | RELINQ | |
| MP 293 | G34393 | Federal | RT | 11/1/2012 | 4,561 | Apache Shelf Exp | 100.0% | EXPIR | |
| MP 294 | G34394 | Federal | RT | 11/1/2012 | 4,561 | Apache Shelf Exp | 100.0% | RELINQ | |
| MP 295 | G32263 | Federal | CONT | 8/1/2008 | 4,561 | Fieldwood En | 37.5% | TERMIN | |
| MP 296 | G01673 | Federal | RT | 6/1/1967 | 4,561 | GOM Shelf | 50.0% | UNIT | [1] |
| MP 296 | G01673 | Federal | OP | 6/1/1967 | 4,561 | GOM Shelf | 25.0% | UNIT | |
| MP 297 | G34395 | Federal | RT | 11/1/2012 | 4,561 | Apache Shelf Exp | 100.0% | RELINQ | |
| MP 300 | G01317 | Federal | OP | 6/1/1962 | 4,561 | Cantium | 10.4% | UNIT | |

13

| Block | Lease | Type | Rights | Date Le Eff | Le Cur Acres | Operator | WI | Lease Status | Notes[†] |
|---|---|---|---|---|---|---|---|---|---|
| MP 301 | G04486 | Federal | OP 1 | 11/1/1980 | 5,000 | Walter O&G | 10.4% | TERMIN | |
| MP 301 | G04486 | Federal | OP 2 | 11/1/1980 | 5,000 | Walter O&G | 6.3% | TERMIN | |
| MP 301 | G04486 | Federal | OP 3 | 11/1/1980 | 5,000 | Walter O&G | 10.4% | TERMIN | |
| MP 301 | G04486 | Federal | RT | 11/1/1980 | 5,000 | Walter O&G | 10.4% | TERMIN | |
| MP 302 | G32264 | Federal | RT | 7/1/2008 | 5,000 | GOM Shelf | 100.0% | PROD | |
| MP 303 | G04253 | Federal | OP 1 | 12/1/1979 | 5,000 | Fieldwood En | 25.0% | UNIT | |
| MP 303 | G04253 | Federal | RT | 12/1/1979 | 5,000 | Fieldwood En | 100.0% | UNIT | |
| MP 304 | G03339 | Federal | OP | 4/1/1976 | 5,000 | ConocoPhillips | 100.0% | UNIT | |
| MP 305 | G34396 | Federal | RT | 12/1/2012 | 5,000 | Apache Shelf Exp | 100.0% | RELINQ | |
| MP 308 | G32265 | Federal | RT | 8/1/2008 | 5,000 | Fieldwood En | 100.0% | PROD | |
| MP 309 | G08760 | Federal | RT | 6/1/1987 | 5,000 | Fieldwood En | 100.0% | PROD | |
| MP 310 | G04126 | Federal | RT | 10/1/1979 | 5,000 | Fieldwood En | 100.0% | UNIT | |
| MP 311 | G02213 | Federal | RT | 11/1/1972 | 5,000 | GOM Shelf | 50.0% | PROD | [1] |
| MP 311 | G02213 | Federal | RT | 11/1/1972 | 5,000 | GOM Shelf | 25.0% | PROD | |
| MP 312 | G16520 | Federal | RT | 7/1/1996 | 5,000 | Fieldwood En | 100.0% | PROD | |
| MP 314 | G33693 | Federal | OP | 7/1/2010 | 5,000 | Apache Shelf Exp | 80.0% | EXPIR | |
| MP 315 | G08467 | Federal | RT | 7/1/1986 | 5,000 | Fieldwood En | 100.0% | PROD | |
| MP 315 | G08467 | Federal | OP 3 | 7/1/1986 | 5,000 | Fieldwood En | 100.0% | PROD | |
| MP 315 | G08467 | Federal | OP 1 | 7/1/1986 | 5,000 | Fieldwood En | 80.0% | PROD | |
| MP 5 | SL13890 | SL-LA | WI | 7/1/1975 | 26 | Apache | 50.0% | TERMIN | |
| MP 59 | G03194 | Federal | OP | 7/1/1975 | 1,406 | Cantium | 37.5% | UNIT | |
| MP 59 | G08461 | Federal | OP | 7/1/1986 | 2,340 | Cantium | 37.5% | UNIT | |
| MP 6 | SL03771 | SL-LA | WI | 4/26/1961 | 1,067 | Apache | 50.0% | TERMIN | |
| MP 6 | SL13580 | SL-LA | WI | | 287 | Apache | 50.0% | TERMIN | |
| MP 6 | SL13891 | SL-LA | WI | | 270 | Apache | 50.0% | TERMIN | |
| MP 64 | G04909 | Federal | ORRI | 12/1/1981 | 4,988 | Sanare En Part | 4.2% | UNIT | |
| MP 7 | SL03773 | SL-LA | WI | 4/26/1961 | – | Apache | 50.0% | TERMIN | |
| MP 7 | SL13892 | SL-LA | WI | | 44 | Apache | 50.0% | TERMIN | |
| MP 74 | G34857 | Federal | RT | 8/1/2013 | 1,733 | Apache Shelf Exp | 75.0% | RELINQ | |
| MP 77 | G04481 | Federal | RT | 11/1/1980 | 4,655 | Fieldwood En Off | 26.2% | RELINQ | [7] |
| MP 77/78 | G04481 | Federal | OP | 11/1/1980 | 4,655 | Fieldwood En Off | 23.5% | RELINQ | [7] |
| MP 91 | G14576 | Federal | RT | 5/1/1994 | 1,017 | Apache | 100.0% | TERMIN | |
| MU 883 | MF98761 | SL - TX | WI | | | Apache | 100.0% | TERMIN | |
| MU A-111 | G03068 | Federal | RT | 4/1/1975 | 5,760 | Apache | 100.0% | TERMIN | |

14

| Block | Lease | Type | Rights | Date Le Eff | Le Cur Acres | Operator | WI | Lease Status | Notes† |
|---|---|---|---|---|---|---|---|---|---|
| MU A133 | G33392 | Federal | RT | 10/1/2009 | 5,760 | Apache Shelf Exp | 100.0% | EXPIR | |
| MU A134 | G32724 | Federal | RT | 11/1/2008 | 5,760 | Apache | 100.0% | EXPIR | |
| MU A85 | G03061 | Federal | RT | 4/1/1975 | 5,760 | EnVen En Vent | 53.3% | PROD | |
| PE 881 | G06390 | Federal | OP | 2/1/1984 | 5,760 | ConocoPhillips | 18.8% | TERMIN | |
| PL 1 | G04234 | Federal | RT | 1/1/1980 | 1,568 | Fieldwood En | 100.0% | TERMIN | |
| PL 10 | G02925 | Federal | RT | 12/1/1974 | 5,000 | Fieldwood En | 100.0% | TERMIN | |
| PL 11 | O0071 | Federal | RT | 9/12/1946 | 5,000 | Fieldwood En | 100.0% | RELINQ | |
| PL 13 | G03171 | Federal | RT | 7/1/1975 | 5,000 | ANKOR En | 12.5% | TERMIN | |
| PL 13 | G03171 | Federal | OP 1 | 7/1/1975 | 391 | ANKOR En | 12.5% | TERMIN | |
| PL 13 | G03171 | Federal | OP 2 | 7/1/1975 | 3,906 | ANKOR En | 12.5% | TERMIN | |
| PL 13 | G03171 | Federal | OP 3 | 7/1/1975 | 703 | ANKOR En | 4.4% | TERMIN | |
| PL 13 | G03171 | Federal | OP 5 | 7/1/1975 | 391 | ANKOR En | 12.5% | TERMIN | |
| PL 25 | G14535 | Federal | RT | 7/1/1994 | 5,000 | Fieldwood En | 100.0% | TERMIN | |
| PL 5 | G12027 | Federal | RT | 6/1/1990 | 5,000 | Talos En Off | 100.0% | RELINQ | |
| PL 6 | G09651 | Federal | RT | 5/1/1988 | 5,000 | Walter O&G | 100.0% | RELINQ | |
| PL 6 | G09651 | Federal | OP 1 | 5/1/1988 | 5,000 | Walter O&G | 35.0% | RELINQ | |
| PL 6 | G09651 | Federal | OP 2 | 5/1/1988 | 5,000 | Walter O&G | 65.0% | RELINQ | |
| PL 8 | G03587 | Federal | RT | 8/1/1977 | 5,000 | ANKOR En | 12.5% | TERMIN | |
| PL 9 | G02924 | Federal | RT | 12/1/1974 | 5,000 | Fieldwood En | 100.0% | TERMIN | |
| PL 9 | G02924 | Federal | OP | 12/1/1974 | 5,000 | Fieldwood En | 50.0% | TERMIN | |
| PN 883 | MF100410 | SL - TX | WI | 10/6/1998 | 720 | Fieldwood | 35.0% | ACTIVE | |
| PN 883 | MF100411 | SL - TX | WI | 10/6/1998 | 720 | Fieldwood | 35.0% | ACTIVE | |
| PN 883 | MF100412 | SL - TX | WI | 10/6/1998 | 720 | Fieldwood | 35.0% | ACTIVE | |
| PN 883 | MF101898 | SL - TX | WI | 10/6/1998 | | Apache | 35.0% | TERMIN | |
| PN 883 | MF96146 | SL - TX | WI | 10/4/1994 | 720 | Fieldwood | 35.0% | ACTIVE | |
| PN 883 | MF96147 | SL - TX | WI | 10/4/1994 | 720 | Fieldwood | 35.0% | ACTIVE | |
| PN 883 | SL96146 | SL - TX | WI | 10/4/1994 | 720 | Fieldwood | 35.0% | ACTIVE | |
| PN 899L | MF100413 | SL - TX | WI | 10/6/1998 | 375 | Fieldwood | 35.0% | ACTIVE | |
| PN 899L | MF100414 | SL - TX | WI | 10/6/1998 | 360 | Fieldwood | 35.0% | ACTIVE | |
| PN 969 | G05953 | Federal | RT | 10/1/1983 | 5,760 | Peregrine O&G II | 8.3% | TERMIN | |
| PN 976 | G05954 | Federal | RT | 10/1/1983 | 5,760 | Peregrine O&G II | 8.3% | TERMIN | |
| SA 10 | G03958 | Federal | RT | 3/1/1979 | 3,144 | Fieldwood En | 92.3% | TERMIN | |
| SA 10 | G03958 | Federal | OP | 3/1/1979 | 3,144 | Fieldwood En | 20.0% | TERMIN | |
| SA 13 | G03959 | Federal | OP | 3/1/1979 | 5,000 | Renaissance Off | 50.0% | TERMIN | |

15

Case 20-33948   Document 1487-2   Filed in TXSB on 06/04/21   Page 126 of 250

| Block | Lease | Type | Rights | Date Le Eff | Le Cur Acres | Operator | WI | Lease Status | Notes[†] |
|---|---|---|---|---|---|---|---|---|---|
| SM 10 | G01181 | Federal | RT | 4/1/1962 | 5,000 | Fieldwood En | 100.0% | TERMIN | |
| SM 105 | G17938 | Federal | RT | 8/1/1997 | 5,000 | Fieldwood En | 100.0% | PROD | |
| SM 106 | G02279 | Federal | RT | 2/1/1973 | 2,500 | Fieldwood En | 100.0% | TERMIN | |
| SM 106 | G03776 | Federal | RT | 6/1/1978 | 2,500 | Fieldwood En | 100.0% | PROD | |
| SM 108 | 00792 | Federal | RT | 5/1/1960 | 5,000 | Talos En Off | 25.0% | PROD | [1] |
| SM 108 | 00792 | Federal | OP | 5/1/1960 | 5,000 | Talos En Off | 12.5% | PROD | |
| SM 11 | G01182 | Federal | RT | 3/1/1962 | 5,000 | Fieldwood En | 100.0% | TERMIN | |
| SM 127 | G02883 | Federal | RT | 12/1/1974 | 2,784 | Fieldwood En | 66.7% | PROD | |
| SM 127 | G02883 | Federal | OP 2 | 12/1/1974 | 2,784 | Fieldwood En | 33.3% | PROD | |
| SM 127 | G02883 | Federal | RT | 12/1/1974 | 2,784 | Fieldwood En | 17.3% | PROD | [1] |
| SM 127 | G02883 | Federal | OP 2 | 12/1/1974 | 2,784 | Fieldwood En | 8.7% | PROD | [1] |
| SM 128 | G02587 | Federal | RT | 5/1/1974 | 5,000 | Fieldwood En | 66.7% | PROD | |
| SM 128 | G02587 | Federal | RT | 5/1/1974 | 5,000 | Fieldwood En | 17.3% | PROD | [1] |
| SM 132 | G02282 | Federal | RT | 2/1/1973 | 5,000 | Fieldwood En | 50.0% | TERMIN | [6] |
| SM 135 | G19776 | Federal | RT | 5/1/1998 | 3,293 | Fieldwood En | 50.0% | TERMIN | [4] |
| SM 136 | G02588 | Federal | RT | 5/1/1974 | 2,500 | Fieldwood En | 50.0% | TERMIN | [6] |
| SM 137 | G02589 | Federal | RT | 5/1/1974 | 5,000 | Fieldwood En | 50.0% | TERMIN | [6] |
| SM 141 | G02885 | Federal | OP 2 | 12/1/1974 | 5,000 | Fieldwood En | 66.7% | TERMIN | |
| SM 141 | G02885 | Federal | RT | 12/1/1974 | 5,000 | Fieldwood En | 77.6% | TERMIN | |
| SM 141 | G02885 | Federal | OP 2 | 12/1/1974 | 5,000 | Fieldwood En | 17.3% | TERMIN | [1] |
| SM 149 | G02592 | Federal | RT | 5/1/1974 | 2,500 | Fieldwood En | 50.0% | PROD | [2] |
| SM 149 | G02592 | Federal | OP | 5/1/1974 | 2,500 | Fieldwood En | 25.0% | PROD | [2] |
| SM 150 | G16325 | Federal | RT | 6/1/1996 | 3,329 | Fieldwood En | 50.0% | RELINQ | [6] |
| SM 161 | G04809 | Federal | RT | 9/1/1981 | 5,000 | Fieldwood En | 100.0% | PROD | |
| SM 171 | G34273 | Federal | RT | 9/1/2012 | 5,000 | Apache Shelf Exp | 100.0% | EXPIR | |
| SM 172 | G34274 | Federal | RT | 9/1/2012 | 5,000 | Apache Shelf Exp | 100.0% | RELINQ | |
| SM 177 | G34275 | Federal | RT | 9/1/2012 | 5,000 | Apache Shelf Exp | 100.0% | RELINQ | |
| SM 178 | G34276 | Federal | RT | 9/1/2012 | 5,000 | Apache Shelf Exp | 100.0% | EXPIR | |
| SM 18 | G08680 | Federal | RT | 6/1/1987 | 5,000 | Fieldwood En | 50.0% | TERMIN | |
| SM 18 | G08680 | Federal | OP | 6/1/1987 | 5,000 | Fieldwood En | 100.0% | TERMIN | |
| SM 188 | G34277 | Federal | RT | 9/1/2012 | 5,000 | Apache Shelf Exp | 100.0% | RELINQ | |
| SM 189 | G34278 | Federal | RT | 9/1/2012 | 5,000 | Apache Shelf Exp | 100.0% | RELINQ | |
| SM 193 | G34279 | Federal | RT | 9/1/2012 | 5,000 | Apache Shelf Exp | 100.0% | RELINQ | |
| SM 195 | G21108 | Federal | ORRI | 6/1/1999 | 5,000 | Tarpon O&D | 4.0% | TERMIN | |

16

Case 20-33948   Document 1285-1   Filed in TXSB on 04/15/21   Page 127 of 1032

| Block | Lease | Type | Rights | Date Le Eff | Le Cur Acres | Operator | WI | Lease Status | Notes[†] |
|---|---|---|---|---|---|---|---|---|---|
| SM 236 | G4437 | Federal | ORRI | 11/1/1980 | | Cox Op | 4.4% | UNIT | |
| SM 241 | 00310 | Federal | RT | 2/7/1936 | 114,601 | Cox Op | 60.0% | UNIT | |
| SM 241 | 00310 | Federal | OP | 2/7/1936 | 114,601 | Cox Op | 60.0% | UNIT | |
| SM 241 | 00310 | Federal | Unit | 2/7/1936 | 114,601 | Cox Op | 16.0% | UNIT | |
| SM 268 | G02310 | Federal | CONT | 12/19/1972 | | Apache | 69.9% | TERMIN | |
| SM 268 | G34284 | Federal | RT | 8/1/2012 | 3,237 | Apache Shelf Exp | 100.0% | EXPIR | [4] |
| SM 269 | G02311 | Federal | RT | 1/1/1973 | 5,000 | Fieldwood En | 72.8% | PROD | [4] |
| SM 280 | G14456 | Federal | OP 1 | 6/1/1994 | 5,000 | Fieldwood En | 50.0% | PROD | [4] |
| SM 280 | G14456 | Federal | OP 3 | 6/1/1994 | 5,000 | Fieldwood En | 50.0% | PROD | [4] |
| SM 280 | G14456 | Federal | RT | 6/1/1994 | 5,000 | Fieldwood En | 50.0% | PROD | [4] |
| SM 281 | G02600 | Federal | RT | 4/1/1974 | 3,214 | Fieldwood En | 68.1% | TERMIN | [4] |
| SM 34 | G13897 | Federal | OP | 5/1/1993 | 5,000 | Black Elk En Off Op | 50.0% | TERMIN | |
| SM 41 | G01192 | Federal | OP 2 | 6/1/1962 | 5,000 | Sanare En Part | 25.0% | PROD | [2] |
| SM 41 | G01192 | Federal | OP 3 | 6/1/1962 | 5,000 | Sanare; Fieldwd En Off | 50.0% | PROD | [2] |
| SM 44 | G23840 | Federal | RT | 5/1/2002 | 5,000 | SandRidge En Off | 100.0% | TERMIN | |
| SM 48 | 00786 | Federal | RT | 5/1/1960 | 5,000 | Fieldwood En | 50.0% | PROD | [2] |
| SM 48 | 00786 | Federal | OP | 5/1/1960 | 5,000 | Fieldwood En | 50.0% | PROD | [2] |
| SM 58 | G01194 | Federal | RT | 5/1/1962 | 5,000 | ANKOR En | 100.0% | PROD | |
| SM 66 | G01198 | Federal | RT | 6/1/1962 | 5,000 | Fieldwood En | 50.0% | TERMIN | [6] |
| SM 7 | G33610 | Federal | RT | 7/1/2010 | 5,000 | Apache Shelf Exp | 100.0% | RELINQ | |
| SM 76 | G01208 | Federal | RT | 6/1/1962 | 5,000 | Fieldwood En | 50.0% | TERMIN | |
| SM 93 | G21618 | Federal | RT | 5/1/2000 | 5,000 | Talos ERT | 12.5% | PROD | |
| SM 97 | G32159 | Federal | RT | 8/1/2008 | 5,000 | Apache | 100.0% | EXPIR | |
| SP 61 | G01609 | Federal | OP | 7/1/1967 | 5,000 | Fieldwood En | 100.0% | UNIT | [5] |
| SP 62 | G01294 | Federal | RT | 6/1/1962 | 5,000 | Fieldwood En | 100.0% | PROD | |
| SP 63 | G34365 | Federal | RT | 8/1/2012 | 5,000 | Apache Shelf Exp | 100.0% | EXPIR | |
| SP 64 | G01901 | Federal | RT | 1/1/1969 | 5,000 | Fieldwood En | 50.0% | UNIT | |
| SP 64 | G01901 | Federal | OP | 1/1/1969 | 5,000 | Fieldwood En | 75.0% | UNIT | |
| SP 65 | G01610 | Federal | RT | 7/1/1967 | 5,000 | Fieldwood En | 50.0% | UNIT | |
| SP 65 | G01610 | Federal | OP | 7/1/1967 | 5,000 | Fieldwood En | 75.0% | UNIT | |
| SP 66 | G1611 | Federal | ORRI | 6/1/1967 | | Fieldwood En | 8.3% | UNIT | [4] |
| SP 68 | G34366 | Federal | RT | 8/1/2012 | 5,000 | Apache Shelf Exp | 100.0% | RELINQ | |
| SP 69 | G34367 | Federal | RT | 8/1/2012 | 5,000 | Apache Shelf Exp | 100.0% | RELINQ | |

17

Case 20-33948   Document 1285-1   Filed in TXSB on 04/15/21   Page 128 of 1032

| Block | Lease | Type | Rights | Date Le Eff | Le Cur Acres | Operator | WI | Lease Status | Notes† |
|---|---|---|---|---|---|---|---|---|---|
| SP 70 | G01614 | Federal | RT | 6/1/1967 | 5,000 | Fieldwood En | 100.0% | PROD | |
| SP 75 | G05051 | Federal | OP 2 | 4/1/1982 | 5,000 | GOM Shelf | 28.8% | TERMIN | [1] |
| SP 75 | G05051 | Federal | RT | 4/1/1982 | 5,000 | GOM Shelf | 71.2% | TERMIN | [1] |
| SP 75 | G05051 | Federal | OP 2 | 4/1/1982 | 5,000 | GOM Shelf | 71.2% | TERMIN | |
| SP 83 | G05052 | Federal | ORRI | 4/1/1982 | 5,000 | Arena Off | 0.7% | RELINQ | |
| SP 87 | G07799 | Federal | RT | 9/1/1985 | 3,540 | Fieldwood En | 33.3% | TERMIN | |
| SP 87 | G07799 | Federal | RT | 9/1/1985 | 3,540 | Fieldwood En | 33.3% | TERMIN | [1] |
| SP 88 | G10894 | Federal | RT | 6/1/1989 | 3,540 | Apache | 100.0% | RELINQ | |
| SP 89 | G01618 | Federal | RT | 7/1/1967 | 5,000 | Fieldwood En | 50.0% | PROD | |
| SP 96 | G31431 | Federal | RT | 3/1/2008 | 5,000 | Stone En | 50.0% | RELINQ | |
| SS 105 | G09614 | Federal | RT | 8/1/1988 | 5,000 | Bennu O&G | 100.0% | PROD | |
| SS 105 | G09614 | Federal | OP 2 | 8/1/1988 | 5,000 | Bennu O&G | 100.0% | PROD | |
| SS 105 | G09614 | Federal | OP 3 | 8/1/1988 | 5,000 | Bennu O&G | 100.0% | PROD | |
| SS 126 | G12940 | Federal | RT | 5/1/1991 | 5,000 | Fieldwood En | 100.0% | TERMIN | |
| SS 126 | G12940 | Federal | OP | 5/1/1991 | 5,000 | Fieldwood En | 100.0% | TERMIN | |
| SS 129 | G12941 | Federal | RT | 5/1/1991 | 5,000 | Fieldwood En | 100.0% | PROD | |
| SS 129 | G12941 | Federal | ORRI | 5/1/1991 | | Fieldwood En | 3.3% | PROD | |
| SS 130 | O0453 | Federal | ORRI | 1/1/1955 | 5,000 | W&T Off | 3.0% | TERMIN | |
| SS 145 | G34831 | Federal | CONT | 9/1/2013 | 5,000 | Hoactzin Part | 25.0% | TERMIN | |
| SS 150 | O0419 | Federal | ORRI | 11/1/1954 | 5,000 | Ridgelake En | 5.0% | PROD | |
| SS 151 | G15282 | Federal | RT | 7/1/1995 | 5,000 | EnVen En Vent | 100.0% | PROD | |
| SS 153 | G18011 | Federal | RT | 7/1/1997 | 5,000 | Fieldwood En | 33.3% | TERMIN | |
| SS 154 | O0420 | Federal | ORRI | 11/1/1954 | | Ridgelake En | 8.0% | PROD | |
| SS 159 | G11984 | Federal | OP | 7/1/1990 | 5,000 | Hoactzin Part | 15.5% | TERMIN | |
| SS 169 | O0820 | Federal | RT | 4/1/1960 | 5,000 | Fieldwood En | 66.7% | PROD | [6] |
| SS 175 | G05550 | Federal | RT | 7/1/1983 | 5,000 | Chevron USA | 66.7% | UNIT | |
| SS 176 | G33646 | Federal | RT | 7/1/2010 | 5,000 | Fieldwood En | 40.0% | PROD | |
| SS 178 | G05551 | Federal | RT | 7/1/1983 | 5,000 | Fieldwood En | 100.0% | PROD | |
| SS 182 | G03998 | Federal | RT | 3/1/1979 | 2,500 | Fieldwood En | 100.0% | PROD | |
| SS 188 | G05203 | Federal | CONT | 1/1/1983 | 5,027 | Fieldwood En | 100.0% | TERMIN | |
| SS 189 | G04232 | Federal | OP 5 | 12/1/1979 | 5,000 | Fieldwood En | 99.0% | PROD | [4] |
| SS 189 | G04232 | Federal | RT | 12/1/1979 | 5,000 | Fieldwood En | 99.0% | PROD | [4] |
| SS 189 | G4232 | Federal | ORRI | 12/1/1979 | | Fieldwood En | 8.0% | PROD | [4] |
| SS 190 | G10775 | Federal | RT | 4/1/1989 | 5,000 | Fieldwood En | 60.0% | TERMIN | |

18

Case 20-33948   Document 1285-1   Filed in TXSB on 04/15/21   Page 129 of 1032

| Block | Lease | Type | Rights | Date Le Eff | Le Cur Acres | Operator | WI | Lease Status | Notes[†] |
|---|---|---|---|---|---|---|---|---|---|
| SS 190 | G10775 | Federal | OP | 4/1/1989 | 5,000 | Fieldwood En | 100.0% | TERMIN | |
| SS 193 | G13917 | Federal | RT | 5/1/1993 | 5,000 | Fieldwood En | 100.0% | PROD | |
| SS 194 | G15288 | Federal | RT | 7/1/1995 | 5,000 | Fieldwood En | 100.0% | PROD | |
| SS 198 | 00593 | Federal | RT | 9/1/1955 | 2,969 | Renaissance Off | 50.0% | PROD | [1] |
| SS 198 | G12355 | Federal | OP | 9/1/1955 | 2,031 | Renaissance Off | 25.0% | PROD | |
| SS 199 | 00594 | Federal | RT | 9/1/1955 | 3,516 | Talos En Off | 50.0% | PROD | |
| SS 199 | G12358 | Federal | OP | 9/1/1955 | 1,484 | Renaissance Off | 50.0% | PROD | |
| SS 204 | G01520 | Federal | RT | 7/1/1967 | 5,000 | Fieldwood En | 55.2% | PROD | [4] |
| SS 206 | G01522 | Federal | RT | 7/1/1967 | 5,000 | Fieldwood En | 60.0% | UNIT | [6] |
| SS 207 | G01523 | Federal | RT | 7/1/1967 | 5,000 | Fieldwood En | 72.2% | UNIT | [7] |
| SS 207 | G01523 | Federal | OP | 7/1/1967 | 5,000 | Fieldwood En | 47.6% | UNIT | [7] |
| SS 210 | G05204 | Federal | CONT | 1/1/1983 | 5,000 | Fieldwood En | 100.0% | RELINQ | |
| SS 216 | G01524 | Federal | RT | 7/1/1967 | 5,000 | Fieldwood En | 80.0% | PROD | [4] |
| SS 243 | G10780 | Federal | RT | 7/1/1989 | 5,000 | Fieldwood En | 50.0% | PROD | |
| SS 243 | G10780 | Federal | ORRI | 7/1/1989 | | Fieldwood En | 4.2% | PROD | |
| SS 249 | G01030 | Federal | OP 1 | 6/1/1962 | 5,000 | Fieldwood En Off | 5.3% | UNIT | [4] |
| SS 249 | G1030 | Federal | ORRI | 6/1/1962 | | Fieldwood En Off | 0.2% | UNIT | [4] |
| SS 258 | G05560 | Federal | RT | 7/1/1983 | 5,000 | Castex Off | 100.0% | TERMIN | |
| SS 258 | G05560 | Federal | OP | 7/1/1983 | 5,000 | Castex Off | 7.4% | TERMIN | |
| SS 259 | G05044 | Federal | RT | 4/1/1982 | 5,141 | Fieldwood En | 100.0% | TERMIN | |
| SS 259 | G05044 | Federal | OP | 4/1/1982 | 5,141 | Fieldwood En | 7.4% | TERMIN | |
| SS 271 | G01038 | Federal | RT | 6/1/1962 | 5,000 | Fieldwood En Off | 20.0% | UNIT | [4] |
| SS 274 | G01039 | Federal | RT | 6/1/1962 | 5,000 | Fieldwood En | 100.0% | PROD | |
| SS 276 | G10785 | Federal | RT | 5/1/1989 | 5,000 | Monforte | 66.7% | TERMIN | |
| SS 277 | G09627 | Federal | RT | 5/1/1988 | 5,000 | Fieldwood En | 1.0% | SOP | |
| SS 277 | G09627 | Federal | OP | 5/1/1988 | 5,000 | Fieldwood En | 100.0% | SOP | |
| SS 278 | G32206 | Federal | RT | 8/1/2008 | 5,000 | Apache | 100.0% | EXPIR | |
| SS 291 | G02923 | Federal | OP | 12/1/1974 | 3,750 | Fieldwood En | 67.9% | OPERNS | [4] |
| SS 30 | 00333 | Federal | RT | 9/12/1946 | 5,000 | W & T Off | 37.5% | UNIT | |
| SS 301 | G10794 | Federal | ORRI | 5/1/1989 | | Fieldwood En | 1.5% | SOP | [2] |
| SS 31 | 00334 | Federal | RT | 9/12/1946 | 5,000 | W & T Off | 37.5% | UNIT | |
| SS 314 | G26074 | Federal | OP 4 | 5/1/2004 | 5,000 | Fieldwood En | 37.5% | PROD | |
| SS 314 | G26074 | Federal | RT | 5/1/2004 | 5,000 | Fieldwood En | 75.0% | PROD | |
| SS 314 | G26074 | Federal | ORRI | 5/1/2004 | | Fieldwood En | 4.5% | PROD | |

Case 20-33948   Document 1285-1   Filed in TXSB on 04/15/21   Page 130 of 1032

| Block | Lease | Type | Rights | Date Le Eff | Le Cur Acres | Operator | WI | Lease Status | Notes† |
|-------|-------|------|--------|-------------|--------------|----------|-----|--------------|--------|
| SS 32 | 00335 | Federal | RT | 9/12/1946 | 5,000 | W & T Off | 37.5% | UNIT | |
| SS 33 | 00336 | Federal | CONT | 9/12/1946 | 5,000 | W&T Off | 28.9% | UNIT | |
| SS 33 | 00336 | Federal | ORRI | 9/12/1946 | 5,000 | W&T Off | 0.8% | UNIT | |
| SS 354 | G15312 | Federal | RT | 7/1/1995 | 5,000 | Fieldwood En | 100.0% | PROD | |
| SS 355 | G33650 | Federal | RT | 6/1/2010 | 5,323 | Apache Shelf Exp | 100.0% | RELINQ | |
| SS 58 | G07746 | Federal | ORRI | 7/1/1985 | 5,000 | Talos Third Cst | 10.5% | PROD | |
| SS 68 | G02917 | Federal | RT | 12/1/1974 | 5,000 | Fieldwood En | 100.0% | RELINQ | |
| SS 87 | G12349 | Federal | ORRI | 9/12/1946 | 1,953 | Sanare En Part | 1.0% | UNIT | |
| SS 91 | G02919 | Federal | RT | 12/1/1974 | 5,000 | Fieldwood En | 87.5% | PROD | |
| SS 91 | G02919 | Federal | OP 2 | 12/1/1974 | 5,000 | Fieldwood En | 87.5% | PROD | |
| SS 91 | G02919 | Federal | OP 2 | 12/1/1974 | 5,000 | Fieldwood En | 12.5% | PROD | [1] |
| SS 91 | G02919 | Federal | RT | 12/1/1974 | 5,000 | Fieldwood En | 12.5% | PROD | [1] |
| ST 146 | G33110 | Federal | RT | 7/1/2009 | 3,772 | Apache Shelf Exp | 100.0% | EXPIR | |
| ST 148 | G01960 | Federal | RT | 2/1/1970 | 2,500 | Arena Off | 15.6% | PROD | |
| ST 148 | G01960 | Federal | OP | 2/1/1970 | 2,500 | Arena Off | 15.6% | PROD | |
| ST 161 | G01248 | Federal | OP | 6/1/1962 | 5,000 | Arena Off | 25.0% | PROD | |
| ST 166 | G01252 | Federal | OP | 6/1/1962 | 5,000 | Apache | 100.0% | TERMIN | |
| ST 173 | G04001 | Federal | RT | 3/1/1979 | 5,000 | Apache | 100.0% | TERMIN | |
| ST 179 | G12020 | Federal | RT | 6/1/1990 | 5,000 | Fieldwood En Off | 50.0% | TERMIN | |
| ST 179 | G12020 | Federal | OP | 6/1/1990 | 5,000 | Fieldwood En Off | 68.8% | TERMIN | |
| ST 190 | G01261 | Federal | RT | 6/1/1962 | 5,000 | Black Elk En Off Op | 40.0% | TERMIN | |
| ST 190 | G01261 | Federal | OP | 6/1/1962 | 5,000 | Black Elk En Off Op | 40.0% | TERMIN | |
| ST 194 | G05610 | Federal | RT | 7/1/1983 | 5,000 | Fieldwood En | 100.0% | TERMIN | |
| ST 203 | G01269 | Federal | OP 1 | 6/1/1962 | 5,000 | Black Elk En Off Op | 40.0% | TERMIN | |
| ST 203 | G01269 | Federal | OP 2 | 6/1/1962 | 5,000 | Black Elk En Off Op | 20.0% | TERMIN | |
| ST 203 | G01269 | Federal | RT | 6/1/1962 | 5,000 | Black Elk En Off Op | 40.0% | TERMIN | |
| ST 205 | G05612 | Federal | RT | 7/1/1983 | 5,000 | Fieldwood En | 50.0% | PROD | |
| ST 205 | G05612 | Federal | OP 3 | 7/1/1983 | 5,000 | Fieldwood En | 75.0% | PROD | |
| ST 205 | G05612 | Federal | OP 4 | 7/1/1983 | 5,000 | Fieldwood En | 100.0% | PROD | |
| ST 205 | G05612 | Federal | OP 7 | 7/1/1983 | 5,000 | Fieldwood En | 50.0% | PROD | |
| ST 205 | G05612 | Federal | OP 6 | 7/1/1983 | 5,000 | Fieldwood En | 75.0% | PROD | |
| ST 205 | G05612 | Federal | OP 5 | 7/1/1983 | 5,000 | Fieldwood En | 50.0% | PROD | |
| ST 205 | G05612 | Federal | ORRI | 7/1/1983 | 5,000 | Fieldwood En | 2.0% | PROD | |
| ST 206 | G05613 | Federal | RT | 7/1/1983 | 5,000 | Fieldwood En | 50.0% | TERMIN | |

20

| Block | Lease | Type | Rights | Date Le Eff | Le Cur Acres | Operator | WI | Lease Status | Notes† |
|---|---|---|---|---|---|---|---|---|---|
| ST 228 | G32217 | Federal | RT | 8/1/2008 | 5,000 | Eni US Op | 40.0% | EXPIR | |
| ST 229 | G13938 | Federal | OP | 7/1/1993 | 2,148 | W & T Off | 33.3% | PROD | |
| ST 244 | G34341 | Federal | RT | 10/1/2012 | 4,572 | Apache Shelf Exp | 100.0% | RELINQ | |
| ST 26 | G01361 | Federal | RT | 5/1/1964 | 625 | Cox Op | 50.0% | UNIT | |
| ST 26 | G01870 | Federal | RT | 11/1/1968 | 1,875 | Cox Op | 50.0% | UNIT | |
| ST 26 | G02620 | Federal | RT | 5/1/1974 | 2,500 | Cox Op | 50.0% | UNIT | |
| ST 276 | G07780 | Federal | RT | 8/1/1985 | 5,000 | Eni US Op | 100.0% | UNIT | |
| ST 276 | G07780 | Federal | OP | 8/1/1985 | 5,000 | Eni US Op | 100.0% | UNIT | |
| ST 290 | G16454 | Federal | RT | 4/24/1996 | 5,000 | Apache | 100.0% | TERMIN | |
| ST 291 | G16455 | Federal | RT | 9/1/1996 | 5,000 | Fieldwood En | 100.0% | PROD | |
| ST 291 | G16455 | Federal | OP | 9/1/1996 | 5,000 | Fieldwood En | 100.0% | PROD | |
| ST 295 | G05646 | Federal | RT | 7/1/1983 | 5,000 | Fieldwood En | 100.0% | UNIT | |
| ST 296 | G12981 | Federal | RT | 5/1/1991 | 5,000 | Fieldwood En | 100.0% | UNIT | |
| ST 296 | G12981 | Federal | OP | 5/1/1991 | 5,000 | Fieldwood En | 100.0% | UNIT | |
| ST 311 | G31418 | Federal | RT | 3/1/2008 | 5,000 | Walter O&G | 45.0% | PROD | |
| ST 316 | G22762 | Federal | RT | 6/1/2001 | 4,435 | W & T Off | 20.0% | PROD | [4] |
| ST 320 | G24990 | Federal | RT | 5/1/2003 | 5,000 | W & T Off | 11.3% | PROD | |
| ST 47 | G33652 | Federal | RT | 7/1/2010 | 5,000 | Apache Shelf Exp | 100.0% | RELINQ | |
| ST 49 | G24956 | Federal | RT | 6/1/2003 | 5,000 | Fieldwood En | 100.0% | PROD | |
| ST 49 | G24956 | Federal | OP | 6/1/2003 | 5,000 | Fieldwood En | 100.0% | PROD | |
| ST 50 | G34331 | Federal | RT | 8/1/2012 | 5,000 | Apache Shelf Exp | 100.0% | RELINQ | |
| ST 53 | G04000 | Federal | RT | 3/1/1979 | 5,000 | Fieldwood En | 50.0% | PROD | [2] |
| ST 53 | G04000 | Federal | OP 1 | 3/1/1979 | 5,000 | Fieldwood En | 50.0% | PROD | [2] |
| ST 53 | G04000 | Federal | OP 2 | 3/1/1979 | 5,000 | Fieldwood En | 25.0% | PROD | [2] |
| ST 59 | G31404 | Federal | RT | 2/1/2008 | 5,000 | LLOG Exp Off | 25.0% | RELINQ | |
| ST 64 | G33106 | Federal | RT | 7/1/2009 | 5,000 | Apache Shelf Exp | 100.0% | EXPIR | |
| ST 67 | 00020 | Federal | CONT | 4/25/1947 | | Fieldwood En | 79.7% | UNIT | [2] |
| SX 17 | G04143 | Federal | RT | 10/1/1979 | 2,042 | Apache | 92.3% | RELINQ | |
| SX 17 | G04143 | Federal | OP | 10/1/1979 | 2,042 | Apache | 20.0% | RELINQ | |
| VK 118 | G33697 | Federal | RT | 5/1/2010 | 5,760 | Apache Shelf Exp | 75.0% | EXPIR | |
| VK 203 | G07890 | Federal | RT | 7/1/1985 | 5,760 | Talos ERT | 33.3% | TERMIN | |
| VK 203 | G07890 | Federal | OP | 7/1/1985 | 5,760 | Talos ERT | 33.3% | TERMIN | |
| VK 204 | G04921 | Federal | RT | 12/1/1981 | 5,760 | Talos ERT | 33.3% | TERMIN | |
| VK 204 | G04921 | Federal | OP | 12/1/1981 | 5,760 | Talos ERT | 33.3% | TERMIN | |

| Block | Lease | Type | Rights | Date Le Eff | Le Cur Acres | Operator | WI | Lease Status | Notes[†] |
|---|---|---|---|---|---|---|---|---|---|
| VK 251 | G10930 | Federal | OP | 7/1/1989 | 5,760 | Fieldwood En Off | 7.5% | UNIT | [3] |
| VK 340 | G10933 | Federal | OP | 7/1/1989 | 5,760 | Fieldwood En Off | 7.5% | UNIT | [3] |
| VK 384 | G16541 | Federal | OP | 6/1/1996 | 5,760 | Chevron USA | 20.0% | TERMIN | |
| VK 692/693 | G07898 | Federal | RT | 9/1/1985 | 4,773 | Fieldwood En | 56.9% | TERMIN | |
| VK 694 | G13055 | Federal | RT | 7/1/1991 | 3,214 | Fieldwood En | 53.1% | TERMIN | |
| VK 694 | G13055 | Federal | OP | 7/1/1991 | 3,214 | Fieldwood En | 92.1% | TERMIN | |
| VK 698 | G07901 | Federal | RT | 8/1/1985 | 4,996 | Fieldwood En | 52.4% | TERMIN | |
| VK 736 | G13987 | Federal | RT | 7/1/1993 | 4,742 | Fieldwood En | 100.0% | TERMIN | |
| VK 780 | G06884 | Federal | RT | 6/1/1984 | 5,760 | Fieldwood En | 100.0% | TERMIN | |
| VK 824 | G15436 | Federal | RT | 9/1/1995 | 5,760 | Apache | 100.0% | RELINQ | |
| VK 856 | G34872 | Federal | RT | 7/1/2013 | 877 | Apache Shelf Exp | 75.0% | RELINQ | |
| VK 899 | G34408 | Federal | RT | 8/1/2012 | 1,553 | Apache Shelf Exp | 100.0% | EXPIR | |
| VR 115 | G33593 | Federal | RT | 6/1/2010 | 5,000 | Apache Shelf Exp | 100.0% | RELINQ | |
| VR 128 | G33594 | Federal | RT | 6/1/2010 | 5,000 | Apache Shelf Exp | 100.0% | RELINQ | |
| VR 131 | 00775 | Federal | OP | 5/1/1960 | 4,923 | Talos En Off | 72.5% | TERMIN | |
| VR 146 | G33084 | Federal | RT | 7/1/2009 | 5,000 | Apache Shelf Exp | 100.0% | EXPIR | |
| VR 156 | G34251 | Federal | RT | 10/1/2012 | 5,000 | Apache Shelf Exp | 100.0% | RELINQ | |
| VR 160 | G34252 | Federal | RT | 10/1/2012 | 5,000 | Apache Shelf Exp | 100.0% | RELINQ | |
| VR 161 | G34253 | Federal | RT | 10/1/2012 | 4,868 | Apache Shelf Exp | 100.0% | RELINQ | |
| VR 252 | G05431 | Federal | ORRI | 7/1/1983 | 4,454 | Castex Off | 2.0% | PROD | |
| VR 253 | G17912 | Federal | ORRI | 7/1/1997 | 5,000 | Castex Off | 0.6% | PROD | |
| VR 26 | 00297 | Federal | OP 1 | 11/26/1946 | 4,646 | Apache Shelf | 100.0% | TERMIN | |
| VR 26 | 00297 | Federal | OP 2 | 11/26/1946 | 4,646 | Apache Shelf | 25.0% | TERMIN | |
| VR 26 | 00297 | Federal | RT | 11/26/1946 | 4,646 | Apache Shelf | 50.0% | TERMIN | |
| VR 261 | G03328 | Federal | RT | 4/1/1976 | 5,429 | Fieldwood En | 75.0% | TERMIN | [6] |
| VR 261 | G03328 | Federal | OP 2 | 4/1/1976 | 5,429 | Fieldwood En | 37.5% | TERMIN | [6] |
| VR 261 | G03328 | Federal | ORRI | 4/1/1976 | | Fieldwood En | 6.3% | TERMIN | [6] |
| VR 262 | G34257 | Federal | RT | 10/1/2012 | 5,485 | Fieldwood En | 75.0% | RELINQ | [4] |
| VR 265 | G01955 | Federal | RT | 1/1/1970 | 5,000 | Fieldwood En | 100.0% | SOP | |
| VR 27 | G01329 | Federal | OP 2 | 12/1/1962 | 1,902 | Apache Shelf | 100.0% | TERMIN | |
| VR 27 | G01329 | Federal | OP 1 | 12/1/1962 | 1,902 | Apache Shelf | 25.0% | TERMIN | |
| VR 27 | G01329 | Federal | RT | 12/1/1962 | 1,902 | Apache Shelf | 50.0% | TERMIN | |
| VR 271 | G04800 | Federal | OP | 9/1/1981 | 4,418 | Castex Off | 12.5% | PROD | |

22

| Block | Lease | Type | Rights | Date Le Eff | Le Cur Acres | Operator | WI | Lease Status | Notes† |
|---|---|---|---|---|---|---|---|---|---|
| VR 326 | G21096 | Federal | RT | 6/1/1999 | 5,000 | Fieldwood En | 70.3% | TERMIN | |
| VR 332 | G09514 | Federal | CONT | 3/30/1988 | | Fieldwood En | 50.0% | PROD | [3] |
| VR 34 | G01356 | Federal | OP 1 | 6/1/1964 | 625 | Apache Shelf | 100.0% | TERMIN | |
| VR 34 | G01356 | Federal | OP 2 | 6/1/1964 | 625 | Apache Shelf | 75.0% | TERMIN | |
| VR 34 | G01356 | Federal | RT | 6/1/1964 | 625 | Apache Shelf | 100.0% | TERMIN | |
| VR 35 | 00548 | Federal | OP 1 | 9/1/1955 | 2,500 | Apache Shelf | 100.0% | TERMIN | |
| VR 35 | 00548 | Federal | OP 2 | 9/1/1955 | 2,500 | Apache Shelf | 75.0% | TERMIN | |
| VR 35 | 00548 | Federal | RT | 9/1/1955 | 2,500 | Apache Shelf | 100.0% | TERMIN | |
| VR 35 | 00549 | Federal | OP 1 | 9/1/1955 | 2,500 | Apache Shelf | 100.0% | TERMIN | |
| VR 35 | 00549 | Federal | OP 2 | 9/1/1955 | 2,500 | Apache Shelf | 75.0% | TERMIN | |
| VR 35 | 00549 | Federal | RT | 9/1/1955 | 2,500 | Apache Shelf | 100.0% | TERMIN | |
| VR 356 | G17921 | Federal | ORRI | 8/1/1997 | 4,093 | EnVen En Vent | 2.6% | PROD | |
| VR 36 | G01357 | Federal | OP 2 | 6/1/1964 | 625 | Apache Shelf | 75.0% | TERMIN | |
| VR 36 | G01357 | Federal | OP 1 | 6/1/1964 | 625 | Apache Shelf | 100.0% | TERMIN | |
| VR 36 | G01357 | Federal | RT | 6/1/1964 | 625 | Apache Shelf | 100.0% | TERMIN | |
| VR 369 | G02274 | Federal | OP 4 | 2/1/1973 | 5,000 | Renaissance Off | 23.2% | UNIT | |
| VR 369 | G02274 | Federal | OP 3 | 2/1/1973 | 5,000 | Renaissance Off | 23.2% | UNIT | |
| VR 369 | G02274 | Federal | RT | 2/1/1973 | 5,000 | Renaissance Off | 23.2% | UNIT | |
| VR 369 | G02274 | Federal | Unit | 2/1/1973 | 5,000 | Renaissance Off | 23.2% | UNIT | |
| VR 374 | G32153 | Federal | RT | 8/1/2008 | 5,000 | Apache | 100.0% | EXPIR | |
| VR 380 | G02580 | Federal | RT | 5/1/1974 | 5,000 | Fieldwood En | 100.0% | PROD | |
| VR 381 | G16314 | Federal | RT | 9/1/1996 | 5,000 | Apache Shelf | 100.0% | TERMIN | |
| VR 381 | G16314 | Federal | OP | 9/1/1996 | 5,000 | Apache Shelf | 80.0% | TERMIN | |
| VR 386 | G02278 | Federal | RT A | 2/1/1973 | 5,000 | Marathon Oil | 30.2% | UNIT | |
| VR 386 | G02278 | Federal | RT B | 2/1/1973 | 5,000 | Marathon Oil | 29.0% | UNIT | |
| VR 408 | G15212 | Federal | RT | 7/1/1995 | 5,000 | Fieldwood En | 12.5% | PROD | |
| VR 408 | G15212 | Federal | OP | 7/1/1995 | 5,000 | Fieldwood En | 100.0% | PROD | |
| WC 102 | 00247 | Federal | RT | 9/9/1946 | 5,000 | Fieldwood En | 100.0% | TERMIN | |
| WC 110 | 00081 | Federal | RT | 6/10/1947 | 5,000 | BP E&P | 100.0% | PROD | |
| WC 110 | 00081 | Federal | OP | 6/10/1947 | 5,000 | BP E&P | 37.5% | PROD | |
| WC 111 | 00082 | Federal | RT | 6/10/1947 | 1,250 | BP E&P | 100.0% | PROD | |
| WC 111 | 00082 | Federal | OP | 6/10/1947 | 1,250 | BP E&P | 37.5% | PROD | |
| WC 111 | G33046 | Federal | RT | 8/12/2009 | 3,750 | Eni US Op | 25.0% | EXPIR | |
| WC 130 | G12761 | Federal | RT | 5/1/1991 | 5,000 | Eni US Op | 25.0% | TERMIN | |

Case 20-33948   Document 1285-1   Filed in TXSB on 04/15/21   Page 134 of 1032

| Block | Lease | Type | Rights | Date Le Eff | Le Cur Acres | Operator | WI | Lease Status | Notes† |
|---|---|---|---|---|---|---|---|---|---|
| WC 144 | G01953 | Federal | RT | 2/1/1970 | 5,000 | Fieldwood En | 62.5% | TERMIN | |
| WC 155 | G32114 | Federal | RT | 8/1/2008 | 5,000 | Apache | 100.0% | EXPIR | |
| WC 163 | G05299 | Federal | RT A | 7/1/1983 | 5,000 | Fieldwood En | 61.0% | TERMIN | |
| WC 163 | G05299 | Federal | RT B | 7/1/1983 | 5,000 | Fieldwood En | 56.2% | TERMIN | |
| WC 165 | 00758 | Federal | RT | 4/1/1960 | 5,000 | Fieldwood En | 100.0% | TERMIN | |
| WC 172 | G01998 | Federal | OP 1 | 2/1/1971 | 5,000 | Apache Shelf | 22.5% | TERMIN | |
| WC 172 | G01998 | Federal | OP 2 | 2/1/1971 | 5,000 | Apache Shelf | 22.5% | TERMIN | |
| WC 172 | G01998 | Federal | OP 3 | 2/1/1971 | 5,000 | Apache Shelf | 22.5% | TERMIN | |
| WC 172 | G01998 | Federal | OP 4 | 2/1/1971 | 5,000 | Apache Shelf | 22.5% | TERMIN | |
| WC 172 | G01998 | Federal | OP 10 | 2/1/1971 | 5,000 | Apache Shelf | 25.0% | TERMIN | |
| WC 172 | G01998 | Federal | OP 11 | 2/1/1971 | 5,000 | Apache Shelf | 25.0% | TERMIN | |
| WC 172 | G01998 | Federal | OP 12 | 2/1/1971 | 5,000 | Apache Shelf | 25.0% | TERMIN | |
| WC 181 | G33558 | Federal | RT | 6/1/2010 | 2,500 | Apache Shelf Exp | 100.0% | RELINQ | |
| WC 196 | G05292 | Federal | RT | 7/1/1983 | 5,000 | Union Oil CA | 8.3% | TERMIN | |
| WC 20 | 00680 | Federal | OP | 8/1/1959 | 1,873 | Sanare En Part | 50.0% | PROD | |
| WC 210 | G34216 | Federal | RT | 10/1/2012 | 5,000 | Apache | 100.0% | RELINQ | |
| WC 225 | G00900 | Federal | OP 1 | 4/1/1962 | 5,000 | Tarpon O&D | 26.7% | TERMIN | |
| WC 269 | G13563 | Federal | OP | 8/1/1992 | 5,000 | Sanare En Part | 33.8% | TERMIN | |
| WC 290 | G04818 | Federal | OP 1 | 9/1/1981 | 5,000 | Fieldwood En Off | 10.4% | TERMIN | [3] |
| WC 290 | G04818 | Federal | RT | 9/1/1981 | 5,000 | Fieldwood En Off | 16.7% | TERMIN | [3] |
| WC 291 | G04397 | Federal | RT | 11/1/1980 | 5,000 | Apache | 100.0% | TERMIN | |
| WC 291 | G04397 | Federal | OP | 11/1/1980 | 5,000 | Apache | 60.0% | TERMIN | |
| WC 295 | G24730 | Federal | OP 1 | 5/1/2003 | 5,000 | Fieldwood En | 20.6% | PROD | [4] |
| WC 300 | G15078 | Federal | RT | 7/1/1995 | 5,000 | SandRidge En Off | 14.0% | TERMIN | |
| WC 300 | G15078 | Federal | OP | 7/1/1995 | 5,000 | SandRidge En Off | 24.4% | TERMIN | |
| WC 310 | G17789 | Federal | RT | 8/1/1997 | 5,000 | Fieldwood En | 100.0% | TERMIN | |
| WC 310 | G17789 | Federal | OP | 8/1/1997 | 5,000 | Fieldwood En | 73.7% | TERMIN | |
| WC 33 | G15050 | Federal | RT | 7/1/1995 | 2,891 | Fieldwood En | 100.0% | PROD | |
| WC 34 | G03251 | Federal | RT | 9/1/1975 | 4,506 | Apache | 100.0% | TERMIN | |
| WC 35 | G02819 | Federal | RT | 12/1/1974 | 4,688 | Apache | 100.0% | TERMIN | |
| WC 35 | G02819 | Federal | OP | 12/1/1974 | 4,688 | Apache | 100.0% | TERMIN | |
| WC 35, WC 66 | G01860 | Federal | OP 2 | 1/1/1969 | 1,563 | BP E&P | 100.0% | PROD | |
| WC 35/66 | G01860 | Federal | RT | 1/1/1969 | 1,563 | BP E&P | 100.0% | PROD | |

24

| Block | Lease | Type | Rights | Date Le Eff | Le Cur Acres | Operator | WI | Lease Status | Notes[†] |
|---|---|---|---|---|---|---|---|---|---|
| WC 401 | G07619 | Federal | RT | 7/1/1985 | 5,000 | ConocoPhillips | 33.3% | TERMIN | |
| WC 576 | G33061 | Federal | RT | 6/1/2009 | 5,000 | Apache Shelf Exp | 100.0% | EXPIR | |
| WC 624 | G33064 | Federal | RT | 6/1/2009 | 5,000 | Apache Shelf Exp | 100.0% | EXPIR | |
| WC 65 | G02825 | Federal | OP 4 | 12/1/1974 | 5,000 | BP E&P | 81.3% | PROD | [4] |
| WC 65 | G02825 | Federal | RT | 12/1/1974 | 5,000 | BP E&P | 100.0% | PROD | [4] |
| WC 65 | G02825 | Federal | OP | 12/1/1974 | 5,000 | BP E&P | 100.0% | PROD | [4] |
| WC 650 | G34217 | Federal | RT | 10/1/2012 | 5,000 | Apache Shelf Exp | 100.0% | RELINQ | |
| WC 656 | G34218 | Federal | RT | 10/1/2012 | 5,000 | Apache Shelf Exp | 100.0% | RELINQ | |
| WC 657 | G34219 | Federal | RT | 10/1/2012 | 5,000 | Apache Shelf Exp | 100.0% | RELINQ | |
| WC 66 | G02826 | Federal | OP 2 | 12/1/1974 | 3,750 | Fieldwood En | 75.0% | PROD | [4] |
| WC 66 | G02826 | Federal | OP | 12/1/1974 | 3,750 | Fieldwood En | 100.0% | PROD | [4] |
| WC 67 | G03256 | Federal | OP 1 | 9/1/1975 | 5,000 | Apache | 100.0% | TERMIN | [4] |
| WC 67 | G03256 | Federal | OP 2 | 9/1/1975 | 5,000 | Apache | 66.6% | TERMIN | [4] |
| WC 68 | 00526 | Federal | RT | 9/1/1955 | 2,500 | BP Am Prod | 100.0% | TERMIN | |
| WC 71 | 00244 | Federal | RT | 9/9/1946 | 5,000 | Fieldwood En | 100.0% | TERMIN | |
| WC 72 | G23735 | Federal | RT | 7/1/2002 | 5,000 | Fieldwood En Off | 25.0% | PROD | |
| WC 73 | G23736 | Federal | OP | 7/1/2002 | 5,000 | Castex Off | 25.0% | PROD | |
| WC 99 | G34213 | Federal | RT | 8/1/2012 | 5,000 | Apache Shelf Exp | 100.0% | RELINQ | |
| WD 103 | 00840 | Federal | RT | 5/1/1960 | 3,984 | Fieldwood En | 100.0% | PROD | |
| WD 103 | G12360 | Federal | OP 1 | 5/1/1960 | 1,016 | Fieldwood En | 81.3% | PROD | [4] |
| WD 104 | 00841 | Federal | RT | 5/1/1960 | 5,000 | Fieldwood En | 100.0% | PROD | |
| WD 104 | 00841 | Federal | OP 1 | 5/1/1960 | 5,000 | Fieldwood En | 100.0% | PROD | |
| WD 104 | 00841 | Federal | OP 2 | 5/1/1960 | 5,000 | Fieldwood En | 100.0% | PROD | |
| WD 104 | 00841 | Federal | OP 3 | 5/1/1960 | 5,000 | Fieldwood En | 100.0% | PROD | |
| WD 104 | 00841 | Federal | OP 5 | 5/1/1960 | 5,000 | Fieldwood En | 100.0% | PROD | |
| WD 105 | 00842 | Federal | RT | 5/1/1960 | 5,000 | Fieldwood En | 100.0% | PROD | |
| WD 105 | 00842 | Federal | OP 3 | 5/1/1960 | 5,000 | Fieldwood En | 100.0% | PROD | |
| WD 105 | 00842 | Federal | OP 4 | 5/1/1960 | 5,000 | Fieldwood En | 100.0% | PROD | |
| WD 105 | 00842 | Federal | OP 5 | 5/1/1960 | 5,000 | Fieldwood En | 100.0% | PROD | |
| WD 105 | 00842 | Federal | OP 6 | 5/1/1960 | 5,000 | Fieldwood En | 100.0% | PROD | |
| WD 121 | G19843 | Federal | OP 1 | 8/1/1998 | 5,000 | Fieldwood En | 84.0% | PROD | [4] |
| WD 122 | G13645 | Federal | OP 1 | 8/1/1992 | 5,000 | Fieldwood En | 84.0% | PROD | [4] |
| WD 122 | G13645 | Federal | OP 2 | 8/1/1992 | 5,000 | Fieldwood En | 84.0% | PROD | [4] |
| WD 122 | G13645 | Federal | RT | 8/1/1992 | 5,000 | Fieldwood En | 100.0% | PROD | [4] |

| Block | Lease | Type | Rights | Date Le Eff | Le Cur Acres | Operator | WI | Lease Status | Notes† |
|---|---|---|---|---|---|---|---|---|---|
| WD 128 | G10883 | Federal | RT | 6/1/1989 | 5,000 | Fieldwood En | 100.0% | TERMIN | |
| WD 133 | G01106 | Federal | RT | 5/1/1962 | 5,000 | Arena Off | 100.0% | PROD | |
| WD 133 | G01106 | Federal | ORRI | 5/1/1962 | | Arena Off | 1.0% | PROD | |
| WD 133 | G01106 | Federal | ORRI | 5/1/1962 | | Arena Off | 7.2% | PROD | |
| WD 34 | G03414 | Federal | RT | 1/1/1977 | 2,500 | Fieldwood En | 76.7% | TERMIN | [1], [2] |
| WD 34 | G03414 | Federal | OP | 1/1/1977 | 2,500 | Fieldwood En | 46.7% | TERMIN | [1], [2] |
| WD 38 | G22772 | Federal | RT | 5/1/2001 | 1,796 | Apache | 87.5% | TERMIN | [1], [2] |
| WD 38 | G22772 | Federal | OP | 5/1/2001 | 1,796 | Apache | 43.8% | TERMIN | [1], [2] |
| WD 41 | G01073 | Federal | RT | 3/1/1962 | 5,000 | Apache | 100.0% | TERMIN | [1], [2] |
| WD 41 | G01073 | Federal | OP | 3/1/1962 | 5,000 | Apache | 50.0% | TERMIN | [1], [2] |
| WD 42 | G16470 | Federal | RT | 9/1/1996 | 5,000 | Fieldwood En | 100.0% | TERMIN | [1], [2] |
| WD 42 | G16470 | Federal | OP | 9/1/1996 | 5,000 | Fieldwood En | 50.0% | TERMIN | [1], [2] |
| WD 53 | 17935 | SL-LA | WI | 10/13/2003 | – | Whitney Oil | 33.3% | TERMIN | [1], [2] |
| WD 67 | 00179 | Federal | RT | 7/17/1948 | 2,500 | GOM Shelf | 75.0% | UNIT | [1], [2] |
| WD 67 | 00179 | Federal | OP 1 | 7/17/1948 | 2,500 | BP E&P | 18.8% | UNIT | [1], [2] |
| WD 67 | 00179 | Federal | OP 2 | 7/17/1948 | 2,500 | GOM Shelf | 37.5% | UNIT | [1], [2] |
| WD 68 | 00180 | Federal | RT | 7/17/1948 | 1,833 | GOM Shelf | 75.0% | UNIT | [1], [2] |
| WD 68 | 00180 | Federal | OP 1 | 7/17/1948 | 1,833 | BP E&P | 18.8% | UNIT | [1], [2] |
| WD 68 | 00180 | Federal | OP 2 | 7/17/1948 | 1,833 | GOM Shelf | 37.5% | UNIT | [1], [2] |
| WD 69 | 00181 | Federal | RT | 7/17/1948 | 3,665 | GOM Shelf | 75.0% | UNIT | [1], [2] |
| WD 69 | 00181 | Federal | OP 1 | 7/17/1948 | 3,665 | BP E&P | 18.8% | UNIT | [1], [2] |
| WD 69 | 00181 | Federal | OP 2 | 7/17/1948 | 3,665 | GOM Shelf | 37.5% | UNIT | [1], [2] |
| WD 70 | 00182 | Federal | RT | 7/17/1948 | 5,000 | GOM Shelf | 75.0% | UNIT | [1], [2] |
| WD 70 | 00182 | Federal | OP 1 | 7/17/1948 | 5,000 | BP E&P | 18.8% | UNIT | [1], [2] |
| WD 70 | 00182 | Federal | OP 2 | 7/17/1948 | 5,000 | GOM Shelf | 37.5% | UNIT | [1], [2] |
| WD 71 | 00838 | Federal | RT | 4/1/1960 | 5,000 | BP E&P | 75.0% | UNIT | [1], [2] |
| WD 71 | 00838 | Federal | OP 1 | 4/1/1960 | 5,000 | BP E&P | 18.8% | UNIT | [1], [2] |
| WD 71 | 00838 | Federal | OP 2 | 4/1/1960 | 5,000 | GOM Shelf | 37.5% | UNIT | [1], [2] |
| WD 75 | G01085 | Federal | RT | 6/1/1962 | 5,000 | Fieldwood En | 100.0% | PROD | |
| WD 90 | G01089 | Federal | OP 3 | 6/1/1962 | 5,000 | Fieldwood En | 81.3% | PROD | [4] |
| WD 90 | G01089 | Federal | RT | 6/1/1962 | 5,000 | Fieldwood En | 100.0% | PROD | [4] |
| WD 94 | 00839 | Federal | RT | 5/1/1960 | 5,000 | GOM Shelf | 75.0% | PROD | [1], [2] |
| WD 94 | 00839 | Federal | OP 1 | 5/1/1960 | 5,000 | GOM Shelf | 37.5% | PROD | [1], [2] |
| WD 94 | 00839 | Federal | OP 2 | 5/1/1960 | 5,000 | GOM Shelf | 75.0% | PROD | [1], [2] |

26

Case 20-33948   Document 1487-2   Filed in TXSB on 06/04/21   Page 137 of 250

| Block | Lease | Type | Rights | Date Le Eff | Le Cur Acres | Operator | WI | Lease Status | Notes[t] |
|-------|-------|------|--------|-------------|--------------|----------|-----|--------------|----------|
| WD 95 | G01497 | Federal | RT | 12/1/1966 | 5,000 | GOM Shelf | 75.0% | PROD | [1], [2] |
| WD 95 | G01497 | Federal | OP 1 | 12/1/1966 | 5,000 | GOM Shelf | 37.5% | PROD | [1], [2] |
| WD 95 | G01497 | Federal | OP 2 | 12/1/1966 | 5,000 | GOM Shelf | 75.0% | PROD | [1], [2] |
| WD 96 | G01498 | Federal | RT | 12/1/1966 | 3,665 | GOM Shelf | 75.0% | PROD | [1], [2] |
| WD 96 | G01498 | Federal | OP 2 | 12/1/1966 | 3,665 | GOM Shelf | 37.5% | PROD | [1], [2] |

## FWE I ROW

| SEGMENT NUMBER | COMPANY NAME | ORG AREA | ORG BLOCK | ORG NAME | REC AREA | REC BLOCK | REC NAME | SIZE | PRODUCT | STATUS | ROW NUMBER | FW LEASE | NOTE[5] |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 15213 | Fieldwood Energy, LLC | BS | 41 | B | BS | 42 | 24" SSTI | 10 | G/C | Partial Abandon | G25383 | G21142 | |
| 17938 | Fieldwood Energy, LLC | CA | 43 | A | VK | 247 | 24"SSTI | 6 | GAS | Active | G29431 | G32268 | |
| 3519 | Fieldwood Energy, LLC | EC | 14 | CF | EC | 9 | F/S | 4 | COND | Out of Service | G13721 | G01440 | |
| 13104 | Fieldwood Energy, LLC | EC | 2 | F/S | EC | 2 | 6" SSTI | 4 | GAS | Permitted for Abandonment | G22383 | G15050 | |
| 17801 | Fieldwood Energy, LLC | EC | 14 | CF | WC | 69 | 30 SSTI | 12 | GAS | Permitted for Abandonment | G28556 | G01440 | |
| 44 | Fieldwood Energy, LLC | EI | 175 | C | EI | 176 | 12" SSTI | 8 | OIL | Out of Service | G13445 | 00438 | [3] |
| 1128 | Fieldwood Energy, LLC | EI | 330 | flanged end | EI | 306 | 14-inch SSTI | 14 | OIL | Active | G02139A | G02115 | [3] |
| 6818 | Fieldwood Energy, LLC | EI | 337 | A | EI | 330 | B | 6 | GAS | Out of Service | G05932 | G03332 | |
| 6819 | Fieldwood Energy, LLC | EI | 337 | A | EI | 330 | 14 SSTI | 6 | OIL | Out of Service | G05931 | G03332 | |
| 6852 | Fieldwood Energy, LLC | EI | 315 | A | EI | 330 | 14 SSTI | 6 | OIL | Out of Service | G13447 | G02112 | |
| 7290 | Fieldwood Energy, LLC | EI | 316 | A | EI | 330 | 14 SSTI | 8 | OIL | Active | G07537 | G05040 | |
| 7347 | Fieldwood Energy, LLC | EI | 316 | A | EI | 330 | 8" SSTI | 6 | GAS | Active | G07555 | G05040 | |
| 7914 | Fieldwood Energy, LLC | EI | 212 | A | SS | 152 | 24 SSTI | 6 | GAS | Out of Service | G08530 | G05503 | |
| 7915 | Fieldwood Energy, LLC | EI | 212 | A | EI | 213 | 12 SSTI | 6 | OIL | Out of Service | G08531 | G05503 | |
| 7943 | Fieldwood Energy, LLC | EI | 342 | C | EI | 327 | 08 SSTI | 4 | OIL | Out of Service | G08541 | G02319 | [4] |

[1] Lease carries $0 liability.
[2] FWE 1 is to obtain 75% of the Debtors' interests in Segment 9084, 50% of the Debtors' interest in Segments 4647 and 5890 and 79.666% of the Debtors' interest in Segment 17266, and the Credit Bid Purchaser is to obtain the Debtors' remaining interests in those four pipeline segments.
[3] Represents each ROW in which FWE I is to acquire solely as to the same 8/8ths undivided interest that FWE I is to acquire in the related lease referenced above for such ROW; the Debtors' remaining interests in such ROW are to be abandoned.
[4] Represents each ROW in which (i) FWE I is to acquire solely as to the same 8/8ths undivided interest that FWE I is to acquire in the related lease referenced above for such ROW; and (ii) FWE IV is to acquire solely as to the same 8/8ths undivided interest that FWE IV is to acquire in the related lease referenced above for such ROW. The Debtors' remaining interests in such ROW are to be abandoned.

Case 20-33948   Document 1285-1   Filed in TXSB on 04/15/21   Page 139 of 1032

| SEGMENT NUMBER | COMPANY NAME | ORG AREA | ORG BLOCK | ORG NAME | REC AREA | REC BLOCK | REC NAME | SIZE | PRODUCT | STATUS | ROW NUMBER | FW LEASE | NOTE[3] |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 9211 | Fieldwood Energy, LLC | EI | 53 | B | EI | 64 | 22 SSTI | 6 | G/C | Partial Abandon | G12373 | 00479 | [3] |
| 9376 | Fieldwood Energy, LLC | EI | 142 | A | EI | 141 | 10 SSTI | 4 | OIL | Out of Service | G12734 | 00052 | |
| 11923 | Fieldwood Energy, LLC | EI | 53 | C | EI | 64 | 22 SSTI | 10 | G/C | Out of Service | G20539 | 00479 | |
| 14073 | Fieldwood Energy, LLC | EI | 188 | JE | EI | 188 | 06 SSTI | 4 | BLKG | Out of Service | G29056 | 00443 | |
| 14479 | Fieldwood Energy, LLC | EI | 158 | C | EI | 176 | 12"SSTI | 6 | OIL | Out of Service | G13702 | G01220 | |
| 15906 | Fieldwood Energy, LLC | EI | 173 | G | EI | 175 | C | 4 | BLKO | Out of Service | G28239 | G13622 | |
| 16225 | Fieldwood Energy, LLC | EI | 354 | D | EI | 337 | A | 4 | OIL | Out of Service | G28598 | G10752 | |
| 16226 | Fieldwood Energy, LLC | EI | 354 | D | EI | 337 | A | 4 | GAS | Out of Service | G28599 | G10752 | |
| 16243 | Fieldwood Energy, LLC | EI | 189 | B | EI | 188 | A | 4 | GAS | Out of Service | G29057 | 00423 | |
| 18493 | Fieldwood Energy, LLC | EI | 342 | C | EI | 343 | SSTI | 6 | GAS | Out of Service | G29108 | G02319 | [4] |
| 19960 | Fieldwood Energy LLC | EI | 342 | C | EI | 342 | Blind Flange | 6 | OIL | Out of Service | G29471 | G02319 | [4] |
| - | Fieldwood Energy, LLC | EI | 187 | 2 | EI | 187 | 2 | | | Active | G30283 | G10736 | |
| 8487 | Fieldwood Energy, LLC | EW | 826 | A | ST | 300 | 12 SSTI | 12 | OIL | Out of Service | G10110 | G05800 | [3] |
| 15298 | Fieldwood Energy, LLC | GA | 210 | B | GA | 239 | 12 SSTI | 8 | G/C | Active | G26931 | G25524 | [3] |
| 7866 | Fieldwood Energy, LLC | GI | 33 | A | GI | 22 | L | 8 | GAS | Permitted for Abandonment Approved | G08514 | G04002 | |
| 9084 | GOM Shelf, LLC | GI | 43 | AS | GI | 19 | F/S | 10 | OIL | Active | G12304 | 00175 | [2] |
| 17673 | Fieldwood Energy, LLC | GI | 54 | #2 | GI | 47 | L | 4 | BLKO | Permitted for Abandonment Approved | G28528 | G27173 | |
| 5470 | Fieldwood Energy, LLC | HI | A356 | Valve | HI | A343 | HIOS | 12 | GAS | Out of Service | G04050 | G02754 | |
| 6504 | Fieldwood Energy, LLC | HI | A595 | D | HI | 573 | B | 8 | OIL | Out of Service | G28525 | G02721 | |
| 6669 | Fieldwood Energy, LLC | HI | A 376 | A | HI | A 356 | 12 SSTI | 10 | GAS | Out of Service | G05238 | G02754 | [3] |
| 6669 | Fieldwood Energy LLC | HI | A 376 | Platform A | HI | A 356 | 12 SSTI W/PSN 10882 | 10 | GAS | Out of Service | G05238 | G02754 | [3] |

29

Case 20-33948   Document 1285-1   Filed in TXSB on 04/15/21   Page 140 of 1032

| SEGMENT NUMBER | COMPANY NAME | ORG AREA | ORG BLOCK | ORG NAME | REC AREA | REC BLOCK | REC NAME | SIZE | PRODUCT | STATUS | ROW NUMBER | FW LEASE | NOTE[3] |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 10882 | Fieldwood Energy, LLC | HI | A356 | 10SST | HI | A356 | 12SSTI | 12 | GAS | Out of Service | G04051 | G02754 | [3] |
| 11841 | Fieldwood Energy, LLC | HI | A 545 | JA | HI | A 547 | B | 6 | BLKG | Permitted for Abandonment | G20510 | G17199 | |
| 14650 | Fieldwood Energy, LLC | HI | 201 | #1 | HI | 199 | A | 6 | BLKG | Partial Abandon | G25397 | G23199 | |
| 15401 | Fieldwood Energy, LLC | HI | A 341 | B | HI | A 340 | 30" SSTI | 812 | G/C | Active | G26938 | G25605 | [3] |
| 15581 | Fieldwood Energy, LLC | HI | 120 | A | HI | 128 | SSTI | 6 | G/C | Out of Service | G26968 | G24730 | |
| 16077 | Fieldwood Energy, LLC | HI | 130 | #2 | HI | 165 | 8-inch SSTI | 8 | BLGH | Partial Abandon | G28284 | G25579 | [1] |
| 18789 | Fieldwood Energy LLC | HI | 116 | Platform A | HI | 71 | 16-inch SSTI | 16 | G/C | PABN | G28649 | G06156 | |
| 9032 | Fieldwood Energy, LLC | MC | 311 | A | MC | 312 | 8 SSTI | 8 | OIL | Active | G11747 | G02968 | |
| 3472 | Fieldwood Energy, LLC | MP | 140 | B | MP | 56 | F/S | 18 | BLKG | Out of Service | G13511 | G02193 | |
| 5917 | GOM Shelf, LLC | MP | 311 | A | MP | 313 | 12 SSTI | 8 | OIL | Out of Service | G13466 | G02213 | |
| 7143 | Fieldwood Energy, LLC | MP | 310 | A | MP | 297 | 12 SSTI | 6 | OIL | Out of Service | G07100 | G04126 | |
| 13100 | Fieldwood Energy, LLC | MP | 259 | A | VK | 739 | #01 | 5 | UMB | Out of Service | G22377 | G07827 | |
| 15818 | Fieldwood Energy Offshore LLC | MP | 77 | A | MP | 151 | 18"SSTI | 8 | GAS | Out of Service | G28221 | G04481 | [4] |
| 5408 | Fieldwood Energy, LLC | PL | 10 | B | PL | 13 | 20 SSTI | 8 | OIL | Out of Service | G09317 | G02925 | |
| 16044 | Fieldwood Energy, LLC | PL | 9 | #10 | PL | 10 | B | 6 | BLKG | Out of Service | G28276 | G02924 | |
| 4008 | Fieldwood Energy, LLC | SM | 268 | A | SS | 28 | A | 12 | OIL | Out of Service | G02816 | G34284 | |
| 4647 | Fieldwood Energy, LLC | SM | 149 | 6"SSTI | SM | 132 | B | 6 | BLKO | Out of Service | G03432 | G02592 | [2] |
| 5427 | Fieldwood Energy, LLC | SM | 281 | E | SM | 268 | A | 12 | SPLY | Out of Service | G02817 | G02600 | |
| 5429 | Fieldwood Energy, LLC | SM | 281 | C | SM | 281 | 12 SSTI | 10 | SPLY | Out of Service | G02817 | G02600 | |
| 6512 | Fieldwood Energy, LLC | SM | 281 | C | SM | 268 | D | 10 | BLKO | Out of Service | G29131 | G02600 | |
| 6513 | Fieldwood Energy, LLC | SM | 268 | D | SM | 268 | A | 10 | BLKO | Out of Service | G29132 | G02310 | |
| 10977 | Fieldwood Energy, LLC | SM | 268 | A | SM | 280 | #03 | 3 | BLKG | Active | G28756 | G14456 | |

30

Case 20-33948   Document 1285-1   Filed in TXSB on 04/15/21   Page 141 of 1032

| SEGMENT NUMBER | COMPANY NAME | ORG AREA | ORG BLOCK | ORG NAME | REC AREA | REC BLOCK | REC NAME | SIZE | PRODUCT | STATUS | ROW NUMBER | FW LEASE | NOTE[3] |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 11046 | Fieldwood Energy, LLC | SM | 11 | Well No.34 | SM | 10 | A | 6 | BLKG | Out of Service | G28813 | G01182 | |
| 11047 | Fieldwood Energy, LLC | SM | 10 | A | SM | 11 | 34 | 3 | LIFT | Out of Service | G28812 | G01181 | |
| 11986 | Fieldwood Energy, LLC | SM | 39 | A | SM | 33 | 30 SSTI | 8 | GAS | Out of Service | G20565 | G16320 | |
| 11987 | Fieldwood Energy, LLC | SM | 39 | A | SM | 40 | 10 SSTI | 6 | OIL | Out of Service | G20566 | G16320 | |
| 13642 | Fieldwood Energy, LLC | SM | 280 | H | SM | 268 | A | 10 | BLKG | Permitted for Abandonment | G28758 | G14456 | [3] |
| 17499 | Fieldwood Energy, LLC | SM | 269 | B | SM | 268 | A | 10 | GAS | Active | G28484 | G02311 | |
| 18057 | Fieldwood Energy, LLC | SM | 11 | No.58 Caisson | SM | 10 | A | 4 | BLKG | Out of Service | G28815 | G01182 | |
| 18510 | Fieldwood Energy, LLC | SM | 10 | A | SM | 287 | SSTI | 6 | GAS | Out of Service | G29113 | G01181 | |
| 18563 | Fieldwood Energy, LLC | SM | 48 | E | SM | 39 | A | 6 | G/C | Out of Service | G29128 | 00786 | |
| 18583 | Fieldwood Energy, LLC | SM | 10 | A | SM | 11 | SSTI | 4 | OIL | Out of Service | G28814 | G01181 | |
| 18802 | Fieldwood Energy, LLC | SM | 39 | A | SM | 48 | E | 3 | LIFT | Out of Service | G29182 | G16320 | |
| 4716 | Fieldwood Energy, LLC | SP | 70 | C | SP | 60 | B | 8 | GAS | Active | G03436 | G01614 | |
| 15064 | FW GOM Pipeline, Inc. | SP | 49 | A | SP | 27 | F/S Boundary | 10 | G/O | Active | G07561 | G05051 | |
| 15598 | Fieldwood Energy, LLC | SP | 70 | C | SP | 60 | E | 6 | OIL | Out of Service | G26860 | G01614 | |
| 15626 | Fieldwood Energy, LLC | SP | 65 | A | SP | 62 | 18 SSTI | 8 | OIL | Out of Service | G01686A | G01610 | |
| 1137 | Fieldwood Energy, LLC | SS | 207 | A Platform | SS | 204 | A | 4 | GAS | Out of Service | G13489 | G01523 | [3] |
| 1138 | Fieldwood Energy, LLC | SS | 204 | A | SS | 207 | A | 6 | G/O | Out of Service | G13491 | G01520 | [3] |
| 1147 | Fieldwood Energy, LLC | SS | 207 | A | SS | 208 | F-Pump | 12 | OIL | Out of Service | G13492 | G01523 | [3] |
| 6432 | Fieldwood Energy, LLC | SS | 182 | A | SS | 169 | 18 SSTI | 6 | OIL | Active | G09321 | G03998 | |
| 6538 | Fieldwood Energy, LLC | SS | 91 | A | PL | 11 | 08 SSTI | 6 | OIL | Out of Service | G05146 | G02919 | |
| 6748 | Fieldwood Energy, LLC | SS | 169 | C Platform | SS | 169 | 18-inch SSTI | 6 | OIL | Out of Service | G09322 | 00820 | [4] |
| 7650 | Fieldwood Energy, LLC | SS | 178 | A | SS | 169 | 18 SSTI | 6 | OIL | Out of Service | G08054 | G05551 | |

31

Case 20-33948   Document 1285-1   Filed in TXSB on 04/15/21   Page 142 of 1032

| SEGMENT NUMBER | COMPANY NAME | ORG AREA | ORG BLOCK | ORG NAME | REC AREA | REC BLOCK | REC NAME | SIZE | PRODUCT | STATUS | ROW NUMBER | FW LEASE | NOTE³ |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 10406 | Fieldwood Energy, LLC | SS | 274 | A | EI | 259 | A | 8 | OIL | Active | G14731 | G01039 | |
| 10780 | Fieldwood Energy, LLC | SS | 193 | A | SS | 183 | 18 SSTI | 6 | OIL | Active | G15683 | G13917 | |
| 10781 | Fieldwood Energy, LLC | SS | 193 | A | SS | 183 | 10 SSTI | 6 | GAS | Active | G15684 | G13917 | |
| 11137 | Fieldwood Energy, LLC | SS | 129 | A | SS | 122 | 18 SSTI | 6 | OIL | Out of Service | G16084 | G12941 | |
| 11145 | Fieldwood Energy, LLC | SS | 129 | A | SS | 149 | 6 SSTI | 6 | G/C | Out of Service | G16087 | G12941 | |
| 11480 | Fieldwood Energy, LLC | SS | 105 | A | EI | 165 | 30 SSTI | 10 | GAS | Out of Service | G18801 | G09614 | |
| 11544 | Fieldwood Energy, LLC | SS | 126 | B | SS | 105 | A | 6 | BLKG | Out of Service | G18820 | G12940 | |
| 12778 | Fieldwood Energy, LLC | SS | 189 | A | SS | 185 | 26"SSTI | 8 | G/C | Out of Service | G22139 | G04232 | [3] |
| 15530 | Fieldwood Energy, LLC | SS | 183 | Flange | SS | 169 | Flange | 10 | GAS | Out of Service | G01460 | G13917 | |
| 16036 | Fieldwood Energy, LLC | SS | 190 | Capped End | SS | 207 | A | 4 | BLKO | Permitted for Abandonment | G14734 | G10775 | |
| 18837 | Fieldwood Energy, LLC | SS | 176 | C | EI | 212 | A | 6 | BLKG | Out of Service | G29190 | G33646 | |
| 20050 | Fieldwood Energy, LLC | SS | 168 | SSTI | SS | 168 | SSTI | 6 | | Proposed | G28788 | 00820 | [4] |
| 5890 | Fieldwood Energy, LLC | ST | 53 | A | ST | 52 | A | 6 | OIL | Out of Service | G09319 | G04000 | [2] |
| 7802 | Fieldwood Energy, LLC | ST | 295 | A | ST | 296 | SS 8487 | 8 | OIL | Active | G08385 | G05646 | |
| 8676 | Fieldwood Energy, LLC | ST | 206 | A | ST | 175 | T-22 | 16 | G/C | Out of Service | G11146 | G05613 | |
| 9313 | Fieldwood Energy, LLC | ST | 295 | A | ST | 295 | 24 SSTI | 8 | GAS | Active | G12709 | G05646 | |
| 13462 | Fieldwood Energy, LLC | ST | 205 | G | ST | 206 | A | 8 | BLKG | Out of Service | G028821 | G05612 | |
| 13462 | Fieldwood Energy LLC | ST | 205 | G | ST | 206 | A | 8 | BLKG | Out of Service | G29451 | G05612 | |
| 17265 | Fieldwood Energy, LLC | ST | 68 | Caisson No. 1 | ST | 53 | A | 6 | BLKO | Out of Service | G28385 | G04000 | [2] |
| 17898 | Fieldwood Energy, LLC | ST | 49 | Platfrom A | ST | 35 | 6-inch SSTI | 4 | OIL | Out of Service | G28577 | G24956 | |
| 19776 | Fieldwood Energy, LLC | ST | 295 | 24" SSTI | ST | 292 | A | 24 | GAS | Active | G29376 | G05646 | |
| 13098 | Fieldwood Energy, LLC | VK | 694 | #04 | MP | 259 | A | 4 | BLKG | Out of Service | G22376 | G13055 | |

32

Case 20-33948   Document 1285-1   Filed in TXSB on 04/15/21   Page 143 of 1032

| SEGMENT NUMBER | COMPANY NAME | ORG AREA | ORG BLOCK | ORG NAME | REC AREA | REC BLOCK | REC NAME | SIZE | PRODUCT | STATUS | ROW NUMBER | FW LEASE | NOTE[3] |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 13099 | Fieldwood Energy LLC | VK | 739 | SS #3 | MP | 259 | A | 4 | BLKG | Out of Service | G22377 | G07827 | |
| 13720 | Fieldwood Energy Offshore LLC | VK | 340 | 8-inch SSTI | VK | 251 | Platform A | 8 | BLGH | Active | G28703 | G10933 | [4] |
| 13721 | Fieldwood Energy LLC | VK | 251 | A | VK | 340 | A | 3 | AIR | Active | G28704 | G10930 | |
| 14876 | Fieldwood Energy LLC | VK | 251 | A | MP | 154 | A | 4 | H2O | Active | G22465 | G10930 | |
| 6113 | Fieldwood Energy LLC | VR | 380 | A | VR | 397 | 24 SSTI | 12 | GAS | Out of Service | G04645 | G02580 | |
| 12502 | Fieldwood Energy LLC | VR | 326 | A Platform | VR | 321 | 22-inch SSTI | 6 | G/C | Out of Service | G21523 | G21096 | |
| 17090 | Fieldwood Energy LLC | VR | 261 | A | VR | 265 | A | 8 | BLKO | Out of Service | G28347 | G03328 | [4] |
| 18502 | Fieldwood Energy LLC | VR | 380 | A | VR | 398 | 16' SSTI | 6 | OIL | Out of Service | G02919 | G02580 | |
| 18502 | Fieldwood Energy LLC | VR | 380 | Platform A | VR | 398 | 16-inch SSTI | 6 | OIL | Out of Service | G29109 | G02580 | |
| 2698 | Fieldwood Energy LLC | WC | 102 | flange | WC | 102 | G | 8 | GAS | Out of Service | G02124D | 00247 | |
| 3763 | Fieldwood Energy LLC | WC | 102 | #02 | WC | 102 | 08 SSTI | 8 | GAS | Out of Service | G02124D | 00247 | |
| 3986 | Fieldwood Energy LLC | WC | 66 | A | WC | 31 | F/S | 10 | G/O | Active | G03345 | G01860 | |
| 5343 | Fieldwood Energy LLC | WC | 34 | D | WC | 35 | 10 SSTI | 8 | G/O | Out of Service | G28659 | G01860 | |
| 8621 | Bandon Oil and Gas, LP | WC | 290 | A | WC | 289 | A | 6 | BLKG | Out of Service | G10532 | G04818 | |
| 9504 | Fieldwood Energy LLC | WC | 71 | 12 SSTI | WC | 71 | 12 SSTI | 12 | GAS | Out of Service | G04346 | 00244 | |
| 14251 | Fieldwood Energy Offshore LLC | WC | 72 | #1 | WC | 65 | JA | 4 | GAS | Out of Service | G25275 | G23735 | [3] |
| 15210 | Fieldwood Energy LLC | WC | 295 | 2 | HI | 120 | A-PROCESS | 6 | BLKG | Out of Service | G26886 | G24730 | |
| 15952 | Fieldwood Energy LLC | WC | 33 | O | WC | 34 | D | 4 | G/O | Out of Service | G28657 | G15050 | |
| 20483 | Fieldwood Energy Offshore LLC | WC | 295 | Flanged End | WC | 293 | 16-inch SSTI | 12 | G/C | PABN | G10085 | G01848 | |
| 23036 | Fieldwood Energy LLC | WC | 289 | A-PROCESS | WC | 289 | A-PROCESS | | | Expired | G14262 | G04818 | |
| 7919 | Fieldwood Energy LLC | WD | 105 | E | WD | 104 | D | 6 | GAS | Out of Service | G08533 | 00842 | |
| 15960 | Fieldwood Energy LLC | WD | 90 | A | WD | 73 | SSTI | 4 | OIL | Out of Service | G28260 | G01089 | [3] |

33

| SEGMENT NUMBER | COMPANY NAME | ORG AREA | ORG BLOCK | ORG NAME | REC AREA | REC BLOCK | REC NAME | SIZE | PRODUCT | STATUS | ROW NUMBER | F/W LEASE | NOTE[3] |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 16088 | Fieldwood Energy, LLC | WD | 122 | A | WD | 105 | E | 6 | GAS | Out of Service | G28289 | G13645 | [3] |
| 16089 | Fieldwood Energy, LLC | WD | 122 | A | WD | 105 | E | 3 | OIL | Out of Service | G28290 | G13645 | [3] |

34

# FWE I RUE

| Area | Block No. | Structure | Complex ID No. | Authority No. | FW Lease | Operator | Approval Date | Associated Assets | Note[4] |
|---|---|---|---|---|---|---|---|---|---|
| EI | 188 | JE | 26052 | G30268 | G10736 | Fieldwood Energy LLC | 04/18/14 | EI 187 JC001, JD001, JD002, 002 & JE002 | |
| HI | 120 | A-PROCESS | 10450 | G30270 | G01848 | Fieldwood Energy LLC | 08/06/14 | WC 295 A001 & A002 | |
| SM | 132 | B | 21982 | G30329 | G02588 | Fieldwood Energy LLC | 05/06/19 | SM 136 C007, SM 149 C001, C002 & C004 | [1] |
| SM | 10 | A | 20706 | G30365 | G01181 | Fieldwood Energy LLC | | | |
| SM | 268 | A | 21739 | G30282 | G14456 | Fieldwood Energy LLC | 06/15/18 | SM 257 001, SM 269 B017, B019, F001, SM 280 G001, G002, H001, B, F, SM 280 G, H, I, SM 281 C010, C014, C015, C020, C023, C024, C025, C026, C028, E005, E011, I001, I003, C & E | [2] |
| SM | 268 | A-PRD | 21739 | G30282 | G14456 | Fieldwood Energy LLC | 06/15/18 | Production from SM 268 A RUE | [2] |
| ST | 206 | A | 23851 | G30291 | G05612 | Fieldwood Energy LLC | 12/11/15 | ST 205 G001 & G003 | |

[1] RUE services a lease to be co-owned by FWE I and the Credit Bid Purchaser (for SM 149) plus a lease going just to FWE I. RUE only assignable to one entity and are assigned to entity with operatorship. Expenditures will be shared based on serviced lease ownership.

[2] RUE services leases included on both FWE I and Abandoned Properties schedules. RUE only assignable to one entity and are assigned to entity with operatorship. Expenditures will be shared based on serviced lease ownership.

35

**Exhibit D**
**Leases, Rights of Way and Rights of Use and Easement Related to**
**FWE III Oil & Gas Lease Interests**

## Leases Related to FWE III Oil & Gas Lease Interests*

| Block | Lease | Type | Rights | Date Le Eff | Le Cur Acres (Ac) | Operator | WI | Lease Status | Note[1] |
|---|---|---|---|---|---|---|---|---|---|
| BS 41 | G21142 | Federal | OP 2 | 5/1/1999 | 4,995 | Fieldwood En Off | 10% | TERMIN | [1] |
| BS 41 | G21142 | Federal | Contractual | 5/1/1999 | 4,995 | Fieldwood En Off | 25% | TERMIN | [1] |
| EC 257 | G21580 | Federal | OP 1 | 7/1/2000 | 5,000 | Fieldwood En Off | 100% | TERMIN | |
| GA 241 | G01772 | Federal | OP 1 | 7/1/1968 | 1,440 | Fieldwood En Off | 100% | TERMIN | |
| GA 241 | G01773 | Federal | RT | 7/1/1968 | 1,440 | Fieldwood En Off | 100% | TERMIN | |
| GA 255 | G01777 | Federal | RT | 7/1/1968 | 5,760 | Fieldwood En Off | 100% | TERMIN | |
| GI 83 | G03793 | Federal | RT | 6/1/1978 | 5,000 | Fieldwood En Off | 100% | TERMIN | |
| HI A-446 | G02359 | Federal | RT | 8/1/1973 | 5,760 | Bandon O&G | 100% | TERMIN | |
| HI A-447 | G02360 | Federal | RT | 8/1/1973 | 5,760 | Bandon O&G | 100% | TERMIN | |
| MP 154 | G10902 | Federal | RT | 7/1/1989 | 4,995 | Fieldwood En Off | 100% | TERMIN | |
| MP 112 | G09707 | Federal | RT | 6/1/1988 | 4,995 | Fieldwood En Off | 100% | RELINQ | |
| SM 39 | G16320 | Federal | RT | 7/1/1996 | 5,000 | Fieldwood En Off | 50% | PROD | |
| ST 242 | G23933 | Federal | RT | 6/1/2002 | 5,000 | Fieldwood En Off | 60% | TERMIN | |
| VR 314 | G05438 | Federal | OP 2 | 7/1/1983 | 5,000 | Fieldwood En Off | 50% | PROD | |
| VR 315 | G04215 | Federal | OP 1 | 1/1/1980 | 5,000 | Dynamic Off Res | 50% | TERMIN | |
| VR 332 | G09514 | Federal | OP 1 | 7/1/1988 | 5,000 | Fieldwood En | 67% | PROD | [1] |
| VR 332 | G09514 | Federal | RT | 7/1/1988 | 5,000 | Fieldwood En | 100% | PROD | [1] |
| VR 333 | G14417 | Federal | RT | 7/1/1994 | 4,201 | Fieldwood En Off | 67% | TERMIN | |
| VK 113 | G16535 | Federal | RT | 6/1/1996 | 5,760 | Fieldwood En Off | 100% | TERMIN | |
| VK 251 | G10930 | Federal | OP 1 | 7/1/1989 | 5,760 | Fieldwood En Off | 100% | UNIT | [1] |
| VK 340 | G10933 | Federal | OP 1 | 7/1/1989 | 5,760 | Fieldwood En Off | 100% | UNIT | [1] |
| WC 100 | G22510 | Federal | RT | 7/1/2001 | 5,000 | Fieldwood En Off | 100% | RELINQ | |
| WC 290 | G04818 | Federal | OP 1 | 9/1/1981 | 5,000 | Fieldwood En Off | 50% | TERMIN | [1] |

---

\*  The Debtors reserve the right to amend, modify, or supplement this schedule in accordance with the terms of the Plan and subject to any consent rights under the Restructuring Support Agreement.

[1]  Represents leases in which Fieldwood III is to acquire all of the Debtors' right, title and interest in such lease (less and except the right, title and interest acquired by FWE from Apache); as to all remaining leases on this schedule, FWE III is to obtain all of the Debtors' right, title and interest in such leases.

**Legend**: CONT – Contractual; OP 1- Operating Rights 1; OP 2 - Operating Rights 2; RT - Record Title

Case 20-33948   Document 1285-1   Filed in TXSB on 04/15/21   Page 148 of 1032

## FWE III ROW

| SEGMENT NUMBER | COMPANY NAME | ORG AREA | ORG BLOCK | ORG NAME | REC AREA | REC BLOCK | REC NAME | SIZE | PRODUCT | STATUS | ROW NUMBER | FW LEASE |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 15213 | Fieldwood Energy, LLC | BS | 41 | B | BS | 42 | 24" SSTI | 10 | G/C | Partial Abandon | G25383 | G21142 |
| 5911 | Bandon Oil and Gas, LP | GI | 83 | A | GI | 82 | 16 SSTI | 6 | GAS | Permitted for Abandonment | G04355 | G03793 |
| 9006 | Fieldwood Energy, LLC | MP | 112 | #02 | MP | 117 | 08 SSTI | 6 | BLKG | Permitted for Abandonment Approved | G11738 | G09707 |
| 15220 | Fieldwood Energy Offshore LLC | ST | 242 | A | SS | 283 | 24 SSTI | 8 | G/C | Permitted for Abandonment | G26891 | G23933 |
| 19427 | Fieldwood Energy, LLC | VK | 113 | A | CA | 43 | A | 4 | BLKG | Out of Service | G29321 | G16535 |
| 13721 | Fieldwood Energy, LLC | VK | 251 | A | VK | 340 | A | 3 | AIR | Active | G28704 | G10930 |
| 14876 | Fieldwood Energy, LLC | VK | 251 | A | MP | 154 | A | 4 | H2O | Active | G22465 | G10930 |
| 13720 | Fieldwood Energy Offshore LLC | VK | 340 | 8-inch SSTI | VK | 251 | Platform A | 8 | BLGH | Active | G28703 | G10933 |
| 7298 | Dynamic Industries, Inc | VR | 315 | A | VR | 331 | 06 SSTI | 6 | OIL | Out of Service | G07545 | G04215 |
| 10736 | Dynamic Industries, Inc | VR | 332 | A | VR | 315 | A | 8 | BLKG | Out of Service | G15672 | G09514 |
| 10737 | Dynamic Industries, Inc | VR | 332 | A | VR | 315 | A | 6 | LIFT | Out of Service | G15673 | G09514 |
| 14210 | Fieldwood Energy Offshore LLC | WC | 100 | A | WC | 102 | 30" SSTI | 8 | G/C | Permitted for Abandonment Approved | G24699 | G22510 |
| 13864 | Fieldwood Energy, LLC | WC | 100 | A | WC | 102 | 30 SSTI | 8 | G/C | Permitted for Abandonment Approved | G24253 | G22510 |
| 8621 | Bandon Oil and Gas, LP | WC | 290 | A | WC | 289 | A | 6 | BLKG | Out of Service | G10532 | G04818 |

2

Case 20-33948   Document 1487-2   Filed in TXSB on 06/04/21   Page 149 of 250

## FWE III RUE

| Area | Block No. | Structure | Complex ID No. | Authority No. | FW Lease | Operator | Approval Date | Associated Assets | Note[3] |
|------|-----------|-----------|----------------|---------------|----------|----------|---------------|-------------------|---------|
| GA | 255 | A | 10050 | G30195 | G01777 | Fieldwood Energy Offshore LLC | 06/12/13 | GA 241 A005 & B004 | |
| MP | 154 | A | 24171 | G30337 | G10902 | Fieldwood Energy Offshore LLC | 02/03/17 | MP 154 A001 & A002 | |
| VR | 315 | A | 22981 | G30213 | G04215 | Fieldwood Energy Offshore LLC | 11/26/13 | VR 332 A001, A002, A005 & A006 | |
| VR | 315 | A-AUX | 22981 | G30213 | G04215 | Fieldwood Energy Offshore LLC | 11/26/13 | Production from VR 315 A RUE | |
| WC | 289 | A-PROCESS | 23036 | G14262 | G04818 | Fieldwood Energy LLC | 12/03/93 | ROW accessory PF WC 289 A | [1] |

[1]  RUE services lease included on both FWE I and FWE III schedules.  RUE only assignable to one entity and are assigned to entity with operatorship.
Expenditures will be shared based on serviced lease ownership.

**Exhibit E**
**Leases, Rights of Way and Rights of Use and Easement Related to**
**FWE IV Oil & Gas Lease Interests**

Case 20-33948   Document 1285-1   Filed in TXSB on 04/15/21   Page 151 of 1032

# Leases Related to FWE IV Oil & Gas Lease Interests[*]

[*] The Debtors and CUSA reserve the right to amend, modify, or supplement this schedule.

**Legend**:   OP 1- Operating Rights 1; OP 2 - Operating Rights 2; RT A - Record Title A; RT B - Record Title B

WEIL:\9791986163\45327.0005

Case 20-33948   Document 1285-1   Filed in TXSB on 04/15/21   Page 152 of 1032

| Block | Lease | Type | Rights | Date Le Eff | Le Cur Acres (Ac) | Operator | WI | Lease Status | Note[2] |
|---|---|---|---|---|---|---|---|---|---|
| BA A-105 | G01757 | Federal | RT A | 7/1/1968 | 5,760 | Fieldwood En | 56.3% | PROD | [3] |
| BA A-105 | G01757 | Federal | RT B | 7/1/1968 | 5,760 | Fieldwood En | 100% | PROD | [1] |
| BA A-105 | G01757 | Federal | OP 1 | 7/1/1968 | 5,760 | Fieldwood En | 88% | PROD | [1] |
| BA A-133 | G02665 | Federal | RT | 7/1/1974 | 5,760 | GOM Shelf | 25% | PROD | [1] |
| EB 158 | G02645 | Federal | RT | 7/1/1974 | 5,760 | Fieldwood SD Off | 66% | PROD | [1] |
| EB 159 | G02646 | Federal | RT | 7/1/1974 | 5,760 | Fieldwood SD Off | 66% | PROD | |
| EB 160 | G02647 | Federal | RT | 7/1/1974 | 5,760 | Fieldwood SD Off | 33% | PROD | [2] |
| EB 161 | G02648 | Federal | RT | 7/1/1974 | 5,760 | Fieldwood SD Off | 33% | PROD | [2] |
| EC 331 | G08658 | Federal | OP 1 | 8/1/1987 | 5,000 | Fieldwood En Off | 53% | TERMIN | [2] |
| EC 331 | G08658 | Federal | OP 2 | 8/1/1987 | 5,000 | Fieldwood En Off | 53% | TERMIN | [2] |
| EC 332 | G09478 | Federal | RT | 5/1/1988 | 5,000 | Fieldwood En Off | 88% | TERMIN | |
| EC 332 | G09478 | Federal | OP 1 | 5/1/1988 | 5,000 | Fieldwood En Off | 88% | TERMIN | |
| EI 342 | G02319 | Federal | RT A | 2/1/1973 | 5,000 | Fieldwood | 50% | TERMIN | [1] |

[1] Represents leases in which FWE IV is to acquire all of the Debtors' right, title and interest in such leases (less and except the right, title and interest acquired by FWE from Apache); as to all remaining leases on this schedule (other than those leases referenced in footnotes [2]-[3] below), all of the Debtors' right, title and interest in such leases are to be acquired by FWE IV.

[2] Represents leases in which FWE IV is to acquire solely the right, title and interest acquired by FWE from Chevron. The Debtors' remaining rights, title and interest in such leases are to be abandoned.

[3] Represents leases in which (i) FWE IV is to acquire solely the right, title and interest acquired by FWE from Chevron; and (ii) FWE I is to acquire solely the right, title and interest acquired by FWE from Apache. The Debtors' remaining rights, title and interest in such leases are to be abandoned.

**Legend**: OP 1 - Operating Rights 1; OP 2 - Operating Rights 2; RT A - Record Title A; RT B - Record Title B

WEIL:\97919816\3\45327.0005

| Block | Lease | Type | Rights | Date Le Eff | Le Cur Acres (Ac) | Operator | WI | Lease Status | Note[2] |
|---|---|---|---|---|---|---|---|---|---|
| HI A-550 | G04081 | Federal | OP 1 | 10/1/1979 | 5,760 | En Off Fieldwood En Off | 100% | PROD | |
| HI A-550 | G04081 | Federal | OP 2 | 10/1/1979 | 5,760 | Fieldwood En Off | 100% | PROD | |
| MP 77 | G04481 | Federal | RT | 11/1/1980 | 4,655 | Fieldwood En Off | 56% | RELINQ | [3] |
| SM 132 | G02282 | Federal | RT | 2/1/1973 | 5,000 | Fieldwood En | 50% | TERMIN | [1] |
| SM 136 | G02588 | Federal | RT | 5/1/1974 | 2,500 | Fieldwood En | 50% | TERMIN | [1] |
| SM 137 | G02589 | Federal | RT | 5/1/1974 | 5,000 | Fieldwood En | 50% | TERMIN | [1] |
| SM 150 | G16325 | Federal | RT | 6/1/1996 | 3,329 | Fieldwood En | 50% | RELINQ | [1] |
| SM 66 | G01198 | Federal | RT | 6/1/1962 | 5,000 | Fieldwood En | 50% | TERMIN | [1] |
| SS 169 | 00820 | Federal | RT | 4/1/1960 | 5,000 | Fieldwood En | 33% | PROD | [1] |
| SS 206 | G01522 | Federal | RT | 7/1/1967 | 5,000 | Fieldwood En | 40% | UNIT | [1] |
| SS 207 | G01523 | Federal | RT | 7/1/1967 | 5,000 | Fieldwood En | 26% | UNIT | [3] |
| ST 169 | G01253 | Federal | RT | 6/1/1962 | 4,708 | Beryl O&G | 100% | TERMIN | |
| ST 195 | G03593 | Federal | RT | 8/1/1977 | 5,000 | Fieldwood En Off | 100% | TERMIN | |
| VR 196 | G19760 | Federal | OP 1 | 8/1/1998 | 5,000 | Fieldwood En Off | 25% | TERMIN | [2] |
| VR 207 | G19761 | Federal | OP 1 | 8/1/1998 | 5,000 | Fieldwood En Off | 46% | RELINQ | |
| VR 261 | G03328 | Federal | RT | 4/1/1976 | 5,429 | Fieldwood En | 25% | TERMIN | [1] |
| VR 261 | G03328 | Federal | OP 1 | 4/1/1976 | 5,429 | Fieldwood En | 25% | TERMIN | [1] |

3

WEIL:\979198163\45327.0005

# FWE IV ROW

| SEGMENT NUMBER | COMPANY NAME | ORG AREA | ORG BLOCK | ORG NAME | REC AREA | REC BLOCK | REC NAME | SIZE | PRODUCT | STATUS | ROW NUMBER | FW LEASE | NOTES |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 7912 | Fieldwood Energy, LLC | EB | 160 | A | HI | A582 | SSTI | 12 | GAS | Out of Service | G08528 | G02647 | [1] |
| 10301 | Bandon Oil and Gas, LP | EC | 332 | A | EC | 330 | 08 SSTI | 6 | OIL | Out of Service | G14699 | G09478 | [1] |
| 7943 | Fieldwood Energy, LLC | EI | 342 | C | EI | 327 | 08 SSTI | 4 | OIL | Out of Service | G08541 | G02319 | [2] |
| 18493 | Fieldwood Energy, LLC | EI | 342 | C | EI | 343 | SSTI | 6 | GAS | Out of Service | G29108 | G02319 | [2] |
| 19960 | Fieldwood Energy LLC | EI | 342 | C | EI | 342 | Blind Flange | 6 | OIL | Out of Service | G29471 | G02319 | [2] |
| 7684 | Fieldwood Energy, LLC | HI | A 550 | A | HI | A 568 | 20 SSTI | 10 | GAS | Out of Service | G08276 | G04081 | [1] |
| 6340 | Fieldwood Energy, LLC | HI | A 568 | Subsea Valve | HI | A 539 | 20 SSTI | 20 | G/C | Out of Service | G04974 | G04081 | [1] |
| 15818 | Fieldwood Energy Offshore LLC | MP | 77 | A | MP | 151 | 18"SSTI | 8 | GAS | Out of Service | G28221 | G04481 | [2] |
| 20050 | Fieldwood Energy, LLC | SS | 168 | SSTI | SS | 168 | SSTI | 6 | | Proposed | G28788 | 00820 | [2] |
| 6748 | Fieldwood Energy, LLC | SS | 169 | C Platform | SS | 169 | 18-inch SSTI | 6 | OIL | Out of Service | G09322 | 00820 | [1] |
| 18094 | Bandon Oil and Gas, LP | ST | 195 | B | ST | 196 | SSTI | 6 | G/C | Permitted for Abandonment Approved | G29005 | G03593 | [1] |
| 11107 | Bandon Oil and Gas, LP | ST | 196 | 06-inch SSTI | SS | 208 | F | 6 | OIL | Permitted for Abandonment Approved | G05120 | G03593 | [1] |
| 13720 | Fieldwood Energy, LLC | VK | 340 | 8"SSTI | VK | 251 | A | 8 | BLGH | Active | G28221 | G04481 | [2] |
| 13193 | Bandon Oil and Gas, LP | VR | 196 | A | VR | 206 | 12 SSTI | 8 | G/C | Out of Service | G22418 | G19760 | [1] |
| 18591 | Fieldwood Energy, LLC | VR | 196 | A | VR | 215 | A | 4 | BLKO | Out of Service | G29137 | G19760 | [1] |
| 18588 | Fieldwood Energy, LLC | VR | 215 | A | VR | 196 | A | 4 | GAS | Active | G29136 | G19760 | [1] |
| 17090 | Fieldwood Energy, LLC | VR | 261 | A | VR | 265 | A | 8 | BLKO | Out of Service | G28347 | G03328 | [2] |

[1]   Represents each ROW in which (i) FWE IV is to acquire solely as to the same 8/8ths undivided interest that FWE IV is to acquire in the related lease referenced above for such ROW. The Debtors' remaining interests in such ROW area to be abandoned.

[2]   Represents each ROW in which (i) FWE I is to acquire solely as to the same 8/8ths undivided interest that FWE I is to acquire in the related lease referenced above for such ROW; and (ii) FWE IV is to acquire solely as to the same 8/8ths undivided interest that FWE IV is to acquire in the related lease referenced above for such ROW. The Debtors' remaining interests in such ROW are to be abandoned.

4

WEIL:\97919816\3\45327.0005

# FWE IV RUE

| Area | Block No. | Structure | Complex ID No. | Authority No. | FW Lease | Operator | Approval Date | Associated Assets |
|------|-----------|-----------|----------------|---------------|----------|----------|---------------|-------------------|
| None | | | | | | | | |

5

WEIL:\97919816\3\45327.0005

**Exhibit F**
**Leases, Rights of Way and Rights of Use and Easement Related to**
**Abandoned Properties**

## Leases Related to Abandoned Properties*

| Block | Lease | Type | Rights | Date Le Eff | Le Cur Acres (Ac) | Operator | WI | Lease Status | Note† |
|-------|-------|------|--------|-------------|-------------------|----------|----|--------------|-------|
| BA A-102 | G01754 | Federal | RT | 6/1/1968 | 5,760 | Fieldwood En | 100% | TERMIN | |
| BA A-105 | G01757 | Federal | RT A | 7/1/1968 | 5,760 | Fieldwood En | 31.25% | PROD | [6] |
| EB 160 | G02647 | Federal | RT | 7/1/1974 | 5,760 | Fieldwood SD Off | 67% | PROD | [5] |
| EB 161 | G02648 | Federal | RT | 7/1/1974 | 5,760 | Fieldwood SD Off | 67% | PROD | [5] |
| EB 165 | G06280 | Federal | RT | 10/1/1983 | 5,760 | Fieldwood SD Off | 100% | UNIT | |
| EB 209 | G07397 | Federal | RT | 9/1/1984 | 5,760 | Fieldwood SD Off | 100% | UNIT | |
| EC 330 | G03540 | Federal | OP 1 | 8/1/1977 | 5,000 | Fieldwood En Off | 50% | TERMIN | |
| EC 331 | G08658 | Federal | OP 1 | 8/1/1987 | 5,000 | Fieldwood En Off | 40% | TERMIN | [5] |
| EC 331 | G08658 | Federal | OP 2 | 8/1/1987 | 5,000 | Fieldwood En Off | 40% | TERMIN | [5] |
| EC 349 | G14385 | Federal | OP 1 | 5/1/1994 | 5,000 | W & T Off | 25% | PROD | |

* The Debtors reserve the right to amend, modify, or supplement this schedule in accordance with the terms of the Plan and subject to any consent rights under the Restructuring Support Agreement.

[1] Represents leases in which all of the Debtors' right, title and interest in such leases are to be abandoned (less and except the right, title and interest acquired by FWE from Apache) as to all remaining leases on this schedule (other than those leases referenced in footnotes [2]-[6] below), all of the Debtors' right, title and interest in such leases are to be abandoned. For each lease on this schedule, see the BOEM's Serial Register Page to identify the Debtors' interests; this schedule identifies each separate interest of the Debtors that carries any assets or liabilities but does not necessarily identify each separate interest of the Debtors in each such lease.

[2] Fieldwood Energy Offshore's record title solely as to the NE/4 of the block and its interest in the operating rights are to be abandoned; its remaining record title and its overriding royalty interests are to be acquired by the Credit Bid Purchaser.

[3] FWE I is to acquire solely the operating rights as to the NE/4 of this block; the Credit Bid Purchaser is to obtain the Debtors' overriding royalty interest in this lease; and the Debtors' remaining interests in the lease are to be abandoned.

[4] Represents leases where the Credit Bid Purchaser is to acquire solely the Debtors' overriding royalty interests; the Debtors' remaining interests in these leases are to be abandoned.

[5] Represents leases in which all of the Debtors' right, title and interest in such leases are to be abandoned (less and except the right, title and interest acquired by FWE from Chevron).

[6] Represents leases in which all of the Debtors' right, title and interest in such leases are to be abandoned (less and except the right, title and interests acquired by FWE from both Apache and Chevron).

**Legend**: CONT - Contractual; OP 1 - Operating Rights 1; OP 2 - Operating Rights 2; OP 3 - Operating Rights 3; OP 4 - Operating Rights 4; OP 5 - Operating Rights 5; OP 11 - Operating Rights 11; OP 13 - Operating Rights 13; ORRI - Overriding Royalty Interest; RT - Record Title; RT A - Record Title A; RT B - Record Title B; RT C - Record Title C; WI - Working Interest

| Block | Lease | Type | Rights | Date Le Eff | Le Cur Acres (Ac) | Operator | WI | Lease Status | Note[1] |
|---|---|---|---|---|---|---|---|---|---|
| EC 350 | G15157 | Federal | OP 1 | 9/1/1995 | 5,000 | W & T Off | 25% | TERMIN | |
| EC 356 | G13592 | Federal | RT | 9/1/1992 | 5,000 | W & T Off | 25% | RELINQ | |
| EC 371 | G22267 | Federal | CONT | 2/1/1973 | 5,000 | Talos ERT | 25% | TERMIN | |
| EI 100 | 796 | Federal | Contractual | 5/1/1960 | 5,000 | Fieldwood En | 100% | PROD | |
| EI 175 | 438 | Federal | OP 1 | 12/1/1954 | 5,000 | Fieldwood En | 25% | PROD | [1] |
| EI 307 | G02110 | Federal | RT | 2/1/1971 | 2,500 | Fieldwood En Off | 25% | TERMIN | [1] |
| EI 311 | G27918 | Federal | RT | 7/1/2006 | 5,000 | Dynamic Off Res | 60% | TERMIN | |
| EI 312 | G22679 | Federal | OP 1 | 6/1/2001 | 5,000 | Fieldwood En | 60% | TERMIN | [1] |
| EI 32 | 00196 | Federal | OP 1 | 11/26/1946 | 5,000 | Cox Op | 24% | PROD | |
| EI 330 | G02115 | Federal | Contractual | 1/1/1971 | 5,000 | Fieldwood En | 17% | UNIT | [1] |
| EI 53 | 00479 | Federal | OP 1 | 12/1/1954 | 5,000 | Fieldwood En | 11% | PROD | [1] |
| EI 63 | 00425 | Federal | RT | 12/1/1954 | 5,000 | Fieldwood En Off | 100% | TERMIN | |
| EW 782 | G05793 | Federal | CONT | 7/1/1983 | 1,093 | Fieldwood En | 100% | TERMIN | [1] |
| GA 151 | G15740 | Federal | RT | 11/1/1995 | 4,804 | Fieldwood En | 33% | TERMIN | [1] |
| GA 210 | G25524 | Federal | OP 1 | 12/1/2003 | 5,760 | Fieldwood En | 17% | PROD | [1] |
| GA 210 | G25524 | Federal | OP 3 | 12/1/2003 | 5,760 | Fieldwood En | 33% | PROD | [1] |
| GA A-155 | G30654 | Federal | RT | 10/1/2004 | 5,760 | Peregrine O&G | 11% | TERMIN | |
| GC 157 | G24154 | Federal | RT | 6/1/2002 | 5,760 | LLOG Exp Off | 15% | TERMIN | |
| GC 201 | G12210 | Federal | OP | 5/1/1990 | 5,760 | LLOG Exp Off | 15% | UNIT | |
| GC 201 | G12210 | Federal | RT NE4 | 5/1/1990 | 5,760 | Fieldwood En Off; LLOG Exp Off | 100% | UNIT | [2] |
| GC 245 | G05916 | Federal | CONT | 7/1/1983 | 5,760 | Fieldwood En Off | 100% | PROD | |
| GC 64 | G07005 | Federal | CONT | 6/1/1984 | 5,760 | Fieldwood En Off | 49% | RELINQ | |
| HI A-341 | G25605 | Federal | RT | 12/1/2003 | 5,760 | Fieldwood En | 40% | PROD | [1] |
| HI A-365 | G02750 | Federal | RT | 7/1/1974 | 5,760 | Fieldwood En | 50% | PROD | [1] |
| HI A-376 | G02754 | Federal | RT | 7/1/1974 | 5,760 | Fieldwood En | 55% | PROD | [1] |
| HI A-382 | G02757 | Federal | RT | 7/1/1974 | 5,760 | Fieldwood En | 28% | PROD | [1] |
| HI A-474 | G02366 | Federal | RT | 8/1/1973 | 5,760 | McMoRan O&G | 12% | TERMIN | [1] |
| HI A-475 | G02367 | Federal | CONT | 8/1/1973 | 5,760 | McMoRan O&G | 12% | TERMIN | [1] |
| HI A-489 | G02372 | Federal | RT | 8/1/1973 | 5,760 | McMoRan O&G | 12% | TERMIN | [1] |
| HI A-531 | G02696 | Federal | OP 1 | 7/1/1974 | 5,760 | Fieldwood En Off | 75% | TERMIN | [1] |
| HI A-563 | G02388 | Federal | OP 1 | 8/1/1973 | 5,760 | Cox Op | 2% | PROD | |

2

| Block | Lease | Type | Rights | Date Le Eff | Le Cur Acres (Ac) | Operator | WI | Lease Status | Note[1] |
|---|---|---|---|---|---|---|---|---|---|
| HI A-564 | G02389 | Federal | OP 1 | 8/1/1973 | 5,760 | Cox Op | 2% | TERMIN | [1] |
| HI A-572 | G02392 | Federal | RT | 8/1/1973 | 5,760 | Fieldwood En | 24% | TERMIN | [1] |
| HI A-573 | G02393 | Federal | RT | 8/1/1973 | 5,760 | Fieldwood En | 28% | PROD | [1] |
| HI A-581 | G18959 | Federal | RT | 12/1/1997 | 5,760 | Cox Op | 2% | TERMIN | [1] |
| HI A-582 | G02719 | Federal | OP 1 | 7/1/1974 | 5,760 | Cox Op | 2% | PROD | [1] |
| HI A-595 | G02721 | Federal | RT | 7/1/1974 | 5,760 | Fieldwood En | 28% | PROD | [1] |
| HI A-596 | G02722 | Federal | RT | 7/1/1974 | 5,760 | Fieldwood En | 28% | PROD | [1] |
| MO 861 | G05062 | Federal | RT | 4/1/1982 | 5,198 | Providence Res GOM 2 | 100% | TERMIN | |
| MO 861 | G05062 | Federal | OP 1 | 4/1/1982 | 5,198 | Providence Res GOM 2 | 50% | TERMIN | |
| MP 101 | G22792 | Federal | RT | 7/1/2001 | 4,995 | Fieldwood En Off | 78% | TERMIN | |
| MP 109 | G22794 | Federal | OP 1 | 5/1/2001 | 4,995 | W & T Off | 33% | TERMIN | |
| MP 109 | G22794 | Federal | OP 2 | 5/1/2001 | 4,995 | W & T Off | 33% | TERMIN | |
| MP 77 | G04481 | Federal | RT | 11/1/1980 | 4,655 | Fieldwood En Off | 18% | RELINQ | [11], [6] |
| PL 13 | G03171 | Federal | OP 3 | 7/1/1975 | 5,000 | ANKOR En | 2% | TERMIN | |
| SM 102 | G24872 | Federal | RT | 5/1/2003 | 3,113 | Fieldwood En Off | 100% | PROD | |
| SM 135 | G19776 | Federal | RT | 5/1/1998 | 3,293 | Fieldwood En | 50% | TERMIN | [1] |
| SM 139 | G21106 | Federal | OP 1 | 7/1/1999 | 5,000 | Fieldwood En Off | 100% | TERMIN | |
| SM 142 | G01216 | Federal | RT | 6/1/1962 | 2,761 | Fieldwood En Off | 86% | TERMIN | |
| SM 142 | G01216 | Federal | OP 1 | 6/1/1962 | 2,761 | Fieldwood En Off | 86% | TERMIN | |
| SM 143 | G01217 | Federal | CONT | 5/1/1962 | 2,738 | Fieldwood En Off | 16% | TERMIN | |
| SM 146 | G09546 | Federal | RT | 7/1/1988 | 5,000 | Dynamic Off Res | 100% | TERMIN | |
| SM 147 | G06693 | Federal | RT | 7/1/1984 | 5,000 | Fieldwood En Off | 100% | TERMIN | |
| SM 268 | G02310 | Federal | RT | 1/1/1973 | 3,237 | Fieldwood En | 30% | TERMIN | [1] |
| SM 269 | G02311 | Federal | RT | 1/1/1973 | 5,000 | Fieldwood En | 18% | PROD | [1] |
| SM 269 | G02311 | Federal | OP 1 | 1/1/1973 | 5,000 | Fieldwood En | 9% | PROD | [1] |
| SM 269 | G02311 | Federal | RT | 1/1/1973 | 5,000 | Fieldwood En | 0% | PROD | [1] |
| SM 280 | G14456 | Federal | OP 1 | 6/1/1994 | 5,000 | Fieldwood En | 50% | PROD | [1] |
| SM 280 | G14456 | Federal | OP 3 | 6/1/1994 | 5,000 | Fieldwood En | 50% | PROD | [1] |
| SM 281 | G02600 | Federal | RT | 4/1/1974 | 3,214 | Fieldwood En | 32% | PROD | [1] |
| SM 87 | G24870 | Federal | RT | 5/1/2003 | 3,077 | Castex Off | 100% | PROD | |
| SP 17 | G02938 | Federal | RT | 11/1/1974 | 962 | Fieldwood En Off | 100% | UNIT | |

3

| Block | Lease | Type | Rights | Date Le Eff | Le Cur Acres (Ac) | Operator | WI | Lease Status | Note[1] |
|---|---|---|---|---|---|---|---|---|---|
| SP 37 | 00697 | Federal | OP 1 | 10/1/1959 | 2,500 | Whitney O&G | 44% | PROD | |
| SP 59 | G02942 | Federal | RT | 11/1/1974 | 1,657 | Fieldwood En Off | 100% | UNIT | |
| SP 59 | G02943 | Federal | RT | 11/1/1974 | 907 | Fieldwood En Off | 100% | UNIT | |
| SP 59, SP 60 | G01608 | Federal | RT | 7/1/1967 | 3,510 | Fieldwood En Off | 100% | UNIT | |
| SP 6 | G03337 | Federal | RT | 4/1/1976 | 318 | Fieldwood En Off | 100% | UNIT | |
| SP 6 | G03337 | Federal | OP | 4/1/1976 | 318 | Fieldwood En Off | 100% | UNIT | |
| SP 60 | G02137 | Federal | RT | 11/1/1971 | 1,762 | Fieldwood En Off | 100% | UNIT | |
| SP 61 | G01609 | Federal | RT | 7/1/1967 | 5,000 | Fieldwood En | 100% | UNIT | [3] |
| SP 61 | G01609 | Federal | OP 1 | 7/1/1967 | 5,000 | Fieldwood En | 100% | UNIT | [3] |
| SP 66 | G01611 | Federal | RT | 6/1/1967 | 4,310 | Fieldwood En Off | 100% | UNIT | [1] |
| SP 67 | G01612 | Federal | RT | 7/1/1967 | 5,000 | Fieldwood En Off | 100% | UNIT | |
| SS 149 | 00434 | Federal | OP 1 | 1/1/1955 | 5,000 | W & T Off | 3% | TERMIN | |
| SS 149 | 00434 | Federal | OP 2 | 1/1/1955 | 5,000 | W & T Off | 3% | TERMIN | |
| SS 149 | 00434 | Federal | OP 1 | 1/1/1955 | 5,000 | W&T Off | 3% | TERMIN | |
| SS 149 | 00434 | Federal | OP 2 | 1/1/1955 | 5,000 | W&T Off | 3% | TERMIN | |
| SS 177 | 00590 | Federal | RT | 9/1/1955 | 5,000 | W & T Off | 25% | PROD | |
| SS 189 | G04232 | Federal | OP 5 | 12/1/1979 | 5,000 | Fieldwood En | 1% | PROD | [1] |
| SS 204 | G01520 | Federal | RT | 7/1/1967 | 5,000 | Fieldwood En | 21% | PROD | [1] |
| SS 204 | G01520 | Federal | RT | 7/1/1967 | 5,000 | Fieldwood En | 0% | PROD | [1] |
| SS 207 | G01523 | Federal | RT | 7/1/1967 | 5,000 | Fieldwood En | 0% | UNIT | [1], [6] |
| SS 214 | 00828 | Federal | RT | 5/1/1960 | 5,000 | W & T Off | 35% | PROD | |
| SS 214 | 00828 | Federal | OP 1 | 5/1/1960 | 5,000 | W & T Off | 14% | PROD | |
| SS 216 | G01524 | Federal | RT | 7/1/1967 | 5,000 | Fieldwood En | 20% | PROD | [1] |
| SS 216 | G01524 | Federal | RT | 7/1/1967 | 5,000 | Fieldwood En | 0% | PROD | [1] |
| SS 232 | G15293 | Federal | RT | 9/1/1995 | 5,000 | W & T Off | 34% | TERMIN | |
| SS 233 | G01528 | Federal | RT | 7/1/1967 | 5,000 | W & T Off | 34% | PROD | |
| SS 238 | G03169 | Federal | RT | 7/1/1975 | 5,000 | W & T Off | 35% | PROD | |
| SS 238 | G03169 | Federal | OP 2 | 7/1/1975 | 5,000 | Peregrine O&G II | 35% | PROD | |
| SS 246 | G01027 | Federal | OP 11 | 6/1/1962 | 5,000 | Fieldwood En Off | 81% | TERMIN | |
| SS 246 | G01027 | Federal | OP 13 | 6/1/1962 | 5,000 | Fieldwood En Off | 77% | TERMIN | |
| SS 247 | G01028 | Federal | RT B | 6/1/1962 | 5,000 | Fieldwood En Off | 89% | UNIT | |
| SS 247 | G01028 | Federal | RT C | 6/1/1962 | 5,000 | Fieldwood En Off | 77% | UNIT | |

| Block | Lease | Type | Rights | Date Le Eff | Le Cur Acres (Ac) | Operator | WI | Lease Status | Note[1] |
|---|---|---|---|---|---|---|---|---|---|
| SS 248 | G01029 | Federal | RT B | 6/1/1962 | 5,000 | Fieldwood En Off | 77% | UNIT | |
| SS 249 | G01030 | Federal | OP 1 | 6/1/1962 | 5,000 | Fieldwood En Off | 80% | UNIT | [1] |
| SS 249 | G01030 | Federal | OP 2 | 6/1/1962 | 5,000 | Fieldwood En Off | 69% | UNIT | [1] |
| SS 252 | G01529 | Federal | RT | 7/1/1967 | 5,000 | Fieldwood En Off | 100% | PROD | |
| SS 252 | G01529 | Federal | OP 1 | 7/1/1967 | 5,000 | Fieldwood En Off | 100% | PROD | |
| SS 252 | G01529 | Federal | OP 2 | 7/1/1967 | 5,000 | Fieldwood En Off | 32% | PROD | |
| SS 253 | G01031 | Federal | RT | 6/1/1962 | 5,000 | Fieldwood En Off | 100% | PROD | |
| SS 253 | G01031 | Federal | OP 1 | 6/1/1962 | 5,000 | Fieldwood En Off | 100% | PROD | |
| SS 253 | G01031 | Federal | OP 2 | 6/1/1962 | 5,000 | Fieldwood En Off | 100% | PROD | |
| SS 253 | G01031 | Federal | OP 4 | 6/1/1962 | 5,000 | Fieldwood En Off | 100% | PROD | |
| SS 253 | G01031 | Federal | OP 5 | 6/1/1962 | 5,000 | Fieldwood En Off | 100% | PROD | |
| SS 270 | G01037 | Federal | RT | 3/13/1962 | 5,000 | Fieldwood En Off | 89% | UNIT | |
| SS 271 | G01038 | Federal | RT | 3/13/1962 | 5,000 | Fieldwood En Off | 72% | UNIT | [1] |
| SS 271 | G01038 | Federal | OP | 3/13/1962 | 5,000 | Fieldwood En Off | 72% | UNIT | [1] |
| SS 291 | G02923 | Federal | RT B | 12/1/1974 | 3,750 | Fieldwood En | 15% | OPERNS | [1] |
| SS 300 | G07760 | Federal | RT | 8/1/1985 | 5,000 | W & T Off | 24% | PROD | |
| SS 315 | G09631 | Federal | RT | 6/1/1988 | 5,000 | W & T Off | 25% | PROD | |
| ST 315 | G23946 | Federal | RT | 7/1/2002 | 4,458 | W & T Off | 50% | PROD | |
| ST 316 | G22762 | Federal | RT | 6/1/2001 | 4,435 | W & T Off | 40% | PROD | [1] |
| VK 824 | G15436 | Federal | CONT | 9/1/1995 | 5,760 | Fieldwood En | 6% | RELINQ | |
| VK 826 | G06888 | Federal | RT | 6/1/1984 | 5760 | Fieldwood En | 100% | TERMIN | |
| VK 917 | G15441 | Federal | OP | 7/1/1995 | 5760 | Fieldwood En | 85% | PROD | |
| VK 962 | G15445 | Federal | OP 1 | 7/1/1995 | 5760 | Fieldwood En | 85% | TERMIN | |
| VR 196 | G19760 | Federal | OP 1 | 8/1/1998 | 5,000 | Fieldwood En Off | 38% | TERMIN | [5] |
| VR 262 | G34257 | Federal | RT | 10/1/2012 | 5,485 | Fieldwood En | 25% | RELINQ | [1] |
| VR 272 | G23829 | Federal | RT | 6/1/2002 | 4,381 | Fieldwood En Off | 100% | PROD | |
| VR 273 | G14412 | Federal | OP 3 | 5/1/1994 | 5,000 | Fieldwood En Off | 100% | TERMIN | |
| VR 279 | G11881 | Federal | OP 1 | 5/1/1990 | 5,000 | Talos En Off | 50% | TERMIN | |
| VR 313 | G01172 | Federal | OP 1 | 6/1/1962 | 5,000 | Fieldwood En Off | 100% | TERMIN | |
| VR 313 | G01172 | Federal | OP 2 | 6/1/1962 | 5,000 | Fieldwood En Off | 100% | TERMIN | |
| VR 408 | G15212 | Federal | CONT | 7/1/1995 | 5,000 | Fieldwood En | 33% | PROD | |
| WC 171 | G01997 | Federal | RT | 1/1/1971 | 5,000 | XTO | 34% | TERMIN | |
| WC 295 | G24730 | Federal | OP 1 | 5/1/2003 | 5,000 | Fieldwood En | 14% | PROD | [1] |

| Block | Lease | Type | Rights | Date Le Eff | Le Cur Acres (Ac) | Operator | WI | Lease Status | Note[1] |
|---|---|---|---|---|---|---|---|---|---|
| WC 485 | G02220 | Federal | RT | 2/1/1973 | 5,000 | Fieldwood En Off | 100% | UNIT | |
| WC 498 | G03520 | Federal | RT | 8/1/1977 | 5,000 | Cox Op | 4% | PROD | |
| WC 507 | G02549 | Federal | RT | 4/1/1974 | 2,500 | Fieldwood En Off | 100% | UNIT | |
| WC 507 | G02549 | Federal | OP 1 | 4/1/1974 | 2,500 | Fieldwood En Off | 50% | UNIT | |
| WC 507 | G10594 | Federal | RT | 6/1/1989 | 2,500 | Fieldwood En Off | 100% | UNIT | |
| WC 65 | G02825 | Federal | OP 4 | 12/1/1974 | 5,000 | Fieldwood En | 19% | PROD | [1] |
| WC 66 | G02826 | Federal | OP 2 | 12/1/1974 | 3,750 | Fieldwood En | 25% | PROD | [1] |
| WC 67 | G03256 | Federal | CONT | 9/1/1975 | 5,000 | Fieldwood En | 17% | TERMIN | [1] |
| WC 72 | G23735 | Federal | RT | 7/1/2002 | 5,000 | Fieldwood En Off | 75% | PROD | |
| WC 96 | G23740 | Federal | OP 1 | 5/1/2002 | 5,000 | Talos | 25% | UNIT | |
| WD 103 | G12360 | Federal | OP 1 | 5/1/1960 | 1,016 | Fieldwood En | 19% | PROD | [1] |
| WD 121 | G19843 | Federal | OP 1 | 8/1/1998 | 5,000 | Fieldwood En | 16% | PROD | [1] |
| WD 122 | G13645 | Federal | OP 1 | 8/1/1992 | 5,000 | Fieldwood En | 16% | PROD | [1] |
| WD 122 | G13645 | Federal | OP 2 | 8/1/1992 | 5,000 | Fieldwood En | 16% | PROD | [1] |
| WD 27 | G04473 | Federal | RT B | 11/1/1980 | 5,000 | Cox Op | 14% | PROD | |
| WD 57, WD 79, WD 80 | G01449 | Federal | RT | 5/1/1966 | 3,125 | Fieldwood En Off | 100% | UNIT | [4] |
| WD 63 | G19839 | Federal | OP 1 | 6/1/1998 | 5,000 | Peregrine O&G | 13% | RELINQ | |
| WD 64 | G25008 | Federal | RT | 5/1/2003 | 5,000 | Peregrine O&G | 6% | TERMIN | |
| WD 73 | G01083 | Federal | OP 2 | 6/1/1962 | 5,000 | Cox Op | 6% | UNIT | |
| WD 74 | G01084 | Federal | OP 1 | 6/1/1962 | 5,000 | Cox Op | 6% | UNIT | |
| WD 79, WD 80 | G01874 | Federal | RT | 12/1/1968 | 3,438 | Fieldwood En Off | 100% | UNIT | [4] |
| WD 80 | G01989 | Federal | RT | 8/1/1970 | 1,875 | Fieldwood En Off | 100% | UNIT | [4] |
| WD 80 | G02136 | Federal | RT | 1/1/1972 | 938 | Fieldwood En Off | 100% | UNIT | [4] |
| WD 85 | G04895 | Federal | RT | 12/1/1981 | 2,630 | Fieldwood En Off | 100% | TERMIN | |
| WD 85 | G04895 | Federal | OP 1 | 12/1/1981 | 2,630 | Fieldwood En Off | 100% | TERMIN | |
| WD 86 | G02934 | Federal | RT | 12/1/1974 | 2,500 | SPN Res | 100% | TERMIN | |
| WD 86 | G04243 | Federal | RT | 1/1/1980 | 2,500 | Fieldwood En Off | 100% | TERMIN | |
| WD 86 | G04243 | Federal | OP 1 | 1/1/1980 | 2,500 | Fieldwood En Off | 100% | TERMIN | |
| WD 86 | G04243 | Federal | OP 2 | 1/1/1980 | 2,500 | Fieldwood En Off | 100% | TERMIN | |
| WD 86 | G04243 | Federal | OP 3 | 1/1/1980 | 2,500 | Fieldwood En Off | 100% | TERMIN | |
| WD 90 | G01089 | Federal | OP 3 | 6/1/1962 | 5,000 | Fieldwood En | 19% | PROD | [1] |

9

Case 20-33948   Document 1285-1   Filed in TXSB on 04/15/21   Page 163 of 1032

| Block | Lease | Type | Rights | Date Le Eff | Le Cur Acres (Ac) | Operator | WI | Lease Status | Note[1] |
|---|---|---|---|---|---|---|---|---|---|
| SP 42 | SL03011 | SL - LA | WI | - | - | - | 100% | SOP | |
| - | 14519 | SL - TX | WI | - | - | - | 50% | UNIT | |
| - | 14520 | SL - TX | WI | - | - | - | 50% | UNIT | |
| - | 14914 | SL - TX | WI | - | - | - | 66% | UNIT | |
| SP 42 | SL16869 | SL - LA | WI | - | - | - | 100% | PROD | |
| | | | | 8/9/2006 | | Southern Oil of Louisiana | | | |
| BS 45 | SL19051 | SL - LA | ORRI | | | | 0% | UNIT | |
| BS 53 | SL3770 | SL - LA | WI | - | - | - | 50% | RELEASED | |
| - | SL17072 | SL - LA | WI | - | - | - | 38% | ACTIVE | |
| - | SL18287 | SL - LA | WI | - | - | - | 44% | - | |
| - | SL19266 | SL - LA | WI | - | - | - | 17% | ACTIVE | |
| - | 42450 | SL - LA | WI | - | - | Fieldwood Onshore | 63% | TERMINATED | |
| - | 490100 | SL - LA | WI | 2/6/2019 | - | SandRidge Exploration & Production | 100% | SCOPING | |
| - | JMB Partnership | Onshore | | 2/6/2019 | | | 100% | - | |
| - | JMB Partnership | Onshore | | 2/25/2018 | | | 100% | - | |
| - | Richardson A Caffery et al | Onshore | | 2/1/2016 | | | 100% | - | |
| - | Caroline Baker Trust No 1 | Onshore | | 1/22/2016 | | | 100% | - | |
| - | 111650 | SL - TX | WI | - | - | TR Offshore, LLC | 7% | ACTIVE | |
| - | 115727 | SL - TX | WI | - | - | TR Offshore, LLC | 7% | ACTIVE | |
| - | 114988 | SL - TX | WI | - | - | TR Offshore, LLC | 7% | ACTIVE | |
| - | 19334 | SL - TX | WI | - | - | Elliott Oil & Gas Operating | 75% | INJECTION | |
| - | 136449 | SL - TX | WI | - | - | TR Offshore, LLC | 7% | ACTIVE | |
| - | 09061 | SL - TX | WI | - | - | Landon Browning | 33% | TERMIN | |
| - | 168986 | SL - TX | WI | - | - | Fieldwood Onshore | 100% | TERMIN | |

7

| Block | Lease | Type | Rights | Date Le Eff | Le Cur Acres (Ac) | Operator | WI | Lease Status | Note[1] |
|---|---|---|---|---|---|---|---|---|---|
| - | 189098 | SL – TX | WI | - | - | Fieldwood Onshore | 100% | TERMIN | |
| - | 206882 | SL – TX | WI | - | - | Fieldwood Onshore | 100% | TERMIN | |

8

Case 20-33948   Document 1285-1   Filed in TXSB on 04/15/21   Page 165 of 1032

## Abandoned Properties ROW

| SEGMENT NUMBER | COMPANY NAME | ORG AREA | ORG BLOCK | ORG NAME | REC AREA | REC BLOCK | REC NAME | SIZE | PRODUCT | STATUS | ROW NUMBER | FW LEASE | NOTE[1] |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 7912 | Fieldwood Energy, LLC | EB | 160 | A | HI | A582 | SSTI | 12 | GAS | Out of Service | G08528 | G02647 | [2] |
| 7923 | Fieldwood Energy, LLC | EB | 165 | A | HI | A 582 | 30 SSTI | 12 | GAS | Active | G08536 | G06280 | |
| 10301 | Bandon Oil and Gas, LP | EC | 332 | A | EC | 330 | 08 SSTI | 6 | OIL | Out of Service | G14699 | G09478 | [2] |
| 44 | Fieldwood Energy, LLC | EI | 175 | C | EI | 176 | 12" SSTI | 8 | OIL | Out of Service | G13445 | 00438 | |
| 1128 | Fieldwood Energy, LLC | EI | 330 | flanged end | EI | 306 | 14-inch SSTI | 14 | OIL | Out of Service | G02139A | G02115 | [2] |
| 7943 | Fieldwood Energy, LLC | EI | 342 | C | EI | 327 | 08 SSTI | 4 | OIL | Out of Service | G08541 | G02319 | [2] |
| 18493 | Fieldwood Energy, LLC | EI | 342 | C | EI | 343 | SSTI | 6 | GAS | Out of Service | G29108 | G02319 | [2] |
| 19960 | Fieldwood Energy, LLC | EI | 342 | C | EI | 342 | Blind Flange | 6 | OIL | Out of Service | G29471 | G02319 | [2] |
| 11923 | Fieldwood Energy, LLC | EI | 53 | C | EI | 64 | 22 SSTI | 10 | G/C | Out of Service | G20539 | 00479 | |
| 9211 | Fieldwood Energy, LLC | EI | 53 | B | EI | 64 | 22 SSTI | 6 | G/C | Partial Abandon | G12373 | 00479 | |
| 15298 | Fieldwood Energy, LLC | GA | 210 | B | GA | 239 | 12 SSTI | 8 | G/C | Active | G26931 | G25524 | |
| 16077 | Fieldwood Energy, LLC | HI | 130 | #2 | HI | 165 | 8-inch SSTI | 8 | BLGH | Partial Abandon | G28284 | G25579 | [1] |
| 15401 | Fieldwood Energy, LLC | HI | A 341 | B | HI | A 340 | 30" SSTI | 812 | G/C | Active | G26938 | G25605 | |
| 6669 | Fieldwood Energy, LLC | HI | A 376 | A | HI | A 356 | 12 SSTI | 10 | GAS | Out of Service | G05238 | G02754 | |
| 6669 | Fieldwood Energy, LLC | HI | A 376 | Platform A | HI | A 356 | 12 SSTI W/PSN 10882 | 10 | GAS | Out of Service | G05238 | G02754 | |
| 7684 | Fieldwood Energy, LLC | HI | A 550 | A | HI | A 568 | 20 SSTI | 10 | GAS | Out of Service | G08276 | G04081 | [2] |
| 6340 | Fieldwood Energy, LLC | HI | A 568 | Subsea Valve | HI | A 539 | 20 SSTI | 20 | G/C | Out of Service | G04974 | G04081 | [2] |
| 5470 | Fieldwood Energy, LLC | HI | A356 | Valve | HI | A343 | HIOS | 12 | GAS | Out of Service | G04050 | G02754 | |

[1]   Lease carries $0 liability
[2]   Represents each ROW in which (i) FWE IV is to acquire solely as to the same 8/8ths undivided interest that FWE IV is to acquire in the related lease referenced above for such ROW. T... Debtors' remaining interests in such ROW are to be abandoned.

9

Case 20-33948   Document 1285-1   Filed in TXSB on 04/15/21   Page 166 of 1032

| SEGMENT NUMBER | COMPANY NAME | ORG AREA | ORG BLOCK | ORG NAME | REC AREA | REC BLOCK | REC NAME | SIZE | PRODUCT | STATUS | ROW NUMBER | FW LEASE | NOTE¹ |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 10882 | Fieldwood Energy, LLC | HI | A356 | 10SST | HI | A356 | 12SSTI | 12 | GAS | Out of Service | G04051 | G02754 | |
| 6504 | Fieldwood Energy, LLC | HI | A595 | D | HI | 573 | B | 8 | OIL | Out of Service | G28525 | G02721 | |
| 14304 | Fieldwood Energy, LLC | MP | 101 | SSTI Manifold | MP | 102 | Plat A | 8 | BLKG | Partial Abandon | G24687 | G22792 | |
| 15810 | Fieldwood Energy Offshore LLC | MP | 29 | Well No. 1 | MP | 118 | Platform A | 6 | BLKG | Out of Service | G28216 | G27196 | [1] |
| 15818 | Fieldwood Energy Offshore LLC | MP | 77 | A | MP | 151 | 18"SSTI | 8 | GAS | Out of Service | G28221 | G04481 | [2] |
| 4733 | Fieldwood Energy Offshore LLC | SM | 142 | A | SM | 127 | 24 SSTI | 10 | G/C | Out of Service | G03441 | G01216 | |
| 15106 | Fieldwood Energy Offshore LLC | SM | 146 | B | SM | 147 | A | 6 | BLKG | Out of Service | G26837 | G09546 | |
| 15107 | Fieldwood Energy, LLC | SM | 146 | B | SM | 147 | A | 4 | BLKG | Out of Service | G26838 | G09546 | |
| 15108 | Fieldwood Energy, LLC | SM | 147 | A | SM | 146 | B | 2 | LIFT | Out of Service | G26839 | G09546 | |
| 19363 | Fieldwood Energy Offshore LLC | SM | 147 | A | SM | 130 | 12 SSTI | 6 | BLKO | Out of Service | G14093 | G06693 | |
| 19363 | Fieldwood Energy Offshore LLC | SM | 147 | A | SM | 130 | 12 SSTI | 6 | BLKO | Out of Service | G29316 | G06693 | |
| 10977 | Fieldwood Energy, LLC | SM | 268 | A | SM | 280 | #03 | 3 | BLKG | Out of Service | G28756 | G14456 | |
| 17499 | Fieldwood Energy, LLC | SM | 269 | B | SM | 268 | A | 10 | GAS | Out of Service | G28484 | G02311 | |
| 13642 | Fieldwood Energy, LLC | SM | 280 | H | SM | 268 | A | 10 | BLKG | Permitted for Abandonment | G28758 | G14456 | |
| 5427 | Fieldwood Energy, LLC | SM | 281 | E | SM | 268 | A | 12 | SPLY | Out of Service | G02817 | G02600 | |
| 5429 | Fieldwood Energy, LLC | SM | 281 | C | SM | 281 | 12 SSTI | 10 | SPLY | Out of Service | G02817 | G02600 | |
| 6512 | Fieldwood Energy, LLC | SM | 281 | C | SM | 268 | D | 10 | BLKO | Out of Service | G29131 | G02600 | |
| 10268 | Fieldwood Energy SP LLC | SP | 60 | A | SP | 6 | F/S | 10 | OIL | Out of Service | G14679 | G02137 | |
| 20050 | Fieldwood Energy, LLC | SS | 168 | SSTI | SS | 168 | SSTI | 6 | | Proposed | G28788 | 00820 | [2] |
| 6748 | Fieldwood Energy, LLC | SS | 169 | C Platform | SS | 169 | 18-inch SSTI | 6 | OIL | Out of Service | G09322 | 00820 | [2] |
| 12778 | Fieldwood Energy, LLC | SS | 189 | A | SS | 185 | 26"SSTI | 8 | G/C | Out of Service | G22139 | G04232 | |
| 1138 | Fieldwood Energy, LLC | SS | 204 | A | SS | 207 | A | 6 | G/O | Out of Service | G13491 | G01520 | |

10

Case 20-33948   Document 1285-1   Filed in TXSB on 04/15/21   Page 167 of 1032

| SEGMENT NUMBER | COMPANY NAME | ORG AREA | ORG BLOCK | ORG NAME | REC AREA | REC BLOCK | REC NAME | SIZE | PRODUCT | STATUS | ROW NUMBER | FW LEASE | NOTE[1] |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1137 | Fieldwood Energy, LLC | SS | 207 | A Platform | SS | 204 | A | 4 | GAS | Out of Service | G13489 | G01523 | |
| 1147 | Fieldwood Energy, LLC | SS | 207 | A | SS | 208 | F-Pump | 12 | OIL | Out of Service | G13492 | G01523 | |
| 17775 | Fieldwood Energy, LLC | SS | 253 | C | SS | 208 | F-Pump | 4 | OIL | Out of Service | G01691C | G01031 | |
| 18094 | Bandon Oil and Gas, LP | ST | 195 | B | ST | 196 | SSTI | 6 | G/C | Permitted for Abandonment Approved | G29005 | G03593 | [2] |
| 11107 | Bandon Oil and Gas, LP | ST | 196 | 06-inch SSTI | SS | 208 | F | 6 | OIL | Permitted for Abandonment Approved | G05120 | G03593 | [2] |
| 13720 | Fieldwood Energy, LLC | VK | 340 | 8"SSTI | VK | 251 | A | 8 | BLGH | Active | G28221 | G04481 | [2] |
| 13193 | Bandon Oil and Gas, LP | VR | 196 | A | VR | 206 | 12 SSTI | 8 | G/C | Out of Service | G22418 | G19760 | [2] |
| 18591 | Fieldwood Energy, LLC | VR | 196 | A | VR | 215 | A | 4 | BLKO | Out of Service | G29137 | G19760 | [2] |
| 18588 | Fieldwood Energy, LLC | VR | 215 | A | VR | 196 | A | 4 | GAS | Active | G29136 | G19760 | [2] |
| 17090 | Fieldwood Energy, LLC | VR | 261 | A | VR | 265 | A | 8 | BLKO | Out of Service | G28347 | G03328 | [2] |
| 14609 | Fieldwood Energy, LLC | VR | 272 | "A" | VR | 250 | 8" SSTI | 4 | OIL | Out of Service | G25384 | G23829 | |
| 14277 | Fieldwood Energy, LLC | VR | 272 | A | SM | 116 | 20" SSTI | 10 | G/C | Out of Service | G25288 | G23829 | |
| 5440 | Fieldwood Energy Offshore LLC | VR | 313 | B | VR | 313 | 20 SSTI | 10 | GAS | Out of Service | G04044 | G01172 | |
| 15136 | Fieldwood Energy Offshore LLC | VR | 313 | B | VR | 313 | 6" SSTI | 6 | OIL | Out of Service | G03879 | G01172 | |
| 4289 | Fieldwood Energy Offshore LLC | WC | 485 | A | WC | 509 | GP | 12 | GAS | Out of Service | G02122E | G02220 | |
| 14251 | Fieldwood Energy Offshore LLC | WC | 72 | #1 | WC | 65 | JA | 4 | BLKG | Out of Service | G25275 | G23735 | |
| 16088 | Fieldwood Energy, LLC | WD | 122 | A | WD | 105 | E | 6 | GAS | Out of Service | G28289 | G13645 | |
| 16089 | Fieldwood Energy, LLC | WD | 122 | A | WD | 105 | E | 3 | OIL | Out of Service | G28290 | G13645 | |
| 15960 | Fieldwood Energy, LLC | WD | 90 | A | WD | 73 | SSTI | 4 | OIL | Out of Service | G28260 | G01089 | |
| 18649 | Fieldwood Energy, LLC | VK | 826 | A | VK | 962 | UTA | 4 | UBEH | Out of Service | G29151 | G15441 | |
| 18904 | Fieldwood Energy, LLC | VK | 826 | A | VK | 917 | SUTA | 1 | UMB | Out of Service | G29151 | G15441 | |

11

Case 20-33948   Document 1285-1   Filed in TXSB on 04/15/21   Page 168 of 1032

| SEGMENT NUMBER | COMPANY NAME | ORG AREA | ORG BLOCK | ORG NAME | REC AREA | REC BLOCK | REC NAME | SIZE | PRODUCT | STATUS | ROW NUMBER | FW LEASE | NOTE[3] |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 18648 | Fieldwood Energy, LLC | VK | 962 | PLET | VK | 826 | A-Nep Spar | 6 | SERV | Active | G29151 | G15441 | |
| 14906 | Fieldwood Energy, LLC | VK | 962 | SSW #1 | VK | 826 | A Nep Spar | 6 | BLKO | Out of Service | G25481 | G15441 | |
| 14907 | Fieldwood Energy, LLC | VK | 962 | SSW#1 | VK | 826 | A | 10 | CSNG | Out of Service | G25481 | G15441 | |

12

Case 20-33948   Document 1487-2   Filed in TXSB on 06/04/21   Page 169 of 250

## Abandoned Properties RUE

| Area | Block No. | Structure | Complex ID No. | Authority No. | FW Lease | Operator | Approval Date | Associated Assets |
|---|---|---|---|---|---|---|---|---|
| EI | 63 | A | 21515 | G30244 | O0425 | Fieldwood Energy Offshore LLC | 12/02/13 | EI 63 002,003, EI 62 and 005, 006, 008, 009, 010 and 011 |
| EI | 63 | B | 21515 | G30244 | O0425 | Fieldwood Energy Offshore LLC | 12/02/13 | Production from EI 63 A |
| EI | 63 | C-QTR | 21515 | G30244 | O0425 | Fieldwood Energy Offshore LLC | 12/02/13 | Production from EI 63 A |
| SM | 146 | B | 1663 | G30248 | G09546 | Fieldwood Energy Offshore LLC | 08/21/13 | SM 139 B001 & B002 |
| SM | 147 | A | 23389 | G30200 | G06693 | Fieldwood Energy Offshore LLC | 09/12/13 | SM 139 B001, B002 & B002D |
| WD | 86 | A | 22593 | G30173 | G04243 | Fieldwood Energy Offshore LLC | 06/20/13 | WD 86 B001, B002 & B005 |
| VK | 826 | A-Neptune Spar | 24235 | G30353 | G15441 | Fieldwood Energy LLC | 07/03/18 | VK 917 SS001 & VK 962 SS001 |

13

**Exhibit G**
**Plan Release Provisions**

**Definitions:**

           *Exculpated Parties* means collectively, and in each case in their capacities as such during the Chapter 11 Cases (a) the Debtors, (b) the Post-Effective Date Debtors, (c) FWE I, (d) the DIP Agent and DIP Lenders under the DIP Facility, (e) the Prepetition FLFO Secured Parties, (f) the Consenting Creditors, (g) the Prepetition FLFO Collateral Agent, (h) the Prepetition FLTL Agents, (i) the Prepetition SLTL Agent, (j) the Creditors' Committee and the current and former members of the Creditors' Committee (solely in their capacities as such), (k) NewCo and all of its subsidiaries (including the Credit Bid Purchaser), (l) the Exit Facility Agents, (m) the Exit Facility Lenders, (n) the Second Lien Backstop Parties, (o) the ERO Backstop Parties, (p) the Apache PSA Parties, and (q) with respect to each of the foregoing Persons in clauses (a) through (p) each of their current and former affiliates, and each such Entity's and its current and former affiliates' current and former directors, managers, officers, equity holders (regardless of whether such interests are held directly or indirectly), predecessors, successors, and assigns, subsidiaries, and each of their current and former officers, members, managers, directors, equity holders (regardless of whether such interests are held directly or indirectly), principals, members, employees, agents, managed accounts or funds, management companies, fund advisors, investment advisors, advisory board members, financial advisors, partners (including both general and limited partners), attorneys, accountants, investment bankers, consultants, representatives and other professionals, such Persons' respective heirs, executors, estates, and nominees, in each case in their capacity as such, and any and all other persons or entities that may purport to assert any cause of action derivatively, by or through the foregoing entities.

           *Released Parties* means, collectively, (a) the Debtors, (b) the Post-Effective Date Debtors, (c) the DIP Agent and DIP Lenders under the DIP Facility, (d) the Prepetition FLFO Secured Parties, (e) the Consenting Creditors, (f) the Prepetition FLFO Collateral Agent, (g) the Prepetition FLTL Agents, (h) the Prepetition SLTL Agent, (i) the Creditors' Committee and the current and former members of the Creditors' Committee (solely in their capacities as such), (j) NewCo and all of its subsidiaries (including the Credit Bid Purchaser), (k) the Exit Facility Agents, (l) the Exit Facility Lenders, (m) the Second Lien Backstop Parties, (n) the ERO Backstop Parties, (o) the Apache PSA Parties, and (p) with respect to each of the foregoing Persons in clauses (a) through (o), each of their current and former affiliates, and each such Entity's and its current and former affiliates' current and former directors, managers, officers, equity holders (regardless of whether such interests are held directly or indirectly), predecessors, successors, and assigns, subsidiaries, and each of their current and former officers, members, managers, directors, equity holders (regardless of whether such interests are held directly or indirectly), principals, members, employees, agents, managed accounts or funds, management companies, fund advisors, investment advisors, advisory board members, financial advisors, partners (including both general and limited partners), attorneys, accountants, investment bankers, consultants, representatives and other professionals, such Persons' respective heirs, executors, estates, and nominees, in each case in their capacity as such, and any and all other persons or entities that may purport to assert any cause of action derivatively, by or through the foregoing entities.

*Releasing Parties* means collectively, (a) the holders of all Claims or Interests that vote to accept the Plan, (b) the holders of all Claims or Interests whose vote to accept or reject the Plan is solicited but that do not vote either to accept or to reject the Plan, (c) the holders of all Claims or Interests that vote, or are deemed, to reject the Plan but do not opt out of granting the releases set forth herein, (d) the holders of all Claims and Interests that were given notice of the opportunity to opt out of granting the releases set forth herein but did not opt out, and (e) the Released Parties (even if such Released Party purports to opt out of the releases set forth herein).

**Provisions:**

### 10.6    *Plan Injunction.*

(a)    Except as otherwise provided in the Plan or in the Confirmation Order, from and after the Effective Date, all Persons who have held, hold, or may hold Claims or Interests, and other parties in interest, along with their respective present or former employees, agents, officers, directors, principals, and affiliates, are, with respect to any such Claim or Interest, permanently enjoined after the entry of the Confirmation Order from: (i) commencing, conducting, or continuing in any manner, directly or indirectly, any suit, action, or other proceeding of any kind (including any proceeding in a judicial, arbitral, administrative, or other forum) against or affecting, directly or indirectly, a Debtor, a Post-Effective Date Debtor, or an Estate or the property of any of the foregoing, or any direct or indirect transferee of any property of, or direct or indirect successor in interest to, any of the foregoing Persons mentioned in this subsection (i) or any property of any such transferee or successor; (ii) enforcing, levying, attaching (including any prejudgment attachment), collecting, or otherwise recovering in any manner or by any means, whether directly or indirectly, any judgment, award, decree, or order against a Debtor, a Post-Effective Date Debtor, or an Estate or its property, or any direct or indirect transferee of any property of, or direct or indirect successor in interest to, any of the foregoing Persons mentioned in this subsection (ii) or any property of any such transferee or successor; (iii) creating, perfecting, or otherwise enforcing in any manner, directly or indirectly, any encumbrance of any kind against a Debtor, a Post-Effective Date Debtor, or an Estate or any of its property, or any direct or indirect transferee of any property of, or successor in interest to, any of the foregoing Persons mentioned in this subsection (iii) or any property of any such transferee or successor; (iv) acting or proceeding in any manner, in any place whatsoever, that does not conform to or comply with the provisions of the Plan to the full extent permitted by applicable law; and (v) commencing or continuing, in any manner or in any place, any action that does not comply with or is inconsistent with the provisions of the Plan; *provided*, that nothing contained in the Plan shall preclude such Persons who have held, hold, or may hold Claims against, or Interests in, a Debtor, a Post-Effective Date Debtor, or an Estate from exercising their rights and remedies, or obtaining benefits, pursuant to and consistent with the terms of the Plan.

(b)    By accepting distributions pursuant to the Plan, each holder of an Allowed Claim or Interest shall be deemed to have affirmatively and specifically consented to be bound by the Plan, including the injunctions set forth in Section 10.6 of the Plan.

10.7    *Releases.*

(a)    **RELEASES BY THE DEBTORS.**  **AS OF THE EFFECTIVE DATE, EXCEPT FOR THE RIGHTS AND REMEDIES THAT REMAIN IN EFFECT FROM AND AFTER THE EFFECTIVE DATE TO ENFORCE THE PLAN, THE CONFIRMATION ORDER, THE OBLIGATIONS CONTEMPLATED BY THE DOCUMENTS IN THE PLAN SUPPLEMENT, THE APACHE DEFINITIVE DOCUMENTS, ANY ADDITIONAL PREDECESSOR AGREEMENT DOCUMENTS, THE CREDIT BID PURCHASE AGREEMENT, THE FIRST LIEN EXIT FACILITY COMMITMENT LETTER, THE SECOND LIEN BACKSTOP COMMITMENT LETTER, THE EQUITY RIGHTS OFFERINGS, THE ERO BACKSTOP AGREEMENTS, THE EXIT FACILITY DOCUMENTS, AND THE RESTRUCTURING TRANSACTIONS, ON AND AFTER THE EFFECTIVE DATE, THE RELEASED PARTIES WILL BE DEEMED CONCLUSIVELY, ABSOLUTELY, UNCONDITIONALLY, IRREVOCABLY, AND FOREVER RELEASED AND DISCHARGED, BY THE DEBTORS, THE POST-EFFECTIVE DATE DEBTORS, AND THE ESTATES, IN EACH CASE ON BEHALF OF THEMSELVES AND THEIR RESPECTIVE SUCCESSORS, ASSIGNS, AND REPRESENTATIVES AND ANY AND ALL OTHER PERSONS THAT MAY PURPORT TO ASSERT ANY CAUSE OF ACTION DERIVATIVELY, BY OR THROUGH THE FOREGOING PERSONS, FROM ANY AND ALL CLAIMS, INTERESTS, OBLIGATIONS, SUITS, JUDGMENTS, DAMAGES, DEMANDS, DEBTS, RIGHTS, AND CAUSES OF ACTION, LOSSES, REMEDIES, OR LIABILITIES WHATSOEVER (INCLUDING ANY DERIVATIVE CLAIMS, ASSERTED OR ASSERTABLE ON BEHALF OF THE DEBTORS, THE POST-EFFECTIVE DATE DEBTORS, OR THE ESTATES), WHETHER LIQUIDATED OR UNLIQUIDATED, FIXED OR CONTINGENT, MATURED OR UNMATURED, KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, ACCRUED OR UNACCRUED, EXISTING OR HEREINAFTER ARISING, WHETHER IN LAW OR EQUITY, WHETHER SOUNDING IN TORT OR CONTRACT, WHETHER ARISING UNDER FEDERAL OR STATE STATUTORY OR COMMON LAW, OR ANY OTHER APPLICABLE INTERNATIONAL, FOREIGN, OR DOMESTIC LAW, RULE, STATUTE, REGULATION, TREATY, RIGHT, DUTY, REQUIREMENTS OR OTHERWISE THAT THE DEBTORS, THE POST-EFFECTIVE DATE DEBTORS, THE ESTATES, OR THEIR AFFILIATES WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT IN THEIR OWN RIGHT (WHETHER INDIVIDUALLY OR COLLECTIVELY) OR ON BEHALF OF THE HOLDER OF ANY CLAIM OR INTEREST OR OTHER PERSON, BASED ON OR RELATING TO, OR IN ANY MANNER ARISING FROM, IN WHOLE OR IN PART, THE DEBTORS, THE CHAPTER 11 CASES, THE RESTRUCTURING, THE PURCHASE, SALE, OR RESCISSION OF THE PURCHASE OR SALE OF ANY SECURITY OF THE DEBTORS OR THE POST-EFFECTIVE DATE DEBTORS, THE SUBJECT MATTER OF, OR THE TRANSACTIONS OR EVENTS GIVING RISE TO, ANY CLAIM OR INTEREST THAT IS TREATED IN THE PLAN, THE BUSINESS OR CONTRACTUAL ARRANGEMENTS BETWEEN ANY DEBTOR AND ANY RELEASED PARTY, THE RESTRUCTURING OF CLAIMS AND INTERESTS BEFORE OR DURING THE CHAPTER 11 CASES, THE NEGOTIATION, FORMULATION, PREPARATION, OR CONSUMMATION OF THE PLAN, THE DOCUMENTS IN THE PLAN SUPPLEMENT, THE CREDIT BID PURCHASE AGREEMENT, THE EXIT FACILITY DOCUMENTS, THE APACHE**

3

DEFINITIVE DOCUMENTS, ANY ADDITIONAL PREDECESSOR AGREEMENT DOCUMENTS, THE FIRST LIEN EXIT FACILITY COMMITMENT LETTER, THE SECOND LIEN BACKSTOP COMMITMENT LETTER, THE EQUITY RIGHTS OFFERINGS, THE ERO BACKSTOP AGREEMENTS, THE DECOMMISSIONING AGREEMENT, OR RELATED AGREEMENTS, INSTRUMENTS, OR OTHER DOCUMENTS RELATING THERETO, OR THE SOLICITATION OF VOTES WITH RESPECT TO THE PLAN, IN ALL CASES BASED UPON ANY ACT OR OMISSION, TRANSACTION, AGREEMENT, EVENT, OR OTHER OCCURRENCE TAKING PLACE ON OR BEFORE THE EFFECTIVE DATE.

ENTRY OF THE CONFIRMATION ORDER BY THE BANKRUPTCY COURT SHALL CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL, PURSUANT TO BANKRUPTCY RULE 9019, OF THE RELEASES IN SECTION 10.7(a) OF THE PLAN (the "<u>DEBTOR RELEASES</u>"), WHICH INCLUDES BY REFERENCE EACH OF THE RELATED PROVISIONS AND DEFINITIONS UNDER THE PLAN, AND FURTHER, SHALL CONSTITUTE THE BANKRUPTCY COURT'S FINDING THAT THE DEBTOR RELEASES ARE: (I) IN EXCHANGE FOR THE GOOD, VALUABLE AND ADEQUATE CONSIDERATION PROVIDED BY THE RELEASED PARTIES, (II) ESSENTIAL TO THE CONFIRMATION OF THE PLAN, (III) A GOOD FAITH SETTLEMENT AND COMPROMISE OF THE RELEASED CLAIMS RELEASED BY THE DEBTORS, THE POST-EFFECTIVE DATE DEBTORS AND THE ESTATES, (IV) IN THE BEST INTERESTS OF THE DEBTORS, THE ESTATES AND ALL HOLDERS OF CLAIMS AND INTERESTS, (IV) FAIR, EQUITABLE AND REASONABLE, (V) GIVEN AND MADE AFTER DUE NOTICE AND OPPORTUNITY FOR HEARING, AND (VII) A BAR TO ANY OF THE DEBTORS, THE POST-EFFECTIVE DATE DEBTORS, OR THE ESTATES ASSERTING ANY CLAIM OR CAUSE OF ACTION RELEASED PURSUANT TO THE DEBTOR RELEASE.

(b) <u>RELEASES BY HOLDERS OF CLAIMS AND INTERESTS</u>. AS OF THE EFFECTIVE DATE, EXCEPT FOR THE RIGHTS AND REMEDIES THAT REMAIN IN EFFECT FROM AND AFTER THE EFFECTIVE DATE TO ENFORCE THE PLAN, THE CONFIRMATION ORDER, THE OBLIGATIONS CONTEMPLATED BY THE DOCUMENTS IN THE PLAN SUPPLEMENT, THE APACHE DEFINITIVE DOCUMENTS, ANY ADDITIONAL PREDECESSOR AGREEMENT DOCUMENTS, THE FIRST LIEN EXIT FACILITY COMMITMENT LETTER, THE CREDIT BID PURCHASE AGREEMENT, THE SECOND LIEN BACKSTOP COMMITMENT LETTER, THE EQUITY RIGHTS OFFERINGS, THE ERO BACKSTOP AGREEMENT, THE EXIT FACILITY DOCUMENTS, AND THE RESTRUCTURING TRANSACTIONS, ON AND AFTER THE EFFECTIVE DATE, THE RELEASED PARTIES WILL BE DEEMED CONCLUSIVELY, ABSOLUTELY, UNCONDITIONALLY, IRREVOCABLY, AND FOREVER RELEASED AND DISCHARGED BY THE RELEASING PARTIES, TO THE MAXIMUM EXTENT PERMITTED BY LAW, AS SUCH LAW MAY BE EXTENDED SUBSEQUENT TO THE EFFECTIVE DATE BY THE RELEASING PARTIES, FROM ANY AND ALL CLAIMS AND CAUSES OF ACTION WHATSOEVER (INCLUDING ANY DERIVATIVE CLAIMS, ASSERTED OR ASSERTABLE ON BEHALF OF THE DEBTORS, THE POST-EFFECTIVE DATE DEBTORS, OR THEIR ESTATES, INCLUDING ANY CAUSES OF ACTION ARISING UNDER CHAPTER 5 OF

THE BANKRUPTCY CODE), WHETHER LIQUIDATED OR UNLIQUIDATED, FIXED OR CONTINGENT, MATURED OR UNMATURED, KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, ASSERTED OR UNASSERTED, ACCRUED OR UNACRUED, EXISTING OR HEREINAFTER ARISING, IN LAW, EQUITY, CONTRACT, TORT, OR OTHERWISE BY STATUTE, WHETHER ARISING UNDER FEDERAL OR STATE, STATUTORY OR COMMON LAW, VIOLATIONS OF FEDERAL OR STATE SECURITIES LAWS, OR ANY OTHER APPLICABLE INTERNATIONAL, FOREIGN, OR DOMESTIC LAW, RULE STATUTE, REGULATION, TREATY, RIGHT, DUTY, REQUIREMENT OR OTHERWISE, THAT THE RELEASING PARTIES OR THEIR ESTATES, AFFILIATES, HEIRS, EXECUTORS, ADMINISTRATORS, SUCCESSORS, ASSIGNS, MANAGERS, ACCOUNTANTS, ATTORNEYS, REPRESENTATIVES, CONSULTANTS, AGENTS, AND ANY OTHER PERSONS CLAIMING UNDER OR THROUGH THEM WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT IN THEIR OWN RIGHT (WHETHER INDIVIDUALLY OR COLLECTIVELY) OR ON BEHALF OF THE HOLDER OF ANY CLAIM OR INTEREST OR OTHER PERSON, BASED ON OR RELATING TO, OR IN ANY MANNER ARISING FROM, IN WHOLE OR IN PART, THE DEBTORS, THE POST-EFFECTIVE DATE DEBTORS, OR THEIR ESTATES, THE CHAPTER 11 CASES, THE RESTRUCTURING, THE PURCHASE, SALE, OR RESCISSION OF THE PURCHASE OR SALE OF ANY SECURITY OF THE DEBTORS OR THE POST-EFFECTIVE DATE DEBTORS, THE SUBJECT MATTER OF, OR THE TRANSACTIONS OR EVENTS GIVING RISE TO, ANY CLAIM OR INTEREST THAT IS TREATED IN THE PLAN, THE BUSINESS OR CONTRACTUAL ARRANGEMENTS OR INTERACTIONS BETWEEN ANY DEBTOR AND ANY RELEASED PARTY, THE RESTRUCTURING, THE RESTRUCTURING OF ANY CLAIMS OR INTERESTS BEFORE OR DURING THE CHAPTER 11 CASES, THE NEGOTIATION, FORMULATION, PREPARATION, OR CONSUMMATION OF THE PLAN, THE DOCUMENTS IN THE PLAN SUPPLEMENT, THE CREDIT BID PURCHASE AGREEMENT, THE EXIT FACILITY DOCUMENTS, THE APACHE DEFINITIVE DOCUMENTS, ANY ADDITIONAL PREDECESSOR AGREEMENT DOCUMENTS, THE FIRST LIEN EXIT FACILITY COMMITMENT LETTER, THE SECOND LIEN BACKSTOP COMMITMENT LETTER, THE EQUITY RIGHTS OFFERINGS, THE ERO BACKSTOP AGREEMENT, THE DECOMMISSIONING AGREEMENTS OR RELATED AGREEMENTS, INSTRUMENTS, OR OTHER DOCUMENTS, RELATING THERETO, OR THE SOLICITATION OF VOTES WITH RESPECT TO THE PLAN, IN ALL CASES BASED UPON ANY ACT OR OMISSION, TRANSACTION, AGREEMENT, EVENT, OR OTHER OCCURRENCES TAKING PLACE ON OR BEFORE THE EFFECTIVE DATE.

ENTRY OF THE CONFIRMATION ORDER BY THE BANKRUPTCY COURT SHALL CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL, PURSUANT TO BANKRUPTCY RULE 9019, OF THE RELEASES IN SECTION 10.7(B) OF THE PLAN (THE "THIRD-PARTY RELEASE"), WHICH INCLUDES, BY REFERENCE, EACH OF THE RELATED PROVISIONS AND DEFINITIONS UNDER THE PLAN, AND, FURTHERMORE, SHALL CONSTITUTE THE BANKRUPTCY COURT'S FINDING THAT THE THIRD-PARTY RELEASE IS (I) CONSENSUAL, (II) ESSENTIAL TO THE CONFIRMATION OF THE PLAN, (III) GIVEN IN EXCHANGE FOR THE GOOD,

**VALUABLE AND ADEQUATE CONSIDERATION PROVIDED BY THE RELEASED PARTIES, (IV) A GOOD FAITH SETTLEMENT AND COMPROMISE OF THE CLAIMS RELEASED BY THE THIRD-PARTY RELEASE, (V) IN THE BEST INTERESTS OF THE DEBTORS AND THEIR ESTATES, (VI) FAIR, EQUITABLE AND REASONABLE, (VII) GIVEN AND MADE AFTER DUE NOTICE AND OPPORTUNITY FOR HEARING, AND (VIII) A BAR TO ANY OF THE RELEASING PARTIES ASSERTING ANY CLAIM OR CAUSE OF ACTION RELEASED PURSUANT TO THE THIRD-PARTY RELEASE.**

**NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THIS SECTION 10.7(B) OF THE PLAN, NO PARTY SHALL BE RELEASED TO THE EXTENT SUCH RELEASE WOULD IMPAIR THE DECOMMISSIONING SECURITY OR THE APACHE PSA PARTIES' ABILITY TO DRAW ON THE DECOMMISSIONING SECURITY, IN ANY RESPECT. FOR THE AVOIDANCE OF DOUBT, ANY AND ALL CLAIMS THE APACHE PSA PARTIES MAY HAVE AGAINST FWE I RELATED TO THE DECOMMISSIONING AGREEMENT ARISING POST-EFFECTIVE DATE AND ANY SECURITY OBTAINED, PROVIDED, OR PLEDGED IN CONNECTION WITH THE DECOMMISSIONING AGREEMENT WILL BE PRESERVED AND ANY AND ALL CLAIMS FWE I MAY HAVE AGAINST THE APACHE PSA PARTIES RELATED TO THE DECOMMISSIONING AGREEMENT ARISING POST-EFFECTIVE DATE AND THE DECOMMISSIONING SECURITY WILL BE PRESERVED.**

(c) ***Release of Liens***. Except as otherwise specifically provided in the Plan (including all Liens securing the FLFO Claims or the First Lien Exit Facility) or in any contract, instrument, release, or other agreement or document contemplated under or executed in connection with the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan and, in the case of a Secured Claim, satisfaction in full of the portion of the Secured Claim that is secured and Allowed as of the Effective Date, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the estates shall be fully released and discharged, and all of the right, title, and interest of any holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the Post-Effective Date Debtors and their successors and assigns, in each case, without any further approval or order of the Bankruptcy Court and without any action or filing being required to be made by the Debtors. For the avoidance of doubt, all liens and encumbrances on, interests in, and claims against the Legacy Apache Properties (as defined in the Apache Term Sheet) and the other FWE I Assets (as defined in Part A of Schedule I of the Initial Plan of Merger) held by the Prepetition FLFO Secured Parties, Prepetition FLTL Lenders, and Prepetition SLTL Lenders shall be released, discharged, and of no further force or effect as of the Effective Date.

**10.8** ***Exculpation.***

**TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, EXCEPT FOR THE RIGHTS THAT REMAIN IN EFFECT FROM AND AFTER THE EFFECTIVE DATE TO ENFORCE THE PLAN, THE CONFIRMATION ORDER AND THE OBLIGATIONS CONTEMPLATED BY THE DOCUMENTS IN THE PLAN SUPPLEMENT, THE APACHE DEFINITIVE DOCUMENTS, ANY ADDITIONAL PREDECESSOR AGREEMENT DOCUMENTS, THE FIRST LIEN EXIT FACILITY**

COMMITMENT LETTER, THE CREDIT BID PURCHASE AGREEMENT, THE SECOND LIEN BACKSTOP COMMITMENT LETTER, THE EXIT FACILITY DOCUMENTS, THE EQUITY RIGHTS OFFERINGS, THE ERO BACKSTOP AGREEMENT, AND THE RESTRUCTURING TRANSACTIONS, NO EXCULPATED PARTY WILL HAVE OR INCUR, AND EACH EXCULPATED PARTY WILL BE RELEASED AND EXCULPATED FROM, ANY CLAIM, OBLIGATION, SUIT, JUDGMENT, DAMAGE, DEMAND, DEBT, RIGHT, REMEDY LOSS, LIABILITY AND CAUSE OF ACTION IN CONNECTION WITH OR ARISING OUT OF THE ADMINISTRATION OF THE CHAPTER 11 CASES; THE NEGOTIATION AND PURSUIT OF THE DIP FACILITY, THE CREDIT BID PURCHASE AGREEMENT, THE NEW MONEY INVESTMENT, THE EXIT FACILITY DOCUMENTS, THE FIRST LIEN EXIT FACILITY COMMITMENT LETTER, THE SECOND LIEN BACKSTOP COMMITMENT LETTER, THE EQUITY RIGHTS OFFERINGS, THE ERO BACKSTOP AGREEMENT, THE APACHE DEFINITIVE DOCUMENTS, ANY ADDITIONAL PREDECESSOR AGREEMENT DOCUMENTS, THE DISCLOSURE STATEMENT, THE RESTRUCTURING, THE PLAN (INCLUDING THE PLAN SUPPLEMENT), AND ALL DOCUMENTS RELATING TO THE FOREGOING, OR THE SOLICITATION OF VOTES FOR, OR CONFIRMATION OF, THE PLAN; THE FUNDING OF THE PLAN; THE OCCURRENCE OF THE EFFECTIVE DATE; THE ADMINISTRATION OF THE PLAN OR THE PROPERTY TO BE DISTRIBUTED UNDER THE PLAN; THE ISSUANCE OF SECURITIES UNDER OR IN CONNECTION WITH THE PLAN; THE PURCHASE, SALE, OR RESCISSION OF THE PURCHASE OR SALE OF ANY SECURITY OF THE DEBTORS OR THE POST-EFFECTIVE DATE DEBTORS; OR THE TRANSACTIONS IN FURTHERANCE OF ANY OF THE FOREGOING; OTHER THAN CLAIMS OR CAUSES OF ACTION ARISING OUT OF OR RELATED TO ANY ACT OR OMISSION OF AN EXCULPATED PARTY THAT CONSTITUTES INTENTIONAL FRAUD, WILLFUL MISCONDUCT, OR GROSS NEGLIGENCE AS DETERMINED BY A FINAL ORDER, BUT IN ALL RESPECTS SUCH PERSONS WILL BE ENTITLED TO REASONABLY RELY UPON THE ADVICE OF COUNSEL WITH RESPECT TO THEIR DUTIES AND RESPONSIBILITIES PURSUANT TO THE PLAN. THE EXCULPATED PARTIES HAVE ACTED IN COMPLIANCE WITH THE APPLICABLE PROVISIONS OF THE BANKRUPTCY CODE WITH REGARD TO THE SOLICITATION OF THE PLAN AND, THEREFORE, ARE NOT, AND ON ACCOUNT OF SUCH DISTRIBUTIONS WILL NOT BE, LIABLE AT ANY TIME FOR THE VIOLATION OF ANY APPLICABLE LAW, RULE, OR REGULATION GOVERNING THE SOLICITATION OF ACCEPTANCES OR REJECTIONS OF THE PLAN OR SUCH DISTRIBUTIONS MADE PURSUANT TO THE PLAN. THE EXCULPATION WILL BE IN ADDITION TO, AND NOT IN LIMITATION OF, ALL OTHER RELEASES, INDEMNITIES, EXCULPATIONS, AND ANY OTHER APPLICABLE LAW OR RULES PROTECTING SUCH EXCULPATED PARTIES FROM LIABILITY.

### 10.9 *INJUNCTION RELATED TO RELEASES AND EXCULPATION.*

The Confirmation Order shall permanently enjoin the commencement or prosecution by any Person or entity, whether directly, derivatively, or otherwise, of any Claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, losses, or liabilities released

pursuant to the Plan, including the claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, and liabilities released or exculpated in the Plan or the Confirmation Order.

**<u>Exhibit H</u>**
**Credit Bid Purchase Agreement**

# PURCHASE AND SALE AGREEMENT

## AMONG

## FIELDWOOD ENERGY LLC

## AND

## ITS AFFILIATES SIGNATORY HERETO

## AS SELLERS

## AND

## [_____]

## AS BUYER

## DATED

## [_____] [____], 2021

**[DISCLAIMER: This is a proposed form purchase agreement only, and not an offer that can be accepted. Until the authorized representatives of the Sellers and Buyer agree to and execute a definitive agreement, neither the Sellers nor Buyer has any obligation (legal or otherwise) to conclude a transaction. Unless included in a definitive agreement, communications (written or oral) shall not create any obligations whatsoever on the Sellers or Buyer and no person, including any recipient of this proposed form, may rely on them as the basis for taking or foregoing any action or opportunity or for incurring any costs. Further, this proposed form purchase agreement may be amended and/or modified in its entirety to provide for the 363 Credit Bid Transaction in the circumstances contemplated by, and subject to any consents required by, Section 5.2(c) of the Plan.]**

# TABLE OF CONTENTS

**Page**

**ARTICLE I**       PURCHASE AND SALE ......................................................................2
    1.1     Purchase and Sale ............................................................................2
    1.2     Acquired Interests; Assets................................................................2
    1.3     Excluded Assets ...............................................................................8
    1.4     Effective Time ...............................................................................10
    1.5     Certain Sellers ...............................................................................10

**ARTICLE II**      CONSIDERATION ..............................................................................10
    2.1     Consideration .................................................................................10
    2.2     Allocation of Adjusted Consideration............................................11
    2.3     Consents to Assign.........................................................................12
    2.4     Governmental Approvals ................................................................14
    2.5     Preferential Rights .........................................................................15
    2.6     [Reserved.] ....................................................................................17
    2.7     Withholding ...................................................................................17
    2.8     Assets Sold "As Is, Where Is" ......................................................17
    2.9     Presence of Wastes, NORM, Hazardous Substances and Asbestos .....................18

**ARTICLE III**     DUE DILIGENCE ..............................................................................19
    3.1     Due Diligence ................................................................................19

**ARTICLE IV**     SELLERS' REPRESENTATIONS ......................................................20
    4.1     Organization/Qualification.............................................................20
    4.2     Power and Authority ......................................................................20
    4.3     Non-Contravention.........................................................................20
    4.4     Authorization and Enforceability...................................................20
    4.5     Liability for Brokers' Fees .............................................................21
    4.6     Litigation.......................................................................................21
    4.7     Governmental Approvals ................................................................21
    4.8     Preferential Rights; Applicable Consents .......................................21
    4.9     Taxes.............................................................................................22
    4.10   Well Status ....................................................................................23
    4.11   Compliance with Laws; Permits ....................................................23
    4.12   Environmental Matters...................................................................23
    4.13   Payments .......................................................................................24
    4.14   Material Contracts..........................................................................24
    4.15   Imbalances; Prepayments...............................................................26
    4.16   AFEs; Cash Calls ..........................................................................26
    4.17   Labor and Employment Matters.....................................................27
    4.18   Employee Benefits .........................................................................28
    4.19   Non-Consent Operations ...............................................................29
    4.20   Suspense Funds..............................................................................29
    4.21   Payout Balances.............................................................................29
    4.22   Title to Acquired Interests .............................................................29
    4.23   Insurance .......................................................................................30
    4.24   Related Party Transactions .............................................................30
    4.25   Intellectual Property.......................................................................30

## TABLE OF CONTENTS

### (continued)

| | | |
|---|---|---|
| 4.26 | Undue Influence | 32 |
| 4.27 | No Undisclosed Material Liabilities | 32 |
| 4.28 | Absence of Certain Changes | 33 |
| 4.29 | Equipment and Fixed Assets | 33 |
| 4.30 | Operatorship | 33 |
| 4.31 | Joint Venture | 33 |
| 4.32 | Plan of Merger | 35 |
| 4.33 | Exhibit X-1 | 35 |

**ARTICLE V**     BUYERS' REPRESENTATIONS ... 35

| | | |
|---|---|---|
| 5.1 | Organization; Standing; Capitalization | 35 |
| 5.2 | Power | 37 |
| 5.3 | Non-Contravention | 37 |
| 5.4 | Authorization and Enforceability | 37 |
| 5.5 | Liability for Brokers' Fees | 37 |
| 5.6 | Litigation | 37 |
| 5.7 | Governmental and Third Person Consents | 37 |
| 5.8 | Financial Capability | 38 |
| 5.9 | Qualification | 38 |
| 5.10 | Bankruptcy | 38 |
| 5.11 | Investor Status; Investigation | 38 |
| 5.12 | No Other Representations | 39 |

**ARTICLE VI**     COVENANTS AND AGREEMENTS ... 39

| | | |
|---|---|---|
| 6.1 | Covenants and Agreements of the Sellers | 39 |
| 6.2 | Casualty Event | 43 |
| 6.3 | Press Releases | 43 |
| 6.4 | Solicitation; Other Offers | 43 |
| 6.5 | Regulatory Matters; Cooperation | 44 |
| 6.6 | Bankruptcy Court Matters | 45 |
| 6.7 | Assumption and Assignment of Contracts | 47 |
| 6.8 | Employee Matters | 49 |
| 6.9 | [Reserved] | 52 |
| 6.10 | Certain Agreements | 52 |
| 6.11 | Transfer Orders; Letters in Lieu | 52 |
| 6.12 | Taxes | 52 |
| 6.13 | Commercially Reasonable Efforts | 53 |
| 6.14 | Insurance Policies | 53 |
| 6.15 | Novation of Hedges | 54 |
| 6.16 | Qualification | 54 |
| 6.17 | Settlements with Governmental Authorities | 54 |
| 6.18 | Operator Forms | 54 |
| 6.19 | [Reserved] | 54 |
| 6.20 | Bonds and Insurance | 54 |

**TABLE OF CONTENTS**

**(continued)**

| | | |
|---|---|---|
| 6.21 | [New Equity Interests | 55 |
| 6.22 | Employment Agreements | 55 |

**ARTICLE VII** CONDITIONS PRECEDENT TO CLOSING ..................................55
| 7.1 | Conditions Precedent of the Parties | 55 |
| 7.2 | Sellers' Conditions Precedent | 56 |
| 7.3 | Buyers' Conditions Precedent | 56 |

**ARTICLE VIII** RIGHT OF TERMINATION AND ABANDONMENT ............58
| 8.1 | Termination | 58 |
| 8.2 | Remedies | 61 |
| 8.3 | Specific Performance | 61 |

**ARTICLE IX** CLOSING ..................................61
| 9.1 | Date of Closing | 61 |
| 9.2 | Closing Obligations | 61 |

**ARTICLE X** POST-CLOSING OBLIGATIONS AND COVENANTS ............62
| 10.1 | Field Data and Records | 62 |
| 10.2 | Suspense Funds; Prepaid JOA Funds | 62 |
| 10.3 | Post-Closing Asset Reconciliation | 63 |
| 10.4 | Assignments; Operatorship | 64 |
| 10.5 | Confidentiality | 65 |
| 10.6 | Seller Marks License | 66 |
| 10.7 | Power of Attorney | 66 |
| 10.8 | No Successor Liability | 66 |
| 10.9 | Access to Records | 66 |
| 10.10 | Payment of Assumed Liabilities | 67 |
| 10.11 | Payment of Retained Liabilities | 67 |
| 10.12 | Accounts Receivables | 67 |
| 10.13 | Directors' and Officers' Indemnification | 69 |
| 10.14 | Rights of Use | 71 |
| 10.15 | Post-Closing Agreements | 71 |
| 10.16 | Effective Date Payments | 71 |

**ARTICLE XI** ASSUMPTION AND RETENTION OF LIABILITIES ............71
| 11.1 | Buyer's Assumption of Liabilities | 71 |
| 11.2 | Sellers' Retention of Liabilities | 73 |
| 11.3 | Reservation as to Third Persons | 74 |

**ARTICLE XII** MISCELLANEOUS ..................................75
| 12.1 | Expenses | 75 |
| 12.2 | Notices | 75 |
| 12.3 | Amendments | 76 |

# TABLE OF CONTENTS

**(continued)**

| | | **Page** |
|---|---|---|

| 12.4 | Waiver | 76 |
| 12.5 | No Third-Party Beneficiaries | 76 |
| 12.6 | Assignment | 76 |
| 12.7 | Counterparts | 77 |
| 12.8 | Governing Law; Jurisdiction; Venue; Jury Trial | 77 |
| 12.9 | Entire Agreement | 78 |
| 12.10 | Binding Effect | 78 |
| 12.11 | Time of the Essence | 78 |
| 12.12 | No Partnership; No Fiduciary Duty | 78 |
| 12.13 | Obligations of the Sellers | 78 |
| 12.14 | No Recourse | 78 |
| 12.15 | Disclosure Schedules | 79 |
| 12.16 | Other Contract Interpretation | 79 |
| **ARTICLE XIII** | **SURVIVAL AND INDEMNIFICATION** | 80 |
| 13.1 | Survival; Limited Recourse Against Sellers | 80 |
| 13.2 | Indemnification by Buyer | 81 |
| 13.3 | Indemnification Procedures | 82 |

| Annex I | Definitions | |

# EXHIBIT LIST[1]

| Exhibit | Title |
| --- | --- |
| EXHIBIT A | Leases |
| EXHIBIT B | Easements |
| EXHIBIT C | Scheduled Wells |
| EXHIBIT D | Platforms and Facilities |
| EXHIBIT D-1 | Inventory |
| EXHIBIT E | Permits |
| EXHIBIT F | Seismic Data |
| EXHIBIT G | Form of Assignment, Bill of Sale and Conveyance for Co-Owned Assets |
| EXHIBIT H | Form of Assignment, Bill of Sale and Conveyance for Other Assets |
| EXHIBIT I | Form of Assignment and Assumption Agreement |
| EXHIBIT J | Form of Assignment of Leases and Subleases |
| EXHIBIT K | Form of Office Assets Conveyance |
| EXHIBIT L | [Reserved] |
| EXHIBIT M | [Reserved] |
| EXHIBIT N | [Reserved] |
| EXHIBIT O | [Reserved] |
| EXHIBIT P | Form of Transition Services Agreement |
| EXHIBIT Q | Form of SEMS Bridging Agreement |
| EXHIBIT R | Form of ST 308 Performance Bond |
| EXHIBIT S | Form of Release Document |
| EXHIBIT T | Form of Farmout Agreement |
| EXHIBIT U | [Reserved] |
| EXHIBIT V | [Reserved] |
| EXHIBIT W | Form of Funding Agreement |
| EXHIBIT X | Working Capital |
| EXHIBIT X-1 | Working Capital Estimate |
| EXHIBIT Y | Specified Oil and Gas Interests |

---

[1] Note to Draft: Exhibits are subject to ongoing review and comment by Buyer and are subject to change in all respects.

| Exhibit | Title |
|---|---|
| EXHIBIT Z | Specified P&A Equipment |

## SCHEDULE LIST

| Schedule | Title |
|---|---|
| Schedule 1.2 | Applicable Shared Asset Interests |
| Schedule 1.3(d) | Scheduled Exclusions |
| Schedule 4.6 | Litigation |
| Schedule 4.7 | Governmental Approvals |
| Schedule 4.8(a) | Preferential Rights |
| Schedule 4.8(b) | Applicable Consents |
| Schedule 4.9 | Taxes |
| Schedule 4.9(p) | Entity Classifications |
| Schedule 4.12 | Environmental Matters |
| Schedule 4.13 | Payments |
| Schedule 4.14 | Material Contracts |
| Schedule 4.14(c) | Leases and Easements |
| Schedule 4.15 | Imbalances |
| Schedule 4.16(a) | AFEs |
| Schedule 4.16(b) | Cash Calls |
| Schedule 4.18 | Employee Benefits |
| Schedule 4.19 | Non-Consent Operations |
| Schedule 4.20 | Suspense Funds |
| Schedule 4.21 | Payout Balances |
| Schedule 4.22 | Title Matters |
| Schedule 4.22(d) | Owned Real Property |
| Schedule 4.23 | Insurance |
| Schedule 4.24 | Related Party Transactions |
| Schedule 4.25(a) | Owned Intellectual Property |
| Schedule 4.27 | Material Liabilities |
| Schedule 4.28(b) | Absence of Certain Changes |

| Schedule | Title |
|---|---|
| Schedule 4.31(c) | Equity Interests of Fieldwood Mexico and Subsidiaries |
| Schedule 4.31(d) | Fieldwood U.A. Interests |
| Schedule 4.31(f) | Fieldwood U.A. Liabilities |
| Schedule 5.1(c) | Buyer Grandparent Equity Interests |
| Schedule 5.7 | Buyer Governmental and Third Person Consents |
| Schedule 5.9 | Lease Bonds, Area-Wide Bonds, Surety Bonds and Insurance Policies |
| Schedule 6.1(a) | Sellers' Required Operations |
| Schedule 6.1(b) | Sellers' Disallowed Operations |
| Schedule 6.7(g) | Required Assigned 365 Contracts |
| Schedule 6.22 | Seller Employees |
| Schedule 7.3(i) | Required Novations |
| Schedule 7.3(l) | Required Governmental Approvals |
| Schedule 10.13(a) | Existing D&O Indemnification Terms |
| Schedule 10.13(e) | D&O Indemnified Parties |
| Schedule 10.14 | Right of Use Easements (RUEs) |

[End of Table of Contents]

# PURCHASE AND SALE AGREEMENT[2]

This Purchase and Sale Agreement (this "***Agreement***") is made as of [_____] [___], 2021 (the "***Execution Date***") by and among (a) Fieldwood Energy LLC, a Delaware limited liability company ("***Fieldwood***"), Fieldwood Energy Inc., a Delaware corporation, Dynamic Offshore Resources NS, LLC, a Texas limited liability company, Fieldwood Energy Offshore LLC, a Delaware limited liability company, Fieldwood Onshore LLC, a Delaware limited liability company, Fieldwood SD Offshore LLC, a Delaware limited liability company, Fieldwood Offshore LLC, a Delaware limited liability company, Bandon Oil and Gas GP, LLC, a Delaware limited liability company, Bandon Oil and Gas, LP, a Delaware limited partnership, Fieldwood Energy SP LLC, a Louisiana limited liability company, Galveston Bay Pipeline LLC, a Delaware limited liability company, and Galveston Bay Processing LLC, a Delaware limited liability company, (b) subject to Section 1.5, FW GOM Pipeline, Inc., a Delaware corporation ("***FW GOM Pipeline***"), and GOM Shelf LLC, a Delaware limited liability company ("***GOM Shelf***" and each of the other entities specified in clauses (a) and (b), a "***Seller***" and collectively the "***Sellers***"), and (c) [_____], a [Delaware limited liability company] ("***Buyer***"), and [_____], [a Delaware limited liability company and a wholly-owned subsidiary of Buyer] ("***Buyer 2***"). The Sellers, Buyer and Buyer 2 may be referred to individually as a "***Party***" or collectively as the "***Parties***." Capitalized terms used in this Agreement have the meanings referenced in **Annex I** to this Agreement.

## RECITALS

A.      The Sellers desire to sell, and Buyer desires to purchase, all of the Acquired Interests on the terms and subject to the conditions set forth below.

B.      On August 3, 2020 and August 4, 2020, the Sellers (collectively, the "***Debtors***") filed voluntary petitions (the "***Bankruptcy Cases***") under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§ 101, et seq. (as amended from time to time, the "***Bankruptcy Code***") in the United States Bankruptcy Court for the Southern District of Texas, Houston Division (the "***Bankruptcy Court***").

C.      [Buyer has provided to the Sellers at or prior to the execution of this Agreement a copy of a fully executed and effective direction letter (the "***Direction Letter***") causing to be delivered at Closing such portion of the **[Obligations]** (as defined in the Credit Agreement) as is necessary to allow for payment of the Credit Bid and Release.][3]

D.      Pursuant to the Plan, and as consideration for the transactions contemplated by the Direction Letter, each holder of Allowed FLTL Secured Claims (as defined in the Plan) will receive its pro rata portion (as determined pursuant to the Plan and the Confirmation Order) of (a) on the Effective Date, the Credit Bid and Release New Equity Interests and (b) if and when issuable

---

[2] Note to Draft: Subject to review by Administrative Agent.

[3] Note to Draft: Subject to review by Administrative Agent.

pursuant to the Plan, Confirmation Order, or any other order entered by the Bankruptcy Court, the FLTL Subscription Rights.

E.    Pursuant to the Plan, each holder of Allowed SLTL Claims (as defined in the Plan) will receive its pro rata portion (as determined pursuant to the Plan and the Confirmation Order) of, if and when issuable pursuant to the Plan, Confirmation Order, or any other order entered by the Bankruptcy Court, the SLTL Subscription Rights.

F.    Upon the terms and subject to the conditions set forth herein, the Parties intend to effectuate the transactions contemplated by this Agreement through a sale of the Acquired Interests pursuant to Sections 105, 363, 365, 1123(a)(5)(D), 1129, 1141 and 1146 of the Bankruptcy Code, and Rules 4001, 6004, 6006 and 3020 of the Federal Rules of Bankruptcy Procedure of the Bankruptcy Code (as amended from time to time, the "***Bankruptcy Rules***").

G.    The execution and delivery of this Agreement and the Sellers' ability to consummate the transactions contemplated by this Agreement are subject to, among other things, the Bankruptcy Court's entry of the Confirmation Order.

## AGREEMENT

In consideration of the recitals above, the provisions below and other good and valuable cause and consideration, the receipt and sufficiency of which are hereby acknowledged, Buyer, Buyer 2 and the Sellers agree as follows:

## ARTICLE I
## PURCHASE AND SALE

1.1    <u>Purchase and Sale</u>.    Subject to the provisions hereof and the entry of the Confirmation Order, Buyer agrees to purchase and accept from the Sellers and the Sellers agree to sell, assign, convey, transfer and deliver, or cause to be sold, assigned conveyed, transferred and delivered to Buyer at the Closing, the Acquired Interests free and clear of any and all Encumbrances (other than Permitted Encumbrances (except that the Fieldwood U.A. Interests and the JV Interests shall not be subject to any Permitted Encumbrances)); *provided* that Buyer and Buyer 2 may determine in their sole discretion that certain Fieldwood U.A. Interests and certain JV Interests may be acquired by Buyer 2 instead of by Buyer, in which case all references hereto to Buyer with respect to such Fieldwood U.A. Interests or JV Interests shall be understood to be to Buyer 2 instead of Buyer.

1.2    <u>Acquired Interests; Assets</u>.    As used herein, the term "***Acquired Interests***" refers to (x) all of each Seller's right, title and interest in, to, under or derived from the Co-Owned Assets excluding the FWE I Assets and the GOM Shelf Oil and Gas Properties other than the Applicable Shared Asset Interests (which Applicable Shared Asset Interests shall be "Co-Owned Assets") and (y) all of each Seller's right, title and interest in, to, under or derived from the Other Assets.  As used herein, the term "***Assets***" means the Co-Owned Assets and Other Assets, wherever located, real, personal or mixed, tangible or intangible, known or unknown, as the same shall exist as of the Closing.  As used herein, the term "***Co-Owned Assets***" means the following (*provided*, that (subject to the following provisos) Buyer may, from time to time prior to the Designation Deadline, subject to obtaining the Sellers' prior written consent (in the Sellers' sole discretion (it being

2

understood that Buyer shall not add to or remove from the "Co-Owned Assets" any FWE I Asset or GOM Shelf Oil and Gas Properties provided that the foregoing shall not prevent the addition or removal of Applicable Shared Asset Interests as appropriate (which may be added or removed with the Sellers' prior written consent))), add any assets to or remove any assets from the "Co-Owned Assets" (and, in the event an asset is added or removed, to the extent applicable, add, modify or remove any related Liabilities to or from the "Assumed Liabilities") and any affected Exhibit or Schedule (including **Schedule 1.3(d)**) will be updated accordingly, and if Buyer removes any asset from the "Co-Owned Assets" Buyer shall indemnify the Sellers with respect to any Liability incurred by the Sellers as a result of the removal by Buyer of any Co-Owned Asset and the retention by the Sellers of such "Co-Owned Asset"; *provided, further,* that (notwithstanding anything to the contrary in this Section 1.2), Buyer may not remove any assets from the "Co-Owned Assets" after the Designation Deadline):

(a)    the oil and gas leases (and other agreements) described in **Part 1** of **Exhibit A**, but excluding the FWE I Assets and the GOM Shelf Oil and Gas Properties (collectively, the "*Co-Owned Leases*"), including all Working Interests, Net Revenue Interests, royalty interests, overriding royalty interests, production payments, net profits interests, carried interests, reversionary interests (including rights under non-consent provisions), possibilities of reverter, conversion rights and options, fee mineral interests and other interests of every kind and character in, to, under or derived from any Co-Owned Lease or any land subject to, covered by or included within any Co-Owned Lease (except that, solely as to each of lease OCS-00786 covering South Marsh Island 48 and lease OCS-G 1609 covering South Pass 61, the interests in such lease to be conveyed hereunder are solely the overriding royalty interests held by the Sellers in such lease);

(b)    (i) each Unit that includes any of the lands covered by or subject to any Co-Owned Lease (each, a "*Co-Owned Subject Unit*"), (ii) each pooling, unitization or communitization declaration, designation, agreement or order creating or modifying any Co-Owned Subject Unit (each, a "*Co-Owned Subject Unit Agreement*") and (iii) the oil and gas leases and lands subject to, covered by or included within each Co-Owned Subject Unit;

(c)    all servitudes, rights of way, easements, surface leases, subsurface agreements and similar rights and agreements related to or held for use in connection with (in each case, whether or not located on) any land subject to or covered by any Co-Owned Lease or Co-Owned Subject Unit (collectively, the "*Co-Owned Easements*"), including those described in **Part 1** of **Exhibit B**;

(d)    all wells (whether producing, not producing, shut-in, temporarily abandoned, injection, disposal or otherwise) owned or operated in connection with any of the Co-Owned Leases or Co-Owned Subject Units, whether or not such well is located on any land subject to or covered by any Co-Owned Lease or Co-Owned Subject Unit (collectively, the "*Co-Owned Wells*"), including those described in **Part 1** of **Exhibit C** (such wells, the "*Co-Owned Scheduled Wells*");

(e)    all equipment, machinery, structures, fixtures, inventory, vehicles, rolling stock, improvements and other movable property related to, used or held for use in connection with or held as inventory in connection with (in each case, whether or not located on) any Co-Owned Lease, Co-Owned Subject Unit, Co-Owned Easement, lands covered by or subject to any

3

Co-Owned Lease, Co-Owned Subject Unit or Co-Owned Easement or Co-Owned Well (including well equipment; casing; rods; tanks and tank batteries; boilers; tubing; pumps; pumping units and engines; Christmas trees; production facilities; dehydration units and facilities; heater-treaters; compressors; testing and sampling equipment; sulfur recovery units and facilities; valves; gauges; supervisory control and data acquisition (SCADA) systems, equipment and related software; meters and other measurement equipment; flow lines; pipelines; gathering systems; processing systems or facilities; umbilicals; caissons; water systems (whether for source water, treatment, disposal, injection or otherwise); the platforms and facilities listed in **Part 1** of **Exhibit D**; and all additions and accessions to, substitutions for and replacements of any of the foregoing, together with all attachments, components, parts, equipment, supplies, pipes, tools, casing, tubing, tubulars, fittings and accessories in connection with any of the foregoing), including the foregoing listed in **Part 1** of **Exhibit D-1** (collectively, the "***Co-Owned Inventory***");

(f)     (i) all oil, gas, minerals, condensate, distillate, natural gasoline, natural gas liquids, plant products and other liquid or gaseous hydrocarbons and all other substances produced with any of the foregoing hydrocarbons (collectively, "***Hydrocarbons***") (A) that are produced on, or the right to explore for which, or an interest in which, is granted pursuant to, any Co-Owned Lease, Co-Owned Subject Unit or Co-Owned Subject Unit Agreement or (B) that are located in any Co-Owned Inventory; and (ii) all proceeds from the sale of any such Hydrocarbons;

(g)     all Permits (and pending applications therefor) that pertain or relate in any way to any of the Co-Owned Field Assets, including the Permits listed in **Part 1** of **Exhibit E**, to the extent assignable by the Sellers to Buyer or Buyer 2, and subject to Section 6.7, all Co-Owned Assigned Contracts;

(h)     all rights (including intangible and inchoate rights), Claims, rights of set-off, rights under warranties and indemnities made by prior owners, manufacturers, vendors and Third Persons or accruing under applicable statutes of limitation or prescription, insofar only as the foregoing relate or are attributable to any of the other Co-Owned Assets or to any Assumed Liabilities, including any and all Claims of any Seller against other Persons pertaining to Imbalances attributable to the Co-Owned Assets;

(i)     to the extent transferable by the Sellers to Buyer at Closing without payment of a fee or other penalty to any Third Party pursuant to any Contract (unless Buyer has, prior to the Closing, separately agreed in writing to pay such fee or penalty), all seismic data (conventional, three dimensional or otherwise; whether owned or licensed; and including original field tapes) (including all such data relating to those licenses and agreements listed in **Part 1** of **Exhibit F**), log cores, geological, reserve engineering and other scientific and technical information, samples, tests, reports, maps and data that relate to any of the Co-Owned Field Assets or any land on which any Co-Owned Field Asset is located (collectively, the "***Co-Owned Field Data***");

(j)     all files, records (including reservoir, production, operation, contract, land and title records; drawings, maps, plats and surveys; abstracts of title, title insurance policies, title opinions and title curative; lease, prospect, contract, division order, marketing, correspondence, operations, environmental, production, processing, accounting, Property-Related Tax, Production Tax, Transfer Tax, regulatory compliance, facility and well records and files; supplier lists and files; customer lists and files; and reports to any Governmental Authority), databases, data and

other information (in each case, whether in written or electronic format) that relate to any of the other Co-Owned Assets (collectively, the "***Co-Owned Records***");

(k)  [reserved];

(l)  all raw materials, work-in-process, finished goods, supplies and other inventories related to, used or held for use in connection with (in each case, whether or not located on) any Co-Owned Lease, Co-Owned Subject Unit, Co-Owned Easement or Co-Owned Well;

(m)  all goodwill associated with any Co-Owned Asset; and

(n)  all credits or other rights to prepaid expenses, deposits, advances, prepayments, excess or unearned premiums, costs, and other refunds attributable to any Co-Owned Assets (excluding Excluded Prepaid JOA Funds).

As used herein, the term "***Other Assets***" means the assets described in clauses (o) through (qq) below; *provided*, that, from time to time prior to the Designation Deadline, Buyer may, in its sole discretion (subject to the following provisos), (x) add any assets to the "Other Assets" or (y) remove any Other Assets from the "Other Assets" (other than (1) to add any Co-Owned Assets to, or to remove any Co-Owned Assets from, the Other Assets or (2) the assets or items set forth in clauses (z), (dd), (ff), (hh), (nn) or (oo) of this Section 1.2), and, in the event an asset is added or removed, to the extent applicable, add, modify or remove any related Liabilities to or from the "Assumed Liabilities" (and any affected Exhibit or Schedule (including **Schedule 1.3(d)**) will be updated accordingly); *provided*, *however*, that Buyer may not add or remove any FWE I Asset or GOM Shelf Oil and Gas Property; *provided, further,* that (notwithstanding anything to the contrary in this Section 1.2), Buyer may not remove any assets from the "Other Assets" after the Designation Deadline; and, *provided*, *further*, that Buyer may not (i) remove any assets from the "Other Assets" unless Buyer has agreed in writing to indemnify Sellers with respect to any Liability incurred by any Seller as a result of the retention by Sellers of such "Other Asset" or (ii) add any assets to the Other Assets if such addition would require a Governmental Approval (except for those which are obtained post Closing) that would reasonably be expected to materially delay the Closing); *provided*, *further* that Buyer may remove any such asset if Buyer increases the Cash Portion to include the amount of such Liability:

(o)  the oil and gas leases (and other agreements) described in **Part 2** of **Exhibit A** (collectively, the "***Other Leases***"), including all Working Interests, Net Revenue Interests, royalty interests, overriding royalty interests, production payments, net profits interests, carried interests, reversionary interests (including rights under non-consent provisions), possibilities of reverter, conversion rights and options, fee mineral interests and other interests of every kind and character in, to, under or derived from any Other Lease or any land subject to, covered by or included within any Other Lease (except that, (x) solely as to lease OCS-G 12210 covering Green Canyon 201, the interests in such lease to be conveyed hereunder exclude any record title or operating rights in the NE1/4 of Block 201, Green Canyon, (y) solely as to lease OCS-G 10794 covering Ship Shoal 301, Fieldwood's overriding royalty interest in such lease is not to be conveyed hereunder; and (z) solely as to each of OCS-G 1449 covering portions of West Delta 57, 79 and 80, OCS-G 1874 covering portions of West Delta 79 and 80 and OCS-G 1989

and OCS-G 2136 covering portions of West Delta 80, the interests in such lease to be conveyed hereunder are solely the overriding royalty interests held by the Sellers in such lease);

(p)    (i) each Unit that includes any land covered by or subject to any Other Lease (each, a "***Other Subject Unit***"), (ii) each pooling, unitization or communitization declaration, designation, agreement or order creating or modifying any Other Subject Unit (each, a "***Other Subject Unit Agreement***") and (iii) the oil and gas leases and lands subject to, covered by or included within each Other Subject Unit;

(q)    all servitudes, rights of way, easements, surface leases, subsurface agreements and similar rights and agreements located on (or related to or held for use in connection with (in each case, whether or not located on)) any land subject to or covered by any Other Lease or Other Subject Unit (collectively, the "***Other Easements***"), including those described in **Part 2** of **Exhibit B**;

(r)    all wells (whether producing, not producing, shut-in, temporarily abandoned, injection, disposal or otherwise) owned or operated in connection with any Other Lease or Other Subject Unit, whether or not such well is located on any land subject to or covered by any Other Lease or Other Subject Unit (collectively, the "***Other Wells***"), including those described in **Part 2** of **Exhibit C** (such wells, the "***Other Scheduled Wells***");

(s)    all equipment, machinery, structures, fixtures, inventory, vehicles, rolling stock, improvements and other movable property related to, used or held for use in connection with or held as inventory in connection with (in each case, whether or not located on) any Other Lease, Other Subject Unit, Other Easement, lands covered by or subject to any Other Lease, Other Subject Unit or Other Easement or Other Well (including well equipment; casing; rods; tanks and tank batteries; boilers; tubing; pumps; pumping units and engines; Christmas trees; production facilities; dehydration units and facilities; heater-treaters; compressors; testing and sampling equipment; sulfur recovery units and facilities; valves; gauges; supervisory control and data acquisition (SCADA) systems, equipment and related software; meters and other measurement equipment; flow lines; pipelines; gathering systems; processing systems or facilities; umbilicals; caissons; water systems (whether for source water, treatment, disposal, injection or otherwise); the platforms and facilities listed in **Part 2** of **Exhibit D**; and all additions and accessions to, substitutions for and replacements of any of the foregoing, together with all attachments, components, parts, equipment, supplies, pipes, tools, casing, tubing, tubulars, fittings and accessories in connection with any of the foregoing), including the foregoing listed in **Part 2** of **Exhibit D-1** (collectively, the "***Other Inventory***");

(t)    (i) all Hydrocarbons (A) that are produced on, or the right to explore for which, or an interest in which, is granted pursuant to, any Other Lease, Other Subject Unit or Other Subject Unit Agreement or (B) that are located in any Other Inventory; and (ii) all proceeds from the sale of any such Hydrocarbons;

(u)    all Permits (and pending applications therefor) that pertain or relate in any way to any of the Other Field Assets, including the Permits listed in **Part 2** of **Exhibit E**, to the extent assignable by the Sellers to Buyer or Buyer 2;

(v)    all rights (including intangible and inchoate rights), Claims, rights of set-off, rights under warranties and indemnities made by prior owners, manufacturers, vendors or Third Persons or accruing under applicable statutes of limitation or prescription, insofar only as the foregoing relate or are attributable to any of the Other Assets, including any and all Claims of any Seller against other Persons pertaining to Imbalances attributable to the Other Assets;

(w)    to the extent transferable by the Sellers to Buyer at Closing without payment of a fee or other penalty to any Third Party pursuant to any Contract (unless Buyer has, prior to the Closing, separately agreed in writing to pay such fee or penalty), (i) all seismic data (conventional, three dimensional or otherwise; whether owned or licensed; and including original field tapes) (including all such data relating to those licenses and agreements listed in **Part 2** of **Exhibit F**), log cores, geological, reserve engineering and other scientific and technical information, samples, tests, reports, maps and data that relate to any of the Other Field Assets or any land on which any Other Field Asset is located and (ii) copies of all proprietary seismic data (conventional, three dimensional or otherwise), log cores, geological, reserve engineering and other scientific and technical information, samples, tests, reports, maps and data that relate to any of the FWE I Oil and Gas Properties or any land on which any FWE I Oil and Gas Property is located (collectively, the "***Other Field Data***");

(x)    all files, records (including reservoir, production, operation, contract, land and title records; drawings, maps, plats and surveys; abstracts of title, title insurance policies, title opinions and title curative; lease, prospect, contract, division order, marketing, correspondence, operations, environmental, production, processing, accounting, Property-Related Tax, Production Tax, Transfer Tax, regulatory compliance, facility and well records and files; supplier lists and files; customer lists and files; and reports to any Governmental Authority), databases, data and other information (in each case, whether in written or electronic format) that relate to any of the Other Assets (collectively, the "***Other Records***");

(y)    subject to Section 6.7, all of the Other Assigned Contracts;

(z)    all Working Capital Assets;

(aa)    all of the Sellers' rights, title and interest as borrowers under the Prepetition FLFO Credit Agreement (as defined in the Plan) as modified to the extent set forth in the First Lien Exit Facility Documents (as defined in the Plan);

(bb)    all raw materials, work-in-process, finished goods, supplies and other inventories located on (or related to, used or held for use in connection with (in each case, whether or not located on)) any Other Lease, Other Subject Unit, Other Easement or Other Well;

(cc)    all goodwill associated with the Other Assets;

(dd)    the Office Sublease, the Lafayette Lease Agreement, the Warehouse Lease and the Lubrizol Sublease and, in each case, the premises demised thereunder, all fixtures and appurtenances thereto, and all furniture and other personal (movable) property located therein (collectively, the "***Office Assets***");

(ee)     all credits or other rights to prepaid expenses, deposits, advances, prepayments, excess or unearned premiums, costs, and other refunds attributable to the Other Assets;

(ff)     all (i) Suspense Funds and Undisbursed Revenue related to the Acquired Interests and (ii) Prepaid JOA Funds;

(gg)     all futures, options, swaps and other derivatives with respect to the sale of Hydrocarbons described in clauses (f) or (t) of this Section 1.2 and novated to Buyer pursuant to Section 6.15 (the "**_Hedges_**");

(hh)     all assets relating to the Assumed Employee Plans (to the extent funded);

(ii)     all of the Sellers' economic analyses and pricing forecasts relating to any of the Assets;

(jj)     all Transferred Intellectual Property;

(kk)     all Seller IT Assets;

(ll)     all Tax refunds other than those described in Section 1.3(f);

(mm)     all collateral securing any bond provided for any of the Assets;

(nn)     all memberships (*lidmaatschap*), including all membership rights (*lidmaatschapsrechten*) of Fieldwood U.A. held by any Seller (the "**_Fieldwood U.A. Interests_**") and all shares in the capital of Fieldwood Mexico and any of its Subsidiaries (Fieldwood Mexico and its Subsidiaries, collectively, the "**_Mexico JV_**") held by any Seller (the "**_JV Interests_**"), and all rights, interests and title in and to such Seller's equity ownership of, and all present and future rights of such Seller as an equity holder of, Fieldwood U.A. or the Mexico JV, as applicable, both actual and contingent, including all distributions of profits, dividends, distribution of reserves, repayments of capital, liquidation or dissolution proceeds and all other distributions, payments and repayments in respect of such equity ownership and any right to receive the same, and all other rights in respect of such equity ownership under or pursuant to the organizational documents of and any equity holders' agreement in respect of Fieldwood U.A. or the Mexico JV, as applicable;

(oo)     the Specified P&A Equipment;

(pp)     all proceeds recovered under the Tail Policy, but only with respect to reimbursement of D&O Indemnified Liabilities actually paid by Buyer pursuant to Section 10.12; and

(qq)     all rights, claims, demands and causes of action of the Sellers relating to the Acquired Interests or the Assumed Liabilities; *provided* that this clause (qq) shall not apply with respect to or in connection with Taxes or Tax refunds.

1.3     Excluded Assets. The Assets and Acquired Interests do not include, and there is hereby expressly excepted and excluded therefrom and reserved to the Sellers, all assets and

properties of each Seller and its Affiliates that are not described or otherwise identified as Acquired Interests in Section 1.2, including the following assets and properties (the "***Excluded Assets***"):

(a)     all corporate, financial, legal (other than title opinions) and tax records of the Sellers, but excluding Records;

(b)     other than (i) the Fieldwood U.A. Interests and the shares of capital stock or equity interests of any Person held, directly or indirectly, by Fieldwood U.A. and (ii) the JV Interests and the shares of capital stock or equity interests of any Person held, directly or indirectly, by Fieldwood Mexico and its Subsidiaries, any shares of capital stock or other equity interest held by the Sellers in any other Person;

(c)     all BOEM operator numbers;

(d)     all of the Sellers' right, title and interest in and to those interests, rights, properties and assets more particularly described on **Schedule 1.3(d)** as such Schedule may be amended in accordance with Section 2.6;

(e)     all of the Sellers' right, title and interest in, to and under any of the FWE I Assets, other than any Applicable Shared Asset Interests added to the Co-Owned Assets or Other Assets by Buyer pursuant to the terms of Section 1.2;

(f)     all Tax refunds attributable to the Retained Liabilities;

(g)     all Excluded Contracts;

(h)     all assets of any Employee Plan that are not Assumed Employee Plans;

(i)     all Intellectual Property owned or purported to be owned by any Seller (other than Transferred Intellectual Property);

(j)     all insurance policies held by the Sellers;

(k)     all rights, claims, demands and causes of action of the Sellers under this Agreement;

(l)     all cash held in accounts of the Sellers, other than (i) Suspense Funds, (ii) Undisbursed Revenue and (iii) Prepaid JOA Funds;

(m)     any and all Claims of any Seller against other Persons pertaining to Imbalances attributable to the FWE I Assets;

(n)     the Specified Excluded Receivables;

(o)     all Avoidance Actions;

(p)     as to each of lease OCS-G 1449 covering portions of West Delta 57, 79 and 80, OCS-G 1874 covering portions of West Delta 79 and 80, OCS-G 1989 and OCS-G 2136 covering portions of West Delta 80, OCS-00786 covering South Marsh Island 48 and lease OCS-

G 1609 covering South Pass 61, any interest other than any overriding royalty interests held by the Sellers in such lease;

       (q)    solely as to lease OCS-G 12210 covering Green Canyon 201 any record title or operating rights (for the avoidance of doubt, not including any overriding royalty interests) in the NE1/4 of Block 201, Green Canyon; and

       (r)    solely as to lease OCS-G 10794 covering Ship Shoal 301, Fieldwood's overriding royalty interest in such lease.

1.4    <u>Effective Time</u>.  The purchase and sale of the Acquired Interests shall be effective as of 7:00 am (Central Prevailing Time) on the Closing Date (the "***Effective Time***").

1.5    <u>Certain Sellers</u>.  The Parties agree that each of FW GOM Pipeline and GOM Shelf have executed this Agreement as Sellers solely for the purpose of selling, assigning, conveying, transferring and delivering to Buyer any Acquired Interests held by such entities as of the Closing pursuant to this <u>Article I</u> and the applicable Transfer Documents, and without limiting the applicability of covenants and representations to the closing conditions set forth in <u>Article VII</u> neither FW GOM Pipeline nor GOM Shelf makes, or shall have any obligation or liability with respect to, any other covenant or representation of the Sellers made under this Agreement or any certificate delivered pursuant hereto.  For the avoidance of doubt, neither FW GOM Pipeline or GOM Shelf shall be required or obligated to sell, assign, convey, transfer or deliver to Buyer or Buyer 2 any of the GOM Shelf Oil and Gas Properties.  Notwithstanding anything to the contrary, Fieldwood Energy I, GOM Shelf, and their Subsidiaries shall have no liability under this Agreement or any Ancillary Document (including, without limitation, for breach, misrepresentation, fraud, breach of warranty, or otherwise) or relating to the sale or purchase of the Acquired Interests, the operation or business of the Acquired Interests, or any other transactions contemplated by this Agreement or any Ancillary Document, except for any breach (i) by Fieldwood Energy I of its obligations pursuant to Section 3(b)(i) of the Plan of Merger (as contemplated by <u>Section 10.12(e)</u>) or (ii) by FW GOM Pipeline or GOM Shelf of its obligations pursuant to <u>Sections 9.2</u>, <u>10.2</u>, <u>10.3</u>, <u>10.4</u>, <u>10.5</u>, <u>10.6</u>, <u>10.7</u>, <u>10.9</u> and, in respect of its interest in an asset which is also in part a Co-Owned Asset, <u>10.11</u>.

## ARTICLE II
## CONSIDERATION

2.1    <u>Consideration</u>.

       (a)    The aggregate consideration to be paid by Buyer and Buyer 2 to the Sellers with respect to the sale to Buyer and Buyer 2 of the Acquired Interests shall consist of the following (collectively, the "***Consideration***"): (1) a credit bid and equivalent release of the Sellers and any guarantors (and their respective successors and assigns) from a portion of the Claims arising under the Credit Agreement, in an aggregate amount up to the FLTL Claims Allowed Amount (as defined in the Plan) (the "***Credit Bid and Release***") [4], (2) the Cash Portion, (3) the GUC Warrants, (4) the

---

[4] <u>Note to Draft</u>: Credit Bid and Release to be equal to at least $1.03 billion, less (i) the Cash Portion, (ii) the GUC Warrants, (iii) the SLTL Warrants, and (iv) the amount of the First Lien Exit Facility on the Closing Date, subject to

SLTL Warrants and (5) Buyer's assumption of the Assumed Liabilities (including, for the avoidance of doubt, the Liabilities set forth in Section 11.1(o))[5].

(b)     Prior to the Closing, the Sellers and Buyer shall in good faith endeavor to agree upon the Closing Cash Amount, the Effective Date Cash Obligations and the Effective Date Cash Obligations Amount in accordance with the definitions thereof.

(c)     The Parties hereby agree that, for U.S. federal income tax purposes, the assumption by Buyer of the remaining Allowed FLFO Claims (as such term is defined in the Plan) pursuant to Section 11.1(o) hereof shall be treated as if: (i) Buyer issues a debt instrument to the Sellers ("**Buyer Obligation**") with terms that are identical (with the exception of the obligor) to the terms of the Buyer Parent Debt (defined below) as additional consideration for the Acquired Interests, (ii) the Sellers deliver the Buyer Obligation to holders of Allowed FLFO Claims (as such term is defined in the Plan) (together with the FLFO Distribution Amount (as such term is defined in the Plan)) in satisfaction of their Allowed FLFO Claims (as such term is defined in the Plan), in a transaction that constitutes a "significant modification" within the meaning of Treasury Regulations Section 1.1001-3, and (iii) Buyer Parent issues the First Lien Exit Facility (as such term is defined in the Plan) (the "**Buyer Parent Debt**") to holders of Allowed FLFO Claims (as such term is defined in the Plan) in substitution of the Buyer Obligation, thereby assuming Buyer's obligation with respect to the Buyer Obligation. The parties further agree that (i) the issue price, within the meaning of Section 1273 of the Code, of the Buyer Obligation is equal to the issue price of the Buyer Parent Debt and (ii) the Sellers shall take into account for U.S. federal income tax purposes any cancellation of debt consequences under the Code, resulting from or in connection with (including as a result of the application of Treasury Regulations Section 1.1274-5, if applicable) or arising from the transactions described in this paragraph.

2.2     Allocation of Adjusted Consideration.  The Parties acknowledge and agree that the Credit Bid and Release and the Cash Portion (and the Assumed Liabilities, taking into account Section 2.1(c), and other relevant items, to the extent properly taken into account under the federal income Tax principles as consideration for the Acquired Interests) shall be allocated among the Acquired Interests in accordance with Section 1060 of the Code and the Treasury Regulations thereunder (and any similar provision of state, local or non-U.S. Law, as appropriate).  Buyer shall, as promptly as practicable after the Closing Date, but in no case later than one hundred twenty (120) days following the Closing Date, prepare and deliver to the Sellers a proposed allocation as described in the preceding sentence (the "***Initial Allocation***").  The Parties, for a period of no more than ninety (90) days, shall cooperate in good faith to resolve any disagreements the Sellers may have with the Initial Allocation and agree on a final allocation (the "***Final Allocation***").  The Parties agree to file all Tax Returns (including the filing of IRS Form 8594 with their U.S. federal income Tax Return for the taxable year that includes the date of the Closing) consistent with the Final Allocation unless otherwise required by applicable Law.

---

such other adjustments as agreed with consent of the Debtors, the Required DIP Lenders and the Requisite FLTL Lenders (each as defined in the Plan).

[5] Note to Draft: Sellers to be third party beneficiaries of the Direction Letter, with the right to specifically enforce the Credit Bid and Release.

2.3     Consents to Assign.

(a)     The Sellers shall, within five (5) Business Days after the Execution Date (to the extent not sent prior to the Execution Date), send to the holder of each Applicable Consent with respect to each Lease and any Assigned Contract that is not a 365 Contract (for which notices regarding 365 Contracts are addressed in Section 6.7) a notice seeking such holder's consent to the transactions contemplated hereby or as otherwise sufficient to permit the assignment of such Lease or Assigned Contract to Buyer or Buyer 2, as applicable, pursuant to this Agreement upon entry of the Confirmation Order.  Upon request of Buyer, the Sellers shall promptly provide a reasonable update to Buyer regarding the status of requests for consents made pursuant to this Section 2.3(a).

(b)     If the Sellers fail to obtain an Applicable Consent prior to Closing and (i) with respect to any Lease or Assigned Contract that is not a 365 Contract, (A) the failure to obtain such Applicable Consent would under the express terms thereof cause the assignment of the Acquired Interest affected thereby to Buyer or Buyer 2, as applicable, to be void or voidable, (B) the failure to obtain such Applicable Consent would under the express terms thereof permit the termination of such Lease or Assigned Contract under the express terms thereof upon the purported assignment of such Lease or Assigned Contract to Buyer or Buyer 2, as applicable, pursuant to this Agreement, or (C) the failure to obtain such Applicable Consent would under the express terms thereof permit a party to such Lease or Assigned Contract to impose a financial or other penalty on any Seller, Buyer or Buyer 2 or (ii) with respect to any Lease or Assigned Contract, a party holding such Applicable Consent right has objected to the assignment of the affected Acquired Interest in accordance with the terms of the relevant Applicable Consent right (each Consent as to which clause (i) or (ii) is applicable, a "***Required Consent***"), then, unless the Bankruptcy Court has entered an order approving (or in the case of clause (ii), such objection is resolved to permit) the sale and assignment of the affected Acquired Interest to Buyer or Buyer 2, as applicable, pursuant to this Agreement without obtaining such Required Consent (and without Buyer or Buyer 2 being subject to the consequences set forth in clauses (i)(A) through (i)(C) of the definition of Required Consent as a result of not obtaining such Required Consent), the Acquired Interests (or portions thereof) affected by such un-obtained Required Consent shall be excluded from the Acquired Interests to be assigned to Buyer or Buyer 2 at Closing (and shall be considered Excluded Assets hereunder)  (a "***Delayed Asset***").  In the event that any such Required Consent with respect to any such Delayed Asset (or portion thereof) is obtained during the Post-Closing Consent Period (or if during the Post-Closing Consent Period the Bankruptcy Court enters an order providing that (x) such Required Consent is not required to consummate the sale and assignment of the Delayed Asset to Buyer or Buyer 2, as applicable, pursuant to this Agreement or (y) the Delayed Asset may be sold and assigned to Buyer or Buyer 2, as applicable, pursuant to this Agreement free and clear (as applicable to the sale and assignment of the Delayed Asset to Buyer or Buyer 2, as applicable, pursuant to this Agreement) of such Required Consent) (in each case of clauses (x) and (y) without Buyer or Buyer 2 being subject to the consequences set forth in clauses (i)(A) through (i)(C) of the definition of Required Consent as a result of not obtaining such Required Consent) then, (1) the Sellers shall so notify Buyer, and (2) on or prior to the tenth (10th) Business Day after the date such Required Consent is obtained or such order referred to above is entered, the Sellers shall assign such Delayed Asset (or portions thereof) that were so excluded as a result of such previously un-obtained Required Consent to Buyer or Buyer 2, as applicable, pursuant to an instrument in substantially the same form as the Assignment, Bill of

Sale and Conveyance, or the JV Assignment Agreement (in the case where the Delayed Asset is a Fieldwood U.A. Interest or a JV Interest) (and such Delayed Asset (or portions thereof) shall no longer be considered Excluded Assets hereunder) and Buyer shall assume all Assumed Liabilities with respect thereto. Notwithstanding anything to the contrary in this Agreement, without limiting any of the rights of Buyer hereunder, including those set forth in Section 7.3, (A) Buyer in its sole discretion may elect for the Sellers not to sell, transfer, convey, assign or deliver such Delayed Assets that is an Other Asset to Buyer, and (B) from and after the Closing, Buyer and the Sellers shall reasonably cooperate in a reasonable arrangement to provide Buyer or Buyer 2, as applicable, with all of the benefits of, or under, each such Delayed Asset, including enforcement (at Buyer's cost) for the benefit of Buyer or Buyer 2, if applicable, of any and all rights of the Sellers against any party with respect to such Delayed Asset arising out of the breach or cancellation with respect to such Delayed Asset by such party; *provided*, *further*, that (i) to the extent that any such arrangement has been made to provide Buyer or Buyer 2, as applicable, with the benefits of, under or with respect to, a Delayed Asset, from and after the Closing, Buyer shall be responsible for, and shall promptly pay and perform all payment and other obligations under such Delayed Asset for the period during which Buyer or Buyer 2, as applicable, is receiving the benefits under the applicable Delayed Asset to the same extent as if such Delayed Asset had been assigned or transferred at the Closing, and (ii) the Sellers shall (or, as to any Delayed Asset that is an Other Asset, at Buyer's request the Sellers shall) sell, transfer, convey, assign and deliver such Delayed Asset to Buyer or Buyer 2, as applicable, promptly after receipt of such Required Consent or the entry of such order referred to above with respect to such Delayed Asset; *provided* that Buyer shall so request such sale, transfer, conveyance, assignment and deliverance promptly after such receipt, unless (1) the retention of such Delayed Asset by the applicable Seller would not result in such Seller retaining an incremental Liability as compared to if such Seller had transferred such Delayed Asset to Buyer (unless Buyer provides an amount in cash to the Sellers equal to the amount of such Liabilities and/or indemnification to the Sellers for any such Liabilities) or (2) the Sellers and Buyer mutually agree not to make such sale, transfer, conveyance, assignment and deliverance of such Delayed Asset; *provided further* that from and after the date that is six (6) months after the Closing, Buyer shall have no obligation to make any such request and may elect for the Sellers to retain such Delayed Asset, in which case such Delayed Asset shall be an Excluded Asset for all purposes under this Agreement and the arrangements described in clause (B)(i) shall terminate.

(c)     If the Sellers fail to obtain a Consent prior to Closing and such Consent (i) is not a Required Consent or (ii) is a Required Consent and prior to Closing the Bankruptcy Court enters an order providing that the affected Acquired Interests may be sold and assigned to Buyer or Buyer 2, as applicable, pursuant to this Agreement free and clear (as applicable to the sale and assignment of the affected Acquired Interests to Buyer pursuant to this Agreement) of such Required Consent (without Buyer or Buyer 2, as applicable, being subject to the consequences set forth in clauses (i)(A) through (i)(C) of the definition of Required Consent as a result of not obtaining such Required Consent), then, in the case of each of clauses (i) and (ii), the Acquired Interests (or portions thereof) subject to such un-obtained Consent shall nevertheless be assigned by the Sellers to Buyer at Closing as part of the Acquired Interests and Buyer shall be deemed to have assumed any and all Liabilities for the failure to obtain any such Consent as part of the Assumed Liabilities hereunder and Buyer shall have no claim against the Sellers from any Liability for the failure to obtain such Consent.

(d)     Prior to Closing and until the 365th day after Closing (the "***Post-Closing Consent Period***"), with respect to any un-obtained Required Consents with respect to which the Bankruptcy Court shall not have entered an order providing that the affected Acquired Interests may be sold and assigned to Buyer or Buyer 2, as applicable, pursuant to this Agreement free and clear (as applicable to the sale and assignment of the affected Acquired Interests to Buyer or Buyer 2, as applicable, pursuant to this Agreement) of such Required Consent (without Buyer or Buyer 2, as applicable, being subject to the consequences set forth in clauses (i)(A) through (i)(C) of the definition of Required Consent as a result of not obtaining such Required Consent), the Sellers shall use their commercially reasonable efforts to obtain such Required Consents, except that such obligation of the Sellers to use their commercially reasonable efforts to obtain Required Consents shall not apply in respect of any Delayed Asset with respect to which Buyer has made the election in accordance with the final sentence of Section 2.3(b).  If Buyer so requests, the Sellers shall be required to make any payments or provide other consideration in order to obtain any such Required Consent (provided that Buyer shall reimburse Sellers for any such payment made after the Closing); *provided, however,* that without the consent of Buyer, the Sellers shall not be required to incur any Liability, pay any money or provide any other consideration in order to obtain any such Consent (other than any Liability or obligation to pay money or provide consideration that has been expressly assumed by Buyer). Buyer shall use its commercially reasonable efforts (without any obligation to incur any Liability, pay money or provide any other consideration) to assist and cooperate with the Sellers in furtherance of the Sellers' efforts pursuant to this Section 2.3(d).

(e)     The Sellers shall be deemed to have obtained all Consents required in respect of the assumption and/or assignment of any Lease or Assigned Contract if (i) the Sellers have properly served under the Bankruptcy Code notice of assumption and/or assignment on the counterparty to such Lease or Assigned Contract, (ii) any objections to assumption and/or assignment of such Lease or Assigned Contracts filed by such counterparty have been withdrawn or overruled (including pursuant to the Confirmation Order or other order of the Bankruptcy Court), and (iii) pursuant to the Confirmation Order or other order of the Bankruptcy Court, the Sellers are authorized to assume and/or assign such Lease or Assigned Contract to Buyer free and clear of such Consents, in each case without Buyer or Buyer 2, as applicable, being subject to the consequences forth in clauses (i)(A) through (i)(C) of the definition of Required Consent as a result of not obtaining such Required Consent.

2.4     <u>Governmental Approvals</u>.     The Sellers and Buyer shall use commercially reasonable efforts to obtain the approval of, or waiver from, each Governmental Authority required, after giving effect to the entry of the Confirmation Order, to permit the assignment of the Acquired Interests to Buyer or Buyer 2, as applicable, pursuant to this Agreement, in accordance with Sections 6.5(b) and (c).  If Buyer so requests, the Sellers shall be required to make any payments or provide any other consideration in order to obtain any Governmental Approval (provided that Buyer shall reimburse Sellers for any such payment made after the Closing); *provided*, *however*, that without the consent of Buyer, the Sellers shall not be required to incur any Liability, pay any money or provide any other consideration in order to obtain any such Governmental Approval (other than any Liability or obligation to pay money or provide consideration that has been expressly assumed by Buyer). If, as of the Closing, any Governmental Approval, other than any Governmental Approval that is required or permitted to be made or obtained after the Closing (and, if permitted, customarily made or obtained after the Closing)

(each, an "***Applicable Governmental Approval***"), has not been obtained and, notwithstanding the entry of the Confirmation Order, the failure to have obtained such Applicable Governmental Approval restricts the Sellers' ability to transfer any Acquired Interest to Buyer or Buyer 2, as applicable, at Closing, then, notwithstanding anything to the contrary herein, (x) (A) without limiting any of the rights of Buyer hereunder, including those set forth in <u>Section 7.3</u>, Buyer in its sole discretion may elect for the Sellers not to sell, transfer, convey, assign or deliver such Acquired Interests (which shall be treated as Delayed Assets, *mutatis mutandis*) and (B) from and after the Closing, (i) the Sellers and Buyer shall reasonably cooperate in a reasonable arrangement (to the extent legally permissible) to provide Buyer or Buyer 2, as applicable, with all of the benefits of, or under, such Delayed Asset, including (at Buyer's cost) enforcement for the benefit of Buyer or Buyer 2, as applicable, of any and all rights of the Sellers against any party with respect to such Delayed Asset arising out of the breach or cancellation with respect to such Delayed Asset by such party; *provided*, that to the extent that any such arrangement has been made to provide Buyer or Buyer 2, as applicable, with the benefits of, under or with respect to, a Delayed Asset, from and after the Closing, Buyer shall be responsible for, and shall promptly pay and perform all payment and other obligations under such Delayed Asset for the period during which Buyer or Buyer 2, as applicable, is receiving the benefits under the applicable Delayed Asset to the same extent as if such Delayed Asset had been assigned or transferred at the Closing, (ii) the Sellers and Buyer shall reasonably cooperate with Buyer to obtain such Applicable Governmental Approval, and (iii) subject to the immediately following proviso, the Sellers shall promptly after receipt of the Applicable Governmental Approval with respect to such Delayed Asset, sell, transfer, convey, assign and deliver such Delayed Asset to Buyer or Buyer 2, as applicable, and Buyer or Buyer 2, as applicable, shall accept such conveyance; *provided* that, with respect to any such Delayed Asset that is an Other Asset, Buyer in its sole discretion (subject to the immediately following proviso) may elect for the Sellers not to sell, transfer, convey, assign or deliver such Delayed Asset to Buyer after receipt of the Applicable Governmental Approval; *provided* however that Buyer shall so request such sale, transfer, conveyance, assignment and deliverance promptly after receipt of the Applicable Governmental Approval, unless (1) the retention of such Delayed Asset by the applicable Seller would not result in such Seller retaining any incremental Liabilities as compared to if such Seller had transferred such Delayed Asset to Buyer (unless Buyer provides an amount in cash to the Sellers equal to the amount of such Liabilities and/or indemnification to the Sellers for any such Liabilities) or (2) the Sellers and Buyer mutually agree not to make such sale, transfer, conveyance, assignment and deliverance of such Delayed Asset; *provided further* that from and after the date that is six (6) months after the Closing, Buyer shall have no obligation to make any such request and may elect for the Sellers to retain such Delayed Asset, in which case such Delayed Asset shall be an Excluded Asset for all purposes under this Agreement and the arrangements described under <u>clause (B)(i)</u> shall terminate.

       2.5    <u>Preferential Rights</u>.

       (a)    The Sellers shall, within five (5) Business Days after the Execution Date (to the extent not sent prior to the Execution Date), send to the holder of each Preferential Right with respect to any Acquired Interest a notice setting forth the information required to satisfy such notice provision for such Preferential Right and requesting a waiver thereof or as otherwise sufficient to permit the assignment of such Acquired Interest to Buyer or Buyer 2, as applicable, pursuant to this Agreement upon entry of the Confirmation Order free and clear of such Preferential Right if such Preferential Right is not validly waived or exercised prior to Closing.

The Sellers and Buyer shall agree in good faith on the holders to whom the notices in the preceding sentence shall be sent. Upon request of Buyer, the Sellers shall promptly provide a reasonable update to Buyer regarding requests for waivers of Preferential Rights made pursuant to this Section 2.5(a).

(b)     If a bona fide Preferential Right with respect to any Acquired Interest is validly exercised prior to the Closing, such Acquired Interest and the related Contracts (solely to the extent related to such Acquired Interest) shall be excluded from the Acquired Interests conveyed to Buyer or Buyer 2, as applicable, at the Closing, the affected Acquired Interest will be deemed to be an Excluded Asset, and the Sellers shall pay over to Buyer all proceeds received for the affected Acquired Interest and related Contracts (or portion thereof) from the Person exercising such Preferential Right.

(c)     If prior to Closing (i) any Acquired Interest is burdened by a Preferential Right that has not been validly exercised or waived as of the Closing, regardless of whether the time period for the exercise of such right has expired or (ii) any Person asserts that it is the beneficiary of a Preferential Right with respect to any Acquired Interest and objects to the sale of such Acquired Interest to Buyer pursuant to this Agreement and such objection is not resolved so as to permit the sale and assignment of such Acquired Interest free and clear of such Preferential Right (as applicable to the sale and assignment to Buyer or Buyer 2, as applicable, pursuant to this Agreement) to Buyer or Buyer 2, as applicable (by Final Order of the Bankruptcy Court or otherwise to Buyer's reasonable satisfaction), then, without limiting any of the rights of Buyer hereunder, including those set forth in Section 7.3, (A) at Buyer's option, such Acquired Interest shall be excluded from the Acquired Interests and treated as a Delayed Asset (*mutatis mutandis*), and (B) from and after the Closing, if Buyer so elects, (i) the Sellers and Buyer shall reasonably cooperate to provide a reasonable arrangement (to the extent legally permissible) to provide Buyer or Buyer 2, as applicable, with all of the benefits of, or under, such Delayed Asset, including (at Buyer's cost) enforcement for the benefit of Buyer or Buyer 2, as applicable, of any and all rights of the Sellers against any party with respect to such Delayed Asset arising out of the breach or cancellation with respect to such Delayed Asset by such party; *provided*, that to the extent that any such arrangement has been made to provide Buyer or Buyer 2, as applicable, with the benefits of, under or with respect to, a Delayed Asset, from and after the Closing, Buyer shall be responsible for, and shall promptly pay and perform all payment and other obligations under such Delayed Asset for the period during which Buyer or Buyer 2, as applicable, is receiving the benefits under the applicable Delayed Asset to the same extent as if such Delayed Asset had been assigned or transferred at the Closing, (ii) the Sellers and Buyer shall reasonably cooperate with Buyer to obtain the waiver of the Preferential Right with respect to such Delayed Asset, and (iii) if such asserted Preferential Right is not validly exercised prior to its expiration or waiver, or if the dispute regarding the Preferential Right affecting such Delayed Asset is resolved by Final Order of the Bankruptcy Court or otherwise to Buyer's reasonable satisfaction, such Delayed Asset, subject to the immediately following proviso, shall be promptly conveyed to Buyer or Buyer 2, as applicable; *provided* that, with respect to any such Delayed Asset that is an Other Asset, Buyer in its sole discretion (subject to the immediately following proviso) may elect for the Sellers not to sell, transfer, convey, assign or deliver such Delayed Asset to Buyer after the occurrence of the events in the preceding clause (iii); *provided* that Buyer shall so elect, unless (x) the retention of such Delayed Asset by the applicable Seller would not result in such Seller retaining any incremental Liability as compared to if such Seller had transferred such Delayed Asset to Buyer (unless Buyer

16

provides an amount in cash to the Sellers equal to the amount of such Liabilities and/or indemnification to the Sellers for any such Liabilities) or (y) the Sellers and Buyer mutually agree for Buyer not to so elect; *provided further* that from and after the date that is six (6) months after the Closing, Buyer shall have no obligation to make any such election and may elect for the Sellers to retain such Delayed Asset, in which case such Delayed Asset shall be an Excluded Asset for all purposes under this Agreement and the arrangements described in clause (B)(i) shall terminate. If, for any reason, such Preferential Right is validly exercised by the holder thereof after the Closing and prior to an election by Buyer for the Sellers to retain such Delayed Asset pursuant to the second proviso in the preceding sentence, the Sellers shall pay over to Buyer all proceeds paid for the affected Acquired Interest by the holder of the relevant Preferential Right.

2.6    [Reserved.]

2.7    Withholding.  Buyer and its Affiliates shall be entitled to deduct and withhold, from any amounts payable under this Agreement, amounts required to be deducted and withheld under the Code or any other applicable Law.  To the extent any amount is so withheld and paid to the appropriate Governmental Authority pursuant to applicable Law, such withheld amounts shall be treated for all purposes of the Agreement as having been paid to the Person in respect of which such deduction or withholding was made.

2.8    Assets Sold "As Is, Where Is".

(a)    BUYER ACKNOWLEDGES AND AGREES THAT THE ACQUIRED INTERESTS SOLD PURSUANT TO THIS AGREEMENT ARE SOLD, CONVEYED, TRANSFERRED AND ASSIGNED ON AN "AS IS, WHERE IS" BASIS "*WITH ALL FAULTS*" AND THAT, EXCEPT AS SET FORTH IN ARTICLE IV OF THIS AGREEMENT AND THE CERTIFICATES DELIVERED BY THE SELLERS AT CLOSING (BUT SUBJECT TO THE TERMINATION OF REPRESENTATIONS AND WARRANTIES AT CLOSING PURSUANT TO SECTION 13.1), THE SELLERS MAKE NO REPRESENTATIONS OR WARRANTIES, TERMS, CONDITIONS, UNDERSTANDINGS OR COLLATERAL AGREEMENTS OF ANY NATURE OR KIND, EXPRESS OR IMPLIED, BY STATUTE OR OTHERWISE, CONCERNING THE ACQUIRED INTERESTS OR THE CONDITION, DESCRIPTION, QUALITY, USEFULNESS, QUANTITY OR ANY OTHER THING AFFECTING OR RELATING TO THE ACQUIRED INTERESTS, INCLUDING WITHOUT LIMITATION ANY IMPLIED WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, WHICH WARRANTIES ARE ALSO HEREBY EXPRESSLY DISCLAIMED. BUYER FURTHER ACKNOWLEDGES THAT THE SELLERS HAVE MADE NO AGREEMENT OR PROMISE TO REPAIR OR IMPROVE ANY OF THE ACQUIRED INTERESTS BEING SOLD TO BUYER, AND THAT BUYER TAKES ALL SUCH ACQUIRED INTERESTS IN THE CONDITION EXISTING ON THE CLOSING DATE (SUBJECT TO SATISFACTION OR WAIVER OF THE CONDITIONS SET FORTH IN ARTICLE VII) "AS IS, WHERE IS" AND "*WITH ALL FAULTS*" AND WITHOUT WARRANTY OF TITLE.  NOTHING HEREIN SHALL LIMIT BUYER'S REMEDIES IN THE EVENT OF FRAUD (AS DEFINED IN ANNEX I), EXCEPT THAT BUYER SHALL HAVE NO REMEDY IN THE EVENT OF FRAUD WITH RESPECT TO FIELDWOOD ENERGY I, FW GOM PIPELINE, GOM SHELF OR ANY OF THEIR RESPECTIVE SUBSIDIARIES.

(b)     EXCEPT AS AND TO THE EXTENT EXPRESSLY SET FORTH IN ARTICLE IV OF THIS AGREEMENT OR THE CERTIFICATES DELIVERED BY THE SELLERS AT CLOSING (BUT SUBJECT TO THE TERMINATION OF REPRESENTATIONS AND WARRANTIES AT CLOSING PURSUANT TO SECTION 13.1), AND WITHOUT LIMITING THE GENERALITY OF SECTION 2.8(a), THE SELLERS EXPRESSLY DISCLAIM ANY REPRESENTATION OR WARRANTY, EXPRESS, STATUTORY OR IMPLIED, AS TO (i) TITLE TO ANY OF THE ACQUIRED INTERESTS, (ii) THE CONTENTS, CHARACTER OR NATURE OF ANY REPORT OF ANY PETROLEUM ENGINEERING CONSULTANT, OR ANY ENGINEERING, GEOLOGICAL OR SEISMIC DATA OR INTERPRETATION, RELATING TO THE ACQUIRED INTERESTS, (iii) THE QUANTITY, QUALITY OR RECOVERABILITY OF HYDROCARBONS IN OR FROM THE ACQUIRED INTERESTS, (iv) ANY ESTIMATES OF THE VALUE OF THE ACQUIRED INTERESTS OR FUTURE REVENUES GENERATED BY THE ACQUIRED INTERESTS, (v) THE PRODUCTION OF HYDROCARBONS FROM THE ACQUIRED INTERESTS, (vi) THE CONDITION, QUALITY, SUITABILITY OR MARKETABILITY OF THE ACQUIRED INTERESTS, INCLUDING THE MARKETABILITY OF ANY HYDROCARBONS, (vii) THE AVAILABILITY OF GATHERING OR TRANSPORTATION FOR HYDROCARBONS FROM THE ACQUIRED INTERESTS, (viii) THE CONTENT, CHARACTER OR NATURE OF ANY INFORMATION MEMORANDUM, REPORTS, BROCHURES, CHARTS OR STATEMENTS PREPARED BY OR ON BEHALF OF THE SELLERS OR THIRD PARTIES WITH RESPECT TO THE ACQUIRED INTERESTS, AND (ix) ANY OTHER MATERIALS OR INFORMATION THAT MAY HAVE BEEN MADE AVAILABLE TO BUYER OR ANY AFFILIATE OF BUYER, OR ITS OR THEIR EMPLOYEES, AGENTS, CONSULTANTS, REPRESENTATIVES OR ADVISORS IN CONNECTION WITH THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT OR ANY DISCUSSION OR PRESENTATION RELATING THERETO.  ANY AND ALL SUCH DATA, INFORMATION AND OTHER MATERIALS FURNISHED BY OR ON BEHALF OF THE SELLERS IS PROVIDED TO BUYER AS A CONVENIENCE, AND ANY RELIANCE ON OR USE OF THE SAME SHALL BE AT BUYER'S SOLE RISK.

2.9     Presence of Wastes, NORM, Hazardous Substances and Asbestos.  BUYER ACKNOWLEDGES THAT THE ACQUIRED INTERESTS HAVE BEEN USED TO EXPLORE FOR, DEVELOP AND PRODUCE HYDROCARBONS, AND THAT SPILLS OF WASTES, CRUDE OIL, PRODUCED WATER, HAZARDOUS SUBSTANCES AND OTHER MATERIALS MAY HAVE OCCURRED THEREON OR THEREFROM.  ADDITIONALLY, THE ACQUIRED INTERESTS, INCLUDING PRODUCTION EQUIPMENT, MAY CONTAIN ASBESTOS, HAZARDOUS SUBSTANCES OR NORM.  NORM MAY AFFIX OR ATTACH ITSELF TO THE INSIDE OF WELLS, MATERIALS AND EQUIPMENT AS SCALE OR IN OTHER FORMS, AND NORM-CONTAINING MATERIAL MAY HAVE BEEN BURIED OR OTHERWISE DISPOSED OF ON THE ACQUIRED INTERESTS.  SPECIAL PROCEDURES MAY BE REQUIRED FOR REMEDIATION, REMOVING, TRANSPORTING AND DISPOSING OF ASBESTOS, NORM, HAZARDOUS SUBSTANCES AND OTHER MATERIALS FROM THE ACQUIRED INTERESTS.

# ARTICLE III
# DUE DILIGENCE

3.1   <u>Due Diligence</u>.

(a)   From and after the date hereof until the Closing Date, the Sellers shall (i) afford to Buyer and its Representatives (at Buyer's cost) during normal business hours (A) upon the reasonable request of Buyer, reasonable access to and entry upon any specified Field Asset (subject to (1) execution of the Sellers' customary boarding agreement, (2) the terms, conditions and restrictions of agreements that are related to access to such Field Assets and to which any Seller is a party and (3) the consent of any third party operator, as applicable), including execution of agreements required by any third party with respect to access to such Field Assets for the purposes of performing onsite tests, inspections, examinations, investigations, studies and assessments of the Field Assets (including non-invasive environmental assessments of the Field Assets and, subject to the consent of the Sellers (such consent not to be unreasonably withheld, conditioned or delayed) invasive environmental assessments of the Field Assets; *provided*, that prior to conducting any invasive environmental assessments, Buyer and Sellers will cooperate in good faith to enter into a written agreement with respect to the parameters and scope of, allocation of liability with respect to, and rights to information (including samples) arising from, such assessments); and (B) at the offices of each of the Sellers, (1) reasonable access to the Sellers' title records, Leases, Easements, Contracts, environmental and legal materials, books, records, statements and operating data, information relating to the Field Assets (including all land and title records, surveys, abstracts of title, title insurance policies, title opinions, title curative and all lease, contract, division order, marketing, acquisition, correspondence, operations, environmental, insurance, production, accounting, regulatory, Property-Related Tax, Production Tax, Transfer Tax and well records and files) and any other information or documents that are in the possession or control of the Sellers and relate in any way to any Acquired Interests and (2) to the extent permitted in accordance with applicable licensing agreements, the opportunity to review the Field Data, and (ii) instruct the Sellers' representatives to reasonably cooperate with Buyer and its Representatives in their investigation of the Acquired Interests.  Notwithstanding anything in this <u>Section 3.1(a)</u> to the contrary, (x) all such information shall be held in confidence by Buyer in accordance with the terms of <u>Section 10.5</u>, and (y) in no event shall the Sellers be obligated to provide (A) access or information in violation of applicable Law, (B) any information the disclosure of which would cause the loss of any legal privilege available to any Seller relating to such information or would cause any Seller to breach a confidentiality obligation to which it is bound; *provided* that the applicable Seller shall use commercially reasonable efforts to provide such information and documents in a manner that does not violate such Law or result in such loss of privilege or breach of obligation, or (C) copies of bids, letters of intent, expressions of interest or other proposals received from other Persons in connection with the transactions contemplated by this Agreement or information and analyses relating to such communications.  For the avoidance of doubt, Buyer and its Representatives shall not be permitted to conduct any invasive environmental investigations without the Sellers' express written consent, which may be withheld by the Sellers in their sole discretion.

(b)   No investigation by Buyer or other information received by Buyer shall operate as a waiver or otherwise affect any representation, warranty or agreement given or made by any Seller hereunder.

## ARTICLE IV
## SELLERS' REPRESENTATIONS

Each Seller represents and warrants to Buyer and Buyer 2, subject to the Disclosure Schedules (subject to Section 12.15), as follows:

4.1     Organization/Qualification.  Each Seller is an entity duly formed, validly existing and in good standing under the Laws of the jurisdiction of its organization.  Each Seller is qualified to do business and is in good standing under the Laws of each jurisdiction where such qualification is necessary, except for those jurisdictions where failure to be so qualified would not, individually or in the aggregate, prevent, materially delay or materially impede the performance by such Seller of its obligations under this Agreement or its consummation of the transactions contemplated by this Agreement.  Each Seller has all requisite power and authority required to own and operate its properties (including the Acquired Interests) and to carry on its business as now conducted.

4.2     Power and Authority.  Subject to entry of the Confirmation Order and such other authorization as may be required by the Bankruptcy Court, each Seller has the requisite power and authority to execute and deliver this Agreement and the other Ancillary Documents to which it is (or, upon its execution and delivery, will be) a party and perform its obligations under this Agreement and such other Ancillary Documents.

4.3     Non-Contravention.  Each Seller's execution, delivery and performance of this Agreement and each Ancillary Document to which such Seller is (or, upon its execution and delivery, will be) a party and each Seller's performance of the transactions contemplated herein and therein will not (a) conflict with or result in a breach of any provisions of the organizational documents of such Seller, Fieldwood U.A. or, to the Sellers' Knowledge, the Mexico JV or (b) subject to (w) the entry of the Disclosure Statement Order and the Confirmation Order, (x) obtaining or making the Applicable Consents set forth on **Schedule 4.8(b)** in accordance with Section 2.3, (y) obtaining or making the Governmental Approvals set forth on **Schedule 4.7** and (z) obtaining waivers for the Preferential Rights set forth on **Schedule 4.8(a)** (in the case of each of the preceding clauses (x) and (z), after giving effect to the Confirmation Order), result in (i) a breach of or default under, or give rise to any right of termination, revocation, cancellation or acceleration under, any Permit, Lease, Subject Unit Agreement, Easement, Assigned Contract, credit agreement (excluding the Credit Agreement), note, bond, mortgage, indenture, license or other agreement, document or instrument to which any Seller is a party or by which any Seller or any of the Acquired Interests may be bound, or otherwise result in a loss of any benefit relating to the Acquired Interests, (ii) the creation or imposition of any Encumbrance upon any Acquired Interest other than Permitted Encumbrances (except that the Fieldwood U.A. Interests and the JV Interests shall not be subject to any Permitted Encumbrances), or (iii) violate any applicable Law, except, in the case of the preceding clauses (i) and (ii), as would not reasonably be expected to result, individually or in the aggregate, in a Material Adverse Effect.

4.4     Authorization and Enforceability.  Subject to entry of the Disclosure Statement Order and the Confirmation Order, each Seller has full capacity, power and authority to enter into and perform this Agreement, each Ancillary Document to which such Seller is (or, upon its execution and delivery, will be) a party and the transactions contemplated herein and therein.  The execution, delivery and performance by each Seller of this Agreement and each Ancillary

Document to which such Seller is (or, upon its execution and delivery, will be) a party have been duly and validly authorized and approved by all necessary company action on the part of such Seller. Subject to entry of the Disclosure Statement Order and the Confirmation Order, this Agreement and each Ancillary Document to which each Seller is (or, upon its execution and delivery, will be) a party are, or upon their execution and delivery will be, the valid and binding obligations of such Seller and enforceable against such Seller in accordance with their respective terms, subject to the effects of bankruptcy, insolvency, reorganization, moratorium and similar Laws as well as to principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law).

4.5 <u>Liability for Brokers' Fees</u>. Other than Houlihan Lokey Capital, Inc., there is no investment banker, broker, finder or other intermediary which has been retained by or is authorized to act on behalf of any Seller who might be entitled to any fee, commission or expenses in connection with the transactions contemplated by this Agreement or any of the Ancillary Documents.

4.6 <u>Litigation</u>. Other than the Bankruptcy Cases or as specified on **Schedule 4.6**, no Claim (or any basis thereof) by any Governmental Authority or other Person (including expropriation or forfeiture proceedings) nor any legal, administrative or arbitration proceeding (or any basis thereof) is pending or, to the Sellers' Knowledge, threatened against any Acquired Interest or against any Seller relating to any Acquired Interest which, individually or in the aggregate, if determined or resolved adversely in accordance with the plaintiff's demands, (x) to the extent the representation is to the existence of any basis of any Claim or any legal, administrative or arbitration proceeding, would reasonably be expected to result, individually or in the aggregate, in a Material Adverse Effect and (y) otherwise, would reasonably be expected to be material to the Acquired Interests, individually or taken as a whole, or which in any manner challenges or seeks to prevent, enjoin, alter or materially delay the transactions contemplated by this Agreement.

4.7 <u>Governmental Approvals</u>. Except as set forth on **Schedule 4.7**, no Governmental Approval (other than the Disclosure Statement Order and the Confirmation Order) is required to authorize, or is otherwise required in connection with, (a) any Seller's valid execution and delivery by such Seller of this Agreement or any Ancillary Document to which such Seller is (or, upon its execution and delivery, will be) a party, (b) any Seller's performance of its obligations hereunder or thereunder or (c) the consummation of the transactions contemplated by this Agreement or any of the Ancillary Documents.

4.8 <u>Preferential Rights; Applicable Consents</u>.

(a) Except as set forth on **Schedule 4.8(a)**, none of the Acquired Interests is subject to a Preferential Right.

(b) Except as set forth on **Schedule 4.8(b)**, none of the Acquired Interests is subject to an Applicable Consent.

The inclusion of any Acquired Interest on **Schedule 4.8** shall not be construed as an admission by Buyer or Sellers that any preferential purchase right or similar right or Consent in any agreement

relating to such Acquired Interest (or any express exception thereto contained in such agreement) is (or is not) applicable to the transactions contemplated hereby.

4.9     Taxes.  Except as would not result, individually or in the aggregate, in a Material Adverse Effect and except as otherwise set forth on **Schedule 4.9**, (a) all Tax Returns required to be filed with respect to the Acquired Interests or any Hydrocarbon production therefrom (including Property-Related Taxes and Production Taxes) or by Fieldwood U.A. have been timely filed, and all such Tax Returns are true, complete and correct; (b) the Sellers have adequately accrued in accordance with GAAP, established adequate reserves for the payment of, and will timely pay, all Taxes which arise from or with respect to the Acquired Interests or any Hydrocarbon production therefrom or allocable thereto incurred in or attributable to all Pre-Closing Tax Periods (other than Taxes described in the preceding clause (a)); (c) all Taxes due and owing by the Sellers with respect to the Acquired Interests or any Hydrocarbon production therefrom (including with respect to Property-Related Taxes and Production Taxes) or by Fieldwood U.A. (whether or not shown on any Tax Return) have been paid, and no extension of time within which to file any such Tax Return is in effect; (d) there are no Encumbrances on any Acquired Interest; (e) no audits, investigations, examinations, audits, litigation, Claims or other proceedings are pending, or to the Sellers' Knowledge threatened in writing, against any Seller relating to the payment of Taxes (including Property-Related Taxes and Production Taxes) with respect to any Acquired Interests or with respect to Taxes for which Fieldwood U.A. may be liable; (f) there are no currently proposed or pending adjustments by any Governmental Authority in connection with any Tax Returns of any Seller pertaining to the Acquired Interests or of Fieldwood U.A.; (g) no waiver or extension of any statute of limitations has been granted or requested as to any Tax matter relating to any Acquired Interests or with respect to any Taxes for which Fieldwood U.A. may be liable, in each case, that is still in effect; (h) Fieldwood U.A. will not be required to include any item of income in, or exclude any item of deduction from, taxable income in any taxable period (or portion thereof) after Closing, as a result of any change in method of accounting, closing agreement, installment sale or receipt of any prepaid amount outside of the ordinary course of business, in each case, made or entered into prior to Closing; (i) no Governmental Authority responsible for the administration or imposition of Taxes in any jurisdiction in which a Seller or any of its Affiliates (in respect of the Acquired Interests) or Fieldwood U.A. has not filed a Tax Return has asserted in writing that such Seller, any of its Affiliates, or Fieldwood U.A., as the case may be, is subject to Tax or required to file a Tax Return in that jurisdiction; (j) Fieldwood U.A. has withheld and paid all Taxes required to have been withheld and paid in connection with amounts paid or owing to any employee, independent contractor, creditor, customer, shareholder or other third party; (k) Fieldwood U.A. has not been a member of any Company Group; (l) none of the Sellers or Fieldwood U.A. has engaged in a "***listed transaction***" within the meaning of Treasury Regulations Section 1.6011-4(b); (m) the Acquired Interests are not subject to, for federal income tax purposes, a partnership between any Seller and any other Person for which a partnership income tax return is required to be filed under Subchapter K of Chapter 1 of Subtitle A of the Code (other than a partnership for which an election to be excluded from such provisions is in effect pursuant to the provisions of Section 761 of the Code and the regulations thereunder); (n) Fieldwood U.A. is not, and does not own (directly or indirectly) stock or a warrant in, a corporation that is (or was at any time during the course of such ownership) a passive foreign investment company, as defined in Section 1297 of the Code; (o) Fieldwood U.A. is not a party to or bound by any Tax Sharing Agreement; and (p) **Schedule 4.9(p)** lists (A) the entity classification of Fieldwood U.A., Fieldwood Mexico and any Subsidiary thereof for U.S. federal income Tax purposes, as of the date hereof and as of the

Closing Date, and (B) each entity classification election and change in entity classification that has been made under Treasury Regulations Section 301.7701-3 with respect to Fieldwood U.A., Fieldwood Mexico and any Subsidiary thereof for U.S. federal income Tax purposes.

4.10    Well Status.  Except as set forth on **Exhibit C**, (a) the Sellers are the operators of that portion of the Lease(s) covering all Scheduled Wells; (b)  all Wells that are not currently producing Hydrocarbons in paying quantities have been plugged, abandoned and decommissioned, and all related salvage, site clearance and surface restoration and decommissioning operations have been completed, in accordance with all applicable Laws in all material respects; (c) no Scheduled Well has been permanently, or is currently temporarily, plugged and abandoned; and (d) there is no Well in respect of which any Seller or any of its Affiliates has received an order from any Governmental Authority requiring that such Well be plugged and abandoned (or re-plugged), other than a Well for which such plugging and abandonment (or re-plugging) requirements have been completely satisfied.  All Wells that have not been plugged, abandoned and decommissioned are listed on **Exhibit C**.

4.11    Compliance with Laws; Permits.  Except as would not reasonably be expected to result, individually or in the aggregate, in a Material Adverse Effect, (a) each Seller, and to the Sellers' Knowledge each Third Person operator of any Lease (or portion thereof), Subject Unit or Easement, is in compliance, and since January 1, 2018 has at all times complied, with all applicable Laws and all Permits necessary or required in each case in connection with the ownership and, with respect to each Acquired Interest operated by a Seller, operation of the Acquired Interests, including the Leases, Subject Units, Easements and Wells and the production, marketing and disposition of Hydrocarbons therefrom; and (b) with respect to each Acquired Interest, the Sellers and, to the Sellers' Knowledge, each Third Person operator of such Acquired Interest, if applicable, has all Permits necessary or required in connection with the ownership and operation of such Acquired Interest, and all such Permits are in full force and effect.  Since January 1, 2018, no Seller has received written notice from any Governmental Authority that any applicable Law or Permit has been violated or not complied with by any Seller.  With respect to Suspense Funds, each Seller is in compliance with applicable Laws in all material respects.  Except as would not reasonably be expected to result, individually or in the aggregate, in a Material Adverse Effect, Fieldwood U.A. and the Mexico JV are in compliance with applicable Laws.  Other than the Bankruptcy Cases, there is no judgment, decree, injunction, rule or order of any arbitrator or Governmental Authority outstanding against any Seller, Fieldwood U.A. or the Mexico JV that has had or would reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.  All Permits held by the Sellers that relate to the Assets are valid and in full force and effect and no Seller is in default under or in violation of any such Permit, except as would not reasonably be expected to result, individually or in the aggregate, in a Material Adverse Effect.

4.12    Environmental Matters.  Except as could not reasonably be expected to result, individually or in the aggregate, in a Material Adverse Effect or as set forth on **Schedule 4.12**, (a) each Seller, and to the Sellers' Knowledge each Third Person operator of any Acquired Interest, if applicable, has all Permits required under Environmental Laws in connection with the ownership and operation of the Acquired Interests, including the Field Assets, the production, marketing and disposition of Hydrocarbons therefrom and the ownership and use of the Office Assets and all such Permits are in full force and effect; (b) no Seller has received, and to the Sellers' Knowledge no Third Person operator has received, any written notice of violation, assessment or incident of non-

compliance or other communication that alleges any actual or potential non-compliance with or Liability under any Environmental Law or Permit required under Environmental Laws in connection with ownership or operations of the Acquired Interests, including the Field Assets and Office Assets; (c) no investigation, proceedings or other Claims resulting from any Environmental Law or Permit required under Environmental Laws is pending, or to the Sellers' Knowledge threatened in writing, against any Asset, (d) the Assets are in compliance in all respects with all applicable Environmental Laws, and (e) there has been no Release under or from any Asset or, to the Sellers' Knowledge, at any asset or property formerly owned, leased or operated by, or otherwise arising from the operations of any Seller or any of its Affiliates or predecessors, in violation of, or in a manner reasonably expected to give rise to Liability under, Environmental Laws or any Permit required under Environmental Laws. The Sellers have made available to Buyer, in written or electronic format, all environmental site assessments, studies and analyses in the possession or control of any Seller addressing potentially material Losses, Claims or obligations pertaining to Environmental Contaminants or Environmental Law in relation to the Acquired Interests.

4.13     _Payments_.  Except (x) as set forth on **Schedule 4.13** and (y) for the Suspense Funds listed on **Schedule 4.20**, each Seller has timely (a) paid all Lease Burdens due in respect of Hydrocarbons produced from or allocable to any Acquired Interests payable by the Sellers, (b) reported to applicable Governmental Authorities, to the extent required by applicable Law, Hydrocarbons produced from or allocable to any Lease, Subject Unit or Well required to be reported by the Sellers, and (c) paid all amounts owing by such Seller under any Easement or with respect to any Office Asset, except, in the case of this clause (c), as would not be reasonably expected to result, individually or in the aggregate, in a Material Adverse Effect.  No Seller has received written notice of any Claim that has not been resolved claiming that such Seller's disbursement of Lease Burdens or reporting of Hydrocarbon production with respect to the Acquired Interests is inaccurate, other than Claims relating to disbursements or reporting that are not, in the aggregate, material to the Acquired Interests taken as a whole.

4.14     _Material Contracts_.

(a)     Prior to the Execution Date, the Sellers made available to Buyer accurate and complete copies of all Material Contracts.  Except as set forth on **Schedule 4.14**, no Seller has delegated or otherwise transferred to any third party any of its material rights or obligations with respect to any Assigned Contract.  Except as set forth on **Schedule 4.14**, no Seller is a party to or bound by any of the following Contracts (other than any Contract that is an Excluded Asset or Retained Liability) (each, a "***Material Contract***"):

(i)     any Contract (excluding any purchase orders entered into in the ordinary course of business) relating to or used in connection with any Acquired Interest that could reasonably be expected to provide for either (A) annual payments by, or revenues to, the Sellers of $5,000,000 or more or (B) aggregate payments by, or revenues to, the Sellers of $10,000,000 or more;

(ii)     any Subject Unit Agreement;

(iii)    any Hydrocarbon purchase and sale, exchange, marketing, compression, fractionation, drilling, completion, gathering, transportation, processing, production handling, refining, treatment, storage, handling, chemicals, construction or similar Contract, in each case, that is not terminable by the Sellers without penalty on thirty (30) days' or less notice;

(iv)    any Contract to acquire, sell, lease, develop or otherwise dispose of or encumber any interest in any of the Acquired Interests after the Closing Date (other than sales of Hydrocarbons in the ordinary course of business);

(v)    any Contract with any individual person acting as an independent contractor or consultant which includes payment for services to such person in excess of $500,000 annually;

(vi)    any Contract relating to or used in connection with any Acquired Interests that limits the freedom of any Seller to engage in any line of business or in any area or to compete with any Person or which would so limit the freedom of Buyer or any of its Affiliates after the Closing Date, including any noncompetition agreement, area of mutual interest or other agreement;

(vii)    any Contract providing for any call upon, option to purchase, or similar rights with respect to the Acquired Interests or to the production therefrom or the processing thereof, or that is a dedication of production;

(viii)    any Contract relating to or used in connection with any Acquired Interest that constitutes an operating agreement, exploration agreement, joint development agreement, farmin agreement, plugging and abandonment agreement, balancing agreement, platform use agreement, farmout agreement, partnership agreement, participation agreement, joint venture agreement, or similar Contract;

(ix)    any Contract relating to or used in connection with any Acquired Interest involving any resolution or settlement or any actual or threatened Claim which imposes material continuing obligations on any Seller will not have been fully performed prior to the Closing Date;

(x)    any Contract relating to or used in connection with any Acquired Interest that requires the posting of a security deposit, letter of credit, performance bond or surety;

(xi)    any Contract relating to or used in connection with any Acquired Interest that is a seismic, engineering, geological or other geophysical acquisition agreement or license;

(xii)    any Contract pursuant to which a Seller (A) grants to a third party any license, right to use or covenant not to sue under any Owned Intellectual Property or (B) is granted by a third party any license, right to use or covenant not to sue under any Intellectual Property (excluding from <u>clause (B)</u>, (x) licenses for commercial off-the-shelf software that are generally available on non-discriminatory pricing terms which have an

aggregate annual cost of $50,000 or less and (y) the licenses and agreements listed on **Exhibit F**);

(xiii)   any lease or sublease for any personal property included in the Acquired Interests providing for annual rentals of $250,000 or more;

(xiv)   any lease or sublease of real property; and

(xv)   any Contract by which any Seller is obligated by virtue of a take or pay payment, advance payment, production payment or other similar payment or commitment, to deliver Hydrocarbons, or proceeds from the sale thereof, attributable to the Sellers' aggregate interest in the Assets at some future time without receiving payment therefor at or after the time of delivery.

(b)   Each Material Contract is in full force and effect and a valid and binding obligation of the Seller(s) party thereto and, to the Sellers' Knowledge, the other parties thereto, in accordance with its terms and conditions, except as such validity and enforceability may be limited by (i) bankruptcy, insolvency, or other similar Laws affecting the enforcement of creditors' rights generally, (ii) equitable principles of general applicability (whether considered in a proceeding at law or in equity), and (iii) the obligation to pay Cure Costs.  No event has occurred which, with the passage of time or the giving of notice, or both, would constitute a default under or a violation of any Material Contract or would cause the acceleration of any right or obligation of any Seller or, to the Sellers' Knowledge, any other party thereto or the creation of an Encumbrance upon any Acquired Interest, except for such events that would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.  No Seller nor, to the Sellers' Knowledge, any other party to any Material Contract has given written notice of any action to terminate, cancel, rescind, repudiate or procure a judicial reformation of any such Material Contract or any provision thereof.

(c)   Prior to the Execution Date, the Sellers made available to Buyer accurate and complete copies of all Leases and Easements.  Except as set forth on **Schedule 4.14(c)**, no Seller is a party to or bound by any Lease or Easement (other than any Lease or Easement that is an Excluded Asset or Retained Liability).

4.15   Imbalances; Prepayments.   Except as set forth on **Schedule 4.15**, as of the Execution Date, (x) no Seller has a Claim constituting an Acquired Interest and (y) no Seller is subject to any Liability constituting an Assumed Liability, with respect to any Imbalance.

4.16   AFEs; Cash Calls.   Except as set forth on **Schedule 4.16(a)**, no authorities for expenditure or other commitments to make capital expenditures relating to any Acquired Interest for which the Sellers' liability is in excess of $200,000 is outstanding.  Except as set forth on **Schedule 4.16(b)**, no cash calls or payments due from any Seller under the terms of the Assigned Contracts or otherwise relating to the Acquired Interests are past due by more than thirty (30) days (excluding amounts being disputed in good faith).

4.17    Labor and Employment Matters.

(a)     The Sellers have provided Buyer's legal and financial advisors, on a confidential basis and for professional eyes only, with a true and complete list of the following information for all employees of the Sellers and of each of their Affiliates (such employees from time to time, and whether or not listed, the "**Seller Employees**"), including name, title, hire date, location, whether full- or part-time, whether active or on leave (and, if on leave, the nature of the leave and the expected return date), whether exempt from the Fair Labor Standards Act of 1938, annual salary or wage rate, most recent annual bonus received, and current annual bonus opportunity (such list, the "**Employee List**"), which list may not be shared with any debt or equity holders of Buyer.  In addition, the Sellers have provided Buyer with the Employee List, but excluding each Seller Employee's name and title, which can be shared with Buyer's debt and equity holders, the DIP Lenders (as such term is defined in the Plan) and the FLTL Lenders (as such term is defined in the Plan).

(b)     The Sellers and each of their Affiliates are, and for the last three (3) years, have been, in compliance in all material respects with applicable Laws relating to labor and employment, including those relating to worker classification, labor management relations, wages and hours (including classification of independent contractors and exempt and non-exempt employees), overtime, collective bargaining, unemployment, workers' compensation, equal employment opportunity, discrimination, civil rights, affirmative action, work authorization, immigration, safety and health, continuation coverage under group health plans, information privacy and security and payment of withholding of taxes and social security.

(c)     For the last three (3) years, (i), no allegations of sexual harassment or other sexual misconduct have been made against any current or former employee or independent contractor of the Sellers or any of their Affiliates who has three or more direct reports, (ii) there are and have been no actions pending or, to the Sellers' Knowledge, threatened in writing related to any allegations of sexual harassment or other sexual misconduct by any current or former employee or independent contractor of the Sellers or any of their Affiliates who has three or more direct reports, and (iii) neither the Sellers nor any of their Affiliates have entered into any settlement agreements related to allegations of sexual harassment or other sexual misconduct by any current or former employee or independent contractor of the Sellers or any of their Affiliates.

(d)     There are no collective bargaining agreements to which any Seller or any Affiliate of any Seller is a party relating to any Seller Employee and, to the Sellers' Knowledge, threatened.  No application for certification of a collective bargaining agent involving any Seller and any Seller Employee is pending.  With respect to the Seller Employees, there are no (i) strikes, slowdowns, picketing or work stoppage by any Seller Employee pending or, to the Sellers' Knowledge, threatened or (ii) except as would not reasonably be expected to result in a material Liability, unfair labor practice charges or other employment or labor complaints pending or, to the Sellers' Knowledge, threatened in writing against any Seller or any of their Affiliates before the National Labor Relations Board or any other Governmental Authority or any current union representation questions involving any current or former employees or independent contractors of any Seller or any of their Affiliates.

4.18    Employee Benefits.

(a)    **Schedule 4.18** sets forth a true and complete list of each material (i) deferred compensation plan, (ii) incentive compensation plan, (iii) equity compensation plan, (iv) "*welfare*" plan, fund or program (within the meaning of Section 3(1) of ERISA), (v) "*pension*" plan, fund or program (within the meaning of Section 3(2) of ERISA), (vi) "*employee benefit plan*" (within the meaning of Section 3(3) of ERISA), (vii) employment (other than offer letters entered into in the ordinary course of business that do not provide for severance, transaction or retention bonuses or any guaranteed payments), termination, severance or "*change in control*" agreement and (viii) other employee benefit plan, fund, program, agreement or arrangement, in each case, that is sponsored, maintained or contributed to or required to be contributed to by any Seller or by any trade or business, whether or not incorporated, that together with any Seller would be deemed a "*single employer*" within the meaning of Section 4001(b) of ERISA (an "*ERISA Affiliate*"), or to which any Seller or any ERISA Affiliate is party, for the benefit of any Seller Employee (each an "*Employee Plan*").  Each Employee Plan that Buyer or one of its Affiliates shall assume as of the Closing will be so noted on **Schedule 4.18** (each an "*Assumed Employee Plan*").

(b)    None of the Sellers nor any of their Affiliates or ERISA Affiliates (nor any predecessor of any such entity) sponsors, maintains, administers or contributes to (or has any obligation to contribute to), or has in the past six (6) years sponsored, maintained, administered or contributed to (or had any obligation to contribute to), or has or is reasonably expected to have any direct or indirect Liability with respect to, any plan subject to Title IV of ERISA, including any "*multiemployer plan*" (as defined in Section 3(37) of ERISA or any plan described in Section 413 of the Code).  No Assumed Employee Plan is a multiple employer welfare arrangement (within the meaning of Section 3(40) of ERISA).

(c)    Each Assumed Employee Plan that is intended to be qualified under Section 401(a) of the Code has received a favorable determination letter or opinion, is entitled to rely on an opinion letter from the IRS or has applied to the IRS for such a letter within the applicable remedial amendment period or such period has not expired and, to the Sellers' Knowledge, no circumstances exist that would reasonably be expected to result in the loss of such qualification.

(d)    No Assumed Employee Plan provides for any post-employment or post-retirement medical, dental, disability, hospitalization, life or similar benefits (whether insured or self-insured) to any current or former employee of the Sellers (other than coverage mandated by applicable Law, including COBRA).

(e)    Each Employee Plan has been maintained, funded and administered in compliance with its terms and all applicable Law, including ERISA and the Code, except where the failure to be so operated would not reasonably be expected to result in a material Liability. There is no action, suit, investigation, audit, proceeding or claim (other than routine claims for benefits) pending against or, to the Sellers' Knowledge, threatened against or involving any Employee Plan before any court or arbitrator or any Governmental Authority, including the IRS, the Department of Labor or the Pension Benefit Guaranty Corporation, that would reasonably be expected to result in a material Liability.

(f)     Neither the execution of this Agreement nor the consummation of the transactions contemplated hereby (either alone or together with any other event) will (i) entitle any current or former employee or independent contractor to any material payment or benefit, including any bonus, retention, severance, retirement or job security payment or benefit, (ii) accelerate the time of payment or vesting or trigger any payment or funding (through a grantor trust or otherwise) of compensation or benefits under, or increase the amount payable or trigger any other obligation under, any Employee Plan with respect to any current or former employee or independent contractor or (iii) result in the payment of any amount that would subject any current or former employee or independent contractor to excise taxes under Section 4999 of the Code.

4.19     <u>Non-Consent Operations</u>.  Except as set forth on **<u>Schedule 4.19</u>**, no operations are being conducted or have been conducted on any Field Assets with respect to which any Seller has elected, or been deemed, to be a non-consenting party under the applicable operating agreement and with respect to which all of such Seller's rights have not yet reverted to it.

4.20     <u>Suspense Funds</u>.  **<u>Schedule 4.20</u>** sets forth the amount of all Suspense Funds as of the date set forth therein.

4.21     <u>Payout Balances</u>.  To the Sellers' Knowledge, **<u>Schedule 4.21</u>** contains a list of the estimated status of any "*payout*" balance (on a gross Working Interest basis for all Working Interest owners affected thereby), as of the date set forth on such Schedule, for each Well, Lease or Subject Unit that is subject to a reversion or other adjustment at some level of cost recovery or payout.

4.22     <u>Title to Acquired Interests</u>.

(a)     The Sellers: (i) with respect to each Lease listed on **<u>Exhibit A</u>**, hold pursuant to such Lease a valid interest in all or a portion of the oil and gas interests leased pursuant to such Lease, (ii) with respect to each Easement listed on **<u>Exhibit B</u>**, have a valid easement or other limited property interest in such Easement and (iii) with respect to each Well listed on **<u>Exhibit C</u>**, hold pursuant to one or more of the Leases a valid interest in all or a portion of the oil and gas produced from such Well, in each case, free and clear of any Encumbrances (other than (x) Permitted Encumbrances and (y) as would not be material to such Acquired Interest).  For the avoidance of doubt, the Sellers do not make any representations or warranties pursuant to the preceding sentence with respect to holding any specific net revenue interest or working interest in any of the Wells or Leases.  Except for the Encumbrances described on **<u>Schedule 4.22</u>**, the Sellers have good and valid title to all Acquired Interests other than the Wells, Leases, Easements and Subject Units, and are the record and beneficial owners of the Fieldwood U.A. Interests and the JV Interests, in each case free and clear of any Encumbrances and any other limitation or restriction (including any restriction on the right to vote, sell or otherwise dispose of the Fieldwood U.A. Interests or the JV Interests), other than Permitted Encumbrances (except that the Fieldwood U.A. Interests and the JV Interests shall not be subject to any Permitted Encumbrances), in each case except as would not be material to such Acquired Interest.

(b)     No Affiliate of Fieldwood that is not a Seller owns any asset, property or right that is an Acquired Interest or would have been an Acquired Interest if such Affiliate had been a Seller hereunder.

29

(c)     The Acquired Interests constitute all of the property and assets used or held for use in the business of the Sellers as it relates to the ownership and operation of the Leases and are adequate to conduct the business of the Sellers as it relates to the ownership and operation of the Leases as currently conducted.

(d)     Except as set forth on **Schedule 4.22(d)**, no Seller or any of its Affiliates owns any real property.

4.23     <u>Insurance</u>.  **Schedule 4.23** sets forth a true and complete list of all policies of insurance held by or maintained by the Sellers or any of their Affiliates related to any Acquired Interests or the Seller Employees, including the type of policy, the limits of the coverage and any deductible or self-retention limit with respect thereto.  Such policies of insurance are in full force and effect.  Except as set forth on **Schedule 4.23**, no Seller has received, since January 1, 2020, any written notice from any insurer under any insurance policy applicable to the Acquired Interests or the Seller Employees disclaiming or limiting coverage with respect to any particular material claim or such policy in general or canceling or amending any such policy.  All premiums payable under all such insurance policies have been timely paid and each Seller has otherwise complied in all material respects with the terms and conditions of all such insurance policies.  To the Knowledge of the Sellers, no termination of, material non-ordinary course premium increase with respect to, or material alteration of coverage under, any of such policies or bonds has been threatened.

4.24     <u>Related Party Transactions</u>.  Except as set forth on **Schedule 4.24**, (a) there are no Assigned Contracts by and between any Seller and (i) any Affiliates of, or holder of five percent (5%) or more of the equity of, any Seller, (ii) any director or officer of any Seller or of any Person referenced in <u>clause (i)</u>, or (iii) any "***associate***" or "***immediate family***" member (as such terms are respectively defined in Rule 12b-2 and Rule 16a-1 of the Securities Exchange Act of 1934) of any Person referenced in <u>clause (i)</u> or <u>(ii)</u> (the Persons referenced in <u>clauses (i)</u>, <u>(ii)</u> and <u>(iii)</u> collectively, the "***Seller Related Parties***") and (b) no Seller has otherwise entered into any transactions or other arrangements with any Seller Related Parties that will be binding on Buyer or the Acquired Interests after the Closing Date.

4.25     <u>Intellectual Property</u>.

(a)     **Schedule 4.25(a)** contains a true and complete list of each of the issuances, registrations and applications for issuance or registration included in the Owned Intellectual Property, specifying as to each such item, as applicable, (i) the owner of such item, (ii) each jurisdiction in which such item is issued or registered or in which any application for issuance or registration has been filed, (iii) the respective issuance, registration and/or application number of such item and (iv) the date of application and issuance or registration of such item.

(b)     The Sellers are the sole and exclusive owners of all Owned Intellectual Property, in each case free and clear of any Encumbrance (except Permitted Encumbrances).  The Sellers own or have a valid and enforceable license or other right to use all Transferred Intellectual Property, and the Transferred Intellectual Property is all of the Intellectual Property (except Trademarks) necessary for the conduct of, or used or held for use in, the business of the Sellers as it relates to the Acquired Interests as currently conducted.

(c)     There exist no restrictions on the Sellers' disclosure, use, license or transfer of the Owned Intellectual Property, and the consummation of the transactions contemplated by this Agreement will not alter, encumber, impair or extinguish any Owned Intellectual Property or the Sellers' rights under any material Licensed Intellectual Property or impair the right of the Sellers to develop, use, sell, license or otherwise dispose of, or to bring any action for the infringement, misappropriation or other violation of, any Owned Intellectual Property.

(d)     The Sellers have not infringed, misappropriated or otherwise violated any Intellectual Property of any Person.  There is no Claim pending or threatened in writing, in each case, against any Seller (i) challenging or seeking to deny or restrict, the rights of any Seller in any of the Transferred Intellectual Property, (ii) alleging that any Transferred Intellectual Property is invalid or unenforceable, (iii) alleging that the use of any of the Transferred Intellectual Property or any services provided, processes used or products manufactured, used, imported or sold by any Seller, misappropriate, infringe or otherwise violate any Intellectual Property of any Person or (iv) otherwise alleging that any Seller has infringed, misappropriated or otherwise violated any Intellectual Property of any Person.

(e)     The Sellers have taken commercially reasonable steps to maintain, enforce and protect the Owned Intellectual Property.  None of the issuances or registrations included in the Owned Intellectual Property has been adjudged invalid or unenforceable in whole or part, all issuances and registrations included in the Owned Intellectual Property are valid, enforceable, in full force and effect and subsisting, and all registration, maintenance and renewal fees applicable to such issuances and registrations that are currently due have been paid and all documents and certificates related to such items and required to be filed with the relevant Governmental Authority for the purposes of maintaining such items have been filed with the relevant Governmental Authority.

(f)     To the Sellers' Knowledge, no Person has infringed, misappropriated or otherwise violated any material Owned Intellectual Property.  The Sellers have taken commercially reasonable steps in accordance with normal industry practice to maintain the confidentiality of all material Owned Intellectual Property the value of which to any of the Sellers is contingent upon maintaining the confidentiality thereof and no such material Owned Intellectual Property has been disclosed other than to employees, representatives, agents or partners of the Sellers or any other Persons, in each case, who are bound by written and enforceable confidentiality agreements.

(g)     The Sellers have appropriate procedures in place designed to provide that all material Intellectual Property conceived or developed by employees performing their duties for any Seller, and by Third Persons performing research and development for any Seller, have been assigned to such Seller, as applicable.  To the extent that any material Owned Intellectual Property has been developed or created by any Third Persons (including any current or former employee) for any Seller, such Seller has a written agreement with such Third Persons with respect thereto, which provides that such Seller either (i) has obtained ownership of and is the sole and exclusive owner of or (ii) has obtained a valid right to exploit, sufficient for the conduct of its business as it relates to the Acquired Interests, as currently conducted, such material Owned Intellectual Property.

(h)    The Seller IT Assets operate and perform in a manner that permits each Seller to conduct its business as it relates to the Acquired Interests as currently conducted, and the Sellers have taken commercially reasonable actions, consistent with current industry standards, to protect the integrity and security of the Seller IT Assets (and the confidentiality and security of all information and transactions stored or contained therein or transmitted thereby) against unauthorized use, access, interruption, modification or corruption, including the implementation of commercially reasonable (i) data backup, (ii) disaster avoidance and recovery procedures, (iii) business continuity procedures and (iv) encryption and other security protocol technology.  There has been no unauthorized use, access, interruption, modification or corruption of any Seller IT Assets that had a material adverse impact on the Sellers.

(i)    The Sellers have at all times materially complied with all applicable Laws, policies, procedures and contractual and all other obligations governing the collection, use, storage, processing, disclosure, protection, or security of Personal Information collected, used, stored, transferred or processed by or on behalf of any Seller (collectively, the "***Data Obligations***").  There has been no material loss, theft, security breach or unauthorized or unlawful disclosure or acquisition of any such Personal Information. No Claim has been asserted or, to the Sellers' Knowledge, threatened in writing, in each case, against any Seller alleging a violation of any Data Obligation.  For purposes of this Section 4.25(b), "***Personal Information***" means, in addition to any definition for any similar term (e.g., "personal data" or "personally identifiable information") provided by applicable Law, all information that identifies or can reasonably be used to identify an individual person.

4.26    Undue Influence.  In the past five (5) years, in connection with the ownership or operation of the business of the Sellers as it relates to the Acquired Interests, neither any Seller nor, to the Sellers' Knowledge, any director, officer, agent, employee or Affiliate, in each case, of any Seller, has taken any action, directly or indirectly, with respect to the business of the Sellers as it relates to the Acquired Interests that would result in a material violation of the Foreign Corrupt Practices Act of 1977 and the rules and regulations thereunder (the "***FCPA***") or any anti-corruption or anti-bribery laws, export control laws or sanctions issued or promulgated by any Governmental Authority.  In the past five (5) years, each Seller, and, to the Sellers' Knowledge, their respective Affiliates, have conducted the business of the Sellers as it relates to the Acquired Interests in compliance with the FCPA and all anti-corruption and anti-bribery laws, export control laws and sanctions issued or promulgated by any Governmental Authority in all material respects.

4.27    No Undisclosed Material Liabilities.  Except as set forth on **Schedule 4.27**, there are no Liabilities of or relating to the business of the Sellers as it relates to the ownership or operation of the Acquired Interests that would constitute Assumed Liabilities (without taking into account any modifications requested by Sellers to the Co-Owned Assets, Other Assets or Assumed Liabilities after the Execution Date) that would be required by GAAP to be disclosed on financial statements of the Sellers as of the Execution Date, other than Liabilities (a) reflected or disclosed in the consolidated balance sheet of the Sellers for the fiscal quarter ended September 30, 2020 ("***Balance Sheet Date***"), (b) incurred in the ordinary course of business since the Balance Sheet Date (excluding any breaches of Law or any Lease, Easement or Contract), (c) disclosed in any materials filed with the Bankruptcy Court prior to the Execution Date in connection with the Bankruptcy Cases, (d) set forth on the Disclosure Schedules or (e) that are not material, individually or in the aggregate, to the Acquired Interests.

4.28    Absence of Certain Changes.

(a)    Since the Balance Sheet date through the Execution Date, (i) except as authorized by the Bankruptcy Court prior to the date hereof, including as expressly contemplated by any orders entered in the Bankruptcy Cases from and after the Petition Date through the date hereof, the Acquired Interests have been owned and operated in the ordinary course of business in all material respects and (ii) except as disclosed on the Financial Statements, there has not been a Material Adverse Effect.

(b)    From January 1, 2020 through the Execution Date, except as set forth on **Schedule 4.28(b)**, or as expressly contemplated by any orders entered in the Bankruptcy Cases from and after the Petition Date, the Sellers have not:  (A) purchased or otherwise acquired any material properties or assets (tangible or intangible) that constitute Acquired Interests or sold, leased, licensed, transferred, abandoned or otherwise disposed of any material assets that would otherwise have constituted Acquired Interests, except for (x) purchases of materials, and sales of Hydrocarbons and surplus inventory, in each case, in the ordinary course of business and (y) purchases or sales not contemplated by the preceding clause (x) that involved consideration of less than $5,000,000 individually, and $10,000,000 in the aggregate, (B) removed any material Inventory or other Acquired Interests from any of the properties or facilities that will transfer to Buyer as a result of the transactions contemplated hereby, other than in the ordinary course of business or (C) suffered any damage or destruction to or loss of any Acquired Interest whether or not covered by insurance where the value of such damage, destruction or loss (measured by cost to the Sellers of repairing or replacing the applicable Acquired Interest) was greater than $1,000,000.

4.29    Equipment and Fixed Assets.  Except as would not reasonably be expected to result, individually or in the aggregate, in a Material Adverse Effect, all Inventory is in good operating condition and state of repair for the purposes for which they are used by the Sellers in the operation of its business, normal wear and tear excepted.

4.30    Operatorship.  The Sellers have not received written notice of any vote to have the Sellers removed as the named operator of any of the Field Assets for which any Seller is currently designated as the operator and for which such vote is pending as of the Execution Date.  From September 30, 2013 through the Execution Date, no Seller has been removed as the named operator of any material Field Asset.

4.31    Joint Venture.

(a)    Fieldwood U.A. is an entity duly formed and validly existing under the Laws of the Netherlands.  To the Sellers' Knowledge, (i) Fieldwood Mexico is an entity duly formed and validly existing under the Laws of the Netherlands and (ii) each of the Subsidiaries of Fieldwood Mexico is an entity duly formed and validly existing under the Laws of its jurisdiction of incorporation.  Fieldwood U.A. is, and, to the Sellers' Knowledge, the Mexico JV is qualified to do business and is in good standing under the Laws of each jurisdiction where such qualification is necessary, except for those jurisdictions where failure to be so qualified would not, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect.  Fieldwood U.A.

has, and, to the Sellers' Knowledge, the Mexico JV has all requisite power and authority required to own and operate their properties and to carry on their business as now conducted.

(b)     Prior to the date hereof, the Sellers have made available to Buyer all organizational documents and equity holder, stockholder, operating, membership, voting and other similar agreements of or relating to Fieldwood U.A. and, to the Sellers' Knowledge, the Mexico JV (the "***Organizational Documents***").  None of any Seller or, to the Sellers' Knowledge, any other Person, is in material breach of any Organizational Document.  Other than the Organizational Documents, there are no agreements to which any Seller is a party with respect to the voting of any JV Interests or Fieldwood U.A. Interests or which restrict the transfer of any JV Interests or Fieldwood U.A. Interests.

(c)     To the Sellers' Knowledge, Fieldwood Mexico has the following Subsidiaries, each of which are incorporated in Mexico: (1) Fieldwood Energy de Mexico, S. de R.L. de C.V.; (2) Fieldwood Energy E&P Mexico, S. de R.L. de C.V.; and (3) Fieldwood Energy Services de Mexico, S. de R.L. de C.V.  To the Sellers' Knowledge, as of the Execution Date, the equity interests of: (i) Fieldwood Mexico consists of (A) class A shares, (B) class B shares and (C) class D shares, (ii) Fieldwood Energy de Mexico, S. de R.L. de C.V. consists of two (2) equity interests (*partes sociales*), (iii) Fieldwood Energy E&P Mexico, S. de R.L. de C.V. consists of two (2) equity interests (*partes sociales*) and (iv) Fieldwood Energy Services de Mexico, S. de R.L. de C.V. consists of two (2) equity interests (*partes sociales*) (the equity interests of the Mexico JV collectively, the "***JV Shares***").   The equity interests of Fieldwood Mexico and each of its Subsidiaries that are held by the Sellers are listed on **Schedule 4.31(c)**.  To the Sellers' Knowledge, (x) the equity interests of Fieldwood Mexico, and (y) the issued and outstanding JV Shares are held of record by the Persons listed on **Schedule 4.31(c)**.

(d)     The outstanding equity interests of Fieldwood U.A., as of the Execution Date, consist of the Fieldwood U.A. Interests, and are held of record by the Persons listed on **Schedule 4.31(d)**.

(e)     All of the issued and outstanding Fieldwood U.A. Interests and, to the Sellers' Knowledge, JV Interests have been duly authorized and validly issued, and are fully paid and nonassessable and were not issued in violation of any rights of first refusal, preemptive rights or similar rights.  Except as set forth on **Schedule 4.31(c)** and **Schedule 4.31(d)**, (i) all of the outstanding securities or other similar ownership interests of any class or type of or in Fieldwood U.A. are held by Fieldwood Offshore LLC and Fieldwood, (ii) there are no outstanding securities or other similar ownership interests of any class or type of or in Fieldwood U.A. or, to the Sellers' Knowledge, the Mexico J.V. and (iii) there are no outstanding options, warrants, calls, purchase rights, subscription rights, exchange rights or other rights, convertible exercisable or exchangeable securities, "***phantom***" equity rights, stock appreciation rights, equity-based performance units, or similar agreements, commitments or undertakings of any kind pursuant to which Fieldwood U.A. or, to the Sellers' Knowledge, the Mexico JV is or may become obligated to (i) issue, deliver, transfer, sell or otherwise dispose of, or pay an amount relating to, any securities or other similar ownership interests of the Mexico JV or Fieldwood U.A., or any securities convertible into or exercisable or exchangeable for any securities or other ownership interests of the Mexico JV or Fieldwood U.A., or (ii) redeem, purchase or otherwise acquire any outstanding securities of the Mexico JV or Fieldwood U.A.

(f)     Fieldwood U.A. has no employees.  Fieldwood U.A. has (i) no assets other than the JV Interests held by Fieldwood U.A. and (ii) except as set forth on **Schedule 4.31(f)**, no non *de minimis* Liabilities other than those Liabilities incident to the ownership of the JV Interests held by Fieldwood U.A. (but not any Liabilities with respect to any breach of Law or Contract with respect to the ownership of such JV Interests).

4.32     Plan of Merger.  The FWE I Oil and Gas Properties (excluding the assets listed on Exhibit I-K of the Plan of Merger) include solely "Legacy Apache Properties" (as such term is defined in the Apache Term Sheet (as such term is defined in the Restructuring Support Agreement)) and no other asset.  As of the Execution Date, there is no asset listed on Exhibit I-K of the Plan of Merger that is related to, used or held for use in connection with or held as inventory in connection with, any Lease, Easement or Well listed on **Exhibit A**, **Exhibit B** or **Exhibit C**.

4.33     Exhibit X-1.  **Exhibit X-1** sets forth an estimate of estimated Working Capital Assets (excluding clause (b) of the definition thereof) and Working Capital Liabilities (excluding clause (b) of the definition thereof) assuming an Effective Time occurring on June 30, 2021, which was prepared at the direction of the Sellers.  To the Sellers' Knowledge, when prepared in February 2021, the information in **Exhibit X-1** reflected a reasonable estimate of Working Capital Assets (excluding clause (b) of the definition thereof) and Working Capital Liabilities (excluding clause (b) of the definition thereof) assuming an Effective Time occurring on June 30, 2021, subject to (a) the assumptions described therein and (b) omission of liabilities for accrued payroll. To the Sellers' Knowledge, (x) the Fieldwood Energy I Closing Accounts Receivable do not include or exclude assets that would have resulted in a material deviation of the net amount of the Working Capital Assets described in **Exhibit X-1** if such assets had been estimated and reflected in **Exhibit X-1** when prepared and (y) the Fieldwood Energy I Closing Accounts Payable do not include or exclude liabilities that would have resulted in a material deviation of the net amount of the Working Capital Liabilities described in **Exhibit X-1** if such liabilities had been estimated and reflected in **Exhibit X-1** when prepared (assuming that all, or substantially all, pre-petition payables are excluded from the calculation of Fieldwood Energy I Closing Accounts Payable as obligations satisfied, compromised (to the extent compromised), settled, released or discharged pursuant to the Plan and Confirmation Order, including by being paid as Cure Costs), in the case of each of clause (x) and clause (y), after taking into account duplication between the accounts described in **Exhibit X-1** and in the definitions of Working Capital Assets and Working Capital Liabilities, on the one hand, and Fieldwood Energy I Closing Accounts Receivable and Fieldwood Energy I Closing Accounts Payable, on the other hand.

## ARTICLE V
## BUYERS' REPRESENTATIONS

Each of Buyer and Buyer 2 represents and warrants to the Sellers, subject to the Disclosure Schedules (subject to Section 12.15), as follows:

5.1     Organization; Standing; Capitalization.

(a)     Each of Buyer and Buyer 2 is a limited liability company duly organized, validly existing and in good standing under the laws of the State of Delaware.  Each of Buyer and

Buyer 2 has all requisite power and authority and all governmental licenses, authorizations, permits, consents and approvals required to carry on its business as now conducted.

(b)     At the Closing, (i) all of the issued and outstanding **[membership interests]** of Buyer are held by [_____], a [_____] ("***Buyer Intermediate***"), (ii) all of the issued and outstanding **[membership interests]** of Buyer 2 are held by Buyer, (iii) all of the issued and outstanding **[membership interests]** of Buyer Intermediate are held by [_____], a [_____] ("***Buyer Parent***") and (iv) all of the issued and outstanding [membership interests] of Buyer Parent are held by [_____], a [_____] ("***Buyer Grandparent***").[6]

(c)     At the Closing, except as set forth on **Schedule 5.1(c)**, the authorized and issued equity interests of Buyer Grandparent (the "***Buyer Grandparent Equity Interests***") shall consist solely of (i) the New Equity Interests to be issued pursuant to Section 4.4(a)(i) of the Plan, (ii) the Subscription Rights (including any New Equity Interests issued in connection with the exercise thereof), (iii) Backstop Commitment Premium Equity Interests (as defined in the Plan), (iv) the GUC Warrants, (v) the SLTL Warrants and (vi) the New Money Warrants, in each case, issued pursuant to, and in accordance with, the Plan.  At the Closing, all of the issued and outstanding Buyer Grandparent Equity Interests, and all of the membership interests of Buyer Parent, Buyer, Buyer 2 and Buyer Intermediate, will have been duly authorized and validly issued, and will be fully paid and nonassessable and not issued in violation of any rights of first refusal, preemptive rights or similar rights.  As of the Closing Date, except as set forth in Section 5.1(b) and the first sentence of this Section 5.1(c), there are no issued and outstanding (i) securities or other similar ownership interests of any class or type of or in Buyer, Buyer 2, Buyer Intermediate, Buyer Parent or Buyer Grandparent or (ii) options, warrants, calls, purchase rights, subscription rights, exchange rights or other rights, convertible exercisable or exchangeable securities, "***phantom***" equity rights, stock appreciation rights, equity-based performance units, or similar agreements, commitments or undertakings of any kind pursuant to which Buyer, Buyer 2, Buyer Intermediate, Buyer Parent or Buyer Grandparent is or may become obligated to (A) issue, deliver, transfer, sell or otherwise dispose of, or pay an amount relating to, any securities or other similar ownership interests of Buyer, Buyer 2, Buyer Intermediate, Buyer Parent or Buyer Grandparent or any securities convertible into or exercisable or exchangeable for any securities or other ownership interests of Buyer, Buyer 2, Buyer Intermediate, Buyer Parent or Buyer Grandparent, or (B) redeem, purchase or otherwise acquire any outstanding securities of Buyer, Buyer 2, Buyer Intermediate, Buyer Parent or Buyer Grandparent.[7]

(d)     As of immediately following the Closing, the only Liabilities of Buyer, Buyer 2, Buyer Intermediate and Buyer Parent will be: (x) liabilities under the Exit Facilities (as defined in the Plan), (y) in the case of Buyer and Buyer 2, the Assumed Liabilities and (z) Liabilities incurred in connection with this Agreement or any of the Ancillary Documents or any of the transactions contemplated hereunder or thereunder (including with respect to any surety bonds).

---

[6] Note to Draft: To be confirmed prior to signing.

[7] Note to Draft: To be confirmed prior to signing.

5.2     Power.  Each of Buyer and Buyer 2 has the requisite power and authority to execute and deliver this Agreement and the Ancillary Documents to which it is a party and perform its obligations under this Agreement and such Ancillary Documents.

5.3     Non-Contravention.    Buyer's execution, delivery and performance of this Agreement and each Ancillary Document to which Buyer is (or, upon its execution and delivery, will be) a party and the performance of the transactions contemplated herein and therein will not (a) conflict with or result in a breach of any provisions of the organizational documents of Buyer or (b) assuming compliance with matters referred to in Section 5.7, violate any material Law applicable to Buyer.  Buyer 2's execution, delivery and performance of this Agreement and each Ancillary Document to which Buyer 2 is (or, upon its execution and delivery, will be) a party and the performance of the transactions contemplated herein and therein will not (x) conflict with or result in a breach of any provisions of the organizational documents of Buyer 2 or (y) assuming compliance with matters referred to in Section 5.7, violate any material Law applicable to Buyer 2.

5.4     Authorization and Enforceability.  Each of Buyer and Buyer 2 has full capacity, power and authority to enter into and perform this Agreement, each Ancillary Document to which Buyer and Buyer 2, as applicable, is (or, upon its execution and delivery, will be) a party and the transactions contemplated herein and therein.  The execution, delivery and performance by each of Buyer and Buyer 2 of this Agreement and each Ancillary Document to which Buyer and Buyer 2, as applicable, is (or, upon its execution and delivery, will be) a party have been duly and validly authorized and approved by all necessary organizational action of Buyer and Buyer 2, as applicable.  This Agreement and each Ancillary Document to which Buyer and Buyer 2 is (or, upon its execution and delivery will be) a party are, or upon their execution and delivery will be, the valid and binding obligations of Buyer and Buyer 2, as applicable, and enforceable against Buyer and Buyer 2, as applicable, in accordance with their respective terms, subject to the effects of bankruptcy, insolvency, reorganization, moratorium and similar Laws as well as to principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law).

5.5     Liability for Brokers' Fees.   Other than Rothschild & Co. US Inc. and Intrepid Partners, LLC, there is no investment banker, broker, finder or other intermediary which has been retained by or is authorized to act on behalf of Buyer or Buyer 2 who might be entitled to any fee, commission or expenses in connection with the transactions contemplated by this Agreement or any of the Ancillary Documents.

5.6     Litigation.  Neither any Claim by any Governmental Authority or other Person nor any legal, administrative or arbitration proceeding is pending or, to Buyer's Knowledge, threatened against Buyer or Buyer 2 which in any manner challenges or seeks to prevent, enjoin, alter or materially delay the transactions contemplated by this Agreement.

5.7     Governmental and Third Person Consents.  Except as set forth on **Schedule 5.7** no Governmental Approval is required to authorize, or is otherwise required in connection with, (a) Buyer's or Buyer 2's valid execution and delivery of this Agreement or any Ancillary Document to which Buyer or Buyer 2 is (or, upon its execution and delivery, will be) a party, (b) Buyer's or

Buyer 2's performance of their respective obligations hereunder or thereunder or (c) the consummation of the transactions contemplated by this Agreement and the Ancillary Documents.

5.8    Financial Capability.  At or prior to the Closing, Buyer has provided to the Sellers a true and complete copy of the [Direction Letter.][8]

5.9    Qualification.  At the Closing, Buyer will have met the BOEM Qualifications.

5.10    Bankruptcy.  There are no bankruptcy, reorganization, receivership or arrangement proceedings pending against or to Buyer's Knowledge, threatened against Buyer or Buyer 2.

5.11    Investor Status; Investigation.

(a)    To the extent any Acquired Interests constitute securities, the Acquired Interests are being acquired by Buyer and Buyer 2 for investment purposes only, for Buyer's and Buyer 2's own account and not with a view to, or for resale in connection with, any distribution thereof in violation of the 1933 Act.

(b)    Each of Buyer and Buyer 2 acknowledges that, to the extent any Acquired Interests constitute securities, the sale of the Acquired Interests has not been registered under the 1933 Act or any state or foreign securities laws and that the Acquired Interests, to the extent constituting securities, may not be sold, transferred, offered for sale, pledged, hypothecated or otherwise disposed of unless such transfer, sale, assignment, pledge, hypothecation or other disposition is pursuant to the terms of an effective registration statement under the 1933 Act and registered under any applicable state or foreign securities laws or pursuant to an exemption from registration under the 1933 Act and any applicable state or foreign securities laws.

(c)    Each of Buyer and Buyer 2 has such expertise, knowledge and sophistication in financial and business matters generally that it is capable of evaluating, and has evaluated, the merits and economic risks of its investment in the Acquired Interests.  Each of Buyer and Buyer 2 is knowledgeable of the oil and gas business and of the usual and customary practices of oil and gas producers, including those in the areas where the Acquired Interests are located.  Further, each of Buyer and Buyer 2 is capable of making such investigation, inspection, review and evaluation of the Acquired Interests as a prudent purchaser would deem appropriate under the circumstances including with respect to all matters relating to the Acquired Interests, their value, operation and suitability.

(d)    Each of Buyer and Buyer 2 has had the opportunity to examine all aspects of the Acquired Interests that Buyer and Buyer 2 have deemed relevant and has had access to all information requested by Buyer or Buyer 2 with respect to the Acquired Interests in order to enter into this Agreement.  In connection with the transactions contemplated hereby, each of Buyer and Buyer 2 has had the opportunity to ask such questions of, and has received sufficient answers from, the representatives of the Sellers and obtain such additional information about the Acquired Interests as each of Buyer and Buyer 2 deems necessary to enter into this Agreement.

---

[8] Note to Draft: Subject to Agent feedback (i.e., whether 1 letter or 2 letters).

(e)    Each of Buyer and Buyer 2 confirms, acknowledges and agrees that Buyer and Buyer 2, as applicable, is relying entirely upon the representations and warranties of the Sellers in this Agreement, any certificates delivered hereunder and any Ancillary Document, as well as Buyer's and Buyer 2's own investigations and inspections of the books, records and assets of the Sellers, including the Acquired Interests, prior to the execution of this Agreement in entering into this Agreement and proceeding with the transactions on the terms as set forth herein.  Each of Buyer and Buyer 2 acknowledges and agrees that, other than the express representations and warranties of the Sellers set forth in Article IV, in the certificates delivered by the Sellers at Closing, or any Ancillary Document, any description of the Sellers, their businesses, operations and assets (including the Acquired Interests) in this Agreement, the Disclosure Schedules or any Ancillary Document is for the sole purpose of identification only and no representation, warranty or condition is or will be given by the Sellers in respect of the accuracy of any description.  In deciding to enter into this Agreement, and to consummate the transactions contemplated hereby, other than the express representations and warranties of the Sellers set forth in Article IV, any certificates delivered hereunder and any Ancillary Document, each of Buyer and Buyer 2 has relied solely upon its own knowledge, investigation, judgment and analysis and not on any other disclosure or representation made by the Sellers or the Sellers' representatives.  Nothing herein shall limit Buyer's or Buyer 2's remedies in the event of Fraud, except that Buyer and Buyer 2 shall have no remedy in the event of Fraud with respect to Fieldwood Energy I, FW GOM Pipeline, GOM Shelf or any of their respective Subsidiaries.

5.12    No Other Representations.  No Seller nor any other Person (on behalf of any Seller or otherwise) has made or is making any representation or warranty whatsoever, express or implied, at law or in equity, with respect to the Sellers, the Acquired Interests, this Agreement or the transactions contemplated by this Agreement other than the representations and warranties expressly set forth in Article IV (as modified by the Disclosure Schedules), the certificates delivered hereunder or any Ancillary Document, and neither Buyer nor Buyer 2 is relying on and has not relied on any representation or warranty other than those representations or warranties set forth in Article IV (as modified by the Disclosure Schedules), the certificates delivered hereunder or any Ancillary Document and any reliance by Buyer or Buyer 2 on any representation or warranty other than those representations and warranties set forth in Article IV (as modified by the Disclosure Schedules), the certificates delivered hereunder or any Ancillary Document is hereby expressly disclaimed.  Nothing herein shall limit Buyer's or Buyer 2's remedies in the event of Fraud, except that Buyer and Buyer 2 shall have no remedy in the event of Fraud with respect to Fieldwood Energy I, FW GOM Pipeline, GOM Shelf or any of their respective Subsidiaries.

## ARTICLE VI
## COVENANTS AND AGREEMENTS

6.1    Covenants and Agreements of the Sellers.  The Sellers covenant and agree that, during the Interim Period (or, if earlier, until termination of this Agreement), except (u) as otherwise expressly required under this Agreement or any Ancillary Document, (v) as required by any applicable Law or Governmental Authority (including the Bankruptcy Code, the Bankruptcy Court and any actions required to be taken (or not taken) by the Sellers in order to comply with any orders of the Bankruptcy Court), (w) to the extent related solely to Excluded Assets and/or Retained Liabilities, (x) for renewal of insurance coverage in the ordinary course of business, (y) for emergency operations to address any emergency that threatens human life, safety or the

environment; *provided* that the Sellers will provide notice to Buyer of any such emergency operation prior to taking such action if practicable and, otherwise, as soon as reasonably practicable thereafter or (z) otherwise with Buyer's prior written consent (not to be unreasonably withheld, conditioned or delayed):

      (a)     except as set forth on **Schedule 6.1(a)**, each Seller shall and shall cause its Affiliates to:

      (i)     carry on the business of the Sellers as it relates to the Acquired Interests in the ordinary course of business consistent with past practice and use commercially reasonable efforts to maintain, preserve and protect the Acquired Interests in the condition in which they exist on the Execution Date, except for ordinary wear and tear and except for replacements, modifications or maintenance in the ordinary course of business consistent with past practice;

      (ii)     maintain and operate as a reasonably prudent operator in the ordinary course of business the Field Assets operated by the Sellers as of the Execution Date and maintain the Office Assets as a reasonably prudent lessee and owner;

      (iii)     use commercially reasonable efforts to maintain their relationships with, and preserve for the business of the Sellers as it relates to the Acquired Interests, and preserve the goodwill of, their key suppliers and customers; *provided*, *however*, that (x) this underline clause (iii) will not restrict the Sellers from taking any action deemed necessary, prudent or advisable in the business judgment of the Sellers in connection with the Bankruptcy Cases, including with respect to any claim of any suppliers or customers of the Sellers that is subject to the Bankruptcy Cases, and (y) prior to taking any action (other than such action required by the Plan or an order of the Bankruptcy Court) outside the ordinary course of business that the Sellers reasonably believe will adversely affect their relationships with their key suppliers and customers, the Sellers will consult with Buyer prior to taking any such action;

      (iv)     pay or cause to be paid, when due, all Taxes, Lease Burdens and development and operating expenses and other payments, in each case consistent with past practice, except (A) royalties held in suspense in good faith and (B) expenses or royalties being contested in good faith;

      (v)     maintain its books, accounts and records consistent with past practice;

      (vi)     pay all post-petition trade payables and use commercially reasonable efforts to collect accounts receivable, as they related to the Acquired Interests after the Petition Date, in each case in the ordinary course of business consistent with past practice but, in the case of post-petition trade payables, in no event later than the due date thereof, unless being disputed in good faith (but, for the avoidance of doubt, subject to applicable orders of the Bankruptcy Court);

      (vii)     provide Buyer (promptly but in no event later than three (3) Business Days after the Sellers' receipt thereof) with copies of any written notice received

from any Third Person with respect to (A) any proposed operations on any Field Asset or (B) any Claim relating to any Acquired Interests (in the case of each of <u>clauses (A)</u> and <u>(B)</u>, where the Sellers' Liability (or potential Liability) is in excess of $1,000,000);

(viii)    provide Buyer with copies of any material correspondence received from any Governmental Authority with respect to any Acquired Interests as soon as reasonably practicable, but in no event later than two (2) Business Days after the Sellers' receipt thereof; and

(ix)    within ten (10) Business Days following the execution of this Agreement, deliver to Buyer a true and complete list of the names, titles, hire date, location, whether full- or part-time, whether active or on leave (and, if on leave, the nature of the leave and the expected return date), whether exempt from the Fair Labor Standards Act of 1938, annual salary or wage rate, most recent annual bonus received, current annual bonus opportunity for all Seller Employees, which list shall be updated not less than ten (10) Business Days prior to the Closing to reflect the hiring, resignation or termination of any Seller Employee; and

(b)    except as set forth on **<u>Schedule 6.1(b)</u>**, each Seller shall not and shall cause its Affiliates not to:

(i)    modify in any material respect its now existing credit, collection or payment policies, procedures or practices as they relate to the Acquired Interests, including accelerating collections of receivables or failing to pay or delaying payment of payables in a manner inconsistent with its now existing practices;

(ii)    remove any Acquired Interest from any real property or other location of the Sellers' business such that such Acquired Interest is no longer located within any property of the Sellers' business that is an Acquired Interest, except for sales of inventory in the ordinary course of business;

(iii)    subject to, and without limiting, the Sellers' rights pursuant to <u>Section 6.4</u>, transfer, convey, sell, abandon or otherwise dispose of any material Acquired Interests (other than sales of Hydrocarbons in the ordinary course of business consistent with past practice) or any interest in any of the Leases;

(iv)    create any Encumbrance on any Acquired Interests other than Permitted Encumbrances (except that the Fieldwood U.A. Interests and the JV Interests shall not be subject to any Permitted Encumbrances) or Encumbrances that will be released prior to Closing (including if released pursuant to the Confirmation Order);

(v)    commence, propose, commit or agree to participate in any single operation with respect to any Field Asset with an anticipated cost in excess of $1,000,000;

(vi)    amend, modify, renew or terminate any Material Contract or enter into any Contract that would be an Material Contract if it existed on the date hereof if such Material Contract would be an Assigned Contract;

(vii)   (A) hire any officers or other senior executive employees or terminate any such officer or employee (other than for "cause"); or (B) except in the ordinary course of business consistent with past practice, hire any other employees or terminate any such other employee (other than for "cause");

(viii)   (A) increase the annual rate of base salary or any target bonus opportunity of any Seller Employee, except in the ordinary course of business consistent with past practice and not in excess of 3% for any Seller Employee; (B) pay any bonus, benefit, or other direct or indirect incentive compensation (other than any such payments authorized pursuant to any first or second day orders in the Bankruptcy Cases); (C) award any equity or equity-based compensation awards (whether phantom or equity) with respect to the equity of any Seller or any of its Affiliates; (D) modify, amend or terminate any Employee Plan; (E) enter into or modify any employment, compensation, severance, non-competition, or similar Contract (or amend any such Contract) to which any Seller or any of its Affiliates is a party; or (F) adopt any new severance pay, termination pay, deferred compensation, bonus, or other employee benefit plan, agreement, program, practice, arrangement or policy with respect to Seller Employees that would be an Employee Plan if it existed on the date hereof (including any employment agreement, severance agreement, change in control agreement, or transaction or retention bonus agreements), except, in the case of each of clauses (A) through (F), (1) to the extent set forth in any order of the Bankruptcy Court or as required by applicable Law; or (2) to the extent required pursuant to the terms of any Employee Plan, as in effect on the date hereof;

(ix)   relinquish its position as operator to any Person other than Buyer or Buyer 2 with respect to any Acquired Interest operated by the Sellers;

(x)   waive, release, settle or compromise any material Claim or proceeding relating to any Acquired Interest;

(xi)   subject to, and without limiting, the Sellers' rights pursuant to Section 6.4, enter into any merger or divisive merger, or liquidate or dissolve;

(xii)   sell, lease, license (except for non-exclusive licenses granted in the ordinary course of business) or otherwise transfer or dispose of, abandon or permit to lapse, fail to take any action necessary to maintain, enforce or protect, or create or incur any Encumbrance (other than Permitted Encumbrances) on, any material Owned Intellectual Property;

(xiii)   cause or allow any of its current directors and officers liability, property or casualty insurance policies that apply to any of the Acquired Interests or that apply to the business of the Sellers as it relates to the Acquired Interests to be canceled or terminated or any of the coverage thereunder to lapse unless, simultaneously with such termination, cancellation or lapse, replacement policies providing coverage equal to or greater than the coverage under the canceled, terminated or lapsed policies are in full force and effect;

(xiv)   make, change or revoke any material Tax election in respect of the Acquired Interests, settle or otherwise compromise any claim relating to Taxes of Fieldwood U.A. or with respect to the Acquired Interests, enter into any closing agreement or similar agreement relating to Taxes of Fieldwood U.A. or the Acquired Interests, surrender any right to claim a Tax refund, offset or other reduction in Tax Liability of Fieldwood U.A. or with respect to the Acquired Interests, or request any ruling or similar guidance with respect to Taxes of Fieldwood U.A. or with respect to the Acquired Interests; or

(xv)   enter into any Contract or other commitment to take, or authorize the taking of or resolve to take, any actions prohibited by this Section 6.1(b).

6.2   Casualty Event.  The Sellers shall give Buyer prompt written notice of any Casualty Event that occurs with respect to any Acquired Interest during the Interim Period, together with a description of the applicable insurance coverage and an estimate of the Sellers' exposure with respect to such Casualty Event.  If the damaged or taken Acquired Interest is not repaired or replaced on or before the Closing Date, the Sellers shall provide to Buyer an assignment of all of the Sellers' right, title and interest in and to all insurance proceeds and recoveries from Third Persons payable, in each case with respect to the Acquired Interest damaged or taken as the result of such Casualty Event.

6.3   Press Releases.  Except as required in the Bankruptcy Cases or by applicable Law (a) each Party shall consult with the other before issuing any press release or otherwise making any public statement with respect to the transactions contemplated by this Agreement and (b) no Party shall issue any press release or make any such public statement before obtaining the other Party's prior written approval, which shall not be unreasonably withheld, conditioned or delayed. To the extent such release or public statement is required by Law, the Party intending to make such release or public statement (i) shall give the other Party the opportunity (within reasonable time before any applicable deadline) to review and comment upon such release or public statement and (ii) shall consider in good faith all reasonable comments thereto received sufficiently in advance of any applicable deadline.

6.4   Solicitation; Other Offers.

(a)   Each of Buyer and Buyer 2 acknowledges and agrees that from and after the Execution Date through entry of the Confirmation Order, the Sellers may take any action (including entering into any agreement or letter-of-intent with respect thereto) to cause, promote, assist with or enter into an Alternative Transaction.

(b)   Without limiting the foregoing, the Sellers may, directly or indirectly through its Representatives, (i) engage in discussions and negotiations regarding an Alternative Transaction with any one or more Third Persons as potential bidders (each, an "*Alternative Bidder*") in connection with the solicitation of one or more proposals relating to an Alternative Transaction and (ii) furnish to any Alternative Bidder who has signed a confidentiality agreement and has made a request therefor any public or non-public information relating to the Sellers and afford to any such Alternative Bidder access to any properties, Acquired Interests, books or records of the Sellers or the business of the Sellers; *provided* that the Sellers shall not actively solicit

proposals relating to an Alternative Transaction unless the failure to do so would be contrary to or inconsistent with applicable fiduciary duties.

6.5    Regulatory Matters; Cooperation.

(a)    The Sellers, on one hand, and Buyer, on the other hand, shall cooperate, and reasonably determine upon the advice of counsel within fifteen (15) Business Days of the Execution Date, other than the notifications required to be filed under the HSR Act, any notifications, filings, consents, clearances, waivers, waiting periods and approvals, if any, required under any applicable Antitrust Law in connection with the transactions contemplated by this Agreement (including by any persons that will hold, directly or indirectly, any equity interest in Buyer as of or immediately after the Closing) (the "***Foreign Antitrust Approvals***").  Subject to Section 6.5(c), as soon as reasonably practicable (and, in any event, within ten (10) Business Days, or a later date as agreed by the Parties) after the Execution Date, the Sellers, on the one hand, and Buyer, on the other hand, shall each prepare and file, or cause to be prepared and filed, any notifications required to be filed under the HSR Act with the United States Federal Trade Commission, the Antitrust Division of the United States Department of Justice and any Foreign Antitrust Approvals, and request early termination of the waiting periods applicable to such notifications.  Subject to Section 6.5(c), Buyer, on the one hand, and the Sellers, on the other hand, shall promptly respond to any requests for additional information or documentary materials in connection with such filings and shall take all commercially reasonable actions necessary to cause the waiting periods applicable to such notifications to terminate or expire at the earliest practicable date after the date of filing.  The Sellers shall be responsible for payment of the applicable filing fee under the HSR Act or Foreign Antitrust Approvals, and each Party shall be responsible for any other payment of its own respective costs and expenses incurred by such Party (including attorneys' fees and other legal fees and expenses) associated with the preparation of its portion of any antitrust filings.

(b)    Subject to the provisions of Section 6.5(c) and Section 6.7, including the limitations set forth therein, the Sellers, on the one hand, and Buyer, on the other hand, shall use reasonable best efforts to obtain, at the earliest practicable date, all necessary Governmental Approvals and all necessary registrations, declarations and filings (including registrations, declarations and filings with Governmental Authorities and any change in control requirements relating to any consent decrees, decisions, judgments, settlements, consent orders, stipulations, decrees or similar orders relating to the Acquired Interests, if any), in each case for the consummation of the transactions contemplated by this Agreement and the Ancillary Documents, and use its reasonable best efforts to avoid any Claim by any Governmental Authority relating to the transactions contemplated by this Agreement and the Ancillary Documents.  Subject to the provisions of Section 6.5(c) and Section 6.7, including the limitations set forth therein, in addition to such actions, the Sellers, on the one hand, and Buyer, on the other hand, shall use reasonable best efforts to (i) take all acts necessary in connection with meeting with any Governmental Authority regarding the transferring of the Permits included in the Acquired Interests and (ii) execute and deliver any additional instruments reasonably necessary to consummate the transactions contemplated hereby and to fully carry out the purposes of this Agreement.

(c)    The Sellers, on the one hand, and Buyer, on the other hand, (i) to the extent permissible, shall promptly inform each other of any material communication from any

Governmental Authority concerning this Agreement, the transactions contemplated hereby, and any filing, notification or request for approval by any Governmental Authority and (ii) to the extent permissible, shall permit the other to review in advance any proposed written or material oral communication or information submitted to any such Governmental Authority in response thereto. In addition, none of the Parties shall agree to participate in any meeting with any Governmental Authority in respect of any filings, investigation or other inquiry with respect to this Agreement or the transactions contemplated hereby, unless, to the extent permissible, such Party consults with the other Parties in advance and, to the extent permitted by any such Governmental Authority, gives the other Party the opportunity to attend and participate thereat, in each case to the maximum extent reasonably practicable. Subject to restrictions under any Law, each of Buyer, on the one hand, and the Sellers, on the other hand, shall furnish the other with copies of all correspondence, filings and communications (and memoranda setting forth the substance thereof) between it and its Affiliates and their respective Representatives on the one hand, and the Governmental Authority or members of its staff on the other hand, with respect to this Agreement, the transactions contemplated hereby (excluding documents and communications which are subject to preexisting confidentiality agreements or to the attorney-client privilege or work product doctrine or which refer to valuation of the Acquired Interests) or any such filing, notification or request for approval. Each Party shall also furnish the other Party with such necessary information and assistance as such other Party and its Affiliates may reasonably request in connection with their preparation of necessary filings, registration or submissions of information to the Governmental Authority in connection with this Agreement, the transactions contemplated hereby and any such filing, notification or request for approval. Notwithstanding anything to the contrary in this Agreement, nothing in this Agreement shall require Buyer or the Sellers, or any of their respective Affiliates to (and none of any Seller or any of its Affiliates shall, without the prior written consent of Buyer), in performing their respective obligations under this <u>Section 6.5</u>, (i) enter into any settlement, undertaking, consent decree, stipulation or agreement with any Governmental Authority in connection with the transactions contemplated hereby, (ii) divest or otherwise hold separate (including by establishing a trust or otherwise), or take any other action (or otherwise agree to do any of the foregoing) with respect to the Acquired Interests or any assets or business of Buyer or any of its Affiliates or (iii) defend any Claim relating to the transactions contemplated by this Agreement or any Ancillary Document, except, in the case of each of <u>clauses (i)</u> through <u>(iii)</u>, actions expressly contemplated to be taken by the Sellers in accordance with the Plan.

(d)     Notwithstanding anything to the contrary contained in this Agreement, Buyer shall, on behalf of the Parties, control and lead all communications and strategy relating to the Antitrust Laws (*provided* that the Sellers are not constrained from complying with applicable Law), *provided*, further, that the Parties shall consult and cooperate with one another, and consider in good faith the views of one another, regarding the form and content of any analyses, appearances, presentations, memoranda, briefs, arguments, opinions and proposals made or submitted by or on behalf of either Party in connection with proceedings under or relating to any Antitrust Law prior to their submission.

6.6     <u>Bankruptcy Court Matters</u>.

(a)     <u>Qualified Bids</u>. Subject to the terms of the Disclosure Statement Order, if one or more Qualified Bid(s) (as such term is defined in the Disclosure Statement Order) is

received by the Sellers on or before the Bid Deadline (as such term is defined in the Disclosure Statement Order), no later than three (3) Business Days after the Bid Deadline (as such term is defined in the Disclosure Statement Order), the Sellers shall file with the Bankruptcy Court a notice of receipt of such Qualified Bid(s) (as such term is defined in the Disclosure Statement Order) and the Sellers' proposed procedures for selecting the highest or otherwise best bid, including, but not limited to, any procedures for submitting revised bids and/or holding an auction to the extent the Sellers determine holding an auction will maximize value to the Sellers' estate.

(b)     <u>Confirmation Order</u>.  The Sellers and Buyer shall use commercially reasonable efforts to obtain entry by the Bankruptcy Court of a Confirmation Order by no later than the Confirmation Outside Date.  The Confirmation Order shall be in form and substance acceptable to the Sellers and Buyer.  The Sellers acknowledge and agree, and the Confirmation Order shall provide that, on the Closing Date and concurrently with the Closing, all then existing or thereafter arising Liabilities and Encumbrances of, against or created by the Sellers or their bankruptcy estates, shall be fully released from and with respect to the Acquired Interests, which shall be transferred to Buyer free and clear of all Encumbrances (other than Permitted Encumbrances (except for the Fieldwood U.A. Interests and the JV Interests, which shall not have any Permitted Encumbrances)) and Retained Liabilities and Buyer shall at Closing be required to assume the Assumed Liabilities as set forth hereunder.  The Sellers and Buyer covenant and agree that if the Confirmation Order is entered, they will pursue the transactions contemplated by the Confirmation Order and in this Agreement.  The Sellers shall use commercially reasonable efforts to cause the Confirmation Order to provide either that (a) the Sellers have complied with the requirements of any applicable Law relating to bulk sales and transfer or (b) compliance with applicable Law relating to bulk sales and transfers is not necessary or appropriate under the circumstances.  Buyer agrees that it will take commercially reasonable efforts to take such actions as are reasonably requested by the Sellers to assist in obtaining entry of the Confirmation Order.

(c)     <u>Reasonable Efforts</u>.  The Sellers shall use commercially reasonable efforts to (i) obtain entry of the Disclosure Statement Order, (ii) promptly commence solicitation on the Plan upon entry of the Disclosure Statement Order, and (iii) (A) facilitate the solicitation, confirmation and consummation of the Plan and the transactions contemplated hereby, (B) obtain entry of the Confirmation Order and (C) consummate the Plan.

(d)     <u>Bankruptcy Filings</u>.

(i)     During the Interim Period, the Sellers shall deliver to Buyer copies of all pleadings, motions, notices, statements, schedules, applications, reports and other papers that relate, in whole or in part, to this Agreement and the transactions contemplated hereby at least two (2) Business Days prior to the date when the Sellers intend to file any such pleading or other document (*provided,* that if delivery of such motions, orders or materials (other than the Plan, the disclosure statement, a disclosure statement order, the Confirmation Order or adequate protection order) at least two (2) Business Days in advance is not reasonably practicable, such motion, order or material shall be delivered as soon as reasonably practicable prior to filing) for Buyer's prior review and comment, and the Sellers shall consult in good faith with Buyer regarding the form and substance of such filings to the extent they are related to the Acquired Interests, any Assumed Liabilities or the transactions contemplated hereby, including any of Buyer's rights or obligations

hereunder. The Parties shall use commercially reasonable efforts to consult and cooperate regarding (i) any such pleadings, motions, notices, statements, schedules, applications, reports or other papers, (ii) any discovery taken in connection with seeking entry of the Confirmation Order (including any depositions) and (iii) any hearings relating to the Confirmation Order, including the submission of any evidence, including witness testimony, in connection with such hearing. The Sellers agree to diligently prosecute the entry of the Confirmation Order as provided herein. During the Interim Period (subject to Section 6.4), the Sellers shall not take any action that is intended to (or is reasonably likely to), or fail to take any action the intent (or reasonably likely result) of which failure to act is to, result in the reversal, voiding, modification or staying of the Confirmation Order, or this Agreement.

(ii)     In the event the entry of the Disclosure Statement Order, the Confirmation Order, or any other order reasonably necessary in connection with the transactions contemplated by this Agreement is appealed, the Sellers shall use commercially reasonable efforts to defend such appeal.

(e)     Cooperation with Plan Administrator. In accordance with the terms of the Plan, the Parties agree that they shall use commercially reasonable efforts to cooperate with the Plan Administrator (as defined in the Plan) and each other, in relation to the Parties' respective activities and obligations under the Plan, including by providing reasonable, good-faith access to personnel, systems, and books and records and their respective personnel and consulting with each other to avoid duplication of effort.

6.7     Assumption and Assignment of Contracts.

(a)     No later than twenty eight (28) days prior to the Designation Deadline, the Sellers shall provide to Buyer a list of all 365 Contracts and the Sellers' good faith estimate of Cure Costs associated with each such 365 Contract (the "*365 Schedule*"). The Sellers may amend or supplement the 365 Schedule from time to time to add or remove any 365 Contract inadvertently included or excluded from such 365 Schedule or to amend, based on the Sellers' good faith calculation of the Cure Costs, any proposed Cure Costs set forth in such 365 Schedule and shall provide Buyer written notice thereof. No later than fourteen (14) days prior to the Designation Deadline, Buyer shall designate in writing which 365 Contracts from the 365 Schedule Buyer desires to be assumed by the Sellers and assigned to Buyer (collectively, and as further modified by Buyer pursuant to the provisions of this Section 6.7, the "*Assigned 365 Contracts*" and Buyer's designated list of Assigned 365 Contracts, the "*Assigned 365 Contracts List*").

(b)     Promptly following the receipt of Buyer's initial designation of the Assigned 365 Contracts pursuant to Section 6.7(a) (to the extent not previously filed) and by no later than the Designation Deadline, the Sellers shall file the Assigned 365 Contracts List with the Bankruptcy Court and deliver a written notice of the proposed assignments of the Assigned 365 Contracts and the proposed Cure Costs for each Assigned 365 Contract (consistent with the Sellers' good faith estimates set forth on the 365 Schedule) to all non-debtor parties of the Assigned 365 Contracts, which notice shall notify each non-debtor party to such Assigned 365 Contract of (i) the proposed Cure Cost for such Assigned 365 Contract and (ii) an objection

deadline for such non-debtor party to object to the proposed assumption and assignment and proposed Cure Cost.

(c)       Notwithstanding anything herein to the contrary, Buyer may, from time to time, in its sole discretion revise the Assigned 365 Contracts List at any time prior to 5:00 p.m. (prevailing Central Time) on the date that is seven (7) days before the Confirmation Hearing (or such other time as agreed in writing between the Sellers and the applicable counterparty to a 365 Contract) (the "*Designation Deadline*") by (x) subtracting therefrom any Assigned 365 Contract, and any 365 Contract so removed shall no longer be considered Assigned 365 Contracts for purposes of this Agreement or (y) adding thereto any 365 Contract, and any 365 Contract so added will be an Assigned 365 Contract for the purposes of this Agreement; *provided* that if the Confirmation Hearing is adjourned or continued, such amendment right shall be extended to 5:00 p.m. (prevailing Central Time) on the date that is seven (7) days before the rescheduled or continued Confirmation Hearing, and this provision shall apply in the case of any and all subsequent adjournments and continuances of the Confirmation Hearing.  The Sellers shall promptly file on the docket in the Bankruptcy Cases and serve on the affected non-Debtor counterparty(ies) a notice of any actions taken by Buyer pursuant to the preceding sentence pursuant to and in accordance with the Disclosure Statement Order.  Subject to the preceding sentences, all 365 Contracts of the Sellers that are listed on the 365 Schedule and which Buyer does not designate in writing for assumption and assignment shall not be considered Assigned 365 Contracts or Acquired Interests and shall automatically be deemed "*Excluded Contracts*;" *provided, however,* that Buyer may not exclude from the Assigned 365 Contracts any 365 Contract that is set forth on **Schedule 6.7(g)**.

(d)       Each of each Seller and Buyer, as applicable, shall use commercially reasonable efforts to assign or cause to be assigned, the Assigned 365 Contracts to Buyer, including, if necessary, taking all actions required by the Bankruptcy Court to obtain a Final Order containing a finding that the proposed assumption and assignment of the Assigned 365 Contract to Buyer satisfies all applicable requirements of Section 365 of the Bankruptcy Code.  If the Sellers are successful in effecting such assumption as of or before the Closing, such Lease, Easement or Contract shall become an Assigned 365 Contract and transferred and conveyed to Buyer.

(e)       On the Closing Date, immediately following payment by Buyer of the Cash Portion, the Sellers shall pay all undisputed Cure Costs with respect to the Assigned 365 Contracts.

(f)       Buyer shall provide adequate assurance of future performance of all of the Assigned 365 Contracts so that all Assigned 365 Contracts can be assumed by the Sellers and assigned to Buyer at the Closing in accordance with the provisions of Section 365 of the Bankruptcy Code and this Agreement, and Buyer acknowledges that such cooperation may require Buyer to provide reasonably necessary information regarding Buyer and its Subsidiaries, as well as a commitment of performance by Buyer and/or its Subsidiaries with respect to the Assigned 365 Contracts from and after the Closing to demonstrate adequate assurance of the performance of the Assigned 365 Contracts, and the Sellers' obligation to assume and assign such Assigned 365 Contracts is subject to Buyer providing such adequate assurance of future performance.

(g)     Notwithstanding anything in this Agreement to the contrary, including Section 6.7(c) above, the Contracts set forth on **Schedule 6.7(g)** shall at all times constitute Assigned 365 Contracts and shall be assigned to Buyer at the Closing.[9]

(h)     Notwithstanding anything to the contrary in this Agreement, no Seller (i) shall agree to, settle or compromise any dispute with respect to, the amount of Cure Costs in respect of any Assigned 365 Contract without the prior written approval of Buyer in its sole discretion or (ii) shall, without the prior written consent of Buyer in its sole discretion, reject or move to reject (A) any 365 Contracts prior to the Designation Deadline or (B) any Assigned 365 Contract (whether before or after the Designation Deadline).

(i)     Notwithstanding anything in this Section 6.7 to the contrary, Buyer may not, except with the prior written consent of the Sellers, designate any 365 Contract as an Assigned 365 Contract to the extent that such 365 Contract is identified on Exhibit I-F of the Plan of Merger (except to the extent constituting Applicable Shared Asset Interests).

6.8     Employee Matters.

(a)     Offers and Terms of Employment.  All Seller Employees (including those on leave of absence or disability) identified by the Sellers on the updated list provided pursuant to Section 6.1(a)(vii) shall be offered employment by Buyer or its Affiliate no later than five (5) days prior to the Closing Date, in each case, such employment to be effective as of the Closing Date; *provided*, *however*, that neither Buyer nor any of its Affiliates shall be required to make an offer of employment to any Section 6.8 Employee unless Buyer and Seller mutually agree that Buyer shall offer employment to such Section 6.8 Employee.  Each offer of employment made by Buyer or its Affiliates to a Seller Employee, as applicable, shall be effective as of the Closing Date and shall contain terms and conditions of employment substantially comparable in the aggregate to the terms and conditions of employment provided by the Sellers immediately prior to the Closing Date with respect to such Seller Employee, *provided* each such offer shall include (i) at least the same level of base salary or wage rate (based on pre-COVID-19 salary or wage rate without regard to any reduction), (ii) for substantially all such Seller Employees, at least the same annual cash incentive compensation opportunity and (iii) substantially similar employee benefits.  For purposes of this Agreement, any individual who becomes employed by Buyer in accordance with this Section 6.8 is referred to as a "***Transferred Employee***."

(b)     Liabilities.  Effective as of the Closing, (i) Buyer shall, or shall cause an Affiliate of Buyer to, assume or retain, as the case may be, any and all Liabilities (contingent or otherwise) relating to, arising out of, or resulting from the employment or services, or termination of employment services, of any Transferred Employee, accrued and unpaid bonuses, accrued and unused vacation, sick days and paid time off and any workers' compensation claims against any Seller or its Affiliates, irrespective of when such claims are made (and Buyer shall or shall cause an Affiliate of Buyer to pay the applicable Transferred Employees the unpaid portion of any Transferred Employee's accrued annual bonus for the calendar year in which the Closing occurs

---

[9] Note to Draft: Schedule 6.7(g) to include the McCarroll agreements and, subject to Buyer's review of Schedule 6.7(g), any agreements related to the Co-Owned Assets that are required to be conveyed in connection with the assignment of the Co-Owned Assets.

at the time such bonuses are paid to such Transferred Employees in the ordinary course consistent with past practice) and (ii) the Sellers shall, or shall cause their Affiliates to assign to Buyer, and Buyer shall, or shall cause an Affiliate of Buyer, to assume, (A) sponsorship of the Fieldwood Energy Health & Welfare Benefit Plan, including any and all Liabilities (contingent or otherwise) relating to, arising out of, or resulting from the operation of the Fieldwood Energy Health & Welfare Benefit Plan, and Buyer shall be, or shall cause an Affiliate to be, responsible for all claims whenever incurred under the Fieldwood Energy Health & Welfare Benefit Plan, including any claims incurred prior to the Closing but not yet reported and any claims reported prior to Closing but which have not yet been processed, (B) sponsorship of the Fieldwood Energy LLC 401(k) Plan, including any and all Liabilities (contingent or otherwise) relating to, arising out of, or resulting from the operation of the Fieldwood Energy LLC 401(k) Plan, and (C) each other Assumed Employee Plan, including any and all Liabilities (contingent or otherwise) relating to, arising out of, or resulting from the operation of each Assumed Employee Plan; *provided* that except as otherwise set forth in <u>Section 6.8(c)</u>, in no event shall Buyer or any of its Affiliates assume any Liabilities relating to bonuses, severance or workers' compensation claims for any current or former employee of any Seller or any of its Affiliates other than a Transferred Employee and all such Liabilities shall be Retained Liabilities.

(c)     <u>Severance</u>.  With respect to any Seller Employee who Sellers and Buyer mutually agree shall not be offered employment by Buyer and who shall not become a Transferred Employee, Sellers shall provide severance payments (subject to executing a general employment release in favor of Sellers and Buyer) in such amount as mutually determined by Sellers and Buyer, which amount shall in no event exceed two (2) months of base salary ("***Employee Severance***"). Employee Severance shall be paid by Sellers to each such Seller Employee in the ordinary course through the Closing.  Buyer shall, and shall cause its Affiliates to, be liable for and provide to each such Seller Employee any portion of the unpaid Employee Severance that otherwise becomes due and payable following the Closing.

(d)     <u>Credit for Service</u>.  Buyer shall, and shall cause its Affiliates to, credit Transferred Employees for service earned on and prior to the Closing Date with the Sellers and their Affiliates or predecessors to the extent that such service would be credited pursuant to the applicable Employee Plan, in addition to service earned with Buyer and its Affiliates on or after the Closing Date to the extent that service is relevant for purposes of eligibility, vesting, paid-leave entitlement or the calculation of benefits under any employee benefit plan, program or arrangement of Buyer or any of its Affiliates for the benefit of the Transferred Employees on or after the Closing Date, but not for the purposes of benefit accrual under any defined benefit pension plan; *provided*, *however*, that nothing herein shall result in a duplication of benefits with respect to the Transferred Employees.

(e)     <u>Pre-existing Conditions; Coordination</u>.  Buyer shall, and shall cause its Affiliates to, waive any pre-existing condition or actively at work limitations, evidence of insurability and waiting periods for the Transferred Employees and their eligible spouses and dependents under any employee benefit plan, program or arrangement of Buyer or any of its Affiliates for the benefit of the Transferred Employees on or after the Closing Date.  Buyer shall, and shall cause its Affiliates to credit for purposes of determining and satisfying annual deductibles, co-insurance, co-pays, out-of-pocket limits and other applicable limits under the comparable health plans and arrangements offered to Transferred Employees, deductibles, co-

insurance, co-pays and out-of-pocket expenses paid by Transferred Employees and their respective spouses and dependents under the Sellers or any of their respective Affiliates' health plans in the calendar year in which the Closing Date occurs.

(f)     Accrued Vacation.  Buyer or its Affiliates shall provide each Transferred Employee with credit for the same number of vacation, sick days and personal days such Transferred Employee has accrued but not used in the calendar year in which the Closing Date occurs; *provided*, that to the extent required by applicable Law, such amount shall be paid by Buyer or its Affiliates to the applicable Transferred Employee in cash.  In the event that a Transferred Employee is unable to use such carried over vacation and sick days within the calendar year in which the Closing Date occurs, Buyer or its Affiliates shall allow such Transferred Employee to carry over such vacation and sick days to be used in the subsequent calendar year solely to the extent that such Transferred Employee would have had the same right to carry over such vacation and sick days pursuant to the policies of the Seller or its Subsidiaries as of the date hereof.

(g)     COBRA.  On the Closing Date, the Sellers and their Affiliates shall cease to provide health and welfare coverage to each Seller Employee and his or her covered dependents and beneficiaries, and Buyer or its Affiliate shall commence providing such coverage to Transferred Employees and his or her covered dependents and beneficiaries.  Buyer and its "buying group" (as defined in Treasury Regulation Section 54.4980B-9, Q&A-2(c)) shall be solely responsible for providing continuation coverage under COBRA to those individuals who are or become M&A qualified beneficiaries (as defined in Treasury Regulation Section 54.490B-9, Q&A-4(a)) with respect to the transactions contemplated by this Agreement. Buyer and its Affiliates shall provide coverage required by COBRA to Transferred Employees and their eligible dependents or beneficiaries under group health plans maintained by Buyer or an Affiliate of Buyer with respect to qualifying events occurring on and after the Closing Date.

(h)     Tax Reporting.  Buyer shall adopt the "*alternate procedure*" for preparing and filing IRS Forms W-2 (Wage and Tax Statements), as described in Revenue Procedure 2004-53.   Under this procedure, Buyer as the successor employer shall provide Forms W-2 to Transferred Employees reflecting all wages paid and Taxes withheld with respect to such Transferred Employees for the calendar year in which the Closing Date occurs.  The Sellers as the predecessor employer shall have no employment tax reporting responsibilities for the Transferred Employees following the Closing Date.  Buyer shall also adopt the "*alternate procedure*" of Revenue Procedure 2004-53 for purposes of IRS Forms W-4 (Employee's Withholding Allowance Certificate) and W-5 (Earned Income Credit Advance Payment Certificate).

(i)     No Third Party Beneficiaries.   Without limiting the generality of Section 12.5, no provision of this Section 6.8 shall (i) be treated as an amendment of, or undertaking to amend, any benefit plan, (ii) obligate Buyer or the Sellers to retain the employment of any particular employee or (iii) confer any rights or benefits on any Third Person beneficiary or create any Third Person beneficiary or other rights in any current or former employee, independent contractor or other service provider (including any beneficiary or dependent thereof) of any Seller in respect of continued employment (or resumed employment) with either Buyer or any of, its Affiliates and no provision of this Section 6.8 shall create any rights in any such Persons in respect of any benefits that may be provided, directly or indirectly, under any Employee Plan or any plan or arrangement that may be established by Buyer or any of its Affiliates, including as to the level

or duration of compensation or benefits. No provision of this Agreement shall constitute a limitation on rights to amend, modify or terminate after the Closing Date any such plans or arrangements of the Sellers, Buyer or any of their respective Affiliates.

6.9     [Reserved].

6.10     Certain Agreements.   The Sellers will obtain assignment of, or replacement agreements with respect to, the Specified Section 6.10 Contract(s) prior to or at the Closing (with any replacement agreement being on substantially the same terms as the Specified Section 6.10 Contract(s) being replaced); *provided* that Buyer understands and agrees that this Section 6.10 will not require Sellers to enter into any settlement, undertaking or agreement, undertake any obligation, or pay any consideration, in each case, with or to any third party, other than, to the extent required to be paid prior to the Closing, if so requested by Buyer, Sellers paying in cash any such consideration requested by such third party.

6.11     Transfer Orders; Letters in Lieu.   Prior to the Closing, the Sellers shall deliver to Buyer completed transfer orders or letters in lieu thereof, directing all purchasers of production to make payment to Buyer of proceeds attributable to Hydrocarbons constituting Acquired Interests effective as of the Closing.

6.12     Taxes.

(a)     To the extent not exempt under the Confirmation Order or Section 1146 of the Bankruptcy Code, Buyer shall assume responsibility for, and shall bear and pay, all Transfer Taxes (if any) incurred or imposed with respect to the conveyance of the Acquired Interests to Buyer; *provided* that if any such Transfer Taxes are due prior to the Closing the Sellers shall assume responsibility for, and shall bear and pay such Transfer Taxes. The Party required by applicable Law to file Tax Returns with respect to Transfer Taxes shall prepare and file such Tax Returns or other documents and the non-preparing Party shall cooperate therewith.

(b)     The Sellers shall timely file or cause to be timely filed when due all Tax Returns that are required to be filed by or with respect to Fieldwood U.A. on or prior to the Closing Date and all Tax Returns that are required to be filed by the Sellers under applicable Law with respect to the Acquired Interests (including any Tax Returns reporting any Property-Related Taxes and Production Taxes) and, in each case, all such Tax Returns shall be prepared and filed in a manner consistent with past practice. In each case, the Sellers shall remit or cause to be remitted any Taxes shown as due on such Tax Returns. Buyer shall timely file or cause to be timely filed when due (taking into account all extensions properly obtained) all other Tax Returns that are required to be filed by or with respect to Fieldwood U.A. and the Acquired Interests after the Closing Date and shall pay any Taxes shown as due on such Tax Returns. The Sellers shall reimburse Buyer for (A) Retained Taxes which are remitted in respect of any Tax Return to be filed by Buyer pursuant to this Section 6.12 or (B) Retained Taxes in respect of any Tax Return to be filed by the Sellers under this Section 6.12(b) which have not been paid by the Sellers and for which a taxing authority seeks payment from Buyer, in each case, up to the amount reserved for such Retained Taxes in determining the Effective Date Cash Obligations Amount, no later than ten (10) days after Buyer's written request therefor.

(c)     For purposes of this Agreement, in the case of a Straddle Period, (x) all Property-Related Taxes and any exemptions, allowances and deductions with respect to such Taxes shall be allocated between the Pre-Closing Tax Period and the Post-Closing Tax Period based on the number of days of such Straddle Period included in the Pre-Closing Tax Period and the number of days of such Straddle Period included in the Post-Closing Tax Period, (y) all Production Taxes shall be allocated between the Pre-Closing Tax Period and the Post-Closing Tax Period based upon the period during which the applicable production occurred, and (z) all other Taxes shall be allocated between the Pre-Closing Tax Period and the Post-Closing Tax Period as if such taxable period ended as of the end of the day on the final day of the Pre-Closing Tax Period.

(d)     Property-Related Taxes and Production Taxes shall be timely paid, and all applicable filings, reports and returns shall be filed as provided by applicable Law.

(e)     All Tax Sharing Agreements between the Sellers and any Affiliates of the Sellers, on the one hand, and Fieldwood U.A., Fieldwood Mexico or any Subsidiary thereof, on the other hand, will terminate as to Fieldwood U.A., Fieldwood Mexico and any Subsidiary thereof prior to the Closing Date and Fieldwood U.A., Fieldwood Mexico and such Subsidiary will not have any liability thereunder on or after the Closing Date.

(f)     Each Seller, on the one hand, and Buyer, on the other hand, will provide each other with such cooperation and information as either of them reasonably may request of the other in filing any Tax Return, claiming any refund of Taxes, determining a Liability for Taxes or a right to a refund of Taxes, or conducting any audit or other proceeding in respect of Taxes.  Such cooperation and information shall include providing copies of relevant Tax Returns or portions thereof, together with accompanying schedules, related work papers and documents relating to rulings and other determinations by Governmental Authorities.  Any information obtained under this Section 6.12 shall be kept confidential except as may be otherwise necessary in connection with the filing of Tax Returns or claims for refund or in conducting any audit or other proceeding.

6.13     Commercially Reasonable Efforts.  Subject to the terms and conditions of this Agreement, and subject to the Bankruptcy Code and any orders of the Bankruptcy Court, and without limiting any other provision of this Agreement (including Section 6.5(c)), Buyer and the Sellers each agree to use commercially reasonable efforts to take, or cause to be taken, all actions and to do, or cause to be done, all things necessary or desirable to cause the conditions precedent to Closing set forth in Article VII to be satisfied and to consummate the transactions; *provided* that the Parties understand and agree that the commercially reasonable efforts of any Party shall not be deemed to include, except as expressly set forth in this Agreement, entering into any settlement, undertaking, consent decree, stipulation or agreement with any Governmental Authority in connection with the transactions contemplated hereby; *provided*, *further* that this Section 6.13 shall not (a) limit or affect the obligation of any Party to perform any of its other obligations and covenants expressly set forth in this Agreement or (b) require any Party to incur any obligations or pay any fees or amounts to third parties not otherwise required under this Agreement or the Plan.

6.14     Insurance Policies.  Effective at or prior to Closing, the Sellers shall cause Buyer to be named as an 'additional insured' with respect to each insurance policy held by the Sellers which provides coverage with respect to any of the Acquired Interests (excluding, for the

avoidance of doubt, any director and officer insurance policies). The Sellers shall maintain such insurance policies in full force and effect until the expiration of their terms, and shall cooperate in good faith with Buyer in connection with any claim made by Buyer under any such policy. The Sellers shall not have any obligation to renew any such insurance policies following the expiration of their terms, and from and after such expiration, Buyer will be solely responsible for maintaining such insurance as Buyer deems reasonable with respect to the Acquired Interests.

6.15    Novation of Hedges.  Buyer shall use commercially reasonable efforts to cause the Hedges to be novated to Buyer at Closing, and the Sellers shall reasonably cooperate with Buyer in connection with such novation; *provided* that (a) to the extent that the total volume of production hedged as of the Closing with respect to the Hedges exceeds 45,000 Boepd, Buyer may elect to (but is not required pursuant to this Section 6.15 to) use commercially reasonable efforts to novate such excess (or any portion thereof) to Buyer at Closing; (b) Buyer shall be solely responsible for any credit support or other requirements in connection with such novation; and (c) the Sellers shall not be required to pay any consideration or undertake any obligation in connection with such novation.

6.16    Qualification.  Prior to the Closing, Sellers (and their respective officers and employees) will provide commercially reasonable assistance to Buyer with respect to Buyer obtaining such qualifications as are necessary to own and, where applicable, to assume operatorship of, the Acquired Interests in all jurisdictions where the Acquired Interests are located.

6.17    Settlements with Governmental Authorities.  From the date hereof until the Closing, none of any Seller nor any of its Affiliates shall make or enter into any material non-ordinary course stipulation, settlement or other agreement with any Governmental Authority (each, a "***Governmental Settlement Agreement***") that is not in form and substance acceptable to Buyer. The Sellers shall pay all amounts due and payable under any Governmental Settlement Agreement executed by any Seller or any of its Affiliates prior to the Closing.

6.18    Operator Forms.  By no later than ten (10) days after the Execution Date, the Sellers shall have sent all applicable Third Persons all designation of operator forms (Form BOEM – 1123) designating Buyer as operator (along with all corresponding OSFR forms) with respect to each Lease or portion thereof as to which any Seller is the designated operator as of the date hereof, and Sellers shall use reasonable best efforts to obtain such executed forms from such Third Persons prior to the Closing.

6.19    [Reserved].

6.20    Bonds and Insurance.  To the extent required by applicable state and federal Governmental Authorities (and subject to compliance by the Sellers with their respective covenants under this Agreement) in connection with the transactions contemplated by this Agreement, as of the Closing or promptly thereafter (and in any case within ten (10) Business Days of the Closing) Buyer and/or Buyer 2, as applicable, will have the lease bonds, area-wide bonds and surety bonds or insurance policies set forth on **Schedule 6.20**, in each case to the extent required by and in accordance with the requirements of such Governmental Authorities.

6.21    [New Equity Interests.  Buyer shall cause (a) the Credit Bid and Release New Equity Interests to be received by the Persons entitled to receipt of such interests pursuant to the Plan on the Effective Date in accordance with the Plan, and (b) the Equity Rights Offering New Equity Interests (if and when authorized pursuant to an order of the Bankruptcy Court) to be received on the Effective Date by the Persons entitled to receipt of such interests in accordance with the Plan, the Subscription Rights, the FLTL ERO Backstop Agreement and the SLTL ERO Backstop Agreement.][10]

6.22    Employment Agreements.  Buyer shall, in good faith, negotiate the terms of an employment agreement (each, an "***Employment Agreement***") with each of the Seller Employees identified on Schedule 6.22 from and after the date hereof.  If terms of an Employment Agreement are mutually agreed between Buyer and a Seller Employee prior to Closing, then at (or immediately following) the Closing Buyer shall enter into an Employment Agreement with each such Seller Employee.

## ARTICLE VII
## CONDITIONS PRECEDENT TO CLOSING

7.1    Conditions Precedent of the Parties.  The obligations of the Sellers, Buyer and Buyer 2 to consummate the transactions contemplated by this Agreement are subject to the fulfillment, at or before the Closing, of each of the following conditions:

(a)    no applicable Law shall prohibit the transactions contemplated hereby or the consummation of the Closing and no suit, action or proceeding shall be pending or threatened before any court or arbitration tribunal seeking to enjoin, restrain, prohibit or declare illegal the transactions contemplated by this Agreement;

(b)    no injunction, order, decree or judgment that restrains, enjoins or prohibits the transactions contemplated in this Agreement shall be in effect;

(c)    any applicable waiting period under the HSR Act relating to the transactions contemplated hereby shall have expired or been terminated;

(d)    the Bankruptcy Court shall have entered the Disclosure Statement Order and the Confirmation Order and each such order shall be a Final Order;

(e)    each of the conditions precedent to the Effective Date shall have been satisfied (or shall become effective concurrent with the Closing Date hereunder) or waived in accordance therewith; and

(f)    (i) the Credit Bid and Release New Equity Interests shall have been, or will be on the Effective Date, received by the holders of Allowed FLTL Secured Claims (as defined in the Plan) in accordance with the Plan and (ii) the Equity Rights Offering New Equity Interests (if and when authorized pursuant to an order of the Bankruptcy Court) shall have been, or will be on

---

[10] Note to Draft: Subject to review of Equity Rights Offerings procedures/ERO Backstop Agreements/obligations of Buyer to issue equity upon exercise of Subscription Rights.

the Effective Date, received by the Persons entitled to receipt of such interests in accordance with the Plan, the Subscription Rights, the FLTL ERO Backstop Agreement and the SLTL ERO Backstop Agreement.

7.2     Sellers' Conditions Precedent.  The obligation of the Sellers to consummate the transactions contemplated by this Agreement are subject to the fulfillment, at or before the Closing, of each of the following conditions:

(a)     the representations and warranties of Buyer and Buyer 2 set forth in this Agreement shall be true and correct, as of the date hereof and as of the Closing Date, as if made at and as of such date (other than any representation and warranty expressly made as of a specific earlier date, which shall have been true and correct as of such earlier date), except for those failures to be true and correct that, individually or in the aggregate, would not adversely affect in any material respect the ability of Buyer and Buyer 2 to consummate the transactions contemplated by this Agreement;

(b)     Each of Buyer and Buyer 2 shall have performed and fulfilled in all material respects each covenant, agreement and condition required by this Agreement to be performed or fulfilled by Buyer or Buyer 2, as applicable, at or before the Closing;

(c)     the Effective Date Cash Obligations Amount shall have been agreed in amounts acceptable to Sellers acting in good faith; and

(d)     Each of Buyer and Buyer 2 shall have executed and delivered all documents required to be executed and delivered by Buyer or Buyer 2, as applicable, as set forth in Section 9.2.

The foregoing conditions of this Section 7.2 are for the sole benefit of the Sellers and may be waived by the Sellers, in whole or in part, at any time and from time to time in the sole discretion of the Sellers.  The failure by the Sellers at any time to exercise any of their rights hereunder shall not be deemed a waiver of any such right and each such right shall be deemed an ongoing right which may be asserted at any time and from time to time.

7.3     Buyers' Conditions Precedent.  The obligation of Buyer and Buyer 2 to consummate the transactions contemplated by this Agreement are subject to the fulfillment, at or before the Closing, of each of the following conditions:

(a)     (i) each of the Fundamental Representations of each Seller shall be true and correct in all respects, except for de minimis inaccuracies, as of the date hereof and as of the Closing Date, as if made at and as of such date (other than any representation and warranty expressly made as of a specific earlier date, which shall have been true and correct as of such earlier date), (ii) the representations and warranties of each Seller set forth in each of Section 4.22(a), Section 4.32 and Section 4.33 shall (disregarding any qualifications or exceptions set forth therein relating to Material Adverse Effect or "materiality" or any similar qualification or standard) be true and correct in all material respects, as of the date hereof and as of the Closing Date, as if made at and as of such date (other than any representation and warranty expressly made as of a specific earlier date, which shall have been true and correct in all material respects as of such earlier date), and (iii) all other representations and warranties of each Seller set forth in Article IV

of this Agreement shall (disregarding any qualifications or exceptions set forth therein relating to Material Adverse Effect or "materiality" or any similar qualification or standard) be true and correct, as of the date hereof and as of the Closing Date, as if made at and as of such date (other than any representation and warranty expressly made as of a specific earlier date, which shall have been true and correct as of such earlier date) except in the case of this <u>clause (iii)</u>, for those failures to be true and correct that would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect;

(b)     each Seller shall have performed and fulfilled in all material respects each covenant, agreement and condition required by this Agreement to be performed or fulfilled by such Seller at or before the Closing;

(c)     each Seller shall have executed and delivered all documents required to be executed and delivered by such Seller as set forth in <u>Section 9.2</u>;

(d)     no Default or Event of Default (each as defined in the DIP Credit Agreement) under the DIP Credit Agreement shall have occurred and be continuing;

(e)     the Restructuring Support Agreement shall not have been terminated with respect to any party thereto;

(f)     the conditions precedent under each of the Backstop Commitment Letters shall have been satisfied or waived;

(g)     the Plan confirmed by the Confirmation Order shall be in substantially the same form and substance as the plan filed by the Debtors on [•], at Docket No. [•] in the Bankruptcy Court, as may be amended, modified or supplemented from time to time in accordance with the Restructuring Support Agreement or as otherwise consented to by or on behalf of Buyer;

(h)     at least five (5) Business Days prior to the Closing Date, the Bankruptcy Court shall have approved and authorized the assumption and assignment of each material Assigned 365 Contract pursuant to Section 365 of the Bankruptcy Code through entry of an order that shall have become a Final Order and all such material Assigned 365 Contracts shall have been duly assigned to Buyer at or prior to the Closing;

(i)     all Assigned 365 Contracts that require novation and are set forth on **Schedule 7.3(i)** will have been novated to Buyer;

(j)     the estimated amount of Allowed Specified Administrative Expense Claims at any time are projected by the Sellers not to exceed the Toggle Amount (as defined in the Plan), or, upon the occurrence of the Toggle Date, such other amount as determined by the Majority Backstop Parties (as defined in the Second Lien Backstop Commitment Letter) in their sole and absolute discretion;

(k)     the aggregate Allocated Values of all Acquired Interests treated as Delayed Assets pursuant to <u>Section 2.3(b)</u>, <u>Section 2.4</u> and <u>Section 2.5</u>, together with the aggregate Allocated Values of all Acquired Interests with respect to which a bona fide Preferential Right is validly exercised prior to the Closing, shall not be greater than $100,000,000;

(l)     all Governmental Approvals set forth on **Schedule 7.3(l)** shall have been obtained and delivered to Buyer and such Governmental Approvals shall be in full force and effect;

(m)     since the Execution Date, no Material Adverse Effect (or any result, event, occurrence, change, circumstance, consequence or development that, individually or in the aggregate, would reasonably be expected to result in a Material Adverse Effect) shall have occurred;

(n)     any agreements between Buyer and the Plan Administrator shall be reasonably acceptable to Buyer;

(o)     Buyer shall have obtained all qualifications required to assume operatorship of the Leases operated by a Seller as of immediately prior to the Closing in all jurisdictions where such Leases are located, all of which qualifications shall be in full force and effect;

(p)     the Sellers shall have delivered to Buyer a fully executed copy of the Fourth Amendment to Office Sublease;

(q)     the Effective Date Cash Obligations Amount shall have been agreed in amounts acceptable to Buyer acting in good faith; and

(r)     the Sellers shall have delivered to Buyer a duly executed letter agreement, or the Bankruptcy Court shall have entered an order which shall have become a Final Order, in each case in a form reasonably acceptable to Buyer, providing that Buyer is not a "successor" or "assign" of Sellers under the NPA.

The foregoing conditions of this <u>Section 7.3</u> are for the sole benefit of Buyer and Buyer 2 and may be waived by Buyer or Buyer 2, as applicable, in whole or in part, at any time and from time to time in the sole discretion of Buyer and Buyer 2.  The failure by Buyer or Buyer 2 at any time to exercise any of its rights hereunder shall not be deemed a waiver of any such right and each such right shall be deemed an ongoing right which may be asserted at any time and from time to time.

## ARTICLE VIII
## RIGHT OF TERMINATION AND ABANDONMENT

8.1     <u>Termination</u>.  This Agreement may be terminated by written notice at any time before the Closing:

(a)     by mutual written consent of the Sellers and Buyer;

(b)     by the Sellers, on one hand, or by Buyer, on the other hand:

(i)     if the Closing shall not have been consummated on or before July 31, 2021 (as such date may be extended by mutual written agreement of the Parties, the "***End Date***"); *provided* that the right to terminate this Agreement pursuant to this <u>Section 8.1(b)(i)</u> shall not be available to any Party (A) who is then in material breach of any of its material agreements, covenants, representations or warranties contained herein or (B)

58

whose breach of any provision of this Agreement is the proximate cause of the failure of the Closing to be consummated before the End Date;

(ii)      if there shall be any applicable Law that makes consummation of the transactions contemplated by this Agreement illegal or otherwise prohibited or if consummation of such transactions would violate any Final Order of any Governmental Authority having competent jurisdiction;

(iii)     for any reason, Buyer is unable, pursuant to Section 363(k) or Section 1123(a) of the Bankruptcy Code, to credit bid in payment of all or any portion of the Consideration as set forth in Section 2.1 (other than the Assumed Liabilities);

(iv)     the Bankruptcy Court shall have entered an order dismissing, or converting into cases under Chapter 7 of the Bankruptcy Code, any of the cases commenced by the Sellers under Chapter 11 of the Bankruptcy Code and comprising part of the Bankruptcy Cases; or

(v)     any of the Sellers shall have entered into any agreement with respect to any Alternative Transaction (consistent with the fiduciary duties of the officers and directors of the Sellers) or if the Bankruptcy Court shall have approved any such Alternative Transaction;

(c)     by Buyer if:

(i)     the Sellers shall have breached any of their representations and warranties, or shall have failed to perform or comply with any of their covenants and agreements contained in this Agreement and such breach or failure to perform or comply (A) would result in the Sellers being unable to satisfy a condition set forth in Section 7.3 and (B) is not cured within ten (10) Business Days after Buyer notifies the Sellers of such breach or failure to perform or comply in writing; *provided*, that Buyer shall not have a right of termination pursuant to this Section 8.1(c)(i) if Buyer is then in material breach of any of its material agreements, covenants, representations or warranties contained herein;

(ii)     any of the Sellers, without the prior consent of Buyer, enter into a definitive agreement with respect to the sale of any material Acquired Interests (excluding sales of Hydrocarbons in the ordinary course of business) or any interest in any of the Leases;

(iii)     the Confirmation Order shall not have been entered by the Confirmation Outside Date;

(iv)     the Restructuring Support Agreement shall have been terminated with respect to any party thereto; *provided*, that the right to terminate this Agreement pursuant to this Section 8.1(c)(iv) shall not be available to Buyer if any Consenting Creditor's breach of any provision of the Restructuring Support Agreement is the proximate cause of the termination of the Restructuring Support Agreement;

(v)      any Event of Default (as defined in the DIP Facility Credit Agreement) under the DIP Facility Credit Agreement shall have occurred and be continuing;

(vi)     the Equity Rights Offerings are not consummated;

(vii)    the Disclosure Statement Order or the Confirmation Order shall have been stayed, vacated, reversed or materially modified or amended by the Bankruptcy Court or another court of competent jurisdiction at any time without the prior written consent of Buyer; or

(viii)   any Seller seeks to have the Bankruptcy Court enter an order dismissing, or converting into cases under Chapter 7 of the Bankruptcy Code, any of the cases commenced by the Sellers under Chapter 11 of the Bankruptcy Code and comprising part of the Bankruptcy Cases, or if a trustee in the Bankruptcy Cases or a responsible officer or an examiner with enlarged powers is appointed (other than a fee examiner) relating to the operation of the Sellers' businesses pursuant to Section 1104 of the Bankruptcy Code, or such an order of dismissal, conversion or appointment is entered; and

(d)      by the Sellers if:

(i)      Buyer or Buyer 2 shall have breached any of its representations and warranties, or shall have failed to perform or comply with any of its covenants and agreements contained in this Agreement and such breach or failure to perform or comply (A) would result in Buyer or Buyer 2, as applicable, being unable to satisfy a condition set forth in Section 7.2 and (B) is not be cured within ten (10) Business Days after the Sellers notify Buyer of such breach or failure to perform or comply in writing; *provided*, that the Sellers shall not have a right of termination pursuant to this Section 8.1(d)(i) if any Seller is then in material breach of any of its material agreements, covenants, representations or warranties contained herein;

(ii)     Any of the Backstop Commitment Letters is terminated and Buyer has not, within thirty (30) days following the termination of such Backstop Commitment Letter, entered into a definitive written agreement with respect to committed financing or other arrangement in an amount at least equal to that provided by such Backstop Commitment Letter (as of the date hereof) and otherwise in form and substance reasonably acceptable to Sellers; or

(iii)    the Equity Rights Offerings are not consummated and Buyer has not, within thirty (30) days following the failure of the Equity Rights Offerings to be consummated, entered into a definitive written agreement with respect to committed financing or other arrangement in an amount at least equal to the amount that would have been provided by the Equity Rights Offerings and otherwise in form and substance reasonably acceptable to Sellers.

Each termination trigger set forth in this Section 8.1, pursuant to which this Agreement may be terminated shall be considered separate and distinct from each other such termination trigger. If more than one of the termination triggers set forth in this Section 8.1 are applicable, the applicable

Party shall have the right to choose the termination trigger pursuant to which this Agreement is to be terminated. Any Party desiring to terminate this Agreement pursuant to this <u>Section 8.1</u> shall give written notice of such termination to the other Party.

      8.2    <u>Remedies</u>. In the event of termination of this Agreement by Buyer or the Sellers pursuant to this <u>Article VIII</u>, this Agreement shall become null and void and have no effect and all rights and obligations of the Parties under this Agreement shall terminate without any Liability of any Party to any other Party except the provisions of this <u>Section 8.2</u>, <u>Section 12.1</u>, <u>Section 12.8</u> and **<u>Annex I</u>** (and, to the extent applicable to the interpretation or enforcement of such provisions, <u>Article XII</u>) shall expressly survive the termination of this Agreement.

      8.3    <u>Specific Performance</u>. The Parties agree that irreparable damage for which monetary damages, even if available, would not be an adequate remedy would occur in the event any provisions of this Agreement were not performed in accordance with the terms hereof (including failing to take such actions as are required hereunder in order to consummate the transactions contemplated hereby) or were otherwise breached and that the Parties shall be entitled to injunctive relief, specific performance and other equitable relief to prevent breaches (or threatened breaches) of this Agreement and to enforce specifically the performance of the provisions hereof. Any Party seeking an injunction to prevent breaches of this Agreement and to enforce specifically the provisions of this Agreement shall not be required to provide any bond or other security in connection with any such order or injunction. The rights set forth in this <u>Section 8.3</u> shall, subject to <u>Section 8.2</u>, be in addition to any other rights which a Party may have at law or in equity pursuant to this Agreement.

**ARTICLE IX**
**CLOSING**

      9.1    <u>Date of Closing</u>. Subject to satisfaction (or waiver by the required Party) of the conditions to Closing set forth in <u>Article VII</u> (other than those conditions that by their nature cannot be satisfied until the time of Closing, but subject to the satisfaction (or waiver by the requisite Party) of those conditions), the Closing shall occur on the Effective Date (the "***Closing Date***"). Notwithstanding the foregoing, the parties hereto may agree in writing to such other date or time for Closing to take place and such other date or time shall be the "***Closing Date***" as such term is defined herein. The Closing shall take place through electronic means of communication on the Closing Date.

      9.2    <u>Closing Obligations</u>. At Closing, the Parties (as applicable) shall take, or cause to be taken, the following actions, each being a condition precedent to the others and each being deemed to have occurred simultaneously with the others:

      (a)    The Sellers and Buyer shall deliver to one another duly executed counterpart signature pages to each Transfer Document to which they are a party, in sufficient numbers of duly executed and acknowledged original counterparts to facilitate, to the extent appropriate, recording in all relevant jurisdictions;

      (b)    The Sellers shall deliver to Buyer the JV Assignment Agreements duly executed by the applicable Sellers;

61

(c)     Buyer and Buyer 2 shall deliver a duly executed counterpart to the Release Document;

(d)     The Sellers shall deliver to Buyer a certificate, dated and effective as of the Closing Date, executed by an authorized officer of each Seller, certifying to Buyer that, on the Closing Date, the conditions set forth in Section 7.3(a) and Section 7.3(b) have been satisfied;

(e)     Buyer shall deliver to the Sellers a certificate, dated and effective as of the Closing Date, executed by an authorized officer of each of Buyer and Buyer 2, certifying to the Sellers that, on the Closing Date, the conditions set forth in Section 7.2(a) and Section 7.2(b) have been satisfied;

(f)     Each Seller shall deliver to Buyer a statement that satisfies the requirements of Treas. Reg. §1.1445-2(b)(2), certifying that such Seller is not a foreign person within the meaning of Section 1445(f)(3) or Section 1446(f)(2) of the Code;

(g)     Fieldwood and Buyer shall deliver to one another duly executed signature pages to the Funding Agreement;

(h)     Buyer shall deliver by wire transfer of immediately available funds an amount in cash equal to the Cash Portion, to one or more accounts designated by the Sellers (which shall be designated by the Sellers at least two (2) days prior to Closing);

(i)     Sellers shall pay the Cure Costs out of the Closing Cash Amount and/or the Cash Portion in accordance with an order of the Bankruptcy Court; and

(j)     Buyer shall deliver to Fieldwood the GUC Warrants and the SLTL Warrants for distribution by Fieldwood pursuant to the Plan.

## ARTICLE X
## POST-CLOSING OBLIGATIONS AND COVENANTS

10.1     Field Data and Records.  Within ten (10) Business Days after the Closing, pursuant to Buyer's reasonable instructions, the Sellers shall deliver to Buyer any Field Data or Records that are not maintained in the Office Assets.  Buyer shall be entitled to all original Field Data and Records.  Within ten (10) Business Days after the Closing, the Sellers may make and retain, at the Sellers' expense, copies of any Field Data and Records (except to the extent prohibited by Contract where Buyer obtains the originals thereof).

10.2     Suspense Funds; Prepaid JOA Funds.

(a)     To the extent that as of Closing, any Seller holds Suspense Funds or Undisbursed Revenue relating to the Acquired Interests (excluding Prepaid JOA Funds) the Sellers shall deliver to Buyer at Closing such Suspense Funds and Undisbursed Revenue and an accounting of such Suspense Funds and Undisbursed Revenue and Buyer shall from and after such time be responsible for the application of such Suspense Funds and Undisbursed Revenue under the applicable operating or other agreement governing the application of such Suspense Funds and Undisbursed Revenue.  The Sellers shall remain liable, and shall be solely responsible, for (i) the

disbursement of all funds owed to Persons (including any Suspense Funds) that are not paid or disbursed to Buyer at Closing and (ii) all Liabilities with respect to any misapplication of any Suspense Funds (or any escheat or other Laws related thereto) as to any period of time at or before the Closing Date; such Liabilities and responsibilities shall be considered Retained Liabilities.

(b)     To the extent that as of Closing, any Seller holds funds received by the Sellers (in their capacity as operator of any Acquired Interests) on account of working interest owners in the Acquired Interests as prepayments for items under operating or other agreements ("***Prepaid JOA Funds***"), the Sellers shall deliver to Buyer at Closing such Prepaid JOA Funds and an accounting of each of such prepayments and Buyer shall from and after Closing be responsible for the application of such Prepaid JOA Funds under the applicable operating or other agreement pursuant to which such Prepaid JOA Funds were collected.  The Sellers shall remain liable, and shall be solely responsible, for (i) the disbursement of all funds owed to Persons (including any Prepaid JOA Funds) that are not paid or disbursed to Buyer at Closing and (ii) all Liabilities with respect to any misapplication of Prepaid JOA Funds (or any escheat or other Laws related thereto) as to any period of time at or before the Closing Date; such Liabilities and responsibilities shall be considered Retained Liabilities.

10.3     <u>Post-Closing Asset Reconciliation</u>.

(a)     After the Closing Date, Buyer and the Sellers shall execute and deliver, or shall cause to be executed and delivered, from time to time such further instruments of conveyance and transfer, and shall take such other actions as Buyer or the Sellers may reasonably request, to convey and deliver the Acquired Interests to Buyer, to perfect Buyer's title thereto and to accomplish the orderly transfer of the Acquired Interests to Buyer.

(b)     In the event that at any time, or from time to time following the Closing Date, any (i) Acquired Interest is found to have been retained by the Sellers or any of their Affiliates (each a "***Non-Transferred Asset***"), then the Sellers shall transfer, or shall cause such Affiliate to transfer, with any necessary prior consent from any Third Person or Governmental Authority, such Non-Transferred Asset to Buyer as soon as practicable, or an Affiliate thereof as designated by Buyer, and to forward or remit to Buyer, or an Affiliate thereof as designated by Buyer, any payments actually received by the Sellers on account of any such Non-Transferred Asset from the Closing until the time such Non-Transferred Asset is transferred to Buyer; *provided*, that Buyer shall pay to the Sellers the amount of any expenses or payables actually paid by the Sellers on account of any such Non-Transferred Asset from the Closing until the time such Non-Transferred Asset is transferred to Buyer (which may be netted by the Sellers against amounts received on account of such Non-Transferred Asset).  Prior to any such transfer, the Sellers shall hold such Non-Transferred Asset in trust for Buyer.

(c)     In the event of a transfer pursuant to <u>clause (b)</u> of this <u>Section 10.3</u>, Buyer or an Affiliate thereof and the Sellers or an Affiliate thereof shall execute and deliver, or cause to be executed and delivered, to the other Party as soon as practicable any conveyances, notices, assumptions, releases and acquittances and such other instruments, and shall take such further actions, as may be necessary or appropriate to fully and effectively transfer, assign and convey unto Buyer or an Affiliate thereof, all of the properties, rights, titles, interests, estates, remedies, powers and privileges intended to be conveyed to Buyer or an Affiliate thereof, and to otherwise

make effective the transactions contemplated hereby, and to confirm Buyer's (or its Affiliate's) title to or interest in and to such Non-Transferred Asset, and to put Buyer or its Affiliate in actual possession and operating control thereof.

(d)     For the avoidance of doubt, this Section 10.3 does not apply to any Delayed Assets retained by a Seller at the Closing.

10.4     Assignments; Operatorship.

(a)     Other than with respect to Governmental Approvals (which are addressed by Section 2.4), the Sellers will prepare and execute, and Buyer will execute, at or before the Closing, all documentation necessary to convey to Buyer the Acquired Interests granted by a Governmental Authority (except any such documentation that is customarily completed post-Closing) in the form as prescribed by the applicable Governmental Authority and otherwise reasonably acceptable to Buyer and the Sellers.

(b)     At the Closing, each Seller shall, as applicable, deliver to Buyer a resignation as operator of (and, as applicable, designated applicant under OSFR for) all Field Assets as to which such Seller served as operator (or, as applicable, the designated applicant under OSFR) immediately before the Closing Date.  With respect to those Field Assets as to which a Seller controls the selection of the successor operator (or, as applicable, the designated applicant under OSFR), such Seller shall at the Closing deliver to Buyer (and any pertinent Third Person) a written notification designating Buyer as the successor operator of (or, as applicable, the successor designated applicable under OSFR for) such Field Assets effective as of the Closing Date.  With respect to any Field Assets as to which the Sellers do not control the selection of the successor operator (or, as applicable, the designated applicant under OSFR), the Sellers will cast their votes at or before Closing, and will use commercially reasonable efforts to obtain before, or promptly following, Closing the votes of the other owners of Working Interests in such Field Assets, in each case in favor of the designation of Buyer as successor operator of (and, as applicable, the designated applicant under OSFR for) such Field Assets effective as of the Closing Date.  Within five (5) days after the later of the Closing Date or the date on which Buyer is named successor operator under the terms of the applicable Contract, the Sellers and Buyer shall make all necessary filings, including any BOEM designation of operator forms and designated applicant OSFR form designations, and take all other actions necessary to cause the resignation of the applicable Sellers as operator of (and, as applicable, the designated applicant under OSFR for), and the designation of Buyer as the successor operator of (and, as applicable, the designated applicant under OSFR for), such Field Assets to be recognized and, if required, approved by all relevant Governmental Authorities.  In each case, the Sellers shall use commercially reasonable efforts to assist Buyer in assuming the timely operation and management of the Field Assets.  Each of the Sellers' covenants in this Section 10.4(b) is subject to the accuracy at Closing of Buyer's representations in Section 5.9.  Each of Buyer's covenants in this Section 10.4(b) is subject to Buyer's receipt from the Sellers and Third Persons of all such required designations and forms.  For the avoidance of doubt, "Field Assets" does not include any Lease, Subject Unit, Easement or Well with respect to which no right, title or interest is included in the Acquired Interests.

(c)     With respect to each Field Asset operated by the Sellers as of the Closing, the Sellers, with the continued assistance of Buyer, shall use commercially reasonable efforts to