IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

|  |  |  |
|---|---|---|
| In re: | § | Chapter 11 |
|  | § |  |
| **Fieldwood Energy LLC, et al.,** | § | **Case No. 20-33948 (MI)** |
|  | § |  |
| Debtors.[1] | § | (Jointly Administered) |
|  | § |  |

## LIMITED OBJECTION TO FOURTH AMENDED JOINT PLAN OF
## REORGANIZATION OF FIELDWOOD ENERGY LLC
## AND ITS AFFILIATE DEBTORS

Seitel Data, Ltd. and affiliates ("**Seitel**") file this *Limited Objection to Fourth Amended Joint Plan of Reorganization of Fieldwood Energy LLC and Its Affiliate Debtors* (the "**Limited Objection**"), and respectfully shows as follows:

## I.
## BACKGROUND FACTS

1.      On August 3-4, 2020, the Debtors, filed voluntary petitions for Chapter 11 bankruptcy relief pursuant to Chapter 11 of Title 11 of the United States Code (the "**Bankruptcy Code**") with the United States Bankruptcy Court for the Southern District of Texas, Houston Division (the "**Bankruptcy Court**").

2.      On June 29, 2020, this Court entered its order authorizing joint administration of these Chapter 11 cases [ECF No. 91].

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are: Dynamic Offshore Resources NS, LLC (0158); Fieldwood Energy LLC (6778); Fieldwood Energy Inc. (4991); Fieldwood Energy Offshore LLC (4494); Fieldwood Onshore LLC (3489); Fieldwood SD Offshore LLC (8786); Fieldwood Offshore LLC (2930); FW GOM Pipeline, Inc. (8440); GOM Shelf LLC (8107); Bandon Oil and Gas GP, LLC (9172); Bandon Oil and Gas, LP (9266); Fieldwood Energy SP LLC (1971); Galveston Bay Pipeline LLC (5703); and Galveston Bay Processing LLC (0422) (collectively, the "**Debtors**").

3.      No trustee or examiner has been appointed and Debtors continue to operate their businesses and manage their properties as debtors-in-possession pursuant to Bankruptcy Code §§ 1107 and 1108.

4.      On April 15, 2021, the Debtors filed the *Fourth Amended Joint Chapter 11 Plan of Fieldwood Energy LLC and Its Affiliated Debtors* [ECF No. 1284] (the "**Plan**").  Pursuant to Article VIII, Section 8.1, all executory contracts not previously assumed are deemed rejected.

5.      The Debtors have filed two notices relating to the assumption of executory contracts under the proposed plan. First, on May 27, 2021, the Debtors' filed the *Notice of Contract Parties to Executory Contracts and Unexpired Lease of the Schedule of Assumed Contracts and Cure Amounts* [Doc. No. 1395] (the "**Initial Assumption Notice**"). Second, on June 2, 2021, the Debtors' filed the *Notice of Filing of Amended Schedule of Assumed Contracts and Cure Amounts* [Doc. No. 1456] (the "**Amended Assumption Notice**") (collectively, with the Initial Assumption Notice, the "**Assumption Notices**").

6.      Seitel was listed on the Initial Assumption Notice, but not listed on the Amended Assumption Notice. On June 4, 2021, the Debtors bankruptcy counsel confirmed via email that the Amended Assumption Notice supersedes the Initial Assumption Notice, and that the Seitel Agreements (defined below) are to be deemed rejected pursuant to the terms of the Plan.

7.      In conjunction with the rejection, Seitel sought approval of specific language preserving Seitel's rights upon the termination of the contract or preserving a status quo of the agreements until the Debtor and Seitel enter into a new contract.[2] Debtors' counsel has not

---

[2] As of June 7, 2021, the Debtors and Seitel are engaged in the negotiation of a new agreement amongst the parties.

responded prior to the deadline of filing this Objection.[3] Accordingly, Seitel files this Limited Objection to seek request the inclusion of preservation language.

## II.
## SEITEL'S INTERESTS

8.      On May 30, 2018, Seitel granted to Debtor, Fieldwood Energy LLC, as Licensee, a non-exclusive, non-transferable licenses for geophysical and geological information pursuant to a *2D & 3D Onshore/Offshore Master Seismic Data Participating and Licensing Agreement* ("**MLA**") (the MLA, together with all supplements, schedules, amendments and/or modifications are hereinafter collectively referred to as the "**Seitel Agreements**").   As part of the Seitel Agreements, Seitel agreed to license geophysical and geological information in certain fields. A true and correct copy of the MLA is attached as *Exhibit A* to the Limited Objection.

9.      The Seitel Agreements specifically license to the Debtors highly sensitive, highly confidential, copyrightable seismic data, which is covered under United States copyright law and federal and Texas trade secret law, the transfer or assumption of which is restricted absent Seitel's written consent. Further, according to United States copyright law, once the seismic data is collected, it becomes copyrighted. Under the MLA, the Debtor acknowledges that the Data, as defined therein, includes trade secrets, copyright protected confidential and proprietary information of Licensor, and that the Data may not be "directly or indirectly, by operation of law or otherwise, transferred to, disclosed to, shown to, sold to, traded to, disposed of, or otherwise made available to, any other person or entity other than Licensee except as specifically provided in this Agreement."

---

[3] On May 30, 2021, the Debtors' counsel agreed to extend the deadline for Seitel to file an objection to confirmation to June 4, 2021 at 12:00 PM CST. On June 4, 2021, Debtors' counsel agreed to further extend the deadline for Seitel to file an objection to confirmation to June 7, 2021 at 5:00 PM CST. On June 7, 2021, Debtors' counsel agreed to further extend the deadline for Seitel to file an objection to confirmation to June 9, 2021 at 5:00 PM CST. Accordingly, Seitel timely files this objection.

10.     Lastly, pursuant to Article VII, Section 7.3 of the MLA, upon the decision of the Debtors to cease using the licensed data, the Debtors have the duty under the Seitel Agreements to return or destroy all seismic data, and further execute a verification of such action (the "**Verification**").

### III.
### LIMITED OBJECTION TO REJECTION OF EXECUTORY CONTRACTS

11.     While Seitel has no objection to the Seitel Agreements being rejected, Seitel files this Limited Objection because the Debtors still have the ongoing duty to maintain confidentiality and, upon termination, to return or destroy all seismic data and execute a Verification that such action was taken in order to fulfill their continuing obligations under the Seitel Agreements.  Thus, Seitel objects to the proposed rejection until the Debtors agree to return or destroy all seismic data, execute a verification with respect to same. To the extent anything in the Plan can be read to eliminate this requirement, Seitel objects to same as an improper modification.

12.     Alternatively, if the Debtors prefer to preserve the status quo of the Seitel Agreements until it becomes clear whether the Debtors and Seitel will enter into a new agreement, Seitel requests language that binds the Debtor, NewCo and/or the Credit Bid Purchaser to the terms of the Seitel Agreements, including but not limited to the duty of confidentiality.

A.  Proposed Language to Resolve Limited Objection to Rejection.

13.     This Limited Objection relating to the deemed rejection through the Plan can be resolved by including the language below in any order authorizing the rejection:

> *Nothing in the Plan, any Plan Supplement or this Confirmation Order to the contrary, (a) all Executory Contracts, including, but not limited to, all Master Licensing Agreements and all supplements, amendments, schedules and attachments thereto (collectively, the "Seitel Agreements") between any of the Debtors, on the one hand, and Seitel Data, Ltd., Seitel Offshore Corp., and other affiliates (collectively, "Seitel"), on the other hand, shall be and hereby are rejected pursuant to Section 365 of the Bankruptcy Code as of the date of entry of*

4

*this Confirmation Order, (b) to the extent necessary, the automatic stay under Section 362 of the Bankruptcy Code is hereby modified to permit the termination of the Seitel Agreements, and (c) the Debtors, NewCo, the Credit Bid Purchaser and/or the Plan Administrator shall comply with all confidentiality provisions, destruction of data and verification of destruction of data provisions required by the Seitel Agreements.*

14.     To the extent that the Debtors prefer to preserve the status quo of the Seitel Agreements if or until it becomes clear that the Debtors and Seitel will enter into a new agreement, this Limited Objection can be resolved by including the language below:

*Nothing in the Plan, any Plan Supplement or this Confirmation Order shall be construed to authorize or permit:  (i) the transfer of any seismic, geological or geophysical data or intellectual property owned Seitel Data, Ltd., Seitel Offshore Corp., and other affiliates, (collectively, "Seitel") or (ii) the assumption and/or assignment or modification of any Master License Agreement and/or supplemental agreements between Seitel and any Debtors (the "Seitel Agreements"), which such assumption and/or assignment or modification, if any, is subject to subsequent court order after notice to Seitel and an opportunity to respond; provided however that the Debtors, NewCo and/or the Credit Bid Purchaser are authorized to continue operating under the Seitel Agreements in the ordinary course of business until such agreements are deemed assumed, assumed and assigned, or rejected. Seitel and the Debtors reserve all rights.*

## IV.
## RESERVATION OF RIGHTS

15.     Seitel reserves its rights, in its absolute and sole discretion, to amend, modify or supplement this Limited Objection including in response to the service or filing of any additional documents or exhibits by the Debtors and/or any party-in-interest.

## V.
## CONCLUSION

WHEREFORE, Seitel prays that this Court (i) deny the Debtors' right to reject the Seitel Agreements unless the Debtors agree to the relief sought and (ii) grant Seitel such other and further relief to which it may be entitled.

Dated: June 9, 2021

Respectfully submitted,

*/s/ Duane J. Brescia*
Duane J. Brescia (TX Bar No. 24075265)
**CLARK HILL PLC**
720 Brazos Street, Suite 700
Austin, Texas 78701
(512) 499-3647
(512)  499-3660 (Fax)
dbrescia@clarkhill.com

Audrey L. Hornisher (TX Bar No. 24094369)
**CLARK HILL PLC**
901 Main Street, Suite 6000
Dallas, Texas 75202
Telephone: (214) 651-2056
Facsimile: (214) 651-4057
ahornisher@clarkhill.com

**Attorneys for Seitel Data, Ltd.**

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing has been served upon all parties that are registered or otherwise entitled to receive electronic notices via electronic notification pursuant to the ECF procedures in this District on this 9th day of June 2021.

