IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| **FIELDWOOD ENERGY LLC, *et al.*,** | § | Case No. 20-33948 (MI) |
| | § | |
| Debtors.[1] | § | (Jointly Administered) |
| | § | |

DEBTORS' MEMORANDUM OF LAW IN SUPPORT OF
(I) CONFIRMATION OF FOURTH AMENDED JOINT CHAPTER 11 PLAN OF
FIELDWOOD ENERGY LLC AND ITS AFFILIATED DEBTORS AND
(II) OMNIBUS REPLY TO OBJECTIONS THERETO

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are:  Dynamic Offshore Resources NS, LLC (0158); Fieldwood Energy LLC (6778); Fieldwood Energy Inc. (4991); Fieldwood Energy Offshore LLC (4494); Fieldwood Onshore LLC (3489); Fieldwood SD Offshore LLC (8786); Fieldwood Offshore LLC (2930); FW GOM Pipeline, Inc. (8440); GOM Shelf LLC (8107); Bandon Oil and Gas GP, LLC (9172); Bandon Oil and Gas, LP (9266); Fieldwood Energy SP LLC (1971); Galveston Bay Pipeline LLC (5703); and Galveston Bay Processing LLC (0422).  The Debtors' primary mailing address is 2000 W. Sam Houston Parkway S., Suite 1200, Houston, TX  77042.

# TABLE OF CONTENTS

**Page**

**Preliminary Statement**.................................................................................4

**Background and Facts in Support of Confirmation**...............................................8
    I.     Chapter 11 Plan and Disclosure Statement ........................................8
    II.    The Restructuring Transactions ....................................................11
        A.    Credit Bid Transaction ......................................................12
        B.    Divisive Mergers..............................................................13
            i.     FWE I...........................................................14
            ii.    FWE III.........................................................16
            iii.   FWE IV..........................................................17
        C.    Additional Agreements with Predecessors .............................18
            i.     Eni...............................................................18
            ii.    Hunt.............................................................19
    III.   The Abandoned Properties...........................................................19

**Argument**.........................................................................................21
    I.     The Plan is Feasible Pursuant to Section 1129(a)(11) ..........................21
        A.    Consummation of the Credit Bid Transaction ..........................23
        B.    Effectuation of Divisive Mergers and Allocation of Assets and
            Liabilities to FWE I, FWE III, and FWE IV...............................25
        C.    Credit Bid Purchaser and Each of the Divisive Merger Entities
            Will Obtain All Required Bonding........................................26
        D.    All of the FWE I Assets Will be Safely Decommissioned, as
            Designed by the Plan ........................................................27
        E.    All of the FWE III Assets Will be Safely Decommissioned, as
            Designed by the Plan ........................................................28
    II.    Abandonment of the Abandoned Properties Is Authorized by the
       Bankruptcy Code and Complies with All Other Applicable Law .........................29
        A.    Operational and Financially Capable Predecessors and CIOs..................31
        B.    Transition Services Proposal to the Government.........................32
    III.   Objections Regarding Debtors' Alleged Inability to Satisfy All
       Administrative Expense Claims Should be Overruled ...........................33
        A.    The Sureties' Contingent Indemnification and Reimbursement
            Claims, Constitute Pre-petition, Unsecured Claims to the Extent
            Allowed.....................................................................34
            i.     Contingent Indemnification Claims are pre-petition claims
                that do not arise out of a transaction with a post-petition
                Debtor .......................................................34
            ii.    Midlantic does not convert any pre-petition Contingent
                Indemnification Claims into post-petition, administrative
                expense obligations of the Debtors .............................36

i

       iii.    Sureties will not expend any amounts on account of the Contingent Indemnification Claims until post-Effective Date ................................................................................38

    B.    Predecessors Do Not Hold Administrative Expense Claims on Account of the Debtors' P&A Obligations ................................39

IV.    Plan Releases, Exculpation Provision, and Injunction Provisions Are Appropriate ..................................................................................40

    A.    Debtor Releases ........................................................................41

    B.    Third-Party Releases ................................................................45

    C.    Exculpation Provision ..............................................................49

    D.    Injunction Provisions. ..............................................................52

**Confirmation Objections**.............................................................................**53**

I.    BP's Objection Should be Overruled .................................................53

    A.    BP's Feasibility Challenges Misstate the Terms of the Plan and Applicable Law ........................................................................53

    B.    BP's Setoff Arguments Fail ....................................................56

II.    Apache Sureties' Arguments Should Be Overruled .........................59

    A.    Apache Sureties Have Waived All Defenses or Counterclaims Related to the Apache Surety's Obligations under the Apache Surety Bonds ............................................................................59

        i.    The Original 2013 Decommissioning Agreement ........................59

        ii.    Letters of Credit and Bonds Issued on Behalf of FWE for Apache's Benefit ................................................................60

        iii.    Fifth Amendment to the Decommissioning Agreement in April 2018 ........................................................................61

        iv.    The Everest and Philadelphia Bonds Contain Waivers of All Defenses and Counterclaims..........................................62

        v.    The Indemnity Agreements...............................................62

    B.    The Apache Sureties' Objections Should be Overruled ...........63

        i.    The Decommissioning Agreement, the Apache Surety Bonds and the Indemnity Agreements are Three Independent Contracts ....................................................63

        ii.    Section 1123(a)(4) is not Violated Because Apache is not Receiving More Favorable Treatment than Other Class 6B Creditors on Account of its Contingent, Unsecured Claims..........66

        iii.    The FWE I Structure is an Integral Component of the Debtors' Plan to Decommission the FWE I Properties ................68

        iv.    FWE I's Proposed Corporate Form does not Violate Sections 1123(a)(6) and (7) of the Bankruptcy Code ................71

III.    The Remaining Provisions of Section 1129 and Other Relevant Sections of the Bankruptcy Code are Satisfied..........................................................73

    A.    The Plan Satisfies 11 U.S.C. § 1129(a)(1)................................74

        i.    The Plan Complies with 11 U.S.C. § 1122 ......................74

        ii.    The Plan Satisfies 11 U.S.C. § 1123 ................................76

        iii.    The Plan Satisfies 11 U.S.C. § 1123(b) ..........................78

    B.    The Plan Satisfies 11 U.S.C. § 1129(a)(2)................................79

|       |     |                                                                      |     |
| ----- | --- | -------------------------------------------------------------------- | --- |
|       | i.  | The Debtors have Complied with 11 U.S.C. § 1125 ...................... | 79  |
|       | ii. | The Debtors have Complied with 11 U.S.C. § 1126 ..................... | 81  |
| C.    |     | The Plan Satisfies 11 U.S.C. § 1129(a)(3)............................... | 82  |
| D.    |     | The Plan Satisfies 11 U.S.C. § 1129(a)(4)............................... | 82  |
| E.    |     | The Plan Satisfies 11 U.S.C. § 1129(a)(5)............................... | 83  |
| F.    |     | The Plan Satisfies 11 U.S.C. § 1129(a)(6)............................... | 84  |
| G.    |     | The Plan Satisfies 11 U.S.C. § 1129(a)(7)............................... | 84  |
| H.    |     | The Plan Satisfies 11 U.S.C. § 1129(a)(8)............................... | 87  |
| I.    |     | The Plan Satisfies 11 U.S.C. § 1129(a)(9)............................... | 87  |
| J.    |     | The Plan Satisfies 11 U.S.C. § 1129(a)(10)............................. | 90  |
| K.    |     | The Plan Satisfies 11 U.S.C. § 1129(a)(11)............................. | 90  |
| L.    |     | The Plan Satisfies 11 U.S.C. § 1129(a)(12)............................. | 91  |
| M.    |     | 11 U.S.C. §§ 1129(a)(13)–(16) Does Not Apply....................... | 91  |
| N.    |     | The Plan Satisfies 11 U.S.C. § 1129(b) ................................. | 92  |
| O.    |     | The Plan Satisfies 11 U.S.C. § 1129(c) ................................. | 94  |
| P.    |     | The Plan Satisfies 11 U.S.C. § 1129(d) ................................. | 95  |
| Q.    |     | 11 U.S.C. § 1129(e) Does Not Apply ................................... | 95  |

WEIL:\97963036\30\45327.0007

Fieldwood Energy LLC ("**FWE**") and its debtor affiliates in the above-captioned chapter 11 cases, as debtors and debtors in possession (collectively, the "**Debtors**") state as follows in support of confirmation of the *Fourth Amended Joint Chapter 11 Plan of Fieldwood Energy LLC and Its Affiliated Debtors* (ECF No. 1284) (including any exhibits and schedules thereto and as may be further amended, supplemented, or modified, the "**Plan**") pursuant to § 1129 of chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**"):

## PRELIMINARY STATEMENT

1.      The Debtors began their restructuring process in March 2020 after a rapid fall in commodity prices, along with the extraordinary pandemic conditions, caused the Debtors to seek relief under Chapter 11 of the Bankruptcy Code to restructure their business to address significant liabilities that could no longer be supported by the Debtors' existing business.  The Debtors have created a Plan to handle all of these liabilities, both in the capital structure and with respect to their decommissioning obligations.

2.      The Plan provides for a comprehensive restructuring to be accomplished through a series of transactions that will preserve over 1,000 jobs, maximize recoveries to creditors, and address 100% of the Debtors' decommissioning obligations (approximately 91% of which is addressed on a consensual basis, as shown in the pie chart below) without imposing any liability on the American taxpayer.



3.      The Plan is supported, based on the voting results and through multiple consensual settlement arrangements, by (i) every class of financial creditors in the Debtors' capital structure, (ii) multiple predecessors in interest (including Apache, Chevron, Eni, and Hunt), (iii) the Debtors' trade creditors, and (iv) the Creditors' Committee.[2]   Perhaps most remarkable is the Debtors' success in securing a significant level of new capital to fund the proposed restructuring, including approximately $225 million from the Debtors' existing lenders, a $450 million standby credit facility from Apache, including a $50 million working capital facility[3] (the Debtors' largest predecessor) to support the FWE I structure, which will address two-thirds of the Debtors' P&A obligations.   Moreover, the Debtors are finalizing a bonding arrangement for Credit Bid Purchaser based on a commitment received from a surety to provide the same.

---

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Plan or Disclosure Statement, as applicable.

[3] The $50 million working capital facility remains subject to lender's final approval.

4.     Most importantly, the Plan creates a framework for all decommissioning obligations to be managed in an organized, environmentally safe manner.  As a result of, among other things, the significant consensus achieved by the Debtors and certain modifications to the Plan to ensure a safe and orderly transition of the Abandoned Properties, the Debtors anticipate that the U.S. Government (the "**Government**") will not object to the Plan, but the Debtors are still in discussions with the Government.

5.     The parties objecting to confirmation of the Plan primarily consist of certain predecessors, co-working interest owners, and sureties where a consensual resolution has not been reached despite the Debtors' open engagement with stakeholders.  The categories of objections generally fall into five buckets: (i) challenges to Plan feasibility, (ii) objections relating to the Debtors' ability to abandon properties, (iii) various objections raised by sureties with outstanding bonds on the Apache Legacy Properties (the "**Apache Sureties**") regarding the FWE I structure, (iv) objections to the release and exculpation provisions of the Plan, and (v) cure objections.  For the reasons discussed below, each of these objections should be overruled.

6.     First, each of the feasibility objections either applies the wrong standard, misunderstands the terms and objectives of the Plan, and/or advances legal theories (such as subrogation rights to the Government) that are legally incorrect.  As further discussed below, where all or substantially all of the debtors' assets are sold pursuant to a plan, courts look to the probability that the transaction will be consummated and the plan implemented—not the subsequent viability of the purchaser as a going concern.  *See In re Cypresswood Land Partners, I*, 409 B.R. 396 (Bankr. S.D. Tex. 2009).  In a similar vein, in cases where the plan contemplates winding down, liquidation, or dissolution, courts generally analyze whether the proposed liquidation or wind-down itself is feasible.  *See In re Heritage Org., L.L.C.*, 375 B.R. 230, 311

6

(Bankr. N.D. Tex. 2007).  Here, the vast majority of the feasibility objections attempt to move the goal post by applying a "going concern" feasibility test to either the NewCo Entities (including Credit Bid Purchaser, a buyer of estate assets, not a reorganized debtor) or FWE I, FWE III, and FWE IV, whose purpose is to decommission, plug and abandon their respective oil and gas leases and interests.  The evidence will show that the Debtors can and will implement the proposed restructuring transactions and successfully carry out the terms of the Plan by addressing all decommissioning obligations in a methodical and safe manner by responsible parties, consummating the Credit Bid Transaction and related transactions, and making all required payments and distributions in accordance with the Plan.

7.    Second, as further described below, the Debtors have formulated adequate conditions to protect the public health and safety at the Abandoned Properties post-abandonment. The Plan satisfies the Debtors' *Midlantic* duties.

8.    Third, the Apache Sureties raise various objections regarding how the FWE I structure impairs the Apache Sureties' rights and/or violates sections of the Bankruptcy Code, including sections 1123(a)(3), 1123(a)(4), 1123(a)(6), 1123(a)(7), 1123(b)(2) and 365. However, as detailed below, the Debtors' use of the FWE I structure to address nearly two thirds of the Debtors' decommissioning obligations does not violate any section of the Bankruptcy Code.  In any event, given that the Apache Surety Bonds contain a broad waiver of ***all suretyship defenses and the Apache Sureties' duty to perform is absolute***, confirmation of the Plan, and the effectiveness of the transactions contemplated therein, including under the Apache Definitive Documents, will not discharge the Apache Sureties' obligations under the Surety Bonds or impair Apache's ability to draw on the Surety Bonds.  *See Am. Cas. Co. of Reading, Pa. v. Irvin*, 426 F.2d 647, 650 (5th Cir. 1970) ("[T]he liability of a surety on a bond which is plain and

unambiguous is governed, like any other contract, by the intention of the parties as expressed in the instrument.").  Accordingly, the Debtors submit that it is reasonable and appropriate to make the findings requested in connection with confirmation of the Plan.

9.    Finally, to the extent certain of the objections are not addressed herein, such objections are addressed in the objection chart filed contemporaneously herewith as **Exhibit A** (the "**Objection Chart**") summarizing (i) each of the remaining objections and (ii) the Debtors' responses thereto.

10.    For the reasons set forth herein and in the supporting evidence and pleadings submitted in support of confirmation, the Plan satisfies the requirements of section 1129 of the Bankruptcy Code, is in the best interests of creditors, stakeholders, and the public, and should be confirmed.

## BACKGROUND AND FACTS IN SUPPORT OF CONFIRMATION

### I.    Chapter 11 Plan and Disclosure Statement

11.    The Debtors refer the Court to the Plan, the *Disclosure Statement for Fourth Amended Joint Chapter 11 Plan of Fieldwood Energy LLC and Its Affiliated Debtors* (ECF No. 1284) (the "**Disclosure Statement**"), the *Amended Order (I) Approving Disclosure Statement and Form and Manner of Notice of Disclosure Statement Hearing; (II) Establishing Solicitation and Voting Procedures; (III) Scheduling Confirmation Hearing; (IV) Establishing Notice and Objection Procedures for Confirmation of the Proposed Plan; (V) Approving Notice and Objection Procedures for the Assumption of Executory Contracts and Unexpired Leases; (VI) Approving Procedures for Objections to the Assignment and Transfer of Property of the Estate; and (VII) Granting Related Relief* (ECF No. 1286) ("**Disclosure Statement Order**"), the *Declaration of Michael Dane in Support of the Debtors' Chapter 11 Petitions and First Day*

*Relief* (ECF No. 29) (the "**First Day Declaration**"), and the record of these Chapter 11 Cases for an overview of the Debtors' business and other facts relevant to confirmation of the Plan.

12.     On May 27, 2021, the Debtors filed a *Notice of Filing of Plan Supplement in Connection with Fourth Amended Joint Chapter 11 Plan of Fieldwood Energy LLC and its Affiliated Debtors* (ECF No. 1394) (the "**Plan Supplement**"), which includes the following documents: (i) the Amended Organizational Documents for FWE I; (ii) the Schedule of Retained Causes of Action; (iii) the Schedule of Assumed Contracts; (iv) the Credit Bid Purchase Agreement; (v) the Apache Definitive Documents; (vi) the First Lien Exit Facility Agreement; (vii) the Chevron Term Sheet; (viii) the Eni Term Sheet; (ix) the Hunt Term Sheet; and (x) the Oil and Gas Lease Schedules.

13.     Also on May 27, 2021, the Debtors filed a *Notice to Contract Parties to Executory Contracts and Unexpired Leases of the Schedule of Assumed Contracts and Cure Amounts* (ECF No. 1395) (the "**Assumption Notice**").  The Assumption Notice was served on all known counterparties to the contracts and leases listed on the Schedule of Assumed Contracts on May 28, 2021.  *See Affidavit of Service for Mailings for the Period from May 23, 2021 through May 29, 2021*, dated June 3, 2021 (ECF 1477-9).  The Assumption Notice set forth, among other things, (i) notice of the potential assumption, assignment, and/or allocation of the executory contracts and unexpired leases listed on the Schedule of Assumed Contracts, (ii) the procedures for objecting to the assumption or the assumption and assignment of such party's contract or lease, and (iii) notice that any contract counterparty that fails to object as required by the terms of the Assumption Notice or the Plan shall be deemed to have assented to the assumption of such executory contract or unexpired lease and shall be forever barred and enjoined from objecting to, or otherwise challenging, or bringing any claims against the Debtors,

the Post-Effective Date Debtors, or the Credit Bid Purchaser regarding the proposed assumption or assumption and assignment or the validity of such assumption or assumption and assignment.

14.     On June 7, 2021, the Debtors filed *the Declaration of Alex Orchowski of Prime Clerk LLC Regarding Solicitation of Votes and Tabulation of Ballots Cast on the Fourth Amended Joint Chapter 11 Plan of Fieldwood Energy LLC and its Affiliated Debtors* (ECF No. 1521) (the "**Voting Declaration**").

15.     In addition, the Debtors file contemporaneously herewith the following declarations in support of confirmation of the Plan:

- *Declaration of Michael Dane in Support of Confirmation of the Fourth Amended Joint Chapter 11 Plan of Fieldwood Energy LLC and its Affiliated Debtors* (the "**Dane Declaration**");

- *Declaration of John-Paul Hanson in Support of Confirmation of the Debtors' Fourth Amended Joint Chapter 11 Plan of Fieldwood Energy LLC and its Affiliated Debtors* (the "**Hanson Declaration**");

- *Declaration of Marc J. Brown in Support of Debtors' Fourth Amended Joint Chapter 11 Plan of Fieldwood Energy LLC and its Affiliated Debtors* (the "**Brown Declaration**"); and

- *Declaration of Clayton Gring in Support of Confirmation of the Fourth Amended Joint Chapter 11 Plan of Fieldwood Energy LLC and its Affiliated Debtors* (the "**Gring Declaration**").

16.     The Debtors also intend to offer documentary evidence and witness testimony at the confirmation hearing on June 18, 2021.

10

## II.       The Restructuring Transactions

17.       The Debtors' Plan contemplates a set of restructuring transactions that integrates consensual arrangements reached with multiple stakeholder groups, including the overwhelming majority of the Debtors' prepetition first and second lien lenders, several Predecessors (including Apache, Chevron ("**CUSA**"), Eni, and Hunt), the Creditors' Committee, and one of the Debtors' largest surety providers.

18.       As depicted in the following chart, the Plan, once implemented, will separate the Debtors' oil and gas assets into four entities—Credit Bid Purchaser (a/k/a NewCo), FWE I, FWE III, and FWE IV:



19.       The Debtors will also abandon their interests in certain properties (the "**Abandoned Properties**").  The evidence will show that all of the Abandoned Properties have financially responsible and creditworthy predecessors in the chain of title ("**Predecessors**")

and/or co-working interest owners ("**CIOs**") that are jointly and severally liable under applicable regulations for decommissioning the Abandoned Properties.

A.     **Credit Bid Transaction**

20.     Following months of negotiations, the Debtors and the Ad Hoc Group of Secured Lenders agreed on the principal terms of a chapter 11 plan that contemplates the sale of specified Deepwater and Shelf Assets (the "**Credit Bid Acquired Interests**") to a new entity formed at the direction of the Consenting FLTL Lenders (the "**Credit Bid Purchaser**").

21.     Accordingly, the Debtors negotiated with the Consenting FLTL Lenders on the form of a *Purchase and Sale Agreement* (the "**Credit Bid PSA**"), pursuant to which the Credit Bid Purchaser will acquire the Credit Bid Acquired Interests for aggregate consideration of approximately $1.03 billion, consisting of (i) a credit bid of Allowed FLTL Claims up to the FLTL Claims Allowed Amount; (ii) cash in the amount up to $105 million (which may be increased to $125 million at the sole discretion of the Credit Bid Purchaser); (iii) the GUC Warrants, (iv) the SLTL Warrants, (v) the Subscription Rights, and (vi) the assumption of certain liabilities set forth in the Credit Bid PSA, including the assumption of substantially all working capital expenses, the P&A and decommissioning obligations arising out of the Acquired Interests, and the Allowed FLFO Claims remaining following distribution of the FLFO Distribution Amount (approximately $139 million of the FLFO Claims Allowed Amount *less* approximately $119 million of the principal amount of the First Lien Exit Facility) (collectively, the "**Credit Bid Consideration**").

22.     In connection with the Credit Bid Transaction, the Credit Bid Purchaser is anticipated to raise $225 million in new money, comprised of (i) up to $185 million from a Second Lien Exit Facility, to be backstopped pursuant to a Backstop Commitment Letter previously approved by this Court on April 9, 2021, *see Order (I) Authorizing the Debtors to*

*Enter into Backstop Commitment Letter, (II) Approving All Obligations Thereunder, and (III) Granting Related Relief* (ECF No. 1248), and (ii) $40 million from two Equity Rights Offerings that were previously approved by this Court on May 28, 2021, *see Order (I) Approving Rights Offering Procedures and Related Forms (II) Authorizing Debtors to Conduct Rights Offerings in Connection with Debtors' Plan of Reorganization, (III) Authorizing Entry Into Equity Backstop Commitment Agreements, (IV) Approving Obligations Thereunder, and (V) Granting Related Relief* (ECF No. 1410).

