**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | § | |
|---|---|---|
| **In re:** | § | **Chapter 11** |
| | § | |
| **FIELDWOOD ENERGY LLC, *et al.,*** | § | **Case No. 20-33948 (MI)** |
| | § | |
| **Debtors.**[1] | § | **(Jointly Administered)** |
| | § | |

**DECLARATION OF MICHAEL DANE IN SUPPORT OF CONFIRMATION OF THE
FOURTH AMENDED JOINT CHAPTER 11 PLAN OF FIELDWOOD ENERGY LLC
AND ITS AFFILIATED DEBTORS**

I, Michael Dane, pursuant to section 1746 of title 28 of the United States Code,

hereby declare that the following is true to the best of my knowledge, information, and belief:

1.     I am the Senior Vice President and Chief Financial Officer of Fieldwood

Energy LLC ("**Fieldwood**" or "**FWE**"), and its debtor affiliates in the above-captioned Chapter

11 Cases, as debtors and debtors in possession (collectively, the "**Debtors**" or the "**Company**").[2]

I have served as Senior Vice President and Chief Financial Officer since March 9, 2016.  Prior to

my appointment to my current role, I was Vice President of Finance for the Debtors.  Before that,

I was Manager of Finance and Planning at Dynamic Offshore Resources, LLC and an equity

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are:  Dynamic Offshore Resources NS, LLC (0158); Fieldwood Energy LLC (6778); Fieldwood Energy Inc. (4991); Fieldwood Energy Offshore LLC (4494); Fieldwood Onshore LLC (3489); Fieldwood SD Offshore LLC (8786); Fieldwood Offshore LLC (2930); FW GOM Pipeline, Inc. (8440); GOM Shelf LLC (8107); Bandon Oil and Gas GP, LLC (9172); Bandon Oil and Gas, LP (9266); Fieldwood Energy SP LLC (1971); Galveston Bay Pipeline LLC (5703); and Galveston Bay Processing LLC (0422).  The Debtors' primary mailing address is 2000 W. Sam Houston Parkway S., Suite 1200, Houston, TX  77042.

[2] Capitalized terms used but not defined herein have the meanings ascribed to them in the *Debtors' Memorandum of Law in Support of (I) Confirmation of Fourth Amended Joint Chapter 11 Plan of Fieldwood Energy LLC and its Affiliated Debtors and (II) Omnibus Reply to Objections Thereto*, which is being filed contemporaneously herewith.

research analyst at SunTrust Robinson Humphrey with a focus on the exploration and production sector.  I hold a Bachelor of Commerce degree from McGill University.

2. On August 3 and 4, 2020 (the "**Petition Date**"), Fieldwood and certain of its subsidiaries commenced in this Court voluntary cases under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**").  I am knowledgeable about and familiar with the Debtors' business and financial affairs.  I am authorized to submit this declaration (the "**Declaration**") on behalf of the Debtors.

3. Except as otherwise indicated, all facts set forth in this Declaration (or incorporated by reference herein) are based upon my personal knowledge; my discussions with other members of the Company's management team and other employees of the Company; my review of relevant documents and the Company's books and records; my opinion based upon my experience as a senior vice president and chief financial officer of the Company; and/or upon information supplied to me by advisors.  If I were called to testify, I would testify competently to the facts set forth (and incorporated by reference) herein.

4. I submit this Declaration in support of confirmation of the *Fourth Amended Joint Chapter 11 Plan of Fieldwood Energy LLC and Its Affiliated Debtors* (ECF No. 1284) (as may be amended, modified, or supplemented in accordance with the terms thereof, the "**Plan**"), including the agreements and other documents set forth in the Plan Supplement, dated May 27, 2021 (ECF No. 1394) (as may be amended, modified, or supplemented in accordance with the Plan, the "**Plan Supplement**"), pursuant to section 1129 of the Bankruptcy Code.  I am familiar with the terms of the Plan.  Together with counsel, I have reviewed the requirements for confirmation of the Plan under section 1129 of the Bankruptcy Code.

5. Based on my personal involvement in the negotiation and implementation

2

of the transactions embodied in the Plan and these Chapter 11 Cases and my discussions with the Debtors' professionals, I believe that the Plan complies with the applicable provisions of the Bankruptcy Code; that the Plan was proposed in good faith; and that the Debtors, acting through their officers, directors, and professionals, have conducted themselves in a manner that complies with applicable law in relation to the formulation and negotiation of, and solicitation of votes on, the Plan.

### Circumstances Giving Rise to These Chapter 11 Cases and the Development of the Plan

6.      The Plan, the Disclosure Statement, and the Solicitation Order (as defined below), the *Declaration of Michael Dane in Support of Debtors' Chapter 11 Petitions and First Day Relief*, dated August 4, 2020 (ECF No. 29), the *Declaration of Alex Orchowski of Prime Clerk LLC Regarding the Solicitation of Votes and Tabulation of Ballots Cast on the Fourth Amended Joint Chapter 11 Plan of Fieldwood Energy LLC and Its Affiliated Debtors* filed contemporaneously herewith (the "**Voting Certification**"), *Declaration of John-Paul Hanson in Support of Confirmation of the Debtors' Fourth Amended Joint Chapter 11 Plan of Fieldwood Energy LLC and its Affiliated Debtors*, filed contemporaneously herewith (the "**Hanson Declaration**")*, Declaration of Marc J. Brown in Support of Debtors' Fourth Amended Joint Chapter 11 Plan of Fieldwood Energy LLC and its Affiliated Debtors*, file contemporaneously herewith (the "**Brown Declaration**"), *Declaration of Clayton Gring in Support of Confirmation of the Fourth Amended Joint Chapter 11 Plan of Fieldwood Energy LLC and its Affiliated Debtors*, filed contemporaneously herewith (the "**Gring Declaration**"), the *Affidavits of Service of Solicitation Materials* (ECF No. 1309-7) (the "**Notice Affidavit**"), and the record of these Chapter

11 Cases provide an overview of the Debtors' business and other facts that are relevant to confirmation of the Plan.

7.       The Debtors are one of the largest oil and gas exploration and production companies in the Gulf of Mexico.  Their portfolio of properties includes both deepwater and shallow water assets.  The majority of the Debtors' shallow water assets was acquired in 2013 when the Debtors purchased certain properties from Apache Corporation (together with its subsidiaries and affiliates, "**Apache**" and, the acquired assets, the "**Legacy Apache Properties**"). The Debtors' other shallow water assets were acquired through multiple subsequent transactions, including the 2014 acquisition of certain subsidiaries of SandRidge Energy, Inc. (the "**Non-Apache Properties**" and, together with the Legacy Apache Properties, the "**Shelf Assets**").  The Debtors subsequently acquired a number of deepwater assets in 2018 when they purchased Noble Energy, Inc.'s deepwater business (the "**Noble Properties**") as part of a previous chapter 11 case. Since 2018, the Debtors acquired and developed additional interests in the Noble Properties and additional deepwater assets to further diversify and complement their portfolio of properties (together with the Noble Properties, the "**Deepwater Assets**").

8.       As one of the largest facility and well owners in the Gulf of Mexico, the Debtors have extensive well plugging and abandonment ("**P&A**") and decommissioning programs, and maintain a robust staff of approximately 80 employees specifically dedicated to managing P&A and decommissioning operations, both in the office and offshore.  The Debtors' personnel are uniquely experienced in offshore decommissioning, including the use of highly specialized equipment in sub-nautical environments and the removal of complex infrastructure in a safe and environmentally friendly manner.  The Debtors' P&A team has a substantial track record of successful decommissioning projects across a large footprint, having decommissioned a total of

WEIL:\97990449\11\45327.0007

approximately 402 platforms, 1,237 wells, and 451 pipelines from 2013 to 2020 and spending, in the aggregate, more than $1.5 billion on P&A activities. There is no similarly situated company to the Debtors in the Gulf of Mexico that has a comparable level of experience in recent years or comparable capabilities in order to safely and efficiently perform large-scale decommissioning and P&A programs, particularly across the Debtors' assets, where the Debtors possess a high degree of familiarity.

9.     One of the key goals of the Debtors' proposed restructuring is the preservation of the Debtors' workforce, including their dedicated P&A team, which will create a platform for safe, reliable, and expeditious P&A of certain of the Debtors' current properties.

10.     The Plan is the result of extensive good-faith negotiations between the Debtors and a number of their key economic stakeholders, including (i) every creditor group in the Debtors' capital structure, (ii) Apache, the predecessor in interest and operator for the vast majority of the Debtors' Shelf Assets (representing approximately 63% of the Debtors' P&A obligations), (iii) the Creditors' Committee; and (iv) a significant number of other Predecessors-in-interest, representing the remainder of the Debtors' P&A obligations.