*/s/ Duane J. Brescia*
Duane J. Brescia

6

# EXHIBIT A

ClarkHill\D5021\B20919\263129174.v1-6/9/21



## 2D & 3D Onshore/Offshore Master Seismic Data Participation and Licensing Agreement

This 2D & 3D Onshore/Offshore Master Seismic Data Participation and Licensing Agreement, dated effective as of May 30, 2018 (the "**Effective Date**"), is by and between the following respective owner(s) or co-owner(s) of each data set licensed hereunder, as applicable, Seitel Canada Ltd., an Alberta, Canada corporation, Seitel Data, Ltd., a Texas limited partnership, Seitel Offshore Corp., a Delaware Corporation, or Seismic Enterprises México, S. de R.L. de C.V., also known as Seitel Mexicana, a Mexico Sociedad de Responsabilidad Limitada de Capital Variable, hereinafter collectively or individually referred to as "**Licensor**", and Fieldwood Energy LLC, a Delaware limited liability company, hereinafter referred to as "**Licensee**", and, together with Licensor as the "**Parties**" or each, individually, a "**Party**".

In consideration of the mutual covenants and premises contained herein, the receipt and sufficiency of which is hereby acknowledged, the Parties hereto agree as follows:

### Definitions

a)  "**Acquirer**" means any third party or parties that acquire, either directly or indirectly, Ownership or Control, whether accomplished voluntarily or by operation of law, by statutory merger, consolidation or share exchange, by stock or asset sale or purchase, or by any other transaction method.

b)  "**Affiliate**" means each Person listed on Exhibit A, so long as such Person (i) remains wholly-owned by Licensee, or (ii) wholly owns Licensee, or (iii) is under common ownership Control with Licensee.

c)  "**Agreement**" means this 2D & 3D Onshore/Offshore Master Seismic Data Participation and Licensing Agreement, including the Exhibits attached hereto and all Supplemental Agreements.

d)  "**Change of Control**" means:

    a)  The sale or transfer of all or substantially all of the stock or assets of Licensee (or its parent company or ultimate parent company);

    b)  Any reorganization or any merger, combination, consolidation or amalgamation of Licensee (or its parent company or ultimate parent company) with any other Person; or

    c)  The acquisition, directly or indirectly, by any Person, or by any group of Persons acting together, that will have the power to direct or cause the direction of the management and policies of Licensee (or its parent company or ultimate parent company), whether through the ownership of voting securities, by contract or otherwise, including, without limitation, the direct or indirect acquisition of 50% or more of the outstanding voting interests in Licensee (or its parent company or ultimate parent company), whether directly or indirectly.

For the sake of clarity, a Change of Control includes a court-approved reorganization or the institution of insolvency, receivership, or liquidation proceedings (including proceedings under Chapter 11 of Title 11 of the United States Code or as applicable under the Bankruptcy and Insolvency Act in Canada), even if Licensee survives as a business entity or there is a transfer to any Third Party, including, without limitation, a liquidating trust or similar entity.

e)  "**Confidentiality Agreement**" means a written agreement between Licensee and a Third Party to maintain the Data in strict confidence in accordance with this Agreement substantially in one of the forms attached hereto as Exhibit B.

f) **"Consultant"** means any Third Parties that are bona fide, recognized consultants in the geophysical industry engaged by Licensee to interpret, reprocess or make other technical studies of the Data for the sole use and benefit of Licensee. A Consultant does not include any party that: (i) is a Prospective Partner, Partner, Prospective Acquirer or Acquirer of Licensee; (ii) is in the business of licensing geophysical data; (iii) is in the business of producing hydrocarbons; or (iv) owns an economic interest in any oil and gas lease, production sharing contract, is signatory to an agreement that provides for them to become a working interest Partner or other interest holder within the geological area of the Data being used, other than an overriding royalty interest (not to exceed 5% of the revenue from such geographic area) granted to such party by Licensee as part of the party's compensation for consulting services.

g) **"Control"** means the ability to, directly or indirectly, direct, manage and/or dictate the actions of and/or determine the management of the entity in question by any method, including without limitation, by the election of members of the board of directors or other governing body of such entity, by having the ability to exercise control over a majority number of members of such governing body or through ownership of, or the exercise of voting consensual rights with respect to, the common stock, voting securities or other interest held in such entity.

h) **"Data"** means geophysical data and any related support documentation delivered to Licensee pursuant to a Supplement, and all tape, electronic and paper/physical copies of all or any part of the geophysical data or related support documentation, regardless of source, including Derivative Products and reprocessed Data, Future Data and Prior Data. All Data constitutes confidential information, trade secrets and/or copyrighted original, creative expressions of Licensor.

i) **"Derivative Products"** means any product directly or indirectly derived, generated, making use of, or created from the Data, whether derived, generated, or created from the Data alone, or in connection or combination with Licensee data, Licensor data or third party data, including but not limited to any and all processed and reprocessed Data (*e.g.*, pre-stack time migration, pre-stack depth migration, AVO Volumes, attribute volumes, and any transformation of the seismic reflection Data, including but not limited to, inversions), regardless of the form or medium on which the Data is displayed, whether produced by Licensor, Licensee, Affiliates or Third Parties.

j) **"Effective Date"** is defined in the first paragraph of this Agreement.

k) **"Excess Costs"** is defined in Section 3.3 of this Agreement.

l) **"Future Data"** means data which is acquired by Licensor in the future and is licensed by Licensor to Licensee pursuant to the terms of this Agreement.

m) **"Licensee"** is defined in the first paragraph of this Agreement.

n) **"Licensor"** is defined in the first paragraph of this Agreement.

o) **"Licensee Derivative Product(s)"** means any Derivative Products created by or for Licensee pursuant to Section 2.3(b).

p) **"Licensor Derivative Product(s)"** means any Derivative Products created by or for Licensor (including those made by Licensor for Licensee) and licensed to Licensee hereunder.

q) **"Original License Fee"** means the fee paid by the original (or first) Licensee for the Data licensed during its normal course of business, as set forth on the original Supplement under which such Data was licensed. For the avoidance of doubt (i) a Re-License Fee shall not be considered an "Original License Fee" when calculating any subsequent Re-License Fee, and (ii) when calculating a Re-License Fee, the amount of the Original License Fee shall include any bonus payments that have become due since the time of the original (or first) license of the Data.

r) **"Original Participants"** means any Person committing to license Data on or before the completion of the acquisition of such Data or those reserving the right to purchase a license as a condition of permit.

s) **"Ownership"** or **"Owns"** means direct or indirect rights in, or legal title to, greater than fifty percent (50%) of (i) the outstanding common stock or other voting securities, (ii) equity interest, (iii) economic interest, (iv) voting power, (v) management, or (vi) interest in the profits.

t) **"Parties"** or **"Party"** is defined in the first paragraph of this Agreement.

u) **"Partner"** means Third Parties contractually related to Licensee in Third Party Business Transactions (whether or not such relationships constitute a partnership at law).

v) **"Person"** is to be broadly construed and includes any individual, corporation, business trust, estate, trust, partnership, limited liability company, association, joint venture, agency, unincorporated organization, governmental or regulatory authority, executor or administrator or other legal or personal representative or any other legal or commercial entity.

w) **"Prior Agreement(s)"** means all prior licensing agreements (or other agreements granting Licensee access to data) between Licensee and any Third Party, including any broker, to the extent that those agreements cover data owned by Licensor.

x) **"Prior Data"** means any and all data licensed to Licensee under Prior Agreements and owned by Licensor.

y) **"Processor(s)"** means Third Parties which are bona fide recognized contractors that are engaged by Licensee to provide reformatting or reprocessing services for geophysical and geological data for the sole use and benefit of Licensee; provided that such contractors are not, directly or indirectly, related to or in the business of exploring for or producing hydrocarbons.

z) **"Prospective Acquirer"** means any Third Party who is conducting an investigation or review in an endeavor to become an Acquirer.

aa) **"Prospective Partner"** means any Third Party who (i) has contacted Licensee or been contacted by Licensee concerning becoming a Partner; or (ii) is in any stage of investigation or review in an endeavor to become a Partner.

bb) **"Prospective Purchaser"** means any Third Party who (i) has contacted Licensee or has been contacted by Licensee concerning becoming a Purchaser; or (ii) is in any stage of investigation or review in an endeavor to become a Purchaser.

cc) **"Purchaser"** means Third Parties contractually related to Licensee in Third Party Sales Transactions.

dd) **"Re-License Fee"** means ▇▇ of the Original License Fee; provided, however, that if the Original License Fee paid for (i) 2D Data is less than ▇▇▇ per linear mile, for whatever reason, the Re-License Fee due for those licenses shall be ▇▇▇ per linear mile regardless of the Original License Fee and (ii) 3D Data is less than ▇▇▇ per square mile, for whatever reason, the Re-License Fee due for those licenses shall be ▇▇▇ per square mile regardless of the Original License Fee. For the sake of clarity, 2D Data may never be re-licensed for less than ▇▇▇ per linear mile and 3D Data may never be re-licensed for less than ▇▇▇ per square mile under any circumstances.

ee) **"Show(n)"** or **"Showing"** means to display or otherwise allow passive viewing, under the direct supervision and control of Licensee, of the Data for short periods of time to a Third Party in a secure environment whereby such Third Parties are not able to (i) make copies, summaries, transcriptions, reproductions, or interpretations of any type; (ii) remove copies, summaries or transcriptions of the Data from Licensee's premises; (iii) make a regional interpretation of the Data; or (iv) otherwise impair the intellectual property value of such Data, and further provided that the Data shown is limited to the portions of the Data directly pertaining to a specific drilling prospect or leasehold interest or relevant for the purposes of a Change of Control.

ff) **"Storage Contractor(s)"** means Third Parties which are bona fide recognized contractors that are engaged by Licensee to provide central storage facilities and retrieval services and/or electronic databases for geophysical and geological data for the sole use and benefit of Licensee; provided that such contractors are not, directly or indirectly, related to or in the business of exploring for or producing hydrocarbons and are not engaged in the business of licensing geophysical data.

gg) **"Supplement"** and **"Supplemental Agreements"** are defined in Section 1.1 of this Agreement.

hh) **"Third Parties"** or **"Third Party"** means any Person not a party to this License (including, without limitation, Prospective Acquirers, Prospective Partners, and Prospective Purchasers) other than an Affiliate.

ii) **"Third Party Business Transaction(s)"** means farmouts, operating agreements, acreage trades, areas of mutual interest, joint development agreements, joint bidding agreements and similar business transactions entered into with Third Parties for the joint exploration and/or development of a particular geographical area(s), partially or wholly covered by any Data.

jj) **"Third Party Sales Transaction"** means individual or group asset sales and similar business transactions entered into with Third Parties for the sale of oil and gas assets (which would not constitute a change in Control or Ownership of Licensee), partially or wholly covered by any Data.

kk) **"Transfer"** means any grant of access to any Data of greater duration or scope than Shown, specifically, any sale, conveyance, sublet, assignment, lease, license, sublicense, transfer, exchange,

trade, publication, lien, mortgage, pledge, hypothecation, encumbrance, or other disposition of any Data, whether voluntary, by operation of law, or by any other method.

ll) **"Unedited Data"** means any Data which has not been edited to exclude areas of mineral no-permit.