23.     Upon consummation of the Credit Bid Transaction, the Credit Bid Purchaser's capital structure will include up to $304 million in funded debt, comprised of approximately $119 million from the First Lien Exit Facility and up to $185 million from the Second Lien Exit Facility, representing a significant reduction of the approximately $1.8 billion in funded debt currently held by the Debtors.  Of the estimated $225 million in new money raised by Credit Bid Purchaser, up to $120 million will be used to capitalize Credit Bid Purchaser's balance sheet.  The remainder of the funds will be used to fund the cash portion of the Credit Bid Consideration, which will in turn fund the Debtors' obligations under the Plan.

**B.     Divisive Mergers**

24.     Subsequent to consummation of the Credit Bid Transaction, the Plan provides FWE will implement two or more divisive mergers pursuant to Title 1, Chapter 10 and Title 1, Chapter 1, Subchapter A, Section 1.0002(55)(A) of the Texas Business Organizations Code ("**TBOC**").  The first such divisive merger will result in the division of FWE into (i) FWE, which will survive such divisive merger under the name  "Fieldwood Energy III LLC" ("**FWE III**"), and (ii) Fieldwood Energy I LLC, a newly-formed Texas limited liability company ("**FWE I**") (the "**Initial Divisive Merger**").  Pursuant to the Initial Divisive Merger, FWE I will be allocated and vested with certain of the Legacy Apache Assets (the "**FWE I Properties**") and

FWE III will be allocated and vested with all of FWE's assets other than FWE I Properties and Credit Bid Acquired Interests (the "**FWE III Properties**").  The FWE I Properties and FWE III Properties are described in schedules annexed to the Plan of Merger for the Initial Divisive Merger (the "**Plan of Merger**").  *See* Discl. Stmt., Ex. K at Ex. 5.

25.     The second divisive merger will result in the division of FWE III into (i) FWE III, which will survive such divisive merger and maintain its name, and (ii) Fieldwood Energy IV LLC, a newly-formed Texas limited liability company ("**FWE IV**") (the "**FWE III Divisive Merger**").  Pursuant to the FWE III Divisive Merger, FWE IV will be allocated and vested with certain interests in a portion of leases previously assigned to FWE by Chevron U.S.A. Inc. (the "**Legacy CUSA Properties**") and FWE III will be allocated and vested with all of FWE III's other assets other than the Legacy CUSA Properties.  The allocation of the assets pursuant to the FWE III Divisive Merger are described in the schedules filed with the Plan Supplement.  *See* Plan Suppl. Ex. O5.

     *i.*    *FWE I*

26.     The Debtors first announced an agreement with Apache with respect to the Legacy Apache Properties in a term sheet annexed to the First Day Declaration (the "**Apache Term Sheet**").  *See* First Day Decl. Ex. A at Ex. B.  Since then, the Debtors have successfully negotiated the forms of definitive documents necessary to implement the transactions contemplated by the Apache Term Sheet (the "**Apache Definitive Documents**").  The forms of the Apache Definitive Documents were filed with the initial Disclosure Statement on January 1, 2021.  More recent versions are annexed to the Plan Supplement at Exhibit H, along with an implementation agreement that the Debtors and Apache executed in connection therewith.

27.     The Apache Definitive Documents provide that FWE I will engage in the ownership and operation of the FWE I Properties, including performing P&A of wells and the ultimate decommissioning of platforms and offshore infrastructure.  FWE I will be managed by Jon Graham, as sole manager (the "**FWE I Sole Manager**") and operations at the properties will initially be performed by the Credit Bid Purchaser under a transition services agreement (the "**TSA**").  Upon termination of the TSA, FWE I may elect to have a third-party service provider operate the properties.

28.     FWE I will be funded with:

- cash flow generated from operating the FWE I Properties;

- a cash contribution from the Debtors on the Effective Date in the amount of approximately $20 million; and

- a $450 million standby credit facility provided by Apache, including a $50 million working capital facility, as discussed above.

29.     Decommissioning of the FWE I Properties will be funded with:

- funds in FWE I, specifically including the $400 million of proceeds under the standby credit facility; and

- $736 million in security available to Apache to secure Fieldwood Energy LLC's decommissioning obligations under the Decommissioning Agreement (the "**Decommissioning Security**"), including approximately $238 million in funds held in trust (the "**Trust A Cash**") and $498 million in letters of credit and surety bonds.

30.     The Debtors project, and the evidence will show, that the aforementioned sources of funding will be adequate to address all liabilities and obligations associated with the FWE I Properties.  Moreover, Apache, as a predecessor in interest for all of the FWE I Properties, will remain jointly and severally liable for the costs of decommissioning such properties.

ii.    FWE III

31.    Following the Initial Divisive Merger, FWE III will continue as the surviving entity of FWE.  The primary purpose of FWE III is to safely and efficiently decommission and wind-down the FWE III Properties within the two-year period after the Effective Date.  *See* Disclosure Statement 3, 11.  The FWE III Properties primarily comprise properties for which (i) there is not a financially capable predecessor in the chain of title or co-working interest owner that is legally responsible for decommissioning the assets or (ii) additional properties for which the Debtors have committed to retaining the decommissioning obligations.  Substantially all of the FWE III Properties were shut-in as of June 13, 2021 and were forecasted to generate *de minimis*, if any, production prior to decommissioning. Additionally, the Debtors are already underway with a significant amount of the decommissioning related to FWE III Properties.

32.    FWE III, acting through the Plan Administrator, will retain Credit Bid Purchaser to decommission the FWE III Properties.

33.    FWE III will be supported by up to approximately $12 million of capital through a combination of approximately (i) $5 million of cash on hand and (ii) up to approximately $7 million in future cash commitments from the Credit Bid Purchaser which, the Debtors' believe, will be sufficient for the Plan Administrator to satisfy all the P&A obligations and wind-down costs associated with the FWE III Properties.  Moreover, an additional $12 million in outstanding security in the form of surety bonds are presently outstanding and available to the appropriate parties to provide additional funding, if necessary.

34.    FWE III will also serve as agent to the designated operator (or as the designated operator) of certain abandoned properties pursuant to a

proposal made to the Government, the terms of which will be incorporated into the Plan.   In connection with that proposal, FWE III will hire Credit Bid Purchaser to serve as a contract operator of certain Abandoned Properties to perform certain safeguarding and day-to-day operational services while operational control of the properties is transitioned to Predecessors.

### iii.   FWE IV

35.     The FWE III Divisive Merger (which creates FWE IV) is the result of negotiations between the Debtors and CUSA with respect to the treatment of the Legacy CUSA Properties.  The Debtors and CUSA entered into a term sheet dated March 22, 2021 (the "**CUSA Term Sheet**").  The CUSA Term Sheet provides, among other things, that the Legacy CUSA Properties will be decommissioned pursuant to a Turnkey Removal Agreement entered into by and among CUSA, FWE IV, and Credit Bid Purchaser (the "**CUSA Turnkey Removal Agreement**").  Under the CUSA Turnkey Removal Agreement, Credit Bid Purchaser will decommission the Legacy CUSA Properties on a lump sum, turnkey payment basis, and Credit Bid Purchaser will earn pre-agreed payments ("**Turnkey Amounts**") in exchange for completing decommissioning projects.  CUSA will be responsible for 100% of the Turnkey Amounts, unless there are other current co-interest owners or predecessors responsible for such decommissioning costs, in which case CUSA will only be responsible for its proportionate share on account of its former interests in the Legacy CUSA Properties.  Credit Bid Purchaser will not be required to undertake a decommissioning project until full funding of a Turnkey Amount has been agreed to by the parties.

36.     The Debtors have agreed to contribute $5 million into an escrow account to cover operations to prepare the Legacy CUSA Properties for decommissioning. Moreover,

FWE IV and Credit Bid Purchaser will enter into a Contract Operator Agreement whereby Credit Bid Purchaser will manage the administrative and corporate activities of FWE IV along with the Legacy CUSA Properties for a period of five years, subject to agreed-upon conditions for assignment. Credit Bid Purchaser will also manage the Neptune Spar under a Transition Services Agreement whereby CUSA will reimburse Credit Bid Purchaser for certain expenses until CUSA takes over management of the facility in connection with a decommissioning campaign for the Neptune Spar. Additionally, CUSA will be responsible for certain operating costs associated with the FWE IV properties other than decommissioning under with the turnkey agreement.

### C. Additional Agreements with Predecessors

37. In addition to the agreements with Apache and CUSA, the Debtors have successfully reached agreements in principle with two additional Predecessors—Eni Petroleum US LLC ("**Eni**") and Hunt Oil Co. ("**Hunt**"). Below is a brief description of each of the additional predecessor agreements.

### i. *Eni*

38. On May 12, 2021, the Debtors and Eni executed a term sheet reflecting an agreement-in-principle as to the treatment of certain oil and gas leases and facilities previously conveyed to the Debtors by Eni and certain of its affiliates (collectively, the "**Eni Properties**"). The Debtors filed a *Notice of Filing of Executed Term Sheet by and between the Debtors and Eni Petroleum US LLC* (ECF No. 1368) on May 12, 2021. The Eni Term Sheet provides, among other terms, that, after abandonment, the Eni Properties will be decommissioned pursuant to a Turnkey Removal Agreement by among Eni, FWE III, and Credit Bid Purchaser (the "**Eni Turnkey Removal Agreement**"). The funds for the Eni Properties will come from the new money being raised in accordance with the Plan.

39.    On the Effective Date, $3 million of the proceeds of the Credit Bid Consideration shall be funded into FWE III, which will then be paid to Eni under the terms of the Eni Implementation Agreement.   Furthermore, subject to certain exceptions, Eni will not be responsible for any operating costs associated with Eni's former interests in the Eni Abandoned Properties.  Post-Effective Date, Credit Bid Purchaser will manage the Eni Properties on behalf of Eni pursuant to a Contract Operating Agreement until the commencement of the decommissioning work under the Eni Turnkey Removal Agreement.

ii.    *Hunt*

40.    On May 20, 2021, the Debtors executed a term sheet with Hunt and its subsidiaries Chieftain International (U.S.) L.L.C. and Hunt Chieftain Development, L.P. (the "Hunt Term Sheet") relating to the treatment of GOM Assets in which Hunt or its affiliates previously held an interest (the "Hunt Properties").    The Debtors filed a *Notice of Filing of Executed Term Sheet by and between the Debtors and Hunt Oil Company and Its Subsidiaries* (ECF No. 1392) on May 24, 2021. The Hunt Term Sheet contemplates that FWE III will be allocated and vested with the Debtors' rights, title, and interests in certain of the Hunt Properties  (the "**Hunt Turnkey Property**" and the "**Hunt Non-Turnkey Properties**," as applicable).   The Hunt Turnkey Property is in the process of being decommissioned pursuant to a Turnkey Removal Agreement between Hunt and the Debtors (the "**Hunt Turnkey Removal Agreement**").

## III.    The Abandoned Properties

41.    In addition to the aforementioned restructuring transactions, the Debtors, on the Effective Date of the Plan, will abandon their interests in certain assets identified on Exhibit F of the Disclosure

Statement (the **"Abandoned Properties"**).  The Abandoned Properties comprise approximately 29 platforms associated with a few primary predecessors that have been identified.  The Debtors have expended considerable resources during the pendency of this case continuing to operate, repair, maintain, and decommission parts of the Abandoned Properties.  The evidence will show that each of the Abandoned Properties has one or more financially capable Predecessors or CIOs in the chain of title that are jointly and severally liable for decommissioning the applicable assets.  The Debtors anticipate that BSEE will issue orders on or after the Effective Date ordering all, or certain of such Predecessors and/or CIO, to complete the decommissioning obligations associated with the applicable Abandoned Properties.

42.    The Debtors are taking the following precautions to ensure that operational control and decommissioning of the Abandoned Properties can be safely transitioned to Predecessors and CIOs upon abandonment:

- **Agreed Activities**: The Debtors have agreed to make approximately $6 million in safety-related repairs and improvements on the Abandoned Properties prior to abandonment (the "**Agreed Activities**").  Included among the work to be performed is restoring egress and conducting certain safety related remediation at the Abandoned Properties so that Predecessors and CIOs can safely access the Abandoned Properties to conduct abandonment and other safekeeping operations.  The Debtors have completed a significant amount of the Agreed Activities to date.

- **Transition Services**: The Debtors have proposed to the Government providing certain safeguarding and day-to-day operational services for the Abandoned Properties for a period of time post-Effective Date (the "**Transition Services**").  The purpose of the Transition Services is to (i) maintain the Abandoned Properties in a safe condition as will exist on the Effective Date and (ii) maintain periodic and regular monitoring of the condition of wells and infrastructure located on the Abandoned

Properties to identify any condition that could threaten public health, safety or the environment  FWE III will provide the services for 9 months or until operational control of the Abandoned Properties is transitioned to a third-party, whichever occurs first (the "**Transition Period**").  Terms for the Transition Services will be incorporated into the Plan.

## ARGUMENT

43.    As set forth herein and as will be demonstrated at the Confirmation Hearing, the Plan satisfies all of the requirements set forth in section 1129 of the Bankruptcy Code for confirmation, and the Objections should be overruled.   This memorandum first addresses the section 1129 requirements that were contested in the Objections and thereafter addresses the uncontested requirements of section 1129 of the Bankruptcy Code.

### I.    The Plan is Feasible Pursuant to Section 1129(a)(11)

44.    Section 1129(a)(11) of the Bankruptcy Code requires the court to determine that a plan is feasible.  Specifically, the court must determine that "[c]onfirmation is not likely to be followed by the liquidation or further financial reorganization of the debtor or its successors in interest, *unless such liquidation or reorganization is proposed in the plan*." 11 U.S.C. § 1129(a)(11)(emphasis added).  "The standard of proof required by the debtor to prove a Chapter 11 plan's feasibility is by a preponderance of the evidence . . . ." *Matter of T-H New Orleans Ltd. P'ship*, 116 F.3d 790, 801 (5th Cir. 1997) (citing *Brisco*, 994 F.2d at 1165.)

45.    Where all or substantially all of the debtors' assets are sold pursuant to a plan, courts look to the probability that the transaction will be consummated and the plan implemented—not the subsequent viability of the purchaser as a going concern.  *See In re Cypresswood Land Partners, I*, 409 B.R. 396 (Bankr. S.D. Tex. 2009) (finding that a plan offered reasonable probability of success where purchaser had sufficient financial strength to

assume the financial obligations pursuant to an asset sale); *In re Station Casinos, Inc.*, No. 09-52477, 2011 Bankr. LEXIS 5822, at *64 (Bankr. D. Nev. 2011) (finding that "[t]he Plan is feasible if the [purchaser] has the financial wherewithal to close on the restructuring transactions in a manner that has a reasonable prospect of resulting in consummation of the Plan").

46.     In cases where the plan contemplates winding down, liquidation, or dissolution, some courts have determined that such plans automatically satisfy section 1129(a)(11).  *See Cypresswood*, 409 B.R., at 432; *In re Two Sts., Inc.*, 597 B.R. 309, 317 (Bankr. S.D. Miss. 2019) ("The feasibility, analysis, however, differs when assessing a liquidating plan . . . [t]he focus . . . is whether the liquidation itself, as proposed in the plan, is feasible"); *In re Heritage Org*., L.L.C., 375 B.R. 230, 311 (Bankr. N.D. Tex. 2007) (citing *In re 47th & Belleview Partners*, 95 B.R. 117, 120 (Bankr. W.D. Mo. 1988); *In re Pero Bros. Farms, Inc.*, 90 B.R. 562, 563 (Bankr. S.D. Fla. 1988).  Or, to put it differently, courts find that section 1129(a)(11) is satisfied where "such liquidation . . . is proposed in the plan."  11 U.S.C. § 1129(a)(11); *In re Cellular Info. Sys., Inc.*, 171 B.R. 926 (Bankr. S.D.N.Y. 1994).

47.     Other courts take a broader approach and apply the feasibility test to plans of liquidation, focusing their analysis on whether the liquidation itself, as proposed in the plan, is feasible.  *See In re Heritage Org., L.L.C.*, 375 B.R. at 311; *In re Cypresswood*, 409 B.R. at 432.

48.     Here, the Plan provides for the implementation of a set of Restructuring Transactions, including the Credit Bid Transaction, the Divisive Mergers, and Predecessor Settlements, designed to accomplish the following primary objectives:

     i.    addressing all decommissioning obligations in a methodical and safe manner by responsible parties;

     ii.    protecting the American taxpayer from financial liability associated with decommissioning;

    iii.   preserving the Debtors' Deepwater Assets and Shelf Assets (each as defined below) and the jobs of over 1,000 employees and contracts through a sale to the Debtors' lenders pursuant to the Credit Bid Transaction;

    iv.   providing for the Credit Bid Purchaser and its experienced and knowledgeable employees to participate in the instrumental role of managing the various consensual arrangements in order to conduct the decommissioning with the appropriate funding;

    v.   making sure all required payments and distributions will be made in accordance with the Plan; and

    vi.   maximizing recoveries to the Debtors' stakeholders.

49.    The Debtors submit that they will satisfy their burden of demonstrating by a preponderance of the evidence that they can and will achieve these objectives by implementing the Plan and the transactions contemplate therein.

**A.    Consummation of the Credit Bid Transaction**

50.    Contrary to objections raised by certain of the Sureties and Predecessors, the Debtors need not demonstrate the subsequent viability of the Credit Bid Purchaser as a going concern.  *See In re Heritage Org*., L.L.C., 375 B.R. at 311 ("[t]he focus [of the feasibility analysis] . . . is whether the liquidation itself, as proposed in the plan, is feasible"); *In re Cypresswood,* 409 B.R. at 433 (finding a liquidating chapter 11 liquidating plan feasible and likely to succeed where a debtor's asset sale would move forward and the consideration would fund the activities of the wind-down entity); *In re Station Casinos, Inc.*, 2011 Bankr. LEXIS 5822 (Bankr. D. Nev. 2011) (finding the feasibility test satisfied in the context of a sale and liquidation where the buyer has the financial wherewithal to close on the restructuring transactions in a manner that has a reasonable prospect of resulting in consummation of the Plan); *see also In re Flour City Bagels, LLC,* 2017 Bankr. LEXIS 2490 (Bankr. W.D.N.Y. 2017) ("The Plan provides for the sale of substantially all of the Debtor's assets followed by a

liquidation of the Debtor and therefore, the requirements of section 1129(a)(11) of the Bankruptcy Code are satisfied."). The Debtors need only show that the Credit Bid Transaction is likely to be consummated. The Debtors can easily make this showing.

51.     As discussed above, pursuant to the Credit Bid Transaction, all Credit Bid Acquired Interests will be transferred to the Credit Bid Purchaser in exchange for aggregate consideration of approximately $1.03 billion, consisting of (i) the credit bid of a portion of the Allowed FLTL Claims, (ii) cash in an amount up to $105 million, (iii) the GUC Warrants, (iv) the SLTL Warrants, and (v) the assumption of certain liabilities.

52.     The evidence will show that the Credit Bid Purchaser will have sufficient funds to meet its obligations under the Plan, including those obligations related to the Credit Bid Acquired Interests. The evidence will show that Credit Bid Purchaser will have up to $304 million in funded debt (compared to approximately $1.8 billion of funded debt held by the Debtors), composed of approximately $119 million from the First Lien Exit Facility and up to $185 million from the Second Lien Exit Facility. In addition, the Credit Bid Purchaser will raise $40 million through the Equity Rights Offerings on the Effective Date. Of the estimated up to $225 million of new money that the Credit Bid Purchaser is anticipated to raise, up to $120 million will be used to capitalize the Credit Bid Purchaser's balance sheet with cash, which is more than enough cash liquidity to efficiently operate an offshore oil and gas company of this size.

53.     Accordingly, the evidence will show that Credit Bid Purchaser will have capacity to satisfy its contractual obligations to FWE I, FWE III, FWE IV and other Predecessors with whom the Debtors and the Consenting Lenders have reached consensual arrangements.

B.     **Effectuation of Divisive Mergers and Allocation of Assets and Liabilities to FWE I, FWE III, and FWE IV**

54.     The evidence will also show that the Plan is feasible because the Divisive Mergers will be effectuated as provided under the Plan.

55.     Lexon Insurance Company, Ironshore Indemnity Inc., and Ironshore Specialty Insurance Company (collectively, "**Lexon**") allege that the Divisive Mergers violate Texas Law because they: (i) circumvent obligations under various surety indemnity agreements, including an indemnity agreement with Lexon; and (ii) allow a foreign entity (Apache) to effectuate a divisive merger to create a new domestic entity (FWE IV).

56.     Lexon's first argument amounts to nothing more than a general statement that an alleged 'circumvention' is a 'violation of Texas Law.'  However, Lexon fails to indicate what Texas Law was violated.  Lexon's completely unfounded and unsupported allegation should be dismissed as casually as it is asserted.

57.     Lexon's second argument appears to assert that because Apache will have certain contractual rights with respect to FWE I following the Initial Divisive Merger, that Apache Corporation itself is actually being merged in the Initial Divisive Merger.  This is nonsensical.  Apache Corporation is not a party to the Initial Plan of Merger or a merging entity pursuant to the applicable certificate of merger.  The mere fact that the Debtors have, and, following the Initial Divisive Merger, FWE I will, enter into contractual agreements with Apache does not result in Apache being deemed to have merged itself notwithstanding that it was never party to a plan of merger or subject to a filed certificate of merger.  To find otherwise would result in great confusion and uncertainty with respect to general state law regarding mergers to say the least.

58.     Accordingly, because Lexon's arguments have no basis in fact nor in law, the Court should overrule their objection, and such baseless allegations have no bearing on the Plan's feasibility.