11.     The Plan, once implemented, will separate the Debtors' oil and gas assets into four entities: Credit Bid Purchaser, FWE I, FWE III, and FWE IV. Each entity will then be responsible for the decommissioning obligations associated with its respective assets. The Debtors will also abandon their interests in certain properties (the "**Abandoned Properties**") where operationally and financially capable predecessors in the chain of title exist to be able to address

5

the P&A liabilities.  Therefore, the Plan provides a comprehensive solution for nearly all of the Debtors' decommissioning obligations.

### i.     Credit Bid Transaction

12.     Following months of negotiations, the Debtors and the Ad Hoc Group of Secured Lenders agreed on the principal terms of a chapter 11 plan that contemplates the sale of specified Deepwater and Shelf Assets (the "**Credit Bid Acquired Interests**") to a new entity formed at the direction of the Consenting FLTL Lenders (the "**Credit Bid Purchaser**").

13.     Accordingly, the Debtors negotiated with the Consenting FLTL Lenders on the form of a *Purchase and Sale Agreement* (the "**Credit Bid PSA**"), pursuant to which the Credit Bid Purchaser will acquire the Credit Bid Acquired Interests for aggregate consideration of approximately $1.03 billion, consisting of (i) a credit bid of Allowed FLTL Claims up to the FLTL Claims Allowed Amount; (ii) cash in the amount up to $105 million (which may be increased to $125 million at the sole discretion of the Credit Bid Purchaser); (iii) the GUC Warrants, (iv) the SLTL Warrants, (v) the Subscription Rights, and (vi) the assumption of certain liabilities set forth in the Credit Bid PSA, including the assumption of substantially all working capital expenses, the P&A and decommissioning obligations arising out of the Acquired Interests, and the Allowed FLFO Claims remaining following distribution of the FLFO Distribution Amount (approximately $139 million of the FLFO Claims Allowed Amount *less* approximately $119 million of the principal amount of the First Lien Exit Facility) (collectively, the "**Credit Bid Consideration**").

14.     In connection with the Credit Bid Transaction, the Credit Bid Purchaser is anticipated to raise $225 million in new money, comprised of (i) up to $185 million from a Second Lien Exit Facility, to be backstopped pursuant to a Backstop Commitment Letter previously approved by this Court on April 9, 2021, *see Order (I) Authorizing the Debtors to Enter into Backstop Commitment Letter, (II) Approving All Obligations Thereunder, and (III) Granting*

*Related Relief* (ECF No. 1248), and (ii) $40 million from two Equity Rights Offerings that were previously approved by this Court on May 28, 2021, *see Order (I) Approving Rights Offering Procedures and Related Forms (II) Authorizing Debtors to Conduct Rights Offerings in Connection with Debtors' Plan of Reorganization, (III) Authorizing Entry Into Equity Backstop Commitment Agreements, (IV) Approving Obligations Thereunder, and (V) Granting Related Relief* (ECF No. 1410).

15.     Upon consummation of the Credit Bid Transaction, the Credit Bid Purchaser's capital structure will include up to $304 million in funded debt, comprised of approximately $119 million from the First Lien Exit Facility and up to $185 million from the Second Lien Exit Facility, representing a significant reduction of the approximately $1.8 billion in funded debt currently held by the Debtors.  Of the estimated $225 million in new money raised by Credit Bid Purchaser, up to $120 million will be used to capitalize Credit Bid Purchaser's balance sheet.  The remainder of the funds will be used to fund the cash portion of the Credit Bid Consideration, which will in turn fund the Debtors' obligations under the Plan.

### ii.     Divisive Mergers

16.     Subsequent to consummation of the Credit Bid Transaction, the Plan provides that FWE will implement two or more divisive mergers pursuant to Title 1, Chapter 10 and Title 1, Chapter 1, Subchapter A, Section 1.0002(55)(A) of the Texas Business Organizations Code ("**TBOC**").  The first such divisive merger will result in the division of FWE into (i) FWE, which will survive such divisive merger under the name "Fieldwood Energy III LLC" ("**FWE III**"), and (ii) Fieldwood Energy I LLC, a newly-formed Texas limited liability company ("**FWE I**") (the "**Initial Divisive Merger**").  Pursuant to the Initial Divisive Merger, FWE I will be allocated and vested with certain of the Legacy Apache Assets (the "**FWE I Properties**") and FWE III will be allocated and vested with all of FWE's assets other than FWE I Properties and

7

Credit Bid Acquired Interests (the "**FWE III Properties**").  The FWE I Properties and FWE III Properties are described in schedules annexed to the Plan of Merger for the Initial Divisive Merger (the "**Plan of Merger**").  *See* Disclosure Statement, Ex. K at Ex. 5.

17.    The second divisive merger will result in the division of FWE III into (i) FWE III, which will survive such divisive merger and maintain its name, and (ii) Fieldwood Energy IV LLC, a newly-formed Texas limited liability company ("**FWE IV**") (the "**FWE III Divisive Merger**").  Pursuant to the FWE III Divisive Merger, FWE IV will be allocated and vested with certain interests in a portion of leases previously assigned to FWE by Chevron U.S.A. Inc. (the "**Legacy Chevron Properties**" or the "**Legacy CUSA Properties**") and FWE III will be allocated and vested with all of FWE III's other assets other than the Legacy CUSA Properties.  The allocation of the assets pursuant to the FWE III Divisive Merger are described in the schedules filed with the Plan Supplement.  *See* Plan Supplement Ex. O5.

### 1.    FWE I

18.    The Debtors first announced an agreement with Apache with respect to the Legacy Apache Properties in a term sheet annexed to the First Day Declaration (the "**Apache Term Sheet**").  *See* First Day Decl. Ex. A at Ex. B.  Since then, the Debtors have successfully negotiated the forms of definitive documents necessary to implement the transactions contemplated by the Apache Term Sheet (the "**Apache Definitive Documents**").  The forms of the Apache Definitive Documents were filed with the initial Disclosure Statement filed on January 1, 2021.  More recent versions are annexed to the Plan Supplement at Exhibit H, along with an implementation agreement that the Debtors and Apache executed in connection therewith.

19.    The Apache Definitive Documents provide that FWE I will engage in the ownership and operation of the FWE I Properties, including performing P&A of wells and the ultimate decommissioning of certain platforms and offshore infrastructure.  FWE I will be

8

managed by Jon Graham, as sole manager (the "**FWE I Sole Manger**") and operations at the properties will initially be performed by the Credit Bid Purchaser under a transition services agreement (the "**TSA**").  In the event of termination of the TSA by either party, FWE I may elect to have a third-party service provider operate the properties.

20.     FWE I will be funded with cash flow generated from operating the FWE I Properties, a cash contribution from the Debtors on the Effective Date in the amount of approximately $15-20 million, and a $50 million working capital facility.  FWE I will have access to a $400 million standby credit facility provided by Apache for use related to P&A.

21.     Additional sources of capital to provide for decommissioning of the FWE I Properties are available and include approximately $736 million in security available to Apache to secure Fieldwood Energy LLC's decommissioning obligations under the Decommissioning Agreement (the "**Decommissioning Security**"), representing approximately $238 million in funds held in trust (the "**Trust A**") and $498 million in letters of credit and surety bonds and Apache, who has joint and several liability with Fieldwood on the asset retirement obligations and is a well-capitalized NYSE company.

## 2.     FWE III

22.     Following the Initial Divisive Merger, FWE III will continue as the surviving entity of FWE.  The primary purpose of FWE III is to safely and efficiently decommission and wind-down the FWE III Properties within the two-year period after the Effective Date.  The FWE III Properties primarily comprise properties for which (i) there is not a financially capable predecessor in the chain of title or co-working interest owner that is legally responsible for decommissioning the assets or (ii) additional properties for which the Debtors have committed to retaining the decommissioning obligations.  Substantially all of the FWE III Properties were shut-in as of June 13, 2021 and were forecasted to generate *de minimis*, if any,

WEIL:\97990449\11\45327.0007

production prior to decommissioning.  Additionally, the Debtors are already underway with a significant amount of the decommissioning related to FWE III Properties.

23.     FWE III, acting through the Plan Administrator, will retain Credit Bid Purchaser to decommission the FWE III Properties.