## Article I
## License

1.1     **General**.  Subject to the terms and conditions provided herein, Licensor agrees to acquire or has acquired and grants to Licensee a non-exclusive, non-transferable license to use certain Data delineated in various supplemental agreements (each a **"Supplement"** and, collectively, the **"Supplemental Agreements"**), which may be executed from time to time.  Upon each occasion Licensor licenses Data to Licensee, the Parties will execute a Supplement to this Agreement. Licensee understands and agrees that each Data set (2D line or 3D survey) may have Derivative Products created from the same field Data. Should Licensee receive license to Licensor Derivative Products, each one shall be specifically itemized in a Supplement.   If no Licensor Derivative Product is specified, Licensee's license is limited to field data and support, and post-stack migration and intermediate products output during creation of these products.

Licensor and Licensee acknowledge and agree that this license transaction is an executory contract, within the meaning of Section 365 of Title 11 of the United States Code or as applicable under the Bankruptcy and Insolvency Act in Canada, with on-going obligations, including, without limitation, to not sue the licensee for misappropriation of trade secrets and infringement of copyright-protected seismic products while the Agreement remains in effect.

Licensee acknowledges and agrees that the license granted herein is personal in nature, and the Data constitutes confidential information, trade secrets and/or copyrighted original, creative expressions of Licensor.

1.2     **Supplemental Agreements**.  Each Supplement shall be executed substantially in the form attached hereto as Exhibit C, and shall:

a)  detail the specific commercial transaction;
b)  identify the specific Data;
c)  include the total license fee, license value or cost of the specific Data;
d)  identify the specific Data licensed by either line number, program name, mileage or square mileage, kilometer, block, 3D program name, and map, as necessary;
e)  identify any related support documentation copies; and
f)  include any other pertinent details concerning the license transaction to which the Parties mutually agree.

1.3     **Derivative Products**.  Licensee hereby grants to Licensor all right, title and interest in and to all Licensee Derivative Products and Licensor hereby grants back to Licensee a non-exclusive, non-transferable license to all Licensee Derivative Products. Provided, however, Licensee Derivative Products that are obtained by Licensee at its own expense shall not be disclosed or transferred to Licensor during the term of this Agreement, nor shall Licensor be permitted to license such Licensee Derivative Products to Third Parties.  At the termination of this Agreement, and hence the termination of licenses, all such Data shall be destroyed by Licensee.

1.4     **Data Ownership**.  Licensor's (and, as applicable, Licensor's co-owners') title to and ownership rights in the Data shall at all times remain vested in Licensor (and, as applicable, Licensor's co-owners), and Licensee shall acquire, under the terms of this Agreement, only the non-exclusive right to utilize the Data as provided herein.  Licensee acknowledges and agrees that that the license transaction(s) governed by this Agreement are executory contracts with ongoing obligations to maintain the confidentiality and secrecy of the Data and to destroy/return copies of the Data upon termination or expiration of this Agreement, and that any assignment or assumption of the Agreement in violation of this Agreement and without consent of the Licensor (including in the bankruptcy context) would constitute irreparable harm to the Licensor.  The Data may not be directly or indirectly, by operation of law or otherwise, Transferred to, Shown to, or otherwise made available to any other Person other than Licensee, except as specifically provided in this Agreement.  Licensee agrees to take any and all actions necessary to protect the Data from unauthorized duplication and to ensure that its employees, representatives or agents do not violate the terms and conditions of this Agreement, including, but not limited to, the limitations on access to and disclosure of the Data provided in Article II.  In the event this Agreement is violated, Licensor will be entitled to all remedies available to it at law and in equity, including, but not limited to, the specific remedies set forth below.  Licensee recognizes that Licensor, as owner or co-owner of the Data, may enter into agreements with other parties to license the Data, and that Licensor is free to license, use, sell, or in any other manner dispose of the Data upon such terms and conditions as Licensor may elect.

**Article II**
**Disclosure of Data**

2.1     **Limitations on Disclosure**.

   a)  General.  Licensee agrees that Licensor's license of the Data is personal, and that the Data shall be for Licensee's internal use only.  Licensee shall not Show, Transfer, or otherwise dispose of or allow access to, any or all of the Data except as specifically provided for in this Agreement.

   b)  Confidentiality Agreement.  Copies of any Confidentiality Agreements between Licensee and Third Parties as required by the terms of this Agreement shall be provided to Licensor upon request.

   c)  Required Disclosure.  Notwithstanding anything to the contrary herein, the Data may be disclosed to the extent such disclosure is specifically required by law, governmental or court decree, order, rule or regulation, or by any similar legal process.  In the event Licensee is required by law, governmental or court decree, order, rule or regulation, or by any similar legal process to disclose any Data, Licensee shall give Licensor prompt notice of such process so that Licensor may seek an appropriate protective order (or other appropriate remedy) with respect to maintaining the confidentiality of the affected Data before disclosure thereof by Licensee.  If, in the absence of a protective order, Licensee is nevertheless compelled to disclose Data, Licensee may disclose only that portion of the Data that Licensee is advised by written opinion of counsel is legally required to be disclosed in compliance with the relevant process.  In the event of such disclosure, Licensee shall give Licensor written notice of the Data to be disclosed as far in advance of its disclosure as practicable, and upon Licensor's request, Licensee shall use all reasonable efforts to obtain assurances that the disclosed Data will be accorded confidential treatment.

2.2     **Affiliates**.  Affiliates shall have the same right of usage of the Data as Licensee, provided that (a) such Affiliate shall agree to be liable under and bound by the terms of this Agreement to the same extent as Licensee, (b) the Affiliate use of the Data shall be for the sole use and benefit of Licensee, and further provided (c) such Affiliates do not competitively bid against the other or against Licensee for any leases or other assets.  Licensee shall promptly notify Licensor in writing of any changes to the Affiliates listed on Exhibit A after the Effective Date of this Agreement.  Exhibit A shall be amended from time to time to

reflect such changes. No new parties shall be added as Affiliates on Exhibit A, unless agreed to in writing by Licensor. All rights of usage by an Affiliate in the Data shall immediately cease and any copies of the Data or physical manifestations thereof then in the possession of an Affiliate shall immediately be returned to Licensee or destroyed in the event that any Affiliate should (i) cease to exist; (ii) commence competitively bidding against Licensee as described above, or (iii) no longer (A) be wholly owned by, (B) wholly own, or (C) remain under common ownership Control with Licensee.

2.3    **Outside Service Providers**.

    a) Consultants. The Data may be made available to Licensee's Consultants for the sole use and benefit of Licensee, provided (i) the Consultant signs a Confidentiality Agreement in advance of the restricted use of the Data; (ii) the Data shall remain on the premises of Licensee and all such analysis and interpretations thereof by Consultant shall be done on the premises and not removed therefrom without the written consent of Licensor; (iii) the period of time which the Consultant has access to the Data is no longer than is reasonably necessary for it to perform the work undertaken for Licensee; and (iv) upon completion of the work for which Consultant has been engaged or termination of this Agreement and/or applicable Supplement, whichever shall sooner occur, the Consultant shall not retain any copies of the Data, including any Derivative Products, or any analysis or interpretations of the Data.

    b) Processors. The Data may be made available to Licensee's Processors for the purpose of creating Derivative Products for the sole use and benefit of Licensee, provided the Processor signs a Confidentiality Agreement in advance of the restricted use of the Data and immediately returns the Data to Licensee upon the completion of the work for which the Processor has been engaged or termination of this License and/or applicable Supplement, whichever shall sooner occur. All Derivative Products created pursuant to this Section 2.3(b) shall be marked as provided in Section 5.1 of this Agreement to identify it as Data proprietary to Licensor.

    c) Storage Contractors. The Data may be delivered to the custody of Licensee's Storage Contractor for the sole use and benefit of Licensee, provided the Storage Contractor (i) signs a Confidentiality Agreement prior to the delivery of any Data; (ii) makes such Data available only to Licensee or Licensee's Affiliates as authorized by Licensor as provided herein; and (iii) immediately returns all copies of the Data to Licensee upon completion of the service engagement with Licensee or termination of this Agreement and/or applicable Supplement, whichever shall sooner occur.

2.4    **Prospective Acquirers / Prospective Partners / Prospective Purchasers**. Licensee may Show the Data to Prospective Acquirers, Prospective Partners and/or Prospective Purchasers, provided the respective Third Party signs a Confidentiality Agreement in advance of the Showing of the Data.

2.5    **Acquirers / Purchasers / Partners**. Licensee shall not Show, give copies of, or otherwise make available the Data to any Acquirers, Purchasers or Partners of Licensee without the prior written consent of Licensor, which consent may be withheld, conditioned, or delayed by Licensor in its sole and absolute discretion and subject to the execution of documents satisfactory to Licensor to protect and maintain the confidentiality of the Data. This prohibition on receiving a Show or access to the Data includes all joint venture entities between Partners and Licensee and any employees of Partners seconded to Licensee or the joint venture entities of Partners/Licensee.

2.6    **Delivery**. Licensee shall not deliver Data to Partners (including Partners in a joint venture with Licensee) or any other Person claiming a license, regardless of whether Licensee believes such Partner to have license to the Data. Deliveries of Data must be made by Licensor or its designee. In the case of Licensee Derivative Products (which Licensor will not possess), Licensee may deliver the Derivative

Products to a Partner only if Licensee has obtained written confirmation from Licensor in advance that such potential recipient is a bona fide license holder of the Data underlying the Licensee Derivative Product.