### C.     Credit Bid Purchaser and Each of the Divisive Merger Entities Will Obtain All Required Bonding

59.     The evidence will also show that Credit Bid Purchaser, FWE I, FWE III, and FWE IV will be able to obtain bonding sufficient to ensure that each respective entity complies with all of its lease and regulatory obligations.

60.     Each entity created in the Divisive Merger or contemplated in the Plan that will either hold an interest in a lease, become a designated operator or an agent for a designated operator, or otherwise perform decommissioning operations will be required by the applicable regulations to post lease-specific or area-wide bonds in prescribed amounts, depending upon the level of activity on a lease or leases.  *See* 30 CFR §556.900-907 and §556.901 (for leases) and 30 CFR § 510.1011 (for pipeline rights-of-way).  Additionally, at its discretion and in accordance with the applicable regulations, BOEM has the authority to request additional or supplemental bonding for lessees and operators.  *See* 30 CFR §556.901.  It is uncertain whether BOEM will require any of the various entities that will hold a leasehold interest to be designated as an operator or otherwise perform decommissioning operations to post additional or supplemental bonds, although the issue has not been raised by the Government in the various regulatory discussions during the case.

61.     The Debtors have been in advanced discussions with various surety providers and anticipate obtaining commitment(s) from one or more sureties to provide Credit Bid Purchaser with surety bond capacity in amounts that are more than sufficient to meet Credit Bid Purchaser's needs for statutory bonds running to BOEM, BLM, the Texas Railroad

Commission and/or any other regulatory agencies with oversight responsibilities for the NewCo Entities' oil and gas assets. As discussed above, the Debtors are finalizing a bonding arrangement based on a commitment received from a surety to provide same.

**D.      All of the FWE I Assets Will be Safely Decommissioned, as Designed by the Plan**

62.      The evidence will further show that all of FWE I's P&A obligations will be satisfied as contemplated in the Plan. The Sureties' "feasibility" objections regarding FWE I are misplaced for a number of reasons. As an initial matter, the "going-concern" feasibility standard that the Sureties attempt to impose on FWE I misunderstands both the Plan and applicable case law on feasibility. Feasibility must be analyzed in the context of the intended purpose of the Plan. FWE I will be a newly created entity formed to effectuate the settlement reached between the Debtors, Apache, and the Consenting Lenders to address approximately $1 billion in decommissioning obligations (representing approximately 63% of FWE's decommissioning obligations).

63.      The evidence will show that the FWE I structure provides the necessary funding and resources to accomplish its purpose, which is to ensure that all of the decommissioning obligations associated with the Legacy Apache Properties are timely performed. Indeed, FWE I will have the following sources of liquidity available to decommission the Legacy Apache Properties:

- cash flow generated from operating the Legacy Apache Properties, many of which are still producing (*see* FWE I Projections, projecting approximately $1.5 billion of revenue over the next five years);

- the Debtors' settlement contribution, which the Debtors project to be approximately $14 million;

- $50 million working capital facility provided by Apache to FWE I, as previously discussed; and

- $400 million standby credit facility provided by Apache to FWE I.

64.     Moreover, Apache has acknowledged that it remains jointly and severally liable for decommissioning the Legacy Apache Properties under 30 CFR § 556.710, and has significant resources and security available to satisfy any of the FWE I Obligations to the extent FWE I's resources are not adequate.   Under the Decommissioning Agreement, the following Decommissioning Security has been provided previously to Apache, as obligee, to secure Fieldwood's plugging, abandonment, and decommissioning obligations associated with the Legacy Apache Properties, including:

- $238 million of Trust A cash; and

- approximately $498 million in letters of credit and surety bonds (payable in accordance with their terms and conditions).

65.     Thus, the evidence will show that the resources and the funding available to FWE I and Apache are more than adequate to timely and safely decommission the FWE I Properties.

**E.      All of the FWE III Assets Will be Safely Decommissioned, as Designed by the Plan**

66.     The evidence will also show that all of the FWE III assets will be safely decommissioned as set forth in the Plan.   The purpose of FWE III is to decommission and wind-down the Debtors' rights, title, and interests in certain platforms (which will be allocated to FWE III pursuant to the Plan of Merger).   A significant amount of activity has already occurred, or is presently in progress, related to the decommissioning of FWE III Properties.

67.     The evidence will demonstrate that all of the FWE III Assets will be safely decommissioned and FWE I will be wound down by the Plan Administrator.   FWE III will be capitalized pursuant to a funding agreement between Fieldwood and the Credit Bid Purchaser (the "**Funding Agreement**") with approximately $12 million of capital through a combination of

approximately (i) $5 million of cash on hand and up to (ii) $7 million in future cash commitments from the Credit Bid Purchaser.  The Plan Administrator will hire Credit Bid Purchaser pursuant to a contract operator agreement (the "**Contract Operating Agreement**") to operate and decommission the FWE III Assets in a safe manner.  At the Confirmation Hearing, the Debtors will prove that the $12 million in funding will be more than adequate to safely decommission the FWE III Properties.  Moreover, even if it is insufficient to decommission the FWE III Assets (which the Debtors dispute), an additional $12 million in outstanding surety bonds may be available to applicable Predecessors to satisfy any outstanding Decommissioning Obligations (in accordance with the terms and conditions of such bonds).

68.     In addition, the Debtors submit that the $8 million in funds set aside for the Plan Administrator Expense Reserve Account will be more than sufficient for the Plan Administrator to wind down the Debtors' estates.

69.     Accordingly, the evidence will show that the FWE III Properties will be decommissioned in a safe manner and the Debtors' estates will be wound down in accordance with the terms of the Plan and the Plan Administrator Agreement.

## II.     Abandonment of the Abandoned Properties Is Authorized by the Bankruptcy Code and Complies with All Other Applicable Law

70.     Section 554(a) of the Bankruptcy Code provides, in relevant part, that a debtor "may abandon any property of the estate that is burdensome to the estate or that is of inconsequential value and benefit to the estate."  A debtor's "power to abandon property is discretionary."  *See In re Slack*, 290 B.R. 282, 284 (Bankr. D.N.J. 2003).  "Courts defer to [a debtor's] judgment and place the burden on the party opposing the abandonment to prove a benefit to the estate and an abuse of the [*debtor's*] discretion."  *Id*. (citing *In re Interpictures, Inc.*, 168 B.R. 526, 535 (Bankr. E.D.N.Y. 1994)).  This requires the party opposing abandonment

to "show some likely benefit to the estate, not mere speculation about possible scenarios in which there might be a benefit to the estate." *Id.*

71.     The Debtors, in their sound business judgment, have determined that the Abandoned Properties are of inconsequential value and are burdensome to the Debtors' estates because the continued expenditures and regulatory burdens associated with such properties exceed any value that could be realized from a sale of the Properties.

72.     No party has challenged the Debtors' business judgment with respect to abandoning the Abandoned Properties.   Certain objecting parties, however, assert that the Debtors have not demonstrated how the Abandoned Properties can be abandoned in compliance with the Supreme Court's decision in *Midlantic*.   In *Midlantic*, the Supreme Court held that a debtor "may not abandon property in contravention of a state statute or regulation that is reasonably designed to protect the public health or safety from identified hazards." *Midlantic Nat'l Bank v. N.J. Dep't of Envtl. Prot.*, 474 U.S. 494, 507 (1986).   The prohibition on abandonment is limited, however, and only applies when a debtor has failed to "formulat[e] conditions that will adequately protect the public's health and safety." *Id.*   The Supreme Court further clarified that:

> Th[e] exception to the abandonment power vested in the [debtor] by § 554 is a narrow one. It does not encompass a speculative or indeterminate future violation of such laws that may stem from abandonment. The abandonment power is not to be fettered by laws or regulations not reasonably calculated to protect the public health or safety from imminent and identifiable harm.

*Id.*, n.9.

73.     The Debtors have formulated adequate conditions to protect the public health and safety at the Abandoned Properties post-abandonment, and abandonment will not pose any imminent threat to the public health or safety.   Among other things, the following

features of the Debtors' Plan ensure that the Abandoned Properties will be abandoned in a safe manner:

- operationally and financially capable Predecessors and CIOs for each of the Abandoned Properties;

- early distribution of Operational Transition Packets to the affected Predecessors and CIOs;

- Fieldwood's commitment to complete all Agreed Activities; and

- proposal to Government to provide Transition Services at Abandoned Properties for up to nine months.

### A.    Operational and Financially Capable Predecessors and CIOs

74.    Each of the Abandoned Properties have financially capable predecessors and/or CIOs in the chain of title.  Federal regulations provide that these predecessors and CIOs are jointly and severally liable for the decommissioning obligations associated with the Abandoned Properties.  *See* 30 CFR § 556.710 ("If you assign your record title interest, . . . you remain liable for all obligations . . . that accrued in connection with your lease during the period in which you owned the record title interest, up to the date BOEM approves your assignment.  BOEM's approval of the assignment does not relieve you of these accrued obligations."); 30 CFR § 556.805 (same regarding assignment of operating rights interests); 30 CFR § 250.1701 ("Lessees and owners of operating rights are jointly and severally responsible for meeting decommissioning obligations for facilities on leases . . . .").

75.    Moreover, the regulations provide that the Department of Interior can order Predecessors and/or current CIOs to assume operational control of and decommission the Abandoned Properties.  *See, e.g.*, 30 CFR § 556.710 ("Even after assignment, BOEM or BSEE may require the assignor to bring the lease into compliance if the assignee or any subsequent assignee fails to perform any obligation under the lease, to the extent the obligation accrued

31

before approval of [the] assignment."); 30 CFR § 556.805 (same), 30 CFR § 250.146(b) ("If your designated operator fails to fulfill your obligations . . . , the Regional Supervisor may require you or all of your co-lessees to fulfill those obligations . . . ."). The Debtors anticipate that BSEE will issue orders compelling all or certain of the Predecessors and/or CIOs for each of the Abandoned Properties to perform the decommissioning upon abandonment of the Abandoned Properties.

76.    The vast majority of the Abandoned Properties are properties that the Debtors previously acquired from BP, Hess, or XTO (a subsidiary of ExxonMobil).  Of the remaining 9% of decommissioning obligations that have not yet been resolved consensually, properties acquired from BP, Hess, or XTO account for approximately 8% of such obligations. Therefore, almost all of the decommissioning liability is associated with Abandoned Properties formerly owned by BP, Hess, and XTO, each of which is financially and operationally capable of performing the decommissioning work.

**B.    Transition Services Proposal to the Government**

77.    To assist the government in ensuring an orderly transition of operational control of the Abandoned Properties after the effective date of the Plan, the Debtors have proposed to provide, as explained above, Transition Services at each of the Abandoned Property for up to nine months in order to maintain the properties in a safe condition.  The Transition Services include, among other things:

- Ensuring safe access and egress to the Abandoned Properties;
- Pollution inspections;
- Firefighting and lifesaving equipment inspections;
- Ensuring the navigation aids are operational at the Abandoned Properties;
- Casing pressure checks;
- Pipeline inspections;

- Periodic visual inspection to monitor the condition of the wells and offshore infrastructure on the Abandoned Properties, in accordance with applicable regulations;
- Keeping the Government reasonably informed of the condition of the wells and offshore infrastructure on the Abandoned Properties; and
- Maintaining spill readiness capabilities at the Abandoned Properties.

78.     In addition, to the extent certain specified events occur at the Abandoned Properties during the Transition Period, FWE III will promptly commence any remediation work necessary to protect the public health and safety and/or the environment from imminent hazardous conditions.

79.     The Transition Services are the result of nearly a year's worth of discussions with the Government as to what might be a viable solution for the decommissioning obligations for the Abandoned Properties.  Terms providing for the Transition Services have been incorporated into the Plan.

80.     Accordingly, the Court should approve the abandonment of the Abandoned Properties.

### III.   Objections Regarding Debtors' Alleged Inability to Satisfy All Administrative Expense Claims Should be Overruled

81.     Certain of the Sureties and Predecessors object to the Plan on the basis that the Debtors will be unable to pay administrative expense claims as and when allowed pursuant to the Plan.  These objections primarily relate to the Debtors' P&A obligations.  In the absence of evidence, such objections should be overruled.  The evidence will show that all Administrative Expense Claims will either be paid pursuant to the Plan from proceeds of the Credit Bid Transaction or assumed and satisfied by Credit Bid Purchaser in the ordinary course of business.  Moreover, any claims for indemnification and unpaid premiums held by any

sureties constitute pre-petition unsecured claims that will be satisfied and discharged under the Plan.

> **A.      The Sureties' Contingent Indemnification and Reimbursement Claims, Constitute Pre-petition, Unsecured Claims to the Extent Allowed**

82.     The Sureties have asserted contingent and unliquidated claims against the Debtors for potential indemnification and/or reimbursement obligations (the "**Contingent Indemnification Claims**") arising under their respective surety bonds (collectively, the "**Surety Bonds**") and respective general indemnity agreements with the Debtors (collectively, the "**General Indemnity Agreements**").

83.     To the extent any of the Contingent Indemnification Claims become Allowed Claims, such claims will **not** constitute Administrative Expense Claims because: (i) Contingent Indemnification Claims are pre-petition claims that do not arise out of a transaction with a post-petition Debtor, (ii) *Midlantic* does not convert any pre-petition Contingent Indemnification Claims into post-petition, administrative expense obligations of the Debtors, and (iii) to the extent Sureties expend any amounts on account of the Contingent Indemnification Claims, such expenditures would occur ***after the Effective Date*** (at which point the Debtors' estates no longer exist).

> i.      *Contingent Indemnification Claims are pre-petition claims that do not arise out of a transaction with a post-petition Debtor*

84.     Section 503(b)(1)(A) of the Bankruptcy Code provides that "actual, necessary costs and expenses of preserving the estate" qualify as administrative expense. "[T]o qualify as an 'actual and necessary cost' under section 503(b)(1)(A), a claim against the estate must have arisen post-petition and as a result of actions taken by the trustee [or debtor-in-possession] that benefitted the estate." *Jack/Wade Drilling, Inc.*, 258 F.3d 385, 387 (5th Cir.

2001).  In other words, "[a]n administrative priority claim 'must have arisen from a transaction with the debtor in possession,' as opposed to the pre-petition debtor."  *In re Whistler Energy II, L.L.C.*, 931 F.3d 432, 442 (5th Cir. 2019).  Moreover, "section 503(b) priorities should be construed narrowly to maximize the value of the estate for all creditors."  4 Collier on Bankruptcy ¶ 503.06[2] (Richard Levin & Henry J. Sommers eds., 16th ed.).

85.    The Contingent Indemnity Claims do not arise out of transactions with post-petition Debtors.  Rather, the Contingent Indemnity Claims arise out of Surety Bonds and General Indemnity Agreements that were issued and entered into prior to the Petition Date.  Accordingly, the Contingent Indemnity Claims do not satisfy the Fifth Circuit's two-part test for an administrative expense claim under section 503(b)(1)(A) of the Bankruptcy Code.

86.    Courts consistently hold that claims under indemnification agreements, including indemnification agreements associated with surety bonds are prepetition claims rather than post-petition obligations.  This is true even if the event that gives rise to liability under an indemnification agreement occurs post-petition.  *See In re Remington Rand Corp.*, 836 F.2d 825, 830 (3d Cir. 1988) ("[A]n indemnity or surety agreement creates a right to payment, albeit contingent, between the contracting parties immediately upon the signing of the agreement."); *In re M. Frenville Co.*, 744 F.2d 332, 337 (3d Cir. 1984) ("[A] surety relationship is the classic case of a contingent right to payment under the Code—the right to payment exists as of the signing of the agreement, but it is dependent on the occurrence of a future event."); *In re Trevino*, 535 B.R. 110, 149 (Bankr. S.D. Tex. 2015) (finding that a claim arising out of a post-petition breach of a contract was a prepetition claim because the "breach was a foreseeable outcome of the pre-petition contract"); *In re Superior Air Parts, Inc.*, 486 B.R. 728, 739 (Bankr. N.D. Tex. 2012), aff'd sub nom. *Lycoming Engines v. Superior Air Parts, Inc.*, No. 3:13-CV-1162-L, 2014 WL

1976757 (N.D. Tex. May 15, 2014) ("This Court aligns itself with those courts that have held that a right to indemnification is a pre-petition 'claim' under the Bankruptcy Code where the indemnification agreement is executed pre-petition, even if the facts giving rise to actual liability did not occur until after the discharge."). Accordingly, the Contingent Indemnity Claims are pre-petition claims rather than post-petition obligations that would be entitled to administrative priority treatment.

        ii.     *Midlantic does not convert any pre-petition Contingent Indemnification Claims into post-petition, administrative expense obligations of the Debtors*

87.    Case law in the Fifth Circuit does recognize a narrow exception when prepetition claims involving P&A obligations of a debtor may constitute "actual, necessary costs and expenses of preserving the estate" entitled to administrative priority. 11 U.S.C. § 503(b)(1)(A). The two leading Fifth Circuit cases that form the basis for this exception are *Texas v. Lowe (In re H.L.S. Energy* Co.), 151 F.3d 434 (5th Cir. 1998) and *In re American Coastal Energy, Inc.*, 399 B.R. 805 (Bankr. S.D. Tex. 2009). In *H.L.S.*, the Fifth Circuit held that costs incurred by the Texas Railroad Commission postpetition to plug an inactive well of the debtor, for which the debtor's obligation to plug the well *accrued postpetition*, was administrative expense. *H.L.S.*, 151 F.3d at 439. In *American Coastal*, this Court expanded on the holding of *H.L.S.* to find that costs incurred by the Texas Railroad Commission postpetition to plug inactive wells of the debtor, for which the debtor's obligation to plug the wells *accrued prepetition*, was also administrative expense. *Am. Coastal*, 399 B.R. at 816. These two cases stand for the straightforward principle that costs incurred by a governmental unit to plug a debtor's well during the administration of a bankruptcy estate may, in certain scenarios, qualify as administrative expense. Neither case establishes a blanket rule

that all P&A obligations of a debtor are to be treated as administrative expense, no matter who incurs such expense and when.

88.    Furthermore, the *American Coastal* opinion contains an important qualifier.  This Court restricted its holding in that case to "claims made by a governmental unit for post-petition remediation."  *Id*. at 809, n.3.  Recently, this Court reinforced this qualification in *In re Northstar Offshore Group, LLC*, 2020 Bankr. LEXIS 1811 (Bankr. S.D. Tex. July 10, 2020).  In *Northstar*, this Court denied an application for administrative expense filed by a co-interest owner of the debtor who, after the petition date, incurred expenses to decommission two federal oil and gas leases in which the co-interest owner and debtor both held an interest.  In doing so, this Court acknowledged that the debtor's "obligation [to decommission the leases] [wa]s the type of 'continuing post-petition duty" that th[e] Court identified in *American Coastal*, which could render 'expenditures necessary to conform with th[e] law actual and necessary costs of preserving the estate entitled to § 503(b)(1)(A) administrative priority.'"  *Id*. at *39.  However, in denying the co-interest owner's application for administrative expense, this Court pointed to several facts that made *American Coastal* and *Northstar* distinguishable, including that the party making the administrative claim in *Northstar* was not a governmental unit: "Unlike in *American Coastal*, **the party asserting administrative priority [wa]s not a state agency**, nor, as [the debtor] argue[d], was the trustee operating a business in light of [the debtor's] sale of substantially all of its assets . . . , nor did 28 U.S.C. § 959 apply because the [the debtor] was not in possession of the property."  *Id*. at *38-39 (emphasis added).[4]

---

4    *See also* Hrg. on Approval of Discl. Stmt., *In re Fieldwood Energy LLC*, Case No. 20-33948 (MI) (Bankr. S.D. Tex. Mar. 24, 2021) (5:15-18, 25:18-20); Hearing on Conditional Approval of Disclosure Statement, *In re Black Elk Offshore Operations, LLC*, Case No. 15-34287 (MI) (Bankr. S.D. Tex. April 29, 2016) (ECF No. 865 at 34:17-21).

89.     In accordance with this Court's holdings in *American Coastal* and *Northstar*, the Sureties do not have administrative expense claims on account of the Debtors' P&A obligations because they are not governmental units and have not expended money on account of the Debtors' P&A obligations during the administration of the Debtors' Chapter 11 Cases.

       iii.     *Sureties will not expend any amounts on account of the Contingent Indemnification Claims until post-Effective Date*

90.     The Contingent Indemnification Claims cannot qualify as administrative expense claims because the Sureties have not, and will not, expend funds on account of any outstanding bonds during the pendency of these Chapter 11 Cases.  In *Northstar*, the Court denied a co-interest owner's application for administrative expense because the decommissioning expenses were incurred at a time when the oil and gas leases no longer belonged to the debtor's estate.  And, if the bankruptcy estate no longer exists, then any costs incurred on account of such property cannot be for the purpose of "preserving the estate":

> [A]lthough § 503 "is silent as to when expenses of a debtor in a reorganization case cease to be accorded administrative priority, courts generally recognize that plan confirmation cuts off the accrual of further administrative expenses. [. . .]  This is true because the 'estate' usually no longer exists after plan confirmation or, at the latest, after the effective date of the plan or reorganization." (quoting 4 Collier on Bankruptcy ¶ 503.06[3][a] (Richard Levin & Henry J. Sommers eds., 16th ed.)).

*Northstar*, 2020 Bankr. LEXIS 1811, at *29-30; *see also* 4 Collier on Bankruptcy ¶ 503.06[3][a] (16th 2020) ("The reference to preserving the 'estate' in section 503(b)(1)(A) also sets an outside time limit for the occurrence of administrative expenses.").

91.     This Court acknowledged a temporal boundary to the incurrence of administration expense in *American Coastal* as well.

Opinions that have denied administrative expense characterization of postpetition expenditures to remediate pre-petition environmental liabilities involved expenditures on property that was no longer property of the bankruptcy estate. *In re Dant & Russell, Inc.*, 853 F.2d 700, 709 (9th Cir.1988) ("*Kovacs* and *Johnson Bronze* are significant in that they involved assertions of administrative expense priority by a lessor for cleanup costs resulting from property not owned by the bankruptcy estate"). *See also Ohio v. Kovacs*, 469 U.S. 274 (1985); *Southern Ry. Co. v. Johnson Bronze Co.*, 758 F.2d 137, 141 (3d Cir. 1985). *Since the property was no longer estate property, the expenditure was not necessary to preserve the estate.*

*Am. Coastal*, 399 B.R. 805, n.4 (emphasis added).