24.     FWE III will be supported by up to approximately $12 million of capital through a combination of approximately (i) $5 million of cash on hand and (ii) up to approximately $7 million in future cash commitments from the Credit Bid Purchaser which, the Debtors' believe, will be sufficient for the Plan Administrator to satisfy all the P&A obligations and wind-down costs associated with the FWE III Properties.  Moreover, an additional $12 million in outstanding security in the form of surety bonds are presently outstanding and available to the appropriate parties to provide additional funding, if necessary.

25.     FWE III will also serve as agent to the designated operator (or as the designated operator) of certain abandoned properties pursuant to a proposal made to the U.S. Government (the "**Government**"), the terms of which will be incorporated into the Plan.  In connection with that proposal, FWE III will hire Credit Bid Purchaser to serve as a contract operator of certain Abandoned Properties to perform certain safeguarding and day-to-day operational services while operational control of the properties is transitioned to Predecessors.

### 3.     FWE IV

26.     The FWE III Divisive Merger (which creates FWE IV) is the result of negotiations between the Debtors and CUSA with respect to the treatment of the Legacy CUSA Properties.  The Debtors and CUSA entered into a term sheet dated March 22, 2021 (the "**CUSA Term Sheet**").  The CUSA Term Sheet provides, among other things, that the Legacy CUSA Properties will be decommissioned pursuant to a Turnkey Removal Agreement entered into by and among CUSA, FWE IV, and Credit Bid Purchaser (the "**CUSA Turnkey Removal Agreement**").

WEIL:\97990449\11\45327.0007

Under the CUSA Turnkey Removal Agreement, Credit Bid Purchaser will decommission the Legacy CUSA Properties on a lump sum, turnkey payment basis, and Credit Bid Purchaser will earn pre-agreed payments (the "**Turnkey Amounts**") in exchange for completing decommissioning projects.  CUSA will be responsible for 100% of the Turnkey Amounts, unless there are other current co-interest owners or predecessors responsible for such decommissioning costs, in which case CUSA will only be responsible for its proportionate share on account of its former interests in the Legacy CUSA Properties.  Credit Bid Purchaser will not be required to undertake a decommissioning project until full funding of a Turnkey Amount has been agreed to by the parties.

27.     The Debtors have agreed to contribute $5 million into an escrow account to cover operations to prepare the Legacy CUSA Properties for decommissioning.  Moreover, FWE IV and Credit Bid Purchaser will enter into a Contract Operator Agreement whereby Credit Bid Purchaser will manage the administrative and corporate activities of FWE IV along with the Legacy CUSA Properties for a period of five years, subject to agreed-upon conditions for assignment.  Credit Bid Purchaser will also manage the Neptune Spar under a Transition Services Agreement whereby CUSA will reimburse Credit Bid Purchaser for certain expenses until CUSA takes over management of the facility in connection with the decommissioning campaign for the Neptune Spar.  Additionally, CUSA will be responsible for certain operating costs associated with the FWE IV properties other than decommissioning under the CUSA Turnkey Removal Agreement.

### iii.     Additional Agreements

28.     In addition to the agreements with Apache and CUSA, the Debtors have successfully reached agreements in principle with two additional Predecessors—Eni Petroleum

11

US LLC ("**Eni**") and Hunt Oil Co. ("**Hunt**").  Below is a brief description of each of the additional predecessor agreements.

## 1. Eni

29.     On May 12, 2021, the Debtors and Eni executed a term sheet reflecting an agreement-in-principle as to the treatment of certain oil and gas leases and facilities previously conveyed to the Debtors by Eni and certain of its affiliates (collectively, the "**Eni Properties**"). The Eni Term Sheet provides, among other terms, that the Eni Properties will be decommissioned pursuant to a Turnkey Removal Agreement by and among Eni, FWE III, and Credit Bid Purchaser (the "**Eni Turnkey Removal Agreement**").

30.     On the Effective Date, $3 million of the proceeds of the Credit Bid Consideration shall be funded into FWE III, which will then be paid to Eni under the terms of the Eni Implementation Agreement.  Furthermore, subject to certain exceptions, Eni will not be responsible for any operating costs associated with Eni's former interests in the Eni Abandoned Properties.  Rather, Post-Effective Date, Credit Bid Purchaser will manage the Eni Properties on behalf of Eni pursuant to a Contract Operating Agreement until the commencement of the decommissioning work under the Eni Turnkey Removal Agreement.

## 2. Hunt

31.     On May 20, 2021, the Debtors executed a term sheet with Hunt and its subsidiaries Chieftain International (U.S.) L.L.C. and Hunt Chieftain Development, L.P. (the "**Hunt Term Sheet**") relating to the treatment of GOM Assets in which Hunt or its affiliates previously held an interest (the "**Hunt Properties**").  The Hunt Term Sheet contemplates that, FWE III will be allocated and vested with the Debtors' rights, title, and interests certain of the Hunt Properties (the "**Hunt Turnkey Properties**" and the "**Hunt Non-Turnkey Properties**," as applicable).  The Hunt Turnkey Property is in the process of being decommissioned pursuant to a

12

Turnkey Removal Agreement between Hunt and the Debtors (the "**Hunt Turnkey Removal Agreement**").

### iv.    The Abandoned Properties

32.    In addition to the aforementioned restructuring transactions, the Debtors, on the Effective Date of the Plan, will abandon their interests in certain assets identified on Exhibit F of the Disclosure Statement (the "**Abandoned Properties**").  The Abandoned Properties comprise approximately 28 platforms associated with three primary predecessors: BP, Hess, and XTO (a subsidiary of ExxonMobil).  The Debtors have expended considerable resources during the pendency of this case continuing to operate, repair, maintain, and decommission parts of the Abandoned Properties.  Each of the Abandoned Properties has one or more financially capable predecessors in the chain of title ("**Predecessors**") or co-working interest owners ("**CIOs**") in the chain of title that are jointly and severally liable for decommissioning the applicable assets.  The Debtors anticipate that BSEE will issue orders on or after the Effective Date ordering all, or certain of such Predecessors and/or CIOs, to complete the decommissioning obligations associated with the applicable Abandoned Properties.

33.    The Debtors are taking the following precautions to ensure that operational control and decommissioning of the Abandoned Properties can be safely transitioned to Predecessors and CIOs upon abandonment:

- **Operational Transition Packets**:    The Debtors have provided comprehensive operational transition packets of information ("**OTP**") organized by each abandoned platform and its associated wells and infrastructure to further ensure that predecessors and co-working interest owners can safely and effectively assume operational control of the Abandoned Properties post-Effective Date.  The OTPs provide information, or access to information, of a kind and detail that a potential purchaser of such property would require, including extensive information regarding, among other things, the condition of the Abandoned Properties and related equipment, all files, records, databases, data, and other information related to the properties, and all applicable permits and regulatory requirements.

13

The Debtors provided OTPs to BP (3/16/21); Hess (3/16/21); XTO (3/9/21); LLOG (3/24/21); and McMoRan (3/24/21) among other parties seeking access.

- **Agreed Activities**: The Debtors have agreed to make approximately $6 million in safety-related repairs and improvements on the Abandoned Properties prior to abandonment (the "**Agreed Activities**"). Included among the work to be performed is restoring egress and conducting certain safety related remediation at the Abandoned Properties so that Predecessors and CIOs can safely access the Abandoned Properties to conduct abandonment and other safekeeping operations. The Debtors have completed a significant amount of the Agreed Activities to date.

- **Transition Services**: The Debtors have proposed to the Government providing certain safeguarding and day-to-day operational services for the Abandoned Properties for a period of time post-Effective Date (the "**Transition Services**"). The purpose of the Transition Services is to (i) maintain the Abandoned Properties in a safe condition as will exist on the Effective Date and (ii) maintain periodic and regular monitoring of the condition of wells and infrastructure located on the Abandoned Properties to identify any condition that could threaten public health, safety, or the environment. FWE III will provide the services for 9 months or until operational control of the Abandoned Properties is transitioned to a third-party, whichever occurs first (the "**Transition Period**"). Terms for the Transition Services will be incorporated into the Plan.

34. The Debtors, their Consenting Creditors, Apache, and certain Predecessors worked diligently over the course of many months to reach this global resolution. The Debtors have also been in constant contact with the Government during every step in this process. Confirmation of the Debtors' Plan is the final step in the administration of these Chapter 11 Cases. For the reasons set forth herein and in the supporting evidence and pleadings submitted in support of confirmation, I believe the Plan satisfies the requirements of section 1129 of the Bankruptcy Code, is in the best interests of creditors, stakeholders, and the public, and should be confirmed.