2.7     **Internet Disclosures**. Licensee shall not Show Data to Persons via the Internet, E-Commerce sites, virtual data rooms, asset divestiture web sites, or any other similar means of virtual access outside of Licensee's premises without the express prior written consent of Licensor; such consent may be withheld by Licensor in its sole and absolute discretion or may be premised upon the payment of a fee to Licensor and execution of documents satisfactory to Licensor to protect and maintain the confidentiality of the Data.

### Article III
### Fees and Payment Terms

3.1     **General**. As consideration for a license to the Data, Licensee agrees to pay Licensor in [U.S./CDN] Dollars (unless another currency is otherwise specified in the relevant Supplement) no later than thirty (30) days from invoice date, the licensing fee delineated in the specific Supplement for the Data, plus reproduction, tape copying and shipping charges. Licensee shall remit all payments to the appropriate one of the following:

   a) If to Seitel Data, Ltd., Seitel Offshore Corp., or Seitel Mexicana at:

   > 10811 South Westview Circle Drive
   > Suite 100, Building C
   > Houston, Texas 77043
   > Attention: President
   > Phone: (713) 881-8900
   > Fax: (713) 881-8901

   b) If to Seitel Canada Ltd. at:

   > 550 6th Avenue SW, Suite 1000
   > Calgary, Alberta T2P 0S2
   > Attention:  Vice President – Finance
   > Phone: (403) 515-2800
   > Fax: (403) 515-2822

Licensee is obligated to pay all amounts due Licensor under this Agreement or any Supplement (i) notwithstanding any Change of Control or Ownership of Licensee, and (ii) whether the Agreement (or any Supplement) is terminated for non-payment or otherwise as provided in this Agreement.

3.2     **Invoice; Late Payments**. Any outstanding balance not paid within the specified time limits, unless disputed in good faith by Licensee, shall bear interest, payable immediately by Licensee to Licensor, at the maximum rate allowed by applicable law, from the invoice date until paid in full. In the event Licensor incurs costs or expenses in connection with the enforcement of this Agreement and collection of any amounts owing hereunder, Licensee hereby agrees to pay, in addition to any unpaid license fees and interest accruing thereon, all such costs and expenses of enforcement and collection, including, without limitation, attorneys' fees. Payment of any invoice shall not prejudice the right of Licensee to challenge, dispute, question or litigate any charges contained in any invoice regardless of whether such challenge, dispute, question or litigation arises before or after such payment; provided Licensee, within one (1) year following the date of such invoice, shall make and deliver to Licensor at the above address written notice of objections to any charge or charges. In the event no such written notice is received, the charges shall be conclusively

deemed valid. Any challenge to such charge or charges shall be limited only to payment or non-payment for Data not delivered by Licensor pursuant to its contractual obligations.

*Sections 3.3, 3.4 and 3.5 apply only to Data that has not yet been acquired by Licensor at the time the Parties enter into a Supplement related to such Data.*

3.3     **Payment for Data Gathered**.  Rates for Data gathered during any particular phase may include permits, access fees, customary operation damages and Data gathering and processing fees, the costs of which have been estimated at the amounts as delineated in the Supplement for any particular program. Should the program square mileage average for such costs exceed the estimated amount, the additional costs (the "**Excess Costs**") may be shared proportionately by the participants in that program as specified and set forth in the applicable Supplement.  Licensee may be invoiced per the terms set forth in the applicable Supplement for such Data, with Excess Costs invoiced upon completion of each individual program, as specified and set forth in the applicable Supplement.

3.4     **Partial Data**.  If Licensor, in Licensor's reasonable judgement and at its sole discretion, is able to complete the gathering of only a portion of the Data because of terrain, permit limitations or obstructions, Licensee will be invoiced only for that portion completed; except, if permit limitations or environmental considerations cause the shots and receivers to be redistributed rather than deleted, Licensee shall be invoiced in full upon completion of such redistributed shots and receivers.

3.5     **Field Tapes**.  Licensor shall retain original field tapes and support information, or equivalent, for a minimum period of two (2) years from the date of completion of Data recording by Licensor.  Licensee may purchase field tape copies, or the equivalent, for data licensed hereunder at the prevailing rates. Licensor shall deliver such tapes within thirty (30) days from the date of request and/or approval of quote outlining pricing and delivery.

### Article IV
### Delivery

4.1     **General**.  Delivery of the processed Data sections and/or tapes will be made by Licensor to Licensee at a convenient, pre-arranged location or by courier, hand delivery, electronic transfer, or overnight delivery on the delivery date, as the Licensee so elects. Delivery will be made simultaneously to Original Participants.  The Data may be delivered either in phases or as a complete program at Licensor's sole option.  The Data shall be delivered as designated on the specific map attached to each Supplement for each particular line, square mile, kilometer, block or program, unless otherwise mutually agreed by the Parties.

4.2     **Delinquent Accounts**.  Notwithstanding Section 4.1, in the event Licensee has an outstanding balance under Section 3.2, Licensor may delay delivery of any Data until such time as Licensee has paid any past due amounts and any interest or expenses due hereunder.

### Article V
### Notice of Confidentiality; Mineral No Permits

5.1     **Notice**.  Licensee accepts full responsibility for ensuring that any Data conveyed hereunder remains confidential and is not made available to any non-Licensee, except as permitted pursuant to this Agreement. Any print, digital or film version of Data must contain the following statement:

"This Data is trade secret, is owned by a Seitel entity and is licensed to Fieldwood Energy LLC (Licensee) under terms and conditions of a 2D & 3D Onshore/Offshore Master Seismic Data Participation and Licensing Agreement, which strictly limits the use of such Data. This Data shall be for Licensee's own internal use only, and shall not be shown, sold, traded, disposed of, or otherwise made available to any party except under certain specific conditions delineated in such licensing agreement. Any unauthorized use or possession of this Data by any party is strictly prohibited."

5.2    **Mineral No Permits**. Licensee acknowledges that original field tapes, or the equivalent, and other pre-stack data may be Unedited Data. Delivery of such Unedited Data to service companies and/or Licensee is contingent upon Licensee agreeing not to receive Data or be shown Data that has not been edited for "mineral no permits" and executing a letter showing such agreement and indemnifying Licensor from the result of failing to abide by this Agreement.

**Article VI**
**Transfer; Change of Control**

6.1    **Prohibited Transfer**.   Licensee shall not Transfer this License, the Supplemental Agreement(s) and any Data (including any Derivative Products) licensed hereunder to a Third Party, in whole or in part, or Transfer its rights or obligations hereunder, expect as expressly authorized in this Agreement.

6.2    **Change of Control**.

   a)  Subject to clause (b) of this Section 6.2, any Change of Control shall constitute a Transfer prohibited by this Article VI, notwithstanding that the Change of Control may constitute an otherwise legal and valid corporate sale, merger, reorganization, combination, consolidation, or amalgamation.

   b)  Notwithstanding the foregoing, a Change of Control will not result in the termination of this Agreement or the charging of additional fees if, in the case of a merger between Licensee and second party, the second party to the merger held, immediately prior to the merger and pursuant to a separate license agreement between Licensor and the second party, a current license to the Data that is the subject of this Agreement.

   c)  For the sake of clarity, this Article VI shall apply even if Licensee continues to exist subsequent to a Change of Control in essentially the same form in which it existed prior to the Change of Control.

6.3    **Certification; Notice**.

   a)  Licensee agrees to, from time to time, upon request of Licensor, provide Licensor with a certification as to the Ownership and Control of Licensee.

   b)  In the event of a Change of Control or the entry into a publicly disclosable agreement by Licensee (or its parent company) that will cause a Change of Control, Licensee agrees to provide prompt written notice to Licensor at the address listed in Article XII below.

6.4    **Termination / Reduced License Fee**. Upon entry by Licensee (or its parent company or ultimate parent company) into an agreement that will cause a Change of Control, this Agreement, as well as all of the licenses granted under this Agreement and all Supplements, will terminate, and Licensee shall return or destroy all Data pursuant to Section 7.3 on or before the effective date of such Change of Control. Provided, however, prior to the effective date of any Change of Control, Licensee or Acquirer, as applicable, may execute Licensor's then standard licensing agreement to be effective upon the effective date of any Change of Control and purchase a license to the Data by paying the Re-License Fee. In the event Licensee or

Acquirer, as applicable, enters into such new agreement and purchases Data by paying the Re-License Fee, then Licensee shall not be required to return or destroy any such re-licensed Data upon the effective date of the Change of Control.

**6.5     Fee / Liquidated Damages**.  Licensee hereby agrees to pay to Licensor one-half percent (.5%) per day of the total Original License Fees paid for any Data not returned or destroyed pursuant to Sections 6.4 and 7.3 for every day beyond the effective date of any Change of Control that such Data is not returned or destroyed limited to the amount of the Re-License Fee.

In the event any Data required to be returned or destroyed pursuant to Section 6.4 and 7.3 has not been returned in accordance with these provisions within ten (10) days after the effective date of any Change of Control then, in addition to all other remedies available to Licensor at law and in equity, Licensee shall pay to Licensor as liquidated damages, and not as a penalty, an amount equal to 150% of the Original License Fees for the Data, which amount shall be deemed to include the amounts above in this Section, within three (3) business days of a written demand letter from Licensor.

**6.6     Termination During Work in Progress**.  In the event of a work in progress, when Licensor either itself or through Third Parties is in the process of acquiring or has committed to expend and/or has expended monies and/or resources to acquire Data and Licensee undergoes a Change of Control before Licensor has acquired, processed or delivered the Data to Licensee under the terms of this Agreement, then Licensee may not elect to return the Data pursuant to Section 6.4 and agrees to pay Licensor (i) any outstanding fees contemplated for the Data under the Agreement and (ii) a Re-License Fee.

### Article VII
### Term; Termination; Return of Data

**7.1     Term**.  This Agreement, including all Supplemental Agreements and the licenses to use the referenced Data therein, shall terminate twenty (20) years from the execution date of this Agreement, but may be extended by mutual written agreement of the Parties.