92.     As far as the Debtors are aware, none of the Sureties have issued payment under any of the bonds during the administration of these Chapter 11 Cases.  Furthermore, the Debtors do not anticipate that any of the Sureties will issue payment under any of the bonds during these Chapter 11 Cases.  Thus, any payments that a Surety may make under the bonds will not occur until after the Effective Date when the Debtors' bankruptcy estates no longer exist. As explained in *Northstar*, such expenses cannot qualify as an administrative expense.  *See also* 4 Collier on Bankruptcy ¶ 503.06 (16th ed. 2021) ("[C]osts associated with the cleanup of the property incurred during the bankruptcy case are accorded administrative priority. Conversely, administrative expense status is denied for cleanup costs on property no longer owned by the estate."); *cf. In re Oldco M Corp.*, 438 B.R. 775, 785 n.7 (Bankr. S.D.N.Y. 2010) ("A state might well have reasonable grounds to object if a sale resulted in an administrative claim for future environmental response costs against a debtor that still owned the property becoming a general unsecured claim (or no claim at all) against the debtor . . . .").

### B.     Predecessors Do Not Hold Administrative Expense Claims on Account of the Debtors' P&A Obligations

93.     Any reimbursement or contribution claims held by Predecessors likewise would not qualify as administrative expense.  Similar to the Sureties, the Predecessors hold

contingent and unliquidated, prepetition claims against the Debtors.  These claims do not arise out of a transaction with the post-petition Debtor but rather prepetition purchase and sale agreements that contain indemnification provisions.  Like Sureties' indemnification claims, the Predecessors' contingent, indemnification claims arose pre-petition when the Debtors acquired lease interests from the applicable Predecessors.

94.     Moreover, the Predecessors are not governmental units and therefore, do not hold *Midlantic* claims, and any expenditures the Predecessors may incur on account of the Debtors' P&A obligations would not be incurred until post-Effective Date, at which point the Debtors' estates will no longer exist.  As such, the Predecessors contingent, indemnification claims do not qualify as an administrative expense.  *See, e.g.*, *In re Rock & Republic Enters.*, 2011 WL 4756571 (Bankr. S.D.N.Y. 2011) ("Although a claim may be contingent, only 'actual' administrative expenses, not contingent expenses, are entitled to priority under § 503."); *In re Oldco M Corp.*, 438 B.R. 775 (Bankr. S.D.N.Y. 2010) (denying an application for administrative expense for future remediation costs when the applicant had not demonstrated that it had expended any money on response costs or that it would do so in the future); *see also In re Microfab, Inc.*, 105 B.R. 161, 166 (Bankr. D. Mass. 1989) (denying the state's request for administrative expense priority as premature where the state had not yet expended any funds to clean up the site and the court "cannot speculate as to what amounts might eventually be allowable as actual and necessary expenses of the estate") (internal citations omitted).

## IV.   Plan Releases, Exculpation Provision, and Injunction Provisions Are Appropriate

95.     The Plan provides for (i) the release of claims and Causes of Action by (a) the Debtors and their Estates as set forth in Section 10.7(a) of the Plan (the "**Debtor**

Releases") and (b) certain non-Debtor third-parties—the Releasing Parties[5]—against the Released Parties[6] as set forth in Section 10.7(b) of the Plan (the "**Third-Party Releases**"); (ii) the exculpation of certain parties as set forth in Section 10.8 of the Plan (the "**Exculpation Provision**"); and (iii) the injunction of certain actions as set forth in Sections 10.4, 10.5, 10.6, and 10.9 of the Plan (the "**Injunction Provisions**").  The Debtor Releases, Third-Party Releases, Exculpation Provision, and Injunction Provisions are integral components of the Plan, are appropriate and necessary under the circumstances, are consistent with the Bankruptcy Code, and comply with applicable law.  As such, each should be approved.

### A.    Debtor Releases

96.    Under section 1123(b)(3)(A) of the Bankruptcy Code, a chapter 11 plan may provide for the settlement or adjustment of any claim or interest belonging to the debtor or

---

[5] "**Releasing Parties**" means, collectively, and in each case, solely in their respective capacities as such, (i) the holders of all Claims that vote to accept the Plan, (ii) the holders of all Claims whose vote to accept or reject the Plan is solicited but that do not vote either to accept or to reject the Plan, (iii) the holders of all Claims that vote, or are deemed, to reject the Plan but do not opt out of granting the releases set forth in the Plan, (iv) the holders of all Claims and Interests that were given notice of the opportunity to opt out of granting the releases set forth in the Plan but did not opt out, and (v) the Released Parties (even if such Released Party purports to opt out of the releases set forth herein).

[6] "**Released Parties**" means, collectively, and in each case, solely in their respective capacities as such, (i) the Debtors, (ii) the Post-Effective Date Debtors, (c) the DIP Agent and DIP Lenders under the DIP Facility, (d) the Prepetition FLFO Secured Parties, (e) the Consenting Creditors, (f) the Prepetition FLFO Collateral Agent, (g) the Prepetition FLTL Agents, (h) the Prepetition SLTL Agent, (i) the Creditors' Committee and the current and former members of the Creditors' Committee (solely in their capacities as such), (j) NewCo and all of its subsidiaries (including the Credit Bid Purchaser), (k) the Exit Facility Agents, (l) the Exit Facility Lenders, (m) the Second Lien Backstop Parties, (n) the ERO Backstop Parties, (o) the Apache PSA Parties, and (p) with respect to each of the foregoing Persons in clauses (a) through (o), each of their current and former affiliates, and each such Entity's and its current and former directors, managers, officers, equity holders (regardless of whether such interests are held directly or indirectly), predecessors, successors, and assigns, subsidiaries, and each of their current and former officers, members, managers, directors, equity holders (regardless of whether such interests are held directly or indirectly), principals, members, employees, agents, managed accounts or funds, management companies, fund advisors, investment advisors, advisory board members, financial advisors, partners (including both general and limited partners), attorneys, accountants, investment bankers, consultants, representatives and other professionals, such Persons' respective heirs, executors, estates, and nominees, in each case in their capacity as such, and any and all other persons and entities that may purport to assert any cause of action derivatively, by or through the foregoing entities.

to the estate." 11 U.S.C. § 1123(b)(3)(A).  Accordingly, the Debtors may release estate Causes of Action as consideration for concessions made by their various stakeholders pursuant to the Plan.  *See, e.g.*, *Bigler*, 442 B.R. at 547 (plan release provision "constitutes an acceptable settlement under § 1123(b)(3) because the Debtors and the Estate are releasing claims that are property of the Estate in consideration for funding of the Plan"); *In re Heritage Org., LLC*, 375 B.R. 230, 308 (Bankr. N.D. Tex. 2007) ("[T]he plain language of § 1123(b)(3) provides for the inclusion in a plan of a settlement of claims belonging to the debtor or to the estate . . . .") (emphasis omitted); *In re Gen. Homes Corp.*, 134 B.R. 853, 861 (Bankr. S.D. Tex. 1991) ("To the extent that . . . the plan purports to release any causes of action against the [creditor] which the Debtor could assert, such provision is authorized by § 1123(b)(3)(A) . . . ."). In considering the appropriateness of such releases, courts consider whether the release is (i) "fair and equitable" and (ii) "in the best interest of the estate."  *See Jackson Brewing Co.*, 624 F.2d at 602.

97.     The "fair and equitable" prong is generally interpreted, consistent with that term's usage in section 1129(b) of the Bankruptcy Code, to require compliance with the Bankruptcy Code's absolute priority rule.  *See In re Cajun Elec. Power Coop., Inc.*, 119 F.3d at 355–56 ("The words 'fair and equitable' are terms of art—they mean that senior interests are entitled to full priority over junior ones") (citations omitted); *see also In re Mirant*, 348 B.R. at 738 ("'[F]air and equitable' translates to the absolute priority rule").  Additionally, courts generally determine whether a release is "in the best interests of the estate" by reference to the same factors considered with respect to compromises under Bankruptcy Rule 9019 and the standards of section 363(b) of the Bankruptcy Code.  *See In re Foster Mortg. Corp.*, 68 F.3d at 917–18; *In re Moore*, 608 F.3d 253, 263-265 (5th Cir. 2010).  Under section 363(b) of the Bankruptcy Code, a disposition of estate property (including potential claims and causes of

action held by the estate) "must be supported by an articulated business justification, good business judgment, or sound business reasons." *In re Moore*, 608 F.3d at 263. Ultimately, courts afford debtors some discretion in determining for themselves the appropriateness of granting plan releases of estate causes of action. *See In re Gen. Homes Corp.*, 134 B.R. at 861 ("The court concludes that such a release is within the discretion of the Debtor.").

98. On July 8, 2020, Jim LaChance, an independent director, joined the board of directors of Debtor Fieldwood Energy Inc., which acts as the governing body for Fieldwood Energy LLC as the managing member of Fieldwood Energy LLC (the "**Board**"), as the sole member of the Leadership Transition Committee ("**LTC**") to oversee the Executive Leadership Team. The On October 20, 2020, the Board authorized and directed Mr. LaChance, the Company's management team, and the Company's professional advisors to negotiate with the Company's stakeholders the terms of a chapter 11 plan of reorganization and to make a recommendation to the Board. In addition to his capacity as an independent director of the Board, Mr. LaChance oversaw an investigation into certain claims and estate causes of action that are proposed to be released pursuant to the Plan (the "**Independent Investigation**"). The Independent Investigation also included a review of certain non-de minimis pledges of collateral and transfers of interests made by the Company within the 90-day period leading up to the Petition Date in connection with its entry into forbearance and amendment agreements, dated May 7, 2020, with the required Prepetition FLFO Lenders, Prepetition FLTL Lenders, and Prepetition SLTL Lenders.

99. Weil, Gotshal & Manges LLP ("**Weil**"), as counsel to the Company, assisted Mr. LaChance in evaluating the colorability of those certain potential claims and estate causes of interest. The Independent Investigation took place over the course of several months

and included extensive factual and legal analysis. In connection with the Independent Investigation, Weil conducted five separate interviews of three different individual members of management or the Board, and reviewed approximately 700 documents comprising several thousand pages.

100.    Based upon the results of the Independent Investigation, Mr. LaChance concluded and therefore recommended to the Board that it is in the best interests of the Company and its stakeholders to pursue the Plan and grant the releases provided for in the Plan. Mr. LaChance's determination was based upon, among other things, no valuable colorable claims having been identified against the officers, directors or shareholders in the Independent Investigation and the significant value provided by the Consenting Creditors in pursuing the Plan which would allow the Company to (i) reorganize as a more streamlined, cost-effective going concern business, (ii) save over 1,000 jobs, and (iii) facilitate the safe, responsible, and accelerated decommissioning of properties, pipelines, and platforms in the Gulf of Mexico.

101.    In consideration of the Releases and the other components of the Restructuring, the Released Parties have, among other things (and as applicable), (i) voted to accept the Plan, (ii) provided consensual postpetition cash collateral usage to the Debtors, (iii) provided the DIP Facility and a committed First Lien Exit Facility and Second Lien Exit Facility on the best terms available to the Debtors, (iv) negotiated in good faith with the Debtors regarding a broad range of disputed issues, (v) provided postpetition services to the Debtors in their capacity as officers or directors, and (vi) guided the Debtors through this restructuring, including these chapter 11 cases. The Debtors' officers and directors and executive management team were instrumental throughout the duration of these chapter 11 cases and in negotiating the Plan, which provides for agreed-upon recoveries to a number of the Debtors' stakeholders

(including to holders of General Unsecured Claims), securing access to debtor-in-possession financing and exit financing, reorganization as a more streamlined, cost-effective going concern business, and the preservation of over 1,000 jobs.  Most importantly, the Debtors' officers and directors and management team were also able to obtain agreements to facilitate the safe, responsible, and accelerated decommissioning of properties, pipelines, and platforms in the Gulf of Mexico, including 100% of the Debtors' P&A obligations, thereby preserving the value of the Debtors' Estates.

102.    Moreover, the evidence shows that the Debtors' Releases were negotiated at arm's length among sophisticated parties and were approved by the Board following its review and approval of the Independent Investigation.  Accordingly, any claims or Causes of Action the Debtors are releasing pursuant to the Debtors' Releases are not worth pursuing at the expense of the Plan.  Therefore, the Debtors' Releases should be approved.

### B.    Third-Party Releases

103.    Under Fifth Circuit law, a plan may include a release of third-parties if such releases are being provided by parties that consented to such releases and that received consideration.  *See Bigler*, 442 B.R. at 549; *see also Republic Supply Co. v. Shoaf*, 815 F.2d 1046, 1050 (5th Cir. 1987) (acknowledging that Bankruptcy Code does not prohibit a nondebtor release "when it has been accepted and confirmed as an integral part of a plan of reorganization"); *In re Wool Growers Cent. Storage Co.*, 371 B.R. 768, 775 (Bankr. N.D. Tex. 2007) ("Most courts allow consensual nondebtor releases to be included in a plan."). Accordingly, third-party releases that are, as here, (i) consensual, (ii) specific in language, (iii) integral to the Plan, (iv) a condition of a settlement, and (v) given for consideration, do not violate the Bankruptcy Code and should be allowed and included in the Plan.  *See In re Wool Growers*, 371 B.R. at 776 ("Consensual nondebtor releases that are specific in language, integral

to the plan, a condition of the settlement, and given for consideration do not violate section 524(e).”); *see also Hernandez v. Larry Miller Roofing, Inc.*, 628 F. App'x 281, 286–88 (5th Cir. 2016) (discussing the specificity requirement for third-party releases in Fifth Circuit); *FOM Puerto Rico S.E. v. Dr. Barnes Eyecenter Inc.*, 255 F. App'x 909, 912 (5th Cir. 2007) (enforcing a nondebtor release where “the release of claims was an integral part of the bankruptcy order [and] was not simply boilerplate language that was inserted into the [reorganization plan], but rather a necessary part of the [reorganization plan] itself”); *Applewood Chair Co. v. Three Rivers Planning & Dev. Dist.* (*In re Applewood Chair Co.*), 203 F.3d 914, 919 (5th Cir. 2000) (declining to uphold a general release that did not contain a specific discharge of indebtedness of a third-party); *Shoaf*, 815 F.2d at 1050 (upholding a third-party release that was specifically provided for in confirmed plan); *Hinojosa Eng'g, Inc. v. Lopez (In re Treyson Dev., Inc.)*, No. 14-70256, 2016 WL 1604347, at *15–17 (Bankr. S.D. Tex. Apr. 19, 2016) (noting that “the Fifth Circuit require[s] that the language in the plan must be specific as to the parties involved and the claim(s) released in order to be sufficient”).

104. The critical factor in determining whether a release is consensual is whether—after the Debtors' due process obligations of providing appropriate notice—“the affected creditor *timely objects* to the provision.” *See In re Wool Growers*, 371 B.R. at 776 (citing *Feld v. Zale Corp. (In re Zale Corp.)*, 62 F.3d 746, 760–61 (5th Cir. 1995)) (emphasis added); *see also In re GenOn Energy, Inc.*, No. 17-33695 (DRJ) (Bankr. S.D. Tex. Dec. 12, 2017) (ECF No. 1250) (approving third-party releases as consensual over objections from parties in interest, including U.S. Trustee (ECF No. 1083)); *In re Ameriforge Grp., Inc.*, No. 17-32660 (DRJ) (Bankr. S.D. Tex. May 22, 2017) (ECF No. 142) (overruling U.S. Trustee objection (ECF No. 126) and confirming chapter 11 plan where general unsecured creditors were unimpaired and

deemed to have consented to third-party release provisions unless they opted out of the same); *In re Ultra Petrol. Corp.*, No. 16-32202 (MI) (Bankr. S.D. Tex. Mar. 14, 2017) (ECF No. 1324) (confirming chapter 11 plan where general unsecured creditors were unimpaired and deemed to have consented to third-party release provisions unless they opted out of the same); *In re Southcross Holdings, LP*, No. 16-20111 (MI) (Bankr. S.D. Tex. Apr. 11, 2016), Conf. Hr'g Tr. at 42 (ECF No. 191) (debtors correctly characterized that release was consensual as debtors provided extensive notice of plan and confirmation hearing and no party specifically objected to plan's release provisions); *see also In re RAAM Glob. Energy Co.*, No. 15-35615 (MI) (Bankr. S.D. Tex. Jan. 19, 2016), Conf. Hr'g Tr. at 61 (ECF No. 399) ("[A]s to the holders of claims, it's limited to parties that have accepted and not opted out, and having reviewed it and in the absence of objections I think it is within the range of authority I have under existing Fifth Circuit law.").[7]

105.    Further, the Complex Rules provide:

> If a proposed plan seeks consensual releases with respect to claims that creditors may hold against non-debtor parties, then a ballot must be sent to creditors entitled to vote on the proposed plan and notices must be sent to non-voting creditors and parties in interest. The ballot and the notice must inform the creditors of such releases and provide a box to check to indicate assent or opposition to such consensual releases together with a method for returning the ballot or notice.

Complex Rules ¶ 36.

106.    Here, the Third-Party Releases satisfy the Fifth Circuit's standard and the Complex Rules.  First, the Third-Party Releases are fully consensual.  As set forth above and in compliance with the Disclosure Statement Order, parties in interest were provided extensive notice of these cases, the Plan, the proposed Third-Party Releases, and the Objection Deadline.

---

[7]    For these reasons and as discussed in this section, arguments in certain objections that *In re Pacific Lumber Co.*, 584 F.3d 229 (5th Cir. 2009) operates as a bar to third-party releases like those in the Plan are inapposite and should be overruled.

The Confirmation Hearing, the Notice of Non-Voting Status, and the Ballots expressly included, in bold font, the terms of the Third-Party Releases, as set forth in section 10.7(b) in the Plan.  In addition, the Notice of Non-Voting Status and the Ballots set forth the procedures for opting out of such Third-Party Releases and attached the appropriate form in compliance with Rule 36 of the Complex Rules.  The Confirmation Hearing Notice, the Notice of Non-Voting Status, and the Ballots advised careful review and consideration of the terms of the Third-Party Releases, along with the Exculpation Provision and the Injunction Provisions.  The language of the Third-Party Releases was also emphasized using bold font in the Plan and the Disclosure Statement.  As a result, approximately 218 holders of Claims and Interests (including holders in Non-Voting Classes) completed and returned forms opting out of the Third-Party Releases.  Orchowski Decl. ¶ 11.

107.    Second, the Third-Party Releases are sufficiently specific to put the Releasing Parties on notice of the claims being released.  The Third-Party Releases describe the nature and type of claims being released, including claims with respect the restructuring of any Claim or Interest before or during the Chapter 11 Cases, the Plan, and related agreements, instruments, and other documents, and the negotiation, formulation, preparation, dissemination, filing, pursuit of consummation, and implementation of the Plan, the solicitation of votes with respect to the Plan, and any other related act or omission.

108.    Third, the Third-Party Releases are an integral part of the Plan and a condition of the settlements embodied in the Second Amended and Restated PSA.  The Third-Party Releases facilitated participation in both the Plan by the Released Parties and the chapter 11 process and were critical in gaining support for the Plan.  As such, the Third-Party Releases

were a core negotiation point and appropriately offer certain protections to parties that constructively participated in the Chapter 11 Cases.

109.     Fourth, the Third-Party Releases are given for consideration.  As discussed in more detail above, the Released Parties have played an extensive and integral role in the Debtors' restructuring.   All parties in interest benefit from the Restructuring Transactions contemplated by the Plan and the significant contributions of the Released Parties in furtherance thereof.  These contributions allow for a holistic restructuring that will enable the Debtors to, among other things, successfully address 100% of their P&A obligations.

110.     Fifth, the Creditors' Committee conducted and investigation of claims, and, following such investigation, supports the grant of the Third-Party Releases.

111.     Based on the foregoing, the Third-Party Releases comply with the controlling Fifth Circuit standards, are appropriate and justified under the circumstances, and should therefore be approved.

## C.     Exculpation Provision

112.     In addition to the releases, Section 10.8 of the Plan contains an Exculpation Provision that exculpates the Exculpated Parties[8] from claims arising out of or

---

[8] "**Exculpated Parties**" means collectively, and in each case in their capacities as such during the Chapter 11 Cases (a) the Debtors, (b) the Post-Effective Date Debtors, (c) FWE I, (d) the DIP Agent and DIP Lenders under the DIP Facility, (e) the Prepetition FLFO Secured Parties, (f) the Consenting Creditors, (g) the Prepetition FLFO Collateral Agent, (h) the Prepetition FLTL Agents, (i) the Prepetition SLTL Agent, (j) the Creditors' Committee and the current and former members of the Creditors' Committee (solely in their capacities as such), (k) NewCo and all of its subsidiaries (including the Credit Bid Purchaser), (l) the Exit Facility Agents, (m) the Exit Facility Lenders, (n) the Second Lien Backstop Parties, (o) the ERO Backstop Parties, (p) the Apache PSA Parties, and (q) with respect to each of the foregoing Persons in clauses (a) through (p) each of their current and former affiliates, and each such Entity's and its current and former affiliates' current and former directors, managers, officers, equity holders (regardless of whether such interests are held directly or indirectly), predecessors, successors, and assigns, subsidiaries, and each of their current and former officers, members, managers, directors, equity holders (regardless of whether such interests are held directly or indirectly), principals, members, employees, agents, managed accounts or funds, management companies, fund advisors, investment advisors, advisory board members, financial advisors, partners (including both general and limited partners), attorneys, accountants, investment bankers, consultants, representatives and other professionals, such Persons' respective heirs, executors,

relating to the Debtors' restructuring, these chapter 11 cases, and the negotiations and agreements made in connection therewith.  The Exculpation carves out acts or omissions that are determined by Final Order to constitute intentional fraud or willful misconduct.