## Plan Solicitation

35. On April 15, 2021, the Court entered the *Amended Order (I) Approving Disclosure Statement and Form and Manner of Notice of Disclosure Statement Hearing; (II) Establishing Solicitation and Voting Procedures; (III) Scheduling Confirmation Hearing;*

*(IV) Establishing Notice and Objection Procedures for Confirmation of the Proposed Plan;*
*(V) Approving Notice and Objection Procedures for the Assumption of Executory Contracts and*
*Unexpired Leases; (VI) Approving Procedures for Objections to the Assignment and Transfer of*
*Property of the Estate; and (VII) Granting Related Relief* (ECF No. 1286) (the "**Solicitation**
**Order**"), approving, among other things, the Disclosure Statement and procedures for solicitation
of votes on the Plan and related notices, forms, and ballots (collectively, the "**Solicitation**
**Packages**").

36.     Pursuant to the Solicitation Order, the Debtors and Prime Clerk LLC
(the "**Solicitation Agent**") distributed Solicitation Packages to all holders of Claims and Interests
eligible to vote on the Plan (the "**Voting Classes**").  The deadline for the Voting Classes to cast
their ballots was June 2, 2021 (the "**Voting Deadline**").

## The Plan Satisfies the Requirements of Section 1129 of the Bankruptcy Code

37.     I am aware that the Debtors must demonstrate that the Plan satisfies the
requirements of section 1129 of the Bankruptcy Code.  Based on my understanding of the Plan,
the events that have occurred throughout these Chapter 11 Cases, my experience as the Debtors'
Senior Vice President and Chief Financial Officer, and discussions I have had with the Debtors'
professionals, advisors, and other members of the management team regarding various orders
entered during these Chapter 11 Cases and the requirements of the Bankruptcy Code, I believe that
the Plan satisfies the confirmation requirements of sections 1129(a) and (b) of the Bankruptcy
Code and should be confirmed.

## I.     Plan Complies with Section 1129(a)(1) of the Bankruptcy Code

38.     Based on my understanding of the Bankruptcy Code, I believe that the Plan

WEIL:\97990449\11\45327.0007

complies with section 1129(a)(1) of the Bankruptcy Code as follows:

      **A.**      **11 U.S.C. § 1122 (Classification)**

      39.      With respect to classifying claims, I have been advised by the Debtors' counsel that such classifications are considered under section 1122. Based on my understanding of the applicable law, the classification of claims under the Plan is proper.

      40.      Here, the Plan provides for 11 Classes of Claims and Interests: (i) Class 1 (Other Secured Claims), (ii) Class 2 (Priority Non-Tax Claims), (iii) Class 3 (FLFO Claims), (iv) Class 4 (FLTL Claims), (v) Class 5 (SLTL Claims), (vi) Class 6A (Unsecured Trade Claims), (vii) Class 6B (General Unsecured Claims), (viii) Class 7 (Intercompany Claims), (ix) Class 8 (Subordinated Securities Claims), (x) Class 9 (Intercompany Interests), and (xi) Class 10 (Existing Equity Interests).[3]

      41.      The Plan satisfies the requirement of section 1122 of the Bankruptcy Code in that each Class consists solely of "substantially similar" Claims or Interests that share common priority or rights against the Debtors' estates. All Claims and Interests within a Class have the same or similar rights against the Debtors. Moreover, the Plan's classification scheme generally tracks the Debtors' prepetition capital structure and divides the applicable Claims and Interests into Classes based on the underlying instruments giving rise to such Claims and Interests and/or

---

[3] Administrative Expense Claims, Fee Claims, Priority Tax Claims, and DIP Claims are not classified and are treated separately under the Plan.

WEIL:\97990449\11\45327.0007

the entity against which Claims or Interests are asserted  With respect to Class 6B, the Debtors have reasonable justification for the separate classification of unsecured trade claims.

42.     Accordingly, I believe the Plan complies with section 1122 of the Bankruptcy Code.

**B.      11 U.S.C. § 1123(a) (Required Plan Provisions)**

43.     I have been informed by Debtors' counsel that section 1123(a) of the Bankruptcy Code sets forth seven requirements applicable to a corporate debtor's plan.  Based on my understanding of the requirements of section 1123(a), I believe the Plan complies with each of the seven requirements:

- <u>Pursuant to 11 U.S.C. § 1123(a)(1)</u>: Section 3 of the Plan designates Classes of Claims and Interests.

- <u>Pursuant to 11 U.S.C. § 1123(a)(2)</u>: Section 3 of the Plan specifies whether each Class is Impaired under the Plan.

- <u>Pursuant to 11 U.S.C. § 1123(a)(3)</u>: Section 4 of the Plan specifies the treatment of each Impaired Class.

- <u>Pursuant to 11 U.S.C. § 1123(a)(4)</u>: Section 4 of the Plan provides that, except as a holder of a particular Claim or Interest may agree to less favorable treatment, the treatment of each Claim or Interest in a particular Class is the same as the treatment of each other Claim or Interest in such Class.

- <u>11 U.S.C. § 1123(a)(5)</u>: The Plan provides adequate means for implementation including, among other things, the compromise and settlement of Claims, Interests, and controversies (Plan § 5.1); the Credit Bid Transaction and Confirmation Outside Date (*id.* § 5.2); Equity Rights Offerings (*id.* § 5.3); New Equity Interests (*id.* § 5.4); NewCo Organizational Documents (*id.* § 5.5); New Money Warrants, SLTL Warrants, and GUC Warrants (*id.* § 5.6); Plan of Merger (*id.* § 5.7); Single Share (*id.* § 5.8); Plan Administrator (*id.* § 5.9); Plan funding (*id.* § 5.10); the Exit Facilities (*id.* § 5.11); the Apache Definitive Documents (*id.* § 5.12); the abandonment of certain properties (*id.* § 5.13); establishment of a claims reserve (*id.* § 5.14); the Plan Administrator expense reserve (*id.* § 5.15); the Debtors' continued corporate existence (unless otherwise specified in the Plan) (*id.* § 5.16); corporate action (*id.* § 5.17); the cancellation of existing securities and agreements of the Debtors (*id.* § 5.18); the cancellation of certain existing security interests in the Debtors (*id.* § 5.19); the Intercompany Interests and corporate reorganization (*id.* § 5.20); the Restructuring Transactions (*id.* § 5.21); the liquidating trust (*id.* § 5.22); securities exemptions (*id.* § 5.23); the closing of the chapter 11 case (*id.* § 5.24); provisions

governing distributions under the Plan (*id.* § 6); procedures for disputed claims (*id.* § 7); and the Debtors' Releases (*id.* § 10.7).

- <u>Pursuant to 11 U.S.C. § 1123(a)(6)</u>: The certificate of incorporation, articles of incorporation, limited liability company agreement or similar governing document, as applicable, of each Debtor has been or will be amended on or before the Effective Date to prohibit the issuance of non-voting equity securities. Further, the securities being issued pursuant to the Plan are the New Equity Interests, the Subscription Rights, the SLTL Warrants, the GUC Warrants, the Backstop Commitment Premium Equity Interests, and the New Money Warrants, all of which are not non-voting equity securities. Thus, the issuance of the New Equity Interests, the Subscription Rights, the SLTL Warrants, the GUC Warrants, the Backstop Commitment Premium Equity Interests, and the New Money Warrants complies with section 1123(a)(6) of the Bankruptcy Code.

- <u>Pursuant to 11 U.S.C. § 1123(a)(7)</u>: The Bankruptcy Code requires that Debtors provide certain information regarding the appointment of directors and officers upon reorganization. The Plan's provisions governing the manner of selection of any officer, director, or manager are consistent with the interests of creditors and equity security holders and with public policy. Upon the Effective Date, the Plan Administrator will serve as the sole officer, director, or manager of each Post-Effective Date Debtor. If known, the officers and the composition of each board of directors of the Reorganized Debtors, FWE I, or any FWE Additional Entity, as the case may be, shall be disclosed prior to the Effective Date to the extent required by section 1129(a)(5) of the Bankruptcy Code. Jon Graham will serve as the sole manager of FWE I and David Dunn of Province LLC will serve as the Plan Administrator of FWE III.

44.     Accordingly, I believe the Plan contains all of the provisions required by section 1123(a) of the Bankruptcy Code.

### C.     11 U.S.C. § 1123(b) (Permissible Plan Provisions)

45.     I have been informed by the Debtors' advisors that section 1123(b) of the Bankruptcy Code sets forth provisions that may be included in a chapter 11 plan. I believe each provision of the Plan is permissible under section 1123(b):

- <u>Pursuant to 11 U.S.C. § 1123(b)(1)</u>: Section 4 of the Plan treats Class 2 (Priority Non-Tax Claims), Class 7 (Intercompany Claims), and Class 9 (Intercompany Interests) as unimpaired.