**7.2     Termination**.  The Agreement, the Supplemental Agreements and the licenses to use the referenced Data therein, will terminate:

  a)  at the election of Licensee under Section 6.4;
  b)  at the election of Licensor,
       1.  immediately upon written notice to Licensee that Licensee has committed a material breach of any provision of this Agreement relating to use, display, disclosure, Showing, sale, trade, lending, Transfer or other disposition of the Data;
       2.  30 days following written notice from Licensor that Licensee has failed to make any required payment as set forth in this Agreement unless the Licensee makes the required payment prior to the end of such 30 day period; or
       3.  30 days following written notice from Licensor that Licensee has breached any other provision of this Agreement not set forth in Sections 7.2(b)(1) and (2), provided Licensee has failed to remedy such breach prior to the end of such 30 day period.
  c)  immediately, without notice, and automatically upon the occurrence of any of the following:
       1.  Licensee ceasing to carry on its business;
       2.  Licensee making an assignment (voluntary or involuntary) for the general benefit of its creditors;
       3.  Licensee proposing any form of financial reorganization because of insolvency with creditors;

4. The institution by or against Licensee of insolvency, receivership, bankruptcy proceedings or any other proceedings or laws relating to insolvency;

5. A receiver, manager, trustee, custodian or similar agent is appointed or takes possession of all or substantially all of the property or business of the Licensee.

7.3  **Return or Destruction of Data**.  Immediately upon termination of the license granted by this Agreement (either as provided in this Article 7, or at Licensee's election in connection with a Change of Control pursuant to Section 6.4), Licensee shall return or cause to be returned to Licensor, or shall destroy or cause to be destroyed, the Data.  Return or destruction of the Data shall be attested to by execution of a Verification of Return/Destruction of Data form in the form attached as Exhibit D ("**Verification Form**"), which shall be provided to Licensor within 10 days of termination.

7.4  **Inspection**.  In the event that Licensee elects to destroy Data pursuant to Section 7.3, Licensor shall have the right, at its sole option, to inspect Licensee's premises, computers and workstations to ensure the return is complete, provided, however, if Licensee chooses not to allow the inspection detailed above, then the Verification Form must be executed by a corporate officer of Licensee.

## Article VIII
## Covenants

*Article VIII is applicable only to the license of Data that has not yet been acquired by Licensor at the time the Parties enter into a Supplement related to such Data.*

8.1  **Gathering of Data**.  The Data will be gathered and processed by reputable geophysical contractors (and competent and experienced sub-contractors) selected at Licensor's discretion, under the direction of Licensor, using personnel, instrumentation, parameters and techniques as are presently available.  The standards of the industry will be followed regarding testing and calibration of instruments for accuracy and performance specifications.

8.2  **Program Changes**.  Licensor agrees to make commercially reasonable efforts in locating the Data as indicated on the specific map attached to each Supplement for any particular line or program.  However, Licensor reserves the right to make program changes, deemed necessary by Licensor, due to permit, terrain or obstructions, which may affect field operations.  Original Participants will be consulted regarding any major program change.  In addition, acquisition of Data (including, without limitation, the scheduling of commencement and completion of operations) is subject to change, delay or cancellation depending upon weather conditions, availability of permits, environmental considerations, actions or inaction or other interference of governmental or regulatory bodies, and any other condition beyond the sole, commercially reasonable control of Licensor, including, without limitation, any occurrence of force-majeure, as defined in Article XIII, below.

8.3  **Changes to Acquisition Parameters**.  The Data will be acquired using the parameters delineated in the specific parameter sheet attached to each Supplement for any particular line or program, and generally processed using the processing sequence outlined in the specific parameter sheet attached to each Supplement.  Licensor will make such changes in both acquisition parameters and the processing sequence, as it deems necessary or appropriate upon review of field tests and initial processing results to ensure the acquisition of quality data.  Original Participants will be notified of any significant changes made in the acquisition parameters or processing sequence and shall be allowed to review the tests and results of the proposed changes.

**Article IX**
**LIMITED WARRANTY; INDEMNIFICATION**

9.1     **AUTHORITY TO LICENSE**.  LICENSOR HEREBY REPRESENTS AND WARRANTS
ONLY THAT IT HAS FULL AUTHORITY AND POWER TO PROVIDE LICENSEE WITH THE DATA
AND THAT IT WILL IN NO WAY BREACH ANY OBLIGATION IT HAS TO ANY OTHER PERSON
BY PROVIDING THE DATA TO LICENSEE. LICENSOR AGREES TO DEFEND, INDEMNIFY AND
HOLD HARMLESS LICENSEE (INCLUDING ITS AFFILIATES AND THEIR RESPECTIVE
EMPLOYEES, OFFICERS, DIRECTORS, AGENTS AND CONSULTANTS) FROM AND AGAINST
ALL CLAIMS, DAMAGES, LIABILITIES AND JUDGMENTS BASED UPON OR ARISING OUT OF
ANY BREACH BY LICENSOR OF THE FOREGOING REPRESENTATION, PROVIDED LICENSEE
NOTIFIES LICENSOR PROMPTLY IN WRITING OF ANY SUCH CLAIMS AGAINST IT AND
GIVES LICENSOR AUTHORITY, INFORMATION AND ASSISTANCE (AT LICENSOR'S
EXPENSE) FOR THE DEFENSE OR ASSISTANCE IN THE DEFENSE OF SUCH PLEADINGS.

9.2     **AS IS, WHERE IS; NO REPRESENTATION**.  EXCEPT AS SET FORTH IN SECTION 9.1,
LICENSEE AGREES THAT THE LICENSE TRANSACTION IS MADE ON AN "AS IS, WHERE IS"
BASIS. LICENSOR DOES NOT WARRANT THE ACCURACY OR QUALITY OF THE DATA, AND
ANY ACTIONS TAKEN OR EXPENDITURES MADE BY LICENSEE AS A RESULT OF
EXAMINATION, EVALUATION OR INTERPRETATION OF THE DATA SHALL BE AT THE SOLE
RISK, RESPONSIBILITY AND LIABILITY OF LICENSEE, WITHOUT ANY RECOURSE TO
LICENSOR. LICENSEE FURTHER AGREES THAT LICENSOR SHALL NOT BE LIABLE FOR ANY
REPRESENTATIONS, CONDITIONS OR WARRANTIES OF ANY KIND, EXPRESS OR IMPLIED,
INCLUDING,   WITHOUT   LIMITATION,   ANY   CONDITION   OR   WARRANTY   OF
MERCHANTABILITY, QUALITY OR FITNESS FOR A PARTICULAR PURPOSE, OR THAT THE
DATA IS COMPLETE, WHOLLY ACCURATE, OR ERROR FREE.

LICENSOR MAKES NO REPRESENTATION THAT OIL AND GAS OR OTHER MINERAL LEASES
WILL BE GRANTED OR OTHER EXPLORATION ACTIVITY WILL BE AUTHORIZED FOR AREAS
COVERED BY THE DATA BY ANY INDIVIDUAL, CORPORATION, GOVERNMENT ENTITY OR
OTHER THIRD PARTY, AND ANY IMPLIED WARRANTY OR REPRESENTATION TO THAT
EFFECT IS HEREBY EXPRESSLY NEGATED.

9.3     **LICENSOR INDEMNIFICATION**.  LICENSOR AGREES, SUBJECT TO THE CONDITIONS
SET FORTH IN THIS SECTION 9.3, TO INDEMNIFY AND HOLD HARMLESS LICENSEE AND
LICENSEE'S APPROVED PARTNERS AND APPROVED DESIGNEES AND THEIR EMPLOYEES,
OFFICERS, DIRECTORS, AGENTS AND CONSULTANTS (THE **"INDEMNIFIED PARTIES"**)
FROM ANY AND ALL CLAIMS FOR DAMAGES OR LIABILITY OF ANY NATURE
WHATSOEVER RESULTING FROM THE EXERCISE OF THE SEISMIC RIGHTS OR OTHERWISE
RELATED IN ANY WAY TO THE ACQUISITION OF THE DATA REGARDLESS OF THE LAW,
WHETHER IN CONTRACT, STRICT LIABILITY, NEGLIGENCE OR ABSOLUTE LIABILITY,
UNDER WHICH SUCH CLAIM FOR LIABILITY IS BROUGHT AND REGARDLESS OF THE
NEGLIGENCE (WHETHER SOLE, CONCURRENT OR CONTRIBUTORY) OF THE INDEMNIFIED
PARTIES.

LICENSEE AGREES THAT IT SHALL (I) PROMPTLY NOTIFY LICENSOR IN WRITING OF ANY
SUCH CLAIMS AGAINST IT AND (II) FULLY COOPERATE WITH LICENSOR OR ITS INSURORS
TO THE EXTENT COMMERCIALLY REASONABLE AND TO THE BEST OF ITS KNOWLEDGE IN

ANSWERING OR DEFENDING ANY CLAIM THAT MAY GIVE RISE TO A CLAIM OF INDEMNITY. LICENSOR SHALL ASSUME THE PRIMARY RESPONSIBILITY FOR AND CONTROL OF ANY MATTER FOR WHICH IT RECEIVES NOTICE FOR THE DEFENSE AND RESOLUTION OR SETTLEMENT OF ANY CLAIM THAT MAY GIVE RISE TO A CLAIM OF INDEMNITY UNDER THIS SECTION 9.3; PROVIDED THAT LICENSOR SHALL NOT SETTLE A CLAIM WITHOUT LICENSEE'S CONSENT IF THE SETTLEMENT INVOLVES ANYTHING OTHER THAN PAYMENT OF A SETTLEMENT FOR WICH LICENSEE IS FULLY INDEMNIFIED HEREUNDER.

9.4    **LICENSEE INDEMNIFICATION**.    IN THE EVENT OF ANY MISUSE OR INAPPROPRIATE DISCLOSURE OF ANY PORTION OF THE DATA OR ANY OTHER BREACH OF THIS AGREEMENT, LICENSEE HEREBY AGREES TO BE FULLY RESPONSIBLE FOR, AND SHALL DEFEND, INDEMNIFY AND HOLD LICENSOR HARMLESS AGAINST, ALL DAMAGES, COSTS OR OTHER LOSS SUFFERED OR INCURRED BY LICENSOR AS A DIRECT OR INDIRECT RESULT OF ANY SUCH MISUSE, INAPPROPRIATE DISCLOSURE OR BREACH OF THIS AGREEMENT.