113.    Unlike the Third-Party Releases, the Exculpation Provision does not affect the liability of third parties *per se*, but rather sets a standard of care of fraud or willful misconduct in hypothetical future litigation against an exculpated party for acts arising out of the Restructuring.  *See, e.g.*, *In re PWS Holding Corp.*, 228 F.3d 224, 245 (3d Cir. 2000) (holding that an exculpation provision "is apparently a commonplace provision in Chapter 11 plans, [and] does not affect the liability of these parties, but rather states the standard of liability under the Code.").  An exculpation provision represents a legal determination that flows from several findings a court must reach in confirming a plan, as well as the exculpation in section 1125(e) of the Bankruptcy Code.  *See* 28 U.S.C. § 157(b)(2)(L); 11 U.S.C. § 1125(e).  Once the court makes a good-faith finding, it is appropriate to set the standard of care of the parties involved in the formulation of that plan.  *See In re PWS Holding*, 228 F.3d at 246-47 (observing that creditors providing services to debtors are entitled to a "limited grant of immunity . . . for actions within the scope of their duties . . . .").  As such, exculpation provisions prevent future collateral attacks against estate fiduciaries and others that participate actively in the Debtors' restructuring.  Here, the Exculpation Provision is appropriate as it provides protection to those parties, and each of the Exculpated Parties has participated in the Debtors' restructuring in good faith.  Additionally,

---

estates, and nominees, in each case in their capacity as such, and any and all other persons or entities that may purport to assert any cause of action derivatively, by or through the foregoing entities.

provisions substantially similar to the Exculpation Provision have been approved in other complex chapter 11 cases in the Southern District of Texas.[9]

114. The Debtors have acted in good faith within the meaning of section 1125(e) of the Bankruptcy Code, as set forth below.  Further, granting such relief falls within the "fresh start" principles underlying the Bankruptcy Code.  *See Bank of N.Y. Tr. Co. v. Official Unsecured Creditors' Comm. (In re Pac. Lumber Co.)*, 584 F.3d 229, 252-53 (5th Cir. 2009). Although courts in the Fifth Circuit more carefully scrutinize exculpation provisions where the provision at issue exculpates non-debtor-affiliated parties, *see, e.g.*, *id.* at 251–52, such courts have still permitted exculpatory relief for non-debtor parties where such parties owe duties in favor of the debtors or their estates and act within the scope of those duties (excluding acts of fraud or willful misconduct).  *See id.* at 253.

115. Here, the Exculpated Parties include fiduciaries of the Debtors' estates. The directors, officers, and advisors that have acted on the Debtors' behalf in these cases owe duties to the Debtors, and, therefore, exculpation for them, and for similar fiduciaries acting on behalf of the Creditors' Committee, is appropriate.  *See In re Pilgrim's Pride Corp.*, No. 08–45664–DML–11, 2010 WL 200000, at *5 (Bankr. N.D. Tex. Jan. 14, 2010) ("Debtors, serving through their management and professionals as debtors in possession, acted in the capacity of trustees for the benefit of their creditors . . . [t]o the extent Debtors acted in the Chapter 11

---

[9] *See, e.g.*, *In re Cal. Pizza Kitchen, Inc.*, Ch. 11 Case No. 20-33752 (MI) (Bankr. S.D. Tex. Oct. 29, 2020) [Docket No. 600] (order confirming chapter 11 plan and approving similar exculpation provision); *In re UTEX Industries, Inc.*, Ch. 11 Case No. 20-34932 (DRJ) (Bankr. S.D. Tex. Oct. 28, 2020) [Docket No. 172] (same); *In re EP Energy Corp.*, Case No. 19-35654 (MI) (Bankr. S.D. Tex. Aug. 27, 2020) [Docket No. 1411] (same); *In re Exco Res. Inc.*, Ch. 11 Case No. 18-30155 (MI) (Bankr. S.D. Tex. June 18, 2019) [Docket No. 2128] (same); *In re Parker Drilling Co.,* Ch. 11 Case No. 18-36958 (MI) (Bankr. S.D. Tex. Mar. 7, 2019) [Docket No. 459] (same); *In re Expro Holdings US Inc.*, Ch. 11 Case No. 17-60179 (DRJ) (Bankr. S.D. Tex. Jan. 25, 2018) [Docket No. 212] (same); *In re GenOn Energy, Inc.*, No. 17-33695 (DRJ) (Bankr. S.D. Tex. Dec. 12, 2017) [Docket No. 1250] (same); *In re Ameriforge Grp., Inc.*, Ch. 11 Case No. 17-32660 (DRJ) (Bankr. S.D. Tex. May 22, 2017) [Docket No. 142] (same); *In re Ultra Petrol. Corp.*, Ch. 11 Case No. 16-32202 (MI) (Bankr. S.D. Tex. Mar. 14, 2017) [Docket No. 1324] (same).

Cases, other than in bad faith, pursuant to the authority granted by the Code or as directed by court order, Debtors' management and professionals presumptively should not be subject to liability."). Although certain of the Exculpated Parties may not owe fiduciary duties to the Debtors, such parties were still integral participants in the Plan negotiation process, de facto proponents of the Plan who acted in good faith before and throughout these cases, and are essential to the success of these chapter 11 cases, and, therefore, are properly included in the Exculpation Provision.

116. The Exculpation Provision is narrowly tailored to protect the Exculpated Parties from inappropriate litigation based on the Restructuring and the Plan Documents and does not release any claim based on any act or omission that constitutes intentional fraud or willful misconduct as determined by a Final Order. Moreover, the Exculpated Parties participated in these chapter 11 cases in reliance upon the protections afforded to them by the Exculpation Provision. Failure to approve the Exculpation Provision would undermine the purpose of the Plan and the settlements embodied in the Plan by allowing parties to pursue claims post-bankruptcy that are otherwise fully and finally resolved by the Plan. Accordingly, the Exculpation Provision is appropriate and conforms to existing case precedent and should therefore be approved.

### D. Injunction Provisions.

117. The Injunction Provisions are appropriate because they comply with the Bankruptcy Code and are necessary to implement and enforce the Plan. The Injunction Provisions are integral to the Plan because, among other things, (i) they provide certainty to the Debtors and Reorganized Debtors that the Plan will be enforceable in accordance with its terms and (ii) enforce the Debtors' Releases, the Third-Party Releases, and the Exculpation Provision. Importantly, the Injunction Provisions implement the same by permanently enjoining all Persons

from commencing or continuing in any manner any claim that was released or exculpated pursuant to such provisions. The Injunction Provisions are narrowly tailored to achieve that purpose and, therefore, should be approved.

118. For the foregoing reasons, the Plan complies with sections 1122 and 1123 of the Bankruptcy Code and therefore satisfies the requirements of section 1129(a)(1) of the Bankruptcy Code.

## CONFIRMATION OBJECTIONS

I.   **BP's Objection Should be Overruled**

A.   **BP's Feasibility Challenges Misstate the Terms of the Plan and Applicable Law**

119. In BP's objection (ECF No. 1468) (the "**BP Objection**"), BP applies the wrong legal standard for feasibility, and contains several inaccurate statements of fact and law. Rather than analyze feasibility in the context of what the Plan seeks to accomplish, as it is required to do, BP instead applies its own feasibility test on without regard for the purpose and structure of each entity and what the Plan seeks to accomplish. *See* BP Obj. ¶¶ 16–18. BP then proceeds to apply an *entity specific* feasibility test in isolation to each of FWE I, FWE III, FWE IV, and NewCo based on (i) its own misplaced judgments and (ii) the flawed assumption that BP will be able to "subrogate" to the Government's alleged non-dischargeable claims in order to render FWE III infeasible, ignoring the fact that BP is already jointly and severally liable and currently holds such liability.

120. At confirmation, the Debtors will prove that the Plan is feasible by demonstrating how each of the restructuring transactions will be implemented to accomplish the terms of the Plan. *See In re Star Ambulance Serv.*, LLC, 540 B.R. 251, 266 (Bankr. S.D. Tex. 2015) ("In the context of § 1129(a)(11) and feasibility, the question to be addressed

is . . . whether the Plan, as proposed, has a reasonable prospect of success . . . § 1129(a)(11) requires a debtor to show that it can accomplish what it proposes to do, in the time period allowed, on the terms set forth in the plan). As discussed above, the Plan addresses approximately 91% of the Debtors' Decommissioning Obligations on a consensual basis and provides adequate conditions to address the remaining 9% of the Decommissioning Obligations to protect the public health and safety.

121. The primary purpose of FWE III is to safely and efficiently decommission and wind-down a subset of the Debtors' properties within a short time frame. Since the Debtors first started engaging with the Government regarding their proposed restructuring, the parties acknowledged the importance of creating a FWE III structure and setting aside committed funding to address the Decommissioning Obligations for certain assets on an expedited basis as is contemplated by the Plan. That is exactly what the FWE III structure is intended to accomplish and the Debtors will prove at confirmation that FWE III will have adequate resources to safely decommission the FWE III Properties.

122. In arguing that FWE III is not feasible, BP argues that it has subrogation rights to the Government and suggests that the effect of exercising such subrogation rights in the future is that BP will hold up to $300 million of "non-dischargeable" claims against FWE III (and therefore FWE III will not be adequately capitalized to satisfy all of its obligations). This logic fails for a number of reasons.

123. First, BP may not be subrogated to the claims of the U.S. Government for at least two independent reasons: (i) parties such as BP may **only** seek subrogation for expenditures related to decommissioning federal oil and gas leases under section 509 of the Bankruptcy Code and, under section 509, an entity only has an allowed subrogation claim if it

has actually **paid** a claim against a debtor and (ii) BP is already jointly and severally liable for the P&A Obligations under applicable law.

124.    BP cannot assert subrogation claims under section 509 because under applicable regulations, BP is jointly and severally liable for the P&A obligations, and under section 509 of the Bankruptcy Code, an "entity that receive[s] the consideration for the claim held by [a] creditor" is not subrogated to the rights of such creditor.  11 U.S.C. § 509(b)(2); *see also Northstar Offshore Group, LLC*, 2020 Bankr. LEXIS 1811 at *49-40 ("courts have 'recognized that a party who pays a judgment on which it is jointly and severally liable with the debtor does not have a right to subrogation, because the paying creditor receives consideration in the form of a release.'") (quoting 4 Collier on Bankruptcy ¶ 509.01[4] (Richard Levin & Henry J. Sommers eds., 16th ed.)  Therefore, if BP decommissions those Abandoned Properties where BP is in the chain of title (the "**BP Abandoned Properties**"), it will have discharged its own independent obligations.

125.    Moreover, section 509 provides that "an entity that is liable with the debtor on, or that has secured, a claim of a creditor against the debtor, ***and that pays such claim***, is subrogated to the rights of such creditor." *See* 11 U.S.C. § 509(a).  Here, of course, BP has not paid any claims on behalf of the Debtors.

126.    Second, even if BP could surrogate itself to the Government, BP would only be subrogated to the Government's dischargeable, unsecured claims against the Debtors. To the extent subrogation is ever available to BP, it may only subrogate to the Government's "economic claims."  *See also* Dis. Stmt. Hr'g Tr. at 60:12–25, 61:1, *In re Fieldwood Energy, LLC*, No. 20-33948 (Bankr. S.D. Tex. Mar. 24, 2021).  As this Court explained in interpreting the following provision in *North Star*'s confirmation order:

> The language of paragraph 62 matters. Paragraph 62 did not create any obligations that did not exist before the entry of the Confirmation Order, and it did not alter the priority of any obligation. **It did not convert a non-regulatory obligation into a regulatory obligation.** It did not elevate the status of any claim. In this Memorandum Opinion, the Court will examine the priority of the Estate's obligations without regard to the Confirmation Order.

*Northstar*, 2020 Bankr. LEXIS 1811 at *19-20.

127.    Here, the "non-dischargeable" nature of BOEM's claims for P&A Obligations arises from the Government's regulatory powers, not its economic claims.  Indeed, BSEE's proof of claim (which BP asserts it may seek to subrogate to) clearly delineates that its rights arising under its regulatory powers are non-dischargeable.  *See* BSEE Proof of Claim, POC #.  BP simply cannot subrogate to the Government's regulatory powers to obtain a "non-dischargeable" claim.

### B.    BP's Setoff Arguments Fail

128.    In its Objection, BP contends that it owes the Debtors approximately $12.7 million, but that Fieldwood owes BP $30 million because the Debtors brought the Genovesa well online in March 2021.  BP Obj. ¶ 44.  It then asserts in conclusory fashion that it has a secured setoff claim.  BP Obj. ¶¶ 44–45.  The Court should reject BP's setoff argument for several reasons.

129.    "The creditor asserting the right to setoff has the burden to establish that the right to setoff exists."  *In re Corp. Res. Servs., Inc.*, 564 B.R. 196, 204 (Bankr. S.D.N.Y. 2017) (case cited at BP Obj. ¶ 45); *see Braniff Airways, Inc. v. Exxon Co., U.S.A.*, 814 F.2d 1030, 1035 (5th Cir. 1987).  A setoff is only available for "a mutual debt owing by such creditor to the debtor that arose before the commencement of the case under this title against a claim of such creditor against the debtor that arose before the commencement of the case."  11 U.S.C. § 553.  To preserve setoff rights pursuant to section 553, the debts must be mutual and must have

arisen prepetition—the requirement of "mutuality" of parties and debt.  *See Braniff Airways, Inc. v. Exxon Co.*, 814 F.2d 1030, 1035–37 (5th Cir. 1987) ("The only requirements [of setoff] are that the debts and claims be mutual and pre-petition. . . . The mutuality element is lacking if a party attempts to setoff a pre-petition debt against a post-petition claim."); *Kosadnar v. Metro. Life Ins. Co.*, 157 F.3d 1011, 1014 (5th Cir. 1998) ("The Bankruptcy Code specifically disallows the setoff of pre-petition claims against post-petition earnings.").  Section 553 does not create a right to setoff, but preserves setoff rights that are otherwise valid and enforceable under state law.  *Citizens Bank of Md. v. Strumpf*, 516 U.S. 16, 18–19 (1995) (noting that "no federal right of setoff is created by the Bankruptcy Code" but that "whatever right of setoff otherwise exists is preserved in bankruptcy");  *In re Delta Air Lines*, 341 B.R. 439, 444–45 (Bankr. S.D.N.Y. 2006) ("Section 553 does not create a federal right of setoff, nor does it enhance, diminish or otherwise modify any state law right of setoff.").

130.     BP has not made any argument for, much less established any of the elements of, setoff.  Its entire legal argument is that "Section 553 of the Bankruptcy Code expressly preserves BP's setoff rights in these chapter 11 cases" with a parenthetical quoting the statute.  BP Obj. ¶ 45.  BP does not, however, assert what state law its alleged right to setoff would arise under—saying only "under applicable state law" (BP Obj. ¶ 44)—much less provide any state statute or case law providing for a right to setoff that Section 553 preserves.  BP's conclusory statements are insufficient to meet its burden of establishing a right to setoff, and the Court should reject BP's setoff argument for this reason alone.  *See In re Adelphia Commc'ns Corp.*, No. 02 CIV. 9770, 2006 WL 1559437, at *4 (S.D.N.Y. June 7, 2006) ("Because it was Global's burden to prove a symmetry or reciprocity of obligation in order to meet the mutuality requirement for setoff, the Court finds that the Bankruptcy Court did not abuse its discretion in

ruling that Global has not satisfied this requirement for establishing a right to setoff under Section 553(a)."); *In re Aquasport, Inc.*, 155 B.R. 245, 248 (S.D. Fla. 1992) (affirming denial of request for setoff, noting "Significantly, the burden of proof rests on the party articulating a right to setoff."), *aff'd sub nom. ITT Com. Fin. v. Tavormina*, 985 F.2d 579 (11th Cir. 1993).

131.    Moreover,  BP cannot meet its burden to establish a right to setoff because there is no mutuality between this $12.7 million post-petition debt and the $30 million pre-petition debt referenced in BP's Objection.[10]  *See Braniff Airways, Inc. v. Exxon Co.,*  814 F.2d 1030, 1035-37 (5th Cir. 1987) ("The only requirements [of setoff] are that the debts and claims be mutual and pre-petition . . . . The mutuality element is lacking if a party attempts to setoff a pre-petition debt against a postpetition claim."); *Kosadnar v. Metro. Life Ins. Co.,* 157 F.3d 1011, 1014 (5th Cir. 1998) ("The Bankruptcy Code specifically disallows the setoff of pre-petition claims against post-petition earnings.").  In addition, the $30 million amount BP says it is owed is only a contingent liability and may never be recognized.

132.    Finally, even if BP had sustained its burden and even if its claim were pre-petition, there is a bona fide dispute over BP's claim for $30 million regarding Genovesa's MC519 PSA (as defined in BP's Objection), thereby precluding BP's setoff rights.  *See Debtors' Response to Motion of BP to Quash Debtors' Bankruptcy Rule 2004 Discovery Requests* (ECF No. 1539) ("At the time of the PSA, BP (1) had the means to obstruct Genovesa from coming online before BP and Shell's Manuel well, which shares the same reservoir as Genovesa, (2) had a motive to prevent it from coming online on the Debtors' stated timeline, namely, to benefit

---

[10] In addition, BP did not even file a proof of claim in these Chapter 11 Cases.

production from Manuel, and (3) in fact, went on to engage in conduct to prevent Genovesa from coming online until well over a year after the Debtors' reasonable timeline expressed consistently represented before, during, and after the PSA negotiations.").  Under Section 363, the underlying property may be sold "free and clear" of BP's purported setoff rights.  11 U.S.C. § 363(f)(4); *see Folger Adam Sec., Inc. v. DeMatteis/MacGregor, J.V.*, 209 F.3d 252, 263 (3d Cir. 2000) ("Consequently, assuming DeMatteis has met the three requirements to maintain a right of setoff, under section 553 its setoff rights are subject to section 363 and therefore are extinguished by the 'free and clear sale.'").

133.    For these reasons, the Court should overrule BP's Objection asserting a right to setoff.

## II.    Apache Sureties' Arguments Should Be Overruled

### A.    Apache Sureties Have Waived All Defenses or Counterclaims Related to the Apache Surety's Obligations under the Apache Surety Bonds

134.    Before addressing each of the Apache Sureties' remaining objections to the Plan—which primarily focus on various arguments as to how the Plan and Apache Definitive Documents allegedly impair their rights under the Surety Bonds—it is important to understand the rights and obligations of each of the Apache Sureties (as sureties), Fieldwood Energy LLC (as principal) and Apache (as obligee) under each of the Decommissioning Agreement, the Apache Surety Bonds, and the General Indemnity Agreements.

### i.    The Original 2013 Decommissioning Agreement

135.    FWE and GOM Shelf LLC (collectively, the "**FWE Parties**") entered into the Decommissioning Agreement with Apache in September 2013 in connection with a Purchase and Sale Agreement whereby the Apache Parties sold the Legacy Apache Properties to FWE (as amended, the "**Apache PSA**").  The Decommissioning Agreement provides a framework with

respect to FWE's decommissioning obligations on the Legacy Apache Properties (the "**Decommissioning Obligations**") and providing security to Apache for those obligations.

136.     To the extent Apache is required to perform Decommissioning Obligations by law or contract, FWE is obligated to reimburse Apache for costs and expenses incurred in performing the Decommissioning Obligations in accordance with the Decommissioning Agreement.     *See* Decommissioning Agreement, § 2.7(b).     FWE's reimbursement obligations to Apache under the Decommissioning Agreement provide for Decommissioning Security.     *See* Decommissioning Agreement, § 2.7(b).     The term "Decommissioning Security" covers any security obtained, provided, or pledged in connection with the Decommissioning Agreement, including the funds available from Trust A (as defined in the Decommissioning Agreement), letters of credit, bonds, and any future value that may be derived from the NPI Conveyances (as defined in the Decommissioning Agreement).     *See* Decommissioning Agreement, § 2.7(b), Implementation Agreement (as defined below), ¶ 4(vii).

137.     The Apache Sureties are **not** party to the Decommissioning Agreement and have **no rights** under the Decommissioning Agreement.

      ii.     *Letters of Credit and Bonds Issued on Behalf of FWE for Apache's Benefit*

138.     The chart below shows the letters of credit and surety bonds issued on behalf of FWE for the benefit of Apache that are currently outstanding pursuant to the Decommissioning Agreement:

| Issuer | LC/Bond # | Amount | Original Issue Date |
|---|---|---|---|
| Deutsche Bank ATG, New York Branch | 839BGC1600430 | $ 50,000,000.00 | 5/23/2016 |
| Deutsche Bank ATG, New York Branch | 839BGC1500968 | $ 67,557,356.00 | 11/12/2015 |
| Deutsche Bank ATG, New York Branch | 839BGC1500969 | $ 67,557,356.00 | 11/12/2015 |
| Deutsche Bank ATG, New York | 839BGC1500970 | $ 67,557,357.00 | 11/12/2015 |

| | | | |
|---|---|---|---|
| Branch | | | |
| Deutsche Bank ATG, New York Branch | DBS-20280 / 839BGC1500971 | $ 97,327,931.00 | 9/30/2013 |
| | | **$ 350,000,000.00** | |
| Philadelphia Indemnity Insurance Company | PB032515 00040 | $ 72,601,297.00 | 9/27/2018 |
| Everest Reinsurance Company | ES00001441 | $ 75,000,000.00 | 8/30/2018 |

139.   The Deutsche Bank letters of credit (the "**LCs**") are backed by surety bonds issued by Zurich and HCCI in favor of Deutsche Bank companies, but Apache is not in privity of contract with those sureties and Deutsche Bank has given no indication that it will refuse to honor a properly made draw by Apache on its LCs.