- <u>Pursuant to 11 U.S.C. § 1123(b)(2)</u>: Section 8 of the Plan provides for the rejection of all executory contracts and unexpired leases, except for those contracts or leases that are

assumed and assigned in accordance with the Plan.  Exhibit D to the Plan Supplement identifies those executory contracts that are being assumed pursuant to the Plan.

- <u>Pursuant to 11 U.S.C. § 1123(b)(3)(A)</u>: The settlements and compromises contemplated by Section 5.1 of the Plan represent a good faith compromise of Claims, Interests, and controversies relating to the contractual, legal, and subordination rights that a creditor or an Interest holder may have with respect to any Allowed Claim or Interest or any distribution to be made on account of such Allowed Claim or Interest.  In addition, Section 10.7(a) of the Plan provides for the Debtors' release of the Released Claims.

- <u>Pursuant to 11 U.S.C. § 1123(b)(3)(B)</u>: Section 10.11 of the Plan preserves for the Reorganized Debtors all of the rights, claims, Causes of Action, rights of setoff or recoupment, and other legal or equitable defenses that the Debtors had immediately before the Effective Date, except as otherwise expressly set forth in the Plan.

- <u>Pursuant to 11 U.S.C. § 1123(b)(5)</u>: Section 4 of the Plan modifies the rights of holders of Claims or Interests in the Impaired Classes, and leaves unaffected the rights of holders of Claims or Interests in the Unimpaired Classes.

- <u>Pursuant to 11 U.S.C. § 1123(b)(6)</u>: Sections 10.6, 10.7, 10.8, and 10.9 of the Plan include release, exculpation, and injunction provisions, respectively, that are integral to the Debtors' reorganization and are consistent with the provisions of the Bankruptcy Code and Fifth Circuit precedent.  The releases and exculpation in the Plan are discussed more fully below.  Further, Section 5.23 of the Plan provides that the offer, issuance, and distribution of New Equity Interests, the Subscription Rights, the SLTL Warrants, the GUC Warrants, the Backstop Commitment Premium Equity Interests, and the New Money Warrants under the Plan will be exempt from registration pursuant to section 4(a)(2) of the Securities Act and/or Regulation D thereunder.

   i.    ***Settlements and Compromises Embodied in Plan are Integral Component of Plan and Should Be Approved***

46.    The Plan embodies settlements and compromises of Claims, Interests, and controversies relating to the contractual, legal, and subordination rights of creditors or Interest holders with respect to Allowed Claim or Interest or any distribution to be made on account thereof.  These settlements and compromises are the result of good-faith, arm's length negotiations with the Debtors' Consenting Creditors, Apache, and certain Predecessors, which resulted in,

WEIL:\97990449\11\45327.0007

among other things, the establishment of an ongoing go forward business and entities to help ensure the safe decommissioning of properties as set forth in the Plan.

ii.     ***The Plan's Releases are Appropriate***

47.     With respect to Article 10 of the Plan, which provides for releases of claims by the Debtors and their Estates (the "**Debtor Releases**"), as well as by holders of certain Claims and Interests (the "**Third-Party Releases**"), I am informed by the Debtors' advisors that section 1123(b)(6) of the Bankruptcy Code provides that a chapter 11 plan may "include any other appropriate provision not inconsistent with the applicable provisions of [the Bankruptcy Code]." Based on my understanding of the law as explained to me by the Debtors' advisors, I believe that the Debtor Releases are consistent with the applicable provisions of the Bankruptcy Code and Fifth Circuit law.

a.     ***The Debtor Releases Are Appropriate***

48.     On July 8, 2020, Jim LaChance, an independent director, joined the board of directors of Debtor Fieldwood Energy Inc., which acts as the governing body for Fieldwood Energy LLC as the managing member of Fieldwood Energy LLC (the "**Board**"), as the sole member of the Leadership Transition Committee ("**LTC**") to oversee the Executive Leadership Team.  On October 20, 2020, the Board authorized an directed Mr. LaChance, the Company's management team, and the Company's professional advisors to negotiate with the Company's stakeholders the terms of a chapter 11 plan of reorganization and to make a recommendation to the Board.  In addition to his capacity as an independent director of the Board, Mr. LaChance oversaw an investigation into certain claims and estate causes of action that are proposed to be released pursuant to the Plan (the "**Independent Investigation**").  The Independent Investigation also included a review of certain non-de minimis pledges of collateral and transfers of interests made by the Company within the 90-day period leading up to the Petition Date in connection with

20

its entry into forbearance and amendment agreements, dated May 7, 2020, with the required Prepetition FLFO Lenders, Prepetition FLTL Lenders, and Prepetition SLTL Lenders.

49. Weil, Gotshal & Manges LLP ("**Weil**"), as counsel to the Company, assisted Mr. LaChance in evaluating the colorability of those certain potential claims and estate causes of interest. The Independent Investigation took place over the course of several months and included extensive factual and legal analysis. In connection with the Independent Investigation, Weil conducted five separate interviews of three different individual members of management or the Board, and reviewed approximately 700 documents comprising several thousand pages.

50. Based upon the results of the Independent Investigation, Mr. LaChance concluded and therefore recommended to the Board that it is in the best interests of the Company and its stakeholders to pursue the Plan and grant the releases provided for in the Plan. Mr. LaChance's determination was based upon, among other things, no valuable colorable claims having been identified against the officers, directors or shareholders in the Independent Investigation and the significant value provided by the Consenting Creditors in pursuing the Plan which would allow the Company to (i) reorganize as a more streamlines, cost-effective going concern business, (ii) save over 1, 000 jobs, and (iii) facilitate the safe, responsible, and accelerated decommissioning of properties, pipelines, and platforms in the Gulf of Mexico.

51. In consideration of the Releases and the other components of the Restructuring, the Released Parties have, among other things (and as applicable): (i) voted to accept the Plan; (ii) provided consensual postpetition cash collateral usage to the Debtors; (iii) provided the DIP Facility and a committed First Lien Exit Facility and Second Lien Exit Facility on the best terms available to the Debtors; (iv) negotiated in good faith with the Debtors regarding

WEIL:\97990449\11\45327.0007

a broad range of disputed issues; (v) provided postpetition services to the Debtors in their capacity as officers or directors; and (vi) guided the Debtors through this restructuring, including these Chapter 11 Cases. The Debtors' officers and directors and executive management team were instrumental throughout the duration of these Chapter 11 Cases and in negotiating the Plan, which provides for agreed-upon recoveries to a number of the Debtors' stakeholders (including to holders of General Unsecured Claims), securing access to debtor-in-possession and exit financing, and reorganization as a more streamlines, cost-effective going concern business, and the preservation of over 1,000 jobs. Most importantly, the Debtors' officers and directors and management team were also able to obtain agreements to facilities the safe, responsible, and accelerated decommissioning of properties, pipelines, and platforms in the Gulf of Mexico, including 100% of the Debtors P&A obligations, thereby preserving the value of the Debtors' Estates.

52.     Moreover, the Debtor Releases were negotiated at arm's length among sophisticated parties and were approved by the Board following its review and approval of the Independent Investigation. Accordingly, any claims or Causes of Action the Debtors are releasing under the Debtors' Releases are not worth pursuing at the expense of the Plan. The Debtors' Releases should be approved.

### b.     *The Third-Party Releases Are Appropriate*

53.     With respect to the Third-Party Releases, I have been advised by the Debtors' counsel that such provisions are considered under sections 1123(a)(5) and 1123(b)(3)(A). Based on my understanding of the applicable law, I believe the Third-Party Releases are proper under these provisions as a consensual settlement of claims and Causes of Action by the Releasing

22

Parties[4] in exchange for consideration provided by the Released Parties.

54.     First, the Third-Party Releases are fully consensual.  Parties in interest were provided extensive notice of these cases, the Plan, the proposed Third-Party Releases, and the deadline to object to confirmation of the Plan.  Each of the Notice of Non-Voting Status and the Ballots expressly included, in bold font, the terms of the Third-Party Releases, as set forth in section 10.7(b) in the Plan.  In addition, the Notice of Non-Voting Status and the Ballots set forth the procedures for opting out of such Third-Party Releases and attached the appropriate form in compliance with Rule 36 of the Complex Rules.  The Confirmation Hearing Notice, the Notice of Non-Voting Status, and the Ballots advised careful review and consideration of the terms of the Third-Party Releases, along with the Exculpation Provision and the Injunction Provisions.  The language of the Third-Party Releases was also emphasized using bold font in the Plan and the Disclosure Statement.  As a result, approximately 218 holders of Claims and Interests (including holders in Non-Voting Classes) completed and returned forms opting out of the Thrid-Party Releases.