9.5    **TAXES**.    Unless specifically set forth in the invoice, Licensor has taken the position that the licensing of Data pursuant to this Agreement does not cause any federal, state, provincial or local tax or fee, including but not limited to sales tax, value added tax, income tax, use tax, special production and services tax, and/or transfer tax. IF ANY TYPE OF FEDERAL, STATE, PROVINCIAL OR LOCAL TAXES OR FEES ARE IMPOSED ON THIS TRANSACTION AT ANY TIME, LICENSEE HEREBY AGREES TO PAY, INDEMNIFY, REIMBURSE AND HOLD HARMLESS LICENSOR FOR ANY LIABILITY FOR SUCH TAX.

## Article X
## LIMITATION OF LIABILITY; NO CONSEQUENTIAL DAMAGES

10.1    **LIMITATION OF LIABILITY**. EXCEPT FOR THE RIGHTS TO INDEMNIFICATION SET FORTH IN ARTICLE IX, LICENSEE'S SOLE AND EXCLUSIVE REMEDY FOR ANY CLAIM HEREUNDER SHALL BE LIMITED TO REPAYMENT OF THE LICENSE FEE BY LICENSOR IN EXCHANGE FOR RETURN OF THE DATA BY LICENSEE.

10.2    **NO CONSEQUENTIAL DAMAGES**.    NOTWITHSTANDING ANYTHING TO THE CONTRARY CONTAINED HEREIN, LICENSOR SHALL IN NO EVENT BE LIABLE TO LICENSEE OR ANY THIRD PARTIES FOR PUNITIVE, INDIRECT, INCIDENTAL OR CONSEQUENTIAL DAMAGES RESULTING FROM OR ARISING OUT OF THIS AGREEMENT OR THE USE BY LICENSEE OR ANY THIRD PARTIES OF THE DATA.

## Article XI
## Confidentiality

The terms of this Agreement shall be kept confidential by the Parties and shall not be disclosed to any other Person, except as may reasonably be necessary to administer this Agreement (*e.g.*, disclosure in connection with permitted disclosures of the Data pursuant to Article II, above), or as otherwise may be required by law.

## Article XII
## Notice

All notices to be given pursuant to this Agreement shall be in writing and shall be deemed to be sufficiently given if delivered by overnight courier, in which case the notice shall be deemed to have been received on the next business day after sending, or if delivered by hand to the representative named below, in which case the notice shall be deemed to have been received on the date of delivery, or if sent by certified mail, return receipt request, in which case the notice shall be deemed to have been received on the date of receipt, or if sent by email, in which case the notice shall be deemed to have been received when the recipient acknowledges receipt of such email (with an automatic "read receipt" not constituting such acknowledgement). Until written notice of change of address given pursuant to this Article XII, notices shall be addressed as follows:

    a) If to Seitel Data, Ltd., Seitel Offshore Corp., or Seitel Mexicana at:

> 10811 South Westview Circle Drive
> Suite 100, Building C
> Houston, Texas 77043
> Attention: President
> Email: sdl_notice@seitel.com
> Phone: (713) 881-8900
> Fax: (713) 881-8901

    b) If to Seitel Canada Ltd. at:

> 550 6th Avenue SW, Suite 1000
> Calgary, Alberta T2P 0S2
> Attention:  Vice President – Finance
> Email: scl_notice@seitel.com
> Phone: (403) 515-2800
> Fax: (403) 515-2822

    c) If to Licensee at:

> 2000 West Sam Houston Pkwy, Suite 1200
> Houston, TX  77042
> Mr. Matt McCarroll, President & CEO
> Email: MattM@fwellc.com
> Phone: (713) 969-1015

## Article XIII
### Force Majeure

Any delay or failure to perform under this Agreement arising from a force majeure event as specified herein shall not be deemed to be a default and shall not put an end to this Agreement, so that the same shall continue in suspense or part performance until such event shall have ceased. A force majeure event means: acts of God, earthquakes, fire, freezing, storm, tornados, floods, hurricanes, or other actions of the elements, explosion, accident, malicious, mischief, sabotage, insurrections, riot, strikes, lockouts, boycotts, picketing, labor disturbances, loss of power, public enemy, war (declared or undeclared), rebellion, civil disturbance, act of terrorism, compliance with any federal, state, or municipal law, or with any regulation, order, rule (including, but not limited to, priority, rationing or allocation orders or regulation) of governmental

agencies, or authorities or representatives of any government (foreign or domestic); total or partial failure or loss or shortage of all or part of transportation or other facilities ordinarily available to and used by a Party hereto in the performance of the obligations imposed by this Agreement, whether such facilities are such Party's own or those of others; or any cause, whether similar to or dissimilar from the causes herein enumerated, including without limiting the generality of the foregoing, any breakdown, either total or partial, of Licensor's facilities for any cause whatsoever; provided, however, that all such causes are beyond the reasonable control of the Party claiming force majeure and the settlement of strikes or lockouts shall be entirely within the discretion of the Party having the difficulty and that even though the Parties hereby agree that any force majeure shall be remedied as soon as practicable, the settlement of strikes or lockouts by acceding to demands of the opposing party when such course is inadvisable in the discretion of the Party having difficulty shall not be required. This Article XIII shall not relieve Licensee from its obligations to make any payments of amounts due and neither Party's time for performance shall be extended for any event that is reasonably in control of that Party.

### Article XIV
### Miscellaneous

14.1    **Entire Agreement**. This Agreement, including any Supplemental Agreements, sets forth the entire agreement between the Parties. The Parties agree that there are no understandings or agreements relative to this Agreement that are not fully expressed herein or in the Supplemental Agreements.

14.2    **Severability**. The Parties agree that any provision of this Agreement that is deemed to be or becomes null and void, illegal, invalid or unenforceable shall be severable herefrom and ineffective to the extent of such voidability, illegality or unenforceability, and shall not invalidate, affect or impair the remaining provisions of this Agreement. If and to the extent any court or governmental authority of competent jurisdiction holds any provision of this Agreement to be invalid or unenforceable, the Parties will negotiate in good faith to equitably adjust the provisions of this Agreement with a view toward effecting the intended purposes; any such holding shall not affect the validity or effectiveness of any other provisions of the Agreement, which will remain in full force and effect. Notwithstanding the foregoing, where permissible, the terms of this Agreement shall supersede statutory provisions to the contrary, if any.

14.3    **Governing Law**. This Agreement, as applied to the licensing of Data concerning properties in the United States, Mexico and the territorial waters of those countries shall be construed in accordance with the laws of the State of Texas, and as applied to the licensing of Data concerning properties in Canada and its territorial waters shall be construed in accordance with the laws of The Province of Alberta; all without giving effect to principles of conflict of laws.

14.4    **Compliance With Laws**. Each party shall comply with all applicable laws, regulations, and orders of all governmental authorities applicable to or issued in conjunction with this Agreement, including all Supplements, or the Data licensed under the Agreement, including, but not limited to any anti-corruption legislation applicable to any Party to this Agreement, such as the Corruption of Foreign Officials Act (Canada) or the Foreign Corrupt Practices Act (United States).

14.5    **DECEPTIVE TRADE PRACTICES ACT**. LICENSEE REPRESENTS TO LICENSOR THAT IT (I) IS IN THE BUSINESS OF SEEKING OR ACQUIRING, BY PURCHASE OR LEASE, GOODS OR SERVICES FOR COMMERCIAL OR BUSINESS USE, (II) HAS (OR IT IS OWNED OR CONTROLLED BY A CORPORATION OR ENTITY WITH) ASSETS OF USD $25 MILLION OR MORE ACCORDING TO ITS MOST RECENT FINANCIAL STATEMENT PREPARED IN ACCORDANCE WITH GAAP, AND (III) THEREFORE, IS A "BUSINESS CONSUMER" AND NOT

A "CONSUMER" AS THOSE TERMS ARE DEFINED AND USED IN THE DECEPTIVE TRADE PRACTICES - CONSUMER PROTECTION ACT, SECTION 17.41, ET. SEQ., OF THE BUSINESS AND COMMERCE CODE OF THE STATE OF TEXAS (THE "DTPA").

WITHOUT IMPAIRING ITS REPRESENTATIONS IN THE PRECEDING PARAGRAPH, IF LICENSEE HAS RIGHTS UNDER THE DTPA, LICENSEE HEREBY WAIVES SUCH RIGHTS.  TO EVIDENCE ITS ABILITY TO GRANT SUCH A WAIVER, LICENSEE REPRESENTS TO LICENSOR THAT IT (I) HAS KNOWLEDGE AND EXPERIENCE IN FINANCIAL AND BUSINESS MATTERS THAT ENABLE IT TO EVALUATE THE MERITS AND RISKS OF THE TRANSACTION CONTEMPLATED HEREBY, (II) IS NOT IN A SIGNIFICANTLY DISPARATE BARGAINING POSITION, AND (III) IS REPRESENTED BY LEGAL COUNSEL.  AFTER CONSULTATION WITH ITS ATTORNEY OF ITS OWN SELECTION, LICENSEE VOLUNTARILY CONSENTS TO THIS WAIVER.

14.6    **Change in Law**.  The Parties agree that if, after the Effective Date of this Agreement, there are changes in laws or regulations (including the imposition of new laws) or in the interpretation or application of laws or regulations, which in the reasonable opinion of Licensor adversely affect the benefits, rights or protections afforded Licensor either pursuant to the terms of this Agreement or by operation of law then, at Licensor's sole request, the Parties shall enter into negotiations and execute an amendment to this Agreement that places Licensor in substantially the same position as before the change of law.

14.7    **Cumulative Rights**.  The rights and remedies granted in this Agreement to Licensor in the event of default are cumulative and the exercise of any of those rights and remedies shall be without prejudice to the enforcement of any other right or remedy including, without limitation, injunctive relief, specific performance, and any other right or remedy available at law or in equity or authorized by this Agreement.

14.8    **No Waiver**.  The rights of each Party, whether granted by this Agreement or by law or equity, may be exercised, from time to time, singularly or in combination, and the waiver of one or more of such rights shall not be deemed to be a waiver of such right in the future or any one or more of the other rights that the exercising Party may have.  Any right, and any breach of a term, provision or condition of this Agreement by one Party shall not be deemed to have been waived by the other Party unless the waiver is expressed in writing and signed by an authorized representative of the waiving Party.  The failure of either Party to insist upon the strict performance of any term, provision or condition of this Agreement shall not be construed as a waiver or relinquishment in the future of the same or any other term, provision or condition.

14.9    **Amendment**.  This Agreement, and any Supplement, can only be modified or amended by mutual agreement of the Parties.  No modification or amendment will be binding on the Parties unless in writing and signed by both Parties.