### iii.    Fifth Amendment to the Decommissioning Agreement in April 2018

140.   The Decommissioning Agreement has been amended five times, including in connection with FWE's 2018 bankruptcy and restructuring, when Apache agreed that FWE could replace up to $148.7 million of the letters of credit then held by Apache as Decommissioning Security with an equal amount of bonds.  *See* Decommissioning Agreement, § 3.1(e).  Importantly, both the form of the bonds and the issuing surety had to be acceptable to Apache.  *See* Decommissioning Agreement, § 3.1(e).  On April 11, 2018, as part of the 2018 FWE restructuring, Apache and FWE executed the Fifth Amendment to the Decommissioning Agreement.   Section 3.1 of the Decommissioning Agreement was amended to permit the replacement bonds and the form of bond was attached as Exhibit B-1 (the "**Form of Surety Bond**").  FWE and Apache agreed that the bond would provide Apache with the very same protections as a letter of credit, and the Form of Surety Bond reflects that agreement:

- The surety "***waives any and all defenses or counterclaims related to Surety's obligations under this Bond*** and expressly agrees that no genuine issue of fact exists that would prevent or preclude Surety's obligations to comply with the Draw Request";

- The surety has no obligation or option to perform decommissioning as an alternative to immediate cash payment to Apache;

- The bond can be drawn upon presentation of a draw request meeting certain requirements specified therein; and

- "Surety's obligations under this Bond are. . . *not contingent on* . . .(ii) *the Surety's ability to obtain indemnification from the Principal or any other person*; or (iii) *any other circumstances which might otherwise constitute a legal or equitable discharge or defense for Surety*."

Form of Surety Bond, ¶ 4 (emphasis added).

> iv.     *The Everest and Philadelphia Bonds Contain Waivers of All Defenses and Counterclaims*

141.    Several months later, Everest Reinsurance Company ("**Everest**") issued Bond No. ES00001441 in the amount of $75,000,000 on behalf of FWE and in favor of Apache as obligee (the "**Everest Bond**") in August 2018.  Philadelphia Indemnity Insurance Company ("**Philadelphia**") issued Bond No. PB03251500040 in the amount of $72,601,297 on behalf of FWE, as principal, and in favor of Apache as obligee (the "**Philadelphia Bond**" and, together with the Everest Bond, the "**Apache Surety Bonds**") in September 2018.

142.    Both Apache Surety Bonds utilize the Form of Surety Bond from the Fifth Amendment to the Decommissioning Agreement, and both Apache Surety Bonds include the above-referenced waiver language.  *See* Surety Bonds, ¶ 4.

143.    Therefore, Everest and Philadelphia have each expressly waived all of their defenses or counterclaims related to their obligations under the Surety Bonds.

> v.     *The Indemnity Agreements*

144.    In connection with the issuance of the Apache Surety Bonds, FWE executed indemnification agreements in favor of Everest and Philadelphia (the "**Everest Indemnity Agreement**" and the "**Philadelphia Indemnity Agreement**," collectively, the "**Indemnity Agreements**").  Apache is not a party to those indemnification agreements.

**B.      The Apache Sureties' Objections Should be Overruled**

145.    With that backdrop, the Debtors turn to four objections raised by the Apache Sureties: (1) the Plan violates sections 1123(b)(2) and 365 of the Bankruptcy Code because the Decommissioning Agreement, Surety Bonds, and Indemnity Agreements constitute one integrated contract that must be assumed together; (2) the treatment of Apache's claim violates section 1123(a)(4) of the Bankruptcy Code by providing Apache with more favorable treatment than other contingent, unsecured claimants in Class 6B; (3) the Plan was not proposed in good faith because of the FWE I structure; and (4) the consent rights provided to Apache under the FWE I LLC Agreement violate sections 1123(a)(6) and (7).  For the reasons set forth below, and as the evidence will show, the Court should overrule these objections.

> *i.     The Decommissioning Agreement, the Apache Surety Bonds and the Indemnity Agreements are Three Independent Contracts*

146.    The Apache Sureties object to the proposed assumption of the Decommissioning Agreement.  They argue such agreement can only be assigned if the Apache Surety Bonds and the Indemnity Agreements entered into in connection with the Decommissioning Agreement are also assumed.  *See* Zurich Obj. (ECF No. 1446) ¶¶ 45–50; Philadelphia Obj. (ECF No. 1449) ¶¶ 46–54; Aspen Obj. (ECF No. 1461) ¶¶ 83–86.  This objection is based on the flawed position that the Decommissioning Agreement, the Apache Surety Bonds, and Indemnity Agreements form a single, integrated contract that must be assumed or rejected in its entirety.

147.    The Decommissioning Agreement is governed by Texas law.  *See* Decommissioning Agreement § 11.1.  Under Texas law, "separate instruments executed at the same time, between the same parties, and relating to the same subject matter may be considered together and construed as one contract."  *Miles v. Martin*, 321 S.W.2d 62, 65 (1959).  However,

"Courts . . . must exercise caution when construing multiple documents together, as the ultimate goal is to determine and give effect to the parties' intent at the time of the agreements." *Tristani v. Optionsellers*, 2020 U.S. Dist. LEXIS 255062, at *8 (E.D. Tex. Aug. 12, 2020); *see also Jones v. Kelley*, 614 S.W.2d at 99 ("the principle of construing contracts together was a 'device for ascertaining and giving effect to the intention of the parties and cannot be applied arbitrarily and without regard to the realities of the situation.'" (quoting *Miles v. Martin*, 321, S.W.2d at 65)).

148.    As discussed above, the Decommissioning Agreement governs FWE and Apache's rights and obligations with respect to decommissioning the Legacy Apache Properties. Separately, the Apache Surety Bonds provide for the Apache Sureties' unconditional and irrevocable obligations to honor any proper Apache draw requests. And the Indemnity Agreements between FWE and the Apache Sureties govern FWE's indemnification obligations to the Apache Sureties. Given the Apache Sureties' complete waiver of defense rights, the Apache Surety Bonds are the functional equivalent of letters of credit. These three separate agreements between three different combinations of parties should be treated as separate, consistent with the independence principle long recognized by the Fifth Circuit. *See In re Compton Corp.*, 831 F.2d 586, 590 (5th Cir. 1987) ("Under the independence principle, an issuer's obligation to the letter of credit's beneficiary is independent from any obligation between the beneficiary and the issuer's customer . . . . Any disputes between the beneficiary and the customer do not affect the issuer's obligation to the beneficiary to pay under the letter of credit."); *In re Coral Petroleum, Inc.*, 878 F.2d 830, 832 (5th Cir. 1989) ("As a general rule, the obligations and duties created by the contract between the issuer and the beneficiary are

completely separate and independent from the underlying transaction between the beneficiary and the bank's customer." (internal citations omitted)).

149.    Indeed, the terms of the Apache Surety Bonds were negotiated to contain a broad waiver of all suretyship defenses, making the Apache Sureties' duty to perform absolute. *See Am. Cas. Co. of Reading, Pa. v. Irvin*, 426 F.2d 647, 650 (5th Cir. 1970) ("[T]he liability of a surety on a bond which is plain and unambiguous is governed, like any other contract, by the intention of the parties as expressed in the instrument.").  When presented with a conforming draw request by Apache, the Apache Sureties' obligation to honor the request is immediate and absolute—*not* contingent on the Apache Sureties' ability to be indemnified by FWE or any other party.  *See* Apache Surety Bonds, ¶ 4 ("Surety's obligations under this Bond are . . . **not contingent on** . . . (ii) the Surety's ability to obtain indemnification from [FWE] or any other person") (emphasis added).  Thus, the Debtors' rejection of the Indemnity Agreements, to the extent executory, will not affect Apache's ability to draw on the Apache Surety Bonds, just like a letter of credit operating under the independence principle.

150.    More importantly, the Decommissioning Agreement is only between the Debtors and Apache and states in unequivocal terms that nothing in the agreement is intended to confer rights or remedies to persons other than the Debtors and Apache.  *See* Decommissioning Agreement § 13.3.  Furthermore, Apache is not a party to the Indemnity Agreements, and the subject matter of the three agreements is not the same.  The Decommissioning Agreement governs the rights and obligations of Apache and Fieldwood in connection with decommissioning of the Legacy Apache Properties, the Apache Surety Bonds govern the Apache Sureties' obligations to Apache, and the Indemnity Agreements govern FWE's indemnification obligations to the Apache Sureties.

151.     The Apache Sureties argue the Decommissioning Agreement is part of the same contract with the Apache Surety Bonds because the Decommissioning Agreement required the Debtors to obtain the Surety Bonds.  *See* Philadelphia Obj. ¶ 50; Zurich ¶ 47.  Under that rationale, all surety bonds would be "integrated" with the underlying contracts that are bonded. The Court should reject the Apache Sureties' integration arguments.

  ii. *Section 1123(a)(4) is not Violated Because Apache is not Receiving More Favorable Treatment than Other Class 6B Creditors on Account of its Contingent, Unsecured Claims*

152.     The Apache Sureties also contend the that Plan violates section 1123(a)(4) of the Bankruptcy Code because Apache is receiving more favorable treatment than other Class 6B creditors, including the Apache Sureties, in light of its alleged *de facto* ability to control FWE I.  *See* Everest Obj., ¶¶ 10, 92; Philadelphia Obj., ¶ 43.

153.     First, the Apache Sureties' continued assertions that Apache will be able to control FWE I post-Effective Date does not make it so.  Consent rights do not equal control. The term "control" is defined in Rule 405 of the Securities & Exchange Act (the "**Act**") as "the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract or otherwise." 17 C.F.R. Chapter 11, § 230.405.  The Bankruptcy Code mirrors these concepts.  *See* 11 U.S.C. § 101(2).  Apache's consent rights under the FWE I LLC Agreement do not give Apache the power to direct or cause the direction of management and policies of FWE I.  This power is the foundation of control as contemplated by the Act.  The FWE I LLC Agreement, as amended, does not give Apache the power to dictate activities to FWE I, but rather, it preserves FWE I's ability to act on its own with respect to matters involving the Decommissioning Agreement.  Simply put, the ability to block certain actions does not equal the ability to direct actions.

154.     Second, any consent rights that Apache has in FWE I are not on account of its contingent, unsecured claims against the Debtors.  Apache's Rule 9019 settlement with the Debtors, pursuant to which the Debtors and Apache have agreed to certain terms and conditions in connection with addressing approximately *$1 billion* of the Debtors' Decommissioning Obligations, reflects a global settlement of a myriad of issues that serves as the cornerstone of the Debtors' restructuring.  The Rule 9019 settlement between the Debtors and Apache was a sound exercise of the Debtors' business judgment to resolve potentially significant litigation between the parties pertaining to, among other things, (i) the amount of various claims asserted by Apache, including claims arising under the Decommissioning Agreement; (ii) whether the Decommissioning Agreement could be rejected; and (iii) the amount to be contributed from the any sale proceeds towards decommissioning the Legacy Apache Properties to satisfy BOEM and BSEE's plugging and abandonment requirements.  In addition, as part of the 9019 Settlement, Apache has agreed to support the Plan and provide the Standby Facility to support FWE I.  The resources saved by settling with Apache, thereby avoiding the risk and extensive costs associated with protracted litigation, was a reasonable exercise of the Debtors' business judgment and benefitted the Debtors' estates and creditors.  The Apache Surety Providers, of course, have not agreed to support the Plan and have not otherwise provided the Debtors' estates with any of the above-mentioned forms of consideration.

155.     Apache's treatment under the Plan, as it pertains to other creditors in the same Class, cannot be viewed in a vacuum.  In the context of a 9019 settlement**,** different treatment of a claimant under section 1123(a)(4) of the Bankruptcy Code is permitted when the settlement achieves, among other things, the parties avoiding litigation.  *See In re Dow Corning Corp.*, 255 B.R. 445, 497 (E.D. Mich. 2000), *aff'd in part and remanded in part*, 280 F.3d 648

(6th Cir. 2002) ("Agreeing to settle, instead of litigating a claim, would permit a claimant to be treated differently, such as giving up more valuable consideration, in exchange for the settlement offer.  This treatment is allowed under § 1123(a)(4).").  Moreover, "[s]ection 1123(a)(4) does not require precise equality, only approximate equality."  *In re Quigley Co., Inc.*, 377 B.R. 110, 116 (Bankr. S.D.N.Y. 2007); *see also In re W.R. Grace & Co.*, 729 F.3d 311, 327 (3d Cir. 2013) (same).

156.    The Plan does not violate section 1123(a)(4) of the Bankruptcy Code in light of Apache foregoing, among other things, its litigation rights in exchange for conferring substantial benefits to the Debtors under the parties' settlement.

### iii.    The FWE I Structure is an Integral Component of the Debtors' Plan to Decommission the FWE I Properties

157.    The Apache Sureties argue that the Plan was not proposed in good faith because (i) Apache has de facto control over FWE I and (ii) the Debtors failed to maximize the value of the FWE I Properties.  Each of these arguments fail.

158.    First, the Apache Sureties allege that Apache has "de facto" control of FWE I.  However, as discussed above, the evidence will show that FWE I will be an independent entity managed by the Sole Manager, Jon Graham, an independent third party with fiduciary duties that run exclusively to FWE I.  *See* Fieldwood Energy I LLC Agreement, Plan Suppl., Ex. A1].  Moreover, Apache will not own equity in FWE I, will not vote on the Sole Manager or Independent Director and will not have consent rights that constitute control as such term is contemplated under the Act, as discussed above.  Moreover, the evidence will show that the Apache Sureties' baseless allegations suggesting that Mr. Graham will not act in accordance with his fiduciary duties should be disregarded.  In any event, even if Apache did have "de facto"

control over FWE I (which the Debtors adamantly dispute), the Apache Sureties expressly waived their rights under the Surety Bonds.

159.    Second, the Apache Sureties' assertion that the Debtors' failure to market the FWE I Assets and maximize the value of FWE I suggests that the Plan was not proposed in good faith.  However, to support these assertions, the Apache Sureties make several statements that demonstrate a fundamental lack of understanding of several key aspects of the Plan, FWE I structure, and certain Apache Definitive Documents.  First, the Apache Sureties fail to cite to any applicable case law to support its suggestion that the Debtors are required to prioritize maximizing the value of specific FWE I Assets when doing so would jeopardize its agreement with Apache, which is the only viable path forward for implementing its proposed restructuring and maximizing value for all creditors.  Second, the Sureties point to a limited number of unsolicited offers related to individual assets associated with the FWE I Properties.  The Debtors do not dispute that the FWE I Properties contain certain potentially valuable properties, among other very substantial overall liabilities.  However, these arguments ignore the comprehensive nature of the FWE I structure.  To the extent the Sole Manager determines the sale of properties is appropriate to provide additional capital for FWE I decommissioning then it will be within the Sole Manager's authority, with the appropriate consents, to conduct such sales at the appropriate time.  Third, the Sureties misconstrue the Farmout Agreement which actually benefits FWE I.

160.    Since the beginning of the Debtors' restructuring process, the Debtors recognized that the decommissioning obligations related to their Shelf Assets were among the Debtors' most significant liabilities and presented the biggest obstacle to a successful restructuring of the Debtors' business.  Moreover, it become clear early on that reaching a deal with Apache was the first step towards the only viable path forward for adequately addressing all

of the Government's concerns and obtaining a sufficient level of consensus with the Debtors' Predecessors to move forward with confirmation without the Government objecting. Ultimately, the Apache transactions will resolve approximately ***$1 billion of the Debtors' decommissioning obligations***, representing approximately 63% of their total decommissioning obligations. The Debtors' settlement with Apache forms the cornerstone of the Debtors' proposed restructuring and created a framework for the Debtors to reach several additional consensual deals with other predecessors (*i.e.*, Chevron, Eni, and Hunt) to facilitate resolution of approximately 91% of the Debtors' decommissioning obligations on a consensual basis (as of the date of this filing). In addition, Apache has committed to providing a $450 million standby credit facility to support FWE I's operations.

161. The Apache Transactions allowed the Debtors to negotiate a comprehensive restructuring that is supported by the Ad Hoc Group of Lenders, the Creditors' Committee, several other Predecessors (CUSA, Eni, and Hunt), and overwhelmingly by almost all the voting classes across the Debtors' capital structure, including the holders of 100% of the voting FFLO Claims, 100% of the voting FLTL Claims, 100% of the voting SLTL Claims, and 94.15% of the voting Unsecured Trade Claims. *See Declaration of Alex Orchowski of Prime Clerk LLC Regarding Solicitation of Votes and Tabulation of Ballots Cast on the Fourth Amended Joint Chapter 11 Plan of Fieldwood Energy LLC and its Affiliated Debtors*, Exhibit A (ECF No. 1521).

162. These facts are the hallmarks of good faith. *See In re Lincolnshire Campus, LLC*, 441 B.R. 524, 530 (Bankr. N.D. Tex. 2010) (holding that a plan was proposed in

good faith where plan was developed and negotiated at arm's-length among representatives of debtors and other major parties in interest); *In re Chemtura Corp.*, 439 B.R. 561, 609 (Bankr. S.D.N.Y. 2010) (finding that a plan was proposed in good faith where, among other things, the debtor negotiated and reached agreements with several parties in interest to put forward a chapter 11 plan which "in the aggregate . . . demonstrate[d] a good faith effort on the part of the debtor to consider the needs and concerns of all major constituencies" in the case).

        iv.     *FWE I's Proposed Corporate Form does not Violate Sections 1123(a)(6) and (7) of the Bankruptcy Code*

163.    The Plan was formulated with the goal of providing a framework to safely and economically decommission the Legacy Apache Properties.  FWE I was structured to fulfill that mission.  Because Apache, as the immediate predecessor in interest, is jointly and severally liable with FWE for decommissioning the Legacy Apache Properties, Apache's input into the structure of FWE I and Apache's support of the Plan were key.   The LLC Agreement, as amended, provides Apache certain consent rights with respect to matters related to the mandate (not the day-to-day management) of FWE I to focus its activities on decommissioning and use its cash flow consistent therewith.  The consent rights are intended to ensure that the people at FWE I responsible for decommissioning are best suited to and positioned to manage the process efficiently, economically, safely and successfully.

164.    The Apache Sureties have objected to the Plan, asserting that the protections afforded Apache violate sections 1123(a)(6) and (7) of the Bankruptcy Code  because Apache is allegedly "controlling" FWE I.

165.    Section 1123(a)(6) of the Bankruptcy Code requires that a plan to "provide for inclusion in the charter of the debtor, if the debtor is a corporation . . . of a provision prohibiting the issuance of nonvoting equity securities."  11 U.S.C. § 1123(a)(6).   The policy

underlying 1123(a)(6) is that "creditors who are forced to take stock in the new company, or whose rights as creditors are modified or altered so that they assume some risk of the success of the **reorganized corporation**, are entitled to an allocation of voting power and a voice in the selection of management that will protect their interests." 7 Collier on Bankruptcy ¶ 1123.01 (16th ed. 2021) (emphasis added); *see also In re Ahead Commc'ns Sys.*, 395 B.R. 512, 518 (D. Conn. 2008) ("The prohibition against issuing nonvoting securities was intended to ensure that investors were able to maintain a voice in the selection of management of the **reorganized firm**." (emphasis added)); *In re Eagle-Picher Indus.*, 1996 U.S. Dist. LEXIS 17160, at *44 (S.D. Ohio Nov. 18, 1996) ("Section 1123(a)(7) of the Bankruptcy Code requires that the manner of selection of any director, officer, or trustee of the **reorganized debtor** . . . be consistent with the interests of creditors and equity interest holders and with public policy. . . . Section 1123(a)(7) does not apply to either the trustees of the PI Trust or the members of the Trust Advisory Committee established thereunder." (emphasis added)).

166.    Here, section 1123(a)(6) is inapplicable because FWE I is not a reorganized debtor and the Apache Sureties are not receiving stock in FWE I on account of their claims. *See* Plan § 1.1 ("For the avoidance of doubt, the Post-Effective Date Debtors does not include . . . FWE I."). In fact, FWE I is a wind-down entity that is intended to P&A the Legacy Apache Properties. Accordingly, the Apache Sureties' objection grounded in section 1123(a)(6) should be overruled.[11]

167.    The Apache Sureties' objection under section 1123(a)(7) of the Bankruptcy should be overruled for similar reasons. Section 1123(a)(7) provides that a plan

---

[11] Further, and for the avoidance of doubt, to the extent any securities are being issued by the Plan, separate from the specific objection discussed herein, the Plan complies with section 1126(a)(6) in that no nonvoting securities are being issued.

must "contain only provisions that are consistent with the interests of creditors and equity security holders and with public policy with respect to the manner of selection of any officer, director, or trustee under the plan and any successor to such officer, director, or trustee."  In construing the "public policy" requirement of section 1123(a)(7) of the Bankruptcy Code, courts look to whether a plan violates applicable state law.  *See, e.g.*, *In re Mesa Air Group, Inc.*, 2011 WL 320466 (Bankr. S.D.N.Y. Jan. 20, 2011) (finding that the plan did not violate section 1123(a)(7) by examining whether the plan's provisions complied with Nevada state corporate law); *In re Machne Menachem, Inc.*, 304 B.R. 140 (Bankr. M.D. Pa. 2003) (finding that "public policy" requires compliance with New York corporate law and concluding that the plan violates section 1123(a)(7) because the plan provides for the removal or selection of the non-profit debtor's directors in a manner contrary to state law); *In re Mahoney*, 80 B.R. 197, 201–02 (Bankr. S.D. Cal. 1987) (finding that although the meaning of section 1123(a)(7) is "far from clear" and section 1123(a)(7) "does not state whose public policy (federal, state, local) should not be violated by a plan of reorganization," the proposed corporate form under the plan violates California's corporations laws and therefore the plan fails to satisfy section 1123(a)(7)).

168.    Here, the Apache Sureties have not alleged that FWE I's proposed corporate form violates any applicable state law on corporate governance, and FWE I's proposed form is consistent with the interests of creditors—Apache will not own equity in FWE I, will not vote on the Independent Director and will not have consent rights that constitute control as such term is contemplated under the Act, as discussed above.