55.     Second, the Third-Party Releases are sufficiently specific to put the Releasing Parties on notice of the claims being released.  The Third-Party Releases describe the nature and type of claims being released, including claims with respect the restructuring of any Claim or Interest before or during the Chapter 11 Cases, the Plan, and related agreements, instruments, and other documents, and the negotiation, formulation, preparation, dissemination,

---

[4] Under Section 1.1 of the Plan, "**Releasing Parties**" means, collectively, (a) the holders of all Claims or Interests that vote to accept the Plan, (b) the holders of all Claims or Interests whose vote to accept or reject the Plan is solicited but that do not vote either to accept or to reject the Plan, (c) the holders of all Claims or Interests that vote, or are deemed, to reject the Plan but do not opt out of granting the releases set forth herein, (d) the holders of all Claims and Interests that were given notice of the opportunity to opt out of granting the releases set forth herein but did not opt out, and (e) the Released Parties (even if such Released Party purports to opt out of the releases set forth herein).

filing, pursuit of consummation, and implementation of the Plan, the solicitation of votes with respect to the Plan, and any other related act or omission.

56.     Third, the Third-Party Releases are an integral part of the Plan and a condition of the settlements embodied in the Second Amended and Restated PSA.  The Third-Party Releases facilitated participation in both the Plan by the Released Parties and the chapter 11 process and were critical in gaining support for the Plan.  As such, the Third-Party Releases were a core negotiation point and appropriately offer certain protections to parties that constructively participated in these Chapter 11 Cases.

57.     Fourth, the Third-Party Releases are given for consideration.  The Released Parties have played an extensive and integral role in the Debtors' restructuring.  All parties in interest benefit from the Restructuring Transactions contemplated by the Plan and the significant contributions of the Released Parties in furtherance thereof.  These contributions help facilitate a restructuring that would (i) recapitalize and preserve the going concern value of specified Debtors' Deepwater Assets and Shelf Assets and the jobs of over 1,000 employees and contractors, (ii) maximize recoveries to the Debtors' stakeholders, and (iii) ensure that all P&A Obligations are addressed in a methodical and safe manner by responsible parties.

58.     Fifth, the Creditors' Committee conducted an investigation of claims, and, following such investigation, supports the grant of the Third-Party Releases.

59.     Furthermore, based on my understanding as explained by the Debtors' advisors, I believe the Third-Party Releases comply with the Complex Rules regarding consensual releases.  As evidenced by the Notice Affidavits, the Ballots were sent to all creditors entitled to vote on the Plan.  The Notice of Non-Voting Status was sent to all non-voting creditors and parties in interest.  The Ballots and the Notice of Non-Voting Status informed creditors of the Third-Party

Releases by providing the exact language of the Release, Exculpation, and Injunction Provisions in bold, conspicuous font and providing the identities of the parties subject to those provisions. The Ballots provided a checkbox to opt-out of the consensual Third-Party Releases, and the Notice of Non-Voting Status included a release opt-out form that also provided a checkbox to opt-out of the consensual Third-Party Releases.

<em>c.   <strong>Exculpation Is Appropriate</strong></em>

60.     With respect to section 10.8 of the Plan (the "**Exculpation Provision**"), I similarly understand that the Plan complies with the requirements of the Bankruptcy Code and applicable law. Under the Exculpation Provision, the Exculpated Parties[5] are exculpated from claims arising out of or relating to the Debtors' restructuring, these Chapter 11 Cases, and the negotiations and agreements made in connection therewith. The Exculpation carves out acts or omissions that are determined by Final Order to constitute fraud, gross negligence, or willful misconduct.

61.     The Exculpation Provision is narrowly tailored to protect the Exculpated Parties from inappropriate litigation based on the Restructuring and the Plan Documents and does

---

[5] Section 1.1 of the Plan defines "**Exculpated Parties**" as, means collectively, and in each case in their capacities as such during the Chapter 11 Cases (a) the Debtors, (b) the Post-Effective Date Debtors, (c) FWE I, (d) the DIP Agent and DIP Lenders under the DIP Facility, (e) the Prepetition FLFO Secured Parties, (f) the Consenting Creditors, (g) the Prepetition FLFO Collateral Agent, (h) the Prepetition FLTL Agents, (i) the Prepetition SLTL Agent, (j) the Creditors' Committee and the current and former members of the Creditors' Committee (solely in their capacities as such), (k) NewCo and all of its subsidiaries (including the Credit Bid Purchaser), (l) the Exit Facility Agents, (m) the Exit Facility Lenders, (n) the Second Lien Backstop Parties, (o) the ERO Backstop Parties, (p) the Apache PSA Parties, and (q) with respect to each of the foregoing Persons in clauses (a) through (p) each of their current and former affiliates, and each such Entity's and its current and former affiliates' current and former directors, managers, officers, equity holders (regardless of whether such interests are held directly or indirectly), predecessors, successors, and assigns, subsidiaries, and each of their current and former officers, members, managers, directors, equity holders (regardless of whether such interests are held directly or indirectly), principals, members, employees, agents, managed accounts or funds, management companies, fund advisors, investment advisors, advisory board members, financial advisors, partners (including both general and limited partners), attorneys, accountants, investment bankers, consultants, representatives and other professionals, such Persons' respective heirs, executors, estates, and nominees, in each case in their capacity as such, and any and all other persons or entities that may purport to assert any cause of action derivatively, by or through the foregoing entities.

25

not release any claim based on any act or omission that is a criminal act or constitutes intentional fraud, willful misconduct, or gross negligence as determined by a Final Order.  Moreover, the Exculpated Parties participated in these Chapter 11 Cases in reliance upon the protections afforded to them by the Exculpation Provision.  Failure to approve the Exculpation Provision would undermine the purpose of the Plan and the settlements embodied in the Plan allowing parties to pursue claims post-bankruptcy that are otherwise fully and finally resolved by the Plan.

62.     Accordingly, I understand the Exculpation Provision to be appropriate and consistent with the provisions of the Bankruptcy Code and applicable law.

### d.     *The Plan Injunctions Are Appropriate*

63.     With respect to the injunctions set forth in Sections 10.4, 10.5, 10.6, and 10.9 of the Plan (the "**Plan Injunctions**"), I further understand that the Plan complies with the requirements of the Bankruptcy Code and applicable law.  The Plan Injunctions are appropriate and necessary to implement and enforce the Plan.  Section 10.4 ensures that all injunctions and stays arising under or entered during the Chapter 11 Cases remain in existence on the date of entry of the Confirmation Order until the later of the Effective Date and the date indicated in the order providing for such injunction or stay.  Section 10.5 enjoins parties from interfering with the implementation of the Plan and provides:

> Except as otherwise provided in the Plan or in the Confirmation Order, upon the entry of the Confirmation Order, all holders of Claims and Interests and all other parties in interest, along with their respective present and former affiliates, employees, agents, officers, directors, and principals, shall be enjoined from taking any action to interfere with the implementation or the occurrence of the Effective Date.

64.     Section 10.6 extends the Plan Injunctions to the Debtors' successors, including the Post-Effective Date Debtors and their property.  Section 10.9 enforces the releases

WEIL:\97990449\11\45327.0007

and exculpations under the Plan and provides:

> The Confirmation Order shall permanently enjoin the commencement or prosecution by any Person or entity, whether directly, derivatively, or otherwise, of any Claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, losses, or liabilities released pursuant to the Plan, including the claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, and liabilities released or exculpated in the Plan or the Confirmation Order.

65.     The Plan Injunctions thus provide a means to enforce the Debtors' discharge pursuant to sections 524 and 1141 of the Bankruptcy Code, the Debtor Releases, the Third-Party Releases, the Exculpation, and the other provisions of the Plan against parties in interest in these Chapter 11 Cases.

66.     The Plan Injunctions are integral to the Plan because they provide certainty to the Debtors and Post-Effective Date Debtors that the Plan will be enforceable in accordance with its terms.

67.     The Plan Injunctions are necessary to implement the discharges, releases, and other provisions of the Plan and should be approved.

68.     For the foregoing reasons and based on my understanding as provided by the Debtors' advisors, the Plan complies with sections 1122 and 1123 of the Bankruptcy Code and therefore satisfies the requirements of section 1129(a)(1) of the Bankruptcy Code.