14.10   **Interpretation**.  This Agreement represents a negotiated agreement and no portion shall be construed for or against either Party by virtue of its having been drafted by that Party.  Headings in this Agreement are for convenience only and shall not affect the meaning or interpretation of the Agreement.  Unless otherwise specifically so stated, terms such as "herein", "hereto" and "hereunder" shall refer to this Agreement in its entirety, and not to a specific paragraph.

14.11   **Survival**.  All provisions that logically ought to survive termination of this Agreement shall survive.

14.12   **Independent Contractor**.  No provision of this Agreement shall be construed to constitute Licensor as agent, servant, or employee of Licensee.  The relationship of Licensor to Licensee shall be that

of independent contractor. Licensee shall not have the right to control or direct the details of the work performed by Licensor. Licensor shall furnish at its own expense and risk, all labor, materials, equipment, tools and transportation and other items necessary in performance of the work covered herein.

14.13   **Prior Agreement**. This Agreement shall replace and supersede all prior unexpired, current and valid licensing agreements for data between Licensor and Licensee or its predecessors as of the date of this Agreement. This Agreement shall also replace and supersede all Prior Agreements. Both Licensee and Licensor agree that (i) Prior Data is expressly subject to the terms and conditions of this Agreement and, in the event of any conflict in terms between any Prior Agreements and this Agreement, the terms of this Agreement (including all Supplemental Agreements) shall control without exception, and (ii) it is the intention of the Parties that any Data in Licensee's possession, now or in the future, be governed by the terms of this Agreement, which shall control in the event of any conflict in terms between this Agreement and any other agreement, unless the Parties expressly agree otherwise in writing or until the termination or expiration of this Agreement by its terms. Licensee agrees to execute a Supplement for any Prior Data (under substantially similar terms to prior supplement) or Future Data that Licensee has access to upon notification by Licensor or discovery by Licensee of ownership of Licensor of such Prior Data or Future Data. The foregoing notwithstanding, nothing herein causes or will cause Licensor to be entitled to payments hereunder for any Transfer resulting from the restructuring transactions and the confirmed plan of reorganization in Licensee's bankruptcy filing in the United States Bankruptcy Court for the Southern District of Texas, Case 18-30648.

*[Signature Page to follow.]*

**IN WITNESS WHEREOF,** each Party, through its duly authorized representative, has executed this Agreement as of the Effective Date.

| **LICENSOR**<br>**Seitel Data, Ltd.** | **LICENSEE**<br>**Fieldwood Energy, LLC** |
|---|---|
| By: | By: |
| Name:   **Randy Sides** | Name:   G. M. McCarroll |
| Title:   Authorized agent of Seitel Delaware,<br>Inc., its sole general partner | Title:   President and CEO |

Please return one executed copy of this Agreement to:

Seitel Data, Ltd.
10811 South Westview Circle Drive
Suite 100, Building C
Houston, Texas 77043
Attn: Marcia J. Nouis

## EXHIBIT A

### Affiliates

None

FW

[*Affiliates*]

**EXHIBIT B**

**Forms of Confidentiality Agreement**

[*See attached.*]

**EXHIBIT B-1**

**Form of Confidentiality Agreement
(for use with Consultant)**

**CONFIDENTIALITY AGREEMENT**

This Confidentiality Agreement ("Confidentiality Agreement") is dated effective this ___ day of
_____, 201_ between _____ ("Disclosing Party") and
_____ ("Receiving Party"). Disclosing Party and Receiving Party are sometimes
referred to individually as a "Party" or together as the "Parties".

The term "Data" means geophysical and geological information, regardless of the form or medium on which
it is displayed or stored. The term "Derivative(s)" means any product directly or indirectly derived,
generated, or created from the Data alone, or in connection or combination with other data, including, but
not limited to any and all processed and reprocessed Data, interpretations, or analysis, regardless of the
form or medium on which it is displayed or stored and regardless of who produced such derivative products.
Collectively, Data and Derivatives shall hereinafter be referred to as "Data".

As a condition to Receiving Party's access and restricted use of the Data at Disclosing Party's premises
("Premises") pursuant to that certain [Consulting Agreement] dated _____ between
Disclosing Party and Receiving Party ("Underlying Agreement"), Disclosing Party and Receiving Party
enter into this Confidentiality Agreement whereby the Parties hereto agree and acknowledge that: (1) the
use of the Data is governed by a license agreement ("Agreement") between Disclosing Party and the
licensor or owner of the Data ("Licensor") and is considered Licensor's proprietary and confidential
information; (2) the Data constitutes valuable and highly confidential trade secrets of Licensor that are not
generally available and are the sole property and proprietary information of Licensor; (3) title to the Data
shall at all times remain with Licensor; and (4) Disclosing Party has acquired, under the terms of the
Agreement, only the non-exclusive right to utilize such Data on the terms provided therein.

As consideration for this Confidentiality Agreement, Receiving Party represents and warrants that it will:
a) keep and maintain the Data in strictest confidence, in accordance herewith; b) not disclose, release,
publish, deliver or otherwise disseminate the Data, directly or indirectly, to any other person or entity; c)
not use the Data in any manner or for any purpose other than for purposes of the Underlying Agreement;
d) not remove the Data in any form (copies, summaries, transcriptions, interpretations, etc.) for any purpose
or reason from the Premises; e) not copy, image, replicate, or duplicate the Data or make transcriptions
thereof; and f) not transfer, sell, convey, sublet, assign, lease, license, sublicense, exchange, trade, publish,
create a lien, mortgage, pledge, hypothecation, encumbrance, or otherwise dispose of the Data or impair its
intellectual property value, whether voluntarily, by operation of law, or by any other method.

Upon completion of Receiving Party's work or services under the Underlying Agreement and/or
termination of the Underlying Agreement, the Agreement, or this Confidentiality Agreement, whichever
shall first occur, Receiving Party shall immediately return all forms of the Data in its possession, care,
custody or control to Disclosing Party and shall retain no copies or transcriptions thereof.

The term of this Confidentiality Agreement shall be contemporaneous with the term of the Underlying
Agreement. In addition, the obligations of the Parties under this Confidentiality Agreement shall survive
termination of this Confidentiality Agreement for a period of five (5) years.

The Parties agree that Licensor shall be entitled to receive a copy of this Confidentiality Agreement and a
map and other detailed description of the Data disclosed hereunder, upon request, and shall be further
entitled to equitable relief, including injunction and specific performance, in the event of any breach of the
provisions of this Confidentiality Agreement, in addition to all other remedies available under the

## EXHIBIT B-1

### Form of Confidentiality Agreement
### (for use with Consultant)

Agreement, at law or in equity. It is further understood and agreed that no failure or delay by the Disclosing Party in exercising any right, power or privilege will operate as a waiver, nor will any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any right, power or privilege.

This Confidentiality Agreement will be governed by and construed in accordance with the substantive laws (but not the rules governing conflicts of laws) of [the State of Texas[1] / The Province of Alberta[2]] and will be binding upon and inure to the benefit of the Parties hereto and their respective successors, assigns and heirs.

This Confidentiality Agreement may be executed in counterparts, and such counterparts, taken together, shall be deemed to constitute one and the same agreement.

**Disclosing Party:**                          **Receiving Party:**

By: _____          By: _____

Name: _____          Name: _____

Title: _____          Title: _____

Date: _____          Date: _____

---

[1] For Data concerning properties in the United States, Mexico and the territorial waters of those countries.
[2] For Data in Canada and its territorial waters.

*[Form of Confidentiality Agreement for use with Consultant]*

**EXHIBIT B-2**

**Form of Confidentiality Agreement**
**(for use with Processors and Storage Contractors)**

**CONFIDENTIALITY AGREEMENT**

This Confidentiality Agreement ("Confidentiality Agreement") is dated effective this ___ day of
_____, 201_ between _____ ("Disclosing Party") and
_____ ("Receiving Party"). Disclosing Party and Receiving Party are sometimes
referred to individually as a "Party" or together as the "Parties".
§
The term "Data" means geophysical and geological information, regardless of the form or medium on which
it is displayed or stored. The term "Derivative(s)" means any product directly or indirectly derived,
generated, or created from the Data alone, or in connection or combination with other data, including, but
not limited to any and all processed and reprocessed Data, interpretations, or analysis, regardless of the
form or medium on which it is displayed or stored and regardless of who produced such derivative products.
Collectively, Data and Derivatives shall hereinafter be referred to as "Data".

As a condition to the receipt and handling of the Data on Receiving Party's premises ("Premises") pursuant
to that certain [Processing Agreement or Storage/Data Management Agreement] dated
_____ between Disclosing Party and Receiving Party ("Underlying Agreement"),
Disclosing Party and Receiving Party enter into this Confidentiality Agreement whereby the Parties hereto
agree and acknowledge that: (1) the use of the Data is governed by a license agreement ("Agreement")
between Disclosing Party and the licensor or owner of the Data ("Licensor") and is considered Licensor's
proprietary and confidential information; (2) the Data constitutes valuable and highly confidential trade
secrets of Licensor that are not generally available and are the sole property and proprietary information of
Licensor; (3) title to the Data shall at all times remain with Licensor; and (4) Disclosing Party has acquired,
under the terms of the Agreement, only the non-exclusive right to utilize such Data according to the terms
provided therein.

As consideration for this Confidentiality Agreement, Receiving Party represents and warrants that it will:
a) keep and maintain the Data in strictest confidence, in accordance herewith; b) not disclose, release,
publish, deliver or otherwise disseminate the Data, directly or indirectly, to any other person or entity; c)
not use the Data in any manner or for any purpose other than for purposes of the Underlying Agreement;
d) not remove the Data in any form (copies, summaries, transcriptions, interpretations, etc.) for any purpose
or reason from the Premises except as expressly instructed by Disclosing Party; e) not copy, image,
replicate, or duplicate the Data or make transcriptions thereof except as expressly instructed by, and for the
sole benefit of, Disclosing Party; f) not transfer, sell, convey, sublet, assign, lease, license, sublicense,
exchange, trade, publish, create a lien, mortgage, pledge, hypothecation, encumbrance, or otherwise dispose
of the Data or impair its intellectual property value, whether voluntarily, by operation of law, or by any
other method; and g) inform its owner(s), successors-in-interest and assigns, officers, directors, agents,
contractors and employees of the confidentiality and non-disclosures terms and conditions of this
Confidentiality Agreement and shall require their strict compliance with such terms.