## III.    The Remaining Provisions of Section 1129 and Other Relevant Sections of the Bankruptcy Code are Satisfied

169.    To obtain confirmation of the Plan, the Debtors must demonstrate by a preponderance of the evidence that the Plan satisfies section 1129 of the Bankruptcy Code with

respect to each Debtor entity. *See Briscoe Enters.*, 994 F.2d at 1165 (holding "that preponderance of the evidence is the debtor's appropriate standard of proof both under § 1129(a) and in a cramdown"). The Debtors have addressed several of the requirements of section 1129 above.[12] For the reasons set forth below, the Plan satisfies the remaining requirements of section 1129 and should be confirmed.

A.      **The Plan Satisfies 11 U.S.C. § 1129(a)(1)**

170.    Under section 1129(a)(1) of the Bankruptcy Code, a plan must comply with the applicable provisions of the Bankruptcy Code. This provision encompasses the requirements of sections 1122 and 1123 of the Bankruptcy Code governing the classification of claims and the contents of the plan, respectively. *See, e.g.*, *Star Ambulance*, 540 B.R. at 260 ("Courts interpret [section 1129(a)(1)] to mean that a plan must meet the requirements of Bankruptcy Code Sections 1122 and 1123.") (citing, *inter alia*, *Alliance, Inc. v. WSI (II)-COS, L.L.C.* (*In re Save Our Springs (S.O.S.) Alliance, Inc.)*, 632 F.3d 168, 174 (5th Cir. 2011)); *In re J T Thorpe Co.*, 308 B.R. 782, 785 (Bankr. S.D. Tex. 2003) ("The Plan complies with the applicable provisions of the Bankruptcy Code, including the requirements of Sections 1122 and 1123(a) and (b) of the Bankruptcy Code, thereby satisfying Section 1129(a)(1) of the Bankruptcy Code."); H.R. Rep. No. 95–595, at 412 (1977), *as reprinted in* 1978 U.S.C.C.A.N. 5963, 6368; S. Rep. No. 95–989, at 126 (1978), *as reprinted in* 1978 U.S.C.C.A.N. 5787, 5912. As discussed below, the Plan complies with both section 1122 and section 1123.

i.      *The Plan Complies with 11 U.S.C. § 1122*

171.    Under section 1122(a) of the Bankruptcy Code:

Except as provided in subsection (b) of this section, a plan may place a claim or an interest in a particular class only if such claim

---

[12] *See supra* sections III.A, III.E (discussing sections 1129(a)(3) and(11)).

> or interest is substantially similar to the other claims or interests of
> such class.

11 U.S.C. § 1122(a).

172.     "Significantly, a plan proponent is afforded significant flexibility in classifying claims under section 1122(a) of the Bankruptcy Code provided there is a reasonable basis for the classification scheme and all claims within a particular class are substantially similar."  *In re Idearc Inc.*, 423 B.R. 138, 160 (Bankr. N.D. Tex. 2009), *aff'd*, 662 F.3d 315 (5th Cir. 2011).

173.     Here, the Plan provides for 11 Classes of Claims and Interests: (i) Class 1 (Other Secured Claims), (ii) Class 2 (Priority Non-Tax Claims), (iii) Class 3 (FLFO Claims), (iv) Class 4 (FLTL Claims), (v) Class 5 (SLTL Claims), (vi) Class 6A (Unsecured Trade Claims), (vii) Class 6B (General Unsecured Claims), (viii) Class 7 (Intercompany Claims), (ix) Class 8 (Subordinated Securities Claims), (x) Class 9 (Intercompany Interests), and (xi) Class 10 (Existing Equity Interests).[13]

174.     Each Class consists solely of "substantially similar" Claims or Interests that share common priority or rights against the Estates.  *See In re Greystone III Joint Venture*, 995 F.2d at 1278 ("'[S]ubstantially similar claims,' those which share common priority and rights against the debtor's estate, should be placed in the same class.").  All Claims and Interests within a Class have the same or similar rights against the Debtors.  Moreover, the Plan's classification scheme generally tracks the Debtors' prepetition capital structure and divides the applicable Claims and Interests into Classes based on the underlying instruments giving rise to such Claims and Interests and/or the entity against which Claims or Interests are asserted.  With

---

[13] Administrative Expense Claims, Fee Claims, Priority Tax Claims, and DIP Claims are not classified and are treated separately under the Plan.

respect to Class 6B, the Debtors have reasonable justification for the separate classification of unsecured trade claims, *i.e.*, the requirement for trade creditors to enter into trade agreements providing at least as favorable terms as existed prepetition, reducing administrative burdens post-effective date, and securing the support of the Creditors' Committee for the Plan. *See Heartland Fed. Sav. & Loan Ass'n v. Briscoe Enters., Ltd. II (In re Briscoe Enters., Ltd. II)*, 994 F.2d 1160, 1167 (5th Cir. 1993) (citing *Phoenix Mut. Life Ins. Co. v. Greystone III Joint Venture (In re Greystone III Joint Venture)*, 995 F.2d 1274 (5th Cir. 1991) (finding good business reasons supported the separate classification where unsecured creditor had a unique interest in the debtor's continued operations and maintaining an ongoing relationship with the creditor was essential to the debtor's ongoing business)).

175. Accordingly, the Debtors have complied with section 1122 of the Bankruptcy Code.

ii. *The Plan Satisfies 11 U.S.C. § 1123*

176. Section 1123(a) of the Bankruptcy Code sets forth seven requirements that a corporate proponent of a chapter 11 plan must satisfy.[14] The Plan satisfies each such requirement.

- Pursuant to 11 U.S.C. § 1123(a)(1): Section 3 of the Plan designates Classes of Claims and Interests.

- Pursuant to 11 U.S.C. § 1123(a)(2): Section 3 of the Plan specifies whether each Class is Impaired under the Plan.

- Pursuant to 11 U.S.C. § 1123(a)(3): Section 4 of the Plan specifies the treatment of each Impaired Class.

- Pursuant to 11 U.S.C. § 1123(a)(4): Section 4 of the Plan provides that, except as a holder of a particular Claim or Interest may agree to less favorable treatment, the treatment of

---

[14] An eighth requirement, set forth in section 1123(a)(8), applies only in cases in which the debtor is an individual.

each Claim or Interest in a particular Class is the same as the treatment of each other Claim or Interest in such Class.

- Pursuant to 11 U.S.C. § 1123(a)(5): The Plan provides adequate means for implementation including, among other things, the compromise and settlement of Claims, Interests, and controversies (Plan § 5.1); the Credit Bid Transaction and Confirmation Outside Date (*id.* § 5.2); Equity Rights Offerings (*id.* § 5.3); New Equity Interests (*id.* § 5.4); NewCo Organizational Documents (*id.* § 5.5); New Money Warrants, SLTL Warrants, and GUC Warrants (*id.* § 5.6); Plan of Merger (*id.* § 5.7); Single Share (*id.* § 5.8); Plan Administrator (*id.* § 5.9); Plan funding (*id.* § 5.10); the Exit Facilities (*id.* § 5.11); the Apache Definitive Documents (*id.* § 5.12); the abandonment of certain properties (*id.* § 5.13); establishment of a claims reserve (*id.* § 5.14); the Plan Administrator expense reserve (*id.* § 5.15); the Debtors' continued corporate existence (unless otherwise specified in the Plan) (*id.* § 5.16); corporate action (*id.* § 5.17); the cancellation of existing securities and agreements of the Debtors (*id.* § 5.18); the cancellation of certain existing security interests in the Debtors (*id.* § 5.19); the Intercompany Interests and corporate reorganization (*id.* § 5.20); the Restructuring Transactions (*id.* § 5.21); the liquidating trust (*id.* § 5.22); securities exemptions (*id.* § 5.23); the closing of the chapter 11 case (*id.* § 5.24); provisions governing distributions under the Plan (*id.* § 6); procedures for disputed claims (*id.* § 7); and the Debtors' Releases (*id.* § 10.7).

- Pursuant to 11 U.S.C. § 1123(a)(6): The certificate of incorporation, articles of incorporation, limited liability company agreement or similar governing document, as applicable, of each Debtor has been or will be amended on or before the Effective Date to prohibit the issuance of non-voting equity securities. Further, the securities being issued pursuant to the Plan are the New Equity Interests, the Subscription Rights, the SLTL Warrants, the GUC Warrants, the Backstop Commitment Premium Equity Interests, and the New Money Warrants, all of which are not non-voting equity securities. Thus, the issuance of the New Equity Interests, the Subscription Rights, the SLTL Warrants, the GUC Warrants, the Backstop Commitment Premium Equity Interests, and the New Money Warrants complies with section 1123(a)(6) of the Bankruptcy Code.

- Pursuant to 11 U.S.C. § 1123(a)(7): The Bankruptcy Code requires that Debtors provide certain information regarding the appointment of directors and officers upon reorganization. The Plan's provisions governing the manner of selection of any officer, director, or manager are consistent with the interests of creditors and equity security holders and with public policy. Upon the Effective Date, the Plan Administrator will serve as the sole officer, director, or manager of each Post-Effective Date Debtor. If known, the officers and the composition of each board of directors of the Reorganized Debtors shall be disclosed prior to the Effective Date to the extent required by section 1129(a)(5) of the Bankruptcy Code. Jon Graham will serve as the Sole Manager of FWE I and David Dunn of Provide LLC will serve as the Plan Administrator for FWE III.

177. Accordingly, the Plan contains all of the provisions required by section 1123(a) of the Bankruptcy Code.

### iii.     The Plan Satisfies 11 U.S.C. § 1123(b)

178.     Section 1123(b) of the Bankruptcy Code sets forth permissive provisions that may be included in a chapter 11 plan.  Each provision of the Plan is consistent with section 1123(b) of the Bankruptcy Code:

- Pursuant to 11 U.S.C. § 1123(b)(1): Section 4 of the Plan treats Class 2 (Priority Non-Tax Claims), Class 7 (Intercompany Claims), and Class 9 (Intercompany Interests) as unimpaired.

- Pursuant to 11 U.S.C. § 1123(b)(2): Section 8 of the Plan provides for the rejection of all executory contracts and unexpired leases, except for those contracts or leases that are assumed and assigned in accordance with the Plan.  Exhibit D to the Plan Supplement identifies those executory contracts that are being assumed pursuant to the Plan.

- Pursuant to 11 U.S.C. § 1123(b)(3)(A): The settlements and compromises contemplated by Section 5.1 of the Plan represent a good faith compromise of Claims, Interests, and controversies relating to the contractual, legal, and subordination rights that a creditor or an Interest holder may have with respect to any Allowed Claim or Interest or any distribution to be made on account of such Allowed Claim or Interest.  In addition, Section 10.7(a) of the Plan provides for the Debtors' release of the Released Claims.

- Pursuant to 11 U.S.C. § 1123(b)(3)(B): Section 10.11 of the Plan preserves for the Reorganized Debtors all of the rights, claims, Causes of Action, rights of setoff or recoupment, and other legal or equitable defenses that the Debtors had immediately before the Effective Date, except as otherwise expressly set forth in the Plan.

- Pursuant to 11 U.S.C. § 1123(b)(5): Section 4 of the Plan modifies the rights of holders of Claims or Interests in the Impaired Classes, and leaves unaffected the rights of holders of Claims or Interests in the Unimpaired Classes.

- Pursuant to 11 U.S.C. § 1123(b)(6): Sections 10.6, 10.7, 10.8, and 10.9 of the Plan include release, exculpation, and injunction provisions, respectively, that are integral to the Debtors' reorganization and are consistent with the provisions of the Bankruptcy Code and Fifth Circuit precedent.  The releases and exculpation in the Plan are discussed more fully below.  Further, Section 5.23 of the Plan provides that the offer, issuance, and distribution of New Equity Interests, the Subscription Rights, the SLTL Warrants, the GUC Warrants, the Backstop Commitment Premium Equity Interests, and the New Money Warrants under the Plan will be exempt from registration pursuant to section 4(a)(2) of the Securities Act and/or Regulation D thereunder.

As discussed herein, these provisions of the Plan are appropriate and comply with applicable law.

179.   For the foregoing reasons, the Plan complies with sections 1122 and 1123 of the Bankruptcy Code and therefore satisfies the requirements of section 1129(a)(1) of the Bankruptcy Code.

**B.   The Plan Satisfies 11 U.S.C. § 1129(a)(2)**

180.   Under section 1129(a)(2) of the Bankruptcy Code, "[t]he proponent of the plan [must] compl[y] with the applicable provisions of th[e Bankruptcy Code]." The "applicable provisions" of the Bankruptcy Code have been interpreted to include, principally, sections 1125 and 1126. *See, e.g.*, *Cajun Elec. Power*, 150 F.3d at 512 n.3 (noting that section 1129(a)(2) includes requirement of compliance with section 1125); *Cypresswood Land Partners*, 409 B.R. at 424 ("Bankruptcy courts limit their inquiry under § 1129(a)(2) to ensuring that the plan proponent has complied with the solicitation and disclosure requirements of § 1125."); *Star Ambulance*, 540 B.R. at 262 ("Courts interpret this language to require that the plan proponent comply with the disclosure and solicitation requirements set forth in Bankruptcy Code §§ 1125 and 1126."). As demonstrated below, the Debtors have complied with the applicable provisions of title 11, including the provisions of sections 1125 and 1126, as well as the Disclosure Statement Order, and, therefore, have satisfied the requirements of section 1129(a)(2) of the Bankruptcy Code.

*i.   The Debtors have Complied with 11 U.S.C. § 1125*

181.   Under section 1125(b) of the Bankruptcy Code:

An acceptance or rejection of a plan may not be solicited after the commencement of the case under [the Bankruptcy Code] from a holder of a claim or interest with respect to such claim or interest, unless, at the time of or before such solicitation, there is transmitted to such holder the plan or a summary of the plan, and a written disclosure statement approved, after notice and a hearing, by the court as containing adequate information.

11 U.S.C. § 1125(b).

Further, under section 1125(e) of the Bankruptcy Code:

> A person that solicits acceptance or rejection of a plan, in good faith and in compliance with the applicable provisions of [the Bankruptcy Code], or that participates, in good faith and in compliance with the applicable provisions of [the Bankruptcy Code], in the offer, issuance, sale, or purchase of a security, offered or sold under the plan, of the debtor, of an affiliate participating in a joint plan with the debtor, or of a newly organized successor to the debtor under the plan, is not liable, on account of such solicitation or participation, for violation of any applicable law, rule, or regulation governing solicitation of acceptance or rejection of a plan or the offer, issuance, sale, or purchase of securities.

11 U.S.C. § 1125(e).

182.   On April 15, 2021, the Court entered the Disclosure Statement Order, which approved the Disclosure Statement and approved the Debtors' proposed solicitation procedures.  As set forth in the Solicitation Affidavit,[15] with respect to each Debtor, each holder of a Claim or Interest was sent the solicitation materials required by the Solicitation Order, including, for holders of Claims or Interests entitled to vote, a USB flash drive containing the Disclosure Statement and Plan, the Solicitation Order (without exhibits), a notice of the confirmation hearing, and an appropriate form of ballot and return envelope (such ballot and envelope being referred to as a "**Ballot**," and together with the foregoing items, a "**Solicitation Package**").  The Solicitation Package was transmitted in connection with the solicitation of votes to accept the Plan in compliance with § 1125 of the Bankruptcy Code and the Solicitation Order.  As further detailed in the Solicitation Affidavit, the Debtors provided notices to the Non-Voting Classes in compliance with the Solicitation Order.  The Debtors did not solicit acceptances of the Plan from any creditor or equity interest holder prior to the transmission of the Disclosure Statement.  Accordingly, the Debtors have complied with § 1125 of the Bankruptcy Code.

---

[15]     *Affidavit of Service of Solicitation Materials*, dated April 23, 2021 (Docket No. 1309-7).

ii.     *The Debtors have Complied with 11 U.S.C. § 1126*

183.    Under section 1126 of the Bankruptcy Code:

(a)     The holder of a claim or interest allowed under section 502 of [the Bankruptcy Code] may accept or reject a plan.

. . .

(c)     A class of claims has accepted a plan if such plan has been accepted by creditors . . . that hold at least two-thirds in amount and more than one-half in number of the allowed claims of such class held by creditors . . . that have accepted or rejected such plan.

(d)     A class of interests has accepted a plan if such plan has been accepted by holders of such interests . . . that hold at least two-thirds in amount of the allowed interests of such class held by holders of such interests . . . that have accepted or rejected such plan.

. . .

(f)     Notwithstanding any other provision of this section, a class that is not impaired under a plan, and each holder of a claim or interests of such class, are conclusively presumed to have accepted the plan, and solicitation of acceptances with respect to such class from the holders of claims or interests of such class is not required.

(g)     Notwithstanding any other provision of this section, a class is deemed not to have accepted a plan if such plan provides that the claims or interests of such class do not entitle the holders of such claims or interests to receive or retain any property under the plan on account of such claims or interests.

184.    The Debtors solicited votes on the Plan in compliance with the Disclosure Statement Order.  The Debtors solicited the votes of all Impaired Classes of Claims.

185.    The Debtors determined that Classes 3, 4, 5 and 6A accepted the Plan and Classes 1 and 6B rejected the Plan based on the voting results described above.  Orchowski Decl. Classes 2, 7, and 9 were conclusively presumed to accept the Plan because those Classes were Unimpaired under the Plan, and Classes 8 and 10 were deemed to reject the Plan because those

Classes will not receive any distribution on account of their claims.  Votes were not solicited from these Classes.

186.    Based on the foregoing, the Debtors have satisfied the requirements of section 1129(a)(2) of the Bankruptcy Code.

### C.    The Plan Satisfies 11 U.S.C. § 1129(a)(3)

187.    This Plan satisfies section 1129(a)(3) as discussed above.

### D.    The Plan Satisfies 11 U.S.C. § 1129(a)(4)

188.    Under section 1129(a)(4) of the Bankruptcy Code, "[a]ny payment made or to be made by the proponent . . . for services or for costs and expenses in or in connection with the case, or in connection with the plan and incident to the case, has been approved by, or is subject to the approval of, the court as reasonable."  11 U.S.C. § 1129(a)(4); *see Cajun Elec. Power*, 150 F.3d at 514–15 (explaining that section 1129(a)(4) ensures that payments for professional services connected with a chapter 11 case will be subject to court's approval as being reasonable).  "What constitutes a reasonable payment will clearly vary from case to case and, among other things, will hinge to some degree upon who makes the payments at issue, who receives those payments, and whether the payments are made from assets of the estate."  *Id.* at 517.

189.    Here, Section 2.2 of the Plan provides that Professionals seeking approval by the Court of compensation for services rendered or reimbursement of expenses incurred after the Petition Date through the Effective Date under sections 327, 328, 330, 331, 503(b)(2), 503(b)(3), 503(b)(4), 503(b)(5), 503(b)(6), or 1103 of the Bankruptcy Code ("**Fee Claims**") must file final applications no later than 45 days after the Effective Date, thereby giving interested parties adequate time to review the Fee Claims.  *Id.*  Further, Section 11.1(i) of the Plan provides

that the Court will retain jurisdiction to "hear and determine all Fee Claims." Accordingly, the

Plan complies with section 1129(a)(4) of the Bankruptcy Code.

### E. The Plan Satisfies 11 U.S.C. § 1129(a)(5)

190. Under section 1129(a)(5) of the Bankruptcy Code, a plan proponent must

disclose:

> (A) (i) . . . the identity and affiliations of any individual proposed to serve, after confirmation of the plan, as a director, officer, or voting trustee of the debtor, an affiliate of the debtor participating in a joint plan with the debtor, or a successor to the debtor under the plan; and
>
> (ii) the appointment to, or continuance in, such office of such individual, is consistent with the interests of creditors and equity security holders and with public policy; and
>
> (B) . . . the identity of any insider that will be employed or retained by the reorganized debtor, and the nature of any compensation for such insider.

11 U.S.C. § 1129(a)(5). "Bankruptcy courts have recognized that keeping a competent officer in

charge of the reorganized debtor is consistent with public policy under § 1129(a)(5)(A)(ii)."

*Cypresswood Land Partners*, 409 B.R. at 427. "In order to lodge a valid objection under section

1129(a)(5), a creditor must show that a debtor's management is unfit or that the continuance of

this management post-confirmation will prejudice the creditors." *In re Landing Assocs., Ltd.*,

157 B.R. 791, 817 (Bankr. W.D. Tex. 1993).

191. The Debtors will identify the directors of the Post-Effective Date Debtors

as soon as possible. The Debtors will also provide information about each of those individuals,

their affiliations, and, with respect to insiders, their compensation. Upon the Effective Date, the

Plan Administrator shall serve as the sole officer, director, or manager of each Post-Effective

Date Debtor. *See* Plan § 5.9. The Plan Administrator will be competent, have relevant and

valuable business and industry experience, and will provide continuity and fresh perspectives on running the Post-Effective Date Debtors' businesses.

F.     **The Plan Satisfies 11 U.S.C. § 1129(a)(6)**

192.    Under section 1129(a)(6) of the Bankruptcy Code, "[a]ny governmental regulatory commission with jurisdiction, after confirmation of the plan, over the rates of the debtor [must have] approved any rate change provided for in the plan, or such rate change is expressly conditioned on such approval." 11 U.S.C. § 1129(a)(6). The Plan does not provide for rate changes by the Debtors. Accordingly, section 1129(a)(6) does not apply to the Plan.