## II.     11 U.S.C. § 1129(a)(2): Plan Proponents' Compliance With the Bankruptcy Code

69.     I have been informed by the Debtors' advisors that section 1129(a)(2) of the Bankruptcy Code requires that plan proponents comply with the applicable provisions of the Bankruptcy Code.  Based on my understanding of the Bankruptcy Code, I believe that the Debtors,

27

as proponents of the Plan, have complied with the Bankruptcy Code, including sections 1125 and 1126 of the Bankruptcy Code regarding disclosure and plan solicitation.

### A.     The Debtors Are Proper Debtors and Plan Proponents

70.     I believe the Debtors have complied with section 109(a) of the Bankruptcy Code.  Each of the Debtors has a domicile, a place of business, and property in the United States and is eligible for relief under chapter 7 of the Bankruptcy Code.

### B.     11 U.S.C. § 1125 (Adequate Information)

71.     I believe the Debtors have complied with section 1125 of the Bankruptcy Code.  On April 15, 2021, the Court entered the Solicitation Order, which approved the Debtors' proposed solicitation procedures.  As detailed in the Notice Affidavits and Voting Certification, the Debtors have solicited votes on the Plan and provided notices to non-voting classes in compliance with the Solicitation Order.  Accordingly, I believe the Debtors have complied with the requirements of section 1125 of the Bankruptcy code pursuant to the Solicitation Order.

### C.     11 U.S.C. § 1126 (Voting)

72.     I have been informed by the Debtors' advisors that section 1126 of the Bankruptcy Code provides that only holders of allowed claims or interests in impaired classes that will receive or retain property under a plan of reorganization on account of such claims or interests may vote to accept or reject a plan.  Accordingly, the Debtors solicited the votes of all Impaired Classes of Claims (Classes 1, 3, 4, 5, 6A, and 6B).  The Debtors determined that Classes 3, 4, 5, and 6A accepted the Plan and Classes 1 and 6B rejected the Plan based on the voting results.  Classes 2, 7, and 9 were conclusively presumed to accept the Plan because those Classes were Unimpaired under the Plan, and Classes 8 and 10 were deemed to reject the Plan because those Classes will not receive any distribution on account of their claims.  Votes were not solicited from

these Classes.   Accordingly, I believe the Debtors have complied with section 1126 of the Bankruptcy Code.

## III.   11 U.S.C. § 1129(a)(3): Plan Proposed in Good Faith

73.   I have been informed by the Debtors' counsel that section 1129(a)(3) of the Bankruptcy Code requires that a plan be "proposed in good faith and not by any means forbidden by law."   For the reasons described herein, I believe the Debtors have proposed the Plan and all agreements to be entered into in connection therewith and contemplated thereunder in good faith and not by any means forbidden by law.

74.   The Plan has been proposed by the Debtors in good faith and for the legitimate and honest purposes of, among other things, (i) ensuring that all Decommissioning Obligations are addressed in a methodical and safe manner, (ii) recapitalizing and presenting going concern value for a key part of the Debtors' business, and (iii) maximizing recoveries to the Debtors' creditors.   Moreover, the Plan has more than a reasonable hope for success.   The viability of the Plan is, in large part, due to the exhaustive negotiation and development of the transactions contemplated by the Plan and the significant level of consensus reached with the Debtors' stakeholders.

75.   The Plan is the culmination of a rigorous and arm's-length process of negotiating and developing a value-maximizing and viable path to reorganize the Debtors' businesses.   Against the backdrop of a global pandemic that shook the very foundations of the oil and gas industry, the Debtors proactively responded to the challenges imposed by the precipitous decline in crude oil prices starting in 2014 and then again in 2020 and the effects of the Covid-19 pandemic by, among other things, (i) developing a new business plan, (ii) exploring strategic alternatives with their advisors, (iii) engaging in discussions with several of their major stakeholders, including the Ad Hoc Group of Secured Lenders, the Prepetition FLFO Secured

parties, the Prepetition FLTL Agents, and the Ad Hoc Group of Prepetition SLTL Lenders, Apache, and certain Predecessors regarding potential paths forward, and (iv) taking steps to reduce potential health, safety, and environmental concerns for the abandonment of certain properties.

76.     Accordingly, I believe the Plan has been proposed in good faith and complies with section 1129(a)(3) of the Bankruptcy Code.

## IV.     11 U.S.C. § 1129(a)(4): Professional Fees Subject to Court Approval

77.     I have been informed that section 1129(a)(4) of the Bankruptcy Code requires that certain professional fees and expenses paid by the plan proponent, the debtor, or a person receiving distributions of property under the plan be subject to approval by the Bankruptcy Court as reasonable.

78.     Here, Section 2.2 of the Plan provides that Professionals seeking approval by the Court of compensation for services rendered or reimbursement of expenses incurred after the Petition Date through the Effective Date under sections 327, 328, 330, 331, 503(b)(2), 503(b)(3), 503(b)(4), 503(b)(5), or 1103 of the Bankruptcy Code ("**Fee Claims**") must file final applications no later than 45 days after the Effective Date, thereby giving interested parties adequate time to review the Fee Claims.  Further, Section 11.1(i) of the Plan provides that the Court will retain jurisdiction to "hear and determine all Fee Claims."  Accordingly, I believe the Plan complies with section 1129(a)(4) of the Bankruptcy Code.

## V.     11 U.S.C. § 1129(a)(5): Information Regarding Proposed Officers and Directors

79.     It is my understanding that section 1129(a)(5) of the Bankruptcy Code requires that a plan proponent disclose the identity and affiliations of the proposed officers and directors of the Post-Effective Date Debtors; that the appointment or continuance of such officers and directors be consistent with the interests of creditors and equity security holders and with public policy; and, if there are any insiders that will be retained or employed by the Post-Effective

WEIL:\97990449\11\45327.0007

Date Debtors, that there be disclosure of the identity and nature of any compensation of any such insiders.

80.     The Debtors will identify the officers and directors of the Post-Effective Date Debtors as soon as possible.  The Debtors will also provide information about each of those individuals, their affiliations, and, with respect to insiders, their compensation.  Upon the Effective Date, the Plan Administrator shall serve as the sole officer, director, or manager of each Post-Effective Date Debtor.  *See* Plan § 5.9.  The Plan Administrator will be competent, have relevant and valuable business and industry experience, and will provide continuity and fresh perspectives on running the Post-Effective Date Debtors' businesses.

## VI.     11 U.S.C. § 1129(a)(6): No Rate Changes

81.     The Debtors' legal advisors have informed me that section 1129(a)(6) of the Bankruptcy Code requires that any regulatory commission that has jurisdiction over the debtor approve any rate change in the Plan.  The Plan does not provide for any rate changes by the Debtors, and, therefore, section 1129(a)(6) is inapplicable.

## VII.     11 U.S.C. § 1129(a)(7): Best Interests Test

82.     It is my understanding that section 1129(a)(7) of the Bankruptcy Code requires that, with respect to each Impaired Class of Claims and Interests, each holder of a Claim or Interest in such Classes must either (i) vote to accept the Plan or (ii) receive or retain under the Plan property of a value, as of the Effective Date, that is not less than the value such holder would receive or retain if the Debtors were to be liquidated under chapter 7 of the Bankruptcy Code.

83.     Here, as detailed in the Brown Declaration, AlixPartners, LLP prepared the liquidation analysis of the Debtors (the "**Liquidation Analysis**") described herein and annexed to the Disclosure Statement as Exhibit M.  As set forth more fully in the Brown Declaration, the Liquidation Analysis demonstrates that each holder of an Allowed Claim and Allowed Interest

WEIL:\97990449\11\45327.0007

will receive or retain under the Plan on account of such Claim or Interest property of a value, as of the Effective Date, that is not less than the amount that such holder would receive or retain if the Debtors were liquidated under chapter 7 of the Bankruptcy Code.  Therefore, the Plan satisfies the "best interests" test as I understand it.

## VIII.   11 U.S.C. § 1129(a)(8): Acceptance of Impaired Classes

84.     It is my understanding that section 1129(a)(8) of the Bankruptcy Code generally requires that each class of claims or interests must either accept the Plan or be unimpaired under the Plan.  Here, Class 6A voted to accept the Plan.  Classes 1 and 6B voted to reject the Plan, and Classes 8 and 10 were deemed to reject and not entitled to vote.  As a result, solely with respect to Classes 1, 6B, 8, and 10, the Plan does not satisfy the requirements of section 1129(a)(8) of the Bankruptcy Code and must be confirmed pursuant to section 1129(b) of the Bankruptcy Code.