Upon completion of Receiving Party's work or services under the Underlying Agreement and/or
termination of the Agreement, the Underlying Agreement, or this Confidentiality Agreement, whichever
shall first occur, Receiving Party shall immediately return all forms of the Data in its possession, care,
custody or control to Disclosing Party and shall also remove any and all Data from its computer drives,
files, storage, and archival systems.

## EXHIBIT B-2

### Form of Confidentiality Agreement
### (for use with Processors and Storage Contractors)

The term of this Confidentiality Agreement shall be contemporaneous with the term of the Underlying Agreement. In addition, the obligations of the Parties under this Confidentiality Agreement shall survive termination of this Confidentiality Agreement for a period of five (5) years.

The Parties agree that Licensor shall be entitled to receive a copy of this Confidentiality Agreement and a map and other detailed description of the Data disclosed hereunder, upon request, and shall be further entitled to equitable relief, including injunction and specific performance, in the event of any breach of the provisions of this Confidentiality Agreement, in addition to all other remedies available under the Agreement, at law or in equity. It is further understood and agreed that no failure or delay by the Disclosing Party in exercising any right, power or privilege will operate as a waiver, nor will any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any right, power or privilege.

This Confidentiality Agreement will be governed by and construed in accordance with the substantive laws (but not the rules governing conflicts of laws) of [the State of Texas[3] / The Province of Alberta[4]] and will be binding upon and inure to the benefit of the Parties hereto and their respective successors, assigns and heirs.

This Confidentiality Agreement may be executed in counterparts, and such counterparts, taken together, shall be deemed to constitute one and the same agreement.

**Disclosing Party:**                          **Receiving Party:**

By: _____              By: _____

Name: _____              Name: _____

Title: _____            Title: _____

Date: _____             Date: _____

---

[3] For Data concerning properties in the United States, Mexico and the territorial waters of those countries.
[4] For Data in Canada and its territorial waters.

**EXHIBIT B-3**

**Form of Confidentiality Agreement**
**(for use with Prospective Acquirers, Prospective Partners, or Prospective Purchasers)**

## CONFIDENTIALITY AGREEMENT

This Confidentiality Agreement ("Confidentiality Agreement") is dated effective this _____ day of _____, 201_ between _____ ("Disclosing Party") and _____ ("Receiving Party"). Disclosing Party and Receiving Party are sometimes referred to individually as a "Party" or together as the "Parties".

The term "Data" means geophysical and geological information, regardless of the form or medium on which it is displayed or stored.  The term "Derivative(s)" means any product directly or indirectly derived, generated, or created from the Data alone, or in connection or combination with other data, including, but not limited to any and all processed and reprocessed Data, interpretations, or analysis, regardless of the form or medium on which it is displayed or stored and regardless of who produced such derivative products. Collectively, Data and Derivatives shall hereinafter be referred to as "Data".

Disclosing Party represents and warrants that it is necessary to disclose to Receiving Party, subject to the terms hereof, certain Data licensed to Disclosing Party, for the limited purpose of facilitating evaluation of a proposed merger or acquisition transaction between the Parties, or proposed farmout, operating agreement, acreage trade, area of mutual interest, joint development agreement, joint bidding agreement or similar business transactions between Disclosing Party and Receiving Party for the joint exploration and/or development of a particular geographical area(s) or prospect(s) as described on the Schedules(s) attached hereto ("Proposed Transaction").

The Parties hereto agree and acknowledge that: (1) the use of the Data is governed by a license agreement ("Agreement") between Disclosing Party and the licensor or owner of the Data ("Licensor") and is considered Licensor's proprietary and confidential information; (2) the Data constitutes valuable and highly confidential trade secrets of Licensor that are not generally available and are the sole property and proprietary information of Licensor; (3) title to the Data shall at all times remain with Licensor; and (4) Disclosing Party has acquired, under the terms of the Agreement, only the non-exclusive right to utilize such Data according to the terms provided therein.

As consideration for this Confidentiality Agreement, Receiving Party represents and warrants that it will: a) keep and maintain the Data in strictest confidence, in accordance herewith; b) not disclose, release, publish, deliver or otherwise disseminate the Data, directly or indirectly, to any other person or entity; c) not use the Data in any manner or for any purpose other than the evaluation of the Proposed Transaction; d) not work or otherwise interpret the Data; e) not operate the workstation on which the Data is stored or in any way manipulate the Data electronically; f) not remove the Data in any form for any purpose or reason from Disclosing Party's premises, possession, and/or control; g) not copy, image, replicate, or duplicate the Data or make transcriptions thereof; and h) not transfer, sell, convey, sublet, assign, lease, license, sublicense, exchange, trade, publish, create a lien, mortgage, pledge, hypothecate, encumbrance, or otherwise dispose of the Data or impair its intellectual property value, whether voluntarily, by operation of law, or by any other method.

Receiving Party shall be responsible for ensuring that all personnel to whom the Data is disclosed under this Confidentiality Agreement have read this Confidentiality Agreement and agree to comply with its terms and confidentiality requirements.

**EXHIBIT B-3**

**Form of Confidentiality Agreement**
**(for use with Prospective Acquirers, Prospective Partners, or Prospective Purchasers)**

This Confidentiality Agreement shall terminate one (1) year from the date of issuance as set forth above, however, the obligations of the parties to this Confidentiality Agreement shall survive termination of this Confidentiality Agreement for a period of five (5) years.

The Parties agree that Licensor shall be entitled to receive a copy of this Confidentiality Agreement and a map and other detailed description of the Data disclosed hereunder, upon request, and shall be further entitled to equitable relief, including injunction and specific performance, in the event of any breach of the provisions of this Confidentiality Agreement, in addition to all other remedies available under the Agreement, at law or in equity. It is further understood and agreed that no failure or delay by the Disclosing Party in exercising any right, power or privilege will operate as a waiver, nor will any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any right, power or privilege.

This Confidentiality Agreement will be governed by and construed in accordance with the substantive laws (but not the rules governing conflicts of laws) of [the State of Texas[5] / The Province of Alberta[6]] and will be binding upon and inure to the benefit of the Parties hereto and their respective successors, assigns and heirs.

This Confidentiality Agreement may be executed in counterparts, and such counterparts, taken together, shall be deemed to constitute one and the same agreement.

**Disclosing Party:**                    **Receiving Party:**

By: _____          By: _____

Name: _____          Name: _____

Title: _____          Title: _____

Date: _____          Date: _____

---

[5] For Data concerning properties in the United States, Mexico and the territorial waters of those countries.
[6] For Data in Canada and its territorial waters.

*[Form of Confidentiality Agreement*
*for use with Prospective Acquirers, Prospective Partners, or Prospective Purchasers]*

**EXHIBIT C**

**SCHEDULE "1"**
Supplemental Agreement to a
2D & 3D Onshore/Offshore Master Seismic Data Participation and Licensing Agreement
between
**Seitel Data, Ltd. ("Licensor")**
and
**Fieldwood Energy LLC ("Licensee")**
**Dated**
May 30, 2018

**Fieldwood Energy LLC** agrees to license *[linear miles] [square miles] [blocks]* of [2-D] [3-D] geophysical data acquired by Licensor as delineated by area and *[linear miles] [square miles] [blocks]* and at rates as specified below, under terms and conditions of the 2D&3D Onshore/Offshore Master Seismic Data Participation and Licensing Agreement to which this supplemental agreement is attached and made a part thereof.

| Area | Committed | Cost Per | Total Cost |
|---|---|---|---|
| | *[linear miles]* | *[linear mile]* | |
| | *[square miles]* | *[square mile]* | |
| | *[blocks]* | *[block]* | |

(does not include normal and customary reproduction charges or field tape copy charges)

Billing Address:     **Fieldwood Energy LLC**
                     2000 West Sam Houston Pkwy
                     Houston, TX  77042
                     Attn: Mr. Matt McCarroll, President & CEO

Delivery Address:     SAME

**ACCEPTED AND AGREED TO THIS _____ DAY OF _____, 20____.**

**Seitel Data, Ltd.**                     **Fieldwood Energy LLC**

By:_____          By:_____
     **Randy Sides**
     Authorized agent of Seitel Delaware, Inc.,     Title:_____
     its sole general partner

**[Form of Supplement]**

**EXHIBIT D**

## FORM VERIFICATION OF RETURN/DESTRUCTION OF DATA

This Verification of Return/Destruction of Data ("Verification Form") is being delivered pursuant to that certain 2D & 3D Onshore/Offshore Master Seismic Data Participation and Licensing Agreement ("Agreement"), by and between the following respective owner(s) or co-owner(s) of Data licensed thereunder, as applicable, Seitel Canada Ltd., Seitel Data, Ltd., Seitel Mexicana or Seitel Offshore Corp., hereinafter collectively or individually referred to as **"Licensor"**, and the undersigned, hereinafter referred to as **"Licensee"** effective as of _____.  Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Agreement.

Licensee hereby represents, warrants and verifies to Licensor, that all Data, including any Derivative Products and any Data provided to any other Person in accordance with the terms of the Agreement, has been *(check one)*:


_____          Returned to Licensor

_____          Destroyed


Specifically, as of the date of this Verification Form, all Data has been completely removed from the computer system, files, offices, warehouses, or other locations within the possession, custody or control of Licensee.  In addition, all references to the Data have been returned or destroyed, as applicable, by permanently deleting or otherwise permanently eliminating them from all computers, files, storage facilities, and any and all other paper, electronic, digital or other forms of media within the possession, custody or control of Licensee.

Notwithstanding the foregoing, to the extent that computer back-up procedures create copies of Data, and Licensee is unable to delete such information from its back-up system, Licensee may retain such information for the period it normally archives backed-up computer files, subject to the confidentiality, use and disclosure restrictions of the Agreement.

Licensee acknowledges and agrees that Licensor is relying on this Verification Form as confirmation that Licensee is not retaining any Data in any form and, further, as Licensee's acknowledgement that retaining any Data would entitle Licensor to damages as provided in the Agreement as well as all other remedies available to Licensor at law or in equity.

Verified this _____ day of _____, 20__.


|  |  |
|---|---|
| By: | _____ |
| Print Name: | _____ |
| Title: | _____ |
| Company | _____ |