G.     **The Plan Satisfies 11 U.S.C. § 1129(a)(7)**

193.    Under section 1129(a)(7) of the Bankruptcy Code, a plan must provide "that each holder of an impaired class of claims or interests receives at least what it would have received if the debtor were liquidated under Chapter 7." *CHS, Inc. v. Plaquemines Holdings, L.L.C.*, 735 F.3d 231, 239 (5th Cir. 2013). "The 'best interests' test applies to individual creditors holding impaired claims, even if the class as a whole votes to accept the plan." *203 N. LaSalle St.*, 526 U.S. at 441 n.13. Moreover, "the inquiry is what would the creditor receive from the debtor's estate if the debtor were to liquidate under chapter 7 of the Bankruptcy Code, not what the creditor would have received from a third party." *Lovett v. Homrich Inc. (In re Philip Servs. Corp.)*, 359 B.R. 616, 630 (Bankr. S.D. Tex. 2006). The value of plan distributions is measured "in present value terms." *Briscoe Enters.*, 994 F.2d at 1167; *In re Pisces Energy, LLC*, Case No. 09-36591-H5-11, 2009 WL 7227880, at *12 (Bankr. S.D. Tex. Dec. 21, 2009). "Although creditors being 'at least as well off' is the statutory requirement for plan confirmation, ordinarily creditors are better off when the debtor is reorganized into a going concern than when a liquidation occurs." *Cantu v. Schmidt (In re Cantu)*, 784 F.3d 253, 262 (5th Cir. 2015). A

party's speculation that it would fare better in a hypothetical chapter 7 liquidation is insufficient to challenge a plan proponent's liquidation analysis. *Block Shim*, 939 F.2d at 292.

194.    Here, the relative recoveries of holders of Claims or Interests under the Plan and in a hypothetical chapter 7 liquidation are set forth in Exhibit M to the Disclosure Statement (the "**Liquidation Analysis**") and supported by the Brown Declaration.   They demonstrate that the holders in each Class of Claims and Interests will receive at least as much value under the Plan as they would in a hypothetical liquidation of the Debtors on the Effective Date. *See* Brown Decl.   Specifically, the Debtors determined that the gross proceeds available for distribution in a hypothetical chapter 7 liquidation would be between $11 to $15 million. *Id.*

195.    These projections are based on reasonable, justified, and widely accepted assumptions regarding a chapter 7 trustee's ability to liquidate the Debtors' assets and the values that such sales would be likely to produce.   As Judge Hughes has reasoned:

> The additional costs of three chapter 7 trustees, the short time allowed a plain liquidation, the potential for more claims to be filed against the estates, and the loss of knowledge and momentum . . . about the management of these assets would combine to reduce significantly the cash to be realized by the estates from these assets.   The lower prices from the liquidation are reasonable.

*MCorp Fin*, 160 B.R. at 961 (confirming chapter 11 plan).   And as Judge Brown has explained:

> [A] chapter 7 liquidation would increase the administrative costs of the Bankruptcy Cases and adversely affect the ultimate proceeds available for distribution to all holders of Allowed Claims in the Bankruptcy Cases and the Debtors' [post-effective] date operations.   Moreover, the increased costs associated with a liquidation under chapter 7 would further reduce the proceeds available for distribution.   These costs would include, among other things, administrative fees and costs payable to a trustee in bankruptcy and professional advisors to such trustee. . . .
>
> The Bankruptcy Court here considers, *inter alia:* (1) the problems associated with the quick sale of assets as contemplated in chapter 7; (2) the limitations of section 721 of the Bankruptcy Code; and (3) loss of value through passage of time.

*Pisces Energy*, 2009 WL 7227880, at \*12 & n.7 (holding that plan satisfied best interests test); *accord In re Adelphia Commc'ns Corp.*, 368 B.R. 140, 252–58 (Bankr. S.D.N.Y. 2007) (considering, among other things, costs of regulatory compliance, administrative costs of one or more chapter 7 trustees and their professionals; a trustee's lack of familiarity with debtors' business; potential for delays in claim and interest holders' receipt of distributions; and likelihood that chapter 7 trustees would adopt settlements embodied in plan).

196.    Here, the Debtors have assumed, among other things, that (i) the business would cease operations on May 1, 2021 and begin a wind down process; (ii) the Debtors' costs of liquidation under chapter 7 would include the fees payable to the Trustee as well as those fees that might be payable to attorneys and other professionals that the Trustee might engage; (iii) the operations of the Debtors will cease and that the Plan construct associated with FWE I, FWE III, FWE IV, the Abandoned Properties, and the Credit Bid Acquired Interests would no longer apply; (iv) the process of liquidating the Debtors' businesses would also be subject to review by numerous regulatory agencies, including BOEM and BSEE, which would likely further delay the liquidation process; and (v) that additional claims would arise by reason of the breach or rejection of obligations incurred and leases and executory contracts assumed or entered into by the Debtors during the pendency of these chapter 11 cases.

197.    As the confirmation evidence will show, these assumptions are consistent with the Debtors' valuation expert, JP Hanson's, extensive experience as a financial advisor to distressed companies and are appropriate for and tailored to the Debtors' specific business and assets.  Accordingly, the Debtors' assumptions and estimates used in the Liquidation Analysis are appropriate.  Because each holder of a Claim or Interest in an impaired Class will receive a

distribution under the Plan in excess of what such holder would receive in a hypothetical chapter 7 liquidation, the Plan complies with section 1129(a)(7) of the Bankruptcy Code.

### H.     The Plan Satisfies 11 U.S.C. § 1129(a)(8)

198.    Under section 1129(a)(8) of the Bankruptcy Code, each class of claims and interests must either accept a plan or be unimpaired under the plan.  11 U.S.C. § 1129(a)(8). Classes 2, 7, and 9 were deemed to consent.  Plan § 3.8(b).

199.    Classes 3, 4, 5, and 6A voted to accept the Plan.   Orchowski Decl. Classes 1 and 6B voted to reject the Plan (*id*.), and Classes 8 and 10 were deemed to reject the Plan and not entitled to vote.  *See* Plan § 3.8.  As a result, solely with respect to Classes 1, 6B, 8, and 10, the Plan does not satisfy the requirements of section 1129(a)(8) of the Bankruptcy Code and must be confirmed pursuant to section 1129(b) of the Bankruptcy Code.

### I.     The Plan Satisfies 11 U.S.C. § 1129(a)(9)

200.    Under section 1129(a)(9) of the Bankruptcy Code, a plan must provide certain treatment for specified priority claims.  As to administrative expense claims:

> Except to the extent that the holder of a particular claim has agreed to a different treatment of such claim, the plan provides that . . . with respect to a claim of a kind specified in section 507(a)(2) or 507(a)(3) of [the Bankruptcy Code], on the effective date of the plan, the holder of such claim will receive on account of such claim cash equal to the allowed amount of such claim[.]

11 U.S.C. § 1129(a)(9)(A).  As to priority non-tax claims:

> (i) if such class has accepted the plan, deferred cash payments of a value, as of the effective date of the plan, equal to the allowed amount of such claim; or (ii) if such class has not accepted the plan, cash on the effective date of the plan equal to the allowed amount of such claim[.]

11 U.S.C. § 1129(a)(9)(B).  As to unsecured priority tax claims:

> the holder of such claim will receive . . . regular installment payments in cash—(i) of a total value, as of the effective date of

87

> the plan, equal to the allowed amount of such claim; (ii) over a period ending not later than 5 years after the date of the order for relief . . . and (iii) in a manner not less favorable than the most favored nonpriority unsecured claim provided for by the plan[.]

11 U.S.C. § 1129(a)(9)(C).  As to secured priority tax claims: "the holder of that claim will receive on account of that claim, cash payments, in the same manner and over the same period, as prescribed in subparagraph (C)."  11 U.S.C. § 1129(a)(9)(D).

201.    Here, the Plan satisfies each of these requirements.  Section 2.1 of the Plan provides that on (or as soon thereafter as is reasonably practicable) the later of (a) the Effective Date and (b) the first Business Day after the date that is thirty (30) calendar days after the date each Administrative Expense Claim becomes an Allowed Administrative Expense Claim, each holder of an Allowed Administrative Expense Claim (other than a Fee Claim) shall receive in full and final satisfaction of such Claim, either (x) Cash in an amount equal to the Allowed amount of such Claim or such other treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code or (y) such other treatment as to which the Debtors, the Post-Effective Date Debtors, or NewCo and its subsidiaries (including the Credit Bid Purchaser), as applicable, and the holder of such Allowed Administrative Expense Claim will have agreed upon in writing; *provided*, that Allowed Administrative Expense Claims representing liabilities incurred in the ordinary course of business by the Debtors, as Debtors in Possession, shall be paid by the Debtors or the Post-Effective Date Debtors, as applicable, in the ordinary course of business, consistent with past practice and in accordance with the terms and subject to the conditions of any orders or agreements governing, instruments evidencing, or other documents establishing, such liabilities; *provided, further*, that any Allowed Administrative Expense Claim assumed by the Credit Bid Purchaser pursuant to the Credit Bid Purchase Agreement shall be solely an obligation of the Credit Bid Purchaser and the holder of such assumed Claim shall have

no recourse to or Claim against the Debtors or Post-Effective Date Debtors or their assets and properties.

202.     Section 2.5 provides that each holder of an Allowed Priority Tax Claims shall receive (a) Cash in an amount equal to the Allowed amount of such Claim or such other treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code or (b) such other treatment as to which the Debtors, the Post-Effective Date Debtors or NewCo and its subsidiaries (including the Credit Bid Purchaser) as applicable, and the holder of such Allowed Priority Tax Claim will have agreed upon in writing; *provided*, that Allowed Priority Tax Claims representing liabilities incurred in the ordinary course of business by the Debtors, as Debtors in Possession, shall be paid by the Debtors or the Post-Effective Date Debtors, as applicable, in the ordinary course of business, consistent with past practice and in accordance with the terms and subject to the conditions of any orders or agreements governing, instruments evidencing, or other documents establishing, such liabilities; *provided, further*, that any Allowed Priority Tax Claim assumed by the Credit Bid Purchaser pursuant to the Credit Bid Purchase Agreement shall be solely an obligation of the Credit Bid Purchaser and the holder of such assumed Claim shall have no recourse to or Claim against the Debtors or Post-Effective Date Debtors or their assets and properties.

203.     Section 4.2 of the Plan provides that Priority Non-Tax Claims are Unimpaired and will (i) be paid in full in Cash or (ii) otherwise receive treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code, payable on the later of the Effective Date and the date that is ten (10) Business Days after the date on which such Priority Non-Tax Claim becomes an Allowed Priority Non-Tax Claim, in each case, or as soon as reasonably practicable thereafter; *provided,* that any Allowed Priority Non-Tax Claim assumed by the Credit

Bid Purchaser pursuant to the Credit Bid Purchase Agreement shall be solely an obligation of the Credit Bid Purchaser and the holder of such assumed Claim shall have no recourse to or Claim against the Debtors or Post-Effective Date Debtors or their assets and properties.

204.    Finally, Section 4.1 of the Plan provides that holders of Other Secured Claims will receive either (i) payment in full in Cash, payable on the later of the Effective Date and the date that is ten (10) Business Days after the date on which such Other Secured Claim becomes an Allowed Other Secured Claim, in each case, or as soon as reasonably practicable thereafter, (ii) such other treatment so as to render such holder's Allowed Other Secured Claim Unimpaired, or (iii) any other treatment consistent with the provisions of section 1129 of the Bankruptcy Code, including by providing such holder with the "indubitable equivalent" of their Allowed Other Secured Claim (which, for the avoidance of doubt, may be in the form of a multiyear promissory note or other financial instrument); *provided,* that any Allowed Other Secured Claim assumed by the Credit Bid Purchaser pursuant to the Credit Bid Purchase Agreement shall be solely an obligation of the Credit Bid Purchaser and the holder of such assumed Claim shall have no recourse to or Claim against the Debtors or Post-Effective Date Debtors or their assets and properties.

### J.    The Plan Satisfies 11 U.S.C. § 1129(a)(10)

205.    Section 1129(a)(10) of the Bankruptcy Code requires the affirmative acceptance of the Plan by at least one class of impaired claims, "determined without including any acceptance of the plan by any insider." 11 U.S.C. § 1129(a)(10). As set forth above and in the Voting Declaration, Classes 3, 4, 5, and 6A are impaired and have voted to accept the Plan. Accordingly, the Plan satisfies section 1129(a)(10) of the Bankruptcy Code.

### K.    The Plan Satisfies 11 U.S.C. § 1129(a)(11)

206.    As set forth in detail above, the Plan is feasible.

### L.      The Plan Satisfies 11 U.S.C. § 1129(a)(12)

207.     Under section 1129(a)(12) of the Bankruptcy Code, a plan must provide for the payment of "[a]ll fees payable under section 1930 of title 28 [of the United States Code], as determined by the court at the hearing on confirmation of the plan . . . on the effective date of the plan." 11 U.S.C. § 1129(a)(12).  In accordance with these sections, Section 12.1 of the Plan provides that, on the Effective Date or as soon as practicable thereafter, such fees shall be paid by the Debtors or the Post-Effective Date Debtors, as applicable.  *See* Plan § 12.1.  The proposed Confirmation Order will also provide for the payment of all such statutory fees.  Accordingly, the Plan complies with section 1129(a)(12) of the Bankruptcy Code.  *See, e.g.*, *Star Ambulance*, 540 B.R. at 267 (holding that plan provision requiring payment of fees under 28 U.S.C. § 1930 satisfies requirements of section 1129(a)(12)); *Cypresswood Land Partners*, 409 B.R. at 433 (holding that testimony that Debtors would pay fees under 28 U.S.C. § 1930 satisfies requirements of section 1129(a)(12)).

### M.      11 U.S.C. §§ 1129(a)(13)–(16) Does Not Apply

208.     Certain provisions of section 1129(a) of the Bankruptcy Code do not apply to the Debtors.  Section 1129(a)(13) of the Bankruptcy Code is applicable only to debtors that maintain "retiree benefits," as that term is defined in section 1114 of the Bankruptcy Code.  The Debtors will not maintain any such retiree benefits, and as such section 1129(a)(13) is inapplicable to these Chapter 11 Cases.  Section 1129(a)(14) is inapplicable because the Debtors do not have domestic support obligations.  Section 1129(a)(15) is inapplicable because no Debtor is an "individual" as that term is used in the Bankruptcy Code.  Section 1129(a)(16) is inapplicable because the Plan does not provide for transfers of property by a nonprofit entity.

N.      **The Plan Satisfies 11 U.S.C. § 1129(b)**

209.     Section 1129(b) of the Bankruptcy Code provides a mechanism (known as "cram down") for confirmation of a chapter 11 plan in circumstances where the plan is not accepted by all impaired classes of claims or interests.  Under section 1129(b), the court may "cram down" a plan over the dissenting vote of an impaired class of claims or interests so long as the plan does not "discriminate unfairly" and is "fair and equitable" with respect to such dissenting class or classes.  *See In re Sentry Operating Co. of Tex., Inc.*, 264 B.R. 850, 862 (Bankr. S.D. Tex. 2001); *In re MCorp Fin., Inc.*, 137 B.R. 219, 231 (Bankr. S.D. Tex. 1992).  By its express terms, § 1129(b) only applies to a class of creditors or interest holders that rejects a plan.  11 U.S.C. § 1129(b)(1) ("[T]he court . . . shall confirm the plan notwithstanding the requirements of [§ 1129(a)(8)] if the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, *and has not accepted*, the plan." (emphasis added)).  Class 1 (Other Secured Claims), Class 6B (General Unsecured Claims), Class 8 (Subordinated Securities Claims), and Class 10 (Existing Equity Interests) did not vote to accept the Plan.

210.     As noted above, Classes 8 and 10 were deemed to reject the Plan because those Classes will not receive any distribution on account of their claims.  While the Plan provides that Classes 7 and 9 may be reinstated, this is a technical preservation of equity to preserve the Debtors' corporate structure post-emergence and is permissible.  Thus, with respect to Classes 8 and 10, section 1129(b) has been satisfied because these classes are both entirely unsecured and no junior Class is receiving a recovery under the Plan.  11 U.S.C. §§ 1129(b)(2)(B)(ii) and (C)(ii).  For the same reasons, section 1129(b) is satisfied as to Class 6B.

211.     Although all Other Secured Claims have been placed in Class 1 for purposes of nomenclature within the Plan, each Other Secured Claim, to the extent secured by a

Lien on Collateral different from the Collateral securing a different Other Secured Claim, shall

be treated as being in a separate sub-Class for the purposes of voting to accept or reject the Plan

and receiving Plan Distributions.    Plan § 3.5.    Therefore, the Debtors must prove that

§ 1129(b)(2) is satisfied with respect to the holders of Claims in Class 1 that voted to reject the

Plan.  Seven claimants in Class 1 voted to reject the Plan and are addressed in turn below:

- Ecopetrol America LLC ("**Ecopetrol**"):   Ecopetrol has asserted a secured claim of $7,075,685 based on amounts owed for known lien claims related to OCS-G-28030 Mississippi Canyon 948.  The JOA for this lease only granted Ecopetrol a security interest in the Debtors' working interest, which is estimated to be only $3,467,161.  The Debtors intend to pay this amount in full in Cash, satisfying the requirements of § 1129(b)(2).

- W&T Offshore, Inc. ("**W&T**"):   W&T has asserted secured claims totaling approximately $4.9 billion on account of future P&A costs that have not yet been incurred for properties in which it is either a co-working interest owner with one or more Debtors or is a predecessor in interest in the chain of title.  These amounts are entirely contingent and unliquidated.  Moreover, W&T submits no support for the claimed amounts or its security interests with its proofs of claim.

  Section 502 of the Bankruptcy Code provides that a claim, for which a proof is filed, is deemed allowed unless a party in interest objects.  11 U.S.C. § 502(a).  Under § 502(e)(1)(B) a secured claim shall be disallowed if: (1) the claim is contingent; (2) the claim is for reimbursement or contribution; and (3) the claimant is co-liable with the debtor in respect of the claim.  *See In re Falcon V*, 2020 Bankr. LEXIS 2490, at *19 (Bankr. M.D. La. Sept. 22, 2020).

  W&T's claims satisfy these criteria and thus, must be disallowed.  First, the claim is contingent for purposes of § 502(e)(1)(B) because it is "unfunded" meaning no payment has yet been made.  *See In re Tri-Union Dev. Corp.*, 314 B.R. 611, 617 (Bankr. S.D. Tex. 2004) (Isgur, J.).  Second, the claim is for reimbursement or contribution for potential future decommissioning work.  Third, W&T is co-liable with the Debtors under the relevant JOAs for any decommissioning work that may become due.  *See, e.g.*, *In re Northstar Offshore Grp., LLC*, 2020 WL 9606995, at *7 n.9 (Bankr. S.D. Tex. July 10, 2020) (Isgur, J.).  Accordingly, because W&T's claim must be disallowed in its entirety, no recoveries are owed to W&T under the Plan.

- Burlington Resources Offshore, Inc.; ConocoPhillips Company; and The Louisiana Land & Exploration Company, LLC ("**COPC**"): The three entities that comprise COPC each assert liens secured by the same collateral for

contingent P&A obligations.  For the same reasons as above, the secured claims of the COPC entities must be disallowed and thus they are not entitled to any recoveries under the Plan.

- McMoRan Oil & Gas LLC ("**McMoRan**"):  McMoRan asserted a secured claim of approximately $64.5 million for contingent P&A obligations.  For the same reasons as above, the secured claim of McMoRan must be disallowed and thus it is not entitled to any recoveries under the Plan.

- Valero Marketing and Supply Company ("**Valero**"):  Valero asserted a secured claim of approximately $2.1 million.  For purposes of confirmation only, if Valero has a valid secured claim, such claim is subject to setoff based on amounts Valero owes to the Debtors and therefore no recoveries would be owed to Valero under the Plan.

212.    To the extent the secured claims of W&T, COPC, or McMoRan are not disallowed under § 502(e)(1)(B), each creditor only has a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property.  11 U.S.C. § 506.  Because the collateral of those three creditors consists of properties that are either being abandoned or wound-down pursuant to the Plan, the Debtors value the secured portions of the creditors' claims as having *de minimis* value, if any.

213.    Accordingly, the Plan satisfies § 1129(b) with respect to all holders of Claims in Class 1 that voted to reject the Plan.

### O.    The Plan Satisfies 11 U.S.C. § 1129(c)

214.    Section 1129(c) provides that "the court may confirm only one plan, unless the order of confirmation in the case has been revoked under section 1144."  11 U.S.C. § 1129(c).  The Plan is the only plan currently on file in these cases and, accordingly, section 1129(c) of the Bankruptcy Code does not apply.

**P.**    **The Plan Satisfies 11 U.S.C. § 1129(d)**

215.    The principal purpose of the Plan is not the avoidance of taxes or the avoidance of section 5 of the Securities Act, and no party has objected on any such grounds.  The Plan, therefore, satisfies the requirements of section 1129(d) of the Bankruptcy Code.

**Q.**    **11 U.S.C. § 1129(e) Does Not Apply**

216.    The provisions of section 1129(e) of the Bankruptcy Code apply only to "small business cases" as defined therein.  These Chapter 11 Cases are not "small business cases."  Accordingly, section 1129(e) of the Bankruptcy Code is inapplicable in these cases.

Dated: June 13, 2021
     Houston, Texas

/s/   Alfredo R. Pérez
WEIL, GOTSHAL & MANGES LLP
Alfredo R. Pérez (15776275)
Clifford Carlson (24090024)
700 Louisiana Street, Suite 1700
Houston, Texas 77002
Telephone:  (713) 546-5000
Facsimile:  (713) 224-9511
Email:   Alfredo.Perez@weil.com

-and-

WEIL, GOTSHAL & MANGES LLP
Matthew S. Barr (admitted *pro hac vice*)
Jessica Liou (admitted *pro hac vice*)
767 Fifth Avenue
New York, New York 10153
Telephone:  (212) 310-8000
Facsimile:  (212) 310-8007
Email:   Matt.Barr@weil.com
        Jessica.Liou@weil.com

-and-

WEIL, GOTSHAL & MANGES LLP
Paul R. Genender (00790758)
Erin M. Choi (24079436)
200 Crescent Court, Suite 300
Dallas, Texas 75201
Telephone: (214) 746-7700
Facsimile: (214) 746-7777
Email: Paul.Genender@weil.com
      Erin.Choi@weil.com

*Attorneys for Debtors and Debtors in Possession*

## **Certificate of Service**

I hereby certify that, on June 13, 2021, a true and correct copy of the foregoing document was served as provided by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

*/s/   Alfredo R. Pérez*
Alfredo R. Pérez