## IX.   11 U.S.C. § 1129(a)(9): Payment in Full of Priority Claims

85.     The Debtors' advisors have informed me that section 1129(a)(9) of the Bankruptcy Code requires the plan to provide certain treatment for specified priority claims. Specifically, as to administrative expense claims, I understand that the following provision of the Bankruptcy Code applies:

> Except to the extent that the holder of a particular claim has agreed to a different treatment of such claim, the plan provides that . . . with respect to a claim of a kind specified in section 507(a)(2) or 507(a)(3) of [the Bankruptcy Code], on the effective date of the plan, the holder of such claim will receive on account of such claim cash equal to the allowed amount of such claim[.]

86.     As to priority non-tax claims, I understand that the following provision of the Bankruptcy Code applies:

> (i) if such class has accepted the plan, deferred cash payments of a value, as of the effective date of the plan, equal to the allowed amount of such claim; or (ii) if such

WEIL:\97990449\11\45327.0007

class has not accepted the plan, cash on the effective date of the plan equal to the amount allowed of such claim[.]

87.    As to unsecured priority tax claims, I understand that the following provision of the Bankruptcy Code applies:

the holder of such claim will receive . . . regular installment payments in cash—(i) of a total value, as of the effective date of the plan, equal to the allowed amount of such claim; (ii) over a period ending not later than 5 years after the date of the order for relief . . . and (iii) in a manner not less favorable than the most favored nonpriority unsecured claim provided for by the plan[.]

88.    And as to secured priority tax claims, I understand that the following provision of the Bankruptcy Code applies: "the holder of that claim will receive on account of that claim, cash payments, in the same manner and over the same period, as prescribed in subparagraph (C)."

89.    Based on my understanding of section 1129(a)(9) of the Bankruptcy Code, I believe the Plan satisfies all four of these requirements.  Section 2.1 of the Plan provides that Administrative Expense Claims will be paid on the Effective Date or on the first Business Day after the date that is 30 days after such Claim becomes Allowed.  Section 2.5 provides that Priority Tax claims shall be paid by the Debtors or the Post-Effective Date Debtors, as applicable, in the ordinary course of business, consistent with past practice and in accordance with the terms and subject to the conditions of any orders or agreements governing, instruments evidencing, or other documents establishing, such liabilities.

90.    Section 4.2 of the Plan provides that Priority Non-Tax Claims are Unimpaired and will (i) be paid in full in Cash or (ii) otherwise receive treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code, payable on the later of the Effective Date or the date that is ten Business Days after the date on which such Claims becomes Allowed,

in each case, or as soon as reasonably practicable thereafter.

91.     Finally, Section 4.1 of the Plan provides that holders of Other Secured Claims will (i) be paid in full in Cash on the Effective Date or the date that is ten Business Days after the date on which such Claim becomes Allowed, (ii) receive such other treatment so as to render such holder's Allowed Other Secured Claim Unimpaired, or (iii) any other treatment consistent with the provisions of section 1129 of the Bankruptcy Code.  Accordingly, I believe the Plan complies with section 1129(a)(9) of the Bankruptcy Code.

## X.     11 U.S.C. § 1129(a)(10): Impaired Accepting Class.

92.     I have been informed that section 1129(a)(10) of the Bankruptcy Code requires that if a class of claims is impaired under a plan, then at least one class of impaired claims must accept the plan, without counting any acceptance of the plan by any insider.

93.     I believe that the Plan satisfies this requirement because Classes 3, 4, 5, and 6A are all Impaired Classes.  Classes 3, 4, 5, and 6A do not include any insiders.  Accordingly, I believe the Plan complies with section 1129(a)(10) of the Bankruptcy Code.

## XI.     11 U.S.C. § 1129(a)(11): Feasibility

94.     It is my understanding, based on conversations with the Debtors' counsel, that section 1129(a)(11) of the Bankruptcy Code permits a plan to be confirmed only if it is feasible, *i.e.*, if the Debtors can demonstrate by a preponderance of the evidence that the Restructuring Transactions will be consummated and the terms of the Plan implemented.  Here, I oversaw the creation of the Debtors' financial projections attached as Exhibit O to the Disclosure Statement and I believe that those projections are reasonable.  Therefore, I believe the Plan is feasible and complies with section 1129(a)(11) of the Bankruptcy Code.

## XII.     11 U.S.C. § 1129(a)(12): Payment of U.S. Trustee Fees

95.     The Debtors' legal advisors have informed me that the Bankruptcy Code

WEIL:\97990449\11\45327.0007

requires the payment of all fees payable under section 1930 of title 28 of the United States Code.

Section 2.1 of the Plan provides that on the Effective Date or as soon as practicable thereafter,

such fees shall be paid by the Debtors or the Post-Effective Date Debtors, as applicable.  The

proposed Confirmation Order also provides for the payment of all such statutory fees.

Accordingly, I believe the Plan complies with section 1129(a)(12) of the Bankruptcy Code.

### XIII.   11 U.S.C. §§ 1129(a)(13)–(16): Inapplicable Provisions

96.    I have been informed by the Debtors' legal advisors that certain

requirements under section 1129(a) of the Bankruptcy Code do not apply to the Debtors.  The

Debtors will not maintain any such retiree benefits, and as such section 1129(a)(13) is inapplicable

to these Chapter 11 Cases.  Section 1129(a)(14) is inapplicable because the Debtors do not have

domestic support obligations.   Section 1129(a)(15) is inapplicable because no Debtor is an

"individual" as that term is used in the Bankruptcy Code.  Section 1129(a)(16) is inapplicable

because the Plan does not provide for transfers of property by a nonprofit entity.

### XIV.   11 U.S.C. § 1129(b): Cramdown of Rejecting Classes

97.    It is my understanding that, pursuant to section 1129(b) of the Bankruptcy

Code, a plan may be confirmed notwithstanding the rejection or deemed rejection by a class of

claims or interests (*i.e.*, "crammed down") so long as the plan is "fair and equitable" and it does

not discriminate unfairly as to the non-accepting class.  As noted above, Classes 3, 4, 5, and 6A

accepted the Plan and Classes 1 and 6B rejected the Plan based on the voting results.  Classes 2,

7, and 9 were conclusively presumed to accept the Plan because those Classes were Unimpaired

under the Plan, and Classes 8 and 10 were deemed to reject the Plan because those Classes will

not receive any distribution on account of their claims.

98.    Classes 8 and 10 were deemed to reject the Plan because those Classes will

not receive any distribution on account of their claims.  While the Plan provides that Classes 7 and

35

9 may be reinstated, this is a technical preservation of equity to preserve the Debtors' corporate structure post-emergence and is permissible. Thus, with respect to Classes 8 and 10, section 1129(b) has been satisfied because these classes are both entirely unsecured and no junior Class is receiving a recovery under the Plan. 11 U.S.C. §§ 1129(b)(2)(B)(ii) and (C)(ii). For the same reasons, section 1129(b) is satisfied as to Class 6B.

99.     It is my understanding that, as set forth more fully in the Gring Declaration, the Claims in Class 1 that voted to reject the Plan will be satisfied in accordance with § 1129(b)(2). Accordingly, I believe the Plan satisfies § 1129(b) with respect to all holders of Claims in Class 1 that voted to reject the Plan.

## XV.      11 U.S.C. § 1129(c): Plan is Only Plan Currently on File

100.     I have been informed by the Debtors' advisors that section 1120(c) of the Bankruptcy Code only applies if more than one plan has been filed. The Plan is the only plan currently on file in these Chapter 11 Cases and, accordingly, section 1129(c) of the Bankruptcy Code does not apply.

## XVI.   11 U.S.C. § 1129(d): Principal Purpose of Plan Is Not Avoidance of Taxes

101.     The principal purpose of the Plan is not the avoidance of taxes or the avoidance of section 5 of the Securities Act, and no party has objected on any such grounds. Therefore, I believe the Plan satisfies the requirements of section 1129(d) of the Bankruptcy Code.

## XVII.  11 U.S.C. § 1129(e): Inapplicable Provisions

102.     I have been informed by the Debtors' advisors that provisions of section 1129(e) of the Bankruptcy Code apply only to "small business cases" as defined therein. These Chapter 11 Cases are not "small business cases." Accordingly, I believe that section 1129(e) of the Bankruptcy Code is not applicable.

103.     Accordingly, I believe that the Plan satisfies the confirmation requirements

36

of the Bankruptcy Code as they have been explained to me and should be approved.


Dated: June 13, 2021
          Houston, Texas

                                        */s/ Michael Dane*
                                        Michael Dane

WEIL:\97990449\11\45327.0007