**EXHIBIT A**

**THE PROPERTY**

Exhibit "G"

**ASSIGNMENT AND BILL OF SALE**

This ASSIGNMENT AND BILL OF SALE ("**Assignment**") dated [●], 20[●], but effective as of 12:01 a.m. Central Standard Time, on [●] (the "**Effective Time**"), is from [●], a [●] [●], with an office at [●] ("**Assignor**") to [●], a [●] [●], with an office at [●] ("**Assignee**"), Assignor and Assignee sometimes individually referred to herein as, a "**Party**" and collectively referred to herein as, the "**Parties**".

FOR Ten Dollars ($10.00) and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, effective as of the Effective Time, Assignor hereby GRANTS, BARGAINS, SELLS, CONVEYS and ASSIGNS to Assignee the Assets. For the purposes of this Assignment, "**Assets**" means all of all of Assignor's right, title, and interests (real personal, mixed, contractual or otherwise) in, to and under or derived from the following:

1.  The oil and gas lease(s) (whether one or more, the "**Lease**,") described on Exhibit "A" attached hereto and made a part hereof.

2.  Any and all wells, whether producing, shut-in, temporarily abandoned, plugged and abandoned, or otherwise located on the Lease (the "**Wells**");

3.  All equipment and facilities associated with or used in connection with the production and operation of the Wells;

4.  Any and all contracts and agreements governing or pertaining to the Lease or the Wells (collectively, the "**Contracts**"), including, without limitation, that certain Joint Operating Agreement dated as of [●] by and between [●] and [●], as amended, insofar and only insofar as such Contracts apply to the Lease or the Wells.

Assignor warrants title to the Assets, unto Assignee, its successors and assigns, against all persons claiming or to claim the same or any part thereof BY, THROUGH OR UNDER ASSIGNOR, BUT NOT OTHERWISE. THE ASSETS ARE ASSIGNED "AS IS, WHERE IS", AND, EXCEPT AS PROVIDED FOR HEREIN, ASSIGNOR MAKES NO, AND EXPRESSLY DISCLAIMS AND NEGATES ANY, REPRESENTATION OR WARRANTY, EXPRESS OR IMPLIED, AS TO (a) MERCHANTABILITY OF THE ASSETS, (b) FITNESS OF THE ASSETS FOR ANY PARTICULAR PURPOSE, (c) CONDITION OF THE ASSETS, AND (d) CONFORMITY OF THE ASSETS TO MODELS OR SAMPLES OF MATERIALS.

TO HAVE AND TO HOLD the Assets subject to the following terms and conditions:

1.  <u>Agreements</u>. This Assignment is made subject to and is burdened by the terms, covenants, and conditions contained in the Contracts. Assignee agrees to be bound by, assume the obligations arising under, and perform all of the terms, covenants, and conditions contained in the Contracts to the extent same relate to the Lease and the Wells.

2.    <u>Compliance with Laws</u>.  This Assignment is made subject to all applicable laws, statutes, ordinances, permits, decrees, orders, judgments, rules, and regulations that are promulgated, issued, or enacted by a governmental entity having jurisdiction; and Assignee agrees to comply with the same on and after the Effective Time.

2.    <u>Successors and Assigns</u>.  The terms, covenants, and conditions contained in this Assignment are binding upon and inure to the benefit of the Parties and their respective successors and assigns, and such terms, covenants, and conditions are covenants running with the land and with each subsequent transfer or assignment of the Assets or any part thereof.

3.    <u>Redhibition Waiver</u>.  ASSIGNEE: (i) WAIVES ALL RIGHTS IN REDHIBITION PURSUANT TO LOUISIANA CIVIL CODE ARTICLES 2520, ET SEQ.; (ii) ACKNOWLEDGES THAT THIS EXPRESS WAIVER SHALL BE CONSIDERED A MATERIAL AND INTEGRAL PART OF THIS SALE AND THE CONSIDERATION THEREOF; AND (iii) ACKNOWLEDGES THAT THIS WAIVER HAS BEEN BROUGHT TO THE ATTENTION OF ASSIGNEE, HAS BEEN EXPLAINED IN DETAIL AND THAT ASSIGNEE HAS VOLUNTARILY AND KNOWINGLY CONSENTED TO THIS WAIVER OF WARRANTY OF FITNESS AND WARRANTY AGAINST REDHIBITORY VICES AND DEFECTS FOR THE ASSETS.

4.    <u>UTPCPL Waiver</u>.  TO THE EXTENT APPLICABLE TO THE ASSETS OR ANY PORTION THEREOF, ASSIGNEE HEREBY WAIVES THE PROVISIONS OF THE LOUISIANA UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION LAW (LA. R.S. 51:1402, *ET SEQ.*).  ASSIGNEE WARRANTS AND REPRESENTS THAT IT: (i) IS EXPERIENCED AND KNOWLEDGEABLE WITH RESPECT TO THE OIL AND GAS INDUSTRY GENERALLY AND WITH TRANSACTIONS OF THIS TYPE SPECIFICALLY; (ii) POSSESSES THE REQUISITE KNOWLEDGE, EXPERIENCE, AND EXPERTISE TO EVALUATE INDEPENDENTLY THE MERITS AND RISKS OF THE TRANSACTIONS HEREIN CONTEMPLATED; AND (iii) IS NOT IN A SIGNIFICANTLY DISPARATE BARGAINING POSITION.

5.    <u>Separate Assignments Required by Government Entities</u>. Some of the properties conveyed by this Assignment may require approval to transfer by a government entity, and as such may require separate assignment instruments made on officially approved forms, or forms acceptable to such government entity, in sufficient multiple originals to satisfy applicable statutory and regulatory requirements. The interests conveyed by such separate assignments are the same, and not in addition to, the interests conveyed in this Assignment.  Assignor and Assignee agree to execute such additional instruments as may be necessary to obtain the approval of the applicable governmental entities for such assignment; and Assignor shall be responsible for recording such assignments.  In addition, it is contemplated that this Assignment will be recorded in the appropriate Parish within the State of Louisiana and the interests conveyed pursuant hereto are the same, and not in addition to, and this assignment shall not constitute multiple transfers of such interests by virtue of the recordation of this Assignment in more than one Parish.

EXECUTED on the day and year first referenced above, but effective as of the Effective Time.

<div style="text-align:center"><strong><u>ASSIGNOR:</u></strong></div>

**WITNESSES:**

[●]

_____
Name: _____

By: _____
Name: [●]
Title:   [●]

_____
Name: _____

<div style="text-align:center"><strong><u>ASSIGNEE:</u></strong></div>

**WITNESSES:**

[●]

_____
Name: _____

By: _____
Name: [●]
Title:   [●]

_____
Name: _____

STATE OF [●]                                        §

COUNTY OF [●]                        §

       On this _____ day of _____, [●], before me appeared [●] to me personally known, who, being by me duly sworn (or affirmed) did say that [he/she] is [●] of [●], a [●] [●], and that the instrument was signed on behalf of said company and that [he/she] acknowledged the instrument to be the free act and deed of the company.

_____
NOTARY PUBLIC
STATE OF [●]
COUNTY OF [●]
Printed Name: _____

STATE OF [●]                                        §

COUNTY OF [●]                        §

       On this _____ day of _____, [●], before me appeared [●] to me personally known, who, being by me duly sworn (or affirmed) did say that [he/she] is [●] of [●], a [●] [●], and that the instrument was signed on behalf of said company and that [he/she] acknowledged the instrument to be the free act and deed of the company.

_____
NOTARY PUBLIC
STATE OF [●]
COUNTY OF [●]
Printed Name: _____

**EXHIBIT A**

**THE LEASE**

## Exhibit 14

**Farmout Agreement**

## FARMOUT AGREEMENT

This Farmout Agreement ("**Agreement**") dated as of [_____], 2021 ("**Execution Date**"), but effective as of the Effective Date, is by and among [Fieldwood Energy I LLC, a Texas limited liability company, and GOM Shelf LLC, a Delaware limited liability company] (collectively "**Owner**") and [Fieldwood Energy II LLC, a Texas limited liability company] ("**Fieldwood II**"). Owner and Fieldwood II may each be referred to herein as a "**Party**" and collectively as the "**Parties**".

### W I T N E S S E T H

WHEREAS, Fieldwood II desires to farm into the development of, operation of, and production of hydrocarbons from the Development Area, subject to the terms and conditions set forth herein; and

WHEREAS, Owner and Fieldwood II desire to set forth their agreements regarding their joint participation in the development of, operation of, and production of hydrocarbons from the Development Area.

NOW, THEREFORE, in consideration of the mutual benefits to each Party, the mutual promises set forth herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

### ARTICLE I.
### DEFINITIONS

**Section 1.1.**   **Defined Terms**.   As used in this Agreement, each of the following terms is defined below:

"**Abandonment Notice**" is defined in Section 4.10(a).

"**Affiliate**" means, with respect to any Person, any other Person that, directly or indirectly, controls, is controlled by or is under common control with, such specified Person through one (1) or more intermediaries or otherwise; provided, however, that, for the purposes of this Agreement, Owner shall not be deemed an Affiliate of Fieldwood II, and *vice versa*.  For the purposes of this definition, "control" means, where used with respect to any Person, the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities, by contract or otherwise, and the terms "controlling" and "controlled" have correlative meanings.

"**Agreement**" is defined in the preamble above.

"**Apache**" means Apache Corporation, a Delaware corporation, and/or its designated Affiliate that is a predecessor of Owner in the chain of title of any applicable property of Owner.

"**Base Assignment Form**" is defined in Section 4.5(b).

"**BOEM**" means the Bureau of Ocean Energy Management of the United States Department of the Interior, and any successor Governmental Authorities thereto.

"**Business Day**" means a day, other than a Saturday or Sunday, on which commercial banks are open for business with the public in Houston, Texas.

"**Capital Development Project**" means either a (i) Rework or Recompletion Project or (ii) a Sidetrack, Bypass, Or Deepening Project.

"**Capital Development Project Costs**" means any and all out-of-pocket costs and expenses incurred in developing, preparing for, and completing a Capital Development Project and conducting all other operations set forth in the applicable Proposal attributable to Owner Interests in the Project, including, without limitation, all reasonable Third Party engineering costs, legal costs, and permitting costs, but excluding overhead and general and administrative costs.

"**Commence(s)**" means (i) with respect to any Rework or Recompletion Project, the entry into the well using the equipment necessary to begin the operation to either rework or plug back the existing completion, as applicable, and (ii) with respect to a Sidetrack, Bypass, or Deepening Project or an Election Well, the commencement of actual drilling of new hole through the turning of a drill bit into the earth, in each case, with a rig, coiled tubing unit, or other equipment capable of completing the applicable Project.

"**Company Agreement**" means that certain Limited Liability Company Agreement of Fieldwood Energy I LLC, a Texas limited liability company, dated [•], 2021.

"**Decommissioning Agreement**" means that certain Decommissioning Agreement, dated as of September 30, 2013, by and among Apache, Apache Shelf, Inc., Apache Deepwater LLC, Apache Shelf Exploration LLC, Fieldwood Energy LLC and GOM Shelf LLC, as amended from time to time.

"**Development Area**" means the state submerged lands and Outer Continental Shelf blocks and acreage held by the leases set forth on Exhibit A.

"**Effective Date**" means [EMERGENCE DATE].

"**Election Period**" is defined in Section 4.1.

"**Election to Participate**" means the form presented by Fieldwood II to Owner with a Proposal pursuant to which Owner can elect to participate in a Proposal.

"**Election Well**" means a new well in the Development Area.

"**Election Well Costs**" means, subject to the terms of the applicable Operating Agreement, any and all out-of-pocket costs and expenses attributable to Owner Interests incurred in drilling, evaluating, completing, and equipping an Election Well to its Objective Depth and conducting all other operations set forth in the applicable Proposal, including, without limitation,

2

all reasonable Third Party engineering costs, legal costs, and permitting costs, but excluding overhead and general and administrative costs.

"**Evaluation Data**" means Seismic Data and other data and information relating to a Prospect Area or, if applicable, the Objective Formation(s) as to a Capital Development Project or an Election Well in the possession of Fieldwood II that was materially relied upon by Fieldwood II in the determination of the Prospect, including, without limitation, to the extent applicable, relevant geological and geophysical interpretations and information, including the most recent reports, interpretations, and maps, and all specialty processing and analysis of Seismic Data (*e.g.*, migration, AVO, *etc.*).

"**Execution Date**" is defined in the preamble above.

"**Excess Net Profit**" means the Net Profit from a Capital Development Project over any applicable period, minus the Pre-Existing Net Profit.  For the purposes of this Agreement, the Pre-Existing Net Profit that would have been realized over such period if the Capital Development Project had not been undertaken will be deemed to be zero ($0) for a recompletion where the well's production data from the most recent three (3) months of production prior to the date Fieldwood II, or another operator pursuant to Section 4.4, applies for a permit to modify the applicable well shows the existing completion producing at average rates of less than fifty (50) barrels of oil per day or, if the well is a gas well, three hundred (300) MCFD of gas; provided, however, periods during which the well was intermittently shut-in during such three (3) month period shall be excluded from the calculation of average production so that such average is not artificially lowered as a result of any such intermittent shut-ins.

"**Existing Burdens**" means the following, to the extent that Owner Interests are burdened by or subject to them as of the time a Proposal is made with respect to such Owner Interests:

(a)    Lessors' royalties (including, without limitation, sliding scale royalties and royalties measured by net profits), overriding royalties, reversionary interests, net profit interests, production payments, carried interests, non-participating royalty interests, and similar burdens on or measured by production from or allocated to the proceeds thereof;

(b)    The terms of leases, unit agreements, pooling agreements, operating agreements, production sales contracts, areas of mutual interest or similar obligations entered into in the ordinary course of the oil and gas industry, and any other contracts, agreements, rights, and instruments applicable to the Owner Interests that are binding on Owner;

(c)    Preferential rights to purchase all or any portion of the Owner Interests;

(d)    Third Party consent requirements and similar restrictions that are applicable to any transfer of all or any portion of the Owner Interests; and

(e)    Rights of reassignment arising upon final intention to abandon or release the Owner Interests.

3

Notwithstanding anything herein to the contrary, as provided in Section 4.5(h), the term "Existing Burdens" when used in connection with an Election Well or the FWII Earned Interest shall not include the Trust NPIs.

"**Expert**" means Netherland, Sewell & Associates or such other reservoir engineering consultant as may be mutually agreed by the Parties or determined pursuant to Section 4.12.

"**Fieldwood II**" is defined in the preamble above.

"**Force Majeure**" means any event or circumstance or combination thereof beyond the reasonable control of the Party claiming to be impacted by such event or circumstance that prevents such Party from performing its obligations under this Agreement, but only to the extent such Party is actually prevented or hindered from so performing, which events or circumstances include acts of God, fires, floods, hurricanes, storms, tornados, earthquakes, landslides, lightning, loop currents, washouts, epidemics, pandemics, or other natural disaster; arrests, restraints, actions, delays, or inaction of any Governmental Authority; strikes, lockouts, or other industrial disturbances; acts of the public enemy, wars, invasions, blockades, embargos, sanctions, sabotage, insurgency, terrorism, civil wars, civil disturbances, riots, malicious mischief, or insurrections of any kind; explosions; breakage or accident to machinery or lines of pipe, freezing of wells or lines of pipe; refusal or inability of resale owner(s) or transporter(s) to take deliveries due to events of Force Majeure, inability or delays of a Party to obtain rights of way, necessary materials, supplies or permits not caused by the failure of the Party claiming to have been affected by Force Majeure to pay for or take diligent and prompt actions to obtain such rights of way, necessary materials, supplies, or permits; or labor strikes or work stoppages.

"**FWII Earned Interest**" means with respect to an Election Well (a) one hundred percent (100%) of Owner Interests (determined at the time the Election Well Proposal is made, reduced by any burdens (except the Trust NPIs), reversions, pay-outs, back-ins, or other contractual interests springing or arising after such time, but existing at the time such Election Well Proposal was made) in the Prospect Area associated with the Prospect to be developed by such Election Well until Fieldwood II has reached the Recovery Threshold relative to such Election Well, and reducing to (b) fifty percent (50%) of Owner Interests (determined at the time the Election Well Proposal was made, reduced by any burdens (except the Trust NPIs), reversions, pay-outs, back-ins, or other contractual interests springing or arising after such time, but existing at the time such Election Well Proposal was made) in such Prospect Area from and after that time at which Fieldwood II has reached the Recovery Threshold relative to such Election Well. For the avoidance of doubt, Owner's working interest, for purposes of the foregoing calculations and otherwise, excludes (i) Owner Interests insofar as they relate to any other wells that are located within the applicable Prospect Area and in existence as of the time the Election Well Proposal is made, regardless of whether such other wells are then or may thereafter be completed within any Objective Formation in the Prospect Area and (ii) Owner's ORRI.

"**FWII NPI**" means, with respect to the production resulting from any Capital Development Project, a net profits interest equal to (i) 100% of the Excess Net Profit until Fieldwood II has reached the Recovery Threshold and (ii) from and after such time that Fieldwood II has reached the Recovery Threshold, fifty percent (50%) of the Excess Net Profit.

4

"**Governmental Authority**" means any federal, state, municipal, tribal, local, or similar governmental authority, regulatory or administrative agency, court or arbitral body, or any subdivision of any of the foregoing.

"**Law**" means any applicable statute, writ, law, rule, regulation, ordinance, order, judgment, injunction, award, determination, or decree of a Governmental Authority.

"**MCFD**" means thousand cubic feet of gas per day, as measured at a base temperature of sixty degrees Fahrenheit (60°F) and a base pressure of fourteen and sixty-five hundredths (14.65) pounds per square inch absolute (psia).

"**Net Profit**" means, with respect to production attributable to Owner Interests obtained as a result of a Capital Development Project, the difference obtained by subtracting Operating Costs from Revenue; where (i) "Operating Costs" equals the sum of (1) direct operating costs related to the well that is the subject of the Capital Development Project during the applicable production month, including platform, facility, processing, and pipeline operating costs and fees allocated equally amongst all producing wells on or tied back to such platform, if applicable, (2) all Existing Burdens on such well, (3) all severance or other taxes measured or calculated based upon production from such well (but for the avoidance of doubt, excluding income taxes and ad valorem taxes), and (4) the ORRI, and (ii) "Revenue" equals the net revenue attributable to Owner's net revenue interest in the proceeds of production from the completion resulting from such Capital Development Project received for that applicable production month.

"**Objective Depth**" means, with respect to an Election Well, the depth that is sufficient to test the applicable Objective Formation(s), or the specific footage depth set forth in the Proposal, whichever is the greater depth, for such Election Well.

"**Objective Formation(s)**" means, with respect to an Election Well, the formations, intervals, or sands that are proposed to be tested, as set forth in the Proposal for such Election Well.

"**Operating Agreement**" means any Subject Operating Agreement or Third Party Operating Agreement.

"**Operating Costs**" has the meaning set forth in the definition of "Net Profits."

"**ORRI**" means, with respect to any FWII Earned Interest or any FWII NPI, an overriding royalty interest equal to twenty-five percent (25%) less Existing Burdens proportionately reduced to the FWII Earned Interest or FWII NPI, as applicable and further proportionately reduced as the FWII Earned Interests or the FWII NPI may be reduced pursuant to the terms of this Agreement as a result of Fieldwood II achieving the Recovery Threshold with respect to any Project, which ORRI shall be a non-operating, non-expense-bearing, overriding royalty interest, free of cost and expense of production, operations, marketing, and delivery of the hydrocarbons to the applicable delivery points; provided however, for the avoidance of doubt, any payment made pursuant to the Trust A NPI or the Trust A-1 NPI for the completed interval that is the subject of the particular Capital Development Project is an Existing Burden

5

and, as a result, shall reduce on a dollar for dollar basis the amount of any ORRI payment during a particular payment period.

"**Owner**" is defined in the preamble above.

"**Owner Interests**" means, with respect to any Proposal and the Project to be carried out pursuant to such Proposal, the rights, title, and interests of Owner in the lands and leases in the applicable portion of the Development Area that is to be developed by such Project, determined as of the date such Proposal is made (reduced by any burdens, reversions, pay-outs, back-ins, or other contractual interests springing or arising after such time, but existing at the time such Proposal was made), and including the Owner's proportionate share of any non-consenting party's interest in the applicable Project that may be allocable to Owner under an applicable Third Party Operating Agreement for only so long as such interest is allocated to Owner in accordance with the terms of such Third Party Operating Agreement.

"**Owner Percentage**" means the difference between (i) the Owner Interests in a Prospect Area that is developed by an Election Well and (ii) the FWII Earned Interest.

"**P&A**" means the plugging, abandonment, and removal of any wells, facilities, platforms, pipelines, or other equipment and the restoration and remediation of the land and seabed in accordance with all applicable Laws and the terms and conditions of any applicable leases, contracts, and agreements, including the removal, surface and subsurface restoration, site clearance, and disposal of the wells, well cellars, fixtures, platforms, flowlines, pipelines, structures, and personal property located on or associated with assets and properties and the lands burdened thereby, the flushing, pickling, burial, removal, or capping of all associated flowlines, field transmission and gathering lines, pipelines, pit closures, the restoration of the surface and seabed, site clearance, and any disposal of related waste materials and hazardous substances.

"**P&A Costs**" means the costs and expenses to conduct P&A.

"**P&A Well**" is defined in Section 4.10(a).

"**Party**" or "**Parties**" is defined in the preamble above.

"**Permitted Encumbrances**" means the following:

(a)     The Existing Burdens;

(b)     Liens for current taxes or assessments not yet delinquent or, if delinquent, being contested in good faith by appropriate actions diligently pursued;

(c)     Materialmen's, mechanic's, repairman's, employee's, contractor's, operator's, and other similar liens or charges arising in the ordinary course of business for amounts not yet delinquent (including any amounts being withheld as provided by Law) or if delinquent, being contested in good faith by appropriate actions diligently pursued;

6

(d)    All rights to consent by, required notices to, filings with, or other actions by Governmental Authorities in connection with the transfer of the Owner Interests;

(e)    All rights reserved to or vested in any Governmental Authorities to control or regulate any of the Development Area in any manner and all obligations and duties under all applicable Laws, rules, and orders of any such Governmental Authorities or under any franchise, grant, license or permit issued by any such Governmental Authorities; and

(f)    Easements, rights-of-way, servitudes, and permits or other burdens or encumbrances that individually or in the aggregate would not be reasonably likely to materially detract from the value of or materially interfere with the use, development, operation or ownership of the Development Area subject thereto or affected thereby.

"**Person**" means an individual, corporation, partnership, limited liability company, association, joint stock company, trust or trustee thereof, estate or executor thereof, unincorporated organization, joint venture, or any other legally recognizable entity.

"**Pre-Existing Net Profit**" means the forecast of Net Profit that would have been realized over the applicable period in which Excess Net Profit is being calculated if the Capital Development Project had not been undertaken, as such forecast is agreed upon by and between the Parties using the forward strip pricing for crude oil and natural gas as provided by NYMEX as of the date the Proposal for such Capital Development Project was delivered to Owner.  If, after ten (10) Business Days following the expiration of the Election Period applicable to a Capital Development Project, the Parties have not yet agreed on the Pre-Existing Net Profit for the well that is the subject of such Capital Development Project, then either Party may submit the determination of such Pre-Existing Net Profit to the Expert pursuant to Section 4.12 below.

"**Project**" means either an Election Well or a Capital Development Project, as applicable.

"**Project Notice**" is defined in Section 3.2.

"**Project Security**" means security, in form and amount reasonably acceptable to Owner (with Apache's reasonable consent), to cover Fieldwood II's obligations and liabilities hereunder associated with (i) with respect to an Election Well, Owner's share of the P&A obligations and liabilities, including P&A Costs, environmental liability, obligations, or liabilities owed to any vendors, co-owners, Governmental Authorities, or Third Party, for such Election Well and (ii) with respect to a Sidetrack, Bypass, or Deepening Project, the well that is sidetracked, bypassed, or deepened, including, without limitation, Owner's share of incremental P&A obligations and liabilities (including P&A Costs, environmental liability, obligations, or liabilities owed to any vendors, co-owners, Governmental Authorities, or Third Party) for such sidetrack, bypass, or deepening well.

"**Proposal**" means a proposal to drill, evaluate, complete, and equip an Election Well or undertake a Capital Development Project, as the case may be, proposed by Fieldwood II to the Owner on lands or facilities in the Development Area.  For the avoidance of doubt, a Proposal may not include more than one Election Well or one proposed completion or recompletion of an existing well, as applicable.

7

"**Prospect**" means a geologic structural or stratigraphic trap located within any Development Area that is believed to have the potential for accumulations of hydrocarbons, to the extent such Development Area also covers or includes such geologic structure or stratigraphic trap.

"**Prospect Area**" is defined in <u>Section 4.5(a)</u>.

"**Recovery Threshold**" means, with respect to a Capital Development Project, Fieldwood II's recovery from the Net Profit it receives attributable to such project of an amount equal to one hundred percent (100%) of the Capital Development Project Costs incurred by Fieldwood II in performing the relevant Project and, with respect to an Election Well, Fieldwood II's recovery from the FWII Earned Interest it receives attributable to such well of an amount equal to one hundred percent (100%) of the Election Well Costs incurred by Fieldwood II in performing the relevant Project.

"**Representatives**" means a Person's directors, officers, partners, members, managers, employees, agents, investors, or advisors (including attorneys, accountants, consultants, bankers, and financial advisors) and any representatives of those advisors, and, in the case of Owner, expressly includes its contractor providing contract operating services for Owner together with such contractor's employees, agents, and representatives.

"**Revenue**" has the meaning set forth in the definition of "Net Profits."

"**Rework or Recompletion Project**" means a development operation on an existing well in the Development Area to either (i) work-over the then-current completion in such existing well in an effort to increase or resume production, cause such well to produce in paying quantities, increase production or reserves, or extend the productive life of such completion or (ii) plug and abandon the then-current completion in such existing well and recomplete the well at a shallower interval.

"**Seismic Data**" means any and all seismic data, two-dimensional multifold seismic data, three-dimensional seismic data, stacked and migrated processed sections, digital field tapes, stacked tapes, support data relating thereto, stick and quality control segments, receiver and bin center locations, stacking velocities, shot hole drilling information, digital shot point locations, magnetic, surface, and other surveys, seismic sections, surface and subsurface maps, plats, charts, and any interpretations of any of the foregoing or other like information customarily used in connection with oil and/or gas exploration.

"**Sidetrack, Bypass, or Deepening Project**" means a development operation on an existing well in the Development Area to plug and abandon the then-current completion and conduct sidetracking, bypassing, or deepening operations on such existing well in an effort to increase or resume production, cause such well to produce in paying quantities, increase production or reserves, or to extend the productive life of such well.

"**Subject Operating Agreement**" is defined in <u>Section 4.5(a)</u>.

"**Technical Review Meeting**" is defined in <u>Section 3.2(b)</u>.

Error! Unknown document property name.

"**Term**" is defined in <u>Section 2.1</u>.

"**Third Party**" means any Person that is not a Party or any Affiliate of any Party.

"**Third Party Operating Agreement**" is defined in <u>Section 4.5(c)</u>.

"**Transaction Documents**" means this Agreement, the TSA, and each other agreement, document, certificate, or instrument delivered pursuant hereto or thereto.

"**Trust A NPI**" means that certain net profits overriding royalty interest created and conveyed under and pursuant to those certain Conveyances of Net Profits Overriding Royalty Interest dated September 30, 2013, as supplemented and amended from time to time, from Fieldwood Energy LLC and GOM Shelf LLC, as Grantor, and the Fieldwood Decommissioning Trust A, as NPI Owner, covering the properties and interests described therein.

"**Trust A-1 NPI**" means that certain net profits overriding royalty interest created and conveyed under and pursuant to those certain Conveyances of Net Profits Overriding Royalty Interest dated September 30, 2013, as supplemented and amended from time to time, from Fieldwood Energy LLC and GOM Shelf LLC, as Grantor, and the Fieldwood Decommissioning Trust B, as NPI Owner, covering the properties and interests described therein, as such net profits overriding royalty interest was amended, assigned, and partially released pursuant to that certain Assignment, Amendment, and Partial Release of Net Profits Overriding Royalty Interest dated as of April 11, 2018 by and between Fieldwood Energy LLC, GOM Shelf LLC, the Fieldwood Decommissioning Trust B, and the Fieldwood Decommissioning Trust A.

"**Trust NPIs**" means the Trust A NPI and the Trust A-1 NPI, collectively.

"**TSA**" means that certain Transition Services Agreement by and among the Parties dated [•], 2020.

"**Well Data**" means any logs, core samples, other geological and geophysical data or similar data created during drilling operations, any engineering records or reports (including wellbore schematics), any drilling records or reports (including detailed daily drilling reports), and any related reports filed with the BOEM.

**Section 1.2.**   <u>**Exhibits**</u>.   The following exhibits are incorporated herein and made a part hereof:

| Exhibit A | Development Area (Including Oil and Gas Leases) |
| Exhibit B | Form of Net Profits Interest Assignment |
| Exhibit C | Form of Election Well Assignment |
| Exhibit D | Form of Operating Agreement |

9

## ARTICLE II.
## TERM

**Section 2.1.**   **Term**.  This Agreement shall be effective for a period commencing on the Effective Date and expiring upon the earlier to occur of (i) the date two (2) years after the Effective Date, and (ii), as to each lease, the expiration of such lease comprising a part of the Development Area (including any and all renewals, replacements, and extensions of such lease) (the "**Term**").

**Section 2.2.**   **Effect of Termination**.  After the expiration of the Term, this Agreement shall terminate and be of no further force and effect; provided, however, that (i) the provisions of this Section 2.2 and Sections 3.2(d), 3.3, 4.8, 4.11, 5.3, 5.4, 5.5, and 5.14, the proviso in the third sentence of Section 3.2(a) and the last sentence of Section 4.5(g), and (ii) any and all rights, obligations and remedies hereunder that have accrued on or prior to the expiration of the Term of this Agreement, shall survive the termination of this Agreement indefinitely; and, provided, further, that any rights, obligations, and remedies in any Transaction Document that by their nature are intended to survive termination or expiration of this Agreement shall so survive. Notwithstanding anything herein to the contrary, termination of this Agreement will not affect the rights of Fieldwood II hereunder to any Proposals presented to Owner before the end of the Term.

## ARTICLE III.
## PROSPECT GENERATION

**Section 3.1.**   **Evaluation of Possible Prospect.**  To assist Fieldwood II in its evaluation of the Development Area, Owner will exercise reasonable efforts to provide Fieldwood II with access to all materials either in its possession or those materials which it is entitled to review regarding the Development Area, including any Evaluation Data, but only to the extent Fieldwood II is permitted to view such materials pursuant to any contract or agreement to which such materials may be subject.  In the event that Fieldwood II desires to present a Proposal, it shall provide a notice to Owner as set forth below.

**Section 3.2.**   **Notice of Prospects or Capital Development Project**.

    (a)     Notice.  With respect to any Proposal being made by Fieldwood II, Fieldwood II shall provide a written notice to the Owner (a "**Project Notice**"), which shall include the following information:

        (i)     a description of the Proposal in reasonable detail (including, if such Proposal relates to an Election Well, all potentially productive zones, the proposed Objective Depths, the proposed Objective Formations, together with descriptions of the Prospect(s) and the associated Prospect Area(s));

        (ii)     a good faith, preliminary estimate of Capital Development Project Costs or the Election Well Costs, as the case may be;

Error! Unknown document property name.

(iii)    a good faith, preliminary estimate of any and all P&A Costs for a Sidetrack, Bypass or Deepening or Election Well, as the case may be, and

(iv)    an Election to Participate.

For the avoidance of doubt, the following shall be void and deemed automatically withdrawn by Fieldwood II: (i) Proposals for which Owner does not have the requisite authority, under the applicable Operating Agreement, to make such Proposal and (ii) Proposals that conflict with any ongoing, approved, or previously proposed operations under any applicable Operating Agreement.  If Owner receives a Proposal for a Capital Development Project to be performed on a well which Owner either (A) desires to continue producing from its then-current completion or (B) desires to conduct an operation that is in conflict with the Capital Development Project proposed by Fieldwood II, Owner may, on or before the expiration of the Election Period for such Proposal, send written notice to Fieldwood II that it rejects the Proposal pursuant to the foregoing grounds, in which case the applicable Proposal shall be deemed to have been withdrawn and void; *provided* that if Owner rejects such a Proposal and undertakes or agrees to participate in the Project that was the subject of such rejected Proposal within two (2) years after expiration of the Election Period for such Proposal, then Owner shall offer Fieldwood II the right (exercisable for a period of 30 days) to participate in such opportunity on the same terms as set forth in the original Proposal and this Agreement.  If, after diligent efforts, Fieldwood II or the Parties are unable to proceed with the operations contemplated under a Proposal because of conflicts with existing operating agreements (or other restrictions affecting the applicable Owner Interests) that existed as of the time the Proposal was made, either Party may send notice to the other Party terminating the affected Proposal.  For the avoidance of doubt, the Parties recognize and agree that nothing in this Agreement shall prevent an Owner from conducting any projects, operations, or activities or from participating in projects, operations, or activities that may be proposed or offered by a Third Party or from entering into any agreements or contracts, including, without limitation, farmouts, sales, or assignments, affecting the Owner Interests, in all cases, without any obligation to offer Fieldwood II the opportunity to participate in any such project, operations, or activities or to obtain the consent of Fieldwood II, unless (x) any such project, operations, or activities were proposed by Fieldwood II under a Proposal received by Owner prior to such Owner's receipt of the proposal from a Third Party and (y) such Fieldwood II Proposal has not terminated, been withdrawn, or deemed to have been withdrawn.

(b)    Technical Review Meeting.  Fieldwood II will present the Proposal and all related Evaluation Data to the Owner and to Apache (for purposes of obtaining its consent) at an in-person meeting at the offices of Fieldwood II (a "**Technical Review Meeting**") to be held on a mutually agreed Business Day during Fieldwood II's normal business hours no later than ten (10) Business Days after delivery of the applicable Project Notice.  At either Party's request, the meeting may be held online via technology that allows a Party to share screens with the other Party and Apache, such as Zoom, Skype, WebEx, or Microsoft Teams.  Each Party shall use reasonable efforts to ensure that the Technical Review Meeting is attended by a reasonably sufficient number of technical representatives of such Party and, in the case of Owner, Apache, who are familiar with and capable of presenting and/or discussing the Proposal with the other Party and Apache.

11

(c)     Access to Evaluation Data.  Until the end of the Election Period, Fieldwood II shall make Evaluation Data with respect to a Proposal available for review and evaluation by the Owner, at the Owner's expense, in Fieldwood II's offices during Fieldwood II's normal business hours or available through a virtual data room or similar electronic platform. Likewise, Owner will provide Fieldwood II with reasonable access to any Evaluation Data in its possession with respect to a Proposal, including but not limited to well files, logs, and data. Notwithstanding the foregoing, neither Party shall be obligated to disclose such Evaluation Data when such disclosure would violate any Third Party contract or agreement binding on a Party or applicable to such Evaluation Data.

(d)     Confidentiality.  Each Party shall, and shall cause its Affiliates and its and their respective Representatives (and Owner shall cause Apache) to, keep the Proposals, all Evaluation Data, Well Data, and Seismic Data of the other Party, information relating to the Proposal and information from the Technical Review Meeting, to the extent prepared by or received from the other Parties, strictly confidential, and no Party or any of its Affiliates or any of its or their respective Representatives shall disclose such Proposals, Evaluation Data, Well Data, or Seismic Data, information relating to the Proposal, or information from the Technical Review Meeting to any Third Party other than Apache or except as required under a Third Party Operating Agreement.  With respect to Evaluation Data, Well Data, and Seismic Data, these disclosure restrictions shall terminate upon the later to occur of (i) two years after the date on which the Technical Review Meeting took place with respect to the applicable Proposal and (ii) the date on which such Evaluation Data, Well Data, or Seismic Data, as applicable, is no longer subject to disclosure restrictions under an agreement or contract with a Third Party.  With respect to the Proposal itself, these disclosure restrictions shall terminate upon the later to occur of (x) the date on which the Project that is the subject of such Proposal is Commenced and (y) that date on which such Proposal terminates, is withdrawn, or is deemed to have been withdrawn.

**Section 3.3.    Waiver of Liability with Respect to Evaluation Data**.  The information included in a Project Notice and any other Evaluation Data or Well Data furnished by Fieldwood II or Owner, as applicable, pursuant to this Agreement shall be provided for informational purposes only.  Each Party is responsible for and shall make its own decisions with respect to Evaluation Data, Well Data, or the opinions or analysis of the other Party that may be provided. (A) FIELDWOOD II DOES NOT MAKE, AND THE OWNER WAIVES AND REPRESENTS AND WARRANTS THAT OWNER HAS NOT AND WILL NOT RELY UPON, AND (B) OWNER DOES NOT MAKE, AND FIELDWOOD II WAIVES AND REPRESENTS AND WARRANTS THAT FIELDWOOD II HAS NOT AND WILL NOT RELY UPON: ANY REPRESENTATION OR WARRANTY, EXPRESS OR IMPLIED, IN THIS AGREEMENT OR ANY OTHER INSTRUMENT, AGREEMENT, OR CONTRACT DELIVERED HEREUNDER OR IN CONNECTION WITH THE EVALUATION DATA, WELL DATA, OR ANY OTHER OPINION OR ANALYSIS THAT MAY BE PROVIDED HEREUNDER, INCLUDING, BUT NOT LIMITED TO, ANY REPRESENTATION OR WARRANTY, EXPRESS OR IMPLIED AS TO (I) THE CONTENTS, CHARACTER, OR NATURE OF ANY DESCRIPTIVE SUMMARY, OR ANY REPORT OF ANY PETROLEUM ENGINEERING CONSULTANT, OR ANY GEOLOGICAL DATA, SEISMIC DATA, WELL DATA, EVALUATION DATA, RESERVE DATA, RESERVE REPORTS, RESERVE

12

INFORMATION (AND ANY ANALYSIS OR INTERPRETATION OF ANY OF THE FOREGOING) RELATING TO ANY SEISMIC DATA OR EVALUATION DATA OR ANY OF THE PROPOSALS, (II) THE QUANTITY, QUALITY, OR RECOVERABILITY OF HYDROCARBONS IN OR FROM ANY PROPOSAL, (III) THE PRODUCTION OF PETROLEUM SUBSTANCES FROM ANY PROPOSAL, OR ANY PRODUCTION OR DECLINE RATES, OR (IV) ANY OTHER RECORD, FILES, MATERIALS, OR INFORMATION (INCLUDING AS TO THE ACCURACY, COMPLETENESS, OR CONTENTS OF THE RECORDS) THAT MAY HAVE BEEN MADE AVAILABLE, DELIVERED, OR COMMUNICATED TO THE OTHER PARTY IN CONNECTION WITH THE REVIEW AND EVALUATION OF THE SEISMIC DATA, WELL DATA, OR EVALUATION DATA PURSUANT TO THIS AGREEMENT. NOTHING IN THIS AGREEMENT SHALL LIMIT ANY PARTY'S RIGHTS OR REMEDIES PURSUANT TO ANY OTHER AGREEMENT BETWEEN THE PARTIES OTHER THAN THIS AGREEMENT OR PURSUANT TO ANY INSTRUMENT OR AGREEMENT DELIVERED PURSUANT TO THIS AGREEMENT.

**ARTICLE IV.**
**JOINT DEVELOPMENT OPERATIONS**

**Section 4.1.    Election to Participate**.  The Owner may elect to participate in a valid Proposal by delivering its written Election to Participate to Fieldwood II no later than 5:00 p.m. in Houston, Texas on the first Business Day that is on or after the date thirty (30) days after the Business Day the Owner received the applicable Project Notice (the "**Election Period**"). The failure of Owner to make a timely written election to participate in a valid Proposal by the expiration of the Election Period shall be deemed to be Owner's election not to participate in such Proposal.  If the Owner delivers to Fieldwood II prior to the expiration of the applicable Election Period a valid written Election to Participate, then, subject to the terms of any applicable Third Party Operating Agreement and the terms and conditions of this Agreement, such election shall constitute a valid and binding obligation of the Parties to participate in the operations set forth in such Proposal upon the terms of this Agreement.

**Section 4.2.    Rework or Recompletion Projects.**    If the Proposal is for a Rework or Recompletion Project and Owner does not reject such Proposal as contemplated under Section 3.2(a) then Fieldwood II may proceed with the Rework or Recompletion Project at its sole risk and expense only after the Pre-Existing Net Profit relating to such Rework or Recompletion Project has been determined either by agreement of the Parties or by the Expert.  In such event (i) Fieldwood II shall pay 100% of the Capital Development Project Costs associated with the Rework or Recompletion Project and attributable to Owner Interests and (ii) upon completing the Rework or Recompletion Project as a successful completion, Fieldwood will receive an assignment of the FWII NPI in a form substantially the same as Exhibit B attached hereto, reserving unto Owner the ORRI.  For the avoidance of doubt, at such time as Fieldwood II has reached the Recovery Threshold for such applicable Rework or Recompletion Project, the FWII NPI will be reduced from one hundred percent (100%) to fifty percent (50%).  The assignment of the FWII NPI to Fieldwood II pursuant to this Section 4.2 shall: (1) be subject to this Agreement, (2) be "as-is," without warranties of any kind, and expressly subject to all agreements and matters of record, and Permitted Encumbrances, (3) be subject to the ORRI reserved by Owner

13

hereunder, and (4) be limited as further described in Section 4.9(a). For the avoidance of doubt, (i) upon completion of the Rework or Recompletion Project, Fieldwood II shall not be responsible for any expenses, costs, losses, or operations associated with the well that is the subject of such Project and attributable to Owner Interests and (ii) if the Rework or Recompletion Project results in a dry hole or if Fieldwood II does not reach the Recovery Threshold relative to a Rework or Recompletion Project, Fieldwood II shall be solely responsible for any loss it incurred as a result of conducting such Project and shall have no right of recovery or recourse against Owner relative to such loss; provided that Fieldwood II shall not be responsible for paying for or conducting P&A activities on such well, except that, in the event of a dry hole or unsuccessful completion attempt, prior to removing any equipment used to conduct the applicable Rework or Recompletion Project, Fieldwood II shall, at its sole cost and expense, take such additional actions as are necessary to leave the well in a condition that will not require Owner to take additional actions or perform any additional operations on such well in order to leave the well in a satisfactory condition under then-current regulations. For the avoidance of doubt, for the purpose of this Section 4.2, so long as Owner does not reject such Proposal as contemplated under Section 3.2(a) and subject to the other terms of this Agreement, Fieldwood II may proceed with the activities contemplated in the Proposal regardless of whether Owner elects to participate.

**Section 4.3.  Sidetrack, Bypass, or Deepening Project.**  If the Proposal is for a Sidetrack, Bypass, or Deepening Project and Owner does not reject such Proposal as contemplated under Section 3.2(a) then Fieldwood II may proceed with the Sidetrack, Bypass, or Deepening Project at its sole risk and expense; provided, however, that before it may proceed with such Proposal, within thirty (30) days of the expiration of the Election Period, (a) Fieldwood II must provide Owner with Project Security for the operations contemplated under such Proposal and (b) the Pre-Existing Net Profit relating to such Sidetrack, Bypass, or Deepening Project shall have been determined either by agreement of the Parties or by the Expert. If Fieldwood II fails to timely provide Owner with Project Security with respect to any Proposal, then such Proposal shall automatically terminate and have no further or ongoing force or effect and shall be deemed to have been withdrawn by Fieldwood II; and, in such event, Fieldwood II may not proceed with the Project contemplated under the applicable Proposal. In the event Fieldwood II proceeds with a Sidetrack, Bypass, or Deepening Project as permitted herein, (i) Fieldwood II shall pay 100% of the Capital Development Project Costs associated with the Sidetrack, Bypass, or Deepening Project and attributable to Owner Interests, (ii) following the completion of the Sidetrack, Bypass, or Deepening Project as a successful completion, Fieldwood II will receive an assignment of the FWII NPI in a form substantially the same as Exhibit B attached hereto, reserving unto Owner the ORRI, (iii) except for P&A Costs as set forth below in clause (iv), upon either completion or termination of the Sidetrack, Bypass, or Deepening Project, Fieldwood II shall not be responsible for any expenses, costs, losses, or operations associated with the well that is the subject of such Project, and (iv) at such time as P&A work and activities are performed on the well that is the subject of such Sidetrack, Bypass, or Deepening Project, Fieldwood II shall pay to Owner fifty percent (50%) of Owner's share of the incremental P&A Costs, if any, incurred by the Sidetrack, Bypass, or Deepening Project. Owner shall have the right to cash call Fieldwood II for its share of P&A Costs due hereunder; and, in such event, Fieldwood II shall pay Owner such cash called amounts within thirty (30) days of its receipt of such cash call request. Owner shall promptly following completion of the P&A notify

14

Fieldwood II of the incremental costs incurred and reimburse Fieldwood II for any overpayment, if applicable. For the avoidance of doubt, at such time as Fieldwood II has reached the Recovery Threshold for such applicable Sidetrack, Bypass, or Deepening Project, the FWII NPI will be reduced from one hundred percent (100%) to fifty percent (50%). The assignment of the NPI to Fieldwood II pursuant to this Section 4.3 shall: (1) be subject to this Agreement, (2) be "as-is," without warranties of any kind, and expressly subject to all agreements and matters of record, and Permitted Encumbrances, (3) be subject to the ORRI reserved by Owner hereunder, and (4) be limited as further described in Section 4.9(a). For the avoidance of doubt, with respect to any Sidetrack, Bypass, or Deepening Project undertaken by Fieldwood II, (A) Owner shall have no liability or responsibility to Fieldwood II in the event Fieldwood II is unable to reach the Recovery Threshold relative to such Project, and (B) regardless of whether Fieldwood II reaches the Recovery Threshold relative to such Project, Fieldwood II shall be responsible for fifty percent (50%) of Owner's share of the incremental P&A Costs caused by the subject of the Sidetrack, Bypass, or Deepening Project. For the avoidance of doubt, for the purpose of this Section 4.3, so long as Owner does not reject such Proposal as contemplated under Section 3.2(a) and subject to the other terms of this Agreement, Fieldwood II may proceed with the activities contemplated in the Proposal regardless of whether Owner elects to participate.

**Section 4.4.** **Fieldwood II Project Manager**.   In the event Fieldwood II is not the contract operator of an Owner Interest at the time of a Proposal or at the time a Capital Development Project is performed, Fieldwood II shall be the project manager on behalf of Owner for the operation, and Owner shall take reasonable actions necessary to cause the then current operator or contract operator to promptly proceed with the operations described in the Proposal at Fieldwood II's direction.  In furtherance of such right of Fieldwood II to be the project manager for such operation, Owner, to the extent it has the ability to do so, hereby grants to Fieldwood II the following rights as the project manager: (i) the right to directly consult with, advise, and direct the then current operator or contract operator, as applicable, regarding such operation, provided that Owner's Representatives shall be included in any such consultations, (ii) access to all books, records, data, and information relating to such operation (including any daily or other periodic operations reports), provided that such access shall be subject to the same restrictions on access and disclosure as apply to Evaluation Data under Section 3.2, and (iii) access to all facilities relating to such operation subject to Fieldwood II's execution of a mutually agreeable boarding agreement. All reasonable out-of-pocket costs incurred by Fieldwood II in performing the foregoing activities as such project manager shall be included in the Capital Development Project Costs for the applicable Project.

**Section 4.5.** **Election Well.**

(a)   _Operating Agreement_.  If the Proposal is for the drilling of an Election Well, then contemporaneously with Owner electing to participate in an Election Well, to the extent not in conflict with any existing Third Party Operating Agreements, the Parties shall execute and deliver to each other an operating agreement in substantially the form attached hereto as Exhibit D (each, a "**Subject Operating Agreement**") setting forth the Owner Percentage and FWII Earned Interest, and the "Contract Area" under such Subject Operating Agreement shall be limited to the Prospect Area to be assigned to Fieldwood II under this Section 4.5(a) if Fieldwood II were to become entitled to such assignment hereunder; provided, however, if

15

Fieldwood II does not earn the assignment to be made pursuant to Section 4.5(b) with respect to any Proposal for which the Parties have executed a Subject Operating Agreement, then such Subject Operating Agreement shall be deemed to have terminated, and the Parties shall take such further actions and execute such additional documents as may be necessary or appropriate to evidence the termination of such Operating Agreement.  With respect to each Prospect that may be the subject of a Proposal for an Election Well, the "**Prospect Area**" associated with any such Prospect shall be limited to (i) such area as may be reasonably developed and drained by such individual well without need for further development within the applicable Prospect Area and (ii) depths from the top of shallowest Objective Formation tested by such Election Well down to the stratigraphic equivalent of one hundred (100) feet below the base of the deepest Objective Formation tested by such Election Well from which production is commenced within two (2) years after spudding such Election Well.

(b)    Owner Participation. If Owner elects to participate in an Election Well, then Fieldwood II shall provide Owner with Project Security for the Election Well, and then, only after providing Owner with such Project Security, may proceed with the Election Well at its sole risk and expense.  In such event, (i) Fieldwood II (A) shall pay 100% of the Election Well Costs associated with the Election Well and attributable to Owner Interests and (B) upon completing the Election Well as a successful completion, will receive an assignment of the FWII Earned Interest applicable to such Election Well in a form substantially the same as Exhibit C attached hereto (the "**Base Assignment Form**"), subject to Section 4.9(c), and shall receive the FWII Earned Interest share of Revenue and bear the FWII Earned Interests share of Operating Costs relative to the Project until Fieldwood II has reached the Recovery Threshold relative to such Project, and (ii) thereafter, the ongoing Revenue and Operating Costs, and including P&A Costs, associated with the Project shall be received and borne by the Parties in accordance with the Owner Percentage and FWII Earned Interest, provided that Owner shall not bear any portion of the ORRI or the Operating Costs incurred prior to Fieldwood II reaching the Recovery Threshold.  For the avoidance of doubt, at such time as Fieldwood II has reached the Recovery Threshold for such applicable Election Well, the FWII Earned Interest will be reduced from one hundred percent (100%) of the applicable Owner Interests to fifty percent (50%) of such Owner Interests, in each case still subject to the ORRI.  The assignment of the FW II Earned Interest to Fieldwood II pursuant to this Section 4.5(b) shall: (1) be subject to this Agreement, (2) be "as-is," without warranties of any kind, and expressly subject to all agreements and matters of record, and Permitted Encumbrances, (3) reserve unto Owner the ORRI, and (4) convey the applicable FWII Earned Interest as further described in Section 4.9(b).  For the avoidance of doubt, if the Election Well is a dry hole or results in a completion for which Fieldwood does not reach the Recovery Threshold, then Fieldwood II shall be solely responsible for bearing such loss and for performing the P&A associated with Owner Interests in such well, including paying all such associated P&A Costs.

(c)    Third Party Operating Agreements.   During the Term, in the event that any Prospect Area is subject to any existing operating agreement other than a Subject Operating Agreement (each a "**Third Party Operating Agreement**"), then the terms of such Third Party Operating Agreement shall govern and control.  In the event the Prospect Area for a Proposal is subject to a Third Party Operating Agreement, Owner agrees to take such reasonable actions as may be required by the terms of such agreement to propose the Proposal to the other parties to

16

such agreement; provided, that Fieldwood II shall assist Owner in taking such actions as may reasonably be requested by Owner.

(d)   Operating Agreement Conflicts.   To the extent that the provisions of this Agreement conflict with the provisions of any Third Party Operating Agreement, then solely between the Parties, the provisions of this Agreement shall govern and control, *mutatis mutandis*; provided, however, upon commencement of any Election Well, the provisions of any applicable Operating Agreement shall govern all further elections and operations with respect to such Election Well and any subsequent operations within a Prospect Area.

(e)   Operator Designation.   To the extent permitted by applicable Law and subject to the terms of any Third Party Operating Agreement, upon written request of Owner (with the consent of Apache acting reasonably) for each Prospect Area associated with an Election Well pursuant to which Fieldwood II earns a FWII Earned Interest, Fieldwood II shall be designated and assume the responsibilities of operator of each such Prospect Area. In such event, Owner agrees to take reasonable actions in assisting Fieldwood II in having all co-owners of such Prospect Area agree to such designation and to execute the required documentation for such designation.

(f)   Existing Facilities.   Subject to (i) the terms of any applicable Third Party Operating Agreement and applicable Law and (ii) the condition of the applicable facilities and any operations then being conducted thereon, to the extent Owner has the ability to grant Fieldwood II such rights, Fieldwood II shall be entitled to access and use existing facilities owned by Owner to the extent necessary to drill, evaluate, complete, equip, and produce any Election Well, free of costs except Third Party costs and the fees described in Section 4.11 (which costs shall be Election Well Costs), and Owner shall take commercially reasonable actions to help facilitate Fieldwood II's right to access such facilities.   In so accessing any of Owner's facilities, Fieldwood II shall execute and deliver to Owner a boarding agreement or such other instrument as may be reasonably required by Owner in its reasonable discretion to permit Fieldwood II's access to such facilities and to allocate risks associated with Fieldwood II's operations on such facilities.

(g)   Elections Not to Participate.   Notwithstanding anything herein to the contrary, if the Proposal is to drill an Election Well and Owner does not elect to participate within the Election Period, then the Proposal shall expire, and neither Party shall have any obligation to the other with respect to the Proposal and Fieldwood II shall have no right to proceed with drilling the Election Well.   If Owner or its successors or assigns undertake to drill the Election Well described in the Proposal within two (2) years after expiration of the Election Period for such Proposal, then Owner shall offer Fieldwood II the right (exercisable for a period of 30 days) to participate in such Election Well on the same terms as set forth in the original Proposal and this Agreement.

(h)   Trust NPIs.   The Parties recognize and agree that this Agreement constitutes a "Farmout Agreement" under Section 7.4 of the Decommissioning Agreement with respect to Election Wells and the FWII Earned Interests earned by Fieldwood II.   As a result, the FWII

17

Earned Interests to be transferred to Fieldwood II pursuant to Section 4.5(b) shall be transferred free and clear of the Trust NPIs.

**Section 4.6.     Withdrawal or Termination of Proposals**.

(a)     Subject to any applicable Third Party Operating Agreement, Fieldwood II may withdraw a Proposal at any time prior to the mobilization of materials and equipment toward the commencement of operations under the Proposal.  If a Proposal is withdrawn by Fieldwood II or deemed to have been withdrawn as provided in this Agreement, then all terms of this Agreement shall be interpreted as if such Proposal was never made.

(b)     Notwithstanding Section 4.6(a), with respect to any Project for which Fieldwood II has the right to proceed hereunder, the Proposal for such Project shall be deemed to have automatically terminated and been withdrawn if Fieldwood II does not (i) Commence the applicable Project within one hundred twenty (120) days (excluding any extension expressly agreed to in writing by the Parties) following Fieldwood II's making of such Proposal and (ii) thereafter diligently and continuously perform such Project until completed, subject to extensions of the foregoing time period to the extent Fieldwood II is prevented from either Commencing or performing such Project by events of Force Majeure; provided that Fieldwood II shall make reasonably diligent efforts to overcome such events of Force Majeure.  In the event any Project is deemed terminated or withdrawn, Owner shall promptly return to Fieldwood II any Project Security it provided to Owner under this Agreement in connection with such Proposal.

(c)     If a Proposal is terminated pursuant to Section 4.6(b) as a result of Fieldwood II's failure to timely Commence performance of a Project, then (i) the applicable Owner may elect to conduct the Project that was the subject of such Proposal without any obligation to offer Fieldwood II the opportunity to participate in such Project notwithstanding any term in this Agreement to the contrary and (ii) if Owner has not so elected and Fieldwood II desires to conduct the Project that was the subject of such terminated Proposal, it must resubmit a new Proposal for such Project which shall be subject to the terms of this Agreement in all respects.

**Section 4.7.     Project Security**.  With respect to any Project for which Fieldwood II has provided Owner with Project Security hereunder, upon the occurrence of the Recovery Threshold for such Project, the Owner agrees that the principal amount of such Project Security shall be proportionately reduced in an amount corresponding to the reduction of Fieldwood II's responsibility for costs and expenses attributable to such Project including the reduction of its P&A obligations; and the Parties agree to execute such instruments or take such other actions as may be reasonably necessary to evidence such reduction.

**Section 4.8.     Liability for Operations**.

(a)     **With respect to any operations conducted by Fieldwood II or its contractors on any Capital Development Project or Election Well, as between Owners and Fieldwood II, Fieldwood II shall be solely responsible and liable for, and shall fully indemnify, defend, and hold harmless Owners, their affiliated and subsidiary companies, contractors (other than Fieldwood II), representatives, and consultants, and all of their respective**

18

officers, directors, and employees, from and against any and all claims, demands, suits, causes of action, judgments, fines, penalties, or orders relating to or arising out of the operations so conducted by Fieldwood II or its contractors, including, without limitation, incidents of non-compliance, civil penalties, personal injuries, property damage, or pollution, without regard to the negligence (whether sole, joint, or concurrent, or active or passive), strict liability, or other fault of the foregoing indemnified Persons, <u>except to the extent resulting from the gross negligence or willful misconduct of any of the foregoing indemnified Persons.</u>

(b)     Notwithstanding anything herein to the contrary, in no event shall Fieldwood II be liable for any damages or claims arising in whole or in part from its failure or inability to reach the Objective Depths or Objective Formations.

Section 4.9.     <u>Assignments</u>.

(a)     <u>NPI Assignments</u>.  If Fieldwood II is entitled to receive an assignment of a FWII NPI in connection with any Capital Development Project, such assignment shall be limited to the interval completed or worked over as a result of such operation.

(b)     <u>Election Well Assignments</u>.  If Fieldwood II is entitled to receive an assignment from Owner in connection with any Proposal for an Election Well, such assignment shall, subject to Section 4.9(c) below, be limited to the applicable oil and gas lease(s) insofar as it pertains to each Prospect Area that is developed by the Election Well and the depths as specified in Section 4.5(a) above.

(c)     <u>BOEM Assignments</u>.  To the extent any Prospect Area in which Fieldwood II earns an assignment of the FWII Earned Interest hereunder covers all or a part of one or more aliquots in which BOEM would recognize Fieldwood II's ownership, then in conjunction with the assignment of the FWII Earned Interest and notwithstanding the Base Assignment Form, the Parties agree to execute and file appropriate BOEM-0150 forms from the pertinent Owner to Fieldwood II and covering fifty percent (50%) of Owner's BOEM recognized operating rights in and to such aliquot(s) from the surface to one hundred feet (100') below the deepest depth drilled of the applicable Election Well (utilizing the Base Assignment Form attached as Exhibit A thereto) ("***BOEM OR Assignments***"). In such event, the Parties recognize and agree that such BOEM OR Assignments must be filed with BOEM or such other required Governmental Authorities.  In the event any such Governmental Authorities fail to accept or approve any such BOEM OR Assignments, the Parties will fully cooperate in the development of an assignment and any other filings or instruments that will comply with the requirements of such Governmental Authority's filing and approval procedures (or such other filing procedures as may be hereafter promulgated) or as will accomplish the intent of this Agreement, together with assignments to be filed in the adjacent county or parish records reasonably necessary to give effect to the intent of this Agreement and provide Third Parties with notice of any such assignments.  Notwithstanding the foregoing, if, as a result of circumstances beyond the reasonable control of Owner and Fieldwood II, the assignment will not be approved by BOEM, the Parties will file the BOEM OR Assignment in the non-required records maintained by BOEM for the applicable lease or leases.

19

(d)    ORRI.  It is understood and agreed that the ORRI reserved by the applicable Owner under any certain assignment made pursuant to the terms of this Agreement shall apply to all renewals, extensions, and other similar arrangements (and/or interests therein) of the applicable subject lease(s). Only a new lease taken by Fieldwood II, its successors or assigns, within one (1) year after expiration or release of a such applicable subject lease and which covers the same lands, shall be considered a renewal or extension for the purposes hereof.

**Section 4.10.    Rights upon Abandonment of Certain Wells.**

(a)    Abandonment Notice.    Subject to the terms of all applicable Third Party Operating Agreements, in the event that Owner and/or the other joint owners in any of the Owner Interests, if any, desire to permanently plug and abandon a well in the Development Area that was producing on the Execution Date (each a "**P&A Well**"), Owner (or, if the TSA is then in effect, Fieldwood II) shall provide Fieldwood II, no later than the earlier of (A) fifteen (15) days prior to the election deadline set forth in the applicable Third Party Operating Agreement, if any, for which the Owner must elect whether to permanently plug and abandon such well and (B) one hundred and twenty (120) days prior to the commencement of such plugging, abandonment, dismantling, or decommissioning, a written notice to Fieldwood II (with a copy to Owner and Apache) ("**Abandonment Notice**") that identifies such P&A Well and, if there are no other then-completed wells within such applicable aliquot, the leasehold interests in the aliquot within which such P&A Well is then completed and for which BOEM would recognize an assignment of such interest to Fieldwood II (the "**P&A Leasehold**"); provided that if the TSA is then in effect or if Fieldwood II or its Affiliate is then the contract service provider to Owners, Owners shall not be obligated to provide any such Abandonment Notice to Fieldwood II.  Notwithstanding anything herein to the contrary, Owners shall have no liability or obligations to Fieldwood II as a result of the failure to provide Fieldwood II with any Abandonment Notice.

(b)    Right to Acquire P&A Well.  Subject to the terms of any Third Party Operating Agreement, Fieldwood II may elect to acquire all or any P&A Well and the corresponding P&A Leasehold, if any, by delivering a written election to acquire same no later than ten (10) days after Fieldwood II's receipt of an Abandonment Notice.  If Fieldwood II fails to deliver a written election to acquire any P&A Well prior to or on the date ten (10) days after receipt of an Abandonment Notice, such failure shall be deemed an election not to acquire any such P&A Well.  Notwithstanding anything in this Agreement to the contrary, Fieldwood II's election to acquire any P&A Well may be accepted or rejected by Owner in Owner's sole discretion.

(c)    Effect of Exercise.  If Fieldwood II validly elects to acquire any P&A Well and the corresponding P&A Leasehold, if any, such election shall constitute a binding obligation of Fieldwood II to acquire Owner Interests in same no later than the later of (i) sixty (60) days after Fieldwood II's election or (ii) the date Fieldwood II obtains all applicable pre-assignment approvals, qualifications, right of use easements, and permits required under applicable Laws and contracts to acquire and operate (if applicable) such P&A Well and P&A Leasehold, if any.  Owner and Fieldwood II shall execute and deliver to Fieldwood II such forms and instruments reasonably requested by Fieldwood II or Owner, including an assignment in form mutually agreeable to the Parties; provided, however, that the P&A Well and P&A Leasehold, if any,

shall be assigned subject to this Agreement, "as-is" and without warranties of any kind, and expressly subject to all agreements and matters of record and all existing encumbrances. In consideration for such assignment, Fieldwood II shall assume, and perform and indemnify, defend, and hold harmless Owner, from the P&A Costs with respect to such P&A Well and P&A Leasehold, if any; however, Owner shall retain liability for and indemnify, defend, and hold harmless Fieldwood II for all other obligations related to the time period prior to the assignment. In connection with delivery of the assignment hereunder, at the sole cost and expense of Fieldwood II, the Owner shall deliver to, or cause to be delivered to, Fieldwood II all Well Data and all other records and information in its possession with respect to the P&A Well in a manner reasonably agreed to by the Parties. Owner shall cooperate with Fieldwood II to execute any assignment, designation of operator, or any other instrument reasonably required by Fieldwood II to consummate the intent of this <u>Section 4.10</u>, including Fieldwood II becoming the owner and designated operator of the P&A Well and P&A Leasehold, if any.

**Section 4.11.  <u>Processing Fees</u>.**  Subject to any applicable Third Party Operating Agreement and in the absence of any other agreement between the Parties governing the processing of production at any facility owned or operated by Owner, Fieldwood II agrees to pay Owner the following fees for the FWII Earned Interest share of production processed at any facility owned by Owner:

(a)     $2.00 per barrel for oil/condensate;

(b)     $1.50 per barrel for water; and

(c)     $0.20 per MCF for gas.

As used herein, "MCF" means one thousand cubic feet measured at standard pressure and temperature, defined to as cubic feet of volume at 60 degrees Fahrenheit and 14.7 pounds per square inch and a "barrel" is 42 U.S. gallons.

Effective March 1 of each year during which any production from a Project conducted under this Agreement is processed under this Section 4.11, the fees to be charged hereunder shall be adjusted by multiplying the rates then in effect by the percentage increase, if any, in the consumer price index, as published by the Bureau of Labor Statistics of the United States Department of Labor for all Urban Consumers, specifically, the "All Items" Unadjusted Expenditure Category (the "CPI-U"), from (i) December 31 of the year immediately preceding the year then just ended to (ii) December 31 of the year just ended. For the avoidance of doubt, no adjustment will be made in the event of a decrease in the CPI-U for an applicable year.

For the avoidance of doubts, the "Operating Costs" used for the purpose of calculating the FWII NPI and for determining when Fieldwood II has reached the Recovery Threshold shall include the processing fees provided herein with respect to FWII NPI share of production resulting from the Capital Development Project. For the purpose of this Section 4.11, the FWII NPI share means fifty percent (50%) of Owner's Interest in the production.

**Section 4.12.  <u>Expert Determination of Pre-Existing Net Profit</u>.**  If, as contemplated in the definition of Pre-Existing Net Profit, a Party submits the determination of Pre-Existing Net Profit

21

with respect to any Capital Development Project to the Expert, the procedures set forth in this Section 4.12 shall apply.  Prior to submitting such matter to the Expert, the Party intending to make the submission shall provide written notice to the other Party of such intent.  If the Parties are still unable to agree upon the Pre-Existing Net Profit within five (5) Business Days following the other Party's receipt of the notice provided herein, then the Party intending to submit the matter to the Expert may so submit such matter to the Expert for final and binding determination. To submit the determination of Pre-Existing Net Profit to the Expert, the submitting Party shall provide the Expert and the other Party with written notice of its request to have the Expert determine Pre-Existing Net Profit.  Within five (5) Business Days of providing that notice, the Parties shall each provide the Expert with (a) such data and information as is necessary for the Expert to be able to determine the Pre-Existing Net Profit, which data and information shall include applicable Well Data, Evaluation Data, and production data relating to the well that is the subject of such proposed Capital Development Project and (b) such Party's estimate of the Pre-Existing Net Profit.  The Expert shall, within five (5) Business Days of receiving such data and information, make its calculation of the Pre-Existing Net Profit using the data and information it has received from the Parties and the most recently available forward curve strip pricing for crude oil and natural gas as provided by NYMEX as of the date preceding the Expert's determination.  In making its determination hereunder, the Expert (i) shall be bound by the provisions of this Section 4.12 and the related definitions and (ii) may not assign a value to the Pre-Existing Net Profit greater than the value provided by Owner or less than the value provided by Fieldwood II.  If, prior to the Expert finalizing its determination of the Pre-Existing Net Profit, the Parties reach agreement, then they may withdraw the matter from the Expert.  The determination of the Expert shall be (x) final and binding on the Parties and (y) final and non-appealable for all purposes hereunder.  The fees and expenses of the Expert under this Section 4.12 shall be borne one half by the Owner and one half by Fieldwood II.  If the party selected as the Expert is unable or unwilling to serve as the Expert hereunder, then the Expert shall be selected by lot from among the nationally recognized independent reserves or reservoir engineering firms that have not represented any Party or its Affiliates at any time during the three-year period of time immediately preceding its designation hereunder.

## ARTICLE V.
## MISCELLANEOUS

**Section 5.1.   Notices**.  All notices, copies, and other communications that are required or that may be given pursuant to this Agreement (including notices to change the below information) shall be (a) sufficient in all respects if given in writing, in English, and delivered by both email and, additionally, by mail, facsimile, or recognized courier service to the Party to be noticed or copied pursuant to the contact information below that corresponds with the applicable form of notice and (b) deemed received when actually delivered (as reflected by the courier's receipt, facsimile record, or similar electronic receipt (as to email transmissions) or without receipt of invalid delivery):

If to Fieldwood II:

_____
_____

22

_____
Attn: _____
Telephone:  (___) ___-____
Fax:  (___) ___-____
Email:  _____

with a copy to:
Apache Corporation
2000 Post Oak Blvd., Suite 100
Attention:  Brian Erickson
Attention:  Brett Cupit
Telephone:  (713) 296-6000
Email:  brian.erickson@apachecorp.com
Email:  brett.cupit@apachecorp.com

If to Owner:

Attn:  _____
Telephone:
Fax:  (___) ___-____
Email:  _____

with a copy to:
Apache Corporation
2000 Post Oak Blvd., Suite 100
Attention:  Brian Erickson
Attention:  Brett Cupit
Telephone:  (713) 296-6000
Email:  brian.erickson@apachecorp.com
Email:  brett.cupit@apachecorp.com

or to such other address or addresses as the Parties or Apache may from time to time designate in writing.

**Section 5.2.** **Conflicts**.  To the extent that any provision of this Agreement conflicts with the provisions of the TSA, then as solely between the Parties, the provisions of this Agreement shall govern and control.  Additionally, Owner's elections in this Agreement are subject to the Company Agreement, and Fieldwood II hereby acknowledges the approval rights of Apache contained therein.

**Section 5.3.** **Governing Law**.  This Agreement shall be governed and construed in accordance with the Laws of the State of Texas, without regard to the Laws that might be applicable under conflicts of laws principles.

**Section 5.4.** **Venue**.  Each Party consents to personal jurisdiction in any action brought in the United States federal and state courts located in the State of Texas with respect to any dispute,

23

claim, or controversy arising out of or in relation to or in connection with this Agreement, and each of the Parties hereto agrees that any action instituted by it against the other with respect to any such dispute, controversy, or claim will be instituted exclusively in the state and federal district courts located in Harris County, Texas.  EACH PARTY HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, ANY OBJECTION WHICH THEY MAY NOW OR HEREAFTER HAVE TO THE VENUE OF ANY SUCH DISPUTE ARISING OUT OF THIS AGREEMENT BROUGHT IN SUCH COURT OR ANY DEFENSE OF INCONVENIENT FORUM FOR THE MAINTENANCE OF SUCH DISPUTE.

**Section 5.5.    Waiver of Jury Trial**.  EACH OF THE PARTIES AND THEIR RESPECTIVE SUCCESSORS AND ASSIGNS HEREBY IRREVOCABLY WAIVES ALL RIGHT TO TRIAL BY JURY IN ANY ACTION, PROCEEDING, OR COUNTERCLAIM (WHETHER BASED ON CONTRACT, TORT, OR OTHERWISE) ARISING OUT OF OR RELATING TO THIS AGREEMENT, THE TRANSACTIONS CONTEMPLATED HEREBY, OR THE ACTIONS OF ANY OTHER PARTY IN THE NEGOTIATION, ADMINISTRATION, PERFORMANCE, AND ENFORCEMENT THEREOF.

**Section 5.6.    Expenses**.  Except as provided in another agreement, all fees, costs, and expenses incurred by Fieldwood II and Owner in negotiating this Agreement shall be paid by the Party incurring the same, including, without limitation, legal fees, costs, and expenses.

**Section 5.7.    Compliance with Law**.  Each Party agrees that it will comply with applicable Laws, rules, regulations, and orders of Governmental Authority in the performance of this Agreement.

**Section 5.8.    Amendment**.  This Agreement may be amended or modified only by a duly authorized agreement in writing that makes reference to this Agreement executed by each Party and consented to by Apache acting reasonably.

**Section 5.9.    Waiver**.  Any failure by any Party to comply with any of its obligations, agreements, or conditions herein contained may be waived by the Party to whom such compliance is owed by an instrument signed by the Party to whom compliance is owed and expressly identified as a waiver, but not in any other manner.  No waiver of, or consent to a change in or modification of, any of the provisions of this Agreement shall be deemed or shall constitute a waiver of, or consent to a change in or modification of, any other provisions hereof (whether or not similar), nor shall such waiver constitute a continuing waiver unless otherwise expressly provided.

**Section 5.10.    Entire Agreement**.  This Agreement (together with the Exhibits hereto) and the other Transaction Documents constitute the entire agreement among the Parties and supersede any term sheets or oral agreements that may have been made or entered into by the Parties or any of their respective Affiliates relating to the transactions contemplated hereby.

**Section 5.11.    Assignment**.  No Party may assign any interest in this Agreement without the prior written consent of the other Party(ies).  This Agreement is personal to the Parties, and any attempted assignment shall be void *ab initio*; provided that the foregoing shall not apply if Fieldwood II assigns this Agreement along with its personnel to an Affiliate.  Neither assignment

24

nor consent to assignment shall relieve or release the assignor from its obligations under this Agreement, without an express written release signed by the other Party or Parties. Notwithstanding anything herein to the contrary, this Agreement is personal between Owner and Fieldwood II and shall not constitute a covenant running with the lands included in the Development Area or a burden on any Owner Interests except as to a particular Owner Interest for which (x) Owner has received a Proposal from Fieldwood II relating to such Owner Interest and (y) such Fieldwood II Proposal has not terminated, been withdrawn, or deemed to have been withdrawn.

**Section 5.12.  Binding Effect**.   The covenants, provisions, and conditions contained in each Assignment given pursuant to this Agreement are agreed and acknowledged to be covenants running with the land and the respective interests of the Parties and will be binding upon and inure to the benefit of the Parties and their respective successors and assigns.

**Section 5.13.  Further Assurances**.   Subject to the terms and conditions of this Agreement, each Party shall use its reasonable efforts to take, or cause to be taken, all actions and to do, or cause to be done, all things necessary or desirable, under applicable Law or otherwise, to consummate the transactions contemplated by this Agreement.  The Parties agree to and shall execute and deliver such other documents, certificates, agreements, and other writings and to take such other actions as may be necessary or desirable in order to consummate or implement expeditiously the transactions contemplated by this Agreement in accordance with the terms hereof.

**Section 5.14.  Construction**.

(a)     All article, section, schedule, and exhibit references used in this Agreement are to articles and sections of, and Schedules and Exhibits to, this Agreement, unless otherwise specified. The Schedules and Exhibits attached to this Agreement shall not amend or modify this Agreement, but the facts (as distinguished from agreements) stated therein are incorporated herein for all purposes.

(b)     Unless otherwise indicated, with respect to either Party, the terms "ordinary course of business" or "ordinary course" shall be deemed to refer to the ordinary conduct of business in a manner consistent with the past practices and customs of such Party.

(c)     If a term is defined as one part of speech (such as a noun), it shall have a corresponding meaning when used as another part of speech (such as a verb).  Terms defined in the singular have the corresponding meanings in the plural, and vice versa.  Unless the context of this Agreement clearly requires otherwise, words importing the masculine gender shall include the feminine and neutral genders and vice versa.  The words "include", "includes" or "including" do not limit the preceding terms and shall be deemed to be followed by the words "without limitation."  The words "hereof," "hereto," "hereby," "herein," "hereunder" and words of similar import, when used in this Agreement, shall refer to this Agreement as a whole and not to any particular section or article in which such words appear.  The term "or" is not exclusive.

(d)     The terms "day" and "days" mean and refer to calendar day(s).  The terms "year" and "years" mean and refer to calendar year(s).  If any action is to be taken or given on or by a

25

particular calendar day, and such calendar day is not a Business Day, then such action shall be deferred until the next Business Day.

(e)    Owner and Fieldwood II have each participated in the negotiation and drafting of this Agreement and if an ambiguity should arise, this Agreement shall be construed as if drafted jointly by the Parties, and no presumption or burden of proof shall arise favoring or burdening any Party by virtue of the authorship of any of the provisions in this Agreement.

(f)    The captions in this Agreement are for convenience only and shall not be considered a part of or affect the construction or interpretation of any provision of this Agreement.

(g)    The phrase "made available" means that such Party or one of its Affiliates or Representatives has had the opportunity prior to the date hereof to review such documents or materials at the offices of another Party or its Affiliates.

(h)    All references to currency herein shall be to, and all payments required hereunder shall be paid in, United States Dollars.

(i)    The serial comma is sometimes included and sometimes omitted.  Its inclusion or omission shall not affect the interpretation of any phrase.

**Section 5.15.    No Partnership**.  Except as otherwise expressly provided in this Agreement, (a) nothing in this Agreement is intended to create, or shall be construed as creating, a partnership, joint venture, association for profit, or other business entity between or among the Parties and (b) for federal and state income tax purposes, the Parties do not intend that the provisions of Subchapter K, Chapter 1, Subtitle A of the Internal Revenue Code of 1986, as amended, as permitted and authorized by Section 761 of said Code and the regulations promulgated thereunder apply to the transactions described in this Agreement.

**Section 5.16.    Severability**.  If any provision of this Agreement is held invalid or unenforceable by any court of competent jurisdiction, the other provisions of this Agreement shall remain in full force and effect.  The Parties further agree that if any provision contained herein is, to any extent, held invalid or unenforceable in any respect under the Laws governing this Agreement, they shall take any actions necessary to render the remaining provisions of this Agreement valid and enforceable to the fullest extent permitted by Law and, to the extent necessary, shall amend or otherwise modify this Agreement to replace any provision contained herein that is held invalid or unenforceable with a valid and enforceable provision giving effect to the intent of the Parties to the greatest extent legally permissible.

**Section 5.17.    Third Party Beneficiaries**.  Apache is an express third-party beneficiary of all of the representations and covenants of Owner and Fieldwood II contained in this Agreement.  However, Owner and Fieldwood II acknowledge and agree that, except for the third-party beneficiary rights expressly granted to Apache in this Section, this Agreement is entered solely for the benefit of the Parties hereto and shall not create any rights, including without limitation third-party beneficiary rights, in favor of any other party.

26

**Section 5.18.  Counterparts**.  This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.  Any .pdf or other electronic transmission hereof or signature hereon shall, for all purposes, be deemed originals.

[Remainder of Page Intentionally Blank]

27

Executed as of the Execution Date but effective as of the Effective Date.

**OWNER:**

**[FIELDWOOD ENERGY I LLC]**


By: _____
Name:
Title:

**GOM SHELF LLC**


By: _____
Name:
Title:



**FIELDWOOD II:**

**[FIELDWOOD ENERGY II LLC]**


By: _____
Name:
Title:

Signature Page to Farmout Agreement

**Error! Unknown document property name.**

**EXHIBIT A**

**DEVELOPMENT AREA (INCLUDING OIL AND GAS LEASES)**

[See Attached]

ADD:

| | |
|---|---|
| Exhibit B | Form of Net Profits Interest Assignment |
| Exhibit C | Form of Election Well Assignment |
| Exhibit D | Form of Operating Agreement |

## ASSIGNMENT OF NET PROFITS INTEREST

This ASSIGNMENT OF NET PROFITS INTEREST ("**Assignment**") dated [_____, 202_], but effective as of 12:01 a.m. Central Standard Time, on [●], 202_ (the "**Effective Time**[1]"), is from [Fieldwood Energy I LLC, a Texas limited liability company / GOM Shelf LLC, a Delaware limited liability company], with an office at [●] ("**Assignor**") to [Fieldwood Energy II LLC, a Delaware limited liability company, with an office at 2000 West Sam Houston Parkway South, Suite 1200, Houston, Texas 77042][2] ("**Assignee**").  Assignor and Assignee sometimes individually referred to herein as, a "**Party**" and collectively referred to herein as, the "**Parties**".

FOR Ten Dollars ($10.00) and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Assignor hereby GRANTS, BARGAINS, SELLS, CONVEYS and ASSIGNS to Assignee the Assigned NPI (as defined below), reserving unto Assignor the ORRI.

TO HAVE AND TO HOLD the Assigned NPI under Assignee subject to the ORRI and the following terms and conditions:

1.      As used in this Assignment, the following terms shall have the meanings ascribed to them below:

"Affiliate" means, with respect to any Person, any other Person that, directly or indirectly, controls, is controlled by or is under common control with, such specified Person through one (1) or more intermediaries or otherwise; provided, however, that, for the purposes of this Agreement, Assignor shall not be deemed an Affiliate of Assignee, and *vice versa*.  For the purposes of this definition, "control" means, where used with respect to any Person, the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities, by contract or otherwise, and the terms "controlling" and "controlled" have correlative meanings.

"Assigned NPI" means with respect to production from the Interval, a net profits interest equal to (i) one hundred percent (100%) of the Excess Net Profit until Assignee has reached the Recovery Threshold with respect to such Interval and (ii) from and after such time that Assignee has reached the Recovery Threshold with respect to such Interval, automatically reducing to fifty percent (50%) of the Excess Net Profit.

"Capital Development Project" means the Capital Development Project (as defined in the Farmout Agreement) resulting in this Assignment.

---

[1] Note to Draft: Effective Time shall be the date the Proposal was made.
[2] Note to Draft: Entity name to be determined.

"Capital Development Project Costs" means any and all out-of-pocket costs and expenses incurred in (i) developing, preparing for, and completing the Capital Development Project and (ii) conducting all other operations set forth in the Proposal which costs and expenses are, in each case, attributable to Assignor's right, title, and interest in and to the Interval, including, without limitation, all reasonable Third Party engineering costs, legal costs, and permitting costs, but excluding overhead and general and administrative costs.

"Excess Net Profit" means the Net Profit from the Capital Development Project over any applicable period, minus the Pre-Existing Net Profit.  For the purposes of this Assignment, the Pre-Existing Net Profit that would have been realized over such period if the Capital Development Project had not been undertaken will be deemed to be zero ($0) for a recompletion where the well's production data from the most recent three (3) months of production prior to the date Assignee, or another operator pursuant to Section 4.4 of the Farmout Agreement, applies for a permit to modify the applicable well shows the existing completion producing at average rates of less than fifty (50) barrels of oil per day or, if the well is a gas well, three hundred (300) MCFD of gas; provided, however, periods during which the well was intermittently shut-in during such three (3) month period shall be excluded from the calculation of average production so that such average is not artificially lowered as a result of any such intermittent shut-ins.

"Existing Burdens" has the meaning given such term in the Farmout Agreement, as such is applied to Assignor's interest in the Well at the time the Proposal was made.

"Farmout Agreement" means that certain Farmout Agreement dated [●] by and between Fieldwood Energy I LLC and GOM Shelf, collectively as Owner, and [Fieldwood Energy II LLC].

"Interval" means the completed or reworked interval from [●] feet TVDSS to [●] feet TVDSS in the Lease as such production is obtained from the Well.

"Lease" means that oil and gas lease [OCS or State of Louisiana No. ] dated        granted by     in favor of     .

"MCFD" means thousand cubic feet of gas per day, as measured at a base temperature of sixty degrees Fahrenheit (60°F) and a base pressure of fourteen and sixty-five hundredths (14.65) pounds per square inch absolute (psia).

"Net Profit" means, with respect to Assignor's rights, title, and interest in and to the production from the Interval, the difference obtained by subtracting Operating Costs from Revenue; where (i) "Operating Costs" equals the sum of (1) direct operating costs related to the Well during the applicable production month, including platform, facility, processing, and pipeline operating costs and fees allocated equally amongst all producing wells on or tied back to such platform, if applicable, (2) all Existing Burdens on such Interval, (3) all severance or other taxes measured or calculated based upon production from such Interval (but for the avoidance of doubt, excluding income taxes and ad valorem taxes), and (4) the ORRI, and (ii) "Revenue" equals the net revenue attributable

to Assignor's net revenue interest in the proceeds of production from the Interval for that applicable production month.

"ORRI" means, with respect to the Assigned NPI, an overriding royalty interest equal to twenty-five percent (25%) less Existing Burdens proportionately reduced to the Assigned NPI, as applicable and further proportionately reduced as the Assigned NPI may be reduced pursuant to the terms of the Farmout Agreement as a result of Assignee achieving the Recovery Threshold with respect to the Interval; provided however, for the avoidance of doubt, any payment made pursuant to the Trust A NPI or the Trust A-1 NPI with regard to production from the Interval shall reduce on a dollar for dollar basis the amount of any ORRI payment during a particular payment period.

"Person" means an individual, corporation, partnership, limited liability company, association, joint stock company, trust or trustee thereof, estate or executor thereof, unincorporated organization, joint venture, or any other legally recognizable entity.

"Pre-Existing Net Profit" means _____ [3].

"Proposal" means the Proposal (as defined in the Farmout Agreement) for the Capital Development Project.

"Recharacterization Mortgages" means those certain Mortgages and Deeds of Trust from Fieldwood Energy LLC and GOM Shelf LLC to Matthew Dundrea, Trustee, and Apache Corporation, as Collateral Agent, dated as of September 30, 2013, as amended, covering and securing the Trust A NPI and the Trust A-1 NPI.

"Recovery Threshold" means, with respect to the Capital Development Project, Assignee's recovery from the Assigned NPI equal to one hundred percent (100%) of the Capital Development Project Costs incurred by Assignee in performing such Capital Development Project.

"Third Party" means any Person who is not a Party or any Affiliate of any Party.

"Trust A NPI" means that certain net profits overriding royalty interest created and conveyed under and pursuant to those certain Conveyances of Net Profits Overriding Royalty Interest dated September 30, 2013, as supplemented and amended from time to time, from Fieldwood Energy LLC and GOM Shelf LLC, as Grantor, and the Fieldwood Decommissioning Trust A, as NPI Owner, covering the properties and interests described therein.

---

[3] Note to Draft: Since this will be determined prior to the time this assignment is made, suggest that we include this information in the assignment so that the amount of the Assigned NPI can be determined.

#93828439v11

"Trust A-1 NPI" means that certain net profits overriding royalty interest created and conveyed under and pursuant to those certain Conveyances of Net Profits Overriding Royalty Interest dated September 30, 2013, as supplemented and amended from time to time, from Fieldwood Energy LLC and GOM Shelf LLC, as Grantor, and the Fieldwood Decommissioning Trust B, as NPI Owner, covering the properties and interests described therein, as such net profits overriding royalty interest was amended, assigned, and partially released pursuant to that certain Assignment, Amendment, and Partial Release of Net Profits Overriding Royalty Interest dated as of April 11, 2018 by and between Fieldwood Energy LLC, GOM Shelf LLC, the Fieldwood Decommissioning Trust B, and the Fieldwood Decommissioning Trust A.

"Well" means the [●] well located on [●].

2.      Agreements.  This Assignment is made subject to and is burdened by the Existing Burdens and the terms of the Farmout Agreement.

3.      ORRI.  The ORRI is expressly reserved unto Assignor hereunder and shall be a non-operating, non-expense-bearing, overriding royalty interest, free of cost and expense of production, operations, marketing, and delivery of the hydrocarbons to the applicable delivery points.

4.      Warranties.  EXCEPT AS SET FORTH BELOW, THIS ASSIGNMENT IS MADE, AND THE ASSIGNED NPI IS CONVEYED AND ASSIGNED HEREUNDER, WITHOUT REPRESENTATION OR WARRANTY OF ANY KIND OR CHARACTER, INCLUDING, WITHOUT LIMITATION, WARRANTIES OF TITLE, FITNESS FOR ANY PARTICULAR PURPOSE, MARKETABILITY, MERCHANTABILITY, FREEDOM FROM DEFECTS, QUALITY OR PRESENCE OF HYDROCARBONS OR RESERVES, AND ANY OTHER REPRESENTATIONS AND WARRANTIES, EXPRESS OR IMPLIED, AT LAW OR IN EQUITY; AND ASSIGNOR DOES HEREBY DISCLAIM AND ASSIGNEE WAIVES ANY AND ALL SUCH REPRESENTATIONS OR WARRANTIES. THE ASSIGNED NPI SHALL BE ASSIGNED TO ASSIGNEE FREE AND CLEAR OF ANY AND ALL MORTGAGES, LIENS, AND ENCUMBRANCES CREATED BY, THROUGH, OR UNDER FIELDWOOD ENERGY LLC AND/OR ASSIGNOR AND ANY OF THEIR AFFILIATES, EXCLUDING THE TRUST A NPI, THE TRUST A-1 NPI, AND THE RECHARACTERIZATION MORTGAGES WHICH SHALL CONTINUE TO BURDEN THE ASSIGNED NPI, BUT WHICH WILL AFFECT THE ORRI IN THE MANNER DESCRIBED IN THE DEFINITION OF ORRI.

5.      Compliance with Laws.  This Assignment is made subject to all applicable laws, statutes, ordinances, permits, decrees, orders, judgments, rules, and regulations that are promulgated, issued or enacted by a governmental entity having jurisdiction, and Assignee agrees to comply with the same on and after the Effective Time.

6.      Successors and Assigns.  The terms, covenants, and conditions contained in this Assignment are binding upon and inure to the benefit of the Parties and their respective successors and assigns, and such terms, covenants, and conditions are covenants running with the land and with each subsequent transfer or assignment of the Assets or any part thereof.

7.     <u>Redhibition Waiver</u>.  ASSIGNEE: (I) WAIVES ALL RIGHTS IN REDHIBITION PURSUANT TO LOUISIANA CIVIL CODE ARTICLES 2520, ET SEQ.; (II) ACKNOWLEDGES THAT THIS EXPRESS WAIVER SHALL BE CONSIDERED A MATERIAL AND INTEGRAL PART OF THIS SALE AND THE CONSIDERATION THEREOF; AND (III) ACKNOWLEDGES THAT THIS WAIVER HAS BEEN BROUGHT TO THE ATTENTION OF ASSIGNEE, HAS BEEN EXPLAINED IN DETAIL AND THAT ASSIGNEE HAS VOLUNTARILY AND KNOWINGLY CONSENTED TO THIS WAIVER OF WARRANTY OF FITNESS AND WARRANTY AGAINST REDHIBITORY VICES AND DEFECTS FOR INTERESTS ASSIGNED AND CONVEYED HEREUNDER.

8.     <u>UTPCPL Waiver</u>.  TO THE EXTENT APPLICABLE TO THE ASSIGNED NPI OR ANY PORTION THEREOF, ASSIGNEE HEREBY WAIVES THE PROVISIONS OF THE LOUISIANA UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION LAW (LA. R.S. 51:1402, ET SEQ.).  ASSIGNEE WARRANTS AND REPRESENTS THAT IT: (I) IS EXPERIENCED AND KNOWLEDGEABLE WITH RESPECT TO THE OIL AND GAS INDUSTRY GENERALLY AND WITH TRANSACTIONS OF THIS TYPE SPECIFICALLY; (II) POSSESSES THE REQUISITE KNOWLEDGE, EXPERIENCE, AND EXPERTISE TO EVALUATE INDEPENDENTLY THE MERITS AND RISKS OF THE TRANSACTIONS HEREIN CONTEMPLATED; AND (III) IS NOT IN A SIGNIFICANTLY DISPARATE BARGAINING POSITION.

9.     <u>Further Assurances</u>.  Each Party covenants and agrees to execute and deliver to the other Party all such additional reasonable instruments and other documents and will do all such other reasonable acts and things as may be reasonably necessary to accomplish the intent of this Assignment.

10.    <u>Governing Law</u>.  This Assignment shall be governed and construed in accordance with the Laws of the State of Texas, without regard to the Laws that might be applicable under conflicts of laws principles.

11.    <u>Jurisdiction and Venue</u>.  Each Party consents to personal jurisdiction in any action brought in the United States federal and state courts located in the State of Texas with respect to any dispute, claim, or controversy arising out of or in relation to or in connection with this Assignment, and each of the Parties hereto agrees that any action with respect to any such dispute, controversy, or claim will be determined exclusively in a state or federal district court located in Harris County, Texas, and they do hereby irrevocably submit to the exclusive jurisdiction of such courts for such purposes.  Each Party hereby irrevocably waives, to the fullest extent permitted by law, any objection which they may now or hereafter have to the venue of any such dispute arising out of this assignment brought in such court or any defense of inconvenient forum for the maintenance of such dispute.

12.    <u>Counterparts</u>.  This Assignment may be executed in any number of counterparts and each of such counterparts shall for all purposes be deemed to be an original, and all such counterparts shall together constitute but one and the same Assignment.

*[Signature Page to Follow]*

#93828439v11

EXECUTED on the day and year first referenced above, but effective as of the Effective Time.

|  | **ASSIGNOR:** |
|---|---|
| **WITNESSES:** | |
| | **[FIELDWOOD ENERGY I LLC / GOM SHELF LLC]** |

_____
Name: _____

By: _____
Name: _____
Title: _____

_____
Name: _____


STATE OF [●]            §
                                §
COUNTY OF [●]      §

     On this _____ day of _____, 202_, before me appeared [●] to me personally known, who, being by me duly sworn (or affirmed) did say that [he/she] is the [●] of [Fieldwood Energy I LLC / GOM Shelf LLC], a [Texas / Delaware] limited liability company, and that the instrument was signed on behalf of the limited liability company and by the authority of the Members and that [he/she] acknowledged the instrument to be the free act and deed of the limited liability company.

_____
NOTARY PUBLIC
STATE OF [●]
COUNTY OF [●]
Printed Name: _____

.

**ASSIGNEE:**

**WITNESSES:**

**[FIELDWOOD ENERGY II LLC]**

_____

Name: _____

By: _____

Name: _____

Title: _____

_____

Name: _____

STATE OF [●]                         §

                                           §

COUNTY OF [●]                     §

       On this _____ day of _____, 202_, before me appeared [●] to me personally known, who, being by me duly sworn (or affirmed) did say that [he/she] is the [●] of [Fieldwood Energy II LLC], a Delaware limited liability company, and that the instrument was signed on behalf of the limited liability company and by the authority of the Members and that [he/she] acknowledged the instrument to be the free act and deed of the limited liability company.

_____

NOTARY PUBLIC

STATE OF [●]

COUNTY OF [●]

Printed Name: _____

.

Page 7 of 7

## ASSIGNMENT AND BILL OF SALE

This ASSIGNMENT AND BILL OF SALE ("**Assignment**") dated [_____, 202\_], but effective as of 12:01 a.m. Central Standard Time, on [●], 202\_ (the "**Effective Time**[1]"), is from [Fieldwood Energy I LLC, a Texas limited liability company / GOM Shelf LLC, a Delaware limited liability company], with an office at [●] ("**Assignor**") to [Fieldwood Energy II LLC, a Delaware limited liability company, with an office at 2000 West Sam Houston Parkway South, Suite 1200, Houston, Texas 77042] ("**Assignee**").  Assignor and Assignee are sometimes individually referred to herein as, a "**Party**" and collectively referred to herein as, the "**Parties**".

FOR Ten Dollars ($10.00) and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Assignor hereby GRANTS, BARGAINS, SELLS, CONVEYS and ASSIGNS to Assignee the Assigned Interest (as defined below), reserving unto Assignor the ORRI.

TO HAVE AND TO HOLD the Assigned Interest under Assignee subject to the ORRI and the following terms and conditions:

1.      As used in this Assignment, the following terms shall have the meanings ascribed to them below:

"Affiliate" means, with respect to any Person, any other Person that, directly or indirectly, controls, is controlled by or is under common control with, such specified Person through one (1) or more intermediaries or otherwise; provided, however, that, for the purposes of this Agreement, Assignor shall not be deemed an Affiliate of Assignee, and *vice versa*.  For the purposes of this definition, "control" means, where used with respect to any Person, the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities, by contract or otherwise, and the terms "controlling" and "controlled" have correlative meanings.

"Assigned Interest" means (subject to and excluding (i) the ORRI and (ii) all of Assignor's rights, title, and interests in and to all Other Wells) (a) one hundred percent (100%) of Assignor's right, title, and interest as of the Effective Time in and to the Prospect Area until Assignee has reached the Recovery Threshold with respect to the Well and (b) from and after such time that Assignee has reached the Recovery Threshold with respect to such Well, automatically reducing to fifty percent (50%) of Assignor's rights, title, and interest as of the Effective Time in and to the Prospect Area.

"Decommissioning Agreement" means the Decommissioning Agreement dated September 30, 2013 by and among Apache Corporation, Apache Shelf, Inc., Apache Deepwater LLC, and Apache Shelf Exploration LLC, collectively as Seller, and Fieldwood Energy LLC and GOM Shelf LLC, collectively as Buyer, as such has been amended from time to time.

---

[1] Note to Draft: Effective Time shall be the date the Proposal was made.

"Existing Burdens" has the meaning given such term in the Farmout Agreement, as such is applied to Assignor's interest in the Well immediately prior to the Effective Time.

"Farmout Agreement" means that certain Farmout Agreement dated [●] by and between Fieldwood Energy I LLC and GOM Shelf, collectively as Owner, and [Fieldwood Energy II LLC].

"Leases" means the oil and gas lease(s) described on Exhibit "A" attached hereto and made a part hereof.

"ORRI" means, with respect to the Assigned Interest, an overriding royalty interest equal to twenty-five percent (25%) less Existing Burdens proportionately reduced to the Assigned Interest, as applicable and further proportionately reduced as the Assigned Interest may be reduced pursuant to the terms of the Farmout Agreement as a result of Assignee achieving the Recovery Threshold.

"Other Wells" means any and all wells located within the Prospect Area as of the Effective Time other than the Well.

"Person" means an individual, corporation, partnership, limited liability company, association, joint stock company, trust or trustee thereof, estate or executor thereof, unincorporated organization, joint venture, or any other legally recognizable entity.

"Project" means the Project (as defined in the Farmout Agreement) with respect to the Well.

"Proposal" has the meaning given such term in the Farmout Agreement.

"Prospect Area" means the Leases, limited as to the lands described on Exhibit "B" attached hereto and made a part hereof, limited in depth from the stratigraphic equivalent of the top of the formation found at [●] feet TVDSS as identified on the [●] log down to and including the stratigraphic equivalent of 100 feet below the base of the formation, as such base is found at [●] feet TVDSS as identified on the [●] log.

"Recovery Threshold" means, with respect to the Well, Assignee's recovery from the Assigned Interest an amount equal to one hundred percent (100%) of the Well Costs incurred by Assignee with respect to such Project.

"Third Party" means any Person who is not a Party or any Affiliate of any Party.

"Well" means the [●] well, API No. _____ , located on OCS _____ [●].

"Well Costs" means, to the extent attributable to Assignor's right, title, and interest in and to the Well, any and all out-of-pocket costs and expenses incurred in (i) drilling, evaluating, completing, and equipping the Well and (ii) conducting all other operations set forth in the applicable Proposal for such Well, including, without limitation, all reasonable Third Party engineering costs, legal costs, and permitting costs, but excluding overhead and general and administrative costs.

#93828438v9

2.      <u>Agreements</u>.   This Assignment is made subject to and is burdened by the Existing Burdens and the terms of the Farmout Agreement.

3.      <u>ORRI</u>.   The ORRI is expressly reserved unto Assignor hereunder and shall be a non-operating, non-expense-bearing, overriding royalty interest, free of cost and expense of production, operations, marketing, and delivery of the hydrocarbons to the applicable delivery points.

4.      <u>Warranties</u>.   EXCEPT AS PROVIDED IN THE FOLLOWING SENTENCES, THIS ASSIGNMENT IS MADE, AND THE ASSIGNED INTEREST IS CONVEYED AND ASSIGNED HEREUNDER, WITHOUT REPRESENTATION OR WARRANTY OF ANY KIND OR CHARACTER, INCLUDING, WITHOUT LIMITATION, WARRANTIES OF TITLE, FITNESS FOR ANY PARTICULAR PURPOSE, MARKETABILITY, MERCHANTABILITY, FREEDOM FROM DEFECTS, QUALITY OR PRESENCE OF HYDROCARBONS OR RESERVES, AND ANY OTHER REPRESENTATIONS AND WARRANTIES, EXPRESS OR IMPLIED, AT LAW OR IN EQUITY; AND ASSIGNOR DOES HEREBY DISCLAIM AND ASSIGNEE WAIVES ANY AND ALL SUCH REPRESENTATIONS OR WARRANTIES.  THE ASSIGNED INTEREST IS CONVEYED AND ASSIGNED TO AND ACCEPTED BY ASSIGNEE IN ITS "AS IS, WHERE IS" CONDITION AND STATE OF REPAIR, AND WITH ALL FAULTS AND DEFECTS, WITHOUT ANY REPRESENTATION, WARRANTY, OR COVENANT OF ANY KIND OR NATURE, EXPRESS, IMPLIED OR STATUTORY.  NOTWITHSTANDING ANY OF THE FOREGOING, ASSIGNOR WARRANTS THAT THE ASSIGNED INTEREST ARE BEING ASSIGNED TO ASSIGNEE FREE AND CLEAR OF ANY AND ALL MORTGAGES, LIENS, AND ENCUMBRANCES CREATED BY, THROUGH, OR UNDER FIELDWOOD ENERGY LLC, ASSIGNOR OR ANY AFFILIATE OF EITHER ENTITY.  ASSIGNOR AND ASSIGNEE EXPRESSLY AGREE AND UNDERSTAND THAT THIS ASSIGNMENT IS MADE PURSUANT TO THE FARMOUT AGREEMENT AND, AS SUCH, IS SUBJECT TO THE TERMS OF SECTION 7.4 OF THE DECOMMISSIONING AGREEMENT SO THAT THE ASSIGNED INTERESTS TRANSFERRED TO ASSIGNEE HEREUNDER SHALL NOT BE SUBJECT TO THE TRUST A NPI OR THE TRUST A-1 NPI, AS SUCH TERMS ARE DEFINED IN THE FARMOUT AGREEMENT; PROVIDED HOWEVER, THAT ALL OF ASSIGNOR'S RIGHTS, TITLE, AND INTERESTS IN AND TO THE PROSPECT AREA NOT ASSIGNED TO ASSIGNEE HEREUNDER, INCLUDING SUCH RIGHTS, TITLE, AND INTERESTS HELD BY ASSIGNOR FROM AND AFTER THE TIME ASSIGNEE HAS REACHED THE RECOVERY THRESHOLD WITH RESPECT TO THE WELL SHALL REMAIN SUBJECT TO THE TRUST A NPI AND THE TRUST A-1 NPI.

5.      <u>Compliance with Laws</u>.   This Assignment is made subject to all applicable laws, statutes, ordinances, permits, decrees, orders, judgments, rules, and regulations that are promulgated, issued or enacted by a governmental entity having jurisdiction, and Assignee agrees to comply with the same on and after the Effective Time.

6.      <u>Successors and Assigns</u>.   The terms, covenants, and conditions contained in this Assignment are binding upon and inure to the benefit of the Parties and their respective successors and assigns, and such terms, covenants, and conditions are covenants running with the land and with each subsequent transfer or assignment of the Assets or any part thereof.

7.      <u>Redhibition Waiver</u>.   ASSIGNEE: (I) WAIVES ALL RIGHTS IN REDHIBITION PURSUANT TO LOUISIANA CIVIL CODE ARTICLES 2520, ET SEQ.; (II) ACKNOWLEDGES THAT THIS EXPRESS WAIVER SHALL BE CONSIDERED A MATERIAL AND INTEGRAL PART OF THIS SALE AND THE CONSIDERATION THEREOF; AND (III) ACKNOWLEDGES THAT THIS WAIVER HAS BEEN BROUGHT TO THE ATTENTION OF

#93828438v9

ASSIGNEE, HAS BEEN EXPLAINED IN DETAIL AND THAT ASSIGNEE HAS VOLUNTARILY AND KNOWINGLY CONSENTED TO THIS WAIVER OF WARRANTY OF FITNESS AND WARRANTY AGAINST REDHIBITORY VICES AND DEFECTS FOR INTERESTS ASSIGNED AND CONVEYED HEREUNDER.

8. <u>UTPCPL Waiver</u>. TO THE EXTENT APPLICABLE TO THE ASSIGNED INTEREST OR ANY PORTION THEREOF, ASSIGNEE HEREBY WAIVES THE PROVISIONS OF THE LOUISIANA UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION LAW (LA. R.S. 51:1402, *ET SEQ.*). ASSIGNEE WARRANTS AND REPRESENTS THAT IT: (I) IS EXPERIENCED AND KNOWLEDGEABLE WITH RESPECT TO THE OIL AND GAS INDUSTRY GENERALLY AND WITH TRANSACTIONS OF THIS TYPE SPECIFICALLY; (II) POSSESSES THE REQUISITE KNOWLEDGE, EXPERIENCE, AND EXPERTISE TO EVALUATE INDEPENDENTLY THE MERITS AND RISKS OF THE TRANSACTIONS HEREIN CONTEMPLATED; AND (III) IS NOT IN A SIGNIFICANTLY DISPARATE BARGAINING POSITION.

9. <u>Further Assurances</u>. Each Party covenants and agrees to execute and deliver to the other Party all such additional reasonable instruments and other documents and will do all such other reasonable acts and things as may be reasonably necessary to accomplish the intent of this Assignment.

10. <u>Governing Law</u>. This Assignment shall be governed and construed in accordance with the Laws of the State of Texas, without regard to the Laws that might be applicable under conflicts of laws principles.

11. <u>Jurisdiction and Venue</u>. Each Party consents to personal jurisdiction in any action brought in the United States federal and state courts located in the State of Texas with respect to any dispute, claim, or controversy arising out of or in relation to or in connection with this Assignment, and each of the Parties hereto agrees that any action with respect to any such dispute, controversy, or claim will be determined exclusively in a state or federal district court located in Harris County, Texas, and they do hereby irrevocably submit to the exclusive jurisdiction of such courts for such purposes. Each Party hereby irrevocably waives, to the fullest extent permitted by law, any objection which they may now or hereafter have to the venue of any such dispute arising out of this assignment brought in such court or any defense of inconvenient forum for the maintenance of such dispute.

12. <u>BOEM Assignment Form</u>. The Parties acknowledge and agree that this Assignment may be attached to a Form BOEM-0151 or other assignment form required by a governmental authority (a "<u>Government Required Form</u>"). The Parties agree that, to the extent of any conflict between this Assignment and any such Government Required Form the Parties may execute in connection herewith, such Government Required Form shall control to extent required by applicable law for the Bureau of Ocean Energy Management (or other applicable governmental authority) to approve the Parties' assignment hereunder.

13. <u>Counterparts</u>. This Assignment may be executed in any number of counterparts and each of such counterparts shall for all purposes be deemed to be an original, and all such counterparts shall together constitute but one and the same Assignment.

*[Signature Pages to Follow]*

#93828438v9

EXECUTED by Assignor in the presence of the undersigned competent witnesses on the date and year referenced in the notarial acknowledgment below, but effective as of the Effective Time.

**WITNESSES:**

**ASSIGNOR:**

**[FIELDWOOD ENERGY I LLC / GOM SHELF LLC]**

_____

Name: _____

By: _____
Name: _____
Title: _____

_____

Name: _____

STATE OF [●]                          §
                                      §
COUNTY OF [●]                         §

On this \_\_\_\_ day of _____, 202\_, before me, the undersigned notary public in and for the foregoing jurisdiction, appeared [●] to me personally known, who, being by me duly sworn (or affirmed) did say that [he/she] is the [●] of [Fieldwood Energy I LLC / GOM Shelf LLC], a [Texas / Delaware] limited liability company, and that the instrument was signed on behalf of the limited liability company and by the authority of its governing authority and that [he/she] acknowledged the instrument to be the free act and deed of the limited liability company.

_____
NOTARY PUBLIC
STATE OF [●]
COUNTY OF [●]
Printed Name: _____
Notarial Commission No._____
My commission expires: _____

EXECUTED by Assignee in the presence of the undersigned competent witnesses on the date and year referenced in the notarial acknowledgment below, but effective as of the Effective Time.

<div align="center"><strong><u>ASSIGNEE:</u></strong></div>

**WITNESSES:**                                 **[FIELDWOOD ENERGY II LLC]**

_____

Name: _____

By: _____

Name: _____

Title: _____

_____

Name: _____

| | |
|---|---|
| STATE OF [●] | § |
| | § |
| COUNTY OF [●] | § |

On this \_\_\_\_ day of _____, 202\_, before me, the undersigned notary public in and for the foregoing jurisdiction, appeared [●] to me personally known, who, being by me duly sworn (or affirmed) did say that [he/she] is the [●] of [Fieldwood Energy II LLC, a Delaware limited liability company], and that the instrument was signed on behalf of the limited liability company and by the authority of its governing authority and that [he/she] acknowledged the instrument to be the free act and deed of the limited liability company.

_____

NOTARY PUBLIC

STATE OF [●]

COUNTY OF [●]

Printed Name: _____

Notarial Commission No._____

My commission expires: _____

#93828438v9

**EXHIBIT "A"**

**ATTACHED TO AND MADE A PART OF THAT CERTAIN ASSIGNMENT AND BILL OF SALE DATED [●] BY AND BETWEEN [FIELDWOOD ENERGY I LLC / GOM SHELF LLC], AS ASSIGNOR, AND [FIELDWOOD ENERGY II LLC], AS ASSIGNEE**

**THE LEASES**

#93828438v9

**EXHIBIT "B"**

**ATTACHED TO AND MADE A PART OF THAT CERTAIN ASSIGNMENT AND BILL OF SALE DATED [●] BY AND BETWEEN [FIELDWOOD ENERGY I LLC / GOM SHELF LLC], AS ASSIGNOR, AND [FIELDWOOD ENERGY II LLC], AS ASSIGNEE**

**THE PROSPECT AREA**

#93828438v9

EXHIBIT "D"

Attached to and made a part of that certain Farmout Agreement dated effective _____ \_\_, 202\_, by and between _____, as Operator, and _____, as Non-Operators

# OFFSHORE OPERATING AGREEMENT

## _____

## (OPERATOR)

## AND

## _____,

## _____, and _____

## (NON-OPERATORS)

## COVERING

## [_____]

## EFFECTIVE _____, 20\_\_

# Table of Contents

**ARTICLE 1 – APPLICATION** ..........................................................................................................1

1.1      APPLICATION TO EACH LEASE ........................................................................................1

**ARTICLE 2 – DEFINITIONS** ...........................................................................................................1

2.1      ADDITIONAL TESTING .....................................................................................................1
2.2      AFFILIATE ......................................................................................................................1
2.3      AUTHORIZATION FOR EXPENDITURE (AFE) ...................................................................1
2.4      BOEMRE .....................................................................................................................1
2.5      COMPLETE, COMPLETING, COMPLETION .........................................................................1
2.6      COMPLETION EQUIPMENT ..............................................................................................1
2.7      CONFIDENTIAL DATA .....................................................................................................2
2.8      DEEPEN, DEEPENING ......................................................................................................2
2.9      DEVELOPMENT FACILITIES .............................................................................................2
2.10    DEVELOPMENT OPERATION ............................................................................................2
2.11    DEVELOPMENT WELL .....................................................................................................2
2.12    EXPLORATORY OPERATION .............................................................................................2
2.13    EXPLORATORY WELL .....................................................................................................2
2.14    EXPORT PIPELINES .........................................................................................................2
2.15    FORCE MAJEURE ............................................................................................................2
2.16    HYDROCARBONS ............................................................................................................2
2.17    JOINT ACCOUNT ............................................................................................................2
2.18    LEASE ...........................................................................................................................3
2.19    NON-CONSENT OPERATION .............................................................................................3
2.20    NON-CONSENT PLATFORM .............................................................................................3
2.21    NON-CONSENT WELL .....................................................................................................3
2.22    NON-OPERATOR(S) .........................................................................................................3
2.23    NON-PARTICIPATING PARTY ...........................................................................................3
2.24    NON-PARTICIPATING PARTY'S SHARE .............................................................................3
2.25    OBJECTIVE DEPTH ..........................................................................................................3
2.26    OBJECTIVE HORIZON ......................................................................................................3
2.27    OFFSITE HOST FACILITIES ..............................................................................................3
2.28    OPERATOR .....................................................................................................................3
2.29    PARTICIPATING INTEREST ...............................................................................................3
2.30    PARTICIPATING PARTY ...................................................................................................3
2.31    PLATFORM .....................................................................................................................3
2.32    PRODUCIBLE RESERVOIR ................................................................................................3
2.33    PRODUCIBLE WELL ........................................................................................................4
2.34    PRODUCTION INTERVAL ..................................................................................................4
2.35    RECOMPLETE, RECOMPLETING, RECOMPLETION ..............................................................4
2.36    REWORK, REWORKING ...................................................................................................4
2.37    SIDETRACK, SIDETRACKING ...........................................................................................4
2.38    TAKE-IN-KIND FACILITIES .............................................................................................4
2.39    TRANSFER OF INTEREST ..................................................................................................4
2.40    WORKING INTEREST ......................................................................................................4

**ARTICLE 3 – EXHIBITS** ................................................................................................................4

3.1      EXHIBITS .......................................................................................................................4

1

3.1.1 Exhibit "A" ....................................................................................................4
3.12 Exhibit "B" .......................................................................................................5
3.13 Exhibit "C" ........................................................................................................5
3.14 Exhibit "D" .......................................................................................................5
3.15 Exhibit "E" ........................................................................................................5
3.16 Exhibit "F" ........................................................................................................5
3.2 CONFLICTS ...........................................................................................................5

**ARTICLE 4 – OPERATOR** ...............................................................................................5

4.1 OPERATOR .............................................................................................................5
4.2 CIRCUMSTANCES UNDER WHICH OPERATOR MUST CONDUCT A NON-CONSENT OPERATION .......5
4.3 OPERATOR'S CONDUCT OF A NON-CONSENT OPERATION IN WHICH IT IS A NON-PARTICIPATING PARTY .....5
4.4 RESIGNATION OF OPERATOR ...................................................................................5
4.5 REMOVAL OF OPERATOR .......................................................................................6
4.6 SELECTION OF SUCCESSOR ....................................................................................6
4.7 EFFECTIVE DATE OF RESIGNATION OR REMOVAL .....................................................6
4.8 DELIVERY OF PROPERTY ........................................................................................6

**ARTICLE 5 – AUTHORITY AND DUTIES OF OPERATOR** .............................................7

5.1 EXCLUSIVE RIGHT TO OPERATE ..............................................................................7
5.2 WORKMANLIKE CONDUCT ......................................................................................7
5.3 LIENS AND ENCUMBRANCES ..................................................................................7
5.4 EMPLOYEES AND CONTRACTORS ..............................................................................7
5.5 RECORDS ..............................................................................................................7
5.6 COMPLIANCE ........................................................................................................7
5.7 CONTRACTORS ......................................................................................................7
5.8 GOVERNMENTAL REPORTS .....................................................................................8
5.9 INFORMATION TO PARTICIPATING PARTIES ..............................................................8
5.10 INFORMATION TO NON-PARTICIPATING PARTIES……………………………………… …………..8

**ARTICLE 6 – VOTING AND VOTING PROCEDURES** ....................................................9

6.1 VOTING PROCEDURES ............................................................................................9
6.1.1 Voting Interest .................................................................................................9
6.1.2 Vote Required .................................................................................................9
6.1.3 Votes ...............................................................................  ......................................9
6.1.4 Meetings .........................................................................................................9

**ARTICLE 7 – ACCESS** ....................................................................................................9

7.1 ACCESS TO LEASE .................................................................................................9
7.2 REPORTS ..............................................................................................................9
7.3 CONFIDENTIALITY ..............................................................................................10
7.4 LIMITED DISCLOSURE ..........................................................................................10
7.5 LIMITED RELEASES TO OFFSHORE SCOUT ASSOCIATION .........................................10
7.6 MEDIA RELEASES ................................................................................................10

**ARTICLE 8 – EXPENDITURES** ......................................................................................11

8.1 BASIS OF CHARGE TO THE PARTIES .......................................................................11
8.2 AFES ..................................................................................................................11
8.3 EMERGENCY AND REQUIRED EXPENDITURES ..........................................................11
8.4 ADVANCE BILLINGS .............................................................................................11
8.5 COMMINGLING OF FUNDS ....................................................................................11
8.6 SECURITY RIGHTS ...............................................................................................11
8.6.1 Mortgage in Favor of Operator ......................................................................11

2

    *8.6.2 Security Interest in Favor of Operator* ...................................................... 12
    *8.6.3 Mortgage in Favor of the Non-operator Parties* ....................................... 13
    *8.6.4 Security Interest in Favor of the Non-operator(s)* ................................... 14
    *8.6.5 Recording* ................................................................................................ 15
    *8.6.6 The Memorandum of Operating Agreement and Financing Statement* ...... 16
8.7    UNPAID CHARGES AND DEFAULT ................................................................... 16
8.8    CONFESSION OF JUDGMENT; EXECUTORY PROCESS ....................................... 16

**ARTICLE 9 – NOTICES** ...................................................................................**17**

9.1    GIVING AND RECEIVING NOTICES ................................................................. 17
9.2    CONTENT OF NOTICE .................................................................................... 18
9.3    RESPONSE TO NOTICES ................................................................................ 18
    *9.3.1 Platform and/or Development Facilities Proposals* ................................. 18
    *9.3.2 Well Proposals* ........................................................................................ 18
    *9.3.3 Proposal for Multiple Operations* .......................................................... 18
    *9.3.4 Other Matters* ........................................................................................ 18
9.4    FAILURE TO RESPOND ................................................................................. 18
9.5    RESPONSE TO COUNTERPROPOSALS ............................................................. 18
9.6    TIMELY WELL OPERATIONS ........................................................................ 18
9.7    TIMELY PLATFORM / DEVELOPMENT FACILITIES OPERATIONS ..................... 19

**ARTICLE 10 – EXPLORATORY OPERATIONS** .......................................**19**

10.1    PROPOSING OPERATIONS ............................................................................ 19
10.2    COUNTERPROPOSALS .................................................................................. 19
10.3    OPERATIONS BY ALL PARTIES .................................................................... 19
10.4    SECOND OPPORTUNITY TO PARTICIPATE ..................................................... 19
10.5    OPERATIONS BY FEWER THAN ALL PARTIES ............................................... 20
    *10.5.1 First Exploratory Well* .......................................................................... 20
10.6    EXPENDITURES APPROVED .......................................................................... 20
10.7    CONDUCT OF OPERATIONS ......................................................................... 20
10.8    COURSE OF ACTION AFTER REACHING OBJECTIVE DEPTH ......................... 20
    *10.8.1 Election by Participating Parties* ......................................................... 20
    *10.8.2 Priority of Operations* ........................................................................... 21
    *10.8.3 Second Opportunity to Participate* ........................................................ 21
    *10.8.4 Operations by Fewer Than All Parties* ................................................. 21
    *10.8.5 Subsequent Operations* ......................................................................... 22
10.9    WELLS PROPOSED BELOW DEEPEST PRODUCIBLE RESERVOIR ................... 22

**ARTICLE 11 – DEVELOPMENT OPERATIONS** ......................................**23**

11.1    PROPOSING OPERATIONS ............................................................................ 23
11.2    COUNTERPROPOSALS .................................................................................. 23
11.3    OPERATIONS BY ALL PARTIES .................................................................... 23
11.4    SECOND OPPORTUNITY TO PARTICIPATE ..................................................... 23
11.5    OPERATIONS BY FEWER THAN ALL PARTIES ............................................... 23
11.6    EXPENDITURES APPROVED .......................................................................... 24
11.7    CONDUCT OF OPERATIONS ......................................................................... 24
11.8    COURSE OF ACTION AFTER REACHING OBJECTIVE DEPTH ......................... 24
    *11.8.1 Election by Fewer Than All Parties* ...................................................... 24
    *11.8.2 Priority of Operations* ........................................................................... 24
    *11.8.3 Second Opportunity to Participate* ........................................................ 25
    *11.8.4 Operations by Fewer Than All Parties* ................................................. 25
    *11.8.5 Subsequent Operations* ......................................................................... 25

3

**ARTICLE 12 – PLATFORM AND DEVELOPMENT FACILITIES** .......................................................26

12.1   PROPOSALS .............................................................................................................26
12.2   COUNTERPROPOSALS ...............................................................................................26
      12.2.1 Operations by All Parties ..............................................................................26
      12.2.2 Second Opportunity to Participate ................................................................26
      12.2.3 Operations by Fewer Than All Parties ..........................................................26
12.3   OWNERSHIP AND USE OF THE PLATFORM AND DEVELOPMENT FACILITIES ...............27
12.4   RIGHTS TO TAKE IN KIND .........................................................................................27
12.5   EXPANSION OR MODIFICATION OF A PLATFORM AND/OR DEVELOPMENT FACILITIES ...28
12.6   OFFSITE HOST FACILITIES .........................................................................................28

**ARTICLE 13 – NON-CONSENT OPERATIONS** ...........................................................................29

13.1   NON-CONSENT OPERATIONS .....................................................................................29
      13.1.1 Non-interference ...........................................................................................29
      13.1.2 Multiple Completion Limitation ...................................................................29
      13.1.3 Metering .......................................................................................................29
      13.1.4 Non-consent Well .........................................................................................29
      13.1.5 Cost Information ...........................................................................................29
      13.1.6 Completions ..................................................................................................30
13.2   RELINQUISHMENT OF INTEREST ...............................................................................30
      13.2.1 Production Reversion Recoupment ...............................................................30
      13.2.2 Non-production Reversion ............................................................................31
13.3   DEEPENING OR SIDETRACKING OF NON-CONSENT WELL ..........................................31
13.4   DEEPENING OR SIDETRACKING COST ADJUSTMENTS .................................................31
13.5   SUBSEQUENT OPERATIONS IN NON-CONSENT WELL ..................................................31
13.6   OPERATIONS IN A PRODUCTION INTERVAL ...............................................................32
13.7   OPERATIONS UTILIZING A NON-CONSENT PLATFORM AND/OR DEVELOPMENT FACILITIES ...32
13.8   DISCOVERY OR EXTENSION FROM NON-CONSENT DRILLING .......................................32
13.9   ALLOCATION OF PLATFORM / DEVELOPMENT FACILITIES COSTS TO NON-CONSENT OPERATIONS ...33
      13.9.1 Charges ........................................................................................................33
      13.9.2 Operating and Maintenance Charges ...........................................................34
13.10  ALLOCATION OF COSTS BETWEEN ZONES .................................................................34
13.11  LEASE MAINTENANCE OPERATIONS ..........................................................................34
      13.11.1 Participation in Lease Maintenance Operations ..........................................34
      13.11.2 Accounting for Non-participation ...............................................................35
13.12  RETENTION OF LEASE BY NON-CONSENT WELL .........................................................35
13.13  NON-CONSENT PREMIUMS .......................................................................................36

**ARTICLE 14 – ABANDONMENT, SALVAGE, AND SURPLUS** ....................................................36

14.1   PLATFORM SALVAGE AND REMOVAL COSTS ..............................................................36
14.2   ABANDONMENT OF PLATFORMS, DEVELOPMENT FACILITIES, OR WELLS .....................36
14.3   ASSIGNMENT OF INTEREST ......................................................................................36
14.4   ABANDONMENT OPERATIONS REQUIRED BY GOVERNMENTAL AUTHORITY ..................36
14.5   DISPOSAL OF SURPLUS MATERIAL ............................................................................37

**ARTICLE 15 – WITHDRAWAL** .................................................................................................37

15.1   RIGHT TO WITHDRAW ..............................................................................................37
15.2   RESPONSE TO WITHDRAWAL NOTICE ........................................................................37
      15.2.1 Unanimous Withdrawal ................................................................................37
      15.2.2 No Additional Withdrawing Parties .............................................................38
      15.2.3 Acceptance of the Withdrawing Parties' Interests ........................................38
      15.2.4 Effects of Withdrawal ...................................................................................38
15.3   LIMITATION ON AND CONDITIONS OF WITHDRAWAL .................................................38
      15.3.1 Prior Expenses .............................................................................................38
      15.3.2 Confidentiality .............................................................................................39

4

*15.3.3 Emergencies and Force Majeure* ........................................................................ 39

**ARTICLE 16 – RENTALS, ROYALTIES, AND OTHER PAYMENTS** .................................... **39**

16.1 OVERRIDING ROYALTY AND OTHER BURDENS ............................................................... 39
16.2 SUBSEQUENTLY CREATED INTEREST .......................................................................... 39
16.3 PAYMENT OF RENTALS AND MINIMUM ROYALTIES .......................................................... 40
16.4 NON-PARTICIPATION IN PAYMENTS ............................................................................ 40
16.5 ROYALTY PAYMENTS .............................................................................................. 40

**ARTICLE 17 - TAXES** ................................................................................................ **40**

17.1 PROPERTY TAXES ................................................................................................. 40
17.2 CONTEST OF PROPERTY TAX VALUATION ..................................................................... 41
17.3 PRODUCTION AND SEVERANCE TAXES ......................................................................... 41
17.4 OTHER TAXES AND ASSESSMENTS ............................................................................. 41

**ARTICLE 18 – INSURANCE** ......................................................................................... **41**

18.1 INSURANCE .......................................................................................................... 41
18.2 BONDS ............................................................................................................... 41

**ARTICLE 19 – LIABILITY, CLAIMS, AND LAWSUITS** ...................................................... **41**

19.1 INDIVIDUAL OBLIGATIONS ....................................................................................... 41
19.2 NOTICE OF CLAIM OR LAWSUIT ............................................................................... 41
19.3 SETTLEMENTS ...................................................................................................... 42
19.4 DEFENSE OF CLAIMS AND LAWSUITS ......................................................................... 42
19.5 LIABILITY FOR DAMAGES ....................................................................................... 42
19.6 INDEMNIFICATION FOR NON-CONSENT OPERATIONS ........................................................ 42
19.7 DAMAGE TO RESERVOIR, LOSS OF RESERVES AND PROFIT ............................................... 42
19.8 NON-ESSENTIAL PERSONNEL .................................................................................... 43

**ARTICLE 20 – INTERNAL REVENUE PROVISION** ............................................................ **43**

20.1 INTERNAL REVENUE PROVISION ................................................................................ 43

**ARTICLE 21 – CONTRIBUTIONS** .................................................................................. **43**

21.1 NOTICE OF CONTRIBUTIONS OTHER THAN ADVANCES FOR SALE OF PRODUCTION ................... 43
21.2 CASH CONTRIBUTIONS ............................................................................................ 43
21.3 ACREAGE CONTRIBUTIONS ....................................................................................... 43

**ARTICLE 22 – DISPOSITION OF PRODUCTION** .............................................................. **44**

22.1 TAKE-IN-KIND FACILITIES ...................................................................................... 44
22.2 DUTY TO TAKE IN KIND ......................................................................................... 44
22.3 FAILURE TO TAKE OIL AND CONDENSATE IN KIND ......................................................... 44
22.4 FAILURE TO TAKE GAS IN KIND ............................................................................... 44
22.5 EXPENSES OF DELIVERY IN KIND ............................................................................. 45

**ARTICLE 23 – APPLICABLE LAW, JURISDICTION, AND VENUE** ......................................... **45**

23.1 APPLICABLE LAW ................................................................................................. 45
23.2 JURISDICTION AND VENUE ...................................................................................... 45

**ARTICLE 24 – LAWS, REGULATIONS, AND NONDISCRIMINATION** ..................................... **45**

24.1 LAWS AND REGULATIONS ....................................................................................... 45
24.2 NONDISCRIMINATION ............................................................................................. 45

**ARTICLE 25 – FORCE MAJEURE** ................................................................................ **45**

25.1 FORCE MAJEURE .................................................................................................. 45

5

**ARTICLE 26 – SUCCESSORS AND ASSIGNS** ................................................................**46**

26.1    TRANSFER OF INTEREST .................................................................................. 46
      *26.1.1 Exceptions to Transfer Notice* ....................................................... 46
      *26.1.2 Effective Date of Transfer of Interest* ........................................... 46
      *26.1.3 Form of Transfer of Interest* ........................................................ 46
      *26.1.4 Warranty* ....................................................................................... 47

**ARTICLE 27 – ADMINISTRATIVE PROVISIONS**................................................**47**

27.1    TERM ............................................................................................................... 47
27.2    WAIVER ........................................................................................................... 47
27.3    WAIVER OF RIGHT TO PARTITION .................................................................. 47
27.4    COMPLIANCE WITH LAWS AND REGULATIONS ............................................. 47
      *27.4.1 Severance of Invalid Provisions* ................................................... 47
      *27.4.2 Fair and Equal Employment* ......................................................... 48
27.5    CONSTRUCTION AND INTERPRETATION OF THIS AGREEMENT ..................... 48
      *27.5.1 Headings for Convenience* ............................................................ 48
      *27.5.2 Article References*......................................................................... 48
      *27.5.3 Gender and Number* ...................................................................... 48
      *27.5.4 Future References*.......................................................................... 48
      *27.5.5 Currency* ....................................................................................... 48
      *27.5.6 Optional Provisions*...................................................................... 48
      *27.5.7 Joint Preparation* ......................................................................... 48
      *27.5.8 Integrated Agreement* ................................................................... 48
      *27.5.9 Binding Effect*............................................................................... 49
      *27.5.10 Further Assurances* ..................................................................... 49
      *27.5.11 Counterpart Execution* ............................................................... 49
27.6    RESTRICTED BIDDING ..................................................................................... 49
27.7    GOVERNING AGREEMENT ............................................................................... 49

**EXHIBIT "A"** ................................................................................................................**1**

**EXHIBIT "B"** *(Insurance Provisions)*........................................................................**1**

**EXHIBIT "C" (COPAS)** ..............................................................................................**1**

**EXHIBIT "D"** *(Non-Discrimination Provisions)*........................................................**1**

**EXHIBIT "E"** *(Gas Balancing Provisions)* ...............................................................**1**

6

# OFFSHORE OPERATING AGREEMENT

This Offshore Operating Agreement (the "Agreement'), made effective the___ day of_____, 20__, by the signers hereof, their respective heirs, successors, legal representatives, and assigns, herein referred to collectively as the "Parties" and individually as a "Party".

WHEREAS, the Parties own or control a leasehold interest in the Lease identified in Exhibit "A" and desire to explore, develop, produce, and operate the Lease pursuant to this Agreement.

NOW, THEREFORE, in consideration of the foregoing premises and the mutual covenants in this Agreement, along with other good and valuable consideration, the receipt of which is hereby acknowledged, the Parties agree as follows:

## ARTICLE 1
## APPLICATION

**1.1     Application to Each Lease**

This Agreement applies separately to each oil and gas Lease or portion thereof described in Exhibit "A".

## ARTICLE 2
## DEFINITIONS

**2.1     Additional Testing**

An operation not previously approved in the AFE and proposed for the specific purpose of obtaining additional subsurface data.

**2.2     Affiliate**

For a person, another person that controls, is controlled by, or is under common control with that person. In this definition, (a) "control" means the ownership by one (1) person, directly or indirectly, of more than fifty percent (50%) of the voting securities of a corporation or, for other persons, the equivalent ownership interest (such as partnership interests), and (b) "person" means an individual, corporation, partnership, trust, estate, unincorporated organization, association, or other legal entity.

**2.3     Authorization for Expenditure (AFE)**

An authority to expend funds prepared by a Party to estimate the costs to be incurred in conducting an operation under this Agreement.

**2.4     BOEMRE**

1

The Bureau of Ocean Energy Management and/or Bureau of Safety and Environmental Enforcement, United States Department of Interior, or their successor agency. Where appropriate, the reference to BOEMRE shall include the appropriate state agency.

**2.5     Complete, Completing, Completion**

An operation to complete a well for initial Hydrocarbon production in one (1) or more Producible Reservoirs, including but not limited to setting production casing, perforating the casing, stimulating the well, installing Completion Equipment, and/or conducting production tests.

**2.6     Completion Equipment**

That certain equipment on an Exploratory Well or a Development Well required to be installed before the movement of a well-completion rig off that well:

(a)     under 30 CFR 250.502, or any succeeding order or regulation issued by the BOEMRE, up to and including the tree, and

(b)     by any other regulatory agency having jurisdiction, including but not limited to a caisson and navigational aids.

**2.7     Confidential Data**

The information and data obtained under this Agreement, including but not limited to geological, geophysical, and reservoir information; originals and copies of logs; core and core analysis; and other well information including but not limited to the progress, tests, or results of a well drilled or an operation conducted under this Agreement, except data or information that becomes public other than by breach of this Agreement or as agreed to in writing by the Participating Parties.

**2.8     Contract Area**

The "Contract Area" described in Exhibit "A".

**2.9     Deepen, Deepening**

A drilling operation conducted in an existing wellbore below the Objective Depth to which the well was previously drilled.

**2.9     Development Facilities**

Production equipment other than Completion Equipment that is installed on or outside the Lease in order to handle or process Hydrocarbon production. Development Facilities include, but are not limited to:

(a)     compression, separation, dehydration, generators, treaters, skimmers, bunkhouses, and metering equipment;

(b)     the flowlines, gathering lines, or lateral lines that deliver Hydrocarbons and water

1     from the Completion Equipment to the Platform or to Offsite Host Facilities, or

2     from the Platform to Export Pipelines; and

(c)     injection and disposal wells.

**2.10    Development Operation**

An operation on the Lease other than an Exploratory Operation.

2

**2.11    Development Well**

A well or portion of a well proposed as a Development Operation.

**2.12    Exploratory Operation**

An operation that is conducted on the Lease and that is any of the following:

(a)        proposed to Complete an Exploratory Well;

(b)        proposed for an Objective Horizon that is not a Producible Reservoir; or

(c)        proposed for an Objective Horizon that has a Producible Well, but that will be penetrated at a location where the distance between the midpoint of the Objective Horizon to be penetrated by the proposed operation and the midpoint of the same Objective Horizon where it is actually penetrated by a Producible Well will be at least two thousand (2,000) feet for a gas Completion and at least one thousand (1,000) feet for an oil Completion.

**2.13    Exploratory Well**

A well or portion of a well proposed as an Exploratory Operation.

**2.14    Export Pipelines**

Pipelines to which a gathering line or lateral line downstream of the Platform and/or Development Facilities or, if there is no Platform, the Completion Equipment, is connected and that are used to transport Hydrocarbons or produced water to shore.

**2.15    Force Majeure**

An event or cause that is reasonably beyond the control of the Party claiming the existence of such event or cause and that reasonably prevents such Party from fulfilling its obligations under this Agreement,  including, but not limited to, a flood, a storm, a hurricane, a loop current/eddy, or other act of God, a fire, loss of well control, an oil spill, or other environmental catastrophe, a war, a terrorist act, a civil disturbance, a labor dispute, a strike, a lockout, compliance with a law, order, rule, or regulation, governmental action or delay in granting necessary permits or permit approvals, and the inability to secure materials or a rig.

**2.16    Hydrocarbons**

Oil and/or gas and associated liquid and gaseous by-products (except helium) that may be produced from a wellbore located on the Lease.

**2.17    Joint Account**

This term has the same definition as the defined term "Joint Account" in Exhibit "C" (Accounting Procedure).

**2.18    Lease**

Each oil and gas lease identified in Exhibit "A" and the lands covered by that lease.

**2.19    Non-consent Operation**

An operation conducted on the Lease by fewer than all Parties, which subjects the Non-participating Party to Article 13 (Non-Consent Operations).

**2.20    Non-consent Platform**

3

A Platform owned by fewer than all Parties.

**2.21 Non-consent Well**

An Exploratory Well or a Development Well owned by fewer than all Parties.

**2.22 Non-operator(s)**

A Party other than Operator.

**2.23 Non-participating Party**

A Party other than a Participating Party.

**2.24 Non-participating Party's Share**

The Participating Interest that a Non-participating Party would have had if all Parties had participated in the operation.

**2.25 Objective Depth**

A depth sufficient to test the lesser of the Objective Horizon or the specific footage depth stated in the AFE and approved by the Participating Parties.

**2.26 Objective Horizon**

The interval consisting of the deepest zone, formation, or horizon to be tested in an Exploratory Well, Development Well, Deepening operation, or Sidetracking operation, as stated in the AFE and approved by the Participating Parties.

**2.27 Offsite Host Facilities**

Development and handling facilities that (a) are located off the Lease and (b) are either owned by one (1) or more third parties or by one (1) or more Participating Parties in a well, whose interests in the development and handling facilities differ from their respective Working Interest shares in the well.

**2.28 Operator**

The Party designated as Operator pursuant to Article 4 of this Agreement.

**2.29 Participating Interest**

The percentage of the costs and risks of conducting an operation under this Agreement that a Participating Party agrees, or is otherwise obligated, to pay and bear.

**2.30 Participating Party**

A Party that executes an AFE for a proposed operation or otherwise agrees, or becomes liable, to pay and bear a share of the costs and risks of conducting an operation under this Agreement.

**2.31 Platform**

An offshore structure on the Lease that supports Wells, Completion Equipment, or Development Facilities, whether fixed, compliant, or floating, and the components of that structure, including but not limited to caissons or well protectors to the extent that same are not Completion Equipment, rising above the water line and used for the exploration, development, or production of Hydrocarbons.   The term "Platform" shall also mean any offshore equipment or template (excluding templates used for drilling operations) and any component thereof, other than

4

Completion Equipment (including but not limited to flow lines and control systems), that is resting on or attached to the sea floor and used to obtain production of Hydrocarbons.

**2.32    Producible Reservoir**

An underground accumulation of Hydrocarbons (a) in a single and separate natural pool characterized by a distinct pressure system, (b) not in Hydrocarbon communication with another accumulation of Hydrocarbons, and (c) into which a Producible Well has been drilled.

**2.33    Producible Well**

A well that is drilled under this Agreement and that (a) is producing Hydrocarbons; (b) is determined to be, or meets the criteria for being determined to be, capable of producing Hydrocarbons in paying quantities under an applicable order or regulation issued by the governmental authority having jurisdiction; or (c) is determined to be a Producible Well by one (1) or more Participating Parties having a combined Working Interest of fifty percent (50%) or more, even if the well has been plugged and permanently or temporarily abandoned.

**2.34    Production Interval**

A zone or interval producing or capable of producing Hydrocarbons from a well without Reworking operations.

**2.35    Recomplete, Recompleting, Recompletion**

An operation whereby a Completion in one (1) Producible Reservoir is abandoned in order to attempt a Completion in a different Producible Reservoir within the existing wellbore.

**2.36    Rework, Reworking**

An operation conducted in a well, after it has been Completed in one (1) or more Producible Reservoirs, to restore, maintain, or improve Hydrocarbon production from one (1) or more of those Producible Reservoirs, but specifically excluding drilling, Sidetracking, Deepening, Completing, or Recompleting the well.

**2.37    Sidetrack, Sidetracking**

The directional control and intentional deviation of a well to change the bottom-hole location, whether it be to the original Objective Depth or formation or another bottom-hole location not deeper than the stratigraphic equivalent of the initial Objective Depth, unless the intentional deviation is done to straighten the hole or to drill around junk in the hole or to overcome other mechanical difficulties.

**2.38    Take-in-Kind Facilities**

Facilities that (i) are not paid for by the Joint Account and (ii) are installed for the benefit and use of a particular Party or Parties to take its or their share of Hydrocarbon production in kind.

**2.39    Transfer of Interest**

A conveyance, assignment, transfer, farmout, exchange, or other disposition of all or part of a Party's Working Interest.

**2.40    Working Interest**

5

The record title interest, or where applicable, the operating rights of each Party in and to each Lease (expressed as the percentage provided in Exhibit "A").  If a Party's record title interest is different from its operating rights, the Working Interest of each Party is the interest provided in Exhibit "A".

Any capitalized terms used herein, but not defined herein, shall have the meaning attributable to them in that certain Farmout Agreement dated effective _____ __, 20__, by and between _____, _____, _____, _____ and _____ (the "Farmout Agreement").


# ARTICLE 3
# EXHIBITS

**3.1**    **Exhibits**

The following exhibits are attached to this Agreement and incorporated into this Agreement by reference:

**3.1.1**    **Exhibit "A"**

Operator, Description of Lease, Division of Interests, and Notification Addresses


**3.1.2**    **Exhibit "B"**

Insurance provisions.

**3.1.3**    **Exhibit "C"**

Accounting procedure.

**3.1.4**    **Exhibit "D"**

Non-discrimination Provisions.

**3.1.5**    **Exhibit "E"**

Gas Balancing Agreement.

**3.1.6**    **Exhibit "F"**

Memorandum of Operating Agreement and Financing Statement.

**3.2**    **Conflicts**

If a provision of an exhibit, except Exhibits "D" or "E" is inconsistent with a provision in the body of this Agreement, the provision in the body of this Agreement shall prevail. If a provision of Exhibit "D" or "E" is inconsistent with a provision in the body of this Agreement, the provision of the exhibit shall prevail.


6

# ARTICLE 4
# OPERATOR

**4.1     Operator**

_____ is designated as Operator of the Lease.  The Parties shall promptly execute and provide Operator with all documents required by the BOEMRE in connection with the designation of _____ as Operator or with the designation of any other Party as a substitute or successor Operator.  Unless agreed to the contrary by all Parties hereto, Operator shall also be classified as the designated applicant for oil spill financial responsibility purposes and each Non-operator Party shall promptly execute the appropriate documentation reflecting this designation and promptly provide same to Operator for filing with BOEMRE.

**4.2     Circumstances Under Which Operator Must Conduct a Non-Consent Operation**

If:

(a)     a drilling rig is on location and Operator becomes a Non-participating Party in a supplemental AFE for an Exploratory Operation, or Development Operation, or

(b)     Operator becomes a Non-participating Party in an operation to be conducted from a Platform operated by Operator,

Operator, as a Non-participating Party, shall conduct the Non-consent Operation on behalf of the Participating Parties and at the Participating Parties' sole cost and risk under Article 13 (Non-Consent Operations).

**4.3     Operator's Conduct of a Non-Consent Operation in Which it is a Non-participating Party**

When, under Article 4.2 (Circumstances Under Which Operator Must Conduct a Non-Consent Operation), Operator conducts a Non-consent Operation in which it is a Non-participating Party, it shall follow the practices and standards in Article 5 (Exclusive Right to Operate). Notwithstanding anything to the contrary in Exhibit "C", Operator shall not be required to proceed with the Non-consent Operation until the Participating Parties have advanced the total estimated costs of the Non-consent Operation to Operator.  Operator shall never be obligated to expend any of its own funds for the Non-consent Operation in which it is a Non-participating Party.

**4.4     Resignation of Operator**

Subject to Article 4.6 (Selection of Successor), Operator may resign at any time by giving written notice to the Parties, except that Operator may not without the other Parties' consent resign during a Force Majeure or an emergency that poses a threat to life, safety, property, or the environment.  If Operator or its Affiliates cease to own a Working Interest, Operator automatically shall be deemed to have resigned as Operator without any action by the Non-operator(s).

**4.5     Removal of Operator**

Operator may be removed by an affirmative vote of the Parties owning a combined Working Interest of fifty percent (50%) or more of the remaining Working Interest after excluding

7

#93828440v3
#93828440v5

Operator's Working Interest if:

(a)     Operator becomes insolvent or unable to pay its debts as they mature, makes an assignment for the benefit of creditors, commits an act of bankruptcy, or seeks relief under laws providing for the relief of debtors;

(b)     a receiver is appointed for Operator or for substantially all its property or affairs;

(c)     a Transfer of Interest by Operator (excluding an interest assigned to an Affiliate) reduces Operator's Working Interest to less than the Working Interest of any Non-operator, whether accomplished by one (1) or more Transfer of Interest.

(d)     Operator commits a substantial breach of a material provision of this Agreement and fails to cure the breach within thirty (30) days after notice of the breach.

**4.6     Selection of Successor**

On resignation or removal of Operator, a successor Operator shall be selected from among the Parties by an affirmative vote of one (1) or more Parties having a combined Working Interest of fifty percent (50%) or more.  If the resigned or removed Operator is not entitled to vote, fails to vote, or votes only to succeed itself, the successor Operator shall be selected by the affirmative vote of the Parties owning a combined Working Interest of fifty percent (50%) or more of the remaining Working Interest after excluding the Working Interest of the resigned or removed Operator.  If Operator assigns all or a part of its Working Interest, under Article 4.4 (Resignation of Operator) or Article 4.5(c), the Party that acquired all or a part of the former Operator's Working Interest shall not be excluded from voting for a successor Operator.  If there are only two (2) Parties to this Agreement when Operator resigns or is removed, the Non-operator automatically has the right, but not the obligation, to become Operator.  If no Party is willing to become Operator, this Agreement shall terminate under Article 27.1 (Term).

**4.7     Effective Date of Resignation or Removal**

The resignation or removal of Operator shall become effective as soon as practical but no later than 7:00 a.m. on the first day of the month following a period of ninety (90) days after the date of resignation or removal, unless a longer period is required for the Parties to obtain approval of the designation of the successor Operator, and designated applicant for oil spill financial responsibility purposes, by the BOEMRE; however, in no event shall the resignation or removal of Operator become effective until a successor Operator has assumed the duties of Operator.  The resignation or removal of the outgoing Operator shall not prejudice any rights, obligations, or liabilities resulting from its operatorship.  The successor Operator may charge the Joint Account for reasonable costs incurred in connection with copying or obtaining the former Operator's records, information, or data except when the change of Operator results from a merger, consolidation, reorganization, or sale or transfer to an Affiliate of Operator.

**4.8     Delivery of Property**

On the effective date of resignation or removal of Operator, the outgoing Operator shall deliver or

8

transfer to the successor Operator custodianship of the Joint Account and possession of all items purchased for the Joint Account under this Agreement, all Hydrocarbons that are not the separate property of a Party, and all equipment, materials, and appurtenances purchased for the Joint Account under this Agreement, which are not already in the possession of the successor Operator.   The outgoing Operator shall further use its reasonable efforts to transfer to the successor Operator, as of the effective date of the resignation or removal, its rights as Operator under all contracts exclusively relating to the activities or operations conducted under this Agreement, and the successor Operator shall assume all obligations of Operator that are assignable under the contracts.   The Parties may audit the Joint Account and conduct an inventory of all property and all Hydrocarbons that are not the separate property of a Party, and the inventory shall be used in the accounting to all Parties by the outgoing Operator of the property and the Hydrocarbons that are not the separate property of a Party.  The inventory and audit shall be conducted under Exhibit "C".

# ARTICLE 5
## AUTHORITY AND DUTIES OF OPERATOR

**5.1     Exclusive Right to Operate**

Unless otherwise provided in this Agreement, Operator shall have the exclusive right and duty to conduct operations (or cause them to be conducted) under this Agreement.   In performing services under this Agreement for the Non-operators, Operator shall be an independent contractor, not subject to the control or direction of Non-operators, except for the type of operation to be undertaken in accordance with the voting and election procedures in this Agreement.   No Party shall be deemed to be, or hold itself out as, the agent or fiduciary of another Party.

**5.2     Workmanlike Conduct**

Operator shall timely commence and conduct all operations in a good and workmanlike manner, as would a prudent operator under the same or similar circumstances.  OPERATOR SHALL NOT BE LIABLE TO NON-OPERATORS FOR LOSSES SUSTAINED OR LIABILITIES INCURRED, EXCEPT AS MAY RESULT FROM OPERATOR'S GROSS NEGLIGENCE OR WILLFUL MISCONDUCT.  Operator shall never be required under this Agreement to conduct an operation that it believes would be unsafe or would endanger persons, property, or the environment. Unless otherwise provided in this Agreement, Operator shall consult with Non-operators and keep them informed of all important matters.

**5.3     Liens and Encumbrances**

Operator shall endeavor to keep the Lease, wells, Platforms, Development Facilities, and other equipment free from all liens and other encumbrances occasioned by operations hereunder,

9

except those provided in Article 8.6 (Security Rights).

**5.4      Employees and Contractors**

Operator shall select employees and contractors and determine their number, hours of labor, and compensation.

**5.5      Records**

Operator shall keep or cause to be kept accurate books, accounts, and records of activities or operations under this Agreement in compliance with the Accounting Procedure in Exhibit "C". Unless otherwise provided in this Agreement, all records of the Joint Account shall be available to a Non-operator as provided in Exhibit "C".  Operator shall use good-faith efforts to ensure that the settlements, billings, and reports rendered to each Party under this Agreement are complete and accurate.

**5.6      Compliance**

Operator shall comply, and shall require all agents and contractors to comply, with all applicable laws, rules, regulations, and orders of governmental authorities having jurisdiction.  Each Non-operator Party shall take all action, including the execution of all documents and forms, as necessary for Operator to comply with all applicable laws, rules, regulations, and orders of governmental authorities having jurisdiction.

**5.7      Contractors**

Operator may enter into contracts with qualified and responsible independent contractors for the design, construction, installation, drilling, production, or operation of wells, Platforms, and Development Facilities. Operator shall, in its discretion, use competitive bidding to procure goods and services for the benefit of the Parties.  All drilling operations conducted under this Agreement shall be conducted by properly qualified and responsible drilling contractors under current competitive contracts.  A drilling contract will be presumed to be a current competitive contract if it (a) was made within twelve (12) months before the commencement of the well and (b) contains terms, rates, and provisions that, when the contract was made, did not exceed those generally prevailing in the area for operations involving substantially equivalent rigs that are capable of conducting the drilling operation.  At its election, Operator may use its own or an Affiliate's drilling equipment, derrick barge, tools, or machinery to conduct drilling operations, but the work shall be (i) performed by Operator or its Affiliate acting as an independent contractor, (ii) approved by written agreement with the Participating Parties before commencement of operations, and (iii) conducted under the same terms and conditions and at the same rates as are customary and prevailing in competitive contracts of third parties doing work of similar nature.

**5.8      Governmental Reports**

Operator shall make reports to governmental authorities it has a duty to make as Operator and shall furnish copies of the reports to the Participating Parties.  Each Non-operator Party shall take all action, including the execution of all documents and forms, as necessary for Operator to make

<div align="center">10</div>

such reports to governmental authorities.

**5.9**　**Information to Participating Parties**

Except as provided in Article 8.7.1, Operator shall furnish each Participating Party at its request the following information, if applicable, for each activity or operation conducted by Operator:

**5.9.1**　A copy of the application for permit to drill and all amendments thereto.

**5.9.2**　A daily drilling report (or Reworking report or Recompletion report, if applicable), giving the depth, corresponding lithological information, data on drilling fluid characteristics, information about drilling or operational difficulties or delays, if any, and other pertinent information, by facsimile transmission or electronic mail within forty-eight (48) hours (excluding Saturdays, Sundays, and federal holidays) for well operations conducted in the preceding twenty-four (24)-hour period.

**5.9.3**　A complete report of each core analysis.

**5.9.4**　A copy of each electrical survey, currently as it is run; all data for each radioactivity log, temperature survey, deviation or directional survey, caliper log, and other log or survey obtained during the drilling of the well; and, on completion of the well, a composite of all electrical-type logs, insofar as is reasonable and customary.

**5.9.5**　A copy of all well test results, bottom-hole pressure surveys, and fluid analyses.

**5.9.6**　On written request received by Operator before commencement of drilling, samples of cuttings and cores taken from the well (if sufficient cores are retrieved), packaged in containers furnished by Operator at the expense of the requesting Party, marked as to the depths from which they were taken, and shipped at the expense of the requesting Party by express courier to the address designated by the requesting Party.

**5.9.7**　To the extent possible, twenty-four (24) hours' advance notice of, and access to, logging, coring, and testing operations.

**5.9.8**　A monthly report on the volume of Hydrocarbons and water produced from each well.

**5.9.9**　A copy of each report made to a governmental authority having jurisdiction.

**5.9.10**　On written request, other pertinent information available to Operator, including but not limited to those portions of the contracts to be used for the benefit of the Joint Account and that pertain to the Lease, but excluding Operator's proprietary or secret information and its subsurface interpretations.

**5.10**　**Information to Non-participating Parties**

Operator shall furnish each Non-participating Party a copy of each Operator's governmental report that is available to the public and associated with the applicable Non-consent Operation. Until the applicable recoupment under Article 13 (Non-consent Operations) is complete, a Non-participating Party shall not receive or review any other information specified by Article 5.9 (Information to Participating Parties), except as may be necessary for a payout audit of the Non-consent Operation.

11

# ARTICLE 6
# VOTING AND VOTING PROCEDURES

**6.1     Voting Procedures**

Unless otherwise provided in this Agreement, each matter requiring approval of the Parties shall be determined as follows:

**6.1.1     Voting Interest**

Subject to Article 8.6 (Security Rights), each Party shall have a voting interest equal to its Working Interest or its Participating Interest, as applicable.

**6.1.2     Vote Required**

Unless expressly stated to the contrary herein, a matter requiring approval of the Parties shall be decided by the affirmative vote of one (1) or more Parties having a combined voting interest of more than fifty percent (50%).  If there are only two (2) Parties to this Agreement, the matter shall be determined by the Party having a majority voting interest or, if the interests are equal, the matter shall require unanimous consent.

**6.1.3     Votes**

The Parties may vote at a meeting; by telephone, promptly confirmed in writing to Operator; by electronic mail; or by facsimile transmission.  Operator shall give each Party prompt notice of the results of the voting.

**6.1.4     Meetings**

Meetings of the Parties may be called by Operator on its own motion or at the request of one or more Parties having a collective voting interest of not less than twenty-five percent (25%).  Except in an emergency, no meeting shall be called on less than ten (10) days' advance written notice, and the notice of meeting shall include the meeting agenda prepared by Operator or the requesting Party.  The representative of Operator shall be chairman of each meeting.  Only matters included in the agenda may be discussed at a meeting, but the agenda and items included in the agenda may be amended before or during the meeting by unanimous agreement of all Parties.

# ARTICLE 7
# ACCESS

**7.1     Access to Lease**

Except as provided in Article 8.7.1, each Party shall have access, at its sole risk and expense and at all reasonable times, to the Lease, Platform, Development Facilities, and Joint Account assets to inspect activities, operations, and wells in which it participates, and to pertinent records and data.  A Non-operator shall give Operator at least twenty-four (24) hours' notice of the Non-

12

operator's intention to visit the Lease.  To protect Operator and the Non-operators from lawsuits, claims, and legal liability, if it is necessary for a person who is not performing services for Operator directly related to the joint operations, but is performing services solely for a Non-operator or pertaining to the business or operations of a Non-operator, to visit, use, or board a rig, well, Platform, or Development Facilities subject to this Agreement, the Non-operator shall give Operator advance notice of the visit, use, or boarding, and shall secure from that person an agreement, in a form satisfactory to Operator, indemnifying and holding Operator and Non-operators harmless, or shall itself provide the same hold harmless and indemnification in favor of Operator and other Non-operators before the visit, use, or boarding.

**7.2     Reports**

On written request, Operator shall furnish a requesting Party any information not otherwise furnished under Article 5 (Authority and Duties of Operator) to which that Party is entitled under this Agreement.  The costs of gathering and furnishing information not furnished under Article 5 shall be charged to the requesting Party. Operator is not obligated to furnish interpretative data that was generated by Operator at its sole cost.

**7.3     Confidentiality**

Except as otherwise provided in Article 7.4 (Limited Disclosure), Article 7.5 (Limited Releases to Offshore Scout Association), Article 7.6 (Media Releases), and Article 21.1 (Notice of Contributions Other Than Advances for Sale of Production), and except for necessary disclosures to governmental authorities having jurisdiction, or except as agreed in writing by all Participating Parties, no Party or Affiliate shall disclose Confidential Data to a third party.  This Article 7.3 shall remain in force and effect during the term of this Agreement and for one (1) year after termination of this Agreement.

**7.4     Limited Disclosure**

A Party may make Confidential Data to which it is entitled under this Agreement available to:

(a)     outside professional consultants and reputable engineering firms for the purpose of evaluations and/or submitting bids;

(b)     gas transmission companies for Hydrocarbon reserve or other technical evaluations;

(c)     reputable financial institutions for study before commitment of funds;

(d)     governmental authorities having jurisdiction or the public, to the extent required by applicable laws or by those governmental authorities;

(e)     the public, to the extent required by the regulations of a recognized stock exchange;

(f)     third parties with which a Party is engaged in a bona fide effort to effect a merger or consolidation, sell all or a controlling part of that Party's stock, or sell all or substantially all assets of that Party or an Affiliate of that Party;

(g)     an Affiliate of a Party;

(h)     such limited well information that is typically disclosed by Operator's representative

13

during meetings of the Offshore Oil Scouts Association; and

(i)     third parties with which a Party is engaged in a bona fide effort to sell, farm out, or trade all or a portion of its interest in the Lease.

Confidential Data made available under Articles 7.4(f) and 7.4(h) shall not be removed from the custody or premises of the Party making the Confidential Data available to third parties described in those Articles.  A third party permitted access under Articles 7.4, (a), (b), (c), (f), and (h) shall first agree in writing neither to disclose the Confidential Data to others nor to use the Confidential Data, except for the purpose for which it was disclosed.  The disclosing Party shall give prior notice to the other Parties that it intends to make the Confidential Data available.

**7.5     Limited Releases to Offshore Scout Association**

Operator may disclose Confidential Data to the Offshore Oil Scouts Association at their regularly scheduled meetings.  The Confidential Data that may be disclosed is limited to information concerning well locations, well operations, and well completions to the extent reasonable and customary in industry practice or required under the by-laws of the Offshore Oil Scouts Association.

**7.6     Media Releases**

Except as unanimously agreed by the Participating Parties or otherwise permitted by this Article, no Party shall issue a news or media release about operations on the Lease.  In an emergency involving extensive property or environmental damage, operations failure, loss of human life, or other clear emergency, and for which there is insufficient time to obtain the prior approval of the Parties, Operator may furnish the minimum, strictly factual, information necessary to satisfy the legitimate public interest of the media and governmental authorities having jurisdiction.  Operator shall then promptly advise the other Parties of the information furnished in response to the emergency.


# ARTICLE 8
# EXPENDITURES

**8.1     Basis of Charge to the Parties**

Subject to the other provisions of this Agreement, Operator shall pay all costs incurred under this Agreement, and each Party shall reimburse Operator in proportion to its Participating Interest.  All charges, credits, and accounting for expenditures shall be made and done pursuant to Exhibit "C".

**8.2     AFEs**

Before undertaking an operation or making a single expenditure to be in excess of Two Hundred Thousand Dollars ($200,000.00), and before conducting an activity or operation to drill, Sidetrack, Deepen, Complete, Rework, or Recomplete a well (regardless of the estimated cost), Operator

14

#93828440v3
#93828440v5

shall submit an AFE for the operation or expenditure to the Parties for approval. Operator shall also furnish an informational AFE to all Parties for an operation or single expenditure estimated to cost Two Hundred Thousand Dollars ($200,000.00) or less, but in excess of Fifty Thousand Dollars ($50,000.00). Operator shall notify the Participating Parties as soon as reasonably possible when it appears that the cost of an ongoing activity or operation, before its completion, will exceed the original AFE by more than one hundred twenty-five percent (125%). This overexpenditure notice shall be furnished to the Participating Parties as a supplemental AFE for informational purposes only and is not subject to an election by any of the Parties.

**8.3    Emergency and Required Expenditures**

Notwithstanding anything in this Agreement to the contrary, Operator is hereby authorized to conduct operations and incur expenses that in its opinion are reasonably necessary to safeguard life, property, and the environment in case of an actual or imminently threatened blowout, explosion, accident, fire, flood, storm, hurricane, catastrophe, or other emergency, and the expenses shall be borne by the Participating Parties in the affected operation. Operator shall report to the Participating Parties, as promptly as practical, the nature of the emergency and the action taken. Operator is also authorized to conduct operations and incur expenses reasonably required by statute, regulation, order, or permit condition or by a governmental authority having jurisdiction, which expenses shall be borne by the Participating Parties in the affected operation, subject to Exhibit "C".

**8.4    Advance Billings**

Operator may require each Party to advance its respective share of estimated expenditures pursuant to Exhibit "C".

**8.5    Commingling of Funds**

Funds received by Operator under this Agreement may be commingled with its own funds.

**8.6    Security Rights**

In addition to any other security rights and remedies provided by law with respect to services rendered or materials and equipment furnished under this Agreement, for and in consideration of the covenants and mutual undertakings of Operator and the Non-operator(s) herein, the Parties shall have the following security rights:

**8.6.1    Mortgage in Favor of Operator**

Each Non-operator(s) hereby grants to Operator a mortgage, hypothecate, and pledge of and over all its rights, titles, and interests in and to (a) the Lease, (b) the oil and gas in, on, under, and that may be produced from the lands within the Lease, and (c) all other immovable property or other property susceptible of mortgage situated within the Lease.

(i)    This mortgage is given to secure the complete and timely performance of and payment by each Non-operator(s) of all obligations and indebtedness of every kind and nature, whether now owed by such Non-operator(s) or hereafter arising,

15

pursuant to this Agreement.  To the extent susceptible under applicable law, this mortgage and the security interests granted in favor of Operator herein shall secure the payment of all costs and other expenses properly charged to such Party, together with (a) interest on such indebtedness, costs, and other expenses at the rate set forth in Exhibit "C" attached hereto (the "Accounting Procedure") or the maximum rate allowed by law, whichever is the lesser, (b) reasonable attorneys' fees, (c) court costs, and (d) other directly related collection costs.  If any Non-operator(s) Party does not pay any such uncontested costs and other expenses or perform its obligations under this Agreement when due, Operator shall have the additional right to notify the purchaser or purchasers of the defaulting Non-operator's(s') production and collect such costs and other expenses out of the proceeds from the sale of the defaulting Non-operator's(s') share of production until the amount owed has been paid.  Operator shall have the right to offset the amount owed against the proceeds from the sale of such defaulting Non-operator's(s) share of production if the amount owing is uncontested.  Any purchaser of such production shall be entitled to rely on Operator's statement concerning the amount of costs and other expenses owed by the defaulting Non-operator(s) and payment made to Operator by any purchaser shall be binding and conclusive as between such purchaser and such defaulting Non-operator(s).

(ii)     The maximum amount for which the mortgage herein granted by each Non-operator(s) shall be deemed to secure the obligations and indebtedness of such Non-operator(s) to Operator as stipulated herein is hereby fixed in an amount equal to Twenty-Five Million Dollars ($25,000,000.00) (the "Limit of the Mortgage of each Non-operator(s)").  Except as provided in the previous sentence (and then only to the extent that such limitations are required by law), the entire amount of obligations and indebtedness of each Non-operator(s) to Operator is secured hereby without limitation.  Notwithstanding the foregoing Limit of the Mortgage of each Non-operator(s), the liability of each Non-operator(s) under this Agreement and the mortgage and security interest granted hereby shall be limited to (and Operator shall not be entitled to enforce the same against such Non-operator(s) for an amount exceeding) the actual obligations and indebtedness (including all interest charges, costs, attorneys' fees, and other charges provided for in this Agreement or in the attached Exhibit "F") outstanding and unpaid and that are attributable to or charged against the interest of such Non-operator(s) pursuant to this Agreement.

**8.6.2   Security Interest in Favor of Operator**

16

To secure the complete and timely performance of and payment by each Non-operator(s) of all obligations and indebtedness of every kind and nature, whether now owed by such Non-operator(s) or hereafter arising, pursuant to this Agreement, each Non-operator Party hereby grants to Operator a continuing security interest in and to all its rights, titles, interests, claims, general intangibles, proceeds, and products thereof, whether now existing or hereafter acquired, in and to (a) all oil and gas produced from the lands or offshore blocks covered by the Lease or attributable to the Lease when produced, (b) all accounts receivable accruing or arising as a result of the sale of such oil and gas (including, without limitation, accounts arising from gas imbalances or from the sale of oil and gas at the wellhead), (c) all cash or other proceeds from the sale of such oil and gas once produced, and (d) all Platforms, wells, facilities, fixtures, other corporeal property, whether movable or immovable, whether now or hereafter placed on the lands or offshore blocks covered by the Lease or maintained or used in connection with the ownership, use, or exploitation of the Lease, and other surface and sub-surface equipment of any kind or character located on or attributable to the Lease and the cash or other proceeds realized from the sale, transfer, disposition, or conversion thereof.  The interest of the Non-operator(s) in and to the oil and gas produced from or attributable to the Lease when extracted and the accounts receivable accruing or arising as the result of the sale thereof shall be financed at the wellhead of the well or wells located on the Lease.  To the extent susceptible under applicable law, the security interest granted by each Non-operator(s) hereunder covers: (a) all substitutions, replacements, and accessions to the property of such Non-operator(s) described herein and is intended to cover all the rights, titles, and interests of such Non-operator(s) in all movable property now or hereafter located on or used in connection with the Lease, whether corporeal or incorporeal; (b) all rights under any gas balancing agreement, farmout rights, option farmout rights, acreage and cash contributions, and conversion rights of such Non-operator(s) in connection with the Lease, or the oil and gas produced from or attributable to the Lease, whether now owned and existing or hereafter acquired or arising, including, without limitation, all interests of each Non-operator(s) in any partnership, tax partnership, limited partnership, association, joint venture, or other entity or enterprise that holds, owns, or controls any interest in the Lease; and (c) all rights, claims, general intangibles, and proceeds, whether now existing or hereafter acquired, of each Non-operator(s) in and to the contracts, agreements, permits, licenses, rights-of-way, and similar rights and privileges that relate to or are appurtenant to the Lease, including the following:

(i)      all its rights, titles, and interests, whether now owned and existing or hereafter acquired or arising, in, to, and under or derived from any present or future operating, farmout, bidding, pooling, unitization, and communitization

17

agreements, assignments, and subleases, whether or not described in Exhibit "A", to the extent, and only to the extent, that such agreements, assignments, and subleases cover or include any of its rights, titles, and interests, whether now owned and existing or hereafter acquired or arising, in and to all or any portion of the Lease, and all units created by any such pooling, unitization, and communitization agreements and all units formed under orders, regulations, rules, or other official acts of any governmental authority having jurisdiction, to the extent and only to the extent that such units cover or include all or any portion of the Lease;

(ii)    all its rights, titles, and interests, whether now owned and existing or hereafter acquired or arising, in, to, and under or derived from all presently existing and future advance payment agreements, and oil, casinghead gas, and gas sales, exchange, and processing contracts and agreements, including, without limitation, those contracts and agreements that are described on Exhibit "A", to the extent, and only to the extent, that those contracts and agreements cover or include all or any portion of the Lease; and

(iii)   all its rights, titles, and interests, whether now owned and existing or hereafter acquired or arising, in, to, and under or derived from all existing and future permits, licenses, rights of way, and similar rights and privileges that relate to or are appurtenant to any of the Lease(s).

### 8.6.3    Mortgage in Favor of the Non-operator Parties

Operator hereby grants to each Non-operator(s) a mortgage, hypothecate, and pledge of and over all its rights, titles, and interests in and to (a) the Lease; (b) the oil and gas in, on, under, and that may be produced from the lands within the Lease; and (c) all other immovable property or other property susceptible of mortgage situated within the Lease.

(i)     This mortgage is given to secure the complete and timely performance of and payment by Operator of all obligations and indebtedness of every kind and nature, whether now owed by Operator or hereafter arising, pursuant to this Agreement.  To the extent susceptible under applicable law, this mortgage and the security interests granted in favor of each Non-operator(s) herein shall secure the payment of all costs and other expenses properly charged to Operator, together with (a) interest on such indebtedness, costs, and other expenses at the rate set forth in the Accounting Procedure or the maximum rate allowed by law, whichever is the lesser, (b) reasonable attorneys' fees, (c) court costs, and (d) other directly related collection costs.  If Operator does not pay any such uncontested costs and other expenses or perform its obligations under this Agreement when due, the Non-operator(s) shall have the additional right to notify

18

the purchaser or purchasers of Operator's production and collect such costs and other expenses out of the proceeds from the sale of Operator's share of production until the amount owed has been paid.  The Non-operator(s) shall have the right to offset the amount owed against the proceeds from the sale of Operator's share of production if the amount owing is uncontested.   Any purchaser of such production shall be entitled to rely on the Non-operator(s)' statement concerning the amount of costs and other expenses owed by Operator and payment made to the Non-operator(s) by any purchaser shall be binding and conclusive as between such purchaser and Operator.

(ii)     The maximum amount for which the mortgage herein granted by Operator shall be deemed to secure the obligations and indebtedness of Operator to all Non-operator(s) as stipulated herein is hereby fixed in an amount equal to Twenty-Five Million Dollars ($25,000,000) in the aggregate (the "Limit of the Mortgage of Operator").  Except as provided in the previous sentence (and then only to the extent such limitations are required by law), the entire amount of obligations and indebtedness of Operator to the Non-operator(s) is secured hereby without limitation.  Notwithstanding the foregoing Limit of the Mortgage of Operator, the liability of Operator under this Agreement and the mortgage and security interest granted hereby shall be limited to (and the Non-operator(s) shall not be entitled to enforce the same against Operator for an amount exceeding) the actual obligations and indebtedness (including all interest charges, costs, attorneys' fees, and other charges provided for in this Agreement or in Exhibit "F") outstanding and unpaid and that are attributable to or charged against the interest of Operator pursuant to this Agreement.

### 8.6.4    Security Interest in Favor of the Non-operator(s)

To secure the complete and timely performance of and payment by Operator of all obligations and indebtedness of every kind and nature, whether now owed by Operator or hereafter arising, pursuant to this Agreement, Operator hereby grants to each Non-operator(s) a continuing security interest in and to all its rights, titles, interests, claims, general intangibles, proceeds, and products thereof, whether now existing or hereafter acquired, in and to (a) all oil and gas produced from the lands or offshore blocks covered by the Lease or attributable to the Lease when produced, (b) all accounts receivable accruing or arising as a result of the sale of such oil and gas (including, without limitation, accounts arising from gas imbalances or from the sale of oil and gas at the wellhead), (c) all cash or other proceeds from the sale of such oil and gas once produced, and (d) all Platforms, wells, facilities, fixtures, other corporeal property whether movable or immovable, whether now or hereafter placed on the offshore blocks covered by the

19

Lease or maintained or used in connection with the ownership, use, or exploitation of the Lease, and other surface and sub-surface equipment of any kind or character located on or attributable to the Lease and the cash or other proceeds realized from the sale, transfer, disposition, or conversion thereof.  The interest of Operator in and to the oil and gas produced from or attributable to the Lease when extracted and the accounts receivable accruing or arising as the result of the sale thereof shall be financed at the wellhead of the well or wells located on the Lease.  To the extent susceptible under applicable law, the security interest granted by Operator hereunder covers: (a) all substitutions, replacements, and accessions to the property of Operator described herein and is intended to cover all the rights, titles and interests of Operator in all movable property now or hereafter located on or used in connection with the Lease, whether corporeal or incorporeal; (b) all rights under any gas balancing agreement, farmout rights, option farmout rights, acreage and cash contributions, and conversion rights of Operator in connection with the Lease, the oil and gas produced from or attributable to the Lease, whether now owned and existing or hereafter acquired or arising, including, without limitation, all interests of Operator in any partnership, tax partnership, limited partnership, association, joint venture, or other entity or enterprise that holds, owns, or controls any interest in the Lease; and (c) all rights, claims, general intangibles, and proceeds, whether now existing or hereafter acquired, of Operator in and to the contracts, agreements, permits, licenses, rights-of-way, and similar rights and privileges that relate to or are appurtenant to the Lease, including the following:

(i)      all its rights, titles, and interests, whether now owned and existing or hereafter acquired or arising, in, to, and under or derived from any present or future operating, farmout, bidding, pooling, unitization, and communitization agreements, assignments, and subleases, whether or not described in Exhibit "A", to the extent, and only to the extent, that such agreements, assignments, and subleases cover or include any of its rights, titles, and interests, whether now owned and existing or hereafter acquired or arising, in and to all or any portion of the Lease, and all units created by any such pooling, unitization, and communitization agreements and all units formed under orders, regulations, rules, or other official acts of any governmental authority having jurisdiction, to the extent and only to the extent that such units cover or include all or any portion of the Lease;

(ii)     all its rights, titles, and interests, whether now owned and existing or hereafter acquired or arising, in, to, and under or derived from all presently existing and future advance payment agreements, and oil, casinghead gas, and gas sales, exchange, and processing contracts and agreements, including, without

20

limitation, those contracts and agreements that are described on Exhibit "A", to the extent, and only to the extent that those contracts and agreements cover or include all or any portion of the Lease; and

(iii)     all its rights, titles, and interests, whether now owned and existing or hereafter acquired or arising, in, to, and under or derived from all existing and future permits, licenses, rights-of-way, and similar rights and privileges that relate to or are appurtenant to any of the Lease.

### 8.6.5   Recording

To provide evidence of, and to further perfect the Parties' security rights created hereunder, on request, each Party shall execute and acknowledge the attached Exhibit "F" (the "Memorandum of Operating Agreement and Financing Statement") in multiple counterparts as appropriate.  The Parties authorize Operator to file the Memorandum of Operating Agreement and Financing Statement in the public records set forth below to serve as notice of the existence of this Agreement as a burden on the title of Operator and the Non-operator(s) to their interests in the Lease and for purposes of satisfying otherwise relevant recording and filing requirements of applicable law and to attach an original of the Memorandum of Operating Agreement and Financing Statement to a standard UCC-1 for filing in the UCC records set forth below to perfect the security interests created by the Parties in this Agreement.  Such Memorandum of Operating Agreement and Financing Statement shall be amended from time to time on acquisition of additional leasehold interests in the Lease, and the Parties shall, within five (5) business days following request by one (1) of the Parties hereto, execute and furnish to the requesting Party for recordation any such amendment.

### 8.6.6   The Memorandum of Operating Agreement and Financing Statement

The Memorandum of Operating Agreement and Financing Statement is to be filed or recorded, as the case may be, in (a) the conveyance records of the parish or parishes adjacent to the lands or offshore blocks covered by the Lease pursuant to La. R.S. 9:2731 et seq., (b) the mortgage records of such parish(es) or county(ies), (c) the appropriate Uniform Commercial Code records, and (d) the records of the BOEMRE as a non–required filing.  A copy of such filed or recorded instrument(s) shall be furnished to Non-operator(s) once received by Operator.

## 8.7   Unpaid Charges and Default

### 8.7.1   If a Party fails to pay the charges due under this Agreement within sixty (60) days after receipt of Operator's statement, and if Operator then issues a notice of default and the default is not cured in the time and manner provided below, the other Participating Parties shall, on Operator's request, pay the unpaid amount in proportion to their Participating Interests.  Each Party paying its share of the unpaid amount shall be

21

subrogated to Operator's security rights, to the extent of the payment.  In addition to other remedies provided by this Agreement or by law, if a Party does not pay, when due, its share of the charges under this Agreement, Operator may give that Party notice that unless payment is made within thirty (30) days after receipt of Operator's notice, the Party shall be in default if the amount owing is uncontested.  A Party in default shall have no further access to the Lease, maps, records, data, or other information obtained in connection with operations.  If a Party believes that Operator's charges, or a portion thereof, are incorrect, that Party shall nevertheless pay the charges claimed by Operator and may notify Operator that the charges are in dispute.  Thereafter, Operator and the Non-operator(s) shall attempt to resolve the issue within sixty (60) days after receipt of payment.  A defaulting Party shall not be entitled to vote or exercise an election on any matter until that Party's payments are current.  The voting interest of each non-defaulting Party shall be in the proportion its Participating Interest bears to the total Participating Interests of all non-defaulting Parties. For each operation approved while a Party is in default, the defaulting Party shall be deemed to have voted not to participate in that operation.

8.7.2    The first sentence of Article 8.6.1(ii) of this Agreement shall be applicable only when both of the following conditions have been met: (i) Operator has fully complied with the provisions of this Agreement that are intended for the prevention of such a default, including, without limitation, timely advance billings, reasonable efforts to timely collect payment for advance billings as well as all monthly billings, providing due notice of default to a party that fails to make timely payment as required and recording of a fully executed Memorandum of Operating Agreement and Financing Statement as set forth in Exhibit "F", and (ii) the defaulting party is any Party other than Operator or its assigns.

8.8    **Confession of Judgment; Executory Process**

To the extent the Contract Area is located adjacent to Louisiana and to the extent allowed under La. C.C.P. art. 2631 et seq., each Party may use executory process to enforce the mortgage and security rights granted hereunder as to any property subject hereto.  Therefore, each Non-operator Party hereby confesses judgment in favor of the Operator up to the full amount secured hereunder as set forth in Article 8.6.1 (Mortgage in Favor of the Operator), and does by these present, consent, agree, and stipulate that, in the event the mortgage or security interests or any charges thereon not being promptly and fully paid when the same becomes due and payable, or in the event of failure to comply with any of the obligations herein set forth, or the breach of this Agreement in any of its parts by such Non-operator Party, the mortgage or security interests shall, at the option of the Operator, become due and payable, anything therein contained to the contrary notwithstanding, and it shall be lawful for the Operator, as holder or the mortgage or security interests, without making a demand and without notice or putting in default, the same

22

being hereby expressly waived, to cause all and singular the property herein mortgaged or secured to be seized and sold without appraisal, which is hereby expressly waived, by executory process issued by a competent court or to proceed with enforcement of its mortgage or security interest in any other manner provided by law.  Furthermore, the Operator hereby confesses judgment in favor of each Non-operator Party up to the full amount secured hereunder as set forth in Article 8.6.3 (Mortgage in Favor of the Non-operator Parties), and does by these present, consent, agree, and stipulate that, in the event the mortgage or security interests or any charges thereon not being promptly and fully paid when the same becomes due and payable, or in the event of failure to comply with any of the obligations herein set forth, or the breach of this Agreement in any of its parts by such Operator, the mortgage or security interests shall, at the option of such Non-operator Party, become due and payable, anything therein contained to the contrary notwithstanding, and it shall be lawful for such Non-operator Party, as holder or the mortgage or security interests, without making a demand and without notice or putting in default, the same being hereby expressly waived, to cause all and singular the property herein mortgaged or secured to be seized and sold by executory process issued by a competent court or to proceed with enforcement of its mortgage or security interest in any other manner provided by law.

## ARTICLE 9
## NOTICES

### 9.1    Giving and Receiving Notices

Except as otherwise provided in this Agreement, all AFEs and notices required or permitted by this Agreement shall be in writing and shall be delivered in person or by mail, courier service, or electronic mail, or facsimile transmission, with postage and charges prepaid, addressed to the Parties at the addresses in Exhibit "A".  When a drilling rig is on location and standby charges are accumulating, however, notices pertaining to the rig shall be given orally or by telephone.  All telephone or oral notices permitted by this Agreement shall be confirmed as soon as reasonably practical thereafter by written notice.  A notice shall be deemed to have been delivered only when received by the Party to which it was directed, and the period for a Party to deliver a response thereto begins on the date the notice is received.  "Receipt", for oral or telephone notice, means actual and immediate communication to the Party to be notified, and for written notice, means actual delivery of the notice to the address of the Party to be notified, as specified in this Agreement, or to the facsimile machine of that Party.  A responsive notice shall be deemed to have been delivered when the Party to be notified is in receipt of same.  When a response is required in forty-eight (48) hours or less, however, the response shall be given orally or by telephone, electronic mail, or facsimile transmission within that period.  If a Party is unavailable to accept delivery of a notice required to be given orally or by telephone, the notice may be

23

delivered by any other method specified in this Article 9.1.  A message left on an answering machine or with an answering service or other third person shall not be deemed to be adequate telephonic or oral notice.

**9.2     Content of Notice**

An AFE or a notice requiring a response shall indicate the maximum response time specified in Article 9.3 (Response to Notices).  A proposal for a Platform and/or Development Facilities shall include an AFE containing a description of the Platform and/or Development Facilities, including but not limited to location and the estimated costs of design, fabrication, transportation, and installation.   A proposal for a well operation shall include an AFE describing the estimated commencement date, the proposed depth, the objective formation or formations to be penetrated or tested, the Objective Horizon, the surface and bottom-hole locations, proposed directional or horizontal drilling operations, the type of equipment to be used, and the estimated costs of the operation, including but not limited to the estimated costs of drilling, testing, and Completing or abandoning the well. If a proposed operation is subject to Article 13.11 (Lease Maintenance Operations), the notice shall specify that the proposal is a Lease Maintenance Operation. A proposal for multiple operations on more than one (1) well location by the same rig shall contain separate AFEs or notices for each operation and shall specify in writing in what order the operations will be conducted. Each Party shall respond to each proposed multiple operation in the manner provided in Article 9.3.3 (Proposal for Multiple Operations).

**9.3     Response to Notices**

Except as provided in Article 9.1, each Party's response to a proposal shall be in writing to the proposing Party. Unless otherwise provided in this Agreement, the response time shall be as follows:

**9.3.1   Platform and/or Development Facilities Proposals**

Each Party shall respond within sixty (60) days after its receipt of the AFE or notice for a Platform and/or Development Facilities.

**9.3.2   Well Proposals**

Except as provided in Article 9.3.3 (Proposal for Multiple Operations), each Party shall respond within thirty (30) days after receipt of the well, Rework, or Recompletion proposal, but if (a) a drilling rig is on location, (b) the proposal relates to the same well or its substitute, and (c) standby charges are accumulating, a response shall be made within forty-eight (48) hours after receipt of the proposal, including Saturdays, Sundays, and federal holidays.

**9.3.3   Proposal for Multiple Operations**

When a proposal is made to conduct multiple Development Operations at separate well locations using the same rig, each Party shall respond (a) to the well operation taking

24

precedence, within thirty (30) days after receipt of the proposal; and (b) to each subsequent well location, within forty-eight (48) hours after completion of approved operations at the prior location and notification thereof by Operator.

### 9.3.4   Other Matters

For all other matters requiring notice, each Party shall respond within thirty (30) days after receipt of notice.

## 9.4   Failure to Respond

Failure of a Party to respond to a proposal or notice, to vote, or to elect to participate within the period required by this Agreement shall be deemed to be a negative response, vote, or election.

## 9.5   Response to Counterproposals

Should a counterproposal be allowed under this Agreement, responses to that counterproposal must be made within the response period for the original proposal.

## 9.6   Timely Well Operations

Unless otherwise provided, an approved well shall be commenced within one hundred eighty (180) days after the date when the last applicable election on that well may be made.  Wells shall be deemed to have commenced on the day charges commence under the drilling contract for that well. Subject to Exhibit "C", if a proposal for a well is deemed to have been withdrawn, all costs incurred in the preparation for or in furtherance of that well will be chargeable to the Parties that voted to participate in the well proposal for that well.

## 9.7   Timely Platform / Development Facilities Operations

Unless otherwise provided, Operator shall commence, or cause to commence, the construction, acquisition, or refurbishment of an approved proposal for a Platform and/or Development Facilities within one hundred eighty (180) days after the date when the last applicable election on that Platform and/or Development Facilities may be made.  The construction, acquisition, or refurbishment of an approved Platform and/or Development Facilities proposal shall be deemed to have commenced on the date the contract is awarded for the design, acquisition, fabrication, or refurbishment of the Platform and/or Development Facilities.  Subject to Exhibit "C", regardless of whether or not the construction, acquisition, or refurbishment of a Platform and/or Development Facilities is commenced, all costs incurred by Operator, attributable to that activity, shall be paid by the Participating Parties.

# ARTICLE 10
# EXPLORATORY OPERATIONS

## 10.1   Proposing Operations

A Party may propose an Exploratory Operation in accordance with Article 9 (Notices) to the other Parties that are entitled to vote or make an election in regard to that operation

25

**10.2    Counterproposals**

When an Exploratory Operation is proposed, a Party may, within seven (7) days (exclusive of Saturdays, Sundays, and federal holidays) after receipt of the AFE or notice for the original proposal, make a counterproposal to conduct an alternative Exploratory Operation by sending an AFE or notice to such Parties in accordance with Article 9 (Notices).  The AFE or notice shall indicate that the proposal is a counterproposal to the original proposal.  If one (1) or more counterproposals are made, such Parties shall elect to participate in either the original proposal, one (1) counterproposal, or neither the original proposal nor a counterproposal.  If two (2) or more proposals receive the approval of the number of Parties and combined Working Interests required by Article 10.5 (Operations by Fewer Than All Parties), the proposal receiving the largest percentage of Working Interest approval shall take precedence, and in the event of a tie between two (2) or more approved proposals, the proposal first received by the Parties shall take precedence.  Except for the response period provided in this Article 10.2, a counterproposal shall be subject to the same terms and conditions as the original proposal.

**10.3    Operations by All Parties**

If all Parties elect to participate in the proposed operation, Operator shall conduct the operation at their cost and risk.

**10.4    Second Opportunity to Participate**

If there are more than two (2) Parties to this Agreement and if fewer than all but one (1) or more Parties elect to participate, the proposing Party shall notify the Parties of the elections made, whereupon a Party originally electing not to participate may then elect to participate by notifying the proposing Party within forty-eight (48) hours, including Saturdays, Sundays, and federal holidays, after receipt of such notice.  If all Parties elect to participate in the proposed operation, Operator shall conduct the operation at their cost and risk.  If there are only two (2) Parties to this Agreement, there shall not be a second opportunity to elect to participate, and if the Participating Party agrees to pay and bear one hundred percent (100%) of the costs and risks of the operation, Operator shall conduct the operation as a Non-consent Operation for the benefit of the Participating Party, and the provisions of Article 13 (Non-consent Operations) shall apply.

**10.5    Operations by Fewer Than All Parties**

If there are more than two (2) Parties to this Agreement and if, after the election made under Article 10.4 (Second Opportunity to Participate), fewer than all but one (1) or more Parties having the requisite Working Interest to approve the operation have elected to participate in the proposed operation, the proposing Party shall notify the Participating Parties, and each Participating Party shall have forty-eight (48) hours, including Saturdays, Sundays, and federal holidays, after receipt of the notice to notify the proposing Party of the portion of costs and risks attributable to the total Non-participating Parties' interests it elects to pay and bear.  Unless

26

otherwise agreed by the Participating Parties, each Participating Party may, but shall not be obligated to, pay and bear that portion of the costs and risks attributable to the total Non-participating Parties' interests in the ratio that the Participating Party's interest bears to the total interests of all Participating Parties that elect to pay and bear a portion of costs and risks attributable to the total Non-participating Parties' interests.  Failure to respond shall be deemed to be an election not to pay or bear any additional costs or risks.  If the Participating Parties agree to pay and bear one hundred percent (100%) of the costs and risks of the operation, Operator shall conduct the operation as a Non-consent Operation for the benefit of the Participating Parties, and the provisions of Article 13 (Non-consent Operations) shall apply.  If such agreement is not obtained, however, the operation shall not be conducted and the effect shall be as if the proposal had not been made.

**10.5.1  First Exploratory Well**

If a Party elects to be a Non-participating Party in the drilling of the first Exploratory Well on the Lease, then, as of the last applicable election date, each Non-participating Party shall be deemed to have relinquished its entire Working Interest in the Lease to the Participating Party.  If such first Exploratory Well is commenced timely after the last applicable election date and is drilled to the proposed Objective Depth or deepest Objective Horizon, whichever is lesser, in accordance with this Agreement, each Non-participating Party shall execute an assignment of its entire Working Interest in the Lease to the Participating Party(ies) in proportion to their interests in such first Exploratory Well.

**10.6  Expenditures Approved**

Approval of an Exploratory Operation shall cover all necessary expenditures associated with the operation proposed in the AFE or notice that are incurred by Operator in connection with (a) preparations for drilling; (b) the actual drilling; (c) evaluations, such as testing, coring, and logging; and (d) plugging and abandonment.

**10.7  Conduct of Operations**

After commencement of drilling an Exploratory Well, Operator shall diligently conduct the operation without unreasonable delay until the well reaches the Objective Depth, unless the well encounters, at a lesser depth, impenetrable conditions or mechanical difficulties that cannot be overcome by reasonable and prudent operations and that render further operations impracticable. If a well does not reach its Objective Depth as a result of the conditions mentioned in this Article 10.7, the operation shall be deemed to have been completed and Article 13 (Non-consent Operations) shall apply to each Non-participating Party for the portion of the well drilled.

**10.8  Course of Action After Reaching Objective Depth**

When an Exploratory Well has been drilled to its Objective Depth and reasonable testing, coring, and logging have been completed as set forth in the approved AFE and the results have been furnished to the Participating Parties, Operator shall notify the Participating Parties of Operator's

27

#93828440v3
#93828440v5

recommendation for further operations in the well, and the following provisions shall apply:

**10.8.1   Election by Participating Parties**

A Participating Party shall have the right to propose another operation by notifying Operator and the other Participating Parties of its proposed operation within twenty-four (24) hours, including Saturdays, Sundays, and federal holidays, of receipt of Operator's notice.   The Participating Parties shall notify Operator within forty-eight (48) hours, including Saturdays, Sundays, and federal holidays, of receipt of Operator's proposal whether the Participating Parties elect to (a) participate in a recommended operation, or (b) not participate in a recommended operation.   Failure to respond shall be deemed to be an election not to participate in any of the recommended operations.

**10.8.2   Priority of Operations**

If all Participating Parties elect to participate in the same proposed operation, Operator shall conduct the operation at their cost and risk.   If more than one (1) operation is approved by one (1) or more Participating Parties having a combined Working Interest of fifty percent (50%) or more, the approved operation with the lowest number as indicated below shall take precedence:

1   Additional Testing, coring, or logging.   (If conflicting proposals are approved, the proposal receiving the largest percentage of Working Interest approval shall take precedence, and in the event of a tie between two (2) or more approved proposals, the approved proposal first received by the Parties shall take precedence.)

2   Deepen.   (If conflicting proposals are approved, the operation proposed to the deepest depth shall take precedence.)

3   Sidetrack.   (If conflicting proposals are approved, the proposal receiving the largest percentage Working Interest approval shall take precedence, and in the event of a tie between two (2) or more approved proposals, the approved proposal first received by the Parties shall take precedence.)

4   Complete at the Objective Horizon.

5   Complete above the Objective Horizon.   (If conflicting proposals are approved, the operation proposed at the deepest depth shall take precedence.)

6   Other operations.   (If conflicting proposals are approved, the proposal receiving the largest percentage Working Interest approval shall take precedence, and in the event of a tie between two (2) or more approved proposals, the approved proposal first received by the Parties shall take precedence.)

7   Temporarily abandon.

8   Plug and abandon.

**10.8.3   Second Opportunity to Participate**

If there are more than two (2) Participating Parties and fewer than all but one (1) or more

28

Participating Parties elect to participate in an operation, the proposing Party shall notify the Participating Parties of the elections made, whereupon a Party originally electing not to participate in the proposed operation may then elect to participate by notifying the proposing Party within forty-eight (48) hours, including Saturdays, Sundays, and federal holidays, after receipt of such notice.  If all Parties elect to participate in the proposed operation, Operator shall conduct the operation at their cost and risk. If there are only two (2) Participating Parties, there shall not be a second opportunity to elect to participate.

**10.8.4   Operations by Fewer Than All Parties**

If, after the election (if applicable) made under Article 10.8.3 (Second Opportunity to Participate), fewer than all but one (1) or more Parties having the requisite Working Interest to approve the operation elect to participate in the proposed operation that takes precedence, the proposing Party shall notify the Participating Parties and each Participating Party shall have forty-eight (48) hours, including Saturdays, Sundays, and federal holidays, after receipt of the notice to notify the proposing Party of the portion of the costs and risks attributable to the total Non-participating Parties' interests it elects to pay and bear.  Unless otherwise agreed by the Participating Parties, each Participating Party may, but shall not be obligated to, pay and bear that portion of the costs and risks attributable to the total Non-participating Parties' interests in the ratio that the Participating Party's interest bears to the total interests of all Participating Parties that elect to pay and bear a portion of costs and risks attributable to the Non-participating Parties' interests.  Failure to respond shall be deemed to be an election not to pay or bear any additional costs or risks.  If the Participating Parties agree to bear one hundred percent (100%) of the costs and risks of the operation, Operator shall conduct the operation as a Non-consent Operation for the benefit of the Participating Parties, and the provisions of Article 13 (Non-consent Operations) shall apply.  If such agreement is not obtained, however, the operation shall not be conducted and the effect shall be as if the proposal had not been made.  If a Participating Party in a well elects not to participate in the Deepening or Sidetracking operation in the well, such non-consenting Party shall become a Non-participating Party in all operations conducted in the Deepened or Sidetracked portion of the well after that election.

**10.8.5   Subsequent Operations**

On completion of an operation conducted under Article 10.8 (Course of Action After Reaching Objective Depth), if the well is not either (a) Completed as a Producible Well, or (b) temporarily abandoned or permanently plugged and abandoned, Operator shall notify the Participating Parties of Operator's recommendation for further operations in the well under Articles 10.8.1 through 10.8.4, which again shall apply.  If sufficient approval is not obtained to conduct a subsequent operation in a well or if all Participating Parties elect to

29

plug and abandon the well, subject to Article 14 (Abandonment and Salvage), Operator shall permanently plug and abandon the well at the cost and risk of all Participating Parties. Each Participating Party shall be responsible for its proportionate share of the plugging and abandonment costs associated with the operation in which it participated.

**10.9    Wells Proposed Below Deepest Producible Reservoir**

If a proposal is made to conduct an Exploratory Operation involving the drilling of a well to an Objective Horizon below the base of the deepest Producible Reservoir, a Party may elect within the applicable period to limit its participation in the operation down to the base of the deepest Producible Reservoir. For purposes of this Article 10.9, a Party that elects to limit its participation in the operation down to the base of the deepest Producible Reservoir shall be referred to as "Shallow Participant" and a Party that elects to participate in the entire operation shall be referred to as "Deep Participant". If a Party elects to limit its participation to the base of the deepest Producible Reservoir, Operator shall prepare and submit to the Shallow Participant, for informational purposes, a separate AFE covering operations down to the deepest Producible Reservoir. The Shallow Participant shall be a Participating Party in, and shall pay and bear the costs and risks of, each operation to the base of the deepest Producible Reservoir, according to its Participating Interest. The Shallow Participant shall be a Non-participating Party in each operation below the deepest Producible Reservoir, and the operation shall be considered a Non-consent Operation, and the provisions of Article 13 (Non-consent Operations) shall apply. If the well is Completed and produces Hydrocarbons from a horizon below the deepest Producible Reservoir, the Deep Participant shall reimburse the Shallow Participant for its share of the actual well costs to the base of the deepest Producible Reservoir. Payment shall be due within thirty (30) days after receipt of notice of the well being completed below the deepest Producible Reservoir. If the well is Completed and produces Hydrocarbons from a horizon below the deepest Producible Reservoir, the Shallow Participant shall reimburse the Deep Participant for its Working Interest share of the actual well costs to the base of the deepest Producible Reservoir in accordance with Article 13.4 (Deepening or Sidetracking Cost Adjustments), on the earlier of the time that (a) the well is plugged back to a horizon above the base of the deepest Producible Reservoir, as determined when the original well was proposed, (b) the well is plugged and abandoned, or (c) the amount to be recouped by the Deep Participant under Article 13 (Non-consent Operations) is recovered.

# ARTICLE 11
# DEVELOPMENT OPERATIONS

**11.1    Proposing Operations**

A Party may propose a Development Operation in accordance with Article 9 (Notices) to the other Parties that are entitled to vote or make an election in regard to that operation.

30

**11.2   Counterproposals**

When a Development Operation is proposed, a Party may, within seven (7) days (exclusive of Saturdays, Sundays, and federal holidays) after receipt of the AFE or notice for the original proposal, make a counterproposal to conduct an alternative Development Operation by sending an AFE or notice to such Parties in accordance with Article 9 (Notices).  The AFE or notice shall indicate that the proposal is a counterproposal to the original proposal.  If one (1) or more counterproposals are made, such Parties shall elect to participate in either the original proposal, one (1) counterproposal, or neither the original proposal nor a counterproposal.  If two (2) or more proposals receive the approval of the number of Parties and combined Working Interests required by Article 11.5 (Operations By Fewer Than All Parties), the proposal receiving the largest percentage Working Interest approval shall take precedence, and in the event of a tie between two (2) or more approved proposals, the approved proposal first received by the Parties shall prevail.  Except for the response period provided in this Article 11.2, a counterproposal shall be subject to the same terms and conditions as the original proposal.

**11.3   Operations by All Parties**

If all Parties elect to participate in the proposed operation, Operator shall conduct the operation at their cost and risk.

**11.4   Second Opportunity to Participate**

If there are more than two (2) Parties to this Agreement and if fewer than all but one (1) or more Parties elect to participate, the proposing Party shall notify the Parties of the elections made, whereupon a Party originally electing not to participate may then elect to participate by notifying the proposing Party within forty-eight (48) hours, including Saturdays, Sundays, and federal holidays, after receipt of such notice.  If all Parties elect to participate in the proposed operation, Operator shall conduct the operation at their cost and risk.  If there are only two (2) Parties to this Agreement, there shall not be a second opportunity to elect to participate, and if the Participating Party agrees to pay and bear one hundred percent (100%) of the costs and risks of the operation, Operator shall conduct the operation as a Non-consent Operation for the benefit of the Participating Party, and the provisions of Article 13 (Non-consent Operations) shall apply.

**11.5   Operations by Fewer Than All Parties**

If there are more than two (2) Parties to this Agreement and if, after the election made under Article 11.4 (Second Opportunity to Participate), fewer than all but one (1) or more Parties having the requisite Working Interest to approve the operation have elected to participate in the proposed operation, the proposing Party shall notify the Participating Parties, and each Participating Party shall have forty-eight (48) hours, including Saturdays, Sundays, and federal holidays, after receipt of the notice to notify the proposing Party of the portion of the costs and risks attributable to the total Non-participating Parties' interests it elects to pay and bear.  Unless otherwise agreed by the Participating Parties, each Participating Party may, but shall not be

31

obligated to, pay and bear that portion of costs and risks attributable to the total Non-participating Parties' interests in the ratio that the Participating Party's interest bears to the total interests of all Participating Parties that elect to pay and bear a portion of the costs and risks attributable to the total Non-participating Parties' interests.  Failure to respond shall be deemed to be an election not to pay or bear any additional costs or risks.  If the Participating Parties agree to pay and bear one hundred percent (100%) of the costs and risks of the operation, Operator shall conduct the operation as a Non-consent Operation for the benefit of the Participating Parties, and the provisions of Article 13 (Non-consent Operations) shall apply.  If such agreement is not obtained, however, the operation shall not be conducted and the effect shall be as if the proposal had not been made.

**11.6    Expenditures Approved**

Approval of a Development Operation shall cover all necessary expenditures associated with the operation proposed in the AFE or notice that are incurred by Operator in connection with (a) preparations for drilling; (b) the actual drilling; (c) evaluations, such as testing, coring, and logging; and (d) plugging and abandonment.

**11.7    Conduct of Operations**

After commencement of a Development Well, Operator shall diligently conduct the operation without unreasonable delay until the well reaches the Objective Depth, unless the well encounters, at a lesser depth, impenetrable conditions or mechanical difficulties that cannot be overcome by reasonable and prudent operations and render further operations impracticable.  If a well does not reach its Objective Depth as a result of the conditions mentioned in this Article 11.7, the operation shall be deemed to have been completed and Article 13 (Non-consent Operations) shall apply to each Non-participating Party for the portion of the well drilled.

**11.8    Course of Action After Reaching Objective Depth**

When a Development Well has been drilled to its Objective Depth and reasonable testing, coring, and logging have been completed and the results have been furnished to the Participating Parties, Operator shall notify the Participating Parties of Operator's recommendation for further operations in the well and the following provisions shall apply:

**11.8.1    Election by Fewer Than All Parties**

A Participating Party shall have the right to propose another operation by notifying Operator and the other Participating Parties of its proposed operation within twenty-four (24) hours, including Saturdays, Sundays, and federal holidays, of receipt of Operator's notice.   The Participating Parties shall notify Operator within forty-eight (48) hours, including Saturdays, Sundays, and federal holidays, of receipt of Operator's proposal whether the Participating Parties elect to (a) participate in a recommended operation, or (b) not participate in a recommended operation.  Failure to respond shall be deemed to be an election not to participate in any of the recommended operations.

32

### 11.8.2  Priority of Operations

If all Participating Parties elect to participate in the same proposed operation, Operator shall conduct the operation at their cost and risk.  If more than one (1) operation is approved by one (1) or more Participating Parties having a combined Working Interest of fifty percent (50%) or more, the approved operation with the lowest number as indicated below shall take precedence:

1        Additional Testing, coring, or logging.  (If conflicting proposals are approved, the proposal receiving the largest percentage of Working Interest approval shall take precedence, and in the event of a tie between two (2) or more approved proposals, the approved proposal first received by the Parties shall take precedence.)

2        Complete at the Objective Horizon.

3        Complete above the Objective Horizon.  (If conflicting proposals are approved, the operation proposed to the deepest depth shall take precedence.)

4        Deepen.  (If conflicting proposals are approved, the operation proposed to the deepest depth shall take precedence.)

5        Sidetrack.  (If conflicting proposals are approved, the proposal receiving the largest percentage of Working Interest approval shall take precedence, and in the event of a tie between two (2) or more approved proposals, the approved proposal first received by the Parties shall take precedence.)

6        Other operations.  (If conflicting proposals are approved, the proposal receiving the largest percentage of Working Interest approval shall take precedence, and in the event of a tie between two (2) or more approved proposals, the approved proposal first received by the Parties shall take precedence.)

7        Temporarily abandon.

8        Plug and abandon.

### 11.8.3  Second Opportunity to Participate

If there are more than two (2) Participating Parties and if fewer than all but one (1) or more Participating Parties elect to participate in an operation, the proposing Party shall notify the Participating Parties of the elections made, whereupon a Party originally electing not to participate in the proposed operation may then elect to participate by notifying the proposing Party within forty-eight (48) hours, including Saturdays, Sundays, and federal holidays, after receipt of such notice.  If all Parties elect to participate in the proposed operation, Operator shall conduct the operation at their cost and risk. If there are only two (2) Participating Parties, there shall not be a second opportunity to elect to participate.

### 11.8.4  Operations by Fewer Than All Parties

33

If, after the election (if applicable) made under Article 11.8.3 (Second Opportunity to Participate), fewer than all but one (1) or more Parties having the requisite Working Interest to approve the operation elect to participate in the proposed operation that takes precedence, the proposing Party shall notify the Participating Parties and each Participating Party shall have forty-eight (48) hours, including Saturdays, Sundays, and federal holidays, after receipt of the notice to notify the proposing Party of the portion of the costs and risks attributable to the total Non-participating Parties' interests that it elects to pay and bear.  Unless otherwise agreed by the Participating Parties, each Participating Party may, but shall not be obligated to, pay and bear that portion of the costs and risks attributable to the total Non-participating Parties' interests in the ratio that the Participating Party's interest bears to the total interests of all Participating Parties that elect to pay and bear a portion of costs and risks attributable to the Non-participating Parties' interests.  Failure to respond shall be deemed to be an election not to pay or bear any additional costs or risks.  If the Participating Parties agree to pay and bear one hundred percent (100%) of the costs and risks of the operation, Operator shall conduct the operation as a Non-consent Operation for the benefit of the Participating Parties, and the provisions of Article 13 (Non-consent Operations) shall apply.  If such agreement is not obtained, however, the operation shall not be conducted and the effect shall be as if the proposal had not been made.  If a Participating Party in a well elects not to participate in the Deepening or Sidetracking operation in the well, such non-consenting Party shall become a Non-participating Party in all operations conducted in the Deepened or Sidetracked portion of the well after that election.

**11.8.5  Subsequent Operations**

On the completion of an operation conducted under Article 11.8 (Course of Action After Reaching Objective Depth), if the well is not either (a) Completed as a well capable of producing Hydrocarbons in paying quantities, or (b) temporarily abandoned or permanently plugged and abandoned, Operator shall notify the Participating Parties of Operator's recommendation for operations in the well under Articles 11.8.1 through 11.8.4, which again shall apply.  If sufficient approval is not obtained to conduct a subsequent operation in a well, or if all Participating Parties elect to plug and abandon the well, subject to Article 14 (Abandonment, Salvage, and Surplus), Operator shall permanently plug and abandon the well at the expense of all Participating Parties.  Each Participating Party shall be responsible for its proportionate share of the plugging and abandonment costs associated with the operation in which it participated.

# ARTICLE 12
# PLATFORM AND DEVELOPMENT FACILITIES

34

**12.1     Proposals**

A Party may propose the fabrication or acquisition and installation of a Platform and/or Development Facilities by sending an AFE or notice to the other Parties in accordance with Article 9 (Notices).

**12.2     Counterproposals**

When a Platform and/or Development Facilities is proposed under Article 12.1, a Party may, within seven (7) days after receipt of the AFE or notice for the original proposal, make a counterproposal to fabricate or otherwise acquire and install said Platform and/or Development Facilities by sending an AFE or notice to the other Parties in accordance with Article 9 (Notices). The AFE or notice shall indicate that the proposal is a counterproposal to the original proposal.  If one (1) or more counterproposals are made, each Party shall elect to participate in either the original proposal, one (1) counterproposal, or neither the original proposal nor a counterproposal. If two (2) or more proposals receive the approval of the number of Parties and combined Working Interests required by Article 12.5 (Operations By Fewer Than All Parties), the proposal receiving the largest percentage Working Interest approval shall be deemed approved, and if two (2) or more approved proposals receive the same Working Interest approval, the approved proposal first received by the Parties shall be deemed approved.

**12.2.1     Operations by All Parties**

If all Parties elect to participate in the proposed operation, Operator shall conduct the operation at their cost and risk.

**12.2.2     Second Opportunity to Participate**

If there are more than two (2) Parties and if fewer than all but one (1) or more Parties elect to participate in the Platform and/or Development Facilities, the proposing Party shall notify the Parties of the elections made, whereupon a Party originally electing not to participate may then elect to participate by notifying the proposing Party within forty-eight (48) hours, including Saturdays, Sundays, and federal holidays, after receipt of such notice.  If all Parties elect to participate in the Platform and/or Development Facilities, Operator shall timely commence the fabrication and installation of the Platform and/or Development Facilities at their cost and risk.  If there are only two (2) Parties to this Agreement, there shall not be a second opportunity to elect to participate, and if the Participating Party agrees to pay and bear one hundred percent (100%) of the costs and risks of the operation, Operator shall conduct the operation as a Non-consent Operation for the benefit of the Participating Party, and the provisions of Article 13 (Non-consent Operations) shall apply.

**12.2.3     Operations by Fewer Than All Parties**

If there are more than two (2) Parties to this Agreement and if, after the election made

35

#93828440v3
#93828440v5

under Article 12.2.2 (Second Opportunity to Participate), fewer than all but one (1) or more Parties having the requisite Working Interest to approve the operation elect to participate in the Platform and/or Development Facilities, the proposing Party shall notify the Participating Parties, and each Participating Party shall have forty-eight (48) hours, including Saturdays, Sundays, and federal holidays, after receipt of the notice to notify the proposing Party of the portion of the costs and risks attributable to the total Non-participating Parties' interests it elects to pay and bear.  Unless otherwise agreed by the Participating Parties, each Participating Party may, but shall not be obligated to, pay and bear that portion of costs and risks attributable to the total Non-participating Parties' interests in the ratio that the Participating Party's interest bears to the total interests of all Participating Parties that elect to pay and bear a portion of the costs and risks attributable to the total Non-participating Parties' interests.  Failure to respond shall be deemed to be an election not to pay or bear any additional costs or risks.  If the Participating Parties agree to pay and bear one hundred percent (100%) of the costs and risks of the operation, Operator shall conduct the operation as a Non-consent Operation for the benefit of the Participating Parties, and except as provided in Article 12.4 (Rights to Take in Kind), the provisions of Article 13.2.1.(b) shall apply.  If such agreement is not obtained, however, the fabrication and installation of the Platform and/or Development Facilities shall not be commenced, and the effect shall be as if the proposal had not been made.

**12.3**    **Ownership and Use of the Platform and Development Facilities**

The Participating Parties in the Development Facilities own all the excess capacity of the Development Facilities and the excess weight, space, and buoyancy of the Platform.  Each Participating Party in the Development Facilities does not have the right to use its Participating Interest share of the excess capacity, weight, space, and buoyancy for hydrocarbon production from outside the Lease.  Each Participating Party in the Development Facilities or Platform must obtain the unanimous approval of the other Participating Parties in the Development Facilities or Platform in order to utilize any portion of the excess capacity, weight, space, and buoyancy.  It must negotiate the payment of a fee with the Participating Parties in the Development Facilities or Platform in order to utilize any portion of the excess capacity, weight, space, and buoyancy. Each of the Participating Parties in the Development Facilities or Platform shall receive its Participating Interest share of all fees derived from the utilization of the excess capacity, weight, space, and buoyancy.  All hydrocarbon production from outside the Lease shall be processed under a "Facilities Use and Production Handling Agreement" unanimously agreed to by the Participating Parties in the Development Facilities.

**12.4**    **Rights to Take in Kind**

Nothing in this Article 12 shall act to limit a Party's rights under Article 22 (Disposition of

#93828440v3
#93828440v5

Production), or to otherwise separately dispose of its share of Hydrocarbon production.  If a Party elects (a) not to participate in an approved Development Facilities proposal and (b) to separately dispose of its share of Hydrocarbon production (the "Separately Disposing Party"), the Separately Disposing Party (c) shall not be subject to the provisions of Article 13.2.1.(b), but must provide proof to the Participating Parties in the approved Development Facilities proposal, within seven (7) days from the last applicable response date to the Development Facilities proposal, that it has entered into fabrication and transportation contracts to separately dispose of its own share of Hydrocarbon production.  If a Separately Disposing Party fails to provide such proof by that deadline and if there is sufficient capacity for the Development Facilities to accommodate the Separately Disposing Party's share of the Hydrocarbons, it shall immediately (i) become a Participating Party in the Development Facilities and utilize the Development Facilities for its share of Hydrocarbon production, (ii) pay to the Participating Parties in the approved Development Facilities proposal an amount equal to two hundred percent (200%) of what would have been the Separately Disposing Party's share of the costs and expense of the Development Facilities had it elected to participate in the Development Facilities under Article 12.1 or 12.2, and (iii) assume its share of the risks and liabilities associated with the construction and ownership of the Development Facilities as of the date of commencement of the operations to construct same. The Participating Parties in the original Development Facilities and the Separately Disposing Party, which becomes a Participating Party in the original Development Facilities under this Article 12.4, shall own the original Development Facilities based on their Participating Interest share in the original Development Facilities.  If a Separately Disposing Party fails to provide such proof by that deadline and if there is insufficient capacity for the Development Facilities to accommodate the Separately Disposing Party's share of the Hydrocarbons, the Separately Disposing Party shall (i) become a Participating Party in the original Development Facilities and utilize the available capacity in the original Development Facilities, if any, for its share of Hydrocarbon production, (ii) pay one hundred percent (100%) of the costs of an expansion or modification of the Development Facilities, which is required to accommodate all or a portion of its share of the Hydrocarbons, and assume one hundred percent (100%) of the risks and liabilities associated with (a) the construction, installation and commissioning of the expanded or modified Development Facilities and (b) the utilization of the expanded or modified Development Facilities for thirty (30) days after the commencement of Hydrocarbon production through same, (iii) pay to the Participating Parties in the approved Development Facilities proposal an amount equal to two hundred percent (200%) of what would have been the Separately Disposing Party's share of the costs and expense of the original Development Facilities had it elected to participate in the original Development Facilities under Article 12.1 or 12.2, and (iv) assume its share of the risks and liabilities associated with the construction and ownership of the original Development Facilities as of the date of commencement of the operations to construct the original

37

Development Facilities.  The Participating Parties in the original Development Facilities and the Separately Disposing Party, which becomes a Participating Party in the original Development Facilities under Article 12.4(i), shall own the expanded or modified Development Facilities based on their Participating Interest share in the original Development Facilities, and the Participating Parties in the original Development Facilities shall assume their Participating Interest share of the risks and liabilities associated with the ownership of the expanded or modified Development Facilities thirty (30) days after that the expanded or modified Development Facilities have been utilized.

12.5    **Expansion or Modification of a Platform and/or Development Facilities**

After installation of a Platform and/or Development Facilities, any Participating Party in that Platform and/or Development Facilities may propose the expansion or modification of that Platform and/or Development Facilities by written notice (along with its associated AFE) to the other Participating Parties in that Platform and/or Development Facilities.  That proposal requires approval by one (1) or more of the Participating Parties in the Platform and/or Development Facilities with more than fifty percent (50%) of the Participating Interest in the Platform and/or Development Facilities.  If approved, that proposal will be binding on all Participating Parties in that Platform and/or Development Facilities, and Operator shall commence that expansion or modification at the sole cost and risk of all the Participating Parties in that Platform and/or Development Facilities unless otherwise agreed.

12.6    **Offsite Host Facilities**

If one (1) or more Parties with more than fifty percent (50%) of the Participating Interest in Hydrocarbon production agree that Hydrocarbon production can most effectively be processed and handled by an Offsite Host Facilities, Operator, on behalf of the Participating Parties, shall use reasonable efforts to secure a formal "Facilities Use and Production Handling Agreement" from the owners of the Offsite Host Facilities.  If Operator does secure access to Offsite Host Facilities in a Facilities Use and Production Handling Agreement, each Participating Party shall have the right, but not the obligation, to utilize its Participating Interest share of the capacity so secured.  This Article 12.6 shall not constitute a limit on a Party's right to install its own Take-in-Kind Facilities under Article 22 (Disposition of Production).

# ARTICLE 13
# NON-CONSENT OPERATIONS

38

**13.1**   **Non-consent Operations**

Operator shall conduct Non-consent Operations at the sole cost and risk of the Participating Parties in accordance with the following provisions:

**13.1.1**   **Non-interference**

Non-consent Operations shall not interfere unreasonably with operations approved by all the Parties.

**13.1.2**   **Multiple Completion Limitation**

Subject to Article 10.9, a Non-consent Operation shall not be conducted in a well having multiple Completions unless (a) each Completion is owned by the same Parties in the same proportions; (b) the well is incapable of producing from any Completion; or (c) all Participating Parties in the well consent to the operation.

**13.1.3**   **Metering**

In Non-consent Operations, Hydrocarbon production shall be determined on the basis of appropriate well tests, unless separate metering devices are required by a governmental authority having jurisdiction.

**13.1.4**   **Non-consent Well**

Operations on a Non-consent Well shall not be conducted in a Producible Reservoir without approval of all Parties unless (a) the Producible Reservoir is designated in the notice as a Completion objective; (b) Completion of the well in the Producible Reservoir will not increase the rates of Hydrocarbon production that are prescribed and approved for the Producible Reservoir by the governmental authority having jurisdiction; and (c) the horizontal distance between the vertical projections of the midpoint of the Producible Reservoir in the well and an existing well currently completed in and producing from the same Producible Reservoir will be at least one thousand (1,000) feet for an oil-well Completion or two thousand (2,000) feet for a gas-well Completion.

**13.1.5**   **Cost Information**

Operator shall, within one hundred twenty (120) days after completion of a Non-consent Operation, furnish the Parties either (a) an inventory and an itemized statement of the cost of the Non-consent Operation and equipment pertaining thereto, or (b) a detailed statement of the monthly billings.  Each quarter thereafter, while the Participating Parties are being reimbursed under Article 13.2.1 (Production Reversion Recoupment), Operator shall furnish the Non-participating Parties a quarterly statement detailing all costs and liabilities incurred in the Non-consent Operation, together with a statement of the quantities of Hydrocarbons produced from it and the amount of the proceeds from the sale of the Non-participating Parties' relinquished Hydrocarbon production from the Non-consent Operation for the preceding quarter.  Operator shall prepare the monthly statement of the quantities of Hydrocarbons produced and the amounts of the proceeds

39

from the sale of Non-participating Parties' relinquished Hydrocarbon production based on the proceeds received for Operator's share of Hydrocarbon production.  When Operator's payout calculation indicates that payout has occurred, Operator shall promptly notify all Parties.  The Participating Parties that assumed a portion of the Non-participating Parties' relinquished interest shall then provide Operator all information pertaining to the cumulative proceeds received from the sale of the Non-participating Parties' relinquished Hydrocarbon production.  Operator shall revise the payout date using the actual proceeds from the sale of the Non-participating Parties' relinquished Hydrocarbon production and administer any subsequent adjustments between the Parties.

### 13.1.6   Completions

For determinations under Article 13.1 (Non-consent Operations), each Non-consent Operation in a single wellbore shall be accounted for separately.

## 13.2   Relinquishment of Interest

On commencement of Non-consent Operations, other than Non-consent Operations governed by Article 10.5 (Operations by Fewer Than All Parties) or Article 13.7 (Operations Utilizing a Non-consent Platform and/or Development Facilities), each Non-participating Party's interest and leasehold operating rights in the Non-consent Operation and title to Hydrocarbon production resulting therefrom; and if Article 13.8 (Discovery or Extension from Non-consent Drilling) is effective, one-half (1/2) of each Non-participating Party's interest and leasehold operating rights and title to Hydrocarbon production from wells mentioned in Article 13.8 (Discovery or Extension from Non-consent Drilling), shall be owned by and vested in each Participating Party in proportion to its Participating Interest, or in the proportions otherwise agreed by the Participating Parties, for as long as the Non-Consent Operation is being conducted or Hydrocarbon production is obtained therefrom, subject to the following:

### 13.2.1   Production Reversion Recoupment

When the Participating Parties have recouped out of Hydrocarbon production from the Non-consent Operations attributable to the Non-participating Party's interest an amount, which when added to amounts received under Article 13.3 (Deepening or Sidetracking of Non-consent Well), equals the sum of the following:

(a)     Eight hundred percent (800%) of the Non-participating Party's share of the costs of the following Non-consent Exploratory Operations, or six hundred percent (600%) of the Non-participating Party's share of the costs of the following Non-consent Development Operations: drilling, testing, Completing, Recompleting, Deepening, Sidetracking, Reworking, plugging back, and temporarily abandoning a well, reduced by the Non-participating Party's Share of a cash contribution received under Article 21.2 (Cash Contributions);

40

(b)     If applicable, three hundred percent (300%) of Non-participating Party's Share of the cost of Platforms and/or Development Facilities approved under Article 12.1 (Proposal) or Article 12.2 (Counterproposals); such recoupment is limited to the Non-participating Party's Share of the Hydrocarbon production that utilize such Platform and/or Development Facilities;

(c)     Two hundred percent (200%) of the Non-participating Party's Share of the cost charged in accordance with Article 13.9 (Allocation of Platform / Development Facilities Costs to Non-consent Operations) of using an existing Platform / Development Facilities; and

(d)     the Non-participating Party's Share of the costs of operation, maintenance, treating, processing, gathering, and transportation, including but not limited to an Offsite Host Facilities' handling fees, as well as lessor's royalties and severance, Hydrocarbon production, and excise taxes,

the relinquished interests of the Non-participating Party shall automatically revert to the Non-participating Party as of 7:00 a.m. of the day after the recoupment occurs. Thereafter, the Non-participating Party shall own the same interest in the Non-consent Well, equipment pertaining thereto, including but not limited to any Platform or Development Facilities, and the Hydrocarbon production therefrom as the Non-participating Party would have owned or been entitled to if it had participated in the Non-consent Operation. On reversion, the Non-participating Party shall become a Participating Party and, as such, shall become liable for its proportionate share of the further costs of the operation as set forth in this Agreement and Exhibit "C".

### 13.2.2   Non-production Reversion

If the Non-consent Operation fails to obtain Hydrocarbon production or if the operation results in Hydrocarbon production that ceases before complete recoupment by the Participating Parties under Article 13.2.1 (Production Reversion Recoupment), such leasehold operating rights shall revert to each Non-participating Party, except that all Non-consent Wells, Platforms, and Development Facilities shall remain vested in the Participating Parties (but the salvage value in excess of the sum remaining under Article 13.2.1 shall be credited to all Parties).

### 13.3   Deepening or Sidetracking of Non-consent Well

If a Participating Party proposes to Deepen or Sidetrack a Non-consent Well, a Non-participating Party may then elect to participate in the Deepening or Sidetracking operation by notifying Operator within thirty (30) days, or within forty-eight (48) hours, including Saturdays, Sundays, and federal holidays, if a rig is on location and standby charges are being incurred, after receiving notice of the proposal.  A Non-participating Party that elects to participate in Deepening or

41

Sidetracking the well, as proposed, shall immediately pay the Participating Parties, in accordance with Article 13.4 (Deepening or Sidetracking Cost Adjustments), its Working Interest share of actual well costs (excluding logging, coring, testing, and Completion costs other than the cost of setting any casing or Completion Equipment that is used in the Deepening or Sidetracking), less all amounts recovered by the Participating Parties from the proceeds of Hydrocarbon production from the well, as if the Non-participating Party had originally participated to the initial objective depth or formation, in the case of a Deepening operation, or the depth at which the Sidetracking operation is initiated.   Thereafter, the Non-participating Party shall be deemed to be a Participating Party for the Deepening or Sidetracking operations, and Article 13.2.1(a) shall not apply to that Party for the Deepened or Sidetracked portion of the well.  The initial Participating Parties, however, shall continue to recoup out of the proceeds of Hydrocarbon production from the non-consent portion of the well any balance for the Non-consent Well remaining to be recovered under Article 13.2.1 (Production Reversion Recoupment), less the amounts paid by the Non-participating Party under this Article 13.3.

**13.4      Deepening or Sidetracking Cost Adjustments**

If a proposal is made to Deepen or Sidetrack a Non-consent Well, a well cost adjustment will be performed as follows:

(a)      Intangible drilling will be valued at the actual cost incurred by the Participating Parties.

(b)      Tangible materials will be valued in accordance with the provisions of Exhibit "C".

(c)      For Sidetracking operations, the values determined in Articles 13.4(a) and 13.4(b) shall be reduced by the amount allocated to that portion of the well from the surface to one hundred feet (100') below the point at which the Sidetracking was initiated.  Such allocations shall be consistent with the guidelines recommended by the applicable Council of Petroleum Accountants Societies ("COPAS") Guideline, as amended from time to time.

(d)      Amortization/depreciation shall be applied to both intangible and tangible values at the rate of ten percent (10%) per annum from the date the well commenced Hydrocarbon production to the date operations commence to Deepen or Sidetrack the well, provided, however, that the value of tangible materials after applying depreciation shall never be less than fifty percent (50%) of the value determined in Article 13.4(b).

**13.5      Subsequent Operations in Non-consent Well**

Except as provided in Article 13.3 (Deepening or Sidetracking of Non-consent Well), an election not to participate in the drilling, Sidetracking, or Deepening of a well shall be deemed to be an election not to participate in any subsequent operations in the well before full recovery by the Participating Parties of the Non-participating Party's recoupment amount.

**13.6      Operations in a Production Interval**

#93828440v3
#93828440v5

A Participating Party in a Production Interval may propose Rework or Sidetrack operations within that Production Interval, or to permanently plug and abandon that Production Interval in a well; however, no Production Interval in a well shall be abandoned without the unanimous approval of the Participating Parties in the Production Interval.  If a proposal, estimated to exceed the amount specified in Article 8.2 (Authorization), is made to Rework or Sidetrack a Production Interval and the Participating Parties elect to participate in the proposed operation, Operator shall conduct the operation at their sole cost and risk.  If fewer than all but one (1) or more Parties having a combined Participating Interest of fifty percent (50%) or more elect to participate in the proposed operation, Operator shall conduct the Reworking or Sidetracking operation at the cost and risk of the Participating Parties owning an interest in the Production Interval.  A proposal to Rework an interval, other than a Production Interval, shall be made and approved in accordance with Article 11.5 (Operations by Fewer Than All Parties).

**13.7**      **Operations Utilizing a Non-consent Platform and/or Development Facilities**

Except as otherwise provided in Article 12.4 (Rights to Take in Kind) and this Article 13.7, if applicable, a Party that did not originally participate in a Platform and/or Development Facilities shall be a Non-participating Party for all operations utilizing the Platform and/or Development Facilities and shall be subject to Article 13.2 (Relinquishment of Interest). Notice, in accordance with Article 9 (Notices), shall be given to the Non-participating Party for all wells proposed to be drilled from or tied back to the Non-consent Platform and/or handled by non-consent Development Facilities.   If a Non-participating Party in a Non-consent Platform and/or Development Facilities desires to participate in the drilling of any such well proposed by the Participating Parties in the Platform and/or Development Facilities, the Non-participating Party desiring to join in the proposed well shall first pay the Participating Parties in the Platform and/or Development Facilities its proportionate share of the cost of the Platform and/or Development Facilities, including but not limited to costs of material, fabrication, transportation, and installation plus any remaining amounts to be recouped under Article 13.2.1(b).  The Non-participating Party shall remit payment to Operator and Operator shall (a) reimburse the Participating Parties in the Platform and/or Development Facilities in the same proportions they are sharing in the Platforms and/or Development Facilities recoupment account, and (b) credit the applicable payout account. On payment of that amount, the original Non-participating Party shall become an owner and a Participating Party in the Platform and/or Development Facilities in the same manner as if recoupment had occurred under Article 13.2.1 (Production Reversion Recoupment), and may participate in all future wells drilled from or tied back to the Platform. As to well operations conducted from the Platform and/or Development Facilities before payment under this Article 13.7, the original Non-participating Party shall remain a Non-participating Party in such Non-consent Operations until such time as the entire recoupment balance applicable to all such Non-consent Operations in the aggregate has occurred, as provided for in Articles 13.2.1(a) and

43

13.2.1(d).

**13.8    Discovery or Extension from Non-consent Drilling**

If a Non-consent Well (a) discovers a new Producible Reservoir or (b) extends an existing Producible Reservoir beyond its recognized boundaries, as unanimously agreed by the Participating Parties in all existing wells currently producing from the existing Producible Reservoir before commencement of drilling operations, the recoupment of costs for the well shall be governed by Article 13.2 (Relinquishment of Interest) and shall be recovered by the Participating Parties in one (1) of the following ways:

(a)    if the Non-consent Well is not completed and produced, recoupment shall be out of one-half (1/2) of each Non-participating Party's interest in Hydrocarbon production from all subsequently drilled and completed wells on the Lease that are completed in the Producible Reservoir discovered, or in that portion extended, by the Non-consent Well and in which the Non-participating Party has a Participating Interest; or

(b)    if the Non-consent Well is completed and produced, recoupment shall be out of the Non-participating Party's Share of all Hydrocarbon production from the Non-consent Well and one-half (1/2) of the Non-participating Party's interest in Hydrocarbon production from all subsequently drilled and completed wells on the Lease that are completed in the Producible Reservoir discovered, or in that portion extended, by the Non-consent Well and in which the Non-participating Party has a Participating Interest.

**13.9    Allocation of Platform / Development Facilities Costs to Non-consent Operations**

Non-consent Operations shall be subject to further conditions as follows:

**13.9.1    Charges**

If a well is drilled or produced from a Platform and/or is produced through Development Facilities whose Participating Parties are different from the Participating Parties in that well or if the Participating Parties' Participating Interest shares in that Platform and/or Development Facilities are different from their Participating Interest shares in that well, the rights of the Participating Parties in that well and the costs to use the Platform and/or Development Facilities for that well shall be determined as follows:

(a)    The Participating Parties in that well shall pay to Operator a one-time slot usage fee for the use of a slot on the Platform equal to two percent (2%) of the cost of the Platform.  Within fifteen (15) days of its receipt of that fee, Operator shall distribute to the Participating Parties in the Platform their Participating Interest share of that payment.  For purposes of calculating the slot usage fee, the total cost of the Platform shall be reduced by one-half percent (0.5%) per month, commencing on the date the Platform was installed and continuing every month thereafter until the month actual drilling operations on that well is commenced; however, the total cost of the Platform shall not be reduced by more than fifty

44

percent (50%) of the total Platform's costs.  The cost of additions to the Platform shall be reduced in the same manner commencing the first month after the addition is installed.   If that well is abandoned having never produced Hydrocarbons, the right of the Participating Parties in that well to use the Platform slot through which the well was drilled shall terminate unless those Parties commence drilling a substitute well for the abandoned well through the same slot within ninety (90) days of the abandonment. If that substitute well is abandoned having never produced Hydrocarbons, the right of the Participating Parties in that well to use the Platform slot through which the well was drilled shall terminate.  The slot usage fee shall not apply to a slot deemed to be "surplus".  A slot may be deemed surplus only by the unanimous agreement of the Participating Parties in the Platform.

(b)     The Participating Parties in that well shall pay to the owners of the Development Facilities a lump sum equal to that portion of the total cost of those Development Facilities that the throughput volume of the Non-consent Operation bears to the current total design throughput volume of the Development Facilities. Throughput volume shall be estimated by Operator in barrels produced per day (with 1 barrel of oil equaling 5.8 mcf of gas), using an average daily volume of the first three (3) months of Hydrocarbon production from the Non-consent Operation.   For purposes of calculating the Development Facilities lump sum payment, the total cost of the Development Facilities shall be reduced by one-half percent (0.5%) per month, commencing from the date when the Development Facilities were installed and continuing every month thereafter until the first month during which Hydrocarbon production from the Non-consent Operation commences, but the total cost of the Development Facilities shall not be reduced more than fifty percent (50%) of the total Development Facilities' cost.  If a modification, expansion, or addition to the Development Facilities is made after commencing first Hydrocarbon production and before connection of the Non-consent Operation to the Development Facilities, the Development Facilities lump sum payment shall be reduced in the same manner described above, from the month in which the Development Facilities modification, expansion, or addition is completed until the first month during which Hydrocarbon production from the Non-consent Operation is commenced.

Payment of sums under this Article 13.9.1 is not a purchase of an additional interest in the Platform or the Development Facilities.  Such payment shall be included in the total amount that the Participating Parties are entitled to recoup out of Hydrocarbon production from the Non-consent Well.

45

### 13.9.2   Operating and Maintenance Charges

The Participating Parties shall pay all costs necessary to connect a Non-consent Well to the Platform and/or Development Facilities and that proportionate part of the costs of operating and maintaining the Platform and/or Development Facilities applicable to the Non-consent Well.  Platform operating and maintenance costs that are costs not directly attributable to a wellbore shall be allocated equally to all actively producing Completions. Operating and maintenance costs for the Development Facilities shall be allocated on a volume throughput basis, that is, in the proportion that the volume throughput of the well bears to the total volume throughput of all wells connected to the Development Facilities. Volume throughput, as used in this Article 13.9.2, shall be determined by considering all Hydrocarbons and water volumes.

## 13.10   Allocation of Costs Between Zones

Except as provided in Article 10.9 (Wells Proposed Below Deepest Producible Reservoir), if for any reason the Participating Interests of the Parties in a well are not the same for the entire depth or the Completion thereof, the costs of drilling, Completing, and equipping the well shall be allocated in an equitable manner, as agreed by the Parties, based on the value and allocation recommended in the applicable COPAS Guideline, as amended from time to time.

## 13.11   Lease Maintenance Operations

An operation proposed within the last one (1) year of the primary term or, subsequent thereto, an operation proposed to perpetuate the Lease or portion thereof at its expiration date or otherwise, including but not limited to well operations, regulatory relief (for example, course of action necessary to satisfy the statutory or regulatory requirements of the governmental authority having jurisdiction), and other Lease operations, shall be deemed to be a "Lease Maintenance Operation."  To invoke this Article 13.11, a notice or an AFE that proposes an operation must state that the proposed operation is a Lease Maintenance Operation.

### 13.11.1 Participation in Lease Maintenance Operations

A Party may propose a Lease Maintenance Operation by giving notice to the other Parties.  If fewer than all Parties elect to participate in the proposed Lease Maintenance Operation, the proposing Party shall notify the Parties of the elections made. Each Party electing not to participate shall then have a second opportunity to participate in the proposed operation by notifying the other Parties of its election within forty-eight (48) hours after receipt of the notice.  A Lease Maintenance Operation shall not require minimum approval, either of the number of Parties or the percentage of the voting interests of the Parties otherwise required in Article 6.1.2 (Vote Required). For a Lease Maintenance Operation to be conducted, the Participating Parties must agree to pay and bear one hundred percent (100%) of the costs and risks of the operation. If more than one (1) Lease Maintenance Operation is proposed, the operation with the greatest

46

percentage approval shall be conducted. Notwithstanding the recoupment provisions of this Agreement, a Party electing not to participate in a well operation proposed as a Lease Maintenance Operation shall promptly assign, effective as of the date the operation commences, to the Participating Parties all its right, title, and interest in and to that portion of the Lease that would otherwise expire and the property and equipment attributable thereto, in accordance with Article 26 (Successors, Assigns).  In the event of such assignment, the assigning Party shall retain all obligations and liabilities incurred before the effective date of such assignment, and the Participating Parties that are assigned such interest may require the assigning Party to provide reasonable financial assurances including but not limited to posting a performance bond (in an amount, form and with a surety acceptable to the Participating Parties) for the retained liabilities for such assigned interest.  If more than one (1) Lease Maintenance Operation is proposed and there is a tie between two (2) proposed operations, both operations shall be conducted and the costs and risks of conducting both operations shall be paid and borne by the Participating Parties.  If the drilling of a well is undertaken as a Lease Maintenance Operation, further operations conducted by the Participating Parties in the well shall be governed by Article 10.9 (Course of Action After Reaching Objective Depth) or Article 11.9 (Course of Action After Reaching Objective Depth), whichever applies.  If more than one (1) well operation is conducted, any of which would perpetuate the Lease or such portion thereof, an assignment shall not be required from a Party participating in any such well operation.

**13.11.2 Accounting for Non-participation**

If, after one (1) year from completion of a well operation conducted as a Lease Maintenance Operation, the Lease or portion thereof is being perpetuated by a Lease Maintenance Operation, as provided in Article 13.11.1 (Participation in Lease Maintenance Operations), Operator shall render a final statement, if applicable, to the assigning Party for its share of all expenses attributed to the assigned interest before the effective date of the assignment, plus any credit or deficiency in salvage value calculated under Article 15.3.1 (Prior Expenses).  The assigning Party shall settle any deficiency owed the non-assigning Parties within thirty (30) days after receipt of Operator's statement.

**13.12   Retention of Lease by Non-consent Well**

If, at the expiration of the primary term of the Lease, one (1) or more Non-consent Wells, except wells drilled under Article 10.5.1 (First Exploratory Well) provision of Article 10.5 (Operations by Fewer Than All Parties), if selected, are the only wells perpetuating the Lease, Operator shall give written notice to each Non-participating Party that the Non-consent Wells are serving to perpetuate the Lease. Each Non-participating Party shall, within thirty (30) days after receipt of

47

Operator's written notice, elect one (1) of the following:

(a)      to assign its entire interest in the Lease to the Participating Parties in the proportions in which the Non-consent Wells are owned subject to the assignor's retained obligations under Article 15.3.1 (Prior Expenses); or

(b)      to pay the Participating Parties, within sixty (60) days after its election, the lesser of its proportionate share of the actual well costs of the wells, as if the Non-participating Party had originally participated, or the balance of the recoupment account.  The payment shall be made to Operator and credited to the account of each Participating Party.  The Non-participating Party shall remain as a Non-participating Party until full recoupment is obtained, but the payment shall be credited against the total amount to be recouped by the Participating Parties.

A Non-participating Party that fails to make the required election shall be deemed to have elected under Article 13.12(a) to relinquish its entire interest in the Lease.  If a Non-participating Party elects to make payment under Article 13.12(b) but fails to make the required payment within sixty (60) days after its election, the Non-participating Party shall either remain liable for the obligation to pay or, by unanimous vote of the Participating Parties, be deemed to have elected under Article 13.12(a) to relinquish its entire interest in the Lease.  Each relinquishing Non-participating Party shall promptly execute and deliver an assignment of its interest to the Participating Parties, in accordance with Article 26 (Successors and Assigns) subject to the assignor's retained obligations under Article 15.3.1 (Prior Expenses).

**13.13   Non-Consent Premiums**

A non-consent premium paid by a Non-Participating Party to the Participating Parties shall be allocated to the Participating Parties based on their original Participating Interest share in the Non-consent Operation that generated the non-consent premium.

# ARTICLE 14
# ABANDONMENT, SALVAGE, AND SURPLUS

**14.1   Platform Salvage and Removal Costs**

When the Parties owning wells, Platforms, and/or Development Facilities unanimously agree to dispose of the wells, Platforms, and/or Development Facilities, it shall be disposed of by Operator in the time and manner approved by the Parties. The costs, risks, and net proceeds, if any, for the disposal shall be shared by the Parties in proportion to their Participating Interests therein.

**14.2   Abandonment of Platforms, Development Facilities, or Wells**

Except as provided in Article 10 (Exploratory Operations) and Article 11 (Development Operations), a Participating Party may propose the abandonment of a Platform and Development Facilities or wells by notifying the other Participating Parties.  No Platform and Development

#93828440v3
#93828440v5

Facilities or wellbore shall be abandoned without the unanimous approval of the Participating Parties.  If the Participating Parties do not approve abandoning the Platform and Development Facilities or wells, Operator shall prepare a statement of the abandoning Party's share of estimated abandonment costs, less its share of estimated salvage value, as determined by Operator pursuant to Exhibit "C".  The Party desiring to abandon it shall pay Operator, on behalf of the Participating Parties for that Party's share of the estimated abandonment costs, less its share of estimated salvage value, within thirty (30) days after receipt of Operator's statement.  If the Party that shall serve as Operator after a Party abandons its interest does not qualify by BOEMRE as exempt from supplemental bonding requirements, then the Party desiring to abandon its interest may place its share of the estimated abandonment costs, less its estimated salvage value, in escrow, with such escrowed funds made available to Operator upon abandoning Party's receipt of all necessary end of operations reports and site clearance and restoration report.  If an abandoning Party's respective share of the estimated salvage value is greater than its share of the estimated costs, Operator, on behalf of the Participating Parties, shall pay a sum equal to the deficiency to the abandoning Party within thirty (30) days after the abandoning Party's receipt of Operator's statement.

14.3    **Assignment of Interest**

Each Participating Party desiring to abandon a Platform and Development Facilities or wells under Article 14.2 (Abandonment of Platforms, Development Facilities, or Wells) shall assign, effective as of the last applicable election date, to the non-abandoning Parties, in proportion to their Participating Interests, its interest in the Platform and Development Facilities or wells and the equipment therein and its ownership in the Hydrocarbon production from the wells.  A Party so assigning shall be relieved from further liability for the Platform and Development Facilities or wells, except liability for payments under Article 14.2 (Abandonment of Platforms, Development Facilities, or Wells).

14.4    **Abandonment Operations Required by Governmental Authority**

A well abandonment or Platform and Development Facilities removal required by a governmental authority having jurisdiction shall be accomplished by Operator with the costs, risks, and net proceeds, if any, to be shared by the Parties owning the well or Platform and Development Facilities in proportion to their Participating Interests therein.  No approval by the Parties will be necessary for Operator to proceed with the government-required well abandonment, or Platform and Development Facilities removal. Operator shall provide the Parties with an informational AFE before commencing such an abandonment or removal.

14.5    **Disposal of Surplus Material**

Material and equipment acquired hereunder may be classified as surplus by Operator when deemed no longer needed in present or foreseeable operations.  Operator shall determine the value and cost of disposing of the materials in accordance with Exhibit "C".  If the material is

#93828440v3
#93828440v5

classified as junk or if the value, less cost of disposal, is less than or equal to Fifty Thousand Dollars ($50,000), Operator shall dispose of the surplus materials in any manner it deems appropriate.  If the value, less the cost of disposal of the surplus material, is greater than Fifty Thousand Dollars ($50,000), Operator shall give written notice thereof to the Parties owning the material. Unless purchased by Operator, the surplus material shall be disposed of in accordance with the method of disposal approved by the Parties owning the material.  Proceeds from the sale or transfer of surplus material shall be promptly credited to each Party in proportion to its ownership of the material at the time of retirement or disposition.

# ARTICLE 15
# WITHDRAWAL

## 15.1    Right to Withdraw

Subject to this Article 15.1, any Party may withdraw from this Agreement as to the Lease (the "Withdrawing Party") by giving prior written notice to all other Parties stating its decision to withdraw ("the withdrawal notice").   The withdrawal notice shall specify an effective date of withdrawal that is at least sixty (60) days, but not more than ninety (90) days, after the date of the withdrawal notice.  Within thirty (30) days of receipt of the withdrawal notice, the other Parties may join in the withdrawal by giving written notice of that fact to Operator ("written notice to join in the withdrawal") and on giving written notice to join in the withdrawal are "Other Withdrawing Parties".  The withdrawal notice and the written notice to join in the withdrawal are unconditional and irrevocable offers by the Withdrawing Party and the Other Withdrawing Parties to convey to the Parties that do not join in the withdrawal ("the Remaining Parties") the Withdrawing Party's and the Other Withdrawing Parties' entire Working Interest in the Lease, Hydrocarbon production, and other property and equipment owned under this Agreement.

## 15.2    Response to Withdrawal Notice

Failure to respond to a withdrawal notice is deemed a decision not to join in the withdrawal.

### 15.2.1   Unanimous Withdrawal

If all the other Parties join in the withdrawal,

(a)     no assignment of Working Interests shall take place;

(b)     subject to Article 14.4, no further operations may be conducted under this Agreement unless agreed to by all Parties;

(c)     the Parties shall abandon all activities and operations within the Lease and relinquish all of their Working Interests to the BOEMRE within one hundred twenty (120) days of the conclusion of the thirty (30) day joining period; and

(d)     notwithstanding anything to the contrary in Article 14 (Abandonment, Salvage and Surplus), Operator shall:

#93828440v3
#93828440v5

1)      furnish all Parties a detailed abandonment plan, if applicable, and a detailed cost estimate for the abandonment within one hundred eighty (180) days after the conclusion of the thirty (30) day joining period; and

2)      cease operations and begin to permanently plug and abandon all wells and remove all Facilities in accordance with the abandonment plan.

**15.2.2   No Additional Withdrawing Parties**

If none of the other Parties join in the withdrawal, the Remaining Parties must accept an assignment of their Participating Interest share of the Withdrawing Party's Working Interest.

**15.2.3   Acceptance of the Withdrawing Parties' Interests**

If one (1) or more but not all of the other Parties join in the withdrawal and become Other Withdrawing Parties, within forty-eight (48) hours (excluding Saturdays, Sundays, and federal holidays) of the conclusion of the thirty (30) day joining period, each of the Remaining Parties shall submit to Operator a written rejection or acceptance of its Participating Interest share of the Withdrawing Party's and Other Withdrawing Parties' Working Interest.  Failure to make that written rejection or acceptance shall be deemed a written acceptance.  If the Remaining Parties are unable to select a successor Operator, if applicable, or if a Remaining Party submits a written rejection and the other Remaining Parties do not agree to accept one hundred percent (100%) of the Withdrawing Party's and Other Withdrawing Parties' Working Interest within fifteen (15) days of the conclusion of the forty-eight- (48-) hour period to submit a written rejection or acceptance, the Remaining Parties will be deemed to have joined in the withdrawal, and Article 15.2.1 (Unanimous Withdrawal) will apply.

**15.2.4   Effects of Withdrawal**

Except as otherwise provided in this Agreement, after giving a withdrawal notice or a written notice to join in the withdrawal, the Withdrawing Party and Other Withdrawing Parties are not entitled to approve or participate in any activity or operation in the Lease, other than those activities or operations for which they retain a financial responsibility. The Withdrawing Party and Other Withdrawing Parties shall take all necessary steps to accomplish their withdrawal by the effective date referred to in Article 15.1 (Right to Withdraw) and shall execute and deliver to the Remaining Parties all necessary instruments to assign their Working Interest to the Remaining Parties.  A Withdrawing Party and Other Withdrawing Parties shall bear all expenses associated with their withdrawal and the transfer of their Working Interest.

**15.3   Limitation on and Conditions of Withdrawal**

**15.3.1   Prior Expenses**

The Withdrawing Party and Other Withdrawing Parties remain liable for their Participating

51

Interest share of the costs of all activities, operations, rentals, royalties, taxes, damages, Hydrocarbon imbalances, or other liability or expense accruing or relating to (i) obligations existing as of the effective date of the withdrawal, (ii) operations conducted before the effective date of the withdrawal, (iii) operations approved by the Withdrawing Party and Other Withdrawing Parties before the effective date of the withdrawal, or (iv) operations commenced by Operator under one (1) of its discretionary powers under this Agreement before the effective date of the withdrawal.  Before the effective date of the withdrawal, Operator shall provide a statement to the Withdrawing Party and Other Withdrawing Parties for (1) their respective shares of all identifiable costs under this Article 15.3.1 and (2) their respective Participating Interest shares of the estimated current costs of plugging and abandoning all wells and removing all Platforms, Development Facilities, and other material and equipment owned by the Joint Account, less their respective Participating Interest Shares of the estimated salvage value of the assets at the time of abandonment, as approved by vote.  This statement of expenses, costs, and salvage value shall be prepared by Operator under Exhibit "C". Before withdrawing, the Withdrawing Party and Other Withdrawing Parties shall pay Operator, for the benefit of the Remaining Parties, the amounts allocated to them as shown in the statement for all obligations and liabilities they have incurred and all obligations and liabilities attributable to them before the effective date of the withdrawal.  All liens, charges, and other encumbrances, including but not limited to overriding royalties, net profits interest, and production payments, that the Withdrawing Party and Other Withdrawing Parties placed (or caused to be placed) on their Working Interest shall be fully satisfied or released before the effective date of its withdrawal (unless the Remaining Parties are willing to accept the Working Interest subject to those liens, charges, and other encumbrances).

**15.3.2  Confidentiality**

The Withdrawing Party and Other Withdrawing Parties will continue to be bound by the confidentiality provisions of Article 7.3 (Confidentiality) after the effective date of the withdrawal but will have no further access to technical information relating to activities or operations under this Agreement.  The Withdrawing Party and Other Withdrawing Parties are not required to return to the Remaining Parties Confidential Data acquired before the effective date of the withdrawal.

**15.3.3  Emergencies and Force Majeure**

No Party may withdraw during a Force Majeure or emergency that poses a threat to life, safety, property, or the environment but may withdraw from this Agreement after termination of the Force Majeure or emergency.  The Withdrawing Party and Other Withdrawing Parties remain liable for their share of all costs and liabilities arising from the

52

Force Majeure or emergency, including but not limited to the drilling of relief wells, containment and clean-up of oil spills and pollution, and all costs of debris removal made necessary by the Force Majeure or emergency.

# ARTICLE 16
# RENTALS, ROYALTIES, AND OTHER PAYMENTS

**16.1   Overriding Royalty and Other Burdens**

If the Working Interest or Participating Interest of a Party is subject to an overriding royalty, Hydrocarbon production payment, net profits interest, mortgage, lien, security interest, or other burden or encumbrance, other than lessor's royalty and other burdens listed in Exhibit "A", the Party so burdened shall pay and bear all liabilities and obligations created or secured by the burden or encumbrance and shall indemnify and hold the other Parties harmless from all claims and demands for payment asserted by the owners of the burdens or encumbrances. If a Party becomes entitled to an assignment under this Agreement, or as a result of Non-consent Operations hereunder becomes entitled to receive a relinquished interest, as provided in Article 13.2 (Relinquishment of Interest), otherwise belonging to a Non-participating Party whose Working Interest in the operations is so burdened or encumbered, the Party entitled to receive the assignment from the Non-participating Party or the relinquished interest of the Non-participating Party's Hydrocarbon production shall receive same free and clear of all such burdens and encumbrances, and the Non-participating Party whose interest is subject to the burdens and encumbrances shall hold the Participating Parties harmless for the burdens and encumbrances, and will bear same at its own expense.

**16.2   Subsequently Created Interest**

Notwithstanding anything in this Agreement to the contrary, if a Party, after execution of this Agreement, creates an overriding royalty, Hydrocarbon production payment, net profits interest, carried interest, or any other interest out of its Working Interest that the Parties do not unanimously agree to list on Exhibit "A" (hereinafter called "Subsequently Created Interest"), the Subsequently Created Interest shall be made specifically subject to this Agreement. If the Party owning the interest from which the Subsequently Created Interest was established fails to pay, when due, its share of costs, and if the proceeds from the sale of Hydrocarbon production under Articles 8.6 (Security Rights) are insufficient for that purpose, or elects to abandon a well, or elects to relinquish its interest in the Lease, the Subsequently Created Interest shall be chargeable with a pro rata portion of all costs in the same manner as if the Subsequently Created Interest were a Working Interest, and Operator may enforce against the Subsequently Created Interest the lien and other rights granted or recognized under this Agreement to secure and enforce collection of costs chargeable to the Subsequently Created Interest.  The rights of the

owner of the Subsequently Created Interest shall be, and hereby are, subordinated to the rights granted or recognized by Article 8.6 (Security Rights).

**16.3     Payment of Rentals and Minimum Royalties**

Operator shall pay in a timely manner, for the joint account of the Parties, all rental, minimum royalties, and other similar payments accruing under the Lease and shall, on request, submit evidence of each such payment to the Parties. Operator shall not be held liable to the other Parties in damages for loss of the Lease or interest therein if, through mistake or oversight, a rental, minimum royalty, or other payment is not paid or is erroneously paid.  The loss of a Lease or interest therein resulting from Operator's failure to pay, or erroneous payment of rental or minimum royalty shall be a joint loss, and there shall be no readjustment of interests.  For Hydrocarbon production delivered in kind by Operator to a Non-operator or to another for the account of a Non-operator, the Non-operator shall provide Operator with information about the Non-operator's proceeds received or the value of the Hydrocarbon production taken in kind in order that Operator may make payments of minimum royalties due.

**16.4     Non-participation in Payments**

A Party that desires not to pay its share of a rental, minimum royalty, or similar payment shall notify the other Parties in writing at least sixty (60) days before the payment is due. Operator shall then make the payment for the benefit of the Parties that do desire to maintain the Lease.  In such event, the Non-participating Party shall assign to the Participating Parties, on their request, the portions of its interest in the Lease maintained by the payment.  The assigned interest shall be owned by each Participating Party in proportion to its Participating Interest. The assignment shall be made in accordance with Article 27 (Successors and Assigns) and shall be subject to the assignor's retained obligations under Article 15.3.1 (Prior Expenses).

**16.5     Royalty Payments**

Each Party shall be responsible for and shall separately bear and properly pay or cause to be paid all royalty and other amounts due on its share of Hydrocarbon production taken in accordance with state or federal regulations, as may be amended from time to time.  Adjustments shall be made among the Parties in accordance with Exhibit "E" (Gas Balancing Agreement). During a period when Participating Parties in a Non-consent Operation are receiving a Non-participating Party's share of Hydrocarbon production, the Participating Parties shall bear and properly pay, or cause to be paid, the Lease royalty on the Hydrocarbon production taken, and shall hold the Non-participating Parties harmless from liability for the payment.

# ARTICLE 17
# TAXES

**17.1     Property Taxes**

54

Operator shall render property covered by this Agreement for ad valorem taxation, if applicable, and shall pay the property taxes for the benefit of each Party.  Operator shall charge each Party its share of the tax payments.  If the ad valorem taxes are based in whole or in part on separate valuations of each Party's Working Interest, notwithstanding anything in this Agreement to the contrary, each Party's share of property taxes shall be in proportion to the tax value generated by that Party's Working Interest.

**17.2   Contest of Property Tax Valuation**

Operator shall timely and diligently protest to a final determination each tax valuation it deems unreasonable.  Pending such determination, Operator may elect to pay under protest.  On final determination, Operator shall pay the taxes and the interest, penalties, and costs accrued as a result of the protest. In either event, Operator shall charge each Party its share of any amounts due, and each Party shall be responsible for reimbursing Operator for any such amounts paid.

**17.3   Production and Severance Taxes**

Each Party shall pay, or cause to be paid, all production and severance taxes due on Hydrocarbon production that it receives under this Agreement.

**17.4   Other Taxes and Assessments**

Operator shall pay other applicable taxes (other than income taxes, excise taxes, or other similar types of taxes) or assessments and charge each Party its share.

# ARTICLE 18
# INSURANCE

**18.1   Insurance**

Operator shall provide and maintain the insurance prescribed in Exhibit "B" and charge those costs to the Joint Account.  No other insurance shall be carried for the benefit of the Parties under this Agreement, except as provided in Exhibit "B".

**18.2   Bonds**

Operator shall obtain and maintain all bonds or financial guarantees required by an applicable law, regulation, or rule.  The costs of those bonds or financial guarantees acquired exclusively for the conduct of activities and operations under this Agreement shall be charged to the Joint Account, including an amount equivalent to the reasonable cost of that bond or financial guarantee if Operator provides that bond or guarantee itself and does not engage a third party to do so. Operator shall require all contractors to obtain and maintain all bonds required by an applicable law, regulation, or rule.

# ARTICLE 19
# LIABILITY, CLAIMS, AND LAWSUITS

**19.1**   **Individual Obligations**

The obligations, duties, and liabilities of the Parties under this Agreement are several, not joint or collective.  Nothing in this Agreement shall ever be construed as creating a partnership of any kind, joint venture, agency relationship, association, or other character of business entity recognizable in law for any purpose.  In their relations with each other under this Agreement, the Parties shall not be considered to be fiduciaries or to have established a confidential relationship, except as specifically provided in Article 7.3 (Confidentiality) and Article 7.4 (Limited Disclosure), but rather shall be free to act at arm's length in accordance with their own respective self-interests.  Each Party shall hold all other Parties harmless from liens and encumbrances on the Lease arising as a result of its acts.

**19.2**   **Notice of Claim or Lawsuit**

If, on account of a matter involving activities or operations under this Agreement, or affecting the Lease, a claim is made against a Party, or if a party outside this Agreement files a lawsuit against a Party, or if a Party files a lawsuit, or if a Party receives notice of a material administrative or judicial hearing or other proceeding, that Party shall give written notice of the claim, lawsuit, hearing, or proceeding ("Claim") to the other Parties as soon as reasonably practical.

**19.3**   **Settlements**

Operator may settle a Claim, or multiple Claims arising out of the same incident, involving activities or operations under this Agreement or affecting the Lease, if the aggregate expenditure does not exceed five hundred thousand dollars ($500,000.00) and if the payment is in complete, or substantially complete, settlement of these Claims.  If the amount required for settlement exceeds this amount, the Parties shall determine the further handling of the Claims under Article 19.4 (Defense of Claims and Lawsuits).

**19.4**   **Defense of Claims and Lawsuits**

Operator shall supervise the handling, conduct, and prosecution of all Claims involving activities or operations under this Agreement or affecting the Lease.  Claims may be settled in excess of the amount specified in Article 19.3 (Settlements) if the settlement is approved by vote in accordance with Article 6.1.2 of the Participating Parties in the activity or operation out of which the Claim arose, but a Party may independently settle a Claim or the portion of a Claim that is attributable to its Participating Interest share alone as long as that settlement does not directly adversely affect the interest or rights of the other Participating Parties. Legal expenses shall be handled in accordance with Exhibit "C".

**19.5**   **Liability for Damages**

**UNLESS SPECIFICALLY PROVIDED OTHERWISE IN THIS AGREEMENT, LIABILITY FOR LOSSES, DAMAGES, COSTS, EXPENSES OR CLAIMS INVOLVING ACTIVITIES OR**

56

OPERATIONS UNDER THIS AGREEMENT OR AFFECTING THE LEASE THAT ARE NOT COVERED BY OR IN EXCESS OF THE INSURANCE CARRIED FOR THE JOINT ACCOUNT SHALL BE BORNE BY EACH PARTY IN PROPORTION TO ITS PARTICIPATING INTEREST SHARE IN THE ACTIVITY OR OPERATION OUT OF WHICH THAT LIABILITY ARISES, EXCEPT TO THE EXTENT THAT LIABILITY RESULTS FROM THE GROSS NEGLIGENCE OR WILLFUL MISCONDUCT OF A PARTY, IN WHICH CASE THAT PARTY SHALL BE SOLELY RESPONSIBLE FOR LIABILITY RESULTING FROM ITS GROSS NEGLIGENCE OR WILLFUL MISCONDUCT.

**19.6    Indemnification for Non-consent Operations**

TO THE EXTENT ALLOWED BY LAW, THE PARTICIPATING PARTIES WILL HOLD THE NON-PARTICIPATING PARTIES (AND THEIR AFFILIATES, AGENTS, INSURERS, DIRECTORS, OFFICERS, AND EMPLOYEES) HARMLESS AND RELEASE, DEFEND, AND INDEMNIFY THEM AGAINST ALL CLAIMS, DEMANDS, LIABILITIES, REGULATORY DECREES, AND LIENS FOR ENVIRONMENTAL POLLUTION AND PROPERTY DAMAGE OR PERSONAL INJURY, INCLUDING SICKNESS AND DEATH, CAUSED BY OR OTHERWISE ARISING OUT OF NON-CONSENT OPERATIONS, AND ANY LOSS AND COST SUFFERED BY A NON-PARTICIPATING PARTY AS AN INCIDENT THEREOF, EXCEPT WHERE THAT LOSS OR COST RESULTS FROM THE SOLE, CONCURRENT, OR JOINT NEGLIGENCE, FAULT, OR STRICT LIABILITY OR WILLFUL MISCONDUCT OF THAT NON-PARTICIPATING PARTY, IN WHICH CASE EACH PARTY SHALL PAY OR CONTRIBUTE TO THE SETTLEMENT OR SATISFACTION OF JUDGMENT IN THE PROPORTION THAT ITS NEGLIGENCE, FAULT, OR STRICT LIABILITY OR WILLFUL MISCONDUCT CAUSED OR CONTRIBUTED TO THE INCIDENT. IF AN INDEMNITY IN THIS AGREEMENT IS DETERMINED TO VIOLATE LAW OR PUBLIC POLICY, THAT INDEMNITY SHALL THEN BE ENFORCEABLE ONLY TO THE MAXIMUM EXTENT ALLOWED BY LAW.

**19.7    Damage to Reservoir, Loss of Reserves and Profit**

NOTWITHSTANDING ANY CONTRARY PROVISION OF THIS AGREEMENT, NO PARTY IS LIABLE TO ANY OTHER PARTY FOR SPECIAL, INDIRECT, CONSEQUENTIAL, EXEMPLARY OR PUNITIVE DAMAGES RESULTING FROM OR ARISING OUT OF THIS AGREEMENT, INCLUDING WITHOUT LIMITATION DAMAGE TO A RESERVOIR, LOSS OF HYDROCARBONS, LOSS OF PROFITS, OR BUSINESS INTERRUPTIONS, HOWSOEVER THE SAME MAY BE CAUSED.

**19.8    Non-essential Personnel**

A NON-OPERATOR THAT REQUESTS TRANSPORTATION OR ACCESS TO A DRILLING RIG, PLATFORM, VESSEL, OR OTHER FACILITY USED FOR ACTIVITIES OR OPERATIONS UNDER THIS AGREEMENT SHALL HOLD THE OTHER PARTIES HARMLESS AND SHALL RELEASE, DEFEND, AND INDEMNIFY THEM AGAINST (I) ALL CLAIMS, DEMANDS, AND

**LIABILITIES FOR PROPERTY DAMAGE AND (II) ALL CLAIMS, DEMANDS, AND LIABILITIES FOR ANY LOSS OR COST SUFFERED BY A PARTY AS AN INCIDENT THEREOF, INCLUDING BUT NOT LIMITED TO INJURY, SICKNESS, AND DEATH, CAUSED BY OR OTHERWISE ARISING OUT OF THAT TRANSPORTATION OR ACCESS, OR BOTH, EXCEPT TO THE EXTENT THAT LOSS OR COST RESULTS FROM THE GROSS NEGLIGENCE OR WILLFUL MISCONDUCT OF THE PARTY SO INDEMNIFIED AND PROTECTED.**

# ARTICLE 20
## INTERNAL REVENUE PROVISION

**20.1    Internal Revenue Provision**

Notwithstanding any provision in this Agreement to the effect that the rights and liabilities of the Parties are several, not joint or collective, and that the Agreement and the activities and operations under this Agreement do not constitute a partnership under state law, each Party elects to be excluded from the application of all or any part of the provisions of Subchapter K, Chapter 1, Subtitle A, of the Internal Revenue Code of 1986, as amended, or similar provisions of applicable state laws regardless of whether for federal income tax purposes this Agreement and the activities and operations under this Agreement are regarded as a partnership.

# ARTICLE 21
## CONTRIBUTIONS

**21.1    Notice of Contributions Other Than Advances for Sale of Production**

Each Party shall promptly notify the other Parties of all offers of contributions that it may obtain, or contributions it is attempting to obtain, for the drilling of a well or the conducting of an operation on the Lease.  Payments received as consideration for entering into a contract for the sale of Hydrocarbon production from the Lease, loans, and other financial arrangements shall not be considered contributions for the purpose of this Article 21.  No Party shall release or obligate itself to release Confidential Data in return for a contribution from a third party without prior written consent of the Participating Parties or Parties having the right to participate in the well.

**21.2    Cash Contributions**

If a Party receives a cash contribution for drilling a well on the Lease or conducting an activity or operation on the Lease, the cash contribution shall be paid to Operator, and Operator shall credit the amount thereof to the Parties in proportion to their Participating Interests in the well or the Platform and/or Development Facilities.  If the well is a Non-consent Well, the amount of the contribution shall be deducted from the cost specified in Article 13.2.1(a) before computation of the amount to be recouped out of Hydrocarbon production.

58

**21.3     Acreage Contributions**

If a Party receives an acreage contribution for the drilling of a well on the Lease, the acreage contribution shall be shared by each Participating Party that accepts it in proportion to its Participating Interest in the well.  As between the Participating Parties, this Agreement shall apply separately to the acreage.


# ARTICLE 22
## DISPOSITION OF PRODUCTION

**22.1     Take-in-Kind Facilities**

Subject to Article 22.2, a Party may, at its sole cost and risk, construct Take-in-Kind Facilities to take its share of Hydrocarbon production in kind.

**22.2     Duty to Take in Kind**

Each Party shall own and, at its own cost and risk, shall take in kind or separately dispose of its share of the oil, gas, and condensate produced and saved from the Lease, excluding Hydrocarbon production used by Operator in activities or operations conducted under this Agreement, subject to this Article 22.  In order to avoid interference with operations on or regarding the Platform, the Development Facilities, and the Lease, a Party exercising its right to construct Take-in Kind Facilities ("the Take in Kind Party") shall provide Operator with a list of equipment it deems necessary for its Take in Kind Facilities ("the components") along with its notice informing Operator of its election to take in kind.  If Operator, in its sole discretion, agrees to install and operate the Take-in Kind Facilities, Operator shall purchase the components and install it on behalf of the Take in Kind Party at the Take in Kind Party's sole risk and cost, including but not limited to any fees, penalties or other costs incurred as a result of any cancellation of placed orders as may be requested by the Take in Kind Party.  Operator shall provide the Take in Kind Party with monthly updates on the progress of the ordering and installation of the Take in Kind Facilities.  Operator, based on the instructions of the Take in Kind Party, shall install and operate all the components.  Operator shall not be responsible for any losses or damages to the components or the Take in Kind Party's Hydrocarbon production metered, treated, processed, or transported by the components unless such losses or damages are the result of Operator's gross negligence or willful misconduct.  If Operator refuses or fails to install the Take-in Kind Facilities by one hundred twenty (120) days before the deadline provided in Section 12.4, the Take-in Kind Party shall have the right to install and operate the Take-in Kind Facilities providing that such operations do not interfere with existing operations or proposed operations that have been approved under terms of this Agreement.

59

**22.3**    **Failure to Take Oil and Condensate in Kind**

Notwithstanding Article 22.2 (Duty to Take in Kind), if a Party fails to take in kind or dispose of its share of the oil or condensate, Operator shall have the right, but not the obligation, subject to revocation at will by the Party owning the Hydrocarbon production, to purchase for its own account, sell to others, or otherwise dispose of all or part of the Hydrocarbon production at the same price at which Operator calculates and pays lessor's royalty on its own portion of the oil or condensate.  Operator shall notify the non-taking Party when the option is exercised. A purchase or sale by Operator of any other Party's share of the oil or condensate shall be for such reasonable periods of time as are consistent with the minimum needs of the industry under the circumstances, but in no event shall a contract be for a period in excess of one (1) year. Proceeds of the oil or condensate purchased, sold, or otherwise disposed of by Operator under this Article 22.3 shall be paid to the Party that had, but did not exercise, the right to take in kind and separately dispose of the oil or condensate.  Operator, in disposing of another Party's oil or condensate, shall not be responsible for making any filing with regulatory agencies not required by law to be made by it in respect to another Party's share of oil or condensate.  Unless required by governmental authority having jurisdiction or by judicial process, no Party shall be forced to share an available market with a non-taking Party.

**22.4**    **Failure to Take Gas in Kind**

Article 22.3 (Failure to Take Oil and Condensate in Kind) shall not apply to gas produced from the Lease.  In no event shall Operator be responsible for, or obligated to dispose of, another Party's share of gas production.  If for any reason a Party fails to take or market its full share of gas as produced, that Party may later take, market, or receive a cash accounting for its full share in accordance with Exhibit "E".

**22.5**    **Expenses of Delivery in Kind**

A cost that is incurred by Operator in making delivery of a Party's share of Hydrocarbons or disposing of same shall be paid by the Party.

# ARTICLE 23
# APPLICABLE LAW, JURISDICTION, AND VENUE

**23.1**    **Applicable Law**

THIS AGREEMENT AND THE RELATIONSHIP OF THE PARTIES UNDER THIS AGREEMENT SHALL BE GOVERNED BY AND INTERPRETED IN ACCORDANCE WITH THE GENERAL MARITIME LAW, OR IF THE GENERAL MARITIME LAW IS NOT APPLICABLE, THE LAWS OF THE STATE OF TEXAS, WITHOUT REGARD TO PRINCIPLES OF CONFLICTS OF LAWS THAT WOULD OTHERWISE REFER THE MATTER TO THE LAWS OF ANOTHER JURISDICTION; PROVIDED HOWEVER, THAT NO LAW THEORY OR PUBLIC POLICY

60

**SHALL BE GIVEN EFFECT THAT WOULD UNDERMINE, DIMINISH, OR REDUCE THE EFFECTIVENESS OF THE WAIVER DAMAGES PROVIDED IN THE PRECEDING ARTICLE 19.7, IT BEING THE EXPRESS INTENT, UNDERSTANDING, AND AGREEMENT OF THE PARTIES THAT SUCH WAIVER IS TO BE GIVEN THE FULLEST EFFECT, NOTWITHSTANDING THE NEGLIGENCE (WHETHER SOLE, JOINT, OR CONCURRENT), GROSS NEGLIGENCE, WILLFUL MISCONDUCT, STRICT LIABILITY, OR OTHER LEGAL FAULT OF A PARTY HERETO.**

**23.2    Jurisdiction and Venue**

For every dispute that arises under this Agreement, including any claim of breach of this Agreement, the Parties hereby consent to the exclusive jurisdiction and venue of a Federal court or Texas state court sitting in Houston, Texas.

# ARTICLE 24
## LAWS, REGULATIONS, AND NONDISCRIMINATION

**24.1    Laws and Regulations**

This Agreement and operations under this Agreement are subject to all applicable laws, rules, regulations, and orders by all governmental authorities claiming jurisdiction now and in the future. A provision of this Agreement found to be contrary to or inconsistent with any such law, rule, regulation, or order shall be deemed to have been modified accordingly.

**24.2    Nondiscrimination**

In performing work under this Agreement, the Parties shall comply and Operator shall require each independent contractor to comply with the governmental requirements in Exhibit "D" and with Articles 202(1) to (7), including Executive Order 11246, as amended.

# ARTICLE 25
## FORCE MAJEURE

**25.1    Force Majeure**

If a Party is unable, wholly or in part because of a Force Majeure, to carry out its obligations under this Agreement, other than the obligation to make money payments, that Party shall give the other Parties prompt written notice of the Force Majeure with sufficient particulars about it. Effective on the date notice is given, the obligations of the Party, so far as they are affected by the Force Majeure, shall be suspended during, but no longer than, the continuance of the Force Majeure.  Time is of the essence in the performance of this Agreement, and every reasonable effort will be made by the Party to avoid delay or suspension of any work or acts to be performed under this Agreement.  The requirement that the Force Majeure be remedied with all reasonable dispatch shall not require a Party to settle strikes or other labor difficulties.

# ARTICLE 26
# SUCCESSORS AND ASSIGNS

**26.1    Transfer of Interest**

Except as provided in 26.1.1 (Exceptions to Transfer Notice), a Transfer of Interest shall be provided by written notice to Operator and the other Parties ("the Transfer Notice"). Any Transfer of Interest shall be made to a party qualified by the BOEMRE to own leases in the Gulf of Mexico, and is financially capable of assuming the corresponding obligations under this Agreement. The non-transferring Parties' consent can be conditioned on requiring the proposed transferee to provide (i) replacement financial assurances for any financial assurances previously provided by the transferring Party and (ii) additional reasonable financial assurances of the party to which the working interest is to be transferred and its ability to perform its obligations under this Agreement, after giving due consideration to the replacement financial assurances to be provided pursuant to clause (i). All Transfers of Interest to any Person must be approved by and consented to in writing by the non-transferring Parties for any assignment made hereunder to be valid and binding upon the non-transferring Parties. Any Transfer of Interest shall contain a provision in the assignment requiring that the non-transferring Parties' written consent must also be obtained before any future Transfer of Interest under this Agreement in whole or in part to any Person, and shall also include a provision that the party to which the working interest is transferred to be bound by all the terms and conditions of this Agreement. No Transfer of Interest shall release a Party from its obligations and liabilities under this Agreement, and the security rights under Article 8.6 (Security Rights) shall continue to burden the Working Interest transferred and to secure the payment of those obligations and liabilities.

**26.1.1    Exceptions to Transfer Notice**

Notwithstanding any contrary provision of this Agreement, the Transfer Notice is not required when a Party proposes to mortgage, pledge, hypothecate, or grant a security interest in all or a portion of its Working Interest (including Assignments of Hydrocarbon production executed as further security for the debt secured by that security device), in any wells, Platforms, Development Facilities, or other equipment. However, an encumbrance arising from the financing transaction shall be expressly made subject and subordinated to this Agreement.

**26.1.2    Effective Date of Transfer of Interest**

A Transfer of Interest becomes effective twenty (20) days after the day all Parties are in receipt of the Transfer Notice. No Transfer of Interest, other than those provided in Article 15.1 (Right to Withdraw) and Article 26.1.1 (Exceptions to Prior Written Notice), is binding on the Parties unless and until (i) the assignor or assignee provides all remaining

62

Parties with a photocopy of a fully executed Transfer of Interest, an executed BOEMRE "Designation of Operator" form and a designation of oil spill responsibility form, and (ii) evidence of receipt of all necessary approvals by the BOEMRE. The Parties shall promptly undertake all reasonable actions necessary to secure those approvals and shall execute and deliver all documents necessary to effectuate that Transfer of Interest. All costs attributable to a Transfer of Interest are the sole obligation of the assigning Party.

### 26.1.3   Form of Transfer of Interest

Any Transfer of Interest shall incorporate provisions that the Transfer of Interest is subordinate to and made expressly subject to this Agreement and provide for the assumption by the assignee of the performance of all the assigning Party's obligations under this Agreement. Any Transfer of Interest not in compliance with this provision is voidable by the non-assigning Parties.

### 26.1.4   Warranty

Any Transfer of Interest, vesting, or relinquishment of Working Interest between the Parties under this Agreement shall be made without warranty of title, except as provided in the next sentence. All liens, charges, and other encumbrances, including but not limited to overriding royalties, net profits interest, and production payments, which a Party placed (or caused to be placed) on its Working Interest shall be fully satisfied or released before the effective date of a Transfer of Interest, vesting, or relinquishment of Working Interest between that Party and another Party under this Agreement (unless the other Party is willing to accept the Working Interest subject to those liens, charges, and other encumbrances).

# ARTICLE 27
# ADMINISTRATIVE PROVISIONS

## 27.1   Term

This Agreement shall remain in effect so long as a Lease remains in effect and thereafter until (a) all wells have been abandoned and plugged or turned over to the Parties owning an interest in the Lease on which the wells are located; (b) all Platforms, Development Facilities, and equipment have been disposed of by Operator in accordance with Article 14 (Abandonment, Salvage, and Surplus); (c) all Claims as defined in Article 19 (Liability, Claims, and Lawsuits) have been settled or otherwise disposed of; and (d) there has been a final accounting and settlement by all Parties. In accordance with Article 4.5 (Selection of Successor Operator), this Agreement will terminate if no Party is willing to become Operator, effective after all conditions in clauses (a) through (d) above have been completed. In accordance with Article 15.2.1

63

(Unanimous Withdrawal), this Agreement will terminate if all Parties elect to withdraw, effective after all conditions in clauses (a) through (d) above have been completed.  Termination of this Agreement shall not relieve a Party of a liability or obligation accrued or incurred before termination and is without prejudice to all continuing confidentiality obligations or other obligations in this Agreement.

**27.2    Waiver**

A term, provision, covenant, representation, warranty, or condition of this Agreement may be waived only by written instrument executed by the Party waiving compliance.  The failure or delay of a Party in the enforcement or exercise of the rights granted under this Agreement shall not constitute a waiver of said rights nor shall it be considered as a basis for estoppel.  Time is of the essence in the performance of this Agreement and all time limits shall be strictly construed and enforced.

**27.3    Waiver of Right to Partition**

Each Party waives the right to bring an action for partition of its interest in the Lease, wells, Platform, Development Facilities, and other equipment held under this Agreement, and covenants that during the existence of this Agreement it shall not resort at any time to an action at law or in equity to partition any or all of the Lease and lands or personal property subject to this Agreement.

**27.4    Compliance with Laws and Regulations**

This Agreement, and all activities or operations conducted by the Parties under this Agreement, are expressly subject to, and shall comply with, all laws, orders, rules, and regulations of all federal, state, and local governmental authorities having jurisdiction over the Lease.

**27.4.1    Severance of Invalid Provisions**

If, for any reason and for so long as, a clause or provision of this Agreement is held by a court of competent jurisdiction to be illegal, invalid, unenforceable, or unconscionable under a present or future law or interpretation thereof, the remainder of this Agreement will not be affected by that illegality or invalidity.  An illegal or invalid provision will be deemed severed from this Agreement, as if this Agreement had been executed without the illegal or invalid provision.  The surviving provisions of this Agreement will remain in full force and effect unless the removal of the illegal or invalid provision destroys the legitimate purposes of this Agreement, in which event this Agreement shall be null and void.

**27.4.2    Fair and Equal Employment**

Each of the Parties is an Equal Opportunity Employer, and the equal opportunity provisions of 30 CFR 270 and 41 CFR 60-1, as amended or modified, are incorporated in this Agreement by reference.   The affirmative-action clauses concerning disabled veterans and veterans of the Vietnam era (41 CFR 60-250) and the affirmative-action

64

clauses concerning employment of the handicapped (41 CFR 60-741) are also incorporated in this Agreement by reference. In performing work under this Agreement, the Parties shall comply with (and Operator shall require each independent contractor to comply with) the governmental requirements in Exhibit "D" that pertain to non-segregated facilities.

### 27.5    Construction and Interpretation of This Agreement

#### 27.5.1   Headings for Convenience

Except for the definition headings in Article 2 (Definitions), all the table of contents, captions, numbering sequences, and paragraph headings in this Agreement are inserted for convenience only and do not define, expand, or limit the scope, meaning, or intent of this Agreement.

#### 27.5.2   Article References

Except as otherwise provided in this Agreement, each reference to an article of this Agreement includes all the referenced article and its sub-articles.

#### 27.5.3   Gender and Number

The use of pronouns in whatever gender or number is a proper reference to the Parties to this Agreement though the Parties may be individuals, business entities, or groups thereof. Reference in this Agreement to the singular of a noun or pronoun includes the plural and vice versa.

#### 27.5.4   Future References

A reference to a Party includes such Party's successors and assigns and, in the case of governmental bodies, persons succeeding to their respective functions and capacities.

#### 27.5.5   Currency

Any amounts due or payable under this Agreement shall be paid in United States currency.

#### 27.5.6   Optional Provisions

If any "Optional" provision of this Agreement is not adopted by the Parties to this Agreement by a typed, printed, or handwritten indication, such provision shall not form a part of this Agreement, and no inference shall be made concerning the intent of the Parties in regard to the subject matter of the "Optional" provision.

#### 27.5.7   Joint Preparation

This Agreement shall be deemed for all purposes to have been prepared through the joint efforts of the Parties and shall not be construed for or against one (1) Party or the other as a result of the preparation, submittal, drafting, execution, or other event of negotiation hereof.

#### 27.5.8   Integrated Agreement

This Agreement contains the final and entire agreement of the Parties for the matters

covered by this Agreement and, as such, supersedes all prior written or oral communications and agreements.  This Agreement may not be modified or changed except by written amendment signed by the Parties.

**27.5.9  Binding Effect**

To the extent that it is assignable, this Agreement shall bind and inure to the benefit of the Parties and their respective successors and assigns, and shall constitute a covenant running with the land comprising the Lease.  This Agreement does not benefit or create any rights in a person or entity that is not a Party to this Agreement.

**27.5.10 Further Assurances**

Each Party will take all actions necessary and will sign all documents necessary to implement this Agreement.  Except as otherwise provided in this Agreement, within thirty (30) days after their receipt of a valid written request for those documents from a Party, all other Parties shall prepare and execute the documents.

**27.5.11 Counterpart Execution**

This Agreement may be executed by signing the original or a counterpart.  If this Agreement is executed in counterparts, all counterparts taken together shall have the same effect as if all Parties had signed the same agreement.  No Party shall be bound to this Agreement until all Parties have executed a counterpart or the original of this Agreement.  This Agreement may also be ratified by a separate instrument that refers to this Agreement and adopts by reference all provisions of this Agreement.  A ratification shall have the same effect as an execution of this Agreement.

**27.6  Restricted Bidding**

If more than one (1) Party is ever on the list of restricted joint bidders for Outer Continental Shelf ("OCS") lease sales, as issued by the BOEMRE under 30 CFR 256.44, as amended, the Parties shall comply with all statutes and regulations regarding restricted joint bidders on the OCS.

**27.7  Governing Agreement**

The Parties to this Agreement are also Parties to that certain Farmout Agreement dated effective _____ __, 20__, by and between _____, _____, _____, _____, and _____.   The Parties agree that should any conflict arise between the terms and conditions of this Agreement and the terms and conditions of the Farmout Agreement, the terms and conditions of the Farmout Agreement shall govern.

**IN WITNESS WHEREOF**, this Agreement has been executed by the Parties as of the day and year first above written.

#93828440v3
#93828440v5

**WITNESSES:**                              [_____]

_____      By: _____

_____      Title:

**WITNESSES:**                              [_____]

_____      By: _____

_____      Title:

**WITNESSES:**                              [_____]

_____      By: _____

_____      Title:

**WITNESSES:**                              [_____]

_____      By: _____

_____      Title:

**WITNESSES:**                              [_____]

_____      By: _____

_____      Title:

## EXHIBIT "A"

Attached to and made a part of that certain Offshore Operating Agreement dated effective _____ _____ __, 20__, by and between _____, as Operator, and _____, as Non-Operators.

**I.      OPERATOR**

[_____]

**II.     NON-OPERATOR(S)**

[_____]
[_____]
[_____]
[_____]

**III.    DESCRIPTION OF CONTRACT AREA**

**IV.    WORKING INTEREST OF THE PARTIES**

| PARTY | WI % |
|---|---|
| [_____] | X |
| [_____] | X |
| [_____] | X |
| [_____] | X |
| [_____] | 50% |

**V.     ADDRESSES AND CONTACT NUMBERS**

[_____]
[_____]
[_____]
Attention:
Phone:
Fax:

[_____]
[_____]
[_____]
Attention:
Phone:
Fax:

[_____]
[_____]
[_____]
Attention:
Phone:
Fax:

[_____]
[_____]
[_____]
Attention:
Phone:
Fax:

1

[_____]
[_____]
[_____]
Attention:
Phone:
Fax:

## VI.    <u>BURDENS AND CONTRACTS IN CONTRACT AREA</u>

2

#93828440v3
#93828440v5

**EXHIBIT "B"**

Attached to and made a part of that certain Offshore Operating Agreement dated effective \_\_\_\_\_ _____ \_\_, 20\_\_, by and between _____, as Operator, and _____, as Non-Operators.

**INSURANCE PROVISIONS**

I.      Operator shall carry the insurance specified in Section I with the limits stipulated below for the joint account.  Operator shall have the right to charge the joint account premiums for the insurance coverage required by this Exhibit "B."  Such premiums shall be allocated to the joint account using a fair and reasonable method based on the nature of the operations covered by this Agreement.

      A.      <u>Workers' Compensation and Employer's Liability</u>.

           1.      Workers' Compensation and Employer's Liability Insurance covering the employees of Operator engaged in operations hereunder in compliance with all applicable State and Federal Laws.

           2.      Coverage under U. S. Longshore and Harbor Worker's Compensation Act, extended to include the Outer Continental Shelf.

           3.      Extension of Coverage B of policy to provide for not less than $1,000,000 ("for assured's interest") for death or bodily injury to one person in any one accident; coverage also to include Employer's Liability under Admiralty Jurisdiction, including the Jones Act, with Marine and Voluntary Compensation Endorsement providing for a limit of liability of not less than $1,000,000 per accident and an endorsement for transportation, maintenance, wages and cure, all with same limits, as well as an endorsement to the effect that a claim "in rem" shall be treated as a claim against the insured.

II.     Operator shall not be obligated or authorized to obtain or carry on behalf of the joint account any additional insurance covering the Parties or the operations to be conducted hereunder.  Each Party, at its own expense, must carry its own coverage for the types of insurance and with the minimum limits as set forth in each of Paragraphs A-G below. Each Party must provide Operator prior to commencement of operations a certificate of insurance or other evidence of coverage demonstrating coverage with the required limits of liability.  All losses and all damages to jointly owned property, except losses covered by insurance carried for the joint account, shall be borne by the Parties in proportion to their respective interests, unless the loss is caused by the gross negligence or willful misconduct of a Party hereto.  The insurance coverages required herein represent minimum requirements and do not limit or invalidate any indemnity or other obligation of the Parties under this Agreement.  A Party's failure to secure the required insurance coverages or the required endorsements on the policies or any denial of coverage by underwriters does not relieve such Party or limit its liabilities or obligations under this Agreement.

      Any Party, at its own expense, may acquire such additional insurance as it may deem necessary to protect its own interest against claims, losses, damages or destruction to property arising out of operations hereunder.

#93828440v3
#93828440v5

Each Party hereby waives its rights of recovery against all other Parties to this agreement and agrees that all insurance covering its interest in the jointly owned property will be suitably endorsed to affect a waiver of subrogation as per the indemnity and obligations assumed within the agreement.

A.   Commercial General Liability and Business Automobile Liability.  Coverage for all operations conducted hereunder with a combined single limit each occurrence, and in the aggregate, of $1,000,000 ("for assured's interest").  Said Commercial General Liability Insurance shall also include contractual liability coverage, sudden and accidental pollution coverage.  Automobile liability insurance shall include coverage for owned, hired and non-owned vehicles and mobile equipment licensed for highway use.

B.   Vessels.  All vessels chartered by any Party shall be covered Protection and Indemnity coverage, with limits of $1,000,000 ("for assured's interest") per occurrence and in the aggregate.

C.   Aircraft.  All aircraft owned or chartered by any Party shall be covered by Aircraft Liability Insurance with limits of $5,000,000 ("for assured's interest") per occurrence and in the aggregate.

D.   Excess Liability.  Each Party shall carry Excess Liability insurance in the amount of $50,000,000 per occurrence and in the aggregate ("for assured's interest"), excess of all primary liability limits in the insurance specified in Sections A-C.

E.   Extra Expense Liability.  Extra expense liability coverage including control of well, seepage, pollution and contamination coverage, cleanup and/or containment coverage, re-drilling and/or restoring, and care, custody and control shall be carried by each Party with limits of liability of $75,000,000 per occurrence and in the aggregate and $5,000,000 per occurrence and in the aggregate for Care, Custody and Control coverage.

F.   Financial Responsibility Insurance:  Operator shall demonstrate coverage, as required by the Bureau of Ocean Energy Management pursuant to the Oil Pollution Act of 1990 as per CFR Part 253 "Final Rule for Oil Spill Financial Responsibility", according to the applicable governmental guidelines.

G.   Contractors:  Operator shall use reasonable efforts to require all contractors working or performing services hereunder to comply with the workers' compensation and employer's liability laws, both State and Federal, and said contractors or others performing services shall be required to procure and maintain appropriate insurance coverage as deemed by Operator for the types of operations undertaken.  All insurance shall be endorsed to include the Operator and the Parties as additional insureds, except for Worker's Compensation.  All such policies shall be endorsed with a Waiver of Subrogation in favor of Operator and the Parties.

<p style="text-align:center">END OF EXHIBIT "B"</p>

<p style="text-align:center">2</p>



COPAS 2005 Accounting Procedure
Recommended by COPAS

# Exhibit " C "
# ACCOUNTING PROCEDURE
# JOINT OPERATIONS

1    Attached to and made part of _that certain Offshore Operating Agreement dated [_____] , by and between [_____],
2    As Operator and [_____] as Non-Operators
3
4
5
6                                 **I. GENERAL PROVISIONS**
7
8    **IF THE PARTIES FAIL TO SELECT EITHER ONE OF COMPETING "ALTERNATIVE" PROVISIONS, OR SELECT ALL THE**
9    **COMPETING "ALTERNATIVE" PROVISIONS, ALTERNATIVE 1 IN EACH SUCH INSTANCE SHALL BE DEEMED TO HAVE**
10   **BEEN ADOPTED BY THE PARTIES AS A RESULT OF ANY SUCH OMISSION OR DUPLICATE NOTATION.**
11
12   **IN THE EVENT THAT ANY "OPTIONAL" PROVISION OF THIS ACCOUNTING PROCEDURE IS NOT ADOPTED BY THE**
13   **PARTIES TO THE AGREEMENT BY A TYPED, PRINTED OR HANDWRITTEN INDICATION, SUCH PROVISION SHALL NOT**
14   **FORM A PART OF THIS ACCOUNTING PROCEDURE, AND NO INFERENCE SHALL BE MADE CONCERNING THE INTENT**
15   **OF THE PARTIES IN SUCH EVENT.**
16
17   **1.    DEFINITIONS**
18
19      All terms used in this Accounting Procedure shall have the following meaning, unless otherwise expressly defined in the Agreement:
20
21      **"Affiliate"** means for a person, another person that controls, is controlled by, or is under common control with that person. In this
22      definition, (a) control means the ownership by one person, directly or indirectly, of more than fifty percent (50%) of the voting securities
23      of a corporation or, for other persons, the equivalent ownership interest (such as partnership interests), and (b) "person" means an
24      individual, corporation, partnership, trust, estate, unincorporated organization, association, or other legal entity.
25
26      **"Agreement"** means the operating agreement, farmout agreement, or other contract between the Parties to which this Accounting
27      Procedure is attached.
28
29      **"Controllable Material"** means Material that, at the time of acquisition or disposition by the Joint Account, as applicable, is so classified
30      in the Material Classification Manual most recently recommended by the Council of Petroleum Accountants Societies (COPAS).
31
32      **"Equalized Freight"** means the procedure of charging transportation cost to the Joint Account based upon the distance from the nearest
33      Railway Receiving Point to the property.
34
35      **"Excluded Amount"** means a specified excluded trucking amount most recently recommended by COPAS.
36
37      **"Field Office"** means a structure, or portion of a structure, whether a temporary or permanent installation, the primary function of which is
38      to directly serve daily operation and maintenance activities of the Joint Property and which serves as a staging area for directly chargeable
39      field personnel.
40
41      **"First Level Supervision"** means those employees whose primary function in Joint Operations is the direct oversight of the Operator's
42      field employees and/or contract labor directly employed On-site in a field operating capacity. First Level Supervision functions may
43      include, but are not limited to:
44
45           • Responsibility for field employees and contract labor engaged in activities that can include field operations, maintenance,
46             construction, well remedial work, equipment movement and drilling
47           • Responsibility for day-to-day direct oversight of rig operations
48           • Responsibility for day-to-day direct oversight of construction operations
49           • Coordination of job priorities and approval of work procedures
50           • Responsibility for optimal resource utilization (equipment, Materials, personnel)
51           • Responsibility for meeting production and field operating expense targets
52           • Representation of the Parties in local matters involving community, vendors, regulatory agents and landowners, as an incidental
53             part of the supervisor's operating responsibilities
54           • Responsibility for all emergency responses with field staff
55           • Responsibility for implementing safety and environmental practices
56           • Responsibility for field adherence to company policy
57           • Responsibility for employment decisions and performance appraisals for field personnel
58           • Oversight of sub-groups for field functions such as electrical, safety, environmental, telecommunications, which may have group
59             or team leaders.
60
61      **"Joint Account"** means the account showing the charges paid and credits received in the conduct of the Joint Operations that are to be
62      shared by the Parties, but does not include proceeds attributable to hydrocarbons and by-products produced under the Agreement.
63
64      **"Joint Operations"** means all operations necessary or proper for the exploration, appraisal, development, production, protection,
65      maintenance, repair, abandonment, and restoration of the Joint Property.
66

COPYRIGHT © 2005 by Council of Petroleum Accountants Societies, Inc. (COPAS)

1   **"Joint Property"** means the real and personal property subject to the Agreement.

3   **"Laws"** means any laws, rules, regulations, decrees, and orders of the United States of America or any state thereof and all other
4   governmental bodies, agencies, and other authorities having jurisdiction over or affecting the provisions contained in or the transactions
5   contemplated by the Agreement or the Parties and their operations, whether such laws now exist or are hereafter amended, enacted,
6   promulgated or issued.

8   **"Material"** means personal property, equipment, supplies, or consumables acquired or held for use by the Joint Property.

10   **"Non-Operators"** means the Parties to the Agreement other than the Operator.

12   **"Offshore Facilities"** means platforms, surface and subsea development and production systems, and other support systems such as oil and
13   gas handling facilities, living quarters, offices, shops, cranes, electrical supply equipment and systems, fuel and water storage and piping,
14   heliport, marine docking installations, communication facilities, navigation aids, and other similar facilities necessary in the conduct of
15   offshore operations, all of which are located offshore.

17   **"Off-site"** means any location that is not considered On-site as defined in this Accounting Procedure.

19   **"On-site"** means on the Joint Property when in direct conduct of Joint Operations. The term "On-site" shall also include that portion of
20   Offshore Facilities, Shore Base Facilities, fabrication yards, and staging areas from which Joint Operations are conducted, or other
21   facilities that directly control equipment on the Joint Property, regardless of whether such facilities are owned by the Joint Account.

23   **"Operator"** means the Party designated pursuant to the Agreement to conduct the Joint Operations.

25   **"Parties"** means legal entities signatory to the Agreement or their successors and assigns. Parties shall be referred to individually as
26   "Party."

28   **"Participating Interest"** means the percentage of the costs and risks of conducting an operation under the Agreement that a Party agrees,
29   or is otherwise obligated, to pay and bear.

31   **"Participating Party"** means a Party that approves a proposed operation or otherwise agrees, or becomes liable, to pay and bear a share of
32   the costs and risks of conducting an operation under the Agreement.

34   **"Personal Expenses"** means reimbursed costs for travel and temporary living expenses.

36   **"Railway Receiving Point"** means the railhead nearest the Joint Property for which freight rates are published, even though an actual
37   railhead may not exist.

39   **"Shore Base Facilities"** means onshore support facilities that during Joint Operations provide such services to the Joint Property as a
40   receiving and transshipment point for Materials; debarkation point for drilling and production personnel and services; communication,
41   scheduling and dispatching center; and other associated functions serving the Joint Property.

43   **"Supply Store"** means a recognized source or common stock point for a given Material item.

45   **"Technical Services"** means services providing specific engineering, geoscience, or other professional skills, such as those performed by
46   engineers, geologists, geophysicists, and technicians, required to handle specific operating conditions and problems for the benefit of Joint
47   Operations; provided, however, Technical Services shall not include those functions specifically identified as overhead under the second
48   paragraph of the introduction of Section III (*Overhead*). Technical Services may be provided by the Operator, Operator's Affiliate, Non-
49   Operator, Non-Operator Affiliates, and/or third parties.

51   2.   **STATEMENTS AND BILLINGS**

53   The Operator shall bill Non-Operators on or before the last day of the month for their proportionate share of the Joint Account for the
54   preceding month. Such bills shall be accompanied by statements that identify the AFE (authority for expenditure), lease or facility, and all
55   charges and credits summarized by appropriate categories of investment and expense. Controllable Material shall be separately identified
56   and fully described in detail, or at the Operator's option, Controllable Material may be summarized by major Material classifications.
57   Intangible drilling costs, audit adjustments, and unusual charges and credits shall be separately and clearly identified.

59   The Operator may make available to Non-Operators any statements and bills required under Section I.2 and/or Section I.3.A (*Advances
60   and Payments by the Parties*) via email, electronic data interchange, internet websites or other equivalent electronic media in lieu of paper
61   copies. The Operator shall provide the Non-Operators instructions and any necessary information to access and receive the statements and
62   bills within the timeframes specified herein. A statement or billing shall be deemed as delivered twenty-four (24) hours (exclusive of
63   weekends and holidays) after the Operator notifies the Non-Operator that the statement or billing is available on the website and/or sent via
64   email or electronic data interchange transmission. Each Non-Operator individually shall elect to receive statements and billings
65   electronically, if available from the Operator, or request paper copies. Such election may be changed upon thirty (30) days prior written
66   notice to the Operator.

COPYRIGHT © 2005 by Council of Petroleum Accountants Societies, Inc. (COPAS)

COPAS 2005 Accounting Procedure
Recommended by COPAS, Inc.

**3.    ADVANCES AND PAYMENTS BY THE PARTIES**

A.    Unless otherwise provided for in the Agreement, the Operator may require the Non-Operators to advance their share of the estimated cash outlay for the succeeding month's operations within fifteen (15) days after receipt of the advance request or by the first day of the month for which the advance is required, whichever is later. The Operator shall adjust each monthly billing to reflect advances received from the Non-Operators for such month. If a refund is due, the Operator shall apply the amount to be refunded to the subsequent month's billing or advance, unless the Non-Operator sends the Operator a written request for a cash refund. The Operator shall remit the refund to the Non-Operator within fifteen (15) days of receipt of such written request.

B.    Except as provided below, each Party shall pay its proportionate share of all bills in full within fifteen (15) days of receipt date. If payment is not made within such time, the unpaid balance shall bear interest compounded monthly at the prime rate published by the *Wall Street Journal* on the first day of each month the payment is delinquent, plus three percent (3%), per annum, or the maximum contract rate permitted by the applicable usury Laws governing the Joint Property, whichever is the lesser, plus attorney's fees, court costs, and other costs in connection with the collection of unpaid amounts. If the *Wall Street Journal* ceases to be published or discontinues publishing a prime rate, the unpaid balance shall bear interest compounded monthly at the prime rate published by the Federal Reserve plus three percent (3%), per annum. Interest shall begin accruing on the first day of the month in which the payment was due. Payment shall not be reduced or delayed as a result of inquiries or anticipated credits unless the Operator has agreed. Notwithstanding the foregoing, the Non-Operator may reduce payment, provided it furnishes documentation and explanation to the Operator at the time payment is made, to the extent such reduction is caused by:

(1)    being billed at an incorrect working interest or Participating Interest that is higher than such Non-Operator's actual working interest or Participating Interest, as applicable; or

(2)    being billed for a project or AFE requiring approval of the Parties under the Agreement that the Non-Operator has not approved or is not otherwise obligated to pay under the Agreement; or

(3)    being billed for a property in which the Non-Operator no longer owns a working interest, provided the Non-Operator has furnished the Operator a copy of the recorded assignment or letter in-lieu. Notwithstanding the foregoing, the Non-Operator shall remain responsible for paying bills attributable to the interest it sold or transferred for any bills rendered during the thirty (30) day period following the Operator's receipt of such written notice; or

(4)    charges outside the adjustment period, as provided in Section I.4 (*Adjustments*).

**4.    ADJUSTMENTS**

A.    Payment of any such bills shall not prejudice the right of any Party to protest or question the correctness thereof; however, all bills and statements, including payout statements, rendered during any calendar year shall conclusively be presumed to be true and correct, with respect only to expenditures, after twenty-four (24) months following the end of any such calendar year, unless within said period a Party takes specific detailed written exception thereto making a claim for adjustment. The Operator shall provide a response to all written exceptions, whether or not contained in an audit report, within the time periods prescribed in Section I.5 (*Expenditure Audits*).

B.    All adjustments initiated by the Operator, except those described in items (1) through (4) of this Section I.4.B, are limited to the twenty-four (24) month period following the end of the calendar year in which the original charge appeared or should have appeared on the Operator's Joint Account or payout statement. Adjustments that may be made beyond the twenty-four (24) month period are limited to adjustments resulting from the following:

(1)    a physical inventory of Controllable Material as provided for in Section V (*Inventories of Controllable Material*), or

(2)    an offsetting entry (whether in whole or in part) that is the direct result of a specific joint interest audit exception granted by the Operator relating to another property, or

(3)    a government/regulatory audit, or

(4)    a working interest ownership or Participating Interest adjustment.

**5.    EXPENDITURE AUDITS**

A.    A Non-Operator, upon written notice to the Operator and all other Non-Operators, shall have the right to audit the Operator's accounts and records relating to the Joint Account within the twenty-four (24) month period following the end of such calendar year in which such bill was rendered; however, conducting an audit shall not extend the time for the taking of written exception to and the adjustment of accounts as provided for in Section I.4 (*Adjustments*). Any Party that is subject to payout accounting under the Agreement shall have the right to audit the accounts and records of the Party responsible for preparing the payout statements, or of the Party furnishing information to the Party responsible for preparing payout statements. Audits of payout accounts may include the volumes of hydrocarbons produced and saved and proceeds received for such hydrocarbons as they pertain to payout accounting required under the Agreement. Unless otherwise provided in the Agreement, audits of a payout account shall be conducted within the twenty-four (24) month period following the end of the calendar year in which the payout statement was rendered.

Where there are two or more Non-Operators, the Non-Operators shall make every reasonable effort to conduct a joint audit in a manner that will result in a minimum of inconvenience to the Operator. The Operator shall bear no portion of the Non-Operators' audit cost incurred under this paragraph unless agreed to by the Operator. The audits shall not be conducted more than once each year without prior approval of the Operator, except upon the resignation or removal of the Operator, and shall be made at the expense of

COPYRIGHT © 2005 by Council of Petroleum Accountants Societies, Inc. (COPAS)



COPAS 2005 Accounting Procedure
Recommended by COPAS, Inc.

those Non-Operators approving such audit.

The Non-Operator leading the audit (hereinafter "lead audit company") shall issue the audit report within ninety (90) days after completion of the audit testing and analysis; however, the ninety (90) day time period shall not extend the twenty-four (24) month requirement for taking specific detailed written exception as required in Section I.4.A (*Adjustments*) above. All claims shall be supported with sufficient documentation.

A timely filed written exception or audit report containing written exceptions (hereinafter "written exceptions") shall, with respect to the claims made therein, preclude the Operator from asserting a statute of limitations defense against such claims, and the Operator hereby waives its right to assert any statute of limitations defense against such claims for so long as any Non-Operator continues to comply with the deadlines for resolving exceptions provided in this Accounting Procedure. If the Non-Operators fail to comply with the additional deadlines in Section I.5.B or I.5.C, the Operator's waiver of its rights to assert a statute of limitations defense against the claims brought by the Non-Operators shall lapse, and such claims shall then be subject to the applicable statute of limitations, provided that such waiver shall not lapse in the event that the Operator has failed to comply with the deadlines in Section I.5.B or I.5.C.

B.  The Operator shall provide a written response to all exceptions in an audit report within one hundred eighty (180) days after Operator receives such report. Denied exceptions should be accompanied by a substantive response. If the Operator fails to provide substantive response to an exception within this one hundred eighty (180) day period, the Operator will owe interest on that exception or portion thereof, if ultimately granted, from the date it received the audit report. Interest shall be calculated using the rate set forth in Section I.3.B (*Advances and Payments by the Parties*).

C.  The lead audit company shall reply to the Operator's response to an audit report within ninety (90) days of receipt, and the Operator shall reply to the lead audit company's follow-up response within ninety (90) days of receipt; provided, however, each Non-Operator shall have the right to represent itself if it disagrees with the lead audit company's position or believes the lead audit company is not adequately fulfilling its duties. Unless otherwise provided for in Section I.5.E, if the Operator fails to provide substantive response to an exception within this ninety (90) day period, the Operator will owe interest on that exception or portion thereof, if ultimately granted, from the date it received the audit report. Interest shall be calculated using the rate set forth in Section I.3.B (*Advances and Payments by the Parties*).

D.  If any Party fails to meet the deadlines in Sections I.5.B or I.5.C or if any audit issues are outstanding fifteen (15) months after Operator receives the audit report, the Operator or any Non-Operator participating in the audit has the right to call a resolution meeting, as set forth in this Section I.5.D or it may invoke the dispute resolution procedures included in the Agreement, if applicable. The meeting will require one month's written notice to the Operator and all Non-Operators participating in the audit. The meeting shall be held at the Operator's office or mutually agreed location, and shall be attended by representatives of the Parties with authority to resolve such outstanding issues. Any Party who fails to attend the resolution meeting shall be bound by any resolution reached at the meeting. The lead audit company will make good faith efforts to coordinate the response and positions of the Non-Operator participants throughout the resolution process; however, each Non-Operator shall have the right to represent itself. Attendees will make good faith efforts to resolve outstanding issues, and each Party will be required to present substantive information supporting its position. A resolution meeting may be held as often as agreed to by the Parties. Issues unresolved at one meeting may be discussed at subsequent meetings until each such issue is resolved.

If the Agreement contains no dispute resolution procedures and the audit issues cannot be resolved by negotiation, the dispute shall be submitted to mediation. In such event, promptly following one Party's written request for mediation, the Parties to the dispute shall choose a mutually acceptable mediator and share the costs of mediation services equally. The Parties shall each have present at the mediation at least one individual who has the authority to settle the dispute. The Parties shall make reasonable efforts to ensure that the mediation commences within sixty (60) days of the date of the mediation request. Notwithstanding the above, any Party may file a lawsuit or complaint (1) if the Parties are unable after reasonable efforts, to commence mediation within sixty (60) days of the date of the mediation request, (2) for statute of limitations reasons, or (3) to seek a preliminary injunction or other provisional judicial relief, if in its sole judgment an injunction or other provisional relief is necessary to avoid irreparable damage or to preserve the status quo. Despite such action, the Parties shall continue to try to resolve the dispute by mediation.

E.  ☐ *(Optional Provision – Forfeiture Penalties)*
*If the Non-Operators fail to meet the deadline in Section I.5.C, any unresolved exceptions that were not addressed by the Non-Operators within one (1) year following receipt of the last substantive response of the Operator shall be deemed to have been withdrawn by the Non-Operators. If the Operator fails to meet the deadlines in Section I.5.B or I.5.C, any unresolved exceptions that were not addressed by the Operator within one (1) year following receipt of the audit report or receipt of the last substantive response of the Non-Operators, whichever is later, shall be deemed to have been granted by the Operator and adjustments shall be made, without interest, to the Joint Account.*

6.  **APPROVAL BY PARTIES**

A.  GENERAL MATTERS

Where an approval or other agreement of the Parties or Non-Operators is expressly required under other Sections of this Accounting Procedure and if the Agreement to which this Accounting Procedure is attached contains no contrary provisions in regard thereto, the

COPYRIGHT © 2005 by Council of Petroleum Accountants Societies, Inc. (COPAS)



COPAS 2005 Accounting Procedure
Recommended by COPAS, Inc.

Operator shall notify all Non-Operators of the Operator's proposal and the agreement or approval of a majority in interest of the Non-Operators shall be controlling on all Non-Operators.

This Section I.6.A applies to specific situations of limited duration where a Party proposes to change the accounting for charges from that prescribed in this Accounting Procedure. This provision does not apply to amendments to this Accounting Procedure, which are covered by Section I.6.B.

B.  AMENDMENTS

If the Agreement to which this Accounting Procedure is attached contains no contrary provisions in regard thereto, this Accounting Procedure can be amended by an affirmative vote of _____one_____ (__1%__) or more Parties, one of which is the Operator, having a combined working interest of at least _____fifty_____ percent (__50__%), which approval shall be binding on all Parties, provided, however, approval of at least one (1) Non-Operator shall be required.

C.  AFFILIATES

For the purpose of administering the voting procedures of Sections I.6.A and I.6.B, if Parties to this Agreement are Affiliates of each other, then such Affiliates shall be combined and treated as a single Party having the combined working interest or Participating Interest of such Affiliates.

For the purposes of administering the voting procedures in Section I.6.A, if a Non-Operator is an Affiliate of the Operator, votes under Section I.6.A shall require the majority in interest of the Non-Operator(s) after excluding the interest of the Operator's Affiliate.

## II. DIRECT CHARGES

The Operator shall charge the Joint Account with the following items:

**1.  RENTALS AND ROYALTIES**

Lease rentals and royalties paid by the Operator, on behalf of all Parties, for the Joint Operations.

**2.  LABOR**

A.  Salaries and wages, including incentive compensation programs as set forth in COPAS MFI-37 ("Chargeability of Incentive Compensation Programs"), for:

(1)  Operator's field employees directly employed On-site in the conduct of Joint Operations,

(2)  Operator's employees directly employed on Shore Base Facilities, Offshore Facilities, or other facilities serving the Joint Property if such costs are not charged under Section II.6 (*Equipment and Facilities Furnished by Operator*) or are not a function covered under Section III (*Overhead*),

(3)  Operator's employees providing First Level Supervision,

(4)  Operator's employees providing On-site Technical Services for the Joint Property if such charges are excluded from the overhead rates in Section III (*Overhead*),

(5)  Operator's employees providing Off-site Technical Services for the Joint Property if such charges are excluded from the overhead rates in Section III (*Overhead*).

Charges for the Operator's employees identified in Section II.2.A may be made based on the employee's actual salaries and wages, or in lieu thereof, a day rate representing the Operator's average salaries and wages of the employee's specific job category.

Charges for personnel chargeable under this Section II.2.A who are foreign nationals shall not exceed comparable compensation paid to an equivalent U.S. employee pursuant to this Section II.2, unless otherwise approved by the Parties pursuant to Section I.6.A (*General Matters*).

B.  Operator's cost of holiday, vacation, sickness, and disability benefits, and other customary allowances paid to employees whose salaries and wages are chargeable to the Joint Account under Section II.2.A, excluding severance payments or other termination allowances. Such costs under this Section II.2.B may be charged on a "when and as-paid basis" or by "percentage assessment" on the amount of salaries and wages chargeable to the Joint Account under Section II.2.A. If percentage assessment is used, the rate shall be based on the Operator's cost experience.

C.  Expenditures or contributions made pursuant to assessments imposed by governmental authority that are applicable to costs chargeable to the Joint Account under Sections II.2.A and B.

COPYRIGHT © 2005 by Council of Petroleum Accountants Societies, Inc. (COPAS)

c o p a s

D.   Personal Expenses of personnel whose salaries and wages are chargeable to the Joint Account under Section II.2.A when the expenses are incurred in connection with directly chargeable activities.

E.   Reasonable relocation costs incurred in transferring to the Joint Property personnel whose salaries and wages are chargeable to the Joint Account under Section II.2.A. Notwithstanding the foregoing, relocation costs that result from reorganization or merger of a Party, or  that are for the primary benefit of the Operator, shall not be chargeable to the Joint Account. Extraordinary relocation costs, such as those incurred as a result of transfers from remote locations, such as Alaska or overseas, shall not be charged to the Joint Account unless approved by the Parties pursuant to Section I.6.A (*General Matters*).

F.   Training costs as specified in COPAS MFI-35 ("Charging of Training Costs to the Joint Account") for personnel whose salaries and wages are chargeable under Section II.2.A. This training charge shall include the wages, salaries, training course cost, and Personal Expenses incurred during the training session. The training cost shall be charged or allocated to the property or properties directly benefiting from the training. The cost of the training course shall not exceed prevailing commercial rates, where such rates are available.

G.   Operator's current cost of established plans for employee benefits, as described in COPAS MFI-27 ("Employee Benefits Chargeable to Joint Operations and Subject to Percentage Limitation"), applicable to the Operator's labor costs chargeable to the Joint Account under Sections II.2.A and B based on the Operator's actual cost not to exceed the employee benefits limitation percentage most recently recommended by COPAS.

H.   Award payments to employees, in accordance with COPAS MFI-49 ("Awards to Employees and Contractors") for personnel whose salaries and wages are chargeable under Section II.2.A.

3.   **MATERIAL**

Material purchased or furnished by the Operator for use on the Joint Property in the conduct of Joint Operations as provided under Section IV (Material *Purchases, Transfers, and Dispositions*). Only such Material shall be purchased for or transferred to the Joint Property as may be required for immediate use or is reasonably practical and consistent with efficient and economical operations. The accumulation of surplus stocks shall be avoided.

4.   **TRANSPORTATION**

A.   Transportation of the Operator's, Operator's Affiliate's, or contractor's personnel necessary for Joint Operations.

B.   Transportation of Material between the Joint Property and another property, or from the Operator's warehouse or other storage point to the Joint Property, shall be charged to the receiving property using one of the methods listed below. Transportation of Material from the Joint Property to the Operator's warehouse or other storage point shall be paid for by the Joint Property using one of the methods listed below:

(1)   If the actual trucking charge is less than or equal to the Excluded Amount the Operator may charge actual trucking cost or a theoretical charge from the Railway Receiving Point to the Joint Property. The basis for the theoretical charge is the per hundred weight charge plus fuel surcharges from the Railway Receiving Point to the Joint Property . The Operator shall consistently  apply the selected alternative.

(2)   If the actual trucking charge is greater than the Excluded Amount, the Operator shall charge Equalized Freight. Accessorial charges such as loading and unloading costs, split pick-up costs, detention, call out charges, and permit fees shall be charged directly to the Joint Property and shall not be included when calculating the Equalized Freight.

5.   **SERVICES**

The cost of contract services, equipment, and utilities used in the conduct of Joint Operations, except for contract services, equipment, and utilities covered by Section III (*Overhead*), or Section II.7 (*Affiliates*), or excluded under Section II.9 (*Legal Expense*). Awards paid to contractors shall be chargeable pursuant to COPAS MFI-49 ("Awards to Employees and Contractors").

The costs of third party Technical Services are chargeable to the extent excluded from the overhead rates under Section III (*Overhead*).

6.   **EQUIPMENT AND FACILITIES FURNISHED BY OPERATOR**

In the absence of a separately negotiated agreement, equipment and facilities furnished by the Operator will be charged as follows:

A.   The Operator shall charge the Joint Account for use of Operator-owned equipment and facilities, including but not limited to production facilities, Shore Base Facilities, Offshore Facilities, and Field Offices, at rates commensurate with the costs of ownership and operation. The cost of Field Offices shall be chargeable to the extent the Field Offices provide direct service to personnel who are chargeable pursuant to Section II.2.A (*Labor*). Such rates may include labor, maintenance, repairs, other operating expense, insurance, taxes, depreciation using straight line depreciation method, and interest on gross investment less accumulated depreciation not to exceed _____eight_____ percent (_____8_____%) per annum; provided, however, depreciation shall not be charged when the

COPYRIGHT © 2005 by Council of Petroleum Accountants Societies, Inc. (COPAS)



1   equipment and facilities investment have been fully depreciated. The rate may include an element of the estimated cost for
2   abandonment, reclamation, and dismantlement. Such rates shall not exceed the average commercial rates currently prevailing in the
3   immediate area of the Joint Property.

5   B.   In lieu of charges in Section II.6.A above, the Operator may elect to use average commercial rates prevailing in the immediate area
6        of the Joint Property, less twenty percent (20%). If equipment and facilities are charged under this Section II.6.B, the Operator shall
7        adequately document and support commercial rates and shall periodically review and update the rate and the supporting
8        documentation. For automotive equipment, the Operator may elect to use rates published by the Petroleum Motor Transport
9        Association (PMTA) or such other organization recognized by COPAS as the official source of rates.

11   **7.   AFFILIATES**

13   A.   Charges for an Affiliate's goods and/or services used in operations requiring an AFE or other authorization from the Non-Operators
14        may be made without the approval of the Parties provided (i) the Affiliate is identified and the Affiliate goods and services are
15        specifically detailed in the approved AFE or other authorization, and (ii) the total costs for such Affiliate's goods and services billed
16        to such individual project do not exceed $ 50,000.00               If the total costs for an Affiliate's goods and services charged to such
17        individual project are not specifically detailed in the approved AFE or authorization or exceed such amount, charges for such
18        Affiliate shall require approval of the Parties, pursuant to Section I.6.A (*General Matters*).

20   B.   For an Affiliate's goods and/or services used in operations not requiring an AFE or other authorization from the Non-Operators,
21        charges for such Affiliate's goods and services shall require approval of the Parties, pursuant to Section I.6.A (*General Matters*), if the
22        charges exceed $ 50,000.00              in a given calendar year.

24   C.   The cost of the Affiliate's goods or services shall not exceed average commercial rates prevailing in the area of the Joint Property,
25        unless the Operator obtains the Non-Operators' approval of such rates. The Operator shall adequately document and support
26        commercial rates and shall periodically review and update the rate and the supporting documentation; provided, however,
27        documentation of commercial rates shall not be required if the Operator obtains Non-Operator approval of its Affiliate's rates or
28        charges prior to billing Non-Operators for such Affiliate's goods and services. Notwithstanding the foregoing, direct charges for
29        Affiliate-owned communication facilities or systems shall be made pursuant to Section II.12 (*Communications*).

31        If the Parties fail to designate an amount in Sections II.7.A or II.7.B, in each instance the amount deemed adopted by the Parties as a
32        result of such omission shall be the amount established as the Operator's expenditure limitation in the Agreement. If the Agreement
33        does not contain an Operator's expenditure limitation, the amount deemed adopted by the Parties as a result of such omission shall be
34        zero dollars ($ 0.00).

36   **8.   DAMAGES AND LOSSES TO JOINT PROPERTY**

38        All costs or expenses necessary for the repair or replacement of Joint Property resulting from damages or losses incurred, except to the
39        extent such damages or losses result from a Party's or Parties' gross negligence or willful misconduct, in which case such Party or Parties
40        shall be solely liable.

42        The Operator shall furnish the Non-Operator written notice of damages or losses incurred as soon as practicable after a report has been
43        received by the Operator.

45   **9.   LEGAL EXPENSE**

47        Recording fees and costs of handling, settling, or otherwise discharging litigation, claims, and liens incurred in or resulting from
48        operations under the Agreement, or necessary to protect or recover the Joint Property, to the extent permitted under the Agreement. Costs
49        of the Operator's or Affiliate's legal staff or outside attorneys, including fees and expenses, are not chargeable unless approved by the
50        Parties pursuant to Section I.6.A (*General Matters*) or otherwise provided for in the Agreement.

52        Notwithstanding the foregoing paragraph, costs for procuring abstracts, fees paid to outside attorneys for title examinations (including
53        preliminary, supplemental, shut-in royalty opinions, division order title opinions), and curative work shall be chargeable to the extent
54        permitted as a direct charge in the Agreement.

57   **10.  TAXES AND PERMITS**

59        All taxes and permitting fees of every kind and nature, assessed or levied upon or in connection with the Joint Property, or the production
60        therefrom, and which have been paid by the Operator for the benefit of the Parties, including penalties and interest, except to the extent the
61        penalties and interest result from the Operator's gross negligence or willful misconduct.

63        If ad valorem taxes paid by the Operator are based in whole or in part upon separate valuations of each Party's working interest, then
64        notwithstanding any contrary provisions, the charges to the Parties will be made in accordance with the tax value generated by each Party's
65        working interest.

COPYRIGHT © 2005 by Council of Petroleum Accountants Societies, Inc. (COPAS)



Costs of tax consultants or advisors, the Operator's employees, or Operator's Affiliate employees in matters regarding ad valorem or other tax matters, are not permitted as direct charges unless approved by the Parties pursuant to Section I.6.A (*General Matters*).

Charges to the Joint Account resulting from sales/use tax audits, including extrapolated amounts and penalties and interest, are permitted, provided the Non-Operator shall be allowed to review the invoices and other underlying source documents which served as the basis for tax charges and to determine that the correct amount of taxes were charged to the Joint Account. If the Non-Operator is not permitted to review such documentation, the sales/use tax amount shall not be directly charged unless the Operator can conclusively document the amount owed by the Joint Account.

**11. INSURANCE**

Net premiums paid for insurance required to be carried for Joint Operations for the protection of the Parties. If Joint Operations are conducted at locations where the Operator acts as self-insurer in regard to its worker's compensation and employer's liability insurance obligation, the Operator shall charge the Joint Account manual rates for the risk assumed in its self-insurance program as regulated by the jurisdiction governing the Joint Property. In the case of offshore operations in federal waters, the manual rates of the adjacent state shall be used for personnel performing work On-site, and such rates shall be adjusted for offshore operations by the U.S. Longshoreman and Harbor Workers (USL&H) or Jones Act surcharge, as appropriate.

**12. COMMUNICATIONS**

Costs of acquiring, leasing, installing, operating, repairing, and maintaining communication facilities or systems, including satellite, radio and microwave facilities, between the Joint Property and the Operator's office(s) directly responsible for field operations in accordance with the provisions of COPAS MFI-44 ("Field Computer and Communication Systems"). If the communications facilities or systems serving the Joint Property are Operator-owned, charges to the Joint Account shall be made as provided in Section II.6 (*Equipment and Facilities Furnished by Operator*). If the communication facilities or systems serving the Joint Property are owned by the Operator's Affiliate, charges to the Joint Account shall not exceed average commercial rates prevailing in the area of the Joint Property. The Operator shall adequately document and support commercial rates and shall periodically review and update the rate and the supporting documentation.

**13. ECOLOGICAL, ENVIRONMENTAL, AND SAFETY**

Costs incurred for Technical Services and drafting to comply with ecological, environmental and safety Laws or standards recommended by Occupational Safety and Health Administration (OSHA) or other regulatory authorities. All other labor and functions incurred for ecological, environmental and safety matters, including management, administration,  and permitting, shall be covered by Sections II.2 (*Labor*), II.5 (*Services*), or Section III (*Overhead*), as applicable.

Costs to provide or have available pollution containment and removal equipment plus actual costs of control and cleanup and resulting responsibilities of oil and other spills as well as discharges from permitted outfalls as required by applicable Laws, or other pollution containment and removal equipment deemed appropriate by the Operator for prudent operations, are directly chargeable.

**14. ABANDONMENT AND RECLAMATION**

Costs incurred for abandonment and reclamation of the Joint Property, including costs required by lease agreements or by Laws.

**15. OTHER EXPENDITURES**

Any other expenditure not covered or dealt with in the foregoing provisions of this Section II (*Direct Charges*), or in Section III (*Overhead*) and which is of direct benefit to the Joint Property and is incurred by the Operator in the necessary and proper conduct of the Joint Operations. Charges made under this Section II.15 shall require approval of the Parties, pursuant to Section I.6.A (*General Matters*).

<div align="center">

**III. OVERHEAD**

</div>

As compensation for costs not specifically identified as chargeable to the Joint Account pursuant to Section II (*Direct Charges*), the Operator shall charge the Joint Account in accordance with this Section III.

Functions included in the overhead rates regardless of whether performed by the Operator, Operator's Affiliates or third parties and regardless of location, shall include, but not be limited to, costs and expenses of:

- warehousing, other than for warehouses that are  jointly owned under this Agreement
- design and drafting (except when allowed as a direct charge under Sections II.13, III.1.A(ii), and III.2, Option B)
- inventory costs not chargeable under Section V (*Inventories of Controllable Material*)
- procurement
- administration
- accounting and auditing
- gas dispatching and gas chart integration

COPYRIGHT © 2005 by Council of Petroleum Accountants Societies, Inc. (COPAS)



COPAS 2005 Accounting Procedure
Recommended by COPAS, Inc.

- human resources
- management
- supervision not directly charged under Section II.2 (*Labor*)
- legal services not directly chargeable under Section II.9 (*Legal Expense*)
- taxation, other than those costs identified as directly chargeable under Section II.10 (*Taxes and Permits*)
- preparation and monitoring of permits and certifications; preparing regulatory reports; appearances before or meetings with governmental agencies or other authorities having jurisdiction over the Joint Property, other than On-site inspections; reviewing, interpreting, or submitting comments on or lobbying with respect to Laws or proposed Laws.

Overhead charges shall include the salaries or wages plus applicable payroll burdens, benefits, and Personal Expenses of personnel performing overhead functions, as well as office and other related expenses of overhead functions.

1. **OVERHEAD—DRILLING AND PRODUCING OPERATIONS**

   As compensation for costs incurred but not chargeable under Section II (*Direct Charges*) and not covered by other provisions of this Section III, the Operator shall charge on either:

   ☑ **(Alternative 1)** Fixed Rate Basis, Section III.1.B.

   A. TECHNICAL SERVICES

   (i)  Except as otherwise provided in Section II.13 (*Ecological Environmental, and Safety*) and Section III.2 (*Overhead – Major Construction and Catastrophe*), or by approval of the Parties pursuant to Section I.6.A (*General Matters*), the salaries, wages, related payroll burdens and benefits, and Personal Expenses for **On-site** Technical Services, including third party Technical Services:

   ☑ **(Alternative 1 – Direct)** shall be charged **direct** to the Joint Account.

   (ii) Except as otherwise provided in Section II.13 (*Ecological, Environmental, and Safety*) and Section III.2 (*Overhead – Major Construction and Catastrophe*), or by approval of the Parties pursuant to Section I.6.A (*General Matters*), the salaries, wages, related payroll burdens and benefits, and Personal Expenses for **Off-site** Technical Services, including third party Technical Services:

   ☑ **(Alternative 1 – All Overhead)** shall be covered by the **overhead** rates.

   ☐ **(Alternative 2 – All Direct)** shall be charged **direct** to the Joint Account.

   Notwithstanding anything to the contrary in this Section III, Technical Services provided by Operator's Affiliates are subject to limitations set forth in Section II.7 (*Affiliates*). Charges for Technical personnel performing non-technical work shall not be governed by this Section III.1.A, but instead governed by other provisions of this Accounting Procedure relating to the type of work being performed.

   B. OVERHEAD—FIXED RATE BASIS

   (1) The Operator shall charge the Joint Account at the following rates per well per month:

       Drilling Well Rate per month $  40,000.00            (prorated for less than a full month)

       Producing Well Rate per month $  4,000.00

   (2) Application of Overhead—Drilling Well Rate shall be as follows:

   (a)  Charges for onshore drilling wells shall begin on the spud date and terminate on the date the drilling and/or completion equipment used on the well is released, whichever occurs later. Charges for offshore and inland waters drilling wells shall begin on the date the drilling or completion equipment arrives on location and terminate on the date the drilling or completion equipment moves off location, or is released, whichever occurs first. No charge shall be made during suspension of drilling and/or completion operations for fifteen (15) or more consecutive calendar days.

COPYRIGHT © 2005 by Council of Petroleum Accountants Societies, Inc. (COPAS)



      (b)    Charges for any well undergoing any type of workover, recompletion, and/or abandonment for a period of five (5) or more consecutive work–days shall be made at the Drilling Well Rate. Such charges shall be applied for the period from date operations, with rig or other units used in operations, commence through date of rig or other unit release, except that no charges shall be made during suspension of operations for fifteen (15) or more consecutive calendar days.

(3)    Application of Overhead—Producing Well Rate shall be as follows:

      (a)    An active well that is produced, injected into for recovery or disposal, or used to obtain water supply to support operations for any portion of the month shall be considered as a one-well charge for the entire month.

      (b)    Each active completion in a multi-completed well shall be considered as a one-well charge provided each completion is considered a separate well by the governing regulatory authority.

      (c)    A one-well charge shall be made for the month in which plugging and abandonment operations are completed on any well, unless the Drilling Well Rate applies, as provided in Sections III.1.B.(2)(a) or (b). This one-well charge shall be made whether or not the well has produced.

      (d)    An active gas well shut in because of overproduction or failure of a purchaser, processor, or transporter to take production shall be considered as a one-well charge provided the gas well is directly connected to a permanent sales outlet.

      (e)    Any well not meeting the criteria set forth in Sections III.1.B.(3) (a), (b), (c), or (d) shall not qualify for a producing overhead charge.

(4)    The well rates shall be adjusted on the first day of April each year following the effective date of the Agreement; provided, however, if this Accounting Procedure is attached to or otherwise governing the payout accounting under a farmout agreement, the rates shall be adjusted on the first day of April each year following the effective date of such farmout agreement. The adjustment shall be computed by applying the adjustment factor most recently published by COPAS. The adjusted rates shall be the initial or amended rates agreed to by the Parties increased or decreased by the adjustment factor described herein, for each year from the effective date of such rates, in accordance with COPAS MFI-47 ("Adjustment of Overhead Rates").

2.    **OVERHEAD—MAJOR CONSTRUCTION AND CATASTROPHE**

To compensate the Operator for overhead costs incurred in connection with a Major Construction project or Catastrophe, the Operator shall either negotiate a rate prior to the beginning of the project, or shall charge the Joint Account for overhead based on the following rates for any Major Construction project in excess of the Operator's expenditure limit under the Agreement, or for any Catastrophe regardless of the amount. If the Agreement to which this Accounting Procedure is attached does not contain an expenditure limit, Major Construction Overhead shall be assessed for any single Major Construction project costing in excess of $100,000 gross.

COPYRIGHT © 2005 by Council of Petroleum Accountants Societies, Inc. (COPAS)



COPAS 2005 Accounting Procedure
Recommended by COPAS, Inc.

Major Construction shall mean the construction and installation of fixed assets, the expansion of fixed assets, and any other project clearly discernible as a fixed asset required for the development and operation of the Joint Property, or in the dismantlement, abandonment, removal, and restoration of platforms, production equipment, and other operating facilities.

Catastrophe is defined as a sudden calamitous event bringing damage, loss, or destruction to property or the environment, such as an oil spill, blowout, explosion, fire, storm, hurricane, or other disaster. The overhead rate shall be applied to those costs necessary to restore the Joint Property to the equivalent condition that existed prior to the event.

A.    If the Operator absorbs the engineering, design and drafting costs related to the project:

    (1)    ____5____% of total costs if such costs are less than $100,000; plus

    (2)    ____3____% of total costs in excess of $100,000 but less than $1,000,000; plus

    (3)    ____2____% of total costs in excess of $1,000,000.

B.    If the Operator charges engineering, design and drafting costs related to the project directly to the Joint Account:

    (1)    ____5____% of total costs if such costs are less than $100,000; plus

    (2)    ____3____% of total costs in excess of $100,000 but less than $1,000,000; plus

    (3)    ____2____% of total costs in excess of $1,000,000.

Total cost shall mean the gross cost of any one project. For the purpose of this paragraph, the component parts of a single Major Construction project shall not be treated separately, and the cost of drilling and workover wells and purchasing and installing pumping units and downhole artificial lift equipment shall be excluded. For Catastrophes, the rates shall be applied to all costs associated with each single occurrence or event.

On each project, the Operator shall advise the Non-Operator(s) in advance which of the above options shall apply.

For the purposes of calculating Catastrophe Overhead, the cost of drilling relief wells, substitute wells, or conducting other well operations directly resulting from the catastrophic event shall be included. Expenditures to which these rates apply shall not be reduced by salvage or insurance recoveries. Expenditures that qualify for Major Construction or Catastrophe Overhead shall not qualify for overhead under any other overhead provisions.

In the event of any conflict between the provisions of this Section III.2 and the provisions of Sections II.2 (*Labor*), II.5 (*Services*), or II.7 (*Affiliates*), the provisions of this Section III.2 shall govern.

3.    **AMENDMENT OF OVERHEAD RATES**

The overhead rates provided for in this Section III may be amended from time to time if, in practice, the rates are found to be insufficient or excessive, in accordance with the provisions of Section I.6.B (*Amendments*).

**IV. MATERIAL PURCHASES, TRANSFERS, AND DISPOSITIONS**

The Operator is responsible for Joint Account Material and shall make proper and timely charges and credits for direct purchases, transfers, and dispositions. The Operator shall provide all Material for use in the conduct of Joint Operations; however, Material may be supplied by the Non-Operators, at the Operator's option. Material furnished by any Party shall be furnished without any express or implied warranties as to quality, fitness for use, or any other matter.

1.    **DIRECT PURCHASES**

Direct purchases shall be charged to the Joint Account at the price paid by the Operator after deduction of all discounts received. The Operator shall make good faith efforts to take discounts offered by suppliers, but shall not be liable for failure to take discounts except to the extent such failure was the result of the Operator's gross negligence or willful misconduct. A direct purchase shall be deemed to occur when an agreement is made between an Operator and a third party for the acquisition of Material for a specific well site or location. Material provided by the Operator under "vendor stocking programs," where the initial use is for a Joint Property and title of the Material does not pass from the manufacturer, distributor, or agent until usage, is considered a direct purchase. If Material is found to be defective or is returned to the manufacturer, distributor, or agent for any other reason, credit shall be passed to the Joint Account within sixty (60) days after the Operator has received adjustment from the manufacturer, distributor, or agent.

COPYRIGHT © 2005 by Council of Petroleum Accountants Societies, Inc. (COPAS)



COPAS 2005 Accounting Procedure
Recommended by COPAS, Inc.

## 2. TRANSFERS

A transfer is determined to occur when the Operator (i) furnishes Material from a storage facility or from another operated property, (ii) has assumed liability for the storage costs and changes in value, and (iii) has previously secured and held title to the transferred Material. Similarly, the removal of Material from the Joint Property to a storage facility or to another operated property is also considered a transfer; provided, however, Material that is moved from the Joint Property to a storage location for safe-keeping pending disposition may remain charged to the Joint Account and is not considered a transfer. Material shall be disposed of in accordance with Section IV.3 (*Disposition of Surplus*) and the Agreement to which this Accounting Procedure is attached.

### A. PRICING

The value of Material transferred to/from the Joint Property should generally reflect the market value on the date of physical transfer. Regardless of the pricing method used, the Operator shall make available to the Non-Operators sufficient documentation to verify the Material valuation. When higher than specification grade or size tubulars are used in the conduct of Joint Operations, the Operator shall charge the Joint Account at the equivalent price for well design specification tubulars, unless such higher specification grade or sized tubulars are approved by the Parties pursuant to Section I.6.A (*General Matters*). Transfers of new Material will be priced using one of the following pricing methods; provided, however, the Operator shall use consistent pricing methods, and not alternate between methods for the purpose of choosing the method most favorable to the Operator for a specific transfer:

(1) Using published prices in effect on date of movement as adjusted by the appropriate COPAS Historical Price Multiplier (HPM) or prices provided by the COPAS Computerized Equipment Pricing System (CEPS).

  (a) For oil country tubulars and line pipe, the published price shall be based upon eastern mill carload base prices (Houston, Texas, for special end) adjusted as of date of movement, plus transportation cost as defined in Section IV.2.B (*Freight*).

  (b) For other Material, the published price shall be the published list price in effect at date of movement, as listed by a Supply Store nearest the Joint Property where like Material is normally available, or point of manufacture plus transportation costs as defined in Section IV.2.B (*Freight*).

(2) Based on a price quotation from a vendor that reflects a current realistic acquisition cost.

(3) Based on the amount paid by the Operator for like Material in the vicinity of the Joint Property within the previous twelve (12) months from the date of physical transfer.

(4) As agreed to by the Participating Parties for Material being transferred to the Joint Property, and by the Parties owning the Material for Material being transferred from the Joint Property.

### B. FREIGHT

Transportation costs shall be added to the Material transfer price using the method prescribed by the COPAS Computerized Equipment Pricing System (CEPS). If not using CEPS, transportation costs shall be calculated as follows:

(1) Transportation costs for oil country tubulars and line pipe shall be calculated using the distance from eastern mill to the Railway Receiving Point based on the carload weight basis as recommended by the COPAS MFI-38 ("Material Pricing Manual") and other COPAS MFIs in effect at the time of the transfer.

(2) Transportation costs for special mill items shall be calculated from that mill's shipping point to the Railway Receiving Point. For transportation costs from other than eastern mills, the 30,000-pound interstate truck rate shall be used. Transportation costs for macaroni tubing shall be calculated based on the interstate truck rate per weight of tubing transferred to the Railway Receiving Point.

(3) Transportation costs for special end tubular goods shall be calculated using the interstate truck rate from Houston, Texas, to the Railway Receiving Point.

(4) Transportation costs for Material other than that described in Sections IV.2.B.(1) through (3), shall be calculated from the Supply Store or point of manufacture, whichever is appropriate, to the Railway Receiving Point

Regardless of whether using CEPS or manually calculating transportation costs, transportation costs from the Railway Receiving Point to the Joint Property are in addition to the foregoing, and may be charged to the Joint Account based on actual costs incurred. All transportation costs are subject to Equalized Freight as provided in Section II.4 (*Transportation*) of this Accounting Procedure.

### C. TAXES

Sales and use taxes shall be added to the Material transfer price using either the method contained in the COPAS Computerized Equipment Pricing System (CEPS) or the applicable tax rate in effect for the Joint Property at the time and place of transfer. In either case, the Joint Account shall be charged or credited at the rate that would have governed had the Material been a direct purchase.

COPYRIGHT © 2005 by Council of Petroleum Accountants Societies, Inc. (COPAS)

COPAS

D.  CONDITION

(1)  Condition "A" – New and unused Material in sound and serviceable condition shall be charged at one hundred percent (100%) of the price as determined in Sections IV.2.A (*Pricing*), IV.2.B (*Freight*), and IV.2.C (*Taxes*). Material transferred from the Joint Property that was not placed in service shall be credited as charged without gain or loss; provided, however, any unused Material that was charged to the Joint Account through a direct purchase will be credited to the Joint Account at the original cost paid less restocking fees charged by the vendor. New and unused Material transferred from the Joint Property may be credited at a price other than the price originally charged to the Joint Account provided such price is approved by the Parties owning such Material, pursuant to Section I.6.A (*General Matters*). All refurbishing costs required or necessary to return the Material to original condition or to correct handling, transportation, or other damages will be borne by the divesting property. The Joint Account is responsible for Material preparation, handling, and transportation costs for new and unused Material charged to the Joint Property either through a direct purchase or transfer. Any preparation costs incurred, including any internal or external coating and wrapping, will be credited on new Material provided these services were not repeated for such Material for the receiving property.

(2)  Condition "B" – Used Material in sound and serviceable condition and suitable for reuse without reconditioning shall be priced by multiplying the price determined in Sections IV.2.A (*Pricing*), IV.2.B (*Freight*), and IV.2.C (*Taxes*) by seventy-five percent (75%).

Except as provided in Section IV.2.D(3), all reconditioning costs required to return the Material to Condition "B" or to correct handling, transportation or other damages will be borne by the divesting property.

If the Material was originally charged to the Joint Account as used Material and placed in service for the Joint Property, the Material will be credited at the price determined in Sections IV.2.A (*Pricing*), IV.2.B (*Freight*), and IV.2.C (*Taxes*) multiplied by sixty-five percent (65%).

Unless otherwise agreed to by the Parties that paid for such Material, used Material transferred from the Joint Property that was not placed in service on the property shall be credited as charged without gain or loss.

(3)  Condition "C" – Material that is not in sound and serviceable condition and not suitable for its original function until after reconditioning shall be priced by multiplying the price determined in Sections IV.2.A (*Pricing*), IV.2.B (*Freight*), and IV.2.C (*Taxes*) by fifty percent (50%).

The cost of reconditioning may be charged to the receiving property to the extent Condition "C" value, plus cost of reconditioning, does not exceed Condition "B" value.

(4)  Condition "D" – Material that (i) is no longer suitable for its original purpose but useable for some other purpose, (ii) is obsolete, or (iii) does not meet original specifications but still has value and can be used in other applications as a substitute for items with different specifications, is considered Condition "D" Material. Casing, tubing, or drill pipe used as line pipe shall be priced as Grade A and B seamless line pipe of comparable size and weight. Used casing, tubing, or drill pipe utilized as line pipe shall be priced at used line pipe prices. Casing, tubing, or drill pipe used as higher pressure service lines than standard line pipe, e.g., power oil lines, shall be priced under normal pricing procedures for casing, tubing, or drill pipe. Upset tubular goods shall be priced on a non-upset basis. For other items, the price used should result in the Joint Account being charged or credited with the value of the service rendered or use of the Material, or as agreed to by the Parties pursuant to Section I.6.A (*General Matters*).

(5)  Condition "E" – Junk shall be priced at prevailing scrap value prices.

E.  OTHER PRICING PROVISIONS

(1)  Preparation Costs

Subject to Section II (*Direct Charges*) and Section III (*Overhead*) of this Accounting Procedure, costs incurred by the Operator in making Material serviceable including inspection, third party surveillance services, and other similar services will be charged to the Joint Account at prices which reflect the Operator's actual costs of the services. Documentation must be provided to the Non-Operators upon request to support the cost of service. New coating and/or wrapping shall be considered a component of the Materials and priced in accordance with Sections IV.1 (*Direct Purchases*) or IV.2.A (*Pricing*), as applicable. No charges or credits shall be made for used coating or wrapping. Charges and credits for inspections shall be made in accordance with COPAS MFI-38 ("Material Pricing Manual").

(2)  Loading and Unloading Costs

Loading and unloading costs related to the movement of the Material to the Joint Property shall be charged in accordance with the methods specified in COPAS MFI-38 ("Material Pricing Manual").

COPYRIGHT © 2005 by Council of Petroleum Accountants Societies, Inc. (COPAS)

COPAS 2005 Accounting Procedure
Recommended by COPAS, Inc.

**3.   DISPOSITION OF SURPLUS**

Surplus Material is that Material, whether new or used, that is no longer required for Joint Operations. The Operator may purchase, but shall be under no obligation to purchase, the interest of the Non-Operators in surplus Material.

Dispositions for the purpose of this procedure are considered to be the relinquishment of title of the Material from the Joint Property to either a third party, a Non-Operator, or to the Operator. To avoid the accumulation of surplus Material, the Operator should make good faith efforts to dispose of surplus within twelve (12) months through buy/sale agreements, trade, sale to a third party, division in kind, or other dispositions as agreed to by the Parties.

Disposal of surplus Materials shall be made in accordance with the terms of the Agreement to which this Accounting Procedure is attached. If the Agreement contains no provisions governing disposal of surplus Material, the following terms shall apply:

- The Operator may, through a sale to an unrelated third party or entity, dispose of surplus Material having a gross sale value that is less than or equal to the Operator's expenditure limit as set forth in the Agreement to which this Accounting Procedure is attached without the prior approval of the Parties owning such Material.

- If the gross sale value exceeds the Agreement expenditure limit, the disposal must be agreed by the Parties owning such Material.

- Operator may purchase surplus Condition "A" or "B" Material without approval of the Parties owning such Material, based on the pricing methods set forth in Section IV.2 (*Transfers*).

- Operator may purchase Condition "C" Material without prior approval of the Parties owning such Material if the value of the Materials, based on the pricing methods set forth in Section IV.2 (*Transfers*), is less than or equal to the Operator's expenditure limitation set forth in the Agreement. The Operator shall provide documentation supporting the classification of the Material as Condition C.

- Operator may dispose of Condition "D" or "E" Material under procedures normally utilized by Operator without prior approval of the Parties owning such Material.

**4.   SPECIAL PRICING PROVISIONS**

A.   PREMIUM PRICING

Whenever Material is available only at inflated prices due to national emergencies, strikes, government imposed foreign trade restrictions, or other unusual causes over which the Operator has no control, for direct purchase the Operator may charge the Joint Account for the required Material at the Operator's actual cost incurred in providing such Material, making it suitable for use, and moving it to the Joint Property. Material transferred or disposed of during premium pricing situations shall be valued in accordance with Section IV.2 (*Transfers*) or Section IV.3 (*Disposition of Surplus*), as applicable.

B.   SHOP-MADE ITEMS

Items fabricated by the Operator's employees, or by contract laborers under the direction of the Operator, shall be priced using the value of the Material used to construct the item plus the cost of labor to fabricate the item. If the Material is from the Operator's scrap or junk account, the Material shall be priced at either twenty-five percent (25%) of the current price as determined in Section IV.2.A (*Pricing*) or scrap value, whichever is higher. In no event shall the amount charged exceed the value of the item commensurate with its use.

C.   MILL REJECTS

Mill rejects purchased as "limited service" casing or tubing shall be priced at eighty percent (80%) of K-55/J-55 price as determined in Section IV.2 (*Transfers*). Line pipe converted to casing or tubing with casing or tubing couplings attached shall be priced as K-55/J-55 casing or tubing at the nearest size and weight.

**V. INVENTORIES OF CONTROLLABLE MATERIAL**

The Operator shall maintain records of Controllable Material charged to the Joint Account, with sufficient detail to perform physical inventories.

Adjustments to the Joint Account by the Operator resulting from a physical inventory of Controllable Material shall be made within twelve (12) months following the taking of the inventory or receipt of Non-Operator inventory report. Charges and credits for overages or shortages will be valued for the Joint Account in accordance with Section IV.2 (*Transfers*) and shall be based on the Condition "B" prices in effect on the date of physical inventory unless the inventorying Parties can provide sufficient evidence another Material condition applies.

COPYRIGHT © 2005 by Council of Petroleum Accountants Societies, Inc. (COPAS)



COPAS 2005 Accounting Procedure
Recommended by COPAS, Inc.

1. **DIRECTED INVENTORIES**

Physical inventories shall be performed by the Operator upon written request of a majority in working interests of the Non-Operators (hereinafter, "directed inventory"); provided, however, the Operator shall not be required to perform directed inventories more frequently than once every five (5) years. Directed inventories shall be commenced within one hundred eighty (180) days after the Operator receives written notice that a majority in interest of the Non-Operators has requested the inventory. All Parties shall be governed by the results of any directed inventory.

Expenses of directed inventories will be borne by the Joint Account; provided, however, costs associated with any post-report follow-up work in settling the inventory will be absorbed by the Party incurring such costs. The Operator is expected to exercise judgment in keeping expenses within reasonable limits. Any anticipated disproportionate or extraordinary costs should be discussed and agreed upon prior to commencement of the inventory. Expenses of directed inventories may include the following:

A. A per diem rate for each inventory person, representative of actual salaries, wages, and payroll burdens and benefits of the personnel performing the inventory or a rate agreed to by the Parties pursuant to Section I.6.A (*General Matters*). The per diem rate shall also be applied to a reasonable number of days for pre-inventory work and report preparation.

B. Actual transportation costs and Personal Expenses for the inventory team.

C. Reasonable charges for report preparation and distribution to the Non-Operators.

2. **NON-DIRECTED INVENTORIES**

A. OPERATOR INVENTORIES

Physical inventories that are not requested by the Non-Operators may be performed by the Operator, at the Operator's discretion. The expenses of conducting such Operator-initiated inventories shall not be charged to the Joint Account.

B. NON-OPERATOR INVENTORIES

Subject to the terms of the Agreement to which this Accounting Procedure is attached, the Non-Operators may conduct a physical inventory at reasonable times at their sole cost and risk after giving the Operator at least ninety (90) days prior written notice. The Non-Operator inventory report shall be furnished to the Operator in writing within ninety (90) days of completing the inventory fieldwork.

C. SPECIAL INVENTORIES

The expense of conducting inventories other than those described in Sections V.1 (*Directed Inventories*), V.2.A (*Operator Inventories*), or V.2.B (*Non-Operator Inventories*), shall be charged to the Party requesting such inventory; provided, however, inventories required due to a change of Operator shall be charged to the Joint Account in the same manner as described in Section V.1 (*Directed Inventories*).

COPYRIGHT © 2005 by Council of Petroleum Accountants Societies, Inc. (COPAS)

## EXHIBIT "D"

Attached to and made a part of that certain Offshore Operating Agreement dated effective _____
_____ __, 20__, by and between _____, as Operator, and _____, as Non-Operators.

## Non-Discrimination Provisions

During the performance of this Agreement, the "contractor" (meaning and referring separately to each party hereto) agrees, unless exempt therefrom to comply with all provisions of Executive Order 11246 which are incorporated herein by reference, and (a) if contractor has more than 50 employees or contracts with another party hereto in excess of $10,000, contractor must file Standard Form 100 (EEO 1), (b) if contractor has 50 or more employees and a contract of $50,000 or more, contractor is required to develop a written "Affirmative Action Compliance Program" for each of its establishments according to the Rules and Regulations published by the United States Department of Labor in 41 CFR, Chapter 60.  Further, contractor hereby certifies that it does not now and will not maintain any facilities provided for its employees in a segregated manner or permit its employees to perform their services at any location under its control where segregated facilities are maintained, as such segregated facilities are defined in Title 41, Chapter 60 1.8, Code of Federal Regulations, revised as of January 1, 1969, unless exempt therefrom.  Contractor further warrants that no other law, regulation or ordinance of the United States, or any state, or any governmental authority or agency has been violated in the manufacture, procurement or sale of any good furnished, work performed or service rendered pursuant to this contract.

Unless exempt by rules, regulations or orders of the United States Secretary of Labor, issued pursuant to Section 204 of Executive Order 11246, dated September 24, 1965, during the performance of this contract, the contractor agrees as follows:

(1)     The contractor will not discriminate against any employee or applicant for employment because of race, color, religion, sex or national origin.  The contractor will take affirmative action to ensure that applicants are employed and that employees are treated during employment, without regard to their race, color, religion, sex or national original.  Such action shall include, but not be limited to, the following:  employment, upgrading, demotion, transfer, recruitment or recruitment advertising; layoff or termination; rates of pay or other forms of compensation; and selection for training, including apprenticeship.  The contractor agrees to post in conspicuous places, available to employees and applicants for employment, notices to be provided by the contracting officer setting forth the provisions of this nondiscrimination clause.

(2)     The contractor will, in all solicitations or advertisements for employees placed by or on behalf of the contractor, state that all qualified applicants will receive consideration for employment without regard to race, color, religion, sex or national origin.

(3)     The contractor will send to each labor union or representative of workers with which he has a collective bargaining agreement or other contract or understanding, a notice to be provided by the agency contracting officer, advising the labor union or workers' representative of the contractor's commitments under Section 202 of Executive Order 11246 of September 24, 1965, and shall post copies of the notice in conspicuous places available to employees and applicants for employment.

1

(4)    The contractor will comply with all provisions of Executive Order 11246 of September 24, 1965, and of the rules, regulations and relevant orders of the Secretary of Labor.

(5)    The contractor will furnish all information and reports required by Executive Order 11246 of September 24, 1965, and by the rules, regulations and orders of the Secretary of Labor, or pursuant thereto, and will permit access to his books, records and accounts by the contracting agency and the Secretary of Labor for purposes of investigating to ascertain compliance with such rules, regulations and orders.

(6)    In the event of the contractor's noncompliance with the nondiscrimination clauses of this contract or with any of such rules, regulations or orders, this contract may be canceled, terminated or suspended in whole or in part and the contractor may be declared ineligible for further Government contracts in accordance with procedures authorized in Executive Order 11246 of September 24, 1965, or by rule, regulation or order of the Secretary of Labor, or as otherwise provided by law.

(7)    The contractor will include the provisions of paragraph (1) through (8) in every subcontract or purchase order unless exempted by rules, regulations or orders of the Secretary of Labor issued pursuant to Section 204 of Executive Order 11246 of September 24, 1965, so that such provisions will be binding upon each subcontractor or vendor.  The contractor will take such action with respect to any subcontract or purchase order as the contracting agency may direct as a means of enforcing such provisions including sanctions for noncompliance; provided, however, that in the event the contractor becomes involved in, or is result of such direction by the contracting agency, the contractor may request the United States to enter into such litigation to protect the interests of the United States.

(8)    Contractor agrees and covenants that none of its employees or employees of its subcontractors who provided services pursuant to this contract are unauthorized aliens, as defined in the Immigration, Reform and Control Act of 1986.

[End of Exhibit "D"]

2

## EXHIBIT "E"

Attached to and made a part of that certain Offshore Operating Agreement dated effective _____ _____ __, 20__, by and between _____, as Operator, and _____, as Non-Operators.

## GAS BALANCING PROVISIONS

1. **DEFINITIONS**

The following definitions shall apply to this Agreement:

1.01 "Arm's Length Agreement" shall mean any gas sales agreement with an unaffiliated purchaser or any gas sales agreement with an affiliated purchaser where the sales price and delivery conditions under such agreement are representative of prices and delivery conditions existing under other similar agreements in the area between unaffiliated parties at the same time for natural gas of comparable quality and quantity.

1.02 "Balancing Area" shall mean **(select one)**:

☑ each well drilled pursuant to **the Lease** that produces Gas or is allocated a share of Gas production. If a single well is completed in two or more producing intervals, each producing interval from which the Gas production is not commingled in the wellbore shall be considered a separate well.

☐ all the acreage and depths subject to the Operating Agreement.

☐ _____

_____

_____

_____

1.03 "Full Share of Current Production" shall mean the Percentage Interest of each Party in the Gas actually produced from the Balancing Area during each month.

1.04 "Gas" shall mean all hydrocarbons produced or producible from the Balancing Area, whether from a well classified as an oil well or gas well by the regulatory agency having jurisdiction in such matters, which are or may be made available for sale or separate disposition by the Parties, excluding oil, condensate and other liquids recovered by field equipment operated for the joint account. "Gas" does not include gas used in joint operations, such as for fuel, recycling or reinjection, or which is vented or lost before its sale or delivery from the Balancing Area.

1.05 "Makeup Gas" shall mean any Gas taken by an Underproduced Party from the Balancing Area in excess of its Full Share of Current Production, whether pursuant to Section 3.3 or Section 4.1 hereof.

1.06 "Mcf" shall mean one thousand cubic feet. A cubic foot of Gas shall mean the volume of gas contained in one cubic foot of space at a standard pressure base and at a standard temperature base.

1.07 "MMBtu" shall mean one million British Thermal Units. A British Thermal Unit shall mean the quantity of heat required to raise one pound avoirdupois of pure water from 58.5 degrees Fahrenheit to 59.5 degrees Fahrenheit at a constant pressure of 14.73 pounds per square inch absolute.

1.08 "Operator" shall mean the individual or entity designated as the operator of the well(s) located in the Balancing Area.

1.09 "Overproduced Party" shall mean any Party having taken a greater quantity of Gas from the Balancing Area than the Percentage interest of such Party in the cumulative quantity of all Gas produced from the Balancing Area.

1.10 "Overproduction" shall mean the cumulative quantity of Gas taken by a Party in excess of its Percentage Interest in the cumulative quantity of all Gas produced from the Balancing Area.

1.11 "Party" shall mean those individuals or entities subject to this Agreement, and their respective heirs, successors, transferees and assigns.

1.12 "Percentage Interest" shall mean the percentage or decimal interest of each Party in the Gas produced from the Balancing Area pursuant to the Lease covering the Balancing Area.

**1.13 ("Intentionally Deleted")**

1.14 "Underproduced Party" shall mean any Party having taken a lesser quantity of Gas from the Balancing Area than the Percentage Interest of such Party in the cumulative quantity of all Gas produced from the Balancing Area.

1.15 "Underproduction" shall mean the deficiency between the cumulative quantity of Gas taken by a Party and its

1

Percentage Interest in the cumulative quantity of all Gas produced from the Balancing Area.

1.16  ☐**(Optional)** "Winter Period" shall mean the month(s) of _____November and December_____ in one calendar year and the month(s) of _____January and February_____ in the succeeding calendar year.

**2.      BALANCING AREA**

2.1  If this Agreement covers more than one Balancing Area, it shall be applied as if each Balancing Area were covered by separate but identical agreements. All balancing hereunder shall be on the basis of Gas taken from the Balancing Area measured in **(Alternative 1)** ☐ Mcfs or **(Alternative 2)** ■ MMBtus.

**3.      RIGHT OF PARTIES TO TAKE GAS**

3.1  Each Party desiring to take Gas will notify the Operator, or cause the Operator to be notified, of the volumes nominated, the name of the transporting pipeline and the pipeline contract number (if available) and meter station relating to such delivery, sufficiently in advance for the Operator, acting with reasonable diligence, to meet all nomination and other requirements. Operator is authorized to deliver the volumes so nominated and confirmed (if confirmation is required) to the transporting pipeline in accordance with the terms of this Agreement. Operator shall provide each Party with an estimate of its Full Share of Current Production and the estimated sustainable Gas volumes for Makeup Gas by the 15th calendar day of the month before the month of production. The Parties recognize that Operator's estimates are no more than estimates, and that these estimated volumes may vary from the actual Gas sales volumes during the month. Operator will, insofar as reasonably possible and practical, notify (by telephone or facsimile) the Parties of significant variances in production volumes relative to nominations where these variances could be reasonably expected to result in penalties being imposed by pipeline/purchases. Operator will notify all the parties of scheduled operations that will impact sustained production.

3.2  Each Party shall make a reasonable, good faith effort to take its Full Share of Current Production each month, to the extent that such production is required to maintain leases in effect, to protect the producing capacity of a well or reservoir, to preserve correlative rights, or to maintain oil production.

3.3  When a Party fails for any reason to take its Full Share of Current Production (as such Share may be reduced by the right of the other Parties to make up for Underproduction as provided herein), the other Parties shall be entitled to take any Gas which such Party fails to take. To the extent practicable, such Gas shall be made available initially to each Underproduced Party in the proportion that its Percentage Interest in the Balancing Area bears to the total Percentage Interests of all Underproduced Parties desiring to take such Gas. If all such Gas is not taken by the Underproduced Parties, the portion not taken shall then be made available to the other Parties in the proportion that their respective Percentage Interests in the Balancing Area bear to the total Percentage Interests of such Parties.

3.4  All Gas taken by a Party in accordance with the provisions of this Agreement, regardless of whether such Party is underproduced or overproduced, shall be regarded as Gas taken for its own account with title thereto being in such taking Party.

3.5  Notwithstanding the provisions of Section 3.3 hereof, no Overproduced Party shall be entitled in any month to take any Gas in excess of three hundred percent (300%) of its Percentage Interest of the Balancing Area's then-current Maximum Monthly Availability; provided, however, that this limitation shall not apply to the extent that it would preclude production that is required to maintain leases in effect, to protect the producing capacity of a well or reservoir, to preserve correlative rights, or to maintain oil production. "Maximum Monthly Availability" shall mean the maximum average monthly rate of production at which Gas can be delivered from the Balancing Area, as determined by the Operator, considering the maximum efficient well rate for each well within the Balancing Area, the maximum allowable(s) set by the appropriate regulatory agency, mode of operation, production facility capabilities and pipeline pressures.

3.6  In the event that a Party fails to make arrangements to take its Full Share of Current Production required to be produced to maintain leases in effect, to protect the producing capacity of a well or reservoir, to preserve correlative rights, or to maintain oil production, the Operator may sell any part of such Party's Full Share of Current Production that such Party fails to take for the account of such Party and render to such Party, on a current basis, the full proceeds of the sale, less any reasonable marketing, compression, treating, gathering or transportation costs incurred directly in connection with the sale of such Full Share of Current Production. In making the sale contemplated herein, the Operator shall be obliged only to obtain such price and conditions for the sale as are reasonable under the circumstances and shall not be obliged to share any of its markets. Any such sale by Operator under the terms hereof shall be only for such reasonable periods of time as are consistent with the minimum needs of the industry under the particular circumstances, but in no event for a period in excess of one year. Notwithstanding the provisions of Article 3.4 hereof, Gas sold by Operator for a Party under the provisions hereof shall be deemed to be Gas taken for the account of such Party. Notwithstanding anything contained herein to the contrary, no agency relationship or other relationship of trust and confidence shall be created by such sale, and Operator's sale of production under the terms hereof shall be subject to the terms of Section 12.3 hereof.

**4. IN-KIND BALANCING**

4.1  Effective the first day of any calendar month following at least _____thirty(_____30 )  days' prior written notice to the Operator, any Underproduced Party may begin taking, in addition to its Full Share of Current

2

Production and any Makeup Gas taken pursuant to Section 3.3 of this Agreement, a share of current production determined by multiplying fifty percent (50%) of the Full Shares of Current Production of all Overproduced Parties by a fraction, the numerator of which is the Percentage Interest of such Underproduced Party and the denominator of which is the total of the Percentage Interests of all Underproduced Parties desiring to take Makeup Gas. In no event will an Overproduced Party be required to provide more than fifty percent ( 50%) of its Full Share of CurrentProduction for Makeup Gas. The Operator will promptly notify all Overproduced Parties of the election of an Underproduced Party to begin taking Makeup Gas.

~~4.2 ☐ **(Optional Seasonal Limitation on Makeup Option 1)** Notwithstanding the provisions of Section 4.1, the average monthly amount of Makeup Gas taken by an Underproduced Party during the Winter Period pursuant to Section 4.1 shall not exceed the average monthly amount of Makeup Gas taken by such Underproduced Party during the ________ (______) months immediately preceding the Winter Period.~~

4.2 ☐ **(Optional - Seasonal Limitation on Makeup - Option 2)** Notwithstanding the provisions of Section 4.1, no Overproduced Party will be required to provide more than twenty-five percent percent ( 25 %) of its Full Share of Current Production for Makeup Gas during the Winter Period.

~~4.3 ☐ **(Optional)** Notwithstanding any other provision of this Agreement, at such time and for so long as Operator, or (insofar as concerns production by the Operator) any Underproduced Party, determines in good faith that an Overproduced Party has produced all its share of the ultimately recoverable reserves in the Balancing Area, such Overproduced Party may be required to make available for Makeup Gas, on the demand of the Operator or any Underproduced Party, up to ___percent (______%) of such Overproduced Party's Full Share of Current Production.~~

**5. STATEMENT OF GAS BALANCES**

5.1 The Operator will maintain appropriate accounting on a monthly and cumulative basis of the volumes of Gas that each Party is entitled to receive and the volumes of Gas actually taken or sold for each Party's account. Within forty-five (45) days after the month of production, the Operator will furnish a statement for such month showing (1) each Party's Full Share of Current Production, (2) the total volume of Gas actually taken or sold for each Party's account, (3) the difference between the volume taken by each Party and that Party's Full Share of Current Production, (4) the Overproduction or Underproduction of each Party, and (5) other data as recommended by the provisions of the Council of Petroleum Accountants Societies Bulletin No.24, as amended or supplemented hereafter. Each Party taking Gas will promptly provide to the Operator any data required by the Operator for preparation of the statements required hereunder.

5.2 If any Party fails to provide the data required herein for four (4) consecutive production months, the Operator, or where the Operator has failed to provide data, another Party, may audit the production and Gas sales and transportation volumes of the non-reporting Party to provide the required data. Such audit shall be conducted only after reasonable notice and during normal business hours in the office of the Party whose records are being audited. All costs associated with such audit will be charged to the account of the Party failing to provide the required data.

**6. PAYMENTS ON PRODUCTION**

6.1 Each Party taking Gas shall pay or cause to be paid all production and severance taxes due on all volumes of Gas actually taken by such Party.

**6.2 (Intentionally Deleted)**

~~6.2.1 ☐ **(Optional For use only with Section 6.2 Alternative I Entitlement)** On written request of a Party taking less than its Full Share of Current Production in a given month ("Current Underproducer"), any Party taking more than its Full Share of Current Production in such month ("Current Overproducer") will pay to such Current Underproducer an amount each month equal to the Royalty percentage of the proceeds received by the Current Overproducer for that portion of the Current Underproducer's Full Share of Current Production taken by the Current Overproducer; provided, however, that such payment will not exceed the Royalty percentage that is common to all Royalty burdens in the Balancing Area. Payments made pursuant to this Section 6.2.1 will be deemed payments to the Underproduced Party's Royalty owners for purposes of Section 7.5.~~

~~6.2 ☐ **(Alternative 2 Sales)** Each Party shall pay or cause to be paid Royalty due with respect to Royalty owners to whom it is accountable based on the volume of Gas actually taken for its account.~~

**6.3 (Intentionally Deleted)**

**7. CASH SETTLEMENTS**

7.1 On the earlier of the plugging and abandonment of the last producing interval in the Balancing Area, or at any time no Gas is taken from the Balancing Area for a period of twelve (12) consecutive months, any Party may give written notice calling for cash Settlement of the Gas production imbalances among the Parties. Such notice shall be given to all Parties in the Balancing Area.

7.2 Within ninety (90) days after the notice calling for cash settlement under Section 7.1, the Operator will distribute to each Party a Final Gas Settlement Statement detailing the quantity of Overproduction owed by each Overproduced Party to each Underproduced Party and identifying the month to which such Overproduction is attributed, pursuant to the methodology set out in Section 7.4.

7.3   ■ **(Alternative 1 - Direct Party-to-Party Settlement)** Within ninety (90) days after receipt of the Final Gas Settlement Statement, each Overproduced Party will pay to each Underproduced Party entitled to settlement the appropriate cash Settlement, accompanied by appropriate accounting detail. At the time of payment, the Overproduced Party will notify the Operator of the Gas imbalance settled by the Overproduced Party's payment.

~~7.3   ☐ **(Alternative 2 — Settlement Through Operator)** Within sixty (60) days after receipt of the Final Gas Settlement Statement, each Overproduced Party will send its cash settlement, accompanied by appropriate accounting detail, to the Operator. The Operator will distribute the monies so received, along with any settlement owed by the Operator as an Overproduced Party, to each Underproduced Party to whom settlement is due within ninety (90) days after issuance of the Final Gas Settlement Statement. In the event that any Overproduced Party fails to pay any settlement due hereunder, the Operator may turn over responsibility for the collection of such settlement to the Party to whom it is owed, and the Operator will have no further responsibility with regard to such settlement.~~

~~7.3.1 ☐ **(Optional   For use only with Section 7.3, Alternative 2 — Settlement Through Operator)** Any Party shall have the right at any time on thirty (30) days' prior written notice to all other Parties to demand that any settlements due such Party for Overproduction be paid directly to such Party by the Overproduced Party, rather than being paid through the Operator. In the event that an Overproduced Party pays the Operator any sums due to an Underproduced Party at any time after thirty (30) days following the receipt of the notice provided for herein, the Overproduced Party will continue to be liable to such Underproduced Party for any sums so paid, until payment is actually received by the Underproduced Party.~~

7.4   ■ **(Alternative 1 - Historical Sales Basis)** The amount of the cash settlement will be based on the proceeds received by the Overproduced Party under an Arm's Length Agreement for the Gas taken from time to time by the Overproduced Party in excess of the Overproduced Party's Full Share of Current Production. Any Makeup Gas taken by the Underproduced Party before monetary settlement hereunder will be applied to offset Overproduction chronologically in the order of accrual. The method of valuation for cash settlement will be First In First Out (FIFO).

~~7.4   ☐ **(Alternative 2 — Most Recent Sales Basis)** The amount of the cash settlement will be based on the proceeds received by the Overproduced Party under an Arm's Length Agreement for the volume of Gas that constituted Overproduction by the Overproduced Party from the Balancing Area. For the purpose of implementing the cash settlement provision of the Section 7, an Overproduced Party will not be considered to have produced any of an Underproduced Party's share of Gas until the Overproduced Party has produced cumulatively all its Percentage Interest share of the Gas ultimately produced from the Balancing Area.~~

7.5   The values used for calculating the cash settlement under Section 7.4 will include all proceeds received for the sale of the Gas by the Overproduced Party calculated at the Balancing Area, after deducting any production or severance taxes paid as well as any reasonable marketing, compression, treating, gathering or transportation costs incurred directly in connection with the sale of the Overproduction.

7.5.1 ■ **(Optional - For Valuation Under Percentage of Proceeds Contracts)** For Overproduction sold under a gas purchase contract providing for payment based on a percentage of the proceeds obtained by the purchaser on resale of residue gas and liquid hydrocarbons extracted at a gas processing plant, the values used for calculating cash settlement will include proceeds received by the Overproduced Party for both the liquid hydrocarbons and the residue gas attributable to the Overproduction.

~~7.5.2 ☐ **(Optional   Valuation for Processed Gas — Option 1)** For Overproduction processed for the account of the Overproduced Party at a gas processing plant for the extraction of liquid hydrocarbons, the full quantity of the Overproduction will be valued for purposes of cash settlement at the prices received by the Overproduced Party for the sale of the residue gas attributable to the Overproduction without regard to proceeds attributable to liquid hydrocarbons which may have been extracted from the Overproduction.~~

7.5.2 ■ **(Optional - Valuation for Processed Gas - Option 2)** For Overproduction processed for the account of the Overproduced Party at a gas processing plant for the extraction of liquid hydrocarbons, the values used for calculating cash settlement will include the proceeds received by the Overproduced Party for the sale of the liquid hydrocarbons extracted from the Overproduction, less the actual reasonable costs incurred by the Overproduced Party to process the Overproduction and to transport, fractionate and handle the liquid hydrocarbons extracted therefrom before sale.

7.6   To the extent the Overproduced Party did not sell all Overproduction under an Arm's Length Agreement, the cash settlement will be based on the weighted average price received by the Overproduced Party for any gas sold from the Balancing Area under Arm's Length Agreements during the months to which such Overproduction is attributed. In the event that no sales under Arm's Length Agreements were made during any such month, the cash settlement for such month will be based on the simple average of the spot sales prices published for the applicable geographic area in the first issue of Inside F.E.R.C.'s Gas Market Report, *~~Natural Gas Week and~~ Natural Gas Intelligence for such month. Should these publications cease to exist, a mutually acceptable pricing bulletin shall be used. * published by McGraw Hill for deliveries at Henry Hub, subject to reasonable base adjustments between the point of delivery to the applicable pipeline transportation system and the point at which the index price applies

7.7   Interest compounded at the ~~rate of~~ Prime rate in effect at Citibank N.A. of New York, plus one percent (1%) percent (_____%)   per   annum   or   the   maximum   lawful

<div align="center">4</div>

#93828440v3
#93828440v5

rate of interest applicable to the Balancing Area, whichever is less, will accrue for all amounts due under Section 7.1 beginning the first day following the date payment is due pursuant to Section 7.3. Such interest shall be borne by the Operator or any Overproduced Party in the proportion that their respective delays beyond the deadlines set out in Sections 7.2 and 7.3 contributed to the accrual of the interest.

7.8   In lieu of the cash settlement required by Section 7.3, an Overproduced Party may deliver to the Underproduced Party an offer to settle its Overproduction in-kind and at such rates, quantities, times and sources as may be agreed on by the Underproduced Party. If the Parties are unable to agree on the manner in which such in-kind settlement gas will be furnished within ninety (90) days after the Overproduced Party's offer to settle in kind, which period may be extended by agreement of said Parties, the Overproduced Party shall make a cash settlement as provided in Section 7.3. The making of an in-kind settlement offer under this Section 7.8 will not delay the accrual of interest on the cash settlement should the Parties fail to reach agreement on an in-kind settlement.

7.9   ■ (Optional Interim Cash Balancing) At any time during the term of this Agreement, any Overproduced Party may, in its sole discretion, make cash settlement(s) with the Underproduced Parties covering all or part of its outstanding Gas imbalance, provided that such settlements must be made with all Underproduced Parties proportionately based on the relative imbalances of the Underproduced Parties, and provided further that such settlements may not be made more often than once every twenty-four (24) months. Such settlements will be calculated in the same manner provided above for final cash settlements. The Overproduced Party will provide Operator a detailed accounting of any such cash settlement within thirty (30) days after the settlement is made..

## 8.   TESTING

Notwithstanding any provision of this Agreement to the contrary, any Party shall have the right, from time to time, to produce and take up to one hundred percent (100%) of a well's entire Gas stream to meet the reasonable deliverability test(s) required by such Party's Gas purchaser, and the right to take any Makeup Gas shall be subordinate to the right of any Party to conduct such tests; provided, however, that such tests shall be conducted in accordance with prudent operating practices only after   thirty_____ (30) days' prior written notice to the Operator and shall last no longer than

seventy-two_____ (72) hours. Consent of parties then taking all or any part of their share of gas shall be required to conduct testing during Winter Period.

## 9.   OPERATING COSTS (Intentionally Deleted)

## 10.   LIQUIDS

The Parties shall share proportionately in and own all liquid hydrocarbons recovered with Gas by field equipment operated for the joint account in accordance with their Percentage Interests in the Balancing Area.

## 11.   AUDIT RIGHTS

Notwithstanding any provision in this Agreement or any other agreement between the Parties hereto, and further notwithstanding any termination or cancellation of this Agreement, for a period of two (2) years from the end of the calendar year in which any information to be furnished under Section 5 or 7 hereof is supplied, any Party shall have the right to audit the records of any other Party regarding quantity, including but not limited to information regarding Btu-content. Any Underproduced Party shall have the right for a period of two (2) years from the end of the calendar year in which any cash settlement is received pursuant to Section 7 to audit the records of any Overproduced Party as to all matters concerning values, including but not limited to information regarding prices and disposition of Gas from the Balancing Area. Any such audit shall be conducted at the expense of the Party or Parties desiring such audit, and shall be conducted, after reasonable notice, during normal business hours in the office of the Party whose records are being audited. Each Party hereto agrees to maintain records as to the volumes and prices of Gas sold each month and the volumes of Gas used in its own operations, along with the Royalty paid on any such Gas used by a Party in its own operations. The audit rights provided for in this Section 11 shall be in addition to those provided for in Section 5.2 of this Agreement, but any statements rendered by Operator shall conclusively be presumed to be true and correct after twenty-four (24) months following the end of any such calendar year, unless with the said twenty-four (24) month period an Underproduced Party takes written exception thereto and makes claim on Overproduced Party for adjustment.

## 12.   MISCELLANEOUS

12.1   As between the Parties, in the event of any conflict between the provisions of this Agreement and the provisions of any gas sales contract, or in the event of any conflict between the provisions of this Agreement and the provisions of the **Lease**, the provisions of this Agreement shall govern.

12.2   Each Party agrees to defend, indemnify and hold harmless all other Parties from and against any and all liability for any claims, which may be asserted by any third party which now or hereafter stands in a contractual relationship with such indemnifying Party and which arise out of the operation of this Agreement or any activities of such indemnifying Party under the provisions of this Agreement, and does further agree to save the other Parties harmless from all judgments or damages sustained and costs incurred in connection therewith.

12.3   Except as otherwise provided in this Agreement, Operator is authorized to administer the provisions of this

5

Agreement, but shall have no liability to the other Parties for losses sustained or liability incurred which arise out of or in connection with the performance of Operator's duties hereunder, except such as may result from Operator's gross negligence or willful misconduct. Operator shall not be liable to any Underproduced Party for the failure of any Overproduced Party, (other than Operator) to pay any amounts owed pursuant to the terms hereof.

12.4 This Agreement shall remain in full force and effect for as long as the **Lease** shall remain in force and effect as to the Balancing Area, and thereafter until the Gas accounts between the Parties are settled in full, and shall inure to the benefit of and be binding on the Parties hereto, and their respective heirs, successors, legal representatives and assigns, if any. The Parties hereto agree to give notice of the existence of this Agreement to any successor in interest of any such Party and to provide that any such successor shall be bound by this Agreement, and shall further make any transfer of any interest subject to the **Lease,** or any part thereof, also subject to the terms of this Agreement.

12.5 Unless the context clearly indicates otherwise, words used in the singular include the plural, the plural includes the singular, and the neuter gender includes the masculine and the feminine.

12.6 In the event that any "Optional" provision of this Agreement is not adopted by the Parties to this Agreement by a typed, printed or handwritten indication, such provision shall not form a part of this Agreement, and no inference shall be made concerning the intent of the Parties in such event. In the event that any "Alternative" provision of this Agreement is not so adopted by the Parties, Alternative 1 in each such instance shall be deemed to have been adopted by the Parties as a result of any such omission. In those cases where it is indicated that an Optional provision may be used only if a specific Alternative is selected: (i) an election to include said Optional provision shall not be effective unless the Alternative in question is selected; and (ii) the election to include said Optional provision must be expressly indicated hereon, it being understood that the selection of an Alternative either expressly or by default as provided herein shall not, in and of itself, constitute an election to include an associated Optional provision.

12.7 This Agreement shall bind the Parties in accordance with the provisions hereof, and nothing herein shall be construed or interpreted as creating any rights in any person or entity not a signatory hereto, or as being a stipulation in favor of any such person or entity.

12.8 If contemporaneously with this Agreement becoming effective, or thereafter, any Party requests that any other Party execute an appropriate memorandum or notice of this Agreement in order to give third parties notice of record of same and submits same for execution in recordable form, such memorandum or notice shall be duly executed by the Party to which such request is made and delivered promptly thereafter to the Party making the request. On receipt, the Party making the request shall cause the memorandum or notice to be duly recorded in the appropriate real property or other records affecting the Balancing Area.

12.9 In the event federal tax regulations require a uniform method of computing taxable income by all Parties, the Parties agree to negotiate in good faith to develop such a uniform method that is in accordance with the requirement of said tax regulations.

**13. ASSIGNMENT AND RIGHTS ON ASSIGNMENT**

13.1 Subject to the provisions of Sections 13.2 (if elected) and 13.3 hereof, and notwithstanding anything in this Agreement or in the Operating Agreement to the contrary, if any Party assigns (including any sale, exchange or other transfer) any of its working interest in the Balancing Area when such Party is an Underproduced or Overproduced Party, the assignment or other act of transfer shall, insofar as the Parties hereto are concerned, include all interest of the assigning or transferring Party in the Gas, all rights to receive or obligations to provide or take Makeup Gas and all rights to receive or obligations to make any monetary payment which may ultimately be due hereunder, as applicable. Operator and each of the other Parties hereto shall thereafter treat the assignment accordingly, and the assigning or transferring Party shall look solely to its assignee or other transferee for any interest in the Gas or monetary payment that such Party may have or to which it may be entitled, and shall cause its assignee or other transferee to assume its obligations hereunder.

13.2 ■ **(Optional - Cash Settlement on Assignment)** Notwithstanding anything in this Agreement (including but not limited to the provisions of Section 13.1 hereof) or in the Operating Agreement to the contrary, and subject to the provisions of Section 13.3 hereof, in the event an Overproduced Party intends to sell, assign, exchange or otherwise transfer any of its interest in a Balancing Area, such Overproduced Party shall notify in writing the other working interest owners who are Parties hereto in such Balancing Area of such fact at least sixty(_____60) days after closing the

transaction. Such notice shall contain a preliminary gas settlement statement detailing the quantity of Overproduction owed by the Overproduced Party to each Underproduced Party and the value of such Overproduction, calculated in accordance with Section 7.4 and 7.6 hereof. Thereafter, any Underproduced Party may demand from such Overproduced Party in writing, within _____sixty_____(_____60_____) days after receipt of the Overproduced Party's notice, a cash settlement of its Underproduction from the Balancing Area. The Operator shall be notified of any such demand and of any cash settlement pursuant to this Section 13, and the Overproduction and Underproduction of each Party shall be adjusted accordingly. Any cash settlement pursuant to this Section 13 shall be paid by the Overproduced Party ~~on or before the earlier to occur (i) of sixty (60) days after receipt of the Underproduced Party's demand or (ii)~~ within 120 days after the closing of the transaction in which the Overproduced Party sells, assigns, exchanges or otherwise transfers its interest in a Balancing Area on the same basis as otherwise set forth in

Sections 7.3 through 7.6 hereof, and shall bear interest at the rate set forth in Section 7.7 hereof, beginning ~~sixty (60) days~~ following the 121st day after closing of

6

after the Overproduced Party's sale, assignment, exchange or transfer of its interest in the Balancing Area for any amounts not paid. Provided, however, if any Underproduced Party does not so demand such cash settlement of its Underproduction from the Balancing Area, such Underproduced Party shall look exclusively to the assignee or other successor in interest of the Overproduced Party giving notice hereunder for the satisfaction of such Underproduced Party's Underproduction in accordance with the provisions of Section 13.1 hereof.

13.3 The provisions of this Section 13 shall not be applicable in the event any Party mortgages its interest or disposes of its interest by merger, reorganization, consolidation or sale of substantially all its assets to a subsidiary or parent company, or to any company in which any parent or subsidiary of such Party owns a majority of the stock of such company.

7

**EXHIBIT "F"**

Attached to and made a part of that certain Offshore Operating Agreement dated effective _____ _____ __, 20__, by and between _____, as Operator, and _____, as Non-Operators.

## MEMORANDUM OF OPERATING AGREEMENT AND FINANCING STATEMENT

To be filed in the conveyance records and in the mortgage records and as a
non-standard financing statement in accordance with Paragraph 6.0 herein.

1.0   This Memorandum of Operating Agreement and Financing Statement (this "Memorandum") is effective as of the effective date of the Operating Agreement referred to in Paragraph 2.0 below and is executed by the undersigned, duly authorized representative of [_____] (the "Operator"), and is executed by the undersigned, duly authorized representatives of [_____],[_____],[_____], and [_____] (the "Non-Operators").  Operator and Non-Operators may be referred to herein individually as a "Party" and together as the "Parties".

2.0   The Operator and Non-Operators are Parties to that certain Operating Agreement effective _____ ___, 20__ (the "Operating Agreement"), which Operating Agreement provides for the exploration, development and operation of the oil and gas leases described in Exhibit "A" of the Operating Agreement (hereinafter called the "Contract Area") and which designates [_____], as the Operator, to conduct such operations for itself and the Non-Operators.

3.0   Among other provisions, the Operating Agreement (a) provides for certain liens, mortgages, pledges and security interests to secure payment by the Parties of their respective share of costs and other obligations under the Operating Agreement, (b) contains an Accounting Procedure, which establishes, among other things, interest to be charged on indebtedness, certain costs, and other expenses under the Operating Agreement at the rate set forth therein, and (c) includes non-consent clauses which establish that Parties who elect not to participate in certain operations shall (i) be deemed to have relinquished their interest in production until the carrying consenting Parties recover their costs of such operations plus a specified amount or (ii) forfeit their interest in certain Contract Area or portions thereof involved in such operations.

4.0   The Operator hereby certifies that a true and correct copy of the Operating Agreement is on file and is available for inspection by third parties at the offices of the Operator at the address set forth in this Memorandum.

5.0   In addition to any other security rights and remedies provided for by law with respect to services rendered or materials and equipment furnished under the Operating Agreement, for and in consideration of the covenants and mutual undertakings of the Operator and the Non-Operators set forth in the Operating Agreement, the Operator and the Non-Operators hereby agree as follows:

5.1   To secure the performance of and payment by the Non-Operators of all obligations and indebtedness of the Non-Operators pursuant to the Operating Agreement, whether now

1

owed or hereafter arising, and to the extent susceptible under applicable law, the Non-Operators hereby grants to the Operator a mortgage, hypothec, and pledge of and over all of its rights, titles, and interests in and to (a) the Contract Area, (b) the oil and gas in, on, under, and that may be produced from the lands covered by the Contract Area, and (c) all other immovable property susceptible of mortgage situated within the Contract Area.

5.2     To secure the performance of and payment by the Non-Operators of all obligations and indebtedness of the Non-Operators pursuant to the Operating Agreement, whether now owed or hereafter arising, and to the extent susceptible under applicable law, the Non-Operators hereby grant to the Operator a continuing security interest in and to all of its rights, titles, interests, claims, general intangibles, proceeds, and products thereof, whether now existing or hereafter acquired, in and to (a) all oil and gas produced from the lands covered by the Contract Area or attributable to the Contract Area when produced, (b) all accounts receivable accruing or arising as a result of the sale of such oil and gas (including, without limitation, accounts arising from gas imbalances or from the sale of oil and gas at the wellhead), (c) all cash or other proceeds from the sale of such oil and gas once produced, and (d) all platforms, wells, facilities, fixtures, other corporeal property, whether movable or immovable, whether now or hereafter placed on the property covered by the Contract Area or maintained or used in connection with the ownership, use, or exploitation of the Contract Area, and other surface and sub-surface equipment of any kind or character located on or attributable to the Contract Area, and the cash or other proceeds realized from any sale, transfer, disposition or conversion thereof.   The interest of the Non-Operators in and to the oil and gas produced from or attributable to the Contract Area when extracted and the accounts receivable accruing or arising as the result of the sale thereof shall be financed at the wellhead of the well or wells located on the Contract Area.  To the extent permissible under applicable law, the security interest granted by the Non-Operators hereunder covers (i) all substitutions, replacements, and accessions to the property of the Non-Operators described herein and is intended to cover all of the rights, titles, and interests of the Non-Operators in all movable property now or hereafter located upon or used in connection with the Contract Area, whether corporeal or incorporeal, (ii) all rights under any gas balancing agreement, farmout rights, option farmout rights, acreage and cash contributions, and conversion rights of the Non-Operators in connection with the Contract Area, or the oil and gas produced from or attributable to the Contract Area, whether now owned or existing or hereafter acquired or arising, including, without limitation, all interests of the Non-Operators in any partnership, tax partnership, limited partnership, association, joint venture, or other entity or enterprise that holds, owns, or controls any interest in the Contract Area, and (iii) all rights, claims, general intangibles, and proceeds, whether now existing or hereafter acquired, of the Non-Operators in and to the contracts, agreements, permits, licenses, rights-of-way, and similar rights and privileges that relate to or are appurtenant to any of the Contract Area, including the following:

#93828440v3
#93828440v5

(1)     all rights, titles, and interests of the Non-Operators, whether now owned and existing or hereafter acquired or arising, in, to, and under or derived from any present or future operating, farmout, bidding, pooling, unitization, and communitization agreements, assignments, and subleases, whether or not described in Attachment "1," to the extent, and only to the extent, that such agreements, assignments, and subleases cover or include any of its rights, titles, and interests, whether now owned and existing or hereafter acquired or arising, in and to all or any portion of the Contract Area, and all units created by any such pooling, unitization, and communitization agreements, and all units formed under orders, regulations, rules, or other official acts of any governmental authority having jurisdiction, to the extent and only to the extent that such units cover or include all or any portion of the  Contract Area;

(2)     all rights, titles, and interests of the Non-Operators, whether now owned and existing or hereafter acquired or arising, in, to, and under or derived from all presently existing and future advance payment agreements, and oil, casinghead gas, and gas sales, exchange, and processing contracts and agreements, including, without limitation, those contracts and agreements that are described on Attachement "1" to the extent, and only to the extent, that those contracts and agreements cover or include all or any portion of the Contract Area; and

(3)     all rights, titles, and interests of the Non-Operators, whether now owned and existing or hereafter acquired or arising, in, to, and under or derived from all existing and future permits, licenses, rights-of-way, and similar rights and privileges that relate to or are appurtenant to any of the Contract Area.

5.3     As applicable to the jurisdiction of operations under the Operating Agreement, this Memorandum (including a carbon, photographic, or other reproduction thereof and hereof) shall constitute a non-standard form of financing statement under the terms of Chapter 9 of the Louisiana Commercial Laws, La. R.S. 10:9-101 et seq. (the "Uniform Commercial Code," as adopted in the State of Louisiana) and, as such, for the purposes of the security interest in favor of the Operator, may be filed for record in the office of the Clerk of Court of any parish in the State of Louisiana and/or any county in the State of Texas, as applicable, with the Operator being the secured party and the Non-Operators being the debtors with respect to such filing.

5.4     The maximum amount for which the mortgage herein granted by the Non-Operators shall be deemed to secure the obligations and indebtedness of such Non-Operators to the Operator as stipulated herein is hereby fixed in an amount equal to Twenty-Five Million Dollars ($25,000,000.00) (the "Limit of the Mortgage of the Non-Operators"). Except as provided in the previous sentence (and then only to the extent such limitations are required by law), the entire amount of obligations and indebtedness of the Non-Operators to the Operator is secured hereby without limitation. Notwithstanding the foregoing Limit of the Mortgage of the Non-Operators, the liability of the Non-Operators under this Memorandum and the mortgage and security interest granted hereby shall be limited to (and the Operator shall not be entitled to enforce the same against the Non-Operators for, an amount exceeding) the actual obligations and

3

indebtedness (including all interest charges, Costs, attorneys' fees, and other charges provided for in this Memorandum or in the Operating Agreement) outstanding and unpaid and that are attributable to or charged against the interest of the Non-Operators pursuant to the Operating Agreement.

5.5    To secure the performance of and payment by the Operator of all obligations and indebtedness of the Operator pursuant to the Operating Agreement, whether now owed or hereafter arising, and to the extent susceptible under applicable law, the Operator hereby grants to the Non-Operators a mortgage, hypothec, and pledge of and over all of its rights, titles, and interests in and to (a) the Contract Area, (b) the oil and gas in, on, under, and that may be produced from the lands included within the Contract Area, and (c) all other immovable property susceptible of mortgage situated within the Contract Area.

5.6    To secure the performance of and payment by the Operator of all obligations and indebtedness of the Operator pursuant to the Operating Agreement, whether now owed or hereafter arising, and to the extent susceptible under applicable law, the Operator hereby grants to the Non-Operators a continuing security interest in and to all of its rights, titles, interests, claims, general intangibles, proceeds, and products thereof, whether now existing or hereafter acquired, in and to (a) all oil and gas produced from the lands covered by the Contract Area or attributable to the Contract Area when produced, (b) all accounts receivable accruing or arising as a result of the sale of such oil and gas (including, without limitation, accounts arising from gas imbalances or from the sale of oil and gas at the wellhead), (c) all cash or other proceeds from the sale of such oil and gas once produced, and (d) all platforms, wells, facilities, fixtures, other corporeal property, whether movable or immovable, whether now or hereafter placed on the property covered by the Contract Area or maintained or used in connection with the ownership, use or exploitation of the Contract Area, and other surface and sub-surface equipment of any kind or character located on or attributable to the Contract Area and the cash or other proceeds realized from any sale, transfer, disposition or conversion thereof.  The interest of the Operator in and to the oil and gas produced from or attributable to the Contract Area when extracted and the accounts receivable accruing or arising as the result of the sale thereof shall be financed at the wellhead of the well or wells located on the Contract Area.  To the extent permissible under applicable law, the security interest granted by the Operator hereunder covers (a) all substitutions, replacements, and accessions to the property of the Operator described herein and is intended to cover all of the rights, titles and interests of the Operator in all movable property now or hereafter located upon or used in connection with the Contract Area, whether corporeal or incorporeal, (b) all rights under any gas balancing agreement, farmout rights, option farmout rights, acreage and cash contributions, and conversion rights of the Operator in connection with the Contract Area, or the oil and gas produced from or attributable to the Contract Area, whether now owned or existing or hereafter acquired or arising, including, without limitation, all interests of the Operator in any partnership, tax partnership, limited partnership, association, joint venture, or other entity or enterprise that holds, owns, or controls any interest in the

4

Contract Area, and (c) all rights, claims, general intangibles, and proceeds of the Operator, whether now existing or hereafter acquired, in and to the contracts, agreements, permits, licenses, rights-of-way, and similar rights and privileges that relate to or are appurtenant to any of the Contract Area, including the following:

(i)     all rights, titles, and interests of the Operator, whether now owned and existing or hereafter acquired or arising, in, to, and under or derived from any present or future operating, farmout, bidding, pooling, unitization, and communitization agreements, assignments, and subleases, whether or not described in Attachment "1," to the extent, and only to the extent, that such agreements, assignments, and subleases cover or include any of its rights, titles, and interests, whether now owned and existing or hereafter acquired or arising, in and to all or any portion of the Contract Area, and all units created by any such pooling, unitization, and communitization agreements and all units formed under orders, regulations, rules, or other official acts of any governmental authority having jurisdiction, to the extent and only to the extent that such units cover or include all or any portion of the Contract Area;

(ii)    all rights, titles, and interests of the Operator, whether now owned and existing or hereafter acquired or arising, in, to, and under or derived from all presently existing and future advance payment agreements, and oil, casinghead gas, and gas sales, exchange, and processing contracts and agreements, including, without limitation, those contracts and agreements that are described on Attachment "1" to the extent, and only to the extent, that those contracts and agreements cover or include all or any portion of the Contract Area; and

(iii)   all rights, titles, and interests of the Operator, whether now owned and existing or hereafter acquired or arising, in, to, and under or derived from all existing and future permits, licenses, rights-of-way, and similar rights and privileges that relate to or are appurtenant to any of the Contract Area.

5.7     For the purposes of the security interest in favor of the Non-Operators, this Memorandum (including a carbon, photographic, or other reproduction thereof and hereof) may be filed as a non-standard form of financing statement pursuant to the Uniform Commercial Code in the office of the Clerk of Court of any parish in the State of Louisiana and/or any county in the State of Texas, as applicable, with the Non-Operators being the secured Party and the Operator being the debtor with respect to such filing.

5.8     The maximum amount for which the mortgage herein granted shall be deemed to secure the obligations and indebtedness of the Operator to the Non-Operators as stipulated herein is hereby fixed in an amount equal to Twenty-Five Million Dollars ($25,000,000.00) in the aggregate (the "Limit of the Mortgage of the Operator"), irrespective of the total number of Non-Operators party to the Operating Agreement at any time.  Except as provided in the previous sentence (and then only to the extent such limitations are required by law), the entire amount of obligations and indebtedness of the Operator to the Non-Operators is secured hereby without limitation.

#93828440v3
#93828440v5

Notwithstanding the foregoing Limit of the Mortgage of the Operator, the liability of the Operator under this Memorandum and the mortgage and security interest granted hereby shall be limited to (and the Non-Operators shall not be entitled to enforce the same against Operator for, an amount exceeding) the actual obligations and indebtedness (including all interest charges, Costs, attorneys' fees, and other charges provided for in this Memorandum or in the Operating Agreement) outstanding and unpaid and that are attributable to or charged against the interest of the Operator pursuant to the Operating Agreement.

6.0    As applicable to the jurisdiction of operations under the Operating Agreement, to serve as notice of the existence of the Operating Agreement as a burden on the title of the Operator and the Non-Operators to their interests in and to the Contract Area, and for purposes of satisfying otherwise relevant recording and filing requirements of applicable law, this Memorandum is to be filed or recorded, as the case may be, in (a) the conveyance records of the parish or parishes in which the lands included within the Contract Area are located or adjacent pursuant to La. R.S. 9:2731 et seq., and/or the conveyance records of the county or counties in which the lands included in the Contract Area or located or adjacent (b) the mortgage records of such parish or parishes and/or county or counties, and (c) the appropriate Uniform Commercial Code records. All parties to the Operating Agreement are identified on Attachment "1" hereto.

7.0    If performance of any obligation under the Operating Agreement or payment of any indebtedness created thereunder does not occur or is not made when due under the Operating Agreement or upon default of any covenant or condition of the Operating Agreement, in addition to any other remedy afforded by law, each Party to the Operating Agreement and any successor to such Party by assignment, operation of law, or otherwise, shall have, and is hereby given and vested with, the power and authority to foreclose the mortgage, pledge, and security interest established in its favor herein and in the Operating Agreement in the manner provided by law and to exercise all rights of a secured Party under the Uniform Commercial Code.  If the Non-Operators do not pay its indebtedness or perform its obligations under the Operating Agreement when due, the Operator shall have the additional right to notify the purchaser or purchasers of the Non-Operator's production and collect such indebtedness out of the proceeds from the sale of the Non-Operator's share of production until the amount owed has been paid. The Operator shall have the right to offset the amount owed against the proceeds from the sale of the Non-Operator's share of production.  Any purchaser of such production shall be entitled to rely on the Operator's statement concerning the amount of indebtedness owed by the Non-Operators and payment made to the Operator by any purchaser shall be binding and conclusive as between such purchaser and the Non-Operators.

8.0    Upon expiration of the Operating Agreement and the satisfaction of all obligations and indebtedness arising thereunder, the Operator, on behalf of all parties to the Operating Agreement, shall file of record an appropriate release and termination of all security and other rights created under the Operating Agreement and this Memorandum executed by all Parties to the Operating Agreement.  Upon the filing of such release and termination instrument, all benefits and obligations under this Memorandum shall terminate as to all Parties who have executed or ratified this Memorandum.  In addition, at any time prior to the filing of such

6

release and termination instrument, each of the Operator and the Non-Operators shall have the right to (i) file a continuation statement pursuant to the Uniform Commercial Code with respect to any financing statement filed in their favor under the terms of this Memorandum and (ii) reinscribe this act in the appropriate mortgage records.

9.0   It is understood and agreed by the Parties hereto that if any part, term, or provision of this Memorandum is held by the courts to be illegal or in conflict with any law of the state where made, the validity of the remaining portions or provisions shall not be affected, and the rights and obligations of the Parties shall be construed and enforced as if the Memorandum did not contain the particular part, term, or provision held to be invalid.

10.0   This Memorandum shall be binding upon and shall inure to the benefit of the Parties hereto and their respective legal representatives, successors and permitted assigns. The failure of one or more persons owning an interest in the Contract Area to execute this Memorandum shall not in any manner affect the validity of the Memorandum as to those persons who execute this Memorandum.

11.0   A party having an interest in the Contract Area may ratify this Memorandum by execution and delivery of an instrument of ratification, adopting and entering into this Memorandum, and such ratification shall have the same effect as if the ratifying party had executed this Memorandum or a counterpart thereof.  By execution or ratification of this Memorandum, such party hereby consents to its ratification and adoption by any party who acquires or may acquire any interest in the Contract Area.

12.0   This Memorandum may be executed or ratified in one or more counterparts and all of the executed or ratified counterparts shall together constitute one instrument.  For purposes of recording in each of the records described in Paragraph 6 above, duplicate copies of this Memorandum with individual signature pages attached thereto may be filed of record, one copy of each to be indexed in the name of the Operator, as grantor, and one copy of each to be indexed in the name of the Non-Operators, as grantor, and duplicate copies of this Memorandum with individual signature pages attached thereto may be filed in the appropriate Uniform Commercial Code records, one filing for the Operator, as secured Party, and another filing for the Non-Operators, as secured Party.  The respective addresses of the Operator, as both secured Party and debtor, and the Non-Operators, as both debtor and secured Party, at which information with respect to the security interests created in the Operating Agreement may be obtained, are set forth in Paragraph 1.0 of this Memorandum.

13.0   The Operator and the Non-Operators hereby agree to execute, acknowledge and deliver or cause to be executed, acknowledged and delivered, any instrument or take any action necessary or appropriate to effectuate the terms of the Operating Agreement or any Exhibit, instrument, certificate or other document pursuant thereto.

14.0   Whenever the context requires, reference herein made to the single number shall be understood to include the plural, and the plural shall likewise be understood to include the singular, and specific enumeration shall not exclude the general, but shall be construed as cumulative.

7

EXECUTED on the dates set forth below each signature but made effective as of _____ _, 20___.

**OPERATOR**:

WITNESSES:                                    [_____]

_____          By:_____

Printed Name: _____

_____

Printed Name: _____          Date:_____

**NON-OPERATORS**:

WITNESSES:                                    [_____]

_____          By:_____

Printed Name: _____

_____

Printed Name: _____          Date:_____

8

WITNESSES:                                    [_____]


_____        By:_____

Printed Name: _____

_____

Printed Name: _____        Date:_____


WITNESSES:                                    [_____]


_____        By:_____

Printed Name: _____

_____

Printed Name: _____        Date:_____


WITNESSES:                                    [_____]


_____        By:_____

Printed Name: _____

_____

Printed Name: _____        Date:_____

#93828440v3
#93828440v5

**ACKNOWLEDGMENT**

THE STATE OF _____     §
                           §
COUNTY OF _____      §

On this ____ day of _____, 20__, before me appeared _____, to me personally known, who, being by me duly sworn, did say that she is the _____ of [_____], a [_____], and that said instrument was signed in behalf of said [_____] by authority of its [_____] and said appearer acknowledged said instrument to be the free act and deed of said [_____].

In witness whereof, I have hereunto set my official hand and seal on the date hereinabove written.

_____
Notary Public in and for the State of Texas

THE STATE OF _____     §
                           §
COUNTY OF _____      §

On this ____ day of _____, 20__, before me appeared _____, to me personally known, who, being by me duly sworn, did say that she is the _____ of [_____], a [_____], and that said instrument was signed in behalf of said [_____] by authority of its [_____] and said appearer acknowledged said instrument to be the free act and deed of said [_____].

In witness whereof, I have hereunto set my official hand and seal on the date hereinabove written.

_____
Notary Public in and for the State of Texas

THE STATE OF _____     §
                           §
COUNTY OF _____      §

On this ____ day of _____, 20__, before me appeared _____, to me personally known, who, being by me duly sworn, did say that she is the _____ of [_____], a [_____], and that said instrument was signed in behalf of said [_____] by authority of its [_____] and said appearer acknowledged said instrument to be the free act and deed of said [_____].

In witness whereof, I have hereunto set my official hand and seal on the date hereinabove written.

_____
Notary Public in and for the State of Texas

#93828440v3
#93828440v5

THE STATE OF _____        §
                               §
COUNTY OF _____          §

On this ____ day of _____, 20__, before me appeared _____, to me personally known, who, being by me duly sworn, did say that she is the _____ of [_____], a [_____], and that said instrument was signed in behalf of said [_____] by authority of its [_____] and said appearer acknowledged said instrument to be the free act and deed of said [_____].

In witness whereof, I have hereunto set my official hand and seal on the date hereinabove written.

_____
Notary Public in and for the State of Texas


THE STATE OF TEXAS    §
                      §
COUNTY OF HARRIS      §

On this ____ day of _____, 20__, before me appeared_____, to me personally known, who, being by me duly sworn, did say that he is the _____ of [_____], a [_____], and that said instrument was signed in behalf of said [_____] by authority of its [_____] and said appearer acknowledged said instrument to be the free act and deed of said [_____].

In witness whereof, I have hereunto set my official hand and seal on the date hereinabove written.

_____
Notary Public in and for the State of Texas

11

**ATTACHMENT "1"**

Attached to and made a part of the Memorandum of Operating Agreement and Financing Statement by and between _____, as Operator, and _____, as Non-Operators

I.   DESCRIPTION OF LANDS AND LEASES WITHIN THE "LEASE"


II.   OPERATOR

[_____]

III.   INTEREST OF THE PARTIES

IV.   NAMES AND ADDRESSES OF PARTIES FOR NOTIFICATION PURPOSES


[_____]                    [_____]
[_____]                    [_____]
[_____]                    [_____]
Attention:                            Attention:
Phone:                                Phone:
Fax:                                  Fax:


[_____]                    [_____]
[_____]                    [_____]
[_____]                    [_____]
Attention:                            Attention:
Phone:                                Phone:
Fax:                                  Fax:


[_____]
[_____]
[_____]
Attention:
Phone:
Fax:

12

## Exhibit 15

**Transition Services Agreement**

**TRANSITION SERVICES AGREEMENT**

This Transition Services Agreement dated and effective as of _____, 202_ (the "<u>Effective Date</u>") (this "<u>Agreement</u>") is by and among [FIELDWOOD ENERGY II LLC], a Delaware limited liability company (the "<u>Operator</u>"), FIELDWOOD ENERGY I LLC, a Texas limited liability company ("<u>Fieldwood Energy I</u>") and GOM Shelf LLC, a Delaware limited liability company ("<u>GOM Shelf</u>" and, together with Fieldwood Energy I, the "<u>Owners</u>", and each, an "<u>Owner</u>"). Operator and Owners are sometimes referred to collectively as the "<u>Parties</u>" and individually as a "<u>Party</u>".

**WHEREAS**, each Owner is the operator, as designated by the Bureau of Ocean Energy Management of the United States Department of the Interior ("<u>BOEM</u>") or the Bureau of Safety and Environmental Enforcement of the United States Department of the Interior ("<u>BSEE</u>") or pursuant to a joint operating (or similar) agreement, of certain of the Assets (as defined below) (such Assets while operated by an Owner, the "<u>Operated Assets</u>");

**WHEREAS**, Fieldwood Energy I is a resulting entity of a divisive merger effected in connection with the confirmed plan of reorganization of Chapter 11 Case 20-33948, *In re: Fieldwood Energy LLC et al.*, in the United States Bankruptcy Court for the Southern District of Texas, Houston Division (the "<u>Plan</u>");

**WHEREAS**, in accordance with the Plan, the Owners do not have, as of the date hereof, employees and require a third party to provide operational, technical, and administrative services for the Assets;

**WHEREAS**, Operator has agreed to provide certain operational, technical, and administrative services with respect to the Assets, upon the terms and conditions set forth herein, until the end of each respective Service Term (as defined below).

**NOW, THEREFORE**, in consideration of the premises and of the mutual promises, covenants, conditions, and agreements contained herein, and for other valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereby agree as follows:

**ARTICLE I.  TRANSITION SERVICES**

**Section 1.1    <u>Services</u>**. Subject to the terms of this Agreement, Operator shall provide or cause to be provided the transition services described on <u>Exhibit A</u> (collectively, the "<u>Services</u>") for all of Owners' assets (the "<u>Assets</u>") in accordance with the standard of performance set forth in <u>Section 1.2</u> below for the period, subject to the provisions of <u>ARTICLE V</u>, with respect to each Service (as to each Service, the "<u>Service Term</u>") set forth on <u>Exhibit A</u>.

**Section 1.2    <u>Standard of Performance</u>**. Subject to the terms of this Agreement, Operator shall perform or cause to be performed the Services (a) in substantially the same manner as such Services were provided by Fieldwood Energy LLC or its Affiliates with respect to the Assets prior to the date hereof, (b) as a reasonably prudent operator as the contract service provider hereunder would perform such Services, (c) in a good and workmanlike manner, (d) with due diligence and dispatch, (e) in accordance with good oilfield practices, and (f) in compliance with

all Laws (as defined below), licenses, authorizations and permits; **PROVIDED, HOWEVER, EXCEPT AS EXPRESSLY PROVIDED HEREIN, IN NO EVENT SHALL OPERATOR HAVE ANY OBLIGATIONS OR LIABILITY TO ANY OWNER GROUP MEMBER EXCEPT FOR DAMAGES BOTH (I) ARISING OUT OF THIS AGREEMENT AND (II) CAUSED BY, ARISING OUT OF, OR RESULTING FROM THE GROSS NEGLIGENCE OR WILLFUL MISCONDUCT OF ANY MEMBER OF OPERATOR GROUP (AS HEREIN DEFINED)**.  For purposes of this Agreement, "Laws" means any and all applicable laws, statutes, codes, constitutions, ordinances, decrees, writs, injunctions, orders, judgments, principles of common law, rules, licenses, authorizations, or regulations (including environmental laws) that are promulgated, issued, or enacted by any Governmental Authority (as defined below) having jurisdiction. In providing the Services to the Owners, Operator may use, at its discretion, its own personnel or the personnel of any of its Affiliates or employ the services of contractors, subcontractors, vendors, or other third parties.  For purposes of this Agreement, "Affiliates" with respect to a Party means any person or entity that controls, is controlled by or is under common control with such Party where control means the direct or indirect power to direct the management of the entity at issue. For the avoidance of doubt, neither of the Owners nor any of their subsidiaries shall constitute an Affiliate of Operator for purposes of this Agreement.

 **Section 1.3**   **Independent Contractor**. At all times during the performance of Services by Operator, all persons performing such Services who shall be in the employ and/or under the control of Operator or its Affiliates (including agents, contractors, temporary employees, and consultants) shall be independent from each Owner and not employees of each Owner and shall not be entitled to any payment, benefit, or perquisite directly from Owners on account of such Services, including, but not limited to, group insurance and participation in any employee benefit and pension plans maintained by each Owner or any Affiliate of each Owner. Operator will not be required to provide any Services the provision of which would violate applicable Laws. Notwithstanding any other provision contained elsewhere in this Agreement, in all cases where the Operator is performing Services under this Agreement offshore the State of Louisiana or are otherwise covered by the Louisiana Worker's Compensation Act, La. Rev. Stat. § 23.1021 et seq., the Parties acknowledge and agree that all such operations pursuant to this Agreement are an integral part of and are essential to the ability of the Owners to generate Owners' goods, products, or services, and that whenever Services and work are performed hereunder in or offshore Louisiana, or the Louisiana Workers' Compensation Act may be applicable, the employees of Operator and their contractors providing such Services or performing such work, if any, whether direct, statutory, borrowed, or otherwise, are statutory employees of each Owner in accordance with the Louisiana Worker's Compensation Act, La. Rev. Stat. § 23.1021 et seq. and the protections afforded a statutory employer under Louisiana Law shall apply. In such event, Operator agrees that such Owner is and shall be deemed a statutory employer of Operator's employees for the sole purposes of La. Rev. Stat. § 23.1061(A)(3), as the same may be amended from time to time.

 **Section 1.4**   **Records**.  Operator shall use commercially reasonable efforts to maintain or cause to be maintained true and correct records of all receipts, invoices, reports, and such other documents as are customarily maintained by Operator for its own operations relating to each Service rendered hereunder for a period of the later of (i) three (3) years following the end of the calendar year during which the end of the Service Term for such Service occurs or (ii) such other

2

time required by applicable Law. All such receipts, invoices, reports, and other documents are the property of Owners.

**Section 1.5** **Representatives**. Each Party shall, at all times during the Service Term, keep one or more representatives available either by telephone, electronic mail, or in person during normal business hours, to receive communications from the other Party regarding the day-to-day Services and to respond to inquiries concerning the performance of the day-to-day Services. For the avoidance of doubt, all Notices required or permitted hereunder shall be delivered pursuant to Section 7.2 of this Agreement. Operator's representatives are designated along with their contact information on Exhibit B. Each Owner's representative shall be the Sole Manager of Fieldwood Energy I. Each Party may replace any of its representatives or designate such other representatives from time to time by written notice to the other Parties delivered pursuant to Section 7.2. At all times while this Agreement remains in effect, each Owner shall cause at least one of its representatives to be included on such Owner's BOEM "qualification card" as an authorized signatory for such Owner.

**Section 1.6** **Limitation of Services**.

(a) Notwithstanding anything herein to the contrary, Owners acknowledge certain personnel of Operator and/or its Affiliates involved in the provision of the Services may leave the employment of such Operator and/or its Affiliates or terminate their employment or contract with such Operator or its Affiliates during the term of this Agreement. The Services shall not include providing any technical evaluations regarding any proposals for drilling, reworking, or other capital expenditure projects, or the new development of any assets which are proposed by Operator under the Farmout Agreement (as defined herein). Operator makes no representation or warranty regarding the ability of Operator and/or its Affiliates to retain any employees, contractors, or subcontractors and neither Operator nor any of its Affiliates shall have any liability to an Owner as to the result of the loss of any such employees, contractors, or subcontractors. Operator and its Affiliates shall use commercially reasonable efforts to report all information accurately, but shall not be responsible for the accuracy or completeness of any information furnished by any other party for inclusion in any reports or for results obtained by use of any inaccurate information so furnished.

(b) Notwithstanding any other provision in this Agreement or the Agency Agreement (attached as Exhibit C hereto) to the contrary:

　　　(i) Operator shall have no obligation to be designated with BOEM, BSEE, or any other applicable state, local, or federal governmental entity (each individually, a "Governmental Authority"; and collectively, "Governmental Authorities") as a designated operator, designated applicant, designated payor, or responsible party for any of the Assets;

　　　(ii) Operator shall have no obligation to post any bond or other security on behalf of any Owner or to make any payment directly out of Operator's own funds for any Services;

3

(iii) Operator shall have no obligation to provide any Service for which a third party is obligated or permitted (under a joint operating agreement, contract services agreement or otherwise) to provide the same service for the applicable Owner; provided, however, that Operator's use of a subcontractor to perform any part of the Services shall not excuse Operator from the obligation to perform such Services;

(iv) each Owner acknowledges and agrees that it will remain responsible for having an authorized representative, and will cause at least one authorized representative to be, readily available (1) to sign and submit on its behalf various forms, filings, payments and other communications with BOEM, BSEE or other Governmental Authority with respect to the Assets and (2) to cooperate and coordinate with Operator with respect to the Services;

(v) each Owner acknowledges and agrees that it will remain responsible for providing any bond or security, or subject to <u>Section 3.6</u>, making any payment, to any third party that may be required in connection with any Assets or Services; and

(vi) if Operator co-owns any lease, right-of-way or other asset with an Owner, Operator shall not be required to provide any Services to (or provide any election for) such Owner in a manner different from what Operator provides for itself with respect to such co-owned asset.

(vii) if Operator reasonably believes that it cannot perform any Service without creating a breach of an agreement to which an Owner is a party or an Asset is bound, and/or violating the Law, then Operator shall have no obligation to perform such Service and such Service shall no longer be included within the Services, and Operator shall give prompt, written notice of such issue to Owners, prior to the discontinuation of such Service, with detailed descriptions of the agreement in question and the breach and/or violation Operator believes will be created.  In the event such possible breach and/or violation is cured or remedied within thirty (30) days following Owners' receipt of such notice, Operator may perform such Service only insofar as performance would not create the breach or violation.

(c)     In the performance of the Services, Operator must obtain consent of the applicable Owner(s) to perform any of the following actions on behalf of such Owner(s):

(i) make any payment to renew or extend a lease;

(ii) plug and abandon any well;

(iii) execute, amend, waive, release, extend, terminate, or otherwise modify any of the governmental approvals, leases, or other agreements related to the

<div align="center">4</div>

Assets (other than an agreement in the ordinary course of business with a service provider using agreements substantially in the form previously used or other forms reasonably approved by such Owner);

(iv)  (a) borrow or lend money; (b) participate in futures, derivatives, or hedging activities; (c) purchase or sell any of the Assets or transfer or dispose of any equipment, material or supplies on any Asset; (d) execute any indemnification, release, or waiver, except for standard indemnities, releases, and waivers that are included in normal and routine operational services contracts, (e) take any other action not in the ordinary course of business; (f) incur any cost or expense for geophysical items (including acquisition, processing, reprocessing, or interpretation); (g) make a capital or expense expenditure or series of related capital or expense expenditures in relation to any particular project of $100,000 or more net to either Owner's interest, including, without limitation, expenditures for repair and maintenance projects and workover and recompletion projects; provided, however, this limitation does not apply to routine operational costs; or (h) assume, guarantee, or otherwise become liable or responsible (whether directly, contingently, or otherwise) for the liabilities of any other person or any indebtedness, except to the extent such assumptions, guarantees or otherwise becoming liable or responsible for the liabilities or indebtedness are standard obligations included in normal and routine operational services contracts; and

(v)  enter into any contract with respect to any of the foregoing in this Section 1.6.

(d)  The Services will be used by the Owners in connection with the operation of the Assets of Owners and, as necessary, to assist in the transition of the operation of the Assets to Owner or another service provider.  All products of Services performed hereunder by Operator for Owners or otherwise in respect of the Assets shall belong exclusively to Owners, and Operator shall retain no ownership, interest, or rights therein.

(e)  Operator and each Owner shall use commercially reasonable efforts to obtain, and to keep and maintain in effect (or to cause their respective Affiliates to obtain, and to keep and maintain in effect), all governmental or third party licenses and consents required for the provision of any Service by Operator in accordance with the terms of this Agreement.  The direct, out-of-pocket costs relating to obtaining any such licenses or consents shall be borne by Owners; and none of Operator or any of its Affiliates shall be required to pay any money or other consideration or grant any other accommodation to any person (including any amendment to any contract) or initiate any action, suit, or proceeding against any person to obtain any such license or consent.  Operator shall have no obligation to provide any Services which require any such licenses or consents which are not obtained.  In the event Owners choose to pursue any action, suit, or proceeding against any person to obtain such license or consent, Operator shall use commercially reasonable efforts to assist Owner in such efforts; provided that Operator shall not be obligated to incur any out-of-pocket costs in providing such assistance.

5

(f)      The Parties are entering into that certain Farmout Agreement of even date herewith (the "Farmout Agreement"), and, therefore, any technical evaluation regarding any drilling, reworking, or other capital expenditure projects that may be proposed by Operator to Owners pursuant to the Farmout Agreement shall not constitute part of the Services to be provided hereunder.  Costs and expenses included in the calculation of the Recovery Threshold (as defined in the Farmout Agreement) may not also be included in the costs charged to the Owners hereunder.

Section 1.7   **Operator's Access to Assets**.  To the extent reasonably necessary for Operator to perform the Services, Owners shall provide Operator unrestricted access to all the Operated Assets and, except to the extent prohibited by contract, all Seismic Data, Well Data, intellectual property and records included in the Assets and, upon Operator's reasonable request from time to time, shall cooperate with Operator in Operator's provision of Services. Operator agrees that it shall use such Operated Assets and the Seismic Data, Well Data, intellectual property and records included in the Assets only for the performance of the Services under this Agreement and for use under the Farmout Agreement; provided, however, Operator shall only be found to have breached this Section 1.7 if it uses such Operated Assets or such Seismic Data, Well Data, intellectual property, or records to (i) compete with Owner in Owner's business of the operation of the Assets where the Assets are located or (ii) to conduct activities that are not related to the Assets or the operation of the Owners' business. Nothing in this Section 1.7 shall restrict Operator's use of the Operated Assets and such Seismic Data, Well Data, intellectual property, and records to the extent Operator has the right to use such assets, data, and information pursuant to any other agreement between Operator and any Owner and to the extent Operator owns or has an interest in such assets, data, or information.

## ARTICLE II.  COMPENSATION

Section 2.1   **Compensation for Services**. During the Service Term set forth on Exhibit A for each Service, each Owner shall pay to and reimburse Operator the amounts determined pursuant to Section 3.1 below for the provision of the Services to such Owner.

Section 2.2   **Overhead**. COPAS recoveries from third parties related to the Operated Assets shall be accounted for on behalf of the Owners. There shall be no separate charge by Operator relating to its overhead (including, but not limited to, head office overhead, field overhead, bonuses, and severances). For the avoidance of doubt, the costs to be paid by Owners to Operator pursuant to Section 3.1 are intended to compensate Operator fully for its overhead associated with the performance of Services.  Nothing in this Section shall limit Operator's rights to collect and retain overhead with respect to properties co-owned by Operator or any of its Affiliates and an Owner that Operator operates on its own behalf.

## ARTICLE III.      PAYMENT AND DEFAULT

Section 3.1   **Submission of Invoice**. Operator shall submit a written invoice (the "Invoice") to Owners on or before the fifteenth (15th) Business Day of each month setting forth an itemized accounting of the actual costs incurred in the preceding month, or as applicable, the

6

preceding months for which an invoice was not issued, for the Services provided by Operator.  For the purposes of this Agreement, "Business Day" shall mean any day other than a Saturday or a Sunday or a day on which federally chartered banking institutions in Houston, Texas, are authorized by Law to close, but for purposes of notices or other communications given hereunder, means before 4:00 p.m. on such day in the city of Houston, Texas.

For shared costs, such as salaried and hourly personnel, IT systems, and other office related infrastructure and overhead, Operator shall allocate those costs as follows:

(a)     For "people" costs, Operator shall bill Owners for actual time incurred by its full-time employees in performing Services hereunder.  The hourly rate of each Operator employee shall be equal to the annual payroll cost (including salary, vacation pay, target bonus, 401(k) match, and payroll taxes) of the employee divided by 2,080 hours.  Any hours accrued and billed by third-party contractors must be approved by Owners in advance of incurring such costs.

For illustrative purposes, two actual employees are shown below:

| Empl<br>ID | Operator<br>Office | Position | Vacation<br>Hours | Target<br>Bonus % | Salary | Vacation | Target<br>Bonus | 6%<br>401(k)<br>Match | Taxes | Total | Hourly |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1692 | TX | Revenue Accountant | 160 | 15% | 85,000 | 7,083 | 12,750 | 5,865 | 7,763 | 118,461 | 57.00 |
| 2060 | TX | Production Engineer | 160 | 30% | 145,000 | 12,083 | 43,500 | 11,310 | 11,872 | 223,765 | 108.00 |

(b)     For all other shared costs, Operator shall bill Owners for the proportionate use in the performance of the Services hereunder.  The proportionate use shall be determined by the Total Hours Billed divided by the Total Employee Hours.  "Total Hours Billed" is equal to the total number of hours recorded by Operator's full-time employees in performing Services hereunder and "Total Employee Hours" is equal to Operator's average daily headcount of full-time employees performing Services hereunder during the applicable month multiplied by eight hours multiplied by the number of Business Days in the month.

All other shared costs includes the following:
(i) IT-related costs (IT systems and software)
(ii) Healthcare and other benefits (benefits cost and administration)
(iii) Office supplies and other expenses
(iv) Communications
(v) Miscellaneous shared costs

For example, assuming an average daily headcount of 275 full-time employees performing Services hereunder and 20 Business Days in the applicable month, Total Employee Hours for the month would equal 44,000 hours (275 employees x 20 Business Days x 8 hours).  If the Total Hours Billed for the month is 30,000, then the Owners' proportionate use would be 68%; and Operator would bill Owners for 68% of these other shared costs.

For the purposes of allocating the other shared costs, Operator shall require that its employees maintain detailed time records measured in 60 minute increments.

7

(c)     For direct pass-through costs, Operator shall bill Owners for the actual costs incurred for the performance of the Services.  Direct pass-through costs shall include:

    (i)   Office rent plus operating expenses for the floors 16, 17, and 18 at the Briar Lake One Office in Houston, Texas;

    (ii)  Office rent plus operating expenses for seventy-five percent (75%) of the space leased by Operator at the Pinhook Tower in Lafayette, Louisiana;

    (iii) Contracted professional fees (legal, audit, reserve engineering, etc.); and

    (iv)  Any other actual, out-of-pocket costs incurred that are identified as directly associated with the performance of the Services hereunder.

**Section 3.2     Payment of Invoices**. Absent manifest error in inclusion or omission of items or calculations contained in an Invoice (if there is a manifest error, Owners will correct such error and show such recalculation), the applicable Owner shall pay within fifteen (15) Business Days of such Owner's receipt of an Invoice the amounts invoiced to such Owner by wire transfer of immediately available funds to the bank account designated on the Invoice by Operator. Adjustment credits or debits shall be shown on the Invoice next succeeding the Invoice in which the adjustment is made. Operator shall provide reasonable back-up and supporting documents related to any Invoice within five (5) Business Days of an Owner's written request. Any preexisting obligation to make payment for the Services provided hereunder or out-of-pocket costs of Operator shall survive the termination of a Service and this Agreement until paid. Each Owner shall have access to and the right to audit all records supporting such Invoiced amounts for the period set forth in Section 1.4.

**Section 3.3     Payment Disputes**. Owners may object to any invoiced amounts for any Service at any time before, at the time of, or after payment is made; provided such objection is made in writing to Operator no later than sixty (60) days after receipt of such Invoice.  Payment of any amount set forth in an Invoice shall not constitute approval thereof, or waive Owners' audit rights as set forth herein.  The Parties shall meet as expeditiously as possible to resolve any dispute. If the Parties fail to reach agreement in writing as to any disputed amounts invoiced by Operator under Section 3.1 above within sixty (60) days after Operator's receipt of such objection, then upon written notice of dispute to the other Party, either Party may submit the matters that remain in dispute to Grant Thornton LLP (the "Accounting Referee") for review and final and binding resolution.  If any person selected as Accounting Referee is unable or unwilling to serve as a referee hereunder, then the Accounting Referee shall be selected by lot from among the independent national accounting firms that have not represented any Party or its Affiliates at any time during the three-year period of time immediately preceding its designation hereunder.  Owners and the Operator shall, not later than seven (7) days prior to the hearing date set by the Accounting Referee, each submit a written brief to the Accounting Referee (and a copy thereof simultaneously to the other Party) with dollar figures for settlement of the disputes as to any amounts owed by Operator. The hearing will be scheduled as soon as is acceptable to the Accounting Referee, but not earlier than seven (7) days after the date for submission of the settlement briefs, and shall be conducted

8

on a confidential basis. The Accounting Referee shall consider only those items or amounts which were identified in a notice in dispute delivered hereunder and which remain in dispute, together with the written briefs, and such other documents submitted therewith, and the Accounting Referee's decision resolving the matters in dispute shall be based upon and be consistent with the terms and conditions in this Agreement. In deciding any matter, the Accounting Referee (i) shall be bound by the provisions of this Section 3.3 and the related definitions and (ii) may not assign a value to any disputed item greater than the greatest value for such item claimed by either the Operator or Owners or less than the smallest value for such item claimed by the Operator or Owners in their respective calculations delivered hereunder. The Accounting Referee shall render a decision resolving the matters in dispute (which decision shall include a written statement of findings and conclusions) promptly after the conclusion of the hearing, unless the Parties reach agreement prior thereto and withdraw the dispute from the Accounting Referee.  The Accounting Referee shall provide to the Parties an explanation in writing of the reasons for its decisions regarding the amounts disputed in the applicable notice. The decision of the Accounting Referee shall be (i) final and binding on the Parties and (ii) final and non-appealable for all purposes hereunder.  The fees and expenses of the Accounting Referee under this Section 3.3 shall be borne one half by the Operator and one half by Owners. The fees and disbursements of Operator's independent auditors and other costs and expenses incurred in connection with the services performed with respect to any dispute under this Section 3.3 shall be borne by the Operator, and the fees and disbursements of Owners' independent auditors and other costs and expenses incurred in connection with the services performed with respect to any dispute under this Section 3.3 shall be borne by Owners.

Section 3.4    **Owner Default**. It shall constitute a default on behalf of an Owner (an "Owner Default") if such Owner fails to timely pay any Invoiced amount for Services provided pursuant to this Agreement in accordance with the provisions of this ARTICLE III or perform any covenants of such Owner under this Agreement or the Agency Agreement, which failure, in the case of a payment default, continues for at least fifteen (15) days following receipt of written notice to such Owner that such Invoiced amount is past due or, in all other instances, at least thirty (30) days following receipt of written notice to such Owner that such performance is required; provided, however, that if such Owner cannot reasonably cure such failure within such thirty (30) day period, no Owner Default shall be deemed to occur provided such Owner demonstrates that it has diligently taken reasonable steps to cure such failure within such thirty (30) day period and diligently prosecutes such cure to completion. Upon the occurrence of an Owner Default, Operator may, in addition to all other remedies available at Law or at equity, (i) suspend all or any portion of the provision of Services hereunder to the applicable Owner that is the subject of the Owner Default, including Services for which payment is outstanding, until such time as the Owner Default is cured and all unpaid, undisputed Invoiced amounts for Services to Operator under this Agreement for such suspended Services are paid in full or (ii) terminate this Agreement effective immediately (provided, however, that Operator may not terminate this Agreement for a specific Owner Default of non-payment (1) within thirty (30) days after Operator has provided written notice of such Owner Default to Apache Corporation ("Apache") or (2) if within such thirty (30)-day period after the provision of notice to Apache, Operator is paid the applicable amount owing) and be entitled to any amounts owed to Operator by Owner hereunder together with interest on such amount at a rate equal to 5% per annum, calculated daily on the basis of a year of 365 days and the actual number of days elapsed (the "Rate") from the date due, until such undisputed

9

amounts, together with all accrued and unpaid interest thereon, are paid in full; provided, however, that Operator may not suspend or terminate Services reasonably determined by Operator to be critical to the safety of the operation of the subject Assets until such time as Operator can make the Assets safe for handover to Owners or their designee.  All costs related to making the Assets safe for handover to Owners or their designee shall be borne by Owners in addition to any other amount due and owing to Operator.

Section 3.5     **Operator Default**. Subject to Section 3.4 above, it shall constitute a default on behalf of Operator (an "Operator Default") if Operator fails to provide a Service to an Owner in accordance with the terms and conditions of this Agreement, which failure is not by reason of an Owner Default or, subject to the requirements and limitations of Section 7.1, Force Majeure and continues for at least thirty (30) days following receipt of written notice to Operator; provided, however, that if Operator cannot reasonably cure such failure within such thirty (30) day period, no Operator Default shall be deemed to occur provided Operator demonstrates that it has diligently taken reasonable steps to cure such failure within such thirty (30) day period and diligently prosecutes such cure to completion.  Upon the occurrence of an Operator Default, Owners may, in addition to any other rights or remedies available at law, in equity, or by contract, terminate this Agreement or specific Services provided hereunder within the time frame specified by Owners in a written notice to Operator so terminating this Agreement.

Section 3.6     **Third Person Services**. Owners recognize that Operator may hire third parties to provide certain portions of the Services and the Owners shall be responsible for the payment of amounts due to such third parties, which are incurred from and after the Effective Date with respect to the Assets, which payment shall be made either through the cash call mechanism described herein, through a direct payment to such third party, or as such may be included on an Invoice as contemplated herein.  Operator may issue a cash-call to the applicable Owner in advance of the month in which such third-party costs will be incurred on behalf of such Owner, and such Owner shall pay such cash call within the later of (i) five (5) Business Days after receipt of the cash call and (ii) five (5) Business Days prior to the month in which payment is due to the third party.  In the event Operator incurs costs not included in such cash call, such costs will be included in an Invoice, and the applicable Owner shall reimburse Operator at the same time and in the same manner as the payment described in Section 3.1.  If the cash-call amount is more than the amount actually expended, Operator will credit the overpayment to the applicable Owner in the next Invoice or the next cash-call for future third party service costs, whichever occurs first.  Any such Invoice or cash-call for which any overpayment has been applied shall reflect the credit for such overpayment at the time it is submitted to such Owner.  For the avoidance of doubt, the costs charged to Owners under Section 3.1 of this Agreement are to compensate Operator for (i) the cost of its employees who are necessary in connection with those Services to be provided herein and (ii) other general and administrative costs that are necessary in connection with the Services to be provided herein, and such costs are not third-party costs for purposes of this Agreement.  Costs to be reimbursed or prepaid pursuant to this Section 3.6 shall not be duplicative of Operator's other fees or reimbursements under this Agreement.

Section 3.7     **Sales Taxes**.  Any sales, use, value-added or similar taxes paid hereunder for Services that Operator is required to pay or incur as a result of such Services shall be passed on to, and be the obligation of, the applicable Owner to which such Services are provided as an

explicit surcharge and shall be paid by such Owner in addition to any payments for Services as set forth in Section 3.1 above, whether included in the applicable Invoice, or added retroactively, such that the amount received by the Operator shall be as if no such taxes had been imposed. If such Owner submits to Operator a timely and valid resale or other exemption certificate sufficient to support the exemption from sales taxes, then such taxes will not be added to the invoices for Services payable pursuant to this ARTICLE III; provided, however, that if Operator is ever required to pay such taxes, such Owner will promptly reimburse Operator for such tax, including any interest, penalties, and attorney's fees assessed thereon by the applicable Government Authority. The Parties will cooperate to contest any invalid sales or use taxes imposed on the Services and to minimize the imposition of any such sales taxes.

Section 3.8    **Notice to Apache of Owner Default**.  If an Owner Default relating to payment occurs and is not cured within the fifteen (15) or thirty (30), as applicable, day period allowed for Owner to cure such Owner Default as described in Section 3.4, then Operator shall submit a written notice to Apache providing reasonable detail of the Owner Default and the amount required to cure such Owner Default.

## ARTICLE IV.      TERM OF AGREEMENT

Section 4.1    **Term**.  No Services shall be provided after the expiration of the Service Term with respect to such Services, except by the mutual written agreement of the Parties; provided, however, that this Agreement shall terminate in its entirety after the end of the Service Term of the Operating Services as described in Section 1.1 of Exhibit A. The Service Term with respect to certain Services may also be terminated prior to the expiration of the applicable Service Term by following the procedures set forth in ARTICLE V.

## ARTICLE V.  CESSATION OF SERVICES

Section 5.1    **Discontinuation of Services**. The Owners acting jointly may, with or without cause and for any or no reason, terminate the Service Term and discontinue any particular Service by giving Operator not less than ninety (90) days (or the lesser period, if any, as set forth in Exhibit A with respect to such Service) prior written notice of such discontinuation, to be effective on the last day of the month specified by Owners in their notice, which month shall not occur earlier than the third month following the date on which Owners have given Operator such written notice of termination. In the case of each discontinued or terminated Service, as applicable, Owners shall be liable to Operator for all costs, expenses, losses, and obligations Operator remains obligated to pay under the terms hereunder or under any other existing contract related to such Services, including as a result of such discontinuation or termination and including any and all actual, documented out-of-pocket amounts reasonably incurred by Operator solely arising from the discontinuation, winding down or termination of such Services hereunder, provided that, Operator shall provide Owners with a notice of a preliminary estimate of such costs within thirty (30) days of its receipt of the applicable notice of discontinuance or termination. The Operator may, with or without cause, terminate the Service Term for the Services as a whole by giving Owners not less than one hundred eighty (180) days prior written notice of such discontinuation,

11

to be effective on the last day of the month specified by Operator in its notice, which month shall not occur earlier than the sixth month following the date on which Operator has given Owners such written notice of termination; provided, however, if the Owners are able to transition the performance of Services to a new provider prior to the expiration of such time period, Owners and Operator may mutually agree to terminate the Services prior to the expiration of such one hundred eighty (180) day period.  Operator shall provide commercially reasonable assistance to Owners in transitioning the performance of the Services to a third party or to Owners; provided that the applicable compensation for Services so transitioned shall continue until the termination thereof in accordance herewith and Owners shall pay any actual, documented out-of-pocket costs incurred for the transition of such Services.

Section 5.2     **Termination Fee**. The Parties agree and acknowledge that Operator will be damaged in the event Owners terminate any particular Service or this Agreement pursuant to Section 5.1 within six (6) months of the Effective Date and that such damages would be difficult or impossible to calculate.  In such event, as liquidated damages and not as a penalty, Owners will pay to Operator, in addition to the amounts payable by Owners under Section 5.1, an early termination fee equal to the lesser of (i) Three Million Three Hundred Thousand U.S. Dollars $3,300,000.00 and (ii) the amount of severance for each employee who provided the particular Services related to the Assets whose employment with Operator is severed as a result of the termination of this Agreement by Owners pursuant to Section 5.1, which amount shall be the equivalent sum of two (2) month's salary for each severed employee, based on the monthly salary of the pertinent employee of Fieldwood Energy LLC as in effect on October 1, 2020.  Upon request by Owners, Operator shall provide Owners with an estimate of the amount of the severance payments it anticipates with respect to clause (ii) in the preceding sentence.  Within thirty (30) days from receipt by Operator of the notice of termination from Owners provided in Section 5.1, Operator will provide Owners a list of the applicable employees who are to be severed from their employment with Operator and their salaries.

Section 5.3     **Procedures Upon Discontinuation or Termination of Services**. Upon the discontinuation or termination of all Services hereunder, this Agreement shall terminate and be of no further force and effect, except as to obligations accrued prior to the date of discontinuation or termination; provided, however, that ARTICLES VI and VII, Section 1.4, the second sentence of Section 1.7, and Owners' audit rights under Section 3.2 of this Agreement shall survive such discontinuation or termination.

Section 5.4     **Transition of Operations**.  During the applicable notice period provided in Section 5.1 and subject to the next sentence, Operator shall deliver all documents, records, and other data to the extent included in the Assets that are in the Operator's possession, including, without limitation, information, data, know-how, interpretations, contracts, and other rights and privileges with respect to each Owner's wells, production, leases, and all Evaluation Data, Seismic Data, and Well Data, to the applicable Owner of such Assets or its designee in a timely, practical manner; provided, however, if the delivery of any such data or material would be a breach of any agreement between Operator and a third party, Operator may withhold delivery of such data and material and shall provide notice to Owners of the reasons for such withholding; provided, further, that Operator may keep copies of any documents, records, and other data included in the Operated Assets that are co-owned between the Operator and Owner (with Owner being provided the

12

originals of such documents, records, and other data) and Operator may keep copies of any documents, records, or other data included in any other Assets in which Operator also has an interest. If Owners are able to overcome any such potential breach, Operator shall promptly deliver such data and materials to Owners. During the term of this Agreement, Operator shall not enter into any agreement(s) hereunder for the benefit or use of Owners or in connection with Owners' assets that prohibits assignment of such agreement to Owners. If such documents, records, or data pertain to the Assets and to other properties owned by Operator that are not included in the Assets, then Operator (i) is not required to deliver any portions of such documents, records, or data that relate to assets or properties other than the Assets and (ii) may retain copies of such documents, records, or data to the extent such relates to the assets or properties that are not part of the Assets, or Operator owns or has interest in such documents, records, or data. Notwithstanding anything to the contrary herein, Operator may retain copies of any documents, records, or data pertaining to Assets for which Operator (i) has submitted a Proposal (as such term is defined in the Farmout Agreement) that has not been rejected, withdrawn, deemed withdrawn, or terminated under the Farmout Agreement or (ii) is conducting or has conducted a Project (as such term is defined in the Farmout Agreement) pursuant to the Farmout Agreement. The Parties agree to preserve as a priority during any transition of operations the safety of individuals and the environment in compliance with all Laws and Governmental Authorities. For the purposes of this Agreement, the term "Evaluation Data" shall mean Seismic Data and other data and information relating to the Assets including, without limitation, to the extent applicable, relevant geological and geophysical interpretations and information, including the most recent reports, interpretations, and maps, and all specialty processing and analysis of Seismic Data (e.g., migration, AVO, etc.); the term "Seismic Data" shall mean any and all seismic data, two-dimensional multifold seismic data, three-dimensional seismic data, stacked and migrated processed sections, digital field tapes, stacked tapes, support data relating thereto, stick and quality control segments, receiver and bin center locations, stacking velocities, shothole drilling information, digital shotpoint locations, magnetic, surface, and other surveys, seismic sections, surface and subsurface maps, plats, charts, and any interpretations of the foregoing, or other like information customarily used in connection with oil and/or gas exploration; and the term "Well Data" shall mean any logs, core samples, other geological and geophysical data or similar data created during drilling operations, any engineering records or reports (including wellbore schematics), any drilling records or reports (including detailed daily drilling reports) and any related reports filed with the BOEM or BSEE.

Section 5.5    **Marketing Contracts**. Upon termination of this Agreement pursuant to the terms hereof, to the extent Operator is the owner of such contracts or agreements, Operator shall immediately assign to Fieldwood Energy I its rights to all contracts or agreements related to the Marketing Services described on Exhibit A hereto and take such actions as may be reasonably necessary to obtain any required consents for such assignments; provided, however, that Operator shall not be required (i) to assign any contract if such assignment would be in breach of an agreement with a third party to which Operator is a party or (ii) to provide any monetary or non-monetary consideration for such consent unless paid by Owner. During the term of this Agreement, Operator shall not enter into any agreement(s) for the benefit or use of the Owners or in connection with the operation of the Assets that prohibits assignment to Owners.

13

## ARTICLE VI.        INDEMNITIES; DISCLAIMERS

**Section 6.1    Owners' Indemnification Obligations**. Notwithstanding any knowledge or investigation of any person, Owners agree, to the fullest extent permitted by applicable Laws, to assume, release, indemnify, defend, and hold harmless Operator, and its equity-holders, parent, affiliates, and subsidiary companies together with its and all of their respective officers, directors, managers, employees, in-house legal counsel, agents, and representatives, and the respective successors, spouses, relatives, dependents, heirs, and estate of any of the foregoing (excluding any members of the Owner Group) (the "Operator Group") against and from all claims, demands, complaints, losses, fines, penalties, citations, damages, causes of action, suits, judgments, orders, expenses, or costs, including court costs, reasonable attorneys' fees, and expert witnesses' fees (collectively "Damages") caused by or arising out of or resulting from this Agreement or the provision of Services pursuant to this Agreement, but only to the extent such Damages are not attributable to (i) the breach of Operator's agreement contained in Section 1.7 above regardless of whether such breach was caused by Operator's gross negligence or willful misconduct, or (ii) the gross negligence or willful misconduct of Operator. Owners shall reimburse any Operator Group member entitled to indemnity hereunder for its legal and other expenses incurred in connection with defending any claim with respect to such Damages, which reimbursement shall be made promptly after receipt by Owners of a written request therefor accompanied by reasonable supporting documentation with respect to the legal and other expenses for which such Operator Group member seeks reimbursement. **THE FOREGOING INDEMNITY OBLIGATIONS SHALL APPLY WHETHER OR NOT SUCH DAMAGES ARISE OUT OF (i) NEGLIGENCE (INCLUDING SOLE, SIMPLE, CONCURRENT, ACTIVE, OR PASSIVE NEGLIGENCE OR OTHERWISE), BUT EXPRESSLY NOT INCLUDING GROSS NEGLIGENCE OR WILLFUL MISCONDUCT OF OPERATOR OR ANY OTHER MEMBER OF THE OPERATOR GROUP, (ii) STRICT LIABILITY, (iii) THE UNSEAWORTHINESS OF ANY VESSEL OR THE UNAIRWORTHINESS OF ANY AIRCRAFT OR (iv) ANY VIOLATION OF ANY LAW, RULE, REGULATION, OR ORDER RELATED TO THE OWNERSHIP OR OPERATION OF THE ASSETS, INCLUDING APPLICABLE ENVIRONMENTAL LAWS, EXCEPT IN THE EVENT THAT SUCH DAMAGES OR VIOLATION IS CAUSED BY OR RESULTS FROM THE GROSS NEGLIGENCE OR WILLFUL MISCONDUCT OF ANY MEMBER OF THE OPERATOR GROUP.**

**Section 6.2**    Operator's Indemnity Obligations.    OPERATOR SHALL, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAWS, ASSUME, RELEASE, INDEMNIFY, DEFEND, AND HOLD HARMLESS OWNERS, AND THEIR EQUITY-HOLDERS, PARENT, AFFILIATES, AND SUBSIDIARY COMPANIES, CO-LESSEES, CO-OWNERS, PARTNERS, JOINT VENTURERS, TOGETHER WITH ITS AND ALL OF THEIR RESPECTIVE OFFICERS, DIRECTORS, MANAGERS, EMPLOYEES, IN-HOUSE LEGAL COUNSEL, AGENTS, AND REPRESENTATIVES, AND THE RESPECTIVE SUCCESSORS, SPOUSES, RELATIVES, DEPENDENTS, HEIRS, AND ESTATE OF ANY OF THE FOREGOING (EXCLUDING ANY MEMBERS OF THE OPERATOR GROUP) (THE "OWNER GROUP") AGAINST AND FROM ALL DAMAGES CAUSED BY OR ARISING OUT OF OR RESULTING FROM (i) THE BREACH OF OPERATOR'S AGREEMENT CONTAINED IN SECTION 1.7 ABOVE OR SECTION Section 7.4 OR (ii) THE GROSS

14

NEGLIGENCE OR WILLFUL MISCONDUCT OF ANY MEMBER OF THE OPERATOR GROUP IN CONNECTION WITH THE PROVISION OF SERVICES UNDER THIS AGREEMENT.

**Section 6.3** **Disclaimers**. EXCEPT WITH RESPECT TO OPERATOR'S AGREEMENT CONTAINED IN SECTION 1.7 ABOVE OR SECTION 7.4 BELOW, BUT OTHERWISE NOTWITHSTANDING ANY OTHER TERM OF THIS AGREEMENT TO THE CONTRARY, OPERATOR MAKES NO, AND DISCLAIMS ANY, REPRESENTATIONS AND WARRANTIES, EXPRESS, IMPLIED, OR STATUTORY, WITH RESPECT TO THIS AGREEMENT OR THE PERFORMANCE OR RESULTS OF THE SERVICES. EXCEPT WITH RESPECT TO (i) ANY BREACH OF OPERATOR'S AGREEMENT CONTAINED IN SECTION 1.7 ABOVE OR SECTION 7.4 BELOW, OR (ii) THE GROSS NEGLIGENCE OR WILLFUL MISCONDUCT OF OPERATOR OR ANY OTHER MEMBER OF THE OPERATOR GROUP IN THE PERFORMANCE OF SERVICES UNDER THIS AGREEMENT, OPERATOR EXPRESSLY DISCLAIMS, AND OWNERS AGREE THAT THE OPERATOR GROUP SHALL BE FREE FROM, ALL LIABILITY AND RESPONSIBILITY FOR ANY REPRESENTATION, WARRANTY, STATEMENT, OR INFORMATION WITH RESPECT TO THE SERVICES THAT IS MADE OR COMMUNICATED (ORALLY OR IN WRITING) TO ANY OWNER GROUP MEMBER (INCLUDING ANY OPINION, INFORMATION, PROJECTION, EVALUATIONS, OR ADVICE THAT MAY HAVE BEEN PROVIDED TO ANY OWNER GROUP MEMBER BY ANY OPERATOR GROUP MEMBER).

**Section 6.4** **Laws; Application**. The indemnification obligations in this ARTICLE VI are intended to comply with applicable Laws. To the extent such indemnification provisions are found to violate any applicable Law, or in the event any applicable Law is enacted or amended so as to cause these provisions to be in violation therewith, this Agreement shall automatically be amended to provide that the indemnification provided hereunder shall extend only to the maximum extent permitted by the applicable Law.

**Section 6.5** **Limitations**. EXCEPT FOR THIRD PARTY CLAIMS FOR WHICH ANY PARTY IS OBLIGATED TO INDEMNIFY, DEFEND, AND HOLD HARMLESS THE OTHER PARTY'S GROUP UNDER THIS AGREEMENT, BUT OTHERWISE NOTWITHSTANDING ANY OTHER TERM OF THIS AGREEMENT TO THE CONTRARY, NEITHER OPERATOR NOR ANY OWNER SHALL BE LIABLE TO THE OTHER PARTY'S GROUP UNDER THIS AGREEMENT FOR ANY PUNITIVE, EXEMPLARY, SPECIAL, INDIRECT OR CONSEQUENTIAL DAMAGE RESULTING FROM OR ARISING OUT OF THIS AGREEMENT, EXCEPT SUCH AS MAY BE AWARDED TO THIRD PARTIES. EXCEPT FOR BREACHES OF OPERATOR'S OBLIGATIONS CONTAINED IN SECTION 7.4, OPERATOR SHALL NOT BE LIABLE TO THE OWNER GROUP FOR ANY AMOUNTS IN THE AGGREGATE GREATER THAN THE AMOUNTS ACTUALLY RECEIVED BY OPERATOR UNDER THIS AGREEMENT; PROVIDED, HOWEVER, THAT THIS LIMITATION SHALL NOT APPLY TO DAMAGES OWNER MAY OWE TO A THIRD PARTY TO THE EXTENT ARISING OUT OF OPERATOR'S BREACH OF ITS OBLIGATIONS CONTAINED IN SECTION 1.7.

15

## ARTICLE VII.        MISCELLANEOUS

**Section 7.1    Force Majeure**.  In the event that Operator is rendered unable, wholly or in part, by Force Majeure or other causes herein specified, to carry out all or any of its obligation under this Agreement, it is agreed that on Operator's delivery of written notice, so far as Operator is prevented by such Force Majeure or other causes herein specified, Operator's obligation shall be suspended during the continuance of any inability so caused, and Operator will not be liable to Owners for any interruptions of service, any delays, or any failure to perform under this Agreement caused by such Force Majeure. For the avoidance of doubt, any delays, interruptions or failures to perform caused by such occurrences shall not be deemed to be a breach or failure to perform under this Agreement. The term "Force Majeure" means occurrences beyond the reasonable control of Operator and includes, without limiting the generality of the foregoing: acts of God, strikes, lockouts, or other industrial disturbances, acts of the public enemy, wars, blockades, insurrections, riots, epidemics, pandemics, landslides, lightning, earthquakes, fires, storms, hurricanes, tropical storms, loop currents, floods, washouts, arrests, and restraints of the Government, either federal or state, civil or military, civil disturbances, explosions, sabotage, malicious mischief, breakage or accident to machinery or lines of pipe, freezing of wells or lines of pipe, refusal or inability of resale owner(s) or transporter(s) to take deliveries due to events of Force Majeure, inability of Operator to obtain right-of-way, necessary materials, supplies, or permits not caused by the failure of Operator to pay for or negligence to obtain such rights-of-way, necessary materials, supplies, or permits, an order, directive, or restraint issued or imposed by any Governmental Authority, regulatory body or court having jurisdiction. It is understood and agreed that the settlement of strikes or other labor difficulties shall be entirely within the discretion of Operator. During the continuation of a Force Majeure event, Operator shall act diligently to overcome the impediments caused by such event and use its commercially reasonable efforts to promptly resume performance of its obligations under this Agreement.

**Section 7.2    Notices**.  Any  notice, request, instruction, correspondence or other document to be given hereunder by any Party to another (herein collectively called "Notice") shall be in writing and delivered by email and additionally in person or by courier service requiring acknowledgement of receipt or mailed by certified mail, postage prepaid and return receipt requested, or by overnight delivery service, or by electronic mail (provided that notices by electronic mail shall also be sent by one of the other permitted means to be effective), as follows:

If to Fieldwood Energy I:

      Fieldwood Energy I LLC
      ADDRESS
      Attn:
      Phone:
      Email:

with a copy to:

Apache Corporation
2000 Post Oak Blvd, Suite 100
Houston, TX  77056
Attn: Brian Erickson
Phone:  713-296-6000
Email:  brian.erickson@apachecorp.com

If to Operator:

[Fieldwood Energy II LLC]
2000 W. Sam Houston Pkwy S. Suite 1200
Houston, Texas 77042
Attn:   Thomas R. Lamme
Phone: (713) 969-1107
Email:  tlamme@fwellc.com

with a copy to:

Apache Corporation
2000 Post Oak Blvd, Suite 100
Houston, TX  77056
Attn: Brian Erickson
Phone:  713-296-6000
Email:  brian.erickson@apachecorp.com

If to GOM Shelf:

GOM Shelf LLC
ADDRESS
Attn:
Phone:
Email:

with a copy to:

Apache Corporation
2000 Post Oak Blvd, Suite 100
Houston, TX  77056
Attn: Brian Erickson
Phone:  713-296-6000
Email:  brian.erickson@apachecorp.com

Notice given by personal delivery or courier shall be effective upon actual receipt. Notice given by mail shall be effective upon actual receipt or, if not actually received, the fifth Business Day following deposit with the U.S. Post Office. Notice given by electronic mail shall be effective upon

17

delivery if delivered to a working email address during the recipient's normal business hours, or at the beginning of the recipient's next Business Day if not delivered during the recipient's normal business hours.  If a date specified herein for giving any Notice or taking any action is not a Business Day (or if the period during which any Notice is required to be given or any action taken expires on a date which is not a Business Day), then the date for giving such Notice or taking such action (and the expiration date of such period during which notice is required to be given or action taken) shall be the next day which is a Business Day. Any Party may change any address, electronic or otherwise, to which Notice is to be given to it by giving Notice as provided above of such change of address; provided that only Apache Corporation may change its address for copies and such copies may not be amended, discontinued, or delayed without Apache Corporation's express written consent.

      **Section 7.3**    <u>**No Joint Venture or Partnership**</u>. Nothing in this Agreement is intended to create, or shall be construed as creating, a partnership, joint venture, association for profit or other business entity between or among the Parties, and for federal and state income  tax purposes, the Parties elect to be excluded from the application of the provisions of Subchapter K, Chapter 1, Subtitle A of the Internal Revenue Code of 1986, as amended, as permitted and authorized by Section 761 of said Code and the regulations promulgated thereunder.

      **Section 7.4**    <u>**No Fiduciary Duty**</u>. It is expressly understood and agreed that this Agreement is a purely commercial transaction between the Parties and that nothing stated herein shall operate to create any fiduciary duty which a Party shall owe to the other Party. Operator agrees that if it handles cash on behalf of any Owner hereunder, it shall do so as an agent of Owner and shall be reasonably prudent in the handling of such cash as if it were handling its own cash. Notwithstanding anything herein to the contrary, Operator shall reimburse Owner dollar for dollar for the misappropriation of cash of the Owner handled by Operator pursuant to this Agreement by any member of the Operator Group; *provided*, that the Parties hereby acknowledge that the disposition of Owners' cash in Operator's good faith performance of the Services pursuant to its reasonable business judgment shall not constitute "misappropriation" hereunder.

      **Section 7.5**    <u>**Entire Agreement**</u>. This Agreement (together with the Exhibits hereto, including the Agency Agreement attached as <u>Exhibit C</u>) and the SEMS Bridging Agreement & Interface Document among Owners and Operator dated the date hereof (the "<u>SEMS Agreement</u>") constitute the entire agreement among the Parties with respect to the subject hereof and supersedes any other representations, understandings or agreements (whether written, oral or otherwise) that may have been made or entered into by the Parties or any of their respective Affiliates relating to the transactions contemplated hereby or the subject hereof.  The Parties agree that Apache Corporation is a third-party beneficiary with respect to the notice requirements under <u>Sections 3.4</u> and <u>3.8</u>.

      **Section 7.6**    <u>**Successors and Assignments**</u>. This Agreement is personal as to Operator and Owners and shall not be assigned by Operator without Owners' consent or any Owner without Operator's consent; provided that the foregoing shall not apply if Operator assigns this Agreement in total (i) along with all of its personnel who are performing any part of the Services hereunder to an Affiliate, provided that no such assignment by Operator to an Affiliate shall relieve Operator of its obligations under this Agreement, or (ii) to an acquirer of all or substantially all of Operator's

<div align="center">18</div>

business or all or substantially all of Operator's employees providing Services hereunder. Except as otherwise provided herein, this Agreement shall be binding upon and inure to the benefit of the Parties hereto and their respective permitted successors, assigns, and legal representatives.

      **Section 7.7**    **Amendment**. This Agreement may be amended or modified in whole or in part, and terms and conditions may be waived, only by a duly authorized agreement in writing which makes reference to this Agreement executed by each Party.

      **Section 7.8**    **Construction**.

      (a)    All article, section, schedule, and exhibit references used in this Agreement are to articles and sections of, and Schedules and Exhibits to, this Agreement, unless otherwise specified. The schedules and exhibits attached to this Agreement constitute a part of this Agreement and are incorporated herein for all purposes.

      (b)    Unless otherwise indicated, with respect to either Party, the terms "ordinary course of business" or "ordinary course" shall be deemed to refer to the ordinary conduct of business in a manner consistent with the past practices and customs of such Party.

      (c)    If a term is defined as one part of speech (such as a noun), it shall have a corresponding meaning when used as another part of speech (such as a verb). Terms defined in the singular have the corresponding meanings in the plural, and vice versa. Unless the context of this Agreement clearly requires otherwise, words importing the masculine gender shall include the feminine and neutral genders and vice versa. The words "include", "includes" or "including" do not limit the preceding terms and shall be deemed to be followed by the words "without limitation." The words "hereof," "hereto," "hereby," "herein," "hereunder" and words of similar import, when used in this Agreement, shall refer to this Agreement as a whole and not to any particular section or article in which such words appear. The term "or" is not exclusive.

      (d)    The terms "day" and "days" mean and refer to calendar day(s). The terms "year" and "years" mean and refer to calendar year(s).

      (e)    Operator and Owners have each participated in the negotiation and drafting of this Agreement, and, if an ambiguity should arise, this Agreement shall be construed as if drafted jointly by the Parties and no presumption or burden of proof shall arise favoring or burdening any Party by virtue of the authorship of any of the provisions in this Agreement.

      (f)    The captions in this Agreement are for convenience only and shall not be considered a part of or affect the construction or interpretation of any provision of this Agreement.

      (g)    All references to currency herein shall be to, and all payments required hereunder shall be paid in, United States Dollars.

      (h)    The serial comma is sometimes included and sometimes omitted. Its inclusion or omission shall not affect the interpretation of any phrase.

<div align="center">19</div>

        **Section 7.9**    <u>**Severability**</u>. If any provision of this Agreement is held invalid or unenforceable by any court of competent jurisdiction, the other provisions of this Agreement shall remain in full force and effect. The Parties further agree that if any provision contained herein is, to any extent, held invalid or unenforceable in any respect under the Laws governing this Agreement, they shall take any actions necessary to render the remaining provisions of this Agreement valid and enforceable to the fullest extent permitted by Law and, to the extent necessary, shall amend or otherwise modify this Agreement to replace any provision contained herein that is held invalid or unenforceable with a valid and enforceable provision giving effect to the intent of the Parties to the greatest extent legally permissible.

        **Section 7.10**    <u>**Counterparts**</u>. This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. Any .pdf or other electronic transmission hereof or signature hereon shall, for all purposes, be deemed originals.

        **Section 7.11**    <u>**Governing Law**</u>. This Agreement shall be governed by, construed under, and enforced in accordance with the laws of the State of Texas without regard to the principles of conflicts of Laws that would direct the application of the Laws of another jurisdiction.

        **Section 7.12**    <u>**WAIVER OF JURY TRIAL**</u>.  EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATED TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

        **Section 7.13**    <u>**Disputes**</u>. Any disputes arising out of or relating to this Agreement shall be resolved exclusively by the state or federal courts located in Houston, Texas.

*[Remainder of Page Intentionally Left Blank. Signature Page(s) to Follow.]*

20

IN WITNESS WHEREOF, this Agreement has been signed by each of the Parties as of the date first above written.


**OPERATOR**:

[FIELDWOOD ENERGY II LLC]


By: _____
Name: _____
Title: _____


**OWNERS:**

FIELDWOOD ENERGY I LLC


By: _____
Name:
Title:


GOM SHELF LLC


By: _____
Name:
Title:


*[Signature page to Transition Services Agreement]*

**EXHIBIT A**

**TO TRANSITION SERVICES AGREEMENT**

**SERVICES**

**1.** **Asset Management Services**. Subject to the terms of this Agreement, Operator shall provide the following Services with respect to the Assets.

**1.1** **Operating Services**.

(a)     Start of Service Term. Effective Date.

(b)     End of Service Term. On the date of the discontinuation of Services as set forth in Section 5.1.

(c)     Services:  Providing the following operating services with respect to the Operated Assets (except to the extent limited by Section 1.6 of this Agreement):

(i)     Complying with, and causing the Operated Assets to be operated in compliance in all material respects with, all state and federal Laws and regulations, including, but not limited to, following all required health, safety and environmental Laws, regulations and programs (such as SEMS), complying with all regulatory filing and reporting requirements, and obtaining all necessary permits as such Operating Services may have been generally provided by Fieldwood Energy LLC immediately before the divisive merger for Fieldwood Energy I; provided that nothing in this provision shall require Operator to make on behalf of an Owner any filing, payment, or submission (or otherwise take any action) that, under applicable Law, may be made only by a party designated with BOEM, BSEE, or other Governmental Authority as a designated operator, designated applicant, designated payor, or responsible party for such Owner or that could make Operator directly liable or responsible to BOEM, BSEE, or other Governmental Authority, or any other third party with respect to any of the Assets in which event Operator shall prepare the necessary filing or submission and provide it to the applicable Owner to file or submit or, in the case of a payment, notify the applicable Owner of such payment so that such Owner can make such payment.

(ii)     Until the end of the Service Term, serve as each Owner's authorized agent with respect to the Operated Assets of such Owner, in accordance with the terms hereof and any applicable operating agreements and similar contracts (if any), by performing the following as and when needed:

Exhibit A – Page 1
Transition Services Agreement

#93623206v16
#93623206v18

(A)    purchasing (either directly or as agent for Owners) supplies, materials, tools, and equipment associated with the Operated Assets, provided that the costs of such that are paid directly by Operator will be reimbursed by the applicable Owner to Operator, further, provided that without such Owner's prior written consent Operator will not purchase any single item with respect to the Operated Assets if such purchase would result in a charge or cost to such Owner greater than one million dollars ($1,000,000.00) for any single item or five million dollars ($5,000,000.00) in the aggregate as to all such items during any calendar year. Such Owner's consent shall be deemed granted unless such Owner notifies Operator to the contrary within ten (10) Business Days from such Owner's receipt of Operator's request;

(B)    contracting (either directly or as agent for Owners) for services associated with the physical operation of the Operated Assets, provided that the costs associated with such services will be paid directly by the Owner of such Operated Assets or reimbursed to Operator by such Owner, further, provided that without such Owner's prior written consent Operator will not contract for any of such services with respect to any of the Operated Assets if such contract (1) is with an affiliate of Operator or (2) would obligate such Owner for a period more than ninety (90) days after the end of the Service Term for the Operating Services. Such Owner's consent shall be deemed granted unless such Owner notifies Operator to the contrary within ten (10) Business Days from receipt of Operator's request;

(C)    executing, amending, or extending contracts (either directly or as agent for Owners) associated with the physical operation of the Operated Assets in the normal course of business, provided that the costs associated with such execution, amendment or extension of the contracts will be paid directly by the Owner of such Operated Assets or reimbursed by such Owner to Operator, further, provided that without such Owner's prior written consent Operator will not contract for any of such services with respect to any of the Operated Assets if such contract (1) is with an Affiliate of Operator; or (2) would obligate such Owner for a period more than ninety (90) days after the end of the Service Term for the Operating Services. Such Owner's consent shall be deemed granted unless such Owner notifies Operator to the contrary within ten (10) Business Days from receipt of Operator's request;

(D)    functioning as each Owner's agent in such Owner's capacity as operator under the applicable joint operating agreements, production handling agreements, and other similar operating agreements related to the Operated Assets with all rights and authority to communicate with co-lessees and non-operating parties and take all actions under the applicable

Exhibit A – Page 2
Transition Services Agreement

agreement as if it were such Owner. Such Owner and Operator shall enter into an Agency Agreement in the form attached hereto as <u>Exhibit C</u> (the "<u>Agency Agreement</u>");

      (E)    functioning as each Owner's agent under the applicable master service agreements, work orders, purchase orders and similar service contracts related to the Operated Assets with all rights and authority to communicate with the service providers and take all actions under the applicable agreement as if it were such Owner, pursuant to the Agency Agreement; and

      (F)    functioning as each Owner's agent in representing such Owner in its capacity as the owner of the Operated Assets in all dealings and communications with Governmental Authorities, provided that such Owner reimburses Operator for any fees, fines, or penalties associated with such dealings and communications, further, provided that Operator must obtain the prior approval of such Owner before Operator agrees to a fine or penalty in excess of one hundred twenty five thousand dollars ($125,000) (it being understood and agreed that no Owner's consent is required for any such fee or penalty to which Owner has no right to approve, reject, or appeal under applicable Law). Operator will provide such Owner copies of all correspondence with Governmental Authorities, other than routine correspondence, on a periodic basis or as requested by such Owner.

**1.2 Production Marketing, Marketing Services, and Marketing Accounting Services**:

    (a)    Start of Service Term. Effective Date.

    (b)    End of Service Term. On the date of the discontinuation of Services as set forth in <u>Section 5.1</u>; provided, however, that each Owner may notify Operator in writing thirty (30) days prior to the end of any production month if such Owner wishes to terminate the Production Marketing, Marketing Services and Marketing Accounting Services as of the end of such month, and such Services shall terminate at the close of accounting business for such production month.

    (c)    Services: Providing the following production marketing, marketing services and marketing accounting services with respect to the Assets (except as limited by <u>Section 1.6</u> of this Agreement):

      (i)    For each third party agreement with respect to the Assets that each Owner and Operator mutually agree, Operator shall function as the agent for such Owner with all rights and authority to communicate with the service providers and take all actions under the applicable

Exhibit A – Page 3
Transition Services Agreement

agreement as if it were such Owner, pursuant to the Agency Agreement;

(ii) Performing all marketing, gas control, crude oil and gas scheduling, contract administration, and other similar services necessary to sell production associated with the Assets in a manner substantially consistent with Operator's or its personnel's current general practices, provided that all marketing shall be at prices Operator reasonably believes to be representative of market value. Upon request, Operator will provide Owner summaries of the scheduled oil and gas or plant statements;

(iii) Performing all revenue and marketing accounting functions relating to the Assets, including the calculation and payment of royalty and overriding royalties, transportation, cash out, netback pricing, weighted average sales price, and other marketing accounting functions performed in the normal course of business; and

(iv) Management of all lease of platform space agreements, production handling agreements, pipeline interconnect agreements, boarding agreements, midstream facility ownership and/or contract operating agreements, and other similar agreements of an Owner with respect to its Assets.

**1.3 Treasury and Accounting Services:**

(a) Start of Service Term. Effective Date.

(b) End of Service Term. On the date of the discontinuation of Services as set forth in Section 5.1; provided, however, that each Owner may notify Operator in writing thirty (30) days prior to the end of any production month if such Owner wishes to terminate the Expenditure Accounting Services as of the end of such month, and such Services shall terminate at the close of accounting business for such production month.

(c) Services: Providing the following treasury and accounting services with respect to the Assets (except as limited by Section 1.6 of this Agreement):

(i) Managing any bank accounts, trusts, etc. of an Owner associated with the operation of the Assets;

(ii) Performing all expenditure accounting functions for each Owner relating to such Owner's Assets, including for such Owner's

Exhibit A – Page 4
Transition Services Agreement

payment of all invoices and subsequent billing of same to all working interest owners, AFE maintenance, and maintenance of property/cost center numbers;

(iii)    Managing the collection of any joint interest billings and revenue relating to the Assets;

(iv)    Performing as needed all the calculations of severance, ad valorem/property, and sales and use taxes, but excluding state or federal income, margin, or excise taxes;

(v)    Performing all of the property, revenue, and royalty accounting services related to the Assets, including properly disbursing payments to and collecting payments from third parties and working interest, royalty, and overriding royalty owners as required by such accounting services as well as rental, severance or production taxes, right of way payments, leasehold, minimum or advance payments due in the normal course of business, and annual 1099 reporting as required by the Internal Revenue Service;

(vi)    Performing all the calculations and preparation of monthly gas and oil balancing and payout statements in the ordinary course of business; and

(vii)    Identifying to the applicable Owner, and making payments for lease rentals, shut-in royalties, minimum royalties, payments in lieu of production, royalties, overriding royalties, production payments, net profit payments, and other similar burdens that are associated with the ownership and operation of the Assets; provided, however, that the consent of the applicable Owner shall be required for the actions set forth in Section 1.6(c) of the Agreement.

**1.4    Land Administration Services.**

(a)    Start of Service Term. Effective Date.

(b)    End of Service Term. On the date of the discontinuation of Services as set forth in Section 5.1; provided, however, that each Owner may notify Operator in writing thirty (30) days prior to the end of any month if such Owner wishes to terminate the Land Administration Services effective as of the end of such month and such Services shall terminate at the end of such month.

Exhibit A – Page 5
Transition Services Agreement

#93623206v16
#93623206v18

(c)     Services: Providing the following land administration services with respect to the Assets (except as limited by <u>Section 1.6</u> of this Agreement):

       (i)     Administering and maintaining all leases and agreements relating to the Assets;

       (ii)     Maintaining and updating all lease, ownership, contract, and property records and databases relating to the Assets;

       (iii)     Maintaining and updating all royalty payment reports and databases;

       (iv)     Maintaining and updating all royalty suspense accounts, reports, and databases and administering escheat duties in accordance with established State rules and regulations;

       (v)     Maintaining and updating all accounts, reports, and databases associated with compulsory pooled interests related to the Assets;

       (vi)     Generating, verifying, processing, approving, and signing all internal and external division orders and transfer orders required in the normal course of business;

       (vii)     Identifying for payment by Owner and appropriately invoicing all rentals, surface, right of way, shut-in payments, and other payments required by the leases or other agreements relating to the Assets;

       (viii)     Maintaining all land, contract, division of interest, lease files, and other files relating to the subject land administration functions; and

       (ix)     Such other administrative services as Operator administered or caused to be administered to maintain the leases or agreements relating to the Assets.

**1.5     Supply Chain**.

(a)     Start of Service Term. Effective Date.

(b)     End of Service Term. On the date of the discontinuation of Services as set forth in <u>Section 5.1</u>; provided, however, that each Owner may notify Operator in writing ten (10) Business Days prior to the end of any month if such Owner wishes to terminate the applicable Services as of the end of such Month and such Services shall terminate at the end of such month.

Exhibit A – Page 6
Transition Services Agreement

#93623206v16
#93623206v18

(c)     Services. Providing the following supply chain services with respect to the Operated Assets (except as limited by Section 1.6 of this Agreement):

(i)     Operator shall provide procurement services with respect to the Operated Assets;

(ii)    Except as it relates to marketing contracts, which shall be covered by Section 1.2 of this Exhibit A, Operator shall provide Contract Administration Services with respect to the Operated Assets; and

(iii)   Operator shall function as the agent for each Owner with all rights and authority to communicate with the service providers and take all actions under the applicable agreement as if it were such Owner, pursuant to the Agency Agreement.

2.      **Hourly Services**. Operator shall provide the following Services with respect to the Assets in a manner substantially consistent with Operator's general practices for similarly situated assets:

2.1     **Legal.**

(a)     Start of Service Term. Effective Date.

(b)     End of Service Term. On the date of the discontinuation of Services as set forth in Section 5.1; provided, however, that each Owner may discontinue these Services by providing Operator ten (10) days prior written notice of its desire to do so, and such Services shall terminate at the end of such ten (10) day period.

(c)     Services. Providing the following legal services with respect to the Assets (except as limited by Section 1.6 of this Agreement):

(i)     Review and negotiation of contracts with service providers and other third parties;

(ii)    Management of litigation, government investigations, and other disputes as directed by such Owner; and

(iii)   Directing outside counsel engaged by such Owner in providing advice and counsel to such Owner with respect to the Assets and the

Exhibit A – Page 7
Transition Services Agreement

#93623206v16
#93623206v18

various legal matters that may arise from time to time related thereto.

**2.2    Finance and Tax.**

(a)    Start of Service Term. Effective Date.

(b)    End of Service Term. On the date of the discontinuation of Services as set forth in Section 5.1; provided, however, that each Owner may discontinue these Services by providing Operator ten (10) days prior written notice of its desire to do so, and such Services shall terminate at the end of such ten (10) day period.

(c)    Services.  Providing the following supply finance and tax services with respect to the Assets (except as limited by Section 1.6 of this Agreement):

(i)     Preparation of projections, analyses and reports related to the Assets;

(ii)    Review and negotiation of financing agreements, including hedging agreements; and

(iii)   Preparation and administration of all federal, state, and local tax processes, including the preparation of appropriate tax returns and/or directing outside tax preparers in the preparation of any tax matters and/or activities related to the Assets.

**2.3    Insurance.**

(a)    Start of Service Term. Effective Date.

(b)    End of Service Term. On the date of the discontinuation of Services as set forth in Section 5.1; provided, however, that each Owner may discontinue these Services by providing Operator ten (10) days prior written notice of its desire to do so, and such Services shall terminate at the end of such ten (10) day period.

(c)    Services. Providing the following insurance services with respect to the Assets (except as limited by Section 1.6 of this Agreement):

(i)     Review and negotiation of insurance documents and agreements, including bonds, insurance policies, and similar agreements;

Exhibit A – Page 8
Transition Services Agreement

(ii)     Management of any claims made or to be made under the applicable insurance policies, bonds, and similar agreements as directed by such Owner; and

(iii)    Procure and maintain insurance coverages on behalf of the applicable Owner(s) that are customary for a reasonably prudent operator with properties, equipment, and other assets similar to the Assets and operations in the Gulf of Mexico and in amounts commensurate with operations and obligations in this Agreement. Such requirements shall include, but shall not be limited to, insurance as required by applicable Law.

**2.4     Financial Reporting and Audit Services.**

(a)     Start of Service Term. Effective Date.

(b)     End of Service Term. On the date of the discontinuation of Services as set forth in Section 5.1; provided, however, that each Owner may discontinue these Services by providing Operator ten (10) days prior written notice of its desire to do so, and such Services shall terminate at the end of such ten (10) day period. The terms of Section 2.4 (d)(i) shall survive the termination of this Agreement for such period of time as is necessary for such Owner or its representatives to conduct the review and audit of financial statements prepared under Section 2.4 (d)(ii) or for the review and audit of financial statements prepared subsequent to discontinuation of Services where financial results are included for the applicable periods the Services were provided.

(c)     Services. Providing the following supply financial reporting and audit services with respect to the Assets (except as limited by Section 1.6 of this Agreement):

(i)     Facilitate and coordinate the review and audit of such Owner's business records in the normal course of business or as required in accordance with the terms of the Limited Liability Agreement of Fieldwood Energy I LLC;

(ii)    Preparing financial statements and/or directing outside accounting personnel in the preparation and maintenance of audit reports and financial statements and any required filings or reporting in accordance with the terms of the Limited Liability Agreement of Fieldwood Energy I LLC; and

Exhibit A – Page 9
Transition Services Agreement

(iii)  Auditing the books and records of third parties related to activities under operating, production handling, and other similar agreements in the normal course of business or as reasonably requested by such Owner.

[*Remainder of Page Intentionally Left Blank*]

Exhibit A – Page 10
Transition Services Agreement

#93623206v16
#93623206v18

## EXHIBIT B

## TO TRANSITION SERVICES AGREEMENT

OPERATOR REPRESENTATIVES LIST

[NTD: List will include name, title and contact information for the individuals in charge of performing each Service.]

Exhibit C – Page 1
Transition Services Agreement

#93623206v16
#93623206v18

**<u>EXHIBIT C</u>**

**<u>TO TRANSITION SERVICES AGREEMENT</u>**

FORM OF AGENCY AGREEMENT

Exhibit C – Page 1
Transition Services Agreement

#93623206v16
#93623206v18

## AGENCY AGREEMENT

This Agency Agreement (this "Agreement") is made effective as of _____, 202_ ("Effective Date") by and between [Fieldwood Energy II LLC], a Delaware limited liability company ("Operator"), and Fieldwood Energy I LLC, a Texas limited liability company ("Fieldwood I") and GOM Shelf LLC, a Delaware limited liability company ("GOM Shelf" and, together with Fieldwood Energy I, the "Owners", and each, an "Owner"). Each capitalized term not defined herein shall have the meaning ascribed to such term in that certain Transition Services Agreement dated as of the Effective Date (the "Transition Services Agreement") between Operator and Owner.

**WHEREAS**, Fieldwood I is a resulting entity of a divisive merger effected in connection with the final plan of reorganization of Chapter 11 Case 20-33948, *In re: Fieldwood Energy LLC et al.*, in the United States Bankruptcy Court for the Southern District of Texas, Houston Division (the "Plan");

**WHEREAS**, Owners are the owners of various assets, comprising certain oil and gas properties and related equipment, contracts, and other assets located primarily in the Gulf of Mexico (the "Assets");

**WHEREAS**, of even date herewith, Operator and Owners entered into that certain Transition Services Agreement, which agreement provides for Operator to provide Owners certain services related to Owners' interests in the Assets; and

**WHEREAS**, Operator and Owners desire that Operator administer those certain services described on Exhibit A to the Transition Services Agreement during the Service Term for each applicable Service as set forth in the Transition Services Agreement; and

**WHEREAS**, subject to the limitations and obligations of Operator pursuant to this Agreement and the Transition Services Agreement, Owners desire that Operator act as agent for Owners for all matters related to certain of the third-party agreements set forth on Schedule 1 of this Agreement (the "Third Party Contracts") and related to representation of each Owner as the owner of the Assets in all dealings and communications with Governmental Authorities, or as may be mutually agreed upon from time to time by Owners and Operator in writing.

**NOW THEREFORE**, in consideration of the mutual premises, covenants, and agreements contained herein, the benefits to be derived by each party hereunder and other good and valuable consideration, the receipt and adequacy of which is hereby acknowledged, Operator and Owners hereby agree as follows:

1.      **Appointment of Agent**. Subject to the limitations and obligations of Operator pursuant to this Agreement and the Transition Services Agreement (including particularly but without limitation Section 1.6 thereof), Owners hereby appoint Operator, and Operator hereby accepts and

Exhibit C – Page 2
Transition Services Agreement

agrees to act as the agent for Owners, in all respects, under the Third Party Contracts and in all dealings and communications with any Governmental Authorities related to the Assets or operations related thereto. Unless expressly permitted by Owners or to the extent permitted under the Transition Services Agreement, no other party shall be authorized to act on behalf of Owners with respect to such Third Party Contracts. Operator's authority as agent for Owners shall be subject to the following limitations and obligations:

(a)     Operator shall hold such Third Party Contracts for the benefit of Owners and shall exercise all rights available to Operator with respect to such third-party agreements in accordance with the Transition Services Agreement;

(b)     Operator shall use commercially reasonable efforts to maintain and keep such Third Party Contracts in full force and effect;

(c)     Operator shall not transfer, sell, hypothecate, encumber, relinquish, or cause the termination of such Third Party Contracts;

(d)     Operator shall not materially amend, or extend any of such Third Party Contracts, except as allowed in the Transition Services Agreement;

(e)     The foregoing notwithstanding, Operator does not assume any obligation under any Third Party Contract and shall not be deemed to have assumed any such obligation under the Third Party Contract by reason of acting as Owners' agent hereunder or by the existence of this Agreement, except as set forth in the Transition Services Agreement; and

(f)     With respect to dealings and communications with Governmental Authorities, Operator shall act in a manner consistent with the limitations of the Transition Services Agreement.

Requests for approval of any action restricted by this Agreement shall be delivered to the sole manager of Owners, provided that Operator may take whatever actions it deems in good faith to be required in the event of an emergency.

**2.     Indemnity.** Except for Damages resulting from Operator's gross negligence or willful misconduct or from Operator's breach of the agreement contained in <u>Section 1.7</u> or <u>Section 7.4</u> of the Transition Services Agreement, Operator and Owners hereby acknowledge and agree that all Damages and obligations arising out of or attributable to Operator's service as Owners' agent hereunder shall constitute obligations for which Owners shall indemnify, defend, and hold harmless the Operator Group (excluding any member of Owner Group), and <u>Section 6.1</u> of the Transition Services Agreement shall apply to such indemnification obligations hereunder, mutatis mutandis **(WHETHER OR NOT SUCH DAMAGES ARISE OUT OF (i) NEGLIGENCE (INCLUDING SOLE, SIMPLE, CONCURRENT, ACTIVE, OR PASSIVE NEGLIGENCE OR OTHERWISE), BUT EXPRESSLY NOT INCLUDING GROSS NEGLIGENCE OR WILLFUL MISCONDUCT OF OPERATOR OR ANY OTHER MEMBER OF THE**

Exhibit C – Page 3
Transition Services Agreement

OPERATOR GROUP OR ANY OTHER PERSON OR OPERATOR'S BREACH OF THE AGREEMENT CONTAINED IN <u>SECTION 1.7</u> OR <u>SECTION 7.4</u> OF THE TRANSITION SERVICES AGREEMENT, (ii) STRICT LIABILITY, (iii) THE UNSEAWORTHINESS OF ANY VESSEL OR THE UNAIRWORTHINESS OF ANY AIRCRAFT OR (iv) ANY VIOLATION OF ANY LAW, RULE, REGULATION, OR ORDER RELATED TO THE OWNERSHIP OR OPERATION OF THE ASSETS, INCLUDING APPLICABLE ENVIRONMENTAL LAWS, EXCEPT IN THE EVENT THAT SUCH DAMAGES OR VIOLATION IS CAUSED BY OR RESULTS FROM THE GROSS NEGLIGENCE OR WILLFUL MISCONDUCT OF ANY MEMBER OF THE OPERATOR GROUP). Sections <u>6.1</u>, <u>6.2</u>, <u>6.3</u>, <u>6.4</u> and <u>6.5</u> of the Transition Services Agreement are hereby incorporated by reference, *mutatis mutandis.*

**3.      Power of Attorney.**  This Agreement shall serve as a general power of attorney. Each Owner hereby grants Operator, and Operator hereby accepts, a power of attorney for Operator to serve as the attorney-in-fact and agent for such Owner and to take any and all actions to effectuate the purpose and activities described in the Transition Services Agreement, including, but not limited to, taking any action under the Third Party Contracts, entering into any agreement, and representing Owners in certain dealings and communications with Governmental Authorities related to the Assets or operations related thereto.  This power of attorney is subject to the limitations of the Transition Services Agreement and this Agreement and shall terminate upon the termination of the Transition Services Agreement.

**4.      Miscellaneous Provisions.**

(a)      Term. The authority for Operator to act as each Owner's agent shall be effective as of the date hereof and shall terminate and be revoked as to each such third-party agreement at the end of each applicable Service Term for each applicable Service as set forth in the Transition Services Agreement, unless sooner revoked by notice in writing from Owner to Operator and to each third party no longer entitled to rely on the agency created by this Agreement.

(b)      Transition Services Agreement. This Agreement is being entered into in conjunction with the Transition Services Agreement whereby Operator shall provide certain Services as such term is defined therein. Operations of the oil and gas properties and collection and disbursement of all revenues and payment of expenses associated with such third-party agreements will be handled in accordance with the Transition Services Agreement.

(c)      Entire Agreement. This Agreement and the SEMS Bridging Agreement & Interface Document among Owners and Operator dated the date hereof constitutes the full understanding of Operator and Owners and a complete and exclusive statement of the terms and conditions of the agreement relating to the subject matter hereof and supersedes all prior negotiations, understandings, and agreements, whether written or oral, between Operator and Owners with respect thereto. This Agreement does not modify or amend any

Exhibit C – Page 4
Transition Services Agreement

terms or provisions of the Transition Services Agreement. Notwithstanding anything herein to the contrary, in the event of any conflict between that the terms of this Agreement and terms of the Transition Services Agreement, the terms of the Transition Services Agreement or any agreement contemplated thereby shall prevail.

(d)     Amendments. No alteration, modification, amendment, or change in this Agreement shall be effective or binding on any party unless the same is in writing and is executed by Operator and Owners.

(e)     Enforceability. This Agreement shall be enforceable by and against Operator, Owners, and their respective heirs, successors, permitted assignees, and legal representatives.

(f)     Assignment. This Agreement is personal to the parties hereto.  Neither Operator nor Owners shall assign, convey, transfer, or otherwise dispose of all or any portion of its interest in, or its rights and obligations under, this Agreement without the prior written consent of the other party unless such assignment is permitted under the Transition Services Agreement. Any attempted assignment without appropriate consent shall be voidable at the sole discretion of the non-assigning party.

(g)     Governing Law. This Agreement shall be governed by, construed under, and enforced in accordance with the laws of the State of Texas without regard to the principles of conflicts of Laws that would direct the application of the Laws of another jurisdiction.

(h)     Disputes. Any disputes arising out of or relating to this Agreement shall be subject to the terms set forth in Sections 7.12 and 7.13 of the Transition Services Agreement.

(i)     Multiple Counterparts. This Agreement may be executed, either originally or by electronic reproduction, by the parties hereto in multiple counterparts, each of which shall be deemed an original for all purposes, and all of which together shall constitute one and the same instrument.

*[Remainder of page intentionally left blank; signature page follows.]*

Exhibit C – Page 5
Transition Services Agreement

#93623206v16
#93623206v18

This Agreement is executed and delivered by Operator and Owner effective as of the Effective Date.

OPERATOR:

[FIELDWOOD ENERGY II LLC]


By: _____
Name: _____
Title:   _____


OWNER:

FIELDWOOD ENERGY I LLC


By: _____
Name: _____
Title:   _____

GOM Shelf, LLC


By: _____
Name: _____
Title:   _____

Exhibit C – Page 6
Transition Services Agreement

#93623206v16
#93623206v18

STATE OF TEXAS                                    §

COUNTY OF HARRIS                                  §

       This instrument was acknowledged before me on this____ day of _____, 202_ by _____, known to me to be the person whose name is subscribed to the foregoing instrument as _____ of Fieldwood Energy II LLC, a Delaware limited liability company, on behalf of said company.

 

_____
Notary Public in and for the State of Texas


STATE OF TEXAS                                    §

COUNTY OF HARRIS                                  §

This instrument was acknowledged before me on this ___ day of _____, 202_ by _____, known to me to be the person whose name is subscribed to the foregoing instrument as _____ of Fieldwood Energy I LLC, a Texas limited liability company, on behalf of said company.

 

_____
Notary Public in and for the State of Texas


STATE OF TEXAS                                    §

COUNTY OF HARRIS                                  §

This instrument was acknowledged before me on this ___ day of _____, 202_ by _____, known to me to be the person whose name is subscribed to the foregoing instrument as _____ of GOM Shelf, LLC, a Delaware limited liability company, on behalf of said company.

 

_____
Notary Public in and for the State of Texas


Exhibit C – Page 7
Transition Services Agreement

**SCHEDULE 1**

**TO SERVICES AGREEMENT**

THIRD-PARTY AGREEMENTS

[NTD:  These are specific marketing, transportation and processing and other service agreements.]

**SCHEDULE 2**

**TO SERVICES AGREEMENT**

EXCLUDED ASSETS

[NTD:  These are the assets which will be co-owned by Owner and Operator and subject to separate operating agreements.]

## Exhibit 16

**SEMS Bridging Agreement**

## SEMS BRIDGING AGREEMENT & INTERFACE DOCUMENT

This Bridging Agreement dated and effective as of _____, 202_ (the "Effective Date") (this "Agreement") is by and among [FIELDWOOD ENERGY II LLC, a Delaware limited liability company][1] (the "Contractor"), FIELDWOOD ENERGY I LLC, a Texas limited liability company (the "Fieldwood Energy I") and GOM Shelf LLC, a Delaware limited liability company ("GOM Shelf" and, together with Fieldwood Energy I, the "Owners", and each, an "Owner").  Contractor and Owners are sometimes referred to collectively as the "Parties" and individually as a "Party".

**WHEREAS**, each Owner is the operator, as designated by the Bureau of Ocean Energy Management of the United States Department of the Interior ("BOEM"), of certain of the assets owned by such Owner as of the Effective Date (the "Assets");

**WHEREAS**, Fieldwood Energy I is a resulting entity of a divisive merger effected in connection with the confirmed plan of reorganization of Chapter 11 Case 20-33948, *In re: Fieldwood Energy LLC et al*, in the United States Bankruptcy Court for the Southern District of Texas, Houston Division (the "Plan");

**WHEREAS**, in accordance with the Plan, the Owners do not have employees and require a third party to provide operational, technical, and administrative services for the Assets;

**WHEREAS**, pursuant to the Transition Services Agreement dated and effective as of the Effective Date by and among the Parties (the "Transition Services Agreement"), Contractor has agreed to provide certain operational, technical, and administrative services with respect to the ownership and operation of the Assets, upon the terms and conditions set forth therein, until the end of each respective Service Term (as defined therein).

In furtherance of and solely in connection with the Services (as such term is defined in the Transition Services Agreement) provided by Contractor pursuant to the Transition Services Agreement (the "Services") the Parties agree as follows:

1. **MANAGEMENT SYSTEM IMPLEMENTATION**
   For the purposes of providing the Services, Contractor agrees that it has used commercially reasonable efforts to;
   **A.** review the requirements of 30 CFR 250.1900 and the American Petroleum Institute's Recommended Practices for Development of a Safety and Environmental Management Program for Offshore Operations and Facilities (API RP 75) as incorporated by reference;
   **B.** identify and review other safety, health, environmental, integrity and quality requirements relevant to the organizational department of Contractor that is providing services for Fieldwood Energy I on the Gulf of Mexico Outer Continental Shelf ("OCS"), such as those found in Contractor's own standards and in regulations promulgated by U.S. government agencies, such as:
      I.    The Bureau of Safety and Environmental Enforcement (BSEE)
      II.   The United States Coast Guard (USCG)
      III.  The Environmental Protection Agency (EPA);

# SEMS BRIDGING AGREEMENT & INTERFACE DOCUMENT

**C.** determine all requirements, to include from sources listed above, that are applicable to Contractor's provision of Services to Fieldwood Energy I on the Gulf of Mexico OCS;

**D.** develop and properly implement safety, health and environmental programs and/or management systems to enable compliance with those applicable requirements set forth above;

**E.** systematically monitor and assess the effectiveness of those systems set forth above on a departmental or unit level; and

**F.** Continuously improve those systems where appropriate.

**2. <u>SEMS INTERFACE DOCUMENT</u>**
This SEMS Bridging Agreement and Interface Document identifies whose environmental, health and safety manuals, policies, procedures and responsibilities shall prevail at the work site and for the activities involved pursuant to the Transition Services Agreement. Contractor shall use commercially reasonable efforts to deliver all documents indicated in this document upon request of Owners at any time or for any reason at the sole discretion of Owners. Notwithstanding anything in this Agreement to the contrary, Contractor and its subcontractors shall not have any obligation under this Agreement to provide any service or item in this Agreement to the extent Contractor is not required to provide any such service under the Transition Services Agreement.

**3. <u>SUBCONTRACTORS</u>**
Contractor shall direct its subcontractor who are providing Services under the Transition Services Agreement to comply with the requirements of this Agreement and shall disseminate to such subcontractors the information appropriate and necessary for such subcontractors to comply with this Agreement.

**4. <u>AGREEMENT</u>**
**A.** By signing below, each Party affirms, agrees to and endorses the contents of this Agreement.

**B.** EACH PARTY HERETO AGREES THAT IN NO EVENT SHALL CONTRACTOR HAVE ANY LIABILITY TO OWNERS HEREUNDER EXCEPT FOR DAMAGES BOTH (I) ARISING OUT OF THIS AGREEMENT AND (II) THOSE CAUSED BY, ARISING OUT OF, OR RESULTING FROM THE GROSS NEGLIGENCE OR WILLFUL MISCONDUCT OF CONTRACTOR.

**C.** Except for Damages resulting from Contractor's gross negligence or willful misconduct, Contractor and Owners hereby acknowledge and agree that all claims, demands, complaints, losses, fines, penalties, citations, damages, causes of action, suits, judgments, orders, expenses, or costs, including court costs, reasonable attorneys' fees, and expert witnesses' fees ("<u>Damages</u>") arising out of or attributable to this Agreement shall constitute obligations for which Owners shall indemnify, defend, and hold harmless Contractor, and Section 6.1 of the Transition Services Agreement shall apply to such indemnification obligations hereunder, mutatis mutandis (WHETHER OR NOT SUCH DAMAGES ARISE OUT OF (i) NEGLIGENCE (INCLUDING SOLE, SIMPLE, CONCURRENT, ACTIVE, OR PASSIVE NEGLIGENCE OR OTHERWISE), BUT EXPRESSLY NOT INCLUDING GROSS NEGLIGENCE OR WILLFUL MISCONDUCT OF CONTRACTOR, (ii) STRICT LIABILITY, (iii) THE

# SEMS BRIDGING AGREEMENT & INTERFACE DOCUMENT

UNSEAWORTHINESS OF ANY VESSEL OR THE UNAIRWORTHINESS OF ANY AIRCRAFT OR (iv) ANY VIOLATION OF ANY LAW, RULE, REGULATION, OR ORDER RELATED TO THE OWNERSHIP OR OPERATION OF THE ASSETS, INCLUDING APPLICABLE ENVIRONMENTAL LAWS, EXCEPT IN THE EVENT THAT SUCH DAMAGES OR VIOLATION IS CAUSED BY OR RESULTS FROM THE GROSS NEGLIGENCE OR WILLFUL MISCONDUCT OF CONTRACTOR).

**D.** This Agreement shall terminate automatically upon the termination of the Transition Services Agreement.

**E.** The provisions of Article VII of the Transition Services Agreement shall apply *mutatis mutandis* to this Agreement.

**F.** This Agreement is personal to the parties hereto. Neither Contractor nor Owners shall assign, convey, transfer, or otherwise dispose of all or any portion of its interest in, or its rights and obligations under, this Agreement without the prior written consent of the other party unless such assignment is permitted under the Transition Services Agreement. Any attempted assignment without appropriate consent shall be voidable at the sole discretion of the non-assigning party.

## INSTRUCTIONS

1) The checked box (**"F1"** for Owners, **"F2"** for Contractor or both) indicates responsibility for the particular item.
2) Review and understand each Party's responsibility for each item or question.
3) For items with shared or dual responsibility of both Owners and Contractor, see additional comments or details.
4) Upon complete review of this Agreement, a member of Owner and Contractor's executive management team is to then properly sign and date this document.
5) Once properly signed, dated and fully executed by both Owner and Contractor, this entire document is then considered a Controlled Document, whereby only changes can be made upon written agreement of all Parties.
6) Any specific issue not listed below shall be submitted and approved by all Parties prior to the execution of work.
7) All matters below are with respect to Services provided by Contractor.

# SEMS BRIDGING AGREEMENT & INTERFACE DOCUMENT

| ITEM | F2 | F1 | ADDITIONAL DETAILS |
|---|---|---|---|
| **ELEMENT 1: GENERAL** | | | |
| Establishing goals and performance measures, appoint management representatives responsible for carrying out SEMS activities | X | | Beginning upon signature of this document, operations performed on Fieldwood Energy I's leases, rights of way, rights of use and easements will adhere to Contactor's SEMS plan |
| Performing annual review of SEMS program in accordance with 250.1909(d) | X | | |
| **ELEMENT 2: SAFETY & ENVIRONMENTAL INFORMATION** | | | |
| Policies and procedures to create or modify the safety & environmental information (i.e. P&IDs, SAFE charts, control systems, NPDES) | X | | |
| To maintain red-line drawings or as built drawings for all modifications to the facility | X | | |
| Well permit or drilling permit approvals and procedures (APM) | X | | |
| **ELEMENT 3: HAZARDS ANALYSIS** | | | |
| Conduct, manage, and communicate the hazards analysis (facility level) | X | | |
| Job safety analysis (JSA) for activities involving equipment, materials or processes led by Contractor. (Note: All personnel performing work must be included in the creation of the JSA.) | X | | |
| JSA for activities involving equipment, materials or processes owned by sub-contractors | X | | |
| **ELEMENT 4: MANAGEMENT OF CHANGE (MOC)** | | | |
| Identify and control hazards caused by changes made to Contractor's equipment, materials, operating conditions, operating procedures and personnel, including a means to communicate the change to all affected personnel | X | | |
| Identify and control hazards caused by changes made to the sub-contractor's equipment, materials, operating conditions, operating procedures and personnel, including a means to communicate the change to all affected personnel | X | | |
| Identify and control hazards by managing changes to existing drilling programs, well design, SAFE charts, control systems, etc. | X | | |
| **ELEMENT 5: OPERATING PROCEDURES** | | | |
| Operating procedures that provide instructions for conducting safe and environmentally sound activities and address equipment or processes | X | | |
| Operating procedures that provide instructions for conducting safe and environmentally sound activities and address equipment or processes owned by sub-contractors or used by Contractor | X | | |
| **ELEMENT 6: SAFE WORK PRACTICES and CONTRACTOR SELECTION** | | | |
| Bypassing critical protections | X | | |
| Confined space entry | X | | |
| Electrical work & isolation of hazardous energy (Lock out / tag out) | X | | |
| Hot work | X | | |

3315019-2

#93792897v5

# SEMS BRIDGING AGREEMENT & INTERFACE DOCUMENT

| | | | |
|---|---|---|---|
| Crane operations, lifting & rigging | X | | |
| Simultaneous operations planning | X | | |
| Working at heights | X | | |
| Spill reporting procedures | X | | |
| Well control procedures | X | | |
| Safe work practices other than those listed above | X | | |
| Safe work practices (other than those listed above) on a third-party owned facility, such as a drilling rig, lift boat, derrick barge, motor vessel, etc. that is contracted by Contractor | X | | |
| Selection of sub-contractors to work under the supervision of Contractor | X | | |
| **ELEMENT 7: TRAINING** | | | |
| Verify all personnel are trained to conduct their assigned duties in a safe and environmentally sound manner. | X | | |
| **ELEMENT 8: MECHANICAL INTEGRITY** | | | |
| Verify that all critical equipment owned, operated or maintained by Contractor is designed, procured, fabricated, installed, calibrated and maintained in accordance with service requirements, OEM recommendations or industry standards | X | | |
| Verify that inspections and tests for critical equipment owned, operated or maintained by Contractor are documented in accordance with regulatory requirements and industry standards.  At a minimum, the documentation must include the date of the inspection/test, the name, position, and signature of the inspector/tester, the equipment's serial number or other unique identifier, a description of the test performed, and the results of the inspection or test | X | | |
| Assure that well control equipment, such as BOP's are tested and maintained according to OEM and regulatory requirements and conditions of approval of the drilling permit application | X | | |
| **ELEMENT 9: PRE-STARTUP SAFETY REVIEW (PSSR)** | | | |
| Conduct the pre-startup safety and environmental review (including appropriate safety, environmental, operating, maintenance, training and emergency information) for commissioning of new or significantly modified facilities | X | | |
| **ELEMENT 10: EMERGENCY RESPONSE AND CONTROL** | | | |
| Maintain and revise accordingly emergency response and control plans | X | | |
| Emergency response and control plan for use during an emergency when working on a sub-contractor owned facility, such as a drilling rig, lift boat, derrick barge, motor vessel, etc. contracted by Contractor | X | | |
| **ELEMENT 11: INCIDENT INVESTIGATION** | | | |
| Investigation of incidents | X | X | Owner reserves the right to participate as necessary |
| Investigation of incidents that occur on a sub-contractor owned facility (rig, derrick barge, lift boat, motor vessel, etc.) by a third party | X | X | Owner reserves the right to participate as necessary |
| **ELEMENT 12: AUDITING** | | | |

3315019-2

#93792897v5

# SEMS BRIDGING AGREEMENT & INTERFACE DOCUMENT

| | | | |
|---|---|---|---|
| Manage/facilitate/execute SEMS auditing in accordance with 30 CFR 250.1920 | X | X | Owner reserves the right to conduct audits as necessary of the Contractor SEMS |
| **ELEMENT 13: RECORDKEEPING & DOCUMENTATION** | | | |
| Record retention, management and control of all records pertaining to scope of operations | X | X | Contractor will maintain all records and share records and documentation as required or requested by Owner |
| **ELEMENT 14: STOP WORK AUTHORITY** | | | |
| Ensure all personnel have the authority to stop work | X | X | |
| **ELEMENT 15: ULTIMATE WORK AUTHORITY (UWA)** | | | |
| Establish person with ultimate work authority (UWA) and communicate UWA to all crewmembers | X | | |
| For situations that may develop during drilling, workover and P&A operations, such as well control or other emergency conditions that may require the UWA responsibility to shift to another individual | X | | As designated in job planning, the UWA will be communicated to all. On sub-contractor owned facilities, sub-contractor is responsible for providing Contractor with UWA designated Parties |
| In the event that stop work authority is initiated for imminent risk or danger, work can only resume after the person with UWA has granted approval | X | | |
| **ELEMENT 16: EMPLOYEE PARTICIPATION** | | | |
| Employee participation and involvement program | X | | |
| **ELEMENT 17: REPORTING UNSAFE WORKING CONDITIONS** | | | |
| Any person may report to BSEE any hazardous or unsafe working condition or possible violation on any facility engaged in OCS activities. In addition, Contractor will provide, at request of Owner, any reports necessary to ascertain working knowledge of unsafe working conditions | X | X | |

**OWNER APPROVAL**
**Fieldwood Energy I LLC**

By:_____
(SIGNATURE)


**GOM Shelf LLC**

By:_____
(SIGNATURE)


_____
Owner Authorized Representative
(PRINT NAME)

Title: _____

Date: _____

**CONTRACTOR APPROVAL**
**[Fieldwood Energy II LLC]**

By:_____
(SIGNATURE)






_____
Contractor Authorized Representative:
(PRINT NAME)

Title: _____

Date: _____

## Exhibit 17

**Amended BriarLake Sublease**

*Execution Version*

# FOURTH AMENDMENT
# TO SUBLEASE AGREEMENT

THIS FOURTH AMENDMENT TO SUBLEASE AGREEMENT (this "Amendment") is made and entered into as of the __ day of _____, 202_, by and between APACHE CORPORATION, a Delaware corporation ("Sublessor"), and FIELDWOOD ENERGY LLC, a Delaware limited liability company ("Sublessee").

WHEREAS, Sublessor and Sublessee entered into that certain Sublease Agreement, dated as of September 30, 2013, pertaining to certain space in the building known as One BriarLake Plaza located at 2000 West Sam Houston Parkway South, Houston, Texas (the "Original Sublease"), as amended by that certain First Amendment to Sublease Agreement, dated as of January 2, 2014, between Sublessor and Sublessee (the "First Amendment"), as further amended by that certain Second Amendment to Sublease Agreement, dated as of September 7, 2017, between Sublessor and Sublessee (the "Second Amendment"), and as further amended by that certain Third Amendment to Sublease Agreement, dated as of May 21, 2018, between Sublessor and Sublessee (the "Third Amendment", and the Original Sublease, the First Amendment, the Second Amendment, and the Third Amendment collectively, the "Sublease");

WHEREAS, commencing August 3, 2020, Sublessee and certain affiliates of Sublessee filed voluntary petitions with the United States Bankruptcy Court for the Southern District of Texas, Houston Division (the "Bankruptcy Court") initiating their respective cases pending under chapter 11 of title 11 of the United States Code styled *In re Fieldwood Energy LLC, et al.*, jointly administered under Case No. 20-33948 (MI) (the "Chapter 11 Case"); and

WHEREAS, Sublessor and Sublessee desire to further amend the Sublease pursuant to this Amendment.

NOW, THEREFORE, for and in consideration of the foregoing and for other good and valuable consideration and of the mutual agreements hereinafter set forth, Sublessor and Sublessee stipulate, covenant, and agree as follows:

1.      All undefined capitalized terms used in this Amendment shall have the meaning given to them in the Sublease.  The term "Effective Date" means the first day of the month after occurrence of each of (i) Sublessee's express assumption of the Sublease, as amended by this Amendment, with approval of such assumption by order of the Bankruptcy Court in form and substance reasonably acceptable to Sublessor, (ii) Sublessee's payment in full to Sublessor of all amounts owed by Sublessee to Sublessor pursuant to the Sublease, which, as of the date hereof, are indicated on Schedule 1 attached hereto, and (iii) Prime Lessor's execution and delivery to Sublessor of its written consent to this Amendment.

2.      On and as of the Effective Date, expiration of the Sublease Term pursuant to Section 3.01 of the Original Sublease is hereby amended as follows:

(a)     The Sublease Term shall expire on October 31, 2024, unless terminated earlier pursuant to the terms of the Sublease, as amended by this Amendment.

(b)     Sublessee shall have the right and option to terminate the Sublease Term as to any of (i) all of floor 12 of the Subleased Premises, (ii) all of floor 15 of the Subleased Premises, or (iii) Suite B0300 in the basement level of the Subleased Premises, with any such termination in the case of (i), (ii), and (iii) being effective no earlier than after occurrence of each of (1) effectiveness of Sublessee's Plan of Reorganization (defined below), (2) consummation of the Credit Bid Transaction, (3) consummation of the transactions contemplated by the Divisive Merger Documents (defined below), (4) the second anniversary of the Effective Date, and (5) timely delivery of Requisite Notice (defined below).

(c)     Sublessee shall have the right and option to terminate the Sublease Term as to any of (i) all of floor 16 of the Subleased Premises, (ii) all of floor 17 of the Subleased Premises, (iii) all of floor 18 of the Subleased Premises, (iv) Suite B0150 in the basement level of the Subleased Premises, or (v) Suite B0200 in the basement level of the Subleased Premises, with any such termination in the case of (i), (ii), (iii), and (iv) being effective no earlier than after occurrence of each of (1) effectiveness of Sublessee's Plan of Reorganization, (2) consummation of the Credit Bid Transaction, (3) consummation of the transactions contemplated by the Divisive Merger Documents, (4) termination of the Transition Services Agreement (defined below), (5) termination of the Service Provider Agreement (defined below), if any, and (6) timely delivery of Requisite Notice.

(d)  To exercise any option under Section 2(b) or 2(c) of this Amendment, Sublessee must deliver to Sublessor no later than six months before the date on which the termination is to be effective a written notice of such exercise, specifying the eligible whole floor or whole floors or basement Suite or Suites in respect of which such early termination of the Sublease Term is to apply, certifying that such exercise complies with the requirements of Section 2(b) or 2(c) hereof, as applicable, and specifying the effective date of such termination, which can be no earlier than six months after the date on which such notice is delivered to Sublessor ("Requisite Notice").

As used in this Amendment, the following terms have the indicated meaning:

"Bankruptcy Code" means title 11 of the United States Code, 11 U.S.C. §§ 101–1532, as amended.

"Confirmation Order" means the confirmation order entered in the Bankruptcy Case which, if and to the extent such confirmation order directly affects Sublessor in its capacity as such or pertains to the Sublease, as amended by this Amendment, or other Apache Definitive Documents (as defined in that certain Apache Term Sheet Implementation Agreement, dated as of the date hereof, by and among Sublessee, GOM Shelf LLC, Sublessor, Apache Shelf, Inc., and Apache Deep Water LLC), shall be in form and substance reasonably acceptable to Sublessor.

"Credit Bid Transaction" means the sale of certain of the Sublessee's deepwater assets and other assets to FWII, which sale may be effectuated through the Plan of Reorganization or as a standalone sale outside of the Plan of Reorganization pursuant to section 363 of the Bankruptcy Code with approval by order of the Bankruptcy Court in form and substance reasonably acceptable to Sublessor with respect to provisions affecting the Sublease or this Amendment.

2

"Divisive Merger Documents" means the certificate of division, the plan of division, the certificate of merger, and other documents included in, and confirmed by, the Confirmation Order and filed by or on behalf of Sublessee with the Texas Secretary of State.

"Fieldwood Energy I LLC" or "FWI" means a Texas limited liability company resulting from implementation of the Divisive Merger Documents, with the composition and structure of the ownership, management, assets, and liabilities of such company being satisfactory to Sublessor.

"FWII" means an entity to be formed and organized under the laws of a state of the United States of America at the direction of the Prepetition FLTL Lenders (as defined in the RSA) for the purposes of the Credit Bid Transaction, with the composition and structure of the ownership, assets, and liabilities of such entity being reasonably satisfactory to Sublessor, it being agreed that the ownership, assets and liabilities of such entity shall be deemed to be reasonably satisfactory to Sublessor so long as it is consistent with the description of such entity referred to as "Fieldwood II" in the RSA.

"Plan of Reorganization" means the plan of reorganization of Sublessee included in, and confirmed by, the Confirmation Order, including, without limitation, the Assignment (defined in Section 7 below) and FWII Assumption (defined in Section 7 below).

"RSA" means that certain Restructuring Support Agreement, dated as of August 4, 2020, by and among Sublessee and certain affiliates of Sublessee, certain of its affiliates specified therein, Sublessor, and the Consenting Creditors (as defined in the RSA), as the same may be amended, restated, or otherwise modified in accordance with its terms.

"Service Provider Agreement" means a service provider agreement if entered into by FWI or Sublessor and FWII pursuant to which FWII is service provider to perform all operations and/or plugging and abandonment and decommissioning activities with respect to the properties or assets of FWI and GOM Shelf LLC, a Delaware limited liability company, and its successors and assigns.

"Transition Services Agreement" means a transition services agreement between FWI and FWII in form and substance attached as Exhibit A to FWI's Limited Liability Company Agreement and to be entered into upon the effectiveness of the Plan of Reorganization.

3.    On and as of the Effective Date, each of (i) Section 3.05 of the Original Sublease, relating to a mutual option to extend the Sublease Term, (ii) Section 17.02 of the Original Sublease, relating to Vacated Space, and (iii) Section 5 of the Third Amendment, relating to a right of first refusal, is terminated.

4.    On and as of the Effective Date, (i) Base Rent for purposes of the first sentence in Section 4.01 of the Original Sublease, Section 3 of the Second Amendment, and Section 3 of the Third Amendment, and (ii) Storage Space Rental for purposes of Section 16.01 of the Original Sublease are hereby amended such that Sublessee shall pay Sublessor, without setoff or deduction whatsoever, except as expressly set forth in the Sublease, the following amounts for the indicated Subleased Premises commencing on the Effective Date through expiration of the Sublease Term, which amounts shall be in addition to Sublessee's Proportionate Share of Operating Expenses of the Building and all other amounts payable by Sublessee under the Sublease, as amended hereby:

3

| Subleased Premises | Square Footage | Annual Base Rent/ Sq. Ft. | Amount/Month | Amount/Year |
|---|---|---|---|---|
| Floor 12 | 24,632 | $10.00 | $20,526.67 | $246,320.00 |
| Floor 15 | 25,865 | $10.00 | $21,554.17 | $258,650.00 |
| Floor 16 | 25,865 | $10.00 | $21,554.17 | $258,650.00 |
| Floor 17 | 25,865 | $10.00 | $21,554.17 | $258,650.00 |
| Floor 18 | 25,865 | $10.00 | $21,554.17 | $258,650.00 |
| Suite B0300 | 3,704 | $10.00 | $3,086.67 | $37,040.00 |
| Suite B0200 | 1,149 | $10.00 | $957.50 | $11,490.00 |
| Suite B0150 | 740 | $10.00 | $616.67 | $7,400.00 |
| *Total* | 133,685 | | $111,404.17 | $1,336,850.00 |

5.     On and as of the Effective Date, Sublessee shall have no right under Article X of the Original Sublease to request Sublessor to exercise Sublessor's right to lease additional parking spaces attributable to the Subleased Premises or to substitute unreserved parking spaces attributable to the Subleased Premises for reserved parking spaces.

6.     The Sublease remains in full force and effect in accordance with its terms and as of the Effective Date, as amended by Sections 2, 3, 4 and 5 of this Amendment.  As of the Effective Date, all references in the Sublease to "Sublease" shall mean the Sublease, as amended by this Amendment.

7.     After the Effective Date and upon effectiveness of Sublessee's Plan of Reorganization, consummation of the Credit Bid Transaction and the transactions contemplated by the Divisive Merger Documents, full performance by Sublessee of Sublessee's obligations under the Sublease to the date of effectiveness of the Assignment, and the FWII Assumption, Sublessee hereby assigns to FWII the rights and delegates to FWII the duties of Sublessee under the Sublease, as amended by this Amendment (the "Assignment").  Upon effectiveness of the Assignment, FWII's execution and delivery to Sublessor of the below counterpart of this Amendment shall constitute FWII's assumption of, and FWII's agreement to fully and timely perform the obligations of Sublessee arising from and after the date of effectiveness of the Assignment under, the Sublease, as amended to the date thereof (the "FWII Assumption"), whereupon FWII shall be bound as Sublessee under the Sublease, as so amended, and all references in the Sublease, as so amended, to "Sublessee" shall mean FWII.

8.     Each party warrants to the other that it has had no dealing with any broker or agent except Cushman & Wakefield of Texas, Inc. in connection with the negotiation or execution of this Amendment.  Each party agrees to indemnify the other party and hold the other party harmless from and against any and all costs, expenses, or liability for commissions, fees, or other compensations or charges which are based on any agreement or understanding such party may have had with any broker or agent with respect to this Amendment.

9.     For purposes of Section 1.04 of the Sublease, Sublessee's address for notice is updated to be as set forth beneath its signature below.

10.     The parties may execute this Amendment in multiple original counterparts, each of which shall have the full force and effect of an original but constituting only one instrument.

4

[SIGNATURE PAGE FOLLOWS]
IN WITNESS WHEREOF, duly authorized representatives of the parties hereto have executed this Amendment as of the day and year first above written.

**SUBLESSOR:**

**APACHE CORPORATION,**
a Delaware corporation


By: _____
Name:  Timothy R. Custer
Title:    Senior Vice President, Commercial

**SUBLESSEE:**

**FIELDWOOD ENERGY LLC,**
a Delaware limited liability company


By: _____
Name: _____
Title: _____

Fieldwood Energy LLC
2000 W. Sam Houston Pkwy. South, Suite 1200
Houston, TX 77042
Fax:  713.969.1099
Attention:_____

5

**FWII COUNTERPART**

Upon existence of FWII, effectiveness of Sublessee's Plan of Reorganization, and consummation of the Credit Bid Transaction and transactions contemplated by the Divisive Merger Documents, an authorized representative of FWII executes this Amendment pursuant to Section 7 hereof on the date written below to evidence FWII's assumption of, and agreement to be bound by, and fully and timely perform the obligations of Sublessee arising from and after the date written below under, the Sublease, as amended to the date written below.

        **FWII:**

        _____,
        a _____

        By: _____
        Name: _____
        Title: _____

        Date Signed:_____

        Address:

        _____
        _____
        _____
        Fax:_____
        Attention: _____

Fieldwood

### RENT

| | PRE-PETITION | | | | | | | | POST-PETITION | | | | TOTAL 2020 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec | |
| Billed | $435,297.63 | $435,297.63 | $435,297.63 | $435,220.68 | $435,220.68 | $435,220.68 | $435,220.68 | $435,220.68 | $435,220.68 | $435,220.68 | 451,236.95 | 451,236.95 | $5,254,911.55 |
| Rec'd | $450,178.00 | $450,140.00 | $405,383.00 | $435,221.00 | $435,221.75 | $435,221.29 | $435,221.00 | $435,221.00 | $435,221.00 | $435,221.00 | 451,756.00 | 451,756.00 | $5,255,761.04 |
| Difference | ($14,880.37) | ($14,842.37) | 29,914.63 | ($0.32) | ($1.07) | ($0.61) | ($0.32) | ($0.32) | ($0.32) | ($0.32) | ($519.05) | ($519.05) | ($849.49) |

**Rent - Total Pre-Petition** $189.25
**Rent - Total Post-Petition** ($1,038.74)

### RESERVED/VIP PARKING

| | PRE-PETITION | | | | | | | | POST-PETITION | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec | TOTAL |
| Billed | $ 530.43 | $ 530.43 | $ 530.43 | $ 530.43 | $ 530.43 | $ 530.43 | $ 530.43 | $ 530.43 | $ 530.43 | $ 151.55 | $ 1,017.55 | $ 1,017.55 | $ 6,960.52 |
| Rec'd | $ 530.43 | $ 530.43 | $ 530.43 | $ - | $ 530.43 | $ - | $ - | $ - | $ 530.43 | $ - | $ - | $ - | $ 2,652.15 |
| Difference | $ - | $ - | $ - | $ 530.43 | $ - | $ 530.43 | $ 530.43 | $ 530.43 | $ - | $ 151.55 | $ 1,017.55 | $ 1,017.55 | $ 4,308.37 |

**Parking - Total Pre-Petition** $1,591.29
**Parking - Total Post-Petition** $2,717.08

### ANCILLARY

| | PRE-PETITION | | | | | | | | POST-PETITION | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec | TOTAL |
| Billed | $ 5,670.00 | $ 4,282.36 | $ 5,924.37 | $ 12,282.77 | May-June | $ 7,305.30 | $ 4,002.69 | $ 5,140.25 | $ 6,657.35 | $ 3,505.70 | $ 3,532.09 | $ 3,499.98 | $ 61,802.86 |
| Rec'd | $ 5,670.00 | $ 4,282.36 | $ 5,924.37 | $ - | | $ - | $ - | $ 69.49 | $ - | $ - | $ - | $ - | $ 15,946.22 |
| Difference | $ - | $ - | $ - | $ 12,282.77 | $ - | $ 7,305.30 | $ 4,002.69 | $ 5,070.76 | $ 6,657.35 | $ 3,505.70 | $ 3,532.09 | $ 3,499.98 | $ 45,856.64 |

**Parking - Total Pre-Petition** $ 23,590.76
**Parking - Total Post-Petition** $ 22,265.88

| SUMMARY | Pre-Petition | Post-Petition |
|---|---|---|
| Rent | $189.25 | ($1,038.74) |
| Parking | $1,591.29 | $2,717.08 |
| Ancillary | $ 23,590.76 | $ 22,265.88 |
| **TOTAL** | **$25,371.30** | **$23,944.22** |

## Exhibit 18

**Certification of Rights**

CERTIFICATION OF RIGHTS

With respect to any decommissioning obligations for which Apache Corporation, or any of its subsidiaries, or a third party designated by Apache Corporation or one of its subsidiaries (as the case may be, the "**Applicable Decommissioning Operator**") either (a) conducts or seeks to conduct pursuant to an order from the Bureau of Safety and Environmental Enforcement ("**BSEE**"), the Bureau of Ocean Energy Management ("**BOEM**"), their respective successor agencies, or any other governmental unit having jurisdiction over such decommissioning obligations or (b) becomes obligated to perform pursuant to any contractual obligation (in each case, such decommissioning obligations being hereinafter referred to as "**Decommissioning Obligations**"), FWE I hereby certifies that it has:

1.  Assigned to such Applicable Decommissioning Operator, to the extent such activity was permitted under the underlying agreement, all documentation, plans, files, permits, contracts, and contract rights, boarding rights, access rights, utilization rights, applicable litigious rights, rights to payment, rights to reimbursement, rights to contribution, audit rights, and any other benefit available to FWE I in conjunction with applicable decommissioning operations which are the subject of the applicable Decommissioning Obligation, each such assignment was made solely as the rights relate to such Decommissioning Obligation;

2.  Authorized the Applicable Decommissioning Operator to perform all required decommissioning operations on any FWE I property or infrastructure that is the subject of a Decommissioning Obligation;

3.  Granted boarding access to the Applicable Decommissioning Operator for any infrastructure owned by FWE I, or to which FWE I has contract access rights, as such may be necessary or convenient for the Applicable Decommissioning Operator or its contractors, representatives, or designees, or the employees, agents, or consultants of any of them, to perform and fulfill each applicable Decommissioning Obligation, without need of further authorization or agreement of FWE I;

4.  Assigned and quitclaimed to the Applicable Decommissioning Operator any salvaged property or materials and the salvage value for any property or infrastructure decommissioned by the Applicable Decommissioning Operator;

5.  Granted to the Applicable Decommissioning Operator access to all contracts applicable to any and all properties and infrastructure associated with the applicable Decommissioning Obligation and assigned to the Applicable Decommissioning Operator, solely as they relate to such Decommissioning Obligation, any contract and/or contract rights or benefits necessary or convenient to the performance of the Decommissioning Obligation or to the rights or ability of the Applicable

Decommissioning Operator to collect and obtain contributions from any and all applicable third parties who have obligations to pay for or contribute to all or any part of the Decommissioning Obligations; and

6.      Assigned all rights to payment, rights to reimbursement, and rights to contribution for decommissioning expenses available to FWE I for any property made the subject of a Decommissioning Obligation.

FWE I further authorizes any co-owner, counterparty, contractor, or other person or entity to rely on the foregoing certifications in taking in action or making any payment or contribution as may be requested or directed by the Applicable Decommissioning Operator toward the fulfillment of the applicable Decommissioning Obligations.

FIELDWOOD ENERGY I LLC


_____

By:    _____

Name:  _____

Title: _____

**<u>Exhibit B</u>**

**Schedule of Defined Terms for Required Confirmation Order Provisions**

"**Decommissioning Agreement**" means that Decommissioning Agreement dated as of September 30, 2013, by and among the Apache PSA Parties, FWE, and the other parties thereto.

["**Lien**" means, with respect to any asset, (a) any mortgage, deed of trust, lien, pledge, hypothecation, encumbrance, charge or security interest in, on or of such asset, (b) the interest of a vendor or a lessor under any conditional sale agreement, capital lease or title retention agreement (or any financing lease having substantially the same economic effect as any of the foregoing) relating to such asset and (c) in the case of securities, any purchase option, call or similar right of a third party with respect to such securities.][1]

"**Permitted Post-Closing Liens**" means with respect to the properties allocated to Fieldwood Energy I LLC and the GOM Shelf LLC properties, the Liens created by or pursuant to the Recharacterization Mortgages or Standby Loan Agreement.

"**Recharacterization Mortgages**" has the meaning given to such term in the Decommissioning Agreement.

"**Standby Loan Agreement**" means that certain Standby Loan Agreement dated as of [_____, 20[●]] by and among Fieldwood Energy I LLC, GOM Shelf LLC, and Apache as lender thereunder.

---

[1] NTD: Definition of Lien to be discussed.

**<u>Exhibit 19</u>**

**Sole Manager Agreement**

[COMPANY LETTERHEAD]

[SOLE MANAGER NAME]
[ADDRESS]
[DATE]

Dear [SOLE MANAGER NAME],

This letter agreement (this "**Agreement**") sets forth the terms and conditions whereby you agree to provide the services to be performed by the "Sole Manager" on behalf of or in the service of Fieldwood Energy I LLC, a Texas limited liability company (the "**Company**"), as more fully set forth and described in the Limited Liability Company Agreement of the Company, dated as of [●], 2020 (such agreement, as it may be amended, supplemented, or modified from time to time, the "**Company Agreement**"), a copy of which is attached as Exhibit A hereto. As used in this Agreement, the term "**Parties**" shall refer to both you and the Company and "**Party**" shall refer to you or the Company.

**Section 1.**      <u>Services</u>.

(a)      The Company hereby agrees to employ you, and you hereby accept such employment, as the Sole Manager (as defined in the Company Agreement) to perform for or provide to the Company the services that are specified in the Company Agreement to be performed or provided by the Sole Manager or that are otherwise delegated or assigned to you by the Independent Director (as defined in the Company Agreement) in accordance with the Company Agreement (the "**Services**"), such Services to be performed or provided on the terms and subject to the conditions set forth in the Company Agreement and this Agreement.

(b)      The scope of the Services to be performed or provided by you as the Sole Manager and your authority to take actions on behalf of the Company as the Sole Manager shall be subject to the limitations thereon as set forth in the Company Agreement and this Agreement, as well as any limitations imposed by the Independent Director in connection with those Services that are delegated or assigned to you by the Independent Director. The Services shall include the services described on Schedule I attached hereto.

(c)      You shall devote your full business time, attention, skill, and best efforts to performing or providing the Services and to the furtherance of the Company's interests. You shall perform or provide the Services and carry out the responsibilities reasonably related thereto, to the best of your ability, in a diligent, trustworthy, and businesslike manner for the purpose of advancing the business of the Company.

(d)      Your principal place of employment shall be at [COMPANY'S CORPORATE OFFICE ADDRESS] subject to business travel as needed to fulfill your employment duties and responsibilities.

**Section 2.**      <u>Term of Employment</u>. The term of your employment under this Agreement shall commence as of the date set forth above and shall continue until the earlier of (a) the date on which you are removed as the Sole Manager by the Company for any reason, with the consent of Apache Corporation, a Delaware corporation ("**Apache**"), and (b) the [tenth] anniversary of this Agreement, unless extended annually thereafter (such period of time, the "**Employment Period**"). **You acknowledge and understand that your employment with the Company will be at-will, meaning that you or the Company (with Apache's consent) may terminate the employment relationship at any time, with or without Cause (as defined herein), and with or without notice and for any reason or no particular reason.** Although your compensation [and benefits] may change from time to time, the at-will nature of your employment

may only be changed by an express written agreement signed by the Independent Director, and shall be subject to the prior written consent of Apache.

**Section 3.**      **Compensation.**

(a)      In consideration for your performing or providing the Services and any duties related thereto and the rights granted to the Company in this Agreement, the Company shall pay you an initial base salary of $[●] per year[, subject to review from time to time], payable [biweekly][monthly] and subject to all withholdings and deductions as required by law.

(b)      You shall also be entitled to receive the compensation described on Schedule II attached hereto, subject to the conditions described on Schedule II.

(c)      [All forms of compensation paid to you as an employee of the Company shall be less all applicable withholdings.]

(d)      The Company shall pay or reimburse you for all expenses (including travel expenses) reasonably incurred by you during the Employment Period in connection with performing or providing the Services or carrying out the responsibilities reasonably related thereto, provided that you shall provide to the Company reasonable documentation or evidence of expenses for which you seek reimbursement.

**Section 4.**      **Intellectual Property Rights.**

(a)      The Company is, and will be, the sole and exclusive owner of all right, title, and interest throughout the world in and to all the results and proceeds of the Services and work related thereto performed or provided by you under this Agreement and the Company Agreement (collectively, the "**Deliverable**s") and all other writings, technology, inventions, discoveries, processes, techniques, methods, ideas, concepts, research, proposals, and materials, and all other work product of any nature whatsoever, that are created, prepared, produced, authored, edited, modified, conceived, or reduced to practice in the course of your performing or providing the Services or other work performed in connection with the Services or this Agreement or the Company Agreement (collectively, and including the Deliverables, "**Work Product**"), including all patents, copyrights, trademarks (together with the goodwill symbolized thereby), trade secrets, know-how, and other confidential or proprietary information, and other intellectual property rights (collectively "**Intellectual Property Right**s") therein. You agree that the Work Product is hereby deemed "work made for hire" as defined in 17 U.S.C. § 101 for the Company and all copyrights therein automatically and immediately vest in the Company. If, for any reason, any Work Product does not constitute a "work made for hire," you hereby irrevocably assign to the Company, for no additional consideration, your entire right, title, and interest throughout the world in and to such Work Product, including all Intellectual Property Rights therein, including the right to sue for past, present, and future infringement, misappropriation, or dilution thereof.

(b)      You shall protect the assets of the Company from misuse or misappropriation, including, without limitation, any Work Product, Intellectual Property Rights, or other confidential information of the Company.

(c)      Notwithstanding Section 4(a), to the extent that any of your pre-existing materials identified in Schedule III are incorporated in or combined with any Deliverable or otherwise necessary for the use or exploitation of any Work Product, you hereby grant to the Company an irrevocable, worldwide, perpetual, royalty-free, non-exclusive license to use, publish, reproduce, perform, display, distribute, modify, prepare derivative works based upon, make, have made, sell, offer to sell, import, and otherwise

2

exploit such preexisting materials and derivative works thereof. The Company may assign, transfer, and sublicense such rights to others without your approval.

(d)     As between you and the Company, the Company is, and will remain, the sole and exclusive owner of all right, title, and interest in and to any documents, specifications, data, know-how, methodologies, software, and other materials provided to you by the Company ("**Company Materials**"), including all Intellectual Property Rights therein. You have no right or license to reproduce or use any Company Materials except solely during the Employment Period to the extent necessary to perform your obligations under this Agreement in furtherance of the Company's business. All other rights in and to the Company Materials are expressly reserved by the Company. You have no right or license to use the Company's trademarks, service marks, trade names, logos, symbols, or brand names.

**Section 5.     Confidentiality**.

(a)     You acknowledge that you will have access to information that is treated as confidential and proprietary by the Company, including, without limitation, the existence and terms of this Agreement and the Company Agreement, trade secrets, technology, and information pertaining to business operations and strategies, customers, pricing, marketing, finances, sourcing, [OTHER CONFIDENTIAL INFORMATION,] seismic information, projected production, projected cost and expenses (including projected plugging and abandonment and decommissioning costs) or operations of the Company, its affiliates, or their suppliers or customers, in each case whether spoken, written, printed, electronic, or in any other form or medium (collectively, the "**Confidential Information**"). Any Confidential Information that you access or develop in connection with the Services or any work related thereto, including but not limited to any Work Product, shall be subject to the terms and conditions of this Section 5. You agree not to use any Confidential Information for any purpose except as required in the performance of the Services. You shall notify the Independent Director and Apache immediately in the event you become aware of any loss or disclosure of any Confidential Information.

(b)     Confidential Information shall not include information that:

(i)     is or becomes generally available to the public other than through your breach of this Agreement; or

(ii)     is communicated to you by a third party that had no confidentiality obligations with respect to such information.

(c)     Nothing herein shall be construed to prevent disclosure of Confidential Information as may be required by applicable law or regulation, or pursuant to the valid order of a court of competent jurisdiction or an authorized government agency.

(d)     Notice of Immunity Under the Defend Trade Secrets Act of 2016 ("**DTSA**"). Notwithstanding any other provision of this Agreement:

(i)     You will not be held criminally or civilly liable under any federal or state trade secret law for any disclosure of a trade secret that:

(A)     is made: (1) in confidence to a federal, state, or local government official, either directly or indirectly, or to an attorney and (2) solely for the purpose of reporting or investigating a suspected violation of law; or

(B)      is made in a complaint or other document that is filed under seal in a lawsuit or other proceeding.

(ii)      If you file a lawsuit for retaliation by the Company for reporting a suspected violation of law, you may disclose the Company's trade secrets to your attorney and use the trade secret information in the court proceeding if you:

(A)      file any document containing the trade secret under seal; and

(B)      do not disclose the trade secret, except pursuant to court order.

**Section 6.      <u>Representations and Warranties</u>.**

(a)      You represent and warrant to the Company that:

(i)      you have the right to enter into this Agreement, to grant the rights granted herein and to perform fully all of your obligations in this Agreement and the Company Agreement;

(ii)      your entering into this Agreement with the Company and your performance of the Services or any work related thereto do not and will not conflict with or result in any breach or default under any other agreement to which you are subject, including, without limitation, any non-competition, non-solicitation, or other work-related restrictions imposed by a current or former employer;

(iii)      you will inform the Independent Director about any non-competition, non-solicitation, or other work-related restrictions to which you are subject and provide the Independent Director with as much information about them as possible, including any agreements between you and your current or former employer describing such restrictions on your activities;

(iv)      you will not:  (1) remove or take any documents or proprietary data or materials of any kind, electronic or otherwise, with you from your current or former employer to the Company without written authorization from your current or former employer or (2) use or disclose any such confidential information of your current or former employer during the course and scope of your employment with the Company;

(v)      you will discuss any questions you may have about ownership of particular documents or other information with your current or former employer before removing or copying the documents or information for use in connection with your employment with the Company;

(vi)      you have the required skill, experience, and qualifications to perform the Services and any work related thereto, you shall perform the Services and such work in a professional and workmanlike manner in accordance with generally recognized industry standards for similar services and you shall devote sufficient resources to ensure that the Services are performed in a timely and reliable manner; and

(vii)      you shall perform the Services in compliance with all applicable federal, state, and local laws and regulations, including by maintaining all licenses, permits, and registrations required to perform the Services or any work related thereto.

(b)      The Company hereby represents and warrants to you that:

        (i)      it has the full right, power, and authority to enter into this Agreement and to perform its obligations hereunder; and

        (ii)      the execution of this Agreement by its representative whose signature is set forth at the end hereof has been duly authorized by all necessary corporate action.

**Section 7.**    **Indemnification**. You shall be entitled to indemnification by the Company on the terms and subject to the conditions set forth in the Company Agreement.

**Section 8.**    **Insurance**. The Company shall, at its own expense, provide directors' and officers' liability insurance coverage to you in your capacity as the Sole Manager, in an amount and on terms reasonably customary for directors and officers of oil and gas exploration and production companies that are similarly situated to the Company. The Company shall notify you of the existence of and any termination, cancellation, or material adverse changes to such insurance coverage provided to you.

**Section 9.**    **Termination**.

    (a)    You or the Independent Director on behalf of the Company (in the case of the Independent Director, subject to the prior consent or approval of Apache as provided in the Company Agreement) may terminate this Agreement without Cause upon 60 calendar days' written notice to the other Party. In the event of termination by you pursuant to this clause (a), the Company shall pay you on a pro-rata basis for any portion of your salary then due and payable for any Services completed up to and including the date of such termination. In the event of termination by the Independent Director on behalf of the Company pursuant to this clause (a), the Company shall pay you six months of your base salary from and after the date of such termination.

    (b)    The Independent Director on behalf of the Company (subject to the prior consent and approval of Apache) may terminate this Agreement, effective immediately upon written notice to you, for "**Cause**" (as defined below), or, if the event giving rise to Cause is an event subject to clause (d) of the definition of Cause, then effective following any applicable right to cure set forth by the Independent Director in the written notice of termination if you do not cure the applicable failure(s), violation(s), breach(es), action(s), or inaction(s) giving rise to Cause within the cure period specified in the written notice of termination you receive from the Independent Director. You may terminate this Agreement, effective immediately upon written notice to the Independent Director (with a copy provided by you to Apache), if the Company breaches any material provision of this Agreement, and such breach is incapable of cure, or with respect to a breach capable of cure, the Company does not cure such breach within thirty (30) calendar days after the Independent Director's and Apache's receipt of your written notice of termination containing a description of the breach giving rise to the termination notice. As used herein, "**Cause**" means a good faith finding by the Independent Director (subject to the prior consent and approval of Apache) of: (a) the commission by you of an act of fraud, dishonesty, or embezzlement against the Company or any of its Affiliates or Subsidiaries, or any customer or client thereof; (b) the unauthorized disclosure by you of material Confidential Information or Intellectual Property Rights of the Company or any of its Affiliates or Subsidiaries; (c) your conviction (or a plea by you or on your behalf of nolo contendere) for: (i) a felony or (ii) a crime involving fraud, dishonesty or moral turpitude; or (d) your failure to perform your material duties as the Sole Manager of the Company in accordance with this Agreement, as reasonably determined by the Independent Director (subject to the prior consent and approval of Apache), or if you intentionally, or with gross negligence, take action (or elect not to take action) or engage in conduct adverse to the interests of the Company, its Affiliates, it Subsidiaries, or its or their assets, business or business opportunities that the Independent Director (subject to the prior consent and approval of Apache) has reasonably determined is or could be materially injurious to the Company; provided, however, that prior to a termination for Cause under clause (d) of this definition the Independent Director shall provide written notice to you of any such

failure(s), violation(s), breach(es), action(s), or inaction(s) upon which the Company intends to rely as the basis for a termination for Cause and the Independent Director will offer the Sole Manager (subject to the consent and approval of Apache) no less than five (5) calendar days to cure such failure(s), violation(s), breach(es), action(s), or inaction(s) (as applicable) if the Independent Director, in the exercise of its good faith judgment, deems such failure(s), violation(s), breach(es), action(s), or inaction(s) (as applicable) to be capable of cure; provided, further, that the Independent Director shall only be required to give the Sole Manager such notice and opportunity to cure one time.  In the event of termination by the Independent Director on behalf of the Company pursuant to this clause (b) for Cause or by you pursuant to this clause (b), the Company shall pay you on a pro-rata basis for any portion of your salary then due and payable for any Services completed up to and including the effective date of such termination.

(c)     Upon expiration or termination of this Agreement for any reason, or at any other time upon the Company's written request, you shall promptly after such expiration or termination:

(i)     deliver to the Company all Deliverables (whether complete or incomplete) and all materials, equipment, and other property provided for your use by the Company;

(ii)     deliver to the Company all tangible documents and other media (including any copies), containing, reflecting, incorporating, or based on the Confidential Information;

(iii)     permanently erase all the Confidential Information from your personal computer systems; and

(iv)     certify in writing to the Company that you have complied with the requirements of this clause.

(d)     The terms and conditions of clause (c) and this clause (d) of Section 9 and Sections 4, 5, 6, 7, 10, **Error! Reference source not found.**, 11, 12, 13, 14, and 15 shall survive the expiration or termination of this Agreement.

**Section 10.     <u>Non-Competition</u>**.

(a)     You acknowledge that (i) the Company and its affiliates will be engaged in the acquisition, disposition, ownership, operation, plugging and abandonment, and decommissioning of the Legacy Apache Properties (as defined in the Company Agreement) and the GOM Shelf Properties (as defined in the Company Agreement) during the Employment Period and thereafter; (ii) during the Employment Period, you will be actively and significantly involved in the day-to-day operations of the Company and its affiliates as the Sole Manager pursuant to the Company Agreement in carrying out the activities of the Company and its affiliates described in the immediately preceding clause (i); (iii) you occupy a position of trust and confidence with the Company and its affiliates during the Employment Period; and (iv) you will become familiar with the Company's and its affiliates' trade secrets and with other proprietary and confidential information (including the Confidential Information) concerning the Company and its affiliates and their respective operations and businesses.

(b)     During the Restricted Period (as defined below) in the Restricted Territory (as defined below), you shall not, directly or indirectly (whether as an owner, partner, shareholder, agent, officer, director, employee, independent contractor, consultant, or otherwise), own, operate, manage, control, invest in, perform services for, or engage or participate in any manner in, or render services to (alone or in association with any person or entity) or otherwise assist any person or entity that engages in, or owns, invests in, operates, manages, or controls any venture or enterprise that engages in, acquiring, disposing of, owning, operating, plugging and abandoning, or decommissioning oil and gas properties.

6

(c)     The term "**Restricted Period**" means the period of time from the date of this Agreement until 24 months after the termination of your employment relationship with the Company or any successor thereto for any reason (whether pursuant to a written agreement or otherwise).  The Restricted Period shall be extended for a period equal to any time period that you are in violation of this Section 10.  Nothing contained in Section 10(b) shall be construed to prevent you from investing in the stock of any competing corporation listed on a national securities exchange or traded in the over-the-counter market, but only if you are not involved in the business of said corporation and if you and your associates (as such term is defined in Regulation 14(A) promulgated under the Securities Exchange Act of 1934, as amended and as in effect on the date hereof), collectively, do not own more than an aggregate of 1.0% of the stock of such corporation.

(d)     The term "**Restricted Territory**" means the Gulf of Mexico.

(e)     The Parties acknowledge that the business of the Company and its affiliates is the Gulf of Mexico and that you are performing or providing the Services to the Company and its affiliates throughout the Restricted Territory. If any court of competent jurisdiction at any time deems the Restricted Period unreasonably lengthy, or the Restricted Territory unreasonably extensive, or any of the covenants set forth in this Section 10 not fully enforceable, the other provisions of this Section 10, and this Agreement in general, will nevertheless stand and to the full extent consistent with law continue in full force and effect, and it is the intention and desire of the parties that the court treat any provisions of this Agreement that are not fully enforceable as having been modified to the minimum extent deemed necessary by the court to render them reasonable and enforceable and that the court enforce them to such extent (for example, that the Restricted Period be deemed to be the longest period permissible by law, but not in excess of the length provided for in Section 10(b), and the Restricted Territory be deemed to comprise the largest territory permissible by law under the circumstances but not in excess of the territory provided for in Section 10(b)).

**Section 11.     Additional Acknowledgment**s.

(a)     You acknowledge and agree that (i) the Services to be performed or provided by you to the Company as Sole Manager under the Company Agreement are of a special and unique character; (ii) you will obtain knowledge and skill relevant to the Company's industry, methods of doing business, and marketing and operational strategies by virtue of your employment; and (iii) the restrictive covenants and other terms and conditions of this Agreement (including, but not limited to, those in Sections 5 and **Error! Reference source not found.** of this Agreement) are reasonable and reasonably necessary to protect the legitimate business interest of the Company and its affiliates.

(b)     You further acknowledge that (i) the benefits provided to you under this Agreement, including the amount of your compensation, reflect, in part, your obligations and the Company's rights under this Agreement, including, but not limited to, those in Sections 5 and 10 of this Agreement; (ii) you have no expectation of any additional compensation, royalties, or other payment of any kind not otherwise referenced herein in connection herewith; and (iii) you will not suffer undue hardship by reason of full compliance with the terms and conditions of Sections 5 and 10 of this Agreement or the Company's enforcement thereof.

**Section 12.     Assignment**.  Neither you nor the Company shall assign any rights or obligations under this Agreement without the prior written consent of the other Party.  Any purported assignment in violation of the foregoing sentence shall be deemed null and void *ab initio*.  Subject to the limits on assignment stated in this Section 12, this Agreement will inure to the benefit of, be binding on, and be enforceable against each of the Parties and their respective successors and assigns.

**Section 13.**     **Remedies**.  In the event you breach or threaten to breach Section 5 and Section 10 of this Agreement, you hereby acknowledge and agree that monetary damages would not afford an adequate remedy and that the Company shall be entitled to seek, in addition to other available remedies, a temporary or permanent injunction or other equitable relief restraining such breach or threatened breach from any court of competent jurisdiction, without the necessity of showing any actual damages, and without the necessity of posting any bond or other security.  This equitable relief shall be in addition to, not in lieu of, legal remedies, monetary damages, or other available forms of relief.

**Section 14.**     **Disputes**.  Subject to Section 13, any dispute, controversy, or claim arising out of or related to this Agreement or any breach or termination of this Agreement, including but not limited to the Services or work related thereto that you provide to the Company, and any alleged violation of any federal, state, or local statute, regulation, common law, or public policy, whether sounding in contract, tort, or statute, shall be submitted to and decided by federal or state courts sitting in Harris County, Texas.

**Section 15.**     **Governing Law, Jurisdiction, and Venue**.  This Agreement and all related documents including all exhibits and schedules attached hereto and all matters arising out of or relating to this Agreement and the Services or work related thereto provided hereunder, whether sounding in contract, tort, or statute, for all purposes shall be governed by and construed in accordance with, the laws of the State of Texas (including its statutes of limitations), without giving effect to the conflict of laws principles that would cause laws of any jurisdiction other than those of the State of Texas to apply.

**Section 16.**     **Miscellaneous**.

(a)     You shall not export, directly or indirectly, any technical data acquired from the Company, or any products utilizing any such data, to any country in violation of any applicable export laws or regulations.

(b)     All notices, requests, consents, claims, demands, waivers, and other communications hereunder (each, a "**Notice**") shall be in writing, and shall be delivered by email and additionally by (i) personal delivery, (ii) nationally recognized overnight courier (with all fees prepaid), or (iii) certified or registered mail (in each case of clause (iii), return receipt requested, postage prepaid).  Except as otherwise provided in this Agreement, a Notice is effective only if (x) the receiving Party has received the Notice and (y) the Party giving the Notice has complied with the requirements of this Section 16(b).  Any Notice must be sent to the respective Parties at the following addresses (or at such other address for a Party as shall be specified in a Notice given in accordance with this Section 16(b)):

If to [SOLE MANAGER NAME]:              [SOLE MANAGER ADDRESS]
                                        Attention: [SOLE MANAGER NAME]
                                        Email: [EMAIL ADDRESS]


[with a copy to
(which shall not constitute notice):    Apache Corporation
                                        2000 Post Oak Boulevard, Suite 100
                                        Houston, Texas 77056
                                        Attention: [●]
                                        Email: [●]][1]

If to the Company:                      Fieldwood Energy I LLC

---

[1] **Note to Draft:** Apache notice information to be confirmed.  Does Apache want to receive copies of notices sent to Independent Director or the Company or just those sent to the Company?

8

1" = "1" "EMF_US 81957797v3 " "" EMF_US 81957797v3

[COMPANY ADDRESS]
Attention: Independent Director
Email: [INDEPENDENT DIRECTOR
EMAIL ADDRESS][2]

with a copy to
(which shall not constitute notice):    Apache Corporation
2000 Post Oak Boulevard, Suite 100
Houston, Texas 77056
Attention: [●]
Email: [●]

(c)    This Agreement, together with the applicable provisions of the Company Agreement and any other documents expressly incorporated herein by reference, and related exhibits and schedules, constitutes the sole and entire agreement of the Parties with respect to the subject matter contained herein, and supersedes all prior and contemporaneous understandings, agreements, representations, and warranties, both written and oral, with respect to such subject matter.

(d)    This Agreement may only be amended, modified, or supplemented by an agreement in writing signed by each Party, and any of the terms thereof may be waived only by a written document signed by each Party or, in the case of waiver, by the Party waiving compliance. Notwithstanding the foregoing, the Parties agree to amend or modify this Employment Agreement as is necessary to comply with the requirements of Section 409A of the Code.

(e)    If any term or provision of this Agreement is invalid, illegal, or unenforceable in any jurisdiction, such invalidity, illegality, or unenforceability shall not affect any other term or provision of this Agreement or invalidate or render unenforceable such term or provision in any other jurisdiction.

(f)    This Agreement may be executed in counterparts and by facsimile signature, each of which shall be deemed an original and all of which together shall constitute one instrument.

*(Signature page follows)*

---

[2] **Note to Draft:** Confirm that notices to the Company under this Agreement would be addressed to the Independent Director.

1" = "1" "EMF_US 81957797v3 " "" EMF_US 81957797v3

If this Agreement accurately sets forth our understanding, kindly execute the enclosed copy and return it to the undersigned.

Very truly yours,

**FIELDWOOD ENERGY I LLC**

By: _____
Name:
Title:

ACCEPTED AND AGREED:

_____
Name:
Date:

**SCHEDULE I**

**SERVICES**

**SCHEDULE II**

**COMPENSATION**

## SCHEDULE III

1. PRE-EXISTING MATERIALS:  [IDENTIFY SOLE MANAGER'S PRE-EXISTING MATERIALS]

**EXHIBIT A**

**Limited Liability Company Agreement of
Fieldwood Energy I LLC**

(See attached)

**Exhibit 20**

**Independent Director Agreement**

<div style="text-align:center">[COMPANY LETTERHEAD]</div>

[INDEPENDENT DIRECTOR NAME]
[ADDRESS]
[DATE]

Dear [INDEPENDENT DIRECTOR NAME],

This letter agreement (this "**Agreement**") sets forth the terms and conditions whereby you agree to provide the services to be performed by the "Independent Director" on behalf of or in the service of Fieldwood Energy I LLC, a Texas limited liability company (the "**Company**"), as more fully set forth and described in the Limited Liability Company Agreement of the Company, dated as of [●], 2020 (such agreement, as it may be amended, supplemented or modified from time to time, the "**Company Agreement**"), a copy of which is attached as <u>Exhibit A</u> hereto.  As used in this Agreement, the term "**Parties**" shall refer to both you and the Company and "**Party**" shall refer to you or the Company.

**Section 1.**      <u>Services</u>.

(a)      The Company hereby engages you, and you hereby accept such engagement, as the Independent Director (as defined in the Company Agreement) to provide to the Company the services specified in the Company Agreement to be performed or provided by the Independent Director (the "**Services**"), such Services to be performed or provided on the terms and subject to the conditions set forth in the Company Agreement and this Agreement.

(b)      Except as otherwise set forth in the Company Agreement, the Company shall not control the manner or means by which you perform or provide the Services.

(c)      As set forth in Schedule 1, the Company shall provide you with access to its premises, materials, information, and systems to the extent necessary for the performance of the Services.  Unless otherwise specified in Schedule 1, you shall furnish, at your own expense, the materials, equipment, and other resources necessary to perform the Services.

(d)      You shall comply with all rules and procedures communicated to you in writing by the Company, including those related to safety, security, and confidentiality.

(e)      Any provisions in this Agreement or the Company Agreement that may appear to give the Company the right to direct you as to the details of performing the Services or doing work related thereto or to exercise a measure of control over the performance of the Services or doing the work related thereto shall be deemed to mean that you shall follow the desires of the Company in the results of the Services or the work related thereto only; provided, however, that the scope of the Services to be performed or provided by you as Independent Director and your authority to take actions on behalf of the Company as Independent Director shall be subject to the limitations thereon as set forth in the Company Agreement and this Agreement.

**Section 2.**      <u>Term</u>.  The term of this Agreement shall commence as of the date set forth above and shall continue until the earlier of (a) the date on which you are removed as the Independent Director by the Company, with the consent of Apache Corporation, a Delaware corporation ("**Apache**"), and (b) the [tenth] anniversary of this Agreement, unless extended annually thereafter (the "**Term**").

**Section 3.**     <u>Fees and Expenses</u>.

(a)     As full compensation for performance of the Services and any work related thereto and the rights granted to the Company in this Agreement, the Company shall pay you a fixed annual fee of $[●] (the "**Fees**"), payable on the dates set forth in Schedule 1.  You acknowledge that you will receive an IRS Form 1099-MISC from the Company, and that you shall be solely responsible for all federal, state, and local taxes, as set out in Section 4(b).

(b)     You are solely responsible for any travel or other costs or expenses incurred by you in connection with the performance of the Services, and in no event shall the Company reimburse you for any such costs or expenses.

(c)     The Company shall pay all the Fees in accordance with the payment schedule set forth on Schedule 1.

**Section 4.**     <u>Relationship of the Parties</u>.

(a)     You are an independent contractor of the Company, and this Agreement shall not be construed to create any association, partnership, joint venture, employment, or agency relationship between you and the Company for any purpose.  Except as expressly set forth in the Company Agreement, you have no authority (and shall not hold yourself out as having authority) to bind the Company and you shall not make any agreements or representations on the Company's behalf without the Company's prior written consent.

(b)     Without limiting Section 4(a), you will not be eligible to participate in any benefits or benefit plans offered by the Company to its employees, and the Company will not be responsible for withholding or paying any income, payroll, Social Security, or other federal, state, or local taxes, making any insurance contributions, including for unemployment or disability, or obtaining workers' compensation insurance on your behalf.  You shall be responsible for, and shall indemnify the Company against, all such taxes or contributions, including penalties and interest.  Any persons employed or engaged by you in connection with the performance of the Services or any work related thereto shall be your employees or contractors and you shall be fully responsible for them and indemnify the Company against any claims made by or on behalf of any such employee or contractor.

**Section 5.**     <u>Intellectual Property Rights</u>.

(a)     The Company is, and will be, the sole and exclusive owner of all right, title, and interest throughout the world in and to all the results and proceeds of the Services and work related thereto performed or provided by you under this Agreement and the Company Agreement (collectively, the "**Deliverables**") and all other writings, technology, inventions, discoveries, processes, techniques, methods, ideas, concepts, research, proposals, and materials, and all other work product of any nature whatsoever, that are created, prepared, produced, authored, edited, modified, conceived, or reduced to practice in the course of your performing or providing the Services or other work performed in connection with the Services or this Agreement or the Company Agreement (collectively, and including the Deliverables, "**Work Product**"), including all patents, copyrights, trademarks (together with the goodwill symbolized thereby), trade secrets, know-how, and other confidential or proprietary information, and other intellectual property rights (collectively "**Intellectual Property Rights**") therein.  You agree that the Work Product is hereby deemed "work made for hire" as defined in 17 U.S.C. § 101 for the Company and all copyrights therein automatically and immediately vest in the Company.  If, for any reason, any Work Product does not constitute a "work made for hire," you hereby irrevocably assign to the Company, for no additional consideration, your entire right, title, and interest throughout the world in and to such Work Product,

2

including all Intellectual Property Rights therein, including the right to sue for past, present, and future infringement, misappropriation, or dilution thereof.

(b)     You shall protect the assets of the Company from misuse or misappropriation, including, without limitation, any Work Product, Intellectual Property Rights, or other confidential information of the Company.

(c)     Notwithstanding Section 5(a), to the extent that any of your pre-existing materials identified in Schedule 1 are incorporated in or combined with any Deliverable or otherwise necessary for the use or exploitation of any Work Product, you hereby grant to the Company an irrevocable, worldwide, perpetual, royalty-free, non-exclusive license to use, publish, reproduce, perform, display, distribute, modify, prepare derivative works based upon, make, have made, sell, offer to sell, import, and otherwise exploit such preexisting materials and derivative works thereof. The Company may assign, transfer, and sublicense such rights to others without your approval.

(d)     As between you and the Company, the Company is, and will remain, the sole and exclusive owner of all right, title, and interest in and to any documents, specifications, data, know-how, methodologies, software, and other materials provided to you by the Company ("**Company Materials**"), including all Intellectual Property Rights therein. You have no right or license to reproduce or use any Company Materials except solely during the Term to the extent necessary to perform your obligations under this Agreement in furtherance of the Company's business. All other rights in and to the Company Materials are expressly reserved by the Company. You have no right or license to use the Company's trademarks, service marks, trade names, logos, symbols, or brand names.

**Section 6.    Confidentiality**.

(a)     You acknowledge that you will have access to information that is treated as confidential and proprietary by the Company, including, without limitation, the existence and terms of this Agreement and the Company Agreement, trade secrets, technology, and information pertaining to business operations and strategies, customers, pricing, marketing, finances, sourcing, [OTHER CONFIDENTIAL INFORMATION,] seismic information, projected production, projected cost and expenses (including projected plugging and abandonment and decommissioning costs) or operations of the Company, its affiliates, or their suppliers or customers, in each case whether spoken, written, printed, electronic, or in any other form or medium (collectively, the "**Confidential Information**"). Any Confidential Information that you access or develop in connection with the Services or any work related thereto, including but not limited to any Work Product, shall be subject to the terms and conditions of this Section 6. You agree not to use any Confidential Information for any purpose except as required in the performance of the Services. You shall notify the Company immediately in the event you become aware of any loss or disclosure of any Confidential Information.

(b)     Confidential Information shall not include information that:

(i)     is or becomes generally available to the public other than through your breach of this Agreement; or

(ii)     is communicated to you by a third party that had no confidentiality obligations with respect to such information.

(c)     Nothing herein shall be construed to prevent disclosure of Confidential Information as may be required by applicable law or regulation, or pursuant to the valid order of a court of competent jurisdiction or an authorized government agency.

3

(d)      Notice of Immunity Under the Defend Trade Secrets Act of 2016 ("**DTSA**"). Notwithstanding any other provision of this Agreement:

(i)      You will not be held criminally or civilly liable under any federal or state trade secret law for any disclosure of a trade secret that:

(A)      is made: (1) in confidence to a federal, state, or local government official, either directly or indirectly, or to an attorney and (2) solely for the purpose of reporting or investigating a suspected violation of law; or

(B)      is made in a complaint or other document that is filed under seal in a lawsuit or other proceeding.

(ii)      If you file a lawsuit for retaliation by the Company for reporting a suspected violation of law, you may disclose the Company's trade secrets to your attorney and use the trade secret information in the court proceeding if you:

(A)      file any document containing the trade secret under seal; and

(B)      do not disclose the trade secret, except pursuant to court order.

**Section 7.      Representations and Warranties.**

(a)      You represent and warrant to the Company that:

(i)      you have the right to enter into this Agreement, to grant the rights granted herein and to perform fully all of your obligations in this Agreement and the Company Agreement;

(ii)      your entering into this Agreement with the Company and your performance of the Services or any work related thereto do not and will not conflict with or result in any breach or default under any other agreement to which you are subject;

(iii)      you have the required skill, experience, and qualifications to perform the Services and any work related thereto, you shall perform the Services and such work in a professional and workmanlike manner in accordance with generally recognized industry standards for similar services and you shall devote sufficient resources to ensure that the Services are performed in a timely and reliable manner; and

(iv)      you shall perform the Services in compliance with all applicable federal, state, and local laws and regulations, including by maintaining all licenses, permits, and registrations required to perform the Services or any work related thereto.

(b)      The Company hereby represents and warrants to you that:

(i)      it has the full right, power, and authority to enter into this Agreement and to perform its obligations hereunder; and

(ii)      the execution of this Agreement by its representative whose signature is set forth at the end hereof has been duly authorized by all necessary corporate action.

**Section 8.**    **Indemnification**. You shall be entitled to indemnification by the Company on the terms and subject to the conditions set forth in the Company Agreement.

**Section 9.**    **Insurance**.  The Company shall, at its own expense, provide directors' and officers' liability insurance coverage to you in your capacity as the Independent Director, in an amount and on terms reasonably customary for directors and officers of oil and gas exploration and production companies that are similarly situated to the Company.  The Company shall notify you of the existence of and any termination, cancellation, or material adverse changes to such insurance coverage provided to you.

**Section 10.**    **Termination**.

(a)    You may resign as Independent Director and terminate this Agreement at any time without Cause (as defined below), or the Sole Manager on behalf of the Company (in the case of termination on behalf of the Company, subject to the prior consent or approval of Apache as provided in the Company Agreement) may remove you as Independent Director and terminate this Agreement without Cause at any time, in each case upon 60 calendar days' advance written notice to the other Party.  In addition, this Agreement shall terminate upon your death any disability that renders you unable to perform the Services. In the event of termination by you or the Sole Manager on behalf of the Company pursuant to this clause (a) or upon your death or disability, the Company shall pay you (or your estate in the event of your death) on a pro-rata basis for any Fees then due and payable for any Services completed up to and including the effective date of such termination.

(b)    The Sole Manager on behalf of the Company (subject to the prior consent and approval of Apache) may terminate this Agreement, effective immediately upon written notice to you, for "**Cause**" (as defined below), or, if the event giving rise to Cause is an event subject to clause (d) of the definition of Cause, then effective following any applicable right to cure set forth by the Sole Manager in the written notice of termination if you do not cure the applicable failure(s), violation(s), breach(es), action(s), or inaction(s) giving rise to Cause within the cure period specified in the written notice of termination you receive from the Sole Manager. You may terminate this Agreement, effective immediately upon written notice to the Sole Manager (with a copy provided by you to Apache), if the Company breaches any material provision of this Agreement, and such breach is incapable of cure, or with respect to a breach capable of cure, the Company does not cure such breach within thirty (30) calendar days after the Sole Manager's and Apache's receipt of your written notice of termination containing a description of the breach giving rise to the termination notice.  As used herein, "**Cause**" means a good faith finding by the Sole Manager (subject to the prior consent and approval of Apache) of: (a) the commission by you of an act of fraud, dishonesty, or embezzlement against the Company or any of its Affiliates or Subsidiaries, or any customer or client thereof; (b) the unauthorized disclosure by you of material Confidential  Information or Intellectual Property Rights of the Company or any of its Affiliates or Subsidiaries; (c) your conviction (or a plea by you or on your behalf of nolo contendere) for: (i) a felony or (ii) a crime involving fraud, dishonesty or moral turpitude; or (d)  your failure to perform your material duties as the Independent Director of the Company in accordance with this Agreement, as reasonably determined by the Sole Manager (subject to the prior consent and approval of Apache), or if you intentionally, or with gross negligence, take action (or elect not to take action) or engage in conduct adverse to the interests of the Company, its Affiliates, it Subsidiaries, or its or their assets, business or business opportunities that the Sole Manager (subject to the prior consent and approval of Apache) has reasonably determined is or could be materially injurious to the Company; provided, however, that prior to a termination for Cause under clause (d) of this definition the Sole Manager shall provide written notice to you of any such failure(s), violation(s), breach(es), action(s), or inaction(s) upon which the Company intends to rely as the basis for a termination for Cause and the Sole Manager will offer the Independent Director (subject to the consent and approval of Apache) no less than five (5) calendar days to cure such failure(s), violation(s), breach(es), action(s), or inaction(s) (as applicable) if the Sole Manager, in the exercise of its good faith judgment, deems such failure(s),

5

violation(s), breach(es), action(s), or inaction(s) (as applicable) to be capable of cure; provided, further, that the Sole Manager shall only be required to give the Independent Director such notice and opportunity to cure one time.  In the event of termination by the Company pursuant to this clause (b) for Cause or by you pursuant to this clause (b), the Company shall pay you on a pro-rata basis for any portion of your Fees then due and payable for any Services completed up to and including the effective date of such termination.

(c)       Upon expiration or termination of this Agreement for any reason, or at any other time upon the Company's written request, you shall promptly after such expiration or termination:

(i)       deliver to the Company all Deliverables (whether complete or incomplete) and all materials, equipment, and other property provided for your use by the Company;

(ii)       deliver to the Company all tangible documents and other media (including any copies), containing, reflecting, incorporating, or based on the Confidential Information;

(iii)       permanently erase all the Confidential Information from your personal computer systems; and

(iv)       certify in writing to the Company that you have complied with the requirements of this clause.

(d)       The terms and conditions of clause (c) and this clause (d) of Section 10 and Sections 4, 5, 6, 7, 8, 11, **Error! Reference source not found.**, 12, 13, 14, and 15 shall survive the expiration or termination of this Agreement.

**Section 11.       Other Business Activities**.  You may be engaged or employed in any other business, trade, profession, or other activity that does not place you in a conflict of interest with the Company; provided that during the Term, you shall not be engaged in any business activities that do or may compete with the business of the Company without having first provided the Company with written notice of such proposed engagement not less than 75 calendar days prior to such engagement.

**Section 12.       Assignment**.  Neither you nor the Company shall assign any rights or obligations under this Agreement without the prior written consent of the other Party.  Any purported assignment in violation of the foregoing sentence shall be deemed null and void *ab initio*.  Subject to the limits on assignment stated in this Section 12, this Agreement will inure to the benefit of, be binding on, and be enforceable against each of the Parties and their respective successors and assigns.

**Section 13.       Remedies**.  In the event you breach or threaten to breach Section 6 or **Error! Reference source not found.** of this Agreement, you hereby acknowledge and agree that monetary damages would not afford an adequate remedy and that the Company shall be entitled to seek, in addition to other available remedies, a temporary or permanent injunction or other equitable relief restraining such breach or threatened breach from any court of competent jurisdiction, without the necessity of showing any actual damages, and without the necessity of posting any bond or other security.  This equitable relief shall be in addition to, not in lieu of, legal remedies, monetary damages, or other available forms of relief.

**Section 14.       Disputes**.  Subject to Section 13, any dispute, controversy, or claim arising out of or related to this Agreement or any breach or termination of this Agreement, including but not limited to the Services or work related thereto that you provide to the Company, and any alleged violation of any federal, state, or local statute, regulation, common law, or public policy, whether sounding in contract, tort, or statute, shall be submitted to and decided by federal or state courts sitting in Harris County, Texas.

**Section 15.** <u>**Governing Law, Jurisdiction, and Venue**</u>.  This Agreement and all related documents including all exhibits and schedules attached hereto and all matters arising out of or relating to this Agreement and the Services or work related thereto provided hereunder, whether sounding in contract, tort, or statute for all purposes shall be governed by and construed in accordance with, the laws of the State of Texas (including its statutes of limitations), without giving effect to the conflict of laws principles that would cause laws of any jurisdiction other than those of the State of Texas to apply.

**Section 16.** <u>**Miscellaneou**</u>s.

        (a)      You shall not export, directly or indirectly, any technical data acquired from the Company, or any products utilizing any such data, to any country in violation of any applicable export laws or regulations.

        (b)      All notices, requests, consents, claims, demands, waivers, and other communications hereunder (each, a "**Notice**") shall be in writing, and shall be delivered by email and additionally by (i) personal delivery, (ii) nationally recognized overnight courier (with all fees prepaid), or (iii) certified or registered mail (in each case of clause (iii), return receipt requested, postage prepaid).  Except as otherwise provided in this Agreement, a Notice is effective only if (x) the receiving Party has received the Notice and (y) the Party giving the Notice has complied with the requirements of this Section 16(b).  Any Notice must be sent to the respective Parties at the following addresses (or at such other address for a Party as shall be specified in a Notice given in accordance with this Section 16(b)):

| | |
|---|---|
| If to [INDEPENDENT DIRECTOR NAME]: | [INDEPENDENT DIRECTOR ADDRESS]<br>Attention: [INDEPENDENT DIRECTOR NAME]<br>Email: [EMAIL ADDRESS] |
| [with a copy to<br>(which shall not constitute notice): | Apache Corporation<br>2000 Post Oak Boulevard, Suite 100<br>Houston, Texas 77056<br>Attention: [●]<br>Email: [●]][1] |
| If to the Company: | Fieldwood Energy I LLC<br>[COMPANY ADDRESS]<br>Attention: Sole Manager<br>Email: [SOLE MANAGER EMAIL ADDRESS] |
| with a copy to<br>(which shall not constitute notice): | Apache Corporation<br>2000 Post Oak Boulevard, Suite 100<br>Houston, Texas 77056<br>Attention: [●]<br>Email: [●] |

        (c)      This Agreement, together with the applicable provisions of the Company Agreement and any other documents expressly incorporated herein by reference, and related exhibits and schedules,

---

[1] **Note to Draft:** Apache notice information to be confirmed.  Does Apache want to receive copies of notices sent to Independent Director or the Company or just those sent to the Company?

constitutes the sole and entire agreement of the Parties with respect to the subject matter contained herein, and supersedes all prior and contemporaneous understandings, agreements, representations, and warranties, both written and oral, with respect to such subject matter.

(d)      This Agreement may only be amended, modified, or supplemented by an agreement in writing signed by each Party, and any of the terms thereof may be waived only by a written document signed by each Party or, in the case of waiver, by the Party waiving compliance.

(e)      If any term or provision of this Agreement is invalid, illegal, or unenforceable in any jurisdiction, such invalidity, illegality, or unenforceability shall not affect any other term or provision of this Agreement or invalidate or render unenforceable such term or provision in any other jurisdiction.

(f)      This Agreement may be executed in counterparts and by facsimile signature, each of which shall be deemed an original and all of which together shall constitute one instrument.

*(Signature page follows)*

If this Agreement accurately sets forth our understanding, kindly execute the enclosed copy and return it to the undersigned.

Very truly yours,

**FIELDWOOD ENERGY I LLC**

By: _____
Name:
Title:

ACCEPTED AND AGREED:

_____
Name:
Date:

## SCHEDULE 1

1.  ACCESS PROVIDED BY COMPANY:  [PREMISES,] [MATERIALS,] [INFORMATION,] AND [SYSTEMS]

2.  PAYMENT SCHEDULE:  Fees shall be paid on a pro rata basis [quarterly][monthly] on the last day of such [fiscal quarter][month] of the Company, beginning with the first such date occurring following the date of this Agreement.

3.  DELIVERABLES:  [IDENTIFY DELIVERABLES]

4.  PRE-EXISTING MATERIALS:  [IDENTIFY INDEPENDENT DIRECTOR`S PRE-EXISTING MATERIALS]

**<u>EXHIBIT A</u>**

**Limited Liability Company Agreement of
Fieldwood Energy I LLC**

(See attached)

**Exhibit 21**

**Form of Contract Services Agreement**

## CONTRACT SERVICES AGREEMENT

This Contract Services Agreement dated and effective as of _____, 202_ (the "Effective Date") (this "Agreement") is by and among [•] (the "Operator"), FIELDWOOD ENERGY I LLC, a Texas limited liability company (the "Fieldwood Energy I") and GOM SHELF LLC, a Delaware limited liability company ("GOM Shelf" and, together with Fieldwood Energy I, the "Owners", and each, an "Owner"). Operator and Owners are sometimes referred to collectively as the "Parties" and individually as a "Party".

WHEREAS, each Owner is the operator, as designated by the Bureau of Ocean Energy Management of the United States Department of the Interior ("BOEM"), of certain of the Assets (as defined below);

WHEREAS, Owners and Fieldwood Energy II LLC, a Texas limited liability company, have entered into that certain Transition Services Agreement dated [•], 202_ (as such agreement may be amended from time to time, the "Transition Agreement"), pursuant to which Fieldwood Energy II LLC agreed to provide certain transition services to Owners with respect to the Assets, on the terms and subject to the conditions set forth therein; and

WHEREAS, upon the termination of the Transition Agreement as to the Assets, Owners desire to engage Operator to perform the Services (as defined below) with respect to the oil and gas properties described on **Schedule I** (the "Assets"), and Operator desires to perform such Services, subject to the terms hereof.

NOW, THEREFORE, in consideration of the premises and of the mutual promises, covenants, conditions, and agreements contained herein and for other valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereby agree as follows:

## ARTICLE I.  SERVICES

**Section 1.1**    **Services**. Subject to the terms of this Agreement, Owners hereby engage Operator to perform, or cause to be performed, all those certain operations and activities with respect to the Assets, as more particularly identified on **Exhibit A** (the "Services"), in accordance with the Approved Budget and reasonable written instructions provided from time to time during the Term of this Agreement to Operator by the Sole Manager of Fieldwood Energy I on behalf of the Owners.

**Section 1.2**    **Decommissioning**. In addition to the operations and activities identified on **Exhibit A**, the Services shall include plugging, abandonment, removal, site clearance, site survey, remediation, disposal, restoration operations, and any other decommissioning activities associated with (i) the Assets described or identified on **Exhibit B** in accordance with the timing set forth on **Exhibit B** (the "Decommissioning Plan") and (ii) all other Assets, to the extent not included in the Decommissioning Plan, as and when required by (a) applicable Laws, including, without limitation, the rules and regulations of BOEM, the Bureau of Safety and Environmental Enforcement ("BSEE"), or any other local, state, or federal governmental entity having jurisdiction over the Assets (collectively, "Governmental Authorities") or (b) applicable contracts (in the case of the decommissioning covered by this clause (ii), "Remaining Decommissioning" and together

with the Decommissioning Plan, "<u>Required Decommissioning</u>").  Promptly upon determining, learning, or being notified that Remaining Decommissioning is or will be required, Operator shall provide written Notice to Owner(s) describing the applicable Remaining Decommissioning in reasonable detail and setting forth the date by which such Remaining Decommissioning is required to be completed and Operator's preliminary estimate of the costs for Operator to perform the applicable Remaining Decommissioning.  Required Decommissioning shall be performed in accordance with the rules and regulations of BOEM, BSEE, and all other applicable Governmental Authorities having jurisdiction, applicable Laws, and in compliance with the terms of all applicable leases, contracts, or agreements pertaining to such Required Decommissioning.  Within thirty (30) Business Days after the completion of any Required Decommissioning, or any part thereof, and any other activities required by the BSEE or other applicable Governmental Authorities having jurisdiction, Operator will provide Owners with: (1) copies of the final reports submitted to BSEE or such other Governmental Authorities; (2) an affidavit or sworn declaration signed by an appropriately authorized senior officer of Operator attesting to completion thereof; (3) a statement identifying all costs incurred in connection therewith (the "<u>Statement</u>"); and (4) such other documentation as requested by Sole Manager of Fieldwood Energy I on behalf of Owners.  Operator will include with the Statement all available back up accounting documentation reasonably necessary to support the information reflected thereon.

**Section 1.3** **Standard of Performance**.  Subject to the terms of this Agreement, Operator shall perform or cause to be performed the Services (a) as a reasonably prudent operator, (b) in a good and workmanlike manner, (c) with due diligence and dispatch, (d) in accordance with good oilfield practices, and (e) in compliance with all applicable Laws, licenses, leases, contracts, authorizations and permits.  Operator shall only use the Assets (including Seismic Data, Well Data, intellectual property, and records included in the Assets) for the performance of the Services under this Agreement, and for no other purpose.  For purposes of this Agreement, "Laws" means any and all applicable laws, statutes, codes, constitutions, ordinances, decrees, writs, injunctions, orders, judgments, principles of common law, rules, licenses, leases, authorizations, or regulations (including environmental laws) that are promulgated, issued, or enacted by any Governmental Authority having jurisdiction.

**Section 1.4** **Independent Contractor**.  At all times during the performance of Services by Operator, all Persons performing such Services who shall be in the employ and/or under the control of Operator or its Affiliates (including agents, contractors, temporary employees, and consultants) shall be independent from each Owner and not employees of each Owner and shall not be entitled to any payment, benefit, or perquisite directly from Owners on account of such Services, including, but not limited to, group insurance and participation in any employee benefit and pension plans maintained by each Owner or any Affiliate of each Owner. Notwithstanding any other provision contained elsewhere in this Agreement, in all cases where the Operator is performing Services under this Agreement offshore the State of Louisiana or are otherwise covered by the Louisiana Worker's Compensation Act, La. Rev. Stat. § 23.1021 et seq., the Parties acknowledge and agree that all such operations pursuant to this Agreement are an integral part of and are essential to the ability of the Owners to generate Owners' goods, products, or services, and that whenever Services and work are performed hereunder in or offshore Louisiana, or the Louisiana Workers' Compensation Act may be applicable, the employees of Operator and their contractors providing such Services or performing such work, if any, whether direct, statutory,

2

borrowed, or otherwise, are statutory employees of each Owner in accordance with the Louisiana Worker's Compensation Act, La. Rev. Stat. § 23.1021 et seq. and the protections afforded a statutory employer under Louisiana Law shall apply. In such event, Operator agrees that such Owner is and shall be deemed a statutory employer of Operator's employees for the sole purposes of La. Rev. Stat. § 23.1061(A)(3), as the same may be amended from time to time.  For purposes of this Agreement, (i) "Affiliate" with respect to a Party means any Person that controls, is controlled by or is under common control with such Party where control means the direct or indirect power to direct the management of the entity at issue and (ii) "Person" means an individual, corporation, partnership, joint venture, limited liability company, Governmental Authority, unincorporated organization, trust, association, or other entity.

**Section 1.5** **Records**.  Operator shall maintain or cause to be maintained true and correct records of all receipts, invoices, reports, and such other documents as are customarily maintained by Operator for its own operations relating to the Services rendered hereunder for a period of the later of (i) three (3) years following the end of the calendar year during which this Agreement terminates and (ii) such other time required by applicable Law.  All such receipts, invoices, reports, and other documents are the property of Owners.

**Section 1.6** **Representatives**.  Each Party shall, at all times during the Term, keep representatives available either by telephone, electronic mail, or in person during normal business hours, to receive communications from the other Party regarding the day-to-day Services and to respond to inquiries concerning the performance of the day-to-day Services.  For the avoidance of doubt, all Notices required or permitted hereunder shall be delivered pursuant to Section 8.2 of this Agreement. Operator's representatives are designated on **Exhibit C**. Owners' representative is the Sole Manager of Fieldwood Energy I. Operator and Owners may replace any of its representatives or designate such other representatives from time to time by written Notice to the other Party delivered pursuant to Section 8.2.

**Section 1.7** **Compliance**. Operator shall comply with all Laws and in accordance with the terms and provisions of the contracts, agreements, leases, and other instruments applicable to the operation of the Assets.  Operator shall prepare and file all reports and be responsible for all compliance with and communications on behalf of Owners to satisfy the reporting requirements of any Governmental Authorities for operations conducted by Operator hereunder.

**Section 1.8** **Limitation of Services**.

(a) Unless otherwise expressly required or allowed by this Agreement, Operator shall (i) not abandon or permit any contracts, agreements, leases, and other instruments applicable to the Assets to lapse or expire (except any abandonment or termination pursuant to their terms or as required by any Governmental Authorities), (ii) not do, perform, or authorize or agree to bind or obligate Owners or the Assets with respect to any matter outside the scope of the Services contemplated by this Agreement without the prior written consent of Owners, and (iii) prevent the Assets or portions thereof from becoming burdened or encumbered by any liens, charges, security interests, and encumbrances as a result of Operator's acts or omissions in providing the Services.

3

(b)     Except to the extent expressly authorized pursuant to this Agreement, Operator shall not, without the prior written consent of Owners:

    (i)     make any payment to renew, extend, or otherwise perpetuate a lease; provided that Operator shall give Owner Notice of any such payment needed to so renew, extend, or perpetuate a lease;

    (ii)     plug and abandon any well, unless such well is part of Required Decommissioning;

    (iii)     execute, amend, waive, release, extend, terminate, or otherwise modify any of the governmental approvals, leases, or other agreements of the Assets;

    (iv)     (a) borrow or lend money on behalf of Owner; (b) participate in futures, derivatives, or hedging activities with respect to the Assets or any production therefrom; (c) purchase or sell any of the Assets or transfer or dispose of any equipment, material, or supplies on or comprising any part of an Asset; (d) execute any indemnification, release, or waiver on behalf of Owner or with respect to any Asset; (e) take any other action on behalf of Owner or pertaining to the Assets not in the ordinary course of business; (f) incur any cost or expense for geophysical items on behalf of Owner (including acquisition, processing, reprocessing, or interpretation); (g) make a capital expenditure or series of related capital expenditures on behalf of Owner not set forth in or in accordance with the Approved Budget for the applicable period, after giving effect to Permitted Variance (as defined below); or (h) assume, guarantee, or otherwise become liable or responsible (whether directly, contingently or otherwise) for the liabilities of any other Person or any indebtedness on behalf of Owner; or

    (v)     enter into any contract on behalf of Owner with respect to any of the foregoing in this Section 1.8(b).

## ARTICLE II. BUDGET

**Section 2.1     Periodic Budget**. As of the date hereof, Owners have approved the operating and general and administrative budget for the period beginning on the date hereof and ending on [•] 31, 202[•] (the "Initial Period"), and attached as **Exhibit E** (the "Initial Periodic Budget"). On or before sixty (60) days prior to the end of Initial Periodic Budget or any subsequent Approved Budget period, Operator shall prepare and present to Owners, for Owners' approval, a proposed operating and general and administrative budget for the period of time specified by Owners (i.e. quarterly, annual, etc.) substantially in the format of the Initial Annual Budget. The proposed periodic budget is subject to Owners' approval in all respects; provided, however, that Operator agrees to timely address any issues that Owners might have raised with Operator with respect to such proposed budget. The Initial Periodic Budget, and the budget for any subsequent period that is approved by Owners, as any such budget may be modified or amended from time to time with the approval of Owners, is referred to as an "Approved Budget."

**Section 2.2      Annual Budget Variance Report**. No later than ten (10) Business Days after the first day of the month, the Operator shall deliver to the Owners a rolling monthly and cumulative variance report (the "Budget Variance Report").  The Budget Variance Report shall measure performance against both the prior month of the Approved Budget and on a cumulative basis for the given budget period and shall include calculations that demonstrate that the Operator is in compliance with the Permitted Variance (defined below).

**Section 2.3      Thirteen Week Cash Flow Budget**. As of the date hereof, Owners have approved the thirteen week cash flow budget for the period beginning on the date hereof and ending thirteen weeks after the date hereof, and attached as **Exhibit F** (the "Approved TWCF Budget"). Every ten (10) Business Days thereafter, the Operator may propose an updated budget (the "Proposed TWCF Budget") to the Owners, (i) which such report, shall set forth in comparative form the projected cash receipts and disbursements of the Operator in respect of the Services performed by Operator pursuant to this Agreement for the succeeding thirteen-week period, for all collections and disbursements, consistent in form and substance (other than Dollar amounts) with the Approved TWCF Budget.  Each Proposed TWCF Budget and the Approved TWCF Budget delivered shall be accompanied by a certificate from an appropriately authorized senior officer of the Operator certifying that such projections were prepared in good faith on the basis of the assumptions stated herein, which assumptions were believed by the preparer thereof to be reasonable at the time prepared.  The Sole Manager of Fieldwood Energy I, acting in its sole and absolute discretion, may approve such Proposed TWCF Budget on behalf of Owners, and upon such approval such Proposed TWCF Budget will then become the "Approved TWCF Budget" then in effect.

**Section 2.4      TWCF Variance Report**. Within ten (10) Business Days following the Effective Date, and every other week thereafter during the Term (each a "Test Date"), the Operator shall deliver to Owners a bi-weekly variance report (the "TWCF Variance Report").  The TWCF Variance Report shall measure performance against both the prior weeks of the Approved TWCF Budget and on a cumulative basis for the given prior four weeks and shall include calculations that demonstrate that the Operator is in compliance with the Permitted Variance.

**Section 2.5      Permitted Variance**. On each Test Date, Operator shall demonstrate in each such TWCF Variance Report that, in the period covered by such TWCF Variance Report, the aggregate actual disbursements, do not exceed the sum of the aggregate amount budgeted therefor in the Approved Budget for such period by more than ten percent (10%) of the budgeted amount (the "Permitted Variance").  Certification of compliance with this Section 2.5 shall be provided on such Test Date, concurrently with delivery of each TWCF Variance Report and shall have been certified by an appropriately authorized senior officer of the Operator and be in a form satisfactory to the Owners.

**Section 2.6      Proposals**. If and as necessary, Operator shall, by Notice to Owners, propose operations to Owners on the Assets representing expenditures that are not included in an Approved Budget and that are considered by Operator as prudent, judged by it as if it were the owner of the Assets.  Notices of proposed operations shall include an AFE (in a form substantially similar to **Exhibit G** attached hereto), which shall include the proposed operation or service, and

5

the estimated costs of such operation or service. Operator shall further consult with Owners in connection with the evaluation of any such proposed operations. Operator shall also notify Owners of any Notice of a proposed operation received by Operator from a third party that is not included in an Approved Budget. Operator will follow the instructions of Owners with respect to each proposed operation and provide timely Notices or responses as may be required. Notwithstanding anything to the contrary contained herein, Operator may conduct or approve any operation in response to an emergency or prevention of an impending emergency and incur expenditures with respect thereto without the approval of Owners and shall be entitled to reimbursement for all such expenditures; provided, however, that Operator shall promptly provide Notice to Owners in the event of emergency actions or operations. Operator shall provide any technical evaluations regarding any drilling, reworking, or other capital expenditure projects that may be requested by Owners. With respect to any proposals made to Owners which Owners have not approved, Operator shall maintain a report of all such proposals and provide such report to Owners upon any Owner's request.

## ARTICLE III.    COMPENSATION

**Section 3.1    Compensation for Services**. For the provision of the Services, Owners shall pay Operator in accordance with **Exhibit H** ("Operator Compensation").

**Section 3.2    Overhead**. COPAS recoveries from third parties related to the Assets shall be accounted for on behalf of Owners. There shall be no separate charge by Operator relating to its overhead (including, but not limited to, head office overhead, field overhead, bonuses, and severances). For the avoidance of doubt, the Operator Compensation fully compensates Operator for its overhead.

## ARTICLE IV.    PAYMENT AND DEFAULT

**Section 4.1    Submission of Invoice**. Operator shall submit a written invoice (the "Invoice") to Owners on or before the fifteenth (15th) Business Day of each month setting forth the Operator Compensation for the preceding month for the Services provided by Operator and all out-of-pocket expenses incurred by Operator to the extent incurred in the performance of the Services. Notwithstanding anything in this Agreement to the contrary, (i) all charges, out-of-pocket expenses, and other disbursements to Operator are subject to and shall not exceed the Approved Budget with respect to such charges, out-of-pocket expenses, and other disbursements for the applicable period, after giving effect to Permitted Variance and (ii) after giving effect to Permitted Variance, Operator shall be solely responsible for any and all costs and expenses incurred by the Operator or associated with the Services.

**Section 4.2    Payment of Invoices**. Excluding amounts that are subject to dispute pursuant to Section 4.3, Owners shall pay within thirty (30) Business Days of Owners' receipt of an Invoice the amounts invoiced to such Owner by wire transfer of immediately available funds to the bank account designated by Operator. Adjustment credits or debits shall be shown on the Invoice next succeeding the Invoice in which the adjustment is made. Operator shall provide reasonable back-up and supporting documents related to any Invoice within five (5) Business Days of Owners' written request. Any preexisting obligation to make payment for the Services provided hereunder or out-of-pocket costs of Operator shall survive the termination of a Service and this

6

Agreement until paid. Owners shall have access to and the right to audit all records supporting such Invoiced amounts for the period set forth in Section 1.5.

**Section 4.3    Payment Disputes.** Owners may object to any Invoiced amounts for any Service at any time before, at the time of, or after payment is made.  Payment of any amount set forth in an Invoice shall not constitute approval thereof, or waive Owners' audit rights as set forth herein.  The Parties shall meet as expeditiously as possible to resolve any dispute. If the Parties fail to reach agreement in writing as to any disputed amounts invoiced by Operator under Section 4.1 above, upon written Notice of dispute to the other Party, either Party may submit the matters that remain in dispute to [_____] (the "Accounting Referee") for review and final and binding resolution.  If any Person selected as Accounting Referee is unable or unwilling to serve as a referee hereunder, then the Accounting Referee shall be selected by lot from among the independent national accounting firms that have not represented any Party or its Affiliates at any time during the three-year period of time immediately preceding its designation hereunder. Owners and the Operator shall, not later than seven (7) days prior to the hearing date set by the Accounting Referee, each submit a written brief to the Accounting Referee (and a copy thereof simultaneously to the other Party) with dollar figures for settlement of the disputes as to any amounts owed by Operator. The hearing will be scheduled as soon as is acceptable to the Accounting Referee, but not earlier than seven (7) days after the date for submission of the settlement briefs, and shall be conducted on a confidential basis. The Accounting Referee shall consider only those items or amounts which were identified in a notice in dispute delivered hereunder and which remain in dispute, together with the written briefs, and such other documents submitted therewith, and the Accounting Referee's decision resolving the matters in dispute shall be based upon and be consistent with the terms and conditions in this Agreement. In deciding any matter, the Accounting Referee (i) shall be bound by the provisions of this Section 4.3 and the related definitions and (ii) may not assign a value to any disputed item greater than the greatest value for such item claimed by either the Operator or Owners or less than the smallest value for such item claimed by the Operator or Owners in their respective calculations delivered hereunder. The Accounting Referee shall render a decision resolving the matters in dispute (which decision shall include a written statement of findings and conclusions) promptly after the conclusion of the hearing, unless the Parties reach agreement prior thereto and withdraw the dispute from the Accounting Referee.  The Accounting Referee shall provide to the Parties an explanation in writing of the reasons for its decisions regarding the amounts disputed in the applicable notice. The decision of the Accounting Referee shall be (i) final and binding on the Parties and (ii) final and non-appealable for all purposes hereunder.  Payment of any disputed amounts shall be made within fifteen (15) Business Days after the earlier to occur of (i) the Parties' agreement in writing as to such disputed amounts and (ii) the rendered decision of the Accounting Referee. The fees and expenses of the Accounting Referee under this Section 4.3 shall be borne one half by the Operator and one half by Owners. The fees and disbursements of Operator's independent auditors and other costs and expenses incurred in connection with the services performed with respect to any dispute under this Section 4.3 shall be borne by the Operator, and the fees and disbursements of Owners' independent auditors and other costs and expenses incurred in connection with the services performed with respect to any dispute under this Section 4.3 shall be borne by Owners.

**Section 4.4    Owner Default.** It shall constitute a default on behalf of an Owner (an "Owner Default") if such Owner fails to timely pay any Invoiced amount for Services provided

pursuant to this Agreement in accordance with the provisions of this <u>Article IV</u> or perform any covenants of such Owner hereunder, which failure, in the case of a payment default, continues undisputed for at least thirty (30) days following receipt of written Notice to such Owner that such Invoiced amount is past due or, in all other instances, at least sixty (60) days following receipt of written Notice to such Owner that such performance is required; provided, however, that if such Owner cannot reasonably cure such failure within such sixty (60) day period, no Owner Default shall be deemed to occur provided such Owner demonstrates that it has taken steps to cure such failure within such sixty (60) day period and diligently prosecutes such cure to completion.

**Section 4.5**    <u>**Operator Default**</u>. Subject to <u>Section 4.4</u> above, it shall constitute a default on behalf of Operator (an "<u>Operator Default</u>") if Operator fails to provide a Service to an Owner in accordance with the terms and conditions of this Agreement, which failure continues for at least ten (10) days following receipt of written Notice to Operator; provided, however, that if Operator cannot reasonably cure such failure within such ten (10) day period, no Operator Default shall be deemed to occur provided Operator demonstrates that it has diligently taken all reasonable steps to cure such failure within such ten (10) day period and diligently prosecutes such cure to completion; provided, however, any such failure that is not cured by Operator within thirty (30) days of Owner's written Notice shall be deemed an Operator Default.

**Section 4.6**    <u>**Sales Taxes**</u>.  Any sales taxes paid hereunder for Services that Operator is required to pay or incur shall be passed on to the Owner to which such Services are provided as an explicit surcharge and shall be paid by such Owner in addition to any Operator Compensation, whether included in the applicable Invoice, or added retroactively. If such Owner submits to Operator a timely and valid resale or other exemption certificate that is sufficient to support the exemption from sales taxes, then such taxes will not be added to the Operator Compensation payable pursuant to this <u>Article IV</u>; provided, however, that if Operator is ever required to pay such taxes, such Owner will promptly reimburse Operator for such tax, including any interest, penalties, and attorney's fees assessed thereon by the applicable Government Authority. The Parties will cooperate to contest any invalid sales taxes imposed on the Services and to minimize the imposition of any such sales taxes.

## ARTICLE V. TERM OF AGREEMENT

**Section 5.1**    <u>**Term**</u>. Unless earlier terminated as hereinafter provided, this Agreement will (i) have an initial term of [•] ([•]) years commencing on the Effective Date (the "<u>Initial Term</u>"), and (ii) automatically be renewed thereafter on a [year-to-year] basis until terminated as provided herein  (the "<u>Extension Term</u>" and together with the Initial Term, the "<u>Term</u>"), unless either Party gives the other Party written Notice of its intent not to renew this Agreement not less than one hundred twenty (120) days prior to the end of the Initial Term or Extension Term, as applicable; <u>provided, however,</u> that each Owner may, with or without cause and for any or no reason, terminate this Agreement applicable to any or all of the Assets owned by such Owner upon sixty (60) days prior written Notice to Operator.  Notwithstanding anything in this Agreement to the contrary, each Owner may discontinue certain Services as more particularly set forth on **Exhibit A**, and, upon such discontinuation, Owners may revise the Approved Budget accordingly.

8

## ARTICLE VI.                 TERMINATION

**Section 6.1      Owner Termination**. Each Owner may terminate this Agreement applicable to the Assets owned by such Owner sooner than described in Section 5.1 by Notice to Operator delivered not less than thirty (30) days before the effective of such termination (i) if an Owner incurs a Loss resulting from or associated with the Services and such Loss was the result of Operator's failure to meet the Standard of Performance set forth in Section 1.3; (ii) in the event of Operator Default; (iii) if Operator is guilty of negligence or misconduct in the performance of the Services; (iv) if any conviction of, or plea of nolo contendere to, any felony or to any crime or offense, including any involving acts of theft, fraud, embezzlement, moral turpitude, or similar conduct, by any officer of Operator, (v) if there is instituted by or against Operator any proceedings under the United States Bankruptcy Code, under any other bankruptcy law, or under any other law for the relief of debtors now or hereafter existing, or a receiver is appointed for all or substantially all of the assets of Operator, and such proceeding is not dismissed or such receiver is not discharged, as the case may be, within thirty (30) days thereafter; or (vi) if Operator shall (A) become insolvent, (B) generally fail to, or admit in writing its inability to, pay debts as they become due, (C) make a general assignment for the benefit of creditors or (D) apply for, consent to or acquiesce in, the appointment of a trustee, receiver, or other custodian.

**Section 6.2      Operator Termination**. Operator may terminate this Agreement sooner than described in Section 5.1 by Notice to Owners delivered not less than thirty (30) days before the effective of such termination (i) in the event of Owner Default that has continued unabated for 120 days after written Notice thereof has been delivered to such Owner and Apache Corporation ("Apache"); (ii) if there is instituted by or against Owners any proceedings under the United States Bankruptcy Code, under any other bankruptcy law, or under any other law for the relief of debtors now or hereafter existing, or a receiver is appointed for all or substantially all of the assets of Owners, and such proceeding is not dismissed or such receiver is not discharged, as the case may be, within thirty (30) days thereafter; or (iii) if Owners shall (A) become insolvent, (B) generally fail to, or admit in writing its inability to, pay debts as they become due, (C) make a general assignment for the benefit of creditors (excluding permitted assigns) or (D) apply for, consent to or acquiesce in, the appointment of a trustee, receiver, or other custodian; provided, however, that Operator may not terminate Services reasonably determined by Owners to be critical to the safety of the operation of the Assets until such time as Operator can make the Assets safe for handover to Owners or their designee.

**Section 6.3      Survival**. Upon termination of this Agreement, the provisions of this Agreement shall forthwith become void and the Parties shall have no liability or obligation with respect to provisions; provided, however, that the termination of this Agreement shall not relieve any Party from any expense, liability, or other obligation (including as to a breach of any provision hereof) or remedy hereof which has accrued or attached prior to the date of such termination; provided, however, that Article VI, Article VII, Section 1.4, Section 1.7, the second sentence of Section 1.3, and Owners' audit rights under Section 4.2 of this Agreement, together with such terms from Article VIII as are necessary or appropriate for the proper application of such surviving Articles, Sections, or provisions, shall survive such discontinuation or termination.

**Section 6.4      Transition of Operations**. Upon termination of this Agreement, Operator shall: (i) cooperate with Owners to facilitate a timely transition of all operations concerning the

9

Assets and the Services; (ii) promptly deliver to Owners, or its representative, to the extent in Operator's possession, copies of all documents, records, and other data related to the Assets in the Operator's possession, including, without limitation, information, data, know-how, interpretations, contracts, and other rights and privileges with respect to each Owner's wells, production, leases, and all Evaluation Data, Seismic Data, and Well Data to the Assets and other information reasonably requested by Owners, in each case, relating to the Assets or the Services performed by Operator hereunder to the extent such records and information are not already in the possession of Owners; (iii) promptly tender and pay to Owner all amounts received by Operator from Owners that are in the possession of Operator as of the effective date of such termination and relate to periods after the date of termination; and (iv) within sixty (60) days from the effective date of such termination, prepare and tender to Owners a final and complete statement setting forth all amounts, if any, that are due and owing to Operator in accordance with this Agreement.  For the purposes of this Agreement, the term "Evaluation Data" shall mean Seismic Data and other data and information relating to the Assets including, without limitation, to the extent applicable, relevant geological and geophysical interpretations and information, including the most recent reports, interpretations, and maps, and all specialty processing and analysis of Seismic Data (e.g., migration, AVO, etc.); the term "Seismic Data" shall mean any and all seismic data, two-dimensional multifold seismic data, three-dimensional seismic data, stacked and migrated processed sections, digital field tapes, stacked tapes, support data relating thereto, stick and quality control segments, receiver and bin center locations, stacking velocities, shothole drilling information, digital shotpoint locations, magnetic, surface, and other surveys, seismic sections, surface and subsurface maps, plats, charts, and any interpretations of any of the foregoing, or other like information customarily used in connection with oil and/or gas exploration; and the term "Well Data" shall mean any logs, core samples, other geological and geophysical data or similar data created during drilling operations, any engineering records or reports (including wellbore schematics), any drilling records or reports (including detailed daily drilling reports) and any related reports filed with the BOEM.

## ARTICLE VII.        INDEMNITIES

**Section 7.1    Operator's Indemnity Obligations**.     The  Operator  agrees  to **INDEMNIFY, DEFEND AND HOLD HARMLESS** Owners, their Affiliates, and their respective parent, subsidiary and affiliated companies, its and their joint owners, co-lessees, partners, joint venturers, and the officers, directors, agents, consultants, contractors, invitees, insurers and employees of all of the foregoing, and other representatives (each, an "Owner Indemnified Party") from and against any and all claims, causes of action, losses, demands, costs, expenses, penalties, or liabilities together with all costs and fees in connection with the same including reasonable attorneys' fees (collectively, "Losses"), and to reimburse each Owner Indemnified Party for all reasonable expenses as they are incurred in investigating, preparing, pursuing, or defending any claim, action, proceeding, or investigation (collectively, "Actions"), whether or not in connection with pending or threatened litigation and whether or not any Owner Indemnified Party is a party, in each case to the extent such Losses have resulted from an Operator Indemnified Party's (a) bodily injury, personal injury, or death, (b) loss or destruction of or damage to any Operator Indemnified Party's property of any kind, (c) performance of the Services in a manner that is inconsistent with the Standard of Performance set forth in Section 1.3, or (d) breach of this Agreement; *provided, however*, that such indemnity shall exclude Losses to the extent resulting from an Owner Indemnified Party's bad faith, fraud, gross negligence, or willful

10

misconduct or breach of this Agreement as determined by the final non-appealable judgment of a court of competent jurisdiction.

**Section 7.2    Owners' Indemnification Obligations**. The Owners agrees to **INDEMNIFY, DEFEND AND HOLD HARMLESS** Operator, its Affiliates, and its and their respective parent, subsidiary and affiliated companies, its and their joint owners, co-lessees, partners, joint venturers, and the officers, directors, agents, consultants, contractors, invitees, insurers and employees of all of the foregoing, and other representatives (each an "Operator Indemnified Party") from and against any Losses, and to reimburse each Operator Indemnified Party for all reasonable expenses as they are incurred in investigating, preparing, pursuing, or defending any Actions, whether or not in connection with pending or threatened litigation and whether or not any Operator Indemnified Party is a party, in each case to the extent such Losses have resulted from an Owner Indemnified Party's (a) bodily injury, personal injury, or death,  (b) bad faith, fraud, gross negligence, or willful misconduct, or (c) breach of this Agreement; *provided, however*, that such indemnity shall exclude Losses to the extent resulting from an Operator Indemnified Party's bad faith, fraud, gross negligence, or willful misconduct or breach of this Agreement.

**Section 7.3    Insurance Support**. Operator, as indemnitor, agrees to obtain, for the benefit of indemnitee, liability insurance and/or qualified self-insurance sufficient to support their indemnity obligations. If Operator fails to carry such insurance, then it is agreed that Operator has qualified self-insurance. The obligations in this Article VII are independent of and in addition to any other provisions in this Agreement, and shall not be prejudiced, reduced, or limited by any insurance coverage requirements or insurance coverage actually maintained.

**Section 7.4    Indemnification Procedure**. Whenever any claim arises for indemnification hereunder, the indemnified Person shall promptly notify the indemnifying Party of the claim and, when known, the facts constituting the basis for such claim, except that in the event of any claim for indemnification hereunder resulting from or in connection with any claim or legal proceedings by a third party, except as otherwise expressly provided in this Article VII, such Notice shall specify, if known, the amount or an estimate of the amount of the Losses asserted by such third party.  In connection with any claim giving rise to indemnity hereunder resulting from or arising out of any claim or legal proceeding by a third party, the indemnifying Party, may, upon Notice to the indemnified Person, assume the defense of any such claim or legal proceeding. Except with the written consent of the indemnified Person, the indemnifying Party shall not consent to the entry of any judgment or settlement arising from any such claim or legal proceedings which, in each case, provides for any non-monetary relief or does not include as an unconditional term thereof the giving by the claimant or the plaintiff to the indemnified Person of a release from all Losses in respect thereof, unless in the latter case the indemnifying Party has actually paid to the indemnified Person the full amount of such judgment or settlement.  Any indemnified Person shall be entitled to participate in (but not control) the defense of any such claim or litigation resulting therefrom.  If the indemnifying Party upon Notice to the indemnified Person does not elect to control the litigation as provided above, the indemnified Person may defend against such claim or litigation in such manner as it may deem appropriate, including, without limitation, settling such claim or litigation, after giving Notice of the same to the indemnifying Party, on such terms as such indemnified Person may deem appropriate, and the indemnifying Party shall

11

promptly reimburse the indemnified Person from time to time as such Losses are incurred.  All indemnification hereunder shall be effected by payment of cash or delivery of a certified or official bank check in the amount of the indemnification Losses.

**Section 7.5**      **Savings Provisions**.

(a)      If any provision contained in this Agreement conflicts with, is prohibited by or violates public policy under any federal, state, or other applicable Law determined to be applicable to a particular situation arising under or involving this Agreement or any Services hereunder, it is understood and agreed that the conflicting, prohibited, or violating provision shall be deemed automatically amended in that situation to the extent—but only to the extent—necessary to conform with, not be prohibited by, and avoid violating public policy under such applicable Law.  No other provisions of this Agreement shall be amended or affected thereby.  The Parties agree that the exculpatory, indemnification, and hold harmless provisions herein shall be modified or altered only insofar as required by a jurisdiction purporting to limit such provisions, it being the intention of both Parties to enforce to the fullest extent, all terms and conditions herein agreed to.

(b)      Section 7.5(a) applies to the extent, and only to the extent, that:

(i)      the Texas Oilfield Anti-Indemnity Act (or a similar statute of another jurisdiction, excluding Louisiana) applies to this Agreement or any Services performed hereunder and would render void, unenforceable, or voidable any obligations hereunder, including any set forth in Article VII; then each Party agrees to carry supporting insurance in equal amounts of the types and in the minimum amounts as specified in the insurance requirements hereunder and if a Party's insurance is deficient or unavailable for any reason, then such Party agrees and shall be deemed  to have approved self funded or self insurance. It is the intention of the Parties hereto that the Party to whom indemnity is owed will receive the benefit of such indemnity regardless of what may happen after this Agreement is signed that might affect the insurance required to be obtained by the Party owing the indemnity; or

(ii)      the Louisiana Oilfield Indemnity Act (La. R.S. 9:2780, as the same may be amended from time to time), applies to this Agreement or any Services performed hereunder and would render void, unenforceable, or voidable any obligations hereunder, including any set forth in Article VII; then each Party who would be the indemnified party under the indemnity provisions contained herein (the "Paying Party") shall have the option to pay to the underwriter(s) of the other Party who would be the indemnifying party ("Indemnitor" or "Primary Insured") the premium required by those underwriters to extend such Primary Insured's policies of liability insurance covering bodily injury or death as required by the  indemnity provisions of this Agreement, by (i) naming the Paying Party (and the other members of that Party's Group, being either the Operator Indemnified Parties or the

12

Owner Indemnified Parties, as required by the indemnity provisions of this Agreement) as additional insured(s), (ii) waiving subrogation against such additional insured(s), and (iii) designating such insurance as primary coverage on behalf of such additional insured(s). In the event that a Party makes this election, the Primary Insured will introduce the Paying Party to the Primary Insured's insurance broker(s)/agent(s) and those broker(s)/agent(s) will coordinate among the Paying Party and the Primary Insured's underwriters to facilitate the Paying Party's negotiation of such coverage, premium, billing, payment, notice, and renewal arrangements with those underwriter(s) as the Paying Party may, in its sole discretion, deem advisable.  All costs and expenses of and in connection with such arrangements shall be for the account of the Paying Party, and invoices and payments in respect of such arrangements shall be exchanged directly between the Paying Party and the Primary Insured's underwriters (directly or through such underwriters' authorized broker(s)/agent(s)).

## ARTICLE VIII.    MISCELLANEOUS

**Section 8.1    Force Majeure**.  In the event  that Operator is rendered unable, wholly or in part, by Force Majeure or other causes herein specified, to carry out all or any of its obligation under this Agreement, it is agreed that on Operator's delivery of written Notice, so far as Operator is prevented by such Force Majeure or other causes herein specified, Operator's obligation shall be suspended during the continuance of any inability so caused, and Operator will not be liable to Owners for any interruptions of service, any delays, or any failure to perform under this Agreement caused by such Force Majeure. For the avoidance of doubt, any delays, interruptions or failures to perform caused by such occurrences shall not be deemed to be a breach or failure to perform under this Agreement. The term "Force Majeure" means occurrences beyond the control of Operator and includes, without limiting the generality of the foregoing: acts of God, strikes, lockouts, or other industrial disturbances, acts of the public enemy, wars, blockades, insurrections, riots, landslides, lightning, earthquakes, fires, storms, hurricanes, tropical storms, loop currents, floods, washouts, arrests, and restraints of the Government, either federal or state, civil or military, civil disturbances, explosions, sabotage, malicious mischief, breakage or accident to machinery or lines of pipe, freezing of wells or lines of pipe, refusal or inability of resale owner(s) or transporter(s) to take deliveries due to events of Force Majeure, inability of Operator to obtain right-of-way, necessary materials, supplies, or permits not caused by the failure of Operator to pay for or negligence to obtain such rights-of-way, necessary materials, supplies, or permits, an order, directive, or restraint issued or imposed by any Governmental Authority, regulatory body or court having jurisdiction. It is understood and agreed that the settlement of strikes or other labor difficulties shall be entirely within the discretion of Operator. During the continuation of a Force Majeure event, Operator shall act diligently to overcome the impediments caused by such event and Operator will perform its obligations under this Agreement to the fullest extent possible under the circumstances during such Force Majeure and, thereafter, in full upon cessation of the Force Majeure.

**Section 8.2    Notices**. Any  notice, request, instruction, correspondence, or other document to be given hereunder by any Party to another (herein collectively called "Notice") shall be in writing and delivered in person or by courier service requiring acknowledgement of receipt

13

2" = "1" "015292.0000004 EMF_US 81940058v3" ""

or mailed by certified mail, postage prepaid and return receipt requested, or by overnight delivery service, as follows:

If to Owners:

       Fieldwood Energy I LLC
       ADDRESS
       Attn:
       Phone:

with a copy to:

       Apache Corporation
       2000 Post Oak Blvd, Suite 100
       Houston, TX  77056
       Attn: Brian Erickson
       Phone:  713-296-6000

If to Operator:

       [•]
       [•]
       [•]
       [•]

with a copy to:

       Apache Corporation
       2000 Post Oak Blvd, Suite 100
       Houston, TX  77056
       Attn: Brian Erickson
       Phone:  713-296-6000

Notice given by personal delivery or courier shall be effective upon actual receipt. Notice given by mail shall be effective upon actual receipt or, if not actually received, the fifth Business Day following deposit with the U.S. Post Office.  If a date specified herein for giving any Notice or taking any action is not a Business Day (or if the period during which any Notice is required to be given or any action taken expires on a date which is not a Business Day), then the date for giving such Notice or taking such action (and the expiration date of such period during which notice is required to be given or action taken) shall be the next day which is a Business Day. Any Party may change any address to which Notice is to be given to it by giving Notice as provided above of such change of address; provided that only Apache may change its address for copies and such copies may not be amended, discontinued, or delayed without Apache's express written consent.

       **Section 8.3**    **No Joint Venture or Partnership**. Nothing in this Agreement is intended to create, or shall be construed as creating, a partnership, joint venture, association for profit or

14

other business entity between or among the Parties, and for federal and state income tax purposes, the Parties elect to be excluded from the application of the provisions of Subchapter K, Chapter 1, Subtitle A of the Internal Revenue Code of 1986, as amended, as permitted and authorized by Section 761 of said Code and the regulations promulgated thereunder.

Section 8.4  **No Fiduciary Duty**.  It is expressly understood and agreed that this Agreement is a purely commercial transaction between the Parties and that nothing stated herein shall operate to create any fiduciary duty which a Party shall owe to the other Party, except with respect to the handling of cash by Operator on behalf of either Owner.

Section 8.5  **Entire Agreement**. This Agreement (together with the Exhibits hereto, including the Agency Agreement attached as **Exhibit D**) constitutes the entire agreement among the Parties with respect to the subject hereof and supersedes any other agreements, whether written or oral, that may have been made or entered into by the Parties or any of their respective Affiliates relating to the transactions contemplated hereby or the subject hereof. The Parties agree that Apache Corporation is a third-party beneficiary of Section 6.2 and Section 8.2 of this Agreement.

Section 8.6  **Successors and Assigns**. Except as otherwise provided herein, this Agreement shall be binding upon and inure to the benefit of the Parties hereto and their respective permitted successors, assigns, and legal representatives.

Section 8.7  **Assignment**.  This Agreement is personal to Operator, and Operator may not assign this Agreement without the prior written consent of Owners, which may be withheld by Owners for any reason or no reason in their sole discretion.  Any assignment or transfer in violation of the forgoing provisions shall be null and void.  No assignment or transfer of this Agreement shall relieve the assigning Party of any expense, liability, or other obligation (including as to a breach of any provision) or remedy hereof which has accrued or attached prior to the date of such assignment.

Section 8.8  **Amendment**.  This Agreement may be amended or modified in whole or in part, and terms and conditions may be waived, only by a duly authorized agreement in writing which makes reference to this Agreement executed by each Party.

Section 8.9  **Construction**.

(a)  All article, section, schedule, and exhibit references used in this Agreement are to articles and sections of, and Schedules and Exhibits to, this Agreement, unless otherwise specified. The schedules and exhibits attached to this Agreement constitute a part of this Agreement and are incorporated herein for all purposes.

(b)  Unless otherwise indicated, with respect to either Party, the terms "ordinary course of business" or "ordinary course" shall be deemed to refer to the ordinary conduct of business in a manner consistent with the past practices and customs of such Party.

(c)  If a term is defined as one part of speech (such as a noun), it shall have a corresponding meaning when used as another part of speech (such as a verb). Terms

defined in the singular have the corresponding meanings in the plural, and vice versa. Unless the context of this Agreement clearly requires otherwise, words importing the masculine gender shall include the feminine and neutral genders and vice versa. The words "include", "includes" or "including" do not limit the preceding terms and shall be deemed to be followed by the words "without limitation." The words "hereof," "hereto," "hereby," "herein," "hereunder" and words of similar import, when used in this Agreement, shall refer to this Agreement as a whole and not to any particular section or article in which such words appear. The term "or" is not exclusive.

(d)     The terms "day" and "days" mean and refer to calendar day(s). The terms "year" and "years" mean and refer to calendar year(s). The term "Business Day" shall mean any day other than a Saturday or a Sunday or a day on which federally chartered banking institutions in Houston, Texas, are authorized by Law to close, but for purposes of Notices or other communications given hereunder, means before 4:00 p.m. on such day in the city of Houston, Texas.

(e)     Operator and Owners have each participated in the negotiation and drafting of this Agreement, and, if an ambiguity should arise, this Agreement shall be construed as if drafted jointly by the Parties and no presumption or burden of proof shall arise favoring or burdening any Party by virtue of the authorship of any of the provisions in this Agreement.

(f)     The captions in this Agreement are for convenience only and shall not be considered a part of or affect the construction or interpretation of any provision of this Agreement.

(g)     All references to currency herein shall be to, and all payments required hereunder shall be paid in, United States Dollars.

(h)     The serial comma is sometimes included and sometimes omitted. Its inclusion or omission shall not affect the interpretation of any phrase.

**Section 8.10    Severability**. Subject to Section 7.5, if any provision of this Agreement is held invalid or unenforceable by any court of competent jurisdiction, the other provisions of this Agreement shall remain in full force and effect. The Parties further agree that if any provision contained herein is, to any extent, held invalid or unenforceable in any respect under the Laws governing this Agreement, they shall take any actions necessary to render the remaining provisions of this Agreement valid and enforceable to the fullest extent permitted by Law and, to the extent necessary, shall amend or otherwise modify this Agreement to replace any provision contained herein that is held invalid or unenforceable with a valid and enforceable provision giving effect to the intent of the Parties to the greatest extent legally permissible.

**Section 8.11    Counterparts**. This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. Any .pdf or other electronic transmission hereof or signature hereon shall, for all purposes, be deemed originals.

      **Section 8.12**   <u>**Governing Law**</u>. This Agreement shall be governed by, construed under, and enforced in accordance with the laws of the State of Texas without regard to the principles of conflicts of Laws that would direct the application of the Laws of another jurisdiction.

      **Section 8.13**   <u>**WAIVER OF JURY TRIAL**</u>.  EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATED TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

      **Section 8.14**   <u>**Disputes**</u>. Any disputes arising out of or relating to this Agreement shall be resolved exclusively by the state or federal courts located in Houston, Texas; and the Parties irrevocably submit to the jurisdiction and venue of such courts for such purposes.

*[Remainder of Page Intentionally Left Blank. Signature Page(s) to Follow.]*

2" = "1" "015292.0000004 EMF_US 81940058v3" ""

IN WITNESS WHEREOF, this Agreement has been signed by each of the Parties as of the date first above written.


**OPERATOR**:

[•]


By: _____
Name: _____
Title: _____


**OWNERS:**

FIELDWOOD ENERGY I LLC


By: _____
Name:
Title:


GOM SHELF LLC


By: _____
Name:
Title:

<u>**EXHIBIT A**</u>

<u>**TO CONTRACT SERVICES AGREEMENT**</u>

**SERVICES**

1.      **Asset Management Services**. Operator shall provide the following Services with respect to the Assets.

1.1     **Operating Services**.

      (a)      Services:

         (i)  Complying with, and causing the Assets to be operated in compliance with all state and federal Laws and regulations, including, but not limited to, following all required health, safety and environmental Laws, regulations and programs (such as SEMS), complying with all regulatory filing and reporting requirements, and obtaining all necessary permits.

        (ii)  Until the end of the Term, serve as contract operator of the Assets, in accordance with the terms hereof and any applicable operating agreements and similar contracts (if any), such Services may include:

            (A)      purchasing supplies, materials, tools, and equipment associated with the Assets, provided that the costs of which will be reimbursed by the applicable Owner to Operator in accordance with and subject to the Approved Budget, further, provided that without such Owner's prior written consent or express inclusion within the Approved Budget, Operator will not purchase any single item with respect to the Assets if such purchase would result in a charge or cost to such Owner greater than one million dollars ($1,000,000.00) for any single item or ten million dollars ($10,000,000.00) aggregate as to all such items in any consecutive twelve (12) month period.  Such Owner's consent shall be deemed granted unless such Owner notifies Operator to the contrary within ten (10) Business Days from such Owner's receipt of Operator's request;

            (B)      contracting for services associated with the physical operation of the Assets, provided that the costs associated with such services will be paid directly by the Owner of such Assets or reimbursed to Operator by such Owner, further, provided that without such Owner's prior written consent Operator will not contract for any of such services with respect to any of the Assets if such contract (1) is with an affiliate of Operator or (2) would obligate such Owner for a period more than ninety (90) days after the end of the Term with respect to the Operating Services. Such Owner's consent shall be deemed granted unless such Owner notifies Operator to the contrary within ten (10) Business Days from receipt of Operator's request;

(C)    executing, amending, or extending contracts associated with the physical operation of the Assets in the normal course of business, provided that the costs associated with such execution, amendment or extension of the contracts will be paid directly by the Owner of such Assets or reimbursed by such Owner to Operator, further, provided that without such Owner's prior written consent Operator will not contract for any of such services with respect to either of the Assets if such contract (1) is with an Affiliate of Operator; or (2) would obligate such Owner for a period more than ninety (90) days after the end of the Term with respect to the Operating Services. Such Owner's consent shall be deemed granted unless such Owner notifies Operator to the contrary within ten (10) Business Days from receipt of Operator's request;

(D)    functioning as operator under the applicable joint operating agreements, production handling agreements, and other similar operating agreements related to the Assets as agent for the Owner of such Assets with all rights and authority to communicate with co-lessees and non-operating parties and take all actions under the applicable agreement as if it were such Owner. Such Owner and Operator shall enter into an Agency Agreement in the form attached hereto as **Exhibit D** (the "Agency Agreement");

(E)    functioning as each Owner's agent under the applicable master service agreements, work orders, purchase orders and similar service contracts related to the Assets with all rights and authority to communicate with the service providers and take all actions under the applicable agreement as if it were such Owner, pursuant to the Agency Agreement; and

(F)    functioning as each Owner's agent in representing such Owner in its capacity as the owner of the Assets in all dealings and communications with Governmental Authorities, provided that such Owner reimburses Operator for any fees, fines, or penalties associated with such dealings and communications, further, provided that such Owner must approve in order for the Operator to agree to a fine or penalty in excess of one hundred twenty five thousand dollars ($125,000). Operator will provide such Owner copies of all correspondence with Governmental Authorities, other than routine correspondence, on a periodic basis or as requested by such Owner.

**1.2 Production Marketing, Marketing Services and Marketing Accounting Services**:

(a)    Services:

(i)     For each third party agreement with respect to the Assets that each Owner and Operator mutually agree, Operator shall function as the agent for such Owner with all rights and authority to communicate with the service providers and take all actions under the applicable agreement as if it were such Owner, pursuant to the Agency Agreement;

(ii)     Performing all marketing, gas control, crude oil and gas scheduling, contract administration, and other similar services necessary to sell production associated with the Assets in a manner substantially consistent with Operator's or its personnel's current general practices, provided that all marketing shall be at prices that are representative of market value. Operator will provide Owners summaries of the scheduled oil and gas or plant statements upon request;

(iii)     Performing all revenue and marketing accounting functions relating to the Assets, including the calculation and payment of royalty and overriding royalties, transportation, cash out, netback pricing, weighted average sales price, and other marketing accounting functions performed in the normal course of business; and

(iv)     Management of all lease of platform space agreements, production handling agreements, pipeline interconnect agreements, boarding agreements, midstream facility ownership and/or contract operating agreements, and other similar agreements.

## 1.3    Treasury and Accounting Services:

(a)     Each Owner may notify Operator in writing thirty (30) days prior to the end of any production month if such Owner wishes to terminate the Expenditure Accounting Services as of the end of such month, and such Services shall terminate at the close of accounting business for such production month.

(b)     Services:

(i)     Managing any bank accounts, trusts, etc. associated with the operation of the Assets;

(ii)     Performing all expenditure accounting functions relating to the Assets, including the payment of all invoices and subsequent billing of same to all working interest owners, AFE maintenance, and maintenance of property/cost center numbers;

(iii)   Managing the collection of any joint interest billings and revenue relating to the Assets;

(iv)   Performing all the calculations of severance, ad valorem/property, and sales and use taxes, but excluding state or federal income, margin, or excise taxes;

(v)   Performing all of the property, revenue, and royalty accounting services related to the Assets, including properly disbursing payments to and collecting payments from third parties and working interest, royalty, and overriding royalty owners as required by such accounting services as well as rental, severance or production taxes, right of way payments, leasehold, minimum or advance payments due in the normal course of business, and annual 1099 reporting as required by the Internal Revenue Service; and

(vi)   Performing all the calculations and preparation of monthly gas and oil balancing and payout statements in the ordinary course of business.

**1.4    Land Administration Services.**

(a)   Each Owner may notify Operator in writing thirty (30) days prior to the end of any month if such Owner wishes to terminate the Land Administration Services effective as of the end of such month and such Services shall terminate at the end of such month.

(b)   Services:

(i)   Administering and maintaining all leases and agreements relating to the Assets;

(ii)   Maintaining and updating all lease, ownership, contract, and property records and databases relating to the Assets;

(iii)   Maintaining and updating all royalty payment reports and databases;

(iv)   Maintaining and updating all royalty suspense accounts, reports and databases and administering escheat duties in accordance with established State rules and regulations;

(v)   Maintaining and updating all accounts, reports and databases associated with compulsory pooled interests related to the Assets;

(vi)     Generating, verifying, processing, approving, and signing all internal and external division orders and transfer orders required in the normal course of business;

(vii)    Identifying, paying and appropriately invoicing all rentals, surface, right of way, shut-in payments, and other payments required by the leases or other agreements relating to the Assets;

(viii)   Maintaining all land, contract, division of interest, lease files, and other files relating to the subject land administration functions; and

(ix)     Such other administrative services as Operator administered or caused to be administered to maintain the leases or agreements relating to the Assets.

**1.5     Supply Chain**.

(a)     Each Owner may notify Operator in writing ten (10) Business Days prior to the end of any month if such Owner wishes to terminate the applicable Services as of the end of such Month and such Services shall terminate at the end of such month.

(b)     Services.

(i)     Operator shall provide procurement services with respect to the Assets;

(ii)    Except as it relates to marketing contracts, which shall be covered by Section 1.2 of this **Exhibit A**, Operator shall provide Contract Administration Services with respect to the Assets; and

(iii)   Operator shall function as the agent for each Owner with all rights and authority to communicate with the service providers and take all actions under the applicable agreement as if it were such Owner, pursuant to the Agency Agreement.

**2.     Hourly Services**. Operator shall provide the following Services with respect to the Assets in a manner substantially consistent with Operator's general practices for similarly situated assets:

**2.1     Legal.**

(a)     Each Owner may discontinue these Services by providing Operator ten (10) days prior written Notice of its desire to do so, and such Services shall terminate at the end of such ten (10) day period.

(b)     Services.

(i)    Review and negotiation of contracts with service providers and other third parties;

(ii)    Management of litigation, government investigations, and other disputes as directed by such Owner; and

(iii)    Directing outside counsel engaged by such Owner in providing advice and counsel to such Owner with respect to the Assets and the various legal matters that may arise from time to time related thereto.

**2.2**    **Finance and Tax.**

(a)    Each Owner may discontinue these Services by providing Operator ten (10) days prior written Notice of its desire to do so, and such Services shall terminate at the end of such ten (10) day period.

(b)    Services.

(i)    Preparation of projections, analyses, and reports related to the Assets;

(ii)    Review and negotiation of financing agreements, including hedging agreements; and

(iii)    Preparation and administration of all federal, state, and local tax processes, including the preparation of appropriate tax returns and/or directing outside tax preparers in the preparation of any tax matters and/or activities related to the Assets.

**2.3**    **Insurance.**

(a)    Each Owner may discontinue these Services by providing Operator ten (10) days prior written Notice of its desire to do so, and such Services shall terminate at the end of such ten (10) day period.

(b)    Services.

(i)    Review and negotiation of insurance documents and agreements, including bonds, insurance policies, and similar agreements;

(ii)    Management of any claims made or to be made under the applicable insurance policies, bonds, and similar agreements as directed by such Owner; and[1]

---

[1] [NTD: To confirm in which party's name the insurance contracts will be.]

Exhibit A – Page 6
Contract Services Agreement

(iii)    Procure and maintain insurance coverages that are customary for a reasonably prudent operator with properties, equipment, and other assets similar to the Assets and operations in the Gulf of Mexico and in amounts commensurate with operations and obligations in this Agreement. Such requirements shall include, but shall not be limited to, insurance as required by applicable Law.

**2.4**    **Financial Reporting and Audit Services.**

(a)    Each Owner may discontinue these Services by providing Operator ten (10) days prior written Notice of its desire to do so, and such Services shall terminate at the end of such ten (10) day period.  The terms of Section 2.4 (c)(i) shall survive the termination of this Agreement for such period of time as is necessary for such Owner or its representatives to conduct the review and audit of financial statements prepared under Section 2.4 (c)(ii) or for the review and audit of financial statements prepared subsequent to discontinuation of Services where financial results are included for the applicable periods the Services were provided.

(b)    Services.

(i)    [Facilitate and coordinate the review and audit of such Owner's business records in the normal course of business or as required in accordance with the terms of the Limited Liability Agreement of Fieldwood Energy I LLC;][2]

(ii)    Preparing financial statements and/or directing outside accounting personnel in the preparation and maintenance of audit reports and financial statements and any required filings or reporting in accordance with the terms of the Limited Liability Agreement of Fieldwood Energy I LLC; and

(iii)    Auditing the books and records of third parties related to activities under operating, production handling, and other similar agreements in the normal course of business or as reasonably requested by such Owner.

*[Remainder of Page Intentionally Left Blank]*

---

[2] [NTD: Assumes Operator will facilitate 3rd party audits for financial reporting and for COPAS JV audits.]

**<u>EXHIBIT B</u>**

**<u>TO CONTRACT SERVICES AGREEMENT</u>**

DECOMMISSIONING PLAN

**<u>EXHIBIT C</u>**

**<u>TO CONTRACT SERVICES AGREEMENT</u>**

OPERATOR REPRESENTATIVES LIST

[NTD: List will include name, title and contact information for the individuals in charge of performing each Service.]

Exhibit C – Page 1
Contract Services Agreement

**<u>EXHIBIT D</u>**

**<u>TO CONTRACT SERVICES AGREEMENT</u>**

FORM OF AGENCY AGREEMENT

## AGENCY AGREEMENT

This Agency Agreement (this "Agreement"), effective as of 12:01 a.m. Central Time on ("Effective Date"), is by and between [•], a [•] ("Operator"), and Fieldwood Energy I LLC, a Texas limited liability company ("Fieldwood Energy I") and GOM Shelf LLC, a Delaware limited liability company ("GOM Shelf"). Fieldwood Energy I and GOM Shelf are each referred to herein as "Owner" and collectively as "Owners". Each capitalized term not defined herein shall have the meaning ascribed to such term in that certain Contract Services Agreement dated as of _____, 202_ (the "Contract Services Agreement") between Operator and Owners.

WHEREAS, of even date herewith, Operator and Owners entered into that certain Contract Services Agreement, which agreement provides for Operator to provide Owner certain services related Owners' interests in the Assets; and

WHEREAS, Operator and Owners desire that Operator administer those certain services described on **Exhibit A** to the Contract Services Agreement; and

WHEREAS, subject to the limitations and obligations of Operator pursuant to this Agreement and the Contract Services Agreement, Owners desire that Operator act as agent for Owners for all matters related to certain of the third-party agreements set forth on Attachment 1 of this Agreement (the "Third Party Contracts") and related to representation of Owners as the owner of the Assets in all dealings and communications with Governmental Authorities, or as may be mutually agreed upon from time to time by Owners and Operator in writing.

**NOW THEREFORE**, in consideration of the mutual premises, covenants, and agreements contained herein, the benefits to be derived by each party hereunder and other good and valuable consideration, the receipt and adequacy of which is hereby acknowledged, Operator and Owners hereby agree as follows:

1.      **Appointment of Agent**. Subject to the limitations and obligations of Operator pursuant to this Agreement and the Contract Services Agreement, Owners hereby appoints Operator, and Operator hereby accepts and agrees to act as the agent for Owners, in all respects, under the Third Party Contracts and in all dealings and communications with any Governmental Authorities related to the Assets or operations related thereto. Unless expressly permitted by Owners or to the extent permitted under the Contract Services Agreement, no other party shall be authorized to act on behalf of Owners with respect to such Third Party Contracts. Operator's authority as agent for Owners shall be subject to the following limitations and obligations:

(a)      Operator shall hold such Third Party Contracts for the benefit of Owners and shall exercise all rights available to Operator with respect to such third-party agreements in accordance with the Contract Services Agreement;

(b)      Operator shall maintain and keep such Third Party Contracts in full force and effect;

(c)      Operator shall not transfer, sell, hypothecate, encumber, relinquish, or cause the termination of such Third Party Contracts;

(d)      Operator shall not amend, or extend any of such Third Party Contracts, except as allowed in the Contract Services Agreement;

(e)      The foregoing notwithstanding, Operator does not assume any obligation under any Third Party Contract and shall not be deemed to have assumed any such obligation under the Third Party Contract by reason of acting as Owners' agent hereunder or by the existence of this Agreement, except as set forth in the Contract Services Agreement; and

(f)      With respect to dealings and communications with Governmental Authorities, Operator shall act in a manner consistent with the limitations of the Contract Services Agreement.

Requests for approval of any action restricted by this Agreement shall be delivered to the Sole Manager of Fieldwood Energy I on behalf of Owners, provided that Operator may take whatever actions it deems in good faith to be required in the event of an emergency.

**2.      Indemnity.** The indemnity obligations of Operator and Owners in Section 1.7 and Article 7 of the Contract Services Agreement shall apply to this Agreement, *mutatis mutandis.*

**3.      Power of Attorney.**  This Agreement shall serve as a general power of attorney. Owners hereby grants Operator, and Operator hereby accepts, a power of attorney for Operator to serve as the attorney-in-fact and agent for Owners and to take any and all actions to effectuate the purpose and activities described in the Contract Services Agreement including, but not limited to, taking certain actions under the Third Party Contracts, entering into any agreement, and representing Owners in all dealings and communications with Governmental Authorities related to the Assets or operations related thereto.  This power of attorney is subject to the limitations of the Contract Services Agreement and this Agreement and shall terminate upon the termination of this Agreement.

**4.      Miscellaneous Provisions.**

(a)      Term. The authority for Operator to act as Owners' agent shall be effective as of the date hereof and shall terminate and be revoked as to each such third-party agreement at the end of the Term for each applicable Service as set forth in the Contract Services Agreement, unless sooner revoked by Notice in writing from Owners to Operator and to each third party no longer entitled to rely on the agency created by this Agreement.

(b)      Contract Services Agreement. This Agreement is being entered into in conjunction with the Contract Services Agreement whereby Operator shall provide certain Services as such term is defined therein. Operations of the oil and gas properties and collection and disbursement of all revenues and payment of expenses associated with such third-party agreements will be handled in accordance with the Contract Service Agreement.

(c)      Entire Agreement. This Agreement constitutes the full understanding of Operator and Owners and a complete and exclusive statement of the terms and conditions of the agreement relating to the subject matter hereof and supersedes all prior negotiations,

understandings, and agreements, whether written or oral, between Operator and Owners with respect thereto. This Agreement does not modify or amend any terms or provisions of the Contract Services Agreement. Notwithstanding anything herein to the contrary, in the event of any conflict between that the terms of this Agreement and terms of the Contract Services Agreement, the terms of the Contract Services Agreement or any agreement contemplated thereby shall prevail.

(d)     Amendments. No alteration, modification, amendment, or change in this Agreement shall be effective or binding on any party unless the same is in writing and is executed by Operator and Owners.

(e)     Enforceability. This Agreement shall be enforceable by and against Operator, Owners, and their respective heirs, successors, permitted assignees, and legal representatives.

(f)     Assignment. This Agreement is personal to the parties hereto.  Operator shall not assign, convey, transfer or otherwise dispose of all or any portion of its interest in, or its rights and obligations under, this Agreement without the prior written consent of the other party or parties unless such assignment is permitted under the Contract Services Agreement.  Any attempted assignment without appropriate consent shall be voidable at the sole discretion of the non-assigning party.

(g)     Governing Law. This Agreement shall be governed by, construed under, and enforced in accordance with the laws of the State of Texas without regard to the principles of conflicts of Laws that would direct the application of the Laws of another jurisdiction.

(h)     Disputes. Any disputes arising out of or relating to this Agreement shall be subject to the terms set forth in Section 8.13 and Section 8.14 of the Contract Services Agreement.

(i)     Multiple Counterparts. This Agreement may be executed, either originally or by electronic reproduction, by the parties hereto in multiple counterparts, each of which shall be deemed an original for all purposes, and all of which together shall constitute one and the same instrument.

*[Remainder of page intentionally left blank; signature page follows.]*

This Agreement is executed and delivered by Operator and Owners effective as of the Effective Date.


OPERATOR:

[•]


By: _____
Name: _____
Title:  _____


OWNERS:

FIELDWOOD ENERGY I LLC


By: _____
Name: _____
Title:  _____


GOM SHELF LLC


By: _____
Name: _____
Title:  _____

STATE OF TEXAS                                    §

COUNTY OF HARRIS                                  §

       This instrument was acknowledged before me on this____ day of _____, by _____, as _____ of [•], a [•], on behalf of said company.

_____
Notary Public in and for the State of _____

STATE OF TEXAS                                    §

COUNTY OF HARRIS                                  §

This instrument was acknowledged before me this ___ day of _____, by _____, known to me to be the person whose name is subscribed to the foregoing instrument as _____ of Fieldwood Energy I LLC, a Texas limited liability company, on behalf of said company.

_____
Notary Public in and for the State of Texas

STATE OF TEXAS                                    §

COUNTY OF HARRIS                                  §

This instrument was acknowledged before me this ___ day of _____, by _____, known to me to be the person whose name is subscribed to the foregoing instrument as _____ of GOM Shelf LLC, a Delaware limited liability company, on behalf of said company.

_____
Notary Public in and for the State of Texas

**ATTACHMENT 1**

**TO AGENCY AGREEMENT**

THIRD-PARTY AGREEMENTS

[NTD:  These are specific marketing, transportation and processing and other service agreements.]

**<u>EXHIBIT E</u>**

**<u>TO CONTRACT SERVICES AGREEMENT</u>**

INITIAL ANNUAL BUDGET

**<u>EXHIBIT F</u>**

**<u>TO CONTRACT SERVICES AGREEMENT</u>**

APPROVED TWCF BUDGET

**EXHIBIT G**

**TO CONTRACT SERVICES AGREEMENT**

FORM OF AFE

**<u>EXHIBIT H</u>**

**<u>TO CONTRACT SERVICES AGREEMENT</u>**

OPERATOR COMPENSATION

**<u>SCHEDULE I</u>**

**<u>TO CONTRACT SERVICES AGREEMENT</u>**

**ASSETS**

**Exhibit 22**

**Credit Bid Purchase Agreement Terms**

The terms set forth below are acceptable to Apache and the Debtors to address the Specified Credit Bid Terms in the Credit Bid Purchase Agreement (or an alternative purchase and sale agreement conveying the Credit Bid Acquired Interests to a buyer):

(i)     Credit Bid Purchaser (or an alternative purchaser under a purchase and sale agreement conveying the Credit Bid Acquired Interests to a buyer) ("**Buyer**") shall assume the Credit Bid Assumed Liabilities, which will include all liabilities and obligations of FWE for (x) Closing Date Payables (as defined below), (y) obligations for personal injury or damage to third party property arising from the ownership or operation of the FWE I Assets (as defined in the Plan of Merger) or the GOM Shelf Oil and Gas Properties (as defined in the Plan of Merger) for which a claim has been made prior to 7:00 a.m. on the Effective Date, but only to the extent of the deductible or retention amount under applicable insurance policies covering such claims, and (z) the FWE II Retained Properties Payables (as defined below), and the Purchase Agreement will include an obligation of Buyer to pay, or to cause to be paid, all Credit Bid Assumed Liabilities and the closing date payables of GOM Shelf and FW GOM Pipeline Inc. (with such closing date payables to be determined consistent with Closing Date Payables).

(ii)     FWE I shall have the right to send all invoices it receives for any of the Credit Bid Assumed Liabilities and all closing date payables of GOM Shelf and FW GOM Pipeline Inc. (with such closing date payables to be determined consistent with Closing Date Payables) to Buyer for payment.

(iii)     The Purchase Agreement shall define "Closing Date Payables" as expenses of FWE incurred but not yet paid as of 7:00 a.m. on the Effective Date attributable to the FWE I Oil and Gas Properties (as defined in the Plan of Merger) and the GOM Shelf Oil and Gas

Properties, including, without limitation, (w) payables arising from the exploration of and production and sale of oil and gas from the FWE I Oil and Gas Properties and the GOM Shelf Oil and Gas Properties, (x) payables to third parties on account of third party working interest owners for which a joint interest billing receivable is included in the Closing Accounts Receivable (as defined below), (y) obligations for Royalties (as defined in the Plan of Merger) in respect of the FWE I Assets or the GOM Shelf Oil and Gas Properties payable on account of Hydrocarbons (as defined in the Plan of Merger,) produced and sold prior to and unpaid as of 7:00 a.m. on the Effective Date (provided that if a Royalty reporting, miscalculation, or underpayment claim is asserted after 7:00 a.m. on the Effective Date with respect to any Royalty paid prior to 7:00 a.m. on the Effective Date such claim or obligation shall not be deemed a Closing Date Payable, except to the extent any reporting, miscalculation, or underpayment claim totals more than one million U.S. dollars ($1,000,000) and arises out of the willful misconduct of the person or persons performing such reporting, calculations, or payments as determined by a final, non-appealable judgment of a court or other tribunal having jurisdiction), and (z) fines and penalties levied or imposed by governmental authorities prior to 7:00 a.m. on the Effective Date in respect of the FWE I Assets or the GOM Shelf Oil and Gas Properties to the extent not otherwise covered by a settlement with applicable governmental authorities entered into prior to the Effective Date that fully excuses payment (other than as provided in such settlement and for which FWE I shall have no obligation) of such fines and penalties, whether classified on the books and records as an account payable or otherwise; ***provided, that,*** the definition of "Closing Date Payables" in the Purchase Agreement shall expressly exclude (1) obligations for FWE I Suspense Funds (as defined in the Plan of Merger), (2) Interim Unpaid P&A Expenses (as defined in the Plan of Merger), (3) obligations to pay Royalties on Hydrocarbons produced from FWE I Oil and Gas Properties or

GOM Shelf Oil and Gas Properties and sold from and after 7:00 a.m. on the Effective Date, (4) obligations for damage to property included in the FWE I Assets or the GOM Shelf Oil and Gas Properties, (5) fines or penalties levied or imposed by governmental authorities after 7:00 a.m. on the Effective Date with respect to the FWE I Oil and Gas Properties or the GOM Shelf Oil and Gas Properties, (6) P&A Obligations and Decommissioning (as defined in the Plan of Merger) expenses, or (7) obligations satisfied, compromised, settled, released or discharged pursuant to the Plan and Confirmation Order

(iv)    All payables of FWE arising from the exploration of and production and sale of oil and gas from the Retained Properties, including payables to third parties on account of third party working interest owners for which a joint interest billing receivable is included in the accounts receivable of FWE in respect of the Retained Properties (such accounts receivable, the "**Retained Properties AR**"), incurred prior to and unpaid as of 7:00 a.m. on the Effective Date, whether classified on the books and records as an account payable or otherwise (such payables, the "**Retained Properties Payables**"), will also be assumed by, and will constitute Credit Bid Assumed Liabilities of, Buyer pursuant to the Purchase Agreement (and the Retained Properties, and the Retained Properties AR will be assigned to Buyer pursuant to the Purchase Agreement and will constitute Credit Bid Acquired Interests in the same manner as will Closing Accounts Receivable (excluding any obligation of the type described in Section 3(b) of the Plan of Merger). In addition FWE II will assume all obligations on the Retained Properties on a go-forward basis following the consummation of the credit bid sale transaction to the Credit Bid Purchaser.

(v)    FWE (and, following consummation of the Divisive Merger, FWE III) will use efforts consistent with past practice to collect Closing Accounts Receivable (including by offsetting amounts owed to FWE under applicable joint operating agreements or otherwise) and

remit proceeds collected (including by offset), net of any cost of collection incurred by FWE III or FWE I, to Buyer, provided neither FWE III nor FWE I shall be obligated to incur any costs or institute any legal proceedings to collect Closing Accounts Receivable.  Buyer will agree that Buyer and its subsidiaries shall pay (and shall indemnify and hold harmless FWE (and following consummation of the Divisive Merger, FWE I and FWE III) from and against) any and all Credit Bid Assumed Liabilities.

(vi)     The accounts receivable to be assigned to Buyer pursuant to the Credit Bid Purchase Agreement ("**Closing Accounts Receivable**") will include all accounts receivable of FWE attributable to the FWE I Oil and Gas Properties or the GOM Shelf Oil and Gas Properties (as defined in the Plan of Merger) as of 7:00 a.m. on the Effective Date, including all accounts receivable attributable to the sale of oil or gas produced and sold from the FWE I Oil and Gas Properties or the GOM Shelf Oil and Gas Properties prior to 7:00 a.m. on the Effective Date and joint interest billing receivables for expenses paid by FWE as of 7:00 a.m. on the Effective Date or for which a payable is included in the Closing Date Payables but expressly excluding receivables as described in item (xiv) and clauses (ii)-(v) of item (xvi) of Part A of Schedule I of the Plan of Merger, Prepaid JIB Cash Amount (as defined in the Plan of Merger), and JIB Advance AR (as defined in the Plan of Merger).  The Purchase Agreement will provide that Buyer and its subsidiaries shall pay (and shall indemnify FWE I and FWE III against) any and all Credit Bid Assumed Liabilities.  FWE will also assign the FWE II Retained Properties AR to Buyer as part of the Credit Bid Acquired Interests.

**<u>Exhibit 23</u>**

**Spill Control Membership Agreements**

Deepwater:  HWCG (membership), NRC (MSA)

FW1:  Clean Gulf (membership), Forefront (MSA), and TRG (MSA)

**<u>Exhibit I</u>**

**First Lien Exit Facility Agreement**

*Current Draft 6/14/21*
*(Subject to further review and comment)*

$118,599,082.31

**THIRD AMENDED AND RESTATED FIRST LIEN TERM LOAN AGREEMENT**

Dated as of [●], 2021,

Among

[NEWCO],
as Holdings,

[●],
as the Borrower,

The Several Lenders
from Time to Time Parties Hereto,

and

GOLDMAN SACHS BANK USA,
as the Administrative Agent and the Collateral Agent

# TABLE OF CONTENTS

Page

## ARTICLE I

Definitions....................................................................................................2
SECTION 1.01.    Defined Terms ..............................................2
SECTION 1.02.    Terms Generally............................................50
SECTION 1.03.    Accounting Terms.........................................50
SECTION 1.04.    Rounding.......................................................51
SECTION 1.05.    Times of Day.................................................51
SECTION 1.06.    Timing of Payment or Performance..............51
SECTION 1.07.    Hedging Requirements Generally; Hedge Unwinding ......51
SECTION 1.08.    Certain Determinations .................................51
SECTION 1.09.    Making or Maintaining LIBOR Loans ...........51
SECTION 1.10.    Divisions .......................................................53
SECTION 1.11.    Deemed Funding of Loans.............................53
SECTION 1.12.    Certain Calculation and Tests .......................53

## ARTICLE II

The Credits....................................................................................................54
SECTION 2.01.    Loans.............................................................54
SECTION 2.02.    Existing Loans ..............................................54
SECTION 2.03.    Notice of Borrowing .....................................54
SECTION 2.04.    Repayment of Loans; Evidence of Debt ........55
SECTION 2.05.    Other Fees ....................................................56
SECTION 2.06.    Interest..........................................................56
SECTION 2.07.    Interest Periods.............................................57
SECTION 2.08.    Increased Costs, Illegality, etc .....................57
SECTION 2.09.    Compensation ...............................................58
SECTION 2.10.    Change of Lending Office .............................58
SECTION 2.11.    Notice of Certain Costs.................................59
SECTION 2.12.    Voluntary Prepayments..................................59

i

SECTION 2.13.    Mandatory Prepayments ....................................................59

SECTION 2.14.    Method and Place of Payment ..........................................61

SECTION 2.15.    Net Payments .....................................................................62

SECTION 2.16.    Limit on Rate of Interest ..................................................65

SECTION 2.17.    Pro Rata Sharing ...............................................................66

SECTION 2.18.    Adjustments; Set-off .........................................................66

SECTION 2.19.    Interest Elections...............................................................66

## ARTICLE III

Representations and Warranties.............................................................................68

SECTION 3.01.    Corporate Status................................................................68

SECTION 3.02.    Corporate Power and Authority; Enforceability; Security Interests ..............................................................................68

SECTION 3.03.    No Violation; Compliance with Laws ...............................68

SECTION 3.04.    Litigation...........................................................................68

SECTION 3.05.    Margin Regulations............................................................69

SECTION 3.06.    Governmental Approvals....................................................69

SECTION 3.07.    Investment Company Act ..................................................69

SECTION 3.08.    True and Complete Disclosure; Financial Condition.........69

SECTION 3.09.    Tax Matters .......................................................................69

SECTION 3.10.    Compliance with ERISA....................................................69

SECTION 3.11.    Capital Stock and Ownership............................................70

SECTION 3.12.    Intellectual Property..........................................................70

SECTION 3.13.    Environmental Laws .........................................................70

SECTION 3.14.    Properties ..........................................................................71

SECTION 3.15.    Solvency............................................................................71

SECTION 3.16.    Anti-Corruption Laws.......................................................72

SECTION 3.17.    Anti-Terrorism and Anti-Money Laundering Laws; Sanctions ..........................................................................72

SECTION 3.18.    Gas Imbalances, Prepayments ..........................................73

SECTION 3.19.    Marketing of Production ...................................................73

SECTION 3.20.    Hedge Agreements.............................................................73

SECTION 3.21.    Senior Indebtedness ..........................................................73

ii

SECTION 3.22.    Defaults ...........................................................................73

SECTION 3.23.    Labor Relations ................................................................73

SECTION 3.24.    Insurance ..........................................................................73

SECTION 3.25.    Material Contracts.............................................................73

**ARTICLE IV**

Conditions Precedent ..................................................................................74

SECTION 4.01.    Conditions Precedent to Effectiveness of this Agreement.74

**ARTICLE V**

Covenants....................................................................................................77

SECTION 5.01.    Information Covenants.......................................................77

SECTION 5.02.    Environmental Covenants..................................................81

SECTION 5.03.    End of Fiscal Years; Fiscal Quarters .................................83

SECTION 5.04.    Use of Proceeds.................................................................83

SECTION 5.05.    Change in Business ...........................................................83

SECTION 5.06.    Limitation on Incurrence of Indebtedness and Issuance of Disqualified Stock and Preferred Stock.............................83

SECTION 5.07.    Limitation on Restricted Payments....................................87

SECTION 5.08.    Dividend and Other Payment Restrictions Affecting Subsidiaries.......................................................................90

SECTION 5.09.    Asset Sales ........................................................................92

SECTION 5.10.    Transactions with Affiliates...............................................93

SECTION 5.11.    Mergers, Etc ......................................................................95

SECTION 5.12.    Future Guarantors ..............................................................96

SECTION 5.13.    Liens..................................................................................96

SECTION 5.14.    Compliance with Material Contracts ..................................96

SECTION 5.15.    Existence; Business and Properties.....................................96

SECTION 5.16.    Maintenance of Insurance ..................................................96

SECTION 5.17.    Additional Collateral..........................................................97

SECTION 5.18.    Payment of Taxes, etc ........................................................98

SECTION 5.19.    Compliance with Laws ......................................................98

SECTION 5.20.    Further Instruments and Acts..............................................98

SECTION 5.21.    Books, Records and Inspections .........................................99

iii

SECTION 5.22.    ERISA ............................................................................99

SECTION 5.23.    Hedge Agreements; Swap Agreements ...........................100

SECTION 5.24.    Lender Meetings ...............................................................101

SECTION 5.25.    Limitations on Amendments.............................................101

SECTION 5.26.    Reserve Reports ................................................................101

SECTION 5.27.    Holdings Covenant............................................................102

SECTION 5.28.    Financial Covenants..........................................................103

SECTION 5.29.    Foreign Subsidiaries; Closing Date Unrestricted
Subsidiary .........................................................................103

SECTION 5.30.    Account Control Agreements ...........................................103

SECTION 5.31.    Gas Imbalances, Take-or-Pay or Other Prepayments......103

SECTION 5.32.    Marketing of Production...................................................103

SECTION 5.33.    Dutch Distributions...........................................................103

SECTION 5.34.    Post-Closing Obligations ..................................................104

**ARTICLE VI**

Events of Default ......................................................................................................104

SECTION 6.01.    Events of Default ..............................................................104

SECTION 6.02.    Application of Proceeds....................................................106

SECTION 6.03.    Control by Majority ..........................................................106

SECTION 6.04.    Limitation on Suits............................................................107

SECTION 6.05.    Cure Rights .......................................................................107

**ARTICLE VII**

The Agents.................................................................................................................108

SECTION 7.01.    Appointment .....................................................................108

SECTION 7.02.    Delegation of Duties .........................................................109

SECTION 7.03.    Exculpatory Provisions .....................................................110

SECTION 7.04.    Reliance by Agents ...........................................................110

SECTION 7.05.    Notice of Default...............................................................111

SECTION 7.06.    Non-Reliance on Administrative Agent, Collateral Agent
and Other Lenders.............................................................111

SECTION 7.07.    Indemnification .................................................................112

SECTION 7.08.    Agents in Their Individual Capacity.................................112

iv

SECTION 7.09.    Successor Agents ................................................................113

SECTION 7.10.    Payments Set Aside............................................................113

SECTION 7.11.    Bankruptcy Plan Voting......................................................114

SECTION 7.13.    Administrative Agent May File Proofs of Claim.............114

SECTION 7.14.    Collateral Matters...............................................................114

SECTION 7.15.    Intercreditor Agreement and Other Collateral Matters....115

SECTION 7.16.    Withholding Tax .................................................................115

SECTION 7.17.    Erroneous Payment ............................................................116

**ARTICLE VIII**

Miscellaneous ........................................................................................................118

SECTION 8.01.    Amendments and Waivers ...............................................118

SECTION 8.02.    Notices ................................................................................120

SECTION 8.03.    No Waiver; Cumulative Remedies ...................................121

SECTION 8.04.    Survival of Representations and Warranties....................121

SECTION 8.05.    Payment of Expenses; Indemnification ...........................121

SECTION 8.06.    Successors and Assigns; Participations and
                         Assignments........................................................................123

SECTION 8.07.    Replacements of Lenders Under Certain Circumstances.127

SECTION 8.08.    Counterparts .......................................................................127

SECTION 8.09.    Severability ........................................................................128

SECTION 8.10.    GOVERNING LAW...........................................................128

SECTION 8.11.    Submission to Jurisdiction; Consent to Service;
                         Waivers ...............................................................................128

SECTION 8.12.    Acknowledgments...............................................................129

SECTION 8.13.    WAIVERS OF JURY TRIAL ...........................................129

SECTION 8.14.    Confidentiality ...................................................................129

SECTION 8.15.    No Advisory or Fiduciary Responsibility.........................130

SECTION 8.16.    USA PATRIOT Act............................................................131

SECTION 8.17.    Conversion of Currencies .................................................131

SECTION 8.18.    Platform; Borrower Materials ...........................................131

SECTION 8.19.    Release of Liens.................................................................131

SECTION 8.20.    Release of Guarantee ........................................................133

v

SECTION 8.21.    Acknowledgement and Consent to Bail-In of Affected Financial Institutions......................................................133

SECTION 8.22.    Amendment and Restatement .........................................133

SECTION 8.23.    Certain ERISA Matters ...................................................133

SECTION 8.24.    Acknowledgement Regarding Any Supported QFCs ......134

SECTION 8.25.    Collateral Matters; Hedge Agreements...........................135

vi

| | |
|---|---|
| Exhibit A | Form of Assignment and Acceptance |
| Exhibit B | Form of Note |
| Exhibit C | Form of Interest Period Election Request |
| Exhibit D1 – D4 | Form of Non-Bank Tax Certificate |
| Exhibit E | Form of Notice of Borrowing |
| Exhibit F | Form of Hedge Bank Notice |
| Exhibit G | Form of Collateral Agreement |
| Exhibit H | Form of Intercreditor Agreement |
| Exhibit I | Form of Solvency Certificate |
| | |
| Schedule 1.01(a) | Approved Counterparties |
| Schedule 1.01(b) | Closing Date Investors |
| Schedule 2.01 | Loans |
| Schedule 3.01 | Jurisdictions |
| Schedule 3.04 | Litigation |
| Schedule 3.11 | Capital Stock and Ownership |
| Schedule 3.18 | Gas Imbalances |
| Schedule 3.19 | Marketing Agreements |
| Schedule 3.20 | Hedge Agreements |
| Schedule 3.25 | Material Contracts |
| Schedule 5.06 | Existing Indebtedness |
| Schedule 5.07 | Existing Investments |
| Schedule 5.10 | Transactions with Affiliates |
| Schedule 5.13 | Existing Liens |
| Schedule 5.34 | Post-Closing Obligations |

WEIL:\97847440\31\45327.0007

*Current Draft 6/14/21*
*(Subject to further review and comment)*

**THIRD AMENDED AND RESTATED FIRST LIEN TERM LOAN AGREEMENT**

This Third Amended and Restated First Lien Term Loan Agreement (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, this "Agreement"), dated as of [●], 2021, by and among [Newco] ("Holdings"), [●] (the "Borrower"), the Lenders from time to time party hereto and Goldman Sachs Bank USA ("GS"), as administrative agent and collateral agent for the Lenders.

WHEREAS, on September 30, 2013, Fieldwood Energy LLC, a Delaware limited liability company ("FWE"), entered into that certain Credit Agreement, by and among, *inter alios*, FWE, certain lenders party thereto from time to time, and Citibank, N.A., as administrative agent and collateral agent, and the other agents party thereto from time to time (as amended, restated, amended and restated, supplemented or otherwise modified from time to time prior to the effectiveness of the 2018 RBL Credit Agreement (as defined below), the "Original RBL Credit Agreement");

WHEREAS, on April 11, 2018, in connection with a Joint Prepackaged Chapter 11 Plan of Fieldwood Energy LLC and its Affiliated Debtors (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "Prior Plan of Reorganization"), which was confirmed by the Bankruptcy Court on April 2, 2018, FWE entered into that certain Amended and Restated Credit Agreement, by and among FWE, Fieldwood Energy Inc., a Delaware corporation ("FWE Inc."), the financial institutions from time to time party thereto, the issuing banks from time to time party thereto and Cantor Fitzgerald Securities ("CFS"), as administrative agent and as collateral agent (as amended, restated, supplemented or otherwise modified from time to time prior to the effectiveness of the Prepetition FLFO Credit Agreement (as defined below), the "2018 RBL Credit Agreement"), which amended and restated in its entirety the Original RBL Credit Agreement;

WHEREAS, on June 28, 2019, FWE entered into that certain Second Amended and Restated Credit Agreement, by and among, *inter alios*, FWE, FWE Inc., the financial institutions from time to time party thereto, GS, as administrative agent for the lenders thereunder, GS, as issuing bank and CFS, as collateral agent for the lenders thereunder (as amended, restated, supplemented or otherwise modified from time to time prior to the effectiveness of this Agreement, the "Prepetition FLFO Credit Agreement"), which amended and restated in its entirety the 2018 RBL Credit Agreement;

WHEREAS, on August 3, 2020 (the "Petition Date"), FWE Inc., FWE and certain other Affiliates of FWE (each a "Debtor" and collectively, the "Debtors") filed voluntary petitions with the United States Bankruptcy Court for the Southern District of Texas (the "Bankruptcy Court") initiating their respective cases that are pending under chapter 11 of the Bankruptcy Code (each case of the Borrower and each other Debtor, a "Case" and collectively, the "Cases") and have continued in the possession of their assets and the management of their business pursuant to Section 1107 and 1108 of the Bankruptcy Code;

WHEREAS, the Debtors filed the Fourth Amended Joint Chapter 11 Plan of Fieldwood Energy LLC and its Affiliated Debtors (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "Plan of Reorganization") which was confirmed by the Bankruptcy Court on [●], 2021 pursuant to [●] (the "Confirmation Order");

WHEREAS, as contemplated by the Plan of Reorganization, [●] ("Credit Bid Purchaser") entered into that certain Purchase and Sale Agreement, dated as of [●] (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "Credit Bid Purchase Agreement"), by and among, *inter alios*, FWE and certain of its Affiliates, as Sellers (as defined therein) and Credit Bid Purchaser, as Buyer (as defined therein);

WHEREAS, pursuant to the Credit Bid Purchase Agreement, Credit Bid Purchaser (i) purchased and assumed the loans and other outstanding obligations of the Debtors under the Prepetition FLFO Credit Agreement and (ii) agreed to continue the outstanding liens and security interests granted pursuant to the Loan Documents (as defined in the Prepetition FLFO Credit Agreement, the "Prepetition Loan Documents")

and to acquire the Acquired Interests subject to such liens and security interests (solely to the extent such Acquired Interest was originally subject to a lien and security interest granted under the Prepetition Loan Documents);

WHEREAS, the Borrower, the Administrative Agent, the Collateral Agent and the Lenders desire to amend and restate the Prepetition FLFO Credit Agreement and, in connection therewith, (i) Credit Bid Purchaser has agreed to assign and the Borrower has agreed to assume all of the Credit Bid Purchaser's liabilities and obligations in its capacity as "Borrower" under the Prepetition FLFO Credit Agreement, with Credit Bid Purchaser continuing to be a Guarantor and "grantor" (or similar term) under the Loan Documents, (ii) the Lenders shall be deemed to provide a term loan on the Closing Date in an initial aggregate principal amount of $118,599,082.31 to the Borrower on the terms and conditions set forth in this Agreement and (iii) the Borrower, the other Credit Parties, the Administrative Agent, the Collateral Agent and the Secured Parties have agreed that the liens and security interests on the Acquired Interests under the Prepetition Loan Documents shall continue to secure the Obligations under this Agreement; and

NOW, THEREFORE, the Lenders are willing to extend such term loan to the Borrower on the terms and subject to the conditions set forth herein.  Accordingly, the parties hereto agree as follows:

## ARTICLE I

### Definitions

SECTION 1.01.    <u>Defined Terms</u>.  As used in this Agreement, the following terms shall have the meanings specified below:

"<u>2018 RBL Credit Agreement</u>" shall have the meaning set forth in the recitals hereto.

"<u>2P Developed Producing Reserves</u>" means, collectively, Proved Developed Producing Reserves and Probable Developed Producing Reserves.

"<u>2P Producing PV-10</u>" means the PV-10 value attributable to 2P Developed Producing Reserves.

"<u>2P PV-15</u>" means the PV-15 value attributable to Proved Reserves and Probable Reserves.

"<u>2P Reserves</u>" means, collectively, Proved Reserves and Probable Reserves.

"<u>ABR</u>" means, for any day, a fluctuating interest rate per annum in effect from time to time, which rate per annum shall at all times be equal to the highest of (a) the Prime Rate in effect on such day, (b) ½ of 1.00% per annum above the Federal Funds Rate, (c) 1.00% per annum above the one-month Adjusted LIBOR and (d) 2.00%.

"<u>ABR Borrowing</u>" means a Borrowing comprised of ABR Loans.

"<u>ABR Loan</u>" means a Loan bearing interest at a rate equal to ABR <u>plus</u> the Applicable Margin.

"<u>Account Control Agreement</u>" means an account control agreement in form and substance satisfactory to the Collateral Agent and duly executed by the applicable Credit Party, the Collateral Agent, the Collateral Agent (as defined in the SLTL Credit Agreement) (if applicable) and the applicable depositary bank or securities intermediary, as the case may be.

"<u>Acquired EBITDAX</u>" means, with respect to any Acquired Entity or Business (any of the foregoing, a "<u>Pro Forma Entity</u>") for any period, the amount for such period of EBITDAX of such Pro Forma

2

Entity (determined using such definitions as if references to the Borrower and its Restricted Subsidiaries therein were to such Pro Forma Entity and its Restricted Subsidiaries), all as determined on a consolidated basis for such Pro Forma Entity in a manner not inconsistent with GAAP.

"<u>Acquired Entity or Business</u>" shall have the meaning provided in the definition of the term "EBITDAX".

"<u>Acquired Interests</u>" shall have the meaning set forth in the Credit Bid Purchase Agreement.

"<u>ACR Cash Cure Amount</u>" shall have the meaning set forth in <u>Section 6.05(a)(ii)</u>.

"<u>ACR Cure Amount</u>" shall have the meaning set forth in <u>Section 6.05(a)(ii)</u>.

"<u>ACR Equity Cure Amount</u>" shall have the meaning set forth in <u>Section 6.05(a)(ii)</u>.

"<u>Additional Refinancing Amount</u>" means, in connection with the Incurrence of any Refinancing Indebtedness, the aggregate principal amount of additional Indebtedness, Disqualified Stock or Preferred Stock Incurred to pay premiums (including tender premiums), expenses, defeasance costs and fees in respect thereof.

"<u>Adjusted LIBOR</u>" means, with respect to any Interest Period, an interest rate per annum equal to the product of (a) LIBOR in effect for such Interest Period and (b) Statutory Reserves; <u>provided</u>, that if Adjusted LIBOR is less than 1.00%, Adjusted LIBOR shall be deemed to be 1.00%.

"<u>Adjustment Date</u>" means the date of delivery of both (i) the financial statements required to be delivered pursuant to <u>Section 5.01(a)</u> or <u>(b)</u> (other than required to be delivered pursuant to <u>Section 5.01(b)</u> with respect to the fiscal quarter ending December 31 of each year), as applicable and (ii) the Reserve Report (or "roll-forward" thereof as permitted under <u>Section 5.26</u>) required to be delivered pursuant to <u>Section 5.26</u>.

"<u>Administrative Agent</u>" means GS, as the administrative agent for the Lenders under this Agreement and the other Loan Documents, or any successor administrative agent appointed in accordance with the provisions of <u>Section 7.09</u>.

"<u>Administrative Questionnaire</u>" shall have the meaning set forth in <u>Section 8.06(b)(ii)(D)</u>.

"<u>Adverse Proceedings</u>" shall have the meaning set forth in <u>Section 3.04</u>.

"<u>Affiliate</u>" means, with respect to any Person, any other Person directly or indirectly controlling, controlled by, or under direct or indirect common control with such Person.  A Person shall be deemed to control another Person if such Person possesses, directly or indirectly, the power to direct or cause the direction of the management and policies of such other Person, whether through the ownership of voting securities, by contract or otherwise.  "Controlling" ("controlling") and "controlled" shall have meanings correlative thereto.

"<u>Affiliate Transaction</u>" shall have the meaning set forth in <u>Section 5.10(a)</u>.

"<u>Affiliated Institutional Lender</u>" means any investment fund managed or advised by Affiliates of an Investor that is a bona fide debt fund and that extends credit or buys loans in the ordinary course of business. The Administrative Agent shall be entitled to rely on <u>Schedule 2.01</u>, any Assignment and Acceptance delivered to the Administrative Agent or any other statement made by a Lender (which may be made electronically) as conclusive evidence regarding whether a Lender is an Affiliated Institutional Lender.

3

"<u>Affiliated Lender</u>" means a Lender that is an Investor or any Affiliate thereof or of the Borrower (other than Holdings, the Borrower, any Subsidiary of the Borrower or any Affiliated Institutional Lender).  The Administrative Agent shall be entitled to rely on <u>Schedule 2.01</u>, any Assignment and Acceptance delivered to the Administrative Agent or any other statement made by a Lender (which may be made electronically) as conclusive evidence regarding whether a Lender is an Affiliated Lender.

"<u>Agents</u>" means the Administrative Agent and the Collateral Agent.

"<u>Agreement</u>" shall have the meaning set forth in the preamble hereto, as amended, restated, amended and restated, supplemented or otherwise modified from time to time.

"<u>Agreement Currency</u>" shall have the meaning set forth in <u>Section 8.17(b)</u>.

"<u>Anti-Corruption Laws</u>" means the U.S. Foreign Corrupt Practices Act of 1977, the Bribery Act 2010 of the United Kingdom or similar law of a jurisdiction in which Holdings, the Borrower or any of its Subsidiaries conduct their business and to which they are lawfully subject.

"<u>Anti-Terrorism and Anti-Money Laundering Laws</u>" means any and all applicable requirements of law relating to engaging in, financing or facilitating terrorism or money laundering, including the USA Patriot Act, The Currency and Foreign Transactions Reporting Act (also known as the "Bank Secrecy Act", 31 U.S.C. §§5311-5330 and 12 U.S.C. §§1818(s), 1820(b) and 1951-1959), Trading With the Enemy Act (50 U.S.C. §1 et seq.), Executive Order 13224 (effective September 24, 2001) and each of the laws, regulations, and executive orders administered by OFAC (31 C.F.R., Subtitle B, Chapter V).

"<u>Applicable Creditor</u>" shall have the meaning set forth in <u>Section 8.17(b)</u>.

"<u>Applicable Margin</u>" means (a) at any time the aggregate principal amount of Loans outstanding under this Agreement is in excess of $100,000,000 (i) in the case of LIBOR Loans, 6.00% per annum and (ii) in the case of ABR Loans, 5.00% per annum and (b) at any time the aggregate principal amount of Loans outstanding under this Agreement is less than or equal to $100,000,000, (i) in the case of LIBOR Loans, the rate per annum set forth in the table below under the caption "LIBOR" and (ii) in the case of ABR Loans, the rate per annum set forth in the table below under the capital "ABR", as the case may be, based upon the Asset Coverage Ratio:

| Category | Asset Coverage Ratio | LIBOR | ABR |
|---|---|---|---|
| 1 | Greater than or equal 3.00:1.00 | 5.00% | 4.00% |
| 2 | Less than 3.00:1.00 | 6.00% | 5.00% |

The Applicable Margin shall be adjusted quarterly on a prospective basis on each Adjustment Date based upon the Asset Coverage Ratio in accordance with the table above and outstanding amount of Loans as of such Adjustment Date; provided, that if financial statements are not delivered when required pursuant to <u>Section 5.01(a)</u> or <u>(b)</u>, as applicable, or if the Reserve Report (or a "roll-forward" thereof, as permitted under <u>Section 5.26</u>) is not delivered when required pursuant to <u>Section 5.26</u>), the "Applicable Margin" shall, at the option of the Administrative Agent or at the direction of the Required Lenders, be the rate per annum set forth above in Category 2 until such financial statements are delivered in compliance with <u>Section 5.01(a)</u> or <u>(b)</u>, as applicable and/or the Reserve Report (or such a "roll-forward" thereof) is delivered in compliance with <u>Section 5.26</u>.

4

In the event that either the Borrower or the Administrative Agent determine in good faith that the calculation of the Asset Coverage Ratio on which the Applicable Margin for any particular period was determined is inaccurate, and such inaccuracy, if corrected, would have led to the application of a higher Applicable Margin for the Loans for such period than the Applicable Margin for such Loans applied for such period, then, (i) the Borrower shall promptly (but in any event within five (5) Business Days of such determination by the Borrower or receipt of notice from the Administrative Agent) deliver to the Administrative Agent the correct certified calculation of the Asset Coverage Ratio for such period and (ii) if, as a consequence of such re-calculation, the Applicable Margin was lower that it would have been, (A) the Applicable Margin for such Loans shall be determined as if such higher Applicable Margin for such Loans were retroactively applied for such period, (B) the Administrative Agent shall notify the Borrower of the amount of interest and fees that would have been due in respect of any outstanding Obligations during such period had the Applicable Margin been calculated based on the correct Asset Coverage Ratio and (C) the Borrower shall promptly pay to the Administrative Agent for the benefit of the Lenders, the difference between the amount that would have been due and the amount that was actually paid in respect of such period; provided, that for the avoidance of doubt, such deficiency shall be due and payable as set forth above and no Default or Event of Default shall be deemed to have occurred solely with respect to the failure to pay such additional interest prior to such date.

"Approved Credit Bid Purchase Agreement" shall have the meaning set forth in Section 4.01(j).

"Approved Fund" shall have the meaning set forth in Section 8.06(b).

"Approved Petroleum Engineers" means (a) Netherland, Sewell & Associates, Inc., (b) Ryder Scott Company, L.P., (c) W. D. Van Gonten & Co. Petroleum Engineering, (d) DeGolyer and MacNaughton, (e) Cawley, Gillespie & Associates, Inc., (f) Miller and Lents, Ltd. and (g) at the Borrower's option, any other independent petroleum engineers selected by the Borrower that is reasonably acceptable to the Administrative Agent.

"Asset Coverage Ratio" means, as of any date of determination, the ratio of (a)(i) total 2P Producing PV-10 of the Credit Parties (including, for the avoidance of doubt and solely to the extent constituting 2P Producing PV-10 of the Credit Parties, the 2P Producing PV-10 attributable to the Genovesa Well and the Troika TA-3 Well) plus (ii) solely through and including the last day of the fiscal quarter ending on or about September 30, 2021 (and solely in the event 2P Producing PV-10 attributable thereto is not included pursuant to clause (a)(i)), the 2P PV-15 attributable to the Genovesa Well and the Troika TA-3 Well, in each case with respect to the foregoing clauses (i) and (ii), as set forth in the Latest Reserve Report, plus (iii) the present value (positive or negative) of the mark-to-market commodity hedge positions at the time of the delivery of the Latest Reserve Report, discounted at 10% per annum, minus (iv) the present value of the estimated plugging and abandonment costs of the Borrower and the Subsidiary Guarantors' wells and any related assets at such time, discounted at 10% per annum (it being understood and agreed that the estimated costs and timing assumptions related to the foregoing clause (iv) shall be consistent with historical practice and otherwise reasonably acceptable to the Administrative Agent), plus (v) the PV-10 values of any Proved Developed Non-Producing Reserves, Probable Developed Non-Producing Reserves, Proved Developed Behind Pipe Reserves, and Probable Developed Behind Pipe Reserves which are capable of producing without incurring additional capital and any Proved Developed Non-Producing Reserves and Probable Developed Non-Producing Reserves previously included as 2P Developed Producing Reserves and anticipated to be returned to 2P Developed Producing Reserves within (x) two months of delivery of the Latest Reserve Report so long as any capital required to return to production is incorporated in the relevant PV-10 values and (y) three to ten months of the delivery of the Latest Reserve Report so long as (1) any capital required to return to production is incorporated into the relevant PV-10 value and (2) the total amount of this clause (a) attributable to the reserves described in this sub-clause (a)(v)(y)(2) does not exceed more than 10% of the total amount of this clause (a) (calculated prior to giving effect to the additions of reserves described in this sub-clause (a)(v)(y)(2)) to (b) the outstanding balance of the Loans as of the last day of the most recent Test Period, net of Consolidated Excess Cash as of the most recently ended Test Period; provided, that (A) the calculation of the foregoing clause (a) shall reflect deductions for severance and ad valorem taxes, for operating, gathering, transportation, marketing costs and other costs required

5

for the production and sale of such Oil and Gas Properties, any purchase price holdbacks in respect of any reserves included in the calculation of <u>clause (a)</u> and any Production Payments and Reserve Sales attributable to reserves described in <u>clause (a)</u> and (B) for purposes of calculating 2P Producing PV-10 (and the 2P PV-15 attributable to the Genovesa Well and Troika TA-3 Well, if applicable) the price deck and mark-to-market hedge valuation shall utilize the average NYMEX strip calculated during the 30 calendar days preceding the "as of" date of the Latest Reserve Report (held flat after year 5 at the average 5th year prices) and including basis differentials determined by the Borrower in a manner consistent with historical and customary industry practices and otherwise subject to the approval of the Administrative Agent.

"<u>Asset Sale</u>" means:

(1)     the sale, conveyance, transfer or other disposition (whether in a single transaction or a series of related transactions) of property or assets (including by way of Production Payments and Reserve Sales and Sale/Leaseback Transactions) (other than an operating lease entered into in the ordinary course of the Oil and Gas Business) (each referred to in this definition as a "*disposition*"); or

(2)     the issuance or sale of Equity Interests (other than directors' qualifying shares and shares issued to foreign nationals or other third parties to the extent required by applicable law) of any Subsidiary (other than to the Borrower or another Restricted Subsidiary) (whether in a single transaction or a series of related transactions),

in each case other than:

(a)     a disposition of Cash Equivalents or Investment Grade Securities or obsolete, damaged or worn out property or equipment in the ordinary course of business;

(b)     any disposition that occurs in connection with a transaction permitted pursuant to <u>Section 5.11</u>;

(c)     any Restricted Payment or Permitted Investment that is permitted to be made, and is made, under <u>Section 5.07</u>;

(d)     any disposition of property or assets, or the issuance of securities, by a Restricted Subsidiary to the Borrower or by the Borrower or a Restricted Subsidiary to a Restricted Subsidiary that is a Guarantor;

(e)     foreclosure, condemnation or any similar action with respect to any property or other asset of the Borrower or any of the Restricted Subsidiaries;

(f)     the lease, assignment or sublease of, or any transfer related to a "reverse build to suit" or similar transaction in respect of, any real or personal property in the ordinary course of business;

(g)     any sale of inventory (including Hydrocarbons and mineral products) in the ordinary course of business;

(h)     any grant in the ordinary course of business of any license of patents, trademarks, know-how or any other intellectual property;

(i)     in the ordinary course of business and other than with respect to any Oil and Gas Properties, any swap of assets, or lease, assignment or sublease of any real or personal property, in exchange for services (including in connection with any outsourcing arrangements) of comparable or greater value or usefulness to the business of the

6

Borrower and the Restricted Subsidiaries as a whole, as determined in good faith by the Borrower;

(j)     any transfer of accounts receivable and related assets of the type specified in the definition of "Receivables Financing" (or a fractional undivided interest therein) by a Receivables Subsidiary in a Qualified Receivables Financing;

(k)     any Sale/Leaseback Transaction provided that the Fair Market Value of all property of the Borrower and its Restricted Subsidiaries subject to such arrangements since the Closing Date does not exceed $10,000,000;

(l)     dispositions in connection with Permitted Liens;

(m)     any disposition of Capital Stock of a Restricted Subsidiary pursuant to an agreement or other obligation with or to a Person (other than the Borrower or a Restricted Subsidiary) from whom such Restricted Subsidiary was acquired or from whom such Restricted Subsidiary acquired its business and assets (having been newly formed in connection with such acquisition), made as part of such acquisition and in each case comprising all or a portion of the consideration in respect of such sale or acquisition;

(n)     dispositions of receivables in connection with the compromise, settlement or collection thereof in the ordinary course of business or in bankruptcy or similar proceedings and exclusive of factoring or similar arrangements;

(o)     any surrender, expiration or waiver of contract rights (other than oil and gas leases) or the settlement, release, recovery on or surrender of contract, tort or other claims of any kind;

(p)     any Production Payments and Reserve Sales; *provided* that any such Production Payments and Reserve Sales, other than incentive compensation programs on terms that are reasonably customary in the Oil and Gas Business for geologists, geophysicists and other providers of technical services to the Borrower or a Restricted Subsidiary, shall have been created, incurred, issued, assumed or guaranteed in connection with the financing of, and within 60 days after the acquisition of, the property that is subject thereto;

(q)     the abandonment, farm-out pursuant to a Farm-Out Agreement, lease or sublease of undeveloped Oil and Gas Properties owned or held by the Borrower or any Restricted Subsidiary in the ordinary course of business or which are usual and customary in the Oil and Gas Business generally or in the geographic region in which such activities occur;

(r)     the unwinding of any Hedge Agreement;

(s)     sales, transfer and other dispositions of Investments in joint ventures to the extent required by, or made pursuant to, customary buy/sell arrangements between the joint venture parties set forth in venture arrangements and similar binding arrangements; and

(t)     the lapse or abandonment of intellectual property in the ordinary course of business, which in the reasonable good faith determination of the Borrower are not material to the conduct of the business of the Borrower and its Subsidiaries, taken as a whole.

7

"Assignee" shall have the meaning set forth in Section 8.06(b)(i).

"Assignment and Acceptance" means an assignment and acceptance entered into by a Lender and an Assignee, and accepted by the Administrative Agent (substantially in the form of Exhibit A or such other form as shall be approved by the Administrative Agent).

"Authorized Officer" means as to any Person, the President, the Chief Executive Officer, the Chief Financial Officer, the Chief Operating Officer, the Treasurer, the Assistant or Vice Treasurer, the Vice President-Finance, the General Counsel and any manager, managing member or general partner, in each case, of such Person, and any other senior officer designated as such in writing to the Administrative Agent by such Person.  Any document delivered hereunder that is signed by an Authorized Officer shall be conclusively presumed to have been authorized by all necessary corporate, limited liability company, partnership and/or other action on the part of the Borrower or any other Credit Party and such Authorized Officer shall be conclusively presumed to have acted on behalf of such Person.

"Available Tenor" means, as of any date of determination and with respect to the then-current Benchmark, as applicable, (x) if the then-current Benchmark is a term rate, any tenor for such Benchmark that is or may be used for determining the length of an Interest Period or (y) otherwise, any payment period for interest calculated with reference to such Benchmark, as applicable, pursuant to this Agreement as of such date.

"Bail-In Action" means the exercise of any Write-Down and Conversion Powers by the applicable Resolution Authority in respect of any liability of an Affected Financial Institution.

"Bail-In Legislation" means, (a) with respect to any EEA Member Country implementing Article 55 of Directive 2014/59/EU of the European Parliament and of the Council of the European Union, the implementing law, regulation, rule or requirement for such EEA Member Country from time to time which is described in the EU Bail-In Legislation Schedule and (b) with respect to the United Kingdom, Part I of the United Kingdom Banking Act 2009 (as amended from time to time) and any other law, regulation or rule applicable in the United Kingdom relating to the resolution of unsound or failing banks, investment firms or other financial institutions or their affiliate (other than through liquidation, administration or other insolvency proceedings).

"Bankruptcy Code" shall have the meaning set forth in Section 6.01(e).

"Bankruptcy Court" shall have the meaning set forth in the recitals hereto.

"Benchmark" means, initially, LIBOR; provided that if a replacement of the Benchmark has occurred pursuant to Section 1.09(b), then "Benchmark" means the applicable Benchmark Replacement to the extent that such Benchmark Replacement has replaced such prior benchmark rate.  Any reference to "Benchmark" shall include, as applicable, the published component used in the calculation thereof.

"Benchmark Replacement" means, for any Available Tenor:

(1)    for purposes of Section 1.09(b)(i), the first alternative set forth below that can be determined by the Administrative Agent:

(a)    the sum of: (i) Term SOFR and (ii) 0.11448% (11.448 basis points) for an Available Tenor of one-month's duration, 0.26161% (26.161 basis points) for an Available Tenor of three-months' duration, and 0.42826% (42.826 basis points) for an Available Tenor of six-months' duration; or

(b)    the sum of: (i) Daily Simple SOFR and (ii) the spread adjustment selected or recommended by the Relevant Governmental Body for the replacement of the tenor of

8

LIBOR with a SOFR-based rate having approximately the same length as the interest payment period specified in Section 1.09(b)(i); and

(2)     for purposes of Section 1.09(b)(ii), the sum of (a) the alternate benchmark rate and (b) an adjustment (which may be a positive or negative value or zero), in each case, that has been selected by the Administrative Agent and the Borrower as the replacement for such Available Tenor of such Benchmark giving due consideration to any evolving or then-prevailing market convention, including any applicable recommendations made by the Relevant Governmental Body, for U.S. dollar- denominated syndicated credit facilities at such time;

provided that, if the Benchmark Replacement as determined pursuant to clause (1) or (2) above would be less than the Floor, the Benchmark Replacement will be deemed to be the Floor for the purposes of this Agreement and the other Loan Documents.

"Benchmark Replacement Conforming Changes" means, with respect to any Benchmark Replacement, any technical, administrative or operational changes (including changes to the definition of "ABR," the definition of "Business Day," the definition of "Interest Period," timing and frequency of determining rates and making payments of interest, timing of borrowing requests or prepayment, conversion or continuation notices, the applicability and length of lookback periods, the applicability of breakage provisions, and other technical, administrative or operational matters) that the Administrative Agent decides may be appropriate to reflect the adoption and implementation of such Benchmark Replacement and to permit the administration thereof by the Administrative Agent in a manner substantially consistent with market practice (or, if the Administrative Agent decides that adoption of any portion of such market practice is not administratively feasible or if the Administrative Agent determines that no market practice for the administration of such Benchmark Replacement exists, in such other manner of administration as the Administrative Agent decides is reasonably necessary in connection with the administration of this Agreement and the other Loan Documents).

"Benchmark Transition Event" means, with respect to any then-current Benchmark other than LIBOR, the occurrence of a public statement or publication of information by or on behalf of the administrator of the then-current Benchmark, the regulatory supervisor for the administrator of such Benchmark, the Board of Governors, the NYFRB, an insolvency official with jurisdiction over the administrator for such Benchmark, a resolution authority with jurisdiction over the administrator for such Benchmark or a court or an entity with similar insolvency or resolution authority over the administrator for such Benchmark, announcing or stating that:

(1)     such administrator has ceased or will cease on a specified date to provide all Available Tenors of such Benchmark, permanently or indefinitely, provided that, at the time of such statement or publication, there is no successor administrator that will continue to provide any Available Tenor of such Benchmark; or

(2)     all Available Tenors of such Benchmark are or will no longer be representative of the underlying market and economic reality that such Benchmark is intended to measure and that representativeness will not be restored.

"Beneficial Ownership Regulation" means 31 C.F.R. § 1010.230.

"Benefit Plan" means any of (a) an "employee benefit plan" (as defined in ERISA) that is subject to Title I of ERISA, (b) a "plan" as defined in Section 4975 of the Code or (c) any Person whose assets include (for purposes of ERISA Section 3(42) or otherwise for purposes of Title I of ERISA or Section 4975 of the Code) the assets of any such "employee benefit plan" or "plan."

"Board" means the Board of Governors of the Federal Reserve System of the United States of America (or any successor).

9

"<u>Board of Directors</u>" means, as to any Person, the board of directors or other governing body of such Person, or if such Person is owned or managed by a single entity, the board of directors or other governing body of such entity.

"<u>Borrower</u>" shall have the meaning set forth in the preamble to this Agreement.

"<u>Borrower Materials</u>" shall have the meaning set forth in <u>Section 8.18</u>.

"<u>Borrowing</u>" means a group of Loans of a single Type and made on a single date and, in the case of LIBOR Loans, as to which a single Interest Period is in effect.

"<u>Budget</u>" shall have the meaning provided in <u>Section 5.01(g)</u>.

"<u>Business Day</u>" means any day excluding Saturday, Sunday and any other day on which banking institutions in New York City or Houston, Texas are authorized by law or other governmental actions to close, and, if such day relates to (a) any interest rate settings as to a LIBOR Loan, (b) any fundings, disbursements, settlements and payments in respect of any such LIBOR Loan, or (c) any other dealings pursuant to this Agreement in respect of any such LIBOR Loan, such day shall be a day on which dealings in deposits in U.S. Dollars are conducted by and between banks in the London interbank eurodollar market.

"<u>Capital Stock</u>" means:

(1)     in the case of a corporation, corporate stock or shares;

(2)     in the case of an association or business entity, any and all shares, interests, participations, rights or other equivalents (however designated) of corporate stock;

(3)     in the case of a partnership or limited liability company, partnership or membership interests (whether general or limited); and

(4)     any other interest or participation that confers on a Person the right to receive a share of the profits and losses of, or distributions of assets of, the issuing Person.

"<u>Capitalized Lease Obligation</u>" means, at the time any determination thereof is to be made, the amount of the liability in respect of a capital lease that would at such time be required to be capitalized and reflected as a liability on a balance sheet (excluding the footnotes thereto) in accordance with GAAP; *provided* that any obligations of the Borrower or its Restricted Subsidiaries, or of a special purpose or other entity not consolidated with the Borrower and its Restricted Subsidiaries, that (i) were not (or would not have been) included on the consolidated balance sheet of the Borrower as capital lease obligations prior to the recharacterization described below and (ii) are subsequently (re)characterized as capital lease obligations or, in the case of such a special purpose or other entity becoming consolidated with the Borrower and its Restricted Subsidiaries, due to a change in accounting treatment or otherwise, shall for all purposes not be treated as Capitalized Lease Obligations or Indebtedness.

"<u>Capitalized Software Expenditures</u>" means, for any period, the aggregate of all expenditures (whether paid in cash or accrued as liabilities) by a person during such period in respect of licensed or purchased software or internally developed software and software enhancements that, in accordance with GAAP, are or are required to be reflected as capitalized costs on the consolidated balance sheet of such Person and its Subsidiaries.

10

"Case" and "Cases" shall have the meaning set forth in the recitals hereto.

"Cash Equivalents" means:

(1)      U.S. Dollars, pounds sterling, euros, the national currency of any member state in the European Union or such local currencies held by an entity from time to time in the ordinary course of business;

(2)      securities issued or directly and fully guaranteed or insured by the U.S. government or any country that is a member of the European Union or any agency or instrumentality thereof in each case maturing not more than two years from the date of acquisition;

(3)      certificates of deposit, time deposits and eurodollar time deposits with maturities of one year or less from the date of acquisition, bankers' acceptances, in each case with maturities not exceeding one year and overnight bank deposits, in each case with any commercial bank having capital and surplus in excess of $250,000,000 in the case of domestic banks and $100,000,000 in the case of (or the U.S. Dollar equivalent thereof) in the case of foreign banks;

(4)      repurchase obligations for underlying securities of the types described in clauses (2) and (3) above entered into with any financial institution meeting the qualifications specified in clause (3) above;

(5)      commercial paper issued by a corporation (other than an Affiliate of the Borrower) rated at least "A-1" or the equivalent thereof by Moody's or S&P (or reasonably equivalent ratings of another internationally recognized ratings agency) and in each case maturing within one year after the date of acquisition;

(6)      readily marketable direct obligations issued by any state of the United States of America or any political subdivision thereof having one of the two highest rating categories obtainable from either Moody's or S&P (or reasonably equivalent ratings of another internationally recognized ratings agency) in each case with maturities not exceeding two years from the date of acquisition;

(7)      Indebtedness issued by Persons (other than the Investors or any of their Affiliates) with a rating of "A" or higher from S&P or "A-2" or higher from Moody's (or reasonably equivalent ratings of another internationally recognized ratings agency) in each case with maturities not exceeding two years from the date of acquisition;

(8)      investment funds investing at least 95% of their assets in securities of the types described in clauses (1) through (7) above; and

(9)      in the case of Investments by any Foreign Subsidiary or Investments made in a country outside the United States, other customarily utilized high-quality Investments in the country where such Foreign Subsidiary is located or in which such Investment is made.

"Cash Management Agreement" shall mean any agreement entered into from time to time by the Borrower or any of the Borrower's Restricted Subsidiaries in connection with cash management services for collections, other Cash Management Services and for operating, payroll and trust accounts of such Person, including automatic clearing house services, controlled disbursement services, electronic funds transfer services, lockbox services, stop payment services and wire transfer services.

"Cash Management Bank" shall mean any Person that (a) is (i) at the time it provides Cash Management Services, (ii) on the Closing Date or (iii) at any time after it has provided any Cash Management Services, is a Lender or an Agent or an Affiliate of a Lender or an Agent or (b) is identified on Part A of Schedule 1.01(a) hereto (as such schedule may be updated from time to time by the Borrower with the consent of the Agent (in its sole discretion)) and, with respect to any Person added to Schedule 1.01(a) after the Closing Date, has delivered a notice substantially in the form attached hereto as Exhibit F.

11

"<u>Cash Management Obligations</u>" shall mean obligations owed by the Borrower or any Restricted Subsidiary to any Cash Management Bank in connection with, or in respect of, any Cash Management Services.

"<u>Cash Management Services</u>" shall mean (a) commercial credit cards, merchant card services, purchase or debit cards, including non-card e-payables services, (b) treasury management services (including, but not limited to, controlled disbursement, overdraft, automated clearing house fund transfer services, return items and interstate depository network services) and (c) any other demand deposit or operating account relationships or other cash management services, including any Cash Management Agreement.

"<u>Casualty Event</u>" means, with respect to any Collateral, (a) any damage to, destruction of, or other casualty or loss involving, any property or asset or (b) any seizure, condemnation, confiscation or taking under the power of eminent domain of, or any requisition of title or use of, or relating to, or any similar event in respect of, any property or asset.

"<u>CFC</u>" means a "controlled foreign corporation" within the meaning of Section 957 of the Code.

"<u>CFS</u>" shall have the meaning set forth in the recitals hereto.

"<u>Change in Law</u>" means (a) the adoption or taking effect of any law, treaty, order, policy, rule or regulation after the Closing Date, (b) any change in any law, treaty, order, policy, rule or regulation or in the administration, interpretation, implementation or application thereof by any Governmental Authority after the Closing Date or (c) the making or issuance of any guideline, request, directive or order enacted or promulgated after the Closing Date by any central bank or other governmental or quasigovernmental authority (whether or not having the force of law); *provided* that notwithstanding anything herein to the contrary, the Dodd-Frank Wall Street Reform and Consumer Protection Act, the Basel Committee on Banking Regulations and Supervisory Practices (or any successor or similar authority) and all guidelines, requests, directives, orders, rules and regulations adopted, enacted or promulgated in connection therewith, in each case pursuant to Basel III, shall in each case be deemed to have gone into effect after the Closing Date regardless of the date adopted, enacted or promulgated and shall be included as a Change in Law; *provided* that no Lender shall be required to disclose any confidential or proprietary information in connection therewith.

"<u>Change of Control</u>" means, at any time: (a) any Person or "group" (within the meaning of Section 13(d) or 14(d) of the Exchange Act, but excluding any employee benefit plan of such Person, entity or "group" and its Subsidiaries and any Person or entity acting in its capacity as trustee, agent or other fiduciary or administrator of any such plan), other than the Permitted Holders (or any holding company parent of Holdings owned directly or indirectly by the Permitted Holders), shall at any time have acquired direct or indirect beneficial ownership (as defined in Rules 13(d)-3 and 13(d)-5 under the Exchange Act) of either (i) voting power of the outstanding Voting Stock of the Borrower having more than 35% of the ordinary voting power for the election of directors of the Borrower or (ii) economic interests in the outstanding Capital Stock of the Borrower having more than 35% of the aggregate economic interests in the outstanding Capital Stock of the Borrower, (b) Holdings shall cease to own 100% of the Capital Stock of the Borrower, or (c) any "change of control" or similar term under the SLTL Facility shall occur.

"<u>Closing Date</u>" means the date on which all the conditions set forth in <u>Section 4.01</u> shall have been satisfied (or waived in accordance with <u>Section 8.01</u>).

"<u>Closing Date Unrestricted Subsidiary</u>" means Fieldwood Cooperatief U.A.

"<u>Code</u>" means the Internal Revenue Code of 1986, as amended from time to time.

12

"Collateral" shall have the meaning provided for such term in each of the Security Documents and shall include any and all assets securing or intended to secure any or all of the Loan Obligations; *provided* that with respect to any Mortgages, "Collateral," as defined herein, shall include "Mortgaged Property" as defined therein; *provided* further, that in no case shall the "Collateral" include any Excluded Asset (including, for the avoidance of doubt, any Excluded Equity Interests).

"Collateral Agent" means GS, as collateral agent for the benefit of the Secured Parties, or any successor collateral agent appointed in accordance with the provisions of Section 7.09.

"Collateral Agreement" means the Collateral Agreement, to be entered into as of the Closing Date, among the Borrower, the Guarantors and the Collateral Agent, substantially in the form attached hereto as Exhibit G, as may be amended, restated, amended and restated, supplemented or otherwise modified from time to time in accordance with its terms and in accordance with this Agreement.

"Commitment Letter" shall have the meaning set forth in Section 4.01(x).

"Consolidated Excess Cash" shall mean, as of the end of any fiscal quarter, the amount that (x) the average daily balance of Unrestricted Cash of the Borrower and Subsidiary Guarantors over the last fiscal month of such fiscal quarter exceeds (y) $130,000,000.

"Consolidated First Lien Indebtedness" means, as of any date of determination, the aggregate amount of Consolidated Total Indebtedness described in clause (a) of the definition thereof (without, for the avoidance of doubt, giving effect to any reduction contemplated by clause (b) of such definition) that is secured by a Lien on the Collateral on an equal priority basis (but without regard to the control of remedies) with the Liens securing the Loan Obligations in effect on the Closing Date.

"Consolidated First Lien Leverage Ratio" means, as of any date of determination, the ratio of (a) Consolidated First Lien Indebtedness as of the last day of the most recent Test Period to (b) EBITDAX for such Test Period; *provided* that the Consolidated First Lien Leverage Ratio shall be determined for the relevant Test Period on a pro forma basis consistent with the definition of "EBITDAX" and Section 1.12.

"Consolidated First Lien Net Indebtedness" means, as of any date of determination, the aggregate amount of Consolidated Total Indebtedness that is secured by a Lien on the Collateral on an equal priority basis (but without regard to the control of remedies) with the Liens securing the Loan Obligations in effect on the Closing Date.

"Consolidated First Lien Net Leverage Ratio" means, as of any date of determination, the ratio of (a) Consolidated First Lien Net Indebtedness as of the last day of the most recent Test Period to (b) EBITDAX for such Test Period; *provided* that the Consolidated First Lien Net Leverage Ratio shall be determined for the relevant Test Period on a pro forma basis consistent with the definition of "EBITDAX" and Section 1.12.

"Consolidated Interest Expense" means, with respect to any Person the consolidated interest expense (including that attributable to Capitalized Lease Obligations), net of cash interest income of the Borrower and its Restricted Subsidiaries with respect to all outstanding Indebtedness of the Borrower and its Restricted Subsidiaries, including all commissions, discounts and other fees and charges owed with respect to letters of credit and bankers' acceptance financing and net costs under hedging agreements, but excluding, for the avoidance of doubt, (a) amortization of deferred financing costs, debt discounts or premiums, debt issuance costs, commissions, fees and expenses, in each case, attributable to Dollar Denominated Production Payments, (b) the accretion or accrual of discounted liabilities not constituting indebtedness during such period, (c) non-cash interest expense attributable to the movement of the mark-to-market valuation of obligations under hedging agreements or other derivative instruments pursuant to FASB Accounting Standards Codification No. 815-Derivatives and Hedging, (d) commissions, discounts, yield and other fees and charges (including any interest expense) incurred in connection with any permitted receivables financing, (e) all non-recurring cash interest

13

expense consisting of liquidated damages for failure to timely comply with registration rights obligations, all as calculated on a consolidated basis in accordance with GAAP, (f) any one-time cash costs associated with breakage in respect of hedging agreements for interest rates, (g) all non-recurring cash interest expense consisting of liquidated damages for failure to timely comply with registration rights obligations, all as calculated on a consolidated basis in accordance with GAAP, including any "additional interest" owing pursuant to a registration rights agreement, (h) non-cash interest expense attributable to a parent entity resulting from push-down accounting, but solely to the extent not reducing consolidated cash interest expense in any prior period, and (i) any non-cash expensing of bridge, commitment and other financing fees that have been previously paid in cash, but solely to the extent not reducing consolidated cash interest expense in any prior period.

"Consolidated Net Income" means, for any period and with respect to any Person, (i) the Net Income of such Person and its Restricted Subsidiaries on a consolidated basis for such period taken as a single accounting period determined in conformity with GAAP, minus (ii) in each case to the extent otherwise included in such Net Income and without duplication, (a) the income of any Subsidiary of the Borrower to the extent that the declaration or payment of dividends or similar distributions by that Subsidiary of that income is not at the time permitted by operation of the terms of its charter or any agreement, instrument, judgment, decree, order, statute, rule or governmental regulation applicable to that Subsidiary and (b) the Net Income for such period of any Person that is not a Subsidiary of such Person or is the Closing Date Unrestricted Subsidiary, or that is accounted for by the equity method of accounting, except to the extent of the amount of dividends or distributions or other payments paid in cash (or to the extent converted into cash) to the referent Person or a Restricted Subsidiary thereof in respect of such period; provided that (1) any net extraordinary, non-recurring or unusual gains or losses shall be excluded to the extent not otherwise excluded from Net Income, and (2) any payments from BP related to the Isabela Transaction shall be included to the extent otherwise included in Net Income; provided that the Consolidated First Lien Net Leverage Ratio shall be determined for the relevant Test Period on a pro forma basis consistent with the definition of "EBITDAX" and Section 1.12.

"Consolidated Total Indebtedness" means, as of any date of determination, the sum of (without duplication) (a)(i) Indebtedness outstanding pursuant clauses (1)(a), 1(b), 1(d) of the definition thereof, plus (ii) reimbursement obligations (whether contingent or otherwise) in respect of letters of credit (other than to the extent fully cash collateralized or to the extent in respect of undrawn letters of credit with an aggregate face amount not in excess of $25,000,000), plus (iii) Disqualified Stock and Preferred Stock, plus (iv) solely to the extent payment with respect thereto is greater than 60 days past due (unless disputed in good faith), the amount of liabilities in respect of obligations to pay the deferred purchase price of any assets or services (including trade payables, but except any such balance that constitutes any earn-out obligations until such obligation becomes a liability on the balance sheet of such Person in accordance with GAAP), plus (v) any of amounts described in the foregoing clauses (i) through (iv) of other Persons in the amount secured by a Lien on the assets of the Borrower or any Subsidiary Guarantor or in the amount guaranteed by the Borrower or any Subsidiary Guarantor, in each case, of the Borrower or any Subsidiary Guarantor on such date (other than intercompany indebtedness) and, to the extent appearing on the balance sheet of the Borrower, determined on a consolidated basis in accordance with GAAP; provided, that, (1) the amount of any Capitalized Lease Obligations or any such indebtedness described in the foregoing clauses (i) through (v) issued at a discount to its face value shall be determined in accordance with GAAP and (2) the amount of any Indebtedness incurred pursuant to Section 5.06(b)(xviii) shall be excluded from the definition of Consolidated Total Indebtedness less (b) the amount that (i) all Unrestricted Cash of the Borrower and Subsidiary Guarantors exceeds (ii) $50,000,000.

"Consolidated Total Net Leverage Ratio" means, as of any date of determination, the ratio of (a) Consolidated Total Indebtedness as of the last day of the most recent Test Period to (b) EBITDAX for such Test Period, provided that the Consolidated Total Net Leverage Ratio shall be determined for the relevant Test Period on a pro forma basis consistent with the definition of "EBITDAX" and Section 1.12.

"Contingent Obligations" means, with respect to any Person, any obligation of such Person guaranteeing any leases, dividends or other obligations that do not constitute Indebtedness ("primary

obligations") of any other Person (the "<u>primary obligor</u>") in any manner, whether directly or indirectly, including, without limitation, any obligation of such Person, whether or not contingent:

        (1)     to purchase any such primary obligation or any property constituting direct or indirect security therefor;

        (2)     to advance or supply funds;

        (a)     for the purchase or payment of any such primary obligation; or

        (b)     to maintain working capital or equity capital of the primary obligor or otherwise to maintain the net worth or solvency of the primary obligor; or

        (3)     to purchase property, securities or services primarily for the purpose of assuring the owner of any such primary obligation of the ability of the primary obligor to make payment of such primary obligation against loss in respect thereof.

"Contractual Requirement" shall have the meaning set forth in Section 3.03.

"Covered Party" shall have the meaning set forth in Section 8.24(a).

"Credit Bid Purchase Agreement" shall have the meaning set forth in the recitals hereto.

"Credit Bid Purchaser" shall have the meaning set forth in the recitals hereto.

"Credit Party" means each of the Borrower and the Guarantors.

"Cure Period" shall have the meaning set forth in Section 6.05(a).

"Cure Right" shall have the meaning set forth in Section 6.05(a).

"Cure Right Fiscal Quarter" shall have the meaning set forth in Section 6.05(b)(i).

"Customary Intercreditor Agreement" means, to the extent executed in connection with the incurrence of Indebtedness secured by Liens on the Collateral which are intended to rank junior to the Liens on the Collateral securing the Loan Obligations, either (i) the Intercreditor Agreement described in clause (i) of the definition thereof, (ii) an intercreditor agreement substantially in the form of the Intercreditor Agreement (with such modifications as may be necessary or appropriate in light of prevailing market conditions and acceptable to the Administrative Agent in its Permitted Business Judgment) or (iii) a customary intercreditor agreement in form and substance acceptable to the Administrative Agent and/or the Collateral Agent and the Borrower, which agreement shall provide that the Liens on the Collateral securing such Indebtedness shall rank junior to the Liens on the Collateral securing the Loan Obligations. With regard to changes in light of prevailing market conditions as set forth above in clause (ii) or with regard to any intercreditor agreements described in clause (iii), such changes or agreement, as applicable, shall be posted to the Lenders not less than three (3) Business Days before execution thereof and, if the Required Lenders shall not have objected in writing to such changes within three (3) Business Days after posting, then the Required Lenders shall be deemed to have agreed that the Administrative Agent's and/or Collateral Agent's entry into such intercreditor agreement (including with such changes) is reasonable and to have consented to such intercreditor agreement (including with such changes) and to the Administrative Agent's and/or Collateral Agent's execution thereof.

"Daily Simple SOFR" means, for any day, SOFR, with the conventions for this rate (which will include a lookback) being established by the Administrative Agent in accordance with the conventions for this rate recommended by the Relevant Governmental Body for determining "Daily Simple SOFR" for syndicated

15

business loans; provided, that if the Administrative Agent decides that any such convention is not administratively feasible for the Administrative Agent, then the Administrative Agent may establish another convention in its reasonable discretion.

"Debt/Equity Incurrence Prepayment Event" means (a) any Incurrence by the Borrower or any of the Restricted Subsidiaries of any Indebtedness, but excluding any Indebtedness permitted to be issued or incurred under Section 5.06 and/or (b) the issuance by Holdings of any Equity Interests (including in connection with the exercise of an Equity Cure) other than, so long as no Event of Default has occurred and is continuing, any issuance of Equity Interests (i) issued in connection with "Permitted Investments" or (ii) for purposes of making capital expenditures.

"Debtors" shall have the meaning set forth in the recitals hereto.

"Default" means any event which is, or after notice or passage of time or both would be, an Event of Default.

"Defaulting Agent" means any Agent (a) has become or is insolvent or has a parent company that has become or is insolvent or (b) has become or has a parent company that has become the subject of a bankruptcy or insolvency proceeding or any action or proceeding of the type described in Section 6.01(e), or has had a receiver, conservator, trustee, administrator, assignee for the benefit of creditors or similar Person charged with reorganization or liquidation of its business or custodian, appointed for it, or has taken any action in furtherance of, or indicating its consent to, approval of or acquiescence in any such proceeding or appointment, or has a parent company that has become the subject of a bankruptcy or insolvency proceeding, or has had a receiver, conservator, trustee, administrator, assignee for the benefit of creditors or similar Person charged with reorganization or liquidation of its business or custodian, appointed for it, or has taken any action in furtherance of, or indicating its consent to, approval of or acquiescence in any such proceeding or appointment.

"Dispose" means to convey, sell, lease, sell and leaseback, assign, transfer (including via a Farm-Out Agreement) or otherwise dispose.

"Disposed EBITDAX" means, with respect to any Sold Entity or Business for any period, the amount for such period of EBITDAX of such Sold Entity or Business (determined as if references to the Borrower and the Restricted Subsidiaries in the definition of EBITDAX were references to such Sold Entity or Business and its respective Subsidiaries), all as determined on a consolidated basis for such Sold Entity or Business.

"Disposition" or "Disposed of" shall have a correlative meaning to the defined term of "Dispose".

"Disqualified Stock" means, with respect to any Person, any Capital Stock of such Person which, by its terms (or by the terms of any security into which it is convertible or for which it is redeemable or exchangeable), or upon the happening of any event:

(1)     matures or is mandatorily redeemable, pursuant to a sinking fund obligation or otherwise (other than as a result of a change of control or asset sale),

(2)     is convertible or exchangeable for Indebtedness or Disqualified Stock of such Person, or

(3)     is redeemable at the option of the holder thereof, in whole or in part (other than solely as a result of a change of control or asset sale),

in each case prior to 180 days after the earlier of the Maturity Date or the date the Loans are no longer outstanding; *provided*, *however*, that only the portion of Capital Stock which so matures or is mandatorily redeemable, is so convertible or exchangeable or is so redeemable at the option of the holder thereof prior to such date shall be deemed to be Disqualified Stock; *provided*, *further*, *however*, that if such Capital Stock is issued to any employee or to any plan for the benefit of employees of the Borrower or its Subsidiaries or by any such plan to such employees, such Capital Stock shall not constitute Disqualified Stock solely because it may be required to be repurchased by such Person in order to satisfy applicable statutory or regulatory obligations or as a result of such employee's termination, death or disability; *provided*, *further*, that any class of Capital Stock of such Person that by its terms authorizes such Person to satisfy its obligations thereunder by delivery of Capital Stock that is not Disqualified Stock shall not be deemed to be Disqualified Stock.

"Dollar Denominated Production Payments" means production payment obligations recorded as liabilities in accordance with GAAP, together with all undertakings and obligations in connection therewith.

"Domestic Subsidiary" means each Subsidiary of the Borrower that is organized under the laws of the United States or any state thereof, or the District of Columbia.

"Early Opt-in Effective Date" means, with respect to any Early Opt-in Election, the sixth (6th) Business Day after the date notice of such Early Opt-in Election is provided to the Lenders, so long as the Administrative Agent has not received, by 5:00 p.m. (New York City time) on the fifth (5th) Business Day after the date notice of such Early Opt-in Election is provided to the Lenders, written notice of objection to such Early Opt-in Election from Lenders comprising the Required Lenders.

"Early Opt-in Election" means the occurrence of (a) a notification by the Administrative Agent to (or the request by the Borrower to the Administrative Agent to notify) each of the other parties hereto that at least 5 currently outstanding U.S. dollar-denominated syndicated credit facilities at such time contain (as a result of amendment or as originally executed) a SOFR-based rate (including SOFR, a term SOFR or any other rate based upon SOFR) as a benchmark rate (and such syndicated credit facilities are identified in such notice and are publicly available for review), and (b) the joint election by the Administrative Agent and the Borrower to trigger a fallback from LIBOR and the provision by the Administrative Agent of written notice of such election to the Lenders.

"EBITDAX" means, with respect to the Borrower and the Subsidiary Guarantors on a consolidated basis for any period, the Consolidated Net Income of the Borrower and the Subsidiary Guarantors for such period *plus* (a) the sum of (in each case without duplication and to the extent the respective amounts described in subclauses (i) through (xii) of this clause (a) are otherwise deducted (and not added back) in arriving at such Consolidated Net Income for the respective period for which EBITDAX is being determined):

(i)        provision for Taxes based on income, profits or capital of the Borrower and the Subsidiary Guarantors for such period, including, without limitation, state, franchise and similar taxes and foreign withholding taxes (including penalties and interest related to taxes or arising from tax examinations),

(ii)        Consolidated Interest Expense of the Borrower and Subsidiary Guarantors for such period (net of interest income of the Borrower and the Restricted Subsidiaries for such period),

(iii)        depreciation, depletion and amortization expenses of the Borrower and the Restricted Subsidiaries for such period including, the amortization of intangible assets and deferred financing fees and amortization of unrecognized prior service costs and actuarial gains and losses related to pensions and other post-employment benefits,

(iv)        Capitalized Software Expenditures; provided, that, the amount included in EBITDAX in any four-fiscal quarter period pursuant to this subclause (iv) shall not exceed $500,000,

17

(v)      any other non-cash charges, including non-cash compensation charges or expenses realized or resulting from stock option plans, employee benefit plans or post-employment benefit plans, or grants or sales of stock, stock appreciation or similar rights, stock options, restricted stock, preferred stock or other rights; *provided*, that, for purposes of this subclause (v), any non-cash charges or losses shall be treated as cash charges or losses in any subsequent period during which cash disbursements attributable thereto are made (but excluding, for the avoidance of doubt, amortization of a prepaid cash item that was paid in a prior period),

(vi)      business optimization expenses and other restructuring charges or reserves (which, for the avoidance of doubt, shall include, without limitation, retention, severance, systems establishment costs, and contract termination costs); provided that (A) the aggregate amount of add-backs made pursuant to this subclause (vi) that are included in EBITDAX in any four-fiscal-quarter period shall not exceed 10% of EBITDAX (prior to giving effect to such add-backs) for such period and (B) shall only be permitted to the extent that the Administrative Agent shall have received reasonably detailed information supporting such amounts,

(vii)      any non-cash impairment charges or asset write-offs, in each case pursuant to GAAP and any non-cash impairment charges, asset write-offs or write-downs, including ceiling test write-downs, on Oil and Gas Properties under GAAP or SEC guidelines,

(viii)      any deductions (less any additions) attributable to minority interests except, in each case, to the extent of cash paid or received,

(ix)      exploration expenses or costs,

(x)      any net after-tax losses (less all fees and expenses or charges relating thereto) attributable to an asset sale (other than of Hydrocarbons in the ordinary course of business) and any Hedge Unwind Event*; provided* that, for purposes of this subclause (x) with respect to any Hedge Unwind Event, the amount of such net-after tax losses shall be added back on a pro rata basis over the remaining period during which the Hedging Obligation which is the subject of the applicable Hedge Unwind Event would have remained outstanding prior to such Hedge Unwind Event;

(xi)      the amount of any payments paid by the Borrower or any Restricted Subsidiary pursuant to settlement agreements or similar agreements, in each case, entered into during the pendency of the Cases in connection with the Restructuring Transactions; provided that, commencing with the four-fiscal quarter period ending on [March 31, 2022], amounts included in EBITDAX pursuant to this subclause (xi) shall (A) only be permitted to the extent that the Administrative Agent shall have received reasonably detailed information supporting such amounts and (B) not exceed $2,750,000 in any four-fiscal quarter period; and

(xii)      costs and expenses incurred in connection with the Plan of Reorganization, the Restructuring Transactions (as defined in the Plan of Reorganization) (including, for the avoidance of doubt and without duplication of other amounts added back to EBITDAX pursuant to this clause (xii), ongoing funding obligations with respect to FWE III (as defined in the Plan of Reorganization) under the FWE III Funding Agreement; provided that if any amounts with respect to the funding obligations referenced in this parenthetical are reimbursed or otherwise returned to the Credit Parties in a future period, the amount so received in cash in such future period shall be subtracted from EBITDAX for such future period) and the Transactions.

minus (b) the sum of (without duplication and to the extent the amounts described in this clause (b) increased such Consolidated Net Income for the respective period for which EBITDAX is being determined) (i) the amount of all general and administrative expenses and drilling and development costs during such period to the extent capitalized and not deducted from Consolidated Net Income for such period, (ii) any

18

net after-tax gains (less all fees and expenses or charges relating thereto) attributable to an asset sale (other than Hydrocarbons in the ordinary course of business) and any Hedge Unwind Event; *provided* that, for purposes of this subclause (ii) and any Hedge Unwind Event the amount of such net-after tax gains shall reduce EBITDAX on a pro rata basis over the remaining period during which the Hedging Obligation which is the subject of the applicable Hedge Unwind Event would have remained outstanding prior to such Hedge Unwind Event and (iii) non-cash items increasing Consolidated Net Income of the Borrower and the Restricted Subsidiaries for such period (but excluding any such items (A) in respect of which cash was received in a prior period or will be received in a future period or (B) which represent the reversal of any accrual of, or cash reserve for, anticipated cash charges that reduced EBITDAX in any prior period); in the case of each of clauses (a) and (b), as determined on a consolidated basis for the Borrower and the Restricted Subsidiaries in accordance with GAAP; *provided* that: (A) there shall be included in determining EBITDAX for any period of four consecutive fiscal quarters, without duplication, the Acquired EBITDAX of any Person or business or attributable to any property or asset, acquired by the Borrower or any Restricted Subsidiary in connection with a Material Acquisition during such period (but not the Acquired EBITDAX of any related Person or business or any Acquired EBITDAX attributable to any assets or property, in each case to the extent not so acquired) to the extent not subsequently sold, transferred, abandoned or otherwise Disposed of by the Borrower or such Restricted Subsidiary (each such Person, business, property or asset acquired and not subsequently so Disposed of, an "Acquired Entity or Business"), based on the actual Acquired EBITDAX of such Acquired Entity or Business or such period (including the portion thereof occurring prior to such acquisition or conversion) determined on a historical pro forma basis reflecting adjustments determined in good faith by a Financial Officer of the Borrower and reasonably acceptable to the Administrative Agent and (B) to the extent included in Consolidated Net Income, there shall be excluded in determining EBITDAX for any period of four consecutive fiscal quarters, the Disposed EBITDAX of any Person or business or attributable to any property or asset (other than the Closing Date Unrestricted Subsidiary) sold, transferred, abandoned or otherwise Disposed of or closed by the Borrower or any Restricted Subsidiary in connection with a Material Disposition during such period (each such Person, business, property or asset so sold or Disposed of or closed, a "Sold Entity or Business"), based on the actual Disposed EBITDAX of such Sold Entity or Business for such period (including the portion thereof occurring prior to such sale, transfer, abandonment or Disposition, closure or conversion) determined on a historical pro forma basis reflecting adjustments determined in good faith by a Financial Officer of the Borrower and reasonably acceptable to the Administrative Agent.

Notwithstanding anything to the contrary herein, with respect to each of the first three full fiscal quarters ending after the Closing Date, EBITDAX as of the last day of each such fiscal quarter shall be annualized (i) for the first full fiscal quarter, by multiplying EBITDAX for such fiscal quarter by four (4), (ii) for the second full fiscal quarter, by multiplying EBITDAX for the first two fiscal quarters ending after the Closing Date by two (2), and (iii) for the third full fiscal quarter, by multiplying EBITDAX for the first three fiscal quarters ending after the Closing Date by four-thirds (4/3).

"EEA Financial Institution" means (a) any credit institution or investment firm established in any EEA Member Country which is subject to the supervision of an EEA Resolution Authority, (b) any entity established in an EEA Member Country which is a parent of an institution described in clause (a) of this definition, or (c) any financial institution established in an EEA Member Country which is a subsidiary of an institution described in clauses (a) or (b) of this definition and is subject to consolidated supervision with its parent;

"EEA Member Country" means any of the member states of the European Union, Iceland, Liechtenstein, and Norway.

"EEA Resolution Authority" means any public administrative authority or any person entrusted with public administrative authority of any EEA Member Country (including any delegee) having responsibility for the resolution of any EEA Financial Institution.

"<u>Employee Benefit Plan</u>" means any "employee benefit plan" as defined in Section 3(3) of ERISA that is or was sponsored, maintained or contributed to by, or required to be contributed by, Holdings, the Borrower, any of their Subsidiaries or any ERISA Affiliates.

"<u>Environmental Claims</u>" means any and all actions, suits, orders, decrees, demands, demand letters, claims, liens, notices of noncompliance, restrictions on use, operations or transferability, violation, or potential responsibility or investigations or proceedings arising under or based upon any Environmental Law, Environmental Permit, or in connection with the presence, Release or threatened Release of, or exposure to, Hazardous Materials (hereinafter, "<u>Claims</u>"), including, without limitation, (i) any and all Claims by governmental or regulatory authorities for enforcement (including, without limitation, as a result of a violation under Environmental Law), cleanup, investigation, removal, response, remediation, corrective action or other actions or damages pursuant to any applicable Environmental Law, (ii) any and all Claims relating to real properties that are currently listed or proposed for listing on the National Priorities List or on the Superfund Enterprise Management System or any analogous state or local list; and (iii) any and all Claims by any third party seeking damages, contribution, indemnification, cost recovery, compensation or injunctive relief regarding the presence, release or threatened release of Hazardous Materials or arising from alleged injury or threat of injury to health or safety (to the extent relating to human exposure to Hazardous Materials), or the environment including, without limitation, ambient air, surface water, groundwater, land surface and subsurface strata and natural resources such as wetlands.

"<u>Environmental Law</u>" means any applicable Federal, state, foreign or local statute, law, rule, regulation, ordinance, code and rule of common law now or hereafter in effect and in each case as amended, and any binding judicial or administrative interpretation thereof, including any binding judicial or administrative order, consent decree or judgment, relating to the protection of the environment, including, without limitation, ambient air, surface water, groundwater, land surface and subsurface strata and natural resources such as wetlands, any generation, treatment, storage, Release or threatened Release, transport or disposal, or arrangement for disposal or transport for disposal of Hazardous Materials, or human health or safety (to the extent relating to human exposure to Hazardous Materials).

"<u>Environmental Permit</u>" means any permit, license, registration, consent, approval, exemption or other authorization required under any Environmental Law or issued by any Governmental Authority.

"<u>Equity Cure Amount</u>" shall have the meaning set forth in <u>Section 6.05(a)(ii)</u>.

"<u>Equity Cures</u>" shall have the meaning set forth in <u>Section 6.05(a)</u>.

"<u>Equity Interests</u>" means Capital Stock and all warrants, options or other rights to acquire Capital Stock (but excluding any debt security that is convertible into, or exchangeable for, Capital Stock).

"<u>ERISA</u>" means the Employee Retirement Income Security Act of 1974, as amended from time to time, and the rules and regulations promulgated thereunder.

"<u>ERISA Affiliate</u>" means each person (as defined in Section 3(9) of ERISA) that together with Holdings, the Borrower or any of their Subsidiaries would be deemed to be a "single employer" within the meaning of Section 414(b) or (c) of the Code or, solely for purposes of Section 302 of ERISA and Section 412 of the Code, is treated as a single employer under Section 414 of the Code.  Any former ERISA Affiliate of Holdings, the Borrower or any of their Subsidiaries shall continue to be considered an ERISA Affiliate of Holdings, the Borrower or any such Subsidiary within the meaning of this definition with respect to the period such entity was an ERISA Affiliate of Holdings, the Borrower or such Subsidiary and with respect to liabilities arising after such period for which Holdings, the Borrower or such Subsidiary could be liable under the Code or ERISA.

20

"ERISA Event" means (a) a Reportable Event with respect to a Plan; (b) a withdrawal by Holdings, the Borrower, any of their Subsidiaries or any ERISA Affiliate from a Plan subject to Section 4063 of ERISA during a plan year in which it was a substantial employer (as defined in Section 4001(a)(2) of ERISA) or a cessation of operations that is treated as such a withdrawal under Section 4062(e) of ERISA; (c) the failure of Holdings, the Borrower, any of their Subsidiaries or any ERISA Affiliate to make by its due date a required installment under Section 430(j) of the Code with respect to any Plan; (d) a failure to satisfy the minimum funding standard under Section 412 of the Code or Section 302 of ERISA, or the filing pursuant to Section 412(c) of the Code or Section 302(c) of ERISA of an application for a waiver of the minimum funding standard, in each case with respect to a Plan, whether or not waived, or a failure to make any required contribution to a Multiemployer Plan; (e) a complete or partial withdrawal by Holdings, the Borrower, any of their Subsidiaries or any ERISA Affiliate from a Multiemployer Plan or notification that a Multiemployer Plan is insolvent within the meaning of Title IV of ERISA, is in endangered or critical status, within the meaning of Section 305 of ERISA, or that it intends to terminate or has terminated under Section 4041A or 4042 of ERISA; (f) the filing of a notice of intent to terminate, the treatment of a Plan amendment as a termination under Section 4041 or 4041A of ERISA, respectively, or the commencement of proceedings by the PBGC to terminate a Plan; (g) the appointment of a trustee to administer any Plan or the occurrence of any event or condition that might constitute grounds under ERISA for the termination of, or appointment of a trustee to administer, any Plan; (h) the imposition of any liability under Title IV of ERISA or the imposition of a lien under Section 412 or 430(k) of the Code or Section 303 or 4068 of ERISA on any property (or rights to property, whether real or personal) of Holdings, the Borrower, any of their Subsidiaries or any ERISA Affiliate, but excluding PBGC premiums due but not delinquent under Section 4007 of ERISA, upon Holdings, the Borrower, any of their Subsidiaries or any ERISA Affiliate; (i) a determination that any Plan is, or is expected to be, in "at-risk" status (within the meaning of Section 303(i)(4)(A) of ERISA or Section 430(i)(4)(A) of the Code); (j) the occurrence of an act or omission that could give rise to the imposition on Holdings, the Borrower, any of their Subsidiaries or any ERISA Affiliate of fines, penalties, taxes or related charges under Chapter 43 of the Code or under Section 409, Section 502(c), (i) or (l), or Section 4071 of ERISA in respect of any Employee Benefit Plan; (k) the assertion of a material claim (other than routine claims for benefits) against any Employee Benefit Plan other than a Multiemployer Plan or the assets thereof, or against Holdings, the Borrower, any of their Subsidiaries or any ERISA Affiliate in connection with any Employee Benefit Plan; or (l) receipt from the Internal Revenue Service of notice of the failure of any Plan (or any other Employee Benefit Plan intended to be qualified under Section 401(a) of the Code) to qualify under Section 401(a) of the Code, or the failure of any trust forming part of any Plan (or any such Employee Benefit Plan) to qualify for exemption from taxation under Section 501(a) of the Code.

"Erroneous Payment" has the meaning assigned to it in Section 7.16(a).

"Erroneous Payment Deficiency Assignment" has the meaning assigned to it in Section 7.16(d).

"Erroneous Payment Impacted Loans" has the meaning assigned to it in Section 7.16(d).

"Erroneous Payment Return Deficiency" has the meaning assigned to it in Section 7.16(d).

"Erroneous Payment Subrogation Rights" has the meaning assigned to it in Section 7.16(d).

"EU Bail-In Legislation Schedule" means the EU Bail-In Legislation Schedule published by the Loan Market Association (or any successor person), as in effect from time to time.

"Event of Default" shall have the meaning set forth in Section 6.01.

"Excess Asset Sale Proceeds" shall have the meaning given to such term in Section 2.13(a).

"Excess Casualty Event Proceeds" shall have the meaning given to such term in Section 2.13(a).

21

"Exchange Act" means the Securities Exchange Act of 1934, as amended, and the rules and regulations of the SEC promulgated thereunder.

"Excluded Accounts" means (a) any deposit account, commodity account or securities account so long as the balance in each such account, individually, does not exceed $500,000 at any time and the aggregate balance of all such deposit accounts, commodity accounts and securities accounts does not at any time exceed $2,500,000, (b) any deposit account that is a zero balance account or a deposit account for which the balance of such deposit account is transferred at the end of each date to a deposit account that is not an Excluded Account, (c) any deposit accounts exclusively used for trust, payroll, payroll taxes and other employee wage and benefit payments to or for the benefit of any employees of the Credit Parties or any of their Subsidiaries, (d) any deposit account which is used in the ordinary course of business as a fiduciary account, trust or suspense account used for payments of royalty obligations, obligations to non-operating working interest owners of Oil and Gas Properties attributable to their share of production from such Oil and Gas Properties attributable to their share of production from such Oil and Gas Properties and similar obligations, in each case, which solely contains deposits made for the benefit of another Person (other than the Borrower or any of its Subsidiaries), and in which such deposits are held on behalf of, and for the benefit of, such other Person, and (e) any other deposit account, commodity account or securities account that is pledged to a third party to the extent such Lien is permitted pursuant to paragraph (1), (4), (6)(C), (13) or (14) of the definition of "Permitted Liens".

"Excluded Assets" shall have the meaning assigned to such term in the Collateral Agreement.

"Excluded Equity Interests" means (a) any Equity Interests with respect to which the Administrative Agent (acting in its sole discretion) and the Borrower mutually agree the cost or other consequences of pledging such Equity Interests in favor of the Secured Parties under the Security Documents shall be excessive in view of the benefits to be obtained by the Secured Parties therefrom, (b) any Equity Interests of a Receivables Subsidiary, and (c) any Equity Interests to the extent the pledge thereof would be prohibited by any applicable Requirement of Law.

"Excluded Subsidiary" means (a) each Domestic Subsidiary that is prohibited by any applicable Requirement of Law from guaranteeing or granting Liens to secure the Obligations at the time such Subsidiary becomes a Restricted Subsidiary (and for so long as such prohibition is in effect), (b) any Receivables Subsidiary, (c) the Closing Date Unrestricted Subsidiary (unless and until the Closing Date Unrestricted Subsidiary becomes a Restricted Subsidiary in accordance with (and solely to the extent required) Section 5.29) and (d) any other Domestic Subsidiary with respect to which, the Administrative Agent (acting in its sole discretion) and the Borrower mutually agree the cost or other consequences of providing a guarantee of or granting Liens to secure the Obligations shall be excessive in view of the benefits to be obtained by the Lenders therefrom.

"Excluded Swap Obligation" means any obligation of any Guarantor to pay or perform under any Swap, if, and to the extent that, all or a portion of the guarantee by such Guarantor of, or the grant by such Guarantor of a security interest to secure, such Swap (or any guarantee thereof) is or becomes illegal under the Commodity Exchange Act or any rule, regulation, or order of the Commodity Futures Trading Commission (or the application or official interpretation of any thereof) or any other applicable Requirement of Law.

"Excluded Taxes" means, with respect to the Administrative Agent, any Lender or any other recipient of any payment to be made by or on account of any obligation of any Credit Party hereunder or under any other Loan Document, (i) Taxes imposed on or measured by net income or branch profits (however denominated, and including (for the avoidance of doubt) any backup withholding in respect thereof under Section 3406 of the Code), and franchise Taxes imposed on it (in lieu of net income Taxes), in each case by a jurisdiction (including any political subdivision thereof) as a result of such recipient being organized in, having its principal office in, or in the case of any Lender, having its applicable lending office in, such jurisdiction or, as a result of any other present or former connection with such jurisdiction (other than any such connection arising solely from such recipient having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction

22

pursuant to or enforced any Loan Document, or sold or assigned an interest in any Loan or Loan Document), (ii) in the case of a Lender, U.S. federal withholding Tax imposed on any payment by or on account of any obligation of any Credit Party hereunder or under any other Loan Document that is required to be imposed on amounts payable to or for the account of a Lender (other than to the extent such Lender is an assignee pursuant to a request by the Borrower under Section 8.07) pursuant to laws in force at the time such Lender becomes a party hereto (or designates a new lending office), except to the extent that such Lender (or its assignor, if any) was entitled, immediately prior to the designation of a new lending office (or assignment), to receive additional amounts or indemnification payments from any Credit Party with respect to such withholding Tax pursuant to Section 2.15, (iii) any Tax attributable to the Administrative Agent's or any Lender's failure to comply with Section 2.15(d), (e), (g) or (h) or (iv) any withholding Tax imposed under FATCA.

"Existing Loans" has the meaning assigned to it in Section 2.02.

"Extraordinary Receipt Event" shall mean the occurrence of any event or circumstance as a result of which any the Borrower or any Restricted Subsidiary receives Extraordinary Receipts.

"Extraordinary Receipts" shall mean 100% of the Net Proceeds actually received by the Borrower or any Restricted Subsidiary not in the ordinary course of business consisting of federal, state or local Tax refunds, pension plan reversions, judgments and proceeds of litigation settlements or other settlements with any Governmental Authority (excluding Casualty Events).

"Fair Market Value" means, with respect to any asset or property, the price which could be negotiated in an arm's-length transaction, for cash, between a willing seller and a willing and able buyer, neither of whom is under undue pressure or compulsion to complete the transaction, as determined by the Borrower in good faith (provided that, upon reasonable request of the Administrative Agent, the Borrower shall provide reasonably detailed supporting evidence of making such determination).

"Farm-In Agreement" means an agreement whereby a Person agrees to pay all or a share of the drilling, completion or other expenses of one or more exploratory or development wells (which agreement may be subject to a maximum payment obligation, after which expenses are shared in accordance with the working or participation interests therein or in accordance with the agreement of the parties) or perform the drilling, completion or other operation on such well or wells as all or a part of the consideration provided in exchange for an ownership interest in an Oil and Gas Property.

"Farm-Out Agreement" means a Farm-In Agreement, viewed from the standpoint of the party that transfers an ownership interest to another.

"FATCA" means Sections 1471 through 1474 of the Code, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), any current or future regulations or official interpretations thereof, any agreements entered into pursuant to Section 1471(b)(1) of the Code and any fiscal or regulatory legislation, rules or practices adopted pursuant to any intergovernmental agreement, treaty or convention among Governmental Authorities and implementing such Sections of the Code.

"FCA" shall have the meaning set forth in Section 1.09(b)(i).

"Federal Funds Rate" means, for any period, a fluctuating interest rate per annum equal for each day during such period to the weighted average of the rates on overnight Federal funds transactions with members of the Federal Reserve System, as published for such day (or, if such day is not a Business Day, for the next preceding Business Day) by the Federal Reserve Bank of New York, or, if such rate is not so published for any day that is a Business Day, the Federal Funds Rate for the last day on which such rate was available.

23

"<u>Fee Letter</u>" means that certain letter agreement, dated as of the Closing Date, between the Borrower and the Agents.

"<u>Financial Officer</u>" of any Person means the Chief Financial Officer, principal accounting officer, Treasurer or Assistant Treasurer of such Person.

"<u>Flood Insurance Laws</u>" means, collectively, (i) the National Flood Insurance Act of 1968, as now or hereafter in effect or any successor statute thereto, (ii) the Flood Disaster Protection Act of 1973, as now or hereafter in effect or any successor statute thereto, (iii) the National Flood Insurance Reform Act of 1994, as now or hereafter in effect or any successor statute thereto and (iv) the Flood Insurance Reform Act of 2004, as now or hereafter in effect or any successor statute thereto.

"<u>Floor</u>" means the benchmark rate floor, if any, provided in this Agreement initially (as of the execution of this Agreement, the modification, amendment or renewal of this Agreement or otherwise) with respect to Adjusted LIBOR.

"<u>Foreign Disposition</u>" shall have the meaning set forth in <u>Section 2.13(a)(ii)</u>.

"<u>Foreign Plan</u>" means any employee benefit plan, program, policy, arrangement or agreement maintained or contributed to by Holdings, the Borrower or any of their Subsidiaries with respect to employees employed outside the United States.

"<u>Foreign Subsidiary</u>" means each Subsidiary of the Borrower that is not a Domestic Subsidiary.

"<u>FWE</u>" shall have the meaning set forth in the recitals hereto.

"<u>FWE III Funding Agreement</u>" means that certain Funding Agreement, dated as of [●], 2021, by and between Credit Bid Purchaser and FWE.

"<u>FWE Inc.</u>" shall have the meaning set forth in the recitals hereto.

"<u>GAAP</u>" means generally accepted accounting principles in the United States set forth in the opinions and pronouncements of the Accounting Principles Board of the American Institute of Certified Public Accountants and statements and pronouncements of the Financial Accounting Standards Board or in such other statements by such other entity as have been approved by a significant segment of the accounting profession, which are in effect from time to time.  For the purposes of this Agreement, the term "consolidated" with respect to any Person means such Person consolidated with its Restricted Subsidiaries, and shall not include the Closing Date Unrestricted Subsidiary, but the interest of such Person in the Closing Date Unrestricted Subsidiary will be accounted for as an Investment.

"<u>Genovesa Well</u>" means the well described in the Latest Reserve Report as MC 519 OCS 27278 #3.

"<u>Goldman Sachs</u>" means Goldman Sachs & Co. LLC.

"<u>Governmental Authority</u>" means any nation, sovereign or government, any state, province, territory or other political subdivision thereof, and any entity or authority exercising executive, legislative, judicial, taxing, regulatory or administrative functions of or pertaining to government, including a central bank or stock exchange.

"<u>GS</u>" shall have the meaning set forth in the preamble to this Agreement.

24

"guarantee" means a guarantee (other than by endorsement of negotiable instruments for collection in the ordinary course of business), direct or indirect, in any manner (including, without limitation, letters of credit and reimbursement agreements in respect thereof), of all or any part of any Indebtedness or other obligations.

"Guarantee" means any guarantee of the Loan Obligations and the Loans by any Guarantor in accordance with the provisions of this Agreement.

"Guarantee Obligations" means, as to any Person, any obligation of such Person guaranteeing or intended to guarantee any Indebtedness of any other Person (the "primary obligor") in any manner, whether directly or indirectly, including any obligation of such Person, whether or not contingent, (a) to purchase any such Indebtedness or any property constituting direct or indirect security therefor, (b) to advance or supply funds (i) for the purchase or payment of any such Indebtedness or (ii) to maintain working capital or equity capital of the primary obligor or otherwise to maintain financial condition or liquidity of the primary obligor so as to enable the primary obligor to pay such Indebtedness, (c) to purchase property, securities or services primarily for the purpose of assuring the owner of any such Indebtedness of the ability of the primary obligor to make payment of such Indebtedness or (d) otherwise to assure or hold harmless the owner of such Indebtedness against loss in respect thereof; *provided*, *however*, that the term "Guarantee Obligations" shall not include endorsements of instruments for deposit or collection in the ordinary course of business or customary and reasonable indemnity obligations in effect on the Closing Date or entered into in connection with any acquisition or disposition of assets permitted under this Agreement (other than such obligations with respect to Indebtedness). The amount of any Guarantee Obligation shall be deemed to be an amount equal to the stated or determinable amount of the Indebtedness in respect of which such Guarantee Obligation is made or, if not stated or determinable, the maximum reasonably anticipated liability in respect thereof as determined by such Person in good faith.

"Guarantor" means each of Holdings and the Subsidiary Guarantors; *provided* that upon the release or discharge of such Person from its Guarantee in accordance with this Agreement, such Person shall cease to be a Guarantor.

"Hazardous Materials" means (a) any petroleum or petroleum products, natural gas or natural gas liquids, radioactive materials, friable asbestos, urea formaldehyde foam insulation, polychlorinated biphenyls, and radon gas, (b) any chemicals, materials or substances defined as or included in the definition of "hazardous substances", "hazardous waste", "hazardous materials", "extremely hazardous waste", "restricted hazardous waste", "toxic substances", "toxic pollutants", "contaminants", or "pollutants", or words of similar import, under any applicable Environmental Law and (c) any other chemical, material or substance, which is prohibited, limited or regulated by any Environmental Law.

"Hazardous Materials Activity" means any past, current, proposed or threatened activity, event or occurrence involving any Hazardous Materials, including the use, manufacture, possession, storage, holding, presence, existence, location, Release, threatened Release, discharge, placement, generation, transportation, processing, construction, treatment, abatement, removal, remediation, disposal, disposition or handling of any Hazardous Materials, and any corrective action or response action with respect to any of the foregoing.

"Hedge Agreements" means (a) any and all rate swap transactions, basis swaps, credit derivative transactions, forward rate transactions, commodity swaps, commodity options, forward commodity contracts, future contracts, equity or equity index swaps or options, bond or bond price or bond index swaps or options or forward bond or forward bond price or forward bond index transactions, interest rate options, forward foreign exchange transactions, cap transactions, floor transactions, collar transactions, currency swap transactions, cross-currency rate swap transactions, currency options, total return swap, credit spread transaction, repurchase transaction, reverse repurchase transaction, securities lending transaction, weather index transaction, spot contracts, fixed-price physical delivery contracts, whether or not exchange traded, or any other similar transactions or any combination of any of the foregoing (including any options to enter into any of the foregoing), whether or not any such transaction is governed by or subject to any master agreement, and (b) any and all

25

transactions of any kind, and the related confirmations, which are subject to the terms and conditions of, or governed by, any form of master agreement published by the International Swaps and Derivatives Association, Inc., any International Foreign Exchange Master Agreement or any other master agreement (any such master agreement, together with any related schedules, a "Master Agreement"), including any such obligations or liabilities under any Master Agreement.  Notwithstanding the foregoing, agreements or obligations to physically sell any commodity at any index-based price shall not be considered Hedge Agreements.

"Hedge Bank" shall mean (a) any Person (other than the Borrower or any of its Subsidiaries) that (x) is a Lender or Agent or an Affiliate of a Lender or Agent on the Closing Date, (y) at the time it enters into a Hedge Agreement is a Lender or Agent or an Affiliate of a Lender or Agent, or (z) at any time after it enters into a Hedge Agreement it becomes a Lender or Agent or an Affiliate of a Lender or Agent or (b) any Person (other than the Borrower or any of its Subsidiaries) that is identified on Part B of Schedule 1.01(a) hereto (as such schedule may be updated from time to time by the Borrower with the consent of the Administrative Agent (such consent not to be unreasonably withheld)) and is a party to a Hedge Agreement with the Borrower or a Restricted Subsidiary and has delivered a notice substantially in the form attached hereto as Exhibit F.

"Hedge Unwind Event" means the monetization of a hedge position, whether by mutual agreement to terminate or "tear up", in connection with the designation of an early termination date (or any similar concept) with respect to, or the settlement of such hedge position.

"Hedge Unwind Proceeds" means any Net Proceeds received by the Borrower and/or its Restricted Subsidiaries in connection with any Hedge Unwind Event.

"Hedging Obligations" means, with respect to any Person, the obligations of such Person under Hedge Agreements other than Excluded Swap Obligations.

"Holdings" shall have the meaning set forth in the preamble to this Agreement.

"Hydrocarbon Interests" means all rights, titles, interests and estates now or hereafter acquired in and to oil and gas leases, oil, gas and mineral leases, or other liquid or gaseous hydrocarbon leases, mineral fee interests, overriding royalty and royalty interests, net profit interests and production payment interests, including any reserved or residual interests of whatever nature.

"Hydrocarbons" means oil, gas, casinghead gas, drip gasoline, natural gasoline, condensate, distillate, liquid hydrocarbons, gaseous hydrocarbons and all products refined or separated therefrom.

"IBA" shall have the meaning set forth in Section 1.09(b)(i).

"Incur" means issue, assume, guarantee, incur or otherwise become liable for; provided, however, that any Indebtedness or Capital Stock of a Person existing at the time such person becomes a Subsidiary (whether by merger, amalgamation, consolidation, acquisition or otherwise) shall be deemed to be Incurred by such Person at the time it becomes a Subsidiary.

"Indebtedness" means, with respect to any Person:

(1)      the principal and premium (if any) of any indebtedness of such Person, whether or not contingent, (a) in respect of borrowed money, (b) evidenced by bonds, notes, debentures or similar instruments or letters of credit or bankers' acceptances (or, without duplication, reimbursement agreements in respect thereof), (c) representing the deferred and unpaid purchase price of any property (except any such balance that constitutes (i) a trade payable or similar obligation to a trade creditor Incurred in the ordinary course of business, (ii) any earn-out obligations until such obligation becomes a liability on the balance sheet of such Person in accordance with GAAP and (iii) liabilities accrued in the ordinary course of business), which purchase price is due more than six months after the date of placing the property in service or taking delivery and title thereto, (d)

26

in respect of Capitalized Lease Obligations, or (e) representing any Hedging Obligations, if and to the extent that any of the foregoing indebtedness would appear as a liability on a balance sheet (excluding the footnotes thereto) of such Person prepared in accordance with GAAP;

(2)     to the extent not otherwise included, any obligation of such Person to be liable for, or to pay, as obligor, guarantor or otherwise, the obligations referred to in clause (1) of another Person (other than by endorsement of negotiable instruments for collection in the ordinary course of business); and

(3)     to the extent not otherwise included, Indebtedness of another Person secured by a Lien on any asset owned by such Person (whether or not such Indebtedness is assumed by such Person); *provided, however*, that the amount of such Indebtedness will be the lesser of: (a) the Fair Market Value of such asset at such date of determination, and (b) the amount of such Indebtedness of such other Person;

*provided, however,* that notwithstanding the foregoing, Indebtedness shall be deemed not to include (1) Contingent Obligations incurred in the ordinary course of business and not in respect of borrowed money (except as expressly included pursuant to clause (1) above); (2) purchase price holdbacks in respect of a portion of the purchase price of an asset to satisfy warranty or other unperformed obligations of the respective seller; (3) Production Payments and Reserve Sales; (4) any obligation of a Person in respect of a Farm-In Agreement or similar arrangement whereby such Person agrees to pay all or a share of the drilling, completion or other expenses of an exploratory or development well (which agreement may be subject to a maximum payment obligation, after which expenses are shared in accordance with the working or participation interest therein or in accordance with the agreement of the parties) or perform the drilling, completion or other operation on such well in exchange for an ownership interest in an oil or gas property; (5) in-kind obligations relating to net oil, natural gas liquids or natural gas balancing positions arising in the ordinary course of business; and (6) any Guarantee Obligations incurred in the ordinary course of business to the extent not guaranteeing Indebtedness.

Notwithstanding anything in this Agreement to the contrary, Indebtedness shall not include, and shall be calculated without giving effect to, the effects of Statement of Financial Accounting Standards No. 133 and related interpretations to the extent such effects would otherwise increase or decrease an amount of Indebtedness for any purpose under this Agreement as a result of accounting for any embedded derivatives created by the terms of such Indebtedness; and any such amounts that would have constituted Indebtedness under this Agreement but for the application of this sentence shall not be deemed an Incurrence of Indebtedness under this Agreement.

"Indemnified Liabilities" means, collectively, any and all liabilities, obligations, losses, damages (including natural resource damages), penalties, claims (including Environmental Claims), actions, judgments, suits, costs (including the costs of any investigation, study, sampling, testing, abatement, cleanup, removal, remediation or other response action necessary to remove, remediate, clean up or abate any Hazardous Materials Activity), Taxes, expenses and disbursements of any kind or nature whatsoever (including attorneys' fees and any fees or expenses incurred by Indemnitees in enforcing this indemnity), whether direct, indirect, special, or consequential and whether based on any federal, state or foreign laws, statutes, rules or regulations (including securities and commercial laws, statutes, rules or regulations and Environmental Laws), on common law or equitable cause or on contract or otherwise, that may be imposed on, incurred by, or asserted against any such Indemnitee (whether asserted by a third party or by any Credit Party or any of its affiliates), in any manner relating to or arising out of (i) this Agreement or the other Loan Documents or the transactions contemplated hereby or thereby (including the Lenders' agreement to make Loans or the use or intended use of the proceeds thereof, or any enforcement of any of the Loan Documents (including any sale of, collection from, or other realization upon any of the Collateral or the enforcement of the Guarantee)); (ii) the statements contained in the commitment letter delivered by any Lender to the Borrower with respect to the transactions contemplated by this Agreement; or (iii) any Environmental Claim or Hazardous Materials Activity relating to or arising from, directly or indirectly, any past or present activity, operation, land ownership, or practice of Holdings or any of its Subsidiaries.

<center>27</center>

"<u>Indemnified Taxes</u>" means all (a) Taxes (other than Excluded Taxes) imposed on or with respect to any payment by or on account of any obligation of any Credit Party hereunder or under any other Loan Document and (b) to the extent not otherwise described in (a), Other Taxes.

"<u>Indemnitee</u>" shall have the meaning set forth in <u>Section 8.05(b)</u>.

"<u>Information</u>" shall have the meaning set forth in <u>Section 3.08</u>.

"<u>Initial Hedging Period</u>" shall have the meaning set forth in <u>Section 5.23(a)</u>.

"<u>Intercreditor Agreement</u>"  shall mean (i) the intercreditor agreement among the Collateral Agent, the collateral agent under the SLTL Facility and the other parties from time to time party thereto, to be entered into on the Closing Date, substantially in the form attached hereto as <u>Exhibit H</u>, with such changes as the Administrative Agent shall reasonably agree in its Permitted Business Judgment, as it may be amended, restated, supplemented or otherwise modified from time to time in accordance with this Agreement or (ii) any replacement thereof that is a Customary Intercreditor Agreement.

"<u>Interest Payment Date</u>" means, (a) with respect to any ABR Loan, the last Business Day of each calendar quarter (being the last day of March, June, September and December of each year), and (b) otherwise, the last day of the Interest Period applicable to the Loan and, in the case of a Loan with an Interest Period of more than three months' duration each day that would have been an Interest Payment Date had successive Interest Periods of three months' duration been applicable to such Loan and, in addition, the date of any conversion of such Loan to an ABR Loan.

"<u>Interest Period</u>" means as to any Loan (other than an ABR Loan), the period commencing on the date of such borrowing or on the last day of the immediately preceding Interest Period applicable to such Loan, as applicable, and ending on the numerically corresponding day (or, if there is no numerically corresponding day, on the last day) in the calendar month that is 1, 3 or 6 months thereafter, as the Borrower may elect, or the date any Loan (other than an ABR Loan) is effectively converted to an ABR Loan in accordance with <u>Section 2.08</u> or repaid or prepaid in accordance with <u>Section 2.04</u>, <u>Section 2.12</u> or <u>Section 2.13</u> or on the Maturity Date; *provided* that if any Interest Period would end on a day other than a Business Day, such Interest Period shall be extended to the next succeeding Business Day unless such next succeeding Business Day would fall in the next calendar month, in which case such Interest Period shall end on the next preceding Business Day. Interest shall accrue from and including the first day of an Interest Period to but excluding the last day of such Interest Period.  For purposes hereof, the date of a borrowing of a Loan initially shall be the date on which such borrowing is made and thereafter shall be the effective date of the most recent conversion or continuation of such borrowing.

"<u>Interest Period Election Request</u>" means a request by the Borrower to elect an Interest Period in accordance with <u>Section 2.19</u>.

"<u>Investment Grade Securities</u>" means:

(1)      securities issued or directly and fully guaranteed or insured by the U.S. government or any agency or instrumentality thereof (other than Cash Equivalents),

(2)      securities that have a rating equal to or higher than Baa3 (or equivalent) by Moody's and BBB- (or equivalent) by S&P, but excluding any debt securities or loans or advances between and among the Borrower and its Subsidiaries,

(3)      investments in any fund that invests exclusively in investments of the type described in <u>clauses (1)</u> and <u>(2)</u> which fund may also hold immaterial amounts of cash pending investment and/or distribution, and

28

(4)        corresponding instruments in countries other than the United States customarily utilized for high quality investments and in each case with maturities not exceeding two years from the date of acquisition.

"<u>Investments</u>" means, with respect to any Person, all investments by such Person in other Persons (including Affiliates) in the form of loans (including guarantees), advances or capital contributions (excluding accounts receivable, trade credit and advances to customers and commission, travel and similar advances to officers, employees and consultants made in the ordinary course of business), purchases or other acquisitions for consideration of Indebtedness, Equity Interests or other securities issued by any other Person and investments that are required by GAAP to be classified on the balance sheet of such Person in the same manner as the other investments included in this definition to the extent such transactions involve the transfer of cash or other property.

"<u>Investors</u>" means the Persons set forth on <u>Schedule 1.01(b)</u>.

"<u>IRS</u>" shall have the meaning set forth in <u>Section 2.15(e)(i)</u>.

"<u>Isabela Transaction</u>" means the transactions that occurred in the fourth quarter of 2018 which provide for monthly cash payments to Holdings from BP Exploration and Production Inc. based on a percentage the revenue generated from the Isabela field through 2021 (subject to an annual true-up).

"<u>Judgment Currency</u>" shall have the meaning set forth in <u>Section 8.17(b)</u>.

"<u>Junior Debt</u>" means any Indebtedness for borrowed money that is expressly subordinated in right of payment and/or security to the Indebtedness incurred under this Agreement (including, without limitation, the SLTL Facility) (or, in each case, any Refinancing Indebtedness in respect thereof to the extent constituting Junior Debt).

"<u>Junior Lien Obligations</u>" means the Obligations with respect to Junior Debt, which by its terms is intended to be secured by the Collateral on a basis junior to the Loans; *provided* such Lien is permitted to be incurred under this Agreement.

"<u>Latest Reserve Report</u>" means the most recent Reserve Report (or "roll-forward" thereof) delivered pursuant to <u>Section 5.26(a)</u> through <u>(d)</u>.

"<u>Lender</u>" means each financial institution listed on <u>Schedule 2.01</u>, and any Person that becomes a "Lender" hereunder pursuant to <u>Section 8.06</u>, other than any such Person that has ceased to be a party hereto pursuant to an Assignment and Acceptance in accordance with <u>Section 8.06</u>.

"<u>Lending Office</u>" means, as to any Lender, the applicable branch, office, Affiliate or account (if appropriate) of such Lender designated by such Lender to make Loans to the Borrower.

"<u>Leverage Cure Amount</u>" shall have the meaning set forth in <u>Section 6.05(a)(i)</u>.

"<u>LIBOR</u>" means for any Interest Period and as determined on the date that is two Business Days prior to the first day of such Interest Period (i)(a) the rate per annum equal to the rate determined by Administrative Agent to be the London interbank offered rate administered by the ICE Benchmark Administration (or any other Person that takes over the administration of that rate) for deposits (for delivery on the first day of such period) with a term equivalent to such period in dollars displayed on the ICE LIBOR USD page of the Reuters Screen (or any replacement Reuters page that displays such rate) or on the appropriate page of any other information service that publishes that rate from time to time in place of Reuters, determined as of approximately 11:00 a.m. (London, England time) on such determination date (the rate referenced in this clause (a), the "<u>Eurodollar Screen Rate</u>"), or (b) in the event the Eurodollar Screen Rate is not available, the rate per

29

WEIL:\97847440\31\45327.0007

annum equal to the offered rate, truncated at five decimal digits, that is set forth on or in such other available quotation page or service as is acceptable to Administrative Agent in its sole discretion and that provides an average ICE Benchmark Administration Limited Interest Settlement Rate or another London interbank offered rate administered by any other Person that takes over the administration of such rate for deposits (for delivery on the first day of the relevant period) with a term equivalent to such period in dollars, determined as of approximately 11:00 a.m. (London, England time) on such determination date, or (c) in the event the rates referenced in the preceding clauses (a) and (b) are not available or if such information, in the reasonable judgment of Administrative Agent, shall cease to accurately reflect the rate offered by leading banks in the London interbank market as reported by any publicly available source of similar market data selected by Administrative Agent, the rate per annum equal to the rate determined by Administrative Agent to be the offered rate, truncated at five decimal digits, to first class banks in the London interbank market for deposits (for delivery on the first day of the relevant period) with a term equivalent to such Interest Period in Dollars, determined as of approximately 11:00 a.m. (London, England time) on such determination date.

"LIBOR Borrowing" means a Borrowing comprised of LIBOR Loans.

"LIBOR Loan" means a Loan bearing interest at a rate equal to Adjusted LIBOR plus the Applicable Margin.

"Lien" means, with respect to any asset, any mortgage, lien, pledge, charge, security interest or similar encumbrance of any kind in respect of such asset, whether or not filed, recorded or otherwise perfected under applicable law (including any conditional sale or other title retention agreement, any lease in the nature thereof, any option or other agreement to sell or give a security interest in and any filing of or agreement to give any financing statement under the Uniform Commercial Code (or equivalent statutes) of any jurisdiction); provided that in no event shall an operating lease be deemed to constitute a Lien.

"Loan Documents" means this Agreement, the Guarantee, the Security Documents, any promissory note issued by the Borrower under this Agreement, the Fee Letter, and any intercreditor agreement with respect to this Agreement and the Loans entered into on or after the Closing Date to which the Administrative Agent or Collateral Agent is a party on behalf of the Lenders (including the Intercreditor Agreement).

"Loan Obligations" means all obligations in respect of the Loans and other obligations arising under this Agreement, the Security Documents and the other Loan Documents, including, for the avoidance of doubt, the Guarantees and all penalties, fees, indemnifications, reimbursements, damages and other liabilities payable thereunder (including, in each case, interest and any other of the foregoing amounts that, but for the filing of a petition in bankruptcy with respect to any Credit Party, would have accrued on any of the foregoing, whether or not a claim is allowed against such Credit Party for such interest in the related bankruptcy proceeding).

"Loans" means the term loans deemed made to the Borrower pursuant to Section 2.01(a).

"Material Acquisition" means an acquisition, merger, amalgamation or consolidation resulting in the Borrower and/or any Subsidiary Guarantor acquiring an Acquired Entity or Business with a Fair Market Value in excess of $2,500,000.

"Material Adverse Effect" means a circumstance or condition that would, individually or in the aggregate, have a material adverse effect on (a) the business, assets, operations, properties or financial condition of Holdings, the Borrower and its Subsidiaries, taken as a whole, (b) the ability of the Borrower and the Credit Parties, taken as a whole, to perform their obligations under this Agreement or any of the other Loan Documents, taken as a whole, (c) the rights and remedies of the Agents and the Lenders under this Agreement or under any of the other Loan Documents or (d) the validity, perfection or priority of a Lien in favor of the Collateral Agent for the benefit of the Secured Parties on the Collateral, taken as a whole.

"Material Contract" means (i) any joint operating agreement covering Oil and Gas Properties of the Borrower and its Restricted Subsidiaries constituting greater than 20% of the PV-10 Value of 2P Developed Producing Reserves, (ii) Contractual Obligations entered into to engage drillships and other equipment and drilling and completion service providers resulting in net costs or other net liabilities to the Borrower and its Restricted Subsidiaries in excess of $25,000,000, (iii) the organizational documents of the Closing Date Unrestricted Subsidiary and any Contractual Obligations relating to the ownership by the Borrower and its Subsidiaries of the Mexico Assets, including any Contractual Obligations providing for required capital contributions to be made in respect thereof, (iv) any contract binding on the Borrower or any of its Restricted Subsidiaries with [Fieldwood Energy I LLC], [Fieldwood Energy II LLC], or any of their respective Affiliates (including, without limitation, any transition services agreements, joint development agreements and net profits interests agreements) and (v) each contract (other than the Loan Documents) to which such Person is a party which is material to the operations, business, properties or financial condition of such Person and which breach, nonperformance, termination or failure to renew would, either individually or in the aggregate, have a Material Adverse Effect.

"Material Disposition" means the sale, transfer, abandonment, Disposition, transfer or closure of any Sold Entity or Business with a fair market value in excess of $2,500,000.

"Material Indebtedness" shall mean Indebtedness (other than Loans or other Indebtedness under any Loan Document) of any one or more of the Borrower or any Restricted Subsidiary in an aggregate principal amount exceeding $10,000,000.

"Material Liability" means liabilities in excess of $15,000,000.

"Maturity Date" means the fourth anniversary of the Closing Date.

"Mexico Assets" means assets (or equity interests in subsidiaries owning assets) associated with the Borrower and its Subsidiaries' operations and/or investments in Mexico on the Closing Date.

"Mexico Liquidity Event" means any sale or other monetization of Mexico Assets.

"Moody's" means Moody's Investors Service, Inc. or any successor to the rating agency business thereof.

"Mortgaged Properties" means the owned real property, and any Oil and Gas Properties constituting real property interests, of the Borrower or any Subsidiary Guarantor encumbered by a Mortgage. Notwithstanding any provision in this Agreement or any other Loan Document to the contrary, in no event is any Building (as defined in the applicable Flood Insurance Laws) or Manufactured (Mobile) Home (as defined in the applicable Flood Insurance Laws) included in the definition of "Mortgaged Property" and no Building or Manufactured (Mobile) Home shall be encumbered by this Agreement or any other Loan Document; *provided*, that (a) such Building and Manufactured (Mobile) Home exclusion shall not exclude any interests in any lands, Hydrocarbons or other property situated under, in, or adjacent to any such Building or Manufactured (Mobile) Home and (b) for the avoidance of doubt, neither the Borrower nor any Restricted Subsidiary shall permit to exist any Lien on any Building or Manufactured (Mobile) Home except Permitted Liens.

["Mortgages" means, collectively, the mortgages, trust deeds, deeds of trust and other security documents (if any) delivered with respect to Mortgaged Properties, as amended, supplemented, or otherwise modified from time to time.][1]

---

[1] NTD: To be updated to specifically reflect documentation to be entered into on the emergence date.

"<u>Multiemployer Plan</u>" means any Employee Benefit Plan that is a multiemployer plan as defined in Section 4001(a)(3) of ERISA.

"<u>Net Income</u>" means, with respect to any Person, the net income (loss) of such Person and its Restricted Subsidiaries, determined in accordance with GAAP and before any reduction in respect of Preferred Stock dividends.

"<u>Net Proceeds</u>" means the aggregate cash proceeds received by Holdings, the Borrower or any Restricted Subsidiary in respect of any Asset Sale, Casualty Event (including, without limitation, any payments pursuant to purchase price adjustments and any cash payments received by way of earnout, deferred payment of principal pursuant to a note or installment receivable or otherwise, but only as and when received, but excluding the assumption by the acquiring person of Indebtedness relating to the disposed assets or other consideration received in any other non-cash form), Extraordinary Receipt Event or Debt/Equity Incurrence Prepayment Event, net of the direct costs relating to such Asset Sale, Casualty Event, Extraordinary Receipt Event or Debt/Equity Incurrence Prepayment Event (including, without limitation, legal, accounting and investment banking fees, and brokerage and sales commissions), and any relocation expenses Incurred as a result thereof, taxes paid or payable as a result thereof (including Tax Distributions and after taking into account any available tax credits or deductions and any tax sharing arrangements related solely to such disposition), amounts required to be applied to the repayment of principal, premium (if any) and interest on Indebtedness required to be paid as a result of such transaction, amounts paid in connection with the termination of Hedging Obligations related to Indebtedness repaid with such proceeds or hedging oil, natural gas and natural gas liquid production in notional volumes corresponding to the Oil and Gas Properties subject to such Asset Sale, Casualty Event, Extraordinary Receipt Event or Debt/Equity Incurrence Prepayment Event, and any deduction of appropriate amounts to be provided by the Borrower as a reserve in accordance with GAAP against any liabilities associated with the asset disposed of in such transaction and retained by the Borrower after such sale or other disposition thereof, including, without limitation, pension and other post-employment benefit liabilities and liabilities related to environmental matters or against any indemnification obligations associated with such transaction.

"<u>Non-Bank Tax Certificate</u>" shall have the meaning set forth in <u>Section 2.15(e)(i)</u>.

"<u>Non-Consenting Lender</u>" shall have the meaning set forth in <u>Section 8.07(b)</u>.

"<u>Non-U.S. Lender</u>" means any Lender (a) that is not disregarded as separate from its owner for U.S. federal income tax purposes and that is not a "United States person" as defined by Section 7701(a)(30) of the Code or (b) that is disregarded as separate from its owner for U.S. federal income tax purposes and whose regarded owner is not a "United States person" as defined by Section 7701(a)(30) of the Code.

"<u>Note</u>" means any promissory note issued to a Lender or its registered assigns that evidences the Loans extended by such Lender to the Borrower.

"<u>Notice of Borrowing</u>" shall have the meaning set forth in <u>Section 2.03(a)</u>.

"<u>Notice of Intent to Cure</u>" shall have the meaning set forth in <u>Section 6.05(d)</u>.

"<u>Obligations</u>" means shall mean all Loan Obligations, all Cash Management Obligations under Secured Cash Management Agreements, all Secured Hedge Obligations, all Erroneous Payment Subrogation Rights and all penalties, fees, indemnifications, reimbursements, damages and other liabilities payable thereunder (including, in each case, interest and any other of the foregoing amounts that, but for the filing of a petition in bankruptcy with respect to such Credit Party, would have accrued on any of the foregoing, whether or not a claim is allowed against such Credit Party for such interest in the related bankruptcy proceeding). Notwithstanding the foregoing, (a) the obligations of the Borrower or any Restricted Subsidiary under any Secured Hedge Agreement and under any Secured Cash Management Agreement that has been secured at the option of the Borrower (such option shall be deemed exercised as reflected in the documents related to any such

32

Secured Hedge Agreement or Secured Cash Management Agreement among the Borrower and the applicable Hedge Bank or Cash Management Bank) shall be secured and guaranteed pursuant to the Security Documents and the Guarantee only to the extent that, and for so long as, the other Obligations are so secured and guaranteed and (b) any release of Collateral or Guarantors effected in the manner permitted by this Agreement and the other Loan Documents shall not require the consent of the holders of Hedge Obligations under Secured Hedge Agreements or of the holders of Cash Management Obligations under Secured Cash Management Agreements.

"OFAC" means the Office of Foreign Assets Control of the U.S. Department of the Treasury and any successor Governmental Authority.

"Officers' Certificate" means a certificate signed on behalf of the Borrower by two Authorized Officers of the Borrower, one of whom must be the principal executive officer, the principal financial officer, the treasurer or the principal accounting officer of the Borrower, which meets the requirements set forth in this Agreement.

"Oil and Gas Business" means:

(1)     the business of acquiring, exploring, exploiting, developing, producing, operating and disposing of interests in oil, natural gas, natural gas liquids, liquefied natural gas and other Hydrocarbons and mineral properties or products produced in association with any of the foregoing;

(2)     the business of gathering, marketing, distributing, treating, processing, storing, refining, selling and transporting of any production from such interests or properties and products produced in association therewith and the marketing of oil, natural gas, other Hydrocarbons and minerals obtained from unrelated Persons;

(3)     any other related energy business, including power generation and electrical transmission business, directly or indirectly, from oil, natural gas and other Hydrocarbons and minerals produced substantially from properties in which the Borrower or its Restricted Subsidiaries, directly or indirectly, participate;

(4)     any business relating to oil field sales and service; and

(5)     any business or activity relating to, arising from, or necessary, appropriate, incidental or ancillary to the activities described in the foregoing clauses (1) through (4) of this definition.

"Oil and Gas Properties" means (a) Hydrocarbon Interests, (b) the properties now or hereafter pooled or unitized with Hydrocarbon Interests, (c) all presently existing or future unitization, pooling agreements and declarations of pooled units and the units created thereby (including all units created under orders, regulations and rules of any Governmental Authority) which may affect all or any portion of the Hydrocarbon Interests, (d) all operating agreements, contracts and other agreements, including production sharing contracts and agreements, which relate to any of the Hydrocarbon Interests or the production, sale, purchase, exchange or processing of Hydrocarbons from or attributable to such Hydrocarbon Interests, (e) all Hydrocarbons in and under and which may be produced and saved or attributable to the Hydrocarbon Interests, including all oil in tanks, and all rents, issues, profits, proceeds, products, revenues and other incomes from or attributable to the Hydrocarbon Interests, (f) all tenements, hereditaments, appurtenances and properties in any manner appertaining, belonging, affixed or incidental to the Hydrocarbon Interests and (g) all properties, rights, titles, interests and estates described or referred to above, including any and all property, real or personal, now owned or hereafter acquired and situated upon, used, held for use or useful in connection with the operating, working or development of any of such Hydrocarbon Interests or property (excluding drilling rigs, automotive equipment, rental equipment or other personal property which may be on such premises for the purpose of drilling a well or for other similar temporary uses) and including any and all oil wells, gas wells, injection wells or other wells, structures, fuel separators, liquid extraction plants, plant compressors, pumps, pumping units, field gathering

33

systems, gas processing plants and pipeline systems and any related infrastructure to any thereof, tanks and tank batteries, fixtures, valves, fittings, machinery and parts, engines, boilers, meters, apparatus, equipment, appliances, tools, implements, cables, wires, towers, casing, tubing and rods, surface leases, rights-of-way, easements and servitudes together with all additions, substitutions, replacements, accessions and attachments to any and all of the foregoing.

"Original RBL Credit Agreement" shall have the meaning set forth in the recitals hereto.

"Other Taxes" means any and all present or future stamp, registration, documentary, intangible, recording, filing or any other excise, property or similar Taxes arising from any payment made hereunder or made under any other Loan Document or from the execution or delivery of, performance, registration or enforcement of, from the receipt or perfection of a security interest under, consummation or administration of, or otherwise with respect to, this Agreement or any other Loan Document; *provided* that such term shall not include Taxes that result from an assignment ("Assignment Taxes") to the extent such Assignment Taxes are imposed as a result of a connection between the assignor and the taxing jurisdiction (other than a connection arising solely from any Loan Documents or any transactions contemplated thereunder), except to the extent that any such action described in this proviso is requested or required by the Borrower.

"Parent Entity" means any Person that is a direct or indirect parent company (which may be organized as a partnership) of the Borrower, including, without limitation, Holdings.

"Participant" shall have the meaning set forth in Section 8.06(c)(i).

"Participant Register" shall have the meaning set forth in Section 8.06(c)(ii).

"Payment Recipient" has the meaning assigned to it in Section 7.16(a).

"PBGC" means the Pension Benefit Guaranty Corporation established pursuant to Section 4002 of ERISA, or any successor thereto.

"Permitted Business Investment" means any Investment and/or expenditure made in the ordinary course of business or which are of a nature that is or shall have become customary in the Oil and Gas Business generally or in the geographic region in which such activities occur, including investments or expenditures for actively exploiting, exploring for, acquiring, developing, producing, processing, gathering, marketing, distributing, storing, or transporting oil, natural gas or other Hydrocarbons and minerals (including with respect to plugging and abandonment) through agreements, transactions, interests or arrangements which permit one to share risks or costs, comply with regulatory requirements regarding local ownership or satisfy other objectives customarily achieved through the conduct of the Oil and Gas Business jointly with third parties, including:

(1)      Investments in ownership interests (including equity, joint venture or other ownership interests) in oil, natural gas, other Hydrocarbons and minerals properties, liquefied natural gas facilities, processing facilities, gathering systems, pipelines, storage facilities or related systems or ancillary real property interests;

(2)      Investments in the form of or pursuant to operating agreements, working interests, royalty interests, mineral leases, processing agreements, Farm-In Agreements, Farm-Out Agreements, contracts for the sale, transportation or exchange of oil, natural gas, other Hydrocarbons and minerals, production sharing agreements, participation agreements, development agreements, area of mutual interest agreements, unitization agreements, pooling agreements, joint bidding agreements, service contracts, joint venture agreements, partnership agreements (whether general or limited), subscription agreements, stock purchase agreements, stockholder agreements and other similar agreements (including for limited liability companies) with third parties; and

34

(3)      Investments in direct or indirect ownership interests in drilling rigs and related equipment, including, without limitation, transportation equipment.

"<u>Permitted Business Judgment</u>" means with respect to any term or provision of this Agreement or the other Loan Documents that requires the approval, satisfaction, discretion, determination, decision, action or inaction or any similar concept of or by the Administrative Agent, in each case, whether at the request of the Borrower or otherwise, as applicable (collectively, an "Agent Action"), a determination made in good faith with respect to such Agent Action by the Administrative Agent in the exercise of its reasonable business judgment; provided that, at the Administrative Agent's option, the Administrative Agent may confirm its authority to take such Agent Action, including after giving such consent, by (a) notifying all Lenders via the Platform of the proposed Agent Action and (b) Lenders constituting Required Lenders consenting to such Agent Action in the manner prescribed in the relevant communication; provided, that if a Lender does not expressly provide its consent or does not expressly provide its lack of consent with respect to such Agent Action within three (3) Business Days of receiving such communication (or such shorter period set forth in the Agreement), then such Lender shall be deemed to have consented to such Agent Action.

"<u>Permitted Cure Securities</u>" means Equity Interests in Holdings in the form of common equity or otherwise in the form reasonably acceptable to the Required Lenders issued during any applicable Cure Period and designated as "Permitted Cure Securities" by the Borrower by notice to the Administrative Agent prior to the end of such Cure Period.

"<u>Permitted Holders</u>" means, at any time, each of the Investors and their respective Affiliates (other than any Affiliate that is a portfolio operating company of such Investors) and any investment funds advised, co-advised, managed or co-managed by any of the foregoing.

"<u>Permitted Investments</u>" means:

(1)      any Investment in the Borrower or any Restricted Subsidiary that is a Guarantor;

(2)      any Investment in Cash Equivalents or Investment Grade Securities;

(3)      any Investment by the Borrower or any Restricted Subsidiary in a Person if as a result of such Investment (a) such Person becomes a Restricted Subsidiary that is a Guarantor, or (b) such Person, in one transaction or a series of related transactions, is merged, consolidated or amalgamated with or into, or transfers or conveys all or substantially all of its assets to, or is liquidated into, the Borrower or a Restricted Subsidiary that is a Guarantor;

(4)      any Investment existing on, or made pursuant to binding commitments existing on, the Closing Date or an Investment consisting of any extension, modification or renewal of any Investment existing on the Closing Date, in each case, listed on <u>Schedule 5.07</u>;

(5)      advances to employees, taken together with all other advances made pursuant to this <u>clause (5)</u>, not to exceed $2,000,000 at any one time outstanding; *provided* that no advances pursuant to this <u>clause (5)</u> shall be made if a Default or Event of Default has occurred and is continuing or would result therefrom;

(6)      any Investment acquired by the Borrower or any Restricted Subsidiary (a) in exchange for any other Investment or accounts receivable held by the Borrower or such Restricted Subsidiary in connection with or as a result of a bankruptcy, workout, reorganization or recapitalization of the issuer of such other Investment or accounts receivable, or (b) as a result of a foreclosure by the Borrower or any Restricted Subsidiary with respect to any secured Investment or other transfer of title with respect to any secured Investment in default;

(7)      Hedging Obligations permitted under <u>Section 5.06</u>;

35

(8)    additional Investments by the Borrower or any Restricted Subsidiary having an aggregate Fair Market Value, taken together with all other Investments made pursuant to this clause (8) that are at that time outstanding, not to exceed $20,000,000 at the time of such Investment (with the Fair Market Value of each Investment being measured at the time made and without giving effect to subsequent changes in value); *provided, however*, that if any Investment pursuant to this clause (8) is made in any Person that is not the Borrower or a Restricted Subsidiary at the date of the making of such Investment and such Person becomes the Borrower or a Restricted Subsidiary after such date, such Investment shall thereafter be deemed to have been made pursuant to clause (1) above and shall cease to have been made pursuant to this clause (8) for so long as such Person continues to be the Borrower or a Restricted Subsidiary;

(9)    loans and advances to officers, directors or employees for business-related travel expenses, moving expenses and other similar expenses, in each case Incurred in the ordinary course of business to fund such person's purchase of Equity Interests of the Borrower or any direct or indirect parent of the Borrower, taken together with all other loans and advances made pursuant to this clause (9), not to exceed $2,000,000 at any one time outstanding; *provided* that no loans or advances pursuant to this clause (9) shall be made if a Default or Event of Default has occurred and is continuing or would result therefrom;

(10)    Investments the payment for which consists of Equity Interests of the Borrower (other than Disqualified Stock) or any direct or indirect parent of the Borrower, as applicable;

(11)    Investments consisting of the licensing or contribution of intellectual property pursuant to joint marketing arrangements with other Persons;

(12)    (x) guarantees issued in accordance with Sections 5.06 and 5.13, including, without limitation, any guarantee or other obligation issued or incurred under this Agreement and SLTL Credit Agreement in connection with any letter of credit issued for the account of the Borrower or any of its Subsidiaries (including with respect to the issuance of, or payments in respect of drawings under, such letters of credit) and (y) guarantees of performance or other obligations (other than Indebtedness) arising in the ordinary course in the Oil and Gas Business, including obligations under Hydrocarbon exploration, development, joint operating and related agreements and licenses, concessions or operating leases related to the Oil and Gas Business;

(13)    Investments consisting of or to finance purchases and acquisitions of inventory, supplies, materials, services or equipment or purchases of contract rights or licenses or leases of intellectual property in the ordinary course of business;

(14)    any Investment in a Receivables Subsidiary or any Investment by a Receivables Subsidiary in any other Person, in each case, in connection with a Qualified Receivables Financing, including Investments of funds held in accounts permitted or required by the arrangements governing such Qualified Receivables Financing or any related Indebtedness;

(15)    any Investment in an entity which is not a Restricted Subsidiary to which a Restricted Subsidiary sells accounts receivable pursuant to a Qualified Receivables Financing;

(16)    so long as no Event of Default has occurred and is continuing or results therefrom, additional Investments in joint ventures not to exceed, at any one time in the aggregate outstanding under this clause (16), $5,000,000 (with the Fair Market Value of each Investment being measured at the time such Investment is made and without giving effect to subsequent changes in value); *provided, however*, that if any Investment pursuant to this clause (16) is made in any Person that is not the Borrower or a Restricted Subsidiary at the date of the making of such Investment and such Person becomes the Borrower or a Restricted Subsidiary after such date, such Investment shall thereafter be deemed to have been made pursuant to clause (1) above and shall cease to have been made pursuant to this clause (16) for so long as such Person continues to be the Borrower or a Restricted Subsidiary;

36

(17)　Investments of a Restricted Subsidiary acquired after the Closing Date or of an entity merged into, amalgamated with, or consolidated with the Borrower or a Restricted Subsidiary in a transaction that is not prohibited by Section 5.11 after the Closing Date to the extent that such Investments were not made in contemplation of such acquisition, merger, amalgamation or consolidation and were in existence on the date of such acquisition, merger, amalgamation or consolidation;

(18)　Permitted Business Investments;

(19)　Investments constituting non-cash proceeds of dispositions of assets to the extent permitted Section 5.08;

(20)　Investments in the ordinary course of business consisting of endorsements for collection or deposit and customary trade arrangements with customers consistent with industry norm;

(21)　advances of payroll payments to employees, consultants or independent contractors or other advances of salaries or compensation to employees, consultants or independent contractors, in each case in the ordinary course of business, taken together with all other advances made pursuant to this clause (21), not to exceed $2,000,000 at any one time outstanding; *provided* that no advances pursuant to this clause (21) shall be made if a Default or Event of Default has occurred and is continuing or would result therefrom;

(22)　to the extent constituting Investments, the Transactions;

(23)　advances in the form of a prepayment of expenses, so long as such expenses are incurred in the ordinary course of business and are being paid in accordance with customary trade terms of the Borrower or the relevant Restricted Subsidiary;

(24)　So long as no Event of Default has occurred and is continuing or result therefrom, Investments in the Closing Date Unrestricted Subsidiary and its Subsidiaries to fund capital calls required pursuant to the organizational documents of Fieldwood Mexico B.V., which Investments shall not exceed, in any fiscal year, the sum of (x) an amount equal to the reimbursements with respect to general and administrative expenses received in cash by the Credit Parties during such fiscal year and (y) $5,000,000 (*provided*, *that*, with respect to the fiscal year ending December 31, 2021, the amount of this clause (y) shall be $10,000,000) (it being understood and agreed that, unless and until the Closing Date Unrestricted Subsidiary becomes a Restricted Subsidiary and Subsidiary Guarantor hereunder, the only Investments permitted to be made by the Borrower and its Restricted Subsidiaries in the Closing Date Unrestricted Subsidiary shall be those permitted under this clause (24)); and

(25)　Investments resulting from pledges and deposits permitted under clauses (1), (4) (6)(C), (14), (31) and (36) of the definition of "Permitted Liens";

"Permitted Liens" means, with respect to any Person:

(1)　pledges or deposits by such Person under workmen's compensation laws, unemployment insurance laws or similar legislation, or good faith deposits in connection with bids, tenders, contracts (other than for the payment of Indebtedness) or leases to which such Person is a party, or deposits to secure plugging and abandonment obligations or public or statutory obligations of such Person or deposits of cash or U.S. government bonds to secure surety or appeal bonds to which such Person is a party, or deposits as security for contested taxes or import duties or for the payment of rent, in each case Incurred in the ordinary course of business;

(2)　Liens imposed by law, such as landlords', carriers', warehousemen's, mechanics', materialmen's, repairmen's, construction or other like Liens securing obligations that are not overdue by more than 30 days or that are being contested in good faith by appropriate proceedings or other Liens arising out of

37

judgments or awards against such Person with respect to which such Person shall then be proceeding with an appeal or other proceedings for review;

(3)    Liens for taxes, assessments or other governmental charges not yet due or payable or that are being contested in good faith by appropriate proceedings and for which adequate reserves have been maintained in accordance with GAAP;

(4)    Liens (including, for the avoidance of doubt, in the form of cash deposits) in favor of issuers of performance and surety bonds or bid bonds or with respect to other regulatory requirements or letters of credit or bankers acceptances issued pursuant to the request of and for, or completion guarantees provided for, the account of such Person in the ordinary course of its business; provided that the amount of cash deposits provided to secure such obligations shall not exceed, at any time outstanding, 20% of the then-outstanding notional amounts of such obligations;

(5)    minor survey exceptions, minor encumbrances, restrictive covenants, easements or reservations of, or rights of others for, licenses, rights-of- way, sewers, electric lines, telegraph and telephone lines and other similar purposes, or zoning or other restrictions as to the use of real properties or Liens incidental to the conduct of the business of such Person or to the ownership of its properties which were not Incurred in connection with Indebtedness and which do not in the aggregate materially adversely affect the value of said properties or materially impair their use in the operation of the business of such Person;

(6)    (A)    Liens on the Collateral (including Liens on Collateral granted pursuant to the Prepetition Loan Documents to secure the obligations arising under the Prepetition Loan Documents) securing Indebtedness that was permitted to be Incurred pursuant to clauses (i), (ii) and, solely with respect to Secured Hedge Obligations, (viii), in each case, of Section 5.06(b) and any Refinancing Indebtedness in respect thereof Incurred pursuant to clause (xi) of Section 5.06(b), in each case subject to the Intercreditor Agreement;

(B)    Liens securing Indebtedness permitted to be Incurred pursuant to clause (iv) (solely with respect to Liens on the assets subject to such Indebtedness and to the extent such Lien is incurred within 180 days of the acquisition, lease, construction, repair, replacement or improvement of property (real or personal)), and (xviii) (solely with respect to Liens on the equipment financed by such Indebtedness) of Section 5.06(b) and any Refinancing Indebtedness in respect thereof Incurred pursuant to clause (xi) of Section 5.06(b); and

(C)    Liens on cash collateral securing Indebtedness permitted to be Incurred pursuant to clause (xiv) of Section 5.06(b);

(7)    Liens existing on the Closing Date listed on Schedule 5.13;

(8)    Liens securing Indebtedness or other obligations of the Borrower or a Restricted Subsidiary owing to the Borrower or another Restricted Subsidiary that is a Subsidiary Guarantor permitted to be Incurred in accordance with Section 5.06;

(9)    Liens on specific items of inventory or other goods and proceeds of any Person securing such Person's obligations in respect of bankers' acceptances issued or created for the account of such Person to facilitate the purchase, shipment or storage of such inventory or other goods;

(10)    leases and subleases of real property (other than Oil and Gas Properties) which do not materially interfere with the ordinary conduct of the business of the Borrower or any of the Restricted Subsidiaries;

(11)    Liens arising from Uniform Commercial Code financing statement filings regarding operating leases entered into by the Borrower and the Restricted Subsidiaries in the ordinary course of business;

WEIL:\97847440\31\45327.0007

(12)     Liens in favor of the Borrower or any Guarantor;

(13)     Liens on accounts receivable and related assets of the type specified in the definition of "Receivables Financing" Incurred in connection with a Qualified Receivables Financing;

(14)     deposits made in the ordinary course of business to secure liability to insurance carriers or self-insurance arrangement;

(15)     grants of software and other technology licenses in the ordinary course of business;

(16)     Liens to secure any refinancing, refunding, extension, renewal or replacement (or successive refinancings, refundings, extensions, renewals or replacements) as a whole, or in part, of any Indebtedness secured by any Lien referred to in the foregoing clauses (3), (6)(C), (7), (8),  (12) and this clause (16); *provided*, *however*, that (x) such new Lien shall be limited to all or part of the same property that secured the original Lien (plus improvements on such property), and (y) the Indebtedness secured by such Lien at such time is not increased to any amount greater than the sum of (A) the outstanding principal amount or, if greater, committed amount of the Indebtedness described under such clause at the time the original Lien became a Permitted Lien under this Agreement, and (B) an amount necessary to pay any fees and expenses, including premiums, related to such refinancing, refunding, extension, renewal or replacement; *provided further*, *however*, that in the case of any Liens to secure any refinancing, refunding, extension or renewal of Indebtedness secured by a Lien referred to in clause (6)(C), the principal amount of any Indebtedness Incurred for such refinancing, refunding, extension or renewal shall be deemed secured by a Lien under clause (6)(C), as applicable, and not this  clause (16) for purposes of determining the principal amount of Indebtedness outstanding under clause (6)(C), as applicable;

(17)     Liens on equipment of the Borrower or any Restricted Subsidiary granted in the ordinary course of business to the Borrower's or such Restricted Subsidiary's client at which such equipment is located;

(18)     judgment and attachment Liens not giving rise to an Event of Default and notices of lis pendens and associated rights related to litigation being contested in good faith by appropriate proceedings and for which adequate reserves have been made;

(19)     Liens arising out of conditional sale, title retention, consignment or similar arrangements for the sale of goods entered into in the ordinary course of business;

(20)     Liens incurred to secure Cash Management Services or to implement cash pooling arrangements, in each case, in the ordinary course of business;

(21)     other Liens securing Indebtedness  (other than Indebtedness for borrowed money) the outstanding principal amount of which does not, taken together with the principal amount of all other obligations secured by Liens incurred under this clause (21) that are at that time outstanding, exceed $10,000,000 at the time of Incurrence;

(22)     any encumbrance or restriction (including put and call arrangements) with respect to Capital Stock of any joint venture or similar arrangement pursuant to any joint venture or similar agreement;

(23)     Liens arising by virtue of any statutory or common law provisions relating to banker's Liens, rights of set-off or similar rights and remedies as to deposit accounts or other funds maintained with a depository or financial institution;

(24)     Liens arising out of judgments or awards against such Person with respect to which such Person shall then be proceeding with any appeal or other proceedings for review;

39

(25)     Liens (i) in favor of credit card companies pursuant to agreements therewith and (ii) in favor of customers;

(26)     Liens in respect of Production Payments and Reserve Sales;

(27)     Liens arising under Farm-Out Agreements, Farm-In Agreements, division orders, contracts for the sale, purchase, exchange, transportation, gathering or processing of Hydrocarbons, unitizations and pooling designations, declarations, orders and agreements, development agreements, joint venture agreements, partnership agreements, operating agreements, royalties, royalty trusts, master limited partnerships, working interests, net profits interests, joint interest billing arrangements, participation agreements, production sales contracts, area of mutual interest agreements, gas balancing or deferred production agreements, injection, repressuring and recycling agreements, salt water or other disposal agreements, seismic or geophysical permits or agreements, and other agreements which are customary in the Oil and Gas Business; *provided*, *however*, in all instances that such Liens are limited to the assets that are the subject of the relevant agreement, program, order, trust, partnership or contract;

(28)     Liens on pipelines or pipeline facilities that arise by operation of law;

(29)     any (a) interest or title of a lessor or sublessor under any lease, liens reserved in oil, gas or other Hydrocarbons, minerals, leases for bonus, royalty or rental payments and for compliance with the terms of such leases; (b) restriction or encumbrance that the interest or title of such lessor or sublessor may be subject to (including, without limitation, ground leases or other prior leases of the demised premises, mortgages, mechanics' liens, tax liens and easements); or (c) subordination of the interest of the lessee or sublessee under such lease to any restrictions or encumbrance referred to in the preceding clause (b);

(30)     Liens that are contractual rights of set-off (i) relating to the establishment of depository relations with banks not given in connection with the issuance of Indebtedness, (ii) relating to pooled deposit or sweep accounts of the Borrower or any of its Restricted Subsidiaries to permit satisfaction of overdraft or similar obligations incurred in the ordinary course of business of the Borrower and its Restricted Subsidiaries or (iii) relating to purchase orders and other agreements entered into with customers of the Borrower or any of its Restricted Subsidiaries in the ordinary course of business;

(31)     security given to a public utility or any municipality or governmental authority when required by such utility or authority in connection with the operations of that Person in the ordinary course of business;

(32)     Liens arising pursuant to Section 107(l) of the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. § 9607(l), or other Environmental Law, unless such Lien (i) by action of the lienholder, or by operation of law, takes priority over any Liens arising under the Loan Documents on the property upon which it is a Lien, and (ii) such Lien materially impairs the use of the property covered by such Lien for the purposes for which such property is held;

(33)     Liens on goods purchased in the ordinary course of business the purchase price of which is financed by a documentary letter of credit issued for the account of the Borrower or any of its subsidiaries;

(34)     Liens in favor of customs and revenue authorities arising as a matter of law to secure payment of customs duties in connection with the importation of goods in the ordinary course of business;

(35)     Liens (i) of a collection bank arising under Section 4-210 of the Uniform Commercial Code or any comparable or successor provision on items in the course of collection, (ii) attaching to commodity trading accounts or other commodity brokerage accounts incurred in the ordinary course of business and (iii) in

40

favor of banking institutions arising as a matter of law encumbering deposits (including the right of set-off) and which are within the general parameters customary in the banking industry; and

(36)     Liens solely on any cash earnest money deposits made by the Borrower or any of its Restricted Subsidiaries in connection with any letter of intent or purchase agreement permitted in this Agreement.

"Person" means any individual, corporation, partnership, limited liability company, joint venture, association, joint-stock company, trust, unincorporated organization, government or any agency or political subdivision thereof or any other entity.

"Petition Date" shall have the meaning set forth in the recitals hereto.

"Petroleum Industry Standards" means the Definitions for Oil and Gas Reserves promulgated by the Society of Petroleum Engineers (or any generally recognized successor) as in effect at the time in question.

"Plan" means any Employee Benefit Plan subject to Title IV of ERISA, Section 412 of the Code or Section 302 of ERISA (other than a Multiemployer Plan).

"Plan of Reorganization" shall have the meaning set forth in the recitals hereto.

"Platform" shall have the meaning set forth in Section 8.18.

"Preferred Stock" means any Equity Interest with preferential right of payment of dividends or upon liquidation, dissolution, or winding up.

"Prepetition FLFO Credit Agreement" shall have the meaning set forth in the recitals hereto.

"Prepetition Loan Documents" shall have the meaning set forth in the recitals hereto.

"Prime Rate" means the rate of interest quoted in the print edition of *The Wall Street Journal*, Money Rates Section as the Prime Rate (currently defined as the base rate on corporate loans posted by at least 75.00% of the nation's thirty largest banks), as in effect from time to time, or, if such source or rate is unavailable, any replacement or successor source or rate as determined by Administrative Agent.  The Prime Rate is a reference rate and does not necessarily represent the lowest or best rate actually charged to any customer. Administrative Agent or any other Lender may make commercial loans or other loans at rates of interest at, above or below the Prime Rate.

"Prior Plan of Reorganization" shall have the meaning set forth in the recitals hereto.

"Probable Developed Behind Pipe Reserves" means oil and gas mineral interests that, in accordance with Petroleum Industry Standards, are classified as both "Probable Reserves" and "Developed Behind Pipe Reserves."

"Probable Developed Non-Producing Reserves" means oil and gas mineral interests that, in accordance with Petroleum Industry Standards, are classified as both "Probable Reserves" and "Developed Non-Producing Reserves."

"Probable Developed Producing Reserves" means oil and gas mineral interests that, in accordance with Petroleum Industry Standards, are classified as both "Probable Reserves" and "Developed Producing Reserves."

41

"<u>Probable Reserves</u>" means oil and gas mineral interests that, in accordance with Petroleum Industry Standards, are classified as both "Probable Reserves" and one of the following: (a) "Developed Producing Reserves", (b) "Developed Non-Producing Reserves", (c) "Undeveloped Reserves" and (d) "Developed Behind Pipe Reserves".

"<u>Production Payments and Reserve Sales</u>" means the grant or transfer by the Borrower or a Restricted Subsidiary to any Person of a royalty, overriding royalty, net profits interest, production payment (whether volumetric or dollar-denominated), partnership or other interest in Oil and Gas Properties, reserves or the right to receive all or a portion of the production or the proceeds from the sale of production attributable to such properties where the holder of such interest has recourse solely to such production or proceeds of production, subject to the obligation of the grantor or transferor to operate and maintain, or cause the subject interests to be operated and maintained, in a reasonably prudent manner or other customary standard or subject to the obligation of the grantor or transferor to indemnify for environmental, title or other matters customary in the Oil and Gas Business, including any such grants or transfers.

"<u>Proved Developed Behind Pipe Reserves</u>" means oil and gas mineral interests that, in accordance with Petroleum Industry Standards, are classified as "Proved Reserves" and "Developed Behind Pipe Reserves."

"<u>Proved Developed Non-Producing Reserves</u>" means oil and gas mineral interests that, in accordance with Petroleum Industry Standards, are classified as "Proved Reserves" and "Developed Non-Producing Reserves."

"<u>Proved Developed Producing Reserves</u>" means oil and gas mineral interests that, in accordance with Petroleum Industry Standards, are classified as both "Proved Reserves" and "Developed Producing Reserves."

"<u>Proved Developed Reserves</u>" means oil and gas mineral interests that, in accordance with Petroleum Industry Standards, are classified as both "Proved Reserves" and one of the following: (a) "Developed Producing Reserves", (b) "Developed Non-Producing Reserves" or (c) "Developed Behind Pipe Reserves."

"<u>Proved Reserves</u>" means oil and gas mineral interests that, in accordance with Petroleum Industry Standards, are classified as both "Proved Reserves" and one of the following: (a) "Developed Producing Reserves", (b) "Developed Non-Producing Reserves", (c) "Undeveloped Reserves" and (d) "Developed Behind Pipe Reserves".

"<u>PTE</u>" means a prohibited transaction class exemption issued by the U.S. Department of Labor, as any such exemption may be amended from time to time.

"<u>Public Information</u>" means any information that (a) has been disseminated in a manner making it available to investors generally, within the meaning of Regulation FD under the Securities Act and the Exchange Act and, where applicable, any comparable doctrines under state and foreign securities laws, (b) does not constitute material non-public information concerning the Borrower, any Parent Entity or any Subsidiary or other Affiliate of any of the foregoing, or any security of any of the foregoing, for purposes of the United States federal and state securities laws and, where applicable, foreign securities laws or (c) solely in the case of information concerning the Borrower, any Parent Entity or any Subsidiary of the foregoing (but only if such information does not constitute material non-public information for the foregoing purposes of any other Affiliate thereof), so long as none of the Borrower, any Parent Entity or any Subsidiary of any of the foregoing shall have any securities registered under the Exchange Act or issued pursuant to Rule 144A under the Securities Act, or shall otherwise be subject to the reporting obligations under the Exchange Act, is information of the type that would be publicly disclosed in connection with an issuance of securities by the Borrower, such Parent Entity or such Subsidiary pursuant to an offering of securities registered under the Securities Act or made in reliance on Rule 144A under the Securities Act.

42

"<u>Public Lender</u>" shall have the meaning set forth in <u>Section 8.18</u>.

"<u>PV-10</u>" means, with respect to any Proved Reserves and/or Probable Reserves expected to be produced from any Oil and Gas Properties of the Credit Parties, the net present value, discounted at 10% per annum, of the future net revenues expected to accrue to the Borrower's and the Credit Parties' collective interests in such reserves during the remaining expected economic lives of such reserves.

"<u>PV-15</u>" means, with respect to any Proved Reserves and/or Probable Reserves expected to be produced from any Oil and Gas Properties of the Credit Parties, the net present value, discounted at 15% per annum, of the future net revenues expected to accrue to the Borrower's and the Credit Parties' collective interests in such reserves during the remaining expected economic lives of such reserves.

"<u>QFC Credit Support</u>" shall have the meaning set forth in <u>Section 8.24</u>.

"<u>Qualified Receivables Financing</u>" means any Receivables Financing of a Receivables Subsidiary that meets the following conditions:

(1)     the Board of Directors of the Borrower shall have determined in good faith that such Qualified Receivables Financing (including financing terms, covenants, termination events and other provisions) is in the aggregate economically fair and reasonable to the Borrower and the Receivables Subsidiary;

(2)     all sales of accounts receivable and related assets to the Receivables Subsidiary are made at Fair Market Value;

(3)     the financing terms, covenants, termination events and other provisions thereof shall be market terms (as determined in good faith by the Borrower) and may include Standard Securitization Undertakings; and

(4)     the maximum committed amount of such Receivables Financing (when aggregated with all other outstanding Receivables Financings) shall not exceed $40,000,000.

The grant of a security interest in any accounts receivable of the Borrower or any Restricted Subsidiary (other than a Receivables Subsidiary) to secure Indebtedness under the SLTL Credit Agreement (or Refinancing Indebtedness with respect thereto), Indebtedness in respect of the Loans or any Refinancing Indebtedness with respect to the Loans shall not be deemed a Qualified Receivables Financing.

"<u>Receivables Fees</u>" means distributions or payments made directly or by means of discounts with respect to any participation interests issued or sold in connection with, and all other fees paid to a Person that is not a Restricted Subsidiary in connection with, any Receivables Financing.

"<u>Receivables Financing</u>" means any transaction or series of transactions that may be entered into by the Borrower or any of its Subsidiaries pursuant to which the Borrower or any of its Subsidiaries may sell, convey or otherwise transfer to (a) a Receivables Subsidiary (in the case of a transfer by the Borrower or any of its Subsidiaries); and (b) any other Person (in the case of a transfer by a Receivables Subsidiary), or may grant a security interest in, any accounts receivable (whether now existing or arising in the future) of the Borrower or any of its Subsidiaries, and any assets related thereto including, without limitation, all collateral securing such accounts receivable, all contracts and all guarantees or other obligations in respect of such accounts receivable, proceeds of such accounts receivable and other assets which are customarily transferred or in respect of which security interests are customarily granted in connection with asset securitization transactions involving accounts receivable and any Hedging Obligations entered into by the Borrower or any such Subsidiary in connection with such accounts receivable.

43

"<u>Receivables Repurchase Obligation</u>" means any obligation of a seller of receivables in a Qualified Receivables Financing to repurchase receivables arising as a result of a breach of a representation, warranty or covenant or otherwise, including as a result of a receivable or portion thereof becoming subject to any asserted defense, dispute, off-set or counterclaim of any kind as a result of any action taken by, any failure to take action by or any other event relating to the seller.

"<u>Receivables Subsidiary</u>" means a Wholly Owned Restricted Subsidiary which engages in no activities other than in connection with the financing of accounts receivable of the Borrower and its Restricted Subsidiaries, all proceeds thereof and all rights (contractual or other), collateral and other assets relating thereto, and any business or activities incidental or related to such business, and which is designated by the Board of Directors of the Borrower (as provided below) as a Receivables Subsidiary and:

<blockquote>
(a)    no portion of the Indebtedness or any other obligations (contingent or otherwise) of which (i) is guaranteed by the Borrower or any other Subsidiary of the Borrower (excluding guarantees of obligations (other than the principal of and interest on, Indebtedness) pursuant to Standard Securitization Undertakings), (ii) is recourse to or obligates the Borrower or any other Subsidiary in any way other than pursuant to Standard Securitization Undertakings, or (iii) subjects any property or asset of the Borrower or any other Subsidiary, directly or indirectly, contingently or otherwise, to the satisfaction thereof, other than pursuant to Standard Securitization Undertakings;

(b)    with which neither the Borrower nor any Subsidiary has any material contract, agreement, arrangement or understanding other than on terms which the Borrower reasonably believes to be no less favorable to the Borrower or such Subsidiary than those that might be obtained at the time from Persons that are not Affiliates of the Borrower; and

(c)    to which neither the Borrower nor any Subsidiary has any obligation to maintain or preserve such entity's financial condition or cause such entity to achieve certain levels of operating results.
</blockquote>

Any such designation by the Board of Directors of the Borrower shall be evidenced to the Administrative Agent by filing with the Administrative Agent a certified copy of the resolution of the Board of Directors of the Borrower giving effect to such designation and an Officers' Certificate certifying that such designation complied with the foregoing conditions and that any Qualified Receivables Financing to be entered into by such Receivables Subsidiary meets the requirements of the definition of "Qualified Receivables Financing".

"<u>Refinancing Indebtedness</u>" shall have the meaning set forth in <u>Section 5.06(b)(xi)</u>.

"<u>Refunding Capital Stock</u>" shall have the meaning set forth in <u>Section 5.07(b)(i)(A)</u>.

"<u>Register</u>" shall have the meaning set forth in <u>Section 8.06(b)(iv)</u>.

"<u>Regulation T</u>" means Regulation U of the Board as from time to time in effect, any successor to all or any portion thereof establishing margin requirements and all official rulings and interpretations thereunder or thereof.

"<u>Regulation U</u>" means Regulation U of the Board as from time to time in effect, any successor to all or any portion thereof establishing margin requirements and all official rulings and interpretations thereunder or thereof.

"Regulation X" means Regulation X of the Board as from time to time in effect, any successor to all or any portion thereof establishing margin requirements and all official rulings and interpretations thereunder or thereof.

"Reinvestment Date" shall have the meaning given to such term in Section 2.13(a)(i).

"Related Parties" means, with respect to any specified Person, such Person's Affiliates and the directors, officers, employees, agents and members of such Person or such Person's Affiliates and any Person that possesses, directly or indirectly, the power to direct or cause the direction of the management or policies of such Person, whether through the ability to exercise voting power, by contract or otherwise.

"Release" means any release, spill, emission, leaking, pumping, pouring, injection, escaping, deposit, disposal, discharge, dispersal, dumping, leaching or migration.

"Relevant Governmental Body" means the Board of Governors or the NYFRB, or a committee officially endorsed or convened by the Board of Governors or the NYFRB, or any successor thereto.

"Reorganization Plan" shall have the meaning set forth in Section 7.11.

"Reportable Event" means an event described in Section 4043(c) of ERISA and the regulations thereunder, other than any event as to which the 30-day notice period has been waived.

"Required Lenders" means, at any time, Lenders having outstanding Loans that, taken together, represent more than 50% of the sum of all outstanding Loans at such time; *provided*, *however*, that in the event that at any time there are two or more unaffiliated Lenders, the consent of at least two Lenders shall be required for Required Lenders.

"Requirement of Law" means, as to any Person, any law, treaty, rule, regulation, statute, order, ordinance, decree, judgment, consent decree, writ, injunction, settlement agreement or governmental requirement enacted, promulgated or imposed or entered into or agreed by any Governmental Authority, in each case applicable to or binding upon such Person or any of its property or assets or to which such Person or any of its property or assets is subject.

"Reserve Report" means a reserve report evaluating, as of the applicable date of determination, the Proved Reserves and the Proved Developed Reserves of the Borrower and its Subsidiaries.

"Resolution Authority" means an EEA Resolution Authority or, with respect to any UK Financial Institution, a UK Resolution Authority.

"Restricted Investment" means an Investment other than a Permitted Investment.

"Restricted Payments" shall have the meaning set forth in Section 5.07(a).

"Restricted Subsidiary" means, with respect to any Person, any Subsidiary of such Person other than the Closing Date Unrestricted Subsidiary (unless and until such time as the Closing Date Unrestricted Subsidiary becomes a Restricted Subsidiary hereunder in accordance with (and solely to the extent required by) Section 5.29). Unless otherwise indicated in this Agreement, all references to Restricted Subsidiaries means Restricted Subsidiaries of the Borrower.

"Retired Capital Stock" shall have the meaning set forth in Section 5.07(b)(i)(A).

"S&P" means Standard & Poor's Ratings Group or any successor to the rating agency business thereof.

45

"<u>Sale/Leaseback Transaction</u>" means an arrangement relating to property now owned or hereafter acquired by the Borrower or a Restricted Subsidiary whereby the Borrower or such Restricted Subsidiary transfers such property to a Person and the Borrower or such Restricted Subsidiary leases it from such Person, other than leases between the Borrower and a Restricted Subsidiary or between Restricted Subsidiaries.

"<u>Sanctioned Country</u>" means, at any time, a country, territory or region that is, or whose government is, the subject or target of any Sanctions, which jurisdictions include, as of the Closing Date, the Crimea region of Ukraine, Cuba, Iran, North Korea, Sudan and Syria.

"<u>Sanctioned Person</u>" means any Person with whom dealings, at the time of the relevant dealing, are restricted or prohibited under Sanctions, including (i) any Person listed in any Sanctions-related list of designated Persons maintained by the U.S. (including by OFAC, the U.S. Department of the Treasury, or the U.S. Department of State), or by the United Nations Security Council, the European Union or any EU member state, Her Majesty's Treasury of the United Kingdom or any other relevant sanctions authority, (ii) any Person located, operating, organized or resident in a Sanctioned Country or (iii) any Person owned or controlled, directly or indirectly, by any such Person described in <u>clause (i)</u> or <u>(ii)</u> of this definition.

"<u>Sanctions</u>" means applicable sanctions or trade embargoes enacted, imposed, administered or enforced from time to time by (i) the U.S. government, including those administered by OFAC, U.S. Department of State, or U.S. Department of Commerce, (ii) the United Nations Security Council, the European Union or any of its member states, Her Majesty's Treasury of the United Kingdom or (iii) any other relevant authority.

"<u>SEC</u>" means the Securities and Exchange Commission or any successor thereto.

"<u>Secured Cash Management Agreement</u>" shall mean any agreement related to Cash Management Services by and between the Borrower or any of its Restricted Subsidiaries and any Cash Management Bank.

"<u>Secured Hedge Agreement</u>" shall mean any Hedge Agreement by and between the Borrower or any of its Restricted Subsidiaries and any Hedge Bank, whether such Hedge Agreement was entered into prior to or after the Closing Date.

"<u>Secured Hedge Obligations</u>" shall mean obligations owed by the Borrower or any Restricted Subsidiary to any Hedge Bank in connection with, or in respect of, any Secured Hedge Agreement.

"<u>Secured Parties</u>" shall mean, collectively, the Administrative Agent, the Collateral Agent, each Lender, each Hedge Bank that is party to any Secured Hedge Agreement, each Cash Management Bank that is a party to any Secured Cash Management Agreement and each Subagent appointed by the Administrative Agent with respect to matters relating to the Loan Documents or by the Collateral Agent with respect to matters relating to any Security Document.

"<u>Securities Act</u>" means the Securities Act of 1933, as amended, and the rules and regulations of the SEC promulgated thereunder.

"<u>Security Documents</u>" means the security agreements, pledge agreements, collateral assignments, mortgages (including the Mortgages) and related agreements, as amended, supplemented, restated, renewed, refunded, replaced, restructured, repaid, refinanced or otherwise modified from time to time, creating the security interests in the Collateral for the benefit of the Collateral Agent and the Lenders as contemplated by this Agreement.

"<u>Similar Business</u>" means a business, the majority of whose revenues are derived from the activities of the Borrower and its Subsidiaries as of the Closing Date or any business or activity that is reasonably

46

similar or complementary thereto or a reasonable extension, development or expansion thereof or ancillary thereto.

"SLTL Credit Agreement" means [●].

"SLTL Credit Agreement Documents" means the collective reference to any SLTL Credit Agreement, any notes issued pursuant thereto and the guarantees thereof, and the collateral documents relating thereto, as amended, supplemented, restated, amended and restated, renewed, refunded, replaced, restructured, repaid, refinanced or otherwise modified, in whole or in part, from time to time.

"SLTL Facility" means the second lien term loan facility provided pursuant to the SLTL Credit Agreement, as amended, restated, amended and restated, supplemented, waived, replaced (whether or not upon termination, and whether with the original lenders or other lenders), restructured, repaid, refunded, refinanced or otherwise modified from time to time, including pursuant to any amendment thereto or pursuant to a new loan agreement with other lenders, providing for term loans, altering the maturity thereof, refinancing, replacing or otherwise restructuring all or any portion of the Indebtedness under such agreement or under any successor or replacement agreement, increasing the amount loaned thereunder or otherwise modifying the terms thereof.

"SOFR" means a rate per annum equal to the secured overnight financing rate for such Business Day published by the NYFRB (or a successor administrator of the secured overnight financing rate) on the website of the NYFRB, currently at http://www.newyorkfed.org (or any successor source for the secured overnight financing rate identified as such by the administrator of the secured overnight financing rate from time to time).

"Sold Entity or Business" shall have the meaning provided in the definition of the term "EBITDAX".

"Specified Asset Sale" has the meaning assigned to it in Section 2.13(a)(i).

"Standard Securitization Undertakings" means representations, warranties, covenants, indemnities and guarantees of performance entered into by the Borrower or any Subsidiary thereof which the Borrower has determined in good faith to be customary in a Receivables Financing including, without limitation, those relating to the servicing of the assets of a Receivables Subsidiary, it being understood that any Receivables Repurchase Obligation shall be deemed to be a Standard Securitization Undertaking.

"Stated Maturity" means, with respect to any security, the date specified in such security as the fixed date on which the final payment of principal of such security is due and payable, including pursuant to any mandatory redemption provision (but excluding any provision providing for the repurchase of such security at the option of the holder thereof upon the happening of any contingency beyond the control of the issuer unless such contingency has occurred).

"Statutory Reserves" means a fraction (expressed as a decimal), the numerator of which is the number one and the denominator of which is the number one minus the aggregate of the maximum reserve percentages (including any marginal, special, emergency or supplemental reserves) expressed as a decimal established by the Board and any other banking authority, domestic or foreign, to which the Administrative Agent or any Lender (including any branch, Affiliate, or other fronting office making or holding a Loan) is subject for Eurocurrency Liabilities (as defined in Regulation D of the Board).  Such reserve percentages shall include those imposed pursuant to such Regulation D.  Without limiting the effect of the foregoing, the Statutory Reserves shall reflect any other reserves required to be maintained by such member banks with respect to (i) any category of liabilities that includes deposits by reference to which the applicable Adjusted LIBOR or any other interest rate of a Loan is to be determined, or (ii) any category of extensions of credit or other assets that include Loans bearing interest at Adjusted LIBOR.  A Loan that is not an ABR Loan shall be deemed to constitute Eurocurrency Liabilities and to be subject to such reserve requirements without benefit of or credit for proration,

47

exemptions or offsets that may be available from time to time to any Lender under such Regulation D. Statutory Reserves shall be adjusted automatically on and as of the effective date of any change in any reserve percentage.

"Subagent" shall have the meaning set forth in Section 7.02.

"Subsidiary" means, with respect to any Person, (a) any corporation more than 50% of whose Equity Interests of any class or classes having by the terms thereof ordinary voting power to elect a majority of the directors of such corporation (irrespective of whether or not at the time Equity Interests of any class or classes of such corporation shall have or might have voting power by reason of the happening of any contingency) is at the time owned by such Person directly or indirectly through Subsidiaries and (b) any limited liability company, partnership, association, joint venture or other entity of which such Person directly or indirectly through Subsidiaries has more than a 50% equity interest at the time. Unless otherwise expressly provided, all references herein to a "Subsidiary" means a Subsidiary of the Borrower.

"Subsidiary Guarantor" means any Subsidiary that Incurs a Guarantee; *provided* that upon the release or discharge of such Person from its Guarantee in accordance with this Agreement, such Subsidiary shall cease to be a Subsidiary Guarantor; *provided further* that no Excluded Subsidiary shall be a Subsidiary Guarantor.

"Supported QFC" has the meaning set forth in Section 8.24.

"Swap" means a "swap" within the meaning of section 1a(47) of the Commodity Exchange Act.

"Tax Distributions" means any distributions pursuant to Section 5.07(b)(v).

"Taxes" means any and all present or future taxes, duties, levies, imposts, assessments, deductions, withholdings (including backup withholding), fees or other charges imposed by any Governmental Authority and any interest, fines, penalties or additions to tax with respect to the foregoing.

"Term SOFR" means, for the applicable corresponding tenor, the forward-looking term rate based on SOFR that has been selected or recommended by the Relevant Governmental Body.

"Test Period" means, as of any date of determination, the four consecutive fiscal quarters of the Borrower then last ended and for which financial statements have been delivered to the Administrative Agent in accordance with Section 5.01(a) or (b); provided that, with respect to any calculation of the Asset Coverage Ratio as of the last day of the fourth fiscal quarter of each year, "Test Period" shall mean, as of any date of determination, the four consecutive fiscal quarters of the Borrower then ended and for which the Reserve Report has been delivered to the Administrative Agent in accordance with Section 5.26(a).

"Transaction Expenses" means any fees or expenses incurred or paid by the Borrower or any of its Subsidiaries or any of their Affiliates in connection with the Transactions, this Agreement and the other Loan Documents.

"Transactions" means, collectively, (a) the assumption of FWE's obligations under the Prepetition FLFO Credit Agreement by Credit Bid Purchaser and the subsequent assignment by Credit Bid Purchaser, and assumption by the Borrower, of the obligations of Credit Bid Purchaser under this Agreement, (b) the deemed funding of the Loans on the Closing Date and the execution, delivery and performance of the Loan Documents to be entered into on the Closing Date, (c) the funding (or deemed funding) of the Loans (as defined in the SLTL Credit Agreement) on the Closing Date and the execution, delivery and performance of the Loan Documents (as defined in the SLTL Credit Agreement) to be entered into on the Closing Date, (d) the other transactions contemplated by the Plan of Reorganization and (e) the payment of Transaction Expenses.

"Troika A-3 Well" means the well described in the Latest Reserve Report as GC 200 OCS 12209 #TA- 3 ST.

"Type" means, when used in respect of any Loan, the Rate by reference to which interest on such Loan is determined.  For purposes hereof, "Rate" shall include the LIBOR and the ABR.

"U.S." means the United States of America.

"U.S. Dollars" or "$" means lawful money of the United States of America.

"U.S. Government Obligations" means securities that are:

(1)     direct obligations of the United States of America for the timely payment of which its full faith and credit is pledged, or

(2)     obligations of a Person controlled or supervised by and acting as an agency or instrumentality of the United States of America, the timely payment of which is unconditionally guaranteed as a full faith and credit obligation by the United States of America, which, in each case, are not callable or redeemable at the option of the issuer thereof, and shall also include a depository receipt issued by a bank (as defined in Section 3(a)(2) of the Securities Act) as custodian with respect to any such U.S. Government Obligations or a specific payment of principal of or interest on any such U.S. Government Obligations held by such custodian for the account of the holder of such depository receipt; *provided* that (except as required by law) such custodian is not authorized to make any deduction from the amount payable to the holder of such depository receipt from any amount received by the custodian in respect of the U.S. Government Obligations or the specific payment of principal of or interest on the U.S. Government Obligations evidenced by such depository receipt.

"U.S. Lender" means any Lender other than a Non-U.S. Lender.

"UK Financial Institution" means any BRRD Undertaking (as such term is defined under the PRA Rulebook (as amended from time to time) promulgated by the United Kingdom Prudential Regulation Authority) or any person falling within IFPRU 11.6 of the FCA Handbook (as amended from time to time) promulgated by the United Kingdom Financial Conduct Authority, which includes certain credit institutions and investment firms, and certain affiliates of such credit institutions or investment firms.

"UK Resolution Authority" means the Bank of England or any other public administrative authority having responsibility for the resolution of any UK Financial Institution.

"Unfunded Current Liability" means, with respect to any Plan, the amount, if any, by which the Accumulated Benefit Obligation (as defined under Statement of Financial Accounting Standards No. 87 or any successor thereto ("SFAS 87")) under the Plan as of the close of its most recent plan year, determined in accordance with SFAS 87 as in effect on the Closing Date, exceeds the value of the Plan assets (as defined under Section 430(g)(3)(A) of the Code without regard to the averaging which may be allowed under Section 430(g)(3)(B) of the Code) allocable thereto and determined as of the close of such plan year.

"Unrestricted Cash" means cash or Cash Equivalents of the Borrower or any Subsidiary Guarantor that would not appear as "restricted" on a consolidated balance sheet of the Borrower or any Subsidiary Guarantor, and (in the case of Section 4.01(q), subject to Section 5.34) held in deposit accounts subject to an Account Control Agreement and is free and clear of all Liens (other than Permitted Liens).

"US Special Resolution Regimes" has the meaning assigned to such term in Section 8.24.

"USA Patriot Act" means the U.S.A. Patriot Act, Title III of Pub.  L. 107-56 (signed into law October 26, 2001).

49

"USD LIBOR" means the London interbank offered rate for U.S. dollars.

"Variable Amortization Percentage" shall mean, as of any date of determination, 25.0%; provided, that, in the event, as of any date of determination, (a) the aggregate principal amount of Loans outstanding under this Agreement shall be less than $75,000,000 and (b) the Consolidated First Lien Leverage Ratio of the Borrower and Subsidiary Guarantors as of the last day of the most recently ended Test Period shall be less than 0.50:1.00, the Variable Amortization Percentage shall be 0.0%.

"Variable Amortization Trigger Date" has the meaning assigned to such term in Section 2.04(a)(iii).

"Voting Procedures Order" shall have the meaning assigned to such term in Section 7.11.

"Voting Stock" of any Person as of any date means the Capital Stock of such Person that is at the time entitled to vote in the election of the Board of Directors of such Person.

"Weighted Average Life to Maturity" means, when applied to any Indebtedness or Disqualified Stock or Preferred Stock, as the case may be, at any date, the quotient obtained by dividing (a) the sum of the products of the number of years from the date of determination to the date of each successive scheduled principal payment of such Indebtedness or redemption or similar payment with respect to such Disqualified Stock or Preferred Stock multiplied by the amount of such payment, by (b) the sum of all such payments.

"Wholly Owned Restricted Subsidiary" means any Wholly Owned Subsidiary that is a Restricted Subsidiary.

"Wholly Owned Subsidiary" of any Person means a Subsidiary of such Person 100% of the outstanding Capital Stock or other ownership interests of which (other than directors' qualifying shares or shares required pursuant to applicable law) shall at the time be owned by such Person or by one or more Wholly Owned Subsidiaries of such Person.

"Write-Down and Conversion Powers" means, (a) with respect to any EEA Resolution Authority, the write-down and conversion powers of such EEA Resolution Authority from time to time under the Bail-In Legislation for the applicable EEA Member Country, which write-down and conversion powers are described in the EU Bail-In Legislation Schedule, and (b) with respect to the United Kingdom, any powers of the applicable Resolution Authority under the Bail-In Legislation to cancel, reduce, modify or change the form of a liability of any UK Financial Institution or any contract or instrument under which that liability arises, to convert all or part of that liability into shares, securities or obligations of that person or any other person, to provide that any such contract or instrument is to have effect as if a right had been exercised under it or to suspend any obligation in respect of that liability or any of the powers under that Bail-In Legislation that are related to or ancillary to any of those powers.

SECTION 1.02.    Terms Generally.  The definitions set forth or referred to in Section 1.01 shall apply equally to both the singular and plural forms of the terms defined.  Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms.  The words "*include*," "*includes*" and "*including*" shall be deemed to be followed by the phrase "*without limitation*."  All references herein to *Articles*, *Sections*, *Exhibits* and *Schedules* shall be deemed references to Articles and Sections of, and Exhibits and Schedules to, this Agreement unless the context shall otherwise require.  Except as otherwise expressly provided herein, any reference in this Agreement to any Loan Document means such document as amended, restated, supplemented or otherwise modified from time to time.  Except as otherwise expressly provided herein, all terms of an accounting or financial nature shall be construed in accordance with GAAP.

SECTION 1.03.    Accounting Terms.  All accounting terms not specifically or completely defined herein shall be construed in conformity with, and all financial data (including financial ratios and other financial

WEIL:\97847440\31\45327.0007

calculations) required to be submitted pursuant to this Agreement shall be prepared in conformity with, GAAP, except as otherwise specifically prescribed herein; *provided, however,* that if the Borrower notifies the Administrative Agent that the Borrower requests an amendment to any provision hereof to eliminate the effect of any change occurring after the Closing Date in GAAP or in the application thereof on the operation of such provision (or if the Administrative Agent notifies the Borrower that the Required Lenders request an amendment to any provision hereof for such purpose), regardless of whether any such notice is given before or after such change in GAAP or in the application thereof, then such provision shall be interpreted on the basis of GAAP as in effect and applied immediately before such change shall have become effective until such notice shall have been withdrawn or such provision amended in accordance herewith.

SECTION 1.04.     Rounding.  Any financial ratios required to be maintained or complied with by the Borrower pursuant to this Agreement (or required to be satisfied in order for a specific action to be permitted under this Agreement) shall be calculated by dividing the appropriate component by the other component, carrying the result to one place more than the number of places by which such ratio is expressed herein and rounding the result up or down to the nearest number (with a rounding-up if there is no nearest number).

SECTION 1.05.     Times of Day.  Unless otherwise specified, all references herein to times of day shall be references to New York City (daylight saving or standard, as applicable).

SECTION 1.06.     Timing of Payment or Performance.  When the payment of any obligation or the performance of any covenant, duty or obligation is stated to be due or performance required on a day which is not a Business Day, the date of such payment (other than as described in Section 2.07) or performance shall extend to the immediately succeeding Business Day.

SECTION 1.07.     Hedging Requirements Generally; Hedge Unwinding.  For purposes of any determination with respect to Hedging Obligations or any other calculation under or requirement of this Agreement in respect of hedging shall be calculated on a "barrel of oil equivalent" basis. All references to the "unwinding" (or any cognate thereof) of a hedge shall mean the monetization of a hedge position, whether by mutual agreement to terminate or "tear up", in connection with the designation of an early termination date (or any similar concept) with respect to, or the settlement of such hedge position.

SECTION 1.08.     Certain Determinations.  For purposes of determining compliance with any of the covenants set forth in Article V, but subject to any limitation expressly set forth therein, as applicable, at any time (whether at the time of incurrence or thereafter), any Lien, Investment, Indebtedness, disposition, Restricted Payment, Affiliate transaction, prepayment, redemption or the consummation of any other transaction meets the criteria of one, or more than one, of the categories permitted pursuant to Article V, as applicable, the Borrower shall, in its good faith discretion, determine under which category such Lien, Investment, Indebtedness, Asset Sale, Restricted Payment, Affiliate transaction, prepayment, redemption or the consummation of any other transaction (or, in each case, any portion thereof) is permitted.

SECTION 1.09.     Making or Maintaining LIBOR Loans.

(a)     Changed Circumstances/Temporary LIBOR Unavailability.  In the event that the Administrative Agent determines (which determination shall be final and conclusive and binding upon all parties hereto), on any interest rate determination date with respect to any LIBOR Loans, that (i) subject to subsection (b) below and Sections 2.08 and 2.09, dollar deposits are not being offered to banks in the London interbank eurodollar market for the applicable amount and Interest Period of such LIBOR Loans, (ii) by reason of circumstances affecting the London interbank market adequate and fair means do not exist for ascertaining the interest rate applicable to such LIBOR Loans on the basis provided for in the definition of LIBOR, or (iii) LIBOR does not adequately and fairly reflect the cost to Lenders of making or maintaining such LIBOR Loans during such Interest Period, the Administrative Agent will reasonably promptly give notice to the Borrower and each Lender of such determination, whereupon (A) no Loans may be made as, or converted to, LIBOR Loans until such time as Administrative Agent notifies the Borrower and Lenders that the circumstances giving rise to such

51

notice no longer exist, and (B) any Notice of Borrowing or Interest Period Election Request given by the Borrower with respect to the Loans in respect of which such determination was made shall be deemed to be rescinded by the Borrower.

(b)     Benchmark Replacement Setting.  Notwithstanding anything to the contrary herein or in any other Loan Document:

(i)     Replacing Adjusted LIBOR. On March 5, 2021 the Financial Conduct Authority ("FCA"), the regulatory supervisor of USD LIBOR's administrator ("IBA"), announced in a public statement the future cessation or loss of representativeness of overnight/Spot Next, 1-month, 3-month, 6-month and 12-month USD LIBOR tenor settings. On the earlier of (i) the date that all Available Tenors of USD LIBOR have either permanently or indefinitely ceased to be provided by IBA or have been announced by the FCA pursuant to public statement or publication of information to be no longer representative and (ii) the Early Opt-in Effective Date, if the then-current Benchmark is USD LIBOR, the Benchmark Replacement will replace such Benchmark for all purposes hereunder and under any Loan Document in respect of any setting of such Benchmark on such day and all subsequent settings without any amendment to, or further action or consent of any other party to this Agreement or any other Loan Document. If the Benchmark Replacement is Daily Simple SOFR, all interest payments will be payable on a quarterly basis.

(ii)     Replacing Future Benchmarks. Upon the occurrence of a Benchmark Transition Event, the Benchmark Replacement will replace the then-current Benchmark for all purposes hereunder and under any Loan Document in respect of any Benchmark setting at or after 5:00 p.m. (New York City time) on the fifth (5th) Business Day after the date notice of such Benchmark Replacement is provided to the Lenders without any amendment to, or further action or consent of any other party to, this Agreement or any other Loan Document, so long as the Administrative Agent has not received, by such time, written notice of objection to such Benchmark Replacement from Lenders comprising the Required Lenders. At any time that the administrator of the then-current Benchmark has permanently or indefinitely ceased to provide such Benchmark or such Benchmark has been announced by the regulatory supervisor for the administrator of such Benchmark pursuant to public statement or publication of information to be no longer representative of the underlying market and economic reality that such Benchmark is intended to measure and that representativeness will not be restored, the Borrower may revoke any request for a borrowing of, conversion to or continuation of Loans to be made, converted or continued that would bear interest by reference to such Benchmark until the Borrower's receipt of notice from the Administrative Agent that a Benchmark Replacement has replaced such Benchmark, and, failing that, the Borrower will be deemed to have converted any such request into a request for a borrowing of or conversion to ABR Loans.  During the period referenced in the foregoing sentence, the component of ABR based upon the Benchmark will not be used in any determination of ABR.

(iii)     Benchmark Replacement Conforming Changes. In connection with the implementation and administration of a Benchmark Replacement, the Administrative Agent will have the right to make Benchmark Replacement Conforming Changes from time to time and, notwithstanding anything to the contrary herein or in any other Loan Document, any amendments implementing such Benchmark Replacement Conforming Changes will become effective without any further action or consent of any other party to this Agreement or any other Loan Document.

(iv)     Notices; Standards for Decisions and Determinations. The Administrative Agent will promptly notify the Borrower and the Lenders of (i) the implementation of any Benchmark Replacement and (ii) the effectiveness of any Benchmark Replacement Conforming Changes. Any determination, decision or election that may be made by the Administrative Agent or, if applicable, any Lender (or group of Lenders) pursuant to this Section 1.09, including any determination with respect to a tenor, rate or adjustment or the occurrence or non-occurrence of an event, circumstance or date and

52

any decision to take or refrain from taking any action, will be conclusive and binding absent manifest error and may be made in its or their sole discretion and without consent from any other party to this Agreement or any other Loan Document, except, in each case, as expressly required pursuant to this <u>Section 1.09</u>.

(v)   <u>Unavailability of Tenor of Benchmark</u>. Notwithstanding anything to the contrary herein or in any other Loan Document, at any time (including in connection with the implementation of a Benchmark Replacement), (i) if the then-current Benchmark is a term rate (including Term SOFR or LIBOR) and either (A) any tenor for such Benchmark is not displayed on a screen or other information service that publishes such rate from time to time as selected by the Administrative Agent in its reasonable discretion or (B) the regulatory supervisor for the administrator of such Benchmark has provided a public statement or publication of information announcing that any tenor for such Benchmark is or will be no longer representative, then the Administrative Agent and the Borrower may modify the definition of "Interest Period" for any Benchmark setting at or after such time to remove such unavailable or non-representative tenor and (ii) if a tenor that was removed pursuant to clause (i) above either (A) is subsequently displayed on a screen or information service for a Benchmark (including a Benchmark Replacement) or (B) is not, or is no longer, subject to an announcement that it is or will no longer be representative for a Benchmark (including a Benchmark Replacement), then the Administrative Agent may modify the definition of "Interest Period" for all Benchmark settings at or after such time to reinstate such previously removed tenor.

SECTION 1.10.   <u>Divisions</u>. For all purposes under the Loan Documents, in connection with any division or plan of division under Delaware law (or any comparable event under a different jurisdiction's laws): (a) if any asset, right, obligation or liability of any Person becomes the asset, right, obligation or liability of a different Person, then it shall be deemed to have been transferred from the original Person to the subsequent Person, and (b) if any new Person comes into existence, such new Person shall be deemed to have been organized on the first date of its existence by the holders of its Equity Interests at such time.

SECTION 1.11.   <u>Deemed Funding of Loans</u>.  All references to any Lender "making" or "funding" a Loan or a Loan being "made" or "funded" (or any similar concept) by a Lender shall for all purposes hereunder, be a reference to the deemed making or funding of such Loan by such Lender or such Loan being deemed made or funded (or any similar concept) by such Lender.

SECTION 1.12.   <u>Certain Calculations and Tests.</u>  In the event that the Borrower or any of its Restricted Subsidiaries Incurs, repays, repurchases or redeems any Indebtedness (other than in the case of any Qualified Receivables Financing, in which case interest expense shall be computed based upon the average daily balance of such Indebtedness during the applicable period) or issues, repurchases or redeems Disqualified Stock or Preferred Stock subsequent to the commencement of the period for which any financial ratio or test (including, without limitation, the Consolidated First Lien Leverage Ratio, Consolidated First Lien Net Leverage Ratio, the Consolidated Total Net Leverage Ratio Asset Coverage Ratio or any other financial covenant) is being calculated but prior to the event for which the calculation is made (the "<u>Calculation Date</u>"), then such calculation shall give pro forma effect to such Incurrence, repayment, repurchase or redemption of Indebtedness, or such issuance, repurchase or redemption of Disqualified Stock or Preferred Stock, as if the same had occurred at the beginning of the applicable four-quarter period.

For purposes of this definition, whenever pro forma effect is to be given to any event, the pro forma calculations shall be made in good faith by a responsible financial or accounting officer of the Borrower.

If any Indebtedness bears a floating rate of interest and is being given pro forma effect, the interest on such Indebtedness shall be calculated as if the rate in effect on the Calculation Date had been the applicable rate for the entire period (taking into account any Hedging Obligations applicable to such Indebtedness if such Hedging Obligation has a remaining term in excess of 12 months).  Interest on a Capitalized Lease Obligation shall be deemed to accrue at an interest rate reasonably determined by a responsible financial

53

or accounting officer of the Borrower to be the rate of interest implicit in such Capitalized Lease Obligation in accordance with GAAP.

For purposes of this definition, any amount in a currency other than U.S. Dollars will be converted to U.S. Dollars based on the average exchange rate for such currency for the most recent twelve month period immediately prior to the date of determination in a manner consistent with that used in calculating EBITDAX for the applicable period.

## ARTICLE II

### The Credits

SECTION 2.01.    Loans.

(a)    Subject to and upon the terms and conditions herein set forth, each Lender severally agrees that it shall be deemed to have made a Loan or Loans on the Closing Date to the Borrower in U.S. Dollars in an aggregate principal amount set forth for such Lender on Schedule 2.01.  The initial aggregate principal amount of the Loans shall be $118,599,082.31. The Loans (i) shall be deemed made on the Closing Date and (ii) may be repaid or prepaid in accordance with the provisions hereof, but once repaid or prepaid, may not be reborrowed.

(b)    Each Lender may at its option make any Loan by causing any domestic or foreign branch or Affiliate of such Lender to make such Loan; *provided* that (i) any exercise of such option shall not affect the obligation of the Borrower to repay such Loan and (ii) in exercising such option, such Lender shall use its reasonable efforts to minimize any increased costs to the Borrower resulting therefrom (which obligation of the Lender shall not require it to take, or refrain from taking, actions that it determines would result in increased costs for which it will not be compensated hereunder or that it determines would be otherwise disadvantageous to it and in the event of such request for costs for which compensation is provided under this Agreement, the provisions of Section 2.08 shall apply).

SECTION 2.02.    Existing Loans.  The parties hereto acknowledge and agree that an aggregate principal amount of "Loans" under and as defined in the Prepetition FLFO Credit Agreement (the "Existing Loans") equal to $118,599,082.31 remains outstanding immediately prior to the Closing Date.  Subject to the terms and conditions set forth herein, each Lender, severally and not jointly, agrees that the Existing Loans made by such Lender under the Prepetition FLFO Credit Agreement and outstanding on the Closing Date immediately prior to giving effect to this Agreement shall be converted into Loans in a principal amount equal to its Existing Loans and such Loans shall be deemed made pursuant to this Agreement on the Closing Date as set forth in Section 2.01(a).  The conversion by a Lender of all or a portion of its Existing Loans shall be deemed to satisfy, dollar for dollar, such Lender's obligation to make Loans on the Closing Date.  Such Existing Loans of each Lender shall hereafter be referred to as "Loans" and on and after the Closing Date shall have all of the rights and benefits of Loans as set forth in this Agreement and the other Loan Documents.  For the avoidance of doubt, such conversion of Existing Loans into Loans hereunder shall be deemed a "Borrowing" for all purposes under this Agreement.

SECTION 2.03.    Notice of Borrowing.

(a)    For the Borrowing made on the Closing Date, the Borrower shall give the Administrative Agent written notice (or telephonic notice promptly confirmed in writing) on or prior to the Closing Date.  The notice (a "Notice of Borrowing") shall be revocable if any of the conditions in Section 4.01 that are not reasonably within the control of the Borrower are not satisfied or waived.  Such Notice of Borrowing shall specify (i) the aggregate principal amount of the Loans to be made, (ii) the proposed date of the Loans (which shall be a Business Day), (iii) whether such Loans are to be ABR Loans or LIBOR Loans and, if LIBOR Loans, the initial Interest Period applicable thereto, and (iv) remittance instructions for

54

disbursement of the proceeds of the Loans.  The Notice of Borrowing shall be in substantially the form of Exhibit E.  The Administrative Agent shall promptly give each Lender written notice of the proposed borrowing of Loans, of such Lender's proportionate share thereof and of the other matters covered by the related Notice of Borrowing.

SECTION 2.04.        Repayment of Loans; Evidence of Debt.

(a)        The Borrower hereby unconditionally promises to repay, in U.S. Dollars, the outstanding principal amount of the Loans to the Administrative Agent for the account of each Lender:

(i)        commencing with the fiscal quarter ending [●], 2021[2], on the last Business Day of each fiscal quarter, in an amount equal to $3,750,000;

(ii)        on December 31, 2021, in an aggregate amount equal to the outstanding principal amount of Loans outstanding under this Agreement minus $100,000,000; provided that, for the avoidance of doubt, if the aggregate principal amount of the Loans outstanding on such date is less than $100,000,000, no such prepayment is required;

(iii)        commencing with the fiscal quarter ending [●], 2022[3] (the "Variable Amortization Trigger Date"), on the last Business Day of each fiscal quarter, in an amount equal to the Variable Amortization Percentage as of the last day of the immediately preceding fiscal quarter of Consolidated Excess Cash at end of such fiscal quarter; provided that, if such payment would cause the outstanding principal balance of the Loans to be less than $75,000,000, then such payment shall only be required in the amount necessary to reduce the outstanding principal balance of the Loans to $75,000,000; and

(iv)        on the Maturity Date, in an amount equal to the then unpaid principal amount of each Loan of such Lender to the Borrower;

provided that all prepayments under this Section 2.04(a) shall be accompanied by all accrued interest thereon, together with, in the case of any such prepayment of a LIBOR Loan on a date other than the last day of an Interest Period therefor, any amounts owing in respect of such LIBOR Loan pursuant to Section 2.04(a).

(b)        Each Lender shall maintain in accordance with its usual practice an account or accounts evidencing the indebtedness of the Borrower to the appropriate Lending Office of such Lender resulting from the Loan made by such Lending Office of such Lender from time to time, including the amounts of principal and interest payable and paid to such Lending Office of such Lender from time to time under this Agreement.

(c)        The Administrative Agent, acting for this purpose as a non-fiduciary agent of the Borrower, shall maintain the Register pursuant to Section 8.06(b)(iv), and a subaccount for each Lender, in which the Register and subaccounts (taken together) shall be recorded (i) the amount of the Loans made hereunder and the Interest Period(s) applicable thereto, (ii) the amount of any principal or interest due and payable or to become due and payable from the Borrower to each Lender hereunder and (iii) the amount of any sum received by the Administrative Agent hereunder from the Borrower and each Lender's share thereof.

---

[2] NTD: To be the fiscal quarter during which the Closing Date occurs.

[3]  NTD: To be the fiscal quarter during which the first anniversary of the Closing Date occurs.

55

(d)     The entries made in the Register and accounts and subaccounts maintained pursuant to clauses (b) and (c) of this Section 2.04 shall, to the extent permitted by applicable law, be prima facie evidence of the existence and amounts of the obligations of the Borrower therein recorded; *provided, however,* that the failure of any Lender or the Administrative Agent to maintain such account, such Register or such subaccount, as applicable, or any error therein, shall not in any manner affect the obligation of the Borrower to repay (with applicable interest) the Loan made to the Borrower by such Lender in accordance with the terms of this Agreement; *provided further* that in the event of any conflict between the accounts maintained by any Lender and those maintained by the Administrative Agent, the Register and the corresponding accounts maintained by the Administrative Agent shall control, absent manifest error.

(e)     Any Lender may request that Loans made by it be evidenced by a Note.  In such event, the Borrower shall prepare, execute and deliver to such Lender a Note payable to such Lender or its registered assigns and in substantially the form attached hereto as Exhibit B.

SECTION 2.05.     Other Fees.     The Borrower shall pay to the Administrative Agent such fees as shall have been separately agreed upon in the Fee Letter in the amounts and at the times specified in the Fee Letter.  Such fees shall be fully earned when paid and shall not be refundable for any reason whatsoever (except as expressly agreed between the Borrower and the Administrative Agent).

SECTION 2.06.     Interest.

(a)     (i) Interest on each Loan that is a LIBOR Loan will accrue and be payable at a rate per annum equal to Adjusted LIBOR plus the Applicable Margin and shall be payable in cash, and (ii) interest on each Loan that is an ABR Loan will accrue and be payable at a rate per annum equal to ABR plus the Applicable Margin and shall be payable in cash, each rate as determined by the Administrative Agent.  Each determination shall, absent clearly demonstrable error, be final and conclusive and binding on all parties hereto.

(b)     (i) At any time when an Event of Default (other than an Event of Default pursuant to Section 6.01(a) or Section 6.01(e)) exists (whether at the stated maturity, by acceleration or otherwise), upon the election of the Required Lenders, or (ii) at any time when an Event of Default pursuant to Section 6.01(a) or Section 6.01(e) (whether at the stated maturity, by acceleration or otherwise) exists, as applicable, all outstanding amounts shall bear interest at a rate per annum that is (x) in the case of principal, the rate that would otherwise be applicable thereto plus 2.00%, (y) in the case of any interest (and premium, if any), to the extent permitted by applicable law, the then-effective rate plus 2.00% and (z) in the case of any amount not specified in subclause (x) or (y) above, a rate per annum equal to the rate per annum otherwise payable at such time on ABR Loans, plus 2.00%. Interest accruing at the rates set forth in this paragraph (b) shall be payable on demand.

(c)     Interest on each Loan shall accrue from and including the date on which such Loan is made to but excluding the date of any repayment thereof and shall be payable (i) on each Interest Payment Date, and (ii) on any prepayment (on the amount prepaid), at maturity (whether by acceleration or otherwise) and, after such maturity, on demand.

(d)     All computations of interest hereunder shall be calculated on the basis of a 360-day year for the actual days elapsed, except that interest computed by reference to the ABR at times when the ABR is based on the prime rate shall be computed on the basis of a year of 365 days (or 366 days in a leap year), and in each case shall be payable for the actual number of days elapsed (including the first day but excluding the last day).

(e)     The Administrative Agent, upon determining Adjusted LIBOR or ABR for any Interest Period, shall promptly notify the Borrower and the relevant Lenders thereof. Each such determination shall, absent clearly demonstrable error, be final and conclusive and binding on all parties hereto.  The

56

Administrative Agent shall, upon the request of any Lender, provide the interest rate then in effect with respect to the applicable Loans.

(f)     Interest on Loans made by Lenders as of the Closing Date shall accrue from and after the Closing Date in accordance with the terms of this Agreement.

SECTION 2.07.     Interest Periods.  Notwithstanding anything to the contrary contained above, if any Interest Period would otherwise expire on a day that is not a Business Day, such Interest Period shall expire on the next succeeding Business Day; *provided* that if any Interest Period would otherwise expire (i) on a day that is not a Business Day but is a day of the month after which no further Business Day occurs in such month, such Interest Period shall expire on the next preceding Business Day and (ii) on a day that is after the Maturity Date, such Interest Period shall expire on the Maturity Date.

SECTION 2.08.     Increased Costs, Illegality, etc.

(a)     In the event that:

(i)     the Administrative Agent shall have reasonably determined (which determination shall, absent clearly demonstrable error, be final and conclusive and binding upon all parties hereto) on any date for determining the LIBOR for any Interest Period that (A) deposits in the principal amounts of the Loans comprising such LIBOR Loan are not generally available in the relevant market or (B) by reason of any changes arising on or after the Closing Date affecting the interbank LIBOR market, adequate and fair means do not exist for ascertaining the applicable interest rate on the basis provided for in the definition of LIBOR; or

(ii)     a Change in Law occurring at any time after the Closing Date shall (A) impose, modify or deem applicable any reserve, special deposit, compulsory loan, insurance charge or similar requirement against assets of, deposits with or for the account of, or credit extended by, any Lender, (B) subject any Lender or the Administrative Agent to any Tax (other than (i) Indemnified Taxes or (ii) Excluded Taxes) on its loans, loan principal, commitments or other obligations, or its deposits, reserves, other liabilities or capital attributable thereto, or (C) impose on any Lender or the London interbank market any other condition, cost or expense (other than Taxes) affecting this Agreement or LIBOR Loans made by such Lender, which, in the case of clause (A), (B) or (C) results in the cost to such Lender or the Administrative Agent of making, converting into, continuing or maintaining LIBOR Loans increasing by an amount or the amounts received or receivable by such Lender or the Administrative Agent hereunder with respect to the foregoing shall be reduced; or

(iii)     any Lender, shall have reasonably determined (which determination shall, absent clearly demonstrable error, be final and conclusive and binding upon all parties hereto), at any time, that the making or continuance of any LIBOR Loan has become unlawful as a result of compliance by such Lender in good faith with any Requirement of Law (or would conflict with any such Requirement of Law not having the force of law even though the failure to comply therewith would not be unlawful);

then, and in any such event, such Lenders (or the Administrative Agent, in the case of clause (i) or (ii)(B) above) shall within a reasonable time thereafter give written notice to the Borrower and to the Administrative Agent of such determination (which notice the Administrative Agent shall promptly transmit to each of the other Lenders). Thereafter (x) in the case of clause (i) above, LIBOR Loans shall no longer be available until such time as the Administrative Agent notifies the Borrower and the Lenders that the circumstances giving rise to such notice by the Administrative Agent no longer exist (which notice the Administrative Agent agrees to give at such time when such circumstances no longer exist), and any Notice of Borrowing given by the Borrower with respect to LIBOR Loans that have not yet been incurred shall be deemed rescinded by the Borrower, (y) in the case of

57

clause (ii) above, the Borrower shall pay to such Lender or the Administrative Agent, promptly (but no later than ten days) after receipt of written demand therefor such additional amounts as shall be required to compensate such Lender or the Administrative Agent for such increased costs or reductions in amounts receivable hereunder (it being agreed that a written notice as to the additional amounts owed to such Lender or the Administrative Agent submitted to the Borrower by such Lender or the Administrative Agent shall, absent clearly demonstrable error, be final and conclusive and binding upon all parties hereto) and (z) in the case of clause (iii) above, the Borrower shall take one of the actions specified in Section 2.08(b) as promptly as possible and, in any event, within the time period required by applicable Requirements of Law.

(b)     At any time that any LIBOR Loan is affected by the circumstances described in Section 2.08(a)(ii) or (iii), the Borrower may (and in the case of a LIBOR Loan affected pursuant to Section 2.08(a)(iii) shall) either (1) if the affected LIBOR Loan is then being made pursuant to a borrowing, cancel such borrowing by giving the Administrative Agent telephonic notice (confirmed promptly in writing) thereof on the same date that the Borrower was notified by a Lender pursuant to Section 2.08(a)(ii) or (iii) or (2) if the affected LIBOR Loan is then outstanding, upon at least three Business Days' notice to the Administrative Agent, require the affected Lender to convert each such LIBOR Loan into an ABR Loan; *provided* that if more than one Lender is affected at any time, then all affected Lenders must be treated in the same manner pursuant to this Section 2.08(b).

(c)     If, after the Closing Date, any Change in Law relating to capital adequacy of any Lender or compliance by any Lender or its parent with any Change in Law relating to capital adequacy occurring after the Closing Date, has or would have the effect of reducing the rate of return on such Lender's or its parent's capital or assets as a consequence of such Lender's commitments or obligations hereunder to a level below that which such Lender or its parent could have achieved but for such Change in Law (taking into consideration such Lender's or its parent's policies with respect to capital adequacy), then from time to time, promptly (but in any event no later than ten days) after written demand by such Lender (with a copy to the Administrative Agent), the Borrower shall pay to such Lender such additional amount or amounts as will compensate such Lender or its parent for such reduction, it being understood and agreed, however, that a Lender shall not be entitled to such compensation as a result of such Lender's compliance with, or pursuant to any request or directive to comply with, any applicable Requirement of Law as in effect on the Closing Date.  Each Lender, upon determining in good faith that any additional amounts will be payable pursuant to this Section 2.08(c), will give prompt written notice thereof to the Borrower, although the failure to give any such notice shall not, subject to Section 2.11, release or diminish the Borrower's obligations to pay additional amounts pursuant to this Section 2.08(c) upon receipt of such notice.

SECTION 2.09.     Compensation.  If (a) any payment of principal of any Loan is made by the Borrower to or for the account of a Lender other than on the last day of the Interest Period for such Loan as a result of a payment pursuant to Section 2.12, as a result of acceleration of the maturity of the Loans pursuant to Article VI or for any other reason, (b) there occurs any failure to borrow, convert, continue or prepay any LIBOR Loan on the date specified in any notice delivered pursuant hereto or (c) there occurs any assignment of any LIBOR Loan other than on the last day of the Interest Period applicable thereto as a result of a request by the Borrower pursuant to Section 8.07, the Borrower shall, after receipt of a written request by such Lender, pay to the Administrative Agent for the account of such Lender any amounts required to compensate such Lender for any additional losses, costs or expenses that such Lender may reasonably incur as a result of such payment, or failure to prepay, including any loss, cost or expense (excluding loss of anticipated profits) actually incurred by reason of the liquidation or reemployment of deposits or other funds acquired by any Lender to fund or maintain such Loan.  A certificate of any Lender setting forth any amount that such Lender is entitled to receive pursuant to this Section 2.09 shall be delivered to the Borrower and shall be conclusive absent manifest error.  The Borrower shall pay such Lender the amount shown as due on such certificate within ten days after receipt thereof, unless such amount is due on an earlier date in accordance with Section 2.12(c).

SECTION 2.10.     Change of Lending Office.  Each Lender agrees that, upon the occurrence of any event giving rise to the operation of Section 2.08(a)(ii), 2.08(a)(iii), 2.08(c) or 2.15 with respect to such Lender,

58

it will, if requested by the Borrower use reasonable efforts  (subject to overall policy considerations of such Lender) to designate another lending office for any Loans affected by such event; *provided* that such designation does not cause such Lender or its lending office to suffer any economic, legal or regulatory disadvantage, with the object of avoiding the consequence of the event giving rise to the operation of any such Section.  Nothing in this <u>Section 2.10</u> shall affect or postpone any of the obligations of the Borrower or the right of any Lender provided in <u>Section 2.08</u> or <u>2.15</u>.

SECTION 2.11.    <u>Notice of Certain Costs</u>.  Notwithstanding anything in this Agreement to the contrary, to the extent any notice required by <u>Section 2.08</u> or <u>2.09</u> is given by any Lender more than 270 days after such Lender has knowledge (or should have had knowledge) of the occurrence of the event giving rise to the additional cost, reduction in amounts, loss, tax or other additional amounts described in such Sections, such Lender shall not be entitled to compensation under <u>Section 2.08</u> or <u>2.09</u>, as the case may be, for any such amounts incurred or accruing prior to the 271st day prior to the giving of such notice to the Borrower; *provided* that if a Change in Law that gives rise to such additional amounts is retroactive, then the 270-day period referred to above shall be extended to include the period of retroactive effect thereof.

SECTION 2.12.    <u>Voluntary Prepayments</u>.

(a)    The Borrower shall have the right at any time and from time to time to prepay any Loan in whole or in part, without premium or penalty, in an aggregate principal amount that is an integral multiple of $500,000 and not less than $1,000,000 or, if less, the amount outstanding, upon prior notice to the Administrative Agent by telephone (confirmed by telecopy), not less than three Business Days prior to the date of prepayment, which notice shall be irrevocable except to the extent provided below in <u>Section 2.12(b)</u>. Each such notice shall be signed by an Authorized Officer of the Borrower and shall specify the date and amount of such prepayment and the Type(s) of Loans to be prepaid and, if LIBOR Loans are to be prepaid, the Interest Period(s) of such Loans.  The Administrative Agent will promptly notify each applicable Lender of its receipt of each such notice, and of the amount of such Lender's pro rata share of such prepayment.  Each prepayment of Loans under this <u>Section 2.12(a)</u> shall be allocated as directed by the Borrower and shall be applied pro rata to the Lenders, based upon the outstanding principal amounts owing to each such Lender.

(b)    Notwithstanding anything to the contrary contained in this Agreement, the Borrower may rescind any notice of prepayment made under <u>Section 2.12(a)</u> by notice to the Administrative Agent a reasonable time prior to the specified effective time of such prepayment if such prepayment would have resulted from a refinancing of all or any portion of the Loans, which refinancing shall not be consummated or shall otherwise be delayed.

(c)    All prepayments under this <u>Section 2.12</u> shall be accompanied by all accrued interest thereon, together with, in the case of any such prepayment of a LIBOR Loan on a date other than the last day of an Interest Period therefor, any amounts owing in respect of such LIBOR Loan pursuant to <u>Section 2.09</u>.

SECTION 2.13.    <u>Mandatory Prepayments</u>.

(a)    <u>Asset Sales</u>.

(i)    If the Borrower and its Restricted Subsidiaries have received Net Proceeds from one or more Asset Sales (including, for the avoidance of doubt, Net Proceeds of a Mexico Liquidity Event (including those Net Proceeds of a Mexico Liquidity Event received from the Closing Date Unrestricted Subsidiary pursuant to <u>Section 5.33</u>)), Hedge Unwind Events, Extraordinary Receipt Events or Casualty Events, not later than the third Business Day following the date of receipt of any such Net Proceeds, an amount equal to 100% of such Net Proceeds shall be applied as a mandatory prepayment of the Loans in accordance with <u>Section 2.13(e)</u>; *provided*, that (A)(1) with respect to Hedge Unwind Events, until the aggregate amount of Hedge Unwind Proceeds received from one or more

59

Hedge Unwind Events exceeds $5,000,000 in any fiscal year, no such prepayment shall be required during such fiscal year, (2) with respect to Asset Sales of assets constituting Proved Developed Producing Reserves, Proved Developed Non-Producing Reserves and/or related infrastructure assets (other than Mexico Liquidity Events) (any such Asset Sale, a "Specified Asset Sale"), until the aggregate amount of Net Proceeds received from one or more such Specified Asset Sales exceeds $15,000,000 in any fiscal year, no such prepayment shall be required during such fiscal year and any such prepayment shall only be required with Net Proceeds in excess of such threshold, (3) with respect to any Asset Sale (other than a Specified Asset Sale or a Mexico Liquidity Event), until the aggregate amount of Net Proceeds received from one or more of such Asset Sales exceeds $50,000,000 on a cumulative basis calculated from the Closing Date, no such prepayment shall be required and any such prepayment shall only be required with Net Proceeds in excess of such threshold and (4) with respect to any Extraordinary Receipt Event or Casualty Event, until the aggregate amount of Extraordinary Receipts and/or Net Proceeds of a Casualty Event received from one or more Extraordinary Receipt Events and/or Casualty Events exceeds $10,000,000 in any fiscal year, no such prepayment shall be required during such fiscal year and any such prepayment shall only be required with Net Proceeds in excess of such threshold and (B) at the Borrower's election and so long as no Event of Default has occurred and is continuing (1) following the receipt of any Net Proceeds described in the foregoing clauses (A)(2) and (A)(3) in excess of the respective threshold described therein (such excess Net Proceeds, "Excess Asset Sale Proceeds"), the Borrower may reinvest up to 50% of such Excess Asset Sale Proceeds in additional Oil and Gas Properties and/or capital expenditures related to existing Oil and Gas Properties, in each case, within 365 days following the receipt thereof (the "Reinvestment Date") and the remaining 50% of such Excess Asset Sale Proceeds shall be required to be applied in accordance with Section 2.13(e); provided, that, to the extent any such Excess Asset Sale Proceeds were received from Specified Asset Sales, such Excess Asset Sale Proceeds shall be reinvested in additional Oil and Gas Properties constituting Proved Developed Producing Reserves and/or capital expenditures on existing Oil and Gas Properties solely to the extent constituting Proved Developed Producing Reserves, Proved Developed Non-Producing Reserves or Proved Developed Behind Pipe Reserves (unless otherwise agree by the Administrative Agent in its sole discretion) and (2) following the receipt of Net Proceeds from any Casualty Event in excess of the threshold described in clause (A)(4) above (such excess Net Proceeds, "Excess Casualty Event Proceeds"), the Borrower may reinvest up to 100% of such Excess Casualty Event Proceeds on or prior to the applicable Reinvestment Date in replacement and/or repair of the property subject to such Casualty Event; provided, that the aggregate amount of Excess Casualty Event Proceeds so reinvested shall not exceed the amount necessary to replace and/or repair the property subject to such Casualty Event and any remaining amount of such Excess Casualty Event Proceed shall be applied in accordance with Section 2.13(e). If on the applicable Reinvestment Date, any portion of such Net Proceeds has not been so reinvested, the Borrower will make a prepayment of the Loans, to the extent required above.

(ii)     Notwithstanding any other provisions of this Section 2.13(a) and other than with respect to a Mexico Liquidity Event, to the extent that any of or all the Net Proceeds of any Disposition by a Foreign Subsidiary ("Foreign Disposition") is prohibited or delayed by applicable local law from being repatriated to the United States, the portion of such Net Proceeds so affected will not be required to be applied to repay Loans at the times provided in this Section 2.13(a) but may be retained by the applicable Foreign Subsidiary, in each case, so long, but only so long, as the applicable local law will not permit repatriation to the United States (the Borrower hereby agreeing to cause the applicable Foreign Subsidiary to promptly take all actions reasonably required by the applicable local law to permit such repatriation), and once such repatriation of any of such affected Net Proceeds that, in each case, would otherwise be required to be used to make an offer of prepayment pursuant to Section 2.13(a), is permitted under the applicable local law, such repatriation will be immediately effected and such repatriated Net Proceeds will be promptly (and in any event not later than two Business Days after such repatriation) applied (net of additional taxes payable or reserved against as a result thereof) to the repayment of the Loans pursuant to this Section 2.13(a).

WEIL:\97847440\31\45327.0007

(iii)    All prepayments under this <u>Section 2.13(a)</u> shall be accompanied by all accrued interest thereon, together with, in the case of any such prepayment of a LIBOR Loan on a date other than the last day of an Interest Period therefor, any amounts owing in respect of such LIBOR Loan pursuant to <u>Section 2.09</u>.

(b)    <u>Debt/Equity Incurrence</u>.  (i) Subject to <u>Section 2.13(b)(ii)</u>, on each occasion that a Debt/Equity Incurrence Prepayment Event occurs, the Borrower shall, within one Business Day after the receipt of Net Proceeds therefrom, prepay, in accordance with <u>Section 2.13(e)</u>, a principal amount of Loans in an amount equal to 100% of the Net Proceeds from such Debt/Equity Incurrence Prepayment Event; <u>provided</u> that if the proceeds from such Debt/Equity Incurrence Prepayment Event constitute an ACR Cure Amount, such proceeds shall be prepaid in accordance with <u>Section 2.13(c)</u> and not this <u>Section 2.13(b)</u>.

(ii)    Notwithstanding any other provisions of this <u>Section 2.13(b)</u>, no prepayment shall be required pursuant to this <u>Section 2.13(b)</u> to the extent that such prepayment would violate applicable Law.

(iii)    All prepayments under this <u>Section 2.13(b)</u> shall be accompanied by all accrued interest thereon, together with, in the case of any such prepayment of a LIBOR Loan on a date other than the last day of an Interest Period therefor, any amounts owing in respect of such LIBOR Loan pursuant to <u>Section 2.09</u>.

(c)    <u>Minimum Asset Coverage Ratio</u>.  The Borrower shall prepay the Loans in an aggregate principal amount equal to the Leverage Cure Amount and/or ACR Cure Amount, as applicable, as required by and in accordance with <u>Section 6.05</u>.

(d)    <u>Redemptions of Junior Debt</u>.  Concurrently with any prepayment of Junior Debt permitted by <u>Section 5.07(b)(xii)</u>, the Borrower shall prepay the Loans in an aggregate principal amount equal to the amount paid by the Borrower to redeem, repurchase, defease or otherwise acquire or retire for value such Junior Debt.

(e)    <u>Application of Mandatory Prepayments</u>.  Each prepayment of Loans required by this <u>Section 2.13</u> shall be allocated ratably to future payments on the Loans required pursuant to <u>Section 2.04(a)(i)</u> and shall be applied pro rata to Lenders, based upon the outstanding principal amounts owing to each such Lender; *provided*, that any Lender may elect, by written notice to the Administrative Agent at least one Business Day prior to the prepayment due date, to decline all or a portion of any prepayment of its Loans (other than a mandatory prepayment under <u>Section 2.13(b)</u> solely to the extent such prepayment represents a refinancing of all of the Obligations, which may not be declined), in which case the aggregate amount of the prepayment that would have been applied to prepay Loans but was so declined shall be retained by the Borrower.

(f)    <u>Notice of Mandatory Prepayments</u>.  The Borrower shall notify the Administrative Agent in writing of any mandatory prepayment of Loans required to be made pursuant to <u>Sections 2.13(a)</u>, <u>(b)</u>, <u>(c)</u> or <u>(d)</u> above at least two Business Days prior to the date of such prepayment.  Each such notice shall specify the date of such prepayment and provide a reasonably detailed calculation of the amount of such prepayment, the Type(s) of Loans to be prepaid and, if LIBOR Loans are to be prepaid, the Interest Period(s) of such Loans.

SECTION 2.14.    <u>Method and Place of Payment</u>.

(a)    Except as otherwise specifically provided herein, all payments under this Agreement shall be made by the Borrower, without set-off, counterclaim or deduction of any kind, to the Administrative Agent for the ratable account of the Lenders entitled thereto not later than 12:00 Noon (New York City time) on the date when due and shall be made in immediately available funds at such office as the Administrative Agent shall specify for such purpose by notice to the Borrower, it being understood that written or facsimile

61

notice by the Borrower to the Administrative Agent to make a payment from the funds attributed to the Borrower in an account of the Administrative Agent shall constitute the making of such payment to the extent of such funds held in such account.  All payments under each Loan Document (whether of principal, interest or otherwise) shall be made in U.S. Dollars.  The Administrative Agent will thereafter cause to be promptly distributed like funds relating to the payment of principal or interest or fees ratably to the Lenders entitled thereto.

(b)     Any payments under this Agreement that are made later than 2:00 p.m. (New York City time) shall be deemed to have been made on the next succeeding Business Day.  Except as otherwise provided herein, whenever any payment to be made hereunder shall be stated to be due on a day that is not a Business Day, the due date thereof shall be extended to the next succeeding Business Day and, with respect to payments of principal, interest shall be payable during such extension at the applicable rate in effect immediately prior to such extension.

SECTION 2.15.    Net Payments.

(a)     Any and all payments made by or on behalf of the Borrower or any Guarantor under this Agreement or any other Loan Document shall be made free and clear of, and without deduction or withholding for or on account of, any Taxes; *provided* that if the Borrower, any Guarantor or the Administrative Agent or any other applicable withholding agent shall be required by applicable Requirements of Law to deduct or withhold any Taxes from such payments, then (i) the applicable withholding agent shall make such deductions or withholdings as are reasonably determined by the applicable withholding agent to be required by any applicable Requirement of Law, (ii) the applicable withholding agent shall timely pay the full amount deducted or withheld to the relevant Governmental Authority in accordance with applicable Requirements of Law, and (iii) to the extent withholding or deduction is required to be made on account of Indemnified Taxes, the sum payable by the Borrower or such Guarantor shall be increased as necessary so that after all required deductions and withholdings have been made (including deductions or withholdings applicable to additional sums payable under this Section 2.15) the Administrative Agent, the Collateral Agent or the applicable Lender, as the case may be, receives an amount equal to the sum it would have received had no such deductions or withholdings been made.  As soon as practicable after any payment of Taxes by any Credit Party to a Governmental Authority as provided in this Section 2.15, the Borrower shall deliver to the Administrative Agent the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of any return reporting such payment or other evidence reasonably satisfactory to the Administrative Agent.

(b)     The Borrower shall timely pay to the relevant Governmental Authority in accordance with applicable Requirements of Law, or at the option of the Administrative Agent timely reimburse it for, any Other Taxes (whether or not such Other Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority).

(c)     The Borrower shall indemnify and hold harmless the Administrative Agent, the Collateral Agent and each Lender within 10 Business Days after written demand therefor, for the full amount of any Indemnified Taxes paid or payable by, or required to be withheld or deducted from a payment to, imposed on the Administrative Agent, the Collateral Agent or such Lender, as the case may be (including Indemnified Taxes imposed or asserted on or attributable to amounts payable under this Section 2.15), and any reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  A certificate as to the amount of such payment or liability delivered to the Borrower (and the Administrative Agent, if sent by a Lender) by a Lender, the Administrative Agent or the Collateral Agent (as applicable) on its own behalf or on behalf of a Lender shall be conclusive absent manifest error.

(d)     Each Lender shall deliver to the Borrower and the Administrative Agent, at such time or times reasonably requested by the Borrower or the Administrative Agent, such properly completed and

62

executed documentation prescribed by applicable law and such other reasonably requested information as will permit the Borrower or the Administrative Agent, as the case may be, to determine (A) whether or not any payments made hereunder or under any other Loan Document are subject to Taxes, (B) if applicable, the required rate of withholding or deduction, and (C) such Lender's entitlement to any available exemption from, or reduction of, applicable Taxes in respect of any payments to be made to such Lender by any Credit Party pursuant to any Loan Document or otherwise to establish such Lender's status for withholding tax purposes in the applicable jurisdiction.  In addition, any Lender, if reasonably requested by the Borrower or the Administrative Agent, shall deliver such other documentation prescribed by applicable law or reasonably requested by the Borrower or the Administrative Agent as will enable the Borrower or the Administrative Agent to determine whether or not such Lender is subject to backup withholding or information reporting requirements.

(e)   Without limiting the generality of Section 2.15(d), each Non-U.S. Lender with respect to any Loan made to the Borrower shall, to the extent it is legally entitled to do so:

(i)   deliver to the Borrower and the Administrative Agent (in such number of copies as shall be requested by the recipient), on or prior to the date on which such Lender becomes a Lender under this Agreement, properly completed and duly executed copies of (A) in the case of a Non-U.S. Lender claiming complete exemption from U.S. federal withholding tax under Section 871(h) or 881(c) of the Code with respect to payments of "portfolio interest", United States Internal Revenue Service ("IRS") Form W-8BEN or IRS Form W-8BEN-E, as applicable, (or any applicable successor form) (together with a certificate substantially in the form of Exhibit D-1, Exhibit D-2, Exhibit D-3 or Exhibit D-4 hereto, as applicable (a "Non-Bank Tax Certificate"), representing that such Non-U.S. Lender is not a bank for purposes of Section 881(c)(3)(A) of the Code, is not a "10 percent shareholder" (within the meaning of Section 871(h)(3)(B) of the Code) of the Borrower, is not a CFC described in Section 881(c)(3)(C) of the Code), (B) IRS Form W-8BEN or IRS Form W-8BEN-E, as applicable, or IRS Form W-8ECI (or any applicable successor form), in each case properly completed and duly executed by such Non-U.S. Lender claiming complete exemption from, or reduced rate of, U.S. federal withholding tax on payments by the Borrower under this Agreement, (C) IRS Form W-8IMY (or any applicable successor form) and all necessary attachments (including the forms described in clauses (A) and (B) above; provided that if the Non-U.S. Lender is a partnership and not a participating Lender, and one or more of the partners is claiming portfolio interest treatment, the Non-Bank Tax Certificate may be provided by such Non-U.S. Lender on behalf of such partners) or (D) any other form prescribed by applicable law as a basis for claiming exemption from or a reduction in U.S. federal withholding tax duly completed together with such supplementary documentation as may be prescribed by applicable law to permit the Borrower or the Administrative Agent to determine the withholding or deduction required to be made; and

(ii)   deliver to the Borrower and the Administrative Agent properly completed and duly executed copies of any such form or certification (or any applicable successor form) promptly after such form or certification expires or becomes obsolete or invalid, after the occurrence of any event requiring a material change in the most recent form previously delivered by it to the Borrower and the Administrative Agent, and from time to time thereafter if reasonably requested by the Borrower or the Administrative Agent or promptly notify the Borrower and the Administrative Agent in writing of such Non-U.S. Lender's legal inability to do so.

Each Person that shall become a Participant pursuant to Section 8.06 or a Lender pursuant to Section 8.06 shall, upon the effectiveness of the related transfer, be required to provide all the forms and statements required pursuant to this Section 2.15(e); provided that in the case of a Participant such Participant shall furnish all such required forms and statements to the Person from which the related participation shall have been purchased.

Notwithstanding anything to the contrary in Section 2.15(d) and this Section 2.15(e), any form and supplementary documentation (other than such documentation set forth in paragraphs (A), (B) and (C) of this

63

Section 2.15(e)) shall not be required if in the Lender's reasonable judgment such completion, execution or submission would subject such Lender to any material unreimbursed cost or expense or would materially prejudice the legal or commercial position of such Lender.

In addition, to the extent it is legally eligible to do so, each Agent shall deliver to the Borrower (x)(I) prior to the date on which the first payment by the Borrower is due hereunder or (II) prior to the first date on or after the date on which such Agent becomes a successor Agent pursuant to Section 7.09 on which payment by the Borrower is due hereunder, as applicable, (A) properly completed and duly executed copies of IRS Form W-9 certifying its exemption from U.S. Federal backup withholding or (B) properly completed and duly executed applicable copies of IRS Form W-8 certifying its non-U.S. status and its entitlement to any applicable treaty benefits (and, in respect of the Administrative Agent, an executed copy of IRS Form W-8IMY certifying on Part I, Part II and Part VI thereof that it is a U.S. branch that has agreed to be treated as a U.S. person for U.S. federal tax purposes with respect to payments received by it from the Borrower in its capacity as Administrative Agent), and (y) on or before the date on which any such previously delivered documentation expires or becomes obsolete or invalid, after the occurrence of any event requiring a change in the most recent documentation previously delivered by it to the Borrower, and from time to time if reasonably requested by the Borrower, properly completed and duly executed copies of such documentation.

     (f)    If any Lender, the Administrative Agent or the Collateral Agent, as applicable, determines, in its sole discretion exercised in good faith, that it has received a refund of an Indemnified Tax for which it has been indemnified pursuant to this Section 2.15 (including by the payment of additional amounts pursuant to this Section 2.15), then the Lender, the Administrative Agent or the Collateral Agent, as the case may be, shall reimburse the Borrower or such Guarantor for such amount (but only to the extent of indemnity payments made under this Section with respect to the Taxes giving rise to such refund) (net of all reasonable out-of-pocket expenses (including Taxes) of such Lender, the Administrative Agent or the Collateral Agent, as the case may be, and without interest other than any interest received thereon from the relevant Governmental Authority with respect to such refund); *provided* that the Borrower or such Guarantor, upon the request of the Lender, the Administrative Agent or the Collateral Agent, agrees to repay the amount paid over to the Borrower or such Guarantor (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) to the Lender, the Administrative Agent or the Collateral Agent in the event the Lender, the Administrative Agent or the Collateral Agent is required to repay such refund to such Governmental Authority. Notwithstanding anything to the contrary in this paragraph (f), in no event will any Lender or Agent be required to pay any amount to the Borrower or any Guarantor pursuant to this paragraph (f), the payment of which would place such Lender or Agent in a less favorable net after-Tax position than such Lender or Agent would have been in if the Tax subject to indemnification and giving rise to such refund had not been deducted, withheld or otherwise imposed and the indemnification payments or additional amounts with respect to such Tax had never been paid. None of the Lender, the Administrative Agent or the Collateral Agent shall be obliged to make available its tax returns (or any other information relating to its taxes that it deems confidential) to any Credit Party in connection with this clause (f) or any other provision of this Section 2.15.

     (g)    Each U.S. Lender shall deliver to the Borrower and the Administrative Agent properly completed and duly executed copies of IRS Forms W-9 (or substitute or successor form), certifying that such U.S. Lender is exempt from United States federal backup withholding (i) on or prior to the Closing Date (or on or prior to the date it becomes a party to this Agreement), (ii) on or before the date that such form expires or becomes obsolete or invalid, (iii) after the occurrence of a change in the U.S. Lender's circumstances requiring a change in the most recent form previously delivered by it to the Borrower and the Administrative Agent, and (iv) from time to time thereafter if reasonably requested by the Borrower or the Administrative Agent.

     (h)    If a payment made to any Lender or any Agent under this Agreement or any other Loan Document would be subject to U.S. federal withholding tax imposed by FATCA if such Lender or such Agent were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Code, as applicable), such Lender or such Agent shall deliver to the Borrower

and the Administrative Agent at the time or times prescribed by law and at such time or times reasonably requested by the Borrower or the Administrative Agent such documentation prescribed by applicable law (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and such additional documentation reasonably requested by the Borrower or the Administrative Agent as may be necessary for the Borrower and the Administrative Agent to comply with their obligations under FATCA, to determine whether such Lender has or has not complied with such Lender's obligations under FATCA or to determine the amount, if any, to deduct and withhold from such payment.   Solely for purposes of this Section 2.15(h), "FATCA" shall include any amendments made to FATCA after the date of this Agreement.

   (i)  Each Lender shall severally indemnify the Administrative Agent, within 10 days after demand therefor, for (i) any Indemnified Taxes attributable to such Lender (but only to the extent that the Borrower has not already indemnified the Administrative Agent for such Indemnified Taxes and without limiting the obligation of the Borrower to do so), (ii) any Taxes attributable to such lender's failure to comply with the provisions of Section 8.06(c) relating to the maintenance of a Participant Register and (iii) any Excluded Taxes attributable to such lender, in each case, that are payable or paid by the Administrative Agent in connection with any Loan Document, and any reasonable expenses arising therefrom or with respect thereto, whether or not such Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority. A certificate as to the amount of such payment or liability delivered to any Lender by the Administrative Agent shall be conclusive absent manifest error. Each Lender hereby authorizes the Administrative Agent to set off and apply any and all amounts at any time owing to such lender under any Loan Document or otherwise payable by the Administrative Agent to the Lender from any other source against any amount due to the Administrative Agent under this paragraph (i).

   (j)  For the avoidance of doubt, for purposes of this Section 2.15, the term "applicable law" or "Requirements of Law" includes FATCA.

   (k)  The agreements in this Section 2.15 shall survive the termination of this Agreement and the payment of the Loans and all other amounts payable hereunder.

  SECTION 2.16.  Limit on Rate of Interest.

   (a)  No Payment Shall Exceed Lawful Rate.   Notwithstanding any other term of this Agreement, the Borrower shall not be obliged to pay any interest or other amounts under or in connection with this Agreement in excess of the amount or rate permitted under or consistent with any applicable law, rule or regulation.

   (b)  Payment at Highest Lawful Rate.  If the Borrower is not obliged to make a payment which it would otherwise be required to make, (as a result of Section 2.16(a), the Borrower shall make such payment to the maximum extent permitted by or consistent with applicable laws, rules and regulations.

   (c)  Adjustment if Any Payment Exceeds Lawful Rate. If any provision of this Agreement or any of the other Loan Documents would obligate the Borrower to make any payment of interest or other amount payable to any Lender in an amount or calculated at a rate which would be prohibited by any applicable law, rule or regulation, then notwithstanding such provision, such amount or rate shall be deemed to have been adjusted with retroactive effect to the maximum amount or rate of interest, as the case may be, as would not be so prohibited by law, such adjustment to be effected, to the extent necessary, by reducing the amount or rate of interest required to be paid by the Borrower to the affected Lender under Section 2.06.

    Notwithstanding the foregoing, and after giving effect to all adjustments contemplated thereby, if any Lender shall have received from the Borrower an amount in excess of the maximum permitted by any applicable law, rule or regulation, then the Borrower shall be entitled, by notice in writing to the Administrative Agent to obtain reimbursement from that Lender in an amount equal to such excess, and pending such reimbursement, such amount shall be deemed to be an amount payable by that Lender to the Borrower.

SECTION 2.17.    Pro Rata Sharing.  Subject in all respect to the provisions of the Intercreditor Agreement, except as expressly set forth herein, whenever any payment received by the Administrative Agent under this Agreement is insufficient to pay in full all amounts then due and payable to the Administrative Agent and the Lenders under this Agreement, such payment shall be distributed by the Administrative Agent and applied by the Administrative Agent and the Lenders in the following order: first, to the payment of fees and expenses due and payable to the Administrative Agent and the Collateral Agent and its Affiliates under and in connection with this Agreement, except any amounts payable to any such Person in its role as Lender, as provided in clause "second" of this Section 2.17; second, to the payment of all expenses due and payable under Section 8.05, ratably among the Lenders in accordance with the aggregate amount of such payments owed to each Lender; third, to the payment of interest and amounts under Sections 2.08 and 2.15, if any, then due and payable on the Loans ratably among the Lenders in accordance with the aggregate amount of interest owed to each Lender; and fourth, to the payment of the principal amount of the Loans that is then due and payable, ratably among the Lenders in accordance with the aggregate principal amount owed to each such Lender.

SECTION 2.18.    Adjustments; Set-off.

(a)    If any Lender shall, by exercising any right of set-off or counterclaim or otherwise, obtain payment in respect of any principal of or interest on any of its Loans resulting in such Lender receiving payment of a greater proportion of the aggregate amount of its Loans and accrued interest thereon than the proportion received by any other Lender entitled to such payment, then the Lender receiving such greater proportion shall purchase for cash at face value participations in the Loans of other Lenders to the extent necessary so that the benefit of all such payments shall be shared by the Lenders entitled thereto ratably in accordance with the aggregate amount of principal of and accrued interest on their respective Loans; *provided* that (i) if any such participations are purchased and all or any portion of the payment giving rise thereto is recovered, such participations shall be rescinded and the purchase price restored to the extent of such recovery, without interest, and (ii) the provisions of this clause (a) shall not be construed to apply to any payment made by the Borrower pursuant to and in accordance with the terms of this Agreement, or any payment obtained by a Lender as consideration for the assignment of or sale of a participation in any of its Loans to any assignee or participant.    The Borrower consents to the foregoing and agrees, to the extent it may effectively do so under applicable law, that any Lender acquiring a participation pursuant to the foregoing arrangements may exercise against the Borrower rights of set-off and counterclaim with respect to such participation as fully as if such Lender were a direct creditor of the Borrower in the amount of such participation.

(b)    After the occurrence and during the continuance of an Event of Default, in addition to any rights and remedies of the Lenders provided by law, each Lender shall have the right, without prior notice to the Borrower, any such notice being expressly waived by the Borrower to the extent permitted by applicable law, upon any amount becoming due and payable by the Borrower hereunder (whether at the stated maturity, by acceleration or otherwise) to set-off and appropriate and apply against such amount any and all deposits (general or special, time or demand, provisional or final), in any currency, and any other credits, indebtedness or claims, in any currency, in each case whether direct or indirect, absolute or contingent, matured or unmatured, at any time held or owing by such Lender or any branch or agency thereof to or for the credit or the account of the Borrower or any Subsidiary.    Each Lender agrees promptly to notify the Borrower and the Administrative Agent after any such set-off and application made by such Lender; *provided* that the failure to give such notice shall not affect the validity of such set-off and application.

SECTION 2.19.    Interest Elections.  The Loans shall have an initial Interest Period as specified in the applicable Notice of Borrowing.  Thereafter, the Borrower may elect Interest Periods therefor, all as provided in this Section 2.19.  The Borrower may elect different options with respect to different portions of the affected Borrowing, in which case each such portion shall be allocated ratably among the Lenders holding the Loans comprising such Borrowing, and the Loans comprising each such portion shall be considered a separate Borrowing.

66

(a)     To make an election pursuant to this Section 2.19, the Borrower shall notify the Administrative Agent of such election (as provided in Section 8.02) in a written Interest Period Election Request in the form set forth in Exhibit C and signed by the Borrower.  Such Interest Period Election Request shall be delivered to the Administrative Agent by telephone not later than 11:00 a.m., New York City time, three Business Days prior to the end of the then applicable Interest Period.  Each such Interest Period Election Request shall be irrevocable.

(b)     Each Interest Period Election Request shall specify the following information:

(i)     the Borrowing to which such Interest Period Election Request applies and, if different options are being elected with respect to different portions thereof, the portions thereof to be allocated to each resulting Borrowing (in which case the information to be specified pursuant to clauses (iii) and (iv) below shall be specified for each resulting Borrowing);

(ii)     the effective date of the election made pursuant to such Interest Period Election Request, which shall be a Business Day;

(iii)     whether the resulting Borrowing is to be an ABR Borrowing or a LIBOR Borrowing;

(iv)     if the resulting Borrowing is a LIBOR Borrowing, the Interest Period to be applicable thereto after giving effect to such election, which shall be a period contemplated by the definition of the term "Interest Period"; and

(v)     no Default or Event of Default shall have occurred and be continuing as of the date such Interest Period Election Request is delivered or as of the effective date of such election.

If any such Interest Period Election Request requests a LIBOR Borrowing but does not specify an Interest Period, then the Borrower shall be deemed to have selected an Interest Period of one month's duration.

(c)     Promptly following receipt of an Interest Period Election Request, the Administrative Agent shall advise each Lender to which such Interest Period Election Request relates of the details thereof and of such Lender's portion of each resulting Loan.

(d)     If the Borrower fails to deliver a timely Interest Period Election Request with respect to a LIBOR Borrowing prior to the end of the Interest Period applicable thereto, then, unless such Borrowing is repaid as provided herein, at the end of such Interest Period such Borrowing shall be converted to an ABR Borrowing.  Notwithstanding any contrary provision hereof, if an Event of Default has occurred and is continuing and the Administrative Agent, at the written request (including a request through electronic means) of the Required Lenders, so notifies the Borrower, then, so long as an Event of Default is continuing, (i) no outstanding Borrowing may be converted to or continued as a LIBOR Borrowing and (ii) unless repaid, each LIBOR Borrowing shall be converted to an ABR Borrowing at the end of the Interest Period applicable thereto.

(e)     After giving effect to all Borrowings, all conversions of Loans from one Type to the other and all continuations of Loans as the same type, there shall be not more than three Interest Periods in effect with respect to the Loans.

WEIL:\97847440\31\45327.0007

## ARTICLE III

Representations and Warranties

In order to induce the Agents and the Lenders to enter into this Agreement and to make the Loans, the Borrower makes, on the Closing Date, the following representations and warranties to the Agents and the Lenders, all of which shall survive the execution and delivery of this Agreement and the making of the Loans.

SECTION 3.01.    Corporate Status.  Each of Holdings, the Borrower and each Subsidiary of the Borrower (a) is a duly organized and validly existing corporation or other entity in good standing (or, if applicable in a foreign jurisdiction, enjoys the equivalent status under the laws of such jurisdiction of organization outside the United States) under the laws of the jurisdiction of its organization and has the corporate or other organizational power and authority to own its property and assets and to transact its business as now conducted and (b) has duly qualified and is authorized to do business and is in good standing (if applicable) in all jurisdictions where it is required to be so qualified, except where the failure to be so qualified or in good standing would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, and all such jurisdictions are set forth on Schedule 3.01.

SECTION 3.02.    Corporate Power and Authority; Enforceability; Security Interests.  Each Credit Party has the corporate or other organizational power and authority to execute, deliver and carry out the terms and provisions of the Loan Documents to which it is a party and has taken all necessary corporate or other organizational action to authorize the execution, delivery and performance of the Loan Documents to which it is a party.  Each Credit Party has duly executed and delivered each Loan Document to which it is a party and each such Loan Document constitutes the legal, valid and binding obligation of such Credit Party enforceable in accordance with its terms, subject to the effects of bankruptcy, insolvency, fraudulent conveyance, reorganization and other similar laws relating to or affecting creditors' rights generally and general principles of equity (whether considered in a proceeding in equity or law).

SECTION 3.03.    No Violation; Compliance with Laws.

(a)    None of the execution, delivery or performance by any Credit Party of the Loan Documents to which it is a party or the compliance with the terms and provisions thereof will (a) contravene any Requirement of Law in any material respect, (b) result in any material breach or material violation of any of the terms, covenants, conditions or provisions of, or constitute a default under, or result in the creation or imposition of (or the obligation to create or impose) any Lien upon any of the property or assets of such Credit Party or any of the Subsidiaries (other than Liens created under the Loan Documents and Liens permitted hereunder) pursuant to the terms of any Material Contract, indenture, loan agreement, lease agreement, mortgage, deed of trust, agreement or other material instrument to which such Credit Party or any of the Subsidiaries is a party or by which it or any of its property or assets is bound (any such term, covenant, condition or provision, a "Contractual Requirement") or (c) violate any provision of the certificate of incorporation, by-laws or other organizational documents of such Credit Party or any of the Subsidiaries.

(b)    Each of Holdings, the Borrower and its Subsidiaries is in compliance in all material respects with all Requirements of Law (it being understood, in the case of any statutes, regulations and orders of, and all applicable restrictions imposed by, all Governmental Authorities that are specifically referred to in any other provision of this Agreement, the Credit Parties shall also be required to represent and/or comply with, as applicable, the express terms of such provision).

SECTION 3.04.    Litigation.  Except as set forth on Schedule 3.04, there are no actions, suits or proceedings, governmental investigations or arbitrations (including Environmental Claims collectively, "Adverse Proceedings") pending or, to the knowledge of the Borrower, threatened in writing against or affecting Holdings, the Borrower, any of its Subsidiaries or any of their respective properties that would

68

reasonably be expected, individually or in the aggregate, to result in a Material Liability to Holdings, the Borrower or any of its Restricted Subsidiaries.

SECTION 3.05.    Margin Regulations. None of Holdings nor any of its Subsidiaries is engaged principally, or as one of its important activities, in the business of extending credit for the purpose of purchasing or carrying any "margin stock" (as defined in the Regulation U of the Board). No portion of the proceeds of the Loans has or will be used in any manner, whether directly or indirectly, that causes or would reasonably be excepted to cause, such Loan or the application of such proceeds to violate Regulation T, Regulation U or Regulation X of the Board or any regulation thereof or to violate the Exchange Act.

SECTION 3.06.    Governmental Approvals.  The execution, delivery and performance of each Loan Document and the consummation of the other Transactions do not (or, in the case of each Subsidiary Guarantor, will not) require any consent or approval of, registration or filing with, or other action by, any Governmental Authority, except for (a) such as have been or will be prior to the Closing Date obtained or made and are or will be prior to the Closing Date in full force and effect, (b) filings and recordings in respect of the Liens created pursuant to the Security Documents and (c) such consents, approvals, registrations, filings or actions the failure of which to obtain or make would not reasonably be expected to have a Material Adverse Effect.

SECTION 3.07.    Investment Company Act.  No Credit Party is required to be registered as an "investment company" within the meaning of the Investment Company Act of 1940, as amended.

SECTION 3.08.    True and Complete Disclosure; Financial Condition.  (a) All written factual information (other than estimates and information of a general economic nature or general industry nature) (the "Information") concerning Holdings, the Borrower, its Subsidiaries, the Transactions and any other transactions contemplated hereby prepared by or on behalf of the foregoing or their representatives and made available to any Lenders or the Administrative Agent in connection with the Transactions or the other transactions contemplated hereby, when taken as a whole, was true and correct in all material respects as of the date such Information was furnished to the Lenders and as of the Closing Date and did not, taken as a whole, contain any untrue statement of a material fact as of any such date or omit to state a material fact necessary in order to make the statements contained therein, taken as a whole, not materially misleading in light of the circumstances under which such statements were  made.

(b)    The estimates and information of a general economic nature or general industry nature prepared by or on behalf of the Borrower or any of its representatives and that have been made available to any Lenders or the Administrative Agent in connection with the Transactions or the other transactions contemplated hereby (i) have been prepared in good faith based upon assumptions believed by the Borrower to be reasonable as of the date thereof, as of the date such estimates were furnished to the Lenders and as of the Closing Date, and (ii) as of the Closing Date, have not been modified in any material respect by the Borrower.

(c)    Since the Closing Date, there have been no events, developments or circumstances that have had, or would reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect

SECTION 3.09.    Tax Matters.  Each of Holdings, the Borrower and the Subsidiaries has filed all federal income Tax returns and all other material Tax returns, domestic and foreign, required to be filed by it (including in its capacity as a withholding agent) and has paid all material Taxes payable by it that have become due, other than those (i) not yet delinquent or (ii) being contested in good faith by appropriate proceedings and as to which adequate reserves have been provided to the extent required by and in accordance with GAAP (or in the case of a Foreign Subsidiary, the comparable accounting principles in the relevant jurisdiction).

SECTION 3.10.    Compliance with ERISA.

(a)    Except to the extent that a breach of any of the following representations or warranties in this Section 3.10(a) would not result, individually or in the aggregate, in a Material Liability to Holdings, the

69

Borrower, any of their Restricted Subsidiaries or any ERISA Affiliate: (i) Holdings, the Borrower, each of their Restricted Subsidiaries and each ERISA Affiliate is in compliance with all applicable provisions and requirements of ERISA and the Code and the regulations and published interpretations thereunder with respect to each Employee Benefit Plan, and have performed all their obligations under each Employee Benefit Plan; (ii) each Employee Benefit Plan that is intended to qualify under Section 401(a) of the Code has received a favorable determination letter from the Internal Revenue Service indicating that such Employee Benefit Plan is so qualified and nothing has occurred subsequent to the issuance of such determination letter that would cause such Employee Benefit Plan to lose its qualified status; (iii) no liability to the PBGC (other than required premium payments), the Internal Revenue Service, any Employee Benefit Plan or any trust established under Title IV of ERISA has been or is expected to be incurred by Holdings, the Borrower, any of their Restricted Subsidiaries or any ERISA Affiliate; (iv) no ERISA Event has occurred or is reasonably expected to occur; (v) no Plan has an Unfunded Current Liability; (vi) except to the extent required under Section 4980B of the Code or similar state laws, no Employee Benefit Plan provides health or welfare benefits (through the purchase of insurance or otherwise) for any retired or former employee of Holdings, the Borrower, any of their Restricted Subsidiaries or any ERISA Affiliate; and (vii) Holdings, the Borrower, each of their Restricted Subsidiaries and each ERISA Affiliate have complied with the requirements of Section 515 of ERISA with respect to each Multiemployer Plan and are not in "default" (as defined in Section 4219(c)(5) of ERISA) with respect to payments to a Multiemployer Plan.

(b)     All Foreign Plans are in compliance with, and have been established, administered and operated in accordance with, the terms of such Foreign Plans and applicable law, except for any failure to so comply, establish, administer or operate the Foreign Plans as would not reasonably be expected to result, individually or in the aggregate, in a Material Liability to Holdings, the Borrower or any of their Restricted Subsidiaries. All material contributions or other payments which are due with respect to each Foreign Plan have been made in full, and none of Holdings, the Borrower or any of their Restricted Subsidiaries has incurred any material obligation in connection with the termination or withdrawal from any Foreign Plan. The present value of the accrued liabilities (whether or not vested) under each Foreign Plan that is funded, determined as of the end of the most recently ended fiscal year of Holdings, the Borrower or a Restricted Subsidiary of Holdings or the Borrower, as applicable, on the basis of actuarial assumptions, each of which is reasonable, did not exceed the current value of the assets of such Foreign Plan by a material amount, and for each Foreign Plan that is not funded, the obligations of such Foreign Plan are properly accrued.

SECTION 3.11.    Capital Stock and Ownership.  The Capital Stock of the Borrower and its Subsidiaries has been duly authorized and validly issued and is fully paid and non-assessable in connection with the Plan of Reorganization. Except as set forth on Schedule 3.11, there is no existing option, warrant, call right, commitment or other agreement to which Holdings, the Borrower or any of its Subsidiaries is a party requiring, and there is no membership interest or other Capital Stock of the Borrower or any of its Subsidiaries outstanding, that upon conversion or exchange would require, the issuance by the Borrower or any of its Subsidiaries of any additional Capital Stock thereof or other securities convertible into, exchangeable for, or evidencing the right to subscribe for or purchase, additional Capital Stock of the Borrower or any of its Subsidiaries. Schedule 3.11 sets forth the ownership interest of the Borrower and each of its Subsidiaries as of the Closing Date.

SECTION 3.12.    Intellectual Property.  The Borrower and each of the Restricted Subsidiaries own or have obtained valid rights to use all intellectual property, free from any burdensome restrictions, that is necessary for the operation of their respective businesses as currently conducted and as proposed to be conducted, except where the failure to obtain any such rights would not reasonably be expected to have a Material Adverse Effect. Except as would not reasonably be expected to result in a Material Adverse Effect, none of the Borrower or any of its Subsidiaries has infringed, misappropriated, or violated any intellectual property rights of any third party.

SECTION 3.13.    Environmental Laws.  Except as would not, individually or in the aggregate, reasonably be expected to result in a Material Liability, (i) Holdings, the Borrower, each of its Subsidiaries and, to the knowledge of the Borrower, each predecessor of Holdings, the Borrower or any of its Subsidiaries

("Predecessor") to the extent such Predecessor's liabilities under Environmental Law have not been discharged under the Cases ("Predecessor Liabilities"), and each of their respective assets and operations are and have been in compliance with all Environmental Laws and the terms and conditions of all applicable Environmental Permits; (ii) all Environmental Permits required of Holdings, the Borrower or any of its Subsidiaries for performance of their respective businesses as currently conducted have been obtained and are currently in full force and effect under Environmental Law and none of Holdings, the Borrower or any of its Subsidiaries has received any notice that any such existing Environmental Permit will be revoked or any pending application for any new Environmental Permit or renewal of any existing Environmental Permit will be protested or denied; (iii) none of Holdings, the Borrower, any of its Subsidiaries or, to the knowledge of the Borrower, any Predecessor with Predecessor Liabilities has received written notice of any Environmental Claim and to Borrower's knowledge, there are no events or occurrences that would reasonably be expected to result in any of Holdings', the Borrower's or any of its Subsidiary's receipt of such written notice; (iv) none of Holdings, the Borrower, any of its Subsidiaries or, to the knowledge of the Borrower, any Predecessor with Predecessor Liabilities is subject to violations of or liabilities (including, without limitation, as a result of any Releases or threatened Releases of Hazardous Materials) under Environmental Law, none of Holdings, the Borrower or any of its Subsidiaries has an actual or alleged obligation to conduct any cleanup, investigation, removal, remediation or other corrective action pursuant to any Environmental Law at any location and to Borrower's knowledge, there are no events or occurrences that would reasonably be expected to result in any of Holdings, the Borrower or any of its Subsidiaries being subject to such obligation; (v) no Hazardous Materials are being or have been treated, stored, transported, released or disposed or arranged for disposal or transport for disposal at, on, under or from any property in a manner that would reasonably be expected to give rise to liability of Holdings, the Borrower or any of its Subsidiaries under Environmental Law; and (vi) none of Holdings, the Borrower or any of its Subsidiaries has assumed or retained by contract any liabilities under any Environmental Law or regarding any Hazardous Materials.

SECTION 3.14.    Properties.

(a)    Except for the assignment or transfer of any Oil and Gas Property to the Borrower or any of its Subsidiaries filed in connection with the Transactions in accordance with all applicable Requirements of Law, but is currently pending approval by the applicable Governmental Authority, each of the Borrower and its Subsidiaries has valid fee simple title to, or valid leasehold interests in, or easements or other limited property interests in, all its real properties, good and defensible title to all Hydrocarbon Interests in the Oil and Gas Properties evaluated in the most recently delivered or prepared Reserve Report (except for those that have been disposed of since the date of such Reserve Report as permitted in accordance with this Agreement or leases which have expired in accordance with its terms) and good and defensible title to all other material properties and assets, in each case, except for Liens permitted hereunder and except for minor defects in title that do not materially interfere with its ability to conduct its business as currently conducted or to utilize such properties and assets for their intended purposes.  All such properties and assets are free and clear of Liens, other than Liens permitted hereunder.

(b)    All material leases and agreements necessary for the conduct of the business of the Borrower and the Restricted Subsidiaries are valid and subsisting, in full force and effect.

(c)    The rights and properties presently owned, leased or licensed by the Credit Parties including all easements and rights of way, include all rights and properties necessary to permit the Credit Parties to conduct their respective businesses as currently conducted, except to the extent any failure to have any such rights or properties would not reasonably be expected to result in a Material Adverse Effect.

(d)    All of the properties of the Borrower and the Subsidiaries that are reasonably necessary for the operation of their businesses are in good working condition and are maintained in all material respects in accordance with prudent business standards.

SECTION 3.15.    Solvency.

71

(a)      On the Closing Date, immediately after giving effect to the Transactions that occur on the Closing Date (and as of any other date required under the Loan Documents and after giving effect to the transactions to occur on such date), (i) the fair value of the assets of the Credit Parties on a consolidated basis, at a fair valuation, will exceed the debts and liabilities, direct, subordinated, contingent or otherwise, of the Credit Parties on a consolidated basis; (ii) the present fair saleable value of the property of the Credit Parties on a consolidated basis will be greater than the amount that will be required to pay the probable liability of the Credit Parties on a consolidated basis on their debts and other liabilities, direct, subordinated, contingent or otherwise, as such debts and other liabilities become absolute and matured; (iii) the Credit Parties on a consolidated basis will be able to pay their debts and liabilities, direct, subordinated, contingent or otherwise, as such debts and liabilities become absolute and matured; and (iv) the Credit Parties on a consolidated basis will not have unreasonably small capital with which to conduct the businesses in which they are engaged as such businesses are now conducted and are proposed to be conducted following the Closing Date.

(b)      The Borrower does not intend to, and the Borrower does not believe that it or any of its Subsidiaries will, incur debts beyond their ability to pay such debts as they mature, taking into account the timing and amounts of cash to be received by them or any such subsidiary and the timing and amounts of cash to be payable on or in respect of their Indebtedness or the Indebtedness of any such Subsidiary.

SECTION 3.16.     Anti-Corruption Laws.     None of Holdings, the Borrower or any of its Subsidiaries, nor, to the knowledge of Holdings, the Borrower or any of its Subsidiaries, any of their directors, officers, agents, employees or Affiliates has (i) used any corporate funds for any unlawful contribution, gift, entertainment or other unlawful expense relating to political activity, (ii) made any direct or indirect unlawful payment to any government official or employee from corporate funds, (iii) violated or is in violation of any Anti-Corruption Laws, (iv) made any unlawful bribe, rebate, payoff, influence payment, kickback or other unlawful payment in violation of Anti-Corruption Laws or (v) has otherwise violated any Anti-Corruption Laws.  No part of the proceeds of the Loans will be used, directly or indirectly, in furtherance of an offer, payment, promise to pay or authorization of the payment or giving of money, or anything else of value, to any person or otherwise in any manner resulting in violation of the Anti-Corruption Laws. Holdings, the Borrower and its Subsidiaries have established and currently maintain policies, procedures and controls that are designed (and otherwise comply with applicable law) to ensure that each of Holdings, the Borrower and its Subsidiaries, and each of their respective directors, officers, employees and agents, is in compliance with all applicable current and future Anti-Corruption Laws.

SECTION 3.17.     Anti-Terrorism and Anti-Money Laundering Laws; Sanctions.

(a)      None of Holdings, the Borrower or any of its Subsidiaries nor, to the knowledge of Borrower, any director, officer, agent, employee or Affiliate of Holdings, the Borrower or any of its Subsidiaries is or is owned or controlled by a person who is currently a Sanctioned Person.

(b)      Each of Holdings, the Borrower and its Subsidiaries and, to the knowledge of Holdings, the Borrower and its Subsidiaries, their directors, officers, agents, employees or Affiliates is in compliance with all and has not violated any Sanctions or Anti-Terrorism and Anti-Money Laundering Laws. None of the proceeds of the Loans has or will be used, directly or indirectly, for the purpose of financing any activities or business of or with any Sanctioned Person or in any Sanctioned Country or otherwise in any manner that would result in a violation of Sanctions or Anti-Terrorism and Anti-Money Laundering Laws.

(c)      Holdings, the Borrower and its Subsidiaries have established and currently maintain policies, procedures and controls that are designed (and otherwise comply with applicable law) to ensure that each of Holdings, the Borrower and its Subsidiaries, and each of their respective directors, officers, employees and agents, is in compliance with all applicable current and future Sanctions and Anti-Terrorism and Anti-Money Laundering Laws.

WEIL:\97847440\31\45327.0007

SECTION 3.18.    Gas Imbalances, Prepayments.    On the Closing Date, except as set forth on Schedule 3.18, on a net basis, there are no gas imbalances, take or pay or other prepayments exceeding 2.5 Bcfe of Hydrocarbon volumes (stated on a gas equivalent basis) for any individual field, with respect to the Credit Parties' Oil and Gas Properties associated with such field that would require any Credit Party to deliver Hydrocarbons either generally or produced from their Oil and Gas Properties at some future time without then or thereafter receiving full payment therefor.

SECTION 3.19.    Marketing of Production.    On the Closing Date, except as set forth on Schedule 3.19, no material agreements exist (which are not cancelable on 60 days' notice or less without penalty or detriment) for the sale of production of the Credit Parties' Hydrocarbons at a fixed non-index price (including calls on, or other rights to purchase, production, whether or not the same are currently being exercised) that (i) represent in respect of such agreements 2.5% or more of the Borrower's average monthly production of Hydrocarbon volumes and (ii) have a maturity or expiry date of longer than six months from the Closing Date.

SECTION 3.20.    Hedge Agreements.    Schedule 3.20 sets forth, as of the Closing Date, a true and complete list of all commodity Hedge Agreements of each Credit Party, the terms thereof relating to the type, term, effective date, termination date and notional amounts or volumes, the net mark to market value thereof (as of the last Business Day of the most recent fiscal quarter preceding the Closing Date and for which a mark to market value is reasonably available), all credit support arrangements relating thereto (including any margin required or supplied) and the counterparty to each such agreement.

SECTION 3.21.    Senior Indebtedness.    The Obligations of each Credit Party, as applicable, constitute "Senior Secured Obligations" or a term of similar import under and as defined in the Intercreditor Agreement.

SECTION 3.22.    Defaults.    No Default or Event of Default has occurred and is continuing.

SECTION 3.23.    Labor Relations.    Neither Holdings, the Borrower nor any of its Subsidiaries is engaged in any unfair labor practice that would reasonably be expected to result in a Material Liability to Holdings, the Borrower or any of its Restricted Subsidiaries.  There is (a) no unfair labor practice complaint pending against Holdings, the Borrower or any of its Restricted Subsidiaries, or to the best knowledge of Holdings and the Borrower, threatened against any of them before the National Labor Relations Board and no grievance or arbitration proceeding arising out of or under any collective bargaining agreement that is so pending against Holdings, the Borrower or any of its Restricted Subsidiaries or to the best knowledge of Holdings and the Borrower, threatened against any of them, (b) no strike or work stoppage in existence or threatened involving Holdings, the Borrower or any of its Restricted Subsidiaries, and (c) to the best knowledge of Holdings and the Borrower, no union representation question existing with respect to the employees of Holdings, the Borrower or any of its Restricted Subsidiaries and, to the best knowledge of Holdings and the Borrower, no union organization activity that is taking place, except (with respect to any matter specified in clause (a), (b) or (c) above, either individually or in the aggregate) such as is not reasonably likely to result in a Material Liability to Holdings, the Borrower or any of its Restricted Subsidiaries.  No Credit Party has incurred any liability or obligation under the Worker Adjustment and Retraining Notification Act or any similar federal or state law that remains unpaid or unsatisfied and could reasonably be expected to, individually or in the aggregate with all such liabilities or obligations, result in a Material Liability to Holdings, the Borrower or any of its Restricted Subsidiaries.

SECTION 3.24.    Insurance.    The Borrower and its Restricted Subsidiaries maintain insurance in compliance with Section 5.16.

SECTION 3.25.    Material Contracts.    Schedule 3.25 contains a true, correct and complete list of all the Material Contracts in effect on the Closing Date.  All Material Contracts are in full force and effect, no material defaults currently exist thereunder, and each such Material Contract has not been amended, waived, or otherwise modified except as permitted under this Agreement.

73

# ARTICLE IV

Conditions Precedent

SECTION 4.01.    <u>Conditions Precedent to Effectiveness of this Agreement</u>.  The effectiveness of this Agreement is subject to the satisfaction of the following conditions, except as otherwise agreed or waived pursuant to <u>Section 8.01</u>:

(a)    The Administrative Agent (or its counsel) shall have received from each party hereto a counterpart of this Agreement (which may include telecopy or electronic transmission of a signed signature page of this Agreement) signed on behalf of such party.

(b)    The Administrative Agent shall have received, on behalf of itself, the Collateral Agent and the Lenders, a customary written opinion of Weil, Gotshal & Manges LLP, counsel to the Borrower, (i) dated the Closing Date and (ii) addressed to the Administrative Agent and the Lenders on the Closing Date.  The Borrower hereby instructs such counsel to deliver such legal opinion.

(c)    The Administrative Agent shall have received:

(i)    a copy of the certificate of formation or incorporation, as applicable, including all amendments thereto, of the Borrower and each other Credit Party, certified as of a recent date by the Secretary of State of Delaware, and a certificate as to the good standing of the Borrower and each other Credit Party as of a recent date from such Secretary of State, and certificates of good standing and/or qualifications to do business as a foreign corporation in such jurisdictions as the Administrative Agent reasonably requests;

(ii)    a certificate of the Secretary or Assistant Secretary or similar officer of the Borrower and each other Credit Party dated the Closing Date and certifying:

(1)    that attached thereto is a true and complete copy of the limited liability company agreement or by-laws, as applicable, of such Person as in effect on the Closing Date and at all times since a date prior to the date of the resolutions described in <u>clause (2)</u> below,

(2)    that attached thereto is a true and complete copy of resolutions duly adopted by the board of directors (or managing general partner, managing member or equivalent) of such Person authorizing the execution, delivery and performance of this Agreement and the borrowings hereunder and each other Loan Document entered into on the Closing Date, and that such resolutions have not been modified, rescinded or amended and are in full force and effect on the Closing Date,

(3)    that the certificate of formation or incorporation, as applicable, of such Person has not been amended since the date of the last amendment thereto disclosed pursuant to <u>clause (i)</u> above,

(4)    as to the incumbency and specimen signature of each officer executing any Loan Document or any other document delivered in connection herewith on behalf of the Borrower and each other Credit Party, and

(5)    a certificate of a director or an officer as to the incumbency and specimen signature of the Secretary or Assistant Secretary or similar officer executing the certificate pursuant to <u>clause (ii)</u> above.

74

(d)     The Administrative Agent shall have received executed copies of (i) the Guarantee, executed by Holdings and each Subsidiary which will be a Subsidiary Guarantor on the Closing Date and (ii) the Intercreditor Agreement.

(e)     The Administrative Agent shall have received the Collateral Agreement, executed and delivered by the Borrower and each Guarantor.

(f)     (i) the Administrative Agent shall have received the results of lien searches with respect to the Credit Parties and (ii) subject to Section 5.34, the Administrative Agent shall have received evidence of insurance coverage of the Credit Parties evidencing that such Credit Party is carrying insurance in accordance with Section 5.16.

(g)     The Borrower shall have received, concurrently with the occurrence of the Closing Date, proceeds of the SLTL Facility in a minimum aggregate principal amount of not less than $140,000,000 and not more than $185,000,000.

(h)     After giving effect to the consummation of the Transactions, Holdings and its Subsidiaries shall have no obligations in respect of, nor any Liens on their assets or Equity Interests securing, in each case, Indebtedness for borrowed money other than in respect of this Agreement and the SLTL Facility;

(i)     The Restructuring Transactions (as defined in the Plan of Reorganization) shall have been, or shall substantially simultaneously be, consummated and effective in accordance with the Plan of Reorganization, the Plan Supplement (as defined in the Plan of Reorganization) and the Plan of Merger (as defined in the Plan of Reorganization), as applicable and the Effective Date (as defined in the Plan of Reorganization) shall have occurred.

(j)     The transactions contemplated by the Credit Bid Purchase Agreement shall have been, or shall substantially simultaneously be, consummated, in all material respects, in accordance with the terms of the Credit Bid Purchase Agreement in the version attached to the draft of the Disclosure Statement (as defined in the Plan of Reorganization) at Docket No. 1022 (including all annexes, schedules and exhibits thereto, the "Approved Credit Bid Purchase Agreement"); provided that any amendments, modifications and waivers to the Approved Credit Bid Purchase Agreement, and consents granted thereunder, in each case, that (i) individually or in the aggregate, result in a reduction of 10% or more of the total PV-10 of total 2P Reserves comprising the assets acquired by Credit Bid Purchaser (which shall be calculated by reference to the FWE YE2020 Internal Reserve Report (as of 5.1.21)), (ii) results in any contract rights constituting material assets not being acquired by Credit Bid Purchaser, (iii) individually or in the aggregate, results in an increase by $40,000,000 or more (which, for the avoidance of doubt, in the case of plugging and abandonment liabilities, shall be calculated on a present value basis) in liabilities assumed by Credit Bid Purchaser, (iv) provide for any change in treatment of the Prepetition FLFO Credit Agreement or this Agreement, or (v) provide for any differences from the Approved Credit Bid Purchase Agreement that are materially adverse to the interests of Administrative Agent and the Lenders, in their capacity as such, in each case, shall have been consented to by the Administrative Agent (which, in the case of clauses (ii) and (v) above, shall not be unreasonably withheld);

(k)     All Material Contracts binding on the Credit Parties as of the Closing Date shall be in form and substance reasonably acceptable to the Administrative Agent;

(l)     Subject to Section 5.34, all documents and instruments, including Uniform Commercial Code or other applicable personal property and financing statements, reasonably requested by the Collateral Agent or the Required Lenders to be filed, registered or recorded to create the Liens intended to be created by any Security Document and perfect such Liens to the extent required by, and with the priority required by, such Security Document shall have been delivered to the Collateral Agent for filing, registration or recording by or on behalf of the Collateral Agent.

(m)     The Administrative Agent shall have received executed Mortgages, together with customary local counsel legal opinions, with respect to 100% of the Oil and Gas Properties (and related assets) owned by the Credit Parties as of the Closing Date (after giving effect to the transactions contemplated by the Credit Bid Purchase Agreement).

(n)     All Equity Interests of the Borrower and each Subsidiary directly owned by the Borrower or any Guarantor, in each case as of the Closing Date, shall have been pledged pursuant to the Collateral Agreement (except that such Credit Parties shall not be required to pledge any Excluded Equity Interests).

(o)     On the Closing Date, the Administrative Agent shall have received a solvency certificate substantially in the form of Exhibit I hereto and signed by a Financial Officer of the Borrower.

(p)     The Administrative Agent shall have received a Reserve Report evaluating the Acquired Interests constituting Proved Reserves of the Credit Parties with a recent "as of" date, in form and substance acceptable to the Administrative Agent (it being understood and agreed that the Reserve Report delivered with an "as of" date of December 31, 2020 is satisfactory to the Administrative Agent).

(q)     The Credit Parties shall have aggregate Unrestricted Cash as of the Closing Date on a pro forma basis (including after payment of Restructuring Expenses (as defined in the Plan of Reorganization) and separate from additional cash reserves to be established on the Closing Date for anticipated litigation settlements (to the extent known to be payable by the Credit Parties or otherwise required under GAAP to be included on the face of the Credit Parties' financial statements) of at least $[__]) of not less than $100,000,000.

(r)     The Credit Parties shall have (x) be in pro forma compliance (after giving effect to the Transactions and the Restructuring Transactions (as defined in the Plan of Reorganization)) with (i) a Consolidated Total Net Leverage Ratio (calculated, solely for the purposes of this Section 4.01(r), assuming EBITDAX of $[●][4] of not greater than 2.25:1.00 and (ii) an Asset Coverage Ratio (calculated utilizing the Reserve Report delivered pursuant to Section 4.01(p), but rolled forward to a date, and based on a price deck, in each case, satisfactory to the Administrative Agent in its sole discretion) of not less than 2.25:1.00 and (y) shall have delivered a certification of a Financial Officer of the Borrower as to such compliance and attaching calculations in form and substance reasonably satisfactory to the Administrative Agent in its sole discretion.

(s)     The Agents shall have received all fees payable thereto (including pursuant to the Fee Letter) on or prior to the Closing Date and, to the extent invoiced, all other amounts due and payable pursuant to the Loan Documents on or prior to the Closing Date, including, to the extent invoiced at least one (1) Business Day prior to the Closing Date, reimbursement or payment of all reasonable out-of-pocket expenses (including reasonable fees, charges and disbursements of Vinson & Elkins LLP) required to be reimbursed or paid by the Credit Parties hereunder or under any Loan Document.

(t)     The Administrative Agent shall have received at least three (3) Business Days prior to the Closing Date all documentation and other information required by regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations, including without limitation, the USA PATRIOT Act and the Beneficial Ownership Regulation, that has been requested not less than ten (10) Business Days prior to the Closing Date.

(u)     On the Closing Date, all representations and warranties made by any Credit Party contained herein or in the other Loan Documents shall be true and correct in all material respects (or with respect to representations and warranties that contain a materiality qualifier, in all respects) with the same effect as though such representations and warranties had been made on and as of such date (except where such

---

[4] NTD: To come.

representations and warranties expressly relate to an earlier date, in which case such representations and warranties shall have been true and correct in all material respects (or with respect to representations and warranties that contain a materiality qualifier, in all respects) as of such earlier date).

(v)     No Default or Event of Default shall have occurred and be continuing or would result from the consummation of the Transactions.

(w)     (A) Since the Execution Date (as defined in the Credit Bid Purchase Agreement), no Material Adverse Effect (as defined in the Credit Bid Purchase Agreement) (or any result, event, occurrence, change, circumstance, consequence or development that, individually or in the aggregate would reasonably be expected to result in a Material Adverse Effect (as defined in the Credit Bid Purchase Agreement)) shall have occurred and (B) since the Execution Date (as defined in the Commitment Letter), there has been no occurrence, development or change that has had or would reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect (provided that, for the avoidance of doubt, any change, development or occurrence, arising individually or in the aggregate, from events that would reasonably be expected to result from the pendency of the Cases shall not constitute a Material Adverse Effect).

(x)     The Disclosure Statement (as defined in the Plan of Reorganization) shall be in form and substance reasonably acceptable to the Administrative Agent and the Plan of Reorganization and Confirmation Order shall be in form and substance acceptable to the Administrative Agent (it being understood that the Plan of Reorganization in the form attached as **Annex C** to the Commitment Letter, dated as of March 23, 2021 (the "Commitment Letter"), is acceptable to the Administrative Agent, as such Plan of Reorganization may be modified with the consent of the Administrative Agent (not to be unreasonably withheld)).

(y)     The Administrative Agent shall be reasonably satisfied with the status of title of the Oil and Gas Properties of the Credit Parties on the Closing Date.

(z)     The Administrative Agent shall have received, in form and substance reasonably satisfactory to it, all other reports, financial statements, budgets, projections, audits or certifications as it may reasonably request within a reasonable period in advance of the Closing Date.

For purposes of determining compliance with the conditions specified in this Article IV, each Lender shall be deemed to have consented to, approved or accepted or deemed to be satisfied with each document or other matter required thereunder to be consented to or approved by, or acceptable or satisfactory to, the Lenders unless an office of the Administrative Agent shall have received notice from such Lender prior to the Closing Date specifying its objection thereto.

## ARTICLE V

### Covenants

SECTION 5.01.     Information Covenants.  The Borrower will furnish to the Administrative Agent (which shall promptly make such information available to the Lenders in accordance with its customary practice):

(a)     Annual Financial Statements.  Within 105 days after the end of each such fiscal year, the audited consolidated balance sheets of the Borrower and the Subsidiaries and, if different, the Borrower and the Restricted Subsidiaries, in each case as at the end of such fiscal year, and the related consolidated statements of operations, shareholders' equity and cash flows for such fiscal year, and, beginning with the fiscal year ending December 31, 2023, setting forth comparative consolidated figures for the preceding fiscal years (or, in lieu of such audited financial statements of the Borrower and the Restricted Subsidiaries, a reconciliation, reflecting such financial information for the Borrower and the Restricted Subsidiaries, on the one hand, and the Borrower and the

77

Subsidiaries, on the other hand, reflecting adjustments necessary to eliminate the accounts of the Closing Date Unrestricted Subsidiary from such consolidated financial statements) prepared in accordance with GAAP, and, except with respect to such reconciliation, certified by independent certified public accountants of recognized national standing whose opinion shall not be qualified with a scope of audit or "going concern" or like qualification or exception (other than with respect to, or resulting from, the occurrence of an upcoming maturity date of Indebtedness within one year of the date of such opinion).  Notwithstanding the foregoing, the obligations in this Section 5.01(a) may be satisfied with respect to financial information of the Borrower and its consolidated Subsidiaries by furnishing the applicable financial statements of any direct or indirect parent of the Borrower; *provided* that (i) to the extent such information relates to a Parent Entity of the Borrower, such information is accompanied by consolidating information that explains in reasonable detail the differences between the information relating to such Parent Entity and its consolidated Subsidiaries, on the one hand, and the information relating to the Borrower and its consolidated Subsidiaries and the Borrower and its consolidated Restricted Subsidiaries on a standalone basis, on the other hand and (ii) to the extent such information is in lieu of information required to be provided under the first sentence of this Section 5.01(a), such materials are accompanied by an opinion of an independent registered public accounting firm of recognized national standing, which opinion shall not be qualified with a scope of audit or "going concern" or like qualification or exception (other than with respect to, or resulting from, the occurrence of an upcoming maturity date of Indebtedness within one year of the date of such opinion).

(b)     Quarterly Financial Statements.     On or before the date that is 45 days after each quarterly accounting period in each fiscal year of the Borrower, the consolidated balance sheets of the Borrower and the Subsidiaries and, if different, the Borrower and the Restricted Subsidiaries, in each case as at the end of such quarterly period and the related consolidated statements of operations, shareholders' equity and cash flows for such quarterly accounting period and for the elapsed portion of the fiscal year ended with the last day of such quarterly period, and setting forth comparative consolidated figures for the related periods in the prior fiscal year or, in the case of such consolidated balance sheet, for the last day of the prior fiscal year (or, in lieu of such unaudited financial statements of the Borrower and the Restricted Subsidiaries, a reconciliation reflecting such financial information for the Borrower and the Restricted Subsidiaries, on the one hand, and the Borrower and the Subsidiaries, on the other hand, reflecting adjustments necessary to eliminate the accounts of the Closing Date Unrestricted Subsidiary from such consolidated financial statements), all of which shall be certified by a Financial Officer of the Borrower as fairly presenting in all material respects the financial condition, results of operations, shareholders' equity and cash flows, of the Borrower and its consolidated Subsidiaries in accordance with GAAP, subject to changes resulting from audit and normal year-end audit adjustments and the absence of footnotes.  Notwithstanding the foregoing, the obligations in this Section 5.01(b) may be satisfied with respect to financial information of the Borrower and its consolidated Subsidiaries by furnishing the applicable financial statements of any direct or indirect parent of the Borrower; *provided* that to the extent such information relates to a parent of the Borrower, such information is accompanied by consolidating information that explains in reasonable detail the differences between the information relating to such parent and its consolidated Subsidiaries, on the one hand, and the information relating to the Borrower and its consolidated Subsidiaries and the Borrower and its consolidated Restricted Subsidiaries on a standalone basis, on the other.

(c)     Notice of Default; Litigation; ERISA Events and Other Events.

(i)     Promptly after an Authorized Officer of the Borrower or any of the Restricted Subsidiaries obtains actual knowledge thereof, notice of (A) the occurrence of any Default or Event of Default, which notice shall specify the nature thereof, the period of existence thereof and what action the Borrower proposes to take with respect thereto, (B) any Adverse Proceeding, and (C) the occurrence of any ERISA Event or similar event with respect to a Plan, Multiemployer Plan or Foreign Plan, in the case of clauses (B) and (C), that would reasonably be expected to result in a Material Liability to Holdings, the Borrower or any of its Restricted Subsidiaries.

78

(ii)       In the event that Holdings, Borrower or any of its Restricted Subsidiaries shall intend to enter into any settlement agreement with any Governmental Authority in connection with any Adverse Proceeding for which the Borrower or any of the Restricted Subsidiaries are required to have given notice pursuant to paragraph (i)(B) above, the Borrower shall give the Administrative Agent reasonable prior written notice (and in any event, not less than five (5) Business Days' prior notice) of such intention, the material terms thereof, the anticipated date of entry and any other details thereof reasonably requested by the Administrative Agent.

(iii)       In the event the Borrower or any Restricted Subsidiary intends to dispose of any property pursuant to an Asset Sale or consummate any Hedge Unwind Event, in each case that would result in a mandatory prepayment being required to be made pursuant to Section 2.13(a) (without giving effect to any threshold amounts or reinvestment rights set forth in such Section), the Borrower shall give the Administrative Agent reasonable prior written notice of such Asset Sale or Hedge Unwind Event, the material terms thereof and the anticipated date of closing and any other details thereof reasonably requested by the Administrative Agent or any Lender; provided that, if market or other strategic considerations make prior notice of a Hedge Unwind Event disadvantageous to the Credit Parties or impractical, the Borrower shall only be required to provide notice within 1 Business Day of such Hedge Unwind Event.

(iv)       In the event that the Borrower or any Restricted Subsidiary intends to incur any Indebtedness for borrowed money that will have an aggregate principal (or committed) balance of $10,000,000 or more, the Borrower shall give the Administrative Agent reasonable prior written notice (and in any event not less than three (3) Business Days' prior notice) of such incurrence of Indebtedness, the material terms thereof and the anticipated date of closing and any other details thereof reasonably requested by the Administrative Agent or any Lender.

(v)       Promptly, and in any event within two (2) days after (A)(x) any Material Contract of the Borrower or any of its Restricted Subsidiaries is terminated or amended in a manner that is materially adverse to the Borrower or any of its Restricted Subsidiaries or to the Lenders or (y) any new Material Contract is entered into, or (B) any officer of the Borrower or any of its Subsidiaries obtaining actual knowledge (x) of any condition or event that constitutes a material default or an event of default under any Material Contract, (y) that any event, circumstance, or condition exists or has occurred that gives any counterparty to such Material Contract a termination or assignment right thereunder, or (z) that notice has been given to the Borrower or any of its Subsidiaries asserting that any such condition or event has occurred, the Borrower shall deliver to the Administrative Agent a certificate of an Authorized Officer specifying the nature and period of existence of such condition or event and, in the case of clause (A), including copies of such material amendments or new contracts and, in the case of clause (B), as applicable, explaining the nature of such claimed default or event of default, and including an explanation of any actions being taken or proposed to be taken by the Borrower and its Restricted Subsidiaries with respect thereto.

(d)       Environmental Matters.  Promptly after the receipt or discovery by an officer of Holdings, the Borrower or any of its Restricted Subsidiaries of information (including, but not limited to, as a result of performance of environmental site assessments, audits, invasive sampling and testing of environmental conditions, or receipt of correspondence from or discussions with Governmental Authorities or other Persons) regarding any one or more of the following environmental matters, unless such environmental matters would not, individually, or when aggregated with all other such matters, be reasonably expected to result in a Material Liability to Holdings, the Borrower or any of its Restricted Subsidiaries, notice of:

(i)       any pending or threatened Environmental Claim against any Credit Party; and

(ii)       the occurrence of any event or discovery of any circumstance that is or would reasonably be expected to result in a violation or liability under Environmental Law including, without

79

limitation, any actual presence, Release or threatened Release of, or exposure to, any Hazardous Material on, at, under or from (A) any facility owned, leased or operated by a Credit Party or (B) any real property offsite such facility that is (x) located adjacent or in close proximity to such facility under circumstances where the presence, Release or threatened Release of, or exposure to, Hazardous Materials may reasonably be expected to threaten the facility or (y) where Holdings, Borrower or any of the Subsidiaries transported or disposed, or arranged for the disposal or transport for disposal of Hazardous Materials or the conduct of any cleanup, investigation, removal, remediation or other corrective action in response to the actual or alleged presence, Release or threatened Release of, or exposure to, any Hazardous Material on, at, under or from (1) any facility owned, leased or operated by a Credit Party or (2) any real property offsite such facility that is (x) located adjacent or in close proximity to such facility under circumstances where the presence, Release or threatened Release of, or exposure to, Hazardous Materials may reasonably be expected to threaten the facility or (y) where Holdings, Borrower or any of the Subsidiaries transported or disposed, or arranged for the disposal or transport for disposal of Hazardous Materials.

All such notices shall describe in reasonable detail the nature of the claim, including, without limitation, providing facts and circumstances of which any Credit Party or any of the Subsidiaries is aware giving rise to the claim, together with planned or any implemented cleanups, investigations, removals, remediations or other corrective actions, any proposed actions to modify operations in a manner that could be expected to subject the Credit Parties to new or added obligations or requirements under Environmental Law, any estimates of damages and costs to cure the claim, any governmental Environmental Claims or threatened Environmental Claims, any governmental requests for information regarding the claim, and any reserves, contractual indemnifications or insuring agreements that may be relied upon by any of Holdings, the Borrower or any of the Subsidiaries in connection with the claim.  Such notice is not intended to create, nor shall it create, any obligation upon the Administrative Agent or any Lender with respect thereto. Upon reasonable request of the Administrative Agent or any Lender, the Credit Parties will be obligated to supply such Person with supporting non-privileged documentation with respect to such claim and any responses thereto, and the Credit Parties shall have a continuing obligation to provide prompt status updates on such until such time as the claim is fully resolved (provided that, to the extent any information is withheld due to privilege, the Borrower agrees to provide written notice of the reason for such information being withheld).

(e)     Officers' Certificates.  At the time of the delivery of the financial statements provided for in Section 5.01(a) and Section 5.01(b) (other than with respect to delivery of the financial statements required by Section 5.01(b) with respect to the fourth fiscal quarter of any fiscal year of the Borrower), commencing with respect to certificates delivered for the fiscal quarter ending June 30, 2021, a certificate of a Financial Officer of the Borrower to the effect that no Default or Event of Default has occurred and is continuing or, if any Default or Event of Default does exist, specifying the nature and extent thereof, which certificate shall (i) set forth a reasonably detailed calculation of the Consolidated Total Leverage Ratio, Consolidated First Lien Leverage Ratio and Asset Coverage Ratio, including a high level summary of the non-proprietary information included in the most recently produced Reserve Report which is relevant to calculation of such ratios, (ii) set forth a reasonably detailed calculation of Consolidated Excess Cash for such fiscal period and (iii) a list of all commodity Hedge Agreements of the Borrower and each Credit Party, the material terms thereof (in respect of the type, term, effective date, termination date and notional amounts or volumes), the net mark-to-market value thereof (as of the last Business Day of such fiscal year or quarter, as applicable and for which a mark-to- market value is reasonably available).

(f)     Other Information.    With reasonable promptness, such other information regarding the operations, business affairs and the financial condition of the Borrower or the Restricted Subsidiaries as the Administrative Agent on behalf of any Lender (acting through the Administrative Agent) may reasonably request in writing from time to time.  Notwithstanding anything to the contrary in this Section 5.01(f), neither the Borrower nor any Restricted Subsidiary will be required to disclose, permit the inspection, examination or making copies or abstracts of, or discussion of, any document, information or other matter (i) that constitutes non-financial trade secrets or non-financial proprietary information, (ii) in respect of which disclosure to the

80

Administrative Agent or any Lender (or their respective representatives or contractors) is prohibited by any Requirement of Law or any binding confidentiality provision (so long as not entered into with the intention of circumventing this provision) or (iii) that is subject to attorney-client or similar privilege or constitutes attorney work product; provided that, to the extent any information is withheld pursuant to the foregoing, the Borrower agrees to provide written notice of the reason for such information being withheld.

(g)    Budget.  Within 60 days after the end of each fiscal year of the Borrower (beginning with the fiscal year ending December 31, 2021), a reasonably detailed consolidated budget for the following fiscal year as customarily prepared by management of the Borrower (including select balance sheet items of the Borrower and its Subsidiaries as of the end of the following fiscal year and a summary of the material underlying assumptions applicable thereto) (collectively, the "Budget"), which Budget shall in each case be accompanied by a certificate of an Authorized Officer stating that such Budget has been prepared in good faith on the basis of the assumptions stated therein, which assumptions were believed to be reasonable at the time of preparation of such Budget, it being understood that actual results may vary from such Budget.

(h)    Production Report; List of Purchasers. Promptly after request by the Administrative Agent, (i) a report setting forth, for each calendar month during the then current fiscal year to date, the volume of production of Hydrocarbons for each such calendar month and/or (ii) a list of Persons purchasing Hydrocarbons from any Credit Party who collectively account for at least 80% of the revenues resulting from the sale of all Hydrocarbons from the Credit Parties during the period for which such request was made; provided that, so long as no Event of Default has occurred and is continuing, the Administrative Agent shall only be permitted to make up to two (2) requests in any fiscal year.

(i)    Title Information. Promptly after request by the Administrative Agent, title information in form and substance acceptable to the Administrative Agent in its reasonable discretion covering the Oil and Gas Properties evaluated in the Latest Reserve Report that were not included in the immediately preceding Reserve Report, so that the Administrative Agent shall have received together with title information previously delivered to the Administrative Agent, title information in respect of the Oil and Gas Properties of the Borrower and its Subsidiaries as is satisfactory to the Administrative Agent in its reasonable discretion.

It is understood that documents required to be delivered pursuant to Sections 5.01(a) through (i) may be delivered electronically and if so delivered, shall be deemed to have been delivered on the date (a) on which such documents are transmitted by electronic mail to the Administrative Agent or (b) on which such documents are posted by the Borrower or on the Borrower's behalf on any relevant website to which each Lender and the Administrative Agent have access (whether a commercial, third-party website or whether sponsored by the Administrative Agent or the administrative agent under the SLTL Credit Agreement); provided that: (i) upon written request by the Administrative Agent, the Borrower shall deliver paper copies of such documents delivered pursuant to Sections 5.01(a), 5.01(b) and 5.01(c), to the Administrative Agent for further distribution to each Lender until a written request to cease delivering paper copies is given by the Administrative Agent and (ii) the Borrower shall notify (which may be by facsimile or electronic mail) the Administrative Agent of the posting of any such documents and provide to the Administrative Agent by electronic mail electronic versions (i.e., soft copies) of such documents.  Each Lender shall be solely responsible for timely accessing posted documents or requesting delivery of paper copies of such documents from the Administrative Agent and maintaining its copies of such documents.

The Administrative Agent shall have no responsibility or liability for the filing, timeliness or content of any report required under this Section 5.01 or any other reports, information and documents required under this Agreement.

SECTION 5.02.    Environmental Covenants.

(a)       Except as could not reasonably be expected to result in a Material Liability to Holdings, the Borrower or any of its Restricted Subsidiaries, each of Holdings and the Borrower will comply, and shall cause each of its Subsidiaries (and shall use commercially reasonable efforts to cause all other Persons, if any, on or occupying any assets of Holdings, the Borrower or any of its Subsidiaries) to comply with all Environmental Laws and Environmental Permits; obtain and renew, and cause each of its Subsidiaries to obtain and renew, all Environmental Permits necessary for each of their respective operations and assets; and conduct, and cause each of its Subsidiaries to conduct, any cleanup, investigation, removal, remediation or other corrective action with respect to any actual or alleged violation of Environmental Law or in response to any Release or threatened Release of, or exposure to, any Hazardous Materials from, at or about any of their respective assets or otherwise relating to or arising out of each of their respective operations, to the extent required by, and in compliance with, all Environmental Laws.

(b)       In the event and to the extent that Holdings, the Borrower or any of its Subsidiaries shall fail to promptly conduct any cleanup, investigation, removal, remediation, or other corrective action with respect to any violation of Environmental Law or any Hazardous Materials as set forth in Section 5.02(a), above, or as otherwise required by Environmental Law, Environmental Permit or a Governmental Authority, which such failure would reasonably be expected to have a Material Adverse Effect, the Administrative Agent on behalf of the Lenders may, but without the obligation to do so, for the sole purpose of protecting the Lenders' interest in the Collateral, upon five (5) Business Days' written notification to the Borrower, enter onto any Holdings, Borrower's or any Subsidiaries' property (or authorize third parties to enter onto any such Person's property) and conduct such cleanups, investigations, removals, remediations, or other corrective actions required by Environmental Law, Environmental Permit or the Governmental Authority with respect to any such violation or Hazardous Material. All reasonable and documented costs and expenses incurred by the Administrative Agent and Lenders (or such third parties) in the exercise of any such rights under this Section 5.02(b), including any sums paid in connection with any judicial or administrative investigation or proceedings, fines and penalties, shall be paid by the Borrower within thirty (30) days of written demand by the Administrative Agent, and until paid shall be added to and become a part of the Loan Obligations.

(c)       In the event there is a Release or threatened Release of, or exposure to, any Hazardous Materials or a failure to comply with any Environmental Law or Environmental Permit at Holdings', the Borrower's or any of its Subsidiaries' assets caused in whole or in part by any of such Persons, which in any event is reasonably expected to have a Material Adverse Effect, Holdings, the Borrower and each of its Subsidiaries shall comply with all reasonable written requests for information made by the Administrative Agent with respect to such matters. Such information reasonably requested may include, at the Borrowers' expense, an environmental site assessment (including invasive sampling and testing) or environmental compliance audit of any such Person's assets caused by any of Holdings, the Borrower or any of its Subsidiaries, to be prepared by a nationally recognized environmental consulting or engineering firm, to assess such Release, threatened Release, exposure or noncompliance with any Environmental Law or Environmental Permit; *provided*, however, that any environmental site assessment, environmental compliance audit or similar report acceptable to the Governmental Authority that is charged to oversee any cleanup, investigation, removal, remediation or other corrective action related to such matters shall be deemed acceptable to the Administrative Agent and the Lenders.

(d)       The Borrower shall defend and indemnify the Agents and the Lenders and hold the Agents, the Lenders and their respective employees, agents, directors and officers harmless from and against all loss, liability, reasonable expense, claims, costs, monetary sanctions, fines and penalties, including, without limitation, reasonable and documented out-of-pocket attorney's fees, suffered or incurred by the Agents or the Lenders under or on account of any Environmental Claim, Hazardous Material, Environmental Law or Environmental Permit, including without limitation, with respect to the presence, Release or threatened Release of, or exposure to, any Hazardous Materials affecting Holdings', the Borrower's or any of its Subsidiaries' assets or operations whether or not the same originates or emerges from any such Person's assets or operations or as a result of any third party's conduct or operations at any nearby site or location, except to the extent such loss, liability, damage and expense is attributable to any presence, Release or threatened Release of, or exposure to, Hazardous Materials that is found by a final and non-appealable judgment of a court of competent jurisdiction

82

to have directly and solely been caused by the gross negligence or willful misconduct of such indemnified party under this Section 5.02(d). The Borrower's obligations under this Section 5.02(d) exist regardless of whether or not any federal, state or local environmental agency has taken or threatened any action in connection with the presence, Release or threatened Release of, or exposure to, any such Hazardous Material. The Borrower's obligations and the indemnifications hereunder shall survive repayment of the Loans and all other amounts payable hereunder, and the earlier resignation or removal of any Agent.

(e)     Upon reasonable request of the Administrative Agent, each of Holdings and the Borrower will make available, and shall cause each of its Subsidiaries to make available complete and correct copies of all environmental site assessments, audits and similar reports and studies, and all documentation and correspondence addressing potentially material environmental liabilities relating to Holdings, the Borrower or any of its Subsidiaries or any of their ownership or operation of the assets.

SECTION 5.03.     End of Fiscal Years; Fiscal Quarters.  The Borrower will, for financial reporting purposes, cause each of its, and each of its Restricted Subsidiaries', fiscal years and fiscal quarters to end on, in the case of the fiscal year, the last day of each calendar year, and in the case of any fiscal quarter, the day of each calendar quarter; *provided*, *however*, that the Borrower may, upon written notice to the Administrative Agent change the financial reporting convention specified above to any other financial reporting convention reasonably acceptable to the Administrative Agent in its Permitted Business Judgment, in which case the Borrower and the Administrative Agent will, and are hereby authorized the Lenders to, make any adjustments to this Agreement that are necessary in order to reflect such change in financial reporting.

SECTION 5.04.     Use of Proceeds.  The Borrower will use the proceeds of the Loans, together with the loans under the SLTL Facility, on the Closing Date, to consummate the Transactions.

SECTION 5.05.     Change in Business.  The Borrower and its Restricted Subsidiaries, taken as a whole, will not fundamentally and substantively alter the character of their business, taken as a whole, from the business conducted by them on the Closing Date, the business of Permitted Business Investments by the Borrower and its Restricted Subsidiaries and other business activities incidental, reasonably related or ancillary to any of the foregoing and reasonable extensions thereof.

SECTION 5.06.     Limitation on Incurrence of Indebtedness and Issuance of Disqualified Stock and Preferred Stock.

(a)     The Borrower shall not, and shall not permit any of its Restricted Subsidiaries to Incur any Indebtedness or issue any shares of Disqualified Stock; and the Borrower shall not permit any of its Restricted Subsidiaries (other than a Subsidiary Guarantor) to issue any shares of Preferred Stock.

(b)     The limitations set forth in Section 5.06(a) shall not apply to:

(i)     the Incurrence by the Borrower or any Restricted Subsidiary of Indebtedness under the Loan Documents (including the Loans and any guarantees thereof (including the Guarantee));

(ii)     the Incurrence by the Borrower or any Restricted Subsidiary of Indebtedness under the SLTL Credit Agreement up to an aggregate principal amount that does not exceed, at the time of Incurrence, $[185,000,000][5] plus (x) the aggregate principal amount of any [Incremental Facility] (as defined in the SLTL Credit Agreement) so long as the sum of the aggregate principal amount of such [Incremental Facility] does not exceed the Incremental Cap (as defined in the SLTL Credit Agreement as in effect on the Closing Date) and (y) any interest which has been paid-in-kind and capitalized on the

---

[5] NTD: to match to principal amount incurred on the Closing Date.

WEIL:\97847440\31\45327.0007

outstanding aggregate principal amount of the SLTL Credit Agreement (including any [Incremental Facility] (as defined in the SLTL Credit Agreement)) in accordance with the terms of the SLTL Credit Agreement as in effect on the Closing Date;

(iii)    Indebtedness existing on the Closing Date and listed on Schedule 5.06 (without giving effect to any increases in principal amount thereof following the Closing Date);

(iv)    Indebtedness (including Capitalized Lease Obligations) Incurred by the Borrower or any of its Restricted Subsidiaries within 180 days of the acquisition, lease, construction, repair, replacement or improvement of property (real or personal) or equipment (whether through the direct purchase of assets or the Capital Stock of any Person owning such assets) in an aggregate principal amount that, when aggregated with the principal amount of all other Indebtedness then outstanding and Incurred pursuant to this clause (iv), together with any Refinancing Indebtedness in respect thereof Incurred pursuant to clause (xi) below, does not exceed $10,000,000 at any time outstanding;

(v)    Indebtedness of the Borrower to a Restricted Subsidiary or of a Restricted Subsidiary to another Restricted Subsidiary; *provided* that any such Indebtedness owed to a Restricted Subsidiary that is not a Subsidiary Guarantor is subordinated in right of payment to the obligations of the Borrower under the Loans pursuant to an intercompany note that is reasonably satisfactory in form and substance to the Administrative Agent; *provided*, *further*, that any subsequent issuance or transfer of any Capital Stock or any other event which results in any such Restricted Subsidiary ceasing to be a Restricted Subsidiary or any other subsequent transfer of any such Indebtedness (except to the Borrower or another Restricted Subsidiary or any pledge of such Indebtedness constituting a Permitted Lien but not the transfer thereof upon foreclosure) shall be deemed, in each case, to be an Incurrence of such Indebtedness not permitted by this clause (v);

(vi)    shares of Preferred Stock of a Restricted Subsidiary issued to the Borrower or a Subsidiary Guarantor; *provided* that any subsequent issuance or transfer of any Capital Stock or any other event which results in any Restricted Subsidiary that holds such shares of Preferred Stock of another Restricted Subsidiary ceasing to be a Restricted Subsidiary or any other subsequent transfer of any such shares of Preferred Stock (except to the Borrower or another Restricted Subsidiary) shall be deemed, in each case, to be an issuance of shares of Preferred Stock not permitted by this clause (vi);

(vii)    Indebtedness of a Restricted Subsidiary to the Borrower or another Restricted Subsidiary; *provided* that such Indebtedness is subordinated in right of payment to the Loan Obligations pursuant to an intercompany note that is reasonably satisfactory in form and substance to the Administrative Agent and duly pledged as Collateral under the Collateral Agreement; *provided*, *further*, that any subsequent issuance or transfer of any Capital Stock or any other event which results in any Restricted Subsidiary holding such Indebtedness ceasing to be a Restricted Subsidiary or any other subsequent transfer of any such Indebtedness (except to the Borrower or another Restricted Subsidiary or any pledge of such Indebtedness constituting a Permitted Lien but not the transfer thereof upon foreclosure) shall be deemed, in each case, to be an Incurrence of such Indebtedness not permitted by this clause (vii);

(viii)    Hedging Obligations that are not incurred for speculative purposes, including, for the avoidance of doubt (1) any Hedging Obligations for the purpose of fixing or hedging interest rate risk with respect to any Indebtedness that is permitted by the terms of this Agreement to be outstanding; (2) any Hedging Obligations for the purpose of fixing or hedging currency exchange rate risk with respect to any currency exchanges; or (3) any Hedging Obligations for the purpose of fixing or hedging commodity price risk with respect to any commodity purchases or sales (including, without limitation, any commodity Hedging Obligation that is intended in good faith, at inception of execution, to hedge or manage any of the risks related to existing and/or forecasted Hydrocarbon production (whether or not contracted)) and, in each case, extensions or replacements thereof;

84

(ix) Indebtedness or Disqualified Stock of the Borrower or Indebtedness, Disqualified Stock or Preferred Stock of any Restricted Subsidiary not otherwise permitted hereunder in an aggregate principal amount or liquidation preference, which when aggregated with the principal amount or liquidation preference of all other Indebtedness, Disqualified Stock and Preferred Stock then outstanding and Incurred pursuant to this clause (ix) does not exceed $10,000,000 at the time of Incurrence;

(x) any guarantee by the Borrower or any Restricted Subsidiary of Indebtedness or other obligations of the Borrower or any Subsidiary Guarantor so long as the Incurrence of such Indebtedness Incurred by the Borrower or such Subsidiary Guarantor is permitted under the terms of this Agreement; *provided* that if such Indebtedness is by its express terms subordinated in right of payment to the Loans or the Guarantee of such Restricted Subsidiary, as applicable, any such guarantee with respect to such Indebtedness shall be subordinated in right of payment to the Loans or such Guarantee, as applicable, substantially to the same extent as such Indebtedness is subordinated to the Loans or the Guarantee, as applicable;

(xi) the Incurrence by the Borrower or any of the Restricted Subsidiaries of Indebtedness or Disqualified Stock or Preferred Stock of a Restricted Subsidiary that serves to refund, refinance or defease any Indebtedness Incurred or Disqualified Stock or Preferred Stock issued as permitted under clauses (i), (ii), (iii), (iv), (ix), (x), (xiv) and (xviii) of Section 5.06(b) up to the outstanding principal amount (or, if applicable, the liquidation preference face amount, or the like) or, if greater, committed amount (only to the extent the committed amount could have been Incurred on the date of initial Incurrence) of such Indebtedness or Disqualified Stock or Preferred Stock, in each case at the time such Indebtedness was Incurred or Disqualified Stock or Preferred Stock was issued pursuant to clauses (i), (ii), (iii), (iv), (ix), (x), (xiv) and (xviii) of Section 5.06(b), or any Indebtedness, Disqualified Stock or Preferred Stock Incurred to so substantially concurrently refund or refinance such Indebtedness, Disqualified Stock or Preferred Stock, including any additional Indebtedness, Disqualified Stock or Preferred Stock Incurred to pay accrued and unpaid interest, penalties, premiums (including tender premiums), expenses, defeasance costs, commissions, underwriting discounts and fees in connection therewith (subject to the following proviso, "Refinancing Indebtedness") prior to its respective maturity; *provided*, *however*, that such Refinancing Indebtedness:

(1) shall have a Weighted Average Life to Maturity at the time such Refinancing Indebtedness is Incurred which is not less than the shorter of (x) the remaining Weighted Average Life to Maturity of the Indebtedness, Disqualified Stock or Preferred Stock being refunded, refinanced or defeased and (y) the Weighted Average Life to Maturity that would result if all payments of principal on the Indebtedness, Disqualified Stock and Preferred Stock being refunded or refinanced that were due on or after the date that is one year following the last maturity date of any Loans then outstanding were instead due on such date;

(2) to the extent such Refinancing Indebtedness refinances (a) Indebtedness junior to the Loans or a Guarantee, as applicable, such Refinancing Indebtedness is junior to the Loans or the Guarantee, as applicable, or unsecured, (b) Disqualified Stock or Preferred Stock, such Refinancing Indebtedness is Disqualified Stock or Preferred Stock or (c) Indebtedness that is payment subordinated to the Loans or a Guarantee, as applicable, such Refinancing Indebtedness is subordinated to the Loans or a Guarantee, as applicable, to at least the same extent pursuant to a customary subordination agreement;

(3) shall not include (X) Indebtedness of a Restricted Subsidiary that is not a Subsidiary Guarantor that refinances Indebtedness of the Borrower or a Subsidiary

85

Guarantor, or (Y) Indebtedness of the Borrower or a Restricted Subsidiary that refinances Indebtedness of the Closing Date Unrestricted Subsidiary; and

(4)       any Refinancing Indebtedness of Indebtedness Incurred in respect of Junior Debt above shall not have a final maturity prior to the date that is 180 days after the earlier of the Maturity Date or the date the Loans are no longer outstanding.

(xii)      to the extent constituting Indebtedness, Indebtedness Incurred by a Receivables Subsidiary in a Qualified Receivables Financing that is not recourse to the Borrower or any Restricted Subsidiary other than a Receivables Subsidiary (except for Standard Securitization Undertakings);

(xiii)      Indebtedness arising from the honoring by a bank or other financial institution of a check, draft or similar instrument drawn against insufficient funds in the ordinary course of business; *provided*, *however*, that such Indebtedness is extinguished within five (5) Business Days of its Incurrence;

(xiv)      Indebtedness in respect of letters of credit with a face amount in an aggregate principal amount or, which when aggregated with the face amount of all other Indebtedness then outstanding and Incurred pursuant to this clause (xiv), does not exceed $50,000,000 at the time of Incurrence;

(xv)      Indebtedness of the Borrower or any Restricted Subsidiary consisting of (1) the financing of insurance premiums or (2) take-or-pay obligations contained in supply arrangements, in each case, in the ordinary course of business and not otherwise restricted by this Agreement;

(xvi)      Indebtedness consisting of Indebtedness issued by the Borrower or a Restricted Subsidiary to current or former officers, directors and employees thereof or any direct or indirect parent thereof, their respective estates, spouses or former spouses, in each case to finance the purchase or redemption of Equity Interests of the Borrower or any Parent Entity to the extent described in clause (i) of Section 5.07(b);

(xvii)      Indebtedness incurred by the Borrower or any Restricted Subsidiary constituting reimbursement obligations with respect to letters of credit issued in the ordinary course of business, including letters of credit in respect of plugging and abandonment obligations, workers' compensation claims, performance or surety bonds, health, disability, or other employee benefits or property, casualty or liability insurance or self-insurance or other Indebtedness with respect to compensation claims, performance or surety bonds, health, disability or other employee benefits or property, casualty or liability insurance or self-insurance; *provided* that upon the drawing of such letters of credit or the Incurrence of such Indebtedness, such obligations are reimbursed within 30 days following such drawing or incurrence;

(xviii)      Indebtedness Incurred in connection with the financing of new equipment in order to reduce near-term capital expenditures associated with deepwater projects that is (x) not recourse to any Credit Party (other than to the equipment so financed by such Credit Party) and (y) otherwise on terms acceptable to the Administrative Agent in its sole discretion, in an aggregate principal amount, which when aggregated with the principal amount or liquidation preference of all other Indebtedness, Disqualified Stock and Preferred Stock then outstanding and Incurred pursuant to this clause (xviii), together with any Refinancing Indebtedness in respect thereof incurred pursuant to clause (xi), does not exceed $80,000,000 at the time of Incurrence (plus, in the case of any Refinancing Indebtedness, the Additional Refinancing Amount); and

86

(xix)     Indebtedness of the Borrower or any of its Restricted Subsidiaries undertaken in connection with cash management and related activities with respect to any Subsidiary in the ordinary course of business.

For purposes of determining compliance with this Section 5.06:

(1)     in the event that an item of Indebtedness, Disqualified Stock or Preferred Stock (or any portion thereof) meets the criteria of more than one of the categories of permitted Indebtedness described in clauses (i) through (xix) of Section 5.06(b), then the Borrower shall, in its sole discretion, classify or divide, such item of Indebtedness, Disqualified Stock or Preferred Stock (or any portion thereof) in any manner that complies with Section 5.06;

(2)     if any Indebtedness denominated in U.S. Dollars is exchanged, converted or refinanced into Indebtedness denominated in a foreign currency, then (in connection with such exchange, conversion or refinancing, and thereafter), the U.S. Dollar amount limitations set forth in any of clauses (i) through (xix) of Section 5.06(b) with respect to such exchange, conversion or refinancing shall be deemed to be the amount of such foreign currency, as applicable, into which such Indebtedness has been exchanged, converted or refinanced at the time of such exchange, conversion or refinancing; and

(3)     if any Indebtedness denominated in a foreign currency is exchanged, converted or refinanced into Indebtedness denominated in U.S. Dollars, then (in connection with such exchange, conversion or refinancing, and thereafter), the U.S. Dollar amount limitations set forth in any of clauses (i) through (xix) of Section 5.06(b) with respect to such exchange, conversion or refinancing shall be deemed to be the amount of U.S. Dollars into which such Indebtedness has been exchanged, converted or refinanced at the time of such exchange, conversion or refinancing.

Accrual of interest, the accretion of accreted value, the payment of interest or dividends in the form of additional Indebtedness, Disqualified Stock or Preferred Stock, as applicable, amortization of original issue discount, the accretion of liquidation preference and increases in the amount of Indebtedness outstanding solely as a result of fluctuations in the exchange rate of currencies will not be deemed to be an Incurrence of Indebtedness, Disqualified Stock or Preferred Stock for purposes of this Section 5.06.  Guarantees of, or obligations in respect of letters of credit relating to, Indebtedness which is otherwise included in the determination of a particular amount of Indebtedness shall not be included in the determination of such amount of Indebtedness; *provided* that the Incurrence of the Indebtedness represented by such guarantee or letter of credit, as the case may be, was in compliance with this Section 5.06.

For purposes of determining compliance with any U.S. Dollar-denominated restriction on the Incurrence of Indebtedness other than as provided in clauses (1) and (2) above, the U.S. Dollar-equivalent principal amount of Indebtedness denominated in a foreign currency shall be calculated based on the relevant currency exchange rate in effect on the date such Indebtedness was Incurred, in the case of term debt, or first committed or first Incurred (whichever yields the lower U.S. Dollar equivalent), in the case of revolving credit debt.

Notwithstanding any other provision of this Section 5.06, the maximum amount of Indebtedness that the Borrower and its Restricted Subsidiaries may Incur pursuant to this Section 5.06 shall not be deemed to be exceeded, with respect to any outstanding Indebtedness, solely as a result of fluctuations in the exchange rate of currencies.

SECTION 5.07.     Limitation on Restricted Payments.

87

(a)        The Borrower shall not, and shall not permit any of its Restricted Subsidiaries to:

(i)        declare or pay any dividend or make any distribution on account of the Borrower's or any of its Restricted Subsidiaries' Equity Interests, including any payment made in connection with any merger, amalgamation or consolidation involving the Borrower (other than (A) dividends or distributions payable solely in Equity Interests (other than Disqualified Stock) of the Borrower or in options, warrants or other rights to purchase Equity Interests (other than Disqualified Stock); or (B) dividends or distributions by a Restricted Subsidiary so long as, in the case of any dividend or distribution payable on or in respect of any class or series of securities issued by a Restricted Subsidiary that is not a Wholly Owned Restricted Subsidiary, the Borrower or a Restricted Subsidiary receives at least its pro rata share of such dividend or distribution in accordance with its Equity Interests in such class or series of securities);

(ii)        purchase or otherwise acquire or retire for value any Equity Interests of the Borrower or any direct or indirect parent of the Borrower;

(iii)        make any principal payment on, or redeem, repurchase, defease or otherwise acquire or retire for value, in each case prior to any scheduled repayment or scheduled maturity, any Junior Debt of the Borrower or any Restricted Subsidiary (other than the payment, redemption, repurchase, defeasance, acquisition or retirement of Indebtedness permitted under clauses (v) and (vii) of Section 5.06(b)); or

(iv)        make any Restricted Investment

(all such payments and other actions set forth in clauses (i) through (iv) above being collectively referred to as "Restricted Payments").

(b)        The provisions of Section 5.07(a) shall not prohibit:

(i)        (A) the redemption, repurchase, retirement or other acquisition of any Equity Interests ("Retired Capital Stock") or Junior Debt of the Borrower, any direct or indirect parent of the Borrower or any Subsidiary Guarantor in exchange for, or out of the proceeds of, the substantially concurrent sale of, Equity Interests of a Parent Entity (other than Disqualified Stock or any Equity Interests sold to the Borrower or a Subsidiary of the Borrower) (collectively, including any such contributions, "Refunding Capital Stock") and

(B) the declaration and payment of dividends on the Retired Capital Stock out of the proceeds of the substantially concurrent sale (other than to the Borrower or a Subsidiary of the Borrower) of Refunding Capital Stock; *provided* that no Restricted Payment shall be permitted to be made pursuant to this clause (i) if a Default or Event of Default has occurred and is continuing or would result therefrom;

(ii)        the repayment, prepayment, redemption, repurchase, defeasance or other acquisition or retirement of Junior Debt of the Borrower or any Subsidiary Guarantor made by exchange for, or out of the proceeds of the substantially concurrent sale of, new Indebtedness of the Borrower or a Subsidiary Guarantor which is Incurred in accordance with Section 5.06(b)(xi);

(iii)        the declaration and payment of dividends or distributions to holders of any class or series of Disqualified Stock of the Borrower or any of its Restricted Subsidiaries issued or incurred in accordance with Section 5.06;

(iv)        other Restricted Payments, in an aggregate amount, when taken together with all other Restricted Payments made pursuant to this clause (iv) not to exceed $1,000,000;

<div align="center">88</div>

(v)      (A)  with respect to any taxable period for which the Borrower and/or any of its Subsidiaries are members of a consolidated, combined, affiliated, unitary or similar income tax group for U.S. federal and/or applicable state or local income tax purposes, or for which the Borrower is a partnership or disregarded entity for U.S. federal income tax purposes that is wholly-owned (directly or indirectly) by a C corporation for U.S. federal and/or applicable state or local income tax purposes, distributions to the Borrower and any direct or indirect parent of the Borrower in an amount not to exceed the excess of (I) the amount of any U.S. federal, state and/or local income taxes that the Borrower and/or its Subsidiaries, as applicable, would have paid for such taxable period had the Borrower and/or its Subsidiaries, as applicable, been a stand-alone corporate group over (II) the portion of such income Taxes that is paid by the Borrower and/or its Subsidiaries; *provided*, that any portion of such Restricted Payments that are made on account of Taxes attributable to the Closing Date Unrestricted Subsidiary shall be limited to the amount actually paid with respect to such period by the Closing Date Unrestricted Subsidiary to the Borrower or its Restricted Subsidiaries for the purposes of paying such Taxes; and

(B)  with respect to any taxable period ending after the Closing Date for which the Borrower is a partnership or disregarded entity for U.S. federal income tax purposes that is not wholly-owned (directly or indirectly) by a C corporation for U.S. federal and/or applicable state or local income tax purposes, distributions to any direct or indirect parent of the Borrower to pay any Taxes attributable to its direct or indirect ownership of the Borrower and its Subsidiaries with respect to such taxable period (assuming that each owner is subject to Tax at the highest combined marginal federal, state and/or local tax rate applicable to any owner for such taxable period and taking into account the deductibility of state and local income taxes for U.S. federal income tax purposes (and any limitations thereon), the alternative minimum tax, any cumulative net taxable loss of the Borrower for prior taxable periods ending after the Closing Date to the extent such loss is of a character that would allow such loss to be available to reduce Taxes in the current taxable period (taking into account any limitations on the utilization of such loss to reduce such Taxes and assuming such loss has not already been utilized) and the character (e.g. long-term or short-term capital gain or ordinary or exempt) of the applicable income); *provided*, that, any portion of such Restricted Payments that are made on account of Taxes to the Closing Date Unrestricted Subsidiary shall be limited to the amount actually paid with respect to such period by the Closing Date Unrestricted Subsidiary to the Borrower or its Restricted Subsidiaries for the purposes of paying such Taxes.

(vi)      any Restricted Payment (100% of which shall be deemed attributable to the Borrower at all times Holdings owns no material assets other than the Equity Interests of the Borrower), if applicable:

(A)  in amounts required for any direct or indirect parent of the Borrower to pay fees and expenses (including franchise or similar taxes) required to maintain its corporate existence, customary salary, bonus and other benefits payable to, and indemnities provided on behalf of, officers and employees of any direct or indirect parent of the Borrower and general corporate operating and overhead expenses of any direct or indirect parent of the Borrower in each case to the extent such fees and expenses are attributable to the ownership or operation of the Borrower, if applicable, and its Subsidiaries; and

(B)  in amounts required for any direct or indirect parent of the Borrower, if applicable, to pay interest and/or principal on Indebtedness the proceeds of which have been contributed to the Borrower or any Restricted Subsidiary and that has been guaranteed by, or is otherwise considered Indebtedness of, the Borrower Incurred in accordance with Section 5.06.

<div align="center">89</div>

(vii)    repurchases of Equity Interests deemed to occur upon exercise of stock options or warrants if such Equity Interests represent a portion of the exercise price of such options or warrants;

(viii)    purchases of receivables pursuant to a Receivables Repurchase Obligation in connection with a Qualified Receivables Financing and the payment or distribution of Receivables Fees;

(ix)    Restricted Payments by the Borrower or any Restricted Subsidiary of the Borrower to allow the payment of cash in lieu of the issuance of fractional shares upon the exercise of options or warrants or upon the conversion or exchange of Capital Stock of any such Person;

(x)    any Restricted Payment used to fund the Transactions and the payment of fees and expenses Incurred in connection with the Transactions or owed by the Borrower or any direct or indirect parent of the Borrower or Restricted Subsidiaries of the Borrower to Affiliates, and any other payments made, including any such payments made to any direct or indirect parent of the Borrower to enable it to make payments in connection with the consummation of the Transactions, whether payable on the Closing Date or thereafter;

(xi)    payment made or expected to be made by the Borrower or any Restricted Subsidiary in respect of withholding or similar taxes payable upon exercise of Equity Interests by any future, present or former employee, director, manager or consultant and repurchases of Equity Interests deemed to occur upon exercise of stock options or warrants if such Equity Interests represent a portion of the exercise price of such options or warrants; and

(xii)    the repayment, prepayment, redemption, repurchase, defeasance or other acquisition or retirement of Junior Debt of the Borrower or any Subsidiary Guarantor once in respect of each fiscal quarter so long as the aggregate principal amount paid in connection with such repayment, prepayment, redemption, repurchase, defeasance or other acquisition or retirement does not to exceed 25% of the amount of Consolidated Excess Cash as of the last day of the most recently ended fiscal quarter, so long as (u) such repayment, prepayment, redemption, repurchase, defeasance or other acquisition or retirement of Junior Debt is made within 5 Business Days of the end of such fiscal quarter, (v) the Variable Amortization Trigger Date has occurred, (w) the aggregate principal amount of Loans outstanding is less than $80,000,000 at such time, (x) after giving effect to such repayment, prepayment, redemption, repurchase, defeasance or other acquisition or retirement of Junior Debt, the Consolidated First Lien Net Leverage Ratio is less than 0.50:1.00, (y) the Borrower complies with Section 2.13(d) hereof and (z) no Event of Default shall have occurred and be continuing prior to or after giving effect to such repayment, prepayment, redemption, repurchase, defeasance or other acquisition or retirement of Junior Debt or would result as a consequence thereof;

*provided, however*, that any Restricted Payments made with property other than cash shall be calculated using the Fair Market Value of such property.

SECTION 5.08.    <u>Dividend and Other Payment Restrictions Affecting Subsidiaries</u>.  The Borrower shall not, and shall not permit any of its Restricted Subsidiaries to, directly or indirectly, create or otherwise cause or suffer to exist or become effective any consensual encumbrance or consensual restriction on the ability of any Restricted Subsidiary to:

(a)    (i) pay dividends or make any other distributions to the Borrower or any of its Restricted Subsidiaries (1) on its Capital Stock; or (2) with respect to any other interest or participation in, or measured by, its profits; or (ii) pay any Indebtedness owed to the Borrower or any of its Restricted Subsidiaries;

(b)    make loans or advances to the Borrower or any of its Restricted Subsidiaries;

90

(c)        sell, lease or transfer any of its properties or assets to the Borrower or any of its Restricted Subsidiaries; or

(d)        grant Liens pursuant to the Security Documents on any of their assets to be pledged as Collateral hereunder;

except in each case (in the case of clause (d) above, solely in the case of clauses (iii), (iv), (vii), (viii), (ix), (x), (xi), (xii) and, with respect to the foregoing clauses, (xvii) below) for such encumbrances or restrictions existing under or by reason of:

(i)        (x) contractual encumbrances or restrictions in effect on the Closing Date, including pursuant to the SLTL Facility (including any guarantee thereof) and any Hedging Obligations (including any guarantee thereof) incurred in connection with such facilities and (y) contractual encumbrances or restrictions pursuant to the SLTL Credit Agreement and SLTL Credit Agreement Documents and, in each case, any similar contractual encumbrances effected by any amendments, modifications, restatements, renewals, supplements, refundings, replacements or refinancings of such agreements or instruments;

(ii)        this Agreement or the Guarantee;

(iii)        applicable law or any applicable rule, regulation or order;

(iv)        any agreement or other instrument of a Person acquired by the Borrower or any Restricted Subsidiary which was in existence at the time of such acquisition (but not created in contemplation thereof or to provide all or any portion of the funds or credit support utilized to consummate such acquisition), which encumbrance or restriction is not applicable to any Person, or the properties or assets of any Person, other than the Person and its Subsidiaries, or the property or assets of the Person and its Subsidiaries, so acquired;

(v)        contracts or agreements for the sale of assets, including any restriction with respect to the Borrower or any Restricted Subsidiary imposed pursuant to an agreement entered into for the sale or disposition of the Capital Stock or assets of the Borrower or any such Restricted Subsidiary to the extent such sale or disposition would be permitted hereunder;

(vi)        secured Indebtedness otherwise permitted to be Incurred pursuant to Section 5.06 that limit the right of the debtor to dispose of the assets securing such Indebtedness;

(vii)        restrictions on cash or other deposits or net worth imposed by customers under contracts entered into in the ordinary course of business;

(viii)        customary provisions in joint venture agreements and other similar agreements entered into in the ordinary course of business;

(ix)        purchase money obligations for property acquired, Capitalized Lease Obligations and obligations in respect of indebtedness permitted to be incurred under Section 5.06(b)(xviii) that impose restrictions of the nature discussed in clause (c) above on the property so acquired;

(x)        customary provisions contained in leases, licenses and other similar agreements entered into in the ordinary course of business;

(xi)        in the case of clause (c) above, any encumbrance or restriction that restricts in a customary manner the subletting, assignment or transfer of any property or asset that is subject to a

91

lease (including leases governing leasehold interests or Farm-In Agreements or Farm-Out Agreements relating to leasehold interests in Oil and Gas Properties), license or similar contract, or the assignment or transfer of any such lease (including leases governing leasehold interests or Farm-In Agreements or Farm-Out Agreements relating to leasehold interests in Oil and Gas Properties), license (including without limitations, licenses of intellectual property) or other contracts;

(xii)    any encumbrance or restriction of a Receivables Subsidiary effected in connection with a Qualified Receivables Financing; *provided, however*, that such restrictions apply only to such Receivables Subsidiary;

(xiii)    other Indebtedness, Disqualified Stock or Preferred Stock (A) of the Borrower or any Restricted Subsidiary that is a Subsidiary Guarantor or a Foreign Subsidiary or (B) of any Restricted Subsidiary that is not a Subsidiary Guarantor or a Foreign Subsidiary so long as such encumbrances and restrictions contained in any agreement or instrument will not materially affect the Borrower's ability to make anticipated principal or interest payments on the Loans (as determined in good faith by the Borrower), *provided* that in the case of each of <u>clauses (A)</u> and <u>(B)</u>, such Indebtedness, Disqualified Stock or Preferred Stock is permitted to be Incurred subsequent to the Closing Date not in violation of <u>Section 5.06</u>;

(xiv)    any Restricted Investment not prohibited by <u>Section 5.07</u> and any Permitted Investment;

(xv)    any customary encumbrances or restrictions imposed pursuant to any agreement of the type described in the definition of "Permitted Business Investment";

(xvi)    any agreements entered into with respect to any sale, transfer, lease or other disposition permitted by <u>Section 5.09</u> and applicable solely to assets under such sale, transfer, lease or other disposition; or

(xvii)    any encumbrances or restrictions of the type referred to in <u>clauses (a)</u>, <u>(b)</u> or <u>(c)</u> above imposed by any amendments, modifications, restatements, renewals, increases, supplements, refundings, replacements or refinancings of the contracts, instruments or obligations referred to in <u>clauses (i)</u> through <u>(xvi)</u> above; *provided* that such amendments, modifications, restatements, renewals, increases, supplements, refundings, replacements or refinancings are, in the good faith judgment of the Borrower, no more restrictive with respect to such dividend and other payment restrictions than those contained in the dividend or other payment restrictions prior to such amendment, modification, restatement, renewal, increase, supplement, refunding, replacement or refinancing.

For purposes of determining compliance with this <u>Section 5.08</u>, (i) the priority of any Preferred Stock in receiving dividends or liquidating distributions prior to dividends or liquidating distributions being paid on common stock shall not be deemed a restriction on the ability to make distributions on Capital Stock and (ii) the subordination of loans or advances made to the Borrower or a Restricted Subsidiary to other Indebtedness Incurred by the Borrower or any such Restricted Subsidiary shall not be deemed a restriction on the ability to make loans or advances.

SECTION 5.09.    <u>Asset Sales</u>.

(a)    The Borrower shall not, and shall not permit any Restricted Subsidiary to, cause or make any Asset Sale.

(b)    The limitations set forth in <u>Section 5.09(a)</u> shall not apply to:

(i)    Asset Sales constituting Mexico Liquidity Events;

(ii)    Asset Sales of Proved Developed Producing Reserves, Proved Developed Non-Producing Reserves (but excluding any Mexico Assets) and, in each case, infrastructure assets related thereto in an aggregate amount not to exceed $30,000,000;

(iii)    Asset Sales of any Oil and Gas Property or interest therein to which no proved reserves are attributable at the time of such disposition; provided that no a Default or Event of Default has occurred and is continuing or would result therefrom;

(iv)    any exchange of assets (including a combination of assets and Cash Equivalents) other than assets constituting Proved Developed Producing Reserves, Proved Developed Non-Producing Reserves, related infrastructure assets and Mexico Assets, for assets related to a Similar Business of comparable or greater market value or usefulness to the business of the Borrower and the Restricted Subsidiaries as a whole, as determined in good faith by the Borrower; provided that any exchange pursuant to this clause (iv) shall only be permitted so long as no Default or Event of Default has occurred and is continuing or would result therefrom;

(v)    other Asset Sales so long as (x) the aggregate amount of Asset Sales pursuant to this clause (v) after the Closing Date does not exceed $100,000,000, (y) at the time of such Asset Sale, no Event of Default has occurred and is continuing and (z) at least 85% of the consideration therefor received by the Borrower or such Restricted Subsidiary, as the case may be, is in the form of cash and/or Cash Equivalents;

*provided* that, in each case of the foregoing, such Asset Sale shall only be permitted (A) solely to the extent occurring pursuant to clause (i), (ii), (iii) or (v) above, if for a consideration no less than Fair Market Value, (B) so long as the Borrower has complied with the notice requirements of Section 5.01(c)(iii) and (C) so long as the Borrower, or other relevant Credit Party, shall apply the proceeds therefrom to the prepayment of the Loans to the extent required pursuant to Section 2.13.

(c)    Solely for the purposes of clause (b)(v) above, the following additional forms of consideration shall qualify as Cash Equivalents;

(i)    any liabilities (as shown on the Borrower's or a Restricted Subsidiary's most recent balance sheet or in the notes thereto) of the Borrower or any Restricted Subsidiary (other than liabilities that are by their terms subordinated to the Loans or any Guarantee) that are assumed by the transferee of any such assets or that are otherwise cancelled or terminated in connection with the transaction with such transferee; and

(ii)    with respect to any Asset Sale of Oil and Gas Properties by the Borrower or any Restricted Subsidiary, the costs and expenses related to the exploration, development, completion or production of such Oil and Gas Properties and activities related thereto which are assumed by the transferee (or an Affiliate thereof) substantially contemporaneously with such Asset Sale.

SECTION 5.10.    Transactions with Affiliates.

(a)    The Borrower shall not, and shall not permit any of its Restricted Subsidiaries to make any payment to, or sell, lease, transfer or otherwise dispose of any of its properties or assets to, or purchase any property or assets from, or enter into or make or amend any transaction or series of transactions, contract, agreement, understanding, loan, advance or guarantee with, or for the benefit of, any Affiliate of the Borrower (each of the foregoing, an "Affiliate Transaction") unless (i) such Affiliate Transaction is on terms that are not materially less favorable to the Borrower or the relevant Restricted Subsidiary than those that could have been obtained in a comparable transaction by the Borrower or such Restricted Subsidiary with an unrelated Person and (ii) the Borrower has provided the Administrative Agent with written notice of such Affiliate Transaction.

93

(b)      The provisions of <u>Section 5.10(a)</u> shall not apply to the following:

(i)      transactions between or among the Borrower and/or any Subsidiary Guarantor (or an entity that becomes a Restricted Subsidiary as a result of such transaction);

(ii)      Restricted Payments permitted by <u>Section 5.07</u> and Permitted Investments;

(iii)      the payment of reasonable and customary fees and reimbursement of expenses paid to, and indemnity provided on behalf of, current or former officers, directors, employees or consultants of the Borrower, any Restricted Subsidiary, or any direct or indirect parent of the Borrower;

(iv)      payments or loans (or cancellation of loans) to officers, directors, employees or consultants which are approved by a majority of the Board of Directors of the Borrower in good faith;

(v)      any agreement as in effect as of the Closing Date and specified on <u>Schedule 5.10</u>;

(vi)      the execution of the Transactions, the performance of the obligations under the Loan Documents, the SLTL Credit Agreement and the related transactions, the transactions contemplated by the Plan of Reorganization, and the payment of all fees and expenses related to the Transactions, including fees to the Investors;

(vii)      any transaction effected as part of a Qualified Receivables Financing;

(viii)      the issuance of Equity Interests (other than Disqualified Stock) of the Borrower to any Person;

(ix)      the issuances of securities or other payments, awards or grants in cash, securities or otherwise pursuant to, or the funding of, employment arrangements, stock option and stock ownership plans or similar employee benefit plans approved by the Board of Directors of the Borrower or any direct or indirect parent of the Borrower or of a Restricted Subsidiary, as appropriate, in good faith;

(x)      the entering into of any tax sharing agreement or arrangement that complies with <u>clause (iv)</u> of <u>Section 5.07(b)</u>;

(xi)      any contribution to the capital of the Borrower;

(xii)      transactions permitted by, and complying with, the provisions of <u>Section 5.11</u>;

(xiii)      transactions between the Borrower or any of its Restricted Subsidiaries and any Person that is an Affiliate solely because a director of such Person is also a director of the Borrower or any direct or indirect parent of the Borrower; *provided*, *however*, that such director abstains from voting as a director of the Borrower or such direct or indirect parent, as the case may be, on any matter involving such other Person;

(xiv)      pledges of Equity Interests of the Closing Date Unrestricted Subsidiary;

(xv)      any employment agreements entered into by the Borrower or any of its Restricted Subsidiaries in the ordinary course of business;

(xvi)      payments by the Borrower or any of its Restricted Subsidiaries to any of the Investors made for any financial advisory, financing, underwriting or placement services or in respect

94

of other investment banking activities, including in connection with acquisitions or divestitures, which payments are approved by a majority of the Board of Directors of the Borrower in good faith;

(xvii)    transactions undertaken in good faith (as certified by a responsible financial or accounting officer of the Borrower in an Officers' Certificate) for the purpose of improving the consolidated tax efficiency of the Borrower and its Subsidiaries and not for the purpose of circumventing any covenant set forth in this Agreement;

(xviii)    customary agreements and arrangements with oil and gas royalty trusts and master limited partnership agreements that comply with the affiliate transaction provisions of such royalty trust or master limited partnership agreement;

(xix)    sales or conveyances of net profits interests for cash at Fair Market Value allowed under Section 5.09;

(xx)    any transaction in respect of which the Borrower delivers to the Administrative Agent a letter addressed to the board of directors or managers of the Borrower from an accounting, appraisal or investment banking firm, in each case of nationally-recognized standing that is in the good faith determination of the Borrower qualified to render such letter, which letter states that such transaction is (A) fair, from a financial point of view, to the Borrower or such Restricted Subsidiary or (B) on terms, taken as a whole, that are no less favorable to the Borrower or such Restricted Subsidiary, as applicable, than would be obtained in a comparable arm's length transaction with a person that is not an Affiliate; and

(xxi)    intellectual property licenses in the ordinary course of business.

SECTION 5.11.    Mergers, Etc.  The Borrower will not, and will not permit any Restricted Subsidiary to, merge into or with or consolidate with any other Person, or permit any other Person to merge into or consolidate with it, or sell, transfer, lease or otherwise dispose of (whether in one transaction or in a series of transactions) all or substantially all of its property to any other Person (whether now owned or hereafter acquired) (any such transaction, a "consolidation"), or liquidate or dissolve; provided that, so long as no Event of Default has occurred and is then continuing:

(a)    any Restricted Subsidiary may be liquidated or may participate in a merger or consolidation with, or dispose of all or substantially all of its assets to, the Borrower or a Subsidiary Guarantor (provided that the Borrower or a Subsidiary Guarantor shall be the continuing or surviving entity in any such transaction involving the Borrower or a Subsidiary Guarantor);

(b)    any Restricted Subsidiary that is not a Subsidiary Guarantor may be liquidated or may participate in a merger or consolidation with, or dispose of all or substantially all of its assets to, any other Restricted Subsidiary that is not a Subsidiary Guarantor or another Person who becomes a Restricted Subsidiary that is not a Subsidiary Guarantor concurrent with such transaction;

(c)    any Subsidiary Guarantor may participate in a merger or consolidation with, or dispose of all or substantially all of its assets to, another Subsidiary Guarantor;

(d)    any Restricted Subsidiary may liquidate or dissolve so long as its assets (if any) are distributed to the Borrower or a Subsidiary Guarantor prior to such liquidation or dissolution; or

(e)    any Restricted Subsidiary may merge or consolidate with any other Person in order to effect a Restricted Investment not prohibited by Section 5.07; provided that the continuing or surviving Person shall be a Restricted Subsidiary or the Borrower, which together with each of its Restricted Subsidiaries, shall have complied with the requirements of Section 5.12 and Section 5.17 to the extent required thereby.

95

SECTION 5.12.    Future Guarantors.  The Borrower shall cause (a) each Restricted Subsidiary (other than an Excluded Subsidiary), formed or acquired after the Closing Date, (b) each other Subsidiary that guarantees any SLTL Facility or any other Material Indebtedness and (c) as required by Section 5.29, the Closing Date Unrestricted Subsidiary, to execute and deliver to the Administrative Agent (which shall be within thirty (30) days (or such later date as the Administrative Agent may reasonably agree) of formation or acquisition in the case of clause (a), concurrently with the provision of any such guarantee in the case of clause (b) and within the time period set forth in Section 5.29 in the case of clause (c)) a joinder agreement to the Guarantee pursuant to which such Restricted Subsidiary will guarantee payment of the Loans on the terms and conditions set forth in this Agreement, and a joinder agreement to each applicable Security Document, and, if required by the Intercreditor Agreement, a joinder to such Intercreditor Agreement; *provided*, that, at its option, the Borrower shall be permitted to cause any other Affiliate to provide a guarantee pursuant to the terms of this Section 5.12. Each Guarantor shall be released in accordance with Section 8.20.

SECTION 5.13.    Liens. The Borrower shall not, and shall not permit any Restricted Subsidiary to create, Incur or suffer to exist any Lien on any asset or property of the Borrower or such Restricted Subsidiary, other than Permitted Liens. For purposes of determining compliance with this Section 5.13, (A) a Lien securing an item of Indebtedness need not be permitted solely by reference to one category of permitted Liens described in the definition of "Permitted Liens" but may be permitted in part under any combination thereof and (B) in the event that a Lien securing an item of Indebtedness, Disqualified Stock or Preferred Stock (or any portion thereof) meets the criteria of one or more of the categories of permitted Liens described in the definition of "Permitted Liens", the Borrower shall, in its sole discretion, classify or divide, such Lien securing such item of Indebtedness (or any portion thereof) in any manner that complies with this Section 5.13 and will only be required to include the amount and type of such Lien or such item of Indebtedness secured by such Lien in one of the clauses of the definition of "Permitted Liens" and such Lien securing such item of Indebtedness will be treated as being Incurred or existing pursuant to only one of such clauses.

SECTION 5.14.    Compliance with Material Contracts. The Borrower shall, and shall cause each Restricted Subsidiary to, comply with and maintain in full force and effect each Material Contract, except where the failure to comply would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect; provided, that the Credit Parties and their Subsidiaries may contest the terms and conditions of any such Material Contract in good faith through applicable proceedings so long as adequate reserves are maintained in accordance with GAAP.

SECTION 5.15.    Existence; Business and Properties.  The Borrower shall, and shall cause each Restricted Subsidiary to:

(a)    Do or cause to be done all things necessary to preserve, renew and keep in full force and effect its legal existence except as otherwise permitted by Section 5.11.

(b)    (i) Do or cause to be done all things necessary to obtain, preserve, renew, extend and keep in full force and effect the permits, franchises, authorizations, intellectual property, licenses and rights with respect thereto necessary in all material respects to the normal conduct of its business and (ii) at all times maintain and preserve all material property necessary to the normal conduct of its business and keep such property in good repair, working order and condition and from time to time make, or cause to be made, all needful and proper repairs, renewals, additions, improvements and replacements thereto necessary in order that the business carried on in connection therewith, if any, may be properly conducted in all material respects at all times (in each case except as permitted by this Agreement).

SECTION 5.16.    Maintenance of Insurance.

(a)    The Borrower and its Restricted Subsidiaries shall maintain or cause to be maintained, with financially sound and reputable insurers, (i) directors and officers insurance, and (ii) such casualty insurance, public liability insurance, third party property damage insurance with respect to liabilities, losses or

damage in respect of the assets, properties and businesses of the Borrower and its Restricted Subsidiaries as may customarily be carried or maintained under similar circumstances by Persons of established reputation engaged in similar businesses, in each case in such amounts (giving effect to self insurance), with such deductibles, covering such risks and otherwise on such terms and conditions as shall be customary for such Persons. Each such policy of insurance shall (i) in the case of each liability insurance policy, name Collateral Agent, for the benefit of Secured Parties, as an additional insured thereunder as its interests may appear, (ii) in the case of each casualty insurance policy, contain a lender loss payable clause or endorsement, satisfactory in form and substance to Collateral Agent, that names Collateral Agent, for the benefit of Secured Parties, as the lender loss payee thereunder, and (iii) in each case, provide for at least thirty days' prior written notice to Collateral Agent of any modification or cancellation of such policy.

(b)     If any improvements located on any Mortgaged Property are at any time located in an area identified by the Federal Emergency Management Agency (or any successor agency) as a Special Flood Hazard Area with respect to which flood insurance has been made available under the National Flood Insurance Act of 1968 (as now or hereafter in effect or successor act thereto), then the Borrower shall, or shall cause the applicable Credit Party to (i) maintain, or cause to be maintained, with a financially sound and reputable insurer, flood insurance in an amount and otherwise sufficient to comply with all applicable rules and regulations promulgated pursuant to the Flood Insurance Laws and (ii) deliver to the Administrative Agent evidence of such compliance.

(c)     In connection with the covenants set forth in this Section 5.16, it is understood and agreed that:

(i)     none of the Administrative Agent, the Lenders and their respective agents or employees shall be liable for any loss or damage insured by the insurance policies required to be maintained under this Section 5.16, it being understood that (A) the Credit Parties shall look solely to their insurance companies or any other parties other than the aforesaid parties for the recovery of such loss or damage and (B) such insurance companies shall have no rights of subrogation against the Administrative Agent, the Lenders or their agents or employees.  If, however, the insurance policies, as a matter of the internal policy of such insurer, do not provide waiver of subrogation rights against such parties, as required above, then the Borrower, on behalf of itself and on behalf of each of its Subsidiaries, hereby agrees, to the extent permitted by law, to waive, and further agrees to cause each of its Subsidiaries to waive, its right of recovery, if any, against the Administrative Agent, the Lenders and their agents and employees; and

(ii)     the designation of any form, type or amount of insurance coverage by the Administrative Agent under this Section 5.16 shall in no event be deemed a representation, warranty or advice by the Administrative Agent or the Lenders that such insurance is adequate for the purposes of the business of the Borrower and the Restricted Subsidiaries or the protection of their properties.

SECTION 5.17.     Additional Collateral.

(a)     In connection with the delivery of the Reserve Reports required by Section 5.26(a) and Section 5.26(c), the Borrower shall review such Reserve Report and the list of current Mortgaged Properties to ascertain whether or not the PV-10 of the Mortgaged Properties evaluated in such Reserve Report represent at least 95% of the PV-10 of the Oil and Gas Properties of the Credit Parties after giving effect to exploration and production activities, acquisitions, dispositions and production. In the event the PV-10 of the Mortgaged Properties do not represent 95% of such PV-10 of the Oil and Gas Properties of the Credit Parties, the Borrower or the appropriate Subsidiary Guarantor shall, within 45 days of the date of delivery of such Reserve Report (or such later date as the Administrative Agent shall reasonably agree), execute and deliver mortgages, deeds of trust, security instruments, financing statements and other Security Documents as shall be reasonably necessary to vest in the Collateral Agent a perfected security interest, subject only to Permitted Liens, such that after giving effect thereto, the PV-10 of the Mortgaged Properties will represent at least 95% of the PV-10 of the Oil and

97

Gas Properties of the Credit Parties (but subject to the limitations described in <u>Article VIII</u>, the Security Documents, the Intercreditor Agreement and limitations under applicable local law).

(b)     Upon any Restricted Subsidiary becoming a Subsidiary Guarantor as contemplated by <u>Section 5.12</u> or the acquisition by the Borrower or any Subsidiary Guarantor of any after-acquired property (other than Excluded Assets), or upon any additional Restricted Subsidiary becoming a Subsidiary Guarantor that has after-acquired property (other than Excluded Assets), the Borrower or such Subsidiary Guarantor shall within 45 days (or such later date as the Administrative Agent shall reasonably agree) of the acquisition of such property (or, in the case of a person that becomes a Subsidiary Guarantor as contemplated by <u>Section 5.12</u>, within the time period for such person becoming a Subsidiary Guarantor set forth therein) execute and deliver such mortgages, deeds of trust, security instruments, financing statements and other Security Documents as shall be reasonably necessary to vest in the Collateral Agent a perfected security interest, subject only to Permitted Liens, in such after-acquired property (other than Excluded Assets) and to have such after-acquired property (other than Excluded Assets) (but subject to the limitations described in <u>Article VIII</u>, the Security Documents, the Intercreditor Agreement and limitations under applicable local law) added to the Collateral, and thereupon all provisions of this Agreement relating to the Collateral shall be deemed to relate to such after-acquired property (other than Excluded Assets) to the same extent and with the same force and effect; *provided* that no such mortgages, deeds of trust, security instruments, financing statements and other Security Documents shall be required to be executed and delivered by the Borrower or such Subsidiary Guarantor if at least 95% of the PV-10 of the Credit Parties' total Proved Reserves shall constitute Collateral and be subject to any applicable mortgages, deeds of trust, security instruments, financing statements and other Security Documents in connection therewith.

SECTION 5.18.    <u>Payment of Taxes, etc.</u>  The Borrower shall, and shall cause each Restricted Subsidiary to, pay, discharge or otherwise satisfy its obligations in respect of all material Taxes, before the same shall become delinquent or in default, except where the amount or validity thereof is being contested in good faith by appropriate proceedings and the Borrower or a Subsidiary thereof has set aside on its books adequate reserves therefor in accordance with GAAP (or in the case of a Foreign Subsidiary, the comparable accounting principles in the relevant jurisdiction).

SECTION 5.19.    <u>Compliance with Laws.</u>  Each of Holdings, the Borrower and its Subsidiaries shall comply in all material respects with all Requirements of Law (it being understood, in the case of statutes, regulations and orders of, and all applicable restrictions imposed by, all Governmental Authorities that are specifically referred to in any other provision of this Agreement, the Credit Parties shall also be required to represent and/or comply with, as applicable, the express terms of such provision). Holdings, the Borrower and its Subsidiaries shall comply in all material respects with all Sanctions, Anti-Corruption Laws and Anti-Terrorism and Anti-Money Laundering Laws and maintain policies and procedures, such that, at all times, the representations and warranties made in <u>Section 3.17</u> are true and correct.

SECTION 5.20.    <u>Further Instruments and Acts</u>.  At any time or from time to time upon the reasonable request of the Administrative Agent, each Credit Party will, at its expense, promptly execute, acknowledge and deliver such further documents and do such other acts and things as the Administrative Agent or the Collateral Agent may reasonably request in order to effect fully the purposes of the Loan Documents or to perfect or renew the rights of the Collateral Agent for the benefit of the Secured Parties with respect to the Collateral (or with respect to any additions thereto or replacements or proceeds thereof or with respect to any other property or assets hereafter acquired by Holdings or any Subsidiary that may be deemed to be part of the Collateral).  In furtherance and not in limitation of the foregoing, each Credit Party shall take such actions as the Administrative Agent or the Collateral Agent may reasonably request from time to time to ensure that the Obligations are guaranteed by the Guarantors and are secured by a first priority Lien (subject to Permitted Liens) on all of the Collateral.

Notwithstanding the foregoing provisions of this <u>Section 5.20</u> or anything in this Agreement or any other Loan Document to the contrary: (A) Liens required to be granted from time to time shall be subject to exceptions and

limitations set forth in the Collateral Agreement and the other Loan Documents and, to the extent appropriate in any applicable jurisdictions, as agreed between the Administrative Agent in its Permitted Business Judgment and the Borrower and (B) the Collateral shall not include any Excluded Assets.

SECTION 5.21.        Books, Records and Inspections.

(a)        The Borrower will, and will cause each Restricted Subsidiary to, permit officers and designated representatives of the Administrative Agent or officers and designated representatives of the Required Lenders (as accompanied by the Administrative Agent), upon prior written notice to visit and inspect any of the properties or assets of the Borrower or such Restricted Subsidiary in whomsoever's possession to the extent that it is within such party's control to permit such inspection (and shall use commercially reasonable efforts to cause such inspection to be permitted to the extent that it is not within such party's control to permit such inspection), and to examine the financial records of the Borrower and any such Restricted Subsidiary and discuss the affairs, finances, accounts and condition of the Borrower or any such Restricted Subsidiary with its and their officers and independent accountants therefor, in each case of the foregoing upon reasonable advance notice to the Borrower, all at such reasonable times and intervals during normal business hours and to such reasonable extent as the Administrative Agent or the Required Lenders may desire (and subject, in the case of any such meetings or advice from such independent accountants, to such accountants' customary policies and procedures); *provided* that, excluding any such visits and inspections during the continuation of an Event of Default, (i) only the Administrative Agent on behalf of the Required Lenders accompanied by officers and designated representatives of the Required Lenders may exercise rights of the Administrative Agent and the Lenders under this Section 5.21, and (ii) only one such visit per fiscal year shall be at the Borrower's expense (limited, in the case of such visit, to the expenses incurred by the Administrative Agent); *provided, further,* that when an Event of Default has occurred and is continuing, the Administrative Agent (or any of its representatives or independent contractors) or any representative of the Required Lenders may do any of the foregoing at the expense of the Borrower at any time during normal business hours and upon reasonable advance notice. The Administrative Agent and the Required Lenders shall give the Borrower the opportunity to participate in any discussions with the Borrower's independent public accountants. Notwithstanding anything to the contrary in this Section 5.21, neither the Borrower nor any Restricted Subsidiary will be required to disclose, permit the inspection, examination or making copies or abstracts of, or discussion of, any document, information or other matter (x) that constitutes non-financial trade secrets or non-financial proprietary information, (y) in respect of which disclosure to the Administrative Agent or any Lender (or their respective representatives or contractors) is prohibited by any Requirement of Law or any binding agreement or (z) that is subject to attorney-client or similar privilege or constitutes attorney work product; provided that, to the extent any information is withheld pursuant to the foregoing, the Borrower agrees to provide written notice of the reason for such information being withheld.

(b)        The Borrower will, and will cause each of the Restricted Subsidiaries to, keep proper books of record and accounts in conformity in all material respects with GAAP.

SECTION 5.22.        ERISA.

(a)        Promptly after the Borrower knows or has reason to know of the occurrence of any ERISA Event that, individually or in the aggregate (including in the aggregate such ERISA Events previously disclosed or exempt from disclosure hereunder, to the extent the liability therefor remains outstanding), would be reasonably likely to result in a Material Liability to any Credit Party, the Borrower will deliver to the Administrative Agent a certificate of an Authorized Officer or any other senior officer of the Borrower setting forth details as to such occurrence and the action, if any, that Holdings, the Borrower, any of their Restricted Subsidiaries or an ERISA Affiliate, as applicable, is required or proposes to take, together with any notices (required, proposed or otherwise) given to or filed with or by Holdings, the Borrower, any such Restricted Subsidiary or any such ERISA Affiliate, the PBGC, a Plan participant (other than notices relating to an individual participant's benefits) or the Plan administrator with respect thereto. Promptly after the same is available to Holdings, the Borrower, any of their Restricted Subsidiaries or any ERISA Affiliate, the Borrower will deliver copies of (i) each Schedule SB (Actuarial Information) to the annual report (Form 5500 Series) filed by Holdings,

99

the Borrower, any of their Restricted Subsidiaries or any ERISA Affiliate with the Internal Revenue Service, the Department of Labor or any other Governmental Authority with respect to each Plan, (ii) all notices received by Holdings, the Borrower, any of their Restricted Subsidiaries or any ERISA Affiliate from a Multiemployer Plan sponsor concerning an ERISA Event; and (iii) copies of such other documents or governmental reports or filings relating to any Employee Benefit Plan as Administrative Agent shall reasonably request.

(b)     Promptly following any request therefor, the Borrower will deliver to the Administrative Agent copies of (i) any documents described in Section 101(k) of ERISA that Holdings, the Borrower, any of their Restricted Subsidiaries or any ERISA Affiliate may request with respect to any Multiemployer Plan and (ii) any notices described in Section 101(l) of ERISA that Holdings, the Borrower, any of their Restricted Subsidiaries or any ERISA Affiliate may request with respect to any Multiemployer Plan; *provided* that if Holdings, the Borrower, any of their Restricted Subsidiaries or any ERISA Affiliate has not requested such documents or notices from the administrator or sponsor of the applicable Multiemployer Plan, Holdings, the Borrower, the applicable Restricted Subsidiaries or the applicable ERISA Affiliates shall promptly make a request for such documents or notices from such administrator or sponsor and shall provide copies of such documents and notices promptly after receipt thereof.

SECTION 5.23.     Hedge Agreements; Swap Agreements.

(a)     The Credit Parties shall enter into within 45 days of the Closing Date (or such later date as approved by the Required Lenders in their reasonable discretion), and thereafter maintain, Hedge Agreements with Hedge Banks at market prices and otherwise on terms reasonably satisfactory to the Administrative Agent with respect to (i) at least 50% (on a barrel of oil equivalent basis) of then currently reasonably anticipated oil and natural gas production from 2P Developed Producing Reserves for the next succeeding 12 months following the date of determination 45 days after the Closing Date (such period, the "Initial Hedging Period") and (ii) at least 25% (on a barrel of oil equivalent basis) of the then-current reasonably anticipated oil and natural gas production from 2P Developed Producing Reserves for each month during the six month period after the Initial Hedging Period, in each case, as forecasted by the Borrower based upon the Latest Reserve Report;

(b)     Commencing with [December 31, 2021], the Credit Parties shall maintain as of June 30 and December 31 of each fiscal year, Hedge Agreements with Hedge Banks at market prices and otherwise with terms reasonably satisfactory to the Administrative Agent with respect to (i) at least 50% (on a barrel of oil equivalent basis) of the then currently reasonably anticipated oil and natural gas production from 2P Developed Producing Reserves (as forecasted in the Latest Reserve Report) for each month on a rolling basis for the 12 month period following the relevant date of determination and (ii) at least 25% (on a barrel of oil equivalent basis) of the then currently reasonably anticipated oil and natural gas production from 2P Developed Producing Reserves (as forecasted in the Latest Reserve Report) for each month on a rolling basis for the six months following the 12 month period described in the foregoing clause (b)(i); *provided*, that, notwithstanding anything in the foregoing clauses (a) and (b) to the contrary, if the Genovesa Well and/or Troika TA-3 Well have come online on or prior to the date that is 45 days after the Closing Date, the volumes associated with any such well shall be treated as Proved Developed Producing Reserves; and

(c)     the Borrower shall not, and shall not permit any Subsidiary to, enter into any Hedging Agreement other than a Hedging Agreement which:

(i)     has a maximum duration of 60 months; and

(ii)     covers notional volumes of not more than, at the time such Hedge Agreement is entered into, for each calendar month 85% of reasonably anticipated production from 2P Developed Producing Reserves of crude oil, natural gas and natural gas liquids (calculated separately), as set forth in the Latest Reserve Report; *provided,* that, if, after the end of any calendar quarter, commencing with the first calendar quarter ending after the Closing Date, the Borrower determines that the aggregate

100

weighted average of the notional volumes of all Hedge Agreements in respect of commodities for such calendar quarter (other than basis differential swaps on volumes already hedged pursuant to other Hedge Agreements) exceeded 100% of actual production of hydrocarbons in such calendar quarter, then the Borrower (i) shall promptly notify the Administrative Agent of such determination and (ii) shall, within 45 days of such determination, terminate, create off-setting positions, or otherwise unwind or monetize (only to the extent such terminations, unwinds or monetizations are permitted under this Agreement) existing Hedge Agreements such that, at such time, future hedging volumes will not exceed 100% of reasonably anticipated projected production for the then-current and any succeeding calendar quarters; *provided*, further, that all purchased put options or price floors for Hydrocarbons shall be excluded for purposes of the foregoing volume limitations.

SECTION 5.24.    Lender Meetings.    The Borrower shall upon the reasonable request of the Administrative Agent (acting upon the reasonable request of the Required Lenders), on a date to be mutually agreed upon by the Borrower and the Administrative Agent following the end of each fiscal year and the end of each of the first three fiscal quarters of each fiscal year, in each case of Borrower (but, in any event, no earlier than the Business Day following the delivery of annual or quarterly financial statements, as applicable, pursuant to Section 5.01(a) or (b), for such fiscal year or fiscal quarter, as the case may be), to participate in a conference call with the Administrative Agent and the Lenders to discuss the financial condition and results of operations of the Borrower and its consolidated Subsidiaries for such fiscal quarter (and for the period from the beginning of the current fiscal year to the end of such fiscal quarter) or for such fiscal year, as the case may be.

SECTION 5.25.    Limitations on Amendments.

(a)    The Borrower shall not and will cause its Restricted Subsidiaries not to amend, supplement, enter into any consent or waiver in respect of or otherwise modify the SLTL Facility, the documentation governing any Refinancing Indebtedness in respect of the SLTL Facility, any other Junior Debt or any other Material Indebtedness, in any manner that would be materially adverse to the interests of the Lenders or not permitted under the terms of the applicable Intercreditor Agreement.

(b)    No Credit Party shall (a) amend or permit any amendments, supplements, waivers or consents under or other modifications to any Credit Party's organizational documents; or (b) amend, terminate, enter into any consent or waiver or other modification of, or permit any amendment, termination, waiver, consent or other modification of any provision of, any Material Contract, if, in either case, such amendment, termination, waiver, consent or other modification would be materially adverse to (x) the Lenders or (y) any Credit Party.

SECTION 5.26.    Reserve Reports.

(a)    On or before the date that is 90 days after the end of each fiscal year (or such later date as the Administrative Agent may agree), the Borrower shall deliver a Reserve Report with an "as of" date of December 31st of the preceding year, in form and substance reasonably satisfactory to the Administrative Agent; *provided,* that, concurrently with delivery of the Reserve Report contemplated by this Section 5.26(a), the Borrower shall deliver certificate of a Financial Officer of the Borrower setting forth a reasonably detailed calculation of the Asset Coverage Ratio for the fiscal quarter ended as of such December 31, including a high level summary of the non-proprietary information included in the most recently produced Reserve Report which is relevant to calculation of such ratios (it being understood that this certification may be included on the certificate contemplated by Section 5.26(g) below).

(b)    On or before the date of delivery of financial statements required with respect to the first fiscal quarter of any fiscal year pursuant to Section 5.01(b), the Borrower shall deliver a "roll-forward" of the Reserve Report most recently delivered pursuant to Section 5.26(a) reflecting any changes between the "as-of" date of such Reserve Report and the last day of such fiscal quarter, in form and substance reasonably satisfactory to the Administrative Agent.

101

(c)     On or before the date of delivery of financial statements required with respect to the second fiscal quarter of any fiscal year pursuant to Section 5.01(b), the Borrower shall deliver a Reserve Report with an "as of" date of June 30th of such fiscal year, in form and substance reasonably satisfactory to the Administrative Agent.

(d)     On or before the date of delivery of financial statements required with respect to the third fiscal quarter of any fiscal year pursuant to Section 5.01(b), the Borrower shall deliver a "roll-forward" of the Reserve Report most recently delivered pursuant to Section 5.26(c) reflecting any changes between the "as-of" date of such Reserve Report and the last day of such fiscal quarter, in form and substance reasonably satisfactory to the Administrative Agent.

(e)     All Reserve Reports may be prepared internally by petroleum engineers that are employees of the Borrower, any Restricted Subsidiary, or any of each of their respective Affiliates; *provided*, that, notwithstanding anything in the foregoing to the contrary, at least one Reserve Report prepared pursuant to Section 5.26(a) or (c) above per fiscal year shall be prepared or audited by an Approved Petroleum Engineer that has audited at least (i) 80% of the Proved Reserves by value and (ii) 80% of Proved Developed Producing Reserves by value.

(f)     Upon the request of the Administrative Agent in its sole discretion and taking into account the necessary time for completion and preparation thereof, the Borrower shall, in addition to the requirements of Section 5.26(e), deliver to the Administrative Agent a third-party audit of the most recently delivered Reserve Report which is reasonably acceptable to the Administrative Agent and covers at least (i) 80% of the Proved Reserves by value and (ii) 80% of Proved Developed Producing Reserves by value; *provided*, that, so long as no Event of Default shall have occurred and is continuing, only one such audit shall be permitted to be requested in any fiscal year.

(g)     With the delivery such information specified in the foregoing clauses (a)-(f), the Borrower shall provide to the Administrative Agent a certificate from an Authorized Officer certifying that in all material respects: (A) the information delivered in connection therewith is true and correct (other than forecasted or forward-looking information), (B) the Credit Parties own good and defensible title to the Oil and Gas Properties evaluated in such engineering information and such Properties are free of all Liens except for Permitted Liens, (C) except as set forth on an exhibit to the certificate, on a net basis there are no gas imbalances, take or pay or other prepayments in excess of the volume specified in Section 5.31 with respect to the Oil and Gas Properties evaluated in such Reserve Report which would require any Credit Party to deliver Hydrocarbons either generally or produced from such Oil and Gas Properties constituting Proved Reserves at some future time without then or thereafter receiving full payment therefor, (D) none of the Oil and Gas Properties to be evaluated in such Reserve Report have been disposed of since the date of the last certificate delivered pursuant to this Section 5.26(g), except as set forth on an exhibit to the certificate, which certificate shall list all of its Oil and Gas Properties disposed of and in such detail as required by the Administrative Agent in its reasonable discretion, and (E) in the case of delivery pursuant to clause (a) or (c) above, certifying that 95% of the PV-10 of Credit Parties' Oil and Gas Properties evaluated in the related Reserve Report (or roll-forward thereof) are Mortgaged Properties, other than Oil and Gas Properties disclosed on a schedule attached thereto, together with a certification that such Oil and Gas Properties will become Mortgaged Properties in accordance with Section 5.17.

SECTION 5.27.     Holdings Covenant.  Holdings covenants and agrees that, unless the Required Lenders shall otherwise consent in writing, Holdings will not engage at any time in any business or business activity other than (i) ownership of the Equity Interests in the Borrower, together with activities related thereto, (ii) performance of its obligations under and in connection with the Loan Documents and the SLTL Credit Agreement Documents, (iii) issuing, selling and redeeming its Equity Interests, (iv) paying taxes, (v) holding directors' and shareholders' meetings, preparing corporate and similar records and other activities (including the ability to incur fees, costs and expenses relating to such maintenance) required to maintain its corporate or other legal structure or to participate in tax, accounting or other administrative matters as a member of the consolidated

group of the Credit Parties, (vi) preparing reports to, and preparing and making notices to and filings with, Governmental Authorities and to its holders of Equity Interests, (vii) receiving, and holding proceeds of, Restricted Payments from the Borrower and the Subsidiaries to the extent not prohibited by Section 5.07 or 5.10, (viii) providing indemnification to officers and directors, (ix) activities permitted hereunder or as otherwise required by Requirements of Law, and (x) activities incidental to the business or activities described in each foregoing clause of this Section 5.27.

SECTION 5.28.    Financial Covenants.

(a)    Consolidated Total Net Leverage Ratio.    The Borrower shall not permit the Consolidated Total Net Leverage Ratio, as of the last day of any fiscal quarter commencing with the first full fiscal quarter ending after the Closing Date, to be greater than 2.25:1.00.

(b)    Asset Coverage Ratio.  The Borrower shall not permit the Asset Coverage Ratio, as of the last day of any fiscal quarter commencing with the first full fiscal quarter ending after the Closing Date, to be less than 2.25:1.00.

SECTION 5.29.    Foreign Subsidiaries; Closing Date Unrestricted Subsidiary.

(a)    Other than the Closing Date Unrestricted Subsidiary and any subsidiaries thereof on the Closing Date, the Borrower shall not, and shall not permit any Credit Party, to have any Foreign Subsidiaries.

(b)    If, at any time, the Closing Date Unrestricted Subsidiary shall become a "restricted subsidiary" and/or a "guarantor" under the SLTL Credit Agreement Documents or any other Material Indebtedness of the Credit Parties, such Closing Date Unrestricted Subsidiary shall, concurrent with such event, become a Restricted Subsidiary and, if applicable, a Subsidiary Guarantor under the Loan Documents.

SECTION 5.30.    Account Control Agreements.  The Borrower shall, and shall cause each Credit Party to, (a) provide notice to the Administrative Agent of the opening of any deposit accounts, commodity accounts or securities accounts (other than an Excluded Account) at least five (5) Business Days prior to the opening thereof (or such other date as the Administrative Agent may agree in its sole discretion) and (b) cause their respective deposit accounts, commodity accounts or securities accounts (in each case, other than Excluded Accounts) to at all times be subject to Account Control Agreements; provided that solely in the case of any deposit accounts, commodity accounts or securities accounts in existence on the Closing Date, compliance with this clause (b) shall not be required until the date that is 45 days after the Closing Date (or such later date as the Administrative Agent may agree in its sole discretion).

SECTION 5.31.    Gas Imbalances, Take-or-Pay or Other Prepayments. The Borrower shall not, and shall not permit any Credit Party to, allow gas imbalances, take-or-pay or other prepayments with respect to the Oil and Gas Properties of the Borrower or any other Credit Party that would require the Borrower or Credit Party to deliver Hydrocarbons at some future time without then or thereafter receiving full payment therefor to exceed 2.5 Bcfe of Hydrocarbon volumes (stated on a gas equivalent basis) in the aggregate for any individual field.

SECTION 5.32.    Marketing of Production. The Borrower shall not, and shall not permit any Credit Party to enter into any material agreement (which is not cancelable on 90 days' notice or less without penalty or detriment) for the sale of production of the Credit Parties' Hydrocarbons at a fixed non-index price (including calls on, or other rights to purchase, production, whether or not the same are currently being exercised) that (i) represents in respect of such agreements 2.5% or more of the Borrower's average monthly production of Hydrocarbon volumes and (ii) has a maturity or expiry date of longer than six months.

SECTION 5.33.    Dutch Distributions. The Borrower shall cause the Closing Date Unrestricted Subsidiary to promptly transfer all amounts received by the Closing Date Unrestricted Subsidiary as a dividend

103

or distribution from Fieldwood Mexico B.V. on account of the Equity Interests of Fieldwood Mexico B.V. held by the Closing Date Unrestricted Subsidiary to a deposit account subject to an Account Control Agreement.

SECTION 5.34.    Post-Closing Obligations.    The Credit Parties will execute and deliver the documents and complete the tasks set forth on Schedule 5.34, in each case within the time limits specified on such schedule (or such longer period as the Administrative Agent may agree in its Permitted Business Judgment).

## ARTICLE VI

Events of Default

SECTION 6.01.    Events of Default.

Upon the occurrence and during the continuation of any of the following specified events (each an "Event of Default"),

(a)    the Borrower shall (i) default in the payment when due of any principal of the Loans or (ii) default, and such default shall continue for three or more Business Days, in the payment when due of any interest on the Loans, fees or of any other amounts owing hereunder or under any other Loan Document (other than any amount referred to in clause (i) above);

(b)    any representation, warranty or statement made or deemed made by any Credit Party herein or in any other Loan Document or any certificate delivered or required to be delivered pursuant hereto or thereto shall prove to be untrue in any material respect on the date as of which made or deemed made (or if any representation or warranty is expressly stated to have been made as of a specific date, untrue in any material respect as of such specific date);

(c)    any Credit Party shall (i) default in the due performance or observance by it of any term, covenant or agreement contained in Section 5.01(a), 5.01(b), 5.01(c)(i)(A), 5.01(e), 5.02, 5.04, 5.06, 5.07, 5.08, 5.09, 5.10, 5.11, 5.12, 5.13, 5.15 (with respect to the Borrower), 5.17, 5.20, 5.26, 5.27, 5.28, 5.29, 5.30 or 5.34, (ii) default in the due performance or observance by it of any term, covenant or agreement contained in Section 5.01(c) (other than to the extent referred to in clause (i) of this Section 6.01(c)) and such default shall continue unremedied for a period of at least 5 Business Days, (iii) default in the due performance or observance by it of any term, covenant or agreement contained in Section 5.01 (other than those referred to in clause (i) or (ii) of this Section 6.01(c)) and such default shall continue unremedied for a period of at least 15 days or (iv) default in the due performance or observance by it of any term, covenant or agreement (other than those referred to in Section 6.01(a) or (b) or clauses (i), (ii) and (iii) of this Section 6.01(c)) contained in this Agreement or any Security Document and such default shall continue unremedied for a period of at least 30 days after receipt of written notice thereof by the Borrower from the Administrative Agent;

(d)    (i) the Borrower or any of the Restricted Subsidiaries shall (1) default in any payment with respect to the SLTL Facility or any other Material Indebtedness (other than the Indebtedness described in Section 6.01(a)) beyond the period of grace, if any, provided in the instrument of agreement under which such Indebtedness was created or (2) default in the observance or performance of any agreement or condition relating to the SLTL Facility or such other Material Indebtedness or contained in any instrument or agreement evidencing, securing or relating thereto, or any other event shall occur or condition exist (other than, (x) with respect to Indebtedness in respect of any Hedge Agreements, termination events or equivalent events pursuant to the terms of such Hedge Agreements, (y) secured Indebtedness that becomes due as a result of a disposition (including as a result of Casualty Event) of the property or assets securing such Indebtedness permitted under this Agreement and (z) any Indebtedness outstanding hereunder), the effect of which default or other event or condition is to cause, or permit the holders of any such Indebtedness to cause, any such Indebtedness to become due or to be repurchased, prepaid, defeased or redeemed (automatically or otherwise), or an offer to repurchase, prepay, defease or redeem such Indebtedness to be made, prior to its stated maturity, unless, in the case of each

104

of the foregoing, such holder or holders shall have (or through its or their trustee or agent on its or their behalf) waived such default in a writing to the Borrower, or (ii) without limiting the provisions of clause (i) above, any such default under any such Material Indebtedness shall cause such Material Indebtedness to be declared to be due and payable, or required to be prepaid other than by a regularly scheduled required prepayment or as a mandatory prepayment (and, (1) with respect to Indebtedness consisting of any Hedge Agreements, other than due to a termination event or equivalent event pursuant to the terms of such Hedge Agreements and (2) any Indebtedness outstanding hereunder), prior to the stated maturity thereof;

(e)       the Borrower or any Subsidiary Guarantor shall commence a voluntary case, proceeding or action concerning itself under (1) Title 11 of the United States Code entitled "Bankruptcy" or any other applicable insolvency, debtor relief, or debt adjustment law (collectively, the "Bankruptcy Code"); or an involuntary case, proceeding or action is commenced against the Borrower or any Subsidiary Guarantor and the petition is not dismissed or stayed within 60 days after commencement of the case, proceeding or action, the Borrower or the applicable Subsidiary Guarantor consents to the institution of such case, proceeding or action prior to such 60-day period, or any order of relief or other order approving any such case, proceeding or action is entered; or a custodian (as defined in the Bankruptcy Code), receiver, receiver manager, trustee, conservator, liquidator, examiner, rehabilitator, administrator, or similar person is appointed for, or takes charge of, the Borrower  or any Subsidiary Guarantor or all or any substantial portion of the property or business thereof; or the Borrower or any Subsidiary Guarantor suffers any appointment of any custodian, receiver, receiver manager, trustee, conservator, liquidator, examiner, rehabilitator, administrator, or the like for it or any substantial part of its property or business to continue undischarged or unstayed for a period of 60 days; or the Borrower or any Subsidiary Guarantor makes a general assignment for the benefit of creditors;

(f)       (i) an ERISA Event shall have occurred that, individually or in the aggregate, results in or would reasonably be expected to result in a Material Liability of Holdings, the Borrower, any of their Subsidiaries or any ERISA Affiliate, or (ii) there exists any fact or circumstance that reasonably could be expected to result in the imposition of a Lien or security interest under Section 430(k) of the Code or ERISA or a violation of Section 436 of the Code;

(g)       the Guarantee or any material provision thereof shall cease to be in full force or effect (other than pursuant to the terms hereof and thereof) or any Guarantor or any other Credit Party shall assert in writing that any such Guarantor's obligations under the Guarantee are not to be in effect or are not to be legal, valid and binding obligations (other than pursuant to the terms hereof or thereof);

(h)       the Collateral Agreement, Mortgage or any other Security Document pursuant to which assets of the Borrower and the Credit Parties with an aggregate Fair Market Value in excess of $10,000,000 are pledged as Collateral or any material provision thereof shall cease to be in full force or effect (other than pursuant to the terms hereof or thereof) or any grantor thereunder or any other Credit Party shall assert in writing that any grantor's obligations under the Collateral Agreement, the Mortgage or any other Security Document are not in effect or not legal, valid and binding obligations (other than pursuant to the terms hereof or thereof);

(i)       one or more monetary judgments or decrees shall be entered against the Borrower or any of the Restricted Subsidiaries involving a liability of $10,000,000 or more in the aggregate for all such judgments and decrees for the Borrower and the Restricted Subsidiaries (to the extent not paid or covered by insurance provided by a carrier not disputing coverage), which judgments are not discharged or effectively waived or stayed for a period of 60 consecutive days; or

(j)       a Change of Control shall have occurred,

then, and in any such event, and at any time thereafter, if any Event of Default shall then be continuing, the Administrative Agent shall upon the written request of the Required Lenders (subject to Article VII), by written notice to the Borrower, take any or all of the following actions, without prejudice to the rights of the

105

Administrative Agent or any Lender to enforce its claims against the Borrower or any other Credit Party, except as otherwise specifically provided for in this Agreement (*provided* that, if an Event of Default specified in Section 6.01(e) shall occur with respect to the Borrower, the result that would occur upon the giving of written notice by the Administrative Agent as specified below shall occur automatically without the giving of any such notice): (i) declare the principal of and any accrued interest and fees in respect of any or all Loans and any or all Obligations owing hereunder and thereunder to be, whereupon the same shall become, forthwith due and payable without presentment, demand, protest or other notice of any kind, all of which are hereby waived by the Borrower or (ii) exercise rights and remedies in respect of the Collateral in accordance with the Collateral Agreement and/or comparable provisions of any other Security Document. In addition, after the occurrence and during the continuance of an Event of Default, the Administrative Agent and the Lenders will have all other rights and remedies available at law and equity.

The foregoing shall constitute Events of Default whatever the reason for any such Event of Default and whether it is voluntary or involuntary or is effected by operation of law or pursuant to any judgment, decree or order of any court or any order, rule or regulation of any administrative or governmental body.

SECTION 6.02.    Application of Proceeds.  Any amount received by the Administrative Agent or the Collateral Agent from any Credit Party (or from proceeds of any Collateral) following any acceleration of the Obligations under this Agreement or any Event of Default with respect to the Borrower under Section 6.01(e) shall, subject to the terms of the Intercreditor Agreement, be applied:

First, to payment of that portion of the Loan Obligations constituting fees, indemnities, expenses and other amounts (including fees, disbursements and other charges of counsel payable under Section 7.07 and amounts payable under Article II) payable to the Administrative Agent and/or Collateral Agent in such Person's capacity as such;

Second, to payment of that portion of the Loan Obligations constituting fees, indemnities and other amounts (other than principal and interest) payable to the Lenders (including fees, disbursements and other charges of counsel payable under Section 7.07) arising under the Loan Documents and amounts payable under Article II, ratably among them in proportion to the respective amounts described in this clause Second payable to them;

Third, to payment of that portion of the Loan Obligations constituting accrued and unpaid interest on the Loans, ratably among the Lenders in proportion to the respective amounts described in this clause held by them;

Fourth, ratably to payment of that portion of the Obligations constituting unpaid principal of the Loans and Obligations then owing under Secured Hedge Agreements and the Secured Cash Management Agreements and;

Fifth, to the payment of all other Loan Obligations of the Credit Parties owing under or in respect of the Loan Documents that are due and payable to the Administrative Agent and the other Secured Parties on such date, ratably based upon the respective aggregate amounts of all such Loan Obligations owing to the Administrative Agent and the other Secured Parties on such date; and

Last, the balance, if any, after all of the Loan Obligations have been paid in full, to the Borrower or as otherwise required by Requirements of Law.

SECTION 6.03.    Control by Majority.  The Required Lenders may direct the time, method and place of conducting any proceeding for any remedy available to the Administrative Agent or of exercising any trust or power conferred on the Administrative Agent.  However, the Administrative Agent may refuse to follow any direction that conflicts with law or this Agreement or, subject to Article VII, that the Administrative Agent determines is unduly prejudicial to the rights of any other Lender or that would involve the Administrative Agent

106

in personal liability or expenses for which it is not adequately indemnified in the Administrative Agent's sole discretion; *provided, however*, that the Administrative Agent may take any other action deemed proper by the Administrative Agent that is not inconsistent with such direction.

SECTION 6.04.     Limitation on Suits.  In no event shall the Required Lenders, without the prior written consent of each Lender, direct the Administrative Agent to accelerate and demand payment of the Loans held by one Lender without accelerating and demanding payment of all other Loans.  Each Lender agrees that, except as otherwise provided in any of the Loan Documents and without the prior written consent of the Required Lenders, it will not take any legal action or institute any action or proceeding against any Credit Party with respect to any of the Loan Obligations or Collateral, or accelerate or otherwise enforce its portion of the Loan Obligations.  Without limiting the generality of the foregoing, none of Lenders may exercise any right that it might otherwise have under applicable law to credit bid at foreclosure sales, uniform commercial code sales or other similar sales or dispositions of any of the Collateral except as authorized by the Required Lenders.  Notwithstanding anything to the contrary set forth in this Section 6.04 or elsewhere herein, each Lender shall be authorized to take such action to preserve or enforce its rights against any Credit Party where a deadline or limitation period is otherwise applicable and would, absent the taking of specified action, bar the enforcement of Loan Obligations held by such Lender against such Credit Party, including the filing of proofs of claim in any insolvency proceeding.

SECTION 6.05.     Cure Rights.

(a)     Notwithstanding anything to the contrary contained in Section 2.13(c) or Sections 6.01 and 6.02, in the event that the Borrower fails to comply with the covenants contained in Section 5.28 as of the end of any applicable fiscal quarter, at the Borrower's option, during the period commencing on the first day after the end of the applicable fiscal quarter until the expiration of the 10th day subsequent to the date the Officers' Certificate for such fiscal quarter is required to be delivered pursuant to Section 5.01(e) or with respect to the fourth fiscal quarter of any fiscal year and the financial covenant set forth in Section 5.28(b), the date on which the certificate pursuant to such fiscal quarter is required to be delivered pursuant to Section 5.26(a) (such period, the "Cure Period"), Holdings shall have the right to cure such failure (the "Cure Right"):

(i)     with respect to the financial covenant contained in Section 5.28(a), by issuing Permitted Cure Securities for cash (the amount thereof, the "Leverage Cure Amount"), so long as such cash is immediately contributed to the capital of the Borrower as common equity; and

(ii)     with respect to the financial covenant contained in Section 5.28(b), (A) by issuing Permitted Cure Securities for cash (the amount thereof, the "ACR Equity Cure Amount" and, together with any Leverage Cure Amount, the "Equity Cure Amount"), so long as such cash is immediately contributed to the capital of the Borrower as common equity or (B) so long as the aggregate Unrestricted Cash of the Borrower and the Subsidiary Guarantors exceeds, on a pro forma basis after giving effect to any prepayment pursuant to Section 2.13(c), $100,000,000, by using internally generated cash (the amount thereof, the "ACR Cash Cure Amount" and, together with the ACR Equity Cure Amount, the "ACR Cure Amount").

*provided* that (i) no more than three Cure Rights using the Equity Cure Amount ("Equity Cures") may be exercised after the Closing Date and (ii) no more than two Equity Cures may be exercised during any consecutive four fiscal quarters.

(b)     (i)     Upon the receipt by the Borrower of the cash proceeds of any capital contribution referred to in Section 6.05(a)(i) such proceeds shall be applied in accordance with Section 2.13(e) to the outstanding principal amount of the Loans (and not, for the avoidance of doubt, as an increase to EBITDAX) as of the end of the fiscal quarter as to which such Cure Right is being exercised (the "Cure Right Fiscal Quarter") and such outstanding principal amount shall be deemed to have been reduced by the Leverage

107

Cure Amount in determining the financial covenant contained in <u>Section 5.28(a)</u> for such Cure Right Fiscal Quarter.

(ii)     Upon (A) the receipt by the Borrower of the cash proceeds of any capital contribution referred to in <u>Section 6.05(a)(ii)(A)</u> or (B) subject to compliance with the terms of <u>Section 6.05(a)(ii)(B)</u>, the election of the Borrower to utilize internally generated cash, such amounts shall be applied in accordance with <u>Section 2.13(e)</u> to the outstanding principal amount of the Loans as of the end of such Cure Right Fiscal Quarter and such outstanding principal amount shall be deemed to have been reduced by the ACR Cure Amount in determining the financial covenant contained in <u>Section 5.28(a)</u> for such Cure Right Fiscal Quarter.

(c)     If after giving effect to the recalculations set forth in <u>Section 6.05(b)</u>, the Borrower shall then be in compliance with all covenants contained in <u>Section 5.28</u>, the Borrower shall be deemed to have satisfied the requirements of such covenants as of the relevant date of determination with the same effect as though there had been no failure to comply therewith at such date, and the applicable Event of Default with respect to any such covenant that had occurred shall be deemed cured for all purposes of this Agreement and the other Loan Documents.

(d)     Upon the Administrative Agent's receipt of a written notice from the Borrower that the Borrower intends to exercise the Cure Right (a "<u>Notice of Intent to Cure</u>"), until the expiration of the applicable Cure Period, neither the Administrative Agent (nor any sub-agent therefor) nor any Lender shall exercise any right to accelerate the Loans, and none of the Administrative Agent (nor any sub-agent therefor) nor any Lender or Secured Party shall exercise any right to foreclose on or take possession of the Collateral or any other right or remedy under the Loan Documents solely on the basis of the relevant failure to comply with any financial covenant.

## ARTICLE VII

### The Agents

SECTION 7.01.     <u>Appointment</u>.

(a)     Effective on the Closing Date, and without the need to provide any notices, CFS has resigned as Collateral Agent under the Prepetition FLFO Credit Agreement. On and after the Closing Date, (i) any reference to CFS as the Collateral Agent on any publicly filed document, to the extent such filing relates to the Liens and security interests in the Collateral, shall, until such filing is modified to reflect the interests of the Collateral Agent with respect to such Liens and security interests, constitute a reference to CFS as sub-agent of the Collateral Agent, as applicable; and (ii) any reference to CFS as Collateral Agent in any pledge agreement, security agreement, mortgage, intellectual property security agreement or other Security Document shall, until the Collateral Agent is substituted thereunder (whether by operation of law or by subsequent amendment, assignment, filing or other instrument), constitute a reference to CFS as sub-agent of the Collateral Agent and, in each case of <u>clauses (i)</u> and <u>(ii)</u>, the parties hereto agree that CFS's role as such sub-agent shall impose no duties, obligations, or liabilities on CFS, including, without limitation, any duty to take any type of direction regarding any enforcement action to be taken against such Collateral, whether such direction comes from the Administrative Agent or the Collateral Agent, the Required Lenders, or otherwise, and CFS shall have the full benefit of the protective provisions of (A) the Prepetition FLFO Credit Agreement including, without limitation, Article VIII and Section 9.05 of the Prepetition FLFO Credit Agreement while serving in such capacity and (B) of this Agreement while serving in such capacity including <u>Article VII</u>; *provided*, that CFS shall reasonably cooperate with the Borrower, the Administrative Agent and the Collateral Agent (at the Borrower's sole cost and expense) to take such actions from time to time, including after the Closing Date, as are reasonably requested by the Borrower, the Administrative Agent and/or the Collateral Agent to assign or transfer such security interest to the Collateral Agent. CFS makes no representation or warranty regarding the validity, enforceability, or effectiveness of any Loan Document or any "Loan Document" under the Prepetition FLFO Credit Agreement,

108

the validity or sufficiency of any document to be entered into pursuant to this <u>Section 7.01(a)</u>, or the existence, priority or perfection of the Liens to be assigned or deemed assigned by CFS pursuant to this <u>Section 7.01(a)</u>. Any documents delivered by CFS pursuant to this <u>Section 7.01(a)</u> shall be without recourse, representation or warranty by CFS, and the Borrower agrees to reimburse CFS for all out-of-pocket fees and expenses (including attorneys' fees) in connection therewith in accordance with Section 9.05(a) of the Prepetition FLFO Credit Agreement.  Each of the Administrative Agent, the Collateral Agent, the Lenders, Holdings and the Borrower hereby agree that any and all releases provided for under Section 10.7(a) of the Plan of Reorganization and Section [●] of the Confirmation Order shall include release of CFS with respect to this <u>Section 7.01(a)</u> in favor of CFS, its equityholders, affiliates, agents, attorneys, employees, directors, and officers and the successors, assigns, heirs and representatives of each of the foregoing.

(b)     Each Lender hereby irrevocably designates and appoints the Administrative Agent as the agent of such Lender under this Agreement and the other Loan Documents and irrevocably authorizes the Administrative Agent, in such capacity, to take such action on its behalf under the provisions of this Agreement and the other Loan Documents and to exercise such powers and perform such duties as are expressly delegated to the Administrative Agent by the terms of this Agreement and the other Loan Documents, together with such other powers as are reasonably incidental thereto.  Notwithstanding any provision to the contrary elsewhere in this Agreement, the Administrative Agent shall not have any duties or responsibilities, except those expressly set forth herein and in the other Loan Documents, or any fiduciary relationship with any Lender or any Credit Party, and no implied covenants, functions, responsibilities, duties, obligations or liabilities shall be read into this Agreement or any other Loan Document or otherwise exist against the Administrative Agent.

(c)     The Administrative Agent and each Lender hereby irrevocably designate and appoint the Collateral Agent as the agent with respect to the Collateral, and each of the Administrative Agent and each Lender irrevocably authorizes the Collateral Agent, in such capacity, to take such action on its behalf under the provisions of this Agreement and the other Loan Documents and to execute and deliver the Security Documents (including the amendments thereto in connection with this Agreement) and to exercise such powers and perform such duties as are expressly delegated to the Collateral Agent by the terms of this Agreement and the other Loan Documents, together with such other powers as are reasonably incidental thereto.  Notwithstanding any provision to the contrary elsewhere in this Agreement, the Collateral Agent shall not have any duties or responsibilities except those expressly set forth herein and in the other Loan Documents, or any fiduciary relationship with any of the Administrative Agent, the Lenders or the Credit Parties, and no implied covenants, functions, responsibilities, duties, obligations or liabilities shall be read into this Agreement or any other Loan Document or otherwise exist against the Collateral Agent.

(d)     The provisions of this <u>Article VII</u> are solely for the benefit of the Agents and the Lenders, and no Credit Party shall have rights as a third-party beneficiary of any such provisions (other than as set forth in <u>Section 7.09</u>, <u>7.11</u> and <u>7.14</u>).  Without limiting the generality of the foregoing, the Agents are expressly authorized to execute each of the Loan Documents and any and all documents (including releases) with respect to the Collateral and any rights of the Secured Parties with respect thereto as contemplated by and in accordance with the provisions of this Agreement and the other Loan Documents, in each case, binding the Lenders to the terms thereof.

SECTION 7.02.    <u>Delegation of Duties</u>.  The Administrative Agent and the Collateral Agent may each execute any of its duties under this Agreement and the other Loan Documents by or through agents, sub-agents, employees or attorneys-in-fact (each, a "<u>Subagent</u>") and shall be entitled to advice of counsel concerning all matters pertaining to such duties; *provided*, *however*, that no such Subagent shall be authorized to take any action with respect to any Collateral unless and except to the extent expressly authorized in writing by the Administrative Agent.  If any Subagent, or successor thereto, shall die, become incapable of acting, resign or be removed, all rights, powers, privileges and duties of such Subagent, to the extent permitted by law, shall automatically vest in and be exercised by the Administrative Agent until the appointment of a new Subagent. Neither the Administrative Agent nor the Collateral Agent shall be responsible for the negligence or misconduct of any Subagents selected by it in the absence of gross negligence or willful misconduct.  The exculpatory,

<div align="center">109</div>

indemnification and other provisions of this <u>Article VII</u> shall apply to any such Subagent and to the Affiliates of the Agents and any such Subagent.

SECTION 7.03.    <u>Exculpatory Provisions</u>.  No Agent nor any of its officers, directors, employees, agents, attorneys-in-fact or Affiliates shall be (a) liable for any action lawfully taken or omitted to be taken by any of them under or in connection with this Agreement or any other Loan Document, including in such Agent's Permitted Business Judgment (except for its or such Person's own gross negligence or willful misconduct, as determined in the final judgment of a court of competent jurisdiction, in connection with its duties expressly set forth herein), (b) responsible in any manner to any of the Lenders or any participant for any recitals, statements, representations or warranties made by any of the Borrower, any other Credit Party or any officer thereof contained in this Agreement or any other Loan Document or in any certificate, report, statement or other document referred to or provided for in, or received by such Agent under or in connection with, this Agreement or any other Loan Document or for the value, validity, effectiveness, genuineness, enforceability or sufficiency of this Agreement or any other Loan Document, or for any failure of the Borrower or any other Credit Party to perform its obligations hereunder or thereunder or (c) subject to any fiduciary or other implied duties, regardless of whether a Default or an Event of Default has occurred and is continuing.  No Agent shall be under any obligation to any Lender to ascertain or to inquire as to the observance or performance of any of the agreements contained in, or conditions of, this Agreement or any other Loan Document, or to inspect the properties, books or records of any Credit Party or any Affiliate thereof.  The Collateral Agent shall not be under any obligation to the Administrative Agent or any Lender to ascertain or to inquire as to the observance or performance of any of the agreements contained in, or conditions of, this Agreement or any other Loan Document, or to inspect the properties, books or records of any Credit Party.

SECTION 7.04.    <u>Reliance by Agents</u>.  The Administrative Agent and the Collateral Agent shall be entitled to rely, and shall be fully protected in relying, upon any writing, resolution, notice, consent, certificate, affidavit, letter, telecopy, telex or teletype message, statement, order or other document or instruction believed by it to be genuine and correct and to have been signed, sent or made by the proper Person or Persons and upon advice and statements of legal counsel (including counsel to the Borrower), independent accountants and other experts selected by the Administrative Agent or the Collateral Agent.  The Administrative Agent and the Collateral Agent may deem and treat the Lender specified in the Register with respect to any amount owing hereunder as the owner thereof for all purposes unless a written notice of assignment, negotiation or transfer thereof shall have been filed with the Administrative Agent.  The Administrative Agent and the Collateral Agent shall be fully justified in failing or refusing to take any action under this Agreement or any other Loan Document unless it shall first receive such advice or concurrence of the Required Lenders as it deems appropriate or it shall first be indemnified to its satisfaction by the Lenders against any and all losses, liability and expense that may be incurred by it by reason of taking or continuing to take any such action.  The Administrative Agent and the Collateral Agent shall in all cases be fully protected in acting, or in refraining from acting, under this Agreement and the other Loan Documents in accordance with a request of the Required Lenders, including in the Administrative Agent's sole discretion, instructions from legal counsel to the Required Lenders (which, as of the date hereof, is Vinson & Elkins LLP), and such request and any action taken or failure to act pursuant thereto shall be binding upon all the Lenders and all future holders of the Loans; *provided* that the Administrative Agent and Collateral Agent shall not be required to take any action that, in its opinion or in the opinion of its counsel, may expose it to liability or that is contrary to any Loan Document or applicable Requirements of Law.  The Agents shall be entitled to rely upon, and shall not incur any liability for relying upon, any notice, request, certificate, consent, statement, instrument, document or other writing (including any electronic message, Internet or intranet website posting or other distribution) believed by it to be genuine and to have been signed, sent, or otherwise authenticated by a proper person.  The Agents may also rely upon any statement made to it orally and believed by it to have been made by a proper person, and shall not incur any liability for relying thereon.  In determining compliance with any condition hereunder to the making of a Loan that by its terms must be fulfilled to the satisfaction of a Lender, the Administrative Agent may presume that such condition is satisfactory to such Lender unless the Administrative Agent shall have received written notice to the contrary from such Lender prior to the making of such Loan.  The Agents may consult with legal counsel (who may be counsel for the Required

110

Lenders), independent accountants and other advisors selected by it, and shall not be liable for any action taken or not taken by it in accordance with the advice of any such counsel, accountants or advisors.

SECTION 7.05.    Notice of Default.  Neither the Administrative Agent nor the Collateral Agent shall be deemed to have knowledge or notice of the occurrence of any Default or Event of Default hereunder unless the Administrative Agent or Collateral Agent, as applicable, has received written notice from a Lender or the Borrower referring to this Agreement, describing such Default or Event of Default and stating that such notice is a "notice of default".  In the event that the Administrative Agent receives such a notice, it shall give notice thereof to the Lenders and the Collateral Agent.  The Administrative Agent shall take such action with respect to such Default or Event of Default as shall be reasonably directed by the Required Lenders; *provided* that unless and until the Administrative Agent shall have received such directions, the Administrative Agent may (but shall not be obligated to) take such action, or refrain from taking such action, with respect to such Default or Event of Default as it shall deem advisable in the best interests of the Lenders except to the extent that this Agreement requires that such action be taken only with the approval of the Required Lenders or each individual Lender, as applicable.

SECTION 7.06.    Non-Reliance on Administrative Agent, Collateral Agent and Other Lenders.  Each Lender expressly acknowledges that neither the Administrative Agent nor the Collateral Agent nor any of their respective officers, directors, employees, agents, attorneys-in-fact or Affiliates has made any representations or warranties to it and that no act by the Administrative Agent or Collateral Agent hereafter taken, including any review of the affairs of the Borrower or any other Credit Party, shall be deemed to constitute any representation or warranty by the Administrative Agent or Collateral Agent to any Lender.  Each Lender represents to the Administrative Agent and the Collateral Agent that it has, independently and without reliance upon the Administrative Agent, Collateral Agent or any other Lender, and based on such documents and information as it has deemed appropriate, made its own appraisal of and investigation into the business, operations, property, financial and other condition and creditworthiness of the Borrower and each other Credit Party and made its own decision to make its Loans hereunder and enter into this Agreement.  Each Lender also represents that it will, independently and without reliance upon the Administrative Agent, Collateral Agent or any other Lender, and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit analysis, appraisals and decisions in taking or not taking action under this Agreement and the other Loan Documents, and to make such investigation as it deems necessary to inform itself as to the business, operations, property, financial and other condition and creditworthiness of the Borrower and any other Credit Party.  Except for notices, reports and other documents expressly required to be furnished to the Lenders by the Administrative Agent hereunder, neither the Administrative Agent nor the Collateral Agent shall have any duty or responsibility to provide any Lender with any credit or other information concerning the business, assets, operations, properties, financial condition, prospects or creditworthiness of the Borrower or any other Credit Party that may come into the possession of the Administrative Agent or Collateral Agent or any of their respective officers, directors, employees, agents, attorneys-in-fact or Affiliates. The Agents shall not be responsible for or have any duty to ascertain or inquire into (i) any statement, warranty or representation made in or in connection with any Loan Document, (ii) the contents of any certificate, report or other document delivered hereunder or thereunder or in connection herewith or therewith, (iii) the performance or observance of any of the covenants, agreements or other terms or conditions set forth in any Loan Document or the occurrence of any Default or Event of Default, (iv) the validity, enforceability, effectiveness or genuineness of any Loan Document or any other agreement, instrument or document or (v) the satisfaction of any condition set forth in Article IV or elsewhere in any Loan Document.  Whenever in the administration of this Agreement, or pursuant to any of the Loan Documents, the Administrative Agent shall deem it necessary or desirable (in each case, in its sole discretion) that a matter be proved or established with respect to Borrower or the Guarantors in connection with the taking, suffering or omitting of any action hereunder by the, such matter (unless other evidence in respect thereof be herein specifically prescribed) may be deemed to be conclusively provided or established by an Officers' Certificate and such certificate shall be full warranty to such Administrative Agent for any action taken, suffered or omitted in reliance thereon.  In no event shall the Administrative Agent be responsible or liable for any failure or delay in the performance of its obligations hereunder arising out of or caused by, directly or indirectly, forces beyond its control, including, without limitation, strikes, work stoppages,

<div align="center">111</div>

accidents, acts of war or terrorism, civil or military disturbances, nuclear or natural catastrophes or acts of God, future changes in applicable law or regulation, and interruptions, loss or malfunctions of utilities, communications or computer (software and hardware) services; it being understood that the Administrative Agent shall use reasonable efforts consistent with accepted practices in the banking industry to resume performance as soon as practicable under the circumstances.

SECTION 7.07.    Indemnification.  The Lenders agree to indemnify the Administrative Agent and the Collateral Agent, each in its capacity as such (to the extent not reimbursed by the Credit Parties and without limiting the obligation of the Credit Parties to do so), ratably according to their respective portions of the Loans, as applicable, outstanding in effect on the date on which indemnification is sought (or, if indemnification is sought after the date upon which the Loans shall have been paid in full, ratably in accordance with their respective portions of the Loans in effect immediately prior to such date), from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind whatsoever that may at any time (including at any time following the payment of the Loans) occur, be imposed on, incurred by or asserted against the Administrative Agent or the Collateral Agent in any way relating to or arising out of this Agreement, any of the other Loan Documents or any documents contemplated by or referred to herein or therein or the transactions contemplated hereby or thereby or any action taken or omitted by the Administrative Agent or the Collateral Agent under or in connection with any of the foregoing, IN ALL CASES, WHETHER OR NOT CAUSED BY OR ARISING, IN WHOLE OR IN PART, OUT OF THE COMPARATIVE, CONTRIBUTORY, OR SOLE NEGLIGENCE OF SUCH AGENT; *provided* that no Lender shall be liable to the Administrative Agent or the Collateral Agent for the payment of any portion of such liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements resulting from such Agent's, as applicable, gross negligence or willful misconduct as determined by a final judgment of a court of competent jurisdiction; *provided*, *further*, that no action taken in accordance with the directions of the Required Lenders (or such other number or percentage of the Lenders as shall be required by the Loan Documents) shall be deemed to constitute gross negligence or willful misconduct for purposes of this Section 7.07.  In the case of any investigation, litigation or proceeding giving rise to any liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind whatsoever that may at any time occur (including at any time following the payment of the Loans), this Section 7.07 applies whether any such investigation, litigation or proceeding is brought by any Lender or any other Person.  Without limitation of the foregoing, each Lender shall reimburse the Administrative Agent and the Collateral Agent upon demand for its ratable share of any fees, costs or out-of-pocket expenses (including attorneys' fees) incurred by such Agent in connection with the preparation, execution, delivery, administration, modification, amendment or enforcement (whether through negotiations, legal proceedings or otherwise) of, or legal advice rendered in respect of rights or responsibilities under, this Agreement, any other Loan Document, or any document contemplated by or referred to herein, to the extent that such Agent is not reimbursed for such expenses by or on behalf of the Borrower; *provided* that such reimbursement by the Lenders shall not affect the Borrower's continuing reimbursement obligations with respect thereto.  If any indemnity furnished to any Agent for any purpose shall, in the opinion of such Agent, be insufficient or become impaired, such Agent may call for additional indemnity and cease, or not commence, to do the acts indemnified against until such additional indemnity is furnished; *provided*, in no event shall this sentence require any Lender to indemnify any Agent against any liability, obligation, loss, damage, penalty, action, judgment, suit, cost, expense or disbursement in excess of such Lender's pro rata portion thereof; and *provided further*, this sentence shall not be deemed to require any Lender to indemnify any Agent against any liability, obligation, loss, damage, penalty, action, judgment, suit, cost, expense or disbursement resulting from such Agent's gross negligence or willful misconduct, as determined in the final judgment of a court of competent jurisdiction.  The agreements in this Section 7.07 shall survive the payment of the Loans and all other amounts payable hereunder, or the earlier resignation or removal of the Agents.

SECTION 7.08.    Agents in Their Individual Capacity.  Each Agent and its Affiliates may make loans to, accept deposits from and generally engage in any kind of business with the Borrower and any other Credit Party as though such Agent were not an Agent hereunder and under the other Loan Documents.  With respect to the Loans made by it, each Agent shall have the same rights and powers under this Agreement and the

<div align="center">112</div>

other Loan Documents as any Lender and may exercise the same as though it were not an Agent, and the terms "Lender" and "Lenders" shall include each Agent in its individual capacity.

SECTION 7.09.    Successor Agents.  Each of the Administrative Agent and Collateral Agent may at any time give notice of its resignation to the Lenders and the Borrower, and the Borrower or the Required Lenders may at any time that the Administrative Agent or the Collateral Agent becomes a Defaulting Agent deliver notice of removal to the Administrative Agent or Collateral Agent, as applicable.  Upon receipt of any such notice of resignation or removal, the Required Lenders shall have the right, subject to the consent of the Borrower (not to be unreasonably withheld or delayed) so long as no Event of Default is continuing, to appoint a successor, which shall be a bank with an office in the United States, or an Affiliate of any such bank with an office in the United States or another institution providing third party loan agency services.  If, in the case of a resignation of a retiring Agent, no such successor shall have been so appointed by the Required Lenders and shall have accepted such appointment within 30 days after the retiring Agent gives notice of its resignation, then the retiring Agent may on behalf of the Lenders, appoint a successor Agent meeting the qualifications set forth above; *provided* that if the retiring Agent shall notify the Borrower and the Lenders that no qualifying Person has accepted such appointment, then such resignation shall nonetheless become effective in accordance with such notice and (1) the retiring Agent shall be discharged from its duties and obligations hereunder and under the other Loan Documents (except in the case of the Collateral Agent holding collateral security on behalf of any Secured Parties, the retiring Collateral Agent shall continue to hold such collateral security as nominee until such time as a successor Collateral Agent is appointed) and (2) all payments, communications and determinations provided to be made by, to or through such Agent shall instead be made by or to each Lender directly, until such time as the Required Lenders appoint a successor Agent as provided for above in this Section 7.09.  Upon the acceptance of a successor's appointment as the Administrative Agent or Collateral Agent, as the case may be, hereunder, and upon the execution and filing or recording of such financing statements, or amendments thereto, and such other instruments or notices, as may be necessary or desirable, or as the Required Lenders may request, in order to continue the perfection of the Liens granted or purported to be granted by the Security Documents, such successor shall succeed to and become vested with all of the rights, powers, privileges and duties of the retiring (or retired) Agent, and the retiring Agent shall be discharged from all of its duties and obligations hereunder or under the other Loan Documents (if not already discharged therefrom as provided above in this Section).  The fees payable by the Borrower (following the effectiveness of such appointment) to such Agent shall be the same as those payable to its predecessor unless otherwise agreed between the Borrower and such successor.  After the retiring Agent's resignation hereunder and under the other Loan Documents, the provisions of this Article VII (including Section 7.07) and Section 8.05 shall continue in effect for the benefit of such retiring Agent, its Subagents and their respective Related Parties in respect of any actions taken or omitted to be taken by any of them while the retiring Agent was acting as an Agent.

SECTION 7.10.    Payments Set Aside.  To the extent that any payment by or on behalf of the Borrower is made to the Administrative Agent, the Collateral Agent or any Lender, or the Administrative Agent, the Collateral Agent or any Lender exercises its right of setoff, and such payment or the proceeds of such setoff or any part thereof is subsequently invalidated, declared to be fraudulent or preferential, set aside or required (including pursuant to any settlement entered into by the Administrative Agent, the Collateral Agent or such Lender in its discretion) to be repaid to a trustee, receiver or any other party, in connection with any proceeding under the Bankruptcy Code or otherwise, then (a) to the extent of such recovery, the obligation or part thereof originally intended to be satisfied shall be revived and continued in full force and effect as if such payment had not been made or such setoff had not occurred and (b) each Lender severally agrees to pay to the Administrative Agent or the Collateral Agent, as applicable, upon demand its applicable share (without duplication) of any amount so recovered from or repaid by the Administrative Agent or the Collateral Agent, as applicable, plus interest thereon from the date of such demand to the date such payment is made at a rate per annum equal to the applicable Federal Funds Rate from time to time in effect, in the applicable currency of such recovery or payment.  The obligations of the Lenders under clause (b) of the preceding sentence shall survive the payment in full of the Loan Obligations and the termination of this Agreement, or the earlier resignation or removal of the Agent.

113

WEIL:\97847440\31\45327.0007

SECTION 7.11.    <u>Bankruptcy Plan Voting</u>.  In case of the pendency of any proceeding under the Bankruptcy Code or other judicial proceeding relative to any Credit Party, each Lender shall submit any vote on a plan of reorganization or similar disposition plan of restructuring or liquidation (a "<u>Reorganization Plan</u>") to the Administrative Agent so that it is received by the Administrative Agent no later than three (3) Business Days prior to voting deadline established pursuant to the terms of such Reorganization Plan or any court order establishing voting procedures with respect to the Reorganization Plan (the "<u>Voting Procedures Order</u>").  If Lenders constituting more than half of the total number of Lenders and having or holding more than two-thirds of the aggregate outstanding Loans of all Lenders at such time timely vote to accept the Reorganization Plan, the Administrative Agent shall submit a ballot on behalf of all Lenders voting to accept the Reorganization Plan in accordance with the terms of the Reorganization Plan or the Voting Procedures Order.  If Lenders constituting more than half of the total number of Lenders and having or holding more than two-thirds of the aggregate outstanding Loans at such time of all Lenders do not timely vote to accept the Reorganization Plan, the Administrative Agent shall submit a ballot on behalf of all Lenders voting to reject the Reorganization Plan in accordance with the terms of the Reorganization Plan or the Voting Procedures Order.  For purposes of calculating the total number of Lenders and the number of Lenders voting to accept the Reorganization Plan, Lenders that are Affiliates shall be deemed to be a single Lender holding a single claim with respect to each class of creditors in which such Lenders and Affiliates are included.  No Lender may submit a ballot with respect to a Reorganization Plan in contravention of the procedures set forth in this <u>Section 7.11</u>, and the Administrative Agent is irrevocably authorized by each Lender to withdraw any vote submitted by such Lender in contravention of the procedures set forth in this <u>Section 7.11</u>.

SECTION 7.12.    <u>Administrative Agent May File Proofs of Claim</u>.  In case of the pendency of any proceeding under the Bankruptcy Code or any other judicial proceeding relative to any Credit Party, the Administrative Agent (irrespective of whether the principal of any Loan shall then be due and payable as herein expressed or by declaration or otherwise and irrespective of whether the Administrative Agent shall have made any demand on the Borrower) shall be entitled and empowered, by intervention in such proceeding or otherwise, (i) to file and prove a claim for the whole amount of the principal and interest owing and unpaid in respect of the Loans and all other Loan Obligations that are owing and unpaid and to file such other documents as may be necessary or advisable in order to have the claims of the Lenders and the Administrative Agent (including any claim for the reasonable compensation, expenses, disbursements and advances of the Lenders and the Administrative Agent and their respective agents and counsel and all other amounts due the Lenders and the Administrative Agent under <u>Section 8.05</u>) allowed in such judicial proceeding and (ii) to collect and receive any monies or other property payable or deliverable on any such claims and to distribute the same; and any custodian, receiver, assignee, trustee, liquidator, sequestrator or other similar official in any such judicial proceeding is hereby authorized by each Lender to make such payments to the Administrative Agent and, if the Administrative Agent shall consent to the making of such payments directly to the Lenders, to pay to the Administrative Agent any amount due for the reasonable compensation, expenses, disbursements and advances of the Administrative Agent and its agents and counsel, and any other amounts due the Administrative Agent under <u>Section 8.05</u>.  Nothing contained herein shall be deemed to authorize the Administrative Agent to authorize or consent to or accept or adopt on behalf of any Lender any plan of reorganization, arrangement, adjustment or composition affecting the Loan Obligations or the rights of any Lender to authorize the Administrative Agent to vote in respect of the claim of any Lender or in any such proceeding.

SECTION 7.13.    <u>Collateral Matters</u>.  (a) The Lenders irrevocably authorize the Collateral Agent, at its option and in its discretion or in accordance with the instructions and Officers' Certificates delivered to the Collateral Agent in connection therewith, to release any Lien on any property granted to or held by the Collateral Agent under any Loan Document (i) upon payment in full of all Loan Obligations (other than contingent indemnification obligations and expense reimbursement claims to the extent no claim therefor has been made), (ii) if approved, authorized or ratified in writing in accordance with <u>Section 8.01</u>, (iii) pursuant to the Intercreditor Agreement or the Security Documents or (iv) pursuant to <u>Section 8.19</u>.  Upon request by the Collateral Agent at any time, the Required Lenders will confirm in writing the Collateral Agent's authority to release its interest in particular types or items of property in accordance with this Section; *provided* that the

114

Collateral Agent shall rely conclusively on Officers' Certificates and instruction delivered by the Borrower or the other Credit Parties in connection herewith.

(b)    Each Secured Party hereby further authorizes the Administrative Agent or Collateral Agent, as applicable, on behalf of and for the benefit of Secured Parties, to be the agent for and representative of the Secured Parties with respect to the Security Documents.  Subject to Section 8.01, without further written consent or authorization from any Secured Party, the Administrative Agent or Collateral Agent, as applicable, may (a) execute any documents or instruments necessary in connection with a disposition of assets permitted by this Agreement, (b) release any Lien encumbering any item of Collateral that is the subject of such disposition of assets permitted hereunder or with respect to which Required Lenders (or such other Lenders as may be required to give such consent under Section 8.01) have otherwise consented or (c) release any Guarantor from the Guarantee with respect to which Required Lenders (or such other Lenders as may be required to give such consent under Section 8.01) have otherwise consented.

(c)    The Agents shall not be responsible for or have a duty to ascertain or inquire into any representation or warranty regarding the existence, value or collectability of the Collateral, the existence, priority or perfection of the Collateral Agent's Lien thereon, or any certificate prepared by any Credit Party in connection therewith, nor shall an Agent be responsible or liable to the Lenders for any failure to monitor or maintain any portion of the Collateral, including the filing of any UCC financing or continuation statements.

SECTION 7.14.    Intercreditor Agreement and Other Collateral Matters.  The Lenders hereby agree to the terms of the Intercreditor Agreement and acknowledge that GS (and any Collateral Agent under the Security Documents and the Intercreditor Agreement) will be serving as Collateral Agent for the Secured Parties under the Security Documents and the Intercreditor Agreement and in other capacities contemplated thereby. Each Lender hereby consents to GS and any successor serving in such capacities and agrees not to assert any claim (including as a result of any conflict of interest) against GS, or any such successor, arising from the role of the Collateral Agent under the Security Documents or the Intercreditor Agreement so long as the Collateral Agent is either acting in accordance with the express terms of such documents or otherwise has not engaged in gross negligence or willful misconduct as found by a final non-appealable judgment of a court of competent jurisdiction. Each Lender hereby consents to GS and any successor serving in such capacities and agrees not to assert any claim (including as a result of any conflict of interest) against GS, or any such successor, arising from the role of the Collateral Agent under the Security Documents so long as the Collateral Agent is either acting in accordance with the express terms of such documents or otherwise has not engaged in gross negligence or willful misconduct as found by a final non-appealable judgment of a court of competent jurisdiction.  In addition, the Administrative Agent and the Collateral Agent shall be authorized, without the consent of any Secured Party, to enter into or execute the Security Documents and the Intercreditor Agreement on or prior to the Closing Date, and, from time to time, to execute or to enter into amendments of, and amendments and restatements of, the Security Documents and the Intercreditor Agreement and any additional and replacement intercreditor agreements, including the Customary Intercreditor Agreements, in each case in order to effect the subordination of and to provide for certain additional rights, obligations and limitations in respect of, any Liens required by the terms of this Agreement to be Liens junior to, pari passu with or senior to the Loan Obligations, that are, in each case, incurred in accordance with Article V of this Agreement, and to establish certain relative rights as between the holders of the Loan Obligations and the holders of the Indebtedness secured by such Liens.

SECTION 7.15.    Withholding Tax.  To the extent required by any applicable Requirement of Law, the Administrative Agent may withhold from any payment to any Lender an amount equivalent to any applicable withholding tax.  If the IRS or any authority of the United States or other jurisdiction asserts a claim that the Administrative Agent did not properly withhold tax from amounts paid to or for the account of any Lender for any reason (including because the appropriate form was not delivered, was not properly executed, or because such Lender failed to notify the Administrative Agent of a change in circumstances that rendered the exemption from, or reduction of, withholding tax ineffective), such Lender shall indemnify the Administrative Agent (to the extent that the Administrative Agent has not already been reimbursed by any applicable Credit Party and without limiting the obligation of any applicable Credit Party to do so) fully for all amounts paid, directly or

indirectly, by the Administrative Agent as Tax or otherwise, including penalties, additions to Tax and interest, together with all expenses incurred, including legal expenses, allocated staff costs and any out of pocket expenses. Each Lender hereby authorizes the Administrative Agent to set off and apply any and all amounts at any time owing to such Lender under this Agreement or any other Loan Document against any amount due to the Administrative Agent under this Section 7.15.

SECTION 7.16.     Erroneous Payment.

(a)     If the Administrative Agent notifies a Lender or Secured Party, or any Person who has received funds on behalf of a Lender or Secured Party (any such Lender, Issuing Bank, Secured Party or other recipient, a "Payment Recipient") that the Administrative Agent has determined in its sole discretion (whether or not after receipt of any notice under immediately succeeding clause (b)) that any funds received by such Payment Recipient from the Administrative Agent or any of its Affiliates were erroneously transmitted to, or otherwise erroneously or mistakenly received by, such Payment Recipient (whether or not known to such Lender, Secured Party or other Payment Recipient on its behalf) (any such funds, whether received as a payment, prepayment or repayment of principal, interest, fees, distribution or otherwise, individually and collectively, an "Erroneous Payment") and demands the return of such Erroneous Payment (or a portion thereof) (provided, that without limiting any other rights or remedies (whether at law or in equity), the Administrative Agent may not make any such demand under this sentence with respect to an Erroneous Payment unless such demand is made within ten (10) Business Days of the date of receipt of such Erroneous Payment by the applicable Payment Recipient), such Erroneous Payment shall at all times remain the property of the Administrative Agent and shall be segregated by the Payment Recipient and held in trust for the benefit of the Administrative Agent, and such Lender or Secured Party shall (or, with respect to any Payment Recipient who received such funds on its behalf, shall cause such Payment Recipient to) promptly, but in no event later than two Business Days thereafter, return to the Administrative Agent the amount of any such Erroneous Payment (or portion thereof) as to which such a demand was made, in same day funds (in the currency so received). A notice of the Administrative Agent to any Payment Recipient under this clause (a) shall be conclusive, absent manifest error.

(b)     Without limiting immediately preceding clause (a), each Lender and Secured Party hereby further agrees that if it (or any Payment Recipient who on its behalf) receives a payment, prepayment or repayment (whether received as a payment, prepayment or repayment of principal, interest, fees, distribution or otherwise) from the Administrative Agent (or any of its Affiliates) (x) that is in a different amount than, or on a different date from, that specified in a notice of payment, prepayment or repayment sent by the Administrative Agent (or any of its Affiliates) with respect to such payment, prepayment or repayment, (y) that was not preceded or accompanied by a notice of payment, prepayment or repayment sent by the Administrative Agent (or any of its Affiliates), or (z) that such Lender or Secured Party, or other such recipient, otherwise becomes aware was transmitted, or received, in error or by mistake (in whole or in part) in each case:

(i)     (A) in the case of immediately preceding clauses (x) or (y), an error shall be presumed to have been made (absent written confirmation from the Administrative Agent to the contrary) or (B) an error has been made (in the case of immediately preceding clause (z)), in each case, with respect to such payment, prepayment or repayment; and

(ii)     such Lender or Secured Party shall (and shall cause any other recipient that receives funds on its respective behalf to) promptly (and, in all events, within one Business Day of its knowledge of such error) notify the Administrative Agent of its receipt of such payment, prepayment or repayment, the details thereof (in reasonable detail) and that it is so notifying the Administrative Agent pursuant to this Section 7.16(b).

(c)     Each Lender or Secured Party hereby authorizes the Administrative Agent to set off, net and apply any and all amounts at any time owing to such Lender or Secured Party under any Loan Document, or otherwise payable or distributable by the Administrative Agent to such Lender or Secured Party from any

116

source, against any amount due to the Administrative Agent under immediately preceding <u>clause (a)</u> or under the indemnification provisions of this Agreement.

(d)     In the event that an Erroneous Payment (or portion thereof) is not recovered by the Administrative Agent for any reason, after demand therefor by the Administrative Agent in accordance with immediately preceding clause (a), from any Lender that has received such Erroneous Payment (or portion thereof) (and/or from any Payment Recipient who received such Erroneous Payment (or portion thereof) on its respective behalf) (such unrecovered amount, an "<u>Erroneous Payment Return Deficiency</u>"), upon the Administrative Agent's notice to such Lender at any time, (i) such Lender shall be deemed to have assigned its Loans with respect to which such Erroneous Payment was made (the "<u>Erroneous Payment Impacted Loans</u>") in an amount equal to the Erroneous Payment Return Deficiency (or such lesser amount as the Administrative Agent may specify) (such assignment of the Loans of the Erroneous Payment Impacted Loans, the "<u>Erroneous Payment Deficiency Assignment</u>") at par plus any accrued and unpaid interest (with the assignment fee to be waived by the Administrative Agent in such instance), and is hereby (together with the Borrower) deemed to execute and deliver an Assignment and Acceptance (or, to the extent applicable, an agreement incorporating an Assignment and Acceptance by reference pursuant to the Platform as to which the Administrative Agent and such parties are participants) with respect to such Erroneous Payment Deficiency Assignment, and such Lender shall deliver any Notes evidencing such Loans to the Borrower or the Administrative Agent, (ii) the Administrative Agent as the assignee Lender shall be deemed to acquire the Erroneous Payment Deficiency Assignment, (iii) upon such deemed acquisition, the Administrative Agent as the assignee Lender shall become a Lender, as applicable, hereunder with respect to such Erroneous Payment Deficiency Assignment and the assigning Lender shall cease to be a Lender hereunder with respect to such Erroneous Payment Deficiency Assignment, excluding, for the avoidance of doubt, its obligations under the indemnification provisions of this Agreement which shall survive as to such assigning Lender and (iv) the Administrative Agent may reflect in the Register its ownership interest in the Loans subject to the Erroneous Payment Deficiency Assignment. The Administrative Agent may, in its discretion, sell any Loans acquired pursuant to an Erroneous Payment Deficiency Assignment and upon receipt of the proceeds of such sale, the Erroneous Payment Return Deficiency owing by the applicable Lender shall be reduced by the net proceeds of the sale of such Loan (or portion thereof), and the Administrative Agent shall retain all other rights, remedies and claims against such Lender (and/or against any recipient that receives funds on its respective behalf). In addition, each party hereto agrees that, except to the extent that the Administrative Agent has sold a Loan (or portion thereof) acquired pursuant to an Erroneous Payment Deficiency Assignment, and irrespective of whether the Administrative Agent may be equitably subrogated, the Administrative Agent shall be contractually subrogated to all the rights and interests of the applicable Lender or Secured Party under the Loan Documents with respect to each Erroneous Payment Return Deficiency (the "<u>Erroneous Payment Subrogation Rights</u>").

(e)     The parties hereto agree that (i) an Erroneous Payment shall not pay, prepay, repay, discharge or otherwise satisfy any Loan Obligations owed by the Borrower or any other Credit Party and (ii) to the extent an Erroneous Payment was in any way or at any time credited as a payment or satisfaction of any of the Loan Obligations, the Loan Obligations or part thereof that were so credited, and all rights of the applicable Lender, other Secured Party or Administrative Agent, as the case may be, shall be reinstated and continue in full force and effect as if such payment or satisfaction had never been received, except, in each case, to the extent such Erroneous Payment is, and solely with respect to the amount of such Erroneous Payment that is, comprised of funds received by the Administrative Agent from the Borrower or any other Credit Party for the purpose of making such Erroneous Payment. Further, each party hereto agrees that, in the event a Secured Party is the recipient of an Erroneous Payment and such Secured Party fails to return such Erroneous Payment in accordance with <u>Section 7.16(a)</u>, then the Administrative Agent shall be entitled to (x) collect from the Borrower or any other Credit Party any Obligations owed by the Borrower or any other Credit Party to such Secured Party up to and including the amount of the Erroneous Payment, plus any other amounts owed by such Secured Party under the indemnification provisions of this Agreement, except, to the extent such Erroneous Payment is, and solely with respect to the amount of such Erroneous Payment that is, comprised of funds received by the Administrative Agent from the Borrower or any other Credit Party for the purpose of making such Erroneous Payment and (y)

117

exercise its rights and remedies under Section 7.16(c) until the Administrative Agent has received all amounts owed by the Secured Party to the Administrative Agent pursuant to Section 7.16(a).

(f)       To the extent permitted by applicable law, no Payment Recipient shall assert any right or claim to an Erroneous Payment, and hereby waives, and is deemed to waive, any claim, counterclaim, defense or right of set-off or recoupment with respect to any demand, claim or counterclaim by the Administrative Agent for the return of any Erroneous Payment received, including without limitation waiver of any defense based on "discharge for value" or any similar doctrine.

(g)       Each party's obligations, agreements and waivers under this Section 7.16 shall survive the resignation or replacement of the Administrative Agent, any transfer of rights or obligations by, or the replacement of, a Lender, and/or the repayment, satisfaction or discharge of all Obligations (or any portion thereof) under any Loan Document.

## ARTICLE VIII

### Miscellaneous

SECTION 8.01.       Amendments and Waivers.

(a)       Without Consent of the Lenders.

The Borrower and the Administrative Agent may amend this Agreement and the other Loan Documents without notice to or consent of any Lender:

(i)       to cure any ambiguity, omission, mistake, defect or inconsistency;

(ii)       to provide for the assumption by a successor corporation, partnership or limited liability company of the obligations of the Borrower or any Subsidiary Guarantor under this Agreement or any other Loan Document (in each case so long as such successor corporation, partnership or limited liability company is designated in accordance with Section 5.11);

(iii)       to comply with Section 5.11;

(iv)       to add a Subsidiary Guarantor with respect to the Obligations or Collateral to secure the Obligations;

(v)       to release Collateral or a Guarantor as permitted by this Agreement, the Security Documents or the Intercreditor Agreement (other than to the extent constituting all or substantially all of the Collateral or value of the Guarantees); and

(vi)       to add additional secured creditors holding other Junior Lien Obligations so long as such obligations are not prohibited by this Agreement or the Security Documents.

The Intercreditor Agreement may be amended without the consent of any Lender or Agent in connection with the permitted entry into the Intercreditor Agreement of any class of additional secured creditors holding Junior Lien Obligations to effectuate such entry into the Intercreditor Agreement and to make the lien of such class equal and ratable with, as applicable, the lien of the Junior Lien Obligations.

Each Lender hereunder (x) consents to the amendment of any Loan Document in the manner and for the purposes set forth in this Section 8.01(a), (y) agrees that it will be bound by and will take no actions contrary to the provisions of any amendment to any Loan Document pursuant to Section 8.01(a) and (z) authorizes and

118

instructs the Administrative Agent to enter into any amendment to any Loan Document pursuant to this Section 8.01(a) on behalf of such Lender.

The Administrative Agent shall receive an Officers' Certificate as conclusive evidence that any amendment executed pursuant to this Section 8.01(a) complies with the requirements of this Section 8.01(a), is permitted or authorized by this Agreement and is the legal, valid and binding obligation of the Borrower, enforceable against it in accordance with its terms.

(b)　　With Consent of the Lenders.  The Borrower and the Administrative Agent may amend this Agreement and the other Loan Documents with the written consent of the Required Lenders, and any past default or noncompliance with any provisions may be waived with the consent of the Required Lenders. Notwithstanding the foregoing, without the consent of each Lender of an affected Loan (but not the Required Lenders), no amendment may:

(i)　　increase or reduce the principal amount of such Loans or waive or extend the time for payment of any portion of the principal amount thereof (it being understood that a waiver, deferral, reduction or other adjustment to a mandatory prepayment under Section 2.13 shall only require the consent of the Required Lenders),

(ii)　　reduce the rate of, or extend the time for payment of interest on, any Loan, (it being understood that only the consent of the Required Lenders shall be necessary to waive any obligation of the Borrower to pay interest at the default rate under Section 2.06(b) or amend Section 2.06(b)),

(iii)　　reduce the principal of or change the Stated Maturity of any Loan (it being understood that a waiver, deferral, reduction or other adjustment to a mandatory prepayment under Section 2.13 shall only require the consent of the Required Lenders),

(iv)　　reduce the premium payable (if any) upon prepayment of any Loan or change the time at which any such premium must be paid,

(v)　　make any Loan payable in money other than that stated in this Agreement,

(vi)　　consent to the transfer of the Borrower's obligations under this Agreement and/or the other Loan Documents,

(vii)　　waive, amend or modify the provisions of Section 2.17 or Section 6.02 in a manner that would alter the pro rata sharing of payments required thereby (except in connection with a transaction permitted under Section 8.06(e) and Section 8.07),

(viii)　　make any change in the second sentence of this Section 8.01(b) or the definition of the term "Required Lenders," or any other provision hereof expressly specifying the number or percentage of Lenders required to waive, amend or modify any rights hereunder or under any other Loan Document,

(ix)　　(A) release all or substantially all of the value of the Guarantee or release all or substantially all of the Collateral, in each case, whether in one or more transactions, (except as otherwise permitted herein or in the other Loan Documents) or (B) subordinate the Loan Obligations or a Lien on a material portion of the Collateral, taken as a whole, (as determined by the Borrower in good faith), securing the Obligations, in either case, to any other Indebtedness other than in connection with a debtor-in-possession financing,

119

(x) make any change in the provisions dealing with the application of proceeds of Collateral in the Intercreditor Agreement or this Agreement that would adversely affect the Lenders,

(xi) amend <u>Section 7.07</u> or any other provision hereof providing for indemnification obligations of the Agents or Lenders;

*provided further* that no amendment, waiver or other modification of any provision of any Loan Document in a manner that directly and adversely affects the Administrative Agent or the Collateral Agent shall be effective without the written consent of the then-current Administrative Agent and Collateral Agent, as applicable, or any other former or current Agent to whom <u>Article VII</u> then applies.

SECTION 8.02.    <u>Notices</u>.  Except as otherwise set forth herein, all notices, requests and demands to or upon the respective parties hereto to be effective shall be in writing (including by facsimile or electronic mail), and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when delivered, or three days after being deposited in the mail, postage prepaid, or, in the case of telecopy or electronic mail notice, when received, addressed as follows in the case of the Borrower and the Administrative Agent, and as set forth on <u>Schedule 2.01</u> in the case of the other parties hereto, or to such other address as may be hereafter notified by the respective parties hereto:

| | |
|---|---|
| The Borrower: | Fieldwood Energy LLC<br>2000 W. Sam Houston Pkwy. S., Suite 1200<br>Houston, TX 77042<br>Attention:  Mike Dane, Chief Financial Officer<br>Fax:  (713) 969-1099<br>Email:  mdane@fwellc.com |
| With a copy to: | Weil, Gotshal & Manges LLP<br>200 Crescent Court, Suite 300<br>Dallas, Texas  75201<br>Attention:  Courtney S. Marcus<br>Fax:  (214) 746-7700<br>Email:  courtney.marcus@weil.com |
| The Administrative Agent and the Collateral Agent: | |
| | Goldman Sachs Bank USA<br>2001 Ross Avenue<br>Suite 2800<br>Dallas, Texas 75201<br>Attention:  [Borrower], Account Manager<br>Email: Brendan.green@gs.com; matt.carter@gs.com; and gs-slg-notices@gs.com |
| With a copy to: | |
| | Vinson & Elkins LLP<br>Trammell Crow Center<br>2001 Ross Avenue, Suite 3700<br>Dallas, TX 75201-2975 |

120

Attention: Christopher J. Dewar
Email: cdewar@velaw.com

Any other Lender:

At the address, telecopier number, electronic mail address or telephone number specified in its Administrative Questionnaire;

*provided* that any notice, request or demand to or upon the Administrative Agent or the Lenders pursuant to Section 2.03 shall not be effective until received.

Notices and other communications to the Lenders hereunder may be delivered or furnished by electronic communication (including email and Internet or intranet websites) pursuant to procedures approved in writing by the Administrative Agent; *provided* that the foregoing shall not apply to notices to any Lender pursuant to Article II if such Lender has notified the Administrative Agent in writing that it is incapable of receiving notices under such Article by electronic communication. The Administrative Agent or the Borrower may, in their discretion, agree to accept notices and other communications to it hereunder by electronic communications pursuant to procedures approved by them, *provided* that approval of such procedures may be limited to particular notices or communications.

Documents required to be delivered pursuant to Section 5.01 (to the extent any such documents are included in materials otherwise filed with the SEC) may be delivered electronically (including as set forth in Section 8.18) and if so delivered, shall be deemed to have been delivered on the date (i) on which the Borrower posts such documents, or provides a link thereto on the Borrower's website on the Internet, or (ii) on which such documents are posted on the Borrower's behalf on an Internet or intranet website, if any, to which each Lender and the Administrative Agent have access (whether a commercial, third-party website or whether sponsored by the Administrative Agent); *provided* that (A) the Borrower shall deliver paper copies of such documents to the Administrative Agent or any Lender that requests the Borrower to deliver such paper copies until a written request to cease delivering paper copies is given by the Administrative Agent or such Lender, and (B) the Borrower shall notify the Administrative Agent and each Lender (by telecopier or electronic mail) of the posting of any such documents and provide to the Administrative Agent by electronic mail electronic versions (i.e., soft copies) of such documents.

SECTION 8.03.   No Waiver; Cumulative Remedies.   No failure to exercise and no delay in exercising, on the part of the Administrative Agent, the Collateral Agent or any Lender, any right, remedy, power or privilege hereunder or under the other Loan Documents shall operate as a waiver thereof, nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege. The rights, remedies, powers and privileges herein provided are cumulative and not exclusive of any rights, remedies, powers and privileges provided by law.

SECTION 8.04.   Survival of Representations and Warranties.   All representations and warranties made hereunder, in the other Loan Documents and in any document, certificate or statement delivered pursuant hereto or in connection herewith shall survive the execution and delivery of this Agreement and the making of the Loans hereunder.

SECTION 8.05.   Payment of Expenses; Indemnification.

(a)   Within 30 days after receipt of a written request, together with customary backup documentation in reasonable detail, the Borrower shall pay (i) all reasonable and documented (in summary form) out-of-pocket expenses incurred by the Administrative Agent in connection with the preparation and administration of this Agreement or any amendments, modifications or waivers of the provisions hereof and (ii) all reasonable and documented (in reasonable detail) out-of-pocket expenses incurred by the Administrative

121

Agent or any Lender, including the fees, charges and disbursements of legal counsel for the Administrative Agent or any Lender, in connection with the enforcement or protection of its rights in connection with this Agreement, including its rights under this <u>Section 8.05(a)</u>, including all such out-of-pocket expenses incurred during any workout, restructuring or negotiations in respect of such Loans; *provided*, that the Borrower's obligations under this <u>Section 8.05(a)</u> for fees and expenses of legal counsel shall be limited to fees and expenses of (x) one primary outside legal counsel for the Administrative Agent and, if necessary, one local, regulatory or foreign legal counsel for the Administrative Agent in each appropriate jurisdiction (which may include a single special counsel acting in multiple jurisdictions) and (y) solely in the case of <u>clause (ii)</u> above, one primary outside legal counsel for the Lenders and, if necessary, one local or foreign legal counsel to the Lenders in each appropriate jurisdiction (which may include a single special counsel acting in multiple jurisdictions).

(b)      Each Credit Party agrees to indemnify and hold harmless each Lender and each Agent and each of their respective affiliates, officers, partners, members, Directors, trustees, employees, managers, advisors, consultants, administrators, agents, sub-agents and other Related Parties (each such Person, an "<u>Indemnitee</u>") promptly after receipt of a written request, together with customary backup documentation in reasonable detail, from and against any Indemnified Liabilities, whether or not such proceedings are brought by the Borrower, any of its Related Parties or any other third Person, IN ALL CASES, WHETHER OR NOT CAUSED BY OR ARISING, IN WHOLE OR IN PART, OUT OF THE COMPARATIVE, CONTRIBUTORY OR SOLE NEGLIGENCE OF SUCH INDEMNITEE; *provided* that each Credit Party's obligations under this <u>Section 8.05(b)</u> for fees and expenses of legal counsel (including the cost of any investigation and preparation) shall be limited to the reasonable and documented (in summary form) out-of-pocket fees, disbursements and other charges of (x) one primary outside counsel for the Indemnitees, taken as a whole, (y) if reasonably necessary, one local or foreign legal counsel for the Indemnitees, taken as a whole, in each appropriate jurisdiction (which may include a single special counsel acting in multiple jurisdictions) and (z) if reasonably necessary, one additional regulatory or other specialist counsel for the Indemnitees, taken as a whole, for each relevant area of expertise (which may include a single special counsel acting in multiple areas) (unless there is an actual or perceived conflict of interest in which case the affected Indemnitees, taken as a whole, may engage one additional counsel and solely in the case of any such conflict of interest, one additional local counsel (which may be a single firm for multiple jurisdictions) to all affected Indemnitees taken as a whole, in each such relevant jurisdiction (limited, in the case of legal counsel, to one counsel to such Indemnitees, taken as a whole, and, if reasonably necessary, of one local counsel in each relevant jurisdiction and one additional regulatory or other specialist counsel for each relevant area of expertise (in each case, which may be a single firm for multiple jurisdictions)); *provided, further*, that the Borrower shall have no obligation hereunder to any Agent or any Lender or any of their respective Related Parties with respect to Indemnified Liabilities to the extent (1) found by a court of competent jurisdiction in a final non- appealable judgment to have resulted from (i) the gross negligence or willful misconduct of the party to be indemnified or (ii) any material breach of any Loan Document by the party to be indemnified (other than a material breach by any Agent in its capacity as such unless such material breach resulted from the gross negligence or willful misconduct of any Agent or its Related Parties) or (2) arising from disputes, claims, demands, actions, judgments or suits not arising from any act or omission by the Borrower or its Affiliates, brought by an indemnified Person against any other indemnified Person (other than disputes, claims, demands, actions, judgments or suits involving claims against any Agent in its capacity as such).    No Person entitled to indemnification under <u>clause (b)</u> of this <u>Section 8.05</u> shall be liable for any damages arising from the use by others of any information or other materials obtained through internet, electronic, telecommunications or other information transmission systems (including IntraLinks or SyndTrak Online) in connection with this Agreement or any other Loan Document, except to the extent that such damages have resulted from the gross negligence, bad faith or willful misconduct of the party to be indemnified or any of its Related Parties (as determined by a court of competent jurisdiction in a final and non-appealable decision). To the extent that the undertakings to defend, indemnify, pay and hold harmless set forth in this <u>Section 8.05</u> may be unenforceable in whole or in part because they are violative of any law or public policy, the applicable Credit Party shall contribute the maximum portion that it is permitted to pay and satisfy under applicable law to the payment and satisfaction of all Indemnified Liabilities incurred by Indemnitees or any of them.

<div align="center">122</div>

(c)      To the extent permitted by applicable law, none of Holdings, the Borrower or any Indemnitee shall have any liability for any special, punitive, indirect or consequential damages (including, without limitation, any loss of profits, business or anticipated savings) relating to this Agreement or any other Loan Document or arising out of its activities in connection herewith or therewith (whether before or after the Closing Date); *provided* that nothing contained in this clause (c) shall limit the obligations of the Borrower under Section 8.05(b) in respect of any such damages claimed against the Indemnitees by Persons other than the Indemnitees.

(d)      The agreements in this Section 8.05 shall survive repayment of the Loans and all other amounts payable hereunder, and the earlier resignation or removal of any Agent.  This Section 8.05 shall not apply with respect to any Taxes other than Taxes that represent liabilities, obligations, losses, damages, penalties, claims, demands, actions, judgments, suits, costs, expenses or disbursements of any kind or nature whatsoever resulting from a non-Tax claim.

SECTION 8.06.      Successors and Assigns; Participations and Assignments.

(a)      The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby, except that (i) the Borrower may not assign or otherwise transfer any of its rights or obligations hereunder without the prior written consent of each Lender other than pursuant to Section 5.11 (and any attempted assignment or transfer by the Borrower without such consent shall be null and void) and (ii) no Lender may assign or otherwise transfer its rights or obligations hereunder except in accordance with this Section 8.06.   Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby, Participants (to the extent provided in clause (c) of this Section 8.06), and, to the extent expressly contemplated hereby, the Related Parties of each of the Agents and the Lenders) any legal or equitable right, remedy or claim under or by reason of this Agreement or the other Loan Documents.

(b)      (i) Subject to the conditions set forth in clause (b)(ii) below and the limitations on assignment set forth in clauses (e) below, any Lender may assign to one or more (each, an "Assignee") all or a portion of its rights and obligations under this Agreement (including all or a portion of the Loans at the time owing to it) by:

(A)  providing written notice to the Borrower and, so long as no Event of Default is continuing, obtaining the consent of the Borrower, which consent shall not be unreasonably withheld or delayed (it being understood that the Borrower will be deemed to have consented to an assignment if it has not responded to a request for consent to such assignment within ten (10) Business Days after receipt of written request therefor); *provided* that no consent of the Borrower shall be required for an assignment of any Loan to a Lender, an Affiliate of a Lender or an Approved Fund (as defined below); and

(B)  obtaining the consent of the Administrative Agent (which consent shall not be unreasonably withheld or delayed); *provided* that no consent of the Administrative Agent shall be required for an assignment of any Loan to a Lender, an Affiliate of a Lender or an Approved Fund (as defined below).

(ii)      Assignments shall be subject to the following additional conditions:

(A)  except in the case of an assignment to a Lender, an Affiliate of a Lender or an Approved Fund or an assignment of the entire remaining amount of the assigning Lender's Loans under the Facility, the amount of the Loans of the assigning Lender subject to each such assignment (determined as of the date the Assignment and Acceptance with respect to such assignment is delivered to the Administrative Agent) shall not be less than $1,000,000; *provided* that contemporaneous assignments to a single assignee made by Affiliates of Lenders

123

and related Approved Funds shall be aggregated for purposes of meeting the minimum assignment amount requirements stated above;

(B)  each partial assignment shall be made as an assignment of a proportionate part of all the assigning Lender's rights and obligations under this Agreement;

(C)  the parties to each assignment shall execute and deliver to the Administrative Agent an Assignment and Acceptance via an electronic settlement system acceptable to the Administrative Agent (or, if previously agreed with the Administrative Agent, manually), and shall pay to the Administrative Agent a processing and recordation fee of $3,500 (which fee may be waived or reduced in the sole discretion of the Administrative Agent); *provided* that, in the case of contemporaneous assignments by any Lender to one or more Approved Funds, only a single processing and recordation fee shall be payable for all such assignments; and

(D)  the Assignee, if it shall not be a Lender, shall deliver to the Administrative Agent an administrative questionnaire in a form approved by the Administrative Agent (the "Administrative Questionnaire") and applicable tax forms (including those described in Sections 2.15(d), (e), (g) and (h), as applicable).

For the purposes of this Section 8.06(b), the term "Approved Fund" means any Person (other than a natural person) that is engaged in making, purchasing, holding or investing in bank loans and similar extensions of credit in the ordinary course and that is administered, advised or managed by (a) a Lender, (b) an Affiliate of a Lender or (c) an entity or an Affiliate of an entity that administers, advises or manages a Lender.

Upon request of the Borrower, the Administrative Agent shall deliver to the Borrower a list of each assignment made during the immediately preceding month, which list shall include the applicable assignor, Assignee, the interest assigned and the date of each assignment.  The delivery of such list shall satisfy the notice requirement set forth in Section 8.06(b)(i)(A).

(iii)     Subject to acceptance and recording thereof pursuant to clause (b)(v) of this Section 8.06, from and after the effective date specified in each Assignment and Acceptance, the Assignee thereunder shall be a party hereto and, to the extent of the interest assigned by such Assignment and Acceptance, have the rights and obligations of a Lender under this Agreement, and the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and Acceptance, be released from its obligations under this Agreement (and, in the case of an Assignment and Acceptance covering all of the assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto but shall continue to be entitled to the benefits of Sections 2.08, 2.09, 2.15 and 8.05).  Any assignment or transfer by a Lender of rights or obligations under this Agreement that does not comply with this Section 8.06 shall be treated for purposes of this Agreement as a sale by such Lender of a participation in such rights and obligations in accordance with clause (c) of this Section 8.06.

(iv)     The Administrative Agent, acting for this purpose as a non- fiduciary agent of the Borrower, shall maintain a copy of each Assignment and Acceptance delivered to it and a register for the recordation of the names and addresses of the Lenders, and principal and stated interest amounts of the Loans (the "Register").  The entries in the Register shall be conclusive absent manifest error, and the Borrower, the Administrative Agent and the Lenders shall treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement, notwithstanding notice to the contrary.  The Register shall be available for inspection by the Borrower, at any reasonable time and from time to time upon reasonable prior notice.

124

(v)     Upon its receipt of a duly completed Assignment and Acceptance executed by an assigning Lender and an Assignee, the Assignee's completed Administrative Questionnaire (unless the Assignee shall already be a Lender hereunder), all applicable tax forms, the processing and recordation fee referred to in clause (b) of this Section 8.06 and any written consent to such assignment required by clause (b) of this Section 8.06, the Administrative Agent shall promptly accept such Assignment and Acceptance and record the information contained therein in the Register.  No assignment, whether or not evidenced by a promissory note, shall be effective for purposes of this Agreement unless it has been recorded in the Register as provided in this clause.

(c)     (i) Any Lender may, without the consent of, or notice to, the Administrative Agent or the Borrower, sell participations to one or more banks or other entities (other than to Holdings, any of its Subsidiaries or any of its Affiliates or any natural persons) (each, a "Participant") in all or a portion of such Lender's rights and obligations under this Agreement (including all or a portion of the Loans owing to it), *provided* that (A) such Lender's obligations under this Agreement shall remain unchanged, (B) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations and (C) the Borrower, the Administrative Agent and the other Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement and the other Loan Documents.  Any agreement or instrument pursuant to which a Lender sells such a participation shall provide that such Lender shall retain the sole right to enforce this Agreement and the other Loan Documents and to approve any amendment, modification or waiver of any provision of this Agreement and the other Loan Documents, *provided* that (x) such agreement or instrument may provide that such Lender will not, without the consent of the Participant, agree to any amendment, modification or waiver described in clause (ii) or (iii) of the second sentence of Section 8.01(b) that directly affects such Participant and (y) no other agreement with respect to amendment, modification or waiver may exist between such Lender and such Participant.   Subject to clause (c)(ii) of this Section 8.06, the Borrower agrees that each Participant shall be entitled to the benefits of Sections 2.08, 2.09 and 2.15 (subject to the limitations and requirements of those Sections and Sections 2.10 and 8.07) to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to clause (b) of this Section 8.06.

(ii)     Each Lender that sells a participation shall, acting solely for this purpose as a non-fiduciary agent of the Borrower, maintain a register on which it enters the name and address of each Participant and the principal and stated interest amounts of each Participant's interest in the Loans held by it (the "Participant Register").  The entries in the Participant Register shall be conclusive absent manifest error, and each party hereto shall treat each Person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement and the other Loan Documents, notwithstanding notice to the contrary.  *No* Lender shall have any obligation to disclose all or any portion of the Participant Register to any Person (including the identity of any Participant or any information relating to a Participant's interest in any Loans or other Obligations under any Loan Document) except to the extent that such disclosure is necessary to establish that such Loan or other Obligation is in registered form Treasury Regulation Section 5f.103-1(c), proposed Treasury Regulation Section 1.163-5 or any applicable temporary, final or other successor regulations. Unless required by the IRS, any disclosure required by the foregoing sentence shall be made by the relevant Lender directly and solely to the IRS. For the avoidance of doubt, Administrative Agent (in its capacity as Administrative Agent) shall have no responsibility for maintaining a Participant Register.

(iii)     A Participant shall not be entitled to receive any greater payment under Section 2.08 or 2.15 than the applicable Lender would have been entitled to receive with respect to the participation sold to such Participant, except to the extent such entitlement to receive a greater payment results from a Change in Law that occurs after such participant acquired the participation or unless the sale of the participation to such Participant thereafter is made with the Borrower's prior written consent.

(d)     Any Lender may at any time pledge or assign a security interest in all or any portion of its rights under this Agreement to secure obligations of such Lender, including any pledge or assignment to

125

secure obligations to a Federal Reserve Bank or other central bank, and this Section 8.06 shall not apply to any such pledge or assignment of a security interest; *provided* that no such pledge or assignment of a security interest shall release a Lender from any of its obligations hereunder or substitute any such pledgee or Assignee for such Lender as a party hereto.  In order to facilitate such pledge or assignment, the Borrower hereby agrees that, upon request of any Lender at any time and from time to time, the Borrower shall provide to such Lender, at the Borrower's own expense, a Note, substantially in the form of Exhibit B.

(e)     Notwithstanding anything to the contrary contained herein, any Lender may (and, for the avoidance of doubt, solely at its discretion), so long as no Event of Default under Section 6.01(a) or (e) shall be continuing and the Administrative Agent shall have consented to such assignment in its sole and absolute discretion, assign all or a portion of its rights and obligations under this Agreement in respect of its Loans to an Affiliated Lender; *provided* that:

(i)     no Affiliated Lender shall have any right to (A) attend (including by telephone) any meeting or discussion (or portion thereof) among the Administrative Agent, the Collateral Agent or any Lender at which representatives of the Borrower are not then present, (B) receive any information or material prepared by the Administrative Agent, the Collateral Agent or any Lender or any communication by or among the Administrative Agent, the Collateral Agent and one or more Lenders, except to the extent such information or materials have been made available to the Borrower or its representatives (other than the right in any case to receive notices of prepayments and other administrative notices in respect of its Loans required to be delivered to Lenders pursuant to Article II), or (C) make or bring (or participate in, other than as a passive participant in or recipient of its pro rata benefits of) any claim, in its capacity as a Lender, against the Administrative Agent, the Collateral Agent or any other Lender with respect to any duties or obligations or alleged duties or obligations of such Agent or any such other Lender under the Loan Documents;

(ii)     except with respect to any amendment, modification, waiver, consent or other action described in clause (ii), (iii), or (iv) of Section 8.01(b) or that releases all or substantially all of the value of the Guarantee or the Collateral or that alters an Affiliated Lender's *pro rata* share of any payments given to all Lenders, the Loans held by an Affiliated Lender shall be disregarded in both the numerator and denominator in the calculation of any Lender vote (and shall be deemed to have been voted in the same percentage as all other Lenders that are not Affiliated Lenders voted if necessary to give legal effect to this clause) under any Loan Document;

(iii)     the aggregate principal amount of Loans held at any one time by Affiliated Lenders may not exceed 30% of the aggregate principal amount of all Loans outstanding at such time under any facility under this Agreement; and

(iv)     any such Loans acquired by an Affiliated Lender may, with the consent of the Borrower, be contributed to the Borrower and exchanged for debt or equity securities that are otherwise permitted to be issued at such time (and such contribution and/or exchange shall be permitted hereunder notwithstanding the non-pro rata reduction and repayment of such Lender's Loans hereunder as a result thereof).

For the avoidance of doubt, assignments to Affiliated Institutional Lenders will be permitted hereunder and the foregoing limitations in this clause (e) shall not be applicable to Affiliated Institutional Lenders; *provided* that, notwithstanding anything in Section 8.01 or the definition of "Required Lenders" to the contrary, for purposes of determining whether the Required Lenders have (i) consented (or not consented) to any amendment, modification, waiver, consent or other action with respect to any of the terms of any Loan Document or any departure by any Credit Party therefrom, (ii) otherwise acted on any matter related to any Loan Document or (iii) directed or required the Administrative Agent or any Lender to undertake any action (or refrain from taking any action) with respect to or under any Loan Document, all Loans held by Affiliated Institutional Lenders may not account for more than 49.9% (pro rata among such Affiliated Institutional Lenders) of the Loans of

126

consenting Lenders included in determining whether the Required Lenders have consented to any action pursuant to Section 8.01.

SECTION 8.07.    Replacements of Lenders Under Certain Circumstances.   (a) If any Lender (i) requests reimbursement for amounts owing pursuant to Section 2.08, 2.09 or 2.15 (other than Section 2.15(b)) or (ii) is affected in the manner described in Section 2.08(a)(iii) and as a result thereof of the action described in Section 2.08(b) is required to be taken, then, *provided* that no Event of Default then exists, the Borrower shall, upon five (5) days' notice to the Administrative Agent and the relevant Lender, have the right to replace such Lender by deeming such Lender to have assigned its Loans hereunder to one or more assignees reasonably acceptable to the Administrative Agent; *provided* that (1) such replacement does not conflict with any Requirement of Law, (2) all Loan Obligations (other than any disputed amounts pursuant to Section 2.08, 2.09, or 2.15, as the case may be) owing to such Lender being replaced shall be paid in full to such Lender concurrently with such assignment and the Borrower shall pay any premium that would have been due if the Loans were prepaid, and (3) the replacement Lender shall purchase the foregoing by paying to such Lender a price equal to the principal amount thereof plus accrued and unpaid interest thereon.  No action by or consent of the replaced Lender shall be necessary in connection with such assignment, which shall be immediately and automatically effective upon payment of such purchase price.  In connection with any such assignment, the Borrower, the Administrative Agent, such replaced Lender and the replacement Lender shall otherwise comply with Section 8.06 (*provided* that the Borrower shall be obligated to pay the registration and processing fee referred to therein).  Any such replacement shall not be deemed to be a waiver of any rights that the Borrower, the Administrative Agent or any other Lender shall have against the replaced Lender.

(b)    If any Lender (such Lender, a "Non-Consenting Lender") has failed to consent to a proposed amendment, waiver, discharge or termination which pursuant to the terms of Section 8.01(b) requires the consent of all of the Lenders affected and with respect to which the Required Lenders shall have granted their consent, then, *provided* that no Event of Default (other than an Event of Default relating to the proposed amendment, waiver, discharge or termination) then exists, the Borrower shall, upon five (5) days' notice to the Administrative Agent and the relevant Lender, have the right (unless such Non-Consenting Lender grants such consent) to replace such Non-Consenting Lender by deeming such Non-Consenting Lender to have assigned its Loans hereunder to one or more assignees, reasonably acceptable to the Administrative Agent; *provided* that:  (1) such replacement does not conflict with any Requirement of Law, (2) all Loan Obligations of the Borrower owing to such Non-Consenting Lender being replaced shall be paid in full to such Non-Consenting Lender concurrently with such assignment and the Borrower shall pay any premium that would have been due if the Loans were prepaid, and (3) the replacement Lender shall purchase the foregoing by paying to such Non-Consenting Lender a price equal to the principal amount thereof plus accrued and unpaid interest thereon.  No action by or consent of the Non-Consenting Lender shall be necessary in connection with such assignment, which shall be immediately and automatically effective upon payment of such purchase price.  In connection with any such assignment, the Borrower, the Administrative Agent, such Non-Consenting Lender and the replacement Lender shall otherwise comply with Section 8.06 (*provided* that the Borrower shall be obligated to pay the registration and processing fee referred to therein).

SECTION 8.08.    Counterparts.  This Agreement may be executed by one or more of the parties to this Agreement on any number of separate counterparts (including by facsimile or other electronic transmission), and all of said counterparts taken together shall be deemed to constitute one and the same instrument.  A set of the copies of this Agreement signed by all the parties shall be lodged with the Borrower and the Administrative Agent.  The words "execution," "signed," "signature," and words of like import in any Assignment and Assumption or any Loan Document shall in each case be deemed to include electronic signatures, signatures exchanged by electronic transmission, or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act; *provided*,

127

that the Administrative Agent or the Collateral Agent may request, and upon any such request the Credit Parties shall be obligated to provide, manually executed "wet ink" signatures to any Loan Document.

SECTION 8.09.    Severability.  Any provision of this Agreement that is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

SECTION 8.10.    GOVERNING LAW.    THIS AGREEMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER SHALL BE GOVERNED BY, AND CONSTRUED AND INTERPRETED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK.

SECTION 8.11.    Submission to Jurisdiction; Consent to Service; Waivers.

(a)    Subject to clause (v) below, the parties hereto hereby irrevocably and unconditionally:

(i)    submits for itself and its property in any legal action or proceeding arising out of or relating to this Agreement and the other Loan Documents to which it is a party, or for recognition and enforcement of any judgment in respect thereof, to the exclusive (subject to clause (v) below) general jurisdiction and venue of the courts of the United States of America sitting in the Borough of Manhattan or, if that court does not have subject matter jurisdiction, in any state court located in the City and County of New York;

(ii)    consents that any such action or proceeding may be brought in such courts and waives any objection that it may now or hereafter have to the venue of any such action or proceeding in any such court or that such action or proceeding was brought in an inconvenient court and agrees not to plead or claim the same;

(iii)    in the case of a Credit Party, each agrees that service of process in any such action or proceeding in any such court may be effected by mailing a copy thereof by registered or certified mail (or any substantially similar form of mail), return receipt requested, to the applicable Credit Party at its respective address set forth in Section 8.02 or at such other address of which the Administrative Agent shall have been notified pursuant thereto;

(iv)    agrees that service as provided in clause (iii) above is sufficient to confer personal jurisdiction over the applicable Credit Party in any such proceeding in any such court, and otherwise constitutes effective and binding service in every respect;

(v)    agrees that Agents and Lenders retain the right to effect service of process in any other manner permitted by law or to bring proceedings against any Credit Party in the courts of any other jurisdiction in connection with the exercise of any rights under any Loan Document or against any Collateral or the enforcement of any judgment and hereby submits to the jurisdiction of, and consents to venue in, any such court; and

(vi)    without limitation of Sections 7.07 and 8.05, waives, to the maximum extent not prohibited by law, any right it may have to claim or recover in any legal action or proceeding referred to in this Section 8.11 any special, exemplary, punitive or consequential damages.

(b)    The parties hereto, to the extent that it has or hereafter may acquire any immunity (sovereign or otherwise) from any legal action, suit or proceeding, from jurisdiction of any court or from setoff or any legal process (whether service of notice, attachment prior to judgment, attachment in aid of execution of judgment, execution of judgment or otherwise) with respect to itself or any of its property or assets, hereby waives and agrees not to plead or claim such immunity in respect of its obligations under this Agreement and

128

the other Loan Documents (it being understood that the waivers contained in this clause (b) shall have the fullest extent permitted under the Foreign Sovereign Immunities Act of 1976, as amended, and are intended to be irrevocable and not subject to withdrawal for the purposes of such Act).

SECTION 8.12.    Acknowledgments.  The parties hereto hereby acknowledge that:

(a)    it has been advised by counsel in the negotiation, execution and delivery of this Agreement and the other Loan Documents;

(b)    none of the Administrative Agent, the Collateral Agent nor any Lender has any fiduciary relationship with or duty to the Borrower arising out of or in connection with this Agreement or any of the other Loan Documents, and the relationship between Administrative Agent, the Collateral Agent and Lenders, on one hand, and the Borrower, on the other hand, in connection herewith or therewith is solely that of debtor and creditor; and

(c)    no joint venture is created hereby or by the other Loan Documents or otherwise exists by virtue of the transactions contemplated hereby among the Lenders or among the Borrower and the Lenders.

SECTION 8.13.    WAIVERS OF JURY TRIAL.  THE PARTIES HERETO HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVE TRIAL BY JURY IN ANY CLAIM, LEGAL ACTION OR PROCEEDING RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT OR AN DEALINGS BETWEEN SUCH PARTIES RELATING TO THE SUBJECT MATTER OF THIS LOAN TRANSACTION OR THE LENDER/BORROWER RELATIONSHIP THAT IS BEING ESTABLISHED AND FOR ANY COUNTERCLAIM THEREIN.  THE SCOPE OF THIS WAIVER IS INTENDED TO BE ALL ENCOMPASSING OF ANY AND ALL DISPUTES THAT MAY BE FILED IN ANY COURT AND THAT RELATE TO THE SUBJECT MATTER OF THIS TRANSACTION, INCLUDING CONTRACT CLAIMS, TORT CLAIMS, BREACH OF DUTY CLAIMS AND ALL OTHER COMMON LAW AND STATUTORY CLAIMS.  EACH PARTY HERETO ACKNOWLEDGES THAT THIS WAIVER IS A MATERIAL INDUCEMENT TO ENTER INTO A BUSINESS RELATIONSHIP THAT EACH HAS ALREADY RELIED ON THIS WAIVER IN ENTERING INTO THIS AGREEMENT, AND THAT EACH WILL CONTINUE TO RELY ON THIS WAIVER IN ITS RELATED FUTURE DEALINGS.  EACH PARTY HERETO FURTHER WARRANTS AND REPRESENTS THAT IT HAS REVIEWED THIS WAIVER WITH ITS LEGAL COUNSEL AND THAT IT KNOWINGLY AND VOLUNTARILY WAIVES ITS JURY TRIAL RIGHTS FOLLOWING CONSULTATION WITH LEGAL COUNSEL.  THIS WAIVER IS IRREVOCABLE, MEANING THAT IT MAY NOT BE MODIFIED EITHER ORALLY OR IN WRITING (OTHER THAN BY A MUTUAL WRITTEN WAIVER SPECIFICALLY REFERRING TO THIS SECTION 8.13 AND EXECUTED BY EACH OF THE PARTIES HERETO), AND THIS WAIVER SHALL APPLY TO ANY SUBSEQUENT AMENDMENTS, RENEWALS, SUPPLEMENTS OR MODIFICATIONS HERETO OR ANY OF THE OTHER LOAN DOCUMENTS OR TO ANY OTHER DOCUMENTS OR AGREEMENTS RELATING TO THE LOANS MADE HEREUNDER.  IN THE EVENT OF LITIGATION, THIS AGREEMENT MAY BE FILED AS A WRITTEN CONSENT TO A TRIAL BY THE COURT.

SECTION 8.14.    Confidentiality.  The Administrative Agent and each Lender shall hold all information relating to Holdings, the Borrower or any Subsidiary and their respective businesses furnished by or on behalf of Holdings, the Borrower or any such Subsidiary in connection with this Agreement (other than information that (a) has become available to the public other than as a result of a disclosure by such party in breach of this Section 8.14, (b) has been independently developed by such Lender or such Agent without violating this Section 8.14 or (c) was or becomes available to such Lender or such Agent from a third party which, to such person's knowledge, had not breached an obligation of confidentiality to the Borrower or any other Credit Party), confidential in accordance with its customary procedure for handling confidential information of such nature and in any event may make disclosure (a) as required or requested by any governmental agency or representative thereof or any securities exchange on which securities of the disclosing party or any Affiliate of the disclosing party are listed or traded or pursuant to legal process or to such Lender's

129

or the Administrative Agent's attorneys, professional advisors or independent auditors or Affiliates, (b) as part of normal reporting or review procedures to, or examinations by, Governmental Authorities or self-regulatory authorities, including the National Association of Insurance Commissioners or the National Association of Securities Dealers, Inc., (c) in connection with the exercise of any remedies hereunder or under any other Loan Document or any action or proceeding relating to this Agreement or any other Loan Document or in order to enforce its rights hereunder or thereunder any Loan Document, (d) to any pledgee under Section 8.06 or any other prospective assignee of, or prospective Participant in, any of its rights under this Agreement (so long as such person shall agree to keep the same confidential in accordance with this Section 8.14 or terms substantially similar to this Section 8.14), (e) to any direct or indirect contractual counterparty in swap agreements or such contractual counterparty's professional advisor (so long as such contractual counterparty or professional advisor to such contractual counterparty agrees to be bound by the provisions of this Section 8.14 or terms substantially similar to this Section 8.14), (f) on a confidential basis to any rating agency, (g) on a confidential basis to the CUSIP Service Bureau or any similar agency in connection with the issuance and monitoring of CUSIP numbers with respect to the Loans, (g) to any Lenders' financing sources; *provided* that prior to any disclosure such financing source is informed of the confidential nature of the information and are or have been advised to keep information of this type confidential, (h) to Affiliates and Related Funds of such Lender or such Agent and to their respective officers, Directors, partners, members, employees, legal counsel, independent auditors and other advisors, experts, or agents on a confidential basis (and to other Persons authorized by a Lender or Agent to organize, present or disseminate such information in connection with disclosures otherwise made in accordance with this Section 8.14) and (i) with the consent of the relevant Credit Party; *provided* that in no event shall any Lender or the Administrative Agent be obligated or required to return any materials furnished by the Borrower or any Subsidiary of the Borrower.  Notwithstanding the foregoing, on or after the Closing Date, Administrative Agent may, at its own expense issue news releases and publish "tombstone" advertisements and other announcements relating to this transaction in newspapers, trade journals and other appropriate media (which may include use of logos of one or more of the Credit Parties)(collectively, "Trade Announcements").  No Lender or Credit Party shall (a) issue any Trade Announcement, (b) use or reference in advertising, publicity, or otherwise the name of Goldman Sachs, any Lender or any of their respective Affiliates, partners, or employees, or (c) represent that any product or any service provided has been approved or endorsed by Goldman Sachs, any Lender, or any of their respective Affiliates, except (i) disclosures required by applicable law, regulation, legal process or the rules of the SEC or in connection with the Transactions or (ii) with the prior approval of Administrative Agent.

SECTION 8.15.     No Advisory or Fiduciary Responsibility.  In connection with all aspects of each transaction contemplated hereby, the Borrower acknowledges and agrees, and acknowledge its Affiliates' understanding, that:  (i) the credit facility provided for hereunder and any related arranging or other services in connection therewith (including in connection with any amendment, waiver or other modification hereof or of any other Loan Document) are an arm's-length commercial transaction between the Borrower, and its Affiliates, on the one hand, and the Administrative Agent,  each other Agent and each Lender (collectively, solely for purposes of this paragraph, the "Lenders"), on the other hand, and the Borrower and each of its Affiliates is capable of evaluating and understanding and understands and accepts the terms, risks and conditions of the transactions contemplated hereby and by the other Loan Documents (including any amendment, waiver or other modification hereof or thereof); (ii) in connection with the process leading to such transaction, each Lender is and has been acting solely as a principal and is not the financial advisor, agent or fiduciary, for the Borrower, or any of its Affiliates, stockholders, creditors or employees or any other Person; (iii) no Lender has assumed or will assume an advisory, agency or fiduciary responsibility in favor of the Borrower or any of its Affiliates with respect to any of the transactions contemplated hereby or the process leading thereto, including with respect to any amendment, waiver or other modification hereof or of any other Loan Document (irrespective of whether any Lender has advised or is currently advising the Borrower or any of its respective Affiliates on other matters) and no Lender has any obligation to the Borrower or any of its Affiliates with respect to the transactions contemplated hereby except those obligations expressly set forth herein and in the other Loan Documents; (iv) each Lender and its respective Affiliates may be engaged in a broad range of transactions that involve interests that differ from those of the Borrower and its Affiliates, and no Lender has any obligation to disclose any of such interests by virtue of any advisory, agency or fiduciary relationship; and (v) no Lender has provided

WEIL:\97847440\31\45327.0007

and no Lender will provide any legal, accounting, regulatory or tax advice with respect to any of the transactions contemplated hereby (including any amendment, waiver or other modification hereof or of any other Loan Document) and the Borrower and each its Affiliates has consulted its own legal, accounting, regulatory and tax advisors to the extent it has deemed appropriate.  The Borrower and each its Affiliates hereby waives and releases, to the fullest extent permitted by law, any claims that it may have against any Lender with respect to any breach or alleged breach of agency or fiduciary duty.

SECTION 8.16.    USA PATRIOT Act.  Each Lender hereby notifies the Borrower that pursuant to the requirements of the USA Patriot Act, it is required to obtain, verify and record information that identifies the Credit Parties, which information includes the name and address of the Credit Parties and other information that will allow such Lender to identify the Credit Parties in accordance with the USA Patriot Act.

SECTION 8.17.    Conversion of Currencies.

(a)    If, for the purpose of obtaining judgment in any court, it is necessary to convert a sum owing hereunder in one currency into another currency, each party hereto agrees, to the fullest extent that it may effectively do so, that the rate of exchange used shall be that at which in accordance with normal banking procedures in the relevant jurisdiction the first currency could be purchased with such other currency on the Business Day immediately preceding the day on which final judgment is given.

(b)    The obligations of the Borrower in respect of any sum due to any party hereto or any holder of the obligations owing hereunder (the "Applicable Creditor") shall, notwithstanding any judgment in a currency (the "Judgment Currency") other than the currency in which such sum is stated to be due hereunder (the "Agreement Currency"), be discharged only to the extent that, on the Business Day following receipt by the Applicable Creditor of any sum adjudged to be so due in the Judgment Currency, the Applicable Creditor may in accordance with normal banking procedures in the relevant jurisdiction purchase the Agreement Currency with the Judgment Currency; if the amount of the Agreement Currency so purchased is less than the sum originally due to the Applicable Creditor in the Agreement Currency, the Borrower agrees, as a separate obligation and notwithstanding any such judgment, to indemnify the Applicable Creditor against such loss.  The obligations of the Borrower contained in this Section 8.17 shall survive the termination of this Agreement and the payment of all other amounts owing hereunder.

SECTION 8.18.    Platform; Borrower Materials.  The Borrower hereby acknowledges that (a) the Administrative Agent will make available to the Lenders materials and/or information provided by or on behalf of the Borrower hereunder (collectively, "Borrower Materials") by posting the Borrower Materials on IntraLinks or another similar electronic system (the "Platform"), and (b) certain of the Lenders may be "public-side" Lenders (i.e., Lenders that do not wish to receive material non-public information with respect to the Borrower or its securities) (each, a "Public Lender").  The Borrower hereby agrees that it will use commercially reasonable efforts to identify that portion of the Borrower Material that may be distributed to the Public Lenders and that (i) all such Borrower Materials shall be clearly and conspicuously marked "PUBLIC" which, at a minimum, means that the word "PUBLIC" shall appear prominently on the first page thereof, (ii) by marking Borrower Materials "PUBLIC," the Borrower shall be deemed to have authorized the Administrative Agent, and the Lenders to treat such Borrower Materials as either publicly available information or not material information (although it may be sensitive and proprietary) with respect to the Borrower or its securities for purposes of United States Federal and state securities laws, (iii) all Borrower Materials marked "PUBLIC" are permitted to be made available through a portion of the Platform designated "Public Investor" and (iv) the Administrative Agent shall be entitled to treat any Borrower Materials that are not marked "PUBLIC" as being suitable only for posting on a portion of the Platform not designated "Public Investor."

SECTION 8.19.    Release of Liens.

(a)    Notwithstanding anything to the contrary in the Security Documents, Collateral may be released from the Lien and security interest created by the Security Documents to secure the Loans and

obligations under this Agreement at any time or from time to time in accordance with the provisions of the Intercreditor Agreement or as provided hereby.  The applicable property and assets included in the Collateral shall be automatically released from the Liens securing the Loans, and the applicable Guarantor shall be automatically released from its obligations under this Agreement and the Security Documents, under any one or more of the following circumstances or any applicable circumstance as provided in the Intercreditor Agreement or the Security Documents:

> (i)    to enable the Borrower and its Subsidiaries to consummate the disposition of such property or assets to a Person that is not the Borrower or a Guarantor to the extent permitted under Section 5.07;

> (ii)    in respect of any assets or property constituting Collateral, upon any assets becoming designated as Excluded Equity Interests, Excluded Assets or assets of an Excluded Subsidiary;

> (iii)    as provided in Section 8.01 or upon the release of such Guarantor pursuant to Section 8.20; and

> (iv)    upon any assets (x) becoming designated as Excluded Equity Interests, Excluded Assets or assets of any Excluded Subsidiary or any Subsidiary Guarantor becoming an Excluded Subsidiary or (y) becoming subject to Liens pursuant to clauses (1), (4), (14), (16) (with respect to a refinancing of Permitted Liens otherwise described in this clause (iv)(y)), (31) and (36) of the definition of Permitted Liens.

> (b)    In connection with any termination or release pursuant to this Section 8.19 or a release of a Guarantor pursuant to Section 8.20, the Collateral Agent shall execute and deliver to any Credit Party, at such Credit Party's expense, all documents that such Credit Party shall reasonably request to evidence such termination or release (including, without limitation, UCC termination statements), and will duly assign and transfer to such Credit Party, such of the Pledged Collateral (as defined in the Collateral Agreement) that may be in the possession of the Collateral Agent and has not theretofore been sold or otherwise applied or released pursuant to this Agreement or the Security Documents.  Any execution and delivery of documents pursuant to this Section 8.19 shall be without recourse to or warranty by the Collateral Agent.  In connection with any release pursuant to this Section 8.19 or 8.20, the Credit Party shall be permitted to take any action in connection therewith consistent with such release including, without limitation, the filing of UCC termination statements. Upon the receipt of any necessary or proper instruments of termination, satisfaction or release prepared by the Borrower, the Collateral Agent shall execute, deliver or acknowledge such instruments or releases to evidence the release of any Collateral permitted to be released pursuant to this Agreement or the Security Documents or the Intercreditor Agreement without the consent of, or notice to, any Lender.

The security interests in all Collateral also will be released upon (i) payment in full of the principal of, together with accrued and unpaid interest on, the Loans and all other Obligations under this Agreement and the Security Documents that are due and payable at or prior to the time such principal, together with accrued and unpaid interest, is paid and (ii) either (x) the termination or expiration of all Secured Hedge Agreements and the payment in full of all obligations due from the Borrower or any of its Restricted Subsidiaries thereunder or (y) arrangements satisfactory to each Hedge Bank which is counterparty to Secured Hedge Agreement being made with respect to (and/or or in replacement of) the security interest in the Collateral granted under the Security Documents.

Prior to executing and delivering or authorization of the filing of any release pursuant to this Section 8.19, the Collateral Agent shall receive, and shall be entitled to conclusively rely on, an Officers' Certificate stating that such release complies with the terms of this Agreement and the other Loan Documents, and all conditions precedent to the execution and delivery of such release have been satisfied.

132

SECTION 8.20.    <u>Release of Guarantee</u>.  Each Guarantor shall be automatically released upon:

(a)    solely in the case of a Subsidiary Guarantor, the sale, disposition, exchange or other transfer (including through merger, consolidation, amalgamation or otherwise) of the Capital Stock (including any sale, disposition or other transfer following which the applicable Subsidiary Guarantor is no longer a Restricted Subsidiary), of the applicable Subsidiary Guarantor if such sale, disposition, exchange or other transfer is made in a manner permitted under this Agreement and the other Loan Documents;

(b)    discharge of the Loan Obligations in accordance with the terms hereof;

(c)    as provided in <u>Section 8.01</u>; and

(d)    solely in the case of a Subsidiary Guarantor, such Subsidiary Guarantor becoming an Excluded Subsidiary.

SECTION 8.21.    <u>Acknowledgement and Consent to Bail-In of Affected Financial Institutions</u>.  Notwithstanding anything to the contrary in any Loan Document or in any other agreement, arrangement or understanding of the parties hereto, each such party acknowledges that any liability of any Affected Financial Institution arising under any Loan Document, to the extent such liability is unsecured, may be subject to the write-down and conversion powers of the applicable Resolution Authority and agrees and consents to, and acknowledges and agrees to be bound by:

(a)    the application of any Write-Down and Conversion Powers by the applicable Resolution Authority to any such liabilities arising hereunder which may be payable to it by any party hereto that is an Affected Financial Institution; and

(b)    the effects of any Bail-in Action on any such liability, including, if applicable:

(i)    a reduction in full or in part or cancellation of any such liability;

(ii)    a conversion of all, or a portion of, such liability into shares or other instruments of ownership in such Affected Financial Institution, its parent undertaking, or a bridge institution that may be issued to it or otherwise conferred on it, and that such shares or other instruments of ownership will be accepted by it in lieu of any rights with respect to any such liability under this Agreement or any other Loan Document; or

(iii)    the variation of the terms of such liability in connection with the exercise of the write-down and conversion powers of the applicable Resolution Authority.

SECTION 8.22.    <u>Amendment and Restatement</u>.  This Agreement shall be deemed to amend and restate the Prepetition FLFO Credit Agreement in its entirety, and all of the terms and provisions hereof shall supersede the terms and conditions thereof.  The parties hereto further agree that this Agreement and the Loans shall serve to extend, renew and continue, but not to extinguish or novate, the "Loans" under the Prepetition FLFO Credit Agreement and the corresponding promissory notes and to amend, restate and supersede, but not to extinguish or cause to be novated the "Obligations" under, the Prepetition FLFO Credit Agreement.  The Borrower hereby agrees that, upon the effectiveness of this Agreement, the "Loans" made and outstanding under the Prepetition FLFO Credit Agreement shall be deemed to be Loans outstanding under and payable by this Agreement.

SECTION 8.23.    <u>Certain ERISA Matters</u>.  Each Lender (x) represents and warrants, as of the date such Person became a Lender party hereto, to, and (y) covenants, from the date such Person became a Lender party hereto to the date such Person ceases being a Lender party hereto, for the benefit of the Agents and their

133

respective Affiliates and not, for the avoidance of doubt, to or for the benefit of the Borrower or any other Credit Party, that at least one of the following is and will be true:

(a)    such Lender is not using "plan assets" (within the meaning of Section 3(42) of ERISA or otherwise) of one or more Benefit Plans with respect to such Lender's entrance into, participation in, administration of and performance of the Loans or this Agreement,

(b)    the transaction exemption set forth in one or more PTEs, such as PTE 84-14 (a class exemption for certain transactions determined by independent qualified professional asset managers), PTE 95-60 (a class exemption for certain transactions involving insurance company general accounts), PTE 90-1 (a class exemption for certain transactions involving insurance company pooled separate accounts), PTE 91-38 (a class exemption for certain transactions involving bank collective investment funds) or PTE 96-23 (a class exemption for certain transactions determined by in-house asset managers), is applicable with respect to such Lender's entrance into, participation in, administration of and performance of the Loans and this Agreement,

(c)    (i) such Lender is an investment fund managed by a "Qualified Professional Asset Manager" (within the meaning of Part VI of PTE 84-14), (ii) such Qualified Professional Asset Manager made the investment decision on behalf of such Lender to enter into, participate in, administer and perform the Loans and this Agreement, (iii) the entrance into, participation in, administration of and performance of the Loans and this Agreement satisfies the requirements of sub-sections (b) through (g) of Part I of PTE 84-14 and (iv) to the best knowledge of such Lender, the requirements of subsection (a) of Part I of PTE 84-14 are satisfied with respect to such Lender's entrance into, participation in, administration of and performance of the Loans and this Agreement, or

(d)    such other representation, warranty and covenant as may be agreed in writing between the Administrative Agent, in its sole discretion, and such Lender.

In addition, unless either (1) sub-clause (a) in the immediately preceding paragraph is true with respect to a Lender or (2) a Lender has provided another representation, warranty and covenant in accordance with sub-clause (d) in the immediately preceding paragraph, such Lender further (x) represents and warrants, as of the date such Person became a Lender party hereto, to, and (y) covenants, from the date such Person became a Lender party hereto to the date such Person ceases being a Lender party hereto, for the benefit of, the Agents and their respective Affiliates and not, for the avoidance of doubt, to or for the benefit of the Borrower or any other Credit Party, that none of the Agents or their respective Affiliates are a fiduciary with respect to the assets of such Lender involved in such Lender's entrance into, participation in, administration of and performance of the Loans and this Agreement (including in connection with the reservation or exercise of any rights by the Agents under this Agreement, any Loan Document or any documents related hereto or thereto).  The Agents hereby inform the Lenders that each Agent is not undertaking to provide impartial investment advice, or to give advice in a fiduciary capacity, in connection with the transactions contemplated hereby, and that such Agent has a financial interest in the transactions contemplated hereby in that such Agent or an Affiliate thereof (i) may receive interest or other payments with respect to the Loans and this Agreement, (ii) may recognize a gain if it extended the Loans for an amount less than the amount being paid for an interest in the Loans by such Lender or (iii) may receive fees or other payments in connection with the transactions contemplated hereby, the Loan Documents or otherwise, including structuring fees, commitment fees, arrangement fees, facility fees, upfront fees, underwriting fees, ticking fees, agency fees, administrative agent or collateral agent fees, utilization fees, minimum usage fees, letter of credit fees, fronting fees, deal-away or alternate transaction fees, amendment fees, processing fees, term out premiums, banker's acceptance fees, breakage or other early termination fees or fees similar to the foregoing.

SECTION 8.24.    Acknowledgement Regarding Any Supported QFCs.  To the extent that the Loan Documents provide support, through a guarantee or otherwise, for Derivative Transactions or any other agreement or instrument that is a QFC (such support, "QFC Credit Support" and each such QFC a "Supported QFC"), the parties acknowledge and agree as follows with respect to the resolution power of the Federal Deposit

134

Insurance Corporation under the Federal Deposit Insurance Act and Title II of the Dodd-Frank Wall Street Reform and Consumer Protection Act (together with the regulations promulgated thereunder, the "US Special Resolution Regimes") in respect of such Supported QFC and QFC Credit Support (with the provisions below applicable notwithstanding that the Loan Documents and any Supported QFC may in fact be stated to be governed by the laws of the State of New York and/or of the U.S. or any other state of the U.S.):

(a)     In the event a Covered Entity that is party to a Supported QFC (each, a "Covered Party") becomes subject to a proceeding under a US Special Resolution Regime, the transfer of such Supported QFC and the benefit of such QFC Credit Support (and any interest and obligation in or under such Supported QFC and such QFC Credit Support, and any rights in property securing such Supported QFC or such QFC Credit Support) from such Covered Party will be effective to the same extent as the transfer would be effective under the US Special Resolution Regime if the Supported QFC and such QFC Credit Support (and any such interest, obligation and rights in property) were governed by the laws of the U.S. or a state of the U.S.  In the event a Covered Party or a BHC Act Affiliate of a Covered Party becomes subject to a proceeding under a US Special Resolution Regime, Default Rights under the Loan Documents that might otherwise apply to such Supported QFC or any QFC Credit Support that may be exercised against such Covered Party are permitted to be exercised to no greater extent than such Default Rights could be exercised under the US Special Resolution Regime if the Supported QFC and the Loan Documents were governed by the laws of the U.S. or a state of the U.S. Without limitation of the foregoing, it is understood and agreed that rights and remedies of the parties with respect to a Defaulting Lender shall in no event affect the rights of any Covered Party with respect to a Supported QFC or any QFC Credit Support.

(b)     As used in this Section 8.24, the following terms have the following meanings:

"BHC ACT Affiliate" means an "affiliate" (as defined under, and interpreted in accordance with, 12 U.S.C. 1841(k)).

"Covered Entity" means any of the following:

(i)     a "covered entity" as that term is defined in, and interpreted in accordance with, 12 C.F.R. § 252.82(b);

(ii)     a "covered bank" as that term is defined in, and interpreted in accordance with, 12 C.F.R. § 47.3(b); or

(iii)     a "covered FSI" as that term is defined in, and interpreted in accordance with, 12 C.F.R. § 382.2(b).

"Default Right" has the meaning assigned to that term in, and shall be interpreted in accordance with, 12 C.F.R. §§ 252.81, 47.2 or 382.1, as applicable.

"QFC" has the meaning assigned to the term "qualified financial contract" in, and shall be interpreted in accordance with, 12 U.S.C. 5390(c)(8)(D).

SECTION 8.25.     Collateral Matters; Hedge Agreements.

The benefit of the Security Documents and of the provisions of this Agreement relating to any Collateral securing the Obligations shall also extend to and be available on a pro rata basis pursuant to terms agreed upon in the Loan Documents to any Person (a) under any Secured Hedge Agreement, in each case, after giving effect to all netting arrangements relating to such Hedge Agreements or (b) under any Secured Cash Management Agreement. No Person shall have any voting rights under any Loan Document solely as a result of the existence of obligations owed to it under any such Secured Hedge Agreement or Secured Cash Management Agreement.

135

[SIGNATURE PAGES FOLLOW]

136

IN WITNESS WHEREOF, each of the parties hereto has caused a counterpart of this Agreement to be duly executed and delivered as of the date first above written.

[●], as the Borrower

By: _____
    Name:
    Title

[●], as Holdings

By: _____
    Name:
    Title

[Signature Page to Credit Agreement]

[●], as the Administrative Agent and the Collateral Agent


By: _____
    Name:
    Title:

Solely for the purposes of <u>Section 7.01(a)</u>:

CANTOR FITZGERALD SECURITIES, in its capacity as collateral agent under the Prepetition FLFO Credit Agreement

By: _____
    Name:
    Title:

[Signature Page to Credit Agreement]

**Exhibit J**

**Second Lien Exit Facility Agreement**

Current Draft
6/4/21

$[185,000,000][1]

**SECOND AMENDED AND RESTATED SECOND LIEN TERM LOAN AGREEMENT**

Dated as of [●], 2021,

Among

[NEWCO],
as Holdings,

[●],
as the Borrower,

The Several Lenders
from Time to Time Parties Hereto,

and

CANTOR FITZGERALD SECURITIES,
as the Administrative Agent and the Collateral Agent

---

[1] Timing of determination of amount to be discussed.

# TABLE OF CONTENTS

Page

## ARTICLE I

Definitions ................................................................................................................ 2
SECTION 1.01.       Defined Terms .......................................................... 2
SECTION 1.02.       Terms Generally ...................................................... 44
SECTION 1.03.       Accounting Terms .................................................... 44
SECTION 1.04.       Rounding ................................................................. 44
SECTION 1.05.       Times of Day ........................................................... 44
SECTION 1.06.       Timing of Payment or Performance .......................... 44
SECTION 1.07.       Hedging Requirements Generally; Hedge Unwinding.................. 44
SECTION 1.08.       Certain Determinations ........................................... 45
SECTION 1.09.       Making or Maintaining LIBOR Loans ....................... 45
SECTION 1.10.       Divisions ................................................................. 47
SECTION 1.11.       Deemed Funding of Loans ........................................ 47
SECTION 1.12.       Certain Calculation and Tests................................... 47

## ARTICLE II

The Credits............................................................................................................. 47
SECTION 2.01.       Loans ....................................................................... 47
SECTION 2.02.       Existing Loans............................... **Error! Bookmark not defined.**
SECTION 2.03.       Notice of Borrowing................................................. 48
SECTION 2.04.       Repayment of Loans; Evidence of Debt....................... 49
SECTION 2.05.       Other Fees ............................................................... 49
SECTION 2.06.       Interest.................................................................... 49
SECTION 2.07.       Interest Periods ....................................................... 50
SECTION 2.08.       Increased Costs, Illegality, etc................................. 50
SECTION 2.09.       Compensation.......................................................... 52
SECTION 2.10.       Change of Lending Office ......................................... 52
SECTION 2.11.       Notice of Certain Costs ............................................ 52
SECTION 2.12.       Voluntary Prepayments ........................................... 53
SECTION 2.13.       Mandatory Prepayments........................................... 53
SECTION 2.14.       Method and Place of Payment.................................... 55
SECTION 2.15.       Net Payments ........................................................... 55
SECTION 2.16.       Limit on Rate of Interest .......................................... 59

i

SECTION 2.17.        Pro Rata Sharing......................................................................... 59

SECTION 2.18.        Adjustments; Set-off .................................................................. 59

SECTION 2.19.        Interest Elections ....................................................................... 60

## ARTICLE III

Representations and Warranties................................................................................................... 63

SECTION 3.01.        Corporate Status ........................................................................ 63

SECTION 3.02.        Corporate Power and Authority; Enforceability; Security Interests63

SECTION 3.03.        No Violation; Compliance with Laws........................................... 63

SECTION 3.04.        Litigation ................................................................................... 64

SECTION 3.05.        Margin Regulations .................................................................... 64

SECTION 3.06.        Governmental Approvals ............................................................ 64

SECTION 3.07.        Investment Company Act ............................................................ 64

SECTION 3.08.        True and Complete Disclosure; Financial Condition ..................... 64

SECTION 3.09.        Tax Matters ............................................................................... 64

SECTION 3.10.        Compliance with ERISA ............................................................. 65

SECTION 3.11.        Capital Stock and Ownership ...................................................... 65

SECTION 3.12.        Intellectual Property ................................................................... 65

SECTION 3.13.        Environmental Laws .................................................................. 66

SECTION 3.14.        Properties................................................................................... 66

SECTION 3.15.        Solvency.................................................................................... 66

SECTION 3.16.        Anti-Corruption Laws ................................................................ 67

SECTION 3.17.        Anti-Terrorism and Anti-Money Laundering Laws; Sanctions ..... 67

SECTION 3.18.        Gas Imbalances, Prepayments..................................................... 68

SECTION 3.19.        Marketing of Production ............................................................. 68

SECTION 3.20.        Hedge Agreements ..................................................................... 68

SECTION 3.21.        Senior Indebtedness......................... **Error! Bookmark not defined.**

SECTION 3.22.        Defaults .................................................................................... 68

SECTION 3.23.        Labor Relations ......................................................................... 68

SECTION 3.24.        Insurance ................................................................................... 69

SECTION 3.25.        Material Contracts ..................................................................... 69

**ARTICLE IV**................................................................................................................... 69

Conditions Precedent ................................................................................................................ 69

SECTION 4.01.        Conditions Precedent to Effectiveness of this Agreement ............. 69

## ARTICLE V

Covenants ................................................................................................................................ 72

**Error! Unknown document property name.**
WEIL:\97986321\6\45327.0007

| | | |
|---|---|---|
| SECTION 5.01. | Information Covenants | 72 |
| SECTION 5.02. | Environmental Covenants | 76 |
| SECTION 5.03. | End of Fiscal Years; Fiscal Quarters | 77 |
| SECTION 5.04. | Use of Proceeds | 78 |
| SECTION 5.05. | Change in Business | 78 |
| SECTION 5.06. | Limitation on Incurrence of Indebtedness and Issuance of Disqualified Stock and Preferred Stock | 78 |
| SECTION 5.07. | Limitation on Restricted Payments | 82 |
| SECTION 5.08. | Dividend and Other Payment Restrictions Affecting Subsidiaries. | 85 |
| SECTION 5.09. | Asset Sales | 87 |
| SECTION 5.10. | Transactions with Affiliates | 88 |
| SECTION 5.11. | Mergers, Etc | 90 |
| SECTION 5.12. | Future Guarantors | 90 |
| SECTION 5.13. | Liens | 90 |
| SECTION 5.14. | Compliance with Material Contracts | 91 |
| SECTION 5.15. | Existence; Business and Properties | 91 |
| SECTION 5.16. | Maintenance of Insurance | 91 |
| SECTION 5.17. | Additional Collateral | 92 |
| SECTION 5.18. | Payment of Taxes, etc | 93 |
| SECTION 5.19. | Compliance with Laws | 93 |
| SECTION 5.20. | Further Instruments and Acts | 93 |
| SECTION 5.21. | Books, Records and Inspections | 93 |
| SECTION 5.22. | ERISA | 94 |
| SECTION 5.23. | Hedge Agreements; Swap Agreements | **Error! Bookmark not defined.** |
| SECTION 5.24. | Lender Meetings | 94 |
| SECTION 5.25. | Limitations on Amendments | 94 |
| SECTION 5.26. | Reserve Reports | 95 |
| SECTION 5.27. | Holdings Covenant | 95 |
| SECTION 5.29. | Foreign Subsidiaries; Closing Date Unrestricted Subsidiary | 96 |
| SECTION 5.30. | Account Control Agreements | 96 |
| SECTION 5.31. | Gas Imbalances, Take-or-Pay or Other Prepayments | 97 |
| SECTION 5.32. | Marketing of Production | 97 |
| SECTION 5.33. | Dutch Distributions | 97 |
| SECTION 5.34. | Post-Closing Obligations | 97 |

Error! Unknown document property name.
WEIL:\97986321\6\45327.0007

## ARTICLE VI

Events of Default ........................................................................................................... 97

SECTION 6.01.    Events of Default....................................................... 97

SECTION 6.02.    Application of Proceeds ............................................ 99

SECTION 6.03.    Control by Majority.................................................. 100

SECTION 6.04.    Limitation on Suits ................................................. 100

## ARTICLE VII

The Agents.................................................................................................................... 100

SECTION 7.01.    Appointment............................................................ 100

SECTION 7.02.    Delegation of Duties................................................ 101

SECTION 7.03.    Exculpatory Provisions ........................................... 101

SECTION 7.04.    Reliance by Agents.................................................. 102

SECTION 7.05.    Notice of Default..................................................... 102

SECTION 7.06.    Non-Reliance on Administrative Agent, Collateral Agent and Other Lenders .................................................................... 102

SECTION 7.07.    Indemnification ....................................................... 103

SECTION 7.08.    Agents in Their Individual Capacity ........................ 104

SECTION 7.09.    Successor Agents..................................................... 104

SECTION 7.10.    Payments Set Aside ................................................ 105

SECTION 7.11.    Bankruptcy Plan Voting .......................................... 105

SECTION 7.13.    Administrative Agent May File Proofs of Claim ........ 105

SECTION 7.14.    Collateral Matters ................................................... 106

SECTION 7.15.    Intercreditor Agreement and Other Collateral Matters................. 106

SECTION 7.16.    Withholding Tax ...................................................... 107

SECTION 7.17.    Erroneous Payment ................................................. 107

## ARTICLE VIII

Miscellaneous .............................................................................................................. 109

SECTION 8.01.    Amendments and Waivers........................................ 109

SECTION 8.02.    Notices.................................................................... 111

SECTION 8.03.    No Waiver; Cumulative Remedies............................. 113

SECTION 8.04.    Survival of Representations and Warranties .............. 113

SECTION 8.05.    Payment of Expenses; Indemnification ..................... 113

SECTION 8.06.    Successors and Assigns; Participations and Assignments............ 115

SECTION 8.07.    Replacements of Lenders Under Certain Circumstances ............. 118

SECTION 8.08.    Counterparts ........................................................... 119

iv

SECTION 8.09.     Severability .................................................................. 119

SECTION 8.10.     GOVERNING LAW ................................................... 119

SECTION 8.11.     Submission to Jurisdiction; Consent to Service; Waivers ............ 119

SECTION 8.12.     Acknowledgments ....................................................... 120

SECTION 8.13.     WAIVERS OF JURY TRIAL ..................................... 120

SECTION 8.14.     Confidentiality............................................................ 121

SECTION 8.15.     No Advisory or Fiduciary Responsibility................................... 121

SECTION 8.16.     USA PATRIOT Act ...................................................... 122

SECTION 8.17.     Conversion of Currencies............................................ 122

SECTION 8.18.     Platform; Borrower Materials ..................................... 122

SECTION 8.19.     Release of Liens .......................................................... 123

SECTION 8.20.     Release of Guarantee................................................... 124

SECTION 8.21.     Acknowledgement and Consent to Bail-In of Affected Financial Institutions.............................................. 124

SECTION 8.22.     Amendment and Restatement...................................... 125

SECTION 8.23.     Certain ERISA Matters ............................................... 125

SECTION 8.24.     Acknowledgement Regarding Any Supported QFCs................. 126

SECTION 8.25.     Collateral Matters; Hedge Agreements .........**Error! Bookmark not defined.**

v

Exhibit A               Form of Assignment and Acceptance
Exhibit B               Form of Note
Exhibit C               Form of Interest Period Election Request
Exhibit D1 – D4         Form of Non-Bank Tax Certificate
Exhibit E               Form of Notice of Borrowing
Exhibit F               Form of PIK Election Notice
Exhibit G               Form of Collateral Agreement
Exhibit H               Form of Senior Lien Intercreditor Agreement
Exhibit I               Form of Solvency Certificate
Exhibit J               Form of Permitted Loan Purchase Assignment and Acceptance

Schedule 1.01(a)        Closing Date Investors
Schedule 2.01           Initial Commitments
Schedule 3.01           Jurisdictions
Schedule 3.04           Litigation
Schedule 3.11           Capital Stock and Ownership
Schedule 3.18           Gas Imbalances
Schedule 3.19           Marketing Agreements
Schedule 3.20           Hedge Agreements
Schedule 3.25           Material Contracts
Schedule 5.06           Existing Indebtedness
Schedule 5.07           Existing Investments
Schedule 5.10           Transactions with Affiliates
Schedule 5.13           Existing Liens
Schedule 5.34           Post-Closing Obligations

**Error! Unknown document property name.**
WEIL:\97986321\6\45327.0007

Current Draft
6/4/21

**SECOND AMENDED AND RESTATED SECOND LIEN TERM LOAN AGREEMENT**

      This Second Amended and Restated Second Lien Term Loan Agreement (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, this "Agreement"), dated as of [●], 2021, by and among [Newco] ("Holdings"), [●] (the "Borrower"), the Lenders from time to time party hereto and Cantor Fitzgerald Securities ("CFS"), as administrative agent and collateral agent for the Lenders.

      WHEREAS, on September 30, 2013, Fieldwood Energy LLC, a Delaware limited liability company ("FWE"), entered into that certain Credit Agreement, by and among, *inter alios*, FWE, certain lenders party thereto from time to time, and Citibank, N.A., as administrative agent and collateral agent, and the other agents party thereto from time to time (as amended, restated, amended and restated, supplemented or otherwise modified from time to time prior to the effectiveness of the Prepetition First Lien Term Credit Agreement (as defined below), the "Original First Lien Credit Agreement");

      WHEREAS, on April 11, 2018, in connection with a Joint Prepackaged Chapter 11 Plan of Fieldwood Energy LLC and its Affiliated Debtors (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "Prior Plan of Reorganization"), which was confirmed by the Bankruptcy Court on April 2, 2018, FWE entered into that certain Amended and Restated First Lien Term Loan Agreement, by and among FWE, Fieldwood Energy Inc., a Delaware corporation ("FWE Inc."), the financial institutions from time to time party thereto, the issuing banks from time to time party thereto and CFS, as administrative agent and as collateral agent (as amended, restated, supplemented or otherwise modified from time to time prior to the effectiveness of this Agreement, the "Prepetition First Lien Credit Agreement"), which amended and restated in its entirety the Original First Lien Credit Agreement;

      WHEREAS, on August 3, 2020 (the "Petition Date"), FWE Inc., FWE and certain other Affiliates of FWE (each a "Debtor" and collectively, the "Debtors") filed voluntary petitions with the United States Bankruptcy Court for the Southern District of Texas (the "Bankruptcy Court") initiating their respective cases that are pending under chapter 11 of the Bankruptcy Code (each case of the Borrower and each other Debtor, a "Case" and collectively, the "Cases") and have continued in the possession of their assets and the management of their business pursuant to Section 1107 and 1108 of the Bankruptcy Code;

      WHEREAS, among others, certain Loan Parties (each, as a debtor and debtor-in-possession under the Cases), the Lenders and CFS, as administrative agent and collateral agent, entered into a senior secured super-priority debtor-in-possession facility, dated as of August 24, 2020 (as amended, restated, amended and restated, supplemented and/or otherwise modified from time to time, the "DIP Facility");

      WHEREAS, the Debtors filed the [Third Amended Joint Chapter 11 Plan of Fieldwood Energy LLC and its Affiliated Debtors] (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "Plan of Reorganization") which was confirmed by the Bankruptcy Court on [●], 2021;

      WHEREAS, as contemplated by the Plan of Reorganization, [●] ("Credit Bid Purchaser") entered into that certain Purchase and Sale Agreement, dated as of [●] (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "Credit Bid Purchase Agreement"), by and among, *inter alios*, FWE and certain of its Affiliates, as Sellers (as defined therein) and Credit Bid Purchaser, as Buyer (as defined therein);

      WHEREAS upon the effectiveness of the Plan of Reorganization, (i) the outstanding DIP Facility Loans (as defined below) on the Closing Date identified as "Converted DIP Facility Loans" on Schedule 2.01 (the "Converted DIP Facility Loans") shall be converted into Initial DIP Converted Loans (as defined below) hereunder and the relevant Lenders shall be deemed to have made Initial DIP Converted Loans on the Closing Date in an aggregate principal amount of $[_] to the Borrower on the terms and conditions set forth in

this Agreement, and (ii) the Lenders have agreed to provide the Borrower Initial New Loans (as defined below) in an aggregate principal amount of $[_] on the terms and conditions set forth in this Agreement; and

NOW, THEREFORE, the Lenders are willing to extend such term loan to the Borrower on the terms and subject to the conditions set forth herein.  Accordingly, the parties hereto agree as follows:

## ARTICLE I

### Definitions

SECTION 1.01.    <u>Defined Terms</u>.  As used in this Agreement, the following terms shall have the meanings specified below:

"<u>2P Developed Producing Reserves</u>" means, collectively, Proved Developed Producing Reserves and Probable Developed Producing Reserves.

"<u>ABR</u>" means, for any day, a fluctuating interest rate per annum in effect from time to time, which rate per annum shall at all times be equal to the highest of (a) the Prime Rate in effect on such day, (b) ½ of 1.00% per annum above the Federal Funds Rate, (c) 1.00% per annum above the one-month Adjusted LIBOR and (d) 2.00%.

"<u>ABR Borrowing</u>" means a Borrowing comprised of ABR Loans.

"<u>ABR Loan</u>" means a Loan bearing interest at a rate equal to ABR <u>plus </u>the Applicable Margin.

"<u>Account Control Agreement</u>" means an account control agreement in form and substance satisfactory to the Collateral Agent (it being agreed that (x) any agreement purporting to require the Collateral Agent to indemnify a depositary bank or securities intermediary in the Collateral Agent's individual capacity shall not be satisfactory to the Collateral Agent and (y) the form of that certain Deposit Account Control Agreement, dated as of May 26, 2020 by and among, *inter alios*, FWE, CFS, Cortland Capital Markets Services, LLC and Capital One, National Association is satisfactory to the Collateral Agent) and the Required Lenders and duly executed by the applicable Credit Party, the Collateral Agent, the Collateral Agent (as defined in the FLTL Credit Agreement) (if applicable) and the applicable depositary bank or securities intermediary, as the case may be.

"<u>Acquired Interests</u>" shall have the meaning set forth in the Credit Bid Purchase Agreement.

"<u>Additional Refinancing Amount</u>" means, in connection with the Incurrence of any Refinancing Indebtedness, the aggregate principal amount of additional Indebtedness, Disqualified Stock or Preferred Stock Incurred to pay premiums (including tender premiums), expenses, defeasance costs and fees in respect thereof.

"<u>Adjusted LIBOR</u>" means, with respect to any Interest Period, an interest rate per annum equal to the product of (a) LIBOR in effect for such Interest Period and (b) Statutory Reserves; <u>provided</u>, that if Adjusted LIBOR is less than 1.00%, Adjusted LIBOR shall be deemed to be 1.00%.

"<u>Administrative Agent</u>" means CFS, as the administrative agent for the Lenders under this Agreement and the other Loan Documents, or any successor administrative agent appointed in accordance with the provisions of <u>Section 7.09</u>.

"<u>Administrative Questionnaire</u>" shall have the meaning set forth in <u>Section 8.06(b)(ii)(D)</u>.

"<u>Adverse Proceedings</u>" shall have the meaning set forth in <u>Section 3.04</u>.

2

"<u>Affiliate</u>" means, with respect to any Person, any other Person directly or indirectly controlling, controlled by, or under direct or indirect common control with such Person.  A Person shall be deemed to control another Person if such Person possesses, directly or indirectly, the power to direct or cause the direction of the management and policies of such other Person, whether through the ownership of voting securities, by contract or otherwise.  "Controlling" ("controlling") and "controlled" shall have meanings correlative thereto.

"<u>Affiliate Transaction</u>" shall have the meaning set forth in <u>Section 5.10(a)</u>.

"<u>Agents</u>" means the Administrative Agent and the Collateral Agent.

"<u>Agreement</u>" shall have the meaning set forth in the preamble hereto, as amended, restated, amended and restated, supplemented or otherwise modified from time to time.

"<u>Agreement Currency</u>" shall have the meaning set forth in <u>Section 8.17(b)</u>.

"<u>Anti-Corruption Laws</u>" means the U.S. Foreign Corrupt Practices Act of 1977, the Bribery Act 2010 of the United Kingdom or similar law of a jurisdiction in which Holdings, the Borrower or any of its Subsidiaries conduct their business and to which they are lawfully subject.

"<u>Anti-Terrorism and Anti-Money Laundering Laws</u>" means any and all applicable requirements of law relating to engaging in, financing or facilitating terrorism or money laundering, including the USA Patriot Act, The Currency and Foreign Transactions Reporting Act (also known as the "Bank Secrecy Act", 31 U.S.C. §§5311-5330 and 12 U.S.C. §§1818(s), 1820(b) and 1951-1959), Trading With the Enemy Act (50 U.S.C. §1 et seq.), Executive Order 13224 (effective September 24, 2001) and each of the laws, regulations, and executive orders administered by OFAC (31 C.F.R., Subtitle B, Chapter V).

"<u>Applicable Creditor</u>" shall have the meaning set forth in <u>Section 8.17(b)</u>.

"<u>Applicable Margin</u>" means (i) in the case of LIBOR Loans, 8.00% per annum and (ii) in the case of ABR Loans, 7.00% per annum; <u>provided</u>, that, with respect to Interest Payment Date in which the Borrower has made a PIK Election, "Applicable Margin" shall mean (i) in the case of LIBOR Loans, 4.75% per annum and (ii) in the case of ABR Loans, 3.75% per annum.

"<u>Approved Fund</u>" shall have the meaning set forth in <u>Section 8.06(b)</u>.

"<u>Approved Petroleum Engineers</u>" means (a) Netherland, Sewell & Associates, Inc., (b) Ryder Scott Company, L.P., (c) W. D. Van Gonten & Co. Petroleum Engineering, (d) DeGolyer and MacNaughton, (e) Cawley, Gillespie & Associates, Inc., (f) Miller and Lents, Ltd. and (g) at the Borrower's option, any other independent petroleum engineers selected by the Borrower that is reasonably acceptable to the Required Lenders.

"<u>Asset Sale</u>" means:

(1)       the sale, conveyance, transfer or other disposition (whether in a single transaction or a series of related transactions) of property or assets (including by way of Production Payments and Reserve Sales and Sale/Leaseback Transactions) (other than an operating lease entered into in the ordinary course of the Oil and Gas Business) (each referred to in this definition as a "*disposition*"); or

(2)       the issuance or sale of Equity Interests (other than directors' qualifying shares and shares issued to foreign nationals or other third parties to the extent required by applicable law) of any Subsidiary (other than to the Borrower or another Restricted Subsidiary) (whether in a single transaction or a series of related transactions),

Error! Unknown document property name.
WEIL:\97986321\6\45327.0007

in each case other than:

(a)     a disposition of Cash Equivalents or Investment Grade Securities or obsolete, damaged or worn out property or equipment in the ordinary course of business;

(b)     any disposition that occurs in connection with a transaction permitted pursuant to Section 5.11;

(c)     any Restricted Payment or Permitted Investment that is permitted to be made, and is made, under Section 5.07;

(d)     any disposition of property or assets, or the issuance of securities, by a Restricted Subsidiary to the Borrower or by the Borrower or a Restricted Subsidiary to a Restricted Subsidiary that is a Guarantor;

(e)     foreclosure, condemnation or any similar action with respect to any property or other asset of the Borrower or any of the Restricted Subsidiaries;

(f)     the lease, assignment or sublease of, or any transfer related to a "reverse build to suit" or similar transaction in respect of, any real or personal property in the ordinary course of business;

(g)     any sale of inventory (including Hydrocarbons and mineral products) in the ordinary course of business;

(h)     any grant in the ordinary course of business of any license of patents, trademarks, know-how or any other intellectual property;

(i)     in the ordinary course of business and other than with respect to any Oil and Gas Properties, any swap of assets, or lease, assignment or sublease of any real or personal property, in exchange for services (including in connection with any outsourcing arrangements) of comparable or greater value or usefulness to the business of the Borrower and the Restricted Subsidiaries as a whole, as determined in good faith by the Borrower;

(j)     any transfer of accounts receivable and related assets of the type specified in the definition of "Receivables Financing" (or a fractional undivided interest therein) by a Receivables Subsidiary in a Qualified Receivables Financing;

(k)     any Sale/Leaseback Transaction provided that the Fair Market Value of all property of the Borrower and its Restricted Subsidiaries subject to such arrangements since the Closing Date does not exceed $11,500,000;

(l)     dispositions in connection with Permitted Liens;

(m)     any disposition of Capital Stock of a Restricted Subsidiary pursuant to an agreement or other obligation with or to a Person (other than the Borrower or a Restricted Subsidiary) from whom such Restricted Subsidiary was acquired or from whom such Restricted Subsidiary acquired its business and assets (having been newly formed in connection with such acquisition), made as part of such acquisition and in each case comprising all or a portion of the consideration in respect of such sale or acquisition;

Error! Unknown document property name.
WEIL:\97986321\6\45327.0007

(n)     dispositions of receivables in connection with the compromise, settlement or collection thereof in the ordinary course of business or in bankruptcy or similar proceedings and exclusive of factoring or similar arrangements;

(o)     any surrender, expiration or waiver of contract rights (other than oil and gas leases) or the settlement, release, recovery on or surrender of contract, tort or other claims of any kind;

(p)     any Production Payments and Reserve Sales; *provided* that any such Production Payments and Reserve Sales, other than incentive compensation programs on terms that are reasonably customary in the Oil and Gas Business for geologists, geophysicists and other providers of technical services to the Borrower or a Restricted Subsidiary, shall have been created, incurred, issued, assumed or guaranteed in connection with the financing of, and within 60 days after the acquisition of, the property that is subject thereto;

(q)     the abandonment, farm-out pursuant to a Farm-Out Agreement, lease or sublease of undeveloped Oil and Gas Properties owned or held by the Borrower or any Restricted Subsidiary in the ordinary course of business or which are usual and customary in the Oil and Gas Business generally or in the geographic region in which such activities occur;

(r)     the unwinding of any Hedge Agreement;

(s)     sales, transfer and other dispositions of Investments in joint ventures to the extent required by, or made pursuant to, customary buy/sell arrangements between the joint venture parties set forth in venture arrangements and similar binding arrangements; and

(t)     the lapse or abandonment of intellectual property in the ordinary course of business, which in the reasonable good faith determination of the Borrower are not material to the conduct of the business of the Borrower and its Subsidiaries, taken as a whole.

"Assignee" shall have the meaning set forth in Section 8.06(b)(i).

"Assignment and Acceptance" means an assignment and acceptance entered into by a Lender and an Assignee, and accepted by the Administrative Agent (substantially in the form of Exhibit A or such other form as shall be approved by the Administrative Agent).

"Authorized Officer" means as to any Person, the President, the Chief Executive Officer, the Chief Financial Officer, the Chief Operating Officer, the Treasurer, the Assistant or Vice Treasurer, the Vice President-Finance, the General Counsel and any manager, managing member or general partner, in each case, of such Person, and any other senior officer designated as such in writing to the Administrative Agent by such Person.  Any document delivered hereunder that is signed by an Authorized Officer shall be conclusively presumed to have been authorized by all necessary corporate, limited liability company, partnership and/or other action on the part of the Borrower or any other Credit Party and such Authorized Officer shall be conclusively presumed to have acted on behalf of such Person.

"Available Tenor" means, as of any date of determination and with respect to the then-current Benchmark, as applicable, (x) if the then-current Benchmark is a term rate, any tenor for such Benchmark that is or may be used for determining the length of an Interest Period or (y) otherwise, any payment period for interest calculated with reference to such Benchmark, as applicable, pursuant to this Agreement as of such date.

5

"Bail-In Action" means the exercise of any Write-Down and Conversion Powers by the applicable Resolution Authority in respect of any liability of an Affected Financial Institution.

"Bail-In Legislation" means, (a) with respect to any EEA Member Country implementing Article 55 of Directive 2014/59/EU of the European Parliament and of the Council of the European Union, the implementing law, regulation, rule or requirement for such EEA Member Country from time to time which is described in the EU Bail-In Legislation Schedule and (b) with respect to the United Kingdom, Part I of the United Kingdom Banking Act 2009 (as amended from time to time) and any other law, regulation or rule applicable in the United Kingdom relating to the resolution of unsound or failing banks, investment firms or other financial institutions or their affiliate (other than through liquidation, administration or other insolvency proceedings).

"Bankruptcy Code" shall have the meaning set forth in Section 6.01(e).

"Bankruptcy Court" shall have the meaning set forth in the recitals hereto.

"Benchmark" means, initially, LIBOR; provided that if a replacement of the Benchmark has occurred pursuant to Section 1.09(b), then "Benchmark" means the applicable Benchmark Replacement to the extent that such Benchmark Replacement has replaced such prior benchmark rate. Any reference to "Benchmark" shall include, as applicable, the published component used in the calculation thereof.

"Benchmark Replacement" means, for any Available Tenor:

(1)      for purposes of Section 1.09(b)(i), the first alternative set forth below that can be determined by the Administrative Agent:

(a)      the sum of: (i) Term SOFR and (ii) 0.11448% (11.448 basis points) for an Available Tenor of one-month's duration, 0.26161% (26.161 basis points) for an Available Tenor of three-months' duration, and 0.42826% (42.826 basis points) for an Available Tenor of six-months' duration; or

(b)      the sum of: (i) Daily Simple SOFR and (ii) the spread adjustment selected or recommended by the Relevant Governmental Body for the replacement of the tenor of LIBOR with a SOFR-based rate having approximately the same length as the interest payment period specified in Section 1.09(b)(i); and

(2)      for purposes of Section 1.09(b)(ii), the sum of (a) the alternate benchmark rate and (b) an adjustment (which may be a positive or negative value or zero), in each case, that has been selected by the Administrative Agent (at the direction of the Required Lenders) and the Borrower as the replacement for such Available Tenor of such Benchmark giving due consideration to any evolving or then-prevailing market convention, including any applicable recommendations made by the Relevant Governmental Body, for U.S. dollar- denominated syndicated credit facilities at such time;

provided that, if the Benchmark Replacement as determined pursuant to clause (1) or (2) above would be less than the Floor, the Benchmark Replacement will be deemed to be the Floor for the purposes of this Agreement and the other Loan Documents.

"Benchmark Replacement Conforming Changes" means, with respect to any Benchmark Replacement, any technical, administrative or operational changes (including changes to the definition of "ABR," the definition of "Business Day," the definition of "Interest Period," timing and frequency of determining rates and making payments of interest, timing of borrowing requests or prepayment, conversion or continuation notices, the applicability and length of lookback periods, the applicability of breakage provisions, and other technical, administrative or operational matters) that the Administrative Agent (at the direction of the

6

Required Lenders) decides may be appropriate to reflect the adoption and implementation of such Benchmark Replacement and to permit the administration thereof by the Administrative Agent in a manner substantially consistent with market practice (or, if the Administrative Agent (at the direction of the Required Lenders) decides that adoption of any portion of such market practice is not administratively feasible or if the Administrative Agent (at the direction of the Required Lenders) determines that no market practice for the administration of such Benchmark Replacement exists, in such other manner of administration as the Administrative Agent decides is reasonably necessary in connection with the administration of this Agreement and the other Loan Documents).

"<u>Benchmark Transition Event</u>" means, with respect to any then-current Benchmark other than LIBOR, the occurrence of a public statement or publication of information by or on behalf of the administrator of the then-current Benchmark, the regulatory supervisor for the administrator of such Benchmark, the Board of Governors, the NYFRB, an insolvency official with jurisdiction over the administrator for such Benchmark, a resolution authority with jurisdiction over the administrator for such Benchmark or a court or an entity with similar insolvency or resolution authority over the administrator for such Benchmark, announcing or stating that:

(1)     such administrator has ceased or will cease on a specified date to provide all Available Tenors of such Benchmark, permanently or indefinitely, provided that, at the time of such statement or publication, there is no successor administrator that will continue to provide any Available Tenor of such Benchmark; or

(2)     all Available Tenors of such Benchmark are or will no longer be representative of the underlying market and economic reality that such Benchmark is intended to measure and that representativeness will not be restored.

"<u>Beneficial Ownership Regulation</u>" means 31 C.F.R. § 1010.230.

"<u>Benefit Plan</u>" means any of (a) an "employee benefit plan" (as defined in ERISA) that is subject to Title I of ERISA, (b) a "plan" as defined in Section 4975 of the Code or (c) any Person whose assets include (for purposes of ERISA Section 3(42) or otherwise for purposes of Title I of ERISA or Section 4975 of the Code) the assets of any such "employee benefit plan" or "plan".

"<u>Board</u>" means the Board of Governors of the Federal Reserve System of the United States of America (or any successor).

"<u>Board of Directors</u>" means, as to any Person, the board of directors or other governing body of such Person, or if such Person is owned or managed by a single entity, the board of directors or other governing body of such entity.

"<u>Borrower</u>" shall have the meaning set forth in the preamble to this Agreement.

"<u>Borrower Materials</u>" shall have the meaning set forth in <u>Section 8.18</u>.

"<u>Borrowing</u>" means a group of Loans of a single Type and made on a single date and, in the case of LIBOR Loans, as to which a single Interest Period is in effect.

"<u>Budget</u>" shall have the meaning provided in <u>Section 5.01(g)</u>.

"<u>Business Day</u>" means any day excluding Saturday, Sunday and any other day on which banking institutions in New York City or Houston, Texas are authorized by law or other governmental actions to close, and, if such day relates to (a) any interest rate settings as to a LIBOR Loan, (b) any fundings, disbursements, settlements and payments in respect of any such LIBOR Loan, or (c) any other dealings pursuant

to this Agreement in respect of any such LIBOR Loan, such day shall be a day on which dealings in deposits in U.S. Dollars are conducted by and between banks in the London interbank eurodollar market.

"Capital Stock" means:

(1)    in the case of a corporation, corporate stock or shares;

(2)    in the case of an association or business entity, any and all shares, interests, participations, rights or other equivalents (however designated) of corporate stock;

(3)    in the case of a partnership or limited liability company, partnership or membership interests (whether general or limited); and

(4)    any other interest or participation that confers on a Person the right to receive a share of the profits and losses of, or distributions of assets of, the issuing Person.

"Capitalized Lease Obligation" means, at the time any determination thereof is to be made, the amount of the liability in respect of a capital lease that would at such time be required to be capitalized and reflected as a liability on a balance sheet (excluding the footnotes thereto) in accordance with GAAP; *provided* that any obligations of the Borrower or its Restricted Subsidiaries, or of a special purpose or other entity not consolidated with the Borrower and its Restricted Subsidiaries, that (i) were not (or would not have been) included on the consolidated balance sheet of the Borrower as capital lease obligations prior to the recharacterization described below and (ii) are subsequently (re)characterized as capital lease obligations or, in the case of such a special purpose or other entity becoming consolidated with the Borrower and its Restricted Subsidiaries, due to a change in accounting treatment or otherwise, shall for all purposes not be treated as Capitalized Lease Obligations or Indebtedness.

"Case" and "Cases" shall have the meaning set forth in the recitals hereto.

"Cash Equivalents" means:

(1)    U.S. Dollars, pounds sterling, euros, the national currency of any member state in the European Union or such local currencies held by an entity from time to time in the ordinary course of business;

(2)    securities issued or directly and fully guaranteed or insured by the U.S. government or any country that is a member of the European Union or any agency or instrumentality thereof in each case maturing not more than two years from the date of acquisition;

(3)    certificates of deposit, time deposits and eurodollar time deposits with maturities of one year or less from the date of acquisition, bankers' acceptances, in each case with maturities not exceeding one year and overnight bank deposits, in each case with any commercial bank having capital and surplus in excess of $250,000,000 in the case of domestic banks and $100,000,000 in the case of (or the U.S. Dollar equivalent thereof) in the case of foreign banks;

(4)    repurchase obligations for underlying securities of the types described in clauses (2) and (3) above entered into with any financial institution meeting the qualifications specified in clause (3) above;

(5)    commercial paper issued by a corporation (other than an Affiliate of the Borrower) rated at least "A-1" or the equivalent thereof by Moody's or S&P (or reasonably equivalent ratings of another internationally recognized ratings agency) and in each case maturing within one year after the date of acquisition;

(6)    readily marketable direct obligations issued by any state of the United States of America or any political subdivision thereof having one of the two highest rating categories obtainable from

8

either Moody's or S&P (or reasonably equivalent ratings of another internationally recognized ratings agency) in each case with maturities not exceeding two years from the date of acquisition;

(7)     Indebtedness issued by Persons (other than the Investors or any of their Affiliates) with a rating of "A" or higher from S&P or "A-2" or higher from Moody's (or reasonably equivalent ratings of another internationally recognized ratings agency) in each case with maturities not exceeding two years from the date of acquisition;

(8)     investment funds investing at least 95% of their assets in securities of the types described in clauses (1) through (7) above; and

(9)     in the case of Investments by any Foreign Subsidiary or Investments made in a country outside the United States, other customarily utilized high-quality Investments in the country where such Foreign Subsidiary is located or in which such Investment is made.

"Cash Management Services" shall mean (a) commercial credit cards, merchant card services, purchase or debit cards, including non-card e-payables services, (b) treasury management services (including, but not limited to, controlled disbursement, overdraft, automated clearing house fund transfer services, return items and interstate depository network services) and (c) any other demand deposit or operating account relationships or other cash management services.

"Casualty Event" means, with respect to any Collateral, (a) any damage to, destruction of, or other casualty or loss involving, any property or asset or (b) any seizure, condemnation, confiscation or taking under the power of eminent domain of, or any requisition of title or use of, or relating to, or any similar event in respect of, any property or asset.

"CFC" means a "controlled foreign corporation" within the meaning of Section 957 of the Code.

"CFS" shall have the meaning set forth in the preamble to this Agreement.

"Change in Law" means (a) the adoption or taking effect of any law, treaty, order, policy, rule or regulation after the Closing Date, (b) any change in any law, treaty, order, policy, rule or regulation or in the administration, interpretation, implementation or application thereof by any Governmental Authority after the Closing Date or (c) the making or issuance of any guideline, request, directive or order enacted or promulgated after the Closing Date by any central bank or other governmental or quasigovernmental authority (whether or not having the force of law); *provided* that notwithstanding anything herein to the contrary, the Dodd-Frank Wall Street Reform and Consumer Protection Act, the Basel Committee on Banking Regulations and Supervisory Practices (or any successor or similar authority) and all guidelines, requests, directives, orders, rules and regulations adopted, enacted or promulgated in connection therewith, in each case pursuant to Basel III, shall in each case be deemed to have gone into effect after the Closing Date regardless of the date adopted, enacted or promulgated and shall be included as a Change in Law; *provided* that no Lender shall be required to disclose any confidential or proprietary information in connection therewith.

"Change of Control" means, at any time: (a) any Person or "group" (within the meaning of Section 13(d) or 14(d) of the Exchange Act, but excluding any employee benefit plan of such Person, entity or "group" and its Subsidiaries and any Person or entity acting in its capacity as trustee, agent or other fiduciary or administrator of any such plan), other than the Permitted Holders (or any holding company parent of Holdings owned directly or indirectly by the Permitted Holders), shall at any time have acquired direct or indirect beneficial ownership (as defined in Rules 13(d)-3 and 13(d)-5 under the Exchange Act) of either (i) voting power of the outstanding Voting Stock of the Borrower having more than 35% of the ordinary voting power for the election of directors of the Borrower or (ii) economic interests in the outstanding Capital Stock of the Borrower having more than 35% of the aggregate economic interests in the outstanding Capital Stock of the Borrower, (b)

9

Holdings shall cease to own 100% of the Capital Stock of the Borrower, or (c) any "change of control" or similar term under the FLTL Facility shall occur.

"Class" when used in reference to (a) any Loan, refers to whether such Loan are Loans made or deemed made by any of the Lenders to the Borrower pursuant to Section 2.01 on the Closing Date or a Loan or Loans of another class established pursuant to Section 2.20 or otherwise hereunder, (b) any Commitment, refers to whether such Commitment is an Initial Commitment or a commitment of another class established pursuant to Section 2.20 or otherwise hereunder and (c) any Lender, refers to whether such Lender has a Loan or Commitment of a particular Class. The Initial New Loans and the Initial DIP Converted Loans shall constitute a single Class of Loans for all purposes under this Agreement

"Closing Date" means the date on which all the conditions set forth in Section 4.01 shall have been satisfied (or waived in accordance with Section 8.01).

"Closing Date Unrestricted Subsidiary" means Fieldwood Cooperatief U.A.

"Code" means the Internal Revenue Code of 1986, as amended from time to time.

"Collateral" shall have the meaning provided for such term in each of the Security Documents and shall include any and all assets securing or intended to secure any or all of the Loan Obligations; *provided* that with respect to any Mortgages, "Collateral," as defined herein, shall include "Mortgaged Property" as defined therein; *provided* further, that in no case shall the "Collateral" include any Excluded Asset (including, for the avoidance of doubt, any Excluded Equity Interests).

"Collateral Agent" means CFS, as collateral agent for the benefit of the Secured Parties, or any successor collateral agent appointed in accordance with the provisions of Section 7.09.

"Collateral Agreement" means the Collateral Agreement, to be entered into as of the Closing Date, among the Borrower, the Guarantors and the Collateral Agent, substantially in the form attached hereto as Exhibit G, as may be amended, restated, amended and restated, supplemented or otherwise modified from time to time in accordance with its terms and in accordance with this Agreement.

"Commitment" means, with respect to any Lender, such Lender's Initial Commitment or Incremental Commitment.

"Commitment Letter" shall have the meaning set forth in Section 4.01(v).

"Consolidated Excess Cash" shall mean, as of the end of any fiscal quarter, the amount that (x) the average daily balance of Unrestricted Cash of the Borrower and Subsidiary Guarantors over the last fiscal month of such fiscal quarter exceeds (y) $130,000,000.

"Contingent Obligations" means, with respect to any Person, any obligation of such Person guaranteeing any leases, dividends or other obligations that do not constitute Indebtedness ("primary obligations") of any other Person (the "primary obligor") in any manner, whether directly or indirectly, including, without limitation, any obligation of such Person, whether or not contingent:

        (1)        to purchase any such primary obligation or any property constituting direct or indirect security therefor;

        (2)        to advance or supply funds;

        (a)        for the purchase or payment of any such primary obligation; or

(b)        to maintain working capital or equity capital of the primary obligor or otherwise to maintain the net worth or solvency of the primary obligor; or

(3)        to purchase property, securities or services primarily for the purpose of assuring the owner of any such primary obligation of the ability of the primary obligor to make payment of such primary obligation against loss in respect thereof.

"Contractual Requirement" shall have the meaning set forth in Section 3.03.

"Converted DIP Facility Loans" shall have the meaning set forth in the recitals hereto.

"Covered Party" shall have the meaning set forth in Section 8.24(a).

"Credit Bid Purchase Agreement" shall have the meaning set forth in the recitals hereto.

"Credit Bid Purchaser" shall have the meaning set forth in the recitals hereto.

"Credit Party" means each of the Borrower and the Guarantors.

"Customary Intercreditor Agreement" means (a) to the extent executed in connection with incurrence of Indebtedness secured by Liens on the Collateral which are intended to rank equal in priority to the Liens on the Collateral securing the Loan Obligations (but without regard to the control of remedies), a customary intercreditor agreement in form and substance reasonably acceptable to the Required Lenders and the Borrower, which agreement shall provide that the Liens on the Collateral securing such Indebtedness shall rank equal in priority to the Liens on the Collateral securing the Loan Obligations (but without regard to the control of remedies) and (b) to the extent executed in connection with the incurrence of Indebtedness secured by Liens on the Collateral which are intended to rank senior or junior to the Liens on the Collateral securing the Loan Obligations, at the option of the Borrower, either (i) the Senior Lien Intercreditor Agreement, (ii) an intercreditor agreement substantially in the form of the Senior Lien Intercreditor Agreement (with such modifications as may be necessary or appropriate in light of prevailing market conditions and reasonably acceptable to the Required Lenders) or (iii) a customary intercreditor agreement in form and substance reasonably acceptable to the Required Lenders and the Borrower, which agreement shall provide that the Liens on the Collateral securing such Indebtedness shall rank senior or junior to the Liens on the Collateral securing the Loan Obligations, as applicable.  With regard to the intercreditor agreements or changes described above (other than with respect to clause (b)(i) above), such changes or agreement, as applicable, shall be posted to the Lenders not less than three (3) Business Days before execution thereof and, if the Required Lenders shall not have objected in writing to such changes within three (3) Business Days after posting, then the Required Lenders shall be deemed to have agreed that the Administrative Agent's and/or Collateral Agent's entry into such intercreditor agreement (including with such changes) is reasonable and to have consented to such intercreditor agreement (including with such changes) and to the Administrative Agent's and/or Collateral Agent's execution thereof.

"Daily Simple SOFR" means, for any day, SOFR, with the conventions for this rate (which will include a lookback) being established by the Administrative Agent (at the direction of the Required Lenders) in accordance with the conventions for this rate recommended by the Relevant Governmental Body for determining "Daily Simple SOFR" for syndicated business loans; provided, that if the Administrative Agent decides that any such convention is not administratively feasible for the Administrative Agent, then the Administrative Agent (at the direction of the Required Lenders)  may establish another convention in its reasonable discretion.

"Debt/Equity Incurrence Prepayment Event" means (a) any Incurrence by the Borrower or any of the Restricted Subsidiaries of any Indebtedness, but excluding any Indebtedness permitted to be issued or incurred under Section 5.06 and/or (b) the issuance by Holdings of any Equity Interests other than, so long as no Event of Default has occurred and is continuing, any issuance of Equity Interests (i) issued in connection with "Permitted Investments" or (ii) for purposes of making capital expenditures.

11

"Debtors" shall have the meaning set forth in the recitals hereto.

"Default" means any event which is, or after notice or passage of time or both would be, an Event of Default.

"Defaulting Agent" means any Agent (a) has become or is insolvent or has a parent company that has become or is insolvent or (b) has become or has a parent company that has become the subject of a bankruptcy or insolvency proceeding or any action or proceeding of the type described in Section 6.01(e), or has had a receiver, conservator, trustee, administrator, assignee for the benefit of creditors or similar Person charged with reorganization or liquidation of its business or custodian, appointed for it, or has taken any action in furtherance of, or indicating its consent to, approval of or acquiescence in any such proceeding or appointment, or has a parent company that has become the subject of a bankruptcy or insolvency proceeding, or has had a receiver, conservator, trustee, administrator, assignee for the benefit of creditors or similar Person charged with reorganization or liquidation of its business or custodian, appointed for it, or has taken any action in furtherance of, or indicating its consent to, approval of or acquiescence in any such proceeding or appointment.

"DIP Facility" has the meaning set forth in the recitals hereto.

"DIP Facility Loans" means the "Loans" as defined in the DIP Facility.

"Discharge of First-Priority Lien Obligations" means, except to the extent otherwise provided in the Senior Lien Intercreditor Agreement with respect to the reinstatement or continuation of any First-Priority Lien Obligation under certain circumstances, the payment in full in cash or immediately available funds (except for contingent indemnities and cost and reimbursement obligations to the extent no claim has been made) of all such First-Priority Lien Obligations then outstanding, if any; provided that the Discharge of First-Priority Lien Obligations shall not be deemed to have occurred if such payments are made with the proceeds of other First-Priority Lien Obligations that constitute an exchange or replacement for or a refinancing of such First-Priority Lien Obligations. In the event the First-Priority Lien Obligations are modified and the First-Priority Lien Obligations are paid over time or otherwise modified pursuant to Section 1129 of the Bankruptcy Code pursuant to a confirmed and consummated plan of reorganization, the First-Priority Lien Obligations shall be deemed to be discharged when the final payment is made in cash or immediately available funds or in the form of consideration otherwise provided for in such plan of reorganization in respect of such Indebtedness and any obligations pursuant to such new or modified indebtedness shall have been satisfied.

"Dispose" means to convey, sell, lease, sell and leaseback, assign, transfer (including via a Farm-Out Agreement) or otherwise dispose.

"Disposition" or "Disposed of" shall have a correlative meaning to the defined term of "Dispose".

"Disqualified Stock" means, with respect to any Person, any Capital Stock of such Person which, by its terms (or by the terms of any security into which it is convertible or for which it is redeemable or exchangeable), or upon the happening of any event:

(1)     matures or is mandatorily redeemable, pursuant to a sinking fund obligation or otherwise (other than as a result of a change of control or asset sale),

(2)     is convertible or exchangeable for Indebtedness or Disqualified Stock of such Person, or

(3)     is redeemable at the option of the holder thereof, in whole or in part (other than solely as a result of a change of control or asset sale),

in each case prior to 180 days after the earlier of the Maturity Date or the date the Loans are no longer outstanding; *provided*, *however*, that only the portion of Capital Stock which so matures or is mandatorily redeemable, is so convertible or exchangeable or is so redeemable at the option of the holder thereof prior to such date shall be deemed to be Disqualified Stock; *provided*, *further*, *however*, that if such Capital Stock is issued to any employee or to any plan for the benefit of employees of the Borrower or its Subsidiaries or by any such plan to such employees, such Capital Stock shall not constitute Disqualified Stock solely because it may be required to be repurchased by such Person in order to satisfy applicable statutory or regulatory obligations or as a result of such employee's termination, death or disability; *provided*, *further*, that any class of Capital Stock of such Person that by its terms authorizes such Person to satisfy its obligations thereunder by delivery of Capital Stock that is not Disqualified Stock shall not be deemed to be Disqualified Stock.

"Dollar Denominated Production Payments" means production payment obligations recorded as liabilities in accordance with GAAP, together with all undertakings and obligations in connection therewith.

"Domestic Subsidiary" means each Subsidiary of the Borrower that is organized under the laws of the United States or any state thereof, or the District of Columbia.

"Early Opt-in Effective Date" means, with respect to any Early Opt-in Election, the sixth (6th) Business Day after the date notice of such Early Opt-in Election is provided to the Lenders, so long as the Administrative Agent has not received, by 5:00 p.m. (New York City time) on the fifth (5th) Business Day after the date notice of such Early Opt-in Election is provided to the Lenders, written notice of objection to such Early Opt-in Election from Lenders comprising the Required Lenders.

"Early Opt-in Election" means the occurrence of (a) a notification by the Administrative Agent (on its own or at the direction of the Required Lenders) to (or the request by the Borrower to the Administrative Agent to notify) each of the other parties hereto that at least 5 currently outstanding U.S. dollar-denominated syndicated credit facilities at such time contain (as a result of amendment or as originally executed) a SOFR-based rate (including SOFR, a term SOFR or any other rate based upon SOFR) as a benchmark rate (and such syndicated credit facilities are identified in such notice and are publicly available for review), and (b) the joint election by the Administrative Agent (at the direction of the Required Lenders) and the Borrower to trigger a fallback from LIBOR and the provision by the Administrative Agent of written notice of such election to the Lenders.

"EEA Financial Institution" means (a) any credit institution or investment firm established in any EEA Member Country which is subject to the supervision of an EEA Resolution Authority, (b) any entity established in an EEA Member Country which is a parent of an institution described in clause (a) of this definition, or (c) any financial institution established in an EEA Member Country which is a subsidiary of an institution described in clauses (a) or (b) of this definition and is subject to consolidated supervision with its parent;

"EEA Member Country" means any of the member states of the European Union, Iceland, Liechtenstein, and Norway.

"EEA Resolution Authority" means any public administrative authority or any person entrusted with public administrative authority of any EEA Member Country (including any delegee) having responsibility for the resolution of any EEA Financial Institution.

"Effective Yield" means, as to any Indebtedness, the effective yield on such Indebtedness as reasonably determined by the Borrower, taking into account the applicable interest rate margins, any interest rate floors (the effect of which floors shall be determined in a manner set forth in the proviso below) or similar devices and all fees, including upfront or similar fees or original issue discount (amortized over the shorter of (x) the remaining Weighted Average Life to Maturity of such Indebtedness and (y) the four years following the date of incurrence thereof) payable generally to Lenders or other institutions providing such Indebtedness, but

excluding any arrangement, structuring or other similar fees payable in connection therewith that are not generally shared with the relevant Lenders and, if applicable, customary consent or ticking fees for an amendment paid generally to consenting Lenders; *provided* that, with respect to any Indebtedness that includes a "LIBOR floor", (1) to the extent that LIBOR on the date that the Effective Yield is being calculated is less than such floor, the amount of such difference shall be deemed added to the interest rate margin for such Indebtedness for the purpose of calculating the Effective Yield and (2) to the extent that LIBOR on the date that the Effective Yield is being calculated is greater than such floor, then the floor shall be disregarded in calculating the Effective Yield.

"Employee Benefit Plan" means any "employee benefit plan" as defined in Section 3(3) of ERISA that is or was sponsored, maintained or contributed to by, or required to be contributed by, Holdings, the Borrower, any of their Subsidiaries or any ERISA Affiliates.

"Environmental Claims" means any and all actions, suits, orders, decrees, demands, demand letters, claims, liens, notices of noncompliance, restrictions on use, operations or transferability, violation, or potential responsibility or investigations or proceedings arising under or based upon any Environmental Law, Environmental Permit, or in connection with the presence, Release or threatened Release of, or exposure to, Hazardous Materials (hereinafter, "Claims"), including, without limitation, (i) any and all Claims by governmental or regulatory authorities for enforcement (including, without limitation, as a result of a violation under Environmental Law), cleanup, investigation, removal, response, remediation, corrective action or other actions or damages pursuant to any applicable Environmental Law, (ii) any and all Claims relating to real properties that are currently listed or proposed for listing on the National Priorities List or on the Superfund Enterprise Management System or any analogous state or local list; and (iii) any and all Claims by any third party seeking damages, contribution, indemnification, cost recovery, compensation or injunctive relief regarding the presence, release or threatened release of Hazardous Materials or arising from alleged injury or threat of injury to health or safety (to the extent relating to human exposure to Hazardous Materials), or the environment including, without limitation, ambient air, surface water, groundwater, land surface and subsurface strata and natural resources such as wetlands.

"Environmental Law" means any applicable Federal, state, foreign or local statute, law, rule, regulation, ordinance, code and rule of common law now or hereafter in effect and in each case as amended, and any binding judicial or administrative interpretation thereof, including any binding judicial or administrative order, consent decree or judgment, relating to the protection of the environment, including, without limitation, ambient air, surface water, groundwater, land surface and subsurface strata and natural resources such as wetlands, any generation, treatment, storage, Release or threatened Release, transport or disposal, or arrangement for disposal or transport for disposal of Hazardous Materials, or human health or safety (to the extent relating to human exposure to Hazardous Materials).

"Environmental Permit" means any permit, license, registration, consent, approval, exemption or other authorization required under any Environmental Law or issued by any Governmental Authority.

"Equity Interests" means Capital Stock and all warrants, options or other rights to acquire Capital Stock (but excluding any debt security that is convertible into, or exchangeable for, Capital Stock).

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended from time to time, and the rules and regulations promulgated thereunder.

"ERISA Affiliate" means each person (as defined in Section 3(9) of ERISA) that together with Holdings, the Borrower or any of their Subsidiaries would be deemed to be a "single employer" within the meaning of Section 414(b) or (c) of the Code or, solely for purposes of Section 302 of ERISA and Section 412 of the Code, is treated as a single employer under Section 414 of the Code.  Any former ERISA Affiliate of Holdings, the Borrower or any of their Subsidiaries shall continue to be considered an ERISA Affiliate of Holdings, the Borrower or any such Subsidiary within the meaning of this definition with respect to the period

such entity was an ERISA Affiliate of Holdings, the Borrower or such Subsidiary and with respect to liabilities arising after such period for which Holdings, the Borrower or such Subsidiary could be liable under the Code or ERISA.

"ERISA Event" means (a) a Reportable Event with respect to a Plan; (b) a withdrawal by Holdings, the Borrower, any of their Subsidiaries or any ERISA Affiliate from a Plan subject to Section 4063 of ERISA during a plan year in which it was a substantial employer (as defined in Section 4001(a)(2) of ERISA) or a cessation of operations that is treated as such withdrawal under Section 4062(e) of ERISA; (c) the failure of Holdings, the Borrower, any of their Subsidiaries or any ERISA Affiliate to make by its due date a required installment under Section 430(j) of the Code with respect to any Plan; (d) a failure to satisfy the minimum funding standard under Section 412 of the Code or Section 302 of ERISA, or the filing pursuant to Section 412(c) of the Code or Section 302(c) of ERISA of an application for a waiver of the minimum funding standard, in each case with respect to a Plan, whether or not waived, or a failure to make any required contribution to a Multiemployer Plan; (e) a complete or partial withdrawal by Holdings, the Borrower, any of their Subsidiaries or any ERISA Affiliate from a Multiemployer Plan or notification that a Multiemployer Plan is insolvent within the meaning of Title IV of ERISA, is in endangered or critical status, within the meaning of Section 305 of ERISA, or that it intends to terminate or has terminated under Section 4041A or 4042 of ERISA; (f) the filing of a notice of intent to terminate, the treatment of a Plan amendment as a termination under Section 4041 or 4041A of ERISA, respectively, or the commencement of proceedings by the PBGC to terminate a Plan; (g) the appointment of a trustee to administer any Plan or the occurrence of any event or condition that might constitute grounds under ERISA for the termination of, or appointment of a trustee to administer, any Plan; (h) the imposition of any liability under Title IV of ERISA or the imposition of a lien under Section 412 or 430(k) of the Code or Section 303 or 4068 of ERISA on any property (or rights to property, whether real or personal) of Holdings, the Borrower, any of their Subsidiaries or any ERISA Affiliate, but excluding PBGC premiums due but not delinquent under Section 4007 of ERISA, upon Holdings, the Borrower, any of their Subsidiaries or any ERISA Affiliate; (i) a determination that any Plan is, or is expected to be, in "at-risk" status (within the meaning of Section 303(i)(4)(A) of ERISA or Section 430(i)(4)(A) of the Code); (j) the occurrence of an act or omission that could give rise to the imposition on Holdings, the Borrower, any of their Subsidiaries or any ERISA Affiliate of fines, penalties, taxes or related charges under Chapter 43 of the Code or under Section 409, Section 502(c), (i) or (l), or Section 4071 of ERISA in respect of any Employee Benefit Plan; (k) the assertion of a material claim (other than routine claims for benefits) against any Employee Benefit Plan other than a Multiemployer Plan or the assets thereof, or against Holdings, the Borrower, any of their Subsidiaries or any ERISA Affiliate in connection with any Employee Benefit Plan; or (l) receipt from the Internal Revenue Service of notice of the failure of any Plan (or any other Employee Benefit Plan intended to be qualified under Section 401(a) of the Code) to qualify under Section 401(a) of the Code, or the failure of any trust forming part of any Plan (or any such Employee Benefit Plan) to qualify for exemption from taxation under Section 501(a) of the Code.

"Erroneous Payment" has the meaning assigned to it in Section 7.16(a).

"Erroneous Payment Deficiency Assignment" has the meaning assigned to it in Section 7.16(d).

"Erroneous Payment Impacted Loans" has the meaning assigned to it in Section 7.16(d).

"Erroneous Payment Return Deficiency" has the meaning assigned to it in Section 7.16(d).

"Erroneous Payment Subrogation Rights" has the meaning assigned to it in Section 7.16(d).

"EU Bail-In Legislation Schedule" means the EU Bail-In Legislation Schedule published by the Loan Market Association (or any successor person), as in effect from time to time.

"Event of Default" shall have the meaning set forth in Section 6.01.

"Excess Asset Sale Proceeds" shall have the meaning given to such term in Section 2.13(a).

"<u>Excess Casualty Event Proceeds</u>" shall have the meaning given to such term in Section 2.13(a).

"<u>Exchange Act</u>" means the Securities Exchange Act of 1934, as amended, and the rules and regulations of the SEC promulgated thereunder.

"<u>Excluded Accounts</u>" means (a) any deposit account, commodity account or securities account so long as the balance in each such account, individually, does not exceed $500,000 at any time and the aggregate balance of all such deposit accounts, commodity accounts and securities accounts does not at any time exceed $2,500,000, (b) any deposit account that is a zero balance account or a deposit account for which the balance of such deposit account is transferred at the end of each date to a deposit account that is not an Excluded Account, (c) any deposit accounts exclusively used for trust, payroll, payroll taxes and other employee wage and benefit payments to or for the benefit of any employees of the Credit Parties or any of their Subsidiaries, (d) any deposit account which is used in the ordinary course of business as a fiduciary account, trust or suspense account used for payments of royalty obligations, obligations to non-operating working interest owners of Oil and Gas Properties attributable to their share of production from such Oil and Gas Properties attributable to their share of production from such Oil and Gas Properties and similar obligations, in each case, which solely contains deposits made for the benefit of another Person (other than the Borrower or any of its Subsidiaries), and in which such deposits are held on behalf of, and for the benefit of, such other Person, and (e) any other deposit account, commodity account or securities account that is pledged to a third party to the extent such Lien is permitted pursuant to paragraph (1), (4), (6)(C), (13) or (14) of the definition of "Permitted Liens".

"<u>Excluded Assets</u>" shall have the meaning assigned to such term in the Collateral Agreement.

"<u>Excluded Equity Interests</u>" means (a) any Equity Interests with respect to which in the Permitted Business Judgment of the Administrative Agent and the Borrower mutually agree the cost or other consequences of pledging such Equity Interests in favor of the Secured Parties under the Security Documents shall be excessive in view of the benefits to be obtained by the Secured Parties therefrom, (b) any Equity Interests of a Receivables Subsidiary, and (c) any Equity Interests to the extent the pledge thereof would be prohibited by any applicable Requirement of Law.

"<u>Excluded Subsidiary</u>" means (a) each Domestic Subsidiary that is prohibited by any applicable Requirement of Law from guaranteeing or granting Liens to secure the Obligations at the time such Subsidiary becomes a Restricted Subsidiary (and for so long as such prohibition is in effect), (b) any Receivables Subsidiary, (c) the Closing Date Unrestricted Subsidiary (unless and until the Closing Date Unrestricted Subsidiary becomes a Restricted Subsidiary in accordance with (and solely to the extent required) <u>Section 5.29</u>) and (d) any other Domestic Subsidiary with respect to which, the Administrative Agent (acting in its Permitted Business Judgment) and the Borrower mutually agree the cost or other consequences of providing a guarantee of or granting Liens to secure the Obligations shall be excessive in view of the benefits to be obtained by the Lenders therefrom.

"<u>Excluded Taxes</u>" means, with respect to the Administrative Agent, any Lender or any other recipient of any payment to be made by or on account of any obligation of any Credit Party hereunder or under any other Loan Document, (i) Taxes imposed on or measured by net income or branch profits (however denominated, and including (for the avoidance of doubt) any backup withholding in respect thereof under Section 3406 of the Code), and franchise Taxes imposed on it (in lieu of net income Taxes), in each case by a jurisdiction (including any political subdivision thereof) as a result of such recipient being organized in, having its principal office in, or in the case of any Lender, having its applicable lending office in, such jurisdiction or, as a result of any other present or former connection with such jurisdiction (other than any such connection arising solely from such recipient having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to or enforced any Loan Document, or sold or assigned an interest in any Loan or Loan Document), (ii) in the case of a Lender, U.S. federal withholding Tax imposed on any payment by or on account of any obligation

Error! Unknown document property name.
WEIL:\97986321\6\45327.0007

of any Credit Party hereunder or under any other Loan Document that is required to be imposed on amounts payable to or for the account of a Lender (other than to the extent such Lender is an assignee pursuant to a request by the Borrower under <u>Section 8.07</u>) pursuant to laws in force at the time such Lender becomes a party hereto (or designates a new lending office), except to the extent that such Lender (or its assignor, if any) was entitled, immediately prior to the designation of a new lending office (or assignment), to receive additional amounts or indemnification payments from any Credit Party with respect to such withholding Tax pursuant to <u>Section 2.15</u>, (iii) any Tax attributable to the Administrative Agent's or any Lender's failure to comply with <u>Section 2.15(d)</u>, <u>(e)</u>, <u>(g)</u> or <u>(h)</u> or (iv) any withholding Tax imposed under FATCA.

"<u>Extraordinary Receipt Event</u>" shall mean the occurrence of any event or circumstance as a result of which any the Borrower or any Restricted Subsidiary receives Extraordinary Receipts.

"<u>Extraordinary Receipts</u>" shall mean 100% of the Net Proceeds actually received by the Borrower or any Restricted Subsidiary not in the ordinary course of business consisting of federal, state or local Tax refunds, pension plan reversions, judgments and proceeds of litigation settlements or other settlements with any Governmental Authority (excluding Casualty Events).

"<u>Fair Market Value</u>" means, with respect to any asset or property, the price which could be negotiated in an arm's-length transaction, for cash, between a willing seller and a willing and able buyer, neither of whom is under undue pressure or compulsion to complete the transaction, as determined by the Borrower in good faith (provided that, upon reasonable request of the Administrative Agent, the Borrower shall provide reasonably detailed supporting evidence of making such determination).

"<u>Farm-In Agreement</u>" means an agreement whereby a Person agrees to pay all or a share of the drilling, completion or other expenses of one or more exploratory or development wells (which agreement may be subject to a maximum payment obligation, after which expenses are shared in accordance with the working or participation interests therein or in accordance with the agreement of the parties) or perform the drilling, completion or other operation on such well or wells as all or a part of the consideration provided in exchange for an ownership interest in an Oil and Gas Property.

"<u>Farm-Out Agreement</u>" means a Farm-In Agreement, viewed from the standpoint of the party that transfers an ownership interest to another.

"<u>FATCA</u>" means Sections 1471 through 1474 of the Code, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), any current or future regulations or official interpretations thereof, any agreements entered into pursuant to Section 1471(b)(1) of the Code and any fiscal or regulatory legislation, rules or practices adopted pursuant to any intergovernmental agreement, treaty or convention among Governmental Authorities and implementing such Sections of the Code.

"<u>FCA</u>" shall have the meaning set forth in <u>Section 1.09(b)(i)</u>.

"<u>Federal Funds Rate</u>" means, for any period, a fluctuating interest rate per annum equal for each day during such period to the weighted average of the rates on overnight Federal funds transactions with members of the Federal Reserve System, as published for such day (or, if such day is not a Business Day, for the next preceding Business Day) by the Federal Reserve Bank of New York, or, if such rate is not so published for any day that is a Business Day, the Federal Funds Rate for the last day on which such rate was available.

"<u>Fee Letter</u>" means that certain letter agreement, dated as of the Closing Date, between the Borrower and the Agents.

"<u>Financial Officer</u>" of any Person means the Chief Financial Officer, principal accounting officer, Treasurer or Assistant Treasurer of such Person.

<div align="center">17</div>

"First-Priority Lien Obligations" means all FLTL Obligations.

"Flood Insurance Laws" means, collectively, (i) the National Flood Insurance Act of 1968, as now or hereafter in effect or any successor statute thereto, (ii) the Flood Disaster Protection Act of 1973, as now or hereafter in effect or any successor statute thereto, (iii) the National Flood Insurance Reform Act of 1994, as now or hereafter in effect or any successor statute thereto and (iv) the Flood Insurance Reform Act of 2004, as now or hereafter in effect or any successor statute thereto.

"Floor" means the benchmark rate floor, if any, provided in this Agreement initially (as of the execution of this Agreement, the modification, amendment or renewal of this Agreement or otherwise) with respect to Adjusted LIBOR.

"FLTL Credit Agreement" means [●].

"FLTL Credit Agreement Documents" means the collective reference to any FLTL Credit Agreement, any notes issued pursuant thereto and the guarantees thereof, and the collateral documents relating thereto, as amended, supplemented, restated, amended and restated, renewed, refunded, replaced, restructured, repaid, refinanced or otherwise modified, in whole or in part, from time to time.

"FLTL Facility" means the first lien term loan facility provided pursuant to the FLTL Credit Agreement, as amended, restated, amended and restated, supplemented, waived, replaced (whether or not upon termination, and whether with the original lenders or other lenders), restructured, repaid, refunded, refinanced or otherwise modified from time to time, including pursuant to any amendment thereto or pursuant to a new loan agreement with other lenders, providing for term loans, altering the maturity thereof, refinancing, replacing or otherwise restructuring all or any portion of the Indebtedness under such agreement or under any successor or replacement agreement, increasing the amount loaned thereunder or otherwise modifying the terms thereof.

"FLTL Obligations" means the "Obligations" as defined in the FLTL Credit Agreement.

"Foreign Disposition" shall have the meaning set forth in Section 2.13(a)(ii).

"Foreign Plan" means any employee benefit plan, program, policy, arrangement or agreement maintained or contributed to by Holdings, the Borrower or any of their Subsidiaries with respect to employees employed outside the United States.

"Foreign Subsidiary" means each Subsidiary of the Borrower that is not a Domestic Subsidiary.

"FWE" shall have the meaning set forth in the recitals hereto.

"FWE Inc." shall have the meaning set forth in the recitals hereto.

"GAAP" means generally accepted accounting principles in the United States set forth in the opinions and pronouncements of the Accounting Principles Board of the American Institute of Certified Public Accountants and statements and pronouncements of the Financial Accounting Standards Board or in such other statements by such other entity as have been approved by a significant segment of the accounting profession, which are in effect from time to time. For the purposes of this Agreement, the term "consolidated" with respect to any Person means such Person consolidated with its Restricted Subsidiaries, and shall not include the Closing Date Unrestricted Subsidiary, but the interest of such Person in the Closing Date Unrestricted Subsidiary will be accounted for as an Investment.

"Governmental Authority" means any nation, sovereign or government, any state, province, territory or other political subdivision thereof, and any entity or authority exercising executive, legislative,

judicial, taxing, regulatory or administrative functions of or pertaining to government, including a central bank or stock exchange.

"guarantee" means a guarantee (other than by endorsement of negotiable instruments for collection in the ordinary course of business), direct or indirect, in any manner (including, without limitation, letters of credit and reimbursement agreements in respect thereof), of all or any part of any Indebtedness or other obligations.

"Guarantee" means any guarantee of the Loan Obligations and the Loans by any Guarantor in accordance with the provisions of this Agreement.

"Guarantee Obligations" means, as to any Person, any obligation of such Person guaranteeing or intended to guarantee any Indebtedness of any other Person (the "primary obligor") in any manner, whether directly or indirectly, including any obligation of such Person, whether or not contingent, (a) to purchase any such Indebtedness or any property constituting direct or indirect security therefor, (b) to advance or supply funds (i) for the purchase or payment of any such Indebtedness or (ii) to maintain working capital or equity capital of the primary obligor or otherwise to maintain financial condition or liquidity of the primary obligor so as to enable the primary obligor to pay such Indebtedness, (c) to purchase property, securities or services primarily for the purpose of assuring the owner of any such Indebtedness of the ability of the primary obligor to make payment of such Indebtedness or (d) otherwise to assure or hold harmless the owner of such Indebtedness against loss in respect thereof; *provided*, *however*, that the term "Guarantee Obligations" shall not include endorsements of instruments for deposit or collection in the ordinary course of business or customary and reasonable indemnity obligations in effect on the Closing Date or entered into in connection with any acquisition or disposition of assets permitted under this Agreement (other than such obligations with respect to Indebtedness).  The amount of any Guarantee Obligation shall be deemed to be an amount equal to the stated or determinable amount of the Indebtedness in respect of which such Guarantee Obligation is made or, if not stated or determinable, the maximum reasonably anticipated liability in respect thereof as determined by such Person in good faith.

"Guarantor" means each of Holdings and the Subsidiary Guarantors; *provided* that upon the release or discharge of such Person from its Guarantee in accordance with this Agreement, such Person shall cease to be a Guarantor.

"Hazardous Materials" means (a) any petroleum or petroleum products, natural gas or natural gas liquids, radioactive materials, friable asbestos, urea formaldehyde foam insulation, polychlorinated biphenyls, and radon gas, (b) any chemicals, materials or substances defined as or included in the definition of "hazardous substances", "hazardous waste", "hazardous materials", "extremely hazardous waste", "restricted hazardous waste", "toxic substances", "toxic pollutants", "contaminants", or "pollutants", or words of similar import, under any applicable Environmental Law and (c) any other chemical, material or substance, which is prohibited, limited or regulated by any Environmental Law.

"Hazardous Materials Activity" means any past, current, proposed or threatened activity, event or occurrence involving any Hazardous Materials, including the use, manufacture, possession, storage, holding, presence, existence, location, Release, threatened Release, discharge, placement, generation, transportation, processing, construction, treatment, abatement, removal, remediation, disposal, disposition or handling of any Hazardous Materials, and any corrective action or response action with respect to any of the foregoing.

"Hedge Agreements" means (a) any and all rate swap transactions, basis swaps, credit derivative transactions, forward rate transactions, commodity swaps, commodity options, forward commodity contracts, future contracts, equity or equity index swaps or options, bond or bond price or bond index swaps or options or forward bond or forward bond price or forward bond index transactions, interest rate options, forward foreign exchange transactions, cap transactions, floor transactions, collar transactions, currency swap transactions, cross-currency rate swap transactions, currency options, total return swap, credit spread transaction, repurchase transaction, reserve repurchase transaction, securities lending transaction, weather index transaction,

spot contracts, fixed-price physical delivery contracts, whether or not exchange traded, or any other similar transactions or any combination of any of the foregoing (including any options to enter into any of the foregoing), whether or not any such transaction is governed by or subject to any master agreement, and (b) any and all transactions of any kind, and the related confirmations, which are subject to the terms and conditions of, or governed by, any form of master agreement published by the International Swaps and Derivatives Association, Inc., any International Foreign Exchange Master Agreement or any other master agreement (any such master agreement, together with any related schedules, a "Master Agreement"), including any such obligations or liabilities under any Master Agreement.  Notwithstanding the foregoing, agreements or obligations to physically sell any commodity at any index-based price shall not be considered Hedge Agreements.

"Hedging Obligations" means, with respect to any Person, the obligations of such Person under Hedge Agreements.

"Hedge Unwind Event" means the monetization of a hedge position, whether by mutual agreement to terminate or "tear up", in connection with the designation of an early termination date (or any similar concept) with respect to, or the settlement of such hedge position.

"Hedge Unwind Proceeds" means any Net Proceeds received by the Borrower and/or its Restricted Subsidiaries in connection with any Hedge Unwind Event.

"Holdings" shall have the meaning set forth in the preamble to this Agreement.

"Hydrocarbon Interests" means all rights, titles, interests and estates now or hereafter acquired in and to oil and gas leases, oil, gas and mineral leases, or other liquid or gaseous hydrocarbon leases, mineral fee interests, overriding royalty and royalty interests, net profit interests and production payment interests, including any reserved or residual interests of whatever nature.

"Hydrocarbons" means oil, gas, casinghead gas, drip gasoline, natural gasoline, condensate, distillate, liquid hydrocarbons, gaseous hydrocarbons and all products refined or separated therefrom.

"IBA" shall have the meaning set forth in Section 1.09(b)(i).

"Incremental Cap" means, at any time, $50,000,000.

"Incremental Commitment" means, with respect to any Lender, the commitment, if any, of such Lender, established pursuant to an Incremental Facility Agreement and Section 2.20, to make Loans of any Class hereunder, expressed as an amount representing the maximum principal amount of the Loans of such Class to be made by such Lender.  The initial amount of each Lender's Incremental Commitment of any Class, if any, is set forth in the Incremental Facility Agreement pursuant to which such Lender shall have established its Incremental Commitment of such Class.

"Incremental Effective Date" shall have the meaning set forth in Section 2.20(a).

"Incremental Facility" shall have the meaning set forth in Section 2.20(a).

"Incremental Facility Agreement" means an agreement in a form to be determined by the Borrower and the Incremental Lenders providing the applicable Incremental Commitment, among the Borrower, the Administrative Agent and such Incremental Lenders, establishing Incremental Commitments of any Class and effecting such other amendments hereto and the other Loan Documents as are contemplated by Section 2.20.

"Incremental Lender" means a Lender with an Incremental Commitment or a Loan of any Class established under an Incremental Commitment.

20

"Incur" means issue, assume, guarantee, incur or otherwise become liable for; *provided*, *however*, that any Indebtedness or Capital Stock of a Person existing at the time such person becomes a Subsidiary (whether by merger, amalgamation, consolidation, acquisition or otherwise) shall be deemed to be Incurred by such Person at the time it becomes a Subsidiary.

"Indebtedness" means, with respect to any Person:

(1)     the principal and premium (if any) of any indebtedness of such Person, whether or not contingent, (a) in respect of borrowed money, (b) evidenced by bonds, notes, debentures or similar instruments or letters of credit or bankers' acceptances (or, without duplication, reimbursement agreements in respect thereof), (c) representing the deferred and unpaid purchase price of any property (except any such balance that constitutes (i) a trade payable or similar obligation to a trade creditor Incurred in the ordinary course of business, (ii) any earn-out obligations until such obligation becomes a liability on the balance sheet of such Person in accordance with GAAP and (iii) liabilities accrued in the ordinary course of business), which purchase price is due more than six months after the date of placing the property in service or taking delivery and title thereto, (d) in respect of Capitalized Lease Obligations, or (e) representing any Hedging Obligations, if and to the extent that any of the foregoing indebtedness would appear as a liability on a balance sheet (excluding the footnotes thereto) of such Person prepared in accordance with GAAP;

(2)     to the extent not otherwise included, any obligation of such Person to be liable for, or to pay, as obligor, guarantor or otherwise, the obligations referred to in clause (1) of another Person (other than by endorsement of negotiable instruments for collection in the ordinary course of business); and

(3)     to the extent not otherwise included, Indebtedness of another Person secured by a Lien on any asset owned by such Person (whether or not such Indebtedness is assumed by such Person); *provided*, *however*, that the amount of such Indebtedness will be the lesser of: (a) the Fair Market Value of such asset at such date of determination, and (b) the amount of such Indebtedness of such other Person;

*provided, however,* that notwithstanding the foregoing, Indebtedness shall be deemed not to include (1) Contingent Obligations incurred in the ordinary course of business and not in respect of borrowed money (except as expressly included pursuant to clause (1) above); (2) purchase price holdbacks in respect of a portion of the purchase price of an asset to satisfy warranty or other unperformed obligations of the respective seller; (3) Production Payments and Reserve Sales; (4) any obligation of a Person in respect of a Farm-In Agreement or similar arrangement whereby such Person agrees to pay all or a share of the drilling, completion or other expenses of an exploratory or development well (which agreement may be subject to a maximum payment obligation, after which expenses are shared in accordance with the working or participation interest therein or in accordance with the agreement of the parties) or perform the drilling, completion or other operation on such well in exchange for an ownership interest in an oil or gas property; (5) in-kind obligations relating to net oil, natural gas liquids or natural gas balancing positions arising in the ordinary course of business; and (6) any Guarantee Obligations incurred in the ordinary course of business to the extent not guaranteeing Indebtedness.

Notwithstanding anything in this Agreement to the contrary, Indebtedness shall not include, and shall be calculated without giving effect to, the effects of Statement of Financial Accounting Standards No. 133 and related interpretations to the extent such effects would otherwise increase or decrease an amount of Indebtedness for any purpose under this Agreement as a result of accounting for any embedded derivatives created by the terms of such Indebtedness; and any such amounts that would have constituted Indebtedness under this Agreement but for the application of this sentence shall not be deemed an Incurrence of Indebtedness under this Agreement.

"Indemnified Liabilities" means, collectively, any and all liabilities, obligations, losses, damages (including natural resource damages), penalties, claims (including Environmental Claims), actions, judgments, suits, costs (including the costs of any investigation, study, sampling, testing, abatement, cleanup, removal, remediation or other response action necessary to remove, remediate, clean up or abate any Hazardous

Materials Activity), Taxes, expenses and disbursements of any kind or nature whatsoever (including attorneys' fees and any fees or expenses incurred by Indemnitees in enforcing this indemnity), whether direct, indirect, special, or consequential and whether based on any federal, state or foreign laws, statutes, rules or regulations (including securities and commercial laws, statutes, rules or regulations and Environmental Laws), on common law or equitable cause or on contract or otherwise, that may be imposed on, incurred by, or asserted against any such Indemnitee (whether asserted by a third party or by any Credit Party or any of its affiliates), in any manner relating to or arising out of (i) this Agreement or the other Loan Documents or the transactions contemplated hereby or thereby (including the Lenders' agreement to make Loans or the use or intended use of the proceeds thereof, or any enforcement of any of the Loan Documents (including any sale of, collection from, or other realization upon any of the Collateral or the enforcement of the Guarantee)); (ii) the statements contained in the commitment letter delivered by any Lender to the Borrower with respect to the transactions contemplated by this Agreement; or (iii) any Environmental Claim or Hazardous Materials Activity relating to or arising from, directly or indirectly, any past or present activity, operation, land ownership, or practice of Holdings or any of its Subsidiaries.

"Indemnified Taxes" means all (a) Taxes (other than Excluded Taxes) imposed on or with respect to any payment by or on account of any obligation of any Credit Party hereunder or under any other Loan Document and (b) to the extent not otherwise described in (a), Other Taxes.

"Indemnitee" shall have the meaning set forth in Section 8.05(b).

"Information" shall have the meaning set forth in Section 3.08.

"Initial Commitment" means, with respect to each Lender, its commitment to (i) in respect of any Initial Loan that is an Initial New Loan, make or otherwise fund such Initial New Loans on the Closing Date, and/or (ii) in respect of any Initial Loan that is an Initial DIP Converted Loan, make or otherwise fund (or be deemed to fund) such Initial DIP Converted Loans on the Closing Date, in each case to the Borrower hereunder. The amount of each Lender's Initial Commitment is set forth on Schedule 2.01. The aggregate principal amount of the Initial Commitments in respect of Initial Loans on the Closing Date is $[185,000,000].

"Initial DIP Converted Loans" means the term loans made or deemed made to the Borrower pursuant to Section 2.01(c).

"Initial Loans" means any of the Initial New Loans made to the Borrower pursuant to Section 2.01(a) and any of the Initial DIP Converted Loans deemed to have been made to the Borrower pursuant to Section 2.01(c).

"Initial New Loans" means the term loans made to the Borrower pursuant to Section 2.01(a).

"Intercreditor Agreement" means (a) in the case of any Indebtedness secured by a Lien on the Collateral senior to the Liens securing the Initial Loans, a Customary Intercreditor Agreement of the type referred to in clause (b) of the definition thereof, (b) in the case of any Indebtedness secured by a Lien on the Collateral pari passu with the Liens securing the Initial Loans, a Customary Intercreditor Agreement of the type referred to in clause (a) of the definition thereof and (c) in the case of any Indebtedness secured by a Lien on the Collateral junior to the Liens securing the Initial Loans, a Customary Intercreditor Agreement of the type referred to in clause (b) of the definition thereof.

"Interest Payment Date" means, (a) with respect to any ABR Loan, the last Business Day of each calendar quarter (being the last day of March, June, September and December of each year), and (b) otherwise, the last day of the Interest Period applicable to the Loan and, in the case of a Loan with an Interest Period of more than three months' duration each day that would have been an Interest Payment Date had successive Interest Periods of three months' duration been applicable to such Loan and, in addition, the date of any conversion of such Loan to an ABR Loan.

"Interest Period" means as to any Loan (other than an ABR Loan), the period commencing on the date of such borrowing or on the last day of the immediately preceding Interest Period applicable to such Loan, as applicable, and ending on the numerically corresponding day (or, if there is no numerically corresponding day, on the last day) in the calendar month that is 1, 3 or 6 months thereafter, as the Borrower may elect, or the date any Loan (other than an ABR Loan) is effectively converted to an ABR Loan in accordance with Section 2.08 or repaid or prepaid in accordance with Section 2.04, Section 2.12 or Section 2.13 or on the Maturity Date; *provided* that if any Interest Period would end on a day other than a Business Day, such Interest Period shall be extended to the next succeeding Business Day unless such next succeeding Business Day would fall in the next calendar month, in which case such Interest Period shall end on the next preceding Business Day. Interest shall accrue from and including the first day of an Interest Period to but excluding the last day of such Interest Period. For purposes hereof, the date of a borrowing of a Loan initially shall be the date on which such borrowing is made and thereafter shall be the effective date of the most recent conversion or continuation of such borrowing.

"Interest Period Election Request" means a request by the Borrower to elect an Interest Period in accordance with Section 2.19.

"Investment Grade Securities" means:

(1)     securities issued or directly and fully guaranteed or insured by the U.S. government or any agency or instrumentality thereof (other than Cash Equivalents),

(2)     securities that have a rating equal to or higher than Baa3 (or equivalent) by Moody's and BBB- (or equivalent) by S&P, but excluding any debt securities or loans or advances between and among the Borrower and its Subsidiaries,

(3)     investments in any fund that invests exclusively in investments of the type described in clauses (1) and (2) which fund may also hold immaterial amounts of cash pending investment and/or distribution, and

(4)     corresponding instruments in countries other than the United States customarily utilized for high quality investments and in each case with maturities not exceeding two years from the date of acquisition.

"Investments" means, with respect to any Person, all investments by such Person in other Persons (including Affiliates) in the form of loans (including guarantees), advances or capital contributions (excluding accounts receivable, trade credit and advances to customers and commission, travel and similar advances to officers, employees and consultants made in the ordinary course of business), purchases or other acquisitions for consideration of Indebtedness, Equity Interests or other securities issued by any other Person and investments that are required by GAAP to be classified on the balance sheet of such Person in the same manner as the other investments included in this definition to the extent such transactions involve the transfer of cash or other property.

"Investors" means the Persons set forth on Schedule 1.01(a).[2]

"IRS" shall have the meaning set forth in Section 2.15(e)(i).

---

[2] NTD: To identify Investors (other than management) holding > 5% on the Closing Date.

"Isabela Transaction" means the transactions that occurred in the fourth quarter of 2018 which provide for monthly cash payments to Holdings from BP Exploration and Production Inc. based on a percentage the revenue generated from the Isabela field through 2021 (subject to an annual true-up).

"Judgment Currency" shall have the meaning set forth in Section 8.17(b).

"Junior Debt" means any Indebtedness for borrowed money that is expressly subordinated in right of payment and/or security to the Indebtedness incurred under this Agreement (or, in each case, any Refinancing Indebtedness in respect thereof to the extent constituting Junior Debt).

"Junior Lien Obligations" means the Obligations with respect to Junior Debt, which by its terms is intended to be secured by the Collateral on a basis junior to the Loans; *provided* such Lien is permitted to be incurred under this Agreement.

"Latest Maturity Date" means, at any date of determination, the latest Maturity Date applicable to any Class of Commitments or Loans that is outstanding hereunder on such date of determination.

"Lender" means each financial institution listed on Schedule 2.01, and any Person that becomes a "Lender" hereunder pursuant to Section 8.06, other than any such Person that has ceased to be a party hereto pursuant to an Assignment and Acceptance in accordance with Section 8.06.

"Lending Office" means, as to any Lender, the applicable branch, office, Affiliate or account (if appropriate) of such Lender designated by such Lender to make Loans to the Borrower.

"LIBOR" means for any Interest Period and as determined on the date that is two Business Days prior to the first day of such Interest Period (i)(a) the rate per annum equal to the rate determined by Administrative Agent to be the London interbank offered rate administered by the ICE Benchmark Administration (or any other Person that takes over the administration of that rate) for deposits (for delivery on the first day of such period) with a term equivalent to such period in dollars displayed on the ICE LIBOR USD page of the Reuters Screen (or other service selected by the Administrative Agent that displays such rate including HIS Markit WSO) or on the appropriate page of any other information service that publishes that rate from time to time in place of Reuters, determined as of approximately 11:00 a.m. (London, England time) on such determination date (the rate referenced in this clause (a), the "Eurodollar Screen Rate"), or (b) in the event the Eurodollar Screen Rate is not available, the rate per annum equal to the offered rate, truncated at five decimal digits, that is set forth on or in such other available quotation page or service as is acceptable to Administrative Agent in its sole discretion and that provides an average ICE Benchmark Administration Limited Interest Settlement Rate or another London interbank offered rate administered by any other Person that takes over the administration of such rate for deposits (for delivery on the first day of the relevant period) with a term equivalent to such period in dollars, determined as of approximately 11:00 a.m. (London, England time) on such determination date, or (c) in the event the rates referenced in the preceding clauses (a) and (b) are not available or if such information, in the reasonable judgment of Administrative Agent (at the direction of the Required Lenders), shall cease to accurately reflect the rate offered by leading banks in the London interbank market as reported by any publicly available source of similar market data selected by Administrative Agent, the rate per annum equal to the rate determined by Administrative Agent to be the offered rate, truncated at five decimal digits, to first class banks in the London interbank market for deposits (for delivery on the first day of the relevant period) with a term equivalent to such Interest Period in Dollars, determined as of approximately 11:00 a.m. (London, England time) on such determination date.

"LIBOR Borrowing" means a Borrowing comprised of LIBOR Loans.

"LIBOR Loan" means a Loan bearing interest at a rate equal to Adjusted LIBOR plus the Applicable Margin.

"Lien" means, with respect to any asset, any mortgage, lien, pledge, charge, security interest or similar encumbrance of any kind in respect of such asset, whether or not filed, recorded or otherwise perfected under applicable law (including any conditional sale or other title retention agreement, any lease in the nature thereof, any option or other agreement to sell or give a security interest in and any filing of or agreement to give any financing statement under the Uniform Commercial Code (or equivalent statutes) of any jurisdiction); *provided* that in no event shall an operating lease be deemed to constitute a Lien.

"Loan Documents" means this Agreement, the Guarantee, the Security Documents, any promissory note issued by the Borrower under this Agreement, the Fee Letter, any Incremental Facility Agreement, and any intercreditor agreement with respect to this Agreement and the Loans entered into on or after the Closing Date to which the Administrative Agent or Collateral Agent is a party on behalf of the Lenders (including the Intercreditor Agreement).

"Loan Obligations" means all obligations in respect of the Loans and other obligations arising under this Agreement, the Security Documents and the other Loan Documents, including, for the avoidance of doubt, the Guarantees and all penalties, fees, indemnifications, reimbursements, damages and other liabilities payable thereunder (including, in each case, interest and any other of the foregoing amounts that, but for the filing of a petition in bankruptcy with respect to any Credit Party, would have accrued on any of the foregoing, whether or not a claim is allowed against such Credit Party for such interest in the related bankruptcy proceeding).

"Loans" means (a) the Initial Loans and (b) any other loans made by Lenders to the Borrower hereunder after the Closing Date.

"Material Adverse Effect" means a circumstance or condition that would, individually or in the aggregate, have a material adverse effect on (a) the business, assets, operations, properties or financial condition of Holdings, the Borrower and its Subsidiaries, taken as a whole, (b) the ability of the Borrower and the Credit Parties, taken as a whole, to perform their obligations under this Agreement or any of the other Loan Documents, taken as a whole, (c) the rights and remedies of the Agents and the Lenders under this Agreement or under any of the other Loan Documents or (d) the validity, perfection or priority of a Lien in favor of the Collateral Agent for the benefit of the Secured Parties on the Collateral, taken as a whole.

"Material Contract" means (i) any joint operating agreement covering Oil and Gas Properties of the Borrower and its Restricted Subsidiaries constituting greater than 20% of the PV-10 Value of 2P Developed Producing Reserves, (ii) Contractual Obligations entered into to engage drillships and other equipment and drilling and completion service providers resulting in net costs or other net liabilities to the Borrower and its Restricted Subsidiaries in excess of $28,750,000, (iii) the organizational documents of the Closing Date Unrestricted Subsidiary and any Contractual Obligations relating to the ownership by the Borrower and its Subsidiaries of the Mexico Assets, including any Contractual Obligations providing for required capital contributions to be made in respect thereof, (iv) any contract binding on the Borrower or any of its Restricted Subsidiaries with [Fieldwood Energy I LLC], [Fieldwood Energy II LLC], or any of their respective Affiliates (including, without limitation, any transition services agreements, joint development agreements and net profits interests agreements) and (v) each contract (other than the Loan Documents) to which such Person is a party which is material to the operations, business, properties or financial condition of such Person and which breach, nonperformance, termination or failure to renew would, either individually or in the aggregate, have a Material Adverse Effect.

"Material Indebtedness" shall mean Indebtedness (other than Loans or other Indebtedness under any Loan Document) of any one or more of the Borrower or any Restricted Subsidiary in an aggregate principal amount exceeding $11,500,000.

"Material Liability" means liabilities in excess of $17,250,000.

25

"<u>Maturity Date</u>" means the fifth anniversary of the Closing Date; *provided* that with respect to any Class of Loans established pursuant to <u>Section 2.20</u>, "Maturity Date" means the final maturity date specified therefor in the Incremental Facility Agreement with respect thereto.

"<u>Mexico Assets</u>" means assets (or equity interests in subsidiaries owning assets) associated with the Borrower and its Subsidiaries' operations and/or investments in Mexico on the Closing Date.

"<u>Mexico Liquidity Event</u>" means any sale or other monetization of Mexico Assets.

"<u>MFN Adjustment</u>" shall have the meaning set forth in <u>Section 2.20(b)</u>.

"<u>Moody's</u>" means Moody's Investors Service, Inc. or any successor to the rating agency business thereof.

"<u>Mortgaged Properties</u>" means the owned real property, and any Oil and Gas Properties constituting real property interests, of the Borrower or any Subsidiary Guarantor encumbered by a Mortgage. Notwithstanding any provision in this Agreement or any other Loan Document to the contrary, in no event is any Building (as defined in the applicable Flood Insurance Laws) or Manufactured (Mobile) Home (as defined in the applicable Flood Insurance Laws) included in the definition of "Mortgaged Property" and no Building or Manufactured (Mobile) Home shall be encumbered by this Agreement or any other Loan Document; *provided*, that (a) such Building and Manufactured (Mobile) Home exclusion shall not exclude any interests in any lands, Hydrocarbons or other property situated under, in, or adjacent to any such Building or Manufactured (Mobile) Home and (b) for the avoidance of doubt, neither the Borrower nor any Restricted Subsidiary shall permit to exist any Lien on any Building or Manufactured (Mobile) Home except Permitted Liens.

"<u>Mortgages</u>" means, collectively, the mortgages, trust deeds, deeds of trust and other security documents (if any) delivered with respect to Mortgaged Properties, as amended, supplemented, or otherwise modified from time to time.

"<u>Multiemployer Plan</u>" means any Employee Benefit Plan that is a multiemployer plan as defined in Section 4001(a)(3) of ERISA.

"<u>Net Income</u>" means, with respect to any Person, the net income (loss) of such Person and its Restricted Subsidiaries, determined in accordance with GAAP and before any reduction in respect of Preferred Stock dividends.

"<u>Net Proceeds</u>" means the aggregate cash proceeds received by Holdings, the Borrower or any Restricted Subsidiary in respect of any Asset Sale, Casualty Event (including, without limitation, any payments pursuant to purchase price adjustments and any cash payments received by way of earnout, deferred payment of principal pursuant to a note or installment receivable or otherwise, but only as and when received, but excluding the assumption by the acquiring person of Indebtedness relating to the disposed assets or other consideration received in any other non-cash form), Extraordinary Receipt Event or Debt/Equity Incurrence Prepayment Event, net of the direct costs relating to such Asset Sale, Casualty Event, Extraordinary Receipt Event or Debt/Equity Incurrence Prepayment Event (including, without limitation, legal, accounting and investment banking fees, and brokerage and sales commissions), and any relocation expenses Incurred as a result thereof, taxes paid or payable as a result thereof (including Tax Distributions and after taking into account any available tax credits or deductions and any tax sharing arrangements related solely to such disposition), amounts required to be applied to the repayment of principal, premium (if any) and interest on Indebtedness required to be paid as a result of such transaction, amounts paid in connection with the termination of Hedging Obligations related to Indebtedness repaid with such proceeds or hedging oil, natural gas and natural gas liquid production in notional volumes corresponding to the Oil and Gas Properties subject to such Asset Sale, Casualty Event, Extraordinary Receipt Event or Debt/Equity Incurrence Prepayment Event, and any deduction of appropriate amounts to be provided by the Borrower as a reserve in accordance with GAAP against any liabilities associated with the asset

disposed of in such transaction and retained by the Borrower after such sale or other disposition thereof, including, without limitation, pension and other post-employment benefit liabilities and liabilities related to environmental matters or against any indemnification obligations associated with such transaction.

"Non-Bank Tax Certificate" shall have the meaning set forth in Section 2.15(e)(i).

"Non-Consenting Lender" shall have the meaning set forth in Section 8.07(b).

"Non-U.S. Lender" means any Lender (a) that is not disregarded as separate from its owner for U.S. federal income tax purposes and that is not a "United States person" as defined by Section 7701(a)(30) of the Code or (b) that is disregarded as separate from its owner for U.S. federal income tax purposes and whose regarded owner is not a "United States person" as defined by Section 7701(a)(30) of the Code.

"Note" means any promissory note issued to a Lender or its registered assigns that evidences the Loans extended by such Lender to the Borrower.

"Notice of Borrowing" shall have the meaning set forth in Section 2.03(a).

"Obligations" means shall mean all Loan Obligations, all Erroneous Payment Subrogation Rights and all penalties, fees, indemnifications, reimbursements, damages and other liabilities payable thereunder (including, in each case, interest and any other of the foregoing amounts that, but for the filing of a petition in bankruptcy with respect to such Credit Party, would have accrued on any of the foregoing, whether or not a claim is allowed against such Credit Party for such interest in the related bankruptcy proceeding).

"OFAC" means the Office of Foreign Assets Control of the U.S. Department of the Treasury and any successor Governmental Authority.

"Officers' Certificate" means a certificate signed on behalf of the Borrower by two Authorized Officers of the Borrower, one of whom must be the principal executive officer, the principal financial officer, the treasurer or the principal accounting officer of the Borrower, which meets the requirements set forth in this Agreement.

"Oil and Gas Business" means:

(1)     the business of acquiring, exploring, exploiting, developing, producing, operating and disposing of interests in oil, natural gas, natural gas liquids, liquefied natural gas and other Hydrocarbons and mineral properties or products produced in association with any of the foregoing;

(2)     the business of gathering, marketing, distributing, treating, processing, storing, refining, selling and transporting of any production from such interests or properties and products produced in association therewith and the marketing of oil, natural gas, other Hydrocarbons and minerals obtained from unrelated Persons;

(3)     any other related energy business, including power generation and electrical transmission business, directly or indirectly, from oil, natural gas and other Hydrocarbons and minerals produced substantially from properties in which the Borrower or its Restricted Subsidiaries, directly or indirectly, participate;

(4)     any business relating to oil field sales and service; and

(5)     any business or activity relating to, arising from, or necessary, appropriate, incidental or ancillary to the activities described in the foregoing clauses (1) through (4) of this definition.

27

"<u>Oil and Gas Properties</u>" means (a) Hydrocarbon Interests, (b) the properties now or hereafter pooled or unitized with Hydrocarbon Interests, (c) all presently existing or future unitization, pooling agreements and declarations of pooled units and the units created thereby (including all units created under orders, regulations and rules of any Governmental Authority) which may affect all or any portion of the Hydrocarbon Interests, (d) all operating agreements, contracts and other agreements, including production sharing contracts and agreements, which relate to any of the Hydrocarbon Interests or the production, sale, purchase, exchange or processing of Hydrocarbons from or attributable to such Hydrocarbon Interests, (e) all Hydrocarbons in and under and which may be produced and saved or attributable to the Hydrocarbon Interests, including all oil in tanks, and all rents, issues, profits, proceeds, products, revenues and other incomes from or attributable to the Hydrocarbon Interests, (f) all tenements, hereditaments, appurtenances and properties in any manner appertaining, belonging, affixed or incidental to the Hydrocarbon Interests and (g) all properties, rights, titles, interests and estates described or referred to above, including any and all property, real or personal, now owned or hereafter acquired and situated upon, used, held for use or useful in connection with the operating, working or development of any of such Hydrocarbon Interests or property (excluding drilling rigs, automotive equipment, rental equipment or other personal property which may be on such premises for the purpose of drilling a well or for other similar temporary uses) and including any and all oil wells, gas wells, injection wells or other wells, structures, fuel separators, liquid extraction plants, plant compressors, pumps, pumping units, field gathering systems, gas processing plants and pipeline systems and any related infrastructure to any thereof, tanks and tank batteries, fixtures, valves, fittings, machinery and parts, engines, boilers, meters, apparatus, equipment, appliances, tools, implements, cables, wires, towers, casing, tubing and rods, surface leases, rights-of-way, easements and servitudes together with all additions, substitutions, replacements, accessions and attachments to any and all of the foregoing.

"<u>Original FLLO Credit Agreement</u>" shall have the meaning set forth in the recitals hereto.

"<u>Other Taxes</u>" means any and all present or future stamp, registration, documentary, intangible, recording, filing or any other excise, property or similar Taxes arising from any payment made hereunder or made under any other Loan Document or from the execution or delivery of, performance, registration or enforcement of, from the receipt or perfection of a security interest under, consummation or administration of, or otherwise with respect to, this Agreement or any other Loan Document; *provided* that such term shall not include Taxes that result from an assignment ("<u>Assignment Taxes</u>") to the extent such Assignment Taxes are imposed as a result of a connection between the assignor and the taxing jurisdiction (other than a connection arising solely from any Loan Documents or any transactions contemplated thereunder), except to the extent that any such action described in this proviso is requested or required by the Borrower.

"<u>Parent Entity</u>" means any Person that is a direct or indirect parent company (which may be organized as a partnership) of the Borrower, including, without limitation, Holdings.

"<u>Participant</u>" shall have the meaning set forth in <u>Section 8.06(c)(i)</u>.

"<u>Participant Register</u>" shall have the meaning set forth in <u>Section 8.06(c)(ii)</u>.

"<u>Payment Recipient</u>" has the meaning assigned to it in <u>Section 7.16(a)</u>.

"<u>PBGC</u>" means the Pension Benefit Guaranty Corporation established pursuant to Section 4002 of ERISA, or any successor thereto.

"<u>Permitted Business Investment</u>" means any Investment and/or expenditure made in the ordinary course of business or which are of a nature that is or shall have become customary in the Oil and Gas Business generally or in the geographic region in which such activities occur, including investments and expenditures for actively exploiting, exploring for, acquiring, developing, producing, processing, gathering, marketing, distributing, storing, or transporting oil, natural gas or other Hydrocarbons and minerals (including with respect to plugging and abandonment) through agreements, transactions, interests or arrangements which

permit one to share risks or costs, comply with regulatory requirements regarding local ownership or satisfy other objectives customarily achieved through the conduct of the Oil and Gas Business jointly with third parties, including:

        (1)     Investments in ownership interests (including equity, joint venture or other ownership interests) in oil, natural gas, other Hydrocarbons and minerals properties, liquefied natural gas facilities, processing facilities, gathering systems, pipelines, storage facilities or related systems or ancillary real property interests;

        (2)     Investments in the form of or pursuant to operating agreements, working interests, royalty interests, mineral leases, processing agreements, Farm-In Agreements, Farm-Out Agreements, contracts for the sale, transportation or exchange of oil, natural gas, other Hydrocarbons and minerals, production sharing agreements, participation agreements, development agreements, area of mutual interest agreements, unitization agreements, pooling agreements, joint bidding agreements, service contracts, joint venture agreements, partnership agreements (whether general or limited), subscription agreements, stock purchase agreements, stockholder agreements and other similar agreements (including for limited liability companies) with third parties; and

        (3)     Investments in direct or indirect ownership interests in drilling rigs and related equipment, including, without limitation, transportation equipment.

"Permitted Business Judgment" means with respect to any term or provision of this Agreement or the other Loan Documents that requires the approval, satisfaction, discretion, determination, decision, action or inaction or any similar concept of or by the Required Lenders or the Administrative Agent, in each case, whether at the request of the Borrower or otherwise, as applicable (collectively, an "Agent Action"), a determination made in good faith with respect to such Agent Action by the Required Lenders or the Administrative Agent, as applicable, in the exercise of their respective reasonable business judgment; provided that, at the Administrative Agent's option, the Administrative Agent may confirm its authority to take such Agent Action, including after giving such consent, by (a) notifying all Lenders (or, with respect to an Agent Action relating solely to one Class of Loans or Commitments, the Lenders under such Class) via the Platform of the proposed Agent Action and (b) Lenders constituting Required Lenders consenting to such Agent Action in the manner prescribed in the relevant communication; provided, that if a Lender does not expressly provide its consent or does not expressly provide its lack of consent with respect to such Agent Action within three (3) Business Days of receiving such communication (or such shorter period set forth in the Agreement), then such Lender shall be deemed to have consented to such Agent Action.

"Permitted Holders" means, at any time, each of the Investors and their respective Affiliates (other than any Affiliate that is a portfolio operating company of such Investors) and any investment funds advised, co-advised, managed or co-managed by any of the foregoing.

"Permitted Investments" means:

        (1)     any Investment in the Borrower or any Restricted Subsidiary that is a Guarantor;

        (2)     any Investment in Cash Equivalents or Investment Grade Securities;

        (3)     any Investment by the Borrower or any Restricted Subsidiary in a Person if as a result of such Investment (a) such Person becomes a Restricted Subsidiary that is a Guarantor, or (b) such Person, in one transaction or a series of related transactions, is merged, consolidated or amalgamated with or into, or transfers or conveys all or substantially all of its assets to, or is liquidated into, the Borrower or a Restricted Subsidiary that is a Guarantor;

29

(4)     any Investment existing on, or made pursuant to binding commitments existing on, the Closing Date or an Investment consisting of any extension, modification or renewal of any Investment existing on the Closing Date, in each case, listed on <u>Schedule 5.07</u>;

(5)     advances to employees, taken together with all other advances made pursuant to this <u>clause (5)</u>, not to exceed $2,300,000 at any one time outstanding; *provided* that no advances pursuant to this <u>clause (5)</u> shall be made if a Default or Event of Default has occurred and is continuing or would result therefrom;

(6)     any Investment acquired by the Borrower or any Restricted Subsidiary (a) in exchange for any other Investment or accounts receivable held by the Borrower or such Restricted Subsidiary in connection with or as a result of a bankruptcy, workout, reorganization or recapitalization of the issuer of such other Investment or accounts receivable, or (b) as a result of a foreclosure by the Borrower or any Restricted Subsidiary with respect to any secured Investment or other transfer of title with respect to any secured Investment in default;

(7)     Hedging Obligations permitted under <u>Section 5.06</u>;

(8)     additional Investments by the Borrower or any Restricted Subsidiary having an aggregate Fair Market Value, taken together with all other Investments made pursuant to this <u>clause (8)</u> that are at that time outstanding, not to exceed $23,000,000 at the time of such Investment (with the Fair Market Value of each Investment being measured at the time made and without giving effect to subsequent changes in value); *provided, however*, that if any Investment pursuant to this <u>clause (8)</u> is made in any Person that is not the Borrower or a Restricted Subsidiary at the date of the making of such Investment and such Person becomes the Borrower or a Restricted Subsidiary after such date, such Investment shall thereafter be deemed to have been made pursuant to <u>clause (1)</u> above and shall cease to have been made pursuant to this <u>clause (8)</u> for so long as such Person continues to be the Borrower or a Restricted Subsidiary;

(9)     loans and advances to officers, directors or employees for business-related travel expenses, moving expenses and other similar expenses, in each case Incurred in the ordinary course of business to fund such person's purchase of Equity Interests of the Borrower or any direct or indirect parent of the Borrower, taken together with all other loans and advances made pursuant to this <u>clause (9)</u>, not to exceed $2,300,000 at any one time outstanding; *provided* that no loans or advances pursuant to this <u>clause (9)</u> shall be made if a Default or Event of Default has occurred and is continuing or would result therefrom;

(10)     Investments the payment for which consists of Equity Interests of the Borrower (other than Disqualified Stock) or any direct or indirect parent of the Borrower, as applicable;

(11)     Investments consisting of the licensing or contribution of intellectual property pursuant to joint marketing arrangements with other Persons;

(12)     (x) guarantees issued in accordance with <u>Sections 5.06</u> and <u>5.13</u>, including, without limitation, any guarantee or other obligation issued or incurred under this Agreement and FLTL Credit Agreement in connection with any letter of credit issued for the account of the Borrower or any of its Subsidiaries (including with respect to the issuance of, or payments in respect of drawings under, such letters of credit) and (y) guarantees of performance or other obligations (other than Indebtedness) arising in the ordinary course in the Oil and Gas Business, including obligations under Hydrocarbon exploration, development, joint operating and related agreements and licenses, concessions or operating leases related to the Oil and Gas Business;

(13)     Investments consisting of or to finance purchases and acquisitions of inventory, supplies, materials, services or equipment or purchases of contract rights or licenses or leases of intellectual property in the ordinary course of business;

(14)     any Investment in a Receivables Subsidiary or any Investment by a Receivables Subsidiary in any other Person, in each case, in connection with a Qualified Receivables Financing, including

Investments of funds held in accounts permitted or required by the arrangements governing such Qualified Receivables Financing or any related Indebtedness;

(15)     any Investment in an entity which is not a Restricted Subsidiary to which a Restricted Subsidiary sells accounts receivable pursuant to a Qualified Receivables Financing;

(16)     so long as no Event of Default has occurred and is continuing or results therefrom, additional Investments in joint ventures not to exceed, at any one time in the aggregate outstanding under this clause (16), $5,750,000 (with the Fair Market Value of each Investment being measured at the time such Investment is made and without giving effect to subsequent changes in value); *provided, however*, that if any Investment pursuant to this clause (16) is made in any Person that is not the Borrower or a Restricted Subsidiary at the date of the making of such Investment and such Person becomes the Borrower or a Restricted Subsidiary after such date, such Investment shall thereafter be deemed to have been made pursuant to clause (1) above and shall cease to have been made pursuant to this clause (16) for so long as such Person continues to be the Borrower or a Restricted Subsidiary;

(17)     Investments of a Restricted Subsidiary acquired after the Closing Date or of an entity merged into, amalgamated with, or consolidated with the Borrower or a Restricted Subsidiary in a transaction that is not prohibited by Section 5.11 after the Closing Date to the extent that such Investments were not made in contemplation of such acquisition, merger, amalgamation or consolidation and were in existence on the date of such acquisition, merger, amalgamation or consolidation;

(18)     Permitted Business Investments;

(19)     Investments constituting non-cash proceeds of dispositions of assets to the extent permitted Section 5.08;

(20)     Investments in the ordinary course of business consisting of endorsements for collection or deposit and customary trade arrangements with customers consistent with industry norm;

(21)     advances of payroll payments to employees, consultants or independent contractors or other advances of salaries or compensation to employees, consultants or independent contractors, in each case in the ordinary course of business, taken together with all other advances made pursuant to this clause (21), not to exceed $2,300,000 at any one time outstanding; *provided* that no advances pursuant to this clause (21) shall be made if a Default or Event of Default has occurred and is continuing or would result therefrom;

(22)     to the extent constituting Investments, the Transactions;

(23)     advances in the form of a prepayment of expenses, so long as such expenses are incurred in the ordinary course of business and are being paid in accordance with customary trade terms of the Borrower or the relevant Restricted Subsidiary;

(24)     so long as no Event of Default has occurred and is continuing or result therefrom, Investments in the Closing Date Unrestricted Subsidiary and its Subsidiaries to fund capital calls required pursuant to the organizational documents of Fieldwood Mexico B.V., which Investments shall not exceed, in any fiscal year, the sum of (x) an amount equal to the reimbursements with respect to general and administrative expenses received in cash by the Credit Parties during such fiscal year and (y) $5,750,000 (*provided, that,* with respect to the fiscal year ending December 31, 2021, the amount of this clause (y) shall be $11,500,000) (it being understood and agreed that, unless and until the Closing Date Unrestricted Subsidiary becomes a Restricted Subsidiary and Subsidiary Guarantor hereunder, the only Investments permitted to be made by the Borrower and its Restricted Subsidiaries in the Closing Date Unrestricted Subsidiary shall be those permitted under this clause (24)); and

(25)   Investments resulting from pledges and deposits permitted under <u>clauses (1)</u>, <u>(4)</u> <u>(6)(C)</u>, <u>(14)</u>, <u>(31)</u> and <u>(36)</u> of the definition of "Permitted Liens";

"<u>Permitted Liens</u>" means, with respect to any Person:

(1)   pledges or deposits by such Person under workmen's compensation laws, unemployment insurance laws or similar legislation, or good faith deposits in connection with bids, tenders, contracts (other than for the payment of Indebtedness) or leases to which such Person is a party, or deposits to secure plugging and abandonment obligations or public or statutory obligations of such Person or deposits of cash or U.S. government bonds to secure surety or appeal bonds to which such Person is a party, or deposits as security for contested taxes or import duties or for the payment of rent, in each case Incurred in the ordinary course of business;

(2)   Liens imposed by law, such as landlords', carriers', warehousemen's, mechanics', materialmen's, repairmen's, construction or other like Liens securing obligations that are not overdue by more than 30 days or that are being contested in good faith by appropriate proceedings or other Liens arising out of judgments or awards against such Person with respect to which such Person shall then be proceeding with an appeal or other proceedings for review;

(3)   Liens for taxes, assessments or other governmental charges not yet due or payable or that are being contested in good faith by appropriate proceedings and for which adequate reserves have been maintained in accordance with GAAP;

(4)   Liens (including, for the avoidance of doubt, in the form of cash deposits) in favor of issuers of performance and surety bonds or bid bonds or with respect to other regulatory requirements or letters of credit or bankers acceptances issued pursuant to the request of and for, or completion guarantees provided for, the account of such Person in the ordinary course of its business; provided that the amount of cash deposits provided to secure such obligations shall not exceed, at any time outstanding, 20% of the then-outstanding notional amounts of such obligations;

(5)   minor survey exceptions, minor encumbrances, restrictive covenants, easements or reservations of, or rights of others for, licenses, rights-of- way, sewers, electric lines, telegraph and telephone lines and other similar purposes, or zoning or other restrictions as to the use of real properties or Liens incidental to the conduct of the business of such Person or to the ownership of its properties which were not Incurred in connection with Indebtedness and which do not in the aggregate materially adversely affect the value of said properties or materially impair their use in the operation of the business of such Person;

(6)   (A)   Liens on the Collateral (including Liens on Collateral granted pursuant to the Prepetition Loan Documents to secure the obligations arising under the Prepetition Loan Documents) securing Indebtedness that was permitted to be Incurred pursuant to <u>clauses (i)</u>, <u>(ii)</u> and, solely with respect to Secured Hedge Obligations (as defined in the FLTL Credit Agreement, <u>(viii)</u> of <u>Section 5.06(b)</u> and any Refinancing Indebtedness in respect thereof Incurred pursuant to <u>clause (xi)</u> of Section 5.06(b), in each case subject to the Intercreditor Agreement;

(B)   Liens securing Indebtedness permitted to be Incurred pursuant to <u>clause (iv)</u> (solely with respect to Liens on the assets subject to such Indebtedness and to the extent such Lien is incurred within 180 days of the acquisition, lease, construction, repair, replacement or improvement of property (real or personal)), and <u>(xviii)</u> (solely with respect to Liens on the equipment financed by such Indebtedness) of <u>Section 5.06(b)</u> and any Refinancing Indebtedness in respect thereof Incurred pursuant to <u>clause (xi)</u> of <u>Section 5.06(b)</u>; and

(C)   Liens on cash collateral securing Indebtedness permitted to be Incurred pursuant to clause <u>(xiv)</u> of <u>Section 5.06(b)</u>;

32

(7)     Liens existing on the Closing Date listed on <u>Schedule 5.13</u>;

(8)     Liens securing Indebtedness or other obligations of the Borrower or a Restricted Subsidiary owing to the Borrower or another Restricted Subsidiary that is a Subsidiary Guarantor permitted to be Incurred in accordance with <u>Section 5.06</u>;

(9)     Liens on specific items of inventory or other goods and proceeds of any Person securing such Person's obligations in respect of bankers' acceptances issued or created for the account of such Person to facilitate the purchase, shipment or storage of such inventory or other goods;

(10)     leases and subleases of real property (other than Oil and Gas Properties) which do not materially interfere with the ordinary conduct of the business of the Borrower or any of the Restricted Subsidiaries;

(11)     Liens arising from Uniform Commercial Code financing statement filings regarding operating leases entered into by the Borrower and the Restricted Subsidiaries in the ordinary course of business;

(12)     Liens in favor of the Borrower or any Guarantor;

(13)     Liens on accounts receivable and related assets of the type specified in the definition of "Receivables Financing" Incurred in connection with a Qualified Receivables Financing;

(14)     deposits made in the ordinary course of business to secure liability to insurance carriers or self-insurance arrangement;

(15)     grants of software and other technology licenses in the ordinary course of business;

(16)     Liens to secure any refinancing, refunding, extension, renewal or replacement (or successive refinancings, refundings, extensions, renewals or replacements) as a whole, or in part, of any Indebtedness secured by any Lien referred to in the foregoing <u>clauses (3)</u>, <u>(6)(C)</u>, <u>(7)</u>, <u>(8)</u>,  <u>(12)</u> and this <u>clause (16)</u>; *provided, however,* that (x) such new Lien shall be limited to all or part of the same property that secured the original Lien (plus improvements on such property), and (y) the Indebtedness secured by such Lien at such time is not increased to any amount greater than the sum of (A) the outstanding principal amount or, if greater, committed amount of the Indebtedness described under such clause at the time the original Lien became a Permitted Lien under this Agreement, and (B) an amount necessary to pay any fees and expenses, including premiums, related to such refinancing, refunding, extension, renewal or replacement; *provided further, however,* that in the case of any Liens to secure any refinancing, refunding, extension or renewal of Indebtedness secured by a Lien referred to in <u>clause (6)(C)</u>, the principal amount of any Indebtedness Incurred for such refinancing, refunding, extension or renewal shall be deemed secured by a Lien under <u>clause (6)(C)</u>, as applicable, and not this <u>clause (16)</u> for purposes of determining the principal amount of Indebtedness outstanding under <u>clause (6)(C)</u>, as applicable;

(17)     Liens on equipment of the Borrower or any Restricted Subsidiary granted in the ordinary course of business to the Borrower's or such Restricted Subsidiary's client at which such equipment is located;

(18)     judgment and attachment Liens not giving rise to an Event of Default and notices of lis pendens and associated rights related to litigation being contested in good faith by appropriate proceedings and for which adequate reserves have been made;

(19)     Liens arising out of conditional sale, title retention, consignment or similar arrangements for the sale of goods entered into in the ordinary course of business;

Error! Unknown document property name.
WEIL:\97986321\6\45327.0007

(20)     Liens incurred to secure Cash Management Services or to implement cash pooling arrangements, in each case, in the ordinary course of business;

(21)     other Liens securing Indebtedness (other than Indebtedness for borrowed money) the outstanding principal amount of which does not, taken together with the principal amount of all other obligations secured by Liens incurred under this <u>clause (21)</u> that are at that time outstanding, exceed $11,500,000 at the time of Incurrence;

(22)     any encumbrance or restriction (including put and call arrangements) with respect to Capital Stock of any joint venture or similar arrangement pursuant to any joint venture or similar agreement;

(23)     Liens arising by virtue of any statutory or common law provisions relating to banker's Liens, rights of set-off or similar rights and remedies as to deposit accounts or other funds maintained with a depository or financial institution;

(24)     Liens arising out of judgments or awards against such Person with respect to which such Person shall then be proceeding with any appeal or other proceedings for review;

(25)     Liens (i) in favor of credit card companies pursuant to agreements therewith and (ii) in favor of customers;

(26)     Liens in respect of Production Payments and Reserve Sales;

(27)     Liens arising under Farm-Out Agreements, Farm-In Agreements, division orders, contracts for the sale, purchase, exchange, transportation, gathering or processing of Hydrocarbons, unitizations and pooling designations, declarations, orders and agreements, development agreements, joint venture agreements, partnership agreements, operating agreements, royalties, royalty trusts, master limited partnerships, working interests, net profits interests, joint interest billing arrangements, participation agreements, production sales contracts, area of mutual interest agreements, gas balancing or deferred production agreements, injection, repressuring and recycling agreements, salt water or other disposal agreements, seismic or geophysical permits or agreements, and other agreements which are customary in the Oil and Gas Business; *provided*, *however*, in all instances that such Liens are limited to the assets that are the subject of the relevant agreement, program, order, trust, partnership or contract;

(28)     Liens on pipelines or pipeline facilities that arise by operation of law;

(29)     any (a) interest or title of a lessor or sublessor under any lease, liens reserved in oil, gas or other Hydrocarbons, minerals, leases for bonus, royalty or rental payments and for compliance with the terms of such leases; (b) restriction or encumbrance that the interest or title of such lessor or sublessor may be subject to (including, without limitation, ground leases or other prior leases of the demised premises, mortgages, mechanics' liens, tax liens and easements); or (c) subordination of the interest of the lessee or sublessee under such lease to any restrictions or encumbrance referred to in the preceding <u>clause (b)</u>;

(30)     Liens that are contractual rights of set-off (i) relating to the establishment of depository relations with banks not given in connection with the issuance of Indebtedness, (ii) relating to pooled deposit or sweep accounts of the Borrower or any of its Restricted Subsidiaries to permit satisfaction of overdraft or similar obligations incurred in the ordinary course of business of the Borrower and its Restricted Subsidiaries or (iii) relating to purchase orders and other agreements entered into with customers of the Borrower or any of its Restricted Subsidiaries in the ordinary course of business;

(31)     security given to a public utility or any municipality or governmental authority when required by such utility or authority in connection with the operations of that Person in the ordinary course of business;

Error! Unknown document property name.
WEIL:\97986321\6\45327.0007

(32)     Liens arising pursuant to Section 107(l) of the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. § 9607(l), or other Environmental Law, unless such Lien (i) by action of the lienholder, or by operation of law, takes priority over any Liens arising under the Loan Documents on the property upon which it is a Lien, and (ii) such Lien materially impairs the use of the property covered by such Lien for the purposes for which such property is held;

(33)     Liens on goods purchased in the ordinary course of business the purchase price of which is financed by a documentary letter of credit issued for the account of the Borrower or any of its subsidiaries;

(34)     Liens in favor of customs and revenue authorities arising as a matter of law to secure payment of customs duties in connection with the importation of goods in the ordinary course of business;

(35)     Liens (i) of a collection bank arising under Section 4-210 of the Uniform Commercial Code or any comparable or successor provision on items in the course of collection, (ii) attaching to commodity trading accounts or other commodity brokerage accounts incurred in the ordinary course of business and (iii) in favor of banking institutions arising as a matter of law encumbering deposits (including the right of set-off) and which are within the general parameters customary in the banking industry; and

(36)     Liens solely on any cash earnest money deposits made by the Borrower or any of its Restricted Subsidiaries in connection with any letter of intent or purchase agreement permitted in this Agreement.

"Permitted Loan Purchase Assignment and Acceptance" means an assignment and acceptance entered into by a Lender as an assignor and the Borrower as an assignee, and accepted by the Administrative Agent, substantially in the form of Exhibit J or such other form as shall be approved by the Administrative Agent and the Borrower (such approval not to be unreasonably withheld or delayed);

"Permitted Loan Purchases" shall have the meaning set forth in Section 9.06(f)(i).

"Person" means any individual, corporation, partnership, limited liability company, joint venture, association, joint-stock company, trust, unincorporated organization, government or any agency or political subdivision thereof or any other entity.

"Petition Date" shall have the meaning set forth in the recitals hereto.

"Petroleum Industry Standards" means the Definitions for Oil and Gas Reserves promulgated by the Society of Petroleum Engineers (or any generally recognized successor) as in effect at the time in question.

"PIK Election" means an election notice substantially in the form of Exhibit F.

"PIK Election Trigger Period" means any period in which the Borrower and its Restricted Subsidiaries had less than $75,000,000 as of the end of the most recently ended fiscal quarter.

"Plan" means any Employee Benefit Plan subject to Title IV of ERISA, Section 412 of the Code or Section 302 of ERISA (other than a Multiemployer Plan).

"Plan of Reorganization" shall have the meaning set forth in the recitals hereto.

"Platform" shall have the meaning set forth in Section 8.18.

"Preferred Stock" means any Equity Interest with preferential right of payment of dividends or upon liquidation, dissolution, or winding up.

35

"<u>Prepetition First Lien Credit Agreement</u>" shall have the meaning set forth in the recitals hereto.

"<u>Prepetition Loan Documents</u>" means the "Loan Documents" as defined in the Prepetition First Lien Credit Agreement.

"<u>Prime Rate</u>" means the rate of interest quoted in the print edition of *The Wall Street Journal*, Money Rates Section as the Prime Rate (currently defined as the base rate on corporate loans posted by at least 75.00% of the nation's thirty largest banks), as in effect from time to time, or, if such source or rate is unavailable, any replacement or successor source or rate as determined by Administrative Agent. The Prime Rate is a reference rate and does not necessarily represent the lowest or best rate actually charged to any customer. Administrative Agent or any other Lender may make commercial loans or other loans at rates of interest at, above or below the Prime Rate.

"<u>Prior Plan of Reorganization</u>" shall have the meaning set forth in the recitals hereto.

"<u>Probable Developed Producing Reserves</u>" means oil and gas mineral interests that, in accordance with Petroleum Industry Standards, are classified as both "Probable Reserves" and "Developed Producing Reserves."

"<u>Probable Reserves</u>**"** means oil and gas mineral interests that, in accordance with Petroleum Industry Standards, are classified as both "Probable Reserves" and one of the following: (a) "Developed Producing Reserves", (b) "Developed Non-Producing Reserves", (c) "Undeveloped Reserves" and (d) "Developed Behind Pipe Reserves".

"<u>Production Payments and Reserve Sales</u>" means the grant or transfer by the Borrower or a Restricted Subsidiary to any Person of a royalty, overriding royalty, net profits interest, production payment (whether volumetric or dollar-denominated), partnership or other interest in Oil and Gas Properties, reserves or the right to receive all or a portion of the production or the proceeds from the sale of production attributable to such properties where the holder of such interest has recourse solely to such production or proceeds of production, subject to the obligation of the grantor or transferor to operate and maintain, or cause the subject interests to be operated and maintained, in a reasonably prudent manner or other customary standard or subject to the obligation of the grantor or transferor to indemnify for environmental, title or other matters customary in the Oil and Gas Business, including any such grants or transfers.

"<u>Proved Developed Behind Pipe Reserves</u>" means oil and gas mineral interests that, in accordance with Petroleum Industry Standards, are classified as "Proved Reserves" and "Developed Behind Pipe Reserves."

"<u>Proved Developed Non-Producing Reserves</u>" means oil and gas mineral interests that, in accordance with Petroleum Industry Standards, are classified as "Proved Reserves" and "Developed Non-Producing Reserves."

"<u>Proved Developed Producing Reserves</u>" means oil and gas mineral interests that, in accordance with Petroleum Industry Standards, are classified as both "Proved Reserves" and "Developed Producing Reserves."

"<u>Proved Developed Reserves</u>" means oil and gas mineral interests that, in accordance with Petroleum Industry Standards, are classified as both "Proved Reserves" and one of the following: (a) "Developed Producing Reserves", (b) "Developed Non-Producing Reserves" or (c) "Developed Behind Pipe Reserves."

"<u>Proved Reserves</u>" means oil and gas mineral interests that, in accordance with Petroleum Industry Standards, are classified as both "Proved Reserves" and one of the following: (a) "Developed Producing

36

Reserves", (b) "Developed Non-Producing Reserves", (c) "Undeveloped Reserves" and (d) "Developed Behind Pipe Reserves".

"PTE" means a prohibited transaction class exemption issued by the U.S. Department of Labor, as any such exemption may be amended from time to time.

"Public Information" means any information that (a) has been disseminated in a manner making it available to investors generally, within the meaning of Regulation FD under the Securities Act and the Exchange Act and, where applicable, any comparable doctrines under state and foreign securities laws, (b) does not constitute material non-public information concerning the Borrower, any Parent Entity or any Subsidiary or other Affiliate of any of the foregoing, or any security of any of the foregoing, for purposes of the United States federal and state securities laws and, where applicable, foreign securities laws or (c) solely in the case of information concerning the Borrower, any Parent Entity or any Subsidiary of the foregoing (but only if such information does not constitute material non-public information for the foregoing purposes of any other Affiliate thereof), so long as none of the Borrower, any Parent Entity or any Subsidiary of any of the foregoing shall have any securities registered under the Exchange Act or issued pursuant to Rule 144A under the Securities Act, or shall otherwise be subject to the reporting obligations under the Exchange Act, is information of the type that would be publicly disclosed in connection with an issuance of securities by the Borrower, such Parent Entity or such Subsidiary pursuant to an offering of securities registered under the Securities Act or made in reliance on Rule 144A under the Securities Act.

"Public Lender" shall have the meaning set forth in Section 8.18.

"PV-10" means, with respect to any Proved Reserves and/or Probable Reserves expected to be produced from any Oil and Gas Properties of the Credit Parties, the net present value, discounted at 10% per annum, of the future net revenues expected to accrue to the Borrower's and the Credit Parties' collective interests in such reserves during the remaining expected economic lives of such reserves.

"QFC Credit Support" shall have the meaning set forth in Section 8.24.

"Qualified Receivables Financing" means any Receivables Financing of a Receivables Subsidiary that meets the following conditions:

(1)     the Board of Directors of the Borrower shall have determined in good faith that such Qualified Receivables Financing (including financing terms, covenants, termination events and other provisions) is in the aggregate economically fair and reasonable to the Borrower and the Receivables Subsidiary;

(2)     all sales of accounts receivable and related assets to the Receivables Subsidiary are made at Fair Market Value;

(3)     the financing terms, covenants, termination events and other provisions thereof shall be market terms (as determined in good faith by the Borrower) and may include Standard Securitization Undertakings; and

(4)     the maximum committed amount of such Receivables Financing (when aggregated with all other outstanding Receivables Financings) shall not exceed $46,000,000.

The grant of a security interest in any accounts receivable of the Borrower or any Restricted Subsidiary (other than a Receivables Subsidiary) to secure Indebtedness under the FLTL Credit Agreement (or Refinancing Indebtedness with respect thereto), Indebtedness in respect of the Loans or any Refinancing Indebtedness with respect to the Loans shall not be deemed a Qualified Receivables Financing.

Error! Unknown document property name.
WEIL:\97986321\6\45327.0007

"Receivables Fees" means distributions or payments made directly or by means of discounts with respect to any participation interests issued or sold in connection with, and all other fees paid to a Person that is not a Restricted Subsidiary in connection with, any Receivables Financing.

"Receivables Financing" means any transaction or series of transactions that may be entered into by the Borrower or any of its Subsidiaries pursuant to which the Borrower or any of its Subsidiaries may sell, convey or otherwise transfer to (a) a Receivables Subsidiary (in the case of a transfer by the Borrower or any of its Subsidiaries); and (b) any other Person (in the case of a transfer by a Receivables Subsidiary), or may grant a security interest in, any accounts receivable (whether now existing or arising in the future) of the Borrower or any of its Subsidiaries, and any assets related thereto including, without limitation, all collateral securing such accounts receivable, all contracts and all guarantees or other obligations in respect of such accounts receivable, proceeds of such accounts receivable and other assets which are customarily transferred or in respect of which security interests are customarily granted in connection with asset securitization transactions involving accounts receivable and any Hedging Obligations entered into by the Borrower or any such Subsidiary in connection with such accounts receivable.

"Receivables Repurchase Obligation" means any obligation of a seller of receivables in a Qualified Receivables Financing to repurchase receivables arising as a result of a breach of a representation, warranty or covenant or otherwise, including as a result of a receivable or portion thereof becoming subject to any asserted defense, dispute, off-set or counterclaim of any kind as a result of any action taken by, any failure to take action by or any other event relating to the seller.

"Receivables Subsidiary" means a Wholly Owned Restricted Subsidiary which engages in no activities other than in connection with the financing of accounts receivable of the Borrower and its Restricted Subsidiaries, all proceeds thereof and all rights (contractual or other), collateral and other assets relating thereto, and any business or activities incidental or related to such business, and which is designated by the Board of Directors of the Borrower (as provided below) as a Receivables Subsidiary and:

(a)    no portion of the Indebtedness or any other obligations (contingent or otherwise) of which (i) is guaranteed by the Borrower or any other Subsidiary of the Borrower (excluding guarantees of obligations (other than the principal of and interest on, Indebtedness) pursuant to Standard Securitization Undertakings), (ii) is recourse to or obligates the Borrower or any other Subsidiary in any way other than pursuant to Standard Securitization Undertakings, or (iii) subjects any property or asset of the Borrower or any other Subsidiary, directly or indirectly, contingently or otherwise, to the satisfaction thereof, other than pursuant to Standard Securitization Undertakings;

(b)    with which neither the Borrower nor any Subsidiary has any material contract, agreement, arrangement or understanding other than on terms which the Borrower reasonably believes to be no less favorable to the Borrower or such Subsidiary than those that might be obtained at the time from Persons that are not Affiliates of the Borrower; and

(c)    to which neither the Borrower nor any Subsidiary has any obligation to maintain or preserve such entity's financial condition or cause such entity to achieve certain levels of operating results.

Any such designation by the Board of Directors of the Borrower shall be evidenced to the Administrative Agent by filing with the Administrative Agent a certified copy of the resolution of the Board of Directors of the Borrower giving effect to such designation and an Officers' Certificate certifying that such designation complied with the foregoing conditions and that any Qualified Receivables Financing to be entered into by such Receivables Subsidiary meets the requirements of the definition of "Qualified Receivables Financing".

"Refinancing Indebtedness" shall have the meaning set forth in Section 5.06(b)(xi).

"Refunding Capital Stock" shall have the meaning set forth in Section 5.07(b)(i)(A).

"Register" shall have the meaning set forth in Section 8.06(b)(iv).

"Regulation T" means Regulation U of the Board as from time to time in effect, any successor to all or any portion thereof establishing margin requirements and all official rulings and interpretations thereunder or thereof.

"Regulation U" means Regulation U of the Board as from time to time in effect, any successor to all or any portion thereof establishing margin requirements and all official rulings and interpretations thereunder or thereof.

"Regulation X" means Regulation X of the Board as from time to time in effect, any successor to all or any portion thereof establishing margin requirements and all official rulings and interpretations thereunder or thereof.

"Reinvestment Date" shall have the meaning given to such term in Section 2.13(a)(i).

"Related Parties" means, with respect to any specified Person, such Person's Affiliates and the directors, officers, employees, agents and members of such Person or such Person's Affiliates and any Person that possesses, directly or indirectly, the power to direct or cause the direction of the management or policies of such Person, whether through the ability to exercise voting power, by contract or otherwise.

"Release" means any release, spill, emission, leaking, pumping, pouring, injection, escaping, deposit, disposal, discharge, dispersal, dumping, leaching or migration.

"Relevant Governmental Body" means the Board of Governors or the NYFRB, or a committee officially endorsed or convened by the Board of Governors or the NYFRB, or any successor thereto.

"Reorganization Plan" shall have the meaning set forth in Section 7.11.

"Reportable Event" means an event described in Section 4043(c) of ERISA and the regulations thereunder, other than any event as to which the 30-day notice period has been waived.

"Required Lenders" means, at any time, Lenders having outstanding Loans that, taken together, represent more than 50% of the sum of all outstanding Loans at such time.

"Requirement of Law" means, as to any Person, any law, treaty, rule, regulation, statute, order, ordinance, decree, judgment, consent decree, writ, injunction, settlement agreement or governmental requirement enacted, promulgated or imposed or entered into or agreed by any Governmental Authority, in each case applicable to or binding upon such Person or any of its property or assets or to which such Person or any of its property or assets is subject.

"Reserve Report" means a reserve report evaluating, as of the applicable date of determination, the Proved Reserves and the Proved Developed Reserves of the Borrower and its Subsidiaries.

"Resolution Authority" means an EEA Resolution Authority or, with respect to any UK Financial Institution, a UK Resolution Authority.

"Restricted Investment" means an Investment other than a Permitted Investment.

"<u>Restricted Payments</u>" shall have the meaning set forth in <u>Section 5.07(a)</u>.

"<u>Restricted Subsidiary</u>" means, with respect to any Person, any Subsidiary of such Person other than the Closing Date Unrestricted Subsidiary (unless and until such time as the Closing Date Unrestricted Subsidiary becomes a Restricted Subsidiary hereunder in accordance with (and solely to the extent required by) <u>Section 5.29</u>).  Unless otherwise indicated in this Agreement, all references to Restricted Subsidiaries means Restricted Subsidiaries of the Borrower.

"<u>Retired Capital Stock</u>" shall have the meaning set forth in <u>Section 5.07(b)(i)(A)</u>.

"<u>S&P</u>" means Standard & Poor's Ratings Group or any successor to the rating agency business thereof.

"<u>Sale/Leaseback Transaction</u>" means an arrangement relating to property now owned or hereafter acquired by the Borrower or a Restricted Subsidiary whereby the Borrower or such Restricted Subsidiary transfers such property to a Person and the Borrower or such Restricted Subsidiary leases it from such Person, other than leases between the Borrower and a Restricted Subsidiary or between Restricted Subsidiaries.

"<u>Sanctioned Country</u>" means, at any time, a country, territory or region that is, or whose government is, the subject or target of any Sanctions, which jurisdictions include, as of the Closing Date, the Crimea region of Ukraine, Cuba, Iran, North Korea, Sudan and Syria.

"<u>Sanctioned Person</u>" means any Person with whom dealings, at the time of the relevant dealing, are restricted or prohibited under Sanctions, including (i) any Person listed in any Sanctions-related list of designated Persons maintained by the U.S. (including by OFAC, the U.S. Department of the Treasury, or the U.S. Department of State), or by the United Nations Security Council, the European Union or any EU member state, Her Majesty's Treasury of the United Kingdom or any other relevant sanctions authority, (ii) any Person located, operating, organized or resident in a Sanctioned Country or (iii) any Person owned or controlled, directly or indirectly, by any such Person described in <u>clause (i)</u> or <u>(ii)</u> of this definition.

"<u>Sanctions</u>" means applicable sanctions or trade embargoes enacted, imposed, administered or enforced from time to time by (i) the U.S. government, including those administered by OFAC, U.S. Department of State, or U.S. Department of Commerce, (ii) the United Nations Security Council, the European Union or any of its member states, Her Majesty's Treasury of the United Kingdom or (iii) any other relevant authority.

"<u>SEC</u>" means the Securities and Exchange Commission or any successor thereto.

"<u>Secured Parties</u>" shall mean, collectively, the Administrative Agent, the Collateral Agent, each Lender, and each Subagent appointed by the Administrative Agent with respect to matters relating to the Loan Documents or by the Collateral Agent with respect to matters relating to any Security Document.

"<u>Securities Act</u>" means the Securities Act of 1933, as amended, and the rules and regulations of the SEC promulgated thereunder.

"<u>Security Documents</u>" means the security agreements, pledge agreements, collateral assignments, mortgages (including the Mortgages) and related agreements, as amended, supplemented, restated, renewed, refunded, replaced, restructured, repaid, refinanced or otherwise modified from time to time, creating the security interests in the Collateral for the benefit of the Collateral Agent and the Lenders as contemplated by this Agreement.

"<u>Senior Lien Intercreditor Agreement</u>" means (i) the intercreditor agreement among the collateral agent under the FLTL Facility, the Collateral Agent, and the other parties from time to time party

Error! Unknown document property name.
WEIL:\97986321\6\45327.0007

thereto, to be entered into on the Closing Date, substantially in the form attached hereto as <u>Exhibit H</u>, with such changes as the Administrative Agent shall reasonably agree in its Permitted Business Judgment, as it may be amended, restated, supplemented or otherwise modified from time to time in accordance with this Agreement or (ii) any replacement thereof that contains terms not materially less favorable to Lenders than the intercreditor agreement referred to in clause (i).

"<u>Similar Business</u>" means a business, the majority of whose revenues are derived from the activities of the Borrower and its Subsidiaries as of the Closing Date or any business or activity that is reasonably similar or complementary thereto or a reasonable extension, development or expansion thereof or ancillary thereto.

"<u>SOFR</u>" means a rate per annum equal to the secured overnight financing rate for such Business Day published by the NYFRB (or a successor administrator of the secured overnight financing rate) on the website of the NYFRB, currently at http://www.newyorkfed.org (or any successor source for the secured overnight financing rate identified as such by the administrator of the secured overnight financing rate from time to time).

"<u>Specified Asset Sale</u>" has the meaning assigned to it in <u>Section 2.13(a)(i)</u>.

"<u>Standard Securitization Undertakings</u>" means representations, warranties, covenants, indemnities and guarantees of performance entered into by the Borrower or any Subsidiary thereof which the Borrower has determined in good faith to be customary in a Receivables Financing including, without limitation, those relating to the servicing of the assets of a Receivables Subsidiary, it being understood that any Receivables Repurchase Obligation shall be deemed to be a Standard Securitization Undertaking.

"<u>Stated Maturity</u>" means, with respect to any security, the date specified in such security as the fixed date on which the final payment of principal of such security is due and payable, including pursuant to any mandatory redemption provision (but excluding any provision providing for the repurchase of such security at the option of the holder thereof upon the happening of any contingency beyond the control of the issuer unless such contingency has occurred).

"<u>Statutory Reserves</u>" means a fraction (expressed as a decimal), the numerator of which is the number one and the denominator of which is the number one <u>minus</u> the aggregate of the maximum reserve percentages (including any marginal, special, emergency or supplemental reserves) expressed as a decimal established by the Board and any other banking authority, domestic or foreign, to which the Administrative Agent or any Lender (including any branch, Affiliate, or other fronting office making or holding a Loan) is subject for Eurocurrency Liabilities (as defined in Regulation D of the Board).  Such reserve percentages shall include those imposed pursuant to such Regulation D.  Without limiting the effect of the foregoing, the Statutory Reserves shall reflect any other reserves required to be maintained by such member banks with respect to (i) any category of liabilities that includes deposits by reference to which the applicable Adjusted LIBOR or any other interest rate of a Loan is to be determined, or (ii) any category of extensions of credit or other assets that include Loans bearing interest at Adjusted LIBOR.  A Loan that is not an ABR Loan shall be deemed to constitute Eurocurrency Liabilities and to be subject to such reserve requirements without benefit of or credit for proration, exemptions or offsets that may be available from time to time to any Lender under such Regulation D.  Statutory Reserves shall be adjusted automatically on and as of the effective date of any change in any reserve percentage.

"<u>Subagent</u>" shall have the meaning set forth in <u>Section 7.02</u>.

"<u>Subsidiary</u>" means, with respect to any Person, (a) any corporation more than 50% of whose Equity Interests of any class or classes having by the terms thereof ordinary voting power to elect a majority of the directors of such corporation (irrespective of whether or not at the time Equity Interests of any class or classes of such corporation shall have or might have voting power by reason of the happening of any contingency) is at the time owned by such Person directly or indirectly through Subsidiaries and (b) any limited liability company,

partnership, association, joint venture or other entity of which such Person directly or indirectly through Subsidiaries has more than a 50% equity interest at the time. Unless otherwise expressly provided, all references herein to a "Subsidiary" means a Subsidiary of the Borrower.

"<u>Subsidiary Guarantor</u>" means any Subsidiary that Incurs a Guarantee; *provided* that upon the release or discharge of such Person from its Guarantee in accordance with this Agreement, such Subsidiary shall cease to be a Subsidiary Guarantor; *provided further* that no Excluded Subsidiary shall be a Subsidiary Guarantor.

"<u>Supported QFC</u>" has the meaning set forth in <u>Section 8.24</u>.

"<u>Tax Distributions</u>" means any distributions pursuant to <u>Section 5.07(b)(v)</u>.

"<u>Taxes</u>" means any and all present or future taxes, duties, levies, imposts, assessments, deductions, withholdings (including backup withholding), fees or other charges imposed by any Governmental Authority and any interest, fines, penalties or additions to tax with respect to the foregoing.

"<u>Term SOFR</u>" means, for the applicable corresponding tenor, the forward-looking term rate based on SOFR that has been selected or recommended by the Relevant Governmental Body.

"<u>Test Period</u>" means, as of any date of determination, the four consecutive fiscal quarters of the Borrower then last ended and for which financial statements have been delivered to the Administrative Agent in accordance with <u>Section 5.01(a)</u> or <u>(b)</u>.

"<u>Transaction Expenses</u>" means any fees or expenses incurred or paid by the Borrower or any of its Subsidiaries or any of their Affiliates in connection with the Transactions, this Agreement and the other Loan Documents.

"<u>Transactions</u>" means, collectively, (a) the funding of (or, as applicable, conversion into) the Initial Loans on the Closing Date and the execution, delivery and performance of the Loan Documents to be entered into on the Closing Date, (b) the funding (or deemed funding) of the Loans (as defined in the FLTL Credit Agreement) on the Closing Date and the execution, delivery and performance of the Loan Documents (as defined in the FLTL Credit Agreement) to be entered into on the Closing Date, (c) the other transactions contemplated by the Plan of Reorganization and (d) the payment of Transaction Expenses.

"<u>Type</u>" means, when used in respect of any Loan, the Rate by reference to which interest on such Loan is determined. For purposes hereof, "*Rate*" shall include the LIBOR and the ABR.

"<u>U.S.</u>" means the United States of America.

"<u>U.S. Dollars</u>" or "<u>$</u>" means lawful money of the United States of America.

"<u>U.S. Government Obligations</u>" means securities that are:

(1)     direct obligations of the United States of America for the timely payment of which its full faith and credit is pledged, or

(2)     obligations of a Person controlled or supervised by and acting as an agency or instrumentality of the United States of America, the timely payment of which is unconditionally guaranteed as a full faith and credit obligation by the United States of America, which, in each case, are not callable or redeemable at the option of the issuer thereof, and shall also include a depository receipt issued by a bank (as defined in Section 3(a)(2) of the Securities Act) as custodian with respect to any such U.S. Government Obligations or a specific payment of principal of or interest on any such U.S. Government Obligations held by

42

such custodian for the account of the holder of such depository receipt; *provided* that (except as required by law) such custodian is not authorized to make any deduction from the amount payable to the holder of such depository receipt from any amount received by the custodian in respect of the U.S. Government Obligations or the specific payment of principal of or interest on the U.S. Government Obligations evidenced by such depository receipt.

"U.S. Lender" means any Lender other than a Non-U.S. Lender.

"UK Financial Institution" means any BRRD Undertaking (as such term is defined under the PRA Rulebook (as amended from time to time) promulgated by the United Kingdom Prudential Regulation Authority) or any person falling within IFPRU 11.6 of the FCA Handbook (as amended from time to time) promulgated by the United Kingdom Financial Conduct Authority, which includes certain credit institutions and investment firms, and certain affiliates of such credit institutions or investment firms.

"UK Resolution Authority" means the Bank of England or any other public administrative authority having responsibility for the resolution of any UK Financial Institution.

"Unfunded Current Liability" means, with respect to any Plan, the amount, if any, by which the Accumulated Benefit Obligation (as defined under Statement of Financial Accounting Standards No. 87 or any successor thereto ("SFAS 87")) under the Plan as of the close of its most recent plan year, determined in accordance with SFAS 87 as in effect on the Closing Date, exceeds the value of the Plan assets (as defined under Section 430(g)(3)(A) of the Code without regard to the averaging which may be allowed under Section 430(g)(3)(B) of the Code) allocable thereto and determined as of the close of such plan year.

"Unrestricted Cash" means cash or Cash Equivalents of the Borrower or any Subsidiary Guarantor that would not appear as "restricted" on a consolidated balance sheet of the Borrower or any Subsidiary Guarantor, and (in the case of Section 4.01(q), subject to Section 5.34), held in deposit accounts subject to an Account Control Agreement and is free and clear of all Liens (other than Permitted Liens).

"US Special Resolution Regimes" has the meaning assigned to such term in Section 8.24.

"USA Patriot Act" means the U.S.A. Patriot Act, Title III of Pub.  L. 107-56 (signed into law October 26, 2001).

"USD LIBOR" means the London interbank offered rate for U.S. dollars.

"Voting Procedures Order" shall have the meaning assigned to such term in Section 7.11.

"Voting Stock" of any Person as of any date means the Capital Stock of such Person that is at the time entitled to vote in the election of the Board of Directors of such Person.

"Weighted Average Life to Maturity" means, when applied to any Indebtedness or Disqualified Stock or Preferred Stock, as the case may be, at any date, the quotient obtained by dividing (a) the sum of the products of the number of years from the date of determination to the date of each successive scheduled principal payment of such Indebtedness or redemption or similar payment with respect to such Disqualified Stock or Preferred Stock multiplied by the amount of such payment, by (b) the sum of all such payments.

"Wholly Owned Restricted Subsidiary" means any Wholly Owned Subsidiary that is a Restricted Subsidiary.

"Wholly Owned Subsidiary" of any Person means a Subsidiary of such Person 100% of the outstanding Capital Stock or other ownership interests of which (other than directors' qualifying shares or shares required pursuant to applicable law) shall at the time be owned by such Person or by one or more Wholly Owned Subsidiaries of such Person.

43

"Write-Down and Conversion Powers" means, (a) with respect to any EEA Resolution Authority, the write-down and conversion powers of such EEA Resolution Authority from time to time under the Bail-In Legislation for the applicable EEA Member Country, which write-down and conversion powers are described in the EU Bail-In Legislation Schedule, and (b) with respect to the United Kingdom, any powers of the applicable Resolution Authority under the Bail-In Legislation to cancel, reduce, modify or change the form of a liability of any UK Financial Institution or any contract or instrument under which that liability arises, to convert all or part of that liability into shares, securities or obligations of that person or any other person, to provide that any such contract or instrument is to have effect as if a right had been exercised under it or to suspend any obligation in respect of that liability or any of the powers under that Bail-In Legislation that are related to or ancillary to any of those powers.

SECTION 1.02.    Terms Generally.  The definitions set forth or referred to in Section 1.01 shall apply equally to both the singular and plural forms of the terms defined.  Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms.  The words "*include*," "*includes*" and "*including*" shall be deemed to be followed by the phrase "*without limitation*."  All references herein to *Articles*, *Sections*, *Exhibits* and *Schedules* shall be deemed references to Articles and Sections of, and Exhibits and Schedules to, this Agreement unless the context shall otherwise require.  Except as otherwise expressly provided herein, any reference in this Agreement to any Loan Document means such document as amended, restated, supplemented or otherwise modified from time to time.  Except as otherwise expressly provided herein, all terms of an accounting or financial nature shall be construed in accordance with GAAP.

SECTION 1.03.    Accounting Terms.  All accounting terms not specifically or completely defined herein shall be construed in conformity with, and all financial data (including financial ratios and other financial calculations) required to be submitted pursuant to this Agreement shall be prepared in conformity with, GAAP, except as otherwise specifically prescribed herein; *provided, however,* that if the Borrower notifies the Administrative Agent that the Borrower requests an amendment to any provision hereof to eliminate the effect of any change occurring after the Closing Date in GAAP or in the application thereof on the operation of such provision (or if the Administrative Agent notifies the Borrower that the Required Lenders request an amendment to any provision hereof for such purpose), regardless of whether any such notice is given before or after such change in GAAP or in the application thereof, then such provision shall be interpreted on the basis of GAAP as in effect and applied immediately before such change shall have become effective until such notice shall have been withdrawn or such provision amended in accordance herewith.

SECTION 1.04.    Rounding.  Any financial ratios required to be maintained or complied with by the Borrower pursuant to this Agreement (or required to be satisfied in order for a specific action to be permitted under this Agreement) shall be calculated by dividing the appropriate component by the other component, carrying the result to one place more than the number of places by which such ratio is expressed herein and rounding the result up or down to the nearest number (with a rounding-up if there is no nearest number).

SECTION 1.05.    Times of Day.  Unless otherwise specified, all references herein to times of day shall be references to New York City (daylight saving or standard, as applicable).

SECTION 1.06.    Timing of Payment or Performance.  When the payment of any obligation or the performance of any covenant, duty or obligation is stated to be due or performance required on a day which is not a Business Day, the date of such payment (other than as described in Section 2.07) or performance shall extend to the immediately succeeding Business Day.

SECTION 1.07.    Hedging Requirements Generally; Hedge Unwinding.  For purposes of any determination with respect to Hedging Obligations or any other calculation under or requirement of this Agreement in respect of hedging shall be calculated on a "barrel of oil equivalent" basis. All references to the "unwinding" (or any cognate thereof) of a hedge shall mean the monetization of a hedge position, whether by mutual agreement to terminate or "tear up", in connection with the designation of an early termination date (or any similar concept) with respect to, or the settlement of such hedge position.

44

SECTION 1.08.    Certain Determinations.  For purposes of determining compliance with any of the covenants set forth in Article V, but subject to any limitation expressly set forth therein, as applicable, at any time (whether at the time of incurrence or thereafter), any Lien, Investment, Indebtedness, disposition, Restricted Payment, Affiliate transaction, prepayment, redemption or the consummation of any other transaction meets the criteria of one, or more than one, of the categories permitted pursuant to Article V, as applicable, the Borrower shall, in its good faith discretion, determine under which category such Lien, Investment, Indebtedness, Asset Sale, Restricted Payment, Affiliate transaction, prepayment, redemption or the consummation of any other transaction (or, in each case, any portion thereof) is permitted.

SECTION 1.09.    Making or Maintaining LIBOR Loans.

(a)    Changed Circumstances/Temporary LIBOR Unavailability.  In the event that the Administrative Agent or the Required Lenders determine (which determination shall be final and conclusive and binding upon all parties hereto), on any interest rate determination date with respect to any LIBOR Loans, that (i) subject to subsection (b) below and Sections 2.08 and 2.09, dollar deposits are not being offered to banks in the London interbank eurodollar market for the applicable amount and Interest Period of such LIBOR Loans, (ii) by reason of circumstances affecting the London interbank market adequate and fair means do not exist for ascertaining the interest rate applicable to such LIBOR Loans on the basis provided for in the definition of LIBOR, or (iii) LIBOR does not adequately and fairly reflect the cost to Lenders of making or maintaining such LIBOR Loans during such Interest Period, the Administrative Agent will reasonably promptly give notice to the Borrower and each Lender of such determination, whereupon (A) no Loans may be made as, or converted to, LIBOR Loans until such time as Administrative Agent (at the direction of the Required Lenders) notifies the Borrower and Lenders that the circumstances giving rise to such notice no longer exist, and (B) any Notice of Borrowing or Interest Period Election Request given by the Borrower with respect to the Loans in respect of which such determination was made shall be deemed to be rescinded by the Borrower.

(b)    Benchmark Replacement Setting.  Notwithstanding anything to the contrary herein or in any other Loan Document:

(i)    Replacing Adjusted LIBOR.  On March 5, 2021 the Financial Conduct Authority ("FCA"), the regulatory supervisor of USD LIBOR's administrator ("IBA"), announced in a public statement the future cessation or loss of representativeness of overnight/Spot Next, 1-month, 3-month, 6-month and 12-month USD LIBOR tenor settings. On the earlier of (i) the date that all Available Tenors of USD LIBOR have either permanently or indefinitely ceased to be provided by IBA or have been announced by the FCA pursuant to public statement or publication of information to be no longer representative and (ii) the Early Opt-in Effective Date, if the then-current Benchmark is USD LIBOR, the Benchmark Replacement will replace such Benchmark for all purposes hereunder and under any Loan Document in respect of any setting of such Benchmark on such day and all subsequent settings without any amendment to, or further action or consent of any other party to this Agreement or any other Loan Document. If the Benchmark Replacement is Daily Simple SOFR, all interest payments will be payable on a quarterly basis.

(ii)    Replacing Future Benchmarks.  Upon the occurrence of a Benchmark Transition Event, the Benchmark Replacement will replace the then-current Benchmark for all purposes hereunder and under any Loan Document in respect of any Benchmark setting at or after 5:00 p.m. (New York City time) on the fifth (5th) Business Day after the date notice of such Benchmark Replacement is provided to the Lenders without any amendment to, or further action or consent of any other party to, this Agreement or any other Loan Document, so long as the Administrative Agent has not received, by such time, written notice of objection to such Benchmark Replacement from Lenders comprising the Required Lenders. At any time that the administrator of the then-current Benchmark has permanently or indefinitely ceased to provide such Benchmark or such Benchmark has been announced by the regulatory supervisor for the administrator of such Benchmark pursuant to public statement or publication of information to be no longer representative of the underlying market and economic reality

45

that such Benchmark is intended to measure and that representativeness will not be restored, the Borrower may revoke any request for a borrowing of, conversion to or continuation of Loans to be made, converted or continued that would bear interest by reference to such Benchmark until the Borrower's receipt of notice from the Administrative Agent (at the direction of the Required Lenders) that a Benchmark Replacement has replaced such Benchmark, and, failing that, the Borrower will be deemed to have converted any such request into a request for a borrowing of or conversion to ABR Loans. During the period referenced in the foregoing sentence, the component of ABR based upon the Benchmark will not be used in any determination of ABR.

(iii)     <u>Benchmark Replacement Conforming Changes</u>. In connection with the implementation and administration of a Benchmark Replacement, the Administrative Agent (at the direction of the Required Lenders) will have the right to make Benchmark Replacement Conforming Changes from time to time and, notwithstanding anything to the contrary herein or in any other Loan Document, any amendments implementing such Benchmark Replacement Conforming Changes will become effective without any further action or consent of any other party to this Agreement or any other Loan Document.

(iv)     <u>Notices; Standards for Decisions and Determinations</u>. The Administrative Agent will promptly notify the Borrower and the Lenders of (i) the implementation of any Benchmark Replacement and (ii) the effectiveness of any Benchmark Replacement Conforming Changes. Any determination, decision or election that may be made by the Administrative Agent or, if applicable, any Lender (or group of Lenders) pursuant to this <u>Section 1.09</u>, including any determination with respect to a tenor, rate or adjustment or the occurrence or non-occurrence of an event, circumstance or date and any decision to take or refrain from taking any action, will be conclusive and binding absent manifest error and may be made in its or their sole discretion and without consent from any other party to this Agreement or any other Loan Document, except, in each case, as expressly required pursuant to this <u>Section 1.09</u>.

(v)     <u>Unavailability of Tenor of Benchmark</u>. Notwithstanding anything to the contrary herein or in any other Loan Document, at any time (including in connection with the implementation of a Benchmark Replacement), (i) if the then-current Benchmark is a term rate (including Term SOFR or LIBOR) and either (A) any tenor for such Benchmark is not displayed on a screen or other information service that publishes such rate from time to time as selected by the Administrative Agent in its reasonable discretion or (B) the regulatory supervisor for the administrator of such Benchmark has provided a public statement or publication of information announcing that any tenor for such Benchmark is or will be no longer representative, then the Administrative Agent (at the direction of the Required Lenders) and the Borrower may modify the definition of "Interest Period" for any Benchmark setting at or after such time to remove such unavailable or non-representative tenor and (ii) if a tenor that was removed pursuant to clause (i) above either (A) is subsequently displayed on a screen or information service for a Benchmark (including a Benchmark Replacement) or (B) is not, or is no longer, subject to an announcement that it is or will no longer be representative for a Benchmark (including a Benchmark Replacement), then the Administrative Agent (at the direction of the Required Lenders) may modify the definition of "Interest Period" for all Benchmark settings at or after such time to reinstate such previously removed tenor.

(vi)     <u>Concerning the Administrative Agent</u>. The Administrative Agent shall have no obligation to make any determination under this <u>Section 1.09</u> or otherwise related to the Benchmark or the Benchmark Replacement; provided that any determination made in good faith by the Administrative Agent shall be binding on all Lenders and the Administrative Agent shall have no liability to the Lenders or any other Person for any such determination made in good faith; provided, further, that in the event that the Administrative Agent elects to make such a determination and seeks the consent of the Required Lenders in connection therewith, if the Required Lenders do not affirmatively select an alternative rate of interest, then such rate may be selected by the Borrower in

Error! Unknown document property name.
WEIL:\97986321\6\45327.0007

good faith and any such selection shall be binding on the Administrative Agent and all Lenders unless and until the Required Lenders select and alternative rate of interest.

SECTION 1.10.    Divisions. For all purposes under the Loan Documents, in connection with any division or plan of division under Delaware law (or any comparable event under a different jurisdiction's laws): (a) if any asset, right, obligation or liability of any Person becomes the asset, right, obligation or liability of a different Person, then it shall be deemed to have been transferred from the original Person to the subsequent Person, and (b) if any new Person comes into existence, such new Person shall be deemed to have been organized on the first date of its existence by the holders of its Equity Interests at such time.

SECTION 1.11.    Deemed Funding of Loans.  All references to any Lender "making" or "funding" a Loan or a Loan being "made" or "funded" (or any similar concept) by a Lender shall for all purposes hereunder, be a reference to the deemed making or funding of such Loan by such Lender or such Loan being deemed made or funded (or any similar concept) by such Lender.

SECTION 1.12.    Certain Calculations and Tests.  In the event that the Borrower or any of its Restricted Subsidiaries Incurs, repays, repurchases or redeems any Indebtedness (other than in the case of any Qualified Receivables Financing, in which case interest expense shall be computed based upon the average daily balance of such Indebtedness during the applicable period) or issues, repurchases or redeems Disqualified Stock or Preferred Stock subsequent to the commencement of the period for which any financial ratio or test is being calculated but prior to the event for which the calculation is made (the "Calculation Date"), then such calculation shall give pro forma effect to such Incurrence, repayment, repurchase or redemption of Indebtedness, or such issuance, repurchase or redemption of Disqualified Stock or Preferred Stock, as if the same had occurred at the beginning of the applicable four-quarter period. For purposes of this definition, whenever pro forma effect is to be given to any event, the pro forma calculations shall be made in good faith by a responsible financial or accounting officer of the Borrower.

If any Indebtedness bears a floating rate of interest and is being given pro forma effect, the interest on such Indebtedness shall be calculated as if the rate in effect on the Calculation Date had been the applicable rate for the entire period (taking into account any Hedging Obligations applicable to such Indebtedness if such Hedging Obligation has a remaining term in excess of 12 months).  Interest on a Capitalized Lease Obligation shall be deemed to accrue at an interest rate reasonably determined by a responsible financial or accounting officer of the Borrower to be the rate of interest implicit in such Capitalized Lease Obligation in accordance with GAAP.

For purposes of this definition, any amount in a currency other than U.S. Dollars will be converted to U.S. Dollars based on the average exchange rate for such currency for the most recent twelve month period immediately prior to the date of determination in a manner consistent with that used in calculating EBITDAX (as defined in the FLTL Credit Agreement) for the applicable period.

## ARTICLE II

The Credits

SECTION 2.01.    Loans.

(a)    Subject to and upon the terms and conditions herein set forth, each Lender having an Initial Commitment with respect to Initial New Loans, severally agrees that it shall make a Loan or Loans on the Closing Date to the Borrower in U.S. Dollars (each such loan, an "Initial New Loan") in an aggregate principal amount set forth for such Lender on Schedule 2.01. The Commitments in respect of the Initial New Loans shall terminate automatically immediately after the making of the Initial New Loans on the Closing Date.  The initial aggregate principal amount of the Initial New Loans shall be $[_]. The Initial New Loans may be repaid or

Error! Unknown document property name.
WEIL:\97986321\6\45327.0007

prepaid in accordance with the provisions hereof, but once repaid or prepaid, may not be reborrowed.  The Initial New Loans, together with the Initial DIP Converted Loans, shall constitute a single Class of Loans hereunder.

        (b)     [Reserved]

        (c)     Subject to the terms and conditions set forth herein and to give effect to the conversion of the Converted DIP Facility Loans owing to each Lender, each Lender having an Initial Commitment with respect to Initial DIP Converted Loans, severally agrees that it shall be deemed to have made a Loan or Loans on the Closing Date to the Borrower in U.S. Dollars (each such loan, an "Initial DIP Converted Loans") in an aggregate principal amount set forth for such Lender on Schedule 2.01. The Initial DIP Converted Loans deemed made pursuant to this Section 2.01(c) shall be converted in accordance with Section 2.02 without any actual funding. After giving effect to this Section 2.01(c), the aggregate principal amount of the Initial DIP Converted Loans on the Closing Date shall be $[_]. The Initial DIP Converted Loans may be repaid or prepaid in accordance with the provisions hereof, but once repaid or prepaid, may not be reborrowed.  The Initial DIP Converted Loans, together with the Initial New Loans, shall constitute a single Class of Loans hereunder.

        (d)     Each Lender may at its option make any Loan by causing any domestic or foreign branch or Affiliate of such Lender to make such Loan; *provided* that (i) any exercise of such option shall not affect the obligation of the Borrower to repay such Loan and (ii) in exercising such option, such Lender shall use its reasonable efforts to minimize any increased costs to the Borrower resulting therefrom (which obligation of the Lender shall not require it to take, or refrain from taking, actions that it determines would result in increased costs for which it will not be compensated hereunder or that it determines would be otherwise disadvantageous to it and in the event of such request for costs for which compensation is provided under this Agreement, the provisions of Section 2.08 shall apply).

        (e)     Incremental Commitments may be established as set forth in Section 2.20. Each Incremental Lender agrees, subject to the terms and conditions set forth in the applicable Incremental Facility Agreement, to make Loans under its Incremental Commitment of any Class in an aggregate principal amount not to exceed such Incremental Commitment.

     SECTION 2.02.     Converted DIP Facility Loans.  Subject to the terms and conditions set forth herein, each Lender, severally and not jointly, agrees that the Converted DIP Facility Loans made by such Lender under the DIP Facility and outstanding on the Closing Date immediately prior to giving effect to this Agreement shall be converted (and prepaid by) into Initial DIP Converted Loans in a principal amount equal to the Cnverted DIP Facility Loans owing to such Lender on the Closing Date and such Loans shall be deemed made pursuant to this Agreement on the Closing Date as set forth in Section 2.01(c).  The conversion by a Lender of all or a portion of its Converted DIP Facility Loans shall be deemed to satisfy, dollar for dollar, such Lender's obligation to make Initial DIP Converted Loans on the Closing Date.  Such Converted DIP Facility Loans of each Lender shall hereafter be referred to as "Initial DIP Converted Loans" and on and after the Closing Date shall have all of the rights and benefits of Loans as set forth in this Agreement and the other Loan Documents.  For the avoidance of doubt, such conversion of Converted DIP Facility Loans into Initial DIP Converted Loans hereunder shall be deemed a "Borrowing" for all purposes under this Agreement.

     SECTION 2.03.     Notice of Borrowing.

        (a)     For the Borrowing made on the Closing Date, the Borrower shall give the Administrative Agent written notice (or telephonic notice promptly confirmed in writing) no later than 12:00 p.m., New York time, one (1) Business Day prior to the Closing Date (or such shorter period as the Administrative Agent may agree).  The notice (a "Notice of Borrowing") shall be revocable if any of the conditions in Section 4.01 that are not reasonably within the control of the Borrower are not satisfied or waived.  Such Notice of Borrowing shall specify (i) the aggregate principal amount of the Loans to be made, (ii) the proposed date of the Loans (which shall be a Business Day), (iii) whether such Loans are to be ABR Loans or LIBOR Loans and, if LIBOR Loans, the initial Interest Period applicable thereto, and (iv) remittance

<div align="center">48</div>

instructions for disbursement of the proceeds of the Loans. The Notice of Borrowing shall be in substantially the form of Exhibit E. The Administrative Agent shall promptly give each Lender written notice of the proposed borrowing of Loans, of such Lender's proportionate share thereof and of the other matters covered by the related Notice of Borrowing.

SECTION 2.04.  Repayment of Loans; Evidence of Debt.

(a)  The Borrower hereby unconditionally promises to repay, in U.S. Dollars, the outstanding principal amount of the Loans to the Administrative Agent for the account of each Lender on the Maturity Date, in an amount equal to the then unpaid principal amount of each Loan of such Lender to the Borrower.

(b)  Each Lender shall maintain in accordance with its usual practice an account or accounts evidencing the indebtedness of the Borrower to the appropriate Lending Office of such Lender resulting from the Loan made by such Lending Office of such Lender from time to time, including the amounts of principal and interest payable and paid to such Lending Office of such Lender from time to time under this Agreement.

(c)  The Administrative Agent, acting for this purpose as a non-fiduciary agent of the Borrower, shall maintain the Register pursuant to Section 8.06(b)(iv), and a subaccount for each Lender, in which the Register and subaccounts (taken together) shall be recorded (i) the amount of the Loans made hereunder and the Interest Period(s) applicable thereto, (ii) the amount of any principal or interest due and payable or to become due and payable from the Borrower to each Lender hereunder and (iii) the amount of any sum received by the Administrative Agent hereunder from the Borrower and each Lender's share thereof.

(d)  The entries made in the Register and accounts and subaccounts maintained pursuant to clauses (b) and (c) of this Section 2.04 shall, to the extent permitted by applicable law, be prima facie evidence of the existence and amounts of the obligations of the Borrower therein recorded; *provided, however*, that the failure of any Lender or the Administrative Agent to maintain such account, such Register or such subaccount, as applicable, or any error therein, shall not in any manner affect the obligation of the Borrower to repay (with applicable interest) the Loan made to the Borrower by such Lender in accordance with the terms of this Agreement; *provided further* that in the event of any conflict between the accounts maintained by any Lender and those maintained by the Administrative Agent, the Register and the corresponding accounts maintained by the Administrative Agent shall control, absent manifest error.

(e)  Any Lender may request that Loans made by it be evidenced by a Note. In such event, the Borrower shall prepare, execute and deliver to such Lender a Note payable to such Lender or its registered assigns and in substantially the form attached hereto as Exhibit B.

SECTION 2.05.  Other Fees.  The Borrower shall pay to the Administrative Agent such fees as shall have been separately agreed upon in the Fee Letter in the amounts and at the times specified in the Fee Letter. Such fees shall be fully earned when paid and shall not be refundable for any reason whatsoever (except as expressly agreed between the Borrower and the Administrative Agent).

SECTION 2.06.  Interest.

(a)  (i) Interest on (A) each Loan that is a LIBOR Loan will accrue and be payable at a rate per annum equal to Adjusted LIBOR plus the Applicable Margin and shall be payable in cash, and (B) each Loan that is an ABR Loan will accrue and be payable at a rate per annum equal to ABR plus the Applicable Margin and shall be payable in cash, each rate as determined by the Administrative Agent;

(ii) [The Borrower may (in its sole discretion) deliver a PIK Election Notice at least [three (3) Business Days' prior to any Interest Payment Date] during a PIK Election Trigger Period to elect to (A)

pay the interest provided for in clause (i) above at the Applicable Margin taking into account the delivery of the PIK Election Notice and (B) make an additional interest payment on such Interest Payment Date in kind in an aggregate amount equal to 5.00% per annum of each Initial Loan (the "PIK Interest"), it being understood and agreed that on each Interest Payment Date on which the Borrower has delivered a PIK Election Notice, the PIK Interest shall be capitalized and added to the outstanding principal balance of the Initial Loans, and bear interest from and after such Interest Payment Date.  If the Borrower has not delivered a PIK Election Notice prior to the time prescribed by this Section 2.06(a)(ii), the Borrower shall have irrevocably deemed to have elected to pay the interest for such Interest Period in cash.]³

(b)    (i) At any time when an Event of Default (other than an Event of Default pursuant to Section 6.01(a) or Section 6.01(e)) exists (whether at the stated maturity, by acceleration or otherwise), upon the election of the Required Lenders, or (ii) at any time when an Event of Default pursuant to Section 6.01(a) or Section 6.01(e) (whether at the stated maturity, by acceleration or otherwise) exists, as applicable, all outstanding amounts shall bear interest at a rate per annum that is (x) in the case of principal, the rate that would otherwise be applicable thereto plus 2.00%, (y) in the case of any interest (and premium, if any), to the extent permitted by applicable law, the then-effective rate plus 2.00% and (z) in the case of any amount not specified in subclause (x) or (y) above, a rate per annum equal to the rate per annum otherwise payable at such time on ABR Loans, plus 2.00%. Interest accruing at the rates set forth in this paragraph (b) shall be payable on demand.

(c)    Interest on each Loan shall accrue from and including the date on which such Loan is made to but excluding the date of any repayment thereof and shall be payable (i) on each Interest Payment Date, and (ii) on any prepayment (on the amount prepaid), at maturity (whether by acceleration or otherwise) and, after such maturity, on demand.

(d)    All computations of interest hereunder shall be calculated on the basis of a 360-day year for the actual days elapsed, except that interest computed by reference to the ABR at times when the ABR is based on the prime rate shall be computed on the basis of a year of 365 days (or 366 days in a leap year), and in each case shall be payable for the actual number of days elapsed (including the first day but excluding the last day).

(e)    The Administrative Agent, upon determining Adjusted LIBOR or ABR for any Interest Period, shall promptly notify the Borrower and the relevant Lenders thereof. Each such determination shall, absent clearly demonstrable error, be final and conclusive and binding on all parties hereto.  The Administrative Agent shall, upon the request of any Lender, provide the interest rate then in effect with respect to the applicable Loans.

(f)    Interest on Loans made by Lenders as of the Closing Date shall accrue from and after the Closing Date in accordance with the terms of this Agreement.

SECTION 2.07.    Interest Periods.  Notwithstanding anything to the contrary contained above, if any Interest Period would otherwise expire on a day that is not a Business Day, such Interest Period shall expire on the next succeeding Business Day; *provided* that if any Interest Period would otherwise expire (i) on a day that is not a Business Day but is a day of the month after which no further Business Day occurs in such month, such Interest Period shall expire on the next preceding Business Day and (ii) on a day that is after the Maturity Date, such Interest Period shall expire on the Maturity Date.

SECTION 2.08.    Increased Costs, Illegality, etc.

---

³ NTD: Mechanics under discussion.

Error! Unknown document property name.
WEIL:\97986321\6\45327.0007

(a)    In the event that:

(i)    the Administrative Agent or the Required Lenders shall have reasonably determined (which determination shall, absent clearly demonstrable error, be final and conclusive and binding upon all parties hereto) on any date for determining the LIBOR for any Interest Period that (A) deposits in the principal amounts of the Loans comprising such LIBOR Loan are not generally available in the relevant market or (B) by reason of any changes arising on or after the Closing Date affecting the interbank LIBOR market, adequate and fair means do not exist for ascertaining the applicable interest rate on the basis provided for in the definition of LIBOR; or

(ii)    a Change in Law occurring at any time after the Closing Date shall (A) impose, modify or deem applicable any reserve, special deposit, compulsory loan, insurance charge or similar requirement against assets of, deposits with or for the account of, or credit extended by, any Lender, (B) subject any Lender or the Administrative Agent to any Tax (other than (i) Indemnified Taxes or (ii) Excluded Taxes) on its loans, loan principal, commitments or other obligations, or its deposits, reserves, other liabilities or capital attributable thereto, or (C) impose on any Lender or the London interbank market any other condition, cost or expense (other than Taxes) affecting this Agreement or LIBOR Loans made by such Lender, which, in the case of clause (A), (B) or (C) results in the cost to such Lender or the Administrative Agent of making, converting into, continuing or maintaining LIBOR Loans increasing by an amount or the amounts received or receivable by such Lender or the Administrative Agent hereunder with respect to the foregoing shall be reduced; or

(iii)    any Lender, shall have reasonably determined (which determination shall, absent clearly demonstrable error, be final and conclusive and binding upon all parties hereto), at any time, that the making or continuance of any LIBOR Loan has become unlawful as a result of compliance by such Lender in good faith with any Requirement of Law (or would conflict with any such Requirement of Law not having the force of law even though the failure to comply therewith would not be unlawful);

then, and in any such event, such Lenders (or the Administrative Agent, in the case of clause (i) or (ii)(B) above) shall within a reasonable time thereafter give written notice to the Borrower and to the Administrative Agent of such determination (which notice the Administrative Agent shall promptly transmit to each of the other Lenders). Thereafter (x) in the case of clause (i) above, LIBOR Loans shall no longer be available until such time as the Administrative Agent notifies the Borrower and the Lenders that the circumstances giving rise to such notice by the Administrative Agent no longer exist (which notice the Administrative Agent agrees to give at such time when such circumstances no longer exist), and any Notice of Borrowing given by the Borrower with respect to LIBOR Loans that have not yet been incurred shall be deemed rescinded by the Borrower, (y) in the case of clause (ii) above, the Borrower shall pay to such Lender or the Administrative Agent, promptly (but no later than ten days) after receipt of written demand therefor such additional amounts as shall be required to compensate such Lender or the Administrative Agent for such increased costs or reductions in amounts receivable hereunder (it being agreed that a written notice as to the additional amounts owed to such Lender or the Administrative Agent submitted to the Borrower by such Lender or the Administrative Agent shall, absent clearly demonstrable error, be final and conclusive and binding upon all parties hereto) and (z) in the case of clause (iii) above, the Borrower shall take one of the actions specified in Section 2.08(b) as promptly as possible and, in any event, within the time period required by applicable Requirements of Law.

(b)    At any time that any LIBOR Loan is affected by the circumstances described in Section 2.08(a)(ii) or (iii), the Borrower may (and in the case of a LIBOR Loan affected pursuant to Section 2.08(a)(iii) shall) either (1) if the affected LIBOR Loan is then being made pursuant to a borrowing, cancel such borrowing by giving the Administrative Agent telephonic notice (confirmed promptly in writing) thereof on the same date that the Borrower was notified by a Lender pursuant to Section 2.08(a)(ii) or (iii) or (2) if the affected LIBOR Loan is then outstanding, upon at least three Business Days' notice to the

Error! Unknown document property name.
WEIL:\97986321\6\45327.0007

Administrative Agent, require the affected Lender to convert each such LIBOR Loan into an ABR Loan; *provided* that if more than one Lender is affected at any time, then all affected Lenders must be treated in the same manner pursuant to this Section 2.08(b).

(c)     If, after the Closing Date, any Change in Law relating to capital adequacy of any Lender or compliance by any Lender or its parent with any Change in Law relating to capital adequacy occurring after the Closing Date, has or would have the effect of reducing the rate of return on such Lender's or its parent's capital or assets as a consequence of such Lender's commitments or obligations hereunder to a level below that which such Lender or its parent could have achieved but for such Change in Law (taking into consideration such Lender's or its parent's policies with respect to capital adequacy), then from time to time, promptly (but in any event no later than ten days) after written demand by such Lender (with a copy to the Administrative Agent), the Borrower shall pay to such Lender such additional amount or amounts as will compensate such Lender or its parent for such reduction, it being understood and agreed, however, that a Lender shall not be entitled to such compensation as a result of such Lender's compliance with, or pursuant to any request or directive to comply with, any applicable Requirement of Law as in effect on the Closing Date.  Each Lender, upon determining in good faith that any additional amounts will be payable pursuant to this Section 2.08(c), will give prompt written notice thereof to the Borrower, although the failure to give any such notice shall not, subject to Section 2.11, release or diminish the Borrower's obligations to pay additional amounts pursuant to this Section 2.08(c) upon receipt of such notice.

SECTION 2.09.     Compensation.  If (a) any payment of principal of any Loan is made by the Borrower to or for the account of a Lender other than on the last day of the Interest Period for such Loan as a result of a payment pursuant to Section 2.12, as a result of acceleration of the maturity of the Loans pursuant to Article VI or for any other reason, (b) there occurs any failure to borrow, convert, continue or prepay any LIBOR Loan on the date specified in any notice delivered pursuant hereto or (c) there occurs any assignment of any LIBOR Loan other than on the last day of the Interest Period applicable thereto as a result of a request by the Borrower pursuant to Section 8.07, the Borrower shall, after receipt of a written request by such Lender, pay to the Administrative Agent for the account of such Lender any amounts required to compensate such Lender for any additional losses, costs or expenses that such Lender may reasonably incur as a result of such payment, or failure to prepay, including any loss, cost or expense (excluding loss of anticipated profits) actually incurred by reason of the liquidation or reemployment of deposits or other funds acquired by any Lender to fund or maintain such Loan.  A certificate of any Lender setting forth any amount that such Lender is entitled to receive pursuant to this Section 2.09 shall be delivered to the Borrower and shall be conclusive absent manifest error.  The Borrower shall pay such Lender the amount shown as due on such certificate within ten days after receipt thereof, unless such amount is due on an earlier date in accordance with Section 2.12(c).

SECTION 2.10.     Change of Lending Office.  Each Lender agrees that, upon the occurrence of any event giving rise to the operation of Section 2.08(a)(ii), 2.08(a)(iii), 2.08(c) or 2.15 with respect to such Lender, it will, if requested by the Borrower use reasonable efforts  (subject to overall policy considerations of such Lender) to designate another lending office for any Loans affected by such event; *provided* that such designation does not cause such Lender or its lending office to suffer any economic, legal or regulatory disadvantage, with the object of avoiding the consequence of the event giving rise to the operation of any such Section.  Nothing in this Section 2.10 shall affect or postpone any of the obligations of the Borrower or the right of any Lender provided in Section 2.08 or 2.15.

SECTION 2.11.     Notice of Certain Costs.  Notwithstanding anything in this Agreement to the contrary, to the extent any notice required by Section 2.08 or 2.09 is given by any Lender more than 270 days after such Lender has knowledge (or should have had knowledge) of the occurrence of the event giving rise to the additional cost, reduction in amounts, loss, tax or other additional amounts described in such Sections, such Lender shall not be entitled to compensation under Section 2.08 or 2.09, as the case may be, for any such amounts incurred or accruing prior to the 271st day prior to the giving of such notice to the Borrower; *provided* that if a Change in Law that gives rise to such additional amounts is retroactive, then the 270-day period referred to above shall be extended to include the period of retroactive effect thereof.

52

SECTION 2.12.     Voluntary Prepayments.

(a)     The Borrower shall have the right at any time and from time to time to prepay any Loan in whole or in part, without premium or penalty, in an aggregate principal amount that is an integral multiple of $500,000 and not less than $1,000,000 or, if less, the amount outstanding, upon prior notice to the Administrative Agent by telephone (confirmed by telecopy), not less than three Business Days prior to the date of prepayment, which notice shall be irrevocable except to the extent provided below in Section 2.12(b). Each such notice shall be signed by an Authorized Officer of the Borrower and shall specify the date and amount of such prepayment and the Type(s) of Loans to be prepaid and, if LIBOR Loans are to be prepaid, the Interest Period(s) of such Loans. The Administrative Agent will promptly notify each applicable Lender of its receipt of each such notice, and of the amount of such Lender's pro rata share of such prepayment. Each prepayment of Loans under this Section 2.12(a) shall be allocated to any Class of Loans outstanding as directed by the Borrower and shall be applied pro rata to the Lenders within each Class, based upon the outstanding principal amounts owing to each such Lender under each such Class of Loans.

(b)     Notwithstanding anything to the contrary contained in this Agreement, the Borrower may rescind any notice of prepayment made under Section 2.12(a) by notice to the Administrative Agent a reasonable time prior to the specified effective time of such prepayment if such prepayment would have resulted from a refinancing of all or any portion of the Loans, which refinancing shall not be consummated or shall otherwise be delayed.

(c)     All prepayments under this Section 2.12 shall be accompanied by all accrued interest thereon, together with, in the case of any such prepayment of a LIBOR Loan on a date other than the last day of an Interest Period therefor, any amounts owing in respect of such LIBOR Loan pursuant to Section 2.09.

SECTION 2.13.     Mandatory Prepayments.

(a)     Asset Sales.

(i)     Subject in all respects to Section 2.13(d), if the Borrower and its Restricted Subsidiaries have received Net Proceeds from one or more Asset Sales (including, for the avoidance of doubt, Net Proceeds of a Mexico Liquidity Event (including those Net Proceeds of a Mexico Liquidity Event received from the Closing Date Unrestricted Subsidiary pursuant to Section 5.33)), Hedge Unwind Events, Extraordinary Receipt Events or Casualty Events, not later than the third Business Day following the date of receipt of any such Net Proceeds, an amount equal to 100% of such Net Proceeds shall be applied as a mandatory prepayment of the Loans in accordance with Section 2.13(e); *provided*, that (A)(1) with respect to Hedge Unwind Events, until the aggregate amount of Hedge Unwind Proceeds received from one or more Hedge Unwind Events exceeds $5,000,000 in any fiscal year, no such prepayment shall be required during such fiscal year, (2) with respect to Asset Sales of assets constituting Proved Developed Producing Reserves, Proved Developed Non-Producing Reserves and/or related infrastructure assets (other than Mexico Liquidity Events) (any such Asset Sale, a "Specified Asset Sale"), until the aggregate amount of Net Proceeds received from one or more such Specified Asset Sales exceeds $15,000,000 in any fiscal year, no such prepayment shall be required during such fiscal year and any such prepayment shall only be required with Net Proceeds in excess of such threshold, (3) with respect to any Asset Sale (other than a Specified Asset Sale or a Mexico Liquidity Event), until the aggregate amount of Net Proceeds received from one or more such Asset Sales exceeds $50,000,000 on a cumulative basis calculated from the Closing Date, no such prepayment shall be required and any such prepayment shall only be required with Net Proceeds in excess of such threshold and (4) with respect to any Extraordinary Receipt Event or Casualty Event, until the aggregate amount of Extraordinary Receipts and/or Net Proceeds of a Casualty Event received from one or more Extraordinary Receipt Events and/or Casualty Events exceeds $10,000,000 in any fiscal year, no such prepayment shall be required during such fiscal year and any such prepayment shall only be required

Error! Unknown document property name.
WEIL:\97986321\6\45327.0007

with Net Proceeds in excess of such threshold and (B) at the Borrower's election and so long as no Event of Default has occurred and is continuing (1) following the receipt of any Net Proceeds described in the foregoing clauses (A)(2) and (A)(3) in excess of the respective threshold described therein (such excess Net Proceeds, "Excess Asset Sale Proceeds"), the Borrower may reinvest up to 50% of such Excess Asset Sale Proceeds in additional Oil and Gas Properties and/or capital expenditures related to existing Oil and Gas Properties, in each case, within 365 days following the receipt thereof (the "Reinvestment Date") and the remaining 50% of such Excess Asset Sale Proceeds shall be required to be applied in accordance with Section 2.13(e); provided, that, to the extent any such Excess Asset Sale Proceeds were received from Specified Asset Sales, such Excess Asset Sale Proceeds shall be reinvested in additional Oil and Gas Properties constituting Proved Developed Producing Reserves and/or capital expenditures on existing Oil and Gas Properties solely to the extent constituting Proved Developed Producing Reserves, Proved Developed Non-Producing Reserves or Proved Developed Behind Pipe Reserves (unless otherwise agree by the Administrative Agent in its sole discretion) and (2) following the receipt of Net Proceeds from any Casualty Event in excess of the threshold described in clause (A)(4) above (such excess Net Proceeds, "Excess Casualty Event Proceeds"), the Borrower may reinvest up to 100% of such Excess Casualty Event Proceeds on or prior to the applicable Reinvestment Date in replacement and/or repair of the property subject to such Casualty Event; provided, that the aggregate amount of Excess Casualty Event Proceeds so reinvested shall not exceed the amount necessary to replace and/or repair the property subject to such Casualty Event and any remaining amount of such Excess Casualty Event Proceed shall be applied in accordance with Section 2.13(e). If on the applicable Reinvestment Date, any portion of such Net Proceeds has not been so reinvested, the Borrower will make a prepayment of the Loans, to the extent required above.

(ii)     Notwithstanding any other provisions of this Section 2.13(a) and other than with respect to a Mexico Liquidity Event, to the extent that any of or all the Net Proceeds of any Disposition by a Foreign Subsidiary ("Foreign Disposition") is prohibited or delayed by applicable local law from being repatriated to the United States, the portion of such Net Proceeds so affected will not be required to be applied to repay Loans at the times provided in this Section 2.13(a) but may be retained by the applicable Foreign Subsidiary, in each case, so long, but only so long, as the applicable local law will not permit repatriation to the United States (the Borrower hereby agreeing to cause the applicable Foreign Subsidiary to promptly take all actions reasonably required by the applicable local law to permit such repatriation), and once such repatriation of any of such affected Net Proceeds that, in each case, would otherwise be required to be used to make an offer of prepayment pursuant to Section 2.13(a), is permitted under the applicable local law, such repatriation will be immediately effected and such repatriated Net Proceeds will be promptly (and in any event not later than two Business Days after such repatriation) applied (net of additional taxes payable or reserved against as a result thereof) to the repayment of the Loans pursuant to this Section 2.13(a).

(iii)    All prepayments under this Section 2.13(a) shall be accompanied by all accrued interest thereon, together with, in the case of any such prepayment of a LIBOR Loan on a date other than the last day of an Interest Period therefor, any amounts owing in respect of such LIBOR Loan pursuant to Section 2.09.

(b)     Debt/Equity Incurrence.  (i) Subject to Section 2.13(b)(ii) and Section 2.13(d), on each occasion that a Debt/Equity Incurrence Prepayment Event occurs, the Borrower shall, within one Business Day after the receipt of Net Proceeds therefrom, prepay, in accordance with Section 2.13(d), a principal amount of Loans in an amount equal to 100% of the Net Proceeds from such Debt/Equity Incurrence Prepayment Event.

(ii)    Notwithstanding any other provisions of this Section 2.13(b), no prepayment shall be required pursuant to this Section 2.13(b) to the extent that such prepayment would violate applicable Law.

(iii)      All prepayments under this Section 2.13(b) shall be accompanied by all accrued interest thereon, together with, in the case of any such prepayment of a LIBOR Loan on a date other than the last day of an Interest Period therefor, any amounts owing in respect of such LIBOR Loan pursuant to Section 2.09.

(c)      Application of Mandatory Prepayments.  Each prepayment of Loans required by this Section 2.13 shall be allocated to any Class of Loans outstanding as directed by the Borrower (*provided* that any prepayment of any Class of Loans shall be accompanied by at least a ratable payment of Loans made on the Closing Date and shall be applied pro rata to Lenders within each Class, based upon the outstanding principal amounts owing to each such Lender under each such Class of Loans; *provided*, that any Lender may elect, by written notice to the Administrative Agent at least one Business Day prior to the prepayment due date, to decline all or a portion of any prepayment of its Loans (other than a mandatory prepayment under Section 2.13(b) solely to the extent such prepayment represents a refinancing of all of the Obligations, which may not be declined), in which case the aggregate amount of the prepayment that would have been applied to prepay Loans of any Class but was so declined shall be retained by the Borrower.

(d)      Discharge of First-Priority Lien Obligations.  Notwithstanding anything to the contrary set forth in any other clause in this Section 2.13, until the Discharge of First-Priority Lien Obligations shall have occurred, no mandatory prepayments of Loans that would have otherwise been required under this Section 2.13 shall be required to be made except to the extent from any proceeds of Refinancing Indebtedness that constitutes a Debt/Equity Incurrence Prepayment Event.

(e)      Notice of Mandatory Prepayments.  The Borrower shall notify the Administrative Agent in writing of any mandatory prepayment of Loans required to be made pursuant to Sections 2.13(a) or (b) above at least two Business Days prior to the date of such prepayment.  Each such notice shall specify the date of such prepayment and provide a reasonably detailed calculation of the amount of such prepayment, the Type(s) of Loans to be prepaid and, if LIBOR Loans are to be prepaid, the Interest Period(s) of such Loans.

SECTION 2.14.      Method and Place of Payment.

(a)      Except as otherwise specifically provided herein, all payments under this Agreement shall be made by the Borrower, without set-off, counterclaim or deduction of any kind, to the Administrative Agent for the ratable account of the Lenders entitled thereto not later than 12:00 Noon (New York City time) on the date when due and shall be made in immediately available funds at such office as the Administrative Agent shall specify for such purpose by notice to the Borrower, it being understood that written or facsimile notice by the Borrower to the Administrative Agent to make a payment from the funds attributed to the Borrower in an account of the Administrative Agent shall constitute the making of such payment to the extent of such funds held in such account.  All payments under each Loan Document (whether of principal, interest or otherwise) shall be made in U.S. Dollars.  The Administrative Agent will thereafter cause to be promptly distributed like funds relating to the payment of principal or interest or fees ratably to the Lenders entitled thereto.

(b)      Any payments under this Agreement that are made later than 2:00 p.m. (New York City time) shall be deemed to have been made on the next succeeding Business Day.  Except as otherwise provided herein, whenever any payment to be made hereunder shall be stated to be due on a day that is not a Business Day, the due date thereof shall be extended to the next succeeding Business Day and, with respect to payments of principal, interest shall be payable during such extension at the applicable rate in effect immediately prior to such extension.

SECTION 2.15.      Net Payments.

(a)      Any and all payments made by or on behalf of the Borrower or any Guarantor under this Agreement or any other Loan Document shall be made free and clear of, and without deduction or

55

withholding for or on account of, any Taxes; *provided* that if the Borrower, any Guarantor or the Administrative Agent or any other applicable withholding agent shall be required by applicable Requirements of Law to deduct or withhold any Taxes from such payments, then (i) the applicable withholding agent shall make such deductions or withholdings as are reasonably determined by the applicable withholding agent to be required by any applicable Requirement of Law, (ii) the applicable withholding agent shall timely pay the full amount deducted or withheld to the relevant Governmental Authority in accordance with applicable Requirements of Law, and (iii) to the extent withholding or deduction is required to be made on account of Indemnified Taxes, the sum payable by the Borrower or such Guarantor shall be increased as necessary so that after all required deductions and withholdings have been made (including deductions or withholdings applicable to additional sums payable under this Section 2.15) the Administrative Agent, the Collateral Agent or the applicable Lender, as the case may be, receives an amount equal to the sum it would have received had no such deductions or withholdings been made.  As soon as practicable after any payment of Taxes by any Credit Party to a Governmental Authority as provided in this Section 2.15, the Borrower shall deliver to the Administrative Agent the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of any return reporting such payment or other evidence reasonably satisfactory to the Administrative Agent or the applicable Lenders, as the case may be.

(b)     The Borrower shall timely pay to the relevant Governmental Authority in accordance with applicable Requirements of Law, or at the option of the Administrative Agent timely reimburse it for, any Other Taxes (whether or not such Other Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority).

(c)     The Borrower shall indemnify and hold harmless the Administrative Agent, the Collateral Agent and each Lender within 10 Business Days after written demand therefor, for the full amount of any Indemnified Taxes paid or payable by, or required to be withheld or deducted from a payment to, imposed on the Administrative Agent, the Collateral Agent or such Lender, as the case may be (including Indemnified Taxes imposed or asserted on or attributable to amounts payable under this Section 2.15), and any reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  A certificate as to the amount of such payment or liability delivered to the Borrower (and the Administrative Agent, if sent by a Lender) by a Lender, the Administrative Agent or the Collateral Agent (as applicable) on its own behalf or on behalf of a Lender shall be conclusive absent manifest error.

(d)     Each Lender shall deliver to the Borrower and the Administrative Agent, at such time or times reasonably requested by the Borrower or the Administrative Agent, such properly completed and executed documentation prescribed by applicable law and such other reasonably requested information as will permit the Borrower or the Administrative Agent, as the case may be, to determine (A) whether or not any payments made hereunder or under any other Loan Document are subject to Taxes, (B) if applicable, the required rate of withholding or deduction, and (C) such Lender's entitlement to any available exemption from, or reduction of, applicable Taxes in respect of any payments to be made to such Lender by any Credit Party pursuant to any Loan Document or otherwise to establish such Lender's status for withholding tax purposes in the applicable jurisdiction.  In addition, any Lender, if reasonably requested by the Borrower or the Administrative Agent, shall deliver such other documentation prescribed by applicable law or reasonably requested by the Borrower or the Administrative Agent as will enable the Borrower or the Administrative Agent to determine whether or not such Lender is subject to backup withholding or information reporting requirements.

(e)     Without limiting the generality of Section 2.15(d), each Non-U.S. Lender with respect to any Loan made to the Borrower shall, to the extent it is legally entitled to do so:

(i)     deliver to the Borrower and the Administrative Agent (in such number of copies as shall be requested by the recipient), on or prior to the date on which such Lender becomes a Lender under this Agreement, properly completed and duly executed copies of (A) in the case of a Non-

U.S. Lender claiming exemption from U.S. federal withholding tax under Section 871(h) or 881(c) of the Code with respect to payments of "portfolio interest", United States Internal Revenue Service ("IRS") Form W-8BEN or IRS Form W-8BEN-E, as applicable, (or any applicable successor form) (together with a certificate substantially in the form of Exhibit D-1, Exhibit D-2, Exhibit D-3 or Exhibit D-4 hereto, as applicable (a "Non-Bank Tax Certificate"), representing that such Non-U.S. Lender is not a bank for purposes of Section 881(c)(3)(A) of the Code, is not a "10 percent shareholder" (within the meaning of Section 871(h)(3)(B) of the Code) of the Borrower, is not a CFC described in Section 881(c)(3)(C) of the Code), (B) IRS Form W-8BEN or IRS Form W-8BEN-E, as applicable, or IRS Form W-8ECI (or any applicable successor form), in each case properly completed and duly executed by such Non-U.S. Lender claiming complete exemption from, or reduced rate of, U.S. federal withholding tax on payments by the Borrower under this Agreement, (C) IRS Form W-8IMY (or any applicable successor form) and all necessary attachments (including the forms described in clauses (A) and (B) above; *provided* that if the Non-U.S. Lender is a partnership and not a participating Lender, and one or more of the partners is claiming portfolio interest treatment, the Non-Bank Tax Certificate may be provided by such Non-U.S. Lender on behalf of such partners) or (D) any other form prescribed by applicable law as a basis for claiming exemption from or a reduction in U.S. federal withholding tax duly completed together with such supplementary documentation as may be prescribed by applicable law to permit the Borrower or the Administrative Agent to determine the withholding or deduction required to be made; and

        (ii)    deliver to the Borrower and the Administrative Agent properly completed and duly executed copies of any such form or certification (or any applicable successor form) promptly after such form or certification expires or becomes obsolete or invalid, after the occurrence of any event requiring a material change in the most recent form previously delivered by it to the Borrower and the Administrative Agent, and from time to time thereafter if reasonably requested by the Borrower or the Administrative Agent or promptly notify the Borrower and the Administrative Agent in writing of such Non-U.S. Lender's legal inability to do so.

Each Person that shall become a Participant pursuant to Section 8.06 or a Lender pursuant to Section 8.06 shall, upon the effectiveness of the related transfer, be required to provide all the forms and statements required pursuant to this Section 2.15(e); *provided* that in the case of a Participant such Participant shall furnish all such required forms and statements to the Person from which the related participation shall have been purchased.

Notwithstanding anything to the contrary in Section 2.15(d) and this Section 2.15(e), any form and supplementary documentation (other than such documentation set forth in paragraphs (A), (B) and (C) of this Section 2.15(e)) shall not be required if in the Lender's reasonable judgment such completion, execution or submission would subject such Lender to any material unreimbursed cost or expense or would materially prejudice the legal or commercial position of such Lender.

In addition, to the extent it is legally eligible to do so, each Agent shall deliver to the Borrower (x)(I) prior to the date on which the first payment by the Borrower is due hereunder or (II) prior to the first date on or after the date on which such Agent becomes a successor Agent pursuant to Section 7.09 on which payment by the Borrower is due hereunder, as applicable, (A) properly completed and duly executed copies of IRS Form W-9 certifying its exemption from U.S. Federal backup withholding or (B) properly completed and duly executed applicable copies of IRS Form W-8 certifying its non-U.S. status and its entitlement to any applicable treaty benefits, and (y) on or before the date on which any such previously delivered documentation expires or becomes obsolete or invalid, after the occurrence of any event requiring a change in the most recent documentation previously delivered by it to the Borrower, and from time to time if reasonably requested by the Borrower, properly completed and duly executed copies of such documentation.

        (f)    If any Lender, the Administrative Agent or the Collateral Agent, as applicable, determines, in its sole discretion exercised in good faith, that it has received a refund of an Indemnified Tax for which it has been indemnified pursuant to this Section 2.15 (including by the payment of additional

amounts pursuant to this Section 2.15), then the Lender, the Administrative Agent or the Collateral Agent, as the case may be, shall reimburse the Borrower or such Guarantor for such amount (but only to the extent of indemnity payments made under this Section with respect to the Taxes giving rise to such refund) (net of all reasonable out-of-pocket expenses (including Taxes) of such Lender, the Administrative Agent or the Collateral Agent, as the case may be, and without interest other than any interest received thereon from the relevant Governmental Authority with respect to such refund); *provided* that the Borrower or such Guarantor, upon the request of the Lender, the Administrative Agent or the Collateral Agent, agrees to repay the amount paid over to the Borrower or such Guarantor (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) to the Lender, the Administrative Agent or the Collateral Agent in the event the Lender, the Administrative Agent or the Collateral Agent is required to repay such refund to such Governmental Authority.  Notwithstanding anything to the contrary in this paragraph (f), in no event will any Lender or Agent be required to pay any amount to the Borrower or any Guarantor pursuant to this paragraph (f), the payment of which would place such Lender or Agent in a less favorable net after-Tax position than such Lender or Agent would have been in if the Tax subject to indemnification and giving rise to such refund had not been deducted, withheld or otherwise imposed and the indemnification payments or additional amounts with respect to such Tax had never been paid.  None of the Lender, the Administrative Agent or the Collateral Agent shall be obliged to make available its tax returns (or any other information relating to its taxes that it deems confidential) to any Credit Party in connection with this clause (f) or any other provision of this Section 2.15.

(g)     Each U.S. Lender shall deliver to the Borrower and the Administrative Agent properly completed and duly executed copies of IRS Forms W-9 (or substitute or successor form), certifying that such U.S. Lender is exempt from United States federal backup withholding (i) on or prior to the Closing Date (or on or prior to the date it becomes a party to this Agreement), (ii) on or before the date that such form expires or becomes obsolete or invalid, (iii) after the occurrence of a change in the U.S. Lender's circumstances requiring a change in the most recent form previously delivered by it to the Borrower and the Administrative Agent, and (iv) from time to time thereafter if reasonably requested by the Borrower or the Administrative Agent.

(h)     If a payment made to any Lender or any Agent under this Agreement or any other Loan Document would be subject to U.S. federal withholding tax imposed by FATCA if such Lender or such Agent were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Code, as applicable), such Lender or such Agent shall deliver to the Borrower and the Administrative Agent at the time or times prescribed by law and at such time or times reasonably requested by the Borrower or the Administrative Agent such documentation prescribed by applicable law (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and such additional documentation reasonably requested by the Borrower or the Administrative Agent as may be necessary for the Borrower and the Administrative Agent to comply with their obligations under FATCA, to determine whether such Lender has or has not complied with such Lender's obligations under FATCA or to determine the amount, if any, to deduct and withhold from such payment.     Solely for purposes of this Section 2.15(h), "FATCA" shall include any amendments made to FATCA after the date of this Agreement.

(i)     Each Lender shall severally indemnify the Administrative Agent, within 10 days after demand therefor, for (i) any Indemnified Taxes attributable to such Lender (but only to the extent that the Borrower has not already indemnified the Administrative Agent for such Indemnified Taxes and without limiting the obligation of the Borrower to do so), (ii) any Taxes attributable to such lender's failure to comply with the provisions of Section 8.06(c) relating to the maintenance of a Participant Register and (iii) any Excluded Taxes attributable to such lender, in each case, that are payable or paid by the Administrative Agent in connection with any Loan Document, and any reasonable expenses arising therefrom or with respect thereto, whether or not such Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority. A certificate as to the amount of such payment or liability delivered to any Lender by the Administrative Agent shall be conclusive absent manifest error. Each Lender hereby authorizes the Administrative Agent to set off and apply any and all amounts at any time owing to such lender under any

Error! Unknown document property name.
WEIL:\97986321\6\45327.0007

Loan Document or otherwise payable by the Administrative Agent to the Lender from any other source against any amount due to the Administrative Agent under this paragraph (i).

(j)     For the avoidance of doubt, for purposes of this Section 2.15, the term "applicable law" or "Requirements of Law" includes FATCA.

(k)     The agreements in this Section 2.15 shall survive the termination of this Agreement and the payment of the Loans and all other amounts payable hereunder.

SECTION 2.16.     Limit on Rate of Interest.

(a)     No Payment Shall Exceed Lawful Rate.  Notwithstanding any other term of this Agreement, the Borrower shall not be obliged to pay any interest or other amounts under or in connection with this Agreement in excess of the amount or rate permitted under or consistent with any applicable law, rule or regulation.

(b)     Payment at Highest Lawful Rate.  If the Borrower is not obliged to make a payment which it would otherwise be required to make, as a result of Section 2.16(a), the Borrower shall make such payment to the maximum extent permitted by or consistent with applicable laws, rules and regulations.

(c)     Adjustment if Any Payment Exceeds Lawful Rate. If any provision of this Agreement or any of the other Loan Documents would obligate the Borrower to make any payment of interest or other amount payable to any Lender in an amount or calculated at a rate which would be prohibited by any applicable law, rule or regulation, then notwithstanding such provision, such amount or rate shall be deemed to have been adjusted with retroactive effect to the maximum amount or rate of interest, as the case may be, as would not be so prohibited by law, such adjustment to be effected, to the extent necessary, by reducing the amount or rate of interest required to be paid by the Borrower to the affected Lender under Section 2.06.

Notwithstanding the foregoing, and after giving effect to all adjustments contemplated thereby, if any Lender shall have received from the Borrower an amount in excess of the maximum permitted by any applicable law, rule or regulation, then the Borrower shall be entitled, by notice in writing to the Administrative Agent to obtain reimbursement from that Lender in an amount equal to such excess, and pending such reimbursement, such amount shall be deemed to be an amount payable by that Lender to the Borrower.

SECTION 2.17.     Pro Rata Sharing.  Subject in all respect to the provisions of the Intercreditor Agreement, except as expressly set forth herein, whenever any payment received by the Administrative Agent under this Agreement is insufficient to pay in full all amounts then due and payable to the Administrative Agent and the Lenders under this Agreement, such payment shall be distributed by the Administrative Agent and applied by the Administrative Agent and the Lenders in the following order: first, to the payment of fees and expenses due and payable to the Administrative Agent and the Collateral Agent and its Affiliates under and in connection with this Agreement, except any amounts payable to any such Person in its role as Lender, as provided in clause "second" of this Section 2.17; second, to the payment of all expenses due and payable under Section 8.05, ratably among the Lenders in accordance with the aggregate amount of such payments owed to each Lender; third, to the payment of interest and amounts under Sections 2.08 and 2.15, if any, then due and payable on the Loans ratably among the Lenders in accordance with the aggregate amount of interest owed to each Lender; and fourth, to the payment of the principal amount of the Loans that is then due and payable, ratably among the Lenders in accordance with the aggregate principal amount owed to each such Lender.

SECTION 2.18.     Adjustments; Set-off.

(a)     If any Lender shall, by exercising any right of set-off or counterclaim or otherwise, obtain payment in respect of any principal of or interest on any of its Loans resulting in such Lender receiving payment of a greater proportion of the aggregate amount of its Loans and accrued interest thereon than the

proportion received by any other Lender entitled to such payment, then the Lender receiving such greater proportion shall purchase for cash at face value participations in the Loans of other Lenders to the extent necessary so that the benefit of all such payments shall be shared by the Lenders entitled thereto ratably in accordance with the aggregate amount of principal of and accrued interest on their respective Loans; *provided* that (i) if any such participations are purchased and all or any portion of the payment giving rise thereto is recovered, such participations shall be rescinded and the purchase price restored to the extent of such recovery, without interest, and (ii) the provisions of this clause (a) shall not be construed to apply to any payment made by the Borrower pursuant to and in accordance with the terms of this Agreement, or any payment obtained by a Lender as consideration for the assignment of or sale of a participation in any of its Loans to any assignee or participant.   The Borrower consents to the foregoing and agrees, to the extent it may effectively do so under applicable law, that any Lender acquiring a participation pursuant to the foregoing arrangements may exercise against the Borrower rights of set-off and counterclaim with respect to such participation as fully as if such Lender were a direct creditor of the Borrower in the amount of such participation.

(b)     After the occurrence and during the continuance of an Event of Default, in addition to any rights and remedies of the Lenders provided by law, each Lender shall have the right, without prior notice to the Borrower, any such notice being expressly waived by the Borrower to the extent permitted by applicable law, upon any amount becoming due and payable by the Borrower hereunder (whether at the stated maturity, by acceleration or otherwise) to set-off and appropriate and apply against such amount any and all deposits (general or special, time or demand, provisional or final), in any currency, and any other credits, indebtedness or claims, in any currency, in each case whether direct or indirect, absolute or contingent, matured or unmatured, at any time held or owing by such Lender or any branch or agency thereof to or for the credit or the account of the Borrower or any Subsidiary.   Each Lender agrees promptly to notify the Borrower and the Administrative Agent after any such set-off and application made by such Lender; *provided* that the failure to give such notice shall not affect the validity of such set-off and application.

SECTION 2.19.     Interest Elections.  The Loans shall have an initial Interest Period as specified in the applicable Notice of Borrowing.  Thereafter, the Borrower may elect Interest Periods therefor, all as provided in this Section 2.19.  The Borrower may elect different options with respect to different portions of the affected Borrowing, in which case each such portion shall be allocated ratably among the Lenders holding the Loans comprising such Borrowing, and the Loans comprising each such portion shall be considered a separate Borrowing.

(a)     To make an election pursuant to this Section 2.19, the Borrower shall notify the Administrative Agent of such election (as provided in Section 8.02) in a written Interest Period Election Request in the form set forth in Exhibit C and signed by the Borrower.  Such Interest Period Election Request shall be delivered to the Administrative Agent by telephone not later than 11:00 a.m., New York City time, three Business Days prior to the end of the then applicable Interest Period.  Each such Interest Period Election Request shall be irrevocable.

(b)     Each Interest Period Election Request shall specify the following information:

(i)     the Borrowing to which such Interest Period Election Request applies and, if different options are being elected with respect to different portions thereof, the portions thereof to be allocated to each resulting Borrowing (in which case the information to be specified pursuant to clauses (iii) and (iv) below shall be specified for each resulting Borrowing);

(ii)     the effective date of the election made pursuant to such Interest Period Election Request, which shall be a Business Day;

(iii)     whether the resulting Borrowing is to be an ABR Borrowing or a LIBOR Borrowing;

(iv)     if the resulting Borrowing is a LIBOR Borrowing, the Interest Period to be applicable thereto after giving effect to such election, which shall be a period contemplated by the definition of the term "Interest Period"; and

(v)     no Default or Event of Default shall have occurred and be continuing as of the date such Interest Period Election Request is delivered or as of the effective date of such election.

If any such Interest Period Election Request requests a LIBOR Borrowing but does not specify an Interest Period, then the Borrower shall be deemed to have selected an Interest Period of one month's duration.

(c)     Promptly following receipt of an Interest Period Election Request, the Administrative Agent shall advise each Lender to which such Interest Period Election Request relates of the details thereof and of such Lender's portion of each resulting Loan.

(d)     If the Borrower fails to deliver a timely Interest Period Election Request with respect to a LIBOR Borrowing prior to the end of the Interest Period applicable thereto, then, unless such Borrowing is repaid as provided herein, at the end of such Interest Period such Borrowing shall be converted to an ABR Borrowing.  Notwithstanding any contrary provision hereof, if an Event of Default has occurred and is continuing and the Administrative Agent, at the written request (including a request through electronic means) of the Required Lenders, so notifies the Borrower, then, so long as an Event of Default is continuing, (i) no outstanding Borrowing may be converted to or continued as a LIBOR Borrowing and (ii) unless repaid, each LIBOR Borrowing shall be converted to an ABR Borrowing at the end of the Interest Period applicable thereto.

(e)     After giving effect to all Borrowings, all conversions of Loans from one Type to the other and all continuations of Loans as the same type, there shall be not more than three Interest Periods in effect with respect to the Loans.

SECTION 2.20.     Incremental Commitments.

(a)     The Borrower may, by written notice to the Administrative Agent from time to time after the Closing Date, add one or more Incremental Commitments in respect of one or more Classes of term loans or increase the Initial Loans in an aggregate outstanding principal amount not to exceed the Incremental Cap (the Incremental Commitments together with the term loans, the "Incremental Facility"); *provided* that (i) after giving effect to the relevant Incremental Facility and the use of proceeds thereof on a pro forma basis, (x) the aggregate amount of cash and Cash Equivalents of the Borrower and its Restricted Subsidiaries shall be less than $80,000,000 (or, in good faith determination of the Board of Directors of the Borrower, are anticipated to be less than $80,000,000 as of the proposed date of incurrence of such Incremental Facility) or (y) the Board of Directors of the Borrower, in its good faith judgment, determines that the incurrence of such Incremental Facility is in the best interest of the Borrower and its Restricted Subsidiaries, (ii) no Event of Default is continuing or would exist immediately after giving effect to such Incremental Commitment and the use of proceeds therefrom, (iii) the representations and warranties contained in this Agreement and in the other Loan Documents shall be true and correct in all material respects (or, in the case of any representations or warranties that contain a materiality qualification, in all respects) immediately prior to, and after giving effect to, the incurrence of the Incremental Commitment and (iv) all fees and expenses owing to the Administrative Agent and the Incremental Lenders in respect of such Incremental Facility shall have been paid.  The Incremental Commitments will be provided by Incremental Lenders (which may include any existing Lender and any additional lenders, subject to the Administrative Agent's consent to the extent such consent would be required in connection with an Assignment and Acceptance under Section 8.06(b), and such additional lenders will become Lenders under this Agreement through providing the Incremental Commitments) willing to provide such Incremental Commitments in their own discretion. Any such notice shall set forth (x) the amount of the Incremental Commitments being requested, (y) the date on which such Incremental Commitments or term loans are requested to become effective (any such date, an "Incremental Effective Date") and (z) the interest rate, maturity and other terms being requested with respect thereto (which shall comply with clause (b) below).

61

(b)     Subject to Section 2.20(c) below, the terms and conditions of any Incremental Commitments and Loans to be made thereunder shall be determined by the applicable Incremental Lenders and the Borrower and shall be as set forth in the applicable Incremental Facility Agreement; *provided* that:

(i)     the Weighted Average Life to Maturity of such Loans shall be no shorter than the Weighted Average Life to Maturity of the Loans, and the maturity date applicable to such Loans shall be no earlier than the Latest Maturity Date in effect at the time of incurrence of such Loans

(ii)     except as otherwise provided in this Section 2.20(b), the terms of any Incremental Facility (other than any terms which are applicable only after the Maturity Date of any then-existing tranche of Loans) must be substantially consistent with those applicable to any then-existing Loans (excluding as to interest rates, fees, floors, funding discounts, redemption or prepayment premiums and other pricing terms) or otherwise reasonably acceptable to the Required Lenders in their Permitted Business Judgment (it being understood that no consent of the Required Lenders shall be required for terms and conditions that are more restrictive than those applicable to the then-existing Loans to the extent that the Facility receives the benefit of such provisions);

(iii)     the Incremental Facility may provide for mandatory prepayments of the loans thereunder on a pro rata basis or less than pro rata basis with the then-existing Loans and the Borrower shall be permitted to voluntarily prepay any Class of Loans on a better than pro rata basis as compared to any other Class;

(iv)     the Incremental Facility shall have the same Guarantors as, and if secured, shall be secured on a pari passu or junior basis by the same Collateral securing the then-existing Loans;

(v)     [reserved]; and

(vi)     with respect to any Incremental Commitments in respect of any Incremental Facility that is secured by a pari passu Lien on the Collateral, the Effective Yield applicable to any such Incremental Commitments shall not be more than 0.50% higher than the Effective Yield on the then-existing Loans, unless the Effective Yield with respect to the then-existing Loans is increased by an amount equal to or greater than (A) the difference between the Effective Yield with respect to the Incremental Commitments and the corresponding Effective Yield on the then-existing Loans minus (B) 0.50% (the "MFN Adjustment").

(c)     any Incremental Commitment shall be effected by an Incremental Facility Agreement; *provided* that the Borrower shall have delivered to the Administrative Agent such legal opinions, board resolutions, secretary's certificates, officer's certificates and other customary documents as shall reasonably be requested by the Incremental Lenders in connection therewith.  The Administrative Agent shall promptly notify each Lender as to the effectiveness of each Incremental Facility Agreement.  Each Incremental Facility Agreement may, without the consent of any Lender, effect such amendments to this Agreement and the other Loan Documents as may be necessary or appropriate, in the opinion of the Administrative Agent, to give effect to the provisions of this Section 2.20.

(d)     Incremental Commitments shall become commitments under this Agreement pursuant to an Incremental Facility Agreement which may amend this Agreement and, as appropriate, the other Loan Documents, executed by the Borrower, each Lender agreeing to provide such commitment, if any, each Incremental Lender, if any, and the Administrative Agent.  The Borrower will use the proceeds of the Loans made pursuant to the Incremental Commitments for any purpose not prohibited by this Agreement.

(e)     Upon the effectiveness of an Incremental Commitment of any Incremental Lender, such Incremental Lender shall be deemed to be a "Lender" (and a Lender in respect of commitments and Loans of the applicable class) hereunder, and henceforth shall be entitled to all the rights of, and benefits accruing to,

Lenders (or Lenders in respect of Commitments and Loans of the applicable Class) hereunder and shall be bound by all agreements, acknowledgements and other obligations of Lenders (or Lenders in respect of Commitments and Loans of the applicable Class) hereunder and under the other Loan Documents.

(f)     This <u>Section 2.20</u> shall supersede any provisions in <u>Section 2.17</u> or <u>9.01</u> to the contrary.  For the avoidance of doubt, any provisions of this <u>Section 2.20</u> may be amended with the consent of the Required Lenders, *provided* no such amendment shall require any Lender to provide any Incremental Commitment without such Lender's consent.

## ARTICLE III

Representations and Warranties

In order to induce the Agents and the Lenders to enter into this Agreement and to make the Loans, the Borrower makes, on the Closing Date, the following representations and warranties to the Agents and the Lenders, all of which shall survive the execution and delivery of this Agreement and the making of the Loans.

SECTION 3.01.     <u>Corporate Status</u>.  Each of Holdings, the Borrower and each Subsidiary of the Borrower (a) is a duly organized and validly existing corporation or other entity in good standing (or, if applicable in a foreign jurisdiction, enjoys the equivalent status under the laws of such jurisdiction of organization outside the United States) under the laws of the jurisdiction of its organization and has the corporate or other organizational power and authority to own its property and assets and to transact its business as now conducted and (b) has duly qualified and is authorized to do business and is in good standing (if applicable) in all jurisdictions where it is required to be so qualified, except where the failure to be so qualified or in good standing would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, and all such jurisdictions are set forth on <u>Schedule 3.01</u>.

SECTION 3.02.     <u>Corporate Power and Authority; Enforceability; Security Interests</u>.  Each Credit Party has the corporate or other organizational power and authority to execute, deliver and carry out the terms and provisions of the Loan Documents to which it is a party and has taken all necessary corporate or other organizational action to authorize the execution, delivery and performance of the Loan Documents to which it is a party.  Each Credit Party has duly executed and delivered each Loan Document to which it is a party and each such Loan Document constitutes the legal, valid and binding obligation of such Credit Party enforceable in accordance with its terms, subject to the effects of bankruptcy, insolvency, fraudulent conveyance, reorganization and other similar laws relating to or affecting creditors' rights generally and general principles of equity (whether considered in a proceeding in equity or law).

SECTION 3.03.     <u>No Violation; Compliance with Laws</u>.

(a)     None of the execution, delivery or performance by any Credit Party of the Loan Documents to which it is a party or the compliance with the terms and provisions thereof will (a) contravene any Requirement of Law in any material respect, (b) result in any material breach or material violation of any of the terms, covenants, conditions or provisions of, or constitute a default under, or result in the creation or imposition of (or the obligation to create or impose) any Lien upon any of the property or assets of such Credit Party or any of the Subsidiaries (other than Liens created under the Loan Documents and Liens permitted hereunder) pursuant to the terms of any Material Contract, indenture, loan agreement, lease agreement, mortgage, deed of trust, agreement or other material instrument to which such Credit Party or any of the Subsidiaries is a party or by which it or any of its property or assets is bound (any such term, covenant, condition or provision, a "<u>Contractual Requirement</u>") or (c) violate any provision of the certificate of incorporation, by-laws or other organizational documents of such Credit Party or any of the Subsidiaries.

(b)     Each of Holdings, the Borrower and its Subsidiaries is in compliance in all material respects with all Requirements of Law (it being understood, in the case of any statutes, regulations and orders

63

of, and all applicable restrictions imposed by, all Governmental Authorities that are specifically referred to in any other provision of this Agreement, the Credit Parties shall also be required to represent and/or comply with, as applicable, the express terms of such provision).

SECTION 3.04.    Litigation.  Except as set forth on Schedule 3.04, there are no actions, suits or proceedings, governmental investigations or arbitrations (including Environmental Claims collectively, "Adverse Proceedings") pending or, to the knowledge of the Borrower, threatened in writing against or affecting Holdings, the Borrower, any of its Subsidiaries or any of their respective properties that would reasonably be expected, individually or in the aggregate, to result in a Material Liability to Holdings, the Borrower or any of its Restricted Subsidiaries.

SECTION 3.05.    Margin Regulations. None of Holdings nor any of its Subsidiaries is engaged principally, or as one of its important activities, in the business of extending credit for the purpose of purchasing or carrying any "margin stock" (as defined in the Regulation U of the Board). No portion of the proceeds of the Loans has or will be used in any manner, whether directly or indirectly, that causes or would reasonably be excepted to cause, such Loan or the application of such proceeds to violate Regulation T, Regulation U or Regulation X of the Board or any regulation thereof or to violate the Exchange Act.

SECTION 3.06.    Governmental Approvals.  The execution, delivery and performance of each Loan Document and the consummation of the other Transactions do not (or, in the case of each Subsidiary Guarantor, will not) require any consent or approval of, registration or filing with, or other action by, any Governmental Authority, except for (a) such as have been or will be prior to the Closing Date obtained or made and are or will be prior to the Closing Date in full force and effect, (b) filings and recordings in respect of the Liens created pursuant to the Security Documents and (c) such consents, approvals, registrations, filings or actions the failure of which to obtain or make would not reasonably be expected to have a Material Adverse Effect.

SECTION 3.07.    Investment Company Act.  No Credit Party is required to be registered as an "investment company" within the meaning of the Investment Company Act of 1940, as amended.

SECTION 3.08.    True and Complete Disclosure; Financial Condition.  (a) All written factual information (other than estimates and information of a general economic nature or general industry nature) (the "Information") concerning Holdings, the Borrower, its Subsidiaries, the Transactions and any other transactions contemplated hereby prepared by or on behalf of the foregoing or their representatives and made available to any Lenders or the Administrative Agent in connection with the Transactions or the other transactions contemplated hereby, when taken as a whole, was true and correct in all material respects as of the date such Information was furnished to the Lenders and as of the Closing Date and did not, taken as a whole, contain any untrue statement of a material fact as of any such date or omit to state a material fact necessary in order to make the statements contained therein, taken as a whole, not materially misleading in light of the circumstances under which such statements were made.

(b)    The estimates and information of a general economic nature or general industry nature prepared by or on behalf of the Borrower or any of its representatives and that have been made available to any Lenders or the Administrative Agent in connection with the Transactions or the other transactions contemplated hereby (i) have been prepared in good faith based upon assumptions believed by the Borrower to be reasonable as of the date thereof, as of the date such estimates were furnished to the Lenders and as of the Closing Date, and (ii) as of the Closing Date, have not been modified in any material respect by the Borrower.

(c)    Since the Closing Date, there have been no events, developments or circumstances that have had, or would reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect

SECTION 3.09.    Tax Matters.  Each of Holdings, the Borrower and the Subsidiaries has filed all federal income Tax returns and all other material Tax returns, domestic and foreign, required to be filed by it (including in its capacity as a withholding agent) and has paid all material Taxes payable by it that have become

64

due, other than those (i) not yet delinquent or (ii) being contested in good faith by appropriate proceedings and as to which adequate reserves have been provided to the extent required by and in accordance with GAAP (or in the case of a Foreign Subsidiary, the comparable accounting principles in the relevant jurisdiction).

SECTION 3.10.   Compliance with ERISA.

(a)      Except to the extent that a breach of any of the following representations or warranties in this Section 3.10(a) would not result, individually or in the aggregate, in a Material Liability to Holdings, the Borrower, any of their Restricted Subsidiaries or any ERISA Affiliate: (i) Holdings, the Borrower, each of their Restricted Subsidiaries and each ERISA Affiliate is in compliance with all applicable provisions and requirements of ERISA and the Code and the regulations and published interpretations thereunder with respect to each Employee Benefit Plan, and have performed all their obligations under each Employee Benefit Plan; (ii) each Employee Benefit Plan that is intended to qualify under Section 401(a) of the Code has received a favorable determination letter from the Internal Revenue Service indicating that such Employee Benefit Plan is so qualified and nothing has occurred subsequent to the issuance of such determination letter that would cause such Employee Benefit Plan to lose its qualified status; (iii) no liability to the PBGC (other than required premium payments), the Internal Revenue Service, any Employee Benefit Plan or any trust established under Title IV of ERISA has been or is expected to be incurred by Holdings, the Borrower, any of their Restricted Subsidiaries or any ERISA Affiliate; (iv) no ERISA Event has occurred or is reasonably expected to occur; (v) no Plan has an Unfunded Current Liability; (vi) except to the extent required under Section 4980B of the Code or similar state laws, no Employee Benefit Plan provides health or welfare benefits (through the purchase of insurance or otherwise) for any retired or former employee of Holdings, the Borrower, any of their Restricted Subsidiaries or any ERISA Affiliate; and (vii) Holdings, the Borrower, each of their Restricted Subsidiaries and each ERISA Affiliate have complied with the requirements of Section 515 of ERISA with respect to each Multiemployer Plan and are not in "default" (as defined in Section 4219(c)(5) of ERISA) with respect to payments to a Multiemployer Plan.

(b)      All Foreign Plans are in compliance with, and have been established, administered and operated in accordance with, the terms of such Foreign Plans and applicable law, except for any failure to so comply, establish, administer or operate the Foreign Plans as would not reasonably be expected to result, individually or in the aggregate, in a Material Liability to Holdings, the Borrower or any of their Restricted Subsidiaries. All material contributions or other payments which are due with respect to each Foreign Plan have been made in full, and none of Holdings, the Borrower or any of their Restricted Subsidiaries has incurred any material obligation in connection with the termination or withdrawal from any Foreign Plan. The present value of the accrued liabilities (whether or not vested) under each Foreign Plan that is funded, determined as of the end of the most recently ended fiscal year of Holdings, the Borrower or a Restricted Subsidiary of Holdings or the Borrower, as applicable, on the basis of actuarial assumptions, each of which is reasonable, did not exceed the current value of the assets of such Foreign Plan by a material amount, and for each Foreign Plan that is not funded, the obligations of such Foreign Plan are properly accrued.

SECTION 3.11.   Capital Stock and Ownership.  The Capital Stock of the Borrower and its Subsidiaries has been duly authorized and validly issued and is fully paid and non-assessable in connection with the Plan of Reorganization. Except as set forth on Schedule 3.11, there is no existing option, warrant, call right, commitment or other agreement to which Holdings, the Borrower or any of its Subsidiaries is a party requiring, and there is no membership interest or other Capital Stock of the Borrower or any of its Subsidiaries outstanding, that upon conversion or exchange would require, the issuance by the Borrower or any of its Subsidiaries of any additional Capital Stock thereof or other securities convertible into, exchangeable for, or evidencing the right to subscribe for or purchase, additional Capital Stock of the Borrower or any of its Subsidiaries. Schedule 3.11 sets forth the ownership interest of the Borrower and each of its Subsidiaries as of the Closing Date.

SECTION 3.12.   Intellectual Property.  The Borrower and each of the Restricted Subsidiaries own or have obtained valid rights to use all intellectual property, free from any burdensome restrictions, that is necessary for the operation of their respective businesses as currently conducted and as proposed to be

Error! Unknown document property name.
WEIL:\97986321\6\45327.0007

conducted, except where the failure to obtain any such rights would not reasonably be expected to have a Material Adverse Effect. Except as would not reasonably be expected to result in a Material Adverse Effect, none of the Borrower or any of its Subsidiaries has infringed, misappropriated, or violated any intellectual property rights of any third party.

SECTION 3.13.    Environmental Laws.  Except as would not, individually or in the aggregate, reasonably be expected to result in a Material Liability, (i) Holdings, the Borrower, each of its Subsidiaries and, to the knowledge of the Borrower, each predecessor of Holdings, the Borrower or any of its Subsidiaries ("Predecessor") to the extent such Predecessor's liabilities under Environmental Law have not been discharged under the Cases ("Predecessor Liabilities"), and each of their respective assets and operations are and have been in compliance with all Environmental Laws and the terms and conditions of all applicable Environmental Permits; (ii) all Environmental Permits required of Holdings, the Borrower or any of its Subsidiaries for performance of their respective businesses as currently conducted have been obtained and are currently in full force and effect under Environmental Law and none of Holdings, the Borrower or any of its Subsidiaries has received any notice that any such existing Environmental Permit will be revoked or any pending application for any new Environmental Permit or renewal of any existing Environmental Permit will be protested or denied; (iii) none of Holdings, the Borrower, any of its Subsidiaries or, to the knowledge of the Borrower, any Predecessor with Predecessor Liabilities has received written notice of any Environmental Claim and to Borrower's knowledge, there are no events or occurrences that would reasonably be expected to result in any of Holdings', the Borrower's or any of its Subsidiary's receipt of such written notice; (iv) none of Holdings, the Borrower, any of its Subsidiaries or, to the knowledge of the Borrower, any Predecessor with Predecessor Liabilities is subject to violations of or liabilities (including, without limitation, as a result of any Releases or threatened Releases of Hazardous Materials) under Environmental Law, none of Holdings, the Borrower or any of its Subsidiaries has an actual or alleged obligation to conduct any cleanup, investigation, removal, remediation or other corrective action pursuant to any Environmental Law at any location and to Borrower's knowledge, there are no events or occurrences that would reasonably be expected to result in any of Holdings, the Borrower or any of its Subsidiaries being subject to such obligation; (v) no Hazardous Materials are being or have been treated, stored, transported, released or disposed or arranged for disposal or transport for disposal at, on, under or from any property in a manner that would reasonably be expected to give rise to liability of Holdings, the Borrower or any of its Subsidiaries under Environmental Law; and (vi) none of Holdings, the Borrower or any of its Subsidiaries has assumed or retained by contract any liabilities under any Environmental Law or regarding any Hazardous Materials.

SECTION 3.14.    Properties.

(a)    Except for the assignment or transfer of any Oil and Gas Property to the Borrower or any of its Subsidiaries filed in connection with the Transactions in accordance with all applicable Requirements of Law, but is currently pending approval by the applicable Governmental Authority, each of the Borrower and its Subsidiaries has valid fee simple title to, or valid leasehold interests in, or easements or other limited property interests in, all its real properties, good and defensible title to all Hydrocarbon Interests in the Oil and Gas Properties evaluated in the most recently delivered or prepared Reserve Report (except for those that have been disposed of since the date of such Reserve Report as permitted in accordance with this Agreement or leases which have expired in accordance with its terms) and good and defensible title to all other material properties and assets, in each case, except for Liens permitted hereunder and except for minor defects in title that do not materially interfere with its ability to conduct its business as currently conducted or to utilize such properties and assets for their intended purposes.  All such properties and assets are free and clear of Liens, other than Liens permitted hereunder.

(b)    All material leases and agreements necessary for the conduct of the business of the Borrower and the Restricted Subsidiaries are valid and subsisting, in full force and effect.

(c)    The rights and properties presently owned, leased or licensed by the Credit Parties including all easements and rights of way, include all rights and properties necessary to permit the Credit Parties

66

to conduct their respective businesses as currently conducted, except to the extent any failure to have any such rights or properties would not reasonably be expected to result in a Material Adverse Effect.

(d)     All of the properties of the Borrower and the Subsidiaries that are reasonably necessary for the operation of their businesses are in good working condition and are maintained in all material respects in accordance with prudent business standards.

SECTION 3.15.     Solvency.

(a)     On the Closing Date, immediately after giving effect to the Transactions that occur on the Closing Date (and as of any other date required under the Loan Documents and after giving effect to the transactions to occur on such date), (i) the fair value of the assets of the Credit Parties on a consolidated basis, at a fair valuation, will exceed the debts and liabilities, direct, subordinated, contingent or otherwise, of the Credit Parties on a consolidated basis; (ii) the present fair saleable value of the property of the Credit Parties on a consolidated basis will be greater than the amount that will be required to pay the probable liability of the Credit Parties on a consolidated basis on their debts and other liabilities, direct, subordinated, contingent or otherwise, as such debts and other liabilities become absolute and matured; (iii) the Credit Parties on a consolidated basis will be able to pay their debts and liabilities, direct, subordinated, contingent or otherwise, as such debts and liabilities become absolute and matured; and (iv) the Credit Parties on a consolidated basis will not have unreasonably small capital with which to conduct the businesses in which they are engaged as such businesses are now conducted and are proposed to be conducted following the Closing Date.

(b)     The Borrower does not intend to, and the Borrower does not believe that it or any of its Subsidiaries will, incur debts beyond their ability to pay such debts as they mature, taking into account the timing and amounts of cash to be received by them or any such subsidiary and the timing and amounts of cash to be payable on or in respect of their Indebtedness or the Indebtedness of any such Subsidiary.

SECTION 3.16.     Anti-Corruption Laws.     None of Holdings, the Borrower or any of its Subsidiaries, nor, to the knowledge of Holdings, the Borrower or any of its Subsidiaries, any of their directors, officers, agents, employees or Affiliates has (i) used any corporate funds for any unlawful contribution, gift, entertainment or other unlawful expense relating to political activity, (ii) made any direct or indirect unlawful payment to any government official or employee from corporate funds, (iii) violated or is in violation of any Anti-Corruption Laws, (iv) made any unlawful bribe, rebate, payoff, influence payment, kickback or other unlawful payment in violation of Anti-Corruption Laws or (v) has otherwise violated any Anti-Corruption Laws.  No part of the proceeds of the Loans will be used, directly or indirectly, in furtherance of an offer, payment, promise to pay or authorization of the payment or giving of money, or anything else of value, to any person or otherwise in any manner resulting in violation of the Anti-Corruption Laws. Holdings, the Borrower and its Subsidiaries have established and currently maintain policies, procedures and controls that are designed (and otherwise comply with applicable law) to ensure that each of Holdings, the Borrower and its Subsidiaries, and each of their respective directors, officers, employees and agents, is in compliance with all applicable current and future Anti-Corruption Laws.

SECTION 3.17.     Anti-Terrorism and Anti-Money Laundering Laws; Sanctions.

(a)     None of Holdings, the Borrower or any of its Subsidiaries nor, to the knowledge of Borrower, any director, officer, agent, employee or Affiliate of Holdings, the Borrower or any of its Subsidiaries is or is owned or controlled by a person who is currently a Sanctioned Person.

(b)     Each of Holdings, the Borrower and its Subsidiaries and, to the knowledge of Holdings, the Borrower and its Subsidiaries, their directors, officers, agents, employees or Affiliates is in compliance with all and has not violated any Sanctions or Anti-Terrorism and Anti-Money Laundering Laws. None of the proceeds of the Loans has or will be used, directly or indirectly, for the purpose of financing any

67

activities or business of or with any Sanctioned Person or in any Sanctioned Country or otherwise in any manner that would result in a violation of Sanctions or Anti-Terrorism and Anti-Money Laundering Laws.

(c)     Holdings, the Borrower and its Subsidiaries have established and currently maintain policies, procedures and controls that are designed (and otherwise comply with applicable law) to ensure that each of Holdings, the Borrower and its Subsidiaries, and each of their respective directors, officers, employees and agents, is in compliance with all applicable current and future Sanctions and Anti-Terrorism and Anti-Money Laundering Laws.

SECTION 3.18.     Gas Imbalances, Prepayments.   On the Closing Date, except as set forth on Schedule 3.18, on a net basis, there are no gas imbalances, take or pay or other prepayments exceeding 2.5 Bcfe of Hydrocarbon volumes (stated on a gas equivalent basis) for any individual field, with respect to the Credit Parties' Oil and Gas Properties associated with such field that would require any Credit Party to deliver Hydrocarbons either generally or produced from their Oil and Gas Properties at some future time without then or thereafter receiving full payment therefor.

SECTION 3.19.     Marketing of Production.   On the Closing Date, except as set forth on Schedule 3.19, no material agreements exist (which are not cancelable on 60 days' notice or less without penalty or detriment) for the sale of production of the Credit Parties' Hydrocarbons at a fixed non-index price (including calls on, or other rights to purchase, production, whether or not the same are currently being exercised) that (i) represent in respect of such agreements 2.5% or more of the Borrower's average monthly production of Hydrocarbon volumes and (ii) have a maturity or expiry date of longer than six months from the Closing Date.

SECTION 3.20.     Hedge Agreements.   Schedule 3.20 sets forth, as of the Closing Date, a true and complete list of all commodity Hedge Agreements of each Credit Party, the terms thereof relating to the type, term, effective date, termination date and notional amounts or volumes, the net mark to market value thereof (as of the last Business Day of the most recent fiscal quarter preceding the Closing Date and for which a mark to market value is reasonably available), all credit support arrangements relating thereto (including any margin required or supplied) and the counterparty to each such agreement.

SECTION 3.21.     [Reserved].

SECTION 3.22.     Defaults.   No Default or Event of Default has occurred and is continuing.

SECTION 3.23.     Labor Relations.   Neither Holdings, the Borrower nor any of its Subsidiaries is engaged in any unfair labor practice that would reasonably be expected to result in a Material Liability to Holdings, the Borrower or any of its Restricted Subsidiaries.  There is (a) no unfair labor practice complaint pending against Holdings, the Borrower or any of its Restricted Subsidiaries, or to the best knowledge of Holdings and the Borrower, threatened against any of them before the National Labor Relations Board and no grievance or arbitration proceeding arising out of or under any collective bargaining agreement that is so pending against Holdings, the Borrower or any of its Restricted Subsidiaries or to the best knowledge of Holdings and the Borrower, threatened against any of them, (b) no strike or work stoppage in existence or threatened involving Holdings, the Borrower or any of its Restricted Subsidiaries, and (c) to the best knowledge of Holdings and the Borrower, no union representation question existing with respect to the employees of Holdings, the Borrower or any of its Restricted Subsidiaries and, to the best knowledge of Holdings and the Borrower, no union organization activity that is taking place, except (with respect to any matter specified in clause (a), (b) or (c) above, either individually or in the aggregate) such as is not reasonably likely to result in a Material Liability to Holdings, the Borrower or any of its Restricted Subsidiaries.  No Credit Party has incurred any liability or obligation under the Worker Adjustment and Retraining Notification Act or any similar federal or state law that remains unpaid or unsatisfied and could reasonably be expected to, individually or in the aggregate with all such liabilities or obligations, result in a Material Liability to Holdings, the Borrower or any of its Restricted Subsidiaries.

SECTION 3.24.    <u>Insurance</u>. The Borrower and its Restricted Subsidiaries maintain insurance in compliance with <u>Section 5.16</u>.

SECTION 3.25.    <u>Material Contracts</u>. <u>Schedule 3.25</u> contains a true, correct and complete list of all the Material Contracts in effect on the Closing Date.  All Material Contracts are in full force and effect, no material defaults currently exist thereunder, and each such Material Contract has not been amended, waived, or otherwise modified except as permitted under this Agreement.

## ARTICLE IV

### Conditions Precedent

SECTION 4.01.    <u>Conditions Precedent to Effectiveness of this Agreement</u>.  The effectiveness of this Agreement is subject to the satisfaction of the following conditions, except as otherwise agreed or waived pursuant to <u>Section 8.01</u>:

(a)    The Administrative Agent (or its counsel) shall have received from each party hereto a counterpart of this Agreement (which may include telecopy or electronic transmission of a signed signature page of this Agreement) signed on behalf of such party.

(b)    The Administrative Agent shall have received, on behalf of itself, the Collateral Agent and the Lenders, a customary written opinion of Weil, Gotshal & Manges LLP, counsel to the Borrower, (i) dated the Closing Date and (ii) addressed to the Administrative Agent and the Lenders on the Closing Date.  The Borrower hereby instructs such counsel to deliver such legal opinion.

(c)    The Administrative Agent shall have received:

(i)    a copy of the certificate of formation or incorporation, as applicable, including all amendments thereto, of the Borrower and each other Credit Party, certified as of a recent date by the Secretary of State of Delaware, and a certificate as to the good standing of the Borrower and each other Credit Party as of a recent date from such Secretary of State, and certificates of good standing and/or qualifications to do business as a foreign corporation in such jurisdictions as the Administrative Agent reasonably requests;

(ii)    a certificate of the Secretary or Assistant Secretary or similar officer of the Borrower and each other Credit Party dated the Closing Date and certifying:

(1)    that attached thereto is a true and complete copy of the limited liability company agreement or by-laws, as applicable, of such Person as in effect on the Closing Date and at all times since a date prior to the date of the resolutions described in <u>clause (2)</u> below,

(2)    that attached thereto is a true and complete copy of resolutions duly adopted by the board of directors (or managing general partner, managing member or equivalent) of such Person authorizing the execution, delivery and performance of this Agreement and the borrowings hereunder and each other Loan Document entered into on the Closing Date, and that such resolutions have not been modified, rescinded or amended and are in full force and effect on the Closing Date,

(3)    that the certificate of formation or incorporation, as applicable, of such Person has not been amended since the date of the last amendment thereto disclosed pursuant to <u>clause (i)</u> above,

69

(4)     as to the incumbency and specimen signature of each officer executing any Loan Document or any other document delivered in connection herewith on behalf of the Borrower and each other Credit Party, and

(5)     a certificate of a director or an officer as to the incumbency and specimen signature of the Secretary or Assistant Secretary or similar officer executing the certificate pursuant to clause (ii) above.

(d)     The Administrative Agent shall have received executed copies of (i) the Guarantee, executed by Holdings and each Subsidiary which will be a Subsidiary Guarantor on the Closing Date and (ii) the Intercreditor Agreement.

(e)     The Administrative Agent shall have received the Collateral Agreement, executed and delivered by the Borrower and each Guarantor.

(f)     (i) the Administrative Agent shall have received the results of lien searches with respect to the Credit Parties and (ii) subject to Section 5.34, the Administrative Agent shall have received evidence of insurance coverage of the Credit Parties evidencing that such Credit Party is carrying insurance in accordance with Section 5.16.

(g)     The conditions precedent to the effectiveness of the FLTL Credit Agreement shall have been satisfied or duly waived in writing substantially simultaneously with the Closing Date.

(h)     [Reserved].

(i)     The Restructuring Transactions (as defined in the Plan of Reorganization) shall have been, or shall substantially simultaneously be, consummated and effective in accordance with the Plan of Reorganization, the Plan Supplement (as defined in the Plan of Reorganization) and the Plan of Merger (as defined in the Plan of Reorganization), as applicable and the Effective Date (as defined in the Plan of Reorganization) shall have occurred.

(j)     Subject to Section 5.34, all documents and instruments, including Uniform Commercial Code or other applicable personal property and financing statements, reasonably requested by the Collateral Agent or the Required Lenders to be filed, registered or recorded to create the Liens intended to be created by any Security Document and perfect such Liens tothe extent required by, and with the priority required by, such Security Document shall have been delivered to the Collateral Agent for filing, registration or recording by or on behalf of the Collateral Agent.

(k)     The Administrative Agent shall have received executed Mortgages, together with customary local counsel legal opinions, with respect to 100% of the Oil and Gas Properties (and related assets) owned by the Credit Parties as of the Closing Date (after giving effect to the transactions contemplated by the Credit Bid Purchase Agreement).

(l)     All Equity Interests of the Borrower and each Subsidiary directly owned by the Borrower or any Guarantor, in each case as of the Closing Date, shall have been pledged pursuant to the Collateral Agreement (except that such Credit Parties shall not be required to pledge any Excluded Equity Interests).

(m)     On the Closing Date, the Administrative Agent shall have received a solvency certificate substantially in the form of Exhibit I hereto and signed by a Financial Officer of the Borrower.

(n)     [Reserved]

Error! Unknown document property name.
WEIL:\97986321\6\45327.0007

(o)      (i) The Agents shall have received all fees payable thereto (including pursuant to the Fee Letter) on or prior to the Closing Date and, to the extent invoiced, all other amounts due and payable pursuant to the Loan Documents on or prior to the Closing Date, including, to the extent invoiced at least one (1) Business Day prior to the Closing Date, reimbursement or payment of all reasonable out-of-pocket expenses (including reasonable fees, charges and disbursements of Davis Polk & Wardwell LLP and Shipman & Goodwin LLP) required to be reimbursed or paid by the Credit Parties hereunder or under any Loan Document and (ii) all other fees, premiums and expenses required to be paid to the Agents, Backstop Parties (as defined in the Commitment Letter) and the Participating DIP Lenders (as defined in the Commitment Letter) at or prior to the Closing Date pursuant to the terms of the Commitment Letter, the Loan Documents and the Plan of Reorganization shall have been paid or shall be paid and the New Money Warrants (as defined in the Commitment Letter) shall be issued substantially simultaneously with the occurrence of the Closing Date.

(p)      The Credit Parties shall have aggregate Unrestricted Cash as of the Closing Date on a pro forma basis (including after payment of Restructuring Expenses (as defined in the Plan of Reorganization) and separate from additional cash reserves to be established on the Closing Date for anticipated litigation settlements (to the extent known to be payable by the Credit Parties or otherwise required under GAAP to be included on the face of the Credit Parties' financial statements) of at least $[__]) of not less than $100,000,000.

(q)      The Administrative Agent shall have received at least three (3) Business Days prior to the Closing Date all documentation and other information required by regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations, including without limitation, the USA PATRIOT Act and the Beneficial Ownership Regulation, that has been requested not less than ten (10) Business Days prior to the Closing Date.

(r)      On the Closing Date, all representations and warranties made by any Credit Party contained herein or in the other Loan Documents shall be true and correct in all material respects (or with respect to representations and warranties that contain a materiality qualifier, in all respects) with the same effect as though such representations and warranties had been made on and as of such date (expect where such representations and warranties expressly relate to an earlier date, in which case such representations and warranties shall have been trued and correct in all material respects as of such earlier date).

(s)      No Default or Event of Default shall have occurred and be continuing or would result from the consummation of the Transactions.

(t)      Credit Bid Purchaser shall have received, or shall receive substantially simultaneously with the Closing Date, gross proceeds in an amount of no less than $20,000,000 through an equity rights offering on terms and conditions acceptable to the Borrower and the Required Lenders.

(u)      (A) Since the Execution Date (as defined in the Credit Bid Purchase Agreement), no Material Adverse Effect (as defined in the Credit Bid Purchase Agreement) (or any result, event, occurrence, change, circumstance, consequence or development that, individually or in the aggregate would reasonably be expected to result in a Material Adverse Effect (as defined in the Credit Bid Purchase Agreement)) shall have occurred and (B) since the Execution Date (as defined in the Commitment Letter), there has been no occurrence, development or change that has had or would reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect (provided that, for the avoidance of doubt, any change, development or occurrence, arising individually or in the aggregate, from events that would reasonably be expected to result from the pendency of the Cases shall not constitute a Material Adverse Effect).

(v)      The Disclosure Statement (as defined in the Plan of Reorganization) shall be in form and substance reasonably acceptable to the Required Lenders and the Plan of Reorganization and Confirmation Order shall be in form and substance acceptable to the Required Lenders (it being understood that the Plan of Reorganization in the form attached as Annex C to the Commitment Letter, dated as of March 23, 2021 (the

"Commitment Letter"), is acceptable to the Required Lenders, as such Plan of Reorganization may be modified with the consent of the Required Lenders).

(w)     The Confirmation Order (as defined in the Plan of Reorganization) shall have been entered and shall be a final order and all conditions precedent described or set forth in the Credit Bid Purchase Agreement shall be satisfied or such conditions shall have been waived in accordance with the terms thereof with the consent of the Majority Backstop Parties (except those conditions precedent that by their nature are to be satisfied concurrently with the closing of the Credit Bid Purchase Agreement or the Closing Date, as applicable; provided that such conditions shall be satisfied concurrently at such times).

(x)     The funding of the Claims Reserve (as defined in the Plan of Reorganization) in the Claims Reserve Amount (as defined in the Plan of Reorganization), which Claims Reserve Amount shall be acceptable to the Borrower and the Majority Backstop Parties (as defined in the Commitment Letter), shall have occurred.

(y)     the estimated amount of Allowed Specified Administrative Expense Claims (as defined in the Plan of Reorganization) to be satisfied under the Plan of Reorganization on or after the Closing Date shall not have been projected at any time prior to the Confirmation Date (as defined in the Plan of Reorganization) to exceed the Toggle Amount (as defined in the Plan of Reorganization)

For purposes of determining compliance with the conditions specified in this Article IV, each Lender shall be deemed to have consented to, approved or accepted or deemed to be satisfied with each document or other matter required thereunder to be consented to or approved by, or acceptable or satisfactory to, the Lenders unless an office of the Administrative Agent shall have received notice from such Lender prior to the Closing Date specifying its objection thereto.

## ARTICLE V

Covenants

SECTION 5.01.     Information Covenants.  The Borrower will furnish to the Administrative Agent (which shall promptly make such information available to the Lenders in accordance with its customary practice):

(a)     Annual Financial Statements.  Within 105 days after the end of each such fiscal year, the audited consolidated balance sheets of the Borrower and the Subsidiaries and, if different, the Borrower and the Restricted Subsidiaries, in each case as at the end of such fiscal year, and the related consolidated statements of operations, shareholders' equity and cash flows for such fiscal year, and, beginning with the fiscal year ending December 31, 2023, setting forth comparative consolidated figures for the preceding fiscal years (or, in lieu of such audited financial statements of the Borrower and the Restricted Subsidiaries, a reconciliation, reflecting such financial information for the Borrower and the Restricted Subsidiaries, on the one hand, and the Borrower and the Subsidiaries, on the other hand, reflecting adjustments necessary to eliminate the accounts of the Closing Date Unrestricted Subsidiary from such consolidated financial statements) prepared in accordance with GAAP, and, except with respect to such reconciliation, certified by independent certified public accountants of recognized national standing whose opinion shall not be qualified with a scope of audit or "going concern" or like qualification or exception (other than with respect to, or resulting from, the occurrence of an upcoming maturity date of Indebtedness within one year of the date of such opinion).  Notwithstanding the foregoing, the obligations in this Section 5.01(a) may be satisfied with respect to financial information of the Borrower and its consolidated Subsidiaries by furnishing the applicable financial statements of any direct or indirect parent of the Borrower; provided that (i) to the extent such information relates to a Parent Entity of the Borrower, such information is accompanied by consolidating information that explains in reasonable detail the

72

differences between the information relating to such Parent Entity and its consolidated Subsidiaries, on the one hand, and the information relating to the Borrower and its consolidated Subsidiaries and the Borrower and its consolidated Restricted Subsidiaries on a standalone basis, on the other hand and (ii) to the extent such information is in lieu of information required to be provided under the first sentence of this Section 5.01(a), such materials are accompanied by an opinion of an independent registered public accounting firm of recognized national standing, which opinion shall not be qualified with a scope of audit or "going concern" or like qualification or exception (other than with respect to, or resulting from, the occurrence of an upcoming maturity date of Indebtedness within one year of the date of such opinion).

(b)     Quarterly Financial Statements.     On or before the date that is 45 days after each quarterly accounting period in each fiscal year of the Borrower, the consolidated balance sheets of the Borrower and the Subsidiaries and, if different, the Borrower and the Restricted Subsidiaries, in each case as at the end of such quarterly period and the related consolidated statements of operations, shareholders' equity and cash flows for such quarterly accounting period and for the elapsed portion of the fiscal year ended with the last day of such quarterly period, and setting forth comparative consolidated figures for the related periods in the prior fiscal year or, in the case of such consolidated balance sheet, for the last day of the prior fiscal year (or, in lieu of such unaudited financial statements of the Borrower and the Restricted Subsidiaries, a reconciliation reflecting such financial information for the Borrower and the Restricted Subsidiaries, on the one hand, and the Borrower and the Subsidiaries, on the other hand, reflecting adjustments necessary to eliminate the accounts of the Closing Date Unrestricted Subsidiary from such consolidated financial statements), all of which shall be certified by a Financial Officer of the Borrower as fairly presenting in all material respects the financial condition, results of operations, shareholders' equity and cash flows, of the Borrower and its consolidated Subsidiaries in accordance with GAAP, subject to changes resulting from audit and normal year-end audit adjustments and the absence of footnotes.  Notwithstanding the foregoing, the obligations in this Section 5.01(b) may be satisfied with respect to financial information of the Borrower and its consolidated Subsidiaries by furnishing the applicable financial statements of any direct or indirect parent of the Borrower; *provided* that to the extent such information  relates to a parent of the Borrower, such information is accompanied by consolidating information that explains in reasonable detail the differences between the information relating to such parent and its consolidated Subsidiaries, on the one hand, and the information relating to the Borrower and its consolidated Subsidiaries and the Borrower and its consolidated Restricted Subsidiaries on a standalone basis, on the other.

(c)     Notice of Default; Litigation; ERISA Events and Other Events.

(i)     Promptly after an Authorized Officer of the Borrower or any of the Restricted Subsidiaries obtains actual knowledge thereof, notice of (A) the occurrence of any Default or Event of Default, which notice shall specify the nature thereof, the period of existence thereof and what action the Borrower proposes to take with respect thereto, (B) any Adverse Proceeding, and (C) the occurrence of any ERISA Event or similar event with respect to a Plan, Multiemployer Plan or Foreign Plan, in the case of clauses (B) and (C), that would reasonably be expected to result in a Material Liability to Holdings, the Borrower or any of its Restricted Subsidiaries.

(ii)     In the event that Holdings, Borrower or any of its Restricted Subsidiaries shall intend to enter into any settlement agreement with any Governmental Authority in connection with any Adverse Proceeding for which the Borrower or any of the Restricted Subsidiaries are required to have given notice pursuant to paragraph (i)(B) above, the Borrower shall give the Administrative Agent (for distribution to the Lenders) reasonable prior written notice (and in any event, not less than five (5) Business Days' prior notice) of such intention, the material terms thereof, the anticipated date of entry and any other details thereof reasonably requested by the Required Lenders or their counsel.

(iii)     [Reserved].

Error! Unknown document property name.
WEIL:\97986321\6\45327.0007

(iv)      In the event that the Borrower or any Restricted Subsidiary intends to incur any Indebtedness for borrowed money that will have an aggregate principal (or committed) balance of $11,500,000 or more, the Borrower shall give the Administrative Agent (for further distribution to the Lenders) reasonable prior written notice (and in any event not less than three (3) Business Days' prior notice) of such incurrence of Indebtedness, the material terms thereof and the anticipated date of closing and any other details thereof reasonably requested by the Administrative Agent or any Lender.

(v)      Promptly, and in any event within two (2) days after (A)(x) any Material Contract of the Borrower or any of its Restricted Subsidiaries is terminated or amended in a manner that is materially adverse to the Borrower or any of its Restricted Subsidiaries or to the Lenders or (y) any new Material Contract is entered into, or (B) any officer of the Borrower or any of its Subsidiaries obtaining actual knowledge (x) of any condition or event that constitutes a material default or an event of default under any Material Contract, (y) that any event, circumstance, or condition exists or has occurred that gives any counterparty to such Material Contract a termination or assignment right thereunder, or (z) that notice has been given to the Borrower or any of its Subsidiaries asserting that any such condition or event has occurred, the Borrower shall deliver to the Administrative Agent a certificate of an Authorized Officer specifying the nature and period of existence of such condition or event and, in the case of clause (A), including copies of such material amendments or new contracts and, in the case of clause (B), as applicable, explaining the nature of such claimed default or event of default, and including an explanation of any actions being taken or proposed to be taken by the Borrower and its Restricted Subsidiaries with respect thereto.

(d)      Environmental Matters.  Promptly after the receipt or discovery by an officer of Holdings, the Borrower or any of its Restricted Subsidiaries of information (including, but not limited to, as a result of performance of environmental site assessments, audits, invasive sampling and testing of environmental conditions, or receipt of correspondence from or discussions with Governmental Authorities or other Persons) regarding any one or more of the following environmental matters, unless such environmental matters would not, individually, or when aggregated with all other such matters, be reasonably expected to result in a Material Liability to Holdings, the Borrower or any of its Restricted Subsidiaries, notice of:

(i)      any pending or threatened Environmental Claim against any Credit Party; and

(ii)      the occurrence of any event or discovery of any circumstance that is or would reasonably be expected to result in a violation or liability under Environmental Law including, without limitation, any actual presence, Release or threatened Release of, or exposure to, any Hazardous Material on, at, under or from (A) any facility owned, leased or operated by a Credit Party or (B) any real property offsite such facility that is (x) located adjacent or in close proximity to such facility under circumstances where the presence, Release or threatened Release of, or exposure to, Hazardous Materials may reasonably be expected to threaten the facility or (y) where Holdings, Borrower or any of the Subsidiaries transported or disposed, or arranged for the disposal or transport for disposal of Hazardous Materials or the conduct of any cleanup, investigation, removal, remediation or other corrective action in response to the actual or alleged presence, Release or threatened Release of, or exposure to, any Hazardous Material on, at, under or from (1) any facility owned, leased or operated by a Credit Party or (2) any real property offsite such facility that is (x) located adjacent or in close proximity to such facility under circumstances where the presence, Release or threatened Release of, or exposure to, Hazardous Materials may reasonably be expected to threaten the facility or (y) where Holdings, Borrower or any of the Subsidiaries transported or disposed, or arranged for the disposal or transport for disposal of Hazardous Materials.

All such notices shall describe in reasonable detail the nature of the claim, including, without limitation, providing facts and circumstances of which any Credit Party or any of the Subsidiaries is aware giving rise to the claim, together with planned or any implemented cleanups, investigations, removals, remediations or other corrective actions, any proposed actions to modify operations in a manner that could be expected to subject the

Credit Parties to new or added obligations or requirements under Environmental Law, any estimates of damages and costs to cure the claim, any governmental Environmental Claims or threatened Environmental Claims, any governmental requests for information regarding the claim, and any reserves, contractual indemnifications or insuring agreements that may be relied upon by any of Holdings, the Borrower or any of the Subsidiaries in connection with the claim. Such notice is not intended to create, nor shall it create, any obligation upon the Administrative Agent or any Lender with respect thereto. Upon reasonable request of the Administrative Agent or any Lender, the Credit Parties will be obligated to supply such Person with supporting non-privileged documentation with respect to such claim and any responses thereto, and the Credit Parties shall have a continuing obligation to provide prompt status updates on such until such time as the claim is fully resolved (provided that, to the extent any information is withheld due to privilege, the Borrower agrees to provide written notice of the reason for such information being withheld).

(e)      Officers' Certificates.  At the time of the delivery of the financial statements provided for in Section 5.01(a) and Section 5.01(b) (other than with respect to delivery of the financial statements required by Section 5.01(b) with respect to the fourth fiscal quarter of any fiscal year of the Borrower), commencing with respect to certificates delivered for the fiscal quarter ending June 30, 2021, a certificate of a Financial Officer of the Borrower to the effect that no Default or Event of Default has occurred and is continuing or, if any Default or Event of Default does exist, specifying the nature and extent thereof, which certificate shall (i) set forth a reasonably detailed calculation of Consolidated Excess Cash for such fiscal period and (ii) a list of all commodity Hedge Agreements of the Borrower and each Credit Party, the material terms thereof (in respect of the type, term, effective date, termination date and notional amounts or volumes), the net mark-to-market value thereof (as of the last Business Day of such fiscal year or quarter, as applicable and for which a mark-to- market value is reasonably available).

(f)      Other Information.    With reasonable promptness, such other information regarding the operations, business affairs and the financial condition of the Borrower or the Restricted Subsidiaries as the Administrative Agent on behalf of any Lender (acting through the Administrative Agent) may reasonably request in writing from time to time.  Notwithstanding anything to the contrary in this Section 5.01(f), neither the Borrower nor any Restricted Subsidiary will be required to disclose, permit the inspection, examination or making copies or abstracts of, or discussion of, any document, information or other matter (i) that constitutes non-financial trade secrets or non-financial proprietary information, (ii) in respect of which disclosure to the Administrative Agent or any Lender (or their respective representatives or contractors) is prohibited by any Requirement of Law or any binding confidentiality provision (so long as not entered into with the intention of circumventing this provision) or (iii) that is subject to attorney-client or similar privilege or constitutes attorney work product; provided that, to the extent any information is withheld pursuant to the foregoing, the Borrower agrees to provide written notice of the reason for such information being withheld.

(g)      Budget.  Within 60 days after the end of each fiscal year of the Borrower (beginning with the fiscal year ending December 31, 2021), a reasonably detailed consolidated budget for the following fiscal year as customarily prepared by management of the Borrower (including select balance sheet items of the Borrower and its Subsidiaries as of the end of the following fiscal year and a summary of the material underlying assumptions applicable thereto) (collectively, the "Budget"), which Budget shall in each case be accompanied by a certificate of an Authorized Officer stating that such Budget has been prepared in good faith on the basis of the assumptions stated therein, which assumptions were believed to be reasonable at the time of preparation of such Budget, it being understood that actual results may vary from such Budget.

(h)      Production Report; List of Purchasers. Promptly after request by the Administrative Agent (at the direction of the Required Lenders), (i) a report setting forth, for each calendar month during the then current fiscal year to date, the volume of production of Hydrocarbons for each such calendar month and/or (ii) a list of Persons purchasing Hydrocarbons from any Credit Party who collectively account for at least 80% of the revenues resulting from the sale of all Hydrocarbons from the Credit Parties during the period for which such request was made; provided that, so long as no Event of Default has occurred and is

Error! Unknown document property name.
WEIL:\97986321\6\45327.0007

continuing, the Administrative Agent shall only be permitted to make up to two (2) requests in any fiscal year.

(i)    Ratings. Within 30 days after the Closing Date (or such later date as the Required Lenders may agree), the Borrower shall use commercially reasonable efforts to obtain a public rating for the Loans from S&P and Moody's and shall continuously maintain such public ratings.

It is understood that documents required to be delivered pursuant to Sections 5.01(a) through (h) may be delivered electronically and if so delivered, shall be deemed to have been delivered on the date (a) on which such documents are transmitted by electronic mail to the Administrative Agent or (b) on which such documents are posted by the Borrower or on the Borrower's behalf on any relevant website to which each Lender and the Administrative Agent have access (whether a commercial, third-party website or whether sponsored by the Administrative Agent or the administrative agent under the FLTL Credit Agreement); *provided* that: (i) upon written request by the Administrative Agent, the Borrower shall deliver paper copies of such documents delivered pursuant to Sections 5.01(a), 5.01(b) and 5.01(c), to the Administrative Agent for further distribution to each Lender until a written request to cease delivering paper copies is given by the Administrative Agent and (ii) the Borrower shall notify (which may be by facsimile or electronic mail) the Administrative Agent of the posting of any such documents and provide to the Administrative Agent by electronic mail electronic versions (i.e., soft copies) of such documents.  Each Lender shall be solely responsible for timely accessing posted documents or requesting delivery of paper copies of such documents from the Administrative Agent and maintaining its copies of such documents.

Delivery of any reports, information and documents under this Section 5.01, as well as any such reports, information and documents pursuant to this Agreement, to the Administrative Agent is for informational purposes only and the Administrative Agent's receipt of such shall not constitute constructive notice of any information contained therein or determinable from information contained therein, including the Borrower's compliance with any of its covenants hereunder (as to which the Administrative Agent is entitled to rely exclusively on the Officers' Certificates). The Administrative Agent shall have no responsibility or liability for the filing, timeliness or content of any report required under this Section 5.01 or any other reports, information and documents required under this Agreement.

SECTION 5.02.    Environmental Covenants.

(a)    Except as could not reasonably be expected to result in a Material Liability to Holdings, the Borrower or any of its Restricted Subsidiaries, each of Holdings and the Borrower will comply, and shall cause each of its Subsidiaries (and shall use commercially reasonable efforts to cause all other Persons, if any, on or occupying any assets of Holdings, the Borrower or any of its Subsidiaries) to comply with all Environmental Laws and Environmental Permits; obtain and renew, and cause each of its Subsidiaries to obtain and renew, all Environmental Permits necessary for each of their respective operations and assets; and conduct, and cause each of its Subsidiaries to conduct, any cleanup, investigation, removal, remediation or other corrective action with respect to any actual or alleged violation of Environmental Law or in response to any Release or threatened Release of, or exposure to, any Hazardous Materials from, at or about any of their respective assets or otherwise relating to or arising out of each of their respective operations, to the extent required by, and in compliance with, all Environmental Laws.

(b)    In the event and to the extent that Holdings, the Borrower or any of its Subsidiaries shall fail to promptly conduct any cleanup, investigation, removal, remediation, or other corrective action with respect to any violation of Environmental Law or any Hazardous Materials as set forth in Section 5.02(a), above, or as otherwise required by Environmental Law, Environmental Permit or a Governmental Authority, which such failure would reasonably be expected to have a Material Adverse Effect, the Administrative Agent on behalf of the Lenders may, but without the obligation to do so, for the sole purpose of protecting the Lenders' interest in the Collateral, upon five (5) Business Days' written notification to the Borrower, enter onto any Holdings, Borrower's or any Subsidiaries' property (or authorize third parties to enter onto any such Person's property)

and conduct such cleanups, investigations, removals, remediations, or other corrective actions required by Environmental Law, Environmental Permit or the Governmental Authority with respect to any such violation or Hazardous Material. All reasonable and documented costs and expenses incurred by the Administrative Agent and Lenders (or such third parties) in the exercise of any such rights under this Section 5.02(b), including any sums paid in connection with any judicial or administrative investigation or proceedings, fines and penalties, shall be paid by the Borrower within thirty (30) days of written demand by the Administrative Agent, and until paid shall be added to and become a part of the Loan Obligations.

(c)     In the event there is a Release or threatened Release of, or exposure to, any Hazardous Materials or a failure to comply with any Environmental Law or Environmental Permit at Holdings', the Borrower's or any of its Subsidiaries' assets caused in whole or in part by any of such Persons, which in any event is reasonably expected to have a Material Adverse Effect, Holdings, the Borrower and each of its Subsidiaries shall comply with all reasonable written requests for information made by the Administrative Agent with respect to such matters. Such information reasonably requested may include, at the Borrowers' expense, an environmental site assessment (including invasive sampling and testing) or environmental compliance audit of any such Person's assets caused by any of Holdings, the Borrower or any of its Subsidiaries, to be prepared by a nationally recognized environmental consulting or engineering firm, to assess such Release, threatened Release, exposure or noncompliance with any Environmental Law or Environmental Permit; *provided*, however, that any environmental site assessment, environmental compliance audit or similar report acceptable to the Governmental Authority that is charged to oversee any cleanup, investigation, removal, remediation or other corrective action related to such matters shall be deemed acceptable to the Administrative Agent and the Lenders.

(d)     The Borrower shall defend and indemnify the Agents and the Lenders and hold the Agents, the Lenders and their respective employees, agents, directors and officers harmless from and against all loss, liability, reasonable expense, claims, costs, monetary sanctions, fines and penalties, including, without limitation, reasonable and documented out-of-pocket attorney's fees, suffered or incurred by the Agents or the Lenders under or on account of any Environmental Claim, Hazardous Material, Environmental Law or Environmental Permit, including without limitation, with respect to the presence, Release or threatened Release of, or exposure to, any Hazardous Materials affecting Holdings', the Borrower's or any of its Subsidiaries' assets or operations whether or not the same originates or emerges from any such Person's assets or operations or as a result of any third party's conduct or operations at any nearby site or location, except to the extent such loss, liability, damage and expense is attributable to any presence, Release or threatened Release of, or exposure to, Hazardous Materials that is found by a final and non-appealable judgment of a court of competent jurisdiction to have directly and solely been caused by the gross negligence or willful misconduct of such indemnified party under this Section 5.02(d). The Borrower's obligations under this Section 5.02(d) exist regardless of whether or not any federal, state or local environmental agency has taken or threatened any action in connection with the presence, Release or threatened Release of, or exposure to, any such Hazardous Material. The Borrower's obligations and the indemnifications hereunder shall survive repayment of the Loans and all other amounts payable hereunder, and the earlier resignation or removal of any Agent.

(e)     Upon reasonable request of the Administrative Agent, each of Holdings and the Borrower will make available, and shall cause each of its Subsidiaries to make available complete and correct copies of all environmental site assessments, audits and similar reports and studies, and all documentation and correspondence addressing potentially material environmental liabilities relating to Holdings, the Borrower or any of its Subsidiaries or any of their ownership or operation of the assets.

SECTION 5.03.     End of Fiscal Years; Fiscal Quarters.  The Borrower will, for financial reporting purposes, cause each of its, and each of its Restricted Subsidiaries', fiscal years and fiscal quarters to end on, in the case of the fiscal year, the last day of each calendar year, and in the case of any fiscal quarter, the day of each calendar quarter; *provided*, *however*, that the Borrower may, upon written notice to the Administrative Agent change the financial reporting convention specified above to any other financial reporting convention reasonably acceptable to the Required Lenders in their Permitted Business Judgment, in which case the Borrower and the

Administrative Agent will, and are hereby authorized by the Lenders to, make any adjustments to this Agreement that are necessary in order to reflect such change in financial reporting.

SECTION 5.04.    Use of Proceeds.  The Borrower will use the proceeds of the Initial Loans, together with the loans under the FLTL Facility, on the Closing Date, to consummate the Transactions and thereafter for ongoing working capital or other general corporate purposes.

SECTION 5.05.    Change in Business.  The Borrower and its Restricted Subsidiaries, taken as a whole, will not fundamentally and substantively alter the character of their business, taken as a whole, from the business conducted by them on the Closing Date, the business of Permitted Business Investments by the Borrower and its Restricted Subsidiaries and other business activities incidental, reasonably related or ancillary to any of the foregoing and reasonable extensions thereof.

SECTION 5.06.    Limitation on Incurrence of Indebtedness and Issuance of Disqualified Stock and Preferred Stock.

(a)    The Borrower shall not, and shall not permit any of its Restricted Subsidiaries to Incur any Indebtedness or issue any shares of Disqualified Stock; and the Borrower shall not permit any of its Restricted Subsidiaries (other than a Subsidiary Guarantor) to issue any shares of Preferred Stock.

(b)    The limitations set forth in Section 5.06(a) shall not apply to:

(i)    the Incurrence by the Borrower or any Restricted Subsidiary of Indebtedness under the Loan Documents (including the Loans, any guarantees thereof (including the Guarantee), any PIK Interest and including any Indebtedness incurred pursuant to Section 2.20);

(ii)    the Incurrence by the Borrower or any Restricted Subsidiary of Indebtedness under the FLTL Credit Agreement up to an aggregate principal amount that does not exceed, at the time of Incurrence, $[●][4];

(iii)    Indebtedness existing on the Closing Date and listed on Schedule 5.06 (without giving effect to any increases in principal amount thereof following the Closing Date);

(iv)    Indebtedness (including Capitalized Lease Obligations) Incurred by the Borrower or any of its Restricted Subsidiaries within 180 days of the acquisition, lease, construction, repair, replacement or improvement of property (real or personal) or equipment (whether through the direct purchase of assets or the Capital Stock of any Person owning such assets) in an aggregate principal amount that, when aggregated with the principal amount of all other Indebtedness then outstanding and Incurred pursuant to this clause (iv), together with any Refinancing Indebtedness in respect thereof Incurred pursuant to clause (xi) below, does not exceed $11,500,000 at any time outstanding;

(v)    Indebtedness of the Borrower to a Restricted Subsidiary or of a Restricted Subsidiary to another Restricted Subsidiary; *provided* that any such Indebtedness owed to a Restricted Subsidiary that is not a Subsidiary Guarantor is subordinated in right of payment to the obligations of the Borrower under the Loans pursuant to an intercompany note that is reasonably satisfactory in form and substance to the Administrative Agent; *provided*, *further*, that any subsequent issuance or transfer of any Capital Stock or any other event which results in any such Restricted Subsidiary ceasing to be a Restricted Subsidiary or any other subsequent transfer of any such Indebtedness (except to the Borrower or another Restricted Subsidiary or any pledge of such Indebtedness constituting a Permitted Lien but

---

[4] NTD: to match to principal amount incurred on the Closing Date.

not the transfer thereof upon foreclosure) shall be deemed, in each case, to be an Incurrence of such Indebtedness not permitted by this clause (v);

(vi)     shares of Preferred Stock of a Restricted Subsidiary issued to the Borrower or a Subsidiary Guarantor; *provided* that any subsequent issuance or transfer of any Capital Stock or any other event which results in any Restricted Subsidiary that holds such shares of Preferred Stock of another Restricted Subsidiary ceasing to be a Restricted Subsidiary or any other subsequent transfer of any such shares of Preferred Stock (except to the Borrower or another Restricted Subsidiary) shall be deemed, in each case, to be an issuance of shares of Preferred Stock not permitted by this clause (vi);

(vii)     Indebtedness of a Restricted Subsidiary to the Borrower or another Restricted Subsidiary; *provided* that such Indebtedness is subordinated in right of payment to the Loan Obligations pursuant to an intercompany note that is reasonably satisfactory in form and substance to the Required Lenders and duly pledged as Collateral under the Collateral Agreement; *provided*, *further*, that any subsequent issuance or transfer of any Capital Stock or any other event which results in any Restricted Subsidiary holding such Indebtedness ceasing to be a Restricted Subsidiary or any other subsequent transfer of any such Indebtedness (except to the Borrower or another Restricted Subsidiary or any pledge of such Indebtedness constituting a Permitted Lien but not the transfer thereof upon foreclosure) shall be deemed, in each case, to be an Incurrence of such Indebtedness not permitted by this clause (vii);

(viii)     Hedging Obligations that are not incurred for speculative purposes, including, for the avoidance of doubt (1) any Hedging Obligations for the purpose of fixing or hedging interest rate risk with respect to any Indebtedness that is permitted by the terms of this Agreement to be outstanding; (2) any Hedging Obligations for the purpose of fixing or hedging currency exchange rate risk with respect to any currency exchanges; or (3) any Hedging Obligations for the purpose of fixing or hedging commodity price risk with respect to any commodity purchases or sales (including, without limitation, any commodity Hedging Obligation that is intended in good faith, at inception of execution, to hedge or manage any of the risks related to existing and/or forecasted Hydrocarbon production (whether or not contracted)) and, in each case, extensions or replacements thereof;

(ix)     Indebtedness or Disqualified Stock of the Borrower or Indebtedness, Disqualified Stock or Preferred Stock of any Restricted Subsidiary not otherwise permitted hereunder in an aggregate principal amount or liquidation preference, which when aggregated with the principal amount or liquidation preference of all other Indebtedness, Disqualified Stock and Preferred Stock then outstanding and Incurred pursuant to this clause (ix) does not exceed $11,500,000 at the time of Incurrence;

(x)     any guarantee by the Borrower or any Restricted Subsidiary of Indebtedness or other obligations of the Borrower or any Subsidiary Guarantor so long as the Incurrence of such Indebtedness Incurred by the Borrower or such Subsidiary Guarantor is permitted under the terms of this Agreement; *provided* that if such Indebtedness is by its express terms subordinated in right of payment to the Loans or the Guarantee of such Restricted Subsidiary, as applicable, any such guarantee with respect to such Indebtedness shall be subordinated in right of payment to the Loans or such Guarantee, as applicable, substantially to the same extent as such Indebtedness is subordinated to the Loans or the Guarantee, as applicable;

(xi)     the Incurrence by the Borrower or any of the Restricted Subsidiaries of Indebtedness or Disqualified Stock or Preferred Stock of a Restricted Subsidiary that serves to refund, refinance or defease any Indebtedness Incurred or Disqualified Stock or Preferred Stock issued as permitted under clauses (i), (ii), (iii), (iv), (ix), (x), (xiv) and (xviii) and Section 5.06(b) up to the outstanding principal amount (or, if applicable, the liquidation preference face amount, or the like) or, if greater, committed amount (only to the extent the committed amount could have been Incurred on the date of initial Incurrence) of such Indebtedness or Disqualified Stock or Preferred Stock, in each case

79

at the time such Indebtedness was Incurred or Disqualified Stock or Preferred Stock was issued pursuant to <u>clauses (i)</u>, <u>(ii)</u>, <u>(iii)</u>, <u>(iv)</u>, <u>(ix)</u>, <u>(x)</u>, <u>(xiv)</u> and <u>(xviii)</u> of <u>Section 5.06(b)</u>, or any Indebtedness, Disqualified Stock or Preferred Stock Incurred to so substantially concurrently refund or refinance such Indebtedness, Disqualified Stock or Preferred Stock, including any additional Indebtedness, Disqualified Stock or Preferred Stock Incurred to pay accrued and unpaid interest, penalties, premiums (including tender premiums), expenses, defeasance costs, commissions, underwriting discounts and fees in connection therewith (subject to the following proviso, "<u>Refinancing Indebtedness</u>") prior to its respective maturity; *provided*, *however*, that such Refinancing Indebtedness:

       (1)     shall have a Weighted Average Life to Maturity at the time such Refinancing Indebtedness is Incurred which is not less than the shorter of (x) the remaining Weighted Average Life to Maturity of the Indebtedness, Disqualified Stock or Preferred Stock being refunded, refinanced or defeased and (y) the Weighted Average Life to Maturity that would result if all payments of principal on the Indebtedness, Disqualified Stock and Preferred Stock being refunded or refinanced that were due on or after the date that is one year following the last maturity date of any Loans then outstanding were instead due on such date;

       (2)     to the extent such Refinancing Indebtedness refinances (a) Indebtedness junior to the Loans or a Guarantee, as applicable, such Refinancing Indebtedness is junior to the Loans or the Guarantee, as applicable, or unsecured, (b) Disqualified Stock or Preferred Stock, such Refinancing Indebtedness is Disqualified Stock or Preferred Stock or (c) Indebtedness that is payment subordinated to the Loans or a Guarantee, as applicable, such Refinancing Indebtedness is subordinated to the Loans or a Guarantee, as applicable, to at least the same extent pursuant to a customary subordination agreement;

       (3)     shall not include (X) Indebtedness of a Restricted Subsidiary that is not a Subsidiary Guarantor that refinances Indebtedness of the Borrower or a Subsidiary Guarantor, or (Y) Indebtedness of the Borrower or a Restricted Subsidiary that refinances Indebtedness of the Closing Date Unrestricted Subsidiary; and

       (4)     any Refinancing Indebtedness of Indebtedness Incurred in respect of Junior Debt above shall not have a final maturity prior to the date that is 180 days after the earlier of the Maturity Date or the date the Loans are no longer outstanding.

       (xii)     to the extent constituting Indebtedness, Indebtedness Incurred by a Receivables Subsidiary in a Qualified Receivables Financing that is not recourse to the Borrower or any Restricted Subsidiary other than a Receivables Subsidiary (except for Standard Securitization Undertakings);

       (xiii)     Indebtedness arising from the honoring by a bank or other financial institution of a check, draft or similar instrument drawn against insufficient funds in the ordinary course of business; *provided*, *however*, that such Indebtedness is extinguished within five (5) Business Days of its Incurrence;

       (xiv)     Indebtedness in respect of letters of credit with a face amount in an aggregate principal amount or, which when aggregated with the face amount of all other Indebtedness then outstanding and Incurred pursuant to this <u>clause (xiv)</u>, does not exceed $57,500,000 at the time of Incurrence;

(xv)   Indebtedness of the Borrower or any Restricted Subsidiary consisting of (1) the financing of insurance premiums or (2) take-or-pay obligations contained in supply arrangements, in each case, in the ordinary course of business and not otherwise restricted by this Agreement;

(xvi)   Indebtedness consisting of Indebtedness issued by the Borrower or a Restricted Subsidiary to current or former officers, directors and employees thereof or any direct or indirect parent thereof, their respective estates, spouses or former spouses, in each case to finance the purchase or redemption of Equity Interests of the Borrower or any Parent Entity to the extent described in clause (i) of Section 5.07(b);

(xvii)   Indebtedness incurred by the Borrower or any Restricted Subsidiary constituting reimbursement obligations with respect to letters of credit issued in the ordinary course of business, including letters of credit in respect of plugging and abandonment obligations, workers' compensation claims, performance or surety bonds, health, disability, or other employee benefits or property, casualty or liability insurance or self-insurance or other Indebtedness with respect to compensation claims, performance or surety bonds, health, disability or other employee benefits or property, casualty or liability insurance or self-insurance; *provided* that upon the drawing of such letters of credit or the Incurrence of such Indebtedness, such obligations are reimbursed within 30 days following such drawing or incurrence;

(xviii)   Indebtedness Incurred in connection with the financing of new equipment in order to reduce near-term capital expenditures associated with deepwater projects that is (x) not recourse to any Credit Party (other than to the equipment so financed by such Credit Party) and (y) otherwise on terms acceptable to the Required Lenders in their sole discretion, in an aggregate principal amount, which when aggregated with the principal amount or liquidation preference of all other Indebtedness, Disqualified Stock and Preferred Stock then outstanding and Incurred pursuant to this clause (xviii), together with any Refinancing Indebtedness in respect thereof incurred pursuant to clause (xi), does not exceed $92,000,000 at the time of Incurrence (plus, in the case of any Refinancing Indebtedness, the Additional Refinancing Amount); and

(xix)   Indebtedness of the Borrower or any of its Restricted Subsidiaries undertaken in connection with cash management and related activities with respect to any Subsidiary in the ordinary course of business.

For purposes of determining compliance with this Section 5.06:

(1)   in the event that an item of Indebtedness, Disqualified Stock or Preferred Stock (or any portion thereof) meets the criteria of more than one of the categories of permitted Indebtedness described in clauses (i) through (xix) of Section 5.06(b), then the Borrower shall, in its sole discretion, classify or divide, such item of Indebtedness, Disqualified Stock or Preferred Stock (or any portion thereof) in any manner that complies with Section 5.06;

(2)   if any Indebtedness denominated in U.S. Dollars is exchanged, converted or refinanced into Indebtedness denominated in a foreign currency, then (in connection with such exchange, conversion or refinancing, and thereafter), the U.S. Dollar amount limitations set forth in any of clauses (i) through (xix) of Section 5.06(b) with respect to such exchange, conversion or refinancing shall be deemed to be the amount of such foreign currency, as applicable, into which such Indebtedness has been exchanged, converted or refinanced at the time of such exchange, conversion or refinancing; and

(3)   if any Indebtedness denominated in a foreign currency is exchanged, converted or refinanced into Indebtedness denominated in U.S. Dollars, then (in

81

connection with such exchange, conversion or refinancing, and thereafter), the U.S. Dollar amount limitations set forth in any of clauses (i) through (xix) of Section 5.06(b) with respect to such exchange, conversion or refinancing shall be deemed to be the amount of U.S. Dollars into which such Indebtedness has been exchanged, converted or refinanced at the time of such exchange, conversion or refinancing.

Accrual of interest, the accretion of accreted value, the payment of interest or dividends in the form of additional Indebtedness, Disqualified Stock or Preferred Stock, as applicable, amortization of original issue discount, the accretion of liquidation preference and increases in the amount of Indebtedness outstanding solely as a result of fluctuations in the exchange rate of currencies will not be deemed to be an Incurrence of Indebtedness, Disqualified Stock or Preferred Stock for purposes of this Section 5.06.  Guarantees of, or obligations in respect of letters of credit relating to, Indebtedness which is otherwise included in the determination of a particular amount of Indebtedness shall not be included in the determination of such amount of Indebtedness; *provided* that the Incurrence of the Indebtedness represented by such guarantee or letter of credit, as the case may be, was in compliance with this Section 5.06.

For purposes of determining compliance with any U.S. Dollar-denominated restriction on the Incurrence of Indebtedness other than as provided in clauses (1) and (2) above, the U.S. Dollar-equivalent principal amount of Indebtedness denominated in a foreign currency shall be calculated based on the relevant currency exchange rate in effect on the date such Indebtedness was Incurred, in the case of term debt, or first committed or first Incurred (whichever yields the lower U.S. Dollar equivalent), in the case of revolving credit debt.

Notwithstanding any other provision of this Section 5.06, the maximum amount of Indebtedness that the Borrower and its Restricted Subsidiaries may Incur pursuant to this Section 5.06 shall not be deemed to be exceeded, with respect to any outstanding Indebtedness, solely as a result of fluctuations in the exchange rate of currencies.

SECTION 5.07.    Limitation on Restricted Payments.

(a)    The Borrower shall not, and shall not permit any of its Restricted Subsidiaries to:

(i)    declare or pay any dividend or make any distribution on account of the Borrower's or any of its Restricted Subsidiaries' Equity Interests, including any payment made in connection with any merger, amalgamation or consolidation involving the Borrower (other than (A) dividends or distributions payable solely in Equity Interests (other than Disqualified Stock) of the Borrower or in options, warrants or other rights to purchase Equity Interests (other than Disqualified Stock); or (B) dividends or distributions by a Restricted Subsidiary so long as, in the case of any dividend or distribution payable on or in respect of any class or series of securities issued by a Restricted Subsidiary that is not a Wholly Owned Restricted Subsidiary, the Borrower or a Restricted Subsidiary receives at least its pro rata share of such dividend or distribution in accordance with its Equity Interests in such class or series of securities);

(ii)    purchase or otherwise acquire or retire for value any Equity Interests of the Borrower or any direct or indirect parent of the Borrower;

(iii)    make any principal payment on, or redeem, repurchase, defease or otherwise acquire or retire for value, in each case prior to any scheduled repayment or scheduled maturity, any Junior Debt of the Borrower or any Restricted Subsidiary (other than the payment, redemption, repurchase, defeasance, acquisition or retirement of Indebtedness permitted under clauses (v) and (vii) of Section 5.06(b)); or

(iv)     make any Restricted Investment

(all such payments and other actions set forth in clauses (i) through (iv) above being collectively referred to as "Restricted Payments").

(b)     The provisions of Section 5.07(a) shall not prohibit:

(i)     (A) the redemption, repurchase, retirement or other acquisition of any Equity Interests ("Retired Capital Stock") or Junior Debt of the Borrower, any direct or indirect parent of the Borrower or any Subsidiary Guarantor in exchange for, or out of the proceeds of, the substantially concurrent sale of, Equity Interests of a Parent Entity (other than Disqualified Stock or any Equity Interests sold to the Borrower or a Subsidiary of the Borrower) (collectively, including any such contributions, "Refunding Capital Stock"); and

(B)     the declaration and payment of dividends on the Retired Capital Stock out of the proceeds of the substantially concurrent sale (other than to the Borrower or a Subsidiary of the Borrower) of Refunding Capital Stock; provided that no Restricted Payment shall be permitted to be made pursuant to this clause (i) if a Default or Event of Default has occurred and is continuing or would result therefrom;

(ii)     the repayment, prepayment, redemption, repurchase, defeasance or other acquisition or retirement of Junior Debt of the Borrower or any Subsidiary Guarantor made by exchange for, or out of the proceeds of the substantially concurrent sale of, new Indebtedness of the Borrower or a Subsidiary Guarantor which is Incurred in accordance with Section 5.06(b)(xi);

(iii)     the declaration and payment of dividends or distributions to holders of any class or series of Disqualified Stock of the Borrower or any of its Restricted Subsidiaries issued or incurred in accordance with Section 5.06;

(iv)     other Restricted Payments, in an aggregate amount, when taken together with all other Restricted Payments made pursuant to this clause (iv) not to exceed $1,150,000;

(v)     (A) with respect to any taxable period for which the Borrower and/or any of its Subsidiaries are members of a consolidated, combined, affiliated, unitary or similar income tax group for U.S. federal and/or applicable state or local income tax purposes, or for which the Borrower is a partnership or disregarded entity for U.S. federal income tax purposes that is wholly-owned (directly or indirectly) by a C corporation for U.S. federal and/or applicable state or local income tax purposes, distributions to the Borrower and any direct or indirect parent of the Borrower in an amount not to exceed the excess of (I) the amount of any U.S. federal, state and/or local income taxes that the Borrower and/or its Subsidiaries, as applicable, would have paid for such taxable period had the Borrower and/or its Subsidiaries, as applicable, been a stand-alone corporate group over (II) the portion of such income Taxes that is paid by the Borrower and/or its Subsidiaries; provided, that any portion of such Restricted Payments that are made on account of Taxes attributable to the Closing Date Unrestricted Subsidiary shall be limited to the amount actually paid with respect to such period by the Closing Date Unrestricted Subsidiary to the Borrower or its Restricted Subsidiaries for the purposes of paying such Taxes; and

(B)     with respect to any taxable period ending after the Closing Date for which the Borrower is a partnership or disregarded entity for U.S. federal income tax purposes that is not wholly-owned (directly or indirectly) by a C corporation for U.S. federal and/or applicable state or local income tax purposes, distributions to any direct or indirect parent of the Borrower to pay any Taxes attributable to its direct or indirect ownership of the Borrower and its Subsidiaries with respect to such taxable period (assuming that each owner is subject to Tax at the highest combined marginal federal, state and/or local tax rate applicable to any owner for

such taxable period and taking into account the deductibility of state and local income taxes for U.S. federal income tax purposes (and any limitations thereon), the alternative minimum tax, any cumulative net taxable loss of the Borrower for prior taxable periods ending after the Closing Date to the extent such loss is of a character that would allow such loss to be available to reduce Taxes in the current taxable period (taking into account any limitations on the utilization of such loss to reduce such Taxes and assuming such loss has not already been utilized) and the character (e.g. long-term or short-term capital gain or ordinary or exempt) of the applicable income); *provided*, that, any portion of such Restricted Payments that are made on account of Taxes to the Closing Date Unrestricted Subsidiary shall be limited to the amount actually paid with respect to such period by the Closing Date Unrestricted Subsidiary to the Borrower or its Restricted Subsidiaries for the purposes of paying such Taxes.

(vi)    any Restricted Payment (100% of which shall be deemed attributable to the Borrower at all times Holdings owns no material assets other than the Equity Interests of the Borrower), if applicable:

(A)  in amounts required for any direct or indirect parent of the Borrower to pay fees and expenses (including franchise or similar taxes) required to maintain its corporate existence, customary salary, bonus and other benefits payable to, and indemnities provided on behalf of, officers and employees of any direct or indirect parent of the Borrower and general corporate operating and overhead expenses of any direct or indirect parent of the Borrower in each case to the extent such fees and expenses are attributable to the ownership or operation of the Borrower, if applicable, and its Subsidiaries; and

(B)  in amounts required for any direct or indirect parent of the Borrower, if applicable, to pay interest and/or principal on Indebtedness the proceeds of which have been contributed to the Borrower or any Restricted Subsidiary and that has been guaranteed by, or is otherwise considered Indebtedness of, the Borrower Incurred in accordance with Section 5.06.

(vii)    repurchases of Equity Interests deemed to occur upon exercise of stock options or warrants if such Equity Interests represent a portion of the exercise price of such options or warrants;

(viii)    purchases of receivables pursuant to a Receivables Repurchase Obligation in connection with a Qualified Receivables Financing and the payment or distribution of Receivables Fees;

(ix)    Restricted Payments by the Borrower or any Restricted Subsidiary of the Borrower to allow the payment of cash in lieu of the issuance of fractional shares upon the exercise of options or warrants or upon the conversion or exchange of Capital Stock of any such Person;

(x)    any Restricted Payment used to fund the Transactions and the payment of fees and expenses Incurred in connection with the Transactions or owed by the Borrower or any direct or indirect parent of the Borrower or Restricted Subsidiaries of the Borrower to Affiliates, and any other payments made, including any such payments made to any direct or indirect parent of the Borrower to enable it to make payments in connection with the consummation of the Transactions, whether payable on the Closing Date or thereafter;

(xi)    payment made or expected to be made by the Borrower or any Restricted Subsidiary in respect of withholding or similar taxes payable upon exercise of Equity Interests by any future, present or former employee, director, manager or consultant and repurchases of Equity Interests deemed to occur upon exercise of stock options or warrants if such Equity Interests represent a portion of the exercise price of such options or warrants;

Error! Unknown document property name.
WEIL:\97986321\6\45327.0007

(xii)     the repayment, prepayment, redemption, repurchase, defeasance or other acquisition or retirement of Junior Debt of the Borrower or any Subsidiary Guarantor once in respect of each fiscal quarter so long as the aggregate principal amount paid in connection with such repayment, prepayment, redemption, repurchase, defeasance or other acquisition or retirement does not to exceed 25% of the amount of Consolidated Excess Cash as of the last day of the most recently ended fiscal quarter, so long as (x) such repayment, prepayment, redemption, repurchase, defeasance or other acquisition or retirement of Junior Debt is made within 5 Business Days of the end of such fiscal quarter, and (y) no Event of Default shall have occurred and be continuing prior to or after giving effect to such repayment, prepayment, redemption, repurchase, defeasance or other acquisition or retirement of Junior Debt or would result as a consequence thereof; and

(xiii)     Restricted Payments consisting of regular cash dividends made by the Borrower from free cash flow (as determined by Board of Directors of the Borrower).

*provided, however*, that any Restricted Payments made with property other than cash shall be calculated using the Fair Market Value of such property.

SECTION 5.08.     Dividend and Other Payment Restrictions Affecting Subsidiaries. The Borrower shall not, and shall not permit any of its Restricted Subsidiaries to, directly or indirectly, create or otherwise cause or suffer to exist or become effective any consensual encumbrance or consensual restriction on the ability of any Restricted Subsidiary to:

(a)     (i) pay dividends or make any other distributions to the Borrower or any of its Restricted Subsidiaries (1) on its Capital Stock; or (2) with respect to any other interest or participation in, or measured by, its profits; or (ii) pay any Indebtedness owed to the Borrower or any of its Restricted Subsidiaries;

(b)     make loans or advances to the Borrower or any of its Restricted Subsidiaries;

(c)     sell, lease or transfer any of its properties or assets to the Borrower or any of its Restricted Subsidiaries; or

(d)     grant Liens pursuant to the Security Documents on any of their assets to be pledged as Collateral hereunder;

except in each case (in the case of clause (d) above, solely in the case of clauses (iii), (iv), (vii), (viii), (ix), (x), (xi), (xii) and, with respect to the foregoing clauses, (xvii) below) for such encumbrances or restrictions existing under or by reason of:

(i)     (x) contractual encumbrances or restrictions in effect on the Closing Date, including pursuant to the FLTL Facility (including any guarantee thereof) and any Hedging Obligations (including any guarantee thereof) incurred in connection with such facilities and (y) contractual encumbrances or restrictions pursuant to the FLTL Credit Agreement and FLTL Credit Agreement Documents and, in each case, any similar contractual encumbrances effected by any amendments, modifications, restatements, renewals, supplements, refundings, replacements or refinancings of such agreements or instruments;

(ii)     this Agreement or the Guarantee;

(iii)     applicable law or any applicable rule, regulation or order;

(iv)     any agreement or other instrument of a Person acquired by the Borrower or any Restricted Subsidiary which was in existence at the time of such acquisition (but not created in contemplation thereof or to provide all or any portion of the funds or credit support utilized to

85

consummate such acquisition), which encumbrance or restriction is not applicable to any Person, or the properties or assets of any Person, other than the Person and its Subsidiaries, or the property or assets of the Person and its Subsidiaries, so acquired;

(v)    contracts or agreements for the sale of assets, including any restriction with respect to the Borrower or any Restricted Subsidiary imposed pursuant to an agreement entered into for the sale or disposition of the Capital Stock or assets of the Borrower or any such Restricted Subsidiary to the extent such sale or disposition would be permitted hereunder;

(vi)    secured Indebtedness otherwise permitted to be Incurred pursuant to Section 5.06 that limit the right of the debtor to dispose of the assets securing such Indebtedness;

(vii)    restrictions on cash or other deposits or net worth imposed by customers under contracts entered into in the ordinary course of business;

(viii)    customary provisions in joint venture agreements and other similar agreements entered into in the ordinary course of business;

(ix)    purchase money obligations for property acquired, Capitalized Lease Obligations and obligations in respect of indebtedness permitted to be incurred under Section 5.06(b)(xviii) that impose restrictions of the nature discussed in clause (c) above on the property so acquired;

(x)    customary provisions contained in leases, licenses and other similar agreements entered into in the ordinary course of business;

(xi)    in the case of clause (c) above, any encumbrance or restriction that restricts in a customary manner the subletting, assignment or transfer of any property or asset that is subject to a lease (including leases governing leasehold interests or Farm-In Agreements or Farm-Out Agreements relating to leasehold interests in Oil and Gas Properties), license or similar contract, or the assignment or transfer of any such lease (including leases governing leasehold interests or Farm-In Agreements or Farm-Out Agreements relating to leasehold interests in Oil and Gas Properties), license (including without limitations, licenses of intellectual property) or other contracts;

(xii)    any encumbrance or restriction of a Receivables Subsidiary effected in connection with a Qualified Receivables Financing; *provided, however*, that such restrictions apply only to such Receivables Subsidiary;

(xiii)    other Indebtedness, Disqualified Stock or Preferred Stock (A) of the Borrower or any Restricted Subsidiary that is a Subsidiary Guarantor or a Foreign Subsidiary or (B) of any Restricted Subsidiary that is not a Subsidiary Guarantor or a Foreign Subsidiary so long as such encumbrances and restrictions contained in any agreement or instrument will not materially affect the Borrower's ability to make anticipated principal or interest payments on the Loans (as determined in good faith by the Borrower), *provided* that in the case of each of clauses (A) and (B), such Indebtedness, Disqualified Stock or Preferred Stock is permitted to be Incurred subsequent to the Closing Date not in violation of Section 5.06;

(xiv)    any Restricted Investment not prohibited by Section 5.07 and any Permitted Investment;

(xv)    any customary encumbrances or restrictions imposed pursuant to any agreement of the type described in the definition of "Permitted Business Investment";

86

(xvi)     any agreements entered into with respect to any sale, transfer, lease or other disposition permitted by Section 5.09 and applicable solely to assets under such sale, transfer, lease or other disposition; or

(xvii)     any encumbrances or restrictions of the type referred to in clauses (a), (b) or (c) above imposed by any amendments, modifications, restatements, renewals, increases, supplements, refundings, replacements or refinancings of the contracts, instruments or obligations referred to in clauses (i) through (xvi) above; *provided* that such amendments, modifications, restatements, renewals, increases, supplements, refundings, replacements or refinancings are, in the good faith judgment of the Borrower, no more restrictive with respect to such dividend and other payment restrictions than those contained in the dividend or other payment restrictions prior to such amendment, modification, restatement, renewal, increase, supplement, refunding, replacement or refinancing.

For purposes of determining compliance with this Section 5.08, (i) the priority of any Preferred Stock in receiving dividends or liquidating distributions prior to dividends or liquidating distributions being paid on common stock shall not be deemed a restriction on the ability to make distributions on Capital Stock and (ii) the subordination of loans or advances made to the Borrower or a Restricted Subsidiary to other Indebtedness Incurred by the Borrower or any such Restricted Subsidiary shall not be deemed a restriction on the ability to make loans or advances.

SECTION 5.09.     Asset Sales.

(a)     The Borrower shall not, and shall not permit any Restricted Subsidiary to, cause or make any Asset Sale.

(b)     The limitations set forth in Section 5.09(a) shall not apply to:

(i)     Asset Sales constituting Mexico Liquidity Events;

(ii)     Asset Sales of Proved Developed Producing Reserves, Proved Developed Non-Producing Reserves (but excluding any Mexico Assets) and, in each case, infrastructure assets related thereto in an aggregate amount not to exceed $34,500,000;

(iii)     Asset Sales of any Oil and Gas Property or interest therein to which no proved reserves are attributable at the time of such disposition; provided that no a Default or Event of Default has occurred and is continuing or would result therefrom;

(iv)     any exchange of assets (including a combination of assets and Cash Equivalents) other than assets constituting Proved Developed Producing Reserves, Proved Developed Non-Producing Reserves, related infrastructure assets and Mexico Assets, for assets related to a Similar Business of comparable or greater market value or usefulness to the business of the Borrower and the Restricted Subsidiaries as a whole, as determined in good faith by the Borrower; provided that any exchange pursuant to this clause (iv) shall only be permitted so long as no Default or Event of Default has occurred and is continuing or would result therefrom;

(v)     other Asset Sales so long as (x) the aggregate amount of Asset Sales pursuant to this clause (v) after the Closing Date does not exceed $115,000,000, (y) at the time of such Asset Sale, no Event of Default has occurred and is continuing and (z) at least 85% of the consideration therefor received by the Borrower or such Restricted Subsidiary, as the case may be, is in the form of cash and/or Cash Equivalents;

*provided* that, in each case of the foregoing, such Asset Sale shall only be permitted (A) solely to the extent occurring pursuant to clause (i), (ii), (iii) or (v) above, if for a consideration no less than Fair

87

Market Value, (B) so long as the Borrower has complied with the notice requirements of <u>Section 5.01(c)(iii)</u> and (C) so long as the Borrower, or other relevant Credit Party, shall apply the proceeds therefrom to the prepayment of the Loans to the extent required pursuant to <u>Section 2.13.</u>

(c)    Solely for the purposes of <u>clause (b)(v)</u> above, the following additional forms of consideration shall qualify as Cash Equivalents;

(i)    any liabilities (as shown on the Borrower's or a Restricted Subsidiary's most recent balance sheet or in the notes thereto) of the Borrower or any Restricted Subsidiary (other than liabilities that are by their terms subordinated to the Loans or any Guarantee) that are assumed by the transferee of any such assets or that are otherwise cancelled or terminated in connection with the transaction with such transferee; and

(ii)    with respect to any Asset Sale of Oil and Gas Properties by the Borrower or any Restricted Subsidiary, the costs and expenses related to the exploration, development, completion or production of such Oil and Gas Properties and activities related thereto which are assumed by the transferee (or an Affiliate thereof) substantially contemporaneously with such Asset Sale.

SECTION 5.10.    <u>Transactions with Affiliates</u>.

(a)    The Borrower shall not, and shall not permit any of its Restricted Subsidiaries to make any payment to, or sell, lease, transfer or otherwise dispose of any of its properties or assets to, or purchase any property or assets from, or enter into or make or amend any transaction or series of transactions, contract, agreement, understanding, loan, advance or guarantee with, or for the benefit of, any Affiliate of the Borrower (each of the foregoing, an "<u>Affiliate Transaction</u>") unless (i) such Affiliate Transaction is on terms that are not materially less favorable to the Borrower or the relevant Restricted Subsidiary than those that could have been obtained in a comparable transaction by the Borrower or such Restricted Subsidiary with an unrelated Person and (ii) the Borrower has provided the Administrative Agent (for further distribution to the Lenders) with written notice of such Affiliate Transaction.

(b)    The provisions of <u>Section 5.10(a)</u> shall not apply to the following:

(i)    transactions between or among the Borrower and/or any Subsidiary Guarantor (or an entity that becomes a Restricted Subsidiary as a result of such transaction);

(ii)    Restricted Payments permitted by <u>Section 5.07</u> and Permitted Investments;

(iii)    the payment of reasonable and customary fees and reimbursement of expenses paid to, and indemnity provided on behalf of, current or former officers, directors, employees or consultants of the Borrower, any Restricted Subsidiary, or any direct or indirect parent of the Borrower;

(iv)    payments or loans (or cancellation of loans) to officers, directors, employees or consultants which are approved by a majority of the Board of Directors of the Borrower in good faith;

(v)    any agreement as in effect as of the Closing Date and specified on <u>Schedule 5.10</u>;

(vi)    the execution of the Transactions, the performance of the obligations under the Loan Documents, the FLTL Credit Agreement and the related transactions, the transactions contemplated by the Plan of Reorganization, and the payment of all fees and expenses related to the Transactions, including fees to the Investors;

(vii)    any transaction effected as part of a Qualified Receivables Financing;

<div align="center">88</div>

(viii)    the issuance of Equity Interests (other than Disqualified Stock) of the Borrower to any Person;

(ix)    the issuances of securities or other payments, awards or grants in cash, securities or otherwise pursuant to, or the funding of, employment arrangements, stock option and stock ownership plans or similar employee benefit plans approved by the Board of Directors of the Borrower or any direct or indirect parent of the Borrower or of a Restricted Subsidiary, as appropriate, in good faith;

(x)    the entering into of any tax sharing agreement or arrangement that complies with clause (iv) of Section 5.07(b);

(xi)    any contribution to the capital of the Borrower;

(xii)    transactions permitted by, and complying with, the provisions of Section 5.11;

(xiii)    transactions between the Borrower or any of its Restricted Subsidiaries and any Person that is an Affiliate solely because a director of such Person is also a director of the Borrower or any direct or indirect parent of the Borrower; *provided*, *however*, that such director abstains from voting as a director of the Borrower or such direct or indirect parent, as the case may be, on any matter involving such other Person;

(xiv)    pledges of Equity Interests of the Closing Date Unrestricted Subsidiary;

(xv)    any employment agreements entered into by the Borrower or any of its Restricted Subsidiaries in the ordinary course of business;

(xvi)    payments by the Borrower or any of its Restricted Subsidiaries to any of the Investors made for any financial advisory, financing, underwriting or placement services or in respect of other investment banking activities, including in connection with acquisitions or divestitures, which payments are approved by a majority of the Board of Directors of the Borrower in good faith;

(xvii)    transactions undertaken in good faith (as certified by a responsible financial or accounting officer of the Borrower in an Officers' Certificate) for the purpose of improving the consolidated tax efficiency of the Borrower and its Subsidiaries and not for the purpose of circumventing any covenant set forth in this Agreement;

(xviii)    customary agreements and arrangements with oil and gas royalty trusts and master limited partnership agreements that comply with the affiliate transaction provisions of such royalty trust or master limited partnership agreement;

(xix)    sales or conveyances of net profits interests for cash at Fair Market Value allowed under Section 5.09;

(xx)    any transaction in respect of which the Borrower delivers to the Administrative Agent a letter addressed to the board of directors or managers of the Borrower from an accounting, appraisal or investment banking firm, in each case of nationally-recognized standing that is in the good faith determination of the Borrower qualified to render such letter, which letter states that such transaction is (A) fair, from a financial point of view, to the Borrower or such Restricted Subsidiary or (B) on terms, taken as a whole, that are no less favorable to the Borrower or such Restricted Subsidiary, as applicable, than would be obtained in a comparable arm's length transaction with a person that is not an Affiliate; and

89

(xxi)    intellectual property licenses in the ordinary course of business.

SECTION 5.11.    Mergers, Etc.  The Borrower will not, and will not permit any Restricted Subsidiary to, merge into or with or consolidate with any other Person, or permit any other Person to merge into or consolidate with it, or sell, transfer, lease or otherwise dispose of (whether in one transaction or in a series of transactions) all or substantially all of its property to any other Person (whether now owned or hereafter acquired) (any such transaction, a "consolidation"), or liquidate or dissolve; provided that, so long as no Event of Default has occurred and is then continuing:

(a)    any Restricted Subsidiary may be liquidated or may participate in a merger or consolidation with, or dispose of all or substantially all of its assets to, the Borrower or a Subsidiary Guarantor (provided that the Borrower or a Subsidiary Guarantor shall be the continuing or surviving entity in any such transaction involving the Borrower or a Subsidiary Guarantor);

(b)    any Restricted Subsidiary that is not a Subsidiary Guarantor may be liquidated or may participate in a merger or consolidation with, or dispose of all or substantially all of its assets to, any other Restricted Subsidiary that is not a Subsidiary Guarantor or another Person who becomes a Restricted Subsidiary that is not a Subsidiary Guarantor concurrent with such transaction;

(c)    any Subsidiary Guarantor may participate in a merger or consolidation with, or dispose of all or substantially all of its assets to, another Subsidiary Guarantor;

(d)    any Restricted Subsidiary may liquidate or dissolve so long as its assets (if any) are distributed to the Borrower or a Subsidiary Guarantor prior to such liquidation or dissolution; or

(e)    any Restricted Subsidiary may merge or consolidate with any other Person in order to effect a Restricted Investment not prohibited by Section 5.07; provided that the continuing or surviving Person shall be a Restricted Subsidiary or the Borrower, which together with each of its Restricted Subsidiaries, shall have complied with the requirements of Section 5.12 and Section 5.17 to the extent required thereby.

SECTION 5.12.    Future Guarantors.  The Borrower shall cause (a) each Restricted Subsidiary (other than an Excluded Subsidiary), formed or acquired after the Closing Date, (b) each other Subsidiary that guarantees any FLTL Facility or any other Material Indebtedness and (c) as required by Section 5.29, the Closing Date Unrestricted Subsidiary, to execute and deliver to the Administrative Agent (which shall be within thirty (30) days (or such later date as the Required Lenders may reasonably agree) of formation or acquisition in the case of clause (a), concurrently with the provision of any such guarantee in the case of clause (b) and within the time period set forth in Section 5.29 in the case of clause (c)) a joinder agreement to the Guarantee pursuant to which such Restricted Subsidiary will guarantee payment of the Loans on the terms and conditions set forth in this Agreement, and a joinder agreement to each applicable Security Document, and, if required by the Intercreditor Agreement, a joinder to such Intercreditor Agreement; provided, that, at its option, the Borrower shall be permitted to cause any other Affiliate to provide a guarantee pursuant to the terms of this Section 5.12. Each Guarantor shall be released in accordance with Section 8.20.

SECTION 5.13.    Liens.  The Borrower shall not, and shall not permit any Restricted Subsidiary to create, Incur or suffer to exist any Lien on any asset or property of the Borrower or such Restricted Subsidiary, other than Permitted Liens. For purposes of determining compliance with this Section 5.13, (A) a Lien securing an item of Indebtedness need not be permitted solely by reference to one category of permitted Liens described in the definition of "Permitted Liens" but may be permitted in part under any combination thereof and (B) in the event that a Lien securing an item of Indebtedness, Disqualified Stock or Preferred Stock (or any portion thereof) meets the criteria of one or more of the categories of permitted Liens described in the definition of "Permitted Liens", the Borrower shall, in its sole discretion, classify or divide, such Lien securing such item of Indebtedness (or any portion thereof) in any manner that complies with this Section 5.13 and will only be required to include the amount and type of such Lien or such item of Indebtedness secured by such Lien in one of the clauses of the

definition of "Permitted Liens" and such Lien securing such item of Indebtedness will be treated as being Incurred or existing pursuant to only one of such clauses.

SECTION 5.14.    <u>Compliance with Material Contracts.</u> The Borrower shall, and shall cause each Restricted Subsidiary to, comply with and maintain in full force and effect each Material Contract, except where the failure to comply would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect; <u>provided</u>, that the Credit Parties and their Subsidiaries may contest the terms and conditions of any such Material Contract in good faith through applicable proceedings so long as adequate reserves are maintained in accordance with GAAP**.**

SECTION 5.15.    <u>Existence; Business and Properties</u>.   The Borrower shall, and shall cause each Restricted Subsidiary to:

(a)    Do or cause to be done all things necessary to preserve, renew and keep in full force and effect its legal existence except as otherwise permitted by <u>Section 5.11</u>.

(b)    (i) Do or cause to be done all things necessary to obtain, preserve, renew, extend and keep in full force and effect the permits, franchises, authorizations, intellectual property, licenses and rights with respect thereto necessary in all material respects to the normal conduct of its business and (ii) at all times maintain and preserve all material property necessary to the normal conduct of its business and keep such property in good repair, working order and condition and from time to time make, or cause to be made, all needful and proper repairs, renewals, additions, improvements and replacements thereto necessary in order that the business carried on in connection therewith, if any, may be properly conducted in all material respects at all times (in each case except as permitted by this Agreement).

SECTION 5.16.    <u>Maintenance of Insurance</u>.

(a)    The Borrower and its Restricted Subsidiaries shall maintain or cause to be maintained, with financially sound and reputable insurers, (i) directors and officers insurance, and (ii) such casualty insurance, public liability insurance, third party property damage insurance with respect to liabilities, losses or damage in respect of the assets, properties and businesses of the Borrower and its Restricted Subsidiaries as may customarily be carried or maintained under similar circumstances by Persons of established reputation engaged in similar businesses, in each case in such amounts (giving effect to self insurance), with such deductibles, covering such risks and otherwise on such terms and conditions as shall be customary for such Persons.  Each such policy of insurance shall (i) in the case of each liability insurance policy, name Collateral Agent, for the benefit of Secured Parties, as an additional insured thereunder as its interests may appear, (ii) in the case of each casualty insurance policy, contain a lender loss payable clause or endorsement, satisfactory in form and substance to Required Lenders, that names Collateral Agent, for the benefit of Secured Parties, as the lender loss payee thereunder, and (iii) in each case, provide for at least thirty days' prior written notice to Collateral Agent of any modification or cancellation of such policy.

(b)    If any improvements located on any Mortgaged Property are at any time located in an area identified by the Federal Emergency Management Agency (or any successor agency) as a Special Flood Hazard Area with respect to which flood insurance has been made available under the National Flood Insurance Act of 1968 (as now or hereafter in effect or successor act thereto), then the Borrower shall, or shall cause the applicable Credit Party to (i) maintain, or cause to be maintained, with a financially sound and reputable insurer, flood insurance in an amount and otherwise sufficient to comply with all applicable rules and regulations promulgated pursuant to the Flood Insurance Laws and (ii) deliver to the Administrative Agent evidence of such compliance.

(c)    In connection with the covenants set forth in this <u>Section 5.16</u>, it is understood and agreed that:

(i)       none of the Administrative Agent, the Lenders and their respective agents or employees shall be liable for any loss or damage insured by the insurance policies required to be maintained under this <u>Section 5.16</u>, it being understood that (A) the Credit Parties shall look solely to their insurance companies or any other parties other than the aforesaid parties for the recovery of such loss or damage and (B) such insurance companies shall have no rights of subrogation against the Administrative Agent, the Lenders or their agents or employees.  If, however, the insurance policies, as a matter of the internal policy of such insurer, do not provide waiver of subrogation rights against such parties, as required above, then the Borrower, on behalf of itself and on behalf of each of its Subsidiaries, hereby agrees, to the extent permitted by law, to waive, and further agrees to cause each of its Subsidiaries to waive, its right of recovery, if any, against the Administrative Agent, the Lenders and their agents and employees; and

(ii)       the designation of any form, type or amount of insurance coverage by the Administrative Agent under this <u>Section 5.16</u> shall in no event be deemed a representation, warranty or advice by the Administrative Agent or the Lenders that such insurance is adequate for the purposes of the business of the Borrower and the Restricted Subsidiaries or the protection of their properties.

SECTION 5.17.      <u>Additional Collateral</u>.

(a)       In connection with the delivery of the Reserve Reports required by <u>Sections 5.26(a)</u> and <u>5.26(c)</u>, the Borrower shall review such Reserve Report and the list of current Mortgaged Properties to ascertain whether or not the PV-10 of the Mortgaged Properties evaluated in such Reserve Report represent at least 95% of the PV-10 of the Oil and Gas Properties of the Credit Parties after giving effect to exploration and production activities, acquisitions, dispositions and production. In the event the PV-10 of the Mortgaged Properties do not represent 95% of such PV-10 of the Oil and Gas Properties of the Credit Parties, the Borrower or the appropriate Subsidiary Guarantor shall, within 45 days of the date of delivery of such Reserve Report (or such later date as the Required Lenders shall reasonably agree), execute and deliver mortgages, deeds of trust, security instruments, financing statements and other Security Documents as shall be reasonably necessary to vest in the Collateral Agent a perfected security interest, subject only to Permitted Liens, such that after giving effect thereto, the PV-10 of the Mortgaged Properties will represent at least 95% of the PV-10 of the Oil and Gas Properties of the Credit Parties (but subject to the limitations described in <u>Article VIII</u>, the Security Documents, the Intercreditor Agreement and limitations under applicable local law).

(b)       Upon any Restricted Subsidiary becoming a Subsidiary Guarantor as contemplated by <u>Section 5.12</u> or the acquisition by the Borrower or any Subsidiary Guarantor of any after-acquired property (other than Excluded Assets), or upon any additional Restricted Subsidiary becoming a Subsidiary Guarantor that has after-acquired property (other than Excluded Assets), the Borrower or such Subsidiary Guarantor shall within 45 days (or such later date as the Required Lenders shall reasonably agree) of the acquisition of such property (or, in the case of a person that becomes a Subsidiary Guarantor as contemplated by <u>Section 5.12</u>, within the time period for such person becoming a Subsidiary Guarantor set forth therein) execute and deliver such mortgages, deeds of trust, security instruments, financing statements and other Security Documents as shall be reasonably necessary to vest in the Collateral Agent a perfected second-priority security interest, subject only to Permitted Liens, in such after-acquired property (other than Excluded Assets) and to have such after-acquired property (other than Excluded Assets) (but subject to the limitations described in <u>Article VIII</u>, the Security Documents, the Intercreditor Agreement and limitations under applicable local law) added to the Collateral, and thereupon all provisions of this Agreement relating to the Collateral shall be deemed to relate to such after-acquired property (other than Excluded Assets) to the same extent and with the same force and effect; *provided* that no such mortgages, deeds of trust, security instruments, financing statements and other Security Documents shall be required to be executed and delivered by the Borrower or such Subsidiary Guarantor if at least 95% of the PV-10 of the Credit Parties' total Proved Reserves shall constitute Collateral and be subject to any applicable mortgages, deeds of trust, security instruments, financing statements and other Security Documents in connection therewith.

92

SECTION 5.18.     Payment of Taxes, etc.  The Borrower shall, and shall cause each Restricted Subsidiary to, pay, discharge or otherwise satisfy its obligations in respect of all material Taxes, before the same shall become delinquent or in default, except where the amount or validity thereof is being contested in good faith by appropriate proceedings and the Borrower or a Subsidiary thereof has set aside on its books adequate reserves therefor in accordance with GAAP (or in the case of a Foreign Subsidiary, the comparable accounting principles in the relevant jurisdiction).

SECTION 5.19.     Compliance with Laws.  Each of Holdings, the Borrower and its Subsidiaries shall comply in all material respects with all Requirements of Law (it being understood, in the case of statutes, regulations and orders of, and all applicable restrictions imposed by, all Governmental Authorities that are specifically referred to in any other provision of this Agreement, the Credit Parties shall also be required to represent and/or comply with, as applicable, the express terms of such provision). Holdings, the Borrower and its Subsidiaries shall comply in all material respects with all Sanctions, Anti-Corruption Laws and Anti-Terrorism and Anti-Money Laundering Laws and maintain policies and procedures, such that, at all times, the representations and warranties made in Section 3.17 are true and correct.

SECTION 5.20.     Further Instruments and Acts.  At any time or from time to time upon the reasonable request of the Administrative Agent, each Credit Party will, at its expense, promptly execute, acknowledge and deliver such further documents and do such other acts and things as the Administrative Agent or the Collateral Agent may reasonably request in order to effect fully the purposes of the Loan Documents or to perfect or renew the rights of the Collateral Agent for the benefit of the Secured Parties with respect to the Collateral (or with respect to any additions thereto or replacements or proceeds thereof or with respect to any other property or assets hereafter acquired by Holdings or any Subsidiary that may be deemed to be part of the Collateral).  In furtherance and not in limitation of the foregoing, each Credit Party shall take such actions as the Administrative Agent or the Collateral Agent may reasonably request from time to time to ensure that the Obligations are guaranteed by the Guarantors and are secured by a second-priority Lien (subject to Permitted Liens) on all of the Collateral.

Notwithstanding the foregoing provisions of this Section 5.20 or anything in this Agreement or any other Loan Document to the contrary: (A) Liens required to be granted from time to time shall be subject to exceptions and limitations set forth in the Collateral Agreement and the other Loan Documents and, to the extent appropriate in any applicable jurisdictions, as agreed between the Required Lenders in their Permitted Business Judgment and the Borrower and (B) the Collateral shall not include any Excluded Assets.

SECTION 5.21.     Books, Records and Inspections.

(a)     The Borrower will, and will cause each Restricted Subsidiary to, permit officers and designated representatives of the Administrative Agent or officers and designated representatives of the Required Lenders (as accompanied by the Administrative Agent), upon prior written notice to visit and inspect any of the properties or assets of the Borrower or such Restricted Subsidiary in whomsoever's possession to the extent that it is within such party's control to permit such inspection (and shall use commercially reasonable efforts to cause such inspection to be permitted to the extent that it is not within such party's control to permit such inspection), and to examine the financial records of the Borrower and any such Restricted Subsidiary and discuss the affairs, finances, accounts and condition of the Borrower or any such Restricted Subsidiary with its and their officers and independent accountants therefor, in each case of the foregoing upon reasonable advance notice to the Borrower, all at such reasonable times and intervals during normal business hours and to such reasonable extent as the Administrative Agent or the Required Lenders may desire (and subject, in the case of any such meetings or advice from such independent accountants, to such accountants' customary policies and procedures); *provided* that, excluding any such visits and inspections during the continuation of an Event of Default, (i) only the Administrative Agent on behalf of the Required Lenders accompanied by officers and designated representatives of the Required Lenders may exercise rights of the Administrative Agent and the Lenders under this Section 5.21, and (ii) only one such visit per fiscal year shall be at the Borrower's expense (limited, in the case of such visit, to the expenses incurred by the Administrative Agent); *provided*, *further*, that when an Event of Default has

occurred and is continuing, the Administrative Agent (or any of its representatives or independent contractors) or any representative of the Required Lenders may do any of the foregoing at the expense of the Borrower at any time during normal business hours and upon reasonable advance notice. The Administrative Agent and the Required Lenders shall give the Borrower the opportunity to participate in any discussions with the Borrower's independent public accountants. Notwithstanding anything to the contrary in this Section 5.21, neither the Borrower nor any Restricted Subsidiary will be required to disclose, permit the inspection, examination or making copies or abstracts of, or discussion of, any document, information or other matter (x) that constitutes non-financial trade secrets or non-financial proprietary information, (y) in respect of which disclosure to the Administrative Agent or any Lender (or their respective representatives or contractors) is prohibited by any Requirement of Law or any binding agreement or (z) that is subject to attorney-client or similar privilege or constitutes attorney work product; provided that, to the extent any information is withheld pursuant to the foregoing, the Borrower agrees to provide written notice of the reason for such information being withheld.

(b)    The Borrower will, and will cause each of the Restricted Subsidiaries to, keep proper books of record and accounts in conformity in all material respects with GAAP.

SECTION 5.22.    ERISA.

(a)    Promptly after the Borrower knows or has reason to know of the occurrence of any ERISA Event that, individually or in the aggregate (including in the aggregate such ERISA Events previously disclosed or exempt from disclosure hereunder, to the extent the liability therefor remains outstanding), would be reasonably likely to result in a Material Liability to any Credit Party, the Borrower will deliver to the Administrative Agent a certificate of an Authorized Officer or any other senior officer of the Borrower setting forth details as to such occurrence and the action, if any, that Holdings, the Borrower, any of their Restricted Subsidiaries or an ERISA Affiliate, as applicable, is required or proposes to take, together with any notices (required, proposed or otherwise) given to or filed with or by Holdings, the Borrower, any such Restricted Subsidiary or any such ERISA Affiliate, the PBGC, a Plan participant (other than notices relating to an individual participant's benefits) or the Plan administrator with respect thereto. Promptly after the same is available to Holdings, the Borrower, any of their Restricted Subsidiaries or any ERISA Affiliate, the Borrower will deliver copies of (i) each Schedule SB (Actuarial Information) to the annual report (Form 5500 Series) filed by Holdings, the Borrower, any of their Restricted Subsidiaries or any ERISA Affiliate with the Internal Revenue Service, the Department of Labor or any other Governmental Authority with respect to each Plan, (ii) all notices received by Holdings, the Borrower, any of their Restricted Subsidiaries or any ERISA Affiliate from a Multiemployer Plan sponsor concerning an ERISA Event; and (iii) copies of such other documents or governmental reports or filings relating to any Employee Benefit Plan as Administrative Agent shall reasonably request.

(b)    Promptly following any request therefor, the Borrower will deliver to the Administrative Agent copies of (i) any documents described in Section 101(k) of ERISA that Holdings, the Borrower, any of their Restricted Subsidiaries or any ERISA Affiliate may request with respect to any Multiemployer Plan and (ii) any notices described in Section 101(l) of ERISA that Holdings, the Borrower, any of their Restricted Subsidiaries or any ERISA Affiliate may request with respect to any Multiemployer Plan; provided that if Holdings, the Borrower, any of their Restricted Subsidiaries or any ERISA Affiliate has not requested such documents or notices from the administrator or sponsor of the applicable Multiemployer Plan, Holdings, the Borrower, the applicable Restricted Subsidiaries or the applicable ERISA Affiliates shall promptly make a request for such documents or notices from such administrator or sponsor and shall provide copies of such documents and notices promptly after receipt thereof.

SECTION 5.23.    [Reserved].

SECTION 5.24.    Lender Meetings. The Borrower shall upon the reasonable request of the Administrative Agent (acting upon the reasonable request of the Required Lenders), on a date to be mutually agreed upon by the Borrower and the Administrative Agent following the end of each fiscal year and the end of each of the first three fiscal quarters of each fiscal year, in each case of Borrower (but, in any event, no earlier

94

Case 20-33948   Document 1562-2   Filed in TXSB on 06/15/21   Page 549 of 1636

than the Business Day following the delivery of annual or quarterly financial statements, as applicable, pursuant to Section 5.01(a) or (b), for such fiscal year or fiscal quarter, as the case may be), to participate in a conference call with the Administrative Agent and the Lenders to discuss the financial condition and results of operations of the Borrower and its consolidated Subsidiaries for such fiscal quarter (and for the period from the beginning of the current fiscal year to the end of such fiscal quarter) or for such fiscal year, as the case may be; provided, that, to the extent the [FLTL Administrative Agent] requests a lender meeting pursuant to Section 5.24 of the FLTL Credit Agreement, the Borrower may (in its sole discretion) combine such lender meeting with any requested lender meeting under this Section 5.24.

SECTION 5.25.    Limitations on Amendments.

(a)    The Borrower shall not and will cause its Restricted Subsidiaries not to amend, supplement, enter into any consent or waiver in respect of or otherwise modify Junior Debt or any other Material Indebtedness, in any manner that would be materially adverse to the interests of the Lenders or not permitted under the terms of the applicable Intercreditor Agreement.

(b)    No Credit Party shall (a) amend or permit any amendments, supplements, waivers or consents under or other modifications to any Credit Party's organizational documents; or (b) amend, terminate, enter into any consent or waiver or other modification of, or permit any amendment, termination, waiver, consent or other modification of any provision of, any Material Contract, if, in either case, such amendment, termination, waiver, consent or other modification would be materially adverse to (x) the Lenders or (y) any Credit Party.

SECTION 5.26.    Reserve Reports.

(a)    On or before the date that is 90 days after the end of each fiscal year (or such later date as the Required Lenders may agree), the Borrower shall deliver a Reserve Report with an "as of" date of December 31st of the preceding year.

(b)    On or before the date of delivery of financial statements required with respect to the first fiscal quarter of any fiscal year pursuant to Section 5.01(b), the Borrower shall deliver a "roll-forward" of the Reserve Report most recently delivered pursuant to Section 5.26(a) reflecting any changes between the "as-of" date of such Reserve Report and the last day of such fiscal quarter.

(c)    On or before the date of delivery of financial statements required with respect to the second fiscal quarter of any fiscal year pursuant to Section 5.01(b), the Borrower shall deliver a Reserve Report with an "as of" date of June 30th of such fiscal year.

(d)    On or before the date of delivery of financial statements required with respect to the third fiscal quarter of any fiscal year pursuant to Section 5.01(b), the Borrower shall deliver a "roll-forward" of the Reserve Report most recently delivered pursuant to Section 5.26(c) reflecting any changes between the "as-of" date of such Reserve Report and the last day of such fiscal quarter.

(e)    All Reserve Reports may be prepared internally by petroleum engineers that are employees of the Borrower, any Restricted Subsidiary, or any of each of their respective Affiliates; provided, that, notwithstanding anything in the foregoing to the contrary, at least one Reserve Report prepared pursuant to Section 5.26(a) or (c) above per fiscal year shall be prepared or audited by an Approved Petroleum Engineer that has audited at least (i) 80% of the Proved Reserves by value and (ii) 80% of Proved Developed Producing Reserves by value.

(f)    With the delivery such information specified in the foregoing clauses (a)-(f), the Borrower shall provide to the Administrative Agent a certificate from an Authorized Officer certifying that in all material respects: (A) the information delivered in connection therewith is true and correct (other than forecasted or forward-looking information), (B) the Credit Parties own good and defensible title to the Oil and

95

Error! Unknown document property name.
WEIL:\97986321\6\45327.0007

Gas Properties evaluated in such engineering information and such Properties are free of all Liens except for Permitted Liens, (C) except as set forth on an exhibit to the certificate, on a net basis there are no gas imbalances, take or pay or other prepayments in excess of the volume specified in Section 5.31 with respect to the Oil and Gas Properties evaluated in such Reserve Report which would require any Credit Party to deliver Hydrocarbons either generally or produced from such Oil and Gas Properties constituting Proved Reserves at some future time without then or thereafter receiving full payment therefor, (D) none of the Oil and Gas Properties to be evaluated in such Reserve Report have been disposed of since the date of the last certificate delivered pursuant to this Section 5.26(f), except as set forth on an exhibit to the certificate, which certificate shall list all of its Oil and Gas Properties disposed of and in such detail as required by the Administrative Agent in its reasonable discretion, and (E) in the case of delivery pursuant to clause (a) or (c) above, certifying that 95% of the PV-10 of Credit Parties' Oil and Gas Properties evaluated in the related Reserve Report (or roll-forward thereof) are Mortgaged Properties, other than Oil and Gas Properties disclosed on a schedule attached thereto, together with a certification that such Oil and Gas Properties will become Mortgaged Properties in accordance with Section 5.17.

SECTION 5.27.    Holdings Covenant.  Holdings covenants and agrees that, unless the Required Lenders shall otherwise consent in writing, Holdings will not engage at any time in any business or business activity other than (i) ownership of the Equity Interests in the Borrower, together with activities related thereto, (ii) performance of its obligations under and in connection with the Loan Documents and the FLTL Credit Agreement Documents, (iii) issuing, selling and redeeming its Equity Interests, (iv) paying taxes, (v) holding directors' and shareholders' meetings, preparing corporate and similar records and other activities (including the ability to incur fees, costs and expenses relating to such maintenance) required to maintain its corporate or other legal structure or to participate in tax, accounting or other administrative matters as a member of the consolidated group of the Credit Parties, (vi) preparing reports to, and preparing and making notices to and filings with, Governmental Authorities and to its holders of Equity Interests, (vii) receiving, and holding proceeds of, Restricted Payments from the Borrower and the Subsidiaries to the extent not prohibited by Section 5.07 or 5.10, (viii) providing indemnification to officers and directors, (ix) activities permitted hereunder or as otherwise required by Requirements of Law, and (x) activities incidental to the business or activities described in each foregoing clause of this Section 5.27.

SECTION 5.28.    [Reserved].

SECTION 5.29.    Foreign Subsidiaries; Closing Date Unrestricted Subsidiary.

(a)    Other than the Closing Date Unrestricted Subsidiary and any subsidiaries thereof on the Closing Date, the Borrower shall not, and shall not permit any Credit Party, to have any Foreign Subsidiaries.

(b)    If, at any time, the Closing Date Unrestricted Subsidiary shall become a "restricted subsidiary" and/or a "guarantor" under the FLTL Credit Agreement Documents or any other Material Indebtedness of the Credit Parties, such Closing Date Unrestricted Subsidiary shall, concurrent with such event, become a Restricted Subsidiary and, if applicable, a Subsidiary Guarantor under the Loan Documents.

SECTION 5.30.    Account Control Agreements.  The Borrower shall, and shall cause each Credit Party to, (a) provide notice to the Administrative Agent of the opening of any deposit accounts, commodity accounts or securities accounts (other than an Excluded Account) at least five (5) Business Days prior to the opening thereof (or such other date as the Required Lenders may agree in their sole discretion) and (b) cause their respective deposit accounts, commodity accounts or securities accounts (in each case, other than Excluded Accounts) to at all times be subject to Account Control Agreements; provided that solely in the case of any deposit accounts, commodity accounts or securities accounts in existence on the Closing Date, compliance with this clause (b) shall not be required until the date that is 45 days after the Closing Date (or such later date as the Required Lenders may agree in their sole discretion).

SECTION 5.31.     <u>Gas Imbalances, Take-or-Pay or Other Prepayments</u>. The Borrower shall not, and shall not permit any Credit Party to, allow gas imbalances, take-or-pay or other prepayments with respect to the Oil and Gas Properties of the Borrower or any other Credit Party that would require the Borrower or Credit Party to deliver Hydrocarbons at some future time without then or thereafter receiving full payment therefor to exceed 2.5 Bcfe of Hydrocarbon volumes (stated on a gas equivalent basis) in the aggregate for any individual field.

SECTION 5.32.     <u>Marketing of Production</u>. The Borrower shall not, and shall not permit any Credit Party to enter into any material agreement (which is not cancelable on 90 days' notice or less without penalty or detriment) for the sale of production of the Credit Parties' Hydrocarbons at a fixed non-index price (including calls on, or other rights to purchase, production, whether or not the same are currently being exercised) that (i) represents in respect of such agreements 2.5% or more of the Borrower's average monthly production of Hydrocarbon volumes and (ii) has a maturity or expiry date of longer than six months.

SECTION 5.33.     <u>Dutch Distributions</u>. The Borrower shall cause the Closing Date Unrestricted Subsidiary to promptly transfer all amounts received by the Closing Date Unrestricted Subsidiary as a dividend or distribution from Fieldwood Mexico B.V. on account of the Equity Interests of Fieldwood Mexico B.V. held by the Closing Date Unrestricted Subsidiary to a deposit account subject to an Account Control Agreement.

SECTION 5.34.     <u>Post-Closing Obligations</u>.     The Credit Parties will execute and deliver the documents and complete the tasks set forth on <u>Schedule 5.34</u>, in each case within the time limits specified on such schedule (or such longer period as the Required Lenders may agree in their Permitted Business Judgment).

<div align="center">

**ARTICLE VI**

Events of Default

</div>

SECTION 6.01.     <u>Events of Default</u>.

Upon the occurrence and during the continuation of any of the following specified events (each an "<u>Event of Default</u>"),

(a)     the Borrower shall (i) default in the payment when due of any principal of the Loans or (ii) default, and such default shall continue for three or more Business Days, in the payment when due of any interest on the Loans, fees or of any other amounts owing hereunder or under any other Loan Document (other than any amount referred to in <u>clause (i)</u> above),

(b)     any representation, warranty or statement made or deemed made by any Credit Party herein or in any other Loan Document or any certificate delivered or required to be delivered pursuant hereto or thereto shall prove to be untrue in any material respect on the date as of which made or deemed made (or if any representation or warranty is expressly stated to have been made as of a specific date, untrue in any material respect as of such specific date);

(c)     any Credit Party shall (i) default in the due performance or observance by it of any term, covenant or agreement contained in <u>Section 5.01(a)</u>, <u>5.01(b)</u>, <u>5.01(c)(i)(A)</u>, <u>5.01(e)</u>, <u>5.02</u>, <u>5.04</u>, <u>5.06</u>, <u>5.07</u>, <u>5.08</u>, <u>5.09</u>, <u>5.10</u>, <u>5.11</u>, <u>5.12</u>, <u>5.13</u>, <u>5.15</u> (with respect to the Borrower), <u>5.17</u>, <u>5.20</u>, <u>5.26</u>, <u>5.27</u>, <u>5.29</u>, <u>5.30</u> or <u>5.34</u>, (ii) default in the due performance or observance by it of any term, covenant or agreement contained in <u>Section 5.01(c)</u> (other than to the extent referred to in <u>clause (i)</u> of this <u>Section 6.01(c)</u>) and such default shall continue unremedied for a period of at least 5 Business Days, (iii) default in the due performance or observance by it of any term, covenant or agreement contained in <u>Section 5.01</u> (other than those referred to in <u>clause (i)</u> or <u>(ii)</u> of this <u>Section 6.01(c)</u>) and such default shall continue unremedied for a period of at least 15 days or (iv) default in the due performance or observance by it of any term, covenant or agreement (other than those referred to in <u>Section 6.01(a)</u> or <u>(b)</u> or <u>clauses (i)</u>, (ii) and <u>(iii)</u> of this <u>Section 6.01(c)</u>) contained in this Agreement or any

<div align="center">97</div>

Security Document and such default shall continue unremedied for a period of at least 30 days after receipt of written notice thereof by the Borrower from the Administrative Agent;

(d)    (i) the Borrower or any of the Restricted Subsidiaries shall (1) default in any payment with respect to the FLTL Facility or any other Material Indebtedness (other than the Indebtedness described in Section 6.01(a)) beyond the period of grace, if any, provided in the instrument of agreement under which such Indebtedness was created or (2) default in the observance or performance of any agreement or condition relating to the FLTL Facility or such other Material Indebtedness or contained in any instrument or agreement evidencing, securing or relating thereto, or any other event shall occur or condition exist (other than, (x) with respect to Indebtedness in respect of any Hedge Agreements, termination events or equivalent events pursuant to the terms of such Hedge Agreements, (y) secured Indebtedness that becomes due as a result of a disposition (including as a result of Casualty Event) of the property or assets securing such Indebtedness permitted under this Agreement and (z) any Indebtedness outstanding hereunder), the effect of which default or other event or condition is to cause, or (other than with respect to the FLTL Facility) permit the holders of any such Indebtedness to cause, any such Indebtedness to become due or to be repurchased, prepaid, defeased or redeemed (automatically or otherwise), or an offer to repurchase, prepay, defease or redeem such Indebtedness to be made, prior to its stated maturity, unless, in the case of each of the foregoing, such holder or holders shall have (or through its or their trustee or agent on its or their behalf) waived such default in a writing to the Borrower, or (ii) without limiting the provisions of clause (i) above, any such default under any such Material Indebtedness shall cause such Material Indebtedness to be declared to be due and payable, or required to be prepaid other than by a regularly scheduled required prepayment or as a mandatory prepayment (and, (1) with respect to Indebtedness consisting of any Hedge Agreements, other than due to a termination event or equivalent event pursuant to the terms of such Hedge Agreements and (2) any Indebtedness outstanding hereunder), prior to the stated maturity thereof;

(e)    the Borrower or any Subsidiary Guarantor shall commence a voluntary case, proceeding or action concerning itself under (1) Title 11 of the United States Code entitled "Bankruptcy" or any other applicable insolvency, debtor relief, or debt adjustment law (collectively, the "Bankruptcy Code"); or an involuntary case, proceeding or action is commenced against the Borrower or any Subsidiary Guarantor and the petition is not dismissed or stayed within 60 days after commencement of the case, proceeding or action, the Borrower or the applicable Subsidiary Guarantor consents to the institution of such case, proceeding or action prior to such 60-day period, or any order of relief or other order approving any such case, proceeding or action is entered; or a custodian (as defined in the Bankruptcy Code), receiver, receiver manager, trustee, conservator, liquidator, examiner, rehabilitator, administrator, or similar person is appointed for, or takes charge of, the Borrower  or any Subsidiary Guarantor or all or any substantial portion of the property or business thereof; or the Borrower or any Subsidiary Guarantor suffers any appointment of any custodian, receiver, receiver manager, trustee, conservator, liquidator, examiner, rehabilitator, administrator, or the like for it or any substantial part of its property or business to continue undischarged or unstayed for a period of 60 days; or the Borrower or any Subsidiary Guarantor makes a general assignment for the benefit of creditors;

(f)    (i) an ERISA Event shall have occurred that, individually or in the aggregate, results in or would reasonably be expected to result in a Material Liability of Holdings, the Borrower, any of their Subsidiaries or any ERISA Affiliate, or (ii) there exists any fact or circumstance that reasonably could be expected to result in the imposition of a Lien or security interest under Section 430(k) of the Code or ERISA or a violation of Section 436 of the Code;

(g)    the Guarantee or any material provision thereof shall cease to be in full force or effect (other than pursuant to the terms hereof and thereof) or any Guarantor or any other Credit Party shall assert in writing that any such Guarantor's obligations under the Guarantee are not to be in effect or are not to be legal, valid and binding obligations (other than pursuant to the terms hereof or thereof);

(h)    the Collateral Agreement, Mortgage or any other Security Document pursuant to which assets of the Borrower and the Credit Parties with an aggregate Fair Market Value in excess of

$11,500,000 are pledged as Collateral or any material provision thereof shall cease to be in full force or effect (other than pursuant to the terms hereof or thereof) or any grantor thereunder or any other Credit Party shall assert in writing that any grantor's obligations under the Collateral Agreement, the Mortgage or any other Security Document are not in effect or not legal, valid and binding obligations (other than pursuant to the terms hereof or thereof);

(i)     one or more monetary judgments or decrees shall be entered against the Borrower or any of the Restricted Subsidiaries involving a liability of $11,500,000 or more in the aggregate for all such judgments and decrees for the Borrower and the Restricted Subsidiaries (to the extent not paid or covered by insurance provided by a carrier not disputing coverage), which judgments are not discharged or effectively waived or stayed for a period of 60 consecutive days; or

(j)     a Change of Control shall have occurred,

then, and in any such event, and at any time thereafter, if any Event of Default shall then be continuing, the Administrative Agent shall upon the written request of the Required Lenders (subject to Article VII), by written notice to the Borrower, take any or all of the following actions, without prejudice to the rights of the Administrative Agent or any Lender to enforce its claims against the Borrower or any other Credit Party, except as otherwise specifically provided for in this Agreement (*provided* that, if an Event of Default specified in Section 6.01(e) shall occur with respect to the Borrower, the result that would occur upon the giving of written notice by the Administrative Agent as specified below shall occur automatically without the giving of any such notice): (i) declare the principal of and any accrued interest and fees in respect of any or all Loans and any or all Obligations owing hereunder and thereunder to be, whereupon the same shall become, forthwith due and payable without presentment, demand, protest or other notice of any kind, all of which are hereby waived by the Borrower or (ii) exercise rights and remedies in respect of the Collateral in accordance with the Collateral Agreement and/or comparable provisions of any other Security Document.  In addition, after the occurrence and during the continuance of an Event of Default, the Administrative Agent and the Lenders will have all other rights and remedies available at law and equity.

The foregoing shall constitute Events of Default whatever the reason for any such Event of Default and whether it is voluntary or involuntary or is effected by operation of law or pursuant to any judgment, decree or order of any court or any order, rule or regulation of any administrative or governmental body.

SECTION 6.02.     Application of Proceeds.  Any amount received by the Administrative Agent or the Collateral Agent from any Credit Party (or from proceeds of any Collateral) following any acceleration of the Obligations under this Agreement or any Event of Default with respect to the Borrower under Section 6.01(e) shall, subject to the terms of the Intercreditor Agreement, be applied:

First, to payment of that portion of the Loan Obligations constituting fees, indemnities, expenses and other amounts (including fees, disbursements and other charges of counsel payable under Section 7.07 and amounts payable under Article II) payable to the Administrative Agent and/or Collateral Agent in such Person's capacity as such;

Second, to payment of that portion of the Loan Obligations constituting fees, indemnities and other amounts (other than principal and interest) payable to the Lenders (including fees, disbursements and other charges of counsel payable under Section 7.07) arising under the Loan Documents and amounts payable under Article II, ratably among them in proportion to the respective amounts described in this clause Second payable to them;

Third, to payment of that portion of the Loan Obligations constituting accrued and unpaid interest on the Loans, ratably among the Lenders in proportion to the respective amounts described in this clause held by them;

Fourth, to payment of that portion of the Loan Obligations constituting unpaid principal of the Loans, ratably among the Lenders in proportion to the respective amounts described in this clause held by them;

Fifth, to the payment of all other Loan Obligations of the Credit Parties owing under or in respect of the Loan Documents that are due and payable to the Administrative Agent and the other Secured Parties on such date, ratably based upon the respective aggregate amounts of all such Loan Obligations owing to the Administrative Agent and the other Secured Parties on such date; and

Last, the balance, if any, after all of the Loan Obligations have been paid in full, to the Borrower or as otherwise required by Requirements of Law.

SECTION 6.03.    Control by Majority.  The Required Lenders may direct the time, method and place of conducting any proceeding for any remedy available to the Administrative Agent or of exercising any trust or power conferred on the Administrative Agent.  However, the Administrative Agent may refuse to follow any direction that conflicts with law or this Agreement or, subject to Article VII, that the Administrative Agent determines is unduly prejudicial to the rights of any other Lender or that would involve the Administrative Agent in personal liability or expenses for which it is not adequately indemnified in the Administrative Agent's sole discretion; *provided, however*, that the Administrative Agent may take any other action deemed proper by the Administrative Agent that is not inconsistent with such direction.

SECTION 6.04.    Limitation on Suits.  In no event shall the Required Lenders, without the prior written consent of each Lender, direct the Administrative Agent to accelerate and demand payment of the Loans held by one Lender without accelerating and demanding payment of all other Loans.  Each Lender agrees that, except as otherwise provided in any of the Loan Documents and without the prior written consent of the Required Lenders, it will not take any legal action or institute any action or proceeding against any Credit Party with respect to any of the Loan Obligations or Collateral, or accelerate or otherwise enforce its portion of the Loan Obligations.  Without limiting the generality of the foregoing, none of Lenders may exercise any right that it might otherwise have under applicable law to credit bid at foreclosure sales, uniform commercial code sales or other similar sales or dispositions of any of the Collateral except as authorized by the Required Lenders. Notwithstanding anything to the contrary set forth in this Section 6.04 or elsewhere herein, each Lender shall be authorized to take such action to preserve or enforce its rights against any Credit Party where a deadline or limitation period is otherwise applicable and would, absent the taking of specified action, bar the enforcement of Loan Obligations held by such Lender against such Credit Party, including the filing of proofs of claim in any insolvency proceeding.

**ARTICLE VII**

The Agents

SECTION 7.01.    Appointment.

(a)    Each Lender hereby irrevocably designates and appoints the Administrative Agent as the agent of such Lender under this Agreement and the other Loan Documents and irrevocably authorizes the Administrative Agent, in such capacity, to take such action on its behalf under the provisions of this Agreement and the other Loan Documents and to exercise such powers and perform such duties as are expressly delegated to the Administrative Agent by the terms of this Agreement and the other Loan Documents, together with such other powers as are reasonably incidental thereto.  Notwithstanding any provision to the contrary elsewhere in this Agreement, the Administrative Agent shall not have any duties or responsibilities, except those expressly set forth herein and in the other Loan Documents, or any fiduciary relationship with any Lender or any Credit Party, and no implied covenants, functions, responsibilities, duties, obligations or liabilities shall be read into this Agreement or any other Loan Document or otherwise exist against the Administrative Agent.

(b)     The Administrative Agent and each Lender hereby irrevocably designate and appoint the Collateral Agent as the agent with respect to the Collateral, and each of the Administrative Agent and each Lender irrevocably authorizes the Collateral Agent, in such capacity, to take such action on its behalf under the provisions of this Agreement and the other Loan Documents and to execute and deliver the Security Documents (including the amendments thereto in connection with this Agreement) and to exercise such powers and perform such duties as are expressly delegated to the Collateral Agent by the terms of this Agreement and the other Loan Documents, together with such other powers as are reasonably incidental thereto. Notwithstanding any provision to the contrary elsewhere in this Agreement, the Collateral Agent shall not have any duties or responsibilities except those expressly set forth herein and in the other Loan Documents, or any fiduciary relationship with any of the Administrative Agent, the Lenders or the Credit Parties, and no implied covenants, functions, responsibilities, duties, obligations or liabilities shall be read into this Agreement or any other Loan Document or otherwise exist against the Collateral Agent.

(c)     The provisions of this Article VII are solely for the benefit of the Agents and the Lenders, and no Credit Party shall have rights as a third-party beneficiary of any such provisions (other than as set forth in Section 7.09, 7.11 and 7.14). Without limiting the generality of the foregoing, the Agents are expressly authorized to execute each of the Loan Documents and any and all documents (including releases) with respect to the Collateral and any rights of the Secured Parties with respect thereto as contemplated by and in accordance with the provisions of this Agreement and the other Loan Documents, in each case, binding the Lenders to the terms thereof.

SECTION 7.02.     Delegation of Duties. The Administrative Agent and the Collateral Agent may each execute any of its duties under this Agreement and the other Loan Documents by or through agents, sub-agents, employees or attorneys-in-fact (each, a "Subagent") and shall be entitled to advice of counsel concerning all matters pertaining to such duties; provided, however, that no such Subagent shall be authorized to take any action with respect to any Collateral unless and except to the extent expressly authorized in writing by the Administrative Agent. If any Subagent, or successor thereto, shall die, become incapable of acting, resign or be removed, all rights, powers, privileges and duties of such Subagent, to the extent permitted by law, shall automatically vest in and be exercised by the Administrative Agent until the appointment of a new Subagent. Neither the Administrative Agent nor the Collateral Agent shall be responsible for the negligence or misconduct of any Subagents selected by it in the absence of gross negligence or willful misconduct. The exculpatory, indemnification and other provisions of this Article VII shall apply to any such Subagent and to the Affiliates of the Agents and any such Subagent.

SECTION 7.03.     Exculpatory Provisions. No Agent nor any of its officers, directors, employees, agents, attorneys-in-fact or Affiliates shall be (a) liable for any action lawfully taken or omitted to be taken by any of them under or in connection with this Agreement or any other Loan Document, including in such Agent's Permitted Business Judgment (except for its or such Person's own gross negligence or willful misconduct, as determined in the final judgment of a court of competent jurisdiction, in connection with its duties expressly set forth herein), (b) responsible in any manner to any of the Lenders or any participant for any recitals, statements, representations or warranties made by any of the Borrower, any other Credit Party or any officer thereof contained in this Agreement or any other Loan Document or in any certificate, report, statement or other document referred to or provided for in, or received by such Agent under or in connection with, this Agreement or any other Loan Document or for the value, validity, effectiveness, genuineness, enforceability or sufficiency of this Agreement or any other Loan Document, or for any failure of the Borrower or any other Credit Party to perform its obligations hereunder or thereunder or (c) subject to any fiduciary or other implied duties, regardless of whether a Default or an Event of Default has occurred and is continuing. No Agent shall be under any obligation to any Lender to ascertain or to inquire as to the observance or performance of any of the agreements contained in, or conditions of, this Agreement or any other Loan Document, or to inspect the properties, books or records of any Credit Party or any Affiliate thereof. The Collateral Agent shall not be under any obligation to the Administrative Agent or any Lender to ascertain or to inquire as to the observance or performance of any of the agreements contained in, or conditions of, this Agreement or any other Loan Document, or to inspect the properties, books or records of any Credit Party.

101

SECTION 7.04.    Reliance by Agents.  The Administrative Agent and the Collateral Agent shall be entitled to rely, and shall be fully protected in relying, upon any writing, resolution, notice, consent, certificate, affidavit, letter, telecopy, telex or teletype message, statement, order or other document or instruction believed by it to be genuine and correct and to have been signed, sent or made by the proper Person or Persons and upon advice and statements of legal counsel (including counsel to the Borrower), independent accountants and other experts selected by the Administrative Agent or the Collateral Agent.  The Administrative Agent and the Collateral Agent may deem and treat the Lender specified in the Register with respect to any amount owing hereunder as the owner thereof for all purposes unless a written notice of assignment, negotiation or transfer thereof shall have been filed with the Administrative Agent.  The Administrative Agent and the Collateral Agent shall be fully justified in failing or refusing to take any action under this Agreement or any other Loan Document unless it shall first receive such advice or concurrence of the Required Lenders as it deems appropriate or it shall first be indemnified to its satisfaction by the Lenders against any and all losses, liability and expense that may be incurred by it by reason of taking or continuing to take any such action.  The Administrative Agent and the Collateral Agent shall in all cases be fully protected in acting, or in refraining from acting, under this Agreement and the other Loan Documents in accordance with a request of the Required Lenders, including in the Administrative Agent's sole discretion, instructions from that legal counsel to the Required Lenders (which, as of the date hereof, is Davis Polk & Wardwell LLP), and such request and any action taken or failure to act pursuant thereto shall be binding upon all the Lenders and all future holders of the Loans; *provided* that the Administrative Agent and Collateral Agent shall not be required to take any action that, in its opinion or in the opinion of its counsel, may expose it to liability or that is contrary to any Loan Document or applicable Requirements of Law.  The Agents shall be entitled to rely upon, and shall not incur any liability for relying upon, any notice, request, certificate, consent, statement, instrument, document or other writing (including any electronic message, Internet or intranet website posting or other distribution) believed by it to be genuine and to have been signed, sent, or otherwise authenticated by a proper person.  The Agents may also rely upon any statement made to it orally and believed by it to have been made by a proper person, and shall not incur any liability for relying thereon.  In determining compliance with any condition hereunder to the making of a Loan that by its terms must be fulfilled to the satisfaction of a Lender, the Administrative Agent may presume that such condition is satisfactory to such Lender unless the Administrative Agent shall have received written notice to the contrary from such Lender prior to the making of such Loan.  The Agents may consult with legal counsel (who may be counsel for the Required Lenders), independent accountants and other advisors selected by it, and shall not be liable for any action taken or not taken by it in accordance with the advice of any such counsel, accountants or advisors.

SECTION 7.05.    Notice of Default.  Neither the Administrative Agent nor the Collateral Agent shall be deemed to have knowledge or notice of the occurrence of any Default or Event of Default hereunder unless the Administrative Agent or Collateral Agent, as applicable, has received written notice from a Lender or the Borrower referring to this Agreement, describing such Default or Event of Default and stating that such notice is a "notice of default".  In the event that the Administrative Agent receives such a notice, it shall give notice thereof to the Lenders and the Collateral Agent.  The Administrative Agent shall take such action with respect to such Default or Event of Default as shall be reasonably directed by the Required Lenders; *provided* that unless and until the Administrative Agent shall have received such directions, the Administrative Agent may (but shall not be obligated to) take such action, or refrain from taking such action, with respect to such Default or Event of Default as it shall deem advisable in the best interests of the Lenders except to the extent that this Agreement requires that such action be taken only with the approval of the Required Lenders or each individual Lender, as applicable.

SECTION 7.06.    Non-Reliance on Administrative Agent, Collateral Agent and Other Lenders.  Each Lender expressly acknowledges that neither the Administrative Agent nor the Collateral Agent nor any of their respective officers, directors, employees, agents, attorneys-in-fact or Affiliates has made any representations or warranties to it and that no act by the Administrative Agent or Collateral Agent hereafter taken, including any review of the affairs of the Borrower or any other Credit Party, shall be deemed to constitute any representation or warranty by the Administrative Agent or Collateral Agent to any Lender.  Each Lender represents to the Administrative Agent and the Collateral Agent that it has, independently and without reliance upon the Administrative Agent, Collateral Agent or any other Lender, and based on such documents and

102

information as it has deemed appropriate, made its own appraisal of and investigation into the business, operations, property, financial and other condition and creditworthiness of the Borrower and each other Credit Party and made its own decision to make its Loans hereunder and enter into this Agreement. Each Lender also represents that it will, independently and without reliance upon the Administrative Agent, Collateral Agent or any other Lender, and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit analysis, appraisals and decisions in taking or not taking action under this Agreement and the other Loan Documents, and to make such investigation as it deems necessary to inform itself as to the business, operations, property, financial and other condition and creditworthiness of the Borrower and any other Credit Party. Except for notices, reports and other documents expressly required to be furnished to the Lenders by the Administrative Agent hereunder, neither the Administrative Agent nor the Collateral Agent shall have any duty or responsibility to provide any Lender with any credit or other information concerning the business, assets, operations, properties, financial condition, prospects or creditworthiness of the Borrower or any other Credit Party that may come into the possession of the Administrative Agent or Collateral Agent or any of their respective officers, directors, employees, agents, attorneys-in-fact or Affiliates. The Agents shall not be responsible for or have any duty to ascertain or inquire into (i) any statement, warranty or representation made in or in connection with any Loan Document, (ii) the contents of any certificate, report or other document delivered hereunder or thereunder or in connection herewith or therewith, (iii) the performance or observance of any of the covenants, agreements or other terms or conditions set forth in any Loan Document or the occurrence of any Default or Event of Default, (iv) the validity, enforceability, effectiveness or genuineness of any Loan Document or any other agreement, instrument or document or (v) the satisfaction of any condition set forth in Article IV or elsewhere in any Loan Document. Whenever in the administration of this Agreement, or pursuant to any of the Loan Documents, the Agents shall deem it necessary or desirable (in each case, in its sole discretion) that a matter be proved or established with respect to Borrower or the Guarantors in connection with the taking, suffering or omitting of any action hereunder by the, such matter (unless other evidence in respect thereof be herein specifically prescribed) may be deemed to be conclusively provided or established by an Officers' Certificate and such certificate shall be full warranty to such Agent for any action taken, suffered or omitted in reliance thereon. In no event shall the Agents be responsible or liable for any failure or delay in the performance of its obligations hereunder arising out of or caused by, directly or indirectly, forces beyond its control, including, without limitation, strikes, work stoppages, accidents, acts of war or terrorism, civil or military disturbances, nuclear or natural catastrophes or acts of God, future changes in applicable law or regulation, and interruptions, loss or malfunctions of utilities, communications or computer (software and hardware) services; it being understood that the Agents shall use reasonable efforts consistent with accepted practices in the banking industry to resume performance as soon as practicable under the circumstances.

SECTION 7.07. <u>Indemnification</u>. The Lenders agree to indemnify the Administrative Agent and the Collateral Agent, each in its capacity as such (to the extent not reimbursed by the Credit Parties and without limiting the obligation of the Credit Parties to do so), ratably according to their respective portions of the Loans, as applicable, outstanding in effect on the date on which indemnification is sought (or, if indemnification is sought after the date upon which the Loans shall have been paid in full, ratably in accordance with their respective portions of the Loans in effect immediately prior to such date), from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind whatsoever that may at any time (including at any time following the payment of the Loans) occur, be imposed on, incurred by or asserted against the Administrative Agent or the Collateral Agent in any way relating to or arising out of this Agreement, any of the other Loan Documents or any documents contemplated by or referred to herein or therein or the transactions contemplated hereby or thereby or any action taken or omitted by the Administrative Agent or the Collateral Agent under or in connection with any of the foregoing, IN ALL CASES, WHETHER OR NOT CAUSED BY OR ARISING, IN WHOLE OR IN PART, OUT OF THE COMPARATIVE, CONTRIBUTORY, OR SOLE NEGLIGENCE OF SUCH AGENT; *provided* that no Lender shall be liable to the Administrative Agent or the Collateral Agent for the payment of any portion of such liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements resulting from such Agent's, as applicable, gross negligence or willful misconduct as determined by a final judgment of a court of competent jurisdiction; *provided*, *further*, that no action taken in accordance with the directions of the Required Lenders (or such other number or percentage of the Lenders as shall be required by

the Loan Documents) shall be deemed to constitute gross negligence or willful misconduct for purposes of this Section 7.07. In the case of any investigation, litigation or proceeding giving rise to any liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind whatsoever that may at any time occur (including at any time following the payment of the Loans), this Section 7.07 applies whether any such investigation, litigation or proceeding is brought by any Lender or any other Person. Without limitation of the foregoing, each Lender shall reimburse the Administrative Agent and the Collateral Agent upon demand for its ratable share of any fees, costs or out-of-pocket expenses (including attorneys' fees) incurred by such Agent in connection with the preparation, execution, delivery, administration, modification, amendment or enforcement (whether through negotiations, legal proceedings or otherwise) of, or legal advice rendered in respect of rights or responsibilities under, this Agreement, any other Loan Document, or any document contemplated by or referred to herein, to the extent that such Agent is not reimbursed for such expenses by or on behalf of the Borrower; *provided* that such reimbursement by the Lenders shall not affect the Borrower's continuing reimbursement obligations with respect thereto. If any indemnity furnished to any Agent for any purpose shall, in the opinion of such Agent, be insufficient or become impaired, such Agent may call for additional indemnity and cease, or not commence, to do the acts indemnified against until such additional indemnity is furnished; *provided*, in no event shall this sentence require any Lender to indemnify any Agent against any liability, obligation, loss, damage, penalty, action, judgment, suit, cost, expense or disbursement in excess of such Lender's pro rata portion thereof; and *provided further*, this sentence shall not be deemed to require any Lender to indemnify any Agent against any liability, obligation, loss, damage, penalty, action, judgment, suit, cost, expense or disbursement resulting from such Agent's gross negligence or willful misconduct, as determined in the final judgment of a court of competent jurisdiction. The agreements in this Section 7.07 shall survive the payment of the Loans and all other amounts payable hereunder, or the earlier resignation or removal of the Agents.

SECTION 7.08.    Agents in Their Individual Capacity. Each Agent and its Affiliates may make loans to, accept deposits from and generally engage in any kind of business with the Borrower and any other Credit Party as though such Agent were not an Agent hereunder and under the other Loan Documents. With respect to the Loans made by it, each Agent shall have the same rights and powers under this Agreement and the other Loan Documents as any Lender and may exercise the same as though it were not an Agent, and the terms "Lender" and "Lenders" shall include each Agent in its individual capacity.

SECTION 7.09.    Successor Agents. Each of the Administrative Agent and Collateral Agent may at any time give notice of its resignation to the Lenders and the Borrower, and the Borrower or the Required Lenders may at any time that the Administrative Agent or the Collateral Agent becomes a Defaulting Agent deliver notice of removal to the Administrative Agent or Collateral Agent, as applicable. Upon receipt of any such notice of resignation or removal, the Required Lenders shall have the right, subject to the consent of the Borrower (not to be unreasonably withheld or delayed) so long as no Event of Default is continuing, to appoint a successor, which shall be a bank with an office in the United States, or an Affiliate of any such bank with an office in the United States or another institution providing third party loan agency services. If, in the case of a resignation of a retiring Agent, no such successor shall have been so appointed by the Required Lenders and shall have accepted such appointment within 30 days after the retiring Agent gives notice of its resignation, then the retiring Agent may on behalf of the Lenders, appoint a successor Agent meeting the qualifications set forth above; *provided* that if the retiring Agent shall notify the Borrower and the Lenders that no qualifying Person has accepted such appointment, then such resignation shall nonetheless become effective in accordance with such notice and (1) the retiring Agent shall be discharged from its duties and obligations hereunder and under the the other Loan Documents (except in the case of the Collateral Agent holding collateral security on behalf of any Secured Parties, the retiring Collateral Agent shall continue to hold such collateral security as nominee until such time as a successor Collateral Agent is appointed) and (2) all payments, communications and determinations provided to be made by, to or through such Agent shall instead be made by or to each Lender directly, until such time as the Required Lenders appoint a successor Agent as provided for above in this Section 7.09. Upon the acceptance of a successor's appointment as the Administrative Agent or Collateral Agent, as the case may be, hereunder, and upon the execution and filing or recording of such financing statements, or amendments thereto, and such other instruments or notices, as may be necessary or desirable, or

as the Required Lenders may request, in order to continue the perfection of the Liens granted or purported to be granted by the Security Documents, such successor shall succeed to and become vested with all of the rights, powers, privileges and duties of the retiring (or retired) Agent, and the retiring Agent shall be discharged from all of its duties and obligations hereunder or under the other Loan Documents (if not already discharged therefrom as provided above in this Section).  The fees payable by the Borrower (following the effectiveness of such appointment) to such Agent shall be the same as those payable to its predecessor unless otherwise agreed between the Borrower and such successor.  After the retiring Agent's resignation hereunder and under the other Loan Documents, the provisions of this Article VII (including Section 7.07) and Section 8.05 shall continue in effect for the benefit of such retiring Agent, its Subagents and their respective Related Parties in respect of any actions taken or omitted to be taken by any of them while the retiring Agent was acting as an Agent.

SECTION 7.10.     Payments Set Aside.   To the extent that any payment by or on behalf of the Borrower is made to the Administrative Agent, the Collateral Agent or any Lender, or the Administrative Agent, the Collateral Agent or any Lender exercises its right of setoff, and such payment or the proceeds of such setoff or any part thereof is subsequently invalidated, declared to be fraudulent or preferential, set aside or required (including pursuant to any settlement entered into by the Administrative Agent, the Collateral Agent or such Lender in its discretion) to be repaid to a trustee, receiver or any other party, in connection with any proceeding under the Bankruptcy Code or otherwise, then (a) to the extent of such recovery, the obligation or part thereof originally intended to be satisfied shall be revived and continued in full force and effect as if such payment had not been made or such setoff had not occurred and (b) each Lender severally agrees to pay to the Administrative Agent or the Collateral Agent, as applicable, upon demand its applicable share (without duplication) of any amount so recovered from or repaid by the Administrative Agent or the Collateral Agent, as applicable, plus interest thereon from the date of such demand to the date such payment is made at a rate per annum equal to the applicable Federal Funds Rate from time to time in effect, in the applicable currency of such recovery or payment.  The obligations of the Lenders under clause (b) of the preceding sentence shall survive the payment in full of the Loan Obligations and the termination of this Agreement, or the earlier resignation or removal of the Agent.

SECTION 7.11.     [Bankruptcy Plan Voting.   In case of the pendency of any proceeding under the Bankruptcy Code or other judicial proceeding relative to any Credit Party, each Lender shall submit any vote on a plan of reorganization or similar disposition plan of restructuring or liquidation (a "Reorganization Plan") to the Administrative Agent so that it is received by the Administrative Agent no later than three (3) Business Days prior to voting deadline established pursuant to the terms of such Reorganization Plan or any court order establishing voting procedures with respect to the Reorganization Plan (the "Voting Procedures Order").  If Lenders constituting more than half of the total number of Lenders and having or holding more than two-thirds of the aggregate outstanding Loans of all Lenders at such time timely vote to accept the Reorganization Plan, the Administrative Agent shall submit a ballot on behalf of all Lenders voting to accept the Reorganization Plan in accordance with the terms of the Reorganization Plan or the Voting Procedures Order.  If Lenders constituting more than half of the total number of Lenders and having or holding more than two-thirds of the aggregate outstanding Loans at such time of all Lenders do not timely vote to accept the Reorganization Plan, the Administrative Agent shall submit a ballot on behalf of all Lenders voting to reject the Reorganization Plan in accordance with the terms of the Reorganization Plan or the Voting Procedures Order.  For purposes of calculating the total number of Lenders and the number of Lenders voting to accept the Reorganization Plan, Lenders that are Affiliates shall be deemed to be a single Lender holding a single claim with respect to each class of creditors in which such Lenders and Affiliates are included.  No Lender may submit a ballot with respect to a Reorganization Plan in contravention of the procedures set forth in this Section 7.11, and the Administrative Agent is irrevocably authorized by each Lender to withdraw any vote submitted by such Lender in contravention of the procedures set forth in this Section 7.11.]

SECTION 7.12.     Administrative Agent May File Proofs of Claim.   In case of the pendency of any proceeding under the Bankruptcy Code or any other judicial proceeding relative to any Credit Party, the Administrative Agent (irrespective of whether the principal of any Loan shall then be due and payable as herein expressed or by declaration or otherwise and irrespective of whether the Administrative Agent shall

have made any demand on the Borrower) shall be entitled and empowered, by intervention in such proceeding or otherwise, (i) to file and prove a claim for the whole amount of the principal and interest owing and unpaid in respect of the Loans and all other Loan Obligations that are owing and unpaid and to file such other documents as may be necessary or advisable in order to have the claims of the Lenders and the Administrative Agent (including any claim for the reasonable compensation, expenses, disbursements and advances of the Lenders and the Administrative Agent and their respective agents and counsel and all other amounts due the Lenders and the Administrative Agent under Section 8.05) allowed in such judicial proceeding and (ii) to collect and receive any monies or other property payable or deliverable on any such claims and to distribute the same; and any custodian, receiver, assignee, trustee, liquidator, sequestrator or other similar official in any such judicial proceeding is hereby authorized by each Lender to make such payments to the Administrative Agent and, if the Administrative Agent shall consent to the making of such payments directly to the Lenders, to pay to the Administrative Agent any amount due for the reasonable compensation, expenses, disbursements and advances of the Administrative Agent and its agents and counsel, and any other amounts due the Administrative Agent under Section 8.05. Nothing contained herein shall be deemed to authorize the Administrative Agent to authorize or consent to or accept or adopt on behalf of any Lender any plan of reorganization, arrangement, adjustment or composition affecting the Loan Obligations or the rights of any Lender to authorize the Administrative Agent to vote in respect of the claim of any Lender or in any such proceeding.

SECTION 7.13.    Collateral Matters. (a) The Lenders irrevocably authorize the Collateral Agent, at its option and in its discretion or in accordance with the instructions and Officers' Certificates delivered to the Collateral Agent in connection therewith, to release any Lien on any property granted to or held by the Collateral Agent under any Loan Document (i) upon payment in full of all Loan Obligations (other than contingent indemnification obligations and expense reimbursement claims to the extent no claim therefor has been made), (ii) if approved, authorized or ratified in writing in accordance with Section 8.01, (iii) pursuant to the Intercreditor Agreement or the Security Documents or (iv) pursuant to Section 8.19. Upon request by the Collateral Agent at any time, the Required Lenders will confirm in writing the Collateral Agent's authority to release its interest in particular types or items of property in accordance with this Section; *provided* that the Collateral Agent shall rely conclusively on Officers' Certificates and instruction delivered by the Borrower or the other Credit Parties in connection herewith.

(b)    Each Secured Party hereby further authorizes the Administrative Agent or Collateral Agent, as applicable, on behalf of and for the benefit of Secured Parties, to be the agent for and representative of the Secured Parties with respect to the Security Documents. Subject to Section 8.01, without further written consent or authorization from any Secured Party, the Administrative Agent or Collateral Agent, as applicable, may (a) execute any documents or instruments necessary in connection with a disposition of assets permitted by this Agreement, (b) release any Lien encumbering any item of Collateral that is the subject of such disposition of assets permitted hereunder or with respect to which Required Lenders (or such other Lenders as may be required to give such consent under Section 8.01) have otherwise consented or (c) release any Guarantor from the Guarantee with respect to which Required Lenders (or such other Lenders as may be required to give such consent under Section 8.01) have otherwise consented.

(c)    The Agents shall not be responsible for or have a duty to ascertain or inquire into any representation or warranty regarding the existence, value or collectability of the Collateral, the existence, priority or perfection of the Collateral Agent's Lien thereon, or any certificate prepared by any Credit Party in connection therewith, nor shall an Agent be responsible or liable to the Lenders for any failure to monitor or maintain any portion of the Collateral, including the filing of any UCC financing or continuation statements.

SECTION 7.14.    Intercreditor Agreement and Other Collateral Matters. The Lenders hereby agree to the terms of the Intercreditor Agreement and acknowledge that CFS (and any Collateral Agent under the Security Documents and the Intercreditor Agreement) will be serving as Collateral Agent for the Secured Parties under the Security Documents and the Intercreditor Agreement and in other capacities contemplated thereby. Each Lender hereby consents to CFS and any successor serving in such capacities and agrees not to assert any

claim (including as a result of any conflict of interest) against CFS, or any such successor, arising from the role of the Collateral Agent under the Security Documents or the Intercreditor Agreement so long as the Collateral Agent is either acting in accordance with the express terms of such documents or otherwise has not engaged in gross negligence or willful misconduct as found by a final non-appealable judgment of a court of competent jurisdiction. Each Lender hereby consents to CFS and any successor serving in such capacities and agrees not to assert any claim (including as a result of any conflict of interest) against CFS, or any such successor, arising from the role of the Collateral Agent under the Security Documents so long as the Collateral Agent is either acting in accordance with the express terms of such documents or otherwise has not engaged in gross negligence or willful misconduct as found by a final non-appealable judgment of a court of competent jurisdiction. In addition, the Administrative Agent and the Collateral Agent shall be authorized, without the consent of any Secured Party, to enter into or execute the Security Documents and the Intercreditor Agreement on or prior to the Closing Date, and, from time to time, to execute or to enter into amendments of, and amendments and restatements of, the Security Documents and the Intercreditor Agreement and any additional and replacement intercreditor agreements, including the Customary Intercreditor Agreements, in each case in order to effect the subordination of and to provide for certain additional rights, obligations and limitations in respect of, any Liens required by the terms of this Agreement to be Liens junior to, pari passu with or senior to the Loan Obligations, that are, in each case, incurred in accordance with Article V of this Agreement, and to establish certain relative rights as between the holders of the Loan Obligations and the holders of the Indebtedness secured by such Liens.

SECTION 7.15.    Withholding Tax. To the extent required by any applicable Requirement of Law, the Administrative Agent may withhold from any payment to any Lender an amount equivalent to any applicable withholding tax. If the IRS or any authority of the United States or other jurisdiction asserts a claim that the Administrative Agent did not properly withhold tax from amounts paid to or for the account of any Lender for any reason (including because the appropriate form was not delivered, was not properly executed, or because such Lender failed to notify the Administrative Agent of a change in circumstances that rendered the exemption from, or reduction of, withholding tax ineffective), such Lender shall indemnify the Administrative Agent (to the extent that the Administrative Agent has not already been reimbursed by any applicable Credit Party and without limiting the obligation of any applicable Credit Party to do so) fully for all amounts paid, directly or indirectly, by the Administrative Agent as Tax or otherwise, including penalties, additions to Tax and interest, together with all expenses incurred, including legal expenses, allocated staff costs and any out of pocket expenses. Each Lender hereby authorizes the Administrative Agent to set off and apply any and all amounts at any time owing to such Lender under this Agreement or any other Loan Document against any amount due to the Administrative Agent under this Section 7.15.

SECTION 7.16.    Erroneous Payment.

(a)        If the Administrative Agent notifies a Lender or Secured Party, or any Person who has received funds on behalf of a Lender or Secured Party (any such Lender, Issuing Bank, Secured Party or other recipient, a "Payment Recipient") that the Administrative Agent has determined in its sole discretion (whether or not after receipt of any notice under immediately succeeding clause (b)) that any funds received by such Payment Recipient from the Administrative Agent or any of its Affiliates were erroneously transmitted to, or otherwise erroneously or mistakenly received by, such Payment Recipient (whether or not known to such Lender, Secured Party or other Payment Recipient on its behalf) (any such funds, whether received as a payment, prepayment or repayment of principal, interest, fees, distribution or otherwise, individually and collectively, an "Erroneous Payment") and demands the return of such Erroneous Payment (or a portion thereof) (provided, that without limiting any other rights or remedies (whether at law or in equity), the Administrative Agent may not make any such demand under this sentence with respect to an Erroneous Payment unless such demand is made within ten (10) Business Days of the date of receipt of such Erroneous Payment by the applicable Payment Recipient), such Erroneous Payment shall at all times remain the property of the Administrative Agent and shall be segregated by the Payment Recipient and held in trust for the benefit of the Administrative Agent, and such Lender or Secured Party shall (or, with respect to any Payment Recipient who received such funds on its behalf, shall cause such Payment Recipient to) promptly, but in no event later than two Business Days thereafter, return to the Administrative Agent the amount of any such Erroneous Payment (or portion thereof) as to which such a

demand was made, in same day funds (in the currency so received). A notice of the Administrative Agent to any Payment Recipient under this clause (a) shall be conclusive, absent manifest error.

(b)      Without limiting immediately preceding clause (a), each Lender and Secured Party hereby further agrees that if it (or any Payment Recipient who on its behalf) receives a payment, prepayment or repayment (whether received as a payment, prepayment or repayment of principal, interest, fees, distribution or otherwise) from the Administrative Agent (or any of its Affiliates) (x) that is in a different amount than, or on a different date from, that specified in a notice of payment, prepayment or repayment sent by the Administrative Agent (or any of its Affiliates) with respect to such payment, prepayment or repayment, (y) that was not preceded or accompanied by a notice of payment, prepayment or repayment sent by the Administrative Agent (or any of its Affiliates), or (z) that such Lender or Secured Party, or other such recipient, otherwise becomes aware was transmitted, or received, in error or by mistake (in whole or in part) in each case:

(i)      (A) in the case of immediately preceding clauses (x) or (y), an error shall be presumed to have been made (absent written confirmation from the Administrative Agent to the contrary) or (B) an error has been made (in the case of immediately preceding clause (z)), in each case, with respect to such payment, prepayment or repayment; and

(ii)      such Lender or Secured Party shall (and shall cause any other recipient that receives funds on its respective behalf to) promptly (and, in all events, within one Business Day of its knowledge of such error) notify the Administrative Agent of its receipt of such payment, prepayment or repayment, the details thereof (in reasonable detail) and that it is so notifying the Administrative Agent pursuant to this Section 7.16(b).

(c)      Each Lender or Secured Party hereby authorizes the Administrative Agent to set off, net and apply any and all amounts at any time owing to such Lender or Secured Party under any Loan Document, or otherwise payable or distributable by the Administrative Agent to such Lender or Secured Party from any source, against any amount due to the Administrative Agent under immediately preceding clause (a) or under the indemnification provisions of this Agreement.

(d)      In the event that an Erroneous Payment (or portion thereof) is not recovered by the Administrative Agent for any reason, after demand therefor by the Administrative Agent in accordance with immediately preceding clause (a), from any Lender that has received such Erroneous Payment (or portion thereof) (and/or from any Payment Recipient who received such Erroneous Payment (or portion thereof) on its respective behalf) (such unrecovered amount, an "Erroneous Payment Return Deficiency"), upon the Administrative Agent's notice to such Lender at any time, (i) such Lender shall be deemed to have assigned its Loans with respect to which such Erroneous Payment was made (the "Erroneous Payment Impacted Loans") in an amount equal to the Erroneous Payment Return Deficiency (or such lesser amount as the Administrative Agent may specify) (such assignment of the Loans of the Erroneous Payment Impacted Loans, the "Erroneous Payment Deficiency Assignment") at par plus any accrued and unpaid interest (with the assignment fee to be waived by the Administrative Agent in such instance), and is hereby (together with the Borrower) deemed to execute and deliver an Assignment and Acceptance (or, to the extent applicable, an agreement incorporating an Assignment and Acceptance by reference pursuant to the Platform as to which the Administrative Agent and such parties are participants) with respect to such Erroneous Payment Deficiency Assignment, and such Lender shall deliver any Notes evidencing such Loans to the Borrower or the Administrative Agent, (ii) the Administrative Agent as the assignee Lender shall be deemed to acquire the Erroneous Payment Deficiency Assignment, (iii) upon such deemed acquisition, the Administrative Agent as the assignee Lender shall become a Lender, as applicable, hereunder with respect to such Erroneous Payment Deficiency Assignment and the assigning Lender shall cease to be a Lender hereunder with respect to such Erroneous Payment Deficiency Assignment, excluding, for the avoidance of doubt, its obligations under the indemnification provisions of this Agreement which shall survive as to such assigning Lender and (iv) the Administrative Agent may reflect in the Register its ownership interest in the Loans subject to the Erroneous Payment Deficiency Assignment. The Administrative Agent may, in its discretion, sell any Loans acquired pursuant to an Erroneous Payment

Deficiency Assignment and upon receipt of the proceeds of such sale, the Erroneous Payment Return Deficiency owing by the applicable Lender shall be reduced by the net proceeds of the sale of such Loan (or portion thereof), and the Administrative Agent shall retain all other rights, remedies and claims against such Lender (and/or against any recipient that receives funds on its respective behalf). In addition, each party hereto agrees that, except to the extent that the Administrative Agent has sold a Loan (or portion thereof) acquired pursuant to an Erroneous Payment Deficiency Assignment, and irrespective of whether the Administrative Agent may be equitably subrogated, the Administrative Agent shall be contractually subrogated to all the rights and interests of the applicable Lender or Secured Party under the Loan Documents with respect to each Erroneous Payment Return Deficiency (the "Erroneous Payment Subrogation Rights").

(e)    The parties hereto agree that (i) an Erroneous Payment shall not pay, prepay, repay, discharge or otherwise satisfy any Loan Obligations owed by the Borrower or any other Credit Party and (ii) to the extent an Erroneous Payment was in any way or at any time credited as a payment or satisfaction of any of the Loan Obligations, the Loan Obligations or part thereof that were so credited, and all rights of the applicable Lender, other Secured Party or Administrative Agent, as the case may be, shall be reinstated and continue in full force and effect as if such payment or satisfaction had never been received, except, in each case, to the extent such Erroneous Payment is, and solely with respect to the amount of such Erroneous Payment that is, comprised of funds received by the Administrative Agent from the Borrower or any other Credit Party for the purpose of making such Erroneous Payment. Further, each party hereto agrees that, in the event a Secured Party is the recipient of an Erroneous Payment and such Secured Party fails to return such Erroneous Payment in accordance with Section 7.16(a), then the Administrative Agent shall be entitled to (x) collect from the Borrower or any other Credit Party any Obligations owed by the Borrower or any other Credit Party to such Secured Party up to and including the amount of the Erroneous Payment, plus any other amounts owed by such Secured Party under the indemnification provisions of this Agreement, except, to the extent such Erroneous Payment is, and solely with respect to the amount of such Erroneous Payment that is, comprised of funds received by the Administrative Agent from the Borrower or any other Credit Party for the purpose of making such Erroneous Payment and (y) exercise its rights and remedies under Section 7.16(c) until the Administrative Agent has received all amounts owed by the Secured Party to the Administrative Agent pursuant to Section 7.16(a).

(f)    To the extent permitted by applicable law, no Payment Recipient shall assert any right or claim to an Erroneous Payment, and hereby waives, and is deemed to waive, any claim, counterclaim, defense or right of set-off or recoupment with respect to any demand, claim or counterclaim by the Administrative Agent for the return of any Erroneous Payment received, including without limitation waiver of any defense based on "discharge for value" or any similar doctrine.

(g)    Each party's obligations, agreements and waivers under this Section 7.16 shall survive the resignation or replacement of the Administrative Agent, any transfer of rights or obligations by, or the replacement of, a Lender, and/or the repayment, satisfaction or discharge of all Obligations (or any portion thereof) under any Loan Document.

## ARTICLE VIII

### Miscellaneous

SECTION 8.01.    Amendments and Waivers.

(a)    Without Consent of the Lenders.

The Borrower and the Administrative Agent may amend this Agreement and the other Loan Documents without notice to or consent of any Lender:

(i)    to cure any ambiguity, omission, mistake, defect or inconsistency;

(ii)        to provide for the assumption by a successor corporation, partnership or limited liability company of the obligations of the Borrower or any Subsidiary Guarantor under this Agreement or any other Loan Document (in each case so long as such successor corporation, partnership or limited liability company is designated in accordance with Section 5.11);

(iii)        to comply with Section 5.11;

(iv)        to add a Subsidiary Guarantor with respect to the Obligations or Collateral to secure the Obligations;

(v)        to release Collateral or a Guarantor as permitted by this Agreement, the Security Documents or the Intercreditor Agreement (other than to the extent constituting all or substantially all of the Collateral or value of the Guarantees); and

(vi)        to add additional secured creditors holding other Junior Lien Obligations so long as such obligations are not prohibited by this Agreement or the Security Documents; and

(vii)        to the extent necessary to integrate any Incremental Commitment as contemplated by Section 2.20.

The Intercreditor Agreement may be amended without the consent of any Lender or Agent in connection with the permitted entry into the Intercreditor Agreement of any class (or Class) of additional secured creditors holding Junior Lien Obligations to effectuate such entry into the Intercreditor Agreement and to make the lien of such class equal and ratable with, as applicable, the lien of the Junior Lien Obligations.

Each Lender hereunder (x) consents to the amendment of any Loan Document in the manner and for the purposes set forth in this Section 8.01(a), (y) agrees that it will be bound by and will take no actions contrary to the provisions of any amendment to any Loan Document pursuant to Section 8.01(a) and (z) authorizes and instructs the Administrative Agent to enter into any amendment to any Loan Document pursuant to this Section 8.01(a) on behalf of such Lender.

The Administrative Agent shall receive an Officers' Certificate as conclusive evidence that any amendment executed pursuant to this Section 8.01(a) complies with the requirements of this Section 8.01(a), is permitted or authorized by this Agreement and is the legal, valid and binding obligation of the Borrower, enforceable against it in accordance with its terms.

(b)        With Consent of the Lenders.  The Borrower and the Administrative Agent may amend this Agreement and the other Loan Documents with the written consent of the Required Lenders, and any past default or noncompliance with any provisions may be waived with the consent of the Required Lenders. Notwithstanding the foregoing, without the consent of each Lender of an affected Loan (but not the Required Lenders), no amendment may:

(i)        increase or reduce the principal amount of such Loans or waive or extend the time for payment of any portion of the principal amount thereof (it being understood that a waiver, deferral, reduction or other adjustment to a mandatory prepayment under Section 2.13 shall only require the consent of the Required Lenders),

(ii)        reduce the rate of, or extend the time for payment of interest on, any Loan, (it being understood that only the consent of the Required Lenders shall be necessary to waive any obligation of the Borrower to pay interest at the default rate under Section 2.06(b) or amend Section 2.06(b)),

110

(iii)     reduce the principal of or change the Stated Maturity of any Loan (it being understood that a waiver, deferral, reduction or other adjustment to a mandatory prepayment under Section 2.13 shall only require the consent of the Required Lenders),

(iv)     reduce the premium payable (if any) upon prepayment of any Loan or change the time at which any such premium must be paid,

(v)     make any Loan payable in money other than that stated in this Agreement,

(vi)     consent to the transfer of the Borrower's obligations under this Agreement and/or the other Loan Documents,

(vii)     waive, amend or modify the provisions of Section 2.17 or Section 6.02 in a manner that would alter the pro rata sharing of payments required thereby (except in connection with a transaction permitted under Section 8.06(e) and Section 8.07),

(viii)     make any change in the second sentence of this Section 8.01(b) or the definition of the term "Required Lenders," or any other provision hereof expressly specifying the number or percentage of Lenders required to waive, amend or modify any rights hereunder or under any other Loan Document,

(ix)     (A) release all or substantially all of the value of the Guarantee or release all or substantially all of the Collateral, in each case, whether in one or more transactions, (except as otherwise permitted herein or in the other Loan Documents) or (B) subordinate the Loan Obligations or a Lien on a material portion of the Collateral, taken as a whole, (as determined by the Borrower in good faith), securing the Obligations, in either case, to any other Indebtedness other than in connection with a debtor-in-possession financing,

(x)     make any change in the provisions dealing with the application of proceeds of Collateral in the Intercreditor Agreement or this Agreement that would adversely affect the Lenders,

(xi)     amend Section 7.07 or any other provision hereof providing for indemnification obligations of the Agents or Lenders;

*provided further* that no amendment, waiver or other modification of any provision of any Loan Document in a manner that directly and adversely affects the Administrative Agent or the Collateral Agent shall be effective without the written consent of the then-current Administrative Agent and Collateral Agent, as applicable, or any other former or current Agent to whom Article VII then applies.

SECTION 8.02.     Notices.  Except as otherwise set forth herein, all notices, requests and demands to or upon the respective parties hereto to be effective shall be in writing (including by facsimile or electronic mail), and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when delivered, or three days after being deposited in the mail, postage prepaid, or, in the case of telecopy or electronic mail notice, when received, addressed as follows in the case of the Borrower and the Administrative Agent, and as set forth on Schedule 2.01 in the case of the other parties hereto, or to such other address as may be hereafter notified by the respective parties hereto:

| | |
|---|---|
| The Borrower: | Fieldwood Energy LLC<br>2000 W. Sam Houston Pkwy. S., Suite 1200<br>Houston, TX 77042<br>Attention:  Mike Dane, Chief Financial Officer |

Error! Unknown document property name.
WEIL:\97986321\6\45327.0007

                                            Fax:  (713) 969-1099
                                            Email:  mdane@fwellc.com

With a copy to:                             Weil, Gotshal & Manges LLP
                                            200 Crescent Court, Suite 300
                                            Dallas, Texas  75201
                                            Attention:  Courtney S. Marcus
                                            Fax:  (214) 746-7700
                                            Email:  courtney.marcus@weil.com

The Administrative Agent and the Collateral Agent:

                                            Cantor Fitzgerald Securities
                                            1801 N. Military Trail, Suite 202
                                            Boca Raton, Florida  33431
                                            Attention:  N. Horning (Fieldwood Administrative Agency)
                                            Telephone: (212) 829-4489
                                            Telecopier: (646) 219-1180
                                            Facsimile: (646) 219-1180
                                            Email:  NHorning@cantor.com

                                            Cantor Fitzgerald Securities
                                            900 West Trade Street, Suite 725
                                            Charlotte, North Carolina 28202
                                            Attention:  B. Young (Fieldwood Administrative Agency)
                                            Telephone: (704) 374-0574
                                            Telecopier: (646) 390-1765
                                            Email:  BYoung@cantor.com

With a copy to:

                                            Shipman & Goodwin LLP
                                            One Constitution Plaza
                                            Hartford, Connecticut  06103
                                            Attention:  Nathan Plotkin
                                            Email:  Nplotkin@goodwin.com

                                            Davis Polk & Wardwell LLP
                                            450 Lexington Avenue
                                            New York, New York 10017
                                            Attention: Jinsoo Kim
                                            Email: jinsoo.kim@davispolk.com

Any other Lender:                           At the address, telecopier number,
                                            electronic mail address or telephone
                                            number specified in its Administrative
                                            Questionnaire;

*provided* that any notice, request or demand to or upon the Administrative Agent or the Lenders pursuant to Section 2.03 shall not be effective until received.

Notices and other communications to the Lenders hereunder may be delivered or furnished by electronic communication (including email and Internet or intranet websites) pursuant to procedures approved in writing by the Administrative Agent; *provided* that the foregoing shall not apply to notices to any Lender

<div align="center">112</div>

pursuant to <u>Article II</u> if such Lender has notified the Administrative Agent in writing that it is incapable of receiving notices under such Article by electronic communication. The Administrative Agent or the Borrower may, in their discretion, agree to accept notices and other communications to it hereunder by electronic communications pursuant to procedures approved by them, *provided* that approval of such procedures may be limited to particular notices or communications.

Documents required to be delivered pursuant to <u>Section 5.01</u> (to the extent any such documents are included in materials otherwise filed with the SEC) may be delivered electronically (including as set forth in <u>Section 8.18</u>) and if so delivered, shall be deemed to have been delivered on the date (i) on which the Borrower posts such documents, or provides a link thereto on the Borrower's website on the Internet, or (ii) on which such documents are posted on the Borrower's behalf on an Internet or intranet website, if any, to which each Lender and the Administrative Agent have access (whether a commercial, third-party website or whether sponsored by the Administrative Agent); *provided* that (A) the Borrower shall deliver paper copies of such documents to the Administrative Agent or any Lender that requests the Borrower to deliver such paper copies until a written request to cease delivering paper copies is given by the Administrative Agent or such Lender, and (B) the Borrower shall notify the Administrative Agent and each Lender (by telecopier or electronic mail) of the posting of any such documents and provide to the Administrative Agent by electronic mail electronic versions (i.e., soft copies) of such documents.

SECTION 8.03.   <u>No Waiver; Cumulative Remedies</u>.   No failure to exercise and no delay in exercising, on the part of the Administrative Agent, the Collateral Agent or any Lender, any right, remedy, power or privilege hereunder or under the other Loan Documents shall operate as a waiver thereof, nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege. The rights, remedies, powers and privileges herein provided are cumulative and not exclusive of any rights, remedies, powers and privileges provided by law.

SECTION 8.04.   <u>Survival of Representations and Warranties</u>.   All representations and warranties made hereunder, in the other Loan Documents and in any document, certificate or statement delivered pursuant hereto or in connection herewith shall survive the execution and delivery of this Agreement and the making of the Loans hereunder.

SECTION 8.05.   <u>Payment of Expenses; Indemnification</u>.

(a)   Within 30 days after receipt of a written request, together with customary backup documentation in reasonable detail, the Borrower shall pay (i) all fees of the Agents set forth in the Fee Letter and the reasonable and documented (in summary form) out-of-pocket expenses incurred by the Administrative Agent in connection with the preparation and administration of this Agreement or any amendments, modifications or waivers of the provisions hereof and (ii) all reasonable and documented (in reasonable detail) out-of-pocket expenses incurred by the Administrative Agent or any Lender, including the fees, charges and disbursements of legal counsel for the Administrative Agent or any Lender, in connection with the enforcement or protection of its rights in connection with this Agreement, including its rights under this <u>Section 8.05(a)</u>, including all such out-of-pocket expenses incurred during any workout, restructuring or negotiations in respect of such Loans; *provided*, that the Borrower's obligations under this <u>Section 8.05(a)</u> for fees and expenses of legal counsel shall be limited to fees and expenses of (x) one primary outside legal counsel for the Administrative Agent (which on the date hereof is Shipman & Goodwin LLP) and, if necessary, one local, regulatory or foreign legal counsel for the Administrative Agent in each appropriate jurisdiction (which may include a single special counsel acting in multiple jurisdictions) and (y) solely in the case of <u>clause (ii)</u> above, one primary outside legal counsel for the Lenders and, if necessary, one local or foreign legal counsel to the Lenders in each appropriate jurisdiction (which may include a single special counsel acting in multiple jurisdictions).

(b)   Each Credit Party agrees to indemnify and hold harmless each Lender and each Agent and each of their respective affiliates, officers, partners, members, Directors, trustees, employees, managers,

Error! Unknown document property name.
WEIL:\97986321\6\45327.0007

advisors, consultants, administrators, agents, sub-agents and other Related Parties (each such Person, an "Indemnitee") promptly after receipt of a written request, together with customary backup documentation in reasonable detail, from and against any Indemnified Liabilities, whether or not such proceedings are brought by the Borrower, any of its Related Parties or any other third Person, IN ALL CASES, WHETHER OR NOT CAUSED BY OR ARISING, IN WHOLE OR IN PART, OUT OF THE COMPARATIVE, CONTRIBUTORY OR SOLE NEGLIGENCE OF SUCH INDEMNITEE; *provided* that each Credit Party's obligations under this Section 8.05(b) for fees and expenses of legal counsel (including the cost of any investigation and preparation) shall be limited to the reasonable and documented (in summary form) out-of-pocket fees, disbursements and other charges of (x) one primary outside counsel for the Indemnitees, taken as a whole, (y) if reasonably necessary, one local or foreign legal counsel for the Indemnitees, taken as a whole, in each appropriate jurisdiction (which may include a single special counsel acting in multiple jurisdictions) and (z) if reasonably necessary, one additional regulatory or other specialist counsel for the Indemnitees, taken as a whole, for each relevant area of expertise (which may include a single special counsel acting in multiple areas) (unless there is an actual or perceived conflict of interest in which case the affected Indemnitees, taken as a whole, may engage one additional counsel and solely in the case of any such conflict of interest, one additional local counsel (which may be a single firm for multiple jurisdictions) to all affected Indemnitees taken as a whole, in each such relevant jurisdiction (limited, in the case of legal counsel, to one primary counsel to the Agents' Indemnitees, one primary counsel to the Lenders' Indemnitees, taken as a whole, and, if reasonably necessary, of one local counsel in each relevant jurisdiction and one additional regulatory or other specialist counsel for each relevant area of expertise (in each case, which may be a single firm for multiple jurisdictions)); *provided*, *further*, that the Borrower shall have no obligation hereunder to any Agent or any Lender or any of their respective Related Parties with respect to Indemnified Liabilities to the extent (1) found by a court of competent jurisdiction in a final non- appealable judgment to have resulted from (i) the gross negligence or willful misconduct of the party to be indemnified or (ii) any material breach of any Loan Document by the party to be indemnified (other than a material breach by any Agent in its capacity as such unless such material breach resulted from the gross negligence or willful misconduct of any Agent or its Related Parties) or (2) arising from disputes, claims, demands, actions, judgments or suits not arising from any act or omission by the Borrower or its Affiliates, brought by an indemnified Person against any other indemnified Person (other than disputes, claims, demands, actions, judgments or suits involving claims against any Agent in its capacity as such).    No Person entitled to indemnification under clause (b) of this Section 8.05 shall be liable for any damages arising from the use by others of any information or other materials obtained through internet, electronic, telecommunications or other information transmission systems (including IntraLinks or SyndTrak Online) in connection with this Agreement or any other Loan Document, except to the extent that such damages have resulted from the gross negligence, bad faith or willful misconduct of the party to be indemnified or any of its Related Parties (as determined by a court of competent jurisdiction in a final and non-appealable decision).    To the extent that the undertakings to defend, indemnify, pay and hold harmless set forth in this Section 8.05 may be unenforceable in whole or in part because they are violative of any law or public policy, the applicable Credit Party shall contribute the maximum portion that it is permitted to pay and satisfy under applicable law to the payment and satisfaction of all Indemnified Liabilities incurred by Indemnitees or any of them.

(c)     To the extent permitted by applicable law, none of Holdings, the Borrower or any Indemnitee shall have any liability for any special, punitive, indirect or consequential damages (including, without limitation, any loss of profits, business or anticipated savings) relating to this Agreement or any other Loan Document or arising out of its activities in connection herewith or therewith (whether before or after the Closing Date); *provided* that nothing contained in this clause (c) shall limit the obligations of the Borrower under Section 8.05(b) in respect of any such damages claimed against the Indemnitees by Persons other than the Indemnitees.

(d)     The agreements in this Section 8.05 shall survive repayment of the Loans and all other amounts payable hereunder, and the earlier resignation or removal of any Agent.  This Section 8.05 shall not apply with respect to any Taxes other than Taxes that represent liabilities, obligations, losses, damages, penalties, claims, demands, actions, judgments, suits, costs, expenses or disbursements of any kind or nature whatsoever resulting from a non-Tax claim.

SECTION 8.06.     <u>Successors and Assigns; Participations and Assignments</u>.

(a)     The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby, except that (i) the Borrower may not assign or otherwise transfer any of its rights or obligations hereunder without the prior written consent of each Lender other than pursuant to <u>Section 5.11</u> (and any attempted assignment or transfer by the Borrower without such consent shall be null and void) and (ii) no Lender may assign or otherwise transfer its rights or obligations hereunder except in accordance with this <u>Section 8.06</u>.     Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby, Participants (to the extent provided in <u>clause (c)</u> of this <u>Section 8.06</u>), and, to the extent expressly contemplated hereby, the Related Parties of each of the Agents and the Lenders) any legal or equitable right, remedy or claim under or by reason of this Agreement or the other Loan Documents.

(b)     (i) Subject to the conditions set forth in <u>clause (b)(ii)</u> below and the limitations on assignment set forth in <u>clauses (e)</u> below, any Lender may assign to one or more (each, an "<u>Assignee</u>") all or a portion of its rights and obligations under this Agreement (including all or a portion of the Loans at the time owing to it) by:

(A)  providing written notice to the Borrower and, so long as no Event of Default is continuing, obtaining the consent of the Borrower, which consent shall not be unreasonably withheld or delayed (it being understood that the Borrower will be deemed to have consented to an assignment if it has not responded to a request for consent to such assignment within ten (10) Business Days after receipt of written request therefor); *provided* that no consent of the Borrower shall be required for an assignment of any Loan to a Lender, an Affiliate of a Lender or an Approved Fund (as defined below); and

(B)  obtaining the consent of the Administrative Agent (which consent shall not be unreasonably withheld or delayed); *provided* that no consent of the Administrative Agent shall be required for an assignment of any Loan to a Lender, an Affiliate of a Lender or an Approved Fund (as defined below).

(ii)     Assignments shall be subject to the following additional conditions:

(A)  except in the case of an assignment to a Lender, an Affiliate of a Lender or an Approved Fund or an assignment of the entire remaining amount of the assigning Lender's Loans under the Facility, the amount of the Loans of the assigning Lender subject to each such assignment (determined as of the date the Assignment and Acceptance with respect to such assignment is delivered to the Administrative Agent) shall not be less than $1,000,000; *provided* that contemporaneous assignments to a single assignee made by Affiliates of Lenders and related Approved Funds shall be aggregated for purposes of meeting the minimum assignment amount requirements stated above;

(B)  each partial assignment shall be made as an assignment of a proportionate part of all the assigning Lender's rights and obligations under this Agreement;

(C)  the parties to each assignment shall execute and deliver to the Administrative Agent an Assignment and Acceptance via an electronic settlement system acceptable to the Administrative Agent (or, if previously agreed with the Administrative Agent, manually), and shall pay to the Administrative Agent a processing and recordation fee of $3,500 (which fee may be waived or reduced in the sole discretion of the Administrative Agent); *provided* that, in the case of contemporaneous assignments by any Lender to one or more Approved Funds, only a single processing and recordation fee shall be payable for all such assignments; and

Error! Unknown document property name.
WEIL:\97986321\6\45327.0007

(D) the Assignee, if it shall not be a Lender, shall deliver to the Administrative Agent an administrative questionnaire in a form approved by the Administrative Agent (the "Administrative Questionnaire") and applicable tax forms (including those described in Sections 2.15(d), (e), (g) and (h), as applicable).

For the purposes of this Section 8.06(b), the term "Approved Fund" means any Person (other than a natural person) that is engaged in making, purchasing, holding or investing in bank loans and similar extensions of credit in the ordinary course and that is administered, advised or managed by (a) a Lender, (b) an Affiliate of a Lender or (c) an entity or an Affiliate of an entity that administers, advises or manages a Lender.

Upon request of the Borrower, the Administrative Agent shall deliver to the Borrower a list of each assignment made during the immediately preceding month, which list shall include the applicable assignor, Assignee, the interest assigned and the date of each assignment. The delivery of such list shall satisfy the notice requirement set forth in Section 8.06(b)(i)(A).

(iii)    Subject to acceptance and recording thereof pursuant to clause (b)(v) of this Section 8.06, from and after the effective date specified in each Assignment and Acceptance, the Assignee thereunder shall be a party hereto and, to the extent of the interest assigned by such Assignment and Acceptance, have the rights and obligations of a Lender under this Agreement, and the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and Acceptance, be released from its obligations under this Agreement (and, in the case of an Assignment and Acceptance covering all of the assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto but shall continue to be entitled to the benefits of Sections 2.08, 2.09, 2.15 and 8.05). Any assignment or transfer by a Lender of rights or obligations under this Agreement that does not comply with this Section 8.06 shall be treated for purposes of this Agreement as a sale by such Lender of a participation in such rights and obligations in accordance with clause (c) of this Section 8.06.

(iv)    The Administrative Agent, acting for this purpose as a non- fiduciary agent of the Borrower, shall maintain a copy of each Assignment and Acceptance delivered to it and a register for the recordation of the names and addresses of the Lenders, and principal and stated interest amounts of the Loans (the "Register"). The entries in the Register shall be conclusive absent manifest error, and the Borrower, the Administrative Agent and the Lenders shall treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement, notwithstanding notice to the contrary. The Register shall be available for inspection by the Borrower, at any reasonable time and from time to time upon reasonable prior notice.

(v)    Upon its receipt of a duly completed Assignment and Acceptance executed by an assigning Lender and an Assignee, the Assignee's completed Administrative Questionnaire (unless the Assignee shall already be a Lender hereunder), all applicable tax forms, the processing and recordation fee referred to in clause (b) of this Section 8.06 and any written consent to such assignment required by clause (b) of this Section 8.06, the Administrative Agent shall promptly accept such Assignment and Acceptance and record the information contained therein in the Register. No assignment, whether or not evidenced by a promissory note, shall be effective for purposes of this Agreement unless it has been recorded in the Register as provided in this clause.

(c)    (i) Any Lender may, without the consent of, or notice to, the Administrative Agent or the Borrower, sell participations to one or more banks or other entities (other than to Holdings, any of its Subsidiaries or any of its Affiliates or any natural persons) (each, a "Participant") in all or a portion of such Lender's rights and obligations under this Agreement (including all or a portion of the Loans owing to it), *provided* that (A) such Lender's obligations under this Agreement shall remain unchanged, (B) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations and (C) the Borrower, the Administrative Agent and the other Lenders shall continue to deal solely and directly with such

116

Lender in connection with such Lender's rights and obligations under this Agreement and the other Loan Documents.  Any agreement or instrument pursuant to which a Lender sells such a participation shall provide that such Lender shall retain the sole right to enforce this Agreement and the other Loan Documents and to approve any amendment, modification or waiver of any provision of this Agreement and the other Loan Documents, *provided* that (x) such agreement or instrument may provide that such Lender will not, without the consent of the Participant, agree to any amendment, modification or waiver described in <u>clause (ii)</u> or <u>(iii)</u> of the second sentence of <u>Section 8.01(b)</u> that directly affects such Participant and (y) no other agreement with respect to amendment, modification or waiver may exist between such Lender and such Participant.  Subject to <u>clause (c)(ii)</u> of this <u>Section 8.06</u>, the Borrower agrees that each Participant shall be entitled to the benefits of <u>Sections 2.08</u>, <u>2.09</u> and <u>2.15</u> (subject to the limitations and requirements of those Sections and <u>Sections 2.10</u> and <u>8.07</u>) to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to <u>clause (b)</u> of this <u>Section 8.06</u>.

(ii)     Each Lender that sells a participation shall, acting solely for this purpose as a non-fiduciary agent of the Borrower, maintain a register on which it enters the name and address of each Participant and the principal and stated interest amounts of each Participant's interest in the Loans held by it (the "<u>Participant Register</u>").  The entries in the Participant Register shall be conclusive absent manifest error, and each party hereto shall treat each Person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement and the other Loan Documents, notwithstanding notice to the contrary.  *No* Lender shall have any obligation to disclose all or any portion of the Participant Register to any Person (including the identity of any Participant or any information relating to a Participant's interest in any Loans or other Obligations under any Loan Document) except to the extent that such disclosure is necessary to establish that such Loan or other Obligation is in registered form Treasury Regulation Section 5f.103-1(c), proposed Treasury Regulation Section 1.163-5 or any applicable temporary, final or other successor regulations. Unless required by the IRS, any disclosure required by the foregoing sentence shall be made by the relevant Lender directly and solely to the IRS. For the avoidance of doubt, Administrative Agent (in its capacity as Administrative Agent) shall have no responsibility for maintaining a Participant Register.

(iii)     A Participant shall not be entitled to receive any greater payment under <u>Section 2.08</u> or <u>2.15</u> than the applicable Lender would have been entitled to receive with respect to the participation sold to such Participant, except to the extent such entitlement to a greater payment results from a Change in Law that occurs after such participant acquired the participation or unless the sale of the participation to such Participant thereafter is made with the Borrower's prior written consent.

(d)     Any Lender may at any time pledge or assign a security interest in all or any portion of its rights under this Agreement to secure obligations of such Lender, including any pledge or assignment to secure obligations to a Federal Reserve Bank or other central bank, and this <u>Section 8.06</u> shall not apply to any such pledge or assignment of a security interest; *provided* that no such pledge or assignment of a security interest shall release a Lender from any of its obligations hereunder or substitute any such pledgee or Assignee for such Lender as a party hereto.  In order to facilitate such pledge or assignment, the Borrower hereby agrees that, upon request of any Lender at any time and from time to time, the Borrower shall provide to such Lender, at the Borrower's own expense, a Note, substantially in the form of <u>Exhibit B</u>.

(e)     [Reserved.]

(f)     (i) Notwithstanding anything to the contrary in this Agreement, the Borrower may purchase by way of assignment from any Lender and become an assignee with respect to, and each Lender shall have the right to assign and transfer to the Borrower, at any time and from time to time, all or a portion of such Lender's Loans either pursuant to Dutch auctions available to all Lenders on the same terms or pursuant to open market purchases ("<u>Permitted Loan Purchases</u>"); *provided* that (A) at the time of the effectiveness thereof, no Default or Event of Default has occurred and is continuing or would result from such Permitted Loan Purchase and (B) the Borrower and such assignor Lender shall execute and deliver to the Administrative Agent a Permitted

Loan Purchase Assignment and Acceptance (and, for the avoidance of doubt, shall not be required to execute and deliver an Assignment and Acceptance pursuant to Section 9.06(b)(ii)(C)).

(ii)     Upon the effectiveness of any Permitted Loan Purchase, the Loans subject thereto shall, without further action by any Person, be deemed cancelled and no longer outstanding for all purposes of this Agreement and the other Loan Documents, including with respect to (1) the making of, or the application of, any payments to the Lenders under this Agreement or any other Loan Document, (2) the making of any request, demand, authorization, direction, notice, consent or waiver under this Agreement or any other Loan Document or (3) the determination of the Required Lenders, or for any similar or related purpose, under this Agreement or any other Loan Document.  The Administrative Agent is authorized to make appropriate entries in the Register to reflect any cancellation of the Loans.  Permitted Loan Purchases pursuant to this Section 9.06(f) shall not constitute voluntary prepayments for purposes of Section 2.14.  In connection with any Permitted Loan Purchase, the assignor Lender shall, to the extent that its Loans shall have been repurchased and assigned to the Borrower pursuant to such Permitted Loan Purchase, be released from its obligations under this Agreement (and, in the case of a Permitted Loan Purchase covering all of the assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto but shall continue to be entitled to the benefits of Section 9.05 (subject to the limitations and requirements of such Section)), but the Borrower shall not obtain any of the rights or obligations of a Lender under this Agreement and the provisions set forth in Section 9.06(b)(ii) shall not apply thereto.

SECTION 8.07.     Replacements of Lenders Under Certain Circumstances.   (a) If any Lender (i) requests reimbursement for amounts owing pursuant to Section 2.08, 2.09 or 2.15 (other than Section 2.15(b)) or (ii) is affected in the manner described in Section 2.08(a)(iii) and as a result thereof of the action described in Section 2.08(b) is required to be taken, then, *provided* that no Event of Default then exists, the Borrower shall, upon five (5) days' notice to the Administrative Agent and the relevant Lender, have the right to replace such Lender by deeming such Lender to have assigned its Loans hereunder to one or more assignees reasonably acceptable to the Administrative Agent; *provided* that (1) such replacement does not conflict with any Requirement of Law, (2) all Loan Obligations (other than any disputed amounts pursuant to Section 2.08, 2.09, or 2.15, as the case may be) owing to such Lender being replaced shall be paid in full to such Lender concurrently with such assignment and the Borrower shall pay any premium that would have been due if the Loans were prepaid, and (3) the replacement Lender shall purchase the foregoing by paying to such Lender a price equal to the principal amount thereof plus accrued and unpaid interest thereon.  No action by or consent of the replaced Lender shall be necessary in connection with such assignment, which shall be immediately and automatically effective upon payment of such purchase price.  In connection with any such assignment, the Borrower, the Administrative Agent, such replaced Lender and the replacement Lender shall otherwise comply with Section 8.06 (*provided* that the Borrower shall be obligated to pay the registration and processing fee referred to therein).  Any such replacement shall not be deemed to be a waiver of any rights that the Borrower, the Administrative Agent or any other Lender shall have against the replaced Lender.

(b)     If any Lender (such Lender, a "Non-Consenting Lender") has failed to consent to a proposed amendment, waiver, discharge or termination which pursuant to the terms of Section 8.01(b) requires the consent of all of the Lenders affected and with respect to which the Required Lenders shall have granted their consent, then, *provided* that no Event of Default (other than an Event of Default relating to the proposed amendment, waiver, discharge or termination) then exists, the Borrower shall, upon five (5) days' notice to the Administrative Agent and the relevant Lender, have the right (unless such Non-Consenting Lender grants such consent) to replace such Non-Consenting Lender by deeming such Non-Consenting Lender to have assigned its Loans hereunder to one or more assignees, reasonably acceptable to the Administrative Agent; *provided* that:  (1) such replacement does not conflict with any Requirement of Law, (2) all Loan Obligations of the Borrower owing to such Non-Consenting Lender being replaced shall be paid in full to such Non-Consenting Lender concurrently with such assignment and the Borrower shall pay any premium that would have been due if the Loans were prepaid, and (3) the replacement Lender shall purchase the foregoing by paying to such Non-Consenting Lender a price equal to the principal amount thereof plus accrued and unpaid interest thereon.  No action by or consent

118

of the Non-Consenting Lender shall be necessary in connection with such assignment, which shall be immediately and automatically effective upon payment of such purchase price. In connection with any such assignment, the Borrower, the Administrative Agent, such Non-Consenting Lender and the replacement Lender shall otherwise comply with Section 8.06 (*provided* that the Borrower shall be obligated to pay the registration and processing fee referred to therein).

SECTION 8.08.    Counterparts. This Agreement may be executed by one or more of the parties to this Agreement on any number of separate counterparts (including by facsimile or other electronic transmission), and all of said counterparts taken together shall be deemed to constitute one and the same instrument. A set of the copies of this Agreement signed by all the parties shall be lodged with the Borrower and the Administrative Agent. The words "execution," "signed," "signature," and words of like import in any Assignment and Assumption or any Loan Document shall in each case be deemed to include electronic signatures, signatures exchanged by electronic transmission, or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act; *provided*, that the Administrative Agent or the Collateral Agent may request, and upon any such request the Credit Parties shall be obligated to provide, manually executed "wet ink" signatures to any Loan Document.

SECTION 8.09.    Severability. Any provision of this Agreement that is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

SECTION 8.10.    GOVERNING LAW.   THIS AGREEMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER SHALL BE GOVERNED BY, AND CONSTRUED AND INTERPRETED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK.

SECTION 8.11.    Submission to Jurisdiction; Consent to Service; Waivers.

(a)    Subject to clause (v) below, the parties hereto hereby irrevocably and unconditionally:

(i)    submits for itself and its property in any legal action or proceeding arising out of or relating to this Agreement and the other Loan Documents to which it is a party, or for recognition and enforcement of any judgment in respect thereof, to the exclusive (subject to clause (v) below) general jurisdiction and venue of the courts of the United States of America sitting in the Borough of Manhattan or, if that court does not have subject matter jurisdiction, in any state court located in the City and County of New York;

(ii)    consents that any such action or proceeding may be brought in such courts and waives any objection that it may now or hereafter have to the venue of any such action or proceeding in any such court or that such action or proceeding was brought in an inconvenient court and agrees not to plead or claim the same;

(iii)    in the case of a Credit Party, each agrees that service of process in any such action or proceeding in any such court may be effected by mailing a copy thereof by registered or certified mail (or any substantially similar form of mail), return receipt requested, to the applicable Credit Party at its respective address set forth in Section 8.02 or at such other address of which the Administrative Agent shall have been notified pursuant thereto;

Error! Unknown document property name.
WEIL:\97986321\6\45327.0007

(iv)     agrees that service as provided in <u>clause (iii)</u> above is sufficient to confer personal jurisdiction over the applicable Credit Party in any such proceeding in any such court, and otherwise constitutes effective and binding service in every respect;

(v)     agrees that Agents and Lenders retain the right to effect service of process in any other manner permitted by law or to bring proceedings against any Credit Party in the courts of any other jurisdiction in connection with the exercise of any rights under any Loan Document or against any Collateral or the enforcement of any judgment and hereby submits to the jurisdiction of, and consents to venue in, any such court; and

(vi)     without limitation of <u>Sections 7.07</u> and <u>8.05</u>, waives, to the maximum extent not prohibited by law, any right it may have to claim or recover in any legal action or proceeding referred to in this <u>Section 8.11</u> any special, exemplary, punitive or consequential damages.

(b)     The parties hereto, to the extent that it has or hereafter may acquire any immunity (sovereign or otherwise) from any legal action, suit or proceeding, from jurisdiction of any court or from setoff or any legal process (whether service of notice, attachment prior to judgment, attachment in aid of execution of judgment, execution of judgment or otherwise) with respect to itself or any of its property or assets, hereby waives and agrees not to plead or claim such immunity in respect of its obligations under this Agreement and the other Loan Documents (it being understood that the waivers contained in this <u>clause (b)</u> shall have the fullest extent permitted under the Foreign Sovereign Immunities Act of 1976, as amended, and are intended to be irrevocable and not subject to withdrawal for the purposes of such Act).

SECTION 8.12.     <u>Acknowledgments</u>.  The parties hereto hereby acknowledge that:

(a)     it has been advised by counsel in the negotiation, execution and delivery of this Agreement and the other Loan Documents;

(b)     none of the Administrative Agent, the Collateral Agent nor any Lender has any fiduciary relationship with or duty to the Borrower arising out of or in connection with this Agreement or any of the other Loan Documents, and the relationship between Administrative Agent, the Collateral Agent and Lenders, on one hand, and the Borrower, on the other hand, in connection herewith or therewith is solely that of debtor and creditor; and

(c)     no joint venture is created hereby or by the other Loan Documents or otherwise exists by virtue of the transactions contemplated hereby among the Lenders or among the Borrower and the Lenders.

SECTION 8.13.     <u>WAIVERS OF JURY TRIAL</u>.  THE PARTIES HERETO HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVE TRIAL BY JURY IN ANY CLAIM, LEGAL ACTION OR PROCEEDING RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT OR AN DEALINGS BETWEEN SUCH PARTIES RELATING TO THE SUBJECT MATTER OF THIS LOAN TRANSACTION OR THE LENDER/BORROWER RELATIONSHIP THAT IS BEING ESTABLISHED AND FOR ANY COUNTERCLAIM THEREIN.  THE SCOPE OF THIS WAIVER IS INTENDED TO BE ALL ENCOMPASSING OF ANY AND ALL DISPUTES THAT MAY BE FILED IN ANY COURT AND THAT RELATE TO THE SUBJECT MATTER OF THIS TRANSACTION, INCLUDING CONTRACT CLAIMS, TORT CLAIMS, BREACH OF DUTY CLAIMS AND ALL OTHER COMMON LAW AND STATUTORY CLAIMS.  EACH PARTY HERETO ACKNOWLEDGES THAT THIS WAIVER IS A MATERIAL INDUCEMENT TO ENTER INTO A BUSINESS RELATIONSHIP THAT EACH HAS ALREADY RELIED ON THIS WAIVER IN ENTERING INTO THIS AGREEMENT, AND THAT EACH WILL CONTINUE TO RELY ON THIS WAIVER IN ITS RELATED FUTURE DEALINGS.  EACH PARTY HERETO FURTHER WARRANTS AND REPRESENTS THAT IT HAS REVIEWED THIS WAIVER WITH ITS LEGAL COUNSEL AND THAT IT KNOWINGLY AND VOLUNTARILY WAIVES ITS JURY TRIAL RIGHTS FOLLOWING CONSULTATION WITH LEGAL COUNSEL.  THIS WAIVER IS IRREVOCABLE,

MEANING THAT IT MAY NOT BE MODIFIED EITHER ORALLY OR IN WRITING (OTHER THAN BY A MUTUAL WRITTEN WAIVER SPECIFICALLY REFERRING TO THIS SECTION 8.13 AND EXECUTED BY EACH OF THE PARTIES HERETO), AND THIS WAIVER SHALL APPLY TO ANY SUBSEQUENT AMENDMENTS, RENEWALS, SUPPLEMENTS OR MODIFICATIONS HERETO OR ANY OF THE OTHER LOAN DOCUMENTS OR TO ANY OTHER DOCUMENTS OR AGREEMENTS RELATING TO THE LOANS MADE HEREUNDER.   IN THE EVENT OF LITIGATION, THIS AGREEMENT MAY BE FILED AS A WRITTEN CONSENT TO A TRIAL BY THE COURT.

SECTION 8.14.    Confidentiality.   The Administrative Agent and each Lender shall hold all information relating to Holdings, the Borrower or any Subsidiary and their respective businesses furnished by or on behalf of Holdings, the Borrower or any such Subsidiary in connection with this Agreement (other than information that (a) has become available to the public other than as a result of a disclosure by such party in breach of this Section 8.14, (b) has been independently developed by such Lender or such Agent without violating this Section 8.14 or (c) was or becomes available to such Lender or such Agent from a third party which, to such person's knowledge, had not breached an obligation of confidentiality to the Borrower or any other Credit Party), confidential in accordance with its customary procedure for handling confidential information of such nature and in any event may make disclosure (a) as required or requested by any governmental agency or representative thereof or any securities exchange on which securities of the disclosing party or any Affiliate of the disclosing party are listed or traded or pursuant to legal process or to such Lender's or the Administrative Agent's attorneys, professional advisors or independent auditors or Affiliates, (b) as part of normal reporting or review procedures to, or examinations by, Governmental Authorities or self-regulatory authorities, including the National Association of Insurance Commissioners or the National Association of Securities Dealers, Inc., (c) in connection with the exercise of any remedies hereunder or under any other Loan Document or any action or proceeding relating to this Agreement or any other Loan Document or in order to enforce its rights hereunder or thereunder any Loan Document, (d) to any pledgee under Section 8.06 or any other prospective assignee of, or prospective Participant in, any of its rights under this Agreement (so long as such person shall agree to keep the same confidential in accordance with this Section 8.14 or terms substantially similar to this Section 8.14), (e) to any direct or indirect contractual counterparty in swap agreements or such contractual counterparty's professional advisor (so long as such contractual counterparty or professional advisor to such contractual counterparty agrees to be bound by the provisions of this Section 8.14 or terms substantially similar to this Section 8.14), (f) on a confidential basis to any rating agency, (g) on a confidential basis to the CUSIP Service Bureau or any similar agency in connection with the issuance and monitoring of CUSIP numbers with respect to the Loans, (g) to any Lenders' financing sources; *provided* that prior to any disclosure such financing source is informed of the confidential nature of the information and are or have been advised to keep information of this type confidential, (h) to Affiliates and Related Funds of such Lender or such Agent and to their respective officers, Directors, partners, members, employees, legal counsel, independent auditors and other advisors, experts, or agents on a confidential basis (and to other Persons authorized by a Lender or Agent to organize, present or disseminate such information in connection with disclosures otherwise made in accordance with this Section 8.14) and (i) with the consent of the relevant Credit Party; *provided* that in no event shall any Lender or the Administrative Agent be obligated or required to return any materials furnished by the Borrower or any Subsidiary of the Borrower.  Notwithstanding the foregoing, on or after the Closing Date, Administrative Agent may, at its own expense issue news releases and publish "tombstone" advertisements and other announcements relating to this transaction in newspapers, trade journals and other appropriate media (which may include use of logos of one or more of the Credit Parties)(collectively, "Trade Announcements").  No Lender or Credit Party shall (a) issue any Trade Announcement, (b) use or reference in advertising, publicity, or otherwise the name of any Lender or any of their respective Affiliates, partners, or employees, or (c) represent that any product or any service provided has been approved or endorsed by any Lender, or any of their respective Affiliates, except (i) disclosures required by applicable law, regulation, legal process or the rules of the SEC or in connection with the Transactions or (ii) with the prior approval of Administrative Agent.

SECTION 8.15.    No Advisory or Fiduciary Responsibility.   In connection with all aspects of each transaction contemplated hereby, the Borrower acknowledges and agrees, and acknowledge its Affiliates' understanding, that:  (i) the credit facility provided for hereunder and any related arranging or other services in

connection therewith (including in connection with any amendment, waiver or other modification hereof or of any other Loan Document) are an arm's-length commercial transaction between the Borrower, and its Affiliates, on the one hand, and the Administrative Agent,  each other Agent and each Lender (collectively, solely for purposes of this paragraph, the "Lenders"), on the other hand, and the Borrower and each of its Affiliates is capable of evaluating and understanding and understands and accepts the terms, risks and conditions of the transactions contemplated hereby and by the other Loan Documents (including any amendment, waiver or other modification hereof or thereof); (ii) in connection with the process leading to such transaction, each Lender is and has been acting solely as a principal and is not the financial advisor, agent or fiduciary, for the Borrower, or any of its Affiliates, stockholders, creditors or employees or any other Person; (iii) no Agent or Lender has assumed or will assume an advisory, agency or fiduciary responsibility in favor of the Borrower or any of its Affiliates with respect to any of the transactions contemplated hereby or the process leading thereto, including with respect to any amendment, waiver or other modification hereof or of any other Loan Document (irrespective of whether any Lender has advised or is currently advising the Borrower or any of its respective Affiliates on other matters) and no Agent or Lender has any obligation to the Borrower or any of its Affiliates with respect to the transactions contemplated hereby except those obligations expressly set forth herein and in the other Loan Documents; (iv) each Agent and Lender and its respective Affiliates may be engaged in a broad range of transactions that involve interests that differ from those of the Borrower and its Affiliates, and no Lender has any obligation to disclose any of such interests by virtue of any advisory, agency or fiduciary relationship; and (v) no Agent or Lender has provided and no Agent or Lender will provide any legal, accounting, regulatory or tax advice with respect to any of the transactions contemplated hereby (including any amendment, waiver or other modification hereof or of any other Loan Document) and the Borrower and each its Affiliates has consulted its own legal, accounting, regulatory and tax advisors to the extent it has deemed appropriate.  The Borrower and each its Affiliates hereby waives and releases, to the fullest extent permitted by law, any claims that it may have against any Agent or Lender with respect to any breach or alleged breach of agency or fiduciary duty.

SECTION 8.16.      USA PATRIOT Act.  Each Lender hereby notifies the Borrower that pursuant to the requirements of the USA Patriot Act, it is required to obtain, verify and record information that identifies the Credit Parties, which information includes the name and address of the Credit Parties and other information that will allow such Lender to identify the Credit Parties in accordance with the USA Patriot Act.

SECTION 8.17.      Conversion of Currencies.

(a)      If, for the purpose of obtaining judgment in any court, it is necessary to convert a sum owing hereunder in one currency into another currency, each party hereto agrees, to the fullest extent that it may effectively do so, that the rate of exchange used shall be that at which in accordance with normal banking procedures in the relevant jurisdiction the first currency could be purchased with such other currency on the Business Day immediately preceding the day on which final judgment is given.

(b)      The obligations of the Borrower in respect of any sum due to any party hereto or any holder of the obligations owing hereunder (the "Applicable Creditor") shall, notwithstanding any judgment in a currency (the "Judgment Currency") other than the currency in which such sum is stated to be due hereunder (the "Agreement Currency"), be discharged only to the extent that, on the Business Day following receipt by the Applicable Creditor of any sum adjudged to be so due in the Judgment Currency, the Applicable Creditor may in accordance with normal banking procedures in the relevant jurisdiction purchase the Agreement Currency with the Judgment Currency; if the amount of the Agreement Currency so purchased is less than the sum originally due to the Applicable Creditor in the Agreement Currency, the Borrower agrees, as a separate obligation and notwithstanding any such judgment, to indemnify the Applicable Creditor against such loss.  The obligations of the Borrower contained in this Section 8.17 shall survive the termination of this Agreement and the payment of all other amounts owing hereunder.

SECTION 8.18.      Platform; Borrower Materials.  The Borrower hereby acknowledges that (a) the Administrative Agent will make available to the Lenders materials and/or information provided by or on behalf of the Borrower hereunder (collectively, "Borrower Materials") by posting the Borrower Materials on IntraLinks

or another similar electronic system (the "Platform"), and (b) certain of the Lenders may be "public-side" Lenders (i.e., Lenders that do not wish to receive material non-public information with respect to the Borrower or its securities) (each, a "Public Lender").  The Borrower hereby agrees that it will use commercially reasonable efforts to identify that portion of the Borrower Material that may be distributed to the Public Lenders and that (i) all such Borrower Materials shall be clearly and conspicuously marked "PUBLIC" which, at a minimum, means that the word "PUBLIC" shall appear prominently on the first page thereof, (ii) by marking Borrower Materials "PUBLIC," the Borrower shall be deemed to have authorized the Administrative Agent, and the Lenders to treat such Borrower Materials as either publicly available information or not material information (although it may be sensitive and proprietary) with respect to the Borrower or its securities for purposes of United States Federal and state securities laws, (iii) all Borrower Materials marked "PUBLIC" are permitted to be made available through a portion of the Platform designated "Public Investor" and (iv) the Administrative Agent shall be entitled to treat any Borrower Materials that are not marked "PUBLIC" as being suitable only for posting on a portion of the Platform not designated "Public Investor."

SECTION 8.19.    Release of Liens.

(a)    Notwithstanding anything to the contrary in the Security Documents, Collateral may be released from the Lien and security interest created by the Security Documents to secure the Loans and obligations under this Agreement at any time or from time to time in accordance with the provisions of the Intercreditor Agreement or as provided hereby.  The applicable property and assets included in the Collateral shall be automatically released from the Liens securing the Loans, and the applicable Guarantor shall be automatically released from its obligations under this Agreement and the Security Documents, under any one or more of the following circumstances or any applicable circumstance as provided in the Intercreditor Agreement or the Security Documents:

(i)    to enable the Borrower and its Subsidiaries to consummate the disposition of such property or assets to a Person that is not the Borrower or a Guarantor to the extent permitted under Section 5.07;

(ii)    in respect of any assets or property constituting Collateral, upon any assets becoming designated as Excluded Equity Interests, Excluded Assets or assets of an Excluded Subsidiary;

(iii)    as provided in Section 8.01 or upon the release of such Guarantor pursuant to Section 8.20; and

(iv)    upon any assets (x) becoming designated as Excluded Equity Interests, Excluded Assets or assets of any Excluded Subsidiary or any Subsidiary Guarantor becoming an Excluded Subsidiary or (y) becoming subject to Liens pursuant to clauses (1), (4), (14), (16) (with respect to a refinancing of Permitted Liens otherwise described in this clause (iv)(y)), (31) and (36) of the definition of Permitted Liens.

(b)    In connection with any termination or release pursuant to this Section 8.19 or a release of a Guarantor pursuant to Section 8.20, the Collateral Agent shall execute and deliver to any Credit Party, at such Credit Party's expense, all documents that such Credit Party shall reasonably request to evidence such termination or release (including, without limitation, UCC termination statements), and will duly assign and transfer to such Credit Party, such of the Pledged Collateral (as defined in the Collateral Agreement) that may be in the possession of the Collateral Agent and has not theretofore been sold or otherwise applied or released pursuant to this Agreement or the Security Documents.  Any execution and delivery of documents pursuant to this Section 8.19 shall be without recourse to or warranty by the Collateral Agent.  In connection with any release pursuant to this Section 8.19 or 8.20, the Credit Party shall be permitted to take any action in connection therewith consistent with such release including, without limitation, the filing of UCC termination statements. Upon the receipt of any necessary or proper instruments of termination, satisfaction or release prepared by the

Error! Unknown document property name.
WEIL:\97986321\6\45327.0007

Borrower, the Collateral Agent shall execute, deliver or acknowledge such instruments or releases to evidence the release of any Collateral permitted to be released pursuant to this Agreement or the Security Documents or the Intercreditor Agreement without the consent of, or notice to, any Lender.

The security interests in all Collateral also will be released upon payment in full of the principal of, together with accrued and unpaid interest on, the Loans and all other Obligations under this Agreement and the Security Documents that are due and payable at or prior to the time such principal, together with accrued and unpaid interest, is paid.

Prior to executing and delivering or authorization of the filing of any release pursuant to this Section 8.19, the Collateral Agent shall receive, and shall be entitled to conclusively rely on, an Officers' Certificate stating that such release complies with the terms of this Agreement and the other Loan Documents, and all conditions precedent to the execution and delivery of such release have been satisfied.

SECTION 8.20.    Release of Guarantee.  Each Guarantor shall be automatically released upon:

(a)    solely in the case of a Subsidiary Guarantor, the sale, disposition, exchange or other transfer (including through merger, consolidation, amalgamation or otherwise) of the Capital Stock (including any sale, disposition or other transfer following which the applicable Subsidiary Guarantor is no longer a Restricted Subsidiary), of the applicable Subsidiary Guarantor if such sale, disposition, exchange or other transfer is made in a manner permitted under this Agreement and the other Loan Documents;

(b)    discharge of the Loan Obligations in accordance with the terms hereof;

(c)    as provided in Section 8.01; and

(d)    solely in the case of a Subsidiary Guarantor, such Subsidiary Guarantor becoming an Excluded Subsidiary.

SECTION 8.21.    Acknowledgement and Consent to Bail-In of Affected Financial Institutions. Notwithstanding anything to the contrary in any Loan Document or in any other agreement, arrangement or understanding of the parties hereto, each such party acknowledges that any liability of any Affected Financial Institution arising under any Loan Document, to the extent such liability is unsecured, may be subject to the write-down and conversion powers of the applicable Resolution Authority and agrees and consents to, and acknowledges and agrees to be bound by:

(a)    the application of any Write-Down and Conversion Powers by the applicable Resolution Authority to any such liabilities arising hereunder which may be payable to it by any party hereto that is an Affected Financial Institution; and

(b)    the effects of any Bail-in Action on any such liability, including, if applicable:

(i)    a reduction in full or in part or cancellation of any such liability;

(ii)    a conversion of all, or a portion of, such liability into shares or other instruments of ownership in such Affected Financial Institution, its parent undertaking, or a bridge institution that may be issued to it or otherwise conferred on it, and that such shares or other instruments of ownership will be accepted by it in lieu of any rights with respect to any such liability under this Agreement or any other Loan Document; or

(iii)    the variation of the terms of such liability in connection with the exercise of the write-down and conversion powers of the applicable Resolution Authority.

Error! Unknown document property name.
WEIL:\97986321\6\45327.0007

SECTION 8.22.    Amendment and Restatement.  This Agreement shall be deemed to amend and restate the Prepetition First Lien Credit Agreement in its entirety, and all of the terms and provisions hereof shall supersede the terms and conditions thereof.

SECTION 8.23.    Certain ERISA Matters.  Each Lender (x) represents and warrants, as of the date such Person became a Lender party hereto, to, and (y) covenants, from the date such Person became a Lender party hereto to the date such Person ceases being a Lender party hereto, for the benefit of the Agents and their respective Affiliates and not, for the avoidance of doubt, to or for the benefit of the Borrower or any other Credit Party, that at least one of the following is and will be true:

(a)    such Lender is not using "plan assets" (within the meaning of Section 3(42) of ERISA or otherwise) of one or more Benefit Plans with respect to such Lender's entrance into, participation in, administration of and performance of the Loans or this Agreement,

(b)    the transaction exemption set forth in one or more PTEs, such as PTE 84-14 (a class exemption for certain transactions determined by independent qualified professional asset managers), PTE 95-60 (a class exemption for certain transactions involving insurance company general accounts), PTE 90-1 (a class exemption for certain transactions involving insurance company pooled separate accounts), PTE 91-38 (a class exemption for certain transactions involving bank collective investment funds) or PTE 96-23 (a class exemption for certain transactions determined by in-house asset managers), is applicable with respect to such Lender's entrance into, participation in, administration of and performance of the Loans and this Agreement,

(c)    (i) such Lender is an investment fund managed by a "Qualified Professional Asset Manager" (within the meaning of Part VI of PTE 84-14), (ii) such Qualified Professional Asset Manager made the investment decision on behalf of such Lender to enter into, participate in, administer and perform the Loans and this Agreement, (iii) the entrance into, participation in, administration of and performance of the Loans and this Agreement satisfies the requirements of sub-sections (b) through (g) of Part I of PTE 84-14 and (iv) to the best knowledge of such Lender, the requirements of subsection (a) of Part I of PTE 84-14 are satisfied with respect to such Lender's entrance into, participation in, administration of and performance of the Loans and this Agreement, or

(d)    such other representation, warranty and covenant as may be agreed in writing between the Administrative Agent, in its sole discretion, and such Lender.

In addition, unless either (1) sub-clause (a) in the immediately preceding paragraph is true with respect to a Lender or (2) a Lender has provided another representation, warranty and covenant in accordance with sub-clause (d) in the immediately preceding paragraph, such Lender further (x) represents and warrants, as of the date such Person became a Lender party hereto, to, and (y) covenants, from the date such Person became a Lender party hereto to the date such Person ceases being a Lender party hereto, for the benefit of, the Agents and their respective Affiliates and not, for the avoidance of doubt, to or for the benefit of the Borrower or any other Credit Party, that none of the Agents or their respective Affiliates are a fiduciary with respect to the assets of such Lender involved in such Lender's entrance into, participation in, administration of and performance of the Loans and this Agreement (including in connection with the reservation or exercise of any rights by the Agents under this Agreement, any Loan Document or any documents related hereto or thereto).  The Agents hereby inform the Lenders that each Agent is not undertaking to provide impartial investment advice, or to give advice in a fiduciary capacity, in connection with the transactions contemplated hereby, and that such Agent has a financial interest in the transactions contemplated hereby in that such Agent or an Affiliate thereof (i) may receive interest or other payments with respect to the Loans and this Agreement, (ii) may recognize a gain if it extended the Loans for an amount less than the amount being paid for an interest in the Loans by such Lender or (iii) may receive fees or other payments in connection with the transactions contemplated hereby, the Loan Documents or otherwise, including structuring fees, commitment fees, arrangement fees, facility fees, upfront fees, underwriting fees, ticking fees, agency fees, administrative agent or collateral agent fees, utilization fees, minimum usage fees, letter of credit fees, fronting fees, deal-away or alternate transaction fees, amendment fees,

125

processing fees, term out premiums, banker's acceptance fees, breakage or other early termination fees or fees similar to the foregoing.

SECTION 8.24.    Acknowledgement Regarding Any Supported QFCs.  To the extent that the Loan Documents provide support, through a guarantee or otherwise, for Derivative Transactions or any other agreement or instrument that is a QFC (such support, "QFC Credit Support" and each such QFC a "Supported QFC"), the parties acknowledge and agree as follows with respect to the resolution power of the Federal Deposit Insurance Corporation under the Federal Deposit Insurance Act and Title II of the Dodd-Frank Wall Street Reform and Consumer Protection Act (together with the regulations promulgated thereunder, the "US Special Resolution Regimes") in respect of such Supported QFC and QFC Credit Support (with the provisions below applicable notwithstanding that the Loan Documents and any Supported QFC may in fact be stated to be governed by the laws of the State of New York and/or of the U.S. or any other state of the U.S.):

(a)    In the event a Covered Entity that is party to a Supported QFC (each, a "Covered Party") becomes subject to a proceeding under a US Special Resolution Regime, the transfer of such Supported QFC and the benefit of such QFC Credit Support (and any interest and obligation in or under such Supported QFC and such QFC Credit Support, and any rights in property securing such Supported QFC or such QFC Credit Support) from such Covered Party will be effective to the same extent as the transfer would be effective under the US Special Resolution Regime if the Supported QFC and such QFC Credit Support (and any such interest, obligation and rights in property) were governed by the laws of the U.S. or a state of the U.S.  In the event a Covered Party or a BHC Act Affiliate of a Covered Party becomes subject to a proceeding under a US Special Resolution Regime, Default Rights under the Loan Documents that might otherwise apply to such Supported QFC or any QFC Credit Support that may be exercised against such Covered Party are permitted to be exercised to no greater extent than such Default Rights could be exercised under the US Special Resolution Regime if the Supported QFC and the Loan Documents were governed by the laws of the U.S. or a state of the U.S. Without limitation of the foregoing, it is understood and agreed that rights and remedies of the parties with respect to a Defaulting Lender shall in no event affect the rights of any Covered Party with respect to a Supported QFC or any QFC Credit Support.

(b)    As used in this Section 8.24, the following terms have the following meanings:

"BHC ACT Affiliate" means an "affiliate" (as defined under, and interpreted in accordance with, 12 U.S.C. 1841(k)).

"Covered Entity" means any of the following:

(i)    a "covered entity" as that term is defined in, and interpreted in accordance with, 12 C.F.R. § 252.82(b);

(ii)    a "covered bank" as that term is defined in, and interpreted in accordance with, 12 C.F.R. § 47.3(b); or

(iii)    a "covered FSI" as that term is defined in, and interpreted in accordance with, 12 C.F.R. § 382.2(b).

"Default Right" has the meaning assigned to that term in, and shall be interpreted in accordance with, 12 C.F.R. §§ 252.81, 47.2 or 382.1, as applicable.

"QFC" has the meaning assigned to the term "qualified financial contract" in, and shall be interpreted in accordance with, 12 U.S.C. 5390(c)(8)(D).

Error! Unknown document property name.
WEIL:\97986321\6\45327.0007

[SIGNATURE PAGES FOLLOW]

**Error! Unknown document property name.**
WEIL:\97986321\6\45327.0007

IN  WITNESS  WHEREOF,  each  of  the  parties  hereto  has  caused  a  counterpart  of  this Agreement to be duly executed and delivered as of the date first above written.

[●], as the Borrower

By: _____
    Name:
    Title

[●], as Holdings

By: _____
    Name:
    Title

[Signature Page to Credit Agreement]

CANTOR FITZGERALD SECURITIES, as the
Administrative Agent and the Collateral Agent


By: _____
      Name:
      Title:

WEIL:\97986321\4\45327.0007
**Error! Unknown document property name.**
WEIL:\97986321\6\45327.0007

## Exhibit K

**New Intercreditor Agreement**

**[To Come]**

**<u>Exhibit L</u>**

**New Money Warrant Agreement**

WARRANT AGREEMENT

between

[NEWCO],

AS ISSUER

and

AMERICAN STOCK TRANSFER & TRUST COMPANY, LLC,

AS WARRANT AGENT

[●], 2021

THE WARRANTS WERE ORIGINALLY ISSUED IN A TRANSACTION EXEMPT FROM REGISTRATION UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), AND THE WARRANTS MAY NOT BE OFFERED, SOLD OR OTHERWISE TRANSFERRED EXCEPT PURSUANT TO A REGISTRATION STATEMENT UNDER THE SECURITIES ACT OR AN APPLICABLE EXEMPTION FROM THE REGISTRATION REQUIREMENTS THEREOF.

# TABLE OF CONTENTS

PAGE

Section 1.  *Certain Defined Terms* ................................................................1
Section 2.  *Appointment of Warrant Agent* ..................................................5
Section 3.  *Issuance of Warrants; Form, Execution and Delivery* ...............5
Section 4.  *Transfers* ....................................................................................7
Section 5.  *Duration and Exercise of Warrants* ...........................................8
Section 6.  *Anti-Dilution Provisions* .........................................................11
Section 7.  *Reorganization* .........................................................................13
Section 8.  *Covenants of the Company* ......................................................14
Section 9.  *Warrant Agent* ..........................................................................15
Section 10.  *Severability* ............................................................................19
Section 11.  *Holder Not Deemed a Shareholder* ........................................19
Section 12.  *Notices to Company and Warrant Agent* ...............................19
Section 13.  *Supplements and Amendments* ...............................................20
Section 14.  *Termination* ............................................................................20
Section 15.  *Governing Law and Consent to Forum* ..................................21
Section 16.  *Waiver of Jury Trial* ..............................................................21
Section 17.  *Benefits of This Agreement* ....................................................22
Section 18.  *Counterparts* ..........................................................................22
Section 19.  *Headings* ................................................................................22
Section 20.  *Electronic Transmission* ........................................................22

EXHIBITS

Exhibit A        Form of Election to Exercise Warrant

Exhibit B        Form of Warrant Assignment

#94593851v2

This WARRANT AGREEMENT (this "**Agreement**") is dated as of [●], 2021, between [NEWCO], a Delaware corporation (the "**Company**"), as issuer, and AMERICAN STOCK TRANSFER & TRUST COMPANY, LLC, as warrant agent (the "**Warrant Agent**").

W I T N E S S E T H

WHEREAS, pursuant to and in connection with [the *Fourth Amended Joint Chapter 11 Plan of Fieldwood Energy LLC and its Affiliated Debtors,* dated April 15, 2021 [Docket No. 1284], Case No. 20-33948 (MI) (Bankr. S.D. Tex.)] (the "**Plan**") relating to a reorganization under chapter 11 of title 11 of the United States Code, the Company has agreed to issue to the Holders (as defined herein) an aggregate of [●] warrants (the "**Warrants**"), which are exercisable to receive shares (the "**Shares**") of common stock (the "**Common Stock**"), par value $0.01 per share, of the Company;

WHEREAS, the Company desires the Warrant Agent to act on behalf of the Company, and the Warrant Agent is willing to so act, in connection with the issuance, registration, transfer, exchange, replacement, exercise and cancellation of the Warrants;

WHEREAS, the Warrant Agent, at the request of the Company, has agreed to act as the agent of the Company in connection with the issuance, registration, transfer, exchange, replacement, exercise and cancellation of the Warrants as provided herein;

WHEREAS, the Warrants are being offered and sold in reliance on the exemption from the registration requirements of the Securities Act of 1933, as amended (the "**Securities Act**"), and any applicable state securities or "blue sky" laws afforded by Section 4(a)(2) of the Securities Act; and

WHEREAS, the Company desires to enter into this Agreement to set forth the terms and conditions of the Warrants and the rights of the Holders thereof.

NOW, THEREFORE, in consideration of the premises and mutual agreements herein set forth, the parties hereto agree as follows:

Section 1.    *Certain Defined Terms*.  Whenever used in this Agreement, the following words and phrases, unless the context otherwise requires, shall have the meanings specified in this Section.

"**Agreement**" has the meaning specified in the preamble hereof.

"**Appropriate Officer**" means the Chief Executive Officer, President, Chief Financial Officer, Treasurer, Secretary, Assistant Secretary or any Vice President (or higher or equivalent officer) of the Company.

"**Board**" means, as of any date, the Board of Directors of the Company in office on such date.

"**Business Day**" means any day other than a Saturday or Sunday or any other day on which national banking associations in the State of New York generally are closed for commercial banking business.

"**Charter**" means the Amended and Restated Certificate of Incorporation of the Company (as amended).

"**Common Stock**" has the meaning specified in the recitals hereof.

"**Company**" has the meaning specified in the preamble hereof.

"**Direct Registration Warrants**" has the meaning specified in Section 3(a) hereof.

"**Distributed Property**" has the meaning specified in Section 6(b) hereof.

"**Effective Date**" has the meaning specified in the Plan.

"**Exchange**" means a U.S. national or regional securities exchange.

"**Exercise Date**" means, with respect to an exercise of a Warrant by a Holder, the first date on which such Holder has satisfied the conditions for exercise of such Warrant as set forth in Section 5(c) (unless such conditions are satisfied after 5:00 p.m., New York City time, on a Business Day or on a date that is not a Business Day, in which event the Exercise Date shall be the next following Business Day).

"**Exercise Period**" means the period commencing upon the execution and delivery of this Agreement by the parties hereto and ending on, and including, the Expiration Date.

"**Expiration Date**" has the meaning specified in Section 5(a) hereof.

"**Fair Market Value**" means, as of any date of determination:

(i)       in the case of shares of stock that are listed on an Exchange on such date, the average of the Last Reported Sale Prices for such shares for the 10 consecutive Trading Days immediately preceding such date (or such less number of Trading Days for which such shares were so listed); *provided* that, with respect to any determination of Fair Market Value pursuant to this clause (i), the Company, in its good faith determination, shall make appropriate adjustments to such Last Reported Sale Prices to account for any adjustments to the Warrant Share Number that become effective, or any event requiring any adjustments to the Warrant Share Number where the record date, effective date or ex-date, as the case may be, of the event occurs, during such period of consecutive Trading Days;

(ii)      in the case of cash, the amount thereof; and

(iii)         in the case of securities not covered by clause (i) above or any other property, as determined in good faith and in a commercially reasonable manner by the Board.

"**Holder**" means the record holder of a Warrant listed on the Warrant Register.

"**Intended Tax Treatment**" has the meaning specified in Section 5(k) hereof.

"**Joinder**" has the meaning specified in the Stockholders Agreement.

"**Last Reported Sale Price**" means, on any day, (i) in the case of shares of stock that are listed on a Principal Exchange on such day, the closing sale price per share (or if no closing sale price is reported, the average of the bid and ask prices or, if more than one in either case, the average of the average bid and the average ask prices) on such day as reported in composite transactions for the Principal Exchange and (ii) in the case of shares of stock that are listed on an Exchange other than a Principal Exchange on such day, the closing sale price per share (or if no closing sale price is reported, the average of the bid and ask prices or, if more than one in either case, the average of the average bid and the average ask prices) on such day as reported in composite transactions for the primary Exchange on which such shares are traded.

"**Marketable Securities**" means any common equity securities (whether voting or non-voting) (including American depositary shares representing common equity securities) listed on a Principal Exchange.

"**Person**" means any natural person, corporation, partnership, limited liability company, firm, association, trust, government, governmental agency, or other entity, whether acting in an individual, fiduciary or other capacity.

"**Plan**" has the meaning specified in the recitals hereof.

"**Principal Exchange**" means each of The New York Stock Exchange, The Nasdaq Global Market and The Nasdaq Global Select Market (or any of their respective successors).

"**Reference Property**" means, in respect of any Reorganization, the kind and amount of shares of stock, other securities or other property or assets (including cash or any combination thereof) that a holder of a number of Shares (or Units of Reference Property in respect of a prior Reorganization, as applicable) equal to the number of Warrant Shares (or Units of Reference Property in respect of a prior Reorganization, as applicable) obtainable upon exercise of each Warrant immediately prior to such Reorganization would have owned or been entitled to receive.

"**Reorganization**" means any consolidation, merger, statutory share exchange, business combination or similar transaction with a third party, any sale, lease or other transfer to a third party of all or substantially all of the consolidated assets of the Company and its Subsidiaries, or any recapitalization, reclassification or transaction that results in a change of the Common Stock (other than as described in Section 6(a)), in

#94593851v2

each case, in which the Common Stock is converted into, is exchanged for or becomes the right to receive cash, other securities or other property.

"**Resale Restriction Termination Date**" has the meaning specified in Section 3(b) hereof.

"**Securities Act**" has the meaning specified in the recitals hereof.

"**Shares**" has the meaning specified in the recitals hereof.

"**Stockholders Agreement**" means the Stockholders Agreement dated as of [___], 2021 by and among the Company and the Stockholders (as defined therein) from time to time party thereto, as amended from time to time.

"**Subsidiary**" means, with respect to any Person, any corporation, partnership, joint venture, limited liability company or other entity (x) of which such Person or a subsidiary of such Person is a general partner or (y) of which a majority of the voting securities or other voting interests, or a majority of the securities or other interests of which having by their terms ordinary voting power to elect a majority of the board of directors or persons performing similar functions with respect to such entity, is directly or indirectly owned by such Person and/or one or more subsidiaries thereof.

"**Trading Day**" means a day on which (i) trading in the Shares (or other security for which a closing sale price must be determined) generally occurs on the Principal Exchange or, if the Shares (or such other security) are not then listed on a Principal Exchange, on the principal other Exchange on which the Shares (or such other security) are then listed, and (ii) a Last Reported Sale Price for the Shares (or closing sale price for such other security) is available on such securities exchange; *provided* that if the Shares (or such other security) are not so listed or traded, "**Trading Day**" means a Business Day.

"**Unit of Reference Property**" means, in respect of any Reorganization, the kind and amount of Reference Property that a holder of one Share (or the holder of one Unit of Reference Property in respect of a prior Reorganization, as applicable) is entitled to receive upon the consummation of such Reorganization.

"**Warrant Agent**" has the meaning specified in the preamble hereof and shall include any successor Warrant Agent hereunder.

"**Warrant Agent Office**" has the meaning specified in Section 4(b)(ii) hereof.

"**Warrant Exercise Notice**" has the meaning specified in Section 5(c) hereof.

"**Warrant Register**" has the meaning specified in Section 3(c) hereof.

"**Warrant Shares**" has the meaning specified in Section 3(a) hereof.

"**Warrant Share Number**" has the meaning specified in Section 3(a) hereof.

4

"**Warrant Statements**" has the meaning specified in Section 3(b) hereof.

"**Warrants**" has the meaning specified in the recitals hereof.

Section 2.      *Appointment of Warrant Agent*.  The Company hereby appoints the Warrant Agent to act as agent for the Company in accordance with the instructions set forth in this Agreement, and the Warrant Agent hereby accepts such appointment, upon the terms and conditions hereinafter set forth.

Section 3.      *Issuance of Warrants; Form, Execution and Delivery*.  (a)  *Issuance of Warrants*.  Pursuant to, and in accordance with, the terms of this Agreement and the Plan, the Company hereby issues the Warrants.  The Warrants shall be, upon issuance, duly authorized and validly issued.  In accordance with Section 4 hereof, as of the date hereof, the Company shall cause to be issued to the applicable registered Holders, one or more Warrants evidenced by an uncertificated, book-entry registration on the books and records of the Warrant Agent (the "**Direct Registration Warrants**").  Each Direct Registration Warrant entitles the Holder, upon proper exercise and subject to Section 5(i), to receive from the Company one Share (as it may be adjusted from time to time as provided herein, the "**Warrant Share Number**").  The Shares deliverable upon proper exercise of the Warrants are referred to herein as the "**Warrant Shares**."

(b)      *Form of Warrant*.  All Warrants issued pursuant to this Agreement shall be in the form of Direct Registration Warrants reflected on statements issued by the Warrant Agent from time to time to the Holders thereof reflecting such uncertificated, book-entry position (the "**Warrant Statements**").  The Warrant Statements may bear such appropriate insertions, omissions, substitutions and other variations as are required or permitted by this Agreement, and may have such letters, numbers or other marks of identification and such legends or endorsements placed thereon as may be required to comply with the Charter, the Stockholders Agreement, any law or any rules made pursuant thereto or as may be determined, consistently herewith and reasonably acceptable to the Warrant Agent, by any Appropriate Officer.  Each Warrant Statement and the Warrant Register shall bear the following legend:

"THE WARRANTS ARE SUBJECT TO VARIOUS CONDITIONS, INCLUDING CERTAIN RESTRICTIONS ON SALE, DISPOSITION OR TRANSFER AS SET FORTH IN THE STOCKHOLDERS AGREEMENT DATED AS OF [__], 2021 BY AND AMONG [NEWCO] (THE "**COMPANY**") AND THE STOCKHOLDERS (AS DEFINED THEREIN) FROM TIME TO TIME PARTY THERETO, AS AMENDED FROM TIME TO TIME (THE "**STOCKHOLDERS AGREEMENT**").  NO REGISTRATION OR TRANSFER OF THE WARRANTS WILL BE MADE ON THE BOOKS OF THE COMPANY OR THE WARRANT AGENT UNLESS AND UNTIL SUCH RESTRICTIONS SHALL HAVE BEEN COMPLIED WITH.  THE COMPANY WILL FURNISH WITHOUT CHARGE, UPON WRITTEN REQUEST TO THE COMPANY AT ITS PRINCIPAL PLACE OF BUSINESS, TO EACH HOLDER OF RECORD OF THE WARRANTS, A COPY OF THE STOCKHOLDERS

#94593851v2

AGREEMENT CONTAINING THE ABOVE-REFERENCED RESTRICTIONS ON TRANSFERS OF SECURITIES."

In addition, until the date (the "**Resale Restriction Termination Date**") that is the later of (1) the date that is one year after the date of original issuance of the Warrants, or such shorter period of time as permitted by Rule 144 under the Securities Act or any successor provision thereto, and (2) such later date, if any, as may be required by applicable law, each Warrant Statement and the Warrant Register shall bear the following legend:

"THIS SECURITY AND THE COMMON STOCK, IF ANY, ISSUABLE UPON EXERCISE OF THIS SECURITY HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "**SECURITIES ACT**"), AND MAY NOT BE OFFERED, SOLD, PLEDGED OR OTHERWISE TRANSFERRED PRIOR TO THE DATE THAT IS THE LATER OF (X) ONE YEAR AFTER THE DATE OF ORIGINAL ISSUANCE HEREOF OR SUCH SHORTER PERIOD OF TIME AS PERMITTED BY RULE 144 UNDER THE SECURITIES ACT OR ANY SUCCESSOR PROVISION THERETO AND (Y) SUCH LATER DATE, IF ANY, AS MAY BE REQUIRED BY APPLICABLE LAW, EXCEPT:

(A)     TO [NEWCO] (THE "**COMPANY**") OR ANY SUBSIDIARY THEREOF, OR

(B)     PURSUANT TO A REGISTRATION STATEMENT WHICH HAS BECOME EFFECTIVE UNDER THE SECURITIES ACT, OR

(C)     PURSUANT TO AN EXEMPTION FROM REGISTRATION PROVIDED BY RULE 144 UNDER THE SECURITIES ACT OR ANY OTHER AVAILABLE EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT.

PRIOR TO THE REGISTRATION OF ANY TRANSFER IN ACCORDANCE WITH CLAUSE (C) ABOVE, THE COMPANY AND THE WARRANT AGENT RESERVE THE RIGHT TO REQUIRE THE DELIVERY OF SUCH LEGAL OPINIONS, CERTIFICATIONS OR OTHER EVIDENCE AS MAY REASONABLY BE REQUIRED IN ORDER TO DETERMINE THAT THE PROPOSED TRANSFER IS BEING MADE IN COMPLIANCE WITH THE SECURITIES ACT AND APPLICABLE STATE SECURITIES LAWS. NO REPRESENTATION IS MADE AS TO THE AVAILABILITY OF ANY EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT."

(c)     *Other Matters.*  Each Warrant shall be, and shall remain, subject to the provisions of this Agreement and the Stockholders Agreement until such time as all of the Warrants shall have been duly exercised or shall have expired or been canceled in accordance with the terms hereof.  Each Holder shall be bound by all of the terms and provisions of this Agreement (a copy of which is available on request to the Secretary of

#94593851v2

the Company) and any amendments thereto as fully and effectively as if such Holder had signed the same.  The Warrant Agent shall keep, at an office designated for such purpose, books (the "**Warrant Register**") in which, subject to such reasonable regulations as it may prescribe, it shall register any Direct Registration Warrants and exchanges and transfers of outstanding Warrants in accordance with the procedures set forth in Section 4 of this Agreement, all in form satisfactory to the Company and the Warrant Agent.  The Company may require payment by the applicable Holder of a sum sufficient to cover any stamp or other tax or other governmental charge that may be imposed on the Holder in connection with any such exchange or registration of transfer.  The Warrant Agent shall have no obligation to effect an exchange or register a transfer unless and until any payments required by the immediately preceding sentence have been made.  The Warrant Agent and the Company may deem and treat the Person in whose name any Warrant is registered on the Warrant Register as the absolute owner of such Warrant, for the purpose of any exercise thereof, any distribution to the Holder thereof and for all other purposes, and neither the Warrant Agent nor the Company shall be affected by notice to the contrary prior to due presentment for registration of transfer or exchange of any Warrant in accordance with the procedures set forth in this Agreement.

Section 4.    *Transfers*.  (a)  *Transfer and Exchange of Direct Registration Warrants*.  When the registered Holder of a Direct Registration Warrant has presented to the Warrant Agent a written request to register the transfer of any Direct Registration Warrant, the Warrant Agent shall register the transfer or make the exchange as requested if such transfer satisfies the provisions of this Agreement (including the legends described in Section 3(b)) and the Stockholders Agreement; *provided* that the Warrant Agent has received a written instruction of transfer in form satisfactory to the Warrant Agent, properly completed and duly executed by the Holder thereof or by his or her attorney, duly authorized in writing.  A party requesting transfer of Warrants must provide any evidence of authority that may be required by the Warrant Agent, including, but not limited to, a signature guarantee from an eligible guarantor institution participating in a signature guarantee program approved by the Securities Transfer Association.

(b)    *Obligations with Respect to Transfers of Warrants*.

(i)    All Direct Registration Warrants issued upon any registration of transfer or exchange shall be the valid obligations of the Company, entitled to the same benefits under this Agreement as the Direct Registration Warrants surrendered upon such registration of transfer or exchange.

(ii)    The Warrant Agent shall, upon receipt of all information, opinions, certifications or other evidence required to be delivered hereunder, register the transfer of any outstanding Warrants in the Warrant Register upon the delivery by the registered Holder thereof, at the Warrant Agent Office referred to in Section 12 hereof (the "**Warrant Agent Office**"), duly endorsed, and accompanied by a completed form of assignment substantially in the form attached as Exhibit B (including a duly endorsed Joinder signed by the transferee) and duly signed by the Holder thereof or by the duly appointed legal representative thereof or by his

#94593851v2

or her attorney, duly authorized in writing, such signature to be guaranteed by a participant in a Medallion Signature Guarantee Program at a guarantee level acceptable to the Warrant Agent.  Upon any such registration of transfer, a new Warrant Statement shall be issued to the transferee.

(iii)     The Warrant Agent shall not undertake the duties and obligations of a transfer agent under this Agreement, including, without limitation, the duty to receive, issue or transfer the Warrant Shares.

(c)     *Holder Acknowledgement.*  Each Holder, by its acceptance of any Warrant under this Agreement, acknowledges and agrees that (i) the Warrants were issued pursuant to the exemption from the registration requirement of Section 5 of the Securities Act provided by Section 4(a)(2) of the Securities Act, and prior to the Resale Restriction Termination Date, a Holder of any Warrants (or a holder of any Warrant Shares issued upon exercise of any Warrants) shall not sell or transfer such Warrants (or Warrant Shares) in the absence of an effective registration statement under the Securities Act or an exemption from registration thereunder and (ii) the Company is not, and has no obligation to currently become, a reporting company under the Securities Exchange Act of 1934, as amended, and the Holder's rights to information relating to the Company are limited.

Section 5.     *Duration and Exercise of Warrants*.  (a)  *Expiration Date*.  The Warrants shall expire at 5:00 p.m., New York City time, on [___], 2028 (the "**Expiration Date**"), which is the seventh (7th) anniversary of the Effective Date.  After 5:00 p.m., New York City time, on the Expiration Date, the Warrants will become void and of no value, and all rights thereunder and all rights in respect thereof under this Agreement shall cease as of such time.

(b)     [Reserved].

(c)     *Manner of Exercise*.  Each Warrant may be exercised by the Holder thereof during the Exercise Period as described below. Subject to the provisions of this Agreement, including Section 6, each Warrant shall entitle the Holder thereof to receive from the Company (and the Company shall issue and sell to such Holder), on a cashless basis and for no consideration whatsoever, a number of Warrant Shares equal to the then-applicable Warrant Share Number.  A Holder may exercise any of its Warrants on any Business Day during the Exercise Period by, no later than 5:00 p.m., New York City time, on such Business Day, delivering (A) written notice of such election (a "**Warrant Exercise Notice**") to exercise the applicable Warrants to the Company and the Warrant Agent at the addresses set forth in Section 12 hereof, which Warrant Exercise Notice shall be substantially in the form set forth in Exhibit A; and (B) a duly completed and executed Joinder to the extent required pursuant to Section [5.01] of the Stockholders Agreement for the Person that will hold the Warrant Shares issued pursuant to the Warrant Exercise Notice in the form provided for in the Stockholders Agreement and attached to the Warrant Exercise Notice.

(d)     [Reserved].

8

(e)     Any exercise of a Warrant pursuant to the terms of this Agreement shall be irrevocable as of the date of delivery of the applicable Warrant Exercise Notice and shall constitute a binding agreement between the Holder and the Company, enforceable in accordance with its terms (except as such enforceability may be limited by bankruptcy, insolvency or similar laws generally affecting creditor's rights).

(f)     The Warrant Agent shall:

(i)     examine all Warrant Exercise Notices and all other documents delivered to it by or on behalf of Holders as contemplated hereunder to ascertain whether, on their face, such Warrant Exercise Notices and any such other documents have been executed and completed in accordance with their terms;

(ii)     inform the Company of and cooperate with and assist the Company in resolving any reconciliation problems between the Warrant Exercise Notices received and delivery of Warrants to the Warrant Agent's account; and

(iii)     advise the Company, no later than two (2) Business Days after receipt of a Warrant Exercise Notice, of (A) the receipt of such Warrant Exercise Notice and the number of Warrants exercised in accordance with the terms of this Agreement, (B) the number of Warrant Shares to be issued upon exercise of such Warrants, (C) the instructions with respect to delivery of the Warrant Shares deliverable upon such exercise, and (D) such other information as the Company shall reasonably require.

(g)     All questions as to the validity, form and sufficiency (including time of receipt) of a Warrant exercise shall be determined by the Company in its reasonable discretion in good faith.  The Warrant Agent shall incur no liability for or in respect of and, except to the extent such liability arises from the Warrant Agent's bad faith, gross negligence or willful misconduct (each as determined by a final, non-appealable order, judgment of a court decree or ruling of competent jurisdiction), shall be indemnified and held harmless by the Company for acting or refraining from acting upon, or as a result of such determination by, the Company.  The Company reserves the right to reject any and all Warrant Exercise Notices not in proper form or for which any corresponding agreement by the Company to exchange would, in the opinion of the Company, be unlawful as determined in good faith in consultation with the Company's legal counsel and the relevant Holder.  Moreover, the Company reserves the absolute right to waive any of the conditions to the exercise of Warrants or defects in Warrant Exercise Notices with regard to any particular exercise of Warrants.  Neither the Company nor the Warrant Agent shall be under any duty to give notice to the Holders of any irregularities in any exercise of Warrants, nor shall they incur any liability for the failure to give such notice; *provided* that the Company and/or the Warrant Agent shall promptly notify a Holder if the Company will not honor a Warrant Exercise Notice from such Holder.

(h)     As soon as reasonably practicable after the Exercise Date for any Warrant, the Company shall issue, or otherwise deliver, in authorized denominations to or upon the order of the Holder, an uncertificated, book-entry interest in the number of Warrant

Shares to which such Holder is entitled on the books and records of the Company's transfer agent.  Such Warrant Shares shall be deemed to have been issued and any Person so designated to be named therein shall be deemed to have become a holder of record of such Warrant Shares as of the close of business on the Exercise Date. Until the Resale Restriction Termination Date, any Warrant Shares issued upon exercise of the Warrants shall bear the following legend:

"THIS SECURITY HAS NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "**SECURITIES ACT**"), AND MAY NOT BE OFFERED, SOLD, PLEDGED OR OTHERWISE TRANSFERRED PRIOR TO THE DATE THAT IS THE LATER OF (X) ONE YEAR AFTER THE DATE OF ORIGINAL ISSUANCE OF THE WARRANT UPON THE EXERCISE OF WHICH THIS SECURITY WAS ISSUED OR SUCH SHORTER PERIOD OF TIME AS PERMITTED BY RULE 144 UNDER THE SECURITIES ACT OR ANY SUCCESSOR PROVISION THERETO AND (Y) SUCH LATER DATE, IF ANY, AS MAY BE REQUIRED BY APPLICABLE LAW, EXCEPT:

(A)     TO [NEWCO] (THE "**COMPANY**") OR ANY SUBSIDIARY THEREOF, OR

(B)     PURSUANT TO A REGISTRATION STATEMENT WHICH HAS BECOME EFFECTIVE UNDER THE SECURITIES ACT, OR

(C)     PURSUANT TO AN EXEMPTION FROM REGISTRATION PROVIDED BY RULE 144 UNDER THE SECURITIES ACT OR ANY OTHER AVAILABLE EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT.

PRIOR TO THE REGISTRATION OF ANY TRANSFER IN ACCORDANCE WITH CLAUSE (C) ABOVE, THE COMPANY AND THE TRANSFER AGENT FOR THE COMPANY'S COMMON STOCK RESERVE THE RIGHT TO REQUIRE THE DELIVERY OF SUCH LEGAL OPINIONS, CERTIFICATIONS OR OTHER EVIDENCE AS MAY REASONABLY BE REQUIRED IN ORDER TO DETERMINE THAT THE PROPOSED TRANSFER IS BEING MADE IN COMPLIANCE WITH THE SECURITIES ACT AND APPLICABLE STATE SECURITIES LAWS. NO REPRESENTATION IS MADE AS TO THE AVAILABILITY OF ANY EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT."

(i)     The Company shall not be required to issue fractions of Warrant Shares upon exercise of the Warrants.  All Warrant Shares (including fractions) to be issued upon exercise of the applicable Warrant will be aggregated for purposes of determining whether the exercise would result in the issuance of any fractional Share.  If, after

10

aggregation, the exercise would result in the issuance of a fractional Share, the Company will, at its sole option, either (A) issue such fractional Share, (B) round such fractional Share up to the nearest whole Share and issue such whole Share or (C) in lieu of issuance of any fractional Share, pay the Holder otherwise entitled to such fractional Share an amount in cash equal to the product resulting from multiplying the then-current Fair Market Value per Share by such fraction.

(j)     The Company shall comply with all applicable tax withholding and reporting requirements imposed by any governmental unit, and all distributions, including deemed distributions, pursuant to the Warrants will be subject to applicable withholding and reporting requirements.  Notwithstanding any provision to the contrary, the Company will be authorized to (i) take any actions that may be reasonably necessary or appropriate to comply with such withholding and reporting requirements, (ii) apply a portion of any cash distribution to be made under the Warrants to pay applicable withholding taxes, (iii) liquidate a portion of any non-cash distribution to be made under the Warrants to generate sufficient funds to pay applicable withholding taxes or (iv) establish any other mechanisms the Company believes are reasonable and appropriate, including requiring Holders to submit appropriate tax and withholding certifications (such as IRS Forms W-9 and the appropriate IRS Forms W-8, as applicable) and/or requiring Holders to pay the withholding tax amount to the Company in cash as a condition of receiving the benefit of any anti-dilution adjustment pursuant to Section 6.

(k)     Solely for U.S. federal, state and local income tax purposes, the Company and each Holder agree that the Warrants shall be deemed exercised as of the date hereof, and, accordingly, each of the parties hereto agrees to treat each Holder as the beneficial owner of the Warrant Shares underlying such Holder's Warrants for all U.S. federal, state and local income tax purposes as of the date hereof (the "**Intended Tax Treatment**"). The Company and each Holder agree to act consistently with the Intended Tax Treatment for all U.S. federal, state and local income tax purposes.

(l)     The Warrant Agent shall keep copies of this Agreement and any notices given or received hereunder for a period beginning on the date of this Agreement and ending no earlier than the third anniversary of the Expiration Date.

Section 6.     *Anti-Dilution Provisions*. No single event shall give rise to an adjustment or pass-through distribution under more than one subsection of this Section 6 (other than in the case of a dividend or other distribution of different types of property, in which case Section 6(a) and Section 6(b) shall apply to the appropriate parts of each such dividend or distribution); *provided* that any issuance of Warrant Shares upon exercise of the Warrants shall not itself give rise to any adjustment under this Section 6.

(a)     *Share Distributions, Subdivisions or Combinations*.  The Warrant Share Number shall be adjusted pursuant to the formula below in the event the Company (i) pays a dividend or makes any other distribution with respect to its Shares solely in Shares, (ii) subdivides or reclassifies its outstanding Shares into a greater number of Shares or (iii) combines or reclassifies its outstanding Shares into a smaller number of Shares.  Such adjustments shall become effective (x) in the case of clause (i) above, at the

#94593851v2

close of business on the record date for such dividend or distribution or (y) in the case of clause (ii) or (iii) above, at the open of business on the effective date of such event. In the event that a dividend or distribution described in clause (i) above is not so paid or made, the Warrant Share Number shall be readjusted, effective as of the date when the Board determines not to make such dividend or distribution, as the case may be, to be the Warrant Share Number that would be in effect if such dividend or distribution had not been declared.

$$Ua = \quad Ub \ \ x \ \ \frac{Oa}{Ob}$$

Where:

Ub = Warrant Share Number immediately before the adjustment

Ua = Warrant Share Number immediately after the adjustment

Ob = Number of Shares outstanding immediately before the adjustment

Oa = Number of Shares outstanding immediately after the transaction in question

(b)     *Certain Dividends and Distributions*.  If the Company shall pay a dividend or make a distribution with respect to the Shares consisting of securities, evidences of indebtedness, assets, cash or rights, options or warrants to purchase securities of the Company (other than any dividends or distributions for which an adjustment is made pursuant to Section 6(a)) to all or substantially all holders of the Shares (any of such securities, evidences of indebtedness, assets, cash or rights, options or warrants, the "**Distributed Property**"), then the Company shall issue, or otherwise deliver, to each Holder, in respect of each Warrant, at the same time and upon the same terms as holders of the Shares receive the Distributed Property, the amount and kind of Distributed Property such Holder would have received if such Holder owned, as of the record date for such dividend or distribution, a number of Shares equal to the Warrant Share Number in effect on such record date.

(c)     *Certain Other Events*. The Company may make increases in the Warrant Share Number as the Board deems advisable in good faith in order to avoid or diminish any income tax to holders of Shares resulting from any dividend or distribution of stock (or rights to acquire stock) or from any event treated as such for income tax purposes.

(d)     *Exceptions to Adjustments*.  Except as specifically provided for herein, there shall be no adjustment or readjustment to the Warrant Share Number.

(e)     *Notice of Adjustment*.  Upon the occurrence of each adjustment or readjustment of the Warrant Share Number, the Company (at its expense) shall promptly compute such adjustment or readjustment in good faith in accordance with the terms hereof and furnish to (i) the Warrant Agent a certificate, signed by an Appropriate Officer, and (ii) to each Holder a notice, in each case setting forth (A) such adjustment or

readjustment and showing in detail the facts upon which such adjustment or readjustment is based and (B) the Warrant Share Number at the time in effect; *provided* that the Company shall not be required to deliver any notice to the Holders until the cumulative change in the Warrant Share Number exceeds one percent (1%) from (x) the initial Warrant Share Number or (y) the Warrant Share Number that the Holders received notice of in the most recent notice provided to them.  The Warrant Agent shall have no duty with respect to any statement filed with it except to keep the same on file and available for inspection by Holders during reasonable business hours.  The Warrant Agent shall not at any time be under any duty or responsibility to any Holder to determine whether any facts exist which may require any adjustment to the Warrant Share Number, or with respect to the nature or extent of any adjustment of the Warrant Share Number when made or with respect to the method employed in making such adjustment.

(f)    *No Change in Warrant Terms on Adjustment*.  Irrespective of any adjustments in the Warrant Share Number, the Warrants theretofore or thereafter issued may continue to express the same amounts as are stated in the similar Warrants issuable initially, or at some subsequent time, pursuant to this Agreement, and the Warrant Share Number, as the case may be, specified thereon shall be deemed to have been so adjusted.

(g)    *Miscellaneous*.  All calculations hereunder shall be made to the nearest one-tenth (1/10th) of a cent or to the nearest one-hundredth (1/100) of a Share, as the case may be. Any provision of this Section 6 to the contrary notwithstanding, no adjustment in the Warrant Share Number shall be made if the amount of such adjustment would be less than one-tenth (1/10th) of a Share, but any such amount shall be carried forward and an adjustment with respect thereto shall be made at the time of and together with any subsequent adjustment which, together with such amount and any other amount or amounts so carried forward, shall aggregate 1/10th of a Share, or more, or upon exercise of a Warrant if it shall earlier occur.

Section 7.    *Reorganization*.  (a)  If a Reorganization occurs at any time on or prior to the Expiration Date (or, if later, the settlement date for any exercise of Warrants), then, following the effective time of such Reorganization, a Holder's right to receive Warrant Shares upon exercise of its Warrants shall be converted into the right to receive upon exercise, with respect to each Warrant Share that would have otherwise been deliverable hereunder, one Unit of Reference Property; *provided* that if the Reference Property consists solely of cash, then on the effective date of such Reorganization, each Holder shall receive, in respect of each Warrant such Holder holds, at the same time and upon the same terms as holders of Shares receive the cash in exchange for their Shares, an amount of cash equal to the greater of (i) the amount of cash that such Holder would receive in such Reorganization if such Holder owned, as of the record date for such Reorganization, a number of Shares equal to the Warrant Share Number in effect on such record date and (ii) $0, and upon the Company's delivery of such cash (if any) in respect of such Warrant, such Warrant shall be deemed to have been exercised in full and canceled. With respect to any exercise of Warrants following the effective time of such Reorganization, the number of Units of Reference Property issuable upon exercise of a Warrant shall be calculated pursuant to Section 5 as if each reference therein to a "Share" or a "Warrant Share" referred to a Unit of Reference Property.

#94593851v2

(b)      In the case of any Reorganization in which holders of Shares may make an election as between different types of Reference Property, such holders of Shares shall be deemed to have elected to receive (i) first, the maximum amount of Marketable Securities and (ii) for any remaining consideration, the maximum amount of cash. The Company shall not consummate any Reorganization unless the Company first shall have made appropriate provision to ensure that the applicable provisions of this Agreement shall immediately after giving effect to such Reorganization be assumed by and binding on the other party to the Reorganization (or the surviving entity, successor, parent company and/or issuer of such Reference Property, as appropriate) and applicable to any Reference Property deliverable upon the exercise of Warrants, pursuant to a customary assumption agreement in form and substance reasonably satisfactory to the Holders of a majority of the Warrants then outstanding.  Any such assumption agreement shall also include any amendments to this Agreement necessary to effect the changes to the terms of the Warrants described in this Section 7 and preserve the intent of the provisions of this Agreement.  The provisions of this Section 7 shall similarly apply to successive Reorganizations.

(c)      The Company shall notify the Holders and the Warrant Agent of any such proposed Reorganization reasonably prior to the consummation thereof so as to provide the Holders with a reasonable opportunity to confirm compliance with the terms hereof and, if they elect, to exercise the Warrants in accordance with the terms and conditions hereof prior to consummation of the Reorganization; *provided* that in the case of a transaction which requires notice to be given to the holders of the Shares, the Holders and the Warrant Agent shall be provided the same notice given to the holders of the Shares.

Section 8.      *Covenants of the Company*.  (a)  *Covenants as to Warrant Shares*. The Company covenants and agrees that all Warrant Shares that may be issued upon the exercise of the rights represented by the Warrants shall, upon issuance, be validly issued and outstanding, fully paid and nonassessable, and free from all taxes (subject to **Error! Reference source not found.**), liens and charges with respect to the issuance thereof and shall not be issued in violation of any applicable law or governmental regulation.  The Company further covenants and agrees that the Company shall at all times prior to the Expiration Date (or any earlier time at which all Warrants have been canceled) have reserved a sufficient number of authorized but unissued Shares to provide for the exercise of all outstanding Warrants.  The Company further covenants and agrees that, if the Shares are at any time listed or traded on a Principal Exchange, the Company shall procure, at its sole expense, the listing of the Shares issuable upon exercise of the Warrants, subject to issuance or notice of issuance, on such Principal Exchange.

(b)      *Notices of Record Date*.  In the event of any taking by the Company of a record of the holders of any class of securities for the purpose of determining the holders thereof who are entitled to receive any distribution of any kind, or any right to subscribe for, purchase or otherwise acquire any Shares or any other securities or property, or to receive any other right or interest of any kind, the Company will mail to the Holders, at least five (5) Business Days prior to such record date, a notice specifying the date on which any such record is to be taken for the purpose of such distribution (other than pursuant to the adjustments provided herein).

14

Section 9.    *Warrant Agent*.  The Warrant Agent undertakes the duties and obligations imposed by this Agreement upon the terms and conditions set forth in this Section 9.

(a)    *Limitation on Liability*.  The Warrant Agent shall not by any act hereunder be accountable with respect to or be deemed to make any representations as to the validity or authorization of the Warrants, as to the validity, authorization or value (or kind or amount) of any Warrant Shares or other property delivered or deliverable upon exercise of any Warrant, or as to the purchase price of such Warrant Shares or other property.  The Warrant Agent shall not (i) be liable for any recital or statement of fact contained herein or for any action taken, suffered or omitted by the Warrant Agent in good faith in the belief that any document or any signature is genuine or properly authorized, (ii) be responsible for determining whether any facts exist that may require any adjustment of the number of Warrant Shares issuable or with respect to the nature or extent of any such adjustments when made, or with respect to the method of adjustment employed, (iii) be responsible for any failure on the part of the Company to issue, transfer or deliver any Warrant Shares or property upon the surrender of any Warrant for the purpose of exercise or to comply with any other of the Company's covenants and obligations contained in this Agreement or (iv) be liable for any action taken, suffered or omitted to be taken in connection with this Agreement, except for its own bad faith, gross negligence or willful misconduct.  The Warrant Agent shall be liable hereunder only for its own bad faith, gross negligence or willful misconduct (which bad faith, gross negligence or willful misconduct must be determined by a final, non-appealable order, judgment, decree or ruling of a court of competent jurisdiction).  Except for the foregoing, notwithstanding anything in this Agreement to the contrary, in no event shall the Warrant Agent be liable for special, indirect, punitive, incidental or consequential loss or damage of any kind whatsoever (including, but not limited to, lost profits).

(b)    *Instructions*.  The Warrant Agent is hereby authorized to accept advice or instructions with respect to the performance of its duties hereunder from an Appropriate Officer and to apply to any such Appropriate Officer for advice or instructions.  The Warrant Agent shall be fully protected and authorized in relying upon the most recent advice or instructions received from any such Appropriate Officer.  The Warrant Agent shall not be liable for any action taken, suffered or omitted by it in accordance with the advice or instructions of any such Appropriate Officer, except to the extent that such action or omission resulted directly from the Warrant Agent's bad faith, gross negligence, or willful misconduct.

(c)    *Agents*.  The Warrant Agent may execute and exercise any of the rights and powers hereby vested in it or perform any duty hereunder either itself or by or through its attorneys, agents or employees, provided reasonable care has been exercised in the selection and in the continued employment of such attorney, agent or employee, provided, further that it shall be liable and responsible for any such attorney, agent or employee.  The Warrant Agent shall not be under any obligation or duty to institute, appear in, or defend any action, suit or legal proceeding in respect hereof, but this provision shall not affect the power of the Warrant Agent to take such action as the Warrant Agent may consider necessary.  The Warrant Agent shall promptly notify the

15

Company in writing of any claim made or action, suit or proceeding instituted against the Warrant Agent arising out of or in connection with this Agreement.

(d)     *Cooperation*.  The Company will perform, execute, acknowledge and deliver or cause to be performed, executed, acknowledged and delivered all such further acts, instruments and assurances as may reasonably be required by the Warrant Agent in order to enable the Warrant Agent to carry out or perform its duties under this Agreement.

(e)     *Agent Only*.  The Warrant Agent shall act solely as agent for the Company in accordance with the terms and conditions hereof and does not assume any obligation or relationship of agency or trust with any Holders.  The Warrant Agent shall not be liable except for the performance of such duties as are specifically set forth herein, and no implied covenants or obligations shall be read into this Agreement against the Warrant Agent, whose duties and obligations shall be determined solely by the express provisions hereof.

(f)     *Right to Counsel*.  The Warrant Agent may at any time consult with legal counsel reasonably satisfactory to it (who may be legal counsel for the Company), and the Warrant Agent shall incur no liability or responsibility to the Company or to any Holder for any action taken, suffered or omitted by the Warrant Agent in good faith in accordance with the opinion or advice of such counsel.

(g)     *Compensation*.  The Company agrees to pay the Warrant Agent reasonable compensation for all services rendered by it hereunder and to reimburse the Warrant Agent for its reasonable expenses hereunder (including reasonable and documented fees and out-of-pocket expenses of one legal counsel and one local counsel), and further agrees to indemnify and hold the Warrant Agent and its employees, officers, directors and agents harmless against any and all loss, claims, damages, expenses and liabilities, including, but not limited to, any judgments, costs and such reasonable counsel fees, for any action taken, suffered or omitted by the Warrant Agent and its employees, officers, directors and agents in connection with the acceptance, administration, exercise and performance of its duties under this Agreement and the Warrants, except for any such liabilities that arise as a result of the Warrant Agent's bad faith, gross negligence or willful misconduct (as determined by a court of competent jurisdiction in a final and non-appealable judgment).  Notwithstanding the foregoing, the Company shall not be responsible for any settlement made without its consent, which consent shall not be unreasonably conditioned, withheld or delayed.

(h)     *Accounting and Payment*.  The Warrant Agent shall account promptly to the Company with respect to Warrants exercised and concurrently pay to the Company all moneys received by the Warrant Agent on behalf of the Company in connection with the exercise of Warrants.  The Warrant Agent shall advise the Company by telephone at the end of each day on which a payment in connection with the exercise of Warrants is received of the amount so deposited to such account.  The Warrant Agent shall as soon as practicable confirm such telephone advice to the Company in writing.

#94593851v2

      (i)    *No Conflict*.  Subject to applicable law, the Warrant Agent and any stockholder, affiliate, director, officer or employee of the Warrant Agent may buy, sell or deal in any of the Warrants or other securities of the Company or become pecuniarily interested in any transaction in which the Company may be interested, or contract with or lend money to the Company or otherwise act as fully and freely as though it were not Warrant Agent under this Agreement.  Subject to applicable law, nothing herein shall preclude the Warrant Agent from acting in any other capacity for the Company or for any other Person including, without limitation, acting as trustee under an indenture.

      (j)    *Resignation; Termination*.  The Warrant Agent may resign its duties and be discharged from all further duties and liabilities hereunder (except liabilities arising as a result of the Warrant Agent's bad faith, gross negligence or willful misconduct) after giving thirty (30) calendar days' prior written notice to the Company.  The Company may remove the Warrant Agent upon thirty (30) calendar days' written notice, and the Warrant Agent shall thereupon in like manner be discharged from all further duties and liabilities hereunder, except as have been caused by the Warrant Agent's bad faith, gross negligence or willful misconduct.  The Company shall cause to be mailed promptly (by first class mail, postage prepaid) to each registered Holder at such Holder's last address as shown on the register of the Company, at the Company's expense, a copy of such notice of resignation or notice of removal, as the case may be.  Upon such resignation or removal the Company shall promptly appoint in writing a new Warrant Agent.  If the Company shall fail to make such appointment within a period of sixty (60) calendar days after it has been notified in writing of such resignation by the resigning Warrant Agent or after such removal, then the Holder of any Warrant may apply to any court of competent jurisdiction for the appointment of a new Warrant Agent.  A resignation or removal of the Warrant Agent and appointment of a successor Warrant Agent will become effective only upon the successor Warrant Agent's acceptance of appointment.  Pending appointment of a successor to the Warrant Agent, either by the Company or by such a court, the duties of the Warrant Agent shall be carried out by the Company.  Any successor Warrant Agent, whether appointed by the Company or by such a court, shall be a Person, organized under the laws of the United States or of any state thereof and authorized under such laws to conduct a shareholder services business, be subject to supervision and examination by a Federal or state authority, and have a combined capital and surplus of not less than $50,000,000 as set forth in its most recent published annual report of condition; or in the case of such capital and surplus requirement, a controlled affiliate of such a Person meeting such capital and surplus requirement.  After acceptance in writing of such appointment by the new Warrant Agent, such successor Warrant Agent shall be vested with the same powers, rights, duties and responsibilities under this Agreement as if it had been originally named herein as the Warrant Agent, without any further assurance, conveyance, act or deed; but if for any reason it shall be necessary or expedient to execute and deliver any further assurance, conveyance, act or deed, the same shall be done at the expense of the Company and shall be legally and validly executed and delivered by the resigning or removed Warrant Agent.  Not later than the effective date of any such appointment, the Company shall send notice thereof to the resigning or removed Warrant Agent and shall forthwith cause a copy of such notice to be mailed (by first class, postage prepaid) to each registered Holder at such Holder's last address as shown on the register of the Company.  Failure to give any notice provided for in this (j), or any

#94593851v2

defect in any such notice, shall not affect the legality or validity of the resignation of the Warrant Agent or the appointment of a successor Warrant Agent, as the case may be.

(k)    *Merger, Consolidation or Change of Name of Warrant Agent*.  Any corporation into which the Warrant Agent may be merged or converted or with which it may be consolidated, or any corporation resulting from any merger, conversion or consolidation to which the Warrant Agent shall be a party, or any corporation succeeding to all or substantially all of the agency business of the Warrant Agent shall be the successor to the Warrant Agent hereunder without the execution or filing of any document or any further act on the part of any of the parties hereto, provided that such corporation would be eligible for appointment as a successor Warrant Agent under the provisions of Section 9(j).

(l)    *Exclusions*.  Unless a court of competent jurisdiction determines by a final, non-appealable order, judgment, decree or ruling that the Warrant Agent's action or inaction constitutes bad faith, gross negligence or willful misconduct on the part of the Warrant Agent, the Warrant Agent shall have no responsibility with respect to the validity of this Agreement or with respect to the validity or execution of any Warrant (except its countersignature thereof); nor shall it be responsible for any breach by the Company of any covenant or condition contained in this Agreement or in any Warrant; nor shall it be responsible or have any duty to make any calculation or adjustment (unless reasonably requested to do so by the Company in writing in a manner consistent with the terms of this Agreement), or to determine when any calculation or adjustment required under the provisions hereof should be made, how it should be made or what it should be, or have any responsibility or liability for the manner, method or amount of any such calculation or adjustment or the ascertaining of the existence of facts that would require any such calculation or adjustment; nor shall it by any act hereunder be deemed to make any representation or warranty as to the authorization or reservation of any Warrant to be issued pursuant to this Agreement or as to whether any Warrant Shares will, when issued, be valid and fully paid and nonassessable.

(m)    *No Liability for Interest*.  The Warrant Agent shall not be under any liability for interest on any monies at any time received by it pursuant to any of the provisions of this Agreement.

(n)    *No Liability for Invalidity*.  The Warrant Agent shall not be under any responsibility with respect to the validity or sufficiency of this Agreement or the execution and delivery hereof (except the due execution and delivery hereof by the Warrant Agent).

(o)    *No Responsibilities for Recitals*.  The recitals contained herein shall be taken as the statements of the Company, and the Warrant Agent assumes no responsibility hereby for the correctness of the same.

(p)    *No Implied Obligations*.  The Warrant Agent shall be obligated to perform such duties as are explicitly set forth herein and no implied duties or obligations shall be read into this Agreement against the Warrant Agent.  The Warrant Agent shall not be

under any obligation to take any action hereunder that may involve it in any expense or liability, the payment of which within a reasonable time is not, in its reasonable opinion, assured to it.  The Warrant Agent shall have no duty or responsibility in case of any default by the Company in the performance of its covenants or agreements contained herein or in the case of the receipt of any written demand from a Holder with respect to such default, including, without limiting the generality of the foregoing, any duty or responsibility to initiate or attempt to initiate any proceedings at law or otherwise or, to make any demand upon the Company.

(q)     *Force Majeure*.  In no event shall the Warrant Agent be responsible or liable for any failure or delay in the performance of its obligations under this Agreement arising out of or caused by, directly or indirectly, forces beyond its reasonable control, including, without limitation, strikes, work stoppages, accidents, acts of war or terrorism, civil or military disturbances, nuclear or natural catastrophes or acts of God, and interruptions, loss or malfunctions of utilities, communications or computer (software or hardware) services.

Section 10.     *Severability*.  The determination by a court of competent jurisdiction that any particular provision of this Agreement is unenforceable or invalid will not affect the enforceability of or invalidate the other provisions hereof, and this Agreement will be construed in all respects as if such invalid or unenforceable provisions had never been part hereof and were omitted here from.  Upon such a determination, the parties will negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible so that the transactions contemplated hereby be consummated as originally contemplated to the fullest extent possible.

Section 11.     *Holder Not Deemed a Shareholder*.  No Holder of a Warrant, by reason of the ownership of such Warrant, shall be entitled to vote or receive dividends on or be deemed the holder of any Warrant Shares for any purpose, nor shall anything contained in the Warrants be construed to confer upon the Holders, as such, any of the rights of a holder of Shares or any right to vote, give or withhold consent to any Company action (whether any reorganization, issuance of Shares, reclassification of Shares, consolidation, merger, conveyance or otherwise), receive notice of meetings, receive dividends or subscription rights or otherwise, except as set forth in the Stockholders Agreement or herein.  No Holder shall have any right not expressly conferred under, or by applicable law with respect to, this Agreement or the Stockholders Agreement.

Section 12.     *Notices to Company and Warrant Agent*.  All notices, requests or demands authorized by this Agreement to be given or made by the Warrant Agent or by any registered Holder of any Warrant to or on the Company or the Warrant Agent to be effective shall be in writing (including by telecopy), and shall be deemed to have been duly given or made when delivered by hand, or two (2) Business Days after being delivered to a recognized courier (whose stated terms of delivery are two Business Days or less to the destination), or five (5) Business Days after being deposited in the mail, or, in the case of facsimile or email notice, when received, addressed (until another address is filed in writing by the Company with the Warrant Agent) as follows:

#94593851v2

[NewCo]
[_____]

If the Company shall fail to maintain such office or agency or shall fail to give such notice of any change in the location thereof, presentation may be made and notices and demands may be served at the principal office of the Warrant Agent.

Any notice pursuant to this Agreement to be given by the Company or by any registered Holder of any Warrant to the Warrant Agent shall be sufficiently given if sent by first-class mail, postage prepaid, or by facsimile or email notice, addressed (until another address is filed in writing by the Warrant Agent with the Company), as follows:

[American Stock Transfer & Trust Company, LLC
6201 15th Avenue
Brooklyn, NY 11219
Attention: Relationship Management for [NewCo]
Email: reorgwarrants@astfinancial.com]

The Warrant Agent maintains the Warrant Agent Office at the above address.

Section 13.   *Supplements and Amendments*.  The Company and the Warrant Agent may from time to time supplement or amend this Agreement (a) without the approval of any Holder in order to cure any ambiguity, manifest error or other mistake in this Agreement, or to correct or supplement any provision contained herein that may be defective or inconsistent with any other provision herein, or to make any other provisions in regard to matters or questions arising hereunder that the Company and the Warrant Agent may deem necessary or desirable and that shall not adversely affect, alter or change the interests of the Holders in any material respect or (b) with the prior written consent of Holders of a majority of the Warrants; *provided* that each amendment or supplement that decreases the Warrant Agent's rights or increases its duties and responsibilities hereunder shall also require the prior written consent of the Warrant Agent.  Notwithstanding the foregoing, the consent of each Holder affected in any material respect shall be required for any amendment pursuant to which the number of Warrant Shares receivable upon exercise of a Warrant would be decreased (other than pursuant to adjustments provided herein), the Holders' rights to receive pass-through distributions pursuant to Section 6(b) would be limited or the Exercise Period would be shortened.  Upon execution and delivery of any supplement or amendment pursuant to this Section 13, such amendment shall be considered a part of this Agreement for all purposes and every Holder of Warrants shall be bound thereby.

Section 14.   *Termination*.  This Agreement shall terminate on the earlier of (a) such date when all Warrants have been cancelled or exercised with respect to all Warrant Shares subject thereto and (b) the Expiration Date or, if later, upon settlement of all Warrants (i) validly exercised on or prior to the Expiration Date; *provided* that the provisions of Sections 10-20 shall survive such termination.

Section 15.  *Governing Law and Consent to Forum*.  This Agreement shall be governed by, and construed in accordance with, the laws of the State of Delaware (without giving effect to choice of law principles thereof to the extent that the application of the laws of another jurisdiction would be required thereby); *provided*, *however*, that the foregoing shall not be construed so as to restrict in any manner the ability of the Company to enforce any judgment obtained in any court of competent jurisdiction. Subject to the provisos to the last sentence of this Section 15, each of the parties hereto (a) consents to submit itself to the exclusive personal jurisdiction of the Chancery Court of Delaware and, if such court declines jurisdiction, any Federal district court located in the State of Delaware in the event of any action arising out of or relating to this Agreement or any of the transactions contemplated by this Agreement, (b) agrees that it will not attempt to deny or defeat such personal jurisdiction by motion or other request for leave from any such court, (c) agrees that, except as provided in clause (d) below, it will not bring any action arising out of or relating to this Agreement or any of the transactions contemplated by this Agreement in any court other than the Chancery Court of Delaware and, if such court declines jurisdiction, a Federal district court sitting in the State of Delaware and (d) agrees, to the maximum extent permitted by law, that it will not bring any action arising out of or relating to the Securities Act in any court other than a Federal district court sitting in the State of Delaware and, if such court declines jurisdiction, to another Federal district court.  Any person or entity purchasing or otherwise acquiring any interest in any Company securities shall be deemed to have notice of and consented to this provision.  In any action arising out of or relating to this Agreement or any of the transactions contemplated by this Agreement, each party irrevocably and unconditionally waives and agrees not to assert by way of motion, as a defense or otherwise any claims that it is not subject to the jurisdiction of the above courts, that such action is brought in an inconvenient forum or that the venue of such action is improper; *provided, however*, that, notwithstanding anything to the contrary in this Section 15 or otherwise, the Company shall retain the right to bring any such action arising out of or relating to this Agreement or any of the transactions contemplated hereby, to the extent that the subject matter of such action is contemplated by the Plan or the Disclosure Statement, in the United States Bankruptcy Court for the District of Delaware, and each of the parties hereto (i) consents to submit itself to the exclusive personal jurisdiction of the Chancery Court of Delaware and, if such court declines jurisdiction, any Federal district court located in the State of Delaware in the event of any action arising out of or relating to this Agreement or any of the transactions contemplated by this Agreement, (ii) agrees that it will not attempt to deny or defeat such personal jurisdiction by motion or other request for leave from any such court.

Section 16.  *Waiver of Jury Trial*.  EACH OF THE PARTIES TO THIS AGREEMENT HEREBY IRREVOCABLY WAIVES ALL RIGHT TO A TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.  THE SCOPE OF THIS WAIVER IS INTENDED TO BE ALL-ENCOMPASSING OF ANY AND ALL DISPUTES THAT MAY BE FILED IN ANY COURT AND THAT RELATE TO THE SUBJECT MATTER OF THIS AGREEMENT, INCLUDING, WITHOUT LIMITATION, CONTRACT CLAIMS, TORT CLAIMS (INCLUDING NEGLIGENCE), BREACH OF DUTY CLAIMS, AND

ALL OTHER COMMON LAW AND STATUTORY CLAIMS.  THIS SECTION 16 HAS BEEN FULLY DISCUSSED BY EACH OF THE PARTIES HERETO AND THESE PROVISIONS WILL NOT BE SUBJECT TO ANY EXCEPTIONS.  EACH PARTY HERETO HEREBY FURTHER WARRANTS AND REPRESENTS THAT SUCH PARTY HAS REVIEWED THIS WAIVER WITH ITS LEGAL COUNSEL, AND THAT SUCH PARTY KNOWINGLY AND VOLUNTARILY WAIVES ITS JURY TRIAL RIGHTS FOLLOWING CONSULTATION WITH LEGAL COUNSEL.

Section 17.  *Benefits of This Agreement*.  Nothing in this Agreement shall be construed to give to any Person other than the Company, the Warrant Agent and the registered Holders (who are express third party beneficiaries of this Agreement) any legal or equitable right, remedy or claim under this Agreement, and this Agreement shall be for the sole and exclusive benefit of the Company, the Warrant Agent and the registered Holders.

Section 18.  *Counterparts*.  This Agreement may be executed in any number of counterparts and each of such counterparts shall for all purposes be deemed to be an original, and such counterparts shall together constitute but one and the same instrument.

Section 19.  *Headings*.  The headings of sections of this Agreement have been inserted for convenience of reference only, are not to be considered a part hereof and in no way modify or restrict any of the terms or provisions hereof.

Section 20.  *Electronic Transmission*.  Each of the parties hereto agrees that (a) any consent or signed document transmitted by electronic transmission shall be treated in all manner and respects as an original written document, (b) any such consent or document shall be considered to have the same binding and legal effect as an original document and (c) at the request of any party hereto, any such consent or document shall be re-delivered or re-executed, as appropriate, by the relevant party or parties in its original form.  Each of the parties further agrees that they will not raise the transmission of a consent or document by electronic transmission as a defense in any proceeding or action in which the validity of such consent or document is at issue and hereby forever waives such defense.  For purposes of this Agreement, the term "electronic transmission" means any form of communication not directly involving the physical transmission of paper, that creates a record that may be retained, retrieved and reviewed by a recipient thereof, and that may be directly reproduced in paper form by such a recipient through an automated process.

[*Signature Page Follows*]

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed and delivered as of the day and year first above written.

[NEWCO]

By: _____
       Name:
       Title:

#94593851v2

AMERICAN STOCK TRANSFER &
TRUST COMPANY, LLC

By: _____
     Name:
     Title:

*[Signature Page to Warrant Agreement]*

**EXHIBIT A**

**FORM OF ELECTION TO EXERCISE WARRANT**

**TO BE COMPLETED BY REGISTERED HOLDER**

[NEWCO]

Warrants to Receive Common Stock

(TO BE EXECUTED UPON EXERCISE OF A WARRANT)

Reference is made to that certain Warrant Agreement, dated [●], 2021 (the "**Warrant Agreement**"), by and between [NewCo] (the "**Company**") and American Stock Transfer & Trust Company, LLC (the "**Warrant Agent**").  Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Warrant Agreement.

The undersigned hereby irrevocably elects to exercise [●] Warrants representing the right to receive [●] Shares as calculated pursuant to the Warrant Agreement (the "**Exercise Shares**") on a cashless basis for no consideration whatsoever.

Concurrently with the receipt of the Exercise Shares, the undersigned agrees to execute and deliver a Joinder in accordance with Section [5.01] of the Stockholders Agreement.

The undersigned requests that the Exercise Shares purchased hereby be in registered form in the authorized denominations, registered in such names and delivered, all as specified in accordance with the instructions set forth below.

(PLEASE PRINT)
RECIPIENT: _____
CONTACT NAME: _____
ADDRESS: _____
TELEPHONE (INCLUDING INTERNATIONAL CODE): _____
EMAIL: _____
SOCIAL SECURITY OR OTHER TAXPAYER IDENTIFICATION NUMBER (IF APPLICABLE): _____

> NOTE: THIS EXERCISE NOTICE MUST BE DELIVERED TO THE WARRANT AGENT, PRIOR TO 5:00 P.M., NEW YORK CITY TIME, ON THE EXPIRATION DATE.  THE WARRANT AGENT SHALL NOTIFY YOU OF THE ADDRESS, PHONE NUMBER AND FACSIMILE NUMBER WHERE YOU CAN CONTACT THE WARRANT AGENT AND TO WHICH WARRANT EXERCISE NOTICES ARE TO BE SUBMITTED.

A-1

_____          _____
(Date)                                     (Signature)

                                          _____
                                           (Print name)

Signature Guaranteed

BY:

Signatures must be guaranteed by a participant in a Medallion Signature Guarantee Program at a guarantee level acceptable to the Company's transfer agent.

## EXHIBIT B

FORM OF ASSIGNMENT FOR WARRANTS

(TO BE EXECUTED BY THE REGISTERED HOLDER
IF SUCH HOLDER DESIRES TO TRANSFER A WARRANT)

Reference is made to that certain Warrant Agreement, dated [•], 2020 (the "**Warrant Agreement**"), by and between [NewCo] (the "**Company**") and American Stock Transfer & Trust Company, LLC (the "**Warrant Agent**").  Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Warrant Agreement.

FOR VALUE RECEIVED, the undersigned registered holder of Warrants hereby sells, assigns and transfers unto

_____

Name of Assignee

_____

Address of Assignee

_____ Warrants to receive Shares held by the undersigned, together with all right, title and interest therein, and does irrevocably constitute and appoint _____ attorney, to transfer such Warrants on the books of the Warrant Agent, with full power of substitution.

In connection with any transfer of Warrants occurring prior to the Resale Restriction Termination Date, the undersigned confirms that such Warrants are being transferred:

☐       To [NewCo] or a subsidiary thereof; or

☐       Pursuant to a registration statement that has become or been declared effective under the Securities Act of 1933, as amended; or

☐       Pursuant to and in compliance with Rule 144 under the Securities Act of 1933, as amended, or any other available exemption from the registration requirements of the Securities Act of 1933, as amended.

_____

Signature

_____

Date

_____

Social Security or Other Taxpayer Identification Number of Assignee

SIGNATURE GUARANTEED BY:

B-1

Signatures must be guaranteed by a participant in a Medallion Signature Guarantee Program at a guarantee level acceptable to the Company's transfer agent.

B-2

## Exhibit M

### GUC/SLTL Form Warrant Agreement[6]

---

[6] The exercise prices of the GUC Warrants and the SLTL Warrants will be determined in accordance with the Plan upon final allocation of the New Equity Interests to be issued pursuant to Section 4.4(a)(i) of the Plan, upon the exercise of the Subscription Rights, and pursuant to the Backstop Commitment Premium Equity Interests and the New Equity Interests issuable upon the exercise of the New Money Warrants, SLTL Tranche 1 Warrants, SLTL Tranche 2 Warrants and GUC Warrants (including the GUC True-Up Warrants) and determination of the shares of NewCo Equity Interest resulting from such allocation.

DPW Draft 6/9/21

WARRANT AGREEMENT

between

[NEWCO],

AS ISSUER

and

AMERICAN STOCK TRANSFER & TRUST COMPANY, LLC,

AS WARRANT AGENT

[●], 2021

# TABLE OF CONTENTS

<u>PAGE</u>

Section 1.  *Certain Defined Terms* ..................................................................................1
Section 2.  *Appointment of Warrant Agent* .....................................................................5
Section 3.  *Issuance of Warrants; Form, Execution and Delivery* ...................................5
Section 4.  *Transfers* ........................................................................................................7
Section 5.  *Duration and Exercise of Warrants* ..............................................................8
Section 6.  *Anti-Dilution Provisions* ..............................................................................12
Section 7.  *Reorganization* ............................................................................................16
Section 8.  *Covenants of the Company* ..........................................................................17
Section 9.  *Warrant Agent* .............................................................................................18
Section 10.  *Severability* ................................................................................................22
Section 11.  *Holder Not Deemed a Shareholder* ...........................................................23
Section 12.  *Notices to Company and Warrant Agent* ...................................................23
Section 13.  *Supplements and Amendments* ...................................................................23
Section 14.  *Termination* ...............................................................................................24
Section 15.  *Governing Law and Consent to Forum* ......................................................24
Section 16.  *Waiver of Jury Trial* ..................................................................................25
Section 17.  *Benefits of This Agreement* ........................................................................25
Section 18.  *Counterparts* ..............................................................................................25
Section 19.  *Headings* .....................................................................................................25
Section 20.  *Electronic Transmission* ............................................................................26

EXHIBITS

Exhibit A       Form of Election to Exercise Warrant

Exhibit B       Form of Warrant Assignment

i

This WARRANT AGREEMENT (this "**Agreement**") is dated as of [●], 2021, between [NEWCO], a Delaware corporation (the "**Company**"), as issuer, and AMERICAN STOCK TRANSFER & TRUST COMPANY, LLC, as warrant agent (the "**Warrant Agent**").

W I T N E S S E T H

WHEREAS, pursuant to and in connection with [the *Fourth Amended Joint Chapter 11 Plan of Fieldwood Energy LLC and its Affiliated Debtors,* dated April 15, 2021 [Docket No. 1284], Case No. 20-33948 (MI) (Bankr. S.D. Tex.)] (the "**Plan**") relating to a reorganization under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**"), the Company has agreed to issue to the Holders (as defined herein) an aggregate of [●] warrants (the "**Warrants**"), which are exercisable to purchase shares (the "**Shares**") of common stock (the "**Common Stock**"), par value $0.01 per share, of the Company;

WHEREAS, the Company desires the Warrant Agent to act on behalf of the Company, and the Warrant Agent is willing to so act, in connection with the issuance, registration, transfer, exchange, replacement, exercise and cancellation of the Warrants;

WHEREAS, the Warrant Agent, at the request of the Company, has agreed to act as the agent of the Company in connection with the issuance, registration, transfer, exchange, replacement, exercise and cancellation of the Warrants as provided herein;

WHEREAS, the Warrants and the underlying Shares are being offered and sold in reliance on the exemption from the registration requirements of the Securities Act of 1933, as amended (the "**Securities Act**"), and any applicable state securities or "blue sky" laws afforded by Section 1145 of the Bankruptcy Code; and

WHEREAS, the Company desires to enter into this Agreement to set forth the terms and conditions of the Warrants and the rights of the Holders thereof.

NOW, THEREFORE, in consideration of the premises and mutual agreements herein set forth, the parties hereto agree as follows:

Section 1.    *Certain Defined Terms*.  Whenever used in this Agreement, the following words and phrases, unless the context otherwise requires, shall have the meanings specified in this Section.

"**Agreement**" has the meaning specified in the preamble hereof.

"**Appropriate Officer**" means the Chief Executive Officer, President, Chief Financial Officer, Treasurer, Secretary, Assistant Secretary or any Vice President (or higher or equivalent officer) of the Company.

"**Bankruptcy Code**" has the meaning specified in the recitals hereof.

"**Board**" means, as of any date, the Board of Directors of the Company in office on such date.

"**Business Day**" means any day other than a Saturday or Sunday or any other day on which national banking associations in the State of New York generally are closed for commercial banking business.

"**Cashless Exercise**" has the meaning specified in Section 5(d)(i) hereof.

"**Cashless Exercise Period**" has the meaning specified in Section 5(d)(ii) hereof.

"**Charter**" means the Amended and Restated Certificate of Incorporation of the Company (as amended).

"**Common Stock**" has the meaning specified in the recitals hereof.

"**Company**" has the meaning specified in the preamble hereof.

"**Direct Registration Warrants**" has the meaning specified in Section 3(a) hereof.

"**Effective Date**" has the meaning specified in the Plan.

"**Exchange**" means a U.S. national or regional securities exchange.

"**Exercise Date**" means, with respect to an exercise of a Warrant by a Holder, the first date on which such Holder has satisfied the conditions for exercise of such Warrant as set forth in Section 5(c) (unless such conditions are satisfied after 5:00 p.m., New York City time, on a Business Day or on a date that is not a Business Day, in which event the Exercise Date shall be the next following Business Day).

"**Exercise Period**" means the period commencing upon the execution and delivery of this Agreement by the parties hereto and ending on, and including, the Expiration Date.

"**Exercise Price**" has the meaning specified in Section 5(b) hereof.

"**Expiration Date**" has the meaning specified in Section 5(a) hereof.

"**Fair Market Value**" means, as of any date of determination:

(i)      in the case of shares of stock that are listed on an Exchange on such date, the average of the Last Reported Sale Prices for such shares for the 10 consecutive Trading Days immediately preceding such date (or such less number of Trading Days for which such shares were so listed); *provided* that, with respect to any determination of Fair Market Value pursuant to this clause (i), the Company, in its good faith determination, shall make appropriate adjustments to such Last Reported Sale Prices to account for any adjustments to the Exercise Price and Warrant Share Number that

2

become effective, or any event requiring any adjustments to the Exercise Price and Warrant Share Number where the record date, effective date or ex-date, as the case may be, of the event occurs, during such period of consecutive Trading Days;

(ii)        in the case of cash, the amount thereof; and

(iii)        in the case of securities not covered by clause (i) above or any other property, as determined in good faith and in a commercially reasonable manner by the Board.

"**Fair Market Value Notice**" has the meaning specified in Section 5(d)(ii) hereof.

["**Final True-Up Notice**" has the meaning specified in Section 6(h)(ii) hereof.][1]

"**Holder**" means the record holder of a Warrant listed on the Warrant Register.

"**Joinder**" has the meaning specified in the Stockholders Agreement.

"**Last Reported Sale Price**" means, on any day, (i) in the case of shares of stock that are listed on a Principal Exchange on such day, the closing sale price per share (or if no closing sale price is reported, the average of the bid and ask prices or, if more than one in either case, the average of the average bid and the average ask prices) on such day as reported in composite transactions for the Principal Exchange and (ii) in the case of shares of stock that are listed on an Exchange other than a Principal Exchange on such day, the closing sale price per share (or if no closing sale price is reported, the average of the bid and ask prices or, if more than one in either case, the average of the average bid and the average ask prices) on such day as reported in composite transactions for the primary Exchange on which such shares are traded.

"**Marketable Securities**" means any common equity securities (whether voting or non-voting) (including American depositary shares representing common equity securities) listed on a Principal Exchange.

"**Person**" means any natural person, corporation, partnership, limited liability company, firm, association, trust, government, governmental agency, or other entity, whether acting in an individual, fiduciary or other capacity.

"**Plan**" has the meaning specified in the recitals hereof.

"**Principal Exchange**" means each of The New York Stock Exchange, The Nasdaq Global Market and The Nasdaq Global Select Market (or any of their respective successors).

"**Reference Property**" means, in respect of any Reorganization, the kind and amount of shares of stock, other securities or other property or assets (including cash or

---

[1] Insert for GUC Warrants.

any combination thereof) that a holder of a number of Shares (or Units of Reference Property in respect of a prior Reorganization, as applicable) equal to the number of Warrant Shares (or Units of Reference Property in respect of a prior Reorganization, as applicable) obtainable upon exercise of each Warrant immediately prior to such Reorganization would have owned or been entitled to receive.

"**Reorganization**" means any consolidation, merger, statutory share exchange, business combination or similar transaction with a third party, any sale, lease or other transfer to a third party of all or substantially all of the consolidated assets of the Company and its Subsidiaries, or any recapitalization, reclassification or transaction that results in a change of the Common Stock (other than as described in Section 6(a)), in each case, in which the Common Stock is converted into, is exchanged for or becomes the right to receive cash, other securities or other property.

"**Securities Act**" has the meaning specified in the recitals hereof.

"**Shares**" has the meaning specified in the recitals hereof.

["**SLTL Adjustment Notice**" has the meaning specified in Section 6(h)(ii) hereof.][2]

["**SLTL Tranche 2 Warrant Agreement**" means the Warrant Agreement dated as of the date hereof between the Company and the Warrant Agent pertaining to the SLTL Tranche 2 Warrants.][3]

["**SLTL Tranche 2 Warrants**" has the meaning specified in the Plan.][4]

"**Stockholders Agreement**" means the Stockholders Agreement dated as of [___], 2021 by and among the Company and the Stockholders (as defined therein) from time to time party thereto, as amended from time to time.

"**Subsidiary**" means, with respect to any Person, any corporation, partnership, joint venture, limited liability company or other entity (x) of which such Person or a subsidiary of such Person is a general partner or (y) of which a majority of the voting securities or other voting interests, or a majority of the securities or other interests of which having by their terms ordinary voting power to elect a majority of the board of directors or persons performing similar functions with respect to such entity, is directly or indirectly owned by such Person and/or one or more subsidiaries thereof.

"**Trading Day**" means a day on which (i) trading in the Shares (or other security for which a closing sale price must be determined) generally occurs on the Principal Exchange or, if the Shares (or such other security) are not then listed on a Principal

---

[2] Insert for GUC Warrants.

[3] Insert for GUC Warrants.

[4] Insert for GUC Warrants.

Exchange, on the principal other Exchange on which the Shares (or such other security) are then listed, and (ii) a Last Reported Sale Price for the Shares (or closing sale price for such other security) is available on such securities exchange; *provided* that if the Shares (or such other security) are not so listed or traded, "**Trading Day**" means a Business Day.

"**Unit of Reference Property**" means, in respect of any Reorganization, the kind and amount of Reference Property that a holder of one Share (or the holder of one Unit of Reference Property in respect of a prior Reorganization, as applicable) is entitled to receive upon the consummation of such Reorganization.

"**Warrant Agent**" has the meaning specified in the preamble hereof and shall include any successor Warrant Agent hereunder.

"**Warrant Agent Office**" has the meaning specified in Section 4(b)(ii) hereof.

"**Warrant Exercise Notice**" has the meaning specified in Section 5(c) hereof.

"**Warrant Register**" has the meaning specified in Section 3(c) hereof.

"**Warrant Shares**" has the meaning specified in Section 3(a) hereof.

"**Warrant Share Number**" has the meaning specified in Section 3(a) hereof.

"**Warrant Statements**" has the meaning specified in Section 3(b) hereof.

"**Warrants**" has the meaning specified in the recitals hereof.

Section 2.    *Appointment of Warrant Agent*.  The Company hereby appoints the Warrant Agent to act as agent for the Company in accordance with the instructions set forth in this Agreement, and the Warrant Agent hereby accepts such appointment, upon the terms and conditions hereinafter set forth.

Section 3.    *Issuance of Warrants; Form, Execution and Delivery*.  (a)  *Issuance of Warrants*.  Pursuant to, and in accordance with, the terms of this Agreement and the Plan, the Company hereby issues the Warrants.  The Warrants shall be, upon issuance, duly authorized and validly issued.  In accordance with Section 4 hereof, as of the date hereof, the Company shall cause to be issued to the applicable registered Holders, one or more Warrants evidenced by an uncertificated, book-entry registration on the books and records of the Warrant Agent (the "**Direct Registration Warrants**").  Each Direct Registration Warrant entitles the Holder, upon proper exercise and payment of the Exercise Price and subject to Section 5(d) and Section 5(i), to receive from the Company one Share (as it may be adjusted from time to time as provided herein, the "**Warrant Share Number**").  The Shares deliverable upon proper exercise of the Warrants are referred to herein as the "**Warrant Shares**."

(b)    *Form of Warrant*.  All Warrants issued pursuant to this Agreement shall be in the form of Direct Registration Warrants reflected on statements issued by the Warrant

#94518622v9

Agent from time to time to the Holders thereof reflecting such uncertificated, book-entry position (the "**Warrant Statements**").  The Warrant Statements may bear such appropriate insertions, omissions, substitutions and other variations as are required or permitted by this Agreement, and may have such letters, numbers or other marks of identification and such legends or endorsements placed thereon as may be required to comply with the Charter, the Stockholders Agreement, any law or any rules made pursuant thereto or as may be determined, consistently herewith and reasonably acceptable to the Warrant Agent, by any Appropriate Officer.  Each Warrant Statement and the Warrant Register shall bear the following legend:

> "THE WARRANTS ARE SUBJECT TO VARIOUS CONDITIONS, INCLUDING CERTAIN RESTRICTIONS ON SALE, DISPOSITION OR TRANSFER AS SET FORTH IN THE STOCKHOLDERS AGREEMENT DATED AS OF [__], 2021 BY AND AMONG [NEWCO] (THE "COMPANY") AND THE STOCKHOLDERS (AS DEFINED THEREIN) FROM TIME TO TIME PARTY THERETO, AS AMENDED FROM TIME TO TIME (THE "STOCKHOLDERS AGREEMENT").  NO REGISTRATION OR TRANSFER OF THE WARRANTS WILL BE MADE ON THE BOOKS OF THE COMPANY OR THE WARRANT AGENT UNLESS AND UNTIL SUCH RESTRICTIONS SHALL HAVE BEEN COMPLIED WITH.  THE COMPANY WILL FURNISH WITHOUT CHARGE, UPON WRITTEN REQUEST TO THE COMPANY AT ITS PRINCIPAL PLACE OF BUSINESS, TO EACH HOLDER OF RECORD OF THE WARRANTS, A COPY OF THE STOCKHOLDERS AGREEMENT CONTAINING THE ABOVE-REFERENCED RESTRICTIONS ON TRANSFERS OF SECURITIES."

(c)    *Other Matters*.  Each Warrant shall be, and shall remain, subject to the provisions of this Agreement and the Stockholders Agreement until such time as no Warrants shall be outstanding in accordance with the terms hereof.  Each Holder shall be bound by all of the terms and provisions of this Agreement (a copy of which is available on request to the Secretary of the Company) and any amendments thereto as fully and effectively as if such Holder had signed the same.  The Warrant Agent shall keep, at an office designated for such purpose, books (the "**Warrant Register**") in which, subject to such reasonable regulations as it may prescribe, it shall register any Direct Registration Warrants and exchanges and transfers of outstanding Warrants in accordance with the procedures set forth in Section 4 of this Agreement, all in form satisfactory to the Company and the Warrant Agent.  The Company may require payment by the applicable Holder of a sum sufficient to cover any stamp or other tax or other governmental charge that may be imposed on the Holder in connection with any such exchange or registration of transfer.  The Warrant Agent shall have no obligation to effect an exchange or register a transfer unless and until any payments required by the immediately preceding sentence have been made.  The Warrant Agent and the Company may deem and treat the Person in whose name any Warrant is registered on the Warrant Register as the absolute owner of such Warrant, for the purpose of any exercise thereof, any distribution to the Holder thereof and for all other purposes, and neither the Warrant Agent nor the Company shall be affected by notice to the contrary prior to due presentment for registration of transfer

or exchange of any Warrant in accordance with the procedures set forth in this Agreement.

Section 4.     *Transfers*.  (a)  *Transfer and Exchange of Direct Registration Warrants*.  When the registered Holder of a Direct Registration Warrant has presented to the Warrant Agent a written request to register the transfer of any Direct Registration Warrant, the Warrant Agent shall register the transfer or make the exchange as requested if such transfer satisfies the provisions of this Agreement and the Stockholders Agreement; *provided* that the Warrant Agent has received a written instruction of transfer in form satisfactory to the Warrant Agent, properly completed and duly executed by the Holder thereof or by his or her attorney, duly authorized in writing.  A party requesting transfer of Warrants must provide any evidence of authority that may be required by the Warrant Agent, including, but not limited to, a signature guarantee from an eligible guarantor institution participating in a signature guarantee program approved by the Securities Transfer Association.

(b)     *Obligations with Respect to Transfers of Warrants*.

(i)     All Direct Registration Warrants issued upon any registration of transfer or exchange shall be the valid obligations of the Company, entitled to the same benefits under this Agreement as the Direct Registration Warrants surrendered upon such registration of transfer or exchange.

(ii)     The Warrant Agent shall, upon receipt of all information required to be delivered hereunder, register the transfer of any outstanding Warrants in the Warrant Register upon the delivery by the registered Holder thereof, at the Warrant Agent Office referred to in Section 12 hereof (the "**Warrant Agent Office**"), duly endorsed, and accompanied by a completed form of assignment substantially in the form attached as Exhibit B (including a duly endorsed Joinder signed by the transferee) and duly signed by the Holder thereof or by the duly appointed legal representative thereof or by his or her attorney, duly authorized in writing, such signature to be guaranteed by a participant in a Medallion Signature Guarantee Program at a guarantee level acceptable to the Warrant Agent.  Upon any such registration of transfer, a new Warrant Statement shall be issued to the transferee.

(iii)     The Warrant Agent shall not undertake the duties and obligations of a transfer agent under this Agreement, including, without limitation, the duty to receive, issue or transfer the Warrant Shares.

(c)     *Holder Acknowledgement*.  Each Holder, by its acceptance of any Warrant under this Agreement, acknowledges and agrees that (i) the Warrants were issued, and the Warrant Shares issuable upon exercise thereof shall be issued, pursuant to the exemption from the registration requirement of Section 5 of the Securities Act provided by Section 1145 of the Bankruptcy Code, and to the extent that a Holder of Warrants (or holder of Warrant Shares) is an "underwriter" as defined in Section 1145(b)(1) of the Bankruptcy Code, such holder shall not sell or transfer any Warrants or Warrant Shares

#94518622v9

in the absence of an effective registration statement under the Securities Act or an exemption from registration thereunder and (ii) the Company is not, and has no obligation to currently become, a reporting company under the Securities Exchange Act of 1934, as amended, and the Holder's rights to information relating to the Company are limited.

Section 5.    *Duration and Exercise of Warrants*.  (a)  *Expiration Date*.  The Warrants shall expire at 5:00 p.m., New York City time, on [____], 2029 (the "**Expiration Date**"), which is the eighth (8th) anniversary of the Effective Date[, subject to Section 6(h)][5].  After 5:00 p.m., New York City time, on the Expiration Date, the Warrants will become void and of no value, and all rights thereunder and all rights in respect thereof under this Agreement shall cease as of such time.

(b)    *Exercise Price*.  On the Effective Date, the Exercise Price shall be $[•][6] per Warrant Share (as it may be adjusted from time to time as provided herein, the "**Exercise Price**").  If the Company at any time makes a Fair Market Value determination in respect of the Common Stock, it shall also determine at such time whether the Fair Market Value for one Share exceeds the Exercise Price, and the Company shall deliver a written notice to the Holders and the Warrant Agent setting forth such determinations as promptly as reasonably practicable following such determinations.

(c)    *Manner of Exercise*.  Each Warrant may be exercised by the Holder thereof during the Exercise Period as described below.  Subject to the provisions of this Agreement, including the Cashless Exercise provisions contained in Section 5(d) and the adjustments contained in Section 6, each Warrant shall entitle the Holder thereof to purchase from the Company (and the Company shall issue and sell to such Holder), upon proper exercise and payment of the Exercise Price in cash, a number of Warrant Shares equal to the then-applicable Warrant Share Number.  A Holder may exercise any of its Warrants on any Business Day during the Exercise Period by, no later than 5:00 p.m., New York City time, on such Business Day, delivering (A) written notice of such election (a "**Warrant Exercise Notice**") to exercise the applicable Warrants to the Company and the Warrant Agent at the addresses set forth in Section 12 hereof, which Warrant Exercise Notice shall be substantially in the form set forth in Exhibit A; and (B) a duly completed and executed Joinder to the extent required pursuant to Section [5.01] of the Stockholders Agreement for the Person that will hold the Warrant Shares issued pursuant to the Warrant Exercise Notice in the form provided for in the Stockholders Agreement and attached to the Warrant Exercise Notice.  The documents referred to in clauses (A) and (B) of the immediately preceding sentence shall be accompanied by payment in full of the Exercise Price in respect of each Warrant Share to be issued, which shall be made by certified or official bank or bank cashier's check payable to the order of the Company, or by wire transfer to the Warrant Agent in immediately available funds.  Such payment shall be in an amount equal to the product of the number of Warrants

---

[5] Insert for GUC Warrants.

[6] To be set at an equity value of (i) for the GUC Warrants and the SLTL Tranche 1 Warrants, $1,321,000,000 and (ii) for the SLTL Tranche 2 Warrants, $1,585,200,000.

#94518622v9

exercised, as designated in such Warrant Exercise Notice, *multiplied by* the then-applicable Exercise Price, *multiplied by* the Warrant Share Number.

(d)     *Cashless Exercise.*  (i) Notwithstanding any provisions of this Agreement to the contrary, if a Holder elects to exercise any of its Warrants hereunder and either (x) the Shares are listed on an Exchange as of the Exercise Date or (y) the Exercise Date occurs during a Cashless Exercise Period, then, in lieu of paying the aggregate Exercise Price in cash as required by Section 5(c), such Holder shall have the right to instruct the Company in the Warrant Exercise Notice to issue the Warrant Shares issuable upon exercise of such Warrants on a net basis (a "**Cashless Exercise**") such that, without payment of any cash in respect of the aggregate Exercise Price, such Holder shall receive a number of Warrant Shares for each Warrant so exercised equal to the greater of (I) zero and (II) "X" as determined pursuant to the following formula:

$$X = Y \ x \ \frac{A\text{-}B}{A}$$

Where:

Y = the Warrant Share Number as of the Exercise Date;

A = the Fair Market Value per Share as of the Exercise Date; and

B = the Exercise Price as of the Exercise Date.

(ii)     Following [_____], 2023 (the second (2nd) anniversary of the Effective Date), the Holders of at least two-thirds of the Warrants then outstanding may request that the Company make a Fair Market Value determination in respect of the Common Stock; *provided* that (x) no more than one such request may be made annually and (y) no more than [two][7][four][8] such requests total may be made during the term of the Warrants; *provided further* that if the Company makes a Fair Market Value determination in respect of the Common Stock at the request of the holders of any warrants other than the Warrants at any time after [_____], 2023, then (A) the Company shall notify the Holders and the Warrant Agent of such determination and such notice shall be deemed to be a Fair Market Value Notice (as defined below) and (B) a Holder request shall be deemed to have been made for purposes of clause (x) of the immediately preceding proviso [and, if such Fair Market Value determination was made at the request of holders of the [SLTL Tranche 2 Warrants][9][SLTL Tranche

---

[7] Insert for GUC Warrants.

[8] Insert for SLTL Tranche 1 Warrants and SLTL Tranche 2 Warrants.

[9] Insert for SLTL Tranche 1 Warrants.

#94518622v9

1 Warrants][10] (as defined in the Plan), a Holder request shall be deemed to have been made for purposes of clause (y) of the immediately preceding proviso][11]. The Company shall complete, and shall notify (a "**Fair Market Value Notice**") the Holders and the Warrant Agent of, such Fair Market Value determination within thirty-five (35) Business Days of such request. The period beginning on, and including, the date of any Fair Market Value Notice and ending on, and including, the tenth (10th) Business Day immediately following the date of such Fair Market Value Notice shall be referred to herein as a "**Cashless Exercise Period**". For the avoidance of doubt, if Cashless Exercise applies to any Warrants with an Exercise Date that occurs during a Cashless Exercise Period, then "A" in the formula set forth in Section 5(d)(i) shall be the Fair Market Value per Share specified in the related Fair Market Value Notice.

(iii)    The Warrant Agent shall have no duty or obligation to investigate or confirm whether the Company's determination of the number of Warrant Shares to be issued upon any Cashless Exercise is accurate or correct, nor shall the Warrant Agent have any duty or obligation to take any action with regard to such Cashless Exercise prior to being notified by the Company of the relevant number of Warrant Shares to be issued.

(e)    Any exercise of a Warrant pursuant to the terms of this Agreement shall be irrevocable as of the date of delivery of the applicable Warrant Exercise Notice and shall constitute a binding agreement between the Holder and the Company, enforceable in accordance with its terms (except as such enforceability may be limited by bankruptcy, insolvency or similar laws generally affecting creditor's rights).

(f)    The Warrant Agent shall:

(i)    examine all Warrant Exercise Notices and all other documents delivered to it by or on behalf of Holders as contemplated hereunder to ascertain whether, on their face, such Warrant Exercise Notices and any such other documents have been executed and completed in accordance with their terms;

(ii)    inform the Company of and cooperate with and assist the Company in resolving any reconciliation problems between the Warrant Exercise Notices received and delivery of Warrants to the Warrant Agent's account; and

(iii)    advise the Company, no later than two (2) Business Days after receipt of a Warrant Exercise Notice, of (A) the receipt of such Warrant Exercise Notice and the number of Warrants exercised in accordance with the terms of this Agreement, (B) the number of Warrant Shares to be issued upon exercise of such Warrants (except in the case of Cashless Exercise), (C) the instructions with

---

[10] Insert for SLTL Tranche 2 Warrants.

[11] Insert for SLTL Tranche 1 Warrants and SLTL Tranche 2 Warrants.

#94518622v9

respect to delivery of the Warrant Shares deliverable upon such exercise, and (D) such other information as the Company shall reasonably require.

(g)     All questions as to the validity, form and sufficiency (including time of receipt) of a Warrant exercise shall be determined by the Company in its reasonable discretion in good faith.  The Warrant Agent shall incur no liability for or in respect of and, except to the extent such liability arises from the Warrant Agent's bad faith, gross negligence or willful misconduct (each as determined by a final, non-appealable order, judgment of a court decree or ruling of competent jurisdiction), shall be indemnified and held harmless by the Company for acting or refraining from acting upon, or as a result of such determination by, the Company.  The Company reserves the right to reject any and all Warrant Exercise Notices not in proper form or for which any corresponding agreement by the Company to exchange would, in the opinion of the Company, be unlawful as determined in good faith in consultation with the Company's legal counsel and the relevant Holder.  Moreover, the Company reserves the absolute right to waive any of the conditions to the exercise of Warrants or defects in Warrant Exercise Notices with regard to any particular exercise of Warrants.  Neither the Company nor the Warrant Agent shall be under any duty to give notice to the Holders of any irregularities in any exercise of Warrants, nor shall they incur any liability for the failure to give such notice; *provided* that the Company and/or the Warrant Agent shall promptly notify a Holder if the Company will not honor a Warrant Exercise Notice from such Holder.

(h)     As soon as reasonably practicable after the Exercise Date for any Warrant, the Company shall issue, or otherwise deliver, in authorized denominations to or upon the order of the Holder, an uncertificated, book-entry interest in the number of Warrant Shares to which such Holder is entitled on the books and records of the Company's transfer agent.  Such Warrant Shares shall be deemed to have been issued and any Person so designated to be named therein shall be deemed to have become a holder of record of such Warrant Shares as of the close of business on the Exercise Date.

(i)     The Company shall not be required to issue fractions of Warrant Shares upon exercise of the Warrants.  All Warrant Shares (including fractions) to be issued upon exercise of the applicable Warrant will be aggregated for purposes of determining whether the exercise would result in the issuance of any fractional Share.  If, after aggregation, the exercise would result in the issuance of a fractional Share, the Company will, at its sole option, either (A) issue such fractional Share, (B) round such fractional Share up to the nearest whole Share and issue such whole Share or (C) in lieu of issuance of any fractional Share, pay the Holder otherwise entitled to such fractional Share an amount in cash equal to the product resulting from multiplying the then-current Fair Market Value per Share by such fraction.

(j)     The Company shall comply with all applicable tax withholding and reporting requirements imposed by any governmental unit, and all distributions, including deemed distributions, pursuant to the Warrants will be subject to applicable withholding and reporting requirements.  Notwithstanding any provision to the contrary, the Company will be authorized to (i) take any actions that may be reasonably necessary or appropriate to comply with such withholding and reporting requirements, (ii) apply a portion of any

11

cash distribution to be made under the Warrants to pay applicable withholding taxes, (iii) liquidate a portion of any non-cash distribution to be made under the Warrants to generate sufficient funds to pay applicable withholding taxes or (iv) establish any other mechanisms the Company believes are reasonable and appropriate, including requiring Holders to submit appropriate tax and withholding certifications (such as IRS Forms W-9 and the appropriate IRS Forms W-8, as applicable) and/or requiring Holders to pay the withholding tax amount to the Company in cash as a condition of receiving the benefit of any anti-dilution adjustment pursuant to Section 6.

(k)     The Warrant Agent shall keep copies of this Agreement and any notices given or received hereunder for a period beginning on the date of this Agreement and ending no earlier than the third anniversary of the Expiration Date.

Section 6.     *Anti-Dilution Provisions*.  The Exercise Price and the Warrant Share Number shall be subject to adjustment from time to time as set forth in this Section 6; *provided* that no single event shall give rise to an adjustment under more than one subsection of this Section 6 (other than in the case of a dividend or other distribution of different types of property, in which case Section 6(a) and Section 6(b) shall apply to the appropriate parts of each such dividend or distribution); *provided further* that any issuance of Warrant Shares upon exercise of the Warrants shall not itself give rise to any adjustment under this Section 6; *provided further* that no adjustment shall be made under this Section 6 if Holders participate (other than in the case of a Share split or Share combination), at the same time and upon the same terms as holders of the Shares and solely as a result of holding the Warrants, in any of the transactions described in this Section 6, without having to exercise their Warrants, as if each Holder held a number of Shares equal to the then-current Warrant Share Number *multiplied by* the number of Warrants held by such Holder.

(a)     *Share Distributions, Subdivisions or Combinations*.  The Exercise Price and Warrant Share Number shall be adjusted pursuant to the formulas below in the event the Company (i) pays a dividend or makes any other distribution with respect to its Shares solely in Shares, (ii) subdivides or reclassifies its outstanding Shares into a greater number of Shares or (iii) combines or reclassifies its outstanding Shares into a smaller number of Shares.  Such adjustments shall become effective (x) in the case of clause (i) above, at the close of business on the record date for such dividend or distribution or (y) in the case of clause (ii) or (iii) above, at the open of business on the effective date of such event. In the event that a dividend or distribution described in clause (i) above is not so paid or made, the Exercise Price and the Warrant Share Number shall be readjusted, effective as of the date when the Board determines not to make such dividend or distribution, as the case may be, to be the Exercise Price and the Warrant Share Number that would be in effect if such dividend or distribution had not been declared.

$$U_a = \quad U_b \ \ x \ \ \frac{O_a}{O_b}$$

$$\frac{}{O_b}$$

$$Pa = \quad Pb \ \ x \qquad Oa$$

Where:

Ub = Warrant Share Number immediately before the adjustment

Ua = Warrant Share Number immediately after the adjustment

Pb = Exercise Price immediately before the adjustment

Pa = Exercise Price immediately after the adjustment

Ob = Number of Shares outstanding immediately before the adjustment

Oa = Number of Shares outstanding immediately after the transaction in question

(b)    *Certain Dividends and Distributions*.  If the Company shall fix a record date for the payment of a dividend or the making of a distribution with respect to the Shares consisting of securities, evidences of indebtedness, assets, cash or rights, options or warrants to purchase securities of the Company (other than (i) any dividends or distributions for which an adjustment is made pursuant to Section 6(a) and (ii) cash dividends up to an aggregate amount per fiscal year equal to 30% of the Company's free cash flow for such fiscal year, as determined by the Board in good faith) to all or substantially all holders of the Shares, the Exercise Price and Warrant Share Number shall be adjusted pursuant to the formulas below.  Such adjustments shall become effective at the close of business on the record date for such dividend or distribution. In the event that such dividend or distribution is not so paid or made, the Exercise Price and the Warrant Share Number shall be readjusted, effective as of the date when the Board determines not to make such dividend or distribution, as the case may be, to be the Exercise Price and the Warrant Share Number that would be in effect if such dividend or distribution had not been declared.

$$Ua = \quad Ub \ \ x \quad \frac{M}{M-D}$$

$$Pa = \quad Pb \ \ x \quad \frac{M-D}{M}$$

Where:

Ub = Warrant Share Number immediately before the adjustment

Ua = Warrant Share Number immediately after the adjustment

Pb = Exercise Price immediately before the adjustment

Pa = Exercise Price immediately after the adjustment

M = Fair Market Value of one Share as of the Trading Day immediately preceding the ex-date for such dividend or distribution

D = Fair Market Value of the dividend or distribution made per Share as of the record date for such dividend or distribution; *provided* that, in the case of a cash dividend a portion of which would cause the aggregate amount of cash dividends paid by the Company for any fiscal year to exceed 30% of the Company's free cash flow for such fiscal year, as determined by the Board in good faith, "D" shall be equal to the Fair Market Value of such portion of such dividend made per Share as of the record date for such dividend.

(c)     *Certain Other Events*. The Company may make decreases in the Exercise Price and/or increases in the Warrant Share Number as the Board deems advisable in good faith in order to avoid or diminish any income tax to holders of Shares resulting from any dividend or distribution of stock (or rights to acquire stock) or from any event treated as such for income tax purposes.

(d)     *Exceptions to Adjustments*.  Except as specifically provided for herein, there shall be no adjustment or readjustment to the Exercise Price or the Warrant Share Number.

(e)     *Notice of Adjustment*.  [Subject to Section 6(h),][12] [u][U]pon the occurrence of each adjustment or readjustment of the Exercise Price or the Warrant Share Number, the Company (at its expense) shall promptly compute such adjustment or readjustment in good faith in accordance with the terms hereof  and furnish to (i) the Warrant Agent a certificate, signed by an Appropriate Officer, and (ii) to each Holder a notice, in each case setting forth (A) such adjustment or readjustment and showing in detail the facts upon which such adjustment or readjustment is based and (B) the Exercise Price and the Warrant Share Number at the time in effect; *provided* that the Company shall not be required to deliver any notice to the Holders until the cumulative change in the Exercise Price or the Warrant Share Number exceeds one percent (1%) from (x) the initial Exercise Price or Warrant Share Number, as the case may be, or (y) the Exercise Price or the Warrant Share Number, as the case may be, that the Holders received notice of in the most recent notice provided to them.  The Warrant Agent shall have no duty with respect to any statement filed with it except to keep the same on file and available for inspection by Holders during reasonable business hours.  The Warrant Agent shall not at any time be under any duty or responsibility to any Holder to determine whether any facts exist which may require any adjustment to the Exercise Price or the Warrant Share Number, or with respect to the nature or extent of any adjustment of the Exercise Price or the Warrant Share Number when made or with respect to the method employed in making such adjustment.

(f)     *No Change in Warrant Terms on Adjustment*.  Irrespective of any adjustments in the Exercise Price or the Warrant Share Number, the Warrants theretofore or thereafter issued may continue to express the same prices and amounts as are stated in the similar Warrants issuable initially, or at some subsequent time, pursuant to this

---

[12] Insert for GUC Warrants.

Agreement, and the Exercise Price or the Warrant Share Number, as the case may be, specified thereon shall be deemed to have been so adjusted.

(g)   *Miscellaneous*.  All calculations hereunder shall be made to the nearest one-tenth (1/10th) of a cent or to the nearest one-hundredth (1/100) of a Share, as the case may be. Any provision of this Section 6 to the contrary notwithstanding, no adjustment in the Exercise Price or the Warrant Share Number shall be made if the amount of such adjustment would be less than $0.01 or[, other than an adjustment as provided in Section 6(h),][13] one-tenth (1/10th) of a Share, but any such amount shall be carried forward and an adjustment with respect thereto shall be made at the time of and together with any subsequent adjustment which, together with such amount and any other amount or amounts so carried forward, shall aggregate $0.01 or 1/10th of a Share, or more, or upon exercise of a Warrant if it shall earlier occur. If an adjustment in the Exercise Price made hereunder would reduce the Exercise Price to an amount below $0.01, then such adjustment in the Exercise Price made hereunder shall reduce the Exercise Price to $0.01 and not lower.

(h)   [*Adjustment upon Exercise of SLTL Tranche 2 Warrants*.

(i)   Upon the exercise of a SLTL Tranche 2 Warrant in accordance with the SLTL Tranche 2 Warrant Agreement, the Warrant Share Number shall be increased as follows:

$$N = \quad P \quad x \quad (S + (1.03627 \ x \ T))$$

Where:

N = Warrant Share Number immediately after the adjustment

P =  0.000009%

S = 11,123,704

T = Aggregate number of Shares issued upon exercise of all SLTL Tranche 2 Warrants exercised on or prior to the effective date of the adjustment

(ii)   Such increase of the Warrant Share Number pursuant to this Section 6(h) shall become effective simultaneously with the "Exercise Date" (as such term is defined in the SLTL Tranche 2 Warrant Agreement) of such SLTL Tranche 2 Warrant.  Upon the occurrence of each increase of the Warrant Share Number pursuant to this Section 6(h), the Company (at its expense) shall promptly compute such increase in good faith in accordance with the terms hereof (and shall make such adjustments thereto as it determines in good faith are appropriate to account for any adjustment to the Warrant Share Number pursuant

---

[13] Insert for GUC Warrants.

to Section 6(a) or 6(b) that occurred prior to the effective date of the adjustment pursuant to this Section 6(h)) and furnish to (A) the Warrant Agent a certificate, signed by an Appropriate Officer, and (B) each Holder a notice ((A) and (B), an "**SLTL Adjustment Notice**"), in each case setting forth (1) such increase in the Warrant Share Number and the calculation upon which such increase is based and (2) the Warrant Share Number after giving effect to such increase; *provided* that the Company shall not be required to deliver any SLTL Adjustment Notice (w) until the cumulative change in the Warrant Share Number immediately after the increase exceed**s** five percent (5%) from the Warrant Share Number immediately before the first such increase (or, if applicable, from the Warrant Share Number set forth in the most recent SLTL Adjustment Notice) or (x) in any event, more than once in any 30-day period; *provided further* that (y) if any Warrant is exercised prior to an SLTL Adjustment Notice having been delivered with respect to any exercise of a SLTL Tranche 2 Warrant, the increase in the Warrant Share Number shall be applied as to such Warrants exercised and (z) if as of the Expiration Date there are any SLTL Tranche 2 Warrants that have been exercised for which an SLTL Adjustment Notice has not previously been delivered at least 30 days prior to the Expiration Date, then upon the Expiration Date the Company shall furnish to (C) the Warrant Agent a certificate, signed by an Appropriate Officer, and (D) each Holder a notice ((C) and (D), a "**Final True-Up Notice**"), in each case setting forth (1) such increase in the Warrant Share Number and the calculation upon which such increase is based and (2) the Warrant Share Number after giving effect to such increase and, notwithstanding Section 5(a), the Warrants may be exercised for 30 days after the date of the Final True-Up Notice (and the Expiration Date shall be extended by such 30-day period).  In addition to the foregoing, the Company shall advise any Holder of any increase in the Warrant Share Number for which an SLTL Adjustment Notice has not been furnished upon the written request of such such Holder and upon the exercise of any Warrant by such Holder.  Notwithstanding anything to the contrary herein, any Warrant that is exercised prior to the full exercise of all SLTL Tranche 2 Warrants shall remain outstanding and may be exercised in accordance with the terms hereof, except that the "Warrant Share Number" for purposes of calculating the number of Warrant Shares issuable upon such exercise shall be equal to (i) the Warrant Share Number as of the relevant Exercise Date *minus* (ii) the Warrant Share Number as of the most recent prior date on which such Warrant was exercised (including pursuant to this Section 6(h)). For the avoidance of doubt, (I) the Exercise Price shall not be adjusted upon any exercise of the SLTL Tranche 2 Warrants, (II) the Exercise Price shall continue to be applicable as the price to be paid for one whole Share upon exercise of a Warrant, and (III) to the extent a Warrant represents the right to acquire fractional Shares, a Holder's Warrants may be aggregated to achieve an exercise for whole Shares, subject to Section 5(i).][14]

Section 7.    *Reorganization*.  (a)  If a Reorganization occurs at any time on or prior to the Expiration Date (or, if later, the settlement date for any exercise of Warrants),

---

[14] Insert for GUC Warrants.

then, following the effective time of such Reorganization, a Holder's right to receive Warrant Shares upon exercise of its Warrants shall be converted into the right to receive upon exercise, with respect to each Warrant Share that would have otherwise been deliverable hereunder, one Unit of Reference Property; *provided* that if the Reference Property consists solely of cash, then on the effective date of such Reorganization, each Holder shall receive, in respect of each Warrant such Holder holds, at the same time and upon the same terms as holders of Shares receive the cash in exchange for their Shares, an amount of cash equal to the greater of (i) (x) the amount of cash that such Holder would receive in such Reorganization if such Holder owned, as of the record date for such Reorganization, a number of Shares equal to the Warrant Share Number in effect on such record date, *minus* (y) the Exercise Price in effect on such record date *multiplied by* the Warrant Share Number in effect on such record date and (ii) $0, and upon the Company's delivery of such cash (if any) in respect of such Warrant, such Warrant shall be deemed to have been exercised in full and canceled. With respect to any exercise of Warrants following the effective time of such Reorganization, the number of Units of Reference Property issuable upon exercise of a Warrant shall be calculated pursuant to Section 5 as if each reference therein to a "Share" or a "Warrant Share" referred to a Unit of Reference Property.

(b)     In the case of any Reorganization in which holders of Shares may make an election as between different types of Reference Property, such holders of Shares shall be deemed to have elected to receive (i) first, the maximum amount of Marketable Securities and (ii) for any remaining consideration, the maximum amount of cash. The Company shall not consummate any Reorganization unless the Company first shall have made appropriate provision to ensure that the applicable provisions of this Agreement shall immediately after giving effect to such Reorganization be assumed by and binding on the other party to the Reorganization (or the surviving entity, successor, parent company and/or issuer of such Reference Property, as appropriate) and applicable to any Reference Property deliverable upon the exercise of Warrants, pursuant to a customary assumption agreement in form and substance reasonably satisfactory to the Holders of a majority of the Warrants then outstanding.  Any such assumption agreement shall also include any amendments to this Agreement necessary to effect the changes to the terms of the Warrants described in this Section 7 and preserve the intent of the provisions of this Agreement.  The provisions of this Section 7 shall similarly apply to successive Reorganizations.

(c)     The Company shall notify the Holders and the Warrant Agent of any such proposed Reorganization reasonably prior to the consummation thereof so as to provide the Holders with a reasonable opportunity to confirm compliance with the terms hereof and, if they elect, to exercise the Warrants in accordance with the terms and conditions hereof prior to consummation of the Reorganization; *provided* that in the case of a transaction which requires notice to be given to the holders of the Shares, the Holders and the Warrant Agent shall be provided the same notice given to the holders of the Shares.

Section 8.     *Covenants of the Company*.  (a)  *Covenants as to Warrant Shares*. The Company covenants and agrees that all Warrant Shares that may be issued upon the exercise of the rights represented by the Warrants shall, upon issuance, be validly issued

#94518622v9

and outstanding, fully paid and nonassessable, and free from all taxes (subject to **Error! Reference source not found.**), liens and charges with respect to the issuance thereof and shall not be issued in violation of any applicable law or governmental regulation.  The Company further covenants and agrees that the Company shall at all times prior to the Expiration Date (or any earlier time at which all Warrants have been canceled) have reserved a sufficient number of authorized but unissued Shares to provide for the exercise of all outstanding Warrants.  The Company further covenants and agrees that, if the Shares are at any time listed or traded on a Principal Exchange, the Company shall procure, at its sole expense, the listing of the Shares issuable upon exercise of the Warrants, subject to issuance or notice of issuance, on such Principal Exchange.

(b)     *Notices of Record Date*.  In the event of any taking by the Company of a record of the holders of any class of securities for the purpose of determining the holders thereof who are entitled to receive any distribution of any kind, or any right to subscribe for, purchase or otherwise acquire any Shares or any other securities or property, or to receive any other right or interest of any kind, the Company will mail to the Holders, at least five (5) Business Days prior to such record date, a notice specifying the date on which any such record is to be taken for the purpose of such distribution (other than pursuant to the adjustments provided herein).

Section 9.     *Warrant Agent*.  The Warrant Agent undertakes the duties and obligations imposed by this Agreement upon the terms and conditions set forth in this Section 9.

(a)     *Limitation on Liability*.  The Warrant Agent shall not by any act hereunder be accountable with respect to or be deemed to make any representations as to the validity or authorization of the Warrants, as to the validity, authorization or value (or kind or amount) of any Warrant Shares or other property delivered or deliverable upon exercise of any Warrant, or as to the purchase price of such Warrant Shares or other property.  The Warrant Agent shall not (i) be liable for any recital or statement of fact contained herein or for any action taken, suffered or omitted by the Warrant Agent in good faith in the belief that any document or any signature is genuine or properly authorized, (ii) be responsible for determining whether any facts exist that may require any adjustment of the Exercise Price or the number of Warrant Shares issuable or with respect to the nature or extent of any such adjustments when made, or with respect to the method of adjustment employed, (iii) be responsible for any failure on the part of the Company to issue, transfer or deliver any Warrant Shares or property upon the surrender of any Warrant for the purpose of exercise or to comply with any other of the Company's covenants and obligations contained in this Agreement or (iv) be liable for any action taken, suffered or omitted to be taken in connection with this Agreement, except for its own bad faith, gross negligence or willful misconduct.  The Warrant Agent shall be liable hereunder only for its own bad faith, gross negligence or willful misconduct (which bad faith, gross negligence or willful misconduct must be determined by a final, non-appealable order, judgment, decree or ruling of a court of competent jurisdiction).  Except for the foregoing, notwithstanding anything in this Agreement to the contrary, in no event shall the Warrant Agent be liable for special, indirect, punitive, incidental or

consequential loss or damage of any kind whatsoever (including, but not limited to, lost profits).

(b)     *Instructions*.  The Warrant Agent is hereby authorized to accept advice or instructions with respect to the performance of its duties hereunder from an Appropriate Officer and to apply to any such Appropriate Officer for advice or instructions.  The Warrant Agent shall be fully protected and authorized in relying upon the most recent advice or instructions received from any such Appropriate Officer.  The Warrant Agent shall not be liable for any action taken, suffered or omitted by it in accordance with the advice or instructions of any such Appropriate Officer, except to the extent that such action or omission resulted directly from the Warrant Agent's bad faith, gross negligence, or willful misconduct.

(c)     *Agents*.  The Warrant Agent may execute and exercise any of the rights and powers hereby vested in it or perform any duty hereunder either itself or by or through its attorneys, agents or employees, provided reasonable care has been exercised in the selection and in the continued employment of such attorney, agent or employee, provided, further that it shall be liable and responsible for any such attorney, agent or employee.  The Warrant Agent shall not be under any obligation or duty to institute, appear in, or defend any action, suit or legal proceeding in respect hereof, but this provision shall not affect the power of the Warrant Agent to take such action as the Warrant Agent may consider necessary.  The Warrant Agent shall promptly notify the Company in writing of any claim made or action, suit or proceeding instituted against the Warrant Agent arising out of or in connection with this Agreement.

(d)     *Cooperation*.  The Company will perform, execute, acknowledge and deliver or cause to be performed, executed, acknowledged and delivered all such further acts, instruments and assurances as may reasonably be required by the Warrant Agent in order to enable the Warrant Agent to carry out or perform its duties under this Agreement.

(e)     *Agent Only*.  The Warrant Agent shall act solely as agent for the Company in accordance with the terms and conditions hereof and does not assume any obligation or relationship of agency or trust with any Holders.  The Warrant Agent shall not be liable except for the performance of such duties as are specifically set forth herein, and no implied covenants or obligations shall be read into this Agreement against the Warrant Agent, whose duties and obligations shall be determined solely by the express provisions hereof.

(f)     *Right to Counsel*.  The Warrant Agent may at any time consult with legal counsel reasonably satisfactory to it (who may be legal counsel for the Company), and the Warrant Agent shall incur no liability or responsibility to the Company or to any Holder for any action taken, suffered or omitted by the Warrant Agent in good faith in accordance with the opinion or advice of such counsel.

(g)     *Compensation*.  The Company agrees to pay the Warrant Agent reasonable compensation for all services rendered by it hereunder and to reimburse the Warrant

19

Agent for its reasonable expenses hereunder (including reasonable and documented fees and out-of-pocket expenses of one legal counsel and one local counsel), and further agrees to indemnify and hold the Warrant Agent and its employees, officers, directors and agents harmless against any and all loss, claims, damages, expenses and liabilities, including, but not limited to, any judgments, costs and such reasonable counsel fees, for any action taken, suffered or omitted by the Warrant Agent and its employees, officers, directors and agents in connection with the acceptance, administration, exercise and performance of its duties under this Agreement and the Warrants, except for any such liabilities that arise as a result of the Warrant Agent's bad faith, gross negligence or willful misconduct (as determined by a court of competent jurisdiction in a final and non-appealable judgment). Notwithstanding the foregoing, the Company shall not be responsible for any settlement made without its consent, which consent shall not be unreasonably conditioned, withheld or delayed.

(h)    *Accounting and Payment*. The Warrant Agent shall account promptly to the Company with respect to Warrants exercised and concurrently pay to the Company all moneys received by the Warrant Agent on behalf of the Company on the purchase of Warrant Shares through the exercise of Warrants. The Warrant Agent shall advise the Company by telephone at the end of each day on which a payment for the exercise of Warrants is received of the amount so deposited to such account. The Warrant Agent shall as soon as practicable confirm such telephone advice to the Company in writing.

(i)    *No Conflict*. Subject to applicable law, the Warrant Agent and any stockholder, affiliate, director, officer or employee of the Warrant Agent may buy, sell or deal in any of the Warrants or other securities of the Company or become pecuniarily interested in any transaction in which the Company may be interested, or contract with or lend money to the Company or otherwise act as fully and freely as though it were not Warrant Agent under this Agreement. Subject to applicable law, nothing herein shall preclude the Warrant Agent from acting in any other capacity for the Company or for any other Person including, without limitation, acting as trustee under an indenture.

(j)    *Resignation; Termination*. The Warrant Agent may resign its duties and be discharged from all further duties and liabilities hereunder (except liabilities arising as a result of the Warrant Agent's bad faith, gross negligence or willful misconduct) after giving thirty (30) calendar days' prior written notice to the Company. The Company may remove the Warrant Agent upon thirty (30) calendar days' written notice, and the Warrant Agent shall thereupon in like manner be discharged from all further duties and liabilities hereunder, except as have been caused by the Warrant Agent's bad faith, gross negligence or willful misconduct. The Company shall cause to be mailed promptly (by first class mail, postage prepaid) to each registered Holder at such Holder's last address as shown on the register of the Company, at the Company's expense, a copy of such notice of resignation or notice of removal, as the case may be. Upon such resignation or removal the Company shall promptly appoint in writing a new Warrant Agent. If the Company shall fail to make such appointment within a period of sixty (60) calendar days after it has been notified in writing of such resignation by the resigning Warrant Agent or after such removal, then the Holder of any Warrant may apply to any court of competent jurisdiction for the appointment of a new Warrant Agent. A resignation or removal of the

20

Warrant Agent and appointment of a successor Warrant Agent will become effective only upon the successor Warrant Agent's acceptance of appointment.  Pending appointment of a successor to the Warrant Agent, either by the Company or by such a court, the duties of the Warrant Agent shall be carried out by the Company.  Any successor Warrant Agent, whether appointed by the Company or by such a court, shall be a Person, organized under the laws of the United States or of any state thereof and authorized under such laws to conduct a shareholder services business, be subject to supervision and examination by a Federal or state authority, and have a combined capital and surplus of not less than $50,000,000 as set forth in its most recent published annual report of condition; or in the case of such capital and surplus requirement, a controlled affiliate of such a Person meeting such capital and surplus requirement.  After acceptance in writing of such appointment by the new Warrant Agent, such successor Warrant Agent shall be vested with the same powers, rights, duties and responsibilities under this Agreement as if it had been originally named herein as the Warrant Agent, without any further assurance, conveyance, act or deed; but if for any reason it shall be necessary or expedient to execute and deliver any further assurance, conveyance, act or deed, the same shall be done at the expense of the Company and shall be legally and validly executed and delivered by the resigning or removed Warrant Agent.  Not later than the effective date of any such appointment, the Company shall send notice thereof to the resigning or removed Warrant Agent and shall forthwith cause a copy of such notice to be mailed (by first class, postage prepaid) to each registered Holder at such Holder's last address as shown on the register of the Company.  Failure to give any notice provided for in this (j), or any defect in any such notice, shall not affect the legality or validity of the resignation of the Warrant Agent or the appointment of a successor Warrant Agent, as the case may be.

(k)     *Merger, Consolidation or Change of Name of Warrant Agent*.  Any corporation into which the Warrant Agent may be merged or converted or with which it may be consolidated, or any corporation resulting from any merger, conversion or consolidation to which the Warrant Agent shall be a party, or any corporation succeeding to all or substantially all of the agency business of the Warrant Agent shall be the successor to the Warrant Agent hereunder without the execution or filing of any document or any further act on the part of any of the parties hereto, provided that such corporation would be eligible for appointment as a successor Warrant Agent under the provisions of Section 9(j).

(l)     *Exclusions*.  Unless a court of competent jurisdiction determines by a final, non-appealable order, judgment, decree or ruling that the Warrant Agent's action or inaction constitutes bad faith, gross negligence or willful misconduct on the part of the Warrant Agent, the Warrant Agent shall have no responsibility with respect to the validity of this Agreement or with respect to the validity or execution of any Warrant (except its countersignature thereof); nor shall it be responsible for any breach by the Company of any covenant or condition contained in this Agreement or in any Warrant; nor shall it be responsible or have any duty to make any calculation or adjustment (unless reasonably requested to do so by the Company in writing in a manner consistent with the terms of this Agreement), or to determine when any calculation or adjustment required under the provisions hereof should be made, how it should be made or what it should be, or have any responsibility or liability for the manner, method or amount of any such

21

calculation or adjustment or the ascertaining of the existence of facts that would require any such calculation or adjustment; nor shall it by any act hereunder be deemed to make any representation or warranty as to the authorization or reservation of any Warrant to be issued pursuant to this Agreement or as to whether any Warrant Shares will, when issued, be valid and fully paid and nonassessable.

(m)     *No Liability for Interest*.  The Warrant Agent shall not be under any liability for interest on any monies at any time received by it pursuant to any of the provisions of this Agreement.

(n)     *No Liability for Invalidity*.  The Warrant Agent shall not be under any responsibility with respect to the validity or sufficiency of this Agreement or the execution and delivery hereof (except the due execution and delivery hereof by the Warrant Agent).

(o)     *No Responsibilities for Recitals*.  The recitals contained herein shall be taken as the statements of the Company, and the Warrant Agent assumes no responsibility hereby for the correctness of the same.

(p)     *No Implied Obligations*.  The Warrant Agent shall be obligated to perform such duties as are explicitly set forth herein and no implied duties or obligations shall be read into this Agreement against the Warrant Agent.  The Warrant Agent shall not be under any obligation to take any action hereunder that may involve it in any expense or liability, the payment of which within a reasonable time is not, in its reasonable opinion, assured to it.  The Warrant Agent shall have no duty or responsibility in case of any default by the Company in the performance of its covenants or agreements contained herein or in the case of the receipt of any written demand from a Holder with respect to such default, including, without limiting the generality of the foregoing, any duty or responsibility to initiate or attempt to initiate any proceedings at law or otherwise or, to make any demand upon the Company.

(q)     *Force Majeure*.  In no event shall the Warrant Agent be responsible or liable for any failure or delay in the performance of its obligations under this Agreement arising out of or caused by, directly or indirectly, forces beyond its reasonable control, including, without limitation, strikes, work stoppages, accidents, acts of war or terrorism, civil or military disturbances, nuclear or natural catastrophes or acts of God, and interruptions, loss or malfunctions of utilities, communications or computer (software or hardware) services.

Section 10.   *Severability*.  The determination by a court of competent jurisdiction that any particular provision of this Agreement is unenforceable or invalid will not affect the enforceability of or invalidate the other provisions hereof, and this Agreement will be construed in all respects as if such invalid or unenforceable provisions had never been part hereof and were omitted here from.  Upon such a determination, the parties will negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible so that the transactions contemplated hereby be consummated as originally contemplated to the fullest extent possible.

#94518622v9

Section 11.  *Holder Not Deemed a Shareholder*.  No Holder of a Warrant, by reason of the ownership of such Warrant, shall be entitled to vote or receive dividends on or be deemed the holder of any Warrant Shares for any purpose, nor shall anything contained in the Warrants be construed to confer upon the Holders, as such, any of the rights of a holder of Shares or any right to vote, give or withhold consent to any Company action (whether any reorganization, issuance of Shares, reclassification of Shares, consolidation, merger, conveyance or otherwise), receive notice of meetings, receive dividends or subscription rights or otherwise, except as set forth in the Stockholders Agreement or herein.  No Holder shall have any right not expressly conferred under, or by applicable law with respect to, this Agreement or the Stockholders Agreement.

Section 12.  *Notices to Company and Warrant Agent*.  All notices, requests or demands authorized by this Agreement to be given or made by the Warrant Agent or by any registered Holder of any Warrant to or on the Company or the Warrant Agent to be effective shall be in writing (including by telecopy), and shall be deemed to have been duly given or made when delivered by hand, or two (2) Business Days after being delivered to a recognized courier (whose stated terms of delivery are two Business Days or less to the destination), or five (5) Business Days after being deposited in the mail, or, in the case of facsimile or email notice, when received, addressed (until another address is filed in writing by the Company with the Warrant Agent) as follows:

> [NewCo]
> [_____]

If the Company shall fail to maintain such office or agency or shall fail to give such notice of any change in the location thereof, presentation may be made and notices and demands may be served at the principal office of the Warrant Agent.

Any notice pursuant to this Agreement to be given by the Company or by any registered Holder of any Warrant to the Warrant Agent shall be sufficiently given if sent by first-class mail, postage prepaid, or by facsimile or email notice, addressed (until another address is filed in writing by the Warrant Agent with the Company), as follows:

> [American Stock Transfer & Trust Company, LLC
> 6201 15th Avenue
> Brooklyn, NY 11219
> Attention: Relationship Management for [NewCo]
> Email: reorgwarrants@astfinancial.com]

The Warrant Agent maintains the Warrant Agent Office at the above address.

Section 13.  *Supplements and Amendments*.  The Company and the Warrant Agent may from time to time supplement or amend this Agreement (a) without the approval of any Holder in order to cure any ambiguity, manifest error or other mistake in this Agreement, or to correct or supplement any provision contained herein that may be defective or inconsistent with any other provision herein, or to make any other provisions

in regard to matters or questions arising hereunder that the Company and the Warrant Agent may deem necessary or desirable and that shall not adversely affect, alter or change the interests of the Holders in any material respect or (b) with the prior written consent of Holders of a majority of the Warrants; *provided* that each amendment or supplement that decreases the Warrant Agent's rights or increases its duties and responsibilities hereunder shall also require the prior written consent of the Warrant Agent.  Notwithstanding the foregoing, the consent of each Holder affected in any material respect shall be required for any amendment pursuant to which the Exercise Price would be increased or the number of Warrant Shares purchasable would be decreased (other than pursuant to adjustments provided herein) or the Exercise Period would be shortened.  Upon execution and delivery of any supplement or amendment pursuant to this Section 13, such amendment shall be considered a part of this Agreement for all purposes and every Holder of Warrants shall be bound thereby.

Section 14.   *Termination*.  This Agreement shall terminate on the earlier of (a) such date when all Warrants have been cancelled or exercised with respect to all Warrant Shares subject thereto [(including pursuant to Section 6(h))][15] and (b) the Expiration Date or, if later, upon settlement of all Warrants (i) validly exercised on or prior to the Expiration Date and, except in the case of Cashless Exercise, for which the Exercise Price was timely paid; *provided* that the provisions of Sections 10-20 shall survive such termination.

Section 15.   *Governing Law and Consent to Forum*.  This Agreement shall be governed by, and construed in accordance with, the laws of the State of Delaware (without giving effect to choice of law principles thereof to the extent that the application of the laws of another jurisdiction would be required thereby); *provided*, *however*, that the foregoing shall not be construed so as to restrict in any manner the ability of the Company to enforce any judgment obtained in any court of competent jurisdiction. Subject to the provisos to the last sentence of this Section 15, each of the parties hereto (a) consents to submit itself to the exclusive personal jurisdiction of the Chancery Court of Delaware and, if such court declines jurisdiction, any Federal district court located in the State of Delaware in the event of any action arising out of or relating to this Agreement or any of the transactions contemplated by this Agreement, (b) agrees that it will not attempt to deny or defeat such personal jurisdiction by motion or other request for leave from any such court, (c) agrees that, except as provided in clause (d) below, it will not bring any action arising out of or relating to this Agreement or any of the transactions contemplated by this Agreement in any court other than the Chancery Court of Delaware and, if such court declines jurisdiction, a Federal district court sitting in the State of Delaware and (d) agrees, to the maximum extent permitted by law, that it will not bring any action arising out of or relating to the Securities Act in any court other than a Federal district court sitting in the State of Delaware and, if such court declines jurisdiction, to another Federal district court.  Any person or entity purchasing or otherwise acquiring any interest in any Company securities shall be deemed to have notice of and consented to this provision.  In any action arising out of or relating to this

---

[15] Insert for GUC Warrants.

Agreement or any of the transactions contemplated by this Agreement, each party irrevocably and unconditionally waives and agrees not to assert by way of motion, as a defense or otherwise any claims that it is not subject to the jurisdiction of the above courts, that such action is brought in an inconvenient forum or that the venue of such action is improper; *provided, however*, that, notwithstanding anything to the contrary in this Section 15 or otherwise, the Company shall retain the right to bring any such action arising out of or relating to this Agreement or any of the transactions contemplated hereby, to the extent that the subject matter of such action is contemplated by the Plan or the Disclosure Statement, in the United States Bankruptcy Court for the District of Delaware, and each of the parties hereto (i) consents to submit itself to the exclusive personal jurisdiction of the Chancery Court of Delaware and, if such court declines jurisdiction, any Federal district court located in the State of Delaware in the event of any action arising out of or relating to this Agreement or any of the transactions contemplated by this Agreement, (ii) agrees that it will not attempt to deny or defeat such personal jurisdiction by motion or other request for leave from any such court.

Section 16.   *Waiver of Jury Trial*.  EACH OF THE PARTIES TO THIS AGREEMENT HEREBY IRREVOCABLY WAIVES ALL RIGHT TO A TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.  THE SCOPE OF THIS WAIVER IS INTENDED TO BE ALL-ENCOMPASSING OF ANY AND ALL DISPUTES THAT MAY BE FILED IN ANY COURT AND THAT RELATE TO THE SUBJECT MATTER OF THIS AGREEMENT, INCLUDING, WITHOUT LIMITATION, CONTRACT CLAIMS, TORT CLAIMS (INCLUDING NEGLIGENCE), BREACH OF DUTY CLAIMS, AND ALL OTHER COMMON LAW AND STATUTORY CLAIMS.  THIS SECTION 16 HAS BEEN FULLY DISCUSSED BY EACH OF THE PARTIES HERETO AND THESE PROVISIONS WILL NOT BE SUBJECT TO ANY EXCEPTIONS.  EACH PARTY HERETO HEREBY FURTHER WARRANTS AND REPRESENTS THAT SUCH PARTY HAS REVIEWED THIS WAIVER WITH ITS LEGAL COUNSEL, AND THAT SUCH PARTY KNOWINGLY AND VOLUNTARILY WAIVES ITS JURY TRIAL RIGHTS FOLLOWING CONSULTATION WITH LEGAL COUNSEL.

Section 17.   *Benefits of This Agreement*.  Nothing in this Agreement shall be construed to give to any Person other than the Company, the Warrant Agent and the registered Holders (who are express third party beneficiaries of this Agreement) any legal or equitable right, remedy or claim under this Agreement, and this Agreement shall be for the sole and exclusive benefit of the Company, the Warrant Agent and the registered Holders.

Section 18.   *Counterparts*.  This Agreement may be executed in any number of counterparts and each of such counterparts shall for all purposes be deemed to be an original, and such counterparts shall together constitute but one and the same instrument.

Section 19.   *Headings*.  The headings of sections of this Agreement have been inserted for convenience of reference only, are not to be considered a part hereof and in no way modify or restrict any of the terms or provisions hereof.

#94518622v9

Section 20.   *Electronic Transmission*.   Each of the parties hereto agrees that (a) any consent or signed document transmitted by electronic transmission shall be treated in all manner and respects as an original written document, (b) any such consent or document shall be considered to have the same binding and legal effect as an original document and (c) at the request of any party hereto, any such consent or document shall be re-delivered or re-executed, as appropriate, by the relevant party or parties in its original form.   Each of the parties further agrees that they will not raise the transmission of a consent or document by electronic transmission as a defense in any proceeding or action in which the validity of such consent or document is at issue and hereby forever waives such defense.   For purposes of this Agreement, the term "electronic transmission" means any form of communication not directly involving the physical transmission of paper, that creates a record that may be retained, retrieved and reviewed by a recipient thereof, and that may be directly reproduced in paper form by such a recipient through an automated process.

[*Signature Page Follows*]

#94518622v9

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed and delivered as of the day and year first above written.

[NEWCO]


By: _____
    Name:
    Title:

*[Signature Page to Warrant Agreement]*

AMERICAN STOCK TRANSFER &
TRUST COMPANY, LLC

By: _____
      Name:
      Title:

**EXHIBIT A**

**FORM OF ELECTION TO EXERCISE WARRANT**

**TO BE COMPLETED BY REGISTERED HOLDER**

[NEWCO]

Warrants to Purchase Common Stock

(TO BE EXECUTED UPON EXERCISE OF A WARRANT)

Reference is made to that certain Warrant Agreement, dated [●], 2021 (the "**Warrant Agreement**"), by and between [NewCo] (the "**Company**") and American Stock Transfer & Trust Company, LLC (the "**Warrant Agent**"). Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Warrant Agreement.

The undersigned hereby irrevocably elects to exercise [●] Warrants representing the right to purchase [●] Shares as calculated pursuant to the Warrant Agreement (the "**Exercise Shares**") at the applicable Exercise Price per Exercise Share.

The undersigned represents, warrants and promises that it has the full power and authority to exercise and deliver the Warrants exercised hereby. Unless the box for Cashless Exercise is checked below, the undersigned represents, warrants and promises that it has delivered or will deliver in payment for such Exercise Shares, $[●] by certified or official bank or bank cashier's check payable to the order of the Company, or by wire transfer in immediately available funds to an account of the Warrant Agent specified in writing by the Warrant Agent for such purpose, no later than 5:00 p.m., New York City time, on the Business Day immediately following the date that this Warrant Exercise Notice is delivered.

☐  Please check if the undersigned, in lieu of paying the aggregate Exercise Price as set forth in the preceding paragraph, elects to exercise the Warrants pursuant to a Cashless Exercise.

Concurrently with the receipt of the Exercise Shares, the undersigned agrees to execute and deliver a Joinder in accordance with Section [5.01] of the Stockholders Agreement.

The undersigned requests that the Exercise Shares purchased hereby be in registered form in the authorized denominations, registered in such names and delivered, all as specified in accordance with the instructions set forth below.

(PLEASE PRINT)
RECIPIENT: _____
CONTACT NAME: _____
ADDRESS: _____
TELEPHONE (INCLUDING INTERNATIONAL CODE): _____
EMAIL: _____
SOCIAL SECURITY OR OTHER TAXPAYER IDENTIFICATION NUMBER (IF APPLICABLE): _____

NOTE: THIS EXERCISE NOTICE MUST BE DELIVERED TO THE WARRANT AGENT, PRIOR TO 5:00 P.M., NEW YORK CITY TIME, ON THE EXPIRATION DATE. THE WARRANT AGENT SHALL NOTIFY YOU OF THE ADDRESS, PHONE NUMBER AND FACSIMILE NUMBER WHERE YOU CAN CONTACT THE WARRANT AGENT AND TO WHICH WARRANT EXERCISE NOTICES ARE TO BE SUBMITTED.

#94518622v9

_____          _____
(Date)                                     (Signature)

                                           _____
                                           (Print name)


Signature Guaranteed

BY:

Signatures must be guaranteed by a participant in a Medallion Signature Guarantee Program at a guarantee level acceptable to the Company's transfer agent.

A-2

**EXHIBIT B**

FORM OF ASSIGNMENT FOR WARRANTS

(TO BE EXECUTED BY THE REGISTERED HOLDER
IF SUCH HOLDER DESIRES TO TRANSFER A WARRANT)

Reference is made to that certain Warrant Agreement, dated [•], 2020 (the "**Warrant Agreement**"), by and between [NewCo] (the "**Company**") and American Stock Transfer & Trust Company, LLC (the "**Warrant Agent**").  Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Warrant Agreement.

FOR VALUE RECEIVED, the undersigned registered holder of Warrants hereby sells, assigns and transfers unto

_____

Name of Assignee

_____

Address of Assignee

_____ Warrants to purchase Shares held by the undersigned, together with all right, title and interest therein, and does irrevocably constitute and appoint _____ attorney, to transfer such Warrants on the books of the Warrant Agent, with full power of substitution.

_____

Signature

_____

Date

_____

Social Security or Other Taxpayer Identification Number of Assignee

SIGNATURE GUARANTEED BY:

_____

Signatures must be guaranteed by a participant in a Medallion Signature Guarantee Program at a guarantee level acceptable to the Company's transfer agent.

**<u>Exhibit N</u>**

**Additional Predecessor Agreements**

## **Exhibit N1**

**Chevron Definitive Documents**

*Execution Version*

## <u>Chevron Term Sheet Implementation Agreement</u>

This IMPLEMENTATION AGREEMENT (the "**Agreement**") is made and entered into as of June 11, 2021, by and among (a) Fieldwood Energy LLC, a Delaware limited liability company ("**FWE**") and (b) Chevron U.S.A. Inc., a Pennsylvania corporation ("**CUSA**") (each, a "**Party**" and collectively, the "**Parties**") to implement the transactions contemplated by or related to the term sheet attached hereto as **<u>Exhibit A</u>** (the "**CUSA Term Sheet**").

## <u>RECITALS</u>

WHEREAS, on March 22, 2021, the Parties executed a letter agreement whereby each Party agreed (i) to work to implement the terms of the CUSA Term Sheet and (ii) negotiate in good faith the definitive documents implementing the transactions contemplated by or relating to the CUSA Term Sheet (the "**CUSA Definitive Documents**");

WHEREAS, CUSA and certain of its affiliates and predecessors sold interests in certain leases, including the associated wells, platforms, and pipelines, to FWE (or companies that would ultimately merge with or be acquired by FWE or its affiliates) in multiple transactions (collectively, the "**Legacy CUSA Properties**");

WHEREAS, CUSA asserts that the decommissioning costs associated with the Legacy CUSA Properties are estimated to total in excess of $500 million and that CUSA and its parent and affiliates, including Noble Energy, Inc., Union Oil Company of California, Unocal Pipeline Company and Texaco Inc., (such parent and affiliates, together with CUSA, individually each a "**CUSA Entity**" and collectively the "**CUSA Entities**") hold certain claims against FWE and its affiliates on account of, among other things, such decommissioning costs (together with any other prepetition claim any CUSA Entity may hold or assert (the "**Chevron Claims**"), including, without limitation, the claims asserted in proofs of claim numbered 424, 425, 430, 226, 429, 440, 452, 445,

444, 448, 446, 447, 449, 451, 427, 428, 431 and 442  filed by certain CUSA Entities against certain of the Debtors (as may be amended from time to time, the "**Chevron POCs**");

WHEREAS, commencing on August 3, 2020 (the "**Petition Date**"), FWE and certain of its affiliates (collectively, the "**Debtors**") each filed with the United States Bankruptcy Court for the Southern District of Texas (the "**Bankruptcy Court**") a voluntary case under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**");

WHEREAS, the Bankruptcy Court established a general bar date of 5:00 p.m. (Central Time) on November 25, 2020 (the "**General Bar Date**") for filing proofs of claim against the Debtors and, on November 11, 2020, CUSA timely filed the Chevron POCs;

WHEREAS, on April 15, 2021, the Debtors filed their *Fourth Amended Joint Chapter 11 Plan of Fieldwood Energy LLC and its Affiliated Debtors* [D.I. 1284] (including any exhibits and schedules thereto and as may be further amended, supplemented or modified, the "**Plan**");[1]

WHEREAS, on April 15, 2021, the Bankruptcy Court entered an order approving the Debtors' disclosure statement with respect to the Plan [D.I. 1285] (including any exhibits and schedules thereto and as may be further amended, supplemented, or modified, the "**Disclosure Statement**") and solicitation procedures with respect to the Plan [D.I. 1286], and set June 2, 2021 at 11:59 p.m. (prevailing Central Time) as the deadline by which parties must file with the Bankruptcy Court an objection or response to confirmation of the Plan; and

WHEREAS, attached to the Disclosure Statement as Exhibit P is the CUSA Term Sheet.

NOW, THEREFORE, in consideration of the mutual covenants and agreements set forth in this Agreement, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties, intending to be legally bound, agree as follows:

---

[1] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Plan.

1.    **CUSA Definitive Documents**.  The documents below comprise the CUSA Definitive Documents as contemplated in the CUSA Term Sheet:

a.    *Merger Documents.*

(i)    *Agreement and Plan of Merger (TX) (FWE III/IV)* (the "**FWE III Plan of Merger**").  Annexed hereto as **Exhibit 1-A**.

(ii)    *Certificate of Merger.*  Annexed hereto as **Exhibit 1-B**.

b.    *FWE IV Governance Documents.*

(i)    *Certificate of Formation (TX) (Fieldwood Energy IV LLC).*  Annexed hereto as **Exhibit 2**.

(ii)    *Fieldwood Energy IV LLC Agreement.*  Annexed hereto as **Exhibit 3**.

(iii)    *Sole Manager Agreement.*  Annexed hereto as **Exhibit 4**.

c.    *Omnibus Agreement* (the "**Omnibus Agreement**")*.*  Annexed hereto as **Exhibit 5**.

d.    *Turnkey Removal Agreement.*  Annexed hereto as **Exhibit 6**.

e.    *Contract Operating Agreement.*  Annexed hereto as **Exhibit 7**.

f.    *Escrow Agreement* (the "**Escrow Agreement**").  Annexed hereto as **Exhibit 8**.

g.    *Neptune Spar Transition Services Agreement.*  Annexed hereto as **Exhibit 9**.

h.    *Deepwater Assets Decommissioning Funding Agreement.*  Annexed hereto as **Exhibit 10**.

i.    *SEMS Bridging Agreement.*  Annexed hereto as **Exhibit 11**.

j.    *NewCo Joint Development Agreement.*  Annexed hereto as **Exhibit 12**.

k.    *Assignment of Record Title in Federal OCS Oil and Gas Lease – Ship Shoal 175 OCS-G0550.*  Annexed hereto as **Exhibit 13**.

l.    *Net Profits Interest Conveyance.*  Annex hereto as **Exhibit 14**.

3

2. **Execution of CUSA Definitive Documents**; **Good Faith Cooperation.**

a.  Each Party agrees, and CUSA expressly acknowledges, that FWE and CUSA have satisfied the requirements under the CUSA Term Sheet to negotiate mutually agreeable CUSA Definitive Documents by the relevant deadlines set forth therein.  Subject to and in accordance with the terms of the CUSA Term Sheet and the applicable consent rights provided for in the Restructuring Support Agreement, each of the Parties shall negotiate any exhibits, amendments, modifications or supplements to the CUSA Definitive Documents in good faith and agree to exercise commercially reasonable efforts with respect to the negotiation, pursuit, approval, execution, delivery, implementation, and consummation of the CUSA Definitive Documents.  Without further Bankruptcy Court approval and subject to the applicable consent rights provided for in the Restructuring Support Agreement, the Parties may at any time prior to the Effective Date of the Plan, by mutual agreement, amend, modify, or supplement this Agreement and/or the forms of the CUSA Definitive Documents attached hereto or negotiate to add additional documents to the list of CUSA Definitive Documents, consistent with the terms and conditions herein, in the CUSA Term Sheet, and subject to the consent rights of the Parties in the CUSA Term Sheet, as necessary or desirable to effectuate the CUSA Term Sheet and the Plan; provided that, either Party hereto may require that, prior to the Effective Date of the Plan, the Parties seek Bankruptcy Court approval with respect to any material amendments, modifications or supplements to the CUSA Definitive Documents.  Subject to the immediately preceding sentence, the Parties shall execute and deliver the CUSA Definitive Documents on or before the Effective Date of the Plan.  Each Party agrees to use commercially reasonable efforts to obtain and/or execute and deliver all instruments, forms, applications,

4

certifications, reports and filings required by federal or state authorities (including, for example, any BOEM or BSEE designation of operator forms and designated applicant Oil Spill Financial Responsibility ("**OSFR**") form designations and any other instruments, forms, applications, certifications, plans, reports and filings required by BOEM, BSEE, EPA, the U.S. Coast Guard or other applicable federal or state authorities) that are necessary to designate and appoint under all applicable laws and contracts Fieldwood Energy IV LLC ("**FWE IV**") as designated operator of producing leases (and, as applicable, the designated applicant under OSFR), and as decommissioning operator for terminated leases (including all steps required for FWE IV to be qualified later to file and obtain approval of a decommissioning plan), for the FWE IV Assets (as defined and set forth in the Plan of Merger) as promptly as practicable.  FWE shall, and shall cause its debtor affiliates in the above-captioned chapter 11 cases to, on the Effective Date, provide for the payment of any and all documentary, filing, recording, stamp, and registration fees, costs, and taxes incurred or imposed in connection with the above obligations.  The FWE IV Divisive Merger (as defined below) shall occur promptly after, and in no case later than one (1) business day following, the Initial Divisive Merger (as defined below).

b.   From the date hereof until the Effective Date, FWE will not, except with CUSA's prior written consent, incur expenses of the type described in clause (viii) of the definition of "FWE IV Obligations" as set forth in the FWE III Plan of Merger, except expenses (i) incurred pursuant to that certain letter agreement, dated as of June 3, 2021, from CUSA to FWE regarding South Timbalier 195 or (ii) that, in the aggregate, do not exceed $100,000.

3.   **Plan and Confirmation Order**.  The Confirmation Order (as defined below) and any amendment to the Plan must be reasonably acceptable to CUSA with respect to

5

any provisions thereof that directly affect the structure of FWE IV or are otherwise materially inconsistent with the terms and provisions of the CUSA Term Sheet, CUSA Definitive Documents, or this Agreement; *provided* that, for the avoidance of doubt, the Plan and Confirmation Order shall be subject to the consent rights in the Restructuring Support Agreement.  To facilitate the implementation of the CUSA Term Sheet and the CUSA Definitive Documents pursuant to the Plan as contemplated in the CUSA Term Sheet, the Parties agree that subject to the negotiation of mutually agreeable definitive language, the Plan, and/or any order of the Bankruptcy Court confirming the Plan (the "**Confirmation Order**"), as applicable, shall provide for the following:

(i)     The Plan shall be amended to provide for the following additional definitions and provisions, in appropriate order thereof:

*CUSA* means Chevron U.S.A. Inc., a Pennsylvania corporation.

*CUSA Definitive Documents* has the meaning set forth in the CUSA Implementation Agreement.

*CUSA Implementation Agreement* means that certain Implementation Agreement, dated June [__], 2021, by and among Debtor Fieldwood Energy LLC, on the one hand, and CUSA on the other hand, as may be amended, restated, or otherwise modified pursuant to the terms thereof.

*CUSA Parties* means, collectively, CUSA and its parent and affiliates, including but not limited to Noble Energy, Inc., Union Oil Company of California, Unocal Pipeline Company and Texaco Inc., and with respect to each of the foregoing Persons, each of their current and former affiliates, and each such Entity's and its current and former affiliates' current and former directors, managers, officers, equity holders (regardless of whether such interests are held directly or indirectly), predecessors, successors, and assigns, subsidiaries, and each of their current and former officers, members, managers, directors, equity holders (regardless of whether such interests are held directly or indirectly), principals, members, employees, agents, managed accounts or funds, management companies, fund advisors, investment advisors, advisory board members, financial advisors, partners (including both general and limited partners), attorneys, accountants, investment bankers, consultants, representatives and other professionals, such Persons' respective heirs, executors, estates, and nominees, in each case solely in their capacity as such.

*CUSA Release Parties* means collectively, and in each case solely in their capacity as such, (a) the DIP Agent and DIP Lenders under the DIP Facility, (b) the Prepetition FLFO

6

Secured Parties, (c) the Consenting Creditors, (d) Prepetition FLFO Collateral Agent, (e) the Prepetition FLTL Agents, (f) the Prepetition SLTL Agent, (g) NewCo and all of its subsidiaries (including the Credit Bid Purchaser), (h) the Exit Facility Agents, (i) the Exit Facility Lenders, (j) the Second Lien Backstop Parties, (k) the ERO Backstop Parties, with respect to each of the foregoing Persons in clauses (a) through (k), in each case solely in their capacity as such, (l) with respect to each of the foregoing Persons in clauses (a) through (k), each of their current and former affiliates, and each such Entity's and its current and former affiliates' current and former directors, managers, officers, equity holders (regardless of whether such interests are held directly or indirectly), predecessors, successors, and assigns, subsidiaries, and each of their current and former officers, members, managers, directors, equity holders (regardless of whether such interests are held directly or indirectly), principals, members, employees, agents, managed accounts or funds, management companies, fund advisors, investment advisors, advisory board members, financial advisors, partners (including both general and limited partners), attorneys, accountants, investment bankers, consultants, representatives and other professionals, such Persons' respective heirs, executors, estates, and nominees, in each case solely in their capacity as such, and (m) each of the Debtor's current and former officers, members, managers, directors, equity holders (regardless of whether such interests are held directly or indirectly (other than any Debtor)), principals, members, employees, agents, managed accounts or funds, management companies, fund advisors, investment advisors, advisory board members, financial advisors, partners (including both general and limited partners), attorneys, accountants, investment bankers, consultants, representatives and other professionals, such Persons' respective heirs, executors, estates, and nominees, in each case solely in their capacity as such; provided, for the avoidance of doubt, no Debtor or Post-Effective Date Debtor will be a CUSA Release Party.

**RELEASES BY THE CUSA PARTIES OF THE CUSA RELEASE PARTIES**. AS OF THE EFFECTIVE DATE, EXCEPT FOR THE RIGHTS AND REMEDIES THAT REMAIN IN EFFECT FROM AND AFTER THE EFFECTIVE DATE TO ENFORCE THE PLAN, THE CONFIRMATION ORDER, THE OBLIGATIONS CONTEMPLATED BY THE DOCUMENTS IN THE PLAN SUPPLEMENT, THE CUSA DEFINITIVE DOCUMENTS, THE FIRST LIEN EXIT FACILITY COMMITMENT LETTER, THE CREDIT BID PURCHASE AGREEMENT, THE SECOND LIEN BACKSTOP COMMITMENT LETTER, THE EQUITY RIGHTS OFFERINGS, THE ERO BACKSTOP AGREEMENTS, THE EXIT FACILITY DOCUMENTS, AND THE RESTRUCTURING TRANSACTIONS, ON AND AFTER THE EFFECTIVE DATE, THE CUSA RELEASE PARTIES WILL BE DEEMED CONCLUSIVELY, ABSOLUTELY, UNCONDITIONALLY, IRREVOCABLY, AND FOREVER RELEASED AND DISCHARGED BY THE CUSA PARTIES, TO THE MAXIMUM EXTENT PERMITTED BY LAW, FROM ANY AND ALL CLAIMS AND CAUSES OF ACTION WHATSOEVER (INCLUDING ANY DERIVATIVE CLAIMS, ASSERTED OR ASSERTABLE ON BEHALF OF THE DEBTORS, THE POST-EFFECTIVE DATE DEBTORS, OR THEIR ESTATES, INCLUDING ANY CAUSES OF ACTION ARISING UNDER CHAPTER 5 OF THE BANKRUPTCY CODE), WHETHER LIQUIDATED OR UNLIQUIDATED, FIXED OR CONTINGENT, MATURED OR UNMATURED, KNOWN OR UNKNOWN, FORESEEN OR

UNFORESEEN, ASSERTED OR UNASSERTED, ACCRUED OR UNACRUED, EXISTING OR HEREINAFTER ARISING, IN LAW, EQUITY, CONTRACT, TORT, OR OTHERWISE BY STATUTE, WHETHER ARISING UNDER FEDERAL OR STATE, STATUTORY OR COMMON LAW, VIOLATIONS OF FEDERAL OR STATE SECURITIES LAWS, OR ANY OTHER APPLICABLE INTERNATIONAL, FOREIGN, OR DOMESTIC LAW, RULE STATUTE, REGULATION, TREATY, RIGHT, DUTY, REQUIREMENT OR OTHERWISE, THAT THE CUSA PARTIES, AFFILIATES, HEIRS, EXECUTORS, ADMINISTRATORS, SUCCESSORS, ASSIGNS, MANAGERS, ACCOUNTANTS, ATTORNEYS, REPRESENTATIVES, CONSULTANTS, AGENTS, AND ANY OTHER PERSONS CLAIMING UNDER OR THROUGH THEM WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT IN THEIR OWN RIGHT (WHETHER INDIVIDUALLY OR COLLECTIVELY) OR ON BEHALF OF THE HOLDER OF ANY CLAIM OR INTEREST OR OTHER PERSON, BASED ON OR RELATING TO, OR IN ANY MANNER ARISING FROM, IN WHOLE OR IN PART, THE DEBTORS, THE POST-EFFECTIVE DATE DEBTORS, OR THEIR ESTATES, THE CHAPTER 11 CASES, THE RESTRUCTURING, THE PURCHASE, SALE, OR RESCISSION OF THE PURCHASE OR SALE OF ANY SECURITY OF THE DEBTORS OR THE POST-EFFECTIVE DATE DEBTORS, THE SUBJECT MATTER OF, OR THE TRANSACTIONS OR EVENTS GIVING RISE TO, ANY CLAIM OR INTEREST THAT IS TREATED IN THE PLAN, THE BUSINESS OR CONTRACTUAL ARRANGEMENTS OR INTERACTIONS BETWEEN ANY DEBTOR AND ANY CUSA PARTY, THE RESTRUCTURING, THE RESTRUCTURING OF ANY CLAIMS OR INTERESTS BEFORE OR DURING THE CHAPTER 11 CASES, THE NEGOTIATION, FORMULATION, PREPARATION, OR CONSUMMATION OF THE PLAN, THE DOCUMENTS IN THE PLAN SUPPLEMENT, THE CREDIT BID PURCHASE AGREEMENT, THE EXIT FACILITY DOCUMENTS, THE FIRST LIEN EXIT FACILITY COMMITMENT LETTER, THE SECOND LIEN BACKSTOP COMMITMENT LETTER, THE EQUITY RIGHTS OFFERINGS, THE ERO BACKSTOP AGREEMENTS, OR RELATED AGREEMENTS, INSTRUMENTS, OR OTHER DOCUMENTS, RELATING THERETO, OR THE SOLICITATION OF VOTES WITH RESPECT TO THE PLAN, IN ALL CASES BASED UPON ANY ACT OR OMISSION, TRANSACTION, AGREEMENT, EVENT, OR OTHER OCCURRENCES TAKING PLACE ON OR BEFORE THE EFFECTIVE DATE.

ENTRY OF THE CONFIRMATION ORDER BY THE BANKRUPTCY COURT SHALL CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL, PURSUANT TO BANKRUPTCY RULE 9019, OF THE RELEASES IN SECTION [10.7(C)] OF THE PLAN (THE "**CUSA-PARTY RELEASE**"), WHICH INCLUDES, BY REFERENCE, EACH OF THE RELATED PROVISIONS AND DEFINITIONS UNDER THE PLAN, AND, FURTHERMORE, SHALL CONSTITUTE THE BANKRUPTCY COURT'S FINDING THAT THE CUSA-PARTY RELEASE IS (I) CONSENSUAL, (II) ESSENTIAL TO THE CONFIRMATION OF THE PLAN, (III) GIVEN IN EXCHANGE FOR THE GOOD, VALUABLE AND ADEQUATE CONSIDERATION PROVIDED BY THE RELEASED PARTIES, (IV) A GOOD FAITH SETTLEMENT AND COMPROMISE OF THE CLAIMS RELEASED BY THE CUSA-PARTY RELEASE,

WEIL:\98002350\6\45327.0007
WORKAMER\51502\366014\38535105.v18-6/10/21

(V) IN THE BEST INTERESTS OF THE DEBTORS AND THEIR ESTATES, (VI) FAIR, EQUITABLE AND REASONABLE, (VII) GIVEN AND MADE AFTER DUE NOTICE AND OPPORTUNITY FOR HEARING, AND (VIII) A BAR TO ANY OF THE CUSA PARTIES ASSERTING ANY CLAIM OR CAUSE OF ACTION RELEASED PURSUANT TO THE CUSA-PARTY RELEASE.

**RELEASES BY THE CUSA RELEASE PARTIES OF THE CUSA PARTIES**. AS OF THE EFFECTIVE DATE, EXCEPT FOR THE RIGHTS AND REMEDIES THAT REMAIN IN EFFECT FROM AND AFTER THE EFFECTIVE DATE TO ENFORCE THE PLAN, THE CONFIRMATION ORDER, THE OBLIGATIONS CONTEMPLATED BY THE DOCUMENTS IN THE PLAN SUPPLEMENT, THE CUSA DEFINITIVE DOCUMENTS, THE FIRST LIEN EXIT FACILITY COMMITMENT LETTER, THE CREDIT BID PURCHASE AGREEMENT, THE SECOND LIEN BACKSTOP COMMITMENT LETTER, THE RIGHTS OFFERINGS, THE ERO BACKSTOP AGREEMENTS, THE EXIT FACILITY DOCUMENTS,  AND THE RESTRUCTURING TRANSACTIONS, ON AND AFTER THE EFFECTIVE DATE, THE CUSA PARTIES WILL BE DEEMED CONCLUSIVELY, ABSOLUTELY, UNCONDITIONALLY, IRREVOCABLY, AND FOREVER RELEASED AND DISCHARGED BY THE CUSA RELEASE PARTIES, TO THE MAXIMUM EXTENT PERMITTED BY LAW, FROM ANY AND ALL CLAIMS AND CAUSES OF ACTION WHATSOEVER (INCLUDING ANY DERIVATIVE CLAIMS, ASSERTED OR ASSERTABLE ON BEHALF OF THE DEBTORS, THE POST-EFFECTIVE DATE DEBTORS, OR THEIR ESTATES, INCLUDING ANY CAUSES OF ACTION ARISING UNDER CHAPTER 5 OF THE BANKRUPTCY CODE), WHETHER LIQUIDATED OR UNLIQUIDATED, FIXED OR CONTINGENT, MATURED OR UNMATURED, KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, ASSERTED OR UNASSERTED, ACCRUED OR UNACRUED, EXISTING OR HEREINAFTER ARISING, IN LAW, EQUITY, CONTRACT, TORT, OR OTHERWISE BY STATUTE, WHETHER ARISING UNDER FEDERAL OR STATE, STATUTORY OR COMMON LAW, VIOLATIONS OF FEDERAL OR STATE SECURITIES LAWS, OR ANY OTHER APPLICABLE INTERNATIONAL, FOREIGN, OR DOMESTIC LAW, RULE STATUTE, REGULATION, TREATY, RIGHT, DUTY, REQUIREMENT OR OTHERWISE, THAT THE CUSA RELEASE PARTIES, AFFILIATES, HEIRS, EXECUTORS, ADMINISTRATORS, SUCCESSORS, ASSIGNS, MANAGERS, ACCOUNTANTS, ATTORNEYS, REPRESENTATIVES, CONSULTANTS, AGENTS, AND ANY OTHER PERSONS CLAIMING UNDER OR THROUGH THEM WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT IN THEIR OWN RIGHT (WHETHER INDIVIDUALLY OR COLLECTIVELY) OR ON BEHALF OF THE HOLDER OF ANY CLAIM OR INTEREST OR OTHER PERSON, BASED ON OR RELATING TO, OR IN ANY MANNER ARISING FROM, IN WHOLE OR IN PART, THE DEBTORS, THE POST-EFFECTIVE DATE DEBTORS, OR THEIR ESTATES, THE CHAPTER 11 CASES, THE RESTRUCTURING, THE PURCHASE, SALE, OR RESCISSION OF THE PURCHASE OR SALE OF ANY SECURITY OF THE DEBTORS OR THE POST-EFFECTIVE DATE DEBTORS, THE SUBJECT MATTER OF, OR THE TRANSACTIONS OR EVENTS GIVING RISE TO, ANY CLAIM OR INTEREST THAT IS TREATED IN THE PLAN, THE BUSINESS OR

WEIL:\98002350\6\45327.0007
WORKAMER\51502\366014\38535105.v18-6/10/21

CONTRACTUAL ARRANGEMENTS OR INTERACTIONS BETWEEN ANY DEBTOR AND ANY CUSA RELEASE PARTY, THE RESTRUCTURING, THE RESTRUCTURING OF ANY CLAIMS OR INTERESTS BEFORE OR DURING THE CHAPTER 11 CASES, THE NEGOTIATION, FORMULATION, PREPARATION, OR CONSUMMATION OF THE PLAN, THE DOCUMENTS IN THE PLAN SUPPLEMENT, THE EXIT FACILITY DOCUMENTS, THE CREDIT BID PURCHASE AGREEMENT, THE FIRST LIEN EXIT FACILITY COMMITMENT LETTER, THE SECOND LIEN BACKSTOP COMMITMENT LETTER, THE EQUITY RIGHTS OFFERINGS, THE ERO BACKSTOP AGREEMENTS, OR RELATED AGREEMENTS, INSTRUMENTS, OR OTHER DOCUMENTS, RELATING THERETO, OR THE SOLICITATION OF VOTES WITH RESPECT TO THE PLAN, IN ALL CASES BASED UPON ANY ACT OR OMISSION, TRANSACTION, AGREEMENT, EVENT, OR OTHER OCCURRENCES TAKING PLACE ON OR BEFORE THE EFFECTIVE DATE.

ENTRY OF THE CONFIRMATION ORDER BY THE BANKRUPTCY COURT SHALL CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL, PURSUANT TO BANKRUPTCY RULE 9019, OF THE RELEASES IN SECTION [10.7(D)] OF THE PLAN (THE "**CUSA RELEASE-PARTY RELEASE**"), WHICH INCLUDES, BY REFERENCE, EACH OF THE RELATED PROVISIONS AND DEFINITIONS UNDER THE PLAN, AND, FURTHERMORE, SHALL CONSTITUTE THE BANKRUPTCY COURT'S FINDING THAT THE CUSA RELEASE-PARTY RELEASE IS (I) CONSENSUAL, (II) ESSENTIAL TO THE CONFIRMATION OF THE PLAN, (III) GIVEN IN EXCHANGE FOR THE GOOD, VALUABLE AND ADEQUATE CONSIDERATION PROVIDED BY THE RELEASED PARTIES, (IV) A GOOD FAITH SETTLEMENT AND COMPROMISE OF THE CLAIMS RELEASED BY THE CUSA RELEASE-PARTY RELEASE, (V) IN THE BEST INTERESTS OF THE DEBTORS AND THEIR ESTATES, (VI) FAIR, EQUITABLE AND REASONABLE, (VII) GIVEN AND MADE AFTER DUE NOTICE AND OPPORTUNITY FOR HEARING, AND (VIII) A BAR TO ANY OF THE CUSA PARTIES ASSERTING ANY CLAIM OR CAUSE OF ACTION RELEASED PURSUANT TO THE CUSA RELEASE-PARTY RELEASE.

(ii)     No CUSA Entity shall be or shall be deemed to be a "Released Party" or a "Releasing Party" under the Plan or Confirmation Order.  For the avoidance of doubt, other than set forth expressly in the Plan, no CUSA Entity has waived or released, or shall be deemed to have waived or released, any claim, including but not limited to any and all claims under the Bankruptcy Code, the Chevron Claims, and any and all claims related to or arising under this Agreement or the CUSA Definitive Documents; provided, any such claims shall receive the applicable treatment set forth in the Plan.

(iii)     In exchange for the consideration provided hereunder, FWE (on behalf of itself and each of the other Debtors) hereby agrees, effective upon effectiveness of the CUSA Definitive Documents pursuant to Section 8, to waive any and all prepetition claims or causes of action against any of the CUSA Entities.  Each CUSA Entity shall be an "Exculpated Party" under the Plan and Confirmation Order (to the maximum extent permitted by the Bankruptcy Court).

(iv)     FWE's assets to be allocated to, possessed by, assumed by, and vested in Fieldwood Energy I LLC ("**FWE I**") and Fieldwood Energy III LLC ("**FWE III**"), respectively, pursuant to the transactions contemplated by and in accordance with the Initial Plan of Merger (the "**Initial Divisive Merger**"), including contracts, permits, leases, oil and gas leases and assets constituting real property interests (including all fee surface interests in land, surface leases, easements, rights of way, servitudes, licenses, franchises, road, railroad, and other surface use permits or agreements), shall be (a) free and clear of (i) any right of consent, notice, and other similar rights, if any, that are applicable to the vesting of the assets in connection with the Initial Divisive Merger and (ii) all preferential purchase rights, rights of first refusal, drag-along rights, tag-along rights, and other similar rights, if any, that are applicable to the vesting of the assets in connection with the Initial Divisive Merger, but (b) subject to and burdened by (x) the liabilities and obligations allocated to and vested in, respectively, FWE I or FWE III, as specified in the Initial Plan of Merger, pursuant to the Initial Divisive Merger and (y) Permitted Post-Closing Liens (as defined in Apache Implementation Agreement).  Notwithstanding anything in this Agreement to the contrary, to the extent Section 4(iii) of the Apache Implementation Agreement is amended, this Clause 3(iv) will be deemed automatically amended to include a corresponding amendment, unless such amendment would be adverse to FWE IV or otherwise adversely affect the implementation of the FWE IV Divisive Merger.

11

(v)    FWE III's assets to be allocated to, possessed by, assumed by, and vested in FWE IV pursuant to the transactions contemplated by and in accordance with the FWE III Plan of Merger (the "**FWE IV Divisive Merger**"), including contracts, permits, leases, oil and gas leases and assets constituting real property interests (including all fee surface interests in land, surface leases, easements, rights of way, servitudes, licenses, franchises, road, railroad, and other surface use permits or agreements), shall be (a) free and clear of (i) any right of consent, notice, and other similar rights, if any, that are applicable to the vesting of the assets in connection with the FWE IV Divisive Merger (such rights, the "**FWE IV Consent Rights**") and (ii) all preferential purchase rights, rights of first refusal, drag-along rights, tag-along rights, and other similar rights, if any, that are applicable to the vesting of the assets in connection with the FWE IV Divisive Merger (such rights, the "**FWE IV Preferential Purchase Rights**"), but (b) subject to and burdened by the liabilities and obligations allocated to and vested in, respectively, FWE III or FWE IV, as specified in the FWE III Plan of Merger (such liability and obligations allocated to and vested in FWE IV, the "**FWE IV Allocated Obligations**").

(vi)    Entities (as defined under section 101(15) of the Bankruptcy Code) or Parties that fail to timely file an objection asserting a FWE IV Consent Right or FWE IV Preferential Purchase Right are (a) forever barred from objecting to the allocation and vesting of the assets in connection with the FWE III Plan of Merger free and clear of all FWE IV Consent Rights and FWE IV Preferential Purchase Rights, and from asserting any alleged FWE IV Consent Rights or FWE IV Preferential Purchase Rights with respect to the FWE III Plan of Merger, and (b) deemed to consent to and approve the allocation and vesting of the assets free and clear of all FWE IV Consent Rights and FWE IV Preferential Purchase Rights, regardless of whether such consent must be in writing pursuant to the terms of any agreement.  For the avoidance of doubt,

12

nothing herein, including the releases provided in Section 3(i), shall affect or be deemed to restrict or limit CUSA's, CUSA's affiliates, or FWE IV's claims for or rights to seek payments or contribution from current or prior working interest owners, predecessors, co-owners and/or operators, or from any other parties that are contractually, legally, regulatorily or equitably liable for decommissioning or related obligations, including obligations under surety bonds, letters of credit or other instruments relating thereto, with respect to the Legacy CUSA Properties or the FWE IV Assets.

(vii)   FWE shall, and shall cause its Debtor affiliates to, on the Effective Date, provide for the payment of any and all documentary, filing, recording, stamp, and registration fees, costs, taxes, and expenses (including all reasonable and documented attorneys' fees and regulatory consultant fees) incurred or imposed in connection with the filing of record by or on behalf of FWE III of any instrument or instruments with the appropriate records office of any county, parish, state, federal, or other governmental unit (including BOEM) that may be required in connection with the implementation of the FWE III Plan of Merger or that the applicable governmental unit or FWE III determines to be necessary or appropriate to reflect in the appropriate records of any governmental unit that as a result of the FWE IV Divisive Merger (a) ownership of the FWE IV Assets have been allocated to and are vested in FWE IV, and (b) the FWE IV Allocated Obligations have been allocated to and vested in, and constitute liabilities and obligations of, FWE III and FWE IV, respectively (collectively, the "**Implementation Costs**"); provided, to the extent any Implementation Costs remain unpaid as of the Effective Date, FWE shall have provided FWE IV with sufficient funds to pay any such outstanding Implementation Costs.

(viii)   All rights of any applicable CUSA Entity with respect to bonds and letters of credit constituting security for the decommissioning of the assets allocated to and vested in

13

FWE IV shall be reserved as against such bonding companies and letter of credit issuers in all respects. The Debtors shall not terminate any bonds issued on behalf of the Debtors relating to such FWE IV assets under which any federal, state or local governmental entity is an obligee.

(ix)    The Bankruptcy Court (i) approves the CUSA Definitive Documents and all transactions contemplated by this Agreement, including the FWE III Plan of Merger, and all actions to be taken, undertakings to be made, and obligations to be incurred by FWE III or FWE IV, as applicable, contemplated thereby; and (ii) following the consummation of the FWE III Plan of Merger, authorizes FWE III or FWE IV, as applicable, without further notice to or action, order, or approval of this Bankruptcy Court and without the need for any further corporate or shareholder action, to enter into, deliver, and fully perform their obligations under the CUSA Definitive Documents.  Upon entry of the Confirmation Order, FWE III or FWE IV, as applicable, shall be authorized and empowered, without further approval of the Bankruptcy Court or any other party, to take such actions and perform such acts as may be necessary, convenient, desirable, or appropriate to execute and deliver the CUSA Definitive Documents in accordance with the Plan and to execute and deliver all documents relating thereto and to perform all of their obligations thereunder.  On the Effective Date, the CUSA Definitive Documents shall constitute legal, valid, binding, and authorized obligations of FWE III or FWE IV, as applicable, enforceable in accordance with their terms, and such obligations of FWE III or FWE IV, as applicable, shall not be enjoined or subject to discharge, impairment, release, avoidance, recharacterization, or subordination by FWE III, FWE IV, the Post-Effective Date Debtors, or the Plan Administrator, under applicable law, the Plan, or the Confirmation Order.

(x)    **Cures**.  In accordance with the Plan, the Debtors or Post-Effective Date Debtors, as applicable, shall be responsible for paying any Cure Amounts associated with the

14

contracts assumed by the Debtors and allocated to FWE IV pursuant to the FWE III Plan of Merger. Notwithstanding anything in the Plan Supplement [Docket No. 1394] with respect to the Schedule of Assumed Contracts and Cure Amounts (or any subsequent schedules and notices with respect to assumed or assumed and assigned contracts and corresponding cure costs, including, without limitation, Docket Nos. 1395 and 1496) to the contrary, only the contracts to be assumed and allocated to FWE IV under the Plan of Merger shall be so assumed and allocated thereto.  The Plan will be revised to remove FWE IV from the definition of "Post Effective Date Debtor."

(xi)  **Murrayfield and Emory Peak**.  Notwithstanding anything in the Plan or Confirmation Order to the contrary, any overriding royalty interests, mortgages, memorandums of understanding and/or UCC-1s related to security documents associated with (x) that certain Joint Operating Agreement by and between Chevron U.S.A. Inc. and Fieldwood Energy LLC, dated July 1, 2019 (as amended) or (y) that certain Joint Operating Agreement by and among Chevron U.S.A. Inc., Fieldwood Energy LLC and Ridgewood Castle Rock, LLC, dated as of August 1, 2019 (as amended), that are being assumed and assigned to Newco in connection with Murrayfield and Emory Peak, shall be permitted encumbrances and shall continue in full force and effect following the Effective Date and such assumption and assignment to Newco.

4.  **Treatment of ASPA Escrow Account and Production Payment**. FWE and CUSA agree that their intent is that the Production Payment (as used in this Section 4, as defined in that Certain Assignment of Production Payment, dated as of June 15, 2016, by Fieldwood Energy Offshore LLC, a Delaware limited liability company, as assignor, to U.S. Bank National Association, as escrow agent and assignee (the "**Production Payment Assignment**")) will be reconveyed to Fieldwood Energy Offshore LLC and terminated as of the Effective Date. Each of FWE and CUSA will take such actions as are necessary (including causing their affiliates

15

to take actions and sending instructions to the Escrow Agent (as used in this Section 4, as defined in the Production Payment Assignment) to (a) terminate the Production Payment effective as of the Effective Date (which interest will revert to Fieldwood Energy Offshore LLC), including any obligations with respect to the Production Payment imposed by Section 18 of that certain Asset Sale and Purchase Agreement between CUSA and Fieldwood Energy Offshore LLC, dated August 1, 2015 (the "**2015 PSA**"), (b) cause the Escrow Agent to disburse all amounts held in the Escrow Account (as used in this Section 4, as defined in the Production Payment Assignment) to FWE IV (to the Escrow Account (in this instance, as defined in the Fieldwood Energy IV LLC Agreement) (such funds, the "**Prior Escrow Funds**").

     5.    **Representations and Warranties**.

a.  FWE represents and warrants to CUSA that (in the case of each of clauses (i) through (iii), subject to entry by the Bankruptcy Court of the Confirmation Order):

    (i)  FWE has all requisite power and authority to execute and deliver this Agreement and each of the CUSA Definitive Documents to which it will be a party and to perform its obligations hereunder and thereunder.  The execution, delivery and performance of this Agreement and the CUSA Definitive Documents to which FWE is or will be a party, and the consummation of the transactions contemplated hereby and thereby, have been duly and validly authorized by all requisite limited liability company action on the part of FWE.

    (ii) This Agreement has been (and when executed, each CUSA Definitive Document to be executed and delivered by FWE will be) duly executed and delivered by FWE and constitutes (or, in the case of each CUSA Definitive Document to be executed by FWE, upon its execution by FWE will constitute) the valid and binding agreement of FWE

16

enforceable against FWE in accordance with its terms, except as may be limited by bankruptcy, insolvency, reorganization, moratorium, or other similar Laws now in effect relating to or affecting creditors' rights generally, general equitable principles (whether considered in a proceeding in equity or at Law), and the power of a court to deny enforcement of remedies generally based upon public policy.

(iii) The execution and delivery of this Agreement and the CUSA Definitive Documents by FWE and the consummation of the transactions contemplated hereby and thereby by FWE do not and shall not: violate, conflict with or result in any breach of any provision of any organizational document of FWE; result in the creation of any lien on any assets of FWE IV; violate (or be rendered void or ineffective by) any law or order applicable to FWE or by which FWE is bound.

(iv) to FWE's knowledge, as of the date hereof, there are no expenses that have been incurred by FWE that FWE has not paid of the type described in clause (viii) of the definition of "FWE IV Obligations" as set forth in the FWE III Plan of Merger.

b. CUSA represents and warrants to FWE that:

(i) CUSA has all requisite power and authority to execute and deliver this Agreement and each of the CUSA Definitive Documents to which it will be a party and to perform its obligations hereunder and thereunder.  The execution, delivery and performance of this Agreement and the CUSA Definitive Documents to which CUSA is or will be a party, and the consummation of the transactions contemplated hereby and thereby, have been duly and validly authorized by all requisite corporate action on the part of CUSA.  To the extent that in this Agreement or any CUSA Definitive Document, CUSA purports to covenant or agree on behalf of, grant a release by, or otherwise bind any affiliate of

17

CUSA, CUSA has all due authority to take such action and such action will be binding on such affiliate of CUSA as though such affiliate were a signatory to this Agreement or such CUSA Definitive Document, as applicable.

(ii) This Agreement has been (and when executed, each CUSA Definitive Document to be executed and delivered by CUSA will be) duly executed and delivered by CUSA and constitutes (or, in the case of each CUSA Definitive Document to be executed by CUSA, upon its execution by CUSA will constitute) the valid and binding agreement of CUSA enforceable against CUSA in accordance with its terms, except as may be limited by bankruptcy, insolvency, reorganization, moratorium, or other similar Laws now in effect relating to or affecting creditors' rights generally, general equitable principles (whether considered in a proceeding in equity or at Law), and the power of a court to deny enforcement of remedies generally based upon public policy.

(iii) The execution and delivery of this Agreement and the CUSA Definitive Documents by CUSA and the consummation of the transactions contemplated hereby and thereby by CUSA do not and shall not: violate, conflict with or result in any breach of any provision of any organizational document of CUSA; result in the creation of any lien on any assets of FWE IV; violate (or be rendered void or ineffective by) any law or order applicable to CUSA or by which CUSA is bound.

6.     **Termination of Agreement.**  This Agreement shall terminate upon the earlier to occur of (a) the effectiveness of the CUSA Definitive Documents pursuant to Section 8 and (b) August 10, 2021 at 11:59 p.m. (Central Time) (the "**Outside Termination Date**"); provided that (i) the Outside Termination Date may be extended by mutual written agreement (which may include email) of the Parties, and (ii) Section 4 shall not terminate until the Prior

WEIL:\98002350\6\45327.0007
WORKAMER\51502\366014\38535105.v18-6/10/21

Escrow Funds have been deposited into the Escrow Account (as defined in the Fieldwood Energy IV LLC Agreement). Upon termination of this Agreement, each Party shall be immediately released from its obligations, commitments, undertakings and agreements under or related to this Agreement; provided that in no event shall any such termination relieve a Party from liability for its breach or non-performance of its obligations hereunder prior to the date of such termination.

7.    **363 Credit Bid Transaction.** In the event that the 363 Credit Bid Transaction is pursued, CUSA agrees to take reasonable actions to facilitate the 363 Credit Bid Transaction, and cooperate in good faith with Debtors, the Required DIP Lenders and the Requisite FLTL Lenders to facilitate the 363 Credit Bid Transaction, including, if necessary, by making amendments to the CUSA Definitive Documents (to the extent that such amendments constitute reasonable actions to facilitate the 363 Credit Bid Transaction and, as it relates to the CUSA Entities, do not materially alter or negatively impact the economics of, or materially change the structure of, the transactions contemplated herein, unless otherwise agreed).

8.    **Effectiveness.**  This Agreement shall become effective and binding upon each Party upon the execution and delivery by such Party of an executed signature page hereto and shall become effective and binding on all Parties on the date when all Parties have executed and delivered a signature page hereto.  The CUSA Definitive Documents shall become effective and binding upon each Party upon the occurrence (or waiver by CUSA in its sole discretion) of the following conditions precedent (and any conditions precedent included in the CUSA Definitive Documents themselves):

a.    the execution and delivery by each of the parties of countersignatures to the CUSA Definitive Documents, as applicable;

b.    the Parties shall have made the initial contributions to the Escrow Account in accordance with the CUSA Term Sheet, CUSA Definitive Documents, Section 4 of this Agreement and the Escrow Agreement, including the Prior Escrow

Funds and the amount for the Initial Safe Out Funds (as such terms are defined in the Omnibus Agreement);

        c.      the Initial Divisive Merger and the FWE IV Divisive Merger shall each have occurred in accordance with the terms of this Agreement;

        d.      the funding of any unpaid Implementation Costs from FWE to FWE IV;

        e.      each of Newco and FWE IV shall have received all approvals and permits by applicable regulatory authorities that are necessary (i) in the case of FWE IV, to hold the FWE IV Leases (as defined in the FWE III Plan of Merger) and (ii) to be a designated operator with respect to offshore leases in the Gulf of Mexico but, in the case of this clause (ii), only if and to the extent required to perform its obligations under the CUSA Definitive Documents (the "**Regulatory Approvals**");

        f.      the Credit Bid Transaction Closing (as defined in the Plan) shall have occurred;

        g.      the entry of the Confirmation Order in a form consistent with Section 3 hereof; and

        h.      the occurrence of the Effective Date.

        9.      **No Waiver**.  For the avoidance of doubt, nothing in this Agreement or in any transactions, acts, and omissions contemplated hereunder, are intended by the Parties to have any effect on any of CUSA's, or any of its affiliates', subsidiaries' or parent's, defenses, claims or rights related to the Legacy CUSA Properties or the FWE IV Assets with respect to parties other than the Debtors, Post-Effective Date Debtors, FWE I or FWE IV, including but not limited to claims for or rights to contractual or regulatory payments or equitable contribution from other parties for decommissioning and related obligations, including obligations under surety bonds, letters of credit or other instruments relating thereto.

        10.      **Counterparts**.  This Agreement may be executed in several counterparts, each of which shall be deemed to be an original, and all of which together shall be deemed to be one and the same agreement.  Execution copies of this Agreement may be delivered by electronic mail, or otherwise, which shall be deemed to be an original for the purposes of this paragraph.

11.     **Governing Law; Jurisdiction; Waiver of Jury Trial; Arbitration.**  To the maximum extent permitted by applicable law, this Agreement is governed by and is to be construed in accordance with the internal laws of the State of Texas, without giving effect to any principles of conflicts of law thereunder that would result in the application of the laws of any other jurisdiction.  Each Party irrevocably agrees that any legal action, suit, or proceeding arising out of or relating to this Agreement brought by any party or its successors or assigns shall be brought and determined in the Bankruptcy Court and each Party hereby irrevocably submits to the exclusive jurisdiction of the Bankruptcy Court, and if the Bankruptcy Court does not have (or abstains from) jurisdiction, Courts of the State of Texas and of the United States District Court of the Southern District of Texas, and any appellate court from any thereof, for itself and with respect to its property, generally and unconditionally, with regard to any such proceeding arising out of or relating to this Agreement.  Each Party further agrees that notice as provided herein shall constitute sufficient service of process and the Parties further waive any argument that such service is insufficient.  Each Party hereby irrevocably and unconditionally waives, and agrees not to assert, by way of motion or as a defense, counterclaim or otherwise, in any proceeding arising out of or relating to this Agreement, (a)  any claim that it is not personally subject to the jurisdiction of the Bankruptcy Court as described herein for any reason, (b) that it or its property is exempt or immune from jurisdiction of such court or from any legal process commenced in such court (whether through service of notice, attachment prior to judgment, attachment in aid of execution of judgment, execution of judgment, or otherwise) and (c) that (1) the proceeding in such court is brought in an inconvenient forum, (2) the venue of such proceeding is improper, or (3) this Agreement, or the subject matter hereof, may not be enforced in or by such court.  EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT

WEIL:\98002350\6\45327.0007
WORKAMER\51502\366014\38535105.v18-6/10/21

PERMITTED BY APPLICABLE LAW, ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY ACTION OR PROCEEDING ARISING OUT OF RELATING TO THIS AGREEMENT.  EACH PARTY CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER.

12. **Notices.**  All notices hereunder shall be deemed given if delivered and received in writing, if contemporaneously sent by electronic mail, courier or by registered or certified mail (return receipt requested) to the following addresses:

(1)     If to FWE, to:

Fieldwood Energy LLC
2000 W. Sam Houston Parkway S., Suite 1200
Houston, Texas 77042
Attention:  Thomas R. Lamme

With a copy to:

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153
Attention:   Matt Barr, Esq. (matt.barr@weil.com)
                 Alfredo Peréz, Esq. (alfredo.perez@weil.com)
                 Jessica Liou, Esq. (jessica.liou@weil.com)

(2)     If to CUSA, to:

Chevron U.S.A. Inc.
100 Northpark Blvd
Covington, LA 70443
Attn: Land Manager
Phone: (985) 773-6538
Email: tdwebre@chevron.com

WEIL:\98002350\6\45327.0007
WORKAMER\51502\366014\38535105.v18-6/10/21

13.    **Amendments.**   Neither this Agreement nor any provision hereof may be waived, amended, or modified except pursuant to an agreement or agreements in writing entered into by FWE and CUSA and subject to the consent rights provided for in the Restructuring Support Agreement.  To the extent of any conflicts between the CUSA Term Sheet and the provisions of this Agreement, the provisions of this Agreement prevail.

*[Signature Pages to Follow]*

WEIL:\98002350\6\45327.0007
WORKAMER\51502\366014\38535105.v18-6/10/21

**IN WITNESS WHEREOF**, the undersigned Parties have executed this Implementation Agreement as of the date first written above.

FIELDWOOD ENERGY LLC,
a Delaware limited liability company

By: _____

Name: Thomas R. Lamme
Title:   Senior Vice President and General Counsel

CHEVRON U.S.A. INC.

By: _____

Name: Ryan G. Schneider
Title:   Land Management Officer

## Exhibit A

**The "CUSA Term Sheet"**



Thomas R. Lamme
*Senior Vice President and General Counsel*
*Direct 713-969-1107*
*Email TLamme@fwellc.com*

March 22, 2021

**VIA EMAIL**

Jennifer M. Welshons
Counsel
Chevron North America Exploration and Production Company
(a division of Chevron U.S.A. Inc.)
1400 Smith Street
Houston, TX 77002

  *Re: Fieldwood/Chevron Term Sheet*

Dear Ms. Welshons:

Attached as <u>Exhibit A</u> is the agreed upon term sheet dated March 22, 2021, by and between Fieldwood Energy LLC ("**Fieldwood**") and Chevron U.S.A. Inc. ("**Chevron**" and, together with Fieldwood, the "**Parties**") supporting the restructuring of the portion of Fieldwood's business relating to certain assets described therein as the "FWE IV Assets" (the "**Fieldwood/Chevron Term Sheet**").

By executing this letter agreement, each of the undersigned Parties agrees (i) to work to implement the terms of the Fieldwood/Chevron Term Sheet and (ii) to negotiate the definitive documents described therein in good faith and in accordance with the terms of the Fieldwood/Chevron Term Sheet.

The Parties may execute and deliver this letter agreement by electronic reproduction and in multiple counterparts, each of which shall constitute an original and all of which shall be one and the same document. This letter agreement shall be governed by the laws of the State of Texas without regard to any choice of law principles.

Regards,

*Thomas R. Lamme*

Thomas R. Lamme
Senior Vice President and General Counsel

Enclosure

cc: Michael T. Dane, *via email* MDane@Fwellc.com

IN WITNESS WHEREOF, the undersigned Parties have executed this letter agreement as of the date first written above.

**FIELDWOOD ENERGY LLC**

By: _Thomas R. Lamme_
Name: Thomas R. Lamme
Title: Senior Vice President and General Counsel

**CHEVRON U.S.A. INC.**

By: _____
Name: Ryan G. Schneider
Title: Land Management Officer

**EXHIBIT A**

FIELDWOOD/CHEVRON TERM SHEET

*This Term Sheet is an expression of interest only and creates no legally binding commitment by either party to negotiate any specific transaction or enter into any agreement. It is expressly understood that no liability or obligation of Fieldwood or Chevron of any nature whatsoever is intended to or will be created hereunder with respect to this Term Sheet or related discussions or writings or the transactions contemplated hereby and that this Term Sheet is neither a contract nor a binding offer. It is understood and agreed that any transaction is expressly conditioned, among others, upon approval by Fieldwood and Chevron, the execution and delivery by Fieldwood and Chevron or their affiliates of definitive written agreements, in form and substance satisfactory to Fieldwood and Chevron in their sole discretion, and the satisfaction of the conditions set forth therein. Fieldwood and Chevron expressly agree that this Term Sheet does not contain all terms that would be required to be agreed to in order to enter into any definitive agreement. Each party is responsible for its own costs and expenses, including those of its legal advisors in conjunction with this Term Sheet.*

## CHEVRON / FIELDWOOD COMMERCIAL TERM SHEET

Fieldwood Energy LLC ("**FWE**") to create a new entity, Fieldwood Energy IV LLC ("**FWE IV**"), via a Texas divisive merger.

### I. Term Sheet Expiration Date

FWE and Chevron U.S.A. Inc ("**CUSA**") shall work together in good faith to negotiate the definitive documents contemplated below and any other agreements required to implement the transaction contemplated in this Term Sheet, in each case in accordance with the terms and conditions set forth herein ("**Definitive Documents**"), provided that this Term Sheet shall terminate if the parties have not fully agreed and finalized all such required Definitive Documents on or before midnight one business day before the deadline for filing objections to the o the Plan Confirmation Hearing as scheduled by the bankruptcy court for In Re: Fieldwood Energy LLC, et al, Chapter 11, Case No. 20-33948 (MI) (the "**Bankruptcy**") ("**Termination Date**").

### II. Condition Precedent to Effectiveness

In addition to any other conditions precedent that may be agreed by the parties, it shall be a condition precedent to the effectiveness of the Definitive Documents that FWE IV will have been granted to the satisfaction of the parties to the Definitive Documents all necessary approvals by applicable regulatory authorities to act as a qualified operator in the Gulf of Mexico for the FWE IV Assets (as defined below) for which it will be required to assume operatorship under the Definitive Documents. In the event that FWE IV has not been granted such approval(s) by the Termination Date, but the Definitive Documents have been finalized as of the Termination Date, the effective date of the Definitive Documents shall be automatically extended on a day-by-day basis until all such approval(s) are received (or until such condition is waived by CUSA, at its sole discretion); provided that, in the event FWE IV has not been granted all such approvals by July 1, 2021, this Term Sheet and any and all executed Definitive Documents shall automatically terminate on such date. For the avoidance of doubt, in no event shall the failure to finalize and execute any Definitive Document result in any such extension after the Termination Date.

### III. Withdrawal of Objection

In conjunction with the execution of this Term Sheet or promptly thereafter, FWE and CUSA will enter into a mutually agreed stipulation and order that will provide, among other things, that: (i) with respect to the Disclosure Statement For Joint Chapter 11" filed by FWE on January 1, 2021, as amended, in the Bankruptcy (the "**Disclosure Statement**"), CUSA will withdraw its objection to the approval of the Disclosure Statement filed February 12, 2021, upon filing the stipulation, and (ii) CUSA will not refile the objection or any other objection to FWE's Disclosure Statement or Plan of Reorganization at any time prior to the Termination Date.

1

## IV. FWE IV Assets

Assets to be allocated to FWE IV are restricted to the rights, title and interests in specific FWE IV assets and the liabilities and obligations associated with those designated assets as described herein. FWE IV shall be the designated operator for the assets allocated to it herein, unless otherwise expressly agreed by the parties. "**Closing**" shall take place in conjunction with the effectiveness of the divisive merger and simultaneous execution and delivery of the Definitive Documents, subject to and following due diligence review of the assets by CUSA, as described below.

*Designated FWE IV Assets*

At Closing, FWE shall allocate to FWE IV certain interests in the leases assigned previously to FWE by CUSA (and its predecessors and affiliates) as described in Exhibit "A" attached hereto, which are a portion of the interests acquired from CUSA that are described in the Abandoned Properties category under the FWE Disclosure Statement, or as otherwise agreed.

FWE IV assets will include the oil and gas leases contributed to FWE IV in accordance with the foregoing (or the section below on Agreed FWE III (Winndown Leases)), together with the platforms, wells, pipelines and equipment (including production equipment) located on and attributable to the CUSA interest in such leases, and any hydrocarbons produced from such leases, if applicable (collectively "**FWE IV Assets**").

*Agreed FWE III (Winndown Leases)*

FWE IV will not be allocated any FWE leases that are currently allocated to Fieldwood Energy III LLC ("**FWE III**") in the Disclosure Statement (the "**FWE III (Winndown Leases)**"); provided that a particular FWE III (Winndown Lease) scheduled on Exhibit B attached hereto may be allocated to FWE IV under the following circumstances: (i) if such lease is required by the government to be replaced by other leases during the Chapter 11 process, or (ii) if CUSA and FWE agree to have such lease allocated to FWE IV. For the avoidance of doubt, CUSA or an affiliate must be a predecessor in the chain of title as noted on BOEM's Serial Register Page of any FWE III (Winndown Lease) lease/asset allocated to FWE IV.

If any such FWE III (Winndown Leases) leases/assets are to be allocated to FWE IV in accordance with (i) in the preceding, then an amount not less than 50% of FWE's predecessor-in-interest share of the funding designated and allocated to FWE III for decommissioning such lease/asset; or, if such lease/asset is allocated to FWE in accordance with (ii) in the preceding, then the agreed upon amount of funding designated and allocated to FWE III for decommissioning such lease/asset ( in either case, the "**FWE III Lease Payment Amount**") shall be paid by FWE into the  Escrow Account for general use at Closing.

## V. FWE IV Governance and Operations

*Divisive Merger*

FWE IV will be a new Texas limited liability company formed via the divisive merger of FWE (an existing Texas limited liability company) after conversion from a Delaware limited liability company. FWE IV will be allocated all FWE IV Assets, identified in accordance with the terms hereof, and all associated operating and decommissioning liabilities allocated to FWE IV via a Plan of Merger. All other assets or liabilities of FWE will remain with a FWE entity and/or be allocated to or assumed and assigned by the various entities described in the Bankruptcy. To the extent any of the oil and gas leases contained within the FWE IV Assets are terminated leases and as such not transferable, or are not transferrable for any other reason, CUSA and FWE shall negotiate in good faith in order to determine a mutually agreeable structure whereby FWE IV shall be allocated or otherwise obtain certain agreed rights

2

and obligations associated with such oil and gas leases and the FWE IV assets relating thereto, including, if applicable, the right to act as decommissioning contractor for such FWE IV assets and contractual rights to recover against predecessors-in-interest, surety bond providers and other applicable persons.

*LLC Company Agreement (LLC Agreement)*

Operating agreement of FWE IV addressing governance, management and funding of FWE IV executed at closing. Terms and conditions will include, among others:

1. Fieldwood Energy Inc. will be sole member and owner of FWE IV.

2. Sole Manager hired, with approval of CUSA, will be sole officer and employee of FWE IV and will run FWE IV in accordance with the terms of the LLC agreement.

3. CUSA will have certain consent rights under LLC Agreement, enforceable in its capacity as a third party beneficiary to the agreement.

4. Sole purpose of the company will be to wind-down and decommission FWE IV Assets.

5. FWE IV must obtain prior written consent of CUSA before conducting any of the following activities:

   • Engage in any business or activity other than plugging and abandoning the FWE IV Assets and/or, if applicable, maintaining current production on the FWE IV Assets,

   • Use revenue or free cash flow for any purpose other than for funding Permitted Third Party Costs, Permitted LOE Charges and, if applicable, payment into the Escrow Account relating to the decommissioning of the FWE IV Assets,

   • Approve any decommissioning plan for the FWE IV Assets and/or retain any other decommissioning subcontractor other than the NewCo,

   • Incur any indebtedness,

   • Replace, remove or change the powers of the Sole Manager,

   • Replace or remove the NewCo under the Contract Operator Agreement or amend, waive or fail to enforce any provision of the Contract Operator Agreement,

   • Divest any of the FWE IV Assets or acquire any other assets, or

   • Declare bankruptcy, liquidate or otherwise terminate the existence of the company or any of its subsidiaries.

6. FWE IV will provide CUSA with regular informational updates from FWE IV, including monthly and quarterly financial reports and an annual financial audit by an independent accountant approved by CUSA; provided that Ernst and Young is deemed to be pre-approved as an independent accountant.

7. As a condition precedent to the effectiveness of the Turnkey Removal Agreement (and the other Definitive Documents), FWE IV will become a qualified operator in the Gulf of Mexico.

8. FWE and CUSA will coordinate as appropriate to assist FWE IV on bonding requirements, with costs allocated in "*Funding and Cost Allocation*", below.

9.    FWE IV will use reasonable efforts to obtain reimbursement/contribution for decommissioning activity that is available under contract or applicable law, including as to predecessors-in-interest to the extent practicable and available surety bonding.[1]

10.    FWE IV shall obtain the written consent of CUSA prior to entering settlement negotiation(s) or agreeing to a settlement and/or initiating dispute resolution, including with respect to obtaining contributions from predecessor-in-interest for decommissioning or funds from surety bonds for decommissioning.

11.    The costs and expenses associated with the formation and administration of FWE IV and the operations conducted by the company shall be allocated as to forth under "*Funding and Cost Allocation*", below.

*Funding and Cost Allocation*

1.    FWE will be responsible for all costs associated with formation of FWE IV in connection with the divisive merger. Funds required for the ongoing operations of FWE IV shall be provided as set forth in "Contract Operator Agreement and Operating Costs", below.

2.    FWE will provide all funds for any premiums for organizational/areawide bonding requirements.

## VI. Turnkey Removal Agreement

1.    CUSA, FWE IV and NewCo to enter into the Turnkey Removal Agreement whereby, upon agreement of the price for a decommissioning project, NewCo will decommission the FWE IV Assets on a lump sum, turnkey payment basis, and NewCo will earn a single pre-agreed payment (turnkey amount) in exchange for completing such decommissioning project. NewCo will have profit opportunity if it is able to perform a decommissioning project for lower cost than the pre-agreed turnkey amount, and NewCo will bear the risk that the costs of a decommissioning project exceeds the pre-agreed turnkey amount. All such turnkey amounts shall be determined on a 100% (gross) basis and shall cover all costs, expenses and overhead associated with a particular decommissioning project, including all third party costs, any fixed and/or capital costs, tax, etc.

2.    At Closing, the parties shall determine the turnkey amounts for all decommissioning projects under the Turnkey Removal Agreement (leases operated by FWE IV) and shall agree on the decommissioning projects scheduled to be conducted during the first year after Closing under the Turnkey Removal Agreement, all of which shall be attached to the Turnkey Removal Agreement. Additionally, the parties shall agree on certain qualified conditions for the decommissioning projects ("**Qualified Conditions**"), which such Qualified Conditions, if present, can, at the election of either NewCo or CUSA, as applicable, and subject to the notice requirements set forth in the Definitive Documents, cause the parties to adjust the applicable turnkey amount for a particular project or agree on alternative cost arrangement; provided that such Qualified Conditions shall be set forth in the Definitive Documents and shall be limited to (i) material changes in government regulations that can reasonably be expected to materially increase or decrease the applicable cost of decommissioning a particular project and (ii) as otherwise mutually agreed in the Definitive Documents to by the parties. In the event the parties are unable to agree to the adjusted turnkey amount or an alternative cost arrangement due to an occurrence of a Qualified Condition, the parties shall follow the method set forth in the Definitive Documents.

3.     For all decommissioning projects to be conducted after the first anniversary of Closing, at least 90 prior to each anniversary of Closing, NewCo will provide CUSA final turnkey amounts for decommissioning projects to be completed in the next successive 12-month period, which final amounts may be the same or updated from the original schedule. Such amounts shall become the agreed upon turnkey amounts for the applicable 12 month period if such amount has not been updated from the original scheduled amount or if CUSA does not object in writing to an updated turnkey amount within 30 days of delivery of the final turnkey amounts. The parties will work in good faith to agree on a final turnkey amount; provided that, if the parties fail to reach agreement on a final turnkey amount for a particular project within 30 days of such objection, the parties shall follow the method set forth in the Definitive Documents. FWE IV will work in good faith with CUSA to determine applicable sources of committed third party funding payments on an asset-by-asset basis prior to commencement of the work for a particular decommissioning project, including (i) available bonds, and (ii) contributions from predecessors-in-interest.

4.     Services provided by NewCo pursuant to the Turnkey Removal Agreement will include performing decommissioning operations to an agreed operational and regulatory performance standard on behalf of FWE IV on agreed terms and conditions. For purposes of clarity, FWE and CUSA agree that NewCo will meet such required standard if it performs such decommissioning operations consistent with required laws, rules and regulations promulgated by governing regulatory agencies, including but not limited to BOEM and BSEE, and consistent with any applicable third party contracts (the "**Performance Standards**").

5.     For each decommissioning project, CUSA shall pay its share of the agreed turnkey payment (as described in "*Funding Obligations and Cost Allocation*", below) into the Escrow Account when FWE IV has received funds or secured a contractual commitment (such as AFE approval) for full funding of the applicable decommissioning project.

6.     Newco shall not undertake the applicable decommissioning project until full funding of the applicable turnkey amount has been agreed to by CUSA and NewCo, including receiving funds or securing a contractual commitment (such as an AFE approval) from applicable third parties, including any Other FWE Party (defined below). Subject to 7 below, CUSA shall authorize, and NewCo shall receive, payment of the full agreed turnkey amount from the Escrow Account (as payment on behalf of FWE IV) upon delivery to FWE IV and CUSA of the filings and other evidence required by BOEM and BSEE or any other applicable governmental authority, including requisite approvals or regulatory concurrence, to support NewCo's representation that all decommissioning obligations with respect to the applicable assets have been satisfied.

7.     If any individual asset subject to the Turnkey Removal Agreement results in an agreed turnkey amount in excess of $5 million or if the aggregate amount of agreed turnkey amounts in effect at any one time for multiple assets subject to the Turnkey Removal Agreement is in excess of $10 million, NewCo and CUSA will agree on milestone payments to be paid in the above manner upon completion of interim decommissioning activities. In no event shall milestone payments equal 100% of the total turnkey amount. Payment of a final percentage of the agreed turnkey amount of 25% shall remain in the applicable Escrow Account until completion of the work in accordance with the terms of the Turnkey Removal Agreement.

8.     CUSA retains the right to terminate the Turnkey Removal Agreement as to a particular asset and/or require FWE IV to competitively bid the decommissioning services with respect to a particular asset in the event NewCo is unable to (or otherwise fails to) perform the services in compliance with Government issued timelines or in the event NewCo is in breach of the Turnkey Removal Agreement, including, but not limited to, the Performance Standards with respect to a particular asset. In the event of termination, CUSA shall be refunded any funds deposited in the Escrow Account for the particular asset decommissioning.

9.     With respect to certain FWE IV Assets for which such activities will be required or otherwise advisable / agreed at Closing, NewCo will perform , and FWE IV will engage NewCo to perform and will reimburse or otherwise pay up to $5 million for, operations necessary to safe-out and otherwise perform preparatory activities to put such FWE IV Assets into a mechanical and operational state such so that they are ready to be decommissioned (up to the $5 million cap on these costs, "**Initial Safe Out**"); provided that NewCo shall not be required to perform any such work without funding therefor from either FWE IV or CUSA.

*Funding Obligations and Cost Allocation*

1.     CUSA will pay 100% of the turnkey amount agreed by the parties to be owed by CUSA for a particular FWE IV Asset decommissioning project when due; provided that in the event there are any other current working interest owner(s) with an interest in the applicable decommissioning project (or the underlying lease or assets), including FWE I or any other entity surviving the FWE divisive merger at Closing, whether as a co-working interest owner in an asset or otherwise ("**Other FWE Party**"), CUSA shall only be required to pay its predecessor-in-interest share of the FWE IV working interest percentage share of the applicable turnkey amount. In the event there are other predecessors-in-interest to the FWE IV Asset (excluding CUSA and the predecessors to CUSA), CUSA shall have the right to elect whether or not to pay 100% of the turnkey amount prior to commencement of work.

2.     CUSA's obligation to pay the turnkey amount for a particular decommissioning project (or its applicable share of the turnkey amount if there are other current working interest owners) shall be subject to reduction (and/or reimbursement) in conjunction with the following (each, a "**CUSA Payment Reduction**"):

     a.     CUSA's obligation to pay the turnkey amount shall be reduced by any funds or contributions that FWE IV secures or otherwise collects from other predecessors-in-interest or otherwise with respect to CUSA's share of the turnkey amount or, if any such funds are collected after the turnkey amount is paid in full, such amounts shall be paid to CUSA as reimbursement such that CUSA's funded amount is equal to its predecessor-in-interest percentage for the particular decommissioning project.

     b.     In the event that there are any funds received from NPI Revenue Amounts available in the Escrow Account, CUSA shall have the option to utilize such funds to reduce its obligation to pay a particular turnkey amount.

     c.     In the event that there are any funds associated with any FWE III Lease Payment Amounts available in the Escrow Account, CUSA shall have the option to utilize such funds to reduce its obligation to pay the FWE III (Winddown Lease) decommissioning turnkey amount or be provided to FWE IV for general use.

     d.     In the event that CUSA is in breach of any of its obligations under a Definitive Document, CUSA Payment Reduction shall exclude subparts (b) and (c) above.

3.   FWE will contribute at Closing $5,000,000 into the **FWE IV Escrow Account** to cover the Initial Safe Out.  FWE IV will pay NewCo for performing the Initial Safe Out upon completion of individual works scopes with such funds from the Escrow Account; Newco shall not be required to undertake any work scopes if funds therefor are not already in the FWE IV Escrow Account.

4.   In no event shall CUSA be required to pay for or otherwise contribute funds in relation to (and no funds in the applicable Escrow Account or any other contribution by CUSA shall be used in any manner for) any of the following ("**Excluded CVX Costs**"):

   a.   Any costs , damages, fines, penalties or liabilities owed to third parties, governmental fines and penalties, environmental liabilities, employment claims and/or any costs, expenses, claims or other liability relating to action taken by FWE IV-

   b.   Any costs , damages, fines, penalties or liabilities owed to third parties, governmental fines and penalties, environmental liabilities, employment claims and/or any costs, expenses, claims or other liability relating to action taken by NewCo in breach of, and subject to, the Turnkey Removal Agreement or Contract Operating Agreement or arising due to the negligence, gross negligence or willful misconduct of NewCo and

   c.   Any costs, damages, fines, penalties or liabilities related to any orphan assets on the FWE IV Assets (as determined with reference to CUSA's predecessor interest in the applicable assets - FWE and CUSA will reasonably agree to the applicable definition of orphan assets).

5.   NewCo shall be responsible for, and otherwise pay, or pay or reimburse FWE IV for, any Excluded CVX Costs arising under 4(b) or 4(c) above.

**VII. Contract Operator Agreement and Operating Costs**

1.   FWE IV and NewCo will enter into a Contract Operator Agreement whereby NewCo manages the administrative and corporate expenses of FWE IV along with the FWE IV Assets for a period of 5 years, subject to agreed-upon conditions for assignment.

2.   Management of the properties shall include, but not be limited to, as services provided: Operations, Production Marketing (for assets that are producing), Accounting and Land Administration.

*Funding Obligations and Cost Allocation*

1.   NewCo will manage the FWE IV Assets at no charge to FWE IV, and NewCo shall bear all amounts associated with such activity, including any corporate activity and administrative overhead of FWE IV, in conjunction with such management obligation, other than any third party costs.  If circumstances change (including changes to the assets or regulations covering operations), NewCo may charge a reasonable, mutually agreed fee for such services.  The parties agree that third party costs associated with the operations of the FWE IV Assets or management of FWE IV, but not including overhead costs, such as rent or equipment lease payments ("**Permitted Third Party Costs**") shall be paid by funds from the Escrow Account and shall be billed directly to FWE IV.  To the extent that any Permitted Third Party Costs are not covered by available funds from the Escrow Account, CUSA shall reimburse and contribute such Permitted Third Party Costs to the Escrow Account on a monthly basis in arrears.

2.   Notwithstanding Item 1 above, to the extent FWE IV or NewCo, through a shared services agreement, incurs lease operating expenditures associated with a permitted operation on or

7

in relation to a particular FWE IV Asset that would properly be chargeable as OPEX under a joint operating agreement (e.g., lease operating expenses), including, but not limited to, costs related to visitation fees, insurance costs, repair and maintenance, or safe-out costs ("**Permitted LOE Costs**"), such Permitted LOE Costs shall be paid for first by funds from revenue generated from the FWE IV Assets and then by CUSA by payment into the Escrow Account on a monthly basis in arrears; provided that, in the event that a particular lease or asset has co-working interest owners, any obligation to contribute Permitted LOE Costs (whether from the Escrow Account or otherwise) shall be limited to the proportionate share of such costs corresponding to FWE IV's working interest. For the avoidance of doubt, Newco shall not be obligated to either provide any such services without funding therefor or to advance any funds for FWE IV. Additionally, NewCo's assumption of expenses in (1) above and Excluded CVX Costs shall not be included as or deemed Permitted LOE Costs.

3. Notwithstanding the foregoing, Permitted Third Party Costs and Permitted LOE Costs shall not include any amounts relating to or otherwise associated with (including any operating expenses or overhead allocated to) any Excluded CVX Costs.

**VIII. Escrow Accounts**

The parties shall agree to the establishment of the appropriate bank account(s) and escrow account(s) to support the transactions described in this Term Sheet, including but not limited to one operating account and at least one escrow account for the amounts to be paid pursuant to the Turnkey Removal Agreement (as applicable, the "**Escrow Agreement**").

1. Contributions to the Escrow Account, shall be as fully described in the Definitive Agreements, but include not less than:

   a. FWE will contribute at Closing $5,000,000 as payment for the Initial Safe Out.

   b. Subject to item 2.a below, FWE IV will grant at Closing a net profits interests on all FWE IV Assets or otherwise agree with CUSA on the treatment of net profits ("**FWE IV NPI**"). The FWE IV NPI will pay all net profits from production generated by the FWE IV Assets, after deducting royalties and taxes and less amounts required to cover operating expenditures of FWE IV, into the Escrow Account ("**NPI Revenue Amount**").

   c. Funds obtained from third parties, including any Other FWE Party, in support of decommissioning activity for FWE IV Assets, including contributions from other predecessors-in-interest and proceeds from surety bonds paid directly to FWE IV, will be paid into the FWE IV Escrow Account and, to the extent practicable, designated for use for the particular asset.

   d. For any FWE III (Winddown Lease) asset allocated to FWE IV in accordance with the provisions above, the corresponding FWE III Lease Payment Amount shall be contributed to the FWE IV Escrow Account by FWE at Closing.

   e. Any agreed turnkey payments made by CUSA in accordance with the Turnkey Removal Agreement or any decommissioning amounts, whether turnkey or otherwise, received from other co-working interest owners, if applicable.

2. Contributions to the operating account:

   a. All revenue from FWE IV Assets will be received into the operating account. If any net revenue exists, after paying Permitted Third Party Costs and Permitted LOE Costs, FWE IV will fund the NPI Revenue Amount out of the operating account.

3. Distributions to NewCo:

    a. Funds required to perform the Initial Safe Out, up to $5,000,000 funded at Closing, as such P&A prep activities are performed.

    b. Turnkey payments upon completion of decommissioning services in accordance with the Turnkey Removal Agreement, including any agreed upon milestone payments.

    c. Reimbursement for Permitted Third Party Costs and Permitted LOE Costs in accordance with the Contract Operating Agreement.

4. Distributions to CUSA:

    a. With respect to any funds associated with a CUSA Payment Reduction amount that are received into the Escrow Account, after CUSA has made an applicable turnkey payment.

5. Distributions to FWE IV:

    a. Costs of FWE IV, including operating costs.

    b. Decommissioning costs to the extent not covered under the Turnkey Removal Agreement.

### IX. Other Agreements to be Negotiated

*Joint Development Agreement*

Parties: FWE IV and NewCo, terms to be mutually agreed.

*Shared Services Agreement*

Parties: FWE IV and NewCo, terms to be mutually agreed.

*Neptune Spar Transition Services Agreement*
Parties: NewCo and CUSA

Terms: Transition services provided by NewCo at CUSA's cost for the period prior to commencement of CUSA's campaign covering decommissioning of the Neptune Spar and related equipment and infrastructure.

*Deepwater Assets Decommissioning Fund*

Parties: NewCo and CUSA

Terms:

1. Subject to paragraph 2 below, NewCo will deliver to CUSA on the second anniversary of closing of the transaction described herein a $25 million irrevocable surety bond issued by a Qualifying Surety, for which CUSA shall be the sole private beneficiary and which CUSA shall be entitled to call to cover and/or to reimburse certain decommissioning costs on the CVX Deepwater Assets (defined below) as described in item 4 below ("**Deepwater Surety Bond**").  For purposes of this agreement a "Qualifying Surety" means an insurance company or financial institution that is rated equivalent to at least "A+" (by S&P or Fitch), "A1" (by Moody's), or "B++" (by AM Best), by any two of such four credit rating agencies.  Subject to 6 below, in order to be released from its obligations hereunder, NewCo shall ensure any buyer of the deepwater assets provides a replacement Deepwater Surety Bond.

2. If NewCo is not able to provide the Deepwater Surety Bond after utilizing commercially reasonable efforts or does not deliver a letter of credit of equal amount to the Deepwater Surety Bond from a mutually agreed upon qualified issuing bank, NewCo will grant a net profits interest equivalent to 5% of the net profits of production from the CVX Deepwater Assets ("**Deepwater NPI**"), which shall pay funds into a decommissioning escrow account until the funds in such account equal $25 million ("**Deepwater Escrow Account**"); provided that when the Deepwater Escrow Account reaches $25 million, the Deepwater NPI shall be returned to NewCo and terminated.

3. If NewCo has funded any portion of the Deepwater Escrow Account, to the extent NewCo provides a qualifying Deepwater Surety Bond in any face amount or an irrevocable standby letter of credit in any amount from a mutually agreed upon qualified issuing bank, NewCo shall be entitled to draw down (and not be required to replenish) from the Deepwater Escrow Account an amount equal to the face amount of the Deepwater Surety Bond or the amount of the letter of credit.

4.  The funds in the Deepwater Escrow Account will be made available to CUSA and/or the Deepwater Surety Bond (or letter of credit) will be callable by CUSA, in each case for the purposes of covering decommissioning costs incurred by CUSA for certain NewCo deepwater or shelf assets acquired originally by FWE from CUSA or any current affiliate of CUSA, in each case as such assets are designated on Exhibit C attached hereto ("**CVX Deepwater Assets**") in the event that CUSA or any of its affiliates is ever held liable therefor or otherwise incurs such costs.

5.  NewCo will have the right to use any funds in such account to perform decommissioning activities on the CVX Deepwater Assets.

6.  The security requirements described hereunder shall terminate, and any security shall be released to NewCo, upon the occurrence of any of the following:

    a.  The Turnkey Removal Agreement terminates as a result of an uncured material breach by CUSA (provided that NewCo is not also in material breach);

    b.  NewCo performs decommissioning activities equal to or in excess of $25 million on the CVX Deepwater Assets;

    c.  NewCo establishes an S&P credit rating equal to BBB or better or an equivalent credit rating with any other established rating agency; or

    d.  NewCo sells all or substantially all of its deepwater assets (including all or substantially all of the CVX Deepwater Assets) in an asset transaction or a corporate or equivalent transaction to a buyer with an S&P credit rating equal to BBB or better or an equivalent credit rating with any other established rating agency.

In the event of 6(c), if NewCo's S&P credit rating drops below a BBB (or equivalent), NewCo shall re-establish the Deepwater Surety Bond or letter of credit at the level of security immediately prior to being released under 6(c), within 60 days or, if it fails to do so, the Deepwater NPI shall come into effect, subject to the provisions described above on any reduction or release.

11

**X. Other**

In the event NewCo has an unpaid balance due to CUSA for any reason under the Definitive Agreements, and that unpaid balance remains due and unpaid for 90 days, CUSA expressly reserves the right to set-off any amounts due to NewCo under the Turnkey Removal Contract or any reimbursement under the Contract Operating Agreement.

At Closing and/or upon qualification as an operator, CUSA and FWE IV shall execute BOEM-0150 "Assignment of Record Title in Federal OCS Oil and Gas Lease" documentation to effectuate the transfer of record title currently held by CUSA to FWE IV in the following leases

- Ship Shoal 175 OCS-G05550

**XI. Due Diligence**

In conjunction with negotiations with FWE, CUSA to commence and perform due diligence of assets and related contracts within the scope of FWE IV. Successful completion of such due diligence (and FWE providing the required materials to CUSA) shall be a condition precedent to the effectiveness of the Definitive Documents.

In accordance with the foregoing, FWE shall provide CUSA with electronic access to the information and materials set forth below promptly after agreeing to this Term Sheet:

1.  All contracts applicable to the assets or used in conjunction with the FWE IV Assets, including operating agreements, production handling arrangements, hydrocarbon transportation, processing and marketing agreements, third party service provider contracts, PSAs, farmouts and any agreements relating to decommissioning,

2.  All bonds, letters of credit, standby funds or other financial arrangements relating to the FWE IV Assets, including any such arrangements in support of decommissioning, and

3.  All government permits, orders and notices relating to the FWE IV Assets or the operation thereof, including any INCs and copies of all BSEE communication relating thereto.

Notwithstanding the information specifically requested above, the scope of CUSA's due diligence will include access to all relevant information relating to the FWE IV Assets that may be requested by CUSA from time to time, which FWE IV shall provide to CUSA in a timely manner following receipt of a request by CUSA.

*[Remainder of page intentionally left blank.]*

**Exhibit "A"**
**FWE IV Assets**

| Area / Block | Lease Number |
|---|---|
| BA A-105 | G01757 |
| BA A-133 | G02665 |
| EB 158 | G02645 |
| EB 159 | G02646 |
| EB 160 | G02647 |
| EB 161 | G02648 |
| EC 331 | G08658 |
| EC 332 | G09478 |
| EI 342 | G02319 |
| HI A-550 | G04081 |
| MP 77 | G04481 |
| SM 132 | G02282 |
| SM 136 | G02588 |
| SM 137 | G02589 |
| SM 150 | G16325 |
| SM 66 | G01198 |
| SS 169 | 00820 |
| SS 206 | G01522 |
| SS 207 | G01523 |
| ST 169 | G01253 |
| ST 195 | G03593 |
| VR 196 | G19760 |
| VR 207 | G19761 |
| VR 261 | G03328 |

End of Exhibit "A"

**Exhibit "B"**
**FWE III (Winddown Leases)**

| Area / Block | Lease Number |
|---|---|
| GI 83 | G03793 |
| HI A-446 | G02359 |
| MP 154 | G30337 |
| VR 332 | G09514 |
| VK 113 | G16535 |
| VK 251 | G10930 |
| VK 340 | G10933 |
| VR 314 | G05438 |
| WC 290 | G04818 |

End of Exhibit "B"

**Exhibit "C"**

**CVX Deepwater Assets**

| Area / Block | Lease Number (OCS-) |
|---|---|
| GI 39 | 00127 |
| GI 40 | 00128 |
| GI 41 | 00130 |
| GI 42 | 00131 |
| GI 46 | 00132 |
| GI 47 | 00133 |
| GI 48 | 00134 |
| GI 43 | 00175 |
| WD 70 | 00182 |
| WD 71 | 00838 |
| WD 94 | 00839 |
| WD 95 | G01497 |
| WD 96 | G01498 |
| SM 149 | G02592 |
| VR 363 | G09522 |
| VR 371 | G09524 |
| VR 362 | G10687 |
| GC 282 | G16727 |
| MC 562 | G19966 |
| MC 563 | G21176 |
| GC 679 | G21811 |
| GC 768 | G21817 |
| MC 992 | G24133 |
| MC 993 | G24134 |
| GC 238 | G26302 |
| MC 519 | G27278 |
| EW 834 | G27982 |
| MC 697 | G28021 |
| MC 698 | G28022 |
| MC 948 | G28030 |
| MC 742 | G32343 |
| MC 949 | G32363 |
| EW 790 | G33140 |
| MC 793 | G33177 |
| EW 835 | G33707 |
| MC 782 | G33757 |
| MC 171 | G34428 |
| MC 172 | G34429 |
| MC 297 | G34434 |
| GC 40 | G34536 |
| GC 41 | G34537 |
| EW 1009 | G34878 |
| EW 1010 | G34879 |
| EW 1011 | G34880 |
| MC 80 | G35311 |
| MC 474 | G35825 |
| MC 518 | G35828 |
| GI 32 | 00174 |
| GI 39 | 00126 |

| Area / Block | Lease Number (OCS-) |
|---|---|
| GI 41 | 00129 |
| GI 44 | 00176 |
| GI 52 | 00177 |
| WD 67 | 00179 |
| WD 68 | 00180 |
| WD 69 | 00181 |

End of Exhibit "C"

## **Exhibit 1-A**

### **FWE III Plan of Merger**

See attached.

*Exhibit 1-A to the Implementation Agreement*

# AGREEMENT AND PLAN OF MERGER
## OF
## FIELDWOOD ENERGY III LLC
## INTO
## FIELDWOOD ENERGY IV LLC
## AND
## FIELDWOOD ENERGY III LLC

This AGREEMENT AND PLAN OF MERGER, dated as of [●], 2021 (this "Plan of Merger"), is executed and adopted by Fieldwood Energy III LLC, a Texas limited liability company ("FWE III").

WHEREAS, commencing August 3, 2020, Fieldwood Energy LLC, a Delaware limited liability company ("FWE"), and certain other affiliates of FWE (each, a "Debtor" and collectively, the "Debtors") filed voluntary petitions with the United States Bankruptcy Court for the Southern District of Texas (the "Bankruptcy Court") initiating their respective cases pending under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") styled *In re Fieldwood Energy LLC, et al.*, jointly administered under Case No. 20-33948 (MI) (each case of a Debtor, a "Case" and collectively, the "Chapter 11 Cases");

WHEREAS, in connection with the Chapter 11 Cases, the Debtors filed the [____ *Amended Joint Chapter 11 Plan of Fieldwood Energy LLC and Its Affiliated Debtors* at Docket No. ___] (as may be amended, restated, amended and restated, supplemented, or otherwise modified from time to time, the "Plan of Reorganization"), which was confirmed by order of the Bankruptcy Court entered on [●], 2021 at Docket No. [●] (as may be amended, modified, and supplemented, the "Confirmation Order");

WHEREAS, in accordance with the Plan of Reorganization and Confirmation Order, pursuant to the Credit Bid Purchase Agreement (as defined below) certain assets and properties of the Debtors were sold and conveyed to, and certain liabilities and obligations of Debtors were assumed by, Mako Buyer LLC, a Delaware limited liability company ("Credit Bid Purchaser"), prior to the effective time of the First Merger (as defined below) (the "Credit Bid Transaction");

WHEREAS, pursuant to the Plan of Reorganization, and as authorized by the Confirmation Order, FWE converted from a Delaware limited liability company to a Texas limited liability company on [●], 2021;

WHEREAS, pursuant to the Plan of Reorganization, and as authorized by the Confirmation Order, following the Credit Bid Transaction and prior to the Effective Time on [●], 2021, FWE effected a divisional merger (the "First Merger") pursuant to that certain Agreement and Plan of Merger of Fieldwood Energy LLC ("FWE I Plan of Merger"), pursuant to which (i) FWE maintained its separate existence and continued as a surviving entity under the name "Fieldwood Energy III LLC;" (ii) a new Texas limited liability company was formed under the name "Fieldwood Energy I LLC" ("FWE I"); and (iii) all of the assets and liabilities of FWE were allocated to FWE I and FWE III, in each case as set forth in the FWE I Plan of Merger;

WHEREAS, pursuant to the Plan of Reorganization, and as authorized by the Confirmation Order, FWE III is to effect a divisional merger as set forth in this Plan of Merger (the "Merger") promptly following the First Merger, pursuant to which, among other things:

a) FWE III shall maintain its separate existence and continue as a surviving entity under its name as of immediately prior to the Merger;

b) a new Texas limited liability company shall be formed under the name "Fieldwood Energy IV LLC" ("FWE IV");

c) all of the FWE IV Assets (as defined below) shall be allocated to and vested in FWE IV;

d) all of the FWE IV Obligations (as defined below) shall be allocated to and shall constitute liabilities and obligations of, FWE IV;

e) all of the FWE III Assets (as defined below) shall be allocated to and vested in FWE III; and

f) all of the FWE III Obligations (as defined below) shall be allocated to, and shall constitute liabilities and obligations of, FWE III; and

WHEREAS, this Plan of Merger has been authorized by the Confirmation Order, which provides such approval of the transactions contemplated hereby as required for purposes of Sections 10.001 et seq. of the Texas Business Organizations Code (the "TBOC"), and Section 1.002(55)(A) of the TBOC and, in accordance with Section 10.008 of TBOC, the Merger shall be consummated without any reversion or impairment, any further act or deed, or any transfer or assignment having occurred.

NOW, THEREFORE, in consideration of the premises and the mutual covenants and agreements herein contained, and for good and valuable consideration, the sufficiency of which is acknowledged, and for the purpose of prescribing the terms and conditions of the Merger, the mode of carrying it into effect, the manner and basis of allocating assets and liabilities of each of the resulting entities and such other details and provisions of the Merger as are deemed necessary or desirable, FWE III has agreed and covenanted, and does hereby agree and covenant, as follows:

1.      Subject to the provisions of this Plan of Merger, FWE III shall cause the Merger to be consummated by filing a certificate of merger with the Secretary of State of the State of Texas in such form as is required by, and executed in accordance with, the relevant provisions of the TBOC, in substantially the form attached as Exhibit A (the "Certificate of Merger"), together with a certificate of formation of FWE IV in substantially the form attached as Exhibit B-A (the "Certificate of Formation"). The Certificate of Merger shall provide that the Merger shall be effective on the date and time the Certificate of Merger is accepted and filed with the Secretary of State of the State of Texas (the "Effective Time"). The Certificate of Formation of FWE IV shall provide that the Certificate of Formation shall be effective as of the Effective Time.

2.      At the Effective Time:

(a)      FWE III shall be divisionally merged in accordance with Section 10.008 of the TBOC with (i) FWE IV being formed as a Texas limited liability company and new domestic entity, separate from FWE III as a result of the Merger and having been allocated the FWE IV Assets and the FWE IV Obligations in accordance with the TBOC under the name "Fieldwood Energy IV LLC" and (ii)  FWE III continuing as a Texas limited liability company and surviving domestic entity of the Merger and having been allocated all assets and liabilities of FWE III (other than the FWE IV Assets and the FWE IV Obligations) in accordance with the TBOC under the same name it had immediately prior to the Merger - "Fieldwood Energy III LLC".  The Merger will have the effect set forth below and in Section 10.008 of the TBOC.

(b)      There shall be no change (through conversion, exchange, or otherwise) to the membership interests of FWE III, which membership interests in FWE III will continue to be owned by Fieldwood Energy Inc. as of the Effective Time.

(c)      All of the membership interests of FWE IV shall be acquired by and owned by Fieldwood Energy Inc. as of the Effective Time.

(d)      The certificate of formation and limited liability company agreement of FWE III as in effect immediately prior to the Effective Time shall be the certificate of formation and limited liability company agreement of FWE III immediately following the Effective Time.

(e)      The Certificate of Formation shall be the certificate of formation of FWE IV, and the limited liability company agreement of FWE IV immediately following the Effective Time shall be substantially in the form of the company agreement attached hereto as <u>Exhibit B-B</u> (the "<u>FWE IV LLC Agreement</u>").

(f)      The officers and managers of FWE III, if any, immediately prior to the Effective Time shall continue to be the officers of FWE III in accordance with and subject to the terms and conditions of the limited liability company agreement of FWE III.

(g)      The officers and managers of FWE IV, if any, shall be as set forth in, and subject to the terms and conditions of, the FWE IV LLC Agreement.

(h)      All of the rights, title and interests to all real estate and other properties of FWE III described in <u>Part A</u> of <u>Schedule I</u> attached hereto (the "<u>FWE IV Assets</u>"), subject to any existing liens or other encumbrances on such property, shall be allocated to and vested in FWE IV without reversion or impairment, without further act or deed, and without transfer or assignment having occurred, and no others (and expressly excluding any FWE III Asset).

(i)      All of the liabilities and obligations of FWE III described in <u>Part B</u> of <u>Schedule I</u> attached hereto (the "<u>FWE IV Obligations</u>") shall be allocated to, and shall constitute liabilities and obligations of, FWE IV, and no others (and expressly excluding any FWE III Obligation).

(j)      All of the rights, title and interests to all real estate and other properties of FWE III other than the FWE IV Assets (collectively, the "<u>FWE III Assets</u>"), subject to any existing

3

liens or other encumbrances on such property, shall be allocated to and vested in FWE III without reversion or impairment, without further act or deed, and without transfer or assignment having occurred.

(k)    All of the liabilities and obligations of FWE III other than the FWE IV Obligations (collectively, the "FWE III Obligations") shall be allocated to, and shall constitute liabilities and obligations of, FWE III.

(l)    FWE IV shall be substituted in any proceeding pending by or against FWE III (the pre-Merger entity) to the extent that such proceeding is associated with the Obligations or Assets allocated to FWE IV pursuant to Section 2(h) or Section 2(i).

(m)    FWE III (the surviving entity) shall be substituted in any proceeding pending by or against FWE III (the pre-Merger entity) to the extent that such proceeding is associated with the Obligations or Assets allocated to FWE III pursuant to Section 2(j) or Section 2(k).

(n)    All acts, plans, policies, Contracts, approvals, and authorizations of FWE III (the pre-Merger entity) and its officers and agents, that were valid and effective immediately prior to the Effective Time shall be taken for all purposes as the acts, plans, policies, Contracts, approvals, and authorizations of FWE III (the surviving entity) and FWE IV, as applicable and consistent with the foregoing and shall be effective and binding thereon as the same were with respect to FWE III (the pre-Merger entity).

(o)    The Assets, Obligations, reserves, and accounts of FWE III (the pre-Merger entity) shall be recorded on the books of FWE III (the surviving entity) or FWE IV, as applicable and consistent with the foregoing, depending on which entity is allocated such Assets, Obligations, reserves, or accounts, at the amounts at which they, respectively, were carried on the books of FWE III (the pre-Merger entity) immediately prior to the Effective Time, subject to such adjustments as may be appropriate in giving effect to the Merger.

3.    Post-Merger Covenants.

(a)    Each of FWE III and FWE IV shall, at any time and from time to time from and after the Effective Time as and when requested by FWE III or FWE IV, as applicable, or by their respective successors or assigns, execute and deliver, or cause to be executed and delivered in its name by its authorized officers, all such conveyances, transfers, deeds, or other instruments as FWE III or FWE IV, as applicable, or such successors or assigns, may reasonably deem necessary in order to carry out the purposes of this Plan of Merger, pursuant to the terms and conditions herein, including to evidence (i) the allocation to and vesting in FWE III of the FWE III Assets, and the allocation to FWE III of, and the liability and obligation of FWE III for, the FWE III Obligations as a result of the Merger and (ii) the allocation to and vesting in FWE IV of the FWE IV Assets, and the allocation to FWE IV of, and the liability and obligation of FWE IV for, the FWE IV Obligations as a result of the Merger. Any cost incurred associated with curing a misallocation of any asset or liability (or failing to properly allocate any asset or liability), or otherwise arising from such misallocation (or failure to allocate), will be properly rectified and borne by FWE III. Without limiting the foregoing, FWE III shall take such actions as necessary to

4

effect a transfer from an account of FWE III to an account designated in writing by FWE IV of (i) the FWE IV Cash Amount, (ii) the FWE IV Suspense Funds, and (iii) the Prepaid JIB Cash Amount.

(b)     From and after the Effective Time (i) FWE IV shall perform the obligations of FWE under Section 10.12 of the Credit Bid Purchase Agreement with respect to Closing Accounts Receivable to the extent attributable to FWE IV Assets as of the Effective Time (provided FWE IV shall have no obligation to incur any cost or expense in performing such obligations), and (ii) FWE III shall, and shall cause its subsidiaries to, perform the obligations of FWE under Section 10.12 of the Credit Bid Purchase Agreement with respect to Closing Accounts Receivable to the extent attributable to FWE III Assets or any assets held by subsidiaries of FWE III as of the Effective Time.

4.     As a result of the consummation of the Merger in accordance with this Plan of Merger, FWE IV shall only be allocated and shall only be vested in and receive the FWE IV Assets, and shall only be allocated, and shall only be subject to the FWE IV Obligations, and FWE IV shall have no rights or obligations relating to any of the FWE III Assets or the FWE III Obligations, except as may be expressly set forth in a separate agreement, which is entered into at or after the Effective Time, between FWE III and FWE IV with respect to such other Assets or Obligations; and FWE IV shall not be deemed to be a predecessor in interest to any of the FWE III Assets or the FWE III Obligations.

5.     As a result of the consummation of the Merger in accordance with this Plan of Merger, FWE III shall only be allocated  and shall only be vested in and receive the FWE III Assets and shall only be allocated   and shall only be subject to the FWE III Obligations, and FWE III shall have no rights or obligations relating to any of the FWE IV Assets or the FWE IV Obligations, except as may be expressly set forth in a separate agreement, which is entered into at or after the Effective Time, between FWE III and FWE IV with respect to such other Assets or Obligations.

6.     FWE III shall provide to FWE IV all rights afforded to FWE III pursuant to Section 6 of the FWE I Plan of Merger to the extent related to any FWE IV Assets; provided, however, that any obligation or liability incurred by FWE III to the extent arising from, related to, or connected with providing such rights to FWE IV, (1) shall not constitute an FWE III Obligation, (2) shall be FWE IV Obligations and the obligations and liabilities of FWE IV, and (3) FWE IV shall indemnify and hold harmless FWE III from and against all such obligations and liabilities allocated to FWE IV pursuant to this <u>Section 6</u>.

7.     <u>Certain Definitions</u>.  As used herein and in the Schedules and Exhibits attached hereto, (i) the terms set forth below have the meanings ascribed to such terms below and (ii) the terms defined in the Schedules and Exhibits attached hereto have the meanings ascribed to such terms in such Schedules and Exhibits.

(a)     "<u>Asset</u>" means any individual asset, property, right, title or interest in any of the FWE III Assets or the FWE IV Assets; "<u>Assets</u>" means, collectively, the FWE III Assets and the FWE IV Assets.

(b)     "Bankruptcy Code" has the meaning ascribed to such term in the recitals hereto.

(c)     "Bankruptcy Court" has the meaning ascribed to such term in the recitals hereto.

(d)     "BOEM" has the meaning ascribed to such term in the definition of Environmental Liabilities.

(e)     "BSEE" has the meaning ascribed to such term in the definition of Environmental Liabilities.

(f)     "Case" has the meaning ascribed to such term in the recitals hereto.

(g)     "CERCLA" has the meaning ascribed to such term in the definition of Environmental Laws.

(h)     "Certificate of Formation" has the meaning ascribed to such term in Section 1 hereto.

(i)     "Certificate of Merger" has the meaning ascribed to such term in Section 1 hereto.

(j)     "Chapter 11 Cases" has the meaning ascribed to such term in the recitals hereto.

(k)     "Chevron PSAs" means, collectively, (i) that certain Asset Sale and Purchase Agreement, dated as of June 15, 2016, by and between CUSA and Fieldwood Energy Offshore LLC, a Delaware limited liability company, (ii) that certain Purchase and Sale Agreement, dated as of September 1, 2003, by and between Northstar Gulfsands, LLC and Noble Energy, Inc., (iii) that certain Purchase and Sale Agreement, dated as of March 1, 2006, by and between Coldren Resources LP and Noble Energy, Inc., (iv) that certain Purchase and Sale Agreement, dated as of January 1, 2018, by and between Fieldwood Energy LLC and Noble Energy, Inc., (v) that certain Asset Sale and Purchase Agreement, dated as of January 1, 2015, by and among Fieldwood Energy Offshore LLC, CUSA and Union Oil Company of California, (vi) that certain Asset Sale and Purchase Agreement, dated as of January 1, 2015, by and among Fieldwood Energy SD Offshore LLC, CUSA, Union Oil Company of California and Unocal Pipeline Company, (vii) that certain Asset Sale and Purchase Agreement, dated as of August 1,2015, by and between Fieldwood Energy Offshore LLC and CUSA, (viii) that certain Purchase and Sale Agreement, dated as of October 1, 2003, by and among SPN Resources, LLC, UnionOil Company of California and Pure Resources, L.P., and (ix) any other agreements pursuant to which FWE or its affiliates acquired any interest in any FWE IV Oil and Gas Properties from CUSA or its affiliates.

(l)     "Closing Accounts Receivable" has the meaning ascribed to such term in the Credit Bid Purchase Agreement.

(m)     "Confirmation Order" has the meaning ascribed to such term in the recitals hereto.

(n)     "Contract" means any contract, subcontract, lease, sublease, mortgage, franchise, license, purchase order, sales order, indenture, settlement, note, bond, guarantee, loan, instrument, obligation, promise, grant, or other agreement, arrangement, understanding or commitment, whether or not in written form, that is binding upon a Person or its property.

(o)     "Conveyed" means conveyed, transferred, assigned, or sold pursuant to the Chevron PSAs, regardless of whether such conveyance, transfer, assignment, or bill of sale was recorded in the appropriate records of, or approved or recognized by, the applicable Governmental Authority.

(p)     "Credit Bid Purchase Agreement" means the Purchase and Sale Agreement, dated [●], 2021, by and among FWE, certain affiliates of FWE and Credit Bid Purchaser.

(q)     "Credit Bid Purchaser" has the meaning ascribed to such term in the recitals hereto.

(r)     "Credit Bid Transaction" has the meaning ascribed to such term in the recitals hereto.

(s)     "CUSA" means Chevron U.S.A. Inc., a Pennsylvania corporation.

(t)     "Debtor" and "Debtors" has the meaning ascribed to such term in the recitals hereto.

(u)     "Effective Time" has the meaning ascribed to such term in Section 1 hereto.

(v)     "Environmental Laws" means, the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. § 9601 et seq. ("CERCLA"); the Resource Conservation and Recovery Act, 42 U.S.C. § 6901 et seq.; the Federal Water Pollution Control Act, 33 U.S.C. § 1251 et seq.; the Clean Air Act, 42 U.S.C. § 7401 et seq.; the Hazardous Materials Transportation Act, 49 U.S.C. § 5101 et seq.; the Toxic Substances Control Act, 15 U.S.C. §§ 2601 through 2629; the Oil Pollution Act, 33 U.S.C. § 2701 et seq.; the Emergency Planning and Community Right to Know Act, 42 U.S.C. § 11001 et seq.; the Endangered Species Act, 16 U.S.C. § 1531 et seq.; the Safe Drinking Water Act, 42 U.S.C. §§ 300f through 300j; the Marine Mammal Protection Act, 16 U.S.C. § 1361 et seq.; the Marine Protection, Research and Sanctuaries Act, 16 U.S.C. § 1431 et seq. and 33 U.S.C. § 1401 et seq.; the Outer Continental Shelf Lands Act, 43 U.S.C. § 1331 et seq., and the National Environmental Policy Act, 42 U.S.C. § 4321 et seq., in each case as amended in effect as of the Effective Time, and all similar Laws in effect as of the Effective Time of any Governmental Authority having jurisdiction over the property in question addressing pollution, protection of the environment, biological resources, Hazardous Substances, occupational safety, or P&A Obligations.

(w)     "Environmental Liabilities" means any and all damages, remediation, obligations, liabilities, environmental response costs, costs to cure, cost to investigate or monitor, restoration costs, costs of remediation or removal, settlements, penalties, fines, and attorneys' and

consultants fees and expenses arising out of or related to any violations or non-compliance with any Environmental Laws, including any contribution obligation under CERCLA or any other Environmental Law or matters incurred or imposed pursuant to any claim or cause of action by a Governmental Authority or other Person, attributable to any environmental liabilities, any Release of Hazardous Substances, or any other environmental condition with respect to the ownership or operation of the Assets, including conditions of FWE IV Facilities not in compliance with Laws promulgated by the Bureau of Ocean Energy Management ("BOEM"), the Bureau of Safety and Environmental Enforcement ("BSEE"), or the United States Coast Guard.

(x)     "First Merger" has the meaning ascribed to such term in the recitals hereto.

(y)     "FWE" has the meaning ascribed to such term in the recitals hereto.

(z)     "FWE I" has the meaning ascribed to such term in the recitals hereto.

(aa)    "FWE I Plan of Merger" has the meaning ascribed to such term in the recitals hereto.

(bb)    "FWE III" has the meaning ascribed to such term in the recitals hereto.

(cc)    "FWE III Assets" has the meaning ascribed to such term in Section 2(j) hereto.

(dd)    "FWE III Obligations" has the meaning ascribed to such term in Section 2(k) hereto.

(ee)    "FWE IV" has the meaning ascribed to such term in the recitals hereto.

(ff)    "FWE IV Assets" has the meaning ascribed to such term in Section 2(h) hereto.

(gg)    "FWE IV Bonds" has the meaning ascribed to such term in clause (xvi) in Part A of Schedule I attached hereto.

(hh)    "FWE IV Cash Amount" has the meaning ascribed to such term in clause (xvii) of Part A of Schedule I hereto.

(ii)    "FWE IV Contracts" has the meaning ascribed to such term in clause (viii) in Part A of Schedule I attached hereto.

(jj)    "FWE IV Facilities" has the meaning ascribed to such term in clause (ii) in Part A of Schedule I attached hereto.

(kk)    "FWE IV Lands" has the meaning ascribed to such term in clause (i) in Part A of Schedule I attached hereto.

(ll)    "FWE IV Leases" has the meaning ascribed to such term in clause (i) in Part A of Schedule I attached hereto.

8

(mm)   "FWE IV Obligations" has the meaning ascribed to such term in Section 2(i) hereto.

(nn)   "FWE IV Oil and Gas Properties" has the meaning ascribed to such term in clause (ii) in Part A of Schedule I attached hereto.

(oo)   "FWE IV Permits" has the meaning ascribed to such term in clause (v) in Part A of Schedule I attached hereto.

(pp)   "FWE IV Rights of Way" has the meaning ascribed to such term in clause (iv) in Part A of Schedule I attached hereto.

(qq)   "FWE IV Suspense Funds" has the meaning ascribed to such term in clause (xiv) in Part A of Schedule I attached hereto.

(rr)   "FWE IV Units" has the meaning ascribed to such term in clause (i) in Part A of Schedule I attached hereto.

(ss)   "FWE IV Wells" has the meaning ascribed to such term in clause (ii) in Part A of Schedule I attached hereto.

(tt)   "Governmental Authority" means any court, tribunal, arbitrator, body, agency, division, board, bureau, commission or any other similar entity exercising executive, legislative, judicial, regulatory, or administrative functions of government, or any subdivision of any of the foregoing, whether federal, state, county, municipal, tribal, local or foreign, in each case with competent jurisdiction.

(uu)   "Hazardous Substances" means any pollutant, contaminant, dangerous or toxic substance, hazardous or extremely hazardous substance or chemical, or otherwise hazardous material or waste defined as "hazardous waste", "hazardous substance" or "hazardous material" under applicable Environmental Laws, including chemicals, pollutants, contaminants, wastes, or toxic substances that are classified as hazardous, toxic, radioactive, or otherwise are regulated by, or form the basis for Environmental Liability under, any applicable Environmental Law, including hazardous substances under CERCLA.

(vv)   "Hydrocarbons" means oil and gas and other hydrocarbons produced or processed in association therewith (regardless of whether such item is in liquid or gaseous form), or any combination thereof, and any minerals (whether in liquid or gaseous form) produced in association therewith, including all crude oil, gas, casinghead gas, condensate, natural gas liquids, and other gaseous or liquid hydrocarbons (including ethane, propane, iso-butane, nor-butane, gasoline, and scrubber liquids) of any type and chemical composition.

(ww)   "Imbalance" means any over-production, under-production, over-delivery, under-delivery, or similar imbalance of Hydrocarbons produced from or allocated to the FWE III Assets or the FWE IV Assets, as applicable, regardless of whether such over-production, under-production, over-delivery, under-delivery, or similar imbalance arises at the wellhead, pipeline, gathering system, transportation system, processing plant, or other location, including any

9

imbalances under gas balancing or similar agreements, imbalances under processing agreements, and imbalances under gathering or transportation agreements.

(xx)    "JIB Advance AR" has the meaning ascribed to such term in clause (xiii) in Part A of Schedule I attached hereto.

(yy)    "Laws" means all laws (including common law), statutes, rules, regulations, ordinances, orders, decrees, requirements, judgments, and codes of Governmental Authorities.

(zz)    "Merger" has the meaning ascribed to such term in the recitals hereto.

(aaa)    "Obligation" means any individual debt, liability or obligation, damages, losses, and claims (whether direct or indirect, absolute or contingent, accrued or unaccrued, liquidated or unliquidated, or due or to become due) and including all costs and expenses relating thereto in any of the FWE III Obligations or the FWE IV Obligations; "Obligations" means, collectively, the FWE III Obligations and the FWE IV Obligations.

(bbb)    "P&A Obligations" means any and all obligations, liabilities, damages, losses, and claims arising out of or attributable to the payment or performance of all Plugging and Abandonment.

(ccc)    "Person" means any individual, corporation, partnership, limited liability company, association, joint stock company, trust, estate, joint venture, firm, association, unincorporated organization, Governmental Authority, or any other entity.

(ddd)    "Plan Effective Date" means the date on which the Plan of Reorganization becomes effective.

(eee)    "Plan of Merger" has the meaning ascribed to such term in the recitals hereto.

(fff)    "Plan of Reorganization" has the meaning ascribed to such term in the recitals hereto.

(ggg)    "Plugging and Abandonment" and "Plugged and Abandoned" and its derivatives mean all plugging, replugging, abandonment, re-plugging and re-abandonment, equipment removal, disposal, or restoration associated with the properties and assets included in or burdened by the FWE III Assets or the FWE IV Assets, as applicable, including all plugging and abandonment, removal, dismantling, decommissioning, surface and subsurface restoration, site clearance, and disposal of the FWE IV Wells or the FWE IV Facilities, well cellars, fixtures, platforms, caissons, flowlines, pipelines, structures, and personal property of whatever kind located on or under, related to, or associated with operations and activities conducted by whomever with respect to each of the FWE III Assets and the FWE IV Assets, as applicable, the flushing, pickling, burial, removal, and capping of all associated flowlines, field transmission and gathering lines, pit closures, the restoration of the surface, site clearance, any disposal of related waste materials and Hazardous Substances and obligations to obtain plugging exceptions for any of the FWE IV Wells with a current plugging exception, all in accordance with 30 CFR 250 Subpart Q

and all other applicable Laws, the terms and conditions of each of the FWE IV Leases or similar leasehold interests, beneficial interests, easements and the FWE IV Leases.

(hhh)    "Prepaid JIB Cash Amount" has the meaning ascribed to such term in clause (xiii) in Part A of Schedule I attached hereto.

(iii)    "Records" means all books, records, files, data, information, drawings, maps, corporate, financial, tax, and legal data and records to the extent (and only to the extent) related to the FWE III Assets, the FWE III Obligations, the FWE IV Assets, and/or the FWE IV Obligations, as applicable, including electronic copies of all computer records where available, Contract files (including lease files), well logs, division order files, title opinions and other title information (including abstracts, evidences of rental payments, maps, surveys, and data sheets), hazard data and surveys, production records, SEMS Documentation and Procedures, engineering files, and environmental records.

(jjj)    "Release" means any discharge, emission, spilling, leaking, emptying, escaping, pumping, pouring, injecting, dumping, burying, leaching, migrating, abandoning, or disposing into or through the environment of any Hazardous Substance, including the abandonment or discarding of barrels, containers, and other closed receptacles containing any Hazardous Substance.

(kkk)    "Royalties" means all rentals, minimum royalties, shut in payments, royalties, overriding royalties, reversionary interests, net profits interests, production payments, carried interests, non-participating royalty interests, reversionary interests, and other royalty burdens and other interests payable out of production of Hydrocarbons from or allocated to the FWE IV Assets, or the proceeds thereof to third parties.

(lll)    "SEMS Documentation and Procedures" means all documents and procedures in place as of the Effective Date by FWE III to comply with BSEE's Safety and Environmental Management System (SEMS) 30 CFR 250 Subpart S with respect to the FWE III Assets and/or the FWE IV Assets.

(mmm)"Suspense Funds" means any and all funds held in suspense by FWE III at the Effective Time, and any interest accrued in escrow accounts for such suspended funds.

(nnn)    "TBOC" has the meaning ascribed to such term in the recitals hereto.

8.    Choice of Law.  This Plan of Merger shall be governed by, construed and interpreted in accordance with the Laws of the State of Texas, without giving effect to any choice or conflict of law provision or rule (whether of the State of Texas or any other jurisdiction) that would cause the application of the Laws of any jurisdiction other than the State of Texas and without regard to any borrowing statute that would result in the application of the statutes of limitations or repose of any other jurisdiction.  In furtherance of the foregoing, the Laws of the State of Texas will control even if under such jurisdiction's choice of law or conflict of law analysis, the substantive or procedural law of some other jurisdiction would ordinarily or necessarily apply.

11

9.    FWE III Obligation to Pay Recording Expenses. FWE III shall, and shall cause its debtor affiliates in the Chapter 11 Cases to, on the Plan Effective Date, provide for the payment of any and all documentary, filing, recording, stamp, and registration fees, costs, taxes, and expenses (including all reasonable and documented attorneys' fees and regulatory consultant fees) incurred or imposed after the Effective Time in connection with the filing of record by or on behalf of FWE IV of any instrument or instruments with the appropriate records office of any county, parish, state, federal, or other governmental unit (including BOEM) that may be required in connection with the implementation of the Merger or that either FWE IV determines in its respective sole discretion to be necessary or appropriate to reflect in the appropriate records of any governmental unit that as a result of the Merger (a) ownership of the FWE IV Assets have been allocated to and are vested in FWE IV, and (b) the liabilities and obligations to be allocated to and vested in, respectively, FWE III or FWE IV pursuant to the Merger have been allocated to and vested in, and constitute liabilities and obligations of, FWE III and FWE IV, respectively.

10.    Interpretation.  The captions herein are included for convenience of reference only and shall be ignored in the construction or interpretation hereof.  As used herein, the words "include," "includes," and "including" shall be deemed to be followed by the words "without limitation" and will not be construed to limit any general statement that it follows to the specific or similar items or matters immediately following it.  Words such as "herein," "hereinafter," "hereof," and "hereunder" refer to this Plan of Merger as a whole and not merely to a subdivision in which such words appear unless the context otherwise requires.  All Exhibits and Schedules annexed hereto or referred to in this Plan of Merger are hereby incorporated in and made a part of this Plan of Merger as if set forth in full in this Plan of Merger, and definitions therein shall apply herein.  Any capitalized terms used in any Schedule or Exhibit but not otherwise defined therein will be defined as set forth in this Plan of Merger, and vice-versa.  A reference to any legislation or to any provision of any legislation shall include any modification or re-enactment thereof, any legislative provision substituted therefor, and all regulations and statutory instruments issued thereunder or pursuant thereto.

11.    Rejected Contracts.  Any Contract rejected pursuant to Section 365 of the Bankruptcy Code in the Chapter 11 Cases shall be deemed to be excluded and removed from any Exhibit or Schedule attached hereto, and any such Contract shall not be allocated to any of FWE III or FWE IV, and any liabilities or obligations of such Contract shall be treated in accordance with the Plan of Reorganization and Confirmation Order or otherwise satisfied, compromised, settled, released, or discharged pursuant to the Plan of Reorganization and Confirmation Order.

12.    Certain Amendments.  This Agreement may not be amended in a manner that is materially adverse to FWE IV except with the prior written of CUSA.  CUSA is an express third party beneficiary of this Plan of Merger.

13.    Electronic Signatures.  A manual signature on this Plan of Merger or other documents to be delivered pursuant to this Plan of Merger, an image of which shall have been transmitted electronically, will constitute an original signature for all purposes. The delivery of copies of this Plan of Merger or other documents to be delivered pursuant to this Plan of Merger, including executed signature pages where required, by electronic transmission will constitute effective delivery of this Plan of Merger or such other document for all purposes and shall have the same effect as if FWE III had executed and delivered an original of this Plan of Merger or such

other document.  Minor variations in the form of the signature page, including footers from earlier versions of this Plan of Merger or any such other document, shall be disregarded in determining FWE III's intent or the effectiveness of such signature.

\* \* \* \* \* \*

IN WITNESS WHEREOF, the undersigned has duly executed this Plan of Merger as of the date first written above.

**FIELDWOOD ENERGY III LLC**,
a Texas limited liability company

By: _____
Name:
Title:

## Schedule I

### FWE IV Assets and FWE IV Obligations[1]

Part A:

"FWE IV Assets" means all of FWE III's right, title, and interest in, to, or under the following:

(i)      all ownership or other interests of FWE III of any kind or nature in the oil, gas, other Hydrocarbon and mineral leases, subleases, operating rights, record title interests, carried interests, royalties, overriding royalty interests, net profits interests, production payments, reversionary interests and other rights or interests of any kind or character in or to Hydrocarbons in place described on Exhibit I-A(i) and Exhibit I-A(ii) attached hereto (including following their termination or expiration), but, in the case of Exhibit I-A(i), only to the extent such ownership interests were Conveyed to FWE or its affiliates pursuant to the Chevron PSAs, and mineral interests or servitudes of every nature, in, on, under, and that may be produced from or attributable to any of the lands covered by such leases, subleases, interests and rights, whether legal or equitable, vested or contingent, and regardless of whether the same are expired or terminated (provided that, with respect to any US OCS oil and gas leases or other assets that are expired or terminated as of the Effective Time, it is acknowledged that (i) such oil and gas leases may not be assignable to the extent they no longer exist, but are being allocated hereby) and (ii) the intent of this definition is to include all interests, rights and obligations held by FWE (including for purposes of the definition of FWE Obligations) with respect to such oil and gas leases as of the Effective Time, if any, but, in the case relating to the interests listed on Exhibit I-A(i), only to the extent such ownership or other interests were Conveyed to FWE or its affiliates pursuant to the Chevron PSAs) (collectively, the "FWE IV Leases"), together with all pooled, communitized, or unitized acreage that includes all or part of any of the FWE IV Leases (the "FWE IV Units"), and all tenements, hereditaments, and appurtenances belonging to the FWE IV Leases and the FWE IV Units (collectively with the FWE IV Leases and FWE IV Units, the "FWE IV Lands"); for the avoidance of doubt, with respect to the FWE IV Leases described on Exhibit I-A(i), the FWE IV Lands comprising a part of the FWE IV Assets shall only include the ownership interests therein Conveyed to FWE or its affiliates pursuant to the Chevron PSAs, and the descriptions in Exhibit I-A(i) shall only reference such ownership interests;

(ii)     all ownership interests of FWE III in the Hydrocarbon, water, CO2, injection, disposal wells or other wells described on Exhibit I-B(i) and Exhibit I-B(ii) attached hereto, but, in the case of Exhibit I-B(i), only to the extent such ownership interests were Conveyed to FWE or its affiliates pursuant to the Chevron PSAs (the "FWE IV Wells" and, together with the FWE IV Leases and the FWE IV Units, the "FWE IV Oil and Gas Properties"); for the avoidance of doubt, (x) in the case of Exhibit I-B(i), the FWE IV Wells comprising a part of the FWE IV Assets shall only include the ownership interests therein Conveyed to FWE or its affiliates pursuant to the Chevron PSAs, and the descriptions in Exhibit I-B(i) shall only reference such ownership interests and (y) rights conveyed to FWE IV pursuant to clause (i) and this clause (ii) include all

---

[1] Note to Draft: Certain interests to be allocated to FWE IV are held by subsidiaries of Fieldwood Energy LLC.  TBD how such interests will be moved to Fieldwood Energy LLC prior to this merger (or otherwise will ultimately be transferred to FWE IV).

rights of FWE III to operate or as to operatorship of the FWE IV Oil and Gas Properties to the extent such rights were Conveyed to FWE or its affiliates pursuant to the Chevron PSAs or otherwise derived from rights and interests Conveyed to FWE or its affiliates pursuant thereto;

(iii)    all platforms identified on Exhibit I-C(i) attached hereto and all facilities identified on Exhibit I-C(ii) attached hereto, including all associated processing systems, buildings, compressors, meters, tanks, machinery, tools, personal property, equipment (including spars, trees, PLETs, jumpers, flowlines, risers, umbilicals, control assemblies, and production handling equipment), pipelines, gathering lines, water lines, tank batteries, pipeline capacity, other water gathering, transportation, or disposal infrastructure and equipment, frac tanks, ponds, metering facilities, interconnections, and other inventory, boats, vehicles, fixtures, improvements, and other property (whether real, immovable, personal, movable, mixed or otherwise), which were acquired by FWE or its affiliates pursuant to the Chevron PSAs, but in such event only as to the interests (A) so acquired by FWE or its affiliates under and pursuant to such Chevron PSAs or (B) relating to the interests described on Exhibit I-A(ii) and Exhibit I-B(ii) (the "FWE IV Facilities");

(iv)    all surface fee interests, easements, right-of-use easements, licenses, servitudes, rights-of-way, surface leases, authorizations, permits, and other rights to use the surface or seabed described on Exhibit I-D(i) attached hereto and Exhibit I-D(ii) attached hereto, but only to the extent such were acquired by FWE or its affiliates pursuant to the Chevron PSAs, and only as to the interests (A) so acquired by FWE or its affiliates under and pursuant to such Chevron PSAs or (B) relating to the interests described on Exhibit I-A(ii) and Exhibit I-B(ii) (the "FWE IV Rights of Way");

(v)    all environmental and other governmental (whether federal, state, or local) permits (including all plans filed with or approved by applicable Governmental Authorities), licenses, orders, authorizations, franchises, and related instruments or rights described on Exhibit I-E attached hereto (the "FWE IV Permits");

(vi)    all Hydrocarbons in, on, under, or that may be produced from or attributable to the FWE IV Leases, the FWE IV Units, or the FWE IV Wells, including all oil, condensate, and scrubber liquids inventories and ethane, propane, iso-butane, nor-butane, and gasoline inventories of FWE III from the FWE IV Oil and Gas Properties in storage or constituting linefill and Imbalances;

(vii)    the FCC licenses associated with the call signs listed on Exhibit I-F attached hereto;

(viii)    all (A) joint operating agreements or unit operating agreements and (B) all other Contracts listed on Exhibit I-G, in each case, to the extent relating to the ownership or operation of any or all of the FWE IV Oil and Gas Properties (the "FWE IV Contracts");

(ix)    originals of the Records that relate exclusively to any one or more of the FWE IV Assets or the FWE IV Obligations, or both, and copies of the Records that constitute FWE I Assets (as defined in the FWE I Plan of Merger) or FWE III Assets and also relate to either or both of the FWE IV Assets or the FWE IV Obligations;

(x)     inventory, equipment, machinery, tools, and other personal property, to the extent located on the FWE IV Facilities or, if located elsewhere, used or held for use exclusively in connection with the FWE IV Oil and Gas Properties, or the FWE IV Facilities, or charged to the joint account pursuant to the applicable FWE IV Contracts;

(xi)     FWE III-owned SCADA equipment and all automation systems, including meters and related telemetry, licensed radio frequencies, and associated communications infrastructure including towers, antennas, data links, and network circuits used or held for use exclusively in connection with the FWE IV Oil and Gas Properties or the FWE IV Facilities, or for the production of Hydrocarbons therefrom;

(xii)     all deposits with third parties, escrow accounts, guarantees, letters of credit, treasury securities, insurance policies, Oil Spill Financial Responsibility coverage (whether consisting of one or more insurance policies) and other forms of credit assurances or credit support provided by a third party for financial assurance for the obligations and liabilities arising out of or related to the FWE IV Assets, including the P&A Obligations arising out of or related to the FWE IV Assets, in each case only to the extent described on **Exhibit I-H**;

(xiii)     all (i) accounts receivable attributable to the FWE IV Oil and Gas Properties as of the Effective Time, if any, other than the Closing Accounts Receivable (ii) rights to insurance proceeds or other claims of recovery, indemnity, contribution, or reimbursement for any casualty occurring on or at any FWE IV Asset, whether occurring prior to, on or after the Effective Time, (iii) instruments and general intangibles (as such terms are defined in the Uniform Commercial Code of the applicable jurisdictions in which the FWE IV Oil and Gas Properties to which such assets relate are located) and other economic benefits in each case attributable to the FWE IV Oil and Gas Properties (excluding only the Closing Accounts Receivable); *provided*, that, for the avoidance of doubt, nothing in the preceding clauses (i) or (ii) shall be interpreted to limit the scope of "Closing Accounts Receivable" as that term is defined in the Credit Bid Purchase Agreement, (iv) claims of indemnity, contribution, or reimbursement relating to the FWE IV Obligations, (v) Imbalances receivables of FWE III attributable to the FWE IV Oil and Gas Properties, (vi) cash in the amount of advance payments on account of third party working interest owners in the FWE IV Oil and Gas Properties ("Prepaid JIB Cash Amount"), to the extent such Prepaid JIB Cash Amount is associated with FWE IV Obligations, and (vii) rights to receive and collect cash and advance payments pursuant to cash calls associated with the FWE IV Oil and Gas Properties ("JIB Advance AR"), to the extent such JIB Advance AR is associated with FWE IV Obligations;

(xiv)     all Suspense Funds to the extent attributable to any of the FWE IV Oil and Gas Properties (collectively, "FWE IV Suspense Funds");

(xv)     unless rejected by the Debtors in the Chapter 11 Cases, the Chevron PSAs and the other transaction documents entered into in connection with the consummation of the transactions contemplated thereby, in each case to the extent related to the FWE IV Assets;

(xvi)     all rights to all area-wide operator bonds described on Exhibit I-I attached hereto (the "FWE IV Bonds");

3

(xvii) cash in an amount (the "<u>FWE IV Cash Amount</u>") equal to $19,469,669.00; and

(xviii) all rights of FWE III under Section 6 of the FWE I Plan of Merger to the extent related to the FWE IV Assets.

<u>Part B</u>:

"<u>FWE IV Obligations</u>" means (A) all of the obligations and liabilities (contractual or otherwise) of FWE III as of the Effective Time (which shall include such obligations and liabilities of FWE as of immediately prior to the effective time of the First Merger which were vested in and became Obligations of FWE III as of the effective time of the First Merger), without duplication, of any kind, character, or description (whether known or unknown, accrued, absolute, contingent, or otherwise, including claims thereunder) relating to, arising out of, or with respect to any of the FWE IV Assets, including obligations and liabilities of FWE immediately before the First Merger, and of FWE III as of the Effective Time: (i) relating to the furnishing of makeup gas according to the terms of applicable gas sales, gathering, or transportation FWE IV Contracts and all liabilities and obligations with respect to Imbalances arising out of, related to, or attributable to FWE IV's ownership interests in any of the FWE IV Oil and Gas Properties; (ii) with respect to Royalties arising out of, related to, or attributable to any of the FWE IV Oil and Gas Properties, FWE IV Suspense Funds, and Prepaid JIB Cash Amounts, including any reporting and/or mis-reporting, and payment and/or mis-payment of such Royalties, FWE IV Suspense Funds, or Prepaid JIB Cash Amounts; (iii) constituting or related to Environmental Liabilities arising out of, related to, or attributable to any of the FWE IV Assets; (iv) applicable to or imposed on the lessee, owner, operator, holder, responsible party, payor or designated applicant under or with respect to any of the FWE IV Assets; (v) constituting or relating to any and all P&A Obligations related to FWE IV's ownership interests in, or operation of, any of the FWE IV Assets; (vi) relating to the FWE IV Suspense Funds; (vii) relating to the Chevron PSAs (unless rejected by the Debtors in the Chapter 11 Cases) or any of the other agreements entered into in connection with the consummation of the transactions contemplated thereby, in each case to the extent related to the FWE IV Assets; and (viii) expenses incurred by FWE or FWE III for Plugging and Abandonment costs and expenses on the FWE IV Assets between the filing on August 3, 2020, of the Chapter 11 Cases and the Effective Time to the extent not paid as of the Effective Time; and (B) the Obligations of FWE IV under Section 3(b)(i) of the Plan of Merger and the Obligations of FWE III under Section 6 of the FWE I Plan of Merger to the extent related to the FWE IV Assets; provided, however, that, subject to the foregoing <u>clause (B)</u>, the FWE IV Obligations do not include any claims, liabilities, or obligations satisfied, compromised, settled, released, or discharged pursuant to the Plan of Reorganization and Confirmation Order, and, for the avoidance of doubt, no other claims, obligations or liabilities of any kind.

**<u>Schedule of Exhibits</u>**

| | |
|---|---|
| Exhibit A: | Certificate of Merger |
| Exhibit B-A: | Certificate of Formation – FWE IV |
| Exhibit B-B | FWE IV LLC Agreement |
| Exhibit I-A(i): | FWE IV Leases |
| Exhibit I-A(ii): | Certain Other FWE IV Leases |
| Exhibit I-B(i): | FWE IV Wells |
| Exhibit I-B(ii): | Certain Other FWE IV Wells |
| Exhibit I-C(i): | FWE IV Platforms |
| Exhibit I-C(ii): | FWE IV Facilities |
| Exhibit I-D(i): | FWE IV Rights of Way |
| Exhibit I-D(ii): | FWE IV RUEs |
| Exhibit I-E: | FWE IV Permits |
| Exhibit I-F: | FWE IV FCC Licenses |
| Exhibit I-G | FWE IV Contracts |
| Exhibit I-H | FWE IV Financial Assurances |
| Exhibit I-I: | FWE IV Bonds |

[End of Schedule of Exhibits]

## **Exhibit A**

### **Certificate of Merger**

[see attached]

**CERTIFICATE OF MERGER**
**(DOMESTIC ENTITY DIVISIONAL MERGER)**
**OF**
**FIELDWOOD ENERGY III LLC**

**[●], 2021**

Pursuant to Title 1, Chapter 10 and Title 3 of the Texas Business Organizations Code (the "TBOC"), the undersigned, Fieldwood Energy III LLC, a Texas limited liability company ("FWE III"), submits this certificate of merger for the purpose of dividing itself into a surviving domestic entity and one new domestic entity, and hereby certifies the following:

FIRST:  The name of the domestic filing entity that is dividing itself is Fieldwood Energy III LLC.

SECOND:  The principal place of business of FWE III is 2000 W Sam Houston Pkwy S #1200, Houston, TX 77042.

THIRD:  The filing number issued to FWE III by the Secretary of State of the State of Texas is [●][1].

FOURTH:  FWE III is organized as a limited liability company.

FIFTH: FWE III shall survive the merger and shall maintain its separate existence and continue as a filing entity under its name as of immediately prior to the merger.

SIXTH:  In lieu of providing the plan of merger, the filing entity certifies that:

(i) An executed copy of the Agreement and Plan of Merger, dated as of [●], 2021 (the "Plan of Merger"), of FWE III is on file at the principal place of business of each surviving and new domestic entity provided in this form.

(ii) On written request, a copy of the Plan of Merger will be furnished without cost by each surviving or new domestic entity to any member of any domestic entity that is a party to or created by the Plan of Merger, and any creditor or obligee of the parties to the merger at the time of the merger if a liability or obligation is then outstanding.

SEVENTH:  No amendments to the certificate of formation of FWE III are being effected by the merger.

EIGHTH:  The name, jurisdiction of organization, principal place of business address, and entity description of the entity to be created pursuant to the plan of merger are set forth below. The

---

[1] **Note to Draft**:  To be assigned upon conversion of FWE to a Texas LLC.

certificate of formation of the new domestic filing entity to be created is being filed with this certificate of merger.

    <u>Name</u>:  Fieldwood Energy IV LLC

    <u>Entity Description</u>:  limited liability company

    <u>Jurisdiction of Organization</u>:  Texas

    <u>Principal place of business</u>: 200 W. Sam Houston Pkwy S. Suite 1200.

    NINTH:  The Plan of Merger has been approved as required by the laws of the jurisdiction of formation and by the governing documents of the filing entity.

    TENTH:  This document becomes effective when the document is accepted and filed by the Secretary of State of the State of Texas.

    ELEVENTH:  In lieu of providing the tax certificate, FWE III shall continue to be liable for the payment of all required franchise taxes of FWE III.

*  *  *  *  *  *

2

IN WITNESS WHEREOF, the undersigned has caused this certificate of merger to be duly executed as of the date first set forth above.

**FIELDWOOD ENERGY III LLC**
a Texas limited liability company

By: _____
Name: _____
Title: _____

**<u>Exhibit B-A</u>**

**Certificate of Formation – FWE IV**

[see attached]

| Form 205<br>(Revised 05/11)<br><br>Submit in duplicate to:<br>Secretary of State<br>P.O. Box 13697<br>Austin, TX 78711-3697<br>512 463-5555<br>FAX: 512 463-5709<br>**Filing Fee: $300** | <br><br>**Certificate of Formation<br>Limited Liability Company** | This space reserved for office use. |
|---|---|---|

## Article 1 – Entity Name and Type

The filing entity being formed is a limited liability company.  The name of the entity is:

FIELDWOOD ENERGY IV LLC
_____
The name must contain the words "limited liability company," "limited company," or an abbreviation of one of these phrases.

## Article 2 – Registered Agent and Registered Office
(See instructions. Select and complete <u>either</u> A or B and complete C.)

☒  A.  The initial registered agent is an organization (cannot be entity named above) by the name of:

CAPITOL CORPORATE SERVICES, INC.
_____
**OR**
☐  B.  The initial registered agent is an individual resident of the state whose name is set forth below:

_____
*First Name*                          *M.I.*          *Last Name*                                    *Suffix*

C.  The business address of the registered agent and the registered office address is:

| 206 E. 9TH STREET, SUITE 1300 | AUSTIN | TX | 78701 |
|---|---|---|---|
| *Street Address* | *City* | *State* | *Zip Code* |

## Article 3—Governing Authority
(Select and complete <u>either</u> A or B and provide the name and address of each governing person.)

☒  A.  The limited liability company will have managers. The name and address of each initial manager are set forth below.

☐  B.  The limited liability company will not have managers.  The company will be governed by its members, and the name and address of each initial member are set forth below.

| **GOVERNING PERSON 1** | | | | |
|---|---|---|---|---|
| **NAME** (Enter the name of either an individual or an organization, but not both.)<br>    **IF INDIVIDUAL** | | | | |
| *First Name*            *M.I.*          *Last Name*                                    *Suffix*<br>**OR**<br>**IF ORGANIZATION** | | | | |
| Sunset Energy Gulf Coast Asset Management LLC | | | | |
| *Organization Name* | | | | |
| **ADDRESS** | | | | |
| 1727 Sunset Boulevard | Houston | TX | USA | 77005 |
| *Street or Mailing Address* | *City* | *State* | *Country* | *Zip Code* |

Form 205                                                              4

| **GOVERNING PERSON 2** |
|---|

**NAME** (Enter the name of either an individual or an organization, but not both.)

**IF INDIVIDUAL**

| *First Name* | *M.I.* | *Last Name* | *Suffix* |
|---|---|---|---|

**OR**

**IF ORGANIZATION**

*Organization Name*

**ADDRESS**

| *Street or Mailing Address* | *City* | *State* | *Country* | *Zip Code* |
|---|---|---|---|---|

| **GOVERNING PERSON 3** |
|---|

**NAME** (Enter the name of either an individual or an organization, but not both.)

**IF INDIVIDUAL**

| *First Name* | *M.I.* | *Last Name* | *Suffix* |
|---|---|---|---|

**OR**

**IF ORGANIZATION**

*Organization Name*

**ADDRESS**

| *Street or Mailing Address* | *City* | *State* | *Country* | *Zip Code* |
|---|---|---|---|---|

## Article 4 – Purpose

The purpose for which the company is formed is for the transaction of any and all lawful purposes for which a limited liability company may be organized under the Texas Business Organizations Code.

### Supplemental Provisions/Information

Text Area: [The attached addendum, if any, is incorporated herein by reference.]

The entity is formed pursuant to a plan of merger. The name of the merging filing entity is Fieldwood Energy III LLC; the surviving domestic entity is Fieldwood Energy III LLC and the new domestic entity created by the divisive merger is this Fieldwood Energy IV LLC.

The address of the merging filing entity is 2000 W. Sam Houston Pkwy. S., Suite 1200, Houston, Texas 77042.

The merging filing entity was previously a Delaware limited liability company, originally formed on 11/5/2012 under the laws of the State of Delaware, USA. The merging filing entity converted to a Texas limited liability company on [___]/[___]/2021.

## Organizer

The name and address of the organizer:

_____
*Name*

_____
*Street or Mailing Address*                    *City*                    *State*    *Zip Code*

## Effectiveness of Filing (Select either A, B, or C.)

A. ☒ This document becomes effective when the document is filed by the secretary of state.

B. ☐ This document becomes effective at a later date, which is not more than ninety (90) days from the date of signing.  The delayed effective date is: _____

C. ☐ This document takes effect upon the occurrence of the future event or fact, other than the passage of time.  The 90th day after the date of signing is: _____

The following event or fact will cause the document to take effect in the manner described below:

_____
|                                                               |
|_____|

## Execution

The undersigned affirms that the person designated as registered agent has consented to the appointment.  The undersigned signs this document subject to the penalties imposed by law for the submission of a materially false or fraudulent instrument and certifies under penalty of perjury that the undersigned is authorized to execute the filing instrument.

Date: _____

_____
Signature of organizer

_____
Printed or typed name of organizer

**Print**     **Reset**

TX060BOC - 11/27/2013 Wolters Kluwer Online

**<u>Exhibit B-B</u>**

**FWE IV LLC Agreement**

[see attached]

# LIMITED LIABILITY COMPANY AGREEMENT

## OF

## FIELDWOOD ENERGY IV LLC

*(a Texas Limited Liability Company)*

**[●], 2021**

**THE MEMBERSHIP INTERESTS REFERENCED IN THIS LIMITED LIABILITY COMPANY AGREEMENT HAVE BEEN ACQUIRED FOR INVESTMENT AND HAVE NOT BEEN REGISTERED UNDER THE U.S. SECURITIES ACT OF 1933, AS AMENDED, OR UNDER ANY APPLICABLE STATE SECURITIES LAWS. SUCH MEMBERSHIP INTERESTS MAY NOT BE SOLD, ASSIGNED, PLEDGED, HYPOTHECATED OR OTHERWISE DISPOSED OF AT ANY TIME WITHOUT EFFECTIVE REGISTRATION UNDER SUCH ACT AND LAWS OR EXEMPTION THEREFROM, AS WELL AS COMPLIANCE WITH THE OTHER SUBSTANTIAL RESTRICTIONS ON TRANSFERABILITY THAT ARE SET FORTH HEREIN.**

# TABLE OF CONTENTS

**ARTICLE I DEFINITIONS** ...............................................................................1
    **Section 1.01**    **Definitions** .................................................1
    **Section 1.02.**   **Interpretation** ............................................12

**ARTICLE II ORGANIZATION** .......................................................................13
    **Section 2.01**    **Formation** ..................................................13
    **Section 2.02**    **Name** .........................................................13
    **Section 2.03**    **Principal Office** .......................................13
    **Section 2.04**    **Registered Office; Registered Agent.** ...13
    **Section 2.05**    **Purposes; Powers.** ...................................14
    **Section 2.06**    **Term** ..........................................................14

**ARTICLE III CAPITAL CONTRIBUTIONS; CAPITAL ACCOUNTS** ...........14
    **Section 3.01**    **Tax Partnership Provisions** ...................14
    **Section 3.02**    **Initial Capital Contributions** ...............14
    **Section 3.03**    **Additional Capital Contributions** .........14
    **Section 3.04**    **Maintenance of Capital Accounts** .........14
    **Section 3.05**    **Succession Upon Transfer** .....................15
    **Section 3.06**    **Negative Capital Accounts** ....................15
    **Section 3.07**    **No Withdrawals from Capital Accounts** .15
    **Section 3.08**    **Treatment of Loans from Members** ........15
    **Section 3.09**    **Modifications** ...........................................16

**ARTICLE IV MEMBERS** ..............................................................................16
    **Section 4.01**    **No Personal Liability** .............................16
    **Section 4.02**    **No Withdrawal** ........................................16
    **Section 4.03**    **No Interest in Company Property** .........16
    **Section 4.04**    **Certification of Membership Interests** ..16
    **Section 4.05**    **Meetings of Members** ..............................17
    **Section 4.06**    **Action Without Meeting** .........................18
    **Section 4.07**    **Power of Members** ...................................18
    **Section 4.08**    **Similar or Competitive Activities; Business Opportunities** ...18

**ARTICLE V ALLOCATIONS** ........................................................................19
    **Section 5.01**    **Tax Partnership Provisions** ...................19
    **Section 5.02**    **Allocation of Net Income and Net Loss** ..19
    **Section 5.03**    **Regulatory and Special Allocations** ......19

i

Section 5.04     **Tax Allocations**..............................................................................20
Section 5.05     **Allocations in Respect of Transferred Membership Interests**............22

**ARTICLE VI DISTRIBUTIONS** ..........................................................................**22**

Section 6.01     **General**........................................................................................22
Section 6.02     **Tax Advances**..............................................................................23
Section 6.03     **Tax Withholding; Withholding Advances**......................................23
Section 6.04     **Distributions in Kind**....................................................................24

**ARTICLE VII MANAGEMENT** ............................................................................**25**

Section 7.01     **Management of the Company** .......................................................25
Section 7.02     **Sole Manager** ..............................................................................25
Section 7.03     **Material Project Contracts; Net Profit Interest** ..............................25
Section 7.04     **Actions Requiring CUSA Consent** ...............................................26
Section 7.05     **No Compensation of the Sole Manager** ........................................27
Section 7.06     **No Personal Liability** ...................................................................27

**ARTICLE VIII TRANSFER** ..................................................................................**28**

Section 8.01     **General Restrictions on Transfer**..................................................28

**ARTICLE IX EXCULPATION AND INDEMNIFICATION** ..................................**29**

Section 9.01     **Exculpation of Covered Persons**...................................................29
Section 9.02     **Liabilities and Duties of Covered Persons**.....................................30
Section 9.03     **Indemnification**............................................................................30
Section 9.04     **Survival**.......................................................................................32

**ARTICLE X ACCOUNTING; TAX MATTERS** ....................................................**33**

Section 10.01    **Financial Statements and Other Information**..................................33
Section 10.02    **Inspection Rights** ........................................................................33
Section 10.03    **Income Tax Status** ......................................................................34
Section 10.04    **Tax Matters Representative**..........................................................34
Section 10.05    **Tax Returns** ................................................................................35
Section 10.06    **Company Funds** ..........................................................................36

**ARTICLE XI WINDING UP AND TERMINATION** ............................................**36**

Section 11.01    **Events Requiring Winding Up** ......................................................36
Section 11.02    **Effectiveness of Termination** ........................................................36
Section 11.03    **Liquidation** .................................................................................37

ii

**Section 11.04**   **Certificate of Termination** ...................................................38
**Section 11.05**   **Survival of Rights, Duties, and Obligations** ...........................38
**Section 11.06**   **Recourse for Claims** .......................................................38

**ARTICLE XII MISCELLANEOUS** ...............................................................**38**
   **Section 12.01**   **Expenses** ..........................................................................38
   **Section 12.02**   **Further Assurances** ..........................................................38
   **Section 12.03**   **Confidentiality** .................................................................39
   **Section 12.04**   **Notices** .............................................................................40
   **Section 12.05**   **Headings** ...........................................................................41
   **Section 12.06**   **Severability** ......................................................................41
   **Section 12.07**   **Entire Agreement** .............................................................41
   **Section 12.08**   **Successors and Assigns** ....................................................41
   **Section 12.09**   **No Third-Party Beneficiaries** .........................................41
   **Section 12.10**   **Amendment** ......................................................................42
   **Section 12.11**   **Waiver** ..............................................................................42
   **Section 12.12**   **Governing Law** .................................................................42
   **Section 12.13**   **Submission to Jurisdiction** .............................................42
   **Section 12.14**   **Waiver of Jury Trial** .......................................................42
   **Section 12.15**   **Equitable Remedies** .........................................................43
   **Section 12.16**   **Attorney's Fees** ................................................................43
   **Section 12.17**   **Remedies Cumulative** ......................................................43
   **Section 12.18**   **Counterparts** ....................................................................43

**SCHEDULE A MEMBERS SCHEDULE**             A-1

WEIL:\97901822\22\45327.0007

## LIMITED LIABILITY COMPANY AGREEMENT OF
## FIELDWOOD ENERGY IV LLC

This Limited Liability Company Agreement of Fieldwood Energy IV LLC, a Texas limited liability company (the "**Company**"), dated as of [●], 2021 (this "**Agreement**"), is entered into by and among the Company, the Initial Member executing this Agreement as of the date hereof, and each other Person who after the date hereof becomes a Member of the Company and becomes a party to this Agreement by executing a joinder agreement in form and substance acceptable to the Company.

### RECITALS

**WHEREAS,** the Company was formed under the laws of the State of Texas by the filing of a Certificate of Formation with the Secretary of State of the State of Texas on [●], 2021 (the "**Certificate of Formation**") for the purposes set forth in Section 2.05 of this Agreement;

**WHEREAS,** pursuant to and in accordance with the Confirmation Order and the Term Sheet, respectively, and as a result of a divisive merger pursuant to § 10.008 of the BOC, the Company owns the FWE IV Assets, subject to the operational liabilities in connection therewith allocated to the Company in the merger, including the FWE IV Obligations; and

**WHEREAS,** the Initial Member wishes to enter into this Agreement to set forth the terms and conditions governing the ownership, operation and management of the Company.

**NOW, THEREFORE,** in consideration of the mutual covenants and agreements hereinafter set forth and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

### ARTICLE I
### DEFINITIONS

**Section 1.01   Definitions.**  Capitalized terms used herein and not otherwise defined shall have the meanings set forth in this Section 1.01:

"**Adjusted Capital Account Deficit**" means, with respect to any Member, the deficit balance, if any, in such Member's Capital Account as of the end of the relevant Fiscal Year, after giving effect to the following adjustments:

(a)     crediting to such Capital Account any amount that such Member is obligated to restore or is deemed to be obligated to restore pursuant to Treasury Regulations Sections 1.704-1(b)(2)(ii)(c), 1.704-2(g)(1) and 1.704-2(i); and

(b)     debiting to such Capital Account the items described in Treasury Regulations Section 1.704-1(b)(2)(ii)(d)(4), (5) and (6).

"**Adjusted Taxable Income**" of a Member, or if the Member is disregarded for U.S. federal income tax purposes, the members or beneficiaries of such Member, for a Fiscal Year (or

portion thereof) with respect to the Membership Interest held by such Member means the federal taxable income allocated by the Company to the Member with respect to its Membership Interest (as adjusted by any final determination in connection with any tax audit or other proceeding) for such Fiscal Year (or portion thereof); provided, that such taxable income shall be computed (i) minus any excess taxable loss of the Company for any prior period allocable to such Member with respect to its Membership Interest that were not previously taken into account for purposes of determining such Member's Adjusted Taxable Income in a prior Fiscal Year to the extent such loss would be available under the Code to offset income of the Member (or, as appropriate, the direct or indirect owners of the Member) determined as if the income and loss from the Company were the only income and loss of the Member (or, as appropriate, the direct or indirect owners of the Member) in such Fiscal Year and all prior Fiscal Years, and (ii) taking into account any special basis adjustment with respect to such Member resulting from an election by the Company under Code Section 754.

"**Affiliate**" means, with respect to any Person, any other Person who, directly or indirectly (including through one or more intermediaries), controls, is controlled by, or is under common control with, such Person. For purposes of this definition, "control," when used with respect to any specified Person, shall mean the power, direct or indirect, to direct or cause the direction of the management and policies of such Person, whether through ownership of voting securities or partnership or other ownership interests, by contract or otherwise; and the terms "controlling" and "controlled" shall have correlative meanings. For the avoidance of doubt, neither CUSA nor any of its Subsidiaries nor Credit Bid Purchaser nor any of its Subsidiaries control the Company and none of them shall constitute an Affiliate of the Company.

"**Agreement**" has the meaning set forth in the Preamble.

"**Applicable Law**" means all applicable provisions of (a) constitutions, treaties, statutes, laws (including the common law), rules, regulations, decrees, ordinances, codes, proclamations, declarations, or orders of any Governmental Authority; (b) any consents or approvals of any Governmental Authority; and (c) any orders, decisions, advisory or interpretative opinions, injunctions, judgments, awards, decrees of, or agreements with, any Governmental Authority.

"**Bankruptcy**" means (i) the filing by the Company of a petition under the Bankruptcy Code seeking to adjudicate the Company a bankrupt or an insolvent or otherwise commencing, authorizing, or acquiescing in the commencement of a proceeding or cause of action seeking liquidation, winding up, reorganization, arrangement, adjustment, protection, composition, or other relief with respect to itself or its debts under any bankruptcy, insolvency, or other similar law now or hereafter in effect or seeking the appointment of a trustee, receiver, liquidator, custodian, or other similar official over it or any substantial part of its property, or consenting to any such relief or to the appointment of or taking possession by any such official in an involuntary case or other proceeding commenced against it, or taking any corporate or similar official action to authorize any of the foregoing; (ii) the making of an assignment or any general arrangement for the benefit of creditors; or (iii) the Company's filing an answer or other pleading admitting or failing to contest the allegations of a petition filed against it in any proceeding of the foregoing nature, or taking any other action to authorize any of the actions set forth above.

WEIL:\97901822\22\45327.0007

"**Bankruptcy Code**" means title 11 of the United States Code, 11 U.S.C. §§ 101, et seq., as amended.

"**BOC**" means the Texas Business Organizations Code, as amended and in effect from time to time.

"**Book Depreciation**" means, with respect to any Company asset for each Fiscal Year, the Company's depreciation, amortization, or other cost recovery deductions determined for federal income tax purposes, except that if the Book Value of an asset differs from its adjusted tax basis at the beginning of such Fiscal Year, Book Depreciation shall be (a) if such difference is being eliminated by use of the remedial method under Treasury Regulations Section 1.704-3(d), the amount of book basis recovered for such period under the rules prescribed by Treasury Regulations Section 1.704-3(d)(2), or (b) if the remedial method is not used, an amount which bears the same ratio to such beginning Book Value as the federal income tax depreciation, amortization, or other cost recovery deduction for such Fiscal Year bears to such beginning adjusted tax basis; provided, that if the adjusted tax basis for federal income tax purposes of an asset at the beginning of such Fiscal Year is zero and the Book Value of the asset is positive, Book Depreciation shall be determined with reference to such beginning Book Value using any permitted method selected by the Sole Manager in accordance with Treasury Regulations Section 1.704-1(b)(2)(iv)(g)(3).

"**Book Value**" means, with respect to any Company asset, the adjusted basis of such asset for federal income tax purposes, except as follows:

(a)      the initial Book Value of any Company asset contributed by a Member to the Company shall be the gross Fair Market Value of such Company asset as of the date of such contribution;

(b)      immediately before the distribution by the Company of any Company asset to a Member, the Book Value of such asset shall be adjusted to its gross Fair Market Value as of the date of such distribution;

(c)      the Book Value of all Company assets may, in the sole discretion of the Sole Manager, be adjusted to equal their respective gross Fair Market Values, as reasonably determined by the Sole Manager, as of the following times:

(i)      the acquisition of an additional Membership Interest in the Company by a new or existing Member in consideration for more than a *de minimis* Capital Contribution;

(ii)      the distribution by the Company to a Member of more than a *de minimis* amount of property (other than cash) as consideration for all or a part of such Member's Membership Interest in the Company; and

(iii)      the liquidation of the Company within the meaning of Treasury Regulations Section 1.704-1(b)(2)(ii)(g);

3

(d)      the Book Value of each Company asset shall be increased or decreased, as the case may be, to reflect any adjustments to the adjusted tax basis of such Company asset pursuant to Code Section 734(b) or Code Section 743(b), but only to the extent that such adjustments are taken into account in determining Capital Account balances pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)(m); provided, that Book Values shall not be adjusted pursuant to this paragraph (d) to the extent that an adjustment pursuant to paragraph (c) above is made in conjunction with a transaction that would otherwise result in an adjustment pursuant to this paragraph (d); and

(e)      if the Book Value of a Company asset has been determined pursuant to paragraph (a) or adjusted pursuant to paragraphs (c) or (d) above, such Book Value shall thereafter be adjusted to reflect the Book Depreciation taken into account with respect to such Company asset for purposes of computing Net Income and Net Losses.

"**Business Day**" means a day other than a Saturday, Sunday or other day on which commercial banks in the State of Texas are authorized or required to close.

"**Capital Account**" has the meaning set forth in Section 3.04.

"**Capital Contribution**" means, for any Member, the total amount of cash and cash equivalents and the Book Value of any property contributed to the Company by such Member.

"**Certificate of Formation**" has the meaning set forth in the Recitals.

"**Certificate of Merger**" means that certain Certificate of Merger filed by Fieldwood III with the Secretary of State of the State of Texas on [●], 2021.

"**Certificate of Termination**" means a certificate to be filed upon completion of the winding up and liquidation of the Company as set forth in Section 11.04, which certificate shall be in the form required by § 11.101 of the BOC.

"**Code**" means the Internal Revenue Code of 1986, as amended.

"**Company**" has the meaning set forth in the Preamble.

"**Company Minimum Gain**" means "partnership minimum gain" as defined in Treasury Regulations Section 1.704-2(b)(2), substituting the term "Company" for the term "partnership" as the context requires.

"**Confidential Information**" has the meaning set forth in Section 12.03(a).

"**Confirmation Order**" means the confirmation order entered in Chapter 11 Case 20-33948, In re: Fieldwood Energy LLC, *et al*, in the United States Bankruptcy Court for the Southern District of Texas, Houston Division.

"**Continuance**" has the meaning set forth in Section 11.01.

"**Contract Operating Agreement**" means that certain Contract Operating Agreement of even date herewith by and among Credit Bid Purchaser and the Company, of which CUSA is an express third party beneficiary.

"**Covered Person**" has the meaning set forth in Section 9.01(a).

"**Credit Bid Purchaser**" means Mako Buyer LLC, a Delaware limited liability company.

"**CUSA**" means Chevron U.S.A. Inc., a Pennsylvania corporation, and its successors or assigns.

"**Deepwater Assets Decommissioning Funding Agreement**" means that certain Decommissioning Funding Agreement, of event date herewith, by and between CUSA and Credit Bid Purchaser.

"**Depletable Property**" means each separate oil and gas property as defined in Section 614 of the Code.

"**Divisive Merger Documents**" means the Certificate of Merger, Plan of Merger, Certificate of Formation and other documents filed by or on behalf of Fieldwood III with respect to the Company with the Texas Secretary of State related to the divisive merger of Fieldwood III into Fieldwood III (the surviving entity) and the newly-created Company.

"**Electronic Transmission**" means any form of communication, including communication by use of or participation in one or more electronic networks or databases, not directly involving the physical transmission of paper that creates a record that may be retained, retrieved, and reviewed by a recipient thereof and that may be directly reproduced in paper form by such a recipient through an automated process.

"**Escrow Account**" means **[bank information for the Escrow Account to come]**.

"**Escrow Agreement**" means that certain Escrow Agreement of even date herewith between U.S. Bank National Association, as escrow agent, Fieldwood III, the Company and Credit Bid Purchaser.

"**Estimated Tax Amount**" of a Member, or if the Member is disregarded for U.S. federal income tax purposes, the members or beneficiaries of such Member, for a Fiscal Year means the Member's Tax Amount for such Fiscal Year as estimated in good faith from time to time by the Sole Manager.  In making such estimate, the Sole Manager shall take into account amounts shown on Internal Revenue Service Form 1065 filed by the Company and similar state or local forms filed by the Company for the preceding taxable year and such other adjustments as the Sole Manager reasonably determines are necessary or appropriate to reflect the estimated operations of the Company for the Fiscal Year.

"**Excess Amount**" has the meaning set forth in Section 6.02(c).

"**Fair Market Value**" of any asset as of any date means the purchase price that a willing buyer having all relevant knowledge would pay a willing seller for such asset in an arm's length transaction, as determined in good faith by the Sole Manager on such factors as the Sole Manager, in the exercise of his or her reasonable business judgment, considers relevant.

"**Fieldwood**" means Fieldwood Energy LLC, a Texas limited liability company, and its successors and assigns (excluding, for the avoidance of doubt, the Company).

"**Fieldwood III**" means Fieldwood Energy III LLC, a Texas limited liability company, and its successors and assigns (excluding, for the avoidance of doubt, the Company).

"**Final Completion**" has the meaning ascribed to such term in the Turnkey Removal Agreement.

"**Fiscal Year**" means the calendar year, unless the Company is required to have a taxable year other than the calendar year, in which case Fiscal Year shall be the period that conforms to its taxable year.

"**FWE IV Assets**" has the meaning set forth in the Plan of Merger.

"**FWE IV Obligations**" has the meaning set forth in the Plan of Merger.

"**GAAP**" means generally accepted accounting principles in the United States of America in effect from time to time; provided, that, notwithstanding any term or provision contained in this Agreement, GAAP will be deemed for all purposes hereof to treat leases that would have not been considered to be indebtedness in accordance with GAAP as in effect on December 31, 2017 (whether such leases were in effect on such date or are entered into thereafter) in a manner consistent with the treatment of such leases under GAAP as in effect on December 31, 2017, notwithstanding any modification or interpretative changes thereto or implementations of any such modifications or interpretative changes that may have occurred thereafter.

"**Governmental Authority**" means any court, tribunal, arbitrator, body, agency, division, board, bureau, commission or any other similar entity exercising executive, legislative, judicial, regulatory, or administrative functions of government, or any subdivision of any of the foregoing, whether federal, state, county, municipal, tribal, local or foreign, in each case with competent jurisdiction.

"**Guarantee Obligation**" means, as to any Person (the "guaranteeing Person"), any obligation of (i) the guaranteeing Person or (ii) another Person (including any bank under any letter of credit), if to induce the creation of such obligation of such other Person the guaranteeing Person has issued a reimbursement, counterindemnity or similar obligation, in either case guaranteeing or in effect guaranteeing any Indebtedness, leases, dividends or other obligations (the "primary obligations") of any other third Person (the "primary obligor") in any manner, whether directly or indirectly, including any obligation of the guaranteeing Person, whether or not contingent, (A) to purchase any such primary obligation or any property constituting direct or indirect security therefor, (B) to advance or supply funds (1) for the purchase or payment of any such primary obligation or (2) to maintain working capital or equity capital of the primary obligor or otherwise

WEIL:\97901822\22\45327.0007

to maintain the net worth or solvency of the primary obligor, (C) to purchase property, securities or services, in each case, primarily for the purpose of assuring the owner of any such primary obligation of the ability of the primary obligor to make payment of such primary obligation or (D) otherwise to assure or hold harmless the owner of any such primary obligation against loss in respect thereof; provided, however, that the term Guarantee Obligation shall not include endorsements of instruments for deposit or collection in the ordinary course of business.

"**Indebtedness**" means, with respect to any Person at any date, without duplication, all (i) indebtedness of such Person for borrowed money; (ii) obligations of such Person for the deferred purchase price of property or services (other than trade payables incurred in the ordinary course of such Person's business); (iii) obligations of such Person evidenced by notes, bonds, debentures or other similar instruments; (iv) indebtedness created or arising under any conditional sale or other title retention agreement with respect to property acquired by such Person (even though the rights and remedies of the seller or lender under such agreement in the event of default are limited to repossession or sale of such property); (v) capital lease obligations of such Person; (vi) obligations of such Person, contingent or otherwise, as an account party or applicant under acceptance, letter of credit or similar facilities; (vii) obligations of such Person, contingent or otherwise, to purchase, redeem, retire or otherwise acquire for value any capital stock of such Person; (viii) Guarantee Obligations of such Person in respect of obligations of the kind referred to in clauses (i) through (vii) above; and (ix) obligations of the kind referred to in clauses (i) through (viii) above secured by (or for which the holder of such obligation has an existing right, contingent or otherwise, to be secured by) any Lien on property (including accounts and contract rights) owned by such Person, whether or not such Person has assumed or become liable for the payment of such obligation.

"**Initial Member**" has the meaning set forth in the term "Member".

"**Joint Development Agreement**" means that certain Joint Development Agreement of even date herewith by and between the Company and Credit Bid Purchaser.

"**Lien**" means any mortgage, pledge, security interest, option, right of first offer, encumbrance, or other restriction or limitation of any nature whatsoever.

"**Liquidator**" has the meaning set forth in Section 11.03(a).

"**Losses**" has the meaning set forth in Section 9.03(a).

"**Material Project Contracts**" means, collectively, the Omnibus Agreement, the NPI Conveyance, the Contract Operating Agreement, the Turnkey Removal Agreement, the Transition Services Agreement, the Joint Development Agreement, the Deepwater Assets Decommissioning Funding Agreement and the SEMS Bridging Agreement, and each a "**Material Project Contract**".

"**Member**" means (a) the Person identified on the Members Schedule as of the date hereof as a Member and who has executed this Agreement or a counterpart thereof (each, an "**Initial Member**"); and (b) each Person who is hereafter admitted as a Member in accordance with the terms of this Agreement and the BOC, in each case so long as such Person is shown on the

Company's books and records as an owner of Membership Interests. The Members shall constitute "members" (as that term is defined in the BOC) of the Company.

"**Member Nonrecourse Debt**" means "partner nonrecourse debt" as defined in Treasury Regulations Section 1.704-2(b)(4), substituting the term "Company" for the term "partnership" and the term "Member" for the term "partner" as the context requires.

"**Member Nonrecourse Debt Minimum Gain**" means an amount, with respect to each Member Nonrecourse Debt, equal to the Company Minimum Gain that would result if the Member Nonrecourse Debt were treated as a Nonrecourse Liability, determined in accordance with Treasury Regulations Section 1.704-2(i)(3).

"**Member Nonrecourse Deduction**" means "partner nonrecourse deduction" as defined in Treasury Regulations Section 1.704-2(i), substituting the term "Member" for the term "partner" as the context requires.

"**Members Schedule**" has the meaning set forth in Section 3.02.

"**Membership Interest**" means an interest in the Company owned by a Member, including such Member's right (a) to its distributive share of Net Income, Net Losses, and other items of income, gain, loss, and deduction of the Company; (b) to its distributive share of the assets of the Company; (c) to vote on, consent to, or otherwise participate in any decision of the Members as provided in this Agreement; and (d) to any and all other benefits to which such Member may be entitled as provided in this Agreement or the BOC. The Membership Interest of each Member shall be expressed as a percentage interest and shall be as set forth on the Members Schedule.

"**Net Income**" and "**Net Loss**" mean, for each Fiscal Year or other period specified in this Agreement, an amount equal to the Company's taxable income or taxable loss, or particular items thereof, determined in accordance with Code Section 703(a) (where, for this purpose, all items of income, gain, loss, or deduction required to be stated separately pursuant to Code Section 703(a)(1) shall be included in taxable income or taxable loss), but with the following adjustments:

(a)     any income realized by the Company that is exempt from federal income taxation, as described in Code Section 705(a)(1)(B), shall be added to such taxable income or taxable loss, notwithstanding that such income is not includable in gross income;

(b)     any expenditures of the Company described in Code Section 705(a)(2)(B), including any items treated under Treasury Regulations Section 1.704-1(b)(2)(iv)(I) as items described in Code Section 705(a)(2)(B), shall be subtracted from such taxable income or taxable loss, notwithstanding that such expenditures are not deductible for federal income tax purposes;

(c)     any gain or loss (including Simulated Gain or Loss) resulting from any disposition of Company property with respect to which gain or loss is recognized for federal income tax purposes shall be computed by reference to the Book Value of the property so disposed, notwithstanding that the adjusted tax basis of such property differs from its Book Value;

8

(d)      any items of depreciation, amortization, and other cost recovery deductions with respect to Company property having a Book Value that differs from its adjusted tax basis shall be computed by reference to the property's Book Value (as adjusted for Book Depreciation) in accordance with Treasury Regulations Section 1.704-1(b)(2)(iv)(g);

(e)      if the Book Value of any Company property is adjusted as provided in the definition of Book Value, then the amount of such adjustment shall be treated as an item of gain or loss and included in the computation of such taxable income or taxable loss;

(f)      to the extent an adjustment to the adjusted tax basis of any Company property pursuant to Code Sections 732(d), 734(b) or 743(b) is required, pursuant to Treasury Regulations Section 1.704 1(b)(2)(iv)(m), to be taken into account in determining Capital Accounts, the amount of such adjustment to the Capital Accounts shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases such basis); and

(g)      any items which are specially allocated pursuant to Section 5.03 hereof shall not be taken into account in computing Net Income or Net Loss.  The amounts of the items of Company income, gain, loss or deduction available to be specially allocated pursuant to Section 5.03 hereof shall be determined by applying rules analogous to those set forth in subparagraphs (a) through (f) above.

"**Nonrecourse Deductions**" has the meaning set forth in Treasury Regulations Section 1.704-2(b).

"**Nonrecourse Liability**" has the meaning set forth in Treasury Regulations Section 1.704-2(b)(3).

"**NPI Conveyance**" means that certain Conveyance of Net Profits Overriding Royalty Interest from Company to the Escrow Account.

"**NPI Payment**" has the meaning attributed to the term "NPI Payment" under the NPI Conveyance.

"**Omnibus Agreement**" means that certain Omnibus Agreement of even date herewith by and between the Company, CUSA and Credit Bid Purchaser.

"**Person**" means any individual, corporation, partnership, limited liability company, association, joint stock company, trust, estate, joint venture, firm, association, unincorporated organization, Governmental Authority, or any other entity.

"**Plan of Merger**" means the Agreement and Plan of Merger of Fieldwood Energy III LLC into Fieldwood Energy IV LLC and Fieldwood Energy III LLC, dated as of [●], 2021, and adopted by Fieldwood Energy III LLC.

"**Plan of Reorganization**" means the plan of reorganization of Fieldwood that was included in, and was confirmed by, the Confirmation Order.

WEIL:\97901822\22\45327.0007

"**Production Period**" has the meaning attributed to the term "Production Period" under the NPI Conveyance.

"**Quarterly Estimated Tax Amount**" of a Member, or if the Member is disregarded for U.S. federal income tax purposes, the members or beneficiaries of such Member, for any calendar quarter of a Fiscal Year means the excess, if any of: (a) the product of (i) a quarter (1/4) in the case of the first calendar quarter of the Fiscal Year, half (1/2) in the case of the second calendar quarter of the Fiscal Year, three-quarters (3/4) in the case of the third calendar quarter of the Fiscal Year, and one (1) in the case of the fourth calendar quarter of the Fiscal Year and (ii) the Member's Estimated Tax Amount for such Fiscal Year; over (b) all distributions previously made during such Fiscal Year to such Member.

"**Regulatory Allocations**" has the meaning set forth in Section 5.03(f).

"**Reimbursable Costs**" has the meaning attributed to such term in the Contract Operating Agreement.

"**Representative**" means, with respect to any Person, any and all directors, officers, employees, consultants, financial advisors or lenders, counsel, accountants, and other agents of such Person.

"**Securities Act**" means the Securities Act of 1933, as amended, and the rules and regulations thereunder, which shall be in effect at the time.

"**SEMS Bridging Agreement**" means that certain SEMS Bridging Agreement & Interface Document, dated of even date herewith by and between Credit Bid Purchaser and the Company.

"**Shortfall Amount**" has the meaning set forth in Section 6.02(b).

"**Simulated Basis**" means, with respect to each Depletable Property, the Book Value of such property.

"**Simulated Depletion**" means, with respect to each Depletable Property, a depletion allowance computed in accordance with U.S. federal income tax principles (as if the Simulated Basis of the property were its adjusted tax basis and using simulated cost depletion) and in the manner specified in Treasury Regulations Section 1.704-1(b)(2)(iv)(k)(2); provided that the Simulated Depletion with respect to a Depletable Property shall in no event exceed the Simulated Basis of such Depletable Property.

"**Simulated Gain or Loss**" means the simulated gain or loss computed with respect to a sale or other disposition of any Depletable Property pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)(k)(2).

"**Sole Manager**" has the meaning set forth in Section 7.01.

"**Subsidiary**" means, with respect to any Person, any other Person of which a majority of the outstanding shares or other equity interests having the power to vote for directors or managers or comparable positions are owned, directly or indirectly, by the first Person.

"**Tax Advance**" has the meaning set forth in Section 6.02(a).

"**Tax Amount**" of a Member, or if the Member is disregarded for U.S. federal income tax purposes, the members or beneficiaries of such Member, for a Fiscal Year means, subject to (i) any restrictions in the Company's then-applicable debt financing arrangements, if any, and (ii) the Sole Manager's good faith determination to retain any other amounts necessary to satisfy obligations of the Company that are reasonably expect to be due and payable during the 90 days following the date of determination (i) the product of (a) the Tax Rate for such Fiscal Year (but not to exceed the Tax Rate applicable to C-corporations for such Fiscal Year) and (b) the Adjusted Taxable Income of the Member for such Fiscal Year with respect to its Membership Interest or (ii) the actual amount of U.S. federal, state and local income tax (including any state or local tax imposed in lieu of an income tax) paid by such Member with respect to such Fiscal Year in respect of the taxable income allocated to the Member by the Company, after taking into account all deductions available to such Member from all sources in excess of such Member's income from other sources; *provided*, *however*, that if at any time Fieldwood Energy Inc. has cash tax liability (including an estimated tax liability) on account of items of income or gain of the Company without sufficient cash on hand from a corresponding cash distribution in respect of such income or gain (all as reasonably determined by Fieldwood Energy Inc.), then the Tax Amount shall be increased such that the Company timely distributes cash sufficient to pay such tax liability.

"**Tax Matters Representative**" has the meaning set forth in Section 10.04(a).

"**Tax Rate**" of a Member, or if the Member is disregarded for U.S. federal income tax purposes, the members or beneficiaries of such Member, for any period, means the highest effective marginal combined federal, state, and local tax rate applicable to an individual residing in Houston, Texas (or, if higher, a corporation doing business in Houston, Texas), taking into account (a) the character (for example, long-term or short-term capital gain, ordinary, or exempt) of the applicable income and (b) if applicable, the deduction under IRC Section 199A.

"**Taxing Authority**" has the meaning set forth in Section 6.03(b).

"**Term Sheet**" means that certain term sheet, dated March 22, 2021, by and between Fieldwood, on the one hand, and CUSA, on the other hand.

"**Third Party Payment**" has the meaning attributed to such term in the Contract Operating Agreement.

"**Transfer**" means to, directly or indirectly, sell, transfer, assign, convey, gift, pledge, encumber, hypothecate, or similarly dispose of, either voluntarily or involuntarily, by operation of law or otherwise (including by merger or division), or to enter into any contract, option, or other arrangement or understanding with respect to the sale, transfer, assignment, conveyance, gift, pledge, encumbrance, hypothecation, or similar disposition of, any Membership Interests owned by a Person or any interest (including a beneficial interest) in any Membership Interests owned by

11

a Person.  "**Transfer**" when used as a noun shall have a correlative meaning.  "**Transferor**" and "**Transferee**" mean a Person who makes or receives a Transfer, respectively.

"**Transition Services Agreement**" means the Neptune Spar Transition Services Agreement of even date herewith by and between Credit Bid Purchaser and Noble Energy, Inc.

"**Treasury Regulations**" means the final or temporary regulations issued by the United States Department of Treasury pursuant to its authority under the Code, and any successor regulations.

"**Turnkey Removal Agreement**" means that certain Turnkey Removal Agreement of even date herewith by and among Credit Bid Purchaser, CUSA and the Company.

"**Withholding Advances**" has the meaning set forth in Section 6.03(b).

**Section 1.02.    Interpretation**.  For purposes of this Agreement: (a) the words "include," "includes," and "including" shall be deemed to be followed by the words "without limitation"; (b) the word "or" is not exclusive; and (c) the words "herein," "hereof," "hereby," "hereto," and "hereunder" refer to this Agreement as a whole.

The definitions given for any defined terms in this Agreement shall apply equally to both the singular and plural forms of the terms defined.  Whenever the context may require, any pronoun shall include the corresponding masculine, feminine, and neuter forms.

Unless the context otherwise requires, references herein: (x) to Articles, Sections, Exhibits, and Schedules mean the Articles and Sections of, and Exhibits and Schedules attached to, this Agreement; (y) to an agreement, instrument, or other document means such agreement, instrument, or other document as amended, supplemented, and modified from time to time to the extent permitted by the provisions thereof; and (z) to a statute means such statute as amended from time to time and includes any successor legislation thereto and any regulations promulgated thereunder.

This Agreement shall be construed without regard to any presumption or rule requiring construction or interpretation against the party drafting an instrument or causing any instrument to be drafted.

The Exhibits and Schedules referred to herein shall be construed with, and as an integral part of, this Agreement to the same extent as if they were set forth verbatim herein.

The headings in this Agreement are for reference only and shall not affect the interpretation of this Agreement.

WEIL:\97901822\22\45327.0007

## ARTICLE II
## ORGANIZATION

**Section 2.01   Formation**.

(a)       The Company was formed on [●], 2021, pursuant to the provisions of the BOC, upon the filing and acceptance of the Certificate of Formation with the Secretary of State of the State of Texas.

(b)       This Agreement shall constitute the "company agreement" (as that term is used in the BOC) of the Company.  The rights, powers, duties, obligations, and liabilities of the Members and the Sole Manager shall be determined pursuant to the BOC and this Agreement.  To the extent that the rights, powers, duties, obligations, and liabilities of any Members or the Sole Manager are different by reason of any provision of this Agreement than they would be under the BOC in the absence of such provision, this Agreement shall, to the extent permitted by the BOC, control.

**Section 2.02   Name.** The name of the Company is "Fieldwood Energy IV LLC" or such other name or names as may be designated by the Sole Manager; provided, that the name shall always contain the words "Limited Liability Company" or "Limited Company" or an abbreviation of one of those phrases.  Amendments to the Certificate of Formation or this Agreement to reflect any such name change may be made by the Sole Manager without the consent of the Members. The Sole Manager shall give prompt notice to the Members and CUSA of any change to the name of the Company and any related amendment to the Certificate of Formation or this Agreement. The Company may conduct business under any assumed or fictitious name required by Applicable Law or otherwise deemed desirable by the Sole Manager.

**Section 2.03   Principal Office.** The principal office of the Company is located at 2000 W. Sam Houston Parkway S., Suite 1200, Houston, Texas 77042, or such other place as may from time to time be determined by the Sole Manager.  The Sole Manager shall give prompt notice of any such change to each of the Members and CUSA.

**Section 2.04   Registered Office; Registered Agent.**

(a)       The registered office of the Company shall be the office of the initial registered agent named in the Certificate of Formation or such other office (which need not be a place of business of the Company) as the Sole Manager may designate from time to time in the manner provided by the BOC and Applicable Law.

(b)       The registered agent for service of process on the Company in the State of Texas shall be the initial registered agent named in the Certificate of Formation or such other Person or Persons as the Sole Manager may designate from time to time in the manner provided by the BOC and Applicable Law.

Section 2.05   **Purposes; Powers**.

(a)      The purposes of the Company are to (i) engage in the Plugging and Abandonment and decommissioning of the FWE IV Assets, as such terms are defined in the Plan of Merger, (ii) the operation of the FWE IV Assets prior to their Plugging and Abandonment and decommissioning, (iii) such other activities as are approved pursuant to the terms of this Agreement, including subject to Section 7.04, and (iv) to engage in any and all activities necessary or incidental to the foregoing purposes.

(b)      The Company shall have all the powers necessary or convenient to carry out the purposes for which it is formed, including the powers granted by the BOC.

Section 2.06   **Term.**  The term of the Company commenced on the date the Certificate of Formation was filed with the Secretary of State of the State of Texas and shall continue in existence perpetually until the Company is terminated in accordance with the provisions of this Agreement.

## ARTICLE III
## CAPITAL CONTRIBUTIONS; CAPITAL ACCOUNTS

Section 3.01   **Tax Partnership Provisions.**  This ARTICLE III is intended to apply only if the Company becomes a partnership for U.S. federal income tax purposes.

Section 3.02   **Initial Capital Contributions.**  Contemporaneously with the execution of this Agreement, and pursuant to the Plan of Reorganization and as a result of a divisive merger pursuant to § 10.008 of the BOC, the Company holds the properties and assets identified as the FWE IV Assets, which shall, together with the amount of any expenses paid pursuant to Section 12.01, constitute the aggregate Capital Contributions made by the Initial Member.  The Initial Member shall own Membership Interests in the amount set forth opposite such Member's name on Schedule A attached hereto (the "**Members Schedule**").  From and after the date of this Agreement, the Sole Manager shall maintain and update the Members Schedule upon the issuance or Transfer of any Membership Interests to any new or existing Member in accordance with this Agreement.

Section 3.03   **Additional Capital Contributions.**  No Member shall be required to make any additional Capital Contributions to the Company.  Any future Capital Contributions made by any Member shall only be made with the consent of the Sole Manager.  To the extent that a Member makes an additional Capital Contribution to the Company, the Sole Manager shall revise the Members Schedule to reflect an increase in the Membership Interest of the contributing Member that fairly and equitably reflects the value of its additional Capital Contribution in relation to the aggregate amount of all Capital Contributions made by the Members.

Section 3.04   **Maintenance of Capital Accounts.**  The Company shall establish and maintain for each Member a separate capital account (a "**Capital Account**") on its books and records in accordance with this Section 3.04.  Each Capital Account shall be established and maintained in accordance with the following provisions:

(a)      Each Member's Capital Account shall be increased by the amount of:

WEIL:\97901822\22\45327.0007

(i)      such Member's Capital Contributions, including such Member's initial Capital Contribution and any additional Capital Contributions;

(ii)      any Net Income or other item of income or gain allocated to such Member pursuant to ARTICLE V; and

(iii)      any liabilities of the Company that are assumed by such Member or secured by any property distributed to such Member.

(b)      Each Member's Capital Account shall be decreased by:

(i)      the cash amount or Book Value of any property distributed to such Member pursuant to ARTICLE VI and Section 11.03(d);

(ii)      the amount of any Net Loss or other item of loss or deduction allocated to such Member pursuant to ARTICLE V; and

(iii)      the amount of any liabilities of such Member assumed by the Company or that are secured by any property contributed by such Member to the Company.

**Section 3.05   Succession Upon Transfer.**  In the event that any Membership Interests are Transferred in accordance with the terms of this Agreement, the Transferee shall succeed to the Capital Account of the Transferor to the extent it relates to the Transferred Membership Interests and, subject to Section 5.05, shall receive allocations and distributions pursuant to ARTICLE V, ARTICLE VI, and ARTICLE XI in respect of such Membership Interests.

**Section 3.06   Negative Capital Accounts.**  In the event that any Member shall have a deficit balance in its Capital Account, such Member shall have no obligation, during the term of the Company or upon termination or liquidation thereof, to restore such negative balance or make any Capital Contributions to the Company by reason thereof, except as may be required by Applicable Law or in respect of any negative balance resulting from a withdrawal of capital or termination in contravention of this Agreement.

**Section 3.07   No Withdrawals from Capital Accounts.**  No Member shall be entitled to withdraw any part of its Capital Account or to receive any distribution from the Company, except as otherwise provided in this Agreement.  No Member shall receive any interest, salary, or drawing with respect to its Capital Contributions or its Capital Account, except as otherwise provided in this Agreement.  The Capital Accounts are maintained for the sole purpose of allocating items of income, gain, loss, and deduction among the Members and shall have no effect on the amount of any distributions to any Members, in liquidation or otherwise.

**Section 3.08   Treatment of Loans from Members.**  Loans by any Member to the Company shall not be considered Capital Contributions and shall not affect the maintenance of such Member's Capital Account, other than to the extent provided in Section 3.04(a)(iii), if applicable.

**Section 3.09   Modifications.**   The foregoing provisions and the other provisions of this Agreement relating to the maintenance of Capital Accounts are intended to comply with Treasury Regulations Section 1.704-1(b) and shall be interpreted and applied in a manner consistent with such Treasury Regulations.  If the Sole Manager determines that it is prudent to modify the manner in which the Capital Accounts, or any increases or decreases to the Capital Accounts, are computed in order to comply with such Treasury Regulations, the Sole Manager may authorize such modifications without the consent of any Member.

## ARTICLE IV
## MEMBERS

**Section 4.01   No Personal Liability.**   Except as otherwise expressly provided in the BOC, by Applicable Law, or expressly in this Agreement, no Member will be obligated personally for any debt, obligation, or liability of the Company or other Members, whether arising in contract, tort, or otherwise, including a debt, obligation, or liability under a judgment, decree, or order of a court, solely by reason of being a Member.

**Section 4.02   No Withdrawal.**   So long as a Member continues to hold a Membership Interest, such Member shall not have the ability to withdraw or resign as a Member prior to the winding up and termination of the Company and any such withdrawal or resignation or attempted withdrawal or resignation by a Member prior to the winding up and termination of the Company shall be null and void.  As soon as any Person who is a Member ceases to hold a Membership Interest, such Person shall no longer be a Member.

**Section 4.03   No Interest in Company Property.**   No real or personal property of the Company shall be deemed to be owned by any Member individually, but shall be owned by, and title shall be vested solely in, the Company.  Without limiting the foregoing, each Member hereby irrevocably waives during the term of the Company any right that such Member may have to maintain any action for partition with respect to the property of the Company.

**Section 4.04   Certification of Membership Interests**.

(a)     The Sole Manager may, but shall not be required to, issue certificates to the Members representing the Membership Interests held by such Member.

(b)     In the event that the Sole Manager shall issue certificates representing Membership Interests in accordance with Section 4.04(a), then in addition to any other legend required by Applicable Law, all certificates representing issued and outstanding Membership Interests shall bear a legend substantially in the following form:

THE MEMBERSHIP INTEREST REPRESENTED BY THIS CERTIFICATE IS SUBJECT TO A LIMITED LIABILITY COMPANY AGREEMENT AMONG THE COMPANY AND ITS MEMBERS, A COPY OF WHICH IS ON FILE AT THE PRINCIPAL EXECUTIVE OFFICE OF THE COMPANY.   NO TRANSFER, SALE, CONVEYANCE, ASSIGNMENT, GIFT, PLEDGE, HYPOTHECATION, ENCUMBRANCE, OR OTHER DISPOSITION OF THE MEMBERSHIP

16

INTEREST REPRESENTED BY THIS CERTIFICATE MAY BE MADE EXCEPT IN ACCORDANCE WITH THE PROVISIONS OF SUCH COMPANY AGREEMENT.

THE MEMBERSHIP INTEREST REPRESENTED BY THIS CERTIFICATE HAS NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR UNDER ANY OTHER APPLICABLE SECURITIES LAWS AND MAY NOT BE TRANSFERRED, SOLD, ASSIGNED, GIFTED, PLEDGED, HYPOTHECATED, OR OTHERWISE DISPOSED EXCEPT PURSUANT TO (A) A REGISTRATION STATEMENT EFFECTIVE UNDER SUCH ACT AND LAWS OR (B) AN EXEMPTION FROM REGISTRATION THEREUNDER.

**Section 4.05   Meetings of Members**.

(a)     Meetings of the Members may be called by (i) the Sole Manager or (ii) Members holding a majority of the Membership Interests.

(b)     Written notice stating the place, date, and time of the meeting and, in the case of a meeting of the Members not regularly scheduled, describing the purposes for which the meeting is called, shall be delivered not fewer than ten days and not more than 60 days before the date of the meeting to each Member, by or at the direction of the Sole Manager or the Member(s) calling the meeting, as the case may be.  The Members may hold meetings at the Company's principal office or at such other place, within or outside the State of Texas, as the Sole Manager or the Member(s) calling the meeting may designate in the notice for such meeting.

(c)     Any Member may participate in a meeting of the Members by means of conference telephone or other communications equipment by means of which all Persons participating in the meeting can talk to and hear each other, and participation in a meeting by such means shall constitute presence in person at such meeting.

(d)     On any matter that is to be voted on by Members, a Member may vote in person or by proxy, and such proxy may be granted in writing, by means of Electronic Transmission or as otherwise permitted by Applicable Law.  Every proxy shall be revocable in the discretion of the Member executing it unless otherwise provided in such proxy; provided, that such right to revocation shall not invalidate or otherwise affect actions taken under such proxy prior to such revocation.  In lieu of a proxy, a Member may grant an irrevocable power of attorney to conduct the affairs of such Member with respect to matters of the Company, including matters relating to the organization, internal affairs, or termination of the Company.

(e)     The business to be conducted at such meeting need not be limited to the purpose described in the notice and can include business to be conducted by Members; provided, that the appropriate Members shall have been notified of the meeting in accordance with Section 4.05(b).  Attendance of a Member at any meeting shall constitute

17

a waiver of notice of such meeting, except where a Member attends a meeting for the express purpose of objecting to the transaction of any business on the ground that the meeting is not lawfully called or convened.

(f)     A quorum of any meeting of the Members shall require the presence, whether in person or by proxy, of the Members holding a majority of the Membership Interests.  Subject to Section 4.06, no action may be taken by the Members unless the appropriate quorum is present at a meeting.

(g)     Subject to Section 4.06, Section 7.04, Section 12.10 or any provision of this Agreement or the BOC requiring the vote, consent, or approval of a different percentage of the Membership Interests, no action may be taken by the Members at any meeting at which a quorum is present without the affirmative vote of the Members holding a majority of the outstanding Membership Interests.

**Section 4.06   Action Without Meeting**.

(a)     Notwithstanding the provisions of Section 4.05, any matter that is to be voted on, consented to, or approved by the Members may be taken without a meeting, without prior notice, and without a vote if consented to, in writing or by Electronic Transmission, by a Member or Members holding not less than the minimum number of votes that would be necessary to authorize or take such action at a meeting at which each Member entitled to vote on the action is present and votes.  A record shall be maintained by the Sole Manager of each such action taken by written consent of a Member or Members.

(b)     A Member's consent may not be established by a Member's failure to object to an action in a timely manner or by any other means not explicitly provided for in this Agreement.

(c)     If any action or decision permitted by this Agreement to be taken or made by less than all of the Members is taken or made by a written consent signed by less than all of the Members, the Sole Manager shall, within ten calendar days after such action is taken or such decision is made, give written notice of the action taken or the decision made to the Members who did not sign the written consent.

**Section 4.07   Power of Members.**  The Members shall have the power to exercise any and all rights or powers granted to Members pursuant to the express terms of this Agreement and the BOC.  Except as otherwise specifically provided by this Agreement or required by the BOC, no Member, in its capacity as a Member, shall have the power to act for or on behalf of, or to bind, the Company, other than to the extent that the Company has granted a power of attorney to such Member to bind the Company on such actions.

**Section 4.08   Similar or Competitive Activities; Business Opportunities.**  Nothing contained in this Agreement shall prevent any Member or any of its Affiliates from engaging in any other activities or businesses, regardless of whether those activities or businesses are similar to or competitive with the Company.  None of the Members nor any of their Affiliates shall be

18

obligated to account to the Company or to the other Members for any profits or income earned or derived from such other activities or businesses.  None of the Members nor any of their Affiliates shall be obligated to inform the Company or the other Members of a business opportunity of any type or description.

<div align="center">

**ARTICLE V**
**ALLOCATIONS**

</div>

**Section 5.01   Tax Partnership Provisions.**  This ARTICLE V is intended to apply only if the Company becomes a partnership for U.S. federal income tax purposes.

**Section 5.02   Allocation of Net Income and Net Loss.**  For each Fiscal Year (or portion thereof), after giving effect to the special allocations set forth in Section 5.03, Net Income and Net Loss of the Company shall be allocated among the Members pro rata in accordance with their Membership Interests.

**Section 5.03   Regulatory and Special Allocations.**  Notwithstanding the provisions of Section 5.02:

(a)      If there is a net decrease in Company Minimum Gain (determined according to Treasury Regulations Section 1.704-2(d)(1)) during any Fiscal Year, each Member shall be specially allocated Net Income for such Fiscal Year (and, if necessary, subsequent Fiscal Years) in an amount equal to such Member's share of the net decrease in Company Minimum Gain, determined in accordance with Treasury Regulations Section 1.704-2(g). The items to be so allocated shall be determined in accordance with Treasury Regulations Sections 1.704-2(f)(6) and 1.704-2(j)(2).  This Section 5.03(a) is intended to comply with the "minimum gain chargeback" requirement in Treasury Regulations Section 1.704-2(f) and shall be interpreted consistently therewith.

(b)      Member Nonrecourse Deductions shall be allocated in the manner required by Treasury Regulations Section 1.704-2(i).  Except as otherwise provided in Treasury Regulations Section 1.704-2(i)(4), if there is a net decrease in Member Nonrecourse Debt Minimum Gain during any Fiscal Year, each Member that has a share of such Member Nonrecourse Debt Minimum Gain shall be specially allocated Net Income for such Fiscal Year (and, if necessary, subsequent Fiscal Years) in an amount equal to that Member's share of the net decrease in Member Nonrecourse Debt Minimum Gain.  Items to be allocated pursuant to this paragraph shall be determined in accordance with Treasury Regulations Sections 1.704-2(i)(4) and 1.704-2(j)(2).  This Section 5.03(b) is intended to comply with the "minimum gain chargeback" requirement in Treasury Regulations Section 1.704-2(i)(4) and shall be interpreted consistently therewith.

(c)      Nonrecourse Deductions shall be allocated to the Members in accordance with their Membership Interests.

(d)      In the event any Member unexpectedly receives any adjustments, allocations, or distributions described in Treasury Regulations Section 1.704-1(b)(2)(ii)(d)(4), (5) or (6), Net Income shall be specially allocated to such Member in an

<div align="center">19</div>

amount and manner sufficient to eliminate the Adjusted Capital Account Deficit created by such adjustments, allocations, or distributions as quickly as possible.  This Section 5.03(d) is intended to comply with the "qualified income offset" requirement in Treasury Regulations Section 1.704-1(b)(2)(ii)(d) and shall be interpreted consistently therewith.

(e)     Simulated Depletion and Simulated Gain or Loss with respect to any Depletable Property shall be allocated among the Members in proportion to their shares of the Simulated Basis in such property.  Each Member's share of the Simulated Basis in each of the Company's Depletable Properties shall be allocated to each Member in accordance with such Member's Membership Interest as of the time such Depletable Property is acquired by the Company, and shall be reallocated among the Members in accordance with the Members' Membership Interest as determined immediately following the occurrence of an event giving rise to any adjustment to the Book Values of the Company's oil and gas properties pursuant to the terms of this Agreement (or at the time of any material additions to the federal income tax basis of such Depletable Property).

(f)     The allocations set forth in subsections Section 5.03(a), Section 5.03(b), Section 5.03(c), Section 5.03(d) and Section 5.03(e) above (the "**Regulatory Allocations**") are intended to comply with certain requirements of the Treasury Regulations under Code Section 704.  Notwithstanding any other provisions of this ARTICLE V (other than the Regulatory Allocations), the Regulatory Allocations shall be taken into account in allocating Net Income and Net Losses among Members so that, to the extent possible, the net amount of such allocations of Net Income and Net Losses and other items and the Regulatory Allocations to each Member shall be equal to the net amount that would have been allocated to such Member if the Regulatory Allocations had not occurred.

**Section 5.04   Tax Allocations**.

(a)     Subject to Section 5.04(b), Section 5.04(c), and Section 5.04(d), all income, gains, losses and deductions of the Company shall be allocated, for federal, state, and local income tax purposes, among the Members in accordance with the allocation of such income, gains, losses, and deductions pursuant to Section 5.02 and Section 5.03, except that if any such allocation for tax purposes is not permitted by the Code or other Applicable Law, the Company's subsequent income, gains, losses, and deductions shall be allocated among the Members for tax purposes, to the extent permitted by the Code and other Applicable Law, so as to reflect as nearly as possible the allocation set forth in Section 5.02 and Section 5.03.

(b)     Items of Company taxable income, gain, loss, and deduction with respect to any property contributed to the capital of the Company shall be allocated among the Members in accordance with Code Section 704(c) using such reasonable method under Treasury Regulations Section 1.704-3 as shall be determined by the Sole Manager, so as to take account of any variation between the adjusted basis of such property to the Company for federal income tax purposes and its Book Value.

(c)      If the Book Value of any Company asset is adjusted pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)(f) as provided in clause (c) of the definition of Book Value, subsequent allocations of items of taxable income, gain, loss, and deduction with respect to such asset shall take account of any variation between the adjusted basis of such asset for federal income tax purposes and its Book Value using such reasonable method under Treasury Regulations Section 1.704-3 as shall be determined by the Sole Manager.

(d)      Allocations of tax credit, tax credit recapture, and any items related thereto shall be allocated to the Members according to their interests in such items as determined by the Sole Manager taking into account the principles of Treasury Regulations Section 1.704-1(b)(4)(ii).

(e)      The deduction for depletion with respect to each separate oil and gas property (as defined in Section 614 of the Code) shall, in accordance with Section 613A(c)(7)(D) of the Code, be computed for federal income tax purposes separately by the Members rather than the Company.  The proportionate share of the adjusted tax basis of each oil and gas property shall be allocated to each Member in accordance with such Member's Membership Interest as of the time such oil and gas property is acquired by the Company (and any additions to such U.S. federal income tax basis resulting from expenditures required to be capitalized in such basis shall be allocated among the Members in a manner designed to cause the Members' proportionate shares of such adjusted U.S. federal income tax basis to be in accordance with their Membership Interests as determined at the time of any such additions), and shall be reallocated among the Members in accordance with the Members' Membership Interests as determined immediately following the occurrence of an event giving rise to an adjustment to the Book Values of the Company's oil and gas properties.  For purposes of the separate computation of gain or loss by each Member on the taxable disposition of each oil and gas property, the amount realized from such disposition shall be allocated (i) first, to the Members in an amount equal to the Simulated Basis in such oil and gas property in proportion to their allocable shares thereof and (ii) second, any remaining amount realized shall be allocated consistent with the allocation of Simulated Gain or Loss.  The allocations described in this Section 5.04(e) are intended to be applied in accordance with the Members' "interests in partnership capital" under Section 613A(c)(7)(D) or the Code; provided, however, that the Members understand and agree that the Sole Manager may authorize special allocations of federal income tax basis, income, gain, deduction or loss, as computed for U.S. federal income tax purposes, in order to eliminate differences between Simulated Basis and adjusted U.S. federal income tax basis with respect to each oil and gas property, in such manner as determined consistent with the principles outlined in Sections 5.04b) and 5.04c).  The provisions of this Section 5.04(e) and the other provisions of this Agreement relating to allocations under Section 613A(c)(7)(D) of the Code are intended to comply with Treasury Regulations Section 1.704-1(b)(4)(v) and shall be interpreted and applied in a manner consistent with such Treasury Regulations.  Each Member, with the assistance of the Company, shall separately keep records of its share of the adjusted tax basis in each oil and gas property, adjust such share of the adjusted tax basis for any cost or percentage depletion allowable with respect to such property and use such adjusted tax basis in the computation of its cost depletion or in the computation of its gain or loss on the disposition

21

of such property by the Company.  Upon the reasonable request of the Company, each Member shall advise the Company of its adjusted tax basis in each oil and gas property and any depletion computed with respect thereto, both as computed in accordance with the provisions of this subsection for purposes of allowing the Company to make adjustments to the tax basis of its assets as a result of certain transfers of interests in the Company or distributions by the Company.  The Company may rely on such information and, if it is not provided by the Member, may make such reasonable assumptions as it shall determine with respect thereto.  When reasonably requested by the Members, the Company shall provide all available information needed by such Members to comply with the record keeping requirements of this Section 5.04(e) and other applicable tax reporting obligations.

(f)     Allocations pursuant to this Section 5.04 are solely for purposes of federal, state, and local taxes and shall not affect, or in any way be taken into account in computing, any Member's Capital Account or share of Net Income, Net Losses, distributions, or other items pursuant to any provisions of this Agreement.

**Section 5.05   Allocations in Respect of Transferred Membership Interests.**  In the event of a Transfer of Membership Interests during any Fiscal Year made in compliance with the provisions of ARTICLE VIII, Net Income, Net Losses, and other items of income, gain, loss, and deduction of the Company attributable to such Membership Interests for such Fiscal Year shall be determined using the interim closing of the books method.

# ARTICLE VI
# DISTRIBUTIONS

**Section 6.01   General**.

(a)     Subject to Section 6.02 and Section 7.03(b), distributions of available cash shall be made to the Members when and in such amounts as determined by the Sole Manager and only following (i) payment of all operating expenses of the Company, including required payments under the Material Project Contracts, and the termination of the Material Project Contracts, (ii) the payment in full of any and all amounts owing to Credit Bid Purchaser or CUSA under any Material Project Contract, and (iii) the cessation of all production from, and Final Completion of all plugging and abandonment and decommissioning of the FWE IV Assets.  After making all distributions required for a given Fiscal Year under Section 6.02, and paying all operating expenses, and making appropriate reserves for future operating expenses, and paying all amounts then due and outstanding under the Material Project Contracts as described in the preceding sentence, the termination of the Material Project Contracts, and the satisfaction of the condition under item (iii), in each case as described in the preceding sentence, distributions determined to be made by the Sole Manager pursuant to this Section 6.01(a) shall be paid to the Members in accordance with their respective Membership Interests.

(b)     Notwithstanding any provision to the contrary contained in this Agreement, the Company shall not make any distribution to the Members (i) prior to the cessation of all production from, and Final Completion of all plugging and abandonment and

decommissioning activities on, the FWE IV Assets, except as provided in Section 6.02, or (ii) if such distribution would violate § 101.206 of the BOC or other Applicable Law.

**Section 6.02   Tax Advances**.

(a)     Subject to (i) any restrictions in the Company's then-applicable debt financing arrangements, if any, and (ii) the Sole Manager's good faith determination to retain any other amounts necessary to satisfy obligations of the Company that are reasonably expected to be due and payable in the 90 days following the date of determination, at least three days before each date prescribed by the Code for a calendar-year corporation to pay quarterly installments of estimated tax, the Company shall use commercially reasonable efforts to distribute cash to each Member in proportion to and to the extent of such Member's Quarterly Estimated Tax Amount for the applicable calendar quarter (each such distribution, a "**Tax Advance**").

(b)     If, at any time after the final Quarterly Estimated Tax Amount has been distributed pursuant to Section 6.02(a) with respect to any Fiscal Year, the aggregate Tax Advances to any Member with respect to such Fiscal Year are less than such Member's Tax Amount for such Fiscal Year (a "**Shortfall Amount**"), the Company shall use commercially reasonable efforts to distribute cash in proportion to and to the extent of each Member's Shortfall Amount.  The Company shall use commercially reasonable efforts to distribute Shortfall Amounts with respect to a Fiscal Year before the 90th day of the next succeeding Fiscal Year; provided, that if the Company has made distributions other than pursuant to this Section 6.02, the Sole Manager may apply such distributions to reduce any Shortfall Amount.

(c)     If the aggregate Tax Advances made to any Member pursuant to this Section 6.02 for any Fiscal Year exceed such Member's Tax Amount (an "**Excess Amount**"), such Excess Amount shall reduce subsequent Tax Advances that would be made to such Member pursuant to this Section 6.02, except to the extent taken into account as an advance pursuant to Section 6.02(d).

(d)     Any distributions made pursuant to this Section 6.02 shall be treated for purposes of this Agreement as advances on distributions pursuant to Section 6.01 and shall reduce, dollar-for-dollar, the amount otherwise distributable to such Member pursuant to Section 6.01.

**Section 6.03   Tax Withholding; Withholding Advances**.

(a)     **Tax Withholding.**  Each Member agrees to furnish the Company with any representations and forms as shall be reasonably requested by the Company to assist it in determining the extent of, and in fulfilling, any withholding obligations it may have.

(b)     **Withholding Advances.**  The Company is hereby authorized at all times to make payments ("**Withholding Advances**") with respect to each Member in amounts required to discharge any obligation of the Company, including any obligation under Section 6225 of the Code (as determined by the Tax Matters Representative based on the

WEIL:\97901822\22\45327.0007

advice of legal or tax counsel to the Company) to withhold or make payments to any federal, state, local or foreign taxing authority (a "**Taxing Authority**") with respect to any distribution or allocation by the Company of income or gain to such Member and to withhold the same from distributions to such Member.  Any funds withheld from a distribution by reason of this Section 6.03(b) shall nonetheless be deemed distributed to the Member in question for all purposes under this Agreement.  If the Company makes any Withholding Advance in respect of a Member hereunder that is not immediately withheld from actual distributions to the Member, then the Member shall promptly reimburse the Company for the amount of such payment, plus interest at a rate equal to the prime rate published in the Wall Street Journal on the date of payment plus two percent per annum, compounded annually, on such amount from the date of such payment until such amount is repaid (or deducted from a distribution) by the Member (any such payment shall not constitute a Capital Contribution).  Each Member's reimbursement obligation under this Section 6.03(b) shall continue after such Member transfers its Membership Interests.

(c)     **Indemnification.**  Each Member hereby agrees to defend, indemnify and hold harmless the Company and the other Members from and against any liability with respect to taxes, interest, or penalties that may be asserted by reason of the Company's failure to deduct and withhold tax on amounts distributable or allocable to such Member.  The provisions of this Section 6.03(c) and the obligations of a Member pursuant to Section 6.03(b) shall survive the termination, dissolution, liquidation, and winding up of the Company and the withdrawal of such Member from the Company or Transfer of its Membership Interests.  The Company may pursue and enforce all rights and remedies it may have against each Member under this Section 6.03, including bringing a lawsuit to collect repayment with interest of any Withholding Advances.

(d)     **Overwithholding.**  None of the Company or the Sole Manager shall be liable for any excess taxes withheld in respect of any distribution or allocation of income or gain to a Member.  In the event of an overwithholding, a Member's sole recourse shall be to apply for a refund from the appropriate Taxing Authority.

**Section 6.04   Distributions in Kind**.

(a)     Subject to Sections 6.01 and 6.02, the Sole Manager is hereby authorized, as it may reasonably determine, to make distributions to the Members in the form of securities or other property (but not including any oil and gas properties) held by the Company; provided, that Tax Advances shall only be made in cash.  In any non-cash distribution, the securities or property so distributed will be distributed among the Members in the same proportion and priority as cash equal to the Fair Market Value of such securities or property would be distributed among the Members pursuant to Section 6.01.

(b)     Any distribution of securities shall be subject to such conditions and restrictions as the Sole Manager determines are required or advisable to ensure compliance with Applicable Law.  In furtherance of the foregoing, the Sole Manager may require that the Members execute and deliver such documents as the Sole Manager may deem necessary or appropriate to ensure compliance with all federal and state securities laws that

WEIL:\97901822\22\45327.0007

apply to such distribution and any further Transfer of the distributed securities, and may appropriately legend the certificates that represent such securities to reflect any restriction on Transfer with respect to such laws.

## ARTICLE VII
## MANAGEMENT

**Section 7.01   Management of the Company.**   The business and affairs of the Company shall be managed, operated, and controlled by or under the direction of one manager designated pursuant to Section 7.02 (the "**Sole Manager**").   Subject to the provisions of Section 7.04, the Sole Manager shall have, and is hereby granted, full and complete power, authority, and discretion for, on behalf of, and in the name of the Company, to take such actions as it may deem necessary or advisable to carry out any and all of the objectives and purposes of the Company, to the exclusion of the Members unless expressly provided for otherwise in this Agreement or expressly required under the BOC.   Subject to the provisions of Section 7.06, the Sole Manager shall have, and is hereby granted, full and complete power, authority, and discretion for, on behalf of, and in the name of the Company, to take such actions as it may deem necessary or advisable to carry out any and all of the objectives and purposes of the Company.

**Section 7.02   Sole Manager.**   The Company shall not have any officers or employees other than the Sole Manager.   Sunset Energy Gulf Coast Asset Management LLC has been selected and designated by the Member with the consent of CUSA to serve as the initial Sole Manager. The Sole Manager may not be removed without CUSA's prior written consent, which may be given, delayed or withheld in its sole discretion.   In the event that the Sole Manager is removed with CUSA's written consent or the Sole Manager resigns or otherwise ceases to serve in such capacity, then the Sole Manager shall be selected pursuant to the following procedure:   CUSA and the Company (acting through the Member for all purposes under this Section 7.02, who shall solicit input from Credit Bid Purchaser for all purposes under this Section 7.02) shall agree on a replacement, and, if they cannot agree, the Company shall designate a replacement, which shall be subject to CUSA's approval (which approval shall not to be unreasonably withheld, conditioned or delayed).

**Section 7.03   Material Project Contracts; Net Profit Interest**.

(a)      The Company's execution and performance of its obligations under each of the Omnibus Agreement, the NPI Conveyance, the Contract Operating Agreement, the Turnkey Removal Agreement, the Joint Development Agreement, the Deepwater Assets Decommissioning Funding Agreement, the SEMS Bridging Agreement, the Transition Services Agreement and the Escrow Agreement has been approved by the Member and shall not require any other approval on the part of the Company (by the Sole Manager or otherwise).   The Sole Manager shall not amend or modify such agreements, except in accordance with this Agreement.

(b)      At the end of each Production Period, the Company shall pay into the Escrow Account the NPI Payment, if any is due, as calculated pursuant to the terms of the NPI Conveyance.

WEIL:\97901822\22\45327.0007

**Section 7.04   Actions Requiring CUSA Consent.**  Without the prior written consent of CUSA (which written consent may be given, delayed or withheld in CUSA's sole discretion, unless expressly indicated otherwise), the Company shall not do, or enter into any commitment to do, any of the following:

(a)    engage in any business or activity other than (i) plugging and abandoning and decommissioning the FWE IV Assets and (ii) operating the FWE IV Assets prior to their plugging and abandonment and decommissioning;

(b)    use revenue or free cash flow for any purpose other than (i) for funding Reimbursable Costs or Third Party Payments under the Contract Operating Agreement (or similar charges under a replacement thereto) and, if applicable, payment into the Escrow Account and (ii) Tax Advances pursuant to Section 6.02(a);

(c)    issue additional Membership Interests or any other equity securities or admit additional Members to the Company;

(d)    approve any decommissioning plan with respect to the FWE IV Assets; or engage or retain any decommissioning subcontractor other than Credit Bid Purchaser pursuant to the Turnkey Removal Agreement;

(e)    incur any Indebtedness;

(f)    make any loan, advance, or capital contribution or make any investment in any Person;

(g)    replace, remove or change the powers of the Sole Manager;

(h)    replace or remove Credit Bid Purchaser under the Contract Operating Agreement; engage or retain any contract operator other than Credit Bid Purchaser pursuant to the Contract Operating Agreement; amend, or waive the application of, any provision of the Contract Operating Agreement;

(i)    divest any of the FWE IV Assets (other than sales of hydrocarbons in the ordinary course of business) or acquire any other assets (other than for a purpose permitted under Section 7.04(a) and in accordance with the terms of the Contract Operating Agreement, and further subject to any approval rights contained therein);

(j)    approving any prospective joint development project or other capital project for which an election to participate has been delivered to the Company pursuant to the Joint Development Agreement or approve any well takeover under the Joint Development Agreement;

(k)    agree to any (i) settlement or order with any Governmental Authority relating to the FWE IV Assets or the operations conducted thereon, (ii) settlement relating to contribution or payment amounts relating to decommissioning obligations with any Person, including any predecessor-in-interest to all or any portion of the leases and lands

covered by the FWE IV Assets or any surety bond provider or other provider or holder of security relating to decommissioning operations, or (iii) any other settlement involving FWE IV Assets or the operation of FWE IV;

(l)     amend any provision of a Material Project Contract, or waive any material right of the Company under a Material Project Contract;

(m)     [Reserved];

(n)     take any act of Bankruptcy, liquidate or otherwise terminate the existence of the Company or any of its Subsidiaries;

(o)     enter into a fundamental business transaction within the meaning of such term in the BOC;

(p)     establish a Subsidiary or enter into any joint venture or similar business arrangement or enter into a transaction covered by Section 7.03;

(q)     enter into, amend, waive, or terminate any contract with an Affiliate of the Company; or

(r)     amend, modify, supplement, restate, or waive any provision of the Certificate of Formation, this Agreement or any other organizational documents of the Company or its Subsidiaries (and any such amendment, modification, supplement, or waiver that is attempted without CUSA's prior written consent shall be void *ab initio* and without effect).

If CUSA in good faith believes that (x) Credit Bid Purchaser is in breach the Contract Operating Agreement in a manner that is materially adverse to the Company or is liable to the Company for indemnification pursuant to the terms of the Contract Operating Agreement, and (y) the Company has failed to enforce its rights (including, if applicable, termination right) with respect to such breach or indemnification and such failure is materially adverse to the Company, then CUSA may (i) deliver a written notice to the Company requesting that the Company enforce such rights (any rights to which such request relates must be specifically identified) and (ii) if the Company fails to enforce such rights within thirty days of its receipt of such notice, CUSA may itself enforce the rights of the Company against Credit Bid Purchaser on the Company's behalf.

**Section 7.05   No Compensation of the Sole Manager**.  The Sole Manager shall receive an offer letter and be compensated for the services provided by such individual as the Sole Manager of the Company in the amount set forth in such offer letter.  The Company shall reimburse the Sole Manager for all reasonable, ordinary, necessary, and direct third-party expenses incurred by the Sole Manager on behalf of the Company in carrying out the Company's business activities.

**Section 7.06   No Personal Liability**.  Except as otherwise provided in the BOC or by Applicable Law, or expressly provided in this Agreement or any written agreement between the Company and the Sole Manager, (i) the Sole Manager will not be obligated personally for any debt, obligation, or liability of the Company, whether arising in contract, tort, or otherwise,

WEIL:\97901822\22\45327.0007

including a debt, obligation, or liability under a judgment, decree, or order of a court, solely by reason of being or acting as the Sole Manager and (ii) subject to Section 7.04, the Sole Manager shall carry out his or her duties under this Agreement in good faith and a manner in which the Sole Manager believes to be consistent with and in furtherance of the purpose of the Company specified in Section 2.05(a).

<div align="center">

**ARTICLE VIII**
**TRANSFER**

</div>

**Section 8.01    General Restrictions on Transfer**.

(a)    No Member shall Transfer all or any portion of its Membership Interest in the Company without the prior written approval of the Sole Manager.

(b)    Subject to Section 8.01(a), each Member agrees that it will not Transfer all or any portion of its Membership Interest in the Company, and the Company agrees that it shall not issue any Membership Interests:

(i)    except as permitted under the Securities Act and other Applicable Laws, and then, with respect to a Transfer of Membership Interests, only upon delivery to the Company of an opinion of counsel in form and substance satisfactory to the Company to the effect that such Transfer may be effected without registration under the Securities Act;

(ii)    if the Company becomes a partnership for U.S. federal income tax purposes, if such Transfer or issuance would cause the Company to be considered a "publicly traded partnership" under Section 7704(b) of the Code within the meaning of Treasury Regulations Section 1.7704-1(h)(1)(ii), including the look-through rule in Treasury Regulations Section 1.7704-1(h)(3);

(iii)    if such Transfer or issuance would affect the Company's existence or qualification as a limited liability company under the BOC;

(iv)    if the Company becomes a partnership for U.S. federal income tax purposes, if such Transfer or issuance would cause the Company to lose its status as a partnership for federal income tax purposes;

(v)    if such Transfer or issuance would cause the Company to be required to register as an investment company under the Investment Company Act of 1940, as amended;

(vi)    if such Transfer or issuance would cause the assets of the Company to be deemed "Plan Assets" as defined under the Employee Retirement Income Security Act of 1974 or its accompanying regulations or result in any "prohibited transaction" thereunder involving the Company; and

<div align="center">28</div>

(vii)   such Transfer would limit, hinder or prohibit the Company from carrying out its purpose under Section 2.05(a).

(c)   Any Transfer or attempted Transfer of any Membership Interest in violation of this Agreement shall be null and void *ab initio*, no such Transfer shall be recorded on the Company's books, and the purported Transferee in any such Transfer shall not be treated (and the purported Transferor shall continue to be treated) as the owner of such Membership Interest for all purposes of this Agreement.

(d)   No Transfer of any Membership Interest to a Person not already a Member of the Company shall be deemed completed until the prospective Transferee has executed a joinder agreement in form and substance acceptable to the Company.

(e)   For the avoidance of doubt, any completed Transfer of a Membership Interest permitted by this Agreement shall be deemed a sale, transfer, conveyance, assignment, or other disposal of such Membership Interest in its entirety as intended by the parties to such Transfer, and shall not be deemed a sale, transfer, conveyance, assignment, or other disposal of any less than all of the rights and benefits described in the definition of the term "Membership Interest."

### ARTICLE IX
### EXCULPATION AND INDEMNIFICATION

**Section 9.01   Exculpation of Covered Persons**.

(a)   **Covered Persons.**  As used herein, the term "**Covered Person**" shall mean (i) each current or former Member; (ii) each current or former manager, officer, director, shareholder, partner, member, Affiliate, employee, agent, or Representative of each Member, and each of their Affiliates; and (iii) each manager (including the Sole Manager), officer (if any), employee (if any), agent, or Representative of the Company.

(b)   **Standard of Care.**  No Covered Person shall be liable to the Company or any other Covered Person for any loss, damage, or claim incurred by reason of any action taken or omitted to be taken by such Covered Person in good faith reliance on the provisions of this Agreement, so long as such action or omission does not constitute fraud or willful misconduct by such Covered Person.

(c)   **Good Faith Reliance.**  A Covered Person shall be fully protected in relying in good faith upon the records of the Company and upon such information, opinions, reports, or statements (including financial statements and information, opinions, reports, or statements as to the value or amount of the assets, liabilities, Net Income, or Net Losses of the Company or any facts pertinent to the existence and amount of assets from which distributions might properly be paid) of the following Persons or groups: (i) another Member; (ii) one or more managers, officers or employees of the Company; (iii) any attorney, independent accountant, appraiser, or other expert or professional employed or engaged by or on behalf of the Company; or (iv) any other Person selected in good faith by or on behalf of the Company, in each case as to matters that such relying Person

WEIL:\97901822\22\45327.0007

reasonably believes to be within such other Person's professional or expert competence. The preceding sentence shall in no way limit any Person's right to rely on information to the extent provided in § 3.102 or § 3.105 of the BOC.

**Section 9.02   Liabilities and Duties of Covered Persons**.

(a)   **Limitation of Liability.**   This Agreement, unless otherwise specifically stated herein, is not intended to, and does not, create or impose any fiduciary duty on any Covered Person.  Furthermore, each of the Members and the Company hereby waives any and all fiduciary duties that, absent such waiver, may be implied by Applicable Law, and in doing so, acknowledges and agrees that the duties and obligations of each Covered Person to each other and to the Company are only as expressly set forth in this Agreement. The provisions of this Agreement, to the extent that they restrict the duties and liabilities of a Covered Person otherwise existing at law or in equity, are agreed by the Members to replace such other duties and liabilities of such Covered Person.

(b)   **Duties.**   Subject to Section 7.06, whenever in this Agreement a Covered Person is permitted or required to make a decision (including a decision that is in such Covered Person's "discretion" or under a grant of similar authority or latitude), the Covered Person shall be entitled to consider only such interests and factors as such Covered Person desires and shall have no duty or obligation to give any consideration to any interest of or factors affecting the Company or any other Person.  Whenever in this Agreement a Covered Person is permitted or required to make a decision in such Covered Person's "good faith," the Covered Person shall act under such express standard and shall not be subject to any other or different standard imposed by this Agreement or any other Applicable Law.

**Section 9.03   Indemnification**.

(a)   **Indemnification.**   To the fullest extent permitted by the BOC, as the same now exists or may hereafter be amended, substituted or replaced (but, in the case of any such amendment, substitution, or replacement, only to the extent that such amendment, substitution, or replacement permits the Company to provide broader indemnification rights than the BOC permitted the Company to provide prior to such amendment, substitution, or replacement), the Company shall indemnify, hold harmless, defend, pay, and reimburse any Covered Person against any and all losses, claims, damages, judgments, fines, or liabilities, including reasonable legal fees or other expenses incurred in investigating or defending against such losses, claims, damages, judgments, fines, or liabilities, and any amounts expended in settlement of any claims (collectively, "**Losses**") to which such Covered Person may become subject by reason of:

(i)    any act or omission or alleged act or omission performed or omitted to be performed on behalf of the Company, any Member, or any direct or indirect Subsidiary of the foregoing in connection with the business of the Company; or

(ii)   such Covered Person being or acting in connection with the business of the Company as a member, shareholder, Affiliate, manager, director, officer, employee, or agent of the Company, any Member, or any of their respective

WEIL:\97901822\22\45327.0007

Affiliates, or that such Covered Person is or was serving at the request of the Company as a member, manager, director, officer, employee, or agent of any Person including the Company;

provided, that (x) such Covered Person acted in good faith and in a manner believed by such Covered Person to be in, or not opposed to, the best interests of the Company and, with respect to any criminal proceeding, had no reasonable cause to believe his conduct was unlawful, and (y) such Covered Person's conduct did not constitute fraud or willful and intentional misconduct, in either case as determined by a final, nonappealable order of a court of competent jurisdiction.  In connection with the foregoing, the termination of any action, suit, or proceeding by judgment, order, settlement, conviction, or upon a plea of nolo contendere or its equivalent, shall not, of itself, create a presumption that the Covered Person did not act in good faith or, with respect to any criminal proceeding, had reasonable cause to believe that such Covered Person's conduct was unlawful, or that the Covered Person's conduct constituted fraud or willful misconduct.

(b)     **Control of Defense.**  Upon a Covered Person's discovery of any claim, lawsuit, or other proceeding relating to any Losses for which such Covered Person may be indemnified pursuant to this Section 9.03, the Covered Person shall give prompt written notice to the Company of such claim, lawsuit, or proceeding; provided, that the failure of the Covered Person to provide such notice shall not relieve the Company of any indemnification obligation under this Section 9.03, unless the Company shall have been materially prejudiced thereby.  The Company shall be entitled to participate in or assume the defense of any such claim, lawsuit, or proceeding at its own expense.  After notice from the Company to the Covered Person of its election to assume the defense of any such claim, lawsuit, or proceeding, the Company shall not be liable to the Covered Person under this Agreement or otherwise for any legal or other expenses subsequently incurred by the Covered Person in connection with investigating, preparing to defend, or defending any such claim, lawsuit, or other proceeding.  If the Company does not elect (or fails to elect) to assume the defense of any such claim, lawsuit, or proceeding, the Covered Person shall have the right to assume the defense of such claim, lawsuit, or proceeding as it deems appropriate, but it shall not settle any such claim, lawsuit, or proceeding without the consent of the Company (which consent shall not be unreasonably withheld, conditioned, or delayed).

(c)     **Reimbursement.**  The Company shall promptly reimburse (and/or advance to the extent reasonably required) each Covered Person for reasonable legal or other expenses (as incurred) of such Covered Person in connection with investigating, preparing to defend, or defending any claim, lawsuit, or other proceeding relating to any Losses for which such Covered Person may be indemnified pursuant to this Section 9.03; provided, that if it is finally judicially determined that such Covered Person is not entitled to the indemnification provided by this Section 9.03, then such Covered Person shall promptly reimburse the Company for any reimbursed or advanced expenses.

(d)     **Entitlement to Indemnity.**  The indemnification provided by this Section 9.03 shall not be deemed exclusive of any other rights to indemnification to which those

31

seeking indemnification may be entitled under the BOC, any agreement or otherwise. The provisions of this Section 9.03 shall continue to afford protection to each Covered Person regardless of whether such Covered Person remains in the position or capacity pursuant to which such Covered Person became entitled to indemnification under this Section 9.03 and shall inure to the benefit of the executors, administrators, legatees, and distributees of such Covered Person.

(e)     **Insurance.**  To the extent available on commercially reasonable terms, the Company may purchase, at its expense, insurance to cover Losses covered by the foregoing indemnification provisions and to otherwise cover Losses for any breach or alleged breach by any Covered Person of such Covered Person's duties in such amount and with such deductibles as the Sole Manager may reasonably determine; provided, that the failure to obtain such insurance shall not affect the right to indemnification of any Covered Person under the indemnification provisions contained herein, including the right to be reimbursed or advanced expenses or otherwise indemnified for Losses hereunder.  If any Covered Person recovers any amounts in respect of any Losses from any insurance coverage, then such Covered Person shall, to the extent that such recovery is duplicative, reimburse the Company for any amounts previously paid to such Covered Person by the Company in respect of such Losses.

(f)     **Funding of Indemnification Obligation.**  Notwithstanding anything contained herein to the contrary, any indemnity by the Company relating to the matters covered in this Section 9.03 shall be provided out of and to the extent of Company assets only, and no Member (unless such Member otherwise agrees in writing) shall have personal liability on account thereof or shall be required to make additional Capital Contributions to help satisfy such indemnity by the Company.

(g)     **Savings Clause.**  If this Section 9.03 or any portion hereof shall be invalidated on any ground by any court of competent jurisdiction, then the Company shall nevertheless indemnify and hold harmless each Covered Person pursuant to this Section 9.03 to the fullest extent permitted by any applicable portion of this Section 9.03 that shall not have been invalidated and to the fullest extent permitted by Applicable Law.

(h)     **Amendment.**  The provisions of this Section 9.03 shall be a contract between the Company, on the one hand, and each Covered Person who served in such capacity at any time while this Section 9.03 is in effect, on the other hand, pursuant to which the Company and each such Covered Person intend to be legally bound.  No amendment, modification, or repeal of this Section 9.03 that adversely affects the rights of a Covered Person to indemnification for Losses incurred or relating to a state of facts existing prior to such amendment, modification or repeal shall apply in such a way as to eliminate or reduce such Covered Person's entitlement to indemnification for such Losses without the Covered Person's prior written consent.

**Section 9.04   Survival.**  The provisions of this ARTICLE IX shall survive the dissolution, liquidation, winding up, termination of the Company and the withdrawal of any Member or the Transfer of any Member's interest in the Company.

ARTICLE X
ACCOUNTING; TAX MATTERS

**Section 10.01 Financial Statements and Other Information.** The Company shall prepare and furnish to each Member and CUSA the following reports:

(a) **Annual Financial Statements.** As soon as available, and in any event within 105 days after the end of each Fiscal Year, its unaudited consolidated balance sheet and related consolidated statements of operations, Members' equity and cash flows as of the end of and for such year prepared in accordance with GAAP consistently applied.

(b) **Quarterly Financial Statements.** As soon as available, and in any event within 60 days after the end of each quarterly accounting period in each Fiscal Year (including the last fiscal quarter of the Fiscal Year), its unaudited consolidated balance sheet and related unaudited consolidated statements of operations, Members' equity and cash flows as of the end of and for such fiscal quarter and the then elapsed portion of the current Fiscal Year, setting forth in each case in comparative form the figures for the corresponding period or periods of the previous Fiscal Year or as at the end of such period or periods, all in reasonable detail and certified by the Company as presenting fairly in all material respects the consolidated financial condition and results of operations of the Company in accordance with GAAP consistently applied, subject to normal year-end audit adjustments and the absence of footnotes.

(c) **Monthly Operating Data.** As soon as available, but in no event later than 45 days after the end of each calendar month, a statement in a form reasonably satisfactory to each Member and CUSA showing all operating data for the Company, including operating expenses and revenue for each of the Company, for such calendar month.

(d) **Budget Updates.** Promptly once available and no less than bi-annually, an operating budget for the Fiscal Year, forecasting revenue, operating costs, and capital expenses for each fiscal quarter.

(e) **Material Government Communication.** Promptly following receipt thereof by FWE IV, copies of all material written notices or other material communications issued or provided by or to any Governmental Authority.

(f) **Additional Information.** Promptly following any reasonable request therefor, such other information regarding the operations, business affairs and financial condition of the Company, as any Member or CUSA may reasonably request, including, without limitation, decommissioning cost estimates and calculations.

**Section 10.02 Inspection Rights.** Upon reasonable notice from a Member or CUSA, the Company shall afford each Member or CUSA and their respective Representatives access during normal business hours to (a) the Company's properties, offices, plants, and other facilities; (b) the corporate, financial, and similar records, reports, and documents of the Company, including, without limitation, all books and records, minutes of proceedings, internal management documents, reports of operations, reports of adverse developments, copies of any management

WEIL:\97901822\22\45327.0007

letters and communications with Members or the Sole Manager, and to permit each Member or CUSA and their respective Representatives to examine such documents and make copies thereof; and (c) the Sole Manager, any officers, senior employees, and public accountants of the Company, and to afford each Member or CUSA and their respective Representatives the opportunity to discuss the affairs, finances, and accounts of the Company with such Sole Manager, officers, senior employees, and public accountants (and the Company hereby authorizes said accountants to discuss with such Member or CUSA and their respective Representatives such affairs, finances, and accounts).

**Section 10.03 Income Tax Status.**  The Company and the Initial Member intend that the Company shall be treated as a disregarded entity for U.S., federal, state, and local income tax purposes.  Neither the Company nor any Member shall make an election for the Company to be classified as other than a partnership or a disregarded entity pursuant to Treasury Regulations Section 301.7701-3.

**Section 10.04 Tax Matters Representative**.  The following Sections 10.04(a)-(f) are intended to apply if the Company becomes a partnership for U.S. federal income tax purposes:

(a)  **Appointment.**  The Members hereby appoint the Sole Manager as "partnership representative" as provided in Code Section 6223(a) (the "**Tax Matters Representative**").  If any state or local tax law provides for a tax matters partner/partnership representative or Person having similar rights, powers, authority or obligations, the Person designated as the Tax Matters Representative shall also serve in such capacity.  To the extent required by Applicable Law, if the Tax Matters Representative is an entity, it shall appoint a "designated individual" to act on its behalf.  The Tax Matters Representative can be removed at any time by a vote of Members holding a majority of the Membership Interests, and shall resign if it is no longer a Member.  In the event of the resignation or removal of the Tax Matters Representative, Members holding a majority of the Membership Interests shall select a replacement Tax Matters Representative.

(b)  **Tax Examinations and Audits.**  The Tax Matters Representative is authorized and required to represent the Company (at the Company's expense) in connection with all examinations of the Company's affairs by Taxing Authorities, including resulting administrative and judicial proceedings, and to expend Company funds for professional services and costs associated therewith.  The Tax Matters Representative shall promptly notify the Members in writing of the commencement of any tax audit of the Company, upon receipt of a tax assessment and upon receipt of a notice of final partnership adjustment, and shall keep the Members reasonably informed of the status of any tax audit and resulting administrative and judicial proceedings.  Without the consent of Members holding a majority of the Membership Interests, the Tax Matters Representative shall not extend the statute of limitations, file a request for administrative adjustment, file suit relating to any Company tax refund or deficiency or enter into any settlement agreement relating to items of income, gain, loss or deduction of the Company with any Taxing Authority.

(c)      **US Federal Tax Proceedings.**   The Members acknowledge that the Company may elect the application of Section 6226 of the Code.  This acknowledgement applies to each Member whether or not the Member owns an interest in the Company in both the reviewed year and the year of the tax adjustment.  In the event that the Company elects the application of Section 6226 of the Code, the Members agree and covenant to take into account and report to the Internal Revenue Service (or any other applicable taxing authority) any adjustment to their tax items for the reviewed year of which they are notified by the Company in a written statement, in the manner provided in Section 6226(b) of the Code, whether or not the Member owns any interest in the Company at such time.  Any Member that fails to report its share of such adjustments on its tax return, agrees to indemnify and hold harmless the Company and the Tax Matters Representative from and against any and all losses, costs, liabilities and expenses related to taxes (including penalties and interest) imposed on the Company as a result of the Member's inaction.  If the Company is required to pay the assessment of the imputed underpayment under Section 6225(a)(1) of the Code or similar provisions of state law, any taxes, penalties, and interest payable by the Company shall be treated as attributable to the Members, and, to the extent possible, the Tax Matters Representative shall allocate the burden of any such amounts to those Members to whom such amounts are reasonably attributable taking into account the Member's or former Member's allocable share of taxable income or loss with respect to the Fiscal Year to which such assessment pertains and adjustments that may have been made in computing the imputed underpayment.  To the extent that any such amount is payable by the Company, at the option of the Tax Matters Representative, such amount shall be recoverable from such Member as provided in Section 6.03(c).  The provisions contained in this Section 10.04 shall survive the dissolution, termination or liquidation of the Company, the withdrawal of any Member or the Transfer of any Member's interest in the Company and apply to unadmitted assignees of a Member's interest who may be considered current or former partners of the Company for federal tax purposes.

(d)      **Tax Returns.**   Each Member agrees that such Member shall not treat any Company item inconsistently such Member's federal, state, foreign or other income tax return with the treatment of the item on the Company's return.

(e)      **Section 754 Election.**   The Tax Matters Representative will make an election under Code Section 754, if the Company becomes a partnership for U.S. federal income tax purposes.

(f)      **Indemnification**.   The Company shall defend, indemnify, and hold harmless the Tax Matters Representative against any and all liabilities sustained as a result of any act or decision concerning Company tax matters and within the scope of responsibilities as Tax Matters Representative, so long as such act or decision was done or made in good faith and does not constitute gross negligence or willful misconduct.

**Section 10.05 Tax Returns.**   At the expense of the Company, the Sole Manager (or any officer of the Company that it may designate pursuant to this Agreement) shall endeavor to cause the preparation and timely filing (including extensions) of all tax returns, if any, required to be filed by the Company pursuant to the Code as well as all other required tax returns in each

jurisdiction in which the Company owns property or does business. If the Company becomes a partnership for U.S. federal income tax purposes, as soon as reasonably possible after the end of each Fiscal Year, the Sole Manager or any designated officer of the Company, as applicable, will cause to be delivered to each Person who was a Member at any time during such Fiscal Year, IRS Schedule K-1 to Form 1065, if applicable, and such other information with respect to the Company as may be necessary for the preparation of such Person's federal, state, and local income tax returns for such Fiscal Year.

**Section 10.06 Company Funds.** All funds of the Company shall be deposited in its name, or in such name as may be designated by the Sole Manager, in such checking, savings, or other accounts, or held in its name in the form of such other investments as shall be designated by the Sole Manager. The funds of the Company shall not be commingled with the funds of any other Person. All withdrawals of such deposits or liquidations of such investments by the Company shall be made exclusively upon the signature or signatures of the Sole Manager, or any officer or officers of the Company that may be designated by the Sole Manager, as applicable, pursuant to this Agreement.

<div align="center">

**ARTICLE XI**
**WINDING UP AND TERMINATION**

</div>

**Section 11.01 Events Requiring Winding Up.** The Company shall begin to wind up its business and affairs only upon the occurrence of any of the following events (in each case, subject to the applicable provisions of Section 7.04):

(a) upon the permanent cessation of all production from, and Final Completion of all plugging and abandonment and decommissioning of, the FWE IV Assets;

(b) the occurrence of a nonwaivable event under the terms of the BOC which requires the winding up of the Company after its termination unless a Continuance occurs in respect of such event; or

(c) the entry of a judicial decree ordering winding up and termination under § 11.314 of the BOC in proceedings of which CUSA has been given notice and an opportunity to participate.

(d) Notwithstanding the occurrence of an event referenced in Section 11.01(b), if the Company is permitted prior to the termination of its existence in accordance with the BOC to revoke a winding up upon the occurrence of such event and the Sole Manager provides its prior written consent to such revocation, then, to the extent so permitted under the BOC and in the manner provided therein, the Company's existence shall be continued (the revocation of such a winding up and continuance of the Company, a "**Continuance**").

**Section 11.02 Effectiveness of Termination.** The Company shall begin to wind up its business and affairs as soon as reasonably practicable upon the occurrence of an event described in Section 11.01 (if such event has not been revoked or cancelled), but the Company shall not terminate until the winding up of the Company has been completed, the assets of the Company

have been distributed as provided in Section 11.03, and the Certificate of Termination shall have been filed as provided in Section 11.04.

**Section 11.03 Liquidation.**   If the Company is to be terminated pursuant to Section 11.01, the Company shall be liquidated and its business and affairs wound up in accordance with the BOC and the following provisions:

(a)   **Liquidator.**   The Sole Manager shall act as liquidator to wind up the Company (the "**Liquidator**"); provided, however, that if there is then a vacancy in the position of the Sole Manager or the Sole Manager is not willing to act as the Liquidator, the Members shall appoint a Person to act as the Liquidator with the consent of CUSA. The Liquidator shall have full power and authority to sell, assign, and encumber any or all of the Company's assets and to wind up and liquidate the affairs of the Company in an orderly and business-like manner.

(b)   **Accounting.**   As promptly as possible after the event requiring winding up and again after final liquidation, the Liquidator shall cause a proper accounting to be made by a recognized firm of certified public accountants of the Company's assets, liabilities, and operations through the last day of the calendar month in which such event occurs or the final liquidation is completed, as applicable.

(c)   **Notice.**   The Liquidator shall deliver to each known claimant of the Company the notice required by § 11.052 of the BOC.

(d)   **Distribution of Proceeds.**   The Liquidator shall liquidate the assets of the Company and distribute the proceeds of such liquidation in the following order of priority, unless otherwise required by mandatory provisions of Applicable Law:

(i)   First, to the payment of all of the Company's debts and liabilities to its creditors (including Members, if applicable), including amounts owed, if any, pursuant to the Material Project Contracts to CUSA and/or Credit Bid Purchaser, and the expenses of liquidation (including sales commissions incident to any sales of assets of the Company);

(ii)   Second, to the establishment of and additions to other reserves that are determined by the Liquidator to be reasonably necessary for any contingent unforeseen liabilities or obligations of the Company; and

(iii)   Third, to the Members in accordance with the positive balances in their respective Capital Accounts, as determined after taking into account all Capital Account adjustments for the taxable year of the Company during which the liquidation of the Company occurs.

(e)   **Discretion of Liquidator.**   Notwithstanding the provisions of Section 11.03(d) that require the liquidation of the assets of the Company, but subject to the order of priorities set forth in Section 11.03(d), if upon winding up of the Company the Liquidator reasonably determines that an immediate sale of part or all of the Company's

assets would be impractical or could cause undue loss to the Members, the Liquidator may defer the liquidation of any assets except those necessary to satisfy Company liabilities and reserves, and may, upon approval of holders of a majority of the outstanding Membership Interests, distribute to the Members, in lieu of cash, as tenants in common and in accordance with the provisions of Section 11.03(d), undivided interests in such Company assets as the Liquidator deems not suitable for liquidation. Any such distribution in kind shall be subject to such conditions relating to the disposition and management of such properties as the Liquidator deems reasonable and equitable and to any agreements governing the operating of such properties at such time. For purposes of any such distribution, any property to be distributed will be valued at its Fair Market Value.

**Section 11.04 Certificate of Termination.** Upon completion of the distribution of the assets of the Company as provided in Section 11.03(d) hereof, the Liquidator or other such officer or Sole Manager shall execute and cause to be filed a Certificate of Termination in the State of Texas and shall cause the cancellation of all qualifications and registrations of the Company as a foreign limited liability company in jurisdictions other than the State of Texas and shall take such other actions as may be necessary to terminate the Company. Upon acceptance of the Certificate of Termination by the Texas Secretary of State, the Company shall be terminated.

**Section 11.05 Survival of Rights, Duties, and Obligations.** Dissolution, liquidation, winding up, or termination of the Company for any reason shall not release any party from any Loss that at the time of such dissolution, liquidation, winding up, or termination already had accrued to any other party or thereafter may accrue in respect of any act or omission prior to such dissolution, liquidation, winding up, or termination. For the avoidance of doubt, none of the foregoing shall replace, diminish, or otherwise adversely affect any Member's right to indemnification pursuant to Section 9.03.

**Section 11.06 Recourse for Claims.** Each Member shall look solely to the assets of the Company for all distributions with respect to the Company, such Member's Capital Account, and such Member's share of Net Income, Net Loss, and other items of income, gain, loss, and deduction, and shall have no recourse therefor (upon termination or otherwise) against the Liquidator or any other Member.

<div align="center">

**ARTICLE XII**
**MISCELLANEOUS**

</div>

**Section 12.01 Expenses.** The Initial Member will pay, or cause to be paid, or contribute to the Company amounts necessary for the Company to pay, all amounts necessary to fully cover (a) costs associated with the formation of the Company in connection with the Divisive Merger Documents and (b) any premiums to satisfy organizational or area wide bonding requirements.

**Section 12.02 Further Assurances.** In connection with this Agreement and the transactions contemplated hereby, the Company and the Member hereby agree, at the request of the Company or any other Member, to execute and deliver such additional documents, instruments, conveyances, and assurances and to take such further actions as may be required to carry out the provisions hereof and give effect to the transactions contemplated hereby.

<div align="center">38</div>

**Section 12.03 Confidentiality**.

(a)    Each Member acknowledges that it will have access to and become acquainted with trade secrets, proprietary information, and confidential information belonging to the Company and its Affiliates that are not generally known to the public, including, but not limited to, information concerning business plans, financial statements, and other information, operating practices and methods, expansion plans, strategic plans, marketing plans, contracts, customer lists, or other business documents that the Company treats as confidential, in any format whatsoever (including oral, written, electronic, or any other form or medium) (collectively, "**Confidential Information**").   In addition, each Member acknowledges that:   (i) the Company has invested, and continues to invest, substantial time, expense, and specialized knowledge in developing its Confidential Information; (ii) the Confidential Information provides the Company with a competitive advantage over others in the marketplace; and (iii) the Company would be irreparably harmed if the Confidential Information were disclosed to competitors or made available to the public.  Without limiting the applicability of any other agreement to which any Member is subject, no Member shall, directly or indirectly, disclose or use (other than solely for the purposes of such Member monitoring and analyzing its investment in the Company) at any time, including, without limitation, use for personal, commercial, or proprietary advantage or profit, either during its association with the Company or thereafter, any Confidential Information of which such Member is or becomes aware.  Each Member in possession of Confidential Information shall take all appropriate steps to safeguard such information and to protect it against disclosure, misuse, espionage, loss, and theft.

(b)    Nothing contained in Section 12.03(a) shall prevent any Member from disclosing Confidential Information: (i) upon the order of any court or administrative agency; (ii) upon the request or demand of any regulatory agency or authority having jurisdiction over such Member; (iii) to the extent compelled by legal process or required or requested pursuant to subpoena, interrogatories, or other discovery requests; (iv) to the extent necessary in connection with the exercise of any remedy hereunder; (v) to the other Members; or (vi) to such Member's Representatives who, in the reasonable judgment of such Member, need to know such Confidential Information and agree to be bound by the provisions of this Section 12.03 as if a Member; or (vii) to any potential Transferee in connection with a proposed Transfer of Membership Interests from such Member, as long as such potential Transferee agrees in writing to be bound by the provisions of this Section 12.03 as if a Member before receiving such Confidential Information; provided, that in the case of clause (i), (ii), or (iii), such Member shall notify the Company and other Members of the proposed disclosure as far in advance of such disclosure as practicable (but in no event make any such disclosure before notifying the Company and other Members) and use reasonable efforts to ensure that any Confidential Information so disclosed is accorded confidential treatment satisfactory to the Company, when and if available.

(c)    The restrictions of Section 12.03(a) shall not apply to Confidential Information that: (i) is or becomes generally available to the public other than as a result of a disclosure by a Member in violation of this Agreement; (ii) is or has been independently developed or conceived by such Member without use of Confidential

Information; or (iii) becomes available to such Member or any of its Representatives on a non-confidential basis from a source other than the Company, the other Members, or any of their respective Representatives, provided, that such source is not known by the receiving Member to be bound by a confidentiality agreement regarding the Company.

(d)     The obligations of each Member under this Section 12.03 shall survive for so long as such Member remains a Member, and for three years following the earlier of (i) termination, dissolution, liquidation, and winding up of the Company; (ii) the withdrawal of such Member from the Company; or (iii) such Member's Transfer of its Membership Interests; provided that with respect to Confidential Information that constitutes a trade secret under Applicable Law, the obligations of each Member under this Section 12.03 shall survive until, if ever, such Confidential Information loses its trade secret protection other than due, directly or indirectly, to an act or omission of the Member.

**Section 12.04 Notices.**  All notices, requests, consents, claims, demands, waivers, and other communications hereunder shall be in writing and shall be deemed to have been given:

(a)     when delivered by hand (with written confirmation of receipt);

(b)     when received by the addressee if sent by a nationally recognized overnight courier (receipt requested);

(c)     on the third day after the date mailed, by certified or registered mail, return receipt requested, postage prepaid; or

(d)     on the day delivered if sent by electronic mail to the address below during normal business hours of the recipient and on the next Business Day if sent by electronic mail after normal business hours of the recipient.

Such communications must be sent to the respective parties at the following addresses (or at such other address for a party as shall be specified in a notice given in accordance with this Section 12.04):

| | |
|---|---|
| **If to the Company:** | Fieldwood Energy IV LLC |
| | 2000 W. Sam Houston Parkway S., Suite 1200 |
| | Houston, Texas 77042 |
| | Attention: Sole Manager |
| | Phone: [●] |
| | Email: [●] |

with a copy to:

(which shall not
constitute notice)

Chevron U.S.A. Inc.
100 Northpark Blvd
Covington, LA 70443
Attention: Land Manager
Phone: (985) 773-6538
Email: tdwebre@chevron.com

**If to Member**:            To the Member's respective mailing address as set forth on the Members Schedule.

**Section 12.05 Headings.**  The headings in this Agreement are inserted for convenience or reference only and are in no way intended to describe, interpret, define, or limit the scope, extent, or intent of this Agreement or any provision of this Agreement.

**Section 12.06 Severability.**  If any term or provision of this Agreement is held to be invalid, illegal, or unenforceable under Applicable Law in any jurisdiction, such invalidity, illegality, or unenforceability shall not affect any other term or provision of this Agreement or invalidate or render unenforceable such term or provision in any other jurisdiction.  Except as provided in Section 9.03(g), upon such determination that any term or other provision is invalid, illegal, or unenforceable, this Agreement shall be modified automatically so as to effect the original intent of the parties as closely as possible in order that the transactions contemplated hereby be consummated as originally contemplated to the greatest extent possible, legal, and enforceable.

**Section 12.07 Entire Agreement.**  This Agreement, together with the Certificate of Merger, Plan of Merger, Certificate of Formation, the Material Project Contracts and all related Exhibits and Schedules, constitute the sole and entire agreement of the parties to this Agreement with respect to the subject matter contained herein and therein, and supersede all prior and contemporaneous understandings, agreements, representations, and warranties, both written and oral, with respect to such subject matter.

**Section 12.08 Successors and Assigns.**  Subject to the restrictions on Transfers set forth herein, this Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective heirs, executors, administrators, successors, and assigns.

**Section 12.09 No Third-Party Beneficiaries.**  Except (a) with respect to certain rights reserved to CUSA as set forth in this Agreement, which shall be for the benefit of and enforceable by CUSA, and (b) as provided in ARTICLE IX, which shall be for the benefit of and enforceable by Covered Persons as described therein, this Agreement is for the sole benefit of the parties hereto (and their respective heirs, executors, administrators, successors, and assigns) and nothing herein, express or implied, is intended to or shall confer upon any other Person, including any creditor of the Company, any legal or equitable right, benefit, or remedy of any nature whatsoever under or by reason of this Agreement; provided, however that CUSA and each Covered Persons shall be an express third party beneficiary of this Agreement.

**Section 12.10 Amendment.**   Subject to Sections 2.02, no provision of this Agreement may be amended or modified except by an instrument in writing executed by the Company and the Members holding a majority of the Membership Interests; provided, however that any amendment or modification which impacts the rights of CUSA hereunder, including changes to Section 2.05 (Purpose) shall be subject to the prior written consent of CUSA, which may be given, delayed or withheld in its sole discretion.   Any such written amendment or modification will be binding upon the Company, CUSA and each Member.   Notwithstanding the foregoing, amendments to the Members Schedule following any new issuance, redemption, repurchase, or Transfer of Membership Interests in accordance with this Agreement may be made by the Sole Manager without the consent of or execution by the Members.

**Section 12.11 Waiver.**   No waiver by any party or CUSA of any of the provisions hereof shall be effective unless explicitly set forth in writing and signed by the party so waiving or CUSA, respectively.   No waiver by any party or CUSA shall operate or be construed as a waiver in respect of any failure, breach, or default not expressly identified by such written waiver, whether of a similar or different character, and whether occurring before or after that waiver.   No failure to exercise, or delay in exercising, any right, remedy, power, or privilege arising from this Agreement shall operate or be construed as a waiver thereof, nor shall any single or partial exercise of any right, remedy, power, or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power, or privilege.   For the avoidance of doubt, nothing contained in this Section 12.11 shall diminish any of the explicit and implicit waivers described in this Agreement.

**Section 12.12 Governing Law.**   All issues and questions concerning the application, construction, validity, interpretation, and enforcement of this Agreement shall be governed by and construed in accordance with the internal laws of the State of Texas, without giving effect to any choice or conflict of law provision or rule (whether of the State of Texas or any other jurisdiction) that would cause the application of laws of any jurisdiction other than those of the State of Texas.

**Section 12.13 Submission to Jurisdiction.**   The parties hereby agree that any suit, action, or proceeding seeking to enforce any provision of, or based on any matter arising out of or in connection with, this Agreement or the transactions contemplated hereby, whether in contract, tort, or otherwise, shall be brought in the federal courts of the United States of America or the courts of the State of Texas, in each case located in Harris County and in Houston, Texas.   Each of the parties hereby irrevocably consents to the jurisdiction of such courts (and of the appropriate appellate courts therefrom) in any such suit, action, or proceeding and irrevocably waives, to the fullest extent permitted by law, any objection that it may now or hereafter have to the laying of the venue of any such suit, action, or proceeding in any such court or that any such suit, action, or proceeding that is brought in any such court has been brought in an inconvenient forum.   Service of process, summons, notice, or other document by registered mail to the address set forth in Section 12.04 shall be effective service of process for any suit, action, or other proceeding brought in any such court.

**Section 12.14 Waiver of Jury Trial**.   EACH PARTY HERETO ACKNOWLEDGES AND AGREES THAT ANY DISPUTE OR CONTROVERSY THAT MAY ARISE UNDER THIS AGREEMENT IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES

WEIL:\97901822\22\45327.0007

AND, THEREFORE, EACH SUCH PARTY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LEGAL ACTION ARISING OUT OF RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

**Section 12.15 Equitable Remedies.** Each party hereto acknowledges that a breach or threatened breach by such party of any of its obligations under this Agreement would give rise to irreparable harm to the other parties or CUSA, for which monetary damages would not be an adequate remedy, and hereby agrees that in the event of a breach or a threatened breach by such party of any such obligations, each of the other parties hereto and CUSA shall, in addition to any and all other rights and remedies that may be available to them in respect of such breach, be entitled to equitable relief, including a temporary restraining order, an injunction, specific performance, and any other relief that may be available from a court of competent jurisdiction (without any requirement to post bond).

**Section 12.16 Attorney's Fees.** In the event that any party or third-party beneficiary hereto institutes any legal suit, action, or proceeding, including arbitration, against another party in respect of a matter arising out of or relating to this Agreement, the prevailing party or third-party beneficiary in the suit, action, or proceeding shall be entitled to receive, in addition to all other damages to which it may be entitled, the costs incurred by it in conducting the suit, action, or proceeding, including reasonable attorneys' fees and expenses and court costs.

**Section 12.17 Remedies Cumulative.** The rights and remedies under this Agreement are cumulative and are in addition to and not in substitution for any other rights and remedies available at law or in equity or otherwise, except to the extent expressly provided in Section 9.02 to the contrary.

**Section 12.18 Counterparts.** This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement. A signed copy of this Agreement delivered by email or other means of Electronic Transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

(SIGNATURE PAGE FOLLOWS)

43

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be entered into as of the date first written above by their respective officers thereunto duly authorized.

**The Company:**

FIELDWOOD ENERGY IV LLC,
a Texas limited liability company


By:_____
Name:
Title:


**The Initial Member:**

FIELDWOOD ENERGY INC.,
a Delaware corporation


By:_____
Name:
Title:

## SCHEDULE A

## MEMBERS SCHEDULE

| Member Name, and Address | Membership Interest |
|---|---|
| Fieldwood Energy Inc.<br>2000 W. Sam Houston Parkway S., Suite 1200<br>Houston, Texas 77042 | 100% |
| Total: | 100% |

WEIL:\97901822\22\45327.0007

**Exhibit I-A(i)**

**FWE IV Leases**

| Field | Block | Lease | Type | Rights | Date Le Eff | Date Le Exp | Le Cur Acres (Ac) | Operator | WI | Lease Status |
|---|---|---|---|---|---|---|---|---|---|---|
| BRAZOS A-102/A-105 | BA A-102 | G01754 | Federal | RT | 6/1/1968 | 6/14/2020 | 5,760 | Fieldwood En | 100.0% | TERMIN |
| BRAZOS A-102/A-105 | BA A-105 | G01757 | Federal | RT A | 7/1/1968 | N/A | 4,320 | Fieldwood En | 56.3% | PROD |
| BRAZOS A-102/A-105 | BA A-105 | G01757 | Federal | RT B | 7/1/1968 | N/A | 1,440 | Fieldwood En | 100.0% | PROD |
| BRAZOS A-102/A-105 | BA A-105 | G01757 | Federal | OP 1 | 7/1/1968 | N/A | 4,320 | Fieldwood En | 56.3% | PROD |
| BRAZOS A-133 | BA A-133 | G02665 | Federal | RT | 7/1/1974 | N/A | 5,760 | GOM Shelf | 25.0% | PROD |
| EAST BREAKS 158/159/160/161 | EB 158 | G02645 | Federal | RT | 7/1/1974 | N/A | 5,760 | Fieldwood SD Off | 66.7% | PROD |
| EAST BREAKS 158/159/160/161 | EB 158 | G02645 | Federal | OP 1 | 7/1/1974 | N/A | 5,760 | Fieldwood SD Off | 66.7% | PROD |
| EAST BREAKS 158/159/160/161 | EB 159 | G02646 | Federal | RT | 7/1/1974 | N/A | 5,760 | Fieldwood SD Off | 66.7% | PROD |
| EAST BREAKS 158/159/160/161 | EB 159 | G02646 | Federal | OP 1 | 7/1/1974 | N/A | 5,760 | Fieldwood SD Off | 66.7% | PROD |
| EAST CAMERON 331/332 | EC 331 | G08658 | Federal | OP 1 | 8/1/1987 | 11/20/2020 | 5,000 | Fieldwood En Off | 52.8% | TERMIN |
| EAST CAMERON 331/332 | EC 331 | G08658 | Federal | OP 2 | 8/1/1987 | 11/20/2020 | 5,000 | Fieldwood En Off | 52.8% | TERMIN |
| EAST CAMERON 331/332 | EC 332 | G09478 | Federal | RT | 5/1/1988 | 11/20/2020 | 5,000 | Fieldwood En Off | 88.0% | TERMIN |
| EAST CAMERON 331/332 | EC 332 | G09478 | Federal | OP 1 | 5/1/1988 | 11/20/2020 | 5,000 | Fieldwood En Off | 88.0% | TERMIN |
| EUGENE IS. 342/343 | EI 342 | G02319 | Federal | RT A | 2/1/1973 | 10/28/2020 | 2,500 | Fieldwood En | 50.0% | TERMIN |
| HIGH IS. A-550 | HI A-550 | G04081 | Federal | RT | 10/1/1979 | N/A | 5,760 | Fieldwood En Off | 100.0% | PROD |
| HIGH IS. A-550 | HI A-550 | G04081 | Federal | OP 1 | 10/1/1979 | N/A | 720 | Fieldwood En Off | 100.0% | PROD |
| HIGH IS. A-550 | HI A-550 | G04081 | Federal | OP 2 | 10/1/1979 | N/A | 5,040 | Fieldwood En Off | 100.0% | PROD |
| MAIN PASS 77 | MP 77 | G04481 | Federal | RT | 11/1/1980 | 10/26/2020 | 4,655 | Fieldwood En Off | 55.6% | RELINQ |

| Field | Block | Lease | Type | Rights | Date Le Eff | Date Le Exp | Le Cur Acres (Ac) | Operator | WI | Lease Status |
|---|---|---|---|---|---|---|---|---|---|---|
| SOUTH MARSH IS. 132 | SM 132 | G02282 | Federal | RT | 2/1/1973 | 4/1/2016 | 5,000 | Fieldwood En | 50.0% | TERMIN |
| SOUTH MARSH IS. 136/137/149/150 | SM 136 | G02588 | Federal | RT | 5/1/1974 | 8/4/2019 | 2,500 | Fieldwood En | 50.0% | TERMIN |
| SOUTH MARSH IS. 136/137/149/150 | SM 137 | G02589 | Federal | RT | 5/1/1974 | 6/30/2015 | 5,000 | Fieldwood En | 50.0% | TERMIN |
| SOUTH MARSH IS. 136/137/149/150 | SM 150 | G16325 | Federal | RT | 6/1/1996 | 5/22/2018 | 3,329 | Fieldwood En | 50.0% | RELINQ |
| SOUTH MARSH IS. 66 | SM 66 | G01198 | Federal | RT | 6/1/1962 | 9/25/2019 | 5,000 | Fieldwood En | 50.0% | TERMIN |
| SHIP SHOAL 169/182/193/194 | SS 169 | 00820 | Federal | RT | 4/1/1960 | N/A | 5,000 | Fieldwood En | 33.3% | PROD |
| SHIP SHOAL 190/206/216 | SS 206 | G01522 | Federal | RT | 7/1/1967 | 3/22/2021 | 5,000 | Fieldwood En | 40.0% | TERMIN |
| SHIP SHOAL 190/206/216 | SS 207 | G01523 | Federal | RT | 7/1/1967 | 3/22/2021 | 5,000 | Fieldwood En | 26.3% | TERMIN |
| SHIP SHOAL 252/253 | SS 252 | G01529 | Federal | RT | 7/1/1967 | 4/23/2021 | 5,000 | Fieldwood En Off | 50.0% | TERMIN |
| SHIP SHOAL 252/253 | SS 253 | G01031 | Federal | RT | 7/1/1967 | 4/23/2021 | 5,000 | Fieldwood En Off | 50.0% | TERMIN |
| SOUTH TIMBALIER 169 | ST 169 | G01253 | Federal | RT | 6/1/1962 | 1/8/2010 | 4,708 | Beryl O&G | 100.0% | TERMIN |
| SOUTH TIMBALIER 195 | ST 195 | G03593 | Federal | RT | 8/1/1977 | 2/5/2019 | 5,000 | Fieldwood En Off | 100.0% | TERMIN |
| VIOSCA KNOLL 113 | VK 113 | G16535 | Federal | RT | 6/1/1996 | 2/23/2020 | 5,760 | Fieldwood En Off | 100.0% | TERMIN |
| VIOSCA KNOLL 251/340/384 | VK 251 | G10930 | Federal | RT | 7/1/1989 | N/A | 5,760 | Fieldwood En Off | 100.0% | UNIT |
| VIOSCA KNOLL 251/340/384 | VK 251 | G10930 | Federal | OP 1 | 7/1/1989 | N/A | 5,760 | Fieldwood En Off | 100.0% | UNIT |
| VIOSCA KNOLL 251/340/384 | VK 251 | G10930 | Federal | OP 2 | 7/1/1989 | N/A | 5,760 | Fieldwood En Off | 55.0% | UNIT |
| VIOSCA KNOLL 251/340/384 | VK 340 | G10933 | Federal | RT | 7/1/1989 | N/A | 5,760 | Fieldwood En Off | 100.0% | UNIT |

| Field | Block | Lease | Type | Rights | Date Le Eff | Date Le Exp | Le Cur Acres (Ac) | Operator | WI | Lease Status |
|---|---|---|---|---|---|---|---|---|---|---|
| VIOSCA KNOLL 251/340/384 | VK 340 | G10933 | Federal | OP 1 | 7/1/1989 | N/A | 5,760 | Fieldwood En Off | 100.0% | UNIT |
| VIOSCA KNOLL 251/340/384 | VK 340 | G10933 | Federal | OP 2 | 7/1/1989 | N/A | 5,760 | Fieldwood En Off | 55.0% | UNIT |
| VERMILION 196 | VR 196 | G19760 | Federal | OP 1 | 8/1/1998 | 11/30/2020 | 5,000 | Fieldwood En Off | 25.0% | TERMIN |
| VERMILION 196 | VR 207 | G19761 | Federal | OP 1 | 8/1/1998 | 7/27/2009 | 5,000 | Beryl O&G | 46.4% | RELINQ |
| VERMILION 261/262 | VR 261 | G03328 | Federal | RT | 4/1/1976 | 8/10/2020 | 5,429 | Fieldwood En | 25.0% | TERMIN |
| VERMILION 261/262 | VR 261 | G03328 | Federal | OP 1 | 4/1/1976 | 8/10/2020 | 509 | Fieldwood En | 25.0% | TERMIN |
| VERMILION 315/332 | VR 314 | G05438 | Federal | OP 2 | 7/1/1983 | 4/30/2021 | 5,000 | Fieldwood En Off | 50.0% | TERMIN |

**Exhibit I-A(ii)**

**Certain Other FWE IV Leases**

| Field | Block | Lease | Type | Rights | Date Le Eff | Date Le Exp | Le Cur Acres (Ac) | Operator | WI | Lease Status |
|---|---|---|---|---|---|---|---|---|---|---|
| EAST BREAKS 158/159/160/161 | EB 160 | G02647 | Federal | RT | 7/1/1974 | N/A | 5,760 | Fieldwood SD Off | 100.0% | PROD |
| EAST BREAKS 158/159/160/161 | EB 160 | G02647 | Federal | OP 1 | 7/1/1974 | N/A | 5,760 | Fieldwood SD Off | 100.0% | PROD |
| EAST BREAKS 158/159/160/161 | EB 161 | G02648 | Federal | RT | 7/1/1974 | N/A | 5,760 | Fieldwood SD Off | 100.0% | PROD |
| EAST BREAKS 158/159/160/161 | EB 161 | G02648 | Federal | OP 1 | 7/1/1974 | N/A | 5,760 | Fieldwood SD Off | 100.0% | PROD |
| HIGH IS. A-446 | HI A-446 | G02359 | Federal | RT | 8/1/1973 | 4/12/2016 | 5,760 | Bandon O&G | 100.0% | TERMIN |
| VERMILION 315/332 | VR 332 | G09514 | Federal | RT | 7/1/1988 | N/A | 5,000 | Fieldwood En | 100.0% | PROD |
| VERMILION 315/332 | VR 332 | G09514 | Federal | OP 1 | 7/1/1988 | N/A | 5,000 | Fieldwood En | 66.5% | PROD |

**Exhibit I-B(i)**

**FWE IV Wells**

| Asset Name | FWE Acct. Code | Lease Number | API | WI | NRI |
|---|---|---|---|---|---|
| BRAZOS A-105 #002 | BAA105002 | G01757 | 427054000400 | 100.0% | 83.3% |
| BRAZOS A-105 #A001 | BAA105A01 | G01757 | 427054003100 | 100.0% | 83.3% |
| BRAZOS A-105 #A002 | BAA102A02 | G01754 | 427054002500 | 100.0% | NP |
| BRAZOS A-105 #A003 | BAA105A03 | G01757 | 427054002900 | 100.0% | 83.3% |
| BRAZOS A-105 #A004 | BAA105A04 | G01757 | 427054003000 | 100.0% | 83.3% |
| BRAZOS A-105 #A005 | BAA105A05 | G01757 | 427054003200 | 100.0% | 83.3% |
| BRAZOS A-105 #B001 | BAA105B010 | G01757 | 427054012200 | 56.3% | 46.9% |
| BRAZOS A-105 #B002 | BAA105B020 | G01757 | 427054012600 | 56.3% | 46.9% |
| BRAZOS A-105 #B003 | BAA105B030 | G01757 | 427054012800 | 56.3% | 46.9% |
| BRAZOS A-105 #B004 | BAA105B040 | G01757 | 427054013000 | 56.3% | 46.9% |
| BRAZOS A-105 #B005 | BAA105B050 | G01757 | 427054013300 | 56.3% | 46.9% |
| BRAZOS A-133 #A001 | BAA133A010 | G02665 | 427054002400 | 25.0% | 20.8% |
| BRAZOS A-133 #A002 | BAA133A020 | G02665 | 427054003300 | 25.0% | 20.8% |
| BRAZOS A-133 #A003 | BAA133A030 | G02665 | 427054003500 | 25.0% | TA |
| BRAZOS A-133 #A004 ST1 | BAA133A041 | G02665 | 427054004301 | 25.0% | 20.8% |
| BRAZOS A-133 #A005 ST1 | BAA133A051 | G02665 | 427054004001 | 25.0% | 20.8% |
| BRAZOS A-133 #A006 | BAA133A060 | G02665 | 427054004500 | 25.0% | 20.8% |
| BRAZOS A-133 #A007 | BAA133A070 | G02665 | 427054004800 | 25.0% | 20.8% |
| BRAZOS A-133 #A008 | BAA133A080 | G02665 | 427054005200 | 25.0% | 20.8% |
| BRAZOS A-133 #A009 | BAA133A090 | G02665 | 427054005400 | 25.0% | 20.8% |
| BRAZOS A-133 #A010 | BAA133A100 | G02665 | 427054013100 | 25.0% | 20.8% |
| BRAZOS A-133 #C001 | BAA133C010 | G02665 | 427054007800 | 25.0% | 20.8% |
| BRAZOS A-133 #C002 | BAA133C020 | G02665 | 427054008200 | 25.0% | 20.8% |
| BRAZOS A-133 #C003 | BAA133C030 | G02665 | 427054010700 | 25.0% | 20.8% |
| BRAZOS A-133 #C004 | BAA133C040 | G02665 | 427054013500 | 25.0% | 20.8% |
| BRAZOS A-133 #D001 ST1 | BAA133D011 | G02665 | 427054009201 | 25.0% | 20.8% |
| BRAZOS A-133 #D003 | BAA133D030 | G02665 | 427054012700 | 25.0% | 20.8% |
| EAST BREAKS 158 #A003 ST4 | EB158A03 | G02645 | 608044004104 | 66.7% | 55.6% |
| EAST BREAKS 158 #A007 | EB158A07 | G02645 | 608044005100 | 66.7% | 55.6% |
| EAST BREAKS 158 #A012 | EB158A12 | G02645 | 608044005601 | 66.7% | 55.6% |
| EAST BREAKS 158 #A014 ST1 | EB158A14 | G02645 | 608044005901 | 66.7% | 55.6% |
| EAST BREAKS 159 #A002 | EB159A02 | G02646 | 608044003800 | 66.7% | 55.6% |
| EAST BREAKS 159 #A003 | EB158A03 | G02647 | 608044004101 | 66.7% | 55.6% |

| Asset Name | FWE Acct. Code | Lease Number | API | WI | NRI |
|---|---|---|---|---|---|
| EAST BREAKS 159 #A005 ST2 | EB159A05 | G02646 | 608044004503 | 66.7% | 55.6% |
| EAST BREAKS 159 #A006 ST1 | EB159A06 | G02646 | 608044004401 | 66.7% | 55.6% |
| EAST BREAKS 159 #A009 | EB159A09 | G02646 | 608044005200 | 66.7% | 55.6% |
| EAST BREAKS 159 #A011 | EB159A11 | G02646 | 608044005400 | 66.7% | 55.6% |
| EAST BREAKS 159 #A012 | EB158A12 | G02646 | 608044005600 | 66.7% | 55.6% |
| EAST BREAKS 159 #A017 | EB159A17 | G02646 | 608044018300 | 66.7% | 55.6% |
| EAST CAMERON 331 #A001 | EC331A01 | G08658 | 177044076300 | 70.4% | NP |
| EAST CAMERON 331 #A003 | EC331A03 | G08658 | 177044076400 | 70.4% | NP |
| EAST CAMERON 331 #A004 | EC331A04 | G08658 | 177044076700 | 70.4% | NP |
| EAST CAMERON 331 #A009 | EC331A09 | G08658 | 177044079400 | 52.8% | NP |
| EAST CAMERON 331 #A010 | EC331A10 | G08658 | 177044079500 | 52.8% | NP |
| EAST CAMERON 331 #A012 | EC331A12 | G08658 | 177044083300 | 52.8% | NP |
| EAST CAMERON 331 #A013 | EC331A13 | G08658 | 177044083400 | 70.4% | NP |
| EAST CAMERON 332 #A002 | EC332A02 | G09478 | 177044076200 | 70.4% | NP |
| EAST CAMERON 332 #A005 | EC332A05 | G09478 | 177044076800 | 70.4% | TA |
| EAST CAMERON 332 #A006 ST1 | EC332A06 | G09478 | 177044077301 | 70.4% | TA |
| EAST CAMERON 332 #A007 | EC332A07 | G09478 | 177044077400 | 70.4% | NP |
| EAST CAMERON 332 #A008 | EC332A08 | G09478 | 177044077700 | 70.4% | NP |
| EAST CAMERON 332 #A011 | EC332A11 | G09478 | 177044083101 | 70.4% | NP |
| EAST CAMERON 332 #A014 | EC332A14 | G09478 | 177044094600 | 70.4% | NP |
| EAST CAMERON 332 #A016 | EC332A16 | G09478 | 177044097901 | 70.4% | NP |
| EAST CAMERON 332 #A017 | EC332A17 | G09478 | 177044078103 | 70.4% | NP |
| EUGENE IS 342 #004 | EI34200400 | G02319 | 177104113000 | 0.0% | NP |
| EUGENE IS 342 #C002 ST1 | EI342C0201 | G02319 | 177104110601 | 0.0% | NP |
| EUGENE IS 342 #C003 | EI342C0300 | G02319 | 177104114000 | 0.0% | NP |

| Asset Name | FWE Acct. Code | Lease Number | API | WI | NRI |
|---|---|---|---|---|---|
| EUGENE IS 342 #C004 | EI342C0401 | G02319 | 177104120101 | 0.0% | NP |
| EUGENE IS 342 #C005 | EI342C0502 | G02319 | 177104120202 | 50.0% | NP |
| EUGENE IS 342 #C006 | EI342C0600 | G02319 | 177104120300 | 0.0% | NP |
| EUGENE IS 342 #C007 | EI342C0700 | G02319 | 177104120800 | 0.0% | NP |
| EUGENE IS 342 #C008 | EI342C0800 | G02319 | 177104121000 | 0.0% | NP |
| EUGENE IS 342 #C009 | EI342C0900 | G02319 | 177104121300 | 0.0% | NP |
| EUGENE IS 342 #C011 | EI342C1100 | G02319 | 177104122000 | 0.0% | NP |
| EUGENE IS 342 #C012 | EI342C1200 | G02319 | 177104122200 | 0.0% | NP |
| EUGENE IS 342 #C013 | EI342C1300 | G02319 | 177104122700 | 0.0% | NP |
| EUGENE IS 342 #C014 | EI342C1400 | G02319 | 177104135800 | 0.0% | NP |
| EUGENE IS 342 #C015 | EI342C1501 | G02319 | 177104162101 | 0.0% | NP |
| EUGENE IS 342 #C016 | EI342C1601 | G02319 | 177104162201 | 0.0% | NP |
| EUGENE IS 342 #C017 BP1 | EI342C1701 | G02319 | 177104162501 | 50.0% | NP |
| HIGH ISLAND A-550 #002 | HIA55002 | G04081 | 427094062700 | 100.0% | TA |
| HIGH ISLAND A-550 #003 | HIA55003 | G04081 | 427094063700 | 100.0% | TA |
| HIGH ISLAND A-550 #A001 ST3 | HIA550A01 | G04081 | 427094057004 | 100.0% | NP |
| HIGH ISLAND A-550 #A002 ST1 | HIA550A02 | G04081 | 427094074101 | 100.0% | NP |
| HIGH ISLAND A-550 #A003 | HIA550A03 | G04081 | 427094076000 | 100.0% | TA |
| HIGH ISLAND A-550 #A004 ST1 | HIA550A04 | G04081 | 427094099501 | 100.0% | NP |
| HIGH ISLAND A-550 #A005 | HIA550A05 | G04081 | 427094099801 | 100.0% | NP |
| HIGH ISLAND A-550 #A006 | HIA550A06 | G04081 | 427094104801 | 100.0% | NP |
| MAIN PASS 077 #A001 | MP077A0100 | G04481 | 177254033800 | 55.6% | NP |
| MAIN PASS 077 #A002 ST1 | MP077A0201 | G04481 | 177254043101 | 55.6% | NP |
| MAIN PASS 077 #A003 | MP077A0300 | G04481 | 177254036100 | 55.6% | NP |
| MAIN PASS 077 #A004 | MP077A0400 | G04481 | 177254036900 | 55.6% | NP |
| MAIN PASS 077 #A005 | MP077A0500 | G04481 | 177254038000 | 55.6% | NP |
| MAIN PASS 077 #A006 ST2 | MP077A0602 | G04481 | 177254036402 | 55.6% | NP |
| MAIN PASS 077 #A010 | MP077A1000 | G04481 | 177254039600 | 55.6% | NP |
| MAIN PASS 077 #A011 | MP077A1100 | G04481 | 177254042400 | 55.6% | NP |
| MAIN PASS 077 #A012 | MP077A1200 | G04481 | 177254039700 | 55.6% | NP |
| MAIN PASS 077 #A013 | MP077A1300 | G04481 | 177254044900 | 55.6% | NP |
| MAIN PASS 077 #A014 | MP077A1400 | G04481 | 177254044500 | 55.6% | NP |
| MAIN PASS 077 #A015 | MP077A1501 | G04481 | 177254045101 | 55.6% | NP |

| Asset Name | FWE Acct. Code | Lease Number | API | WI | NRI |
|---|---|---|---|---|---|
| MAIN PASS 077 #A016 | MP077A1600 | G04481 | 177254045900 | 55.6% | NP |
| MAIN PASS 077 #A017 | MP077A1700 | G04481 | 177254046200 | 55.6% | NP |
| MAIN PASS 077 #A018 | MP077A1800 | G04481 | 177254046800 | 55.6% | NP |
| MAIN PASS 077 #A019 | MP077A1900 | G04481 | 177254048200 | 55.6% | NP |
| MAIN PASS 077 #A020 ST1 | MP077A2001 | G04481 | 177254048501 | 55.6% | NP |
| MAIN PASS 077 #A021 ST2 | MP077A2100 | G04481 | 177254067002 | 55.6% | NP |
| MAIN PASS 077 #A022 | MP077A2201 | G04481 | 177254067401 | 55.6% | NP |
| MAIN PASS 077 #A023 | MP077A23 | G04481 | 177254067601 | 55.6% | NP |
| MAIN PASS 077 #A07 | MP077A0700 | G04481 | 177254041000 | 55.6% | NP |
| MAIN PASS 077 #A08 | MP077A0800 | G04481 | 177254038200 | 55.6% | NP |
| MAIN PASS 077 #A09 | MP077A0900 | G04481 | 177254039000 | 55.6% | NP |
| MAIN PASS 154 #A001 | MP154A01 | G10902 | 177244060400 | 100.0% | NP |
| MAIN PASS 154 #A002 | MP154A02 | G10902 | 177244069000 | 100.0% | NP |
| SHIP SHOAL 169 #BB001 | SS169BB010 | 00820 | 177114048100 | 33.3% | 27.4% |
| SHIP SHOAL 169 #BB002 | SS169BB020 | 00820 | 177114055501 | 33.3% | 27.4% |
| SHIP SHOAL 169 #BB003 | SS169BB030 | 00820 | 177114057800 | 33.3% | 27.4% |
| SHIP SHOAL 169 #BB004 | SS169BB040 | 00820 | 177114056500 | 33.3% | 27.4% |
| SHIP SHOAL 169 #BB005 | SS169BB050 | 00820 | 177114059600 | 33.3% | 27.4% |
| SHIP SHOAL 169 #BB006 | SS169BB060 | 00820 | 177114060101 | 33.3% | 27.4% |
| SHIP SHOAL 169 #C001 | SS169C0100 | 00820 | 177114075600 | 33.3% | 27.4% |
| SHIP SHOAL 169 #C003 | SS169C0300 | 00820 | 177114078500 | 33.3% | 27.4% |
| SHIP SHOAL 169 #C004 | SS169C0400 | 00820 | 177114077400 | 33.3% | 27.4% |
| SHIP SHOAL 169 #C006 | SS169C0600 | 00820 | 177114080200 | 33.3% | 27.4% |
| SHIP SHOAL 169 #C007 | SS169C0700 | 00820 | 177114080601 | 33.3% | 27.4% |
| SHIP SHOAL 169 #C008 | SS169C0800 | 00820 | 177114081300 | 33.3% | 27.4% |
| SHIP SHOAL 169 #C009 | SS169C0900 | 00820 | 177114144400 | 33.3% | 27.4% |
| SHIP SHOAL 169 #C010 | SS169C1000 | 00820 | 177114144800 | 33.3% | 27.4% |
| SHIP SHOAL 169 #G001 | SS169G0100 | 00820 | 177114127400 | 33.3% | 27.4% |
| SHIP SHOAL 169 #G002 | SS169G0200 | 00820 | 177114128500 | 33.3% | 27.4% |
| SHIP SHOAL 169 #G003 | SS169G0300 | 00820 | 177114156600 | 33.3% | TA |
| SHIP SHOAL 206 #E002 | SS206E0201 | G01522 | 177114118101 | 37.94% | NP |
| SHIP SHOAL 206 #E003 | SS206E0301 | G01522 | 177114118201 | 40.0% | NP |
| SHIP SHOAL 206 #E004 | SS206E0400 | G01522 | 177114141800 | 37.94% | NP |
| SHIP SHOAL 206 #E005 | SS206E0500 | G01522 | 177114142000 | 37.94% | NP |
| SHIP SHOAL 207 #A003 ST1 | SS207A0301 | G01523 | 177110072801 | 26.3% | NP |
| SHIP SHOAL 207 #A004B | SS207A04B0 | G01523 | 177110075500 | 26.3% | NP |
| SHIP SHOAL 207 #A006D | SS207A06D0 | G01523 | 177110078200 | 26.3% | NP |

| Asset Name | FWE Acct. Code | Lease Number | API | WI | NRI |
|---|---|---|---|---|---|
| SHIP SHOAL 207 #A008B | SS207A08B0 | G01523 | 177110080700 | 26.3% | NP |
| SHIP SHOAL 207 #A009 | SS207A0900 | G01523 | 177110082400 | 26.3% | NP |
| SHIP SHOAL 207 #A010D | SS207A10D0 | G01523 | 177110083900 | 26.3% | NP |
| SHIP SHOAL 207 #A013 | SS207A1300 | G01523 | 177112002500 | 26.3% | NP |
| SHIP SHOAL 207 #A015 ST1 | SS207A1501 | G01523 | 177112010601 | 26.3% | NP |
| SHIP SHOAL 207 #A016 ST1 | SS207A1601 | G01523 | 177112011401 | 26.3% | NP |
| SHIP SHOAL 207 #A018 | SS207A1800 | G01523 | 177112005000 | 26.3% | NP |
| SHIP SHOAL 207 #A019ST | SS207A1901 | G01523 | 177114009401 | 26.3% | NP |
| SHIP SHOAL 207 #A020 | SS207A2000 | G01523 | 177114010300 | 26.3% | NP |
| SHIP SHOAL 207 #A022 ST1 | SS207A2201 | G01523 | 177114011301 | 26.3% | NP |
| SHIP SHOAL 207 #A023B | SS207A23B0 | G01523 | 177114013500 | 26.3% | NP |
| SHIP SHOAL 207 #A024 | SS207A2400 | G01523 | 177114014300 | 26.3% | NP |
| SHIP SHOAL 207 #A025 | SS207A2500 | G01523 | 177114015500 | 26.3% | NP |
| SHIP SHOAL 207 #A026 | SS207A2601 | G01523 | 177112001101 | 26.3% | NP |
| SHIP SHOAL 207 #A027 | SS207A2701 | G01523 | 177110079401 | 26.3% | NP |
| SHIP SHOAL 207 #A028 | SS207A2801 | G01523 | 177110077301 | 26.3% | NP |
| SHIP SHOAL 207 #A029 ST | SS207A2901 | G01523 | 177112001901 | 26.3% | NP |
| SHIP SHOAL 207 #A030 | SS207A3001 | G01523 | 177110071501 | 26.3% | NP |
| SHIP SHOAL 207 #A031 ST2 | SS207A3102 | G01523 | 177114117702 | 26.3% | NP |
| SHIP SHOAL 207 #A032 | SS207A3201 | G01523 | 177114119701 | 26.3% | NP |
| SHIP SHOAL 207 #A033 ST1 | SS207A3301 | G01523 | 177114121901 | 26.3% | NP |
| SHIP SHOAL 207 #A034 | SS207A3400 | G01523 | 177114122200 | 26.3% | NP |
| SHIP SHOAL 207 #A035 ST1 | SS207A3501 | G01523 | 177114133301 | 26.3% | NP |
| SHIP SHOAL 207 #A036 | SS207A3600 | G01523 | 177114137700 | 26.3% | NP |
| SHIP SHOAL 207 #D002 | SS207D0200 | G01523 | 177114025400 | 26.3% | NP |
| SHIP SHOAL 207 #D007 | SS207D0700 | G01523 | 177114030300 | 26.3% | NP |
| SHIP SHOAL 207 #D008 | SS207D0800 | G01523 | 177114032300 | 26.3% | NP |
| SHIP SHOAL 207 #D009 | SS207D0900 | G01523 | 177114116400 | 26.3% | NP |
| SHIP SHOAL 207 #D010 ST1 | SS207D1001 | G01523 | 177114116501 | 26.3% | NP |
| SHIP SHOAL 252 #C004 | SS252C04 | G01529 | 177122001500 | 50.0% | NP |
| SHIP SHOAL 252 #C005 | SS252C05 | G01529 | 177122002000 | 50.0% | NP |
| SHIP SHOAL 252 #C009 | SS252C09 | G01529 | 177124029400 | 50.0% | NP |
| SHIP SHOAL 252 #C012 | SS252C12 | G01529 | 177124047300 | 50.0% | NP |

| Asset Name | FWE Acct. Code | Lease Number | API | WI | NRI |
|---|---|---|---|---|---|
| SHIP SHOAL 252 #F001 | SS252F01 | G01529 | 177124052000 | 50.0% | NP |
| SHIP SHOAL 252 #F003 | SS252F03 | G01529 | 177124052200 | 50.0% | NP |
| SHIP SHOAL 252 #F004 | N/A | G01529 | 177124067400 | 50.0% | NP |
| SHIP SHOAL 253 #C001 | SS253C01 | G01031 | 177122000100 | 50.0% | NP |
| SHIP SHOAL 253 #C002 | SS253C02 | G01031 | 177122006700 | 50.0% | NP |
| SHIP SHOAL 253 #C003 | SS253C03 | G01031 | 177122001400 | 50.0% | NP |
| SHIP SHOAL 253 #C006 | SS253C06 | G01031 | 177122002100 | 50.0% | NP |
| SHIP SHOAL 253 #C007 | SS253C07 | G01031 | 177122002300 | 50.0% | NP |
| SHIP SHOAL 253 #C008 | SS253C08 | G01031 | 177124030000 | 50.0% | NP |
| SHIP SHOAL 253 #C010 | SS253C10 | G01031 | 177124029300 | 50.0% | NP |
| SHIP SHOAL 253 #C011 | SS253C11 | G01031 | 177124030900 | 50.0% | NP |
| SHIP SHOAL 253 #C012 | SS252C12 | G01031 | 177124047300 | 50.0% | NP |
| SHIP SHOAL 253 #D001 | SS253D01 | G01031 | 177122004200 | 50.0% | NP |
| SHIP SHOAL 253 #D003 | SS253D03 | G01031 | 177124000400 | 50.0% | NP |
| SHIP SHOAL 253 #D004 | SS253D04 | G01031 | 177124001100 | 50.0% | NP |
| SHIP SHOAL 253 #D005 | SS253D05 | G01031 | 177124001200 | 50.0% | NP |
| SHIP SHOAL 253 #D006 | SS253D06 | G01031 | 177124001300 | 50.0% | NP |
| SHIP SHOAL 253 #D007 | SS253D07 | G01031 | 177124001400 | 50.0% | NP |
| SHIP SHOAL 253 #D008 | SS253D08 | G01031 | 177124001600 | 50.0% | NP |
| SHIP SHOAL 253 #D009 | SS253D09 | G01031 | 177124001800 | 50.0% | NP |
| SHIP SHOAL 253 #D010 | SS253D10 | G01031 | 177124002000 | 50.0% | NP |
| SHIP SHOAL 253 #D012 | N/A | G01031 | 177124002400 | 50.0% | NP |
| SHIP SHOAL 253 #D013 | SS253D13 | G01031 | 177124002600 | 50.0% | NP |
| SHIP SHOAL 253 #D014 | SS253D14 | G01031 | 177124002700 | 50.0% | NP |
| SHIP SHOAL 253 #E001 | SS253E01 | G01031 | 177124024200 | 50.0% | NP |
| SHIP SHOAL 253 #E002 | SS253E02 | G01031 | 177124024600 | 50.0% | NP |
| SHIP SHOAL 253 #E003 ST1 | SS253E03 | G01031 | 177124025301 | 50.0% | NP |
| SHIP SHOAL 253 #E004 | SS253E04 | G01031 | 177124025400 | 50.0% | NP |
| SHIP SHOAL 253 #E005 ST1 | SS253E05 | G01031 | 177124025501 | 50.0% | NP |
| SHIP SHOAL 253 #E006 | SS253E06 | G01031 | 177124026600 | 50.0% | NP |
| SHIP SHOAL 253 #E007 | SS253E07 | G01031 | 177124026800 | 50.0% | NP |
| SHIP SHOAL 253 #E008 | SS253E08 | G01031 | 177124027600 | 50.0% | NP |
| SHIP SHOAL 253 #E009 ST1 | SS253E09 | G01031 | 177124027700 | 50.0% | NP |
| SHIP SHOAL 253 #E010 | SS253E10 | G01031 | 177124027800 | 50.0% | NP |
| SHIP SHOAL 253 #E011 | SS253E11 | G01031 | 177124028200 | 50.0% | NP |
| SHIP SHOAL 253 #E012 | SS253E12 | G01031 | 177124028400 | 50.0% | NP |
| SHIP SHOAL 253 #E013 | SS253E13 | G01031 | 177124037500 | 50.0% | NP |

| Asset Name | FWE Acct. Code | Lease Number | API | WI | NRI |
|---|---|---|---|---|---|
| SHIP SHOAL 253 #E014 | SS253E14 | G01031 | 177124042100 | 50.0% | NP |
| SHIP SHOAL 253 #E015 ST1 | SS253E15 | G01031 | 177124044401 | 50.0% | NP |
| SHIP SHOAL 253 #F002 | SS253F02 | G01031 | 177124044400 | 50.0% | NP |
| SHIP SHOAL206#E001(SS207E1 | SS207E0100 | G01523 | 177114115500 | 37.94% | NP |
| SOUTH MARSH IS 066 #C001 | SM066C0100 | G01198 | 177070041200 | 50.0% | NP |
| SOUTH MARSH IS 066 #C002 | SM066C0200 | G01198 | 177070049000 | 50.0% | NP |
| SOUTH MARSH IS 066 #C003 | SM066C0300 | G01198 | 177074005800 | 50.0% | NP |
| SOUTH MARSH IS 066 #C004 | SM066C0400 | G01198 | 177070050000 | 50.0% | NP |
| SOUTH MARSH IS 066 #C005 | SM066C0500 | G01198 | 177070050700 | 50.0% | NP |
| SOUTH MARSH IS 066 #C006 | SM066C0600 | G01198 | 177072018700 | 50.0% | NP |
| SOUTH MARSH IS 066 #C007 | SM066C0700 | G01198 | 177070052800 | 50.0% | NP |
| SOUTH MARSH IS 066 #C009B | SM066C09B0 | G01198 | 177072001200 | 50.0% | NP |
| SOUTH MARSH IS 066 #C011 | SM066C1100 | G01198 | 177074072900 | 50.0% | NP |
| SOUTH MARSH IS 066 #C012 | SM066C1200 | G01198 | 177074073500 | 50.0% | NP |
| SOUTH MARSH IS 066 #D001 | SM066D0100 | G01198 | 177074025400 | 50.0% | NP |
| SOUTH MARSH IS 066 #D003 | SM066D0300 | G01198 | 177074029000 | 50.0% | NP |
| SOUTH MARSH IS 066 #D004 | SM066D0400 | G01198 | 177074032000 | 50.0% | NP |
| SOUTH MARSH IS 066 #D005 | SM066D0500 | G01198 | 177074032600 | 50.0% | NP |
| SOUTH MARSH IS 066 #D006 ST | SM066D0601 | G01198 | 177074031201 | 50.0% | NP |
| SOUTH MARSH IS 066 #D007 ST1BP | SM066D0701 | G01198 | 177074027401 | 50.0% | NP |
| SOUTH MARSH IS 132 #B002 | SM132B0200 | G02282 | 177084031800 | 50.0% | TA |
| SOUTH MARSH IS 132 #B003 ST1 | SM132B0301 | G02282 | 177084031601 | 50.0% | TA |
| SOUTH MARSH IS 132 #B004 | SM132B0400 | G02282 | 177084033000 | 50.0% | TA |

| Asset Name | FWE Acct. Code | Lease Number | API | WI | NRI |
|---|---|---|---|---|---|
| SOUTH MARSH IS 132 #B005 | SM132B0500 | G02282 | 177084033500 | 50.0% | TA |
| SOUTH MARSH IS 132 #B006 | SM132B0600 | G02282 | 177084033900 | 50.0% | TA |
| SOUTH MARSH IS 132 #B007 | SM132B0700 | G02282 | 177084034100 | 50.0% | TA |
| SOUTH MARSH IS 132 #B008 | SM132B0800 | G02282 | 177084035500 | 50.0% | TA |
| SOUTH MARSH IS 132 #B009 | SM132B0900 | G02282 | 177084036200 | 50.0% | TA |
| SOUTH MARSH IS 132 #B010 | SM132B1000 | G02282 | 177084036500 | 50.0% | TA |
| SOUTH MARSH IS 132 #B011 | SM132B1100 | G02282 | 177084037800 | 50.0% | NP |
| SOUTH MARSH IS 136 #A004 | SM136A0400 | G02588 | 177084021900 | 50.0% | NP |
| SOUTH MARSH IS 136 #A008 | SM136A08 | G02588 | 177084032401 | 50.0% | NP |
| SOUTH MARSH IS 136 #A010 | SM136A1000 | G02588 | 177084035700 | 50.0% | NP |
| SOUTH MARSH IS 136 #A015 | SM136A1500 | G02588 | 177084071200 | 50.0% | NP |
| SOUTH MARSH IS 136 #C007 | SM136C0700 | G02588 | 177084091900 | 50.0% | NP |
| SOUTH MARSH IS 137 #A001 | SM137A0100 | G02589 | 177084007700 | 50.0% | NP |
| SOUTH MARSH IS 137 #A003 | SM137A0300 | G02589 | 177084020400 | 50.0% | NP |
| SOUTH MARSH IS 137 #A005 | SM137A0500 | G02589 | 177084024100 | 50.0% | NP |
| SOUTH MARSH IS 137 #A009 | SM137A0900 | G02589 | 177084034600 | 50.0% | NP |
| SOUTH MARSH IS 137 #A011 ST1 | SM137A1101 | G02589 | 177084030201 | 50.0% | NP |
| SOUTH MARSH IS 137 #A012 | SM137A1200 | G02589 | 177084040400 | 50.0% | NP |
| SOUTH MARSH IS 137 #A013 | SM137A1300 | G02589 | 177084042900 | 50.0% | NP |
| SOUTH MARSH IS 137 #A014 | SM137A1400 | G02589 | 177084045000 | 50.0% | NP |
| SOUTH MARSH IS 137 #A018 | SM137A1800 | G02589 | 177084072800 | 50.0% | NP |
| SOUTH MARSH IS 150 #C006 BP2 | SM150C0600 | G16325 | 177084091802 | 50.0% | NP |

| Asset Name | FWE Acct. Code | Lease Number | API | WI | NRI |
|---|---|---|---|---|---|
| SOUTH TIMBALIER 195 #B001 | ST195B01 | G03593 | 177154091400 | 100.0% | TA |
| SOUTH TIMBALIER 195 #B002 | ST195B02 | G03593 | 177154092500 | 100.0% | TA |
| SOUTH TIMBALIER 195 #B003 | ST195B03 | G03593 | 177154117901 | 100.0% | NP |
| VERMILION 196 #A001 | VR196A01 | G19760 | 177054112300 | 25.0% | NP |
| VERMILION 196 #A002 | VR196A02 | G19760 | 177054116700 | 25.0% | NP |
| VERMILION 196 #A004 | VR196A04 | G19760 | 177054127900 | 25.0% | NP |
| VERMILION 207 #A003 | VR207A03 | G19761 | 177054117600 | 46.4% | TA |
| VERMILION 261 #A001 | VR261A0100 | G03328 | 177064029000 | 25.0% | NP |
| VERMILION 261 #A002 | VR261A0200 | G03328 | 177064033000 | 25.0% | NP |
| VERMILION 261 #A004 | VR261A0402 | G03328 | 177064032902 | 25.0% | NP |
| VERMILION 261 #A005 | VR261A0500 | G03328 | 177064034600 | 25.0% | NP |
| VERMILION 261 #A007 | VR261A0700 | G03328 | 177064035400 | 25.0% | NP |
| VERMILION 261 #A008 | VR261A0800 | G03328 | 177064084900 | 25.0% | NP |
| VERMILION 314 #A009 | VR314A09 | G05438 | 177064076900 | 50.0% | NP |
| VIOSCA KNOLL 113 #A001 | VK113A01 | G16535 | 608164039101 | 100.0% | 83.3% |
| VIOSCA KNOLL 251 #A001 | VK251A001 | G10930 | 608164029800 | 100.0% | 81.3% |
| VIOSCA KNOLL 251 #A002 | VK251A002 | G10930 | 608164034501 | 100.0% | 81.3% |
| VIOSCA KNOLL 251 #A003 | VK251A003 | G10930 | 608164041500 | 100.0% | 81.3% |
| VIOSCA KNOLL 251 #A004 | VK251A004 | G10930 | 608164042101 | 100.0% | 81.3% |
| VIOSCA KNOLL 340 #A001 | VK340A01 | G10933 | 608164038800 | 100.0% | 81.4% |
| VIOSCA KNOLL 340 #A002 | VK340A02 | G10933 | 608164044400 | 100.0% | 81.4% |

**Exhibit I-B(ii)**

**Certain Other FWE IV Wells**

| Asset Name | FWE Acct. Code | Lease Number | API | WI | NRI |
|---|---|---|---|---|---|
| EAST BREAKS 160 #A005 HB-2 | EB160A05 | G02647 | 608044003700 | 100.0% | 83.3% |
| EAST BREAKS 160 #A009 HB2 | EB160A09 | G02647 | 608044005800 | 100.0% | 83.3% |
| EAST BREAKS 160 #A010 GA1 | EB160A10 | G02647 | 608044008702 | 100.0% | 83.3% |
| EAST BREAKS 160 #A016 | EB160A16 | G02647 | 608044006000 | 100.0% | 83.3% |
| EAST BREAKS 160 #A018 ST4 | EB160A18 | G02647 | 608044006904 | 100.0% | 83.3% |
| EAST BREAKS 160 #A023 | EB160A23 | G02647 | 608044003900 | 100.0% | 83.3% |
| EAST BREAKS 160 #A025 | EB160A25 | G02647 | 608044004600 | 100.0% | 83.3% |
| EAST BREAKS 160 #A027 HB2 | EB160A27 | G02647 | 608044004900 | 100.0% | 83.3% |
| EAST BREAKS 160 #A031 HB2 | EB160A31 | G02647 | 608044008400 | 100.0% | 83.3% |
| EAST BREAKS 160 #A033 ST TA | EB160A33 | G02647 | 608044007002 | 100.0% | 83.3% |
| EAST BREAKS 161 #002 (CORONA) | EB16102 | G02648 | 608044022600 | 100.0% | 83.3% |
| EAST BREAKS 161 #A001 ST | EB161A01 | G02648 | 608044002801 | 100.0% | 83.3% |
| EAST BREAKS 161 #A002 | EB161A02 | G02648 | 608044003100 | 100.0% | 83.3% |
| EAST BREAKS 161 #A003 HB4 | EB161A03 | G02648 | 608044002900 | 100.0% | 83.3% |
| EAST BREAKS 161 #A004 | N/A | G02648 | 608044003400 | 100.0% | 83.3% |
| EAST BREAKS 161 #A007 GM1 | EB161A07 | G02648 | 608044004300 | 100.0% | 83.3% |
| EAST BREAKS 161 #A008 HB2 | EB161A08 | G02648 | 608044004400 | 100.0% | 83.3% |
| EAST BREAKS 161 #A013 ST | EB161A13 | G02648 | 608044024501 | 100.0% | 83.3% |
| EAST BREAKS 161 #A024 | EB161A24 | G02648 | 608044009701 | 100.0% | 83.3% |
| EAST BREAKS 161 #A029 GA3 | EB161A29 | G02648 | 608044005300 | 100.0% | 83.3% |
| HIGH ISLAND A-446 #A001 | HIA446A01 | G02359 | 427094055400 | 100.0% | 68.4% |
| HIGH ISLAND A-446 #A002B | HIA446A02 | G02360 | 427094055700 | 100.0% | 68.4% |
| HIGH ISLAND A-446 #A004 | HIA446A04 | G02359 | 427094056300 | 100.0% | TA |
| HIGH ISLAND A-446 #A005 | HIA446A05 | G02359 | 427094057700 | 100.0% | TA |
| HIGH ISLAND A-446 #A006 | HIA446A06 | G02359 | 427094056700 | 100.0% | 68.4% |
| HIGH ISLAND A-446 #A007 | HIA446A07 | G02359 | 427094056800 | 100.0% | TA |
| HIGH ISLAND A-446 #A008 | HIA446A08 | G02359 | 427094057400 | 100.0% | TA |
| HIGH ISLAND A-446 #A009 | HIA446A09 | G02359 | 427094060200 | 100.0% | 68.4% |
| HIGH ISLAND A-446 #A010 | HIA446A10 | G02359 | 427094058300 | 100.0% | 68.4% |
| HIGH ISLAND A-446 #A011 | HIA446A11 | G02359 | 427094058700 | 100.0% | TA |
| HIGH ISLAND A-446 #A012 | HIA446A12 | G02359 | 427094059400 | 100.0% | TA |
| HIGH ISLAND A-446 #A014 | HIA446A14 | G02359 | 427094060900 | 100.0% | 68.4% |
| HIGH ISLAND A-446 #A015 | HIA446A15 | G02359 | 427094061300 | 100.0% | TA |
| HIGH ISLAND A-446 #A016 | HIA446A16 | G02359 | 427094062300 | 100.0% | TA |
| VERMILION 332 #A001 | VR332A01 | G09514 | 177064069400 | 66.5% | 55.4% |

| VERMILION 332 #A002 | VR332A02 | G09514 | 177064069900 | 66.5% | 55.4% |
|---|---|---|---|---|---|
| VERMILION 332 #A003 | VR332A03 | G09514 | 177064072300 | 66.5% | TA |
| VERMILION 333 #A004 | N/A | G14417 | 177064072600 | 50.0% | TA |
| VERMILION 332 #A005 | VR332A05 | G09514 | 177064077802 | 66.5% | 55.4% |
| VERMILION 332 #A006 | VR332A06 | G09514 | 177064077901 | 66.5% | 55.4% |

**Exhibit I-C(i)**

**FWE IV Platforms**

| Asset Name | FWE Acct. Code | Lease Number | Area/Block | WI |
|---|---|---|---|---|
| BRAZOS A-105 P/F-A | BAA105PFA | G01757 | BAA105 | 56.3% |
| BRAZOS A-105 P/F-B | BAA105PFB | G01757 | BAA105 | 56.3% |
| BRAZOS A-133 P/F-A | BAA133APLT | G02665 | BAA133 | 25.0% |
| BRAZOS A-133 P/F-B | BAA133BPLT | G02665 | BAA133 | 25.0% |
| BRAZOS A-133 P/F-C-AUX | BAA133CAUX | G02665 | BAA133 | 25.0% |
| BRAZOS A-133 P/F-D | BAA133DPLT | G02665 | BAA133 | 25.0% |
| BRAZOS A-133 P/F-E | BAA133EPLT | G02665 | BAA133 | 25.0% |
| EAST BREAKS 159 P/F-A | EB159PFA | G02646 | EB159 | 66.7% |
| EAST CAMERON 332 P/F-A | EC332PFA | G09478 | EC332 | 88.0% |
| HIGH ISLAND A-550 P/F-A | HIA550PFA | G04081 | HIA550 | 100.0% |
| MAIN PASS 077 P/F-A | MP077PFA | G04481 | MP077 | 55.6% |
| MAIN PASS 154 P/F-A | MP154PFA | G30337 | MP154 | 100.0% |
| SHIP SHOAL 169 P/F-BB | SS169PFBB | 00820 | SS169 | 33.3% |
| SHIP SHOAL 169 P/F-C | SS169PFC | 00820 | SS169 | 33.3% |
| SHIP SHOAL 169 P/F-G | SS169PFG | 00820 | SS169 | 33.3% |
| SHIP SHOAL 206 P/F-E | SS206EPLT | G01522 | SS206 | 40.0% |
| SHIP SHOAL 207 P/F-A-CMP | SS207ACOMP | G01523 | SS207 | 26.3% |
| SHIP SHOAL 207 P/F-A-DRILL | SS207ADRL | G01523 | SS207 | 26.3% |
| SHIP SHOAL 207 P/F-A-MANTIS | SS207PFAMA | G01523 | SS207 | 26.3% |
| SHIP SHOAL 207 P/F-A-PROD | SS207APRD | G01523 | SS207 | 26.3% |
| SHIP SHOAL 207 P/F-D | SS207DPLT | G01523 | SS207 | 26.3% |
| SHIP SHOAL 207 P/F-DWPF | SS207DPLT | G01523 | SS207 | 26.3% |
| SHIP SHOAL 253 C | SS253PFC | G01031 | SS 253 | 50.0% |
| SHIP SHOAL 253 D | SS253PFD | G01031 | SS 253 | 50.0% |
| SHIP SHOAL 253 E | SS253PFE | G01031 | SS 253 | 50.0% |
| SHIP SHOAL 253 F | SS253PFF | G01031 | SS 253 | 50.0% |
| SOUTH MARSH IS 066 P/F-C | SM66CPLT | G01198 | SM066 | 50.0% |
| SOUTH MARSH IS 066 P/F-D | SM66DPLT | G01198 | SM066 | 50.0% |
| SOUTH MARSH IS 137 P/F-A | SM137APLT | G02589 | SM137 | 50.0% |
| SOUTH TIMBALIER 195 P/F-B | ST195PFB | G03593 | ST195 | 100.0% |
| VERMILION 196 P/F-A | VR196PFA | G19760 | VR196 | 25.0% |
| VERMILION 261 P/F-A | VR261APLT | G03328 | VR261 | 25.0% |
| VERMILION 261 P/F-A-AUX | VR261AAUX | G03328 | VR261 | 25.0% |
| VERMILION 315 P/F-A | VR315PFA | G30213 | VR315 | 100.0% |
| VERMILION 315 P/F-A-AUX | VR315PFAAU | G30213 | VR315 | 100.0% |

| Asset Name | FWE Acct. Code | Lease Number | Area/Block | WI |
|---|---|---|---|---|
| VIOSCA KNOLL 113 P/F-A | VK113PFA | G16535 | VK113 | 100.0% |
| VIOSCA KNOLL 251 P/F-A | VK251PFA | G10930 | VK251 | 100.0% |
| VIOSCA KNOLL 251 P/F-A-AUX | VK251PFAAU | G10930 | VK251 | 100.0% |
| VIOSCA KNOLL 340 P/F-A | VK340PFA | G10933 | VK340 | 100.0% |

## Exhibit I-C(ii)

### FWE IV Facilities

| Asset Name | FWE Acct. Code | Lease Number | Area/Block | WI | |
|---|---|---|---|---|---|
| EAST BREAKS 160 P/F-A | EB160PFA | G02647 | EB160 | 100.0% | *1 |
| HIGH ISLAND A-446 P/F-A | HIA446PFA | G02359 | HIA446 | 100.0% | *1 |
| VERMILION 332 P/F-A | VR332PFA | G09514 | VR332 | 66.5% | *1 |

*1 - FWE IV Assets to include all rights of FWE III held in applicable FWE IV Facility immediately prior to the Effective Time, as contemplated by part (B) of clause (iv) in Part A of Schedule I of the Plan of Merger.

**Exhibit I-D(i)**
**FWE IV Rights of Way**

| SEGMENT NUMBER | COMPANY NAME | ORG AREA | ORG BLOCK | ORG NAME | REC AREA | REC BLOCK | REC NAME | SIZE | PRODUCT | STATUS | ROW NUMBER | FW Lease | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 7912 | Fieldwood SD Offshore LLC | EB | 160 | A | HI | A582 | SSTI | 12 | GAS | Out of Service | G08528 | G02647 | *2 |
| 10301 | Bandon Oil and Gas, LP | EC | 332 | A | EC | 330 | 08 SSTI | 6 | OIL | Out of Service | G14699 | G09478 | |
| 7943 | Fieldwood Energy, LLC | EI | 342 | C | EI | 327 | 08 SSTI | 4 | OIL | Out of Service | G08541 | G02319 | *1 |
| 18493 | Fieldwood Energy, LLC | EI | 342 | C | EI | 343 | SSTI | 6 | GAS | Out of Service | G29108 | G02319 | *1 |
| 19960 | Fieldwood Energy LLC | EI | 342 | C | EI | 342 | Blind Flange | 6 | OIL | Out of Service | G29471 | G02319 | *1 |
| 15818 | Fieldwood Energy Offshore LLC | MP | 77 | A | MP | 151 | 18"SSTI | 8 | GAS | Out of Service | G28221 | G04481 | |
| 6748 | Fieldwood Energy, LLC | SS | 169 | C Platform | SS | 169 | 18-inch SSTI | 6 | OIL | Out of Service | G09322 | 00820 | |
| 11107 | Bandon Oil and Gas, LP | ST | 196 | 06-inch SSTI | SS | 208 | F | 6 | OIL | Permitted for Abandonment Approved | G05120 | G03593 | |
| 13193 | Bandon Oil and Gas, LP | VR | 196 | A | VR | 206 | 12 SSTI | 8 | G/C | Out of Service | G22418 | G19760 | |
| 18591 | Fieldwood Energy, LLC | VR | 196 | A | VR | 215 | A | 4 | BLKO | Out of Service | G29137 | G19760 | |
| 18588 | Fieldwood Energy, LLC | VR | 215 | A | VR | 196 | A | 4 | GAS | Active | G29136 | G19760 | |
| 17090 | Fieldwood Energy, LLC | VR | 261 | A | VR | 265 | A | 8 | BLKO | Out of Service | G28347 | G03328 | *1 |
| 19427 | Fieldwood Energy, LLC | VK | 113 | A | CA | 43 | A | 4 | BLKG | Out of Service | G29321 | G16535 | |

| SEGMENT NUMBER | COMPANY NAME | ORG AREA | ORG BLOCK | ORG NAME | REC AREA | REC BLOCK | REC NAME | SIZE | PRODUCT | STATUS | ROW NUMBER | FW Lease | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 13721 | Fieldwood Energy, LLC | VK | 251 | A | VK | 340 | A | 3 | AIR | Active | G28704 | G10930 | |
| 14876 | Fieldwood Energy, LLC | VK | 251 | A | MP | 154 | A | 4 | H2O | Active | G22465 | G10930 | |
| 13720 | Fieldwood Energy Offshore LLC | VK | 340 | 8-inch SSTI | VK | 251 | Platform A | 8 | BLGH | Active | G28703 | G10933 | |
| 7298 | Dynamic Industries, Inc | VR | 315 | A | VR | 331 | 06 SSTI | 6 | OIL | Out of Service | G07545 | G04215 | |
| 10736 | Dynamic Industries, Inc | VR | 332 | A | VR | 315 | A | 8 | BLKG | Out of Service | G15672 | G09514 | *2 |
| 10737 | Dynamic Industries, Inc | VR | 332 | A | VR | 315 | A | 6 | LIFT | Out of Service | G15673 | G09514 | *2 |

*1 - The Parties recognize that segments and ROWs will be operated by Fieldwood Energy I, LLC. In addition, the Parties acknowledges that segment numbers and ROW names may have changed after the FWE IV Rights of Way were conveyed pursuant to the Chevron PSAs.

*2 - FWE IV Assets to include all rights of FWE III held in applicable FWE IV Right of Way immediately prior to the Effective Time, as contemplated by part (B) of clause (iv) in Part A of Schedule I of the Plan of Merger.

**Exhibit I-D(ii)**

**FWE IV RUEs**

| Area | Block No. | Structure | Complex ID No. | Authority No. | FW Lease | Operator | Approval Date | Associated Assets |
|------|-----------|-----------|----------------|---------------|----------|----------|---------------|-------------------|
| MP | 154 | A | 24171 | G30337 | G10902 | Fieldwood Energy Offshore LLC | 02/03/17 | MP 154 A001 & A002 |
| VR | 315 | A | 22981 | G30213 | G04215 | Fieldwood Energy Offshore LLC | 11/26/13 | VR 332 A001, A002, A005 & A006 |
| VR | 315 | A-AUX | 22981 | G30213 | G04215 | Fieldwood Energy Offshore LLC | 11/26/13 | Production from VR 315 A RUE |

## Exhibit I-E

**FWE IV Permits**

To be agreed.

## **Exhibit I-F**

**FWE IV FCC Licenses**

None.

**<u>Exhibit I-G</u>**

**FWE IV Contracts**

To be agreed.

## Exhibit I-H

### FWE IV Financial Assurances

| Account | Acct No. | Amount | Associated Asset |
|---|---|---|---|
| U.S. Bank Escrow Account | 246166000 | $792,381.49 | MAIN PASS 77 (MP 77) |

## Exhibit I-I

**FWE IV Bonds**

None.

**<u>Exhibit 1-B</u>**

**Certificate of Merger**

See attached.

*Exhibit 1-B to the Implementation Agreement*

# CERTIFICATE OF MERGER
## (DOMESTIC ENTITY DIVISIONAL MERGER)
## OF
## FIELDWOOD ENERGY III LLC

**[●], 2021**

Pursuant to Title 1, Chapter 10 and Title 3 of the Texas Business Organizations Code (the "TBOC"), the undersigned, Fieldwood Energy III LLC, a Texas limited liability company ("FWE III"), submits this certificate of merger for the purpose of dividing itself into a surviving domestic entity and one new domestic entity, and hereby certifies the following:

FIRST:  The name of the domestic filing entity that is dividing itself is Fieldwood Energy III LLC.

SECOND:  The principal place of business of FWE III is 2000 W Sam Houston Pkwy S #1200, Houston, TX 77042.

THIRD:  The filing number issued to FWE III by the Secretary of State of the State of Texas is [●][1].

FOURTH:  FWE III is organized as a limited liability company.

FIFTH: FWE III shall survive the merger and shall maintain its separate existence and continue as a filing entity under its name as of immediately prior to the merger.

SIXTH:  In lieu of providing the plan of merger, the filing entity certifies that:

(i) An executed copy of the Agreement and Plan of Merger, dated as of [●], 2021 (the "Plan of Merger"), of FWE III is on file at the principal place of business of each surviving and new domestic entity provided in this form.

(ii)  On written request, a copy of the Plan of Merger will be furnished without cost by each surviving or new domestic entity to any member of any domestic entity that is a party to or created by the Plan of Merger, and any creditor or obligee of the parties to the merger at the time of the merger if a liability or obligation is then outstanding.

SEVENTH:  No amendments to the certificate of formation of FWE III are being effected by the merger.

EIGHTH:  The name, jurisdiction of organization, principal place of business address, and entity description of the entity to be created pursuant to the plan of merger are set forth below. The

---

[1] **Note to Draft**:  To be assigned upon conversion of FWE to a Texas LLC.

certificate of formation of the new domestic filing entity to be created is being filed with this certificate of merger.

Name:  Fieldwood Energy IV LLC

Entity Description:  limited liability company

Jurisdiction of Organization:  Texas

Principal place of business: 200 W. Sam Houston Pkwy S. Suite 1200.

NINTH:  The Plan of Merger has been approved as required by the laws of the jurisdiction of formation and by the governing documents of the filing entity.

TENTH:  This document becomes effective when the document is accepted and filed by the Secretary of State of the State of Texas.

ELEVENTH:  In lieu of providing the tax certificate, FWE III shall continue to be liable for the payment of all required franchise taxes of FWE III.

\* \* \* \* \* \*

IN WITNESS WHEREOF, the undersigned has caused this certificate of merger to be duly executed as of the date first set forth above.

**FIELDWOOD ENERGY III LLC**
a Texas limited liability company

By: _____
Name: _____
Title: _____

**<u>Exhibit 2</u>**

**Certificate of Formation (TX) (Fieldwood Energy IV LLC)**

See attached.

| Form 205<br>(Revised 05/11)<br><br>Submit in duplicate to:<br>Secretary of State<br>P.O. Box 13697<br>Austin, TX 78711-3697<br>512 463-5555<br>FAX: 512 463-5709<br>**Filing Fee: $300** | <br>**Certificate of Formation<br>Limited Liability Company** | This space reserved for office use. |
| --- | --- | --- |

## Article 1 – Entity Name and Type

The filing entity being formed is a limited liability company.  The name of the entity is:

FIELDWOOD ENERGY IV LLC

The name must contain the words "limited liability company," "limited company," or an abbreviation of one of these phrases.

## Article 2 – Registered Agent and Registered Office
(See instructions. Select and complete either A or B and complete C.)

☒  A.  The initial registered agent is an organization (cannot be entity named above) by the name of:

CAPITOL CORPORATE SERVICES, INC.

**OR**

☐  B.  The initial registered agent is an individual resident of the state whose name is set forth below:

| *First Name* | *M.I.* | *Last Name* | *Suffix* |
| --- | --- | --- | --- |

C.  The business address of the registered agent and the registered office address is:

| 206 E. 9TH STREET, SUITE 1300 | AUSTIN | TX | 78701 |
| --- | --- | --- | --- |
| *Street Address* | *City* | *State* | *Zip Code* |

## Article 3—Governing Authority
(Select and complete either A or B and provide the name and address of each governing person.)

☒  A.  The limited liability company will have managers. The name and address of each initial manager are set forth below.

☐  B.  The limited liability company will not have managers.  The company will be governed by its members, and the name and address of each initial member are set forth below.

| **GOVERNING PERSON 1** | | | | |
| --- | --- | --- | --- | --- |
| **NAME** (Enter the name of either an individual or an organization, but not both.)<br>    **IF INDIVIDUAL** | | | | |
|    *First Name* | *M.I.* | *Last Name* | | *Suffix* |
| **OR**<br>**IF ORGANIZATION** | | | | |
|    Sunset Energy Gulf Coast Asset Management LLC | | | | |
| *Organization Name* | | | | |
| **ADDRESS** | | | | |
| 1727 Sunset Boulevard | Houston | TX | USA | 77005 |
| *Street or Mailing Address* | *City* | *State* | *Country* | *Zip Code* |

Form 205 4

| GOVERNING PERSON 2 | | | | | |
|---|---|---|---|---|---|
| **NAME** (Enter the name of either an individual or an organization, but not both.) | | | | | |
| **IF INDIVIDUAL** | | | | | |
| *First Name* | *M.I.* | *Last Name* | | | *Suffix* |
| **OR** | | | | | |
| **IF ORGANIZATION** | | | | | |
| *Organization Name* | | | | | |
| **ADDRESS** | | | | | |
| *Street or Mailing Address* | *City* | | *State* | *Country* | *Zip Code* |

| GOVERNING PERSON 3 | | | | | |
|---|---|---|---|---|---|
| **NAME** (Enter the name of either an individual or an organization, but not both.) | | | | | |
| **IF INDIVIDUAL** | | | | | |
| *First Name* | *M.I.* | *Last Name* | | | *Suffix* |
| **OR** | | | | | |
| **IF ORGANIZATION** | | | | | |
| *Organization Name* | | | | | |
| **ADDRESS** | | | | | |
| *Street or Mailing Address* | *City* | | *State* | *Country* | *Zip Code* |

## Article 4 – Purpose

The purpose for which the company is formed is for the transaction of any and all lawful purposes for which a limited liability company may be organized under the Texas Business Organizations Code.

### Supplemental Provisions/Information

Text Area: [The attached addendum, if any, is incorporated herein by reference.]

The entity is formed pursuant to a plan of merger. The name of the merging filing entity is Fieldwood Energy III LLC; the surviving domestic entity is Fieldwood Energy III LLC and the new domestic entity created by the divisive merger is this Fieldwood Energy IV LLC.

The address of the merging filing entity is 2000 W. Sam Houston Pkwy. S., Suite 1200, Houston, Texas 77042.

The merging filing entity was previously a Delaware limited liability company, originally formed on 11/5/2012 under the laws of the State of Delaware, USA. The merging filing entity converted to a Texas limited liability company on [___]/[___]/2021.

TX060BOC - 11/27/2013 Wolters Kluwer Online

## Organizer

The name and address of the organizer:

_____
*Name*


_____
*Street or Mailing Address*                              *City*                          *State*     *Zip Code*

## Effectiveness of Filing (Select either A, B, or C.)

A. ☒ This document becomes effective when the document is filed by the secretary of state.

B. ☐ This document becomes effective at a later date, which is not more than ninety (90) days from the date of signing.  The delayed effective date is: _____

C. ☐ This document takes effect upon the occurrence of the future event or fact, other than the passage of time.  The 90th day after the date of signing is: _____

The following event or fact will cause the document to take effect in the manner described below:

+-------------------------------------------------------------------------------+
|                                                                               |
|                                                                               |
+-------------------------------------------------------------------------------+

## Execution

The undersigned affirms that the person designated as registered agent has consented to the appointment.  The undersigned signs this document subject to the penalties imposed by law for the submission of a materially false or fraudulent instrument and certifies under penalty of perjury that the undersigned is authorized to execute the filing instrument.

Date:  _____


_____
Signature of organizer


_____
Printed or typed name of organizer


| Print | Reset |

**<u>Exhibit 3</u>**

**Fieldwood Energy IV LLC Agreement**

See attached.

*Exhibit 3 to the Implementation Agreement*

# LIMITED LIABILITY COMPANY AGREEMENT

## OF

## FIELDWOOD ENERGY IV LLC

*(a Texas Limited Liability Company)*

**[●], 2021**

**THE MEMBERSHIP INTERESTS REFERENCED IN THIS LIMITED LIABILITY COMPANY AGREEMENT HAVE BEEN ACQUIRED FOR INVESTMENT AND HAVE NOT BEEN REGISTERED UNDER THE U.S. SECURITIES ACT OF 1933, AS AMENDED, OR UNDER ANY APPLICABLE STATE SECURITIES LAWS. SUCH MEMBERSHIP INTERESTS MAY NOT BE SOLD, ASSIGNED, PLEDGED, HYPOTHECATED OR OTHERWISE DISPOSED OF AT ANY TIME WITHOUT EFFECTIVE REGISTRATION UNDER SUCH ACT AND LAWS OR EXEMPTION THEREFROM, AS WELL AS COMPLIANCE WITH THE OTHER SUBSTANTIAL RESTRICTIONS ON TRANSFERABILITY THAT ARE SET FORTH HEREIN.**

## TABLE OF CONTENTS

**ARTICLE I DEFINITIONS** ...............................................................................................1

    **Section 1.01**    **Definitions**................................................................1
    **Section 1.02.**    **Interpretation**.........................................................12

**ARTICLE II ORGANIZATION** ....................................................................................13

    **Section 2.01**    **Formation**.............................................................13
    **Section 2.02**    **Name**...................................................................13
    **Section 2.03**    **Principal Office**....................................................13
    **Section 2.04**    **Registered Office; Registered Agent.**........................13
    **Section 2.05**    **Purposes; Powers**.................................................14
    **Section 2.06**    **Term**...................................................................14

**ARTICLE III CAPITAL CONTRIBUTIONS; CAPITAL ACCOUNTS**............................14

    **Section 3.01**    **Tax Partnership Provisions**....................................14
    **Section 3.02**    **Initial Capital Contributions**..................................14
    **Section 3.03**    **Additional Capital Contributions**............................14
    **Section 3.04**    **Maintenance of Capital Accounts**.............................14
    **Section 3.05**    **Succession Upon Transfer**......................................15
    **Section 3.06**    **Negative Capital Accounts**.....................................15
    **Section 3.07**    **No Withdrawals from Capital Accounts**....................15
    **Section 3.08**    **Treatment of Loans from Members**..........................15
    **Section 3.09**    **Modifications**......................................................16

**ARTICLE IV MEMBERS** ............................................................................................16

    **Section 4.01**    **No Personal Liability**...........................................16
    **Section 4.02**    **No Withdrawal**....................................................16
    **Section 4.03**    **No Interest in Company Property**.............................16
    **Section 4.04**    **Certification of Membership Interests**......................16
    **Section 4.05**    **Meetings of Members**...........................................17
    **Section 4.06**    **Action Without Meeting**.......................................18
    **Section 4.07**    **Power of Members**...............................................18
    **Section 4.08**    **Similar or Competitive Activities; Business Opportunities**...............18

**ARTICLE V ALLOCATIONS**......................................................................................19

    **Section 5.01**    **Tax Partnership Provisions**....................................19
    **Section 5.02**    **Allocation of Net Income and Net Loss**.....................19
    **Section 5.03**    **Regulatory and Special Allocations**..........................19

i

| | | |
|---|---|---|
| **Section 5.04** | **Tax Allocations**. | 20 |
| **Section 5.05** | **Allocations in Respect of Transferred Membership Interests** | 22 |

**ARTICLE VI DISTRIBUTIONS** .......22

| | | |
|---|---|---|
| **Section 6.01** | **General**. | 22 |
| **Section 6.02** | **Tax Advances**. | 23 |
| **Section 6.03** | **Tax Withholding; Withholding Advances** | 23 |
| **Section 6.04** | **Distributions in Kind**. | 24 |

**ARTICLE VII MANAGEMENT** .......25

| | | |
|---|---|---|
| **Section 7.01** | **Management of the Company** | 25 |
| **Section 7.02** | **Sole Manager**. | 25 |
| **Section 7.03** | **Material Project Contracts; Net Profit Interest** | 25 |
| **Section 7.04** | **Actions Requiring CUSA Consent** | 26 |
| **Section 7.05** | **No Compensation of the Sole Manager** | 27 |
| **Section 7.06** | **No Personal Liability** | 27 |

**ARTICLE VIII TRANSFER** .......28

| | | |
|---|---|---|
| **Section 8.01** | **General Restrictions on Transfer**. | 28 |

**ARTICLE IX EXCULPATION AND INDEMNIFICATION** .......29

| | | |
|---|---|---|
| **Section 9.01** | **Exculpation of Covered Persons**. | 29 |
| **Section 9.02** | **Liabilities and Duties of Covered Persons**. | 30 |
| **Section 9.03** | **Indemnification**. | 30 |
| **Section 9.04** | **Survival** | 32 |

**ARTICLE X ACCOUNTING; TAX MATTERS** .......33

| | | |
|---|---|---|
| **Section 10.01** | **Financial Statements and Other Information** | 33 |
| **Section 10.02** | **Inspection Rights** | 33 |
| **Section 10.03** | **Income Tax Status** | 34 |
| **Section 10.04** | **Tax Matters Representative**. | 34 |
| **Section 10.05** | **Tax Returns** | 35 |
| **Section 10.06** | **Company Funds** | 36 |

**ARTICLE XI WINDING UP AND TERMINATION** .......36

| | | |
|---|---|---|
| **Section 11.01** | **Events Requiring Winding Up** | 36 |
| **Section 11.02** | **Effectiveness of Termination** | 36 |
| **Section 11.03** | **Liquidation** | 37 |

ii

**Section 11.04**    **Certificate of Termination** ...................................................38
**Section 11.05**    **Survival of Rights, Duties, and Obligations** ..........................38
**Section 11.06**    **Recourse for Claims** .........................................................38

**ARTICLE XII MISCELLANEOUS** ..............................................................**38**
   **Section 12.01**    **Expenses** .............................................................38
   **Section 12.02**    **Further Assurances** .............................................38
   **Section 12.03**    **Confidentiality** ...................................................39
   **Section 12.04**    **Notices** ..............................................................40
   **Section 12.05**    **Headings** ............................................................41
   **Section 12.06**    **Severability** .........................................................41
   **Section 12.07**    **Entire Agreement** ...............................................41
   **Section 12.08**    **Successors and Assigns** ......................................41
   **Section 12.09**    **No Third-Party Beneficiaries** ............................41
   **Section 12.10**    **Amendment** ........................................................42
   **Section 12.11**    **Waiver** ...............................................................42
   **Section 12.12**    **Governing Law** ..................................................42
   **Section 12.13**    **Submission to Jurisdiction** .................................42
   **Section 12.14**    **Waiver of Jury Trial** ..........................................42
   **Section 12.15**    **Equitable Remedies** ...........................................43
   **Section 12.16**    **Attorney's Fees** .................................................43
   **Section 12.17**    **Remedies Cumulative** ........................................43
   **Section 12.18**    **Counterparts** ......................................................43

**SCHEDULE A MEMBERS SCHEDULE**    A-1

WEIL:\97901822\22\45327.0007

## LIMITED LIABILITY COMPANY AGREEMENT OF
## FIELDWOOD ENERGY IV LLC

This Limited Liability Company Agreement of Fieldwood Energy IV LLC, a Texas limited liability company (the "**Company**"), dated as of [●], 2021 (this "**Agreement**"), is entered into by and among the Company, the Initial Member executing this Agreement as of the date hereof, and each other Person who after the date hereof becomes a Member of the Company and becomes a party to this Agreement by executing a joinder agreement in form and substance acceptable to the Company.

## RECITALS

**WHEREAS,** the Company was formed under the laws of the State of Texas by the filing of a Certificate of Formation with the Secretary of State of the State of Texas on [●], 2021 (the "**Certificate of Formation**") for the purposes set forth in Section 2.05 of this Agreement;

**WHEREAS,** pursuant to and in accordance with the Confirmation Order and the Term Sheet, respectively, and as a result of a divisive merger pursuant to § 10.008 of the BOC, the Company owns the FWE IV Assets, subject to the operational liabilities in connection therewith allocated to the Company in the merger, including the FWE IV Obligations; and

**WHEREAS,** the Initial Member wishes to enter into this Agreement to set forth the terms and conditions governing the ownership, operation and management of the Company.

**NOW, THEREFORE,** in consideration of the mutual covenants and agreements hereinafter set forth and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

## ARTICLE I
## DEFINITIONS

**Section 1.01   Definitions.**  Capitalized terms used herein and not otherwise defined shall have the meanings set forth in this Section 1.01:

"**Adjusted Capital Account Deficit**" means, with respect to any Member, the deficit balance, if any, in such Member's Capital Account as of the end of the relevant Fiscal Year, after giving effect to the following adjustments:

(a)     crediting to such Capital Account any amount that such Member is obligated to restore or is deemed to be obligated to restore pursuant to Treasury Regulations Sections 1.704-1(b)(2)(ii)(c), 1.704-2(g)(1) and 1.704-2(i); and

(b)     debiting to such Capital Account the items described in Treasury Regulations Section 1.704-1(b)(2)(ii)(d)(4), (5) and (6).

"**Adjusted Taxable Income**" of a Member, or if the Member is disregarded for U.S. federal income tax purposes, the members or beneficiaries of such Member, for a Fiscal Year (or

portion thereof) with respect to the Membership Interest held by such Member means the federal taxable income allocated by the Company to the Member with respect to its Membership Interest (as adjusted by any final determination in connection with any tax audit or other proceeding) for such Fiscal Year (or portion thereof); provided, that such taxable income shall be computed (i) minus any excess taxable loss of the Company for any prior period allocable to such Member with respect to its Membership Interest that were not previously taken into account for purposes of determining such Member's Adjusted Taxable Income in a prior Fiscal Year to the extent such loss would be available under the Code to offset income of the Member (or, as appropriate, the direct or indirect owners of the Member) determined as if the income and loss from the Company were the only income and loss of the Member (or, as appropriate, the direct or indirect owners of the Member) in such Fiscal Year and all prior Fiscal Years, and (ii) taking into account any special basis adjustment with respect to such Member resulting from an election by the Company under Code Section 754.

"**Affiliate**" means, with respect to any Person, any other Person who, directly or indirectly (including through one or more intermediaries), controls, is controlled by, or is under common control with, such Person. For purposes of this definition, "control," when used with respect to any specified Person, shall mean the power, direct or indirect, to direct or cause the direction of the management and policies of such Person, whether through ownership of voting securities or partnership or other ownership interests, by contract or otherwise; and the terms "controlling" and "controlled" shall have correlative meanings. For the avoidance of doubt, neither CUSA nor any of its Subsidiaries nor Credit Bid Purchaser nor any of its Subsidiaries control the Company and none of them shall constitute an Affiliate of the Company.

"**Agreement**" has the meaning set forth in the Preamble.

"**Applicable Law**" means all applicable provisions of (a) constitutions, treaties, statutes, laws (including the common law), rules, regulations, decrees, ordinances, codes, proclamations, declarations, or orders of any Governmental Authority; (b) any consents or approvals of any Governmental Authority; and (c) any orders, decisions, advisory or interpretative opinions, injunctions, judgments, awards, decrees of, or agreements with, any Governmental Authority.

"**Bankruptcy**" means (i) the filing by the Company of a petition under the Bankruptcy Code seeking to adjudicate the Company a bankrupt or an insolvent or otherwise commencing, authorizing, or acquiescing in the commencement of a proceeding or cause of action seeking liquidation, winding up, reorganization, arrangement, adjustment, protection, composition, or other relief with respect to itself or its debts under any bankruptcy, insolvency, or other similar law now or hereafter in effect or seeking the appointment of a trustee, receiver, liquidator, custodian, or other similar official over it or any substantial part of its property, or consenting to any such relief or to the appointment of or taking possession by any such official in an involuntary case or other proceeding commenced against it, or taking any corporate or similar official action to authorize any of the foregoing; (ii) the making of an assignment or any general arrangement for the benefit of creditors; or (iii) the Company's filing an answer or other pleading admitting or failing to contest the allegations of a petition filed against it in any proceeding of the foregoing nature, or taking any other action to authorize any of the actions set forth above.

"**Bankruptcy Code**" means title 11 of the United States Code, 11 U.S.C. §§ 101, et seq., as amended.

"**BOC**" means the Texas Business Organizations Code, as amended and in effect from time to time.

"**Book Depreciation**" means, with respect to any Company asset for each Fiscal Year, the Company's depreciation, amortization, or other cost recovery deductions determined for federal income tax purposes, except that if the Book Value of an asset differs from its adjusted tax basis at the beginning of such Fiscal Year, Book Depreciation shall be (a) if such difference is being eliminated by use of the remedial method under Treasury Regulations Section 1.704-3(d), the amount of book basis recovered for such period under the rules prescribed by Treasury Regulations Section 1.704-3(d)(2), or (b) if the remedial method is not used, an amount which bears the same ratio to such beginning Book Value as the federal income tax depreciation, amortization, or other cost recovery deduction for such Fiscal Year bears to such beginning adjusted tax basis; provided, that if the adjusted basis for federal income tax purposes of an asset at the beginning of such Fiscal Year is zero and the Book Value of the asset is positive, Book Depreciation shall be determined with reference to such beginning Book Value using any permitted method selected by the Sole Manager in accordance with Treasury Regulations Section 1.704-1(b)(2)(iv)(g)(3).

"**Book Value**" means, with respect to any Company asset, the adjusted basis of such asset for federal income tax purposes, except as follows:

(a)     the initial Book Value of any Company asset contributed by a Member to the Company shall be the gross Fair Market Value of such Company asset as of the date of such contribution;

(b)     immediately before the distribution by the Company of any Company asset to a Member, the Book Value of such asset shall be adjusted to its gross Fair Market Value as of the date of such distribution;

(c)     the Book Value of all Company assets may, in the sole discretion of the Sole Manager, be adjusted to equal their respective gross Fair Market Values, as reasonably determined by the Sole Manager, as of the following times:

(i)     the acquisition of an additional Membership Interest in the Company by a new or existing Member in consideration for more than a *de minimis* Capital Contribution;

(ii)     the distribution by the Company to a Member of more than a *de minimis* amount of property (other than cash) as consideration for all or a part of such Member's Membership Interest in the Company; and

(iii)     the liquidation of the Company within the meaning of Treasury Regulations Section 1.704-1(b)(2)(ii)(g);

(d)      the Book Value of each Company asset shall be increased or decreased, as the case may be, to reflect any adjustments to the adjusted tax basis of such Company asset pursuant to Code Section 734(b) or Code Section 743(b), but only to the extent that such adjustments are taken into account in determining Capital Account balances pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)(m); provided, that Book Values shall not be adjusted pursuant to this paragraph (d) to the extent that an adjustment pursuant to paragraph (c) above is made in conjunction with a transaction that would otherwise result in an adjustment pursuant to this paragraph (d); and

(e)      if the Book Value of a Company asset has been determined pursuant to paragraph (a) or adjusted pursuant to paragraphs (c) or (d) above, such Book Value shall thereafter be adjusted to reflect the Book Depreciation taken into account with respect to such Company asset for purposes of computing Net Income and Net Losses.

"**Business Day**" means a day other than a Saturday, Sunday or other day on which commercial banks in the State of Texas are authorized or required to close.

"**Capital Account**" has the meaning set forth in Section 3.04.

"**Capital Contribution**" means, for any Member, the total amount of cash and cash equivalents and the Book Value of any property contributed to the Company by such Member.

"**Certificate of Formation**" has the meaning set forth in the Recitals.

"**Certificate of Merger**" means that certain Certificate of Merger filed by Fieldwood III with the Secretary of State of the State of Texas on [●], 2021.

"**Certificate of Termination**" means a certificate to be filed upon completion of the winding up and liquidation of the Company as set forth in Section 11.04, which certificate shall be in the form required by § 11.101 of the BOC.

"**Code**" means the Internal Revenue Code of 1986, as amended.

"**Company**" has the meaning set forth in the Preamble.

"**Company Minimum Gain**" means "partnership minimum gain" as defined in Treasury Regulations Section 1.704-2(b)(2), substituting the term "Company" for the term "partnership" as the context requires.

"**Confidential Information**" has the meaning set forth in Section 12.03(a).

"**Confirmation Order**" means the confirmation order entered in Chapter 11 Case 20-33948, In re: Fieldwood Energy LLC, *et al*, in the United States Bankruptcy Court for the Southern District of Texas, Houston Division.

"**Continuance**" has the meaning set forth in Section 11.01.

"**Contract Operating Agreement**" means that certain Contract Operating Agreement of even date herewith by and among Credit Bid Purchaser and the Company, of which CUSA is an express third party beneficiary.

"**Covered Person**" has the meaning set forth in Section 9.01(a).

"**Credit Bid Purchaser**" means Mako Buyer LLC, a Delaware limited liability company.

"**CUSA**" means Chevron U.S.A. Inc., a Pennsylvania corporation, and its successors or assigns.

"**Deepwater Assets Decommissioning Funding Agreement**" means that certain Decommissioning Funding Agreement, of event date herewith, by and between CUSA and Credit Bid Purchaser.

"**Depletable Property**" means each separate oil and gas property as defined in Section 614 of the Code.

"**Divisive Merger Documents**" means the Certificate of Merger, Plan of Merger, Certificate of Formation and other documents filed by or on behalf of Fieldwood III with respect to the Company with the Texas Secretary of State related to the divisive merger of Fieldwood III into Fieldwood III (the surviving entity) and the newly-created Company.

"**Electronic Transmission**" means any form of communication, including communication by use of or participation in one or more electronic networks or databases, not directly involving the physical transmission of paper that creates a record that may be retained, retrieved, and reviewed by a recipient thereof and that may be directly reproduced in paper form by such a recipient through an automated process.

"**Escrow Account**" means **[bank information for the Escrow Account to come]**.

"**Escrow Agreement**" means that certain Escrow Agreement of even date herewith between U.S. Bank National Association, as escrow agent, Fieldwood III, the Company and Credit Bid Purchaser.

"**Estimated Tax Amount**" of a Member, or if the Member is disregarded for U.S. federal income tax purposes, the members or beneficiaries of such Member, for a Fiscal Year means the Member's Tax Amount for such Fiscal Year as estimated in good faith from time to time by the Sole Manager. In making such estimate, the Sole Manager shall take into account amounts shown on Internal Revenue Service Form 1065 filed by the Company and similar state or local forms filed by the Company for the preceding taxable year and such other adjustments as the Sole Manager reasonably determines are necessary or appropriate to reflect the estimated operations of the Company for the Fiscal Year.

"**Excess Amount**" has the meaning set forth in Section 6.02(c).

WEIL:\97901822\22\45327.0007

"**Fair Market Value**" of any asset as of any date means the purchase price that a willing buyer having all relevant knowledge would pay a willing seller for such asset in an arm's length transaction, as determined in good faith by the Sole Manager on such factors as the Sole Manager, in the exercise of his or her reasonable business judgment, considers relevant.

"**Fieldwood**" means Fieldwood Energy LLC, a Texas limited liability company, and its successors and assigns (excluding, for the avoidance of doubt, the Company).

"**Fieldwood III**" means Fieldwood Energy III LLC, a Texas limited liability company, and its successors and assigns (excluding, for the avoidance of doubt, the Company).

"**Final Completion**" has the meaning ascribed to such term in the Turnkey Removal Agreement.

"**Fiscal Year**" means the calendar year, unless the Company is required to have a taxable year other than the calendar year, in which case Fiscal Year shall be the period that conforms to its taxable year.

"**FWE IV Assets**" has the meaning set forth in the Plan of Merger.

"**FWE IV Obligations**" has the meaning set forth in the Plan of Merger.

"**GAAP**" means generally accepted accounting principles in the United States of America in effect from time to time; provided, that, notwithstanding any term or provision contained in this Agreement, GAAP will be deemed for all purposes hereof to treat leases that would have not been considered to be indebtedness in accordance with GAAP as in effect on December 31, 2017 (whether such leases were in effect on such date or are entered into thereafter) in a manner consistent with the treatment of such leases under GAAP as in effect on December 31, 2017, notwithstanding any modification or interpretative changes thereto or implementations of any such modifications or interpretative changes that may have occurred thereafter.

"**Governmental Authority**" means any court, tribunal, arbitrator, body, agency, division, board, bureau, commission or any other similar entity exercising executive, legislative, judicial, regulatory, or administrative functions of government, or any subdivision of any of the foregoing, whether federal, state, county, municipal, tribal, local or foreign, in each case with competent jurisdiction.

"**Guarantee Obligation**" means, as to any Person (the "guaranteeing Person"), any obligation of (i) the guaranteeing Person or (ii) another Person (including any bank under any letter of credit), if to induce the creation of such obligation of such other Person the guaranteeing Person has issued a reimbursement, counterindemnity or similar obligation, in either case guaranteeing or in effect guaranteeing any Indebtedness, leases, dividends or other obligations (the "primary obligations") of any other third Person (the "primary obligor") in any manner, whether directly or indirectly, including any obligation of the guaranteeing Person, whether or not contingent, (A) to purchase any such primary obligation or any property constituting direct or indirect security therefor, (B) to advance or supply funds (1) for the purchase or payment of any such primary obligation or (2) to maintain working capital or equity capital of the primary obligor or otherwise

to maintain the net worth or solvency of the primary obligor, (C) to purchase property, securities or services, in each case, primarily for the purpose of assuring the owner of any such primary obligation of the ability of the primary obligor to make payment of such primary obligation or (D) otherwise to assure or hold harmless the owner of any such primary obligation against loss in respect thereof; provided, however, that the term Guarantee Obligation shall not include endorsements of instruments for deposit or collection in the ordinary course of business.

"**Indebtedness**" means, with respect to any Person at any date, without duplication, all (i) indebtedness of such Person for borrowed money; (ii) obligations of such Person for the deferred purchase price of property or services (other than trade payables incurred in the ordinary course of such Person's business); (iii) obligations of such Person evidenced by notes, bonds, debentures or other similar instruments; (iv) indebtedness created or arising under any conditional sale or other title retention agreement with respect to property acquired by such Person (even though the rights and remedies of the seller or lender under such agreement in the event of default are limited to repossession or sale of such property); (v) capital lease obligations of such Person; (vi) obligations of such Person, contingent or otherwise, as an account party or applicant under acceptance, letter of credit or similar facilities; (vii) obligations of such Person, contingent or otherwise, to purchase, redeem, retire or otherwise acquire for value any capital stock of such Person; (viii) Guarantee Obligations of such Person in respect of obligations of the kind referred to in clauses (i) through (vii) above; and (ix) obligations of the kind referred to in clauses (i) through (viii) above secured by (or for which the holder of such obligation has an existing right, contingent or otherwise, to be secured by) any Lien on property (including accounts and contract rights) owned by such Person, whether or not such Person has assumed or become liable for the payment of such obligation.

"**Initial Member**" has the meaning set forth in the term "Member".

"**Joint Development Agreement**" means that certain Joint Development Agreement of even date herewith by and between the Company and Credit Bid Purchaser.

"**Lien**" means any mortgage, pledge, security interest, option, right of first offer, encumbrance, or other restriction or limitation of any nature whatsoever.

"**Liquidator**" has the meaning set forth in Section 11.03(a).

"**Losses**" has the meaning set forth in Section 9.03(a).

"**Material Project Contracts**" means, collectively, the Omnibus Agreement, the NPI Conveyance, the Contract Operating Agreement, the Turnkey Removal Agreement, the Transition Services Agreement, the Joint Development Agreement, the Deepwater Assets Decommissioning Funding Agreement and the SEMS Bridging Agreement, and each a "**Material Project Contract**".

"**Member**" means (a) the Person identified on the Members Schedule as of the date hereof as a Member and who has executed this Agreement or a counterpart thereof (each, an "**Initial Member**"); and (b) each Person who is hereafter admitted as a Member in accordance with the terms of this Agreement and the BOC, in each case so long as such Person is shown on the

7

Company's books and records as an owner of Membership Interests.  The Members shall constitute "members" (as that term is defined in the BOC) of the Company.

"**Member Nonrecourse Debt**" means "partner nonrecourse debt" as defined in Treasury Regulations Section 1.704-2(b)(4), substituting the term "Company" for the term "partnership" and the term "Member" for the term "partner" as the context requires.

"**Member Nonrecourse Debt Minimum Gain**" means an amount, with respect to each Member Nonrecourse Debt, equal to the Company Minimum Gain that would result if the Member Nonrecourse Debt were treated as a Nonrecourse Liability, determined in accordance with Treasury Regulations Section 1.704-2(i)(3).

"**Member Nonrecourse Deduction**" means "partner nonrecourse deduction" as defined in Treasury Regulations Section 1.704-2(i), substituting the term "Member" for the term "partner" as the context requires.

"**Members Schedule**" has the meaning set forth in Section 3.02.

"**Membership Interest**" means an interest in the Company owned by a Member, including such Member's right (a) to its distributive share of Net Income, Net Losses, and other items of income, gain, loss, and deduction of the Company; (b) to its distributive share of the assets of the Company; (c) to vote on, consent to, or otherwise participate in any decision of the Members as provided in this Agreement; and (d) to any and all other benefits to which such Member may be entitled as provided in this Agreement or the BOC.  The Membership Interest of each Member shall be expressed as a percentage interest and shall be as set forth on the Members Schedule.

"**Net Income**" and "**Net Loss**" mean, for each Fiscal Year or other period specified in this Agreement, an amount equal to the Company's taxable income or taxable loss, or particular items thereof, determined in accordance with Code Section 703(a) (where, for this purpose, all items of income, gain, loss, or deduction required to be stated separately pursuant to Code Section 703(a)(1) shall be included in taxable income or taxable loss), but with the following adjustments:

> (a) any income realized by the Company that is exempt from federal income taxation, as described in Code Section 705(a)(1)(B), shall be added to such taxable income or taxable loss, notwithstanding that such income is not includable in gross income;

> (b) any expenditures of the Company described in Code Section 705(a)(2)(B), including any items treated under Treasury Regulations Section 1.704-1(b)(2)(iv)(I) as items described in Code Section 705(a)(2)(B), shall be subtracted from such taxable income or taxable loss, notwithstanding that such expenditures are not deductible for federal income tax purposes;

> (c) any gain or loss (including Simulated Gain or Loss) resulting from any disposition of Company property with respect to which gain or loss is recognized for federal income tax purposes shall be computed by reference to the Book Value of the property so disposed, notwithstanding that the adjusted tax basis of such property differs from its Book Value;

8

(d)     any items of depreciation, amortization, and other cost recovery deductions with respect to Company property having a Book Value that differs from its adjusted tax basis shall be computed by reference to the property's Book Value (as adjusted for Book Depreciation) in accordance with Treasury Regulations Section 1.704-1(b)(2)(iv)(g);

(e)     if the Book Value of any Company property is adjusted as provided in the definition of Book Value, then the amount of such adjustment shall be treated as an item of gain or loss and included in the computation of such taxable income or taxable loss;

(f)     to the extent an adjustment to the adjusted tax basis of any Company property pursuant to Code Sections 732(d), 734(b) or 743(b) is required, pursuant to Treasury Regulations Section 1.704 1(b)(2)(iv)(m), to be taken into account in determining Capital Accounts, the amount of such adjustment to the Capital Accounts shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases such basis); and

(g)     any items which are specially allocated pursuant to Section 5.03 hereof shall not be taken into account in computing Net Income or Net Loss.  The amounts of the items of Company income, gain, loss or deduction available to be specially allocated pursuant to Section 5.03 hereof shall be determined by applying rules analogous to those set forth in subparagraphs (a) through (f) above.

"**Nonrecourse Deductions**" has the meaning set forth in Treasury Regulations Section 1.704-2(b).

"**Nonrecourse Liability**" has the meaning set forth in Treasury Regulations Section 1.704-2(b)(3).

"**NPI Conveyance**" means that certain Conveyance of Net Profits Overriding Royalty Interest from Company to the Escrow Account.

"**NPI Payment**" has the meaning attributed to the term "NPI Payment" under the NPI Conveyance.

"**Omnibus Agreement**" means that certain Omnibus Agreement of even date herewith by and between the Company, CUSA and Credit Bid Purchaser.

"**Person**" means any individual, corporation, partnership, limited liability company, association, joint stock company, trust, estate, joint venture, firm, association, unincorporated organization, Governmental Authority, or any other entity.

"**Plan of Merger**" means the Agreement and Plan of Merger of Fieldwood Energy III LLC into Fieldwood Energy IV LLC and Fieldwood Energy III LLC, dated as of [●], 2021, and adopted by Fieldwood Energy III LLC.

"**Plan of Reorganization**" means the plan of reorganization of Fieldwood that was included in, and was confirmed by, the Confirmation Order.

"**Production Period**" has the meaning attributed to the term "Production Period" under the NPI Conveyance.

"**Quarterly Estimated Tax Amount**" of a Member, or if the Member is disregarded for U.S. federal income tax purposes, the members or beneficiaries of such Member, for any calendar quarter of a Fiscal Year means the excess, if any of: (a) the product of (i) a quarter (1/4) in the case of the first calendar quarter of the Fiscal Year, half (1/2) in the case of the second calendar quarter of the Fiscal Year, three-quarters (3/4) in the case of the third calendar quarter of the Fiscal Year, and one (1) in the case of the fourth calendar quarter of the Fiscal Year and (ii) the Member's Estimated Tax Amount for such Fiscal Year; over (b) all distributions previously made during such Fiscal Year to such Member.

"**Regulatory Allocations**" has the meaning set forth in Section 5.03(f).

"**Reimbursable Costs**" has the meaning attributed to such term in the Contract Operating Agreement.

"**Representative**" means, with respect to any Person, any and all directors, officers, employees, consultants, financial advisors or lenders, counsel, accountants, and other agents of such Person.

"**Securities Act**" means the Securities Act of 1933, as amended, and the rules and regulations thereunder, which shall be in effect at the time.

"**SEMS Bridging Agreement**" means that certain SEMS Bridging Agreement & Interface Document, dated of even date herewith by and between Credit Bid Purchaser and the Company.

"**Shortfall Amount**" has the meaning set forth in Section 6.02(b).

"**Simulated Basis**" means, with respect to each Depletable Property, the Book Value of such property.

"**Simulated Depletion**" means, with respect to each Depletable Property, a depletion allowance computed in accordance with U.S. federal income tax principles (as if the Simulated Basis of the property were its adjusted tax basis and using simulated cost depletion) and in the manner specified in Treasury Regulations Section 1.704-1(b)(2)(iv)(k)(2); provided that the Simulated Depletion with respect to a Depletable Property shall in no event exceed the Simulated Basis of such Depletable Property.

"**Simulated Gain or Loss**" means the simulated gain or loss computed with respect to a sale or other disposition of any Depletable Property pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)(k)(2).

"**Sole Manager**" has the meaning set forth in Section 7.01.

WEIL:\97901822\22\45327.0007

"**Subsidiary**" means, with respect to any Person, any other Person of which a majority of the outstanding shares or other equity interests having the power to vote for directors or managers or comparable positions are owned, directly or indirectly, by the first Person.

"**Tax Advance**" has the meaning set forth in Section 6.02(a).

"**Tax Amount**" of a Member, or if the Member is disregarded for U.S. federal income tax purposes, the members or beneficiaries of such Member, for a Fiscal Year means, subject to (i) any restrictions in the Company's then-applicable debt financing arrangements, if any, and (ii) the Sole Manager's good faith determination to retain any other amounts necessary to satisfy obligations of the Company that are reasonably expect to be due and payable during the 90 days following the date of determination (i) the product of (a) the Tax Rate for such Fiscal Year (but not to exceed the Tax Rate applicable to C-corporations for such Fiscal Year) and (b) the Adjusted Taxable Income of the Member for such Fiscal Year with respect to its Membership Interest or (ii) the actual amount of U.S. federal, state and local income tax (including any state or local tax imposed in lieu of an income tax) paid by such Member with respect to such Fiscal Year in respect of the taxable income allocated to the Member by the Company, after taking into account all deductions available to such Member from all sources in excess of such Member's income from other sources; *provided*, *however*, that if at any time Fieldwood Energy Inc. has cash tax liability (including an estimated tax liability) on account of items of income or gain of the Company without sufficient cash on hand from a corresponding cash distribution in respect of such income or gain (all as reasonably determined by Fieldwood Energy Inc.), then the Tax Amount shall be increased such that the Company timely distributes cash sufficient to pay such tax liability.

"**Tax Matters Representative**" has the meaning set forth in Section 10.04(a).

"**Tax Rate**" of a Member, or if the Member is disregarded for U.S. federal income tax purposes, the members or beneficiaries of such Member, for any period, means the highest effective marginal combined federal, state, and local tax rate applicable to an individual residing in Houston, Texas (or, if higher, a corporation doing business in Houston, Texas), taking into account (a) the character (for example, long-term or short-term capital gain, ordinary, or exempt) of the applicable income and (b) if applicable, the deduction under IRC Section 199A.

"**Taxing Authority**" has the meaning set forth in Section 6.03(b).

"**Term Sheet**" means that certain term sheet, dated March 22, 2021, by and between Fieldwood, on the one hand, and CUSA, on the other hand.

"**Third Party Payment**" has the meaning attributed to such term in the Contract Operating Agreement.

"**Transfer**" means to, directly or indirectly, sell, transfer, assign, convey, gift, pledge, encumber, hypothecate, or similarly dispose of, either voluntarily or involuntarily, by operation of law or otherwise (including by merger or division), or to enter into any contract, option, or other arrangement or understanding with respect to the sale, transfer, assignment, conveyance, gift, pledge, encumbrance, hypothecation, or similar disposition of, any Membership Interests owned by a Person or any interest (including a beneficial interest) in any Membership Interests owned by

11

a Person.  "**Transfer**" when used as a noun shall have a correlative meaning.  "**Transferor**" and "**Transferee**" mean a Person who makes or receives a Transfer, respectively.

"**Transition Services Agreement**" means the Neptune Spar Transition Services Agreement of even date herewith by and between Credit Bid Purchaser and Noble Energy, Inc.

"**Treasury Regulations**" means the final or temporary regulations issued by the United States Department of Treasury pursuant to its authority under the Code, and any successor regulations.

"**Turnkey Removal Agreement**" means that certain Turnkey Removal Agreement of even date herewith by and among Credit Bid Purchaser, CUSA and the Company.

"**Withholding Advances**" has the meaning set forth in Section 6.03(b).

**Section 1.02.    Interpretation**.  For purposes of this Agreement: (a) the words "include," "includes," and "including" shall be deemed to be followed by the words "without limitation"; (b) the word "or" is not exclusive; and (c) the words "herein," "hereof," "hereby," "hereto," and "hereunder" refer to this Agreement as a whole.

The definitions given for any defined terms in this Agreement shall apply equally to both the singular and plural forms of the terms defined.  Whenever the context may require, any pronoun shall include the corresponding masculine, feminine, and neuter forms.

Unless the context otherwise requires, references herein: (x) to Articles, Sections, Exhibits, and Schedules mean the Articles and Sections of, and Exhibits and Schedules attached to, this Agreement; (y) to an agreement, instrument, or other document means such agreement, instrument, or other document as amended, supplemented, and modified from time to time to the extent permitted by the provisions thereof; and (z) to a statute means such statute as amended from time to time and includes any successor legislation thereto and any regulations promulgated thereunder.

This Agreement shall be construed without regard to any presumption or rule requiring construction or interpretation against the party drafting an instrument or causing any instrument to be drafted.

The Exhibits and Schedules referred to herein shall be construed with, and as an integral part of, this Agreement to the same extent as if they were set forth verbatim herein.

The headings in this Agreement are for reference only and shall not affect the interpretation of this Agreement.

WEIL:\97901822\22\45327.0007

## ARTICLE II
## ORGANIZATION

**Section 2.01    Formation**.

(a)    The Company was formed on [●], 2021, pursuant to the provisions of the BOC, upon the filing and acceptance of the Certificate of Formation with the Secretary of State of the State of Texas.

(b)    This Agreement shall constitute the "company agreement" (as that term is used in the BOC) of the Company.  The rights, powers, duties, obligations, and liabilities of the Members and the Sole Manager shall be determined pursuant to the BOC and this Agreement.  To the extent that the rights, powers, duties, obligations, and liabilities of any Members or the Sole Manager are different by reason of any provision of this Agreement than they would be under the BOC in the absence of such provision, this Agreement shall, to the extent permitted by the BOC, control.

**Section 2.02    Name.** The name of the Company is "Fieldwood Energy IV LLC" or such other name or names as may be designated by the Sole Manager; provided, that the name shall always contain the words "Limited Liability Company" or "Limited Company" or an abbreviation of one of those phrases.  Amendments to the Certificate of Formation or this Agreement to reflect any such name change may be made by the Sole Manager without the consent of the Members. The Sole Manager shall give prompt notice to the Members and CUSA of any change to the name of the Company and any related amendment to the Certificate of Formation or this Agreement. The Company may conduct business under any assumed or fictitious name required by Applicable Law or otherwise deemed desirable by the Sole Manager.

**Section 2.03    Principal Office.** The principal office of the Company is located at 2000 W. Sam Houston Parkway S., Suite 1200, Houston, Texas 77042, or such other place as may from time to time be determined by the Sole Manager.  The Sole Manager shall give prompt notice of any such change to each of the Members and CUSA.

**Section 2.04    Registered Office; Registered Agent.**

(a)    The registered office of the Company shall be the office of the initial registered agent named in the Certificate of Formation or such other office (which need not be a place of business of the Company) as the Sole Manager may designate from time to time in the manner provided by the BOC and Applicable Law.

(b)    The registered agent for service of process on the Company in the State of Texas shall be the initial registered agent named in the Certificate of Formation or such other Person or Persons as the Sole Manager may designate from time to time in the manner provided by the BOC and Applicable Law.

WEIL:\97901822\22\45327.0007

**Section 2.05    Purposes; Powers**.

(a)    The purposes of the Company are to (i) engage in the Plugging and Abandonment and decommissioning of the FWE IV Assets, as such terms are defined in the Plan of Merger, (ii) the operation of the FWE IV Assets prior to their Plugging and Abandonment and decommissioning, (iii) such other activities as are approved pursuant to the terms of this Agreement, including subject to Section 7.04, and (iv) to engage in any and all activities necessary or incidental to the foregoing purposes.

(b)    The Company shall have all the powers necessary or convenient to carry out the purposes for which it is formed, including the powers granted by the BOC.

**Section 2.06    Term.**  The term of the Company commenced on the date the Certificate of Formation was filed with the Secretary of State of the State of Texas and shall continue in existence perpetually until the Company is terminated in accordance with the provisions of this Agreement.

## ARTICLE III
## CAPITAL CONTRIBUTIONS; CAPITAL ACCOUNTS

**Section 3.01    Tax Partnership Provisions.**  This ARTICLE III is intended to apply only if the Company becomes a partnership for U.S. federal income tax purposes.

**Section 3.02    Initial Capital Contributions.**  Contemporaneously with the execution of this Agreement, and pursuant to the Plan of Reorganization and as a result of a divisive merger pursuant to § 10.008 of the BOC, the Company holds the properties and assets identified as the FWE IV Assets, which shall, together with the amount of any expenses paid pursuant to Section 12.01, constitute the aggregate Capital Contributions made by the Initial Member.  The Initial Member shall own Membership Interests in the amount set forth opposite such Member's name on Schedule A attached hereto (the "**Members Schedule**").  From and after the date of this Agreement, the Sole Manager shall maintain and update the Members Schedule upon the issuance or Transfer of any Membership Interests to any new or existing Member in accordance with this Agreement.

**Section 3.03    Additional Capital Contributions.**  No Member shall be required to make any additional Capital Contributions to the Company.  Any future Capital Contributions made by any Member shall only be made with the consent of the Sole Manager.  To the extent that a Member makes an additional Capital Contribution to the Company, the Sole Manager shall revise the Members Schedule to reflect an increase in the Membership Interest of the contributing Member that fairly and equitably reflects the value of its additional Capital Contribution in relation to the aggregate amount of all Capital Contributions made by the Members.

**Section 3.04    Maintenance of Capital Accounts.**  The Company shall establish and maintain for each Member a separate capital account (a "**Capital Account**") on its books and records in accordance with this Section 3.04.  Each Capital Account shall be established and maintained in accordance with the following provisions:

(a)    Each Member's Capital Account shall be increased by the amount of:

(i)      such Member's Capital Contributions, including such Member's initial Capital Contribution and any additional Capital Contributions;

(ii)     any Net Income or other item of income or gain allocated to such Member pursuant to ARTICLE V; and

(iii)    any liabilities of the Company that are assumed by such Member or secured by any property distributed to such Member.

(b)      Each Member's Capital Account shall be decreased by:

(i)      the cash amount or Book Value of any property distributed to such Member pursuant to ARTICLE VI and Section 11.03(d);

(ii)     the amount of any Net Loss or other item of loss or deduction allocated to such Member pursuant to ARTICLE V; and

(iii)    the amount of any liabilities of such Member assumed by the Company or that are secured by any property contributed by such Member to the Company.

**Section 3.05   Succession Upon Transfer.**  In the event that any Membership Interests are Transferred in accordance with the terms of this Agreement, the Transferee shall succeed to the Capital Account of the Transferor to the extent it relates to the Transferred Membership Interests and, subject to Section 5.05, shall receive allocations and distributions pursuant to ARTICLE V, ARTICLE VI, and ARTICLE XI in respect of such Membership Interests.

**Section 3.06   Negative Capital Accounts.**  In the event that any Member shall have a deficit balance in its Capital Account, such Member shall have no obligation, during the term of the Company or upon termination or liquidation thereof, to restore such negative balance or make any Capital Contributions to the Company by reason thereof, except as may be required by Applicable Law or in respect of any negative balance resulting from a withdrawal of capital or termination in contravention of this Agreement.

**Section 3.07   No Withdrawals from Capital Accounts.**  No Member shall be entitled to withdraw any part of its Capital Account or to receive any distribution from the Company, except as otherwise provided in this Agreement.  No Member shall receive any interest, salary, or drawing with respect to its Capital Contributions or its Capital Account, except as otherwise provided in this Agreement.  The Capital Accounts are maintained for the sole purpose of allocating items of income, gain, loss, and deduction among the Members and shall have no effect on the amount of any distributions to any Members, in liquidation or otherwise.

**Section 3.08   Treatment of Loans from Members.**  Loans by any Member to the Company shall not be considered Capital Contributions and shall not affect the maintenance of such Member's Capital Account, other than to the extent provided in Section 3.04(a)(iii), if applicable.

WEIL:\97901822\22\45327.0007

**Section 3.09   Modifications.**  The foregoing provisions and the other provisions of this Agreement relating to the maintenance of Capital Accounts are intended to comply with Treasury Regulations Section 1.704-1(b) and shall be interpreted and applied in a manner consistent with such Treasury Regulations.  If the Sole Manager determines that it is prudent to modify the manner in which the Capital Accounts, or any increases or decreases to the Capital Accounts, are computed in order to comply with such Treasury Regulations, the Sole Manager may authorize such modifications without the consent of any Member.

<div align="center">

**ARTICLE IV**
**MEMBERS**

</div>

**Section 4.01   No Personal Liability.**  Except as otherwise expressly provided in the BOC, by Applicable Law, or expressly in this Agreement, no Member will be obligated personally for any debt, obligation, or liability of the Company or other Members, whether arising in contract, tort, or otherwise, including a debt, obligation, or liability under a judgment, decree, or order of a court, solely by reason of being a Member.

**Section 4.02   No Withdrawal.**  So long as a Member continues to hold a Membership Interest, such Member shall not have the ability to withdraw or resign as a Member prior to the winding up and termination of the Company and any such withdrawal or resignation or attempted withdrawal or resignation by a Member prior to the winding up and termination of the Company shall be null and void.  As soon as any Person who is a Member ceases to hold a Membership Interest, such Person shall no longer be a Member.

**Section 4.03   No Interest in Company Property.**  No real or personal property of the Company shall be deemed to be owned by any Member individually, but shall be owned by, and title shall be vested solely in, the Company.  Without limiting the foregoing, each Member hereby irrevocably waives during the term of the Company any right that such Member may have to maintain any action for partition with respect to the property of the Company.

**Section 4.04   Certification of Membership Interests**.

(a)     The Sole Manager may, but shall not be required to, issue certificates to the Members representing the Membership Interests held by such Member.

(b)     In the event that the Sole Manager shall issue certificates representing Membership Interests in accordance with Section 4.04(a), then in addition to any other legend required by Applicable Law, all certificates representing issued and outstanding Membership Interests shall bear a legend substantially in the following form:

THE MEMBERSHIP INTEREST REPRESENTED BY THIS CERTIFICATE IS SUBJECT TO A LIMITED LIABILITY COMPANY AGREEMENT AMONG THE COMPANY AND ITS MEMBERS, A COPY OF WHICH IS ON FILE AT THE PRINCIPAL EXECUTIVE OFFICE OF THE COMPANY.   NO TRANSFER, SALE, CONVEYANCE, ASSIGNMENT, GIFT, PLEDGE, HYPOTHECATION, ENCUMBRANCE, OR OTHER DISPOSITION OF THE MEMBERSHIP

<div align="center">16</div>

INTEREST REPRESENTED BY THIS CERTIFICATE MAY BE MADE EXCEPT IN ACCORDANCE WITH THE PROVISIONS OF SUCH COMPANY AGREEMENT.

THE MEMBERSHIP INTEREST REPRESENTED BY THIS CERTIFICATE HAS NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR UNDER ANY OTHER APPLICABLE SECURITIES LAWS AND MAY NOT BE TRANSFERRED, SOLD, ASSIGNED, GIFTED, PLEDGED, HYPOTHECATED, OR OTHERWISE DISPOSED EXCEPT PURSUANT TO (A) A REGISTRATION STATEMENT EFFECTIVE UNDER SUCH ACT AND LAWS OR (B) AN EXEMPTION FROM REGISTRATION THEREUNDER.

**Section 4.05   Meetings of Members**.

(a)      Meetings of the Members may be called by (i) the Sole Manager or (ii) Members holding a majority of the Membership Interests.

(b)      Written notice stating the place, date, and time of the meeting and, in the case of a meeting of the Members not regularly scheduled, describing the purposes for which the meeting is called, shall be delivered not fewer than ten days and not more than 60 days before the date of the meeting to each Member, by or at the direction of the Sole Manager or the Member(s) calling the meeting, as the case may be.  The Members may hold meetings at the Company's principal office or at such other place, within or outside the State of Texas, as the Sole Manager or the Member(s) calling the meeting may designate in the notice for such meeting.

(c)      Any Member may participate in a meeting of the Members by means of conference telephone or other communications equipment by means of which all Persons participating in the meeting can talk to and hear each other, and participation in a meeting by such means shall constitute presence in person at such meeting.

(d)      On any matter that is to be voted on by Members, a Member may vote in person or by proxy, and such proxy may be granted in writing, by means of Electronic Transmission or as otherwise permitted by Applicable Law.  Every proxy shall be revocable in the discretion of the Member executing it unless otherwise provided in such proxy; provided, that such right to revocation shall not invalidate or otherwise affect actions taken under such proxy prior to such revocation.  In lieu of a proxy, a Member may grant an irrevocable power of attorney to conduct the affairs of such Member with respect to matters of the Company, including matters relating to the organization, internal affairs, or termination of the Company.

(e)      The business to be conducted at such meeting need not be limited to the purpose described in the notice and can include business to be conducted by Members; provided, that the appropriate Members shall have been notified of the meeting in accordance with Section 4.05(b).  Attendance of a Member at any meeting shall constitute

17

a waiver of notice of such meeting, except where a Member attends a meeting for the express purpose of objecting to the transaction of any business on the ground that the meeting is not lawfully called or convened.

(f)      A quorum of any meeting of the Members shall require the presence, whether in person or by proxy, of the Members holding a majority of the Membership Interests.  Subject to Section 4.06, no action may be taken by the Members unless the appropriate quorum is present at a meeting.

(g)      Subject to Section 4.06, Section 7.04, Section 12.10 or any provision of this Agreement or the BOC requiring the vote, consent, or approval of a different percentage of the Membership Interests, no action may be taken by the Members at any meeting at which a quorum is present without the affirmative vote of the Members holding a majority of the outstanding Membership Interests.

**Section 4.06   Action Without Meeting**.

(a)      Notwithstanding the provisions of Section 4.05, any matter that is to be voted on, consented to, or approved by the Members may be taken without a meeting, without prior notice, and without a vote if consented to, in writing or by Electronic Transmission, by a Member or Members holding not less than the minimum number of votes that would be necessary to authorize or take such action at a meeting at which each Member entitled to vote on the action is present and votes.  A record shall be maintained by the Sole Manager of each such action taken by written consent of a Member or Members.

(b)      A Member's consent may not be established by a Member's failure to object to an action in a timely manner or by any other means not explicitly provided for in this Agreement.

(c)      If any action or decision permitted by this Agreement to be taken or made by less than all of the Members is taken or made by a written consent signed by less than all of the Members, the Sole Manager shall, within ten calendar days after such action is taken or such decision is made, give written notice of the action taken or the decision made to the Members who did not sign the written consent.

**Section 4.07   Power of Members.**  The Members shall have the power to exercise any and all rights or powers granted to Members pursuant to the express terms of this Agreement and the BOC.  Except as otherwise specifically provided by this Agreement or required by the BOC, no Member, in its capacity as a Member, shall have the power to act for or on behalf of, or to bind, the Company, other than to the extent that the Company has granted a power of attorney to such Member to bind the Company on such actions.

**Section 4.08   Similar or Competitive Activities; Business Opportunities.**  Nothing contained in this Agreement shall prevent any Member or any of its Affiliates from engaging in any other activities or businesses, regardless of whether those activities or businesses are similar to or competitive with the Company.  None of the Members nor any of their Affiliates shall be

WEIL:\97901822\22\45327.0007

obligated to account to the Company or to the other Members for any profits or income earned or derived from such other activities or businesses.  None of the Members nor any of their Affiliates shall be obligated to inform the Company or the other Members of a business opportunity of any type or description.

<div align="center">

**ARTICLE V**
**ALLOCATIONS**

</div>

**Section 5.01   Tax Partnership Provisions.**  This ARTICLE V is intended to apply only if the Company becomes a partnership for U.S. federal income tax purposes.

**Section 5.02   Allocation of Net Income and Net Loss.**  For each Fiscal Year (or portion thereof), after giving effect to the special allocations set forth in Section 5.03, Net Income and Net Loss of the Company shall be allocated among the Members pro rata in accordance with their Membership Interests.

**Section 5.03   Regulatory and Special Allocations.**  Notwithstanding the provisions of Section 5.02:

(a)      If there is a net decrease in Company Minimum Gain (determined according to Treasury Regulations Section 1.704-2(d)(1)) during any Fiscal Year, each Member shall be specially allocated Net Income for such Fiscal Year (and, if necessary, subsequent Fiscal Years) in an amount equal to such Member's share of the net decrease in Company Minimum Gain, determined in accordance with Treasury Regulations Section 1.704-2(g). The items to be so allocated shall be determined in accordance with Treasury Regulations Sections 1.704-2(f)(6) and 1.704-2(j)(2).  This Section 5.03(a) is intended to comply with the "minimum gain chargeback" requirement in Treasury Regulations Section 1.704-2(f) and shall be interpreted consistently therewith.

(b)      Member Nonrecourse Deductions shall be allocated in the manner required by Treasury Regulations Section 1.704-2(i).  Except as otherwise provided in Treasury Regulations Section 1.704-2(i)(4), if there is a net decrease in Member Nonrecourse Debt Minimum Gain during any Fiscal Year, each Member that has a share of such Member Nonrecourse Debt Minimum Gain shall be specially allocated Net Income for such Fiscal Year (and, if necessary, subsequent Fiscal Years) in an amount equal to that Member's share of the net decrease in Member Nonrecourse Debt Minimum Gain.  Items to be allocated pursuant to this paragraph shall be determined in accordance with Treasury Regulations Sections 1.704-2(i)(4) and 1.704-2(j)(2).  This Section 5.03(b) is intended to comply with the "minimum gain chargeback" requirement in Treasury Regulations Section 1.704-2(i)(4) and shall be interpreted consistently therewith.

(c)      Nonrecourse Deductions shall be allocated to the Members in accordance with their Membership Interests.

(d)      In the event any Member unexpectedly receives any adjustments, allocations, or distributions described in Treasury Regulations Section 1.704-1(b)(2)(ii)(d)(4), (5) or (6), Net Income shall be specially allocated to such Member in an

<div align="center">19</div>

amount and manner sufficient to eliminate the Adjusted Capital Account Deficit created by such adjustments, allocations, or distributions as quickly as possible.  This Section 5.03(d) is intended to comply with the "qualified income offset" requirement in Treasury Regulations Section 1.704-1(b)(2)(ii)(d) and shall be interpreted consistently therewith.

(e)     Simulated Depletion and Simulated Gain or Loss with respect to any Depletable Property shall be allocated among the Members in proportion to their shares of the Simulated Basis in such property.  Each Member's share of the Simulated Basis in each of the Company's Depletable Properties shall be allocated to each Member in accordance with such Member's Membership Interest as of the time such Depletable Property is acquired by the Company, and shall be reallocated among the Members in accordance with the Members' Membership Interest as determined immediately following the occurrence of an event giving rise to any adjustment to the Book Values of the Company's oil and gas properties pursuant to the terms of this Agreement (or at the time of any material additions to the federal income tax basis of such Depletable Property).

(f)     The allocations set forth in subsections Section 5.03(a), Section 5.03(b), Section 5.03(c), Section 5.03(d) and Section 5.03(e) above (the "**Regulatory Allocations**") are intended to comply with certain requirements of the Treasury Regulations under Code Section 704.  Notwithstanding any other provisions of this ARTICLE V (other than the Regulatory Allocations), the Regulatory Allocations shall be taken into account in allocating Net Income and Net Losses among Members so that, to the extent possible, the net amount of such allocations of Net Income and Net Losses and other items and the Regulatory Allocations to each Member shall be equal to the net amount that would have been allocated to such Member if the Regulatory Allocations had not occurred.

**Section 5.04   Tax Allocations**.

(a)     Subject to Section 5.04(b), Section 5.04(c), and Section 5.04(d), all income, gains, losses and deductions of the Company shall be allocated, for federal, state, and local income tax purposes, among the Members in accordance with the allocation of such income, gains, losses, and deductions pursuant to Section 5.02 and Section 5.03, except that if any such allocation for tax purposes is not permitted by the Code or other Applicable Law, the Company's subsequent income, gains, losses, and deductions shall be allocated among the Members for tax purposes, to the extent permitted by the Code and other Applicable Law, so as to reflect as nearly as possible the allocation set forth in Section 5.02 and Section 5.03.

(b)     Items of Company taxable income, gain, loss, and deduction with respect to any property contributed to the capital of the Company shall be allocated among the Members in accordance with Code Section 704(c) using such reasonable method under Treasury Regulations Section 1.704-3 as shall be determined by the Sole Manager, so as to take account of any variation between the adjusted basis of such property to the Company for federal income tax purposes and its Book Value.

(c)        If the Book Value of any Company asset is adjusted pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)(f) as provided in clause (c) of the definition of Book Value, subsequent allocations of items of taxable income, gain, loss, and deduction with respect to such asset shall take account of any variation between the adjusted basis of such asset for federal income tax purposes and its Book Value using such reasonable method under Treasury Regulations Section 1.704-3 as shall be determined by the Sole Manager.

(d)        Allocations of tax credit, tax credit recapture, and any items related thereto shall be allocated to the Members according to their interests in such items as determined by the Sole Manager taking into account the principles of Treasury Regulations Section 1.704-1(b)(4)(ii).

(e)        The deduction for depletion with respect to each separate oil and gas property (as defined in Section 614 of the Code) shall, in accordance with Section 613A(c)(7)(D) of the Code, be computed for federal income tax purposes separately by the Members rather than the Company.  The proportionate share of the adjusted tax basis of each oil and gas property shall be allocated to each Member in accordance with such Member's Membership Interest as of the time such oil and gas property is acquired by the Company (and any additions to such U.S. federal income tax basis resulting from expenditures required to be capitalized in such basis shall be allocated among the Members in a manner designed to cause the Members' proportionate shares of such adjusted U.S. federal income tax basis to be in accordance with their Membership Interests as determined at the time of any such additions), and shall be reallocated among the Members in accordance with the Members' Membership Interests as determined immediately following the occurrence of an event giving rise to an adjustment to the Book Values of the Company's oil and gas properties.  For purposes of the separate computation of gain or loss by each Member on the taxable disposition of each oil and gas property, the amount realized from such disposition shall be allocated (i) first, to the Members in an amount equal to the Simulated Basis in such oil and gas property in proportion to their allocable shares thereof and (ii) second, any remaining amount realized shall be allocated consistent with the allocation of Simulated Gain or Loss.  The allocations described in this Section 5.04(e) are intended to be applied in accordance with the Members' "interests in partnership capital" under Section 613A(c)(7)(D) or the Code; provided, however, that the Members understand and agree that the Sole Manager may authorize special allocations of federal income tax basis, income, gain, deduction or loss, as computed for U.S. federal income tax purposes, in order to eliminate differences between Simulated Basis and adjusted U.S. federal income tax basis with respect to each oil and gas property, in such manner as determined consistent with the principles outlined in Sections 5.04b) and 5.04c).  The provisions of this Section 5.04(e) and the other provisions of this Agreement relating to allocations under Section 613A(c)(7)(D) of the Code are intended to comply with Treasury Regulations Section 1.704-1(b)(4)(v) and shall be interpreted and applied in a manner consistent with such Treasury Regulations.  Each Member, with the assistance of the Company, shall separately keep records of its share of the adjusted tax basis in each oil and gas property, adjust such share of the adjusted tax basis for any cost or percentage depletion allowable with respect to such property and use such adjusted tax basis in the computation of its cost depletion or in the computation of its gain or loss on the disposition

of such property by the Company.  Upon the reasonable request of the Company, each Member shall advise the Company of its adjusted tax basis in each oil and gas property and any depletion computed with respect thereto, both as computed in accordance with the provisions of this subsection for purposes of allowing the Company to make adjustments to the tax basis of its assets as a result of certain transfers of interests in the Company or distributions by the Company.  The Company may rely on such information and, if it is not provided by the Member, may make such reasonable assumptions as it shall determine with respect thereto.  When reasonably requested by the Members, the Company shall provide all available information needed by such Members to comply with the record keeping requirements of this Section 5.04(e) and other applicable tax reporting obligations.

(f)     Allocations pursuant to this Section 5.04 are solely for purposes of federal, state, and local taxes and shall not affect, or in any way be taken into account in computing, any Member's Capital Account or share of Net Income, Net Losses, distributions, or other items pursuant to any provisions of this Agreement.

**Section 5.05   Allocations in Respect of Transferred Membership Interests.**  In the event of a Transfer of Membership Interests during any Fiscal Year made in compliance with the provisions of ARTICLE VIII, Net Income, Net Losses, and other items of income, gain, loss, and deduction of the Company attributable to such Membership Interests for such Fiscal Year shall be determined using the interim closing of the books method.

<div align="center">

**ARTICLE VI**
**DISTRIBUTIONS**

</div>

**Section 6.01   General**.

(a)     Subject to Section 6.02 and Section 7.03(b), distributions of available cash shall be made to the Members when and in such amounts as determined by the Sole Manager and only following (i) payment of all operating expenses of the Company, including required payments under the Material Project Contracts, and the termination of the Material Project Contracts, (ii) the payment in full of any and all amounts owing to Credit Bid Purchaser or CUSA under any Material Project Contract, and (iii) the cessation of all production from, and Final Completion of all plugging and abandonment and decommissioning of the FWE IV Assets.  After making all distributions required for a given Fiscal Year under Section 6.02, and paying all operating expenses, and making appropriate reserves for future operating expenses, and paying all amounts then due and outstanding under the Material Project Contracts as described in the preceding sentence, the termination of the Material Project Contracts, and the satisfaction of the condition under item (iii), in each case as described in the preceding sentence, distributions determined to be made by the Sole Manager pursuant to this Section 6.01(a) shall be paid to the Members in accordance with their respective Membership Interests.

(b)     Notwithstanding any provision to the contrary contained in this Agreement, the Company shall not make any distribution to the Members (i) prior to the cessation of all production from, and Final Completion of all plugging and abandonment and

<div align="center">22</div>

decommissioning activities on, the FWE IV Assets, except as provided in Section 6.02, or (ii) if such distribution would violate § 101.206 of the BOC or other Applicable Law.

**Section 6.02   Tax Advances**.

(a)     Subject to (i) any restrictions in the Company's then-applicable debt financing arrangements, if any, and (ii) the Sole Manager's good faith determination to retain any other amounts necessary to satisfy obligations of the Company that are reasonably expected to be due and payable in the 90 days following the date of determination, at least three days before each date prescribed by the Code for a calendar-year corporation to pay quarterly installments of estimated tax, the Company shall use commercially reasonable efforts to distribute cash to each Member in proportion to and to the extent of such Member's Quarterly Estimated Tax Amount for the applicable calendar quarter (each such distribution, a "**Tax Advance**").

(b)     If, at any time after the final Quarterly Estimated Tax Amount has been distributed pursuant to Section 6.02(a) with respect to any Fiscal Year, the aggregate Tax Advances to any Member with respect to such Fiscal Year are less than such Member's Tax Amount for such Fiscal Year (a "**Shortfall Amount**"), the Company shall use commercially reasonable efforts to distribute cash in proportion to and to the extent of each Member's Shortfall Amount.  The Company shall use commercially reasonable efforts to distribute Shortfall Amounts with respect to a Fiscal Year before the 90th day of the next succeeding Fiscal Year; provided, that if the Company has made distributions other than pursuant to this Section 6.02, the Sole Manager may apply such distributions to reduce any Shortfall Amount.

(c)     If the aggregate Tax Advances made to any Member pursuant to this Section 6.02 for any Fiscal Year exceed such Member's Tax Amount (an "**Excess Amount**"), such Excess Amount shall reduce subsequent Tax Advances that would be made to such Member pursuant to this Section 6.02, except to the extent taken into account as an advance pursuant to Section 6.02(d).

(d)     Any distributions made pursuant to this Section 6.02 shall be treated for purposes of this Agreement as advances on distributions pursuant to Section 6.01 and shall reduce, dollar-for-dollar, the amount otherwise distributable to such Member pursuant to Section 6.01.

**Section 6.03   Tax Withholding; Withholding Advances**.

(a)     **Tax Withholding.**  Each Member agrees to furnish the Company with any representations and forms as shall be reasonably requested by the Company to assist it in determining the extent of, and in fulfilling, any withholding obligations it may have.

(b)     **Withholding Advances.**  The Company is hereby authorized at all times to make payments ("**Withholding Advances**") with respect to each Member in amounts required to discharge any obligation of the Company, including any obligation under Section 6225 of the Code (as determined by the Tax Matters Representative based on the

advice of legal or tax counsel to the Company) to withhold or make payments to any federal, state, local or foreign taxing authority (a "**Taxing Authority**") with respect to any distribution or allocation by the Company of income or gain to such Member and to withhold the same from distributions to such Member.  Any funds withheld from a distribution by reason of this Section 6.03(b) shall nonetheless be deemed distributed to the Member in question for all purposes under this Agreement.  If the Company makes any Withholding Advance in respect of a Member hereunder that is not immediately withheld from actual distributions to the Member, then the Member shall promptly reimburse the Company for the amount of such payment, plus interest at a rate equal to the prime rate published in the Wall Street Journal on the date of payment plus two percent per annum, compounded annually, on such amount from the date of such payment until such amount is repaid (or deducted from a distribution) by the Member (any such payment shall not constitute a Capital Contribution).  Each Member's reimbursement obligation under this Section 6.03(b) shall continue after such Member transfers its Membership Interests.

(c)      **Indemnification.**  Each Member hereby agrees to defend, indemnify and hold harmless the Company and the other Members from and against any liability with respect to taxes, interest, or penalties that may be asserted by reason of the Company's failure to deduct and withhold tax on amounts distributable or allocable to such Member. The provisions of this Section 6.03(c) and the obligations of a Member pursuant to Section 6.03(b) shall survive the termination, dissolution, liquidation, and winding up of the Company and the withdrawal of such Member from the Company or Transfer of its Membership Interests.  The Company may pursue and enforce all rights and remedies it may have against each Member under this Section 6.03, including bringing a lawsuit to collect repayment with interest of any Withholding Advances.

(d)      **Overwithholding.**  None of the Company or the Sole Manager shall be liable for any excess taxes withheld in respect of any distribution or allocation of income or gain to a Member.  In the event of an overwithholding, a Member's sole recourse shall be to apply for a refund from the appropriate Taxing Authority.

**Section 6.04  Distributions in Kind**.

(a)      Subject to Sections 6.01 and 6.02, the Sole Manager is hereby authorized, as it may reasonably determine, to make distributions to the Members in the form of securities or other property (but not including any oil and gas properties) held by the Company; provided, that Tax Advances shall only be made in cash.  In any non-cash distribution, the securities or property so distributed will be distributed among the Members in the same proportion and priority as cash equal to the Fair Market Value of such securities or property would be distributed among the Members pursuant to Section 6.01.

(b)      Any distribution of securities shall be subject to such conditions and restrictions as the Sole Manager determines are required or advisable to ensure compliance with Applicable Law.  In furtherance of the foregoing, the Sole Manager may require that the Members execute and deliver such documents as the Sole Manager may deem necessary or appropriate to ensure compliance with all federal and state securities laws that

24

apply to such distribution and any further Transfer of the distributed securities, and may appropriately legend the certificates that represent such securities to reflect any restriction on Transfer with respect to such laws.

## ARTICLE VII
## MANAGEMENT

**Section 7.01   Management of the Company.**   The business and affairs of the Company shall be managed, operated, and controlled by or under the direction of one manager designated pursuant to Section 7.02 (the "**Sole Manager**").   Subject to the provisions of Section 7.04, the Sole Manager shall have, and is hereby granted, full and complete power, authority, and discretion for, on behalf of, and in the name of the Company, to take such actions as it may deem necessary or advisable to carry out any and all of the objectives and purposes of the Company, to the exclusion of the Members unless expressly provided for otherwise in this Agreement or expressly required under the BOC.   Subject to the provisions of Section 7.06, the Sole Manager shall have, and is hereby granted, full and complete power, authority, and discretion for, on behalf of, and in the name of the Company, to take such actions as it may deem necessary or advisable to carry out any and all of the objectives and purposes of the Company.

**Section 7.02   Sole Manager.**   The Company shall not have any officers or employees other than the Sole Manager.   Sunset Energy Gulf Coast Asset Management LLC has been selected and designated by the Member with the consent of CUSA to serve as the initial Sole Manager. The Sole Manager may not be removed without CUSA's prior written consent, which may be given, delayed or withheld in its sole discretion.   In the event that the Sole Manager is removed with CUSA's written consent or the Sole Manager resigns or otherwise ceases to serve in such capacity, then the Sole Manager shall be selected pursuant to the following procedure:   CUSA and the Company (acting through the Member for all purposes under this Section 7.02, who shall solicit input from Credit Bid Purchaser for all purposes under this Section 7.02) shall agree on a replacement, and, if they cannot agree, the Company shall designate a replacement, which shall be subject to CUSA's approval (which approval shall not to be unreasonably withheld, conditioned or delayed).

**Section 7.03   Material Project Contracts; Net Profit Interest**.

(a)      The Company's execution and performance of its obligations under each of the Omnibus Agreement, the NPI Conveyance, the Contract Operating Agreement, the Turnkey Removal Agreement, the Joint Development Agreement, the Deepwater Assets Decommissioning Funding Agreement, the SEMS Bridging Agreement, the Transition Services Agreement and the Escrow Agreement has been approved by the Member and shall not require any other approval on the part of the Company (by the Sole Manager or otherwise).   The Sole Manager shall not amend or modify such agreements, except in accordance with this Agreement.

(b)      At the end of each Production Period, the Company shall pay into the Escrow Account the NPI Payment, if any is due, as calculated pursuant to the terms of the NPI Conveyance.

**Section 7.04   Actions Requiring CUSA Consent.**  Without the prior written consent of CUSA (which written consent may be given, delayed or withheld in CUSA's sole discretion, unless expressly indicated otherwise), the Company shall not do, or enter into any commitment to do, any of the following:

(a)   engage in any business or activity other than (i) plugging and abandoning and decommissioning the FWE IV Assets and (ii) operating the FWE IV Assets prior to their plugging and abandonment and decommissioning;

(b)   use revenue or free cash flow for any purpose other than (i) for funding Reimbursable Costs or Third Party Payments under the Contract Operating Agreement (or similar charges under a replacement thereto) and, if applicable, payment into the Escrow Account and (ii) Tax Advances pursuant to Section 6.02(a);

(c)   issue additional Membership Interests or any other equity securities or admit additional Members to the Company;

(d)   approve any decommissioning plan with respect to the FWE IV Assets; or engage or retain any decommissioning subcontractor other than Credit Bid Purchaser pursuant to the Turnkey Removal Agreement;

(e)   incur any Indebtedness;

(f)   make any loan, advance, or capital contribution or make any investment in any Person;

(g)   replace, remove or change the powers of the Sole Manager;

(h)   replace or remove Credit Bid Purchaser under the Contract Operating Agreement; engage or retain any contract operator other than Credit Bid Purchaser pursuant to the Contract Operating Agreement; amend, or waive the application of, any provision of the Contract Operating Agreement;

(i)   divest any of the FWE IV Assets (other than sales of hydrocarbons in the ordinary course of business) or acquire any other assets (other than for a purpose permitted under Section 7.04(a) and in accordance with the terms of the Contract Operating Agreement, and further subject to any approval rights contained therein);

(j)   approving any prospective joint development project or other capital project for which an election to participate has been delivered to the Company pursuant to the Joint Development Agreement or approve any well takeover under the Joint Development Agreement;

(k)   agree to any (i) settlement or order with any Governmental Authority relating to the FWE IV Assets or the operations conducted thereon, (ii) settlement relating to contribution or payment amounts relating to decommissioning obligations with any Person, including any predecessor-in-interest to all or any portion of the leases and lands

covered by the FWE IV Assets or any surety bond provider or other provider or holder of security relating to decommissioning operations, or (iii) any other settlement involving FWE IV Assets or the operation of FWE IV;

(l)     amend any provision of a Material Project Contract, or waive any material right of the Company under a Material Project Contract;

(m)     [Reserved];

(n)     take any act of Bankruptcy, liquidate or otherwise terminate the existence of the Company or any of its Subsidiaries;

(o)     enter into a fundamental business transaction within the meaning of such term in the BOC;

(p)     establish a Subsidiary or enter into any joint venture or similar business arrangement or enter into a transaction covered by Section 7.03;

(q)     enter into, amend, waive, or terminate any contract with an Affiliate of the Company; or

(r)     amend, modify, supplement, restate, or waive any provision of the Certificate of Formation, this Agreement or any other organizational documents of the Company or its Subsidiaries (and any such amendment, modification, supplement, or waiver that is attempted without CUSA's prior written consent shall be void *ab initio* and without effect).

If CUSA in good faith believes that (x) Credit Bid Purchaser is in breach the Contract Operating Agreement in a manner that is materially adverse to the Company or is liable to the Company for indemnification pursuant to the terms of the Contract Operating Agreement, and (y) the Company has failed to enforce its rights (including, if applicable, termination right) with respect to such breach or indemnification and such failure is materially adverse to the Company, then CUSA may (i) deliver a written notice to the Company requesting that the Company enforce such rights (any rights to which such request relates must be specifically identified) and (ii) if the Company fails to enforce such rights within thirty days of its receipt of such notice, CUSA may itself enforce the rights of the Company against Credit Bid Purchaser on the Company's behalf.

**Section 7.05   No Compensation of the Sole Manager**.  The Sole Manager shall receive an offer letter and be compensated for the services provided by such individual as the Sole Manager of the Company in the amount set forth in such offer letter.  The Company shall reimburse the Sole Manager for all reasonable, ordinary, necessary, and direct third-party expenses incurred by the Sole Manager on behalf of the Company in carrying out the Company's business activities.

**Section 7.06   No Personal Liability**.  Except as otherwise provided in the BOC or by Applicable Law, or expressly provided in this Agreement or any written agreement between the Company and the Sole Manager, (i) the Sole Manager will not be obligated personally for any debt, obligation, or liability of the Company, whether arising in contract, tort, or otherwise,

including a debt, obligation, or liability under a judgment, decree, or order of a court, solely by reason of being or acting as the Sole Manager and (ii) subject to Section 7.04, the Sole Manager shall carry out his or her duties under this Agreement in good faith and a manner in which the Sole Manager believes to be consistent with and in furtherance of the purpose of the Company specified in Section 2.05(a).

<div align="center">

**ARTICLE VIII**
**TRANSFER**

</div>

**Section 8.01   General Restrictions on Transfer**.

(a)      No Member shall Transfer all or any portion of its Membership Interest in the Company without the prior written approval of the Sole Manager.

(b)      Subject to Section 8.01(a), each Member agrees that it will not Transfer all or any portion of its Membership Interest in the Company, and the Company agrees that it shall not issue any Membership Interests:

(i)      except as permitted under the Securities Act and other Applicable Laws, and then, with respect to a Transfer of Membership Interests, only upon delivery to the Company of an opinion of counsel in form and substance satisfactory to the Company to the effect that such Transfer may be effected without registration under the Securities Act;

(ii)      if the Company becomes a partnership for U.S. federal income tax purposes, if such Transfer or issuance would cause the Company to be considered a "publicly traded partnership" under Section 7704(b) of the Code within the meaning of Treasury Regulations Section 1.7704-1(h)(1)(ii), including the look-through rule in Treasury Regulations Section 1.7704-1(h)(3);

(iii)      if such Transfer or issuance would affect the Company's existence or qualification as a limited liability company under the BOC;

(iv)      if the Company becomes a partnership for U.S. federal income tax purposes, if such Transfer or issuance would cause the Company to lose its status as a partnership for federal income tax purposes;

(v)      if such Transfer or issuance would cause the Company to be required to register as an investment company under the Investment Company Act of 1940, as amended;

(vi)      if such Transfer or issuance would cause the assets of the Company to be deemed "Plan Assets" as defined under the Employee Retirement Income Security Act of 1974 or its accompanying regulations or result in any "prohibited transaction" thereunder involving the Company; and

<div align="center">28</div>

(vii)   such Transfer would limit, hinder or prohibit the Company from carrying out its purpose under Section 2.05(a).

(c)   Any Transfer or attempted Transfer of any Membership Interest in violation of this Agreement shall be null and void *ab initio*, no such Transfer shall be recorded on the Company's books, and the purported Transferee in any such Transfer shall not be treated (and the purported Transferor shall continue to be treated) as the owner of such Membership Interest for all purposes of this Agreement.

(d)   No Transfer of any Membership Interest to a Person not already a Member of the Company shall be deemed completed until the prospective Transferee has executed a joinder agreement in form and substance acceptable to the Company.

(e)   For the avoidance of doubt, any completed Transfer of a Membership Interest permitted by this Agreement shall be deemed a sale, transfer, conveyance, assignment, or other disposal of such Membership Interest in its entirety as intended by the parties to such Transfer, and shall not be deemed a sale, transfer, conveyance, assignment, or other disposal of any less than all of the rights and benefits described in the definition of the term "Membership Interest."

## ARTICLE IX
## EXCULPATION AND INDEMNIFICATION

**Section 9.01   Exculpation of Covered Persons**.

(a)   **Covered Persons.**  As used herein, the term "**Covered Person**" shall mean (i) each current or former Member; (ii) each current or former manager, officer, director, shareholder, partner, member, Affiliate, employee, agent, or Representative of each Member, and each of their Affiliates; and (iii) each manager (including the Sole Manager), officer (if any), employee (if any), agent, or Representative of the Company.

(b)   **Standard of Care.**  No Covered Person shall be liable to the Company or any other Covered Person for any loss, damage, or claim incurred by reason of any action taken or omitted to be taken by such Covered Person in good faith reliance on the provisions of this Agreement, so long as such action or omission does not constitute fraud or willful misconduct by such Covered Person.

(c)   **Good Faith Reliance.**  A Covered Person shall be fully protected in relying in good faith upon the records of the Company and upon such information, opinions, reports, or statements (including financial statements and information, opinions, reports, or statements as to the value or amount of the assets, liabilities, Net Income, or Net Losses of the Company or any facts pertinent to the existence and amount of assets from which distributions might properly be paid) of the following Persons or groups: (i) another Member; (ii) one or more managers, officers or employees of the Company; (iii) any attorney, independent accountant, appraiser, or other expert or professional employed or engaged by or on behalf of the Company; or (iv) any other Person selected in good faith by or on behalf of the Company, in each case as to matters that such relying Person

WEIL:\97901822\22\45327.0007

reasonably believes to be within such other Person's professional or expert competence. The preceding sentence shall in no way limit any Person's right to rely on information to the extent provided in § 3.102 or § 3.105 of the BOC.

**Section 9.02    Liabilities and Duties of Covered Persons**.

(a)    **Limitation of Liability.**  This Agreement, unless otherwise specifically stated herein, is not intended to, and does not, create or impose any fiduciary duty on any Covered Person.  Furthermore, each of the Members and the Company hereby waives any and all fiduciary duties that, absent such waiver, may be implied by Applicable Law, and in doing so, acknowledges and agrees that the duties and obligations of each Covered Person to each other and to the Company are only as expressly set forth in this Agreement. The provisions of this Agreement, to the extent that they restrict the duties and liabilities of a Covered Person otherwise existing at law or in equity, are agreed by the Members to replace such other duties and liabilities of such Covered Person.

(b)    **Duties.**  Subject to Section 7.06, whenever in this Agreement a Covered Person is permitted or required to make a decision (including a decision that is in such Covered Person's "discretion" or under a grant of similar authority or latitude), the Covered Person shall be entitled to consider only such interests and factors as such Covered Person desires and shall have no duty or obligation to give any consideration to any interest of or factors affecting the Company or any other Person.  Whenever in this Agreement a Covered Person is permitted or required to make a decision in such Covered Person's "good faith," the Covered Person shall act under such express standard and shall not be subject to any other or different standard imposed by this Agreement or any other Applicable Law.

**Section 9.03    Indemnification**.

(a)    **Indemnification.**  To the fullest extent permitted by the BOC, as the same now exists or may hereafter be amended, substituted or replaced (but, in the case of any such amendment, substitution, or replacement, only to the extent that such amendment, substitution, or replacement permits the Company to provide broader indemnification rights than the BOC permitted the Company to provide prior to such amendment, substitution, or replacement), the Company shall indemnify, hold harmless, defend, pay, and reimburse any Covered Person against any and all losses, claims, damages, judgments, fines, or liabilities, including reasonable legal fees or other expenses incurred in investigating or defending against such losses, claims, damages, judgments, fines, or liabilities, and any amounts expended in settlement of any claims (collectively, "**Losses**") to which such Covered Person may become subject by reason of:

(i)    any act or omission or alleged act or omission performed or omitted to be performed on behalf of the Company, any Member, or any direct or indirect Subsidiary of the foregoing in connection with the business of the Company; or

(ii)    such Covered Person being or acting in connection with the business of the Company as a member, shareholder, Affiliate, manager, director, officer, employee, or agent of the Company, any Member, or any of their respective

WEIL:\97901822\22\45327.0007

Affiliates, or that such Covered Person is or was serving at the request of the Company as a member, manager, director, officer, employee, or agent of any Person including the Company;

provided, that (x) such Covered Person acted in good faith and in a manner believed by such Covered Person to be in, or not opposed to, the best interests of the Company and, with respect to any criminal proceeding, had no reasonable cause to believe his conduct was unlawful, and (y) such Covered Person's conduct did not constitute fraud or willful and intentional misconduct, in either case as determined by a final, nonappealable order of a court of competent jurisdiction.  In connection with the foregoing, the termination of any action, suit, or proceeding by judgment, order, settlement, conviction, or upon a plea of nolo contendere or its equivalent, shall not, of itself, create a presumption that the Covered Person did not act in good faith or, with respect to any criminal proceeding, had reasonable cause to believe that such Covered Person's conduct was unlawful, or that the Covered Person's conduct constituted fraud or willful misconduct.

(b)     **Control of Defense.**  Upon a Covered Person's discovery of any claim, lawsuit, or other proceeding relating to any Losses for which such Covered Person may be indemnified pursuant to this Section 9.03, the Covered Person shall give prompt written notice to the Company of such claim, lawsuit, or proceeding; provided, that the failure of the Covered Person to provide such notice shall not relieve the Company of any indemnification obligation under this Section 9.03, unless the Company shall have been materially prejudiced thereby.  The Company shall be entitled to participate in or assume the defense of any such claim, lawsuit, or proceeding at its own expense.  After notice from the Company to the Covered Person of its election to assume the defense of any such claim, lawsuit, or proceeding, the Company shall not be liable to the Covered Person under this Agreement or otherwise for any legal or other expenses subsequently incurred by the Covered Person in connection with investigating, preparing to defend, or defending any such claim, lawsuit, or other proceeding.  If the Company does not elect (or fails to elect) to assume the defense of any such claim, lawsuit, or proceeding, the Covered Person shall have the right to assume the defense of such claim, lawsuit, or proceeding as it deems appropriate, but it shall not settle any such claim, lawsuit, or proceeding without the consent of the Company (which consent shall not be unreasonably withheld, conditioned, or delayed).

(c)     **Reimbursement.**  The Company shall promptly reimburse (and/or advance to the extent reasonably required) each Covered Person for reasonable legal or other expenses (as incurred) of such Covered Person in connection with investigating, preparing to defend, or defending any claim, lawsuit, or other proceeding relating to any Losses for which such Covered Person may be indemnified pursuant to this Section 9.03; provided, that if it is finally judicially determined that such Covered Person is not entitled to the indemnification provided by this Section 9.03, then such Covered Person shall promptly reimburse the Company for any reimbursed or advanced expenses.

(d)     **Entitlement to Indemnity.**  The indemnification provided by this Section 9.03 shall not be deemed exclusive of any other rights to indemnification to which those

31

seeking indemnification may be entitled under the BOC, any agreement or otherwise.  The provisions of this Section 9.03 shall continue to afford protection to each Covered Person regardless of whether such Covered Person remains in the position or capacity pursuant to which such Covered Person became entitled to indemnification under this Section 9.03 and shall inure to the benefit of the executors, administrators, legatees, and distributees of such Covered Person.

(e)     **Insurance.**  To the extent available on commercially reasonable terms, the Company may purchase, at its expense, insurance to cover Losses covered by the foregoing indemnification provisions and to otherwise cover Losses for any breach or alleged breach by any Covered Person of such Covered Person's duties in such amount and with such deductibles as the Sole Manager may reasonably determine; provided, that the failure to obtain such insurance shall not affect the right to indemnification of any Covered Person under the indemnification provisions contained herein, including the right to be reimbursed or advanced expenses or otherwise indemnified for Losses hereunder.  If any Covered Person recovers any amounts in respect of any Losses from any insurance coverage, then such Covered Person shall, to the extent that such recovery is duplicative, reimburse the Company for any amounts previously paid to such Covered Person by the Company in respect of such Losses.

(f)     **Funding of Indemnification Obligation.**   Notwithstanding anything contained herein to the contrary, any indemnity by the Company relating to the matters covered in this Section 9.03 shall be provided out of and to the extent of Company assets only, and no Member (unless such Member otherwise agrees in writing) shall have personal liability on account thereof or shall be required to make additional Capital Contributions to help satisfy such indemnity by the Company.

(g)     **Savings Clause.**   If this Section 9.03 or any portion hereof shall be invalidated on any ground by any court of competent jurisdiction, then the Company shall nevertheless indemnify and hold harmless each Covered Person pursuant to this Section 9.03 to the fullest extent permitted by any applicable portion of this Section 9.03 that shall not have been invalidated and to the fullest extent permitted by Applicable Law.

(h)     **Amendment.**   The provisions of this Section 9.03 shall be a contract between the Company, on the one hand, and each Covered Person who served in such capacity at any time while this Section 9.03 is in effect, on the other hand, pursuant to which the Company and each such Covered Person intend to be legally bound.   No amendment, modification, or repeal of this Section 9.03 that adversely affects the rights of a Covered Person to indemnification for Losses incurred or relating to a state of facts existing prior to such amendment, modification or repeal shall apply in such a way as to eliminate or reduce such Covered Person's entitlement to indemnification for such Losses without the Covered Person's prior written consent.

**Section 9.04   Survival.** The provisions of this ARTICLE IX shall survive the dissolution, liquidation, winding up, termination of the Company and the withdrawal of any Member or the Transfer of any Member's interest in the Company.

# ARTICLE X
## ACCOUNTING; TAX MATTERS

**Section 10.01 Financial Statements and Other Information.**  The Company shall prepare and furnish to each Member and CUSA the following reports:

(a)    **Annual Financial Statements.**  As soon as available, and in any event within 105 days after the end of each Fiscal Year, its unaudited consolidated balance sheet and related consolidated statements of operations, Members' equity and cash flows as of the end of and for such year prepared in accordance with GAAP consistently applied.

(b)    **Quarterly Financial Statements.**  As soon as available, and in any event within 60 days after the end of each quarterly accounting period in each Fiscal Year (including the last fiscal quarter of the Fiscal Year), its unaudited consolidated balance sheet and related unaudited consolidated statements of operations, Members' equity and cash flows as of the end of and for such fiscal quarter and the then elapsed portion of the current Fiscal Year, setting forth in each case in comparative form the figures for the corresponding period or periods of the previous Fiscal Year or as at the end of such period or periods, all in reasonable detail and certified by the Company as presenting fairly in all material respects the consolidated financial condition and results of operations of the Company in accordance with GAAP consistently applied, subject to normal year-end audit adjustments and the absence of footnotes.

(c)    **Monthly Operating Data.**  As soon as available, but in no event later than 45 days after the end of each calendar month, a statement in a form reasonably satisfactory to each Member and CUSA showing all operating data for the Company, including operating expenses and revenue for each of the Company, for such calendar month.

(d)    **Budget Updates.**  Promptly once available and no less than bi-annually, an operating budget for the Fiscal Year, forecasting revenue, operating costs, and capital expenses for each fiscal quarter.

(e)    **Material Government Communication.**  Promptly following receipt thereof by FWE IV, copies of all material written notices or other material communications issued or provided by or to any Governmental Authority.

(f)    **Additional Information.**  Promptly following any reasonable request therefor, such other information regarding the operations, business affairs and financial condition of the Company, as any Member or CUSA may reasonably request, including, without limitation, decommissioning cost estimates and calculations.

**Section 10.02 Inspection Rights.**  Upon reasonable notice from a Member or CUSA, the Company shall afford each Member or CUSA and their respective Representatives access during normal business hours to (a) the Company's properties, offices, plants, and other facilities; (b) the corporate, financial, and similar records, reports, and documents of the Company, including, without limitation, all books and records, minutes of proceedings, internal management documents, reports of operations, reports of adverse developments, copies of any management

33

letters and communications with Members or the Sole Manager, and to permit each Member or CUSA and their respective Representatives to examine such documents and make copies thereof; and (c) the Sole Manager, any officers, senior employees, and public accountants of the Company, and to afford each Member or CUSA and their respective Representatives the opportunity to discuss the affairs, finances, and accounts of the Company with such Sole Manager, officers, senior employees, and public accountants (and the Company hereby authorizes said accountants to discuss with such Member or CUSA and their respective Representatives such affairs, finances, and accounts).

**Section 10.03 Income Tax Status.**  The Company and the Initial Member intend that the Company shall be treated as a disregarded entity for U.S., federal, state, and local income tax purposes.  Neither the Company nor any Member shall make an election for the Company to be classified as other than a partnership or a disregarded entity pursuant to Treasury Regulations Section 301.7701-3.

**Section 10.04 Tax Matters Representative**.  The following Sections 10.04(a)-(f) are intended to apply if the Company becomes a partnership for U.S. federal income tax purposes:

(a)  **Appointment.**  The Members hereby appoint the Sole Manager as "partnership representative" as provided in Code Section 6223(a) (the "**Tax Matters Representative**").  If any state or local tax law provides for a tax matters partner/partnership representative or Person having similar rights, powers, authority or obligations, the Person designated as the Tax Matters Representative shall also serve in such capacity.  To the extent required by Applicable Law, if the Tax Matters Representative is an entity, it shall appoint a "designated individual" to act on its behalf.  The Tax Matters Representative can be removed at any time by a vote of Members holding a majority of the Membership Interests, and shall resign if it is no longer a Member.  In the event of the resignation or removal of the Tax Matters Representative, Members holding a majority of the Membership Interests shall select a replacement Tax Matters Representative.

(b)  **Tax Examinations and Audits.**  The Tax Matters Representative is authorized and required to represent the Company (at the Company's expense) in connection with all examinations of the Company's affairs by Taxing Authorities, including resulting administrative and judicial proceedings, and to expend Company funds for professional services and costs associated therewith.  The Tax Matters Representative shall promptly notify the Members in writing of the commencement of any tax audit of the Company, upon receipt of a tax assessment and upon receipt of a notice of final partnership adjustment, and shall keep the Members reasonably informed of the status of any tax audit and resulting administrative and judicial proceedings.  Without the consent of Members holding a majority of the Membership Interests, the Tax Matters Representative shall not extend the statute of limitations, file a request for administrative adjustment, file suit relating to any Company tax refund or deficiency or enter into any settlement agreement relating to items of income, gain, loss or deduction of the Company with any Taxing Authority.

(c)  **US Federal Tax Proceedings.**  The Members acknowledge that the Company may elect the application of Section 6226 of the Code.  This acknowledgement applies to each Member whether or not the Member owns an interest in the Company in both the reviewed year and the year of the tax adjustment.  In the event that the Company elects the application of Section 6226 of the Code, the Members agree and covenant to take into account and report to the Internal Revenue Service (or any other applicable taxing authority) any adjustment to their tax items for the reviewed year of which they are notified by the Company in a written statement, in the manner provided in Section 6226(b) of the Code, whether or not the Member owns any interest in the Company at such time.  Any Member that fails to report its share of such adjustments on its tax return, agrees to indemnify and hold harmless the Company and the Tax Matters Representative from and against any and all losses, costs, liabilities and expenses related to taxes (including penalties and interest) imposed on the Company as a result of the Member's inaction.  If the Company is required to pay the assessment of the imputed underpayment under Section 6225(a)(1) of the Code or similar provisions of state law, any taxes, penalties, and interest payable by the Company shall be treated as attributable to the Members, and, to the extent possible, the Tax Matters Representative shall allocate the burden of any such amounts to those Members to whom such amounts are reasonably attributable taking into account the Member's or former Member's allocable share of taxable income or loss with respect to the Fiscal Year to which such assessment pertains and adjustments that may have been made in computing the imputed underpayment.  To the extent that any such amount is payable by the Company, at the option of the Tax Matters Representative, such amount shall be recoverable from such Member as provided in Section 6.03(c).  The provisions contained in this Section 10.04 shall survive the dissolution, termination or liquidation of the Company, the withdrawal of any Member or the Transfer of any Member's interest in the Company and apply to unadmitted assignees of a Member's interest who may be considered current or former partners of the Company for federal tax purposes.

(d)  **Tax Returns.**  Each Member agrees that such Member shall not treat any Company item inconsistently such Member's federal, state, foreign or other income tax return with the treatment of the item on the Company's return.

(e)  **Section 754 Election.**  The Tax Matters Representative will make an election under Code Section 754, if the Company becomes a partnership for U.S. federal income tax purposes.

(f)  **Indemnification**.  The Company shall defend, indemnify, and hold harmless the Tax Matters Representative against any and all liabilities sustained as a result of any act or decision concerning Company tax matters and within the scope of responsibilities as Tax Matters Representative, so long as such act or decision was done or made in good faith and does not constitute gross negligence or willful misconduct.

**Section 10.05 Tax Returns.**  At the expense of the Company, the Sole Manager (or any officer of the Company that it may designate pursuant to this Agreement) shall endeavor to cause the preparation and timely filing (including extensions) of all tax returns, if any, required to be filed by the Company pursuant to the Code as well as all other required tax returns in each

WEIL:\97901822\22\45327.0007

jurisdiction in which the Company owns property or does business.  If the Company becomes a partnership for U.S. federal income tax purposes, as soon as reasonably possible after the end of each Fiscal Year, the Sole Manager or any designated officer of the Company, as applicable, will cause to be delivered to each Person who was a Member at any time during such Fiscal Year, IRS Schedule K-1 to Form 1065, if applicable, and such other information with respect to the Company as may be necessary for the preparation of such Person's federal, state, and local income tax returns for such Fiscal Year.

**Section 10.06 Company Funds.**  All funds of the Company shall be deposited in its name, or in such name as may be designated by the Sole Manager, in such checking, savings, or other accounts, or held in its name in the form of such other investments as shall be designated by the Sole Manager.  The funds of the Company shall not be commingled with the funds of any other Person.  All withdrawals of such deposits or liquidations of such investments by the Company shall be made exclusively upon the signature or signatures of the Sole Manager, or any officer or officers of the Company that may be designated by the Sole Manager, as applicable, pursuant to this Agreement.

## ARTICLE XI
## WINDING UP AND TERMINATION

**Section 11.01 Events Requiring Winding Up.**  The Company shall begin to wind up its business and affairs only upon the occurrence of any of the following events (in each case, subject to the applicable provisions of Section 7.04):

(a)    upon the permanent cessation of all production from, and Final Completion of all plugging and abandonment and decommissioning of, the FWE IV Assets;

(b)    the occurrence of a nonwaivable event under the terms of the BOC which requires the winding up of the Company after its termination unless a Continuance occurs in respect of such event; or

(c)    the entry of a judicial decree ordering winding up and termination under § 11.314 of the BOC in proceedings of which CUSA has been given notice and an opportunity to participate.

(d)    Notwithstanding the occurrence of an event referenced in Section 11.01(b), if the Company is permitted prior to the termination of its existence in accordance with the BOC to revoke a winding up upon the occurrence of such event and the Sole Manager provides its prior written consent to such revocation, then, to the extent so permitted under the BOC and in the manner provided therein, the Company's existence shall be continued (the revocation of such a winding up and continuance of the Company, a "**Continuance**").

**Section 11.02 Effectiveness of Termination.**  The Company shall begin to wind up its business and affairs as soon as reasonably practicable upon the occurrence of an event described in Section 11.01 (if such event has not been revoked or cancelled), but the Company shall not terminate until the winding up of the Company has been completed, the assets of the Company

36

have been distributed as provided in Section 11.03, and the Certificate of Termination shall have been filed as provided in Section 11.04.

**Section 11.03 Liquidation.**   If the Company is to be terminated pursuant to Section 11.01, the Company shall be liquidated and its business and affairs wound up in accordance with the BOC and the following provisions:

(a)   **Liquidator.**   The Sole Manager shall act as liquidator to wind up the Company (the "**Liquidator**"); provided, however, that if there is then a vacancy in the position of the Sole Manager or the Sole Manager is not willing to act as the Liquidator, the Members shall appoint a Person to act as the Liquidator with the consent of CUSA. The Liquidator shall have full power and authority to sell, assign, and encumber any or all of the Company's assets and to wind up and liquidate the affairs of the Company in an orderly and business-like manner.

(b)   **Accounting.**   As promptly as possible after the event requiring winding up and again after final liquidation, the Liquidator shall cause a proper accounting to be made by a recognized firm of certified public accountants of the Company's assets, liabilities, and operations through the last day of the calendar month in which such event occurs or the final liquidation is completed, as applicable.

(c)   **Notice.**   The Liquidator shall deliver to each known claimant of the Company the notice required by § 11.052 of the BOC.

(d)   **Distribution of Proceeds.**   The Liquidator shall liquidate the assets of the Company and distribute the proceeds of such liquidation in the following order of priority, unless otherwise required by mandatory provisions of Applicable Law:

(i)   First, to the payment of all of the Company's debts and liabilities to its creditors (including Members, if applicable), including amounts owed, if any, pursuant to the Material Project Contracts to CUSA and/or Credit Bid Purchaser, and the expenses of liquidation (including sales commissions incident to any sales of assets of the Company);

(ii)   Second, to the establishment of and additions to other reserves that are determined by the Liquidator to be reasonably necessary for any contingent unforeseen liabilities or obligations of the Company; and

(iii)   Third, to the Members in accordance with the positive balances in their respective Capital Accounts, as determined after taking into account all Capital Account adjustments for the taxable year of the Company during which the liquidation of the Company occurs.

(e)   **Discretion of Liquidator.**   Notwithstanding the provisions of Section 11.03(d) that require the liquidation of the assets of the Company, but subject to the order of priorities set forth in Section 11.03(d), if upon winding up of the Company the Liquidator reasonably determines that an immediate sale of part or all of the Company's

WEIL:\97901822\22\45327.0007

assets would be impractical or could cause undue loss to the Members, the Liquidator may defer the liquidation of any assets except those necessary to satisfy Company liabilities and reserves, and may, upon approval of holders of a majority of the outstanding Membership Interests, distribute to the Members, in lieu of cash, as tenants in common and in accordance with the provisions of Section 11.03(d), undivided interests in such Company assets as the Liquidator deems not suitable for liquidation. Any such distribution in kind shall be subject to such conditions relating to the disposition and management of such properties as the Liquidator deems reasonable and equitable and to any agreements governing the operating of such properties at such time. For purposes of any such distribution, any property to be distributed will be valued at its Fair Market Value.

**Section 11.04 Certificate of Termination.** Upon completion of the distribution of the assets of the Company as provided in Section 11.03(d) hereof, the Liquidator or other such officer or Sole Manager shall execute and cause to be filed a Certificate of Termination in the State of Texas and shall cause the cancellation of all qualifications and registrations of the Company as a foreign limited liability company in jurisdictions other than the State of Texas and shall take such other actions as may be necessary to terminate the Company. Upon acceptance of the Certificate of Termination by the Texas Secretary of State, the Company shall be terminated.

**Section 11.05 Survival of Rights, Duties, and Obligations.** Dissolution, liquidation, winding up, or termination of the Company for any reason shall not release any party from any Loss that at the time of such dissolution, liquidation, winding up, or termination already had accrued to any other party or thereafter may accrue in respect of any act or omission prior to such dissolution, liquidation, winding up, or termination. For the avoidance of doubt, none of the foregoing shall replace, diminish, or otherwise adversely affect any Member's right to indemnification pursuant to Section 9.03.

**Section 11.06 Recourse for Claims.** Each Member shall look solely to the assets of the Company for all distributions with respect to the Company, such Member's Capital Account, and such Member's share of Net Income, Net Loss, and other items of income, gain, loss, and deduction, and shall have no recourse therefor (upon termination or otherwise) against the Liquidator or any other Member.

<div align="center">

**ARTICLE XII**
**MISCELLANEOUS**

</div>

**Section 12.01 Expenses.** The Initial Member will pay, or cause to be paid, or contribute to the Company amounts necessary for the Company to pay, all amounts necessary to fully cover (a) costs associated with the formation of the Company in connection with the Divisive Merger Documents and (b) any premiums to satisfy organizational or area wide bonding requirements.

**Section 12.02 Further Assurances.** In connection with this Agreement and the transactions contemplated hereby, the Company and the Member hereby agree, at the request of the Company or any other Member, to execute and deliver such additional documents, instruments, conveyances, and assurances and to take such further actions as may be required to carry out the provisions hereof and give effect to the transactions contemplated hereby.

<div align="center">38</div>

**Section 12.03 Confidentiality**.

(a)     Each Member acknowledges that it will have access to and become acquainted with trade secrets, proprietary information, and confidential information belonging to the Company and its Affiliates that are not generally known to the public, including, but not limited to, information concerning business plans, financial statements, and other information, operating practices and methods, expansion plans, strategic plans, marketing plans, contracts, customer lists, or other business documents that the Company treats as confidential, in any format whatsoever (including oral, written, electronic, or any other form or medium) (collectively, "**Confidential Information**").   In addition, each Member acknowledges that:   (i) the Company has invested, and continues to invest, substantial time, expense, and specialized knowledge in developing its Confidential Information; (ii) the Confidential Information provides the Company with a competitive advantage over others in the marketplace; and (iii) the Company would be irreparably harmed if the Confidential Information were disclosed to competitors or made available to the public.   Without limiting the applicability of any other agreement to which any Member is subject, no Member shall, directly or indirectly, disclose or use (other than solely for the purposes of such Member monitoring and analyzing its investment in the Company) at any time, including, without limitation, use for personal, commercial, or proprietary advantage or profit, either during its association with the Company or thereafter, any Confidential Information of which such Member is or becomes aware.   Each Member in possession of Confidential Information shall take all appropriate steps to safeguard such information and to protect it against disclosure, misuse, espionage, loss, and theft.

(b)     Nothing contained in Section 12.03(a) shall prevent any Member from disclosing Confidential Information: (i) upon the order of any court or administrative agency; (ii) upon the request or demand of any regulatory agency or authority having jurisdiction over such Member; (iii) to the extent compelled by legal process or required or requested pursuant to subpoena, interrogatories, or other discovery requests; (iv) to the extent necessary in connection with the exercise of any remedy hereunder; (v) to the other Members; or (vi) to such Member's Representatives who, in the reasonable judgment of such Member, need to know such Confidential Information and agree to be bound by the provisions of this Section 12.03 as if a Member; or (vii) to any potential Transferee in connection with a proposed Transfer of Membership Interests from such Member, as long as such potential Transferee agrees in writing to be bound by the provisions of this Section 12.03 as if a Member before receiving such Confidential Information; provided, that in the case of clause (i), (ii), or (iii), such Member shall notify the Company and other Members of the proposed disclosure as far in advance of such disclosure as practicable (but in no event make any such disclosure before notifying the Company and other Members) and use reasonable efforts to ensure that any Confidential Information so disclosed is accorded confidential treatment satisfactory to the Company, when and if available.

(c)     The restrictions of Section 12.03(a) shall not apply to Confidential Information that: (i) is or becomes generally available to the public other than as a result of a disclosure by a Member in violation of this Agreement; (ii) is or has been independently developed or conceived by such Member without use of Confidential

Information; or (iii) becomes available to such Member or any of its Representatives on a non-confidential basis from a source other than the Company, the other Members, or any of their respective Representatives, provided, that such source is not known by the receiving Member to be bound by a confidentiality agreement regarding the Company.

(d)     The obligations of each Member under this Section 12.03 shall survive for so long as such Member remains a Member, and for three years following the earlier of (i) termination, dissolution, liquidation, and winding up of the Company; (ii) the withdrawal of such Member from the Company; or (iii) such Member's Transfer of its Membership Interests; provided that with respect to Confidential Information that constitutes a trade secret under Applicable Law, the obligations of each Member under this Section 12.03 shall survive until, if ever, such Confidential Information loses its trade secret protection other than due, directly or indirectly, to an act or omission of the Member.

**Section 12.04 Notices.**  All notices, requests, consents, claims, demands, waivers, and other communications hereunder shall be in writing and shall be deemed to have been given:

(a)     when delivered by hand (with written confirmation of receipt);

(b)     when received by the addressee if sent by a nationally recognized overnight courier (receipt requested);

(c)     on the third day after the date mailed, by certified or registered mail, return receipt requested, postage prepaid; or

(d)     on the day delivered if sent by electronic mail to the address below during normal business hours of the recipient and on the next Business Day if sent by electronic mail after normal business hours of the recipient.

Such communications must be sent to the respective parties at the following addresses (or at such other address for a party as shall be specified in a notice given in accordance with this Section 12.04):

|  |  |
|---|---|
| **If to the Company:** | Fieldwood Energy IV LLC |
| | 2000 W. Sam Houston Parkway S., Suite 1200 |
| | Houston, Texas 77042 |
| | Attention: Sole Manager |
| | Phone: [●] |
| | Email: [●] |

with a copy to:

(which shall not
constitute notice)

Chevron U.S.A. Inc.
100 Northpark Blvd
Covington, LA 70443
Attention: Land Manager
Phone: (985) 773-6538
Email: tdwebre@chevron.com

**If to Member**:                    To the Member's respective mailing address as set forth on the
Members Schedule.

    **Section 12.05 Headings.**  The headings in this Agreement are inserted for convenience or reference only and are in no way intended to describe, interpret, define, or limit the scope, extent, or intent of this Agreement or any provision of this Agreement.

    **Section 12.06 Severability.**  If any term or provision of this Agreement is held to be invalid, illegal, or unenforceable under Applicable Law in any jurisdiction, such invalidity, illegality, or unenforceability shall not affect any other term or provision of this Agreement or invalidate or render unenforceable such term or provision in any other jurisdiction.  Except as provided in Section 9.03(g), upon such determination that any term or other provision is invalid, illegal, or unenforceable, this Agreement shall be modified automatically so as to effect the original intent of the parties as closely as possible in order that the transactions contemplated hereby be consummated as originally contemplated to the greatest extent possible, legal, and enforceable.

    **Section 12.07 Entire Agreement.**  This Agreement, together with the Certificate of Merger, Plan of Merger, Certificate of Formation, the Material Project Contracts and all related Exhibits and Schedules, constitute the sole and entire agreement of the parties to this Agreement with respect to the subject matter contained herein and therein, and supersede all prior and contemporaneous understandings, agreements, representations, and warranties, both written and oral, with respect to such subject matter.

    **Section 12.08 Successors and Assigns.**  Subject to the restrictions on Transfers set forth herein, this Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective heirs, executors, administrators, successors, and assigns.

    **Section 12.09 No Third-Party Beneficiaries.**  Except (a) with respect to certain rights reserved to CUSA as set forth in this Agreement, which shall be for the benefit of and enforceable by CUSA, and (b) as provided in ARTICLE IX, which shall be for the benefit of and enforceable by Covered Persons as described therein, this Agreement is for the sole benefit of the parties hereto (and their respective heirs, executors, administrators, successors, and assigns) and nothing herein, express or implied, is intended to or shall confer upon any other Person, including any creditor of the Company, any legal or equitable right, benefit, or remedy of any nature whatsoever under or by reason of this Agreement; provided, however that CUSA and each Covered Persons shall be an express third party beneficiary of this Agreement.

WEIL:\97901822\22\45327.0007

**Section 12.10 Amendment.**   Subject to Sections 2.02, no provision of this Agreement may be amended or modified except by an instrument in writing executed by the Company and the Members holding a majority of the Membership Interests; provided, however that any amendment or modification which impacts the rights of CUSA hereunder, including changes to Section 2.05 (Purpose) shall be subject to the prior written consent of CUSA, which may be given, delayed or withheld in its sole discretion.   Any such written amendment or modification will be binding upon the Company, CUSA and each Member.    Notwithstanding the foregoing, amendments to the Members Schedule following any new issuance, redemption, repurchase, or Transfer of Membership Interests in accordance with this Agreement may be made by the Sole Manager without the consent of or execution by the Members.

**Section 12.11 Waiver.**   No waiver by any party or CUSA of any of the provisions hereof shall be effective unless explicitly set forth in writing and signed by the party so waiving or CUSA, respectively.   No waiver by any party or CUSA shall operate or be construed as a waiver in respect of any failure, breach, or default not expressly identified by such written waiver, whether of a similar or different character, and whether occurring before or after that waiver.   No failure to exercise, or delay in exercising, any right, remedy, power, or privilege arising from this Agreement shall operate or be construed as a waiver thereof, nor shall any single or partial exercise of any right, remedy, power, or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power, or privilege.   For the avoidance of doubt, nothing contained in this Section 12.11 shall diminish any of the explicit and implicit waivers described in this Agreement.

**Section 12.12 Governing Law.**   All issues and questions concerning the application, construction, validity, interpretation, and enforcement of this Agreement shall be governed by and construed in accordance with the internal laws of the State of Texas, without giving effect to any choice or conflict of law provision or rule (whether of the State of Texas or any other jurisdiction) that would cause the application of laws of any jurisdiction other than those of the State of Texas.

**Section 12.13 Submission to Jurisdiction.**   The parties hereby agree that any suit, action, or proceeding seeking to enforce any provision of, or based on any matter arising out of or in connection with, this Agreement or the transactions contemplated hereby, whether in contract, tort, or otherwise, shall be brought in the federal courts of the United States of America or the courts of the State of Texas, in each case located in Harris County and in Houston, Texas.   Each of the parties hereby irrevocably consents to the jurisdiction of such courts (and of the appropriate appellate courts therefrom) in any such suit, action, or proceeding and irrevocably waives, to the fullest extent permitted by law, any objection that it may now or hereafter have to the laying of the venue of any such suit, action, or proceeding in any such court or that any such suit, action, or proceeding that is brought in any such court has been brought in an inconvenient forum.   Service of process, summons, notice, or other document by registered mail to the address set forth in Section 12.04 shall be effective service of process for any suit, action, or other proceeding brought in any such court.

**Section 12.14 Waiver of Jury Trial**.   EACH PARTY HERETO ACKNOWLEDGES AND AGREES THAT ANY DISPUTE OR CONTROVERSY THAT MAY ARISE UNDER THIS AGREEMENT IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES

AND, THEREFORE, EACH SUCH PARTY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LEGAL ACTION ARISING OUT OF RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

**Section 12.15 Equitable Remedies.**  Each party hereto acknowledges that a breach or threatened breach by such party of any of its obligations under this Agreement would give rise to irreparable harm to the other parties or CUSA, for which monetary damages would not be an adequate remedy, and hereby agrees that in the event of a breach or a threatened breach by such party of any such obligations, each of the other parties hereto and CUSA shall, in addition to any and all other rights and remedies that may be available to them in respect of such breach, be entitled to equitable relief, including a temporary restraining order, an injunction, specific performance, and any other relief that may be available from a court of competent jurisdiction (without any requirement to post bond).

**Section 12.16 Attorney's Fees.**  In the event that any party or third-party beneficiary hereto institutes any legal suit, action, or proceeding, including arbitration, against another party in respect of a matter arising out of or relating to this Agreement, the prevailing party or third-party beneficiary in the suit, action, or proceeding shall be entitled to receive, in addition to all other damages to which it may be entitled, the costs incurred by it in conducting the suit, action, or proceeding, including reasonable attorneys' fees and expenses and court costs.

**Section 12.17 Remedies Cumulative.**  The rights and remedies under this Agreement are cumulative and are in addition to and not in substitution for any other rights and remedies available at law or in equity or otherwise, except to the extent expressly provided in Section 9.02 to the contrary.

**Section 12.18 Counterparts.**  This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement.  A signed copy of this Agreement delivered by email or other means of Electronic Transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

(SIGNATURE PAGE FOLLOWS)

43

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be entered into as of the date first written above by their respective officers thereunto duly authorized.

**The Company:**

FIELDWOOD ENERGY IV LLC,
a Texas limited liability company


By:_____
Name:
Title:


**The Initial Member:**

FIELDWOOD ENERGY INC.,
a Delaware corporation


By:_____
Name:
Title:

**SCHEDULE A**

**MEMBERS SCHEDULE**

| Member Name, and Address | Membership Interest |
|---|---|
| Fieldwood Energy Inc.<br>2000 W. Sam Houston Parkway S., Suite 1200<br>Houston, Texas 77042 | 100% |
| Total: | 100% |

WEIL:\97901822\22\45327.0007

## __Exhibit 4__

**Sole Manager Agreement**

See attached.

*Exhibit 4 to the Implementation Agreement*

Sunset Energy Gulf Coast Asset Management LLC
Attn: David Abell
1727 Sunset Boulevard
Houston, TX 77005

June ___, 2021

Dear Mr. Abell,

This letter agreement (this "**Agreement**") sets forth the terms and conditions whereby Sunset Energy Gulf Coast Asset Management LLC ("Sunset", "you", "your") agrees to provide the services to be performed by the "Sole Manager" on behalf of or in the service of Fieldwood Energy IV LLC, a Texas limited liability company (the "**Company**"), as more fully set forth and described in the Limited Liability Company Agreement of the Company, dated as of [●], 2021 (such agreement, as it may be amended, supplemented, or modified from time to time, the "**Company Agreement**"), a copy of which is attached as Exhibit A hereto. In connection with this Agreement, Sunset will appoint David Abell to direct or otherwise oversee and be responsible for the activities of the Sole Manager. As used in this Agreement, the term "**Parties**" shall refer to both Sunset and the Company and "**Party**" shall refer to Sunset or the Company. For purposes of this Agreement and the Company Agreement, Sunset will be a "manager" within the meaning of that term under the Texas Business Organizations Code, which is referred to as the Sole Manager in the Company Agreement. Capitalized terms used but not defined herein shall have the meaning set forth in the Company Agreement.

**Section 1.**  <u>**Services**</u>.

(a)  The Company hereby agrees that Sunset will serve as Sole Manager of the Company and the Company will engage Sunset, and Sunset hereby accepts such appointment as Sole Manager and the engagement to perform for or provide to the Company the services that are specified in the Company Agreement to be performed or provided by the Sole Manager in accordance with the Company Agreement and as otherwise set forth herein (collectively, the "**Services**"), such Services to be performed or provided on the terms and subject to the conditions set forth in the Company Agreement and this Agreement.

(b)  The scope of the Services to be performed or provided by the Sole Manager and Sunset's authority to take actions on behalf of the Company as the Sole Manager shall be subject to the limitations thereon as set forth in the Company Agreement and this Agreement.

(c)  Sunset shall devote the appropriate business time and attention and its full skill and best efforts to performing or providing the Services and to the furtherance of the Company's interests. Sunset shall perform or provide the Services and carry out the responsibilities reasonably related thereto, to the best of its ability, in a diligent, trustworthy, and businesslike manner for the purpose of advancing the business of the Company.

(d)  Sunset agrees that it shall work with Mako Buyer LLC in accordance with the terms of the Contract Operating Agreement between Mako Buyer LLC and Company.

**Section 2.**  <u>**Service as Sole Manager; Term of Engagement**</u>. The term of your service as Sole Manager and engagement under this Agreement shall commence as of the date set forth above and shall continue until the earlier of (a) the date on which you are removed as the Sole Manager by the Company for any reason, with the consent of CUSA, and (b) the [tenth] anniversary of this Agreement, unless extended annually thereafter (such period of time, the "**Engagement Period**"). **You acknowledge and understand that your engagement with the Company may be terminated pursuant to Section 9 below,**

**meaning that you or the Company (with CUSA's consent) may terminate the engagement and your role as Sole Manager at any time, with or without Cause (as defined herein), and with or without notice and for any reason or no particular reason.** Although your compensation and benefits may change from time to time, the at-will nature of your engagement and service as Sole Manager may only be changed with the prior written consent of CUSA.

**Section 3.**   **Compensation**.

(a)   In consideration for your performing or providing the Services and any duties related thereto and the rights granted to the Company in this Agreement, the Company shall pay you an initial annual fee of ████████████, subject to review from time to time, payable at the beginning of each month in equal monthly instalments without deductions; provided, however, that you acknowledge that you shall be solely responsible and liable for any all taxes payable with respect thereto and shall remit and pay such taxes on a timely basis and indemnify the Company for any failure to do so.

(b)   The Company shall pay or reimburse you for all expenses (including travel expenses) reasonably incurred by you during the Engagement Period in connection with performing or providing the Services or carrying out the responsibilities reasonably related thereto, provided that you shall provide to the Company reasonable documentation or evidence of expenses for which you seek reimbursement.

**Section 4.**   **Property Rights**.

(a)   You shall protect the assets of the Company from misuse or misappropriation, including, without limitation, any Confidential Information (as defined below) or other intellectual property rights of the Company.

(b)   As between you and the Company, the Company is, and will remain, the sole and exclusive owner of all right, title, and interest in and to any documents, specifications, data, know-how, methodologies, software, and other materials provided to you by the Company, including any intellectual property rights therein or other Confidential Information ("**Company Materials**"). You have no right or license to reproduce or use any Company Materials except solely during the Engagement Period to the extent necessary to perform your obligations under this Agreement in furtherance of the Company's business. All other rights in and to the Company Materials are expressly reserved by the Company. Without prior written permission, you have no right or license to use the Company's trademarks, service marks, trade names, logos, symbols, or brand names.

**Section 5.**   **Confidentiality**.

(a)   You acknowledge that you will have access to information that is non-public or otherwise treated as confidential and proprietary by the Company, including, without limitation, the existence and terms of the Company Agreement, trade secrets, technology, and information pertaining to business operations and strategies, customers, pricing, marketing, finances, sourcing, seismic information, projected production, projected cost and expenses (including projected plugging and abandonment and decommissioning costs) or operations of the Company, its Affiliates, or their suppliers or customers, in each case whether  spoken, written, printed, electronic, or in any other form or medium, including with respect to the Company's or its Affiliates' arrangements with CUSA or agreements related thereto (collectively, the "**Confidential Information**"). Any Confidential Information that you access in connection with the Services or any work related thereto shall be subject to the terms and conditions of this Section 5 during the term of your engagement and for two years after Termination. You agree not to use any Confidential Information for any purpose except as required in the performance of the Services. You

shall notify the Member of the Company (who shall also notify CUSA) immediately in the event you become aware of any loss or disclosure of any Confidential Information.

(b)      Confidential Information shall not include information that:

(i)      is or becomes generally available to the public other than through your breach of this Agreement; or

(ii)      is communicated to you by a third party that had no confidentiality obligations with respect to such information; or

(iii)      was available to you on a non-confidential basis prior to its disclosure by the Company without violation of any confidentiality obligations appliable to Sunset or its affiliates.

(c)      Nothing herein shall be construed to prevent disclosure of Confidential Information as may be required by applicable law or regulation, or pursuant to a valid order of a court of competent jurisdiction or an authorized government agency.

(d)      Notice of Immunity Under the Defend Trade Secrets Act of 2016 ("**DTSA**").

Notwithstanding any other provision of this Agreement:

(i)      You will not be held criminally or civilly liable under any federal or state trade secret law for any disclosure of a trade secret that:

(A)      is made: (1) in confidence to a federal, state, or local government official, either directly or indirectly, or to an attorney and (2) solely for the purpose of reporting or investigating a suspected violation of law; or

(B)      is made in a complaint or other document that is filed under seal in a lawsuit or other proceeding.

(ii)      If you file a lawsuit for retaliation by the Company for reporting a suspected violation of law, you may disclose the Company's trade secrets to your attorney and use the trade secret information in the court proceeding if you:

(A)      file any document containing the trade secret under seal; and

(B)      do not disclose the trade secret, except pursuant to court order.

**Section 6.      Representations and Warranties**.

(a)      You represent and warrant to the Company that:

(i)      you have the right to enter into this Agreement, to grant the rights granted herein and to perform fully all of your obligations in this Agreement and the Company Agreement;

(ii)      your entering into this Agreement with the Company and your performance of the Services or any work related thereto do not and will not conflict with or result in any breach or default under any other agreement to which you are subject, including, without limitation, any non-competition, non-solicitation, or other work-related restrictions imposed by a current or former employer, and you have informed any entity with which you have such restrictions that are you assuming the role of Sole Manager;

      (iii)     you will inform the Member (who shall promptly inform CUSA) about any non-competition, non-solicitation, or other work-related restrictions to which you are subject and provide as much information about them as legally possible, including any agreements describing such restrictions on your activities;

      (iv)     you will not use or disclose non-public, confidential or propriety information of others or subject to other confidentiality agreements with the Company;

      (v)     you will discuss any questions you may have about ownership of particular documents or other information with appropriate personnel from your clients or former employers before removing or copying the documents or information for use in connection with your employment with the Company;

      (vi)     you have the required skill, experience, and qualifications to perform the Services and any work related thereto, you shall perform the Services and such work in a professional and workmanlike manner in accordance with generally recognized industry standards for similar services and you shall devote sufficient resources to ensure that the Services are performed in a timely and reliable manner; and

      (vii)     you shall perform the Services in compliance with all applicable federal, state, and local laws and regulations, including by maintaining all licenses, permits, and registrations required to perform the Services or any work related thereto.

      (b)     The Company hereby represents and warrants to you that:

      (i)     it has the full right, power, and authority to enter into this Agreement and to perform its obligations hereunder; and

      (ii)     the execution of this Agreement by its representative whose signature is set forth at the end hereof has been duly authorized by all necessary limited liability company action.

**Section 7.**    **Indemnification**.  You shall be entitled to indemnification by the Company on the terms and subject to the conditions set forth in the Company Agreement, all of which you acknowledge by your signature below.

**Section 8.**    **Insurance**.  The Company may, at its own expense, but is not required to, provide directors' and officers' liability insurance coverage to you in your capacity as the Sole Manager, in an amount and on terms reasonably customary for directors and officers of oil and gas exploration and production companies that are similarly situated to the Company.  The Company shall notify you of the existence of and any termination, cancellation, or material adverse changes to such insurance coverage provided to you.

**Section 9.**    **Termination**.

      (a)     You or the Company (in the case of the Company, as directed by the Member and subject to the prior consent or approval of CUSA as provided in the Company Agreement) may terminate this Agreement without Cause upon sixty (60) calendar days' written notice to the other Party.  In the event of termination by you pursuant to this clause (a), the Company shall pay you on a pro-rata basis for any portion of your compensation then due and payable for any Services completed up to and including the date of such termination, plus unreimbursed expenses pursuant to Section 3 (b) above.  In the event of termination by

the Company pursuant to this clause (a), the Company shall pay you six (6) months of your annual fee from and after the date of such termination.

(b)　　The Company (as directed by the Member and subject to the prior consent and approval of CUSA) may terminate this Agreement, effective immediately upon written notice to you, for "**Cause**" (as defined below) or should David Abell cease (or otherwise be unavailable) to  direct the activities of the Sole Manager. You may terminate this Agreement upon thirty (30) days advance written notice to the Member (who shall promptly notify CUSA).  As used herein, "**Cause**" means a good faith finding by the Member (in consultation with CUSA) of: (a) the commission by you of an act of fraud, dishonesty, or embezzlement against the Company or any of its Affiliates or Subsidiaries, or any customer or client thereof; (b) the unauthorized use or disclosure by you of material Confidential Information or intellectual property rights of the Company or any of its Affiliates or Subsidiaries; (c) your indictment or conviction (or a plea by you or on your behalf of nolo contendere) for: (i) a felony or (ii) a crime involving fraud, dishonesty or moral turpitude; or (d)  your failure to perform your material duties as the Sole Manager of the Company in accordance with this Agreement or if you intentionally, or with gross negligence, take action (or elect not to take action) or engage in conduct adverse to the interests of the Company, its Affiliates, it Subsidiaries, or its or their assets, business or business opportunities that the Member has reasonably determined is or could be materially injurious to the Company; provided, however, that prior to a termination for Cause under clause (d) of this definition, the Member shall provide written notice to you of any such failure(s), violation(s), breach(es), action(s), or inaction(s) upon which the Company intends to rely as the basis for a termination for Cause and the Member will offer the Sole Manager (subject to the consent of CUSA) no less than five (5) calendar days to cure such failure(s), violation(s), breach(es), action(s), or inaction(s) (as applicable) if the Member, in the exercise of its good faith judgment, deems such failure(s), violation(s), breach(es), action(s), or inaction(s) (as applicable) to be capable of cure; provided, further, that the Member shall only be required to give the Sole Manager such notice and opportunity to cure one time.  In the event of termination by the Member pursuant to this clause (b) for Cause or by you pursuant to this clause (b), the Company shall pay you on a pro-rata basis for any portion of your compensation then due and payable for any Services completed up to and including the effective date of such termination.

(c)　　Upon expiration or termination of this Agreement for any reason, or at any other time upon the Company's written request, you shall promptly after such expiration or termination:

(i)　　deliver to the Company  all materials, equipment, and other property provided for your use by the Company;

(ii)　　deliver to the Company all tangible documents and other media (including any copies), containing, reflecting, incorporating, or based on the Confidential Information;

(iii)　　permanently erase all the Confidential Information from your personal computer systems; and

(iv)　　certify in writing to the Company that you have complied with the requirements of this clause.

(d)　　The terms and conditions of clause (c) and this clause (d) of Section 9 and Sections 4, 5, 6, 7, 10, 11, 12, 13, 14, and 15 shall survive the expiration or termination of this Agreement.

**Section 10.**　　**Reserved**

**Section 11.**   **Additional Acknowledgments**.

(a)      You acknowledge and agree that (i) the Services to be performed or provided by you to the Company as Sole Manager under the Company Agreement are of a special and unique character; (ii) you will obtain knowledge and skill relevant to the Company's industry, methods of doing business, and marketing and operational strategies by virtue of your engagement; and (iii) the restrictive covenants and other terms and conditions of this Agreement (including, but not limited to, those in Section 5 of this Agreement) are reasonable and reasonably necessary to protect the legitimate business interest of the Company and its Affiliates.

(b)      You further acknowledge that (i) the benefits provided to you under this Agreement, including the amount of your compensation, reflect, in part, your obligations and the Company's rights under this Agreement, including, but not limited to, those in Section 5 of this Agreement; (ii) you have no expectation of any additional compensation, royalties, or other payment of any kind not otherwise referenced herein in connection herewith; and (iii) you will not suffer undue hardship by reason of full compliance with the terms and conditions of Section 5 of this Agreement or the Company's enforcement thereof.

**Section 12.**   **Assignment**.  You may not assign any rights or obligations under this Agreement without the prior written consent of the Member (which such consent is subject to the prior consent of CUSA).  Any purported assignment in violation of the foregoing sentence shall be deemed null and void *ab initio*.  Subject to the limits on assignment stated in this Section 12, this Agreement will inure to the benefit of, be binding on, and be enforceable against each of the Parties and their respective successors and assigns.

**Section 13.**   **Remedies**.  In the event you breach or threaten to breach Section 5 of this Agreement, you hereby acknowledge and agree that monetary damages would not afford an adequate remedy and that the Company shall be entitled to seek, in addition to other available remedies, a temporary or permanent injunction or other equitable relief restraining such breach or threatened breach from any court of competent jurisdiction, without the necessity of showing any actual damages, and without the necessity of posting any bond or other security.  This equitable relief shall be in addition to, not in lieu of, legal remedies, monetary damages, or other available forms of relief.

**Section 14.**   **Disputes**.  Subject to Section 13, any dispute, controversy, or claim arising out of or related to this Agreement or any breach or termination of this Agreement, including but not limited to the Services or work related thereto that you provide to the Company, and any alleged violation of any federal, state, or local statute, regulation, common law, or public policy, whether sounding in contract, tort, or statute, shall be submitted to and decided by federal or state courts sitting in Harris County, Texas.

**Section 15.**   **Governing Law, Jurisdiction, and Venue**.  This Agreement and all related documents including all exhibits and schedules attached hereto and all matters arising out of or relating to this Agreement and the Services or work related thereto provided hereunder, whether sounding in contract, tort, or statute, for all purposes shall be governed by and construed in accordance with, the laws of the State of Texas (including its statutes of limitations), without giving effect to the conflict of laws principles that would cause laws of any jurisdiction other than those of the State of Texas to apply.

**Section 16.**   **Miscellaneous**.

(a)      You shall not export, directly or indirectly, any technical data acquired from the Company, or any products utilizing any such data, to any country in violation of any applicable export laws or regulations.

(b)      All notices, requests, consents, claims, demands, waivers, and other communications hereunder (each, a "**Notice**") shall be in writing, and shall be delivered by email and additionally by (i) personal delivery, (ii) nationally recognized overnight courier (with all fees prepaid), or (iii) certified or registered mail (in each case of clause (iii), return receipt requested, postage prepaid).  Except as otherwise provided in this Agreement, a Notice is effective only if (x) the receiving Party has received the Notice and (y) the Party giving the Notice has complied with the requirements of this Section 16(b).  Any Notice must be sent to the respective Parties at the following addresses (or at such other address for a Party as shall be specified in a Notice given in accordance with this Section 16(b)):

If to Sole Manager:

Sunset Energy Gulf Coast Asset Management LLC
1727 Sunset Boulevard
Houston, TX 77005
Attention: David Abell
Email: [EMAIL ADDRESS]

with a copy to
(which shall not constitute notice):

Chevron U.S.A. Inc.
100 Northpark Blvd
Covington, LA 70443
Attention: Land Manager
Email: tdwebre@chevron.com

If to the Company:

Fieldwood Energy IV LLC
2000 W. Sam Houston Parkway S., Suite 1200
Houston, TX 77042
Attention: Member
Email: TLamme@fwellc.com

with a copy to
(which shall not constitute notice):

Chevron U.S.A. Inc.
100 Northpark Blvd
Covington, LA 70443
Attention: Land Manager
Email: tdwebre@chevron.com

(c)      This Agreement, together with the applicable provisions of the Company Agreement and any other documents expressly incorporated herein by reference, and related exhibits and schedules, constitutes the sole and entire agreement of the Parties with respect to the subject matter contained herein, and supersedes all prior and contemporaneous understandings, agreements, representations, and warranties, both written and oral, with respect to such subject matter.

(d)      This Agreement may only be amended, modified, or supplemented by an agreement in writing signed by each Party, and any of the terms thereof may be waived only by a written document signed by each Party or, in the case of waiver, by the Party waiving compliance.  Notwithstanding the foregoing, the Parties agree to amend or modify this Agreement as is necessary to comply with the requirements of Section 409A of the Code.

(e)      If any term or provision of this Agreement is invalid, illegal, or unenforceable in any jurisdiction, such invalidity, illegality, or unenforceability shall not affect any other term or provision of this Agreement or invalidate or render unenforceable such term or provision in any other jurisdiction.

(f)        This Agreement may be executed in counterparts and by facsimile signature, each of which shall be deemed an original and all of which together shall constitute one instrument.

<p align="center">(<em>Signature page follows</em>)</p>

If this Agreement accurately sets forth our understanding, kindly execute the enclosed copy and return it to the undersigned.

Very truly yours,

**FIELDWOOD ENERGY IV LLC**

By: _____

Name:

Title:

ACCEPTED AND AGREED:

**SUNSET ENERGY GULF COAST ASSET MANAGEMENT LLC**

_____

Name: David Abell

Date:

## EXHIBIT A

**Limited Liability Company Agreement of
Fieldwood Energy IV LLC**

(See attached)

*Exhibit A to Sole Manager Agreement*

# LIMITED LIABILITY COMPANY AGREEMENT

## OF

## FIELDWOOD ENERGY IV LLC

*(a Texas Limited Liability Company)*

**[●], 2021**

**THE MEMBERSHIP INTERESTS REFERENCED IN THIS LIMITED LIABILITY COMPANY AGREEMENT HAVE BEEN ACQUIRED FOR INVESTMENT AND HAVE NOT BEEN REGISTERED UNDER THE U.S. SECURITIES ACT OF 1933, AS AMENDED, OR UNDER ANY APPLICABLE STATE SECURITIES LAWS. SUCH MEMBERSHIP INTERESTS MAY NOT BE SOLD, ASSIGNED, PLEDGED, HYPOTHECATED OR OTHERWISE DISPOSED OF AT ANY TIME WITHOUT EFFECTIVE REGISTRATION UNDER SUCH ACT AND LAWS OR EXEMPTION THEREFROM, AS WELL AS COMPLIANCE WITH THE OTHER SUBSTANTIAL RESTRICTIONS ON TRANSFERABILITY THAT ARE SET FORTH HEREIN.**

## TABLE OF CONTENTS

**ARTICLE I DEFINITIONS** ...................................................................................................1

    **Section 1.01**    **Definitions**..................................................................................1
    **Section 1.02.**    **Interpretation**...........................................................................12

**ARTICLE II ORGANIZATION** .........................................................................................13

    **Section 2.01**    **Formation**.................................................................................13
    **Section 2.02**    **Name** ........................................................................................13
    **Section 2.03**    **Principal Office** .......................................................................13
    **Section 2.04**    **Registered Office; Registered Agent.**......................................13
    **Section 2.05**    **Purposes; Powers**....................................................................14
    **Section 2.06**    **Term** ........................................................................................14

**ARTICLE III CAPITAL CONTRIBUTIONS; CAPITAL ACCOUNTS**............................14

    **Section 3.01**    **Tax Partnership Provisions** ....................................................14
    **Section 3.02**    **Initial Capital Contributions** .................................................14
    **Section 3.03**    **Additional Capital Contributions** ..........................................14
    **Section 3.04**    **Maintenance of Capital Accounts** ..........................................14
    **Section 3.05**    **Succession Upon Transfer** ......................................................15
    **Section 3.06**    **Negative Capital Accounts** .....................................................15
    **Section 3.07**    **No Withdrawals from Capital Accounts** .................................15
    **Section 3.08**    **Treatment of Loans from Members** ........................................15
    **Section 3.09**    **Modifications**...........................................................................16

**ARTICLE IV MEMBERS** ....................................................................................................16

    **Section 4.01**    **No Personal Liability**..............................................................16
    **Section 4.02**    **No Withdrawal** ........................................................................16
    **Section 4.03**    **No Interest in Company Property** ...........................................16
    **Section 4.04**    **Certification of Membership Interests**.....................................16
    **Section 4.05**    **Meetings of Members** .............................................................17
    **Section 4.06**    **Action Without Meeting** .........................................................18
    **Section 4.07**    **Power of Members** ..................................................................18
    **Section 4.08**    **Similar or Competitive Activities; Business Opportunities** ...............18

**ARTICLE V ALLOCATIONS** .............................................................................................19

    **Section 5.01**    **Tax Partnership Provisions** ....................................................19
    **Section 5.02**    **Allocation of Net Income and Net Loss** ..................................19
    **Section 5.03**    **Regulatory and Special Allocations** ........................................19

i

**Section 5.04**     **Tax Allocations**. ...............................................................20

**Section 5.05**     **Allocations in Respect of Transferred Membership Interests**............22

**ARTICLE VI DISTRIBUTIONS** ..........................................................................**22**

**Section 6.01**     **General**. ................................................................................22

**Section 6.02**     **Tax Advances**. ......................................................................23

**Section 6.03**     **Tax Withholding; Withholding Advances**...............................23

**Section 6.04**     **Distributions in Kind**. ..........................................................24

**ARTICLE VII MANAGEMENT** ...........................................................................**25**

**Section 7.01**     **Management of the Company** ..............................................25

**Section 7.02**     **Sole Manager**. ......................................................................25

**Section 7.03**     **Material Project Contracts; Net Profit Interest** ...................25

**Section 7.04**     **Actions Requiring CUSA Consent** ......................................26

**Section 7.05**     **No Compensation of the Sole Manager** ...............................27

**Section 7.06**     **No Personal Liability**...........................................................27

**ARTICLE VIII TRANSFER** ................................................................................**28**

**Section 8.01**     **General Restrictions on Transfer**.........................................28

**ARTICLE IX EXCULPATION AND INDEMNIFICATION** ............................**29**

**Section 9.01**     **Exculpation of Covered Persons**. .........................................29

**Section 9.02**     **Liabilities and Duties of Covered Persons**............................30

**Section 9.03**     **Indemnification**. ...................................................................30

**Section 9.04**     **Survival**. ...............................................................................32

**ARTICLE X ACCOUNTING; TAX MATTERS** .................................................**33**

**Section 10.01**     **Financial Statements and Other Information**......................33

**Section 10.02**     **Inspection Rights** .................................................................33

**Section 10.03**     **Income Tax Status** ...............................................................34

**Section 10.04**     **Tax Matters Representative**.................................................34

**Section 10.05**     **Tax Returns** .........................................................................35

**Section 10.06**     **Company Funds** ...................................................................36

**ARTICLE XI WINDING UP AND TERMINATION** ........................................**36**

**Section 11.01**     **Events Requiring Winding Up** .............................................36

**Section 11.02**     **Effectiveness of Termination** ..............................................36

**Section 11.03**     **Liquidation** ..........................................................................37

**Section 11.04**    **Certificate of Termination** ...............................................38
**Section 11.05**    **Survival of Rights, Duties, and Obligations** ........................38
**Section 11.06**    **Recourse for Claims** .......................................................38

**ARTICLE XII MISCELLANEOUS** ....................................................................**38**
    **Section 12.01**    **Expenses** ...............................................................................38
    **Section 12.02**    **Further Assurances** ..............................................................38
    **Section 12.03**    **Confidentiality** .....................................................................39
    **Section 12.04**    **Notices** ..................................................................................40
    **Section 12.05**    **Headings** ...............................................................................41
    **Section 12.06**    **Severability** ..........................................................................41
    **Section 12.07**    **Entire Agreement** .................................................................41
    **Section 12.08**    **Successors and Assigns** ........................................................41
    **Section 12.09**    **No Third-Party Beneficiaries** ...............................................41
    **Section 12.10**    **Amendment** ...........................................................................42
    **Section 12.11**    **Waiver** ..................................................................................42
    **Section 12.12**    **Governing Law** .....................................................................42
    **Section 12.13**    **Submission to Jurisdiction** ..................................................42
    **Section 12.14**    **Waiver of Jury Trial** ...........................................................42
    **Section 12.15**    **Equitable Remedies** .............................................................43
    **Section 12.16**    **Attorney's Fees** ....................................................................43
    **Section 12.17**    **Remedies Cumulative** ..........................................................43
    **Section 12.18**    **Counterparts** ........................................................................43

**SCHEDULE A MEMBERS SCHEDULE**                                                  A-1

WEIL:\97901822\22\45327.0007

## LIMITED LIABILITY COMPANY AGREEMENT OF
## FIELDWOOD ENERGY IV LLC

This Limited Liability Company Agreement of Fieldwood Energy IV LLC, a Texas limited liability company (the "**Company**"), dated as of [●], 2021 (this "**Agreement**"), is entered into by and among the Company, the Initial Member executing this Agreement as of the date hereof, and each other Person who after the date hereof becomes a Member of the Company and becomes a party to this Agreement by executing a joinder agreement in form and substance acceptable to the Company.

### RECITALS

**WHEREAS,** the Company was formed under the laws of the State of Texas by the filing of a Certificate of Formation with the Secretary of State of the State of Texas on [●], 2021 (the "**Certificate of Formation**") for the purposes set forth in Section 2.05 of this Agreement;

**WHEREAS,** pursuant to and in accordance with the Confirmation Order and the Term Sheet, respectively, and as a result of a divisive merger pursuant to § 10.008 of the BOC, the Company owns the FWE IV Assets, subject to the operational liabilities in connection therewith allocated to the Company in the merger, including the FWE IV Obligations; and

**WHEREAS,** the Initial Member wishes to enter into this Agreement to set forth the terms and conditions governing the ownership, operation and management of the Company.

**NOW, THEREFORE,** in consideration of the mutual covenants and agreements hereinafter set forth and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

### ARTICLE I
### DEFINITIONS

**Section 1.01   Definitions.** Capitalized terms used herein and not otherwise defined shall have the meanings set forth in this Section 1.01:

"**Adjusted Capital Account Deficit**" means, with respect to any Member, the deficit balance, if any, in such Member's Capital Account as of the end of the relevant Fiscal Year, after giving effect to the following adjustments:

(a)     crediting to such Capital Account any amount that such Member is obligated to restore or is deemed to be obligated to restore pursuant to Treasury Regulations Sections 1.704-1(b)(2)(ii)(c), 1.704-2(g)(1) and 1.704-2(i); and

(b)     debiting to such Capital Account the items described in Treasury Regulations Section 1.704-1(b)(2)(ii)(d)(4), (5) and (6).

"**Adjusted Taxable Income**" of a Member, or if the Member is disregarded for U.S. federal income tax purposes, the members or beneficiaries of such Member, for a Fiscal Year (or

portion thereof) with respect to the Membership Interest held by such Member means the federal taxable income allocated by the Company to the Member with respect to its Membership Interest (as adjusted by any final determination in connection with any tax audit or other proceeding) for such Fiscal Year (or portion thereof); provided, that such taxable income shall be computed (i) minus any excess taxable loss of the Company for any prior period allocable to such Member with respect to its Membership Interest that were not previously taken into account for purposes of determining such Member's Adjusted Taxable Income in a prior Fiscal Year to the extent such loss would be available under the Code to offset income of the Member (or, as appropriate, the direct or indirect owners of the Member) determined as if the income and loss from the Company were the only income and loss of the Member (or, as appropriate, the direct or indirect owners of the Member) in such Fiscal Year and all prior Fiscal Years, and (ii) taking into account any special basis adjustment with respect to such Member resulting from an election by the Company under Code Section 754.

"**Affiliate**" means, with respect to any Person, any other Person who, directly or indirectly (including through one or more intermediaries), controls, is controlled by, or is under common control with, such Person. For purposes of this definition, "control," when used with respect to any specified Person, shall mean the power, direct or indirect, to direct or cause the direction of the management and policies of such Person, whether through ownership of voting securities or partnership or other ownership interests, by contract or otherwise; and the terms "controlling" and "controlled" shall have correlative meanings. For the avoidance of doubt, neither CUSA nor any of its Subsidiaries nor Credit Bid Purchaser nor any of its Subsidiaries control the Company and none of them shall constitute an Affiliate of the Company.

"**Agreement**" has the meaning set forth in the Preamble.

"**Applicable Law**" means all applicable provisions of (a) constitutions, treaties, statutes, laws (including the common law), rules, regulations, decrees, ordinances, codes, proclamations, declarations, or orders of any Governmental Authority; (b) any consents or approvals of any Governmental Authority; and (c) any orders, decisions, advisory or interpretative opinions, injunctions, judgments, awards, decrees of, or agreements with, any Governmental Authority.

"**Bankruptcy**" means (i) the filing by the Company of a petition under the Bankruptcy Code seeking to adjudicate the Company a bankrupt or an insolvent or otherwise commencing, authorizing, or acquiescing in the commencement of a proceeding or cause of action seeking liquidation, winding up, reorganization, arrangement, adjustment, protection, composition, or other relief with respect to itself or its debts under any bankruptcy, insolvency, or other similar law now or hereafter in effect or seeking the appointment of a trustee, receiver, liquidator, custodian, or other similar official over it or any substantial part of its property, or consenting to any such relief or to the appointment of or taking possession by any such official in an involuntary case or other proceeding commenced against it, or taking any corporate or similar official action to authorize any of the foregoing; (ii) the making of an assignment or any general arrangement for the benefit of creditors; or (iii) the Company's filing an answer or other pleading admitting or failing to contest the allegations of a petition filed against it in any proceeding of the foregoing nature, or taking any other action to authorize any of the actions set forth above.

"**Bankruptcy Code**" means title 11 of the United States Code, 11 U.S.C. §§ 101, et seq., as amended.

"**BOC**" means the Texas Business Organizations Code, as amended and in effect from time to time.

"**Book Depreciation**" means, with respect to any Company asset for each Fiscal Year, the Company's depreciation, amortization, or other cost recovery deductions determined for federal income tax purposes, except that if the Book Value of an asset differs from its adjusted tax basis at the beginning of such Fiscal Year, Book Depreciation shall be (a) if such difference is being eliminated by use of the remedial method under Treasury Regulations Section 1.704-3(d), the amount of book basis recovered for such period under the rules prescribed by Treasury Regulations Section 1.704-3(d)(2), or (b) if the remedial method is not used, an amount which bears the same ratio to such beginning Book Value as the federal income tax depreciation, amortization, or other cost recovery deduction for such Fiscal Year bears to such beginning adjusted tax basis; provided, that if the adjusted tax basis for federal income tax purposes of an asset at the beginning of such Fiscal Year is zero and the Book Value of the asset is positive, Book Depreciation shall be determined with reference to such beginning Book Value using any permitted method selected by the Sole Manager in accordance with Treasury Regulations Section 1.704-1(b)(2)(iv)(g)(3).

"**Book Value**" means, with respect to any Company asset, the adjusted basis of such asset for federal income tax purposes, except as follows:

(a) the initial Book Value of any Company asset contributed by a Member to the Company shall be the gross Fair Market Value of such Company asset as of the date of such contribution;

(b) immediately before the distribution by the Company of any Company asset to a Member, the Book Value of such asset shall be adjusted to its gross Fair Market Value as of the date of such distribution;

(c) the Book Value of all Company assets may, in the sole discretion of the Sole Manager, be adjusted to equal their respective gross Fair Market Values, as reasonably determined by the Sole Manager, as of the following times:

(i) the acquisition of an additional Membership Interest in the Company by a new or existing Member in consideration for more than a *de minimis* Capital Contribution;

(ii) the distribution by the Company to a Member of more than a *de minimis* amount of property (other than cash) as consideration for all or a part of such Member's Membership Interest in the Company; and

(iii) the liquidation of the Company within the meaning of Treasury Regulations Section 1.704-1(b)(2)(ii)(g);

(d)    the Book Value of each Company asset shall be increased or decreased, as the case may be, to reflect any adjustments to the adjusted tax basis of such Company asset pursuant to Code Section 734(b) or Code Section 743(b), but only to the extent that such adjustments are taken into account in determining Capital Account balances pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)(m); provided, that Book Values shall not be adjusted pursuant to this paragraph (d) to the extent that an adjustment pursuant to paragraph (c) above is made in conjunction with a transaction that would otherwise result in an adjustment pursuant to this paragraph (d); and

(e)    if the Book Value of a Company asset has been determined pursuant to paragraph (a) or adjusted pursuant to paragraphs (c) or (d) above, such Book Value shall thereafter be adjusted to reflect the Book Depreciation taken into account with respect to such Company asset for purposes of computing Net Income and Net Losses.

"**Business Day**" means a day other than a Saturday, Sunday or other day on which commercial banks in the State of Texas are authorized or required to close.

"**Capital Account**" has the meaning set forth in Section 3.04.

"**Capital Contribution**" means, for any Member, the total amount of cash and cash equivalents and the Book Value of any property contributed to the Company by such Member.

"**Certificate of Formation**" has the meaning set forth in the Recitals.

"**Certificate of Merger**" means that certain Certificate of Merger filed by Fieldwood III with the Secretary of State of the State of Texas on [●], 2021.

"**Certificate of Termination**" means a certificate to be filed upon completion of the winding up and liquidation of the Company as set forth in Section 11.04, which certificate shall be in the form required by § 11.101 of the BOC.

"**Code**" means the Internal Revenue Code of 1986, as amended.

"**Company**" has the meaning set forth in the Preamble.

"**Company Minimum Gain**" means "partnership minimum gain" as defined in Treasury Regulations Section 1.704-2(b)(2), substituting the term "Company" for the term "partnership" as the context requires.

"**Confidential Information**" has the meaning set forth in Section 12.03(a).

"**Confirmation Order**" means the confirmation order entered in Chapter 11 Case 20-33948, In re: Fieldwood Energy LLC, *et al*, in the United States Bankruptcy Court for the Southern District of Texas, Houston Division.

"**Continuance**" has the meaning set forth in Section 11.01.

"**Contract Operating Agreement**" means that certain Contract Operating Agreement of even date herewith by and among Credit Bid Purchaser and the Company, of which CUSA is an express third party beneficiary.

"**Covered Person**" has the meaning set forth in Section 9.01(a).

"**Credit Bid Purchaser**" means Mako Buyer LLC, a Delaware limited liability company.

"**CUSA**" means Chevron U.S.A. Inc., a Pennsylvania corporation, and its successors or assigns.

"**Deepwater Assets Decommissioning Funding Agreement**" means that certain Decommissioning Funding Agreement, of event date herewith, by and between CUSA and Credit Bid Purchaser.

"**Depletable Property**" means each separate oil and gas property as defined in Section 614 of the Code.

"**Divisive Merger Documents**" means the Certificate of Merger, Plan of Merger, Certificate of Formation and other documents filed by or on behalf of Fieldwood III with respect to the Company with the Texas Secretary of State related to the divisive merger of Fieldwood III into Fieldwood III (the surviving entity) and the newly-created Company.

"**Electronic Transmission**" means any form of communication, including communication by use of or participation in one or more electronic networks or databases, not directly involving the physical transmission of paper that creates a record that may be retained, retrieved, and reviewed by a recipient thereof and that may be directly reproduced in paper form by such a recipient through an automated process.

"**Escrow Account**" means **[bank information for the Escrow Account to come]**.

"**Escrow Agreement**" means that certain Escrow Agreement of even date herewith between U.S. Bank National Association, as escrow agent, Fieldwood III, the Company and Credit Bid Purchaser.

"**Estimated Tax Amount**" of a Member, or if the Member is disregarded for U.S. federal income tax purposes, the members or beneficiaries of such Member, for a Fiscal Year means the Member's Tax Amount for such Fiscal Year as estimated in good faith from time to time by the Sole Manager. In making such estimate, the Sole Manager shall take into account amounts shown on Internal Revenue Service Form 1065 filed by the Company and similar state or local forms filed by the Company for the preceding taxable year and such other adjustments as the Sole Manager reasonably determines are necessary or appropriate to reflect the estimated operations of the Company for the Fiscal Year.

"**Excess Amount**" has the meaning set forth in Section 6.02(c).

"**Fair Market Value**" of any asset as of any date means the purchase price that a willing buyer having all relevant knowledge would pay a willing seller for such asset in an arm's length transaction, as determined in good faith by the Sole Manager on such factors as the Sole Manager, in the exercise of his or her reasonable business judgment, considers relevant.

"**Fieldwood**" means Fieldwood Energy LLC, a Texas limited liability company, and its successors and assigns (excluding, for the avoidance of doubt, the Company).

"**Fieldwood III**" means Fieldwood Energy III LLC, a Texas limited liability company, and its successors and assigns (excluding, for the avoidance of doubt, the Company).

"**Final Completion**" has the meaning ascribed to such term in the Turnkey Removal Agreement.

"**Fiscal Year**" means the calendar year, unless the Company is required to have a taxable year other than the calendar year, in which case Fiscal Year shall be the period that conforms to its taxable year.

"**FWE IV Assets**" has the meaning set forth in the Plan of Merger.

"**FWE IV Obligations**" has the meaning set forth in the Plan of Merger.

"**GAAP**" means generally accepted accounting principles in the United States of America in effect from time to time; provided, that, notwithstanding any term or provision contained in this Agreement, GAAP will be deemed for all purposes hereof to treat leases that would have not been considered to be indebtedness in accordance with GAAP as in effect on December 31, 2017 (whether such leases were in effect on such date or are entered into thereafter) in a manner consistent with the treatment of such leases under GAAP as in effect on December 31, 2017, notwithstanding any modification or interpretative changes thereto or implementations of any such modifications or interpretative changes that may have occurred thereafter.

"**Governmental Authority**" means any court, tribunal, arbitrator, body, agency, division, board, bureau, commission or any other similar entity exercising executive, legislative, judicial, regulatory, or administrative functions of government, or any subdivision of any of the foregoing, whether federal, state, county, municipal, tribal, local or foreign, in each case with competent jurisdiction.

"**Guarantee Obligation**" means, as to any Person (the "guaranteeing Person"), any obligation of (i) the guaranteeing Person or (ii) another Person (including any bank under any letter of credit), if to induce the creation of such obligation of such other Person the guaranteeing Person has issued a reimbursement, counterindemnity or similar obligation, in either case guaranteeing or in effect guaranteeing any Indebtedness, leases, dividends or other obligations (the "primary obligations") of any other third Person (the "primary obligor") in any manner, whether directly or indirectly, including any obligation of the guaranteeing Person, whether or not contingent, (A) to purchase any such primary obligation or any property constituting direct or indirect security therefor, (B) to advance or supply funds (1) for the purchase or payment of any such primary obligation or (2) to maintain working capital or equity capital of the primary obligor or otherwise

WEIL:\97901822\22\45327.0007

Case 20-33948 Document 1562-2 Filed in TXSB on 06/15/21 Page 881 of 1636

to maintain the net worth or solvency of the primary obligor, (C) to purchase property, securities or services, in each case, primarily for the purpose of assuring the owner of any such primary obligation of the ability of the primary obligor to make payment of such primary obligation or (D) otherwise to assure or hold harmless the owner of any such primary obligation against loss in respect thereof; provided, however, that the term Guarantee Obligation shall not include endorsements of instruments for deposit or collection in the ordinary course of business.

"**Indebtedness**" means, with respect to any Person at any date, without duplication, all (i) indebtedness of such Person for borrowed money; (ii) obligations of such Person for the deferred purchase price of property or services (other than trade payables incurred in the ordinary course of such Person's business); (iii) obligations of such Person evidenced by notes, bonds, debentures or other similar instruments; (iv) indebtedness created or arising under any conditional sale or other title retention agreement with respect to property acquired by such Person (even though the rights and remedies of the seller or lender under such agreement in the event of default are limited to repossession or sale of such property); (v) capital lease obligations of such Person; (vi) obligations of such Person, contingent or otherwise, as an account party or applicant under acceptance, letter of credit or similar facilities; (vii) obligations of such Person, contingent or otherwise, to purchase, redeem, retire or otherwise acquire for value any capital stock of such Person; (viii) Guarantee Obligations of such Person in respect of obligations of the kind referred to in clauses (i) through (vii) above; and (ix) obligations of the kind referred to in clauses (i) through (viii) above secured by (or for which the holder of such obligation has an existing right, contingent or otherwise, to be secured by) any Lien on property (including accounts and contract rights) owned by such Person, whether or not such Person has assumed or become liable for the payment of such obligation.

"**Initial Member**" has the meaning set forth in the term "Member".

"**Joint Development Agreement**" means that certain Joint Development Agreement of even date herewith by and between the Company and Credit Bid Purchaser.

"**Lien**" means any mortgage, pledge, security interest, option, right of first offer, encumbrance, or other restriction or limitation of any nature whatsoever.

"**Liquidator**" has the meaning set forth in Section 11.03(a).

"**Losses**" has the meaning set forth in Section 9.03(a).

"**Material Project Contracts**" means, collectively, the Omnibus Agreement, the NPI Conveyance, the Contract Operating Agreement, the Turnkey Removal Agreement, the Transition Services Agreement, the Joint Development Agreement, the Deepwater Assets Decommissioning Funding Agreement and the SEMS Bridging Agreement, and each a "**Material Project Contract**".

"**Member**" means (a) the Person identified on the Members Schedule as of the date hereof as a Member and who has executed this Agreement or a counterpart thereof (each, an "**Initial Member**"); and (b) each Person who is hereafter admitted as a Member in accordance with the terms of this Agreement and the BOC, in each case so long as such Person is shown on the

WEIL:\97901822\22\45327.0007

Company's books and records as an owner of Membership Interests. The Members shall constitute "members" (as that term is defined in the BOC) of the Company.

"**Member Nonrecourse Debt**" means "partner nonrecourse debt" as defined in Treasury Regulations Section 1.704-2(b)(4), substituting the term "Company" for the term "partnership" and the term "Member" for the term "partner" as the context requires.

"**Member Nonrecourse Debt Minimum Gain**" means an amount, with respect to each Member Nonrecourse Debt, equal to the Company Minimum Gain that would result if the Member Nonrecourse Debt were treated as a Nonrecourse Liability, determined in accordance with Treasury Regulations Section 1.704-2(i)(3).

"**Member Nonrecourse Deduction**" means "partner nonrecourse deduction" as defined in Treasury Regulations Section 1.704-2(i), substituting the term "Member" for the term "partner" as the context requires.

"**Members Schedule**" has the meaning set forth in Section 3.02.

"**Membership Interest**" means an interest in the Company owned by a Member, including such Member's right (a) to its distributive share of Net Income, Net Losses, and other items of income, gain, loss, and deduction of the Company; (b) to its distributive share of the assets of the Company; (c) to vote on, consent to, or otherwise participate in any decision of the Members as provided in this Agreement; and (d) to any and all other benefits to which such Member may be entitled as provided in this Agreement or the BOC. The Membership Interest of each Member shall be expressed as a percentage interest and shall be as set forth on the Members Schedule.

"**Net Income**" and "**Net Loss**" mean, for each Fiscal Year or other period specified in this Agreement, an amount equal to the Company's taxable income or taxable loss, or particular items thereof, determined in accordance with Code Section 703(a) (where, for this purpose, all items of income, gain, loss, or deduction required to be stated separately pursuant to Code Section 703(a)(1) shall be included in taxable income or taxable loss), but with the following adjustments:

(a)     any income realized by the Company that is exempt from federal income taxation, as described in Code Section 705(a)(1)(B), shall be added to such taxable income or taxable loss, notwithstanding that such income is not includable in gross income;

(b)     any expenditures of the Company described in Code Section 705(a)(2)(B), including any items treated under Treasury Regulations Section 1.704-1(b)(2)(iv)(I) as items described in Code Section 705(a)(2)(B), shall be subtracted from such taxable income or taxable loss, notwithstanding that such expenditures are not deductible for federal income tax purposes;

(c)     any gain or loss (including Simulated Gain or Loss) resulting from any disposition of Company property with respect to which gain or loss is recognized for federal income tax purposes shall be computed by reference to the Book Value of the property so disposed, notwithstanding that the adjusted tax basis of such property differs from its Book Value;

WEIL:\97901822\22\45327.0007

(d)      any items of depreciation, amortization, and other cost recovery deductions with respect to Company property having a Book Value that differs from its adjusted tax basis shall be computed by reference to the property's Book Value (as adjusted for Book Depreciation) in accordance with Treasury Regulations Section 1.704-1(b)(2)(iv)(g);

(e)      if the Book Value of any Company property is adjusted as provided in the definition of Book Value, then the amount of such adjustment shall be treated as an item of gain or loss and included in the computation of such taxable income or taxable loss;

(f)      to the extent an adjustment to the adjusted tax basis of any Company property pursuant to Code Sections 732(d), 734(b) or 743(b) is required, pursuant to Treasury Regulations Section 1.704 1(b)(2)(iv)(m), to be taken into account in determining Capital Accounts, the amount of such adjustment to the Capital Accounts shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases such basis); and

(g)      any items which are specially allocated pursuant to Section 5.03 hereof shall not be taken into account in computing Net Income or Net Loss.  The amounts of the items of Company income, gain, loss or deduction available to be specially allocated pursuant to Section 5.03 hereof shall be determined by applying rules analogous to those set forth in subparagraphs (a) through (f) above.

"**Nonrecourse Deductions**" has the meaning set forth in Treasury Regulations Section 1.704-2(b).

"**Nonrecourse Liability**" has the meaning set forth in Treasury Regulations Section 1.704-2(b)(3).

"**NPI Conveyance**" means that certain Conveyance of Net Profits Overriding Royalty Interest from Company to the Escrow Account.

"**NPI Payment**" has the meaning attributed to the term "NPI Payment" under the NPI Conveyance.

"**Omnibus Agreement**" means that certain Omnibus Agreement of even date herewith by and between the Company, CUSA and Credit Bid Purchaser.

"**Person**" means any individual, corporation, partnership, limited liability company, association, joint stock company, trust, estate, joint venture, firm, association, unincorporated organization, Governmental Authority, or any other entity.

"**Plan of Merger**" means the Agreement and Plan of Merger of Fieldwood Energy III LLC into Fieldwood Energy IV LLC and Fieldwood Energy III LLC, dated as of [●], 2021, and adopted by Fieldwood Energy III LLC.

"**Plan of Reorganization**" means the plan of reorganization of Fieldwood that was included in, and was confirmed by, the Confirmation Order.

"**Production Period**" has the meaning attributed to the term "Production Period" under the NPI Conveyance.

"**Quarterly Estimated Tax Amount**" of a Member, or if the Member is disregarded for U.S. federal income tax purposes, the members or beneficiaries of such Member, for any calendar quarter of a Fiscal Year means the excess, if any of: (a) the product of (i) a quarter (1/4) in the case of the first calendar quarter of the Fiscal Year, half (1/2) in the case of the second calendar quarter of the Fiscal Year, three-quarters (3/4) in the case of the third calendar quarter of the Fiscal Year, and one (1) in the case of the fourth calendar quarter of the Fiscal Year and (ii) the Member's Estimated Tax Amount for such Fiscal Year; over (b) all distributions previously made during such Fiscal Year to such Member.

"**Regulatory Allocations**" has the meaning set forth in Section 5.03(f).

"**Reimbursable Costs**" has the meaning attributed to such term in the Contract Operating Agreement.

"**Representative**" means, with respect to any Person, any and all directors, officers, employees, consultants, financial advisors or lenders, counsel, accountants, and other agents of such Person.

"**Securities Act**" means the Securities Act of 1933, as amended, and the rules and regulations thereunder, which shall be in effect at the time.

"**SEMS Bridging Agreement**" means that certain SEMS Bridging Agreement & Interface Document, dated of even date herewith by and between Credit Bid Purchaser and the Company.

"**Shortfall Amount**" has the meaning set forth in Section 6.02(b).

"**Simulated Basis**" means, with respect to each Depletable Property, the Book Value of such property.

"**Simulated Depletion**" means, with respect to each Depletable Property, a depletion allowance computed in accordance with U.S. federal income tax principles (as if the Simulated Basis of the property were its adjusted tax basis and using simulated cost depletion) and in the manner specified in Treasury Regulations Section 1.704-1(b)(2)(iv)(k)(2); provided that the Simulated Depletion with respect to a Depletable Property shall in no event exceed the Simulated Basis of such Depletable Property.

"**Simulated Gain or Loss**" means the simulated gain or loss computed with respect to a sale or other disposition of any Depletable Property pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)(k)(2).

"**Sole Manager**" has the meaning set forth in Section 7.01.

10

"**Subsidiary**" means, with respect to any Person, any other Person of which a majority of the outstanding shares or other equity interests having the power to vote for directors or managers or comparable positions are owned, directly or indirectly, by the first Person.

"**Tax Advance**" has the meaning set forth in Section 6.02(a).

"**Tax Amount**" of a Member, or if the Member is disregarded for U.S. federal income tax purposes, the members or beneficiaries of such Member, for a Fiscal Year means, subject to (i) any restrictions in the Company's then-applicable debt financing arrangements, if any, and (ii) the Sole Manager's good faith determination to retain any other amounts necessary to satisfy obligations of the Company that are reasonably expect to be due and payable during the 90 days following the date of determination (i) the product of (a) the Tax Rate for such Fiscal Year (but not to exceed the Tax Rate applicable to C-corporations for such Fiscal Year) and (b) the Adjusted Taxable Income of the Member for such Fiscal Year with respect to its Membership Interest or (ii) the actual amount of U.S. federal, state and local income tax (including any state or local tax imposed in lieu of an income tax) paid by such Member with respect to such Fiscal Year in respect of the taxable income allocated to the Member by the Company, after taking into account all deductions available to such Member from all sources in excess of such Member's income from other sources; *provided*, *however*, that if at any time Fieldwood Energy Inc. has cash tax liability (including an estimated tax liability) on account of items of income or gain of the Company without sufficient cash on hand from a corresponding cash distribution in respect of such income or gain (all as reasonably determined by Fieldwood Energy Inc.), then the Tax Amount shall be increased such that the Company timely distributes cash sufficient to pay such tax liability.

"**Tax Matters Representative**" has the meaning set forth in Section 10.04(a).

"**Tax Rate**" of a Member, or if the Member is disregarded for U.S. federal income tax purposes, the members or beneficiaries of such Member, for any period, means the highest effective marginal combined federal, state, and local tax rate applicable to an individual residing in Houston, Texas (or, if higher, a corporation doing business in Houston, Texas), taking into account (a) the character (for example, long-term or short-term capital gain, ordinary, or exempt) of the applicable income and (b) if applicable, the deduction under IRC Section 199A.

"**Taxing Authority**" has the meaning set forth in Section 6.03(b).

"**Term Sheet**" means that certain term sheet, dated March 22, 2021, by and between Fieldwood, on the one hand, and CUSA, on the other hand.

"**Third Party Payment**" has the meaning attributed to such term in the Contract Operating Agreement.

"**Transfer**" means to, directly or indirectly, sell, transfer, assign, convey, gift, pledge, encumber, hypothecate, or similarly dispose of, either voluntarily or involuntarily, by operation of law or otherwise (including by merger or division), or to enter into any contract, option, or other arrangement or understanding with respect to the sale, transfer, assignment, conveyance, gift, pledge, encumbrance, hypothecation, or similar disposition of, any Membership Interests owned by a Person or any interest (including a beneficial interest) in any Membership Interests owned by

11

a Person.  "**Transfer**" when used as a noun shall have a correlative meaning.  "**Transferor**" and "**Transferee**" mean a Person who makes or receives a Transfer, respectively.

"**Transition Services Agreement**" means the Neptune Spar Transition Services Agreement of even date herewith by and between Credit Bid Purchaser and Noble Energy, Inc.

"**Treasury Regulations**" means the final or temporary regulations issued by the United States Department of Treasury pursuant to its authority under the Code, and any successor regulations.

"**Turnkey Removal Agreement**" means that certain Turnkey Removal Agreement of even date herewith by and among Credit Bid Purchaser, CUSA and the Company.

"**Withholding Advances**" has the meaning set forth in Section 6.03(b).

**Section 1.02.    Interpretation**.  For purposes of this Agreement: (a) the words "include," "includes," and "including" shall be deemed to be followed by the words "without limitation"; (b) the word "or" is not exclusive; and (c) the words "herein," "hereof," "hereby," "hereto," and "hereunder" refer to this Agreement as a whole.

The definitions given for any defined terms in this Agreement shall apply equally to both the singular and plural forms of the terms defined.  Whenever the context may require, any pronoun shall include the corresponding masculine, feminine, and neuter forms.

Unless the context otherwise requires, references herein: (x) to Articles, Sections, Exhibits, and Schedules mean the Articles and Sections of, and Exhibits and Schedules attached to, this Agreement; (y) to an agreement, instrument, or other document means such agreement, instrument, or other document as amended, supplemented, and modified from time to time to the extent permitted by the provisions thereof; and (z) to a statute means such statute as amended from time to time and includes any successor legislation thereto and any regulations promulgated thereunder.

This Agreement shall be construed without regard to any presumption or rule requiring construction or interpretation against the party drafting an instrument or causing any instrument to be drafted.

The Exhibits and Schedules referred to herein shall be construed with, and as an integral part of, this Agreement to the same extent as if they were set forth verbatim herein.

The headings in this Agreement are for reference only and shall not affect the interpretation of this Agreement.

WEIL:\97901822\22\45327.0007

## ARTICLE II
## ORGANIZATION

**Section 2.01    Formation**.

(a)    The Company was formed on [●], 2021, pursuant to the provisions of the BOC, upon the filing and acceptance of the Certificate of Formation with the Secretary of State of the State of Texas.

(b)    This Agreement shall constitute the "company agreement" (as that term is used in the BOC) of the Company.  The rights, powers, duties, obligations, and liabilities of the Members and the Sole Manager shall be determined pursuant to the BOC and this Agreement.  To the extent that the rights, powers, duties, obligations, and liabilities of any Members or the Sole Manager are different by reason of any provision of this Agreement than they would be under the BOC in the absence of such provision, this Agreement shall, to the extent permitted by the BOC, control.

**Section 2.02    Name.** The name of the Company is "Fieldwood Energy IV LLC" or such other name or names as may be designated by the Sole Manager; provided, that the name shall always contain the words "Limited Liability Company" or "Limited Company" or an abbreviation of one of those phrases.  Amendments to the Certificate of Formation or this Agreement to reflect any such name change may be made by the Sole Manager without the consent of the Members. The Sole Manager shall give prompt notice to the Members and CUSA of any change to the name of the Company and any related amendment to the Certificate of Formation or this Agreement. The Company may conduct business under any assumed or fictitious name required by Applicable Law or otherwise deemed desirable by the Sole Manager.

**Section 2.03    Principal Office.** The principal office of the Company is located at 2000 W. Sam Houston Parkway S., Suite 1200, Houston, Texas 77042, or such other place as may from time to time be determined by the Sole Manager.  The Sole Manager shall give prompt notice of any such change to each of the Members and CUSA.

**Section 2.04    Registered Office; Registered Agent.**

(a)    The registered office of the Company shall be the office of the initial registered agent named in the Certificate of Formation or such other office (which need not be a place of business of the Company) as the Sole Manager may designate from time to time in the manner provided by the BOC and Applicable Law.

(b)    The registered agent for service of process on the Company in the State of Texas shall be the initial registered agent named in the Certificate of Formation or such other Person or Persons as the Sole Manager may designate from time to time in the manner provided by the BOC and Applicable Law.

WEIL:\97901822\22\45327.0007

**Section 2.05   Purposes; Powers**.

(a)      The purposes of the Company are to (i) engage in the Plugging and Abandonment and decommissioning of the FWE IV Assets, as such terms are defined in the Plan of Merger, (ii) the operation of the FWE IV Assets prior to their Plugging and Abandonment and decommissioning, (iii) such other activities as are approved pursuant to the terms of this Agreement, including subject to Section 7.04, and (iv) to engage in any and all activities necessary or incidental to the foregoing purposes.

(b)      The Company shall have all the powers necessary or convenient to carry out the purposes for which it is formed, including the powers granted by the BOC.

**Section 2.06   Term.**  The term of the Company commenced on the date the Certificate of Formation was filed with the Secretary of State of the State of Texas and shall continue in existence perpetually until the Company is terminated in accordance with the provisions of this Agreement.

## ARTICLE III
## CAPITAL CONTRIBUTIONS; CAPITAL ACCOUNTS

**Section 3.01   Tax Partnership Provisions.**  This ARTICLE III is intended to apply only if the Company becomes a partnership for U.S. federal income tax purposes.

**Section 3.02   Initial Capital Contributions.**  Contemporaneously with the execution of this Agreement, and pursuant to the Plan of Reorganization and as a result of a divisive merger pursuant to § 10.008 of the BOC, the Company holds the properties and assets identified as the FWE IV Assets, which shall, together with the amount of any expenses paid pursuant to Section 12.01, constitute the aggregate Capital Contributions made by the Initial Member.  The Initial Member shall own Membership Interests in the amount set forth opposite such Member's name on Schedule A attached hereto (the "**Members Schedule**").  From and after the date of this Agreement, the Sole Manager shall maintain and update the Members Schedule upon the issuance or Transfer of any Membership Interests to any new or existing Member in accordance with this Agreement.

**Section 3.03   Additional Capital Contributions.**  No Member shall be required to make any additional Capital Contributions to the Company.  Any future Capital Contributions made by any Member shall only be made with the consent of the Sole Manager.  To the extent that a Member makes an additional Capital Contribution to the Company, the Sole Manager shall revise the Members Schedule to reflect an increase in the Membership Interest of the contributing Member that fairly and equitably reflects the value of its additional Capital Contribution in relation to the aggregate amount of all Capital Contributions made by the Members.

**Section 3.04   Maintenance of Capital Accounts.**  The Company shall establish and maintain for each Member a separate capital account (a "**Capital Account**") on its books and records in accordance with this Section 3.04.  Each Capital Account shall be established and maintained in accordance with the following provisions:

(a)      Each Member's Capital Account shall be increased by the amount of:

(i)      such Member's Capital Contributions, including such Member's initial Capital Contribution and any additional Capital Contributions;

(ii)      any Net Income or other item of income or gain allocated to such Member pursuant to ARTICLE V; and

(iii)      any liabilities of the Company that are assumed by such Member or secured by any property distributed to such Member.

(b)      Each Member's Capital Account shall be decreased by:

(i)      the cash amount or Book Value of any property distributed to such Member pursuant to ARTICLE VI and Section 11.03(d);

(ii)      the amount of any Net Loss or other item of loss or deduction allocated to such Member pursuant to ARTICLE V; and

(iii)      the amount of any liabilities of such Member assumed by the Company or that are secured by any property contributed by such Member to the Company.

**Section 3.05   Succession Upon Transfer.**  In the event that any Membership Interests are Transferred in accordance with the terms of this Agreement, the Transferee shall succeed to the Capital Account of the Transferor to the extent it relates to the Transferred Membership Interests and, subject to Section 5.05, shall receive allocations and distributions pursuant to ARTICLE V, ARTICLE VI, and ARTICLE XI in respect of such Membership Interests.

**Section 3.06   Negative Capital Accounts.**  In the event that any Member shall have a deficit balance in its Capital Account, such Member shall have no obligation, during the term of the Company or upon termination or liquidation thereof, to restore such negative balance or make any Capital Contributions to the Company by reason thereof, except as may be required by Applicable Law or in respect of any negative balance resulting from a withdrawal of capital or termination in contravention of this Agreement.

**Section 3.07   No Withdrawals from Capital Accounts.**  No Member shall be entitled to withdraw any part of its Capital Account or to receive any distribution from the Company, except as otherwise provided in this Agreement.  No Member shall receive any interest, salary, or drawing with respect to its Capital Contributions or its Capital Account, except as otherwise provided in this Agreement.  The Capital Accounts are maintained for the sole purpose of allocating items of income, gain, loss, and deduction among the Members and shall have no effect on the amount of any distributions to any Members, in liquidation or otherwise.

**Section 3.08   Treatment of Loans from Members.**  Loans by any Member to the Company shall not be considered Capital Contributions and shall not affect the maintenance of such Member's Capital Account, other than to the extent provided in Section 3.04(a)(iii), if applicable.

WEIL:\97901822\22\45327.0007

**Section 3.09   Modifications.**   The foregoing provisions and the other provisions of this Agreement relating to the maintenance of Capital Accounts are intended to comply with Treasury Regulations Section 1.704-1(b) and shall be interpreted and applied in a manner consistent with such Treasury Regulations.  If the Sole Manager determines that it is prudent to modify the manner in which the Capital Accounts, or any increases or decreases to the Capital Accounts, are computed in order to comply with such Treasury Regulations, the Sole Manager may authorize such modifications without the consent of any Member.

<div align="center">

**ARTICLE IV**
**MEMBERS**

</div>

**Section 4.01   No Personal Liability.**   Except as otherwise expressly provided in the BOC, by Applicable Law, or expressly in this Agreement, no Member will be obligated personally for any debt, obligation, or liability of the Company or other Members, whether arising in contract, tort, or otherwise, including a debt, obligation, or liability under a judgment, decree, or order of a court, solely by reason of being a Member.

**Section 4.02   No Withdrawal.**   So long as a Member continues to hold a Membership Interest, such Member shall not have the ability to withdraw or resign as a Member prior to the winding up and termination of the Company and any such withdrawal or resignation or attempted withdrawal or resignation by a Member prior to the winding up and termination of the Company shall be null and void.  As soon as any Person who is a Member ceases to hold a Membership Interest, such Person shall no longer be a Member.

**Section 4.03   No Interest in Company Property.**   No real or personal property of the Company shall be deemed to be owned by any Member individually, but shall be owned by, and title shall be vested solely in, the Company.  Without limiting the foregoing, each Member hereby irrevocably waives during the term of the Company any right that such Member may have to maintain any action for partition with respect to the property of the Company.

**Section 4.04   Certification of Membership Interests**.

(a)   The Sole Manager may, but shall not be required to, issue certificates to the Members representing the Membership Interests held by such Member.

(b)   In the event that the Sole Manager shall issue certificates representing Membership Interests in accordance with Section 4.04(a), then in addition to any other legend required by Applicable Law, all certificates representing issued and outstanding Membership Interests shall bear a legend substantially in the following form:

THE MEMBERSHIP INTEREST REPRESENTED BY THIS CERTIFICATE IS SUBJECT TO A LIMITED LIABILITY COMPANY AGREEMENT AMONG THE COMPANY AND ITS MEMBERS, A COPY OF WHICH IS ON FILE AT THE PRINCIPAL EXECUTIVE OFFICE OF THE COMPANY.   NO TRANSFER, SALE, CONVEYANCE, ASSIGNMENT, GIFT, PLEDGE, HYPOTHECATION, ENCUMBRANCE, OR OTHER DISPOSITION OF THE MEMBERSHIP

<div align="center">16</div>

INTEREST REPRESENTED BY THIS CERTIFICATE MAY BE MADE EXCEPT IN ACCORDANCE WITH THE PROVISIONS OF SUCH COMPANY AGREEMENT.

THE MEMBERSHIP INTEREST REPRESENTED BY THIS CERTIFICATE HAS NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR UNDER ANY OTHER APPLICABLE SECURITIES LAWS AND MAY NOT BE TRANSFERRED, SOLD, ASSIGNED, GIFTED, PLEDGED, HYPOTHECATED, OR OTHERWISE DISPOSED EXCEPT PURSUANT TO (A) A REGISTRATION STATEMENT EFFECTIVE UNDER SUCH ACT AND LAWS OR (B) AN EXEMPTION FROM REGISTRATION THEREUNDER.

**Section 4.05   Meetings of Members.**

(a)      Meetings of the Members may be called by (i) the Sole Manager or (ii) Members holding a majority of the Membership Interests.

(b)      Written notice stating the place, date, and time of the meeting and, in the case of a meeting of the Members not regularly scheduled, describing the purposes for which the meeting is called, shall be delivered not fewer than ten days and not more than 60 days before the date of the meeting to each Member, by or at the direction of the Sole Manager or the Member(s) calling the meeting, as the case may be.  The Members may hold meetings at the Company's principal office or at such other place, within or outside the State of Texas, as the Sole Manager or the Member(s) calling the meeting may designate in the notice for such meeting.

(c)      Any Member may participate in a meeting of the Members by means of conference telephone or other communications equipment by means of which all Persons participating in the meeting can talk to and hear each other, and participation in a meeting by such means shall constitute presence in person at such meeting.

(d)      On any matter that is to be voted on by Members, a Member may vote in person or by proxy, and such proxy may be granted in writing, by means of Electronic Transmission or as otherwise permitted by Applicable Law.  Every proxy shall be revocable in the discretion of the Member executing it unless otherwise provided in such proxy; provided, that such right to revocation shall not invalidate or otherwise affect actions taken under such proxy prior to such revocation.  In lieu of a proxy, a Member may grant an irrevocable power of attorney to conduct the affairs of such Member with respect to matters of the Company, including matters relating to the organization, internal affairs, or termination of the Company.

(e)      The business to be conducted at such meeting need not be limited to the purpose described in the notice and can include business to be conducted by Members; provided, that the appropriate Members shall have been notified of the meeting in accordance with Section 4.05(b).  Attendance of a Member at any meeting shall constitute

a waiver of notice of such meeting, except where a Member attends a meeting for the express purpose of objecting to the transaction of any business on the ground that the meeting is not lawfully called or convened.

(f)      A quorum of any meeting of the Members shall require the presence, whether in person or by proxy, of the Members holding a majority of the Membership Interests.  Subject to Section 4.06, no action may be taken by the Members unless the appropriate quorum is present at a meeting.

(g)      Subject to Section 4.06, Section 7.04, Section 12.10 or any provision of this Agreement or the BOC requiring the vote, consent, or approval of a different percentage of the Membership Interests, no action may be taken by the Members at any meeting at which a quorum is present without the affirmative vote of the Members holding a majority of the outstanding Membership Interests.

**Section 4.06   Action Without Meeting**.

(a)      Notwithstanding the provisions of Section 4.05, any matter that is to be voted on, consented to, or approved by the Members may be taken without a meeting, without prior notice, and without a vote if consented to, in writing or by Electronic Transmission, by a Member or Members holding not less than the minimum number of votes that would be necessary to authorize or take such action at a meeting at which each Member entitled to vote on the action is present and votes.  A record shall be maintained by the Sole Manager of each such action taken by written consent of a Member or Members.

(b)      A Member's consent may not be established by a Member's failure to object to an action in a timely manner or by any other means not explicitly provided for in this Agreement.

(c)      If any action or decision permitted by this Agreement to be taken or made by less than all of the Members is taken or made by a written consent signed by less than all of the Members, the Sole Manager shall, within ten calendar days after such action is taken or such decision is made, give written notice of the action taken or the decision made to the Members who did not sign the written consent.

**Section 4.07   Power of Members.**  The Members shall have the power to exercise any and all rights or powers granted to Members pursuant to the express terms of this Agreement and the BOC.  Except as otherwise specifically provided by this Agreement or required by the BOC, no Member, in its capacity as a Member, shall have the power to act for or on behalf of, or to bind, the Company, other than to the extent that the Company has granted a power of attorney to such Member to bind the Company on such actions.

**Section 4.08   Similar or Competitive Activities; Business Opportunities.**  Nothing contained in this Agreement shall prevent any Member or any of its Affiliates from engaging in any other activities or businesses, regardless of whether those activities or businesses are similar to or competitive with the Company.  None of the Members nor any of their Affiliates shall be

WEIL:\97901822\22\45327.0007

obligated to account to the Company or to the other Members for any profits or income earned or derived from such other activities or businesses.  None of the Members nor any of their Affiliates shall be obligated to inform the Company or the other Members of a business opportunity of any type or description.

<div align="center">

**ARTICLE V**
**ALLOCATIONS**

</div>

**Section 5.01   Tax Partnership Provisions.**  This ARTICLE V is intended to apply only if the Company becomes a partnership for U.S. federal income tax purposes.

**Section 5.02   Allocation of Net Income and Net Loss.**  For each Fiscal Year (or portion thereof), after giving effect to the special allocations set forth in Section 5.03, Net Income and Net Loss of the Company shall be allocated among the Members pro rata in accordance with their Membership Interests.

**Section 5.03   Regulatory and Special Allocations.**  Notwithstanding the provisions of Section 5.02:

(a)      If there is a net decrease in Company Minimum Gain (determined according to Treasury Regulations Section 1.704-2(d)(1)) during any Fiscal Year, each Member shall be specially allocated Net Income for such Fiscal Year (and, if necessary, subsequent Fiscal Years) in an amount equal to such Member's share of the net decrease in Company Minimum Gain, determined in accordance with Treasury Regulations Section 1.704-2(g). The items to be so allocated shall be determined in accordance with Treasury Regulations Sections 1.704-2(f)(6) and 1.704-2(j)(2).  This Section 5.03(a) is intended to comply with the "minimum gain chargeback" requirement in Treasury Regulations Section 1.704-2(f) and shall be interpreted consistently therewith.

(b)      Member Nonrecourse Deductions shall be allocated in the manner required by Treasury Regulations Section 1.704-2(i).  Except as otherwise provided in Treasury Regulations Section 1.704-2(i)(4), if there is a net decrease in Member Nonrecourse Debt Minimum Gain during any Fiscal Year, each Member that has a share of such Member Nonrecourse Debt Minimum Gain shall be specially allocated Net Income for such Fiscal Year (and, if necessary, subsequent Fiscal Years) in an amount equal to that Member's share of the net decrease in Member Nonrecourse Debt Minimum Gain.  Items to be allocated pursuant to this paragraph shall be determined in accordance with Treasury Regulations Sections 1.704-2(i)(4) and 1.704-2(j)(2).  This Section 5.03(b) is intended to comply with the "minimum gain chargeback" requirement in Treasury Regulations Section 1.704-2(i)(4) and shall be interpreted consistently therewith.

(c)      Nonrecourse Deductions shall be allocated to the Members in accordance with their Membership Interests.

(d)      In the event any Member unexpectedly receives any adjustments, allocations, or distributions described in Treasury Regulations Section 1.704-1(b)(2)(ii)(d)(4), (5) or (6), Net Income shall be specially allocated to such Member in an

<div align="center">19</div>

amount and manner sufficient to eliminate the Adjusted Capital Account Deficit created by such adjustments, allocations, or distributions as quickly as possible.  This Section 5.03(d) is intended to comply with the "qualified income offset" requirement in Treasury Regulations Section 1.704-1(b)(2)(ii)(d) and shall be interpreted consistently therewith.

(e)     Simulated Depletion and Simulated Gain or Loss with respect to any Depletable Property shall be allocated among the Members in proportion to their shares of the Simulated Basis in such property.  Each Member's share of the Simulated Basis in each of the Company's Depletable Properties shall be allocated to each Member in accordance with such Member's Membership Interest as of the time such Depletable Property is acquired by the Company, and shall be reallocated among the Members in accordance with the Members' Membership Interest as determined immediately following the occurrence of an event giving rise to any adjustment to the Book Values of the Company's oil and gas properties pursuant to the terms of this Agreement (or at the time of any material additions to the federal income tax basis of such Depletable Property).

(f)     The allocations set forth in subsections Section 5.03(a), Section 5.03(b), Section 5.03(c), Section 5.03(d) and Section 5.03(e) above (the "**Regulatory Allocations**") are intended to comply with certain requirements of the Treasury Regulations under Code Section 704.  Notwithstanding any other provisions of this ARTICLE V (other than the Regulatory Allocations), the Regulatory Allocations shall be taken into account in allocating Net Income and Net Losses among Members so that, to the extent possible, the net amount of such allocations of Net Income and Net Losses and other items and the Regulatory Allocations to each Member shall be equal to the net amount that would have been allocated to such Member if the Regulatory Allocations had not occurred.

**Section 5.04   Tax Allocations**.

(a)     Subject to Section 5.04(b), Section 5.04(c), and Section 5.04(d), all income, gains, losses and deductions of the Company shall be allocated, for federal, state, and local income tax purposes, among the Members in accordance with the allocation of such income, gains, losses, and deductions pursuant to Section 5.02 and Section 5.03, except that if any such allocation for tax purposes is not permitted by the Code or other Applicable Law, the Company's subsequent income, gains, losses, and deductions shall be allocated among the Members for tax purposes, to the extent permitted by the Code and other Applicable Law, so as to reflect as nearly as possible the allocation set forth in Section 5.02 and Section 5.03.

(b)     Items of Company taxable income, gain, loss, and deduction with respect to any property contributed to the capital of the Company shall be allocated among the Members in accordance with Code Section 704(c) using such reasonable method under Treasury Regulations Section 1.704-3 as shall be determined by the Sole Manager, so as to take account of any variation between the adjusted basis of such property to the Company for federal income tax purposes and its Book Value.

(c)      If the Book Value of any Company asset is adjusted pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)(f) as provided in clause (c) of the definition of Book Value, subsequent allocations of items of taxable income, gain, loss, and deduction with respect to such asset shall take account of any variation between the adjusted basis of such asset for federal income tax purposes and its Book Value using such reasonable method under Treasury Regulations Section 1.704-3 as shall be determined by the Sole Manager.

(d)      Allocations of tax credit, tax credit recapture, and any items related thereto shall be allocated to the Members according to their interests in such items as determined by the Sole Manager taking into account the principles of Treasury Regulations Section 1.704-1(b)(4)(ii).

(e)      The deduction for depletion with respect to each separate oil and gas property (as defined in Section 614 of the Code) shall, in accordance with Section 613A(c)(7)(D) of the Code, be computed for federal income tax purposes separately by the Members rather than the Company.  The proportionate share of the adjusted tax basis of each oil and gas property shall be allocated to each Member in accordance with such Member's Membership Interest as of the time such oil and gas property is acquired by the Company (and any additions to such U.S. federal income tax basis resulting from expenditures required to be capitalized in such basis shall be allocated among the Members in a manner designed to cause the Members' proportionate shares of such adjusted U.S. federal income tax basis to be in accordance with their Membership Interests as determined at the time of any such additions), and shall be reallocated among the Members in accordance with the Members' Membership Interests as determined immediately following the occurrence of an event giving rise to an adjustment to the Book Values of the Company's oil and gas properties.  For purposes of the separate computation of gain or loss by each Member on the taxable disposition of each oil and gas property, the amount realized from such disposition shall be allocated (i) first, to the Members in an amount equal to the Simulated Basis in such oil and gas property in proportion to their allocable shares thereof and (ii) second, any remaining amount realized shall be allocated consistent with the allocation of Simulated Gain or Loss.  The allocations described in this Section 5.04(e) are intended to be applied in accordance with the Members' "interests in partnership capital" under Section 613A(c)(7)(D) or the Code; provided, however, that the Members understand and agree that the Sole Manager may authorize special allocations of federal income tax basis, income, gain, deduction or loss, as computed for U.S. federal income tax purposes, in order to eliminate differences between Simulated Basis and adjusted U.S. federal income tax basis with respect to each oil and gas property, in such manner as determined consistent with the principles outlined in Sections 5.04b) and 5.04c).  The provisions of this Section 5.04(e) and the other provisions of this Agreement relating to allocations under Section 613A(c)(7)(D) of the Code are intended to comply with Treasury Regulations Section 1.704-1(b)(4)(v) and shall be interpreted and applied in a manner consistent with such Treasury Regulations.  Each Member, with the assistance of the Company, shall separately keep records of its share of the adjusted tax basis in each oil and gas property, adjust such share of the adjusted tax basis for any cost or percentage depletion allowable with respect to such property and use such adjusted tax basis in the computation of its cost depletion or in the computation of its gain or loss on the disposition

21

of such property by the Company.  Upon the reasonable request of the Company, each Member shall advise the Company of its adjusted tax basis in each oil and gas property and any depletion computed with respect thereto, both as computed in accordance with the provisions of this subsection for purposes of allowing the Company to make adjustments to the tax basis of its assets as a result of certain transfers of interests in the Company or distributions by the Company.  The Company may rely on such information and, if it is not provided by the Member, may make such reasonable assumptions as it shall determine with respect thereto.  When reasonably requested by the Members, the Company shall provide all available information needed by such Members to comply with the record keeping requirements of this Section 5.04(e) and other applicable tax reporting obligations.

(f)     Allocations pursuant to this Section 5.04 are solely for purposes of federal, state, and local taxes and shall not affect, or in any way be taken into account in computing, any Member's Capital Account or share of Net Income, Net Losses, distributions, or other items pursuant to any provisions of this Agreement.

**Section 5.05   Allocations in Respect of Transferred Membership Interests.**  In the event of a Transfer of Membership Interests during any Fiscal Year made in compliance with the provisions of ARTICLE VIII, Net Income, Net Losses, and other items of income, gain, loss, and deduction of the Company attributable to such Membership Interests for such Fiscal Year shall be determined using the interim closing of the books method.

<div align="center">

**ARTICLE VI**
**DISTRIBUTIONS**

</div>

**Section 6.01   General**.

(a)     Subject to Section 6.02 and Section 7.03(b), distributions of available cash shall be made to the Members when and in such amounts as determined by the Sole Manager and only following (i) payment of all operating expenses of the Company, including required payments under the Material Project Contracts, and the termination of the Material Project Contracts, (ii) the payment in full of any and all amounts owing to Credit Bid Purchaser or CUSA under any Material Project Contract, and (iii) the cessation of all production from, and Final Completion of all plugging and abandonment and decommissioning of the FWE IV Assets.  After making all distributions required for a given Fiscal Year under Section 6.02, and paying all operating expenses, and making appropriate reserves for future operating expenses, and paying all amounts then due and outstanding under the Material Project Contracts as described in the preceding sentence, the termination of the Material Project Contracts, and the satisfaction of the condition under item (iii), in each case as described in the preceding sentence, distributions determined to be made by the Sole Manager pursuant to this Section 6.01(a) shall be paid to the Members in accordance with their respective Membership Interests.

(b)     Notwithstanding any provision to the contrary contained in this Agreement, the Company shall not make any distribution to the Members (i) prior to the cessation of all production from, and Final Completion of all plugging and abandonment and

WEIL:\97901822\22\45327.0007

decommissioning activities on, the FWE IV Assets, except as provided in Section 6.02, or (ii) if such distribution would violate § 101.206 of the BOC or other Applicable Law.

**Section 6.02   Tax Advances**.

(a)      Subject to (i) any restrictions in the Company's then-applicable debt financing arrangements, if any, and (ii) the Sole Manager's good faith determination to retain any other amounts necessary to satisfy obligations of the Company that are reasonably expected to be due and payable in the 90 days following the date of determination, at least three days before each date prescribed by the Code for a calendar-year corporation to pay quarterly installments of estimated tax, the Company shall use commercially reasonable efforts to distribute cash to each Member in proportion to and to the extent of such Member's Quarterly Estimated Tax Amount for the applicable calendar quarter (each such distribution, a "**Tax Advance**").

(b)      If, at any time after the final Quarterly Estimated Tax Amount has been distributed pursuant to Section 6.02(a) with respect to any Fiscal Year, the aggregate Tax Advances to any Member with respect to such Fiscal Year are less than such Member's Tax Amount for such Fiscal Year (a "**Shortfall Amount**"), the Company shall use commercially reasonable efforts to distribute cash in proportion to and to the extent of each Member's Shortfall Amount.  The Company shall use commercially reasonable efforts to distribute Shortfall Amounts with respect to a Fiscal Year before the 90th day of the next succeeding Fiscal Year; provided, that if the Company has made distributions other than pursuant to this Section 6.02, the Sole Manager may apply such distributions to reduce any Shortfall Amount.

(c)      If the aggregate Tax Advances made to any Member pursuant to this Section 6.02 for any Fiscal Year exceed such Member's Tax Amount (an "**Excess Amount**"), such Excess Amount shall reduce subsequent Tax Advances that would be made to such Member pursuant to this Section 6.02, except to the extent taken into account as an advance pursuant to Section 6.02(d).

(d)      Any distributions made pursuant to this Section 6.02 shall be treated for purposes of this Agreement as advances on distributions pursuant to Section 6.01 and shall reduce, dollar-for-dollar, the amount otherwise distributable to such Member pursuant to Section 6.01.

**Section 6.03   Tax Withholding; Withholding Advances**.

(a)      **Tax Withholding.**  Each Member agrees to furnish the Company with any representations and forms as shall be reasonably requested by the Company to assist it in determining the extent of, and in fulfilling, any withholding obligations it may have.

(b)      **Withholding Advances.**  The Company is hereby authorized at all times to make payments ("**Withholding Advances**") with respect to each Member in amounts required to discharge any obligation of the Company, including any obligation under Section 6225 of the Code (as determined by the Tax Matters Representative based on the

23

advice of legal or tax counsel to the Company) to withhold or make payments to any federal, state, local or foreign taxing authority (a "**Taxing Authority**") with respect to any distribution or allocation by the Company of income or gain to such Member and to withhold the same from distributions to such Member. Any funds withheld from a distribution by reason of this Section 6.03(b) shall nonetheless be deemed distributed to the Member in question for all purposes under this Agreement. If the Company makes any Withholding Advance in respect of a Member hereunder that is not immediately withheld from actual distributions to the Member, then the Member shall promptly reimburse the Company for the amount of such payment, plus interest at a rate equal to the prime rate published in the Wall Street Journal on the date of payment plus two percent per annum, compounded annually, on such amount from the date of such payment until such amount is repaid (or deducted from a distribution) by the Member (any such payment shall not constitute a Capital Contribution). Each Member's reimbursement obligation under this Section 6.03(b) shall continue after such Member transfers its Membership Interests.

(c)     **Indemnification.** Each Member hereby agrees to defend, indemnify and hold harmless the Company and the other Members from and against any liability with respect to taxes, interest, or penalties that may be asserted by reason of the Company's failure to deduct and withhold tax on amounts distributable or allocable to such Member. The provisions of this Section 6.03(c) and the obligations of a Member pursuant to Section 6.03(b) shall survive the termination, dissolution, liquidation, and winding up of the Company and the withdrawal of such Member from the Company or Transfer of its Membership Interests. The Company may pursue and enforce all rights and remedies it may have against each Member under this Section 6.03, including bringing a lawsuit to collect repayment with interest of any Withholding Advances.

(d)     **Overwithholding.** None of the Company or the Sole Manager shall be liable for any excess taxes withheld in respect of any distribution or allocation of income or gain to a Member. In the event of an overwithholding, a Member's sole recourse shall be to apply for a refund from the appropriate Taxing Authority.

**Section 6.04   Distributions in Kind**.

(a)     Subject to Sections 6.01 and 6.02, the Sole Manager is hereby authorized, as it may reasonably determine, to make distributions to the Members in the form of securities or other property (but not including any oil and gas properties) held by the Company; provided, that Tax Advances shall only be made in cash. In any non-cash distribution, the securities or property so distributed will be distributed among the Members in the same proportion and priority as cash equal to the Fair Market Value of such securities or property would be distributed among the Members pursuant to Section 6.01.

(b)     Any distribution of securities shall be subject to such conditions and restrictions as the Sole Manager determines are required or advisable to ensure compliance with Applicable Law. In furtherance of the foregoing, the Sole Manager may require that the Members execute and deliver such documents as the Sole Manager may deem necessary or appropriate to ensure compliance with all federal and state securities laws that

apply to such distribution and any further Transfer of the distributed securities, and may appropriately legend the certificates that represent such securities to reflect any restriction on Transfer with respect to such laws.

# ARTICLE VII
# MANAGEMENT

**Section 7.01   Management of the Company.**   The business and affairs of the Company shall be managed, operated, and controlled by or under the direction of one manager designated pursuant to Section 7.02 (the "**Sole Manager**").   Subject to the provisions of Section 7.04, the Sole Manager shall have, and is hereby granted, full and complete power, authority, and discretion for, on behalf of, and in the name of the Company, to take such actions as it may deem necessary or advisable to carry out any and all of the objectives and purposes of the Company, to the exclusion of the Members unless expressly provided for otherwise in this Agreement or expressly required under the BOC.   Subject to the provisions of Section 7.06, the Sole Manager shall have, and is hereby granted, full and complete power, authority, and discretion for, on behalf of, and in the name of the Company, to take such actions as it may deem necessary or advisable to carry out any and all of the objectives and purposes of the Company.

**Section 7.02   Sole Manager.**   The Company shall not have any officers or employees other than the Sole Manager.   Sunset Energy Gulf Coast Asset Management LLC has been selected and designated by the Member with the consent of CUSA to serve as the initial Sole Manager. The Sole Manager may not be removed without CUSA's prior written consent, which may be given, delayed or withheld in its sole discretion.   In the event that the Sole Manager is removed with CUSA's written consent or the Sole Manager resigns or otherwise ceases to serve in such capacity, then the Sole Manager shall be selected pursuant to the following procedure:   CUSA and the Company (acting through the Member for all purposes under this Section 7.02, who shall solicit input from Credit Bid Purchaser for all purposes under this Section 7.02) shall agree on a replacement, and, if they cannot agree, the Company shall designate a replacement, which shall be subject to CUSA's approval (which approval shall not to be unreasonably withheld, conditioned or delayed).

**Section 7.03   Material Project Contracts; Net Profit Interest**.

(a)       The Company's execution and performance of its obligations under each of the Omnibus Agreement, the NPI Conveyance, the Contract Operating Agreement, the Turnkey Removal Agreement, the Joint Development Agreement, the Deepwater Assets Decommissioning Funding Agreement, the SEMS Bridging Agreement, the Transition Services Agreement and the Escrow Agreement has been approved by the Member and shall not require any other approval on the part of the Company (by the Sole Manager or otherwise).   The Sole Manager shall not amend or modify such agreements, except in accordance with this Agreement.

(b)       At the end of each Production Period, the Company shall pay into the Escrow Account the NPI Payment, if any is due, as calculated pursuant to the terms of the NPI Conveyance.

**Section 7.04   Actions Requiring CUSA Consent.**  Without the prior written consent of CUSA (which written consent may be given, delayed or withheld in CUSA's sole discretion, unless expressly indicated otherwise), the Company shall not do, or enter into any commitment to do, any of the following:

(a)   engage in any business or activity other than (i) plugging and abandoning and decommissioning the FWE IV Assets and (ii) operating the FWE IV Assets prior to their plugging and abandonment and decommissioning;

(b)   use revenue or free cash flow for any purpose other than (i) for funding Reimbursable Costs or Third Party Payments under the Contract Operating Agreement (or similar charges under a replacement thereto) and, if applicable, payment into the Escrow Account and (ii) Tax Advances pursuant to Section 6.02(a);

(c)   issue additional Membership Interests or any other equity securities or admit additional Members to the Company;

(d)   approve any decommissioning plan with respect to the FWE IV Assets; or engage or retain any decommissioning subcontractor other than Credit Bid Purchaser pursuant to the Turnkey Removal Agreement;

(e)   incur any Indebtedness;

(f)   make any loan, advance, or capital contribution or make any investment in any Person;

(g)   replace, remove or change the powers of the Sole Manager;

(h)   replace or remove Credit Bid Purchaser under the Contract Operating Agreement; engage or retain any contract operator other than Credit Bid Purchaser pursuant to the Contract Operating Agreement; amend, or waive the application of, any provision of the Contract Operating Agreement;

(i)   divest any of the FWE IV Assets (other than sales of hydrocarbons in the ordinary course of business) or acquire any other assets (other than for a purpose permitted under Section 7.04(a) and in accordance with the terms of the Contract Operating Agreement, and further subject to any approval rights contained therein);

(j)   approving any prospective joint development project or other capital project for which an election to participate has been delivered to the Company pursuant to the Joint Development Agreement or approve any well takeover under the Joint Development Agreement;

(k)   agree to any (i) settlement or order with any Governmental Authority relating to the FWE IV Assets or the operations conducted thereon, (ii) settlement relating to contribution or payment amounts relating to decommissioning obligations with any Person, including any predecessor-in-interest to all or any portion of the leases and lands

26

covered by the FWE IV Assets or any surety bond provider or other provider or holder of security relating to decommissioning operations, or (iii) any other settlement involving FWE IV Assets or the operation of FWE IV;

(l)     amend any provision of a Material Project Contract, or waive any material right of the Company under a Material Project Contract;

(m)     [Reserved];

(n)     take any act of Bankruptcy, liquidate or otherwise terminate the existence of the Company or any of its Subsidiaries;

(o)     enter into a fundamental business transaction within the meaning of such term in the BOC;

(p)     establish a Subsidiary or enter into any joint venture or similar business arrangement or enter into a transaction covered by Section 7.03;

(q)     enter into, amend, waive, or terminate any contract with an Affiliate of the Company; or

(r)     amend, modify, supplement, restate, or waive any provision of the Certificate of Formation, this Agreement or any other organizational documents of the Company or its Subsidiaries (and any such amendment, modification, supplement, or waiver that is attempted without CUSA's prior written consent shall be void *ab initio* and without effect).

If CUSA in good faith believes that (x) Credit Bid Purchaser is in breach the Contract Operating Agreement in a manner that is materially adverse to the Company or is liable to the Company for indemnification pursuant to the terms of the Contract Operating Agreement, and (y) the Company has failed to enforce its rights (including, if applicable, termination right) with respect to such breach or indemnification and such failure is materially adverse to the Company, then CUSA may (i) deliver a written notice to the Company requesting that the Company enforce such rights (any rights to which such request relates must be specifically identified) and (ii) if the Company fails to enforce such rights within thirty days of its receipt of such notice, CUSA may itself enforce the rights of the Company against Credit Bid Purchaser on the Company's behalf.

**Section 7.05   No Compensation of the Sole Manager**.  The Sole Manager shall receive an offer letter and be compensated for the services provided by such individual as the Sole Manager of the Company in the amount set forth in such offer letter.  The Company shall reimburse the Sole Manager for all reasonable, ordinary, necessary, and direct third-party expenses incurred by the Sole Manager on behalf of the Company in carrying out the Company's business activities.

**Section 7.06   No Personal Liability**.  Except as otherwise provided in the BOC or by Applicable Law, or expressly provided in this Agreement or any written agreement between the Company and the Sole Manager, (i) the Sole Manager will not be obligated personally for any debt, obligation, or liability of the Company, whether arising in contract, tort, or otherwise,

including a debt, obligation, or liability under a judgment, decree, or order of a court, solely by reason of being or acting as the Sole Manager and (ii) subject to Section 7.04, the Sole Manager shall carry out his or her duties under this Agreement in good faith and a manner in which the Sole Manager believes to be consistent with and in furtherance of the purpose of the Company specified in Section 2.05(a).

## ARTICLE VIII
## TRANSFER

**Section 8.01   General Restrictions on Transfer**.

(a)      No Member shall Transfer all or any portion of its Membership Interest in the Company without the prior written approval of the Sole Manager.

(b)      Subject to Section 8.01(a), each Member agrees that it will not Transfer all or any portion of its Membership Interest in the Company, and the Company agrees that it shall not issue any Membership Interests:

(i)      except as permitted under the Securities Act and other Applicable Laws, and then, with respect to a Transfer of Membership Interests, only upon delivery to the Company of an opinion of counsel in form and substance satisfactory to the Company to the effect that such Transfer may be effected without registration under the Securities Act;

(ii)      if the Company becomes a partnership for U.S. federal income tax purposes, if such Transfer or issuance would cause the Company to be considered a "publicly traded partnership" under Section 7704(b) of the Code within the meaning of Treasury Regulations Section 1.7704-1(h)(1)(ii), including the look-through rule in Treasury Regulations Section 1.7704-1(h)(3);

(iii)      if such Transfer or issuance would affect the Company's existence or qualification as a limited liability company under the BOC;

(iv)      if the Company becomes a partnership for U.S. federal income tax purposes, if such Transfer or issuance would cause the Company to lose its status as a partnership for federal income tax purposes;

(v)      if such Transfer or issuance would cause the Company to be required to register as an investment company under the Investment Company Act of 1940, as amended;

(vi)      if such Transfer or issuance would cause the assets of the Company to be deemed "Plan Assets" as defined under the Employee Retirement Income Security Act of 1974 or its accompanying regulations or result in any "prohibited transaction" thereunder involving the Company; and

28

(vii)    such Transfer would limit, hinder or prohibit the Company from carrying out its purpose under Section 2.05(a).

(c)    Any Transfer or attempted Transfer of any Membership Interest in violation of this Agreement shall be null and void *ab initio*, no such Transfer shall be recorded on the Company's books, and the purported Transferee in any such Transfer shall not be treated (and the purported Transferor shall continue to be treated) as the owner of such Membership Interest for all purposes of this Agreement.

(d)    No Transfer of any Membership Interest to a Person not already a Member of the Company shall be deemed completed until the prospective Transferee has executed a joinder agreement in form and substance acceptable to the Company.

(e)    For the avoidance of doubt, any completed Transfer of a Membership Interest permitted by this Agreement shall be deemed a sale, transfer, conveyance, assignment, or other disposal of such Membership Interest in its entirety as intended by the parties to such Transfer, and shall not be deemed a sale, transfer, conveyance, assignment, or other disposal of any less than all of the rights and benefits described in the definition of the term "Membership Interest."

## ARTICLE IX
## EXCULPATION AND INDEMNIFICATION

**Section 9.01    Exculpation of Covered Persons**.

(a)    **Covered Persons.**  As used herein, the term "**Covered Person**" shall mean (i) each current or former Member; (ii) each current or former manager, officer, director, shareholder, partner, member, Affiliate, employee, agent, or Representative of each Member, and each of their Affiliates; and (iii) each manager (including the Sole Manager), officer (if any), employee (if any), agent, or Representative of the Company.

(b)    **Standard of Care.**  No Covered Person shall be liable to the Company or any other Covered Person for any loss, damage, or claim incurred by reason of any action taken or omitted to be taken by such Covered Person in good faith reliance on the provisions of this Agreement, so long as such action or omission does not constitute fraud or willful misconduct by such Covered Person.

(c)    **Good Faith Reliance.**  A Covered Person shall be fully protected in relying in good faith upon the records of the Company and upon such information, opinions, reports, or statements (including financial statements and information, opinions, reports, or statements as to the value or amount of the assets, liabilities, Net Income, or Net Losses of the Company or any facts pertinent to the existence and amount of assets from which distributions might properly be paid) of the following Persons or groups: (i) another Member; (ii) one or more managers, officers or employees of the Company; (iii) any attorney, independent accountant, appraiser, or other expert or professional employed or engaged by or on behalf of the Company; or (iv) any other Person selected in good faith by or on behalf of the Company, in each case as to matters that such relying Person

reasonably believes to be within such other Person's professional or expert competence. The preceding sentence shall in no way limit any Person's right to rely on information to the extent provided in § 3.102 or § 3.105 of the BOC.

**Section 9.02    Liabilities and Duties of Covered Persons**.

(a)    **Limitation of Liability.**   This Agreement, unless otherwise specifically stated herein, is not intended to, and does not, create or impose any fiduciary duty on any Covered Person.  Furthermore, each of the Members and the Company hereby waives any and all fiduciary duties that, absent such waiver, may be implied by Applicable Law, and in doing so, acknowledges and agrees that the duties and obligations of each Covered Person to each other and to the Company are only as expressly set forth in this Agreement.  The provisions of this Agreement, to the extent that they restrict the duties and liabilities of a Covered Person otherwise existing at law or in equity, are agreed by the Members to replace such other duties and liabilities of such Covered Person.

(b)    **Duties.**   Subject to Section 7.06, whenever in this Agreement a Covered Person is permitted or required to make a decision (including a decision that is in such Covered Person's "discretion" or under a grant of similar authority or latitude), the Covered Person shall be entitled to consider only such interests and factors as such Covered Person desires and shall have no duty or obligation to give any consideration to any interest of or factors affecting the Company or any other Person.  Whenever in this Agreement a Covered Person is permitted or required to make a decision in such Covered Person's "good faith," the Covered Person shall act under such express standard and shall not be subject to any other or different standard imposed by this Agreement or any other Applicable Law.

**Section 9.03    Indemnification**.

(a)    **Indemnification.**   To the fullest extent permitted by the BOC, as the same now exists or may hereafter be amended, substituted or replaced (but, in the case of any such amendment, substitution, or replacement, only to the extent that such amendment, substitution, or replacement permits the Company to provide broader indemnification rights than the BOC permitted the Company to provide prior to such amendment, substitution, or replacement), the Company shall indemnify, hold harmless, defend, pay, and reimburse any Covered Person against any and all losses, claims, damages, judgments, fines, or liabilities, including reasonable legal fees or other expenses incurred in investigating or defending against such losses, claims, damages, judgments, fines, or liabilities, and any amounts expended in settlement of any claims (collectively, "**Losses**") to which such Covered Person may become subject by reason of:

(i)    any act or omission or alleged act or omission performed or omitted to be performed on behalf of the Company, any Member, or any direct or indirect Subsidiary of the foregoing in connection with the business of the Company; or

(ii)    such Covered Person being or acting in connection with the business of the Company as a member, shareholder, Affiliate, manager, director, officer, employee, or agent of the Company, any Member, or any of their respective

30

Affiliates, or that such Covered Person is or was serving at the request of the Company as a member, manager, director, officer, employee, or agent of any Person including the Company;

provided, that (x) such Covered Person acted in good faith and in a manner believed by such Covered Person to be in, or not opposed to, the best interests of the Company and, with respect to any criminal proceeding, had no reasonable cause to believe his conduct was unlawful, and (y) such Covered Person's conduct did not constitute fraud or willful and intentional misconduct, in either case as determined by a final, nonappealable order of a court of competent jurisdiction. In connection with the foregoing, the termination of any action, suit, or proceeding by judgment, order, settlement, conviction, or upon a plea of nolo contendere or its equivalent, shall not, of itself, create a presumption that the Covered Person did not act in good faith or, with respect to any criminal proceeding, had reasonable cause to believe that such Covered Person's conduct was unlawful, or that the Covered Person's conduct constituted fraud or willful misconduct.

(b)     **Control of Defense.**  Upon a Covered Person's discovery of any claim, lawsuit, or other proceeding relating to any Losses for which such Covered Person may be indemnified pursuant to this Section 9.03, the Covered Person shall give prompt written notice to the Company of such claim, lawsuit, or proceeding; provided, that the failure of the Covered Person to provide such notice shall not relieve the Company of any indemnification obligation under this Section 9.03, unless the Company shall have been materially prejudiced thereby. The Company shall be entitled to participate in or assume the defense of any such claim, lawsuit, or proceeding at its own expense. After notice from the Company to the Covered Person of its election to assume the defense of any such claim, lawsuit, or proceeding, the Company shall not be liable to the Covered Person under this Agreement or otherwise for any legal or other expenses subsequently incurred by the Covered Person in connection with investigating, preparing to defend, or defending any such claim, lawsuit, or other proceeding. If the Company does not elect (or fails to elect) to assume the defense of any such claim, lawsuit, or proceeding, the Covered Person shall have the right to assume the defense of such claim, lawsuit, or proceeding as it deems appropriate, but it shall not settle any such claim, lawsuit, or proceeding without the consent of the Company (which consent shall not be unreasonably withheld, conditioned, or delayed).

(c)     **Reimbursement.**  The Company shall promptly reimburse (and/or advance to the extent reasonably required) each Covered Person for reasonable legal or other expenses (as incurred) of such Covered Person in connection with investigating, preparing to defend, or defending any claim, lawsuit, or other proceeding relating to any Losses for which such Covered Person may be indemnified pursuant to this Section 9.03; provided, that if it is finally judicially determined that such Covered Person is not entitled to the indemnification provided by this Section 9.03, then such Covered Person shall promptly reimburse the Company for any reimbursed or advanced expenses.

(d)     **Entitlement to Indemnity.**  The indemnification provided by this Section 9.03 shall not be deemed exclusive of any other rights to indemnification to which those

31

seeking indemnification may be entitled under the BOC, any agreement or otherwise. The provisions of this Section 9.03 shall continue to afford protection to each Covered Person regardless of whether such Covered Person remains in the position or capacity pursuant to which such Covered Person became entitled to indemnification under this Section 9.03 and shall inure to the benefit of the executors, administrators, legatees, and distributees of such Covered Person.

(e)     **Insurance.**  To the extent available on commercially reasonable terms, the Company may purchase, at its expense, insurance to cover Losses covered by the foregoing indemnification provisions and to otherwise cover Losses for any breach or alleged breach by any Covered Person of such Covered Person's duties in such amount and with such deductibles as the Sole Manager may reasonably determine; provided, that the failure to obtain such insurance shall not affect the right to indemnification of any Covered Person under the indemnification provisions contained herein, including the right to be reimbursed or advanced expenses or otherwise indemnified for Losses hereunder.  If any Covered Person recovers any amounts in respect of any Losses from any insurance coverage, then such Covered Person shall, to the extent that such recovery is duplicative, reimburse the Company for any amounts previously paid to such Covered Person by the Company in respect of such Losses.

(f)     **Funding of Indemnification Obligation.**  Notwithstanding anything contained herein to the contrary, any indemnity by the Company relating to the matters covered in this Section 9.03 shall be provided out of and to the extent of Company assets only, and no Member (unless such Member otherwise agrees in writing) shall have personal liability on account thereof or shall be required to make additional Capital Contributions to help satisfy such indemnity by the Company.

(g)     **Savings Clause.**  If this Section 9.03 or any portion hereof shall be invalidated on any ground by any court of competent jurisdiction, then the Company shall nevertheless indemnify and hold harmless each Covered Person pursuant to this Section 9.03 to the fullest extent permitted by any applicable portion of this Section 9.03 that shall not have been invalidated and to the fullest extent permitted by Applicable Law.

(h)     **Amendment.**  The provisions of this Section 9.03 shall be a contract between the Company, on the one hand, and each Covered Person who served in such capacity at any time while this Section 9.03 is in effect, on the other hand, pursuant to which the Company and each such Covered Person intend to be legally bound.  No amendment, modification, or repeal of this Section 9.03 that adversely affects the rights of a Covered Person to indemnification for Losses incurred or relating to a state of facts existing prior to such amendment, modification or repeal shall apply in such a way as to eliminate or reduce such Covered Person's entitlement to indemnification for such Losses without the Covered Person's prior written consent.

**Section 9.04   Survival.**  The provisions of this ARTICLE IX shall survive the dissolution, liquidation, winding up, termination of the Company and the withdrawal of any Member or the Transfer of any Member's interest in the Company.

WEIL:\97901822\22\45327.0007

## ARTICLE X
## ACCOUNTING; TAX MATTERS

**Section 10.01 Financial Statements and Other Information.**  The Company shall prepare and furnish to each Member and CUSA the following reports:

(a)    **Annual Financial Statements.**  As soon as available, and in any event within 105 days after the end of each Fiscal Year, its unaudited consolidated balance sheet and related consolidated statements of operations, Members' equity and cash flows as of the end of and for such year prepared in accordance with GAAP consistently applied.

(b)    **Quarterly Financial Statements.**  As soon as available, and in any event within 60 days after the end of each quarterly accounting period in each Fiscal Year (including the last fiscal quarter of the Fiscal Year), its unaudited consolidated balance sheet and related unaudited consolidated statements of operations, Members' equity and cash flows as of the end of and for such fiscal quarter and the then elapsed portion of the current Fiscal Year, setting forth in each case in comparative form the figures for the corresponding period or periods of the previous Fiscal Year or as at the end of such period or periods, all in reasonable detail and certified by the Company as presenting fairly in all material respects the consolidated financial condition and results of operations of the Company in accordance with GAAP consistently applied, subject to normal year-end audit adjustments and the absence of footnotes.

(c)    **Monthly Operating Data.**  As soon as available, but in no event later than 45 days after the end of each calendar month, a statement in a form reasonably satisfactory to each Member and CUSA showing all operating data for the Company, including operating expenses and revenue for each of the Company, for such calendar month.

(d)    **Budget Updates.**  Promptly once available and no less than bi-annually, an operating budget for the Fiscal Year, forecasting revenue, operating costs, and capital expenses for each fiscal quarter.

(e)    **Material Government Communication.**  Promptly following receipt thereof by FWE IV, copies of all material written notices or other material communications issued or provided by or to any Governmental Authority.

(f)    **Additional Information.**  Promptly following any reasonable request therefor, such other information regarding the operations, business affairs and financial condition of the Company, as any Member or CUSA may reasonably request, including, without limitation, decommissioning cost estimates and calculations.

**Section 10.02 Inspection Rights.**  Upon reasonable notice from a Member or CUSA, the Company shall afford each Member or CUSA and their respective Representatives access during normal business hours to (a) the Company's properties, offices, plants, and other facilities; (b) the corporate, financial, and similar records, reports, and documents of the Company, including, without limitation, all books and records, minutes of proceedings, internal management documents, reports of operations, reports of adverse developments, copies of any management

letters and communications with Members or the Sole Manager, and to permit each Member or CUSA and their respective Representatives to examine such documents and make copies thereof; and (c) the Sole Manager, any officers, senior employees, and public accountants of the Company, and to afford each Member or CUSA and their respective Representatives the opportunity to discuss the affairs, finances, and accounts of the Company with such Sole Manager, officers, senior employees, and public accountants (and the Company hereby authorizes said accountants to discuss with such Member or CUSA and their respective Representatives such affairs, finances, and accounts).

**Section 10.03 Income Tax Status.**  The Company and the Initial Member intend that the Company shall be treated as a disregarded entity for U.S., federal, state, and local income tax purposes.  Neither the Company nor any Member shall make an election for the Company to be classified as other than a partnership or a disregarded entity pursuant to Treasury Regulations Section 301.7701-3.

**Section 10.04 Tax Matters Representative**.  The following Sections 10.04(a)-(f) are intended to apply if the Company becomes a partnership for U.S. federal income tax purposes:

(a)    **Appointment.**   The Members hereby appoint the Sole Manager as "partnership representative" as provided in Code Section 6223(a) (the "**Tax Matters Representative**").    If any state or local tax law provides for a tax matters partner/partnership representative or Person having similar rights, powers, authority or obligations, the Person designated as the Tax Matters Representative shall also serve in such capacity.  To the extent required by Applicable Law, if the Tax Matters Representative is an entity, it shall appoint a "designated individual" to act on its behalf.  The Tax Matters Representative can be removed at any time by a vote of Members holding a majority of the Membership Interests, and shall resign if it is no longer a Member.  In the event of the resignation or removal of the Tax Matters Representative, Members holding a majority of the Membership Interests shall select a replacement Tax Matters Representative.

(b)    **Tax Examinations and Audits.**   The Tax Matters Representative is authorized and required to represent the Company (at the Company's expense) in connection with all examinations of the Company's affairs by Taxing Authorities, including resulting administrative and judicial proceedings, and to expend Company funds for professional services and costs associated therewith.  The Tax Matters Representative shall promptly notify the Members in writing of the commencement of any tax audit of the Company, upon receipt of a tax assessment and upon receipt of a notice of final partnership adjustment, and shall keep the Members reasonably informed of the status of any tax audit and resulting administrative and judicial proceedings.  Without the consent of Members holding a majority of the Membership Interests, the Tax Matters Representative shall not extend the statute of limitations, file a request for administrative adjustment, file suit relating to any Company tax refund or deficiency or enter into any settlement agreement relating to items of income, gain, loss or deduction of the Company with any Taxing Authority.

WEIL:\97901822\22\45327.0007

(c)　**US Federal Tax Proceedings.**　The Members acknowledge that the Company may elect the application of Section 6226 of the Code.  This acknowledgement applies to each Member whether or not the Member owns an interest in the Company in both the reviewed year and the year of the tax adjustment.  In the event that the Company elects the application of Section 6226 of the Code, the Members agree and covenant to take into account and report to the Internal Revenue Service (or any other applicable taxing authority) any adjustment to their tax items for the reviewed year of which they are notified by the Company in a written statement, in the manner provided in Section 6226(b) of the Code, whether or not the Member owns any interest in the Company at such time.  Any Member that fails to report its share of such adjustments on its tax return, agrees to indemnify and hold harmless the Company and the Tax Matters Representative from and against any and all losses, costs, liabilities and expenses related to taxes (including penalties and interest) imposed on the Company as a result of the Member's inaction.  If the Company is required to pay the assessment of the imputed underpayment under Section 6225(a)(1) of the Code or similar provisions of state law, any taxes, penalties, and interest payable by the Company shall be treated as attributable to the Members, and, to the extent possible, the Tax Matters Representative shall allocate the burden of any such amounts to those Members to whom such amounts are reasonably attributable taking into account the Member's or former Member's allocable share of taxable income or loss with respect to the Fiscal Year to which such assessment pertains and adjustments that may have been made in computing the imputed underpayment.  To the extent that any such amount is payable by the Company, at the option of the Tax Matters Representative, such amount shall be recoverable from such Member as provided in Section 6.03(c).  The provisions contained in this Section 10.04 shall survive the dissolution, termination or liquidation of the Company, the withdrawal of any Member or the Transfer of any Member's interest in the Company and apply to unadmitted assignees of a Member's interest who may be considered current or former partners of the Company for federal tax purposes.

(d)　**Tax Returns.**　Each Member agrees that such Member shall not treat any Company item inconsistently on such Member's federal, state, foreign or other income tax return with the treatment of the item on the Company's return.

(e)　**Section 754 Election.**　The Tax Matters Representative will make an election under Code Section 754, if the Company becomes a partnership for U.S. federal income tax purposes.

(f)　**Indemnification**.　The Company shall defend, indemnify, and hold harmless the Tax Matters Representative against any and all liabilities sustained as a result of any act or decision concerning Company tax matters and within the scope of responsibilities as Tax Matters Representative, so long as such act or decision was done or made in good faith and does not constitute gross negligence or willful misconduct.

**Section 10.05 Tax Returns.**　At the expense of the Company, the Sole Manager (or any officer of the Company that it may designate pursuant to this Agreement) shall endeavor to cause the preparation and timely filing (including extensions) of all tax returns, if any, required to be filed by the Company pursuant to the Code as well as all other required tax returns in each

35

jurisdiction in which the Company owns property or does business.  If the Company becomes a partnership for U.S. federal income tax purposes, as soon as reasonably possible after the end of each Fiscal Year, the Sole Manager or any designated officer of the Company, as applicable, will cause to be delivered to each Person who was a Member at any time during such Fiscal Year, IRS Schedule K-1 to Form 1065, if applicable, and such other information with respect to the Company as may be necessary for the preparation of such Person's federal, state, and local income tax returns for such Fiscal Year.

Section 10.06 Company Funds.  All funds of the Company shall be deposited in its name, or in such name as may be designated by the Sole Manager, in such checking, savings, or other accounts, or held in its name in the form of such other investments as shall be designated by the Sole Manager.  The funds of the Company shall not be commingled with the funds of any other Person.  All withdrawals of such deposits or liquidations of such investments by the Company shall be made exclusively upon the signature or signatures of the Sole Manager, or any officer or officers of the Company that may be designated by the Sole Manager, as applicable, pursuant to this Agreement.

## ARTICLE XI
## WINDING UP AND TERMINATION

Section 11.01 Events Requiring Winding Up.  The Company shall begin to wind up its business and affairs only upon the occurrence of any of the following events (in each case, subject to the applicable provisions of Section 7.04):

(a)     upon the permanent cessation of all production from, and Final Completion of all plugging and abandonment and decommissioning of, the FWE IV Assets;

(b)     the occurrence of a nonwaivable event under the terms of the BOC which requires the winding up of the Company after its termination unless a Continuance occurs in respect of such event; or

(c)     the entry of a judicial decree ordering winding up and termination under § 11.314 of the BOC in proceedings of which CUSA has been given notice and an opportunity to participate.

(d)     Notwithstanding the occurrence of an event referenced in Section 11.01(b), if the Company is permitted prior to the termination of its existence in accordance with the BOC to revoke a winding up upon the occurrence of such event and the Sole Manager provides its prior written consent to such revocation, then, to the extent so permitted under the BOC and in the manner provided therein, the Company's existence shall be continued (the revocation of such a winding up and continuance of the Company, a "**Continuance**").

Section 11.02 Effectiveness of Termination.  The Company shall begin to wind up its business and affairs as soon as reasonably practicable upon the occurrence of an event described in Section 11.01 (if such event has not been revoked or cancelled), but the Company shall not terminate until the winding up of the Company has been completed, the assets of the Company

WEIL:\97901822\22\45327.0007

have been distributed as provided in Section 11.03, and the Certificate of Termination shall have been filed as provided in Section 11.04.

**Section 11.03 Liquidation.**   If the Company is to be terminated pursuant to Section 11.01, the Company shall be liquidated and its business and affairs wound up in accordance with the BOC and the following provisions:

(a)   **Liquidator.**   The Sole Manager shall act as liquidator to wind up the Company (the "**Liquidator**"); provided, however, that if there is then a vacancy in the position of the Sole Manager or the Sole Manager is not willing to act as the Liquidator, the Members shall appoint a Person to act as the Liquidator with the consent of CUSA. The Liquidator shall have full power and authority to sell, assign, and encumber any or all of the Company's assets and to wind up and liquidate the affairs of the Company in an orderly and business-like manner.

(b)   **Accounting.**   As promptly as possible after the event requiring winding up and again after final liquidation, the Liquidator shall cause a proper accounting to be made by a recognized firm of certified public accountants of the Company's assets, liabilities, and operations through the last day of the calendar month in which such event occurs or the final liquidation is completed, as applicable.

(c)   **Notice.**   The Liquidator shall deliver to each known claimant of the Company the notice required by § 11.052 of the BOC.

(d)   **Distribution of Proceeds.**   The Liquidator shall liquidate the assets of the Company and distribute the proceeds of such liquidation in the following order of priority, unless otherwise required by mandatory provisions of Applicable Law:

(i)   First, to the payment of all of the Company's debts and liabilities to its creditors (including Members, if applicable), including amounts owed, if any, pursuant to the Material Project Contracts to CUSA and/or Credit Bid Purchaser, and the expenses of liquidation (including sales commissions incident to any sales of assets of the Company);

(ii)   Second, to the establishment of and additions to other reserves that are determined by the Liquidator to be reasonably necessary for any contingent unforeseen liabilities or obligations of the Company; and

(iii)   Third, to the Members in accordance with the positive balances in their respective Capital Accounts, as determined after taking into account all Capital Account adjustments for the taxable year of the Company during which the liquidation of the Company occurs.

(e)   **Discretion of Liquidator.**   Notwithstanding the provisions of Section 11.03(d) that require the liquidation of the assets of the Company, but subject to the order of priorities set forth in Section 11.03(d), if upon winding up of the Company the Liquidator reasonably determines that an immediate sale of part or all of the Company's

WEIL:\97901822\22\45327.0007

assets would be impractical or could cause undue loss to the Members, the Liquidator may defer the liquidation of any assets except those necessary to satisfy Company liabilities and reserves, and may, upon approval of holders of a majority of the outstanding Membership Interests, distribute to the Members, in lieu of cash, as tenants in common and in accordance with the provisions of Section 11.03(d), undivided interests in such Company assets as the Liquidator deems not suitable for liquidation.  Any such distribution in kind shall be subject to such conditions relating to the disposition and management of such properties as the Liquidator deems reasonable and equitable and to any agreements governing the operating of such properties at such time.  For purposes of any such distribution, any property to be distributed will be valued at its Fair Market Value.

**Section 11.04 Certificate of Termination.**  Upon completion of the distribution of the assets of the Company as provided in Section 11.03(d) hereof, the Liquidator or other such officer or Sole Manager shall execute and cause to be filed a Certificate of Termination in the State of Texas and shall cause the cancellation of all qualifications and registrations of the Company as a foreign limited liability company in jurisdictions other than the State of Texas and shall take such other actions as may be necessary to terminate the Company.  Upon acceptance of the Certificate of Termination by the Texas Secretary of State, the Company shall be terminated.

**Section 11.05 Survival of Rights, Duties, and Obligations.**  Dissolution, liquidation, winding up, or termination of the Company for any reason shall not release any party from any Loss that at the time of such dissolution, liquidation, winding up, or termination already had accrued to any other party or thereafter may accrue in respect of any act or omission prior to such dissolution, liquidation, winding up, or termination.  For the avoidance of doubt, none of the foregoing shall replace, diminish, or otherwise adversely affect any Member's right to indemnification pursuant to Section 9.03.

**Section 11.06 Recourse for Claims.**  Each Member shall look solely to the assets of the Company for all distributions with respect to the Company, such Member's Capital Account, and such Member's share of Net Income, Net Loss, and other items of income, gain, loss, and deduction, and shall have no recourse therefor (upon termination or otherwise) against the Liquidator or any other Member.

## ARTICLE XII
## MISCELLANEOUS

**Section 12.01 Expenses.**  The Initial Member will pay, or cause to be paid, or contribute to the Company amounts necessary for the Company to pay, all amounts necessary to fully cover (a) costs associated with the formation of the Company in connection with the Divisive Merger Documents and (b) any premiums to satisfy organizational or area wide bonding requirements.

**Section 12.02 Further Assurances.**   In connection with this Agreement and the transactions contemplated hereby, the Company and the Member hereby agree, at the request of the Company or any other Member, to execute and deliver such additional documents, instruments, conveyances, and assurances and to take such further actions as may be required to carry out the provisions hereof and give effect to the transactions contemplated hereby.

**Section 12.03 Confidentiality**.

(a)     Each Member acknowledges that it will have access to and become acquainted with trade secrets, proprietary information, and confidential information belonging to the Company and its Affiliates that are not generally known to the public, including, but not limited to, information concerning business plans, financial statements, and other information, operating practices and methods, expansion plans, strategic plans, marketing plans, contracts, customer lists, or other business documents that the Company treats as confidential, in any format whatsoever (including oral, written, electronic, or any other form or medium) (collectively, "**Confidential Information**").  In addition, each Member acknowledges that:  (i) the Company has invested, and continues to invest, substantial time, expense, and specialized knowledge in developing its Confidential Information; (ii) the Confidential Information provides the Company with a competitive advantage over others in the marketplace; and (iii) the Company would be irreparably harmed if the Confidential Information were disclosed to competitors or made available to the public.  Without limiting the applicability of any other agreement to which any Member is subject, no Member shall, directly or indirectly, disclose or use (other than solely for the purposes of such Member monitoring and analyzing its investment in the Company) at any time, including, without limitation, use for personal, commercial, or proprietary advantage or profit, either during its association with the Company or thereafter, any Confidential Information of which such Member is or becomes aware.  Each Member in possession of Confidential Information shall take all appropriate steps to safeguard such information and to protect it against disclosure, misuse, espionage, loss, and theft.

(b)     Nothing contained in Section 12.03(a) shall prevent any Member from disclosing Confidential Information: (i) upon the order of any court or administrative agency; (ii) upon the request or demand of any regulatory agency or authority having jurisdiction over such Member; (iii) to the extent compelled by legal process or required or requested pursuant to subpoena, interrogatories, or other discovery requests; (iv) to the extent necessary in connection with the exercise of any remedy hereunder; (v) to the other Members; or (vi) to such Member's Representatives who, in the reasonable judgment of such Member, need to know such Confidential Information and agree to be bound by the provisions of this Section 12.03 as if a Member; or (vii) to any potential Transferee in connection with a proposed Transfer of Membership Interests from such Member, as long as such potential Transferee agrees in writing to be bound by the provisions of this Section 12.03 as if a Member before receiving such Confidential Information; provided, that in the case of clause (i), (ii), or (iii), such Member shall notify the Company and other Members of the proposed disclosure as far in advance of such disclosure as practicable (but in no event make any such disclosure before notifying the Company and other Members) and use reasonable efforts to ensure that any Confidential Information so disclosed is accorded confidential treatment satisfactory to the Company, when and if available.

(c)     The restrictions of Section 12.03(a) shall not apply to Confidential Information that: (i) is or becomes generally available to the public other than as a result of a disclosure by a Member in violation of this Agreement; (ii) is or has been independently developed or conceived by such Member without use of Confidential

WEIL:\97901822\22\45327.0007

Information; or (iii) becomes available to such Member or any of its Representatives on a non-confidential basis from a source other than the Company, the other Members, or any of their respective Representatives, provided, that such source is not known by the receiving Member to be bound by a confidentiality agreement regarding the Company.

(d)     The obligations of each Member under this Section 12.03 shall survive for so long as such Member remains a Member, and for three years following the earlier of (i) termination, dissolution, liquidation, and winding up of the Company; (ii) the withdrawal of such Member from the Company; or (iii) such Member's Transfer of its Membership Interests; provided that with respect to Confidential Information that constitutes a trade secret under Applicable Law, the obligations of each Member under this Section 12.03 shall survive until, if ever, such Confidential Information loses its trade secret protection other than due, directly or indirectly, to an act or omission of the Member.

**Section 12.04 Notices.**  All notices, requests, consents, claims, demands, waivers, and other communications hereunder shall be in writing and shall be deemed to have been given:

(a)     when delivered by hand (with written confirmation of receipt);

(b)     when received by the addressee if sent by a nationally recognized overnight courier (receipt requested);

(c)     on the third day after the date mailed, by certified or registered mail, return receipt requested, postage prepaid; or

(d)     on the day delivered if sent by electronic mail to the address below during normal business hours of the recipient and on the next Business Day if sent by electronic mail after normal business hours of the recipient.

Such communications must be sent to the respective parties at the following addresses (or at such other address for a party as shall be specified in a notice given in accordance with this Section 12.04):

**If to the Company:**     Fieldwood Energy IV LLC
2000 W. Sam Houston Parkway S., Suite 1200
Houston, Texas 77042
Attention: Sole Manager
Phone: [●]
Email: [●]

with a copy to:

(which shall not
constitute notice)

Chevron U.S.A. Inc.
100 Northpark Blvd
Covington, LA 70443
Attention: Land Manager
Phone: (985) 773-6538
Email: tdwebre@chevron.com

**If to Member**: To the Member's respective mailing address as set forth on the Members Schedule.

**Section 12.05 Headings.**  The headings in this Agreement are inserted for convenience or reference only and are in no way intended to describe, interpret, define, or limit the scope, extent, or intent of this Agreement or any provision of this Agreement.

**Section 12.06 Severability.**  If any term or provision of this Agreement is held to be invalid, illegal, or unenforceable under Applicable Law in any jurisdiction, such invalidity, illegality, or unenforceability shall not affect any other term or provision of this Agreement or invalidate or render unenforceable such term or provision in any other jurisdiction.  Except as provided in Section 9.03(g), upon such determination that any term or other provision is invalid, illegal, or unenforceable, this Agreement shall be modified automatically so as to effect the original intent of the parties as closely as possible in order that the transactions contemplated hereby be consummated as originally contemplated to the greatest extent possible, legal, and enforceable.

**Section 12.07 Entire Agreement.**  This Agreement, together with the Certificate of Merger, Plan of Merger, Certificate of Formation, the Material Project Contracts and all related Exhibits and Schedules, constitute the sole and entire agreement of the parties to this Agreement with respect to the subject matter contained herein and therein, and supersede all prior and contemporaneous understandings, agreements, representations, and warranties, both written and oral, with respect to such subject matter.

**Section 12.08 Successors and Assigns.**  Subject to the restrictions on Transfers set forth herein, this Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective heirs, executors, administrators, successors, and assigns.

**Section 12.09 No Third-Party Beneficiaries.**  Except (a) with respect to certain rights reserved to CUSA as set forth in this Agreement, which shall be for the benefit of and enforceable by CUSA, and (b) as provided in ARTICLE IX, which shall be for the benefit of and enforceable by Covered Persons as described therein, this Agreement is for the sole benefit of the parties hereto (and their respective heirs, executors, administrators, successors, and assigns) and nothing herein, express or implied, is intended to or shall confer upon any other Person, including any creditor of the Company, any legal or equitable right, benefit, or remedy of any nature whatsoever under or by reason of this Agreement; provided, however that CUSA and each Covered Persons shall be an express third party beneficiary of this Agreement.

**Section 12.10 Amendment.** Subject to Sections 2.02, no provision of this Agreement may be amended or modified except by an instrument in writing executed by the Company and the Members holding a majority of the Membership Interests; provided, however that any amendment or modification which impacts the rights of CUSA hereunder, including changes to Section 2.05 (Purpose) shall be subject to the prior written consent of CUSA, which may be given, delayed or withheld in its sole discretion. Any such written amendment or modification will be binding upon the Company, CUSA and each Member. Notwithstanding the foregoing, amendments to the Members Schedule following any new issuance, redemption, repurchase, or Transfer of Membership Interests in accordance with this Agreement may be made by the Sole Manager without the consent of or execution by the Members.

**Section 12.11 Waiver.** No waiver by any party or CUSA of any of the provisions hereof shall be effective unless explicitly set forth in writing and signed by the party so waiving or CUSA, respectively. No waiver by any party or CUSA shall operate or be construed as a waiver in respect of any failure, breach, or default not expressly identified by such written waiver, whether of a similar or different character, and whether occurring before or after that waiver. No failure to exercise, or delay in exercising, any right, remedy, power, or privilege arising from this Agreement shall operate or be construed as a waiver thereof, nor shall any single or partial exercise of any right, remedy, power, or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power, or privilege. For the avoidance of doubt, nothing contained in this Section 12.11 shall diminish any of the explicit and implicit waivers described in this Agreement.

**Section 12.12 Governing Law.** All issues and questions concerning the application, construction, validity, interpretation, and enforcement of this Agreement shall be governed by and construed in accordance with the internal laws of the State of Texas, without giving effect to any choice or conflict of law provision or rule (whether of the State of Texas or any other jurisdiction) that would cause the application of laws of any jurisdiction other than those of the State of Texas.

**Section 12.13 Submission to Jurisdiction.** The parties hereby agree that any suit, action, or proceeding seeking to enforce any provision of, or based on any matter arising out of or in connection with, this Agreement or the transactions contemplated hereby, whether in contract, tort, or otherwise, shall be brought in the federal courts of the United States of America or the courts of the State of Texas, in each case located in Harris County and in Houston, Texas. Each of the parties hereby irrevocably consents to the jurisdiction of such courts (and of the appropriate appellate courts therefrom) in any such suit, action, or proceeding and irrevocably waives, to the fullest extent permitted by law, any objection that it may now or hereafter have to the laying of the venue of any such suit, action, or proceeding in any such court or that any such suit, action, or proceeding that is brought in any such court has been brought in an inconvenient forum. Service of process, summons, notice, or other document by registered mail to the address set forth in Section 12.04 shall be effective service of process for any suit, action, or other proceeding brought in any such court.

**Section 12.14 Waiver of Jury Trial.** EACH PARTY HERETO ACKNOWLEDGES AND AGREES THAT ANY DISPUTE OR CONTROVERSY THAT MAY ARISE UNDER THIS AGREEMENT IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES

WEIL:\97901822\22\45327.0007

AND, THEREFORE, EACH SUCH PARTY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LEGAL ACTION ARISING OUT OF RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

**Section 12.15 Equitable Remedies.**  Each party hereto acknowledges that a breach or threatened breach by such party of any of its obligations under this Agreement would give rise to irreparable harm to the other parties or CUSA, for which monetary damages would not be an adequate remedy, and hereby agrees that in the event of a breach or a threatened breach by such party of any such obligations, each of the other parties hereto and CUSA shall, in addition to any and all other rights and remedies that may be available to them in respect of such breach, be entitled to equitable relief, including a temporary restraining order, an injunction, specific performance, and any other relief that may be available from a court of competent jurisdiction (without any requirement to post bond).

**Section 12.16 Attorney's Fees.**  In the event that any party or third-party beneficiary hereto institutes any legal suit, action, or proceeding, including arbitration, against another party in respect of a matter arising out of or relating to this Agreement, the prevailing party or third-party beneficiary in the suit, action, or proceeding shall be entitled to receive, in addition to all other damages to which it may be entitled, the costs incurred by it in conducting the suit, action, or proceeding, including reasonable attorneys' fees and expenses and court costs.

**Section 12.17 Remedies Cumulative.**  The rights and remedies under this Agreement are cumulative and are in addition to and not in substitution for any other rights and remedies available at law or in equity or otherwise, except to the extent expressly provided in Section 9.02 to the contrary.

**Section 12.18 Counterparts.**  This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement.  A signed copy of this Agreement delivered by email or other means of Electronic Transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

(SIGNATURE PAGE FOLLOWS)

43

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be entered into as of the date first written above by their respective officers thereunto duly authorized.

**The Company:**

FIELDWOOD ENERGY IV LLC,
a Texas limited liability company


By:_____
Name:
Title:


**The Initial Member:**

FIELDWOOD ENERGY INC.,
a Delaware corporation


By:_____
Name:
Title:

**SCHEDULE A**

<u>**MEMBERS SCHEDULE**</u>

| Member Name, and Address | Membership Interest |
|---|---|
| Fieldwood Energy Inc.<br>2000 W. Sam Houston Parkway S., Suite 1200<br>Houston, Texas 77042 | 100% |
| Total: | 100% |

WEIL:\97901822\22\45327.0007

**<u>Exhibit 5</u>**

**Omnibus Agreement**

See attached.

*Exhibit 5 to the Implementation Agreement*

## OMNIBUS AGREEMENT

This Omnibus Agreement (this "<u>Agreement</u>"), dated and effective as of _____, 2021 (the "<u>Effective Date</u>"), is by and among Mako Buyer LLC, a Delaware limited liability company ("<u>Operator</u>"), Fieldwood Energy IV LLC, a Texas limited liability company (the "<u>Company</u>"), and Chevron U.S.A. Inc., a Pennsylvania corporation ("<u>CUSA</u>").  Operator, Company and CUSA are sometimes referred to collectively as the "Parties" and individually as a "Party".

**WHEREAS**, Company is a resulting entity of a divisive merger effected pursuant to the laws of the State of Texas in connection with the confirmed plan of reorganization (the "Plan") of Fieldwood Energy LLC (and its affiliated debtor entities) pursuant to Chapter 11 of the United States Bankruptcy Code in Case 20-33948, *In re: Fieldwood Energy LLC et al.*, in the United States Bankruptcy Court for the Southern District of Texas, Houston Division (the "Bankruptcy Cases");

**WHEREAS**, the divisive merger was conducted in accordance with (i) the Implementation Agreement, which was agreed prior to the confirmation of the Plan, and (ii) the Plan of Merger;

**WHEREAS**, under the Implementation Agreement and pursuant to the divisive merger as set out in the Plan of Merger, Company was allocated the Operating Properties and operational responsibility of the Terminated Properties for the purposes of Decommissioning such Assets;

**WHEREAS,** CUSA is desirous of entering into the Material Project Contracts to support Company and Operator's economical and orderly Decommissioning of Assets; and

**WHEREAS**, Company, CUSA and Operator wish to memorialize certain funding obligations and related limitations and certain other rights and obligations of the Parties relating to the Decommissioning operations of Company and the Assets.

**NOW, THEREFORE**, in consideration of the premises and of the mutual promises, covenants, conditions, and agreements contained herein, and for other valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereby agree as follows:

### ARTICLE I.  DEFINITIONS

**Section 1.1** **Defined Terms**. Capitalized terms used herein shall have the meanings given such terms in <u>Appendix 1</u>.

### ARTICLE II.  ESCROW ACCOUNT

**Section 2.1** **Escrow Account**.  CUSA and Company shall establish and maintain until this Agreement has terminated the Decommissioning Escrow Account and apply the funds contained therein in accordance with this Agreement and the other Material Project Contracts until Final Completion has occurred with respect to all of the Assets.

**Section 2.2** **Deposits into Decommissioning Escrow Account**.

(a)    **Decommissioning Costs**.  The Parties shall cause the amounts required by <u>Section 3.1</u> to be deposited in the Decommissioning Escrow Account at the times required therein.  Such amounts will be used solely to pay Turnkey Amounts and Decommissioning Costs in accordance with <u>Section 3.2</u> or <u>Section 5.3(c)</u> or distributed in accordance with <u>Section 2.3(d)</u> or <u>Section 3.3</u>.  CUSA may deposit additional funds in the Decommissioning Escrow Account in accordance with <u>Section 5.3(c)</u> which will be used solely to pay Decommissioning Costs in accordance with <u>Section 5.3(c)</u>.

(b)    **NPI Payments**.  Company shall cause all NPI Payments made under, and as defined in, the NPI Conveyance to be deposited in the Decommissioning Escrow Account when made.  Such amounts will be used to pay Turnkey Amounts and Decommissioning Costs in accordance with <u>Sections 3.2</u> or <u>Section 5.3(c)</u> or distributed in accordance with <u>Section 2.3(d)</u> or <u>Section 3.3</u>.

(c)    **Initial Deposits**.

(1)  Fieldwood Energy, LLC shall deposit, or cause to be deposited, five million dollars ($5,000,000) into the Decommissioning Escrow Account on the Effective Date (the "<u>Initial Safe Out Funds</u>") pursuant to the Plan of Merger.  The Initial Safe Out Funds will for be used solely to pay Operator for completion of the Initial Safe Out Work in accordance with <u>Section 3.4</u>.

(2)  Fieldwood Energy, LLC shall deposit, or cause to be deposited, fourteen million, four hundred and sixty-nine thousand and six hundred and sixty nine dollars ($14,469,669) into the Decommissioning Escrow Account on the Effective Date (the "<u>Additional FWE IV Property Funds</u>") pursuant to the Plan of Merger.  The Additional FWE IV Property Funds will deemed to be Available Funds hereunder.

(3)  Fieldwood Energy, LLC and CUSA shall cause the Prior Escrow Funds to be deposited into the Decommissioning Escrow Account on the Effective Date pursuant to the Implementation Agreement.  The Prior Escrow Funds will deemed to be Available Funds hereunder.

**Section 2.3**    **Transfers from Decommissioning Escrow Account**.  A transfer from the Decommissioning Escrow Account may be made from time to time as set forth in clauses (a)-(d) below only if: (i) written instruction signed by CUSA (and, in the case of <u>Section 2.3(c)</u>, Operator) is given to the Escrow Agent in accordance with the Decommissioning Escrow Agreement, (ii) the circumstance permitting the applicable draw set forth below has occurred, and (iii) the proceeds of such draw are paid to the Person(s) and in the amount(s) for the applicable draw as set forth below.

(a)    **Turnkey Amounts and Decommissioning Costs**.  From the Decommissioning Escrow Account: (i) to Operator upon Operator's delivery of the written Notices of Payment Milestone or Final Completion in accordance with <u>Section 3.2(b)</u>, <u>Section 3.2(c)</u> or <u>Section 3.2(d)(3)</u>, respectively; (ii) to CUSA upon the events specified in <u>Section 3.1(a)</u>, <u>Section 3.3(a)</u>, <u>Section 3.3(b)</u> or <u>Section 3.3(c)(i)</u> respectively; (iii) to a non-Affiliate entitled to such

2

amounts upon the event specified in <u>Section 3.3(c)(ii)</u> in the amount such non-Affiliate is entitled to thereunder and (iv) to Company or applicable decommissioning contractor entitled to such amounts under <u>Section 5.3(c)</u> upon Company's delivery of a written Notice specifying the amounts then due and payable for the applicable Decommissioning Project.

(b)     **Initial Safe Out Costs**.  From the Decommissioning Escrow Account to Operator upon Operator's delivery of an Invoice containing Safe Out Costs in accordance with <u>Section 3.4</u>.

(c)     **Escrow Agreement**.    From the Decommissioning Escrow Account to the applicable Person(s) in accordance with instructions given jointly by CUSA and Operator pursuant to Sections 5 or 6.1(A) of the Escrow Agreement, for the amount specified in such instructions.

(d)     **Termination**.  On the termination of this Agreement, in the following order, (i) first, from the Decommissioning Escrow Account to Operator in an amount equal to all amounts then due and payable to Operator pursuant to <u>this Agreement</u>, (ii) second, from the Decommissioning Escrow Account to the applicable non-Affiliates, such amounts as are subject to any contractual obligations of CUSA or Company with respect to any non-Affiliate that would require returning such funds to such non-Affiliate, (iii) third, from the Decommissioning Escrow Account to CUSA (after taking into account the releases specified by the preceding clauses (i) and (ii)) (A) any amounts constituting CUSA Turnkey Payments and, as applicable to the extent permitted by applicable agreements with third parties, Other WI Turnkey Payments, Contributed Predecessor Funds or Recovered Bond Proceeds then held in the Decommissioning Escrow Account, and (B) any additional amounts sufficient to reimburse CUSA for all other Decommissioning Costs paid by CUSA and/or payments made by CUSA pursuant to <u>Section 4.2</u> (for the avoidance of doubt, clause (iii) is limited to recovery to the extent available in the Escrow Account and no Party will have any obligation to reimburse CUSA for such amounts), and (iv) fourth, from the Decommissioning Escrow Account to Company any remaining funds on deposit in the Decommissioning Escrow Account (after taking into account the releases specified by the preceding clauses (i), (ii) and (iii)).

**Section 2.4     Timing of Escrow Notices**.  Subject to <u>Section 2.3</u>, the following shall apply with respect to the timing of written instructions made to the Escrow Agent (as contemplated under paragraph (i) of the first paragraph of <u>Section 2.3</u>):

(a)     With respect to transfers made under <u>Section 2.3(a)(i)</u>, CUSA shall send the written instruction to the Escrow Agent promptly, and in any event within five (5) Business Days following Operator's delivery of the written Notices of Payment Milestone or Final Completion in accordance with <u>Section 3.2(b)</u>, <u>Section 3.2(c)</u> or <u>Section 3.2(d)(3)</u>, respectively;

(b)     With respect to transfers made under <u>Section 2.3(b)</u>, CUSA shall send the written instruction to the Escrow Agent promptly, and in any event within five (5) Business Days following Operator's delivery of written Notice of completion of the Initial Safe Out Work in accordance with <u>Section 3.4</u>; and

(c)     If CUSA intends to cause a release of Escrowed Project Funds that relate to a Decommissioning Project for which CUSA has delivered the Notice specified by <u>Section 3.2(a)(i)</u>

3

to Operator under Section 3.3(c)(i) following a termination of the Turnkey Removal Agreement in its entirety by CUSA due to an alleged breach of the Turnkey Removal Agreement, then CUSA shall deliver written Notice of its intent to cause such release to Operator at least five (5) Business Days prior to delivering a written instruction to the Escrow Agent with respect to such release.

<p style="text-align:center;">**ARTICLE III.        TURNKEY REMOVAL AGREEMENT**</p>

**Section 3.1    Decommissioning Cost Funding Obligation**.

(a)      With respect to each Decommissioning Project conducted under the Turnkey Removal Agreement, subject to the other provisions of this Section 3.1 and subject to Section 5.7, CUSA shall fund the CUSA Turnkey Payment attributable to such Decommissioning Project by wire transfer of immediately available funds made into the Decommissioning Escrow Account by no later than the Target Funding Date for such Decommissioning Project; provided that, in the event that there are one or more Other WI Parties other than CUSA (or its Affiliates) with respect to a particular Asset subject to a Decommissioning Project and such Other WI Parties have not provided Committed WI Payments in support of such Decommissioning Project in an amount that is, in total, equivalent to the Other WI Turnkey Payment with respect to the applicable Decommissioning Project (and CUSA has not agree to contribute such amount as a CUSA Covered Payment), then CUSA shall not be required to fund or otherwise pay any amount in excess of the CUSA Turnkey Payment.  If a Decommissioning Project does not become Fully Committed within 90 days of the Target Funding Date, then CUSA shall be entitled to transfer any CUSA Turnkey Payment associated with such Decommissioning Project that CUSA has made into the Decommissioning Escrow Account for such Decommissioning Project to CUSA from the Decommissioning Escrow Account.

(b)      No Orphan Asset shall be part of any Decommissioning Project.  Each Orphan Asset shall be Decommissioned to Final Completion on or before the applicable scheduled completion date for such Orphan Asset set out on Exhibit A attached hereto.  If an Orphan Asset is not listed on Exhibit A but is designated by the Parties as an Orphan Asset under Section 3.5, then Operator will Decommission the applicable Orphan Asset to Final Completion; provided further that Operator shall use commercially reasonable efforts to achieve Final Completion with respect to any such Orphan Asset within one hundred eighty (180) days following such designation.  Notwithstanding any other provision contained herein or in any other Material Project Contract, it shall be Operator's sole responsibility to Decommission each Orphan Asset, at Operator's sole cost, and Company and CUSA shall not bear any costs associated therewith.

(c)      If there is an Other WI Turnkey Payment amount associated with an applicable Decommissioning Project, then, the Company shall use commercially reasonable efforts to obtain Committed WI Payments from each applicable Other WI Party with respect to such Person's allocable share of such Other WI Turnkey Payment, by no later than the Target Funding Date for such Decommissioning Project and all Committed WI Payments shall be transferred directly into the Decommissioning Escrow Account when and as received (except as contemplated by the final proviso to Section 3.2(c)).  Operator, in its capacity as "Operator" under the Contract Operating Agreement shall use commercially reasonable efforts to support such efforts to obtain Committed WI Payments from each Other WI Party for each Decommissioning Project.  In the event that

<p style="text-align:center;">4</p>

Company or Operator (as stated above) has not deposited or otherwise obtained, as applicable, Committed WI Payments for a particular Decommissioning Project equivalent to the total Other WI Payment amount associated with such Decommissioning Project then, at any time prior to the applicable Target Start Date for such Decommissioning Project, CUSA, at its sole discretion, may elect to cover all or any portion of the applicable shortfall amount by providing written Notice to each other Party hereunder (any such amount, a "<u>CUSA Covered Payment</u>").  Such CUSA Covered Payment will be transferred to the Decommissioning Escrow Account pursuant to clause (a) above.

(d)       To the extent Company (or any other Party) receives any Contributed Predecessor Funds or Recovered Bond Proceeds relating to a particular Decommissioning Project, such funds shall be transferred to the Decommissioning Escrow Account as funds designated in support of such Decommissioning Project.

(e)       In the event that there are any Available Funds in the Decommissioning Escrow Account on the Target Funding Date for a particular Decommissioning Project, CUSA may designate such funds to be allocated to the such Decommissioning Project by providing written Notice to the Parties (any such funds so designated, "<u>Allocated Available Funds</u>"); *provided*, that CUSA will not be permitted to designate Available Funds as Allocated Available Funds pursuant to this <u>Section 3.1(e)</u> at any time that CUSA (or any of its Affiliates) is in breach of any of its (or their) obligations under a Material Project Contract.

(f)       In the event that the Turnkey Amount for an applicable Decommissioning Project increases in accordance with the Turnkey Removal Agreement following the Target Funding Date for such Decommissioning Project, (i) Operator shall provide written Notice to CUSA of such increase, and (ii) CUSA shall deposit funds into the Decommissioning Escrow Account to cover any shortfall between the CUSA Turnkey Payment for such Decommissioning Project as calculated prior to such increase and the CUSA Turnkey Payment as calculated following such increase within thirty (30) days following receipt of such Notice, provided that if there are any Available Funds in the Decommissioning Escrow Account at such time, CUSA shall have the option to allocate such Available Funds for such particular Decommissioning Project to cover such shortfall (which such funds shall thereafter be deemed Allocated Available Funds).

(g)       With respect to each Decommissioning Project, (i) any CUSA Turnkey Payment, Contributed Predecessor Funds, Recovered Bond Proceeds, or Committed WI Payment that are paid into the Decommissioning Escrow Account for such Decommissioning Project, (ii) any Allocated Available Funds contained in the Decommissioning Escrow Account that are designated by CUSA in accordance with <u>Section 3.1(e)</u> for such Decommissioning Project, and (iii) for the avoidance of doubt, any amounts associated with a CUSA At-Cost Payment (including At-Cost Allocated Funds or CUSA At-Cost Shortfall Payments) or an Other At-Cost Payment made under <u>Section 3.2(d)</u> shall remain in the Decommissioning Escrow Account and not be used for any other purposes or otherwise distributed to any Person, except in accordance with <u>Section 3.1(a)</u>, <u>Section 3.2</u> or <u>Section 3.3</u>.

**Section 3.2      <u>Payment under Turnkey Removal Agreement</u>**.

#94614673v11
WEIL:\97967346\16\45327.0007

(a)     In the event that the total amount of Escrowed Project Funds for a particular Decommissioning Project equals or exceeds the Turnkey Amount (such project is "Fully Committed"), (i) CUSA shall provide written Notice to Operator, and (ii) Operator, in its capacity as "Contractor" under the Turnkey Removal Agreement, shall initiate work on the applicable Decommissioning Project.

(b)     In the event that a particular Decommissioning Project qualifies for Payment Milestones under the Turnkey Removal Agreement, Operator shall provide written Notice to CUSA certifying that such Payment Milestone has been met and that payment associated with a Payment Milestone is due and, pursuant to Section 2.3(a), CUSA shall transfer to Operator Escrowed Project Funds for such Decommissioning Project, in an amount equal to the amount due and payable to Operator, in its capacity as "Contractor" under the Turnkey Removal Agreement for the applicable Payment Milestone, for the benefit of Company, in its capacity as "FWE IV" under the Turnkey Removal Agreement.

(c)     Upon Final Completion of an applicable Decommissioning Project, Operator shall provide written Notice to CUSA certifying that Final Completion has occurred and, pursuant to Section 2.3(a), CUSA shall transfer to Operator the Escrowed Project Funds for such Decommissioning Project, in an amount equal to the Turnkey Amount (as adjusted from time to time in accordance with the Turnkey Removal Agreement) for such Decommissioning Project (less any Payment Milestone payments actually made in connection with such Decommissioning Project or any Committed WI Payment not yet received by Company), payable to Operator, in its capacity as "Contractor" under the Turnkey Removal Agreement, for the benefit of Company in its capacity as "FWE IV" under the Turnkey Removal Agreement.  Such payment shall be deemed to satisfy all payment obligations of Company and CUSA, respectively, under the Turnkey Removal Agreement for the applicable Decommissioning Project; provided that in the event that any Committed WI Payment has not been paid in full by an applicable Other WI Party at the time of such payment and any amounts attributable to such Committed WI Payment are received by Company following such date, Company shall transfer such amounts to Operator (and, if such amounts are received into the Decommissioning Escrow Account, CUSA shall, pursuant to Section 2.3(a), cause such amounts to be released to Operator), promptly, and not later than thirty (30) days of receipt by Company or Escrow Agent, as applicable.

(d)     Notwithstanding any provisions to the contrary in this Article 3, the following provisions shall apply to Decommissioning Projects on the Additional FWE IV Properties:

(1)   The applicable Decommissioning Project shall be conducted as an At-Cost Project under the Turnkey Removal Agreement.  CUSA's obligation to make or otherwise secure payment under the Turnkey Removal Agreement for an At-Cost Project shall be limited to an amount equivalent to the Company Working Interest share of the applicable amounts due under Section 2.3(a)(iii) of the Turnkey Removal Agreement for such At-Cost Project.

(2)   Each applicable Decommissioning Project shall be deemed "Fully Committed" hereunder if the Company Working Interest in the applicable Decommissioning Project is 100%.  If the Company Working Interest in an applicable Decommissioning Project is not 100%,

6

then Operator, CUSA and Company shall negotiate in good faith to agree on cost sharing arrangements with the applicable Other WI Parties to cover the Other Party Working Interest share of applicable amounts due under Section 2.3(a)(iii) of the Turnkey Removal Agreement for such Decommissioning Project; and such Decommissioning Project shall be deemed "Fully Committed" once such Other WI Parties have entered into contractual commitments covering such payments that are satisfactory to each Party at its reasonable discretion.  Each payment made by an Other WI Party in accordance with such contractual commitments shall be referred to herein as an "Other At-Cost Payment".

(3)   Upon delivery by Operator of an invoice for monthly costs associated with an At-Cost Project under Section 3.2(a)(iii) of the Turnkey Removal Agreement (an "At-Cost Invoice"), CUSA shall transfer to Operator the following amounts by the date that is 30 days after receipt of the At-Cost Invoice (the "At-Cost Invoice Due Date"):

(i)   The total amount due under such At-Cost Invoice, multiplied by the Company Working Interest in the applicable Decommissioning Project (the "CUSA At-Cost Payment"); and

(ii)   If the Company Working Interest in the applicable Decommissioning Project is not 100%, the aggregate amount of Other At-Cost Payments that have been made into the Decommissioning Escrow Account prior to the At-Cost Invoice Due Date; provided that, in the event that any Other At-Cost Payment has not been paid in full by an applicable Other WI Party at the time of such payment and any amounts attributable to such Other At-Cost Payment are received by Company following such date, Company shall transfer such amounts to Operator (and, if such amounts are received into the Decommissioning Escrow Account, CUSA shall cause such amounts to be released to Operator), promptly, and not later than thirty (30) days of receipt by Company.

(4)   CUSA shall be entitled to cover all or any portion of a CUSA At-Cost Payment by one or more of the following sources of funds, by providing written notice to the Parties setting out the applicable allocation of the At-Cost Allocated Funds on or prior to the applicable At-Cost Invoice Due Date (in aggregate, the "At-Cost Allocated Funds"):

(i)   Any Available Funds in the Decommissioning Escrow Account that are allocated by CUSA to cover all or any part of the amount due, in accordance with the procedures under Section 3.1(e);

(ii)   The equitable portion (as determined in good faith by CUSA and the Company) of any Contributed Predecessor Funds that have been contributed into the Decommissioning Escrow Account for such Decommissioning Project; and

(iii)   Any Recovered Bond Proceeds that have been contributed into the Decommissioning Escrow Account for such Decommissioning Project to the extent CUSA is the beneficiary of such Recovered Bond Proceeds (and any other Recovered Bond Proceeds that the Company and CUSA agree to apply).

7

(5)   In the event that CUSA is unable to (or, at its discretion, chooses not to) cover all or any portion of a CUSA At-Cost Payment with At-Cost Allocated Funds, CUSA shall transfer the applicable shortfall amount into the Decommissioning Escrow Account on or prior to the At-Cost Invoice Due Date (as applicable, a "<u>CUSA At-Cost Shortfall Payment</u>").

(6)   The funds transferred under <u>Section 3.2(d)(3)</u> above shall be amounts payable to Operator, in its capacity as "Contractor" under the Turnkey Removal Agreement, for the benefit of Company in its capacity as "FWE IV" under the Turnkey Removal Agreement. Such payment shall be deemed to satisfy the payment obligations of Company and CUSA, respectively, under the Turnkey Removal Agreement for the applicable Decommissioning Project that are attributable to the applicable At-Cost Invoice.

**Section 3.3**     **<u>Refund or Reuse of Escrow Amounts for Decommissioning</u>**.

(a)     To the extent that CUSA has elected to make, and has paid into the Decommissioning Escrow Account, any CUSA Covered Payment, and the applicable Other WI Payment covered by such CUSA Covered Payment is recovered by any Party, it shall be paid into the Decommissioning Escrow Account.  Following payment of such funds into the Decommissioning Escrow Account, the Company shall give CUSA written Notice of such deposit and, pursuant to <u>Section 2.3(a)</u>, CUSA may transfer funds from the Escrow Account equal to the amount of such Other WI Payment so contributed, payable to CUSA as reimbursement of the corresponding portion of the applicable CUSA Covered Payment.

(b)     In the event that any Contributed Predecessor Funds or Recovered Bond Proceeds for a particular Decommissioning Project are transferred into the Decommissioning Escrow Account and CUSA has already paid the CUSA Turnkey Payment for such Decommissioning Project into the Decommissioning Escrow Account as of the date of such transfer, the Company shall give CUSA written Notice of such deposit and, pursuant to <u>Section 2.3(a)</u>, CUSA may transfer funds payable to CUSA (as reimbursement) from the Decommissioning Escrow Account in an amount reasonably determined by CUSA and the Company to represent CUSA's equitable share of such Contributed Predecessor Funds or Recovered Bond Proceeds (determined consistent with the definition of CUSA Turnkey Payment).

(c)     In the event that the Turnkey Removal Agreement is terminated with respect to a particular Decommissioning Project prior to Final Completion thereof pursuant to the Turnkey Removal Agreement (including any termination of the Turnkey Removal Agreement in its entirety prior to Final Completion of one or more Decommissioning Projects), then: (i) in the event CUSA has funded any CUSA Turnkey Payment into the Decommissioning Escrow Account for such Decommissioning Project, pursuant to <u>Section 2.3(a)</u>, CUSA may transfer funds from the Decommissioning Escrow Account in an amount equal to the amount of such CUSA Turnkey Payment to CUSA (less any Decommissioning Costs or Payment Milestones paid prior to such time with respect to such Decommissioning Project); (ii) in the event any Other WI Turnkey Payment, Contributed Predecessor Funds or Recovered Bond Proceeds have been funded into the Decommissioning Escrow Account, such funds shall remain in the Decommissioning Escrow Account to cover future Decommissioning Costs for the applicable Assets in accordance with

8

Section 5.3, subject to any contractual obligations of CUSA or Company with respect to any non-Affiliate that would require returning such funds, in which case, pursuant to Section 2.3(a), CUSA may transfer funds from the Decommissioning Escrow Account in an amount equal to the amount of such Other WI Turnkey Payment, Contributed Predecessor Funds or Recovered Bond Proceeds that such non-Affiliate is entitled to, to such non-Affiliate; and (iii) in the event that CUSA has designated any Allocated Available Funds to the applicable Decommissioning Project, CUSA shall be entitled to release such funds from their designation as Allocated Available Funds within the Decommissioning Escrow Account, to be applied to other permitted uses as addressed herein.

Section 3.4    **Initial Safe-Out Costs**.    With respect to the five million dollars ($5,000,000) contributed into the Decommissioning Escrow Account on the Effective Date for the purpose of performing the Initial Safe Out Work (the "Safe Out Funds"), Operator shall conduct the Initial Safe Out Work until the total actual costs incurred by Operator for such Initial Safe Out Work (the "Safe Out Costs") is equivalent to the total actual amount of Safe Out Funds contributed into the Decommissioning Escrow Account on the Effective Date.  For the first full or partial calendar month following the Effective Date, and then for each calendar month thereafter, following the end of the applicable prior month, Operator shall deliver to CUSA and Company an invoice setting out (i) the Initial Safe Out Work conducted by Operator during such (full or partial) month, and (ii) the Safe Out Costs incurred by Operator for such Initial Safe Out Work.  Upon receipt by CUSA of such an invoice from Operator, CUSA shall initiate a release of funds from the Decommissioning Escrow Account in an amount equivalent to the Safe Out Costs set forth therein, payable to Operator; provided that the total amount of Safe Out Costs invoiced and paid under this Section 3.4 shall not exceed the total amount of the Safe Out Funds contributed into the Decommissioning Escrow Account on the Effective Date.  The Safe Out Funds do not constitute Available Funds and will not be released for any purpose other than pursuant to this Section 3.4, except with the written consent of Operator. Operator shall use commercially reasonable efforts to complete the Initial Safe Out Work in a commercially prudent manner, provided that Operator will not be obligated to perform a particular Initial Safe Out Work if the Decommissioning Escrow Account does not hold Safe Out Funds sufficient to cover the applicable Safe Out Costs associated with such Initial Safe Out Work.  Subject to the foregoing payment provisions, the Initial Safe Out Work shall be conducted under the Contract Operating Agreement and shall be deemed to be "Services" (as such term is defined in the Contract Operating Agreement) conducted by Operator thereunder for all purposes; provided that all fees and costs earned or incurred by Operator and/or funded, reimbursed or paid by Company or CUSA for such Services shall be limited solely to the transfer of the Safe Out Funds as forth in this Section 3.4.  For the avoidance of doubt, all Safe Out Work (other than Initial Safe Out Work), if any is conducted, shall be performed by Operator subject to and in accordance with the Contract Operating Agreement and shall be subject to the terms set out thereunder, including Operator's right to recover Reimbursable Costs.

Section 3.5    **Orphan Assets**. The Parties agree that the Assets listed on Exhibit A attached hereto shall be deemed to be Orphan Assets for the purpose of this Agreement and the other Material Project Contracts, as applicable.  In the event that following the Effective Date CUSA determines in good faith that any Asset (or part thereof) that is not listed on Exhibit A is an Orphan Asset, it shall provide written Notice to Operator with a description of the particular Asset (or part thereof) and information in support of CUSA's determination that such Asset (or part thereof) is an Orphan Asset.  If Operator fails to respond to such Notice within thirty (30) days or

9

otherwise affirms CUSA's determination, then the applicable Asset shall be deemed to be an Orphan Asset for all purposes hereunder. If Operator provides a written Notice in response to CUSA's Notice disputing CUSA's determination that the Asset is an Orphan Asset, then the applicable dispute shall be resolved in accordance with the dispute resolution provisions of <u>Article IX</u>. Notwithstanding the foregoing, the Parties agree for the purposes of this Agreement that those certain pipeline segments listed on <u>Exhibit A-2</u> are not Orphan Assets.

      **Section 3.6**    **Surety Decommissioning**. In the event that a surety bond or other private bond in support of Decommissioning any of the Assets provides the surety or other bond counterparty (a "<u>Surety Counterparty</u>") with the option to perform the applicable Decommissioning of the Asset in lieu of payment of Decommissioning Costs or otherwise, and the applicable Surety Counterparty elects to exercise such performance right, the Parties shall permit the Surety Counterparty to perform the applicable Decommissioning. To the extent the Surety Counterparty then actually does Decommission the applicable Asset, the Turnkey Removal Agreement shall no longer apply to such Asset (and any Decommissioning Project associated therewith) and no Party hereunder shall have any related obligations (including performance or payment obligations) under the Turnkey Removal Agreement with respect to such Asset.

## ARTICLE IV.      CONTRACT OPERATING AGREEMENT

      **Section 4.1**    **Company Payment Request**. In the event that, in accordance with the terms of the Contract Operating Agreement, Operator delivers to Company during a particular month: (i) an Invoice requiring Company to make an Invoice Payment relating to Reimbursable Costs or Third Party Payments to Operator or (ii) a cash call pursuant to Section 3.1(b) of the Contract Operating Agreement and, in each case, the amounts required to be paid by the Company thereunder are properly due and payable under the Contract Operating Agreement, then Company shall (or Operator may on Company's behalf) deliver such Invoice or cash call(s) to CUSA (x) in the case of an Invoice, within three (3) Business Days following receipt by the Company and (y) in the case of a cash call, on, on but not prior to the succeeding 15th day of a calendar month following its delivery to the Company, provided that, if a particular amount owed by the Company to Operator for a cash call exceeds two hundred fifty thousand dollars ($250,000), then Company shall deliver such cash call to CUSA within one (1) Business Day following receipt of such cash call (a "<u>COA Payment Request</u>").

      **Section 4.2**    **CUSA Payment**. CUSA shall, no later than thirty (30) days after CUSA receives a COA Payment Request, transfer into the Revenue Account an amount equivalent to (a) the Invoice Payment amount payable with respect to any Invoice included in such COA Payment Request and (b) the amount requested and payable pursuant to any cash call included in such COA Payment Request.

## ARTICLE V. OTHER PAYMENT COVENANTS

      **Section 5.1**    **Excluded CUSA Costs**. Notwithstanding any other provision herein or in any other Material Project Contract, the Parties agree that CUSA shall not be obligated to bear any costs or expenses of Company or otherwise associated with the Assets to the extent consisting of or relating to the following (collectively, the "<u>Excluded CUSA Costs</u>"):

10

(a)     Any costs, damages, fines, penalties or liabilities owed to third parties, governmental fines and penalties, Environmental Liabilities, employment claims and/or any costs, expenses, claims or other liability relating to action taken by Company;

(b)     Any costs, damages, fines, penalties or liabilities owed to third parties, governmental fines and penalties, Environmental Liabilities, employment claims and/or any costs, expenses, claims or other liability relating to action taken by Operator (i) in breach of, and subject to, the Turnkey Removal Agreement or Contract Operating Agreement or (ii) arising due to the negligence, gross negligence or willful misconduct of Operator, in each case in Operator's capacity as "Contractor" under the Turnkey Removal Agreement or as "Operator" under the Contract Operating Agreement, as applicable; and

(c)     Any costs, damages, fines, penalties or liabilities (including Environmental Liabilities and Decommissioning Costs) related to any Orphan Assets.

**Section 5.2     Covered Operator Costs**.

(a)     Notwithstanding any other provision herein or in any other Material Project Contract (but without duplication of any payment made under a Material Project Contract), the Parties agree that Operator shall be responsible for all costs or expenses of Company to the extent consisting of or relating to the following (collectively, the "Covered Operator Costs"):

(1)  Any costs, damages, fines, penalties or liabilities owed to third parties, governmental fines and penalties, Environmental Liabilities, employment claims and/or any costs, expenses, claims or other liability relating to action taken by Operator (i) in breach of, and subject to, the Turnkey Removal Agreement or Contract Operating Agreement or (ii) arising due to the negligence, gross negligence or willful misconduct of Operator, in each case in Operator's capacity as "Contractor" under the Turnkey Removal Agreement or as "Operator" under the Contract Operating Agreement, as applicable; and

(2)  Any costs, damages, fines, penalties or liabilities (including Environmental Liabilities and Decommissioning Costs) related to any Orphan Assets; and

(3)  The premiums for any organizational or areawide bonds for the Company.

(b)     To the extent Company incurs any Covered Operator Costs, it shall provide written Notice to Operator and CUSA detailing such costs.  Operator shall pay to Company the applicable Covered Operator Costs contained in such Notice by the later of (i) thirty (30) days prior to the date that such costs are due, or (ii) thirty (30) days following the date of such Notice.

**Section 5.3     Other Decommissioning Costs**.  In the event that the Turnkey Removal Agreement does not apply to a particular Asset for whatever reason, including the fact that the Turnkey Removal Agreement has terminated with respect to a particular Asset in accordance with its terms (a "Non-Covered Asset"):

11

#94614673v11
WEIL:\97967346\16\45327.0007

(a)     Operator shall remain liable for Decommissioning all Orphan Assets to Final Completion in accordance with the terms of <u>Section 3.1(b)</u>.

(b)     Operator, in its capacity as "Operator" under the Contract Operating Agreement, will remain the contract operator with respect to such Non-Covered Asset until (x) with respect to a Non-Covered Asset that is a Terminated Property, a decommissioning contractor is engaged pursuant to <u>Section 5.3(c)</u> and such decommissioning contractor assumes operational control of such Asset or (y) with respect a Non-Covered Asset that is an Operating Property, the date that is three (3) months following the termination of the Turnkey Removal Agreement with respect to such Non-Covered Asset, upon the expiration of which period such Non-Covered Asset will be removed from the scope of the Contract Operating Agreement and Operator and Company will enter into a new agreement in the form attached hereto as <u>Exhibit C</u>, pursuant to which Operator will act as contract operator with respect to such Non-Covered Asset (subject to <u>Section 5.3(c)</u>).

(c)     With respect to a particular Non-Covered Asset, CUSA shall have the right to use any of the following type of funds contained in the Escrow Account to fund Decommissioning Costs associated with a Decommissioning Project for such Asset: (i) Available Funds, (ii) Contributed Predecessor Funds attributable to such Asset, and (iii) Recovered Bond Proceeds attributable to such Asset.  With respect to a particular Non-Covered Asset, CUSA shall have the option, but not the obligation, to fund any Decommissioning Costs associated with a Decommissioning Project on such Non-Covered Asset that are not covered by amounts available in the Escrow Account under this <u>Section 5.3(c)</u> with respect to such Non-Covered Asset, either through deposit to the Decommissioning Escrow Account or otherwise.  CUSA shall provide Notice to Company of the applicable amount available in the Decommissioning Escrow Account for a particular Decommissioning Project by no later than ten (10) days prior to the targeted start date for work for such Decommissioning Project.  Upon written Notice from Company of Decommissioning Costs that are due and payable with a respect to a Non-Covered Asset, subject to the foregoing provisions of this <u>Section 5.3(c)</u>, CUSA shall transfer funds from the Decommissioning Escrow Account (pursuant to <u>Section 2.3(a)</u>) equivalent to the amount contained in such Notice, payable to Company or to the applicable decommissioning contractor, as applicable; provided that CUSA and Company shall work together in good faith to coordinate the amount and timing of distribution of the applicable funds.

**Section 5.4     Certain Covenants**.  Each Party shall use commercially reasonable efforts:

(a)     to cause Company to be made "decommissioning operator" (or provided functionally equivalent status) of the Terminated Properties, including engaging with BSEE to reach an agreement memorializing that Company shall be "decommissioning operator" (or provided functionally equivalent status) with respect to the Terminated Properties, in each case, to the extent permitted by BSEE and applicable Law.

(b)     to seek to recover Recovered Bond Proceeds and Contributed Predecessor Funds with respect to the Assets to the extent available under Law, prior to or following Final Completion with respect to any applicable Asset (or part thereof); provided that Company and Operator shall obtain the written consent of CUSA prior to entering settlement negotiation(s) or agreeing to a

settlement and/or initiating dispute resolution with respect to Recovered Bond Proceeds and Contributed Predecessor Funds.

(c)      To execute, in conjunction execution of this Agreement, the BOEM-0150 "Assignment of Record Title in Federal OCS Oil and Gas Lease" document attached as Exhibit D to effectuate the transfer of record title from CUSA to Company of Ship Shoal 175, OCS-G05550.

**Section 5.5      Additional Bonding**. CUSA shall use its commercially reasonable efforts to assist Company with obtaining bonding; provided that CUSA shall have no obligation to contribute any funds towards obtaining such bonding.

**Section 5.6      Set-Off**. In the event Operator has an unpaid balance due to CUSA or Company for any reason under any Material Project Contract, and that unpaid balance remains due and unpaid for ninety (90) days, CUSA and/or Company expressly reserves the right to set-off any amounts due to Operator under the Turnkey Removal Agreement or the Contract Operating Agreement (including any amount payable under this Agreement) against such amounts.

**Section 5.7      Limitations**. Notwithstanding any other provision contained herein, unless otherwise agreed (i) CUSA shall not be required to fund or pay Operator any portion of Decommissioning Costs of any Decommissioning Project in an amount that is in excess of CUSA's equitable share of Decommissioning Costs that is directly attributable to CUSA's (and its Affiliate's) prior ownership of the applicable underlying oil and gas leases as an Existing Predecessor thereof, and (ii) CUSA shall not be required to fund or pay Operator any portion of Decommissioning Costs of any Decommissioning Project that is not conducted under the Turnkey Removal Agreement.  With respect to the foregoing, and notwithstanding any other provision in contained herein, unless otherwise agreed by CUSA in writing, the Company Working Interest for a particular Asset shall never exceed the working interest percentage that is directly attributable to CUSA's (and its Affiliate's) prior ownership of the applicable underlying oil and gas leases as an Existing Predecessor thereof, which such working interest percentage is set out on Exhibit E attached hereto.

### ARTICLE VI.      TERM OF AGREEMENT

**Section 6.1      Term**. Subject to Section 6.2, the term of this Agreement shall be from the Effective Date until Final Completion has been achieved for all Assets, provided that the following provisions shall survive termination: Articles V through IX.

**Section 6.2      Termination of Contract Operating Agreement and Turnkey Removal Agreement**. In the event that the Turnkey Removal Agreement terminates in its entirety, then Article III of this Agreement shall terminate upon the effective date of such termination; provided that Article III shall continue to apply to any rights or obligations that accrued prior to the effective date of such termination.  In the event that the Contract Operating Agreement terminates in its entirety, then Article IV of this Agreement shall terminate upon the effective date of such termination; provided that Article IV shall continue to apply to any rights or obligations that accrued prior to the effective date of such termination.

13

## ARTICLE VII.        MISCELLANEOUS

**Section 7.1    Notices**. Any notice, request, instruction, correspondence or other document to be given hereunder by any Party to another (herein collectively called "Notice") shall be in writing and delivered (i) in person, (ii) by courier service or by overnight delivery service in each case that requires acknowledgement of receipt, (iii) mailed by certified mail, postage prepaid and return receipt requested, or (iv) delivered by electronic mail and expressly acknowledged as received by return electronic mail, as follows:

If to Company:

> Fieldwood Energy IV LLC
> 2000 W. Sam Houston Parkway S., Suite 1200
> Houston, Texas 77042
> Attn: Sole Manager
> Phone: [__]
> Email: [__]

If to Operator:

> Mako Buyer LLC
> 2000 W. Sam Houston Pkwy S. Suite 1200
> Houston, Texas 77042
> Attn:   Thomas R. Lamme
> Phone: (713) 969-1107
> Email: TLamme@fwellc.com

If to CUSA:

> Chevron U.S.A. Inc.
> 100 Northpark Blvd
> Covington, LA 70443
> Attn:   Land Manager
> Phone: (985) 773-6538
> Email:  tdwebre@chevron.com

Notice given by personal delivery or courier shall be effective upon actual receipt. Notice given by mail shall be effective upon actual receipt or, if not actually received, the fifth Business Day following deposit with the U.S. Post Office. Notice given by electronic mail shall be effective upon acknowledgement of receipt.  If a date specified herein for giving any Notice or taking any action is not a Business Day (or if the period during which any Notice is required to be given or any action taken expires on a date which is not a Business Day), then the date for giving such Notice or taking such action (and the expiration date of such period during which notice is required to be given or action taken) shall be the next day which is a Business Day. Any Party may change any

14

address, electronic or otherwise, to which Notice is to be given to it by giving Notice as provided above of such change of address; provided that copies to CUSA may not be amended, discontinued or delayed without CUSA's express written consent.

Section 7.2    **No Joint Venture or Partnership**. Nothing in this Agreement is intended to create, or shall be construed as creating, a partnership, joint venture, association for profit or other business entity between or among the Parties, and for federal and state income tax purposes, the Parties elect to be excluded from the application of the provisions of Subchapter K, Chapter 1, Subtitle A of the Internal Revenue Code of 1986, as amended, as permitted and authorized by Section 761 of said Code and the regulations promulgated thereunder.

Section 7.3    **No Fiduciary Duty**. It is expressly understood and agreed that this Agreement is a purely commercial transaction between the Parties and that nothing stated herein shall operate to create any fiduciary duty which a Party shall owe to the other Party.

Section 7.4    **Confidentiality**.

(a)    Each Party acknowledges that during term of this Agreement, it will have access to and become acquainted with trade secrets, proprietary information and confidential information belonging to each other Party that are not generally known to the public, including, but not limited to, information concerning business plans, operating practices and methods, financial statements, personnel information, contracts, and other information provided pursuant to this Agreement that each other Party treats as confidential, in any format whatsoever (including oral, written, electronic or any other form or medium) (collectively, "Confidential Information").  In addition, each Party acknowledges that: (i) each other Party has invested, and continues to invest, substantial time, expense and specialized knowledge in developing its Confidential Information; (ii) the Confidential Information provides each such other Party with a competitive advantage over others in the marketplace; and (iii) each such other Party would be irreparably harmed if the Confidential Information were disclosed to competitors or made available to the public. Without limiting the applicability of any other agreement to which each Party is subject, each such Party may not, without the each other Party's consent, directly or indirectly, disclose or use (other than solely for the purposes of complying with a Party's obligations under this Agreement or the other Material Project Contracts) at any time, including, without limitation, use for personal, commercial or proprietary advantage or profit, any Confidential Information of which such Party is or becomes aware. Each Party must take all appropriate steps to safeguard the Confidential Information in its possession and to protect it against disclosure, misuse, espionage, loss and theft.

(b)    Nothing contained in this Section 7.4 will prevent a Party from disclosing Confidential Information:  (i) upon the order of any court or administrative agency; (ii) upon the request or demand of any regulatory agency or authority having jurisdiction over such Party; (iii) to the extent compelled by legal process or required or requested pursuant to subpoena, interrogatories or other discovery requests; (iv) to the extent necessary in connection with the exercise of any remedy hereunder; (v) to the extent necessary to perform such Party's obligations under a Material Project Contract; or (vi) to the Party's employees, agents, representatives and advisors who, in the reasonable judgment of the Party, need to know such Confidential Information and agree to be bound by the provisions of this Section 7.4 (provided that such Party will remain

15

liable for any breach of this Section 7.4 by any such Person); provided, that in the case of clause (i), (ii) or (iii), the applicable Party must notify the other Parties of the proposed disclosure as far in advance of such disclosure as practicable (but in no event make any such disclosure before notifying the other Parties) and use reasonable efforts to ensure that any Confidential Information so disclosed is accorded confidential treatment satisfactory to the other Parties, when and if available.

(c)     With respect to a particular Party, the restrictions of Section 7.4 will not apply to Confidential Information that: (i) is or becomes generally available to the public other than as a result of a disclosure by such Party in violation of this Agreement; (ii) is or has been independently developed or conceived such Party without use of Confidential Information and outside of its duties hereunder; or (iii) becomes available to such Party or any of its employees, agents, representatives and advisors on a non-confidential basis from a source other than the other Parties or any of their employees, agents, representatives and advisors, provided, that such source is not known by the Party to be bound by a confidentiality agreement with one of the other Parties.

(d)     The obligations of each Party under this Section 7.4 shall survive the termination of this Agreement.

(e)     Each Party hereby acknowledges that the provisions of Section 7.4 are reasonable and necessary to protect the legitimate interests of the other Parties and that any violation of such provisions would result in irreparable injury to the other Parties. In the event of a violation of the provisions of this Section 7.4, each Party further agrees that the other Parties will, in addition to all other remedies available to it, be entitled to equitable relief by way of injunction and any other legal or equitable remedies without any requirement to post bond.

**Section 7.5**     **Costs and Expenses**.  Each Party shall bear its own costs and expenses in relation to the negotiation and preparation of this Agreement.

**Section 7.6**     **Further Assurances**.  The Parties shall at their own cost and expense execute and deliver such further documents and instruments and shall take such other actions as may be reasonably required or appropriate to evidence or carry out the intent and purposes of this Agreement.

**Section 7.7**     **Authority of Parties/Signatories**. Each Party represents and warrants to the other that the execution and delivery of this Agreement and the performance of such Party's duties have been duly authorized and that this Agreement is a valid and legal agreement binding on such Party and enforceable in accordance with its terms.

**Section 7.8**     **Public Announcements**.  No Party shall issue any public announcement or statement concerning this Agreement or make any use of the names, image, logos, or trademarks of any other Party or any of its Affiliates without obtaining the prior written consent of the other Parties, except as may be determined to be required or reasonably necessary by the Company or Operator in connection with the Bankruptcy Cases.

**Section 7.9     Entire Agreement**. This Agreement (together with the Appendix and Exhibits hereto) constitutes the entire agreement among the Parties with respect to the subject hereof and supersedes any other representations, understandings or agreements (whether written, oral or otherwise) that may have been made or entered into by the Parties or any of their respective Affiliates relating to the transactions contemplated hereby or the subject hereof.

**Section 7.10     Successors and Assignments**. No Party may assign, directly or indirectly, all or any part of its rights or obligations under this Agreement to any Person, including in the event of a reorganization, merger, consolidation or asset sale, without the prior written consent of the other Parties, which may be withheld at such Party's sole discretion; *provided*, *however*, that the foregoing shall not apply if Operator assigns this Agreement in total (i) along with all of its personnel who are performing any part of the Work (as defined in Appendix 1 to the Turnkey Removal Agreement) to an Affiliate, provided that no such assignment by Operator to an Affiliate shall relieve Operator of its obligations under this Agreement, or (ii) to an acquirer of all or substantially all of Operator's business or all or substantially all of Operator's employees providing Work (as defined in Appendix 1 to the Turnkey Removal Agreement) and the Services (as defined in the Contract Operating Agreement); provided that, with respect to an assignment under item (ii), any such assignment must be made in conjunction with an assignment of Operator's interest in the Turnkey Removal Agreement and the Contract Operating Agreement and, following any such assignment, CUSA shall have the right to trigger any and all termination rights of Company and/or CUSA under the Turnkey Removal Agreement and/or the Contract Operating Agreement without any liability accruing to Company or CUSA thereunder except as required thereunder. Notwithstanding any provision to the contrary, Operator may not assign its interest in the Turnkey Removal Agreement or the Contract Operating Agreement to a particular transferee unless such assignment also includes an assignment of 100% of Operator's interest in this Agreement, the Turnkey Removal Agreement and the Contract Operating Agreement to such transferee and is performed in conjunction with the requirements of this Section 7.10. Any attempted assignment in breach of this Section 7.10 is void.

**Section 7.11     Amendment**. This Agreement may be amended or modified in whole or in part, and terms and conditions may be waived, only by a duly authorized agreement in writing which makes reference to this Agreement executed by each Party.

**Section 7.12     Construction**.

All article, section, schedule, and exhibit references used in this Agreement are to articles and sections of, and Appendix and Exhibits to, this Agreement, unless otherwise specified. The appendix and exhibits attached to this Agreement constitute a part of this Agreement and are incorporated herein for all purposes.

Unless otherwise indicated, with respect to a Party, the terms "ordinary course of business" or "ordinary course" shall be deemed to refer to the ordinary conduct of business in a manner consistent with the past practices and customs of such Party.

If a term is defined as one part of speech (such as a noun), it shall have a corresponding meaning when used as another part of speech (such as a verb). Terms defined in the singular have the

17

corresponding meanings in the plural, and vice versa. Unless the context of this Agreement clearly requires otherwise, words importing the masculine gender shall include the feminine and neutral genders and vice versa. The words "include", "includes" or "including" do not limit the preceding terms and shall be deemed to be followed by the words "without limitation." The words "hereof," "hereto," "hereby," "herein," "hereunder" and words of similar import, when used in this Agreement, shall refer to this Agreement as a whole and not to any particular section or article in which such words appear. The term "or" is not exclusive.

The terms "day" and "days" mean and refer to calendar day(s). The terms "year" and "years" mean and refer to calendar year(s).

Each Party has participated in the negotiation and drafting of this Agreement, and, if an ambiguity should arise, this Agreement shall be construed as if drafted jointly by the Parties and no presumption or burden of proof shall arise favoring or burdening any Party by virtue of the authorship of any of the provisions in this Agreement.

The captions in this Agreement are for convenience only and shall not be considered a part of or affect the construction or interpretation of any provision of this Agreement.

All references to currency herein shall be to, and all payments required hereunder shall be paid in, United States Dollars.

The serial comma is sometimes included and sometimes omitted. Its inclusion or omission shall not affect the interpretation of any phrase.

Section 7.13   **Severability**. If any provision of this Agreement is held invalid or unenforceable by any court of competent jurisdiction, the other provisions of this Agreement shall remain in full force and effect. The Parties further agree that if any provision contained herein is, to any extent, held invalid or unenforceable in any respect under the Laws governing this Agreement, they shall take any actions necessary to render the remaining provisions of this Agreement valid and enforceable to the fullest extent permitted by Law and, to the extent necessary, shall amend or otherwise modify this Agreement to replace any provision contained herein that is held invalid or unenforceable with a valid and enforceable provision giving effect to the intent of the Parties to the greatest extent legally permissible.

Section 7.14   **Counterparts**. This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. Any .pdf or other electronic transmission hereof or signature hereon shall, for all purposes, be deemed originals.

Section 7.15   **Third Party Beneficiaries**.  No Person who is not a Party to this Agreement has any rights under this Agreement or may enforce any provision in this Agreement.

Section 7.16   **Waivers**.  No waiver by any Party of this Agreement's terms, provisions or conditions is effective unless specifically evidenced in writing and signed by or on behalf of the Party granting such waiver. Any Party's failure to pursue remedies for breach of this Agreement,

18

or payment by any Party of invoices, does not constitute a waiver by any such Party of any breach of this Agreement or raise any defense against claims against a Party for breach of this Agreement. The waiver, failure to pursue remedies or to require the performance of any agreement or obligation under this Agreement, does not constitute (1) a waiver of any breach of this Agreement, or (2) a waiver of a later breach of any such agreement or obligation.

Section 7.17   **Conflict**.   In the event of a conflict between the provisions of this Agreement and the provisions of any other Material Project Contract, the provisions of this Agreement shall control.

## ARTICLE VIII.       COMPLIANCE

Section 8.1   **Compliance with Laws**. In performing their obligations hereunder and under each Material Project Contract, each Party shall observe and comply with, and shall ensure that all members of its Party Group observe and comply with, all federal, state and local laws, orders, rules and regulations which are now or may in the future become applicable to such Party (or such employee, agent, representative or subcontractor, as the case may be) or to the performance of such obligations.

Section 8.2   **Conflict of Interest and Improper Influence**. In performing their obligations hereunder and under each Material Project Contract, no member of any Party Group will (A) give to or receive from any director, employee, or agent of any other Party or their individual Affiliate in connection with such obligations, any gift, entertainment, or other benefit of more than nominal cost or value, or any commission, fee, or rebate, (B) enter into any business arrangement with any individual known by such member of a Party Group to be a director, employee or agent (excluding attorneys and accountants) of any other Party or their individual Affiliate without such other Party's prior written consent, (C) offer or make any payment, or offer or give anything of value to any Government Official, or any immediate family member of a Government Official, any political party to influence any act or decision by any Government Official, government, government instrumentality, party, or Public International Organization, or to gain any other advantage for any Party Group arising out of this Agreement, or (D) offer or make any payment, or offer or give anything of value to any Person if the Party Group member knows or has reason to believe that any portion of the payment or thing of value will be given directly, indirectly, or through a third party to any Government Official, any immediate family member of any Government Official, or any political party.

(a)       **Representation and Warranty**. Each Party represents and warrants for itself and on behalf of each member of its Party Group (acting in their capacities as such) that no event has occurred prior to the Effective Date which, had it occurred after the Effective Date, would constitute a violation of Section 8.2.

(b)       **Reporting Violations and Termination**. Each Party shall immediately notify each other Party, as applicable, of any violation of Section 8.2 or breach of the warranty under Section 8.2(a). Notwithstanding any other provision of this Agreement, CUSA or Company, as applicable, may terminate this Agreement at any time for any violation of Section 8.2, or breach of the warranty under Section 8.2(a) by Operator, and neither CUSA nor Company is obligated to make

19

any payment to Operator after the date of such violation or event, except in satisfaction of payment obligations that accrued on or prior to the date of such violation or event, and that CUSA or Company has determined are not directly or indirectly related to such violation or event.

Section 8.3    **Controls and Records**.

(a)    In performing their obligations hereunder and under each Material Project Contract, each Party shall ensure that all members of its Party Group establish and maintain all internal controls and Records that are necessary and appropriate in accordance with good management practice to achieve the following.

(1)    Ensure the accuracy and completeness of Party's invoices and of the Records required to be kept under this Agreement.

(2)    Ensure and to record accurately and completely compliance with Section 8.2(a), and detection of any other improper conduct by members of its Party Group.

(3)    Ensure and to record accurately and completely compliance with all other obligations of Party under this Agreement and the other Material Project Contracts.

(4)    Record accurately and completely the performance by such Party of its obligations under this Agreement and the other Material Project Contracts, and the liability for and calculation of all amounts payable by CUSA or Company to Operator under this Agreement or the other Material Project Contracts.

(5)    Record accurately and completely all amounts payable by members of its Party Group to other members of its Party Group, or other Person in connection with the performance of such Party's obligations under the Material Project Contracts.

(b)    Each Party shall maintain complete, accurate and current detailed Records of all costs and documentation of equipment, materials, supplies, labor and any other items or aspects of performing their obligations hereunder and under each Material Project Contract for not less than two (2) years after final termination of this Agreement or the other Material Project Contracts; provided, however, if any Claim related to such obligations is made by any Person or entity within such two (2) year period, then such Party shall retain such Records until final resolution of such Claim. Each Party shall grant to each other Party, its authorized representatives, its authorized invitees and/or public accounting firm selected by such Party, the right, at a reasonable time, to inspect, audit, examine and copy any applicable Records or documents of such Party as may be necessary to confirm that the requirements of this Agreement or another Material Project Contract are met, including to verify the validity and correctness of the charges reflected on any invoice and to protest or dispute any such charge; *provided*, that no Party shall request more than one inspection, audit or examination in any twelve month period.

Section 8.4    **Trade Sanctions Compliance**. Each Party shall provide each other Party with ninety (90) days' advance Notice of the names and addresses of any member of its Party Group which may be the target of, or owned or subject to control by, any country, institution,

#94614673v11
WEIL:\97967346\16\45327.0007

organization, entity, or Person that is subject to economic sanctions or any trade restrictions imposed by the U.S. government; debarred or excluded or declared ineligible to participate in U.S. government contracts, or contracts, grants, or other programs financed in whole or part by the U.S. government; or listed by the U.S. Departments of Commerce or State as an entity which U.S. persons may not engage in export or re-export related transactions.

**Section 8.5    Import and Export Charges**. Each Party is responsible for importing and exporting all equipment that such Party requires to perform its obligations hereunder and under each Material Project Contract. Each Party is solely responsible for all import and export charges and any other lawfully payable charged related to the import and export of such Party's equipment.

<div align="center">

**ARTICLE IX.          DISPUTE RESOLUTION**

</div>

**Section 9.1    Governing Law**. This Agreement is governed by and interpreted in accordance with the laws of the State of Texas, without regard to its choice of law rules, except that the substantive and procedural rules of the Federal Arbitration Act, 9 U.S.C. §§ 1-16 (the "Act") govern Section 9.5.

**Section 9.2    Resolution of Disputes**. The Parties shall exclusively and finally resolve any dispute between them using direct negotiations, mediation, and then arbitration as set out in this Article IX.

**Section 9.3    Direct Negotiations.** If a dispute arises, a Party seeking to initiate the dispute resolution process shall give Notice to the other Party (or Parties) to the dispute setting out, in writing and in detail, the issues in dispute and the value of the disputed amount. The Parties to the dispute shall attempt to resolve the dispute through direct negotiations in a meeting between the Parties to the dispute, attended by individuals with decision-making authority, which must take place within thirty (30) days, or as otherwise agreed to by such Parties, from the date the Notice was sent.

**Section 9.4    Mediation.** If the dispute cannot be resolved by direct negotiations within thirty (30) days of initiation of the resolution process, a Party to the dispute may initiate mediation by giving notice to the other Party (or Parties) to the dispute. Mediation must be attended by a representative from each such Party with decision-making authority, and the proceeding must take place in Houston, Texas.

**Section 9.5    Arbitration Proceedings.** If the Parties to a dispute fail to resolve the dispute within sixty (60) days from Notice of mediation, any Party (or Parties) the dispute may initiate binding arbitration by giving Notice to the other Party (or Parties) to the dispute. The arbitration must be conducted in accordance with the International Institute for Conflict Prevention and Resolution ("CPR") Rules. To the extent of any conflicts between the Act or the CPR Rules and the provisions of this Agreement, the provisions of this Agreement prevail. The CPR is the appointing authority. The place of arbitration must be Houston, Texas.

The following provisions will apply to arbitration proceedings, in each case with respect to the Parties to a particular dispute:

<div align="center">

21

</div>

(A) One arbitrator (or three (3) arbitrators if the monetary value of the dispute is more than US five million dollars ($5,000,000_ or its currency equivalent) will conduct the arbitral proceedings in English. If there is a dispute whether the monetary value exceeds the US five million dollars ($5,000,000), then the number of arbitrators must be three (3).

(B) The maximum number of witnesses each Party may call to give evidence on its behalf, including by oral testimony, declaration or witness statement, is five (5) witnesses of fact and three (3) expert witnesses.

(C) The existence of a dispute and any negotiations, mediation, and arbitration proceedings between the Parties in relation to any dispute are confidential and the Parties shall not make any disclosure to any third party. Any information, documents, or materials, created or produced for the purposes of, or used in, negotiations, mediation, or arbitration of a dispute are confidential and the Parties shall not disclose them to any third party unless there is a legal or regulatory obligation to make a disclosure (but the disclosure must be limited to the extent necessary to comply with that legal or regulatory obligation), or to the extent required to enforce or challenge an award in bona fide legal proceedings before a state court or other judicial authority.

(D) The arbitrator(s) has no authority to appoint or retain expert witnesses for any purpose unless agreed to by the Parties. The arbitrator(s) may not act as *amiable compositeur or ex aequo et bono*.

(E) In resolving any dispute among the Parties, the arbitrator(s) shall have the authority to construe the Parties' rights and obligations under any Material Project Contract.

(F) The Parties intend that regardless of which Party prevails, all arbitration fees and costs must be split equally, between the Parties, and each Party shall bear its own costs of legal representation, witness expenses, and ancillary costs.

(G) The award is final and binding, and except for proceedings under Section 9.5(H), the Parties agree to waive their rights to: (1) apply to the court for determination of a point of Law; and (2) any form of appeal, review or recourse in respect of any such award to any court or other judicial authority, to the extent that such waiver may be validly made.

(H) The Parties may apply to a court with appropriate jurisdiction for any of the following without waiving its arbitration rights:

(1) Interim measures as necessary until appointment of the arbitrator(s) or pending determination by the arbitrator(s).
(2) Preserving property pending determination by the arbitrator(s).
(3) Enforcing judgment entered on an award over the Person or assets of the non-prevailing Party.

22

(4) Enforcing <u>Section 9.5(C)</u> and preventing any information, documents or materials used in those proceedings from being used or disclosed by that Party for any purpose other than enforcement of <u>Section 9.5(C)</u>.

(I) Proceedings to (1) preserve property pending determination by the arbitrator(s), (2) enforce <u>Section 9.5(C)</u>, or (3) enforce judgment entered on an award may be brought in any court having jurisdiction over the Person or assets of the non-prevailing Party. The prevailing Party may seek, in any court having jurisdiction, judicial recognition of the award, or order of enforcement or any other order or decree that is necessary to give full effect to the award.

**Section 9.6    Consolidation of Disputes.** The Parties agree that the arbitration agreements contained the Material Project Contracts are compatible and that two or more arbitrations pending under the CPR Rules may be consolidated into the arbitration commenced first.  The arbitrator(s) of the arbitration commenced first shall determine whether to consolidate and may shall take into account any circumstances it considers to be relevant, including whether one or more arbitrators have been appointed in more than one of the arbitrations and, if so, whether the same or different persons have been appointed; the existence of common issues of Law or fact creates the possibility of conflicting decisions in the separate arbitration proceedings; prejudice resulting from a failure to consolidate is not outweighed by the risk of undue delay or prejudice to the rights of or hardship to parties opposing consolidation; and consolidation would serve the interests of justice and efficiency. Any request for consolidation shall be made within sixty (60) days of the commencement of the later arbitration.  The monetary value of the consolidated dispute shall be considered in determining the number of arbitrators pursuant to <u>Section 9.5(A)</u>.

*[Remainder of Page Intentionally Left Blank. Signature Page(s) to Follow.]*

23

IN WITNESS WHEREOF, this Agreement has been signed by each of the Parties as of the date first above written.

**OPERATOR**:

Mako Buyer LLC


By: _____
Name: _____
Title: _____


**COMPANY:**

Fieldwood Energy IV LLC


By: _____
Name: _____
Title: _____


**CUSA**:

Chevron U.S.A. Inc.


By: _____
Name: _____
Title: _____

Omnibus Agreement Signature Page

**Appendix 1**

**Definitions**

Capitalized terms used in this Agreement shall have the meanings set forth in this Appendix.

1)  "Act" has the meaning attributed to such term in Section 9.1.

2)  "Additional FWE IV Properties" means those Assets described on Exhibit F attached hereto.

3)  "Additional FWE IV Property Funds" has the meaning attributed to such term in Section 2.2(c)(2).

4)  "Affiliate" means, with respect to a Party means any Person or entity that controls, is controlled by or is under common control with such Party where control means the direct or indirect power to direct the management of the entity at issue.  For the avoidance of doubt, (i) neither the Company nor any of its direct or indirect subsidiaries shall constitute an Affiliate of Operator for purposes of this Agreement, and (ii) neither the Operator nor any of its direct or indirect subsidiaries shall constitute an Affiliate of Company for purposes of this Agreement.

5)  "Agreement" has the meaning attributed to such term in the Preamble.

6)  "Allocated Available Funds" has the meaning attributed to such term in Section 3.1(e).

7)  "Assets" means, collectively, the Terminated Properties and the Operating Properties.

8)  "At-Cost Allocated Funds" has the meaning attributed to such term in Section 3.2(d)(4).

9)  "At-Cost Invoice Due Date" has the meaning attributed to such term in Section 3.2(d)(3).

10)  "At-Cost Project" has the meaning attributed to such term in the Turnkey Removal Agreement.

11)  "Available Funds" means an amount in dollars equivalent to, at the time of such designation: (i) the total funds contained in the Decommissioning Escrow Account; *minus* (ii) the aggregate amount of Escrowed Project Funds contained in the Decommissioning Escrow Account.

12)  "Available Project Funds" means, with respect to a particular Decommissioning Project, an amount in dollars equivalent to: (i) the equitable portion (as determined in good faith by CUSA and the Company) of any Contributed Predecessor Funds that have been contributed into the Decommissioning Escrow Account for such Decommissioning Project that are attributable to the Turnkey Amount for such Decommissioning Project, *plus* (ii) any Recovered Bond Proceeds that have been contributed into the Decommissioning Escrow Account for such Decommissioning Project to the extent CUSA is the beneficiary of such

Recovered Bond Proceeds (and any other Recovered Bond Proceeds that the Company and CUSA agree to apply as Available Project Funds), *plus* (iii) any Allocated Available Funds for such Decommissioning Project that have been designated to such Decommissioning Project by CUSA in accordance with <u>Section 3.1(e)</u>.

13) "<u>Bankruptcy Cases</u>" has the meaning attributed to such term in the Recitals.

14) "<u>BOEM</u>" means the Bureau of Ocean Energy Management of the United States Department of the Interior, or any successor agency.

15) "<u>BSEE</u>" means the Bureau of Safety and Environmental Enforcement of the United States Department of the Interior, or any successor agency.

16) "<u>Business Day</u>" mean any day other than a Saturday or a Sunday or a day on which federally chartered banking institutions in Houston, Texas, are authorized by Law to close, but for purposes of Notices or other communications given hereunder, means before 4:00 p.m. Central Time on such day in the city of Houston, Texas.

17) "<u>COA Payment Request</u>" has the meaning attributed to such term in <u>Section 4.1</u>.

18) "<u>Committed WI Payment</u>" means, with respect to a particular Other WI Party's share of the total Other WI Turnkey Payment associated with a particular Decommissioning Project, any amount(s): (i) that are paid by or on behalf of such Other WI Party into the Decommissioning Escrow Account, or (ii) that are subject to a contractual commitment by such Other WI Party and enforceable by one or more of the Parties to make such payment to Company or to contribute such payment into the Decommissioning Escrow Account for the purpose of funding the Decommissioning Project; provided that in each case the applicable Other WI Party shall also be subject to a contractual commitment by such Other WI Party that is enforceable by one or more of the Parties to contribute, as an additional payment into the Decommissioning Escrow Account, such Other WI Party's share of any applicable shortfall in the total Other WI Turnkey Payment for such Decommissioning Project caused by an increase in the Turnkey Amount for such Decommissioning Project that occurs after the Target Funding Date in accordance with the terms of the Turnkey Removal Agreement.

19) "<u>Company</u>" has the meaning attributed to such term in the Preamble.

20) "<u>Company Working Interest</u>" means, subject to <u>Section 5.7</u>, with respect to a particular Asset, a percentage expressed as a decimal equivalent to: (i) for Operating Properties, the current working interest ownership percentage held by Company in the applicable Asset, and (ii) for Terminated Properties, the undivided percentage ownership interest in the applicable Asset that was (a) held by FWE (or its Affiliates) immediately prior to the expiration of termination of such applicable oil and gas lease, and then (b) actually allocated to Company under the Plan of Merger.  For the purposes of this definition, "working interest" means the cost bearing interest in the applicable underlying Asset, which shall either be the interest associated with the "operating rights" or the "record title" of the applicable underlying oil and gas lease, as such terms are defined in 43 CFR § §3100.0-5 (Definitions).

Omnibus Agreement
Appendix 1 – Definitions

21) "<u>Confidential Information</u>" has the meaning attributed to such term in <u>Section 7.4(a)</u>.

22) "<u>Contract Operating Agreement</u>" means that certain Contract Operating Agreement, of even date herewith, between Operator and Company.

23) "<u>Contributed Predecessor Funds</u>" means funds contributed by an Existing Predecessor for Decommissioning a particular Asset which are not made as part of an Other WI Turnkey Payment.

24) "<u>Covered Operator Costs</u>" has the meaning attributed to such term in <u>Section 5.2(a)</u>.

25) "<u>CPR</u>" has the meaning attributed to such term in <u>Section 9.5</u>.

26) "<u>CUSA At-Cost Payment</u>" has the meaning attributed to such term in <u>Section 3.2(d)(3)(i)</u>.

27) "<u>CUSA At-Cost Shortfall Payment</u>" has the meaning attributed to such term in <u>Section 3.2(d)(5)</u>.

28) "<u>CUSA Covered Payment</u>" has the meaning attributed to such term in <u>Section 3.1(c)</u>.

29) "<u>CUSA Turnkey Payment</u>" means, with respect to a particular Decommissioning Project, an amount in dollars equivalent to (i) the Turnkey Amount for such Decommissioning Project *multiplied by* the Company Working Interest for the applicable Asset; *plus* (ii) any CUSA Covered Payment applicable to such Decommissioning Project, *minus*; (iii) any Available Project Funds applicable to such Decommissioning Project.

30) "<u>Decommissioning</u>" and its derivatives mean all plugging, replugging, abandonment, re-plugging and re-abandonment, equipment removal, disposal, remediation, reclamation, or restoration associated with the properties and assets included in or burdened by the Assets, as applicable, including all plugging and abandonment, removal, dismantling, decommissioning, surface and subsurface restoration, reclamation, site clearance, and disposal (including any associated pre-planning, planning and engineering) of the FWE IV Wells or the FWE IV Facilities, fixtures, platforms, caissons, flowlines, pipelines, structures, and personal property of whatever kind located on or under, related to, or associated with operations and activities conducted by whomever with respect to each of the Assets, as applicable, and the flushing, pickling, burial, removal, and capping of all associated flowlines, field transmission and gathering lines, the restoration of the surface, site clearance, any proper disposal of related waste materials and Hazardous Substances, and obligations to obtain plugging exceptions for any of the FWE IV Wells with a current plugging exception  in accordance therewith, all in accordance with 30 CFR 250 Subpart Q and all other applicable Laws, the terms and conditions of each of the FWE IV Leases or similar leasehold interests, beneficial interests, easements and the FWE IV Leases.

31) "<u>Decommissioning Costs</u>" means any and all cost associated with Decommissioning Obligations for a particular Asset (or part thereof).

32) "<u>Decommissioning Escrow Account</u>" means that certain escrow account established pursuant to the Decommissioning Escrow Agreement.

33) "<u>Decommissioning Escrow Agreement</u>" means that certain escrow agreement governing the account established on the Effective Date to collect and safeguard funds to pay for certain future Decommissioning Costs of Company, dated the Effective Date, by and between Company, CUSA and Escrow Agent.

34) "<u>Decommissioning Obligations</u>" means any and all costs, obligations, liabilities, damages, losses, and claims arising out of or attributable to the payment or performance of achieving Final Completion.

35) "<u>Decommissioning Project</u>" means a project to Decommission an Asset (or part thereof) as allocated under the Turnkey Removal Agreement or pursuant to 30 CFR 250 Subpart Q or otherwise, as the context requires.

36) "<u>Effective Date</u>" has the meaning attributed to such term in the Preamble.

37) "<u>Environmental Laws</u>" means, the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. § 9601 et seq. ("CERCLA"); the Resource Conservation and Recovery Act, 42 U.S.C. § 6901 et seq.; the Federal Water Pollution Control Act, 33 U.S.C. § 1251 et seq.; the Clean Air Act, 42 U.S.C. § 7401 et seq.; the Hazardous Materials Transportation Act, 49 U.S.C. § 5101 et seq.; the Toxic Substances Control Act, 15 U.S.C. §§ 2601 through 2629; the Oil Pollution Act, 33 U.S.C. § 2701 et seq.; the Emergency Planning and Community Right to Know Act, 42 U.S.C. § 11001 et seq.; the Endangered Species Act, 16 U.S.C. § 1531 et seq.; the Safe Drinking Water Act, 42 U.S.C. §§ 300f through 300j; the Marine Mammal Protection Act, 16 U.S.C. § 1361 et seq.; the Marine Protection, Research and Sanctuaries Act, 16 U.S.C. § 1431 et seq. and 33 U.S.C. § 1401 et seq.; the Outer Continental Shelf Lands Act, 43 U.S.C. § 1331 et seq., and the National Environmental Policy Act, 42 U.S.C. § 4321 et seq., the Occupational Safety and Health Act, 29 U.S.C. ch. 15 § 651 et seq. (and all Occupational Safety and Health Administration (OSHA) promulgated standards), and the Hazardous Materials Transportation Act, 49 U.S.C. §§ 5101 et seq., in each case as amended in effect as of the Effective Date (or amended after the Effective Date), and all similar Laws in effect as of the Effective Date (or amended or passed after the Effective Date) of any Governmental Authority having jurisdiction over the property, operation, activity, or condition in question addressing pollution, protection of the environment, biological resources, Hazardous Substances, occupational safety, product registrations, hazard communication, Decommissioning Obligations, or the generation, storage, transportation, disposal, or Release of Hazardous Substances.

38) "<u>Environmental Liabilities</u>" means any and all claims, actions, damages, remediation, obligations, liabilities, environmental response costs, natural resource damages, costs to cure, cost to investigate or monitor, restoration costs, costs of remediation or removal, corrective action, injunctive relief, settlements, penalties, fines, and attorneys' and consultants fees and expenses arising out of or related to any violations or non-compliance with or liability under any Environmental Laws, including any contribution obligation under CERCLA or any other Environmental Law, or any cost, responsibility, or liability incurred related to or airing from a claim or cause of action by a Governmental Authority or Person, attributable to any environmental liabilities, any Release of Hazardous

Substances, or any other environmental condition or circumstance with respect to the ownership or operation of the Assets, including conditions of FWE IV Facilities not in compliance with Laws promulgated by the Environmental Protection Agency, BOEM, BSEE or the United States Coast Guard.

39) "<u>Escrow Agent</u>" means U.S. Bank National Association.

40) "<u>Escrowed Project Funds</u>" means, with respect to a particular Decommissioning Project, an amount in dollars equivalent to the total amount of (i) any CUSA Turnkey Payment paid into the Decommissioning Escrow Account for such Decommissioning Project, (ii) any Contributed Predecessor Funds or Recovered Bond Proceeds paid into the Decommissioning Escrow Account for such Decommissioning Project, (iii) any Committed WI Payment associated with such Decommissioning Project, and (iv) any Allocated Available Funds contained in the Decommissioning Escrow Account that are designated by CUSA in accordance with <u>Section 3.1(e)</u> for such Decommissioning Project.

41) "<u>Excluded CUSA Costs</u>" has the meaning attributed to such term in <u>Section 5.1</u>.

42) "<u>Existing Predecessor</u>" means, with respect to a particular Asset, a Person that is a predecessor-in-interest in the chain of title with respect to such Asset, or the legal successor-in-interest to any such Person.

43) "<u>Final Completion</u>" has the meaning ascribed to such term in the Turnkey Removal Agreement

44) "<u>Fully Committed</u>" has the meaning attributed to such term in <u>Section 3.2(a)</u>.

45) "<u>FWE</u>" means Fieldwood Energy LLC.

46) "<u>FWE IV Facilities</u>" means all platforms and facilities, including all associated processing systems, buildings, compressors, meters, tanks, machinery, tools, personal property, equipment (including spars, trees, PLETs, jumpers, flowlines, risers, umbilicals, control assemblies, and production handling equipment), pipelines, gathering lines, water lines, tank batteries, pipeline capacity, other water gathering, transportation, or disposal infrastructure and equipment, frac tanks, ponds, metering facilities, interconnections, and other inventory, boats, vehicles, fixtures, improvements, and other property (whether real, immovable, personal, movable, mixed or otherwise), contained within the Assets, to the extent of Company's interest therein.

47) "<u>FWE IV Leases</u>" has the meaning ascribed to such term in the Plan of Merger.

48) "<u>FWE IV Wells</u>" means all hydrocarbon wells, CO2 wells, injection wells, disposal wells or other wells contained within the Assets, to the extent of Company's interest therein.

49) "<u>Governmental Authority</u>" means any court, tribunal, arbitrator, body, agency, division, board, bureau, commission or any other similar entity exercising executive, legislative, judicial, regulatory, or administrative functions of government, or any subdivision of any

of the foregoing, whether federal, state, county, municipal, tribal, local or foreign, in each case with competent jurisdiction.

50) "<u>Government Official</u>" means any officer or employee of any government (including federal, state, local, and national governments), Public International Organization, any department, agency, company, or other instrumentality of any government or Public International Organization, or any candidate for political office.

51) "<u>Hazardous Substances</u>" means any material, product, pollutant, contaminant, dangerous or toxic substance, hazardous or extremely hazardous substance or chemical, or otherwise hazardous material or waste defined as "hazardous waste", "hazardous substance," "pollutant," or "hazardous material" under applicable Environmental Laws, including chemicals, pollutants, contaminants, wastes, or toxic substances that are classified as hazardous, toxic, radioactive, or otherwise are regulated by, or form the basis for Environmental Liability under, any applicable Environmental Law, including hazardous substances under CERCLA, and oil of any kind or in any form, oil waste, petroleum and any fraction thereof, petroleum by-products and components, hydrocarbons, hydrocarbon waste, naturally occurring radioactive material, produced water, polychlorinated biphenyls, and asbestos.

52) "<u>Implementation Agreement</u>" means that certain Implementation Agreement, dated [___], by and between CUSA and FWE.

53) "<u>Initial Safe Out Funds</u>" has the meaning attributed to such term in <u>Section 2.2(c)(1)</u>.

54) "<u>Safe Out Work</u>" means the performance of necessary preparatory activities to prepare an Asset into a mechanical and operational state such that said Asset is ready to be Decommissioned.

55) "<u>Initial Safe Out Work</u>" means Safe Out Work conducted under Section 3.4 until the Safe Out Funds are fully expended.

56) "<u>Invoice</u>" has the meaning attributed to such term in the Contract Operating Agreement.

57) "<u>Invoice Payment</u>" has the meaning attributed to such term in the Contract Operating Agreement.

58) "<u>Laws</u>" means any and all applicable laws, statutes, codes, constitutions, ordinances, decrees, writs, injunctions, orders, judgments, principles of common law, rules, licenses, authorizations, or regulations (including Environmental Laws and Notices to Lessees,) that are promulgated, issued, or enacted by any Governmental Authority having jurisdiction.

59) "<u>LLC Agreement</u>" means the limited liability company operating agreement of Company.

60) "<u>Material Project Contracts</u>" means the following agreements: (i) this Agreement, (ii) the Contract Operating Agreement, (iii) the Turnkey Removal Agreement, (iv) the LLC Agreement, (v) the NPI Conveyance, and (vi) the Escrow Agreement, and "<u>Material Project Contract</u>" means any such agreement.

61) "Notice" has the meaning attributed to such term in Section 7.1.

62) "Non-Covered Asset" has the meaning set forth in Section 5.3.

63) "NPI Conveyance" means the Net Profits Conveyance, of even date herewith made by Company to the Escrow Agent.

64) "NPI Payments" means the net profits payments made under the NPI Conveyance.

65) "Operating Properties" means those certain FWE IV Leases that have not expired or terminated as of the Effective Date (as such term is defined in the Plan of Merger) and the FWE IV Assets (as such term is defined in the Plan of Merger) associated therewith.

66) "Operator" has the meaning set forth in the Preamble.

67) "Orphan Asset" means a FWE IV Well or FWE IV Facility that was drilled or constructed on a date after CUSA or its Affiliates divested its interests in the underlying lease and specifically (i) includes those Assets set forth on Exhibit A but (ii) excludes those Assets set forth in Exhibit A-2.

68) "Other At-Cost Payment" has the meaning attributed to such term in Section 3.2(d)(2).

69) "Other Party Working Interest" means, with respect to a particular Asset, a percentage expressed as a decimal equivalent 1.00 minus the Company Working Interest for such Asset, expressed as decimal.

70) "Other WI Party" means, with respect to a particular Asset, (i) for Operating Properties, each Person with a current working interest ownership in the applicable Asset (or any Existing Predecessor to such Person with respect to such working interest ownership), and (ii) for Terminated Properties, each Person that held an ownership interest in the applicable Asset immediately prior to the expiration of termination of the applicable underlying oil and gas lease associated with such Asset (or any Existing Predecessor to such Person with respect to such ownership interest).

71) "Other WI Turnkey Payment" means, with respect to a particular Decommissioning Project, an amount in dollars equivalent to the Turnkey Amount for such Decommissioning Project, *multiplied by* the Other Party Working Interest for the applicable Asset.

72) "Party" and "Parties" has the meaning attributed to such term in the Preamble.

73) "Party Group" means, with respect to each Party, mean, individually and collectively, such Party, its parent, its Affiliates, its and their, joint venturers, contractors and subcontractors (of any tier), and all of their respective employees, officers, directors, agents, representatives, subcontractors, insurers and the subrogees of all such parties.

74) "Payment Milestone" has the meaning attributed to such term in the Turnkey Removal Agreement.

75) "<u>Person</u>" means any individual, corporation, partnership, limited liability company, association, joint stock company, trust, estate, joint venture, firm, association, unincorporated organization, Governmental Authority, or any other entity.

76) "<u>Plan</u>" has the meaning attributed to such term in the Recitals.

77) "<u>Plan of Merger</u>" means that certain Agreement and Plan of Merger dated [   ], pursuant to which Fieldwood Energy III LLC was divisively merged into the Company and Fieldwood Energy III LLC which was attached as an exhibit to the Implementation Agreement .

78) "<u>Prior Escrow Funds</u>" has the meaning attributed to such term in the Implementation Agreement.

79) "<u>Public International Organization</u>" means an international organization formed by governments or other public international organizations, whatever the form of organization and scope of competence.

80) "<u>Recovered Bond Proceeds</u>" means the proceeds of any surety bonds or private bonds payable for Decommissioning Costs associated with an Asset that are recovered by the Parties.

81) "<u>Records</u>" means information in any recorded form, including electronic, that relates to this Agreement or another Material Project Contract, as applicable.

82) "<u>Reimbursable Costs</u>" has the meaning attributed to such term in the Contract Operating Agreement

83) "<u>Release</u>" means any discharge, emission, spilling, leaking, pumping, pouring, injecting, dumping, burying, leaching, migrating, abandoning, or disposing into or through the environment of any Hazardous Substance, including the abandonment or discarding of barrels, containers, and other closed receptacles containing any Hazardous Substance.

84) "<u>Revenue Account</u>" has the meaning attributed to such term in the Contract Operating Agreement

85) "<u>Safe Out Funds</u>" has the meaning attributed to such term in <u>Section 3.4</u>.

86) "<u>Surety Counterparty</u>" has the meaning attributed to such term in <u>Section 3.6</u>.

87) "<u>Target Funding Date</u>" means thirty (30) days prior to the Target Start Date for such Decommissioning Project.

88) "<u>Target Start Date</u>" means the date that a particular Decommissioning Project is targeted to start as determined pursuant to the Turnkey Removal Agreement.

89) "<u>Terminated Properties</u>" means those certain FWE IV Leases that have expired or terminated as of the Effective Date (as such term is defined in the Plan of Merger) and the FWE IV Assets (as such term is defined in the Plan of Merger) associated therewith.

Omnibus Agreement
Appendix 1 – Definitions

90) "<u>Third Party Payment</u>" has the meaning attributed to such term in the Contract Operating Agreement

91) "<u>Turnkey Amount</u>" has the meaning attributed to such term in the Turnkey Removal Agreement.

92) "<u>Turnkey Removal Agreement</u>" means that certain Turnkey Removal Agreement, of even date herewith, between Operator, Company and CUSA.

**EXHIBIT A**

<u>Orphan Assets</u>

1. OCS-G01529, Ship Shoal Block 252, Well F004, API No. 177124067400
2. OCS-G16535, Viosca Knoll 113, Pipeline Segment No. 19427

**EXHIBIT A-2**

# REDACTED

**EXHIBIT B**

<u>[RESERVED]</u>

# EXHIBIT C

Form of Contract Operating Agreement

See attached.

## TRANSITION SERVICES AGREEMENT

This Transition Services Agreement dated and effective as of _____, 2021 (the "Effective Date") (this "Agreement") is by and between Mako Buyer LLC, a Delaware company (the "Service Provider") and [_____] a [state] [entity] (the "Predecessor"). Service Provider and Predecessor are sometimes referred to collectively as the "Parties" and individually as a "Party".

**WHEREAS**, pursuant to the final confirmation order in respect of the Chapter 11 cases of Fieldwood Energy LLC and its debtor Affiliates (as defined below) (collectively the "Debtors") in Case No. 20-33948 the Debtors have abandoned certain oil and gas properties and assets for which Predecessor is a predecessor-in-interest;

**WHEREAS**, Predecessor has requested that Service Provider provide certain operational maintenance, monitoring, technical, and administrative services with respect to the Asset (as defined below), upon the terms and conditions set forth herein, for three hundred sixty-five (365) days from the exit of the Chapter 11 cases, and Service Provider has agreed to do so; and

**WHEREAS**, other than as otherwise agreed by the Parties, during the Service Term (as defined below) and during any transition activities, Predecessor will be responsible for and shall pay all costs associated with the Asset and/or the Services (as defined below), including but not limited to third party costs and costs associated with Services provided by Service Provider's employees.

**NOW, THEREFORE**, in consideration of the premises and of the mutual promises, covenants, conditions, and agreements contained herein, and for other valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereby agree as follows:

## ARTICLE I.  TRANSITION SERVICES

**Section 1.1     Services**. Subject to the terms of this Agreement, Service Provider shall provide or cause to be provided the transition services described on Exhibit A (collectively, the "Services") for all of the oil and gas assets described in Schedule 1 attached hereto (the "Asset") in accordance with the standard of performance set forth in Section 1.2 below for the period set forth in Article IV, subject to the provisions of Article V.  The Services will be provided to Predecessor in connection with the continued maintenance and monitoring of the Asset and, as necessary, to assist in the transition of the maintenance and monitoring of the Asset to Predecessor or another service provider and terminate the Services hereunder on or before the end of the Service Term.

**Section 1.2     Standard of Performance**. Subject to the terms of this Agreement, Service Provider shall perform or cause to be performed the Services (a) as a reasonably prudent operator as the contract service provider hereunder would perform such Services, (b) in a good and workmanlike manner consistent with past practices related to the Asset, (c) with due diligence and dispatch, and (d) in compliance with all Laws (as defined below), licenses, authorizations and permits; **PROVIDED, HOWEVER, EXCEPT AS EXPRESSLY PROVIDED HEREIN, IN NO EVENT SHALL SERVICE PROVIDER HAVE ANY OBLIGATIONS OR LIABILITY TO ANY PREDECESSOR GROUP MEMBER EXCEPT WITH RESPECT TO SERVICE**

**PROVIDER'S INDEMNITY OBLIGATIONS AS PROVIDED IN SECTION 6.2.** For purposes of this Agreement, "Laws" means any and all applicable laws, statutes, codes, constitutions, ordinances, decrees, writs, injunctions, orders, judgments, principles of common law, rules, licenses, authorizations, or regulations (including environmental laws) that are promulgated, issued, or enacted by any Governmental Authority (as defined below) having jurisdiction. In providing the Services to the Predecessor, Service Provider may use, at its discretion, its own personnel or the personnel of any of its Affiliates or employ the services of contractors, subcontractors, vendors, or other third parties. For purposes of this Agreement, "Affiliates" with respect to a Party means any person or entity that controls, is controlled by or is under common control with such Party where control means the direct or indirect power to direct the management of the entity at issue.

      **Section 1.3**    **Independent Contractor**. At all times during the performance of Services by Service Provider, all persons performing such Services who shall be in the employ and/or under the control of Service Provider or its Affiliates (including agents, contractors, temporary employees, and consultants) shall be independent from Predecessor and not employees of Predecessor and shall not be entitled to any payment, benefit, or perquisite directly from Predecessor on account of such Services, including, but not limited to, group insurance and participation in any employee benefit and pension plans maintained by Predecessor or any Affiliate of Predecessor. Service Provider shall be responsible for all employee benefits and payroll taxes of its employees performing the Services. Service Provider will not be required to provide any Services the provision of which would violate applicable Laws. Notwithstanding any other provision contained elsewhere in this Agreement, in all cases where the Service Provider is performing Services under this Agreement offshore the State of Louisiana or are otherwise covered by the Louisiana Worker's Compensation Act, La. Rev. Stat. § 23.1021 et seq., the Parties acknowledge and agree that all such operations pursuant to this Agreement are an integral part of and are essential to the ability of Predecessor to generate Predecessor's goods, products, or services, and that whenever Services and work are performed hereunder in or offshore Louisiana, or the Louisiana Workers' Compensation Act may be applicable, the employees of Service Provider and their contractors providing such Services or performing such work, if any, whether direct, statutory, borrowed, or otherwise, are statutory employees of Predecessor in accordance with the Louisiana Worker's Compensation Act, La. Rev. Stat. § 23.1021 et seq. and the protections afforded a statutory employer under Louisiana Law shall apply. In such event, Service Provider agrees that Predecessor is and shall be deemed a statutory employer of Service Provider's employees for the sole purposes of La. Rev. Stat. § 23.1061(A)(3), as the same may be amended from time to time.

      **Section 1.4**    **Records**. Service Provider shall use commercially reasonable efforts to maintain or cause to be maintained true and correct records of all receipts, invoices, reports, and such other documents as are customarily maintained by Service Provider for its own operations relating to each Service rendered hereunder for a period of the later of (i) two (2) years following the end of the Service Term or (ii) such other time required by applicable Law. All such receipts, invoices, reports, and other documents are the property of Predecessor.

      **Section 1.5**    **Limitation of Services**. Notwithstanding anything herein to the contrary, Predecessor acknowledges certain personnel of Service Provider and/or its Affiliates involved in

the provision of the Services may leave the employment of such Service Provider and/or its Affiliates or terminate their employment or contract with such Service Provider or its Affiliates during the term of this Agreement. The Services shall not include providing any technical evaluations regarding any proposals for drilling, reworking, or other capital expenditure projects, or the new development of any assets. Service Provider makes no representation or warranty regarding the ability of Service Provider and/or its Affiliates to retain any employees, contractors, or subcontractors and neither Service Provider nor any of its Affiliates shall have any liability to Predecessor as to the result of the loss of any such employees, contractors, or subcontractors. Service Provider and its Affiliates shall use commercially reasonable efforts to report all information accurately but shall not be responsible for the accuracy or completeness of any information furnished by any other party for inclusion in any reports or for results obtained by use of any inaccurate information so furnished.

(A) Notwithstanding any other provision in this Agreement to the contrary:

   (i)   Service Provider shall have no obligation to be designated with any applicable state, local, or federal governmental entity (each individually, a "Governmental Authority"; and collectively, "Governmental Authorities") as a designated operator, designated applicant, designated payor, or responsible party for the Asset;

   (ii)  Service Provider shall have no obligation to post any bond or other security on behalf of Predecessor or to make any payment directly out of Service Provider's own funds for any Services;

   (iii) Service Provider shall have no obligation to provide any Service for which a third party is obligated or permitted (under a joint operating agreement, contract services agreement or otherwise) to provide the same service for Predecessor; provided, however, that Service Provider's use of a subcontractor to perform any part of the Services shall not excuse Service Provider from the obligation to perform such Services;

   (iv)  Predecessor acknowledges and agrees that it will be responsible for and shall provide any required bond or security for the Services;

   (v)   if Service Provider reasonably believes that it cannot perform any Service without creating a breach of an existing agreement to which Predecessor is a party or the Asset is bound as of the Effective Date, and/or violating the Law, then Service Provider shall have no obligation to perform such Service and such Service shall no longer be included  within the Services, and Service Provider shall give prompt, written Notice (as defined below) of such issue to Predecessor, prior to the discontinuation of such Service, with detailed descriptions of the agreement in question and the breach and/or violation Service Provider believes will be created.  In the event such possible breach and/or violation is cured or remedied within thirty (30) days following Predecessor's receipt of such Notice, Service Provider may perform such Service only insofar as performance would not create the breach or violation; and

   (vi)  In the performance of the Services, Service Provider must obtain consent of Predecessor to perform any of the following actions on behalf of Predecessor: execute, amend, waive, release, extend, terminate, or otherwise modify any of the

3

governmental approvals, leases, or other agreements related to the Asset (other than an agreement in the ordinary course of business with a service provider using agreements substantially in the form previously used or other forms reasonably approved by Predecessor).

**Section 1.6**   **Service Provider's Access to the Asset**.  To the extent necessary for Service Provider to perform the Services, Predecessor shall provide Service Provider unrestricted access to the Asset and shall execute any instrument, license, certificate, or other agreement reasonably necessary to provide such access.

**Section 1.7**   **Designated Operator.**  To the extent allowed or required under applicable Law, as soon as reasonably possible after the Effective Date, Predecessor shall become the designated operator of the Asset for decommissioning purposes.

## ARTICLE II. COMPENSATION

**Section 2.1**   **Compensation for Services**. During the Service Term, Predecessor shall pay to and reimburse Service Provider the amounts determined pursuant to Section 3.1 below for the provision of the Services to Predecessor.

## ARTICLE III.        PAYMENT AND DEFAULT

**Section 3.1**   **Submission of Invoice**. Service Provider shall submit a written invoice (the "Invoice") to Predecessor, along with copies of any third party invoices and other supporting details evidencing the expenses satisfactory to Predecessor, on or before the fifteenth (15th) Business Day of each month setting forth an itemized accounting of the actual costs incurred in the preceding month, or as applicable, the preceding months for which an Invoice was not issued, for the Services provided by Service Provider.  For the purposes of this Agreement, "Business Day" shall mean any day other than a Saturday or a Sunday or a day on which federally chartered banking institutions in Houston, Texas, are authorized by Law to close, but for purposes of Notices or other communications given hereunder, means before 4:00 p.m. on such day in the city of Houston, Texas.

For shared costs, such as salaried and hourly personnel, IT systems, and other office related infrastructure and overhead, Service Provider shall allocate those costs as follows:

For "people" costs, Service Provider shall bill Predecessor for actual time incurred by its full-time employees in performing Services hereunder rounded up to the nearest hour.  The hourly rate of each Service Provider employee shall be equal to the annual payroll cost (including salary, vacation pay, target bonus, 401(k) match, and payroll taxes) of the employee divided by 2,080 hours.

For illustrative purposes, two actual employees are shown below:

4



For all other shared costs identified below, Service Provider shall bill Predecessor for the proportionate use in the performance of the Services hereunder.  The proportionate use shall be determined by the Total Hours Billed divided by the Total Employee Hours. "Total Hours Billed" is equal to the total number of hours recorded by Service Provider's full-time employees in performing Services hereunder and "Total Employee Hours" is equal to Service Provider's average daily headcount of full-time employees performing Services hereunder during the applicable month multiplied by eight hours multiplied by the number of Business Days in the month.

All other shared costs include and are limited to the following:
 (i)  IT-related costs (IT systems and software)
 (ii)  Healthcare and other benefits (benefits cost and administration)
(iii)  Communications

For example, assuming an average daily headcount of 275 full-time employees performing Services hereunder and 20 Business Days in the applicable month, Total Employee Hours for the month would equal 44,000 hours (275 employees x 20 Business Days x 8 hours).  If the Total Hours Billed for the month is 100, Predecessor's proportionate use would be 0.23%; and Service Provider would bill Predecessor for 0.23% of these other shared costs.

Any third party costs associated with the Services will be billed to the Service Provider and charged to the Predecessor on monthly invoices.

**Section 3.2**   **Payment of Invoices**. Absent manifest error in inclusion or omission of items or calculations contained in an Invoice (if there is a manifest error, Predecessor will correct such error and show such recalculation on or before the date when payment would otherwise be due), the Predecessor shall pay within thirty (30) Business Days of Predecessor's receipt of an Invoice the undisputed amounts invoiced to Predecessor by wire transfer of immediately available funds to the bank account designated on the Invoice by Service Provider. Service Provider shall be liable for any state or local sales or use taxes required to be paid in connection with its receipt of such payment of Invoice amounts. Adjustment credit or debits shall be shown on the Invoice next succeeding the Invoice in which the adjustment is made. Service Provider shall provide reasonable back-up and supporting documents related to any Invoice within five (5) Business Days of Predecessor's written request. Any preexisting obligation to make payment for the Services provided hereunder or out-of-pocket costs of Service Provider shall survive the termination of this Agreement until paid. Predecessor shall have access to and the right to audit all records supporting such Invoice amounts for the period set forth in Section 1.4 and Section 7.4.

**Section 3.3**   **Predecessor Default**. It shall constitute a default on behalf of Predecessor (an "Predecessor Default") if Predecessor fails to timely pay any Invoice amount for Services

provided pursuant to this Agreement in accordance with the provisions of this <u>Article III</u> or fails to perform any covenants of Predecessor under this Agreement, which failure continues for at least fifteen (15) days following receipt of written Notice to Predecessor that such Invoice amount is past due; provided, however, that if Predecessor cannot reasonably cure such failure (other than for the payment of money or providing indemnity defense) within such fifteen (15) day period, no Predecessor Default shall be deemed to occur provided Predecessor demonstrates that it has diligently taken reasonable steps to cure such failure within such fifteen (15) day period and diligently prosecutes such cure to completion. Upon the occurrence of a Predecessor Default, Service Provider may, in addition to all other remedies available at Law or at equity, (i) suspend all or any portion of the provision of Services hereunder to Predecessor until such time as the Predecessor Default is cured and all unpaid, undisputed Invoice amounts for Services to Service Provider under this Agreement for such suspended Services are paid in full or (ii) terminate this Agreement effective immediately and be entitled to any amounts owed to Service Provider by Predecessor hereunder together with interest on such amount at a rate equal to 5% per annum, calculated daily on the basis of a year of 365 days and the actual number of days elapsed (the "<u>Rate</u>") from the date due, until such undisputed amounts, together with  all accrued and unpaid interest thereon, are paid in full.

       **Section 3.4**    <u>**Service Provider Default**</u>. Subject to <u>Section 3.3</u> above, it shall constitute a default on behalf of Service Provider (an "<u>Service Provider Default</u>") if Service Provider fails to provide a Service to Predecessor in accordance with the terms and conditions of this Agreement, which failure is not by reason of an Predecessor Default or Force Majeure and continues for at least fifteen (15) days following receipt of written Notice to Service Provider; provided, however, that if Service Provider cannot reasonably cure such failure within such fifteen (15) day period, no Service Provider Default shall be deemed to occur provided Service Provider demonstrates that it has diligently taken reasonable steps to cure such failure within such fifteen (15) day period and diligently prosecutes such cure to completion.  Upon the occurrence of a Service Provider Default, Predecessor may, in addition to any other rights or remedies available at Law, in equity, or by contract, terminate this Agreement within the time frame specified by Predecessor in a written Notice to Service Provider so terminating this Agreement.

       **Section 3.5**    <u>**Third Person Services**</u>. Predecessor recognizes that Service Provider may hire third parties to provide certain portions of the Services, and Predecessor shall be responsible for the payment to Service Provider of amounts due by Service Provider to such third parties, which are incurred from and after the Effective Date with respect to the Asset.  In the event Service Provider incurs costs of a third party, such costs will be included in an Invoice, and Predecessor shall reimburse Service Provider at the same time and in the same manner as the payment described in <u>Section 3.2</u>.

       **Section 3.6**    <u>**Sales Taxes**</u>.  Except as otherwise provided in Section 3.2, any sales, use, value-added or similar taxes paid or incurred hereunder for Services that Service Provider is required to pay or incur as a result of such Services shall be passed on to, and be the obligation of, Predecessor as an explicit surcharge and shall be paid by Predecessor in addition to any payments for Services as set forth in <u>Section 3.1</u> above, whether included in the applicable Invoice, or added retroactively, such that the amount received by the Service Provider shall be as if no such taxes had been imposed. If Predecessor submits to Service Provider a timely and valid resale or other

exemption certificate sufficient to support the exemption from sales taxes, then such taxes will not be added to the Invoices for Services payable pursuant to this Article III; provided, however, that if Service Provider is ever required to pay such taxes, Predecessor will promptly reimburse Service Provider for such tax, including any interest, penalties, and attorney's fees assessed thereon by the applicable Governmental Authority. The Parties will reasonably cooperate to contest any invalid sales or use taxes imposed on the Services and to minimize the imposition of any such sales taxes.

## ARTICLE IV.        TERM OF AGREEMENT

**Section 4.1      Term**. The term of this Agreement (the "Service Term") shall be a period beginning on the Effective Date until the earlier to occur of (i) the date Predecessor, in its sole discretion, is ready and able to take over operations on the Asset and (ii) a date which is 365 days from the Effective Date, subject to Article V.  No Services shall be provided after the expiration of the Service Term, except by the mutual written agreement of the Parties.

## ARTICLE V.  CESSATION OF SERVICES

**Section 5.1      Discontinuation of Services**. Predecessor may, with or without cause and for any or no reason, terminate the Service Term and discontinue any Service by giving Service Provider not less than ten (10) days prior written Notice of such discontinuation. Predecessor shall be liable to Service Provider for all costs, expenses, losses, and obligations Service Provider remains obligated to pay for (i) Services provided through the date of such termination or discontinuation under the terms hereunder or (ii) the actual and documented costs incurred under any other existing contract directly as a result of the termination or discontinuation of such Services, provided that Service Provider has an obligation to mitigate such costs and any such costs billed to Predecessor pursuant to clause (ii) shall be limited to the average monthly charge billed to Predecessor under Section 3.1 using the previous three (3) calendar months to determine such average monthly charge.

**Section 5.2      Effect of Termination of Services**. Upon the discontinuation or termination of all Services hereunder, this Agreement shall terminate and be of no further force and effect, except as to obligations accrued prior to the date of discontinuation or termination; provided, however, that Section 1.4, Articles VI and VII, and Predecessor's audit rights under Section 3.2 and Section 7.4 of this Agreement shall survive such discontinuation or termination.

**Section 5.3      Transition of Operations**.  The Parties agree to preserve as a priority during any transition of operations the safety of individuals and the environment in compliance with all Laws and Governmental Authorities.  Prior to and through the termination of this Agreement, Service Provider shall make commercially reasonable efforts to transition the performance of the Services to a third party or to Predecessor, including providing commercially reasonable assistance to Predecessor to facilitate such transition; provided that the applicable compensation for Services so transitioned shall continue until the actual termination thereof, and Predecessor shall pay any actual, documented out-of-pocket costs incurred for the transition of such Services.  Upon request, Predecessor shall provide Service Provider with an update as to the status of activities to transition the Services.  At Predecessor's request and expense, Service Provider shall deliver all documents, records, and other data to the extent related to the Assets that

are in the Service Provider's possession.  Alternatively, at Predecessor's request and expense, Service Provider shall make such documents available for Predecessor to retrieve.  Service Provider may keep copies of any documents, records or other data it is required to maintain by any Governmental Authority.

Section 5.4    **Predecessor's Access to Employees and Asset**.  In order that Predecessor may become familiar with the Services as described in Exhibit A provided by the employees and agents of Service Provider and make orderly arrangements for the assumption of the obligations for the provision of such Services after the termination of this Agreement, Predecessor Group, upon the prior written consent of Service Provider, which consent will not be unreasonably withheld, shall be entitled to access the Asset and to consult with the employees or agents of Service Provider providing the Services during normal business hours throughout the Service Term, provided such consultations do not unreasonably interfere with the performance by those employees of their duties.

## ARTICLE VI.        INDEMNITIES; DISCLAIMERS

Section 6.1    **Predecessor's Indemnification Obligations**. EXCEPT AS PROVIDED IN SECTION 6.2, NOTWITHSTANDING ANY KNOWLEDGE OR INVESTIGATION OF ANY PERSON, PREDECESSOR AGREES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAWS, TO ASSUME, RELEASE, INDEMNIFY, DEFEND, AND HOLD HARMLESS SERVICE PROVIDER, AND ITS EQUITY-HOLDERS, PARENT, AFFILIATES, AND SUBSIDIARY COMPANIES TOGETHER WITH ITS AND ALL OF THEIR RESPECTIVE OFFICERS, DIRECTORS, MANAGERS, EMPLOYEES, COUNSEL, CONTRACTORS, SUBCONTRACTORS, AGENTS, AND REPRESENTATIVES, AND THE RESPECTIVE SUCCESSORS, SPOUSES, RELATIVES, DEPENDENTS, HEIRS, AND ESTATE OF ANY OF THE FOREGOING (EXCLUDING ANY MEMBERS OF THE PREDECESSOR GROUP) (THE "SERVICE PROVIDER GROUP") AGAINST AND FROM ALL CLAIMS, DEMANDS, COMPLAINTS, LOSSES, FINES, PENALTIES, CITATIONS, DAMAGES, CAUSES OF ACTION, SUITS, JUDGMENTS, ORDERS, EXPENSES, OR COSTS, INCLUDING COURT COSTS, REASONABLE ATTORNEYS' FEES, AND EXPERT WITNESSES' FEES (COLLECTIVELY "DAMAGES") CAUSED BY OR ARISING OUT OF OR RESULTING FROM THIS AGREEMENT OR THE PROVISION OF SERVICES PURSUANT TO THIS AGREEMENT, BUT ONLY TO THE EXTENT SUCH DAMAGES ARE NOT CAUSED BY ANY MEMBER OF SERVICE PROVIDER GROUP'S GROSS NEGLIGENCE OR WILLFUL MISCONDUCT. **THE FOREGOING INDEMNITY OBLIGATIONS SHALL APPLY WHETHER OR NOT SUCH DAMAGES ARISE OUT OF (i) NEGLIGENCE (INCLUDING SOLE, SIMPLE, CONCURRENT, ACTIVE, OR PASSIVE NEGLIGENCE OR OTHERWISE), BUT EXPRESSLY NOT INCLUDING GROSS NEGLIGENCE OR WILLFUL MISCONDUCT OF SERVICE PROVIDER OR ANY OTHER MEMBER OF THE SERVICE PROVIDER GROUP, (ii) STRICT LIABILITY, OR (iii) THE UNSEAWORTHINESS OF ANY VESSEL OR THE UNAIRWORTHINESS OF ANY AIRCRAFT EXCEPT IN THE EVENT THAT SUCH DAMAGES OR VIOLATION IS CAUSED BY OR RESULTS FROM THE GROSS NEGLIGENCE OR WILLFUL MISCONDUCT OF ANY MEMBER OF THE SERVICE PROVIDER GROUP.**

**Section 6.2    Service Provider's Indemnity Obligations.**  SERVICE PROVIDER SHALL, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAWS, ASSUME, RELEASE, INDEMNIFY, DEFEND, AND HOLD HARMLESS PREDECESSOR, AND ITS EQUITY-HOLDERS, PARENT, AFFILIATES, AND SUBSIDIARY COMPANIES, CO-LESSEES, CO-OWNERS, PARTNERS, JOINT VENTURERS, TOGETHER WITH ITS AND ALL OF THEIR RESPECTIVE OFFICERS, DIRECTORS, MANAGERS, EMPLOYEES, IN-HOUSE LEGAL COUNSEL, AGENTS, AND REPRESENTATIVES, AND THE RESPECTIVE SUCCESSORS, SPOUSES, RELATIVES, DEPENDENTS, HEIRS, AND ESTATE OF ANY OF THE FOREGOING (EXCLUDING ANY MEMBERS OF THE SERVICE PROVIDER GROUP) (THE "PREDECESSOR GROUP") AGAINST AND FROM (A) ALL DAMAGES CAUSED BY OR ARISING OUT OF OR RESULTING FROM THE GROSS NEGLIGENCE OR WILLFUL MISCONDUCT OF ANY MEMBER OF THE SERVICE PROVIDER GROUP IN CONNECTION WITH THE PROVISION OF SERVICES UNDER THIS AGREEMENT, (B) ALL DAMAGES IN RELATION TO PERSONAL INJURY, DEATH, OR DISEASE OF ANY MEMBER OF THE SERVICE PROVIDER GROUP ARISING OUT OF OR RESULTING FROM THE PROVISION OF SERVICES UNDER THIS AGREEMENT, (C) ALL DAMAGES IN RELATION TO PROPERTY DAMAGE OF ANY MEMBER OF THE SERVICE PROVIDER GROUP ARISING OUT OF OR RESULTING FROM THE PROVISION OF SERVICES UNDER THIS AGREEMENT,  (D) ALL DAMAGES (INCLUDING COSTS AND EXPENSES) IN RELATION TO GOVERNMENTAL FINES AND PENALTIES ASSESSED IN CONNECTION WITH ANY PERFORMANCE OF THE SERVICES RESULTING FROM THE NEGLIGENCE OR FAULT OF ANY MEMBER OF SERVICE PROVIDER, AND (E) ALL DAMAGES INCURRED BY THIRD PARTIES ARISING OUT OF OR RESULTING FROM THE PROVISION OF SERVICES UNDER THIS AGREEMENT. **THE INDEMNITY OBLIGATIONS IN SET FORTH IN THE FOREGOING CLAUSES (B) AND (C) SHALL APPLY WHETHER OR NOT SUCH DAMAGES ARISE OUT OF (i) NEGLIGENCE (INCLUDING SOLE, SIMPLE, CONCURRENT, ACTIVE, OR PASSIVE NEGLIGENCE OR OTHERWISE), BUT EXPRESSLY NOT INCLUDING GROSS NEGLIGENCE OR WILLFUL MISCONDUCT OF PREDECESSOR OR ANY OTHER MEMBER OF THE PREDECESSOR GROUP, (ii) STRICT LIABILITY, OR (iii) THE UNSEAWORTHINESS OF ANY VESSEL OR THE UNAIRWORTHINESS OF ANY AIRCRAFT EXCEPT IN THE EVENT THAT SUCH DAMAGES OR VIOLATION IS CAUSED BY OR RESULTS FROM THE GROSS NEGLIGENCE OR WILLFUL MISCONDUCT OF ANY MEMBER OF THE PREDECESSOR GROUP**

**Section 6.3    Disclaimers.**  NOTWITHSTANDING ANY OTHER TERM OF THIS AGREEMENT TO THE CONTRARY, SERVICE PROVIDER MAKES NO, AND DISCLAIMS ANY, REPRESENTATIONS AND WARRANTIES, EXPRESS, IMPLIED, OR STATUTORY, WITH RESPECT TO THIS AGREEMENT OR THE PERFORMANCE OR RESULTS OF THE SERVICES.  EXCEPT AS PROVIDED IN Section 6.2 WITH RESPECT TO THE GROSS NEGLIGENCE OR WILLFUL MISCONDUCT OF SERVICE PROVIDER OR ANY OTHER MEMBER OF THE SERVICE PROVIDER GROUP IN THE PERFORMANCE OF SERVICES UNDER THIS AGREEMENT, SERVICE PROVIDER EXPRESSLY DISCLAIMS, AND PREDECESSOR AGREES THAT THE SERVICE PROVIDER GROUP SHALL BE FREE FROM, ALL LIABILITY AND RESPONSIBILITY FOR ANY REPRESENTATION,

WARRANTY, STATEMENT, OR INFORMATION WITH RESPECT TO THE SERVICES THAT IS MADE OR COMMUNICATED (ORALLY OR IN WRITING) TO ANY PREDECESSOR GROUP MEMBER (INCLUDING ANY OPINION, INFORMATION, PROJECTION, EVALUATIONS, OR ADVICE THAT MAY HAVE BEEN PROVIDED TO ANY PREDECESSOR GROUP MEMBER BY ANY SERVICE PROVIDER GROUP MEMBER).

**Section 6.4    Laws; Application**. The indemnification obligations in this Article VI are intended to comply with applicable Laws. To the extent such indemnification provisions are found to violate any applicable Law, or in the event any applicable Law is enacted or amended so as to cause these provisions to be in violation therewith, this Agreement shall automatically be amended to provide that the indemnification provided hereunder shall extend only to the maximum extent permitted by the applicable Law.

**Section 6.5    Limitations**. NOTWITHSTANDING ANY OTHER TERM OF THIS AGREEMENT TO THE CONTRARY, NO PARTY SHALL BE LIABLE TO ANY OTHER PARTY OR TO A MEMBER OF THE PREDCESSOR GROUP OR SERVICE PROVIDER GROUP UNDER THIS AGREEMENT FOR ANY PUNITIVE, EXEMPLARY, SPECIAL, INDIRECT OR CONSEQUENTIAL DAMAGE RESULTING FROM OR ARISING OUT OF THIS AGREEMENT.

## ARTICLE VII.        ADDITIONAL OBLIGATIONS

**Section 7.1    Conflict of Interest**. In performing their obligations hereunder, no member of Service Provider Group will (A) enter into any business arrangement with any individual known by such member of Service Provider Group to be a director, employee or agent (excluding attorneys and accountants) of Predecessor or any of its Affiliates without Predecessor's prior written consent  or (B) give to or receive from any director, employee or agent of Predecessor or any of its Affiliates in connection with such obligations anything that is more than a nominal cost or value. Service Provider shall ensure that all members of Service Provider Group comply with this Agreement.

**Section 7.2    Improper Influence**. No member of Service Provider Group may, directly or indirectly, offer or make any payment, or offer or give anything of value to any official or immediate family member of an official of any government, public international organization, or political party (including any officer or employee of any department, agency, or instrumentality of any government or public organization), or to any candidate for public office to influence their or its act or decision, or to gain any other advantage for Predecessor, its Affiliates, Service Provider Group, or any of them arising out of this Agreement.

**Section 7.3    Pre-Contract Violations and Reporting**. Service Provider warrants that no event has occurred prior to the Effective Date, which if it had occurred after the Effective Date, would be a violation of Section 7.1 or Section 7.2. Service Provider shall immediately notify Predecessor of any violation of Section 7.1, Section 7.2 or Section 7.3. Nothing in this Agreement requires either Party to comply with Laws if such requirement would be inconsistent with United States ("U.S.") laws, including U.S. anti-boycott laws.

**Section 7.4    Records and Inspection**. Up until 24 months from the end of the calendar year in which this Agreement is completed or terminated, (A) Service Provider shall ensure that all members of Service Provider Group retain all records related to this Agreement (or until expiry of the statute of limitations for taxes or import or export charges) and (B) Predecessor may inspect at any time all records to confirm that the requirements of the Agreement are met.

**Section 7.5    Trade Sanctions Compliance**. Service Provider shall provide Predecessor with advance Notice of the names and addresses of any member of Service Provider Group who is or may be in the near future subject to economic sanctions or any trade restrictions imposed by the U.S. government; or debarred or excluded or declared ineligible to participate in U.S. government contracts, or contracts, grants, or other programs financed in whole or part by the U.S. government (collectively "Restricted Parties"). Service Provider shall provide such Notice promptly upon, and in no event later that 90 days after, learning of the Service Provider Group member's designation as a Restricted Party. Service Provider Group personnel providing Services must not be citizens of countries subject to comprehensive U.S. trade sanctions without Predecessor's prior written consent.

**Section 7.6    Data Protection**. Service Provider shall process any information in connection with this Agreement that can be used to identify an individual in accordance with Law and Predecessor's reasonable instructions. Service Provider shall (A) apply appropriate security measures for the protection of, and restrict third party access to, this personal information, (B) immediately notify Predecessor of any improper use, disclosure, or exposure of the personal information, and (C) cooperate with Predecessor's reasonable requests to investigate and remediate such incidents.

**Section 7.7    Flow Down Requirements**. Service Provider shall ensure that the Services are performed in accordance with the applicable U.S. regulations referenced at http://www-eproc.chevron.com/Public/GDS%20Documents/Certain%20U.S.%20Regulations.pdf.

**Section 7.8    Confidentiality**. From and after the date hereof, Service Provider shall not, and shall ensure that members of Service Provider Group do not, directly or indirectly, use or disclose or divulge any trade secrets or other Confidential Information of Predecessor, including information of others that Service Provider has agreed to keep confidential; provided that the foregoing restriction shall not apply to information (a) which is lawfully and independently obtained by Service Provider from a third party without restriction as to disclosure, (b) which is already known to Service Provider or to others not bound by a duty of confidentiality or which is in the public domain or enters into the public domain through no fault of any member of Service Provider Group, and (c) Service Provider is required by Law or legal process to disclose; and provided further that Service Provider may use such information in connection with the performance of the transactions contemplated by this Agreement, including enforcement of its rights thereunder or under any document delivered pursuant thereto. As used herein, **"Confidential Information"** shall mean confidential and/or proprietary information including, without limitation, all geological, geophysical, economic, financial or other information, whether in the form of maps, charts, logs, seismographs, interpretations, calculations, summaries or opinion, as well as other written notes, analyses, compilations, studies, interpretations, trade secrets, ideas, processes, procedures, data, know-how, improvements, discoveries, developments, designs, blueprints,

11

drawings, techniques and other documents, materials or information regarding plans for exploration, development, marketing and selling, business records and plans, budgets, prices and costs, suppliers, customers and potential customers.

### ARTICLE VIII.        GOVERNING LAW AND RESOLUTION OF DISPUTES

#### Section 8.1        <u>Governing Law</u>

(a)        If the Services (as defined in <u>Exhibit A</u>) is performed offshore or on inland waters, notwithstanding the place of execution hereof or the place for performance of any covenant, promise or agreement herein made, this Agreement and the validity hereof, the agreements evidenced hereby, and all matters and issues arising hereunder, shall, to the fullest extent possible, be construed pursuant to and governed by the General Maritime Laws of the United States.  If the General Maritime Laws of the United States are held to be inapplicable to this Agreement or the Services (or any part thereof) to be performed hereunder by a court of competent jurisdiction, then Subsections 8.1(b) and 8.1(c) below shall apply, as appropriate, but only to the extent that United States General Maritime Law is held to be inapplicable.

(b)        If any court of competent jurisdiction determines that United States General Maritime Law is not applicable to any relevant part of this Agreement or the work to be performed hereunder, then such part of this Agreement and/or the work to be performed hereunder, shall, to the fullest extent enforceable under applicable Law, be interpreted and enforced exclusively in accordance with the Laws of the State of Texas.

(c)        If any court of competent jurisdiction determines that neither United States General Maritime Law nor the Laws of the state of Texas are applicable to any relevant part of this Agreement or the work to be performed hereunder, then such part of this Agreement and/or the work to be performed hereunder, shall, to the fullest extent enforceable under applicable Law, be interpreted and enforced exclusively in accordance with the Laws of the State of Louisiana, excluding any conflicts of law rules that might refer same to another jurisdiction.

**Section 8.2        <u>Resolution of Disputes</u>.** The Parties shall exclusively and finally resolve any Dispute between them using direct negotiations, mediation, and then arbitration as set out in Article VIII, except as permitted in Sections 8.5(G) and 8.5(H). Service Provider shall not stop, suspend, or otherwise fail to progress the Services pending resolution of a Dispute.  "<u>Dispute</u>" means any claim, disagreement or controversy arising out of this Agreement, including a claim under this Agreement and any dispute or controversy regarding the existence, construction, validity, interpretation, enforceability, termination or breach of this Agreement, whether based in contract, tort or in any other manner.

**Section 8.3        <u>Direct Negotiations</u>.** If a Dispute arises, a Party seeking to initiate the dispute resolution process shall give Notice to the other Party setting out, in writing and in detail, the issues in Dispute and the value of the claim. The Parties shall attempt to resolve the Dispute through direct negotiations in a meeting between the Parties, attended by individuals with decision-making authority, which must take place within thirty (30) days, or as otherwise agreed to by the Parties, from the date the Notice was sent.

**Section 8.4    Mediation.** If the Dispute cannot be resolved by direct negotiations within 30 days of initiation of the resolution process, either Party may initiate mediation by giving Notice to the other Party. Mediation must be attended by a representative from each Party with decision-making authority, and the proceeding must take place in Houston, Texas.

**Section 8.5    Arbitration Proceedings.** If the Parties fail to resolve the Dispute within 60 days from Notice of mediation, either Party may initiate binding arbitration by giving Notice to the other Party. The arbitration must be conducted in accordance with the International Institute for Conflict Prevention and Resolution ("CPR") Rules. To the extent of any conflicts between the Act or the CPR Rules and the provisions of this Agreement, the provisions of this Agreement prevail. The CPR is the appointing authority. The place of arbitration must be Houston, Texas.

The following provisions will apply to arbitration proceedings:

(A)    One (1) arbitrator (or three (3) arbitrators if the monetary value of the Dispute is more than US$5,000,000 or its currency equivalent) will conduct the arbitral proceedings in English. If there is a Dispute whether the monetary value exceeds the US$5,000,000, then the number of arbitrators must be three (3).

(B)    The maximum number of witnesses each Party may call to give evidence on its behalf, including by oral testimony, declaration or witness statement, is five (5) witnesses of fact and three (3) expert witnesses.

(C)    The existence of a Dispute and any negotiations, mediation, and arbitration proceedings between the Parties in relation to any Dispute are confidential and the Parties shall not make any disclosure to any third party. Any information, documents, or materials, created or produced for the purposes of, or used in, negotiations, mediation, or arbitration of a Dispute are confidential and the Parties shall not disclose them to any third party unless there is a legal or regulatory obligation to make a disclosure (but the disclosure must be limited to the extent necessary to comply with that legal or regulatory obligation), or to the extent required to enforce or challenge an award in bona fide legal proceedings before a state court or other judicial authority.

(D)    The arbitrator(s) does not have the power to award, nor will the arbitrator(s) award, the Damages waived and released under Section 6.5. The arbitrator(s) has no authority to appoint or retain expert witnesses for any purpose unless agreed to by the Parties. The arbitrator(s) may not act as *amiable compositeur or ex aequo et bono*.

(E)    Unless a Party is otherwise entitled to be indemnified for such costs pursuant to this Agreement, the Parties intend that regardless of which Party prevails, all arbitration fees and costs must be split equally, between the Parties, and each Party shall bear its own costs of legal representation, witness expenses, and ancillary costs.

(F)    The award is final and binding, and except for proceedings under Sections 8.5(G) and 8.5(H), the Parties agree to waive their rights to: (1) apply to the court for

13

determination of a point of law; and (2) any form of appeal, review or recourse in respect of any such award to any court or other judicial authority, to the extent that such waiver may be validly made.

(G)     The Parties may apply to a court with appropriate jurisdiction for any of the following without waiving its arbitration rights:

    (1)     Interim measures as necessary until appointment of the arbitrator(s) or pending determination by the arbitrator(s).

    (2)     Preserving property pending determination by the arbitrator(s).

    (3)     Enforcing judgment entered on an award.

    (4)     Enforcing Section 8.5(C) and preventing any information, documents or materials used in those proceedings from being used or disclosed by that Party for any purpose other than enforcement of Section 8.5(C).

(H)     Proceedings to (1) preserve property pending determination by the arbitrator(s), (2) enforce Section 8.5(C), (3) enforce judgment entered on an award may be brought in any court having jurisdiction over the person or assets of the non-prevailing Party. The prevailing Party may seek, in any court having jurisdiction, judicial recognition of the award, or order of enforcement or any other order or decree that is necessary to give full effect to the award.

## ARTICLE IX.        INSURANCE

**Section 9.1     <u>Insurance Coverage</u>**. Service Provider shall  maintain, at its own expense, the following insurance and all other insurance required by applicable Law:

    (i)  Workers' Compensation and Employer's Liability Insurance as prescribed by applicable Laws where the Services are performed and, if applicable, the states of residence of any subcontractor personnel performing the Services;

    (ii) Commercial General Liability (Bodily Injury and Property Damage) Insurance. The policy territory coverage must include all areas where the Services are to be performed.   The policy limits must not be less than US$10,000,000 combined single limit per occurrence; and

    (iii) Automobile Bodily Injury and Property Damage Liability Insurance extending to all vehicles provided by Service Provider in the performance of the Services. The policy limits for this insurance must be the higher of the amount required by applicable Law or US$5,000,000 combined single limit per occurrence.

**Section 9.2     <u>Policy Endorsements</u>**.

14

(i) Service Provider shall, or shall endeavor to cause its insurer to provide Predecessor with thirty days' Notice before canceling or making a material change to an insurance policy obtained pursuant to this Section during the Service Term of this Agreement;

(ii) Service Provider shall require its insurer to provide waivers of subrogation in favor of Predecessor in any Workers' Compensation insurance policies obtained pursuant to this Section; and

(iii) Service Provider shall require its insurer to provide that any insurance obtained pursuant to Sections 9.1(ii) and 9.1(iii) shall include all of the following, but only to the extent that the Service Provider Group has liability under Section 6.2 of this Agreement:

(a) Predecessor shall be named as an additional insured;

(b) A provision that the insurance is primary with respect to all insureds, including additional insureds, and that no other insurance carried by Predecessor will be considered as contributory insurance for any loss; and

(c) A cross liability or severability of interest clause which has the effect of insuring that each insured (including additional insureds) is covered as a separate insured.

**Section 9.3    Evidence of Insurance**.  If requested by Predecessor in writing before performance any of the Services, Service Provider shall provide Predecessor or its designee with certificates or other documentary evidence satisfactory to Predecessor of the insurance and endorsements obtained pursuant to this Section. Service Provider acknowledges that failure to provide a certificate other evidence of insurance obtained pursuant to this Section may lead to non-payment of Service Provider's Invoices or termination of this Agreement.

**Section 9.4    Satisfaction of Insurance Limits**.  Service Provider may satisfy the insurance limits provided for in this Section through any combination of primary and excess layers of insurance.

## ARTICLE X. MISCELLANEOUS

**Section 10.1   Force Majeure**.  In the event that Service Provider is rendered unable, wholly or in part, by Force Majeure or other causes herein specified, to carry out all or any of its obligation under this Agreement, it is agreed that on Service Provider's delivery of written Notice, so far as Service Provider is prevented by such Force Majeure or other causes herein specified, Service Provider's obligation shall be suspended during the continuance of any inability so caused, and Service Provider will not be liable to Predecessor for any interruptions of service, any delays, or any failure to perform under this Agreement caused by such Force Majeure. For the avoidance of doubt, any delays, interruptions or failures to perform caused by such occurrences shall not be deemed to be a breach or failure to perform under this Agreement. The term "Force Majeure" means occurrences beyond the reasonable control of Service Provider and is limited to: acts of

God, strikes, lockouts, or other industrial disturbances, acts of the public enemy, wars, blockades, insurrections, riots, epidemics, pandemics, landslides, lightning, earthquakes, fires, storms, hurricanes, tropical storms, loop currents, floods, washouts, arrests, and restraints of the Government, either federal or state, civil or military, civil disturbances, explosions, sabotage, malicious mischief, breakage or accident to machinery or lines of pipe, freezing of wells or lines of pipe, refusal or inability of resale owner(s) or transporter(s) to take deliveries due to events of Force Majeure, inability of Service Provider to obtain right-of-way, necessary materials, supplies, or permits not caused by the failure of Service Provider to pay for or negligence to obtain such rights-of-way, necessary materials, supplies, or permits, an order, directive, or restraint issued or imposed by any Governmental Authority, regulatory body or court having jurisdiction. It is understood and agreed that the settlement of strikes or other labor difficulties shall be entirely within the discretion of Service Provider. During the continuation of a Force Majeure event, Service Provider shall act diligently to overcome the impediments caused by such event and use its commercially reasonable efforts to promptly resume performance of its obligations under this Agreement.

    **Section 10.2   Notices**. Any   notice, request, instruction, correspondence or other document to be given hereunder by any Party to another (herein collectively called "Notice") shall be in writing and delivered by email and additionally in person or by courier service requiring acknowledgement of receipt or mailed by certified mail, postage prepaid and return receipt requested, or by overnight delivery service, or by electronic mail (provided that Notices by electronic mail shall also be sent by one of the other permitted means to be effective), as follows:

If to Predecessor:

    [_____]
    100 Northpark Blvd
    Covington, LA 70433
    Attn:   Scott Ritter
    Phone: (985) 773-7424
    Email: scottritter@chevron.com


If to Service Provider:

    Mako Buyer LLC
    2000 W. Sam Houston Pkwy S. Suite 1200
    Houston, Texas 77042
    Attn:   Thomas R. Lamme
    Phone: (713) 969-1107
    Email: TLamme@fwellc.com

Notice given by personal delivery or courier shall be effective upon actual receipt. Notice given by mail shall be effective upon actual receipt or, if not actually received, the fifth Business Day following deposit with the U.S. Post Office. Notice given by electronic mail shall be effective upon delivery if delivered to a working email address during the recipient's normal business hours, or

at the beginning of the recipient's next Business Day if not delivered during the recipient's normal business hours.  If a date specified herein for giving any Notice or taking any action is not a Business Day (or if the period during which any Notice is required to be given or any action taken expires on a date which is not a Business Day), then the date for giving such Notice or taking such action (and the expiration date of such period during which Notice is required to be given or action taken) shall be the next day which is a Business Day. Any Party may change any address, electronic or otherwise, to which Notice is to be given to it by giving Notice as provided above of such change of address.

Section 10.3   **No Joint Venture or Partnership**. Nothing in this Agreement is intended to create, or shall be construed as creating, a partnership, joint venture, association for profit or other business entity between or among the Parties, and for federal and state income  tax purposes, the Parties elect to be excluded from the application of the provisions of Subchapter K, Chapter 1, Subtitle A of the Internal Revenue Code of 1986, as amended, as permitted and authorized by Section 761 of said Code and the regulations promulgated thereunder.

Section 10.4   **No Fiduciary Duty**. It is expressly understood and agreed that this Agreement is a purely commercial transaction between the Parties and that nothing stated herein shall operate to create any fiduciary duty which a Party shall owe to the other Party.

Section 10.5   **Entire Agreement**. This Agreement constitutes the entire agreement among the Parties with respect to the subject hereof and supersedes any other representations, understandings or agreements (whether written, oral or otherwise) that may have been made or entered into by the Parties or any of their respective Affiliates relating to the transactions contemplated hereby or the subject hereof.

Section 10.6   **Successors and Assignments**. This Agreement is personal as to Service Provider and Predecessor and shall not be assigned by either Party without the other Party's prior written consent.

Section 10.7   **Amendment**.  This Agreement may be amended or modified in whole or in part, and terms and conditions may be waived, only by a duly authorized agreement in writing which makes reference to this Agreement executed by each Party.

Section 10.8   **Construction**.  All article, section, schedule, and exhibit references used in this Agreement are to articles and sections of, and Schedules and Exhibits to, this Agreement, unless otherwise specified. The schedules and exhibits attached to this Agreement constitute a part of this Agreement and are incorporated herein for all purposes.

Unless otherwise indicated, with respect to either Party, the terms "ordinary course of business" or "ordinary course" shall be deemed to refer to the ordinary conduct of business in a manner consistent with the past practices and customs of such Party.

If a term is defined as one part of speech (such as a noun), it shall have a corresponding meaning when used as another part of speech (such as a verb). Terms defined in the singular have the corresponding meanings in the plural, and vice versa. Unless the context of this

17

Agreement clearly requires otherwise, words importing the masculine gender shall include the feminine and neutral genders and vice versa. The words "include", "includes" or "including" do not limit the preceding terms and shall be deemed to be followed by the words "without limitation." The words "hereof," "hereto," "hereby," "herein," "hereunder" and words of similar import, when used in this Agreement, shall refer to this Agreement as a whole and not to any particular section or article in which such words appear. The term "or" is not exclusive.

The terms "day" and "days" mean and refer to calendar day(s). The terms "year" and "years" mean and refer to calendar year(s).

Service Provider and Predecessor have each participated in the negotiation and drafting of this Agreement, and, if an ambiguity should arise, this Agreement shall be construed as if drafted jointly by the Parties and no presumption or burden of proof shall arise favoring or burdening any Party by virtue of the authorship of any of the provisions in this Agreement.

The captions in this Agreement are for convenience only and shall not be considered a part of or affect the construction or interpretation of any provision of this Agreement.

All references to currency herein shall be to, and all payments required hereunder shall be paid in, United States Dollars.

The serial comma is sometimes included and sometimes omitted. Its inclusion or omission shall not affect the interpretation of any phrase.

**Section 10.9** **Severability**. If any provision of this Agreement is held invalid or unenforceable by any court of competent jurisdiction, the other provisions of this Agreement shall remain in full force and effect. The Parties further agree that if any provision contained herein is, to any extent, held invalid or unenforceable in any respect under the Laws governing this Agreement, they shall take any actions necessary to render the remaining provisions of this Agreement valid and enforceable to the fullest extent permitted by Law and, to the extent necessary, shall amend or otherwise modify this Agreement to replace any provision contained herein that is held invalid or unenforceable with a valid and enforceable provision giving effect to the intent of the Parties to the greatest extent legally permissible.

**Section 10.10 Counterparts**. This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. Any .pdf or other electronic transmission hereof or signature hereon shall, for all purposes, be deemed originals.

*[Remainder of Page Intentionally Left Blank. Signature Page to Follow.]*

IN WITNESS WHEREOF, this Agreement has been signed by each of the Parties as of the date first above written.


**SERVICE PROVIDER**:

Mako Buyer LLC


By: _____
Name: _____
Title: _____


**PREDECESSOR:**

[_____]


By: _____
Name:
Title:


[*Signature page to the Transition Services Agreement*]

<u>**EXHIBIT A**</u>

<u>**TO TRANSITION SERVICES AGREEMENT**</u>

**SERVICES**

1.    **Asset Services**. Subject to the terms of this Agreement, including but not limited to <u>Section 1.5</u> of this Agreement, Service Provider shall provide the following Services with respect to the Asset.

**1.1    Maintenance and Monitoring Services**.

Services:  Providing the following maintenance and monitoring services with respect to the Assets:

(i)  Complying with, and causing the Asset to be operated in compliance in all material respects with, all state and federal Laws and regulations, including, but not limited to, following all required health, safety and environmental Laws, regulations and programs (such as SEMS), complying with all regulatory filing and reporting requirements, and obtaining all necessary permits; provided that nothing in this provision shall require Service Provider to make on behalf of Predecessor any filing, payment, or submission (or otherwise take any action) that, under applicable Law, may be made only by a party designated with the applicable Governmental Authority as a designated operator, designated applicant, designated payor, or responsible party for Predecessor or that could make Service Provider directly liable or responsible to the applicable Governmental Authority, or any other third party with respect to any of the Assets in which event Service Provider shall prepare the necessary filing or submission and provide it to the Predecessor to file or submit or, in the case of a payment, notify the Predecessor of such payment so that Predecessor can make such payment.

(ii)  Performing the following as and when needed:

(A)    purchasing (either directly or as agent for Predecessor) supplies, materials, tools, and equipment associated with the Asset, provided that the costs of such that are paid directly by Service Provider will be reimbursed by the Predecessor to Service Provider, further, provided that without Predecessor's prior written consent Service Provider will not purchase any single item with respect to the Assets if such purchase would result in a charge or cost to Predecessor greater than $10,000.00 dollars for any single item  during the Service Term.

(B)    contracting (either directly or as agent for Predecessor) for services associated with the physical maintenance and monitoring of the Asset,  provided  that  the  costs  associated  with  such  services  will  be

reimbursed to Service Provider by Predecessor, further, provided that without Predecessor's prior written consent Service Provider will not contract for any of such services with respect to any of the Assets if such contract (1) is with an Affiliate of Service Provider or (2) would obligate Predecessor for a period more than the Service Term for the operating services or (3) involves a fair market value of greater than $100,000.00.

(C)    providing to the Predecessor communications with Governmental Authorities related to the Asset.

*[Remainder of Page Intentionally Left Blank]*

<u>SCHEDULE 1</u>

<u>TO THE TRANSITION SERVICES AGREEMENT</u>

[Description]

**EXHIBIT D**

Form of Assignment of Record Title

See attached.

Form 3000-3
(Aug 2018)

FORM APPROVED
OMB NO. 1004-0034
Expires: June 30, 2021

UNITED STATES
DEPARTMENT OF THE INTERIOR
BUREAU OF LAND MANAGEMENT
**ASSIGNMENT OF RECORD TITLE INTEREST IN A
LEASE FOR OIL AND GAS OR GEOTHERMAL RESOURCES**

Mineral Leasing Act of 1920 (30 U.S.C. 181 et seq.)
Act for Acquired Lands of 1947 (30 U.S.C. 351-359)
Geothermal Steam Act of 1970 (30 U.S.C. 1001-1025)
Department of the Interior Appropriations Act, Fiscal Year 1981 (42 U.S.C. 6508)

| Lease Serial No. |
| --- |
| OCS-G05550 |

Lease Effective Date
(Anniversary Date)
07/01/1983

New Serial No.

**Type or print plainly in ink and sign in ink.**

## PART A: ASSIGNMENT

1. Assignee*  Fieldwood Energy IV LLC
   Street  2000 W. Sam Houston Pkwy S, Suite 1200
   City, State, Zip Code Houston, Texas 77042

1a. Assignor  Chevron U.S.A. Inc.

*If more than one assignee, check here ☐ and list the name(s) and address(es) of all additional assignees on page 2 of this form or on a separate attached sheet of paper.

This record title assignment is for: *(Check one)* ☑ Oil and Gas Lease, or ☐ Geothermal Lease

Interest conveyed: *(Check one or both, as appropriate)* ☑ Record Title, ☐ Overriding Royalty, payment out of production or other similar interests or payments

2. This assignment conveys the following interest:

| Land Description<br><br>Additional space on page 2, if needed.  Do not submit documents or agreements other than this form, such documents or agreements shall only be referenced herein.<br><br>a | Percent of Interest | | | Percent of Overriding Royalty Similar Interests | |
| --- | --- | --- | --- | --- | --- |
| | Owned | Conveyed | Retained | Reserved | Previously reserved or conveyed |
| | b | c | d | e | f |
| E1/2;N1/2NW1/4;SE1/4NW1/4;N1/2SW1/4NW1/4;S1/2SW1/4;<br>NE1/4SW1/4 of Block 175, Ship Shoal Area (4531.25) | 100% | 100% | 0 | 0% | 0% |

## FOR BLM USE ONLY – DO NOT WRITE BELOW THIS LINE
UNITED STATES OF AMERICA

**This assignment is approved solely for administrative purposes. Approval does not warrant that either party to this assignment holds legal or equitable title to this lease.**

☐ Assignment approved for above described lands;

Assignment approved effective _____

☐ Assignment approved for attached land description

☐ Assignment approved for land description indicated on reverse of this form

By _____

| Bureau of Land Management (BLM) | (Title) | (Date) |
| --- | --- | --- |

(Continued on Page 2)

(Form 3000-3)

Part A (Continued) ADDITIONAL SPACE for Names and addresses of additional assignees in Item No. 1, if needed, or for Land Description in Item 2, if needed.

## PART B – CERTIFICATION AND REQUEST FOR APPROVAL

1.  The Assignor certifies as owner of an interest in the above designated lease that he/she hereby assigns to the above assignee(s) the rights specified above.

2.  Assignee certifies as follows: (a) Assignee is a citizen of the United States; as association of such citizens; a municipality; or a corpora-tion organized under the  laws of the United States or of any State or territory thereof.  For the assignment of NPR-A leases, assignee is a citizen, national, or resident alien of the United  States or associations of such citizens, nationals, resident aliens or private, public or municipal corporations; (b) Assignee is not considered a minor under the  laws of the State in which the lands covered by this assign-ment are located; (c) Assignee's chargeable interests, direct and indirect, in each public domain and  acquired lands separately in the same State, do not exceed 246,080 acres in oil and gas leases (of which up to 200,000 acres may be in oil and gas options), or  300,000 acres in leases in each leasing District in Alaska of which up to 200,000 acres may be in options, if this is an oil and gas lease issued in accordance  with the Minerals Leasing Act of 1920, or 51,200 acres in any one State if this is a geothermal lease; (d) All parties holding an interest in the assignment are  otherwise in compliance with the regulations (43 CFR Group 3100 or 3200) and the authorizing Acts; (e) Assignee is in compliance with reclamation  requirements for all Federal oil and gas lease holdings as required by sec. 17(g) of the Mineral Leasing Act; and (f) Assignee is not in violation of sec. 41 of the  Mineral Leasing Act.

3.  Assignee's signature to this assignment constitutes acceptance of all applicable terms, conditions, stipulations and restrictions pertain-ing to the lease described herein.

For geothermal assignments, an overriding royalty may not be less than one-fourth (1/4) of one percent of the value of output, nor greater than 50 percent of the  rate of royalty due to the United States when this assignment is added to all previously created overriding royalties (43 CFR 3241).

I certify that the statements made herein by me are true, complete, and correct to the best of my knowledge and belief and are made in good faith.

Executed this _____ day of _____ 20$^{21}$     Executed this _____ day of _____ 20$^{21}$

Name of Assignor   Chevron U.S.A. Inc. _____
                                                          (Please type or print)

Assignor   _____     Assignee   _____
                                    (Signature)                                                                  (Signature)

           R. G. Schneider   Assistant Secretary                      _____
                                    (Title)                                                                         (Title)
       or                                                                                   or
Attorney-in-fact _____     Attorney-in-fact _____
                                    (Signature)                                                                  (Signature)

_____
                      (Assignor's Address)

_____  _____  _____
        (City)                (State)          (Zip Code)

Title 18 U.S.C. Sec. 1001 makes it a crime for any person knowingly and willfully to make to any Department or agency of the United States any false, fictitious,  or fraudulent statements or representations as to any matter within its jurisdiction.

**PART C – GENERAL INSTRUCTIONS**

1. Assignor/Assignee must complete Parts A1 and A2 and Part B. All parties to assignment must sign as follows. The assignor(s) must manually sign 3 original copies and the assignee(s) must manually sign at least 1 of the 3 original copies. File three (3) completed copies of this form in the proper BLM office for each assignment of record title. For a transfer of overriding royalty interest, payment out of production or other similar interest or payment, file one (1) manually signed copy of this form. The required filing fee (nonrefundable) must accompany the assignment. File assignment within ninety (90) days after date of execution of assignor.

2. Separate form must be used for each lease being affected by this assignment and for each type of interest conveyed.

3. In Item No. 2 of Part A, describe lands affected (See 43 CFR 3106, 3135 or 3241). For columns b, c, d, and e, enter the interest expressed as a percentage of total interest in the lease, *e.g.,* if assign or assigns one quarter of a 20% interest, enter 20% in column b, 5% in column c, and 15% in column d.

4. If assignment is to more than one assignee, enter each assignee's name across columns d, e, and f next to the respective interest being conveyed. Also, list names and addresses of any additional assignee(s) on reverse of this form or on a separate attached sheet of paper.

5. If any payment out of production or similar interest, arrangements or payments have previously been created out of the interest being assigned, or if any such payments or interests are reserved under this assignment, include a statement giving full details as to amount, method of payment, and other pertinent terms as provided under 43 CFR 3106, 3135, or 3241.

6. The lease account must be in good standing before this assignment can be approved as provided under 43 CFR 3106 and 3241.

7. Assignment, if approved, takes effect on the first day of the month following the date of filing in the proper BLM office. If a bond is necessary it must be furnished prior to approval of the assignment.

8. Approval of assignment of record title to 100% of a portion of the leased lands creates separate leases of the retained and the assigned portions, but does not change the terms and conditions of the lease anniversary date for purposes of payment of annual rental.

9. Overriding royalty, payment out of production or other similar types of transfers must be filed with BLM, but will be accepted for record purpose only. No official approval will be given.

**NOTICES**

AUTHORITY: This information is solicited under the authority of 30 U.S.C. 181 et seq.; 30 U.S.C. 1001-1025; 42 U.S.C. 6508
PURPOSE: The primary purpose for collecting this information is to facilitate the timely processing of record title  assignments for oil and gas/geothermal resources leases.

ROUTINE USES: This information may be disclosed to agencies, organizations or persons for authorized purposes  as follows: (1) The adjudication of the assignee's rights to the land or resources.  (2) Documentation for public  information in support of notations made on land status, records for the management, disposal, and use of public  lands and resource.  (3) Transfer to appropriate Federal agencies when concurrence is required prior to granting a  right in public lands or resources.  (4) Information from the record and/or the record will be transferred to  appropriate Federal, State, local or foreign agencies, when relevant to civil, criminal or regulatory investigations or  prosecutions.  Additional information on authorized routine uses may be found in the published system of records  notice, BLM-3, Mineral Lease Management—Interior, which may be viewed at  https://www.doi.gov/privacy/blm_notices

DISCLOSURE:  Furnishing the information on this form is voluntary, however, failure to provide all or part of the  requested information may result in the rejection of the assignment.  See regulations at 43 CFR Groups 3100 and  3200.

The Paperwork Reduction Act of 1995 requires us to inform you that:
The BLM collects this information to create and maintain a record of oil and gas/geothermal lease activity.

Response to this request is required to obtain a benefit.

The BLM would like you to know that you do not have to respond to this or any other Federal agency-sponsored  information collection unless it displays a currently valid OMB control number.

**BURDEN HOURS STATEMENT:** Public reporting burden for this form is estimated to average 30 minutes per  response including the time for reviewing instructions, gathering and maintaining data, and completing and  reviewing the form.  Direct comments regarding the burden estimate or any other aspect of this form to U.S.  Department of the Interior, Bureau of Land Management (1004-0034), Bureau Information Collection Clearance  Officer (WO-630), 1849 C Street, N.W., Room 2134LM, Washington, D. C. 20240.

**EXHIBIT E**

<u>Company Working Interests</u>

To be completed.

**EXHIBIT F**

Additional FWE IV Properties

| Field | Block | Lease | Type | Rights | Date Le Eff | Date Le Exp | Le Cur Acres (Ac) | Operator | WI | | Lease Status |
|-------|-------|-------|------|--------|-------------|-------------|-------------------|----------|-----|---|--------------|
| VIOSCA KNOLL 113 | VK 113 | G16535 | Federal | RT | 6/1/1996 | 2/23/2020 | 5,760 | Fieldwood En Off | 100.0% | | TERMIN |
| VIOSCA KNOLL 251/340/384 | VK 251 | G10930 | Federal | OP 1 | 7/1/1989 | N/A | 5,760 | Fieldwood En Off | 100.0% | | UNIT |
| VIOSCA KNOLL 251/340/384 | VK 251 | G10930 | Federal | RT | 7/1/1989 | N/A | 5,760 | Fieldwood En Off | 100.0% | | UNIT |
| VIOSCA KNOLL 251/340/384 | VK 251 | G10930 | Federal | OP 2 | 7/1/1989 | N/A | 5,760 | Fieldwood En Off | 55.0% | | UNIT |
| VIOSCA KNOLL 251/340/384 | VK 340 | G10933 | Federal | OP 1 | 7/1/1989 | N/A | 5,760 | Fieldwood En Off | 100.0% | | UNIT |
| VIOSCA KNOLL 251/340/384 | VK 340 | G10933 | Federal | RT | 7/1/1989 | N/A | 5,760 | Fieldwood En Off | 100.0% | | UNIT |
| VIOSCA KNOLL 251/340/384 | VK 340 | G10933 | Federal | OP 2 | 7/1/1989 | N/A | 5,760 | Fieldwood En Off | 55.0% | | UNIT |
| VERMILION 315/332 | VR 314 | G05438 | Federal | OP 2 | 7/1/1983 | 4/30/2021 | 5,000 | Fieldwood En Off | 50.0% | | TERMIN |
| HIGH IS. A-446 | HI A-446 | G02359 | Federal | RT | 8/1/1973 | 4/12/2016 | 5,760 | Bandon O&G | 100.0% | | TERMIN |
| VERMILION 315/332 | VR 332 | G09514 | Federal | OP 1 | 7/1/1988 | N/A | 5,000 | Fieldwood En | 66.5% | | PROD |
| VERMILION 315/332 | VR 332 | G09514 | Federal | RT | 7/1/1988 | N/A | 5,000 | Fieldwood En | 100.0% | | PROD |

| Area | Block No. | Structure | Complex ID No. | Authority No. | FW Lease | Operator | Approval Date | Associated Assets |
|------|-----------|-----------|----------------|---------------|----------|----------|---------------|-------------------|
| MP | 154 | A | 24171 | G30337 | G10902 | Fieldwood Energy Offshore LLC | 02/03/17 | MP 154 A001 & A002 |
| VR | 315 | A | 22981 | G30213 | G04215 | Fieldwood Energy Offshore LLC | 11/26/13 | VR 332 A001, A002, A005 & A006 |
| VR | 315 | A-AUX | 22981 | G30213 | G04215 | Fieldwood Energy Offshore LLC | 11/26/13 | Production from VR 315 A RUE |

## **Exhibit 6**

**Turnkey Removal Agreement**

See attached.

*Exhibit 6 to the Implementation Agreement*

# TURNKEY REMOVAL AGREEMENT
## by and among
## CHEVRON U.S.A. INC,
## AND
## FIELDWOOD ENERGY IV LLC
## AND

## MAKO BUYER LLC

THIS TURNKEY REMOVAL AGREEMENT (the "**Agreement**") is made effective as of [_____] (the "**Effective Date**"), by and among Chevron U.S.A. Inc. ("**CUSA**") a Pennsylvania corporation with offices at 1500 Louisiana Street, Houston, Texas 77002, Fieldwood Energy IV LLC ("**FWE IV**") a Delaware limited liability company with offices at 2000 W. Sam Houston Pkwy S, Suite 1200, and Mako Buyer LLC, a Delaware limited liability company, with offices at 2000 W Sam Houston Pkwy S, Suite 1200, Houston, Texas 77042 (hereinafter referred to as "**Contractor**").  CUSA, FWE IV and Contractor may hereinafter be referred to collectively as "**Parties**" or individually as a "**Party**."

## RECITALS

WHEREAS, FWE IV is a resulting entity of a divisive merger effected in connection with the confirmed plan of reorganization of Chapter 11 Case 20-33948, In re: Fieldwood Energy LLC et al., in the United States Bankruptcy Court for the Southern District of Texas, Houston Division;

WHEREAS, CUSA is identified as a predecessor-in-interest of the FWE IV Assets (as defined herein);

WHEREAS, CUSA and FWE IV desire that Contractor provide certain decommissioning and removal services with respect to the FWE IV Assets, upon the terms and conditions set forth herein, and Contractor has agreed to do so for the consideration set forth herein.

NOW, THEREFORE, in consideration of the premises and of the mutual promises, covenants, conditions, and agreements contained herein, and for other valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereby agree as follows:

## ARTICLE I.
## SERVICES

**Section 1.1    Services**. Subject to the terms of this Agreement, Contractor will plug, abandon, decommission, and remove certain assets associated with the leases, together with the platforms, wells, pipelines and equipment (including production equipment) located on such leases, and any hydrocarbons produced from such leases, if applicable (collectively the "**FWE IV Assets**") on a lump sum, project-by-project, turnkey payment basis.  Each such decommissioning project is described in detail on Exhibit A hereto (each a "**Decommissioning Project**").  In exchange for completing each such Decommissioning Project identified on Exhibit A hereto, Contractor will earn a single lump sum amount (the "**Turnkey Amount**") for such Decommissioning Project.  Each Turnkey Amount is subject to adjustment only by Change Order

pursuant to <u>Section 1.3</u>, <u>Section 1.4</u> or <u>Section 1.6</u>, and each Turnkey Amount shall compensate Contractor in full for the full and complete performance of each applicable Decommissioning Project, including all taxes, costs, expenses, charges and overhead associated with a particular Decommissioning Project, including all third party costs and expenses. Additionally, the Parties agree that Contractor shall have no obligation to commence any one Decommissioning Project until the full funding of such project (i.e. the one hundred percent (100%) of the applicable Turnkey Amount) has been Fully Committed as further defined in <u>Section 2.2</u> below.

**Section 1.2**     <u>**First Year**</u>. The Parties agree that the Decommissioning Projects that Contractor will endeavor to commence during the twelve (12) month period commencing on the Effective Date ("**Year 1**") are those identified on <u>Exhibit A</u> for Year 1 (the "**Year 1 Projects**"). All Decommissioning Projects to be commenced by Contractor under this Agreement in years subsequent to Year 1 (each year a "**Contract Year**") are additionally identified on <u>Exhibit A</u> and are identified by the Contract Year. Additionally, the Turnkey Amounts for all Decommissioning Projects to be performed and completed by Contractor under this Agreement are identified on <u>Exhibit A</u>, which such Turnkey Amounts may only be adjusted by Change Order as provided herein. The Parties agree it shall not be a breach of this Agreement if Contractor does not complete a Decommissioning Project in the scheduled Contract Year, provided that this sentence shall not limit CUSA's rights to terminate any Decommissioning Project or this Agreement as provided in <u>Section 3.2</u> or <u>Section 3.3</u>.

**Section 1.3**     <u>**Subsequent Years**</u>.

(a)     For Decommissioning Projects to be commenced in Contract Years other than Year 1, Contractor shall have the opportunity to submit for CUSA's consideration updated proposed Turnkey Amounts for any such Decommissioning Project. Contractor shall submit such updated proposed Turnkey Amounts no later than the date that is (90) days prior to the beginning of the Contract Year in which such Decommissioning Project is to be commenced by Contractor as identified on Exhibit A. Any such updated proposed Turnkey Amounts shall become the agreed upon Turnkey Amount for the applicable Decommissioning Project if the Parties agree on such updated proposed pricing, or if CUSA does not object in writing to an updated Turnkey Amount within thirty (30) days of delivery of such updated Turnkey Amount to CUSA, and the Turnkey Amount shall be updated by Change Order signed by all Parties. If Contractor submits any updated proposed Turnkey Amount pursuant to this <u>Section 1.3</u>, the Parties will work in good faith to agree on a final Turnkey Amount; *provided that*, if the Parties fail to reach agreement on a final Turnkey Amount for a particular Decommissioning Project by the beginning of the applicable Contract Year, the Parties shall submit the dispute for Expert Determination as provided in <u>Section 1.6</u>; *provided further, however*, the Parties may at any time agree on a final Turnkey Amount and may issue a Change Order to reflect the same (even if proceedings for an Expert Determination have already commenced).

(b)     The Parties agree that upon the date that funding with respect to a Decommissioning Project has been Fully Committed pursuant to <u>Section 2.2</u>, the Turnkey Amount applicable to such Decommissioning Project shall not be subject to further adjustment, except as provided in <u>Section 1.4</u> below.

**Section 1.4    Claims for Qualified Conditions**.

(a)    The Parties have agreed upon certain qualified conditions for all of the Decommissioning Projects which are provided in Exhibit B (the "**Qualified Conditions**").

(b)    If Contractor believes that any such Qualified Conditions exist with respect to any Decommissioning Project, Contractor shall promptly provide written notice to CUSA. Contractor's notice shall state in detail all known and presumed facts upon which its claim is based, including the character, duration and extent of such circumstance, the date Contractor first knew of such circumstance, any activities impacted by such circumstance, the cost and time consequences of such circumstance (including showing the impact of such circumstance, if any, on the critical path of the Work for such Decommissioning Project) and any other details or information that are expressly required under this Agreement (including under Appendix 1 hereto). Thereafter, Contractor shall submit to CUSA a request for a proposed Change Order as soon as reasonable practicable after giving CUSA written notice but in no event later than thirty (30) days after the completion of each such circumstance, together with a written statement (i) detailing why Contractor believes that a Change Order should be issued, plus all documentation reasonably requested by or necessary for CUSA to determine the factors necessitating the possibility of a Change Order and all other information and details expressly required under this Agreement; and (ii) setting forth the effect, if any, which such proposed Change Order would have for the Work.

(c)    After receiving the required notice and proposed Change Order pursuant to Section 1.4(b), if CUSA agrees that a Change Order is necessary to adjust the Turnkey Amount and agrees with Contractor's proposed adjustment to the applicable Turnkey Amount, then CUSA shall issue a Change Order reflecting such agreed-upon adjustment to the applicable Turnkey Amount, and such Change Order shall become binding on the Parties as part of this Agreement upon execution thereof by CUSA and Contractor.

(d)    In the event CUSA and Contractor are unable to agree either (i) that a Qualified Condition occurred or (ii) upon the appropriate adjustment to the Turnkey Amount due to the occurrence of a Qualified Condition, CUSA and Contractor shall submit the dispute for Expert Determination as provided in Section 1.6; *provided, however*, CUSA and Contractor may agree to resolve the dispute by and between themselves at any time, and may issue a Change Order to reflect the same (even if proceedings for an Expert Determination have already commenced.

(e)    The Parties acknowledge that CUSA may be prejudiced if Contractor fails to provide the notices and proposed Change Orders as required under this Section 1.4. Contractor therefore agrees that, to the extent Contractor's failure to comply with such requirements prejudices CUSA, that such requirements are an express condition precedent necessary to any right for an adjustment to any Turnkey Amount arising out of any Qualified Conditions and that, to the extent Contractor's failure to comply with such requirements in fact prejudice CUSA, any right to adjust the Turnkey Amount related to the required notice or Change Order proposal that was not provided by Contractor in accordance with such requirements shall be waived and the related claim shall be barred.  Oral notice, shortness of time, or CUSA's actual knowledge of a particular

circumstance shall not waive, satisfy, discharge or otherwise excuse Contractor's strict compliance with this <u>Section 1.4</u>.

     **Section 1.5**    <u>**Terms and Conditions**</u>. The Parties agree that the performance of each Decommissioning Project shall also be governed by the definitions, terms and conditions attached hereto as <u>Appendix 1</u>, which are incorporated herein by this reference.

     **Section 1.6**    <u>**Expert Determination**</u>.

     (a)     If CUSA and Contractor cannot agree on an adjusted Turnkey Amount either (i) after Contractor's submission of proposed updated pricing in accordance with <u>Section 1.3</u> or (ii) in relation to Contractor's claim for an adjustment to a Turnkey Amount due to the occurrence of Qualified Conditions in accordance with <u>Section 1.4</u> after good faith negotiations, such Parties shall submit the dispute for Expert Determination pursuant to this <u>Section 1.6</u>.

     (b)     Prior to submitting a dispute for Expert Determination, the Party intending to make the submission shall provide written notice to the other Parties of such intent (a "**Dispute Notice**"). The Parties to the dispute shall attempt to resolve the dispute through direct negotiations in a meeting between the Parties to the dispute, attended by individuals with decision-making authority, which must take place no later than thirty (30) days from the date the notice was sent, or any longer time as mutually agreed by the Parties in writing. If CUSA and Contractor are unable to agree upon the Turnkey Amount within such time period, the Party intending to submit the matter for Expert Determination may so submit such matter to the Expert for final and binding determination.

     (c)     The Party that submits a dispute for Expert Determination pursuant to this <u>Section 1.6</u> (the "**Disputing Party**") shall provide the Expert (copying the other Parties) with (i) its proposed Turnkey Amount and (ii) all such supporting data and information that the Disputing Party believes justifies its proposed Turnkey Amount, which such data and information shall include applicable well data and information related to any structures, pipelines, facilities and other assets associated with the Decommissioning Project, provided that if Contractor is the Disputing Party and the dispute is concerning a Qualified Condition under <u>Section 1.4</u>, the supporting data and information submitted by Contractor shall be materially consistent with the supporting data and information provided by Contractor under <u>Section 1.4(e)</u>. No later than fourteen (14) days after the Disputing Party's submission of its proposed Turnkey Amount and all permitted supporting evidence, the other Party (the "**Responding Party**") shall provide the Expert with (i) its proposed Turnkey Amount (which, for clarity, may be the original Turnkey Amount set forth in Exhibit A) and (ii) all such supporting data and information justifying its proposed Turnkey Amount (as applicable).

     (d)     After receiving all information required under <u>Section 1.6(c)</u> from both the Disputing Party and the Responding Party, the Expert shall within fifteen (15) days, select the final Turnkey Amount by selecting either (i) the Turnkey Amount proposed by the Disputing Party pursuant to <u>Section 1.6(c)</u> or (ii) the Turnkey Amount proposed by the Responding Party pursuant to <u>Section 1.6(c)</u>. For clarity, the Expert shall not have the authority to calculate or select any other Turnkey Amount but must select between the options presented by such Parties.

<div align="center">4</div>

(e)      If, prior to the Expert finalizing its determination of the Turnkey Amount, CUSA and Contractor reach agreement, such Parties may withdraw the matter from the Expert.  If different from the Turnkey Amount in <u>Exhibit A</u>, the final Turnkey Amount shall be implemented by a Change Order.

(f)      The determination of the Expert pursuant to <u>Section 1.6(d)</u> shall be final and binding on the Parties for all purposes hereunder.  The fees and expenses of the Expert under this <u>Section 1.6</u> shall be borne one half by CUSA and one half by Contractor, and such cost sharing shall occur regardless of who prevails in a dispute before the Expert or if the dispute is resolved by the Parties prior to or after issuance of the Expert's determination pursuant to <u>Section 1.6(d)</u>. Additionally, for all purposes of this <u>Section 1.6</u>, FWE IV and CUSA shall be treated as being one (1) Party, and Contractor shall be treated as the other Party (and thus if Contractor is the Disputing Party, CUSA and FWE IV shall be treated as the Responding Party).

(g)      The Parties agree to utilize one of the following as the Expert for the purposes herein (the "**Expert**"): *EDG, Inc. (https://www.edg.net/)* ("**EDG**"); *or TSB Offshore (https://tsboffshore.com/)* ("**TSB**"), with TSB being the Expert unless TSB is unable or unwilling to serve as the Expert, in which case, EDG shall be the Expert, unless the Parties otherwise agree in writing.  If both Experts are unable or unwilling to serve as the Expert hereunder, CUSA and Contractor shall agree on a newly identified Expert.

(h)      Notwithstanding any dispute between the Parties regarding a Qualified Condition on a particular Decommissioning Project, it shall be the responsibility of Contractor to continue to prosecute all of the Work on all Decommissioning Projects diligently in conformity with this Agreement, including the particular Decommissioning Project which is the subject of such dispute pursuant to this <u>Section 1.6</u>.  Contractor shall have no right to cease performance hereunder or to permit the prosecution of the Work to be delayed on such Decommissioning Project unless the amount of the disputed adjustment to the subject Turnkey Amount due to a Qualified Condition is more than fifty percent (50%) of said original Turnkey Amount for the particular Decommissioning Project.

**Section 1.7      <u>Acknowledgement Regarding Certain Decommissioning Projects</u>**.

(a)      The Parties acknowledge that the following two (2) pipeline segments were installed after CUSA sold its ownership interest to an Affiliate of FWE IV; however the Parties have agreed to include such as Decommissioning Projects.  Such assets are identified as follows:

o Vermillion Block 196 (OCS-G 19760) SN 18591 Pipeline

o Vermillion Block 196 (OCS-G 19760) SN 18588 Pipeline

## ARTICLE II.
## FUNDING AND COST REPORTS

**Section 2.1**        <u>Escrow Account</u>.  The following escrow account has been established by the Parties to fund portions of the decommissioning liabilities for the FWE IV Assets (the "**Escrow Account**"): [_____].  The Escrow Account shall be funded and distributions from the Escrow Account shall be made, in each case, in accordance with the Omnibus Agreement (as defined in Appendix 1 hereto) and is called the "Decommissioning Escrow Account" under the Omnibus Agreement.

**Section 2.2**        <u>Funding Commitment and Commencing a Decommissioning Project</u>.

(a)        When Contractor is ready to commence a particular Decommissioning Project, Contractor shall issue written notice of the same to CUSA (each a "**Ready-to-Commence Notice**"), *provided that*, Contractor shall not issue a Ready-to-Commence Notice to CUSA for a given Decommissioning Project earlier than the date that is ninety (90) days before the Targeted Funding Date (as set forth in <u>Exhibit A</u>) for such Decommissioning Project (unless CUSA and Contractor otherwise agree in a writing signed by both such Parties referring to this <u>Section 2.2(a)</u>).

(b)        Within the ninety (90) days after issuance of a Ready-to-Commence Notice for a Decommissioning Project, CUSA shall deposit its proportionate share of the Turnkey Amount into the Escrow Agreement.  The Parties agree that Contractor shall not be obligated to commence a Decommissioning Project until one hundred percent (100%) of the Turnkey Amount applicable to such Decommissioning Project has been Fully Committed.

(c)        Funds are "**Fully Committed**" when Contractor has received notice of the same in accordance with the Omnibus Agreement.

(d)        If one hundred percent (100%) of the Turnkey Amount applicable to a Decommissioning Project has been Fully Committed, and Contractor nonetheless has not commenced the applicable Decommissioning Project within the ninety (90) days after issuance of notice under the Omnibus Agreement that such funds have been Fully Committed, CUSA shall be entitled to withdraw its proportionate share of the Fully Committed funds from the Escrow Account; *provided that* such ninety (90) day period shall be extended if the Work has not commenced due to an event of *force majeure* (as defined in Appendix 1) with such extension equal to the time that such event of *force majeure* prevented the commencement of such Work.  In such event, Contractor shall be required to issue a new Ready-to-Commence Notice for such Decommissioning Project when it is ready to commence the applicable Decommissioning Project, and this <u>Section 2.2</u> shall apply as if the original notice had not been issued.  Furthermore, if Contractor has not received notice under <u>Section 2.2(c)</u> above that the funds are Fully Committed within ninety (90) days of the date CUSA deposits its proportionate share of the Turnkey Amount for any particular Decommissioning Project into the applicable Escrow Account, CUSA shall have the right to withdraw its proportionate share of such Turnkey Amounts pursuant to this <u>Section 2.2(d)</u>.  In such event, Contractor shall be required to issue a new Ready-to-Commence Notice for

6

such Decommissioning Project when it is ready to commence the applicable Decommissioning Project, and this <u>Section 2.2</u> shall apply as if the original notice had not been issued.

      **Section 2.3**      **<u>Payments</u>**. Contractor shall be compensated for the performance of each Decommissioning Project pursuant to this <u>0</u>.

      (a)      Upon achieving Final Completion (as defined in Appendix 1) of a Decommissioning Project, Contractor shall be entitled to the Turnkey Amount applicable to such Decommissioning Project as set forth in <u>Exhibit A</u>, as adjusted pursuant to this Agreement; *provided, however*, CUSA and Contractor may agree on a case-by-case basis to an alternative payment structure for any Decommissioning Project provided that such alternative payment structure is incorporated into a writing referencing this <u>Section 2.3(a)</u> and signed by both such Parties. For clarity, Contractor's compensation earned under this Agreement shall be paid pursuant to and subject to the Omnibus Agreement.

      (i)      ***Interim Payment Milestones***. Notwithstanding <u>Section 2.3(a)</u>, the Parties agree that if the Turnkey Amount of a particular Decommissioning Project is in excess of Five Million U.S. Dollars (U.S. $5,000,000), or if the commencement of a particular Decommissioning Project would result in Contractor simultaneously performing Work on two or more Decommissioning Projects that, in the aggregate, result in CUSA's proportionate share of the Turnkey Amounts being in excess of Ten Million U.S. Dollars (U.S. $10,000,000), then, for such Decommissioning Project, CUSA and Contractor will negotiate interim payment milestones authorizing the release of agreed-upon sums of compensation to Contractor upon achievement of objectively-defined milestones in the Work to complete any such Decommissioning Project; *provided, however*, the Parties agree that the last payment milestone for any such Decommissioning Project shall not be less than twenty five (25%) of the applicable Turnkey Amount and shall not become owed before achievement of Final Completion of such Decommissioning Project. The agreed-upon payment milestones for such Decommissioning Project shall be set forth in writing and signed by both such Parties.

      (ii)      ***Alternative Cost-Plus Pricing***. The Parties agree that Contractor shall be compensated on a lump sum, turnkey basis for all Decommissioning Projects unless, prior to the commencement of a particular Decommissioning Project, CUSA and Contractor mutually elect in writing (signed by both such Parties) to utilize a cost-plus reimbursable pricing and compensation methodology (instead of a lump sum, turnkey payment and compensation methodology) for that particular Decommissioning Project. The Parties agree that any such cost-plus reimbursable compensation model shall be set forth in detail and agreed to by CUSA and Contractor in writing, including procedures, rules and limitations on what shall be and what shall not be reimbursable thereunder, and which shall be based, to the extent applicable, on the procedures, rules and limitations set forth in the "COPAS

7

2012 Deepwater Accounting Procedure" published by the Council of Petroleum Accountants Societies (COPAS). The markup for profit owed under any such cost-plus compensation model shall be fifteen percent (15%) on allowable costs. The details of the cost-plus reimbursable payment methodology shall be finalized by CUSA and Contractor prior to the commencement of Work on any such Decommissioning Project.

(iii) **_At-Cost Projects_**. Certain Decommission Projects have been designated by the Parties in Exhibit A as "at-cost" Decommissioning Projects (the "**At-Cost Projects**"). The Parties agree that Contractor shall be compensated for such At-Cost Project on a reimbursable, at-cost basis without markup. The Parties agree that they will negotiate in good faith and agree upon a reimbursable compensation model applicable to the At-Cost Projects, including procedures, rules and limitations on what shall be and what shall not be an "allowable cost" thereunder, and which shall be based, to the extent applicable, on the procedures, rules and limitations set forth in the "COPAS 2012 Deepwater Accounting Procedure" published by the Council of Petroleum Accountants Societies (COPAS). The details of the reimbursable payment methodology shall be finalized by CUSA and Contractor prior to the commencement of Work on any At-Cost Project. After the commencement of an At-Cost Project, Contractor shall submit invoices in the first ten (10) days of each month during the performance of such At-Cost Project incorporating the allowable costs incurred in the prior month. Contractor's entitlement to receive compensation under this Agreement for the At-Cost Projects shall be pursuant to the Omnibus Agreement. The Parties agree that Section 2.2 shall not apply to the At-Cost Projects.

(b) Notwithstanding Section 2.3(a), if Contractor has achieved all requirements of Final Completion of a particular Decommissioning Project but BOEM has failed to issue the applicable approval required under the definition of Final Completion with respect to such Decommissioning Project within the forty-five (45) day period immediately following Contractor's proper request and submission for such approval from BOEM, and _provided that_ BOEM's failure to issue an approval in such forty-five (45) day period is not due to the fault or other act or omission of Contractor or any person for whom Contractor is responsible under this Agreement, including but not limited to Contractor failing to meet BOEM's requirements to receive such approval, "Final Completion" for the purposes of this 0 shall be deemed to have been achieved and Contractor shall be entitled to the applicable payment provided that Contractor submits to CUSA all documents provided to BOEM to obtain such Final Completion. Notwithstanding the foregoing, if BOEM requires that additional work be performed as a condition of BOEM issuing its approval in relation to the applicable Decommissioning Project, Contractor shall promptly and diligently complete such additional work at Contractor's own cost.

**Section 2.4**          **Cost Reporting**. Contractor shall submit a monthly cost report to FWE IV LLC, with a copy to CUSA, summarizing the accrued costs for each Decommissioning Project in each month after the Effective Date (each a "**Monthly Cost Report**"). If CUSA or

FWE IV request additional information with respect to any cost in any Monthly Cost Report, Contractor shall provide reasonable and appropriate documentation to substantiate the charges on the cost report and/or respond to such request for additional information.

## ARTICLE III.
## TERM

**Section 3.1**          **Term**.  The term of this Agreement shall be from and after the Effective Date until the FWE IV Assets identified on <u>Exhibit A</u> are completely plugged and abandoned and Site Clearance (as defined in Appendix 1) has been achieved with respect to all such FWE IV Assets, unless terminated earlier as provided herein.

**Section 3.2**          **Termination by CUSA of Entire Agreement**.  CUSA retains the right to terminate this Agreement in its entirety in the event that (i) Contractor repudiates or abandons this Agreement; or (ii) the Decommissioning Projects on <u>Exhibit A</u> are performed in a manner or in a timing that is materially inconsistent with the Standard of Performance (as defined in Appendix 1).  In the event the Agreement is terminated in its entirety, any funds deposited in the Escrow Account for any uncompleted portions of any Decommissioning Projects shall be transferred to CUSA in accordance with the Omnibus Agreement.

**Section 3.3**          **Termination by CUSA for Particular Asset.**  CUSA retains the right to terminate this Agreement as to a particular Decommissioning Project or portion thereof in the event Contractor (i) is unable to (or otherwise fails to) perform or complete such Work in compliance with government issued timelines, or (ii) in the event Contractor is in breach of this Agreement, including, but not limited to, the Standard of Performance (as defined in Appendix 1) with respect to such Work, and such breach remains outstanding after CUSA or FWE IV having provided thirty (30) days' written notice to Contractor.  In the event of termination as to a particular Decommissioning Project, any funds deposited in the Escrow Account for the particular Decommissioning Project shall be transferred to CUSA in accordance with the Omnibus Agreement.

**Section 3.4**          **Additional Rights After Such A Termination**.  If this entire Agreement is terminated pursuant to <u>Section 3.2</u> or if this Agreement is terminated as to a particular Decommissioning Project or portion thereof pursuant to <u>Section 3.3</u>, CUSA may: (i) if requested by CUSA and if agreed by Contractor, take assignment of any or all of Contractor's subcontracts with respect to such terminated Work; and (ii) complete such Work either itself or through others (including through FWE IV).  In the event of such a termination, the Parties shall have all rights at law with respect to such a termination.

**Section 3.5**          **Termination for Convenience by CUSA**.  If Contractor assigns its obligations under this Agreement to any other person or entity pursuant to <u>Section 5.10</u>, notwithstanding anything to the contrary, CUSA shall have the right to terminate this Agreement in whole by issuing written notice of the same to Contractor.  The termination for convenience shall become effective six (6) months after Contractor's receipt of the termination notice; provided that Contractor shall be entitled (but not obligated) to complete any Decommissioning Projects commenced prior to the date of CUSA's termination notice, in which case this Agreement shall

remain in effect as it relates to such Decommissioning Projects until such Decommissioning Projects reach Final Completion.  Upon termination pursuant to this <u>Section 3.5</u>, Contractor shall (i) not commence any further Decommissioning Projects, (ii) place no further orders for subcontracts, equipment, or any other items or services except as may be necessary for completion of such portion of the Work as is not discontinued, (iii) promptly make every reasonable effort to procure cancellation upon terms satisfactory to CUSA of all subcontracts and rental agreements to the extent they relate to the performance of the Work that is discontinued unless CUSA elects to take assignment of any such subcontracts subject to the agreement of Contractor, and (iv) use commercially reasonable efforts to cooperate with CUSA for the efficient transition of the Work. Upon termination for convenience, Contractor shall be entitled to (a) the portion of the applicable Turnkey Amount(s) for the Work completed prior to termination, less that portion of the Turnkey Amount(s) previously paid to Contractor, plus (b) actual and direct close-out costs reasonably incurred by Contractor on account of such termination (which costs shall be adequately documented and supported by Contractor) but in no event shall Contractor be entitled to receive any amount for unabsorbed overhead, contingency, risk, or anticipatory profit.  Contractor shall submit all reasonable direct close-out costs to CUSA for verification and audit within sixty (60) Days after the effective date of termination.  If no Work has been performed by Contractor under the Agreement at the time of termination, Contractor shall be entitled to the sum of One Hundred U.S. Dollars (U.S. $100) for its undertaking to perform.  Upon termination for convenience, any funds deposited in the Escrow Agreement for any Decommissioning Projects shall be transferred in accordance with the Omnibus Agreement.

**Section 3.6**          **Termination by Contractor**.

(a)     **Suspension of Work**:  Subject to CUSA's right to withhold or offset payment to Contractor, if Contractor does not receive undisputed amounts owed to Contractor when due and owing, Contractor shall provide written notice of the same to CUSA, and, if such failure has not been cured by CUSA within thirty (30) days after Contractor's written notice to CUSA to cure such failure, Contractor may suspend performance of the Work and the obligation to commence or progress any Decommissioning Project during a Contract Year shall be tolled until such failure is cured by CUSA.

(b)     **Termination of Work**:  Contractor may terminate this Agreement if Contractor has suspended performance of the Work in accordance with <u>Section 3.6(a)</u> and Contractor has provided CUSA with notice at the time of such Work suspension that it intends to terminate the Agreement if such nonpayment is not cured in ninety (90) days after such notice, and such nonpayment is not cured within ninety (90) days after receipt of such notice from Contractor.  In the event of such a termination, the Parties shall have all rights at law with respect to such a termination.  Contractor's sole right to terminate any portion of this Agreement is set forth in this <u>Section 3.6(b)</u>.

## ARTICLE IV.
## GOVERNING LAW; DISPUTES

**Section 4.1**     **Governing Law**.

(a)      Notwithstanding the place of execution hereof or the place for performance of any covenant, promise or agreement herein made, this Agreement and the validity hereof, the agreements evidenced hereby, and all matters and issues arising hereunder, shall, to the fullest extent possible, be construed pursuant to and governed by the General Maritime Laws of the United States.  If the General Maritime Laws of the United States are held to be inapplicable to this Agreement or to the Work (or any part thereof) to be performed hereunder, then such part of this Agreement or of the Work shall, to the fullest extent possible, be construed pursuant to and governed by the laws of the State of Texas, without regard to its choice of law rules, except that the substantive and procedural rules of the Federal Arbitration Act, 9 U.S.C. §§ 1-16 (the "**Act**") govern this Article IV, provided that if it is not possible for the laws of the State of Texas to apply as to a particular issue due to the application of the federal law of the United States (specifically, the Outer Continental Shelf Lands Act (OCSLA)), then the laws of the State of the United States adjacent to the part of the Agreement or the Work giving rise to such dispute shall govern such dispute.

**Section 4.2      Resolution of Disputes**. The Parties shall exclusively and finally resolve any dispute between them using direct negotiations, mediation, and then arbitration as set out in this Article IV, except as permitted in Section 1.6.

**Section 4.3      Direct Negotiations.** If a dispute arises, a Party seeking to initiate the dispute resolution process shall give notice to the other Party (or Parties) to the dispute setting out, in writing and in detail, the issues in dispute and the value of the disputed amount (the "**Claim**"). The Parties to the dispute shall attempt to resolve the dispute through direct negotiations in a meeting between the Parties to the dispute, attended by individuals with decision-making authority, which must take place within 30 days, or as otherwise agreed to by such Parties, from the date the notice was sent.

**Section 4.4      Mediation.** If the dispute cannot be resolved by direct negotiations within 30 days of initiation of the resolution process, a Party to the dispute may initiate mediation by giving notice to the other Party (or Parties) to the dispute. Mediation must be attended by a representative from each such Party with decision-making authority, and the proceeding must take place in Houston, Texas.

**Section 4.5      Arbitration Proceedings.** If the Parties to a dispute fail to resolve the dispute within 60 days from notice of mediation, any Party (or Parties) the dispute may initiate binding arbitration by giving notice to the other Party (or Parties) to the dispute. The arbitration must be conducted in accordance with the International Institute for Conflict Prevention and Resolution ("**CPR**") Rules. To the extent of any conflicts between the Act or the CPR Rules and the provisions of this Agreement, the provisions of this Agreement prevail. The CPR is the appointing authority. The place of arbitration must be Houston, Texas.

The following provisions will apply to arbitration proceedings, in each case with respect to the Parties to a particular dispute:

(a)      One arbitrator (or 3 arbitrators if the monetary value of the dispute is more than US $5,000,000 or its currency equivalent) will conduct the arbitral proceedings in English. If there is

11

a dispute whether the monetary value exceeds the US $5,000,000, then the number of arbitrators must be 3.

(b)      The maximum number of witnesses each Party may call to give evidence on its behalf, including by oral testimony, declaration or witness statement, is 5 witnesses of fact and 3 expert witnesses.

(c)      The existence of a dispute and any negotiations, mediation, and arbitration proceedings between the Parties in relation to any dispute are confidential and the Parties shall not make any disclosure to any third party. Any information, documents, or materials, created or produced for the purposes of, or used in, negotiations, mediation, or arbitration of a dispute are confidential and the Parties shall not disclose them to any third party unless there is a legal or regulatory obligation to make a disclosure (but the disclosure must be limited to the extent necessary to comply with that legal or regulatory obligation), or to the extent required to enforce or challenge an award in bona fide legal proceedings before a state court or other judicial authority.

(d)      The arbitrator(s) has no authority to appoint or retain expert witnesses for any purpose unless agreed to by the Parties. The arbitrator(s) may not act as *amiable compositeur or ex aequo et bono*.

(e)      Subject to Section 4.3(b), the Parties intend that regardless of which Party prevails, all arbitration fees and costs must be split equally, between the Parties, and each Party shall bear its own costs of legal representation, witness expenses, and ancillary costs.

(f)      The award is final and binding, and except for proceedings under Section 4.3(g), the Parties agree to waive their rights to: (1) apply to the court for determination of a point of law; and (2) any form of appeal, review or recourse in respect of any such award to any court or other judicial authority, to the extent that such waiver may be validly made.

(g)      The Parties may apply to a court with appropriate jurisdiction for any of the following without waiving its arbitration rights:

    (i)    Interim measures as necessary until appointment of the arbitrator(s) or pending determination by the arbitrator(s).
    (ii)   Preserving property pending determination by the arbitrator(s).
    (iii)  Enforcing judgment entered on an award over the Person or assets of the non-prevailing Party.
    (iv)   Enforcing Section 4.3(c) and preventing any information, documents or materials used in those proceedings from being used or disclosed by that Party for any purpose other than enforcement of Section 4.3(c).

(h)      Proceedings to (1) preserve property pending determination by the arbitrator(s), (2) enforce Section 4.3(c), (3) enforce judgment entered on an award may be brought in any court having jurisdiction over the Person or assets of the non-prevailing Party. The prevailing Party may

seek, in any court having jurisdiction, judicial recognition of the award, or order of enforcement or any other order or decree that is necessary to give full effect to the award.

Section 4.6 **Consolidation of Disputes.** The Parties agree that a dispute under this Agreement may raise issues that are common with other disputes under one or more of the Material Project Documents or which are substantially the same or interdependent and interrelated or connected with issues raised in any such related dispute, controversy, or claim between or among the Parties and their Affiliates under one or more of the Material Project Documents. "**Material Project Documents**" shall have the meaning set forth in the Omnibus Agreement (as defined in Appendix 1). Accordingly, any Party to a dispute under this Agreement or another Material Project Documents that is related to another dispute under this Agreement or another Material Project Document may elect in writing within fifteen (15) days after the initiation of a such dispute to refer such new dispute and any such related dispute for resolution in accordance with the provision of Section 4.5 on a consolidated basis. If the applicable arbitral panel determines that the applicable disputes are related, then the disputes shall be resolved on a consolidated basis; provided that, if the arbitral panel determines that the disputes are not related or for any other equitable reason should not be consolidated, then the disputes shall proceed separately.

## ARTICLE V.
## MISCELLANEOUS

Section 5.1 **Notices.** Any notice, request, instruction, correspondence or other document to be given hereunder by any Party to another (herein collectively called "**Notice**") shall be in writing and delivered (i) in person, (ii) by courier service or by overnight delivery service in each case that requires acknowledgement of receipt, (iii) mailed by certified mail, postage prepaid and return receipt requested, or (iv) delivered by electronic mail and expressly acknowledged as received by return electronic mail, as follows:

If to FWE IV:

Fieldwood Energy IV LLC
2000 W. Sam Houston Parkway S., Suite 1200
Houston, Texas 77042
Attention: Sole Manager
Phone: [●]
Email: [●]

If to Contractor:

Mako Buyer LLC
2000 W. Sam Houston Pkwy S. Suite 1200
Houston, Texas 77042
Attn:   Thomas R. Lamme
Phone: (713) 969-1107
Email: TLamme@fwellc.com


If to CUSA:

Chevron U.S.A. Inc.
100 Northpark Blvd
Covington, LA 70433
Attn:   Land Manager
Phone: (985) 773-6538
Email:  tdwebre@chevron.com

Notice given by personal delivery or courier shall be effective upon actual receipt. Notice given by mail shall be effective upon actual receipt or, if not actually received, the fifth Business Day following deposit with the U.S. Post Office. "**Business Day**" means every day other than a Saturday, a Sunday or a day that is an official holiday for employees of the federal government of the United States of America. Notice given by electronic mail shall be effective upon acknowledgement of receipt.  If a date specified herein for giving any Notice or taking any action is not Business Day (or if the period during which any Notice is required to be given or any action taken expires on a date which is not a Business Day), then the date for giving such Notice or taking such action (and the expiration date of such period during which notice is required to be given or action taken) shall be the next Business Day. Any Party may change any address, electronic or otherwise, to which Notice is to be given to it by giving Notice as provided above of such change of address; provided that copies to Chevron may not be amended, discontinued or delayed without CUSA's express written consent.


**Section 5.2**     **No Joint Venture or Partnership**. Nothing in this Agreement is intended to create, or shall be construed as creating, a partnership, joint venture, association for profit or other business entity between or among the Parties, and for federal and state income  tax purposes, the Parties elect to be excluded from the application of the provisions of Subchapter K, Chapter 1, Subtitle A of the Internal Revenue Code of 1986, as amended, as permitted and authorized by Section 761 of said Code and the regulations promulgated thereunder.


**Section 5.3**     **No Fiduciary Duty**. It is expressly understood and agreed that this Agreement is a purely commercial transaction among the Parties and that nothing stated herein shall operate to create any fiduciary duty which a Party shall owe to another Party.


**Section 5.4**     **Confidentiality**.


14

(a)     Each Party acknowledges that during term of this Agreement, it will have access to and become acquainted with trade secrets, proprietary information and confidential information belonging to each other Party that are not generally known to the public, including, but not limited to, information concerning business plans, operating practices and methods, financial statements, personnel information, contracts, and other information provided pursuant to this Agreement that each other Party treats as confidential, in any format whatsoever (including oral, written, electronic or any other form or medium) (collectively, "**Confidential Information**").  In addition, each Party acknowledges that: (i) each other Party has invested, and continues to invest, substantial time, expense and specialized knowledge in developing its Confidential Information; (ii) the Confidential Information provides each such other Party with a competitive advantage over others in the marketplace; and (iii) each such other Party would be irreparably harmed if the Confidential Information were disclosed to competitors or made available to the public. Without limiting the applicability of any other agreement to which each Party is subject, each such Party may not, without the each other Party's consent, directly or indirectly, disclose or use (other than solely for the purposes of complying with a Party's obligations under this Agreement or the other Material Project Contracts) at any time, including, without limitation, use for personal, commercial or proprietary advantage or profit, any Confidential Information of which such Party is or becomes aware.  Each Party must take all appropriate steps to safeguard the Confidential Information in its possession and to protect it against disclosure, misuse, espionage, loss and theft.

(b)     Nothing contained in this Section 5.4 will prevent a Party from disclosing Confidential Information:  (i) upon the order of any court or administrative agency; (ii) upon the request or demand of any regulatory agency or authority having jurisdiction over such Party; (iii) to the extent compelled by legal process or required or requested pursuant to subpoena, interrogatories or other discovery requests; (iv) to the extent necessary in connection with the exercise of any remedy hereunder; or (v) to the Party's employees, agents, representatives and advisors who, in the reasonable judgment of the Party, need to know such Confidential Information and agree to be bound by the provisions of this Section 5.4 (provided that such Party will remain liable for any breach of this Section 5.4 by any such Person); provided, that in the case of clause (i), (ii) or (iii), the applicable Party must notify the other Parties of the proposed disclosure as far in advance of such disclosure as practicable (but in no event make any such disclosure before notifying the other Parties) and use reasonable efforts to ensure that any Confidential Information so disclosed is accorded confidential treatment satisfactory to the other Parties, when and if available.

(c)     With respect to a particular Party, the restrictions of Section 5.4 will not apply to Confidential Information that: (i) is or becomes generally available to the public other than as a result of a disclosure by such Party in violation of this Agreement; (ii) is or has been independently developed or conceived such Party without use of Confidential Information and outside of its duties hereunder; or (iii) becomes available to such Party or any of its employees, agents, representatives and advisors on a non-confidential basis from a source other than the other Parties or any of their employees, agents, representatives and advisors, provided, that such source is not known by the Party to be bound by a confidentiality agreement with one of the other Parties.

(d)     The obligations of each Party under this Section 5.4 shall survive the termination of this Agreement.

(e)     Each Party hereby acknowledges that the provisions of <u>Section 5.4</u> are reasonable and necessary to protect the legitimate interests of the other Parties and that any violation of such provisions would result in irreparable injury to the other Parties. In the event of a violation of the provisions of this <u>Section 5.4</u>, each Party further agrees that the other Parties may, in addition to all other remedies available to it, be entitled to equitable relief by way of injunction and any other legal or equitable remedies without any requirement to post bond.

**Section 5.5     Costs and Expenses**.  Each Party shall bear its own costs and expenses in relation to the negotiation and preparation of this Agreement.

**Section 5.6     Further Assurances**.  The Parties shall at their own cost and expense execute and deliver such further documents and instruments and shall take such other actions as may be reasonably required or appropriate to evidence or carry out the intent and purposes of this Agreement.

**Section 5.7     Authority of Parties/Signatories**. Each person signing this Agreement represents and warrants that he or she is duly authorized and has legal capacity to execute and deliver this Agreement. Each Party represents and warrants to the other that the execution and delivery of this Agreement and the performance of such Party's duties have been duly authorized and that this Agreement is a valid and legal agreement binding on such Party and enforceable in accordance with its terms.

**Section 5.8     Public Announcements**.  No Party shall issue any public announcement or statement concerning this Agreement or make any use of the names, image, logos, or trademarks of any other Party or any of its Affiliates without obtaining the prior written consent of the other Parties.

**Section 5.9     Entire Agreement**. This Agreement (together with the Schedules, Exhibits and Appendices hereto), together with the other Material Project Contracts, constitutes the entire agreement among the Parties with respect to the subject hereof and supersedes any other representations, understandings or agreements (whether written, oral or otherwise) by any Party or any of its Affiliates relating to the transactions contemplated hereby or the subject hereof.

**Section 5.10   Successors and Assignments**.  No Party may assign, directly or indirectly, all or any part of its rights or obligations under this Agreement to any person, including in the event of a reorganization, merger, consolidation or asset sale, without the prior written consent of each other Party, which may be withheld at such Party's sole discretion; *provided that* the foregoing shall not apply if Contractor assigns this Agreement in total (i) along with all of its personnel who are performing any part of the Work (as defined in Appendix 1) hereunder to an Affiliate, provided that no such assignment by Contractor to an Affiliate shall relieve Contractor of its obligations under this Agreement, or (ii) to an acquirer of all or substantially all of Contractor's business or all or substantially all of Contractor's employees providing Work (as defined in Appendix 1).  Any attempted assignment in breach of this obligation is void.

**Section 5.11**   **Amendment**.  This Agreement may be amended or modified in whole or in part, and terms and conditions may be waived, only by a duly authorized agreement in writing or by Change Order which makes reference to this Agreement executed by each Party.

**Section 5.12**   **Construction**.

All article, section, schedule, and exhibit references used in this Agreement are to articles and sections of, and Schedules, Appendices and Exhibits to, this Agreement, unless otherwise specified. The schedules and exhibits attached to this Agreement constitute a part of this Agreement and are incorporated herein for all purposes.

Unless otherwise indicated, with respect to a Party, the terms "ordinary course of business" or "ordinary course" shall be deemed to refer to the ordinary conduct of business in a manner consistent with the past practices and customs of such Party.

If a term is defined as one part of speech (such as a noun), it shall have a corresponding meaning when used as another part of speech (such as a verb). Terms defined in the singular have the corresponding meanings in the plural, and vice versa. Unless the context of this Agreement clearly requires otherwise, words importing the masculine gender shall include the feminine and neutral genders and vice versa. The words "include", "includes" or "including" do not limit the preceding terms and shall be deemed to be followed by the words "without limitation." The words "hereof," "hereto," "hereby," "herein," "hereunder" and words of similar import, when used in this Agreement, shall refer to this Agreement as a whole and not to any particular section or article in which such words appear. The term "or" is not exclusive.

The terms "day" and "days" mean and refer to calendar day(s). The terms "year" and "years" mean and refer to calendar year(s), provided that the terms "Year 1" and "Contract Year" shall have the meanings specified in Section 1.2.

Each Party has participated in the negotiation and drafting of this Agreement, and, if an ambiguity should arise, this Agreement shall be construed as if drafted jointly by the Parties and no presumption or burden of proof shall arise favoring or burdening any Party by virtue of the authorship of any of the provisions in this Agreement.

The captions in this Agreement are for convenience only and shall not be considered a part of or affect the construction or interpretation of any provision of this Agreement.

All references to currency herein shall be to, and all payments required hereunder shall be paid in, United States Dollars.

The serial comma is sometimes included and sometimes omitted. Its inclusion or omission shall not affect the interpretation of any phrase.

**Section 5.13**   **Severability**. If any provision of this Agreement is held invalid or unenforceable by any court of competent jurisdiction, the other provisions of this Agreement shall remain in full force and effect. The Parties further agree that if any provision contained herein is, to any extent, held invalid or unenforceable in any respect under the laws governing this Agreement, they shall take any actions necessary to render the remaining provisions of this Agreement valid and enforceable to the fullest extent permitted by applicable law and, to the extent

17

necessary, shall amend or otherwise modify this Agreement to replace any provision contained herein that is held invalid or unenforceable with a valid and enforceable provision giving effect to the intent of the Parties to the greatest extent legally permissible.

      **Section 5.14   Counterparts**. This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. Any .pdf or other electronic transmission hereof or signature hereon shall, for all purposes, be deemed originals.

      **Section 5.15   Third Party Beneficiaries**.  No Person who is not a Party to this Agreement has any rights under this Agreement or may enforce any provision in this Agreement.

      **Section 5.16   Waivers**.  No waiver by any Party of this Agreement's terms, provisions or conditions is effective unless specifically evidenced in writing and signed by or on behalf of the Party granting such waiver. Any Party's failure to pursue remedies for breach of this Agreement, or payment by any Party of invoices, does not constitute a waiver by any such Party of any breach of this Agreement or raise any defense against claims against a Party for breach of this Agreement. The waiver, failure to pursue remedies or to require the performance of any agreement or obligation under this Agreement, does not constitute (1) a waiver of any breach of this Agreement, or (2) a waiver of a later breach of any such agreement or obligation.

*[Signature page to follow]*

WITNESS THE SIGNATURES of the Parties hereto as set forth below.

**CUSA**:

**CHEVRON U.S.A. INC.**

By: _____
Name:
Title:

**FIELDWOOD ENERGY IV LLC**

By: _____
Name:
Title:

**CONTRACTOR:**

**MAKO BUYER LLC**

By: _____
Name:
Title:

[*Signature page to Turnkey Removal Contract*]

Exhibit A
<u>Turnkey Projects and Turnkey Amounts</u>

# REDACTED

Exhibit B
<u>Qualified Conditions</u>

# REDACTED

Appendix 1
Terms and Conditions

[*See attached.*]

*Final Version*

# TURNKEY REMOVAL TERMS AND CONDITIONS

## ARTICLE I.      DEFINITIONS

As used in this Appendix, each of the following terms has the meaning provided below.

1.1    "<u>Affiliate</u>" means, with respect to a Party means any person or entity that controls, is controlled by or is under common control with such Party where control means the direct or indirect power to direct the management of the entity at issue.  For the avoidance of doubt, (i) neither CUSA nor any of its direct or indirect subsidiaries shall constitute an Affiliate of Contractor for purposes of this Agreement, and (ii) neither Contractor nor FWE IV nor any of their direct or indirect subsidiaries shall constitute an Affiliate of CUSA for purposes of this <u>Appendix 1</u>.

1.2    "<u>Appendix</u>" shall mean this <u>Appendix 1</u> (including all Exhibits attached hereto) which is itself attached to and incorporated in the Turnkey Removal Agreement.

1.3    "<u>BOEM</u>" shall mean the Bureau of Ocean Energy Management and/or any successor agencies thereto, as applicable.

1.4    "<u>BSEE</u>" shall mean the Bureau of Safety and Environmental Enforcement, and/or any successor agencies thereto, as applicable.

1.5    "<u>Business Day</u>" means every day other than a Saturday, a Sunday or a day that is an official holiday for employees of the federal government of the United States of America.

1.6     "<u>Claims</u>" shall mean any and all losses, liabilities, damages, obligations, expenses, fines, penalties, costs, claims, causes of action, judgments, awards and any and all other losses of any kind or character, including, without limitation, court costs and attorneys' fees.

1.7    "<u>Contractor</u>" shall have the meaning set forth in the Turnkey Removal Agreement.

1.8    "<u>Contractor Group</u>" shall mean, individually and collectively, Contractor, its parent, its Affiliates, its and their, joint venturers, contractors and subcontractors (of any tier), and all of their respective employees, officers, managers, directors, agents, representatives, subcontractors, and insurers and the subrogees of all such parties.

1.9    "<u>CUSA</u>" shall have the meaning set forth in the Turnkey Removal Agreement.

1.10    "<u>Decommissioning Project</u>" shall have the meaning set forth in the Turnkey Removal Agreement.

1.11    "<u>Escrow Account</u>" means that certain escrow account established pursuant to the Decommissioning Escrow Agreement (as defined in the Omnibus Agreement).

1.12    "<u>Facilities</u>" shall mean the platforms, pipelines, facilities, structures and other items or

38555021.v10

objects connected to or associated with the FWE IV Assets (as identified on <u>Exhibit A</u> to the Turnkey Removal Agreement) and all parts and components thereof.

1.13 "<u>Final Completion</u>" means:

> i. with respect to any Decommissioning Project that is a Well, acceptance by the applicable regulators of the End of Operations Report (EOR) with respect to such Well;
>
> ii. with respect to any Decommissioning Project that is a Pipeline, acceptance by the applicable regulators of a "completion report" with respect to such Pipeline; and
>
> iii. with respect to any Decommissioning Project that is a Platform/Facility, acceptance by the applicable regulators of Site Clearance with respect to such Platform/Facility,

with the type of each Decommissioning Project being as set forth in <u>Exhibit A</u> to the Turnkey Removal Agreement; *provided, however*, the Parties may agree on an alternative definition of "Final Completion" on a case-by-case basis in a writing signed by CUSA and Contractor prior to commencement of such Decommissioning Project.

1.14 "<u>FWE IV Group</u>" shall mean, individually and collectively, FWE IV, CUSA, and their respective parents, their Affiliates, and their respective co-venturers, co-lessees, co-owners, joint venturers, and all of their respective employees, officers, managers, directors, agents, representatives, attorneys-in-fact, and insurers and the subrogees of all such parties (provided that no member of the Contractor Group shall be a member of the FWE IV Group).

1.15 "<u>Government Official</u>" means any officer or employee of any government (including federal, state, local, and national governments), Public International Organization, any department, agency, company, or other instrumentality of any government or Public International Organization, or any candidate for political office.

1.16 "<u>Group</u>" means, with respect to FWE IV or CUSA, the FWE IV Group and, with respect to Contractor, the Contractor Group.

1.17 "<u>Notice</u>" and "<u>notice</u>" shall mean any notice, request, direction or other communication permitted or required to be given by one Party to the other with regard to this Appendix.

1.18 "<u>Omnibus Agreement</u>" means the omnibus agreement dated [_____] between Contractor, FWE IV and CUSA governing, among other matters, contributions into and distributions from the Escrow Account.

1.19 "<u>On The Hook</u>" shall mean the moment that such portion of the Facility (or part, piece or component thereof, as the case may be) is first lifted from its original resting position and is hanging free on Contractor's (or its subcontractor's) crane or other equipment during

the performance of the Work to be performed under this Appendix.

1.20 **"Public International Organization**" means an international organization formed by governments or other public international organizations, whatever the form of organization and scope of competence

1.21 **"Records**" mean information in any recorded form, including electronic, that relates to this Agreement.

1.22 "Reefed Items" shall mean the Facilities (and any part, piece and component thereof) to be reefed as set out in Section 2.4 herein and in accordance with the applicable reef permit.

1.23 "Site Clearance" shall mean delivery by Contractor to FWE IV (with a copy to CUSA) of evidence that BOEM and BSEE and all other applicable governmental authorities have accepted "site clearance" of the applicable Platform/Facility comprised in the applicable Decommissioning Project, including all requisite approvals or regulatory concurrence from such governmental authorities with respect to such Platform/Facility.

1.24 "Special Claim(s)" shall mean any and all Claims for or relating to special, indirect, consequential, exemplary, incidental or punitive damages of any kind or character, including, but not limited to, loss of use, loss of profit, loss of revenue, loss of product or production, reservoir damage, or hole damage (due to blowout or cratering).

1.25 "Targeted Completion Date" shall have the meaning set forth in Exhibit A to the Turnkey Removal Agreement.

1.26 "Third Party" shall mean any individual, person, company or entity or any other natural or juridical being, other than any member of the FWE IV Group or the Contractor Group.

1.27 "Transferred Items" shall mean the Facilities (and any part, piece and component thereof), including any equipment, materials, scrap metal, caissons, risers (and any and all other pieces, part or components thereof), but no part of any lease, that are to be removed or abandoned by Contractor as part of the Work and in accordance with this Appendix.

1.28 "Turnkey Removal Agreement" means the agreement between Contractor, FWE IV and CUSA with an effective date of [_____] and to which this Appendix 1 is attached and into which these Turnkey Removal Terms and Conditions have been incorporated.

1.29 "Turnkey Removal Terms and Conditions" means Article I through Article VIII of this Appendix 1 and Exhibits "A" through "F" attached hereto.

1.30 "Work" shall mean the work and activities, including the plugging, abandonment, decommissioning and removal of the relevant components of the FWE IV Assets, and the salvage and removal of the Facilities, to be conducted by or on behalf of Contractor pursuant to the terms and provisions of this Appendix, as more fully described in

- 3 -

Schedule "A" to this Appendix.

1.31    Any capitalized terms used herein but not defined in this Appendix shall have the meaning ascribed in the Turnkey Removal Agreement.


## ARTICLE II.    WORK

2.1    Scope of Work.

Contractor shall perform the Work upon the terms and provision set forth in this Appendix 1.  The scope of the Work for each Decommissioning Project is more fully set forth in Schedule "A" to this Appendix.

Additionally, the Parties acknowledge that Contractor will prepare a particularized scope of work for certain Decommissioning Projects that Contractor will submit to BSEE through Contractor's Application for Permit to Modify (APM) for each Decommissioning Project. Upon submittal of such APM to BSEE, Contractor shall also provide to CUSA, for informational purposes only, an unredacted copy of the APM and all supporting documents reasonably requested by CUSA.  For any Decommissioning Project that does not require an APM, Contractor shall provide CUSA, for informational purposes only, with copies of any permit applications filed with BSEE.  Upon approval by BSEE of the APM or applicable permit application and BSEE's issuance of the applicable permit approving such Decommissioning Project, Contractor's particularized scope of work that was so approved by BSEE shall become the "Definitive Scope of Work" for such Decommissioning Project. Upon request by CUSA, Contractor shall provide CUSA with the project execution plan for any Decommissioning Project.

2.2    Inspection.

The Work and all parts thereof shall be subject to inspection at all reasonable times by inspectors designated by FWE IV, its representatives, or its invitees (which such invitees may include CUSA and/or representatives of CUSA).  No such inspection shall relieve Contractor of any of its obligations hereunder.  No failure to inspect or failure to discover any aspect of the Work that is not performed in accordance with any provision of this Appendix shall be construed to imply any acceptance of such Work or to relieve Contractor of any of its obligations hereunder.  Contractor shall correct any portion of the Work that is incomplete or otherwise as required to achieve Final Completion of the Decommissioning Project, subject to the terms of the Agreement.

2.3    Title.

FWE IV grants, bargains, sells, conveys and assigns to Contractor, and Contractor accepts and assumes title to and ownership of the Transferred Items, which such transfer shall occur for each of the Transferred Items at such time as such Transferred Items are On The Hook.

THE TRANSFERRED ITEMS SHALL BE TRANSFERRED TO AND ACCEPTED BY CONTRACTOR "AS IS, WHERE IS" WITH ALL FAULTS. FWE IV DOES NOT MAKE ANY, AND FWE IV EXPRESSLY DISCLAIMS ANY AND ALL, WARRANTIES CONCERNING THE TRANSFERRED ITEMS, WHETHER EXPRESS, IMPLIED, STATUTORY OR OTHERWISE, INCLUDING, WITHOUT LIMITATION, ANY WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR USE, AND FREEDOM FROM DEFECTS, WHETHER SUCH DEFECTS ARE PATENT, LATENT, PRE-EXISTING, REDHIBITORY OR OTHERWISE. UPON SUCH TRANSFER OF OWNERSHIP FROM FWE IV TO CONTRACTOR OF THE TRANSFERRED ITEMS, CONTRACTOR SHALL BE SOLELY RESPONSIBLE FOR, AND SHALL ASSUME ALL RISK AND LIABILITY FOR SUCH TRANSFERRED ITEMS, INCLUDING, WITHOUT LIMITATION, ALL LIABILITY FOR TIE DOWN AND SEA FASTENING, SALVAGE IF LOST DURING TRANSPORT, REMOVAL AND DISPOSAL OF SUCH TRANSFERRED ITEMS AND ALL POLLUTION OR ENVIRONMENTAL CONTAMINATION ATTRIBUTABLE THERETO. The foregoing notwithstanding, the Parties expressly acknowledge that nothing herein shall cause the transfer of, and Contractor does not accept, the assignment or conveyance of any record title ownership of any lease or any operating rights thereunder. FWE IV agrees to provide a bill of sale related to such Transferred Items upon request by Contractor.

2.4     Reefed Items. In accordance with the Work to be performed under this Appendix, Contractor shall remove and transport the Reefed Items to the designated reef sites as described in the applicable reef permits. CONTRACTOR SHALL BE SOLELY RESPONSIBLE FOR, AND SHALL ASSUME ALL RISK AND LIABILITY FOR SUCH REEFED ITEMS, INCLUDING, WITHOUT LIMITATION, ALL LIABILITY FOR THE TOW AND SALVAGE, IF LOST DURING TOWING, OF SUCH REEFED ITEMS AND ALL POLLUTION AND ENVIRONMENTAL CONTAMINATION ATTRIBUTABLE THERETO (EXCEPT TO THE EXTENT DUE TO THE CONDITION OR STRUCTURAL INTEGRITY OF THE RETAINED ITEMS FOR WHICH FWE IV SHALL REMAIN RESPONSIBLE) BEGINNING WHEN SUCH REEFED ITEMS ARE ON THE HOOK AND UNTIL SUCH TIME AS THE REEFED ITEMS ARE DELIVERED BY MATERIAL BARGE TO THE DESIGNATED REEF SITES FOR POSITIONING ON THE SEA FLOOR PURSUANT TO THE APPLICABLE REEF PERMIT.

## ARTICLE III.     SURVEY AND PERMITS

3.1     On-Site Survey.

At the completion of the removal, reefing or abandonment of any particular Facility in accordance with the Work to be performed hereunder, Contractor shall conduct a survey over the relevant Facility site, if necessary to obtain Final Completion of the Decommissioning Project. Any costs of such on-site survey shall be to Contractor's account.

3.2     Permits.

FWE IV agrees to timely obtain and shall thereafter maintain all permits and approvals that are necessary for Contractor to perform the Work and required to be in the name of any member of Contractor Group (the "Contractor Permits").  Contractor shall provide all necessary information, assistance and documentation to FWE IV as reasonably requested in connection with the permits to be obtained by FWE IV.

## ARTICLE IV.     OBLIGATIONS OF CONTRACTOR

4.1     Independent Contractor.

Contractor is an independent contractor with the sole authority and right to direct, supervise and control the performance of all details of the Work, subject only to the general right of inspection by FWE IV or its representatives or invitees (including CUSA) to achieve the desired results and satisfactory completion of the Work. Any provision of this Appendix that may appear to give FWE IV or its representatives or invitees (including CUSA) the right to direct Contractor as to the details of doing the Work or to exercise a measure of control over the Work shall be deemed to mean that Contractor shall follow the desires of FWE IV or its representatives or its invitees (including CUSA) in the results of the Work only and not in the means whereby the Work is to be accomplished.  Except as otherwise expressly provided in Section 4.2 hereof, no member of the Contractor Group shall be deemed to be an agent, representative, or employee of FWE IV or any other member of FWE IV Group.  Contractor shall remain responsible for all of the actions of its subcontractors and the agents, representatives and employees of such subcontractors.

4.2     Statutory Employee.

In all cases where Contractor's employees (defined for the purposes of this Section 4.2 to include any Contractor Group member's direct, borrowed, special or statutory employees) are performing Work in or offshore the State of Louisiana or are otherwise covered by the Louisiana Worker's Compensation Act, La. Rev. Stat. §§ 23.1021 et seq., FWE IV, CUSA and Contractor acknowledge and agree that all Work and operations performed by Contractor and its subcontractors and their employees pursuant to this Appendix are an integral part of and are essential to the ability of FWE IV to generate FWE IV's goods, products or services.  In such event, and without limiting the provisions of Section 4.1 above, FWE IV and Contractor agree that FWE IV is and shall be deemed a statutory employer of Contractor's employees and its subcontractor's employees for the sole purposes of La. Rev. Stat. § 23.1061(A)(3), as the same may be amended from time to time. Contractor shall ensure that all of its subcontracts contain the same provisions as this Section 4.2.

4.3     Standard of Performance.

A. Contractor covenants and agrees that it shall safely and efficiently prosecute the Work with due diligence and care in a good and workmanlike manner with qualified, careful and efficient workers in strict compliance and accordance with (i) generally accepted standards of engineering, construction and decommissioning practice for work that is substantially

- 6 -

similar to the Work covered under this Appendix; (ii) the provisions of the Appendix; and (iii) all applicable laws, rules, regulations and standards of the BOEM and any other applicable governmental or regulatory agency or body (together, the "Standard of Performance"). The Parties agree that Contractor will have met the Standard of Performance under the Agreement, including this Appendix, if it performs the Work consistent with all required laws, rules and regulations promulgated by governing regulatory agencies, including but not limited to BOEM and BSEE, and consistent with any applicable third party contracts. As used in this Section 4.3, "third party contracts" means contracts that govern or otherwise impose obligations on FWE IV with respect to the performance of engineering, construction and decommissioning activities in relation to the FWE IV Assets.

B.   With respect to the Decommissioning Projects known to the Parties as (i) East Breaks 158 (OCS-G02645), (ii) East Breaks 159 (OSC-G02646), (iii) East Breaks 160 (OCS-G02647) and (iv) East Breaks 161 (OSC-G02648) (hereinafter the "East Breaks Assets"), Contractor agrees to comply with the following and that the following shall be part of the "Standard of Performance" with respect to the Decommissioning Projects that include any of the East Breaks Assets:

    i.   For the East Breaks Assets that are Wells, Contractor shall monitor such wells for pressure or bubbles in accordance with BSEE regulations for sixty (60) consecutive days following achievement of "Temporary Abandoned Status" (as commonly defined and accepted by BSEE) through surface plug completion date. When Contractor experiences zero (0) flow and zero (0) bubbles for thirty (30) consecutive minutes, such monitoring may cease. In the event of denial by BSEE of sustained casing pressure departure requests submitted on the wells known to the Parties as the EB 159 A007, EB 160 A029, EB 160 A007 and EB 160 A024 Wells, the above requirement shall be conducted only when Work scheduling allows (as determined by Contractor).

    ii.   All conductors shall be reefed at a maximum depth of 200' below the waterline, unless such reefing is not approved by BSEE or Texas Parks & Wildlife. The Parties reserve the right to mutually agree in writing to different severance depths.

4.4   Contractor's Personnel.

Notwithstanding the fact that Contractor shall perform the Work as an independent contractor, Contractor covenants and agrees to keep competent personnel on the job.

4.5   Compliance with Laws.

Contractor shall observe and comply with, and shall ensure that all members of the Contractor Group observe and comply with, all federal, state and local laws, orders, rules and regulations which are now or may in the future become applicable to Contractor (or such employee, agent, representative or subcontractor, as the case may be) or to the performance of the Work under this Appendix and shall comply with the provisions in Schedule "B" attached hereto and made a part hereof for all purposes.

- 7 -

4.6      Equipment & Materials.

All equipment, tools, materials and facilities to be furnished by Contractor in the performance of the Work shall be serviceable and kept in good operating condition.  Contractor shall schedule its other operations so as to ensure that the necessary equipment, tools, materials and facilities and personnel to operate the same shall be available at the times necessary for the orderly completion of the Work in accordance with the terms of this Appendix.

4.7      Schedule Obligations.

Contractor shall provide FWE IV and CUSA a schedule for the commencement of each Decommissioning Project for Year 1 on a date no more than sixty (60) days after the Effective Date of the Turnkey Removal Agreement.  For each subsequent Contract Year, Contractor will provide a schedule related to the Decommissioning Projects to be conducted in such Contract Year no later than the date that is ninety (90) days prior to the beginning of the Contract Year in which such Decommissioning Project is to be commenced as identified on Exhibit A for the Turnkey Removal Agreement.  Contractor shall provide FWE IV and CUSA a monthly update to the schedule reflecting any changes to the schedule.

4.8      Delay Notice.

If, at any time, Contractor becomes aware that it will achieve Final Completion of a Decommissioning Project later than the applicable Targeted Completion Date, Contractor shall notify CUSA of such delay and the measures Contractor is taking and will take to timely complete such Decommissioning Project.

4.9      Liens.

CONTRACTOR SHALL INDEMNIFY AND HOLD HARMLESS THE FWE IV GROUP FROM ANY AND ALL LIENS AND OTHER ENCUMBRANCES AGAINST ANY PROPERTY OR INTERESTS OF ANY MEMBER OF THE FWE IV GROUP AND FROM AND AGAINST ANY AND ALL CLAIMS ON ACCOUNT OF DEBTS ALLEGED TO BE DUE FROM ANY MEMBER OF CONTRACTOR GROUP, TO ANY PERSON INCLUDING ANY OTHER MEMBER OF CONTRACTOR GROUP, AND SHALL DEFEND AT ITS OWN EXPENSE ANY CLAIM OR LITIGATION IN CONNECTION THEREWITH; PROVIDED, HOWEVER, THE FOREGOING SHALL NOT APPLY TO THE EXTENT THE LIEN OR OTHER ENCUMBRANCE OR OTHER CLAIM ARISES OUT OF CUSA'S OR OTHER WI PARTY'S (AS SUCH TERM IS DEFINED IN THE OMNIBUS AGREEMENT) FAILURE TO PAY UNDISPUTED AMOUNTS OWED.

4.10     Conflict of Interest and Improper Influence

In performing their obligations hereunder, no member of Contractor Group will (a) give to or receive from any director, employee, or agent of FWE IV or CUSA or their individual Affiliate in connection with the Work, any gift, entertainment, or other benefit of more than nominal cost or value, or any commission, fee, or rebate, (b) enter into any business arrangement with any individual known by such member of the Contractor Group to be a director, employee or agent (excluding

attorneys and accountants) of FWE IV or CUSA or their individual Affiliate without FWE IV or CUSA's, as applicable, prior written consent, (c) offer or make any payment, or offer or give anything of value to any Government Official, or any immediate family member of a Government Official, any political party to influence any act or decision by any Government Official, government, government instrumentality, party, or Public International Organization, or to gain any other advantage for FWE IV Group or Contractor Group or any of them arising out of this Agreement, or (d) offer or make any payment, or offer or give anything of value to any person if the Contractor member knows or has reason to believe that any portion of the payment or thing of value will be given directly, indirectly, or through a third party to any Government Official, any immediate family member of any Government Official, or any political party.

A. **Representation and Warranty.** Contractor represents and warrants for itself and on behalf of each member of the Contractor Group (acting in its capacity as such) that no event has occurred prior to the Effective Date which, had it occurred after the Effective Date, would constitute a violation of <u>Section 4.10</u>.

B. **Reporting Violations and Termination.** Contractor shall immediately notify FWE IV or CUSA, as applicable, of any violation of <u>Section 4.10</u> or breach of the warranty under <u>Section 4.10(A)</u>. Notwithstanding any other provision of this Agreement, FWE IV or CUSA, as applicable, may terminate this Agreement at any time for any violation of <u>Section 4.10</u>, or breach of the warranty under <u>Section 4.10(A)</u>, and neither FWE IV nor CUSA is obligated to make any payment to Contractor after the date of such violation or event, except in satisfaction of payment obligations that accrued on or prior to the date of such violation or event, and that FWE IV or CUSA has determined are not directly or indirectly related to such violation or event.

4.11    <u>Controls and Records.</u>

Contractor shall ensure that all members of Contractor Group establish and maintain all internal controls and Records that are necessary and appropriate in accordance with good management practice to achieve the following:

(i)     Ensure the accuracy and completeness of Contractor's invoices and of the Records required to be kept under this Agreement.

(ii)    Ensure and to record accurately and completely compliance with <u>Section 4.10(A)</u>, and detection of any other improper conduct by members of Contractor Group.

(iii)   Ensure and to record accurately and completely compliance with all other obligations of Contractor under this Agreement, including HES Guidelines and DAS Policy.

(iv)    Record accurately and completely the performance by Contractor of its obligations under this Agreement, and the liability for and calculation of all amounts payable by FWE IV to Contractor under this Agreement.

(v)     Record accurately and completely all amounts payable by members of Contractor Group to other members of Contractor Group, or other person in connection with the performance of Contractor of its obligations under this Agreement.

4.12    <u>Records.</u>

Contractor shall maintain complete, accurate and current detailed Records of all costs and documentation of equipment, materials, supplies, labor and any other items or aspects of the Work performed hereunder for not less than two (2) years after final termination of the Agreement; provided, however, if any Claim related to the Work performed pursuant to this Appendix is made by any person or entity within such two (2) year period, then Contractor shall retain such Records until final resolution of such Claim.  Contractor shall grant to FWE IV, its authorized representatives, its authorized invitees (including CUSA) and/or public accounting firm selected by FWE IV, the right, at a reasonable time, to inspect, audit, examine and copy any applicable Records or documents of Contractor as may be necessary confirm that the requirements of this Agreement are met, including to verify the validity and correctness of the charges reflected on any invoice and to protest or dispute any such charge.  Nonetheless, nothing in this Appendix shall create a right to inspect, audit, examine or copy any records relating to Contractor's profits or overhead or to its costs or expenses relating to any Decommissioning Project performed on a lump sum basis; provided that this sentence shall not limit CUSA's rights to inspect, audit, examine or copy records relating to (i) Decommissioning Projects performed on a cost-plus, at-cost or other reimbursable basis or (ii) Contractor claims in relation to Qualified Conditions.

4.13    Trade Sanctions Compliance.

Contractor shall provide FWE IV and CUSA with 90 days' advance notice of the names and addresses of any member of Contractor Group which may be the target of, or owned or subject to control by, any country, institution, organization, entity, or person that is subject to economic sanctions or any trade restrictions imposed by the U.S. government; debarred or excluded or declared ineligible to participate in U.S. government contracts, or contracts, grants, or other programs financed in whole or part by the U.S. government; or listed by the U.S. Departments of Commerce or State as an entity which U.S. persons may not engage in export or re-export related transactions.

4.14    Import and Export Charges.

Contractor is responsible for importing and exporting all Contractor equipment that Contractor requires to perform the Work.  Contractor is solely responsible for all import and export charges and any other lawfully payable charged related to the import and export of Contractor equipment.

4.15    Taxes.

Contractor agrees to pay all taxes, licenses and fees levied or assessed in connection with, or incident to, Contractor's performance of the Work by any governmental agency, including for (i) income taxes; (ii) unemployment compensation insurance, benefits, social security; or (iii) any other taxes upon the amounts paid to Contractor, its agents, employees and representatives.  Contractor shall also be responsible for and shall pay all sales, ad valorem or use taxes and all import/customs duties, fees, charges or costs that may be assessed or incurred as a result of the performance of the Work, including the transfer of the Transferred Items from FWE IV to Contractor pursuant to the terms hereof and the Turnkey Removal Agreement.

## ARTICLE V.    INDEMNIFICATION AND LIABILITY

**5.1** **CONTRACTOR'S INDEMNITY.**

CONTRACTOR SHALL BE LIABLE AND RESPONSIBLE FOR, AND SHALL RELEASE, DEFEND, PROTECT, INDEMNIFY AND HOLD HARMLESS THE FWE IV GROUP FROM AND AGAINST ANY AND ALL CLAIMS ARISING FROM OR RELATING TO:

A.  THE LOSS OF OR DAMAGE OR INJURY TO THE PROPERTY OF ANY MEMBER OF THE CONTRACTOR GROUP AND/OR WRECK REMOVAL OF SUCH PROPERTY, INCLUDING, WITHOUT LIMITATION, ANY SUCH MEMBER'S EQUIPMENT, VESSELS, BARGES AND TUGS, AND (FROM AND AFTER THE TIME AT WHICH THE OWNERSHIP OF SUCH TRANSFERRED ITEMS VESTS IN CONTRACTOR PURSUANT TO SECTION 2.3) THE TRANSFERRED ITEMS, WHETHER SUCH PROPERTY IS OWNED, RENTED OR OPERATED BY ANY SUCH MEMBER OF THE CONTRACTOR GROUP;

B.  ANY ILLNESS, INJURY OR DEATH SUFFERED BY ANY MEMBER OF THE CONTRACTOR GROUP;

C.  (1) THE LOSS OF OR DAMAGE OR INJURY TO THE PROPERTY OF ANY THIRD PARTY, OR (2) THE ILLNESS, INJURY OR DEATH SUFFERED BY ANY THIRD PARTY, TO THE EXTENT THAT ANY SUCH CLAIM IS CAUSED BY THE BREACH OF THE TURNKEY REMOVAL AGREEMENT (INCLUDING THIS APPENDIX) BY CONTRACTOR OR THE NEGLIGENCE, GROSS NEGLIGENCE OR WILLFUL MISCONDUCT OF ANY MEMBER OF CONTRACTOR GROUP;

D.  THE LOSS OF OR DAMAGE OR INJURY TO THE PROPERTY OF FWE IV THAT IS NOT THE SUBJECT OF THE APPLICABLE DECOMMISSIONING PROJECT BEING UNDERTAKEN AT THE TIME OF SUCH LOSS OR DAMAGE, TO THE EXTENT THAT ANY SUCH CLAIM IS CAUSED BY THE NEGLIGENCE, GROSS NEGLIGENCE OR WILLFUL MISCONDUCT OF ANY MEMBER OF CONTRACTOR GROUP;

E.  GOVERNMENTAL FINES AND PENALTIES ASSESSED IN CONNECTION WITH ANY DECOMMISSIONING PROJECT OR ANY OF THE WORK RESULTING FROM THE BREACH OF THE TURNKEY REMOVAL AGREEMENT (INCLUDING THIS APPENDIX) BY CONTRACTOR OR THE NEGLIGENCE, GROSS NEGLIGENCE OR WILLFUL MISCONDUCT OF ANY MEMBER OF CONTRACTOR GROUP;

F.  THE FAILURE OF CONTRACTOR OR ANY OTHER PERSON FOR WHOM CONTRACTOR IS RESPONSIBLE TO PAY TAXES THAT ARE CONTRACTOR'S RESPONSIBILITY PURSUANT TO SECTION 4.15;

G.  POLLUTION OR CONTAMINATION (INCLUDING, WITHOUT LIMITATION, PROPERTY DAMAGE, CONTROL, REMOVAL, RESTORATION OF LANDS OR SEA BEDS, AND CLEANUP OF ALL POLLUTION OR CONTAMINATION), INCLUDING, WITHOUT

LIMITATION, SPILLS OR LEAKS OR FUEL, LUBRICANTS, MOTOR OILS, PIPE DOPE, PAINTS, SOLVENTS, BALLASTS, BILGE, GARBAGE OR SEWAGE, WHICH EITHER (I) ORIGINATES FROM THE PROPERTY OF ANY MEMBER OF CONTRACTOR GROUP OR (II) IS CAUSED BY A BREACH OF THE TURNKEY REMOVAL AGREEMENT (INCLUDING THIS APPENDIX) BY CONTRACTOR OR THE NEGLIGENCE, GROSS NEGLIGENCE OR WILLFUL MISCONDUCT OF ANY MEMBER OF CONTRACTOR GROUP;

H.   ASSESSMENTS OR LEVIES AGAINST FWE IV GROUP IN CONNECTION WITH CONTRACTOR'S IMPORT/EXPORT OBLIGATIONS ARISING OUT OF THIS AGREEMENT;

I.   ANY INACCURACY OF THE REPRESENTATIONS SET FORTH IN <u>SECTIONS 4.5 AND 4.10</u>;

J.   ANY BREACH OF APPLICABLE LAW BY ANY MEMBER OF CONTRACTOR GROUP;

K.   LIENS;

WHICH ARISE OUT OF OR RELATE TO THE TURNKEY REMOVAL AGREEMENT (INCLUDING THIS APPENDIX) OR THE PERFORMANCE OF ANY WORK HEREUNDER.  <u>CONTRACTOR'S OBLIGATIONS UNDER THIS SECTION 5.1, INCLUDING, WITHOUT LIMITATION, ITS OBLIGATIONS TO DEFEND, PROTECT, INDEMNIFY AND HOLD HARMLESS THE FWE IV GROUP, SHALL BE OWED WITHOUT LIMIT AND WITHOUT REGARD TO THE CAUSE OR CAUSES OF ANY CLAIMS FOR WHICH SUCH OBLIGATIONS ARE OWED, INCLUDING, WITHOUT LIMITATION, THE SOLE, JOINT OR CONTRIBUTORY NEGLIGENCE, STRICT LIABILITY, LIABILITY WITHOUT FAULT, STATUTORY LIABILITY, CONTRACTUAL LIABILITY OR OTHER FAULT OF ANY MEMBER OF THE FWE IV GROUP, THE UNSEAWORTHINESS OF ANY VESSEL, THE UNAIRWORTHINESS OF ANY AIRCRAFT OR THE EXISTENCE OF ANY DEFECT, WHETHER PATENT, LATENT, PRE-EXISTING OR OTHERWISE; PROVIDED, HOWEVER, THAT SUCH OBLIGATIONS SHALL NOT BE OWED TO THE EXTENT SUCH CLAIMS ARE CAUSED BY THE GROSS NEGLIGENCE OR WILLFUL MISCONDUCT OF ANY MEMBER OF THE FWE IV GROUP.</u>

## 5.2   <u>FWE IV's INDEMNITY.</u>

FWE IV SHALL BE LIABLE AND RESPONSIBLE FOR, AND SHALL RELEASE, DEFEND, PROTECT, INDEMNIFY AND HOLD HARMLESS THE CONTRACTOR GROUP FROM AND AGAINST ANY AND ALL CLAIMS ARISING FROM OR RELATING TO:

A.   SUBJECT TO <u>SECTION 5.1D</u>, THE LOSS OF OR DAMAGE OR INJURY TO THE PROPERTY OF ANY MEMBER OF THE FWE IV GROUP AND/OR WRECK REMOVAL OF SUCH PROPERTY, INCLUDING, WITHOUT LIMITATION, ANY SUCH MEMBER'S EQUIPMENT, VESSELS, BARGES AND TUGS, WHETHER SUCH PROPERTY IS OWNED, RENTED OR OPERATED BY ANY SUCH MEMBER OF FWE IV GROUP;

B.   ANY ILLNESS, INJURY OR DEATH SUFFERED BY ANY MEMBER OF THE FWE IV GROUP; AND

- 12 -

**C.** **(1)** THE LOSS OF OR DAMAGE OR INJURY TO THE PROPERTY OF ANY THIRD PARTY, OR **(2)** THE ILLNESS, INJURY OR DEATH SUFFERED BY ANY THIRD PARTY, TO THE EXTENT THAT ANY SUCH CLAIM IS CAUSED BY THE NEGLIGENCE, GROSS NEGLIGENCE OR WILLFUL MISCONDUCT OF ANY MEMBER OF FWE IV GROUP;

WHICH ARISE OUT OF OR RELATE TO THE TURNKEY REMOVAL AGREEMENT (INCLUDING THIS APPENDIX) OR THE PERFORMANCE OF ANY WORK HEREUNDER. <u>FWE IV'S OBLIGATIONS UNDER THIS SECTION 5.2, INCLUDING, WITHOUT LIMITATION, ITS OBLIGATIONS TO DEFEND, PROTECT, INDEMNIFY AND HOLD HARMLESS THE CONTRACTOR GROUP, SHALL BE OWED WITHOUT REGARD TO THE CAUSE OR CAUSES OF ANY CLAIMS FOR WHICH SUCH OBLIGATIONS ARE OWED, INCLUDING, WITHOUT LIMITATION, THE SOLE, JOINT OR CONTRIBUTORY NEGLIGENCE, STRICT LIABILITY, LIABILITY WITHOUT FAULT, STATUTORY LIABILITY, CONTRACTUAL LIABILITY OR OTHER FAULT OF ANY MEMBER OF THE CONTRACTOR GROUP, THE UNSEAWORTHINESS OF ANY VESSEL, THE UNAIRWORTHINESS OF ANY AIRCRAFT OR THE EXISTENCE OF ANY DEFECT, WHETHER PATENT, LATENT, PRE-EXISTING OR OTHERWISE; PROVIDED, HOWEVER, THAT SUCH OBLIGATIONS SHALL NOT BE OWED TO THE EXTENT SUCH CLAIMS ARE CAUSED BY THE GROSS NEGLIGENCE OR WILLFUL MISCONDUCT OF ANY MEMBER OF THE CONTRACTOR GROUP.</u>

## 5.3    SPECIAL CLAIMS.

NOTWITHSTANDING ANYTHING TO THE CONTRARY CONTAINED ELSEWHERE HEREIN, NEITHER PARTY (NOR THE MEMBERS OF SUCH PARTY'S GROUP) SHALL BE LIABLE TO THE OTHER PARTY FOR ANY SPECIAL CLAIM(S), WHENEVER ARISING UNDER THE TURNKEY REMOVAL AGREEMENT (INCLUDING THIS APPENDIX) OR AS A RESULT OF, RELATING TO OR IN CONNECTION WITH ANY WORK; AND NO SUCH SPECIAL CLAIM(S) SHALL BE MADE BY ANY PARTY AGAINST ANY OTHER PARTY OR SUCH OTHER PARTY'S GROUP (OR ANY MEMBER OF SUCH OTHER PARTY'S GROUP AS SUCH IS CONTEMPLATED HEREUNDER), <u>REGARDLESS OF THE CAUSE OR CAUSES OF SUCH SPECIAL CLAIM(S), INCLUDING WHETHER OR NOT ANY SUCH SPECIAL CLAIM IS BASED OR ALLEGED TO BE BASED, IN WHOLE OR IN PART, ON THE NEGLIGENCE (INCLUDING SOLE, JOINT, ACTIVE, PASSIVE, CONCURRENT OR GROSS NEGLIGENCE), BREACH OF WARRANTY, STRICT LIABILITY, STATUTORY LIABILITY, CONTRACTUAL LIABILITY OR OTHER FAULT OF ANY PARTY OR ANY MEMBER OF SUCH PARTY'S GROUP, THE UNSEAWORTHINESS OF ANY VESSEL, THE UNAIRWORTHINESS OF ANY AIRCRAFT, OR THE EXISTENCE OF ANY DEFECT, WHETHER PATENT, LATENT, PRE-EXISTING OR OTHERWISE; PROVIDED, HOWEVER, THIS SECTION 5.3 SHALL NOT APPLY TO CLAIMS MADE BY THIRD PARTIES (OR TO OBLIGATIONS TO INDEMNIFY AND DEFEND AGAINST CLAIMS MADE BY THIRD PARTIES)</u>.

## ARTICLE VI.    INSURANCE

6.1    <u>Contractor's Insurance.</u>

Contractor shall carry, at its own expense, with insurers who are reliable and with an A.M Best rating of not less than A- and authorized to do business in the states or other jurisdictions in which the Work is to be performed by Contractor hereunder, insurance coverages of the types and

with limits no less than those set forth in Schedule "C" attached hereto and made a part hereof. Further, Contractor agrees to carry adequate contractual liability insurance to support the indemnities given herein. Prior to commencing any of the Work to be conducted pursuant to the terms of this Appendix, if requested by CUSA, Contractor agrees to provide CUSA with certificates of insurance evidencing such insurance coverages in commercially-available forms acceptable to CUSA, and Contractor agrees to maintain current certificates of insurance on file with CUSA for the duration of this Appendix. The Parties expressly acknowledge and agree that the insurance and indemnity provisions of this Appendix are separate and distinct; and that any insurance requirements contained herein shall not be deemed to restrict or limit any of the indemnity obligations set forth in this Appendix.

If Contractor hires any subcontractor to perform any of the Work hereunder, then Contractor shall require that any such subcontractor will obtain insurance protection with coverages of the types and with limits deemed appropriate by Contractor. Any deficiencies in the coverages, policy limits or endorsements of Contractor's subcontractors shall be the sole responsibility of Contractor and shall be covered by Contractor's insurance.

6.2    Louisiana Anti-Indemnity Provisions.

Notwithstanding anything contained herein to the contrary, Contractor and FWE IV agree that with respect to all Work performed in Louisiana or offshore Louisiana and with respect to which the laws of the state of Louisiana are otherwise applicable, FWE IV (on its own behalf, on behalf of CUSA, and on behalf of their respective agents and representatives and their respective employees) and Contractor (on its behalf, and on behalf of its subcontractors, agents and representatives and their respective employees) may pay to each other's insurers the premium required by their respective insurers or their insurer's agents or authorized representatives to extend all of their insurance policies to include coverage for FWE IV's and Contractor's respective indemnities as required under this Appendix, and such insurance protection shall be governed by Louisiana law. Each of FWE IV and Contractor will arrange to have the other billed for the premium by its respective insurer, and will advise the other prior to the commencement of any Work under this Appendix if the premium will be in excess of $2,000.00. The insurance policy shall apply to incidents arising out of the performance of this Appendix. At each subsequent renewal of insurance, during the term of the Appendix, each party will advise the other of the amounts of the premium required for the extensions described above and arrange billing for the appropriate premium by its insurers or their agents or authorized representatives. It is expressly acknowledged and agreed to by the Parties that the provisions of this Section 6.2 are intended to comply with the provisions of *Marcel v. Placid Oil Co.*, 11 F.3d 563 (5th Cir. 1994), and the provisions hereof shall be interpreted in such a manner as to comply therewith.

6.3    Texas Anti-Indemnity Act.

To the extent that the Work or any part thereof is subject to the laws of the state of Texas, the Parties agree that in order to be in compliance with the Texas Anti-Indemnity Act regarding indemnification mutually assumed for the other Party's sole or concurrent negligence, each Party agrees to carry supporting insurance in equal amounts of the types and in the minimum amounts

specified in the insurance agreements hereunder; provided, however, that FWE IV shall have the right to self-insure any or all coverages required of it hereunder.

## ARTICLE VII.    CUSA POLICIES

7.1    <u>Compliance with Policies</u>.

Contractor covenants and agrees to, and shall cause its subcontractors to agree to, abide by and act in accordance with the following Contractor policies, as such are set forth in <u>Exhibits "B,"</u> "<u>D</u>," "<u>E</u>" and "<u>F</u>," respectively, attached hereto and made a part hereof:

    1.    Equal Opportunity Policy
    2.    Drug and Alcohol Policy;
    3.    Safety Program; and
    4.    Search and Seizure Policy.

## ARTICLE VIII.    GENERAL PROVISIONS

8.1    <u>Force Majeure</u>.

A.  All obligations imposed by the Turnkey Removal Agreement (including this Appendix) on each Party, except for obligations to pay money or to provide defense or indemnity, shall be suspended while compliance is prevented, in whole or in part, by an event of *force majeure*. As used herein an event of *force majeure* shall mean any of: an industry-wide labor dispute, fire, flood, war, civil disturbance, act of God (including numbered or named tropical disturbances); a change in laws or governmental rules, regulations or orders (other than a Change in Law as defined in <u>Exhibit B</u> to the Turnkey Removal Agreement, which, for clarity, shall be addressed as a Qualified Condition and not as an event of *force majeure* pursuant to this <u>Section 8.1</u>), or any other cause, whether similar or dissimilar, provided that such event or circumstance (i) delays or renders impossible the affected Party's performance of its obligations under this Appendix; (ii) is beyond the reasonable control of the affected Party, not due to its fault or negligence and was not reasonable foreseeable, and (iii) could not have been prevented or avoided by the affected Party through the exercise of due diligence, including the expenditure of any reasonable sum, and provided further that *force majeure* shall not include any of the following: (i) economic hardship, (ii) changes in market conditions, (iii) late delivery or failure of construction equipment or materials (unless such late delivery or failure was itself caused by an event of *force majeure*); (iv) labor availability, strikes or other similar labor actions limited to personnel of Contractor Group, or (v) climatic conditions (including rain, snow, wind, temperature and other weather conditions), tides, and seasons, regardless of the magnitude, severity, duration or frequency of such climatic conditions, tides or seasons, other than an act of God (including numbered or named tropical disturbances).

B.  Notwithstanding the foregoing, such Party shall resume performance within a reasonable time after such event of *force majeure* has ended or been removed, or such Party is able to overcome the prevention caused by such event.  Contractor shall consistently monitor and use its commercially reasonable endeavors, including the reasonable expenditure of money, to

- 15 -

overcome, mitigate and minimize the event of *force majeure* and its consequences.  No Party shall be entitled to additional compensation or other payment as a result of an event of force majeure.

8.2     Work Site Access.

        To the extent reasonably necessary for Contractor to perform the Work, FWE IV shall provide Contractor unrestricted access to all the Facilities and shall execute any agency agreement, power of attorney, instrument, license, certificate, or other agreement reasonably necessary to provide such access.  Only the authorized personnel of Contractor Group, CUSA or proper governmental agencies shall be permitted access to any premises where Work is being performed under this Appendix.

8.3     Survival.

        All provisions of this Appendix that cannot be performed before the expiration or termination of this Appendix, including, without limitation, the indemnity and confidentiality provisions contained herein, and all representations, promises, releases, and indemnities under this Appendix, shall survive the expiration or termination of this Appendix.


                [End of Appendix 1; Schedules "A"-"F" to Appendix 1 follow]

## SCHEDULE "A" to APPENDIX 1

The Scope of Work includes all plugging and abandonment of the FWE IV Assets, including abandonment and removal of all wells/conductors, removal of all platforms/structures, achieving Site Clearance with respect to all Platforms/Facilities, and flushing and abandonment in place or removal of pipelines as permitted.

The Definitive Scope of Work for each Decommissioning Project shall be established by the documentation submitted by Contractor to BSEE for the Application for Permit to Modify (APM) or other permit filed with BSEE on Decommissioning Projects that do not consist of wells, with respect to each Decommissioning Project.

## SCOPE OF WORK

### 1.0    CONTRACTOR RESPONSIBILITIES

1.1    Contractor shall perform the following Work, as applicable, as required to complete and to achieve Final Completion for each Decommissioning Project identified on Exhibit A to the Turnkey Removal Agreement:

- Abandon all wells as per the BSEE-approved permits (APM's & RPM's)
- Abandon all pipelines as per the BSEE-approved permits (abandonment in place being the standard and removal only where mandated by BSEE or another governmental agency).
- Remove or reef all platforms as per the BSEE and/or COE-approved permits.

1.2    Contractor shall furnish all equipment, services, and personnel to conduct the offshore operations outlined in 1.1 including but not limited to the following (as applicable and necessary):

- Derrick / Lift Vessel
- Lift Boats
- Dive Support Vessels
- Support Tugs and Crew Boats
- Shorebase support
- NORM & Asbestos remediation & disposal
- Material Barges and Tugs
- All slings, shackles, spreader bars, spreader frames, and rigging
- Pile jetting equipment and personnel
- Conductor and pile cutting personnel and equipment
- Divers and equipment
- Flushing & Filtration equipment
- Engineering & Project Management
- Permit Generation & Submittal

1.3 Contractor shall supply all labor, equipment, and material required to perform and complete the Scope of Work that is not specifically stated as being supplied by FWE IV.

1.4 Contractor's derrick barge shall maintain an anchor handling tugboat with it at all times capable of handling the vessel's anchors.

1.5 Contractor's derrick barge and anchor handling tug(s) shall be equipped with an appropriate positioning system to assure safe placement of anchors.

1.6 Contractor is responsible for notification of Operators of facilities and pipelines affected by placement of anchors near or over those facilities and/or pipelines.

1.7 Contractor's derrick barge shall have a current certificate of classification and a load line certificate from a recognized marine classification society.

1.8 Contractor shall provide current crane certification on the derrick barges primary crane and all auxiliary cranes.  All rigging must be certified and tagged.

1.9    Cargo Barges

1.9.1 Contractor shall provide cargo barges of sufficient size to safely operate in the most severe environmental conditions in which tow may occur.

1.9.2 Contractor shall ensure that the cargo barge(s) have adequate strength for the load out, tie down, transport, and offloading of the salvaged material.

1.9.3 Each cargo barge shall have a valid U.S. Coast Guard certificate of inspection and a U.S. Coast Guard stability letter.

1.10 Tugs

1.10.1  Contractor shall provide with each barge a minimum of one (1) tug of sufficient size, bollard pull, and horsepower to operate in any sea environment that may develop.

1.10.2  Contractor shall provide assist (tail) tugs as required to guide the barge from the open sea to the offloading site.

1.10.3  Vessels and crews shall comply with U.S. Coast Guard licensing and manning requirements.

1.11 Diving

1.11.1  Contractor shall ensure that diving subcontractor performs all diving operations in strict accordance with the latest rules and regulations governing diving operations.

2

1.12 Any equipment, material, jacket, deck, or piles that fall into the sea during the salvage operation shall be retrieved by Contractor at Contractor's expense.

1.13 If at any time during the platform removal operations Contractor has to pull away from the structure, Contractor shall supply and install on the structure temporary navigational aids meeting U.S. Coast Guard Class "A" specifications for lights and horn.

1.14 Contractor shall assume all weather liability, other than Severe Weather Events that constitute Unforeseen Events.

1.15 CUSA is not obligated to pay Contractor for weather downtime, named tropical storms or otherwise, at any time before or during mobilization, or during or after demobilization.

1.16 EH&S

   1.16.1  Contractor shall submit safety records upon request for review by CUSA.

   1.16.2  Contractor shall provide gas detection devices, fire extinguishers, and other safety equipment to check all structural members, equipment, and piping for the presence of hydrocarbons.

   1.16.3  Contractor shall check for the presence of hydrocarbons prior to flame cutting or using spark producing devices on any structural members, equipment, and piping.

   1.16.4  Contractor shall provide a dedicated fire watch when hot work operations are in progress.

   1.16.5  Contractor shall comply with government regulations, Contractor's policies, and CUSA's policies regarding confined space entry.


**2.0    TECHNICAL**

   **2.1   Engineering**

      2.1.1   Contractor Required Design and Analysis Work

         Contractor shall perform all design, analysis, and design checks required to complete the Work in accordance with all applicable drawings, specifications, standards and codes, and other documents that are part of or are incorporated into this Scope of Work.  Contractor's proposed methods of performing the design and analysis work listed below shall be submitted to FWE IV prior to beginning the work.

      2.1.2   Engineering to be provided by Contractor to include the following (as applicable and necessary):

3

- Material Barge Ballast Plan
- Removal Rigging
- Tie-Down Design
- Transportation Analysis
- Component Lift Weight Analysis
- Component Center of Gravity Analysis
- Component Pad Eye or Lifting Trunnions Design
- Welding procedures and welder qualifications.

       2.1.4   Contractor shall confirm all lift weights, center of gravities, and Pad Eye or Lifting Trunion designs in writing.  Contractor will be responsible for any Pad Eye or Lifting Trunion design or modification.

Without limitation to the turnkey nature of each Decommissioning Project and the Work to be completed under the Turnkey Removal Agreement and this Appendix, Contractor shall be fully responsible for all of the following costs and expenses:

- The costs of salaries and travel expenses of executive officers or personnel who are not directly assigned to the Change Order Work
- The costs of salaries and travel expenses of non-exempt administrative support personnel
- Interest on capital employed or on borrowed money
- Gross receipts taxes and/or income taxes
- Costs for employee bonus or profit sharing plans
- Engineering, administrative, and drafting tools and equipment and stock office supplies
- Consumable supplies and materials utilized during construction of the components
- All disposal and environmental fees and costs
- Rotation expenses
- Severance expenses
- Recruiting expenses
- General and administrative expenses
- Small tools, equipment and rental items
- Costs for general business license or professional license
- Insurance premiums and deductibles applicable to Contractor's insurance
- Overtime and rainout costs

[End of Schedule "A" to Appendix 1]

4

## SCHEDULE "B" to APPENDIX 1

## <u>FEDERAL CONTRACT PROVISIONS</u>

Contractor shall fully comply with the following statutes and executive orders as well as the regulations, orders and rules promulgated thereunder, where required by law, and such statutes and executive orders are hereby incorporated in this Contract by reference as set out:

(1)     Equal Opportunity Clause (41 CFR 60-1.4).  Applicable to all contracts or purchase orders in excess of $10,000;

(2)     Affirmative Action Compliance Programs (41 CFR 60-1.40).  Applicable to contracts or purchase orders of $50,000 or more and if Contractor has 50 or more employees;

(3)     Equal Employment Opportunity Reporting Requirements (CFR 60-1-7). Applicable to contracts or purchase orders of $50,000 or more and if Contractor has 50 or more employees;

(4)     Employment of the handicapped (41 CFR 60-250).  Applicable to contracts or purchase orders $2,500; or employment of disabled veterans and veterans of the Vietnam Era (Applicable to contracts or purchase orders of $10,000 or more;

(6)     Utilization of Minority Business Enterprises (41 CFR 1-1.13).  Applicable to contracts or purchase orders of $10,000 or more;

(7)     Utilization of Small Business Concerns (41 CFR 1-1.710-3).  Applicable to contracts or purchase orders of $10,000 or more;

(8)     Utilization of Labor Surplus Area Concerns (41 CFR 1-1.,305-3(a)). Applicable to contracts or purchase orders of $10,000 or more;

(9)     Minority Business, Small businesses and Labor Surplus Area Subcontracting (41 CFR 1-1.1310-2(b), 1-1710-3(b), 1-1.805-3). Applicable to contracts or purchase orders of $500,000 or more; and

(10)    Clean Air and Water.  Applicable to contracts or purchase orders of CFR 15.4 and 15.5, 41 CFR 1-1.2302.

Contractor certifies that it does not maintain or provide for its employees any segregated facilities at any of its establishments, and that it does not permit its employees to perform their services at any location, under its control, where segregated facilities are maintained.  It certifies further that it will not maintain or provide for its employees any segregated facilities at any of its establishments and that it will not permit its employees to perform their services at any location, under its control, where segregated facilities are maintained.  The Contractor agrees that a breach of this certification is a violation of the Equal Opportunity Clause in this Contract.  As used in this certification, the term "segregated facilities" means but is not limited to any waiting rooms, work areas, rest rooms and wash rooms, restaurants and other eating areas, time clocks, locker rooms

and other storage or dressing areas, parking lots, drinking fountains, recreation or entertainment areas, transportation and housing facilities provided for employees which are segregated by explicit directive or are in fact segregated on the basis of race, color, religion, sex or national origin, because of habit, local custom or otherwise.  It further agrees that (except where it has obtained identical certifications from proposed subcontractors for specific time periods) it will obtain identical certifications from proposed subcontractors prior to the award of subcontracts exceeding $10,000, which are not exempt from the provisions of the Equal Opportunity Clause; that it will retain such certification in its files; and that it will forward the following notice to such proposed subcontractors (except where the proposed subcontractors have submitted identical certificates for specific time periods):

NOTICE TO PROSPECTIVE SUBCONTRACTORS OF REQUIREMENT FOR CERTIFICATIONS OF NONSEGREGATED FACILITIES:

Certification of Nonsegregated Facilities must be submitted prior to the award of a subcontract exceeding $10,000 which is not exempt from the provisions of the Equal Opportunity Clause.  The certification may be submitted either for each subcontract or for all subcontracts during a period (i.e. quarterly, semi-annually or annually).  Note:  The penalty for making false statements is prescribed in 18 U.S.C. 1001.

[End of Schedule "B" to Appendix 1]

## SCHEDULE "C" to APPENDIX 1

## <u>INSURANCE PROVISIONS</u>

**Insurance Requirements.** During the term of the Agreement, Contractor will carry insurance coverages as set forth below at its own expense and with deductibles for its own account, with providers reasonably satisfactory to CUSA and authorized to do business in the states or territories in which Contractor performs any Work. The insurance coverages required herein represent Contractor's minimum requirements and do not limit or invalidate any indemnity or other obligations of Contractor under this agreement. Contractor's failure to secure the required insurance coverages or the required endorsements on the policies or any denial of coverage by underwriters does not relieve Contractor from or limit its liabilities or obligations under this agreement.

**Required Coverage.** The following insurance coverage is required. An owner's limitation clause, including any clause purporting to limit coverage to liability of an insured "as owner of the vessel," shall not be included in any of the policies required below. All policies and group policies must contain applicable territorial extensions and navigation limits adequate for the performance of the Work.

**Workers' Compensation**, as required by applicable law.

**Employer's Liability**, with a limit of not less than **$1,000,000** per occurrence, including (i) coverage for the Longshore and Harbor Workers' Compensation Act, including its extension by the Outer Continental Shelf Lands Act, the Jones Act, and the Death on the High Seas Act, (ii) coverage for masters and members of the crews of vessels (on a voluntary compensation basis), including transportation, wages, maintenance, and cure; alternatively, protection and indemnity insurance may be used for this coverage as specified below, (iii) "in rem" endorsement, stating that an action "in rem" will be treated as a claim against the insured "in personam," and (iv) "borrowed servant" endorsement, stating that a claim brought against FWE IV Group for compensation as a "borrowed servant" by any member of Contractor Group will be treated as a claim against Contractor.

**Automobile Liability**, with a limit of not less than **$1,000,000** per occurrence, combined single limit for bodily injury and property damage, covering all owned, hired, leased, or non-owned vehicles (as required by applicable law).

**Commercial General Liability**, with a limit of not less than **$1,000,000** per occurrence, combined single limit for bodily injury and property damage, including (i) blanket contractual liability, (ii) products/completed operations liability, (iii) sudden and accidental pollution liability (including cleanup costs), (iv) surface damage for blowout and cratering, (v) removal of any exclusions, restrictions, or limitations relating to explosion, collapse, or underground property damage, (vi) removal of any professional liability exclusions or limitations, (vii) action over buyback and deletion of any provisions that limit or exclude coverage of claims made by Contractor Group's employees against any member of FWE IV Group, (viii) extended reporting

period of not less than 36 months, if written on a claims-made policy and is non-renewed or canceled, or deletion of any "sunset clause" purporting to cancel coverage on claims following cancellation or non-renewal, if written on an occurrence policy, (ix) "in rem" endorsement stating that an action "in rem" will be treated as a claim against the insured "in personam," and (x) removal of the "watercraft" exclusion; alternatively, protection and indemnity insurance may be used for this coverage as specified below.

**Hull and Machinery**, which Contractor will carry, or cause to be carried, for each vessel owned or chartered by Contractor Group in connection with the Work at the declared value of each vessel and its equipment, including (i) deletion of limitation of liability clause, (ii) if any vessel engages in towing operations, this insurance will include full towers liability with the sistership clause un-amended, and (iii)  removal of wreck or debris, if removal is required by applicable law.

**Protection and Indemnity**, which Contractor will carry, or cause to be carried, for each vessel owned or chartered by Contractor Group in connection with the Work with a limit of not less than **$5,000,000** per occurrence, including (i) coverage for pollution emanating from or caused by a vessel or vessels owned or chartered by Contractor Group, (ii) deletion of any language limiting coverage for FWE IV Group in the event of the applicability of any statute limiting liability; (iii) "in rem" endorsement stating that an action "in rem" will be treated as a claim against the insured "in personam," (iv) towers liability, where applicable; alternatively, liability coverage may be afforded in accordance with the Commercial General Liability coverages above (deleting the "watercraft" exclusions), (v) coverage for the crews; alternatively, the crew coverage may be afforded in accordance with the workers' compensation and employer's liability coverages above, and (vi) removal of wreck or debris, if removal is required by applicable law.

**Charterers Legal Liability**, which Contractor will carry, or cause to be carried, for each vessel chartered by Contractor Group in connection with the Work with a limit of not less than **$1,000,000** per occurrence, including (i) liabilities arising out of operation and use of such vessel and (ii) contractual liability for liabilities assumed by Contractor.

**Excess or Umbrella Liability**, with a limit of not less than **$20,000,000** per occurrence, combined single limit for bodily injury and property damage in excess of the limits specified above for employer's liability, automobile liability, commercial general liability, hull and machinery, protection and indemnity, and charterers legal liability, which such liability limits may be met with any combination of primary, umbrella, and excess policies.

**Aircraft Liability**, which Contractor will carry, or cause to be carried, for each aircraft owned or chartered by Contractor Group in connection with the Work with a limit of not less than **$75,000,000** per occurrence, combined single limit for bodily injury or death (including passengers) and loss of or damage to property, including (i) passenger liability, (ii) cargo legal liability, and (iii) no provision limiting coverage "per seat" or "per passenger."

**Aircraft Hull**, which Contractor will carry, or cause to be carried, for each aircraft owned or chartered by Contractor Group in connection with the Work for the declared value of each aircraft and its equipment.

**Professional Liability**, if applicable, with a limit of not less than **$1,000,000** per claim, including errors or omissions or rendering or failing to render any professional services as required under this agreement.

**Endorsements and Other Requirements.** To the extent of the liabilities assumed by Contractor hereunder, all insurance policies of Contractor will comply with the following:

**Waiver of Subrogation.** Such policies will expressly waive subrogation as to FWE IV Group.

**Additional Insured.** Such policies, other than workers' compensation, employer's liability, and professional liability policies, will include FWE IV Group as an additional insured, on a broad-form basis. Such additional-insured endorsements must include coverage for the sole, joint, or concurrent negligence of the additional insureds and not be restricted to: (i) ongoing operations and products/completed operations; (ii) coverage for vicarious liability; or (iii) circumstances in which the named insured is partially negligent. The parties deem a portion of the payment made by CUSA for Work performed to include compensation to Contractor for any costs Contractor may incur due to including FWE IV Group as additional insured. If any additional-insured endorsement limits coverage to amounts required by written contract, the amounts required in the agreement will instead be the maximum amounts of Contractor's insurance policies, but not less than the minimums set forth herein.

**Primary.** Such policies will be primary to and receive no contribution from any insurance policies maintained by FWE IV Group.

[End of Schedule "C" to Appendix 1]

**SCHEDULE "D" to APPENDIX 1**

**<u>DRUG AND ALCOHOL POLICY</u>**

**PURPOSE**

This policy implements Contractor's effort to enhance the safety of its operations and to provide its employees an opportunity to work in an environment free of drugs and alcohol. Contractor will deter alcohol and drug abuse by prevention through education, detection through testing, and disciplinary action when warranted.

**POLICY**

Contractor prohibits:

- employees possessing or consuming alcohol or drugs while working;
- employees working while under the influence of alcohol or drugs; and
- employees possessing or consuming drugs while not working.

**EXCEPTIONS**

Contractor permits employee possession of prescription drugs in containers that bear the doctor's and employee's name and a prescription date less than one year old, and permits the safe use of those drugs for the prescribed purposes, but Contractor does not permit employees to work while under the influence of prescription medications that may have an adverse effect on the employee's fitness for duty.

Contractor permits possession and moderate, lawful consumption of alcohol at business-related social functions that have been appropriately authorized by management, but prohibits employees and other attendees from working or operating motor vehicles after such a function if their abilities may have been impaired by alcohol.

**DEFINITIONS**

"Employees" means (for purposes of this policy only) all regular full-time, regular part-time or temporary employees, all Contractor independent contractors and agents, and all other persons using Contractor equipment, vehicles or boats (including those owned, used, rented or leased by or for Contractor) or performing duties on Contractor premises or property.

"Drugs" means (1) marijuana, cocaine, opiates, phencyclidine (PCP) and amphetamines; and (2) any other substances specified in Schedule I through V of the federal Controlled Substances Act whether or not prescribed for employee use by a physician.

"Test" means a drug test and/or alcohol test using urine and/or blood samples, conducted in accordance with this policy and Contractor testing procedures.

"Working" means reporting for work, performing job duties, engaging in business-related travel or entertainment, operating any Contractor equipment, vehicle or boat (including those owned, used, rented or leased by or for Contractor), being on Contractor property or premises, or attending any Contractor -related business or social function.

## TESTING AND DISCIPLINE

Contractor may require employees to submit to tests to determine the presence of drugs or alcohol.  If an employee's test yields a verified positive result, their employment will be terminated immediately.   In the case of a verified positive pre-employment test result, any offer of employment will be automatically withdrawn.

A refusal to take a test, failure to cooperate with a test, an attempt to tamper with a specimen, violation of Contractor testing policies or procedures or any attempt to subvert Contractor testing policies or procedures will have the same consequences as failing a drug test – immediate termination of employment or withdrawal of offer of employment.

The Contractor human resources department maintains written procedures for testing, which may be changed by Contractor at any time, for any reason.  The procedures are available for employee review.

## EMPLOYEE DRUG CONVICTIONS

As required by the Drug Free Work Place Act of 1989, any employee convicted of any violation of any criminal drug statute must notify management of the conviction no later than five (5) days after a conviction.  Failure to give notice shall result in the employee's termination.  The management personnel given the notice will immediately notify the human resources department of any reported conviction.  Contractor may terminate any employee convicted of drug-related crime regardless of the results of any administered drug test.

## PRE-EMPLOYMENT TESTING

All applicants for employment at Contractor shall undergo a pre-employment drug test within 24 hours of Contractor's request.

## POST ACCIDENT TESTING

Contractor will test each employee whose performance either contributed to an accident or cannot be completely discounted as a contributing factor to the accident, if the accident:

- results in a death or a personal injury necessitating medical attention;
- results in an explosion or fire;

2

- causes a significant damage to or loss of property;
- requires the emergency shut-down of an operation or facility;
- is a reportable incident regarding a gas pipeline facility under 49 CFR Part 191; or
- is a reportable accident involving pipeline facilities used in the transportation of hazardous liquids under 49 CFR Part 195.

In addition to the mandatory post-accident testing described above, Contractor may, in its sole discretion, also require post-accident testing following any accident that it determines is significant and warrants post-accident testing.

## RANDOM TESTING

Contractor will conduct random testing on employees at certain Contractor facilities designated by the Vice President of Exploration and Production, the Vice President of Human Resources, and the Sr. Vice President and General Counsel. Procedures for selecting of employees for random testing are stated in Contractor's written procedures for testing.

## REASONABLE CAUSE TESTING

Contractor will test an employee when there is reasonable cause to believe that the employee is using a drug or is under the influence of alcohol. "Reasonable cause" depends on the circumstances of each case. It includes observation of an employee's:

- unauthorized use or possession of alcohol while working;
- use or possession of drugs;
- slurred speech;
- unsafe actions;
- inability or difficulty in performing routine tasks effectively;
- unsteady standing or walking;
- disorientation or confusion; or
- erratic or unusual behavior.

It may also include:

- concerns about the employee's fitness for duty;
- an employee's voluntary admission of the prohibited use of alcohol or drugs;
- an employee's arrest or conviction for a drug-related offense, or the identification of an employee as the focus of a criminal investigation into illegal drug possession, use or trafficking;
- information related to employee drug use or prohibited alcohol use provided by reliable and credible sources or independently corroborated by Contractor;
- evidence that an employee has tampered with a drug test;
- the odor of alcohol, marijuana, or any other drug; or
- an employee's operation of a Contractor vehicle after leaving an establishment where alcohol is served.

3

Reasonable cause for testing may arise in circumstances in addition to those specified above.  A test for reasonable cause will be conducted only upon concurrence of at least two of the employee's supervisors, one of whom is trained in the detection of the possible symptoms of drug and alcohol use.  A drug test for reasonable cause will also require the concurrence of either the Vice President of Human Resources or the Sr. Vice President and General Counsel (either of whom may also constitute the concurring supervisors).

**OTHER TESTING**

If an employee transfers to a facility designated for random testing, a drug test will be required before transfer.  If an employee is on a leave of absence from a facility designated for random-testing, a drug test may be required before the employee may return to work.  Employees may be drug tested upon commencing or ending multiple-day work shifts on offshore facilities.

**MEDICAL REVIEW OFFICER**

Contractor has designated a licensed physician with knowledge of drug abuse disorders as its medical review officer ("MRO").  The MRO reviews and interprets positive test results obtained through Contractor's testing program.  The MRO is responsible for verifying positive test results.  The MRO examines alternative medical explanations for any positive test results, and review all medical records made available by the tested employee when a confirmed positive drug test could have resulted from legally prescribed drugs.  Contractor's test procedures describe the process under which the MRO reviews information, gives the tested employee an opportunity to discuss the test result, and otherwise determines whether the test result should be reported as negative or should be reported as a verified positive test:

**RE-TESTING AT THE EMPLOYEE'S REQUEST**

An employee may submit a written request to the MRO within 72 hours of receipt of a verified positive drug test, asking that the employee's original specimen be re-tested.  Employees are entitled to only one re-test of each specimen.  Re-testing procedures are stated in the written procedures for testing maintained by the human resources department.

**EMPLOYEE EDUCATION AND TRAINING**

Employees at the facilities designated for random testing will participate in a training program that addresses the consequences of alcohol and drug use on personal health, safety, and the work environment.  The program will also address indicators of alcohol and drug use and abuse.  Informational materials (including a community service drug hot-line telephone number for employee assistance), and Contractor's policy regarding drug and alcohol use in the work place will be distributed as part of the training program.

In addition to training for all employees, supervisors of the designated facilities will receive annual training of specific contemporaneous physical, behavioral and performance indicators of probable drug use.

**VOLUNTARY REHABILITATION**

Employees are encouraged to seek treatment for any alcohol or drug problem before being in a situation that may warrant a test.  Upon request, the Contractor human resources department will refer employees to an independent treatment program.

Medical and disability benefits will be provided for treatment to the extent available under Contractor's medical and disability plans.  Employees referred by Contractor to a treatment program and employees seeking Contractor medical or disability benefits for treatment must consent to the disclosure of all treatment-related information to Contractor.  An employee's employment shall be terminated if they do not cooperate with treatment, if they leave a treatment program before being discharged, or if they violate this policy after returning to work following treatment.

**IMPLIED CONSENT**

Employees are conclusively deemed to consent to cooperate in maintaining a work place free from the effects of alcohol and drugs through the use and enforcement of this and related corporate policies and procedures.

[End of Schedule "D" to Appendix 1]

# SCHEDULE "E" to APPENDIX 1

## CONTRACTOR SAFETY AND ENVIRONMENTAL REQUIREMENTS

### A.     Purpose and Scope

A.1     The purpose and scope of these requirements is to establish safety and environmental requirements for contractors to be able to work on CUSA owned or managed properties.

The objectives of these requirements are to ensure that all contractors and subcontractors working on CUSA's facilities/work sites have programs in place to comply with the Bureau of Safety and Environmental Enforcement (BSEE) Safety and Environmental Management Systems (SEMS) requirements or other applicable safety and environmental regulations, laws, rules and standards of agencies having jurisdiction at locations, their employees are adequately skilled and knowledgeable to safely perform their assigned job task functions, to ensure that safety and environmental policies have been established and to ensure that contractor's management is committed to safety.

### B.     Written Safety and Environmental Programs

B.1     Contractors shall develop and implement written safety and environmental management programs which must include but not be limited to the following:

- Management Commitment
- Written Safe Work Practices specific for work to be performed in compliance with applicable OSHA, BSEE, U.S. Coast Guard, EPA and other applicable government agencies.
- Training Program to include an employee Skills and Knowledge Verification process
- Drug and Alcohol Prevention Program (DISA)
- Hazard Recognition Program to include JSA (Job Safety Analysis)
- Stop Work Authority Program
- Incident Reporting and Investigation Program
- Operating Procedures for Equipment
- Mechanical Integrity Program
- Management of Change (MOC)

### C.     Training Requirements

C.1     Contractor's personnel (and those of all subcontractors) shall be skilled and knowledgeable for the tasks or activities to be accomplished. This includes being in compliance with appropriate safety and environmental training codes, standards, laws and regulations as required by governmental agencies having jurisdiction at the work site (e.g., BSEE, USCG, EPA, DOT, OSHA) as well as Contractor's Contractor Training Requirements.

C.2     A Training Matrix has been established to identify minimal training requirements for contractor personnel performing work on CUSA properties. Contractors should refer to Contractor's SEMS portal for the latest version of the Training Matrix and must verify the training requirements are met for the appropriate job titles (functions).

**D.     Safety and Environmental Management Systems (SEMS) - Contractor Requirements**

D.1     Contractor has established very specific contractor safety and environmental management requirements in order to provide for the safety of all personnel and to comply with current safety and environmental regulations. Below are specific requirements as part of the SEMS contractor agreement/bridging process. A detailed description and compliance guide can be obtained from through Contractor's EH&S department.

D.2     Requirements

D.2.1   Contractors performing activities on-site offshore must participate in the ISNetworld Review and Verification, as well as the Training Qualification (TQ) processes;

D.2.2   Contractor must review Contractor's  Safety and Environmental Management System (SEMS), related SEMS requirements, Safe Work Practices and must perform all contractual obligations in accordance with such Contractor programs;

D.2.3   The Contractor must communicate identified hazards to all affected personnel (including CUSA and 3rd Party personnel) prior to performing oil, gas and sulphur operations for CUSA;

D.2.4   The Contractor must comply with all applicable safety and environmental regulations, laws, rules and standards of agencies having jurisdiction at locations where work is conducted for the Operator;

D.2.5   Contractor must verify and provide documentation upon request that its personnel and any subcontractors performing work for Contractor have the skills and knowledge to perform their assigned duties in a safe and environmentally sound manner, has documented such, and that the information contained therein is accurate, timely and reflective of all appropriate safety and environmental training codes, standards, laws and regulations as required by governmental or regulatory agencies having jurisdiction at the work site.(e.g., BOEM, BSEE, USCG, EPA, DOT, OSHA) ;

D.2.6   The Contractor must have written safe work practices that help minimize the risk to personnel and the environment for all work conducted for CUSA, and all activities performed by the Contractor will be conducted in accordance with those safe work practices;

D.2.7   The Contractor must require all personnel performing work for Contractor to undergo periodic retraining and skill assessments, in accordance with Contractor's Training Requirements  for On-Site Contractors (Training Matrix), to ensure adequate retention of the skills and knowledge required to perform their assigned duties;

D.2.8   The Contractor must obtain and/or develop written operating procedures to ensure the safe operation of critical equipment that is operated and maintained by the Contractor whether or not that equipment is owned by the Contractor or any Third Party.  Critical equipment, per Appendix D of API RP 75, is defined as: "Equipment and other systems determined to be essential in preventing the

occurrence of or mitigating the consequences of an uncontrolled release." Such equipment may include vessels, machinery (compressors, mud pumps, fire pumps, etc.), piping, blowout preventers, wellheads and related valving, flares, wireline equipment, coil tubing equipment, fluid management equipment, safety systems, alarms, interlocks, fire protection equipment and other monitoring, control and response systems.

D.2.9    The Contractor must periodically review their written operating procedures used to operate critical equipment to ensure they reflect actual operating conditions;

D.2.10   The Contractor must develop and implement a written mechanical integrity program for any critical equipment that will be maintained and operated by the Contractor. Such a program must include, as applicable:

- The design, fabrication, procurement, installation, testing, calibration and inspection criteria and limits;
- The basis for maintenance (manufacturer's recommendation, industry standards, etc.
- A quality assurance program to ensure the mechanical integrity and safe operation of the Equipment;

D.2.11   All documents required per 30 CFR 250, Subpart S and API RP 75 will be maintained in an orderly manner, will be readily identifiable, retrievable, and legible, and will be available for review on request by CUSA or appropriate regulatory authorities. Examples of such documentation include, but are not limited to:

- Safe work practices and policies;

- Training records, including certifications for specialty work, as applicable;

- Verifications that personnel are skilled and knowledgeable in their assigned duties;

- Approved Job Safety Analyses (JSAs) as required;

D.2.12   For oil, gas and sulphur activities performed on CUSA's *facilities* and on a Contractor's *facility* on  the OCS the Contractor agrees to the following, where "facilities" is defined to include all types of offshore structures permanently or temporarily attached to the seabed ( *i.e.* , mobile offshore drilling units; floating production systems; floating production, storage and offloading facilities; tension-leg platforms; spars used for exploration, development, production, and transportation activities for oil, gas, or sulphur from areas leased in the OCS, as well as wells, structures, living quarters, drilling and workover packages, process equipment, utilities and DOI regulated pipelines (except as noted in API RP 75 section 1.3.1.1):

D.2.13   The Contractor must conduct, keep current and provide upon request to Contractor Hazards Analyses (including Mitigation plans) of the Contractor's facilities and ongoing operations;

D.2.14   The Contractor must manage and document all changes to the Contractor's facility that are directly involved in performing oil, gas and sulphur activities for CUSA;

D.2.15   The Contractor must develop and communicate an Emergency Action Plan to all personnel on the Contractor's facilities;

D.2.16   The Contractor must conduct Job Safety Analysis (JSA) to identify potential task specific hazards associated with the work to be performed and must include the steps required to mitigate the hazards

identified.  Copies of all JSAs must be kept at the work site and be readily accessible for at least 30 days to all personnel involved with the work. The Contractor must also maintain copies of all completed JSAs for at least 2 years.

D.2.17   The Contactor must conduct routine safety meetings to communicate safety expectations, incidents, near miss reports, prevention, safety alerts, etc.

D.2.18   The Contractor must immediately notify a CUSA representative by whatever means  of communication is most expedient, and shall maintain written records in addition thereto, of any incidents resulting in the following:
- Fatalities
-                                     All injuries that require the evacuation of the injured person(s) from the facility to shore or to another offshore facility
- All losses of well control
- All fires and explosions
- All reportable releases of H2S gas
- All collisions
- All incidents involving severe structural damage
- All incidents involving crane or personnel/material handling operations
- All incidents that damage or disable safety systems or equipment

D.2.19   Contractor is required to complete incident reports and provide additional information as necessary in order to determine root cause and corrective actions.


**E.    Personal Protective Equipment (PPE)**

Contractor shall provide its employees and personnel with proper PPE for them to perform their jobs safely. Contractor shall also ensure that its employees and personnel are trained in the proper use and maintenance of all PPE issued. The following is only the minimum PPE required to work on facilities owned, operated or managed by CUSA or any of its Affiliates. Any additional job specific PPE (face shields, goggles, respiratory protection, fall protection, hand protection, gas monitors, etc.) required by CUSA, governmental regulations or hazard assessments shall also be provided by Contractor.

*Minimal PPE Requirements for contractors*:

- Safety Glasses – Safety Glasses shall comply with ANSI Z87.1 – 1989, as such may be updated or modified from time to time, and shall be worn in areas where personnel are exposed to flying particles and/or when working  around pressurized process equipment, piping, pumps, etc.

- Hard Hat – Hard hats shall comply with ANSI Z89.1 – 1997, Type 1 requirements, as such may be updated or modified from time to time, and shall be worn at all times when working on CUSA facilities or work sites.

- Safety/Steel Toe Shoes / Boots – Safety/Steel toe shoes / boots shall comply with ANSI Z41 – 1991, as such may be updated or modified from time to time, and shall be worn at all times when working at any facility or work site owned, operated or managed by CUSA or any of its Affiliates.

- Hearing Protection – Hearing protection is required in high noise areas or areas that are posted as requiring hearing protection.

- Personal Flotation Devices (PFD's) – USCG Type 1 or 5 are necessary for any Work or portion thereof that is to be performed outside the handrails, on +10 level of offshore platforms, during personnel transfers to and from offshore platforms and while boarding and exiting boats from boat landings.

**F.      Inspections/Audits**

In addition to any right provided elsewhere in the Contract or otherwise available by law, CUSA reserves the right to inspect/audit the Environmental, Health and Safety activities of all contractors and subcontractors who work on any properties, facilities or premises owned, operated or managed by CUSA or any of its Affiliates. CUSA or third party auditing teams or individuals may conduct these inspections/audits.

The objective of conducting an inspection/audit is to assess Contractor's compliance with applicable CUSA, governmental and regulatory requirements and to prevent adverse environmental and safety incidents.

F.1      Field Inspections/audits

CUSA may have field inspections conducted so that the inspector(s)/auditor(s) can:

- Physically observe the Work or any part thereof that Contractor, or any of its subcontractors or personnel, is performing.
- Assess Contractor's performance of Work, or any part thereof, according to applicable CUSA, governmental or regulatory requirements.
- Advise Contractor regarding any deficiencies that are observed and require that such be corrected.

CUSA may conduct field inspections at any time and from time to time as CUSA, in its sole discretion, may deem necessary or appropriate to maintain compliance with the applicable requirements of CUSA or any governmental or regulatory agency or body.

F.2      Office Audits

CUSA may have office audits conducted:

- To verify information that Contractor certifies as having when completing this Contractor Safety Program Requirements agreement.
- To check Contractor's documentation of training, safety meeting attendance, accidents,

- equipment inspections, safety program elements, etc.
- To share environmental, safety and health philosophies.


[End of Schedule "E" to Appendix 1]

SCHEDULE "F" to APPENDIX 1

<u>SEARCH AND SEIZURE POLICY</u>

<u>NOTICE TO ALL PERSONNEL WORKING ON CUSA OWNED OR
OPERATED PROPERTIES</u>

It is the Contractor's belief that the misuse of drugs, alcohol, or any substance having a physiological, psychological, or biochemical effect impairs a person's health and performance and creates unsafe working conditions.  Contractor is committed to maintaining a productive, safe and healthy work environment, free of unauthorized drug and alcohol usage.  In order to achieve this objective, Contractor has adopted a Drug and Alcohol Policy.  All Contractor Personnel are required to comply with the policy.

The use, possession, distribution or sale of unauthorized drugs by anyone while on Contractor premises or while engaged in Contractor business is prohibited.  A person reporting for work on Contractor premises with unauthorized drugs and/or alcohol in his/her body is in violation of this policy.

Reporting to work while under the influence of alcohol by any person is prohibited.  The consumption or possession of alcohol in unsealed or opened containers on Contractor premises is prohibited.  No alcohol is allowed at any offshore location.

For the purpose of this policy, the term "unauthorized drugs" shall mean any substance, other than an authorized substance, which has the effect on the human body of being a narcotic, depressant, stimulant, hallucinogen or cannabinoid, their precursors, derivatives or analogues, and includes, but is not limited to, those substances scheduled as controlled substances pursuant to the Federal Controlled Substances Act.

"Authorized substances" are substances having a physiological, psychological, or biochemical effect that are lawfully prescribed or that are available without a prescription, that are lawfully obtained by an individual and that the individual possesses and uses in the appropriate manner, in the dosages and for the purposes for which the substances were prescribed or manufactured.

It is each person's responsibility to notify his or her supervisor in writing when that person is taking any prescription or non-prescription medicine or substance which may impair judgment or performance or otherwise adversely affect the normal functions or his or her mental faculties or physical abilities.

In enforcing the policy, searches of persons and their property on Contractor premises, work area searches, and laboratory testing are authorized.  Any person who refuses, when requested, to cooperate with a search or to submit to laboratory testing shall be deemed to be in violation of the policy.  Contractor reserves the right to conduct unannounced personal searches.  Entry upon Contractor's premises by Personnel will be deemed to constitute consent by such persons to personal searches pursuant to this policy.

A personal search includes inspection of any personal property of Personnel located on Contractor premises including, but not limited to, their personal effects, lockers, baggage, desks, lunch boxes, containers, purses, billfolds, parcels, or vehicles if on Contractor premises.

Any person charged with or under investigation in connection with a drug-related or alcohol-related criminal offense may be required to submit to laboratory testing.

Any person possessing food, supplies, or tools not belonging to them, at a time when such items should not be in their possession, is subject to disciplinary action.

Firearms are prohibited on all Contractor premises.  Without limiting the generality of the foregoing, Personnel may not possess firearms on their person, or in their personal effects, lockers, baggage, desks, lunch boxes, containers, purses, parcels, or vehicles if on Contractor premises.

[End of Schedule "F" to Appendix 1]

**<u>Exhibit 7</u>**

**Contract Operating Agreement**

See attached.

*Exhibit 7 to the Implementation Agreement*

## CONTRACT OPERATING AGREEMENT

This Contract Operating Agreement (this "<u>Agreement</u>"), dated and effective as of _____, 2021 (the "<u>Effective Date</u>"), is by and among Mako Buyer LLC, a Delaware limited liability company (the "<u>Operator</u>") and Fieldwood Energy IV LLC (the "<u>Owner</u>").  Operator and Owner are sometimes referred to collectively as the "<u>Parties</u>" and individually as a "<u>Party</u>".  Capitalized terms used in this Agreement but not defined herein are defined in <u>Appendix I</u>.

**WHEREAS**, Owner is a resulting entity of a divisive merger effected in connection with the confirmed plan of reorganization of Chapter 11 Case 20-33948, *In re: Fieldwood Energy LLC et al.*, in the United States Bankruptcy Court for the Southern District of Texas, Houston Division (the "<u>Plan</u>");

**WHEREAS**, the divisive merger was conducted in accordance with (i) the Implementation Agreement, which was agreed prior to the confirmation of the Plan, and (ii) the Plan of Merger;

**WHEREAS**, under the Implementation Agreement and pursuant to the divisive merger as set out in the Plan of Merger, (i) Owner was allocated the Operating Assets, and (ii) Owner agreed to assume operational responsibility for the purposes of decommissioning the Terminated Properties;

**WHEREAS**, Owner is or will become the operator (as designated by BOEM or BSEE or pursuant to a joint operating (or similar) agreement), of certain Assets;

**WHEREAS**, in accordance with the Owner's LLC Agreement, the business and activity of Owner is managed by a Sole Manager (as such term is defined in the LLC Agreement); and

**WHEREAS**, Owner has requested that Operator provide certain contract operational, technical, and administrative services with respect to the Assets, upon the terms and conditions set forth herein, until the end of each respective Service Term, and Operator has agreed to do so.

**NOW, THEREFORE**, in consideration of the premises and of the mutual promises, covenants, conditions, and agreements contained herein, and for other valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereby agree as follows:

## ARTICLE I.  SERVICES

**Section 1.1**     <u>Services</u>. Subject to the terms of this Agreement, Operator shall provide or cause to be provided the Services in support of Permitted Operations for Owner and on the Assets, in each case in accordance with the standard of performance set forth in <u>Section 1.2</u> below for the Service Term.  Rights to all products of the Services performed hereunder by Operator for Owner or otherwise in respect of the Assets shall belong exclusively to Owner, and Operator shall retain no ownership, interest, or rights therein.  For the avoidance of doubt, the Services provided by Operator hereunder shall not include, and Operator shall not perform the Restricted Activities.  Notwithstanding anything in <u>Exhibit A</u> to the contrary, the Services shall include, and Operator shall conduct, the day-to-day business of Owner in relation to the management of the Assets and the corporate functions of Owner, subject to Owner's general oversight and instruction and any approval or consent rights expressly attributed to Owner herein;

provided that Operator agrees and acknowledges that it is the intent of the Owner that the business and operations of the Owner and the operation of the Assets shall be limited to, and in support of, the Permitted Operations.

**Section 1.2    Standard of Performance**. Subject to the terms of this Agreement, Operator shall perform or cause to be performed the Services as follows (collectively, the "Performance Standard"):  (a) as a reasonably prudent operator as the contract service provider hereunder would perform such Services, (b) in a good and workmanlike manner, (c) with due diligence and dispatch, (d) in accordance with good oilfield practices, and (e) in compliance with all Laws (as defined below), licenses, authorizations and permits.  In providing the Services to the Owner, Operator may use, at its discretion, its own personnel or the personnel of any of its Affiliates or employ the services of contractors, Subcontractors, vendors, or other Third Parties.

**Section 1.3    Independent Contractor**. At all times during the performance of  Services by Operator, all Persons performing such Services who shall be in the employ and/or under the control of Operator or its Affiliates (including agents, contractors, temporary employees, and consultants) shall be independent from Owner and not employees of Owner and shall not be entitled to any payment, benefit, or perquisite directly from Owner on account of such Services, including, but not limited to, group insurance and participation in any employee benefit and pension plans maintained by Owner or any Affiliate of Owner.  Operator will not be required to provide any Services solely to the extent the provision of such Services would violate applicable Laws. Notwithstanding any other provision contained elsewhere in this Agreement, in all cases where the Operator is performing Services under this Agreement offshore the State of Louisiana or are otherwise covered by the Louisiana Worker's Compensation Act, La. Rev. Stat. § 23.1021 et seq., the Parties acknowledge and agree that all such operations pursuant to this Agreement are an integral part of and are essential to the ability of the Owner to generate Owner's goods, products, or services, and that whenever Services and work are performed hereunder in or offshore Louisiana, or the Louisiana Workers' Compensation Act may be applicable, the employees of Operator and their contractors providing such Services or performing such work, if any, whether direct, statutory, borrowed, or otherwise, are statutory employees of Owner in accordance with the Louisiana Worker's Compensation Act, La. Rev. Stat. § 23.1021 et seq. and the protections afforded a statutory employer under Louisiana Law shall apply. In such event, Operator agrees that Owner is and shall be deemed a statutory employer of Operator's employees for the sole purposes of La. Rev. Stat. § 23.1061(A)(3), as the same may be amended from time to time.

**Section 1.4    Records**.  Operator shall use commercially reasonable efforts to maintain or cause to be maintained true and correct records of all receipts, invoices, reports, and such other documents as are customarily maintained by Operator for its own operations relating to each Service rendered hereunder for a period of the later of (i) two (2) years following the end of the calendar year during which the end of the Service Term for such Service occurs or (ii) such other time required by applicable Law. All such receipts, invoices, reports, and other documents are the property of Owner.

**Section 1.5    Representatives**. Each Party shall, at all times during the Service Term, keep one or more representatives available either by telephone, electronic mail, or in person during normal business hours, to receive communications from the other Party regarding the day-to-day Services and to respond to inquiries concerning the performance of the day-to-day Services.  For the avoidance of doubt, all Notices required or permitted hereunder shall be delivered pursuant to Section 7.2 of this Agreement. Operator's representatives are designated along with their contact information on Exhibit C ("Operator's

Representative"). Each Party may replace any of its representatives or designate such other representatives from time to time by written Notice to the other Parties delivered pursuant to Section 7.2. At all times while this Agreement remains in effect, Owner shall cause at least one of its representatives to be included on Owner's BOEM "qualification card" as an authorized signatory for Owner.

**Section 1.6     Limitation of Services**.

(a)     Notwithstanding anything herein to the contrary, Owner acknowledges certain personnel of Operator and/or its Affiliates involved in the provision of the Services may leave the employment of Operator and/or its Affiliates or terminate their employment or contract with Operator or its Affiliates during the term of this Agreement. The Services shall not include providing any technical evaluations regarding any proposals for the new development of any assets, including the drilling of new wells or other capital expenditure projects associated with new development. Operator makes no representation or warranty regarding the ability of Operator and/or its Affiliates to retain any employees, contractors, or Subcontractors and neither Operator nor any of its Affiliates shall have any liability to Owner as to the result of the loss of any such employees, contractors, or Subcontractors; provided that in no event will any such losses excuse Operator from the obligation to perform the Services. Operator and its Affiliates shall use commercially reasonable efforts to report all information accurately, but shall not be responsible for the accuracy or completeness of any information furnished by any other party for inclusion in any reports or for results obtained by use of any inaccurate information so furnished.

(b)     Notwithstanding any other provision in this Agreement to the contrary, in each case with respect to Operator's obligation to provide the Services under this Agreement:

(i)      Operator shall have no obligation to be designated with any Governmental Authority, as a designated operator, designated applicant, designated payor, or responsible party for any of the Assets;

(ii)     Operator shall have no obligation to post any bond or other security on behalf of the Owner arising solely from its capacity as Operator hereunder;

(iii)    Operator shall have no obligation to provide any Service for which a Third Party is obligated or permitted (under a joint operating agreement, contract services agreement or otherwise) to provide the same service for the Owner; provided, however, that Operator's use of a Subcontractor to perform any part of the Services shall not excuse Operator from the obligation to perform such Services;

(iv)    Owner acknowledges and agrees that it will remain responsible for providing any bond or security, subject to Section 5.2(a)(3) of the Omnibus Agreement; and

(v)     if Operator reasonably believes that it cannot perform any Service without creating a breach of an agreement to which Owner is a party or an Asset is bound, and/or violating the Law, Operator shall have no obligation to perform such Service and such Service shall no longer be included within the Services, and Operator shall give prompt, written Notice of such issue to Owner, prior to the discontinuation of such Service, with detailed descriptions of the agreement in question and the breach

3

and/or violation Operator believes will be created.  In the event such possible breach and/or violation is cured or remedied within thirty (30) days following Owner's receipt of such Notice, Operator may perform such Service only insofar as performance would not create the breach or violation.

(c)     Operator and Owner shall use commercially reasonable efforts to obtain, and to keep and maintain in effect (or to cause their respective Affiliates to obtain, and to keep and maintain in effect), all governmental or Third Party licenses and consents required for the provision of any Service by Operator in accordance with the terms of this Agreement, in each case to the extent directly attributable to the Assets (and not arising from any requirement that applies on a general or areawide basis).  Any direct, out-of-pocket costs relating to obtaining any such licenses or consents shall be borne by Owner; and none of Operator or any of its Affiliates shall be required to pay any money or other consideration or grant any other accommodation to any person (including any amendment to any contract) or initiate any action, suit, or proceeding against any person to obtain any such license or consent.  Operator shall have no obligation to provide any Services which require any such licenses or consents which are not obtained.

(d)     The Parties are entering into the Joint Development Agreement of even date herewith, and, therefore, any technical evaluation regarding any drilling, reworking, or other capital expenditure projects that may be proposed by Operator to Owner in Operator's capacity as a party to the Joint Development Agreement shall not constitute part of the Services to be provided hereunder.  Costs and expenses included in the calculation of the Recovery Threshold (as defined in the Joint Development Agreement) may not also be included in Third Party costs charged to the Owner hereunder.

**Section 1.7     Operator's Access to Assets**.  To the extent reasonably necessary for Operator to perform the Services, Owner shall provide Operator unrestricted access to all the Operated Assets.  In the event requested by Owner in writing, Owner and Operator shall execute any agency agreement mutually agreed to by Operator and Owner covering certain areas of service, as requested by Owner in writing.

**Section 1.8     Accounts**.

(a)     Operator shall receive and keep all production revenue from the Assets or other revenue received by Operator or its Affiliates that is generated by the Assets or otherwise attributable to the Owner or any of its Affiliates in the Revenue Account, provided that Operator shall have access and permission to utilize the Revenue Account in the performance of the Services.  Operator shall have the right to transfer funds from the Revenue Account to timely pay on behalf of Owner: (i) taxes and royalties attributable to production from the Assets; (ii) Reimbursable Costs; (iii) Third Party Payments that are properly incurred hereunder; and (iv) any NPI Payment made (and as defined) under the NPI Conveyance shall be paid into the Escrow Account and in the event received by Operator or Owner for any reasons, shall immediately be transferred into the Escrow Account.

(b)     Notwithstanding any other provision contained herein, Operator shall not have any rights under the Escrow Agreement and the Services provided hereunder shall expressly exclude management of the Escrow Account.

**Section 1.9**     **Owner Meeting and Approvals**.

(a)     Owner's Representative and Operator's Representative(s) (and/or their designated representatives and consultants) shall meet on a quarterly basis by no later than ten (10) days following the end of the prior calendar quarter at the offices of Operator or another mutually agreed location to review the performance of the Services for the prior calendar quarter and the Services that Operator anticipates providing for the current calendar quarter and the three immediately subsequent calendar quarters.

(b)     Operator must obtain the prior written consent of Owner's Representative for the following: (i) to perform any of the operations or other actions set forth on Exhibit B-1 on the Assets or otherwise on behalf of Owner (such operations or actions, the "Restricted Activities"); or (ii) prior to entering into any contract set forth on Exhibit B-2 on behalf of Owner or for which Operator has a reimbursement right hereunder (such contracts, the "Material Contracts").

**Section 1.10   Decommissioning Services**.

(a)     Operator shall not amend, waive or otherwise modify any rights or obligations of Owner under the Turnkey Removal Agreement or the Omnibus Agreement or provide any consent or approval of Owner, or any release by Owner, with respect to any provision of the Turnkey Removal Agreement or the Omnibus Agreement.  Any such action taken by or on behalf of Owner with respect to the Turnkey Removal Agreement or the Omnibus Agreement shall be under the sole authority of Owner's Representative, and may be performed at the sole discretion of Owner's Representative. Operator shall provide copies of all written notices, written communication and other information that is delivered or that is required to be provided by either party under the Turnkey Removal Agreement or the Omnibus Agreement to the Owner's Representative.

(b)     In the event that the Turnkey Removal Agreement is terminated as to all or part of the Assets, with the cooperation of Owner's Representative, Operator shall obtain bids from at least three (3) potential counterparties to act as decommissioning operator of the applicable Assets no longer covered by the Turnkey Removal Agreement; provided that the applicable performance and pricing methodology applicable to the bid shall be approved in advance by Owner's Representative.   Owner's Representative shall choose the winning bidder, with input from Operator.

## ARTICLE II.  COMPENSATION

**Section 2.1    Compensation for Services**.  During the Service Term for each Service and subject to Owner's obligation to pay for Reimbursable Costs and Third Party Payments, Operator shall perform the Services at no cost to Owner, including any administrative overhead of Owner; provided that the Parties agree that: (i) if the cost for Operator to provide the Services (other than any services for which Owner bears Reimbursable Costs or Third Party Payments) increases due to a material change in Law or due to a material increase in the costs to provide services similar to the Services that impacts the overall U.S. offshore oil and gas industry or that is reflected in a broadly used price index relevant to the oil and gas industry, the Parties will work in good faith to determine appropriate fees for the Services; and (ii) any qualifying Reimbursable Costs or Third Party Payments shall be paid by Owner as provided in Section 3.1.

**Section 2.2    Initial Safe Out**.  Notwithstanding anything herein to the contrary, payment for any Initial Safe Out Work (as defined in the Omnibus Agreement) shall be made in accordance with Section 3.4 of the Omnibus Agreement.

## ARTICLE III.        PAYMENT AND DEFAULT

**Section 3.1    Third Person Services**.

(a)    *Reimbursable Costs*.  Owner recognizes that Operator may hire Third Parties to provide certain portions of the Services from and after the Effective Date with respect to the Assets, whether or not the cost for such Third Party services qualify as Reimbursable Costs hereunder. Operator shall bear all costs and expenses associated with the Services, including the hire of and payment to such Third Parties; provided that in the event that Operator incurs any permitted Reimbursable Costs during a particular month, Operator shall be entitled to reimbursement of such costs and expenses by Owner under the Invoice attributable to such month pursuant to Section 3.2 and Section 3.3.

(b)    *Third Party Payments*.  In the event that Operator incurs and pays any Third Party Payments during a particular month, Operator shall pay such costs when due and Operator shall be entitled to reimbursement of such costs and expenses by Owner under the Invoice attributable to such month pursuant to Section 3.2 and Section 3.3; provided that, in the event that the total amount of Third Party Payments for a particular month are reasonably expected to exceed the funds in the Revenue Account that are available to cover such costs and expenses, Operator shall be entitled to require Owner to pay or cause to be paid such amount into the Revenue Account by issuance of a prepayment cash call equivalent to such excess amount to the Owner in advance of the month in which such costs will be incurred on behalf of Owner, and Owner shall cause the amount of the applicable cash call to be transferred into the Revenue Account by the date specified in Section 4.2 of the Omnibus Agreement, pursuant to Article IV of the Omnibus Agreement.  If the amount of the Owner prepayment is not actually expended by Operator during a particular month, Operator will credit the overpayment to the Owner in the Invoice for such month or the next cash call issued by Operator, whichever occurs first.  Any such Invoice or cash call for which any overpayment has been applied shall reflect the credit for such overpayment at the time it is submitted to Owner.

(c)    With respect to any services, equipment or materials for which Owner will bear Reimbursable Costs hereunder, to the extent that Operator also utilizes such services, equipment or materials for the purpose of providing Services in support of Non-FWE IV Operations, Operator shall allocate the Reimbursable Costs charged to Owner hereunder in a commercially reasonable manner between the applicable operations and otherwise accordance with applicable COPAS guidance as between the applicable operations.

**Section 3.2    Submission of Invoice**. Operator shall submit an Invoice to Owner on or before the fifteenth (15th) Business Day of each month setting forth an itemized accounting of the following, in each case with respect to the prior month: (i) all revenue generated by the Assets attributable to such month, including any production revenue, (ii) the total amount of Reimbursable Costs and Third Party Payments incurred by Operator during such month, or as applicable, any earlier months for which an

Invoice was not issued, for the Services provided by Operator; (iii) the amount of any prepayments made by Owner in response to cash calls that are attributable to such month, if any; (iv) the Revenue Account balance as of the beginning and the end of the applicable month; (v) the amount, if any, that Operator has transferred from the Revenue Account to cover Reimbursable Costs and Third Party Payments; and (vi) any shortfall between the amount of funds contained in the Revenue Account and the total amount owed under clause (ii), which shall be the Invoice Payment.

Section 3.3    **Payment of Invoices**. Absent manifest error in inclusion or omission of items or calculations contained in an Invoice (if there is a manifest error, Owner will correct such error and show such recalculation), if there are not sufficient funds in the Revenue Account to cover an applicable Invoice amount, Owner shall cause the amount of the applicable undisputed Invoice Payment to be transferred into the Revenue Account by the date specified in Section 4.2 of the Omnibus Agreement, pursuant to Article IV of the Omnibus Agreement.  The Operator and Owner agree to use reasonable efforts to resolve any dispute over Invoice amounts within thirty (30) days of Owner's written Notice to Operator of such dispute.  Adjustment credit or debits shall be shown on the Invoice next succeeding the Invoice in which the adjustment is made. Operator shall provide reasonable back-up and supporting documents related to any Invoice within five (5) Business Days of an Owner's written request. Any preexisting obligation to make payment for the Services provided hereunder or out-of-pocket costs of Operator shall survive the termination of a Service and this Agreement until paid.  Owner shall have access to and the right to audit all records supporting such Invoice amounts for the period set forth in Section 1.4 and Section 7.7 during normal business hours and on dates reasonably agreed between Operator and Owner.

Section 3.4    **Owner Default**. It shall constitute a default on behalf of an Owner (an "Owner Default") if Owner fails to timely transfer into the Revenue Account or otherwise cover any undisputed Invoice Payment amount for Services provided pursuant to this Agreement in accordance with the provisions of this ARTICLE III or perform any covenants of Owner under this Agreement, which failure is not by reason of an Operator Default or, subject to the requirements and limitations of Section 7.1 (Force Majeure), excused by an event of *force majeure*, and continues for at least thirty (30) days following receipt of written Notice to Owner that such performance is required; provided, however, that if Owner cannot reasonably cure such failure within such thirty (30) day period (other than in the case of a payment default), no Owner Default shall be deemed to occur provided Owner demonstrates that it has diligently taken reasonable steps to cure such failure within such thirty (30) day period and diligently prosecutes such cure to completion. Upon the occurrence of an Owner Default, Operator may, in addition to all other remedies available at Law or in equity, (i) suspend all or any portion of the provision of Services hereunder to Owner that is the subject of the Owner Default, including Services for which payment is outstanding, until such time as the Owner Default is cured and all unpaid, undisputed Invoice amounts for Services to Operator under this Agreement for such suspended Services are paid in full or (ii) terminate this Agreement effective immediately and be entitled to any amounts owed to Operator by Owner hereunder together with interest on such amount at a rate equal to 5% per annum, calculated daily on the basis of a year of 365 days and the actual number of days elapsed (the "Rate") from the date due, until such undisputed amounts, together with  all accrued and unpaid interest thereon, are paid in full; provided, however, that Operator may not suspend or terminate Services reasonably determined by Operator to be critical to the safety of the operation of the subject Assets until such time as Operator can make the Assets safe for handover to Owner or its designee.  All costs related to making the Assets safe for handover to Owner or its designee shall be borne by Owner in addition to any other amount due and owing to Operator.

**Section 3.5** **Operator Default**. It shall constitute an Operator Default if Operator fails (i) to maintain the Revenue Account in accordance with the requirements set forth herein or to pay applicable Third Party costs and expenses that are required to provide the Services if it has an obligation to do so hereunder, (ii) to provide a Service to Owner in accordance with the terms and conditions of this Agreement or to perform any other covenants of Owner under this Agreement, which failure is not by reason of an Owner Default or, subject to the requirements and limitations of Section 7.1 (Force Majeure), excused by an event of *force majeure* event or (iii) to comply with a BSEE deadline, and in the case of a default under (iii), continues for at least fifteen (15) days following receipt of written Notice to Operator that such default has occurred or, in all other instances, for at least thirty (30) days following receipt of written Notice to Owner that such performance is required; provided, however, that if Operator cannot reasonably cure such failure within such fifteen (15) or thirty (30) day period, as applicable, no Operator Default shall be deemed to occur provided Operator demonstrates that it has diligently taken reasonable steps to cure such failure within such fifteen (15) or thirty (30) day period, as applicable, and diligently prosecutes such cure to completion. Upon the occurrence of an Operator Default, Owner may, in addition to any other rights or remedies available at Law or in equity, terminate this Agreement or specific Services provided hereunder within the time frame specified by Owner in a written Notice to Operator so terminating this Agreement.

**Section 3.6** **Sales Taxes**. Any sales, use, value-added or similar excise taxes (but excluding any income, withholding, excess profit or other taxes levied on account of Operator's earnings or receipts, franchise taxes, or taxes assessed on any Operator property) paid hereunder for Services that Operator is required to pay or incur as a result of such Services shall be passed on to, and be the obligation of, the Owner to which such Services are provided as an explicit surcharge and shall be paid by Owner in addition to any payments for Services as set forth in Section 3.1 above, whether included in the applicable Invoice, or added retroactively, such that the amount received by the Operator shall be as if no such taxes had been imposed. If Owner submits to Operator a timely and valid resale or other exemption certificate sufficient to support the exemption from sales taxes, then such taxes will not be added to the Invoices for Services payable pursuant to this ARTICLE III; provided, however, that if Operator is ever required to pay such taxes, Owner will promptly reimburse Operator for such tax, including any interest, penalties, and attorney's fees assessed thereon by the applicable Governmental Authority. The Parties will cooperate to contest any invalid sales or use taxes imposed on the Services and to minimize the imposition of any such sales taxes.

<div align="center">

**ARTICLE IV.** **TERM OF AGREEMENT**

</div>

**Section 4.1** **Term**. Unless earlier terminated as herein provided, Operator shall perform the Services for the Service Term. No Services shall be provided after the expiration of the Service Term, except by the mutual written agreement of the Parties; provided however the Parties will comply with the provisions of Section 5.3 at the conclusion of the Service Term.

<div align="center">

**ARTICLE V.  CESSATION OF SERVICES**

</div>

**Section 5.1** **Discontinuation of Services**. Owner may, with or without cause and for any or no reason, terminate this Agreement or discontinue any Service by giving Operator not less than ten (10) days prior written Notice of such discontinuation, to be effective on the last day of the month specified by Owner in its Notice. Owner shall be liable to Operator for all costs and expenses that Operator remains obligated to pay for Services provided until the actual completion of the transition of the Services.

<div align="center">

8

</div>

Operator shall act under the Performance Standard in transitioning the performance of the Services to a Third Party or to Owner or another operator; provided that the applicable compensation for Services so transitioned shall continue until the termination thereof in accordance herewith and, with respect to any transition following a termination of Services under this Section 5.1, Owner shall pay any actual, documented out-of-pocket costs incurred for the transition of such Services.

**Section 5.2** **Procedures Upon Discontinuation or Termination of Services**. Upon the discontinuation of all of the Services hereunder, this Agreement shall terminate and be of no further force and effect, except as to obligations accrued prior to the date of discontinuation or termination; provided, however, that Section 1.4, Section 3.3, Section 5.3 and ARTICLES VI, VII and VIII and Owner's audit rights under Section 3.3 and Section 7.7, shall survive such discontinuation or termination.

**Section 5.3** **Transition of Operations**. The Parties agree to preserve as a priority during any transition of operations the safety of individuals and the environment in compliance with all Laws and Governmental Authorities. Prior to and through the expiration of the Service Term, including any termination of this Agreement, Operator shall make commercially reasonable efforts to transition the performance of the Services to a Third Party or to Owner in accordance with the Performance Standard, including providing commercially reasonable assistance to Owner to facilitate such transition; provided that the applicable compensation for Services so transitioned shall continue until the actual termination thereof, and Owner shall pay Operator any actual, documented out-of-pocket costs incurred by Operator for the transition of such Services. Owner shall provide Notice to Operator containing the applicable recipient and the manner and formant of delivery for transfer of any records to Owner (or its designee). Operator shall promptly deliver the records in accordance with such Notice, provided that Operator shall deliver the records by no later than 30 (thirty) days after the expiration of the Service Term and any supplemental records received by Operator after such date shall be transferred to the applicable recipient in a timely manner according to protocols established by the parties, if necessary. Owner shall be responsible for the documented out of pocket costs incurred by Operator to transfer and deliver such records. Operator may retain copies of any records or other data it is required to maintain by any Governmental Authority.

**Section 5.4** **Marketing Contracts**. Upon expiration or termination of this Agreement pursuant to the terms hereof, to the extent Operator is the owner of such contracts or agreements, Operator shall immediately assign to Owner its rights to all contracts or agreements related to the Marketing Services described on Exhibit A hereto and take such actions as may be reasonably necessary to obtain any required consents for such assignments; provided, however, that Operator shall not be required to provide any monetary or non-monetary consideration for such consent unless paid by Owner. During the term of this Agreement, Operator shall not enter into any agreement(s) for the benefit or use of the Owner or in connection with the operation of the Assets that prohibits assignment to Owner.

## ARTICLE VI.      INDEMNITIES; DISCLAIMERS

**Section 6.1** **Operator Indemnification**.

Operator shall be liable and responsible for, and shall release, defend, protect, indemnify and hold harmless the Owner Group from and against any and all Claims arising from or relating to any of the following, in each case (i) relating to action or inaction taken by any member of Operator Group in breach of the Agreement, or (ii) arising due to the negligence, gross negligence or willful misconduct

of any member of Operator Group in performance of the Services or arising out of or related to the Agreement:

    A.    the loss of or damage or injury to the property of Operator Group;

    B.    any illness, injury or death suffered by any member of the Operator Group;

    C.    (1) the loss of or damage or injury to the property of any Third Party, or (2) the illness, injury or death suffered by any Third Party;

    D.    the loss of or damage or injury to the property of Owner, where Operator indemnifies the Owner Group under this Section 6.1, Operator shall where possible repair or replace the damaged or lost Property at Owner's sole option;

    E.    governmental fines and penalties assessed in connection with provision of the Services;

    F.    the failure of Operator or any other person for whom Operator is responsible to pay taxes that are Operator's responsibility pursuant to Section 3.6

    G.    pollution or contamination (including, without limitation, property damage, control, removal, restoration of lands or sea beds, and cleanup of all pollution or contamination), including, without limitation, spills or leaks or fuel, lubricants, motor oils, pipe dope, paints, solvents, ballasts, bilge, garbage or sewage;

    H.    any breach of applicable Laws;

    I.    Liens; or

    J.    Claims brought against the Owner Group by any member of the Operator Group, including employment-related Claims, other than Claims by Operator consistent with this Agreement.

**Section 6.2**    **Limitations on Classes of Damages**.

    (a)    Operator and Owner mutually waive and release to the fullest extent permitted by applicable Law all of the following Claims for damages suffered by the other Party arising out of this Agreement, whether such Claims are made in connection with an indemnity, a breach of any obligation under this Agreement, or any other Claim:

    (i)    Indirect, special, or consequential damages or losses;

    (ii)    Loss of profits, loss of production (including production of petroleum or petroleum products), loss of economic advantage or benefit, or loss of business opportunity, in each case whether direct, indirect, prospective, or actual; and

    (iii)    Punitive or exemplary damages.

(b)     The limitations provided in <u>Section 6.2</u> do not apply to Claims for damages or losses suffered by any Person other than Owner or Operator.

**Section 6.3     <u>Exclusions for Gross Negligence or Willful Misconduct</u>.**

(a)     **THE WAIVER, AND RELEASE OBLIGATIONS IN SECTION 6.2 APPLY REGARDLESS OF THE ACTIVE, SOLE, PASSIVE, CONTRIBUTORY, CONCURRENT OR GROSS NEGLIGENCE OR LIABILITY WITHOUT FAULT OF ANY PERSON RELEASED, EXCEPT AS PROVIDED FOR IN <u>SECTION 6.3(b)</u> .**

(b)     **OPERATOR'S AND OWNER'S WAIVER AND RELEASE OBLIGATIONS DO NOT APPLY WHERE THE LOSS IN RELATION TO A CLAIM IS THE RESULT OF THE WILLFUL OR INTENTIONAL MISCONDUCT OF A MEMBER OF THE OWNER GROUP OR OPERATOR GROUP, RESPECTIVELY, TO THE EXTENT THAT SUCH MEMBER'S WILLFUL OR INTENTIONAL MISCONDUCT CONTRIBUTED TO THE DEATH, INJURY, DISEASE, DAMAGE, OR LOSS.**

**Section 6.4     <u>Defense of Claims</u>.**

(a)     When a Party indemnifies any member of the Operator Group or the Owner Group against Claims, the indemnifying Party shall defend and hold the indemnified party harmless against those Claims and against all reasonable costs, expenses, and fees of any kind (including attorneys' fees) incurred by the indemnified party in defending those Claims, and any tax imposed on the indemnified party as a consequence of receiving payment under this <u>Article VI</u>. Any such defense costs are in addition to any amounts that are subject to a maximum liability amount under this Agreement.

(b)     A Person seeking to rely on an indemnity has the right to reasonably object to counsel selected by the indemnifying Party and select alternative counsel at the cost of the indemnifying Party.

**Section 6.5     <u>Insurance</u>.**  Operator shall maintain, in all areas where Services are to be performed, all insurance required by applicable Law during the time that Services are being performed. Nothing contained under this <u>Section 6.6</u>, nor the actual amounts of insurance maintained by Operator or its Subcontractors, limits or reduces Operator's liability and indemnity obligations under this Agreement.

**Section 6.6     <u>Disclaimers</u>.**  EXCEPT AS EXPRESSLY SET FORTH IN THIS AGREEMENT, OPERATOR MAKES NO, AND DISCLAIMS ANY, REPRESENTATIONS AND WARRANTIES, EXPRESS, IMPLIED, OR STATUTORY, WITH RESPECT TO THIS AGREEMENT OR THE PERFORMANCE OR RESULTS OF THE SERVICES.

**Section 6.7     <u>Laws; Application</u>.**  The indemnification obligations in this <u>ARTICLE VI</u> are intended to comply with applicable Laws. To the extent such indemnification provisions are found to violate any applicable Laws, or in the event any applicable Laws are enacted or amended so as to cause these provisions to be in violation therewith, this Agreement shall automatically be amended to provide

that the indemnification provided hereunder shall extend only to the maximum extent permitted by the applicable Laws.

<div align="center">

**ARTICLE VII.**      **MISCELLANEOUS**

</div>

**Section 7.1**      <u>**Force Majeure**</u>.

(a)      All obligations imposed by this Agreement on each Party, except for obligations to pay money or to provide indemnity, shall be suspended while compliance is prevented, in whole or in part, by an event of *force majeure*. As used herein an event of *force majeure* shall mean any of: an industry-wide labor dispute, fire, flood, war, civil disturbance, act of God (including numbered or named tropical disturbances); a change in laws or governmental rules, regulations or orders, or any other cause, whether similar or dissimilar, provided that such event or circumstance (i) delays or renders impossible the affected Party's performance of its obligations under this Agreement; (ii) is beyond the reasonable control of the affected Party, not due to its fault or negligence and was not reasonable foreseeable, and (iii) could not have been prevented or avoided by the affected Party through the exercise of due diligence, including the expenditure of any reasonable sum, and provided further that *force majeure* shall not include any of the following: (i) economic hardship, (ii) changes in market conditions, (iii) late delivery or failure of construction equipment or materials (unless such late delivery or failure was itself caused by an event of *force majeure*); (iv) labor availability, strikes or other similar labor actions limited to personnel of Operator Group, or (v) climatic conditions (including rain, snow, wind, temperature and other weather conditions), tides, and seasons, regardless of the magnitude, severity, duration or frequency of such climatic conditions, tides or seasons, other than an act of God (including numbered or named tropical disturbances).

(b)      A Party seeking relief under this <u>Section 7.1</u> shall give Notice to the other Party of the fact of the occurrence of the event of force majeure as soon as reasonably practicable after the commencement of such occurrence, and, such Party shall serve on the other Party further written details which shall include (i) a description of the event of force majeure and its likely effect on the affected Party's obligations under this Agreement; (ii) a good faith estimate of the duration of the event of force majeure; and (iii) the actions being taken (or that will be taken) to mitigate against the impacts of such event of force majeure. For continuing events of force majeure, the affected Party shall update such information no less frequently than once per week.

(c)      Notwithstanding the foregoing, such Party shall resume performance within a reasonable time after such event of *force majeure* has ended or been removed, or such Party is able to overcome the prevention caused by such event. Operator shall consistently monitor and use its reasonable best endeavors, including the reasonable expenditure of money, to overcome, mitigate and minimize the event of *force majeure* and its consequences. Neither Party shall be entitled to additional compensation or other payment as a result of an event of *force majeure*.

**Section 7.2**      <u>**Notices**</u>. Any Notice shall be in writing and delivered (i) in person, (ii) by courier service or by overnight delivery service in each case that requires acknowledgement of receipt, (iii) mailed by certified mail, postage prepaid and return receipt requested, or (iv) delivered by electronic mail and expressly acknowledged as received by return electronic mail, as follows:

<div align="center">

12

</div>

If to Owner:

        Fieldwood Energy IV LLC
        2000 W. Sam Houston Pkwy S. Suite 1200
        Houston, Texas 77042
        Attn:   Sole Manager
        Phone: _____
        Email: _____


If to Operator:

        Mako Buyer LLC
        2000 W. Sam Houston Pkwy S. Suite 1200
        Houston, Texas 77042
        Attn:   Thomas R. Lamme
        Phone: (713) 969-1107
        Email: TLamme@fwellc.com

Notice given by personal delivery or courier shall be effective upon actual receipt. Notice given by mail shall be effective upon actual receipt or, if not actually received, the fifth Business Day following deposit with the U.S. Post Office. Notice given by electronic mail shall be effective upon delivery if delivered to a working email address during the recipient's normal business hours, or at the beginning of the recipient's next Business Day if not delivered during the recipient's normal business hours.  If a date specified herein for giving any Notice or taking any action is not a Business Day (or if the period during which any Notice is required to be given or any action taken expires on a date which is not a Business Day), then the date for giving such Notice or taking such action (and the expiration date of such period during which notice is required to be given or action taken) shall be the next day which is a Business Day. Any Party may change any address, electronic or otherwise, to which Notice is to be given to it by giving Notice as provided above of such change of address.

     **Section 7.3**    __No Joint Venture or Partnership__. Nothing in this Agreement is intended   to create, or shall be construed as creating, a partnership, joint venture, association for profit or  other business entity between or among the Parties, and for federal and state income  tax purposes, the Parties elect to be excluded from the application of the provisions of Subchapter K, Chapter 1, Subtitle A of the Internal Revenue Code of 1986, as amended, as permitted and authorized by Section 761 of said Code and the regulations promulgated thereunder.

     **Section 7.4**    __No Fiduciary Duty__. It is expressly understood and agreed that this Agreement is a purely commercial transaction between the Parties and that nothing stated herein shall operate to create any fiduciary duty which a Party shall owe to the other Party, except with respect to the handling of cash by Operator on behalf of Owner.

     **Section 7.5**    __Confidentiality__. From and after the Effective Date, neither Party shall, and shall ensure that members of its Group do not, directly or indirectly, use or disclose or divulge any trade secrets or other Confidential Information of the other Party, including information of others that such Party has

agreed to keep confidential; provided that the foregoing restriction shall not apply to information (a) which is lawfully and independently obtained from a Third Party without restriction as to disclosure, (b) which is already known to the Party or to others not bound by a duty of confidentiality or which is in the public domain or enters into the public domain through no fault of any member of such Party's Group, and (c) the Party is required by law or legal process to disclose; and provided further that (i) the Parties may use such information in connection with the performance of the transactions contemplated by this Agreement, including enforcement of its rights thereunder or under any document delivered pursuant thereto, and (ii) Owner may disclose such information to the extent Owner is required to disclose or expressly permitted to disclose such information under any Material Project Contract.

Section 7.6    **Costs and Expenses**.  Each Party shall bear its own costs and expenses in relation to the negotiation and preparation of this Agreement.

Section 7.7    **Records and Inspection**. Up until 24 months from the end of the calendar year in which this Agreement is completed or terminated, (A) Operator shall ensure that all members of Operator Group retain all records related to this Agreement (or until expiry of the statute of limitations for taxes or import or export charges) and (B) Owner may inspect at any time all records to confirm that the requirements of the Agreement are met.

Section 7.8    **Further Assurances.**  The Parties shall at their own cost and expense execute and deliver such further documents and instruments and shall take such other actions as may be reasonably required or appropriate to evidence or carry out the intent and purposes of this Agreement.

Section 7.9    **Authority of Parties/Signatories**. Each person signing this Agreement represents and warrants that he or she is duly authorized and has legal capacity to execute and deliver this Agreement. Each Party represents and warrants to the other that the execution and delivery of this Agreement and the performance of such Party's duties have been duly authorized and that this Agreement is a valid and legal agreement binding on such Party and enforceable in accordance with its terms.

Section 7.10    **Public Announcements**.  Operator shall not issue any public announcement or statement concerning this Agreement or make any use of the names, image, logos, or trademarks of Owner or any of its Affiliates or CUSA or any of its Affiliates without obtaining the prior written consent of Owner and CUSA's prior written consent.  If the proposed public announcement or statement makes any use of the names, image, logos, or trademarks of CUSA or any of its Affiliates, Operator shall not proceed without obtaining the prior written consent of CUSA.

Section 7.11    **Entire Agreement**. This Agreement (together with the Appendix and Exhibits hereto,) constitutes the entire agreement among the Parties with respect to the subject hereof and supersedes any other representations, understandings or agreements (whether written, oral or otherwise) that may have been made or entered into by the Parties or any of their respective Affiliates relating to the transactions contemplated hereby or the subject hereof.

Section 7.12    **Successors and Assignments**.  This Agreement is personal as to Operator and Owner and shall not be assigned by Operator without Owner's consent or any Owner without Operator's consent; provided that the foregoing shall not apply if Operator assigns this Agreement in total (i) along with all of its personnel who are performing any part of the Services hereunder to an Affiliate, provided

that no such assignment by Operator shall relieve Operator of its obligations under this Agreement, or (ii) to an acquirer of all or substantially all of Operator's employees providing Services hereunder.

**Section 7.13    Amendment**.  This Agreement may be amended or modified in whole or in part, and terms and conditions may be waived, only by a duly authorized agreement in writing which makes reference to this Agreement executed by each Party.

**Section 7.14    Construction**.

(a)    All article, section, schedule, and exhibit references used in this Agreement are to articles and sections of, and Appendix and Exhibits to, this Agreement, unless otherwise specified. The appendix and exhibits attached to this Agreement constitute a part of this Agreement and are incorporated herein for all purposes.

(b)    Unless otherwise indicated, with respect to either Party, the terms "ordinary course of business" or "ordinary course" shall be deemed to refer to the ordinary conduct of business in a manner consistent with the past practices and customs of such Party.

(c)    If a term is defined as one part of speech (such as a noun), it shall have a corresponding meaning when used as another part of speech (such as a verb). Terms defined in the singular have the corresponding meanings in the plural, and vice versa. Unless the context of this Agreement clearly requires otherwise, words importing the masculine gender shall include the feminine and neutral genders and vice versa. The words "include", "includes" or "including" do not limit the preceding terms and shall be deemed to be followed by the words "without limitation." The words "hereof," "hereto," "hereby," "herein," "hereunder" and words of similar import, when used in this Agreement, shall refer to this Agreement as a whole and not to any particular section or article in which such words appear. The term "or" is not exclusive.

(d)    The terms "day" and "days" mean and refer to calendar day(s). The terms "year" and "years" mean and refer to calendar year(s).

(e)    Operator and Owner have each participated in the negotiation and drafting of this Agreement, and, if an ambiguity should arise, this Agreement shall be construed as if drafted jointly by the Parties and no presumption or burden of proof shall arise favoring or burdening any Party by virtue of the authorship of any of the provisions in this Agreement.

(f)    The captions in this Agreement are for convenience only and shall not be considered a part of or affect the construction or interpretation of any provision of this Agreement.

(g)    All references to currency herein shall be to, and all payments required hereunder shall be paid in, United States Dollars.

(h)    The serial comma is sometimes included and sometimes omitted. Its inclusion or omission shall not affect the interpretation of any phrase.

**Section 7.15    Severability**. If any provision of this Agreement is held invalid or unenforceable by any court of competent jurisdiction, the other provisions of this Agreement shall remain in full force

and effect. The Parties further agree that if any provision contained herein is, to any extent, held invalid or unenforceable in any respect under the Laws governing this Agreement, they shall take any actions necessary to render the remaining provisions of this Agreement valid and enforceable to the fullest extent permitted by Law and, to the extent necessary, shall amend or otherwise modify this Agreement to replace any provision contained herein that is held invalid or unenforceable with a valid and enforceable provision giving effect to the intent of the Parties to the greatest extent legally permissible.

Section 7.16    **Counterparts**. This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. Any .pdf or other electronic transmission hereof or signature hereon shall, for all purposes, be deemed originals.

Section 7.17    **Third Party Beneficiaries**.  No Person who is not a Party to this Agreement has any rights under this Agreement or may enforce any provision in this Agreement, except where a Person, or CUSA is entitled to insurance, defense, release, limitation of liability or indemnity protection under this Agreement. Notwithstanding the foregoing, the Parties agree that CUSA is an express third-party beneficiary of this Agreement.  The Parties agree that CUSA shall have the right to enforce (i) Owner's rights hereunder in the event of an Operator breach or default under this Agreement, including those rights set out in Section 3.5, on behalf of Owner, in accordance with the last paragraph of Section 7.04 of the LLC Agreement, and (ii) Owner's termination rights hereunder, including those rights set out in Section 5.1, on behalf of Owner, in accordance with Section 7.10 of the Omnibus Agreement.

Section 7.18    **Waivers**.   No waiver by any Party of this Agreement's terms, provisions or conditions is effective unless specifically evidenced in writing and signed by or on behalf of the Party granting such waiver. Any Party's failure to pursue remedies for breach of this Agreement, or payment by any Party of Invoices, does not constitute a waiver by any such Party of any breach of this Agreement or raise any defense against claims against a Party for breach of this Agreement. The waiver, failure to pursue remedies or to require the performance of any agreement or obligation under this Agreement, does not constitute (1) a waiver of any breach of this Agreement, or (2) a waiver of a later breach of any such agreement or obligation.

## ARTICLE VIII.        DISPUTE RESOLUTION

Section 8.1    **Governing Law**.

(a)    If the Services are performed offshore or on inland waters, notwithstanding the place of execution hereof or the place for performance of any covenant, promise or agreement herein made, this Agreement and the validity hereof, the agreements evidenced hereby, and all matters and issues arising hereunder, shall, to the fullest extent possible, be construed pursuant to and governed by the General Maritime Laws of the United States.  If the General Maritime Laws of the United States are held to be inapplicable to this Agreement or the work to be performed hereunder (or any part thereof) to be performed hereunder by a court of competent jurisdiction, then Sections 8.1(b) and 8.1(c) below shall apply, as appropriate, but only to the extent that United States General Maritime Law is held to be inapplicable.

(b)    If any court of competent jurisdiction determines that United States Maritime Law is not applicable to any relevant part of this Agreement or the work to be performed hereunder, then

16

such part of this Agreement and/or the work to be performed hereunder, shall, to the fullest extent enforceable under applicable law, be interpreted and enforced exclusively in accordance with the laws of the State of Texas.

(c)     If any court of competent jurisdiction determines that neither United States General Maritime Law nor the laws of the state of Texas are applicable to any relevant part of this Agreement or the work to be performed hereunder, then such part of this Agreement and/or the work to be performed hereunder, shall, to the fullest extent enforceable under applicable law, be interpreted and enforced exclusively in accordance with the laws of the State of Louisiana, excluding any conflicts of law rules that might refer same to another jurisdiction .

**Section 8.2     Resolution of Disputes**. The Parties shall exclusively and finally resolve any dispute between them using direct negotiations, mediation, and then arbitration as set out in this Article VIII, except as permitted in Section 8.5(g).

**Section 8.3     Direct Negotiations.** If a dispute arises, a Party seeking to initiate the dispute resolution process shall give Notice to the other Party of the Claim. The Parties shall attempt to resolve the dispute through direct negotiations in a meeting between the Parties, attended by individuals with decision-making authority, which must take place within 30 days, or as otherwise agreed to by the Parties, from the date the Notice was sent.

**Section 8.4     Mediation.** If the dispute cannot be resolved by direct negotiations within 30 days of initiation of the resolution process, either Party may initiate mediation by giving Notice to the other Party. Mediation must be attended by a representative from each Party with decision-making authority, and the proceeding must take place in Houston, Texas.

**Section 8.5     Arbitration Proceedings.** If the Parties fail to resolve the dispute within 60 days from Notice of mediation, either Party may initiate binding arbitration by giving Notice to the other Party. The arbitration must be conducted in accordance with the CPR Rules. To the extent of any conflicts between the Act or the CPR Rules and the provisions of this Agreement, the provisions of this Agreement prevail. The CPR is the appointing authority. The place of arbitration must be Houston, Texas. The following provisions will apply to arbitration proceedings:

(a)     One arbitrator (or three (3) arbitrators if the monetary value of the dispute is more than US $5,000,000 or its currency equivalent) will conduct the arbitral proceedings in English. If there is a dispute whether the monetary value exceeds the US $5,000,000, then the number of arbitrators must be three (3).

(b)     The maximum number of witnesses each Party may call to give evidence on its behalf, including by oral testimony, declaration or witness statement, is five (5) witnesses of fact and three (3) expert witnesses.

(c)     The existence of a dispute and any negotiations, mediation, and arbitration proceedings between the Parties in relation to any dispute are confidential and the Parties shall not make any disclosure to any Third Party. Any information, documents, or materials, created or produced for the purposes of, or used in, negotiations, mediation, or arbitration of a dispute are confidential and the Parties shall not disclose them to any Third Party unless there is a legal or

17

regulatory obligation to make a disclosure (but the disclosure must be limited to the extent necessary to comply with that legal or regulatory obligation), or to the extent required to enforce or challenge an award in bona fide legal proceedings before a state court or other judicial authority.

(d)    The arbitrator(s) has no authority to appoint or retain expert witnesses for any purpose unless agreed to by the Parties. The arbitrator(s) may not act as *amiable compositeur or ex aequo et bono*.

(e)    Unless a Party is otherwise entitled to be indemnified for such costs pursuant to this Agreement, the Parties intend that regardless of which Party prevails, all arbitration fees and costs must be split equally, between the Parties, and each Party shall bear its own costs of legal representation, witness expenses, and ancillary costs.

(f)    The award is final and binding, and except for proceedings under Section 8.5(g), the Parties agree to waive their rights to: (i) apply to the court for determination of a point of law; and (ii) any form of appeal, review or recourse in respect of any such award to any court or other judicial authority, to the extent that such waiver may be validly made.

(g)    The Parties may apply to a court with appropriate jurisdiction for any of the following without waiving its arbitration rights:

(i)    Interim measures as necessary until appointment of the arbitrator(s) or pending determination by the arbitrator(s).

(ii)    Preserving property pending determination by the arbitrator(s).

(iii)    Enforcing judgment entered on an award over the Person or assets of the non-prevailing Party.

(iv)    Enforcing Section 8.5(c) and preventing any information, documents or materials used in those proceedings from being used or disclosed by that Party for any purpose other than enforcement of Section 8.5(c).

(v)    Proceedings to (A) preserve property pending determination by the arbitrator(s), (B) enforce Section 8.5(c), or (C) enforce judgment entered on an award may be brought in any court having jurisdiction over the Person or assets of the non-prevailing Party. The prevailing Party may seek, in any court having jurisdiction, judicial recognition of the award, or order of enforcement or any other order or decree that is necessary to give full effect to the award.

[*Remainder of Page Intentionally Left Blank. Signature Page(s) to Follow.*]

IN WITNESS WHEREOF, this Agreement has been signed by each of the Parties as of the date first above written.

**OPERATOR**:

Mako Buyer LLC


By: _____
Name: _____
Title: _____


**OWNER:**

Fieldwood Energy IV LLC


By: _____
Name: _____
Title: _____

[*Signature page to Contract Operating Agreement*]

**APPENDIX I**

**DEFINITIONS**

"Act" means the Federal Arbitration Act, 9 U.S.C. §§ 1-16.

"Affiliate" means, with respect to a Party means any Person or entity that controls, is controlled by or is under common control with such Party where control means the direct or indirect power to direct the management of the entity at issue.  For the avoidance of doubt, (i) neither the Owner nor any of its direct or indirect subsidiaries shall constitute an Affiliate of Operator for purposes of this Agreement, and (ii) neither the Operator nor any of its direct or indirect subsidiaries shall constitute an Affiliate of Owner for purposes of this Agreement.

"Assets" means, collectively, the Terminated Properties and the Operating Assets.

"BOEM" means the Bureau of Ocean Energy Management of the United States Department of the Interior, or any successor agency.

"BSEE" means the Bureau of Safety and Environmental Enforcement of the United States Department of the Interior, or any successor agency.

"Business Day" mean any day other than a Saturday or a Sunday or a day on which federally chartered banking institutions in Houston, Texas, are authorized by Law to close, but for purposes of Notices or other communications given hereunder, means before 4:00 p.m. on such day in the city of Houston, Texas.

"Claim" means any claim, liability, loss, demand, damage, cost, lien, cause of action of any kind, obligation, requirement, clean-up costs, penalty, fine, interest and award, and whether arising by law, contract, tort (including negligence), voluntary settlement, or in any other manner. For indemnification Claims involving damage to Property, "Claim" also includes the cost of removal of lost or damaged Property.

"Confidential Information" means, collectively, trade secrets, proprietary information and confidential information including, but not limited to, all geological, geophysical, economic, financial, personnel information, contracts, and other information provided pursuant to this Agreement, whether in the form of maps, charts, logs, seismographs, interpretations, calculations, summaries or opinion, as well as other written notes, analyses, compilations, studies, interpretations, trade secrets, ideas, processes, procedures, data, know-how, improvements, discoveries, developments, designs, blueprints, drawings, techniques and other documents, materials or information regarding plans for exploration, development, marketing and selling, business records and plans, budgets, prices and costs, suppliers, customers and potential customers.

"CPR" means Conflict Prevention and Resolution.

"CPR Rules" means the International Institute for CPR Rules.

"CUSA" means Chevron U.S.A. Inc.

"<u>Escrow Account</u>" means that certain escrow account established pursuant to the Escrow Agreement.

"<u>Escrow Agreement</u>" means that certain escrow agreement governing the escrow account established on the Effective Date to collect and safeguard funds to pay for certain future decommissioning costs of Owner, dated the Effective Date, by and between Owner, CUSA, and the U.S. Bank National Association, as escrow agent.

"<u>FWE Parent</u>" means Fieldwood Energy LLC.

"<u>Governmental Authority</u>", individually, and "<u>Governmental Authorities</u>", collectively, means BOEM, BSEE, or any other applicable state, local, or federal governmental entity.

"<u>Implementation Agreement</u>" means that certain Implementation Agreement, dated [__], by and between CUSA and FWE Parent.

"<u>Invoice</u>" means a written invoice submitted by Operator.

"<u>Invoice Payment</u>" means the amount due to be paid by Owner to Operator pursuant to <u>Section 3.2</u>.

"<u>Joint Development Agreement</u>" means that certain Joint Development Agreement of even date herewith by and between the Owner and Operator.

"<u>Joint Interest Owner</u>" means any Person with whom Owner (or its Affiliates) has a legal or contractual relationship regarding the ownership of the project, joint venture, or license for which the Services are performed, and their successors in interest (but for the purposes of this Agreement, only in such ownership capacity).

"<u>Laws</u>" means any and all applicable laws, statutes, codes, constitutions, ordinances, decrees, writs, injunctions, orders, judgments, principles of common law, rules, licenses, authorizations, or regulations (including environmental laws) that are promulgated, issued, or enacted by any Governmental Authority having jurisdiction.

"<u>LLC Agreement</u>" means the limited liability company operating agreement of Owner, of even date herewith.

"<u>Material Contracts</u>" has the meaning attributed to such term in <u>Section 1.9(b)</u>.

"<u>Material Project Contracts</u>" means the following agreements: (i) this Agreement, (ii) the Omnibus Agreement, (iii) the Turnkey Removal Agreement, (iv) the LLC Agreement, (v) the NPI Conveyance and (vi) the Escrow Agreement, and "<u>Material Project Contract</u>" means any such agreement.

"<u>Non-Affiliate</u>" means any Person that is not Operator or an Affiliate of any such Person.

"<u>Non-FWE IV Operations</u>" means operations, business or other activity that is not related to the Services provided hereunder or that is not conducted on the Assets, including any operations

conducted by Operator or any of its Affiliates on its or its Affiliates oil and gas leases or the oil and gas leases of a Non-Affiliate.

"Non-Operated Assets" means Assets other than Operated Assets.

"Notice" means any notice, request, instruction, correspondence or other document to be given hereunder by any Party to another.

"NPI Conveyance" means the net profits conveyance, of even date herewith, made by Owner to U.S. Bank National Association, as escrow agent of the Escrow Account.

"Omnibus Agreement" means that certain Omnibus Agreement, of even date herewith, by and between Owner, Operator and CUSA.

"Operated Assets" means Assets while operated by Owner (or by Operator on behalf of Owner).

"Operating Assets" means those certain FWE IV Leases (as such term is defined in the Plan of Merger) that have not expired or terminated as of the Effective Date (as such term is defined in the Plan of Merger) and the FWE IV Assets (as such term is defined in the Plan of Merger) associated therewith.

"Operator" means Mako Buyer LLC, a Delaware limited liability company.

"Operator Default" means a default on behalf of Operator, as set forth in Section 3.5.

"Operator Group" means Operator, Operator's Affiliates, Subcontractors, and their respective directors, officers, employees, and any Person acting on behalf of any of them in connection with any subject matter of this Agreement.

"Owner" means Fieldwood Energy IV LLC.

"Owner Default" means a default on behalf of Owner, as set forth in Section 3.4.

"Owner Group" means Owner, Owner's Affiliates, Owner invitees, Joint Interest Owners and their Affiliates, and their respective directors, officers, and employees (and excludes Owner's contractors and their subcontractors, and their respective directors, officers, and employees).

"Operator's Representative" has the meaning set forth in Section 1.5.

"Owner's Representative" means, as of the Effective Date, the "Sole Manager" appointed under the LLC Agreement.

"Performance Standard" has the meaning attributed to such term in Section 1.2.

"Permitted Operations" means the following activities: (i) managing the safe-out operations and maintenance and monitoring activities with respect to the Terminated Properties; (ii) maintaining current production on the Operating Assets in a safe and cost-effective manner until the wells and facilities associated therewith are ready to be decommissioned; (iii) upon cessation of production on the Operating Assets, performing safe-out operations and maintenance and monitoring

activities; and (iv) for all Assets that are plugged, abandoned or decommissioned or that are to be plugged, abandoned and decommissioned, using commercially reasonable efforts to maximize third-party contribution amounts and other appropriate revenue sources to support such decommissioning operations, including from current working interest owners, predecessors-in-interest and surety bond providers.

"Person" means an individual, corporation, company, association, partnership, state, statutory corporation, government entity, or any other legal entity.

"Plan" means the plan of reorganization of Chapter 11 Case 20-33948, In re: Fieldwood Energy LLC et al., in the United States Bankruptcy Court for the Southern District of Texas, Houston Division, which was confirmed as of [_], 2021.

"Plan of Merger" means that certain Plan of Merger Agreement, of even date herewith, by Fieldwood Energy III LLC.

"Property" means property owned, leased, or furnished by a Person or in which a Person has a legal, beneficial, or economic interest.

"Rate" means a rate equal to 5% per annum, calculated daily on the basis of a year of 365 days and the actual number of days elapsed.

"Reimbursable Costs" means costs or expenditures consisting of: (i) any expenses actually incurred and paid by Operator for any service, insurance coverage, equipment or material that is required to provide the Services hereunder and that is procured by Operator from a Non-Affiliate, in each case to the extent such service, equipment or materials (A) is utilized by Operator to provide the Services (B) would be obtained from Third Parties by a reasonable and prudent operator, and (C) does not consist of overhead costs; or (ii) lease operating expenses associated with Permitted Operations on Operated Assets, that would properly be chargeable as OPEX under a joint operating agreement, but excluding any overhead costs.

"Restricted Activities" has the meaning attributed to such term in Section 1.9(b).

"Revenue Account" means a segregated bank account in the name of Operator where Operator shall receive and keep all production revenue from the Assets or other revenue received by Operator or its Affiliates that is generated by the Assets or otherwise attributable to the Owner or any of its Affiliates.

"Services" means the services described on Exhibit A.

"Service Term" means five (5) years commencing on the Effective Date, and with respect to each Service, the period set forth on Exhibit A.

"Subcontractor" means any Person who is engaged by Operator or any subcontractor or subsupplier of any tier to provide Services (other than an employee of Operator).

"Terminated Properties" means those certain FWE IV Leases (as such term is defined in the Plan of Merger) that have expired or terminated as of the Effective Date (as such term is defined in the

Plan of Merger) and the FWE IV Assets (as such term is defined in the Plan of Merger) associated therewith.

"Third Party" means any Person who is not a member of Operator Group or Owner Group.

"Third Party Operator" means Assets other than Operated Assets.

"Third Party Payment" means costs or expenditures consisting of: (i) any amounts payable in accordance with Permitted Operations on Non-Operated Assets to the operator thereof, that are properly charged under the applicable joint operating agreement; or (ii) lease operating expenses associated with Permitted Operations on Non-Operated Assets that are properly charged as OPEX under the applicable joint operating agreement.

"Turnkey Removal Agreement" means that certain Turnkey Removal Agreement for decommissioning the Assets, of even date herewith, by and between Operator, Owner and CUSA.

## EXHIBIT A

## TO CONTRACT OPERATING AGREEMENT

**SERVICES**

**0.1     Generally Applicable Provisions**. The following provisions shall apply to each type of Services set forth in this Exhibit A:

(i)      Operator shall provide the Services at no cost to Owner, provided that Operator shall have the right to obtain reimbursement or advance payment for Reimbursable Costs or Third Party Payments, in each case subject to and in accordance with Section 3.1 and Section 4.1 of the Contract Operating Agreement.

(ii)     All Services described in this Exhibit A shall exclude and be expressly limited by any provisions contained in the Contract Operating Agreement applicable thereto, including Section 1.1, Section 1.6 and Sections 1.8 through 1.11. In the event of a conflict between the Contract Operating Agreement and this Exhibit A, the Contract Operating Agreement shall apply.

**1.     Asset Management Services**. Subject to the terms of this Agreement, Operator shall provide the following Services with respect to the Assets.

**1.1     Operating Services**.

Services:  Providing the following operating services ("Operating Services") with respect to the Operated Assets:

(i)      Complying with, and causing the Operated Assets to be operated (and maintained) in compliance with all state and federal Laws and regulations, including, but not limited to, following all required health, safety and environmental Laws, regulations and programs (such as SEMS), complying with all regulatory filing and reporting requirements, and obtaining all necessary permits; provided that nothing in this provision shall require Operator to make on behalf of Owner any filing, payment, or submission (or otherwise take any action) that, under applicable Law, may be made only by a party designated with BOEM, BSEE, or other Governmental Authority as a designated operator, designated applicant, designated payor, or responsible party for Owner or that could make Operator directly liable or responsible to BOEM, BSEE, or other Governmental Authority, or any other third party with respect to any of the Assets in which event Operator shall prepare the necessary filing or submission and provide it to the Owner to file or submit or, in the case of a payment, notify the Owner of such payment so that Owner can make such payment.

(ii)     Until the end of the Service Term, serve as Owner's authorized agent with respect to the Operated Assets of Owner, in accordance with the terms hereof and any applicable

operating agreements and similar contracts (if any), by performing the following as and when needed:

(1) purchasing (either directly or as agent for Owner) supplies, materials, tools, and equipment associated with the Operated Assets, provided that the costs of such that are paid directly by Operator will be reimbursed by the Owner to Operator, further, provided that without Owner's prior written consent Operator will not purchase any single item with respect to the Operated Assets if such purchase would result in a charge or cost to Owner greater than one million dollars ($1,000,000.00) for any single item or five million dollars ($5,000,000.00) in the aggregate as to all such items during any calendar year.  Owner's consent shall be deemed granted unless Owner notifies Operator to the contrary within ten (10) Business Days from Owner's receipt of Operator's request;

(2) contracting (either directly or as agent for Owner) for services associated with the physical operation of the Operated Assets, provided that without Owner's prior written consent Operator will not contract for any of such services with respect to any of the Operated Assets if such contract (1) is with an affiliate of Operator or (2) would obligate Owner for a period more than ninety (90) days after the end of the Service Term for the Operating Services. Owner's consent shall be deemed granted unless Owner notifies Operator to the contrary within ten (10) Business Days from receipt of Operator's request;

(3) executing, amending, or extending contracts (either directly or as agent for Owner) associated with the physical operation of the Operated Assets in the normal course of business, provided that without Owner's prior written consent Operator will not contract for any of such services with respect to any of the Operated Assets if such contract (1) is with an Affiliate of Operator; or (2) would obligate Owner for a period more than ninety (90) days after the end of the Service Term for the Operating Services. Owner's consent shall be deemed granted unless Owner notifies Operator to the contrary within ten (10) Business Days from receipt of Operator's request;

(4) assisting Owner in Owner's capacity as operator under the applicable joint operating agreements, production handling agreements, and other similar operating agreements related to the Operated Assets with all rights and authority to communicate with co-lessees and non-operating parties and take all actions under the applicable agreement as if it were Owner;

(5) assisting Owner with the implementation of applicable master service agreements, work orders, purchase orders and similar service contracts related to the Operated Assets; and

(6) assisting Owner in all dealings and communications with Governmental Authorities, provided that Operator must obtain the prior approval of Owner before Operator agrees to any fine or penalty.  Operator will provide Owner copies of all correspondence with Governmental Authorities, other than routine correspondence, on a periodic basis or as requested by Owner.

**1.2     Production Marketing, Marketing Services, and Marketing Accounting Services**:

Services: Providing the following production marketing, marketing services and marketing accounting services (collectively, the "<u>Marketing Services</u>") with respect to the Assets:

(1) Performing all marketing, gas control, crude oil and gas scheduling, contract administration, and other similar services necessary to sell production associated with the Assets in a manner substantially consistent with Operator's or its personnel's current general practices, provided that all marketing shall be at prices Operator reasonably believes to be representative of market value. Upon request, Operator will provide Owner summaries of the scheduled oil and gas or plant statements;

(2) Performing all revenue and marketing accounting functions relating to the Assets, including the calculation and payment of royalty and overriding royalties, transportation, cash out, netback pricing, weighted average sales price, and other marketing accounting functions performed in the normal course of business; and

(3) Management of all lease of platform space agreements, production handling agreements, pipeline interconnect agreements, boarding agreements, midstream facility ownership and/or contract operating agreements, and other similar agreements of an Owner with respect to its Assets.

## 1.3     Treasury and Accounting Services:

Services: Providing the following treasury and accounting services with respect to the Assets:

(1) Managing the Revenue Account and any other bank accounts of Owner associated with the operation of the Assets;

(2) Performing all expenditure accounting functions for Owner relating to Owner's Assets, including for Owner's payment of all invoices and subsequent billing of same to all working interest owners, AFE maintenance, and maintenance of property/cost center numbers;

      (i)     Managing the collection of any joint interest billings and revenue relating to the Assets;

      (ii)    Performing as needed all the calculations of severance, ad valorem/property, and sales and use taxes, but excluding state or federal income, margin, or excise taxes;

      (iii)   Performing all of the property, revenue, and royalty accounting services related to the Assets, including properly disbursing payments to and collecting payments from Third Parties and working interest, royalty, and overriding royalty owners as required by such accounting services as well as rental, severance or production taxes, right of way payments, leasehold, minimum or

advance payments due in the normal course of business, and annual 1099 reporting as required by the Internal Revenue Service;

(iv)   Performing all the calculations and preparation of monthly gas and oil balancing and payout statements in the ordinary course of business;

(v)   Identifying to the Owner, and making payments for lease rentals, shut-in royalties, minimum royalties, payments in lieu of production, royalties, overriding royalties, production payments, net profit payments, and other similar burdens that are associated with the ownership and operation of the Assets;

(vi)   Prepare and obtain monthly and quarterly financial reports, and procure and assist with annual financial audit by independent accountant approved by Owner (Ernst & Young is deemed pre-approved);

(vii)   Prepare and obtain monthly and quarterly financial reports, and procure and assist with annual financial audit by independent accountant approved by Owner (Ernst & Young is deemed pre-approved); and

(viii)   Use reasonable efforts to obtain reimbursement/contribution for Owner decommissioning operations that is available under contract or applicable law, including as to predecessors-in-interest to the extent practicable and available surety bonding.

**1.4    Land Administration Services.**

Services: Providing the following land administration services with respect to the Assets:

(1) Administering and maintaining all leases and agreements relating to the Assets;

(2) Maintaining and updating all lease, ownership, contract, and property records and databases relating to the Assets;

(3) Maintaining and updating all royalty payment reports and databases;

(4) Maintaining and updating all royalty suspense accounts, reports, and databases and administering escheat duties in accordance with established State rules and regulations;

(5) Maintaining and updating all accounts, reports, and databases associated with compulsory pooled interests related to the Assets;

(6) Generating, verifying, processing, approving, and signing all internal and external division orders and transfer orders required in the normal course of business;

Exhibit A – Page 4
Contract Operating Agreement

(7) Identifying for payment by Owner and appropriately invoicing all rentals, surface, right of way, shut-in payments, and other payments required by the leases or other agreements relating to the Assets;

(8) Maintaining all land, contract, division of interest, lease files, and other files relating to the subject land administration functions; and

(9) Such other administrative services as Operator administered or caused to be administered to maintain the leases or agreements relating to the Assets.

**1.5    Supply Chain**.

Services. Providing the following supply chain services with respect to the Operated Assets:

(1) Operator shall provide procurement services with respect to the Operated Assets; and

(2) Except as it relates to marketing contracts, which shall be covered by <u>Section 1.2</u> of this <u>Exhibit A</u>, Operator shall provide contract administration services with respect to the Operated Assets.

**1.6    Records Management and Reporting Services:**

Services: Providing the following records creation and management and information reporting services:

(1) Format and data storage for records;

(2) Preparing all reports and updates that Owner is required to provide under LLC Agreement and responding to questions and requests relating to same; and

(3) Respond to data requests from CUSA made in accordance with LLC Agreement, Omnibus Agreement or other Material Project Contract.

<p align="center">[<em>Remainder of Page Intentionally Left Blank</em>]</p>

**<u>EXHIBIT B-1</u>**

**<u>TO CONTRACT OPERATING AGREEMENT</u>**

RESTRICTED ACTIVITIES

1.      Make any payment to renew or extend a lease;

2.      Plug and abandon any well;

3.      Execute, amend, waive, release, extend, terminate, or otherwise modify any of the governmental approvals, leases, or other agreements related to the Assets (other than an agreement in the ordinary course of business with a service provider using agreements substantially in the form previously used or other forms reasonably approved by Owner); and,

4.      Conduct or cause Owner to conduct any of the activities set  out in Section 7.04 of the LLC Agreement.

**EXHIBIT B-2**

**TO CONTRACT OPERATING AGREEMENT**

MATERIAL CONTRACTS*

1.      Any contract with Operator, Fieldwood Energy I LLC, a Texas limited liability company, Fieldwood Energy III LLC, a Texas limited liability company or an Affiliate of any of them with Owner or involving any Asset;

2.      Any contract for an amount receivable or payable in excess of One Hundred Thousand Dollars ($100,000) net to Owner;

3.      Any hydrocarbon purchase and sale, transportation, gathering, treating, compression, processing or similar contract that is not terminable by Owner without penalty on ninety (90) days' or less notice;

4.      Any contract that constitutes a lease under which Owner is the lessor or the lessee of real or personal property that (A) cannot be terminated by Owner without penalty upon ninety (90) days' or less notice and (B) involves an annual base rental of more than One Hundred Thousand Dollars ($100,000.00);

5.      Any contract that is an indenture, mortgage, loan, credit agreement, sale-leaseback, guaranty of any obligation, bond, letter of credit or similar financial contract;

6.      Any contract that is a farmout or farmin agreement, joint venture agreement, term assignment, participation agreement, exploration agreement, development agreement, joint operating agreement, unit operating agreement, operating agreement, unit agreement, pooling agreement or similar contract;

7.      Any contract for the sale, lease or exchange, of Owner's interest in the Assets;

8.      Any contract that contains any calls on, or options to purchase, material quantities of hydrocarbon production;

9.      Any contract that can reasonably be expected to result in aggregate payments by or on behalf of Owner or aggregate revenues paid to Owner, in each case, (A) of more than One Hundred Thousand Dollars ($100,000) during the current or any subsequent fiscal year or (B) One Hundred Thousand Dollars ($100,000) in the aggregate over the term of such contract (in each case, based solely on the terms thereof);

10.      Any contract that is a seismic or other geophysical acquisition or sharing agreement or license;

11.      Any contract, the primary purpose of which is to provide indemnity rights;

Exhibit B-2 – Page 1
Contract Operating Agreement

12.     Any contract that (A) contains or constitutes an existing area of mutual interest agreement or (B) includes non-competition restrictions, non-solicitation or no-hire obligations;

13.     Any contract that is a drilling contract, rig contract (including workover rig) or fracturing services contract;

14.     Any joint operating agreement;

15.     Any contract that constitutes a partnership agreement, joint venture agreement or similar contract; and

16.     Any contract to perform or agree to a Restricted Activity.

\*  For the purposes of this Exhibit B-2, the word "contract" includes any work orders, service orders, purchase orders or any other operative instruments associated with an agreement or contract.

**EXHIBIT C**

**TO CONTRACT OPERATING AGREEMENT**

OPERATOR REPRESENTATIVES LIST[1]

To be completed.

---

[1] NTD: List will include name, title and contact information for the individuals in charge of performing each Service.

Exhibit C – Page 1
Contract Operating Agreement

**<u>Exhibit 8</u>**

**Escrow Agreement**

See attached.

*Exhibit 8 to the Implementation Agreement*

## ESCROW AGREEMENT

THIS ESCROW AGREEMENT (this "**Agreement**") is made and entered into this [--] day of [--], 2021 (the "**Effective Date**"), by and among Chevron U.S.A. Inc., a Pennsylvania corporation ("**CUSA**"), Mako Buyer LLC, a Delaware limited liability company ("**Operator**"), Fieldwood Energy IV LLC, a Texas limited liability company ("**FWE IV**"), and **U.S. BANK NATIONAL ASSOCIATION**, as escrow agent (in such capacity, "**Escrow Agent**").  Operator, FWE IV and CUSA are sometimes referred to in this Agreement individually as "**Party**" or collectively as the "**Parties**".

## RECITALS

A.   CUSA and Fieldwood Energy LLC, a Texas limited liability company (now known as Fieldwood Energy III LLC ("**FWE**")), entered into that certain Implementation Agreement, dated as of June 9, 2021 (as amended, restated, supplemented or otherwise modified, the "**Implementation Agreement**").

B.   FWE IV was formed in connection with a divisive merger under Texas law of FWE.

C.   CUSA, FWE IV and Operator have entered into that certain Omnibus Agreement, dated as of [____], 2021 (as amended, restated, supplemented or otherwise modified, the "**Omnibus Agreement**"). Capitalized terms used but not defined in this Agreement have the meanings assigned thereto in the Omnibus Agreement.

D.   As part of the consideration under the Omnibus Agreement and the Implementation Agreement, and subject to the terms of the Omnibus Agreement and the Implementation Agreement, the Parties have agreed that each of the Parties, as and when required by the Omnibus Agreement or the Implementation Agreement, will make, or cause to be made, certain deposits of cash into the Escrow Account (the "**Escrow Amounts**").

E.   CUSA, FWE IV and Operator have requested, and Escrow Agent has agreed, that Escrow Agent will hold the Escrowed Funds, invested as provided for in this Agreement, for the purposes set forth in the Omnibus Agreement and make disbursements to the Parties as provided in this Agreement.

F.   In consideration of the premises and the mutual covenants set out in this Agreement, and other good and valuable consideration, the receipt and sufficiency of which is acknowledged, the Parties and the Escrow Agent agree to be bound by the provisions of this Agreement (and, solely as between the Parties, the provisions of the Omnibus Agreement).

**1.   DEPOSIT TO THE ESCROW ACCOUNT.**

1.1   The Parties shall from time to time deposit, or cause to be deposited, any and all Escrow Amounts as required pursuant to the Implementation Agreement and the Omnibus Agreement, and Escrow Agent hereby confirms that all or any portion of the Escrow Amount deposited from time to time in the Escrow Account will be available for payment in accordance with this Agreement.  For purposes of this Agreement:

(A)   "**Escrow Account**" means the deposit account of Escrow Agent bearing number [--] maintained by and with Escrow Agent for the benefit of CUSA, FWE IV and Operator pursuant to this Agreement.

(B)     "**Banking Day**" means any day other than a Saturday, Sunday or day when Escrow Agent is authorized or required to be closed for business to the public.

(C)     "**Dollars**" and "**US$**" means United States Dollars.

1.2     Escrow Agent will hold the Escrow Amount (including any interest accrued thereon as a result of the Permitted Investments) in the Escrow Account (collectively, the "**Escrowed Funds**"), for the benefit of CUSA, FWE IV and Operator, and will disburse the Escrowed Funds solely in accordance with this Agreement.

## 2.     DISBURSEMENT OF ESCROWED FUNDS.

2.1     Escrow Agent shall not disburse or otherwise transfer any Escrowed Funds except as follows:

(A)     After receipt from a duly authorized representative of CUSA from time to time of executed disbursement instructions in the form attached hereto as <u>Exhibit A</u> (each, a "**Disbursement Notice**"), that are executed by only CUSA and specifically reference this <u>Section 2.1(A)</u>, Escrow Agent will disburse, within one (1) Banking Day (but no later than the third Banking Day) after receipt of such Disbursement Notice to the person or persons indicated in such Disbursement Notice the portion of Escrowed Funds equal to the amount set forth in such Disbursement Notice. CUSA will only give Escrow Agent Disbursement Notices pursuant to this <u>Section 2.1(A)</u> in the circumstances and in the amounts permitted by Section 2.3 of the Omnibus Agreement (except Section 2.3(c) of the Omnibus Agreement).

(B)     After receipt from a duly authorized representative of each of Operator and CUSA from time to time of a Disbursement Notice executed by each of Operator and CUSA, that specifically references this <u>Section 2.1(B)</u>, Escrow Agent will disburse, within one (1) Banking Day (but no later than the third Banking Day) after receipt of such Disbursement Notice to the person or persons indicated in such Disbursement Notice the portion of Escrowed Funds equal to the amount set forth in such Disbursement Notice. Operator and CUSA will only give Escrow Agent Disbursement Notices pursuant to this <u>Section 2.1(B)</u> in the circumstances and in the amounts permitted by Section 2.3(c) of the Omnibus Agreement.

(C)     After receipt from a duly authorized representative of each of the Parties from time to time of a Disbursement Notice executed by each of CUSA, FWE IV and Operator, that specifically references this <u>Section 2.1(C)</u>, Escrow Agent will disburse, within one (1) Banking Day (but no later than the third Banking Day) after receipt of such Disbursement Notice to the person or persons indicated in such Disbursement Notice the portion of Escrowed Funds equal to the amount set forth in such Disbursement Notice.

(D)     Escrow Agent shall transfer and deposit the Escrowed Funds as provided in <u>Sections 5</u> and <u>6.1(A)</u>.

2.2     Escrow Agent may conclusively rely on without question, investigation, consent of or additional notice to either Party, and act upon, in each case, (A) the written instructions from a duly authorized representative of CUSA given pursuant to a Disbursement Notice with respect to the Escrow Account and Escrowed Funds if given in accordance with

Section 2.1(A), (B) the joint written instructions from a duly authorized representative of each of Operator and CUSA given pursuant to a Disbursement Notice with respect to the Escrow Account and Escrowed Funds if given in accordance with Section 2.1(B), and (C) the joint written instructions from a duly authorized representative of each Party given pursuant to a Disbursement Notice with respect to the Escrow Account and Escrowed Funds if given in accordance with Section 2.1(C), Section 5 or Section 6.1(A). For the avoidance of doubt, Escrow Agent may not take any action with respect to the Escrow Account, the Escrowed Funds or this Agreement based upon the unilateral instruction from Operator (or any person or entity acting on its behalf, including any trustee or the equivalent on its behalf in any insolvency, bankruptcy, receivership or similar proceeding) unless CUSA agrees in writing thereto.

**3.    DUTIES OF ESCROW AGENT.**

3.1    The duties of Escrow Agent shall be as follows:

(A)    During the term of this Agreement, Escrow Agent shall hold and disburse the Escrowed Funds in accordance with only the terms and provisions of this Agreement (*provided* that, for the avoidance of doubt, the Parties are bound by the terms of the Omnibus Agreement and will only instruct the Escrow Agent to make disbursements of the Escrowed Funds in accordance with the terms of the Omnibus Agreement).

(B)    Escrow Agent shall be obligated only for the performance of the duties as are specifically set forth in this Agreement.  Escrow Agent has no fiduciary or discretionary duties of any kind.  Escrow Agent assumes no liability in connection with this Agreement except for its negligence, gross negligence, fraud or willful misconduct.  Escrow Agent shall in no case or event be liable for punitive, incidental or consequential damages (including, but not limited to, lost profits).

(C)    Except as provided in Sections 3.1(B) and 9.1, Escrow Agent shall not be responsible for the validity, correctness or genuineness of any document, statement, invoice or notice submitted to it by the Parties under this Agreement, provided that such documents, statements, invoices or notices are delivered by at least one of the Parties. Escrow Agent may seek advice from its own counsel and, except as provided in Sections 3.1(B) and 9.1, shall be fully protected in any action reasonably taken by it in good faith reliance upon the advice of its counsel.

**4.    STATEMENTS.**

4.1    The Escrow Agent shall send statements on the status of the Escrow Account to the Parties on a monthly basis, showing any disbursements and to whom disbursed, any service charges levied, all earnings on or attributable to the Escrowed Funds, opening and closing balances and the type of investments and rates of earnings on the Escrowed Funds.  Each of the Parties may request and obtain reasonable additional information concerning such matters from the Escrow Agent.

5.    **REMOVAL OF OR RESIGNATION OF ESCROW AGENT.**

5.1    CUSA and Operator may at any time remove Escrow Agent upon thirty (30) days' prior written notice with or without cause by any instrument or instruments in writing signed by authorized representatives of both CUSA and Operator and delivered to Escrow Agent.

5.2    Escrow Agent may resign at any time on ninety (90) days' prior written notice to the Parties hereto by delivering written notice of its intended resignation to the Parties; *provided* that such resignation shall not be effective until a successor escrow agent has been appointed and accepted its appointment.  If Operator and CUSA jointly designate in writing a successor escrow agent, then Escrow Agent shall transfer the Escrowed Funds to such successor and, once the Escrowed Funds have been securely transferred to such successor, Escrow Agent shall be discharged of any liability or responsibility with respect to the Escrowed Funds arising from and after the date that Escrow Agent delivers the Escrowed Funds to the designated successor Escrow Agent.

6.    **TERMINATION.**

6.1    This Agreement shall terminate upon the earliest of the following:

(A)    Receipt by Escrow Agent of a joint written notice of termination signed by authorized representatives of each of the Parties, whereupon Escrow Agent shall disburse all remaining Escrowed Funds to the applicable Party stated in such notice.

(B)    Following release by Escrow Agent of all the Escrowed Funds in accordance with this Agreement upon written confirmation by the Parties to Escrow Agent that the Omnibus Agreement has been terminated.

(C)    Upon termination in accordance with any other provision of this Agreement.

Upon termination of this Agreement, none of the Parties, on the one hand, or Escrow Agent, on the other, shall have any further rights, duties or obligations under this Agreement to the other; *provided* that this statement in no way affects the obligations of the Parties to each other under the Omnibus Agreement.

7.    **NOTICES.**

7.1    All notices and other communications to Operator, FWE IV, CUSA or Escrow Agent may be hand delivered or sent by email or courier, to any Party or the Escrow Agent at the addresses provided in this Section 7:

**If to Operator**:

Mako Buyer LLC
2000 W. Sam Houston Pkwy S. Suite 1200
Houston, Texas 77042
Attn:        Thomas R. Lamme
Telephone:  (713) 969-1107
Email:        TLamme@fwellc.com

4

**If to FWE IV**:

> Fieldwood Energy IV LLC
> 2000 W. Sam Houston Pkwy S. Suite 1200
> Houston, Texas 77042
> Attn:    Sole Manager
> Telephone: [--]
> Email: [--]

**If to CUSA**:

> Chevron U.S.A. Inc.
> 100 Northpark Boulevard
> Covington, LA 70433
> Attn:        Land Manager
> Telephone:  (985) 773-6538
> Email:        tdwebre@chevron.com

**If to Escrow Agent**:

> U.S. Bank National Association
> One California Street, Suite 1000
> San Francisco, CA 94111
> Attn:    Global Corporate Trust
>              David A. Jason, Vice President
> Telephone: (415) 677-3622
> Facsimile: (415) 677-3769
> Email: david.jason@usbank.com

7.2     For all purposes of this Agreement, a notice or communication will be deemed effective: on the day it is delivered unless (a) that day is not a day upon which commercial banks are open for the transaction of business in the city specified (a "**Local Banking Day**") in the address for notice provided by the recipient or (b) if delivered after the close of business on a Local Banking Day, then on the next succeeding Local Banking Day.

**8.     FEE.**

8.1     FWE IV shall pay Escrow Agent the compensation in accordance with the fee schedule attached as Exhibit B hereto.  If not paid by FWE IV within ten Banking Days of demand, Escrow Agent shall have the right to set off against the Escrowed Funds (A) the amounts due in such fee schedule, and (B) as provided for in Section 10.  Otherwise, Escrow Agent shall have no right of set off against the Escrowed Funds and shall have no lien or security interest in the Escrow Account or the Escrowed Funds.  CUSA shall have no obligation to pay fees to Escrow Agent.

**9.     INDEMNIFICATION.**

9.1     In consideration of Escrow Agent's acceptance of this appointment, each Party hereby agrees to indemnify and hold Escrow Agent harmless as to any liability, and reasonable and duly documented costs and expenses (including, without limitation, counsel fees and expenses) which Escrow Agent may suffer or incur by reason of (a) any action, claim or

proceeding brought against Escrow Agent by such Party and arising out of or relating in any way to this Escrow Agreement or the transaction to which Agreement relates, except in the case of Escrow Agent's negligence, gross negligence, fraud or willful misconduct and (b) Escrow Agent's enforcement of its rights under this Section 9.  The foregoing indemnification and agreement to hold harmless shall survive any resignation or removal of Escrow Agent and shall survive the termination of this Agreement.

## 10. INVESTMENTS.

10.1    Escrow Agent shall invest Escrowed Funds only in investments described on Exhibit C into which the Parties direct Escrow Agent in writing to invest ("**Permitted Investments**"); and Escrow Agent shall have no power or authority to invest or reinvest the Escrowed Funds except in such investments.  All investments held in the name of Escrow Agent shall be held as the agent of the Parties.  In the absence of written investment instructions described above, Escrow Agent shall invest the Escrowed Funds to the extent reasonably practicable in the investment identified in clause (a) in Exhibit C.  Escrow Agent may make Permitted Investments through its own investment department or through affiliates.  Interest earned will become part of the Escrowed Funds.  Escrow Agent represents and warrants that neither it nor any affiliate of it will receive any compensation, commissions, fees (including, without limitation, any sale load charges, redemption fees, exchange fees, account fees, purchase fees, management fees, distribution fees, service fees or charges or similar payment) in connection with any investment of the Escrowed Funds except as disclosed on Exhibit B.  The representation and warranty in the preceding sentence shall be deemed to have been made and repeated by Escrow Agent on each occasion on which any investment is made with any portion of the Escrowed Funds.  Escrow Agent may elect, but shall not be obligated, to credit the Escrow Account with funds representing income or principal payments due on, or sales proceeds due in respect of, assets in any of the Escrow Account, or to credit to any of the Escrow Account assets intended to be purchased with such funds, in each case before actually receiving the requisite funds from the payment source, or to otherwise advance funds for Escrow Account transactions.  Notwithstanding anything else in this Agreement, any such crediting of funds or assets shall be provisional in nature, and the Escrow Agent shall be authorized to reverse any such transactions or advances of funds in the event that it does not receive good funds with respect thereto.

## 11. CONFLICTS OF INTEREST.

11.1    No director, employee or agent of Escrow Agent shall give to or receive from any director, employee or agent of the Parties or any affiliate thereof any commission, fee, rebate, or any gift or entertainment of significant cost or value, or enter into any business arrangement with any director, employee or agent of the Parties or any affiliate thereof other than as a representative of the Parties or their affiliates, in connection with the services provided hereunder without the Parties' prior written consent.  Escrow Agent shall promptly notify the Parties of any violation of this provision and any consideration received as a result of such violation shall be paid over or credited to the Parties.  Additionally, if any violation of this provision occurring prior to the date of this Agreement resulted directly or indirectly in the Parties' consent to enter into this Agreement with Escrow Agent, the Parties may, at their sole option, terminate this Agreement at any time and, notwithstanding any other provision of this Agreement, pay no compensation or reimbursement to Escrow Agent whatsoever for any services provided after the date of termination.

**12.   NO PAYMENT TO GOVERNMENT OFFICIALS.**

12.1   Neither Escrow Agent nor its employees, agents or subcontractors shall make any payment or give anything of value to any official of any government or public international organization, including any officer or employee of any government department, agency, or instrumentality to influence his or its decision, or to gain any other advantage for any Party or Escrow Agent in connection with the services performed hereunder.  Any party to this Agreement shall immediately notify the other parties to this Agreement of any violation of this Section.  Each party to this Agreement shall hold the others harmless from and against all losses and expenses arising out of any such violation.  In the event of any violation of this Section, any party to this Agreement may, at its sole option, terminate this Agreement at any time.

**13.   RIGHT TO AUDIT.**

13.1   Escrow Agent shall maintain true and correct records in connection with all matters relating to this Agreement and retain such records for the greater of 24 months or such period of time as is required by the Escrow Agent's document retention policies.   Any representative(s) authorized by the Parties may in a reasonable time and to a reasonable extent audit records of Escrow Agent for the sole purpose of determining whether there has been compliance with the applicable provisions of this Agreement.

**14.   TAX REPORTING.**

14.1   Each Party shall provide Escrow Agent a properly completed and duly executed applicable U.S. Internal Revenue Service ("**IRS**") Form W-9 for each payee to which it directs payment. If such tax documentation is not so provided, Escrow Agent is authorized to withhold taxes as required by the U.S. Internal Revenue Code and regulations promulgated thereunder. The Parties have determined that any interest or income on Escrowed Funds shall be reported on an accrual basis and deemed to be for the account of CUSA, and the Parties shall prepare and file all required tax filings with any applicable taxing authority consistent therewith.

14.2   The Parties shall provide Escrow Agent with all information requested by Escrow Agent necessary for (a) the preparation and filing by Escrow Agent with the IRS or other taxing authority of any applicable IRS Form 1099, IRS Form 1042-S, or similar document, or (b) the performance by Escrow Agent of any reporting obligations under the Foreign Account Tax Compliance Act, Foreign Investment in Real Property Tax Act, or other applicable law or regulation, in each case to the extent related to the performance or fulfilment of Escrow Agent's duties and obligations pursuant to this Agreement.

**15.   MISCELLANEOUS.**

15.1   This Agreement (and, solely as between the Parties, the Omnibus Agreement and the Implementation Agreement) sets forth the entire agreement of the Parties and Escrow Agent with respect to the subject matter hereof.  The provisions of this Agreement may be waived, altered, amended or supplemented, in whole or in part, only by writing signed by each of the Parties and Escrow Agent.  Neither this Agreement nor any right or interest hereunder may be assigned in whole or in part by any party to this Agreement, except to affiliates of such party, without the prior written consent of the other parties hereto.

15.2    This Agreement shall be governed by and construed under the laws of the State of Texas, without giving effect to its conflict of law principles; provided, however, that nothing herein shall be construed to modify or negate the agreement of the Parties, solely as between themselves, that all disputes between them shall be resolved exclusively and finally pursuant to the dispute resolution provisions in the Omnibus Agreement.

15.3    No party to this Agreement is liable to any other party hereto for losses due to, or if it is unable to perform its obligations under the terms of this Agreement because of, acts of God, fire, war, earthquake, terrorism, floods, strikes, electrical outages, equipment or transmission failure, or other causes reasonably beyond its control.

15.4    This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute the same instrument. All signatures of the Parties and Escrow Agent may be transmitted by facsimile, by email with the signature page as an image attachment (such as a .PDF, .TIF, .BIT, or .JPEG file) or by way of a digital signature provided by DocuSign (or such other digital signature provider as specified in writing to Escrow Agent by the authorized representative of the applicable Party), and such facsimile, email image attachment or digital signature will, for all purposes, be deemed the original signature of such Party or Escrow Agent whose signature it reproduces, and will be binding upon such Party or Escrow Agent.  Each party hereto agrees to assume all risks arising out of the use of digital signatures and electronic methods to submit communications to the other parties hereto, including without limitation the risk of Escrow Agent acting on unauthorized instructions, and the risk of interception and misuse by third parties.

15.5    If any provision of this Agreement is determined to be prohibited or unenforceable by reason of any applicable law of a jurisdiction, then such provision shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions thereof, and any such prohibition or unenforceability in such jurisdiction shall not invalidate or render unenforceable such provisions in any other jurisdiction.

15.6    A person who is not a Party or Escrow Agent shall have no right to enforce any term of this Agreement.

15.7    The Parties represent, warrant and covenant that each document, notice, instruction or request provided by such Party to Escrow Agent shall comply with applicable laws and regulations.  Where, however, the conflicting provisions of any such applicable law may be waived, they are hereby irrevocably waived by the Parties and Escrow Agent to the fullest extent permitted by law, to the end that this Agreement shall be enforced as written.

15.8    Each of the Parties and Escrow Agent submits to the exclusive jurisdiction of the Federal and state law courts of Harris County, Texas for the limited and sole purpose to resolve any disputes regarding the formation, existence, construction, performance, validity and all aspects of this Agreement, provided that such submission will not prevent the enforcement of a Texas Federal or state court judgment in another jurisdiction.  Nothing in this Section 15.8 shall be deemed to be an agreement by the Parties and Escrow Agent that Texas federal or state courts can exercise general jurisdiction over any Party or Escrow Agent. Any process may be validly served upon the Parties and Escrow Agent at the applicable address of the Party and Escrow Agent provided in Section 7.1.

8

16.     **CONFIDENTIALITY.**

16.1    This Agreement and all transactions hereunder shall be kept confidential by Escrow Agent, and Escrow Agent hereby agrees not to provide copies of this Agreement or to disclose its specific terms or any of the transactions to any person without the prior written consent of CUSA and Operator except: (a) Escrow Agent may disclose to the applicable court in connection with any proceedings initiated to collect payment under this Agreement; (b) to any extent that it is required to disclose the same pursuant to any law or order of any court of competent jurisdiction, or any procedure for disclosure of documents in any proceedings before any such court (including any proceeding to enforce this Agreement) or in regulatory proceedings, or pursuant to any law or regulation having the force of law; provided, however, Escrow Agent shall give CUSA and Operator advance written notice of Escrow Agent's intention to disclose the same based on that requirement and a reasonable amount of time consistent with the requirement pursuant to which disclosure is to occur in which to seek adequate protective orders; and (c) to Escrow Agent's direct or indirect shareholders, directors, officers, employees, independent auditors, legal counsel, and other professional advisors to the extent such persons have a need to know, in each case if such persons are informed by Escrow Agent of its confidential nature and of their duty to maintain the confidentiality hereof, and who prior to any such disclosures shall have agreed to be bound by such duty of confidentiality. Notwithstanding anything to the contrary herein, Escrow Agent may provide copies of this Agreement and disclose its specific terms to a bank regulatory agency or in connection with an examination of its records by bank examiners without prior notice to CUSA or Operator, provided that Escrow Agent shall provide notice to CUSA and Operator as soon as practicable thereafter.

17.     **PATRIOT ACT DISCLOSURE.**

17.1    Section 326 of the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 ("**USA PATRIOT Act**") requires Escrow Agent to implement reasonable procedures to verify the identity of any person that opens a new account with it.  Accordingly, the Parties acknowledge that Section 326 of the USA PATRIOT Act and agree that Escrow Agent's identity verification procedures require Escrow Agent to obtain information which may be used to confirm a Party's identity, including, without limitation, name, address and organizational documents ("identifying information"). The Parties each agree to provide Escrow Agent with any such identifying information required as a condition of opening an account with or using any service provided by Escrow Agent.

18.     **SECURITY PROCEDURE FOR FUNDS TRANSFERS**

18.1    Escrow Agent shall confirm each Disbursement Notice and any other funds transfer instruction received in the name of a Party by means of the security procedure selected by such Party and communicated to Escrow Agent through a signed certificate in the form of Exhibit D-1 (in the case of CUSA) or Exhibit D-2 (in the case of Operator) attached hereto, which upon receipt by Escrow Agent shall become a part of this Agreement.  Once delivered to Escrow Agent, Exhibit D-1 and Exhibit D-2 may be revised or rescinded only by a writing signed by an authorized representative of CUSA (in the case of Exhibit D-1) or the Operator (in the case of Exhibit D-2).  Such revisions or rescissions shall be effective only after actual receipt by Escrow Agent and following such period of time as may be necessary to afford Escrow Agent a reasonable opportunity to act on it. If a revised Exhibit

D-1 or Exhibit D-2 or a rescission of an existing Exhibit D-1 or Exhibit D-2 is delivered to Escrow Agent by an entity that is a successor-in-interest to the applicable Party, such document shall be accompanied by additional documentation satisfactory to the Escrow Agent showing that such entity has succeeded to the rights and responsibilities of such Party under this Escrow Agreement.

18.2    The Parties understand that Escrow Agent's inability to receive or confirm each Disbursement Notice or any other funds transfer instructions received in the name of a Party pursuant to the security procedure selected by such Party may result in a delay in accomplishing the funds transfer requested pursuant to such Disbursement Notice or other funds transfer instructions, and agree that Escrow Agent shall not be liable for any loss caused by any such delay.

[SIGNATURE PAGES IMMEDIATELY FOLLOW THIS PAGE]

WITNESS the following execution and delivery of this Agreement by duly authorized representatives of each of the following Parties and Escrow Agent as of the Effective Date:

**MAKO BUYER LLC**

By: _____
Name:
Title:

**CHEVRON U.S.A. INC.**

By: _____
Name:
Title:

**FIELDWOOD ENERGY IV LLC**

By: _____
Name:
Title:

**ESCROW AGENT:**

**U.S. BANK NATIONAL ASSOCIATION**


By: _____
Name:
Title:

14

# EXHIBITS TO ESCROW AGREEMENT

# TO BE AGREED WITH ESCROW AGENT

## **Exhibit 9**

**Neptune Spar Transition Services Agreement**

See attached.

*Exhibit 9 to the Implementation Agreement*

## NEPTUNE SPAR TRANSITION SERVICES AGREEMENT

This Neptune Spar Transition Services Agreement dated and effective as of _____, 2021 (the "Effective Date") (this "Agreement") is by and between Mako Buyer LLC, a Delaware limited liability company (the "Service Provider") and Noble Energy, Inc. a Delaware corporation (the "Predecessor").  Service Provider and Predecessor are sometimes referred to collectively as the "Parties" and individually as a "Party".

**WHEREAS**, pursuant to the final confirmation order in respect of the Chapter 11 cases of Fieldwood Energy LLC and its debtor Affiliates (as defined below) (collectively the "Debtors") in Case No. 20-33948 the Debtors have abandoned certain oil and gas properties and assets for which Predecessor is a predecessor-in-interest;

**WHEREAS**, Predecessor has requested that Service Provider provide certain operational maintenance, monitoring, technical, and administrative services with respect to the Asset (as defined below), upon the terms and conditions set forth herein, for three hundred sixty-five (365) days from the exit of the Chapter 11 cases, and Service Provider has agreed to do so; and

**WHEREAS**, other than as otherwise agreed by the Parties, during the Service Term (as defined below) and during any transition activities, Predecessor will be responsible for and shall pay all costs associated with the Asset and/or the Services (as defined below), including but not limited to third party costs and costs associated with Services provided by Service Provider's employees.

**NOW, THEREFORE**, in consideration of the premises and of the mutual promises, covenants, conditions, and agreements contained herein, and for other valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereby agree as follows:

## ARTICLE I.  TRANSITION SERVICES

**Section 1.1**     **Services**. Subject to the terms of this Agreement, Service Provider shall provide or cause to be provided the transition services described on Exhibit A (collectively, the "Services") for all of the oil and gas assets described in Schedule 1 attached hereto (the "Asset") in accordance with the standard of performance set forth in Section 1.2 below for the period set forth in Article IV, subject to the provisions of Article V.  The Services will be provided to Predecessor in connection with the continued maintenance and monitoring of the Asset and, as necessary, to assist in the transition of the maintenance and monitoring of the Asset to Predecessor or another service provider and terminate the Services hereunder on or before the end of the Service Term.

**Section 1.2**     **Standard of Performance**. Subject to the terms of this Agreement, Service Provider shall perform or cause to be performed the Services (a) as a reasonably prudent operator as the contract service provider hereunder would perform such Services, (b) in a good and workmanlike manner consistent with past practices related to the Asset, (c) with due diligence and dispatch, and (d) in compliance with all Laws (as defined below), licenses, authorizations and permits; **PROVIDED, HOWEVER, EXCEPT AS EXPRESSLY PROVIDED HEREIN, IN NO EVENT SHALL SERVICE PROVIDER HAVE ANY OBLIGATIONS OR LIABILITY**

**TO ANY PREDECESSOR GROUP MEMBER EXCEPT WITH RESPECT TO SERVICE PROVIDER'S INDEMNITY OBLIGATIONS AS PROVIDED IN SECTION 6.2.** For purposes of this Agreement, "Laws" means any and all applicable laws, statutes, codes, constitutions, ordinances, decrees, writs, injunctions, orders, judgments, principles of common law, rules, licenses, authorizations, or regulations (including environmental laws) that are promulgated, issued, or enacted by any Governmental Authority (as defined below) having jurisdiction. In providing the Services to the Predecessor, Service Provider may use, at its discretion, its own personnel or the personnel of any of its Affiliates or employ the services of contractors, subcontractors, vendors, or other third parties. For purposes of this Agreement, "Affiliates" with respect to a Party means any person or entity that controls, is controlled by or is under common control with such Party where control means the direct or indirect power to direct the management of the entity at issue.

      **Section 1.3**    **Independent Contractor**. At all times during the performance of Services by Service Provider, all persons performing such Services who shall be in the employ and/or under the control of Service Provider or its Affiliates (including agents, contractors, temporary employees, and consultants) shall be independent from Predecessor and not employees of Predecessor and shall not be entitled to any payment, benefit, or perquisite directly from Predecessor on account of such Services, including, but not limited to, group insurance and participation in any employee benefit and pension plans maintained by Predecessor or any Affiliate of Predecessor. Service Provider shall be responsible for all employee benefits and payroll taxes of its employees performing the Services. Service Provider will not be required to provide any Services the provision of which would violate applicable Laws. Notwithstanding any other provision contained elsewhere in this Agreement, in all cases where the Service Provider is performing Services under this Agreement offshore the State of Louisiana or are otherwise covered by the Louisiana Worker's Compensation Act, La. Rev. Stat. § 23.1021 et seq., the Parties acknowledge and agree that all such operations pursuant to this Agreement are an integral part of and are essential to the ability of Predecessor to generate Predecessor's goods, products, or services, and that whenever Services and work are performed hereunder in or offshore Louisiana, or the Louisiana Workers' Compensation Act may be applicable, the employees of Service Provider and their contractors providing such Services or performing such work, if any, whether direct, statutory, borrowed, or otherwise, are statutory employees of Predecessor in accordance with the Louisiana Worker's Compensation Act, La. Rev. Stat. § 23.1021 et seq. and the protections afforded a statutory employer under Louisiana Law shall apply. In such event, Service Provider agrees that Predecessor is and shall be deemed a statutory employer of Service Provider's employees for the sole purposes of La. Rev. Stat. § 23.1061(A)(3), as the same may be amended from time to time.

      **Section 1.4**    **Records**. Service Provider shall use commercially reasonable efforts to maintain or cause to be maintained true and correct records of all receipts, invoices, reports, and such other documents as are customarily maintained by Service Provider for its own operations relating to each Service rendered hereunder for a period of the later of (i) two (2) years following the end of the Service Term or (ii) such other time required by applicable Law. All such receipts, invoices, reports, and other documents are the property of Predecessor.

WEIL:\98011006\2\45327.0007

**Section 1.5** <u>Limitation of Services</u>.  Notwithstanding anything herein to the contrary, Predecessor acknowledges certain personnel of Service Provider and/or its Affiliates involved in the provision of the Services may leave the employment of such Service Provider and/or its Affiliates or terminate their employment or contract with such Service Provider or its Affiliates during the term of this Agreement. The Services shall not include providing any technical evaluations regarding any proposals for drilling, reworking, or other capital expenditure projects, or the new development of any assets. Service Provider makes no representation or warranty regarding the ability of Service Provider and/or its Affiliates to retain any employees, contractors, or subcontractors and neither Service Provider nor any of its Affiliates shall have any liability to Predecessor as to the result of the loss of any such employees, contractors, or subcontractors. Service Provider and its Affiliates shall use commercially reasonable efforts to report all information accurately but shall not be responsible for the accuracy or completeness of any information furnished by any other party for inclusion in any reports or for results obtained by use of any inaccurate information so furnished.

(A) Notwithstanding any other provision in this Agreement to the contrary:

(i) Service Provider shall have no obligation to be designated with any applicable state, local, or federal governmental entity (each individually, a "<u>Governmental Authority</u>"; and collectively, "<u>Governmental Authorities</u>") as a designated operator, designated applicant, designated payor, or responsible party for the Asset;

(ii) Service Provider shall have no obligation to post any bond or other security on behalf of Predecessor or to make any payment directly out of Service Provider's own funds for any Services;

(iii) Service Provider shall have no obligation to provide any Service for which a third party is obligated or permitted (under a joint operating agreement, contract services agreement or otherwise) to provide the same service for Predecessor; provided, however, that Service Provider's use of a subcontractor to perform any part of the Services shall not excuse Service Provider from the obligation to perform such Services;

(iv) Predecessor acknowledges and agrees that it will be responsible for and shall provide any required bond or security for the Services;

(v) if Service Provider reasonably believes that it cannot perform any Service without creating a breach of an existing agreement to which Predecessor is a party or the Asset is bound as of the Effective Date, and/or violating the Law, then Service Provider shall have no obligation to perform such Service and such Service shall no longer be included  within the Services, and Service Provider shall give prompt, written Notice (as defined below) of such issue to Predecessor, prior to the discontinuation of such Service, with detailed descriptions of the agreement in question and the breach and/or violation Service Provider believes will be created.  In the event such possible breach and/or violation is cured or remedied within thirty (30) days following Predecessor's receipt of such Notice, Service Provider may perform such Service only insofar as performance would not create the breach or violation; and

WEIL:\98011006\2\45327.0007

(vi)  In the performance of the Services, Service Provider must obtain consent of Predecessor to perform any of the following actions on behalf of Predecessor: execute, amend, waive, release, extend, terminate, or otherwise modify any of the governmental approvals, leases, or other agreements related to the Asset (other than an agreement in the ordinary course of business with a service provider using agreements substantially in the form previously used or other forms reasonably approved by Predecessor).

**Section 1.6**   **Service Provider's Access to the Asset**.  To the extent necessary for Service Provider to perform the Services, Predecessor shall provide Service Provider unrestricted access to the Asset and shall execute any instrument, license, certificate, or other agreement reasonably necessary to provide such access.

**Section 1.7**   **Designated Operator.**  To the extent allowed or required under applicable Law, as soon as reasonably possible after the Effective Date, Predecessor shall become the designated operator of the Asset for decommissioning purposes and shall provide any required bonding and/or Certificate of Financial Responsibility coverage.

## ARTICLE II.  COMPENSATION

**Section 2.1**   **Compensation for Services**. During the Service Term, Predecessor shall pay to and reimburse Service Provider the amounts determined pursuant to Section 3.1 below for the provision of the Services to Predecessor.

## ARTICLE III.   PAYMENT AND DEFAULT

**Section 3.1**   **Submission of Invoice**. Service Provider shall submit a written invoice (the "Invoice") to Predecessor, along with copies of any third party invoices and other supporting details evidencing the expenses satisfactory to Predecessor, on or before the fifteenth (15th) Business Day of each month setting forth an itemized accounting of the actual costs incurred in the preceding month, or as applicable, the preceding months for which an Invoice was not issued, for the Services provided by Service Provider.  For the purposes of this Agreement, "Business Day" shall mean any day other than a Saturday or a Sunday or a day on which federally chartered banking institutions in Houston, Texas, are authorized by Law to close, but for purposes of Notices or other communications given hereunder, means before 4:00 p.m. on such day in the city of Houston, Texas.

For shared costs, such as salaried and hourly personnel, IT systems, and other office related infrastructure and overhead, Service Provider shall allocate those costs as follows:

For "people" costs, Service Provider shall bill Predecessor for actual time incurred by its full-time employees in performing Services hereunder rounded up to the nearest hour.  The hourly rate of each Service Provider employee shall be equal to the annual payroll cost (including salary, vacation pay, target bonus, 401(k) match, and payroll taxes) of the employee divided by 2,080 hours.

For illustrative purposes, two actual employees are shown below:



For all other shared costs identified below, Service Provider shall bill Predecessor for the proportionate use in the performance of the Services hereunder. The proportionate use shall be determined by the Total Hours Billed divided by the Total Employee Hours. "Total Hours Billed" is equal to the total number of hours recorded by Service Provider's full-time employees in performing Services hereunder and "Total Employee Hours" is equal to Service Provider's average daily headcount of full-time employees performing Services hereunder during the applicable month multiplied by eight hours multiplied by the number of Business Days in the month.

All other shared costs include and are limited to the following:
  (i)   IT-related costs (IT systems and software)
 (ii)   Healthcare and other benefits (benefits cost and administration)
(iii)   Communications

For example, assuming an average daily headcount of 275 full-time employees performing Services hereunder and 20 Business Days in the applicable month, Total Employee Hours for the month would equal 44,000 hours (275 employees x 20 Business Days x 8 hours). If the Total Hours Billed for the month is 100, Predecessor's proportionate use would be 0.23%; and Service Provider would bill Predecessor for 0.23% of these other shared costs.

Any third party costs associated with the Services will be billed to the Service Provider and charged to the Predecessor on monthly invoices.

**Section 3.2    Payment of Invoices**. Absent manifest error in inclusion or omission of items or calculations contained in an Invoice (if there is a manifest error, Predecessor will correct such error and show such recalculation on or before the date when payment would otherwise be due), the Predecessor shall pay within thirty (30) Business Days of Predecessor's receipt of an Invoice the undisputed amounts invoiced to Predecessor by wire transfer of immediately available funds to the bank account designated on the Invoice by Service Provider. Adjustment credit or debits shall be shown on the Invoice next succeeding the Invoice in which the adjustment is made. Service Provider shall provide reasonable back-up and supporting documents related to any Invoice within five (5) Business Days of Predecessor's written request. Any preexisting obligation to make payment for the Services provided hereunder or out-of-pocket costs of Service Provider shall survive the termination of this Agreement until paid. Predecessor shall have access to and the right to audit all records supporting such Invoice amounts for the period set forth in <u>Section 1.4</u> and <u>Section 7.4</u>.

WEIL:\98011006\2\45327.0007

**Section 3.3    Predecessor Default**. It shall constitute a default on behalf of Predecessor (an "Predecessor Default") if Predecessor fails to timely pay any Invoice amount for Services provided pursuant to this Agreement in accordance with the provisions of this Article III or fails to perform any covenants of Predecessor under this Agreement, which failure continues for at least fifteen (15) days following receipt of written Notice to Predecessor of such failure; provided, however, that if Predecessor cannot reasonably cure such failure (other than for the payment of money or providing indemnity defense) within such fifteen (15) day period, no Predecessor Default shall be deemed to occur provided Predecessor demonstrates that it has diligently taken reasonable steps to cure such failure within such fifteen (15) day period and diligently prosecutes such cure to completion. Upon the occurrence of a Predecessor Default, Service Provider may, in addition to all other remedies available at Law or at equity, (i) suspend all or any portion of the provision of Services hereunder to Predecessor until such time as the Predecessor Default is cured and all unpaid, undisputed Invoice amounts for Services to Service Provider under this Agreement for such suspended Services are paid in full or (ii) terminate this Agreement effective immediately and be entitled to any amounts owed to Service Provider by Predecessor hereunder together with interest on such amount at a rate equal to 5% per annum, calculated daily on the basis of a year of 365 days and the actual number of days elapsed (the "Rate") from the date due, until such undisputed amounts, together with all accrued and unpaid interest thereon, are paid in full.

**Section 3.4    Service Provider Default**. Subject to Section 3.3 above, it shall constitute a default on behalf of Service Provider (an "Service Provider Default") if Service Provider fails to provide a Service to Predecessor in accordance with the terms and conditions of this Agreement, which failure is not by reason of an Predecessor Default or Force Majeure and continues for at least fifteen (15) days following receipt of written Notice to Service Provider; provided, however, that if Service Provider cannot reasonably cure such failure within such fifteen (15) day period, no Service Provider Default shall be deemed to occur provided Service Provider demonstrates that it has diligently taken reasonable steps to cure such failure within such fifteen (15) day period and diligently prosecutes such cure to completion. Upon the occurrence of a Service Provider Default, Predecessor may, in addition to any other rights or remedies available at Law, in equity, or by contract, terminate this Agreement within the time frame specified by Predecessor in a written Notice to Service Provider so terminating this Agreement.

**Section 3.5    Third Person Services**. Predecessor recognizes that Service Provider may hire third parties to provide certain portions of the Services, and Predecessor shall be responsible for the payment to Service Provider of amounts due by Service Provider to such third parties, which are incurred from and after the Effective Date with respect to the Asset. In the event Service Provider incurs costs of a third party, such costs will be included in an Invoice, and Predecessor shall reimburse Service Provider at the same time and in the same manner as the payment described in Section 3.2.

**Section 3.6    Sales Taxes**. Any sales, use, value-added or similar taxes paid or incurred hereunder for Services that Service Provider is required to pay or incur as a result of such Services shall be passed on to, and be the obligation of, Predecessor as an explicit surcharge and shall be paid by Predecessor in addition to any payments for Services as set forth in Section 3.1 above, whether included in the applicable Invoice, or added retroactively, such that the amount received by the Service Provider shall be as if no such taxes had been imposed. If Predecessor submits to

Service Provider a timely and valid resale or other exemption certificate sufficient to support the exemption from sales taxes, then such taxes will not be added to the Invoices for Services payable pursuant to this Article III; provided, however, that if Service Provider is ever required to pay such taxes, Predecessor will promptly reimburse Service Provider for such tax, including any interest, penalties, and attorney's fees assessed thereon by the applicable Governmental Authority. The Parties will reasonably cooperate to contest any invalid sales or use taxes imposed on the Services and to minimize the imposition of any such sales taxes.

<div align="center">

**ARTICLE IV.      TERM OF AGREEMENT**

</div>

**Section 4.1      Term**. The term of this Agreement (the "Service Term") shall be a period beginning on the Effective Date until the earlier to occur of (i) the date Predecessor, in its sole discretion, is ready and able to take over operations on the Asset and (ii) a date which is 365 days from the Effective Date, subject to Article V.  No Services shall be provided after the expiration of the Service Term, except by the mutual written agreement of the Parties.

<div align="center">

**ARTICLE V.  CESSATION OF SERVICES**

</div>

**Section 5.1      Discontinuation of Services**. Predecessor may, with or without cause and for any or no reason, terminate the Service Term and discontinue any Service by giving Service Provider not less than ten (10) days prior written Notice of such discontinuation. Predecessor shall be liable to Service Provider for all costs, expenses, losses, and obligations Service Provider remains obligated to pay (x_ under the terms hereunder or (y) under any other existing contract related to such Services, including as a result of such termination or discontinuation, including any and all actual, documented out-of-pocket amounts reasonably incurred by Service Provider, provided that (a) Service Provider has an obligation to mitigate such costs and (b) any such costs billed to Predecessor pursuant to clause (y)  shall be limited to the average monthly charge billed to Predecessor under Section 3.1 using the previous three (3) calendar months to determine such average monthly charge.

**Section 5.2      Effect of Termination of Services**. Upon the discontinuation or termination of all Services hereunder, this Agreement shall terminate and be of no further force and effect, except as to obligations accrued prior to the date of discontinuation or termination; provided, however, that Section 1.4, Articles VI and VII, and Predecessor's audit rights under Section 3.2 and Section 7.4 of this Agreement shall survive such discontinuation or termination.

**Section 5.3      Transition of Operations**.  The Parties agree to preserve as a priority during any transition of operations the safety of individuals and the environment in compliance with all Laws and Governmental Authorities.  Prior to and through the termination of this Agreement, Service Provider shall make commercially reasonable efforts to transition the performance of the Services to a third party or to Predecessor, including providing commercially reasonable assistance to Predecessor to facilitate such transition; provided that the applicable compensation for Services so transitioned shall continue until the actual termination thereof, and Predecessor shall pay any actual, documented out-of-pocket costs incurred for the transition of such Services.  Upon request, Predecessor shall provide Service Provider with an update as to the status of activities to transition the Services.  At Predecessor's request and expense, Service

<div align="center">

7

</div>

Provider shall deliver all documents, records, and other data to the extent related to the Assets that are in the Service Provider's possession. Alternatively, at Predecessor's request and expense, Service Provider shall make such documents available for Predecessor to retrieve. Service Provider may keep copies of any documents, records or other data it is required to maintain by any Governmental Authority.

      **Section 5.4**    **Predecessor's Access to Employees and Asset**. In order that Predecessor may become familiar with the Services as described in <u>Exhibit A</u> provided by the employees and agents of Service Provider and make orderly arrangements for the assumption of the obligations for the provision of such Services after the termination of this Agreement, Predecessor Group, upon the prior written consent of Service Provider, which consent will not be unreasonably withheld, shall be entitled to access the Asset and to consult with the employees or agents of Service Provider providing the Services during normal business hours throughout the Service Term, provided such consultations do not unreasonably interfere with the performance by those employees of their duties.

<div align="center">

**ARTICLE VI.**          **INDEMNITIES; DISCLAIMERS**

</div>

      **Section 6.1**    **Predecessor's Indemnification Obligations**. EXCEPT AS PROVIDED IN SECTION 6.2, NOTWITHSTANDING ANY KNOWLEDGE OR INVESTIGATION OF ANY PERSON, PREDECESSOR AGREES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAWS, TO ASSUME, RELEASE, INDEMNIFY, DEFEND, AND HOLD HARMLESS SERVICE PROVIDER, AND ITS EQUITY-HOLDERS, PARENT, AFFILIATES, AND SUBSIDIARY COMPANIES TOGETHER WITH ITS AND ALL OF THEIR RESPECTIVE OFFICERS, DIRECTORS, MANAGERS, EMPLOYEES, COUNSEL, CONTRACTORS, SUBCONTRACTORS, AGENTS, AND REPRESENTATIVES, AND THE RESPECTIVE SUCCESSORS, SPOUSES, RELATIVES, DEPENDENTS, HEIRS, AND ESTATE OF ANY OF THE FOREGOING (EXCLUDING ANY MEMBERS OF THE PREDECESSOR GROUP) (THE "<u>SERVICE PROVIDER GROUP</u>") AGAINST AND FROM ALL CLAIMS, DEMANDS, COMPLAINTS, LOSSES, FINES, PENALTIES, CITATIONS, DAMAGES, CAUSES OF ACTION, SUITS, JUDGMENTS, ORDERS, EXPENSES, OR COSTS, INCLUDING COURT COSTS, REASONABLE ATTORNEYS' FEES, AND EXPERT WITNESSES' FEES (COLLECTIVELY "<u>DAMAGES</u>") CAUSED BY OR ARISING OUT OF OR RESULTING FROM THIS AGREEMENT OR THE PROVISION OF SERVICES PURSUANT TO THIS AGREEMENT, BUT ONLY TO THE EXTENT SUCH DAMAGES ARE NOT CAUSED BY ANY MEMBER OF SERVICE PROVIDER GROUP'S GROSS NEGLIGENCE OR WILLFUL MISCONDUCT. **THE FOREGOING INDEMNITY OBLIGATIONS SHALL APPLY WHETHER OR NOT SUCH DAMAGES ARISE OUT OF (i) NEGLIGENCE (INCLUDING SOLE, SIMPLE, CONCURRENT, ACTIVE, OR PASSIVE NEGLIGENCE OR OTHERWISE), BUT EXPRESSLY NOT INCLUDING GROSS NEGLIGENCE OR WILLFUL MISCONDUCT OF SERVICE PROVIDER OR ANY OTHER MEMBER OF THE SERVICE PROVIDER GROUP, (ii) STRICT LIABILITY, OR (iii) THE UNSEAWORTHINESS OF ANY VESSEL OR THE UNAIRWORTHINESS OF ANY AIRCRAFT EXCEPT IN THE EVENT THAT SUCH DAMAGES OR VIOLATION IS CAUSED BY OR RESULTS FROM THE GROSS**

<div align="center">8</div>

NEGLIGENCE OR WILLFUL MISCONDUCT OF ANY MEMBER OF THE SERVICE PROVIDER GROUP.

Section 6.2   <u>Service Provider's Indemnity Obligations</u>.   SERVICE PROVIDER SHALL, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAWS, ASSUME, RELEASE, INDEMNIFY, DEFEND, AND HOLD HARMLESS PREDECESSOR, AND ITS EQUITY-HOLDERS, PARENT, AFFILIATES, AND SUBSIDIARY COMPANIES, CO-LESSEES, CO-OWNERS, PARTNERS, JOINT VENTURERS, TOGETHER WITH ITS AND ALL OF THEIR RESPECTIVE OFFICERS, DIRECTORS, MANAGERS, EMPLOYEES, IN-HOUSE LEGAL COUNSEL, AGENTS, AND REPRESENTATIVES, AND THE RESPECTIVE SUCCESSORS, SPOUSES, RELATIVES, DEPENDENTS, HEIRS, AND ESTATE OF ANY OF THE FOREGOING (EXCLUDING ANY MEMBERS OF THE SERVICE PROVIDER GROUP) (THE "<u>PREDECESSOR GROUP</u>") AGAINST AND FROM (A) ALL DAMAGES CAUSED BY OR ARISING OUT OF OR RESULTING FROM THE GROSS NEGLIGENCE OR WILLFUL MISCONDUCT OF ANY MEMBER OF THE SERVICE PROVIDER GROUP IN CONNECTION WITH THE PROVISION OF SERVICES UNDER THIS AGREEMENT, (B) ALL DAMAGES IN RELATION TO PERSONAL INJURY, DEATH, OR DISEASE OF ANY MEMBER OF THE SERVICE PROVIDER GROUP ARISING OUT OF OR RESULTING FROM THE PROVISION OF SERVICES UNDER THIS AGREEMENT, (C) ALL DAMAGES IN RELATION TO PROPERTY DAMAGE OF ANY MEMBER OF THE SERVICE PROVIDER GROUP ARISING OUT OF OR RESULTING FROM THE PROVISION OF SERVICES UNDER THIS AGREEMENT,  (D) ALL DAMAGES (INCLUDING COSTS AND EXPENSES) IN RELATION TO GOVERNMENTAL FINES AND PENALTIES ASSESSED IN CONNECTION WITH ANY PERFORMANCE OF THE SERVICES RESULTING FROM THE NEGLIGENCE OR FAULT OF ANY MEMBER OF SERVICE PROVIDER, AND (E) ALL DAMAGES INCURRED BY THIRD PARTIES ARISING OUT OF OR RESULTING FROM THE PROVISION OF SERVICES UNDER THIS AGREEMENT. **THE INDEMNITY OBLIGATIONS IN SET FORTH IN THE FOREGOING CLAUSES (B) AND (C) SHALL APPLY WHETHER OR NOT SUCH DAMAGES ARISE OUT OF (i) NEGLIGENCE (INCLUDING SOLE, SIMPLE, CONCURRENT, ACTIVE, OR PASSIVE NEGLIGENCE OR OTHERWISE), BUT EXPRESSLY NOT INCLUDING GROSS NEGLIGENCE OR WILLFUL MISCONDUCT OF PREDECESSOR OR ANY OTHER MEMBER OF THE PREDECESSOR GROUP, (ii) STRICT LIABILITY, OR (iii) THE UNSEAWORTHINESS OF ANY VESSEL OR THE UNAIRWORTHINESS OF ANY AIRCRAFT EXCEPT IN THE EVENT THAT SUCH DAMAGES OR VIOLATION IS CAUSED BY OR RESULTS FROM THE GROSS NEGLIGENCE OR WILLFUL MISCONDUCT OF ANY MEMBER OF THE PREDECESSOR GROUP**

Section 6.3   <u>Disclaimers</u>.   NOTWITHSTANDING ANY OTHER TERM OF THIS AGREEMENT TO THE CONTRARY, SERVICE PROVIDER MAKES NO, AND DISCLAIMS ANY, REPRESENTATIONS AND WARRANTIES, EXPRESS, IMPLIED, OR STATUTORY, WITH RESPECT TO THIS AGREEMENT OR THE PERFORMANCE OR RESULTS OF THE SERVICES.  EXCEPT AS PROVIDED IN <u>Section 6.2</u> WITH RESPECT TO THE GROSS NEGLIGENCE OR WILLFUL MISCONDUCT OF SERVICE PROVIDER OR ANY OTHER MEMBER OF THE SERVICE PROVIDER GROUP IN THE PERFORMANCE OF SERVICES UNDER THIS AGREEMENT, SERVICE PROVIDER EXPRESSLY DISCLAIMS, AND

WEIL:\98011006\2\45327.0007

PREDECESSOR AGREES THAT THE SERVICE PROVIDER GROUP SHALL BE FREE FROM, ALL LIABILITY AND RESPONSIBILITY FOR ANY REPRESENTATION, WARRANTY, STATEMENT, OR INFORMATION WITH RESPECT TO THE SERVICES THAT IS MADE OR COMMUNICATED (ORALLY OR IN WRITING) TO ANY PREDECESSOR GROUP MEMBER (INCLUDING ANY OPINION, INFORMATION, PROJECTION, EVALUATIONS, OR ADVICE THAT MAY HAVE BEEN PROVIDED TO ANY PREDECESSOR GROUP MEMBER BY ANY SERVICE PROVIDER GROUP MEMBER).

**Section 6.4     Laws; Application**.  The indemnification obligations in this Article VI are intended to comply with applicable Laws. To the extent such indemnification provisions are found to violate any applicable Law, or in the event any applicable Law is enacted or amended so as to cause these provisions to be in violation therewith, this Agreement shall automatically be amended to provide that the indemnification provided hereunder shall extend only to the maximum extent permitted by the applicable Law.

**Section 6.5     Limitations**.  NOTWITHSTANDING ANY OTHER TERM OF THIS AGREEMENT TO THE CONTRARY, NO PARTY SHALL BE LIABLE TO ANY OTHER PARTY OR TO A MEMBER OF THE PREDECESSOR GROUP OR SERVICE PROVIDER GROUP UNDER THIS AGREEMENT FOR ANY PUNITIVE, EXEMPLARY, SPECIAL, INDIRECT OR CONSEQUENTIAL DAMAGE RESULTING FROM OR ARISING OUT OF THIS AGREEMENT.

## ARTICLE VII.        ADDITIONAL OBLIGATIONS

**Section 7.1     Conflict of Interest**.  In performing their obligations hereunder, no member of Service Provider Group will (A) enter into any business arrangement with any individual known by such member of Service Provider Group to be a director, employee or agent (excluding attorneys and accountants) of Predecessor or any of its Affiliates without Predecessor's prior written consent  or (B) give to or receive from any director, employee or agent of Predecessor or any of its Affiliates in connection with such obligations anything that is more than a nominal cost or value. Service Provider shall ensure that all members of Service Provider Group comply with this Agreement.

**Section 7.2     Improper Influence**. No member of Service Provider Group may, directly or indirectly, offer or make any payment, or offer or give anything of value to any official or immediate family member of an official of any government, public international organization, or political party (including any officer or employee of any department, agency, or instrumentality of any government or public organization), or to any candidate for public office to influence their or its act or decision, or to gain any other advantage for Predecessor, its Affiliates, Service Provider Group, or any of them arising out of this Agreement.

**Section 7.3     Pre-Contract Violations and Reporting**. Service Provider warrants that no event has occurred prior to the Effective Date, which if it had occurred after the Effective Date, would be a violation of Section 7.1 or Section 7.2. Service Provider shall immediately notify Predecessor of any violation of Section 7.1, Section 7.2 or Section 7.3. Nothing in this Agreement requires either Party to comply with Laws if such requirement would be inconsistent with United States ("U.S.") laws, including U.S. anti-boycott laws.

**Section 7.4** **Records and Inspection**. Up until 24 months from the end of the calendar year in which this Agreement is completed or terminated, (A) Service Provider shall ensure that all members of Service Provider Group retain all records related to this Agreement (or until expiry of the statute of limitations for taxes or import or export charges) and (B) Predecessor may inspect at any time all records to confirm that the requirements of the Agreement are met.

**Section 7.5** **Trade Sanctions Compliance**. Service Provider shall provide Predecessor with advance Notice of the names and addresses of any member of Service Provider Group who is or may be in the near future subject to economic sanctions or any trade restrictions imposed by the U.S. government; or debarred or excluded or declared ineligible to participate in U.S. government contracts, or contracts, grants, or other programs financed in whole or part by the U.S. government (collectively "Restricted Parties"). Service Provider shall provide such Notice promptly upon, and in no event later that 90 days after, learning of the Service Provider Group member's designation as a Restricted Party. Service Provider Group personnel providing Services must not be citizens of countries subject to comprehensive U.S. trade sanctions without Predecessor's prior written consent.

**Section 7.6** **Data Protection**. Service Provider shall process any information in connection with this Agreement that can be used to identify an individual in accordance with Law and Predecessor's reasonable instructions. Service Provider shall (A) apply appropriate security measures for the protection of, and restrict third party access to, this personal information, (B) immediately notify Predecessor of any improper use, disclosure, or exposure of the personal information, and (C) cooperate with Predecessor's reasonable requests to investigate and remediate such incidents.

**Section 7.7** **Flow Down Requirements**. Service Provider shall ensure that the Services are performed in accordance with the applicable U.S. regulations referenced at http://www-eproc.chevron.com/Public/GDS%20Documents/Certain%20U.S.%20Regulations.pdf.

**Section 7.8** **Confidentiality**. From and after the date hereof, Service Provider shall not, and shall ensure that members of Service Provider Group do not, directly or indirectly, use or disclose or divulge any trade secrets or other Confidential Information of Predecessor, including information of others that Service Provider has agreed to keep confidential; provided that the foregoing restriction shall not apply to information (a) which is lawfully and independently obtained by Service Provider from a third party without restriction as to disclosure, (b) which is already known to Service Provider or to others not bound by a duty of confidentiality or which is in the public domain or enters into the public domain through no fault of any member of Service Provider Group, and (c) Service Provider is required by Law or legal process to disclose; and provided further that Service Provider may use such information in connection with the performance of the transactions contemplated by this Agreement, including enforcement of its rights thereunder or under any document delivered pursuant thereto. As used herein, "Confidential Information" shall mean confidential and/or proprietary information including, without limitation, all geological, geophysical, economic, financial or other information, whether in the form of maps, charts, logs, seismographs, interpretations, calculations, summaries or opinion, as well as other written notes, analyses, compilations, studies, interpretations, trade secrets, ideas, processes,

11

procedures, data, know-how, improvements, discoveries, developments, designs, blueprints, drawings, techniques and other documents, materials or information regarding plans for exploration, development, marketing and selling, business records and plans, budgets, prices and costs, suppliers, customers and potential customers.

### ARTICLE VIII.    GOVERNING LAW AND RESOLUTION OF DISPUTES

#### Section 8.1    Governing Law

(a)    If the Services (as defined in Exhibit A) is performed offshore or on inland waters, notwithstanding the place of execution hereof or the place for performance of any covenant, promise or agreement herein made, this Agreement and the validity hereof, the agreements evidenced hereby, and all matters and issues arising hereunder, shall, to the fullest extent possible, be construed pursuant to and governed by the General Maritime Laws of the United States. If the General Maritime Laws of the United States are held to be inapplicable to this Agreement or the Services (or any part thereof) to be performed hereunder by a court of competent jurisdiction, then Subsections 8.1(b) and 8.1(c) below shall apply, as appropriate, but only to the extent that United States General Maritime Law is held to be inapplicable.

(b)    If any court of competent jurisdiction determines that United States General Maritime Law is not applicable to any relevant part of this Agreement or the work to be performed hereunder, then such part of this Agreement and/or the work to be performed hereunder, shall, to the fullest extent enforceable under applicable Law, be interpreted and enforced exclusively in accordance with the Laws of the State of Texas.

(c)    If any court of competent jurisdiction determines that neither United States General Maritime Law nor the Laws of the state of Texas are applicable to any relevant part of this Agreement or the work to be performed hereunder, then such part of this Agreement and/or the work to be performed hereunder, shall, to the fullest extent enforceable under applicable Law, be interpreted and enforced exclusively in accordance with the Laws of the State of Louisiana, excluding any conflicts of law rules that might refer same to another jurisdiction.

#### Section 8.2    Resolution of Disputes. The Parties shall exclusively and finally resolve any Dispute between them using direct negotiations, mediation, and then arbitration as set out in Article VIII, except as permitted in Sections 8.5(G) and 8.5(H). Service Provider shall not stop, suspend, or otherwise fail to progress the Services pending resolution of a Dispute. "Dispute" means any claim, disagreement or controversy arising out of this Agreement, including a claim under this Agreement and any dispute or controversy regarding the existence, construction, validity, interpretation, enforceability, termination or breach of this Agreement, whether based in contract, tort or in any other manner.

#### Section 8.3    Direct Negotiations. If a Dispute arises, a Party seeking to initiate the dispute resolution process shall give Notice to the other Party setting out, in writing and in detail, the issues in Dispute and the value of the claim. The Parties shall attempt to resolve the Dispute through direct negotiations in a meeting between the Parties, attended by individuals with decision-making authority, which must take place within thirty (30) days, or as otherwise agreed to by the Parties, from the date the Notice was sent.

WEIL:\98011006\2\45327.0007

**Section 8.4    Mediation.** If the Dispute cannot be resolved by direct negotiations within 30 days of initiation of the resolution process, either Party may initiate mediation by giving Notice to the other Party. Mediation must be attended by a representative from each Party with decision-making authority, and the proceeding must take place in Houston, Texas.

**Section 8.5    Arbitration Proceedings.** If the Parties fail to resolve the Dispute within 60 days from Notice of mediation, either Party may initiate binding arbitration by giving Notice to the other Party. The arbitration must be conducted in accordance with the International Institute for Conflict Prevention and Resolution ("CPR") Rules. To the extent of any conflicts between the Act or the CPR Rules and the provisions of this Agreement, the provisions of this Agreement prevail. The CPR is the appointing authority. The place of arbitration must be Houston, Texas.

The following provisions will apply to arbitration proceedings:

(A)    One (1) arbitrator (or three (3) arbitrators if the monetary value of the Dispute is more than US$5,000,000 or its currency equivalent) will conduct the arbitral proceedings in English. If there is a Dispute whether the monetary value exceeds the US$5,000,000, then the number of arbitrators must be three (3).

(B)    The maximum number of witnesses each Party may call to give evidence on its behalf, including by oral testimony, declaration or witness statement, is five (5) witnesses of fact and three (3) expert witnesses.

(C)    The existence of a Dispute and any negotiations, mediation, and arbitration proceedings between the Parties in relation to any Dispute are confidential and the Parties shall not make any disclosure to any third party. Any information, documents, or materials, created or produced for the purposes of, or used in, negotiations, mediation, or arbitration of a Dispute are confidential and the Parties shall not disclose them to any third party unless there is a legal or regulatory obligation to make a disclosure (but the disclosure must be limited to the extent necessary to comply with that legal or regulatory obligation), or to the extent required to enforce or challenge an award in bona fide legal proceedings before a state court or other judicial authority.

(D)    The arbitrator(s) does not have the power to award, nor will the arbitrator(s) award, the Damages waived and released under Section 6.5. The arbitrator(s) has no authority to appoint or retain expert witnesses for any purpose unless agreed to by the Parties. The arbitrator(s) may not act as *amiable compositeur or ex aequo et bono*.

(E)    Unless a Party is otherwise entitled to be indemnified for such costs pursuant to this Agreement, the Parties intend that regardless of which Party prevails, all arbitration fees and costs must be split equally, between the Parties, and each Party shall bear its own costs of legal representation, witness expenses, and ancillary costs.

WEIL:\98011006\2\45327.0007

(F)     The award is final and binding, and except for proceedings under Sections 8.5(G) and 8.5(H), the Parties agree to waive their rights to: (1) apply to the court for determination of a point of law; and (2) any form of appeal, review or recourse in respect of any such award to any court or other judicial authority, to the extent that such waiver may be validly made.

(G)     The Parties may apply to a court with appropriate jurisdiction for any of the following without waiving its arbitration rights:

    (1)     Interim measures as necessary until appointment of the arbitrator(s) or pending determination by the arbitrator(s).

    (2)     Preserving property pending determination by the arbitrator(s).

    (3)     Enforcing judgment entered on an award.

    (4)     Enforcing Section 8.5(C) and preventing any information, documents or materials used in those proceedings from being used or disclosed by that Party for any purpose other than enforcement of Section 8.5(C).

(H)     Proceedings to (1) preserve property pending determination by the arbitrator(s), (2) enforce Section 8.5(C), (3) enforce judgment entered on an award may be brought in any court having jurisdiction over the person or assets of the non-prevailing Party. The prevailing Party may seek, in any court having jurisdiction, judicial recognition of the award, or order of enforcement or any other order or decree that is necessary to give full effect to the award.

## ARTICLE IX.          INSURANCE

**Section 9.1     Insurance Coverage**. Service Provider shall  maintain, at its own expense, the following insurance and all other insurance required by applicable Law:

    (i)  Workers' Compensation and Employer's Liability Insurance as prescribed by applicable Laws where the Services are performed and, if applicable, the states of residence of any subcontractor personnel performing the Services;

    (ii) Commercial General Liability (Bodily Injury and Property Damage) Insurance. The policy territory coverage must include all areas where the Services are to be performed.  The policy limits must not be less than US$10,000,000 combined single limit per occurrence; and

    (iii) Automobile Bodily Injury and Property Damage Liability Insurance extending to all vehicles provided by Service Provider in the performance of the Services. The policy limits for this insurance must be the higher of the amount required by applicable Law or US$5,000,000 combined single limit per occurrence.

14

**Section 9.2      Policy Endorsements**.

(i) Service Provider shall, or shall endeavor to cause its insurer to provide Predecessor with thirty days' Notice before canceling or making a material change to an insurance policy obtained pursuant to this Section during the Service Term of this Agreement;

(ii) Service Provider shall require its insurer to provide waivers of subrogation in favor of Predecessor in any Workers' Compensation insurance policies obtained pursuant to this Section; and

(iii) Service Provider shall require its insurer to provide that any insurance obtained pursuant to Sections 9.1(ii) and 9.1(iii) shall include all of the following, but only to the extent that the Service Provider Group has liability under Section 6.2 of this Agreement:

(a) Predecessor shall be named as an additional insured;

(b) A provision that the insurance is primary with respect to all insureds, including additional insureds, and that no other insurance carried by Predecessor will be considered as contributory insurance for any loss; and

(c) A cross liability or severability of interest clause which has the effect of insuring that each insured (including additional insureds) is covered as a separate insured.

**Section 9.3     Evidence of Insurance**.  If requested by Predecessor in writing before performance any of the Services, Service Provider shall provide Predecessor or its designee with certificates or other documentary evidence satisfactory to Predecessor of the insurance and endorsements obtained pursuant to this Section. Service Provider acknowledges that failure to provide a certificate other evidence of insurance obtained pursuant to this Section may lead to non-payment of Service Provider's Invoices or termination of this Agreement.

**Section 9.4     Satisfaction of Insurance Limits**.  Service Provider may satisfy the insurance limits provided for in this Section through any combination of primary and excess layers of insurance.

## ARTICLE X. MISCELLANEOUS

**Section 10.1    Force Majeure**.  In the event that Service Provider is rendered unable, wholly or in part, by Force Majeure or other causes herein specified, to carry out all or any of its obligation under this Agreement, it is agreed that on Service Provider's delivery of written Notice, so far as Service Provider is prevented by such Force Majeure or other causes herein specified, Service Provider's obligation shall be suspended during the continuance of any inability so caused, and Service Provider will not be liable to Predecessor for any interruptions of service, any delays, or any failure to perform under this Agreement caused by such Force Majeure. For the avoidance of doubt, any delays, interruptions or failures to perform caused by such occurrences shall not be

deemed to be a breach or failure to perform under this Agreement. The term "Force Majeure" means occurrences beyond the reasonable control of Service Provider and is limited to: acts of God, strikes, lockouts, or other industrial disturbances, acts of the public enemy, wars, blockades, insurrections, riots, epidemics, pandemics, landslides, lightning, earthquakes, fires, storms, hurricanes, tropical storms, loop currents, floods, washouts, arrests, and restraints of the Government, either federal or state, civil or military, civil disturbances, explosions, sabotage, malicious mischief, breakage or accident to machinery or lines of pipe, freezing of wells or lines of pipe, refusal or inability of resale owner(s) or transporter(s) to take deliveries due to events of Force Majeure, inability of Service Provider to obtain right-of-way, necessary materials, supplies, or permits not caused by the failure of Service Provider to pay for or negligence to obtain such rights-of-way, necessary materials, supplies, or permits, an order, directive, or restraint issued or imposed by any Governmental Authority, regulatory body or court having jurisdiction. It is understood and agreed that the settlement of strikes or other labor difficulties shall be entirely within the discretion of Service Provider. During the continuation of a Force Majeure event, Service Provider shall act diligently to overcome the impediments caused by such event and use its commercially reasonable efforts to promptly resume performance of its obligations under this Agreement.

 Section 10.2  Notices. Any   notice, request, instruction, correspondence or other document to be given hereunder by any Party to another (herein collectively called "Notice") shall be in writing and delivered by email and additionally in person or by courier service requiring acknowledgement of receipt or mailed by certified mail, postage prepaid and return receipt requested, or by overnight delivery service, or by electronic mail (provided that Notices by electronic mail shall also be sent by one of the other permitted means to be effective), as follows:

If to Predecessor:

 Noble Energy, Inc.
 100 Northpark Blvd
 Covington, LA 70433
 Attn:  Scott Ritter
 Phone: (985) 773-7424
 Email: scottritter@chevron.com


If to Service Provider:

 Mako Buyer LLC
 2000 W. Sam Houston Pkwy S. Suite 1200
 Houston, Texas 77042
 Attn:  Thomas R. Lamme
 Phone: (713) 969-1107
 Email:  TLamme@fwellc.com


Notice given by personal delivery or courier shall be effective upon actual receipt. Notice given by mail shall be effective upon actual receipt or, if not actually received, the fifth Business Day

16

following deposit with the U.S. Post Office. Notice given by electronic mail shall be effective upon delivery if delivered to a working email address during the recipient's normal business hours, or at the beginning of the recipient's next Business Day if not delivered during the recipient's normal business hours.  If a date specified herein for giving any Notice or taking any action is not a Business Day (or if the period during which any Notice is required to be given or any action taken expires on a date which is not a Business Day), then the date for giving such Notice or taking such action (and the expiration date of such period during which Notice is required to be given or action taken) shall be the next day which is a Business Day. Any Party may change any address, electronic or otherwise, to which Notice is to be given to it by giving Notice as provided above of such change of address.

Section 10.3   **No Joint Venture or Partnership**. Nothing in this Agreement is intended to create, or shall be construed as creating, a partnership, joint venture, association for profit or other business entity between or among the Parties, and for federal and state income  tax purposes, the Parties elect to be excluded from the application of the provisions of Subchapter K, Chapter 1, Subtitle A of the Internal Revenue Code of 1986, as amended, as permitted and authorized by Section 761 of said Code and the regulations promulgated thereunder.

Section 10.4   **No Fiduciary Duty**. It is expressly understood and agreed that this Agreement is a purely commercial transaction between the Parties and that nothing stated herein shall operate to create any fiduciary duty which a Party shall owe to the other Party.

Section 10.5   **Entire Agreement**. This Agreement constitutes the entire agreement among the Parties with respect to the subject hereof and supersedes any other representations, understandings or agreements (whether written, oral or otherwise) that may have been made or entered into by the Parties or any of their respective Affiliates relating to the transactions contemplated hereby or the subject hereof.

Section 10.6   **Successors and Assignments**. This Agreement is personal as to Service Provider and Predecessor and shall not be assigned by either Party without the other Party's prior written consent; provided that the foregoing shall not apply if Service Provider assigns this Agreement in total (i) along with all of its personnel who are performing any part of the Services hereunder to an Affiliate, provided that no such assignment by Service Provider to an Affiliate shall relieve Service Provider of its obligations under this Agreement, or (ii) to an acquirer of all or substantially all of Service Provider's business or all or substantially all of Service Provider's employees providing Services hereunder.

Section 10.7   **Amendment**.  This Agreement may be amended or modified in whole or in part, and terms and conditions may be waived, only by a duly authorized agreement in writing which makes reference to this Agreement executed by each Party.

Section 10.8   **Construction**.  All article, section, schedule, and exhibit references used in this Agreement are to articles and sections of, and Schedules and Exhibits to, this Agreement, unless otherwise specified. The schedules and exhibits attached to this Agreement constitute a part of this Agreement and are incorporated herein for all purposes.

Unless otherwise indicated, with respect to either Party, the terms "ordinary course of business" or "ordinary course" shall be deemed to refer to the ordinary conduct of business in a manner consistent with the past practices and customs of such Party.

If a term is defined as one part of speech (such as a noun), it shall have a corresponding meaning when used as another part of speech (such as a verb). Terms defined in the singular have the corresponding meanings in the plural, and vice versa. Unless the context of this Agreement clearly requires otherwise, words importing the masculine gender shall include the feminine and neutral genders and vice versa. The words "include", "includes" or "including" do not limit the preceding terms and shall be deemed to be followed by the words "without limitation." The words "hereof," "hereto," "hereby," "herein," "hereunder" and words of similar import, when used in this Agreement, shall refer to this Agreement as a whole and not to any particular section or article in which such words appear. The term "or" is not exclusive.

The terms "day" and "days" mean and refer to calendar day(s). The terms "year" and "years" mean and refer to calendar year(s).

Service Provider and Predecessor have each participated in the negotiation and drafting of this Agreement, and, if an ambiguity should arise, this Agreement shall be construed as if drafted jointly by the Parties and no presumption or burden of proof shall arise favoring or burdening any Party by virtue of the authorship of any of the provisions in this Agreement.

The captions in this Agreement are for convenience only and shall not be considered a part of or affect the construction or interpretation of any provision of this Agreement.

All references to currency herein shall be to, and all payments required hereunder shall be paid in, United States Dollars.

The serial comma is sometimes included and sometimes omitted. Its inclusion or omission shall not affect the interpretation of any phrase.

**Section 10.9** <u>**Severability**</u>. If any provision of this Agreement is held invalid or unenforceable by any court of competent jurisdiction, the other provisions of this Agreement shall remain in full force and effect. The Parties further agree that if any provision contained herein is, to any extent, held invalid or unenforceable in any respect under the Laws governing this Agreement, they shall take any actions necessary to render the remaining provisions of this Agreement valid and enforceable to the fullest extent permitted by Law and, to the extent necessary, shall amend or otherwise modify this Agreement to replace any provision contained herein that is held invalid or unenforceable with a valid and enforceable provision giving effect to the intent of the Parties to the greatest extent legally permissible.

**Section 10.10** <u>**Counterparts**</u>. This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. Any .pdf or other electronic transmission hereof or signature hereon shall, for all purposes, be deemed originals.

*[Remainder of Page Intentionally Left Blank. Signature Page to Follow.]*

19

IN WITNESS WHEREOF, this Agreement has been signed by each of the Parties as of the date first above written.


**SERVICE PROVIDER**:

Mako Buyer LLC


By: _____
Name: _____
Title: _____


**PREDECESSOR:**

Noble Energy, Inc.


By: _____
Name:
Title:

## EXHIBIT A

## TO NEPTUNE SPAR TRANSITION SERVICES AGREEMENT

**SERVICES**

**1.     Asset Services**. Subject to the terms of this Agreement, including but not limited to <u>Section 1.5</u> of this Agreement, Service Provider shall provide the following Services with respect to the Asset.

**1.1     Maintenance and Monitoring Services**.

Services:  Providing the following maintenance and monitoring services with respect to the Assets:

(i)   Complying with, and causing the Asset to be operated in compliance in all material respects with, all state and federal Laws and regulations, including, but not limited to, following all required health, safety and environmental Laws, regulations and programs (such as SEMS), complying with all regulatory filing and reporting requirements, and obtaining all necessary permits; provided that nothing in this provision shall require Service Provider to make on behalf of Predecessor any filing, payment, or submission (or otherwise take any action) that, under applicable Law, may be made only by a party designated with the applicable Governmental Authority as a designated operator, designated applicant, designated payor, or responsible party for Predecessor or that could make Service Provider directly liable or responsible to the applicable Governmental Authority, or any other third party with respect to any of the Assets in which event Service Provider shall prepare the necessary filing or submission and provide it to the Predecessor to file or submit or, in the case of a payment, notify the Predecessor of such payment so that Predecessor can make such payment.

(ii)  Performing the following as and when needed:

(A)     purchasing (either directly or as agent for Predecessor) supplies, materials, tools, and equipment associated with the Asset, provided that the costs of such that are paid directly by Service Provider will be reimbursed by the Predecessor to Service Provider, further, provided that without Predecessor's prior written consent Service Provider will not purchase any single item with respect to the Assets if such purchase would result in a charge or cost to Predecessor greater than $10,000.00 dollars for any single item  during the Service Term.

(B)     contracting (either directly or as agent for Predecessor) for services associated with the physical maintenance and monitoring of the Asset, provided that the costs associated with such services will be reimbursed to Service Provider by Predecessor, further, provided that

without Predecessor's prior written consent Service Provider will not contract for any of such services with respect to any of the Assets if such contract (1) is with an Affiliate of Service Provider or (2) would obligate Predecessor for a period more than the Service Term for the operating services or (3) involves a fair market value of greater than $100,000.00.

(C) providing to the Predecessor communications with Governmental Authorities related to the Asset.

*[Remainder of Page Intentionally Left Blank]*

## SCHEDULE 1

## TO THE NEPTUNE SPAR TRANSITION SERVICES AGREEMENT

Neptune Spar, Complex ID No. 24235, located on Viosca Knoll (VK) Block 826 (VK 826)
Including, but not limited to, the following spar components:
- Topsides;
- Hull;
- On-platform mooring components;
- Mooring lines; and,
- All transferrable equipment on the spar, including subsea cathodic protection systems.
- Risers, end terminations and equipment associated with pipelines

Well (VK 826 SS012) (API#60-81640358-00)
Including, but not limited to, the following spar components:
- All subsea connections;
- Subsea wellhead and Jumper, and
- Risers, subsea manifolds, end terminations and equipment associated with pipelines

Well VK 917 01 ST2 (API#60-816-40400-02)
Including, but not limited to, the following spar components:
- All subsea connections;
- Subsea wellhead and Jumper, and
- Risers, subsea manifolds, end terminations and equipment associated with pipelines

Well VK 962 ST 1 (API#60-816-40399-01)
Including, but not limited to, the following spar components:
- All subsea connections;
- Subsea wellhead and Jumper, and
- Risers, subsea manifolds, end terminations and equipment associated with pipelines

ROW G29151 and Pipeline Segment No. 18648, 18649 and 18904

Subsea Equipment on VK 826, including but not limited to all dry tree wells, well heads and installed downhole equipment associated with all wells currently in PA state on VK 826.

## Exhibit 10

**Deepwater Assets Decommissioning Funding Agreement**

See attached.

**SUBJECT TO FRE 408**
**Confidential**
*Exhibit 10 to the Implementation Agreement*

## DECOMMISSIONING FUNDING AGREEMENT

This Decommissioning Funding Agreement dated and effective as of _____, 2021 (the "Effective Date") (this "Agreement") is by and among Mako Buyer LLC, a Delaware limited liability company ("Operator"), and Chevron U.S.A. Inc., a Pennsylvania corporation ("CUSA"). Operator and CUSA are sometimes referred to collectively as the "Parties" and individually as a "Party".

RECITALS

**WHEREAS**, Operator acquired certain oil and gas assets from Fieldwood Energy LLC and certain of its subsidiaries pursuant to that certain Purchase and Sale Agreement ("PSA") effected in connection with the *Fourth Amended Joint Chapter 11 Plan of Fieldwood Energy LLC and Its Affiliated Debtors* filed at Docket No. 1284 in the Chapter 11 cases styled as *In re: Fieldwood Energy LLC et al.*, Case No. 20-33948, which was confirmed by order of the United States Bankruptcy Court for the Southern District of Texas, Houston Division, on [_____], 2021 at Docket No. [____] (as amended, modified, and supplemented, the "Plan");

**WHEREAS**, pursuant to the terms and subject to the conditions set forth in this Agreement, CUSA and Operator desire to establish the obligation of Operator to provide security to support the decommissioning of the CUSA Deepwater Assets, which were acquired by Operator under the PSA; and

**WHEREAS**, this Agreement sets out the mechanisms by which Operator will provide financial security for the Coverage Amount for CUSA's benefit in the event CUSA or any of its Affiliates incur any costs or liabilities in relation to the decommissioning of any CUSA Deepwater Assets, and the circumstances in which CUSA shall be entitled to call upon any such security to cover any such costs or liabilities.

**NOW, THEREFORE**, in consideration of the premises and of the mutual promises, covenants, conditions, and agreements contained herein, and for other valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereby agree as follows:

## ARTICLE I.  DEFINITIONS

**Section 1.1**     As used herein, the following terms have the following meanings:

(a)     "Acceptable Credit Rating" means, in respect of the relevant entity, a credit rating (in respect of the senior, unsecured, long-term debt, not supported by third party credit enhancement) that is equal to or better than one of the following: (i) BBB by Standard & Poor's Rating Services; (ii) BBB by Fitch, Inc.; (iii) Baa2 by Moody's Investors Service; or (iv) any comparable credit rating by any other nationally recognized statistical rating organizations registered with the U.S. Securities and Exchange Commission.

(b)     "Affiliate" means, with respect to a Party means any Person or entity that controls, is controlled by or is under common control with such Party where control means the direct or indirect power to direct the management of the entity at issue.

(c)     "Agreement" has the meaning set forth in the preamble.

(d)     "Applicable Required Security" means, collectively, any then-outstanding Deepwater Surety Bond, LC and funds in the Deepwater Escrow Account.

(e)     "BOEM" means the Bureau of Ocean Energy Management of the United States Department of the Interior and any successor agency.

(f)     "BSEE" means the Bureau of Safety and Environmental Enforcement of the United States Department of the Interior and any successor agency.

(g)     "Coverage Amount" means (a) twenty five million U.S. dollars ($25,000,000), *less* (b) the aggregate Paid Reduction Amounts expended by Operator or its Affiliates, *less* (c) the aggregate amounts drawn by CUSA pursuant to Section 2.4(b), *less* (d) the aggregate amount called by CUSA against a Deepwater Surety Bond or LC pursuant to Section 2.5; provided that the Coverage Amount shall never be reduced below zero.

(h)     "CPR" has the meaning set forth in Section 4.14.

(i)     "CUSA" has the meaning set forth in the preamble.

(j)     "CUSA Deepwater Assets" means the ownership interest in the oil and gas leases described on Exhibit A attached hereto and the oil and gas assets located thereon or attached thereto, including any wells, facilities, pipelines and equipment, in each case to the extent such oil and gas leases and/or assets were acquired by Fieldwood Energy LLC (or any of its Affiliates) from CUSA (or any of its Affiliates as of the Effective Date); provided that CUSA Deepwater Assets shall only include the interests in the assets acquired by Operator under the PSA.

(k)     "Decommissioning" and its derivatives mean all plugging, replugging, abandonment, re-plugging and re-abandonment, equipment removal, disposal, remediation, reclamation, or restoration associated with the properties and assets included in or burdened by the CUSA Deepwater Assets, as applicable, including all plugging and abandonment, removal, dismantling, decommissioning, surface and subsurface restoration, reclamation, site clearance, and disposal (including any associated pre-planning, planning and engineering) of the CUSA Deepwater Assets, fixtures, platforms, caissons, flowlines, pipelines, structures, and personal property of whatever kind located on or under, related to, or associated with operations and activities conducted by whomever with respect to each of the CUSA Deepwater Assets, as applicable, and the flushing, pickling, burial, removal, and capping of all associated flowlines, field transmission and gathering lines, the restoration of the surface, site clearance, any proper disposal of related waste materials and hazardous substances, and obligations to obtain plugging exceptions for any of the CUSA Deepwater Assets with a current plugging exception   in accordance therewith, all in accordance with 30 CFR 250 Subpart Q and all other applicable laws, the terms and conditions of each of the applicable leases, leasehold interests, beneficial interests, easements and the like.

(l)     "Decommissioning Costs" means any and all cost associated with Decommissioning for a particular CUSA Deepwater Asset (or part thereof).

(m)    "Deepwater Escrow Account" has the meaning set forth in Section 2.3.

(n)    "Deepwater Surety Bond" has the meaning set forth in Section 2.2(a).

(o)    "Effective Date" has the meaning set forth in the preamble.

(p)    "Escrow Agreement" has the meaning set forth in Section 2.3.

(q)    "Final Completion" means:

   (i)    with respect to the Decommissioning of a well, acceptance by the applicable regulators of the End of Operations Report (EOR) with respect to such well;

   (ii)    with respect to the Decommissioning of a pipeline, acceptance by the applicable regulators of a completion report with respect to such pipeline; and

   (iii)    with respect to the Decommissioning of a platform or facility, acceptance by the applicable regulators of Site Clearance with respect to such platform or facility, indicated by delivery by Operator to CUSA of evidence that the applicable regulators have accepted "site clearance" of the applicable platform or facility, including all requisite approvals or regulatory concurrence from such governmental authorities with respect to such platform or facility.

(r)    "Funding Date" has the meaning set forth in Section 4.1.

(s)    "FWE IV" means Fieldwood Energy IV LLC.

(t)    "LC" has the meaning set forth in Section 2.2(b).

(u)    "Notice" has the meaning set forth in Section 4.2.

(v)    "NPI Grant" has the meaning set forth in Section 2.2.

(w)    "Operator" has the meaning set forth in the preamble.

(x)    "Paid Reduction Amounts" means amounts that are actually expended by Operator or its Affiliates for field operations to Decommission CUSA Deepwater Assets (net to Operator's interest), without counting any contribution or reimbursement received from third parties, including working interest owner parties, bonding entities or predecessors-in-interest other than CUSA or its Affiliates, and for which Operator has delivered a PRA Certificate pursuant to Section 2.1.

(y)    "Party" or "Parties" has the meaning set forth in the preamble.

(z)    "Person" means an individual, corporation, company, association, partnership, state, statutory corporation, government entity, or any other legal entity.

(aa)    "Plan" has the meaning set forth in the recitals.

3

(bb)    "PRA Certificate" has the meaning set forth in Section 2.1.

(cc)    "Qualified Surety" means an insurance company or financial institution with two credit ratings (in respect of the senior, unsecured, long-term debt, not supported by third party credit enhancement) from the following named rating agencies (or their successor agencies) that are each equal to or better than the following: (i) A+ by Standard & Poor's Rating Services; (ii) A+ by Fitch, Inc.; (iii) A1 by Moody's Investors Service; and (iv) in the case of an insurance company,  B++ by AM Best Company.

(dd)    "Release Date" has the meaning set forth in Section 3.2.

(ee)    "Turnkey Removal Agreement" means that certain Turnkey Removal Agreement pursuant to which Operator will undertake decommissioning operations in relation to assets held by FWE IV.

## ARTICLE II. FUNDING SECURITY; RELEASE DATE

**Section 2.1    PRA Certificates**.  From time to time after Operator has commenced the operations contemplated by this Agreement, but not more frequently than once per calendar quarter, Operator may deliver a certificate to CUSA (a "PRA Certificate"), executed by an officer of Operator, and certifying to the amount of Paid Reduction Amounts expended by Operator and its Affiliates prior to the date of delivery of such PRA Certificate (without duplication of Paid Reduction Amounts certified to in prior PRA Certificates delivered by Operator) on Decommissioning projects for which Final Completion has been achieved; and with all requisite filings and other evidence provided or otherwise required by BOEM, BSEE and any other applicable governmental authority, supporting the representations therein attached to the PRA Certificate.

**Section 2.2    Funding of Security**.  Subject to Section 3.1, on the second anniversary of the Effective Date Operator shall deliver to CUSA security with face value totaling no less than the Coverage Amount and, from and after the second anniversary of the Effective Date through the Release Date, Operator shall maintain such security in full force and effect at all times, utilizing one or more of the following forms:

(a)    one or more irrevocable decommissioning surety bonds, each in a form reasonably acceptable to CUSA, issued by a Qualified Surety and naming CUSA as the sole private beneficiary and otherwise consistent with this Agreement, including Section 2.5 (each, a "Deepwater Surety Bond"); or

(b)    one or more irrevocable standby letters of credit, each issued by a Qualified Surety or other financial institution mutually agreeable to Operator and CUSA on terms substantially consistent with those set forth in the form of letter of credit attached as Exhibit C and otherwise consistent with this Agreement, including Section 2.5 (each, an "LC").

(c)    If Operator is unable, after using commercially reasonable efforts, to secure a Deepwater Surety Bond and/or LC as set forth in Sections 2.2(a) and 2.2(b) sufficient to cause the aggregate of funding from all Applicable Required Securities to equal the Coverage Amount by the second anniversary of the Effective Date, then on or before such date Operator will execute a grant (in the

 reset

form attached hereto as <u>Exhibit B</u>) of a five percent (5%) interest from the net profits of production from the CUSA Deepwater Assets in favor of the "NPI Owner" (as defined in the form of NPI Grant attached as <u>Exhibit B</u>) (or such other grantee as agreed to by the Parties) for payment into the Escrow Account as contemplated by the last sentence of this Section 2.2 and in Section 2.3 (an "<u>NPI Grant</u>").  Any and all amounts payable under the NPI Grant shall be deposited into the Deepwater Escrow Account until the earlier of the aggregate of funding from all Applicable Required Securities is equal to the Coverage Amount (as the amount may be reduced) or the occurrence of the Release Date upon which event the NPI Grant shall be reconveyed to Operator and terminated.

(d)      If at any time any issuer of an LC notifies CUSA that it will not allow the automatic renewal of such LC for an additional one-year period, or a Deepwater Surety Bond or LC will terminate prior to the Release Date, as applicable, Contractor shall, within one hundred eighty days of receipt of such notice (or, if expiration upon such non-renewal or such termination will occur prior to the expiration of such one hundred eighty day period, then at least 5 days prior to termination of the applicable Deepwater Surety Bond or LC), replace the applicable LC or Deepwater Surety Bond with a replacement letter of credit or decommissioning surety bond which satisfies all of the applicable requirements for such type of security set forth in this Section 2.2 and is otherwise consistent with this Agreement, including Section 2.5.  If, at any time, any issuer of a Deepwater Surety Bond or LC ceases to meet the requirements (including the ratings requirements) to be a Qualified Surety, Operator shall, within one-hundred-eighty days of receipt of Notice from CUSA, replace such LC or Deepwater Surety Bond with a replacement letter of credit or decommissioning surety bond which satisfies all the requirements in this Section 2.2 and is otherwise consistent with this Agreement, including Section 2.5.

      **Section 2.3**    <u>**Deepwater Escrow Account**</u>.  If the NPI Grant is granted in accordance with Section 2.2, the Parties shall establish a decommissioning escrow account with U.S. Bank National Association, or another financial institution acceptable to CUSA (such account, the "<u>Deepwater Escrow Account</u>"), pursuant to an escrow account agreement in substantially the form attached hereto as <u>Exhibit D</u> (the "<u>Escrow Agreement</u>").

      **Section 2.4**    <u>**Draw on Escrow Account**</u>.  A draw against the Deepwater Escrow Account may be made from time to time as follows:

(a)      upon instruction by CUSA and Operator, to Operator upon Operator's delivery of a Deepwater Surety Bond or LC in any face amount, for an amount not to exceed the face amount of such Deepwater Surety Bond or LC, respectively;

(b)      upon instruction by CUSA and Operator, to Operator in the circumstances contemplated by Section 3.1(b) for the full amount then on deposit in the Deepwater Escrow Account;

(c)      upon instruction by CUSA, to CUSA in the event BOEM or BSEE issues a decommissioning order to CUSA or any of its Affiliates in respect of any CUSA Deepwater Assets in an amount equal to the Decommissioning Costs actually incurred by CUSA or any of its Affiliates in connection with such order or CUSA or any of its Affiliates otherwise incurs any such

<div align="center">5</div>

Decommissioning Costs with respect to the CUSA Deepwater Assets, for up to the amount of such Decommissioning Costs;

(d)     upon instruction by CUSA and Operator, to Operator, upon delivery of a PRA Certificate, for the amount of the applicable Paid Reduction Amounts certified to CUSA in such PRA Certificate;

(e)     upon instruction by CUSA and Operator, to the applicable Person(s) in accordance with instructions given by CUSA and Operator pursuant to Sections 5 or 6.1(A) of the Escrow Agreement, for the amount specified in such instructions; or

(f)     upon instruction by CUSA and Operator, on the Release Date (i) if the Release Date occurred pursuant to Section 3.2(c), to CUSA for the amount of any Decommissioning Costs incurred by CUSA or any of its Affiliates and not previously paid under clause (b) above, in the amount of such Decommissioning Costs and (ii) to Operator, in an amount equal to the remaining funds on deposit in the Deepwater Escrow Account (after, if applicable, the payments made to CUSA pursuant to clause (i) above).

Upon a draw in accordance with Section 2.4(b), the Coverage Amount will be reduced by the amount of draw (as contemplated by the definition of Coverage Amount). No draw shall reduce the Deepwater Escrow Account below a zero balance.

Section 2.5    **Calls on Other Securities**.  A call against any Deepwater Surety Bond or LC may be made from time to time by CUSA (a) in the event BOEM or BSEE issues a decommissioning order to CUSA or any of its Affiliates in relation to any CUSA Deepwater Assets in an amount equal to the Decommissioning Costs actually incurred by CUSA or any of its Affiliates in connection with such order, (b) in the event CUSA or any of its Affiliates otherwise incurs any such Decommissioning Costs with respect to the CUSA Deepwater Assets, for up to the amount of such Decommissioning Costs or (c) if Operator has failed to deliver a replacement letter of credit, decommissioning surety bond or other Applicable Required Security when required under Section 2.2(d), in the maximum amount available under such LC or Deepwater Surety Bond.

### ARTICLE III.     SUSPENSION; RELEASE.

Section 3.1     Suspension of Security Obligation.

(a)     Operator's obligation under Section 2.2 to provide and maintain the financial security shall be suspended when Operator achieves and maintains an Acceptable Credit Rating.

(b)     Upon achievement by Operator of an Acceptable Credit Rating, any security then posted by Operator pursuant to Section 2.2 shall be promptly released to Operator.

(c)     If Operator is subsequently downgraded and no longer has an Acceptable Credit Rating, then Operator's obligations in Section 2.2 shall resume immediately and Operator shall provide financial security to the Coverage Amount within 60 days thereafter or, failing to do so, the Parties shall effect and instate (or reinstate) the NPI Grant pursuant to Section 2.2.

**Section 3.2    Release Date**.  Operator's security requirements described hereunder shall terminate, and all outstanding security shall be promptly released to Operator, upon the first to occur of any of the following (such date, the "Release Date"), so long as no demand has been made by CUSA pursuant to such security that remains unsatisfied as of such time:

(a)    the Turnkey Removal Agreement is terminated in its entirety by Operator due to a breach and uncured default by CUSA thereunder resulting in termination of the agreement by Operator (and provided that Operator is not also in material breach thereunder);

(b)    the Coverage Amount is reduced to zero; or

(c)    Operator sells all or substantially all of its deepwater assets in the U.S. Gulf of Mexico (including all or substantially all of the CUSA Deepwater Assets), whether via an asset or equity sale or equivalent transaction, to a buyer with an Acceptable Credit Rating.

## ARTICLE IV.      MISCELLANEOUS

**Section 4.1    Representations and Warranties**. Each Party hereby represents and warrants to the other Party as of the date hereof and as of each date that Operator delivers security pursuant to Article II (each, a "Funding Date"):

(a)    such Party is duly formed, validly existing and in good standing under the laws of the state of its formation and has all company power and authority to execute and deliver this Agreement and to perform its obligations hereunder;

(b)    the execution and delivery of this Agreement by such Party and the performance by such Party of its obligations hereunder have been duly authorized by all requisite action on the part of such Party and do not and will not require any governmental approvals or third party consents, except such as have been previously obtained and will be in full force and effect as of such Funding Date; and

(c)    this Agreement has been duly executed and delivered by such Party, and this Agreement constitutes a valid and binding obligation of such Party, enforceable against it in accordance with its terms, except as enforcement may be limited by general principles of equity whether applied in a court of law or a court of equity, and by applicable bankruptcy, insolvency and similar laws affecting creditors' rights and remedies generally.

**Section 4.2    Notices**. Any notice, request, instruction, correspondence or other document to be given hereunder by any Party to another (herein collectively called "Notice") shall be in writing and delivered in person or by courier service, requiring acknowledgement of receipt, mailed by certified mail, postage prepaid and return receipt requested, or by overnight delivery service, or by electronic mail, as follows:

If to CUSA:

Chevron U.S.A. Inc.
100 Northpark Boulevard
Covington, LA  70433

Attn: GOM Land Manager
Phone: (985) 773-6538
Email: tdwebre@chevron.com

If to Operator:

Mako Buyer LLC
2000 W. Sam Houston Pkwy S. Suite 1200
Houston, Texas 77042
Attn:   Thomas R. Lamme
Phone: (713) 969-1107
Email: TLamme@fwellc.com  _____

Notice given by personal delivery or courier shall be effective upon actual receipt. Notice given by mail shall be effective upon actual receipt or, if not actually received, the fifth business day following deposit with the U.S. Post Office.  Notice given by electronic mail shall be effective upon confirmation of receipt (via electronic mail or phone call) by the recipient.  If a date specified herein for giving any Notice or taking any action is not a business day (or if the period during which any Notice is required to be given or any action taken expires on a date which is not a business day), then the date for giving such Notice or taking such action (and the expiration date of such period during which notice is required to be given or action taken) shall be the next day which is a business day. Any Party may change any address, electronic or otherwise, to which Notice is to be given to it by giving Notice as provided above of such change of address.

   **Section 4.3**   **No Joint Venture or Partnership**. Nothing in this Agreement is intended to create, or shall be construed as creating, a partnership, joint venture, association for profit or other business entity between or among the Parties, and for federal and state income tax purposes, the Parties elect to be excluded from the application of the provisions of Subchapter K, Chapter 1, Subtitle A of the Internal Revenue Code of 1986, as amended, as permitted and authorized by Section 761 of said Code and the regulations promulgated thereunder.

   **Section 4.4**   **No Fiduciary Duty**. It is expressly understood and agreed that this Agreement is a purely commercial transaction between the Parties and that nothing stated herein shall operate to create any fiduciary duty which a Party shall owe to the other Party.

   **Section 4.5**   **Entire Agreement**. This Agreement (together with the Exhibits hereto) constitute the entire agreement among the Parties with respect to the subject hereof and supersedes any other representations, understandings or agreements (whether written, oral or otherwise) that may have been made or entered into by the Parties or any of their respective Affiliates relating to the transactions contemplated hereby or the subject hereof.

   **Section 4.6**   **Successors and Assignments**. This Agreement may not be assigned by a Party, whether by contract, by operation of law or otherwise, without the express written consent of the other Party (which consent may be granted or withheld in the sole discretion of such Party) and any such assignment or attempted assignment without such consent shall be void; provided, however, (i) CUSA may assign this Agreement to an Affiliate without the consent of Operator, and (ii) Operator may assign this Agreement without the consent of CUSA to an acquirer of all or

8

substantially all of its deepwater assets in the U.S. Gulf of Mexico (including all or substantially all of the CUSA Deepwater Assets), whether via an asset or equity sale or equivalent transaction if such buyer has assumed this Agreement and provided Applicable Required Security in the amount of the then current Coverage Amount.  Following an assignment pursuant to the preceding clause (ii), Operator will be released from its obligations hereunder and any Applicable Required Security posted by Operator will be released and returned to Operator.

Section 4.7    **Expenses**.  Except as otherwise expressly specified in this Agreement, all costs and expenses, including fees and disbursements of counsel, financial advisors and accountants, incurred by Operator or any of its Affiliates in connection with the establishment, maintenance and operations of any financial security in Article II shall be paid by Operator. Notwithstanding the prior sentence, each Party shall bear its own costs and expenses in relation to the negotiation and preparation of this Agreement.

Section 4.8    **Waivers; Cumulative Remedies**.  Any waiver shall be valid only if set forth in an instrument in writing signed by the Party to be bound thereby. Any waiver of any term or condition shall not be construed as a waiver of any subsequent breach or a subsequent waiver of the same term or condition, or a waiver of any other term or condition of this Agreement. The failure of any Party hereto to assert any of its rights hereunder shall not constitute a waiver of any of such rights. All rights and remedies existing under this Agreement are cumulative to, and not exclusive of, any rights or remedies otherwise available under contract, under law or in equity, and may include specific performance.

Section 4.9    **Amendment**.  This Agreement may be amended or modified in whole or in part, and terms and conditions may be waived, only by a duly authorized agreement in writing which makes reference to this Agreement executed by each Party.

Section 4.10   **Construction**.

(a)    All article, section, and exhibit references used in this Agreement are to articles and sections of, and Exhibits to, this Agreement, unless otherwise specified. The exhibits attached to this Agreement constitute a part of this Agreement and are incorporated herein for all purposes.

(b)    If a term is defined as one part of speech (such as a noun), it shall have a corresponding meaning when used as another part of speech (such as a verb). Terms defined in the singular have the corresponding meanings in the plural, and vice versa. Unless the context of this Agreement clearly requires otherwise, words importing the masculine gender shall include the feminine and neutral genders and vice versa. The words "include", "includes" or "including" do not limit the preceding terms and shall be deemed to be followed by the words "without limitation." The words "hereof," "hereto," "hereby," "herein," "hereunder" and words of similar import, when used in this Agreement, shall refer to this Agreement as a whole and not to any particular section or article in which such words appear. The term "or" is not exclusive and unless preceded by "either" means "and/or".  The terms "day" and "days" mean and refer to calendar day(s). The terms "year" and "years" mean and refer to calendar year(s).

(c)    Operator and CUSA have each participated in the negotiation and drafting of this Agreement, and, if an ambiguity should arise, this Agreement shall be construed as if drafted

9

jointly by the Parties and no presumption or burden of proof shall arise favoring or burdening any Party by virtue of the authorship of any of the provisions in this Agreement.

(d)    The captions in this Agreement are for convenience only and shall not be considered a part of or affect the construction or interpretation of any provision of this Agreement.

(e)    All references to currency herein shall be to, and all payments required hereunder shall be paid in, United States Dollars.

(f)    The serial comma is sometimes included and sometimes omitted. Its inclusion or omission shall not affect the interpretation of any phrase.

Section 4.11   **Severability**. If any provision of this Agreement is held invalid or unenforceable by any court of competent jurisdiction, the other provisions of this Agreement shall remain in full force and effect. The Parties further agree that if any provision contained herein is, to any extent, held invalid or unenforceable in any respect under the laws governing this Agreement, they shall take any actions necessary to render the remaining provisions of this Agreement valid and enforceable to the fullest extent permitted by law and, to the extent necessary, shall amend or otherwise modify this Agreement to replace any provision contained herein that is held invalid or unenforceable with a valid and enforceable provision giving effect to the intent of the Parties to the greatest extent legally permissible.

Section 4.12   **Counterparts**. This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. Any .pdf or other electronic transmission hereof or signature hereon shall, for all purposes, be deemed originals.

Section 4.13   **Governing Law**. This Agreement shall be governed by, construed under, and enforced in accordance with the laws of the State of Texas without regard to the principles of conflicts of laws that would direct the application of the laws of another jurisdiction.

Section 4.14   **Dispute Resolution**.  The Parties shall exclusively and finally resolve any dispute between them using direct negotiations, mediation, and then arbitration as set out in this Section 4.14.  If a dispute arising out of or in connection with this Agreement (including dispute in respect of arbitrability) is not resolved by direct negotiations, either Party may initiate mediation by giving Notice to the other setting out the disputed issues and the value of the claim.  If the Parties fail to resolve the dispute within sixty (60) days from notice of mediation, either Party may initiate binding arbitration by giving notice to the other Party. The place of arbitration must be Houston, Texas. One arbitrator (or three (3) arbitrators if the monetary value of the dispute is more than five million U.S. dollars (US$5,000,000) or its currency equivalent, or if there is a dispute whether the monetary value exceeds the US$5,000,000 threshold) will conduct the arbitral proceedings in accordance with the International Institute for Conflict Prevention and Resolution ("CPR") Rules. To the extent of any conflicts between the Act or the CPR Rules and the provisions of this Agreement, the provisions of this Agreement prevail. The CPR is the appointing authority. The maximum number of witnesses each Party may call to give evidence is three (3) witnesses of fact and one (1) expert witness. The arbitration award is final and binding.

WEIL:\98010843\2\45327.0007

[*Remainder of Page Intentionally Left Blank. Signature Page(s) to Follow.*]

11

IN WITNESS WHEREOF, this Agreement has been signed by each of the Parties as of the Effective Date.

**OPERATOR**:

Mako Buyer LLC


By: _____
Name: _____
Title: _____


**CUSA:**

Chevron U.S.A. Inc.


By: _____
Name: _____
Title: _____

[*Signature page to Decommissioning Funding Agreement*]

# EXHIBIT A

## CUSA DEEPWATER ASSETS

| Area / Block | Lease Number (OCS–) | CBP Interest |
|---|---|---|
| GI 39 | 127 | 25% record title<br>25% operating rights in W/2 of Block 39, Grand Isle Area, from 12,256' TVDSS to 18,000' subsea (TVDS)<br>25% operating rights in W/2 of Block 39, Grand Isle Area, as to depths below 18,000 feet subsea (TVDS) to 99,999 feet subsea (TVDS) |
| GI 40 | 128 | 25% record title<br>25% operating rights in all of Block 40, Grand Isle Area, from 12,469' TVDSS to 18,000' subsea (TVDS)<br>25% operating rights in all of Block 40, Grand Isle Area, as to depths below 18,000 feet subsea (TVDS) to 99,999 feet subsea (TVDS) |
| GI 41 | 130 | 25% record title<br>25% operating rights in W/2 of Block 41, Grand Isle Area, from 14,123' TVDSS to 18,000' subsea (TVDS)<br>25% operating rights in W/2 of Block 41, Grand Isle Area, as to depths below 18,000 feet subsea (TVDS) to 99,999 feet subsea (TVDS) |
| GI 42 | 131 | 25% record title<br>25% operating rights in all of Block 42, Grand Isle Area, from 12,504' TVDSS to 18,000' subsea (TVDS)<br>25% operating rights in all of Block 42, Grand Isle Area, as to depths below 18,000 feet subsea (TVDS) to 99,999 feet subsea (TVDS) |
| GI 46 | 132 | 25% record title<br>25% operating rights in all of Block 46, Grand Isle Area, from 12,792' TVDSS to 18,000' subsea (TVDS)<br>25% operating rights in all of Block 46, Grand Isle Area, as to depths below 18,000 feet subsea (TVDS) to 99,999 feet subsea (TVDS) |
| GI 47 | 133 | 25% record title<br>25% operating rights in all of Block 47, Grand Isle Area, from 15,742' TVDSS to 18,000' subsea (TVDS)<br>25% operating rights in all of Block 47, Grand Isle Area, as to depths below 18,000 feet subsea (TVDS) to 99,999 feet subsea (TVDS) |

| Area / Block | Lease Number (OCS-) | CBP Interest |
|---|---|---|
| GI 48 | 134 | 25% record title<br>25% operating rights in all of Block 48, Grand Isle Area, from 16,812' TVDSS to 18,000' subsea (TVDS)<br>25% operating rights in all of Block 48, Grand Isle Area, as to depths below 18,000 feet subsea (TVDS) to 99,999 feet subsea (TVDS) |
| GI 43 | 175 | 25% record title<br>25% operating rights in all of Block 43, Grand Isle Area, from 12,830' TVDSS to 18,000' subsea (TVDS)<br>25% operating rights in all of Block 43, Grand Isle Area, as to depths below 18,000 feet subsea (TVDS) to 99,999 feet subsea (TVDS) |
| WD 70 | 182 | 25% record title<br>25% operating rights in all of Block 70, West Delta Area, from 13,182' TVDSS to 18,000' subsea (TVDS)<br>25% operating rights in all of Block 70, West Delta Area, as to depths below 18,000 feet subsea (TVDS) to 99,999 feet subsea (TVDS) |
| WD 71 | 838 | 25% record title<br>25% operating rights in all of Block 71, West Delta Area, from 13,357' TVDSS to 18,000' SSTVD<br>25% operating rights in all of Block 71, West Delta Area, as to depths below 18,000 feet subsea (TVDS) to 99,999 feet subsea (TVDS) |
| WD 94 | 839 | 25% record title<br>25% operating rights in all of Block 94, West Delta Area, from 13,159' SSTVD to 99,999' SSTVD |
| WD 95 | G01497 | 25% record title<br>25% operating rights in the S1/2SE1/4; S1/2N1/2SE1/4; SE1/4SW1/4; S1/2SW1/4SW1/4 of Block 95, West Delta Area, from the surface of the earth down to and including 7,369 feet subsea<br>25% operating rights in N1/2; N1/2N1/2SE1/4; N1/2SW1/4; N1/2SW1/4SW1/4 of Block 95, West Delta Area, from 13,601' SSTVD to 99,999' SSTVD |
| WD 96 | G01498 | 25% record title<br>25% operating rights in all of Block 96, West Delta Area, from 13,399' TVDSS to 18,000' SSTVD<br>25% operating rights in all of Block 96, West Delta Area, from 18,000' TVDSS to 99,999' TVDSS |

Exhibit A – Page 2
Decommissioning Funding Agreement

| Area / Block | Lease Number (OCS-) | CBP Interest |
|---|---|---|
| SM 149 | G02592 | 50% record title<br>4.2% ORRI as to production from the South Marsh Island 149 #D001 well (API 177084094401)<br>50% operating rights in all of Block 149, South Marsh Island Area, South Addition, from 7,386' SSTVD to 99,999' SSTVD |
| VR 363 | G09522 | 100% record title<br>33.33333% operating rights in the SE/4 of Block 363, Vermilion Area, South Addition<br>66.66667% operating rights in the SE/4 of Block 363, Vermilion Area, South Addition<br>100% operating rights in the N1/2; SW1/4 of Block 363, Vermilion Area, South Addition, from the surface to 10,180' SSTVD<br>50% operating rights in the N1/2; SW1/4 of Block 363, Vermilion Area, South Addition, from 10,180' SSTVD to 99,999' SSTVD |
| VR 371 | G09524 | 33.33333% record title<br>66.66667% record title<br>16.66667% operating rights in all of Block 371, Vermilion Area, South Addition, from 11,820' SSTVS to 99,999' SSTVD<br>66.66667% operating rights in all of Block 371, Vermilion Area, South Addition, from 11,820' SSTVS to 99,999' SSTVD |
| VR 362 | G10687 | 33.33333% record title<br>66.66667% record title |
| GC 282 | G16727 | 25% operating rights in all of Block 282, Green Canyon, from 16,700' TVD to 99,999' TVD<br>1.75% ORRI insofar as the lease pertains to depths from 0 to 16,999' TVD |
| MC 562 | G19966 | 12.5% record title<br>0% operating rights in N/2 of Block 562, Mississippi Canyon, from the surface to 19,500' TVDSS<br>0% operating rights in N/2 of Block 562, Mississippi Canyon, from depths below 19,500' TVDSS down to and including 99,999' TVDSS<br>0% operating rights in S/2 of Block 562, Mississippi Canyon, from depths below 20,000' TVDSS down to and including 99,999' TVDSS |

Exhibit A – Page 3
Decommissioning Funding Agreement

| Area / Block | Lease Number (OCS-) | CBP Interest |
|---|---|---|
| MC 563 | G21176 | 23.25% operating rights in all of Block 563, Mississippi Canyon, as to depths from below 19,000' down to 99,999' TVDSS<br>0.465% ORRI insofar as the lease covers all of Block 563, Mississippi Canyon, limited to depths from the surface to 19,000' TVDSS |
| GC 679 | G21811 | 37.5% record title<br>0% operating rights in E1/2 of Block 679, Green Canyon Area, limited in depth from the surface down to the stratigraphic equivalent of 16,048' TVD (17,315' MD) as seen in the Kerr-McGee OCS-G 21811 No. 1 (ST#1) well<br>0% operating rights in W1/2 of Block 679, Green Canyon Area, limited in depth from the surface down to 16,048' TVD<br>43.125% operating rights in all of Block 679, Green Canyon, below 16,048' TVD to 99,999' TVD |
| GC 768 | G21817 | 100% record title<br>50% operating rights in all of Block 768, Green Canyon, from the surface to the stratigraphic equivalent of 13,370' subsea TVD in the OCS-G 21817 #1 Well<br>43.125% operating rights in all of Block 768, Green Canyon, below the stratigraphic equivalent of 13,370' subsea TVD in the OCS-G 21817 #1 Well down to a depth of 40,000' subsea TVD |
| MC 992 | G24133 | 58.9363% record title in N1/2 of Block 992, Mississippi Canyon<br>52.94% record title in S1/2 of Block 992, Mississippi Canyon |
| MC 993 | G24134 | 58.9363% record title in N1/2 of Block 993, Mississippi Canyon<br>45% record title in S1/2 of Block 993, Mississippi Canyon |
| GC 238 | G26302 | 40% operating rights in all of Block 238, Green Canyon, from 16,700' TVD to 99,999' TVD<br>2.8% ORRI insofar as the lease pertains to depths from 0 to 16,999' TVD |

Exhibit A – Page 4
Decommissioning Funding Agreement

| Area / Block | Lease Number (OCS-) | CBP Interest |
|---|---|---|
| MC 519 | G27278 | 65.0% record title<br>49% operating rights in SW1/4 of Block 519, Mississippi Canyon, from the surface down to and including 99,999' TVDSS<br>49% operating rights in S1/2NW1/4 of Block 519, Mississippi Canyon, from the surface down to and including 14,000'<br>25.75% operating rights in S1/2; S1/2SE1/4NE1/4 of Block 519, Mississippi Canyon, from depths below 19,300' TVDSS down to and including 99,999' TVDSS<br>25.75% operating rights in S1/2NW1/4 of Block 519, Mississippi Canyon, from depths below 14,000' TVDSS down to and including 99,999' TVDSS<br>25.75% operating rights in N1/2NW1/4; N1/2NE1/4; SW1/4NE1/4 and N1/2SE1/4NE1/4 of Block 519, Mississippi Canyon, from the surface down to and including 99,999' TVDSS |
| EW 834 | G27982 | 1.3% ORRI insofar as the lease covers NE1/4, NW1/4NW1/4, N/2SE1/4NE1/4 and NE/4NE/4 of Block 834, Ewing Bank, from the surface down to 26,000' TVDSS |
| MC 697 | G28021 | 54% record title |
| MC 698 | G28022 | 54% record title |
| MC 948 | G28030 | 58.9363% record title |
| MC 742 | G32343 | 100% record title in NE1/4; S1/2 of Block 742, Mississippi Canyon<br>54% record title in NW1/4 of Block 742, Mississippi Canyon |
| MC 949 | G32363 | 58.9363% record title |
| EW 790 | G33140 | 100.0% operating rights in  SW1/4SW1/4; S1/2SE1/4SW1/4; S1/2SW1/4SE1/4 and NW1/4SE1/4SW1/4 of Block 790, Ewing Bank, limited to depths from below 26,000' TVDSS to 99,999' TVDSS<br>100.0% operating rights in N1/2; N1/2S1/2; SE1/4SE1/4; N1/2SW1/4SE1/4 and N1/4SE1/5SW1/4 of Block 790, Ewing Bank, from the surface to 99,999' TVDSS<br>1.3% ORRI insofar as the lease covers SW1/4SW1/4; S1/2SE1/4SW1/4; S1/2SW1/4SE1/4; NW1/4SE1/4SW1/4 of Block 790, Ewing Bank, from surface down to and including 26,000' TVDSS |
| MC 793 | G33177 | 1.3% ORRI insofar as the lease covers the W1/2W1/2NW1/4 of Block 793, Mississippi Canyon, from the surface down to 26,000' TVDSS |
| EW 835 | G33707 | 1.3% ORRI insofar as the lease covers the North 7800' of Block 835, Ewing Bank, from the surface down to 26,000' TVDSS |

Exhibit A – Page 5
Decommissioning Funding Agreement

| Area / Block | Lease Number (OCS-) | CBP Interest |
|---|---|---|
| MC 782 | G33757 | 45% record title |
| MC 171 | G34428 | 100% record title |
| MC 172 | G34429 | 100% record title |
| MC 297 | G34434 | 70% record title |
| GC 40 | G34536 | 50% record title |
| GC 41 | G34537 | 50% record title |
| EW 1009 | G34878 | 50% record title |
| EW 1010 | G34879 | 50% record title |
| EW 1011 | G34880 | 50% record title |
| MC 474 | G35825 | 24.33333% record title<br>12.5% operating rights in all of Block 474, Mississippi Canyon, from depths below 20,000' TVDSS down to and including 99,9999' TVDSS |
| MC 518 | G35828 | 24.33333% record title<br>0% operating rights in all of Block 518, Mississippi Canyon, from depths below 19,500' TVDSS down to and including 99,9999' TVDSS |
| GI 32 | 174 | 25% record title<br>25% operating rights in S/2 of Block 32, Grand Isle Area, from 12,756' TVDSS to 18,000' subsea (TVDS)<br>25% operating rights in S/2 of Block 32, Grand Isle Area, as to depths below 18,000 feet subsea (TVDS) to 99,999 feet subsea (TVDS) |
| GI 39 | 126 | 25% record title<br>25% operating rights in W/2 of Block 39, Grand Isle Area, from 12,256' TVDSS to 18,000' TVDSS<br>25% operating rights in W/2 of Block 39, Grand Isle Area, from 18,000' feet TVDS to 99,999' TVDS |
| GI 41 | 129 | 25% record title<br>25% operating rights in E/2 of Block 41, Grand Isle Area, from 14,123' TVDSS to 18,000' subsea (TVDS)<br>25% operating rights in E/2 of Block 41, Grand Isle Area, as to depths below 18,000 feet subsea (TVDS) to 99,999 feet subsea (TVDS) |

Exhibit A – Page 6
Decommissioning Funding Agreement

| Area / Block | Lease Number (OCS-) | CBP Interest |
|---|---|---|
| GI 44 | 176 | 25% record title<br>25% operating rights in N/2 of Block 44, Grand Isle Area, from 13,102' TVDSS to 18,000' subsea (TVDS)<br>25% operating rights in N/2 of Block 44, Grand Isle Area, as to depths below 18,000 feet subsea (TVDS) to 99,999 feet subsea (TVDS) |
| GI 52 | 177 | 25% record title<br>25% operating rights in N/2 of Block 52, Grand Isle Area, as to all depths below 17,651 feet TVDSS down to 99,999 feet TVDSS |
| WD 67 | 179 | 25% record title<br>25% operating rights in S/2 of Block 67, West Delta Area, from 11,650' TVDSS to 18,000' subsea (TVDS)<br>25% operating rights in S/2 of Block 67, West Delta Area, as to depths below 18,000' subsea (TVDS) to 99,999' subsea (TVDS) |
| WD 68 | 180 | 25% record title<br>25% operating rights in S/2 of Block 68, West Delta Area, from 13,225' TVDSS to 18,000' subsea (TVDS)<br>25% operating rights in S/2 of Block 68, West Delta Area, as to depths below 18,000' subsea (TVDS) to 99,999' subsea (TVDS) |
| WD 69 | 181 | 25% record title<br>25% operating rights in all of Block 69, West Delta Area, from 13,102' TVDSS to 18,000' subsea (TVDS)<br>25% operating rights in all of Block 69, West Delta Area, as to depths below 18,000 feet subsea (TVDS) to 99,999 feet subsea (TVDS) |

**EXHIBIT B**

**FORM OF NPI GRANT**

See attached.

**Execution Version**

**CONVEYANCE OF**

**NET PROFITS OVERRIDING ROYALTY INTEREST**

**From**

**MAKO BUYER LLC**

**as Grantor**

**to**

**DEEPWATER ASSET DECOMMISSIONING ESCROW ACCOUNT**

**as NPI Owner**

**_____ __, 2021**

This document prepared by and when recorded return to:
[  ]

#4325225.15

## CONVEYANCE OF NET PROFITS OVERRIDING ROYALTY INTEREST

THIS CONVEYANCE OF NET PROFITS OVERRIDING ROYALTY INTEREST (as from time to time supplemented or amended, this "Conveyance"), dated as of [_____] (the "Conveyance Date"), is made from and by Mako Buyer LLC, a Delaware limited liability company (the "Grantor"), to and in favor of [The Deepwater Asset Decommissioning Escrow Account], through U.S. Bank National Association as escrow agent (herein called "NPI Owner").

## RECITALS

WHEREAS, Grantor acquired certain oil and gas assets from Fieldwood Energy LLC and certain of its subsidiaries pursuant to that certain Purchase and Sale Agreement ("PSA") effected in connection with the Fourth Amended Joint Chapter 11 Plan of Fieldwood Energy LLC and Its Affiliated Debtors filed at Docket No. 1284 in the chapter 11 cases styled as In re: Fieldwood Energy LLC et al., Case No. 20-33948, which was confirmed by order of the United States Bankruptcy Court for the Southern District of Texas, Houston Division, on [_____], 2021 at Docket No. [____] (as amended, modified, and supplemented, the "Plan");

WHEREAS, pursuant to the terms and subject to that certain Deepwater Funding Agreement, dated [__] by and between Grantor and Chevron U.S.A. Inc., a Pennsylvania corporation ("CUSA") (the "Deepwater Security Agreement"), Grantor agreed to provide CUSA with certain security in support of decommissioning operations on certain of the assets acquired by Grantor in connection with the PSA; and

WHEREAS, this Conveyance is granted in conjunction with the security obligations of Grantor set out in the Deepwater Security Agreement;

NOW, THEREFORE, in consideration of the premises, the agreements and mutual covenants contained herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

## ARTICLE I

## DEFINED TERMS

Section 1.1.    Defined Terms.   When used in this Conveyance or in any exhibit or schedule hereto (unless otherwise defined in any such exhibit or schedule), the following terms have the respective meanings assigned to them in this section or in the sections, subsections, exhibits and schedules referred to below:

"Act" has the meaning ascribed to such term in Section 7.6(a).

"Affiliate" means, with respect to any Person, any other Person that, directly or indirectly, controls, is controlled by or is under common control with, such specified Person through one or more intermediaries or otherwise.  For the purposes of this definition, "control" means, where used with respect to any Person, the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of

voting securities, by contract or otherwise, and the terms "controlling" and "controlled" have correlative meanings.

"Applicable JOA" means any joint operating agreement applicable to any part of the Subject Interests.

"Application Date" means, with respect to Net Profits attributable to Subject Hydrocarbons produced, saved and sold during any Production Period, the last Business Day of the Month following such Production Period; provided that the Application Date with regard to the Production Periods during the period of time beginning on the Effective Time until the end of the Month following the Month in which the Conveyance Date occurs shall be deemed to occur ninety (90) days after the Conveyance Date.

"BOEM" means the Bureau of Ocean Energy Management of the U.S. Department of Interior.

"BSEE" means the Bureau of Safety and Environmental Enforcement of the U.S. Department of Interior.

"Business Day" means any day that is not a Saturday, Sunday or legal holiday in the State of Texas and that is not otherwise a federal holiday in the United States.

"Claim" has the meaning ascribed to such term in Section 7.6(c).

"Conveyance Date" has the meaning ascribed to such term in the preamble.

"Conveyance" has the meaning ascribed to such term in the preamble.

"CPR" has the meaning ascribed to such term in Section 7.6(e).

"CUSA" means has the meaning ascribed to such term in the recitals.

"Debited Taxes" means all Taxes incurred, accrued or paid by Grantor with respect to the ownership of the Subject Interests or the extraction of the Subject Hydrocarbons after the Effective Time, including (a) production, severance, excise and other similar Taxes assessed against, and/or measured by, the production of Subject Hydrocarbons, (b) occupation Taxes, (c) sales and use taxes, (d) ad valorem Taxes assessed against or attributable to the Subject Interests or the Non-Processing Equipment and (e) any extraordinary or windfall profits Taxes that may be assessed in the future based upon profits realized or prices received from the sale of Subject Hydrocarbons.

"Decommissioning" has the meaning attributed thereto in the Deepwater Security Agreement.

"Effective Time" means 7:00 a.m. local time at the locations of the Subject Interests on the Conveyance Date.

"Environmental Laws" means, the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. § 9601 et seq. ("CERCLA"); the Resource

Conservation and Recovery Act, 42 U.S.C. § 6901 et seq.; the Federal Water Pollution Control Act, 33 U.S.C. § 1251 et seq.; the Clean Air Act, 42 U.S.C. § 7401 et seq.; the Hazardous Materials Transportation Act, 49 U.S.C. § 5101 et seq.; the Toxic Substances Control Act, 15 U.S.C. §§ 2601 through 2629; the Oil Pollution Act, 33 U.S.C. § 2701 et seq.; the Emergency Planning and Community Right to Know Act, 42 U.S.C. § 11001 et seq.; the Endangered Species Act, 16 U.S.C. § 1531 et seq.; the Safe Drinking Water Act, 42 U.S.C. §§ 300f through 300j; the Marine Mammal Protection Act, 16 U.S.C. § 1361 et seq.; the Marine Protection, Research and Sanctuaries Act, 16 U.S.C. § 1431 et seq. and 33 U.S.C. § 1401 et seq.; the Outer Continental Shelf Lands Act, 43 U.S.C. § 1331 et seq., and the National Environmental Policy Act, 42 U.S.C. § 4321 et seq., the Occupational Safety and Health Act, 29 U.S.C. ch. 15 § 651 et seq. (and all Occupational Safety and Health Administration (OSHA) promulgated standards), and the Hazardous Materials Transportation Act, 49 U.S.C. §§ 5101 et seq., in each case as amended in effect as of the Conveyance Date (or amended after the Conveyance Date), and all similar Laws  in effect as of the Conveyance Date (or amended or passed after the Conveyance Date) of any Governmental Authority having jurisdiction over the property, operation, activity, or condition in question addressing pollution, protection of the environment, biological resources, Hazardous Substances, occupational safety, product registrations, hazard communication, decommissioning obligations, or the generation, storage, transportation, disposal, or release of Hazardous Substances.

"Equipment" means all equipment and machinery (including well equipment and machinery), platforms, facilities, buildings, fixtures, and other tangible personal property and improvements owned by Grantor and used or held for use by Grantor in connection with the operation of the Subject Interests or the production of Subject Hydrocarbons.

"Escrow Account" means that certain escrow account established pursuant to the Escrow Agreement and called the "Deepwater Escrow Account" under the Deepwater Security Agreement.

"Escrow Agreement" means that certain escrow agreement governing the Escrow Account, dated [_____] by and between Grantor, CUSA, and U.S. Bank National Association, as escrow agent, and called the "Escrow Agreement" under Deepwater Security Agreement.

"Fixed Rate" means, for any day, the lesser of (i) the rate of six percent (6%) per annum and (ii) the maximum rate of interest permitted to be charged pursuant to this Conveyance under applicable Law.

"Governmental Authority" means any federal, state, municipal, local or similar governmental authority, regulatory or administrative agency, court or arbitral body or any subdivision of the foregoing.

"Gross Proceeds" has the meaning ascribed to such term in Section 3.2.

"Hazardous Substances" means any material,  product, pollutant, contaminant, dangerous or toxic substance, hazardous or extremely hazardous substance or chemical, or otherwise hazardous material or waste defined as "hazardous waste", "hazardous substance," "pollutant," or "hazardous material" under applicable Environmental Laws, including chemicals, pollutants, contaminants, wastes, or toxic substances that are classified as hazardous, toxic, radioactive, or

otherwise are regulated by, or form the basis for Environmental Liability under, any applicable Environmental Law, including hazardous substances under CERCLA, and oil of any kind or in any form, oil waste, petroleum and any fraction thereof, petroleum by-products and components, hydrocarbons, hydrocarbon waste, naturally occurring radioactive material, produced water, polychlorinated biphenyls, and asbestos.

"Hydrocarbons" means all of the oil, liquid hydrocarbons, gas, and any and all other liquid or gaseous hydrocarbons, as well as their respective constituent products (including condensate, casinghead gas, distillate and natural gas liquids), and, to the extent useful for the exploration for and production of the foregoing, any other minerals produced in association therewith (including, elemental sulfur, helium, carbon dioxide and other non-hydrocarbon substances produced in association with any of the above-described items).

"Law" means any and all applicable laws, statutes, codes, constitutions, ordinances, decrees, writs, injunctions, orders, judgments, principles of common law, rules, licenses, authorizations, or regulations (including Environmental Laws) that are promulgated, issued, or enacted by any Governmental Authority having jurisdiction.

"Lease" means (i) as of the Conveyance Date, an oil, gas and/or mineral lease described in Exhibit A hereto, together with (ii) any renewal, amendment, ratification, or extension of any such Subject Interest that is to be subject to this Agreement pursuant to Section 2.4.

"Losses" has the meaning ascribed to such term in Section 7.9(b).

"Manufacturing Costs" shall mean the costs of Processing any Subject Hydrocarbons, which shall be equivalent to (i) for Processing of any Subject Hydrocarbons performed by a Non-Affiliate, the actual costs charged by such Non-Affiliate and paid by Grantor for such Processing (or debited with respect to revenue from such Subject Hydrocarbons actually received by Grantor for such Processing), or (ii) for any other Processing of Subject Hydrocarbons, the actual costs incurred by Grantor or its Affiliate and paid to a Non-Affiliate (or debited from revenue attributable to) for Processing.

"Month" means the period between 7:00 a.m. (local time, at the location of each Subject Interest) on the first day of each calendar month and 7:00 a.m. on the first day of the next succeeding calendar month.

"Monthly Statement" has the meaning ascribed to such term in Section 3.6.

"Net Deficit" has the meaning ascribed to such term in Section 3.5(c).

"Net Profit" has the meaning ascribed to such term in Section 3.5(b).

"Net Profits Account" has the meaning ascribed to such term in Section 3.1.

"Non-Affiliate" means any Person that is not a Related Person.

-4-

"Non-Processing Equipment" means all fixtures, equipment and supplies (other than any of the same used in Processing) located on or used in connection with production from any of the Subject Interests.

"Non-Qualified Expenditures" means any amount attributable to (i) costs and expenses that are paid or incurred in connection with Decommissioning of the Subject Interests, or (ii) capital expenditures for the drilling and development of the Subject Interests.

"Notice" has the meaning ascribed to such term in Section 7.8.

"NPI" has the meaning ascribed to such term in Section 2.1.

"NPI Owner Indemnitees" has the meaning ascribed to such term in Section 7.9(a).

"NPI Payment" has the meaning ascribed to such term in Section 3.5(b).

"NPI Percentage" means an undivided five percent (5%).

"Parties" means Grantor and NPI Owner and each, a "Party".

"Person" means an individual, partnership, corporation, limited liability company, association, trust, unincorporated organization, or a government or agency or political subdivision thereof.

"Processing" or "Processed" means to process, manufacture, fractionate or refine Subject Hydrocarbons, but does not mean or include the use of lease or well equipment (such as dehydrators, gas treating facilities, separators, heater-treaters, lease compression facilities, injection or recycling equipment, tank batteries, field gathering systems, pipelines and equipment and so forth) for treating or conditioning Hydrocarbons or other normal operations on any of the Subject Interests.

"Production Period" means each Month in which Subject Hydrocarbons are produced and saved from the Subject Interests.  Except as otherwise provided herein, for purposes of this Conveyance, the first Production Period shall begin at the Effective Time.

"Reasonably Prudent Operator" means an operational standard requiring an operator to maintain and exercise a degree of skill and judgment, and the utilization of practices, methods, techniques and standards, that are generally expected of a skilled and experienced operator engaged in work similar in nature which shall at a minimum require operations be conducted (a) in a good and workmanlike manner, (b) with due diligence and dispatch, (c) in accordance with good oilfield practices, and (d) in compliance with all applicable Laws, licenses, authorizations and permits.

"Reimbursable Expenses" means all costs and expenses paid or incurred by or on behalf of NPI Owner or its Affiliates which are related to:  (a) the enforcement or termination of the NPI, this Conveyance, or any waivers or amendments hereto or thereto, or (b) any litigation, contest, release or discharge of any adverse claim or demand made or proceeding instituted by any Person affecting in any manner whatsoever the NPI, this Conveyance, the enforcement or defense hereof

or thereof, or the defense of NPI Owner's and its Affiliates' exercise of their rights hereunder or thereunder.  Included among the Reimbursable Expenses are, in each case to the extent paid or incurred by NPI Owner or its Affiliates: (i) all recording and filing fees and (ii) all costs of NPI Owner in exercising any of its remedies hereunder.

"Related Person" means Grantor, Fieldwood Energy I LLC, Fieldwood Energy III LLC, Fieldwood Energy IV LLC or Fieldwood Energy LLC or any Affiliate of any such Person.

"Subject Hydrocarbons" means the Hydrocarbons in and under Subject Lands that may be produced after the Effective Time from (or, to the extent pooled or unitized, allocated to) the Subject Lands that are attributable to the Subject Interests.

"Subject Interests" means:

(a)      all of Grantor's right, title and interest in and to the leasehold interests and other property interests described in Exhibit A attached hereto;

(b)      without limitation of the foregoing, all other right, title and interest (of whatever kind or character, whether legal or equitable and whether vested or contingent) of Grantor (whether in the form of a record title interest or interest in operating rights or contractual working interests) in and to the Hydrocarbons in and under or that may be produced from any Subject Lands (including interests in oil, gas or mineral leases to the extent the same cover such lands, overriding royalties, production payments and net profits interests in such lands or such leases, and fee mineral interests, fee royalty interests and other interests in such oil, gas and other minerals) even though Grantor's interest in such oil, gas and other minerals may be incorrectly described in, or omitted from, Exhibit A; and

(c)      all rights, titles and interests of Grantor in and to, or otherwise derived from, all presently existing and valid oil, gas or mineral unitization, pooling, or communitization agreements, declarations or orders and in and to the properties covered and the units created thereby (including all units formed under orders, rules, regulations, or other official acts of any federal, state, or other authority having jurisdiction, voluntary unitization agreements, designations or declarations, and so-called "working interest units" created under operating agreements or otherwise) relating to the interests described in clauses (a) and (b) of this definition,

in each case, as any of the foregoing may be enlarged from time to time by the discharge of any burdens or by the removal of any charges or encumbrances to which any of the foregoing may be subject as of the date hereof, and any and all renewals and extensions of any of the same pursuant to Section 2.4.  For purposes of clarity, it is expressly understood and agreed that the term "Subject Interests", as used in this Conveyance, shall mean gross interests before any deductions, charges or encumbrances.  The Subject Interests shall not include additional interests acquired by Grantor from a third party from and after the Conveyance Date, including additional interests acquired by Grantor in the Leases that comprise the Subject Interests, unless such interests are expressly added to this Conveyance by qualifying amendment.

"Subject Lands" means all of the tracts of land described in Exhibit A and all lands subject to each Lease, unit or other property interest that is described in Exhibit A, in each case, as to all depths.

"<u>Subject Wells</u>" means all wells now located on the Subject Lands (whether fully drilled and completed or not) or hereafter drilled on the Subject Lands, and any other wells now or hereafter located on lands or leases pooled, communitized or unitized with the Subject Interests, including any wells identified on <u>Exhibit A</u>.

"<u>Taxes</u>" means all ad valorem, property, gathering, transportation, pipeline regulating, severance, production, excise, heating content, carbon, environmental, occupation, sales, use, value added, fuel, and other taxes and governmental charges and assessments imposed on or as a result of all or any part of the Subject Interests, the Subject Hydrocarbons or the proceeds thereof, or the NPI, regardless of the point at which or the manner in which or the Person against whom such taxes, charges, or assessments are charged, collected, levied, or otherwise imposed. Any estimated taxes, deficiency assessments, additions to tax, interest, penalties, and withholding obligations owing to Governmental Authorities with respect to any Taxes shall also constitute Taxes. The only taxes which are not Taxes for purposes hereof are federal and state income taxes, state franchise taxes, state margin taxes, and any penalty or interest surcharges thereon.

Section 1.2.   <u>Rules of Construction</u>.   All references in this Conveyance to articles, sections, subsections and other subdivisions refer to corresponding articles, sections, subsections and other subdivisions of this Conveyance unless expressly provided otherwise. Titles appearing at the beginning of any of such subdivisions are for convenience only and shall not constitute part of such subdivisions and shall be disregarded in construing the language contained in such subdivisions. The words "this Conveyance", "this instrument", "herein", "hereof", "hereunder" and words of similar import refer to this Conveyance as a whole and not to any particular subdivision unless expressly so limited. Unless the context otherwise requires:  "including" and its grammatical variations mean "including without limitation"; "of" is not exclusive; words in the singular form shall be construed to include the plural and vice versa; words in any gender include all other genders; references herein to any instrument or agreement refer to such instrument or agreement as it may be from time to time amended or supplemented; and references herein to any Person include such Person's successors and assigns. All references in this Conveyance to exhibits and schedules refer to exhibits and schedules to this Conveyance unless expressly provided otherwise, and all such exhibits and schedules are hereby incorporated herein by reference and made a part hereof for all purposes. Any reference to a Law includes any amendment or modification to such Law, and all regulations, rulings, and other Laws promulgated under such Law.

## ARTICLE II
## GRANTING PROVISIONS

Section 2.1.   <u>Granting Clause</u>.   For and in consideration of good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Grantor does hereby GRANT, BARGAIN, SELL, TRANSFER, ASSIGN, CONVEY, WARRANT and DELIVER to NPI Owner a net profits overriding royalty interest in and to the Subject Interests and in and to the Subject Hydrocarbons in and under the Subject Interests and that may be produced and saved from (or otherwise allocable to) each Subject Interest that is equal to (and measured by) the NPI Percentage of the Net Profits, as determined by and calculated in accordance with the terms of <u>Article III</u>, of the Subject Hydrocarbons that may be produced and saved from (or otherwise allocable to) the Subject Interests, together with all and singular the rights and appurtenances

-7-

thereto in anywise belonging (the "NPI"), all as more fully discussed and subject to the terms provided below.

TO HAVE AND TO HOLD the NPI unto NPI Owner, its successors and assigns, forever. Grantor will pay and account to NPI Owner the NPI as provided herein.

Section 2.2.    Non-Operating, Limited Cost-Bearing Interest.  The NPI is a non-operating, limited expense-bearing net profits overriding royalty interest in and to the Subject Interests, free of all cost, risk, and expense of exploration, development, plugging and abandonment of the Subject Interests or the Subject Hydrocarbons.  Except as described in Section 3.3(c), the NPI shall be free and clear of (and without deduction therefrom of), and Grantor shall bear and pay, all Taxes (other than Debited Taxes) with respect to the NPI and the Subject Hydrocarbons imposed on NPI Owner.  Without limitation of the foregoing, Grantor will promptly (and in any event within thirty (30) days after receiving any notice or statement for the same) pay all Reimbursable Expenses which have been incurred and are unpaid and will reimburse NPI Owner for any Reimbursable Expenses, and for any other amounts that Grantor is obligated to pay hereunder, which have nonetheless been paid by or on behalf of NPI Owner.  Each amount that is to be paid by Grantor pursuant to this Conveyance which is instead paid by or on behalf of NPI Owner shall bear interest at the Fixed Rate on each day from and including the date of such payment until but not including the date repaid by Grantor  This Conveyance is an absolute conveyance of a presently vested interest in real and/or immovable property and, in the State of Louisiana, an immovable right, causing title to the NPI to be vested in NPI Owner as of the Effective Time.

Section 2.3.    No Proportionate Reduction.  It is understood and agreed that, although the NPI is conveyed by Grantor to NPI Owner out of the Subject Interests, the NPI shall be determined based on all of Grantor's right, title and interest in and to the Subject Interests as of the Conveyance Date.

Section 2.4.    Renewals and Extensions.  Grantor shall have the unrestricted right to renew, extend, modify or amend the Leases with respect to any of the Subject Lands covered thereby without the consent of NPI Owner.  This Conveyance and the NPI shall apply to Grantor's and its Affiliates' interests in all renewals, extensions, modifications and amendments of each lease (or other determinable interest) which is included in the Subject Interests, whether such renewals, extensions, modifications and amendments have heretofore been obtained by Grantor or are hereafter obtained by or for Grantor or any Affiliate thereof and whether or not the same are described in Exhibit A; provided that any fees, costs and expenses actually paid by Grantor with respect to such renewal, extension, modification and amendment may be debited to the Net Profits Account.  For the purposes of the preceding sentence, a new lease or other determinable property interest that covers the same interest (or any part thereof) covered by a prior lease or property interest, and which is acquired within twelve (12) months after the expiration, termination, or release of such prior lease or property interest, shall be treated as a renewal or extension of such prior lease or property interest.

Section 2.5.    Termination of a Subject Interest.  In the event any particular Subject Interest (or portion thereof, as applicable) should by its terms terminate and not be extended, renewed, or replaced, the NPI shall no longer apply to that particular Subject Interest (or such portion thereof, as applicable), but the NPI shall remain in full force and effect and undiminished

as to all remaining Subject Interests, if any, (and the remaining portion of such Subject Interest, as applicable); provided, however, that, notwithstanding such termination, any costs and expenses attributable to such Subject Interest (or portion thereof, as applicable) that are otherwise eligible to be debited from the Net Profits Account shall continue to be debited pursuant to the provisions of Article III.

Section 2.6.   Pooling, Communitization and Unitization.

(a)     Certain of the Subject Interests may have been pooled, communitized or unitized for the production of oil, gas and/or minerals prior to the Effective Time or, after the Effective Time, may be so pooled or unitized pursuant to Section 2.6(b).   Such Subject Interests are and shall be subject to the terms and provisions of such pooling and unitization agreements, and the NPI in each such Subject Interest shall apply to (and the term "Subject Hydrocarbons" shall include) the production from such units which is attributable to such Subject Interest (and the Net Profits Account shall be computed giving consideration to such production and costs, expenses, charges and credits attributable to such Subject Interest) under and by virtue of the applicable pooling and unitization agreements.

(b)     Grantor shall have the right and power to unitize, communitize or pool, on a voluntary basis, any portion or portions of the Subject Interests without the express written consent of NPI Owner.   Notwithstanding the foregoing, if pursuant to any such voluntary pooling or unitization or any Law or order of any Governmental Authority, any portion of the Subject Interests is pooled, communitized or unitized in any manner, the NPI shall apply to the production which is attributable to such portion of the Subject Interests under and by virtue of such pooling, communitization and unitization arrangements (as if such unit or property interest and the interest of Grantor therein were specifically described in Exhibit A).   NPI Owner shall, at Grantor's sole cost and expense, cooperate in good faith to prepare and execute any documents reasonably necessary to accomplish the purposes of this Section 2.6.

## ARTICLE III
## ESTABLISHMENT OF NET PROFITS ACCOUNT

Section 3.1.   Establishment.   Grantor shall establish on its books and maintain a net profits account (herein called the "Net Profits Account") in accordance with sound, accurate and comprehensive accounting practices and consistent with the various provisions of this Conveyance and shall at all times keep true and correct books and records with respect thereto.

Section 3.2.   Credits.   Except as otherwise provided herein, the Net Profits Account shall be credited (without duplication herein) with the following gross revenue actually received by (or credited to Grantor if credited by a Related Person) from the sale or other disposition of Subject Hydrocarbons produced from and after the Effective Time, in each case as of the date the corresponding proceeds for Subject Hydrocarbons are actually received by Grantor (the "Gross Proceeds").   The amount of Gross Proceeds to be credited to the Net Profits Account with respect to any sale or disposition of Subject Hydrocarbons shall be subject to the following:

(a)     Gross Proceeds shall include all consideration and other amounts actually received by (or credited to Grantor if credited by a Related Person) attributable to the sale or other

-9-

disposition of Subject Hydrocarbons, including any amounts actually received by (or credited to Grantor if credited by a Related Person) attributable to overriding royalty or other royalty interest that is part of the Subject Interests and owned by Grantor;

(b)     If any Non-Affiliate withholds or delays payment of proceeds of Subject Hydrocarbons for any reason (other than at the request of Grantor), such proceeds shall not be considered to be Gross Proceeds until such proceeds are actually paid and received by Grantor (provided that if any interest or penalty is also paid in connection therewith, such interest or penalty shall be deemed proceeds of Subject Hydrocarbons), and provided further that if a Related Person withholds or delays payment of proceeds of Subject Hydrocarbons for any reason, such proceeds shall be considered to be Gross Proceeds relating to the applicable Production Period;

(c)     If any Subject Hydrocarbons are Processed before sale, the amount of Gross Proceeds credited to the Net Profits Account for such Subject Hydrocarbons shall be the amount actually received from the sale of such Subject Hydrocarbons less the Manufacturing Costs; and

(d)     Gross Proceeds shall not include any amounts that are to be applied as reductions to debits pursuant to Section 3.4.

Section 3.3.     Debits.  Except as otherwise provided herein, the Net Profits Account shall be debited (without duplication herein or any duplication resulting from any charges under the COPAS accounting procedures attached to any Applicable JOA) with the following costs and expenses to the extent (i) such costs and expenses are properly allocable to the Subject Interests and incurred during the period from and after the Effective Time, and (ii) such costs and expenses are actually paid by Grantor from and after the Effective Time:

(a)     All costs and expenses for (i) direct lease-level and field-level services and labor (including fringe benefits) necessary for exploring, developing, operating, producing, reworking, and maintaining the Subject Interests, (ii) dehydration, compression, processing, treating, metering, separation, transportation, gathering, storage and marketing of the Subject Hydrocarbons to the or at the first point of sale giving rise to Gross Proceeds, (iii) material, supplies, equipment, fixtures, vehicles, vessels, and other personal property purchased or rented in connection with operating, producing, reworking and maintaining the Subject Interests, including all costs relating to fuel supply, power supply, salt water disposal, repairs, dock services and other charges incidental thereto, (iv) fluid injection, pressure maintenance, secondary recovery, recycling and other enhanced recovery operations attributable to the Subject Interests, and (v) all other charges permitted under the COPAS accounting procedures attached to any Applicable JOA;

(b)     All Debited Taxes;

(c)     The portion of any insurance costs paid by Grantor attributable to the ownership or operation of the Subject Interests;

(d)     All amounts attributable to any Subject Interest consisting of royalties, overriding royalties, production payments, rentals, shut-in well royalties, minimum royalties and similar payments and burdens that are payable with respect to periods after the Effective Time and are payable to any Non-Affiliate;

(e)     All direct costs and charges attributable to the Subject Interests that are paid by Grantor to a Non-Affiliate operator with respect to periods after the Effective Time under an Applicable JOA (and all exhibits attached thereto including the COPAS accounting procedures) governing the relevant Subject Interests;

(f)     All (i) costs and expenses of litigation, proceedings, collections, liens, judgments, liabilities and claims incurred and paid by Grantor allocable to the Subject Interests or Subject Hydrocarbons and (ii) payment of judgments, penalties and other liabilities (including interest thereon), incurred by Grantor (and not paid or reimbursed under insurance maintained by Grantor or others) and involving any of the Subject Interests, or incident to the development, operation or maintenance of the Subject Interests from and after the Effective Time, or requiring the payment or restitution of any proceeds of Subject Hydrocarbons;

(g)     If as a result of the occurrence of the bankruptcy or insolvency or similar occurrence of the purchaser of Subject Hydrocarbons any amounts previously included in Gross Proceeds are reclaimed from Grantor or its representative, then the amounts reclaimed as promptly as practicable following Grantor's payment thereof; and

(h)     All costs, expenses and liabilities incurred by Grantor in maintaining, renewing or extending any of the Leases or maintaining or increasing production on such Lease.

Notwithstanding the foregoing provisions of this Section 3.3 or anything else to the contrary contained in this Conveyance, the amounts debited to the Net Profits Account shall not include any of the following:

(i)     Non-Qualified Expenditures.

(ii)     Any amount otherwise able to be debited which has also reduced the amount of the Subject Hydrocarbons or Gross Proceeds (including, by way of example, royalties and overriding royalties not included in Subject Hydrocarbons and production, severance, and other Taxes (other than penalties or interest) withheld and not included in Gross Proceeds).

(iii)     Any overriding royalty, production payment or other charge burdening the Subject Interests which is created by Grantor after the Effective Time.

(iv)     Any expenses and any penalties, interests or other similar charges which result from the failure of Grantor to properly discharge all costs and expenses (including Taxes) of operating, producing and maintaining the Subject Interests as a Reasonably Prudent Operator.

(v)     Any interest, premiums, fees or similar charges arising out of borrowings, bonds, letters of credit or other credit support or purchases of any goods, equipment or other items on credit, whether or not used on or otherwise related to the Subject Interests.

(vi)     Any general, administrative or overhead costs paid or incurred by Grantor or its Affiliates, except for any of such costs permitted under Sections 3.3(a).

(vii)    Any amounts paid by Grantor (A) for the acquisition of any new Lease, including any bonus or similar payment or (B) to any of Grantor's predecessors in interest with respect to the acquisition of the Subject Interests (including any purchase price or other consideration paid by Grantor to any such predecessor in interest to acquire all or part of the Subject Interests).

(viii)    Any expenses, expenditures or other amounts accrued prior to the Effective Time, even if paid after the Effective Time, unless agreed to by Grantor and CUSA in writing.

Section 3.4.    <u>Reduction of Debits</u>.  The debits to the Net Profits Account provided for in <u>Section 3.3</u> and elsewhere in this Conveyance shall be reduced after the Effective Time by the following to the extent actually received by or credit to Grantor and to the extent applicable to the Subject Interests:

(a)    The gross proceeds attributable to Subject Interests which are received by Grantor from the sale of (or, if disposed of by Grantor other than by sale, the then current market value of) any materials, supplies, equipment and other personal property or fixtures located on or used in connection with the Subject Interests (including all amounts attributable thereto which are received by Grantor by way of conformance of investment in personal property and equipment if the Subject Interests or any part or parts thereof are hereafter unitized).

(b)    The gross proceeds of all insurance payments collected by Grantor (i) if the cost of the related policy is chargeable to the Net Profits Account, directly or indirectly, or (ii) for loss of or damage to any of the Subject Interests, any Subject Hydrocarbons, or any materials, supplies, equipment or other personal property or fixtures located on or used in connection with any of the Subject Interests.

(c)    The proceeds of all judgments and settlements (net of legal fees and expenses) collected by Grantor for loss of or damage to any of the Subject Interests or any part thereof or interest therein, any Subject Hydrocarbons, or any materials, supplies, equipment or other personal property or fixtures, or any part thereof or interest therein, located on or used in connection with any of the Subject Interests.

(d)    Any Prior Period Debit Reduction.

Section 3.5.    <u>Accounting</u>.

(a)    By the end of the second Month after each Production Period, a calculation of Net Profits or Net Deficit shall then be made by Grantor with respect to the NPI for such Production Period by deducting (i) the result of (A) the total debits properly made to the Net Profits Account during such Production Period pursuant to <u>Section 3.3</u>, *plus* (B) the Net Deficit carried forward from the prior Production Period (as determined under <u>Section 3.5)(c)</u>), if any, *minus* (C) the total debit reductions properly made to the Net Profits Account during such Production Period pursuant to <u>Section 3.4</u>; *from* (ii) the results of (A) total credits properly made to the Net Profits Account for Subject Hydrocarbons produced during such Production Period pursuant to <u>Section 3.2</u>, *plus* (B) total credits properly made to the Net Profits Account for Subject Hydrocarbons produced during any prior Production Period, to the extent the applicable credit was not actually received by

or credited to Grantor until after the Application Date for such prior Production Period or was not otherwise allocated to the Net Profits Account for a prior Production Period; provided that if the result of the calculation under (i) is a negative number, then the absolute value of such amount shall be deemed a "Prior Period Debit Reduction" and carried forward into the next Production Period under Section 3.4.

(b)    If the computation made in accordance with Section 3.5(a) results in a positive amount with respect to a Production Period (the "Net Profits"), then (i) that positive amount shall be subtracted from the balance of the Net Profits Account to cause the Net Profits Account to have a zero balance immediately following the end of such Production Period, (ii) that positive amount shall be multiplied by the NPI Percentage to determine the NPI payable with respect to such Production Period, and (iii) the product resulting from the calculations in (ii) above shall be payable to NPI Owner, as specified in Section 4.1 (the "NPI Payment").

(c)    If the computation made in accordance with Section 3.5(a) results in a negative amount with respect to a Production Period, the negative sum shall be deemed the "Net Deficit." Any Net Deficit shall be carried forward as a debit to the Net Profits Account for the following Production Period. If there is a Net Deficit with respect to the Net Profits Account at the end of any Production Period, no payments shall be made to NPI Owner in respect of the NPI. For the avoidance of doubt, NPI Owner shall never be liable to make any payment to Grantor in respect of the Net Deficit.

Section 3.6.    Monthly Statements.    On or before the last day of the second Month following each Production Period, beginning with the first Production Period after the Conveyance Date, Grantor shall furnish to NPI Owner a detailed statement (a "Monthly Statement") (a) identifying the balance (if any) of the Net Profits Account as of the close of business on the last day of the preceding Production Period, (b) identifying (with sufficient description so that NPI Owner can identify such items and the particular Subject Interest involved) those items which gave rise to debits and credits to the Net Profits Account during such Production Period and (c) identifying, with respect to each Subject Interest, the volumes of Subject Hydrocarbons both produced and sold therefrom during the Production Period covered by such Monthly Statement, the prices at which such volumes were sold, and the Taxes paid with respect to such sales. Any Net Deficit reflected by any Monthly Statement shall be carried forward and used in the calculation of Net Profits Account for the next and succeeding Production Periods until such Net Deficit has been eliminated and liquidated. As more particularly described in Section 3.5(b), NPI Payments shall be made to NPI Owner in accordance with Section 4.1 when a Net Profit is reflected by any Monthly Statement.

Section 3.7.    Overpayments.    If at any time Grantor pays NPI Owner more than the amount then due with respect to the NPI to NPI Owner, NPI Owner shall not be obligated to return any such overpayment to Grantor, but the amount or amounts otherwise payable for any subsequent period or periods shall be reduced by such overpayment, unless such overpayment is disputed by NPI Owner, in which case Grantor shall not reduce any future payment by the amount of the disputed overpayment until such dispute is resolved.

Section 3.8.   <u>Past Due Payments</u>.  Any amount not paid by Grantor to NPI Owner with respect to the NPI when due shall bear, and Grantor hereby agrees to pay, interest at a rate equal to the Fixed Rate, from the due date until such amount has been paid.

<div align="center">

**ARTICLE IV**
**<u>PAYMENTS; MARKETING; AUDIT AND INSPECTION RIGHTS</u>**

</div>

Section 4.1.   <u>NPI Payments</u>.   Grantor shall pay to NPI Owner the NPI Payment attributable to each Production Period in immediately available U.S. funds on or before the Application Date for such Production Period.  NPI Owner and Grantor agree that all NPI Payments or other payments required to be made to NPI Owner hereunder shall be paid via wire transfer, or other agreed means, of immediately available funds to the Escrow Account and NPI Owner agrees that all funds in the Escrow Account will be used in accordance with the terms of the Deepwater Security Agreement and the Escrow Agreement without any further notice, consent or action to or from NPI Owner.

Section 4.2.   <u>Nature of Marketing Arrangements</u>.  Grantor shall have the obligation to prudently market, or cause to be prudently marketed, the Subject Hydrocarbons in arm's-length transactions with reputable purchasers who are not Affiliates.  Grantor shall duly and prudently perform all obligations performable by it under any arrangements by which Subject Hydrocarbons are sold or otherwise marketed, and shall take all appropriate measures to enforce the performance under each such arrangement of the obligations of the other parties thereto.

Section 4.3.   <u>Audit and Inspection Rights</u>.  NPI Owner shall have the right from time to time to audit the books and records of Grantor with respect to the Subject Interests and the Subject Hydrocarbons, including all information with respect to the matters to be reported on by Grantor as provided herein, and Grantor shall, within thirty (30) days after being invoiced therefor, pay (or reimburse NPI Owner for) the costs and expenses of one (but no more than one) such audit during each calendar year.  Such audits shall be conducted by NPI Owner so as to result in a minimum disruption in the ongoing business and affairs of Grantor and shall be conducted during normal business hours at Grantor's offices or at the offices where Grantor maintains the records relating to the items set forth above.  If, as a result of any such audit, it is determined that any amount is due NPI Owner as a result of the failure of Grantor to properly pay the full amount of any NPI Payment that is required to be made hereunder, Grantor shall pay NPI Owner the value (as reasonably determined by NPI Owner) of the proceeds which Grantor failed to remit, together with interest at the Fixed Rate from the date that such amount should have been delivered or paid in accordance with the terms of this Conveyance to the date of payment.  If, as a result of any such audit, it is determined that any amount is due Grantor as a result of overpayment by Grantor, such overpayment shall be resolved in accordance with <u>Section 3.7</u>.

<div align="center">

**ARTICLE V**
**<u>OPERATIONAL MATTERS</u>**

</div>

Section 5.1.   <u>Operations</u>.  Grantor shall conduct and carry on, or cause to be conducted and carried on, the development, maintenance and operation of the Subject Interests as a Reasonably Prudent Operator operating in the Outer Continental Shelf of the Gulf of Mexico without regard to the burden of the NPI.   Without limitation of the foregoing, Grantor, without

<div align="center">-14-</div>

regard to the burden of the NPI, (a) shall maintain and operate the Subject Interests in accordance with all applicable Laws in all material respects, including Environmental Laws and (b) pay promptly as and when due and payable by Grantor (i) all royalties and other lease burdens with respect to the Subject Interests or Subject Hydrocarbons (or necessary to maintain the Subject Interests in full force and effect), (ii) all Taxes which may be imposed on the Subject Interests or the Subject Hydrocarbons, and (iii) all costs and expenses of development, maintenance and operation of the Subject Interests.  Decisions with regard to the conduct of operations, including, with respect to the election to shut-in, abandon or make a non-consent election on any well located or proposed to be located on the Subject Interests, will be made by Grantor without regard to the burden of the NPI.  As to any portions of the Subject Interests, if any, as to which Grantor is not the operator, Grantor shall take all such action and exercise all such rights and remedies as are legally and reasonably available to it to cause the operator to so develop, maintain and operate such portions of the Subject Interests (*provided* that Grantor shall never be obligated to pay any costs or expenses attributable to any interest other than the Subject Interests and all royalties related thereto) but shall not be deemed to be in violation of any of its covenants or agreements hereunder in the event that such operator fails to do so. It is expressly understood that the powers given to Grantor in this <u>Section 5.1</u> shall include the power of Grantor to elect to participate, or not participate, in drilling, reworking, plugging back, deepening, sidetracking or completing of a well, or in other operations (including, but not limited to, operations in connection with secondary and/or tertiary recovery) proposed to be conducted on the Subject Interests.

Section 5.2.    <u>Title</u>.  Grantor hereby binds itself to WARRANT and FOREVER DEFEND all and singular title to the NPI unto NPI Owner, its successors and permitted assigns, against every Person lawfully claiming or to claim the same or any part thereof by, through or under Grantor, but not otherwise.

Section 5.3.    <u>Leases, Deeds and Contracts:  Performance of Obligations</u>.  Grantor agrees to use commercially reasonable efforts to maintain the oil, gas or mineral leases, contracts, servitudes, fees, deeds, and other agreements forming a part of the Subject Interests producing as of the Conveyance Date, to the extent the same cover or otherwise relate to the Subject Interests, in full force and effect to the extent a Reasonably Prudent Operator, without giving effect to the burden of the NPI or this Conveyance, would do so.

Section 5.4.    <u>Abandonment</u>.  Subject to <u>Section 5.3</u>, Grantor shall have the right without the joinder of NPI Owner to release, surrender and/or abandon its interest in the Subject Interests, or any part thereof, or interest therein even though the effect of such release, surrender or abandonment will be to release, surrender or abandon the NPI the same as though NPI Owner had joined therein insofar as the NPI covers the Subject Interests, or any part thereof or interest therein, so released, surrendered or abandoned by Grantor.  Grantor shall have an unequivocal right to abandon the Subject Interests, or any part thereof, if such abandonment is necessary for health, safety or environmental reasons or if the Subject Hydrocarbons cannot be produced in a manner sufficient to cover operating expenses.

Section 5.5.    <u>Compliance with Laws</u>.  Grantor will not cause or permit the Subject Lands or Grantor to be in violation of any Environmental Laws or other Laws with respect to the Subject Lands.

Section 5.6.    Non-consent Operations.  If Grantor elects to be a non-participating party with respect to any drilling, deepening, plugging back, reworking, sidetracking or completion (or other) operation on any Subject Interest or elects to be an abandoning party with respect to a Subject Well, the consequence of which election is that Grantor's interest in such Subject Interest or part thereof is temporarily (i.e., during a recoupment period) or permanently forfeited to the parties participating in such operations, or electing not to abandon such well, then the costs and proceeds attributable to such forfeited interest shall not, for the period of such forfeiture (which may be a continuous and permanent period), be debited or credited to the Net Profits Account and such forfeited interest shall not, for the period of such forfeiture, be subject to the NPI.

## ARTICLE VI
## ASSIGNMENTS AND TRANSFERS

Section 6.1.    Assignment and Transfer by NPI Owner.  NPI Owner may not sell, convey, assign, mortgage or otherwise dispose of the NPI (including its rights, titles, interests, estates, remedies, powers and privileges appurtenant or incident to the NPI under this Conveyance), in whole or in part without the prior written consent of Grantor, which may be withheld at Grantor's discretion.  No change of ownership of the NPI shall be binding upon Grantor, however, until Grantor is furnished with copies of the documents evidencing such change.  Each Person comprising NPI Owner may exercise the rights of NPI Owner attributable to its percentage share. Upon receipt by Grantor of copies of the documents evidencing a sale, conveyance, assignment, mortgage or other disposition of the NPI, Grantor shall thereafter deal with the transferee NPI Owner with respect to the NPI transferred to such transferee NPI Owner in place of the transferring NPI Owner and references herein to the NPI Owner with respect to the NPI transferred to such transferee NPI Owner shall thereafter be deemed to be references to such transferee NPI Owner, provided that the transferring NPI Owner shall continue to have, and benefit from, all rights to indemnification and reimbursement that are provided herein with regard to the period of its ownership of the NPI transferred to such transferee NPI Owner.

Section 6.2.    Assignment and Transfer by Grantor.  Except as contemplated in the Deepwater Security Agreement, any sale, conveyance or assignment of the Subject Interests, or any part thereof or interest therein, by Grantor shall be void.  Any sale, conveyance or assignment of the Subject Interests, or any part thereof or interest therein, permitted hereunder shall be subject to this Conveyance, and in the instrument effecting such sale, conveyance or assignment, the transferee or recipient must expressly recognize and assume all obligations, covenants and agreements of Grantor hereunder.

Section 6.3.    Covenants Running With the Subject Interests.    All covenants and agreements of Grantor herein contained shall be deemed to be covenants running with the Subject Interests.  All of the provisions hereof shall inure to the benefit of NPI Owner and its successors and assigns.

## ARTICLE VII
## MISCELLANEOUS PROVISIONS

Section 7.1.    Further Assurances.  Grantor agrees to execute and deliver to NPI Owner, and, to the extent it is within Grantor's power to do so, to cause any third parties to execute and

-16-

deliver to NPI Owner, all such other and additional instruments and to do all such further acts and things as may be necessary or appropriate to more fully vest in and assure to NPI Owner all of the rights, titles, interests, remedies, powers and privileges herein granted or intended so to be including executing, delivering and recording further conveyances to effect the provisions of Section 2.4.  NPI Owner agrees to execute and deliver to Grantor all such other and additional instruments and to all such further acts and things as may be necessary or appropriate to more fully implement the transactions contemplated by this Conveyance.

Section 7.2.    No Waiver.  The failure of any Party to insist upon strict performance of a covenant hereunder or of any obligation hereunder, irrespective of the length of time for which such failure continues, shall not be a waiver of such Party's right to demand strict compliance in the future.  No consent or waiver, express or implied, to or of any breach or default in the performance of any obligation hereunder shall constitute a consent or waiver to or of any other breach or default in the performance of the same or any other obligation hereunder.  No provision of this Conveyance shall be deemed a waiver by NPI Owner of any rights granted to NPI Owner under applicable Law governing overriding royalty interests and the rights of the owners thereof.

Section 7.3.    Authority of Parties/Signatories.  Each Person signing this Conveyance represents and warrants that he or she is duly authorized and has legal capacity to execute and deliver this Conveyance. Each Party represents and warrants to the other that the execution and delivery of this Conveyance and the performance of such Party's duties have been duly authorized and that this Conveyance is a valid and legal agreement binding on such Party and enforceable in accordance with its terms.

Section 7.4.    Public Announcements.  No Party shall issue any public announcement or statement concerning this Agreement or make any use of the names, image, logos, or trademarks of any other Party or any of its Affiliates without obtaining the prior written consent of the other Parties.

Section 7.5.    Time is of the Essence. Each Party shall perform the obligations under this Agreement in a timely manner as set out in this Agreement.  Each Party shall meet these timing requirements at its own cost. Each Party may recover against each other Party an amount equal to such Party damages arising from such other Party's failure to perform in time.

Section 7.6.    Applicable Law; Dispute Resolution.

(a)    Governing Law. This Agreement is governed by and interpreted in accordance with the laws of the State of Texas, without regard to its choice of law rules, except that the substantive and procedural rules of the Federal Arbitration Act, 9 U.S.C. §§ 1-16 (the "Act") govern Section 7.6(e).

(b)    Resolution of Disputes. The Parties shall exclusively and finally resolve any dispute between them using direct negotiations, mediation, and then arbitration as set out in this Section 7.6.

(c)    Direct Negotiations. If a dispute arises, a Party seeking to initiate the dispute resolution process shall give Notice to the other Party (or Parties) to the dispute setting out, in writing and in detail, the issues in dispute and the value of the disputed amount (the "Claim"). The

Parties to the dispute shall attempt to resolve the dispute through direct negotiations in a meeting between the Parties to the dispute, attended by individuals with decision-making authority, which must take place within thirty (30) days, or as otherwise agreed to by such Parties, from the date the Notice was sent.

(d)   <u>Mediation</u>. If the dispute cannot be resolved by direct negotiations within thirty (30) days of initiation of the resolution process, a Party to the dispute may initiate mediation by giving Notice to the other Party (or Parties) to the dispute. Mediation must be attended by a representative from each such Party with decision-making authority, and the proceeding must take place in Houston, Texas.

(e)   <u>Arbitration Proceedings</u>. If the Parties to a dispute fail to resolve the dispute within sixty (60) days from Notice of mediation, any Party (or Parties) the dispute may initiate binding arbitration by giving Notice to the other Party (or Parties) to the dispute. The arbitration must be conducted in accordance with the International Institute for Conflict Prevention and Resolution ("<u>CPR</u>") Rules. To the extent of any conflicts between the Act or the CPR Rules and the provisions of this Agreement, the provisions of this Agreement prevail. The CPR is the appointing authority. The place of arbitration must be Houston, Texas.

The following provisions will apply to arbitration proceedings, in each case with respect to the Parties to a particular dispute:

1. One arbitrator (or three (3) arbitrators if the monetary value of the dispute is more than US $5,000,000 or its currency equivalent) will conduct the arbitral proceedings in English. If there is a dispute whether the monetary value exceeds the US $5,000,000, then the number of arbitrators must be three (3).

2. The maximum number of witnesses each Party may call to give evidence on its behalf, including by oral testimony, declaration or witness statement, is five (5) witnesses of fact and three (3) expert witnesses.

3. The existence of a dispute and any negotiations, mediation, and arbitration proceedings between the Parties in relation to any dispute are confidential and the Parties shall not make any disclosure to any third party. Any information, documents, or materials, created or produced for the purposes of, or used in, negotiations, mediation, or arbitration of a dispute are confidential and the Parties shall not disclose them to any third party unless there is a legal or regulatory obligation to make a disclosure (but the disclosure must be limited to the extent necessary to comply with that legal or regulatory obligation), or to the extent required to enforce or challenge an award in bona fide legal proceedings before a state court or other judicial authority.

4. The arbitrator(s) has no authority to appoint or retain expert witnesses for any purpose unless agreed to by the Parties. The arbitrator(s) may not act as *amiable compositeur or ex aequo et bono*.

5. The Parties intend that regardless of which Party prevails, all arbitration fees and costs must be split equally, between the Parties, and each Party shall bear its own costs of legal representation, witness expenses, and ancillary costs.

6. The award is final and binding, and except for proceedings under <u>Section 7.6(e)(7)</u>, the Parties agree to waive their rights to: (1) apply to the court for determination of a point of law; and (2) any form of appeal, review or recourse in respect of any such award to any court or other judicial authority, to the extent that such waiver may be validly made.

7. The Parties may apply to a court with appropriate jurisdiction for any of the following without waiving its arbitration rights:

    (1) Interim measures as necessary until appointment of the arbitrator(s) or pending determination by the arbitrator(s).

    (2) Preserving property pending determination by the arbitrator(s).

    (3) Enforcing judgment entered on an award over the Person or assets of the non-prevailing Party.

    (4) Enforcing <u>Section 7.6(e)(3)</u> and preventing any information, documents or materials used in those proceedings from being used or disclosed by that Party for any purpose other than enforcement of <u>Section 7.6(e)(3)</u>.

8. Proceedings to (1) preserve property pending determination by the arbitrator(s), (2) enforce <u>Section 7.6(e)(3)</u>, (3) enforce judgment entered on an award may be brought in any court having jurisdiction over the Person or assets of the non-prevailing Party. The prevailing Party may seek, in any court having jurisdiction, judicial recognition of the award, or order of enforcement or any other order or decree that is necessary to give full effect to the award.

Section 7.7.   <u>Severability</u>.   Every provision in this Conveyance is intended to be severable.  If any term or provision hereof is determined to be invalid, illegal or unenforceable for any reason whatsoever, such invalidity, illegality or unenforceability shall not affect the validity, legality and enforceability of the remainder of this Conveyance.  The Parties further agree that if any provision contained herein is, to any extent, held invalid or unenforceable in any respect under the Laws governing this Conveyance, they shall take any actions necessary to render the remaining provisions of this Conveyance valid and enforceable to the fullest extent permitted by Law and, to the extent necessary, this Conveyance shall be deemed to be automatically amended to replace any provision contained herein that is held invalid or unenforceable with a valid and enforceable provision giving effect to the intent of the Parties to the greatest extent legally permissible.

Section 7.8.   <u>Notices</u>.   Any notice, request, instruction, correspondence or other document to be given hereunder by any Party to another (herein collectively called "<u>Notice</u>") shall be in writing and delivered (i) in person, (ii) by courier service or by overnight delivery service in each case that requires acknowledgement of receipt, (iii) mailed by certified mail, postage prepaid and return receipt requested, or (iv) delivered by electronic mail and expressly acknowledged as received by return electronic mail, as follows:

**<u>Grantor</u>**

Mako Buyer LLC
2000 W. Sam Houston Parkway S., Suite 1200
Houston, Texas 77042
Attention: Thomas R. Lamme
Phone: (713) 969-1107

Email: TLamme@fwellc.com

**NPI Owner**

[To Come]

Notice given by personal delivery or courier shall be effective upon actual receipt. Notice given by mail shall be effective upon actual receipt or, if not actually received, the fifth Business Day following deposit with the U.S. Post Office. Notice given by electronic mail shall be effective upon acknowledgement of receipt. If a date specified herein for giving any Notice or taking any action is not a Business Day (or if the period during which any Notice is required to be given or any action taken expires on a date which is not a Business Day), then the date for giving such Notice or taking such action (and the expiration date of such period during which Notice is required to be given or action taken) shall be the next day which is a Business Day. Any Party may change any address, electronic or otherwise, to which Notice is to be given to it by giving Notice as provided above of such change of address.

Section 7.9.    Indemnity.

(a)    As used herein, "NPI Owner Indemnitees" means NPI Owner and NPI Owner's successor and permitted assigns, all of their respective Affiliates, and all of the officers, directors, agents, beneficiaries, trustees, attorneys and employees of themselves and their Affiliates.

(b)    Grantor will, promptly upon demand, indemnify and hold each NPI Owner Indemnitee harmless from and against all claims, demands, damages, liabilities, liens, losses, fines, penalties, charges, administrative and judicial proceedings, orders, judgments, remedial action requirements, investigations, and enforcement actions of any kind, together with all interest thereon and all costs and expenses related thereto (including reasonable fees and disbursements of counsel and other advisors) and all other obligations whatsoever (collectively, "Losses") arising, in whole or in part, directly or indirectly, from or in connection with any of the following:

(i)    the acquiring, exploring, drilling, completing, developing, operating, producing, maintaining, reworking, redrilling, recompleting, plugging, abandoning or otherwise disposing of any Subject Interests or any Subject Wells, or other operations on any of the Subject Lands, or the production of Subject Hydrocarbons, or the dehydration, compression, treatment, gathering, transporting, processing or other handling of any Subject Hydrocarbons,

(ii)    any Losses suffered by any NPI Owner Indemnitee as a result of any claim that NPI Owner must deliver or pay over to any Person any part of the payments attributable to the Subject Hydrocarbons at any time received by NPI Owner for any reason other than the sale or assignment of interests in such payments (or the NPI under which such payments are received) by NPI Owner, or

(iii)     any breach by Grantor of any of its representations, warranties, covenants or agreements herein or any matters relating to the enforcement or defense of this Conveyance by NPI Owner.

(c)     **THE FOREGOING INDEMNITY WILL APPLY WHETHER OR NOT ARISING OUT OF THE SOLE, JOINT OR CONCURRENT NEGLIGENCE, FAULT OR STRICT LIABILITY OF ANY NPI OWNER INDEMNITEE, ANY PERSON THAT IS PART OF GRANTOR, OR ANY OTHER PERSON, AND WILL APPLY, WITHOUT LIMITATION, TO ANY LIABILITY IMPOSED UPON ANY NPI OWNER INDEMNITEE, ANY PERSON THAT IS PART OF GRANTOR, OR ANY OTHER PERSON AS A RESULT OF ANY THEORY OF STRICT LIABILITY OR ANY OTHER DOCTRINE OF LAW**, *provided* that the foregoing indemnity will not apply to any Losses incurred by any NPI Owner Indemnitee to the extent proximately caused by the gross negligence or willful misconduct of such NPI Owner Indemnitee.  The rights of the NPI Owner Indemnitees under this Section 7.9 will survive any termination of this Conveyance and will be in addition to, and not in replacement or limitation of, all other indemnities, reimbursement rights, and other similar rights and assurances at any time made by Grantor for the benefit of any NPI Owner Indemnitee.

Section 7.10.  No Partition.  Grantor and NPI Owner acknowledge that neither has any right or interest that would permit it to partition any portion of the Subject Interests as against the other, and each waives any such right.

Section 7.11.  Disclaimer.  EXCEPT AS SET FORTH IN SECTION 5.2, GRANTOR MAKES THIS CONVEYANCE AND ASSIGNS THE NPI WITHOUT RECOURSE, COVENANT OR WARRANTY OF TITLE OF ANY KIND, EXPRESS, IMPLIED OR STATUTORY.  ANY COVENANTS OR WARRANTIES IMPLIED BY STATUTE OR LAW BY THE USE HEREIN OF THE WORDS "GRANT", "CONVEY" OR OTHER SIMILAR WORDS ARE HEREBY EXPRESSLY DISCLAIMED, WAIVED AND NEGATED. WITHOUT LIMITING THE GENERALITY OF THE TWO PRECEDING SENTENCES, NPI OWNER ACKNOWLEDGES THAT GRANTOR HAS NOT MADE, AND GRANTOR HEREBY EXPRESSLY DISCLAIMS AND NEGATES, AND NPI OWNER HEREBY EXPRESSLY WAIVES, ANY REPRESENTATION OR WARRANTY, EXPRESS, IMPLIED, AT COMMON LAW, BY STATUTE OR OTHERWISE RELATING TO (i) PRODUCTION RATES, RECOMPLETION OPPORTUNITIES, DECLINE RATES OR THE QUALITY, QUANTITY OR VOLUME OF THE RESERVES OF HYDROCARBONS, IF ANY, ATTRIBUTABLE TO THE SUBJECT INTERESTS, (ii) ANY IMPLIED OR EXPRESS WARRANTY OF MERCHANTABILITY, (iii) ANY IMPLIED OR EXPRESS WARRANTY OF FITNESS FOR A PARTICULAR PURPOSE, (iv) ANY IMPLIED OR EXPRESS WARRANTY OF CONFORMITY TO MODELS OR SAMPLES OF MATERIALS, (v) REDHIBITORY DEFECTS, AND (vi) ANY AND ALL IMPLIED WARRANTIES EXISTING UNDER ANY APPLICABLE LEGAL REQUIREMENT; IT BEING THE EXPRESS INTENTION OF BOTH THE GRANTOR AND THE NPI OWNER THAT THE NPI IS HEREBY ASSIGNED TO NPI OWNER ON AN "AS IS" AND "WHERE IS" BASIS WITH ALL FAULTS, AND THAT NPI OWNER HAS MADE OR CAUSED TO BE MADE SUCH INSPECTIONS AS NPI OWNER DEEMS APPROPRIATE.  GRANTOR AND NPI OWNER AGREE THAT, TO THE EXTENT REQUIRED BY APPLICABLE LAW TO BE EFFECTIVE,

THE DISCLAIMERS OF CERTAIN WARRANTIES CONTAINED IN THIS <u>SECTION 7.11</u> ARE "CONSPICUOUS" DISCLAIMERS FOR THE PURPOSES OF ANY APPLICABLE LAW.

Section 7.12.   <u>Amendments</u>.   This Conveyance may not be modified or amended except by an instrument or instruments in writing signed by Grantor and NPI Owner.  Provisions of this Conveyance that require consent, approval or agreement of the Parties or of one Party shall require such consent, approval or agreement to be in writing.

Section 7.13.   <u>Counterparts</u>.   This Conveyance is being executed in several counterparts, all of which are identical, except that, to facilitate recordation, in certain counterparts hereof only that portion of <u>Exhibit A</u> which contains specific descriptions of the Subject Interests located in the recording jurisdiction in which the counterpart is to be recorded shall be included, and all other portions of <u>Exhibit A</u> shall be included by reference only.  All of such counterparts together shall constitute one and the same instrument.  Complete copies, of this Conveyance, containing the entire <u>Exhibit A</u>, have been retained by Grantor and NPI Owner.

Section 7.14.   <u>Third Party Beneficiary</u>.  The Parties acknowledge that Chevron U.S.A. Inc. is a third party beneficiary to this Conveyance and can enforce the rights of NPI Owner hereunder.

*[Remainder of page intentionally left blank]*

IN WITNESS WHEREOF, Grantor and NPI Owner have each executed this Conveyance on the dates set forth in their respective acknowledgments below and Grantor has delivered this Conveyance to NPI Owner as the transfer and conveyance to NPI Owner of a presently vested interest in real and/or immovable property, to be effective as of the Effective Time.

**[Other Relevant State Acknowledgments To Come.]**

**GRANTOR:**                                    **MAKO BUYER LLC**

By:_____
    Name:
    Title:

**TEXAS ACKNOWLEDGEMENT**

**STATE OF** _____          §
                                                §

**COUNTY OF** _____          §

The foregoing instrument was acknowledged before me this _____ day of _____, 2021 by _____, as _____ of [_____], a [_____], as the act and deed of such [_____].


_____

Name:_____

Notary Public in and for the State of
_____

**NPI OWNER:**                                    [_____]

                                                By:_____
                                                Name:
                                                Title:


### TEXAS ACKNOWLEDGEMENT

**STATE OF** _____          §

                                                §

**COUNTY OF** _____          §


        The foregoing instrument was acknowledged before me this \_\_\_\_\_ day of _____, 2021 by _____, as _____ of [_____], a [_____], as the act and deed of such [_____].


                    _____

                    Name:_____

                    Notary Public in and for the State of _____


*[Signature Page and Texas Acknowledgment to Conveyance]*

**Exhibit A**

**Leases**

**<u>EXHIBIT C</u>**

**<u>FORM OF LC</u>**

See attached.

Exhibit C – Page 1
Decommissioning Funding Agreement

## IRREVOCABLE STANDBY LETTER OF CREDIT

**DATE:**            [Insert Date]

**APPLICANT:**
Mako Buyer LLC
2000 W. Sam Houston Pkwy S. Suite 1200
Houston, Texas 77042
Attn:   Thomas R. Lamme
Phone:  (713) 969-1107

**BENEFICIARY:**
Chevron U.S.A. Inc.
100 Northpark Boulevard
Covington, LA 70433
Attn:   Land Manager
Phone: (985) 773-6538
Email:  tdwebre@chevron.com

By order and for the account of Mako Buyer LLC, a Delaware limited liablity company ("**Applicant**"), [Insert Name of Bank] (the "**Bank**" or "**we**" or "**us**" or "**our**") opens our irrevocable standby letter of credit no. [Insert Number] (this "**Letter of Credit**") in favor of  Chevron U.S.A. Inc. ("**Beneficiary**") for an amount up to [_____] U.S. dollars ($[_____]), expiring at our counters with the close of business on [Insert Date].

Payments under this Letter of Credit are available to Beneficiary upon presentation of a statement in the form of Annex 1 attached to this Letter of Credit purportedly signed by an authorized representative of Beneficiary. The amount of such draft will not exceed [_____] U.S. dollars ($[_____]). Such presentation may be made to us in person, or by courier or facsimile transmission. Presentations by facsimile transmission are permitted to us at facsimile no. [Insert Fax Number], Attention: [Insert Name].

Multiple and partial drawings may be made under this Letter of Credit. Each drawing paid by us will permanently reduce the available amount of this Letter of Credit by the amount paid. Notwithstanding any contrary provision in this Letter of Credit, in no event will the total of the amounts payable under this Letter of Credit exceed [_____] U.S. dollars ($[_____]) in the aggregate.

The expiration date of this Letter of Credit will be automatically extended without amendment for additional periods of one year from the present or any future expiration date of this Letter of Credit, unless we notify Beneficiary by certified mail at least sixty calendar days prior to the expiration date then applicable, that we elect not to renew this Letter of Credit for an additional one year period.

Each presentation under this Letter of Credit will be honored by [Insert Time] p.m. on the day on which such demand is received if such demand is received before [Insert Time] on that day. Any demand received after that time will be honored by [Insert Time] p.m. on the next day on which we are open for business. Payments must be made in full without any deduction or withholding (whether in respect of set off, counterclaim, duties, present or future taxes, charges or otherwise whatsoever). Upon presentation of a demand in the form of Annex 1, our obligation to make such payment shall be irrevocable and unconditional, without regard to any circumstance, including following the bankruptcy of, or insolvency with respect to, the Applicant.

WEIL:\97994501\2\45327.0007

All fees associated with this Letter of Credit are for the Applicant's account.

Spelling and typographical errors are not to be considered discrepancies, except for numbers and amounts.

All amendments and notices to Beneficiary must be delivered via courier at 100 Northpark Boulevard Covington, LA  70433, Attention: [Insert Job Title, e.g., Finance Manager].

If the original Letter of Credit is lost, stolen, mutilated or destroyed, then, subject to Beneficiary providing us with an indemnity stating that Beneficiary shall indemnify us for all losses it may incur as a result of issuing a replacement letter of credit, we shall issue a replacement letter of credit.

This Letter of Credit is freely transferrable and the proceeds of draws under this Letter of Credit are freely assignable.

This Letter of Credit is subject to the International Standby Practices 98, International Chamber of Commerce Publication Number 590 ("**ISP 98**") (excluding Rule 3.12). As to matters not governed by ISP 98, this Letter of Credit will be governed by the laws of the State of [_____] (without regard to conflicts of law provisions). We irrevocably agree that any legal action or proceeding with respect to this Letter of Credit must be brought in the courts of the State of [_____].

Please direct any correspondence including drawing or inquiry to us at [Insert Bank Name, Address, or Other Contact Information].

**BANK:**
**[INSERT ISSUING BANK NAME]**

**By:**
**Name:**     [Insert Authorized Name - Bank]

**Title:**     [Insert Authorized Title - Bank]

## ANNEX 1 TO STANDBY LETTER OF CREDIT
## NO. [INSERT CREDIT NUMBER]
## DATED [INSERT DATE]

[Insert Date]

[Insert Issuing Bank Name]
[Insert Issuing Bank Address]

Re: Letter of Credit No. [Insert Letter of Credit Number] dated [Insert Letter of Credit Date]

Dear Ladies and Gentlemen:

This is a demand for payment of [Insert Specific Amount In Words] U.S. dollars ($[Insert Specific Amount In Numbers]) under the above-referenced standby letter of credit. We certify that we are entitled to demand payment under such letter of credit pursuant to that certain Decommissioning Funding Agreement (as amended, restated, supplemented or otherwise modified), dated as of [_____], 2021, by and between Mako Buyer LLC, a Delaware limited liablity company, and Chevron U.S.A. Inc., a Pennsylvania corporation.

Please pay the amount demanded to the following account:

[Insert Specific Details]

**BENEFICIARY:**

**CHEVRON U.S.A. INC.**

**By:**

**Name:**    [Insert Beneficiary Name]

**Title:**    [Insert Beneficiary Title]

3

## **EXHIBIT D**

## **FORM OF ESCROW AGREEMENT**

See attached.

*Exhibit D to the Decommissioning Funding Agreement*

## ESCROW AGREEMENT

THIS ESCROW AGREEMENT (this "**Agreement**") is made and entered into this [--] day of [--] (the "**Effective Date**"), by and among Chevron U.S.A. Inc., a Pennsylvania corporation ("**CUSA**"), Mako Buyer LLC, a Delaware limited liability company ("**Operator**"), and **U.S. BANK NATIONAL ASSOCIATION**, as escrow agent (in such capacity, "**Escrow Agent**").  Operator and CUSA are sometimes referred to in this Agreement individually as "**Party**" or collectively as the "**Parties**".

## RECITALS

A.      CUSA and Operator have entered into that certain Decommissioning Funding Agreement, dated as of [____], 2021 (as amended, restated, supplemented or otherwise modified, the "**Decommissioning Agreement**").  Capitalized terms used but not defined in this Agreement have the meanings assigned thereto in the Decommissioning Agreement.

B.      As part of the consideration under the Decommissioning Agreement, and subject to the terms of the Decommissioning Agreement, the Parties have agreed that if applicable pursuant to Section 2.2 of the Decommissioning Agreement, any and all amounts payable under the NPI Grant (as defined in the Decommissioning Agreement) shall be deposited into the Escrow Account until the aggregate funding from all Applicable Required Securities (as defined in the Decommissioning Agreement) is equal to the Coverage Amount (as defined in the Decommissioning Agreement).

C.      CUSA and Operator have requested, and Escrow Agent has agreed, that Escrow Agent will hold the Escrowed Funds, invested as provided for in this Agreement, for the purposes set forth in the Decommissioning Agreement and make disbursements to the Parties as provided in this Agreement.

D.      In consideration of the premises and the mutual covenants set out in this Agreement, and other good and valuable consideration, the receipt and sufficiency of which is acknowledged, the Parties and the Escrow Agent agree to be bound by the provisions of this Agreement (and, solely as between the Parties, the provisions of the Decommissioning Agreement).

## 1.      DEPOSIT TO THE ESCROW ACCOUNT.

1.1      Operator shall from time to time deposit any and all amounts payable under the NPI Grant into the Escrow Account until the aggregate funding from all Applicable Required Securities is equal to the Coverage Amount (such aggregate amount of funds, the "**Escrow Amount**"), and Escrow Agent hereby confirms that all or any portion of the Escrow Amount deposited from time to time in the Escrow Account will be available for payment in accordance with this Agreement.  For purposes of this Agreement:

(A)      "**Escrow Account**" means the deposit account of Escrow Agent bearing number [--] maintained by and with Escrow Agent for the benefit of CUSA and Operator pursuant to this Agreement.

(B)      "**Banking Day**" means any day other than a Saturday, Sunday or day when Escrow Agent is authorized or required to be closed for business to the public.

(C)      "**Dollars**" and "**US$**" means United States Dollars.

1.2     Escrow Agent will hold the Escrow Amount (including any interest accrued thereon as a result of the Permitted Investments) in the Escrow Account (collectively, the "**Escrowed Funds**"), for the benefit of CUSA and Operator, and will disburse the Escrowed Funds solely in accordance with this Agreement.

## 2.     DISBURSEMENT OF ESCROWED FUNDS.

2.1     Escrow Agent shall not disburse or otherwise transfer any Escrowed Funds except as follows:

(A)     After receipt from a duly authorized representative of CUSA from time to time of executed disbursement instructions in the form attached hereto as Exhibit A (each, a "**Disbursement Notice**"), that are executed by only CUSA and specifically reference this Section 2.1(A), Escrow Agent will disburse, within one (1) Banking Day (but no later than the third Banking Day) after receipt of such Disbursement Notice to CUSA the portion of Escrowed Funds equal to the amount set forth in such Disbursement Notice.  CUSA will only give Escrow Agent Disbursement Notices pursuant to this Section 2.1(A) in the circumstances and in the amounts permitted by Section 2.4(c) of the Decommissioning Agreement.

(B)     After receipt from a duly authorized representative of each of the Parties from time to time of a Disbursement Notice executed by each of CUSA and Operator, that specifically references this Section 2.1(B), Escrow Agent will disburse, within one (1) Banking Day (but no later than the third Banking Day) after receipt of such Disbursement Notice to Operator the portion of Escrowed Funds equal to the amount set forth in such Disbursement Notice.  The Parties will only give Escrow Agent Disbursement Notices pursuant to this Section 2.1(B) in the circumstances and in the amounts permitted by Section 2.4(a), Section 2.4(b) and Section 2.4(d) of the Decommissioning Agreement.

(C)     After receipt from a duly authorized representative of each of the Parties from time to time of a Disbursement Notice executed by each of CUSA and Operator, that specifically references this Section 2.1(C), Escrow Agent will disburse, within one (1) Banking Day (but no later than the third Banking Day) after receipt of such Disbursement Notice to the Party or Parties indicated in such Disbursement Notice the portion of Escrowed Funds equal to the amount set forth in such Disbursement Notice. The Parties will only give Escrow Agent Disbursement Notices pursuant to this Section 2.1(C) in the circumstances and in the amounts permitted by Section 2.4(e) and Section 2.4(f) of the Decommissioning Agreement.

(D)     Escrow Agent shall transfer and deposit the Escrowed Funds as provided in Sections 5 and 6.1(A).

2.2     Escrow Agent may conclusively rely on without question, investigation, consent of or additional notice to either Party, and act upon, in each case, (A) the written instructions from a duly authorized representative of CUSA given pursuant to a Disbursement Notice with respect to the Escrow Account and Escrowed Funds if given in accordance with Section 2.1(A) and (B) the joint written instructions from a duly authorized representative of each of the Parties given pursuant to a Disbursement Notice with respect to the Escrow Account and Escrowed Funds if given in accordance with Section 2.1(B), Section 2.1(C), Section 5 or Section 6.1(A). For the avoidance of doubt, Escrow Agent may not take any

action with respect to the Escrow Account, the Escrowed Funds or this Agreement based upon the unilateral instruction from Operator (or any person or entity acting on its behalf, including any trustee or the equivalent on its behalf in any insolvency, bankruptcy, receivership or similar proceeding) unless CUSA agrees in writing thereto.

**3.      DUTIES OF ESCROW AGENT.**

3.1      The duties of Escrow Agent shall be as follows:

(A)      During the term of this Agreement, Escrow Agent shall hold and disburse the Escrowed Funds in accordance with only the terms and provisions of this Agreement (*provided* that, for the avoidance of doubt, the Parties are bound by the terms of the Decommissioning Agreement and will only instruct the Escrow Agent to make disbursements of the Escrowed Funds in accordance with the terms of the Decommissioning Agreement).

(B)      Escrow Agent shall be obligated only for the performance of the duties as are specifically set forth in this Agreement.  Escrow Agent has no fiduciary or discretionary duties of any kind.  Escrow Agent assumes no liability in connection with this Agreement except for its negligence, gross negligence, fraud or willful misconduct.  Escrow Agent shall in no case or event be liable for punitive, incidental or consequential damages (including, but not limited to, lost profits).

(C)      Except as provided in Sections 3.1(B) and 9.1, Escrow Agent shall not be responsible for the validity, correctness or genuineness of any document, statement, invoice or notice submitted to it by the Parties under this Agreement, provided that such documents, statements, invoices or notices are delivered by at least one of the Parties. Escrow Agent may seek advice from its own counsel and, except as provided in Sections 3.1(B) and 9.1, shall be fully protected in any action reasonably taken by it in good faith reliance upon the advice of its counsel.

**4.      STATEMENTS.**

4.1      The Escrow Agent shall send statements on the status of the Escrow Account to CUSA and Operator on a monthly basis, showing any disbursements and to whom disbursed, any service charges levied, all earnings on or attributable to the Escrowed Funds, opening and closing balances and the type of investments and rates of earnings on the Escrowed Funds. Each of CUSA and Operator may request and obtain reasonable additional information concerning such matters from the Escrow Agent.

**5.      REMOVAL OF OR RESIGNATION OF ESCROW AGENT.**

5.1      CUSA and Operator may at any time remove Escrow Agent upon thirty (30) days' prior written notice with or without cause by any instrument or instruments in writing signed by authorized representatives of both CUSA and Operator and delivered to Escrow Agent.

5.2      Escrow Agent may resign at any time on ninety (90) days' prior written notice to the Parties hereto by delivering written notice of its intended resignation to the Parties; *provided* that such resignation shall not be effective until a successor escrow agent has been appointed and accepted its appointment.  If Operator and CUSA jointly designate in writing a successor escrow agent, then Escrow Agent shall transfer the Escrowed Funds to such

successor and, once the Escrowed Funds have been securely transferred to such successor, Escrow Agent shall be discharged of any liability or responsibility with respect to the Escrowed Funds arising from and after the date that Escrow Agent delivers the Escrowed Funds to the designated successor Escrow Agent.

**6.    TERMINATION.**

6.1    This Agreement shall terminate upon the earliest of the following:

(A)    Receipt by Escrow Agent of a joint written notice of termination signed by authorized representatives of both CUSA and Operator, whereupon Escrow Agent shall disburse all remaining Escrowed Funds to the applicable Party stated in such notice.

(B)    Following release by Escrow Agent of all the Escrowed Funds in accordance with this Agreement upon written confirmation by the Parties to Escrow Agent that the NPI Grant has been terminated.

(C)    Upon termination in accordance with any other provision of this Agreement.

Upon termination of this Agreement, none of the Parties, on the one hand, or Escrow Agent, on the other, shall have any further rights, duties or obligations under this Agreement to the other; *provided* that this statement in no way affects the obligations of the Parties to each other under the Decommissioning Agreement.

**7.    NOTICES.**

7.1    All notices and other communications to Operator, CUSA or Escrow Agent may be hand delivered or sent by email or courier, to any Party or the Escrow Agent at the addresses provided in this Section 7:

**If to Operator**:

Mako Buyer LLC
2000 W. Sam Houston Pkwy S. Suite 1200
Houston, Texas 77042
Attn:        Thomas R. Lamme
Telephone:  (713) 969-1107
Email:        TLamme@fwellc.com

**If to CUSA**:

Chevron U.S.A. Inc.
100 Northpark Boulevard
Covington, LA 70433
Attn:        Land Manager
Telephone:  (985) 773-6538
Email:        tdwebre@chevron.com

**If to Escrow Agent**:

U.S. Bank National Association
One California Street, Suite 1000
San Francisco, CA 94111
Attn:   Global Corporate Trust
        David A. Jason, Vice President
Telephone: (415) 677-3622
Facsimile: (415) 677-3769
Email: david.jason@usbank.com

7.2     For all purposes of this Agreement, a notice or communication will be deemed effective: on the day it is delivered unless (a) that day is not a day upon which commercial banks are open for the transaction of business in the city specified (a "**Local Banking Day**") in the address for notice provided by the recipient or (b) if delivered after the close of business on a Local Banking Day, then on the next succeeding Local Banking Day.

**8.      FEE.**

8.1     Operator shall pay Escrow Agent the compensation in accordance with the fee schedule attached as <u>Exhibit B</u> hereto.  If not paid by Operator within ten Banking Days of demand, Escrow Agent shall have the right to set off against the Escrowed Funds (A) the amounts due in such fee schedule, and (B) as provided for in Section 10.  Otherwise, Escrow Agent shall have no right of set off against the Escrowed Funds and shall have no lien or security interest in the Escrow Account or the Escrowed Funds.  CUSA shall have no obligation to pay fees to Escrow Agent.

**9.      INDEMNIFICATION.**

9.1     In consideration of Escrow Agent's acceptance of this appointment, each Party hereby agrees to indemnify and hold Escrow Agent harmless as to any liability, and reasonable and duly documented costs and expenses (including, without limitation, counsel fees and expenses) which Escrow Agent may suffer or incur by reason of (a) any action, claim or proceeding brought against Escrow Agent by such Party and arising out of or relating in any way to this Escrow Agreement or the transaction to which Agreement relates, except in the case of Escrow Agent's negligence, gross negligence, fraud or willful misconduct and (b) Escrow Agent's enforcement of its rights under this Section 9.  The foregoing indemnification and agreement to hold harmless shall survive any resignation or removal of Escrow Agent and shall survive the termination of this Agreement.

**10.     INVESTMENTS.**

10.1    Escrow Agent shall invest Escrowed Funds only in investments described on <u>Exhibit C</u> into which the Parties direct Escrow Agent in writing to invest ("**Permitted Investments**"); and Escrow Agent shall have no power or authority to invest or reinvest the Escrowed Funds except in such investments.  All investments held in the name of Escrow Agent shall be held as the agent of the Parties.  In the absence of written investment instructions described above, Escrow Agent shall invest the Escrowed Funds to the extent reasonably practicable in the investment identified in clause (a) in <u>Exhibit C</u>.  Escrow Agent may make Permitted Investments through its own investment department or through affiliates.  Interest earned will become part of the Escrowed Funds.  Escrow Agent represents and warrants that neither it nor any affiliate of it will receive any compensation, commissions, fees (including, without limitation, any sale load charges, redemption fees,

5

exchange fees, account fees, purchase fees, management fees, distribution fees, service fees or charges or similar payment) in connection with any investment of the Escrowed Funds except as disclosed on <u>Exhibit B</u>.  The representation and warranty in the preceding sentence shall be deemed to have been made and repeated by Escrow Agent on each occasion on which any investment is made with any portion of the Escrowed Funds. Escrow Agent may elect, but shall not be obligated, to credit the Escrow Account with funds representing income or principal payments due on, or sales proceeds due in respect of, assets in any of the Escrow Account, or to credit to any of the Escrow Account assets intended to be purchased with such funds, in each case before actually receiving the requisite funds from the payment source, or to otherwise advance funds for Escrow Account transactions.  Notwithstanding anything else in this Agreement, any such crediting of funds or assets shall be provisional in nature, and the Escrow Agent shall be authorized to reverse any such transactions or advances of funds in the event that it does not receive good funds with respect thereto.

**11. CONFLICTS OF INTEREST.**

11.1    No director, employee or agent of Escrow Agent shall give to or receive from any director, employee or agent of the Parties or any affiliate thereof any commission, fee, rebate, or any gift or entertainment of significant cost or value, or enter into any business arrangement with any director, employee or agent of the Parties or any affiliate thereof other than as a representative of the Parties or their affiliates, in connection with the services provided hereunder without the Parties' prior written consent.  Escrow Agent shall promptly notify the Parties of any violation of this provision and any consideration received as a result of such violation shall be paid over or credited to the Parties.  Additionally, if any violation of this provision occurring prior to the date of this Agreement resulted directly or indirectly in the Parties' consent to enter into this Agreement with Escrow Agent, the Parties may, at their sole option, terminate this Agreement at any time and, notwithstanding any other provision of this Agreement, pay no compensation or reimbursement to Escrow Agent whatsoever for any services provided after the date of termination.

**12. NO PAYMENT TO GOVERNMENT OFFICIALS.**

12.1    Neither Escrow Agent nor its employees, agents or subcontractors shall make any payment or give anything of value to any official of any government or public international organization, including any officer or employee of any government department, agency, or instrumentality to influence his or its decision, or to gain any other advantage for any Party or Escrow Agent in connection with the services performed hereunder.  Any party to this Agreement shall immediately notify the other parties to this Agreement of any violation of this Section.  Each party to this Agreement shall hold the others harmless from and against all losses and expenses arising out of any such violation.  In the event of any violation of this Section, any party to this Agreement may, at its sole option, terminate this Agreement at any time.

**13. RIGHT TO AUDIT.**

13.1    Escrow Agent shall maintain true and correct records in connection with all matters relating to this Agreement and retain such records for the greater of 24 months or such period of time as is required by the Escrow Agent's document retention policies.  Any representative(s) authorized by the Parties may in a reasonable time and to a reasonable

extent audit records of Escrow Agent for the sole purpose of determining whether there has been compliance with the applicable provisions of this Agreement.

14.   **TAX REPORTING.**

14.1   Each Party shall provide Escrow Agent a properly completed and duly executed applicable U.S. Internal Revenue Service ("**IRS**") Form W-9 for each payee to which it directs payment. If such tax documentation is not so provided, Escrow Agent is authorized to withhold taxes as required by the U.S. Internal Revenue Code and regulations promulgated thereunder. Operator and CUSA have determined that any interest or income on Escrowed Funds shall be reported on an accrual basis and deemed to be for the account of CUSA, and Operator and CUSA shall prepare and file all required tax filings with any applicable taxing authority consistent therewith.

14.2   Operator and CUSA shall provide Escrow Agent with all information requested by Escrow Agent necessary for (a) the preparation and filing by Escrow Agent with the IRS or other taxing authority of any applicable IRS Form 1099, IRS Form 1042-S, or similar document, or (b) the performance by Escrow Agent of any reporting obligations under the Foreign Account Tax Compliance Act, Foreign Investment in Real Property Tax Act, or other applicable law or regulation, in each case to the extent related to the performance or fulfilment of Escrow Agent's duties and obligations pursuant to this Agreement.

15.   **MISCELLANEOUS.**

15.1   This Agreement (and, solely as between the Parties, the Decommissioning Agreement and the NPI Grant) sets forth the entire agreement of the Parties and Escrow Agent with respect to the subject matter hereof.  The provisions of this Agreement may be waived, altered, amended or supplemented, in whole or in part, only by writing signed by each of the Parties and Escrow Agent.  Neither this Agreement nor any right or interest hereunder may be assigned in whole or in part by any party to this Agreement, except to affiliates of such party, without the prior written consent of the other parties hereto.

15.2   This Agreement shall be governed by and construed under the laws of the State of Texas, without giving effect to its conflict of law principles; provided, however, that nothing herein shall be construed to modify or negate the agreement of CUSA and Operator, solely as between themselves, that all disputes between them shall be resolved exclusively and finally pursuant to the dispute resolution provisions in the Decommissioning Agreement.

15.3   No party to this Agreement is liable to any other party hereto for losses due to, or if it is unable to perform its obligations under the terms of this Agreement because of, acts of God, fire, war, earthquake, terrorism, floods, strikes, electrical outages, equipment or transmission failure, or other causes reasonably beyond its control.

15.4   This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute the same instrument. All signatures of the Parties and Escrow Agent may be transmitted by facsimile, by email with the signature page as an image attachment (such as a .PDF, .TIF, .BIT, or .JPEG file) or by way of a digital signature provided by DocuSign (or such other digital signature provider as specified in writing to Escrow Agent by the authorized representative of the applicable Party), and such facsimile, email image attachment or digital signature will, for all purposes, be deemed the original signature of such Party or Escrow Agent whose signature

7

it reproduces, and will be binding upon such Party or Escrow Agent.  Each party hereto agrees to assume all risks arising out of the use of digital signatures and electronic methods to submit communications to the other parties hereto, including without limitation the risk of Escrow Agent acting on unauthorized instructions, and the risk of interception and misuse by third parties.

15.5    If any provision of this Agreement is determined to be prohibited or unenforceable by reason of any applicable law of a jurisdiction, then such provision shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions thereof, and any such prohibition or unenforceability in such jurisdiction shall not invalidate or render unenforceable such provisions in any other jurisdiction.

15.6    A person who is not a Party or Escrow Agent shall have no right to enforce any term of this Agreement.

15.7    The Parties represent, warrant and covenant that each document, notice, instruction or request provided by such Party to Escrow Agent shall comply with applicable laws and regulations.  Where, however, the conflicting provisions of any such applicable law may be waived, they are hereby irrevocably waived by the Parties and Escrow Agent to the fullest extent permitted by law, to the end that this Agreement shall be enforced as written.

15.8    Each of the Parties and Escrow Agent submits to the exclusive jurisdiction of the Federal and state law courts of Harris County, Texas for the limited and sole purpose to resolve any disputes regarding the formation, existence, construction, performance, validity and all aspects of this Agreement, provided that such submission will not prevent the enforcement of a Texas Federal or state court judgment in another jurisdiction.  Nothing in this Section 15.8 shall be deemed to be an agreement by the Parties and Escrow Agent that Texas federal or state courts can exercise general jurisdiction over any Party or Escrow Agent. Any process may be validly served upon the Parties and Escrow Agent at the applicable address of the Party and Escrow Agent provided in Section 7.1.

16.    **CONFIDENTIALITY.**

16.1    This Agreement and all transactions hereunder shall be kept confidential by Escrow Agent, and Escrow Agent hereby agrees not to provide copies of this Agreement or to disclose its specific terms or any of the transactions to any person without the prior written consent of CUSA and Operator except: (a) Escrow Agent may disclose to the applicable court in connection with any proceedings initiated to collect payment under this Agreement; (b) to any extent that it is required to disclose the same pursuant to any law or order of any court of competent jurisdiction, or any procedure for disclosure of documents in any proceedings before any such court (including any proceeding to enforce this Agreement) or in regulatory proceedings, or pursuant to any law or regulation having the force of law; provided, however, Escrow Agent shall give CUSA and Operator advance written notice of Escrow Agent's intention to disclose the same based on that requirement and a reasonable amount of time consistent with the requirement pursuant to which disclosure is to occur in which to seek adequate protective orders; and (c) to Escrow Agent's direct or indirect shareholders, directors, officers, employees, independent auditors, legal counsel, and other professional advisors to the extent such persons have a need to know, in each case if such persons are informed by Escrow Agent of its confidential nature and of their

8

duty to maintain the confidentiality hereof, and who prior to any such disclosures shall have agreed to be bound by such duty of confidentiality. Notwithstanding anything to the contrary herein, Escrow Agent may provide copies of this Agreement and disclose its specific terms to a bank regulatory agency or in connection with an examination of its records by bank examiners without prior notice to CUSA or Operator, <u>provided</u> that Escrow Agent shall provide notice to CUSA and Operator as soon as practicable thereafter.

## 17.    PATRIOT ACT DISCLOSURE.

17.1    Section 326 of the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 ("**USA PATRIOT Act**") requires Escrow Agent to implement reasonable procedures to verify the identity of any person that opens a new account with it.  Accordingly, CUSA and Operator acknowledge Section 326 of the USA PATRIOT Act and agree that Escrow Agent's identity verification procedures require Escrow Agent to obtain information which may be used to confirm Operator's or CUSA's respective identities, including, without limitation, name, address and organizational documents ("identifying information"). Operator and CUSA each agree to provide Escrow Agent with any such identifying information required as a condition of opening an account with or using any service provided by Escrow Agent.

## 18.    SECURITY PROCEDURE FOR FUNDS TRANSFERS

18.1    Escrow Agent shall confirm each Disbursement Notice and any other funds transfer instruction received in the name of a Party by means of the security procedure selected by such Party and communicated to Escrow Agent through a signed certificate in the form of <u>Exhibit D-1</u> (in the case of CUSA) or <u>Exhibit D-2</u> (in the case of Operator) attached hereto, which upon receipt by Escrow Agent shall become a part of this Agreement.  Once delivered to Escrow Agent, <u>Exhibit D-1</u> and <u>Exhibit D-2</u> may be revised or rescinded only by a writing signed by an authorized representative of CUSA (in the case of <u>Exhibit D-1</u>) or the Operator (in the case of <u>Exhibit D-2</u>).  Such revisions or rescissions shall be effective only after actual receipt by Escrow Agent and following such period of time as may be necessary to afford Escrow Agent a reasonable opportunity to act on it.  If a revised <u>Exhibit D-1</u> or <u>Exhibit D-2</u> or a rescission of an existing <u>Exhibit D-1</u> or <u>Exhibit D-2</u> is delivered to Escrow Agent by an entity that is a successor-in-interest to the applicable Party, such document shall be accompanied by additional documentation satisfactory to the Escrow Agent showing that such entity has succeeded to the rights and responsibilities of such Party under this Escrow Agreement.

18.2    The Parties understand that Escrow Agent's inability to receive or confirm each Disbursement Notice or any other funds transfer instructions received in the name of a Party pursuant to the security procedure selected by such Party may result in a delay in accomplishing the funds transfer requested pursuant to such Disbursement Notice or other funds transfer instructions, and agree that Escrow Agent shall not be liable for any loss caused by any such delay.

[SIGNATURE PAGES IMMEDIATELY FOLLOW THIS PAGE]

WITNESS the following execution and delivery of this Agreement by duly authorized representatives of each of the following Parties and Escrow Agent as of the Effective Date:

**MAKO BUYER LLC**

By: _____
Name:
Title:

**CHEVRON U.S.A. INC.**

By: _____

Name:

Title:

**ESCROW AGENT:**

**U.S. BANK NATIONAL ASSOCIATION**


By: _____

Name:

Title:

# EXHIBITS TO ESCROW AGREEMENT

# TO BE AGREED WITH ESCROW AGENT

## **Exhibit 11**

### **SEMS Bridging Agreement**

See attached.

*Exhibit II to Implementation Agreement*

## SEMS BRIDGING AGREEMENT & INTERFACE DOCUMENT

This Bridging Agreement dated and effective as of _____, 2021 (the "<u>Effective Date</u>") (this "<u>Agreement</u>") is by and among Mako Buyer LLC, a Delaware limited liability company (the "<u>Contractor</u>"), FIELDWOOD ENERGY IV LLC, a Delaware limited liability company (the "<u>Owner</u>"). Contractor and Owner are sometimes referred to collectively as the "<u>Parties</u>" and individually as a "<u>Party</u>".

**WHEREAS**, each Owner is the operator, as designated by the Bureau of Ocean Energy Management of the United States Department of the Interior ("<u>BOEM</u>"), of certain of the assets owned by such Owner as of the Effective Date (the "<u>Assets</u>");

**WHEREAS**, Fieldwood Energy IV is a resulting entity of a divisive merger effected in connection with the confirmed plan of reorganization of Chapter 11 Case 20-33948, *In re: Fieldwood Energy LLC et al*, in the United States Bankruptcy Court for the Southern District of Texas, Houston Division (the "<u>Plan</u>");

**WHEREAS**, in accordance with the Plan, the Owner does not have employees and require a third party to provide operational, technical, and administrative services for the Assets;

**WHEREAS**, pursuant to the Contract Operating Agreement dated and effective as of the Effective Date by and among the Parties (the "<u>Contract Operating Agreement</u>"), Contractor has agreed to provide certain operational, technical, and administrative services with respect to the ownership and operation of the Assets, upon the terms and conditions set forth therein, until the end of the Term (as defined therein).

In furtherance of and solely in connection with the Services (as such term is defined in the Contract Operating Agreement) provided by Contractor pursuant to the Contract Operating Agreement (the "<u>Services</u>") the Parties agree as follows:

1. **MANAGEMENT SYSTEM IMPLEMENTATION**
   For the purposes of providing the Services, Contractor agrees that it has used commercially reasonable efforts to;
   A. review the requirements of 30 CFR 250.1900 and the American Petroleum Institute's Recommended Practices for Development of a Safety and Environmental Management Program for Offshore Operations and Facilities (API RP 75) as incorporated by reference;
   B. identify and review other safety, health, environmental, integrity and quality requirements relevant to the organizational department of Contractor that is providing services for Fieldwood Energy I on the Gulf of Mexico Outer Continental Shelf ("OCS"), such as those found in Contractor's own standards and in regulations promulgated by U.S. government agencies, such as:
      I. The Bureau of Safety and Environmental Enforcement (BSEE)
      II. The United States Coast Guard (USCG)
      III. The Environmental Protection Agency (EPA);
   C. determine all requirements, to include from sources listed above, that are applicable to Contractor's provision of Services to Fieldwood Energy I on the Gulf of Mexico OCS;
   D. develop and properly implement safety, health and environmental programs and/or management systems to enable compliance with those applicable requirements set forth above;

## SEMS BRIDGING AGREEMENT & INTERFACE DOCUMENT

**E.** systematically monitor and assess the effectiveness of those systems set forth above on a departmental or unit level; and

**F.** Continuously improve those systems where appropriate.

**2. SEMS INTERFACE DOCUMENT**

This SEMS Bridging Agreement and Interface Document identifies whose environmental, health and safety manuals, policies, procedures and responsibilities shall prevail at the work site and for the activities involved pursuant to the Contract Operating Agreement. Contractor shall use commercially reasonable efforts to deliver all documents indicated in this document upon request of Owner at any time or for any reason at the sole discretion of Owner. Notwithstanding anything in this Agreement to the contrary, Contractor and its subcontractors shall not have any obligation under this Agreement to provide any service or item in this Agreement to the extent Contractor is not required to provide any such service under the Contract Operating Agreement.

**3. SUBCONTRACTORS**

Contractor shall direct its subcontractor who are providing Services under the Contract Operating Agreement to comply with the requirements of this Agreement and shall disseminate to such subcontractors the information appropriate and necessary for such subcontractors to comply with this Agreement.

**4. AGREEMENT**

**A.** By signing below, each Party affirms, agrees to and endorses the contents of this Agreement.

**B.** This Agreement shall terminate automatically upon the termination of the Contract Operating Agreement.

**C.** This Agreement is personal to the parties hereto. Neither Contractor nor Owner shall assign, convey, transfer, or otherwise dispose of all or any portion of its interest in, or its rights and obligations under, this Agreement without the prior written consent of the other party unless such assignment is permitted under the Contract Operating Agreement. Any attempted assignment without appropriate consent shall be voidable at the sole discretion of the non-assigning party.

## INSTRUCTIONS

1) The checked box (**"F1"** for Owners, **"F2"** for Contractor or both) indicates responsibility for the particular item.

2) Review and understand each Party's responsibility for each item or question.

3) For items with shared or dual responsibility of both Owner and Contractor, see additional comments or details.

4) Upon complete review of this Agreement, a member of Owner and Contractor's executive management team is to then properly sign and date this document.

5) Once properly signed, dated and fully executed by both Owner and Contractor, this entire document is then considered a Controlled Document, whereby only changes can be made upon written agreement of all Parties.

## SEMS BRIDGING AGREEMENT & INTERFACE DOCUMENT

6) Any specific issue not listed below shall be submitted and approved by all Parties prior to the execution of work.

7) All matters below are with respect to Services provided by Contractor.



## SEMS BRIDGING AGREEMENT & INTERFACE DOCUMENT

| ITEM | F2 | F1 | ADDITIONAL DETAILS |
|---|:---:|:---:|---|
| **ELEMENT 1: GENERAL** | | | |
| Establishing goals and performance measures, appoint management representatives responsible for carrying out SEMS activities | X | | Beginning upon signature of this document, operations performed on Fieldwood Energy IV's leases, rights of way, rights of use and easements will adhere to Contactor's SEMS plan |
| Performing annual review of SEMS program in accordance with 250.1909(d) | X | | |
| **ELEMENT 2: SAFETY & ENVIRONMENTAL INFORMATION** | | | |
| Policies and procedures to create or modify the safety & environmental information (i.e. P&IDs, SAFE charts, control systems, NPDES) | X | | |
| To maintain red-line drawings or as built drawings for all modifications to the facility | X | | |
| Well permit or drilling permit approvals and procedures (APM) | X | | |
| **ELEMENT 3: HAZARDS ANALYSIS** | | | |
| Conduct, manage, and communicate the hazards analysis (facility level) | X | | |
| Job safety analysis (JSA) for activities involving equipment, materials or processes led by Contractor. (Note: All personnel performing work must be included in the creation of the JSA.) | X | | |
| JSA for activities involving equipment, materials or processes owned by sub-contractors | X | | |
| **ELEMENT 4: MANAGEMENT OF CHANGE (MOC)** | | | |
| Identify and control hazards caused by changes made to Contractor's equipment, materials, operating conditions, operating procedures and personnel, including a means to communicate the change to all affected personnel | X | | |
| Identify and control hazards caused by changes made to the sub-contractor's equipment, materials, operating conditions, operating procedures and personnel, including a means to communicate the change to all affected personnel | X | | |
| Identify and control hazards by managing changes to existing drilling programs, well design, SAFE charts, control systems, etc. | X | | |
| **ELEMENT 5: OPERATING PROCEDURES** | | | |
| Operating procedures that provide instructions for conducting safe and environmentally sound activities and address equipment or processes | X | | |
| Operating procedures that provide instructions for conducting safe and environmentally sound activities and address equipment or processes owned by sub-contractors or used by Contractor | X | | |
| **ELEMENT 6: SAFE WORK PRACTICES and CONTRACTOR SELECTION** | | | |
| Bypassing critical protections | X | | |
| Confined space entry | X | | |
| Electrical work & isolation of hazardous energy (Lock out / tag out) | X | | |
| Hot work | X | | |

# SEMS BRIDGING AGREEMENT & INTERFACE DOCUMENT

| | | | |
|---|---|---|---|
| Crane operations, lifting & rigging | X | | |
| Simultaneous operations planning | X | | |
| Working at heights | X | | |
| Spill reporting procedures | X | | |
| Well control procedures | X | | |
| Safe work practices other than those listed above | X | | |
| Safe work practices (other than those listed above) on a third-party owned facility, such as a drilling rig, lift boat, derrick barge, motor vessel, etc. that is contracted by Contractor | X | | |
| Selection of sub-contractors to work under the supervision of Contractor | X | | |
| **ELEMENT 7: TRAINING** | | | |
| Verify all personnel are trained to conduct their assigned duties in a safe and environmentally sound manner. | X | | |
| **ELEMENT 8: MECHANICAL INTEGRITY** | | | |
| Verify that all critical equipment owned, operated or maintained by Contractor is designed, procured, fabricated, installed, calibrated and maintained in accordance with service requirements, OEM recommendations or industry standards | X | | |
| Verify that inspections and tests for critical equipment owned, operated or maintained by Contractor are documented in accordance with regulatory requirements and industry standards. At a minimum, the documentation must include the date of the inspection/test, the name, position, and signature of the inspector/tester, the equipment's serial number or other unique identifier, a description of the test performed, and the results of the inspection or test | X | | |
| Assure that well control equipment, such as BOP's are tested and maintained according to OEM and regulatory requirements and conditions of approval of the drilling permit application | X | | |
| **ELEMENT 9: PRE-STARTUP SAFETY REVIEW (PSSR)** | | | |
| Conduct the pre-startup safety and environmental review (including appropriate safety, environmental, operating, maintenance, training and emergency information) for commissioning of new or significantly modified facilities | X | | |
| **ELEMENT 10: EMERGENCY RESPONSE AND CONTROL** | | | |
| Maintain and revise accordingly emergency response and control plans | X | | |
| Emergency response and control plan for use during an emergency when working on a sub-contractor owned facility, such as a drilling rig, lift boat, derrick barge, motor vessel, etc. contracted by Contractor | X | | |
| **ELEMENT 11: INCIDENT INVESTIGATION** | | | |
| Investigation of incidents | X | X | Owner reserves the right to participate as necessary |
| Investigation of incidents that occur on a sub-contractor owned facility (rig, derrick barge, lift boat, motor vessel, etc.) by a third party | X | X | Owner reserves the right to participate as necessary |
| **ELEMENT 12: AUDITING** | | | |

# SEMS BRIDGING AGREEMENT & INTERFACE DOCUMENT

| | | | |
|---|---|---|---|
| Manage/facilitate/execute SEMS auditing in accordance with 30 CFR 250.1920 | X | X | Owner reserves the right to conduct audits as necessary of the Contractor SEMS |
| **ELEMENT 13: RECORDKEEPING & DOCUMENTATION** | | | |
| Record retention, management and control of all records pertaining to scope of operations | X | X | Contractor will maintain all records and share records and documentation as required or requested by Owner |
| **ELEMENT 14: STOP WORK AUTHORITY** | | | |
| Ensure all personnel have the authority to stop work | X | X | |
| **ELEMENT 15: ULTIMATE WORK AUTHORITY (UWA)** | | | |
| Establish person with ultimate work authority (UWA) and communicate UWA to all crewmembers | X | | |
| For situations that may develop during drilling, workover and P&A operations, such as well control or other emergency conditions that may require the UWA responsibility to shift to another individual | X | | As designated in job planning, the UWA will be communicated to all. On sub-contractor owned facilities, sub-contractor is responsible for providing Contractor with UWA designated Parties |
| In the event that stop work authority is initiated for imminent risk or danger, work can only resume after the person with UWA has granted approval | X | | |
| **ELEMENT 16: EMPLOYEE PARTICIPATION** | | | |
| Employee participation and involvement program | X | | |
| **ELEMENT 17: REPORTING UNSAFE WORKING CONDITIONS** | | | |
| Any person may report to BSEE any hazardous or unsafe working condition or possible violation on any facility engaged in OCS activities. In addition, Contractor will provide, at request of Owner, any reports necessary to ascertain working knowledge of unsafe working conditions | X | X | |

**OWNER APPROVAL**
**Fieldwood Energy IV LLC**

By:_____
(SIGNATURE)


_____
Owner Authorized Representative
(PRINT NAME)

Title: _____

Date: _____

**CONTRACTOR APPROVAL**
**Mako Buyer LLC**

By:_____
(SIGNATURE)


_____
Contractor Authorized Representative:
(PRINT NAME)

Title: _____

Date: _____

<u>**Exhibit 12**</u>

**NewCo Joint Development Agreement**

See attached.

*Exhibit 12 to the Implementation Agreement*

## JOINT DEVELOPMENT AGREEMENT

This Joint Development Agreement ("**Agreement**") dated as of [_____], 2021 ("**Execution Date**"), but effective as of the Effective Date, is by and among Fieldwood Energy IV LLC, a Texas limited liability company ("**Owner**") and Mako Buyer LLC, a Delaware limited liability company ("**NewCo**"). Owner and NewCo may each be referred to herein as a "**Party**" and collectively as the "**Parties**".

### W I T N E S S E T H

WHEREAS, NewCo desires to farm into the development of, operation of, and production of hydrocarbons from the Development Area, subject to the terms and conditions set forth herein; and

WHEREAS, Owner and NewCo desire to set forth their agreements regarding their joint participation in the development of, operation of, and production of hydrocarbons from the Development Area.

NOW, THEREFORE, in consideration of the mutual benefits to each Party, the mutual promises set forth herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

### ARTICLE I.
### DEFINITIONS

**Section 1.1.** **Defined Terms**. As used in this Agreement, each of the following terms is defined below:

"**Abandonment Notice**" is defined in Section 4.10(a).

"**Affiliate**" means, with respect to any Person, any other Person that, directly or indirectly, controls, is controlled by or is under common control with, such specified Person through one (1) or more intermediaries or otherwise; provided, however, that, for the purposes of this Agreement, Owner shall not be deemed an Affiliate of NewCo, and *vice versa*. For the purposes of this definition, "control" means, where used with respect to any Person, the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities, by contract or otherwise, and the terms "controlling" and "controlled" have correlative meanings.

"**Agreement**" is defined in the preamble above.

"**Base Assignment Form**" is defined in Section 4.5(b).

"**BOEM**" means the Bureau of Ocean Energy Management of the United States Department of the Interior, and any successor Governmental Authorities thereto.

"**Business Day**" means a day, other than a Saturday or Sunday, on which commercial banks are open for business with the public in Houston, Texas.

"**Capital Development Project**" means either a (i) Rework or Recompletion Project or (ii) a Sidetrack, Bypass, Or Deepening Project.

"**Capital Development Project Costs**" means any and all out-of-pocket costs and expenses incurred in developing, preparing for, and completing a Capital Development Project and conducting all other operations set forth in the applicable Proposal attributable to Owner Interests in the Project, including, without limitation, all reasonable Third Party engineering costs, legal costs, and permitting costs, but excluding overhead and general and administrative costs.

"**Commence(s)**" means (i) with respect to any Rework or Recompletion Project, the entry into the well using the equipment necessary to begin the operation to either rework or plug back the existing completion, as applicable, and (ii) with respect to a Sidetrack, Bypass, or Deepening Project or an Election Well, the commencement of actual drilling of new hole through the turning of a drill bit into the earth, in each case, with a rig, coiled tubing unit, or other equipment capable of completing the applicable Project.

"**Company Agreement**" means that certain Limited Liability Company Agreement of Fieldwood Energy IV LLC, a Texas limited liability company, dated [•], 2021.

"**Contractor Operator Agreement**" means that certain Contract Operator Agreement by and among the Parties dated [•], 2021.

"**Development Area**" means the state submerged lands and Outer Continental Shelf blocks and acreage held by the leases set forth on Exhibit A.

"**Effective Date**" means [EMERGENCE DATE].

"**Election Period**" is defined in Section 4.1.

"**Election to Participate**" means the form presented by NewCo to Owner with a Proposal pursuant to which Owner can elect to participate in a Proposal.

"**Election Well**" means a new well in the Development Area.

"**Election Well Costs**" means, subject to the terms of the applicable Operating Agreement, any and all out-of-pocket costs and expenses attributable to Owner Interests incurred in drilling, evaluating, completing, and equipping an Election Well to its Objective Depth and conducting all other operations set forth in the applicable Proposal, including, without limitation, all reasonable Third Party engineering costs, legal costs, and permitting costs, but excluding overhead and general and administrative costs.

"**Evaluation Data**" means Seismic Data and other data and information relating to a Prospect Area or, if applicable, the Objective Formation(s) as to a Capital Development Project or an Election Well in the possession of NewCo that was materially relied upon by NewCo in the

2

determination of the Prospect, including, without limitation, to the extent applicable, relevant geological and geophysical interpretations and information, including the most recent reports, interpretations, and maps, and all specialty processing and analysis of Seismic Data (*e.g.*, migration, AVO, *etc.*).

"**Execution Date**" is defined in the preamble above.

"**Excess Net Profit**" means the Net Profit from a Capital Development Project over any applicable period, minus the Pre-Existing Net Profit. For the purposes of this Agreement, the Pre-Existing Net Profit that would have been realized over such period if the Capital Development Project had not been undertaken will be deemed to be zero ($0) for a recompletion where the well's production data from the most recent three (3) months of production prior to the date NewCo, or another operator pursuant to Section 4.4, applies for a permit to modify the applicable well shows the existing completion producing at average rates of less than fifty (50) barrels of oil per day or, if the well is a gas well, three hundred (300) MCFD of gas; provided, however, periods during which the well was intermittently shut-in during such three (3) month period shall be excluded from the calculation of average production so that such average is not artificially lowered as a result of any such intermittent shut-ins.

"**Existing Burdens**" means the following, to the extent that Owner Interests are burdened by or subject to them as of the time a Proposal is made with respect to such Owner Interests:

(a)     Lessors' royalties (including, without limitation, sliding scale royalties and royalties measured by net profits), overriding royalties, reversionary interests, net profit interests, production payments, carried interests, non-participating royalty interests, and similar burdens on or measured by production from or allocated to the proceeds thereof;

(b)     The terms of leases, unit agreements, pooling agreements, operating agreements, production sales contracts, areas of mutual interest or similar obligations entered into in the ordinary course of the oil and gas industry, and any other contracts, agreements, rights, and instruments applicable to the Owner Interests that are binding on Owner;

(c)     Preferential rights to purchase all or any portion of the Owner Interests;

(d)     Third Party consent requirements and similar restrictions that are applicable to any transfer of all or any portion of the Owner Interests; and

(e)     Rights of reassignment arising upon final intention to abandon or release the Owner Interests.

"**Expert**" means Netherland, Sewell & Associates or such other reservoir engineering consultant as may be mutually agreed by the Parties or determined pursuant to Section 4.12.

"**Force Majeure**" means any event or circumstance or combination thereof beyond the reasonable control of the Party claiming to be impacted by such event or circumstance that prevents such Party from performing its obligations under this Agreement, but only to the extent such Party is actually prevented or hindered from so performing, which events or circumstances include acts

of God, fires, floods, hurricanes, storms, tornados, earthquakes, landslides, lightning, loop currents, washouts, epidemics, pandemics, or other natural disaster; arrests, restraints, actions, delays, or inaction of any Governmental Authority; strikes, lockouts, or other industrial disturbances; acts of the public enemy, wars, invasions, blockades, embargos, sanctions, sabotage, insurgency, terrorism, civil wars, civil disturbances, riots, malicious mischief, or insurrections of any kind; explosions; breakage or accident to machinery or lines of pipe, freezing of wells or lines of pipe; refusal or inability of resale owner(s) or transporter(s) to take deliveries due to events of Force Majeure, inability or delays of a Party to obtain rights of way, necessary materials, supplies or permits not caused by the failure of the Party claiming to have been affected by Force Majeure to pay for or take diligent and prompt actions to obtain such rights of way, necessary materials, supplies, or permits; or labor strikes or work stoppages.

 "**Governmental Authority**" means any federal, state, municipal, tribal, local, or similar governmental authority, regulatory or administrative agency, court or arbitral body, or any subdivision of any of the foregoing.

"**Law**" means any applicable statute, writ, law, rule, regulation, ordinance, order, judgment, injunction, award, determination, or decree of a Governmental Authority.

"**MCFD**" means thousand cubic feet of gas per day, as measured at a base temperature of sixty degrees Fahrenheit (60ºF) and a base pressure of fourteen and sixty-five hundredths (14.65) pounds per square inch absolute (psia).

"**Net Profit**" means, with respect to production attributable to Owner Interests obtained as a result of a Capital Development Project, the difference obtained by subtracting Operating Costs from Revenue; where (i) "Operating Costs" equals the sum of (1) direct operating costs related to the well that is the subject of the Capital Development Project during the applicable production month, including platform, facility, processing, and pipeline operating costs and fees allocated equally amongst all producing wells on or tied back to such platform, if applicable, (2) all Existing Burdens on such well, (3) all severance or other taxes measured or calculated based upon production from such well (but for the avoidance of doubt, excluding income taxes and ad valorem taxes), and (4) the ORRI, and (ii) "Revenue" equals the net revenue attributable to Owner's net revenue interest in the proceeds of production from the completion resulting from such Capital Development Project received for that applicable production month.

"**NewCo**" is defined in the preamble above.

"**NewCo Earned Interest**" means with respect to an Election Well (a) one hundred percent (100%) of Owner Interests (determined at the time the Election Well Proposal is made, reduced by any burdens, reversions, pay-outs, back-ins, or other contractual interests springing or arising after such time, but existing at the time such Election Well Proposal was made) in the Prospect Area associated with the Prospect to be developed by such Election Well until NewCo has reached the Recovery Threshold relative to such Election Well, and reducing to (b) fifty percent (50%) of Owner Interests (determined at the time the Election Well Proposal was made, reduced by any burdens, reversions, pay-outs, back-ins, or other contractual interests springing or arising after such time, but existing at the time such Election Well Proposal was made) in such Prospect Area

4

from and after that time at which NewCo has reached the Recovery Threshold relative to such Election Well.  For the avoidance of doubt, Owner's working interest, for purposes of the foregoing calculations and otherwise, excludes (i) Owner Interests insofar as they relate to any other wells that are located within the applicable Prospect Area and in existence as of the time the Election Well Proposal is made, regardless of whether such other wells are then or may thereafter be completed within any Objective Formation in the Prospect Area and (ii) Owner's ORRI.

"**NewCo NPI**" means, with respect to the production resulting from any Capital Development Project, a net profits interest equal to (i) 100% of the Excess Net Profit until NewCo has reached the Recovery Threshold and (ii) from and after such time that NewCo has reached the Recovery Threshold, fifty percent (50%) of the Excess Net Profit.

"**Objective Depth**" means, with respect to an Election Well, the depth that is sufficient to test the applicable Objective Formation(s), or the specific footage depth set forth in the Proposal, whichever is the greater depth, for such Election Well.

"**Objective Formation(s)**" means, with respect to an Election Well, the formations, intervals, or sands that are proposed to be tested, as set forth in the Proposal for such Election Well.

"**Operating Agreement**" means any Subject Operating Agreement or Third Party Operating Agreement.

"**Operating Costs**" has the meaning set forth in the definition of "Net Profits."

"**ORRI**" means, with respect to any NewCo Earned Interest or any NewCo NPI, an overriding royalty interest equal to twenty-five percent (25%) less Existing Burdens proportionately reduced to the NewCo Earned Interest or NewCo NPI, as applicable and further proportionately reduced as the NewCo Earned Interests or the NewCo NPI may be reduced pursuant to the terms of this Agreement as a result of NewCo achieving the Recovery Threshold with respect to any Project, which ORRI shall be a non-operating, non-expense-bearing, overriding royalty interest, free of cost and expense of production, operations, marketing, and delivery of the hydrocarbons to the applicable delivery points.

"**Owner**" is defined in the preamble above.

"**Owner Interests**" means, with respect to any Proposal and the Project to be carried out pursuant to such Proposal, the rights, title, and interests of Owner in the lands and leases in the applicable portion of the Development Area that is to be developed by such Project, determined as of the date such Proposal is made (reduced by any burdens, reversions, pay-outs, back-ins, or other contractual interests springing or arising after such time, but existing at the time such Proposal was made), and including the Owner's proportionate share of any non-consenting party's interest in the applicable Project that may be allocable to Owner under an applicable Third Party Operating Agreement for only so long as such interest is allocated to Owner in accordance with the terms of such Third Party Operating Agreement.

5

"**Owner Percentage**" means the difference between (i) the Owner Interests in a Prospect Area that is developed by an Election Well and (ii) the NewCo Earned Interest.

"**P&A**" means the plugging, abandonment, and removal of any wells, facilities, platforms, pipelines, or other equipment and the restoration and remediation of the land and seabed in accordance with all applicable Laws and the terms and conditions of any applicable leases, contracts, and agreements, including the removal, surface and subsurface restoration, site clearance, and disposal of the wells, well cellars, fixtures, platforms, flowlines, pipelines, structures, and personal property located on or associated with assets and properties and the lands burdened thereby, the flushing, pickling, burial, removal, or capping of all associated flowlines, field transmission and gathering lines, pipelines, pit closures, the restoration of the surface and seabed, site clearance, and any disposal of related waste materials and hazardous substances.

"**P&A Costs**" means the costs and expenses to conduct P&A.

"**P&A Well**" is defined in Section 4.10(a).

"**Party**" or "**Parties**" is defined in the preamble above.

"**Permitted Encumbrances**" means the following:

(a)     The Existing Burdens;

(b)     Liens for current taxes or assessments not yet delinquent or, if delinquent, being contested in good faith by appropriate actions diligently pursued;

(c)     Materialmen's, mechanic's, repairman's, employee's, contractor's, operator's, and other similar liens or charges arising in the ordinary course of business for amounts not yet delinquent (including any amounts being withheld as provided by Law) or if delinquent, being contested in good faith by appropriate actions diligently pursued;

(d)     All rights to consent by, required notices to, filings with, or other actions by Governmental Authorities in connection with the transfer of the Owner Interests;

(e)     All rights reserved to or vested in any Governmental Authorities to control or regulate any of the Development Area in any manner and all obligations and duties under all applicable Laws, rules, and orders of any such Governmental Authorities or under any franchise, grant, license or permit issued by any such Governmental Authorities; and

(f)     Easements, rights-of-way, servitudes, and permits or other burdens or encumbrances that individually or in the aggregate would not be reasonably likely to materially detract from the value of or materially interfere with the use, development, operation or ownership of the Development Area subject thereto or affected thereby.

"**Person**" means an individual, corporation, partnership, limited liability company, association, joint stock company, trust or trustee thereof, estate or executor thereof, unincorporated organization, joint venture, or any other legally recognizable entity.

"**Pre-Existing Net Profit**" means the forecast of Net Profit that would have been realized over the applicable period in which Excess Net Profit is being calculated if the Capital Development Project had not been undertaken, as such forecast is agreed upon by and between the Parties using the forward strip pricing for crude oil and natural gas as provided by NYMEX as of the date the Proposal for such Capital Development Project was delivered to Owner. If, after ten (10) Business Days following the expiration of the Election Period applicable to a Capital Development Project, the Parties have not yet agreed on the Pre-Existing Net Profit for the well that is the subject of such Capital Development Project, then either Party may submit the determination of such Pre-Existing Net Profit to the Expert pursuant to Section 4.12 below.

"**Project**" means either an Election Well or a Capital Development Project, as applicable.

"**Project Notice**" is defined in Section 3.2.

"**Project Security**" means security, in form and amount reasonably acceptable to Owner, to cover NewCo's obligations and liabilities hereunder associated with (i) with respect to an Election Well, Owner's share of the P&A obligations and liabilities, including P&A Costs, environmental liability, obligations, or liabilities owed to any vendors, co-owners, Governmental Authorities, or Third Party, for such Election Well and (ii) with respect to a Sidetrack, Bypass, or Deepening Project, the well that is sidetracked, bypassed, or deepened, including, without limitation, Owner's share of incremental P&A obligations and liabilities (including P&A Costs, environmental liability, obligations, or liabilities owed to any vendors, co-owners, Governmental Authorities, or Third Party) for such sidetrack, bypass, or deepening well.

"**Proposal**" means a proposal to drill, evaluate, and complete an Election Well or undertake a Capital Development Project, as the case may be, proposed by NewCo to the Owner on lands or facilities in the Development Area. For the avoidance of doubt, a Proposal may not include more than one Election Well or one proposed completion or recompletion of an existing well, as applicable.

"**Prospect**" means a geologic structural or stratigraphic trap located within any Development Area that is believed to have the potential for accumulations of hydrocarbons, to the extent such Development Area also covers or includes such geologic structure or stratigraphic trap.

"**Prospect Area**" is defined in Section 4.5(a).

"**Recovery Threshold**" means, with respect to a Capital Development Project, NewCo's recovery from the Net Profit it receives attributable to such project of an amount equal to one hundred percent (100%) of the Capital Development Project Costs incurred by NewCo in performing the relevant Project and, with respect to an Election Well, NewCo's recovery from the NewCo Earned Interest it receives attributable to such well of an amount equal to one hundred percent (100%) of the Election Well Costs incurred by NewCo in performing the relevant Project.

"**Representatives**" means a Person's directors, officers, partners, members, managers, employees, agents, investors, or advisors (including attorneys, accountants, consultants, bankers, and financial advisors) and any representatives of those advisors (provided that Newco and its Representatives shall not be considered Representatives of Owner).

7

"**Revenue**" has the meaning set forth in the definition of "Net Profits."

"**Rework or Recompletion Project**" means a development operation on an existing well in the Development Area to either (i) work-over the then-current completion in such existing well in an effort to increase or resume production, cause such well to produce in paying quantities, increase production or reserves, or extend the productive life of such completion or (ii) plug and abandon the then-current completion in such existing well and recomplete the well at a shallower interval.

"**Seismic Data**" means any and all seismic data, two-dimensional multifold seismic data, three-dimensional seismic data, stacked and migrated processed sections, digital field tapes, stacked tapes, support data relating thereto, stick and quality control segments, receiver and bin center locations, stacking velocities, shot hole drilling information, digital shot point locations, magnetic, surface, and other surveys, seismic sections, surface and subsurface maps, plats, charts, and any interpretations of any of the foregoing or other like information customarily used in connection with oil and/or gas exploration.

"**Sidetrack, Bypass, or Deepening Project**" means a development operation on an existing well in the Development Area to plug and abandon the then-current completion and conduct sidetracking, bypassing, or deepening operations on such existing well in an effort to increase or resume production, cause such well to produce in paying quantities, increase production or reserves, or to extend the productive life of such well.

"**Subject Operating Agreement**" is defined in Section 4.5(a).

"**Technical Review Meeting**" is defined in Section 3.2(b).

"**Term**" is defined in Section 2.1.

"**Third Party**" means any Person that is not a Party or any Affiliate of any Party.

"**Third Party Operating Agreement**" is defined in Section 4.5(c).

"**Transaction Documents**" means this Agreement, the Contract Operator Agreement, and each other agreement, document, certificate, or instrument delivered pursuant hereto or thereto.

"**Well Data**" means any logs, core samples, other geological and geophysical data or similar data created during drilling operations, any engineering records or reports (including wellbore schematics), any drilling records or reports (including detailed daily drilling reports), and any related reports filed with the BOEM.

**Section 1.2.**   **Exhibits.**   The following exhibits are incorporated herein and made a part hereof:

Exhibit A      Development Area (Including Oil and Gas Leases)

Exhibit B      Form of Net Profits Interest Assignment

8

Exhibit C      Form of Election Well Assignment

Exhibit D      Form of Operating Agreement

## ARTICLE II.
## TERM

**Section 2.1.      Term**. This Agreement shall be effective for a period commencing on the Effective Date and expiring upon the earlier to occur of (i) the date two (2) years after the Effective Date, and (ii), as to each lease, the expiration of such lease comprising a part of the Development Area (including any and all renewals, replacements, and extensions of such lease) (the "**Term**").

**Section 2.2.      Effect of Termination**.  After the expiration of the Term, this Agreement shall terminate and be of no further force and effect; provided, however, that (i) the provisions of this Section 2.2 and Sections 3.2(d), 3.3, 4.8, 4.11, 5.3, 5.4, 5.5, and 5.14, the provisions in the third sentence of Section 3.2(a) (the sentence beginning "If Owner receives") and the last sentence of Section 4.5(g), and (ii) any and all rights, obligations and remedies hereunder that have accrued on or prior to the expiration of the Term of this Agreement, shall survive the termination of this Agreement indefinitely; and, provided, further, that any rights, obligations, and remedies in any Transaction Document that by their nature are intended to survive termination or expiration of this Agreement shall so survive.  Notwithstanding anything herein to the contrary, termination of this Agreement will not affect the rights of NewCo hereunder to any Proposals presented to Owner before the end of the Term.

## ARTICLE III.
## PROSPECT GENERATION

**Section 3.1.      Evaluation of Possible Prospect.** To assist NewCo in its evaluation of the Development Area, Owner will exercise reasonable efforts to provide NewCo with access to all materials either in its possession or those materials which it is entitled to review regarding the Development Area, including any Evaluation Data, but only to the extent NewCo is permitted to view such materials pursuant to any contract or agreement to which such materials may be subject.  In the event that NewCo desires to present a Proposal, it shall provide a notice to Owner as set forth below.

**Section 3.2.      Notice of Prospects or Capital Development Project**.

(a)      Notice.  With respect to any Proposal being made by NewCo, NewCo shall provide a written notice to the Owner (a "**Project Notice**"), which shall include the following information:

(i)      a description of the Proposal in reasonable detail (including, if such Proposal relates to an Election Well, all potentially productive zones, the proposed Objective Depths, the proposed Objective Formations, together with descriptions of the Prospect(s) and the associated Prospect Area(s));

(ii)      a good faith, preliminary estimate of Capital Development Project Costs or the Election Well Costs, as the case may be;

9

(iii)     a good faith, preliminary estimate of any and all P&A Costs for a Sidetrack, Bypass or Deepening Project or Election Well, as the case may be, and

(iv)     an Election to Participate.

For the avoidance of doubt, the following shall be void and deemed automatically withdrawn by NewCo: (i) Proposals for which Owner does not have the requisite authority, under the applicable Operating Agreement, to make such Proposal and (ii) Proposals that conflict with any ongoing, approved, or previously proposed operations under any applicable Operating Agreement.  If Owner receives a Proposal for a Capital Development Project to be performed on a well which Owner either (A) desires to continue producing from its then-current completion or (B) desires to conduct an operation that is in conflict with the Capital Development Project proposed by NewCo, Owner may, on or before the expiration of the Election Period for such Proposal, send written notice to NewCo that it rejects the Proposal pursuant to the foregoing grounds, in which case the applicable Proposal shall be deemed to have been withdrawn and void; *provided* that if Owner rejects such a Proposal and undertakes or agrees to participate in the Project that was the subject of such rejected Proposal within two (2) years after expiration of the Election Period for such Proposal, then Owner shall offer NewCo the right (exercisable for a period of 30 days) to participate in such opportunity on the same terms as set forth in the original Proposal and this Agreement.  If, after diligent efforts, NewCo or the Parties are unable to proceed with the operations contemplated under a Proposal because of conflicts with existing Operating Agreements (or other restrictions affecting the applicable Owner Interests) that existed as of the time the Proposal was made, either Party may send notice to the other Party terminating the affected Proposal.  For the avoidance of doubt, the Parties recognize and agree that nothing in this Agreement shall prevent an Owner from conducting any projects, operations, or activities or from participating in projects, operations, or activities that may be proposed or offered by a Third Party or from entering into any agreements or contracts, including, without limitation, farmouts, sales, or assignments, affecting the Owner Interests, in all cases, without any obligation to offer NewCo the opportunity to participate in any such project, operations, or activities or to obtain the consent of NewCo, unless (x) any such project, operations, or activities were proposed by NewCo under a Proposal received by Owner prior to such Owner's receipt of the proposal from a Third Party and (y) such NewCo Proposal has not terminated, been withdrawn, or deemed to have been withdrawn.

(b)     Technical Review Meeting.  NewCo will present the Proposal and all related Evaluation Data to the Owner at an in-person meeting at the offices of NewCo (a "**Technical Review Meeting**") to be held on a mutually agreed Business Day during NewCo's normal business hours no later than ten (10) Business Days after delivery of the applicable Project Notice.  At either Party's request, the meeting may be held online via technology that allows a Party to share screens with the other Party, such as Zoom, Skype, WebEx, or Microsoft Teams.  Each Party shall use reasonable efforts to ensure that the Technical Review Meeting is attended by a reasonably sufficient number of technical representatives of such Party who are familiar with and capable of presenting and/or discussing the Proposal with the other Party.

(c)     Access to Evaluation Data.  Until the end of the Election Period, NewCo shall make Evaluation Data with respect to a Proposal available for review and evaluation by the Owner, at

the Owner's expense, in NewCo's offices during NewCo's normal business hours or available through a virtual data room or similar electronic platform. Likewise, Owner will provide NewCo with reasonable access to any Evaluation Data in its possession with respect to a Proposal, including but not limited to well files, logs, and data. Notwithstanding the foregoing, neither Party shall be obligated to disclose such Evaluation Data when such disclosure would violate any Third Party contract or agreement binding on a Party or applicable to such Evaluation Data.

(d)    Confidentiality. Each Party shall, and shall cause its Affiliates and its and their respective Representatives to, keep the Proposals, all Evaluation Data, Well Data, and Seismic Data of the other Party, information relating to the Proposal and information from the Technical Review Meeting, to the extent prepared by or received from the other Parties, strictly confidential, and no Party or any of its Affiliates or any of its or their respective Representatives shall disclose such Proposals, Evaluation Data, Well Data, or Seismic Data, information relating to the Proposal, or information from the Technical Review Meeting to any Third Party except as required under a Third Party Operating Agreement. With respect to Evaluation Data, Well Data, and Seismic Data, these disclosure restrictions shall terminate upon the later to occur of (i) two (2) years after the date on which the Technical Review Meeting took place with respect to the applicable Proposal and (ii) the date on which such Evaluation Data, Well Data, or Seismic Data, as applicable, is no longer subject to disclosure restrictions under an agreement or contract with a Third Party. With respect to the Proposal itself, these disclosure restrictions shall terminate upon the later to occur of (x) the date on which the Project that is the subject of such Proposal is Commenced and (y) that date on which such Proposal terminates, is withdrawn, or is deemed to have been withdrawn.

**Section 3.3.    Waiver of Liability with Respect to Evaluation Data**. The information included in a Project Notice and any other Evaluation Data or Well Data furnished by NewCo or Owner, as applicable, pursuant to this Agreement shall be provided for informational purposes only. Each Party is responsible for and shall make its own decisions with respect to Evaluation Data, Well Data, or the opinions or analysis of the other Party that may be provided. (A) NEWCO DOES NOT MAKE, AND THE OWNER WAIVES AND REPRESENTS AND WARRANTS THAT OWNER HAS NOT AND WILL NOT RELY UPON, AND (B) OWNER DOES NOT MAKE, AND NEWCO WAIVES AND REPRESENTS AND WARRANTS THAT NEWCO HAS NOT AND WILL NOT RELY UPON: ANY REPRESENTATION OR WARRANTY, EXPRESS OR IMPLIED, IN THIS AGREEMENT OR ANY OTHER INSTRUMENT, AGREEMENT, OR CONTRACT DELIVERED HEREUNDER OR IN CONNECTION WITH THE EVALUATION DATA, WELL DATA, OR ANY OTHER OPINION OR ANALYSIS THAT MAY BE PROVIDED HEREUNDER, INCLUDING, BUT NOT LIMITED TO, ANY REPRESENTATION OR WARRANTY, EXPRESS OR IMPLIED AS TO (I) THE CONTENTS, CHARACTER, OR NATURE OF ANY DESCRIPTIVE SUMMARY, OR ANY REPORT OF ANY PETROLEUM ENGINEERING CONSULTANT, OR ANY GEOLOGICAL DATA, SEISMIC DATA, WELL DATA, EVALUATION DATA, RESERVE DATA, RESERVE REPORTS, RESERVE INFORMATION (AND ANY ANALYSIS OR INTERPRETATION OF ANY OF THE FOREGOING) RELATING TO ANY SEISMIC DATA OR EVALUATION DATA OR ANY OF THE PROPOSALS, (II) THE QUANTITY, QUALITY, OR RECOVERABILITY OF HYDROCARBONS IN OR FROM ANY PROPOSAL, (III) THE PRODUCTION OF PETROLEUM SUBSTANCES FROM ANY PROPOSAL, OR ANY PRODUCTION OR DECLINE RATES, OR (IV) ANY OTHER RECORD, FILES,

11

MATERIALS, OR INFORMATION (INCLUDING AS TO THE ACCURACY, COMPLETENESS, OR CONTENTS OF THE RECORDS) THAT MAY HAVE BEEN MADE AVAILABLE, DELIVERED, OR COMMUNICATED TO THE OTHER PARTY IN CONNECTION WITH THE REVIEW AND EVALUATION OF THE SEISMIC DATA, WELL DATA, OR EVALUATION DATA PURSUANT TO THIS AGREEMENT. NOTHING IN THIS AGREEMENT SHALL LIMIT ANY PARTY'S RIGHTS OR REMEDIES PURSUANT TO ANY OTHER AGREEMENT BETWEEN THE PARTIES OTHER THAN THIS AGREEMENT OR PURSUANT TO ANY INSTRUMENT OR AGREEMENT DELIVERED PURSUANT TO THIS AGREEMENT.

## ARTICLE IV.
## JOINT DEVELOPMENT OPERATIONS

**Section 4.1.** **Election to Participate**. The Owner may elect to participate in a valid Proposal by delivering its written Election to Participate to NewCo no later than 5:00 p.m. in Houston, Texas on the first Business Day that is on or after the date thirty (30) days after the Business Day the Owner received the applicable Project Notice (the "**Election Period**"). The failure of Owner to make a timely written election to participate in a valid Proposal by the expiration of the Election Period shall be deemed to be Owner's election not to participate in such Proposal. If the Owner delivers to NewCo prior to the expiration of the applicable Election Period a valid written Election to Participate, then, subject to the terms of any applicable Third Party Operating Agreement and the terms and conditions of this Agreement, such election shall constitute a valid and binding obligation of the Parties to participate in the operations set forth in such Proposal upon the terms of this Agreement.

**Section 4.2.** **Rework or Recompletion Projects.** If the Proposal is for a Rework or Recompletion Project and Owner does not reject such Proposal as contemplated under Section 3.2(a) then NewCo may proceed with the Rework or Recompletion Project at its sole risk and expense only after the Pre-Existing Net Profit relating to such Rework or Recompletion Project has been determined either by agreement of the Parties or by the Expert. In such event (i) NewCo shall pay 100% of the Capital Development Project Costs associated with the Rework or Recompletion Project and attributable to Owner Interests and (ii) upon completing the Rework or Recompletion Project as a successful completion, NewCo will receive an assignment of the NewCo NPI from Owner in a form substantially the same as Exhibit B attached hereto, reserving unto Owner the ORRI. For the avoidance of doubt, at such time as NewCo has reached the Recovery Threshold for such applicable Rework or Recompletion Project, the NewCo NPI will be reduced from one hundred percent (100%) to fifty percent (50%). The assignment of the NewCo NPI to NewCo pursuant to this Section 4.2 shall: (1) be subject to this Agreement, (2) be "as-is," without warranties of any kind, and expressly subject to all agreements and matters of record, and Permitted Encumbrances, (3) be subject to the ORRI reserved by Owner hereunder, and (4) be limited as further described in Section 4.9(a). For the avoidance of doubt, (i) upon completion of the Rework or Recompletion Project, NewCo shall not be responsible for any expenses, costs, losses, or operations associated with the well that is the subject of such Project and attributable to Owner Interests and (ii) if the Rework or Recompletion Project results in a dry hole or if NewCo does not reach the Recovery Threshold relative to a Rework or Recompletion Project, NewCo shall be solely responsible for any loss it incurred as a result of conducting such Project and shall have

no right of recovery or recourse against Owner relative to such loss; provided that NewCo shall not be responsible for paying for or conducting P&A activities on such well, except that, in the event of a dry hole or unsuccessful completion attempt, prior to removing any equipment used to conduct the applicable Rework or Recompletion Project, NewCo shall, at its sole cost and expense, take such additional actions as are necessary to leave the well in a condition that will not require Owner to take additional actions or perform any additional operations on such well in order to leave the well in a satisfactory condition under then-current regulations. For the avoidance of doubt, for the purpose of this <u>Section 4.2</u>, so long as Owner does not reject such Proposal as contemplated under Section 3.2(a) and subject to the other terms of this Agreement, NewCo may proceed with the activities contemplated in the Proposal regardless of whether Owner elects to participate.

**Section 4.3.** <u>**Sidetrack, Bypass, or Deepening Project.**</u>  If the Proposal is for a Sidetrack, Bypass, or Deepening Project and Owner does not reject such Proposal as contemplated under Section 3.2(a) then NewCo may proceed with the Sidetrack, Bypass, or Deepening Project at its sole risk and expense; provided, however, that before it may proceed with such Proposal, within thirty (30) days of the expiration of the Election Period, (a) NewCo must provide Owner with Project Security for the operations contemplated under such Proposal and (b) the Pre-Existing Net Profit relating to such Sidetrack, Bypass, or Deepening Project shall have been determined either by agreement of the Parties or by the Expert.  If NewCo fails to timely provide Owner with Project Security with respect to any Proposal, then such Proposal shall automatically terminate and have no further or ongoing force or effect and shall be deemed to have been withdrawn by NewCo; and, in such event, NewCo may not proceed with the Project contemplated under the applicable Proposal.   In the event NewCo proceeds with a Sidetrack, Bypass, or Deepening Project as permitted herein, (i) NewCo shall pay 100% of the Capital Development Project Costs associated with the Sidetrack, Bypass, or Deepening Project and attributable to Owner Interests, (ii) following the completion of the Sidetrack, Bypass, or Deepening Project as a successful completion, NewCo will receive an assignment of the NewCo NPI in a form substantially the same as Exhibit B attached hereto, reserving unto Owner the ORRI, (iii) except for P&A Costs as set forth below in clause (iv), upon either completion or termination of the Sidetrack, Bypass, or Deepening Project, NewCo shall not be responsible for any expenses, costs, losses, or operations associated with the well that is the subject of such Project, and (iv) at such time as NewCo has reached the Recovery Threshold and the P&A work and activities are performed on the well that is the subject of such Sidetrack, Bypass, or Deepening Project, NewCo shall pay to Owner fifty percent (50%) of Owner's share of the incremental P&A Costs, if any, incurred by the Sidetrack, Bypass, or Deepening Project.  Owner shall have the right to cash call NewCo for its share of P&A Costs due hereunder; and, in such event, NewCo shall pay Owner such cash called amounts within thirty (30) days of its receipt of such cash call request.  Owner shall promptly following completion of the P&A notify NewCo of the incremental costs incurred and reimburse NewCo for any overpayment, if applicable. For the avoidance of doubt, at such time as NewCo has reached the Recovery Threshold for such applicable Sidetrack, Bypass, or Deepening Project, the NewCo NPI will be reduced from one hundred percent (100%) to fifty percent (50%).  The assignment of the NPI to NewCo pursuant to this Section 4.3 shall: (1) be subject to this Agreement, (2) be "as-is," without warranties of any kind, and expressly subject to all agreements and matters of record, and Permitted Encumbrances, (3) be subject to the ORRI reserved by Owner hereunder, and (4) be limited as further described in Section 4.9(a).  For the avoidance of doubt, with respect to any

13

Sidetrack, Bypass, or Deepening Project undertaken by NewCo, (A) Owner shall have no liability or responsibility to NewCo in the event NewCo is unable to reach the Recovery Threshold relative to such Project, and (B) if NewCo does not reach the Recovery Threshold relative to such Project, then NewCo shall be responsible for one hundred percent (100%) of Owner's share of the incremental P&A Costs caused by the subject of the Sidetrack, Bypass, or Deepening Project. For the avoidance of doubt, for the purpose of this <u>Section 4.3</u>, so long as Owner does not reject such Proposal as contemplated under Section 3.2(a) and subject to the other terms of this Agreement, NewCo may proceed with the activities contemplated in the Proposal regardless of whether Owner elects to participate.

**Section 4.4.** **NewCo Project Manager**.  In the event NewCo is not the contract operator of an Owner Interest at the time of a Proposal or at the time a Capital Development Project is performed, NewCo shall be the project manager on behalf of Owner for the operation, and Owner shall take reasonable actions necessary to cause the then current operator or contract operator to promptly proceed with the operations described in the Proposal at NewCo's direction.  In furtherance of such right of NewCo to be the project manager for such operation, Owner, to the extent it has the ability to do so, hereby grants to NewCo the following rights as the project manager: (i) the right to directly consult with, advise, and direct the then current operator or contract operator, as applicable, regarding such operation, provided that Owner's Representatives shall be included in any such consultations, (ii) access to all books, records, data, and information relating to such operation (including any daily or other periodic operations reports), provided that such access shall be subject to the same restrictions on access and disclosure as apply to Evaluation Data under Section 3.2, and (iii) access to all facilities relating to such operation subject to NewCo's execution of a mutually agreeable boarding agreement. All reasonable out-of-pocket costs incurred by NewCo in performing the foregoing activities as such project manager shall be included in the Capital Development Project Costs for the applicable Project.

**Section 4.5.** **Election Well.**

      (a)    <u>Operating Agreement</u>.  If the Proposal is for the drilling of an Election Well, then contemporaneously with Owner electing to participate in an Election Well, to the extent not in conflict with any existing Third Party Operating Agreements, the Parties shall execute and deliver to each other an operating agreement in substantially the form attached hereto as Exhibit D (each, a "**<u>Subject Operating Agreement</u>**") setting forth the Owner Percentage and NewCo Earned Interest, and the "Contract Area" under such Subject Operating Agreement shall be limited to the Prospect Area to be assigned to NewCo under this Section 4.5(a) if NewCo were to become entitled to such assignment hereunder; provided, however, if NewCo does not earn the assignment to be made pursuant to Section 4.5(b) with respect to any Proposal for which the Parties have executed a Subject Operating Agreement, then such Subject Operating Agreement shall be deemed to have terminated, and the Parties shall take such further actions and execute such additional documents as may be necessary or appropriate to evidence the termination of such Operating Agreement.  With respect to each Prospect that may be the subject of a Proposal for an Election Well, the "**<u>Prospect Area</u>**" associated with any such Prospect shall be limited to (i) such area as may be reasonably developed and drained by such individual well without need for further development within the applicable Prospect Area and (ii) depths from the top of shallowest Objective Formation tested by such Election Well down to the stratigraphic equivalent of one

14

hundred (100) feet below the base of the deepest Objective Formation tested by such Election Well from which production is commenced within two (2) years after spudding such Election Well.

(b)     Owner Participation. If Owner elects to participate in an Election Well, then NewCo shall provide Owner with Project Security for the Election Well, and then, only after providing Owner with such Project Security, may proceed with the Election Well at its sole risk and expense. In such event, (i) NewCo (A) shall pay 100% of the Election Well Costs associated with the Election Well and attributable to Owner Interests and (B) upon completing the Election Well as a successful completion, will receive an assignment of the NewCo Earned Interest applicable to such Election Well in a form substantially the same as Exhibit C attached hereto (the "**Base Assignment Form**"), subject to Section 4.9(c), and shall receive the NewCo Earned Interest share of Revenue and bear the NewCo Earned Interests share of Operating Costs relative to the Project until NewCo has reached the Recovery Threshold relative to such Project, and (ii) thereafter, the ongoing Revenue and Operating Costs, and including P&A Costs, associated with the Project shall be received and borne by the Parties in accordance with the Owner Percentage and NewCo Earned Interest, provided that Owner shall not bear any portion of the ORRI or the Operating Costs incurred prior to NewCo reaching the Recovery Threshold. For the avoidance of doubt, at such time as NewCo has reached the Recovery Threshold for such applicable Election Well, the NewCo Earned Interest will be reduced from one hundred percent (100%) of the applicable Owner Interests to fifty percent (50%) of such Owner Interests, in each case still subject to the ORRI. The assignment of the NewCo Earned Interest to NewCo pursuant to this Section 4.5(b) shall: (1) be subject to this Agreement, (2) be "as-is," without warranties of any kind, and expressly subject to all agreements and matters of record, and Permitted Encumbrances, (3) reserve unto Owner the ORRI, and (4) convey the applicable NewCo Earned Interest as further described in Section 4.9(b). For the avoidance of doubt, if the Election Well is a dry hole or results in a completion for which Owner does not reach the Recovery Threshold, then NewCo shall be solely responsible for bearing such loss and for performing the P&A associated with Owner Interests in such well, including paying all such associated P&A Costs.

(c)     Third Party Operating Agreements. During the Term, in the event that any Prospect Area is subject to any existing operating agreement other than a Subject Operating Agreement (each a "**Third Party Operating Agreement**"), then the terms of such Third Party Operating Agreement shall govern and control. In the event the Prospect Area for a Proposal is subject to a Third Party Operating Agreement, Owner agrees to take such reasonable actions as may be required by the terms of such agreement to propose the Proposal to the other parties to such agreement; provided, that NewCo shall assist Owner in taking such actions as may reasonably be requested by Owner.

(d)     Operating Agreement Conflicts. To the extent that the provisions of this Agreement conflict with the provisions of any Third Party Operating Agreement, then solely between the Parties, the provisions of this Agreement shall govern and control, *mutatis mutandis*; provided, however, upon commencement of any Election Well, the provisions of any applicable Operating Agreement shall govern all further elections and operations with respect to such Election Well and any subsequent operations within a Prospect Area.

15

(e)    Operator Designation.  To the extent permitted by applicable Law and subject to the terms of any Third Party Operating Agreement, upon written request of Owner for each Prospect Area associated with an Election Well pursuant to which NewCo earns a NewCo Earned Interest, NewCo shall be designated and assume the responsibilities of operator of each such Prospect Area. In such event, Owner agrees to take reasonable actions in assisting NewCo in having all co-owners of such Prospect Area agree to such designation and to execute the required documentation for such designation.

(f)    Existing Facilities.  Subject to (i) the terms of any applicable Third Party Operating Agreement and applicable Law and (ii) the condition of the applicable facilities and any operations then being conducted thereon, to the extent Owner has the ability to grant NewCo such rights, NewCo shall be entitled to access and use existing facilities owned by Owner to the extent necessary to drill, evaluate, complete, equip, and produce any Election Well, free of costs except Third Party costs and the fees described in Section 4.11 (which costs shall be Election Well Costs), and Owner shall take commercially reasonable actions to help facilitate NewCo's right to access such facilities.  In so accessing any of Owner's facilities, NewCo shall execute and deliver to Owner a boarding agreement or such other instrument as may be reasonably required by Owner in its reasonable discretion to permit NewCo's access to such facilities and to allocate risks associated with NewCo's operations on such facilities.

(g)    Elections Not to Participate.  Notwithstanding anything herein to the contrary, if the Proposal is to drill an Election Well and Owner does not elect to participate within the Election Period, then the Proposal shall expire, and neither Party shall have any obligation to the other with respect to the Proposal and NewCo shall have no right to proceed with drilling the Election Well.  If Owner or its successors or assigns undertake to drill the Election Well described in the Proposal within two (2) years after expiration of the Election Period for such Proposal, then Owner shall offer NewCo the right (exercisable for a period of 30 days) to participate in such Election Well on the same terms as set forth in the original Proposal and this Agreement.

**Section 4.6.    Withdrawal or Termination of Proposals.**

(a)    Subject to any applicable Third Party Operating Agreement, NewCo may withdraw a Proposal at any time prior to the mobilization of materials and equipment toward the commencement of operations under the Proposal.  If a Proposal is withdrawn by NewCo or deemed to have been withdrawn as provided in this Agreement, then all terms of this Agreement shall be interpreted as if such Proposal was never made.

(b)    Notwithstanding Section 4.6(a), with respect to any Project for which NewCo has the right to proceed hereunder, the Proposal for such Project shall be deemed to have automatically terminated and been withdrawn if NewCo does not (i) Commence the applicable Project within one hundred twenty (120) days (excluding any extension expressly agreed to in writing by the Parties) following NewCo's making of such Proposal and (ii) thereafter diligently and continuously perform such Project until completed, subject to extensions of the foregoing time period to the extent NewCo is prevented from either Commencing or performing such Project by events of Force Majeure; provided that NewCo shall make reasonably diligent efforts to overcome such events of Force Majeure.  In the event any Project is deemed terminated or

16

withdrawn, Owner shall promptly return to NewCo any Project Security it provided to Owner under this Agreement in connection with such Proposal.

      (c)     If a Proposal is terminated pursuant to Section 4.6(b) as a result of NewCo's failure to timely Commence performance of a Project, then (i) the applicable Owner may elect to conduct the Project that was the subject of such Proposal without any obligation to offer NewCo the opportunity to participate in such Project notwithstanding any term in this Agreement to the contrary and (ii) if Owner has not so elected and NewCo desires to conduct the Project that was the subject of such terminated Proposal, it must resubmit a new Proposal for such Project which shall be subject to the terms of this Agreement in all respects.

**Section 4.7.**   **Project Security**. With respect to any Project for which NewCo has provided Owner with Project Security hereunder, upon the occurrence of the Recovery Threshold for such Project, the Owner agrees that the principal amount of such Project Security shall be proportionately reduced in an amount corresponding to the reduction of NewCo's responsibility for costs and expenses attributable to such Project including the reduction of its P&A obligations; and the Parties agree to execute such instruments or take such other actions as may be reasonably necessary to evidence such reduction.

**Section 4.8.**   **Liability for Operations**.

      **(a)**     **With respect to any operations conducted by NewCo or its contractors on any Capital Development Project or Election Well, as between Owner and NewCo, NewCo shall be solely responsible and liable for, and shall fully indemnify, defend, and hold harmless Owner, their affiliated and subsidiary companies, contractors (other than NewCo), representatives, and consultants, and all of their respective officers, directors, and employees, from and against any and all claims, demands, suits, causes of action, judgments, fines, penalties, or orders relating to or arising out of the operations so conducted by NewCo or its contractors, including, without limitation, incidents of non-compliance, civil penalties, personal injuries, property damage, or pollution, without regard to the negligence (whether sole, joint, or concurrent, or active or passive), strict liability, or other fault of the foregoing indemnified Persons, <u>except to the extent resulting from the negligence, gross negligence or willful misconduct of any of the foregoing indemnified Persons.</u>**

      **(b)**     **Notwithstanding anything herein to the contrary, in no event shall NewCo be liable for any damages or claims arising in whole or in part from its failure or inability to reach the Objective Depths or Objective Formations.**

**Section 4.9.**   **Assignments**.

      (a)     <u>NPI Assignments</u>. If NewCo is entitled to receive an assignment of a NewCo NPI in connection with any Capital Development Project, such assignment shall be limited to the interval completed or worked over as a result of such operation.

      (b)     <u>Election Well Assignments</u>. If NewCo is entitled to receive an assignment from Owner in connection with any Proposal for an Election Well, such assignment shall, subject to Section 4.9(c) below, be limited to the applicable oil and gas lease(s) insofar as it pertains to each

Prospect Area that is developed by the Election Well and the depths as specified in Section 4.5(a) above.

(c)    BOEM Assignments.  To the extent any Prospect Area in which NewCo earns an assignment of the NewCo Earned Interest hereunder covers all or a part of one or more aliquots in which BOEM would recognize NewCo's ownership, then in conjunction with the assignment of the NewCo Earned Interest and notwithstanding the Base Assignment Form, the Parties agree to execute and file appropriate BOEM-0150 forms from the pertinent Owner to NewCo and covering fifty percent (50%) of Owner's BOEM recognized operating rights in and to such aliquot(s) from the surface to one hundred feet (100') below the deepest depth drilled of the applicable Election Well (utilizing the Base Assignment Form attached as Exhibit A thereto) ("*BOEM OR Assignments*"). In such event, the Parties recognize and agree that such BOEM OR Assignments must be filed with BOEM or such other required Governmental Authorities.  In the event any such Governmental Authorities fail to accept or approve any such BOEM OR Assignments, the Parties will fully cooperate in the development of an assignment and any other filings or instruments that will comply with the requirements of such Governmental Authority's filing and approval procedures (or such other filing procedures as may be hereafter promulgated) or as will accomplish the intent of this Agreement, together with assignments to be filed in the adjacent county or parish records reasonably necessary to give effect to the intent of this Agreement and provide Third Parties with notice of any such assignments.  Notwithstanding the foregoing, if, as a result of circumstances beyond the reasonable control of Owner and NewCo, the assignment will not be approved by BOEM, the Parties will file the BOEM OR Assignment in the non-required records maintained by BOEM for the applicable lease or leases.

(d)    ORRI. It is understood and agreed that the ORRI reserved by the applicable Owner under any certain assignment made pursuant to the terms of this Agreement shall apply to all renewals, extensions, and other similar arrangements (and/or interests therein) of the applicable subject lease(s). Only a new lease taken by NewCo, its successors or assigns, within one (1) year after expiration or release of a such applicable subject lease and which covers the same lands, shall be considered a renewal or extension for the purposes hereof.

**Section 4.10.**    **Rights upon Abandonment of Certain Wells**.

(a)    Abandonment Notice.  Subject to the terms of all applicable Third Party Operating Agreements, in the event that Owner and/or the other joint owners in any of the Owner Interests, if any, desire to permanently plug and abandon a well in the Development Area that was producing on the Execution Date (each a "**P&A Well**"), Owner (or, if the Contract Operator Agreement is then in effect, NewCo) shall provide NewCo, no later than the earlier of (A) fifteen (15) days prior to the election deadline set forth in the applicable Third Party Operating Agreement, if any, for which the Owner must elect whether to permanently plug and abandon such well and (B) one hundred and twenty (120) days prior to the commencement of such plugging, abandonment, dismantling, or decommissioning, a written notice to NewCo ("**Abandonment Notice**") that identifies such P&A Well and, if there are no other then-completed wells within such applicable aliquot, the leasehold interests in the aliquot within which such P&A Well is then completed and for which BOEM would recognize an assignment of such interest to NewCo (the "**P&A Leasehold**"); provided that if the Contact Operator Agreement is

then in effect or if NewCo or its Affiliate is then the contract service provider to Owner, Owner shall not be obligated to provide any such Abandonment Notice to NewCo.  Notwithstanding anything herein to the contrary, Owners shall have no liability or obligations to NewCo as a result of the failure to provide NewCo with any Abandonment Notice.

(b)   Right to Acquire P&A Well.  Subject to the terms of any Third Party Operating Agreement, NewCo may elect to acquire all or any P&A Well and the corresponding P&A Leasehold, if any, by delivering a written election to acquire same no later than ten (10) days after NewCo's receipt of an Abandonment Notice.  If NewCo fails to deliver a written election to acquire any P&A Well prior to or on the date ten (10) days after receipt of an Abandonment Notice, such failure shall be deemed an election not to acquire any such P&A Well. Notwithstanding anything in this Agreement to the contrary, NewCo's election to acquire any P&A Well may be accepted or rejected by Owner in Owner's sole discretion.

(c)   Effect of Exercise.  If NewCo validly elects to acquire any P&A Well and the corresponding P&A Leasehold, if any, such election shall constitute a binding obligation of NewCo to acquire Owner Interests in same no later than the later of (i) sixty (60) days after NewCo's election or (ii) the date NewCo obtains all applicable pre-assignment approvals, qualifications, right of use easements, and permits required under applicable Laws and contracts to acquire and operate (if applicable) such P&A Well and P&A Leasehold, if any.  Owner and NewCo shall execute and deliver to NewCo such forms and instruments reasonably requested by NewCo or Owner, including an assignment in form mutually agreeable to the Parties; provided, however, that the P&A Well and P&A Leasehold, if any, shall be assigned subject to this Agreement, "as-is" and without warranties of any kind, and expressly subject to all agreements and matters of record and all existing encumbrances.  In consideration for such assignment, NewCo shall assume, and perform and indemnify, defend, and hold harmless Owner, from the P&A Costs with respect to such P&A Well and P&A Leasehold, if any; however, Owner shall retain liability for and indemnify, defend, and hold harmless NewCo for all other obligations related to the time period prior to the assignment. Furthermore, NewCo must provide Owner with a mutually agreed upon security instrument covering the full estimated cost for such P&A Well at the time of the assignment, which shall remain in place until NewCo has completed the P&A for such P&A Well. In connection with delivery of the assignment hereunder, at the sole cost and expense of NewCo, the Owner shall deliver to, or cause to be delivered to, NewCo all Well Data and all other records and information in its possession with respect to the P&A Well in a manner reasonably agreed to by the Parties.  Owner shall cooperate with NewCo to execute any assignment, designation of operator, or any other instrument reasonably required by NewCo to consummate the intent of this Section 4.10, including NewCo becoming the owner and designated operator of the P&A Well and P&A Leasehold, if any.

**Section 4.11.  Processing Fees.**

(a)   Subject to any applicable Third Party Operating Agreement, NewCo agrees to pay of its proportionate share of all fees associated with any production handling agreement or any other agreement governing the processing of production at any facility owned in part or in whole or operated by Owner.

19

(b)     Subject to any applicable Third Party Operating Agreement, in absence of a production handling agreement or any other agreement covering the processor of production any facility owned by Owner, NewCo hereby agrees to pay Owner the following fees for the NewCo Earned Interest share of production processed at any facility owned in party or in whole by Owner:

      (i)     $2.00 per barrel for oil/condensate;

      (ii)     $1.50 per barrel for water; and

      (iii)     $0.20 per MCF for gas.

As used herein, "MCF" means one thousand cubic feet measured at standard pressure and temperature, defined to as cubic feet of volume at 60 degrees Fahrenheit and 14.7 pounds per square inch and a "barrel" is 42 U.S. gallons.

Effective March 1 of each year during which any production from a Project conducted under this Agreement is processed under this Section 4.11, the fees to be charged hereunder shall be adjusted by multiplying the rates then in effect by the percentage increase, if any, in the consumer price index, as published by the Bureau of Labor Statistics of the United States Department of Labor for all Urban Consumers, specifically, the "All Items" Unadjusted Expenditure Category (the "CPI-U"), from (i) December 31 of the year immediately preceding the year then just ended to (ii) December 31 of the year just ended. For the avoidance of doubt, no adjustment will be made in the event of a decrease in the CPI-U for an applicable year.

For the avoidance of doubts, the "Operating Costs" used for the purpose of calculating the NewCo NPI and for determining when NewCo has reached the Recovery Threshold shall include the processing fees provided herein with respect to NewCo NPI share of production resulting from the Capital Development Project. For the purpose of this Section 4.11, the NewCo NPI share means fifty percent (50%) of Owner's Interest in the production.

**Section 4.12.** **Expert Determination of Pre-Existing Net Profit**. If, as contemplated in the definition of Pre-Existing Net Profit, a Party submits the determination of Pre-Existing Net Profit with respect to any Capital Development Project to the Expert, the procedures set forth in this Section 4.12 shall apply. Prior to submitting such matter to the Expert, the Party intending to make the submission shall provide written notice to the other Party of such intent. If the Parties are still unable to agree upon the Pre-Existing Net Profit within five (5) Business Days following the other Party's receipt of the notice provided herein, then the Party intending to submit the matter to the Expert may so submit such matter to the Expert for final and binding determination. To submit the determination of Pre-Existing Net Profit to the Expert, the submitting Party shall provide the Expert and the other Party with written notice of its request to have the Expert determine Pre-Existing Net Profit. Within five (5) Business Days of providing that notice, the Parties shall each provide the Expert with (a) such data and information as is necessary for the Expert to be able to determine the Pre-Existing Net Profit, which data and information shall include applicable Well Data, Evaluation Data, and production data relating to the well that is the subject of such proposed Capital Development Project and (b) such Party's estimate of the Pre-Existing Net Profit. The Expert shall, within five (5) Business Days of receiving such data and information, make its calculation of the Pre-Existing Net Profit using the data and information it has received from the

20

Parties and the most recently available forward curve strip pricing for crude oil and natural gas as provided by NYMEX as of the date preceding the Expert's determination. In making its determination hereunder, the Expert (i) shall be bound by the provisions of this Section 4.12 and the related definitions and (ii) may not assign a value to the Pre-Existing Net Profit greater than the value provided by Owner or less than the value provided by NewCo. If, prior to the Expert finalizing its determination of the Pre-Existing Net Profit, the Parties reach agreement, then they may withdraw the matter from the Expert. The determination of the Expert shall be (x) final and binding on the Parties and (y) final and non-appealable for all purposes hereunder. The fees and expenses of the Expert under this Section 4.12 shall be borne one half by the Owner and one half by NewCo. If the party selected as the Expert is unable or unwilling to serve as the Expert hereunder, then the Expert shall be selected by lot from among the nationally recognized independent reserves or reservoir engineering firms that have not represented any Party or its Affiliates at any time during the three-year period of time immediately preceding its designation hereunder.

## ARTICLE V.
## MISCELLANEOUS

**Section 5.1.    Notices**.  All notices, copies, and other communications that are required or that may be given pursuant to this Agreement (including notices to change the below information) shall be (a) sufficient in all respects if given in writing, in English, and delivered by both email and, additionally, by mail, or recognized courier service to the Party to be noticed or copied pursuant to the contact information below that corresponds with the applicable form of notice and (b) deemed received when actually delivered (as reflected by the courier's receipt or similar electronic receipt (as to email transmissions) or without receipt of invalid delivery):

If to NewCo:

Mako Buyer LLC
2000 W. Sam Houston Parkway, Suite 1200
Houston, Texas 77042
Attn: Thomas R. Lamme
Telephone:  (713) 969-1107
Email:  TLamme@fwellc.com

If to Owner:

Fieldwood Energy IV LLC
2000 W. Sam Houston Parkway S., Suite 1200
Houston, Texas 77042
Attn:  Sole Manager
Telephone:  _____
Email:  _____

or to such other address or addresses as the Parties may from time to time designate in writing.

21

**Section 5.2.** **Conflicts**. To the extent that any provision of this Agreement conflicts with the provisions of the Contractor Operator Agreement, then as solely between the Parties, the provisions of this Agreement shall govern and control. Additionally, Owner's elections in this Agreement are subject to the Company Agreement.

**Section 5.3.** **Governing Law**. This Agreement shall be governed and construed in accordance with the Laws of the State of Texas, without regard to the Laws that might be applicable under conflicts of laws principles.

**Section 5.4.** **Venue**. Each Party consents to personal jurisdiction in any action brought in the United States federal and state courts located in the State of Texas with respect to any dispute, claim, or controversy arising out of or in relation to or in connection with this Agreement, and each of the Parties hereto agrees that any action instituted by it against the other with respect to any such dispute, controversy, or claim will be instituted exclusively in the state and federal district courts located in Harris County, Texas. EACH PARTY HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, ANY OBJECTION WHICH THEY MAY NOW OR HEREAFTER HAVE TO THE VENUE OF ANY SUCH DISPUTE ARISING OUT OF THIS AGREEMENT BROUGHT IN SUCH COURT OR ANY DEFENSE OF INCONVENIENT FORUM FOR THE MAINTENANCE OF SUCH DISPUTE.

**Section 5.5.** **Waiver of Jury Trial**. EACH OF THE PARTIES AND THEIR RESPECTIVE SUCCESSORS AND ASSIGNS HEREBY IRREVOCABLY WAIVES ALL RIGHT TO TRIAL BY JURY IN ANY ACTION, PROCEEDING, OR COUNTERCLAIM (WHETHER BASED ON CONTRACT, TORT, OR OTHERWISE) ARISING OUT OF OR RELATING TO THIS AGREEMENT, THE TRANSACTIONS CONTEMPLATED HEREBY, OR THE ACTIONS OF ANY OTHER PARTY IN THE NEGOTIATION, ADMINISTRATION, PERFORMANCE, AND ENFORCEMENT THEREOF.

**Section 5.6.** **Expenses**. Except as provided in another agreement, all fees, costs, and expenses incurred by NewCo and Owner in negotiating this Agreement shall be paid by the Party incurring the same, including, without limitation, legal fees, costs, and expenses.

**Section 5.7.** **Compliance with Law**. Each Party agrees that it will comply with applicable Laws, rules, regulations, and orders of Governmental Authority in the performance of this Agreement.

**Section 5.8.** **Amendment**. This Agreement may be amended or modified only by a duly authorized agreement in writing that makes reference to this Agreement executed by each Party.

**Section 5.9.** **Waiver**. Any failure by any Party to comply with any of its obligations, agreements, or conditions herein contained may be waived by the Party to whom such compliance is owed by an instrument signed by the Party to whom compliance is owed and expressly identified as a waiver, but not in any other manner. No waiver of, or consent to a change in or modification of, any of the provisions of this Agreement shall be deemed or shall constitute a waiver of, or consent to a change in or modification of, any other provisions hereof (whether or not similar), nor shall such waiver constitute a continuing waiver unless otherwise expressly provided.

**Section 5.10.  Entire Agreement**.  This Agreement (together with the Exhibits hereto) and the other Transaction Documents constitute the entire agreement among the Parties and supersede any term sheets or oral agreements that may have been made or entered into by the Parties or any of their respective Affiliates relating to the transactions contemplated hereby.

**Section 5.11.  Assignment**.  No Party may assign any interest in this Agreement without the prior written consent of the other Party(ies).  This Agreement is personal to the Parties, and any attempted assignment shall be void *ab initio*; provided that the foregoing shall not apply if NewCo assigns this Agreement along with its personnel to an Affiliate.  Neither assignment nor consent to assignment shall relieve or release the assignor from its obligations under this Agreement, without an express written release signed by the other Party or Parties.  Notwithstanding anything herein to the contrary, this Agreement is personal between Owner and NewCo and shall not constitute a covenant running with the lands included in the Development Area or a burden on any Owner Interests except as to a particular Owner Interest for which (x) Owner has received a Proposal from NewCo relating to such Owner Interest and (y) such NewCo Proposal has not terminated, been withdrawn, or deemed to have been withdrawn.

**Section 5.12.  Binding Effect**.  The covenants, provisions, and conditions contained in each Assignment given pursuant to this Agreement are agreed and acknowledged to be covenants running with the land and the respective interests of the Parties and will be binding upon and inure to the benefit of the Parties and their respective successors and assigns.

**Section 5.13.  Further Assurances**.  Subject to the terms and conditions of this Agreement, each Party shall use its reasonable efforts to take, or cause to be taken, all actions and to do, or cause to be done, all things necessary or desirable, under applicable Law or otherwise, to consummate the transactions contemplated by this Agreement.  The Parties agree to and shall execute and deliver such other documents, certificates, agreements, and other writings and to take such other actions as may be necessary or desirable in order to consummate or implement expeditiously the transactions contemplated by this Agreement in accordance with the terms hereof.

**Section 5.14.  Construction**.

(a)  All article, section, schedule, and exhibit references used in this Agreement are to articles and sections of, and Schedules and Exhibits to, this Agreement, unless otherwise specified. The Schedules and Exhibits attached to this Agreement shall not amend or modify this Agreement, but the facts (as distinguished from agreements) stated therein are incorporated herein for all purposes.

(b)  Unless otherwise indicated, with respect to either Party, the terms "ordinary course of business" or "ordinary course" shall be deemed to refer to the ordinary conduct of business in a manner consistent with the past practices and customs of such Party.

(c)  If a term is defined as one part of speech (such as a noun), it shall have a corresponding meaning when used as another part of speech (such as a verb).  Terms defined in the singular have the corresponding meanings in the plural, and vice versa.  Unless the context of this Agreement clearly requires otherwise, words importing the masculine gender shall include the feminine and neutral genders and vice versa.  The words "include", "includes" or "including"

23

do not limit the preceding terms and shall be deemed to be followed by the words "without limitation." The words "hereof," "hereto," "hereby," "herein," "hereunder" and words of similar import, when used in this Agreement, shall refer to this Agreement as a whole and not to any particular section or article in which such words appear. The term "or" is not exclusive.

(d) The terms "day" and "days" mean and refer to calendar day(s). The terms "year" and "years" mean and refer to calendar year(s). If any action is to be taken or given on or by a particular calendar day, and such calendar day is not a Business Day, then such action shall be deferred until the next Business Day.

(e) Owner and NewCo have each participated in the negotiation and drafting of this Agreement and if an ambiguity should arise, this Agreement shall be construed as if drafted jointly by the Parties, and no presumption or burden of proof shall arise favoring or burdening any Party by virtue of the authorship of any of the provisions in this Agreement.

(f) The captions in this Agreement are for convenience only and shall not be considered a part of or affect the construction or interpretation of any provision of this Agreement.

(g) The phrase "made available" means that such Party or one of its Affiliates or Representatives has had the opportunity prior to the date hereof to review such documents or materials at the offices of another Party or its Affiliates.

(h) All references to currency herein shall be to, and all payments required hereunder shall be paid in, United States Dollars.

(i) The serial comma is sometimes included and sometimes omitted. Its inclusion or omission shall not affect the interpretation of any phrase.

**Section 5.15. No Partnership**. Except as otherwise expressly provided in this Agreement, (a) nothing in this Agreement is intended to create, or shall be construed as creating, a partnership, joint venture, association for profit, or other business entity between or among the Parties and (b) for federal and state income tax purposes, the Parties do not intend that the provisions of Subchapter K, Chapter 1, Subtitle A of the Internal Revenue Code of 1986, as amended, as permitted and authorized by Section 761 of said Code and the regulations promulgated thereunder apply to the transactions described in this Agreement.

**Section 5.16. Severability**. If any provision of this Agreement is held invalid or unenforceable by any court of competent jurisdiction, the other provisions of this Agreement shall remain in full force and effect. The Parties further agree that if any provision contained herein is, to any extent, held invalid or unenforceable in any respect under the Laws governing this Agreement, they shall take any actions necessary to render the remaining provisions of this Agreement valid and enforceable to the fullest extent permitted by Law and, to the extent necessary, shall amend or otherwise modify this Agreement to replace any provision contained herein that is held invalid or unenforceable with a valid and enforceable provision giving effect to the intent of the Parties to the greatest extent legally permissible.

**Section 5.17.  Third Party Beneficiaries**.  Owner and NewCo acknowledge and agree that this Agreement is entered solely for the benefit of the Parties hereto and shall not create any rights, including without limitation third-party beneficiary rights, in favor of any other party.

**Section 5.18.  Counterparts**.  This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.  Any .pdf or other electronic transmission hereof or signature hereon shall, for all purposes, be deemed originals.

[Remainder of Page Intentionally Blank]

25

Executed as of the Execution Date but effective as of the Effective Date.

**OWNER:**

**FIELDWOOD ENERGY IV LLC**


By:  _____
Name:
Title:



**NEWCO:**

**MAKO BUYER LLC**


By:  _____
Name:
Title:

**EXHIBIT A**

**DEVELOPMENT AREA (INCLUDING OIL AND GAS LEASES)**

| Area / Block | Lease Number |
| --- | --- |
| BA A-105 | OCS-G01757 |
| BA A-133 | OCS-G02665 |
| EB 158 | OCS-G02645 |
| EB 159 | OCS-G02646 |
| EB 160 | OCS-G02647 |
| EB 161 | OCS-G02648 |
| SS 169 | OCS-00820 |

**EXHIBIT B**

**<u>Form of Net Profits Interest Assignment</u>**

(See attached.)

**ASSIGNMENT OF NET PROFITS INTEREST**

This ASSIGNMENT OF NET PROFITS INTEREST ("**Assignment**") dated [_____, 202_], but effective as of 12:01 a.m. Central Standard Time, on [●], 202_ (the "**Effective Time**"), is from Fieldwood Energy IV LLC, a Texas limited liability, with an office at 2000 West Sam Houston Parkway South, Suite 1200, Houston, Texas 77042 ("**Assignor**") to Mako Buyer LLC, a Delaware limited liability company, with an office at 2000 West Sam Houston Parkway South, Suite 1200, Houston, Texas 77042 ("**Assignee**").  Assignor and Assignee sometimes individually referred to herein as, a "**Party**" and collectively referred to herein as, the "**Parties**".

FOR Ten Dollars ($10.00) and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Assignor hereby GRANTS, BARGAINS, SELLS, CONVEYS and ASSIGNS to Assignee the Assigned NPI (as defined below), reserving unto Assignor the ORRI.

TO HAVE AND TO HOLD the Assigned NPI under Assignee subject to the ORRI and the following terms and conditions:

1.      As used in this Assignment, the following terms shall have the meanings ascribed to them below:

"Affiliate" means, with respect to any Person, any other Person that, directly or indirectly, controls, is controlled by or is under common control with, such specified Person through one (1) or more intermediaries or otherwise; provided, however, that, for the purposes of this Agreement, Assignor shall not be deemed an Affiliate of Assignee, and *vice versa*.  For the purposes of this definition, "control" means, where used with respect to any Person, the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities, by contract or otherwise, and the terms "controlling" and "controlled" have correlative meanings.

"Assigned NPI" means with respect to production from the Interval, a net profits interest equal to (i) one hundred percent (100%) of the Excess Net Profit until Assignee has reached the Recovery Threshold with respect to such Interval and (ii) from and after such time that Assignee has reached the Recovery Threshold with respect to such Interval, automatically reducing to fifty percent (50%) of the Excess Net Profit.

"Capital Development Project" has the meaning given such term in the Joint Development Agreement.

"Capital Development Project Costs" means, to the extent attributable to Assignor's right, title, and interest in and to the Interval, any and all out-of-pocket costs and expenses incurred in (i) preparing for and completing the Capital Development Project pursuant to which Assignee is receiving this Assignment and (ii) conducting all other operations set forth in the applicable Proposal for such Capital Development Project, including, without

limitation, all reasonable Third Party engineering costs, legal costs, and permitting costs, but excluding overhead and general and administrative costs.

"Excess Net Profit" means the Net Profit from a Capital Development Project over any applicable period, minus the Pre-Existing Net Profit. For the purposes of this Assignment, the  Pre-Existing Net Profit that would have been realized over such period if the Capital Development Project had not been undertaken will be deemed to be zero ($0) for a recompletion where the well's production data from the most recent three (3) months of production prior to the date Assignee, or another operator pursuant to Section 4.4 of the Joint Development Agreement, applies for a permit to modify the applicable well shows the existing completion producing at average rates of less than fifty (50) barrels of oil per day or, if the well is a gas well, three hundred (300) MCFD of gas; provided, however, periods during which the well was intermittently shut-in during such three (3) month period shall be excluded from the calculation of average production so that such average is not artificially lowered as a result of any such intermittent shut-ins.

"Existing Burdens" has the meaning given such term in the Joint Development Agreement, as such is applied to Assignor's interest in the Well at the time the Proposal for this Capital Development Project was made.

"Interval" means the completed or reworked interval from [●] feet TVDSS to [●] feet TVDSS in the Lease as such production is obtained from the Well.

"Joint Development Agreement" means that certain Joint Development Agreement dated [●] by and between Fieldwood Energy IV LLC, as Owner, and Mako Buyer LLC, as NewCo.

"Lease" means that oil and gas lease [OCS or State of Louisiana No. ] dated        granted by     in favor of     .

"MCFD" means thousand cubic feet of gas per day, as measured at a base temperature of sixty degrees Fahrenheit (60ºF) and a base pressure of fourteen and sixty-five hundredths (14.65) pounds per square inch absolute (psia).

"Net Profit" means, with respect to Assignor's rights, title, and interest in and to the production from the Interval, the difference obtained by subtracting Operating Costs from Revenue; where (i) "Operating Costs" equals the sum of (1) direct operating costs related to the Well during the applicable production month, including platform, facility, processing, and pipeline operating costs and fees allocated equally amongst all producing wells on or tied back to such platform, if applicable, (2) all Existing Burdens on such Interval, (3) all severance or other taxes measured or calculated based upon production from such Well (but for the avoidance of doubt, excluding income taxes and ad valorem taxes), and (4) the ORRI, and (ii) "Revenue" equals the net revenue attributable to Assignor's net revenue interest in the proceeds of production from the Interval for that applicable production month.

"ORRI" means, with respect to the Assigned NPI, an overriding royalty interest equal to twenty-five percent (25%) less Existing Burdens proportionately reduced to the Assigned NPI, as applicable and further proportionately reduced as the Assigned NPI may be reduced pursuant to the terms of the Joint Development Agreement as a result of Assignee achieving the Recovery Threshold with respect to the Interval.

"Person" means an individual, corporation, partnership, limited liability company, association, joint stock company, trust or trustee thereof, estate or executor thereof, unincorporated organization, joint venture, or any other legally recognizable entity.

"Pre-Existing Net Profit" means [●].

"Proposal" has the meaning given such term in the Joint Development Agreement.

"Recovery Threshold" means, with respect to the Capital Development Project resulting in this Assignment, Assignee's recovery from the Assigned NPI equal to one hundred percent (100%) of the Capital Development Project Costs incurred by Assignee in performing such Capital Development Project.

"Third Party" means any Person who is not a Party or any Affiliate of any Party.

"Well" means the [●] well located on [●].

2.    Agreements.  This Assignment is made subject to and is burdened by the Existing Burdens and the terms of the Joint Development Agreement.

3.    ORRI.  The ORRI is expressly reserved unto Assignor hereunder and shall be a non-operating, non-expense-bearing, overriding royalty interest, free of cost and expense of production, operations, marketing, and delivery of the hydrocarbons to the applicable delivery points.

4.    Warranties.  EXCEPT AS SET FORTH BELOW, THIS ASSIGNMENT IS MADE, AND THE ASSIGNED NPI IS CONVEYED AND ASSIGNED HEREUNDER, WITHOUT REPRESENTATION OR WARRANTY OF ANY KIND OR CHARACTER, INCLUDING, WITHOUT LIMITATION, WARRANTIES OF TITLE, FITNESS FOR ANY PARTICULAR PURPOSE, MARKETABILITY, MERCHANTABILITY, FREEDOM FROM DEFECTS, QUALITY OR PRESENCE OF HYDROCARBONS OR RESERVES, AND ANY OTHER REPRESENTATIONS AND WARRANTIES, EXPRESS OR IMPLIED, AT LAW OR IN EQUITY; AND ASSIGNOR DOES HEREBY DISCLAIM AND ASSIGNEE WAIVES ANY AND ALL SUCH REPRESENTATIONS OR WARRANTIES. THE ASSIGNED NPI SHALL BE ASSIGNED TO ASSIGNEE FREE AND CLEAR OF ANY AND ALL MORTGAGES, LIENS AND ENCUMBRANCES CREATED BY, THROUGH, OR UNDER ASSIGNOR.

5.    Compliance with Laws.  This Assignment is made subject to all applicable laws, statutes, ordinances, permits, decrees, orders, judgments, rules, and regulations that are promulgated, issued or enacted by a governmental entity having jurisdiction, and Assignee agrees to comply with the same on and after the Effective Time.

6.      Successors and Assigns.    The terms, covenants, and conditions contained in this Assignment are binding upon and inure to the benefit of the Parties and their respective successors and assigns, and such terms, covenants, and conditions are covenants running with the land and with each subsequent transfer or assignment of the Assets or any part thereof.

7.      Redhibition Waiver.    ASSIGNEE: (I) WAIVES ALL RIGHTS IN REDHIBITION PURSUANT TO LOUISIANA CIVIL CODE ARTICLES 2520, ET SEQ.; (II) ACKNOWLEDGES THAT THIS EXPRESS WAIVER SHALL BE CONSIDERED A MATERIAL AND INTEGRAL PART OF THIS SALE AND THE CONSIDERATION THEREOF; AND (III) ACKNOWLEDGES THAT THIS WAIVER HAS BEEN BROUGHT TO THE ATTENTION OF ASSIGNEE, HAS BEEN EXPLAINED IN DETAIL AND THAT ASSIGNEE HAS VOLUNTARILY AND KNOWINGLY CONSENTED TO THIS WAIVER OF WARRANTY OF FITNESS AND WARRANTY AGAINST REDHIBITORY VICES AND DEFECTS FOR INTERESTS ASSIGNED AND CONVEYED HEREUNDER.

8.      UTPCPL Waiver.    TO THE EXTENT APPLICABLE TO THE ASSIGNED NPI OR ANY PORTION THEREOF, ASSIGNEE HEREBY WAIVES THE PROVISIONS OF THE LOUISIANA UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION LAW (LA. R.S. 51:1402, *ET SEQ.*).  ASSIGNEE WARRANTS AND REPRESENTS THAT IT: (I) IS EXPERIENCED AND KNOWLEDGEABLE WITH RESPECT TO THE OIL AND GAS INDUSTRY GENERALLY AND WITH TRANSACTIONS OF THIS TYPE SPECIFICALLY; (II) POSSESSES THE REQUISITE KNOWLEDGE, EXPERIENCE, AND EXPERTISE TO EVALUATE INDEPENDENTLY THE MERITS AND RISKS OF THE TRANSACTIONS HEREIN CONTEMPLATED; AND (III) IS NOT IN A SIGNIFICANTLY DISPARATE BARGAINING POSITION.

9.      Further Assurances.  Each Party covenants and agrees to execute and deliver to the other Party all such additional reasonable instruments and other documents and will do all such other reasonable acts and things as may be reasonably necessary to accomplish the intent of this Assignment.

10.     Governing Law.  This Assignment shall be governed and construed in accordance with the Laws of the State of Texas, without regard to the Laws that might be applicable under conflicts of laws principles.

11.     Jurisdiction and Venue.  Each Party consents to personal jurisdiction in any action brought in the United States federal and state courts located in the State of Texas with respect to any dispute, claim, or controversy arising out of or in relation to or in connection with this Assignment, and each of the Parties hereto agrees that any action with respect to any such dispute, controversy, or claim will be determined exclusively in a state or federal district court located in Harris County, Texas, and they do hereby irrevocably submit to the exclusive jurisdiction of such courts for such purposes.  Each Party hereby irrevocably waives, to the fullest extent permitted by law, any objection which they may now or hereafter have to the venue of any such dispute arising out of this assignment brought in such court or any defense of inconvenient forum for the maintenance of such dispute.

12.     Counterparts.  This Assignment may be executed in any number of counterparts and each of such counterparts shall for all purposes be deemed to be an original, and all such counterparts shall together constitute but one and the same Assignment.

[*Signature Page to Follow*]

EXECUTED on the day and year first referenced above, but effective as of the Effective Time.

**WITNESSES:**

 

 

_____
Name: _____

 

_____
Name: _____

<u>**ASSIGNOR:**</u>

**FIELDWOOD ENERGY IV LLC**

By: _____
Name: _____
Title: _____

| | |
|---|---|
| STATE OF [●] | § |
| | § |
| COUNTY OF [●] | § |

On this \_\_\_\_ day of _____, 202\_, before me appeared [●] to me personally known, who, being by me duly sworn (or affirmed) did say that [he/she] is the [●] of Fieldwood Energy IV LLC, a Texas limited liability company, and that the instrument was signed on behalf of the limited liability company and by the authority of the Members and that [he/she] acknowledged the instrument to be the free act and deed of the limited liability company.

_____
NOTARY PUBLIC
STATE OF [●]
COUNTY OF [●]
Printed Name: _____

.

**ASSIGNEE:**

**WITNESSES:**                    **MAKO BUYER LLC**


_____          By: _____
Name: _____    Name: _____
                                 Title: _____


_____
Name: _____



STATE OF [●]                    §
                                §
COUNTY OF [●]                   §

     On this ____ day of _____, 202_, before me appeared [●] to me personally known, who, being by me duly sworn (or affirmed) did say that [he/she] is the [●] of Mako Buyer LLC, a Delaware limited liability company, and that the instrument was signed on behalf of the limited liability company and by the authority of the Members and that [he/she] acknowledged the instrument to be the free act and deed of the limited liability company.


_____
NOTARY PUBLIC
STATE OF [●]
COUNTY OF [●]
Printed Name: _____


.

**EXHIBIT C**

**Form of Election Well Assignment**

(See attached.)

## ASSIGNMENT AND BILL OF SALE

This ASSIGNMENT AND BILL OF SALE ("**Assignment**") dated [_____, 2021], but effective as of 12:01 a.m. Central Standard Time, on [●], 2021 (the "**Effective Time**"), is from Fieldwood Energy IV LLC, a Texas limited liability with an office at 2000 West Sam Houston Parkway South, Suite 1200, Houston, Texas 77042 ("**Assignor**") to Mako Buyer LLC, a Delaware limited liability company, with an office at 2000 West Sam Houston Parkway South, Suite 1200, Houston, Texas 77042 ("**Assignee**").  Assignor and Assignee are sometimes individually referred to herein as, a "**Party**" and collectively referred to herein as, the "**Parties**".

FOR Ten Dollars ($10.00) and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Assignor hereby GRANTS, BARGAINS, SELLS, CONVEYS and ASSIGNS to Assignee the Assigned Interest (as defined below), reserving unto Assignor the ORRI.

TO HAVE AND TO HOLD the Assigned Interest under Assignee subject to the ORRI and the following terms and conditions:

1.      As used in this Assignment, the following terms shall have the meanings ascribed to them below:

"<u>Affiliate</u>" means, with respect to any Person, any other Person that, directly or indirectly, controls, is controlled by or is under common control with, such specified Person through one (1) or more intermediaries or otherwise; provided, however, that, for the purposes of this Agreement, Assignor shall not be deemed an Affiliate of Assignee, and *vice versa*.  For the purposes of this definition, "control" means, where used with respect to any Person, the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities, by contract or otherwise, and the terms "controlling" and "controlled" have correlative meanings.

"<u>Assigned Interest</u>" means (subject to and excluding (i) the ORRI and (ii) all of Assignor's rights, title, and interests in and to all Other Wells) (a) one hundred percent (100%) of Assignor's right, title, and interest as of the Effective Time in and to the Prospect Area until Assignee has reached the Recovery Threshold with respect to the Well and (b) from and after such time that Assignee has reached the Recovery Threshold with respect to such Well, automatically reducing to fifty percent (50%) of Assignor's rights, title, and interest as of the Effective Time in and to the Prospect Area.

"<u>Existing Burdens</u>" has the meaning given such term in the Joint Development Agreement, as such is applied to Assignor's interest in the Well immediately prior to the Effective Time.

"<u>Joint Development Agreement</u>" means that certain Joint Development Agreement dated [●] by and between Fieldwood Energy IV LLC and Mako Buyer LLC.

"<u>Leases</u>" means the oil and gas lease(s) described on Exhibit "A" attached hereto and made a part hereof.

"ORRI" means, with respect to the Assigned Interest, an overriding royalty interest equal to twenty-five percent (25%) less Existing Burdens proportionately reduced to the Assigned Interest, as applicable and further proportionately reduced as the Assigned Interest may be reduced pursuant to the terms of the Joint Development Agreement as a result of Assignee achieving the Recovery Threshold.

"Other Wells" means any and all wells located within the Prospect Area as of the Effective Time other than the Well.

"Person" means an individual, corporation, partnership, limited liability company, association, joint stock company, trust or trustee thereof, estate or executor thereof, unincorporated organization, joint venture, or any other legally recognizable entity.

"Project" means the Project (as defined in the Joint Development Agreement) with respect to the Well.

"Proposal" has the meaning given such term in the Joint Development Agreement.

"Prospect Area" means the Leases, limited as to the lands described on Exhibit "B" attached hereto and made a part hereof, limited in depth from the stratigraphic equivalent of the top of the formation found at [●] feet TVDSS as identified on the [●] log down to and including the stratigraphic equivalent of 100 feet below the base of the formation, as such base is found at [●] feet TVDSS as identified on the [●] log.

"Recovery Threshold" means, with respect to the Well, Assignee's recovery from the Assigned Interest in an amount equal to one hundred percent (100%) of the Well Costs incurred by Assignee with respect to such Project.

"Third Party" means any Person who is not a Party or any Affiliate of any Party.

"Well" means the [●] well, API No. _____ , located on OCS _____[●].

"Well Costs" means, to the extent attributable to Assignor's right, title, and interest in and to the Well, any and all out-of-pocket costs and expenses incurred in (i) drilling, evaluating, completing, and equipping the Well and (ii) conducting all other operations set forth in the applicable Proposal for such Well, including, without limitation, all reasonable Third Party engineering costs, legal costs, and permitting costs, but excluding overhead and general and administrative costs.

2.      Agreements.  This Assignment is made subject to and is burdened by the Existing Burdens and the terms of the Joint Development Agreement.

3.      ORRI.  The ORRI is expressly reserved unto Assignor hereunder and shall be a non-operating, non-expense-bearing, overriding royalty interest, free of cost and expense of production, operations, marketing, and delivery of the hydrocarbons to the applicable delivery points.

4.      Warranties.  EXCEPT AS PROVIDED IN THE FOLLOWING SENTENCES, THIS ASSIGNMENT IS MADE, AND THE ASSIGNED INTEREST IS CONVEYED AND ASSIGNED HEREUNDER, WITHOUT

REPRESENTATION OR WARRANTY OF ANY KIND OR CHARACTER, INCLUDING, WITHOUT LIMITATION, WARRANTIES OF TITLE, FITNESS FOR ANY PARTICULAR PURPOSE, MARKETABILITY, MERCHANTABILITY, FREEDOM FROM DEFECTS, QUALITY OR PRESENCE OF HYDROCARBONS OR RESERVES, AND ANY OTHER REPRESENTATIONS AND WARRANTIES, EXPRESS OR IMPLIED, AT LAW OR IN EQUITY; AND ASSIGNOR DOES HEREBY DISCLAIM AND ASSIGNEE WAIVES ANY AND ALL SUCH REPRESENTATIONS OR WARRANTIES. THE ASSIGNED INTEREST IS CONVEYED AND ASSIGNED TO AND ACCEPTED BY ASSIGNEE IN ITS "AS IS, WHERE IS" CONDITION AND STATE OF REPAIR, AND WITH ALL FAULTS AND DEFECTS, WITHOUT ANY REPRESENTATION, WARRANTY, OR COVENANT OF ANY KIND OR NATURE, EXPRESS, IMPLIED OR STATUTORY. NOTWITHSTANDING ANY OF THE FOREGOING, ASSIGNOR WARRANTS THAT THE ASSIGNED INTEREST ARE BEING ASSIGNED TO ASSIGNEE FREE AND CLEAR OF ANY AND ALL MORTGAGES, LIENS, AND ENCUMBRANCES CREATED BY, THROUGH, OR UNDER FIELDWOOD ENERGY LLC, ASSIGNOR OR ANY AFFILIATE OF EITHER ENTITY. ASSIGNOR AND ASSIGNEE EXPRESSLY AGREE AND UNDERSTAND THAT THIS ASSIGNMENT IS MADE PURSUANT TO THE JOINT DEVELOPMENT AGREEMENT.

5.     Compliance with Laws.  This Assignment is made subject to all applicable laws, statutes, ordinances, permits, decrees, orders, judgments, rules, and regulations that are promulgated, issued or enacted by a governmental entity having jurisdiction, and Assignee agrees to comply with the same on and after the Effective Time.

6.     Successors and Assigns.    The terms, covenants, and conditions contained in this Assignment are binding upon and inure to the benefit of the Parties and their respective successors and assigns, and such terms, covenants, and conditions are covenants running with the land and with each subsequent transfer or assignment of the Assets or any part thereof.

7.     Redhibition Waiver.  ASSIGNEE: (I) WAIVES ALL RIGHTS IN REDHIBITION PURSUANT TO LOUISIANA CIVIL CODE ARTICLES 2520, ET SEQ.; (II) ACKNOWLEDGES THAT THIS EXPRESS WAIVER SHALL BE CONSIDERED A MATERIAL AND INTEGRAL PART OF THIS SALE AND THE CONSIDERATION THEREOF; AND (III) ACKNOWLEDGES THAT THIS WAIVER HAS BEEN BROUGHT TO THE ATTENTION OF ASSIGNEE, HAS BEEN EXPLAINED IN DETAIL AND THAT ASSIGNEE HAS VOLUNTARILY AND KNOWINGLY CONSENTED TO THIS WAIVER OF WARRANTY OF FITNESS AND WARRANTY AGAINST REDHIBITORY VICES AND DEFECTS FOR INTERESTS ASSIGNED AND CONVEYED HEREUNDER.

8.     UTPCPL Waiver.  TO THE EXTENT APPLICABLE TO THE ASSIGNED INTEREST OR ANY PORTION THEREOF, ASSIGNEE HEREBY WAIVES THE PROVISIONS OF THE LOUISIANA UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION LAW (LA. R.S. 51:1402, ET SEQ.). ASSIGNEE WARRANTS AND REPRESENTS THAT IT: (I) IS EXPERIENCED AND KNOWLEDGEABLE WITH RESPECT TO THE OIL AND GAS INDUSTRY GENERALLY AND WITH TRANSACTIONS OF THIS TYPE SPECIFICALLY; (II) POSSESSES THE REQUISITE KNOWLEDGE, EXPERIENCE, AND EXPERTISE TO EVALUATE INDEPENDENTLY THE MERITS AND RISKS OF THE TRANSACTIONS HEREIN CONTEMPLATED; AND (III) IS NOT IN A SIGNIFICANTLY DISPARATE BARGAINING POSITION.

9.     Further Assurances.  Each Party covenants and agrees to execute and deliver to the other Party all such additional reasonable instruments and other documents and will do all such other reasonable acts and things as may be reasonably necessary to accomplish the intent of this Assignment.

10.     <u>Governing Law</u>.  This Assignment shall be governed and construed in accordance with the Laws of the State of Texas, without regard to the Laws that might be applicable under conflicts of laws principles.

11.     <u>Jurisdiction and Venue</u>.  Each Party consents to personal jurisdiction in any action brought in the United States federal and state courts located in the State of Texas with respect to any dispute, claim, or controversy arising out of or in relation to or in connection with this Assignment, and each of the Parties hereto agrees that any action with respect to any such dispute, controversy, or claim will be determined exclusively in a state or federal district court located in Harris County, Texas, and they do hereby irrevocably submit to the exclusive jurisdiction of such courts for such purposes.  Each Party hereby irrevocably waives, to the fullest extent permitted by law, any objection which they may now or hereafter have to the venue of any such dispute arising out of this assignment brought in such court or any defense of inconvenient forum for the maintenance of such dispute.

12.     <u>BOEM Assignment Form</u>.  The Parties acknowledge and agree that this Assignment may be attached to a Form BOEM-0151 or other assignment form required by a governmental authority (a "<u>Government Required Form</u>").  The Parties agree that, to the extent of any conflict between this Assignment and any such Government Required Form the Parties may execute in connection herewith, such Government Required Form shall control to extent required by applicable law for the Bureau of Ocean Energy Management (or other applicable governmental authority) to approve the Parties' assignment hereunder.

13.     <u>Counterparts</u>.  This Assignment may be executed in any number of counterparts and each of such counterparts shall for all purposes be deemed to be an original, and all such counterparts shall together constitute but one and the same Assignment.

*[Signature Pages to Follow]*

EXECUTED by Assignor in the presence of the undersigned competent witnesses on the date and year referenced in the notarial acknowledgment below, but effective as of the Effective Time.

**WITNESSES:**

**ASSIGNOR:**

**FIELDWOOD ENERGY IV LLC**

_____

Name: _____

By: _____

Name: _____

Title: _____

_____

Name: _____

STATE OF [●]                          §
                                      §
COUNTY OF [●]                         §

      On this ____ day of _____, 202_, before me, the undersigned notary public in and for the foregoing jurisdiction, appeared [●] to me personally known, who, being by me duly sworn (or affirmed) did say that [he/she] is the [●] of Fieldwood Energy IV LLC, a Texas limited liability company, and that the instrument was signed on behalf of the limited liability company and by the authority of its governing authority and that [he/she] acknowledged the instrument to be the free act and deed of the limited liability company.

_____
NOTARY PUBLIC
STATE OF [●]
COUNTY OF [●]
Printed Name: _____
Notarial Commission No._____
My commission expires: _____

EXECUTED by Assignee in the presence of the undersigned competent witnesses on the date and year referenced in the notarial acknowledgment below, but effective as of the Effective Time.

<div align="center"><strong><u>ASSIGNEE:</u></strong></div>

**WITNESSES:**                                                 **MAKO BUYER LLC**

_____                    By: _____
Name: _____             Name: _____
                                                              Title: _____

_____
Name: _____


STATE OF [●]                            §
                                        §
COUNTY OF [●]                           §

On this \_\_\_\_ day of _____, 202\_, before me, the undersigned notary public in and for the foregoing jurisdiction, appeared [●] to me personally known, who, being by me duly sworn (or affirmed) did say that [he/she] is the [●] of Mako Buyer LLC, a Delaware limited liability company, and that the instrument was signed on behalf of the limited liability company and by the authority of its governing authority and that [he/she] acknowledged the instrument to be the free act and deed of the limited liability company.


_____
NOTARY PUBLIC
STATE OF [●]
COUNTY OF [●]
Printed Name: _____
Notarial Commission No._____
My commission expires: _____

**EXHIBIT "A"**

**ATTACHED TO AND MADE A PART OF THAT CERTAIN ASSIGNMENT AND BILL OF SALE DATED [●] BY AND BETWEEN FIELDWOOD ENERGY IV LLC, AS ASSIGNOR, AND MAKO BUYER LLC, AS ASSIGNEE**

**THE LEASES**

**EXHIBIT "B"**

**ATTACHED TO AND MADE A PART OF THAT CERTAIN ASSIGNMENT AND BILL OF SALE DATED [●] BY AND BETWEEN FIELDWOOD ENERGY IV LLC, AS ASSIGNOR, AND MAKO BUYER LLC, AS ASSIGNEE**

**THE PROSPECT AREA**

**EXHIBIT D**

**<u>Form of Operating Agreement</u>**

(See attached.)

Professionals Eyes Only
Highly Confidential
Subject to FRE 408

EXHIBIT "D"

Attached to and made a part of that certain Joint Development Agreement dated effective _____ __, 202_, by and between _____, as Operator, and _____, as Non-Operators

# OFFSHORE OPERATING AGREEMENT


## _____

## (OPERATOR)

## AND


## _____,

## _____, and _____

## (NON-OPERATORS)


## COVERING

## [_____]


## EFFECTIVE _____, 20__

#93828440v3
#93828440v5

Professionals Eyes Only
Highly Confidential
Subject to FRE 408

# Table of Contents

**ARTICLE 1 – APPLICATION** ...........................................................................1

1.1    APPLICATION TO EACH LEASE ....................................................................1

**ARTICLE 2 – DEFINITIONS** ..............................................................................1

2.1    ADDITIONAL TESTING ...............................................................................1
2.2    AFFILIATE ...............................................................................................1
2.3    AUTHORIZATION FOR EXPENDITURE (AFE) ...............................................1
2.4    BOEMRE ................................................................................................1
2.5    COMPLETE, COMPLETING, COMPLETION ...................................................1
2.6    COMPLETION EQUIPMENT .........................................................................1
2.7    CONFIDENTIAL DATA ................................................................................2
2.8    DEEPEN, DEEPENING ................................................................................2
2.9    DEVELOPMENT FACILITIES .......................................................................2
2.10   DEVELOPMENT OPERATION .......................................................................2
2.11   DEVELOPMENT WELL ...............................................................................2
2.12   EXPLORATORY OPERATION .......................................................................2
2.13   EXPLORATORY WELL ................................................................................2
2.14   EXPORT PIPELINES ...................................................................................2
2.15   FORCE MAJEURE ......................................................................................2
2.16   HYDROCARBONS ......................................................................................2
2.17   JOINT ACCOUNT ......................................................................................2
2.18   LEASE .....................................................................................................3
2.19   NON-CONSENT OPERATION .......................................................................3
2.20   NON-CONSENT PLATFORM .......................................................................3
2.21   NON-CONSENT WELL ...............................................................................3
2.22   NON-OPERATOR(S) ...................................................................................3
2.23   NON-PARTICIPATING PARTY ......................................................................3
2.24   NON-PARTICIPATING PARTY'S SHARE ........................................................3
2.25   OBJECTIVE DEPTH ...................................................................................3
2.26   OBJECTIVE HORIZON ................................................................................3
2.27   OFFSITE HOST FACILITIES ........................................................................3
2.28   OPERATOR ...............................................................................................3
2.29   PARTICIPATING INTEREST .........................................................................3
2.30   PARTICIPATING PARTY ..............................................................................3
2.31   PLATFORM ...............................................................................................3
2.32   PRODUCIBLE RESERVOIR ..........................................................................3
2.33   PRODUCIBLE WELL ..................................................................................4
2.34   PRODUCTION INTERVAL ............................................................................4
2.35   RECOMPLETE, RECOMPLETING, RECOMPLETION ........................................4
2.36   REWORK, REWORKING .............................................................................4
2.37   SIDETRACK, SIDETRACKING ......................................................................4
2.38   TAKE-IN-KIND FACILITIES ........................................................................4
2.39   TRANSFER OF INTEREST ...........................................................................4
2.40   WORKING INTEREST .................................................................................4

**ARTICLE 3 – EXHIBITS** .....................................................................................4

#93828440v3
#93828440v5

3.1    Exhibits .................................................................................................................4
      3.1.1  Exhibit "A" ................................................................................................4
      3.12  Exhibit "B" .................................................................................................5
      3.13  Exhibit "C" .................................................................................................5
      3.14  Exhibit "D" ................................................................................................5
      3.15  Exhibit "E" .................................................................................................5
      3.16  Exhibit "F" .................................................................................................5
3.2    Conflicts ................................................................................................................5

**ARTICLE 4 – OPERATOR** ................................................................................................5

4.1    Operator ................................................................................................................5
4.2    Circumstances Under Which Operator Must Conduct a Non-Consent Operation .....5
4.3    Operator's Conduct of a Non-Consent Operation in Which it is a Non-participating Party ........5
4.4    Resignation of Operator .......................................................................................5
4.5    Removal of Operator .............................................................................................6
4.6    Selection of Successor .........................................................................................6
4.7    Effective Date of Resignation or Removal ...........................................................6
4.8    Delivery of Property .............................................................................................6

**ARTICLE 5 –  AUTHORITY AND DUTIES OF OPERATOR** ...............................................7

5.1    Exclusive Right to Operate ..................................................................................7
5.2    Workmanlike Conduct ..........................................................................................7
5.3    Liens and Encumbrances .....................................................................................7
5.4    Employees and Contractors .................................................................................7
5.5    Records ..................................................................................................................7
5.6    Compliance .............................................................................................................7
5.7    Contractors ............................................................................................................7
5.8    Governmental Reports .........................................................................................8
5.9    Information to Participating Parties .....................................................................8
5.10   Information to Non-Participating  Parties…………………………………… ………….8

**ARTICLE 6 – VOTING AND VOTING PROCEDURES** .......................................................9

6.1    Voting Procedures ................................................................................................9
      6.1.1  Voting Interest ...........................................................................................9
      6.1.2  Vote Required ...........................................................................................9
      6.1.3 Votes...........................................................................................................9
      6.1.4  Meetings....................................................................................................9

**ARTICLE 7 – ACCESS** .....................................................................................................9

7.1    Access to Lease ...................................................................................................9
7.2    Reports ..................................................................................................................9
7.3    Confidentiality .....................................................................................................10
7.4    Limited Disclosure .............................................................................................10
7.5    Limited Releases to Offshore Scout Association ..............................................10
7.6    Media Releases ...................................................................................................10

**ARTICLE 8 – EXPENDITURES** ........................................................................................11

8.1    Basis of Charge to the Parties ...........................................................................11
8.2    AFEs......................................................................................................................11
8.3    Emergency and Required Expenditures .............................................................11
8.4    Advance Billings ..................................................................................................11
8.5    Commingling of Funds ........................................................................................11
8.6    Security Rights ....................................................................................................11
      8.6.1  Mortgage in Favor of Operator .............................................................11

2

        *8.6.2 Security Interest in Favor of Operator* ................................................................ 12
        *8.6.3 Mortgage in Favor of the Non-operator Parties* ................................................ 13
        *8.6.4 Security Interest in Favor of the Non-operator(s)* .......................................... 14
        *8.6.5 Recording* ...................................................................................................... 15
        *8.6.6 The Memorandum of Operating Agreement and Financing Statement* ........... 16

8.7     UNPAID CHARGES AND DEFAULT ........................................................................... 16
8.8     CONFESSION OF JUDGMENT; EXECUTORY PROCESS ............................................ 16

**ARTICLE 9 – NOTICES** ............................................................................................... **17**

9.1     GIVING AND RECEIVING NOTICES ......................................................................... 17
9.2     CONTENT OF NOTICE ............................................................................................. 18
9.3     RESPONSE TO NOTICES ......................................................................................... 18
        *9.3.1 Platform and/or Development Facilities Proposals* .......................................... 18
        *9.3.2 Well Proposals* ................................................................................................ 18
        *9.3.3 Proposal for Multiple Operations* .................................................................... 18
        *9.3.4 Other Matters* ................................................................................................. 18
9.4     FAILURE TO RESPOND ........................................................................................... 18
9.5     RESPONSE TO COUNTERPROPOSALS ..................................................................... 18
9.6     TIMELY WELL OPERATIONS .................................................................................. 18
9.7     TIMELY PLATFORM / DEVELOPMENT FACILITIES OPERATIONS .............................. 19

**ARTICLE 10 – EXPLORATORY OPERATIONS** ..................................................... **19**

10.1    PROPOSING OPERATIONS ....................................................................................... 19
10.2    COUNTERPROPOSALS ............................................................................................ 19
10.3    OPERATIONS BY ALL PARTIES ............................................................................. 19
10.4    SECOND OPPORTUNITY TO PARTICIPATE ............................................................. 19
10.5    OPERATIONS BY FEWER THAN ALL PARTIES ....................................................... 20
        *10.5.1 First Exploratory Well* .................................................................................... 20
10.6    EXPENDITURES APPROVED .................................................................................... 20
10.7    CONDUCT OF OPERATIONS .................................................................................... 20
10.8    COURSE OF ACTION AFTER REACHING OBJECTIVE DEPTH .................................. 20
        *10.8.1 Election by Participating Parties* .................................................................... 20
        *10.8.2 Priority of Operations* ..................................................................................... 21
        *10.8.3 Second Opportunity to Participate* .................................................................. 21
        *10.8.4 Operations by Fewer Than All Parties* ............................................................ 21
        *10.8.5 Subsequent Operations* ................................................................................... 22
10.9    WELLS PROPOSED BELOW DEEPEST PRODUCIBLE RESERVOIR ............................ 22

**ARTICLE 11 – DEVELOPMENT OPERATIONS** ..................................................... **23**

11.1    PROPOSING OPERATIONS ....................................................................................... 23
11.2    COUNTERPROPOSALS ............................................................................................ 23
11.3    OPERATIONS BY ALL PARTIES ............................................................................. 23
11.4    SECOND OPPORTUNITY TO PARTICIPATE ............................................................. 23
11.5    OPERATIONS BY FEWER THAN ALL PARTIES ....................................................... 23
11.6    EXPENDITURES APPROVED .................................................................................... 24
11.7    CONDUCT OF OPERATIONS .................................................................................... 24
11.8    COURSE OF ACTION AFTER REACHING OBJECTIVE DEPTH .................................. 24
        *11.8.1 Election by Fewer Than All Parties* ................................................................ 24
        *11.8.2 Priority of Operations* ..................................................................................... 24
        *11.8.3 Second Opportunity to Participate* .................................................................. 25
        *11.8.4 Operations by Fewer Than All Parties* ............................................................ 25
        *11.8.5 Subsequent Operations* ................................................................................... 25

#93828440v3
#93828440v5

**ARTICLE 12 – PLATFORM AND DEVELOPMENT FACILITIES** ...................................................**26**

12.1    PROPOSALS ...................................................................................................................26
12.2    COUNTERPROPOSALS ....................................................................................................26
    *12.2.1 Operations by All Parties* ....................................................................................26
    *12.2.2 Second Opportunity to Participate* ......................................................................26
    *12.2.3 Operations by Fewer Than All Parties* ...............................................................26
12.3    OWNERSHIP AND USE OF THE PLATFORM AND DEVELOPMENT FACILITIES ...............27
12.4    RIGHTS TO TAKE IN KIND ............................................................................................27
12.5    EXPANSION OR MODIFICATION OF A PLATFORM AND/OR DEVELOPMENT FACILITIES ...28
12.6    OFFSITE HOST FACILITIES ............................................................................................28

**ARTICLE 13 – NON-CONSENT OPERATIONS** ...................................................................**29**

13.1    NON-CONSENT OPERATIONS .........................................................................................29
    *13.1.1 Non-interference* .................................................................................................29
    *13.1.2 Multiple Completion Limitation* .........................................................................29
    *13.1.3 Metering* .............................................................................................................29
    *13.1.4 Non-consent Well* ...............................................................................................29
    *13.1.5 Cost Information* .................................................................................................29
    *13.1.6 Completions* .......................................................................................................30
13.2    RELINQUISHMENT OF INTEREST ...................................................................................30
    *13.2.1 Production Reversion Recoupment* .....................................................................30
    *13.2.2 Non-production Reversion* ...................................................................................31
13.3    DEEPENING OR SIDETRACKING OF NON-CONSENT WELL ..............................................31
13.4    DEEPENING OR SIDETRACKING COST ADJUSTMENTS .....................................................31
13.5    SUBSEQUENT OPERATIONS IN NON-CONSENT WELL .....................................................31
13.6    OPERATIONS IN A PRODUCTION INTERVAL ...................................................................32
13.7    OPERATIONS UTILIZING A NON-CONSENT PLATFORM AND/OR DEVELOPMENT FACILITIES ...32
13.8    DISCOVERY OR EXTENSION FROM NON-CONSENT DRILLING ...........................................32
13.9    ALLOCATION OF PLATFORM / DEVELOPMENT FACILITIES COSTS TO NON-CONSENT OPERATIONS ...33
    *13.9.1 Charges* ..............................................................................................................33
    *13.9.2 Operating and Maintenance Charges* .................................................................34
13.10    ALLOCATION OF COSTS BETWEEN ZONES ...................................................................34
13.11    LEASE MAINTENANCE OPERATIONS ............................................................................34
    *13.11.1 Participation in Lease Maintenance Operations* ...............................................34
    *13.11.2 Accounting for Non-participation* .....................................................................35
13.12    RETENTION OF LEASE BY NON-CONSENT WELL ..........................................................35
13.13    NON-CONSENT PREMIUMS ..........................................................................................36

**ARTICLE 14 – ABANDONMENT, SALVAGE, AND SURPLUS** .............................................**36**

14.1    PLATFORM SALVAGE AND REMOVAL COSTS .................................................................36
14.2    ABANDONMENT OF PLATFORMS, DEVELOPMENT FACILITIES, OR WELLS ......................36
14.3    ASSIGNMENT OF INTEREST ...........................................................................................36
14.4    ABANDONMENT OPERATIONS REQUIRED BY GOVERNMENTAL AUTHORITY ..................36
14.5    DISPOSAL OF SURPLUS MATERIAL ...............................................................................37

**ARTICLE 15 – WITHDRAWAL** ............................................................................................**37**

15.1    RIGHT TO WITHDRAW ..................................................................................................37
15.2    RESPONSE TO WITHDRAWAL NOTICE ...........................................................................37
    *15.2.1 Unanimous Withdrawal* .......................................................................................37
    *15.2.2 No Additional Withdrawing Parties* ...................................................................38
    *15.2.3 Acceptance of the Withdrawing Parties' Interests* .............................................38
    *15.2.4 Effects of Withdrawal* .........................................................................................38
15.3    LIMITATION ON AND CONDITIONS OF WITHDRAWAL ...................................................38
    *15.3.1 Prior Expenses* ...................................................................................................38
    *15.3.2 Confidentiality* ...................................................................................................39

4

*15.3.3 Emergencies and Force Majeure* ...................................................................................39

## ARTICLE 16 – RENTALS, ROYALTIES, AND OTHER PAYMENTS .....................................**39**

16.1 OVERRIDING ROYALTY AND OTHER BURDENS ..........................................................39
16.2 SUBSEQUENTLY CREATED INTEREST .......................................................................39
16.3 PAYMENT OF RENTALS AND MINIMUM ROYALTIES .....................................................40
16.4 NON-PARTICIPATION IN PAYMENTS ........................................................................40
16.5 ROYALTY PAYMENTS ..........................................................................................40

## ARTICLE 17 -  TAXES ......................................................................................**40**

17.1 PROPERTY TAXES ...............................................................................................40
17.2 CONTEST OF PROPERTY TAX VALUATION ................................................................41
17.3 PRODUCTION AND SEVERANCE TAXES .....................................................................41
17.4 OTHER TAXES AND ASSESSMENTS .........................................................................41

## ARTICLE 18 – INSURANCE ..............................................................................**41**

18.1 INSURANCE ......................................................................................................41
18.2 BONDS ............................................................................................................41

## ARTICLE 19 – LIABILITY, CLAIMS, AND LAWSUITS ..........................................**41**

19.1 INDIVIDUAL OBLIGATIONS ...................................................................................41
19.2 NOTICE OF CLAIM OR LAWSUIT ............................................................................41
19.3 SETTLEMENTS ...................................................................................................42
19.4 DEFENSE OF CLAIMS AND LAWSUITS ......................................................................42
19.5 LIABILITY FOR DAMAGES .....................................................................................42
19.6 INDEMNIFICATION FOR NON-CONSENT OPERATIONS ...................................................42
19.7 DAMAGE TO RESERVOIR, LOSS OF RESERVES AND PROFIT ...........................................42
19.8 NON-ESSENTIAL PERSONNEL ................................................................................43

## ARTICLE 20 – INTERNAL REVENUE PROVISION ...............................................**43**

20.1 INTERNAL REVENUE PROVISION ............................................................................43

## ARTICLE 21 – CONTRIBUTIONS .......................................................................**43**

21.1 NOTICE OF CONTRIBUTIONS OTHER THAN ADVANCES FOR SALE OF PRODUCTION ...............43
21.2 CASH CONTRIBUTIONS ........................................................................................43
21.3 ACREAGE CONTRIBUTIONS ...................................................................................43

## ARTICLE 22 – DISPOSITION OF PRODUCTION ..................................................**44**

22.1 TAKE-IN-KIND FACILITIES ...................................................................................44
22.2 DUTY TO TAKE IN KIND ......................................................................................44
22.3 FAILURE TO TAKE OIL AND CONDENSATE IN KIND .....................................................44
22.4 FAILURE TO TAKE GAS IN KIND ............................................................................44
22.5 EXPENSES OF DELIVERY IN KIND ...........................................................................45

## ARTICLE 23 – APPLICABLE LAW, JURISDICTION, AND VENUE ...........................**45**

23.1 APPLICABLE LAW ..............................................................................................45
23.2 JURISDICTION AND VENUE ...................................................................................45

## ARTICLE 24 – LAWS, REGULATIONS, AND NONDISCRIMINATION ......................**45**

24.1 LAWS AND REGULATIONS .....................................................................................45
24.2 NONDISCRIMINATION ..........................................................................................45

## ARTICLE 25 – FORCE MAJEURE .....................................................................**45**

25.1 FORCE MAJEURE ...............................................................................................45

**ARTICLE 26 – SUCCESSORS AND ASSIGNS** ................................................................**46**

26.1     Transfer of Interest ..............................................................................46
        *26.1.1 Exceptions to Transfer Notice* ................................................46
        *26.1.2 Effective Date of Transfer of Interest* ..................................46
        *26.1.3 Form of Transfer of Interest* ...............................................46
        *26.1.4 Warranty* .............................................................................47

**ARTICLE 27 – ADMINISTRATIVE PROVISIONS** ...........................................**47**

27.1     Term ...................................................................................................47
27.2     Waiver ...............................................................................................47
27.3     Waiver of Right to Partition ...............................................................47
27.4     Compliance with Laws and Regulations .............................................47
        *27.4.1  Severance of Invalid Provisions* ..........................................47
        *27.4.2  Fair and Equal Employment* .................................................48
27.5     Construction and Interpretation of This Agreement ...........................48
        *27.5.1 Headings for Convenience* ...................................................48
        *27.5.2 Article References* .................................................................48
        *27.5.3 Gender and Number* .............................................................48
        *27.5.4 Future References* .................................................................48
        *27.5.5 Currency* ..............................................................................48
        *27.5.6 Optional Provisions* .............................................................48
        *27.5.7 Joint Preparation* .................................................................48
        *27.5.8 Integrated Agreement* ...........................................................48
        *27.5.9 Binding Effect* ......................................................................49
        *27.5.10 Further Assurances* .............................................................49
        *27.5.11 Counterpart Execution* ........................................................49
27.6     Restricted Bidding .............................................................................49
27.7     Governing Agreement ........................................................................49

**EXHIBIT "A"** .........................................................................................................**1**

**EXHIBIT "B"** *(Insurance Provisions)* ....................................................................**1**

**EXHIBIT "C"** (COPAS) ..........................................................................................**1**

**EXHIBIT "D"** *(Non-Discrimination Provisions)* ...................................................**1**

**EXHIBIT "E"** *(Gas Balancing Provisions)* ............................................................**1**

#93828440v3
#93828440v5

Professionals Eyes Only
Highly Confidential
Subject to FRE 408

# OFFSHORE OPERATING AGREEMENT

This Offshore Operating Agreement (the "Agreement'), made effective the___ day of_____,  20__, by the signers hereof, their respective heirs, successors, legal representatives, and assigns, herein referred to collectively as the "Parties" and individually as a "Party".

WHEREAS, the Parties own or control a leasehold interest in the Lease identified in Exhibit "A" and desire to explore, develop, produce, and operate the Lease pursuant to this Agreement.

NOW, THEREFORE, in consideration of the foregoing premises and the mutual covenants in this Agreement, along with other good and valuable consideration, the receipt of which is hereby acknowledged, the Parties agree as follows:

## ARTICLE 1
## APPLICATION

**1.1**  **Application to Each Lease**

This Agreement applies separately to each oil and gas Lease or portion thereof described in Exhibit "A".

## ARTICLE 2
## DEFINITIONS

**2.1**  **Additional Testing**

An operation not previously approved in the AFE and proposed for the specific purpose of obtaining additional subsurface data.

**2.2**  **Affiliate**

For a person, another person that controls, is controlled by, or is under common control with that person. In this definition, (a) "control" means the ownership by one (1) person, directly or indirectly, of more than fifty percent (50%) of the voting securities of a corporation or, for other persons, the equivalent ownership interest (such as partnership interests), and (b) "person" means an individual, corporation, partnership, trust, estate, unincorporated organization, association, or other legal entity.

**2.3**  **Authorization for Expenditure (AFE)**

An authority to expend funds prepared by a Party to estimate the costs to be incurred in conducting an operation under this Agreement.

1

**2.4    BOEMRE**

The Bureau of Ocean Energy Management and/or Bureau of Safety and Environmental Enforcement, United States Department of Interior, or their successor agency.   Where appropriate, the reference to BOEMRE shall include the appropriate state agency.

**2.5    Complete, Completing, Completion**

An operation to complete a well for initial Hydrocarbon production in one (1) or more Producible Reservoirs, including but not limited to setting production casing, perforating the casing, stimulating the well, installing Completion Equipment, and/or conducting production tests.

**2.6    Completion Equipment**

That certain equipment on an Exploratory Well or a Development Well required to be installed before the movement of a well-completion rig off that well:

(a)    under 30 CFR 250.502, or any succeeding order or regulation issued by the BOEMRE, up to and including the tree, and

(b)    by any other regulatory agency having jurisdiction, including but not limited to a caisson and navigational aids.

**2.7    Confidential Data**

The information and data obtained under this Agreement, including but not limited to geological, geophysical, and reservoir information; originals and copies of logs; core and core analysis; and other well information including but not limited to the progress, tests, or results of a well drilled or an operation conducted under this Agreement, except data or information that becomes public other than by breach of this Agreement or as agreed to in writing by the Participating Parties.

**2.8    Contract Area**

The "Contract Area" described in Exhibit "A".

**2.9    Deepen, Deepening**

A drilling operation conducted in an existing wellbore below the Objective Depth to which the well was previously drilled.

**2.9    Development Facilities**

Production equipment other than Completion Equipment that is installed on or outside the Lease in order to handle or process Hydrocarbon production. Development Facilities include, but are not limited to:

(a)    compression, separation, dehydration, generators, treaters, skimmers, bunkhouses, and metering equipment;

(b)    the flowlines, gathering lines, or lateral lines that deliver Hydrocarbons and water

1    from the Completion Equipment to the Platform or to Offsite Host Facilities, or

2    from the Platform to Export Pipelines; and

(c)    injection and disposal wells.

**2.10    Development Operation**

2

An operation on the Lease other than an Exploratory Operation.

**2.11    Development Well**

A well or portion of a well proposed as a Development Operation.

**2.12    Exploratory Operation**

An operation that is conducted on the Lease and that is any of the following:

(a)       proposed to Complete an Exploratory Well;

(b)       proposed for an Objective Horizon that is not a Producible Reservoir; or

(c)       proposed for an Objective Horizon that has a Producible Well, but that will be penetrated at a location where the distance between the midpoint of the Objective Horizon to be penetrated by the proposed operation and the midpoint of the same Objective Horizon where it is actually penetrated by a Producible Well will be at least two thousand (2,000) feet for a gas Completion and at least one thousand (1,000) feet for an oil Completion.

**2.13    Exploratory Well**

A well or portion of a well proposed as an Exploratory Operation.

**2.14    Export Pipelines**

Pipelines to which a gathering line or lateral line downstream of the Platform and/or Development Facilities or, if there is no Platform, the Completion Equipment, is connected and that are used to transport Hydrocarbons or produced water to shore.

**2.15    Force Majeure**

An event or cause that is reasonably beyond the control of the Party claiming the existence of such event or cause and that reasonably prevents such Party from fulfilling its obligations under this Agreement,  including, but not limited to, a flood, a storm, a hurricane, a loop current/eddy, or other act of God, a fire, loss of well control, an oil spill, or other environmental catastrophe, a war, a terrorist act, a civil disturbance, a labor dispute, a strike, a lockout, compliance with a law, order, rule, or regulation, governmental action or delay in granting necessary permits or permit approvals, and the inability to secure materials or a rig.

**2.16    Hydrocarbons**

Oil and/or gas and associated liquid and gaseous by-products (except helium) that may be produced from a wellbore located on the Lease.

**2.17    Joint Account**

This term has the same definition as the defined term "Joint Account" in Exhibit "C" (Accounting Procedure).

**2.18    Lease**

Each oil and gas lease identified in Exhibit "A" and the lands covered by that lease.

**2.19    Non-consent Operation**

An operation conducted on the Lease by fewer than all Parties, which subjects the Non-participating Party to Article 13 (Non-Consent Operations).

3

2.20 **Non-consent Platform**

A Platform owned by fewer than all Parties.

2.21 **Non-consent Well**

An Exploratory Well or a Development Well owned by fewer than all Parties.

2.22 **Non-operator(s)**

A Party other than Operator.

2.23 **Non-participating Party**

A Party other than a Participating Party.

2.24 **Non-participating Party's Share**

The Participating Interest that a Non-participating Party would have had if all Parties had participated in the operation.

2.25 **Objective Depth**

A depth sufficient to test the lesser of the Objective Horizon or the specific footage depth stated in the AFE and approved by the Participating Parties.

2.26 **Objective Horizon**

The interval consisting of the deepest zone, formation, or horizon to be tested in an Exploratory Well, Development Well, Deepening operation, or Sidetracking operation, as stated in the AFE and approved by the Participating Parties.

2.27 **Offsite Host Facilities**

Development and handling facilities that (a) are located off the Lease and (b) are either owned by one (1) or more third parties or by one (1) or more Participating Parties in a well, whose interests in the development and handling facilities differ from their respective Working Interest shares in the well.

2.28 **Operator**

The Party designated as Operator pursuant to Article 4 of this Agreement.

2.29 **Participating Interest**

The percentage of the costs and risks of conducting an operation under this Agreement that a Participating Party agrees, or is otherwise obligated, to pay and bear.

2.30 **Participating Party**

A Party that executes an AFE for a proposed operation or otherwise agrees, or becomes liable, to pay and bear a share of the costs and risks of conducting an operation under this Agreement.

2.31 **Platform**

An offshore structure on the Lease that supports Wells, Completion Equipment, or Development Facilities, whether fixed, compliant, or floating, and the components of that structure, including but not limited to caissons or well protectors to the extent that same are not Completion Equipment, rising above the water line and used for the exploration, development, or production of Hydrocarbons.   The term "Platform" shall also mean any offshore equipment or template

4

(excluding templates used for drilling operations) and any component thereof, other than Completion Equipment (including but not limited to flow lines and control systems), that is resting on or attached to the sea floor and used to obtain production of Hydrocarbons.

**2.32    Producible Reservoir**

An underground accumulation of Hydrocarbons (a) in a single and separate natural pool characterized by a distinct pressure system, (b) not in Hydrocarbon communication with another accumulation of Hydrocarbons, and (c) into which a Producible Well has been drilled.

**2.33    Producible Well**

A well that is drilled under this Agreement and that (a) is producing Hydrocarbons; (b) is determined to be, or meets the criteria for being determined to be, capable of producing Hydrocarbons in paying quantities under an applicable order or regulation issued by the governmental authority having jurisdiction; or (c) is determined to be a Producible Well by one (1) or more Participating Parties having a combined Working Interest of fifty percent (50%) or more, even if the well has been plugged and permanently or temporarily abandoned.

**2.34    Production Interval**

A zone or interval producing or capable of producing Hydrocarbons from a well without Reworking operations.

**2.35    Recomplete, Recompleting, Recompletion**

An operation whereby a Completion in one (1) Producible Reservoir is abandoned in order to attempt a Completion in a different Producible Reservoir within the existing wellbore.

**2.36    Rework, Reworking**

An operation conducted in a well, after it has been Completed in one (1) or more Producible Reservoirs, to restore, maintain, or improve Hydrocarbon production from one (1) or more of those Producible Reservoirs, but specifically excluding drilling, Sidetracking, Deepening, Completing, or Recompleting the well.

**2.37    Sidetrack, Sidetracking**

The directional control and intentional deviation of a well to change the bottom-hole location, whether it be to the original Objective Depth or formation or another bottom-hole location not deeper than the stratigraphic equivalent of the initial Objective Depth, unless the intentional deviation is done to straighten the hole or to drill around junk in the hole or to overcome other mechanical difficulties.

**2.38    Take-in-Kind Facilities**

Facilities that (i) are not paid for by the Joint Account and (ii) are installed for the benefit and use of a particular Party or Parties to take its or their share of Hydrocarbon production in kind.

**2.39    Transfer of Interest**

A conveyance, assignment, transfer, farmout, exchange, or other disposition of all or part of a Party's Working Interest.

5

**2.40**     **Working Interest**

The record title interest, or where applicable, the operating rights of each Party in and to each Lease (expressed as the percentage provided in Exhibit "A").  If a Party's record title interest is different from its operating rights, the Working Interest of each Party is the interest provided in Exhibit "A".

Any capitalized terms used herein, but not defined herein, shall have the meaning attributable to them in that certain Joint Development Agreement dated effective _____ __, 20__, by and between _____, _____, _____, _____ and _____ (the "Joint Development Agreement").


# ARTICLE 3
# EXHIBITS

**3.1**     **Exhibits**

The following exhibits are attached to this Agreement and incorporated into this Agreement by reference:

**3.1.1**     **Exhibit "A"**

Operator, Description of Lease, Division of Interests, and Notification Addresses


**3.1.2**     **Exhibit "B"**

Insurance provisions.

**3.1.3**     **Exhibit "C"**

Accounting procedure.

**3.1.4**     **Exhibit "D"**

Non-discrimination Provisions.

**3.1.5**     **Exhibit "E"**

Gas Balancing Agreement.

**3.1.6**     **Exhibit "F"**

Memorandum of Operating Agreement and Financing Statement.

**3.2**     **Conflicts**

If a provision of an exhibit, except Exhibits "D" or "E" is inconsistent with a provision in the body of this Agreement, the provision in the body of this Agreement shall prevail. If a provision of Exhibit "D" or "E" is inconsistent with a provision in the body of this Agreement, the provision of the exhibit shall prevail.


# ARTICLE 4
# OPERATOR

6

**4.1**     **Operator**

_____ is designated as Operator of the Lease.  The Parties shall promptly execute and provide Operator with all documents required by the BOEMRE in connection with the designation of _____ as Operator or with the designation of any other Party as a substitute or successor Operator.  Unless agreed to the contrary by all Parties hereto, Operator shall also be classified as the designated applicant for oil spill financial responsibility purposes and each Non-operator Party shall promptly execute the appropriate documentation reflecting this designation and promptly provide same to Operator for filing with BOEMRE.

**4.2**     **Circumstances Under Which Operator Must Conduct a Non-Consent Operation**

If:

(a)     a drilling rig is on location and Operator becomes a Non-participating Party in a supplemental AFE for an Exploratory Operation, or Development Operation, or

(b)     Operator becomes a Non-participating Party in an operation to be conducted from a Platform operated by Operator,

Operator, as a Non-participating Party, shall conduct the Non-consent Operation on behalf of the Participating Parties and at the Participating Parties' sole cost and risk under Article 13 (Non-Consent Operations).

**4.3**     **Operator's Conduct of a Non-Consent Operation in Which it is a Non-participating Party**

When, under Article 4.2 (Circumstances Under Which Operator Must Conduct a Non-Consent Operation), Operator conducts a Non-consent Operation in which it is a Non-participating Party, it shall follow the practices and standards in Article 5 (Exclusive Right to Operate). Notwithstanding anything to the contrary in Exhibit "C", Operator shall not be required to proceed with the Non-consent Operation until the Participating Parties have advanced the total estimated costs of the Non-consent Operation to Operator.  Operator shall never be obligated to expend any of its own funds for the Non-consent Operation in which it is a Non-participating Party.

**4.4**     **Resignation of Operator**

Subject to Article 4.6 (Selection of Successor), Operator may resign at any time by giving written notice to the Parties, except that Operator may not without the other Parties' consent resign during a Force Majeure or an emergency that poses a threat to life, safety, property, or the environment.  If Operator or its Affiliates cease to own a Working Interest, Operator automatically shall be deemed to have resigned as Operator without any action by the Non-operator(s).

**4.5**     **Removal of Operator**

Operator may be removed by an affirmative vote of the Parties owning a combined Working Interest of fifty percent (50%) or more of the remaining Working Interest after excluding Operator's Working Interest if:

(a)     Operator becomes insolvent or unable to pay its debts as they mature, makes an

#93828440v3
#93828440v5

assignment for the benefit of creditors, commits an act of bankruptcy, or seeks relief under laws providing for the relief of debtors;

(b)      a receiver is appointed for Operator or for substantially all its property or affairs;

(c)      a Transfer of Interest by Operator (excluding an interest assigned to an Affiliate) reduces Operator's Working Interest to less than the Working Interest of any Non-operator, whether accomplished by one (1) or more Transfer of Interest.

(d)      Operator commits a substantial breach of a material provision of this Agreement and fails to cure the breach within thirty (30) days after notice of the breach.

**4.6      Selection of Successor**

On resignation or removal of Operator, a successor Operator shall be selected from among the Parties by an affirmative vote of one (1) or more Parties having a combined Working Interest of fifty percent (50%) or more.  If the resigned or removed Operator is not entitled to vote, fails to vote, or votes only to succeed itself, the successor Operator shall be selected by the affirmative vote of the Parties owning a combined Working Interest of fifty percent (50%) or more of the remaining Working Interest after excluding the Working Interest of the resigned or removed Operator.  If Operator assigns all or a part of its Working Interest, under Article 4.4 (Resignation of Operator) or Article 4.5(c), the Party that acquired all or a part of the former Operator's Working Interest shall not be excluded from voting for a successor Operator.  If there are only two (2) Parties to this Agreement when Operator resigns or is removed, the Non-operator automatically has the right, but not the obligation, to become Operator.  If no Party is willing to become Operator, this Agreement shall terminate under Article 27.1 (Term).

**4.7      Effective Date of Resignation or Removal**

The resignation or removal of Operator shall become effective as soon as practical but no later than 7:00 a.m. on the first day of the month following a period of ninety (90) days after the date of resignation or removal, unless a longer period is required for the Parties to obtain approval of the designation of the successor Operator, and designated applicant for oil spill financial responsibility purposes, by the BOEMRE; however, in no event shall the resignation or removal of Operator become effective until a successor Operator has assumed the duties of Operator.  The resignation or removal of the outgoing Operator shall not prejudice any rights, obligations, or liabilities resulting from its operatorship.  The successor Operator may charge the Joint Account for reasonable costs incurred in connection with copying or obtaining the former Operator's records, information, or data except when the change of Operator results from a merger, consolidation, reorganization, or sale or transfer to an Affiliate of Operator.

**4.8      Delivery of Property**

On the effective date of resignation or removal of Operator, the outgoing Operator shall deliver or transfer to the successor Operator custodianship of the Joint Account and possession of all items purchased for the Joint Account under this Agreement, all Hydrocarbons that are not the separate

property of a Party, and all equipment, materials, and appurtenances purchased for the Joint Account under this Agreement, which are not already in the possession of the successor Operator.  The outgoing Operator shall further use its reasonable efforts to transfer to the successor Operator, as of the effective date of the resignation or removal, its rights as Operator under all contracts exclusively relating to the activities or operations conducted under this Agreement, and the successor Operator shall assume all obligations of Operator that are assignable under the contracts.  The Parties may audit the Joint Account and conduct an inventory of all property and all Hydrocarbons that are not the separate property of a Party, and the inventory shall be used in the accounting to all Parties by the outgoing Operator of the property and the Hydrocarbons that are not the separate property of a Party.  The inventory and audit shall be conducted under Exhibit "C".

# ARTICLE 5
# AUTHORITY AND DUTIES OF OPERATOR

**5.1    Exclusive Right to Operate**

Unless otherwise provided in this Agreement, Operator shall have the exclusive right and duty to conduct operations (or cause them to be conducted) under this Agreement.  In performing services under this Agreement for the Non-operators, Operator shall be an independent contractor, not subject to the control or direction of Non-operators, except for the type of operation to be undertaken in accordance with the voting and election procedures in this Agreement.  No Party shall be deemed to be, or hold itself out as, the agent or fiduciary of another Party.

**5.2    Workmanlike Conduct**

Operator shall timely commence and conduct all operations in a good and workmanlike manner, as would a prudent operator under the same or similar circumstances.  OPERATOR SHALL NOT BE LIABLE TO NON-OPERATORS FOR LOSSES SUSTAINED OR LIABILITIES INCURRED, EXCEPT AS MAY RESULT FROM OPERATOR'S GROSS NEGLIGENCE OR WILLFUL MISCONDUCT.  Operator shall never be required under this Agreement to conduct an operation that it believes would be unsafe or would endanger persons, property, or the environment. Unless otherwise provided in this Agreement, Operator shall consult with Non-operators and keep them informed of all important matters.

**5.3    Liens and Encumbrances**

Operator shall endeavor to keep the Lease, wells, Platforms, Development Facilities, and other equipment free from all liens and other encumbrances occasioned by operations hereunder, except those provided in Article 8.6 (Security Rights).

**5.4    Employees and Contractors**

9

Operator shall select employees and contractors and determine their number, hours of labor, and compensation.

**5.5     Records**

Operator shall keep or cause to be kept accurate books, accounts, and records of activities or operations under this Agreement in compliance with the Accounting Procedure in Exhibit "C". Unless otherwise provided in this Agreement, all records of the Joint Account shall be available to a Non-operator as provided in Exhibit "C". Operator shall use good-faith efforts to ensure that the settlements, billings, and reports rendered to each Party under this Agreement are complete and accurate.

**5.6     Compliance**

Operator shall comply, and shall require all agents and contractors to comply, with all applicable laws, rules, regulations, and orders of governmental authorities having jurisdiction. Each Non-operator Party shall take all action, including the execution of all documents and forms, as necessary for Operator to comply with all applicable laws, rules, regulations, and orders of governmental authorities having jurisdiction.

**5.7     Contractors**

Operator may enter into contracts with qualified and responsible independent contractors for the design, construction, installation, drilling, production, or operation of wells, Platforms, and Development Facilities. Operator shall, in its discretion, use competitive bidding to procure goods and services for the benefit of the Parties. All drilling operations conducted under this Agreement shall be conducted by properly qualified and responsible drilling contractors under current competitive contracts. A drilling contract will be presumed to be a current competitive contract if it (a) was made within twelve (12) months before the commencement of the well and (b) contains terms, rates, and provisions that, when the contract was made, did not exceed those generally prevailing in the area for operations involving substantially equivalent rigs that are capable of conducting the drilling operation. At its election, Operator may use its own or an Affiliate's drilling equipment, derrick barge, tools, or machinery to conduct drilling operations, but the work shall be (i) performed by Operator or its Affiliate acting as an independent contractor, (ii) approved by written agreement with the Participating Parties before commencement of operations, and (iii) conducted under the same terms and conditions and at the same rates as are customary and prevailing in competitive contracts of third parties doing work of similar nature.

**5.8     Governmental Reports**

Operator shall make reports to governmental authorities it has a duty to make as Operator and shall furnish copies of the reports to the Participating Parties. Each Non-operator Party shall take all action, including the execution of all documents and forms, as necessary for Operator to make such reports to governmental authorities.

**5.9     Information to Participating Parties**

10

Except as provided in Article 8.7.1, Operator shall furnish each Participating Party at its request the following information, if applicable, for each activity or operation conducted by Operator:

**5.9.1**    A copy of the application for permit to drill and all amendments thereto.

**5.9.2**    A daily drilling report (or Reworking report or Recompletion report, if applicable), giving the depth, corresponding lithological information, data on drilling fluid characteristics, information about drilling or operational difficulties or delays, if any, and other pertinent information, by facsimile transmission or electronic mail within forty-eight (48) hours (excluding Saturdays, Sundays, and federal holidays) for well operations conducted in the preceding twenty-four (24)-hour period.

**5.9.3**    A complete report of each core analysis.

**5.9.4**    A copy of each electrical survey, currently as it is run; all data for each radioactivity log, temperature survey, deviation or directional survey, caliper log, and other log or survey obtained during the drilling of the well; and, on completion of the well, a composite of all electrical-type logs, insofar as is reasonable and customary.

**5.9.5**    A copy of all well test results, bottom-hole pressure surveys, and fluid analyses.

**5.9.6**    On written request received by Operator before commencement of drilling, samples of cuttings and cores taken from the well (if sufficient cores are retrieved), packaged in containers furnished by Operator at the expense of the requesting Party, marked as to the depths from which they were taken, and shipped at the expense of the requesting Party by express courier to the address designated by the requesting Party.

**5.9.7**    To the extent possible, twenty-four (24) hours' advance notice of, and access to, logging, coring, and testing operations.

**5.9.8**    A monthly report on the volume of Hydrocarbons and water produced from each well.

**5.9.9**    A copy of each report made to a governmental authority having jurisdiction.

**5.9.10**   On written request, other pertinent information available to Operator, including but not limited to those portions of the contracts to be used for the benefit of the Joint Account and that pertain to the Lease, but excluding Operator's proprietary or secret information and its subsurface interpretations.

**5.10**    **Information to Non-participating Parties**

Operator shall furnish each Non-participating Party a copy of each Operator's governmental report that is available to the public and associated with the applicable Non-consent Operation. Until the applicable recoupment under Article 13 (Non-consent Operations) is complete, a Non-participating Party shall not receive or review any other information specified by Article 5.9 (Information to Participating Parties), except as may be necessary for a payout audit of the Non-consent Operation.

# ARTICLE 6

## VOTING AND VOTING PROCEDURES

**6.1    Voting Procedures**

Unless otherwise provided in this Agreement, each matter requiring approval of the Parties shall be determined as follows:

**6.1.1    Voting Interest**

Subject to Article 8.6 (Security Rights), each Party shall have a voting interest equal to its Working Interest or its Participating Interest, as applicable.

**6.1.2    Vote Required**

Unless expressly stated to the contrary herein, a matter requiring approval of the Parties shall be decided by the affirmative vote of one (1) or more Parties having a combined voting interest of more than fifty percent (50%).  If there are only two (2) Parties to this Agreement, the matter shall be determined by the Party having a majority voting interest or, if the interests are equal, the matter shall require unanimous consent.

**6.1.3    Votes**

The Parties may vote at a meeting; by telephone, promptly confirmed in writing to Operator; by electronic mail; or by facsimile transmission.  Operator shall give each Party prompt notice of the results of the voting.

**6.1.4    Meetings**

Meetings of the Parties may be called by Operator on its own motion or at the request of one or more Parties having a collective voting interest of not less than twenty-five percent (25%).  Except in an emergency, no meeting shall be called on less than ten (10) days' advance written notice, and the notice of meeting shall include the meeting agenda prepared by Operator or the requesting Party.  The representative of Operator shall be chairman of each meeting.  Only matters included in the agenda may be discussed at a meeting, but the agenda and items included in the agenda may be amended before or during the meeting by unanimous agreement of all Parties.

# ARTICLE 7
# ACCESS

**7.1    Access to Lease**

Except as provided in Article 8.7.1, each Party shall have access, at its sole risk and expense and at all reasonable times, to the Lease, Platform, Development Facilities, and Joint Account assets to inspect activities, operations, and wells in which it participates, and to pertinent records and data.  A Non-operator shall give Operator at least twenty-four (24) hours' notice of the Non-operator's intention to visit the Lease.  To protect Operator and the Non-operators from lawsuits,

12

claims, and legal liability, if it is necessary for a person who is not performing services for Operator directly related to the joint operations, but is performing services solely for a Non-operator or pertaining to the business or operations of a Non-operator, to visit, use, or board a rig, well, Platform, or Development Facilities subject to this Agreement, the Non-operator shall give Operator advance notice of the visit, use, or boarding, and shall secure from that person an agreement, in a form satisfactory to Operator, indemnifying and holding Operator and Non-operators harmless, or shall itself provide the same hold harmless and indemnification in favor of Operator and other Non-operators before the visit, use, or boarding.

7.2     **Reports**

On written request, Operator shall furnish a requesting Party any information not otherwise furnished under Article 5 (Authority and Duties of Operator) to which that Party is entitled under this Agreement.  The costs of gathering and furnishing information not furnished under Article 5 shall be charged to the requesting Party. Operator is not obligated to furnish interpretative data that was generated by Operator at its sole cost.

7.3     **Confidentiality**

Except as otherwise provided in Article 7.4 (Limited Disclosure), Article 7.5 (Limited Releases to Offshore Scout Association), Article 7.6 (Media Releases), and Article 21.1 (Notice of Contributions Other Than Advances for Sale of Production), and except for necessary disclosures to governmental authorities having jurisdiction, or except as agreed in writing by all Participating Parties, no Party or Affiliate shall disclose Confidential Data to a third party.  This Article 7.3 shall remain in force and effect during the term of this Agreement and for one (1) year after termination of this Agreement.

7.4     **Limited Disclosure**

A Party may make Confidential Data to which it is entitled under this Agreement available to:

(a)     outside professional consultants and reputable engineering firms for the purpose of evaluations and/or submitting bids;

(b)     gas transmission companies for Hydrocarbon reserve or other technical evaluations;

(c)     reputable financial institutions for study before commitment of funds;

(d)     governmental authorities having jurisdiction or the public, to the extent required by applicable laws or by those governmental authorities;

(e)     the public, to the extent required by the regulations of a recognized stock exchange;

(f)     third parties with which a Party is engaged in a bona fide effort to effect a merger or consolidation, sell all or a controlling part of that Party's stock, or sell all or substantially all assets of that Party or an Affiliate of that Party;

(g)     an Affiliate of a Party;

(h)     such limited well information that is typically disclosed by Operator's representative during meetings of the Offshore Oil Scouts Association; and

13

(i)      third parties with which a Party is engaged in a bona fide effort to sell, farm out, or trade all or a portion of its interest in the Lease.

Confidential Data made available under Articles 7.4(f) and 7.4(h) shall not be removed from the custody or premises of the Party making the Confidential Data available to third parties described in those Articles.  A third party permitted access under Articles 7.4, (a), (b), (c), (f), and (h) shall first agree in writing neither to disclose the Confidential Data to others nor to use the Confidential Data, except for the purpose for which it was disclosed.  The disclosing Party shall give prior notice to the other Parties that it intends to make the Confidential Data available.

**7.5     Limited Releases to Offshore Scout Association**

Operator may disclose Confidential Data to the Offshore Oil Scouts Association at their regularly scheduled meetings.  The Confidential Data that may be disclosed is limited to information concerning well locations, well operations, and well completions to the extent reasonable and customary in industry practice or required under the by-laws of the Offshore Oil Scouts Association.

**7.6     Media Releases**

Except as unanimously agreed by the Participating Parties or otherwise permitted by this Article, no Party shall issue a news or media release about operations on the Lease.  In an emergency involving extensive property or environmental damage, operations failure, loss of human life, or other clear emergency, and for which there is insufficient time to obtain the prior approval of the Parties, Operator may furnish the minimum, strictly factual, information necessary to satisfy the legitimate public interest of the media and governmental authorities having jurisdiction.  Operator shall then promptly advise the other Parties of the information furnished in response to the emergency.

# ARTICLE 8
# EXPENDITURES

**8.1     Basis of Charge to the Parties**

Subject to the other provisions of this Agreement, Operator shall pay all costs incurred under this Agreement, and each Party shall reimburse Operator in proportion to its Participating Interest.  All charges, credits, and accounting for expenditures shall be made and done pursuant to Exhibit "C".

**8.2     AFEs**

Before undertaking an operation or making a single expenditure to be in excess of Two Hundred Thousand Dollars ($200,000.00), and before conducting an activity or operation to drill, Sidetrack, Deepen, Complete, Rework, or Recomplete a well (regardless of the estimated cost), Operator shall submit an AFE for the operation or expenditure to the Parties for approval.  Operator shall

14

also furnish an informational AFE to all Parties for an operation or single expenditure estimated to cost Two Hundred Thousand Dollars ($200,000.00) or less, but in excess of Fifty Thousand Dollars ($50,000.00).   Operator shall notify the Participating Parties as soon as reasonably possible when it appears that the cost of an ongoing activity or operation, before its completion, will exceed the original AFE by more than one hundred twenty-five percent (125%).   This overexpenditure notice shall be furnished to the Participating Parties as a supplemental AFE for informational purposes only and is not subject to an election by any of the Parties.

**8.3    Emergency and Required Expenditures**

Notwithstanding anything in this Agreement to the contrary, Operator is hereby authorized to conduct operations and incur expenses that in its opinion are reasonably necessary to safeguard life, property, and the environment in case of an actual or imminently threatened blowout, explosion, accident, fire, flood, storm, hurricane, catastrophe, or other emergency, and the expenses shall be borne by the Participating Parties in the affected operation.   Operator shall report to the Participating Parties, as promptly as practical, the nature of the emergency and the action taken.   Operator is also authorized to conduct operations and incur expenses reasonably required by statute, regulation, order, or permit condition or by a governmental authority having jurisdiction, which expenses shall be borne by the Participating Parties in the affected operation, subject to Exhibit "C".

**8.4    Advance Billings**

Operator may require each Party to advance its respective share of estimated expenditures pursuant to Exhibit "C".

**8.5    Commingling of Funds**

Funds received by Operator under this Agreement may be commingled with its own funds.

**8.6    Security Rights**

In addition to any other security rights and remedies provided by law with respect to services rendered or materials and equipment furnished under this Agreement, for and in consideration of the covenants and mutual undertakings of Operator and the Non-operator(s) herein, the Parties shall have the following security rights:

**8.6.1    Mortgage in Favor of Operator**

Each Non-operator(s) hereby grants to Operator a mortgage, hypothecate, and pledge of and over all its rights, titles, and interests in and to (a) the Lease, (b) the oil and gas in, on, under, and that may be produced from the lands within the Lease, and (c) all other immovable property or other property susceptible of mortgage situated within the Lease.

(i)       This mortgage is given to secure the complete and timely performance of and payment by each Non-operator(s) of all obligations and indebtedness of every kind and nature, whether now owed by such Non-operator(s) or hereafter arising, pursuant to this Agreement.   To the extent susceptible under applicable law, this

15

mortgage and the security interests granted in favor of Operator herein shall secure the payment of all costs and other expenses properly charged to such Party, together with (a) interest on such indebtedness, costs, and other expenses at the rate set forth in Exhibit "C" attached hereto (the "Accounting Procedure") or the maximum rate allowed by law, whichever is the lesser, (b) reasonable attorneys' fees, (c) court costs, and (d) other directly related collection costs.  If any Non-operator(s) Party does not pay any such uncontested costs and other expenses or perform its obligations under this Agreement when due, Operator shall have the additional right to notify the purchaser or purchasers of the defaulting Non-operator's(s') production and collect such costs and other expenses out of the proceeds from the sale of the defaulting Non-operator's(s') share of production until the amount owed has been paid.  Operator shall have the right to offset the amount owed against the proceeds from the sale of such defaulting Non-operator's(s) share of production if the amount owing is uncontested.  Any purchaser of such production shall be entitled to rely on Operator's statement concerning the amount of costs and other expenses owed by the defaulting Non-operator(s) and payment made to Operator by any purchaser shall be binding and conclusive as between such purchaser and such defaulting Non-operator(s).

(ii)      The maximum amount for which the mortgage herein granted by each Non-operator(s) shall be deemed to secure the obligations and indebtedness of such Non-operator(s) to Operator as stipulated herein is hereby fixed in an amount equal to Twenty-Five Million Dollars ($25,000,000.00) (the "Limit of the Mortgage of each Non-operator(s)").  Except as provided in the previous sentence (and then only to the extent that such limitations are required by law), the entire amount of obligations and indebtedness of each Non-operator(s) to Operator is secured hereby without limitation.  Notwithstanding the foregoing Limit of the Mortgage of each Non-operator(s), the liability of each Non-operator(s) under this Agreement and the mortgage and security interest granted hereby shall be limited to (and Operator shall not be entitled to enforce the same against such Non-operator(s) for an amount exceeding) the actual obligations and indebtedness (including all interest charges, costs, attorneys' fees, and other charges provided for in this Agreement or in the attached Exhibit "F") outstanding and unpaid and that are attributable to or charged against the interest of such Non-operator(s) pursuant to this Agreement.

**8.6.2    Security Interest in Favor of Operator**

To secure the complete and timely performance of and payment by each Non-operator(s)

16

of all obligations and indebtedness of every kind and nature, whether now owed by such Non-operator(s) or hereafter arising, pursuant to this Agreement, each Non-operator Party hereby grants to Operator a continuing security interest in and to all its rights, titles, interests, claims, general intangibles, proceeds, and products thereof, whether now existing or hereafter acquired, in and to (a) all oil and gas produced from the lands or offshore blocks covered by the Lease or attributable to the Lease when produced, (b) all accounts receivable accruing or arising as a result of the sale of such oil and gas (including, without limitation, accounts arising from gas imbalances or from the sale of oil and gas at the wellhead), (c) all cash or other proceeds from the sale of such oil and gas once produced, and (d) all Platforms, wells, facilities, fixtures, other corporeal property, whether movable or immovable, whether now or hereafter placed on the lands or offshore blocks covered by the Lease or maintained or used in connection with the ownership, use, or exploitation of the Lease, and other surface and sub-surface equipment of any kind or character located on or attributable to the Lease and the cash or other proceeds realized from the sale, transfer, disposition, or conversion thereof.  The interest of the Non-operator(s) in and to the oil and gas produced from or attributable to the Lease when extracted and the accounts receivable accruing or arising as the result of the sale thereof shall be financed at the wellhead of the well or wells located on the Lease.  To the extent susceptible under applicable law, the security interest granted by each Non-operator(s) hereunder covers: (a) all substitutions, replacements, and accessions to the property of such Non-operator(s) described herein and is intended to cover all the rights, titles, and interests of such Non-operator(s) in all movable property now or hereafter located on or used in connection with the Lease, whether corporeal or incorporeal; (b) all rights under any gas balancing agreement, farmout rights, option farmout rights, acreage and cash contributions, and conversion rights of such Non-operator(s) in connection with the Lease, or the oil and gas produced from or attributable to the Lease, whether now owned and existing or hereafter acquired or arising, including, without limitation, all interests of each Non-operator(s) in any partnership, tax partnership, limited partnership, association, joint venture, or other entity or enterprise that holds, owns, or controls any interest in the Lease; and (c) all rights, claims, general intangibles, and proceeds, whether now existing or hereafter acquired, of each Non-operator(s) in and to the contracts, agreements, permits, licenses, rights-of-way, and similar rights and privileges that relate to or are appurtenant to the Lease, including the following:

(i)        all its rights, titles, and interests, whether now owned and existing or hereafter acquired or arising, in, to, and under or derived from any present or future operating, farmout, bidding, pooling, unitization, and communitization agreements, assignments, and subleases, whether or not described in Exhibit

<div align="center">17</div>

"A", to the extent, and only to the extent, that such agreements, assignments, and subleases cover or include any of its rights, titles, and interests, whether now owned and existing or hereafter acquired or arising, in and to all or any portion of the Lease, and all units created by any such pooling, unitization, and communitization agreements and all units formed under orders, regulations, rules, or other official acts of any governmental authority having jurisdiction, to the extent and only to the extent that such units cover or include all or any portion of the Lease;

(ii)     all its rights, titles, and interests, whether now owned and existing or hereafter acquired or arising, in, to, and under or derived from all presently existing and future advance payment agreements, and oil, casinghead gas, and gas sales, exchange, and processing contracts and agreements, including, without limitation, those contracts and agreements that are described on Exhibit "A", to the extent, and only to the extent, that those contracts and agreements cover or include all or any portion of the Lease; and

(iii)    all its rights, titles, and interests, whether now owned and existing or hereafter acquired or arising, in, to, and under or derived from all existing and future permits, licenses, rights of way, and similar rights and privileges that relate to or are appurtenant to any of the Lease(s).

### 8.6.3   Mortgage in Favor of the Non-operator Parties

Operator hereby grants to each Non-operator(s) a mortgage, hypothecate, and pledge of and over all its rights, titles, and interests in and to (a) the Lease; (b) the oil and gas in, on, under, and that may be produced from the lands within the Lease; and (c) all other immovable property or other property susceptible of mortgage situated within the Lease.

(i)     This mortgage is given to secure the complete and timely performance of and payment by Operator of all obligations and indebtedness of every kind and nature, whether now owed by Operator or hereafter arising, pursuant to this Agreement.  To the extent susceptible under applicable law, this mortgage and the security interests granted in favor of each Non-operator(s) herein shall secure the payment of all costs and other expenses properly charged to Operator, together with (a) interest on such indebtedness, costs, and other expenses at the rate set forth in the Accounting Procedure or the maximum rate allowed by law, whichever is the lesser, (b) reasonable attorneys' fees, (c) court costs, and (d) other directly related collection costs.  If Operator does not pay any such uncontested costs and other expenses or perform its obligations under this Agreement when due, the Non-operator(s) shall have the additional right to notify the purchaser or purchasers of Operator's production and collect such costs and

other expenses out of the proceeds from the sale of Operator's share of production until the amount owed has been paid.  The Non-operator(s) shall have the right to offset the amount owed against the proceeds from the sale of Operator's share of production if the amount owing is uncontested.   Any purchaser of such production shall be entitled to rely on the Non-operator(s)' statement concerning the amount of costs and other expenses owed by Operator and payment made to the Non-operator(s) by any purchaser shall be binding and conclusive as between such purchaser and Operator.

(ii)   The maximum amount for which the mortgage herein granted by Operator shall be deemed to secure the obligations and indebtedness of Operator to all Non-operator(s) as stipulated herein is hereby fixed in an amount equal to Twenty-Five Million Dollars ($25,000,000) in the aggregate (the "Limit of the Mortgage of Operator").  Except as provided in the previous sentence (and then only to the extent such limitations are required by law), the entire amount of obligations and indebtedness of Operator to the Non-operator(s) is secured hereby without limitation.  Notwithstanding the foregoing Limit of the Mortgage of Operator, the liability of Operator under this Agreement and the mortgage and security interest granted hereby shall be limited to (and the Non-operator(s) shall not be entitled to enforce the same against Operator for an amount exceeding) the actual obligations and indebtedness (including all interest charges, costs, attorneys' fees, and other charges provided for in this Agreement or in Exhibit "F") outstanding and unpaid and that are attributable to or charged against the interest of Operator pursuant to this Agreement.

**8.6.4   Security Interest in Favor of the Non-operator(s)**

To secure the complete and timely performance of and payment by Operator of all obligations and indebtedness of every kind and nature, whether now owed by Operator or hereafter arising, pursuant to this Agreement, Operator hereby grants to each Non-operator(s) a continuing security interest in and to all its rights, titles, interests, claims, general intangibles, proceeds, and products thereof, whether now existing or hereafter acquired, in and to (a) all oil and gas produced from the lands or offshore blocks covered by the Lease or attributable to the Lease when produced, (b) all accounts receivable accruing or arising as a result of the sale of such oil and gas (including, without limitation, accounts arising from gas imbalances or from the sale of oil and gas at the wellhead), (c) all cash or other proceeds from the sale of such oil and gas once produced, and (d) all Platforms, wells, facilities, fixtures, other corporeal property whether movable or immovable, whether now or hereafter placed on the offshore blocks covered by the Lease or maintained or used in connection with the ownership, use, or exploitation of the

19

Lease, and other surface and sub-surface equipment of any kind or character located on or attributable to the Lease and the cash or other proceeds realized from the sale, transfer, disposition, or conversion thereof.  The interest of Operator in and to the oil and gas produced from or attributable to the Lease when extracted and the accounts receivable accruing or arising as the result of the sale thereof shall be financed at the wellhead of the well or wells located on the Lease.  To the extent susceptible under applicable law, the security interest granted by Operator hereunder covers: (a) all substitutions, replacements, and accessions to the property of Operator described herein and is intended to cover all the rights, titles and interests of Operator in all movable property now or hereafter located on or used in connection with the Lease, whether corporeal or incorporeal; (b) all rights under any gas balancing agreement, farmout rights, option farmout rights, acreage and cash contributions, and conversion rights of Operator in connection with the Lease, the oil and gas produced from or attributable to the Lease, whether now owned and existing or hereafter acquired or arising, including, without limitation, all interests of Operator in any partnership, tax partnership, limited partnership, association, joint venture, or other entity or enterprise that holds, owns, or controls any interest in the Lease; and (c) all rights, claims, general intangibles, and proceeds, whether now existing or hereafter acquired, of Operator in and to the contracts, agreements, permits, licenses, rights-of-way, and similar rights and privileges that relate to or are appurtenant to the Lease, including the following:

(i)     all its rights, titles, and interests, whether now owned and existing or hereafter acquired or arising, in, to, and under or derived from any present or future operating, farmout, bidding, pooling, unitization, and communitization agreements, assignments, and subleases, whether or not described in Exhibit "A", to the extent, and only to the extent, that such agreements, assignments, and subleases cover or include any of its rights, titles, and interests, whether now owned and existing or hereafter acquired or arising, in and to all or any portion of the Lease, and all units created by any such pooling, unitization, and communitization agreements and all units formed under orders, regulations, rules, or other official acts of any governmental authority having jurisdiction, to the extent and only to the extent that such units cover or include all or any portion of the Lease;

(ii)    all its rights, titles, and interests, whether now owned and existing or hereafter acquired or arising, in, to, and under or derived from all presently existing and future advance payment agreements, and oil, casinghead gas, and gas sales, exchange, and processing contracts and agreements, including, without limitation, those contracts and agreements that are described on Exhibit "A", to

20

the extent, and only to the extent that those contracts and agreements cover or include all or any portion of the Lease; and

(iii)     all its rights, titles, and interests, whether now owned and existing or hereafter acquired or arising, in, to, and under or derived from all existing and future permits, licenses, rights-of-way, and similar rights and privileges that relate to or are appurtenant to any of the Lease.

**8.6.5    Recording**

To provide evidence of, and to further perfect the Parties' security rights created hereunder, on request, each Party shall execute and acknowledge the attached Exhibit "F" (the "Memorandum of Operating Agreement and Financing Statement") in multiple counterparts as appropriate.  The Parties authorize Operator to file the Memorandum of Operating Agreement and Financing Statement in the public records set forth below to serve as notice of the existence of this Agreement as a burden on the title of Operator and the Non-operator(s) to their interests in the Lease and for purposes of satisfying otherwise relevant recording and filing requirements of applicable law and to attach an original of the Memorandum of Operating Agreement and Financing Statement to a standard UCC-1 for filing in the UCC records set forth below to perfect the security interests created by the Parties in this Agreement.  Such Memorandum of Operating Agreement and Financing Statement shall be amended from time to time on acquisition of additional leasehold interests in the Lease, and the Parties shall, within five (5) business days following request by one (1) of the Parties hereto, execute and furnish to the requesting Party for recordation any such amendment.

**8.6.6    The Memorandum of Operating Agreement and Financing Statement**

The Memorandum of Operating Agreement and Financing Statement is to be filed or recorded, as the case may be, in (a) the conveyance records of the parish or parishes adjacent to the lands or offshore blocks covered by the Lease pursuant to La. R.S. 9:2731 et seq., (b) the mortgage records of such parish(es) or county(ies), (c) the appropriate Uniform Commercial Code records, and (d) the records of the BOEMRE as a non–required filing.  A copy of such filed or recorded instrument(s) shall be furnished to Non-operator(s) once received by Operator.

**8.7    Unpaid Charges and Default**

**8.7.1**    If a Party fails to pay the charges due under this Agreement within sixty (60) days after receipt of Operator's statement, and if Operator then issues a notice of default and the default is not cured in the time and manner provided below, the other Participating Parties shall, on Operator's request, pay the unpaid amount in proportion to their Participating Interests.  Each Party paying its share of the unpaid amount shall be subrogated to Operator's security rights, to the extent of the payment.  In addition to other

21

remedies provided by this Agreement or by law, if a Party does not pay, when due, its share of the charges under this Agreement, Operator may give that Party notice that unless payment is made within thirty (30) days after receipt of Operator's notice, the Party shall be in default if the amount owing is uncontested.  A Party in default shall have no further access to the Lease, maps, records, data, or other information obtained in connection with operations.  If a Party believes that Operator's charges, or a portion thereof, are incorrect, that Party shall nevertheless pay the charges claimed by Operator and may notify Operator that the charges are in dispute.  Thereafter, Operator and the Non-operator(s) shall attempt to resolve the issue within sixty (60) days after receipt of payment.  A defaulting Party shall not be entitled to vote or exercise an election on any matter until that Party's payments are current.  The voting interest of each non-defaulting Party shall be in the proportion its Participating Interest bears to the total Participating Interests of all non-defaulting Parties. For each operation approved while a Party is in default, the defaulting Party shall be deemed to have voted not to participate in that operation.

**8.7.2**   The first sentence of Article 8.6.1(ii) of this Agreement shall be applicable only when both of the following conditions have been met: (i) Operator has fully complied with the provisions of this Agreement that are intended for the prevention of such a default, including, without limitation, timely advance billings, reasonable efforts to timely collect payment for advance billings as well as all monthly billings, providing due notice of default to a party that fails to make timely payment as required and recording of a fully executed Memorandum of Operating Agreement and Financing Statement as set forth in Exhibit "F", and (ii) the defaulting party is any Party other than Operator or its assigns.

**8.8**   **Confession of Judgment; Executory Process**

To the extent the Contract Area is located adjacent to Louisiana and to the extent allowed under La. C.C.P. art. 2631 et seq., each Party may use executory process to enforce the mortgage and security rights granted hereunder as to any property subject hereto.  Therefore, each Non-operator Party hereby confesses judgment in favor of the Operator up to the full amount secured hereunder as set forth in Article 8.6.1 (Mortgage in Favor of the Operator), and does by these present, consent, agree, and stipulate that, in the event the mortgage or security interests or any charges thereon not being promptly and fully paid when the same becomes due and payable, or in the event of failure to comply with any of the obligations herein set forth, or the breach of this Agreement in any of its parts by such Non-operator Party, the mortgage or security interests shall, at the option of the Operator, become due and payable, anything therein contained to the contrary notwithstanding, and it shall be lawful for the Operator, as holder or the mortgage or security interests, without making a demand and without notice or putting in default, the same being hereby expressly waived, to cause all and singular the property herein mortgaged or

22

secured to be seized and sold without appraisal, which is hereby expressly waived, by executory process issued by a competent court or to proceed with enforcement of its mortgage or security interest in any other manner provided by law.   Furthermore, the Operator hereby confesses judgment in favor of each Non-operator Party up to the full amount secured hereunder as set forth in Article 8.6.3 (Mortgage in Favor of the Non-operator Parties), and does by these present, consent, agree, and stipulate that, in the event the mortgage or security interests or any charges thereon not being promptly and fully paid when the same becomes due and payable, or in the event of failure to comply with any of the obligations herein set forth, or the breach of this Agreement in any of its parts by such Operator, the mortgage or security interests shall, at the option of such Non-operator Party, become due and payable, anything therein contained to the contrary notwithstanding, and it shall be lawful for such Non-operator Party, as holder or the mortgage or security interests, without making a demand and without notice or putting in default, the same being hereby expressly waived, to cause all and singular the property herein mortgaged or secured to be seized and sold by executory process issued by a competent court or to proceed with enforcement of its mortgage or security interest in any other manner provided by law.

# ARTICLE 9
# NOTICES

**9.1      Giving and Receiving Notices**

Except as otherwise provided in this Agreement, all AFEs and notices required or permitted by this Agreement shall be in writing and shall be delivered in person or by mail, courier service, or electronic mail, or facsimile transmission, with postage and charges prepaid, addressed to the Parties at the addresses in Exhibit "A".  When a drilling rig is on location and standby charges are accumulating, however, notices pertaining to the rig shall be given orally or by telephone.   All telephone or oral notices permitted by this Agreement shall be confirmed as soon as reasonably practical thereafter by written notice.  A notice shall be deemed to have been delivered only when received by the Party to which it was directed, and the period for a Party to deliver a response thereto begins on the date the notice is received.   "Receipt", for oral or telephone notice, means actual and immediate communication to the Party to be notified, and for written notice, means actual delivery of the notice to the address of the Party to be notified, as specified in this Agreement, or to the facsimile machine of that Party.  A responsive notice shall be deemed to have been delivered when the Party to be notified is in receipt of same.  When a response is required in forty-eight (48) hours or less, however, the response shall be given orally or by telephone, electronic mail, or facsimile transmission within that period.  If a Party is unavailable to accept delivery of a notice required to be given orally or by telephone, the notice may be delivered by any other method specified in this Article 9.1.   A message left on an answering

#93828440v3
#93828440v5

machine or with an answering service or other third person shall not be deemed to be adequate telephonic or oral notice.

**9.2     Content of Notice**

An AFE or a notice requiring a response shall indicate the maximum response time specified in Article 9.3 (Response to Notices).  A proposal for a Platform and/or Development Facilities shall include an AFE containing a description of the Platform and/or Development Facilities, including but not limited to location and the estimated costs of design, fabrication, transportation, and installation.   A proposal for a well operation shall include an AFE describing the estimated commencement date, the proposed depth, the objective formation or formations to be penetrated or tested, the Objective Horizon, the surface and bottom-hole locations, proposed directional or horizontal drilling operations, the type of equipment to be used, and the estimated costs of the operation, including but not limited to the estimated costs of drilling, testing, and Completing or abandoning the well. If a proposed operation is subject to Article 13.11 (Lease Maintenance Operations), the notice shall specify that the proposal is a Lease Maintenance Operation. A proposal for multiple operations on more than one (1) well location by the same rig shall contain separate AFEs or notices for each operation and shall specify in writing in what order the operations will be conducted. Each Party shall respond to each proposed multiple operation in the manner provided in Article 9.3.3 (Proposal for Multiple Operations).

**9.3     Response to Notices**

Except as provided in Article 9.1, each Party's response to a proposal shall be in writing to the proposing Party. Unless otherwise provided in this Agreement, the response time shall be as follows:

**9.3.1     Platform and/or Development Facilities Proposals**

Each Party shall respond within sixty (60) days after its receipt of the AFE or notice for a Platform and/or Development Facilities.

**9.3.2     Well Proposals**

Except as provided in Article 9.3.3 (Proposal for Multiple Operations), each Party shall respond within thirty (30) days after receipt of the well, Rework, or Recompletion proposal, but if (a) a drilling rig is on location, (b) the proposal relates to the same well or its substitute, and (c) standby charges are accumulating, a response shall be made within forty-eight (48) hours after receipt of the proposal, including Saturdays, Sundays, and federal holidays.

**9.3.3     Proposal for Multiple Operations**

When a proposal is made to conduct multiple Development Operations at separate well locations using the same rig, each Party shall respond (a) to the well operation taking precedence,  within  thirty  (30)  days  after  receipt  of  the  proposal;  and  (b)  to  each

#93828440v3
#93828440v5

subsequent well location, within forty-eight (48) hours after completion of approved operations at the prior location and notification thereof by Operator.

### 9.3.4 Other Matters

For all other matters requiring notice, each Party shall respond within thirty (30) days after receipt of notice.

## 9.4 Failure to Respond

Failure of a Party to respond to a proposal or notice, to vote, or to elect to participate within the period required by this Agreement shall be deemed to be a negative response, vote, or election.

## 9.5 Response to Counterproposals

Should a counterproposal be allowed under this Agreement, responses to that counterproposal must be made within the response period for the original proposal.

## 9.6 Timely Well Operations

Unless otherwise provided, an approved well shall be commenced within one hundred eighty (180) days after the date when the last applicable election on that well may be made.  Wells shall be deemed to have commenced on the day charges commence under the drilling contract for that well. Subject to Exhibit "C", if a proposal for a well is deemed to have been withdrawn, all costs incurred in the preparation for or in furtherance of that well will be chargeable to the Parties that voted to participate in the well proposal for that well.

## 9.7 Timely Platform / Development Facilities Operations

Unless otherwise provided, Operator shall commence, or cause to commence, the construction, acquisition, or refurbishment of an approved proposal for a Platform and/or Development Facilities within one hundred eighty (180) days after the date when the last applicable election on that Platform and/or Development Facilities may be made.  The construction, acquisition, or refurbishment of an approved Platform and/or Development Facilities proposal shall be deemed to have commenced on the date the contract is awarded for the design, acquisition, fabrication, or refurbishment of the Platform and/or Development Facilities.  Subject to Exhibit "C", regardless of whether or not the construction, acquisition, or refurbishment of a Platform and/or Development Facilities is commenced, all costs incurred by Operator, attributable to that activity, shall be paid by the Participating Parties.

# ARTICLE 10
# EXPLORATORY OPERATIONS

## 10.1 Proposing Operations

A Party may propose an Exploratory Operation in accordance with Article 9 (Notices) to the other Parties that are entitled to vote or make an election in regard to that operation

## 10.2 Counterproposals

25

When an Exploratory Operation is proposed, a Party may, within seven (7) days (exclusive of Saturdays, Sundays, and federal holidays) after receipt of the AFE or notice for the original proposal, make a counterproposal to conduct an alternative Exploratory Operation by sending an AFE or notice to such Parties in accordance with Article 9 (Notices).  The AFE or notice shall indicate that the proposal is a counterproposal to the original proposal.  If one (1) or more counterproposals are made, such Parties shall elect to participate in either the original proposal, one (1) counterproposal, or neither the original proposal nor a counterproposal.  If two (2) or more proposals receive the approval of the number of Parties and combined Working Interests required by Article 10.5 (Operations by Fewer Than All Parties), the proposal receiving the largest percentage of Working Interest approval shall take precedence, and in the event of a tie between two (2) or more approved proposals, the proposal first received by the Parties shall take precedence.  Except for the response period provided in this Article 10.2, a counterproposal shall be subject to the same terms and conditions as the original proposal.

**10.3    Operations by All Parties**

If all Parties elect to participate in the proposed operation, Operator shall conduct the operation at their cost and risk.

**10.4    Second Opportunity to Participate**

If there are more than two (2) Parties to this Agreement and if fewer than all but one (1) or more Parties elect to participate, the proposing Party shall notify the Parties of the elections made, whereupon a Party originally electing not to participate may then elect to participate by notifying the proposing Party within forty-eight (48) hours, including Saturdays, Sundays, and federal holidays, after receipt of such notice.  If all Parties elect to participate in the proposed operation, Operator shall conduct the operation at their cost and risk.  If there are only two (2) Parties to this Agreement, there shall not be a second opportunity to elect to participate, and if the Participating Party agrees to pay and bear one hundred percent (100%) of the costs and risks of the operation, Operator shall conduct the operation as a Non-consent Operation for the benefit of the Participating Party, and the provisions of Article 13 (Non-consent Operations) shall apply.

**10.5    Operations by Fewer Than All Parties**

If there are more than two (2) Parties to this Agreement and if, after the election made under Article 10.4 (Second Opportunity to Participate), fewer than all but one (1) or more Parties having the requisite Working Interest to approve the operation have elected to participate in the proposed operation, the proposing Party shall notify the Participating Parties, and each Participating Party shall have forty-eight (48) hours, including Saturdays, Sundays, and federal holidays, after receipt of the notice to notify the proposing Party of the portion of costs and risks attributable to the total Non-participating Parties' interests it elects to pay and bear.  Unless otherwise agreed by the Participating Parties, each Participating Party may, but shall not be

26

obligated to, pay and bear that portion of the costs and risks attributable to the total Non-participating Parties' interests in the ratio that the Participating Party's interest bears to the total interests of all Participating Parties that elect to pay and bear a portion of costs and risks attributable to the total Non-participating Parties' interests. Failure to respond shall be deemed to be an election not to pay or bear any additional costs or risks. If the Participating Parties agree to pay and bear one hundred percent (100%) of the costs and risks of the operation, Operator shall conduct the operation as a Non-consent Operation for the benefit of the Participating Parties, and the provisions of Article 13 (Non-consent Operations) shall apply. If such agreement is not obtained, however, the operation shall not be conducted and the effect shall be as if the proposal had not been made.

**10.5.1  First Exploratory Well**

If a Party elects to be a Non-participating Party in the drilling of the first Exploratory Well on the Lease, then, as of the last applicable election date, each Non-participating Party shall be deemed to have relinquished its entire Working Interest in the Lease to the Participating Party. If such first Exploratory Well is commenced timely after the last applicable election date and is drilled to the proposed Objective Depth or deepest Objective Horizon, whichever is lesser, in accordance with this Agreement, each Non-participating Party shall execute an assignment of its entire Working Interest in the Lease to the Participating Party(ies) in proportion to their interests in such first Exploratory Well.

**10.6  Expenditures Approved**

Approval of an Exploratory Operation shall cover all necessary expenditures associated with the operation proposed in the AFE or notice that are incurred by Operator in connection with (a) preparations for drilling; (b) the actual drilling; (c) evaluations, such as testing, coring, and logging; and (d) plugging and abandonment.

**10.7  Conduct of Operations**

After commencement of drilling an Exploratory Well, Operator shall diligently conduct the operation without unreasonable delay until the well reaches the Objective Depth, unless the well encounters, at a lesser depth, impenetrable conditions or mechanical difficulties that cannot be overcome by reasonable and prudent operations and that render further operations impracticable. If a well does not reach its Objective Depth as a result of the conditions mentioned in this Article 10.7, the operation shall be deemed to have been completed and Article 13 (Non-consent Operations) shall apply to each Non-participating Party for the portion of the well drilled.

**10.8  Course of Action After Reaching Objective Depth**

When an Exploratory Well has been drilled to its Objective Depth and reasonable testing, coring, and logging have been completed as set forth in the approved AFE and the results have been furnished to the Participating Parties, Operator shall notify the Participating Parties of Operator's recommendation for further operations in the well, and the following provisions shall apply:

**10.8.1   Election by Participating Parties**

A Participating Party shall have the right to propose another operation by notifying Operator and the other Participating Parties of its proposed operation within twenty-four (24) hours, including Saturdays, Sundays, and federal holidays, of receipt of Operator's notice.  The Participating Parties shall notify Operator within forty-eight (48) hours, including Saturdays, Sundays, and federal holidays, of receipt of Operator's proposal whether the Participating Parties elect to (a) participate in a recommended operation, or (b) not participate in a recommended operation.  Failure to respond shall be deemed to be an election not to participate in any of the recommended operations.

**10.8.2   Priority of Operations**

If all Participating Parties elect to participate in the same proposed operation, Operator shall conduct the operation at their cost and risk.  If more than one (1) operation is approved by one (1) or more Participating Parties having a combined Working Interest of fifty percent (50%) or more, the approved operation with the lowest number as indicated below shall take precedence:

1   Additional Testing, coring, or logging.  (If conflicting proposals are approved, the proposal receiving the largest percentage of Working Interest approval shall take precedence, and in the event of a tie between two (2) or more approved proposals, the approved proposal first received by the Parties shall take precedence.)

2   Deepen.  (If conflicting proposals are approved, the operation proposed to the deepest depth shall take precedence.)

3   Sidetrack.  (If conflicting proposals are approved, the proposal receiving the largest percentage Working Interest approval shall take precedence, and in the event of a tie between two (2) or more approved proposals, the approved proposal first received by the Parties shall take precedence.)

4   Complete at the Objective Horizon.

5   Complete above the Objective Horizon.  (If conflicting proposals are approved, the operation proposed at the deepest depth shall take precedence.)

6   Other operations.  (If conflicting proposals are approved, the proposal receiving the largest percentage Working Interest approval shall take precedence, and in the event of a tie between two (2) or more approved proposals, the approved proposal first received by the Parties shall take precedence.)

7   Temporarily abandon.

8   Plug and abandon.

**10.8.3   Second Opportunity to Participate**

If there are more than two (2) Participating Parties and fewer than all but one (1) or more Participating Parties elect to participate in an operation, the proposing Party shall notify

28

the Participating Parties of the elections made, whereupon a Party originally electing not to participate in the proposed operation may then elect to participate by notifying the proposing Party within forty-eight (48) hours, including Saturdays, Sundays, and federal holidays, after receipt of such notice.  If all Parties elect to participate in the proposed operation, Operator shall conduct the operation at their cost and risk. If there are only two (2) Participating Parties, there shall not be a second opportunity to elect to participate.

**10.8.4   Operations by Fewer Than All Parties**

If, after the election (if applicable) made under Article 10.8.3 (Second Opportunity to Participate), fewer than all but one (1) or more Parties having the requisite Working Interest to approve the operation elect to participate in the proposed operation that takes precedence, the proposing Party shall notify the Participating Parties and each Participating Party shall have forty-eight (48) hours, including Saturdays, Sundays, and federal holidays, after receipt of the notice to notify the proposing Party of the portion of the costs and risks attributable to the total Non-participating Parties' interests it elects to pay and bear.  Unless otherwise agreed by the Participating Parties, each Participating Party may, but shall not be obligated to, pay and bear that portion of the costs and risks attributable to the total Non-participating Parties' interests in the ratio that the Participating Party's interest bears to the total interests of all Participating Parties that elect to pay and bear a portion of costs and risks attributable to the Non-participating Parties' interests.  Failure to respond shall be deemed to be an election not to pay or bear any additional costs or risks.  If the Participating Parties agree to bear one hundred percent (100%) of the costs and risks of the operation, Operator shall conduct the operation as a Non-consent Operation for the benefit of the Participating Parties, and the provisions of Article 13 (Non-consent Operations) shall apply.  If such agreement is not obtained, however, the operation shall not be conducted and the effect shall be as if the proposal had not been made.  If a Participating Party in a well elects not to participate in the Deepening or Sidetracking operation in the well, such non-consenting Party shall become a Non-participating Party in all operations conducted in the Deepened or Sidetracked portion of the well after that election.

**10.8.5   Subsequent Operations**

On completion of an operation conducted under Article 10.8 (Course of Action After Reaching Objective Depth), if the well is not either (a) Completed as a Producible Well, or (b) temporarily abandoned or permanently plugged and abandoned, Operator shall notify the Participating Parties of Operator's recommendation for further operations in the well under Articles 10.8.1 through 10.8.4, which again shall apply.  If sufficient approval is not obtained to conduct a subsequent operation in a well or if all Participating Parties elect to plug and abandon the well, subject to Article 14 (Abandonment and Salvage), Operator

29

shall permanently plug and abandon the well at the cost and risk of all Participating Parties. Each Participating Party shall be responsible for its proportionate share of the plugging and abandonment costs associated with the operation in which it participated.

**10.9    Wells Proposed Below Deepest Producible Reservoir**

If a proposal is made to conduct an Exploratory Operation involving the drilling of a well to an Objective Horizon below the base of the deepest Producible Reservoir, a Party may elect within the applicable period to limit its participation in the operation down to the base of the deepest Producible Reservoir. For purposes of this Article 10.9, a Party that elects to limit its participation in the operation down to the base of the deepest Producible Reservoir shall be referred to as "Shallow Participant" and a Party that elects to participate in the entire operation shall be referred to as "Deep Participant". If a Party elects to limit its participation to the base of the deepest Producible Reservoir, Operator shall prepare and submit to the Shallow Participant, for informational purposes, a separate AFE covering operations down to the deepest Producible Reservoir. The Shallow Participant shall be a Participating Party in, and shall pay and bear the costs and risks of, each operation to the base of the deepest Producible Reservoir, according to its Participating Interest. The Shallow Participant shall be a Non-participating Party in each operation below the deepest Producible Reservoir, and the operation shall be considered a Non-consent Operation, and the provisions of Article 13 (Non-consent Operations) shall apply. If the well is Completed and produces Hydrocarbons from a horizon below the deepest Producible Reservoir, the Deep Participant shall reimburse the Shallow Participant for its share of the actual well costs to the base of the deepest Producible Reservoir. Payment shall be due within thirty (30) days after receipt of notice of the well being completed below the deepest Producible Reservoir. If the well is Completed and produces Hydrocarbons from a horizon below the deepest Producible Reservoir, the Shallow Participant shall reimburse the Deep Participant for its Working Interest share of the actual well costs to the base of the deepest Producible Reservoir in accordance with Article 13.4 (Deepening or Sidetracking Cost Adjustments), on the earlier of the time that (a) the well is plugged back to a horizon above the base of the deepest Producible Reservoir, as determined when the original well was proposed, (b) the well is plugged and abandoned, or (c) the amount to be recouped by the Deep Participant under Article 13 (Non-consent Operations) is recovered.

# ARTICLE 11
# DEVELOPMENT OPERATIONS

**11.1    Proposing Operations**

A Party may propose a Development Operation in accordance with Article 9 (Notices) to the other Parties that are entitled to vote or make an election in regard to that operation.

**11.2    Counterproposals**

#93828440v3
#93828440v5

When a Development Operation is proposed, a Party may, within seven (7) days (exclusive of Saturdays, Sundays, and federal holidays) after receipt of the AFE or notice for the original proposal, make a counterproposal to conduct an alternative Development Operation by sending an AFE or notice to such Parties in accordance with Article 9 (Notices).  The AFE or notice shall indicate that the proposal is a counterproposal to the original proposal.  If one (1) or more counterproposals are made, such Parties shall elect to participate in either the original proposal, one (1) counterproposal, or neither the original proposal nor a counterproposal.  If two (2) or more proposals receive the approval of the number of Parties and combined Working Interests required by Article 11.5 (Operations By Fewer Than All Parties), the proposal receiving the largest percentage Working Interest approval shall take precedence, and in the event of a tie between two (2) or more approved proposals, the approved proposal first received by the Parties shall prevail.  Except for the response period provided in this Article 11.2, a counterproposal shall be subject to the same terms and conditions as the original proposal.

**11.3    Operations by All Parties**

If all Parties elect to participate in the proposed operation, Operator shall conduct the operation at their cost and risk.

**11.4    Second Opportunity to Participate**

If there are more than two (2) Parties to this Agreement and if fewer than all but one (1) or more Parties elect to participate, the proposing Party shall notify the Parties of the elections made, whereupon a Party originally electing not to participate may then elect to participate by notifying the proposing Party within forty-eight (48) hours, including Saturdays, Sundays, and federal holidays, after receipt of such notice.  If all Parties elect to participate in the proposed operation, Operator shall conduct the operation at their cost and risk.  If there are only two (2) Parties to this Agreement, there shall not be a second opportunity to elect to participate, and if the Participating Party agrees to pay and bear one hundred percent (100%) of the costs and risks of the operation, Operator shall conduct the operation as a Non-consent Operation for the benefit of the Participating Party, and the provisions of Article 13 (Non-consent Operations) shall apply.

**11.5    Operations by Fewer Than All Parties**

If there are more than two (2) Parties to this Agreement and if, after the election made under Article 11.4 (Second Opportunity to Participate), fewer than all but one (1) or more Parties having the requisite Working Interest to approve the operation have elected to participate in the proposed operation, the proposing Party shall notify the Participating Parties, and each Participating Party shall have forty-eight (48) hours, including Saturdays, Sundays, and federal holidays, after receipt of the notice to notify the proposing Party of the portion of the costs and risks attributable to the total Non-participating Parties' interests it elects to pay and bear.  Unless otherwise agreed by the Participating Parties, each Participating Party may, but shall not be obligated to, pay and bear that portion of costs and risks attributable to the total Non-participating

31

Parties' interests in the ratio that the Participating Party's interest bears to the total interests of all Participating Parties that elect to pay and bear a portion of the costs and risks attributable to the total Non-participating Parties' interests.  Failure to respond shall be deemed to be an election not to pay or bear any additional costs or risks.  If the Participating Parties agree to pay and bear one hundred percent (100%) of the costs and risks of the operation, Operator shall conduct the operation as a Non-consent Operation for the benefit of the Participating Parties, and the provisions of Article 13 (Non-consent Operations) shall apply.  If such agreement is not obtained, however, the operation shall not be conducted and the effect shall be as if the proposal had not been made.

**11.6    Expenditures Approved**

Approval of a Development Operation shall cover all necessary expenditures associated with the operation proposed in the AFE or notice that are incurred by Operator in connection with (a) preparations for drilling; (b) the actual drilling; (c) evaluations, such as testing, coring, and logging; and (d) plugging and abandonment.

**11.7    Conduct of Operations**

After commencement of a Development Well, Operator shall diligently conduct the operation without unreasonable delay until the well reaches the Objective Depth, unless the well encounters, at a lesser depth, impenetrable conditions or mechanical difficulties that cannot be overcome by reasonable and prudent operations and render further operations impracticable.  If a well does not reach its Objective Depth as a result of the conditions mentioned in this Article 11.7, the operation shall be deemed to have been completed and Article 13 (Non-consent Operations) shall apply to each Non-participating Party for the portion of the well drilled.

**11.8    Course of Action After Reaching Objective Depth**

When a Development Well has been drilled to its Objective Depth and reasonable testing, coring, and logging have been completed and the results have been furnished to the Participating Parties, Operator shall notify the Participating Parties of Operator's recommendation for further operations in the well and the following provisions shall apply:

**11.8.1    Election by Fewer Than All Parties**

A Participating Party shall have the right to propose another operation by notifying Operator and the other Participating Parties of its proposed operation within twenty-four (24) hours, including Saturdays, Sundays, and federal holidays, of receipt of Operator's notice.  The Participating Parties shall notify Operator within forty-eight (48) hours, including Saturdays, Sundays, and federal holidays, of receipt of Operator's proposal whether the Participating Parties elect to (a) participate in a recommended operation, or (b) not participate in a recommended operation.  Failure to respond shall be deemed to be an election not to participate in any of the recommended operations.

**11.8.2    Priority of Operations**

32

If all Participating Parties elect to participate in the same proposed operation, Operator shall conduct the operation at their cost and risk.  If more than one (1) operation is approved by one (1) or more Participating Parties having a combined Working Interest of fifty percent (50%) or more, the approved operation with the lowest number as indicated below shall take precedence:

1       Additional Testing, coring, or logging.  (If conflicting proposals are approved, the proposal receiving the largest percentage of Working Interest approval shall take precedence, and in the event of a tie between two (2) or more approved proposals, the approved proposal first received by the Parties shall take precedence.)

2       Complete at the Objective Horizon.

3       Complete above the Objective Horizon.  (If conflicting proposals are approved, the operation proposed to the deepest depth shall take precedence.)

4       Deepen.  (If conflicting proposals are approved, the operation proposed to the deepest depth shall take precedence.)

5       Sidetrack.  (If conflicting proposals are approved, the proposal receiving the largest percentage of Working Interest approval shall take precedence, and in the event of a tie between two (2) or more approved proposals, the approved proposal first received by the Parties shall take precedence.)

6       Other operations.  (If conflicting proposals are approved, the proposal receiving the largest percentage of Working Interest approval shall take precedence, and in the event of a tie between two (2) or more approved proposals, the approved proposal first received by the Parties shall take precedence.)

7       Temporarily abandon.

8       Plug and abandon.

**11.8.3   Second Opportunity to Participate**

If there are more than two (2) Participating Parties and if fewer than all but one (1) or more Participating Parties elect to participate in an operation, the proposing Party shall notify the Participating Parties of the elections made, whereupon a Party originally electing not to participate in the proposed operation may then elect to participate by notifying the proposing Party within forty-eight (48) hours, including Saturdays, Sundays, and federal holidays, after receipt of such notice.  If all Parties elect to participate in the proposed operation, Operator shall conduct the operation at their cost and risk. If there are only two (2) Participating Parties, there shall not be a second opportunity to elect to participate.

**11.8.4   Operations by Fewer Than All Parties**

If, after the election (if applicable) made under Article 11.8.3 (Second Opportunity to

33

Participate), fewer than all but one (1) or more Parties having the requisite Working Interest to approve the operation elect to participate in the proposed operation that takes precedence, the proposing Party shall notify the Participating Parties and each Participating Party shall have forty-eight (48) hours, including Saturdays, Sundays, and federal holidays, after receipt of the notice to notify the proposing Party of the portion of the costs and risks attributable to the total Non-participating Parties' interests that it elects to pay and bear.  Unless otherwise agreed by the Participating Parties, each Participating Party may, but shall not be obligated to, pay and bear that portion of the costs and risks attributable to the total Non-participating Parties' interests in the ratio that the Participating Party's interest bears to the total interests of all Participating Parties that elect to pay and bear a portion of costs and risks attributable to the Non-participating Parties' interests.  Failure to respond shall be deemed to be an election not to pay or bear any additional costs or risks.  If the Participating Parties agree to pay and bear one hundred percent (100%) of the costs and risks of the operation, Operator shall conduct the operation as a Non-consent Operation for the benefit of the Participating Parties, and the provisions of Article 13 (Non-consent Operations) shall apply.  If such agreement is not obtained, however, the operation shall not be conducted and the effect shall be as if the proposal had not been made.  If a Participating Party in a well elects not to participate in the Deepening or Sidetracking operation in the well, such non-consenting Party shall become a Non-participating Party in all operations conducted in the Deepened or Sidetracked portion of the well after that election.

**11.8.5  Subsequent Operations**

On the completion of an operation conducted under Article 11.8 (Course of Action After Reaching Objective Depth), if the well is not either (a) Completed as a well capable of producing Hydrocarbons in paying quantities, or (b) temporarily abandoned or permanently plugged and abandoned, Operator shall notify the Participating Parties of Operator's recommendation for operations in the well under Articles 11.8.1 through 11.8.4, which again shall apply.  If sufficient approval is not obtained to conduct a subsequent operation in a well, or if all Participating Parties elect to plug and abandon the well, subject to Article 14 (Abandonment, Salvage, and Surplus), Operator shall permanently plug and abandon the well at the expense of all Participating Parties.  Each Participating Party shall be responsible for its proportionate share of the plugging and abandonment costs associated with the operation in which it participated.

## ARTICLE 12
## PLATFORM AND DEVELOPMENT FACILITIES

#93828440v3
#93828440v5

**12.1**  **Proposals**

A Party may propose the fabrication or acquisition and installation of a Platform and/or Development Facilities by sending an AFE or notice to the other Parties in accordance with Article 9 (Notices).

**12.2**  **Counterproposals**

When a Platform and/or Development Facilities is proposed under Article 12.1, a Party may, within seven (7) days after receipt of the AFE or notice for the original proposal, make a counterproposal to fabricate or otherwise acquire and install said Platform and/or Development Facilities by sending an AFE or notice to the other Parties in accordance with Article 9 (Notices). The AFE or notice shall indicate that the proposal is a counterproposal to the original proposal.  If one (1) or more counterproposals are made, each Party shall elect to participate in either the original proposal, one (1) counterproposal, or neither the original proposal nor a counterproposal. If two (2) or more proposals receive the approval of the number of Parties and combined Working Interests required by Article 12.5 (Operations By Fewer Than All Parties), the proposal receiving the largest percentage Working Interest approval shall be deemed approved, and if two (2) or more approved proposals receive the same Working Interest approval, the approved proposal first received by the Parties shall be deemed approved.

**12.2.1**  **Operations by All Parties**

If all Parties elect to participate in the proposed operation, Operator shall conduct the operation at their cost and risk.

**12.2.2**  **Second Opportunity to Participate**

If there are more than two (2) Parties and if fewer than all but one (1) or more Parties elect to participate in the Platform and/or Development Facilities, the proposing Party shall notify the Parties of the elections made, whereupon a Party originally electing not to participate may then elect to participate by notifying the proposing Party within forty-eight (48) hours, including Saturdays, Sundays, and federal holidays, after receipt of such notice.  If all Parties elect to participate in the Platform and/or Development Facilities, Operator shall timely commence the fabrication and installation of the Platform and/or Development Facilities at their cost and risk.  If there are only two (2) Parties to this Agreement, there shall not be a second opportunity to elect to participate, and if the Participating Party agrees to pay and bear one hundred percent (100%) of the costs and risks of the operation, Operator shall conduct the operation as a Non-consent Operation for the benefit of the Participating Party, and the provisions of Article 13 (Non-consent Operations) shall apply.

**12.2.3**  **Operations by Fewer Than All Parties**

If there are more than two (2) Parties to this Agreement and if, after the election made under Article 12.2.2 (Second Opportunity to Participate), fewer than all but one (1) or

35

more Parties having the requisite Working Interest to approve the operation elect to participate in the Platform and/or Development Facilities, the proposing Party shall notify the Participating Parties, and each Participating Party shall have forty-eight (48) hours, including Saturdays, Sundays, and federal holidays, after receipt of the notice to notify the proposing Party of the portion of the costs and risks attributable to the total Non-participating Parties' interests it elects to pay and bear.  Unless otherwise agreed by the Participating Parties, each Participating Party may, but shall not be obligated to, pay and bear that portion of costs and risks attributable to the total Non-participating Parties' interests in the ratio that the Participating Party's interest bears to the total interests of all Participating Parties that elect to pay and bear a portion of the costs and risks attributable to the total Non-participating Parties' interests.  Failure to respond shall be deemed to be an election not to pay or bear any additional costs or risks.  If the Participating Parties agree to pay and bear one hundred percent (100%) of the costs and risks of the operation, Operator shall conduct the operation as a Non-consent Operation for the benefit of the Participating Parties, and except as provided in Article 12.4 (Rights to Take in Kind), the provisions of Article 13.2.1.(b) shall apply.   If such agreement is not obtained, however, the fabrication and installation of the Platform and/or Development Facilities shall not be commenced, and the effect shall be as if the proposal had not been made.

**12.3    Ownership and Use of the Platform and Development Facilities**

The Participating Parties in the Development Facilities own all the excess capacity of the Development Facilities and the excess weight, space, and buoyancy of the Platform.  Each Participating Party in the Development Facilities does not have the right to use its Participating Interest share of the excess capacity, weight, space, and buoyancy for hydrocarbon production from outside the Lease.  Each Participating Party in the Development Facilities or Platform must obtain the unanimous approval of the other Participating Parties in the Development Facilities or Platform in order to utilize any portion of the excess capacity, weight, space, and buoyancy.  It must negotiate the payment of a fee with the Participating Parties in the Development Facilities or Platform in order to utilize any portion of the excess capacity, weight, space, and buoyancy.  Each of the Participating Parties in the Development Facilities or Platform shall receive its Participating Interest share of all fees derived from the utilization of the excess capacity, weight, space, and buoyancy.  All hydrocarbon production from outside the Lease shall be processed under a "Facilities Use and Production Handling Agreement" unanimously agreed to by the Participating Parties in the Development Facilities.

**12.4    Rights to Take in Kind**

Nothing in this Article 12 shall act to limit a Party's rights under Article 22 (Disposition of Production), or to otherwise separately dispose of its share of Hydrocarbon production.  If a Party

36

#93828440v3
#93828440v5

elects (a) not to participate in an approved Development Facilities proposal and (b) to separately dispose of its share of Hydrocarbon production (the "Separately Disposing Party"), the Separately Disposing Party (c) shall not be subject to the provisions of Article 13.2.1.(b), but must provide proof to the Participating Parties in the approved Development Facilities proposal, within seven (7) days from the last applicable response date to the Development Facilities proposal, that it has entered into fabrication and transportation contracts to separately dispose of its own share of Hydrocarbon production.  If a Separately Disposing Party fails to provide such proof by that deadline and if there is sufficient capacity for the Development Facilities to accommodate the Separately Disposing Party's share of the Hydrocarbons, it shall immediately (i) become a Participating Party in the Development Facilities and utilize the Development Facilities for its share of Hydrocarbon production, (ii) pay to the Participating Parties in the approved Development Facilities proposal an amount equal to two hundred percent (200%) of what would have been the Separately Disposing Party's share of the costs and expense of the Development Facilities had it elected to participate in the Development Facilities under Article 12.1 or 12.2, and (iii) assume its share of the risks and liabilities associated with the construction and ownership of the Development Facilities as of the date of commencement of the operations to construct same. The Participating Parties in the original Development Facilities and the Separately Disposing Party, which becomes a Participating Party in the original Development Facilities under this Article 12.4, shall own the original Development Facilities based on their Participating Interest share in the original Development Facilities.  If a Separately Disposing Party fails to provide such proof by that deadline and if there is insufficient capacity for the Development Facilities to accommodate the Separately Disposing Party's share of the Hydrocarbons, the Separately Disposing Party shall (i) become a Participating Party in the original Development Facilities and utilize the available capacity in the original Development Facilities, if any, for its share of Hydrocarbon production, (ii) pay one hundred percent (100%) of the costs of an expansion or modification of the Development Facilities, which is required to accommodate all or a portion of its share of the Hydrocarbons, and assume one hundred percent (100%) of the risks and liabilities associated with (a) the construction, installation and commissioning of the expanded or modified Development Facilities and (b) the utilization of the expanded or modified Development Facilities for thirty (30) days after the commencement of Hydrocarbon production through same, (iii) pay to the Participating Parties in the approved Development Facilities proposal an amount equal to two hundred percent (200%) of what would have been the Separately Disposing Party's share of the costs and expense of the original Development Facilities had it elected to participate in the original Development Facilities under Article 12.1 or 12.2, and (iv) assume its share of the risks and liabilities associated with the construction and ownership of the original Development Facilities as of the date of commencement of the operations to construct the original Development Facilities.  The Participating Parties in the original Development Facilities and the

37

Separately Disposing Party, which becomes a Participating Party in the original Development Facilities under Article 12.4(i), shall own the expanded or modified Development Facilities based on their Participating Interest share in the original Development Facilities, and the Participating Parties in the original Development Facilities shall assume their Participating Interest share of the risks and liabilities associated with the ownership of the expanded or modified Development Facilities thirty (30) days after that the expanded or modified Development Facilities have been utilized.

**12.5    Expansion or Modification of a Platform and/or Development Facilities**

After installation of a Platform and/or Development Facilities, any Participating Party in that Platform and/or Development Facilities may propose the expansion or modification of that Platform and/or Development Facilities by written notice (along with its associated AFE) to the other Participating Parties in that Platform and/or Development Facilities.  That proposal requires approval by one (1) or more of the Participating Parties in the Platform and/or Development Facilities with more than fifty percent (50%) of the Participating Interest in the Platform and/or Development Facilities.  If approved, that proposal will be binding on all Participating Parties in that Platform and/or Development Facilities, and Operator shall commence that expansion or modification at the sole cost and risk of all the Participating Parties in that Platform and/or Development Facilities unless otherwise agreed.

**12.6    Offsite Host Facilities**

If one (1) or more Parties with more than fifty percent (50%) of the Participating Interest in Hydrocarbon production agree that Hydrocarbon production can most effectively be processed and handled by an Offsite Host Facilities, Operator, on behalf of the Participating Parties, shall use reasonable efforts to secure a formal "Facilities Use and Production Handling Agreement" from the owners of the Offsite Host Facilities.  If Operator does secure access to Offsite Host Facilities in a Facilities Use and Production Handling Agreement, each Participating Party shall have the right, but not the obligation, to utilize its Participating Interest share of the capacity so secured.  This Article 12.6 shall not constitute a limit on a Party's right to install its own Take-in-Kind Facilities under Article 22 (Disposition of Production).

# ARTICLE 13
# NON-CONSENT OPERATIONS

**13.1    Non-consent Operations**

38

#93828440v3
#93828440v5

Operator shall conduct Non-consent Operations at the sole cost and risk of the Participating Parties in accordance with the following provisions:

**13.1.1  Non-interference**

Non-consent Operations shall not interfere unreasonably with operations approved by all the Parties.

**13.1.2  Multiple Completion Limitation**

Subject to Article 10.9, a Non-consent Operation shall not be conducted in a well having multiple Completions unless (a) each Completion is owned by the same Parties in the same proportions; (b) the well is incapable of producing from any Completion; or (c) all Participating Parties in the well consent to the operation.

**13.1.3  Metering**

In Non-consent Operations, Hydrocarbon production shall be determined on the basis of appropriate well tests, unless separate metering devices are required by a governmental authority having jurisdiction.

**13.1.4  Non-consent Well**

Operations on a Non-consent Well shall not be conducted in a Producible Reservoir without approval of all Parties unless (a) the Producible Reservoir is designated in the notice as a Completion objective; (b) Completion of the well in the Producible Reservoir will not increase the rates of Hydrocarbon production that are prescribed and approved for the Producible Reservoir by the governmental authority having jurisdiction; and (c) the horizontal distance between the vertical projections of the midpoint of the Producible Reservoir in the well and an existing well currently completed in and producing from the same Producible Reservoir will be at least one thousand (1,000) feet for an oil-well Completion or two thousand (2,000) feet for a gas-well Completion.

**13.1.5  Cost Information**

Operator shall, within one hundred twenty (120) days after completion of a Non-consent Operation, furnish the Parties either (a) an inventory and an itemized statement of the cost of the Non-consent Operation and equipment pertaining thereto, or (b) a detailed statement of the monthly billings.  Each quarter thereafter, while the Participating Parties are being reimbursed under Article 13.2.1 (Production Reversion Recoupment), Operator shall furnish the Non-participating Parties a quarterly statement detailing all costs and liabilities incurred in the Non-consent Operation, together with a statement of the quantities of Hydrocarbons produced from it and the amount of the proceeds from the sale of the Non-participating Parties' relinquished Hydrocarbon production from the Non-consent Operation for the preceding quarter.  Operator shall prepare the monthly statement of the quantities of Hydrocarbons produced and the amounts of the proceeds from the sale of Non-participating Parties' relinquished Hydrocarbon production based on

39

the proceeds received for Operator's share of Hydrocarbon production.  When Operator's payout calculation indicates that payout has occurred, Operator shall promptly notify all Parties.  The Participating Parties that assumed a portion of the Non-participating Parties' relinquished interest shall then provide Operator all information pertaining to the cumulative proceeds received from the sale of the Non-participating Parties' relinquished Hydrocarbon production.  Operator shall revise the payout date using the actual proceeds from the sale of the Non-participating Parties' relinquished Hydrocarbon production and administer any subsequent adjustments between the Parties.

### 13.1.6   Completions

For determinations under Article 13.1 (Non-consent Operations), each Non-consent Operation in a single wellbore shall be accounted for separately.

## 13.2   Relinquishment of Interest

On commencement of Non-consent Operations, other than Non-consent Operations governed by Article 10.5 (Operations by Fewer Than All Parties) or Article 13.7 (Operations Utilizing a Non-consent Platform and/or Development Facilities), each Non-participating Party's interest and leasehold operating rights in the Non-consent Operation and title to Hydrocarbon production resulting therefrom; and if Article 13.8 (Discovery or Extension from Non-consent Drilling) is effective, one-half (1/2) of each Non-participating Party's interest and leasehold operating rights and title to Hydrocarbon production from wells mentioned in Article 13.8 (Discovery or Extension from Non-consent Drilling), shall be owned by and vested in each Participating Party in proportion to its Participating Interest, or in the proportions otherwise agreed by the Participating Parties, for as long as the Non-Consent Operation is being conducted or Hydrocarbon production is obtained therefrom, subject to the following:

### 13.2.1   Production Reversion Recoupment

When the Participating Parties have recouped out of Hydrocarbon production from the Non-consent Operations attributable to the Non-participating Party's interest an amount, which when added to amounts received under Article 13.3 (Deepening or Sidetracking of Non-consent Well), equals the sum of the following:

(a)     Eight hundred percent (800%) of the Non-participating Party's share of the costs of the following Non-consent Exploratory Operations, or six hundred percent (600%) of the Non-participating Party's share of the costs of the following Non-consent Development Operations: drilling, testing, Completing, Recompleting, Deepening, Sidetracking, Reworking, plugging back, and temporarily abandoning a well, reduced by the Non-participating Party's Share of a cash contribution received under Article 21.2 (Cash Contributions);

(b)     If applicable, three hundred percent (300%) of Non-participating Party's Share of

40

the cost of Platforms and/or Development Facilities approved under Article 12.1 (Proposal) or Article 12.2 (Counterproposals); such recoupment is limited to the Non-participating Party's Share of the Hydrocarbon production that utilize such Platform and/or Development Facilities;

(c)     Two hundred percent (200%) of the Non-participating Party's Share of the cost charged in accordance with Article 13.9 (Allocation of Platform / Development Facilities Costs to Non-consent Operations) of using an existing Platform / Development Facilities; and

(d)     the Non-participating Party's Share of the costs of operation, maintenance, treating, processing, gathering, and transportation, including but not limited to an Offsite Host Facilities' handling fees, as well as lessor's royalties and severance, Hydrocarbon production, and excise taxes,

the relinquished interests of the Non-participating Party shall automatically revert to the Non-participating Party as of 7:00 a.m. of the day after the recoupment occurs. Thereafter, the Non-participating Party shall own the same interest in the Non-consent Well, equipment pertaining thereto, including but not limited to any Platform or Development Facilities, and the Hydrocarbon production therefrom as the Non-participating Party would have owned or been entitled to if it had participated in the Non-consent Operation. On reversion, the Non-participating Party shall become a Participating Party and, as such, shall become liable for its proportionate share of the further costs of the operation as set forth in this Agreement and Exhibit "C".

### 13.2.2   Non-production Reversion

If the Non-consent Operation fails to obtain Hydrocarbon production or if the operation results in Hydrocarbon production that ceases before complete recoupment by the Participating Parties under Article 13.2.1 (Production Reversion Recoupment), such leasehold operating rights shall revert to each Non-participating Party, except that all Non-consent Wells, Platforms, and Development Facilities shall remain vested in the Participating Parties (but the salvage value in excess of the sum remaining under Article 13.2.1 shall be credited to all Parties).

### 13.3   Deepening or Sidetracking of Non-consent Well

If a Participating Party proposes to Deepen or Sidetrack a Non-consent Well, a Non-participating Party may then elect to participate in the Deepening or Sidetracking operation by notifying Operator within thirty (30) days, or within forty-eight (48) hours, including Saturdays, Sundays, and federal holidays, if a rig is on location and standby charges are being incurred, after receiving notice of the proposal.   A Non-participating Party that elects to participate in Deepening or Sidetracking the well, as proposed, shall immediately pay the Participating Parties, in accordance

41

with Article 13.4 (Deepening or Sidetracking Cost Adjustments), its Working Interest share of actual well costs (excluding logging, coring, testing, and Completion costs other than the cost of setting any casing or Completion Equipment that is used in the Deepening or Sidetracking), less all amounts recovered by the Participating Parties from the proceeds of Hydrocarbon production from the well, as if the Non-participating Party had originally participated to the initial objective depth or formation, in the case of a Deepening operation, or the depth at which the Sidetracking operation is initiated.   Thereafter, the Non-participating Party shall be deemed to be a Participating Party for the Deepening or Sidetracking operations, and Article 13.2.1(a) shall not apply to that Party for the Deepened or Sidetracked portion of the well.  The initial Participating Parties, however, shall continue to recoup out of the proceeds of Hydrocarbon production from the non-consent portion of the well any balance for the Non-consent Well remaining to be recovered under Article 13.2.1 (Production Reversion Recoupment), less the amounts paid by the Non-participating Party under this Article 13.3.

**13.4**   **Deepening or Sidetracking Cost Adjustments**

If a proposal is made to Deepen or Sidetrack a Non-consent Well, a well cost adjustment will be performed as follows:

(a)      Intangible drilling will be valued at the actual cost incurred by the Participating Parties.

(b)      Tangible materials will be valued in accordance with the provisions of Exhibit "C".

(c)      For Sidetracking operations, the values determined in Articles 13.4(a) and 13.4(b) shall be reduced by the amount allocated to that portion of the well from the surface to one hundred feet (100') below the point at which the Sidetracking was initiated.   Such allocations shall be consistent with the guidelines recommended by the applicable Council of Petroleum Accountants Societies ("COPAS") Guideline, as amended from time to time.

(d)      Amortization/depreciation shall be applied to both intangible and tangible values at the rate of ten percent (10%) per annum from the date the well commenced Hydrocarbon production to the date operations commence to Deepen or Sidetrack the well, provided, however, that the value of tangible materials after applying depreciation shall never be less than fifty percent (50%) of the value determined in Article 13.4(b).

**13.5**   **Subsequent Operations in Non-consent Well**

Except as provided in Article 13.3 (Deepening or Sidetracking of Non-consent Well), an election not to participate in the drilling, Sidetracking, or Deepening of a well shall be deemed to be an election not to participate in any subsequent operations in the well before full recovery by the Participating Parties of the Non-participating Party's recoupment amount.

**13.6**   **Operations in a Production Interval**

A Participating Party in a Production Interval may propose Rework or Sidetrack operations within

42

that Production Interval, or to permanently plug and abandon that Production Interval in a well; however, no Production Interval in a well shall be abandoned without the unanimous approval of the Participating Parties in the Production Interval.  If a proposal, estimated to exceed the amount specified in Article 8.2 (Authorization), is made to Rework or Sidetrack a Production Interval and the Participating Parties elect to participate in the proposed operation, Operator shall conduct the operation at their sole cost and risk.  If fewer than all but one (1) or more Parties having a combined Participating Interest of fifty percent (50%) or more elect to participate in the proposed operation, Operator shall conduct the Reworking or Sidetracking operation at the cost and risk of the Participating Parties owning an interest in the Production Interval.  A proposal to Rework an interval, other than a Production Interval, shall be made and approved in accordance with Article 11.5 (Operations by Fewer Than All Parties).

**13.7    Operations Utilizing a Non-consent Platform and/or Development Facilities**

Except as otherwise provided in Article 12.4 (Rights to Take in Kind) and this Article 13.7, if applicable, a Party that did not originally participate in a Platform and/or Development Facilities shall be a Non-participating Party for all operations utilizing the Platform and/or Development Facilities and shall be subject to Article 13.2 (Relinquishment of Interest). Notice, in accordance with Article 9 (Notices), shall be given to the Non-participating Party for all wells proposed to be drilled from or tied back to the Non-consent Platform and/or handled by non-consent Development Facilities.   If a Non-participating Party in a Non-consent Platform and/or Development Facilities desires to participate in the drilling of any such well proposed by the Participating Parties in the Platform and/or Development Facilities, the Non-participating Party desiring to join in the proposed well shall first pay the Participating Parties in the Platform and/or Development Facilities its proportionate share of the cost of the Platform and/or Development Facilities, including but not limited to costs of material, fabrication, transportation, and installation plus any remaining amounts to be recouped under Article 13.2.1(b).  The Non-participating Party shall remit payment to Operator and Operator shall (a) reimburse the Participating Parties in the Platform and/or Development Facilities in the same proportions they are sharing in the Platforms and/or Development Facilities recoupment account, and (b) credit the applicable payout account. On payment of that amount, the original Non-participating Party shall become an owner and a Participating Party in the Platform and/or Development Facilities in the same manner as if recoupment had occurred under Article 13.2.1 (Production Reversion Recoupment), and may participate in all future wells drilled from or tied back to the Platform. As to well operations conducted from the Platform and/or Development Facilities before payment under this Article 13.7, the original Non-participating Party shall remain a Non-participating Party in such Non-consent Operations until such time as the entire recoupment balance applicable to all such Non-consent Operations in the aggregate has occurred, as provided for in Articles 13.2.1(a) and 13.2.1(d).

43

**13.8**     **Discovery or Extension from Non-consent Drilling**

If a Non-consent Well (a) discovers a new Producible Reservoir or (b) extends an existing Producible Reservoir beyond its recognized boundaries, as unanimously agreed by the Participating Parties in all existing wells currently producing from the existing Producible Reservoir before commencement of drilling operations, the recoupment of costs for the well shall be governed by Article 13.2 (Relinquishment of Interest) and shall be recovered by the Participating Parties in one (1) of the following ways:

(a)     if the Non-consent Well is not completed and produced, recoupment shall be out of one-half (1/2) of each Non-participating Party's interest in Hydrocarbon production from all subsequently drilled and completed wells on the Lease that are completed in the Producible Reservoir discovered, or in that portion extended, by the Non-consent Well and in which the Non-participating Party has a Participating Interest; or

(b)     if the Non-consent Well is completed and produced, recoupment shall be out of the Non-participating Party's Share of all Hydrocarbon production from the Non-consent Well and one-half (1/2) of the Non-participating Party's interest in Hydrocarbon production from all subsequently drilled and completed wells on the Lease that are completed in the Producible Reservoir discovered, or in that portion extended, by the Non-consent Well and in which the Non-participating Party has a Participating Interest.

**13.9**     **Allocation of Platform / Development Facilities Costs to Non-consent Operations**

Non-consent Operations shall be subject to further conditions as follows:

**13.9.1**     **Charges**

If a well is drilled or produced from a Platform and/or is produced through Development Facilities whose Participating Parties are different from the Participating Parties in that well or if the Participating Parties' Participating Interest shares in that Platform and/or Development Facilities are different from their Participating Interest shares in that well, the rights of the Participating Parties in that well and the costs to use the Platform and/or Development Facilities for that well shall be determined as follows:

(a)     The Participating Parties in that well shall pay to Operator a one-time slot usage fee for the use of a slot on the Platform equal to two percent (2%) of the cost of the Platform. Within fifteen (15) days of its receipt of that fee, Operator shall distribute to the Participating Parties in the Platform their Participating Interest share of that payment. For purposes of calculating the slot usage fee, the total cost of the Platform shall be reduced by one-half percent (0.5%) per month, commencing on the date the Platform was installed and continuing every month thereafter until the month actual drilling operations on that well is commenced; however, the total cost of the Platform shall not be reduced by more than fifty percent (50%) of the total Platform's costs. The cost of additions to the Platform

44

shall be reduced in the same manner commencing the first month after the addition is installed. If that well is abandoned having never produced Hydrocarbons, the right of the Participating Parties in that well to use the Platform slot through which the well was drilled shall terminate unless those Parties commence drilling a substitute well for the abandoned well through the same slot within ninety (90) days of the abandonment. If that substitute well is abandoned having never produced Hydrocarbons, the right of the Participating Parties in that well to use the Platform slot through which the well was drilled shall terminate. The slot usage fee shall not apply to a slot deemed to be "surplus". A slot may be deemed surplus only by the unanimous agreement of the Participating Parties in the Platform.

(b)     The Participating Parties in that well shall pay to the owners of the Development Facilities a lump sum equal to that portion of the total cost of those Development Facilities that the throughput volume of the Non-consent Operation bears to the current total design throughput volume of the Development Facilities. Throughput volume shall be estimated by Operator in barrels produced per day (with 1 barrel of oil equaling 5.8 mcf of gas), using an average daily volume of the first three (3) months of Hydrocarbon production from the Non-consent Operation. For purposes of calculating the Development Facilities lump sum payment, the total cost of the Development Facilities shall be reduced by one-half percent (0.5%) per month, commencing from the date when the Development Facilities were installed and continuing every month thereafter until the first month during which Hydrocarbon production from the Non-consent Operation commences, but the total cost of the Development Facilities shall not be reduced more than fifty percent (50%) of the total Development Facilities' cost. If a modification, expansion, or addition to the Development Facilities is made after commencing first Hydrocarbon production and before connection of the Non-consent Operation to the Development Facilities, the Development Facilities lump sum payment shall be reduced in the same manner described above, from the month in which the Development Facilities modification, expansion, or addition is completed until the first month during which Hydrocarbon production from the Non-consent Operation is commenced.

Payment of sums under this Article 13.9.1 is not a purchase of an additional interest in the Platform or the Development Facilities. Such payment shall be included in the total amount that the Participating Parties are entitled to recoup out of Hydrocarbon production from the Non-consent Well.

**13.9.2   Operating and Maintenance Charges**

45

The Participating Parties shall pay all costs necessary to connect a Non-consent Well to the Platform and/or Development Facilities and that proportionate part of the costs of operating and maintaining the Platform and/or Development Facilities applicable to the Non-consent Well.  Platform operating and maintenance costs that are costs not directly attributable to a wellbore shall be allocated equally to all actively producing Completions. Operating and maintenance costs for the Development Facilities shall be allocated on a volume throughput basis, that is, in the proportion that the volume throughput of the well bears to the total volume throughput of all wells connected to the Development Facilities. Volume throughput, as used in this Article 13.9.2, shall be determined by considering all Hydrocarbons and water volumes.

**13.10    Allocation of Costs Between Zones**

Except as provided in Article 10.9 (Wells Proposed Below Deepest Producible Reservoir), if for any reason the Participating Interests of the Parties in a well are not the same for the entire depth or the Completion thereof, the costs of drilling, Completing, and equipping the well shall be allocated in an equitable manner, as agreed by the Parties, based on the value and allocation recommended in the applicable COPAS Guideline, as amended from time to time.

**13.11    Lease Maintenance Operations**

An operation proposed within the last one (1) year of the primary term or, subsequent thereto, an operation proposed to perpetuate the Lease or portion thereof at its expiration date or otherwise, including but not limited to well operations, regulatory relief (for example, course of action necessary to satisfy the statutory or regulatory requirements of the governmental authority having jurisdiction), and other Lease operations, shall be deemed to be a "Lease Maintenance Operation."  To invoke this Article 13.11, a notice or an AFE that proposes an operation must state that the proposed operation is a Lease Maintenance Operation.

**13.11.1 Participation in Lease Maintenance Operations**

A Party may propose a Lease Maintenance Operation by giving notice to the other Parties.  If fewer than all Parties elect to participate in the proposed Lease Maintenance Operation, the proposing Party shall notify the Parties of the elections made. Each Party electing not to participate shall then have a second opportunity to participate in the proposed operation by notifying the other Parties of its election within forty-eight (48) hours after receipt of the notice.   A Lease Maintenance Operation shall not require minimum approval, either of the number of Parties or the percentage of the voting interests of the Parties otherwise required in Article 6.1.2 (Vote Required). For a Lease Maintenance Operation to be conducted, the Participating Parties must agree to pay and bear one hundred percent (100%) of the costs and risks of the operation. If more than one (1) Lease Maintenance Operation is proposed, the operation with the greatest percentage approval shall be conducted. Notwithstanding the recoupment provisions of

#93828440v3
#93828440v5

this Agreement, a Party electing not to participate in a well operation proposed as a Lease Maintenance Operation shall promptly assign, effective as of the date the operation commences, to the Participating Parties all its right, title, and interest in and to that portion of the Lease that would otherwise expire and the property and equipment attributable thereto, in accordance with Article 26 (Successors, Assigns).  In the event of such assignment, the assigning Party shall retain all obligations and liabilities incurred before the effective date of such assignment, and the Participating Parties that are assigned such interest may require the assigning Party to provide reasonable financial assurances including but not limited to posting a performance bond (in an amount, form and with a surety acceptable to the Participating Parties) for the retained liabilities for such assigned interest.  If more than one (1) Lease Maintenance Operation is proposed and there is a tie between two (2) proposed operations, both operations shall be conducted and the costs and risks of conducting both operations shall be paid and borne by the Participating Parties.  If the drilling of a well is undertaken as a Lease Maintenance Operation, further operations conducted by the Participating Parties in the well shall be governed by Article 10.9 (Course of Action After Reaching Objective Depth) or Article 11.9 (Course of Action After Reaching Objective Depth), whichever applies.  If more than one (1) well operation is conducted, any of which would perpetuate the Lease or such portion thereof, an assignment shall not be required from a Party participating in any such well operation.

**13.11.2 Accounting for Non-participation**

If, after one (1) year from completion of a well operation conducted as a Lease Maintenance Operation, the Lease or portion thereof is being perpetuated by a Lease Maintenance Operation, as provided in Article 13.11.1 (Participation in Lease Maintenance Operations), Operator shall render a final statement, if applicable, to the assigning Party for its share of all expenses attributed to the assigned interest before the effective date of the assignment, plus any credit or deficiency in salvage value calculated under Article 15.3.1 (Prior Expenses).  The assigning Party shall settle any deficiency owed the non-assigning Parties within thirty (30) days after receipt of Operator's statement.

**13.12   Retention of Lease by Non-consent Well**

If, at the expiration of the primary term of the Lease, one (1) or more Non-consent Wells, except wells drilled under Article 10.5.1 (First Exploratory Well) provision of Article 10.5 (Operations by Fewer Than All Parties), if selected, are the only wells perpetuating the Lease, Operator shall give written notice to each Non-participating Party that the Non-consent Wells are serving to perpetuate the Lease. Each Non-participating Party shall, within thirty (30) days after receipt of Operator's written notice, elect one (1) of the following:

47

(a)     to assign its entire interest in the Lease to the Participating Parties in the proportions in which the Non-consent Wells are owned subject to the assignor's retained obligations under Article 15.3.1 (Prior Expenses); or

(b)     to pay the Participating Parties, within sixty (60) days after its election, the lesser of its proportionate share of the actual well costs of the wells, as if the Non-participating Party had originally participated, or the balance of the recoupment account.  The payment shall be made to Operator and credited to the account of each Participating Party.  The Non-participating Party shall remain as a Non-participating Party until full recoupment is obtained, but the payment shall be credited against the total amount to be recouped by the Participating Parties.

A Non-participating Party that fails to make the required election shall be deemed to have elected under Article 13.12(a) to relinquish its entire interest in the Lease.  If a Non-participating Party elects to make payment under Article 13.12(b) but fails to make the required payment within sixty (60) days after its election, the Non-participating Party shall either remain liable for the obligation to pay or, by unanimous vote of the Participating Parties, be deemed to have elected under Article 13.12(a) to relinquish its entire interest in the Lease.  Each relinquishing Non-participating Party shall promptly execute and deliver an assignment of its interest to the Participating Parties, in accordance with Article 26 (Successors and Assigns) subject to the assignor's retained obligations under Article 15.3.1 (Prior Expenses).

**13.13    Non-Consent Premiums**

A non-consent premium paid by a Non-Participating Party to the Participating Parties shall be allocated to the Participating Parties based on their original Participating Interest share in the Non-consent Operation that generated the non-consent premium.


# ARTICLE 14
# ABANDONMENT, SALVAGE, AND SURPLUS

**14.1    Platform Salvage and Removal Costs**

When the Parties owning wells, Platforms, and/or Development Facilities unanimously agree to dispose of the wells, Platforms, and/or Development Facilities, it shall be disposed of by Operator in the time and manner approved by the Parties. The costs, risks, and net proceeds, if any, for the disposal shall be shared by the Parties in proportion to their Participating Interests therein.

**14.2    Abandonment of Platforms, Development Facilities, or Wells**

Except as provided in Article 10 (Exploratory Operations) and Article 11 (Development Operations), a Participating Party may propose the abandonment of a Platform and Development Facilities or wells by notifying the other Participating Parties.  No Platform and Development Facilities or wellbore shall be abandoned without the unanimous approval of the Participating

48

Parties.  If the Participating Parties do not approve abandoning the Platform and Development Facilities or wells, Operator shall prepare a statement of the abandoning Party's share of estimated abandonment costs, less its share of estimated salvage value, as determined by Operator pursuant to Exhibit "C".  The Party desiring to abandon it shall pay Operator, on behalf of the Participating Parties for that Party's share of the estimated abandonment costs, less its share of estimated salvage value, within thirty (30) days after receipt of Operator's statement.  If the Party that shall serve as Operator after a Party abandons its interest does not qualify by BOEMRE as exempt from supplemental bonding requirements, then the Party desiring to abandon its interest may place its share of the estimated abandonment costs, less its estimated salvage value, in escrow, with such escrowed funds made available to Operator upon abandoning Party's receipt of all necessary end of operations reports and site clearance and restoration report.  If an abandoning Party's respective share of the estimated salvage value is greater than its share of the estimated costs, Operator, on behalf of the Participating Parties, shall pay a sum equal to the deficiency to the abandoning Party within thirty (30) days after the abandoning Party's receipt of Operator's statement.

14.3    **Assignment of Interest**

Each Participating Party desiring to abandon a Platform and Development Facilities or wells under Article 14.2 (Abandonment of Platforms, Development Facilities, or Wells) shall assign, effective as of the last applicable election date, to the non-abandoning Parties, in proportion to their Participating Interests, its interest in the Platform and Development Facilities or wells and the equipment therein and its ownership in the Hydrocarbon production from the wells.  A Party so assigning shall be relieved from further liability for the Platform and Development Facilities or wells, except liability for payments under Article 14.2 (Abandonment of Platforms, Development Facilities, or Wells).

14.4    **Abandonment Operations Required by Governmental Authority**

A well abandonment or Platform and Development Facilities removal required by a governmental authority having jurisdiction shall be accomplished by Operator with the costs, risks, and net proceeds, if any, to be shared by the Parties owning the well or Platform and Development Facilities in proportion to their Participating Interests therein.  No approval by the Parties will be necessary for Operator to proceed with the government-required well abandonment, or Platform and Development Facilities removal. Operator shall provide the Parties with an informational AFE before commencing such an abandonment or removal.

14.5    **Disposal of Surplus Material**

Material and equipment acquired hereunder may be classified as surplus by Operator when deemed no longer needed in present or foreseeable operations.  Operator shall determine the value and cost of disposing of the materials in accordance with Exhibit "C".  If the material is classified as junk or if the value, less cost of disposal, is less than or equal to Fifty Thousand

Dollars ($50,000), Operator shall dispose of the surplus materials in any manner it deems appropriate.  If the value, less the cost of disposal of the surplus material, is greater than Fifty Thousand Dollars ($50,000), Operator shall give written notice thereof to the Parties owning the material. Unless purchased by Operator, the surplus material shall be disposed of in accordance with the method of disposal approved by the Parties owning the material.  Proceeds from the sale or transfer of surplus material shall be promptly credited to each Party in proportion to its ownership of the material at the time of retirement or disposition.

# ARTICLE 15
# WITHDRAWAL

**15.1**   **Right to Withdraw**

Subject to this Article 15.1, any Party may withdraw from this Agreement as to the Lease (the "Withdrawing Party") by giving prior written notice to all other Parties stating its decision to withdraw ("the withdrawal notice").  The withdrawal notice shall specify an effective date of withdrawal that is at least sixty (60) days, but not more than ninety (90) days, after the date of the withdrawal notice.  Within thirty (30) days of receipt of the withdrawal notice, the other Parties may join in the withdrawal by giving written notice of that fact to Operator ("written notice to join in the withdrawal") and on giving written notice to join in the withdrawal are "Other Withdrawing Parties".  The withdrawal notice and the written notice to join in the withdrawal are unconditional and irrevocable offers by the Withdrawing Party and the Other Withdrawing Parties to convey to the Parties that do not join in the withdrawal ("the Remaining Parties") the Withdrawing Party's and the Other Withdrawing Parties' entire Working Interest in the Lease, Hydrocarbon production, and other property and equipment owned under this Agreement.

**15.2**   **Response to Withdrawal Notice**

Failure to respond to a withdrawal notice is deemed a decision not to join in the withdrawal.

### 15.2.1   Unanimous Withdrawal

If all the other Parties join in the withdrawal,

(a)      no assignment of Working Interests shall take place;

(b)      subject to Article 14.4, no further operations may be conducted under this Agreement unless agreed to by all Parties;

(c)      the Parties shall abandon all activities and operations within the Lease and relinquish all of their Working Interests to the BOEMRE within one hundred twenty (120) days of the conclusion of the thirty (30) day joining period; and

(d)      notwithstanding anything to the contrary in Article 14 (Abandonment, Salvage and Surplus), Operator shall:

1)      furnish all Parties a detailed abandonment plan, if applicable, and a

50

detailed cost estimate for the abandonment within one hundred eighty (180) days after the conclusion of the thirty (30) day joining period; and

2)     cease operations and begin to permanently plug and abandon all wells and remove all Facilities in accordance with the abandonment plan.

### 15.2.2   No Additional Withdrawing Parties

If none of the other Parties join in the withdrawal, the Remaining Parties must accept an assignment of their Participating Interest share of the Withdrawing Party's Working Interest.

### 15.2.3   Acceptance of the Withdrawing Parties' Interests

If one (1) or more but not all of the other Parties join in the withdrawal and become Other Withdrawing Parties, within forty-eight (48) hours (excluding Saturdays, Sundays, and federal holidays) of the conclusion of the thirty (30) day joining period, each of the Remaining Parties shall submit to Operator a written rejection or acceptance of its Participating Interest share of the Withdrawing Party's and Other Withdrawing Parties' Working Interest.  Failure to make that written rejection or acceptance shall be deemed a written acceptance.  If the Remaining Parties are unable to select a successor Operator, if applicable, or if a Remaining Party submits a written rejection and the other Remaining Parties do not agree to accept one hundred percent (100%) of the Withdrawing Party's and Other Withdrawing Parties' Working Interest within fifteen (15) days of the conclusion of the forty-eight- (48-) hour period to submit a written rejection or acceptance, the Remaining Parties will be deemed to have joined in the withdrawal, and Article 15.2.1 (Unanimous Withdrawal) will apply.

### 15.2.4   Effects of Withdrawal

Except as otherwise provided in this Agreement, after giving a withdrawal notice or a written notice to join in the withdrawal, the Withdrawing Party and Other Withdrawing Parties are not entitled to approve or participate in any activity or operation in the Lease, other than those activities or operations for which they retain a financial responsibility. The Withdrawing Party and Other Withdrawing Parties shall take all necessary steps to accomplish their withdrawal by the effective date referred to in Article 15.1 (Right to Withdraw) and shall execute and deliver to the Remaining Parties all necessary instruments to assign their Working Interest to the Remaining Parties.  A Withdrawing Party and Other Withdrawing Parties shall bear all expenses associated with their withdrawal and the transfer of their Working Interest.

## 15.3   Limitation on and Conditions of Withdrawal

### 15.3.1   Prior Expenses

The Withdrawing Party and Other Withdrawing Parties remain liable for their Participating Interest share of the costs of all activities, operations, rentals, royalties, taxes, damages,

51

Hydrocarbon imbalances, or other liability or expense accruing or relating to (i) obligations existing as of the effective date of the withdrawal, (ii) operations conducted before the effective date of the withdrawal, (iii) operations approved by the Withdrawing Party and Other Withdrawing Parties before the effective date of the withdrawal, or (iv) operations commenced by Operator under one (1) of its discretionary powers under this Agreement before the effective date of the withdrawal.  Before the effective date of the withdrawal, Operator shall provide a statement to the Withdrawing Party and Other Withdrawing Parties for (1) their respective shares of all identifiable costs under this Article 15.3.1 and (2) their respective Participating Interest shares of the estimated current costs of plugging and abandoning all wells and removing all Platforms, Development Facilities, and other material and equipment owned by the Joint Account, less their respective Participating Interest Shares of the estimated salvage value of the assets at the time of abandonment, as approved by vote.  This statement of expenses, costs, and salvage value shall be prepared by Operator under Exhibit "C". Before withdrawing, the Withdrawing Party and Other Withdrawing Parties shall pay Operator, for the benefit of the Remaining Parties, the amounts allocated to them as shown in the statement for all obligations and liabilities they have incurred and all obligations and liabilities attributable to them before the effective date of the withdrawal.  All liens, charges, and other encumbrances, including but not limited to overriding royalties, net profits interest, and production payments, that the Withdrawing Party and Other Withdrawing Parties placed (or caused to be placed) on their Working Interest shall be fully satisfied or released before the effective date of its withdrawal (unless the Remaining Parties are willing to accept the Working Interest subject to those liens, charges, and other encumbrances).

**15.3.2  Confidentiality**

The Withdrawing Party and Other Withdrawing Parties will continue to be bound by the confidentiality provisions of Article 7.3 (Confidentiality) after the effective date of the withdrawal but will have no further access to technical information relating to activities or operations under this Agreement.  The Withdrawing Party and Other Withdrawing Parties are not required to return to the Remaining Parties Confidential Data acquired before the effective date of the withdrawal.

**15.3.3  Emergencies and Force Majeure**

No Party may withdraw during a Force Majeure or emergency that poses a threat to life, safety, property, or the environment but may withdraw from this Agreement after termination of the Force Majeure or emergency.  The Withdrawing Party and Other Withdrawing Parties remain liable for their share of all costs and liabilities arising from the Force Majeure or emergency, including but not limited to the drilling of relief wells,

#93828440v3
#93828440v5

containment and clean-up of oil spills and pollution, and all costs of debris removal made necessary by the Force Majeure or emergency.

# ARTICLE 16
# RENTALS, ROYALTIES, AND OTHER PAYMENTS

**16.1**    **Overriding Royalty and Other Burdens**

If the Working Interest or Participating Interest of a Party is subject to an overriding royalty, Hydrocarbon production payment, net profits interest, mortgage, lien, security interest, or other burden or encumbrance, other than lessor's royalty and other burdens listed in Exhibit "A", the Party so burdened shall pay and bear all liabilities and obligations created or secured by the burden or encumbrance and shall indemnify and hold the other Parties harmless from all claims and demands for payment asserted by the owners of the burdens or encumbrances. If a Party becomes entitled to an assignment under this Agreement, or as a result of Non-consent Operations hereunder becomes entitled to receive a relinquished interest, as provided in Article 13.2 (Relinquishment of Interest), otherwise belonging to a Non-participating Party whose Working Interest in the operations is so burdened or encumbered, the Party entitled to receive the assignment from the Non-participating Party or the relinquished interest of the Non-participating Party's Hydrocarbon production shall receive same free and clear of all such burdens and encumbrances, and the Non-participating Party whose interest is subject to the burdens and encumbrances shall hold the Participating Parties harmless for the burdens and encumbrances, and will bear same at its own expense.

**16.2**    **Subsequently Created Interest**

Notwithstanding anything in this Agreement to the contrary, if a Party, after execution of this Agreement, creates an overriding royalty, Hydrocarbon production payment, net profits interest, carried interest, or any other interest out of its Working Interest that the Parties do not unanimously agree to list on Exhibit "A" (hereinafter called "Subsequently Created Interest"), the Subsequently Created Interest shall be made specifically subject to this Agreement. If the Party owning the interest from which the Subsequently Created Interest was established fails to pay, when due, its share of costs, and if the proceeds from the sale of Hydrocarbon production under Articles 8.6 (Security Rights) are insufficient for that purpose, or elects to abandon a well, or elects to relinquish its interest in the Lease, the Subsequently Created Interest shall be chargeable with a pro rata portion of all costs in the same manner as if the Subsequently Created Interest were a Working Interest, and Operator may enforce against the Subsequently Created Interest the lien and other rights granted or recognized under this Agreement to secure and enforce collection of costs chargeable to the Subsequently Created Interest.  The rights of the owner of the Subsequently Created Interest shall be, and hereby are, subordinated to the rights

53

granted or recognized by Article 8.6 (Security Rights).

**16.3    Payment of Rentals and Minimum Royalties**

Operator shall pay in a timely manner, for the joint account of the Parties, all rental, minimum royalties, and other similar payments accruing under the Lease and shall, on request, submit evidence of each such payment to the Parties. Operator shall not be held liable to the other Parties in damages for loss of the Lease or interest therein if, through mistake or oversight, a rental, minimum royalty, or other payment is not paid or is erroneously paid.  The loss of a Lease or interest therein resulting from Operator's failure to pay, or erroneous payment of rental or minimum royalty shall be a joint loss, and there shall be no readjustment of interests.  For Hydrocarbon production delivered in kind by Operator to a Non-operator or to another for the account of a Non-operator, the Non-operator shall provide Operator with information about the Non-operator's proceeds received or the value of the Hydrocarbon production taken in kind in order that Operator may make payments of minimum royalties due.

**16.4    Non-participation in Payments**

A Party that desires not to pay its share of a rental, minimum royalty, or similar payment shall notify the other Parties in writing at least sixty (60) days before the payment is due. Operator shall then make the payment for the benefit of the Parties that do desire to maintain the Lease.  In such event, the Non-participating Party shall assign to the Participating Parties, on their request, the portions of its interest in the Lease maintained by the payment.  The assigned interest shall be owned by each Participating Party in proportion to its Participating Interest. The assignment shall be made in accordance with Article 27 (Successors and Assigns) and shall be subject to the assignor's retained obligations under Article 15.3.1 (Prior Expenses).

**16.5    Royalty Payments**

Each Party shall be responsible for and shall separately bear and properly pay or cause to be paid all royalty and other amounts due on its share of Hydrocarbon production taken in accordance with state or federal regulations, as may be amended from time to time.  Adjustments shall be made among the Parties in accordance with Exhibit "E" (Gas Balancing Agreement). During a period when Participating Parties in a Non-consent Operation are receiving a Non-participating Party's share of Hydrocarbon production, the Participating Parties shall bear and properly pay, or cause to be paid, the Lease royalty on the Hydrocarbon production taken, and shall hold the Non-participating Parties harmless from liability for the payment.

# ARTICLE 17
## TAXES

**17.1    Property Taxes**

Operator shall render property covered by this Agreement for ad valorem taxation, if applicable,

#93828440v3
#93828440v5

and shall pay the property taxes for the benefit of each Party.  Operator shall charge each Party its share of the tax payments.  If the ad valorem taxes are based in whole or in part on separate valuations of each Party's Working Interest, notwithstanding anything in this Agreement to the contrary, each Party's share of property taxes shall be in proportion to the tax value generated by that Party's Working Interest.

**17.2     Contest of Property Tax Valuation**

Operator shall timely and diligently protest to a final determination each tax valuation it deems unreasonable.  Pending such determination, Operator may elect to pay under protest.  On final determination, Operator shall pay the taxes and the interest, penalties, and costs accrued as a result of the protest. In either event, Operator shall charge each Party its share of any amounts due, and each Party shall be responsible for reimbursing Operator for any such amounts paid.

**17.3     Production and Severance Taxes**

Each Party shall pay, or cause to be paid, all production and severance taxes due on Hydrocarbon production that it receives under this Agreement.

**17.4     Other Taxes and Assessments**

Operator shall pay other applicable taxes (other than income taxes, excise taxes, or other similar types of taxes) or assessments and charge each Party its share.

# ARTICLE 18
# INSURANCE

**18.1     Insurance**

Operator shall provide and maintain the insurance prescribed in Exhibit "B" and charge those costs to the Joint Account.  No other insurance shall be carried for the benefit of the Parties under this Agreement, except as provided in Exhibit "B".

**18.2     Bonds**

Operator shall obtain and maintain all bonds or financial guarantees required by an applicable law, regulation, or rule.  The costs of those bonds or financial guarantees acquired exclusively for the conduct of activities and operations under this Agreement shall be charged to the Joint Account, including an amount equivalent to the reasonable cost of that bond or financial guarantee if Operator provides that bond or guarantee itself and does not engage a third party to do so. Operator shall require all contractors to obtain and maintain all bonds required by an applicable law, regulation, or rule.

# ARTICLE 19
# LIABILITY, CLAIMS, AND LAWSUITS

#93828440v3
#93828440v5

**19.1    Individual Obligations**

The obligations, duties, and liabilities of the Parties under this Agreement are several, not joint or collective.  Nothing in this Agreement shall ever be construed as creating a partnership of any kind, joint venture, agency relationship, association, or other character of business entity recognizable in law for any purpose.  In their relations with each other under this Agreement, the Parties shall not be considered to be fiduciaries or to have established a confidential relationship, except as specifically provided in Article 7.3 (Confidentiality) and Article 7.4 (Limited Disclosure), but rather shall be free to act at arm's length in accordance with their own respective self-interests.  Each Party shall hold all other Parties harmless from liens and encumbrances on the Lease arising as a result of its acts.

**19.2    Notice of Claim or Lawsuit**

If, on account of a matter involving activities or operations under this Agreement, or affecting the Lease, a claim is made against a Party, or if a party outside this Agreement files a lawsuit against a Party, or if a Party files a lawsuit, or if a Party receives notice of a material administrative or judicial hearing or other proceeding, that Party shall give written notice of the claim, lawsuit, hearing, or proceeding ("Claim") to the other Parties as soon as reasonably practical.

**19.3    Settlements**

Operator may settle a Claim, or multiple Claims arising out of the same incident, involving activities or operations under this Agreement or affecting the Lease, if the aggregate expenditure does not exceed five hundred thousand dollars ($500,000.00) and if the payment is in complete, or substantially complete, settlement of these Claims.  If the amount required for settlement exceeds this amount, the Parties shall determine the further handling of the Claims under Article 19.4 (Defense of Claims and Lawsuits).

**19.4    Defense of Claims and Lawsuits**

Operator shall supervise the handling, conduct, and prosecution of all Claims involving activities or operations under this Agreement or affecting the Lease.  Claims may be settled in excess of the amount specified in Article 19.3 (Settlements) if the settlement is approved by vote in accordance with Article 6.1.2 of the Participating Parties in the activity or operation out of which the Claim arose, but a Party may independently settle a Claim or the portion of a Claim that is attributable to its Participating Interest share alone as long as that settlement does not directly adversely affect the interest or rights of the other Participating Parties. Legal expenses shall be handled in accordance with Exhibit "C".

**19.5    Liability for Damages**

**UNLESS SPECIFICALLY PROVIDED OTHERWISE IN THIS AGREEMENT, LIABILITY FOR LOSSES, DAMAGES, COSTS, EXPENSES OR CLAIMS INVOLVING ACTIVITIES OR OPERATIONS UNDER THIS AGREEMENT OR AFFECTING THE LEASE THAT ARE NOT**

56

COVERED BY OR IN EXCESS OF THE INSURANCE CARRIED FOR THE JOINT ACCOUNT SHALL BE BORNE BY EACH PARTY IN PROPORTION TO ITS PARTICIPATING INTEREST SHARE IN THE ACTIVITY OR OPERATION OUT OF WHICH THAT LIABILITY ARISES, EXCEPT TO THE EXTENT THAT LIABILITY RESULTS FROM THE GROSS NEGLIGENCE OR WILLFUL MISCONDUCT OF A PARTY, IN WHICH CASE THAT PARTY SHALL BE SOLELY RESPONSIBLE FOR LIABILITY RESULTING FROM ITS GROSS NEGLIGENCE OR WILLFUL MISCONDUCT.

**19.6    Indemnification for Non-consent Operations**

TO THE EXTENT ALLOWED BY LAW, THE PARTICIPATING PARTIES WILL HOLD THE NON-PARTICIPATING PARTIES (AND THEIR AFFILIATES, AGENTS, INSURERS, DIRECTORS, OFFICERS, AND EMPLOYEES) HARMLESS AND RELEASE, DEFEND, AND INDEMNIFY THEM AGAINST ALL CLAIMS, DEMANDS, LIABILITIES, REGULATORY DECREES, AND LIENS FOR ENVIRONMENTAL POLLUTION AND PROPERTY DAMAGE OR PERSONAL INJURY, INCLUDING SICKNESS AND DEATH, CAUSED BY OR OTHERWISE ARISING OUT OF NON-CONSENT OPERATIONS, AND ANY LOSS AND COST SUFFERED BY A NON-PARTICIPATING PARTY AS AN INCIDENT THEREOF, EXCEPT WHERE THAT LOSS OR COST RESULTS FROM THE SOLE, CONCURRENT, OR JOINT NEGLIGENCE, FAULT, OR STRICT LIABILITY OR WILLFUL MISCONDUCT OF THAT NON-PARTICIPATING PARTY, IN WHICH CASE EACH PARTY SHALL PAY OR CONTRIBUTE TO THE SETTLEMENT OR SATISFACTION OF JUDGMENT IN THE PROPORTION THAT ITS NEGLIGENCE, FAULT, OR STRICT LIABILITY OR WILLFUL MISCONDUCT CAUSED OR CONTRIBUTED TO THE INCIDENT. IF AN INDEMNITY IN THIS AGREEMENT IS DETERMINED TO VIOLATE LAW OR PUBLIC POLICY, THAT INDEMNITY SHALL THEN BE ENFORCEABLE ONLY TO THE MAXIMUM EXTENT ALLOWED BY LAW.

**19.7    Damage to Reservoir, Loss of Reserves and Profit**

NOTWITHSTANDING ANY CONTRARY PROVISION OF THIS AGREEMENT, NO PARTY IS LIABLE TO ANY OTHER PARTY FOR SPECIAL, INDIRECT, CONSEQUENTIAL, EXEMPLARY OR PUNITIVE DAMAGES RESULTING FROM OR ARISING OUT OF THIS AGREEMENT, INCLUDING WITHOUT LIMITATION DAMAGE TO A RESERVOIR, LOSS OF HYDROCARBONS, LOSS OF PROFITS, OR BUSINESS INTERRUPTIONS, HOWSOEVER THE SAME MAY BE CAUSED.

**19.8    Non-essential Personnel**

A NON-OPERATOR THAT REQUESTS TRANSPORTATION OR ACCESS TO A DRILLING RIG, PLATFORM, VESSEL, OR OTHER FACILITY USED FOR ACTIVITIES OR OPERATIONS UNDER THIS AGREEMENT SHALL HOLD THE OTHER PARTIES HARMLESS AND SHALL RELEASE, DEFEND, AND INDEMNIFY THEM AGAINST (I) ALL CLAIMS, DEMANDS, AND LIABILITIES FOR PROPERTY DAMAGE AND (II) ALL CLAIMS, DEMANDS, AND

#93828440v3
#93828440v5

**LIABILITIES FOR ANY LOSS OR COST SUFFERED BY A PARTY AS AN INCIDENT THEREOF, INCLUDING BUT NOT LIMITED TO INJURY, SICKNESS, AND DEATH, CAUSED BY OR OTHERWISE ARISING OUT OF THAT TRANSPORTATION OR ACCESS, OR BOTH, EXCEPT TO THE EXTENT THAT LOSS OR COST RESULTS FROM THE GROSS NEGLIGENCE OR WILLFUL MISCONDUCT OF THE PARTY SO INDEMNIFIED AND PROTECTED.**

# ARTICLE 20
# INTERNAL REVENUE PROVISION

**20.1    Internal Revenue Provision**

Notwithstanding any provision in this Agreement to the effect that the rights and liabilities of the Parties are several, not joint or collective, and that the Agreement and the activities and operations under this Agreement do not constitute a partnership under state law, each Party elects to be excluded from the application of all or any part of the provisions of Subchapter K, Chapter 1, Subtitle A, of the Internal Revenue Code of 1986, as amended, or similar provisions of applicable state laws regardless of whether for federal income tax purposes this Agreement and the activities and operations under this Agreement are regarded as a partnership.

# ARTICLE 21
# CONTRIBUTIONS

**21.1    Notice of Contributions Other Than Advances for Sale of Production**

Each Party shall promptly notify the other Parties of all offers of contributions that it may obtain, or contributions it is attempting to obtain, for the drilling of a well or the conducting of an operation on the Lease.  Payments received as consideration for entering into a contract for the sale of Hydrocarbon production from the Lease, loans, and other financial arrangements shall not be considered contributions for the purpose of this Article 21.  No Party shall release or obligate itself to release Confidential Data in return for a contribution from a third party without prior written consent of the Participating Parties or Parties having the right to participate in the well.

**21.2    Cash Contributions**

If a Party receives a cash contribution for drilling a well on the Lease or conducting an activity or operation on the Lease, the cash contribution shall be paid to Operator, and Operator shall credit the amount thereof to the Parties in proportion to their Participating Interests in the well or the Platform and/or Development Facilities.  If the well is a Non-consent Well, the amount of the contribution shall be deducted from the cost specified in Article 13.2.1(a) before computation of the amount to be recouped out of Hydrocarbon production.

**21.3    Acreage Contributions**

58

If a Party receives an acreage contribution for the drilling of a well on the Lease, the acreage contribution shall be shared by each Participating Party that accepts it in proportion to its Participating Interest in the well.  As between the Participating Parties, this Agreement shall apply separately to the acreage.


# ARTICLE 22
# DISPOSITION OF PRODUCTION

**22.1**  **Take-in-Kind Facilities**

Subject to Article 22.2, a Party may, at its sole cost and risk, construct Take-in-Kind Facilities to take its share of Hydrocarbon production in kind.

**22.2**  **Duty to Take in Kind**

Each Party shall own and, at its own cost and risk, shall take in kind or separately dispose of its share of the oil, gas, and condensate produced and saved from the Lease, excluding Hydrocarbon production used by Operator in activities or operations conducted under this Agreement, subject to this Article 22.  In order to avoid interference with operations on or regarding the Platform, the Development Facilities, and the Lease, a Party exercising its right to construct Take-in Kind Facilities ("the Take in Kind Party") shall provide Operator with a list of equipment it deems necessary for its Take in Kind Facilities ("the components") along with its notice informing Operator of its election to take in kind.  If Operator, in its sole discretion, agrees to install and operate the Take-in Kind Facilities, Operator shall purchase the components and install it on behalf of the Take in Kind Party at the Take in Kind Party's sole risk and cost, including but not limited to any fees, penalties or other costs incurred as a result of any cancellation of placed orders as may be requested by the Take in Kind Party.  Operator shall provide the Take in Kind Party with monthly updates on the progress of the ordering and installation of the Take in Kind Facilities.  Operator, based on the instructions of the Take in Kind Party, shall install and operate all the components.  Operator shall not be responsible for any losses or damages to the components or the Take in Kind Party's Hydrocarbon production metered, treated, processed, or transported by the components unless such losses or damages are the result of Operator's gross negligence or willful misconduct.  If Operator refuses or fails to install the Take-in Kind Facilities by one hundred twenty (120) days before the deadline provided in Section 12.4, the Take-in Kind Party shall have the right to install and operate the Take-in Kind Facilities providing that such operations do not interfere with existing operations or proposed operations that have been approved under terms of this Agreement.

**22.3**  **Failure to Take Oil and Condensate in Kind**

#93828440v3
#93828440v5

Notwithstanding Article 22.2 (Duty to Take in Kind), if a Party fails to take in kind or dispose of its share of the oil or condensate, Operator shall have the right, but not the obligation, subject to revocation at will by the Party owning the Hydrocarbon production, to purchase for its own account, sell to others, or otherwise dispose of all or part of the Hydrocarbon production at the same price at which Operator calculates and pays lessor's royalty on its own portion of the oil or condensate.  Operator shall notify the non-taking Party when the option is exercised. A purchase or sale by Operator of any other Party's share of the oil or condensate shall be for such reasonable periods of time as are consistent with the minimum needs of the industry under the circumstances, but in no event shall a contract be for a period in excess of one (1) year. Proceeds of the oil or condensate purchased, sold, or otherwise disposed of by Operator under this Article 22.3 shall be paid to the Party that had, but did not exercise, the right to take in kind and separately dispose of the oil or condensate.  Operator, in disposing of another Party's oil or condensate, shall not be responsible for making any filing with regulatory agencies not required by law to be made by it in respect to another Party's share of oil or condensate.  Unless required by governmental authority having jurisdiction or by judicial process, no Party shall be forced to share an available market with a non-taking Party.

**22.4    Failure to Take Gas in Kind**

Article 22.3 (Failure to Take Oil and Condensate in Kind) shall not apply to gas produced from the Lease.  In no event shall Operator be responsible for, or obligated to dispose of, another Party's share of gas production.  If for any reason a Party fails to take or market its full share of gas as produced, that Party may later take, market, or receive a cash accounting for its full share in accordance with Exhibit "E".

**22.5    Expenses of Delivery in Kind**

A cost that is incurred by Operator in making delivery of a Party's share of Hydrocarbons or disposing of same shall be paid by the Party.


# ARTICLE 23
# APPLICABLE LAW, JURISDICTION, AND VENUE

**23.1    Applicable Law**

**THIS AGREEMENT AND THE RELATIONSHIP OF THE PARTIES UNDER THIS AGREEMENT SHALL BE GOVERNED BY AND INTERPRETED IN ACCORDANCE WITH THE GENERAL MARITIME LAW, OR IF THE GENERAL MARITIME LAW IS NOT APPLICABLE, THE LAWS OF THE STATE OF TEXAS, WITHOUT REGARD TO PRINCIPLES OF CONFLICTS OF LAWS THAT WOULD OTHERWISE REFER THE MATTER TO THE LAWS OF ANOTHER JURISDICTION; PROVIDED HOWEVER, THAT NO LAW THEORY OR PUBLIC POLICY SHALL BE GIVEN EFFECT THAT WOULD UNDERMINE, DIMINISH, OR REDUCE THE**

**EFFECTIVENESS OF THE WAIVER DAMAGES PROVIDED IN THE PRECEDING ARTICLE 19.7, IT BEING THE EXPRESS INTENT, UNDERSTANDING, AND AGREEMENT OF THE PARTIES THAT SUCH WAIVER IS TO BE GIVEN THE FULLEST EFFECT, NOTWITHSTANDING THE NEGLIGENCE (WHETHER SOLE, JOINT, OR CONCURRENT), GROSS NEGLIGENCE, WILLFUL MISCONDUCT, STRICT LIABILITY, OR OTHER LEGAL FAULT OF A PARTY HERETO.**

**23.2    Jurisdiction and Venue**

For every dispute that arises under this Agreement, including any claim of breach of this Agreement, the Parties hereby consent to the exclusive jurisdiction and venue of a Federal court or Texas state court sitting in Houston, Texas.

# ARTICLE 24
## LAWS, REGULATIONS, AND NONDISCRIMINATION

**24.1    Laws and Regulations**

This Agreement and operations under this Agreement are subject to all applicable laws, rules, regulations, and orders by all governmental authorities claiming jurisdiction now and in the future. A provision of this Agreement found to be contrary to or inconsistent with any such law, rule, regulation, or order shall be deemed to have been modified accordingly.

**24.2    Nondiscrimination**

In performing work under this Agreement, the Parties shall comply and Operator shall require each independent contractor to comply with the governmental requirements in Exhibit "D" and with Articles 202(1) to (7), including Executive Order 11246, as amended.

# ARTICLE 25
## FORCE MAJEURE

**25.1    Force Majeure**

If a Party is unable, wholly or in part because of a Force Majeure, to carry out its obligations under this Agreement, other than the obligation to make money payments, that Party shall give the other Parties prompt written notice of the Force Majeure with sufficient particulars about it. Effective on the date notice is given, the obligations of the Party, so far as they are affected by the Force Majeure, shall be suspended during, but no longer than, the continuance of the Force Majeure.  Time is of the essence in the performance of this Agreement, and every reasonable effort will be made by the Party to avoid delay or suspension of any work or acts to be performed under this Agreement.  The requirement that the Force Majeure be remedied with all reasonable dispatch shall not require a Party to settle strikes or other labor difficulties.

#93828440v3
#93828440v5

# ARTICLE 26
# SUCCESSORS AND ASSIGNS

**26.1    Transfer of Interest**

Except as provided in 26.1.1 (Exceptions to Transfer Notice), a Transfer of Interest shall be provided by written notice to Operator and the other Parties ("the Transfer Notice").  Any Transfer of Interest shall be made to a party qualified by the BOEMRE to own leases in the Gulf of Mexico, and is financially capable of assuming the corresponding obligations under this Agreement.  The non-transferring Parties' consent can be conditioned on requiring the proposed transferee to provide (i) replacement financial assurances for any financial assurances previously provided by the transferring Party and (ii) additional reasonable financial assurances of the party to which the working interest is to be transferred and its ability to perform its obligations under this Agreement, after giving due consideration to the replacement financial assurances to be provided pursuant to clause (i).  All Transfers of Interest to any Person must be approved by and consented to in writing by the non-transferring Parties for any assignment made hereunder to be valid and binding upon the non-transferring Parties.  Any Transfer of Interest shall contain a provision in the assignment requiring that the non-transferring Parties' written consent must also be obtained before any future Transfer of Interest under this Agreement in whole or in part to any Person, and shall also include a provision that the party to which the working interest is transferred to be bound by all the terms and conditions of this Agreement.  No Transfer of Interest shall release a Party from its obligations and liabilities under this Agreement, and the security rights under Article 8.6 (Security Rights) shall continue to burden the Working Interest transferred and to secure the payment of those obligations and liabilities.

**26.1.1    Exceptions to Transfer Notice**

Notwithstanding any contrary provision of this Agreement, the Transfer Notice is not required when a Party proposes to mortgage, pledge, hypothecate, or grant a security interest in all or a portion of its Working Interest (including Assignments of Hydrocarbon production executed as further security for the debt secured by that security device), in any wells, Platforms, Development Facilities, or other equipment.   However, an encumbrance arising from the financing transaction shall be expressly made subject and subordinated to this Agreement.

**26.1.2    Effective Date of Transfer of Interest**

A Transfer of Interest becomes effective twenty (20) days after the day all Parties are in receipt of the Transfer Notice.  No Transfer of Interest, other than those provided in Article 15.1 (Right to Withdraw) and Article 26.1.1 (Exceptions to Prior Written Notice), is binding on the Parties unless and until (i) the assignor or assignee provides all remaining Parties with a photocopy of a fully executed Transfer of Interest, an executed BOEMRE

62

#93828440v3
#93828440v5

"Designation of Operator" form and a designation of oil spill responsibility form, and (ii) evidence of receipt of all necessary approvals by the BOEMRE.  The Parties shall promptly undertake all reasonable actions necessary to secure those approvals and shall execute and deliver all documents necessary to effectuate that Transfer of Interest.  All costs attributable to a Transfer of Interest are the sole obligation of the assigning Party.

**26.1.3   Form of Transfer of Interest**

Any Transfer of Interest shall incorporate provisions that the Transfer of Interest is subordinate to and made expressly subject to this Agreement and provide for the assumption by the assignee of the performance of all the assigning Party's obligations under this Agreement.  Any Transfer of Interest not in compliance with this provision is voidable by the non-assigning Parties.

**26.1.4   Warranty**

Any Transfer of Interest, vesting, or relinquishment of Working Interest between the Parties under this Agreement shall be made without warranty of title, except as provided in the next sentence.  All liens, charges, and other encumbrances, including but not limited to overriding royalties, net profits interest, and production payments, which a Party placed (or caused to be placed) on its Working Interest shall be fully satisfied or released before the effective date of a Transfer of Interest, vesting, or relinquishment of Working Interest between that Party and another Party under this Agreement (unless the other Party is willing to accept the Working Interest subject to those liens, charges, and other encumbrances).

# ARTICLE 27
## ADMINISTRATIVE PROVISIONS

**27.1   Term**

This Agreement shall remain in effect so long as a Lease remains in effect and thereafter until (a) all wells have been abandoned and plugged or turned over to the Parties owning an interest in the Lease on which the wells are located; (b) all Platforms, Development Facilities, and equipment have been disposed of by Operator in accordance with Article 14 (Abandonment, Salvage, and Surplus); (c) all Claims as defined in Article 19 (Liability, Claims, and Lawsuits) have been settled or otherwise disposed of; and (d) there has been a final accounting and settlement by all Parties.  In accordance with Article 4.5 (Selection of Successor Operator), this Agreement will terminate if no Party is willing to become Operator, effective after all conditions in clauses (a) through (d) above have been completed.  In accordance with Article 15.2.1 (Unanimous Withdrawal), this Agreement will terminate if all Parties elect to withdraw, effective

#93828440v3
#93828440v5

after all conditions in clauses (a) through (d) above have been completed.  Termination of this Agreement shall not relieve a Party of a liability or obligation accrued or incurred before termination and is without prejudice to all continuing confidentiality obligations or other obligations in this Agreement.

**27.2    Waiver**

A term, provision, covenant, representation, warranty, or condition of this Agreement may be waived only by written instrument executed by the Party waiving compliance.  The failure or delay of a Party in the enforcement or exercise of the rights granted under this Agreement shall not constitute a waiver of said rights nor shall it be considered as a basis for estoppel.  Time is of the essence in the performance of this Agreement and all time limits shall be strictly construed and enforced.

**27.3    Waiver of Right to Partition**

Each Party waives the right to bring an action for partition of its interest in the Lease, wells, Platform, Development Facilities, and other equipment held under this Agreement, and covenants that during the existence of this Agreement it shall not resort at any time to an action at law or in equity to partition any or all of the Lease and lands or personal property subject to this Agreement.

**27.4    Compliance with Laws and Regulations**

This Agreement, and all activities or operations conducted by the Parties under this Agreement, are expressly subject to, and shall comply with, all laws, orders, rules, and regulations of all federal, state, and local governmental authorities having jurisdiction over the Lease.

**27.4.1    Severance of Invalid Provisions**

If, for any reason and for so long as, a clause or provision of this Agreement is held by a court of competent jurisdiction to be illegal, invalid, unenforceable, or unconscionable under a present or future law or interpretation thereof, the remainder of this Agreement will not be affected by that illegality or invalidity.  An illegal or invalid provision will be deemed severed from this Agreement, as if this Agreement had been executed without the illegal or invalid provision.  The surviving provisions of this Agreement will remain in full force and effect unless the removal of the illegal or invalid provision destroys the legitimate purposes of this Agreement, in which event this Agreement shall be null and void.

**27.4.2    Fair and Equal Employment**

Each of the Parties is an Equal Opportunity Employer, and the equal opportunity provisions of 30 CFR 270 and 41 CFR 60-1, as amended or modified, are incorporated in this Agreement by reference.   The affirmative-action clauses concerning disabled veterans and veterans of the Vietnam era (41 CFR 60-250) and the affirmative-action clauses concerning employment of the handicapped (41 CFR 60-741) are also

64

incorporated in this Agreement by reference. In performing work under this Agreement, the Parties shall comply with (and Operator shall require each independent contractor to comply with) the governmental requirements in Exhibit "D" that pertain to non-segregated facilities.

**27.5    Construction and Interpretation of This Agreement**

**27.5.1    Headings for Convenience**

Except for the definition headings in Article 2 (Definitions), all the table of contents, captions, numbering sequences, and paragraph headings in this Agreement are inserted for convenience only and do not define, expand, or limit the scope, meaning, or intent of this Agreement.

**27.5.2    Article References**

Except as otherwise provided in this Agreement, each reference to an article of this Agreement includes all the referenced article and its sub-articles.

**27.5.3    Gender and Number**

The use of pronouns in whatever gender or number is a proper reference to the Parties to this Agreement though the Parties may be individuals, business entities, or groups thereof. Reference in this Agreement to the singular of a noun or pronoun includes the plural and vice versa.

**27.5.4    Future References**

A reference to a Party includes such Party's successors and assigns and, in the case of governmental bodies, persons succeeding to their respective functions and capacities.

**27.5.5    Currency**

Any amounts due or payable under this Agreement shall be paid in United States currency.

**27.5.6    Optional Provisions**

If any "Optional" provision of this Agreement is not adopted by the Parties to this Agreement by a typed, printed, or handwritten indication, such provision shall not form a part of this Agreement, and no inference shall be made concerning the intent of the Parties in regard to the subject matter of the "Optional" provision.

**27.5.7    Joint Preparation**

This Agreement shall be deemed for all purposes to have been prepared through the joint efforts of the Parties and shall not be construed for or against one (1) Party or the other as a result of the preparation, submittal, drafting, execution, or other event of negotiation hereof.

**27.5.8    Integrated Agreement**

This Agreement contains the final and entire agreement of the Parties for the matters covered by this Agreement and, as such, supersedes all prior written or oral

65

communications and agreements.  This Agreement may not be modified or changed except by written amendment signed by the Parties.

### 27.5.9  Binding Effect

To the extent that it is assignable, this Agreement shall bind and inure to the benefit of the Parties and their respective successors and assigns, and shall constitute a covenant running with the land comprising the Lease.  This Agreement does not benefit or create any rights in a person or entity that is not a Party to this Agreement.

### 27.5.10 Further Assurances

Each Party will take all actions necessary and will sign all documents necessary to implement this Agreement.  Except as otherwise provided in this Agreement, within thirty (30) days after their receipt of a valid written request for those documents from a Party, all other Parties shall prepare and execute the documents.

### 27.5.11 Counterpart Execution

This Agreement may be executed by signing the original or a counterpart.  If this Agreement is executed in counterparts, all counterparts taken together shall have the same effect as if all Parties had signed the same agreement.  No Party shall be bound to this Agreement until all Parties have executed a counterpart or the original of this Agreement.  This Agreement may also be ratified by a separate instrument that refers to this Agreement and adopts by reference all provisions of this Agreement.  A ratification shall have the same effect as an execution of this Agreement.

### 27.6  Restricted Bidding

If more than one (1) Party is ever on the list of restricted joint bidders for Outer Continental Shelf ("OCS") lease sales, as issued by the BOEMRE under 30 CFR 256.44, as amended, the Parties shall comply with all statutes and regulations regarding restricted joint bidders on the OCS.

### 27.7  Governing Agreement

The Parties to this Agreement are also Parties to that certain Joint Development Agreement dated effective _____ __,  20__,  by  and  between  _____,  _____,  _____, _____, and _____.   The Parties agree that should any conflict arise between the terms and conditions of this Agreement and the terms and conditions of the Joint Development Agreement, the terms and conditions of the Joint Development Agreement shall govern.


**IN WITNESS WHEREOF**, this Agreement has been executed by the Parties as of the day and year first above written.

**WITNESSES:**

[_____]

_____  By: _____

_____  Title:

**WITNESSES:**

[_____]

_____  By: _____

_____  Title:

**WITNESSES:**

[_____]

_____  By: _____

_____  Title:

**WITNESSES:**

[_____]

_____  By: _____

_____  Title:

**WITNESSES:**

[_____]

_____  By: _____

_____  Title:

67

#93828440v3
#93828440v5

Professionals Eyes Only
Highly Confidential
Subject to FRE 408

## EXHIBIT "A"

Attached to and made a part of that certain Offshore Operating Agreement dated effective _____ _____ __, 20__, by and between _____, as Operator, and _____, as Non-Operators.

**I.       OPERATOR**

[_____]

**II.      NON-OPERATOR(S)**

[_____]
[_____]
[_____]
[_____]

**III.     DESCRIPTION OF CONTRACT AREA**

**IV.     WORKING INTEREST OF THE PARTIES**

| PARTY | WI % |
|---|---|
| [_____] | X |
| [_____] | X |
| [_____] | X |
| [_____] | X |
| [_____] | 50% |

**V.      ADDRESSES AND CONTACT NUMBERS**

[_____]                          [_____]
[_____]                          [_____]
[_____]                          [_____]
Attention:                                 Attention:
Phone:                                     Phone:
Fax:                                       Fax:

[_____]                          [_____]
[_____]                          [_____]
[_____]                          [_____]
Attention:                                 Attention:
Phone:                                     Phone:
Fax:                                       Fax:

[_____]

1

#93828440v3
#93828440v5

[_____]
[_____]
Attention:
Phone:
Fax:

**VI.**     **BURDENS AND CONTRACTS IN CONTRACT AREA**

2

Professionals Eyes Only
Highly Confidential
Subject to FRE 408

**EXHIBIT "B"**

Attached to and made a part of that certain Offshore Operating Agreement dated effective _____ _____ __, 20__, by and between _____, as Operator, and _____, as Non-Operators.


**INSURANCE PROVISIONS**

I.     Operator shall carry the insurance specified in Section I with the limits stipulated below for the joint account.  Operator shall have the right to charge the joint account premiums for the insurance coverage required by this Exhibit "B."  Such premiums shall be allocated to the joint account using a fair and reasonable method based on the nature of the operations covered by this Agreement.

     A.     <u>Workers' Compensation and Employer's Liability</u>.

          1.     Workers' Compensation and Employer's Liability Insurance covering the employees of Operator engaged in operations hereunder in compliance with all applicable State and Federal Laws.

          2.     Coverage under U. S. Longshore and Harbor Worker's Compensation Act, extended to include the Outer Continental Shelf.

          3.     Extension of Coverage B of policy to provide for not less than $1,000,000 ("for assured's interest") for death or bodily injury to one person in any one accident; coverage also to include Employer's Liability under Admiralty Jurisdiction, including the Jones Act, with Marine and Voluntary Compensation Endorsement providing for a limit of liability of not less than $1,000,000 per accident and an endorsement for transportation, maintenance, wages and cure, all with same limits, as well as an endorsement to the effect that a claim "in rem" shall be treated as a claim against the insured.

II.    Operator shall not be obligated or authorized to obtain or carry on behalf of the joint account any additional insurance covering the Parties or the operations to be conducted hereunder.  Each Party, at its own expense, must carry its own coverage for the types of insurance and with the minimum limits as set forth in each of Paragraphs A-G below.  Each Party must provide Operator prior to commencement of operations a certificate of insurance or other evidence of coverage demonstrating coverage with the required limits of liability.  All losses and all damages to jointly owned property, except losses covered by insurance carried for the joint account, shall be borne by the Parties in proportion to their respective interests, unless the loss is caused by the gross negligence or willful misconduct of a Party hereto.  The insurance coverages required herein represent minimum requirements and do not limit or invalidate any indemnity or other obligation of the Parties under this Agreement.  A Party's failure to secure the required insurance coverages or the required endorsements on the policies or any denial of coverage by underwriters does not relieve such Party or limit its liabilities or obligations under this Agreement.

     Any Party, at its own expense, may acquire such additional insurance as it may deem necessary to protect its own interest against claims, losses, damages or destruction to property arising out of operations hereunder.

1

Each Party hereby waives its rights of recovery against all other Parties to this agreement and agrees that all insurance covering its interest in the jointly owned property will be suitably endorsed to affect a waiver of subrogation as per the indemnity and obligations assumed within the agreement.

A.   <u>Commercial General Liability and Business Automobile Liability</u>.  Coverage for all operations conducted hereunder with a combined single limit each occurrence, and in the aggregate, of $1,000,000 ("for assured's interest").  Said Commercial General Liability Insurance shall also include contractual liability coverage, sudden and accidental pollution coverage.  Automobile liability insurance shall include coverage for owned, hired and non-owned vehicles and mobile equipment licensed for highway use.

B.   <u>Vessels</u>. All vessels chartered by any Party shall be covered Protection and Indemnity coverage, with limits of $1,000,000 ("for assured's interest") per occurrence and in the aggregate.

C.   <u>Aircraft</u>. All aircraft owned or chartered by any Party shall be covered by Aircraft Liability Insurance with limits of $5,000,000 ("for assured's interest") per occurrence and in the aggregate.

D.   <u>Excess Liability</u>. Each Party shall carry Excess Liability insurance in the amount of $50,000,000 per occurrence and in the aggregate ("for assured's interest"), excess of all primary liability limits in the insurance specified in Sections A-C.

E.   <u>Extra Expense Liability</u>.  Extra expense liability coverage including control of well, seepage, pollution and contamination coverage, cleanup and/or containment coverage, re-drilling and/or restoring, and care, custody and control shall be carried by each Party with limits of liability of $75,000,000 per occurrence and in the aggregate and $5,000,000 per occurrence and in the aggregate for Care, Custody and Control coverage.

F.   <u>Financial Responsibility Insurance</u>:  Operator shall demonstrate coverage, as required by the Bureau of Ocean Energy Management pursuant to the Oil Pollution Act of 1990 as per CFR Part 253 "Final Rule for Oil Spill Financial Responsibility", according to the applicable governmental guidelines.

G.   <u>Contractors</u>:  Operator shall use reasonable efforts to require all contractors working or performing services hereunder to comply with the workers' compensation and employer's liability laws, both State and Federal, and said contractors or others performing services shall be required to procure and maintain appropriate insurance coverage as deemed by Operator for the types of operations undertaken.  All insurance shall be endorsed to include the Operator and the Parties as additional insureds, except for Worker's Compensation.  All such policies shall be endorsed with a Waiver of Subrogation in favor of Operator and the Parties.


<div align="center">END OF EXHIBIT "B"</div>


<div align="center">2</div>

Professionals Eyes Only
Highly Confidential
Subject to FRE 408

<u>**EXHIBIT "C"**</u>

Attached to and made a part of that certain Offshore Operating Agreement dated effective _____ _____ __, 20__, by and between _____, as Operator, and _____, as Non-Operators.

**[*insert COPAS provisions*]**[1]

---

[1] **NOTE TO DRAFT:** This Exhibit "C" needs to be filled out and inserted.

#93828440v3
#93828440v5

## EXHIBIT "D"

Attached to and made a part of that certain Offshore Operating Agreement dated effective _____ _____ __, 20__, by and between _____, as Operator, and _____, as Non-Operators.

## Non-Discrimination Provisions

During the performance of this Agreement, the "contractor" (meaning and referring separately to each party hereto) agrees, unless exempt therefrom to comply with all provisions of Executive Order 11246 which are incorporated herein by reference, and (a) if contractor has more than 50 employees or contracts with another party hereto in excess of $10,000, contractor must file Standard Form 100 (EEO 1), (b) if contractor has 50 or more employees and a contract of $50,000 or more, contractor is required to develop a written "Affirmative Action Compliance Program" for each of its establishments according to the Rules and Regulations published by the United States Department of Labor in 41 CFR, Chapter 60.  Further, contractor hereby certifies that it does not now and will not maintain any facilities provided for its employees in a segregated manner or permit its employees to perform their services at any location under its control where segregated facilities are maintained, as such segregated facilities are defined in Title 41, Chapter 60 1.8, Code of Federal Regulations, revised as of January 1, 1969, unless exempt therefrom.  Contractor further warrants that no other law, regulation or ordinance of the United States, or any state, or any governmental authority or agency has been violated in the manufacture, procurement or sale of any good furnished, work performed or service rendered pursuant to this contract.

Unless exempt by rules, regulations or orders of the United States Secretary of Labor, issued pursuant to Section 204 of Executive Order 11246, dated September 24, 1965, during the performance of this contract, the contractor agrees as follows:

(1)     The contractor will not discriminate against any employee or applicant for employment because of race, color, religion, sex or national origin.  The contractor will take affirmative action to ensure that applicants are employed and that employees are treated during employment, without regard to their race, color, religion, sex or national original.  Such action shall include, but not be limited to, the following:  employment, upgrading, demotion, transfer, recruitment or recruitment advertising; layoff or termination; rates of pay or other forms of compensation; and selection for training, including apprenticeship.  The contractor agrees to post in conspicuous places, available to employees and applicants for employment, notices to be provided by the contracting officer setting forth the provisions of this nondiscrimination clause.

(2)     The contractor will, in all solicitations or advertisements for employees placed by or on behalf of the contractor, state that all qualified applicants will receive consideration for employment without regard to race, color, religion, sex or national origin.

(3)     The contractor will send to each labor union or representative of workers with which he has a collective bargaining agreement or other contract or understanding, a notice to be provided by the agency contracting officer, advising the labor union or workers' representative of the contractor's commitments under Section 202 of Executive Order 11246 of September 24, 1965, and shall post copies of the notice in conspicuous places available to employees and applicants for employment.

1

#93828440v3
#93828440v5

(4)     The contractor will comply with all provisions of Executive Order 11246 of September 24, 1965, and of the rules, regulations and relevant orders of the Secretary of Labor.

(5)     The contractor will furnish all information and reports required by Executive Order 11246 of September 24, 1965, and by the rules, regulations and orders of the Secretary of Labor, or pursuant thereto, and will permit access to his books, records and accounts by the contracting agency and the Secretary of Labor for purposes of investigating to ascertain compliance with such rules, regulations and orders.

(6)     In the event of the contractor's noncompliance with the nondiscrimination clauses of this contract or with any of such rules, regulations or orders, this contract may be canceled, terminated or suspended in whole or in part and the contractor may be declared ineligible for further Government contracts in accordance with procedures authorized in Executive Order 11246 of September 24, 1965, or by rule, regulation or order of the Secretary of Labor, or as otherwise provided by law.

(7)     The contractor will include the provisions of paragraph (1) through (8) in every subcontract or purchase order unless exempted by rules, regulations or orders of the Secretary of Labor issued pursuant to Section 204 of Executive Order 11246 of September 24, 1965, so that such provisions will be binding upon each subcontract or vendor.  The contractor will take such action with respect to any subcontract or purchase order as the contracting agency may direct as a means of enforcing such provisions including sanctions for noncompliance; provided, however, that in the event the contractor becomes involved in, or is result of such direction by the contracting agency, the contractor may request the United States to enter into such litigation to protect the interests of the United States.

(8)     Contractor agrees and covenants that none of its employees or employees of its subcontractors who provided services pursuant to this contract are unauthorized aliens, as defined in the Immigration, Reform and Control Act of 1986.


[End of Exhibit "D"]


2

## EXHIBIT "E"

Attached to and made a part of that certain Offshore Operating Agreement dated effective _____ _____ __, 20__, by and between _____, as Operator, and _____, as Non-Operators.

## GAS BALANCING PROVISIONS

1. **DEFINITIONS**

   The following definitions shall apply to this Agreement:

   1.01 "Arm's Length Agreement" shall mean any gas sales agreement with an unaffiliated purchaser or any gas sales agreement with an affiliated purchaser where the sales price and delivery conditions under such agreement are representative of prices and delivery conditions existing under other similar agreements in the area between unaffiliated parties at the same time for natural gas of comparable quality and quantity.

   1.02 "Balancing Area" shall mean **(select one):**

   ☑ each well drilled pursuant to **the Lease** that produces Gas or is allocated a share of Gas production. If a single well is completed in two or more producing intervals, each producing interval from which the Gas production is not commingled in the wellbore shall be considered a separate well.

   ☐ all the acreage and depths subject to the Operating Agreement.

   ☐ _____
   _____
   _____
   _____

   1.03 "Full Share of Current Production" shall mean the Percentage Interest of each Party in the Gas actually produced from the Balancing Area during each month.

   1.04 "Gas" shall mean all hydrocarbons produced or producible from the Balancing Area, whether from a well classified as an oil well or gas well by the regulatory agency having jurisdiction in such matters, which are or may be made available for sale or separate disposition by the Parties, excluding oil, condensate and other liquids recovered by field equipment operated for the joint account. "Gas" does not include gas used in joint operations, such as for fuel, recycling or reinjection, or which is vented or lost before its sale or delivery from the Balancing Area.

   1.05 "Makeup Gas" shall mean any Gas taken by an Underproduced Party from the Balancing Area in excess of its Full Share of Current Production, whether pursuant to Section 3.3 or Section 4.1 hereof.

   1.06 "Mcf" shall mean one thousand cubic feet. A cubic foot of Gas shall mean the volume of gas contained in one cubic foot of space at a standard pressure base and at a standard temperature base.

   1.07 "MMBtu" shall mean one million British Thermal Units. A British Thermal Unit shall mean the quantity of heat required to raise one pound avoirdupois of pure water from 58.5 degrees Fahrenheit to 59.5 degrees Fahrenheit at a constant pressure of 14.73 pounds per square inch absolute.

   1.08 "Operator" shall mean the individual or entity designated as the operator of the well(s) located in the Balancing Area.

   1.09 "Overproduced Party" shall mean any Party having taken a greater quantity of Gas from the Balancing Area than the Percentage interest of such Party in the cumulative quantity of all Gas produced from the Balancing Area.

   1.10 "Overproduction" shall mean the cumulative quantity of Gas taken by a Party in excess of its Percentage Interest in the cumulative quantity of all Gas produced from the Balancing Area.

   1.11 "Party" shall mean those individuals or entities subject to this Agreement, and their respective heirs, successors, transferees and assigns.

   1.12 "Percentage Interest" shall mean the percentage or decimal interest of each Party in the Gas produced from the Balancing Area pursuant to the Lease covering the Balancing Area.

   1.13 **("Intentionally Deleted")**

   1.14 "Underproduced Party" shall mean any Party having taken a lesser quantity of Gas from the Balancing Area than the Percentage Interest of such Party in the cumulative quantity of all Gas produced from the Balancing Area.

   1.15 "Underproduction" shall mean the deficiency between the cumulative quantity of Gas taken by a Party and its

1

Percentage Interest in the cumulative quantity of all Gas produced from the Balancing Area.

1.16 ☐**(Optional)** "Winter Period" shall mean the month(s) of _____November and December_____ in one calendar year and the month(s) of _____January and February_____ in the succeeding calendar year.

**2. BALANCING AREA**

2.1 If this Agreement covers more than one Balancing Area, it shall be applied as if each Balancing Area were covered by separate but identical agreements. All balancing hereunder shall be on the basis of Gas taken from the Balancing Area measured in **(Alternative 1)** ☐ Mcfs or **(Alternative 2)** ■ MMBtus.

**3. RIGHT OF PARTIES TO TAKE GAS**

3.1 Each Party desiring to take Gas will notify the Operator, or cause the Operator to be notified, of the volumes nominated, the name of the transporting pipeline and the pipeline contract number (if available) and meter station relating to such delivery, sufficiently in advance for the Operator, acting with reasonable diligence, to meet all nomination and other requirements. Operator is authorized to deliver the volumes so nominated and confirmed (if confirmation is required) to the transporting pipeline in accordance with the terms of this Agreement. Operator shall provide each Party with an estimate of its Full Share of Current Production and the estimated sustainable Gas volumes for Makeup Gas by the 15th calendar day of the month before the month of production. The Parties recognize that Operator's estimates are no more than estimates, and that these estimated volumes may vary from the actual Gas sales volumes during the month. Operator will, insofar as reasonably possible and practical, notify (by telephone or facsimile) the Parties of significant variances in production volumes relative to nominations where these variances could be reasonably expected to result in penalties being imposed by pipeline/purchases. Operator will notify all the parties of scheduled operations that will impact sustained production.

3.2 Each Party shall make a reasonable, good faith effort to take its Full Share of Current Production each month, to the extent that such production is required to maintain leases in effect, to protect the producing capacity of a well or reservoir, to preserve correlative rights, or to maintain oil production.

3.3 When a Party fails for any reason to take its Full Share of Current Production (as such Share may be reduced by the right of the other Parties to make up for Underproduction as provided herein), the other Parties shall be entitled to take any Gas which such Party fails to take. To the extent practicable, such Gas shall be made available initially to each Underproduced Party in the proportion that its Percentage Interest in the Balancing Area bears to the total Percentage Interests of all Underproduced Parties desiring to take such Gas. If all such Gas is not taken by the Underproduced Parties, the portion not taken shall then be made available to the other Parties in the proportion that their respective Percentage Interests in the Balancing Area bear to the total Percentage Interests of such Parties.

3.4 All Gas taken by a Party in accordance with the provisions of this Agreement, regardless of whether such Party is underproduced or overproduced, shall be regarded as Gas taken for its own account with title thereto being in such taking Party.

3.5 Notwithstanding the provisions of Section 3.3 hereof, no Overproduced Party shall be entitled in any month to take any Gas in excess of three hundred percent (300%) of its Percentage Interest of the Balancing Area's then-current Maximum Monthly Availability; provided, however, that this limitation shall not apply to the extent that it would preclude production that is required to maintain leases in effect, to protect the producing capacity of a well or reservoir, to preserve correlative rights, or to maintain oil production. "Maximum Monthly Availability" shall mean the maximum average monthly rate of production at which Gas can be delivered from the Balancing Area, as determined by the Operator, considering the maximum efficient well rate for each well within the Balancing Area, the maximum allowable(s) set by the appropriate regulatory agency, mode of operation, production facility capabilities and pipeline pressures.

3.6 In the event that a Party fails to make arrangements to take its Full Share of Current Production required to be produced to maintain leases in effect, to protect the producing capacity of a well or reservoir, to preserve correlative rights, or to maintain oil production, the Operator may sell any part of such Party's Full Share of Current Production that such Party fails to take for the account of such Party and render to such Party, on a current basis, the full proceeds of the sale, less any reasonable marketing, compression, treating, gathering or transportation costs incurred directly in connection with the sale of such Full Share of Current Production. In making the sale contemplated herein, the Operator shall be obliged only to obtain such price and conditions for the sale as are reasonable under the circumstances and shall not be obliged to share any of its markets. Any such sale by Operator under the terms hereof shall be only for such reasonable periods of time as are consistent with the minimum needs of the industry under the particular circumstances, but in no event for a period in excess of one year. Notwithstanding the provisions of Article 3.4 hereof, Gas sold by Operator for a Party under the provisions hereof shall be deemed to be Gas taken for the account of such Party. Notwithstanding anything contained herein to the contrary, no agency relationship or other relationship of trust and confidence shall be created by such sale, and Operator's sale of production under the terms hereof shall be subject to the terms of Section 12.3 hereof.

**4. IN-KIND BALANCING**

4.1 Effective the first day of any calendar month following at least    thirty(                                    30)  days' prior written notice to the Operator, any Underproduced Party may begin taking, in addition to its Full Share of Current

2

Production and any Makeup Gas taken pursuant to Section 3.3 of this Agreement, a share of current production determined by multiplying <u>fifty</u> percent (<u>50</u>%) of the Full Shares of Current Production of all Overproduced Parties by a fraction, the numerator of which is the Percentage Interest of such Underproduced Party and the denominator of which is the total of the Percentage Interests of all Underproduced Parties desiring to take Makeup Gas. In no event will an Overproduced Party be required to provide more than <u>fifty</u> percent (<u>50</u>%) of its Full Share of CurrentProduction for Makeup Gas. The Operator will promptly notify all Overproduced Parties of the election of an Underproduced Party to begin taking Makeup Gas.

~~4.2 ☐ **(Optional – Seasonal Limitation on Makeup – Option 1)** Notwithstanding the provisions of Section 4.1, the average monthly amount of Makeup Gas taken by an Underproduced Party during the Winter Period pursuant to Section 4.1 shall not exceed the average monthly amount of Makeup Gas taken by such Underproduced Party during the _____( _____ ) months immediately preceding the Winter Period.~~

4.2 ☐ **(Optional - Seasonal Limitation on Makeup - Option 2)** Notwithstanding the provisions of Section 4.1, no Overproduced Party will be required to provide more than <u>twenty-five percent</u> percent ( <u>25</u> %) of its Full Share

of Current Production for Makeup Gas during the Winter Period.

~~4.3 ☐ **(Optional)** Notwithstanding any other provision of this Agreement, at such time and for so long as Operator, or (insofar as concerns production by the Operator) any Underproduced Party, determines in good faith that an Overproduced Party has produced all its share of the ultimately recoverable reserves in the Balancing Area, such Overproduced Party may be required to make available for Makeup Gas, on the demand of the Operator or any Underproduced Party, up to _____ percent ( _____%) of such Overproduced Party's Full Share of Current Production.~~

## 5. STATEMENT OF GAS BALANCES

5.1   The Operator will maintain appropriate accounting on a monthly and cumulative basis of the volumes of Gas that each Party is entitled to receive and the volumes of Gas actually taken or sold for each Party's account. Within forty-five (45) days after the month of production, the Operator will furnish a statement for such month showing (1) each Party's Full Share of Current Production, (2) the total volume of Gas actually taken or sold for each Party's account, (3) the difference between the volume taken by each Party and that Party's Full Share of Current Production, (4) the Overproduction or Underproduction of each Party, and (5) other data as recommended by the provisions of the Council of Petroleum Accountants Societies Bulletin No.24, as amended or supplemented hereafter. Each Party taking Gas will promptly provide to the Operator any data required by the Operator for preparation of the statements required hereunder.

5.2   If any Party fails to provide the data required herein for four (4) consecutive production months, the Operator, or where the Operator has failed to provide data, another Party, may audit the production and Gas sales and transportation volumes of the non-reporting Party to provide the required data. Such audit shall be conducted only after reasonable notice and during normal business hours in the office of the Party whose records are being audited. All costs associated with such audit will be charged to the account of the Party failing to provide the required data.

## 6. PAYMENTS ON PRODUCTION

6.1   Each Party taking Gas shall pay or cause to be paid all production and severance taxes due on all volumes of Gas actually taken by such Party.

6.2   **(Intentionally Deleted)**

~~6.2.1 ☐ **(Optional – For use only with Section 6.2 – Alternative I – Entitlement)** On written request of a Party taking less than its Full Share of Current Production in a given month ("Current Underproducer"), any Party taking more than its Full Share of Current Production in such month ("Current Overproducer") will pay to such Current Underproducer an amount each month equal to the Royalty percentage of the proceeds received by the Current Overproducer for that portion of the Current Underproducer's Full Share of Current Production taken by the Current Overproducer; provided, however, that such payment will not exceed the Royalty percentage that is common to all Royalty burdens in the Balancing Area. Payments made pursuant to this Section 6.2.1 will be deemed payments to the Underproduced Party's Royalty owners for purposes of Section 7.5.~~

~~6.2 ☐ **(Alternative 2 – Sales)** Each Party shall pay or cause to be paid Royalty due with respect to Royalty owners to whom it is accountable based on the volume of Gas actually taken for its account.~~

6.3   **(Intentionally Deleted)**

## 7. CASH SETTLEMENTS

7.1   On the earlier of the plugging and abandonment of the last producing interval in the Balancing Area, or at any time no Gas is taken from the Balancing Area for a period of twelve (12) consecutive months, any Party may give written notice calling for cash Settlement of the Gas production imbalances among the Parties. Such notice shall be given to all Parties in the Balancing Area.

7.2   Within ninety (90) days after the notice calling for cash settlement under Section 7.1, the Operator will distribute to each Party a Final Gas Settlement Statement detailing the quantity of Overproduction owed by each Overproduced Party to each Underproduced Party and identifying the month to which such Overproduction is attributed, pursuant to the methodology set out in Section 7.4.

3

7.3 ■ **(Alternative 1 - Direct Party-to-Party Settlement)** Within ninety (90) days after receipt of the Final Gas Settlement Statement, each Overproduced Party will pay to each Underproduced Party entitled to settlement the appropriate cash Settlement, accompanied by appropriate accounting detail. At the time of payment, the Overproduced Party will notify the Operator of the Gas imbalance settled by the Overproduced Party's payment.

~~7.3 ☐ **(Alternative 2 – Settlement Through Operator)** Within sixty (60) days after receipt of the Final Gas Settlement Statement, each Overproduced Party will send its cash settlement, accompanied by appropriate accounting detail, to the Operator. The Operator will distribute the monies so received, along with any settlement owed by the Operator as an Overproduced Party, to each Underproduced Party to whom settlement is due within ninety (90) days after issuance of the Final Gas Settlement Statement. In the event that any Overproduced Party fails to pay any settlement due hereunder, the Operator may turn over responsibility for the collection of such settlement to the Party to whom it is owed, and the Operator will have no further responsibility with regard to such settlement.~~

~~7.3.1 **(Optional – For use only with Section 7.3, Alternative 2 – Settlement Through Operator)** Any Party shall have the right at any time on thirty (30) days' prior written notice to all other Parties to demand that any settlements due such Party for Overproduction be paid directly to such Party by the Overproduced Party, rather than being paid through the Operator. In the event that an Overproduced Party pays the Operator any sums due to an Underproduced Party at any time after thirty (30) days following the receipt of the notice provided for herein, the Overproduced Party will continue to be liable to such Underproduced Party for any sums so paid, until payment is actually received by the Underproduced Party.~~

7.4 ■ **(Alternative 1 - Historical Sales Basis)** The amount of the cash settlement will be based on the proceeds received by the Overproduced Party under an Arm's Length Agreement for the Gas taken from time to time by the Overproduced Party in excess of the Overproduced Party's Full Share of Current Production. Any Makeup Gas taken by the Underproduced Party before monetary settlement hereunder will be applied to offset Overproduction chronologically in the order of accrual. The method of valuation for cash settlement will be First In First Out (FIFO)

~~7.4 ☐ **(Alternative 2 – Most Recent Sales Basis)** The amount of the cash settlement will be based on the proceeds received by the Overproduced Party under an Arm's Length Agreement for the volume of Gas that constituted Overproduction by the Overproduced Party from the Balancing Area. For the purpose of implementing the cash settlement provision of the Section 7, an Overproduced Party will not be considered to have produced any of an Underproduced Party's share of Gas until the Overproduced Party has produced cumulatively all its Percentage Interest share of the Gas ultimately produced from the Balancing Area.~~

7.5 The values used for calculating the cash settlement under Section 7.4 will include all proceeds received for the sale of the Gas by the Overproduced Party calculated at the Balancing Area, after deducting any production or severance taxes paid as well as any reasonable marketing, compression, treating, gathering or transportation costs incurred directly in connection with the sale of the Overproduction.

7.5.1 ■ **(Optional - For Valuation Under Percentage of Proceeds Contracts)** For Overproduction sold under a gas purchase contract providing for payment based on a percentage of the proceeds obtained by the purchaser on resale of residue gas and liquid hydrocarbons extracted at a gas processing plant, the values used for calculating cash settlement will include proceeds received by the Overproduced Party for both the liquid hydrocarbons and the residue gas attributable to the Overproduction.

~~7.5.2 ☐ **(Optional – Valuation for Processed Gas – Option 1)** For Overproduction processed for the account of the Overproduced Party at a gas processing plant for the extraction of liquid hydrocarbons, the full quantity of the Overproduction will be valued for purposes of cash settlement at the prices received by the Overproduced Party for the sale of the residue gas attributable to the Overproduction without regard to proceeds attributable to liquid hydrocarbons which may have been extracted from the Overproduction.~~

7.5.2 ■ **(Optional - Valuation for Processed Gas - Option 2)** For Overproduction processed for the account of the Overproduced Party at a gas processing plant for the extraction of liquid hydrocarbons, the values used for calculating cash settlement will include the proceeds received by the Overproduced Party for the sale of the liquid hydrocarbons extracted from the Overproduction, less the actual reasonable costs incurred by the Overproduced Party to process the Overproduction and to transport, fractionate and handle the liquid hydrocarbons extracted therefrom before sale.

7.6 To the extent the Overproduced Party did not sell all Overproduction under an Arm's Length Agreement, the cash settlement will be based on the weighted average price received by the Overproduced Party for any gas sold from the Balancing Area under Arm's Length Agreements during the months to which such Overproduction is attributed. In the event that no sales under Arm's Length Agreements were made during any such month, the cash settlement for such month will be based on the simple average of the spot index prices published for the applicable geographic area in the first issue of Inside F.E.R.C.'s Gas Market Report, *Natural Gas Week and Natural Gas Intelligence for such month. Should these publications cease to exist, a mutually acceptable pricing bulletin shall be used. * published by McGraw Hill for deliveries at Henry Hub, subject to reasonable base adjustments between the point of delivery to the applicable pipeline transportation system and the point at which the index price applies

7.7 Interest compounded at the ~~rate of~~ Prime rate in effect at Citibank N.A. of New York, plus one percent (1%) percent (_____%) per annum or the maximum lawful

4

rate of interest applicable to the Balancing Area, whichever is less, will accrue for all amounts due under Section 7.1 beginning the first day following the date payment is due pursuant to Section 7.3. Such interest shall be borne by the Operator or any Overproduced Party in the proportion that their respective delays beyond the deadlines set out in Sections 7.2 and 7.3 contributed to the accrual of the interest.

7.8  In lieu of the cash settlement required by Section 7.3, an Overproduced Party may deliver to the Underproduced Party an offer to settle its Overproduction in-kind and at such rates, quantities, times and sources as may be agreed on by the Underproduced Party. If the Parties are unable to agree on the manner in which such in-kind settlement gas will be furnished within ninety (90) days after the Overproduced Party's offer to settle in kind, which period may be extended by agreement of said Parties, the Overproduced Party shall make a cash settlement as provided in Section 7.3. The making of an in-kind settlement offer under this Section 7.8 will not delay the accrual of interest on the cash settlement should the Parties fail to reach agreement on an in-kind settlement.

~~7.9 ▆ **(Optional – Interim Cash Balancing)** At any time during the term of this Agreement, any Overproduced Party may, in its sole discretion, make cash settlement(s) with the Underproduced Parties covering all or part of its outstanding Gas imbalance, provided that such settlements must be made with all Underproduced Parties proportionately based on the relative imbalances of the Underproduced Parties, and provided further that such settlements may not be made more often than once every twenty-four (24) months. Such settlements will be calculated in the same manner provided above for final cash settlements. The Overproduced Party will provide Operator a detailed accounting of any such cash settlement within thirty (30) days after the settlement is made.~~

## 8.  TESTING

Notwithstanding any provision of this Agreement to the contrary, any Party shall have the right, from time to time, to produce and take up to one hundred percent (100%) of a well's entire Gas stream to meet the reasonable deliverability test(s) required by such Party's Gas purchaser, and the right to take any Makeup Gas shall be subordinate to the right of any Party to conduct such tests; provided, however, that such tests shall be conducted in accordance with prudent operating practices only after thirty_____(30) days' prior written notice to the Operator and shall last no longer than seventy-two_____(72) hours. Consent of parties then taking all or any part of their share of gas shall be required to conduct testing during Winter Period.

## 9.  OPERATING COSTS (Intentionally Deleted)

## 10.  LIQUIDS

The Parties shall share proportionately in and own all liquid hydrocarbons recovered with Gas by field equipment operated for the joint account in accordance with their Percentage Interests in the Balancing Area.

## 11.  AUDIT RIGHTS

Notwithstanding any provision in this Agreement or any other agreement between the Parties hereto, and further notwithstanding any termination or cancellation of this Agreement, for a period of two (2) years from the end of the calendar year in which any information to be furnished under Section 5 or 7 hereof is supplied, any Party shall have the right to audit the records of any other Party regarding quantity, including but not limited to information regarding Btu-content. Any Underproduced Party shall have the right for a period of two (2) years from the end of the calendar year in which any cash settlement is received pursuant to Section 7 to audit the records of any Overproduced Party as to all matters concerning values, including but not limited to information regarding prices and disposition of Gas from the Balancing Area. Any such audit shall be conducted at the expense of the Party or Parties desiring such audit, and shall be conducted, after reasonable notice, during normal business hours in the office of the Party whose records are being audited. Each Party hereto agrees to maintain records as to the volumes and prices of Gas sold each month and the volumes of Gas used in its own operations, along with the Royalty paid on any such Gas used by a Party in its own operations. The audit rights provided for in this Section 11 shall be in addition to those provided for in Section 5.2 of this Agreement, but any statements rendered by Operator shall conclusively be presumed to be true and correct after twenty-four (24) months following the end of any such calendar year, unless with the said twenty-four (24) month period an Underproduced Party takes written exception thereto and makes claim on Overproduced Party for adjustment.

## 12.  MISCELLANEOUS

12.1  As between the Parties, in the event of any conflict between the provisions of this Agreement and the provisions of any gas sales contract, or in the event of any conflict between the provisions of this Agreement and the provisions of the **Lease**, the provisions of this Agreement shall govern.

12.2  Each Party agrees to defend, indemnify and hold harmless all other Parties from and against any and all liability for any claims, which may be asserted by any third party which now or hereafter stands in a contractual relationship with such indemnifying Party and which arise out of the operation of this Agreement or any activities of such indemnifying Party under the provisions of this Agreement, and does further agree to save the other Parties harmless from all judgments or damages sustained and costs incurred in connection therewith.

12.3  Except as otherwise provided in this Agreement, Operator is authorized to administer the provisions of this

<center>5</center>

Agreement, but shall have no liability to the other Parties for losses sustained or liability incurred which arise out of or in connection with the performance of Operator's duties hereunder, except such as may result from Operator's gross negligence or willful misconduct. Operator shall not be liable to any Underproduced Party for the failure of any Overproduced Party, (other than Operator) to pay any amounts owed pursuant to the terms hereof.

12.4 This Agreement shall remain in full force and effect for as long as the **Lease** shall remain in force and effect as to the Balancing Area, and thereafter until the Gas accounts between the Parties are settled in full, and shall inure to the benefit of and be binding on the Parties hereto, and their respective heirs, successors, legal representatives and assigns, if any. The Parties hereto agree to give notice of the existence of this Agreement to any successor in interest of any such Party and to provide that any such successor shall be bound by this Agreement, and shall further make any transfer of any interest subject to the **Lease,** or any part thereof, also subject to the terms of this Agreement.

12.5 Unless the context clearly indicates otherwise, words used in the singular include the plural, the plural includes the singular, and the neuter gender includes the masculine and the feminine.

12.6 In the event that any "Optional" provision of this Agreement is not adopted by the Parties to this Agreement by a typed, printed or handwritten indication, such provision shall not form a part of this Agreement, and no inference shall be made concerning the intent of the Parties in such event. In the event that any "Alternative" provision of this Agreement is not so adopted by the Parties, Alternative 1 in each such instance shall be deemed to have been adopted by the Parties as a result of any such omission. In those cases where it is indicated that an Optional provision may be used only if a specific Alternative is selected: (i) an election to include said Optional provision shall not be effective unless the Alternative in question is selected; and (ii) the election to include said Optional provision must be expressly indicated hereon, it being understood that the selection of an Alternative either expressly or by default as provided herein shall not, in and of itself, constitute an election to include an associated Optional provision.

12.7 This Agreement shall bind the Parties in accordance with the provisions hereof, and nothing herein shall be construed or interpreted as creating any rights in any person or entity not a signatory hereto, or as being a stipulation in favor of any such person or entity.

12.8 If contemporaneously with this Agreement becoming effective, or thereafter, any Party requests that any other Party execute an appropriate memorandum or notice of this Agreement in order to give third parties notice of record of same and submits same for execution in recordable form, such memorandum or notice shall be duly executed by the Party to which such request is made and delivered promptly thereafter to the Party making the request. On receipt, the Party making the request shall cause the memorandum or notice to be duly recorded in the appropriate real property or other records affecting the Balancing Area.

12.9 In the event federal tax regulations require a uniform method of computing taxable income by all Parties, the Parties agree to negotiate in good faith to develop such a uniform method that is in accordance with the requirement of said tax regulations.

**13. ASSIGNMENT AND RIGHTS ON ASSIGNMENT**

13.1 Subject to the provisions of Sections 13.2 (if elected) and 13.3 hereof, and notwithstanding anything in this Agreement or in the Operating Agreement to the contrary, if any Party assigns (including any sale, exchange or other transfer) any of its working interest in the Balancing Area when such Party is an Underproduced or Overproduced Party, the assignment or other act of transfer shall, insofar as the Parties hereto are concerned, include all interest of the assigning or transferring Party in the Gas, all rights to receive or obligations to provide or take Makeup Gas and all rights to receive or obligations to make any monetary payment which may ultimately be due hereunder, as applicable. Operator and each of the other Parties hereto shall thereafter treat the assignment accordingly, and the assigning or transferring Party shall look solely to its assignee or other transferee for any interest in the Gas or monetary payment that such Party may have or to which it may be entitled, and shall cause its assignee or other transferee to assume its obligations hereunder.

13.2 ▇ **(Optional - Cash Settlement on Assignment)** Notwithstanding anything in this Agreement (including but not limited to the provisions of Section 13.1 hereof) or in the Operating Agreement to the contrary, and subject to the provisions of Section 13.3 hereof, in the event an Overproduced Party intends to sell, assign, exchange or otherwise transfer any of its interest in a Balancing Area, such Overproduced Party shall notify in writing the other working interest owners who are Parties hereto in such Balancing Area of such fact at least sixty(_____ 60) days after closing the transaction. Such notice shall contain a preliminary gas settlement statement detailing the quantity of Overproduction owed by the Overproduced Party to each Underproduced Party and the value of such Overproduction, calculated in accordance with Section 7.4 and 7.6 hereof. Thereafter, any Underproduced Party may demand from such Overproduced Party in writing, within _____ sixty (_____ 60 _____) days after receipt of the Overproduced Party's notice, a cash settlement of its Underproduction from the Balancing Area. The Operator shall be notified of any such demand and of any cash settlement pursuant to this Section 13, and the Overproduction and Underproduction of each Party shall be adjusted accordingly. Any cash settlement pursuant to this Section 13 shall be paid by the Overproduced Party ~~on or before the earlier (i) of sixty (60) days after receipt of the Underproduced Party's demand or (ii)~~ within 120 days after the closing of the transaction in which the Overproduced Party sells, assigns, exchanges or otherwise transfers its interest in a Balancing Area on the same basis as otherwise set forth in

Sections 7.3 through 7.6 hereof, and shall bear interest at the rate set forth in Section 7.7 hereof, beginning ~~sixty (60) days~~ following the 121st day after closing of

6

~~after~~ the Overproduced Party's sale, assignment, exchange or transfer of its interest in the Balancing Area for any amounts not paid. Provided, however, if any Underproduced Party does not so demand such cash settlement of its Underproduction from the Balancing Area, such Underproduced Party shall look exclusively to the assignee or other successor in interest of the Overproduced Party giving notice hereunder for the satisfaction of such Underproduced Party's Underproduction in accordance with the provisions of Section 13.1 hereof.

13.3  The provisions of this Section 13 shall not be applicable in the event any Party mortgages its interest or disposes of its interest by merger, reorganization, consolidation or sale of substantially all its assets to a subsidiary or parent company, or to any company in which any parent or subsidiary of such Party owns a majority of the stock of such company.

**EXHIBIT "F"**

Attached to and made a part of that certain Offshore Operating Agreement dated effective _____ _____ __, 20__, by and between _____, as Operator, and _____, as Non-Operators.

# MEMORANDUM OF OPERATING AGREEMENT AND FINANCING STATEMENT

To be filed in the conveyance records and in the mortgage records and as a
non-standard financing statement in accordance with Paragraph 6.0 herein.

1.0    This Memorandum of Operating Agreement and Financing Statement (this "Memorandum") is effective as of the effective date of the Operating Agreement referred to in Paragraph 2.0 below and is executed by the undersigned, duly authorized representative of [_____] (the "Operator"), and is executed by the undersigned, duly authorized representatives of [_____],[_____],[_____], and [_____] (the "Non-Operators").  Operator and Non-Operators may be referred to herein individually as a "Party" and together as the "Parties".

2.0    The Operator and Non-Operators are Parties to that certain Operating Agreement effective _____ ___, 20__ (the "Operating Agreement"), which Operating Agreement provides for the exploration, development and operation of the oil and gas leases described in Exhibit "A" of the Operating Agreement (hereinafter called the "Contract Area") and which designates [_____], as the Operator, to conduct such operations for itself and the Non-Operators.

3.0    Among other provisions, the Operating Agreement (a) provides for certain liens, mortgages, pledges and security interests to secure payment by the Parties of their respective share of costs and other obligations under the Operating Agreement, (b) contains an Accounting Procedure, which establishes, among other things, interest to be charged on indebtedness, certain costs, and other expenses under the Operating Agreement at the rate set forth therein, and (c) includes non-consent clauses which establish that Parties who elect not to participate in certain operations shall (i) be deemed to have relinquished their interest in production until the carrying consenting Parties recover their costs of such operations plus a specified amount or (ii) forfeit their interest in certain Contract Area or portions thereof involved in such operations.

4.0    The Operator hereby certifies that a true and correct copy of the Operating Agreement is on file and is available for inspection by third parties at the offices of the Operator at the address set forth in this Memorandum.

5.0    In addition to any other security rights and remedies provided for by law with respect to services rendered or materials and equipment furnished under the Operating Agreement, for and in consideration of the covenants and mutual undertakings of the Operator and the Non-Operators set forth in the Operating Agreement, the Operator and the Non-Operators hereby agree as follows:

5.1    To secure the performance of and payment by the Non-Operators of all obligations and indebtedness of the Non-Operators pursuant to the Operating Agreement, whether now

1

owed or hereafter arising, and to the extent susceptible under applicable law, the Non-Operators hereby grants to the Operator a mortgage, hypothec, and pledge of and over all of its rights, titles, and interests in and to (a) the Contract Area, (b) the oil and gas in, on, under, and that may be produced from the lands covered by the Contract Area, and (c) all other immovable property susceptible of mortgage situated within the Contract Area.

5.2     To secure the performance of and payment by the Non-Operators of all obligations and indebtedness of the Non-Operators pursuant to the Operating Agreement, whether now owed or hereafter arising, and to the extent susceptible under applicable law, the Non-Operators hereby grant to the Operator a continuing security interest in and to all of its rights, titles, interests, claims, general intangibles, proceeds, and products thereof, whether now existing or hereafter acquired, in and to (a) all oil and gas produced from the lands covered by the Contract Area or attributable to the Contract Area when produced, (b) all accounts receivable accruing or arising as a result of the sale of such oil and gas (including, without limitation, accounts arising from gas imbalances or from the sale of oil and gas at the wellhead), (c) all cash or other proceeds from the sale of such oil and gas once produced, and (d) all platforms, wells, facilities, fixtures, other corporeal property, whether movable or immovable, whether now or hereafter placed on the property covered by the Contract Area or maintained or used in connection with the ownership, use, or exploitation of the Contract Area, and other surface and sub-surface equipment of any kind or character located on or attributable to the Contract Area, and the cash or other proceeds realized from any sale, transfer, disposition or conversion thereof.   The interest of the Non-Operators in and to the oil and gas produced from or attributable to the Contract Area when extracted and the accounts receivable accruing or arising as the result of the sale thereof shall be financed at the wellhead of the well or wells located on the Contract Area.  To the extent permissible under applicable law, the security interest granted by the Non-Operators hereunder covers (i) all substitutions, replacements, and accessions to the property of the Non-Operators described herein and is intended to cover all of the rights, titles, and interests of the Non-Operators in all movable property now or hereafter located upon or used in connection with the Contract Area, whether corporeal or incorporeal, (ii) all rights under any gas balancing agreement, farmout rights, option farmout rights, acreage and cash contributions, and conversion rights of the Non-Operators in connection with the Contract Area, or the oil and gas produced from or attributable to the Contract Area, whether now owned or existing or hereafter acquired or arising, including, without limitation, all interests of the Non-Operators in any partnership, tax partnership, limited partnership, association, joint venture, or other entity or enterprise that holds, owns, or controls any interest in the Contract Area, and (iii) all rights, claims, general intangibles, and proceeds, whether now existing or hereafter acquired, of the Non-Operators in and to the contracts, agreements, permits, licenses, rights-of-way, and similar rights and privileges that relate to or are appurtenant to any of the Contract Area, including the following:

2

(1) all rights, titles, and interests of the Non-Operators, whether now owned and existing or hereafter acquired or arising, in, to, and under or derived from any present or future operating, farmout, bidding, pooling, unitization, and communitization agreements, assignments, and subleases, whether or not described in Attachment "1," to the extent, and only to the extent, that such agreements, assignments, and subleases cover or include any of its rights, titles, and interests, whether now owned and existing or hereafter acquired or arising, in and to all or any portion of the Contract Area, and all units created by any such pooling, unitization, and communitization agreements, and all units formed under orders, regulations, rules, or other official acts of any governmental authority having jurisdiction, to the extent and only to the extent that such units cover or include all or any portion of the Contract Area;

(2) all rights, titles, and interests of the Non-Operators, whether now owned and existing or hereafter acquired or arising, in, to, and under or derived from all presently existing and future advance payment agreements, and oil, casinghead gas, and gas sales, exchange, and processing contracts and agreements, including, without limitation, those contracts and agreements that are described on Attachement "1" to the extent, and only to the extent, that those contracts and agreements cover or include all or any portion of the Contract Area; and

(3) all rights, titles, and interests of the Non-Operators, whether now owned and existing or hereafter acquired or arising, in, to, and under or derived from all existing and future permits, licenses, rights-of-way, and similar rights and privileges that relate to or are appurtenant to any of the Contract Area.

5.3 As applicable to the jurisdiction of operations under the Operating Agreement, this Memorandum (including a carbon, photographic, or other reproduction thereof and hereof) shall constitute a non-standard form of financing statement under the terms of Chapter 9 of the Louisiana Commercial Laws, La. R.S. 10:9-101 et seq. (the "Uniform Commercial Code," as adopted in the State of Louisiana) and, as such, for the purposes of the security interest in favor of the Operator, may be filed for record in the office of the Clerk of Court of any parish in the State of Louisiana and/or any county in the State of Texas, as applicable, with the Operator being the secured party and the Non-Operators being the debtors with respect to such filing.

5.4 The maximum amount for which the mortgage herein granted by the Non-Operators shall be deemed to secure the obligations and indebtedness of such Non-Operators to the Operator as stipulated herein is hereby fixed in an amount equal to Twenty-Five Million Dollars ($25,000,000.00) (the "Limit of the Mortgage of the Non-Operators"). Except as provided in the previous sentence (and then only to the extent such limitations are required by law), the entire amount of obligations and indebtedness of the Non-Operators to the Operator is secured hereby without limitation. Notwithstanding the foregoing Limit of the Mortgage of the Non-Operators, the liability of the Non-Operators under this Memorandum and the mortgage and security interest granted hereby shall be limited to (and the Operator shall not be entitled to enforce the same against the Non-Operators for, an amount exceeding) the actual obligations and

3

indebtedness (including all interest charges, Costs, attorneys' fees, and other charges provided for in this Memorandum or in the Operating Agreement) outstanding and unpaid and that are attributable to or charged against the interest of the Non-Operators pursuant to the Operating Agreement.

5.5    To secure the performance of and payment by the Operator of all obligations and indebtedness of the Operator pursuant to the Operating Agreement, whether now owed or hereafter arising, and to the extent susceptible under applicable law, the Operator hereby grants to the Non-Operators a mortgage, hypothec, and pledge of and over all of its rights, titles, and interests in and to (a) the Contract Area, (b) the oil and gas in, on, under, and that may be produced from the lands included within the Contract Area, and (c) all other immovable property susceptible of mortgage situated within the Contract Area.

5.6    To secure the performance of and payment by the Operator of all obligations and indebtedness of the Operator pursuant to the Operating Agreement, whether now owed or hereafter arising, and to the extent susceptible under applicable law, the Operator hereby grants to the Non-Operators a continuing security interest in and to all of its rights, titles, interests, claims, general intangibles, proceeds, and products thereof, whether now existing or hereafter acquired, in and to (a) all oil and gas produced from the lands covered by the Contract Area or attributable to the Contract Area when produced, (b) all accounts receivable accruing or arising as a result of the sale of such oil and gas (including, without limitation, accounts arising from gas imbalances or from the sale of oil and gas at the wellhead), (c) all cash or other proceeds from the sale of such oil and gas once produced, and (d) all platforms, wells, facilities, fixtures, other corporeal property, whether movable or immovable, whether now or hereafter placed on the property covered by the Contract Area or maintained or used in connection with the ownership, use or exploitation of the Contract Area, and other surface and sub-surface equipment of any kind or character located on or attributable to the Contract Area and the cash or other proceeds realized from any sale, transfer, disposition or conversion thereof.  The interest of the Operator in and to the oil and gas produced from or attributable to the Contract Area when extracted and the accounts receivable accruing or arising as the result of the sale thereof shall be financed at the wellhead of the well or wells located on the Contract Area.  To the extent permissible under applicable law, the security interest granted by the Operator hereunder covers (a) all substitutions, replacements, and accessions to the property of the Operator described herein and is intended to cover all of the rights, titles and interests of the Operator in all movable property now or hereafter located upon or used in connection with the Contract Area, whether corporeal or incorporeal, (b) all rights under any gas balancing agreement, farmout rights, option farmout rights, acreage and cash contributions, and conversion rights of the Operator in connection with the Contract Area, or the oil and gas produced from or attributable to the Contract Area, whether now owned or existing or hereafter acquired or arising, including, without limitation, all interests of the Operator in any partnership, tax partnership, limited partnership, association, joint venture, or other entity or enterprise that holds, owns, or controls any interest in the

4

Contract Area, and (c) all rights, claims, general intangibles, and proceeds of the Operator, whether now existing or hereafter acquired, in and to the contracts, agreements, permits, licenses, rights-of-way, and similar rights and privileges that relate to or are appurtenant to any of the Contract Area, including the following:

(i)     all rights, titles, and interests of the Operator, whether now owned and existing or hereafter acquired or arising, in, to, and under or derived from any present or future operating, farmout, bidding, pooling, unitization, and communitization agreements, assignments, and subleases, whether or not described in Attachment "1," to the extent, and only to the extent, that such agreements, assignments, and subleases cover or include any of its rights, titles, and interests, whether now owned and existing or hereafter acquired or arising, in and to all or any portion of the Contract Area, and all units created by any such pooling, unitization, and communitization agreements and all units formed under orders, regulations, rules, or other official acts of any governmental authority having jurisdiction, to the extent and only to the extent that such units cover or include all or any portion of the Contract Area;

(ii)    all rights, titles, and interests of the Operator, whether now owned and existing or hereafter acquired or arising, in, to, and under or derived from all presently existing and future advance payment agreements, and oil, casinghead gas, and gas sales, exchange, and processing contracts and agreements, including, without limitation, those contracts and agreements that are described on Attachment "1" to the extent, and only to the extent, that those contracts and agreements cover or include all or any portion of the Contract Area; and

(iii)   all rights, titles, and interests of the Operator, whether now owned and existing or hereafter acquired or arising, in, to, and under or derived from all existing and future permits, licenses, rights-of-way, and similar rights and privileges that relate to or are appurtenant to any of the Contract Area.

5.7     For the purposes of the security interest in favor of the Non-Operators, this Memorandum (including a carbon, photographic, or other reproduction thereof and hereof) may be filed as a non-standard form of financing statement pursuant to the Uniform Commercial Code in the office of the Clerk of Court of any parish in the State of Louisiana and/or any county in the State of Texas, as applicable, with the Non-Operators being the secured Party and the Operator being the debtor with respect to such filing.

5.8     The maximum amount for which the mortgage herein granted shall be deemed to secure the obligations and indebtedness of the Operator to the Non-Operators as stipulated herein is hereby fixed in an amount equal to Twenty-Five Million Dollars ($25,000,000.00) in the aggregate (the "Limit of the Mortgage of the Operator"), irrespective of the total number of Non-Operators party to the Operating Agreement at any time.  Except as provided in the previous sentence (and then only to the extent such limitations are required by law), the entire amount of obligations and indebtedness of the Operator to the Non-Operators is secured hereby without limitation.

5

Notwithstanding the foregoing Limit of the Mortgage of the Operator, the liability of the Operator under this Memorandum and the mortgage and security interest granted hereby shall be limited to (and the Non-Operators shall not be entitled to enforce the same against Operator for, an amount exceeding) the actual obligations and indebtedness (including all interest charges, Costs, attorneys' fees, and other charges provided for in this Memorandum or in the Operating Agreement) outstanding and unpaid and that are attributable to or charged against the interest of the Operator pursuant to the Operating Agreement.

6.0     As applicable to the jurisdiction of operations under the Operating Agreement, to serve as notice of the existence of the Operating Agreement as a burden on the title of the Operator and the Non-Operators to their interests in and to the Contract Area, and for purposes of satisfying otherwise relevant recording and filing requirements of applicable law, this Memorandum is to be filed or recorded, as the case may be, in (a) the conveyance records of the parish or parishes in which the lands included within the Contract Area are located or adjacent pursuant to La. R.S. 9:2731 et seq., and/or the conveyance records of the county or counties in which the lands included in the Contract Area or located or adjacent (b) the mortgage records of such parish or parishes and/or county or counties, and (c) the appropriate Uniform Commercial Code records. All parties to the Operating Agreement are identified on Attachment "1" hereto.

7.0     If performance of any obligation under the Operating Agreement or payment of any indebtedness created thereunder does not occur or is not made when due under the Operating Agreement or upon default of any covenant or condition of the Operating Agreement, in addition to any other remedy afforded by law, each Party to the Operating Agreement and any successor to such Party by assignment, operation of law, or otherwise, shall have, and is hereby given and vested with, the power and authority to foreclose the mortgage, pledge, and security interest established in its favor herein and in the Operating Agreement in the manner provided by law and to exercise all rights of a secured Party under the Uniform Commercial Code.  If the Non-Operators do not pay its indebtedness or perform its obligations under the Operating Agreement when due, the Operator shall have the additional right to notify the purchaser or purchasers of the Non-Operator's production and collect such indebtedness out of the proceeds from the sale of the Non-Operator's share of production until the amount owed has been paid. The Operator shall have the right to offset the amount owed against the proceeds from the sale of the Non-Operator's share of production.  Any purchaser of such production shall be entitled to rely on the Operator's statement concerning the amount of indebtedness owed by the Non-Operators and payment made to the Operator by any purchaser shall be binding and conclusive as between such purchaser and the Non-Operators.

8.0     Upon expiration of the Operating Agreement and the satisfaction of all obligations and indebtedness arising thereunder, the Operator, on behalf of all parties to the Operating Agreement, shall file of record an appropriate release and termination of all security and other rights created under the Operating Agreement and this Memorandum executed by all Parties to the Operating Agreement.  Upon the filing of such release and termination instrument, all benefits and obligations under this Memorandum shall terminate as to all Parties who have executed or ratified this Memorandum.  In addition, at any time prior to the filing of such

release and termination instrument, each of the Operator and the Non-Operators shall have the right to (i) file a continuation statement pursuant to the Uniform Commercial Code with respect to any financing statement filed in their favor under the terms of this Memorandum and (ii) reinscribe this act in the appropriate mortgage records.

9.0     It is understood and agreed by the Parties hereto that if any part, term, or provision of this Memorandum is held by the courts to be illegal or in conflict with any law of the state where made, the validity of the remaining portions or provisions shall not be affected, and the rights and obligations of the Parties shall be construed and enforced as if the Memorandum did not contain the particular part, term, or provision held to be invalid.

10.0    This Memorandum shall be binding upon and shall inure to the benefit of the Parties hereto and their respective legal representatives, successors and permitted assigns. The failure of one or more persons owning an interest in the Contract Area to execute this Memorandum shall not in any manner affect the validity of the Memorandum as to those persons who execute this Memorandum.

11.0    A party having an interest in the Contract Area may ratify this Memorandum by execution and delivery of an instrument of ratification, adopting and entering into this Memorandum, and such ratification shall have the same effect as if the ratifying party had executed this Memorandum or a counterpart thereof.  By execution or ratification of this Memorandum, such party hereby consents to its ratification and adoption by any party who acquires or may acquire any interest in the Contract Area.

12.0    This Memorandum may be executed or ratified in one or more counterparts and all of the executed or ratified counterparts shall together constitute one instrument.  For purposes of recording in each of the records described in Paragraph 6 above, duplicate copies of this Memorandum with individual signature pages attached thereto may be filed of record, one copy of each to be indexed in the name of the Operator, as grantor, and one copy of each to be indexed in the name of the Non-Operators, as grantor, and duplicate copies of this Memorandum with individual signature pages attached thereto may be filed in the appropriate Uniform Commercial Code records, one filing for the Operator, as secured Party, and another filing for the Non-Operators, as secured Party.  The respective addresses of the Operator, as both secured Party and debtor, and the Non-Operators, as both debtor and secured Party, at which information with respect to the security interests created in the Operating Agreement may be obtained, are set forth in Paragraph 1.0 of this Memorandum.

13.0    The Operator and the Non-Operators hereby agree to execute, acknowledge and deliver or cause to be executed, acknowledged and delivered, any instrument or take any action necessary or appropriate to effectuate the terms of the Operating Agreement or any Exhibit, instrument, certificate or other document pursuant thereto.

14.0    Whenever the context requires, reference herein made to the single number shall be understood to include the plural, and the plural shall likewise be understood to include the singular, and specific enumeration shall not exclude the general, but shall be construed as cumulative.

EXECUTED on the dates set forth below each signature but made effective as of _____ _, 20__.

**OPERATOR**:

WITNESSES:                                    [_____]

_____          By:_____

Printed Name: _____

_____

Printed Name: _____          Date:_____

**NON-OPERATORS**:

WITNESSES:                                    [_____]

_____          By:_____

Printed Name: _____

_____

Printed Name: _____          Date:_____

8

WITNESSES:                                    [_____]


_____            By:_____

Printed Name: _____

_____

Printed Name: _____            Date:_____


WITNESSES:                                    [_____]


_____            By:_____

Printed Name: _____

_____

Printed Name: _____            Date:_____


WITNESSES:                                    [_____]


_____            By:_____

Printed Name: _____

_____

Printed Name: _____            Date:_____


9

**ACKNOWLEDGMENT**

**THE STATE OF** _____  §
             §
**COUNTY OF** _____  §

   On this \_\_\_\_ day of _____, 20\_\_, before me appeared _____, to me personally known, who, being by me duly sworn, did say that she is the _____ of [_____], a [_____], and that said instrument was signed in behalf of said [_____] by authority of its [_____] and said appearer acknowledged said instrument to be the free act and deed of said [_____].

   In witness whereof, I have hereunto set my official hand and seal on the date hereinabove written.

           _____
           Notary Public in and for the State of Texas

**THE STATE OF** _____  §
             §
**COUNTY OF** _____  §

   On this \_\_\_\_ day of _____, 20\_\_, before me appeared _____, to me personally known, who, being by me duly sworn, did say that she is the _____ of [_____], a [_____], and that said instrument was signed in behalf of said [_____] by authority of its [_____] and said appearer acknowledged said instrument to be the free act and deed of said [_____].

   In witness whereof, I have hereunto set my official hand and seal on the date hereinabove written.

           _____
           Notary Public in and for the State of Texas

**THE STATE OF** _____  §
             §
**COUNTY OF** _____  §

   On this \_\_\_\_ day of _____, 20\_\_, before me appeared _____, to me personally known, who, being by me duly sworn, did say that she is the _____ of [_____], a [_____], and that said instrument was signed in behalf of said [_____] by authority of its [_____] and said appearer acknowledged said instrument to be the free act and deed of said [_____].

   In witness whereof, I have hereunto set my official hand and seal on the date hereinabove written.

           _____
           Notary Public in and for the State of Texas

#93828440v3
#93828440v5

**THE STATE OF _____** §
§
**COUNTY OF _____** §

On this _____ day of _____, 20__, before me appeared _____, to me personally known, who, being by me duly sworn, did say that she is the _____ of [_____], a [_____], and that said instrument was signed in behalf of said [_____] by authority of its [_____] and said appearer acknowledged said instrument to be the free act and deed of said [_____].

In witness whereof, I have hereunto set my official hand and seal on the date hereinabove written.

_____
Notary Public in and for the State of Texas

**THE STATE OF TEXAS** §
§
**COUNTY OF HARRIS** §

On this _____ day of _____, 20__, before me appeared_____, to me personally known, who, being by me duly sworn, did say that he is the _____ of [_____], a [_____], and that said instrument was signed in behalf of said [_____] by authority of its [_____] and said appearer acknowledged said instrument to be the free act and deed of said [_____].

In witness whereof, I have hereunto set my official hand and seal on the date hereinabove written.

_____
Notary Public in and for the State of Texas

11

**ATTACHMENT "1"**


Attached to and made a part of the Memorandum of Operating Agreement and Financing Statement by and between _____, as Operator, and _____, as Non-Operators

I.   <u>DESCRIPTION OF LANDS AND LEASES WITHIN THE "LEASE"</u>


II.  <u>OPERATOR</u>

     [_____]

III. <u>INTEREST OF THE PARTIES</u>

IV.  <u>NAMES AND ADDRESSES OF PARTIES FOR NOTIFICATION PURPOSES</u>


[_____]                        [_____]
[_____]                        [_____]
[_____]                        [_____]
Attention:                            Attention:
Phone:                                Phone:
Fax:                                  Fax:


[_____]                        [_____]
[_____]                        [_____]
[_____]                        [_____]
Attention:                            Attention:
Phone:                                Phone:
Fax:                                  Fax:


[_____]
[_____]
[_____]
Attention:
Phone:
Fax:

12

## **Exhibit 13**

**Assignment of Record Title in Federal OCS Oil and Gas Lease – Ship Shoal 175 OCS-G0550**

See attached.

Form 3000-3
(Aug 2018)

UNITED STATES
DEPARTMENT OF THE INTERIOR
BUREAU OF LAND MANAGEMENT
**ASSIGNMENT OF RECORD TITLE INTEREST IN A
LEASE FOR OIL AND GAS OR GEOTHERMAL RESOURCES**

Mineral Leasing Act of 1920 (30 U.S.C. 181 et seq.)
Act for Acquired Lands of 1947 (30 U.S.C. 351-359)
Geothermal Steam Act of 1970 (30 U.S.C. 1001-1025)
Department of the Interior Appropriations Act, Fiscal Year 1981 (42 U.S.C. 6508)

FORM APPROVED
OMB NO. 1004-0034
Expires: June 30, 2021

Lease Serial No.
OCS-G05550

Lease Effective Date
(Anniversary Date)
07/01/1983

New Serial No.

**Type or print plainly in ink and sign in ink.**

## PART A: ASSIGNMENT

1. Assignee*  Fieldwood Energy IV LLC
   Street  2000 W. Sam Houston Pkwy S, Suite 1200
   City, State, Zip Code Houston, Texas 77042

1a. Assignor  Chevron U.S.A. Inc.

*If more than one assignee, check here ☐ and list the name(s) and address(es) of all additional assignees on page 2 of this form or on a separate attached sheet of paper.

This record title assignment is for: *(Check one)*  ☑ Oil and Gas Lease, or  ☐ Geothermal Lease

Interest conveyed: *(Check one or both, as appropriate)*  ☑ Record Title,  ☐ Overriding Royalty, payment out of production or other similar interests or payments

2. This assignment conveys the following interest:

| Land Description | Percent of Interest | | | Percent of Overriding Royalty Similar Interests | |
|---|---|---|---|---|---|
| Additional space on page 2, if needed. Do not submit documents or agreements other than this form, such documents or agreements shall only be referenced herein. | Owned | Conveyed | Retained | Reserved | Previously reserved or conveyed |
| a | b | c | d | e | f |
| E1/2;N1/2NW1/4;SE1/4NW1/4;N1/2SW1/4NW1/4;S1/2SW1/4; NE1/4SW1/4 of Block 175, Ship Shoal Area (4531.25) | 100% | 100% | 0 | 0% | 0% |

## FOR BLM USE ONLY – DO NOT WRITE BELOW THIS LINE
UNITED STATES OF AMERICA

**This assignment is approved solely for administrative purposes. Approval does not warrant that either party to this assignment holds legal or equitable title to this lease.**

☐  Assignment approved for above described lands;

Assignment approved effective _____

☐  Assignment approved for attached land description

☐  Assignment approved for land description indicated on reverse of this form

By _____
   Bureau of Land Management (BLM)                    (Title)                    (Date)

Part A (Continued) ADDITIONAL SPACE for Names and addresses of additional assignees in Item No. 1, if needed, or for Land Description in Item 2, if needed.

## PART B – CERTIFICATION AND REQUEST FOR APPROVAL

1. The Assignor certifies as owner of an interest in the above designated lease that he/she hereby assigns to the above assignee(s) the rights specified above.

2. Assignee certifies as follows: (a) Assignee is a citizen of the United States; as association of such citizens; a municipality; or a corpora-tion organized under the laws of the United States or of any State or territory thereof. For the assignment of NPR-A leases, assignee is a citizen, national, or resident alien of the United States or associations of such citizens, nationals, resident aliens or private, public or municipal corporations; (b) Assignee is not considered a minor under the laws of the State in which the lands covered by this assign-ment are located; (c) Assignee's chargeable interests, direct and indirect, in each public domain and acquired lands separately in the same State, do not exceed 246,080 acres in oil and gas leases (of which up to 200,000 acres may be in oil and gas options), or 300,000 acres in leases in each leasing District in Alaska of which up to 200,000 acres may be in options, if this is an oil and gas lease issued in accordance with the Minerals Leasing Act of 1920, or 51,200 acres in any one State if this is a geothermal lease; (d) All parties holding an interest in the assignment are otherwise in compliance with the regulations (43 CFR Group 3100 or 3200) and the authorizing Acts; (e) Assignee is in compliance with reclamation requirements for all Federal oil and gas lease holdings as required by sec. 17(g) of the Mineral Leasing Act; and (f) Assignee is not in violation of sec. 41 of the Mineral Leasing Act.

3. Assignee's signature to this assignment constitutes acceptance of all applicable terms, conditions, stipulations and restrictions pertain-ing to the lease described herein.

For geothermal assignments, an overriding royalty may not be less than one-fourth (1/4) of one percent of the value of output, nor greater than 50 percent of the rate of royalty due to the United States when this assignment is added to all previously created overriding royalties (43 CFR 3241).

I certify that the statements made herein by me are true, complete, and correct to the best of my knowledge and belief and are made in good faith.

Executed this _____ day of _____ 20$^{21}$_____     Executed this _____ day of _____ 20$^{21}$_____

Name of Assignor  Chevron U.S.A. Inc.
_____
(Please type or print)

Assignor  _____     Assignee  _____
(Signature)                                                    (Signature)

R. G. Schneider    Assistant Secretary         _____
(Title)                                                       (Title)

or          _____     or          _____
Attorney-in-fact                                     Attorney-in-fact
(Signature)                                                    (Signature)

_____
(Assignor's Address)

_____   _____   _____
(City)              (State)     (Zip Code)

Title 18 U.S.C. Sec. 1001 makes it a crime for any person knowingly and willfully to make to any Department or agency of the United States any false, fictitious, or fraudulent statements or representations as to any matter within its jurisdiction.

(Continued on Page 3)                                                (Form 3000-3, Page 2)

## PART C – GENERAL INSTRUCTIONS

1. Assignor/Assignee must complete Parts A1 and A2 and Part B. All parties to assignment must sign as follows. The assignor(s) must manually sign 3 original copies and the assignee(s) must manually sign at least 1 of the 3 original copies. File three (3) completed copies of this form in the proper BLM office for each assignment of record title. For a transfer of overriding royalty interest, payment out of production or other similar interest or payment, file one (1) manually signed copy of this form. The required filing fee (nonrefundable) must accompany the assignment. File assignment within ninety (90) days after date of execution of assignor.

2. Separate form must be used for each lease being affected by this assignment and for each type of interest conveyed.

3. In Item No. 2 of Part A, describe lands affected (See 43 CFR 3106, 3135 or 3241). For columns b, c, d, and e, enter the interest expressed as a percentage of total interest in the lease, *e.g.*, if assign or assigns one quarter of a 20% interest, enter 20% in column b, 5% in column c, and 15% in column d.

4. If assignment is to more than one assignee, enter each assignee's name across columns d, e, and f next to the respective interest being conveyed. Also, list names and addresses of any additional assignee(s) on reverse of this form or on a separate attached sheet of paper.

5. If any payment out of production or similar interest, arrangements or payments have previously been created out of the interest being assigned, or if any such payments or interests are reserved under this assignment, include a statement giving full details as to amount, method of payment, and other pertinent terms as provided under 43 CFR 3106, 3135, or 3241.

6. The lease account must be in good standing before this assignment can be approved as provided under 43 CFR 3106 and 3241.

7. Assignment, if approved, takes effect on the first day of the month following the date of filing in the proper BLM office. If a bond is necessary it must be furnished prior to approval of the assignment.

8. Approval of assignment of record title to 100% of a portion of the leased lands creates separate leases of the retained and the assigned portions, but does not change the terms and conditions of the lease anniversary date for purposes of payment of annual rental.

9. Overriding royalty, payment out of production or other similar types of transfers must be filed with BLM, but will be accepted for record purpose only. No official approval will be given.

**NOTICES**

AUTHORITY: This information is solicited under the authority of 30 U.S.C. 181 et seq.; 30 U.S.C. 1001-1025; 42 U.S.C. 6508
PURPOSE: The primary purpose for collecting this information is to facilitate the timely processing of record title  assignments for oil and gas/geothermal resources leases.

ROUTINE USES: This information may be disclosed to agencies, organizations or persons for authorized purposes  as follows: (1) The adjudication of the assignee's rights to the land or resources.  (2) Documentation for public  information in support of notations made on land status, records for the management, disposal, and use of public  lands and resource.  (3) Transfer to appropriate Federal agencies when concurrence is required prior to granting a  right in public lands or resources. (4) Information from the record and/or the record will be transferred to  appropriate Federal, State, local or foreign agencies, when relevant to civil, criminal or regulatory investigations or  prosecutions.  Additional information on authorized routine uses may be found in the published system of records  notice, BLM-3, Mineral Lease Management—Interior, which may be viewed at  https://www.doi.gov/privacy/blm_notices

DISCLOSURE:  Furnishing the information on this form is voluntary, however, failure to provide all or part of the  requested information may result in the rejection of the assignment.  See regulations at 43 CFR Groups 3100 and  3200.

The Paperwork Reduction Act of 1995 requires us to inform you that:
The BLM collects this information to create and maintain a record of oil and gas/geothermal lease activity.

Response to this request is required to obtain a benefit.

The BLM would like you to know that you do not have to respond to this or any other Federal agency-sponsored  information collection unless it displays a currently valid OMB control number.

**BURDEN HOURS STATEMENT:** Public reporting burden for this form is estimated to average 30 minutes per  response including the time for reviewing instructions, gathering and maintaining data, and completing and  reviewing the form.  Direct comments regarding the burden estimate or any other aspect of this form to U.S.  Department of the Interior, Bureau of Land Management (1004-0034), Bureau Information Collection Clearance  Officer (WO-630), 1849 C Street, N.W., Room 2134LM, Washington, D. C. 20240.

## __Exhibit 14__

**Net Profits Interest Conveyance**

See attached.

*Exhibit 14 to the Implementation Agreement*

**CONVEYANCE OF**

**NET PROFITS OVERRIDING ROYALTY INTEREST**

**From**

**FIELDWOOD ENERGY IV LLC**

**as Grantor**

**to**

**FIELDWOOD IV DECOMMISSIONING ESCROW ACCOUNT**

**as NPI Owner**

**_____ __, 2021**

This document prepared by and when recorded return to:
[  ]

## CONVEYANCE OF NET PROFITS OVERRIDING ROYALTY INTEREST

THIS CONVEYANCE OF NET PROFITS OVERRIDING ROYALTY INTEREST (as from time to time supplemented or amended, this "Conveyance"), dated as of [_____] (the "Closing Date"), is made from and by Fieldwood Energy IV LLC, a Texas limited liability company (the "Grantor"), to and in favor of The Fieldwood IV Decommissioning Escrow Account, through U.S. Bank National Association as escrow agent (herein called "NPI Owner").

### RECITALS

WHEREAS, Fieldwood Energy IV LLC is a resulting entity of a divisive merger effected in connection with the confirmed plan of reorganization of Chapter 11 Case 20-33948, In re: Fieldwood Energy LLC et al., in the United States Bankruptcy Court for the Southern District of Texas, Houston Division (the "Plan");

WHEREAS, this Conveyance is granted in conjunction with the formation of Grantor by divisive merger upon confirmation of the Plan and in support of certain arrangements entered into in support of Grantor's decommissioning obligations from and after its formation, as set out under that certain Omnibus Agreement (as defined below).

NOW, THEREFORE, in consideration of the premises, the agreements and mutual covenants contained herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

### ARTICLE I

### DEFINED TERMS

Section 1.1.   Defined Terms.   When used in this Conveyance or in any exhibit or schedule hereto (unless otherwise defined in any such exhibit or schedule), the following terms have the respective meanings assigned to them in this section or in the sections, subsections, exhibits and schedules referred to below:

"Act" has the meaning ascribed to such term in Section 7.6(a).

"Affiliate" means, with respect to any Person, any other Person that, directly or indirectly, controls, is controlled by or is under common control with, such specified Person through one or more intermediaries or otherwise.  For the purposes of this definition, "control" means, where used with respect to any Person, the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities, by contract or otherwise, and the terms "controlling" and "controlled" have correlative meanings.

"Applicable JOA" means any joint operating agreement applicable to any part of the Subject Interests.

"Application Date" means, with respect to Net Profits attributable to Subject Hydrocarbons produced, saved and sold during any Production Period, the last Business Day of the Month following such Production Period; provided that the Application Date with regard to the Production Periods during the period of time beginning on the Effective Time until the end of the Month following the Month in which the Closing Date occurs shall be deemed to occur ninety (90) days after the Closing Date.

"Business Day" means any day that is not a Saturday, Sunday or legal holiday in the State of Texas and that is not otherwise a federal holiday in the United States.

"Claim" has the meaning ascribed to such term in Section 7.6(c).

"Closing" means the time on the Closing Date at which Grantor is allocated or otherwise receives the Subject Interests in accordance with the transactions contemplated by the Omnibus Agreement.

"Closing Date" has the meaning ascribed to such term in the preamble.

"Conveyance" has the meaning ascribed to such term in the preamble.

"Contract Operating Agreement" means that certain Contract Operating Agreement, dated [____], between Grantor and Mako Buyer LLC.

"CPR" has the meaning ascribed to such term in Section 7.6(e).

"CUSA" means Chevron U.S.A Inc.

"Debited Taxes" means all Taxes incurred, accrued or paid by Grantor with respect to the ownership of the Subject Interests or the extraction of the Subject Hydrocarbons after the Effective Time, including (a) production, severance, excise and other similar Taxes assessed against, and/or measured by, the production of Subject Hydrocarbons, (b) occupation Taxes, (c) sales and use taxes, (d) ad valorem Taxes assessed against or attributable to the Subject Interests or the Non-Processing Equipment and (e) any extraordinary or windfall profits Taxes that may be assessed in the future based upon profits realized or prices received from the sale of Subject Hydrocarbons.

"Decommissioning Obligations" has the meaning attributed thereto in the Omnibus Agreement.

"Effective Time" means 7:00 a.m. local time at the locations of the Subject Interests on [____].

"Environmental Laws" has the meaning attributed thereto in the Omnibus Agreement.

"Equipment" means all equipment and machinery (including well equipment and machinery), platforms, facilities, buildings, fixtures, and other tangible personal property and improvements owned by Grantor and used or held for use by Grantor in connection with the operation of the Subject Interests or the production of Subject Hydrocarbons.

"Escrow Account" means that certain escrow account established pursuant to the Escrow Agreement and called the "Decommissioning Escrow Account" under the Omnibus Agreement.

"Escrow Agreement" means that certain escrow agreement governing the FWE IV Escrow Account, dated [_____] by and between Grantor, CUSA, and U.S. Bank National Association, as escrow agent, and called the "Decommissioning Escrow Agreement" under the Omnibus Agreement.

"Fixed Rate" means, for any day, the lesser of (i) the rate of six percent (6%) per annum and (ii) the maximum rate of interest permitted to be charged pursuant to this Conveyance under applicable Law.

"Governmental Authority" has the meaning attributed thereto in the Omnibus Agreement.

"Gross Proceeds" has the meaning ascribed to such term in Section 3.2.

"Hydrocarbons" means all of the oil, liquid hydrocarbons, gas, and any and all other liquid or gaseous hydrocarbons, as well as their respective constituent products (including condensate, casinghead gas, distillate and natural gas liquids), and, to the extent useful for the exploration for and production of the foregoing, any other minerals produced in association therewith (including, elemental sulfur, helium, carbon dioxide and other non-hydrocarbon substances produced in association with any of the above-described items).

"Law" has the meaning attributed thereto in the Omnibus Agreement.

"Lease" means (i) as of the Closing Date, an oil, gas and/or mineral lease described in Exhibit A hereto, together with (ii) any renewal, amendment, ratification, or extension of any such Subject Interest that is to be subject to this Agreement pursuant to Section 2.4.

"Losses" has the meaning ascribed to such term in Section 7.9(b).

"Manufacturing Costs" shall mean the costs of Processing any Subject Hydrocarbons, which shall be equivalent to (i) for Processing of any Subject Hydrocarbons performed by a Non-Affiliate, the actual costs charged by such Non-Affiliate and paid by Grantor for such Processing (or debited with respect to revenue from such Subject Hydrocarbons actually received by Grantor for such Processing), or (ii) for any other Processing of Subject Hydrocarbons, the actual costs incurred by Grantor or its Affiliate and paid to a Non-Affiliate (or debited from revenue attributable to) for Processing.

"Month" means the period between 7:00 a.m. (local time, at the location of each Subject Interest) on the first day of each calendar month and 7:00 a.m. on the first day of the next succeeding calendar month.

"Monthly Statement" has the meaning ascribed to such term in Section 3.6.

"Net Deficit" has the meaning ascribed to such term in Section 3.5(c).

"Net Profit" has the meaning ascribed to such term in Section 3.5(b).

"Net Profits Account" has the meaning ascribed to such term in Section 3.1.

"Non-Affiliate" means any Person that is not a Related Person.

"Non-Processing Equipment" means all fixtures, equipment and supplies (other than any of the same used in Processing) located on or used in connection with production from any of the Subject Interests.

"Non-Qualified Expenditures" means any amount attributable to any costs and expenses that are paid or incurred (i) in connection with paying, performing, discharging or otherwise satisfying any Decommissioning Obligations, or (ii) in connection with operations other than Permitted Operations.

"Notice" has the meaning ascribed to such term in Section 7.8.

"NPI" has the meaning ascribed to such term in Section 2.1.

"NPI Owner Indemnitees" has the meaning ascribed to such term in Section 7.9(a).

"NPI Payment" has the meaning ascribed to such term in Section 3.5(b).

"NPI Percentage" means an undivided one hundred percent (100%).

"Omnibus Agreement" means that certain Omnibus Agreement, dated [_____], between Grantor. CUSA and Mako Buyer LLC.

"Parties" means Grantor and NPI Owner and each, a "Party".

"Permitted Operations" has the meaning attributed thereto in the Contract Operating Agreement.

"Person" means an individual, partnership, corporation, limited liability company, association, trust, unincorporated organization, or a government or agency or political subdivision thereof.

"Processing" or "Processed" means to process, manufacture, fractionate or refine Subject Hydrocarbons, but does not mean or include the use of lease or well equipment (such as dehydrators, gas treating facilities, separators, heater-treaters, lease compression facilities, injection or recycling equipment, tank batteries, field gathering systems, pipelines and equipment and so forth) for treating or conditioning Hydrocarbons or other normal operations on any of the Subject Interests.

"Production Period" means each Month in which Subject Hydrocarbons are produced and saved from the Subject Interests.  Except as otherwise provided herein, for purposes of this Conveyance, the first Production Period shall begin at the Effective Time.

"Reasonably Prudent Operator" means an operational standard requiring an operator to maintain and exercise a degree of skill and judgment, and the utilization of practices, methods,

techniques and standards, that are generally expected of a skilled and experienced operator engaged in work similar in nature which shall at a minimum require operations be conducted (a) in a good and workmanlike manner, (b) with due diligence and dispatch, (c) in accordance with good oilfield practices, and (d) in compliance with all applicable Laws, licenses, authorizations and permits.

"Reimbursable Expenses" means all costs and expenses paid or incurred by or on behalf of NPI Owner or its Affiliates which are related to:  (a) the enforcement or termination of the NPI, this Conveyance, or any waivers or amendments hereto or thereto, or (b) any litigation, contest, release or discharge of any adverse claim or demand made or proceeding instituted by any Person affecting in any manner whatsoever the NPI, this Conveyance, the enforcement or defense hereof or thereof, or the defense of NPI Owner's and its Affiliates' exercise of their rights hereunder or thereunder.  Included among the Reimbursable Expenses are, in each case to the extent paid or incurred by NPI Owner or its Affiliates: (i) all recording and filing fees and (ii) all costs of NPI Owner in exercising any of its remedies hereunder.

"Related Person" means Fieldwood Energy I LLC, Fieldwood Energy III LLC, Fieldwood Energy IV LLC, Fieldwood Energy LLC or Mako Buyer LLC or any Affiliate of any such Person.

"Subject Hydrocarbons" means the Hydrocarbons in and under Subject Lands that may be produced after the Effective Time from (or, to the extent pooled or unitized, allocated to) the Subject Lands that are attributable to the Subject Interests.

"Subject Interests" means:

(a)     upon consummation of the Closing, all of Grantor's right, title and interest in and to the leasehold interests and other property interests described in Exhibit A attached hereto;

(b)     without limitation of the foregoing, all other right, title and interest (of whatever kind or character, whether legal or equitable and whether vested or contingent) of Grantor (whether in the form of a record title interest or interest in operating rights or contractual working interests) as of the Closing in and to the Hydrocarbons in and under or that may be produced from any Subject Lands (including interests in oil, gas or mineral leases to the extent the same cover such lands, overriding royalties, production payments and net profits interests in such lands or such leases, and fee mineral interests, fee royalty interests and other interests in such oil, gas and other minerals) even though Grantor's interest in such oil, gas and other minerals may be incorrectly described in, or omitted from, Exhibit A; and

(c)     all rights, titles and interests of Grantor in and to, or otherwise derived from, all presently existing and valid oil, gas or mineral unitization, pooling, or communitization agreements, declarations or orders and in and to the properties covered and the units created thereby (including all units formed under orders, rules, regulations, or other official acts of any federal, state, or other authority having jurisdiction, voluntary unitization agreements, designations or declarations, and so-called "working interest units" created under operating agreements or otherwise) relating to the interests described in clauses (a) and (b) of this definition,

in each case, as any of the foregoing may be enlarged from time to time by the discharge of any burdens or by the removal of any charges or encumbrances to which any of the foregoing may be

subject as of the date hereof, and any and all renewals and extensions of any of the same pursuant to Section 2.4. For purposes of clarity, it is expressly understood and agreed that the term "Subject Interests", as used in this Conveyance, shall mean gross interests before any deductions, charges or encumbrances. The Subject Interests shall not include additional interests acquired by Grantor from a third party from and after the Closing Date, including additional interests acquired by Grantor in the Leases that comprise the Subject Interests, unless such interests are expressly added to this Conveyance by qualifying amendment.

"Subject Lands" means all of the tracts of land described in Exhibit A and all lands subject to each Lease, unit or other property interest that is described in Exhibit A, in each case, as to all depths.

"Subject Wells" means all wells now located on the Subject Lands (whether fully drilled and completed or not) or hereafter drilled on the Subject Lands, and any other wells now or hereafter located on lands or leases pooled, communitized or unitized with the Subject Interests, including any wells identified on Exhibit A.

"Taxes" means all ad valorem, property, gathering, transportation, pipeline regulating, severance, production, excise, heating content, carbon, environmental, occupation, sales, use, value added, fuel, and other taxes and governmental charges and assessments imposed on or as a result of all or any part of the Subject Interests, the Subject Hydrocarbons or the proceeds thereof, or the NPI, regardless of the point at which or the manner in which or the Person against whom such taxes, charges, or assessments are charged, collected, levied, or otherwise imposed. Any estimated taxes, deficiency assessments, additions to tax, interest, penalties, and withholding obligations owing to Governmental Authorities with respect to any Taxes shall also constitute Taxes. The only taxes which are not Taxes for purposes hereof are federal and state income taxes, state franchise taxes, state margin taxes, and any penalty or interest surcharges thereon.

"Turnkey Removal Agreement" means that certain Turnkey Removal Agreement, dated [_____], between Grantor, CUSA and Mako Buyer LLC.

Section 1.2.   Rules of Construction.   All references in this Conveyance to articles, sections, subsections and other subdivisions refer to corresponding articles, sections, subsections and other subdivisions of this Conveyance unless expressly provided otherwise. Titles appearing at the beginning of any of such subdivisions are for convenience only and shall not constitute part of such subdivisions and shall be disregarded in construing the language contained in such subdivisions. The words "this Conveyance", "this instrument", "herein", "hereof", "hereunder" and words of similar import refer to this Conveyance as a whole and not to any particular subdivision unless expressly so limited. Unless the context otherwise requires: "including" and its grammatical variations mean "including without limitation"; "of" is not exclusive; words in the singular form shall be construed to include the plural and vice versa; words in any gender include all other genders; references herein to any instrument or agreement refer to such instrument or agreement as it may be from time to time amended or supplemented; and references herein to any Person include such Person's successors and assigns. All references in this Conveyance to exhibits and schedules refer to exhibits and schedules to this Conveyance unless expressly provided otherwise, and all such exhibits and schedules are hereby incorporated herein by reference and made a part hereof for all purposes. Any reference to a Law includes any amendment or

modification to such Law, and all regulations, rulings, and other Laws promulgated under such Law.

## ARTICLE II
## GRANTING PROVISIONS

Section 2.1.    <u>Granting Clause</u>.    For and in consideration of good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Grantor does hereby GRANT, BARGAIN, SELL, TRANSFER, ASSIGN, CONVEY, WARRANT and DELIVER to NPI Owner a net profits overriding royalty interest in and to the Subject Interests and in and to the Subject Hydrocarbons in and under the Subject Interests and that may be produced and saved from (or otherwise allocable to) each Subject Interest that is equal to (and measured by) the NPI Percentage of the Net Profits, as determined by and calculated in accordance with the terms of <u>Article III</u>, of the Subject Hydrocarbons that may be produced and saved from (or otherwise allocable to) the Subject Interests, together with all and singular the rights and appurtenances thereto in anywise belonging (the "<u>NPI</u>"), all as more fully discussed and subject to the terms provided below.

TO HAVE AND TO HOLD the NPI unto NPI Owner, its successors and assigns, forever. Grantor will pay and account to NPI Owner the NPI as provided herein.

Section 2.2.    <u>Non-Operating, Limited Cost-Bearing Interest</u>.  The NPI is a non-operating, limited expense-bearing net profits overriding royalty interest in and to the Subject Interests, free of all cost, risk, and expense of exploration, development, plugging and abandonment of the Subject Interests or the Subject Hydrocarbons.  Except as described in <u>Section 3.3(c)</u>, the NPI shall be free and clear of (and without deduction therefrom of), and Grantor shall bear and pay, all Taxes (other than Debited Taxes) with respect to the NPI and the Subject Hydrocarbons imposed on NPI Owner.  Without limitation of the foregoing, Grantor will promptly (and in any event within thirty (30) days after receiving any notice or statement for the same) pay all Reimbursable Expenses which have been incurred and are unpaid and will reimburse NPI Owner for any Reimbursable Expenses, and for any other amounts that Grantor is obligated to pay hereunder, which have nonetheless been paid by or on behalf of NPI Owner.  Each amount that is to be paid by Grantor pursuant to this Conveyance which is instead paid by or on behalf of NPI Owner shall bear interest at the Fixed Rate on each day from and including the date of such payment until but not including the date repaid by Grantor  This Conveyance is an absolute conveyance of a presently vested interest in real and/or immovable property and, in the State of Louisiana, an immovable right, causing title to the NPI to be vested in NPI Owner as of the Effective Time.

Section 2.3.    <u>No Proportionate Reduction</u>.  It is understood and agreed that, although the NPI is conveyed by Grantor to NPI Owner out of the Subject Interests, the NPI shall be determined based on all of Grantor's right, title and interest in and to the Subject Interests as of the Closing.

Section 2.4.    <u>Renewals and Extensions</u>.  Grantor shall have the unrestricted right to renew, extend, modify or amend the Leases with respect to any of the Subject Lands covered thereby without the consent of NPI Owner.  This Conveyance and the NPI shall apply to Grantor's and its Affiliates' interests in all renewals, extensions, modifications and amendments of each lease (or other determinable interest) which is included in the Subject Interests, whether such

-7-

renewals, extensions, modifications and amendments have heretofore been obtained by Grantor or are hereafter obtained by or for Grantor or any Affiliate thereof and whether or not the same are described in Exhibit A; provided that any fees, costs and expenses actually paid by Grantor with respect to such renewal, extension, modification and amendment may be debited to the Net Profits Account.  For the purposes of the preceding sentence, only a new lease or other determinable property interest that covers the same interest (or any part thereof) covered by a prior lease or property interest, and which is acquired within twelve (12) months after the expiration, termination, or release of such prior lease or property interest, shall be treated as a renewal or extension of such prior lease or property interest.

Section 2.5.    Termination of a Subject Interest.  In the event any particular Subject Interest (or portion thereof, as applicable) should by its terms terminate and not be extended, renewed, or replaced, the NPI shall no longer apply to that particular Subject Interest (or such portion thereof, as applicable), but the NPI shall remain in full force and effect and undiminished as to all remaining Subject Interests, if any, (and the remaining portion of such Subject Interest, as applicable); provided, however, that, notwithstanding such termination, any costs and expenses attributable to such Subject Interest (or portion thereof, as applicable) that are otherwise eligible to be debited from the Net Profits Account shall continue to be debited pursuant to the provisions of Article III.

Section 2.6.    Pooling, Communitization and Unitization.  Grantor shall have the right and power to unitize, communitize or pool, on a voluntary basis, any portion or portions of the Subject Interests without the express written consent of NPI Owner.  Notwithstanding the foregoing, if pursuant to any such voluntary pooling or unitization or any Law or order of any Governmental Authority, any portion of the Subject Interests is pooled, communitized or unitized in any manner, the NPI shall apply to the production which is attributable to such portion of the Subject Interests under and by virtue of such pooling, communitization and unitization arrangements (as if such unit or property interest and the interest of Grantor therein were specifically described in Exhibit A). NPI Owner shall, at Grantor's sole cost and expense, cooperate in good faith to prepare and execute any documents reasonably necessary to accomplish the purposes of this Section 2.6.

## ARTICLE III
## ESTABLISHMENT OF NET PROFITS ACCOUNT

Section 3.1.    Establishment.  Grantor shall establish on its books and maintain a net profits account (herein called the "Net Profits Account") in accordance with sound, accurate and comprehensive accounting practices and consistent with the various provisions of this Conveyance and shall at all times keep true and correct books and records with respect thereto.

Section 3.2.    Credits.  Except as otherwise provided herein, the Net Profits Account shall be credited (without duplication herein) with the following gross revenue actually received by (or credited to Grantor if credited by a Related Person) from the sale or other disposition of Subject Hydrocarbons produced from and after the Effective Time, in each case as of the date the corresponding proceeds for Subject Hydrocarbons are actually received by Grantor (the "Gross Proceeds").  The amount of Gross Proceeds to be credited to the Net Profits Account with respect to any sale or disposition of Subject Hydrocarbons shall be subject to the following:

(a)     Gross Proceeds shall include all consideration and other amounts actually received by (or credited to Grantor if credited by a Related Person) attributable to the sale or other disposition of Subject Hydrocarbons, including any amounts actually received by (or credited to Grantor if credited by a Related Person) attributable to overriding royalty or other royalty interest that is part of the Subject Interests and owned by Grantor;

(b)     If any Non-Affiliate withholds or delays payment of proceeds of Subject Hydrocarbons for any reason (other than at the request of Grantor), such proceeds shall not be considered to be Gross Proceeds until such proceeds are actually paid and received by Grantor (provided that if any interest or penalty is also paid in connection therewith, such interest or penalty shall be deemed proceeds of Subject Hydrocarbons), and provided further that if a Related Person withholds or delays payment of proceeds of Subject Hydrocarbons for any reason, such proceeds shall be considered to be Gross Proceeds relating to the applicable Production Period;

(c)     If any Subject Hydrocarbons are Processed before sale, the amount of Gross Proceeds credited to the Net Profits Account for such Subject Hydrocarbons shall be the amount actually received from the sale of such Subject Hydrocarbons less the Manufacturing Costs; and

(d)     Gross Proceeds shall not include any amounts that are to be applied as reductions to debits pursuant to Section 3.4.

Section 3.3.     Debits.  Except as otherwise provided herein, the Net Profits Account shall be debited (without duplication herein or any duplication resulting from any charges under the COPAS accounting procedures attached to any Applicable JOA) with the following costs and expenses to the extent (i) such costs and expenses are properly allocable to the Subject Interests and incurred during the period from and after the Effective Time, (ii) such costs and expenses are actually paid by Grantor from and after the Effective Time, and (iii) to the extent and only to the extent such costs and expenses were incurred in conjunction with or otherwise relate to Permitted Operations:

(a)     All costs and expenses for Permitted Operations and for reasonable general, administrative or overhead charges, to the extent such charges are permitted under the COPAS accounting procedures attached to any Applicable JOA;

(b)     All Debited Taxes;

(c)     The portion of any insurance costs paid by Grantor attributable to the ownership or operation of the Subject Interests;

(d)     All amounts attributable to any Subject Interest consisting of royalties, overriding royalties, production payments, rentals, shut-in well royalties, minimum royalties and similar payments and burdens that are payable with respect to periods after the Effective Time and are payable to Non-Affiliate;

(e)     All direct costs and charges attributable to the Subject Interests that are paid by Grantor to a Non-Affiliate operator with respect to periods after the Effective Time under an Applicable JOA (and all exhibits attached thereto including the COPAS accounting procedures) governing the relevant Subject Interests;

      (f)      All (i) costs and expenses of litigation, proceedings, collections, liens, judgments, liabilities and claims incurred and paid by Grantor allocable to the Subject Interests or Subject Hydrocarbons and (ii) payment of judgments, penalties and other liabilities (including interest thereon), incurred by Grantor (and not paid or reimbursed under insurance maintained by Grantor or others) and involving any of the Subject Interests, or incident to the development, operation or maintenance of the Subject Interests from and after the Effective Time, or requiring the payment or restitution of any proceeds of Subject Hydrocarbons;

      (g)      If as a result of the occurrence of the bankruptcy or insolvency or similar occurrence of the purchaser of Subject Hydrocarbons any amounts previously included in Gross Proceeds are reclaimed from Grantor or its representative, then the amounts reclaimed as promptly as practicable following Grantor's payment thereof; and

      (h)      All costs, expenses and liabilities incurred by Grantor in maintaining, renewing or extending any of the Leases or maintaining or increasing production on such Lease.

Notwithstanding the foregoing provisions of this <u>Section 3.3</u> or anything else to the contrary contained in this Conveyance, the amounts debited to the Net Profits Account shall not include any of the following:

      (i)      Non-Qualified Expenditures.

      (ii)      Any amount otherwise able to be debited which has also reduced the amount of the Subject Hydrocarbons or Gross Proceeds (including, by way of example, royalties and overriding royalties not included in Subject Hydrocarbons and production, severance, and other Taxes (other than penalties or interest) withheld and not included in Gross Proceeds).

      (iii)      Any overriding royalty, production payment or other charge burdening the Subject Interests which is created by Grantor after the Effective Time.

      (iv)      Any expenses and any penalties, interests or other similar charges which result from the failure of Grantor to properly discharge all costs and expenses (including Taxes) of operating, producing and maintaining the Subject Interests as a Reasonably Prudent Operator.

      (v)      Any interest, premiums, fees or similar charges arising out of borrowings, bonds, letters of credit or other credit support or purchases of any goods, equipment or other items on credit, whether or not used on or otherwise related to the Subject Interests.

      (vi)      Any general, administrative or overhead costs paid or incurred by Grantor or its Affiliates, except for any of such costs permitted under <u>Sections 3.3(a)</u>.

      (vii)      Any amounts paid by Grantor (A) for the acquisition of any new Lease, including any bonus or similar payment or (B) to any of Grantor's predecessors in interest with respect to the acquisition of the Subject Interests (including any purchase price or other consideration paid by Grantor to any such predecessor in interest to acquire all or part of the Subject Interests).

(viii)   Any expenses, expenditures or other amounts accrued prior to the Effective Time, even if paid after the Effective Time, unless agreed to by Grantor and CUSA in writing.

(ix)   Any costs or expenses paid or incurred to pay, perform, discharge or otherwise satisfy Decommissioning Obligations.

Section 3.4.   <u>Reduction of Debits</u>.  The debits to the Net Profits Account provided for in <u>Section 3.3</u> and elsewhere in this Conveyance shall be reduced after the Effective Time by the following to the extent actually received by or credited to Grantor and to the extent applicable to the Subject Interests:

(a)   The gross proceeds attributable to Subject Interests which are received by Grantor from the sale of (or, if disposed of by Grantor other than by sale, the then current market value of) any materials, supplies, equipment and other personal property or fixtures located on or used in connection with the Subject Interests (including all amounts attributable thereto which are received by Grantor by way of conformance of investment in personal property and equipment if the Subject Interests or any part or parts thereof are hereafter unitized).

(b)   The gross proceeds of all insurance payments collected by Grantor (i) if the cost of the related policy is chargeable to the Net Profits Account, directly or indirectly, or (ii) for loss of or damage to any of the Subject Interests, any Subject Hydrocarbons, or any materials, supplies, equipment or other personal property or fixtures located on or used in connection with any of the Subject Interests.

(c)   The proceeds of all judgments and settlements (net of legal fees and expenses) collected by Grantor for loss of or damage to any of the Subject Interests or any part thereof or interest therein, any Subject Hydrocarbons, or any materials, supplies, equipment or other personal property or fixtures, or any part thereof or interest therein, located on or used in connection with any of the Subject Interests.

(d)   Any Prior Period Debit Reduction.

Section 3.5.   <u>Accounting</u>.

(a)   By the end of the second Month after each Production Period, a calculation of Net Profits or Net Deficit shall then be made by Grantor with respect to the NPI for such Production Period by deducting (i) the result of (A) the total debits properly made to the Net Profits Account during such Production Period pursuant to <u>Section 3.3</u>, *plus* (B) the Net Deficit carried forward from the prior Production Period (as determined under <u>Section 3.5)(c)</u>), if any, *minus* (C) the total debit reductions properly made to the Net Profits Account during such Production Period pursuant to <u>Section 3.4</u>; *from* (ii) the results of (A) total credits properly made to the Net Profits Account for Subject Hydrocarbons produced during such Production Period pursuant to <u>Section 3.2</u>, *plus* (B) total credits properly made to the Net Profits Account total credits for Subject Hydrocarbons produced during any prior Production Period, to the extent the applicable credit was not actually received by or credited to Grantor until after the Application Date for such prior Production Period or was not otherwise allocated to the Net Profits Account for a prior Production Period; provided that if the result of the calculation under (i) is a negative number, then the absolute value of such

-11-

amount shall be deemed a "Prior Period Debit Reduction" and carried forward into the next Production Period under Section 3.4.

(b)     If the computation made in accordance with Section 3.5(a) results in a positive amount with respect to a Production Period (the "Net Profits"), then (i) that positive amount shall be subtracted from the balance of the Net Profits Account to cause the Net Profits Account to have a zero balance immediately following the end of such Production Period, (ii) that positive amount shall be multiplied by the NPI Percentage to determine the NPI payable with respect to such Production Period, and (iii) the product resulting from the calculations in (ii) above shall be payable to NPI Owner, as specified in Section 4.1 (the "NPI Payment").

(c)     If the computation made in accordance with Section 3.5(a) results in a negative amount with respect to a Production Period, the negative sum shall be deemed the "Net Deficit." Any Net Deficit shall be carried forward as a debit to the Net Profits Account for the following Production Period. If there is a Net Deficit with respect to the Net Profits Account at the end of any Production Period, no payments shall be made to NPI Owner in respect of the NPI. For the avoidance of doubt, NPI Owner shall never be liable to make any payment to Grantor in respect of the Net Deficit.

Section 3.6.   Monthly Statements.   On or before the last day of the second Month following each Production Period, beginning with the first Production Period after the Closing Date, Grantor shall furnish to NPI Owner a detailed statement (a "Monthly Statement") (a) identifying the balance (if any) of the Net Profits Account as of the close of business on the last day of the preceding Production Period, (b) identifying (with sufficient description so that NPI Owner can identify such items and the particular Subject Interest involved) those items which gave rise to debits and credits to the Net Profits Account during such Production Period and (c) identifying, with respect to each Subject Interest, the volumes of Subject Hydrocarbons both produced and sold therefrom during the Production Period covered by such Monthly Statement, the prices at which such volumes were sold, and the Taxes paid with respect to such sales. Any Net Deficit reflected by any Monthly Statement shall be carried forward and used in the calculation of Net Profits Account for the next and succeeding Production Periods until such Net Deficit has been eliminated and liquidated. As more particularly described in Section 3.5(b), NPI Payments shall be made to NPI Owner in accordance with Section 4.1 when a Net Profit is reflected by any Monthly Statement.

Section 3.7.   Overpayments.   If at any time Grantor pays NPI Owner more than the amount then due with respect to the NPI to NPI Owner, NPI Owner shall not be obligated to return any such overpayment to Grantor, but the amount or amounts otherwise payable for any subsequent period or periods shall be reduced by such overpayment, unless such overpayment is disputed by NPI Owner, in which case Grantor shall not reduce any future payment by the amount of the disputed overpayment until such dispute is resolved.

Section 3.8.   Past Due Payments.   Any amount not paid by Grantor to NPI Owner with respect to the NPI when due shall bear, and Grantor hereby agrees to pay, interest at a rate equal to the Fixed Rate, from the due date until such amount has been paid.

**ARTICLE IV**
**PAYMENTS; MARKETING; AUDIT AND INSPECTION RIGHTS**

Section 4.1.    NPI Payments.   Grantor shall pay to NPI Owner the NPI Payment attributable to each Production Period in immediately available U.S. funds on or before the Application Date for such Production Period.  NPI Owner and Grantor agree that all NPI Payments or other payments required to be made to NPI Owner hereunder shall be paid via wire transfer, or other agreed means, of immediately available funds to the Escrow Account and NPI Owner agrees that all funds in the Escrow Account will be used in accordance with the terms of the Omnibus Agreement and the Escrow Agreement without any further notice, consent or action to or from NPI Owner.

Section 4.2.    Nature of Marketing Arrangements.   Grantor shall have the obligation to prudently market, or cause to be prudently marketed, the Subject Hydrocarbons in arm's-length transactions with reputable purchasers who are not Affiliates.  Grantor shall duly and prudently perform all obligations performable by it under any arrangements by which Subject Hydrocarbons are sold or otherwise marketed, and shall take all appropriate measures to enforce the performance under each such arrangement of the obligations of the other parties thereto.

Section 4.3.    Audit and Inspection Rights.   NPI Owner shall have the right from time to time to audit the books and records of Grantor with respect to the Subject Interests and the Subject Hydrocarbons, including all information with respect to the matters to be reported on by Grantor as provided herein, and Grantor shall, within thirty (30) days after being invoiced therefor, pay (or reimburse NPI Owner for) the costs and expenses of one (but no more than one) such audit during each calendar year.  Such audits shall be conducted by NPI Owner so as to result in a minimum disruption in the ongoing business and affairs of Grantor and shall be conducted during normal business hours at Grantor's offices or at the offices where Grantor maintains the records relating to the items set forth above.  If, as a result of any such audit, it is determined that any amount is due NPI Owner as a result of the failure of Grantor to properly pay the full amount of any NPI Payment that is required to be made hereunder, Grantor shall pay NPI Owner the value (as reasonably determined by NPI Owner) of the proceeds which Grantor failed to remit, together with interest at the Fixed Rate from the date that such amount should have been delivered or paid in accordance with the terms of this Conveyance to the date of payment.  If, as a result of any such audit, it is determined that any amount is due Grantor as a result of overpayment by Grantor, such overpayment shall be resolved in accordance with Section 3.7.

**ARTICLE V**
**OPERATIONAL MATTERS**

Section 5.1.    Operations.   Grantor shall conduct and carry on, or cause to be conducted and carried on, the maintenance and operation of the Subject Interests as a Reasonably Prudent Operator operating in the Outer Continental Shelf of the Gulf of Mexico without regard to the burden of the NPI.   Without limitation of the foregoing, Grantor, without regard to the burden of the NPI, (a) shall maintain and operate the Subject Interests in accordance with all applicable Laws in all material respects, including Environmental Laws and (b) pay promptly as and when due and payable by Grantor (i) all royalties and other lease burdens with respect to the Subject Interests or Subject Hydrocarbons (or necessary to maintain the Subject Interests in full force and effect), (ii)

all Taxes which may be imposed on the Subject Interests or the Subject Hydrocarbons, and (iii) all costs and expenses of maintenance and operation of the Subject Interests. Decisions with regard to the conduct of operations, including, with respect to the election to shut-in, abandon or make a non-consent election on any well located or proposed to be located on the Subject Interests, will be made by Grantor without regard to the burden of the NPI. As to any portions of the Subject Interests, if any, as to which Grantor is not the operator, Grantor shall take all such action and exercise all such rights and remedies as are legally and reasonably available to it to cause the operator to so develop, maintain and operate such portions of the Subject Interests (*provided* that Grantor shall never be obligated to pay any costs or expenses attributable to any interest other than the Subject Interests and all royalties related thereto) but shall not be deemed to be in violation of any of its covenants or agreements hereunder in the event that such operator fails to do so. It is expressly understood that the powers given to Grantor in this <u>Section 5.1</u> shall include the power of Grantor to elect to participate, or not participate, in drilling, reworking, plugging back, deepening, sidetracking or completing of a well, or in other operations (including, but not limited to, operations in connection with secondary and/or tertiary recovery) proposed to be conducted on the Subject Interests.

Section 5.2.   <u>Title</u>.  Grantor hereby binds itself to WARRANT and FOREVER DEFEND all and singular title to the NPI unto NPI Owner, its successors and permitted assigns, against every Person lawfully claiming or to claim the same or any part thereof by, through or under Grantor, but not otherwise.

Section 5.3.   <u>Leases, Deeds and Contracts:  Performance of Obligations</u>.  Grantor agrees to use commercially reasonable efforts to maintain the oil, gas or mineral leases, contracts, servitudes, fees, deeds, and other agreements forming a part of the Subject Interests producing as of the Closing Date, to the extent the same cover or otherwise relate to the Subject Interests, in full force and effect to the extent a Reasonably Prudent Operator, without giving effect to the burden of the NPI or this Conveyance, would do so.

Section 5.4.   <u>Abandonment</u>.  Subject to <u>Section 5.3</u>, Grantor shall have the right without the joinder of NPI Owner to release, surrender and/or abandon its interest in the Subject Interests, or any part thereof, or interest therein even though the effect of such release, surrender or abandonment will be to release, surrender or abandon the NPI the same as though NPI Owner had joined therein insofar as the NPI covers the Subject Interests, or any part thereof or interest therein, so released, surrendered or abandoned by Grantor.  Grantor shall have an unequivocal right to abandon the Subject Interests, or any part thereof, if such abandonment is necessary for health, safety or environmental reasons or if the Subject Hydrocarbons cannot be produced in a manner sufficient to cover operating expenses.

Section 5.5.   <u>Compliance with Laws</u>.  Grantor will not cause or permit the Subject Lands or Grantor to be in violation of any Environmental Laws or other Laws with respect to the Subject Lands.

Section 5.6.   <u>Non-consent Operations</u>.  If Grantor elects to be a non-participating party with respect to any drilling, deepening, plugging back, reworking, sidetracking or completion (or other) operation on any Subject Interest or elects to be an abandoning party with respect to a Subject Well, the consequence of which election is that Grantor's interest in such Subject Interest

or part thereof is temporarily (i.e., during a recoupment period) or permanently forfeited to the parties participating in such operations, or electing not to abandon such well, then the costs and proceeds attributable to such forfeited interest shall not, for the period of such forfeiture (which may be a continuous and permanent period), be debited or credited to the Net Profits Account and such forfeited interest shall not, for the period of such forfeiture, be subject to the NPI.

## ARTICLE VI
## ASSIGNMENTS AND TRANSFERS

Section 6.1.    Assignment and Transfer by NPI Owner.  NPI Owner may not sell, convey, assign, mortgage or otherwise dispose of the NPI (including its rights, titles, interests, estates, remedies, powers and privileges appurtenant or incident to the NPI under this Conveyance), in whole or in part without the prior written consent of Grantor, which may be withheld at Grantor's discretion.  No permitted change of ownership of the NPI shall be binding upon Grantor, however, until Grantor is furnished with copies of the documents evidencing such change.  Each Person comprising NPI Owner may exercise the rights of NPI Owner attributable to its percentage share.  Upon receipt by Grantor of copies of the documents evidencing a permitted sale, conveyance, assignment, mortgage or other disposition of the NPI, Grantor shall thereafter deal with the transferee NPI Owner with respect to the NPI transferred to such transferee NPI Owner in place of the transferring NPI Owner and references herein to the NPI Owner with respect to the NPI transferred to such transferee NPI Owner shall thereafter be deemed to be references to such transferee NPI Owner, provided that the transferring NPI Owner shall continue to have, and benefit from, all rights to indemnification and reimbursement that are provided herein with regard to the period of its ownership of the NPI transferred to such transferee NPI Owner.

Section 6.2.    Assignment and Transfer by Grantor.  Except as contemplated in the Omnibus Agreement or the Turnkey Removal Agreement, any sale, conveyance or assignment of the Subject Interests, or any part thereof or interest therein, by Grantor shall be void.  Any sale, conveyance or assignment of the Subject Interests, or any part thereof or interest therein, permitted hereunder shall be subject to this Conveyance, and in the instrument effecting such sale, conveyance or assignment, the transferee or recipient must expressly recognize and assume all obligations, covenants and agreements of Grantor hereunder.

Section 6.3.    Covenants Running with the Subject Interests.  All covenants and agreements of Grantor herein contained shall be deemed to be covenants running with the Subject Interests.  All of the provisions hereof shall inure to the benefit of NPI Owner and its successors and assigns.

## ARTICLE VII
## MISCELLANEOUS PROVISIONS

Section 7.1.    Further Assurances.  Grantor agrees to execute and deliver to NPI Owner, and, to the extent it is within Grantor's power to do so, to cause any third parties to execute and deliver to NPI Owner, all such other and additional instruments and to do all such further acts and things as may be necessary or appropriate to more fully vest in and assure to NPI Owner all of the rights, titles, interests, remedies, powers and privileges herein granted or intended so to be including executing, delivering and recording further conveyances to effect the provisions of

-15-

Section 2.4.  NPI Owner agrees to execute and deliver to Grantor all such other and additional instruments and to all such further acts and things as may be necessary or appropriate to more fully implement the transactions contemplated by this Conveyance.

Section 7.2.  No Waiver.  The failure of any Party to insist upon strict performance of a covenant hereunder or of any obligation hereunder, irrespective of the length of time for which such failure continues, shall not be a waiver of such Party's right to demand strict compliance in the future.  No consent or waiver, express or implied, to or of any breach or default in the performance of any obligation hereunder shall constitute a consent or waiver to or of any other breach or default in the performance of the same or any other obligation hereunder.  No provision of this Conveyance shall be deemed a waiver by NPI Owner of any rights granted to NPI Owner under applicable Law governing overriding royalty interests and the rights of the owners thereof.

Section 7.3.  Authority of Parties/Signatories.  Each Person signing this Conveyance represents and warrants that he or she is duly authorized and has legal capacity to execute and deliver this Conveyance. Each Party represents and warrants to the other that the execution and delivery of this Conveyance and the performance of such Party's duties have been duly authorized and that this Conveyance is a valid and legal agreement binding on such Party and enforceable in accordance with its terms.

Section 7.4.  Public Announcements.  No Party shall issue any public announcement or statement concerning this Agreement or make any use of the names, image, logos, or trademarks of any other Party or any of its Affiliates without obtaining the prior written consent of the other Parties.

Section 7.5.  Time is of the Essence. Each Party shall perform the obligations under this Agreement in a timely manner as set out in this Agreement.  Each Party shall meet these timing requirements at its own cost. Each Party may recover against each other Party an amount equal to such Party damages arising from such other Party's failure to perform in time.

Section 7.6.  Applicable Law; Dispute Resolution.

(a)  Governing Law. This Agreement is governed by and interpreted in accordance with the laws of the State of Texas, without regard to its choice of law rules, except that the substantive and procedural rules of the Federal Arbitration Act, 9 U.S.C. §§ 1-16 (the "Act") govern Section 7.6(e).

(b)  Resolution of Disputes. The Parties shall exclusively and finally resolve any dispute between them using direct negotiations, mediation, and then arbitration as set out in this Section 7.6.

(c)  Direct Negotiations. If a dispute arises, a Party seeking to initiate the dispute resolution process shall give Notice to the other Party (or Parties) to the dispute setting out, in writing and in detail, the issues in dispute and the value of the disputed amount (the "Claim"). The Parties to the dispute shall attempt to resolve the dispute through direct negotiations in a meeting between the Parties to the dispute, attended by individuals with decision-making authority, which must take place within thirty (30) days, or as otherwise agreed to by such Parties, from the date the Notice was sent.

(d)    <u>Mediation</u>. If the dispute cannot be resolved by direct negotiations within thirty (30) days of initiation of the resolution process, a Party to the dispute may initiate mediation by giving Notice to the other Party (or Parties) to the dispute. Mediation must be attended by a representative from each such Party with decision-making authority, and the proceeding must take place in Houston, Texas.

(e)    <u>Arbitration Proceedings</u>. If the Parties to a dispute fail to resolve the dispute within sixty (60) days from Notice of mediation, any Party (or Parties) the dispute may initiate binding arbitration by giving Notice to the other Party (or Parties) to the dispute. The arbitration must be conducted in accordance with the International Institute for Conflict Prevention and Resolution ("<u>CPR</u>") Rules. To the extent of any conflicts between the Act or the CPR Rules and the provisions of this Agreement, the provisions of this Agreement prevail. The CPR is the appointing authority. The place of arbitration must be Houston, Texas.

The following provisions will apply to arbitration proceedings, in each case with respect to the Parties to a particular dispute:

1. One arbitrator (or three (3) arbitrators if the monetary value of the dispute is more than US $5,000,000 or its currency equivalent) will conduct the arbitral proceedings in English. If there is a dispute whether the monetary value exceeds the US $5,000,000, then the number of arbitrators must be three (3).

2. The maximum number of witnesses each Party may call to give evidence on its behalf, including by oral testimony, declaration or witness statement, is five (5) witnesses of fact and three (3) expert witnesses.

3. The existence of a dispute and any negotiations, mediation, and arbitration proceedings between the Parties in relation to any dispute are confidential and the Parties shall not make any disclosure to any third party. Any information, documents, or materials, created or produced for the purposes of, or used in, negotiations, mediation, or arbitration of a dispute are confidential and the Parties shall not disclose them to any third party unless there is a legal or regulatory obligation to make a disclosure (but the disclosure must be limited to the extent necessary to comply with that legal or regulatory obligation), or to the extent required to enforce or challenge an award in bona fide legal proceedings before a state court or other judicial authority.

4. The arbitrator(s) has no authority to appoint or retain expert witnesses for any purpose unless agreed to by the Parties. The arbitrator(s) may not act as *amiable compositeur or ex aequo et bono*.

5. The Parties intend that regardless of which Party prevails, all arbitration fees and costs must be split equally, between the Parties, and each Party shall bear its own costs of legal representation, witness expenses, and ancillary costs.

6. The award is final and binding, and except for proceedings under <u>Section 7.6(e)(7)</u>, the Parties agree to waive their rights to: (1) apply to the court for determination of a point of law; and (2) any form of appeal, review or recourse in respect of any such award to any court or other judicial authority, to the extent that such waiver may be validly made.

7.  The Parties may apply to a court with appropriate jurisdiction for any of the following without waiving its arbitration rights:

   (1) Interim measures as necessary until appointment of the arbitrator(s) or pending determination by the arbitrator(s).

   (2) Preserving property pending determination by the arbitrator(s).

   (3) Enforcing judgment entered on an award over the Person or assets of the non-prevailing Party.

   (4) Enforcing Section 7.6(e)(3) and preventing any information, documents or materials used in those proceedings from being used or disclosed by that Party for any purpose other than enforcement of Section 7.6(e)(3).

8.  Proceedings to (1) preserve property pending determination by the arbitrator(s), (2) enforce Section 7.6(e)(3), (3) enforce judgment entered on an award may be brought in any court having jurisdiction over the Person or assets of the non-prevailing Party. The prevailing Party may seek, in any court having jurisdiction, judicial recognition of the award, or order of enforcement or any other order or decree that is necessary to give full effect to the award.

Section 7.7.   Severability.   Every provision in this Conveyance is intended to be severable.  If any term or provision hereof is determined to be invalid, illegal or unenforceable for any reason whatsoever, such invalidity, illegality or unenforceability shall not affect the validity, legality and enforceability of the remainder of this Conveyance.  The Parties further agree that if any provision contained herein is, to any extent, held invalid or unenforceable in any respect under the Laws governing this Conveyance, they shall take any actions necessary to render the remaining provisions of this Conveyance valid and enforceable to the fullest extent permitted by Law and, to the extent necessary, this Conveyance shall be deemed to be automatically amended to replace any provision contained herein that is held invalid or unenforceable with a valid and enforceable provision giving effect to the intent of the Parties to the greatest extent legally permissible.

Section 7.8.   Notices.   Any notice, request, instruction, correspondence or other document to be given hereunder by any Party to another (herein collectively called "Notice") shall be in writing and delivered (i) in person, (ii) by courier service or by overnight delivery service in each case that requires acknowledgement of receipt, (iii) mailed by certified mail, postage prepaid and return receipt requested, or (iv) delivered by electronic mail and expressly acknowledged as received by return electronic mail, as follows:

**Grantor**

Fieldwood Energy IV LLC
2000 W. Sam Houston Parkway S., Suite 1200
Houston, Texas 77042
Attention: Sole Manager
Phone: [●]
Email: [●]

**NPI Owner**

[To Come]

Notice given by personal delivery or courier shall be effective upon actual receipt. Notice given by mail shall be effective upon actual receipt or, if not actually received, the fifth Business Day following deposit with the U.S. Post Office. Notice given by electronic mail shall be effective upon acknowledgement of receipt. If a date specified herein for giving any Notice or taking any action is not a Business Day (or if the period during which any Notice is required to be given or any action taken expires on a date which is not a Business Day), then the date for giving such Notice or taking such action (and the expiration date of such period during which Notice is required to be given or action taken) shall be the next day which is a Business Day. Any Party may change any address, electronic or otherwise, to which Notice is to be given to it by giving Notice as provided above of such change of address.

Section 7.9.    Indemnity.

(a)    As used herein, "NPI Owner Indemnitees" means NPI Owner and NPI Owner's successor and permitted assigns, all of their respective Affiliates, and all of the officers, directors, agents, beneficiaries, trustees, attorneys and employees of themselves and their Affiliates.

(b)    Grantor will, promptly upon demand, indemnify and hold NPI Owner harmless from and against all claims, demands, damages, liabilities, liens, losses, fines, penalties, charges, administrative and judicial proceedings, orders, judgments, remedial action requirements, investigations, and enforcement actions of any kind, together with all interest thereon and all costs and expenses related thereto (including reasonable fees and disbursements of counsel and other advisors) and all other obligations whatsoever (collectively, "Losses") arising, in whole or in part, directly or indirectly, from or in connection with any Losses suffered by NPI Owner as a result of any claim that NPI Owner must deliver or pay over to any Person any part of the payments attributable to the Subject Hydrocarbons at any time received by NPI Owner for any reason other than the sale or assignment of interests in such payments (or the NPI under which such payments are received) by NPI Owner.

(c)    **THE FOREGOING INDEMNITY WILL APPLY WHETHER OR NOT ARISING OUT OF THE SOLE, JOINT OR CONCURRENT NEGLIGENCE, FAULT OR STRICT LIABILITY OF ANY NPI OWNER INDEMNITEE, ANY PERSON THAT IS PART OF GRANTOR, OR ANY OTHER PERSON, AND WILL APPLY, WITHOUT LIMITATION, TO ANY LIABILITY IMPOSED UPON ANY NPI OWNER INDEMNITEE, ANY PERSON THAT IS PART OF GRANTOR, OR ANY OTHER PERSON AS A RESULT OF ANY THEORY OF STRICT LIABILITY OR ANY OTHER DOCTRINE OF LAW**, *provided* that the foregoing indemnity will not apply to any Losses incurred by any NPI Owner Indemnitee to the extent arising from or proximately caused by the gross negligence or willful misconduct of such NPI Owner Indemnitee. The rights of the NPI Owner Indemnitees under this Section 7.9 will survive any termination of this Conveyance and will be in addition to, and not in replacement or limitation of, all other indemnities, reimbursement rights, and other similar rights and assurances at any time made by Grantor for the benefit of any NPI Owner Indemnitee.

Section 7.10.  <u>No Partition</u>.  Grantor and NPI Owner acknowledge that neither has any right or interest that would permit it to partition any portion of the Subject Interests as against the other, and each waives any such right.

Section 7.11.  <u>Disclaimer</u>.  EXCEPT AS SET FORTH IN <u>SECTION 5.2</u>, GRANTOR MAKES THIS CONVEYANCE AND ASSIGNS THE NPI WITHOUT RECOURSE, COVENANT OR WARRANTY OF TITLE OF ANY KIND, EXPRESS, IMPLIED OR STATUTORY.  ANY COVENANTS OR WARRANTIES IMPLIED BY STATUTE OR LAW BY THE USE HEREIN OF THE WORDS "GRANT", "CONVEY" OR OTHER SIMILAR WORDS ARE HEREBY EXPRESSLY DISCLAIMED, WAIVED AND NEGATED. WITHOUT LIMITING THE GENERALITY OF THE TWO PRECEDING SENTENCES, NPI OWNER ACKNOWLEDGES THAT GRANTOR HAS NOT MADE, AND GRANTOR HEREBY EXPRESSLY DISCLAIMS AND NEGATES, AND NPI OWNER HEREBY EXPRESSLY WAIVES, ANY REPRESENTATION OR WARRANTY, EXPRESS, IMPLIED, AT COMMON LAW, BY STATUTE OR OTHERWISE RELATING TO (i) PRODUCTION RATES, RECOMPLETION OPPORTUNITIES, DECLINE RATES OR THE QUALITY, QUANTITY OR VOLUME OF THE RESERVES OF HYDROCARBONS, IF ANY, ATTRIBUTABLE TO THE SUBJECT INTERESTS, (ii) ANY IMPLIED OR EXPRESS WARRANTY OF MERCHANTABILITY, (iii) ANY IMPLIED OR EXPRESS WARRANTY OF FITNESS FOR A PARTICULAR PURPOSE, (iv) ANY IMPLIED OR EXPRESS WARRANTY OF CONFORMITY TO MODELS OR SAMPLES OF MATERIALS, (v) REDHIBITORY DEFECTS, AND (vi) ANY AND ALL IMPLIED WARRANTIES EXISTING UNDER ANY APPLICABLE LEGAL REQUIREMENT; IT BEING THE EXPRESS INTENTION OF BOTH THE GRANTOR AND THE NPI OWNER THAT THE NPI IS HEREBY ASSIGNED TO NPI OWNER ON AN "AS IS" AND "WHERE IS" BASIS WITH ALL FAULTS, AND THAT NPI OWNER HAS MADE OR CAUSED TO BE MADE SUCH INSPECTIONS AS NPI OWNER DEEMS APPROPRIATE.  GRANTOR AND NPI OWNER AGREE THAT, TO THE EXTENT REQUIRED BY APPLICABLE LAW TO BE EFFECTIVE, THE DISCLAIMERS OF CERTAIN WARRANTIES CONTAINED IN THIS <u>SECTION 7.11</u> ARE "CONSPICUOUS" DISCLAIMERS FOR THE PURPOSES OF ANY APPLICABLE LAW.

Section 7.12.  <u>Amendments</u>.  This Conveyance may not be modified or amended except by an instrument or instruments in writing signed by Grantor and NPI Owner.  Provisions of this Conveyance that require consent, approval or agreement of the Parties or of one Party shall require such consent, approval or agreement to be in writing.

Section 7.13.  <u>Counterparts</u>.  This Conveyance is being executed in several counterparts, all of which are identical, except that, to facilitate recordation, in certain counterparts hereof only that portion of <u>Exhibit A</u> which contains specific descriptions of the Subject Interests located in the recording jurisdiction in which the counterpart is to be recorded shall be included, and all other portions of <u>Exhibit A</u> shall be included by reference only.  All of such counterparts together shall constitute one and the same instrument.  Complete copies, of this Conveyance, containing the entire <u>Exhibit A</u>, have been retained by Grantor and NPI Owner.

Section 7.14.  <u>Third Party Beneficiary</u>.  The Parties acknowledge that CUSA is a third party beneficiary to this Conveyance and can enforce the rights of NPI Owner hereunder.

*[Remainder of page intentionally left blank]*

IN WITNESS WHEREOF, Grantor and NPI Owner have each executed this Conveyance on the dates set forth in their respective acknowledgments below and Grantor has delivered this Conveyance to NPI Owner as the transfer and conveyance to NPI Owner of a presently vested interest in real and/or immovable property, to be effective as of the Effective Time.

**[Other Relevant State Acknowledgments To Come.]**

**GRANTOR:**                                      **FIELDWOOD ENERGY IV, LLC**

By: _____
    Name:
    Title:

**TEXAS ACKNOWLEDGEMENT**

**STATE OF** _____               §
                                            §
**COUNTY OF** _____               §

The foregoing instrument was acknowledged before me this _____ day of _____, 2021   by   _____,   as   _____   of   [_____],   a [_____], as the act and deed of such [_____].

_____

Name: _____

Notary Public in and for the State of
_____

*[Signature Page and Texas Acknowledgment to Conveyance]*

**NPI OWNER:**                                    [_____]


By:_____
Name:
Title:


## TEXAS ACKNOWLEDGEMENT

**STATE OF** _____                §

                                               §

**COUNTY OF** _____                §


    The foregoing instrument was acknowledged before me this _____ day of _____, 2021 by _____, as _____ of [_____], a [_____], as the act and deed of such [_____].


_____

Name:_____

Notary Public in and for the State of _____


*[Signature Page and Texas Acknowledgment to Conveyance]*

**Exhibit A**

**Leases**

| Field | Block | Lease | Type | Rights | Date Le Eff | Date Le Exp | Le Cur Acres (Ac) | Operator | WI | Lease Status |
|---|---|---|---|---|---|---|---|---|---|---|
| BRAZOS A-102/A-105 | BA A-105 | G01757 | Federal | RT A | 7/1/1968 | N/A | 1,440 | Fieldwood En | 56.3% | PROD |
| BRAZOS A-102/A-105 | BA A-105 | G01757 | Federal | RT B | 7/1/1968 | N/A | 4,320 | Fieldwood En | 100.0% | PROD |
| BRAZOS A-133 | BA A-133 | G02665 | Federal | RT | 7/1/1974 | N/A | 5,760 | GOM Shelf | 25.0% | PROD |
| EAST BREAKS 158/159/160/161 | EB 158 | G02645 | Federal | RT | 7/1/1974 | N/A | 5,760 | Fieldwood SD Off | 66.7% | PROD |
| EAST BREAKS 158/159/160/161 | EB 159 | G02646 | Federal | RT | 7/1/1974 | N/A | 5,760 | Fieldwood SD Off | 66.7% | PROD |
| HIGH IS. A-550 | HI A-550 | G04081 | Federal | RT | 10/1/1979 | N/A | 5,760 | Fieldwood En Off | 100.0% | PROD |
| HIGH IS. A-550 | HI A-550 | G04081 | Federal | OP 1 | 10/1/1979 | N/A | 720 | Fieldwood En Off | 100.0% | PROD |
| HIGH IS. A-550 | HI A-550 | G04081 | Federal | OP 2 | 10/1/1979 | N/A | 5,040 | Fieldwood En Off | 100.0% | PROD |
| SHIP SHOAL 169/182/193/194 | SS 169 | 00820 | Federal | RT | 4/1/1960 | N/A | 5,000 | Fieldwood En | 33.3% | PROD |
| VIOSCA KNOLL 251/340/384 | VK 251 | G10930 | Federal | OP 1 | 7/1/1989 | N/A | 5,760 | Fieldwood En Off | 100.0% | UNIT |
| VIOSCA KNOLL 251/340/384 | VK 251 | G10930 | Federal | RT | 7/1/1989 | N/A | 5,760 | Fieldwood En Off | 100.0% | UNIT |
| VIOSCA KNOLL 251/340/384 | VK 251 | G10930 | Federal | OP 2 | 7/1/1989 | N/A | 5,760 | Fieldwood En Off | 55.0% | UNIT |
| VIOSCA KNOLL 251/340/384 | VK 340 | G10933 | Federal | OP 1 | 7/1/1989 | N/A | 5,760 | Fieldwood En Off | 100.0% | UNIT |
| VIOSCA KNOLL 251/340/384 | VK 340 | G10933 | Federal | RT | 7/1/1989 | N/A | 5,760 | Fieldwood En Off | 100.0% | UNIT |

| Field | Block | Lease | Type | Rights | Date Le Eff | Date Le Exp | Le Cur Acres (Ac) | Operator | WI | Lease Status |
|---|---|---|---|---|---|---|---|---|---|---|
| VIOSCA KNOLL 251/340/384 | VK 340 | G10933 | Federal | OP 2 | 7/1/1989 | N/A | 5,760 | Fieldwood En Off | 55.0% | UNIT |
| EAST BREAKS 158/159/160/161 | EB 160 | G02647 | Federal | RT | 7/1/1974 | N/A | 5,760 | Fieldwood SD Off | 100.0% | PROD |
| EAST BREAKS 158/159/160/161 | EB 161 | G02648 | Federal | RT | 7/1/1974 | N/A | 5,760 | Fieldwood SD Off | 100.0% | PROD |
| VERMILION 315/332 | VR 332 | G09514 | Federal | OP 1 | 7/1/1988 | N/A | 5,000 | Fieldwood En | 66.5% | PROD |
| VERMILION 315/332 | VR 332 | G09514 | Federal | RT | 7/1/1988 | N/A | 5,000 | Fieldwood En | 100.0% | PROD |

[Exhibit A]

**Exhibit N2**

**Eni Definitive Documents**

*EXECUTION VERSION*

## Eni Term Sheet Implementation Agreement

This ENI TERM SHEET IMPLEMENTATION AGREEMENT (the "**Agreement**") is made and entered into as of June [\_\_], 2021, by and among (a) Fieldwood Energy LLC, a Delaware limited liability company ("**FWE**") and its affiliated debtors and debtors in possession in the chapter 11 cases pending before the Honorable Marvin Isgur jointly administered under Case No. 20-33948 (collectively, the "**Debtors**"), (b) Eni Petroleum US LLC, a Delaware limited liability company, and Eni US Operating Co. Inc., a Delaware corporation, (collectively, "**Eni**"), and, following execution of the Joinders (as defined below), (c) [\_\_\_], a Delaware limited liability company ("**Credit Bid Purchaser**"), and (d) Fieldwood Energy III LLC ("**FWE III**") to implement the transactions contemplated by or related to the Eni Term Sheet (as defined in the recitals below). Each of the Debtors, Eni and, following execution of a Joinder, Credit Bid Purchaser and FWE III, may be referred to as a "**Party**" and, collectively, the "**Parties**". Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Plan (as defined below).

## RECITALS

WHEREAS, on May 12, 2021, the Debtors and Eni executed a letter agreement whereby each of Eni and FWE agreed (i) to work to implement the terms of the Eni Term Sheet and (ii) negotiate the definitive documents described therein in good faith and in accordance with the terms of the Eni Term Sheet (the "**Eni Definitive Documents**");

WHEREAS, commencing on August 3, 2020 (the "**Petition Date**"), the Debtors each filed with the United States Bankruptcy Court for the Southern District of Texas (the "**Bankruptcy Court**") a voluntary case under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**");

WHEREAS, the Bankruptcy Court established November 25, 2020 at 5:00 p.m. (Central Time) as the deadline for creditors, other than governmental entities, to file proofs of claim against any of the Debtors (the "**Bar Date**");

WHEREAS, Eni and its affiliates have asserted claims against certain of the Debtors that are described in proofs of claim numbered 461, 462, 468, 497, 498, 500, 601, and 693 (collectively, the "**Eni Claims**");

WHEREAS, on April 15, 2021, the Debtors filed the solicitation versions of their *Disclosure Statement for Fourth Amended Joint Chapter 11 Plan of Fieldwood Energy LLC and its Affiliated Debtors* [D.I. 1285] (including any exhibits and schedules thereto and as may be further amended, supplemented, or modified, the "**Disclosure Statement**") and *Fourth Amended Joint Chapter 11 Plan of Fieldwood Energy LLC and its Affiliated Debtors* [D.I. 1284] (including any exhibits and schedules thereto and as may be further amended, supplemented or modified, the "**Plan**");[1]

WHEREAS, on April 15, 2021, the Bankruptcy Court entered an order [D.I. 1286] approving, among other things, the Debtors' Disclosure Statement and solicitation procedures with respect to the Plan;

WHEREAS, on May 12, 2021, the Debtors filed the *Notice of Filing of Executed Term Sheet By and Between the Debtors and Eni Petroleum US LLC* [D.I. 1368], which attached, as **Exhibit A** thereto, a term sheet by and between Eni and the Debtors reflecting an agreement-in-principle with respect to the treatment under the Plan of certain oil and gas leases and facilities (including but not limited to, for all purposes thereunder, any wells, pipelines, or other structures

---

[1] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Plan.

set forth therein) that were previously conveyed to the Debtors by Eni and certain of its affiliates (the "**Eni Term Sheet**");

WHEREAS, FWE will survive the Initial Plan of Merger contemplated by the Plan as FWE III; and

WHEREAS, the interests of the Debtors in the oil and gas leases set forth on **Exhibit C** (the "**Specified Interests**") and certain related rights-of-way and rights-of-use, as well as related facilities (including wells, pipelines and other structures) to the extent they were previously conveyed to the Debtors by Eni and certain of its affiliates (collectively, the "**Specified Assets**") shall be abandoned pursuant to the Plan.

NOW, THEREFORE, in consideration of the mutual covenants and agreements set forth in this Agreement, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties, intending to be legally bound, agree as follows:

1.  **Eni Definitive Documents**.   The documents below comprise the Eni Definitive Documents as contemplated in the Eni Term Sheet:

a.  *Turnkey Removal Agreement*.   Annexed hereto as **Exhibit B** (the "**Turnkey Removal Agreement**").

2.  **Execution of Eni Definitive Documents**; **Good Faith Cooperation.**

a.  Each Party agrees, and Eni expressly acknowledges, that the Debtors and Eni have satisfied the requirements under the Eni Term Sheet to negotiate mutually agreeable Eni Definitive Documents by the relevant deadlines set forth therein.  Each Party agrees to negotiate any exhibits, amendments, modifications or supplements to the Eni Definitive Documents in good faith and to exercise commercially reasonable efforts with respect to the negotiation, pursuit, approval, execution, delivery, implementation, and consummation of the Eni Definitive Documents.  The

Parties may, by mutual agreement, amend, modify, or supplement this Agreement and/or the forms of the Eni Definitive Documents attached hereto or negotiate to add additional documents to the list of Eni Definitive Documents, consistent with the terms and conditions herein, in the Turnkey Removal Agreement, and subject to the applicable consent rights under the Restructuring Support Agreement.  Subject to the immediately preceding sentence, FWE III and Eni shall execute and deliver the Eni Definitive Documents, and Credit Bid Purchaser and FWE III shall each execute and deliver a Joinder to this Agreement in the form attached as **Exhibit D** and **E** (the "**Joinders**"), in each case, on the Effective Date of the Plan (and, for the avoidance of doubt, after the consummation of the transactions contemplated by the Credit Bid Purchase Agreement and the Divisive Merger pursuant to the Initial Plan of Merger) (the "**Credit Bid Transaction Closing**").

b.      Each Party agrees to use commercially reasonable efforts to obtain and/or execute and deliver all instruments, forms, applications, certifications, reports, permits, and filings required by federal or state authorities (including, for example, any BOEM or BSEE designation of operator forms and designated applicant Oil Spill Financial Responsibility ("**OSFR**") form designations and any other instruments, forms, applications, certifications, plans, reports and filings required by BOEM, BSEE, EPA, the U.S. Coast Guard or other applicable federal or state authorities) that are necessary for FWE III to perform its obligations pursuant to the Eni Definitive Documents. On the Effective Date, the Debtors shall fund such premiums as are required to maintain the organizational or area-wide bonds applicable to FWE III.

3.      **Support of the Plan.**  Eni agrees not to file any objections to the Plan or to support any other party, directly or indirectly, in objecting to or opposing the Plan and agrees it will support confirmation of the Plan.

4.    **Plan and Confirmation Order**.   The Confirmation Order and any amendment to the Plan must be reasonably acceptable to Eni solely with respect to any provisions thereof that directly affect the rights and obligations of Eni in the Eni Definitive Documents as contemplated by the Eni Term Sheet; *provided* that, for the avoidance of doubt, the Plan and Confirmation Order shall be subject to the applicable consent rights set forth in the Restructuring Support Agreement.   To facilitate the implementation of the Eni Term Sheet and the Eni Definitive Documents pursuant to the Plan as contemplated in the Eni Term Sheet, the Parties agree that any order of the Bankruptcy Court confirming the Plan (the "**Confirmation Order**") shall provide for the following:

a.    On the Effective Date, FWE shall have withdrawn as operator of the Specified Assets immediately prior to their abandonment pursuant to the Plan.

b.    On the Effective Date, FWE III shall reimburse Eni for reasonable and documented legal fees and expenses incurred in connection with the Chapter 11 Cases in the amount of $1.5 million.   Additionally, on the Effective Date, FWE III shall pay $3 million in cash to Eni to be used in connection with Actual Decommissioning Costs (as defined in the Turnkey Removal Agreement) not covered by the proceeds of Performance Bond No. 2196705 by and between Fieldwood Energy Offshore LLC ("**FEO**") as Principal, North American Specialty Insurance Company ("**NAS**") as Surety, and Eni as Obligee (the "**NAS Bond**").

c.    On the Effective Date, FWE III shall provide for the payment of any and all documentary, filing, recording, stamp, and registration fees, costs, and expenses  incurred in connection with any required filing of record by or on behalf of FWE III of any instrument or instruments with the appropriate records office of any county, parish, state, federal, or other governmental unit (including BOEM) that may be required in connection with the FWE III Plan

of Merger as it relates to the Specified Assets or incurred in connection with the satisfaction of the Regulatory Condition (collectively, the "**Implementation Costs**").

d.      Immediately upon the occurrence of the Effective Date, FEO's interests in the Specified Assets shall be abandoned by FEO pursuant to section 554(a) of the Bankruptcy Code, the Plan, and the Confirmation Order.  For the avoidance of doubt, upon abandonment of the Specified Assets, no funds shall have been allocated to FEO to perform or satisfy any plugging, abandonment, or decommissioning obligations associated with the Specified Assets and FEO acknowledges it will be in default of such decommissioning obligations.  Any Debtor which previously owned or operated a Specified Asset shall appoint FWE III as its agent to perform the Agreed Activities (as defined in the Turnkey Removal Agreement) and the Initial Safe Out (as defined in the Turnkey Removal Agreement) work, and, subject to the commencement triggers set forth in the Turnkey Removal Agreement, FWE III shall be authorized and empowered by Eni to be its decommissioning agent in relation to the Specified Assets.

e.      On the Effective Date, except for the rights and remedies of Eni to enforce (i) the Plan, (ii) the Confirmation Order, and (iii) the obligations contemplated by the Eni Definitive Documents, Eni shall be deemed a Releasing Party (without submitting a ballot(s) to accept the Plan) against all Released Parties other than FEO and its Estate under the Plan for all purposes thereunder, and shall waive and release any and all pre-Effective Date claims of any kind against the Debtors, their Estates and any other Released Party, other than FEO and its Estate, including, without limitation, the Eni Claims and any claims for administrative expense under sections 503(b) or 507(a)(2) of the Bankruptcy Code; *provided, however,* that, upon the occurrence of (i) the Effective Date and (ii) effectiveness of the Eni Definitive Documents, notwithstanding this <u>Section 4(e)</u>, Eni shall be deemed to have an Allowed Class 6B General Unsecured Claim in an amount

equal to the aggregate sum of the Eni Net Turnkey Amounts for the Decommissioning Projects (each as defined in the Turnkey Removal Agreement).  Except as otherwise provided for hereunder with respect to the Released Parties (under and as defined in the Plan other than Apache and FEO and its Estate), nothing herein shall affect or be deemed to restrict or limit Eni's claims for or rights to seek payments or contribution from current or prior working interest owners, predecessors, co-owners and/or operators, or from any other parties that are contractually, legally, regulatorily or equitably liable for decommissioning or related obligations, including obligations under surety bonds, letters of credit or other instruments relating thereto, with respect to the Specified Assets. For the avoidance of doubt, the Eni Definitive Documents shall be included within the definition of Additional Predecessor Agreement Documents provided in the Plan.

f.      On the Effective Date, except for the rights and remedies to enforce (i) the Plan, (ii) the Confirmation Order, and (iii) the obligations contemplated by this Agreement or the Eni Definitive Documents, the Debtors shall waive and release any and all pre-Effective Date claims of any kind against Eni (including, for the avoidance of doubt, each of Eni's affiliates and each of their and their affiliates' current and former directors, managers, officers, equity holders, predecessors, successors, and assigns, subsidiaries, and each of their current and former officers, members, managers, directors, equity holders, principals, members, employees, or other agents, in each case, in their capacities as such), in all circumstances only to the extent such claims accrued on or prior to the Effective Date.

g.      All rights of Eni with respect to bonds and letters of credit constituting security for the decommissioning of the assets associated with the Specified Assets shall be reserved as against such bonding companies and letter of credit issuers in all respects. The Debtors shall not terminate

any bonds issued on behalf of the Debtors relating to such Specified Assets under which any federal, state or local governmental entity is an obligee.

h.       The Bankruptcy Court (i) approves the Eni Definitive Documents and all transactions contemplated by this Agreement and all actions to be taken, undertakings to be made, and obligations to be incurred by the parties thereto; (ii) following the consummation of the Initial Plan of Merger, authorizes FWE III, without further notice to or action, order, or approval of this Bankruptcy Court and without the need for any further corporate or shareholder action, to enter into, deliver, and fully perform their obligations under the Eni Definitive Documents; and (iii) finds that the parties' entry into the Eni Definitive Documents and the implementation of the transactions contemplated therein shall not impair Eni's right and ability to draw on Performance Bond No. 2196705 by and between FEO as Principal, NAS as Surety, and Eni as Obligee, and shall not impair NAS's defenses to such draw.  Upon entry of the Confirmation Order, FWE III shall be authorized and empowered, without further approval of the Bankruptcy Court or any other party, to take such actions and perform such acts as may be necessary, convenient, desirable, or appropriate to execute and deliver the Eni Definitive Documents in accordance with the Plan and Confirmation Order and to execute and deliver all documents relating thereto and to perform all of their obligations thereunder.  On the Effective Date, the Eni Definitive Documents shall constitute legal, valid, binding, and authorized obligations of FWE III enforceable in accordance with their terms, and such obligations of FWE III shall not be enjoined or subject to discharge, impairment, release, avoidance, recharacterization, or subordination by FWE III, the Post-Effective Date Debtors, or the Plan Administrator, under applicable law, the Plan, or the Confirmation Order.

5.      **Right of First Offer; ORRI; Notice of Sale**.

a.      To the extent that, in connection with the resolution of any other predecessor-in-interest's decommissioning claims against the Debtors, any such predecessor-in-interest is granted (or Credit Bid Purchaser agrees to grant to such predecessor-in-interest) a right of first offer, right of first refusal, or similar preferential purchase right in connection with any assets to be transferred to Credit Bid Purchaser pursuant to the Plan (such assets, collectively, the "**Credit Bid Purchaser Assets**"), Credit Bid Purchaser shall grant Eni rights that are substantially similar with respect to the Credit Bid Purchaser Assets.

b.      To the extent that, in connection with the resolution of any other predecessor-in-interest's decommissioning claims against the Debtors, any other predecessor-in-interest is granted (or Credit Bid Purchaser agrees to grant to such predecessor-in-interest) an overriding royalty interest or similar future interest in Credit Bid Purchaser's production from any of the Credit Bid Purchaser Assets in connection with the decommissioning of any predecessor-in-interest's prior assets, Credit Bid Purchaser shall grant Eni a similar and proportionate overriding royalty interest burdening such Credit Bid Purchaser Assets in connection with Eni's turnkey removal payments.

c.      After the Effective Date of the Plan, in the event that Credit Bid Purchaser desires to sell, transfer or otherwise dispose of any portion of Credit Bid Purchaser Assets pursuant to the Plan through a sale process that has been publicly announced utilizing a third party agent, investment bank, or similar service approaching multiple potential purchasers, Credit Bid

Purchaser shall use commercially reasonable efforts to cause such agent or investment bank to provide Eni with written notice and an opportunity to participate in any related sales process.

6.    **FWE III Governance and Operations**.

a.    FWE III shall, from and after the Effective Date, prepare and furnish to Eni the following reports which, in each case, will be limited to relate solely to the Specified Assets and the Eni Definitive Documents:

(i) <u>Annual Financial Statements</u>.  As soon as available, and in any event within 105 days after the end of each fiscal year of FWE III, its unaudited consolidated balance sheet and related consolidated statements of operations, members' equity and cash flows as of the end of and for such year.

(ii) <u>Quarterly Financial Statements</u>.  As soon as available, and in any event within 60 days after the end of each quarterly accounting period in each fiscal year of FWE III (including the last fiscal quarter of such fiscal year), its unaudited consolidated balance sheet and related unaudited consolidated statements of operations, members' equity and cash flows as of the end of and for such fiscal quarter and the then elapsed portion of the current fiscal year.

(iii) <u>Monthly Operating Data</u>.  As soon as available, but in no event later than 45 days after the end of each calendar month, a statement showing monthly operating data for  FWE III, including operating expenses and revenue for each of FWE III, for such calendar month.

b.    FWE III will use reasonable efforts to seek to obtain reimbursement and/or contribution for decommissioning activity relating to the Specified Assets that is available under contract or applicable law, including any other record title and/or operating rights interest holders

and predecessors-in-interest other than Eni to the extent practicable and available surety bonding, including available surety bonding for which Eni is the beneficiary; *provided* that, for the avoidance of doubt, FWE III shall not be required to incur any out-of-pocket costs or obligations in connection with such efforts, unless such costs or obligations are reimbursed by Eni.

c.       FWE III shall obtain the written consent of Eni (not to be unreasonably withheld) prior to agreeing to a settlement agreement and/or initiating dispute resolution or other formal settlement negotiation proceedings(s) with respect to obtaining contributions from other record title and/or operating rights interest holders and predecessors-in-interest for decommissioning or funds from surety bonds for decommissioning, in each case, with respect to the Specified Assets.

7.       **Temporary Abandoned Wells and Excluded Wells**.

a.       Reference is made to that certain Purchase and Sale Agreement by and among Eni and Eni US Operating Co. Inc., as Seller, and FEO, a Purchaser, dated as of December 1, 2015 (the "**Comal PSA**"). Defined terms used in this <u>Section 7</u> that are not otherwise defined in this Agreement will have the meanings ascribed to such terms in the Comal PSA (and, for the avoidance of doubt, such definition will not be affected by the termination, or rejection in connection with the Chapter 11 Cases, of the Comal PSA). As used herein, the term "**Temporary Abandoned Well**" or "**Temporary Abandoned Wells**" means individually any of, or collectively those Wells listed on **<u>Exhibit G</u>** and the term "**Excluded Wells**" means all wells which are located on the Lands that are permanently Plugged, Abandoned, and Decommissioned as of the Closing Date, including without limitation, those listed on **<u>Exhibit F.</u>** As used herein, and as was defined in the Comal PSA, the term "**Well Intervention Work**" shall mean any work within the portion of the wellbore of any Temporary Abandoned Well or Excluded Well that FWE III deems necessary as a reasonably prudent operator to correct, remediate or redo any Plugging,

Abandonment and Decommissioning work that was performed by any member of Seller Group (when used in this Section 7, as such term is defined in the Comal PSA) or Seller's (when used in this Section 7, as such term is defined in the Comal PSA) predecessors or their respective contractors prior to the Effective Date, including which, if there is an existing plug in the wellbore of such well, requires FWE III to drill through such existing plug (or otherwise penetrate that point where such existing plug is located) in the wellbore of such Temporary Abandoned Well or Excluded Well (as determined to be required in the reasonable discretion of FWE III), and, in each case, is necessary to put any Temporary Abandoned Well or Excluded Well into compliance with applicable Laws, requirements of Governmental Authority, the Leases or the Contracts. Notwithstanding the foregoing, the following work with respect to any Temporary Abandoned Well shall not constitute Well Intervention Work: setting a surface plug if there is not currently a surface plug present in the wellbore of such well as of the Effective Date (as such term is defined in the Comal PSA), any measuring operations or circulation of fluids in the wellbore above and unrelated to any plugs or cement which were previously set by any member of Seller Group or Seller's predecessors or their respective contractors prior to the Effective Date (when used in this Section 7, as such term is defined in the Comal PSA), cutting and/or pulling the production casing in such well (except to the extent such casing is located below a plug set by Seller, Seller's predecessors or their respective contractors prior to the Effective Date), and/or cutting and/or pulling the conductor in the wellbore of any such well.

b.      Without waiving any right of contribution, Eni agrees that it shall be solely responsible for the costs of Plugging, Abandoning and Decommissioning of all Excluded Wells. If FWE III becomes aware of information that indicates that the Plugging, Abandonment and Decommissioning with respect to any Excluded Well is no longer in compliance with applicable

Laws, requirements of Governmental Authority, the Leases or the Contracts, FWE III shall provide written notice to the other Parties and such Parties shall cooperate in determining how to address causing such Excluded Well to be in compliance, subject to the other provisions of this Section 7; provided, however, in the event that the Parties do not agree on how to address causing such Excluded Well to be in compliance then FWE III shall proceed with the Well Intervention Work as FWE III deems necessary at Eni's cost and expense to the extent provided in this Section 7. Upon such notice, FWE III hereby covenants and agrees to diligently perform or cause to be performed all Plugging, Abandonment and Decommissioning work with respect to any such Excluded Well as necessary to bring such Excluded Well into compliance with applicable Laws, requirements of Governmental Authority, the Leases or the Contracts. Eni shall be liable and responsible to pay for all Eligible Well Intervention Costs (as defined in Section 7(e) below) with respect to any such Excluded Well.

c.      Eni shall be liable and responsible to pay for all Eligible Well Intervention Costs with respect to any Temporary Abandoned Well which is required to properly Plug, Abandon and Decommission any such Temporary Abandoned Well. For the sake of clarity, subject to Section 7(f), Eni shall remain responsible for all obligations, liabilities and Damages relating to, arising out of or attributable to work performed with respect to the Temporary Abandoned Wells prior to the Effective Date (as defined in the Comal PSA) to the extent set forth in subpart (i)(f) in the definition of "Retained Obligations" in the Comal PSA.

d.      Notwithstanding anything in this Section 7 to the contrary, but and subject to Section 7(f), with respect to any Temporary Abandoned Well, FWE III shall determine whether any Well Intervention Work is necessary to properly Plug, Abandon and Decommission such Temporary Abandoned Well or Excluded Well as provided in this Section 7(d). Within thirty (30)

days of FWE III determining that Well Intervention Work is necessary to properly Plug, Abandon and Decommission any Temporary Abandoned Well or Excluded Well, FWE III shall deliver to Eni a notice that such Well Intervention Work is necessary, subject to any event of Force Majeure or imminent danger to life, property and/or the environment which requires the immediate commencement of such Well Intervention Work. The Parties shall cooperate in determining what Well Intervention Work is necessary to be conducted with respect to any Temporary Abandoned Well or Excluded Well, provided, however, in the event that the Parties do not agree on what Well Intervention Work is necessary to be conducted with respect to such Temporary Abandoned Well or Excluded Well then FWE III shall proceed with the Well Intervention Work as FWE III deems necessary at Eni's cost and expense to the extent provided in this Section 7.  At least thirty (30) days prior to commencement of any Well Intervention Work concerning any Temporary Abandoned Well or Excluded Well (subject to any event of Force Majeure or imminent danger to life, property and/or the environment and/or additional or revised Well Intervention Work, in each case as set forth in this Section 7(d)), FWE III shall be required to provide any applicable Well Intervention Work Orders with respect to either the applicable Temporary Abandoned Well or the applicable Excluded Well. Subject to Section 7(f), any Well Intervention Work with respect to a Temporary Abandoned Well or Excluded Well that is set forth on a Well Intervention Work Order that is delivered to Eni on or prior to the applicable thirtieth (30th) day prior to commencement of such Well Intervention Work shall be deemed to be "Eligible Well Intervention Work" for purposes of this Section 7; provided, however, subject to Section 7(f), Eligible Well Intervention Work may include (i) additional or revised Well Intervention Work that is determined by FWE III to be necessary or is required by applicable Laws, requirements of Governmental Authority, the Leases or the Contracts if circumstances reasonably change requiring such additional or revised

14

Well Intervention Work after the delivery of the Well Intervention Work Order (including if such situation arises while the Well Intervention Work is being conducted) and/or (ii) Well Intervention Work that FWE III reasonably deems necessary to be performed prior to such thirty (30) day notice due to any event of Force Majeure or imminent danger to life, property and/or the environment. Upon completion of the Well Intervention Work set forth in any Well Intervention Work Order, FWE III will provide to Eni a written statement setting forth (x) evidence that such work has been completed, (y) invoices and/or billing statements outlining in reasonable detail the Well Intervention Work actually done and the costs and expenses of such Well Intervention Work (including, in the event that such costs and expenses exceed the amount set forth on the applicable Well Intervention Work Order for such work, reasonably detailed information itemizing the amount and cause of any such excess costs and expenses) and (z) the bank account to which Eni is to make payment of the amount of Eligible Well Intervention Costs (as defined below) with respect to such work (each a "**Well Intervention Completion Notice**"). Within thirty (30) days of receipt of a Well Intervention Completion Notice, Eni shall pay (or cause to be paid) to FWE III the amount of the Eligible Well Intervention Costs set forth on such Well Intervention Completion Notice by a wire transfer of immediately available funds to the account set forth in the Well Intervention Completion Notice.

e.    For purposes of this Section 7, the term "**Eligible Well Intervention Costs**" shall mean, with respect to Temporary Abandoned Wells, any costs and expenses for Eligible Well Intervention Work and, with respect to Excluded Wells, any costs and expenses for Well Intervention Work incurred by FWE III pursuant to Section 7(b), such costs and expenses shall include costs to obtain, mobilize, transport, house and store, equipment, supplies and personnel to perform such Well Intervention Work. Notwithstanding anything in this Section 7 to the contrary,

Eni shall not be obligated to pay for the costs and expenses of Well Intervention Work on any Temporary Abandoned Well which is not Eligible Well Intervention Work, provided, however, Eni's obligation to pay Eligible Well Intervention Costs under this Section 7 shall not be limited to the amounts set forth on any Well Intervention Work Order but shall also include any excess costs and expenses for any Eligible Well Intervention Work that are identified on the applicable Well Intervention Completion Notice and which are reasonably and prudently incurred for any Eligible Well Intervention Work.  In the event of a conflict between this Section 7 and the Turnkey Removal Agreement with respect to the costs associated with a Temporary Abandoned Well, this Section 7 shall control. All amounts charged by FWE III under this Section 7 shall include reasonable overhead charges by Credit Bid Purchaser in accordance with the COPAS attached to the Contract Operating Agreement (as defined in the Turnkey Removal Agreement), including if FWE III engages Credit Bid Purchaser to perform any Eligible Well Intervention Work.

f.      Notwithstanding anything in this Section 7 to the contrary, Eni's liability for, and obligation and responsibility to pay for, Eligible Well Intervention Costs with respect to any Temporary Abandoned Well pursuant to Section 7(c) shall terminate with respect to each Temporary Abandoned Well as follows:

(i)  With respect to any Temporary Abandoned Well which (i) any Debtor has re-entered since the Effective Date of the Comal PSA or (ii) FWE III re-enters after the Effective Date of the Turnkey Removal Agreement, in each case, in order to conduct development operations (including, without limitation, to conduct any sidetracking, completing or re-completing operation in such Temporary Abandoned Well) other than operations arising out of or related to permanently Plugging, Abandonment and Decommissioning such Temporary Abandoned Well (the "**Development**

16

**Operations**"). Eni's liability for and/or responsibility and obligation to pay Eligible Well Intervention Costs with respect to such Temporary Abandoned Well pursuant to Section 7(c) shall terminate upon the re-entry of such Temporary Abandoned Well for such Development Operations.

(ii) With respect to any Temporary Abandoned Well which FWE III re-enters in order to conduct operations to permanently Plug, Abandon and Decommission such Temporary Abandoned Well and in which FWE III also conducts Well Intervention Work, Eni's liability for and/or responsibility and obligation to pay Eligible Well Intervention Costs with respect to such Temporary Abandoned Well pursuant to Section 7(c) shall terminate upon the acceptance by BSEE of an End of Operations Report (Form BSEE-0125) for such Temporary Abandoned Well. For the sake of clarity, Eni shall retain the liability for and/or responsibility and obligation to pay Eligible Well Intervention Costs for any Temporary Abandoned Well pursuant to this Agreement in the event that FWE III permanently Plugs, Abandons and Decommissions such Temporary Abandoned Well but does not conduct any Well Intervention Work for such Temporary Abandoned Well.

8.   **Termination of Agreement.**

a.   This Agreement shall terminate in its entirety at 11:59 p.m. on September 30, 2021 (prevailing Central Time) (the "**Outside Termination Date**") if either (i) the ENI Definitive Documents have not been executed and delivered in accordance with Section 2(a) or (ii) the Regulatory Condition (as defined below) has not been satisfied on or prior to such date; *provided*, *however,* that the Outside Termination Date may be extended by mutual written agreement of the Parties (which writing may include e-mail).  Each of Sections 1 through 4 hereof will terminate

automatically upon the occurrence of the Effective Date.  Upon termination of this Agreement in its entirety, each Party shall be immediately released from its obligations, commitments, undertakings and agreements under or related to this Agreement and the Eni Term Sheet; *provided* that in no event shall any such termination relieve a Party from liability for its breach or non-performance of its obligations hereunder prior to the date of such termination.

b.      The "**Regulatory Condition**" means that FWE III has been granted, or otherwise holds, to the satisfaction of the Parties, all necessary recognitions or approvals by applicable regulatory authorities to act as a qualified operator in the Gulf of Mexico to the extent required to perform its obligations pursuant to the Definitive Documents.

9.      **363 Credit Bid Transaction**. In the event that the 363 Credit Bid Transaction is pursued, Eni agrees to support and take reasonable actions to facilitate the 363 Credit Bid Transaction, and cooperate in good faith with Debtors, the Required DIP Lenders, and the Requisite FLTL Lenders to facilitate the 363 Credit Bid Transaction, including, without limitation, by making amendments to the Eni Definitive Documents (in form and substance reasonably acceptable to Eni, the Debtors, the Required DIP Lenders, and the Requisite FLTL Lenders and to the extent that such amendments constitute reasonable actions to facilitate the 363 Credit Bid Transaction).

10.     **Effectiveness.**  This Agreement shall become effective and binding upon each of the parties hereto upon execution and delivery by such party of an executed signature page hereto on the Effective Date.

11.     **Counterparts**.  This Agreement may be executed in several counterparts, each of which shall be deemed to be an original, and all of which together shall be deemed to be

one and the same agreement.  Execution copies of this Agreement may be delivered by electronic

mail, or otherwise, which shall be deemed to be an original for the purposes of this paragraph.

        12.    **Governing Law; Jurisdiction; Waiver of Jury Trial.**  To the maximum

extent permitted by applicable law, this Agreement is governed by and is to be construed in

accordance with the internal laws of the State of Texas, without giving effect to any principles of

conflicts of law thereunder that would result in the application of the laws of any other jurisdiction.

Each Party irrevocably agrees that any legal action, suit, or proceeding arising out of or relating to

this Agreement brought by any Party or its successors or assigns shall be brought and determined

in the Bankruptcy Court and each Party hereby irrevocably submits to the exclusive jurisdiction of

the Bankruptcy Court, and if the Bankruptcy Court does not have (or abstains from) jurisdiction,

Courts of the State of Texas and of the United States District Court of the Southern District of

Texas, and any appellate court from any thereof, for itself and with respect to its property, generally

and unconditionally, with regard to any such proceeding arising out of or relating to this

Agreement.  Each Party further agrees that notice as provided herein shall constitute sufficient

service of process and the Parties further waive any argument that such service is insufficient.

Each Party hereby irrevocably and unconditionally waives, and agrees not to assert, by way of

motion or as a defense, counterclaim or otherwise, in any proceeding arising out of or relating to

this Agreement, (a)  any claim that it is not personally subject to the jurisdiction of the Bankruptcy

Court as described herein for any reason, (b) that it or its property is exempt or immune from

jurisdiction of such court or from any legal process commenced in such court (whether through

service of notice, attachment prior to judgment, attachment in aid of execution of judgment,

execution of judgment, or otherwise) and (c) that (1) the proceeding in such court is brought in an

inconvenient forum, (2) the venue of such proceeding is improper, or (3) this Agreement, or the

subject matter hereof, may not be enforced in or by such court.  EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT.  EACH PARTY CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER.

13.    **Notices.**  All notices hereunder shall be deemed given if delivered and received in writing, if contemporaneously sent by electronic mail, courier or by registered or certified mail (return receipt requested) to the following addresses:

(1)    If to FWE III, to:

Fieldwood Energy III LLC
2000 W. Sam Houston Parkway S., Suite 1200
Houston, Texas 77042
Attention:  Thomas R. Lamme

With a copy to:

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153
Attention:  Matt Barr, Esq. (matt.barr@weil.com)
            Alfredo Peréz, Esq. (alfredo.perez@weil.com)
            Jessica Liou, Esq. (jessica.liou@weil.com)

(2)     If to Eni, to:

Eni Petroleum US LLC
1200 Smith Street, Suite 1700
Houston, Texas 77002
Attention:  Christian Johnson
Telephone: (713) 393-6184
Email:  chris.johnson@eni.com

With a copy to:

Bracewell LLP
711 Louisiana Street, Suite 2300
Houston, Texas 77002
Attention:     J.J. McAnelly (james.mcanelly@bracewell.com)
               Jason Hutt (jason.hutt@bracewell.com)
               Mark Dendinger (mark.dendinger@bracewell.com)

(3)     If to Credit Bid Purchaser, to:

[_____]

With a copy to:

[_____]

14.     **Amendments.**  Neither this Agreement nor any provision hereof may be
waived, amended, or modified except pursuant to an agreement or agreements in writing entered
into by the Parties.

*[Signature Pages to Follow]*

21

**IN WITNESS WHEREOF**, the undersigned Parties have executed this Eni Term Sheet Implementation Agreement as of the date first written above.

FIELDWOOD ENERGY LLC,
a Delaware limited liability company

By:_____
_____
Name: _____
_____
Title: _____
_____

ENI PETROLEUM US LLC


By:_____

Name: Luca Pellicciotta
Title: President and CEO


ENI US OPERATING CO. INC.


By:_____

Name: Luca Pellicciotta
Title: President and CEO

## Exhibit A

**Notice of Filing Term Sheet**

See attached.

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | § | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| **FIELDWOOD ENERGY LLC, *et al.,*** | § | Case No. 20-33948 (MI) |
| | § | |
| Debtors.[1] | § | **(Jointly Administered)** |
| | § | Re Docket No. 1284 |

**NOTICE OF FILING OF EXECUTED TERM SHEET BY AND BETWEEN
THE DEBTORS AND ENI PETROLEUM US LLC**

        **PLEASE TAKE NOTICE** that on May 12, 2021, Fieldwood Energy LLC

("**Fieldwood**") and its debtor affiliates, as debtors and debtors in possession in the above-

captioned chapter 11 cases (collectively, the "**Debtors**"), after extensive good faith, arm's length

negotiations, executed a term sheet with Eni Petroleum US LLC ("**Eni**" and, together with the

Debtors, the "**Parties**") reflecting an agreement-in-principle between the Parties with respect to

the treatment under the *Fourth Amended Joint Chapter 11 Plan of Fieldwood Energy LLC and

Its Affiliated Debtors* dated April 15, 2021 filed at ECF No. 1284 (including any exhibits and

schedules thereto and as may be further amended, supplemented, or modified, the "**Plan**") of

certain oil and gas leases and related interests and obligations, a copy of which is attached hereto

as **Exhibit A** (the "**Fieldwood/Eni Term Sheet**").

        **PLEASE TAKE FURTHER NOTICE** that the Fieldwood/Eni Term Sheet

provides for, among other terms and conditions:

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are: Dynamic Offshore Resources NS, LLC (0158); Fieldwood Energy LLC (6778); Fieldwood Energy Inc. (4991); Fieldwood Energy Offshore LLC (4494); Fieldwood Onshore LLC (3489); Fieldwood SD Offshore LLC (8786); Fieldwood Offshore LLC (2930); FW GOM Pipeline, Inc. (8440); GOM Shelf LLC (8107); Bandon Oil and Gas GP, LLC (9172); Bandon Oil and Gas, LP (9266); Fieldwood Energy SP LLC (1971); Galveston Bay Pipeline LLC (5703); and Galveston Bay Processing LLC (0422). The Debtors' primary mailing address is 2000 W. Sam Houston Parkway S., Suite 1200, Houston, TX 77042.

- an agreement-in-principle between the Parties regarding the treatment of the oil and gas leases and facilities (including but not limited to, for all purposes thereunder, any wells, pipelines, or other structures) set forth on Exhibit A attached to the Fieldwood/Eni Term Sheet previously conveyed to the Debtors by Eni and certain of its affiliates;

- Eni's agreement to withdraw any pending objections it has filed to the Plan and to not file any further objections to the Plan or support any other party in objecting to or opposing the Plan and agrees it will support confirmation of the Plan; and

- that the Debtors, Fieldwood, Credit Bid Purchaser,[2] and Eni shall work together in good faith to negotiate the definitive documents contemplated in the Fieldwood/Eni Term Sheet and any other agreements required to implement the transactions contemplated therein, in each case in accordance with the terms and conditions set forth herein and acceptable to the Required DIP Lenders and the Requisite FLTL Lenders.

---

[2] Capitalized terms used but not defined herein have the meanings ascribed to them in the Plan.

Dated: May 12, 2021
        Houston, Texas

                          Respectfully submitted,


                           /s/ Jessica Liou
                          WEIL, GOTSHAL & MANGES LLP
                          Alfredo R. Pérez (15776275)
                          700 Louisiana Street, Suite 1700
                          Houston, Texas 77002
                          Telephone:  (713) 546-5000
                          Facsimile:  (713) 224-9511
                          Email:   Alfredo.Perez@weil.com


                          -and-

                          WEIL, GOTSHAL & MANGES LLP
                          Matthew S. Barr (admitted *pro hac vice*)
                          Jessica Liou (admitted *pro hac vice*)
                          767 Fifth Avenue
                          New York, New York 10153
                          Telephone:  (212) 310-8000
                          Facsimile:  (212) 310-8007
                          Email:   Matt.Barr@weil.com
                                   Jessica.Liou@weil.com


                          *Attorneys for Debtors*
                          *and Debtors in Possession*

**Certificate of Service**

I hereby certify that, on May 12, 2021, a true and correct copy of the foregoing document was served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

 */s/  Jessica Liou*
Jessica Liou

## EXHIBIT A

**Fieldwood/Eni Term Sheet**

# FIELDWOOD ENERGY

*Thomas R. Lamme*
*Senior Vice President and General Counsel*
*Direct: 713-969-1107*
*Email: TLamme@fwellc.com*

May 12, 2021

**VIA EMAIL**

Luca Pellicciotta
President and CEO
Eni Petroleum US LLC
1200 Smith Street, Suite 1700
Houston, Texas 77002
E-mail: luca.pellicciotta@eni.com

   *Re: Fieldwood/Eni Term Sheet*

Dear Mr. Pellicciotta:

Attached as Exhibit A is the agreed upon term sheet dated May 12, 2021, by and between Fieldwood Energy LLC and its affiliated debtors and Eni Petroleum US LLC ("**Eni**" and, together with the Debtors, the "**Parties**") supporting the restructuring of the portion of the Debtors' business relating to certain assets described therein as the "Abandoned Properties" (the "**Fieldwood/Eni Term Sheet**").

By executing this letter agreement, each of the undersigned Parties agrees (i) to work to implement the terms of the Fieldwood/Eni Term Sheet and (ii) to negotiate the definitive documents described therein in good faith and in accordance with the terms of the Fieldwood/Eni Term Sheet.

The Parties may execute and deliver this letter agreement by electronic reproduction and in multiple counterparts, each of which shall constitute an original and all of which shall be one and the same document. This letter agreement shall be governed by the laws of the State of Texas without regard to any choice of law principles.

[Signature Pages Follow]

Enclosure

cc: Michael T. Dane, *via email* MDane@Fwellc.com

IN WITNESS WHEREOF, the undersigned Parties have executed this letter agreement as of the date first written above.

**FIELDWOOD ENERGY LLC**

By: _Thomas R. Lamme_

Name:  Thomas R. Lamme
Title:   Senior Vice President and General Counsel

**ENI**:

ENI PETROLEUM US LLC

By:
Name:        Luca Pellicciotta
Title:        President and CEO

**EXHIBIT A**

FIELDWOOD/ENI TERM SHEET

*This Term Sheet is an expression of interest only and creates no legally binding commitment by either party to negotiate any specific transaction or enter into any agreement. It is expressly understood that no liability or obligation of Fieldwood Energy LLC and its affiliated debtors (collectively, the "Debtors") or Eni Petroleum US LLC ("Eni") of any nature whatsoever is intended to or will be created hereunder with respect to this Term Sheet or related discussions or writings or the transactions contemplated hereby and that this Term Sheet is neither a contract nor a binding offer. It is understood and agreed that any transaction is expressly conditioned, among others, upon approval by the Debtors and Eni, the execution and delivery by the Debtors and Eni or their affiliates of definitive written agreements, in form and substance satisfactory to the Debtors and Eni in their sole discretion, the satisfaction of the conditions set forth therein, and Bankruptcy Court approval. The Debtors and Eni expressly agree that this Term Sheet does not contain all terms that would be required to be agreed to in order to enter into any definitive agreement. Without prejudice to the foregoing, this Term Sheet constitutes a "Definitive Document" under the Restructuring Support Agreement (as defined in the Plan (as defined below)) and is subject to the consent rights set forth therein. Except as provided for herein, each party is responsible for its own costs and expenses, including those of its legal advisors in conjunction with this Term Sheet.* [1]

| |
|---|
| **ENI / FIELDWOOD COMMERCIAL TERM SHEET** |
| |

Through the Initial Plan of Merger contemplated under the *Fourth Amended Joint Chapter 11 Plan of Fieldwood Energy LLC and Its Affiliated Debtors* dated April 15, 2021 filed at ECF No. 1284 (including any exhibits and schedules thereto and as may be further amended, supplemented, or modified, the "**Plan**"), Fieldwood Energy III LLC ("**FWE III**") will, subject to the terms and conditions set forth herein, decommission the oil and gas leases and facilities (including but not limited to, for all purposes hereunder, any wells, pipelines, or other structures) set forth on **Exhibit A** attached hereto (collectively, the "**Abandoned Properties**" and each individually, an "**Abandoned Property**") previously conveyed to Debtors by Eni and certain of its affiliates.

**Term Sheet Expiration Date**

The Debtors, FWE, Credit Bid Purchaser, and Eni shall work together in good faith to negotiate the definitive documents contemplated below and any other agreements required to implement the transactions contemplated in this Term Sheet, in each case in accordance with the terms and conditions set forth herein and acceptable to the Required DIP Lenders and the Requisite FLTL Lenders ("**Definitive Documents**"), provided that this Term Sheet shall terminate if the parties have not fully agreed and finalized all such required Definitive Documents on or before the Effective Date of the Plan (such date, the "**Termination Date**").

**Conditions Precedent to Effectiveness**

In addition to any other conditions precedent that may be agreed by the parties, it shall be a condition precedent to the effectiveness of the Definitive Documents that FWE III will have been granted to the satisfaction of the parties to the Definitive Documents all necessary approvals by applicable regulatory authorities to act as a qualified operator in the Gulf of Mexico. In the event that FWE III has not been granted such approval(s) by September 30, 2021, this Term Sheet and any and all executed Definitive Documents shall automatically terminate on such date. For the avoidance of doubt, in no event shall the failure to consummate any Definitive Document result in any such extension after the Termination Date.

**Closing**

---

[1] Capitalized terms used but not defined herein have the meanings ascribed to them in the Plan.

"**Closing**" shall take place in conjunction with the effectiveness of the divisive merger and simultaneous execution and delivery of the Definitive Documents.

**FWE III Governance and Operations**

1. FWE III will provide Eni with regular informational updates, including monthly, quarterly, and annual financial reports. Eni shall have the right but not the obligation to share such information with the sureties.

2. As a condition precedent to the effectiveness of the Turnkey Removal Agreement (and the other Definitive Documents), FWE III will become a qualified operator in the Gulf of Mexico.

3. FWE III will use reasonable efforts to obtain reimbursement/contribution for decommissioning activity that is available under contract or applicable law, including any other record title and/or operating rights interest holders and predecessors-in-interest other than Eni to the extent practicable and available surety bonding other than Eni's bonds; provided that, for the avoidance of doubt, FWE III shall not be required to incur any out-of-pocket costs or obligations in connection with such efforts.

4. FWE III shall obtain the written consent of Eni (not to be unreasonably withheld) prior to entering settlement negotiation(s) or agreeing to a settlement and/or initiating dispute resolution regarding the Abandoned Properties, including with respect to obtaining contributions from other record title and/or operating rights interest holders and predecessors-in-interest for decommissioning or funds from surety bonds for decommissioning.

5. The Debtors and FWE III will be responsible for all costs associated with formation of FWE III in connection with the Initial Plan of Merger as contemplated in the Plan. Funds required for the ongoing operations of FWE III shall be provided as set forth in the "Implementation and Funding Agreement" below.

6. FWE III will provide all funds for any premiums for organizational/area-wide bonding requirements.

**Withdrawal of Objections and Support of the Plan**

In conjunction with the execution of this Term Sheet or promptly thereafter, Eni will withdraw any pending objections it has filed to the Plan, and agree not to file any further objections to the Plan or to support any other party in objecting to or opposing the Plan and agrees it will support confirmation of the Plan.

**Turnkey Removal Agreement**

1. *Total Turnkey Amount*.

   a. Eni, FWE III and Credit Bid Purchaser agree to enter into a Turnkey Removal Agreement acceptable to Eni, FWE III, Credit Bid Purchaser, the Required DIP Lenders, and the Requisite FLTL Lenders, whereby Credit Bid Purchaser will decommission the Abandoned Properties on a turnkey payment basis, and Credit Bid Purchaser will earn a turnkey amount in exchange for completing each such decommissioning project. The total turnkey amount for each lease or facility comprising an Abandoned Property shall be set forth (i) on a gross 8/8ths basis (the "**Gross Decom Amount**") and (ii) on a net basis to Eni (such amount, the "**Eni (Net) Costs**"). The sum of each Gross Decom Amount for each lease and/or facility located at the Abandoned Properties shall not exceed $95,755,436.46 (the "**Total Decom Cost**"). The sum of all Eni (Net) Costs for each lease and/or facility located at the Abandoned Properties shall not exceed $57,325,130.98 ("**Total Eni (Net) Costs**"). The Total Decom Cost and Total Eni Cost

may be adjusted for the Qualified Conditions and/or Regulatory Changes, as set forth below. For the avoidance of doubt, each Gross Decom Amount for each Abandoned Property shall be inclusive of all operating expenses and all costs and expenses of decommissioning as required to meet the Performance Standard defined below. Subject to Section 1.b and Section 4 below, Eni shall have no obligation to pay the parties to this Term Sheet any costs or liability to perform any obligations associated with the decommissioning of any lease or facility comprising an Abandoned Property once Eni has paid Credit Bid Purchaser the applicable turnkey costs, as adjusted hereunder, for such lease or facility, as applicable.

b. In order to facilitate the diligent and continuous performance of the decommissioning obligations set forth in this Term Sheet, Credit Bid Purchaser, FWE III, and Eni agree that Eni shall have the right, but not the obligation (in Eni's sole discretion) to make an irrevocable election to agree to pay to Credit Bid Purchaser the Gross Decom Amount for any such lease or facility comprising an Abandoned Property (such election, the "**Turnkey Election**"). In the event that Eni desires to make such a Turnkey Election, Eni shall provide Credit Bid Purchaser and FWE III written notice of its intent (a "**Turnkey Notice**") and Credit Bid Purchaser shall promptly commence the decommissioning contemplated for any such lease or facility. The decommissioning project schedule contained in the Turnkey Removal Agreement shall be modified to address any such Turnkey Election. Notwithstanding anything to the contrary contained in this Term Sheet or any other Definitive Document, in the event Eni makes a Turnkey Election, (i) Eni agrees to pay Credit Bid Purchaser the applicable Gross Decom Amount, as it may be increased, (ii) in the event the actual cost to decommission the lease or facility, as applicable, associated with such Turnkey Election and excluding the costs addressed in Section 4 in accordance with the Performance Standard exceeds the Gross Decom Amount, as adjusted for the Qualified Conditions and/or Regulatory Changes, Credit Bid Purchaser shall assume the risk of any costs in excess of the Gross Decom Amount, as such amounts may be adjusted as a result of a Qualified Condition and/or Regulatory Changes, and (iii) Eni shall have the right to seek contribution from third parties for any share of the Gross Decom Amount for any lease or facility comprising an Abandoned Property. In the event Eni makes a Turnkey Election, it may assign its interest in the Turnkey Removal Agreement insofar as it covers such asset (to the extent that it relates to Eni's prior undivided interests in the Abandoned Property) to any third party or parties with joint and several liability for such decommissioning, provided that Eni shall remain responsible for all of its obligations.

c. Subject to the Qualified Conditions and Regulatory Changes provisions, Credit Bid Purchaser shall assume the risk that the costs of decommissioning each lease or facility comprising an Abandoned Property exceeds (i) the Eni (Net) Costs attributable to Eni's prior interest in such lease or facility, as applicable, in the event no Turnkey Election is made, or (ii) the Gross Decom Amount attributed to such lease or facility, as applicable, in the event a Turnkey Election is made. In the event of a Qualified Condition (as defined in Section 3 below), Eni and Credit Bid Purchaser shall share in any costs related to the Qualified Condition(s) in excess of the relevant Eni (Net) Costs (or the Gross Decom Amount if the Turnkey Election is made) up to, on an aggregated basis of all Abandoned Properties, $15,000,000 (the "**Qualified Condition Cap**") as follows: (i) Eni shall be responsible for the first $5,000,000 of costs related to Qualified Conditions, and (ii) Eni and Credit Bid Purchaser shall be responsible 75% / 25% respectively for the remaining cost up to the Qualified Condition Cap. Eni's responsibility for any costs related to a Qualified Condition shall not commence until the full amount of the relevant Eni (Net) Costs, or if the Turnkey Election is made the relevant Gross Decom Amount, have been

incurred. The calculation and application of these amounts (including such Qualified Condition Cap) shall be limited to the portion allocated to the Eni (Net Costs) in the event Eni did not elect to pay the Gross Decom Amount with regard to such asset. In the event that one or more Qualified Conditions results in costs that exceed the Qualified Condition Cap, Eni's liability for any additional costs shall terminate once the Qualified Condition Cap has been reached and Eni shall have no further liability for any costs or the performance of any obligations associated with any Qualified Condition.

d. Credit Bid Purchaser will have profit opportunity following the completion of decommissioning for any lease or facility comprising an Abandoned Property if it is able to decommission any lease or facility comprising an Abandoned Property for a lower cost than the (i) the Eni (Net) Costs, provided that Eni did not make a Turnkey Election for such asset or (ii) the Gross Decom Amount if a Turnkey Election was made by Eni (including any increases to the applicable Eni (Net) Costs or Gross Decom Amount, respectively, for any Qualified Conditions or Regularly Conditions) attributed to such lease or facility comprising an Abandoned Property.

e. FWE III's obligations under the Turnkey Removal Agreement for any specific Abandoned Property shall commence upon the earlier of (i) receipt by Eni and other joint and several liable parties of a BOEM/BSEE order requiring decommissioning of such Abandoned Property and after full funding for the project has been finalized, or (ii) a Turnkey Election by Eni for such Abandoned Property; provided that the decommissioning project schedule contained in the Turnkey Removal Agreement shall be modified to address either such event.

2. ***Services***. Services provided by Credit Bid Purchaser pursuant to the Turnkey Removal Agreement will include performing decommissioning operations at the Abandoned Properties to an agreed operational and regulatory performance standard on behalf of FWE III and Eni agree that Credit Bid Purchaser will meet such required standard if it performs such decommissioning operations consistent with required laws, rules and regulations promulgated by governing regulatory agencies, including but not limited to BOEM and BSEE, and consistent with any applicable third party contracts (the "**Performance Standards**").

3. ***Qualified Conditions***. At or before Closing, Credit Bid Purchaser and Eni shall determine the turnkey amounts on a project-by-project basis for all decommissioning projects under the Turnkey Removal Agreement (leases and facilities to be operated by FWE III) and shall agree on a decommissioning project schedule consistent with the terms set forth in Section 7 below, all of which shall be attached to the Turnkey Removal Agreement. The parties shall also agree upon certain qualified conditions for the decommissioning projects ("**Qualified Conditions**"), which such Qualified Conditions, if present, can, at the election of either Credit Bid Purchaser or Eni, as applicable, and subject to the notice requirements set forth in the Definitive Documents, cause the parties to adjust the applicable turnkey amount for a particular project or agree on alternative cost arrangement; provided that such Qualified Conditions shall be set forth in the Definitive Documents and shall be limited to the items listed on **Schedule 1** attached hereto. In the event the parties are unable to agree to the adjusted turnkey amount or an alternative cost arrangement due to an occurrence of a Qualified Condition, the parties shall follow the method set forth in the Definitive Documents.

4. ***Temporary Abandoned Wells and Excluded Wells***. Credit Bid Purchaser and Eni acknowledge and agree that there may be decommissioning obligations attributable to the wells identified on **Exhibit B** attached hereto which were purported to have been temporarily

plugged and abandoned as of the effective date of that certain *Purchase and Sale Agreement by and among Eni Petroleum US LLC and Eni US Operating Co. Inc., as Seller, and Fieldwood Energy Offshore LLC, a Purchaser, dated as of December 1, 2015* (the "**Comal PSA**"). Eni will be solely responsible for the costs associated with the decommissioning of the "Excluded Wells" (as such term is defined in the Comal PSA) and shall be solely responsible for the "Eligible Well Intervention Costs" (as such term is defined in the Comal PSA) for any "Temporary Abandoned Well" (as such term is defined in the Comal PSA) as provided in the following sentence. Notwithstanding the foregoing, Eni shall have no obligation for (i) any costs or obligations attributable to any Temporary Abandoned Well in excess of the "Eligible Well Intervention Costs" associated with any such Temporary Abandoned Well, or (ii) any costs or obligations attributable to a Temporary Abandoned Well for which Eni's liability terminated pursuant to Section 7.19(e) of the Comal PSA. Notwithstanding anything herein to the contrary, in the event the Credit Bid Purchaser is required to handle Eni's obligations as addressed in this section, Eni shall promptly reimburse Credit Bid Purchaser for all costs and expenses incurred in connection therewith, together with a reasonable overhead charge in accordance with the COPAS attached to the Contract Operating Agreement defined in Section 2 of the Implementation and Funding Agreement and, for the avoidance of doubt, none of such costs, expenses or overhead shall be considered in the calculation of the Qualified Condition Cap. Such payment shall occur promptly upon completion of the work set forth in this section.

5.   *Regulatory Changes*.  In addition to the Qualified Conditions described on **Schedule 1** attached hereto, if any regulatory body either (i) issues new regulations that increase or materially change the cost to conduct decommissioning or (ii) designates additional sand sediment areas requiring pipeline removal as opposed to abandonment in place (if the turnkey amount for the particular pipeline assumes abandonment in place), Eni and Credit Bid Purchaser shall negotiate in good faith to adjust the applicable Gross Decom Amount to take into account the incremental costs to complete the project under the Turnkey Removal Agreement.  For the avoidance of doubt, new regulations include but are not limited to, NTLs, BSEE or BOEM national, regional or district policies, executive orders and new regulations in the CFRs that govern decommissioning. If the parties cannot agree on a revised Gross Decom Amount, the project shall be completed on a cost-plus 15% basis.

6.   *Surety Bonds*.  Eni may apply any available proceeds from bonds that cover the decommissioning costs associated with the Abandoned Properties to any amounts owed hereunder.  Eni will bear all costs and risks associated with such bonds and notwithstanding its failure to recover all or any bond proceeds, Eni will be required to pay the Total Eni (Net) Costs or Gross Decom Amount, as applicable pursuant to terms and conditions of this Term Sheet.

7.   *Payments*. Subject to Section 1.b and without limitation of Credit Bid Purchaser's obligation to perform the Initial Safe Out as provided in Section 9 below, Credit Bid Purchaser shall not undertake the applicable decommissioning project until full funding of the applicable Gross Decom Amount has been agreed to by Eni and Credit Bid Purchaser, including receiving or securing a contractual commitment (such as a decommissioning agreement) from applicable third parties. Eni will be required to pay Credit Bid Purchaser the Eni (Net) Costs or Gross Decom Amount (in the event a Turnkey Election was made pursuant to this Term Sheet), as applicable, attributable to the decommissioning activities performed for each lease or facility comprising an Abandoned Property upon delivery to FWE III and to Eni of the filings and other evidence (i) required by BOEM and/or BSEE or any other applicable governmental authority, including requisite approvals or regulatory concurrence, with regard to the satisfaction of decommissioning obligations with respect to the applicable asset to

5

support Credit Bid Purchaser's representation that the applicable project has been completed; and (ii) an invoice and/or billing statement outlining in detail the decommissioning work actually performed for such lease or facility along with supporting documentation. Notwithstanding anything to the contrary herein, the payments made by Eni in satisfaction of the obligations set forth herein, shall not exceed $20,000,000 on an annual basis for any given year; provided that (i) if Eni has delivered the Turnkey Notice as provided in this Term Sheet or (ii) if Eni is required, pursuant to an order from any governmental or regulatory authority, to perform any decommissioning project on a schedule that is more accelerated than contemplated in the schedule set forth in the Turnkey Removal Agreement, then such annual limitation will be increased above $20,000,000 to the extent such increase is necessitated to perform the decommissioning activities contemplated in subparts (i) and (ii) of this sentence.

8.  **Termination**. Eni retains the right to terminate the Turnkey Removal Agreement as to any particular lease or facility located at the Abandoned Properties and/or require FWE III to competitively bid the decommissioning services with respect to any particular lease or facility attributable to an Abandoned Property in the event Credit Bid Purchaser is in material breach of the Turnkey Removal Agreement in relation to the particular lease or facility. Credit Bid Purchaser or Eni may terminate the Turnkey Removal Agreement as to any particular lease or facility located at the Abandoned Properties if, within three (3) years from the effective date of the Turnkey Removal Agreement, a Turnkey Election is not made for such lease or facility or contractual commitments for full funding of the applicable Gross Decom Amount for such lease or facility have not been received.

9.  **Initial Safe Out**. With respect to the Abandoned Properties, FWE III will engage Credit Bid Purchaser to promptly perform, operations necessary to safe-out and otherwise perform preparatory activities to put such Abandoned Properties, subject to Section 4, into a mechanical and operational state such that they are hydrocarbon free and ready to be decommissioned (the "**Initial Safe Out**"); provided, however that such Initial Safe Out shall be completed no later than December 31, 2021, unless agreed to in writing by Eni (such consent not to be unreasonably withheld, delayed or conditioned).

10. **Right of First Offer and Notice of Sale**. To the extent that any other predecessor-in-interest, in connection with the decommissioning of such predecessor-in-interest's prior assets, is granted a right of first offer, right of first refusal, or similar preferential purchase right in connection with any assets transferred to Credit Bid Purchaser pursuant to the Plan, Credit Bid Purchaser shall grant Eni rights that are substantially similar in connection with the Abandoned Properties. After the Effective Date of the Plan, in the event that Credit Bid Purchaser desires to sell, transfer or otherwise dispose of any portion of its interests in any assets transferred to Credit Bid Purchaser pursuant to the Plan through a public marketing process utilizing a third party agent, investment bank, or similar service, Credit Bid Purchaser shall use reasonable efforts to cause such agent or investment bank to provide Eni with written notice and an opportunity to participate in any related sales process.

11. **Mutual Indemnity**. Credit Bid Purchaser and Eni shall indemnify one another for a material breach of their respective obligations under the Turnkey Removal Agreement; provided, however, the indemnity obligations set forth herein shall not include lost profit opportunity, indirect damages, consequential damages, third party claims, fines or penalties (except to the extent directly resulting from a material breach by the other party), attorney's fees, or any other third party costs.

12. **Audit Rights**. For each year the Turnkey Removal Agreement remains in effect and for up to twelve (12) months following the completion of the decommissioning obligations

| |
|---|
| contemplated in this Term Sheet, Eni shall have the right to conduct, during normal business hours upon at least thirty (30) days' prior notice, an audit of Credit Bid Purchaser's records to the extent related to any amount charged to Eni hereunder. |

**Implementation and Funding Agreement**

1. ***Funding Contribution***. Without limitation of FWE's obligation to perform the Agreed Activities pursuant to the Plan, FWE will contribute on the Effective Date $3 million to FWE III (the "**Contribution Amount**"), which amount will be used solely in connection with the Abandoned Properties and partially in satisfaction of Eni's obligation to pay the Total Eni (Net) Costs.

2. ***Operating Costs***.  From and after the Effective Date and subject to Section 4 above, Credit Bid Purchaser will manage on behalf of FWE III the Abandoned Properties until the commencement of the decommissioning pursuant to a mutually acceptable contract operating agreement between FWE III and Credit Bid Purchaser (the "**Contract Operating Agreement**").  Except as set forth in Section 4 above, Eni shall not be responsible for any operating costs associated with Eni's interests in the Abandoned Properties. Management of the properties shall include, but not be limited to, as services provided: operations, production marketing (for producing assets), accounting and land administration.

3. ***Legal Fees***.  FWE/FWE III, as applicable, will pay for Eni's reasonable and documented legal fees incurred in connection with the Debtors' chapter 11 cases, up to a cap of $1.5 million.

4. ***ORRI***. To the extent that any other predecessor-in-interest is granted an overriding royalty interest or similar future interest in Credit Bid Purchaser's production prior to the Effective Date in connection with the decommissioning of such predecessor-in-interest's prior assets, FWE shall grant Eni a similar and proportionate interest in connection with Eni's turnkey removal payments.

7

**Exhibit "A"**
**Abandoned Properties**

| Block | Lease |
|-------|-------|
| SS 246 | OCS-G 01027 |
| VR 313 | OCS-G 01172 |
| SS 247 | OCS-G 01028 |
| SS 248 | OCS-G 01029 |
| SS 249 | OCS-G 01030 |
| SS 270 | OCS-G 01037 |
| WC 72 | OCS-G 23735 |

End of Exhibit "A"

**Exhibit "B"**
**Temporary Abandoned Wells**

# EXHIBIT B
## TEMPORARY ABANDONED WELLS

| API | LEASE | AREA | BLOCK | WELL NAME | SUFFIX | Status |
|-----|-------|------|-------|-----------|--------|--------|
| 42-706-40442-00 | OCS-G15740 | Galveston | 151 | 5 | ST00BP00 | Temporarily Abandoned. Operated by Fieldwood. |
| 17-712-40057-00 | OCS-G 01027 | Ship Shoal | 246 | A-001 | ST00BP00 | TA 2010. 13 3/8" CICR @ 164' BML with 120' surface cement plug f/ 164' to 44' BML. 13 3/8" and 20" removed to 25' BML. Top of 30" is +/ 5" AML. Need to remove 30" to 15' BML when platform is removed. |
| 17-712-40074-00 | OCS-G 01027 | Ship Shoal | 246 | A-002 | ST00BP02 | TA 2001. LS@ 1357', SS@ 1424'. Spotted cmt plugs in LS 10100'-9800' and 3100' - 2800'. CICR @ 1300' with 200' cmt on top f/ 1300' - 1100'. Need to PT & BT annuli, set surface cmt plug and remove 7", 9 5/8", 13 3/8", 20" and 26" casings to 15' BML. |
| 17-712-40102-00 | OCS-G 01027 | Ship Shoal | 246 | A-009 | ST00BP00 | TA 2001. Casing damage at 9764'. 7", 29# CIBP at 9000' with 200' cement plug f/ 8800' - 9000'. Displace well w/ 13.5ppg WBM. Test cmt plug w/ 1000 psi. Need to PT & BT annuli and set additional cement plugs as required by BSEE. Remove 7", 9 5/8", 13 3/8", 20", and 26" at 15' BML. |
| 17-712-40224-00 | OCS-G01028 | Ship Shoal | 247 | F-010 | ST00BP00 | TA 2013. Surface cement plug @ 70' BML. Need to cut 7 5/8", 10 ¾", 16" & 26" at 15' BML. |
| 17-712-40221-00 | OCS-G01029 | Ship Shoal | 248 | F-008 | ST00BP00 | TA 2000. 197' surface cement plug at 81' - 278' BML. 7 5/8" casing cut at 276' and 186' BML, could not pull. Cemented to surface. Need to PT & BT all annuli and remove 7 5/8", 10 3/4", 16" and 26" to 15' BML. |
| 17-712-40131-00 | OCS-G01028 | Ship Shoal | 247 | D-003 | ST00BP02 | TA 1982. 205' surface cement plug f/ 50' - 255' BML in 7". Need to PT & BT all annuli and remove 7", 9 5/8", 13 3/8", 20" and 26" casings to 15' BML. |
| 17-712-40156-00 | OCS-G01028 | Ship Shoal | 247 | D-007 | ST00BP03 | TA 2013. Surface cement plug @ 100' BML. Need to cut 10 ¾", 16", & 26" at 15' BML. |
| 17-712-40166-00 | OCS-G01028 | Ship Shoal | 247 | D-009 | ST00BP00 | TA 1999. Casing restriction @ 11195'. CICR @ 11150' with 370' cement plug on top f/ 11150' - 10780'. 7" wellbore has 13.0 ppg WBM. Need to PT & BT all annuli, set additional cmt plugs as required by BSEE and remove 7", 9 5/8", 13 3/8" 20" and 26" to 15' BML. |
| 17-712-40179-03 | OCS-G01028 | Ship Shoal | 247 | D-012 | ST03BP00 | TA 2013. Highest cement plug @ 789' BML. Need to set surface cement plug. PT & BT. Cut 9 5/8", 13 3/8", 18 5/8" & 26" at 15' BML. |
| 17-712-40150-0 | OCS-G01029 | Ship Shoal | 248 | D-006 | ST00BP00 | TA 1977. Drilled and TA'd 1977. Highest cement plug (150') f/ 420' - 540' RKB (150' - 300' BML). 17.5 ppg WBM in wellbore. Need to tag cement plug at 150' BML, circulate clean with seawater, set 9 5/8" CIBP at TOC and spot +/- 50' cement on top. PT & BT annuli. Remove 9 5/8", 13 3/8", 20" and 26" casings to 15' BML. |

1 of 3

# EXHIBIT B
## TEMPORARY ABANDONED WELLS

| API | LEASE | AREA | BLOCK | WELL NAME | SUFFIX | Status |
|---|---|---|---|---|---|---|
| 17-712-40206-00 | OCS-G01029 | Ship Shoal | 248 | D-015 | ST00BP00 | TA 2013. Highest cement plug @ 900' RKB (620' BML). Need to set surface cement plug. PT & BT. Cut 7 5/8", 10 ¾", 16" & 26" at 15' BML. |
| 17-712-40210-00 | OCS-G01029 | Ship Shoal | 248 | D-016 | ST00BP00 | TA 2014. Highest cement plug @ 670' RKB (390' BML). Need to set surface cement plug. PT & BT. Cut 7 5/8", 10 ¾", 16" & 26" at 15' BML. |
| 17-712-40211-00 | OCS-G01029 | Ship Shoal | 248 | D-018 | ST00BP00 | TA 2013. Highest cement plug @ 900' RKB (620' BML). Need to set surface cement plug. PT & BT. Cut 7 5/8", 10 ¾", 16" & 26" at 15' BML. |
| 17-712-40530-00 | OCS-G01029 | Ship Shoal | 248 | G-002 | ST00BP00 | TA 2013. Surface cement plug @ 124' BML. Need to cut 9 5/8", 13 3/8" & 26" at 15' BML. |
| 17-712-40533-00 | OCS-G01029 | Ship Shoal | 248 | G-003 | ST00BP00 | TA 2013. Surface cement plug @ 45' BML. Need to cut 9 5/8", 13 3/8", 20" & 26" at 15' BML. |
| 17-712-40120-00 | OCS-G01030 | Ship Shoal | 249 | D-002 | ST00BP00 | TA 2013. Highest cement plug @ 620' BML. Need to set surface cement plug. PT & BT. Cut 7", 9 5/8", 13 3/8", 20" & 26" at 15' BML. |
| 17-712-40159-00 | OCS-G01030 | Ship Shoal | 249 | D-008 | ST00BP00 | TA 2013. Surface cement plug @ 90' BML. Need to cut 7", 9 5/8", 13 3/8", 20" & 26" at 15' BML. |
| 17-712-40171-00 | OCS-G01030 | Ship Shoal | 249 | D-004 | ST00BP00 | TA 1978. Drilled and TA'd in 1978. Highest cement plug (150') at 465' - 315' RKB (185' - 35' BML). Plug tested 1000 psi. 15.9 ppg WBM in wellbore. Need to PT & BT annull and remove 9 5/8", 13 3/8", 20" and 26" casings to 15' BML. |
| 17-712-40192-00 | OCS-G01030 | Ship Shoal | 249 | D-014 | ST00BP01 | TA 1978. Drilled and TA'd in 1978. Highest cement plug f/ 10120' to 10389' (269'). Set 9 5/8" CICR @ 10170'. Squeeze 61 sxs below (219') and spot 50' on top of CR.  9 5/8" shoe @ 10239'.  16.8 ppg WBM in wellbore. Need to PT & BT annuli, spot additional cement plugs as required by BSEE and remove 9 5/8", 13 3/8", 20" and 26" casings to 15' BML. |
| 17-712-40208-00 | OCS-G01030 | Ship Shoal | 249 | D-017 | ST00BP00 | TA 2013. Highest cement plug @ 620' BML. Need to set surface cement plug. PT & BT. Cut 7 5/8", 10 ¾", 16" & 26" at 15' BML. |
| 17-712-40215-00 | OCS-G01030 | Ship Shoal | 249 | D-019 | ST00BP00 | TA 2013. Highest cement plug @ 820' BML. Need to set surface cement plug. PT & BT. Cut 7", 9 5/8", 13 3/8", 20" & 26" at 15' BML. |
| 17-712-40622-00 | OCS-G01030 | Ship Shoal | 249 | 6 | ST00BP00 | TA 2001. 7 5/8" CIBP set at 200' BML, no cement. Need to spot surface cement plug on CIBP. Cut 16" and 24" at 15' BML. |
| 17-705-40778-00 | OCS-G04421 | Vermilion | 78 | A001 | ST00BP00 | Temporarily Abandoned. Operated by Fieldwood. |
| 17-706-40281-00 | OCS-G01172 | Vermilion | 313 | B001 | ST00BP01 | TA 2014. Surface cement plug @ 110' BML. Need to cut 10 ¾", 16" & 26" at 15' BML. |
| 17-706-40297-00 | OCS-G01172 | Vermilion | 313 | B002 | ST00BP00 | TA 2014. Surface cement plug @ 110' BML. Need to cut 7 5/8", 10 ¾", 16" & 26" at 15' BML. |

2 of 3

# EXHIBIT B
## TEMPORARY ABANDONED WELLS

| API | LEASE | AREA | BLOCK | WELL NAME | SUFFIX | Status |
|---|---|---|---|---|---|---|
| 17-706-40314-00 | OCS-G01172 | Vermilion | 313 | B004 | ST00BP00 | Listed in BSEE database (and OWL) as P&A in 1978. HOWEVER THE CASINGS AND WELLHEADS ARE STILL IN PLACE ON PLATFORM. SO IT IS ACTUALLY TA'd. Drilled and TA'd in 1978. Set 10 3/4" CICR at 3425'. Squeezed 75 sxs cmt below CR and left 25 sxs on top. Highest cement plug (155') f/ 605' - 450' RKB (322'- 167' BML). Surface plug tested to 2000 psi. 13.8 ppg WBM left in wellbore. Need to PT & BT annuli, tag plug at 450', circulate clean with seawater, complete surface plug with additional +/- 60' of cement and remove 10 3/4", 16" and 26" casings to 15' BML. |
| 17-706-40319-00 | OCS-G01172 | Vermilion | 313 | B006 | ST00BP00 | TA 2014. Surface cement plug @ 110' BML. Need to cut 7 5/8", 10 ¾", 16" & 26" at 15' BML. |
| 17-706-40327-00 | OCS-G01172 | Vermilion | 313 | B007 | ST00BP00 | TA 1978. Drilled and TA'd in 1978. Highest cement plug (150') at 450'-600' RKB (167' - 317' BML). 13.7ppg WBM in wellbore. Need to spot additional +/- 50' cement to complete surface plug, PT & BT annuli and remove 10 3/4", 16" and 26" casings to 15' BML. |
| 17-706-40338-01 | OCS-G01172 | Vermilion | 313 | B009 | ST01BP00 | TA 2014. Surface cement plug @ 110' BML. Need to cut 7 5/8", 10 ¾", 16" & 26" at 15' BML. |
| 17-706-40371-00 | OCS-G01172 | Vermilion | 313 | B011 | ST00BP00 | TA 2014. Surface cement plug @ 110' BML. Need to cut 7 5/8", 10 ¾", 16" & 26" at 15' BML. |
| 17-706-40719-00 | OCS-G01172 | Vermilion | 313 | C002 | ST00BP00 | TA 2014. Surface cement plug @ 98' BML. Need to cut 7", 10 ¾", 16" & 30" at 15' BML. |
| 17-706-40722-00 | OCS-G01172 | Vermilion | 313 | C003 | ST00BP00 | TA 2014. Surface cement plug @ 96' BML. Need to cut 7", 10 ¾", 16" & 30" at 15' BML. |
| 17-706-40720-00 | OCS-G01172 | Vermilion | 313 | C004 | ST00BP00 | TA 2014. Surface cement plug @ 100' BML. Need to cut 7", 10 ¾", 16" & 30" at 15' BML. |

3 of 3

**Schedule 1**

Qualified Conditions

1) To the extent that any well comprising an Abandoned Property that is not assigned a Gross Decom Amount requires the performance of any decommissioning activities, Eni and Credit Bid Purchaser shall agree to a Gross Decom Amount before commencing any decommissioning activities; provided, however, Temporary Abandoned with no estimated cost will not be subject to the Qualified Condition Cap.

2) For a period of up to eighteen (18) months after the effective date of the Turnkey Removal Agreement, any damage to an Abandoned Property due to a wind-storm, weather damage, or other casualty events associated with severe tropical weather arising after the effective date of the Turnkey Removal Agreement; provided, however, any damage to any platform related to ingress and egress shall not be a Qualified Condition.

3) To the extent that any pipeline comprising an Abandoned Property is required to be buried where the Turnkey Removal Agreement does not already assume burial, the incremental cost (above the agreed Gross Decom Amount) shall be performed at cost and the Gross Decom Amounts and Eni (Net) Costs shall be proportionately adjusted subject to Section 1.c of the Term Sheet, provided that Eni and Credit Bid Purchaser shall agree to a Gross Decom Amount before commencing any such activities.

End of Schedule "1"

## Exhibit B

**Turnkey Removal Agreement**

See attached.

*EXECUTION VERSION*

## TURNKEY REMOVAL AGREEMENT
### by and among
### ENI PETROLEUM US LLC
### AND
### FIELDWOOD ENERGY III LLC
### AND
### MAKO BUYER LLC

THIS TURNKEY REMOVAL AGREEMENT (the "**Agreement**") is made effective as of the [_____], 2021 (the "**Effective Date**"), by and among Eni Petroleum US LLC ("**Eni**"), a Delaware limited liability company having a mailing address of 1200 Smith Street, Suite 1700, Houston, Texas 77002, Fieldwood Energy III LLC ("**FWE III**"), a Delaware limited liability company having a mailing address of 2000 W. Sam Houston Pkwy S, Suite 1200, Houston, Texas 77042, and Mako Buyer LLC, a Delaware limited liability company (hereinafter referred to as "**Contractor**"), a Delaware limited liability company, having its mailing address at 2000 W Sam Houston Pkwy S, Suite 1200, Houston, Texas 77042.  Eni, FWE III and Contractor may hereinafter be referred to collectively as "**Parties**" or individually as a "**Party**."

### RECITALS

WHEREAS, FWE III is a resulting entity of a divisive merger effected in connection with the confirmed plan of reorganization of Chapter 11 Case 20-33948, In re: Fieldwood Energy LLC et al., in the United States Bankruptcy Court for the Southern District of Texas, Houston Division;

WHEREAS, Eni is identified as a predecessor-in-interest of the Specified Assets (as defined below);

WHEREAS, Eni and FWE III have requested that Contractor provide certain decommissioning and removal services with respect to the Specified Assets, upon the terms and conditions set forth herein, and Contractor has agreed to do so.

NOW, THEREFORE, in consideration of the premises and of the mutual promises, covenants, conditions, and agreements contained herein, and for other valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereby agree as follows:

### ARTICLE I.
### SERVICES

**Section 1.1**     **Services**. Subject to the terms of this Agreement, including the Performance Standards (as defined below), with respect to the interests identified on Schedule 1 of this Agreement (the "**Specified Interests**"), Contractor will perform (i) the Agreed Activities, (ii) the Initial Safe Out,  and (iii) plug, abandon, decommission, remove when reefing or burial are not allowed, and salvage as appropriate ("**Decommission**" or "**Decommissioning**") certain platforms, wells, pipelines, facilities and equipment (including production equipment) located at, and any

hydrocarbons produced from, if applicable, the Specified Interests (collectively the "**Specified Assets**") on a lump sum, project-by-project, turnkey payment basis as contemplated in this Agreement.

   **Section 1.2**     Turnkey Amounts.

   (a)     Contractor will earn a single turnkey payment in exchange for completing the Decommissioning for each decommissioning project identified on Exhibit A hereto (each a "**Decommissioning Project**"). The total turnkey amount for each Decommissioning Project set forth on Exhibit A shall be set forth (i) on a gross 8/8ths basis (the "**Gross Turnkey Amount**") and (ii) Eni's individual net share of such Gross Turnkey Amount (such amount, the "**Eni Net Turnkey Amount**"). Without limitation of Eni's share of any Agreed Excess Qualified Conditions Costs pursuant to Section 1.8 up to the Qualified Condition Cap or any Excess Regulatory Costs pursuant to Section 1.7, (i) the aggregate sum of Gross Turnkey Amounts for the Decommissioning Projects shall not exceed $95,755,436.46, and (ii) the aggregate sum of Eni Net Turnkey Amounts for the Decommissioning Projects shall not exceed $57,325,130.98.  The Parties acknowledge and agree that except as provided in this Agreement or the Implementation Agreement (as defined below), neither Contractor nor Eni shall have any obligation to Decommission any Specified Assets which are not identified on Exhibit A.

   (b)     Subject to the terms of this Agreement, each Gross Turnkey Amount for each applicable Decommissioning Project shall be inclusive of all costs, expenses, taxes and reasonable overhead (in accordance with COPAS provisions attached to the Contract Operating Agreement as defined in Section 1.12) associated with a particular Decommissioning Project, including all third-party costs, any fixed and/or capital costs, and  taxes as necessary to meet the Performance Standard (collectively, the "**Actual Decommissioning Costs**"). Contractor shall be paid the applicable Eni Net Turnkey Amount for each completed Decommissioning Project, unless Eni makes a Turnkey Election pursuant to Section 1.4 below, in which case, Contractor shall be paid the applicable Gross Turnkey Amount; provided, however, in either case, the payment shall be made pursuant to Section 2.3 of this Agreement.

   (c)     Contractor shall have a profit opportunity following the completion of Decommissioning for any Decommissioning Project if it is able to Decommission such Decommissioning Project for a lower Actual Decommissioning Cost (i) net to the interests of Eni, as set forth in Decommissioning Project Schedule on Exhibit A in the column labeled "Eni Ownership (%)*," than the Eni Net Turnkey Amount, provided, that Eni did not make a Turnkey Election for such Decommissioning Project, or (ii) than the Gross Turnkey Amount if a Turnkey Election was made by Eni.  The Parties acknowledge and agree that once Eni has paid Contractor the Eni Net Turnkey Amount or Gross Turnkey Amount, as applicable, Eni shall have (subject to Sections 1.4, 1.6, 1.7, and 1.8) no further obligations (monetary or otherwise) with respect to the applicable Decommissioning Project, and Contractor shall bear the risk that the Actual Decommissioning Costs of a Decommissioning Project exceed the applicable Eni Net Turnkey Amount in the event no Turnkey Election is made, or the Gross Turnkey Amount attributed to such Decommissioning Project, in the event a Turnkey Election is made.

**Section 1.3**     **Commencement of Decommissioning Projects**. Without limitation of Contractor's obligations under Section 1.5, Contractor shall not be obligated to commence a Decommissioning Project until the earlier of (i) receipt by Eni and other joint and several parties of a BOEM/BSEE order(s) requiring such Decommissioning and full funding for such Decommissioning Project has been agreed upon in accordance with Section 2.3, or (ii) Eni makes a Turnkey Election for such Decommissioning Project; provided that the Decommissioning Project Schedule on Exhibit A shall be modified to address either such event.

**Section 1.4**     **Turnkey Election**. Eni shall have the right, but not the obligation (in Eni's sole discretion), to make an irrevocable election to agree to pay to Contractor the Gross Turnkey Amount for any particular Decommissioning Project (a "**Turnkey Election**"). In order to make a Turnkey Election, Eni shall provide Notice of its election to Contractor and FWE III, specifically identifying the Decommissioning Project to which the Turnkey Election applies (a "**Turnkey Notice**"). Upon receipt of a Turnkey Notice, Contractor shall promptly commence the applicable Decommissioning Project. Notwithstanding anything to the contrary contained in this Agreement, the Eni Term Sheet Implementation Agreement by and among (a) Fieldwood Energy LLC and its affiliated debtors and debtors in possession in the jointly administered Chapter 11 cases pending before the Honorable Marvin Isgur under Case No. 20-33948, (b) Eni Petroleum US LLC, and (c) the Credit Bid Purchaser dated of even date herewith (the "**Implementation Agreement**"), or any other Eni Definitive Documents (as defined in the Implementation Agreement), in the event Eni makes a Turnkey Election: (i) Eni agrees to pay Contractor the applicable Gross Turnkey Amount, subject to the terms of Section 2.3, plus, as applicable, any Agreed Excess Qualified Conditions Costs pursuant to Section 1.8 up to the Qualified Condition Cap or any Excess Regulatory Costs pursuant to Section 1.7, (ii) Contractor assumes the risk that the actual costs for the Decommissioning Project, performed in accordance with the Performance Standards, and excluding any costs for "Excluded Wells" and/or "Eligible Well Intervention Costs" (as such terms are defined in the Implementation Agreement) with respect to any particular "Temporary Abandoned Well" (as such term is defined in the Implementation Agreement) pursuant to Section 7 of the Implementation Agreement, exceed the Gross Turnkey Amount, plus, as applicable, any Agreed Excess Qualified Conditions Costs pursuant to Section 1.8 (up to the Qualified Condition Cap) and any Excess Regulatory Costs pursuant to Section 1.7, and (iii) Eni shall have the right to seek contribution from third parties for any share of the Gross Turnkey Amount. In the event Eni makes a Turnkey Election for any Decommissioning Project, Eni may assign its rights in this Agreement insofar as it covers such Decommissioning Project (to the extent that it relates to Eni's prior undivided interests in the Specified Assets) to any third party or parties with joint and several liability for such Decommissioning Project, provided that Eni shall remain responsible for all of its obligations hereunder in relation to such Decommissioning Project.

**Section 1.5**     **Initial Safe Out**. With respect to the Decommissioning Projects, Contractor shall promptly perform the operations necessary to safe-out and otherwise perform preparatory activities in accordance with the Performance Standards to put such assets into a mechanical and operational state such that they are hydrocarbon free and ready to be Decommissioned (the "**Initial Safe Out**"). The Initial Safe Out for all Decommissioning Projects shall be completed no later than

December 31, 2021, unless agreed to in writing by Eni, such consent not to be unreasonably withheld, delayed or conditioned.

Section 1.6    Qualified Conditions. If it is discovered that any qualified condition(s) identified on Exhibit B ("**Qualified Conditions**") is present and is reasonably likely to result in additional costs or expenses to Contractor in excess of the existing Gross Turnkey Amount, either Contractor or Eni may provide Notice to the other, and for thirty (30) days following receipt of such Notice, the Parties shall work together in good faith to agree, as applicable, upon (i) any excess costs and expenses for such Qualified Conditions above the existing Gross Turnkey Amount or an alternative cost arrangement for an existing Decommissioning Project, and/or (ii) a Gross Turnkey Amount for a Specified Asset that is not already included in a Decommissioning Project as provided in Section 1 of Exhibit B ((i) and (ii) collectively, the "**Excess Qualified Conditions Costs**"). In the event the Parties are unable to reach an agreement with respect to (i) the existence of a Qualified Condition or (ii) the Excess Qualified Conditions Costs attributable to a Qualified Condition, the Parties may submit the matter for Expert Determination, as provided in Section 1.10 below. As either agreed by the Parties or determined by Expert Determination, any such Excess Qualified Conditions Costs are the "**Agreed Excess Qualified Conditions Costs**."

Section 1.7    **Regulatory Changes**. If any regulatory body either (i) issues a new regulation(s) that increases the cost to conduct a Decommissioning Project in accordance with Performance Standards, or (ii) designates additional sand sediment areas requiring pipeline removal as opposed to abandonment in place for any Decommissioning Project that did not already assume pipeline removal, following thirty (30) days prior written notice by Contractor to Eni, Eni and Contractor shall negotiate in good faith as to the existence of any regulatory change, and any necessary excess costs above the existing Gross Turnkey Amount for any affected Decommissioning Projects ("**Excess Regulatory Costs**") to take into account the incremental costs required to complete any such Decommissioning Project.  For the avoidance of doubt, new regulations include but are not limited to, NTLs, BSEE or BOEM national, regional or district policies and requirements, executive and Secretary of Interior orders and new and revised CFR regulations that govern or affect decommissioning. In the event that of new regulations, then (i) the Excess Regulatory Costs therefor shall be as agreed upon by the Parties, or (ii) if Eni and Contractor are unable to agree on the amount of Excess Regulatory Costs for a particular Decommissioning Project, then such Excess Regulatory costs shall be determined on a cost-plus 15% basis where costs are actual, reasonable third-party costs necessary for Decommissioning in accordance with Performance Standards.

Section 1.8    **Qualified Conditions Cap**. Without limitation of and subject to Section 1.7, above, but subject to the existence of a Qualified Condition, Contractor shall assume the risk that the costs to Decommission a Decommissioning Project exceeds the Eni Net Turnkey Amount attributed to such Decommissioning Project, in the event no Turnkey Election is made, or the Gross Turnkey Amount attributed to such Decommissioning Project, in the event a Turnkey Election is made. In the event of a Qualified Condition, Eni and Contractor shall share in any Agreed Excess Qualified Conditions Costs related to the Qualified Condition(s) in excess of the relevant Eni Net Turnkey Amount (or the Gross Turnkey Amount if the Turnkey Election is made) up to, on an aggregated basis of all Decommissioning Projects, fifteen million and 00/100 dollars ($15,000,000) (the "**Qualified Condition Cap**") as follows: (i) Eni shall be responsible for the first five million and 00/100 dollars ($5,000,000) of Agreed Excess Qualified Conditions Costs

4

related to Qualified Conditions, and (ii) Eni shall be responsible for 75% and Contractor shall be responsible for 25% of the remaining Agreed Excess Qualified Conditions Costs up to the Qualified Condition Cap.  Eni's responsibility for any Agreed Excess Qualified Conditions Costs related to a Qualified Condition shall not commence until the full amount of the relevant Eni Net Turnkey Amount, or if the Turnkey Election is made, the relevant Gross Turnkey Amount, have been incurred. The calculation and application of these amounts (including such Agreed Excess Qualified Conditions Costs) shall be limited to the percentage portion (based on the "Eni Ownership (%)" as indicated on <u>Exhibit A)</u> for a particular Decommissioning Project in the event Eni did not elect to make the Turnkey Election with regard to such Decommissioning Project. In the event that one or more Qualified Conditions results in costs that exceed the Qualified Condition Cap, Eni's liability for any additional costs shall terminate once the Qualified Condition Cap has been reached and Eni shall have no further liability for any costs or the performance of any obligations associated with any Qualified Condition or the applicable Decommissioning Project.

Section 1.9 **Terms and Conditions**. The Parties agree that the performance of the Agreed Activities, the Initial Safe Out, and each Decommissioning Project shall be performed in accordance with the terms and conditions of this Agreement.  Eni agrees that Contractor will have met the required standard of performance under this Agreement if it performs the Agreed Activities, the Initial Safe Out, and such Decommissioning Project consistent with required laws, rules and regulations promulgated by governing regulatory agencies, including but not limited to BOEM and BSEE; consistent with any applicable third-party contracts; and consistent with the Decommissioning Schedule set forth on <u>Exhibit A</u> (the "**Performance Standards**").

Section 1.10 **Expert Determination**. If the Parties cannot agree on (i) the existence of a Qualified Condition or (ii) the Excess Qualified Condition Costs as contemplated above (the "**Qualified Condition Dispute**") after good faith negotiations, either Eni or Contractor may submit the matter for expert determination according to the procedure outlined in this <u>Section 1.10</u>. Prior to submitting such matter to the Expert (as defined below), the Party intending to make the submission shall provide written notice to the other Party of such intent.  If the Parties are unable to agree upon resolve the Qualified Condition Dispute within fifteen (15) days following the other Party's receipt of the notice provided herein, the Party intending to submit the matter to the Expert may so submit such matter to the Expert for final and binding determination.  To submit the determination of the Qualified Condition Dispute to the Expert, the Parties shall each provide the Expert with (a) such data and information as is necessary for the Expert to be able to determine the resolution of the Qualified Condition Dispute, such data and information shall include applicable well data and information related to any structures, pipelines, facilities and other assets associated with the Decommissioning Project.  The Expert shall, within fifteen (15) days of receiving such data and information, make its determination of the Qualified Condition Dispute using the data and information it has received from the Parties.  In making its determination hereunder, the Expert (i) shall be bound by the provisions of this <u>Section 1.10</u> and (ii) if the Qualified Condition Dispute relates to the amount of the Excess Qualified Condition Costs, the Expert may not assign a value to the Excess Qualified Condition Costs greater than the value provided by Contractor or less than the value provided by Eni.  If, prior to the Expert finalizing its determination that the Qualified Condition Dispute relates to the amount of the Excess Qualified Condition Costs, the Expert, the Parties reach agreement, the Parties may withdraw the matter from the Expert.  The determination of the Expert shall be final and binding on the Parties for all

5

purposes hereunder.  The fees and expenses of the Expert under this <u>Section 1.10</u> shall be borne one half by the Eni and one half by Contractor.  The Parties agree to utilize TSB Offshore, Inc. as the Expert for the purposes herein (the "**Expert**").  If the party selected as the Expert is unable or unwilling to serve as the Expert hereunder the Parties shall agree on a newly identified Expert.  If the Parties cannot agree after thirty (30) days of good faith negotiations, the Expert shall be selected by lot from among the nationally recognized independent engineering firms that have not represented any Party or its affiliates at any time during the three-year period of time immediately preceding its designation hereunder.  For selection by lot, Eni shall provide two (2) options, and Contractor shall provide two (2) options.  The Parties designate Opportune, LLP to make the selection by lot.

Section 1.11   <u>**Contributions from Other Predecessors**</u>.  FWE III will use commercially reasonable efforts to obtain reimbursement and/or contribution for Decommissioning activity that is available under contract or applicable law, including from any other record title and/or operating rights interest holders and predecessors-in-interest other than Eni to the extent practicable and from available surety bonding other than Eni's bonds; provided that, for the avoidance of doubt, FWE III shall not be required to incur any out-of-pocket costs or obligations in connection with such efforts. In addition, FWE III shall obtain the written consent of Eni, not to be unreasonably withheld, delayed or conditioned, prior to entering into settlement negotiation(s), agreeing to a settlement, and/or initiating dispute resolution regarding the Specified Assets, including with respect to obtaining contributions for decommissioning from other record title and/or operating rights interest holders and predecessors-in-interest or obtaining funds from surety bonds for decommissioning.

Section 1.12   <u>**Operations**</u>.  Contractor will manage, on behalf of FWE III, the Specified Assets until the commencement of the Decommissioning pursuant to a contract operating agreement which is mutually acceptable to the Parties and by and between FWE III and Contractor (the "**Contract Operating Agreement**"). Except as set forth in the Implementation Agreement, Eni shall not be responsible for any operating costs associated with Eni's interests for any Decommissioning Project. Management of the Specified Assets shall include, but not be limited to, as services provided: operations, production marketing (for producing assets), accounting and land/regulatory administration, including all actions necessary for compliance with the Turnkey Removal Additional Terms and Conditions set forth in <u>Appendix 1</u>. Notwithstanding anything to the contrary, the Parties acknowledge and agree that the members of the Predecessor Group shall receive the benefit of any indemnification provisions contained in the Contract Operating Agreement which are provided by Contractor in favor of FWE III as intended third party beneficiaries of such provisions.

<div align="center">

**ARTICLE II.**
**FUNDING AND INVOICES**

</div>

Section 2.1   <u>**Funding Commitment**</u>. Except with respect to the "Agreed Activities" (as such term is defined in the Plan) and the Initial Safe Out, which is governed by <u>Section 1.5</u>, Contractor shall not undertake any Decommissioning Project until (a) full funding of the applicable Gross Turnkey Amount has been agreed to by Eni and Contractor, including receiving funds or securing a contractual commitment (such as a decommissioning agreement) from applicable third

<div align="center">6</div>

parties for any such Decommissioning Project, or (b) Eni makes a Turnkey Election for any such Decommissioning Project.

**Section 2.2**    **Invoicing**. Contractor shall submit a monthly invoice to FWE III LLC, with a copy to Eni, summarizing the accrued Actual Decommissioning Costs for each Decommissioning Project. If Eni or FWE III reasonably disputes any portion of any invoice, Eni or FWE III shall notify Contractor within fifteen (15) days of receipt of the invoice in writing of the amount in dispute and the reasons thereof. Contractor will provide reasonable and appropriate documentation to substantiate the charges on the invoice.

**Section 2.3**    **Payment**. For each Decommissioning Project, Eni shall pay to Contractor and Contractor shall receive, payment of the full agreed Eni Net Turnkey Amount or Gross Turnkey Amount (in the event a Turnkey Election was made), as adjusted pursuant to Section 1.7 and subject to Section 1.8. For the avoidance of doubt, such payment shall include Eni's share of any Agreed Excess Qualified Conditions Costs pursuant to Section 1.8 up to the Qualified Conditions Cap or Excess Regulatory Costs, provided Eni shall have no obligation to tender any such payment contemplated in this Section 2.3 until Contractor delivers to FWE III and to Eni (i) a Site Clearance (as defined in Appendix 1) with respect to such Specified Interest; and (ii) an invoice and/or billing statement outlining in detail the Decommissioning work actually performed for such Decommissioning Project itemized by the applicable Decommissioning Project on Exhibit A, along with supporting documentation. Notwithstanding the foregoing but subject to Section 3.1, if Contractor has achieved all requirements of Site Clearance of a particular Decommissioning Project but BOEM has failed to issue the applicable approval required under the definition of Site Clearance with respect to such Decommissioning Project within the forty-five (45) day period immediately following Contractor's proper request and submission for such approval from BOEM, and *provided that* BOEM's failure to issue an approval in such forty-five (45) day period is not due to the fault or other act or omission of Contractor or any person for whom Contractor is responsible under this Agreement, including but not limited to Contractor failing to meet BOEM's requirements to receive such approval, "Site Clearance" for the purposes of this Section 2.3 shall be deemed to have been achieved and Contractor shall be entitled to the applicable payment provided that Contractor submits to Eni all documents provided to BOEM to obtain such Site Clearance. Notwithstanding anything to the contrary herein, the payments made by Eni in satisfaction of the obligations set forth herein, shall not exceed twenty million dollars ($20,000,000.00) on an annual basis for any given calendar year; provided that (i) if Eni has delivered a Turnkey Notice, or (ii) if Eni is required, pursuant to an order from any governmental or regulatory authority, to perform any Decommissioning Project on a schedule that is more accelerated than contemplated on Exhibit A, then such annual limitation will be increased above twenty million dollars ($20,000,000.00) to the extent such increase is necessitated to perform the Decommissioning Project contemplated in subparts (i) and (ii) of this sentence. Such payment will be made by wire transfer in immediately available funds to a bank account designated by Contractor. Notwithstanding anything herein to the contrary in this Agreement, any amounts paid by Eni for a Decommissioning Project pursuant to this Section 2.3, shall be net of any proceeds realized by Contractor from the sale of hydrocarbons produced from the underlying Specified Asset of a Decommissioning Project identified on Exhibit A after the Effective Date. For the

avoidance of doubt, such proceeds shall be netted on the percentage basis attributed to Eni in the "Eni Ownership (%)" as indicated on Exhibit A for such particular Specified Asset.

Section 2.4    **Surety Bonds.** Eni may apply to any amounts owed hereunder any available proceeds from surety bonds that cover the Decommissioning of any applicable Decommissioning Projects.  Eni shall bear all costs and risks associated with such surety bonds.

Section 2.5    **Audit Rights**. Eni shall have the right to conduct, during normal business hours upon at least thirty (30) days' prior written notice, an audit of Contractor's records to the extent related to any amount charged to Eni hereunder. These audit rights shall survive the termination of this Agreement for a period of twelve (12) months.

Section 2.6    **Waiver and Release**.  Within ninety (90) days following the completion of a Decommissioning Project and only if (i) all amounts payable under this Agreement by Eni with respect to that Decommissioning Project have been paid by Eni in accordance with this Agreement and (ii) Eni has completely performed in accordance with this Agreement all of its obligations under this Agreement with respect to that Decommissioning Project, Contractor shall execute and deliver legal instruments in form and substance that are acceptable to Eni acting reasonably whereby Contractor: (a) acknowledges and agree that all amounts payable under this Agreement by Eni with respect to that Decommissioning Project have been paid by Eni in accordance with this Agreement; (b) waives, releases and forever discharges the members of the Predecessor Group from any and all Claims arising out of or relating to that Decommissioning Project; (c) acknowledges and agrees that Eni has completely performed in accordance with this Agreement all of its obligations under this Agreement with respect to that Decommissioning Project; and (d) acknowledges that Contractor has fully paid any non-disputed amounts owed to third parties in connection with such Decommissioning Project.

## ARTICLE III.
## TERM

Section 3.1    **Term and Survival**.  Subject to the condition precedent in Section 3.5 below, the term of this Agreement shall be from and after the Effective Date until (i) the Decommissioning Projects are completely Decommissioned in accordance with Performance Standards and (ii) Contractor has delivered a Site Clearance (as defined in Appendix 1) to FWE III and to Eni with respect to such Specified Interest, unless terminated earlier as provided in this Article III. In the event of termination pursuant to this Article III, Article II, and the terms and conditions set forth in Appendix 1, each of the foregoing shall survive such termination for four (4) years following the date of termination; provided, however, the definitions set forth in Appendix 1, the terms of Article V and Article VI, and the defined terms set forth in this Agreement shall survive indefinitely; provided further, Eni shall pay Contractor for any Decommissioning Projects completed prior to the date of termination in accordance with the terms of this Agreement. Following the termination or expiration of this Agreement, as applicable, in the event BOEM/BSEE issues an order with respect to any Specified Asset which indicates that the Decommissioning for such Decommissioning Project was not performed in accordance with the Performance Standards, then Contractor shall promptly cause, at its sole cost and expense, any

such Specified Asset that was the subject of a specific Decommissioning Project to be further Decommissioned in accordance with the Performance Standards.

Section 3.2    **Termination by Eni for Particular Asset.**    Eni may terminate this Agreement as to any Decommissioning Project and/or require FWE III to competitively bid the decommissioning services with respect to a Decommissioning Project in the event Contractor is in breach of this Agreement with respect to such Decommissioning Project, and such breach remains outstanding thirty (30) days after Eni or FWE III have provided written notice of such breach to Contractor; provided, however, any such termination shall be limited to the applicable Decommissioning Project and the remainder of this Agreement shall survive in full force and effect in accordance with the terms set forth herein.

Section 3.3    **Termination by Eni or Contractor**. Contractor or Eni may terminate this Agreement as to a particular Decommissioning Project if, within three (3) years of the Effective Date, (i) a Turnkey Election is not made by Eni for such Decommissioning Project, or (ii) contractual commitments for full funding of the Gross Turnkey Amount for such Decommissioning Project has not been received; provided, however, in the event that a Party is entitled to a right of termination pursuant to subpart (i) or subpart (ii) of this Section 3.3, such termination shall be limited to the applicable Decommissioning Project and the remainder of this Agreement shall survive in full force and effect in accordance with the terms set forth herein.

Section 3.4    **Suspension by Contractor**. Contractor may suspend performance under this Agreement if Eni is in breach of this Agreement, and such breach remains outstanding for thirty (30) days after Contractor has provided written notice of such breach to Eni. All schedules and timelines in this Agreement shall be tolled until such breach is remedied.

Section 3.5    **Condition Precedent**. This Agreement shall become effective only in the event that on or before September 30, 2021 (except as otherwise mutually agreed by the Parties), Contractor has received all necessary approvals by applicable regulatory authorities to act as a qualified operator in the Gulf of Mexico.

**ARTICLE IV.**
**NOTICE**

Section 4.1    **Notice Addresses.**    All notices and correspondence required or permitted to be given by one Party to another hereunder shall be made in writing and shall be delivered to the appropriate Party at the address specified below either by hand, by nationally recognized overnight delivery service or by electronic delivery, unless a different address for notice or copy thereof is changed by notice, with copies to such other parties or addresses as a Party may designate by notice (each, a "**Notice**"). Notices sent by hand delivery or nationally recognized overnight delivery service shall be deemed to have been received upon the recipient's actual receipt of such Notice. Notices sent by electronic delivery shall be deemed to have been received (i) on the date such transmission was sent if it was sent prior to 5:00 p.m. (at the recipient's local time) on a business day; or (ii) on the next business day following the date such transmission was sent if it

9

was sent after 5:00 p.m. (at the recipient's local time) on any business day or at any time on a non-business day.

> If to Eni Petroleum US LLC:
>
> Eni Petroleum US LLC
> 1200 Smith Street, Suite 1700
> Houston, Texas 77002
> Attn:  Christian Johnson
> Telephone: (713) 393-6184
> Email:  chris.johnson@eni.com
>
> With a copy to:
>
> Bracewell LLP
> 711 Louisiana Street, Suite 2300
> Houston, Texas 77002
> Attention:    J.J. McAnelly (james.mcanelly@bracewell.com)
>                    Jason Hutt (jason.hutt@bracewell.com)
>                    Mark Dendinger (mark.dendinger@bracewell.com)
>
>
> If to Fieldwood Energy III LLC:
>
> Fieldwood Energy III LLC
> 2000 W. Sam Houston Pkwy South, Suite 1200
> Houston, Texas  77042
> Attn:  Thomas R. Lamme
> Telephone:  (713) 969-1000
> Email: TLamme@fwellc.com
>
> If to Mako Buyer LLC:
>
> Mako Buyer LLC
> 2000 W. Sam Houston Pkwy South, Suite 1200
> Houston, Texas  77042
> Attn:  Thomas R. Lamme
> Telephone: (713) 969-1000
> Email:  TLamme@fwellc.com

## ARTICLE V.
## GOVERNING LAW; DISPUTES

**Section 5.1**     Governing Law.

(a)     Notwithstanding the place of execution hereof or the place for performance of any covenant, promise or agreement herein made, this Agreement and the validity hereof, the agreements evidenced hereby, and all matters and issues arising hereunder, shall, to the fullest extent possible, be construed pursuant to and governed by the General Maritime Laws of the United States.  If the General Maritime Laws of the United States are held to be inapplicable to this Agreement or the Work (or any part thereof) to be performed hereunder by a court of competent jurisdiction, then Subsections 5.1(b) and 5.1(c) below shall apply, as appropriate, but only to the extent that United States General Maritime Law is held to be inapplicable.

(b)     If any court of competent jurisdiction determines that United States Maritime Law is not applicable to any relevant part of this Agreement or the Work to be performed hereunder, then such part of this Agreement and/or the work to be performed hereunder, shall, to the fullest extent enforceable under applicable law, be interpreted and enforced exclusively in accordance with the laws of the State of Texas.

(c)     If any court of competent jurisdiction determines that neither United States General Maritime Law nor the laws of the state of Texas are applicable to any relevant part of this Agreement or the Work to be performed hereunder, then such part of this Agreement and/or the work to be performed hereunder, shall, to the fullest extent enforceable under applicable law, be interpreted and enforced exclusively in accordance with the laws of the State of Louisiana, excluding any conflicts of law rules that might refer same to another jurisdiction.

(d)     Notwithstanding the choice of law provisions contained in this Article V, no conflicts of laws principles that would require the application of any law other than that expressly set forth in Sections 5.1(a), 5.1(b) or 5.1(c), as appropriate, shall be applicable to this Agreement or the enforcement of any provision hereof.  **FURTHER, NO LAW, THEORY OR PUBLIC POLICY, SHALL BE GIVEN EFFECT WHICH WOULD UNDERMINE, DIMINISH OR REDUCE THE EFFECTIVENESS OF THE WAIVER OF SPECIAL CLAIMS PROVIDED IN SECTION 5.3 OF APPENDIX 1 ATTACHED HERETO, IT BEING THE EXPRESS INTENT, UNDERSTANDING AND AGREEMENT OF THE PARTIES THAT SUCH WAIVER IS TO BE GIVEN THE FULLEST EFFECT, NOTWITHSTANDING ANY PRE-EXISTING DEFECT OR THE NEGLIGENCE (WHETHER SOLE, JOINT OR CONCURRENT), GROSS NEGLIGENCE, WILLFUL MISCONDUCT, STRICT LIABILITY OR OTHER LEGAL FAULT OF ANY PARTY OR OTHERWISE.**

**Section 5.2     WAIVER OF JURY TRIAL**.   EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATED TO THIS AGREEMENT,

INCLUDING THE ENFORCEABILITY OF THE AGREEMENT, OR THE TRANSACTIONS CONTEMPLATED HEREBY.

**Section 5.3** **Disputes**. The Parties agree that all disputes in any way arising out of or resulting from this Agreement that will be litigated, if any at all, shall be litigated exclusively in the state and/or federal courts in Harris County, Texas.  The Parties accordingly hereby submit to the jurisdiction and venue of such courts for all purposes.

**Section 5.4**   Compliance with Anti-Corruption Laws.

(a)    Each Party warrants that, in connection with this Agreement, it and its affiliates will comply with all applicable anti-bribery and corruption, anti-money laundering, trade control, and sanctions laws and regulations, such as the Bribery Act 2010 of the United Kingdom, Foreign Corrupt Practices Act 1977 of the United States of America, and the Australian Criminal Code of 1995, as amended, Division 70 – Bribery of foreign public officials, and the OECD Convention on Combating Bribery of Foreign Public Officials in International Business Transactions, and all applicable successor legislation, and in any event, will not and will procure that its employees and third party providers (including its subcontractors, agents and other intermediaries) will not offer, give or agree to give any person whosoever, or solicit, accept or agree to accept from any person, either directly or indirectly, anything of value in order to obtain, influence, induce or reward any improper advantage (the "**Anti-Corruption Obligation**").

(b)    Contractor and FWE III each represent and warrant that it has reviewed and understood: (a) the general standards of transparency of the sensitive activities related to the Model 231 pursuant to Legislative Decree 231/2001 and Eni's Supplier Code of Conduct, adopted by Eni; (b) the Anti-Corruption Management System Guidelines of Eni; and (c) Eni's Statement on respect for human rights.  Contractor and FWE III take note that each of the documents under (a) to (c) above are available on the website: *www.eni.com* and undertake to comply with the principles contained therein.

(c)    Each Party agrees it shall on an on-going basis, and subject to any applicable data privacy law, legal privilege, or other legal restriction:

(i)   as soon as reasonably possible disclose in writing to the other Parties details of any breach of the Anti-Corruption Obligation; and

(ii)  on reasonable request, use best endeavors to cooperate to ensure and monitor compliance with the Anti-Corruption Obligation, which shall include promptly responding in reasonable detail to any notice from another Party reasonably connected to the Anti-Corruption Obligation and making any relevant books, records, or personnel relating to this Agreement and a Party's compliance with the Anti-Corruption Obligation available for review by the other Parties.

12

(d)     Each Party shall throughout the term of this Agreement:

    (i)   institute and maintain policies and procedures which are designed to ensure compliance with all applicable laws and the Anti-Corruption Obligation, including the maintenance of complete and accurate books and records and an effective system of internal accounting controls;

    (ii)   maintain at its normal place of business, throughout the term and for at least two (2) years following its expiration or termination, detailed books, records and accounts which accurately and fairly reflect all transactions and payments made by it in connection with this Agreement;

    (iii)   make clear, in its dealings connected to this Agreement, that it is required to act, and is acting, in accordance with the Anti-Corruption Obligation; and

    (iv)   on reasonable notice, and subject to any applicable data privacy law,  legal privilege, confidentiality obligation, license agreement or other express legal restriction, permit any other Party or its duly appointed third party representatives, at the other Party's sole expense, during normal working hours, at the Party's normal place of business, to access, review, inspect and make copies of its books, records and accounts, but only to the extent reasonably necessary in order to audit its compliance with the Anti-Corruption Obligation.  The rights set out in this <u>Section 5.4</u> will be exercised in accordance with all applicable competition laws.

## ARTICLE VI.
## MISCELLANEOUS

**Section 6.1     Entire Agreement**. This Agreement (together with the schedule, exhibits, and appendices hereto, which are incorporated herein by reference), the Implementation Agreement of even date herewith, and the other Definitive Documents constitute the entire agreement among the Parties with respect to the subject matter hereof and supersede any other representations, understandings or agreements (whether written, oral or otherwise) that may have been made, understood or entered into by the Parties or any of their respective affiliates relating to the transactions contemplated hereby or the subject matter hereof.

**Section 6.2     Successors and Assigns**.  This Agreement is personal as to each Party and shall not be assigned without the other Parties' consent; *provided* that the foregoing shall not apply if Contractor assigns this Agreement in total:

(a)     along with all of its personnel who are performing any part of the services hereunder to another entity *provided*, that no such assignment by Contractor, or any subsequent assignment or Transfer of ownership (other than, in each case, a Transfer that conforms with the

requirements of subpart (b) below), shall relieve Contractor of its obligations under this Agreement; or

(b)     to an acquirer of all or substantially all of Contractor's employees providing services hereunder provided that: (i) such acquirer has a Tangible Net Worth of at least five (5) times the then-current P90 estimate of the remaining Decommissioning Projects to be Decommissioned in accordance with the Performance Standards and, (ii) at the time of the assignment, at least seventy percent (70%) of the Work (as defined in Appendix 1) described in the Decommissioning Schedule set forth on Exhibit A, based on the Eni Net Turnkey Amount, has been Decommissioned in accordance with the Performance Standards (a "Permitted 3rd-Party Assignment"). If any platform described on Exhibit A has not been Decommissioned in accordance with the Performance Standards ("Remaining Platforms") at the time of any Permitted 3rd Party Assignment made pursuant to this Section 6.2, the Credit Bid Purchaser shall cause the assignee to deliver, as conditions of the assignment, with evidence of their respective satisfaction prior to the effectiveness of such assignment, (i) a windstorm and casualty policy, at the expense of assignee, with a limit of not less than the total amount of the then-current P90 estimate of the Remaining Platforms, with applicable endorsements and other requirements as set forth on Exhibit C of Appendix 1, covering the Remaining  Platforms that have not been Decommissioned in accordance with the Performance Standards, which such policy shall have a deductible reasonably acceptable to Eni and shall be required to be maintained throughout the Decommissioning of the Remaining Platforms in accordance with the Performance Standards; and (ii) an express assumption and agreement by assignee to the terms and obligations, accrued or unaccrued, contemplated in this Agreement.

(c)     For purposes of this Agreement, "**Tangible Net Worth**" of any assignee means, as of any date of determination, the positive difference, if any, of the total assets of such assignee minus total liabilities of such assignee, with total assets and total liabilities each to be determined in accordance with generally accepted accounting principles applicable to such assignee, *excluding*, *however*, from the determination of total assets (i) patents, patent applications, trademarks, copyrights and trade names, (ii) goodwill, organizational, experimental, research and development expense and other like intangibles, , and (iii) unamortized debt discount and expense. For purposes of this Agreement, "**Transfer**" means the assignment, transfer, equity sale, merger, divisive merger, or hypothecation, as well as any change of control transaction.

Section 6.3     **Amendment**.  This Agreement may be amended or modified in whole or in part, and terms and conditions may be waived, only by a duly authorized agreement in writing which makes express reference to this Agreement and is executed by each Party.

Section 6.4     **Severability**.  If any provision of this Agreement is held invalid or unenforceable by any court of competent jurisdiction, the other provisions of this Agreement shall remain in full force and effect. The Parties further agree that if any provision contained herein is, to any extent, held invalid or unenforceable in any respect under the laws governing this Agreement, they shall take any actions necessary to render the remaining provisions of this Agreement valid and enforceable to the fullest extent permitted by law and, to the extent necessary, shall amend or otherwise modify this Agreement to replace any provision contained herein that is

14

held invalid or unenforceable with a valid and enforceable provision giving effect to the intent of the Parties to the greatest extent legally permissible.

Section 6.5    **Counterparts**. This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. Any .pdf or other electronic transmission of an executed signature page to this Agreement shall, for all purposes, be deemed an original.

Section 6.6    **Further Assurances**. Subject to the terms and conditions of this Agreement, each Party shall use its reasonable efforts to take, or cause to be taken, all actions and to do, or cause to be done, all things necessary or desirable, under applicable law or otherwise, to consummate or implement the transactions contemplated by this Agreement.  The Parties agree to and shall execute and deliver all such other documents, certificates, agreements, and other writings and shall take all such other actions as may be necessary or desirable in order to consummate or implement expeditiously the transactions contemplated in this Agreement in accordance with the terms hereof, including but not limited to any actions or agreements reasonably necessary as a result of the presence of a Qualified Condition or Regulatory Change.

[*Signature page to follow*]

15

IN WITNESS WHEREOF, the Parties hereto as set forth below have executed this Agreement as of the date first written above.

**ENI PETROLEUM US LLC**

By: _____

Name:  Luca Pellicciotta

Title:  President and CEO

[*Signature page to Turnkey Removal Agreement*]

**FIELDWOOD ENERGY III LLC**

By: _____
Name:
Title:

[*Signature page to Turnkey Removal Agreement*]

**<u>CONTRACTOR:</u>**

**MAKO BUYER LLC**

By: _____

Name:

Title:

Schedule 1

Specified Interests

| Block | Lease |
|-------|-------|
| GA 151 | OCS-G 15740 |
| SS 246 | OCS-G 01027 |
| VR 78 | OCS-G 04421 |
| VR 313 | OCS-G 01172 |
| SS 247 | OCS-G 01028 |
| SS 248 | OCS-G 01029 |
| SS 249 | OCS-G 01030 |
| SS 270 | OCS-G 01037 |
| SS 271 | OCS-G 01038 |
| WC 72 | OCS-G 23735 |

<u>Exhibit A</u>

<u>Decommissioning Projects, Turnkey Amounts and Decommissioning Schedule</u>

See attached.

| | | | | | | | Turnkey Estimates | |
|---|---|---|---|---|---|---|---|---|

**2021**

| Block | Year | Host Platform | Designation | Asset | Status | Water Depth | ENI Ownership (%)* | Gross | Net (ENI) |
|---|---|---|---|---|---|---|---|---|---|
| SS 246 | 2021 | SS 246 A | A002 | Well | Partial TA | 166 | 76.76% | 470,971 | 361,538 |
| SS 246 | 2021 | SS 246 A | A004 | Well | COM | 166 | 76.76% | 1,036,136 | 795,383 |
| SS 246 | 2021 | SS 246 A | A005 | Well | COM | 166 | 80.69% | 1,036,136 | 836,079 |
| SS 246 | 2021 | SS 246 A | A006 | Well | COM | 166 | 80.69% | 1,036,136 | 836,079 |
| SS 246 | 2021 | SS 246 A | A007 | Well | COM | 166 | 80.69% | 1,036,136 | 836,079 |
| SS 246 | 2021 | SS 246 A | A009 | Well | Partial TA | 166 | 76.76% | 470,971 | 361,538 |
| SS 246 | 2021 | SS 246 A | A011 | Well | COM | 166 | 76.76% | 2,825,825 | 2,169,227 |
| SS 246 | 2021 | SS 246 A | A014 | Well | COM | 166 | 76.76% | 1,036,136 | 795,383 |
| SS 246 | 2021 | SS 246 A | A019 | Well | COM | 166 | 76.76% | 847,748 | 650,768 |
| SS 246 | 2021 | SS 246 A | A020 | Well | COM | 166 | 80.69% | 1,224,524 | 988,093 |
| SS 246 | 2021 | SS 246 A | 10258 | Pipeline | OUT | 166 | 77.22% | 236,329 | 182,488 |
| SS 246 | 2021 | SS 246 J | J001 | Well | COM | 162 | 80.69% | 1,036,136 | 836,079 |
| SS 246 | 2021 | SS 246 J | 13056 | Pipeline | OUT | 162 | 97.30% | 240,915 | 234,416 |
| VR 313 | 2021 | VR 313 B | SN 5440 | Pipeline | OUT | 202 | 100.00% | 375,323 | 375,323 |
| VR 313 | 2021 | VR 313 B | SN 15136 | Pipeline | OUT | 202 | 100.00% | 375,323 | 375,323 |
| VR 313 | 2021 | VR 313 C | SN 10558 | Pipeline | OUT | 213 | 100.00% | 187,626 | 187,626 |
| VR 313 | 2021 | VR 313 C | C001 | Well | COM | 213 | 100.00% | 1,152,493 | 1,152,493 |
| VR 313 | 2021 | VR 313 C | C004 | Well | Partial TA | 213 | 100.00% | 443,267 | 443,267 |
| VR 313 | 2021 | VR 313 D | D001 | Well | COM | 214 | 50.00% | 797,880 | 398,940 |
| VR 313 | 2021 | VR 313 D | D002 | Well | COM | 214 | 50.00% | 797,880 | 398,940 |
| VR 313 | 2021 | VR 313 D | D003 | Well | COM | 214 | 50.00% | 797,880 | 398,940 |
| VR 313 | 2021 | VR 313 D | D004 | Well | COM | 214 | 50.00% | 797,880 | 398,940 |
| VR 313 | 2021 | VR 313 D | D005 | Well | COM | 214 | 50.00% | 797,880 | 398,940 |
| SS 247 | 2021 | SS 247 F | SN 5902 | Pipeline | OUT | 225 | 25.59% | 240,783 | 61,612 |
| SS 248 | 2021 | SS 248 G | 10611 | Pipeline | OUT | 180 | 30.78% | 410,379 | 126,303 |
| SS 248 | 2021 | SS 248 G | 10349 | Pipeline | PABN | 188 | 30.78% | 241,979 | 74,474 |
| WC 72 | 2021 | WC 72 #2 | #2 | Platform | | 39 | 75.00% | 620,573 | 465,430 |
| WC 72 | 2021 | WC 72 #2 | 002 | Well | COM | 39 | 75.00% | 1,008,432 | 756,324 |
| | | | | | | | **Total** | **$21,579,675.68** | **$15,896,024.01** |

**2022**

| Block | Year | Host Platform | Designation | Asset | Status | Water Depth | ENI Ownership (%) | Gross | Net (ENI) |
|---|---|---|---|---|---|---|---|---|---|
| VR 313 | 2022 | VR 313 B | B003 | Well | COM | 202 | 100.00% | 797,880 | 797,880 |
| VR 313 | 2022 | VR 313 B | B005 | Well | COM | 202 | 100.00% | 797,880 | 797,880 |
| VR 313 | 2022 | VR 313 B | B010 | Well | COM | 202 | 100.00% | 797,880 | 797,880 |
| VR 313 | 2022 | VR 313 B | B012 | Well | COM | 202 | 100.00% | 1,152,493 | 1,152,493 |
| SS 246 | 2022 | SS 246 A | SS 246 A | Platform | | 166 | 77.22% | 9,915,095 | 7,656,196 |
| SS 246 | 2022 | SS 246 E | SS 246 E | Platform | | 166 | 77.22% | 5,329,033 | 4,114,950 |
| SS 246 | 2022 | SS 246 J | SS 246 J | Platform | | 162 | 97.30% | 2,340,530 | 2,277,743 |
| SS 248 | 2022 | SS 248 D | D009 | Well | Partial TA | 180 | 25.00% | 659,359 | 164,840 |
| SS 248 | 2022 | SS 248 D | D012 | Well | Partial TA | 180 | 30.85% | 470,971 | 145,285 |
| SS 248 | 2022 | SS 248 D | D015 | Well | Partial TA | 180 | 30.78% | 659,359 | 202,932 |
| SS 248 | 2022 | SS 248 D | D016 | Well | Partial TA | 180 | 30.78% | 470,971 | 144,951 |
| SS 248 | 2022 | SS 248 D | D018 | Well | Partial TA | 180 | 30.78% | 470,971 | 144,951 |
| SS 248 | 2022 | SS 248 D | D020 | Well | COM | 180 | 30.78% | 847,748 | 260,913 |
| SS 248 | 2022 | SS 248 D | D002 | Well | Partial TA | 180 | 39.57% | 470,971 | 186,370 |
| SS 249 | 2022 | SS 248 D | D005 | Well | COM | 180 | 55.76% | 847,748 | 472,683 |
| SS 249 | 2022 | SS 248 D | D011 | Well | COM | 180 | 39.57% | 1,036,136 | 410,014 |
| SS 249 | 2022 | SS 248 D | D014 | Well | Partial TA | 180 | 39.57% | 659,359 | 260,918 |
| SS 249 | 2022 | SS 248 D | D017 | Well | Partial TA | 180 | 30.78% | 470,971 | 144,951 |
| SS 249 | 2022 | SS 248 D | D019 | Well | Partial TA | 180 | 52.29% | 470,971 | 246,293 |
| SS 248 | 2022 | SS 248 G | G001 | Well | COM | 188 | 30.78% | 847,748 | 260,913 |
| SS 248 | 2022 | Subsea | SS 249 | Well | Partial TA | 195 | 53.49% | 941,942 | 503,882 |
| | | | | | | | **Total** | **$30,456,369.02** | **$21,144,920.17** |

**2023**

| Block | Year | Host Platform | Designation | Asset | Status | Water Depth | ENI Ownership (%) | Gross | Net (ENI) |
|---|---|---|---|---|---|---|---|---|---|
| VR 313 | 2023 | VR 313 B | VR 313 B | Platform | | 202 | 100.00% | 4,875,933 | 4,875,933 |
| VR 313 | 2023 | VR 313 C | VR 313 C | Platform | | 213 | 100.00% | 2,659,600 | 2,659,600 |
| VR 313 | 2023 | VR 313 D | VR 313 D | Platform | | 214 | 50.00% | 3,102,867 | 1,551,433 |
| SS 247 | 2023 | SS 247 F | F002 | Well | COM | 225 | 25.00% | 847,748 | 211,937 |
| SS 247 | 2023 | SS 247 F | F014 | Well | COM | 225 | 25.00% | 1,036,136 | 259,034 |
| SS 247 | 2023 | SS 247 F | F017 | Well | COM | 225 | 25.00% | 847,748 | 211,937 |
| SS 247 | 2023 | SS 247 F | F018 | Well | COM | 225 | 45.80% | 847,748 | 388,281 |
| SS 247 | 2023 | SS 247 F | F019 | Well | COM | 225 | 25.00% | 847,748 | 211,937 |
| SS 247 | 2023 | SS 247 F | SS 247 F | Platform | | 225 | 25.59% | 10,361,358 | 2,651,289 |
| SS 248 | 2023 | SS 248 D | SS 248 D | Platform | | 180 | 30.78% | 10,361,358 | 3,188,933 |
| SS 248 | 2023 | SS 248 G | SS 248 G | Platform | | 188 | 30.78% | 4,238,738 | 1,304,563 |
| WC 72 | 2023 | WC 72 #1 | #1 | Platform | | 37 | 75.00% | 543,002 | 407,251 |
| WC 72 | 2023 | WC 72 #1 | 001 | Well | COM | 37 | 75.00% | 1,008,432 | 756,324 |
| WC 72 | 2023 | WC 72 #1 | SN 14251 | Pipeline | ACTIVE | 37 | 75.00% | 232,715 | 174,536 |
| WC 72 | 2023 | WC 72 #3 | #3 | Platform | | 37 | 75.00% | 543,002 | 407,251 |
| WC 72 | 2023 | WC 72 #3 | 003 | Well | COM | 37 | 75.00% | 1,318,718 | 989,039 |
| WC 72 | 2023 | WC 72 #3 | SN 15893 | Pipeline | OUT | 37 | 75.00% | 46,543 | 34,907 |
| | | | | | | | **Total** | **$43,719,391.75** | **$20,284,186.80** |
| | | | | | | | **Grand Total** | **$95,755,436.46** | **$57,325,130.98** |

COM: Completed Well

Full TA: Temporarily Abandoned well that has the required plugs and testing

Partial TA:  Partially Temporarily Abandoned where a well does not have the required plugs to fully temporarily abandon a well  Active:  An Active pipeline according to BOEM/BSEE records

Active:  An Active pipeline according to BOEM/BSEE records

PABN:  Pipeline that is proposed to be abandoned

OUT:  A pipeline that is out of service

Note: The following wells have been temporarily abandoned and all that remains necessary to decommission these wells is the removal of the applicable conductor and the cost to remove such conductor has been included in the Gross Decom Amount(s) and Eni (Net) Costs for each applicable host facility for each applicable well that is referenced above:

Ship Shoal 246: SS 246 A001

Ship Shoal 247: SS 247 F001, SS 247 F003, SS 247 F004, SS 247 F005, SS 247 F006, SS 247 F007, SS 247 F008, SS 247 F009, SS 247 F010, SS 247 F011, SS 247 F012, SS 247 F013, SS 247 F016

Ship Shoal 248: SS 248 D001, SS 248 D003, SS 248 D004, SS 248 D006, SS 248 D007, SS 248 G002, SS 248 G003

Vermilion 313: VR 313 B001, VR 313 B002, VR 313 B004, VR 313 B006, VR 313 B007, VR 313 B 009, VR 313 C002, VR 313 C003

* The Parties acknowledge and agree that in the event that either Party presents evidence that the ownership interest allocated pursuant to this Decommissioning Schedule is less than or greater than set forth in this Decommissioning Schedule, that they will use commercially reasonable efforts to amend and revise the ownership interest and other obligations within this Decommissioning Schedule allocated to Eni based on the applicable title records for the applicable Decommissioning Project.

Exhibit B

Qualified Conditions

1) To the extent that any well comprising a Specified Asset is not assigned a Gross Turnkey Amount and requires the performance of any decommissioning activities, Eni and Contractor shall agree to a Gross Turnkey Amount for such well before commencing any decommissioning activities.

2) For a period of up to eighteen (18) months after the Effective Date, any damage to a Specified Asset due to a wind-storm, weather damage, or other casualty events associated with severe tropical weather arising after the Effective Date; provided, however, any damage to any platform related to ingress and egress shall not be a Qualified Condition.

3) To the extent that any pipeline included in a Decommissioning Project is required to be buried where this Agreement does not already assume burial, the work associated with such burial shall be a Qualified Condition and such work shall be performed at cost.


End of Exhibit B

<u>Appendix 1</u>
<u>Additional Terms and Conditions</u>

See attached.

*EXECUTION VERSION*

## APPENDIX 1

**TURNKEY REMOVAL ADDITIONAL TERMS AND CONDITIONS**

### ARTICLE I.
### DEFINITIONS

As used in this <u>Appendix 1</u>, each of the following terms has the meaning provided below.

1.1 "<u>Agreed Activities</u>" shall mean those certain safety and related repairs and improvements on Specified Assets at such Abandoned Properties as provided in Section I.G.2 of the Disclosure Statement, to the extent the repairs and improvements are necessary to protect the public health and safety and/or the environment from hazardous conditions or to re-establish ingress and egress to Facilities so that the decommissioning of the Facilities can be conducted in a safe manner. For the avoidance of doubt, any capitalized terms used in this definition but not assigned a meaning in this Agreement shall have the meaning set forth in the Disclosure Statement.

1.2 "<u>Agreement</u>" shall mean the Turnkey Removal Agreement to which this <u>Appendix 1</u> is attached and made a part thereof.

1.3 "<u>Appendix 1</u>" shall mean these Turnkey Removal Additional Terms and Conditions.

1.4 "<u>BOEM</u>" shall mean the Bureau of Ocean Energy Management and/or any successor agencies thereto, as applicable.

1.5 "<u>BSEE</u>" shall mean the Bureau of Safety and Environmental Enforcement and/or any successor agency thereto, as applicable.

1.6 "<u>Claims</u>" shall mean any and all losses, liabilities, damages (including natural resource damages), obligations, expenses, fines, penalties, costs, claims, causes of action, judgments, awards and any and all other losses of any kind or character, including, without limitation, court costs.

1.7 "<u>Contractor</u>" shall mean Mako Buyer LLC.

1.8 "<u>Contractor Group</u>" shall mean, individually and collectively, Contractor, its parent, subsidiary and affiliated companies, its and their joint venturers, contractors and subcontractors (of any tier), and all of their respective employees, officers, directors, agents, representatives, attorneys-in-fact, subcontractors and insurers, and the subrogees of all such parties.

1.9 "<u>Contractor Obligation</u>" shall mean any obligation attributable to Contractor under the terms of the Agreement.

1.10    "Disclosure Statement" shall mean the *Disclosure Statement for Fourth Amended Joint Chapter 11 Plan of Fieldwood Energy LLC and its Affiliated Debtors*, filed on April 15, 2021 [Dkt. 1285], including any exhibits and schedules thereto and as may be further amended, supplemented or modified from time to time.

1.11    "Facilities" shall mean the platforms, wells, pipelines, caissons, risers, facilities, structures and equipment (including production equipment) located on the Specified Interests and all parts and components thereof.

1.12    "On The Hook" shall mean the condition of any Facility (or any part, piece or component thereof) that occurs at the instant such Facility (or part, piece or component thereof, as the case may be) is first lifted from its original resting position and is hanging free on Contractor's (or its subcontractor's) crane or other equipment in accordance with the Work to be performed under this Appendix 1.

1.13    "Owner" shall mean Fieldwood Energy III LLC

1.14    "Owner Group" shall mean, individually and collectively, Owner, its parent, subsidiary and affiliated companies, its and their joint venturers, contractors and subcontractors (of any tier), and all of their respective employees, officers, directors, agents, representatives, attorneys-in-fact, subcontractors and insurers, and the subrogees of all such parties.

1.15    "Predecessor" shall mean ENI Petroleum US LLC.

1.16    "Predecessor Group" shall mean, individually and collectively, Predecessor, its parent, subsidiary and affiliated companies, its and their joint venturers, contractors and subcontractors (of any tier), and all of their respective employees, officers, directors, agents, representatives, attorneys-in-fact, subcontractors and insurers, and the subrogees of all such parties.

1.17    "Predecessor Obligation" shall mean any obligation attributable to Predecessor under the terms of the Agreement.

1.18    "Reefed Items" shall mean the Facilities to be reefed as set out in Section 2.4 herein and in accordance with Owner's reef permit.

1.19    "Site Clearance" shall mean (subject to Section 2.3 of the Agreement) delivery to Owner and Predecessor of (i) any On-Site Survey required by BOEM or BSEE and (ii) the filings and other evidence required by BOEM and BSEE or any other applicable governmental authority, including any required approvals or regulatory concurrence from relevant governmental authorities, to support Contractor's representation that all Decommissioning obligations with respect to the applicable assets have been satisfied, and (iii) documentation reasonably satisfactory to Predecessor from BSEE and/or BOEM reflecting that their databases have been updated to show that all Decommissioning obligations with respect to the applicable assets have been fully satisfied.

1.20   "Special Claim(s)" shall mean any and all Claims for or relating to special, indirect, consequential, exemplary, incidental or punitive damages of any kind or character, including, but not limited to, loss of use, loss of profit, loss of revenue, loss of product or production, reservoir damage, loss of hole damage, and any attorneys' fees; provided however, any and all claims for fines or penalties shall not be Special Claims to the extent arising from, or as a result of, a material breach by a party.

1.21   "Third Party" shall mean any individual, person, company or entity or any other natural or juridical being, other than any member of the Owner Group or Contractor Group.

1.22   "Transferred Items" shall mean the Facilities that are to be removed or abandoned in accordance with this Appendix 1.

1.23   "Work" shall mean the work and activities to Decommission the Specified Assets, to be conducted by or on behalf of Contractor pursuant to the terms and provisions of this Agreement, including, without limitation, the Agreed Activities and the Initial Safe Out.

1.24   Any capitalized terms used herein but not defined in this Appendix 1 shall have the meaning ascribed in the Agreement.

## ARTICLE II.
## WORK

2.1   Scope of Work.

Contractor shall perform the Work upon the terms and provisions set forth in this Agreement, including the Performance Standards.  The scope of the Work is more fully set forth in Exhibit A to this Appendix 1 and shall be performed with respect to the Decommissioning of the Specified Assets described on Exhibit A to the Agreement.

2.2   Inspection.

The Work and all parts thereof shall be subject to inspection at all reasonable times by inspectors designated by Owner or Predecessor or their representatives at such Party's costs and risk.  No such inspection shall relieve Contractor of any of its obligations hereunder.  No failure to inspect or failure to discover any aspect of the Work that is not performed in accordance with any provision of this Appendix 1 shall be construed to imply any acceptance of such Work or to relieve Contractor of any of its obligations hereunder.  Contractor shall correct any portion of the Work that is incomplete or otherwise as required to receive Site Clearance, subject to the terms of the Agreement.

2.3   Title.

At Contractor's option to be exercised by written notice to Owner with respect to any Transferred Items, Owner grants, bargains, sells, conveys and assigns to Contractor, and

DM-#8062177
#94614816v4
#94614816v6

Contractor accepts and assumes title to and ownership of such Transferred Items at such time as such Transferred Items are On The Hook. **THE TRANSFERRED ITEMS SHALL BE TRANSFERRED TO AND ACCEPTED BY CONTRACTOR, "AS IS, WHERE IS" WITH ALL FAULTS. OWNER MAKES NO, AND EXPRESSLY DISCLAIMS ANY AND ALL, WARRANTIES CONCERNING THE TRANSFERRED ITEMS, WHETHER EXPRESS, IMPLIED, STATUTORY OR OTHERWISE, INCLUDING, WITHOUT LIMITATION, ANY WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR USE, AND FREEDOM FROM DEFECTS, WHETHER SUCH DEFECTS ARE PATENT, LATENT, PRE-EXISTING, REDHIBITORY OR OTHERWISE. UPON SUCH TRANSFER OF OWNERSHIP OF THE TRANSFERRED ITEMS, CONTRACTOR SHALL BE SOLELY RESPONSIBLE FOR, AND SHALL ASSUME ALL RISK AND LIABILITY FOR SUCH TRANSFERRED ITEMS, INCLUDING, WITHOUT LIMITATION, ALL LIABILITY FOR TIE DOWN AND SEA FASTENING, SALVAGE IF LOST DURING TRANSPORT, REMOVAL AND DISPOSAL OF SUCH TRANSFERRED ITEMS AND ALL POLLUTION OR ENVIRONMENTAL CONTAMINATION ATTRIBUTABLE THERETO AFTER SUCH TRANSFERRED ITEMS ARE ON THE HOOK.** The foregoing notwithstanding, the Parties expressly acknowledge that nothing herein shall cause the transfer of, and Contractor does not accept, the assignment or conveyance of any record title ownership of any lease or any operating rights thereunder. Owner agrees to provide a bill of sale related to such Transferred Items upon request by Contractor.

2.4   <u>Reefed Items.</u> In accordance with the Work to be performed under this <u>Appendix 1</u>, Contractor shall remove and transport the Reefed Items to the designated reef sites. **CONTRACTOR SHALL BE SOLELY RESPONSIBLE FOR, AND SHALL ASSUME ALL RISK AND LIABILITY FOR ANY REEFED ITEM (INCLUDING, WITHOUT LIMITATION, ALL LIABILITY FOR THE TOW AND SALVAGE, IF LOST DURING TOWING, OF SUCH REEFED ITEMS AND ALL POLLUTION AND ENVIRONMENTAL CONTAMINATION ATTRIBUTABLE THERETO (EXCEPT TO THE EXTENT DUE TO THE CONDITION OR STRUCTURAL INTEGRITY OF SUCH REEFED ITEM FOR WHICH OWNER SHALL REMAIN RESPONSIBLE)) FROM THE TIME SUCH REEFED ITEM IS ON THE HOOK UNTIL SUCH TIME AS SUCH REEFED ITEM IS DELIVERED BY MATERIAL BARGE TO THE DESIGNATED REEF SITES FOR POSITIONING ON THE SEA FLOOR PURSUANT TO THE OWNER'S REEF PERMIT.**

## ARTICLE III.
## SURVEY AND PERMITS

3.1   <u>On-Site Survey.</u>

At the completion of the removal, reefing or abandonment of any particular Facility in accordance with the Work to be performed hereunder, Contractor shall conduct a survey over the relevant Facility site if required by BOEM or BSEE to obtain Site Clearance.

DM-#8062177
#94614816v4
#94614816v6

3.2     Permits.

Owner agrees to timely and diligently obtain all necessary permits and approvals that must be obtained by Owner in order for Contractor to perform the Work, and Contractor agrees to timely and diligently obtain all necessary permits and approvals that must be obtained by Contractor to perform the Work.

ARTICLE IV.
OBLIGATIONS OF CONTRACTOR

4.1     Independent Contractor.

Contractor is an independent contractor with the sole authority and right to direct, supervise and control the performance of all details of the Work, subject only to the Performance Standards, and the general right of inspection by Owner and Predecessor to achieve the desired results and satisfactory completion of the Work. Any provision of this Appendix 1 that may appear to give Owner and Predecessor or their representatives the right to direct Contractor as to the details of doing the Work or to exercise a measure of control over the Work shall be deemed to mean that Contractor shall follow the desires of Owner and/or Predecessor or its or their representatives in the results of the Work only and not in the means whereby the Work is to be accomplished.  Except as otherwise expressly provided in Section 4.2 hereof, no member of the Contractor Group shall be deemed to be an agent, representative, or employee of Owner or Predecessor.  Contractor shall remain responsible for all of the actions of its subcontractors and the agents, representatives and employees of such subcontractors.

4.2     Statutory Employee.

In all cases where Contractor's employees (defined for the purposes of this Section 4.2 to include any Contractor Group member's direct, borrowed, special or statutory employees) are performing Work in or offshore the State of Louisiana or are otherwise covered by the Louisiana Worker's Compensation Act, La. Rev. Stat. §§ 23.1021 et seq., Owner, Predecessor and Contractor acknowledge and agree that all Work and operations performed by Contractor and its subcontractors and their employees pursuant to this Appendix 1 are an integral part of and are essential to the ability of Owner and Predecessor to generate Owner's and Predecessor's goods, products or services.  In such event, and without limiting the provisions of Section 4.1 above, Owner, Predecessor and Contractor agree that Owner and Predecessor shall each be deemed a statutory employer of Contractor's employees and its subcontractor's employees for the sole purposes of La. Rev. Stat. § 23.1061(A)(3), as the same may be amended from time to time.  Contractor shall ensure that all of its subcontracts contain the same provisions as this Section 4.2.

DM-#8062177
#94614816v4
#94614816v6

4.3     Standard of Performance.

Contractor covenants and agrees that it shall safely and efficiently prosecute the Work with due diligence and care in a good and workmanlike manner using good oilfield practices with qualified, careful and efficient workers in accordance with (i) generally accepted standards of engineering, construction and decommissioning practice for the Work covered under this Appendix 1; (ii) the provisions of this Appendix 1; and (iii) all applicable laws, rules, regulations and standards of the BOEM, the BSEE and any other applicable governmental or regulatory agency or body.  The Parties agree that Contractor will have met the required standard of performance under the Agreement, including this Appendix 1, if it performs the Work consistent with the Performance Standards.

4.4     Contractor's Personnel.

Notwithstanding the fact that Contractor shall perform the Work as an independent contractor, Contractor covenants and agrees to keep on the job a competent superintendent, project manager, engineer and all necessary assistants, who will be in charge of the Work.

4.5     Compliance with Laws.

Contractor shall observe and comply with, and shall ensure that all members of the Contractor Group observe and comply with, all federal, state and local laws, orders, rules and regulations which are now or may in the future become applicable to Contractor (or such employee, agent, representative or subcontractor, as the case may be) or to the performance of the Work under this Appendix 1, including, but not limited to, those statutes and regulations set out in Exhibit B attached hereto and made a part hereof for all purposes.

4.6     Equipment & Materials.

All equipment, tools, materials and facilities to be furnished by Contractor in the performance of the Work shall be serviceable and kept in good operating condition.  Contractor shall schedule its other operations so as to ensure that the necessary equipment, tools, materials and facilities and personnel to operate the same shall be available at the times necessary for the orderly completion of the Work in accordance with the terms of this Appendix 1.

4.7     Liens.

CONTRACTOR SHALL INDEMNIFY AND HOLD HARMLESS THE OWNER GROUP AND THE PREDECESSOR GROUP FROM ANY AND ALL LIENS AND OTHER ENCUMBRANCES AGAINST ANY PROPERTY OR INTERESTS OF ANY MEMBER OF THE OWNER GROUP OR THE PREDECESSOR GROUP AND FROM AND AGAINST ANY AND ALL CLAIMS ON ACCOUNT OF DEBTS ALLEGED TO BE DUE FROM ANY MEMBER OF CONTRACTOR GROUP, TO ANY PERSON INCLUDING ANY OTHER MEMBER OF CONTRACTOR GROUP, AND WILL DEFEND AT ITS OWN EXPENSE ANY CLAIM OR LITIGATION IN CONNECTION THEREWITH; PROVIDED, HOWEVER, THE FOREGOING SHALL NOT APPLY IN THE

DM-#8062177
#94614816v4
#94614816v6

**EVENT THAT CONTRACTOR IS NOT TIMELY PAID (BY OWNER, PREDECESSOR OR OTHERWISE) FOR ANY PORTION OF THE WORK.**

4.8     Records.

Contractor shall maintain complete, accurate and current detailed records of all costs and documentation of equipment, materials, supplies, labor and any other items or aspects of the Work performed hereunder for a Decommissioning Project for not less than two (2) years after Site Clearance for such Decommissioning Project; provided, however, if Owner, any member of Contractor Group, any member of Owner Group or any Third Party, makes a timely written Claim which relates to the Work performed pursuant to this Appendix 1 within such two (2) year period, then Contractor shall retain such records until final resolution of such Claim. Contractor shall grant to FWE III, its authorized representatives, and/or public accounting firm selected by Owner, the right, at a reasonable time, to inspect, audit, examine and copy any applicable records or documents of Contractor as may be necessary to verify the validity and correctness of the charges reflected on any invoice and to protest or dispute any such charge.

4.9     Taxes.

Contractor agrees to pay all taxes, licenses and fees levied or assessed against Contractor in connection with, or incident to, Contractor's performance of the Work by any governmental agency for (i) income taxes; (ii) unemployment compensation insurance, benefits, social security; or (iii) any other taxes upon the amounts paid to Contractor, its agents, employees and representatives. Notwithstanding the foregoing, Owner shall be responsible for and shall pay all sales, ad valorem or use taxes and all import/customs duties, fees, charges or costs that may be assessed or incurred as a result of the performance of the Work or the transfer of the Transferred Items to Contractor pursuant to the terms hereof.

## ARTICLE V.
## INDEMNIFICATION AND LIABILITY

**5.1     CONTRACTOR'S INDEMNITY.**

**EXCEPT AS PROVIDED IN THE FOLLOWING SENTENCE, CONTRACTOR SHALL PROTECT, DEFEND, INDEMNIFY AND HOLD HARMLESS THE PREDECESSOR GROUP FOR CLAIMS ARISING OUT OF OR RESULTING FROM, IN WHOLE OR IN PART, A MATERIAL BREACH BY CONTRACTOR OF ANY CONTRACTOR OBLIGATION ("CONTRACTOR'S INDEMNITY"). NOTWITHSTANDING THE FOREGOING, CONTRACTOR'S INDEMNITY DOES NOT COVER ANY SPECIAL CLAIMS ARISING OUT OF OR RESULTING FROM CONTRACTOR'S MATERIAL BREACH OF A CONTRACTOR OBLIGATION.**

**5.2     PREDECESSOR'S INDEMNITY.**

**EXCEPT AS PROVIDED IN THE FOLLOWING SENTENCE, PREDECESSOR SHALL PROTECT, DEFEND, INDEMNIFY AND HOLD HARMLESS THE CONTRACTOR GROUP FOR CLAIMS ARISING**

DM-#8062177
#94614816v4
#94614816v6

OUT OF OR RESULTING FROM, IN WHOLE OR IN PART, A MATERIAL BREACH BY PREDECESSOR OF ANY PREDECESSOR OBLIGATION ("PREDECESSOR'S INDEMNITY"). NOTWITHSTANDING THE FOREGOING, PREDECESSOR'S INDEMNITY DOES NOT COVER ANY SPECIAL CLAIMS ARISING OUT OF OR RESULTING FROM PREDECESSOR'S MATERIAL BREACH OF A PREDECESSOR OBLIGATION.

## 5.3    SPECIAL CLAIMS.

NOTWITHSTANDING ANYTHING TO THE CONTRARY CONTAINED ELSEWHERE IN THE AGREEMENT, NEITHER PREDECESSOR NOR CONTRACTOR (NOR THE MEMBERS OF SUCH PARTY'S "GROUP") SHALL BE LIABLE TO ANOTHER PARTY (NOR THE MEMBERS OF SUCH OTHER PARTY'S "GROUP") FOR ANY SPECIAL CLAIM(S), INCLUDING ATTORNEY'S FEES, WHENEVER ARISING, AS A RESULT OF, RELATING TO OR IN CONNECTION WITH THE AGREEMENT OR ANY WORK; AND NO SPECIAL CLAIM(S), INCLUDING ATTORNEY'S FEES, SHALL BE MADE BY A PARTY AGAINST ANOTHER PARTY (OR AGAINST ANY MEMBER OF ANOTHER PARTY'S "GROUP"), REGARDLESS OF THE CAUSE OR CAUSES OF SUCH SPECIAL CLAIM(S), INCLUDING WHETHER OR NOT ANY SUCH SPECIAL CLAIM IS BASED OR ALLEGED TO BE BASED, IN WHOLE OR IN PART, ON THE NEGLIGENCE (INCLUDING SOLE, JOINT, ACTIVE, PASSIVE, CONCURRENT OR GROSS NEGLIGENCE), BREACH OF WARRANTY, STRICT LIABILITY, STATUTORY LIABILITY, CONTRACTUAL LIABILITY OR OTHER FAULT OF ANY MEMBER OF PREDECESSOR GROUP OR CONTRACTOR GROUP, THE UNSEAWORTHINESS OF ANY VESSEL, THE UNAIRWORTHINESS OF ANY AIRCRAFT, OR THE EXISTENCE OF ANY DEFECT, WHETHER PATENT, LATENT, PRE-EXISTING OR OTHERWISE.

## 5.4    EXPRESS NEGLIGENCE

WITH RESPECT TO THIS AGREEMENT, THE PARTIES AGREE THAT THIS STATEMENT COMPLIES WITH THE REQUIREMENT, KNOWN AS THE EXPRESS NEGLIGENCE RULE, TO EXPRESSLY STATE IN A CONSPICUOUS MANNER TO AFFORD FAIR AND ADEQUATE NOTICE THAT THIS AGREEMENT HAS PROVISIONS THAT COULD REQUIRE A PARTY TO BE RESPONSIBLE FOR THE NEGLIGENCE, STRICT LIABILITY, OR OTHER FAULT OF ANOTHER PARTY (OR THE MEMBERS OF ANOTHER PARTY'S "GROUP").

<div align="center">

ARTICLE VI.
INSURANCE
</div>

6.1    Contractor's Insurance.

Contractor shall carry, at its own expense, with insurers who are reliable and with an A.M Best rating of not less than A- and authorized to do business in the states or other jurisdictions in which the Work is to be performed by Contractor hereunder, or in the states or other jurisdictions adjacent to the offshore location in which the Work is to be performed hereunder, insurance coverages of the types and with limits required by Owner but in no event less than those set forth in Exhibit C attached hereto and made a part hereof.  Further, Contractor agrees to carry adequate contractual liability insurance to support the indemnities given herein.  Prior to commencing any of

<div align="center">Appendix 1<br>Page 8 of 11</div>

the Work to be conducted pursuant to the terms of this <u>Appendix 1</u>, if requested by Owner, Contractor agrees to provide Owner with certificates of insurance evidencing such insurance coverages in commercially available forms acceptable to Owner, and Contractor agrees to maintain current certificates of insurance on file with Owner for the duration of the Agreement.  The Parties expressly acknowledge and agree that the insurance and indemnity provisions of this <u>Appendix 1</u> are separate and distinct; and that any insurance requirements contained herein shall not be deemed to restrict or limit any of the indemnity obligations set forth in this <u>Appendix 1</u>.

If Contractor hires any subcontractor to perform any of the Work hereunder, then Contractor shall require that any such subcontractor will obtain insurance protection with coverages of the types and with limits deemed appropriate by Contractor.  Any deficiencies in the coverages, policy limits or endorsements of Contractor's subcontractors shall be the sole responsibility of Contractor and shall be covered by Contractor's insurance.

6.2     <u>Louisiana Anti-Indemnity Provisions</u>.

Notwithstanding anything contained herein to the contrary, Contractor and Owner agree that with respect to all Work performed in Louisiana or offshore Louisiana and with respect to which the laws of the state of Louisiana are otherwise applicable, Owner (on its own behalf, and on behalf of its other contractors, subcontractors, agents and representatives and their respective employees) and Contractor (on its behalf, and on behalf of its subcontractors, agents and representatives and their respective employees) shall pay to each other's insurers the premium required by their respective insurers or their insurer's agents or authorized representatives to extend all of their insurance policies to include coverage for Owner's and Contractor's respective indemnities as required under this <u>Appendix 1</u>, and such insurance protection shall be governed by Louisiana law.  Each Party will arrange to have the other Party billed for the premium by its respective insurer, and will advise the other Party prior to the inception of this <u>Appendix 1</u> if the premium will be in excess of $2,000.00.  The insurance policy shall apply to incidents arising out of the performance of this <u>Appendix 1</u>.  At each subsequent renewal of insurance, during the term of this <u>Appendix 1</u>, each Party will advise the other of the amounts of the premium required for the extensions described above and arrange billing for the appropriate premium by its insurers or their agents or authorized representatives.  It is expressly acknowledged and agreed to by the Parties that the provisions of this <u>Section 6.2</u> are intended to comply with the provisions of *Marcel v. Placid Oil Co.*, 11 F.3d 563 (5th Cir. 1994), and the provisions hereof shall be interpreted in such a manner as to comply therewith.

6.3     <u>Texas Anti-Indemnity Act</u>.

To the extent that the Work or any part thereof is subject to the laws of the state of Texas, the Parties agree that in order to be in compliance with the Texas Anti-Indemnity Act regarding indemnification mutually assumed for the other Party's sole or concurrent negligence, each Party agrees to carry supporting insurance in equal amounts of the types and in the minimum amounts specified in the insurance agreements hereunder; provided, however, that Owner shall have the right to self-insure any or all coverages required of it hereunder.

DM-#8062177
#94614816v4
#94614816v6

# ARTICLE VII.
## CONTRACTOR'S POLICIES

7.1     <u>Compliance with Policies</u>.

Contractor covenants and agrees to, and shall cause its subcontractors to agree to, abide by and act in accordance with the following Contractor policies, as such are set forth in <u>Exhibits B</u>, <u>D</u>, <u>E</u> and <u>F</u>, respectively, attached hereto and made a part hereof:

1.      Federal Contract Requirements
2.      Drug and Alcohol Policy;
3.      Safety Program; and
4.      Search and Seizure Policy.

# ARTICLE VIII.
## GENERAL PROVISIONS

8.1     <u>Force Majeure</u>.

All obligations imposed by this <u>Appendix 1</u> or the Agreement on each Party, except for obligations to pay money or to provide indemnity, shall be suspended while compliance with such obligations are prevented, in whole or in part, by an event of *force majeure*.  As used herein an event of *force majeure* shall mean any of: a labor dispute, pandemic or epidemic impacting the region where the Work is to be performed, fire, flood, war, civil disturbance, act of God (including numbered or named tropical disturbances and other adverse weather or wave conditions); a change in laws or governmental rules, regulations or orders, an inability to timely secure materials or an inability to timely secure government permits from the BOEM, BSEE or any other governmental agency as required for the Work, or any other cause, whether similar or dissimilar, beyond the reasonable control of the Party claiming that its compliance has been prevented or delayed by such event of *force majeure*.  Notwithstanding the foregoing, such Party shall resume performance within a reasonable time after such event of *force majeure* has ended or been removed, or such Party is able to overcome the prevention caused by such event; provided, however, that no Party shall be required, against its will, to settle any labor dispute so at to overcome such event of *force majeure*.  If a Party's obligations are suspended under this <u>Section 8.1</u>, such Party shall promptly notify the other Party and give full particulars of the reasons for such suspension. For the avoidance of doubt, this <u>Section 8.1</u> does not modify the Qualified Conditions and allocation of risk under the Agreement.

8.2     <u>Work Site Access</u>.

To the extent reasonably necessary for Contractor to perform the Work, Owner shall provide Contractor unrestricted access to all the Specified Assets and shall execute any agency agreement, power of attorney, instrument, license, certificate, or other agreement reasonably necessary to provide such access.  Only the authorized personnel of Contractor, Owner or proper governmental

agencies shall be permitted access to any premises where Work is being performed under this Appendix 1.

8.3     Survival.

All provisions of this Appendix 1 that cannot be performed before the expiration or termination of this Appendix 1, including, without limitation, the indemnity provisions contained herein, and all representations, promises, releases, and indemnities under this Appendix 1, shall survive the expiration or termination of this Appendix 1.

Page 11 of 11

DM-#8062177
#94614816v4
#94614816v6

**EXHIBIT A to APPENDIX 1**

**SCOPE OF WORK**

**1.0     CONTRACTOR RESPONSIBILITIES**

1.1   Contractor shall perform the following Work, as applicable, as required to complete and to achieve Final Completion for each Decommissioning Project identified on Exhibit A to the Agreement:

- Perform and complete the Agreed Activities.
- Perform and complete the Initial Safe Out.
- Abandon all wells as per the BSEE-approved permits (APM's & RPM's).
- Abandon all pipelines as per the BSEE-approved permits (abandonment in place being the standard and removal only where mandated by BSEE or another governmental agency).
- Remove or reef all platforms as per the BSEE and/or COE-approved permits.

1.2   Contractor shall furnish all equipment, services, and personnel to conduct the offshore operations outlined in Section 1.1 including but not limited to the following as may be applicable and required:

- Derrick / Lift Vessel
- Lift Boats
- Dive Support Vessels
- Support Tugs and Crew Boats
- Shorebase support
- NORM & Asbestos remediation & disposal
- Material Barges and Tugs
- All slings, shackles, spreader bars, spreader frames, and rigging
- Pile jetting equipment and personnel
- Conductor and pile cutting personnel and equipment
- Divers and equipment
- Flushing & Filtration equipment
- Engineering & Project Management
- Permit Generation & Submittal

1.3   Contractor shall supply all labor, equipment, and material required to perform and complete the Scope of Work that is not specifically stated as being supplied by FWE III.

1.4   Contractor's derrick barge shall maintain an anchor handling tugboat with it at all times capable of handling the vessel's anchors.

1.5   Contractor's derrick barge and anchor handling tug(s) shall be equipped with an

appropriate positioning system to assure safe placement of anchors.

1.6  Contractor is responsible for notification of Operators of facilities and pipelines affected by placement of anchors near or over those facilities and/or pipelines.

1.7  Contractor's derrick barge shall have a current certificate of classification and a load line certificate from a recognized marine classification society.

1.8  Contractor shall provide current crane certification on the derrick barges primary crane and all auxiliary cranes.  All rigging must be certified and tagged.

1.9   Cargo Barges

    1.9.1 Contractor shall provide cargo barges of sufficient size to safely operate in the most severe environmental conditions in which tow may occur.

    1.9.2 Contractor shall ensure that the cargo barge(s) have adequate strength for the load out, tie down, transport, and offloading of the salvaged material.

    1.9.3 Each cargo barge shall have a valid U.S. Coast Guard certificate of inspection and a U.S. Coast Guard stability letter.

1.10 Tugs

    1.10.1  Contractor shall provide with each barge a minimum of one (1) tug of sufficient size, bollard pull, and horsepower to operate in any sea environment that may develop.

    1.10.2  Contractor shall provide assist (tail) tugs as required to guide the barge from the open sea to the offloading site.

    1.10.3  Vessels and crews shall comply with U.S. Coast Guard licensing and manning requirements.

1.11 Diving

    1.11.1  Contractor shall ensure that diving subcontractor performs all diving operations in strict accordance with the latest rules and regulations governing diving operations.

1.12 Any equipment, material, jacket, deck, or piles that fall into the sea during the salvage operation shall be retrieved by Contractor at Contractor's expense.

1.13 If at any time during the platform removal operations Contractor has to pull away from the structure, Contractor shall supply and install on the structure temporary navigational aids meeting U.S. Coast Guard Class "A" specifications for lights and horn.

DM-#8062177
#94614816v4
#94614816v6

1.14 Contractor shall assume all weather liability.

1.15 Company is not obligated to pay Contractor for weather downtime, named tropical storms or otherwise, at any time before or during mobilization, or during or after demobilization.

1.16 EH&S

   1.16.1  Contractor shall submit safety records upon request for review by Company.

   1.16.2  Contractor shall provide gas detection devices, fire extinguishers, and other safety equipment to check all structural members, equipment, and piping for the presence of hydrocarbons.

   1.16.3  Contractor shall check for the presence of hydrocarbons prior to flame cutting or using spark producing devices on any structural members, equipment, and piping.

   1.16.4  Contractor shall provide a dedicated fire watch when hot work operations are in progress.

   1.16.5  Contractor shall comply with government regulations, Contractor's policies, and Company's policies regarding confined space entry.

**2.0   TECHNICAL**

   **2.1   Engineering**

      2.1.1  Contractor Required Design and Analysis Work

      Contractor shall perform all design, analysis, and design checks required to complete the Work in accordance with all applicable drawings, specifications, standards and codes, and other documents that are part of or are incorporated into this Scope of Work.  Contractor's proposed methods of performing the design and analysis work listed below shall be submitted to FWE III and Predecessor prior to beginning the work.

      2.1.2  Engineering to be provided by Contractor to include the following as may be applicable and required:

- Material Barge Ballast Plan
- Removal Rigging
- Tie-Down Design
- Transportation Analysis
- Component Lift Weight Analysis

- Component Center of Gravity Analysis
- Component Pad Eye or Lifting Trunnions Design
- Welding procedures and welder qualifications.

2.1.4   Contractor shall confirm all lift weights, center of gravities, and Pad Eye or Lifting Trunion designs in writing.  Contractor will be responsible for any Pad Eye or Lifting Trunion design or modification.

END OF EXHIBIT A  TO APPENDIX 1

DM-#8062177
#94614816v4
#94614816v6

**EXHIBIT B to APPENDIX 1**

**<u>FEDERAL CONTRACT REQUIREMENTS</u>**

Contractor shall fully comply with all applicable statutes and executive orders as well as the regulations, orders and rules promulgated thereunder ("Federal Contract Requirements"), and such Federal Contract Requirements, including the regulations set out below to the extent applicable hereto, are hereby incorporated into <u>Appendix 1</u> by reference:

(1)     Equal Opportunity Clause (41 CFR 60-1.4).  Applicable to all contracts or purchase orders in excess of $10,000;

(2)     Affirmative Action Compliance Programs (41 CFR 60-1.40).  Applicable to contracts or purchase orders of $50,000 or more and if Contractor has 50 or more employees;

(3)     Equal Employment Opportunity Reporting Requirements (CFR 60-1-7).  Applicable to contracts or purchase orders of $50,000 or more and if Contractor has 50 or more employees;

(4)     Employment of the handicapped (41 CFR 60-250).  Applicable to contracts or purchase orders $2,500; or employment of disabled veterans and veterans of the Vietnam Era (Applicable to contracts or purchase orders of $10,000 or more;

(6)     Utilization of Minority Business Enterprises (41 CFR 1-1.13).  Applicable to contracts or purchase orders of $10,000 or more;

(7)     Utilization of Small Business Concerns (41 CFR 1-1.710-3).  Applicable to contracts or purchase orders of $10,000 or more;

(8)     Utilization of Labor Surplus Area Concerns (41 CFR 1-1.305-3(a)).  Applicable to contracts or purchase orders of $10,000 or more;

(9)     Minority Business, Small Businesses and Labor Surplus Area Subcontracting (41 CFR 1-1.1310-2(b), 1-1710-3(b), 1-1.805-3).  Applicable to contracts or purchase orders of $500,000 or more;

(10)    Clean Air and Water.  Applicable to contracts or purchase orders of CFR 15.4 and 15.5, 41 CFR 1-1.2302;

(11)    Outer Continental Shelf Lands Act endorsement (WC 00 01 09 A) (43 U.S.C. §§ 1331 *et seq.*); and

(12)    Oil Pollution Act of 1990, as amended (33 U.S.C. § 2701 *et seq.*).

Contractor certifies that it does not maintain or provide for its employees any segregated facilities at any of its establishments, and that it does not permit its employees to perform their services at any location, under its control, where segregated facilities are maintained.  It certifies

DM-#8062177
#94614816v4
#94614816v6

further that it will not maintain or provide for its employees any segregated facilities at any of its establishments and that it will not permit its employees to perform their services at any location, under its control, where segregated facilities are maintained.  The Contractor agrees that a breach of this certification is a violation of the Equal Opportunity Clause under this <u>Appendix 1</u>.  As used in this certification, the term "segregated facilities" means but is not limited to any waiting rooms, work areas, rest rooms and wash rooms, restaurants and other eating areas, time clocks, locker rooms and other storage or dressing areas, parking lots, drinking fountains, recreation or entertainment areas, transportation and housing facilities provided for employees which are segregated by explicit directive or are in fact segregated on the basis of race, color, religion, sex or national origin, because of habit, local custom or otherwise.  It further agrees that (except where it has obtained identical certifications from proposed subcontractors for specific time periods) it will obtain identical certifications from proposed subcontractors prior to the award of subcontracts exceeding $10,000.00, which are not exempt from the provisions of the Equal Opportunity Clause; that it will retain such certification in its files; and that it will forward the following notice to such proposed subcontractors (except where the proposed subcontractors have submitted identical certificates for specific time periods):

> NOTICE TO PROSPECTIVE SUBCONTRACTORS OF REQUIREMENT FOR CERTIFICATIONS OF NONSEGREGATED FACILITIES:
>
> Certification of Nonsegregated Facilities must be submitted prior to the award of a subcontract exceeding $10,000.00, which is not exempt from the provisions of the Equal Opportunity Clause.  The certification may be submitted either for each subcontract or for all subcontracts during a period (i.e. quarterly, semi-annually or annually).  Note:  The penalty for making false statements is prescribed in 18 U.S.C. 1001.

<div align="center">END OF EXHIBIT B TO APPENDIX 1</div>

DM-#8062177
#94614816v4
#94614816v6

**EXHIBIT C to APPENDIX 1**

**INSURANCE PROVISIONS**

**Insurance Requirements.** During the term of the Agreement, Contractor will carry insurance coverages as set forth below at its own expense and with deductibles for its own account, with providers reasonably satisfactory to Owner and authorized to do business in the states or territories in which, and in the offshore blocks on which, Contractor performs any Work. The insurance coverages required herein represent Contractor's minimum requirements and do not limit or invalidate any indemnity or other obligations of Contractor under the Agreement. Contractor's failure to secure the required insurance coverages or the required endorsements on the policies or any denial of coverage by underwriters does not relieve Contractor from or limit its liabilities or obligations under the Agreement.

**Required Coverage.** The following insurance coverage is required. An owner's limitation clause, including any clause purporting to limit coverage to liability of an insured "as owner of the vessel," shall not be included in any of the policies required below. All policies and group policies must contain applicable territorial extensions and navigation limits adequate for the performance of the Work.

**Workers' Compensation**, as required by applicable law.

**Employer's Liability**, with a limit of not less than **$1,000,000** per occurrence, including (i) coverage for the Longshore and Harbor Workers' Compensation Act, including its extension by the Outer Continental Shelf Lands Act, the Jones Act, and the Death on the High Seas Act, (ii) coverage for masters and members of the crews of vessels (on a voluntary compensation basis), including transportation, wages, maintenance, and cure; alternatively, protection and indemnity insurance may be used for this coverage as specified below, (iii) "in rem" endorsement, stating that an action "in rem" will be treated as a claim against the insured "in personam," and (iv) "borrowed servant" endorsement, stating that a claim brought against Owner Group for compensation as a "borrowed servant" by any member of Contractor Group will be treated as a claim against Contractor.

**Automobile Liability**, with a limit of not less than **$1,000,000** per occurrence, combined single limit for bodily injury and property damage, covering all owned, hired, leased, or non-owned vehicles (as required by applicable law).

**Commercial General Liability**, with a limit of not less than **$1,000,000** per occurrence, combined single limit for bodily injury and property damage, including (i) blanket contractual liability, (ii) products/completed operations liability, (iii) sudden and accidental pollution liability (including cleanup costs), (iv) surface damage for blowout and cratering, (v) removal of any exclusions, restrictions, or limitations relating to explosion, collapse, or underground property damage, (vi) removal of any professional liability exclusions or limitations, (vii) action over buyback and deletion of any provisions that limit or exclude coverage of claims made by

Exhibit C to Appendix 1
Page 1 of 3

DM-#8062177
#94614816v4
#94614816v6

Contractor Group's employees against any member of Owner Group, (viii) extended reporting period of not less than 36 months, if written on a claims-made policy and is non-renewed or canceled, or deletion of any "sunset clause" purporting to cancel coverage on claims following cancellation or non-renewal, if written on an occurrence policy, (ix) "in rem" endorsement stating that an action "in rem" will be treated as a claim against the insured "in personam," and (ix) removal of the "watercraft" exclusion; alternatively, protection and indemnity insurance may be used for this coverage as specified below.

**Hull and Machinery**, which Contractor will carry, or cause to be carried, for each vessel owned or chartered by Contractor Group in connection with the Work at the declared value of each vessel and its equipment, including (i) deletion of limitation of liability clause, (ii) if any vessel engages in towing operations, this insurance will include full towers liability with the sistership clause un-amended, and (iii) removal of wreck or debris, if removal is required by applicable law.

**Protection and Indemnity**, which Contractor will carry, or cause to be carried, for each vessel owned or chartered by Contractor Group in connection with the Work with a limit of not less than **$5,000,000** per occurrence, including (i) coverage for pollution emanating from or caused by a vessel or vessels owned or chartered by Contractor Group, (ii) deletion of any language limiting coverage for Owner Group in the event of the applicability of any statute limiting liability; (iii) "in rem" endorsement stating that an action "in rem" will be treated as a claim against the insured "in personam," (iv) towers liability, where applicable; alternatively, liability coverage may be afforded in accordance with the Commercial General Liability coverages above (deleting the "watercraft" exclusions), (v) coverage for the crews; alternatively, the crew coverage may be afforded in accordance with the workers' compensation and employer's liability coverages above, and (vi) removal of wreck or debris, if removal is required by applicable law.

**Charterers Legal Liability**, which Contractor will carry, or cause to be carried, for each vessel chartered by Contractor Group in connection with the Work with a limit of not less than **$1,000,000** per occurrence, including (i) liabilities arising out of operation and use of such vessel and (ii) contractual liability for liabilities assumed by Contractor.

**Excess or Umbrella Liability**, with a limit of not less than **$100,000,000** per occurrence, combined single limit for bodily injury and property damage in excess of the limits specified above and is follow-form with additional exclusions for employer's liability, automobile liability, commercial general liability, hull and machinery, protection and indemnity, and charterers legal liability, which such liability limits may be met with any combination of primary, umbrella, and excess policies.

**Aircraft Liability**, which Contractor will carry, or cause to be carried, for each aircraft owned or chartered by Contractor Group in connection with the Work with a limit of not less than **$75,000,000** per occurrence, combined single limit for bodily injury or death (including passengers) and loss of or damage to property, including (i) passenger liability, (ii) cargo legal liability, and (iii) no provision limiting coverage "per seat" or "per passenger."

Exhibit C to Appendix 1
Page 2 of 3

DM-#8062177
#94614816v4
#94614816v6

**Aircraft Hull**, which Contractor will carry, or cause to be carried, for each aircraft owned or chartered by Contractor Group in connection with the Work for the declared value of each aircraft and its equipment.

**Professional Liability**, if applicable, with a limit of not less than $1,000,000 per claim, including errors or omissions or rendering or failing to render any professional services as required under the Agreement.

**Endorsements and Other Requirements.** To the extent of the liabilities assumed by Contractor hereunder, all insurance policies of Contractor will comply with the following:

(a) **Waiver of Subrogation.** Such policies will expressly waive subrogation as to Owner Group.

(b) **Additional Insured.** Such policies, other than workers' compensation, employer's liability, and professional liability policies, will include Owner Group as an additional insured, on a broad-form basis. Such additional-insured endorsements must include coverage for the sole, joint, or concurrent negligence of the additional insureds and not be restricted to: (i) ongoing operations and products/completed operations; (ii) coverage for vicarious liability; or (iii) circumstances in which the named insured is partially negligent. The Parties deem a portion of the payment made by Owner for Work performed to include compensation to Contractor for any costs Contractor may incur due to including Owner Group as additional insured. If any additional-insured endorsement limits coverage to amounts required by written contract, the amounts required in the agreement will instead be the maximum amounts of Contractor's insurance policies, but not less than the minimums set forth herein.

(c) **Primary.** Such policies will be primary to and receive no contribution from any insurance policies maintained by Owner Group.

<div align="center">END OF EXHIBIT C OF APPENDIX 1</div>

Exhibit C to Appendix 1
Page 3 of 3

DM-#8062177
#94614816v4
#94614816v6

**EXHIBIT D to APPENDIX 1**


**<u>DRUG AND ALCOHOL POLICY</u>**


**PURPOSE**

This policy implements Contractor's effort to enhance the safety of its operations and to provide its employees an opportunity to work in an environment free of drugs and alcohol.  Contractor will deter alcohol and drug abuse by prevention through education, detection through testing, and disciplinary action when warranted.

**POLICY**

Contractor prohibits:

- employees possessing or consuming alcohol or drugs while working;
- employees working while under the influence of alcohol or drugs; and
- employees possessing or consuming drugs while not working.

**EXCEPTIONS**

Contractor permits employee possession of prescription drugs in containers that bear the doctor's and employee's name and a prescription date less than one year old, and permits the safe use of those drugs for the prescribed purposes, but Contractor does not permit employees to work while under the influence of prescription medications that may have an adverse effect on the employee's fitness for duty.

Contractor permits possession and moderate, lawful consumption of alcohol at business-related social functions that have been appropriately authorized by management, but prohibits employees and other attendees from working or operating motor vehicles after such a function if their abilities may have been impaired by alcohol.

**DEFINITIONS**

"Employees" means (for purposes of this policy only) all regular full-time, regular part-time or temporary employees, all Contractor independent contractors and agents, and all other persons using Contractor equipment, vehicles or boats (including those owned, used, rented or leased by or for Contractor) or performing duties on Contractor premises or property.

"Drugs" means (1) marijuana, cocaine, opiates, phencyclidine (PCP) and amphetamines; and (2) any other substances specified in Schedule I through V of the federal Controlled Substances Act whether or not prescribed for employee use by a physician.

DM-#8062177
#94614816v4
#94614816v6

"Test" means a drug test and/or alcohol test using urine and/or blood samples, conducted in accordance with this policy and Contractor testing procedures.

"Working" means reporting for work, performing job duties, engaging in business-related travel or entertainment, operating any Contractor equipment, vehicle or boat (including those owned, used, rented or leased by or for Contractor), being on Contractor property or premises, or attending any Contractor-related business or social function.

## TESTING AND DISCIPLINE

Contractor may require employees to submit to tests to determine the presence of drugs or alcohol.  If an employee's test yields a verified positive result, their employment will be terminated immediately.   In the case of a verified positive pre-employment test result, any offer of employment will be automatically withdrawn.

A refusal to take a test, failure to cooperate with a test, an attempt to tamper with a specimen, violation of Contractor testing policies or procedures or any attempt to subvert Contractor testing policies or procedures will have the same consequences as failing a drug test – immediate termination of employment or withdrawal of offer of employment.

The Contractor human resources department maintains written procedures for testing, which may be changed by Contractor at any time, for any reason.  The procedures are available for employee review.

## EMPLOYEE DRUG CONVICTIONS

As required by the Drug Free Work Place Act of 1989, any employee convicted of any violation of any criminal drug statute must notify management of the conviction no later than five (5) days after a conviction.  Failure to give notice shall result in the employee's termination.  The management personnel given the notice will immediately notify the human resources department of any reported conviction.  Contractor may terminate any employee convicted of a drug-related crime regardless of the results of any administered drug test.

## PRE-EMPLOYMENT TESTING

All applicants for employment at Contractor shall undergo a pre-employment drug test within 24 hours of Contractor's request.

## POST ACCIDENT TESTING

Contractor will test each employee whose performance either contributed to an accident or cannot be completely discounted as a contributing factor to the accident, if the accident:

- results in a death or a personal injury necessitating medical attention;

Exhibit D to Appendix 1
Page 2 of 5

- results in an explosion or fire;
- causes a significant damage to or loss of property;
- requires the emergency shut-down of an operation or facility;
- is a reportable incident regarding a gas pipeline facility under 49 CFR Part 191; or
- is a reportable accident involving pipeline facilities used in the transportation of hazardous liquids under 49 CFR Part 195.

In addition to the mandatory post-accident testing described above, Contractor may, in its sole discretion, also require post-accident testing following any accident that it determines is significant and warrants post-accident testing.

**RANDOM TESTING**

Contractor will conduct random testing on employees at certain Contractor facilities designated by the Vice President of Exploration and Production, the Vice President of Human Resources, and the Sr. Vice President and General Counsel.  Procedures for selecting employees for random testing are stated in Contractor's written procedures for testing.

**REASONABLE CAUSE TESTING**

Contractor will test an employee when there is reasonable cause to believe that the employee is using a drug or is under the influence of alcohol.  "Reasonable cause" depends on the circumstances of each case.  It includes observation of an employee's:

- unauthorized use or possession of alcohol while working;
- use or possession of drugs;
- slurred speech;
- unsafe actions;
- inability or difficulty in performing routine tasks effectively;
- unsteady standing or walking;
- disorientation or confusion; or
- erratic or unusual behavior.

It may also include:

- concerns about the employee's fitness for duty;
- an employee's voluntary admission of the prohibited use of alcohol or drugs;
- an employee's arrest or conviction for a drug-related offense, or the identification of an employee as the focus of a criminal investigation into illegal drug possession, use or trafficking;
- information related to employee drug use or prohibited alcohol use provided by reliable and credible sources or independently corroborated by Contractor;
- evidence that an employee has tampered with a drug test;
- the odor of alcohol, marijuana, or any other drug; or

- an employee's operation of a Contractor vehicle after leaving an establishment where alcohol is served.

Reasonable cause for testing may arise in circumstances in addition to those specified above. A test for reasonable cause will be conducted only upon concurrence of at least two of the employee's supervisors, one of whom is trained in the detection of the possible symptoms of drug and alcohol use. A drug test for reasonable cause will also require the concurrence of either the Vice President of Human Resources or the Sr. Vice President and General Counsel (either of whom may also constitute the concurring supervisors).

## OTHER TESTING

If an employee transfers to a facility designated for random testing, a drug test will be required before transfer. If an employee is on a leave of absence from a facility designated for random testing, a drug test may be required before the employee may return to work. Employees may be drug tested upon commencing or ending multiple-day work shifts on offshore facilities.

## MEDICAL REVIEW OFFICER

Contractor has designated a licensed physician with knowledge of drug abuse disorders as its medical review officer ("MRO"). The MRO reviews and interprets positive test results obtained through Contractor's testing program. The MRO is responsible for verifying positive test results. The MRO examines alternative medical explanations for any positive test results, and reviews all medical records made available by the tested employee when a confirmed positive drug test could have resulted from legally prescribed drugs. Contractor's test procedures describe the process under which the MRO reviews information, gives the tested employee an opportunity to discuss the test result, and otherwise determines whether the test result should be reported as negative or should be reported as a verified positive test.

## RE-TESTING AT THE EMPLOYEE'S REQUEST

An employee may submit a written request to the MRO within 72 hours of receipt of a verified positive drug test, asking that the employee's original specimen be re-tested. Employees are entitled to only one re-test of each specimen. Re-testing procedures are stated in the written procedures for testing maintained by the Contractor's human resources department.

## EMPLOYEE EDUCATION AND TRAINING

Employees at the facilities designated for random testing will participate in a training program that addresses the consequences of alcohol and drug use on personal health, safety, and the work environment. The program will also address indicators of alcohol and drug use and abuse. Informational materials (including a community service drug hot-line telephone number for employee assistance), and Contractor's policy regarding drug and alcohol use in the work place will be distributed as part of the training program.

Exhibit D to Appendix 1
Page 4 of 5

In addition to training for all employees, supervisors of the designated facilities will receive annual training of specific contemporaneous physical, behavioral and performance indicators of probable drug use.

**VOLUNTARY REHABILITATION**

Employees are encouraged to seek treatment for any alcohol or drug problem before being in a situation that may warrant a test. Upon request, the Contractor's human resources department will refer employees to an independent treatment program.

Medical and disability benefits will be provided for treatment to the extent available under Contractor's medical and disability plans. Employees referred by Contractor to a treatment program and employees seeking Contractor medical or disability benefits for treatment must consent to the disclosure of all treatment-related information to Contractor. An employee's employment shall be terminated if they do not cooperate with treatment, if they leave a treatment program before being discharged, or if they violate this policy after returning to work following treatment.

**IMPLIED CONSENT**

Employees are conclusively deemed to consent to cooperate in maintaining a work place free from the effects of alcohol and drugs through the use and enforcement of this and related corporate policies and procedures.

<div align="center">END OF EXHIBIT D OF APPENDIX 1</div>

DM-#8062177
#94614816v4
#94614816v6

**EXHIBIT E to APPENDIX 1**

**CONTRACTOR SAFETY AND ENVIRONMENTAL REQUIREMENTS**

**A**      **Purpose and Scope**

A.1      The purpose and scope of these requirements is to establish safety and environmental requirements for contractors to be able to work on Owner owned or managed properties.

The objectives of these requirements are to ensure that all contractors and subcontractors working on Owner's facilities/work sites have programs in place to comply with the Bureau of Safety and Environmental Enforcement (BSEE) Safety and Environmental Management Systems (SEMS) requirements or other applicable safety and environmental regulations, laws, rules and standards of agencies having jurisdiction at locations, their employees are adequately skilled and knowledgeable to safely perform their assigned job task functions, to ensure that safety and environmental policies have been established and to ensure that Contractor's management is committed to safety.

**B**      **Written Safety and Environmental Programs**

B.1      Contractors shall develop and implement written safety and environmental management programs which must include but not be limited to the following:

- Management Commitment
- Written Safe Work Practices specific for work to be performed in compliance with applicable OSHA, BSEE, U.S. Coast Guard, EPA and other applicable government agencies.
- Training Program to include an employee Skills and Knowledge Verification process
- Drug and Alcohol Prevention Program (e.g., DISA)
- Hazard Recognition Program to include JSA (Job Safety Analysis)
- Stop Work Authority Program
- Incident Reporting and Investigation Program
- Operating Procedures for Equipment
- Mechanical Integrity Program
- Management of Change (MOC)

**C**      **Training Requirements**

C.1      Contractor's personnel (and those of all subcontractors) shall be skilled and knowledgeable for the tasks or activities to be accomplished. This includes being in compliance with appropriate safety and environmental training codes, standards, laws and regulations as required by governmental agencies having jurisdiction at the work site (e.g., BSEE, USCG, EPA, DOT, OSHA) as well as Contractor's Contractor Training Requirements.

C.2      A Training Matrix has been established to identify minimal training requirements for Contractor personnel performing work on Owner properties. Contractors should refer to Contractor's SEMS portal for the latest version of the Training Matrix and must verify the training requirements are met for the appropriate job titles (functions).

DM-#8062177
#94614816v4
#94614816v6

**D**      **Safety and Environmental Management Systems (SEMS) - Contractor Requirements**

D.1      Contractor has established very specific contractor safety and environmental management requirements in order to provide for the safety of all personnel and to comply with current safety and environmental regulations. Below are specific requirements as part of the SEMS contractor agreement/bridging process. A detailed description and compliance guide can be obtained from the Contractor SEMS portal or by calling Contractor's EH&S department.

D.2      Requirements

    D.2.1      Contractors performing activities on-site offshore must participate in the ISNetworld Review and Verification, as well as the Training Qualification (TQ) processes;

    D.2.2      Contractor must review Contractor's Safety and Environmental Management System (SEMS), related SEMS requirements, Safe Work Practices and must perform all contractual obligations in accordance with such Contractor programs;

    D.2.3      The Contractor must communicate identified hazards to all affected personnel (including Owner and 3rd Party personnel) prior to performing oil, gas and sulphur operations for Owner;

    D.2.4      The Contractor must comply with all applicable safety and environmental regulations, laws, rules and standards of agencies having jurisdiction at locations where work is conducted for the Operator;

    D.2.5      Contractor must verify and provide documentation upon request that its personnel and any subcontractors performing work for Contractor have the skills and knowledge to perform their assigned duties in a safe and environmentally sound manner, has documented such, and that the information contained therein is accurate, timely and reflective of all appropriate safety and environmental training codes, standards, laws and regulations as required by governmental or regulatory agencies having jurisdiction at the work site.(e.g., BOEM, BSEE, USCG, EPA, DOT, OSHA) ;

    D.2.6      The Contractor must have written safe work practices that help minimize the risk to personnel and the environment for all work conducted for Owner, and all activities performed by the Contractor will be conducted in accordance with those safe work practices;

    D.2.7      The Contractor must require all personnel performing work for Contractor to undergo periodic retraining and skill assessments, in accordance with Contractor's Training Requirements for On-Site Contractors (Training Matrix), to ensure adequate retention of the skills and knowledge required to perform their assigned duties;

    D.2.8      The Contractor must obtain and/or develop written operating procedures to ensure the safe operation of critical equipment that is operated and maintained by the

Contractor whether or not that equipment is owned by the Contractor or any Third Party.  Critical equipment, per Appendix D of API RP 75, is defined as: "Equipment and other systems determined to be essential in preventing the occurrence of or mitigating the consequences of an uncontrolled release."  Such equipment may include vessels, machinery (compressors, mud pumps, fire pumps, etc.), piping, blowout preventers, wellheads and related valving, flares, wireline equipment, coil tubing equipment, fluid management equipment, safety systems, alarms, interlocks, fire protection equipment and other monitoring, control and response systems.

D.2.9   The Contractor must periodically review their written operating procedures used to operate critical equipment to ensure they reflect actual operating conditions;

D.2.10  The Contractor must develop and implement a written mechanical integrity program for any critical equipment that will be maintained and operated by the Contractor. Such a program must include, as applicable:

- The design, fabrication, procurement, installation, testing, calibration and inspection criteria and limits;
- The basis for maintenance (manufacturer's recommendation, industry standards, etc.
- A quality assurance program to ensure the mechanical integrity and safe operation of the equipment;

D.2.11  All documents required per 30 CFR 250, Subpart S and API RP 75 will be maintained in an orderly manner, will be readily identifiable, retrievable, and legible, and will be available for review on request by Owner or appropriate regulatory authorities. Examples of such documentation include, but are not limited to:

- Safe work practices and policies;
- Training records, including certifications for specialty work, as applicable;
- Verifications that personnel are skilled and knowledgeable in their assigned duties;
- Approved Job Safety Analyses (JSAs) as required;

D.2.12  For oil, gas and sulphur activities performed on Owner's *facilities* and on a Contractor's *facility* on  the OCS the Contractor agrees to the following, where "facilities" is defined to include all types of offshore structures permanently or temporarily attached to the seabed ( *i.e.* , mobile offshore drilling units; floating production systems; floating production, storage and offloading facilities; tension-leg platforms; spars used for exploration, development, production, and transportation activities for oil, gas, or sulphur from areas leased in the OCS, as well as wells, structures, living quarters, drilling and workover packages, process equipment, utilities and DOI regulated pipelines (except as noted in API RP 75 section 1.3.1.1);

DM-#8062177
#94614816v4
#94614816v6

D.2.13   The Contractor must conduct, keep current and provide upon request to Contractor Hazards Analyses (including Mitigation plans) of the Contractor's facilities and ongoing operations;

D.2.14   The Contractor must manage and document all changes to the Contractor's facility that are directly involved in performing oil, gas and sulphur activities for Owner;

D.2.15   The Contractor must develop and communicate an Emergency Action Plan to all personnel on the Contractor's facilities;

D.2.16   The Contractor must conduct Job Safety Analysis (JSA) to identify potential task specific hazards associated with the work to be performed and must include the steps required to mitigate the hazards identified.  Copies of all JSAs must be kept at the work site and be readily accessible for at least 30 days to all personnel involved with the work. The Contractor must also maintain copies of all completed JSAs for at least 2 years.

D.2.17   The Contactor must conduct routine safety meetings to communicate safety expectations, incidents, near miss reports, prevention, safety alerts, etc.

D.2.18   The Contractor must immediately notify an Owner representative by whatever means  of communication is most expedient, and shall maintain written records in addition thereto, of any incidents resulting in the following:

- Fatalities
- All injuries that require the evacuation of the injured person(s) from the facility to shore or to another offshore facility
- All losses of well control
- All fires and explosions
- All reportable releases of H2S gas
- All collisions
- All incidents involving severe structural damage
- All incidents involving crane or personnel/material handling operations
- All incidents that damage or disable safety systems or equipment

D.2.19   Contractor is required to complete incident reports and provide additional information as necessary in order to determine root cause and corrective actions.

**E       Personal Protective Equipment (PPE)**

Contractor shall provide its employees and personnel with proper PPE for them to perform their jobs safely. Contractor shall also ensure that its employees and personnel are trained in the proper use and maintenance of all PPE issued. The following is only the minimum PPE required to work on facilities owned, operated or managed by Owner or any of its affiliated or subsidiary companies. Any additional job specific PPE (face shields, goggles, respiratory protection, fall protection, hand protection, gas monitors, etc.) required by Owner, governmental regulations or hazard assessments shall also be provided by Contractor.

DM-#8062177
#94614816v4
#94614816v6

*Minimal PPE Requirements for contractors*:

- Safety Glasses – Safety Glasses shall comply with ANSI Z87.1 – 1989, as such may be updated or modified from time to time, and shall be worn in areas where personnel are exposed to flying particles and/or when working around pressurized process equipment, piping, pumps, etc.

- Hard Hat – Hard hats shall comply with ANSI Z89.1 – 1997, Type 1 requirements, as such may be updated or modified from time to time, and shall be worn at all times when working on Owner facilities or work sites.

- Safety/Steel Toe Shoes / Boots – Safety/Steel toe shoes / boots shall comply with ANSI Z41 – 1991, as such may be updated or modified from time to time, and shall be worn at all times when working at any facility or work site owned, operated or managed by Owner or any of its affiliated or subsidiary companies.

- Hearing Protection – Hearing protection is required in high noise areas or areas that are posted as requiring hearing protection.

- Personal Flotation Devices (PFD's) – USCG Type 1 or 5 are necessary for any Work or portion thereof that is to be performed outside the handrails, on +10 level of offshore platforms, during personnel transfers to and from offshore platforms and while boarding and exiting boats from boat landings.

**F**      **Inspections/Audits**

In addition to any right provided elsewhere in this <u>Appendix 1</u> or otherwise available by law, Owner reserves the right to inspect/audit the Environmental, Health and Safety activities of all contractors and subcontractors who work on any properties, facilities or premises owned, operated or managed by Owner or any of its affiliated or subsidiary companies. Owner or Third Party auditing teams or individuals may conduct these inspections/audits.

The objective of conducting an inspection/audit is to assess Contractor's compliance with applicable Owner, governmental and regulatory requirements and to prevent adverse environmental and safety incidents.

F.1      Field Inspections/audits

Owner may have field inspections conducted so that the inspector(s)/auditor(s) can:

- Physically observe the Work or any part thereof that Contractor, or any of its subcontractors or personnel, is performing.
- Assess Contractor's performance of Work, or any part thereof, according to applicable Owner, governmental or regulatory requirements.
- Advise Contractor regarding any deficiencies that are observed and require that such be corrected.

Exhibit E to Appendix 1
Page 5 of 6

Owner may conduct field inspections at any time and from time to time as Owner, in its sole discretion, may deem necessary or appropriate to maintain compliance with the applicable requirements of Owner or any governmental or regulatory agency or body.

F.2     Office Audits

Owner may have office audits conducted:

- To verify information that Contractor certifies as having when completing this Contractor Safety Program Requirements agreement.
- To check Contractor's documentation of training, safety meeting attendance, accidents, equipment inspections, safety program elements, etc.
- To share environmental, safety and health philosophies.

END OF EXHIBIT E TO APPENDIX 1

DM-#8062177
#94614816v4
#94614816v6

**EXHIBIT F to APPENDIX 1**

**SEARCH AND SEIZURE POLICY**

**NOTICE TO ALL PERSONNEL**

It is the Contractor's belief that the misuse of drugs, alcohol, or any substance having a physiological, psychological, or biochemical effect impairs a person's health and performance and creates unsafe working conditions. Contractor is committed to maintaining a productive, safe and healthy work environment, free of unauthorized drug and alcohol usage. In order to achieve this objective, Contractor has adopted a Drug and Alcohol Policy. All Contractor personnel are required to comply with the policy.

The use, possession, distribution or sale of unauthorized drugs by anyone while on Contractor premises or while engaged in Contractor business is prohibited. A person reporting for work on Contractor premises with unauthorized drugs and/or alcohol in his/her body is in violation of this policy.

Reporting to work while under the influence of alcohol by any person is prohibited. The consumption or possession of alcohol in unsealed or opened containers on Contractor premises is prohibited. No alcohol is allowed at any offshore location.

For the purpose of this policy, the term "unauthorized drugs" shall mean any substance, other than an authorized substance, which has the effect on the human body of being a narcotic, depressant, stimulant, hallucinogen or cannabinoid, their precursors, derivatives or analogues, and includes, but is not limited to, those substances scheduled as controlled substances pursuant to the Federal Controlled Substances Act.

"Authorized substances" are substances having a physiological, psychological, or biochemical effect that are lawfully prescribed or that are available without a prescription, that are lawfully obtained by an individual and that the individual possesses and uses in the appropriate manner, in the dosages and for the purposes for which the substances were prescribed or manufactured.

It is each person's responsibility to notify his or her supervisor in writing when that person is taking any prescription or non-prescription medicine or substance which may impair judgment or performance or otherwise adversely affect the normal functions or his or her mental faculties or physical abilities.

In enforcing the policy, searches of persons and their property on Contractor premises, work area searches, and laboratory testing are authorized. Any person who refuses, when requested, to cooperate with a search or to submit to laboratory testing shall be deemed to be in violation of the policy. Contractor reserves the right to conduct unannounced personal searches. Entry upon Contractor's premises by personnel will be deemed to constitute consent by such persons to personal searches pursuant to this policy.

Exhibit F to Appendix 1
Page 1 of 2

A personal search includes inspection of any personal property of personnel located on Contractor premises including, but not limited to, their personal effects, lockers, baggage, desks, lunch boxes, containers, purses, billfolds, parcels, or vehicles if on Contractor premises.

Any person charged with or under investigation in connection with a drug-related or alcohol-related criminal offense may be required to submit to laboratory testing.

Any person possessing food, supplies, or tools not belonging to them, at a time when such items should not be in their possession, is subject to disciplinary action.

Firearms are prohibited on all Contractor premises.  Without limiting the generality of the foregoing, personnel may not possess firearms on their person, or in their personal effects, lockers, baggage, desks, lunch boxes, containers, purses, parcels, or vehicles if on Contractor premises.

<p style="text-align:center">END OF EXHIBIT F TO APPENDIX 1; END OF AGREEMENT</p>

DM-#8062177
#94614816v4
#94614816v6

## Exhibit C

**Specified Interests**

| Block | Lease |
|-------|-------|
| GA 151 | OCS-G 15740 |
| SS 246 | OCS-G 01027 |
| VR 78 | OCS-G 04421 |
| VR 313 | OCS-G 01172 |
| SS 247 | OCS-G 01028 |
| SS 248 | OCS-G 01029 |
| SS 249 | OCS-G 01030 |
| SS 270 | OCS-G 01037 |
| SS 271 | OCS-G 01038 |
| WC 72 | OCS-G 23735 |

**Exhibit D**

**Form of Joinder**

**CREDIT BID PURCHASER JOINDER**

        This Joinder ("**Joinder**") to the Eni Term Sheet Implementation Agreement, dated as of [\_\_\_], 2021 (as amended, supplemented or otherwise modified from time to time, the "**Implementation Agreement**"), by and among Fieldwood Energy III LLC, a Delaware limited liability company ("**FWE III**"), and its affiliated debtors and debtors in possession in the jointly administered chapter 11 cases pending before the Honorable Marvin Isgur under Case No. 20-33948 (collectively, the "**Debtors**"), (b) Eni Petroleum US LLC and Eni US Operating Co. Inc. (collectively, "**Eni**") and (c) following execution of this Joinder, [\_\_\_], a Delaware limited liability company ("**Credit Bid Purchaser**"), is executed and delivered by Credit Bid Purchaser as of [●], 2021.  Each capitalized term used herein but not otherwise defined shall have the meaning set forth in the Implementation Agreement.

        Section 1.     <u>Agreement to be Bound</u>.  Credit Bid Purchaser hereby agrees to and shall become and be bound by all of the terms and conditions, commitments, and obligations of Credit Bid Purchaser under the Implementation Agreement.

        Section 2.     <u>Governing Law</u>. For the avoidance of doubt, <u>Section 12</u> of the Implementation Agreement shall apply to this Joinder *mutatis mutandis*.

        Section 3.     <u>Notice</u>. All notices and other communications given or made pursuant to the Implementation Agreement shall be sent to Credit Bid Purchaser at the address set forth in signature pages hereto.

        Section 4.     <u>No Recourse</u>. Notwithstanding anything that may be expressed or implied in this Joinder or any other document, with respect to Credit Bid Purchaser, no Person other than Credit Bid Purchaser (and its successors or assignees) has any obligation hereunder.

**[*Signature Pages Follow*]**

IN WITNESS WHEREOF, Credit Bid Purchaser has caused this Joinder to be executed as of the date first written above.

**[Credit Bid Purchaser]**


By:_____
Name:
Title:


**<u>Notice Address</u>:**
[●]

Fax: [●]

Attention: [●]

Email: [●]

**Exhibit E**

**Form of Joinder**

**FWE III JOINDER**

This Joinder ("**Joinder**") to the Eni Term Sheet Implementation Agreement, dated as of [____], 2021 (as amended, supplemented or otherwise modified from time to time, the "**Implementation Agreement**"), by and among Fieldwood Energy LLC, a Delaware limited liability company ("**FWE**"), and its affiliated debtors and debtors in possession in the jointly administered chapter 11 cases pending before the Honorable Marvin Isgur under Case No. 20-33948 (collectively, the "**Debtors**"), (b) Eni Petroleum US LLC and Eni US Operating Co. Inc. (collectively, "**Eni**") and (c) following execution of this Joinder, Fieldwood Energy III LLC, a Delaware limited liability company ("**FWE III**"), is executed and delivered by FWE III as of [●], 2021.  Each capitalized term used herein but not otherwise defined shall have the meaning set forth in the Implementation Agreement.

Section 1.      Agreement to be Bound.  FWE III hereby agrees to and shall become and be bound by all of the terms and conditions, commitments, and obligations of FWE III under the Implementation Agreement.

Section 2.      Governing Law. For the avoidance of doubt, Section 12 of the Implementation Agreement shall apply to this Joinder *mutatis mutandis*.

Section 3.      Notice. All notices and other communications given or made pursuant to the Implementation Agreement shall be sent to FWE III at the address set forth in signature pages hereto.

Section 4.      No Recourse. Notwithstanding anything that may be expressed or implied in this Joinder or any other document, with respect to FWE III, no Person other than FWE III (and its successors or assignees) has any obligation hereunder.

**[*Signature Pages Follow*]**

[Exhibit to Form of Joinder]

     IN WITNESS WHEREOF, FWE III has caused this Joinder to be executed as of the date first written above.

FWE III


By:_____
Name:
Title:


**<u>Notice Address</u>:**
[●]

Fax: [●]

Attention: [●]

Email: [●]

## **Exhibit F**

**Excluded Wells**

See attached.

EXHIBIT F
EXCLUDED WELLS

| API | LEASE | AREA | BLOCK | WELL NAME | SUFFIX |
|---|---|---|---|---|---|
| 4270640465-02 | G15740 | GA | 151 | B1 | ST00BP02 |
| 1771200065-00 | G01027 | SS | 246 | 1 | ST00BP00 |
| 1771240061-00 | G01027 | SS | 246 | 3 | ST00BP00 |
| 1771240071-00 | G01027 | SS | 246 | B001 | ST00BP00 |
| 1771240073-00 | G01027 | SS | 246 | 5 | ST00BP00 |
| 1771240079-00 | G01027 | SS | 246 | A003 | ST00BP00 |
| 1771240080-00 | G01027 | SS | 246 | B002 | ST00BP00 |
| 1771240081-01 | G01027 | SS | 246 | B006 | ST01BP00 |
| 1771240088-00 | G01027 | SS | 246 | B007 | ST00BP00 |
| 1771240096-00 | G01027 | SS | 246 | A008 | ST00BP00 |
| 1771240105-00 | G01027 | SS | 246 | A010 | ST00BP00 |
| 1771240121-00 | G01027 | SS | 246 | A012 | ST00BP00 |
| 1771240135-00 | G01027 | SS | 246 | A015 | ST00BP00 |
| 1771240126-00 | G01027 | SS | 246 | A016 | ST00BP00 |
| 1771240134-00 | G01027 | SS | 246 | A017 | ST00BP01 |
| 1771240440-00 | G01027 | SS | 246 | H001 | ST00BP00 |
| 1771200064-00 | G01028 | SS | 247 | 1 | ST00BP00 |
| 1771200114-00 | G01028 | SS | 247 | 2 | ST00BP00 |
| 1771240094-00 | G01028 | SS | 247 | C001 | ST00BP00 |
| 1771240100-00 | G01028 | SS | 247 | C005 | ST00BP00 |
| 1771240108-00 | G01028 | SS | 247 | C003 | ST00BP00 |
| 1771240112-00 | G01028 | SS | 247 | C007 | ST00BP00 |
| 1771240155-03 | G01028 | SS | 247 | F001 | ST00BP00 |
| 1771240174-00 | G01028 | SS | 247 | 4 | ST00BP00 |
| 1771240196-00 | G01028 | SS | 247 | F004 | ST00BP00 |
| 1771240198-00 | G01028 | SS | 247 | F003 | ST00BP00 |
| 1771240209-00 | G01028 | SS | 247 | F006 | ST00BP00 |
| 1771240212-00 | G01028 | SS | 247 | F005 | ST00BP00 |
| 1771240216-00 | G01028 | SS | 247 | F009 | ST00BP00 |
| 1771240218-01 | G01028 | SS | 247 | F007 | ST01BP00 |

1 of 3

**EXHIBIT F**
**EXCLUDED WELLS**

| API | LEASE | AREA | BLOCK | WELL NAME | SUFFIX |
|---|---|---|---|---|---|
| 1771240219-00 | G01028 | SS | 247 | F011 | ST00BP00 |
| 1771240227-00 | G01028 | SS | 247 | F012 | ST00BP00 |
| 1771240230-00 | G01028 | SS | 247 | F013 | ST00BP00 |
| 1771240231-00 | G01028 | SS | 247 | F016 | ST00BP00 |
| 1771200011-00 | G01029 | SS | 248 | A003 | ST02BP00 |
| 1771240010-00 | G01029 | SS | 248 | 1 | ST00BP00 |
| 1771240077-00 | G01029 | SS | 248 | D001 | ST00BP00 |
| 1771240147-00 | G01029 | SS | 248 | 4 | ST00BP00 |
| 1771240238-00 | G01029 | SS | 248 | 5 | ST00BP00 |
| 1771240482-00 | G01029 | SS | 248 | 6 | ST00BP00 |
| 1771240486-00 | G01029 | SS | 248 | 7 | ST00BP00 |
| 1771200066-00 | G01030 | SS | 249 | 1 | ST00BP00 |
| 1771240060-00 | G01030 | SS | 249 | 2 | ST00BP00 |
| 1771240263-00 | G01030 | SS | 249 | 5 | ST00BP00 |
| 1771240563-00 | G01030 | SS | 249 | H002 | ST00BP00 |
| 1771240045-00 | G01037 | SS | 270 | 1 | ST00BP00 |
| 1771200032-01 | G01038 | SS | 271 | A005 | ST01BP00 |
| 1771200033-02 | G01038 | SS | 271 | A007 | ST02BP00 |
| 1771200081-00 | G01038 | SS | 271 | 1 | ST00BP00 |
| 1771240089-01 | G01038 | SS | 271 | A006 | ST01BP00 |
| 1771240099-00 | G01038 | SS | 271 | A008 | ST00BP00 |
| 1771240133-01 | G01038 | SS | 271 | 5 | ST01BP00 |
| 1771240136-00 | G01038 | SS | 271 | 3 | ST00BP00 |
| 1771240182-00 | G01038 | SS | 271 | B001 | ST00BP00 |
| 1771240187-00 | G01038 | SS | 271 | B002 | ST00BP00 |
| 1771240205-00 | G01038 | SS | 271 | B004 | ST00BP00 |
| 1771240250-00 | G01038 | SS | 271 | 4 | ST00BP00 |
| 1771240261-00 | G01038 | SS | 271 | B005 | ST00BP00 |
| 1771240264-00 | G01038 | SS | 271 | B006 | ST00BP00 |
| 1771240267-00 | G01038 | SS | 271 | B009 | ST00BP00 |
| 1771240455-00 | G01038 | SS | 271 | 6 | ST00BP00 |
| 1770541031-00 | G04421 | VR | 78 | A004 | ST00BP00 |
| 1770600047-00 | G01172 | VR | 313 | 1 | ST00BP00 |

**EXHIBIT F**
**EXCLUDED WELLS**

| API | LEASE | AREA | BLOCK | WELL NAME | SUFFIX |
|---|---|---|---|---|---|
| 1770600066-00 | G01172 | VR | 313 | 2 | ST00BP00 |
| 1770620027-00 | G01172 | VR | 313 | 3 | ST00BP00 |
| 1770640024-00 | G01172 | VR | 313 | 4 | ST00BP00 |
| 1770640061-00 | G01172 | VR | 313 | 5 | ST00BP00 |
| 1770640163-00 | G01172 | VR | 313 | 6 | ST00BP00 |
| 1770640202-00 | G01172 | VR | 313 | A001 | ST00BP00 |
| 1770640208-01 | G01172 | VR | 313 | A009 | ST01BP00 |
| 1770640210-00 | G01172 | VR | 313 | A003 | ST00BP00 |
| 1770640215-00 | G01172 | VR | 313 | A004 | ST00BP00 |
| 1770640218-02 | G01172 | VR | 313 | A011 | ST02BP00 |
| 1770640221-01 | G01172 | VR | 313 | A012 | ST01BP00 |
| 1770640222-00 | G01172 | VR | 313 | A007 | ST00BP00 |
| 1770640244-00 | G01172 | VR | 313 | A010 | ST00BP00 |
| 1770041148-00 | G22510 | WC | 100 | 3 | ST00BP00 |
| 1770041161-01 | G12761 | WC | 130 | 2 | ST01BP00 |
| 1770041259-01 | G12761 | WC | 130 | 4 | ST00BP01 |

3 of 3

## **Exhibit G**

### **Temporary Abandoned Wells**

See attached.

# EXHIBIT G
# TEMPORARY ABANDONED WELLS

| API | LEASE | AREA | BLOCK | WELL NAME | SUFFIX | Status |
|---|---|---|---|---|---|---|
| 42-706-40442-00 | OCS-G15740 | Galveston | 151 | 5 | ST00BP00 | Temporarily Abandoned.  Operated by Fieldwood. |
| 17-712-40057-00 | OCS-G 01027 | Ship Shoal | 246 | A-001 | ST00BP00 | TA 2010.  13 3/8" CICR @ 164' BML with 120' surface cement plug f/ 164' to 44' BML.  13 3/8" and 20' removed to 25' BML.  Top of 30" is +/ 5" AML.  Need to remove 30" to 15' BML when platform is removed. |
| 17-712-40074-00 | OCS-G 01027 | Ship Shoal | 246 | A-002 | ST00BP02 | TA 2001.  LS@ 1357', SS@ 1424'.  Spotted cmt plugs in LS 10100'- 9800' and 3100' - 2800'.  CICR @ 1300' with 200' cmt on top f/ 1300' - 1100'.  Need to PT & BT annuli, set surface cmt plug and remove 7", 9 5/8", 13 3/8", 20" and 26" casings to 15' BML. |
| 17-712-40102-00 | OCS-G 01027 | Ship Shoal | 246 | A-009 | ST00BP00 | TA 2001.  Casing damage at 9764'.  7", 29# CIBP at 9000' with 200' cement plug f/ 8800' - 9000'.  Displace well w/ 13.5ppg WBM.  Test cmt plug w/ 1000 psi.  Need to PT & BT annuli and set additional cement plugs as required by BSEE.  Remove 7", 9 5/8", 13 3/8", 20", and 26" at 15' BML. |
| 17-712-40224-00 | OCS-G01028 | Ship Shoal | 247 | F-010 | ST00BP00 | TA 2013.  Surface cement plug @ 70' BML.  Need to cut 7 5/8", 10 ¾", 16" & 26" at 15' BML. |
| 17-712-40221-00 | OCS-G01029 | Ship Shoal | 248 | F-008 | ST00BP00 | TA 2000.  197' surface cement plug at 81' - 278' BML.  7 5/8" casing cut at 276' and 186' BML, could not pull.  Cemented to surface.  Need to PT & BT all annuli and remove 7 5/8", 10 3/4", 16" and 26" to 15' BML. |
| 17-712-40131-00 | OCS-G01028 | Ship Shoal | 247 | D-003 | ST00BP02 | TA 1982.  205' surface cement plug f/ 50' - 255' BML in 7".  Need to PT & BT all annuli and remove 7", 9 5/8", 13 3/8", 20" and 26" casings to 15' BML. |
| 17-712-40156-00 | OCS-G01028 | Ship Shoal | 247 | D-007 | ST00BP03 | TA 2013. Surface cement plug @ 100' BML.  Need to cut 10 ¾", 16", & 26" at 15' BML. |
| 17-712-40166-00 | OCS-G01028 | Ship Shoal | 247 | D-009 | ST00BP00 | TA 1999.  Casing restriction @ 11195'.  CICR @ 11150' with 370' cement plug on top f/ 11150' - 10780'.  7" wellbore has 13.0 ppg WBM.  Need to PT & BT all annuli, set additional cmt plugs as required by BSEE and remove 7", 9 5/8", 13 3/8" 20" and 26" to 15' BML. |
| 17-712-40179-03 | OCS-G01028 | Ship Shoal | 247 | D-012 | ST03BP00 | TA 2013.  Highest cement plug @ 789' BML.  Need to set surface cement plug.  PT & BT.  Cut 9 5/8", 13 3/8", 18 5/8" & 26" at 15' BML. |
| 17-712-40150-0 | OCS-G01029 | Ship Shoal | 248 | D-006 | ST00BP00 | TA 1977.  Drilled and TA'd 1977.  Highest cement plug (150') f/ 420' - 540' RKB (150' - 300' BML).  17.5 ppg WBM in wellbore.  Need to tag cement plug at 150' BML, circulate clean with seawater, set 9 5/8" CIBP at TOC and spot +/- 50' cement on top.  PT & BT annuli.  Remove 9 5/8", 13 3/8", 20" and 26" casings to 15' BML. |

1 of 3

# EXHIBIT G
## TEMPORARY ABANDONED WELLS

| API | LEASE | AREA | BLOCK | WELL NAME | SUFFIX | Status |
|---|---|---|---|---|---|---|
| 17-712-40206-00 | OCS-G01029 | Ship Shoal | 248 | D-015 | ST00BP00 | TA 2013. Highest cement plug @ 900' RKB (620' BML). Need to set surface cement plug. PT & BT. Cut 7 5/8", 10 ¾", 16" & 26" at 15' BML. |
| 17-712-40210-00 | OCS-G01029 | Ship Shoal | 248 | D-016 | ST00BP00 | TA 2014. Highest cement plug @ 670' RKB (390' BML). Need to set surface cement plug. PT & BT. Cut 7 5/8", 10 ¾", 16" & 26" at 15' BML. |
| 17-712-40211-00 | OCS-G01029 | Ship Shoal | 248 | D-018 | ST00BP00 | TA 2013. Highest cement plug @ 900' RKB (620' BML). Need to set surface cement plug. PT & BT. Cut 7 5/8", 10 ¾", 16" & 26" at 15' BML. |
| 17-712-40530-00 | OCS-G01029 | Ship Shoal | 248 | G-002 | ST00BP00 | TA 2013. Surface cement plug @ 124' BML. Need to cut 9 5/8", 13 3/8" & 26" at 15' BML. |
| 17-712-40533-00 | OCS-G01029 | Ship Shoal | 248 | G-003 | ST00BP00 | TA 2013. Surface cement plug @ 45' BML. Need to cut 9 5/8", 13 3/8", 20" & 26" at 15' BML. |
| 17-712-40120-00 | OCS-G01030 | Ship Shoal | 249 | D-002 | ST00BP00 | TA 2013. Highest cement plug @ 620' BML. Need to set surface cement plug. PT & BT. Cut 7", 9 5/8", 13 3/8", 20" & 26" at 15' BML. |
| 17-712-40159-00 | OCS-G01030 | Ship Shoal | 249 | D-008 | ST00BP00 | TA 2013. Surface cement plug @ 90' BML. Need to cut 7", 9 5/8", 13 3/8", 20" & 26" at 15' BML. |
| 17-712-40171-00 | OCS-G01030 | Ship Shoal | 249 | D-004 | ST00BP00 | TA 1978. Drilled and TA'd in 1978. Highest cement plug (150') at 465' - 315' RKB (185' - 35' BML). Plug tested 1000 psi. 15.9 ppg WBM in wellbore. Need to PT & BT annull and remove 9 5/8", 13 3/8", 20" and 26" casings to 15' BML. |
| 17-712-40192-00 | OCS-G01030 | Ship Shoal | 249 | D-014 | ST00BP01 | TA 1978. Drilled and TA'd in 1978. Highest cement plug f/ 10120' to 10389' (269'). Set 9 5/8" CICR @ 10170'. Squeeze 61 sxs below (219') and spot 50' on top of CR. 9 5/8" shoe @ 10239'. 16.8 ppg WBM in wellbore. Need to PT & BT annuli, spot additional cement plugs as required by BSEE and remove 9 5/8", 13 3/8", 20" and 26" casings to 15' BML. |
| 17-712-40208-00 | OCS-G01030 | Ship Shoal | 249 | D-017 | ST00BP00 | TA 2013. Highest cement plug @ 620' BML. Need to set surface cement plug. PT & BT. Cut 7 5/8", 10 ¾", 16" & 26" at 15' BML. |
| 17-712-40215-00 | OCS-G01030 | Ship Shoal | 249 | D-019 | ST00BP00 | TA 2013. Highest cement plug @ 820' BML. Need to set surface cement plug. PT & BT. Cut 7", 9 5/8", 13 3/8", 20" & 26" at 15' BML. |
| 17-712-40622-00 | OCS-G01030 | Ship Shoal | 249 | 6 | ST00BP00 | TA 2001. 7 5/8" CIBP set at 200' BML, no cement. Need to spot surface cement plug on CIBP. Cut 16" and 24" at 15' BML. |
| 17-70S-40778-00 | OCS-G04421 | Vermilion | 78 | A001 | ST00BP00 | Temporarily Abandoned. Operated by Fieldwood. |
| 17-706-40281-00 | OCS-G01172 | Vermilion | 313 | B001 | ST00BP01 | TA 2014. Surface cement plug @ 110' BML. Need to cut 10 ¾", 16" & 26" at 15' BML. |
| 17-706-40297-00 | OCS-G01172 | Vermilion | 313 | B002 | ST00BP00 | TA 2014. Surface cement plug @ 110' BML. Need to cut 7 5/8", 10 ¾", 16" & 26" at 15' BML. |

2 of 3

**EXHIBIT G**
**TEMPORARY ABANDONED WELLS**

| API | LEASE | AREA | BLOCK | WELL NAME | SUFFIX | Status |
|---|---|---|---|---|---|---|
| 17-706-40314-00 | OCS-G01172 | Vermilion | 313 | B004 | ST00BP00 | Listed in BSEE database (and OWL) as P&A in 1978. HOWEVER THE CASINGS AND WELLHEADS ARE STILL IN PLACE ON PLATFORM. SO IT IS ACTUALLY TA'd. Drilled and TA'd in 1978. Set 10 3/4" CICR at 3425'. Squeezed 75 sxs cmt below CR and left 25 sxs on top. Highest cement plug (155') f/ 605' - 450' RKB (322'- 167' BML). Surface plug tested to 2000 psi. 13.8 ppg WBM left in wellbore. Need to PT & BT annuli, tag plug at 450', circulate clean with seawater, complete surface plug with additional +/- 60' of cement and remove 10 3/4", 16" and 26" casings to 15' BML. |
| 17-706-40319-00 | OCS-G01172 | Vermilion | 313 | B006 | ST00BP00 | TA 2014.  Surface cement plug @ 110' BML. Need to cut 7 5/8", 10 ¾", 16" & 26" at 15' BML. |
| 17-706-40327-00 | OCS-G01172 | Vermilion | 313 | B007 | ST00BP00 | TA 1978.  Drilled and TA'd in 1978.  Highest cement plug (150') at 450'-600' RKB (167' - 317' BML).  13.7ppg WBM in wellbore.  Need to spot additional +/- 50' cement to complete surface plug, PT & BT annuli and remove 10 3/4", 16" and 26" casings to 15' BML. |
| 17-706-40338-01 | OCS-G01172 | Vermilion | 313 | B009 | ST01BP00 | TA 2014.  Surface cement plug @ 110' BML. Need to cut 7 5/8", 10 ¾", 16" & 26" at 15' BML. |
| 17-706-40371-00 | OCS-G01172 | Vermilion | 313 | B011 | ST00BP00 | TA 2014.  Surface cement plug @ 110' BML. Need to cut 7 5/8", 10 ¾", 16" & 26" at 15' BML. |
| 17-706-40719-00 | OCS-G01172 | Vermilion | 313 | C002 | ST00BP00 | TA 2014.  Surface cement plug @ 98' BML.  Need to cut 7", 10 ¾", 16" & 30" at 15' BML. |
| 17-706-40722-00 | OCS-G01172 | Vermilion | 313 | C003 | ST00BP00 | TA 2014.  Surface cement plug @ 96' BML.  Need to cut 7", 10 ¾", 16" & 30" at 15' BML. |
| 17-706-40720-00 | OCS-G01172 | Vermilion | 313 | C004 | ST00BP00 | TA 2014.  Surface cement plug @ 100' BML.  Need to cut 7", 10 ¾", 16" & 30" at 15' BML. |

3 of 3

*EXECUTION VERSION*

# TURNKEY REMOVAL AGREEMENT
## by and among
## ENI PETROLEUM US LLC
## AND
## FIELDWOOD ENERGY III LLC
## AND

## MAKO BUYER LLC

THIS TURNKEY REMOVAL AGREEMENT (the "**Agreement**") is made effective as of the [_____], 2021 (the "**Effective Date**"), by and among Eni Petroleum US LLC ("**Eni**"), a Delaware limited liability company having a mailing address of 1200 Smith Street, Suite 1700, Houston, Texas 77002, Fieldwood Energy III LLC ("**FWE III**"), a Delaware limited liability company having a mailing address of 2000 W. Sam Houston Pkwy S, Suite 1200, Houston, Texas 77042, and Mako Buyer LLC, a Delaware limited liability company (hereinafter referred to as "**Contractor**"), a Delaware limited liability company, having its mailing address at 2000 W Sam Houston Pkwy S, Suite 1200, Houston, Texas 77042.  Eni, FWE III and Contractor may hereinafter be referred to collectively as "**Parties**" or individually as a "**Party**."

## RECITALS

WHEREAS, FWE III is a resulting entity of a divisive merger effected in connection with the confirmed plan of reorganization of Chapter 11 Case 20-33948, In re: Fieldwood Energy LLC et al., in the United States Bankruptcy Court for the Southern District of Texas, Houston Division;

WHEREAS, Eni is identified as a predecessor-in-interest of the Specified Assets (as defined below);

WHEREAS, Eni and FWE III have requested that Contractor provide certain decommissioning and removal services with respect to the Specified Assets, upon the terms and conditions set forth herein, and Contractor has agreed to do so.

NOW, THEREFORE, in consideration of the premises and of the mutual promises, covenants, conditions, and agreements contained herein, and for other valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereby agree as follows:

## ARTICLE I.
## SERVICES

**Section 1.1    Services**. Subject to the terms of this Agreement, including the Performance Standards (as defined below), with respect to the interests identified on <u>Schedule 1</u> of this Agreement (the "**Specified Interests**"), Contractor will perform (i) the Agreed Activities, (ii) the Initial Safe Out,  and (iii) plug, abandon, decommission, remove when reefing or burial are not allowed, and salvage as appropriate ("**Decommission**" or "**Decommissioning**") certain platforms, wells, pipelines, facilities and equipment (including production equipment) located at, and any

hydrocarbons produced from, if applicable, the Specified Interests (collectively the "**Specified Assets**") on a lump sum, project-by-project, turnkey payment basis as contemplated in this Agreement.

      **Section 1.2**    Turnkey Amounts.

      (a)    Contractor will earn a single turnkey payment in exchange for completing the Decommissioning for each decommissioning project identified on Exhibit A hereto (each a "**Decommissioning Project**"). The total turnkey amount for each Decommissioning Project set forth on Exhibit A shall be set forth (i) on a gross 8/8ths basis (the "**Gross Turnkey Amount**") and (ii) Eni's individual net share of such Gross Turnkey Amount (such amount, the "**Eni Net Turnkey Amount**"). Without limitation of Eni's share of any Agreed Excess Qualified Conditions Costs pursuant to Section 1.8 up to the Qualified Condition Cap or any Excess Regulatory Costs pursuant to Section 1.7, (i) the aggregate sum of Gross Turnkey Amounts for the Decommissioning Projects shall not exceed $95,755,436.46, and (ii) the aggregate sum of Eni Net Turnkey Amounts for the Decommissioning Projects shall not exceed $57,325,130.98.  The Parties acknowledge and agree that except as provided in this Agreement or the Implementation Agreement (as defined below), neither Contractor nor Eni shall have any obligation to Decommission any Specified Assets which are not identified on Exhibit A.

      (b)    Subject to the terms of this Agreement, each Gross Turnkey Amount for each applicable Decommissioning Project shall be inclusive of all costs, expenses, taxes and reasonable overhead (in accordance with COPAS provisions attached to the Contract Operating Agreement as defined in Section 1.12) associated with a particular Decommissioning Project, including all third-party costs, any fixed and/or capital costs, and  taxes as necessary to meet the Performance Standard (collectively, the "**Actual Decommissioning Costs**"). Contractor shall be paid the applicable Eni Net Turnkey Amount for each completed Decommissioning Project, unless Eni makes a Turnkey Election pursuant to Section 1.4 below, in which case, Contractor shall be paid the applicable Gross Turnkey Amount; provided, however, in either case, the payment shall be made pursuant to Section 2.3 of this Agreement.

      (c)    Contractor shall have a profit opportunity following the completion of Decommissioning for any Decommissioning Project if it is able to Decommission such Decommissioning Project for a lower Actual Decommissioning Cost (i) net to the interests of Eni, as set forth in Decommissioning Project Schedule on Exhibit A in the column labeled "Eni Ownership (%)*," than the Eni Net Turnkey Amount, provided, that Eni did not make a Turnkey Election for such Decommissioning Project, or (ii) than the Gross Turnkey Amount if a Turnkey Election was made by Eni.  The Parties acknowledge and agree that once Eni has paid Contractor the Eni Net Turnkey Amount or Gross Turnkey Amount, as applicable, Eni shall have (subject to Sections 1.4, 1.6, 1.7, and 1.8) no further obligations (monetary or otherwise) with respect to the applicable Decommissioning Project, and Contractor shall bear the risk that the Actual Decommissioning Costs of a Decommissioning Project exceed the applicable Eni Net Turnkey Amount in the event no Turnkey Election is made, or the Gross Turnkey Amount attributed to such Decommissioning Project, in the event a Turnkey Election is made.

**Section 1.3**      <u>**Commencement of Decommissioning Projects**</u>. Without limitation of Contractor's obligations under <u>Section 1.5</u>, Contractor shall not be obligated to commence a Decommissioning Project until the earlier of (i) receipt by Eni and other joint and several parties of a BOEM/BSEE order(s) requiring such Decommissioning and full funding for such Decommissioning Project has been agreed upon in accordance with <u>Section 2.3</u>, or (ii) Eni makes a Turnkey Election for such Decommissioning Project; provided that the Decommissioning Project Schedule on <u>Exhibit A</u> shall be modified to address either such event.

**Section 1.4**      <u>**Turnkey Election**</u>. Eni shall have the right, but not the obligation (in Eni's sole discretion), to make an irrevocable election to agree to pay to Contractor the Gross Turnkey Amount for any particular Decommissioning Project (a "**Turnkey Election**"). In order to make a Turnkey Election, Eni shall provide Notice of its election to Contractor and FWE III, specifically identifying the Decommissioning Project to which the Turnkey Election applies (a "**Turnkey Notice**"). Upon receipt of a Turnkey Notice, Contractor shall promptly commence the applicable Decommissioning Project. Notwithstanding anything to the contrary contained in this Agreement, the Eni Term Sheet Implementation Agreement by and among (a) Fieldwood Energy LLC and its affiliated debtors and debtors in possession in the jointly administered Chapter 11 cases pending before the Honorable Marvin Isgur under Case No. 20-33948, (b) Eni Petroleum US LLC, and (c) the Credit Bid Purchaser dated of even date herewith (the "**Implementation Agreement**"), or any other Eni Definitive Documents (as defined in the Implementation Agreement), in the event Eni makes a Turnkey Election: (i) Eni agrees to pay Contractor the applicable Gross Turnkey Amount, subject to the terms of <u>Section 2.3</u>, plus, as applicable, any Agreed Excess Qualified Conditions Costs pursuant to <u>Section 1.8</u> up to the Qualified Condition Cap or any Excess Regulatory Costs pursuant to <u>Section 1.7</u>, (ii) Contractor assumes that the actual costs for the Decommissioning Project, performed in accordance with the Performance Standards, and excluding any costs for "Excluded Wells" and/or "Eligible Well Intervention Costs" (as such terms are defined in the Implementation Agreement) with respect to any particular "Temporary Abandoned Well" (as such term is defined in the Implementation Agreement) pursuant to <u>Section 7</u> of the Implementation Agreement, exceed the Gross Turnkey Amount, plus, as applicable, any Agreed Excess Qualified Conditions Costs pursuant to <u>Section 1.8</u> (up to the Qualified Condition Cap) and any Excess Regulatory Costs pursuant to <u>Section 1.7</u>, and (iii) Eni shall have the right to seek contribution from third parties for any share of the Gross Turnkey Amount.  In the event Eni makes a Turnkey Election for any Decommissioning Project, Eni may assign its rights in this Agreement insofar as it covers such Decommissioning Project (to the extent that it relates to Eni's prior undivided interests in the Specified Assets) to any third party or parties with joint and several liability for such Decommissioning Project, provided that Eni shall remain responsible for all of its obligations hereunder in relation to such Decommissioning Project.

**Section 1.5**      <u>**Initial Safe Out**</u>. With respect to the Decommissioning Projects, Contractor shall promptly perform the operations necessary to safe-out and otherwise perform preparatory activities in accordance with the Performance Standards to put such assets into a mechanical and operational state such that they are hydrocarbon free and ready to be Decommissioned (the "**Initial Safe Out**"). The Initial Safe Out for all Decommissioning Projects shall be completed no later than

December 31, 2021, unless agreed to in writing by Eni, such consent not to be unreasonably withheld, delayed or conditioned.

Section 1.6    **Qualified Conditions**. If it is discovered that any qualified condition(s) identified on <u>Exhibit B</u> ("**Qualified Conditions**") is present and is reasonably likely to result in additional costs or expenses to Contractor in excess of the existing Gross Turnkey Amount, either Contractor or Eni may provide Notice to the other, and for thirty (30) days following receipt of such Notice, the Parties shall work together in good faith to agree, as applicable, upon (i) any excess costs and expenses for such Qualified Conditions above the existing Gross Turnkey Amount or an alternative cost arrangement for an existing Decommissioning Project, and/or (ii) a Gross Turnkey Amount for a Specified Asset that is not already included in a Decommissioning Project as provided in <u>Section 1</u> of <u>Exhibit B</u> ((i) and (ii) collectively, the "**Excess Qualified Conditions Costs**"). In the event the Parties are unable to reach an agreement with respect to (i) the existence of a Qualified Condition or (ii) the Excess Qualified Conditions Costs attributable to a Qualified Condition, the Parties may submit the matter for Expert Determination, as provided in <u>Section 1.10</u> below. As either agreed by the Parties or determined by Expert Determination, any such Excess Qualified Conditions Costs are the "**Agreed Excess Qualified Conditions Costs**."

Section 1.7    **Regulatory Changes**. If any regulatory body either (i) issues a new regulation(s) that increases the cost to conduct a Decommissioning Project in accordance with Performance Standards, or (ii) designates additional sand sediment areas requiring pipeline removal as opposed to abandonment in place for any Decommissioning Project that did not already assume pipeline removal, following thirty (30) days prior written notice by Contractor to Eni, Eni and Contractor shall negotiate in good faith as to the existence of any regulatory change, and any necessary excess costs above the existing Gross Turnkey Amount for any affected Decommissioning Projects ("**Excess Regulatory Costs**") to take into account the incremental costs required to complete any such Decommissioning Project.  For the avoidance of doubt, new regulations include but are not limited to, NTLs, BSEE or BOEM national, regional or district policies and requirements, executive and Secretary of Interior orders and new and revised CFR regulations that govern or affect decommissioning. In the event that of new regulations, then (i) the Excess Regulatory Costs therefor shall be as agreed upon by the Parties, or (ii) if Eni and Contractor are unable to agree on the amount of Excess Regulatory Costs for a particular Decommissioning Project, then such Excess Regulatory costs shall be determined on a cost-plus 15% basis where costs are actual, reasonable third-party costs necessary for Decommissioning in accordance with Performance Standards.

Section 1.8    **Qualified Conditions Cap**. Without limitation of and subject to <u>Section 1.7</u>, above, but subject to the existence of a Qualified Condition, Contractor shall assume the risk that the costs to Decommission a Decommissioning Project exceeds the Eni Net Turnkey Amount attributed to such Decommissioning Project, in the event no Turnkey Election is made, or the Gross Turnkey Amount attributed to such Decommissioning Project, in the event a Turnkey Election is made. In the event of a Qualified Condition, Eni and Contractor shall share in any Agreed Excess Qualified Conditions Costs related to the Qualified Condition(s) in excess of the relevant Eni Net Turnkey Amount (or the Gross Turnkey Amount if the Turnkey Election is made) up to, on an aggregated basis of all Decommissioning Projects, fifteen million and 00/100 dollars ($15,000,000) (the "**Qualified Condition Cap**") as follows: (i) Eni shall be responsible for the first five million and 00/100 dollars ($5,000,000) of Agreed Excess Qualified Conditions Costs

related to Qualified Conditions, and (ii) Eni shall be responsible for 75% and Contractor shall be responsible for 25% of the remaining Agreed Excess Qualified Conditions Costs up to the Qualified Condition Cap. Eni's responsibility for any Agreed Excess Qualified Conditions Costs related to a Qualified Condition shall not commence until the full amount of the relevant Eni Net Turnkey Amount, or if the Turnkey Election is made, the relevant Gross Turnkey Amount, have been incurred. The calculation and application of these amounts (including such Agreed Excess Qualified Conditions Costs) shall be limited to the percentage portion (based on the "Eni Ownership (%)" as indicated on <u>Exhibit A</u>) for a particular Decommissioning Project in the event Eni did not elect to make the Turnkey Election with regard to such Decommissioning Project. In the event that one or more Qualified Conditions results in costs that exceed the Qualified Condition Cap, Eni's liability for any additional costs shall terminate once the Qualified Condition Cap has been reached and Eni shall have no further liability for any costs or the performance of any obligations associated with any Qualified Condition or the applicable Decommissioning Project.

Section 1.9    <u>**Terms and Conditions**</u>. The Parties agree that the performance of the Agreed Activities, the Initial Safe Out, and each Decommissioning Project shall be performed in accordance with the terms and conditions of this Agreement. Eni agrees that Contractor will have met the required standard of performance under this Agreement if it performs the Agreed Activities, the Initial Safe Out, and such Decommissioning Project consistent with required laws, rules and regulations promulgated by governing regulatory agencies, including but not limited to BOEM and BSEE; consistent with any applicable third-party contracts; and consistent with the Decommissioning Schedule set forth on <u>Exhibit A</u> (the "**Performance Standards**").

Section 1.10    <u>**Expert Determination**</u>. If the Parties cannot agree on (i) the existence of a Qualified Condition or (ii) the Excess Qualified Condition Costs as contemplated above (the "**Qualified Condition Dispute**") after good faith negotiations, either Eni or Contractor may submit the matter for expert determination according to the procedure outlined in this <u>Section 1.10</u>. Prior to submitting such matter to the Expert (as defined below), the Party intending to make the submission shall provide written notice to the other Party of such intent. If the Parties are unable to agree upon resolve the Qualified Condition Dispute within fifteen (15) days following the other Party's receipt of the notice provided herein, the Party intending to submit the matter to the Expert may so submit such matter to the Expert for final and binding determination. To submit the determination of the Qualified Condition Dispute to the Expert, the Parties shall each provide the Expert with (a) such data and information as is necessary for the Expert to be able to determine the resolution of the Qualified Condition Dispute, such data and information shall include applicable well data and information related to any structures, pipelines, facilities and other assets associated with the Decommissioning Project. The Expert shall, within fifteen (15) days of receiving such data and information, make its determination of the Qualified Condition Dispute using the data and information it has received from the Parties. In making its determination hereunder, the Expert (i) shall be bound by the provisions of this <u>Section 1.10</u> and (ii) if the Qualified Condition Dispute relates to the amount of the Excess Qualified Condition Costs, the Expert may not assign a value to the Excess Qualified Condition Costs greater than the value provided by Contractor or less than the value provided by Eni. If, prior to the Expert finalizing its determination that the Qualified Condition Dispute relates to the amount of the Excess Qualified Condition Costs, the Expert, the Parties reach agreement, the Parties may withdraw the matter from the Expert. The determination of the Expert shall be final and binding on the Parties for all

purposes hereunder.  The fees and expenses of the Expert under this <u>Section 1.10</u> shall be borne one half by the Eni and one half by Contractor.  The Parties agree to utilize TSB Offshore, Inc. as the Expert for the purposes herein (the "**Expert**").  If the party selected as the Expert is unable or unwilling to serve as the Expert hereunder the Parties shall agree on a newly identified Expert.  If the Parties cannot agree after thirty (30) days of good faith negotiations, the Expert shall be selected by lot from among the nationally recognized independent engineering firms that have not represented any Party or its affiliates at any time during the three-year period of time immediately preceding its designation hereunder.  For selection by lot, Eni shall provide two (2) options, and Contractor shall provide two (2) options.  The Parties designate Opportune, LLP to make the selection by lot.

Section 1.11   **Contributions from Other Predecessors**.  FWE III will use commercially reasonable efforts to obtain reimbursement and/or contribution for Decommissioning activity that is available under contract or applicable law, including from any other record title and/or operating rights interest holders and predecessors-in-interest other than Eni to the extent practicable and from available surety bonding other than Eni's bonds; provided that, for the avoidance of doubt, FWE III shall not be required to incur any out-of-pocket costs or obligations in connection with such efforts. In addition, FWE III shall obtain the written consent of Eni, not to be unreasonably withheld, delayed or conditioned, prior to entering into settlement negotiation(s), agreeing to a settlement, and/or initiating dispute resolution regarding the Specified Assets, including with respect to obtaining contributions for decommissioning from other record title and/or operating rights interest holders and predecessors-in-interest or obtaining funds from surety bonds for decommissioning.

Section 1.12   **Operations**.  Contractor will manage, on behalf of FWE III, the Specified Assets until the commencement of the Decommissioning pursuant to a contract operating agreement which is mutually acceptable to the Parties and by and between FWE III and Contractor (the "**Contract Operating Agreement**"). Except as set forth in the Implementation Agreement, Eni shall not be responsible for any operating costs associated with Eni's interests for any Decommissioning Project. Management of the Specified Assets shall include, but not be limited to, as services provided: operations, production marketing (for producing assets), accounting and land/regulatory administration, including all actions necessary for compliance with the Turnkey Removal Additional Terms and Conditions set forth in <u>Appendix 1</u>. Notwithstanding anything to the contrary, the Parties acknowledge and agree that the members of the Predecessor Group shall receive the benefit of any indemnification provisions contained in the Contract Operating Agreement which are provided by Contractor in favor of FWE III as intended third party beneficiaries of such provisions.

<div align="center">

**ARTICLE II.**
**FUNDING AND INVOICES**

</div>

Section 2.1   **Funding Commitment**. Except with respect to the "Agreed Activities" (as such term is defined in the Plan) and the Initial Safe Out, which is governed by <u>Section 1.5</u>, Contractor shall not undertake any Decommissioning Project until (a) full funding of the applicable Gross Turnkey Amount has been agreed to by Eni and Contractor, including receiving funds or securing a contractual commitment (such as a decommissioning agreement) from applicable third

<div align="center">6</div>

parties for any such Decommissioning Project, or (b) Eni makes a Turnkey Election for any such Decommissioning Project.

       **Section 2.2**    **Invoicing**. Contractor shall submit a monthly invoice to FWE III LLC, with a copy to Eni, summarizing the accrued Actual Decommissioning Costs for each Decommissioning Project.  If Eni or FWE III reasonably disputes any portion of any invoice, Eni or FWE III shall notify Contractor within fifteen (15) days of receipt of the invoice in writing of the amount in dispute and the reasons thereof.  Contractor will provide reasonable and appropriate documentation to substantiate the charges on the invoice.

       **Section 2.3**    **Payment**. For each Decommissioning Project, Eni shall pay to Contractor and Contractor shall receive, payment of the full agreed Eni Net Turnkey Amount or Gross Turnkey Amount (in the event a Turnkey Election was made), as adjusted pursuant to Section 1.7 and subject to Section 1.8.  For the avoidance of doubt, such payment shall include Eni's share of any Agreed Excess Qualified Conditions Costs pursuant to Section 1.8 up to the Qualified Conditions Cap or Excess Regulatory Costs, provided Eni shall have no obligation to tender any such payment contemplated in this Section 2.3 until Contractor delivers to FWE III and to Eni (i) a Site Clearance (as defined in Appendix 1) with respect to such Specified Interest; and (ii) an invoice and/or billing statement outlining in detail the Decommissioning work actually performed for such Decommissioning Project itemized by the applicable Decommissioning Project on Exhibit A, along with supporting documentation. Notwithstanding the foregoing but subject to Section 3.1, if Contractor has achieved all requirements of Site Clearance of a particular Decommissioning Project but BOEM has failed to issue the applicable approval required under the definition of Site Clearance with respect to such Decommissioning Project within the forty-five (45) day period immediately following Contractor's proper request and submission for such approval from BOEM, and *provided that* BOEM's failure to issue an approval in such forty-five (45) day period is not due to the fault or other act or omission of Contractor or any person for whom Contractor is responsible under this Agreement, including but not limited to Contractor failing to meet BOEM's requirements to receive such approval, "Site Clearance" for the purposes of this Section 2.3 shall be deemed to have been achieved and Contractor shall be entitled to the applicable payment provided that Contractor submits to Eni all documents provided to BOEM to obtain such Site Clearance.  Notwithstanding anything to the contrary herein, the payments made by Eni in satisfaction of the obligations set forth herein, shall not exceed twenty million dollars ($20,000,000.00) on an annual basis for any given calendar year; provided that (i) if Eni has delivered a Turnkey Notice, or (ii) if Eni is required, pursuant to an order from any governmental or regulatory authority, to perform any Decommissioning Project on a schedule that is more accelerated than contemplated on Exhibit A, then such annual limitation will be increased above twenty million dollars ($20,000,000.00) to the extent such increase is necessitated to perform the Decommissioning Project contemplated in subparts (i) and (ii) of this sentence. Such payment will be made by wire transfer in immediately available funds to a bank account designated by Contractor. Notwithstanding anything herein to the contrary in this Agreement, any amounts paid by Eni for a Decommissioning Project pursuant to this Section 2.3, shall be net of any proceeds realized by Contractor from the sale of hydrocarbons produced from the underlying Specified Asset of a Decommissioning Project identified on Exhibit A after the Effective Date. For the

avoidance of doubt, such proceeds shall be netted on the percentage basis attributed to Eni in the "Eni Ownership (%)" as indicated on <u>Exhibit A</u> for such particular Specified Asset.

   **Section 2.4**  <u>**Surety Bonds.**</u> Eni may apply to any amounts owed hereunder any available proceeds from surety bonds that cover the Decommissioning of any applicable Decommissioning Projects.  Eni shall bear all costs and risks associated with such surety bonds.

   **Section 2.5**  <u>**Audit Rights**</u>. Eni shall have the right to conduct, during normal business hours upon at least thirty (30) days' prior written notice, an audit of Contractor's records to the extent related to any amount charged to Eni hereunder. These audit rights shall survive the termination of this Agreement for a period of twelve (12) months.

   **Section 2.6**  <u>**Waiver and Release**</u>.  Within ninety (90) days following the completion of a Decommissioning Project and only if (i) all amounts payable under this Agreement by Eni with respect to that Decommissioning Project have been paid by Eni in accordance with this Agreement and (ii) Eni has completely performed in accordance with this Agreement all of its obligations under this Agreement with respect to that Decommissioning Project, Contractor shall execute and deliver legal instruments in form and substance that are acceptable to Eni acting reasonably whereby Contractor: (a) acknowledges and agree that all amounts payable under this Agreement by Eni with respect to that Decommissioning Project have been paid by Eni in accordance with this Agreement; (b) waives, releases and forever discharges the members of the Predecessor Group from any and all Claims arising out of or relating to that Decommissioning Project; (c) acknowledges and agrees that Eni has completely performed in accordance with this Agreement all of its obligations under this Agreement with respect to that Decommissioning Project; and (d) acknowledges that Contractor has fully paid any non-disputed amounts owed to third parties in connection with such Decommissioning Project.

<div align="center">

**ARTICLE III.**
**TERM**

</div>

   **Section 3.1**  <u>**Term and Survival**</u>.  Subject to the condition precedent in <u>Section 3.5</u> below, the term of this Agreement shall be from and after the Effective Date until (i) the Decommissioning Projects are completely Decommissioned in accordance with Performance Standards and (ii) Contractor has delivered a Site Clearance (as defined in <u>Appendix 1</u>) to FWE III and to Eni with respect to such Specified Interest, unless terminated earlier as provided in this <u>Article III</u>. In the event of termination pursuant to this <u>Article III</u>, <u>Article II</u>, and the terms and conditions set forth in <u>Appendix 1</u>, each of the foregoing shall survive such termination for four (4) years following the date of termination; provided, however, the definitions set forth in <u>Appendix 1</u>, the terms of <u>Article V</u> and <u>Article VI</u>, and the defined terms set forth in this Agreement shall survive indefinitely; provided further, Eni shall pay Contractor for any Decommissioning Projects completed prior to the date of termination in accordance with the terms of this Agreement. Following the termination or expiration of this Agreement, as applicable, in the event BOEM/BSEE issues an order with respect to any Specified Asset which indicates that the Decommissioning for such Decommissioning Project was not performed in accordance with the Performance Standards, then Contractor shall promptly cause, at its sole cost and expense, any

<div align="center">8</div>

such Specified Asset that was the subject of a specific Decommissioning Project to be further Decommissioned in accordance with the Performance Standards.

       **Section 3.2**    **Termination by Eni for Particular Asset.**  Eni may terminate this Agreement as to any Decommissioning Project and/or require FWE III to competitively bid the decommissioning services with respect to a Decommissioning Project in the event Contractor is in breach of this Agreement with respect to such Decommissioning Project, and such breach remains outstanding thirty (30) days after Eni or FWE III have provided written notice of such breach to Contractor; provided, however, any such termination shall be limited to the applicable Decommissioning Project and the remainder of this Agreement shall survive in full force and effect in accordance with the terms set forth herein.

       **Section 3.3**    **Termination by Eni or Contractor**. Contractor or Eni may terminate this Agreement as to a particular Decommissioning Project if, within three (3) years of the Effective Date, (i) a Turnkey Election is not made by Eni for such Decommissioning Project, or (ii) contractual commitments for full funding of the Gross Turnkey Amount for such Decommissioning Project has not been received; provided, however, in the event that a Party is entitled to a right of termination pursuant to subpart (i) or subpart (ii) of this Section 3.3, such termination shall be limited to the applicable Decommissioning Project and the remainder of this Agreement shall survive in full force and effect in accordance with the terms set forth herein.

       **Section 3.4**    **Suspension by Contractor**. Contractor may suspend performance under this Agreement if Eni is in breach of this Agreement, and such breach remains outstanding for thirty (30) days after Contractor has provided written notice of such breach to Eni. All schedules and timelines in this Agreement shall be tolled until such breach is remedied.

       **Section 3.5**    **Condition Precedent**. This Agreement shall become effective only in the event that on or before September 30, 2021 (except as otherwise mutually agreed by the Parties), Contractor has received all necessary approvals by applicable regulatory authorities to act as a qualified operator in the Gulf of Mexico.

<div align="center">

**ARTICLE IV.**
**NOTICE**

</div>

       **Section 4.1**    **Notice Addresses.**  All notices and correspondence required or permitted to be given by one Party to another hereunder shall be made in writing and shall be delivered to the appropriate Party at the address specified below either by hand, by nationally recognized overnight delivery service or by electronic delivery, unless a different address for notice or copy thereof is changed by notice, with copies to such other parties or addresses as a Party may designate by notice (each, a "**Notice**"). Notices sent by hand delivery or nationally recognized overnight delivery service shall be deemed to have been received upon the recipient's actual receipt of such Notice. Notices sent by electronic delivery shall be deemed to have been received (i) on the date such transmission was sent if it was sent prior to 5:00 p.m. (at the recipient's local time) on a business day; or (ii) on the next business day following the date such transmission was sent if it

was sent after 5:00 p.m. (at the recipient's local time) on any business day or at any time on a non-business day.

        <u>If to Eni Petroleum US LLC</u>:

        Eni Petroleum US LLC
        1200 Smith Street, Suite 1700
        Houston, Texas 77002
        Attn:  Christian Johnson
        Telephone: (713) 393-6184
        Email: chris.johnson@eni.com

        With a copy to:

        Bracewell LLP
        711 Louisiana Street, Suite 2300
        Houston, Texas 77002
        Attention:    J.J. McAnelly (james.mcanelly@bracewell.com)
                       Jason Hutt (jason.hutt@bracewell.com)
                       Mark Dendinger (mark.dendinger@bracewell.com)

        <u>If to Fieldwood Energy III LLC</u>:

        Fieldwood Energy III LLC
        2000 W. Sam Houston Pkwy South, Suite 1200
        Houston, Texas  77042
        Attn:  Thomas R. Lamme
        Telephone:  (713) 969-1000
        Email: TLamme@fwellc.com

        <u>If to Mako Buyer LLC</u>:

        Mako Buyer LLC
        2000 W. Sam Houston Pkwy South, Suite 1200
        Houston, Texas  77042
        Attn:  Thomas R. Lamme
        Telephone: (713) 969-1000
        Email: TLamme@fwellc.com

## ARTICLE V.
## GOVERNING LAW; DISPUTES

**Section 5.1**     Governing Law.

(a)     Notwithstanding the place of execution hereof or the place for performance of any covenant, promise or agreement herein made, this Agreement and the validity hereof, the agreements evidenced hereby, and all matters and issues arising hereunder, shall, to the fullest extent possible, be construed pursuant to and governed by the General Maritime Laws of the United States. If the General Maritime Laws of the United States are held to be inapplicable to this Agreement or the Work (or any part thereof) to be performed hereunder by a court of competent jurisdiction, then Subsections 5.1(b) and 5.1(c) below shall apply, as appropriate, but only to the extent that United States General Maritime Law is held to be inapplicable.

(b)     If any court of competent jurisdiction determines that United States Maritime Law is not applicable to any relevant part of this Agreement or the Work to be performed hereunder, then such part of this Agreement and/or the work to be performed hereunder, shall, to the fullest extent enforceable under applicable law, be interpreted and enforced exclusively in accordance with the laws of the State of Texas.

(c)     If any court of competent jurisdiction determines that neither United States General Maritime Law nor the laws of the state of Texas are applicable to any relevant part of this Agreement or the Work to be performed hereunder, then such part of this Agreement and/or the work to be performed hereunder, shall, to the fullest extent enforceable under applicable law, be interpreted and enforced exclusively in accordance with the laws of the State of Louisiana, excluding any conflicts of law rules that might refer same to another jurisdiction.

(d)     Notwithstanding the choice of law provisions contained in this Article V, no conflicts of laws principles that would require the application of any law other than that expressly set forth in Sections 5.1(a), 5.1(b) or 5.1(c), as appropriate, shall be applicable to this Agreement or the enforcement of any provision hereof. **FURTHER, NO LAW, THEORY OR PUBLIC POLICY, SHALL BE GIVEN EFFECT WHICH WOULD UNDERMINE, DIMINISH OR REDUCE THE EFFECTIVENESS OF THE WAIVER OF SPECIAL CLAIMS PROVIDED IN SECTION 5.3 OF APPENDIX 1 ATTACHED HERETO, IT BEING THE EXPRESS INTENT, UNDERSTANDING AND AGREEMENT OF THE PARTIES THAT SUCH WAIVER IS TO BE GIVEN THE FULLEST EFFECT, NOTWITHSTANDING ANY PRE-EXISTING DEFECT OR THE NEGLIGENCE (WHETHER SOLE, JOINT OR CONCURRENT), GROSS NEGLIGENCE, WILLFUL MISCONDUCT, STRICT LIABILITY OR OTHER LEGAL FAULT OF ANY PARTY OR OTHERWISE.**

**Section 5.2     WAIVER OF JURY TRIAL**.  EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATED TO THIS AGREEMENT,

INCLUDING THE ENFORCEABILITY OF THE AGREEMENT, OR THE TRANSACTIONS CONTEMPLATED HEREBY.

**Section 5.3** **Disputes**. The Parties agree that all disputes in any way arising out of or resulting from this Agreement that will be litigated, if any at all, shall be litigated exclusively in the state and/or federal courts in Harris County, Texas.  The Parties accordingly hereby submit to the jurisdiction and venue of such courts for all purposes.

**Section 5.4** Compliance with Anti-Corruption Laws.

(a) Each Party warrants that, in connection with this Agreement, it and its affiliates will comply with all applicable anti-bribery and corruption, anti-money laundering, trade control, and sanctions laws and regulations, such as the Bribery Act 2010 of the United Kingdom, Foreign Corrupt Practices Act 1977 of the United States of America, and the Australian Criminal Code of 1995, as amended, Division 70 – Bribery of foreign public officials, and the OECD Convention on Combating Bribery of Foreign Public Officials in International Business Transactions, and all applicable successor legislation, and in any event, will not and will procure that its employees and third party providers (including its subcontractors, agents and other intermediaries) will not offer, give or agree to give any person whosoever, or solicit, accept or agree to accept from any person, either directly or indirectly, anything of value in order to obtain, influence, induce or reward any improper advantage (the "**Anti-Corruption Obligation**").

(b) Contractor and FWE III each represent and warrant that it has reviewed and understood: (a) the general standards of transparency of the sensitive activities related to the Model 231 pursuant to Legislative Decree 231/2001 and Eni's Supplier Code of Conduct, adopted by Eni; (b) the Anti-Corruption Management System Guidelines of Eni; and (c) Eni's Statement on respect for human rights.  Contractor and FWE III take note that each of the documents under (a) to (c) above are available on the website: *www.eni.com* and undertake to comply with the principles contained therein.

(c) Each Party agrees it shall on an on-going basis, and subject to any applicable data privacy law, legal privilege, or other legal restriction:

> (i) as soon as reasonably possible disclose in writing to the other Parties details of any breach of the Anti-Corruption Obligation; and

> (ii) on reasonable request, use best endeavors to cooperate to ensure and monitor compliance with the Anti-Corruption Obligation, which shall include promptly responding in reasonable detail to any notice from another Party reasonably connected to the Anti-Corruption Obligation and making any relevant books, records, or personnel relating to this Agreement and a Party's compliance with the Anti-Corruption Obligation available for review by the other Parties.

(d)      Each Party shall throughout the term of this Agreement:

    (i)   institute and maintain policies and procedures which are designed to ensure compliance with all applicable laws and the Anti-Corruption Obligation, including the maintenance of complete and accurate books and records and an effective system of internal accounting controls;

    (ii)   maintain at its normal place of business, throughout the term and for at least two (2) years following its expiration or termination, detailed books, records and accounts which accurately and fairly reflect all transactions and payments made by it in connection with this Agreement;

    (iii)   make clear, in its dealings connected to this Agreement, that it is required to act, and is acting, in accordance with the Anti-Corruption Obligation; and

    (iv)   on reasonable notice, and subject to any applicable data privacy law, legal privilege, confidentiality obligation, license agreement or other express legal restriction, permit any other Party or its duly appointed third party representatives, at the other Party's sole expense, during normal working hours, at the Party's normal place of business, to access, review, inspect and make copies of its books, records and accounts, but only to the extent reasonably necessary in order to audit its compliance with the Anti-Corruption Obligation.  The rights set out in this Section 5.4 will be exercised in accordance with all applicable competition laws.

## ARTICLE VI.
## MISCELLANEOUS

**Section 6.1**    **Entire Agreement**. This Agreement (together with the schedule, exhibits, and appendices hereto, which are incorporated herein by reference), the Implementation Agreement of even date herewith, and the other Definitive Documents constitute the entire agreement among the Parties with respect to the subject matter hereof and supersede any other representations, understandings or agreements (whether written, oral or otherwise) that may have been made, understood or entered into by the Parties or any of their respective affiliates relating to the transactions contemplated hereby or the subject matter hereof.

**Section 6.2**    **Successors and Assigns**.  This Agreement is personal as to each Party and shall not be assigned without the other Parties' consent; *provided* that the foregoing shall not apply if Contractor assigns this Agreement in total:

(a)      along with all of its personnel who are performing any part of the services hereunder to another entity *provided*, that no such assignment by Contractor, or any subsequent assignment or Transfer of ownership (other than, in each case, a Transfer that conforms with the

requirements of subpart (b) below), shall relieve Contractor of its obligations under this Agreement; or

(b)     to an acquirer of all or substantially all of Contractor's employees providing services hereunder provided that: (i) such acquirer has a Tangible Net Worth of at least five (5) times the then-current P90 estimate of the remaining Decommissioning Projects to be Decommissioned in accordance with the Performance Standards and, (ii) at the time of the assignment, at least seventy percent (70%) of the Work (as defined in Appendix 1) described in the Decommissioning Schedule set forth on Exhibit A, based on the Eni Net Turnkey Amount, has been Decommissioned in accordance with the Performance Standards (a "Permitted 3rd-Party Assignment"). If any platform described on Exhibit A has not been Decommissioned in accordance with the Performance Standards ("Remaining Platforms") at the time of any Permitted 3rd Party Assignment made pursuant to this Section 6.2, the Credit Bid Purchaser shall cause the assignee to deliver, as conditions of the assignment, with evidence of their respective satisfaction prior to the effectiveness of such assignment, (i) a windstorm and casualty policy, at the expense of assignee, with a limit of not less than the total amount of the then-current P90 estimate of the Remaining Platforms, with applicable endorsements and other requirements as set forth on Exhibit C of Appendix 1, covering the Remaining  Platforms that have not been Decommissioned in accordance with the Performance Standards, which such policy shall have a deductible reasonably acceptable to Eni and shall be required to be maintained throughout the Decommissioning of the Remaining Platforms in accordance with the Performance Standards; and (ii) an express assumption and agreement by assignee to the terms and obligations, accrued or unaccrued, contemplated in this Agreement.

(c)     For purposes of this Agreement, "**Tangible Net Worth**" of any assignee means, as of any date of determination, the positive difference, if any, of the total assets of such assignee minus total liabilities of such assignee, with total assets and total liabilities each to be determined in accordance with generally accepted accounting principles applicable to such assignee, *excluding*, *however*, from the determination of total assets (i) patents, patent applications, trademarks, copyrights and trade names, (ii) goodwill, organizational, experimental, research and development expense and other like intangibles, , and (iii) unamortized debt discount and expense. For purposes of this Agreement, "**Transfer**" means the assignment, transfer, equity sale, merger, divisive merger, or hypothecation, as well as any change of control transaction.

Section 6.3     **Amendment**.  This Agreement may be amended or modified in whole or in part, and terms and conditions may be waived, only by a duly authorized agreement in writing which makes express reference to this Agreement and is executed by each Party.

Section 6.4     **Severability**.  If any provision of this Agreement is held invalid or unenforceable by any court of competent jurisdiction, the other provisions of this Agreement shall remain in full force and effect. The Parties further agree that if any provision contained herein is, to any extent, held invalid or unenforceable in any respect under the laws governing this Agreement, they shall take any actions necessary to render the remaining provisions of this Agreement valid and enforceable to the fullest extent permitted by law and, to the extent necessary, shall amend or otherwise modify this Agreement to replace any provision contained herein that is

14

held invalid or unenforceable with a valid and enforceable provision giving effect to the intent of the Parties to the greatest extent legally permissible.

> **Section 6.5** **Counterparts**. This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. Any .pdf or other electronic transmission of an executed signature page to this Agreement shall, for all purposes, be deemed an original.

> **Section 6.6** **Further Assurances**. Subject to the terms and conditions of this Agreement, each Party shall use its reasonable efforts to take, or cause to be taken, all actions and to do, or cause to be done, all things necessary or desirable, under applicable law or otherwise, to consummate or implement the transactions contemplated by this Agreement.  The Parties agree to and shall execute and deliver all such other documents, certificates, agreements, and other writings and shall take all such other actions as may be necessary or desirable in order to consummate or implement expeditiously the transactions contemplated in this Agreement in accordance with the terms hereof, including but not limited to any actions or agreements reasonably necessary as a result of the presence of a Qualified Condition or Regulatory Change.

[*Signature page to follow*]

15

IN WITNESS WHEREOF, the Parties hereto as set forth below have executed this Agreement as of the date first written above.

**ENI PETROLEUM US LLC**

By: _____

Name:  Luca Pellicciotta

Title:  President and CEO

[*Signature page to Turnkey Removal Agreement*]

**FIELDWOOD ENERGY III LLC**

By: _____
Name:
Title:

[*Signature page to Turnkey Removal Agreement*]

**<u>CONTRACTOR:</u>**

**MAKO BUYER LLC**


By: _____
Name:
Title:

*[Signature page to Turnkey Removal Agreement]*

Schedule 1

Specified Interests

| Block | Lease |
|---|---|
| GA 151 | OCS-G 15740 |
| SS 246 | OCS-G 01027 |
| VR 78 | OCS-G 04421 |
| VR 313 | OCS-G 01172 |
| SS 247 | OCS-G 01028 |
| SS 248 | OCS-G 01029 |
| SS 249 | OCS-G 01030 |
| SS 270 | OCS-G 01037 |
| SS 271 | OCS-G 01038 |
| WC 72 | OCS-G 23735 |

<u>Exhibit A</u>

<u>Decommissioning Projects, Turnkey Amounts and Decommissioning Schedule</u>

See attached.

**Turnkey Estimates**

## 2021

| Block | Year | Host Platform | Designation | Asset | Status | Water Depth | ENI Ownership (%)* | Gross | Net (ENI) |
|---|---|---|---|---|---|---|---|---|---|
| SS 246 | 2021 | SS 246 A | A002 | Well | Partial TA | 166 | 76.76% | 470,971 | 361,538 |
| SS 246 | 2021 | SS 246 A | A004 | Well | COM | 166 | 76.76% | 1,036,136 | 795,383 |
| SS 246 | 2021 | SS 246 A | A005 | Well | COM | 166 | 80.69% | 1,036,136 | 836,079 |
| SS 246 | 2021 | SS 246 A | A006 | Well | COM | 166 | 80.69% | 1,036,136 | 836,079 |
| SS 246 | 2021 | SS 246 A | A007 | Well | COM | 166 | 80.69% | 1,036,136 | 836,079 |
| SS 246 | 2021 | SS 246 A | A009 | Well | Partial TA | 166 | 76.76% | 470,971 | 361,538 |
| SS 246 | 2021 | SS 246 A | A011 | Well | COM | 166 | 76.76% | 2,825,825 | 2,169,227 |
| SS 246 | 2021 | SS 246 A | A014 | Well | COM | 166 | 76.76% | 1,036,136 | 795,383 |
| SS 246 | 2021 | SS 246 A | A019 | Well | COM | 166 | 76.76% | 847,748 | 650,768 |
| SS 246 | 2021 | SS 246 A | A020 | Well | COM | 166 | 80.69% | 1,224,524 | 988,093 |
| SS 246 | 2021 | SS 246 A | 10258 | Pipeline | OUT | 166 | 77.22% | 236,329 | 182,488 |
| SS 246 | 2021 | SS 246 J | J001 | Well | COM | 162 | 80.69% | 1,036,136 | 836,079 |
| SS 246 | 2021 | SS 246 J | 13056 | Pipeline | OUT | 162 | 97.30% | 240,915 | 234,416 |
| VR 313 | 2021 | VR 313 B | SN 5440 | Pipeline | OUT | 202 | 100.00% | 375,323 | 375,323 |
| VR 313 | 2021 | VR 313 B | SN 15136 | Pipeline | OUT | 202 | 100.00% | 375,323 | 375,323 |
| VR 313 | 2021 | VR 313 C | SN 10558 | Pipeline | OUT | 213 | 100.00% | 187,626 | 187,626 |
| VR 313 | 2021 | VR 313 C | C001 | Well | COM | 213 | 100.00% | 1,152,493 | 1,152,493 |
| VR 313 | 2021 | VR 313 C | C004 | Well | Partial TA | 213 | 100.00% | 443,267 | 443,267 |
| VR 313 | 2021 | VR 313 D | D001 | Well | COM | 214 | 50.00% | 797,880 | 398,940 |
| VR 313 | 2021 | VR 313 D | D002 | Well | COM | 214 | 50.00% | 797,880 | 398,940 |
| VR 313 | 2021 | VR 313 D | D003 | Well | COM | 214 | 50.00% | 797,880 | 398,940 |
| VR 313 | 2021 | VR 313 D | D004 | Well | COM | 214 | 50.00% | 797,880 | 398,940 |
| VR 313 | 2021 | VR 313 D | D005 | Well | COM | 214 | 50.00% | 797,880 | 398,940 |
| SS 247 | 2021 | SS 247 F | SN 5902 | Pipeline | OUT | 225 | 25.59% | 240,783 | 61,612 |
| SS 248 | 2021 | SS 248 D | 10611 | Pipeline | OUT | 180 | 30.78% | 410,379 | 126,303 |
| SS 248 | 2021 | SS 248 G | 10349 | Pipeline | PABN | 188 | 30.78% | 241,979 | 74,474 |
| WC 72 | 2021 | WC 72 #2 | #2 | Platform | | 39 | 75.00% | 620,573 | 465,430 |
| WC 72 | 2021 | WC 72 #2 | 002 | Well | COM | 39 | 75.00% | 1,008,432 | 756,324 |
| | | | | | | | **Total** | **$21,579,675.68** | **$15,896,024.01** |

## 2022

| Block | Year | Host Platform | Designation | Asset | Status | Water Depth | ENI Ownership (%) | Gross | Net (ENI) |
|---|---|---|---|---|---|---|---|---|---|
| VR 313 | 2022 | VR 313 B | B003 | Well | COM | 202 | 100.00% | 797,880 | 797,880 |
| VR 313 | 2022 | VR 313 B | B005 | Well | COM | 202 | 100.00% | 797,880 | 797,880 |
| VR 313 | 2022 | VR 313 B | B010 | Well | COM | 202 | 100.00% | 797,880 | 797,880 |
| VR 313 | 2022 | VR 313 B | B012 | Well | COM | 202 | 100.00% | 1,152,493 | 1,152,493 |
| SS 246 | 2022 | SS 246 A | SS 246 A | Platform | | 166 | 77.22% | 9,915,095 | 7,656,196 |
| SS 246 | 2022 | SS 246 E | SS 246 E | Platform | | 166 | 77.22% | 5,329,033 | 4,114,950 |
| SS 246 | 2022 | SS 246 J | SS 246 J | Platform | | 162 | 97.30% | 2,340,885 | 2,277,743 |
| SS 248 | 2022 | SS 248 D | D009 | Well | Partial TA | 180 | 25.00% | 659,359 | 164,840 |
| SS 248 | 2022 | SS 248 D | D012 | Well | Partial TA | 180 | 30.85% | 470,971 | 145,285 |
| SS 248 | 2022 | SS 248 D | D015 | Well | Partial TA | 180 | 30.78% | 659,359 | 202,932 |
| SS 248 | 2022 | SS 248 D | D016 | Well | Partial TA | 180 | 30.78% | 470,971 | 144,951 |
| SS 248 | 2022 | SS 248 D | D018 | Well | Partial TA | 180 | 30.78% | 470,971 | 144,951 |
| SS 248 | 2022 | SS 248 D | D020 | Well | COM | 180 | 30.78% | 847,748 | 260,913 |
| SS 249 | 2022 | SS 248 D | D002 | Well | Partial TA | 180 | 39.57% | 470,971 | 186,370 |
| SS 249 | 2022 | SS 248 D | D005 | Well | COM | 180 | 55.76% | 847,748 | 472,683 |
| SS 249 | 2022 | SS 248 D | D011 | Well | COM | 180 | 39.57% | 1,036,136 | 410,014 |
| SS 249 | 2022 | SS 248 D | D014 | Well | Partial TA | 180 | 39.57% | 659,359 | 260,918 |
| SS 249 | 2022 | SS 248 D | D017 | Well | Partial TA | 180 | 30.78% | 470,971 | 144,951 |
| SS 249 | 2022 | SS 248 D | D019 | Well | Partial TA | 180 | 52.29% | 470,971 | 246,293 |
| SS 248 | 2022 | SS 248 G | G001 | Well | Partial TA | 188 | 30.78% | 847,748 | 260,913 |
| SS 248 | 2022 | Subsea | SS 249 | Well | Partial TA | 195 | 53.49% | 941,942 | 503,882 |
| | | | | | | | **Total** | **$30,456,369.02** | **$21,144,920.17** |

## 2023

| Block | Year | Host Platform | Designation | Asset | Status | Water Depth | ENI Ownership (%) | Gross | Net (ENI) |
|---|---|---|---|---|---|---|---|---|---|
| VR 313 | 2023 | VR 313 B | VR 313 B | Platform | | 202 | 100.00% | 4,875,933 | 4,875,933 |
| VR 313 | 2023 | VR 313 C | VR 313 C | Platform | | 213 | 100.00% | 2,659,600 | 2,659,600 |
| VR 313 | 2023 | VR 313 D | VR 313 D | Platform | | 214 | 50.00% | 3,102,867 | 1,551,433 |
| SS 247 | 2023 | SS 247 F | F002 | Well | COM | 225 | 25.00% | 847,748 | 211,937 |
| SS 247 | 2023 | SS 247 F | F014 | Well | COM | 225 | 25.00% | 1,036,136 | 259,034 |
| SS 247 | 2023 | SS 247 F | F017 | Well | COM | 225 | 25.00% | 847,748 | 211,937 |
| SS 247 | 2023 | SS 247 F | F018 | Well | COM | 225 | 45.80% | 847,748 | 388,281 |
| SS 247 | 2023 | SS 247 F | F019 | Well | COM | 225 | 25.00% | 847,748 | 211,937 |
| SS 247 | 2023 | SS 247 F | SS 247 F | Platform | | 225 | 25.59% | 10,361,358 | 2,651,289 |
| SS 248 | 2023 | SS 248 D | SS 248 D | Platform | | 180 | 30.78% | 10,361,358 | 3,188,933 |
| SS 248 | 2023 | SS 248 G | SS 248 G | Platform | | 188 | 30.78% | 4,238,738 | 1,304,563 |
| WC 72 | 2023 | WC 72 #1 | #1 | Platform | | 37 | 75.00% | 543,002 | 407,251 |
| WC 72 | 2023 | WC 72 #1 | 001 | Well | COM | 37 | 75.00% | 1,008,432 | 756,324 |
| WC 72 | 2023 | WC 72 #1 | SN 14251 | Pipeline | ACTIVE | 37 | 75.00% | 232,715 | 174,536 |
| WC 72 | 2023 | WC 72 #3 | #3 | Platform | | 37 | 75.00% | 543,002 | 407,251 |
| WC 72 | 2023 | WC 72 #3 | 003 | Well | COM | 37 | 75.00% | 1,318,718 | 989,039 |
| WC 72 | 2023 | WC 72 #3 | SN 15893 | Pipeline | OUT | 37 | 75.00% | 46,543 | 34,907 |
| | | | | | | | **Total** | **$43,719,391.75** | **$20,284,186.80** |
| | | | | | | | **Grand Total** | **$95,755,436.46** | **$57,325,130.98** |

COM: Completed Well

Full TA: Temporarily Abandoned well that has the required plugs and testing

Partial TA: Partially Temporarily Abandoned where a well does not have the required plugs to fully temporarily abandon a well  Active: An Active pipeline according to BOEM/BSEE records

Active: An Active pipeline according to BOEM/BSEE records

PABN: Pipeline that is proposed to be abandoned

OUT: A pipeline that is out of service

Note: The following wells have been temporarily abandoned and all that remains necessary to decommission these wells is the removal of the applicable conductor and the cost to remove such conductor has been included in the Gross Decom Amount(s) and Eni (Net) Costs for each applicable host facility for each applicable well that is referenced above:

Ship Shoal 246: SS 246 A001

Ship Shoal 247: SS 247 F001, SS 247 F003, SS 247 F004, SS 247 F005, SS 247 F006, SS 247 F007, SS 247 F008, SS 247 F009, SS 247 F010, SS 247 F011, SS 247 F012, SS 247 F013, SS 247 F016

Ship Shoal 248: SS 248 D001, SS 248 D003, SS 248 D004, SS 248 D006, SS 248 D007, SS 248 G002, SS 248 G003

Vermilion 313: VR 313 B001, VR 313 B002, VR 313 B004, VR 313 B006, VR 313 B007, VR 313 B 009, VR 313 C002, VR 313 C003

* The Parties acknowledge and agree that in the event that either Party presents evidence that the ownership interest allocated pursuant to this Decommissioning Schedule is less than or greater than set forth in this Decommissioning Schedule, that they will use commercially reasonable efforts to amend and revise the ownership interest and other obligations within this Decommissioning Schedule allocated to Eni based on the applicable title records for the applicable Decommissioning Project.

<u>Exhibit B</u>

<u>Qualified Conditions</u>

1) To the extent that any well comprising a Specified Asset is not assigned a Gross Turnkey Amount and requires the performance of any decommissioning activities, Eni and Contractor shall agree to a Gross Turnkey Amount for such well before commencing any decommissioning activities.

2) For a period of up to eighteen (18) months after the Effective Date, any damage to a Specified Asset due to a wind-storm, weather damage, or other casualty events associated with severe tropical weather arising after the Effective Date; provided, however, any damage to any platform related to ingress and egress shall not be a Qualified Condition.

3) To the extent that any pipeline included in a Decommissioning Project is required to be buried where this Agreement does not already assume burial, the work associated with such burial shall be a Qualified Condition and such work shall be performed at cost.

End of <u>Exhibit B</u>

<u>Appendix 1</u>
<u>Additional Terms and Conditions</u>

See attached.

*EXECUTION VERSION*

## APPENDIX 1

**TURNKEY REMOVAL ADDITIONAL TERMS AND CONDITIONS**

### ARTICLE I.
### DEFINITIONS

As used in this <u>Appendix 1</u>, each of the following terms has the meaning provided below.

1.1    "<u>Agreed Activities</u>" shall mean those certain safety and related repairs and improvements on Specified Assets at such Abandoned Properties as provided in Section I.G.2 of the Disclosure Statement, to the extent the repairs and improvements are necessary to protect the public health and safety and/or the environment from hazardous conditions or to re-establish ingress and egress to Facilities so that the decommissioning of the Facilities can be conducted in a safe manner. For the avoidance of doubt, any capitalized terms used in this definition but not assigned a meaning in this Agreement shall have the meaning set forth in the Disclosure Statement.

1.2    "<u>Agreement</u>" shall mean the Turnkey Removal Agreement to which this <u>Appendix 1</u> is attached and made a part thereof.

1.3    "<u>Appendix 1</u>" shall mean these Turnkey Removal Additional Terms and Conditions.

1.4    "<u>BOEM</u>" shall mean the Bureau of Ocean Energy Management and/or any successor agencies thereto, as applicable.

1.5    "<u>BSEE</u>" shall mean the Bureau of Safety and Environmental Enforcement and/or any successor agency thereto, as applicable.

1.6    "<u>Claims</u>" shall mean any and all losses, liabilities, damages (including natural resource damages), obligations, expenses, fines, penalties, costs, claims, causes of action, judgments, awards and any and all other losses of any kind or character, including, without limitation, court costs.

1.7    "<u>Contractor</u>" shall mean Mako Buyer LLC.

1.8    "<u>Contractor Group</u>" shall mean, individually and collectively, Contractor, its parent, subsidiary and affiliated companies, its and their joint venturers, contractors and subcontractors (of any tier), and all of their respective employees, officers, directors, agents, representatives, attorneys-in-fact, subcontractors and insurers, and the subrogees of all such parties.

1.9    "<u>Contractor Obligation</u>" shall mean any obligation attributable to Contractor under the terms of the Agreement.

1.10   "Disclosure Statement" shall mean the *Disclosure Statement for Fourth Amended Joint Chapter 11 Plan of Fieldwood Energy LLC and its Affiliated Debtors*, filed on April 15, 2021 [Dkt. 1285], including any exhibits and schedules thereto and as may be further amended, supplemented or modified from time to time.

1.11   "Facilities" shall mean the platforms, wells, pipelines, caissons, risers, facilities, structures and equipment (including production equipment) located on the Specified Interests and all parts and components thereof.

1.12   "On The Hook" shall mean the condition of any Facility (or any part, piece or component thereof) that occurs at the instant such Facility (or part, piece or component thereof, as the case may be) is first lifted from its original resting position and is hanging free on Contractor's (or its subcontractor's) crane or other equipment in accordance with the Work to be performed under this Appendix 1.

1.13   "Owner" shall mean Fieldwood Energy III LLC

1.14   "Owner Group" shall mean, individually and collectively, Owner, its parent, subsidiary and affiliated companies, its and their joint venturers, contractors and subcontractors (of any tier), and all of their respective employees, officers, directors, agents, representatives, attorneys-in-fact, subcontractors and insurers, and the subrogees of all such parties.

1.15   "Predecessor" shall mean ENI Petroleum US LLC.

1.16   "Predecessor Group" shall mean, individually and collectively, Predecessor, its parent, subsidiary and affiliated companies, its and their joint venturers, contractors and subcontractors (of any tier), and all of their respective employees, officers, directors, agents, representatives, attorneys-in-fact, subcontractors and insurers, and the subrogees of all such parties.

1.17   "Predecessor Obligation" shall mean any obligation attributable to Predecessor under the terms of the Agreement.

1.18   "Reefed Items" shall mean the Facilities to be reefed as set out in Section 2.4 herein and in accordance with Owner's reef permit.

1.19   "Site Clearance" shall mean (subject to Section 2.3 of the Agreement) delivery to Owner and Predecessor of (i) any On-Site Survey required by BOEM or BSEE and (ii) the filings and other evidence required by BOEM and BSEE or any other applicable governmental authority, including any required approvals or regulatory concurrence from relevant governmental authorities, to support Contractor's representation that all Decommissioning obligations with respect to the applicable assets have been satisfied, and (iii) documentation reasonably satisfactory to Predecessor from BSEE and/or BOEM reflecting that their databases have been updated to show that all Decommissioning obligations with respect to the applicable assets have been fully satisfied.

1.20 "<u>Special Claim(s)</u>" shall mean any and all Claims for or relating to special, indirect, consequential, exemplary, incidental or punitive damages of any kind or character, including, but not limited to, loss of use, loss of profit, loss of revenue, loss of product or production, reservoir damage, loss of hole damage, and any attorneys' fees; provided however, any and all claims for fines or penalties shall not be Special Claims to the extent arising from, or as a result of, a material breach by a party.

1.21 "<u>Third Party</u>" shall mean any individual, person, company or entity or any other natural or juridical being, other than any member of the Owner Group or Contractor Group.

1.22 "<u>Transferred Items</u>" shall mean the Facilities that are to be removed or abandoned in accordance with this <u>Appendix 1</u>.

1.23 "<u>Work</u>" shall mean the work and activities to Decommission the Specified Assets, to be conducted by or on behalf of Contractor pursuant to the terms and provisions of this Agreement, including, without limitation, the Agreed Activities and the Initial Safe Out.

1.24 Any capitalized terms used herein but not defined in this <u>Appendix 1</u> shall have the meaning ascribed in the Agreement.

<div align="center">

**ARTICLE II.**
**WORK**

</div>

2.1 <u>Scope of Work.</u>

Contractor shall perform the Work upon the terms and provisions set forth in this Agreement, including the Performance Standards. The scope of the Work is more fully set forth in <u>Exhibit A</u> to this <u>Appendix 1</u> and shall be performed with respect to the Decommissioning of the Specified Assets described on <u>Exhibit A</u> to the Agreement.

2.2 <u>Inspection.</u>

The Work and all parts thereof shall be subject to inspection at all reasonable times by inspectors designated by Owner or Predecessor or their representatives at such Party's costs and risk. No such inspection shall relieve Contractor of any of its obligations hereunder. No failure to inspect or failure to discover any aspect of the Work that is not performed in accordance with any provision of this <u>Appendix 1</u> shall be construed to imply any acceptance of such Work or to relieve Contractor of any of its obligations hereunder. Contractor shall correct any portion of the Work that is incomplete or otherwise as required to receive Site Clearance, subject to the terms of the Agreement.

2.3 <u>Title.</u>

At Contractor's option to be exercised by written notice to Owner with respect to any Transferred Items, Owner grants, bargains, sells, conveys and assigns to Contractor, and

<div align="center">

Appendix 1
Page 3 of 11

</div>

Contractor accepts and assumes title to and ownership of such Transferred Items at such time as such Transferred Items are On The Hook. **THE TRANSFERRED ITEMS SHALL BE TRANSFERRED TO AND ACCEPTED BY CONTRACTOR, "AS IS, WHERE IS" WITH ALL FAULTS. OWNER MAKES NO, AND EXPRESSLY DISCLAIMS ANY AND ALL, WARRANTIES CONCERNING THE TRANSFERRED ITEMS, WHETHER EXPRESS, IMPLIED, STATUTORY OR OTHERWISE, INCLUDING, WITHOUT LIMITATION, ANY WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR USE, AND FREEDOM FROM DEFECTS, WHETHER SUCH DEFECTS ARE PATENT, LATENT, PRE-EXISTING, REDHIBITORY OR OTHERWISE. UPON SUCH TRANSFER OF OWNERSHIP OF THE TRANSFERRED ITEMS, CONTRACTOR SHALL BE SOLELY RESPONSIBLE FOR, AND SHALL ASSUME ALL RISK AND LIABILITY FOR SUCH TRANSFERRED ITEMS, INCLUDING, WITHOUT LIMITATION, ALL LIABILITY FOR TIE DOWN AND SEA FASTENING, SALVAGE IF LOST DURING TRANSPORT, REMOVAL AND DISPOSAL OF SUCH TRANSFERRED ITEMS AND ALL POLLUTION OR ENVIRONMENTAL CONTAMINATION ATTRIBUTABLE THERETO AFTER SUCH TRANSFERRED ITEMS ARE ON THE HOOK.** The foregoing notwithstanding, the Parties expressly acknowledge that nothing herein shall cause the transfer of, and Contractor does not accept, the assignment or conveyance of any record title ownership of any lease or any operating rights thereunder. Owner agrees to provide a bill of sale related to such Transferred Items upon request by Contractor.

2.4    <u>Reefed Items.</u> In accordance with the Work to be performed under this <u>Appendix 1</u>, Contractor shall remove and transport the Reefed Items to the designated reef sites. **CONTRACTOR SHALL BE SOLELY RESPONSIBLE FOR, AND SHALL ASSUME ALL RISK AND LIABILITY FOR ANY REEFED ITEM (INCLUDING, WITHOUT LIMITATION, ALL LIABILITY FOR THE TOW AND SALVAGE, IF LOST DURING TOWING, OF SUCH REEFED ITEMS AND ALL POLLUTION AND ENVIRONMENTAL CONTAMINATION ATTRIBUTABLE THERETO (EXCEPT TO THE EXTENT DUE TO THE CONDITION OR STRUCTURAL INTEGRITY OF SUCH REEFED ITEM FOR WHICH OWNER SHALL REMAIN RESPONSIBLE)) FROM THE TIME SUCH REEFED ITEM IS ON THE HOOK UNTIL SUCH TIME AS SUCH REEFED ITEM IS DELIVERED BY MATERIAL BARGE TO THE DESIGNATED REEF SITES FOR POSITIONING ON THE SEA FLOOR PURSUANT TO THE OWNER'S REEF PERMIT.**

<div align="center">

**ARTICLE III.**
**SURVEY AND PERMITS**

</div>

3.1    <u>On-Site Survey.</u>

At the completion of the removal, reefing or abandonment of any particular Facility in accordance with the Work to be performed hereunder, Contractor shall conduct a survey over the relevant Facility site if required by BOEM or BSEE to obtain Site Clearance.

<div align="center">

Appendix 1
Page 4 of 11

</div>

3.2     Permits.

Owner agrees to timely and diligently obtain all necessary permits and approvals that must be obtained by Owner in order for Contractor to perform the Work, and Contractor agrees to timely and diligently obtain all necessary permits and approvals that must be obtained by Contractor to perform the Work.

## ARTICLE IV.
## OBLIGATIONS OF CONTRACTOR

4.1     Independent Contractor.

Contractor is an independent contractor with the sole authority and right to direct, supervise and control the performance of all details of the Work, subject only to the Performance Standards, and the general right of inspection by Owner and Predecessor to achieve the desired results and satisfactory completion of the Work. Any provision of this Appendix 1 that may appear to give Owner and Predecessor or their representatives the right to direct Contractor as to the details of doing the Work or to exercise a measure of control over the Work shall be deemed to mean that Contractor shall follow the desires of Owner and/or Predecessor or its or their representatives in the results of the Work only and not in the means whereby the Work is to be accomplished.  Except as otherwise expressly provided in Section 4.2 hereof, no member of the Contractor Group shall be deemed to be an agent, representative, or employee of Owner or Predecessor.  Contractor shall remain responsible for all of the actions of its subcontractors and the agents, representatives and employees of such subcontractors.

4.2     Statutory Employee.

In all cases where Contractor's employees (defined for the purposes of this Section 4.2 to include any Contractor Group member's direct, borrowed, special or statutory employees) are performing Work in or offshore the State of Louisiana or are otherwise covered by the Louisiana Worker's Compensation Act, La. Rev. Stat. §§ 23.1021 et seq., Owner, Predecessor and Contractor acknowledge and agree that all Work and operations performed by Contractor and its subcontractors and their employees pursuant to this Appendix 1 are an integral part of and are essential to the ability of Owner and Predecessor to generate Owner's and Predecessor's goods, products or services.  In such event, and without limiting the provisions of Section 4.1 above, Owner, Predecessor and Contractor agree that Owner and Predecessor shall each be deemed a statutory employer of Contractor's employees and its subcontractor's employees for the sole purposes of La. Rev. Stat. § 23.1061(A)(3), as the same may be amended from time to time.  Contractor shall ensure that all of its subcontracts contain the same provisions as this Section 4.2.

DM-#8062177
#94614816v4
#94614816v6

4.3     Standard of Performance.

Contractor covenants and agrees that it shall safely and efficiently prosecute the Work with due diligence and care in a good and workmanlike manner using good oilfield practices with qualified, careful and efficient workers in accordance with (i) generally accepted standards of engineering, construction and decommissioning practice for the Work covered under this Appendix 1; (ii) the provisions of this Appendix 1; and (iii) all applicable laws, rules, regulations and standards of the BOEM, the BSEE and any other applicable governmental or regulatory agency or body.  The Parties agree that Contractor will have met the required standard of performance under the Agreement, including this Appendix 1, if it performs the Work consistent with the Performance Standards.

4.4     Contractor's Personnel.

Notwithstanding the fact that Contractor shall perform the Work as an independent contractor, Contractor covenants and agrees to keep on the job a competent superintendent, project manager, engineer and all necessary assistants, who will be in charge of the Work.

4.5     Compliance with Laws.

Contractor shall observe and comply with, and shall ensure that all members of the Contractor Group observe and comply with, all federal, state and local laws, orders, rules and regulations which are now or may in the future become applicable to Contractor (or such employee, agent, representative or subcontractor, as the case may be) or to the performance of the Work under this Appendix 1, including, but not limited to, those statutes and regulations set out in Exhibit B attached hereto and made a part hereof for all purposes.

4.6     Equipment & Materials.

All equipment, tools, materials and facilities to be furnished by Contractor in the performance of the Work shall be serviceable and kept in good operating condition.  Contractor shall schedule its other operations so as to ensure that the necessary equipment, tools, materials and facilities and personnel to operate the same shall be available at the times necessary for the orderly completion of the Work in accordance with the terms of this Appendix 1.

4.7     Liens.

CONTRACTOR SHALL INDEMNIFY AND HOLD HARMLESS THE OWNER GROUP AND THE PREDECESSOR GROUP FROM ANY AND ALL LIENS AND OTHER ENCUMBRANCES AGAINST ANY PROPERTY OR INTERESTS OF ANY MEMBER OF THE OWNER GROUP OR THE PREDECESSOR GROUP AND FROM AND AGAINST ANY AND ALL CLAIMS ON ACCOUNT OF DEBTS ALLEGED TO BE DUE FROM ANY MEMBER OF CONTRACTOR GROUP, TO ANY PERSON INCLUDING ANY OTHER MEMBER OF CONTRACTOR GROUP, AND WILL DEFEND AT ITS OWN EXPENSE ANY CLAIM OR LITIGATION IN CONNECTION THEREWITH; PROVIDED, HOWEVER, THE FOREGOING SHALL NOT APPLY IN THE

DM-#8062177
#94614816v4
#94614816v6

**EVENT THAT CONTRACTOR IS NOT TIMELY PAID (BY OWNER, PREDECESSOR OR OTHERWISE) FOR ANY PORTION OF THE WORK.**

4.8     Records.

Contractor shall maintain complete, accurate and current detailed records of all costs and documentation of equipment, materials, supplies, labor and any other items or aspects of the Work performed hereunder for a Decommissioning Project for not less than two (2) years after Site Clearance for such Decommissioning Project; provided, however, if Owner, any member of Contractor Group, any member of Owner Group or any Third Party, makes a timely written Claim which relates to the Work performed pursuant to this Appendix 1 within such two (2) year period, then Contractor shall retain such records until final resolution of such Claim.  Contractor shall grant to FWE III, its authorized representatives, and/or public accounting firm selected by Owner, the right, at a reasonable time, to inspect, audit, examine and copy any applicable records or documents of Contractor as may be necessary to verify the validity and correctness of the charges reflected on any invoice and to protest or dispute any such charge.

4.9     Taxes.

Contractor agrees to pay all taxes, licenses and fees levied or assessed against Contractor in connection with, or incident to, Contractor's performance of the Work by any governmental agency for (i) income taxes; (ii) unemployment compensation insurance, benefits, social security; or (iii) any other taxes upon the amounts paid to Contractor, its agents, employees and representatives. Notwithstanding the foregoing, Owner shall be responsible for and shall pay all sales, ad valorem or use taxes and all import/customs duties, fees, charges or costs that may be assessed or incurred as a result of the performance of the Work or the transfer of the Transferred Items to Contractor pursuant to the terms hereof.

# ARTICLE V.
## INDEMNIFICATION AND LIABILITY

**5.1     CONTRACTOR'S INDEMNITY.**

**EXCEPT AS PROVIDED IN THE FOLLOWING SENTENCE, CONTRACTOR SHALL PROTECT, DEFEND, INDEMNIFY AND HOLD HARMLESS THE PREDECESSOR GROUP FOR CLAIMS ARISING OUT OF OR RESULTING FROM, IN WHOLE OR IN PART, A MATERIAL BREACH BY CONTRACTOR OF ANY CONTRACTOR OBLIGATION ("CONTRACTOR'S INDEMNITY"). NOTWITHSTANDING THE FOREGOING, CONTRACTOR'S INDEMNITY DOES NOT COVER ANY SPECIAL CLAIMS ARISING OUT OF OR RESULTING FROM CONTRACTOR'S MATERIAL BREACH OF A CONTRACTOR OBLIGATION.**

**5.2     PREDECESSOR'S INDEMNITY.**

**EXCEPT AS PROVIDED IN THE FOLLOWING SENTENCE, PREDECESSOR SHALL PROTECT, DEFEND, INDEMNIFY AND HOLD HARMLESS THE CONTRACTOR GROUP FOR CLAIMS ARISING**

OUT OF OR RESULTING FROM, IN WHOLE OR IN PART, A MATERIAL BREACH BY PREDECESSOR OF ANY PREDECESSOR OBLIGATION ("PREDECESSOR'S INDEMNITY"). NOTWITHSTANDING THE FOREGOING, PREDECESSOR'S INDEMNITY DOES NOT COVER ANY SPECIAL CLAIMS ARISING OUT OF OR RESULTING FROM PREDECESSOR'S MATERIAL BREACH OF A PREDECESSOR OBLIGATION.

## 5.3   SPECIAL CLAIMS.

NOTWITHSTANDING ANYTHING TO THE CONTRARY CONTAINED ELSEWHERE IN THE AGREEMENT, NEITHER PREDECESSOR NOR CONTRACTOR (NOR THE MEMBERS OF SUCH PARTY'S "GROUP") SHALL BE LIABLE TO ANOTHER PARTY (NOR THE MEMBERS OF SUCH OTHER PARTY'S "GROUP") FOR ANY SPECIAL CLAIM(S), INCLUDING ATTORNEY'S FEES, WHENEVER ARISING, AS A RESULT OF, RELATING TO OR IN CONNECTION WITH THE AGREEMENT OR ANY WORK; AND NO SPECIAL CLAIM(S), INCLUDING ATTORNEY'S FEES, SHALL BE MADE BY A PARTY AGAINST ANOTHER PARTY (OR AGAINST ANY MEMBER OF ANOTHER PARTY'S "GROUP"), REGARDLESS OF THE CAUSE OR CAUSES OF SUCH SPECIAL CLAIM(S), INCLUDING WHETHER OR NOT ANY SUCH SPECIAL CLAIM IS BASED OR ALLEGED TO BE BASED, IN WHOLE OR IN PART, ON THE NEGLIGENCE (INCLUDING SOLE, JOINT, ACTIVE, PASSIVE, CONCURRENT OR GROSS NEGLIGENCE), BREACH OF WARRANTY, STRICT LIABILITY, STATUTORY LIABILITY, CONTRACTUAL LIABILITY OR OTHER FAULT OF ANY MEMBER OF PREDECESSOR GROUP OR CONTRACTOR GROUP, THE UNSEAWORTHINESS OF ANY VESSEL, THE UNAIRWORTHINESS OF ANY AIRCRAFT, OR THE EXISTENCE OF ANY DEFECT, WHETHER PATENT, LATENT, PRE-EXISTING OR OTHERWISE.

## 5.4   EXPRESS NEGLIGENCE

WITH RESPECT TO THIS AGREEMENT, THE PARTIES AGREE THAT THIS STATEMENT COMPLIES WITH THE REQUIREMENT, KNOWN AS THE EXPRESS NEGLIGENCE RULE, TO EXPRESSLY STATE IN A CONSPICUOUS MANNER TO AFFORD FAIR AND ADEQUATE NOTICE THAT THIS AGREEMENT HAS PROVISIONS THAT COULD REQUIRE A PARTY TO BE RESPONSIBLE FOR THE NEGLIGENCE, STRICT LIABILITY, OR OTHER FAULT OF ANOTHER PARTY (OR THE MEMBERS OF ANOTHER PARTY'S "GROUP").

<div align="center">

**ARTICLE VI.**
**INSURANCE**

</div>

6.1   Contractor's Insurance.

Contractor shall carry, at its own expense, with insurers who are reliable and with an A.M Best rating of not less than A- and authorized to do business in the states or other jurisdictions in which the Work is to be performed by Contractor hereunder, or in the states or other jurisdictions adjacent to the offshore location in which the Work is to be performed hereunder, insurance coverages of the types and with limits required by Owner but in no event less than those set forth in Exhibit C attached hereto and made a part hereof.  Further, Contractor agrees to carry adequate contractual liability insurance to support the indemnities given herein.  Prior to commencing any of

<div align="center">

Appendix 1
Page 8 of 11

</div>

the Work to be conducted pursuant to the terms of this Appendix 1, if requested by Owner, Contractor agrees to provide Owner with certificates of insurance evidencing such insurance coverages in commercially available forms acceptable to Owner, and Contractor agrees to maintain current certificates of insurance on file with Owner for the duration of the Agreement.  The Parties expressly acknowledge and agree that the insurance and indemnity provisions of this Appendix 1 are separate and distinct; and that any insurance requirements contained herein shall not be deemed to restrict or limit any of the indemnity obligations set forth in this Appendix 1.

If Contractor hires any subcontractor to perform any of the Work hereunder, then Contractor shall require that any such subcontractor will obtain insurance protection with coverages of the types and with limits deemed appropriate by Contractor.  Any deficiencies in the coverages, policy limits or endorsements of Contractor's subcontractors shall be the sole responsibility of Contractor and shall be covered by Contractor's insurance.

6.2    Louisiana Anti-Indemnity Provisions.

Notwithstanding anything contained herein to the contrary, Contractor and Owner agree that with respect to all Work performed in Louisiana or offshore Louisiana and with respect to which the laws of the state of Louisiana are otherwise applicable, Owner (on its own behalf, and on behalf of its other contractors, subcontractors, agents and representatives and their respective employees) and Contractor (on its behalf, and on behalf of its subcontractors, agents and representatives and their respective employees) shall pay to each other's insurers the premium required by their respective insurers or their insurer's agents or authorized representatives to extend all of their insurance policies to include coverage for Owner's and Contractor's respective indemnities as required under this Appendix 1, and such insurance protection shall be governed by Louisiana law.  Each Party will arrange to have the other Party billed for the premium by its respective insurer, and will advise the other Party prior to the inception of this Appendix 1 if the premium will be in excess of $2,000.00.  The insurance policy shall apply to incidents arising out of the performance of this Appendix 1.  At each subsequent renewal of insurance, during the term of this Appendix 1, each Party will advise the other of the amounts of the premium required for the extensions described above and arrange billing for the appropriate premium by its insurers or their agents or authorized representatives.  It is expressly acknowledged and agreed to by the Parties that the provisions of this Section 6.2 are intended to comply with the provisions of *Marcel v. Placid Oil Co.*, 11 F.3d 563 (5th Cir. 1994), and the provisions hereof shall be interpreted in such a manner as to comply therewith.

6.3    Texas Anti-Indemnity Act.

To the extent that the Work or any part thereof is subject to the laws of the state of Texas, the Parties agree that in order to be in compliance with the Texas Anti-Indemnity Act regarding indemnification mutually assumed for the other Party's sole or concurrent negligence, each Party agrees to carry supporting insurance in equal amounts of the types and in the minimum amounts specified in the insurance agreements hereunder; provided, however, that Owner shall have the right to self-insure any or all coverages required of it hereunder.

DM-#8062177
#94614816v4
#94614816v6

## ARTICLE VII.
## CONTRACTOR'S POLICIES

7.1     <u>Compliance with Policies</u>.

Contractor covenants and agrees to, and shall cause its subcontractors to agree to, abide by and act in accordance with the following Contractor policies, as such are set forth in <u>Exhibits B</u>, <u>D</u>, <u>E</u> and <u>F</u>, respectively, attached hereto and made a part hereof:

1.     Federal Contract Requirements
2.     Drug and Alcohol Policy;
3.     Safety Program; and
4.     Search and Seizure Policy.

## ARTICLE VIII.
## GENERAL PROVISIONS

8.1     <u>Force Majeure</u>.

All obligations imposed by this <u>Appendix 1</u> or the Agreement on each Party, except for obligations to pay money or to provide indemnity, shall be suspended while compliance with such obligations are prevented, in whole or in part, by an event of *force majeure*.  As used herein an event of *force majeure* shall mean any of: a labor dispute, pandemic or epidemic impacting the region where the Work is to be performed, fire, flood, war, civil disturbance, act of God (including numbered or named tropical disturbances and other adverse weather or wave conditions); a change in laws or governmental rules, regulations or orders, an inability to timely secure materials or an inability to timely secure government permits from the BOEM, BSEE or any other governmental agency as required for the Work, or any other cause, whether similar or dissimilar, beyond the reasonable control of the Party claiming that its compliance has been prevented or delayed by such event of *force majeure*.  Notwithstanding the foregoing, such Party shall resume performance within a reasonable time after such event of *force majeure* has ended or been removed, or such Party is able to overcome the prevention caused by such event; provided, however, that no Party shall be required, against its will, to settle any labor dispute so at to overcome such event of *force majeure*.  If a Party's obligations are suspended under this <u>Section 8.1</u>, such Party shall promptly notify the other Party and give full particulars of the reasons for such suspension. For the avoidance of doubt, this <u>Section 8.1</u> does not modify the Qualified Conditions and allocation of risk under the Agreement.

8.2     <u>Work Site Access</u>.

To the extent reasonably necessary for Contractor to perform the Work, Owner shall provide Contractor unrestricted access to all the Specified Assets and shall execute any agency agreement, power of attorney, instrument, license, certificate, or other agreement reasonably necessary to provide such access.  Only the authorized personnel of Contractor, Owner or proper governmental

agencies shall be permitted access to any premises where Work is being performed under this <u>Appendix 1</u>.

8.3     <u>Survival.</u>

All provisions of this <u>Appendix 1</u> that cannot be performed before the expiration or termination of this <u>Appendix 1</u>, including, without limitation, the indemnity provisions contained herein, and all representations, promises, releases, and indemnities under this <u>Appendix 1</u>, shall survive the expiration or termination of this <u>Appendix 1</u>.

DM-#8062177
#94614816v4
#94614816v6

**EXHIBIT A to APPENDIX 1**

**SCOPE OF WORK**

**1.0**     **CONTRACTOR RESPONSIBILITIES**

1.1  Contractor shall perform the following Work, as applicable, as required to complete and to achieve Final Completion for each Decommissioning Project identified on Exhibit A to the Agreement:

- Perform and complete the Agreed Activities.
- Perform and complete the Initial Safe Out.
- Abandon all wells as per the BSEE-approved permits (APM's & RPM's).
- Abandon all pipelines as per the BSEE-approved permits (abandonment in place being the standard and removal only where mandated by BSEE or another governmental agency).
- Remove or reef all platforms as per the BSEE and/or COE-approved permits.

1.2  Contractor shall furnish all equipment, services, and personnel to conduct the offshore operations outlined in Section 1.1 including but not limited to the following as may be applicable and required:

- Derrick / Lift Vessel
- Lift Boats
- Dive Support Vessels
- Support Tugs and Crew Boats
- Shorebase support
- NORM & Asbestos remediation & disposal
- Material Barges and Tugs
- All slings, shackles, spreader bars, spreader frames, and rigging
- Pile jetting equipment and personnel
- Conductor and pile cutting personnel and equipment
- Divers and equipment
- Flushing & Filtration equipment
- Engineering & Project Management
- Permit Generation & Submittal

1.3  Contractor shall supply all labor, equipment, and material required to perform and complete the Scope of Work that is not specifically stated as being supplied by FWE III.

1.4  Contractor's derrick barge shall maintain an anchor handling tugboat with it at all times capable of handling the vessel's anchors.

1.5  Contractor's derrick barge and anchor handling tug(s) shall be equipped with an

appropriate positioning system to assure safe placement of anchors.

1.6  Contractor is responsible for notification of Operators of facilities and pipelines affected by placement of anchors near or over those facilities and/or pipelines.

1.7  Contractor's derrick barge shall have a current certificate of classification and a load line certificate from a recognized marine classification society.

1.8  Contractor shall provide current crane certification on the derrick barges primary crane and all auxiliary cranes.  All rigging must be certified and tagged.

1.9  Cargo Barges

1.9.1 Contractor shall provide cargo barges of sufficient size to safely operate in the most severe environmental conditions in which tow may occur.

1.9.2 Contractor shall ensure that the cargo barge(s) have adequate strength for the load out, tie down, transport, and offloading of the salvaged material.

1.9.3 Each cargo barge shall have a valid U.S. Coast Guard certificate of inspection and a U.S. Coast Guard stability letter.

1.10 Tugs

1.10.1  Contractor shall provide with each barge a minimum of one (1) tug of sufficient size, bollard pull, and horsepower to operate in any sea environment that may develop.

1.10.2  Contractor shall provide assist (tail) tugs as required to guide the barge from the open sea to the offloading site.

1.10.3  Vessels and crews shall comply with U.S. Coast Guard licensing and manning requirements.

1.11 Diving

1.11.1  Contractor shall ensure that diving subcontractor performs all diving operations in strict accordance with the latest rules and regulations governing diving operations.

1.12 Any equipment, material, jacket, deck, or piles that fall into the sea during the salvage operation shall be retrieved by Contractor at Contractor's expense.

1.13 If at any time during the platform removal operations Contractor has to pull away from the structure, Contractor shall supply and install on the structure temporary navigational aids meeting U.S. Coast Guard Class "A" specifications for lights and horn.

DM-#8062177
#94614816v4
#94614816v6

1.14 Contractor shall assume all weather liability.

1.15 Company is not obligated to pay Contractor for weather downtime, named tropical storms or otherwise, at any time before or during mobilization, or during or after demobilization.

1.16 EH&S

1.16.1  Contractor shall submit safety records upon request for review by Company.

1.16.2  Contractor shall provide gas detection devices, fire extinguishers, and other safety equipment to check all structural members, equipment, and piping for the presence of hydrocarbons.

1.16.3  Contractor shall check for the presence of hydrocarbons prior to flame cutting or using spark producing devices on any structural members, equipment, and piping.

1.16.4  Contractor shall provide a dedicated fire watch when hot work operations are in progress.

1.16.5  Contractor shall comply with government regulations, Contractor's policies, and Company's policies regarding confined space entry.

## 2.0   **TECHNICAL**

### 2.1   **Engineering**

2.1.1   Contractor Required Design and Analysis Work

Contractor shall perform all design, analysis, and design checks required to complete the Work in accordance with all applicable drawings, specifications, standards and codes, and other documents that are part of or are incorporated into this Scope of Work.  Contractor's proposed methods of performing the design and analysis work listed below shall be submitted to FWE III and Predecessor prior to beginning the work.

2.1.2   Engineering to be provided by Contractor to include the following as may be applicable and required:

- Material Barge Ballast Plan
- Removal Rigging
- Tie-Down Design
- Transportation Analysis
- Component Lift Weight Analysis

Exhibit A to Appendix 1
Page 3 of 4

- Component Center of Gravity Analysis
- Component Pad Eye or Lifting Trunnions Design
- Welding procedures and welder qualifications.

2.1.4   Contractor shall confirm all lift weights, center of gravities, and Pad Eye or Lifting Trunion designs in writing.  Contractor will be responsible for any Pad Eye or Lifting Trunion design or modification.

END OF EXHIBIT A  TO APPENDIX 1

DM-#8062177
#94614816v4
#94614816v6

**EXHIBIT B to APPENDIX 1**

**FEDERAL CONTRACT REQUIREMENTS**

Contractor shall fully comply with all applicable statutes and executive orders as well as the regulations, orders and rules promulgated thereunder ("Federal Contract Requirements"), and such Federal Contract Requirements, including the regulations set out below to the extent applicable hereto, are hereby incorporated into <u>Appendix 1</u> by reference:

(1)     Equal Opportunity Clause (41 CFR 60-1.4).  Applicable to all contracts or purchase orders in excess of $10,000;

(2)     Affirmative Action Compliance Programs (41 CFR 60-1.40).  Applicable to contracts or purchase orders of $50,000 or more and if Contractor has 50 or more employees;

(3)     Equal Employment Opportunity Reporting Requirements (CFR 60-1-7). Applicable to contracts or purchase orders of $50,000 or more and if Contractor has 50 or more employees;

(4)     Employment of the handicapped (41 CFR 60-250).  Applicable to contracts or purchase orders $2,500; or employment of disabled veterans and veterans of the Vietnam Era (Applicable to contracts or purchase orders of $10,000 or more;

(6)     Utilization of Minority Business Enterprises (41 CFR 1-1.13).  Applicable to contracts or purchase orders of $10,000 or more;

(7)     Utilization of Small Business Concerns (41 CFR 1-1.710-3).  Applicable to contracts or purchase orders of $10,000 or more;

(8)     Utilization of Labor Surplus Area Concerns (41 CFR 1-1.305-3(a)). Applicable to contracts or purchase orders of $10,000 or more;

(9)     Minority Business, Small Businesses and Labor Surplus Area Subcontracting (41 CFR 1-1.1310-2(b), 1-1710-3(b), 1-1.805-3). Applicable to contracts or purchase orders of $500,000 or more;

(10)    Clean Air and Water.  Applicable to contracts or purchase orders of CFR 15.4 and 15.5, 41 CFR 1-1.2302;

(11)    Outer Continental Shelf Lands Act endorsement (WC 00 01 09 A) (43 U.S.C. §§ 1331 *et seq.*); and

(12)    Oil Pollution Act of 1990, as amended (33 U.S.C. § 2701 *et seq.*).

Contractor certifies that it does not maintain or provide for its employees any segregated facilities at any of its establishments, and that it does not permit its employees to perform their services at any location, under its control, where segregated facilities are maintained.  It certifies

DM-#8062177
#94614816v4
#94614816v6

further that it will not maintain or provide for its employees any segregated facilities at any of its establishments and that it will not permit its employees to perform their services at any location, under its control, where segregated facilities are maintained.  The Contractor agrees that a breach of this certification is a violation of the Equal Opportunity Clause under this <u>Appendix 1</u>.  As used in this certification, the term "segregated facilities" means but is not limited to any waiting rooms, work areas, rest rooms and wash rooms, restaurants and other eating areas, time clocks, locker rooms and other storage or dressing areas, parking lots, drinking fountains, recreation or entertainment areas, transportation and housing facilities provided for employees which are segregated by explicit directive or are in fact segregated on the basis of race, color, religion, sex or national origin, because of habit, local custom or otherwise.  It further agrees that (except where it has obtained identical certifications from proposed subcontractors for specific time periods) it will obtain identical certifications from proposed subcontractors prior to the award of subcontracts exceeding $10,000.00, which are not exempt from the provisions of the Equal Opportunity Clause; that it will retain such certification in its files; and that it will forward the following notice to such proposed subcontractors (except where the proposed subcontractors have submitted identical certificates for specific time periods):

NOTICE TO PROSPECTIVE SUBCONTRACTORS OF REQUIREMENT FOR CERTIFICATIONS OF NONSEGREGATED FACILITIES:

Certification of Nonsegregated Facilities must be submitted prior to the award of a subcontract exceeding $10,000.00, which is not exempt from the provisions of the Equal Opportunity Clause.  The certification may be submitted either for each subcontract or for all subcontracts during a period (i.e. quarterly, semi-annually or annually).  Note:  The penalty for making false statements is prescribed in 18 U.S.C. 1001.

END OF EXHIBIT B TO APPENDIX 1

DM-#8062177
#94614816v4
#94614816v6

**EXHIBIT C to APPENDIX 1**

**INSURANCE PROVISIONS**

**Insurance Requirements.** During the term of the Agreement, Contractor will carry insurance coverages as set forth below at its own expense and with deductibles for its own account, with providers reasonably satisfactory to Owner and authorized to do business in the states or territories in which, and in the offshore blocks on which, Contractor performs any Work. The insurance coverages required herein represent Contractor's minimum requirements and do not limit or invalidate any indemnity or other obligations of Contractor under the Agreement. Contractor's failure to secure the required insurance coverages or the required endorsements on the policies or any denial of coverage by underwriters does not relieve Contractor from or limit its liabilities or obligations under the Agreement.

**Required Coverage.** The following insurance coverage is required. An owner's limitation clause, including any clause purporting to limit coverage to liability of an insured "as owner of the vessel," shall not be included in any of the policies required below. All policies and group policies must contain applicable territorial extensions and navigation limits adequate for the performance of the Work.

**Workers' Compensation**, as required by applicable law.

**Employer's Liability**, with a limit of not less than **$1,000,000** per occurrence, including (i) coverage for the Longshore and Harbor Workers' Compensation Act, including its extension by the Outer Continental Shelf Lands Act, the Jones Act, and the Death on the High Seas Act, (ii) coverage for masters and members of the crews of vessels (on a voluntary compensation basis), including transportation, wages, maintenance, and cure; alternatively, protection and indemnity insurance may be used for this coverage as specified below, (iii) "in rem" endorsement, stating that an action "in rem" will be treated as a claim against the insured "in personam," and (iv) "borrowed servant" endorsement, stating that a claim brought against Owner Group for compensation as a "borrowed servant" by any member of Contractor Group will be treated as a claim against Contractor.

**Automobile Liability**, with a limit of not less than **$1,000,000** per occurrence, combined single limit for bodily injury and property damage, covering all owned, hired, leased, or non-owned vehicles (as required by applicable law).

**Commercial General Liability**, with a limit of not less than **$1,000,000** per occurrence, combined single limit for bodily injury and property damage, including (i) blanket contractual liability, (ii) products/completed operations liability, (iii) sudden and accidental pollution liability (including cleanup costs), (iv) surface damage for blowout and cratering, (v) removal of any exclusions, restrictions, or limitations relating to explosion, collapse, or underground property damage, (vi) removal of any professional liability exclusions or limitations, (vii) action over buyback and deletion of any provisions that limit or exclude coverage of claims made by

Exhibit C to Appendix 1
Page 1 of 3

Contractor Group's employees against any member of Owner Group, (viii) extended reporting period of not less than 36 months, if written on a claims-made policy and is non-renewed or canceled, or deletion of any "sunset clause" purporting to cancel coverage on claims following cancellation or non-renewal, if written on an occurrence policy, (ix) "in rem" endorsement stating that an action "in rem" will be treated as a claim against the insured "in personam," and (ix) removal of the "watercraft" exclusion; alternatively, protection and indemnity insurance may be used for this coverage as specified below.

**Hull and Machinery**, which Contractor will carry, or cause to be carried, for each vessel owned or chartered by Contractor Group in connection with the Work at the declared value of each vessel and its equipment, including (i) deletion of limitation of liability clause, (ii) if any vessel engages in towing operations, this insurance will include full towers liability with the sistership clause un-amended, and (iii)  removal of wreck or debris, if removal is required by applicable law.

**Protection and Indemnity**, which Contractor will carry, or cause to be carried, for each vessel owned or chartered by Contractor Group in connection with the Work with a limit of not less than **$5,000,000** per occurrence, including (i) coverage for pollution emanating from or caused by a vessel or vessels owned or chartered by Contractor Group, (ii) deletion of any language limiting coverage for Owner Group in the event of the applicability of any statute limiting liability; (iii) "in rem" endorsement stating that an action "in rem" will be treated as a claim against the insured "in personam," (iv) towers liability, where applicable; alternatively, liability coverage may be afforded in accordance with the Commercial General Liability coverages above (deleting the "watercraft" exclusions), (v) coverage for the crews; alternatively, the crew coverage may be afforded in accordance with the workers' compensation and employer's liability coverages above, and (vi) removal of wreck or debris, if removal is required by applicable law.

**Charterers Legal Liability**, which Contractor will carry, or cause to be carried, for each vessel chartered by Contractor Group in connection with the Work with a limit of not less than **$1,000,000** per occurrence, including (i) liabilities arising out of operation and use of such vessel and (ii) contractual liability for liabilities assumed by Contractor.

**Excess or Umbrella Liability**, with a limit of not less than **$100,000,000** per occurrence, combined single limit for bodily injury and property damage in excess of the limits specified above and is follow-form with additional exclusions for employer's liability, automobile liability, commercial general liability, hull and machinery, protection and indemnity, and charterers legal liability, which such liability limits may be met with any combination of primary, umbrella, and excess policies.

**Aircraft Liability**, which Contractor will carry, or cause to be carried, for each aircraft owned or chartered by Contractor Group in connection with the Work with a limit of not less than **$75,000,000** per occurrence, combined single limit for bodily injury or death (including passengers) and loss of or damage to property, including (i) passenger liability, (ii) cargo legal liability, and (iii) no provision limiting coverage "per seat" or "per passenger."

Exhibit C to Appendix 1
Page 2 of 3

DM-#8062177
#94614816v4
#94614816v6

**Aircraft Hull**, which Contractor will carry, or cause to be carried, for each aircraft owned or chartered by Contractor Group in connection with the Work for the declared value of each aircraft and its equipment.

**Professional Liability**, if applicable, with a limit of not less than $1,000,000 per claim, including errors or omissions or rendering or failing to render any professional services as required under the Agreement.

**Endorsements and Other Requirements.** To the extent of the liabilities assumed by Contractor hereunder, all insurance policies of Contractor will comply with the following:

(a) **Waiver of Subrogation.** Such policies will expressly waive subrogation as to Owner Group.

(b) **Additional Insured.** Such policies, other than workers' compensation, employer's liability, and professional liability policies, will include Owner Group as an additional insured, on a broad-form basis. Such additional-insured endorsements must include coverage for the sole, joint, or concurrent negligence of the additional insureds and not be restricted to: (i) ongoing operations and products/completed operations; (ii) coverage for vicarious liability; or (iii) circumstances in which the named insured is partially negligent. The Parties deem a portion of the payment made by Owner for Work performed to include compensation to Contractor for any costs Contractor may incur due to including Owner Group as additional insured. If any additional-insured endorsement limits coverage to amounts required by written contract, the amounts required in the agreement will instead be the maximum amounts of Contractor's insurance policies, but not less than the minimums set forth herein.

(c) **Primary.** Such policies will be primary to and receive no contribution from any insurance policies maintained by Owner Group.

<div align="center">END OF EXHIBIT C OF APPENDIX 1</div>

Exhibit C to Appendix 1
Page 3 of 3

DM-#8062177
#94614816v4
#94614816v6

**EXHIBIT D to APPENDIX 1**

**<u>DRUG AND ALCOHOL POLICY</u>**

**PURPOSE**

This policy implements Contractor's effort to enhance the safety of its operations and to provide its employees an opportunity to work in an environment free of drugs and alcohol.  Contractor will deter alcohol and drug abuse by prevention through education, detection through testing, and disciplinary action when warranted.

**POLICY**

Contractor prohibits:

- employees possessing or consuming alcohol or drugs while working;
- employees working while under the influence of alcohol or drugs; and
- employees possessing or consuming drugs while not working.

**EXCEPTIONS**

Contractor permits employee possession of prescription drugs in containers that bear the doctor's and employee's name and a prescription date less than one year old, and permits the safe use of those drugs for the prescribed purposes, but Contractor does not permit employees to work while under the influence of prescription medications that may have an adverse effect on the employee's fitness for duty.

Contractor permits possession and moderate, lawful consumption of alcohol at business-related social functions that have been appropriately authorized by management, but prohibits employees and other attendees from working or operating motor vehicles after such a function if their abilities may have been impaired by alcohol.

**DEFINITIONS**

"Employees" means (for purposes of this policy only) all regular full-time, regular part-time or temporary employees, all Contractor independent contractors and agents, and all other persons using Contractor equipment, vehicles or boats (including those owned, used, rented or leased by or for Contractor) or performing duties on Contractor premises or property.

"Drugs" means (1) marijuana, cocaine, opiates, phencyclidine (PCP) and amphetamines; and (2) any other substances specified in Schedule I through V of the federal Controlled Substances Act whether or not prescribed for employee use by a physician.

DM-#8062177
#94614816v4
#94614816v6

"Test" means a drug test and/or alcohol test using urine and/or blood samples, conducted in accordance with this policy and Contractor testing procedures.

"Working" means reporting for work, performing job duties, engaging in business-related travel or entertainment, operating any Contractor equipment, vehicle or boat (including those owned, used, rented or leased by or for Contractor), being on Contractor property or premises, or attending any Contractor-related business or social function.

**TESTING AND DISCIPLINE**

Contractor may require employees to submit to tests to determine the presence of drugs or alcohol.  If an employee's test yields a verified positive result, their employment will be terminated immediately.   In the case of a verified positive pre-employment test result, any offer of employment will be automatically withdrawn.

A refusal to take a test, failure to cooperate with a test, an attempt to tamper with a specimen, violation of Contractor testing policies or procedures or any attempt to subvert Contractor testing policies or procedures will have the same consequences as failing a drug test – immediate termination of employment or withdrawal of offer of employment.

The Contractor human resources department maintains written procedures for testing, which may be changed by Contractor at any time, for any reason.  The procedures are available for employee review.

**EMPLOYEE DRUG CONVICTIONS**

As required by the Drug Free Work Place Act of 1989, any employee convicted of any violation of any criminal drug statute must notify management of the conviction no later than five (5) days after a conviction.  Failure to give notice shall result in the employee's termination.  The management personnel given the notice will immediately notify the human resources department of any reported conviction.  Contractor may terminate any employee convicted of a drug-related crime regardless of the results of any administered drug test.

**PRE-EMPLOYMENT TESTING**

All applicants for employment at Contractor shall undergo a pre-employment drug test within 24 hours of Contractor's request.

**POST ACCIDENT TESTING**

Contractor will test each employee whose performance either contributed to an accident or cannot be completely discounted as a contributing factor to the accident, if the accident:

- results in a death or a personal injury necessitating medical attention;

- results in an explosion or fire;
- causes a significant damage to or loss of property;
- requires the emergency shut-down of an operation or facility;
- is a reportable incident regarding a gas pipeline facility under 49 CFR Part 191; or
- is a reportable accident involving pipeline facilities used in the transportation of hazardous liquids under 49 CFR Part 195.

In addition to the mandatory post-accident testing described above, Contractor may, in its sole discretion, also require post-accident testing following any accident that it determines is significant and warrants post-accident testing.

## RANDOM TESTING

Contractor will conduct random testing on employees at certain Contractor facilities designated by the Vice President of Exploration and Production, the Vice President of Human Resources, and the Sr. Vice President and General Counsel. Procedures for selecting employees for random testing are stated in Contractor's written procedures for testing.

## REASONABLE CAUSE TESTING

Contractor will test an employee when there is reasonable cause to believe that the employee is using a drug or is under the influence of alcohol. "Reasonable cause" depends on the circumstances of each case. It includes observation of an employee's:

- unauthorized use or possession of alcohol while working;
- use or possession of drugs;
- slurred speech;
- unsafe actions;
- inability or difficulty in performing routine tasks effectively;
- unsteady standing or walking;
- disorientation or confusion; or
- erratic or unusual behavior.

It may also include:

- concerns about the employee's fitness for duty;
- an employee's voluntary admission of the prohibited use of alcohol or drugs;
- an employee's arrest or conviction for a drug-related offense, or the identification of an employee as the focus of a criminal investigation into illegal drug possession, use or trafficking;
- information related to employee drug use or prohibited alcohol use provided by reliable and credible sources or independently corroborated by Contractor;
- evidence that an employee has tampered with a drug test;
- the odor of alcohol, marijuana, or any other drug; or

Exhibit D to Appendix 1
Page 3 of 5

- an employee's operation of a Contractor vehicle after leaving an establishment where alcohol is served.

Reasonable cause for testing may arise in circumstances in addition to those specified above. A test for reasonable cause will be conducted only upon concurrence of at least two of the employee's supervisors, one of whom is trained in the detection of the possible symptoms of drug and alcohol use. A drug test for reasonable cause will also require the concurrence of either the Vice President of Human Resources or the Sr. Vice President and General Counsel (either of whom may also constitute the concurring supervisors).

## OTHER TESTING

If an employee transfers to a facility designated for random testing, a drug test will be required before transfer. If an employee is on a leave of absence from a facility designated for random testing, a drug test may be required before the employee may return to work. Employees may be drug tested upon commencing or ending multiple-day work shifts on offshore facilities.

## MEDICAL REVIEW OFFICER

Contractor has designated a licensed physician with knowledge of drug abuse disorders as its medical review officer ("MRO"). The MRO reviews and interprets positive test results obtained through Contractor's testing program. The MRO is responsible for verifying positive test results. The MRO examines alternative medical explanations for any positive test results, and reviews all medical records made available by the tested employee when a confirmed positive drug test could have resulted from legally prescribed drugs. Contractor's test procedures describe the process under which the MRO reviews information, gives the tested employee an opportunity to discuss the test result, and otherwise determines whether the test result should be reported as negative or should be reported as a verified positive test.

## RE-TESTING AT THE EMPLOYEE'S REQUEST

An employee may submit a written request to the MRO within 72 hours of receipt of a verified positive drug test, asking that the employee's original specimen be re-tested. Employees are entitled to only one re-test of each specimen. Re-testing procedures are stated in the written procedures for testing maintained by the Contractor's human resources department.

## EMPLOYEE EDUCATION AND TRAINING

Employees at the facilities designated for random testing will participate in a training program that addresses the consequences of alcohol and drug use on personal health, safety, and the work environment. The program will also address indicators of alcohol and drug use and abuse. Informational materials (including a community service drug hot-line telephone number for employee assistance), and Contractor's policy regarding drug and alcohol use in the work place will be distributed as part of the training program.

Exhibit D to Appendix 1
Page 4 of 5

In addition to training for all employees, supervisors of the designated facilities will receive annual training of specific contemporaneous physical, behavioral and performance indicators of probable drug use.

**VOLUNTARY REHABILITATION**

Employees are encouraged to seek treatment for any alcohol or drug problem before being in a situation that may warrant a test.  Upon request, the Contractor's human resources department will refer employees to an independent treatment program.

Medical and disability benefits will be provided for treatment to the extent available under Contractor's medical and disability plans.  Employees referred by Contractor to a treatment program and employees seeking Contractor medical or disability benefits for treatment must consent to the disclosure of all treatment-related information to Contractor.  An employee's employment shall be terminated if they do not cooperate with treatment, if they leave a treatment program before being discharged, or if they violate this policy after returning to work following treatment.

**IMPLIED CONSENT**

Employees are conclusively deemed to consent to cooperate in maintaining a work place free from the effects of alcohol and drugs through the use and enforcement of this and related corporate policies and procedures.

<div align="center">END OF EXHIBIT D OF APPENDIX 1</div>

DM-#8062177
#94614816v4
#94614816v6

**EXHIBIT E to APPENDIX 1**

<u>**CONTRACTOR SAFETY AND ENVIRONMENTAL REQUIREMENTS**</u>

**A**  **Purpose and Scope**

A.1    The purpose and scope of these requirements is to establish safety and environmental requirements for contractors to be able to work on Owner owned or managed properties.

The objectives of these requirements are to ensure that all contractors and subcontractors working on Owner's facilities/work sites have programs in place to comply with the Bureau of Safety and Environmental Enforcement (BSEE) Safety and Environmental Management Systems (SEMS) requirements or other applicable safety and environmental regulations, laws, rules and standards of agencies having jurisdiction at locations, their employees are adequately skilled and knowledgeable to safely perform their assigned job task functions, to ensure that safety and environmental policies have been established and to ensure that Contractor's management is committed to safety.

**B**  **Written Safety and Environmental Programs**

B.1    Contractors shall develop and implement written safety and environmental management programs which must include but not be limited to the following:

- Management Commitment
- Written Safe Work Practices specific for work to be performed in compliance with applicable OSHA, BSEE, U.S. Coast Guard, EPA and other applicable government agencies.
- Training Program to include an employee Skills and Knowledge Verification process
- Drug and Alcohol Prevention Program (e.g., DISA)
- Hazard Recognition Program to include JSA (Job Safety Analysis)
- Stop Work Authority Program
- Incident Reporting and Investigation Program
- Operating Procedures for Equipment
- Mechanical Integrity Program
- Management of Change (MOC)

**C**  **Training Requirements**

C.1    Contractor's personnel (and those of all subcontractors) shall be skilled and knowledgeable for the tasks or activities to be accomplished. This includes being in compliance with appropriate safety and environmental training codes, standards, laws and regulations as required by governmental agencies having jurisdiction at the work site (e.g., BSEE, USCG, EPA, DOT, OSHA) as well as Contractor's Contractor Training Requirements.

C.2    A Training Matrix has been established to identify minimal training requirements for Contractor personnel performing work on Owner properties. Contractors should refer to Contractor's SEMS portal for the latest version of the Training Matrix and must verify the training requirements are met for the appropriate job titles (functions).

DM-#8062177
#94614816v4
#94614816v6

**D**      **Safety and Environmental Management Systems (SEMS) - Contractor Requirements**

D.1      Contractor has established very specific contractor safety and environmental management requirements in order to provide for the safety of all personnel and to comply with current safety and environmental regulations. Below are specific requirements as part of the SEMS contractor agreement/bridging process. A detailed description and compliance guide can be obtained from the Contractor SEMS portal or by calling Contractor's EH&S department.

D.2      Requirements

    D.2.1      Contractors performing activities on-site offshore must participate in the ISNetworld Review and Verification, as well as the Training Qualification (TQ) processes;

    D.2.2      Contractor must review Contractor's  Safety and Environmental Management System (SEMS), related  SEMS requirements, Safe Work Practices and must perform all contractual obligations in accordance with such Contractor programs;

    D.2.3      The Contractor must communicate identified hazards to all affected personnel (including Owner and 3rd Party personnel) prior to performing oil, gas and sulphur operations for Owner;

    D.2.4      The Contractor must comply with all applicable safety and environmental regulations, laws, rules and standards of agencies having jurisdiction at locations where work is conducted for the Operator;

    D.2.5      Contractor must verify and provide documentation upon request that its personnel and any subcontractors performing work for Contractor have the skills and knowledge to perform their assigned duties in a safe and environmentally sound manner, has documented such, and that the information contained therein is accurate, timely and reflective of all appropriate safety and environmental training codes, standards, laws and regulations as required by governmental or regulatory agencies having jurisdiction at the work site.(e.g., BOEM, BSEE, USCG, EPA, DOT, OSHA) ;

    D.2.6      The Contractor must have written safe work practices that help minimize the risk to personnel and the environment for all work conducted for Owner, and all activities performed by the Contractor will be conducted in accordance with those safe work practices;

    D.2.7      The Contractor must require all personnel performing work for Contractor to undergo periodic retraining and skill assessments, in accordance with Contractor's Training Requirements  for On-Site Contractors (Training Matrix), to ensure adequate retention of the skills and knowledge required to perform their assigned duties;

    D.2.8      The Contractor must obtain and/or develop written operating procedures to ensure the safe operation of critical equipment that is operated and maintained by the

Exhibit E to Appendix 1
Page 2 of 6

Contractor whether or not that equipment is owned by the Contractor or any Third Party.  Critical equipment, per Appendix D of API RP 75, is defined as: "Equipment and other systems determined to be essential in preventing the occurrence of or mitigating the consequences of an uncontrolled release."  Such equipment may include vessels, machinery (compressors, mud pumps, fire pumps, etc.), piping, blowout preventers, wellheads and related valving, flares, wireline equipment, coil tubing equipment, fluid management equipment, safety systems, alarms, interlocks, fire protection equipment and other monitoring, control and response systems.

D.2.9   The Contractor must periodically review their written operating procedures used to operate critical equipment to ensure they reflect actual operating conditions;

D.2.10  The Contractor must develop and implement a written mechanical integrity program for any critical equipment that will be maintained and operated by the Contractor. Such a program must include, as applicable:

- The design, fabrication, procurement, installation, testing, calibration and inspection criteria and limits;
- The basis for maintenance (manufacturer's recommendation, industry standards, etc.
- A quality assurance program to ensure the mechanical integrity and safe operation of the equipment;

D.2.11  All documents required per 30 CFR 250, Subpart S and API RP 75 will be maintained in an orderly manner, will be readily identifiable, retrievable, and legible, and will be available for review on request by Owner or appropriate regulatory authorities. Examples of such documentation include, but are not limited to:

- Safe work practices and policies;
- Training records, including certifications for specialty work, as applicable;
- Verifications that personnel are skilled and knowledgeable in their assigned duties;
- Approved Job Safety Analyses (JSAs) as required;

D.2.12  For oil, gas and sulphur activities performed on Owner's *facilities* and on a Contractor's *facility* on  the OCS the Contractor agrees to the following, where "facilities" is defined to include all types of offshore structures permanently or temporarily attached to the seabed ( *i.e.* , mobile offshore drilling units; floating production systems; floating production, storage and offloading facilities; tension-leg platforms; spars used for exploration, development, production, and transportation activities for oil, gas, or sulphur from areas leased in the OCS, as well as wells, structures, living quarters, drilling and workover packages, process equipment, utilities and DOI regulated pipelines (except as noted in API RP 75 section 1.3.1.1);

D.2.13   The Contractor must conduct, keep current and provide upon request to Contractor Hazards Analyses (including Mitigation plans) of the Contractor's facilities and ongoing operations;

D.2.14   The Contractor must manage and document all changes to the Contractor's facility that are directly involved in performing oil, gas and sulphur activities for Owner;

D.2.15   The Contractor must develop and communicate an Emergency Action Plan to all personnel on the Contractor's facilities;

D.2.16   The Contractor must conduct Job Safety Analysis (JSA) to identify potential task specific hazards associated with the work to be performed and must include the steps required to mitigate the hazards identified.  Copies of all JSAs must be kept at the work site and be readily accessible for at least 30 days to all personnel involved with the work. The Contractor must also maintain copies of all completed JSAs for at least 2 years.

D.2.17   The Contactor must conduct routine safety meetings to communicate safety expectations, incidents, near miss reports, prevention, safety alerts, etc.

D.2.18   The Contractor must immediately notify an Owner representative by whatever means  of communication is most expedient, and shall maintain written records in addition thereto, of any incidents resulting in the following:

- Fatalities
- All injuries that require the evacuation of the injured person(s) from the facility to shore or to another offshore facility
- All losses of well control
- All fires and explosions
- All reportable releases of H2S gas
- All collisions
- All incidents involving severe structural damage
- All incidents involving crane or personnel/material handling operations
- All incidents that damage or disable safety systems or equipment

D.2.19   Contractor is required to complete incident reports and provide additional information as necessary in order to determine root cause and corrective actions.

# E        Personal Protective Equipment (PPE)

Contractor shall provide its employees and personnel with proper PPE for them to perform their jobs safely. Contractor shall also ensure that its employees and personnel are trained in the proper use and maintenance of all PPE issued. The following is only the minimum PPE required to work on facilities owned, operated or managed by Owner or any of its affiliated or subsidiary companies. Any additional job specific PPE (face shields, goggles, respiratory protection, fall protection, hand protection, gas monitors, etc.) required by Owner, governmental regulations or hazard assessments shall also be provided by Contractor.

DM-#8062177
#94614816v4
#94614816v6

*Minimal PPE Requirements for contractors*:

- Safety Glasses – Safety Glasses shall comply with ANSI Z87.1 – 1989, as such may be updated or modified from time to time, and shall be worn in areas where personnel are exposed to flying particles and/or when working around pressurized process equipment, piping, pumps, etc.

- Hard Hat – Hard hats shall comply with ANSI Z89.1 – 1997, Type 1 requirements, as such may be updated or modified from time to time, and shall be worn at all times when working on Owner facilities or work sites.

- Safety/Steel Toe Shoes / Boots – Safety/Steel toe shoes / boots shall comply with ANSI Z41 – 1991, as such may be updated or modified from time to time, and shall be worn at all times when working at any facility or work site owned, operated or managed by Owner or any of its affiliated or subsidiary companies.

- Hearing Protection – Hearing protection is required in high noise areas or areas that are posted as requiring hearing protection.

- Personal Flotation Devices (PFD's) – USCG Type 1 or 5 are necessary for any Work or portion thereof that is to be performed outside the handrails, on +10 level of offshore platforms, during personnel transfers to and from offshore platforms and while boarding and exiting boats from boat landings.

**F      Inspections/Audits**

In addition to any right provided elsewhere in this <u>Appendix 1</u> or otherwise available by law, Owner reserves the right to inspect/audit the Environmental, Health and Safety activities of all contractors and subcontractors who work on any properties, facilities or premises owned, operated or managed by Owner or any of its affiliated or subsidiary companies. Owner or Third Party auditing teams or individuals may conduct these inspections/audits.

The objective of conducting an inspection/audit is to assess Contractor's compliance with applicable Owner, governmental and regulatory requirements and to prevent adverse environmental and safety incidents.

F.1      Field Inspections/audits

Owner may have field inspections conducted so that the inspector(s)/auditor(s) can:

- Physically observe the Work or any part thereof that Contractor, or any of its subcontractors or personnel, is performing.
- Assess Contractor's performance of Work, or any part thereof, according to applicable Owner, governmental or regulatory requirements.
- Advise Contractor regarding any deficiencies that are observed and require that such be corrected.

Exhibit E to Appendix 1
Page 5 of 6

Owner may conduct field inspections at any time and from time to time as Owner, in its sole discretion, may deem necessary or appropriate to maintain compliance with the applicable requirements of Owner or any governmental or regulatory agency or body.

F.2     Office Audits

Owner may have office audits conducted:

- To verify information that Contractor certifies as having when completing this Contractor Safety Program Requirements agreement.
- To check Contractor's documentation of training, safety meeting attendance, accidents, equipment inspections, safety program elements, etc.
- To share environmental, safety and health philosophies.

<div align="center">END OF EXHIBIT E TO APPENDIX 1</div>

DM-#8062177
#94614816v4
#94614816v6

**EXHIBIT F to APPENDIX 1**

**SEARCH AND SEIZURE POLICY**

**NOTICE TO ALL PERSONNEL**

It is the Contractor's belief that the misuse of drugs, alcohol, or any substance having a physiological, psychological, or biochemical effect impairs a person's health and performance and creates unsafe working conditions. Contractor is committed to maintaining a productive, safe and healthy work environment, free of unauthorized drug and alcohol usage. In order to achieve this objective, Contractor has adopted a Drug and Alcohol Policy. All Contractor personnel are required to comply with the policy.

The use, possession, distribution or sale of unauthorized drugs by anyone while on Contractor premises or while engaged in Contractor business is prohibited. A person reporting for work on Contractor premises with unauthorized drugs and/or alcohol in his/her body is in violation of this policy.

Reporting to work while under the influence of alcohol by any person is prohibited. The consumption or possession of alcohol in unsealed or opened containers on Contractor premises is prohibited. No alcohol is allowed at any offshore location.

For the purpose of this policy, the term "unauthorized drugs" shall mean any substance, other than an authorized substance, which has the effect on the human body of being a narcotic, depressant, stimulant, hallucinogen or cannabinoid, their precursors, derivatives or analogues, and includes, but is not limited to, those substances scheduled as controlled substances pursuant to the Federal Controlled Substances Act.

"Authorized substances" are substances having a physiological, psychological, or biochemical effect that are lawfully prescribed or that are available without a prescription, that are lawfully obtained by an individual and that the individual possesses and uses in the appropriate manner, in the dosages and for the purposes for which the substances were prescribed or manufactured.

It is each person's responsibility to notify his or her supervisor in writing when that person is taking any prescription or non-prescription medicine or substance which may impair judgment or performance or otherwise adversely affect the normal functions or his or her mental faculties or physical abilities.

In enforcing the policy, searches of persons and their property on Contractor premises, work area searches, and laboratory testing are authorized. Any person who refuses, when requested, to cooperate with a search or to submit to laboratory testing shall be deemed to be in violation of the policy. Contractor reserves the right to conduct unannounced personal searches. Entry upon Contractor's premises by personnel will be deemed to constitute consent by such persons to personal searches pursuant to this policy.

DM-#8062177
#94614816v4
#94614816v6

A personal search includes inspection of any personal property of personnel located on Contractor premises including, but not limited to, their personal effects, lockers, baggage, desks, lunch boxes, containers, purses, billfolds, parcels, or vehicles if on Contractor premises.

Any person charged with or under investigation in connection with a drug-related or alcohol-related criminal offense may be required to submit to laboratory testing.

Any person possessing food, supplies, or tools not belonging to them, at a time when such items should not be in their possession, is subject to disciplinary action.

Firearms are prohibited on all Contractor premises.  Without limiting the generality of the foregoing, personnel may not possess firearms on their person, or in their personal effects, lockers, baggage, desks, lunch boxes, containers, purses, parcels, or vehicles if on Contractor premises.

<div align="center">END OF EXHIBIT F TO APPENDIX 1; END OF AGREEMENT</div>

DM-#8062177
#94614816v4
#94614816v6

<u>**Exhibit N3**</u>

**Hunt Term Sheet**



*Thomas R. Lamme*
*Senior Vice President and General Counsel*
*Direct: 713-969-1107*
*Email: TLamme@fwellc.com*

May 20, 2021

**VIA EMAIL**

Matt Johnson
Assistant General Counsel
Hunt Oil Company
1900 North Akard Street
Dallas, Texas 75201
E-mail: mjohnson@huntoil.com

*Re: Fieldwood/Hunt Term Sheet*

Dear Matt:

Attached as <u>Exhibit A</u> is the agreed upon term sheet dated May [20], 2021, by and between Fieldwood Energy LLC and its affiliated debtors and Hunt Oil Company and its subsidiaries Chieftain International (U.S.) L.L.C. and Hunt Chieftain Development, L.P. (collectively, "**Hunt**" and, together with the Debtors, the "**Parties**") supporting the restructuring of the portion of the Debtors' business relating to certain assets described therein as the "Hunt Turnkey Property," "Hunt Non-Turnkey Properties," and the "Abandoned Properties" (the "**Fieldwood/Hunt Term Sheet**").

By executing this letter agreement, each of the undersigned Parties agrees (i) to work to implement the terms of the Fieldwood/Hunt Term Sheet and (ii) to negotiate the definitive documents described therein in good faith and in accordance with the terms of the Fieldwood/Hunt Term Sheet.

The Parties may execute and deliver this letter agreement by electronic reproduction and in multiple counterparts, each of which shall constitute an original and all of which shall be one and the same document.  This letter agreement shall be governed by the laws of the State of Texas without regard to any choice of law principles.

[Signature Pages Follow]

Enclosure

cc: Michael T. Dane, *via email* MDane@Fwellc.com

IN WITNESS WHEREOF, the undersigned Parties have executed this letter agreement as of the date first written above.

**FIELDWOOD ENERGY LLC**

By:  *Thomas R. Lamme*

Name:   Thomas R. Lamme
Title:    Senior Vice President and General Counsel

IN WITNESS WHEREOF, the undersigned Parties have executed this letter agreement as of the date first written above.

**HUNT OIL COMPANY**

By: _____
Name:        Mark C. Gunnin
Title:        President

**EXHIBIT A**

FIELDWOOD/HUNT TERM SHEET

*This Term Sheet is an expression of interest only and creates no legally binding commitment by either party to negotiate any specific transaction or enter into any agreement. It is expressly understood that no liability or obligation of Fieldwood Energy LLC and its affiliated debtors (collectively, the "**Debtors**") or Hunt Oil Company and its subsidiaries Chieftain International (U.S.) L.L.C. and Hunt Chieftain Development, L.P. (collectively, "**Hunt**") of any nature whatsoever is intended to or will be created hereunder with respect to this Term Sheet or related discussions or writings or the transactions contemplated hereby and that this Term Sheet is neither a contract nor a binding offer. It is understood and agreed that any transaction is expressly conditioned, among others, upon approval by the Debtors and Hunt, the execution and delivery by the Debtors and Hunt or their affiliates of definitive written agreements, in form and substance satisfactory to the Debtors and Hunt in their sole discretion, the satisfaction of the conditions set forth therein, and Bankruptcy Court approval. The Debtors and Hunt expressly agree that this Term Sheet does not contain all terms that would be required to be agreed to in order to enter into any definitive agreement. Without prejudice to the foregoing, this Term Sheet constitutes a "Definitive Document" under the Restructuring Support Agreement (as defined in the Plan (as defined below)) and is subject to the consent rights set forth therein. Except as provided for herein, each party is responsible for its own costs and expenses, including those of its legal advisors in conjunction with this Term Sheet.*

## HUNT / FIELDWOOD COMMERCIAL TERM SHEET

Through the divisive merger (the "**Divisive Merger**") contemplated under the *Fourth Amended Joint Chapter 11 Plan of Fieldwood Energy LLC and Its Affiliated Debtors* dated April 15, 2021 filed at ECF No. 1284 (including any exhibits and schedules thereto and as may be further amended, supplemented, or modified, the "**Plan**"),[1] Fieldwood Energy III LLC ("**FWE III**") will be allocated and vested with the Debtors' rights, title, and interests in Eugene Island Block 63 (OCS Lease No. G00425) and OCS RUE No. G30244 (collectively, the "**Hunt Turnkey Property**").

Through the Divisive Merger, FWE III will also be allocated and vested with rights, title, and interests in certain other oil and gas assets (collectively, the "**Hunt Non-Turnkey Properties**"). FWE III will be responsible for the decommissioning the Hunt Non-Turnkey Properties. A schedule of the Hunt Non-Turnkey Properties is attached hereto as **Exhibit A**.

The Debtors' rights, title, and interests in certain other oil and gas assets (collectively, the "**Hunt Abandoned Properties**") will be abandoned as set forth in the Plan. A schedule of the Hunt Abandoned Properties is attached hereto as **Exhibit B**.

**Withdrawal of Objections, Support of the Plan and Hunt's Unsecured Claim**

In conjunction with the execution of this Term Sheet or promptly thereafter, Fieldwood and Hunt will enter into a mutually agreed stipulation and order that will provide that Hunt will (i) withdraw any pending objections it has filed to the Plan; (ii) not file any further objections to the Plan; (iii) support confirmation of the Plan; and (iv) not support any party in objecting to or opposing the Plan.

In conjunction with the execution of this Term Sheet or promptly thereafter, Fieldwood agrees to allow, support and approve the filing by Hunt of an unsecured claim in the bankruptcy equal to $22,770,453.59 for the net BSEE estimated (P90) decommissioning and site clearance costs for the Hunt Abandoned Properties and RUEs and ROWs to be abandoned by Debtors as set forth in the Plan.

**Turnkey Removal Agreement**

---

[1] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Plan.

1. ***Turnkey Amount***. Subject to Bankruptcy Court approval (if required), Hunt and Fieldwood Energy LLC ("**Fieldwood**") will enter into a Turnkey Removal Agreement acceptable to Hunt, Fieldwood, the Required DIP Lenders (as defined in the Plan), and the Requisite FLTL Lenders (as defined in the Plan) whereby Fieldwood will decommission the Hunt Turnkey Property on a turnkey payment basis and Fieldwood will earn a single pre-agreed payment (the "**Turnkey Amount**") in exchange for decommissioning the Hunt Turnkey Property.  The Turnkey Amount will be $5.4 million.  Fieldwood will take commercially reasonable efforts to perform all decommissioning work for the Hunt Turnkey Property on or before June 30, 2021.  Subject to certain exceptions,[2] Fieldwood will have an opportunity to realize a profit if it is able to decommission the Hunt Turnkey Property for a lower cost than the Turnkey Amount, and Fieldwood will bear the risk that the cost of decommissioning the Hunt Turnkey Property exceeds the sum of the Turnkey Amount.

2. ***Parties to the Turnkey Removal Agreement***. On the Effective Date of the Plan, (i) FWE III will be allocated and vested with all of Fieldwood's rights, interests, and obligations under the Turnkey Removal Agreement pursuant to the Divisive Merger and (ii) Credit Bid Purchaser will become a party to the Turnkey Removal Agreement and will perform any remaining decommissioning activities on the Hunt Turnkey Property pursuant to the terms of the Turnkey Removal Agreement.

3. ***Mutual Indemnity***. Credit Bid Purchaser and Hunt shall indemnify one another for a material breach of their respective obligations under the Turnkey Removal Agreement; provided, however, the indemnity obligations set forth herein shall not include lost profit opportunity, indirect damages, consequential damages, third party claims, fines or penalties (except to the extent directly resulting from a material breach by the other party), attorney's fees, or any other third party costs.

4. ***Excluded Wells***. Notwithstanding anything herein to the contrary, the Turnkey Amount shall not include any decommissioning obligations that relate to any wells located on the Hunt Turnkey Property that were plugged and abandoned or temporarily plugged and abandoned prior to the entry into the Turnkey Removal Agreement (the "**Excluded Wells**"), and Hunt will be solely responsible for any such obligations related to the Excluded Wells.[3] Fieldwood/FWE III, Credit Bid Purchaser and Hunt, as applicable, will determine the list of Excluded Wells.

5. ***Surety Bonds***.  Hunt may apply any available proceeds from bonds that cover the decommissioning costs associated with the Hunt Turnkey Property to the Turnkey Amount.  Hunt will bear all costs and risks associated with such bonds, and notwithstanding its failure to recover all or any bond proceeds, Hunt will pay the Turnkey Amount, as it may be adjusted.

6. ***Payments***.  Hunt will pay Fieldwood or Credit Bid Purchaser, as applicable, the full agreed

---

[2] This agreement will include exceptions that will cause the parties to increase the Turnkey Amount limited to (i) changes to the conditions of the properties to be decommissioned outside of Fieldwood's, FWE III's and/or Credit Bid Purchaser's reasonable control, including extraordinary events, such as hurricanes; and (ii) material changes in government regulations that can reasonably be expected to materially increase the applicable cost of decommissioning a particular project.

[3] The Debtors are not currently aware of any liabilities, including any downhole well work, associated with the Excluded Wells.

Turnkey Amount, as it may be adjusted, upon delivery to Hunt of the filings and other evidence required by BOEM and/or BSEE or any other applicable governmental authority, including requisite approvals or regulatory concurrence, with regard to the satisfaction of decommissioning obligations with respect to the Hunt Turnkey Property; including the following filings, to the extent applicable:

a)   Certified platform post-removal report that complies with the requirements of 30 C.F.R. 250.1729, and

b)   Certified site clearance report that complies with the requirements of 30 C.F.R. 250.1743(b).

**Implementation and Funding Agreement**

1.   *Funding Contribution*.   Subject to Bankruptcy Court approval (if necessary), Hunt and Fieldwood will enter into an Implementation and Funding Agreement (unless otherwise included in the Turnkey Removal Agreement) acceptable to Hunt, Fieldwood, the Required DIP Lenders (as defined in the Plan), and the Requisite FLTL Lenders (as defined in the Plan) whereby the Debtors will contribute on the Effective Date $375,000 to FWE III (the "**Contribution Amount**"), which amount will be used in connection with the Hunt Turnkey Property. The Contribution Amount shall be reduced by any amount spent on safety related repairs and improvements ("**Agreed Activities**") performed on the Hunt Turnkey Property. Any Contribution Amount remaining after reduction for amounts spent on the Agreed Activities (the "**Remaining Balance**") will be paid by FWE III to Hunt; provided that if the Turnkey Amount becomes due prior to the Effective Date, the Turnkey Amount shall be reduced by the Remaining Balance and the Debtors will not contribute any Contribution Amount to FWE III.

2.   *Operating Costs*.   The Implementation and Funding Agreement shall also provide that, from and after the Effective Date, Credit Bid Purchaser will manage on behalf of FWE III the Hunt Turnkey Property and the Hunt Non-Turnkey Properties, except for the Excluded Wells, until the completion of the decommissioning pursuant to a mutually acceptable contract operator agreement between FWE III and Credit Bid Purchaser. Hunt shall be responsible for any operating costs associated with the Excluded Wells, but shall not be responsible for any operating costs associated with the rest of the Hunt Turnkey Property or the Hunt Non-Turnkey Properties.

**State Leases**

Fieldwood and Hunt will endeavor in good faith to mutually agree on the responsibility for Debtors' rights, title and interests acquired from Hunt in any oil and gas leases granted by the State of Louisiana.

**Exhibit A**
**Hunt Non-Turnkey Properties**

| Area / Block | Lease Number |
|---|---|
| SM 39 | G16320 |
| ST 242 | G23933 |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |

[End of Exhibit A]

**Exhibit B**
**Hunt Abandoned Properties**

| Area / Block | Lease Number |
|---|---|
| SP 37 | 00697 |
| SM 268 | G02310 |
| SS 216 | G01524 |
| SS 204 | G01520 |
| SM 269 | G02311 |
| SM 281 | G02600 |
| EC 349 | G14385 |
| EC 350 | G15157 |
| EC 356 | G13592 |
| HI A-531 | G02696 |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |

[End of Exhibit B]

**<u>Exhibit O</u>**

**Oil and Gas Lease Schedules**

**Exhibit O1**

**Leases, Rights of Way and Rights of Use and Easement Related to Purchased Oil & Gas Lease Interests**

# Purchased Oil & Gas Lease Interests*

| Block | Lease | Type | Rights | Date Le Eff | Le Cur Acres (Ac) | Operator | WI | Lease Status | Note† |
|-------|-------|------|--------|-------------|-------------------|----------|-----|--------------|-------|
| BS 25 | G31442 | Federal | RT | 2/1/2008 | 2,079 | Tana Exp | 25% | UNIT | |
| BS 25 | SL19718 | SL-LA | WI | 7/9/2008 | 154 | Tana Exp | 25% | Active | |
| BS 45 | SL15683 | SL-LA | WI A | 4/14/1997 | – | Southern Oil of Louisiana | 38% | UNIT | [2] |
| BS 52 | SL17675 | SL-LA | WI A | 12/16/2002 | – | Southern Oil of Louisiana | 38% | UNIT | [3] |
| BS 52 | SL17860 | SL-LA | WI | 8/18/2003 | – | Southern Oil of Louisiana | 15% | UNIT | |
| EC 345 | G15156 | Federal | ORRI | 8/1/1995 | 2,500 | Talos ERT | 1% | PROD (production ceased 4/28/20) | |
| EW 1009 | G34878 | Federal | RT | 8/1/2013 | 5,760 | Fieldwood En | 50% | UNIT | |

---

* The Debtors and the Consenting FLTL Lenders reserve the right to amend, modify, or supplement this schedule subject to any consent rights under the Restructuring Support Agreement.

[1] Represents leases in which the Credit Bid Purchaser is to acquire all of the Debtors' right, title and interest in such lease (less and except the right, title and interest acquired by FWE from Apache and/or held by GOM Shelf); as to all remaining leases on this schedule (except those referenced in footnotes [5]-[7] below), the Credit Bid Purchaser is to obtain all of the Debtors' right, title and interest in such leases.

[2] This lease has different ownership in 4 different portions, and a Seller (Fieldwood Offshore) has a working interest (37.5%) in only one of these 4 portions.

[3] This lease has different ownership in 3 different portions, and a Seller (Fieldwood Offshore) has a working interest (37.5%) in only one of these 3 portions.

[4] Fieldwood Energy Offshore has two ORRIs: a 1.225% ORRI from assignment filed with BOEM 2/09/2015 and another 3.43% (or 49% of 7%) ORRI that is granted each year.  However, as to the SS 005 ST01 well, its combined ORRI is only 3.92% until 5.8 million barrels of oil equivalent from this well.

[5] The Credit Bid Purchaser to acquire record title solely as to the W/2 and SE/4 of the block. The record title and the Debtors' operating rights solely as to the NE/4 of the block are to be abandoned.

[6] FWE I is to acquire solely the operating rights as to the NE/4 of this block; the Credit Bid Purchaser is to obtain the Debtors' overriding royalty interest in this lease; and the Debtors' remaining interests in this lease are to be abandoned.

[7] Represents leases where the Credit Bid Purchaser is to acquire solely the Debtors' overriding royalty interests; the Debtors' remaining interests in these leases are to be abandoned.

**Legend**:  OP 1- Operating Rights 1; OP 2 - Operating Rights 2; OP 3 - Operating Rights 3; OP 4 - Operating Rights 4; OP 5 - Operating Rights 5; OP 6 - Operating Rights 6; ORRI - Overriding Royalty Interest; RT A - Record Title A; RT B - Record Title B; WI - Working Interest; WI A - Working Interest A

| Block | Lease | Type | Rights | Date Le Eff | Le Cur Acres (Ac) | Operator | WI | Lease Status | Note[†] |
|---|---|---|---|---|---|---|---|---|---|
| EW 1010 | G34879 | Federal | RT | 8/1/2013 | 5,760 | Fieldwood En | 50% | UNIT | |
| EW 1011 | G34880 | Federal | RT | 8/1/2013 | 1,500 | Fieldwood En | 50% | UNIT | |
| EW 789 | G35805 | Federal | ORRI | 7/1/2016 | 5,760 | Walter O&G | 1% | UNIT | |
| EW 790 | G33140 | Federal | OP 1 | 7/1/2009 | 5,753 | Fieldwood En | 100% | UNIT | |
| EW 790 | G33140 | Federal | OP 2 | 7/1/2009 | 5,753 | Fieldwood En | 100% | UNIT | |
| EW 790 | G33140 | Federal | ORRI | 7/1/2009 | 5,753 | Walter O&G | 1% | UNIT | |
| EW 790 | G33140 | Federal | ORRI | 7/1/2009 | 5,753 | Walter O&G | 1% | UNIT | |
| EW 828 | G35806 | Federal | RT | 6/1/2016 | 3,731 | Fieldwood En Off | 100% | PRIMARY | |
| EW 834 | G27982 | Federal | ORRI | 7/1/2006 | 5,760 | Walter O&G | 1% | UNIT | |
| EW 835 | G33707 | Federal | ORRI | 5/1/2010 | 364 | Walter O&G | 1% | UNIT | |
| GC 039 B | G36476 | Federal | RT | 9/1/2013 | 450 | Fieldwood En | 50% | PRIMARY | |
| GC 040 | G34536 | Federal | RT | 11/1/2012 | 5,760 | Fieldwood En | 50% | UNIT | |
| GC 041 | G34537 | Federal | RT | 10/1/2012 | 1,783 | Fieldwood En | 50% | UNIT | |
| GC 064 | G34539 | Federal | RT | 8/1/2012 | 5,760 | Fieldwood En Off | 49% | PROD | |
| GC 065 | G05889 | Federal | OP | 7/1/1983 | 5,760 | Fieldwood En Off | 49% | UNIT | |
| GC 108 | G14668 | Federal | OP | 7/1/1994 | 5,760 | Fieldwood En Off | 49% | UNIT | |
| GC 109 | G05900 | Federal | OP | 7/1/1983 | 5,760 | Fieldwood En Off | 49% | UNIT | |
| GC 153 | G36814 | Federal | RT | 11/1/2019 | 5,760 | Fieldwood En | 100% | PRIMARY | |
| GC 198 | G36021 | Federal | RT | 6/1/2017 | 5,760 | Fieldwood En Off | 100% | PRIMARY | |
| GC 200 | G12209 | Federal | OP | 5/1/1990 | 5,760 | Fieldwood En Off | 53% | UNIT | |
| GC 200 | G12209 | Federal | RT | 5/1/1990 | 5,760 | Fieldwood En Off | 100% | UNIT | |
| GC 201 | G12210 | Federal | ORRI | 5/1/1990 | 5,760 | LLOG Exp Off | 5% | UNIT | |
| GC 201 | G12210 | Federal | RT | 5/1/1990 | 5,760 | Fieldwood En Off | 100% | UNIT | [5] |
| GC 238 | G26302 | Federal | ORRI | 7/1/2004 | 5,760 | Talos ERT | 3% | PROD | |
| GC 238 | G26302 | Federal | OP | 7/1/2004 | 5,760 | BHP Billiton Pet GOM | 40% | PROD | |

| Block | Lease | Type | Rights | Date Le Eff | Le Cur Acres (Ac) | Operator | WI | Lease Status | Note[†] |
|---|---|---|---|---|---|---|---|---|---|
| GC 243 | G20051 | Federal | ORRI | 7/1/1998 | 5,760 | Walter O&G | 5% | PROD | [4] |
| GC 244 | G11043 | Federal | RT | 5/1/1989 | 5,760 | Fieldwood En Offshore | 100% | UNIT | |
| GC 282 | G16727 | Federal | OP | 9/1/1996 | 5,760 | BHP Billiton Pet GOM | 25% | PROD | |
| GC 282 | G16727 | Federal | ORRI | 9/1/1996 | 5,760 | Talos ERT | 2% | PROD | |
| GC 39 A | G34966 | Federal | RT | 9/1/2013 | 540 | Fieldwood En | 50% | UNIT | |
| GC 39 A | G34966 | Federal | OP | 9/1/2013 | 540 | Fieldwood En | 50% | UNIT | |
| GC 679 | G21811 | Federal | OP 2 | 7/1/2000 | 5,760 | Fieldwood En | 43% | PROD | |
| GC 679 | G21811 | Federal | RT | 7/1/2000 | 5,760 | Fieldwood En | 38% | PROD | |
| GC 768 | G21817 | Federal | OP 1 | 6/1/2000 | 5,760 | Anadarko Pet | 50% | PROD | |
| GC 768 | G21817 | Federal | OP 2 | 6/1/2000 | 5,760 | Fieldwood En | 43% | PROD | |
| GC 768 | G21817 | Federal | RT | 6/1/2000 | 5,760 | Fieldwood En | 100% | PROD | |
| GI 110 | G13943 | Federal | RT | 8/1/1993 | 5,000 | Fieldwood En | 50% | UNIT | [1] |
| GI 116 | G13944 | Federal | RT | 7/1/1993 | 5,000 | Fieldwood En | 50% | UNIT | [1] |
| GI 116 | G13944 | Federal | OP | 7/1/1993 | 5,000 | Fieldwood En | 50% | UNIT | [1] |
| S/2 GI 32 | 00174 | Federal | RT | 7/17/1948 | 2,500 | GOM Shelf | 25% | UNIT | [1] |
| S/2 GI 32 | 00174 | Federal | OP 1 | 7/17/1948 | 2,500 | BP E&P | 25% | UNIT | [1] |
| S/2 GI 32 | 00174 | Federal | OP 2 | 7/17/1948 | 2,500 | GOM Shelf | 25% | UNIT | [1] |
| E/2 GI 39 | 00126 | Federal | RT | 4/21/1947 | 2,500 | GOM Shelf | 25% | UNIT | [1] |
| E/2 GI 39 | 00126 | Federal | OP 1 | 4/21/1947 | 2,500 | BP E&P | 25% | UNIT | [1] |
| E/2 GI 39 | 00126 | Federal | OP 2 | 4/21/1947 | 2,500 | GOM Shelf | 25% | UNIT | [1] |
| W/2 GI 39 | 00127 | Federal | RT | 4/21/1947 | 2,500 | GOM Shelf | 25% | UNIT | [1] |
| W/2 GI 39 | 00127 | Federal | OP 1 | 4/21/1947 | 2,500 | BP E&P | 25% | UNIT | [1] |
| W/2 GI 39 | 00127 | Federal | OP 2 | 4/21/1947 | 2,500 | GOM Shelf | 25% | UNIT | [1] |
| E/2 GI 40 | 00128 | Federal | RT | 4/21/1947 | 5,000 | GOM Shelf | 25% | UNIT | [1] |
| GI 40 | 00128 | Federal | OP 1 | 4/21/1947 | 5,000 | BP E&P | 25% | UNIT | [1] |
| GI 40 | 00128 | Federal | OP 2 | 4/21/1947 | 5,000 | GOM Shelf | 25% | UNIT | [1] |
| E/2 GI 41 | 00129 | Federal | RT | 4/21/1947 | 2,500 | GOM Shelf | 25% | UNIT | [1] |
| E/2 GI 41 | 00129 | Federal | OP 1 | 4/21/1947 | 2,500 | BP E&P | 25% | UNIT | [1] |
| E/2 GI 41 | 00129 | Federal | OP 2 | 4/21/1947 | 2,500 | GOM Shelf | 25% | UNIT | [1] |

| Block | Lease | Type | Rights | Date Le Eff | Le Cur Acres (Ac) | Operator | WI | Lease Status | Note[†] |
|---|---|---|---|---|---|---|---|---|---|
| W/2 GI 41 | 00130 | Federal | OP 1 | 4/21/1947 | 2,500 | BP E&P | 25% | UNIT | [1] |
| W/2 GI 41 | 00130 | Federal | OP 2 | 4/21/1947 | 2,500 | GOM Shelf | 25% | UNIT | [1] |
| W/2 GI 41 | 00130 | Federal | RT | 4/21/1947 | 2,500 | GOM Shelf | 25% | UNIT | [1] |
| GI 42 | 00131 | Federal | RT | 4/21/1947 | 5,000 | GOM Shelf | 25% | UNIT | [1] |
| GI 42 | 00131 | Federal | OP 1 | 4/21/1947 | 5,000 | BP E&P | 25% | UNIT | [1] |
| GI 42 | 00131 | Federal | OP 2 | 4/21/1947 | 5,000 | GOM Shelf | 25% | UNIT | [1] |
| GI 43 | 00175 | Federal | RT | 7/17/1948 | 5,000 | GOM Shelf | 25% | UNIT | [1] |
| GI 43 | 00175 | Federal | OP 1 | 7/17/1948 | 5,000 | BP E&P | 25% | UNIT | [1] |
| GI 43 | 00175 | Federal | OP 2 | 7/17/1948 | 5,000 | GOM Shelf | 25% | UNIT | [1] |
| N/2 GI 44 | 00176 | Federal | RT | 7/17/1948 | 2,500 | GOM Shelf | 25% | UNIT | [1] |
| N/2 GI 44 | 00176 | Federal | OP 1 | 7/17/1948 | 2,500 | BP E&P | 25% | UNIT | [1] |
| N/2 GI 44 | 00176 | Federal | OP 2 | 7/17/1948 | 2,500 | GOM Shelf | 25% | UNIT | [1] |
| GI 46 | 00132 | Federal | RT | 4/21/1947 | 5,000 | GOM Shelf | 25% | UNIT | [1] |
| GI 46 | 00132 | Federal | OP 1 | 4/21/1947 | 5,000 | BP E&P | 25% | UNIT | [1] |
| GI 46 | 00132 | Federal | OP 2 | 4/21/1947 | 5,000 | GOM Shelf | 25% | UNIT | [1] |
| GI 47 | 00133 | Federal | RT | 4/21/1947 | 5,000 | GOM Shelf | 25% | UNIT | [1] |
| GI 47 | 00133 | Federal | OP 1 | 4/21/1947 | 5,000 | BP E&P | 25% | UNIT | [1] |
| GI 47 | 00133 | Federal | OP 2 | 4/21/1947 | 5,000 | GOM Shelf | 25% | UNIT | [1] |
| GI 48 | 00134 | Federal | RT | 4/21/1947 | 5,000 | GOM Shelf | 25% | UNIT | [1] |
| GI 48 | 00134 | Federal | OP 1 | 4/21/1947 | 5,000 | BP E&P | 25% | UNIT | [1] |
| GI 48 | 00134 | Federal | OP 2 | 4/21/1947 | 5,000 | GOM Shelf | 25% | UNIT | [1] |
| N/2 GI 52 | 00177 | Federal | RT | 7/17/1948 | 2,500 | GOM Shelf | 25% | UNIT | [1] |
| N/2 GI 52 | 00177 | Federal | OP 2 | 7/17/1948 | 2,500 | BP E&P | 25% | UNIT | [1] |
| HI 176 | G27509 | Federal | ORRI | 1/1/2006 | 5,760 | Castex Off | 3% | PROD | |
| MC 110 | G18192 | Federal | RT | 8/1/1997 | 5,760 | Talos | 8% | PROD | [1] |
| MC 110 | G18192 | Federal | OP | 8/1/1997 | 5,760 | Talos | 8% | PROD | [1] |
| MC 118 | G35963 | Federal | RT | 8/1/2017 | 5,760 | Chevron USA | 5% | PRIMARY | |
| MC 119 | G36537 | Federal | RT | 7/1/2019 | 5,760 | Chevron USA | 5% | PRIMARY | |
| MC 162 | G36880 | Federal | RT | 8/1/2020 | 5,760 | Chevron USA | 5% | PRIMARY | |
| MC 163 | G36538 | Federal | RT | 7/1/2019 | 5,760 | Chevron USA | 5% | PRIMARY | |
| MC 171 | G34428 | Federal | RT | 12/1/2012 | 5,760 | Fieldwood En | 100% | PRIMARY | |

4

| Block | Lease | Type | Rights | Date Le Eff | Le Cur Acres (Ac) | Operator | WI | Lease Status | Note† |
|---|---|---|---|---|---|---|---|---|---|
| MC 172 | G34429 | Federal | RT | 12/1/2012 | 5,760 | Fieldwood En | 100% | PRIMARY | |
| MC 206 | G36540 | Federal | RT | 7/1/2019 | 5,760 | Chevron USA | 5% | PRIMARY | |
| MC 297 | G34434 | Federal | RT | 11/1/2012 | 5,760 | Fieldwood En | 70% | PRIMARY | |
| MC 380 | G36544 | Federal | RT | 7/1/2019 | 5,760 | Fieldwood En | 100% | PRIMARY | |
| MC 424 | G36545 | Federal | RT | 7/1/2019 | 5,760 | Fieldwood En | 100% | PRIMARY | |
| MC 435 | G36772 | Federal | RT | 11/1/2019 | 5,760 | Fieldwood En | 100% | PRIMARY | |
| MC 436 | G36773 | Federal | RT | 11/1/2019 | 5,760 | Fieldwood En | 100% | PRIMARY | |
| MC 474 | G35825 | Federal | RT | 7/1/2016 | 5,760 | BP E&P | 24% | PRIMARY | |
| MC 474 | G35825 | Federal | OP | 7/1/2016 | 5,760 | BP E&P | 13% | PRIMARY | |
| MC 518 | G35828 | Federal | RT | 7/1/2016 | 5,760 | BP E&P | 24% | PRIMARY | |
| MC 519 | G27278 | Federal | RT | 7/1/2005 | 5,760 | BP E&P | 65% | PROD | |
| MC 519 | G27278 | Federal | OP 2 | 7/1/2005 | 5,760 | Fieldwood En | 49% | PROD | |
| MC 519 | G27278 | Federal | OP 3 | 7/1/2005 | 5,760 | Fieldwood En | 49% | PROD | |
| MC 519 | G27278 | Federal | OP 4 | 7/1/2005 | 5,760 | BP E&P | 26% | PROD | |
| MC 519 | G27278 | Federal | OP 5 | 7/1/2005 | 5,760 | BP E&P | 26% | PROD | |
| MC 519 | G27278 | Federal | OP 6 | 7/1/2005 | 5,760 | BP E&P | 26% | PROD | |
| MC 562 | G19966 | Federal | RT | 7/1/1998 | 5,760 | BP E&P | 13% | PROD | |
| MC 563 | G21176 | Federal | OP 2 | 7/1/1999 | 5,760 | Fieldwood En | 23% | PROD | |
| MC 563 | G21176 | Federal | ORRI | 3/17/1999 | 5,760 | Kosmos En GOM Op | 0% | PROD | |
| MC 691 | G36400 | Federal | RT | 12/1/2018 | 5,760 | Fieldwood En | 50% | PRIMARY | |
| MC 697 | G28021 | Federal | RT | 4/1/2006 | 540 | Fieldwood En | 54% | UNIT | |
| MC 698 | G28022 | Federal | RT | 7/1/2006 | 5,760 | Fieldwood En | 54% | UNIT | |
| MC 742 | G32343 | Federal | RT B | 9/1/2008 | 1,440 | Fieldwood En | 54% | UNIT | |
| MC 742 | G32343 | Federal | RT A | 9/1/2008 | 4,320 | Fieldwood En | 100% | UNIT | |
| MC 743 | G36401 | Federal | RT | 11/1/2018 | 5,760 | Chevron USA | 25% | PRIMARY | |
| MC 782 | G33757 | Federal | RT | 7/1/2010 | 5,760 | Fieldwood En | 45% | PROD | |
| MC 789 | G36557 | Federal | RT | 7/1/2019 | 5,760 | Fieldwood En | 100% | PRIMARY | |
| MC 793 | G33177 | Federal | ORRI | 7/1/2009 | 5,760 | Walter O&G | 1% | UNIT | |
| MC 904 | G36566 | Federal | RT | 7/1/2019 | 5,760 | Fieldwood En | 59% | PRIMARY | |
| MC 905 | G36405 | Federal | RT | 11/1/2018 | 5,760 | Fieldwood En | 59% | PRIMARY | |
| MC 948 | G28030 | Federal | RT | 7/1/2006 | 5,760 | Fieldwood En | 59% | UNIT | |
| MC 949 | G32363 | Federal | RT | 7/1/2008 | 5,760 | Fieldwood En | 59% | UNIT | |
| MC 992 | G24133 | Federal | RT A | 7/1/2002 | 5,760 | Fieldwood En | 53% | UNIT | |

| Block | Lease | Type | Rights | Date Le Eff | Le Cur Acres (Ac) | Operator | WI | Lease Status | Note[†] |
|-------|-------|------|--------|-------------|-------------------|----------|-----|--------------|---------|
| MC 992 | G24133 | Federal | RT B | 7/1/2002 | 5,760 | Fieldwood En | 59% | UNIT | |
| MC 993 | G24134 | Federal | RT A | 7/1/2002 | 5,760 | Fieldwood En | 45% | UNIT | |
| MC 993 | G24134 | Federal | RT B | 7/1/2002 | 5,760 | Fieldwood En | 59% | UNIT | |
| MP 316 | G36231 | Federal | RT | 7/1/2018 | 5,000 | Fieldwood En Off | 50% | PRIMARY | |
| SM 149 | G02592 | Federal | RT | 5/1/1974 | 2,500 | Fieldwood En | 50% | PROD | [1] |
| SM 149 | G02592 | Federal | OP | 5/1/1974 | 2,500 | Fieldwood En | 50% | PROD | [1] |
| SM 149 | G02592 | Federal | ORRI | 5/1/1974 | 2,500 | Fieldwood En | 4% | PROD | [1] |
| SM 40 | G13607 | Federal | RT | 8/1/1992 | 5,000 | Fieldwood En Off | 100% | TERMIN | |
| SM 41 | G01192 | Federal | OP 1 | 6/1/1962 | 5,000 | Fieldwood En Off | 100% | PROD | [1] |
| SM 48 | 00786 | Federal | ORRI | 2/24/1960 | 5,000 | Fieldwood En | 3% | PROD (production ceased 8/16/20) | [1] |
| SP 61 | G01609 | Federal | ORRI | 7/1/1967 | 5,000 | Fieldwood En | 19% | UNIT | [6] |
| SS 301 | G10794 | Federal | RT | 5/1/1989 | 5,000 | Fieldwood En Off | 65% | SOP extension request pending | [1] |
| SS 301 | G10794 | Federal | OP 1 | 5/1/1989 | 5,000 | Fieldwood En Off | 100% | SOP extension request pending | [1] |
| SS 313 | G36362 | Federal | RT | 11/01/2018 | 5,000 | Fieldwood En | 100% | PRIMARY | |
| SS 358 | G36122 | Federal | RT | 11/01/2017 | 5,000 | Fieldwood En Off | 100% | PRIMARY | |
| SS 79 | G15277 | Federal | RT | 8/1/1995 | 5,000 | Fieldwood En Off | 33% | PROD | |
| SS 79 | G15277 | Federal | OP 1 | 8/1/1995 | 5,000 | Fieldwood En Off | 51% | PROD | |
| ST 287 | G24987 | Federal | RT | 5/1/2003 | 5,000 | Fieldwood En | 100% | PROD | |
| ST 287 | G24987 | Federal | OP 1 | 5/1/2003 | 5,000 | Fieldwood En | 100% | PROD | |
| ST 287 | G24987 | Federal | OP 2 | 5/1/2003 | 5,000 | Fieldwood En | 50% | PROD | |

6

| Block | Lease | Type | Rights | Date Le Eff | Le Cur Acres (Ac) | Operator | WI | Lease Status | Note[†] |
|---|---|---|---|---|---|---|---|---|---|
| ST 308 | G21685 | Federal | RT | 6/1/2000 | 5,000 | Fieldwood En | 100% | PROD | |
| ST 308 | G21685 | Federal | OP 1 | 6/1/2000 | 5,000 | Fieldwood En | 100% | PROD | |
| ST 308 | G21685 | Federal | OP 2 | 6/1/2000 | 5,000 | Fieldwood En | 50% | PROD | |
| ST 53 | G04000 | Federal | RT | 3/1/1979 | 5,000 | Fieldwood En | 50% | PROD | [1] |
| ST 53 | G04000 | Federal | OP 1 | 3/1/1979 | 5,000 | Fieldwood En | 50% | PROD | [1] |
| ST 53 | G04000 | Federal | OP 2 | 3/1/1979 | 5,000 | Fieldwood En | 50% | PROD | [1] |
| ST 67 | 00020 | Federal | CONT | 4/25/1947 | 5,000 | Fieldwood En | 20% | UNIT | [1] |
| VR 229 | G27070 | Federal | RT A | 5/1/2005 | 1,250 | Fieldwood En Off | 50% | PROD | |
| VR 229 | G27070 | Federal | RT B | 5/1/2005 | 3,750 | Fieldwood En Off | 50% | PROD | |
| VR 362 | G10687 | Federal | RT | 6/1/1989 | 5,000 | Fieldwood En Off | 100% | UNIT (production ceased 8/22/20) | |
| VR 362 | G10687 | Federal | OP | 6/1/1989 | 5,000 | Fieldwood En Off | 83% | UNIT (production ceased 8/22/20) | |
| VR 363 | G09522 | Federal | RT | 5/1/1988 | 5,000 | Fieldwood En | 100% | UNIT (production ceased 8/22/20) | |
| VR 363 | G09522 | Federal | OP 1 | 5/1/1988 | 5,000 | Fieldwood En Off | 100% | UNIT (production ceased 8/22/20) | |
| VR 363 | G09522 | Federal | OP 2 | 5/1/1988 | 5,000 | Fieldwood En | 100% | UNIT (production ceased 8/22/20) | |
| VR 363 | G09522 | Federal | OP 3 | 5/1/1988 | 5,000 | Fieldwood En | 50% | UNIT (production ceased 8/22/20) | |

| Block | Lease | Type | Rights | Date Le Eff | Le Cur Acres (Ac) | Operator | WI | Lease Status | Note[†] |
|---|---|---|---|---|---|---|---|---|---|
| VR 371 | G09524 | Federal | RT | 7/1/1988 | 5,000 | Fieldwood En Off | 100% | PROD | |
| VR 371 | G09524 | Federal | OP | 7/1/1988 | 5,000 | Fieldwood En Off | 83% | PROD | |
| VR 78 | G04421 | Federal | RT | 11/1/1980 | 5,000 | Fieldwood En | 100% | PROD | |
| VR 78 | G04421 | Federal | OP | 11/1/1980 | 5,000 | Fieldwood En | 81% | PROD | |
| WD 57, WD 79, WD 80 | G01449 | Federal | ORRI | 5/1/1966 | 3,125 | Fieldwood En Off | 3% | UNIT | [7] |
| S/2 WD 67 | 00179 | Federal | RT | 7/17/1948 | 2,500 | GOM Shelf | 25% | UNIT | [1] |
| S/2 WD 67 | 00179 | Federal | OP 1 | 7/17/1948 | 2,500 | BP E&P | 25% | UNIT | [1] |
| S/2 WD 67 | 00179 | Federal | OP 2 | 7/17/1948 | 2,500 | GOM Shelf | 25% | UNIT | [1] |
| S/2 WD 68 | 00180 | Federal | RT | 7/17/1948 | 1,833 | GOM Shelf | 25% | UNIT | [1] |
| S/2 WD 68 | 00180 | Federal | OP 1 | 7/17/1948 | 1,833 | BP E&P | 25% | UNIT | [1] |
| S/2 WD 68 | 00180 | Federal | OP 2 | 7/17/1948 | 1,833 | GOM Shelf | 25% | UNIT | [1] |
| WD 69 | 00181 | Federal | RT | 7/17/1948 | 3,665 | GOM Shelf | 25% | UNIT | [1] |
| WD 69 | 00181 | Federal | OP 1 | 7/17/1948 | 3,665 | BP E&P | 25% | UNIT | [1] |
| WD 69 | 00181 | Federal | OP 2 | 7/17/1948 | 3,665 | GOM Shelf | 25% | UNIT | [1] |
| WD 70 | 00182 | Federal | RT | 7/17/1948 | 5,000 | GOM Shelf | 25% | UNIT | [1] |
| WD 70 | 00182 | Federal | OP 1 | 7/17/1948 | 5,000 | BP E&P | 25% | UNIT | [1] |
| WD 70 | 00182 | Federal | OP 2 | 7/17/1948 | 5,000 | GOM Shelf | 25% | UNIT | [1] |
| WD 71 | 00838 | Federal | RT | 4/1/1960 | 5,000 | GOM Shelf | 25% | UNIT | [1] |
| WD 71 | 00838 | Federal | OP 1 | 4/1/1960 | 5,000 | BP E&P | 25% | UNIT | [1] |
| WD 71 | 00838 | Federal | OP 2 | 4/1/1960 | 5,000 | GOM Shelf | 25% | UNIT | [1] |
| WD 79, WD 80 | G01874 | Federal | ORRI | 12/1/1968 | 3,438 | Fieldwood En Off | 3% | UNIT | [7] |
| WD 80 | G01989 | Federal | ORRI | 8/1/1970 | 1,875 | Fieldwood En Off | 3% | UNIT | [7] |

| Block | Lease | Type | Rights | Date Le Eff | Le Cur Acres (Ac) | Operator | WI | Lease Status | Note[†] |
|---|---|---|---|---|---|---|---|---|---|
| WD 80 | G02136 | Federal | ORRI | 1/1/1972 | 938 | Fieldwood En Off | 3% | UNIT | [7] |
| WD 94 | 00839 | Federal | RT | 5/1/1960 | 5,000 | GOM Shelf | 25% | PROD | [1] |
| WD 94 | 00839 | Federal | OP 1 | 5/1/1960 | 5,000 | GOM Shelf | 25% | PROD | [1] |
| WD 95 | G01497 | Federal | RT | 12/1/1966 | 5,000 | GOM Shelf | 25% | PROD | [1] |
| WD 95 | G01497 | Federal | OP 1 | 12/1/1966 | 5,000 | GOM Shelf | 25% | PROD | [1] |
| WD 95 | G01497 | Federal | OP 2 | 12/1/1966 | 5,000 | GOM Shelf | 25% | PROD | [1] |
| WD 96 | G01498 | Federal | RT | 12/1/1966 | 3,665 | GOM Shelf | 25% | PROD | [1] |
| WD 96 | G01498 | Federal | OP 1 | 12/1/1966 | 3,665 | BP E&P | 25% | PROD | [1] |
| WD 96 | G01498 | Federal | OP 2 | 12/1/1966 | 3,665 | GOM Shelf | 25% | PROD | [1] |
| - | 5749 | SL-TX | WI | - | - | Fieldwood SD Offshore | 100% | UNIT | |
| - | 5797 | SL-TX | WI | - | - | Fieldwood SD Offshore | 100% | TERMIN | |
| - | 23017 | SL-MS | ORRI | | | Tellus Operating Group LLC | 1% | UNIT | |
| - | 24318 | SL-TX | WI | - | - | Fieldwood Onshore | 100% | TERMINATE D | |
| - | 106158 | SL-TX | WI | - | - | Fieldwood Energy Offshore LLC | 100% | TERMIN | |
| - | 106159 | SL-TX | WI | - | - | Fieldwood Energy Offshore LLC | 100% | TERMIN | |
| - | 114921 | SL-TX | WI | - | - | Fieldwood Energy Offshore LLC | 100% | TERMIN | |
| - | 170650 | SL-MS | ORRI | | | Whiting Oil & Gas | 1% | UNIT | |
| - | 172915 | SL-TX | WI | - | - | Fieldwood SD Offshore | 100% | ACTIVE | |
| - | 172916 | SL-TX | WI | - | - | Fieldwood SD Offshore | 100% | ACTIVE | |

| Block | Lease | Type | Rights | Date Le Eff | Le Cur Acres (Ac) | Operator | WI | Lease Status | Note[†] |
|---|---|---|---|---|---|---|---|---|---|
| - | 178537 | SL-TX | WI | - | - | Fieldwood | 100% | TERMINATED | |
| - | 183756 | SL-TX | WI | - | - | Fieldwood | 100% | TERMINATED | |
| - | 185633 | SL-TX | WI | - | - | Fieldwood Onshore | 100% | TERMINATED | |
| - | 186891 | SL-TX | WI | - | - | Fieldwood Onshore | 100% | ACTIVE | |
| - | 191681 | SL-TX | WI | - | - | Fieldwood SD Offshore | 100% | ACTIVE | |
| - | 207398 | SL-TX | WI | - | - | Fieldwood | 90% | ACTIVE | |
| - | 227360 | SL-TX | WI | - | - | Fieldwood Onshore | 74% | ACTIVE | |
| - | 230140 | SL-MS | ORRI | | | Black Jack Oil Co Inc | 1% | UNIT | |
| - | 230150 | SL-MS | ORRI | | | Wilcox Energy Co | 1% | UNIT | |
| - | 231240 | SL-MS | ORRI | | | Wilcox Energy Co | 1% | UNIT | |
| - | 234082 | SL-TX | WI | - | - | Fieldwood Onshore | 100% | TERMINATED | |
| - | 255675 | SL-TX | WI | - | - | Fieldwood Onshore | 100% | TERMINATED | |
| - | 5752 | SL-TX | WI | - | - | Fieldwood Onshore | 100% | TERMINATED | |
| - | 140960 | SL-TX | WI | - | - | Fieldwood SD Offshore | 100% | TERMINATED | |
| - | 165888 | SL-TX | WI | - | - | Fieldwood Onshore | 100% | TERMINATED | |
| - | 186892 | SL-TX | WI | - | - | Fieldwood Onshore | 100% | TERMINATED | |
| - | 176012 | SL-TX | WI | - | - | Fieldwood Onshore | 100% | TERMINATED | |
| - | 179673 | SL-TX | WI | - | - | Fieldwood Onshore | 100% | TERMINATED | |

10

| Block | Lease | Type | Rights | Date Le Eff | Le Cur Acres (Ac) | Operator | WI | Lease Status | Note† |
|-------|-------|------|--------|-------------|-------------------|----------|-----|--------------|-------|
| - | 188919 | SL-TX | WI | - | - | Fieldwood Onshore | 100% | TERMINATED | |
| - | 188921 | SL-TX | WI | - | - | Fieldwood Onshore | 100% | TERMINATED | |
| - | 269151 | SL-TX | WI | - | - | Fieldwood Onshore | 100% | TERMINATED | |

## Credit Bid Purchaser ROW

| SEGMENT NUMBER | COMPANY NAME | ORG AREA | ORG BLOCK | ORG NAME | REC AREA | REC BLOCK | REC NAME | SIZE | PRODUCT | STATUS | ROW NUMBER | FW LEASE | NOTE[3] |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 20200 | Fieldwood Energy, LLC | GC | 39 | K2 SUTA | GC | 40 | K1 SUTA | 5 | UBEH | Active | G29427 | G34966 | |
| 20202 | Fieldwood Energy, LLC | GC | 40 | K1 PLET | ST | 308 | | 8 | BLKO | Proposed | G29427 | G34966 | |
| 20203 | Fieldwood Energy, LLC | GC | 40 | K1 PLET | ST | 308 | Start Up Flange | 12 | CSNG | Proposed | G29427 | G34966 | |
| 8255 | Fieldwood Energy Offshore LLC | GC | 65 | A | GC | 19 | A | 12 | OIL | Out of Service | G09349 | G05889 | |
| 11260 | Fieldwood Energy Offshore LLC | GC | 65 | A | GC | 19 | A | 16 | OIL | Out of Service | G17685 | G05889 | |
| 20195 | Fieldwood Energy Offshore LLC | GC | 65 | A | GC | 200 | SUTA | 3 | UMB | Proposed | G29424 | G12209 | |
| 20221 | Fieldwood Energy Offshore LLC | GC | 156 | Mid-Line PLET A-1 | GC | 156 | Md-Line PLET A-2 | 8 | BLKO | Proposed | G29417 | G12209 | |
| 20197 | Fieldwood Energy Offshore LLC | GC | 156 | PLET 2 | GC | 156 | A-2 PLET | 8 | BLKO | Out of Service | G28820 | G12209 | |
| 20155 | Fieldwood Energy Offshore LLC | GC | 156 | Mid-Lne PLET A-2 | GC | 65 | A | 8 | BLKO | Out of Service | G29417 | G12209 | |
| 20183 | Fieldwood Energy Offshore LLC | GC | 200 | SUTA | GC | 244 | TROIKA SUTA | 5 | UMB | Proposed | G29420 | G11043 | |
| 11393 | Fieldwood Energy, LLC | GC | 200 | SS Manifold | GC | 65 | A | 10 | BLKO | Out of Service | G17737 | G12210 | |
| 11394 | Fieldwood Energy, LLC | GC | 200 | SSMANIFO | GC | 65 | A | 24 | CSNG | Out of Service | G17737 | G12210 | |
| 11395 | Fieldwood Energy, LLC | GC | 200 | SSMANIFO | GC | 65 | A | 5 | UMB | Out of Service | G17737 | G12210 | |
| 11396 | Fieldwood Energy, LLC | GC | 200 | SSMANIFO | GC | 65 | A | 10 | BLKG | Out of Service | G17738 | G12210 | |
| 11397 | Fieldwood Energy, LLC | GC | 200 | SSMANIFO | GC | 65 | A | 24 | CSNG | Out of Service | G17738 | G12210 | |
| 11410 | Fieldwood Energy, LLC | GC | 200 | SSMANIFO | GC | 65 | A | 5 | UMB | Out of Service | G17738 | G12210 | |
| 11959 | Fieldwood Energy Offshore LLC | GC | 200 | SSMANIFO | GC | 65 | A | 2 | UMB | Out of Service | G17737 | G12210 | |
| 12141 | Fieldwood Energy Offshore LLC | GC | 200 | SSMANIFO | GC | 65 | A | 5 | UMB | Out of Service | G17738 | G12210 | |
| 20196 | Fieldwood Energy Offshore LLC | GC | 200 | PLET-1 | GC | 156 | PLET-2 | 8 | BLKO | Proposed | G29425 | G12210 | |
| 20222 | Fieldwood Energy Offshore LLC | GC | 244 | PLEM A | GC | 156 | Mid-Line PLET A-1 | 8 | BLKO | Proposed | G28809 | G11043 | |
| 9084 | GOM Shelf, LLC | GI | 43 | AS | GI | 19 | F/S | 10 | OIL | Active | G12304 | 00175 | [1] |
| 19097 | Fieldwood Energy, LLC | MC | 698 | RGL PLET 1 | MC | 736 | A Thunderhawk | 8 | BLKO | Out of Service | G29295 | G28022 | |

[1]   FWE I is to obtain 75% of the Debtors' interests in Segment 9084, 50% of the Debtors' interest in Segments 4647 and 5890 and 79.666% of the Debtors' interest in Segment 17265, and the Credit Bid Purchaser is to obtain the Debtors' remaining interests in those four pipeline segments.

| SEGMENT NUMBER | COMPANY NAME | ORG AREA | ORG BLOCK | ORG NAME | REC AREA | REC BLOCK | REC NAME | SIZE | PRODUCT | STATUS | ROW NUMBER | FW LEASE | NOTE[3] |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 19149 | Fieldwood Energy, LLC | MC | 698 | RGL PLET 1 | MC | 736 | A Thunderhawk | 8 | BLKO | Out of Service | G29295 | G28022 | |
| 19296 | Fieldwood Energy, LLC | MC | 698 | RGL PLET 1 | MC | 736 | A Thunderhawk | 12 | CSNG | Out of Service | G29294 | G28022 | |
| 19364 | Fieldwood Energy, LLC | MC | 698 | RGL PLET 1 | MC | 736 | A | 12 | CSNG | Out of Service | G29295 | G28022 | |
| 19362 | Fieldwood Energy, LLC | MC | 724 | Gulfstar 1 Spar | MC | 948 | UTA1 | 8 | UMB | Out of Service | G29287 | G28030 | |
| 19334 | Fieldwood Energy, LLC | MC | 736 | A Thunderhawk | MC | 692 | SUTA | 5 | UMBH | Out of Service | G29299 | G28022 | |
| 19283 | Fieldwood Energy, LLC | MC | 736 | A Thunderhawk | MC | 698 | BBD SUTA | 6 | UMB | Out of Service | G29295 | G28022 | |
| 19297 | Fieldwood Energy, LLC | MC | 736 | A Thunderhawk | MC | 692 | North Plet | 1 | LIFT | Out of Service | G29299 | G28022 | |
| 19282 | Fieldwood Energy, LLC | MC | 736 | A Thunderhawk | MC | 782 | Dan 1 STUA 1 | 6 | UBEH | Out of Service | G29294 | G33757 | |
| 19154 | Fieldwood Energy, LLC | MC | 948 | PLET NPL3 HUB | MC | 724 | Gulfstar 1 SPAR | 8 | BLKO | Out of Service | G28736 | G28030 | |
| 19155 | Fieldwood Energy, LLC | MC | 948 | PLET SPL2 HUB | MC | 724 | Gulfstar 1 SPAR | 8 | BLKO | Out of Service | G29287 | G28030 | |
| 19365 | Fieldwood Energy, LLC | MC | 948 | PLET NPL3 HUB | MC | 767 | ILS NPL1 | 12 | CSNG | Out of Service | G28736 | G28030 | |
| 19374 | Fieldwood Energy, LLC | MC | 948 | PLET NPL3 HUB | MC | 948 | PLET SPL2 HUB | 8 | BLKO | Out of Service | G28736 | G28030 | |
| 19432 | Fieldwood Energy, LLC | MC | 948 | PLET SPL2 | MC | 768 | ILS SPL1 | 12 | CSNG | Out of Service | G29287 | G28030 | |
| 14292 | Fieldwood Energy, LLC | SM | 40 | JA | SM | 40 | 10"SSTI | 6 | OIL | Out of Service | G28816 | G13607 | |
| 14293 | Fieldwood Energy, LLC | SM | 40 | B | SM | 40 | JA | 6 | BLKO | Out of Service | G28817 | G13607 | |
| 14294 | Fieldwood Energy, LLC | SM | 40 | B | SM | 40 | JA | 6 | BLKO | Out of Service | G28818 | G13607 | |
| 14295 | Fieldwood Energy, LLC | SM | 40 | JA | SM | 40 | B | 2 | LIFT | Out of Service | G28819 | G13607 | |
| 4647 | Fieldwood Energy, LLC | SM | 149 | 6"SSTI | SM | 132 | B | 6 | BLKO | Out of Service | G03432 | G02592 | [1] |
| 13736 | Fieldwood Energy, LLC | SS | 79 | #2 | SS | 80 | A | 4 | BLKO | Out of Service | G23712 | G15277 | |
| 13737 | Fieldwood Energy, LLC | SS | 79 | #2 | SS | 80 | A | 4 | BLKO | Out of Service | G23713 | G15277 | |
| 8204 | Fieldwood Energy Offshore LLC | SS | 80 | A | EI | 125 | 30 SSTI | 6 | G/C | Out of Service | G09330 | G15277 | |
| 11050 | Fieldwood Energy Offshore LLC | SS | 301 | A | SS | 300 | B | 8 | BLKO | Out of Service | G16055 | G10794 | |
| 5890 | Fieldwood Energy, LLC | ST | 53 | A | ST | 52 | A | 6 | OIL | Out of Service | G09319 | G04000 | [1] |
| 17265 | Fieldwood Energy, LLC | ST | 68 | Caisson No. 1 | ST | 53 | A | 6 | BLKO | Out of Service | G28385 | G04000 | [1] |
| 20278 | Fieldwood Energy, LLC | ST | 308 | A | GC | 39 | K2 SUTA | 5 | UBEH | Proposed | G29427 | G34966 | |
| 10675 | Bandon Oil and Gas, LP | VR | 371 | A | VR | 350 | 08 SSTI | 6 | OIL | Out of Service | G15047 | G09524 | |

## Credit Bid Purchaser RUE

| Area | Block No. | Structure | Complex ID No. | Authority No. | FW Lease | Operator | Approval Date | Associated Assets | Note |
|------|-----------|-----------|----------------|---------------|----------|----------|---------------|-------------------|------|
| MC | 736 | A (Thunder Hawk) | 2045 | G30354 | G28022 | Fieldwood Energy LLC | 07/03/18 | MC 698 001, MC 734 SS002, SS004, SS005, SS006, MC 782 001 & 002 | |
| SM | 40 | B | 1266 | G30342 | G13607 | Fieldwood Energy Offshore LLC | 06/21/18 | SM 41 B2, B3, B4, B6 & SM 40 B5 | |
| SM | 40 | JA | 27017 | G30352 | G13607 | Fieldwood Energy Offshore | | SM 41 B PF and wells | |
| SS | 80 | A | 23548 | G30201 | G15277 | Fieldwood Energy Offshore LLC | 02/07/13 | SS 79 A002 | |
| ST | 68 | CAISS. #1 | 24108 | G30267 | 00020 | Fieldwood Energy LLC | 03/09/18 | ST 67 #6 | [1] |

**<u>Exhibit O2</u>**

**Leases, Rights of Way and Rights of Use and Easement Related to FWE I Oil & Gas Lease Interests**

# Leases Related to FWE I Oil & Gas Lease Interests*

| Block | Lease | Type | Rights | Date Le Eff | Le Cur Acres | Operator | WI | Lease Status | Notes† |
|-------|-------|------|--------|-------------|--------------|----------|-----|-------------|--------|
| BA 491 | G06069 | Federal | RT | 10/1/1983 | 5,760 | Fieldwood En | 100.0% | TERMIN | |
| BA A105 | G01757 | Federal | RT | 7/1/1968 | 5,760 | Fieldwood En | 12.5% | PROD | [6] |
| BA A-105 | G01757 | Federal | RT A | 7/1/1968 | 5,760 | Fieldwood En | 12.5% | PROD | [6] |
| BA A-105 | G01757 | Federal | OP 1 | 7/1/1968 | 5,760 | Fieldwood En | 6.3% | PROD | [6] |
| BA A133 | G02665 | Federal | OP | 7/1/1974 | 5,760 | GOM Shelf | 12.5% | PROD | [1], [6] |
| BA A-133 | G02665 | Federal | RT | 7/1/1974 | 5,760 | GOM Shelf | 25.0% | PROD | [1], [6] |
| BA A19 | G33399 | Federal | RT | 1/1/2010 | 5,760 | Apache Shelf Exp | 100.0% | EXPIR | |
| BA A47 | G03940 | Federal | RT | 3/1/1979 | 5,760 | Fieldwood En | 33.3% | TERMIN | |
| BA A47 | G03940 | Federal | OP | 3/1/1979 | 5,760 | Fieldwood En | 100.0% | TERMIN | |
| BA A69 | G32733 | Federal | RT | 11/1/2008 | 5,760 | Apache Shelf Exp | 100.0% | EXPIR | |
| BS 39 | G33683 | Federal | RT | 7/1/2010 | 1,237 | Petsec En | 18.8% | RELINQ | |
| BS 41 | G21142 | Federal | OP 2 | 5/1/1999 | 4,995 | Fieldwood En Off | 13.1% | TERMIN | [3] |
| BS 41 | G21142 | Federal | Contractual | 5/1/1999 | 4,995 | Fieldwood En Off | TBD | TERMIN | [3] |

---

\*   The Debtors reserve the right to amend, modify, or supplement this schedule in accordance with the terms of the Plan and subject to any consent rights under the Restructuring Support Agreement.

[1]  Represents leases owned by GOM Shelf LLC.

[2]  Represents leases in which FWE I is to acquire solely the right, title and interest acquired by FWE from Apache; the Credit Bid Purchaser will acquire the Debtors' remaining right, title and interest in such leases. As to all remaining leases on this schedule (except the leases referenced in footnotes [3]-[7] below), FWE I is to obtain all of FWE's right, title and interest in such leases.

[3]  Represents leases in which FWE I is to acquire solely the right, title and interest acquired by FWE from Apache. FWE III will acquire the Debtors' remaining right, title and interest in such leases.

[4]  Represents leases in which FWE I is to acquire solely the right, title and interest acquired by FWE from Apache. The Debtors' remaining right, title and interest in such leases are to be abandoned.

[5]  FWE I is to acquire solely the operating rights as to the NE/4 of this block; the Credit Bid Purchaser is to obtain the Debtors' overriding royalty interest in this lease; and the Debtors' remaining interests in the lease are to be abandoned.

[6]  Represents leases in which FWE I is to acquire solely the right, title and interest acquired by FWE from Apache. The Debtors' remaining right, title and interest in such leases are to be acquired by Chevron.

[7]   Represents leases in which (i) FWE I is to acquire solely the right, title and interest acquired by FWE from Apache and (ii) FWE IV is to acquire solely the right, title and interest acquired by FWE from Chevron. The Debtors' remaining right, title and interest in such leases are to be abandoned.

**Legend**:  CONT - Contractual; OP - Operating Rights; OP 1- Operating Rights 1; OP 2 - Operating Rights 2; OP 3 - Operating Rights 3; OP 4 - Operating Rights 4; OP 5 - Operating Rights 5; OP 6 - Operating Rights 6; OP 7 - Operating Rights 7; OP 10 - Operating Rights 10; OP 11 - Operating Rights 11; OP 12 - Operating Rights 12; OPRTS - Operating Rights; OPRTS Cont - Operating Rights / Contractual; ORRI - Overriding Royalty Interest; RT - Record Title; RT A - Record Title A; RT B - Record Title B; WI - Working Interest

| Block | Lease | Type | Rights | Date Le Eff | Le Cur Acres | Operator | WI | Lease Status | Notes[†] |
|---|---|---|---|---|---|---|---|---|---|
| BS 42 | G33684 | Federal | RT | 7/1/2010 | 4,552 | Apache Shelf Exp | 37.5% | RELINQ | |
| CA 42 | G32267 | Federal | OP 1 | 7/1/2008 | 5,000 | Fieldwood En | 50.0% | RELINQ | |
| CA 43 | G32268 | Federal | OP 1 | 7/1/2008 | 5,000 | Fieldwood En | 50.0% | PROD | |
| CS 71 | SL06618 | SL-LA | ORRI | - | - | - | 5.2% | - | |
| CS 71 | SL12503 | SL-LA | ORRI | - | - | - | 0.6% | TERMIN | |
| DD 253 | G10426 | Federal | RT | 6/1/1990 | 5,760 | Apache Shelf Exp | 100.0% | EXPIR | |
| DD 297 | G10427 | Federal | RT | 6/1/1990 | 5,760 | Apache Shelf Exp | 100.0% | EXPIR | |
| EB 128 | G34034 | Federal | RT | 4/1/2012 | 165 | Apache Shelf Exp | 100.0% | RELINQ | |
| EB 172 | G34035 | Federal | RT | 4/1/2012 | 5,760 | Apache Shelf Exp | 100.0% | RELINQ | |
| EC 12 | G34220 | Federal | RT | 8/1/2012 | 5,000 | Apache Shelf Exp | 100.0% | RELINQ | |
| EC 14 | G13572 | Federal | RT | 7/1/1992 | 2,544 | Fieldwood En | 100.0% | TERMIN | |
| EC 171 | G34228 | Federal | RT | 9/1/2012 | 5,000 | Apache Shelf Exp | 100.0% | RELINQ | |
| EC 172 | G17858 | Federal | RT | 7/1/1997 | 5,000 | Fieldwood En | 100.0% | TERMIN | |
| EC 178 | G34229 | Federal | RT | 10/1/2012 | 5,000 | Apache Shelf Exp | 100.0% | RELINQ | |
| EC 179 | G34230 | Federal | RT | 10/1/2012 | 5,000 | Apache Shelf Exp | 100.0% | RELINQ | |
| EC 185 | G34796 | Federal | RT | 6/1/2013 | 5,000 | Fieldwood En | 100.0% | RELINQ | |
| EC 2 | SL16473 | SL-LA | WI | 7/13/1999 | 148 | Apache | 89.1% | RELINQ | |
| EC 2 | SL16475 | SL-LA | WI | 7/19/1999 | 135 | Apache | 89.1% | ACTIVE | |
| EC 2 | SL18121 | SL-LA | WI | 5/12/2004 | 220 | Fieldwood | 50.0% | ACTIVE | |
| EC 222 | G02037 | Federal | OP 1 | 2/1/1971 | 5,000 | Talos | 17.9% | TERMIN | |
| EC 222 | G02037 | Federal | OP 2 | 2/1/1971 | 5,000 | Talos | 17.9% | TERMIN | |
| EC 229 | G34232 | Federal | RT | 10/1/2012 | 5,000 | Apache Shelf Exp | 100.0% | RELINQ | |
| EC 230 | G34233 | Federal | RT | 10/1/2012 | 5,000 | Apache Shelf Exp | 100.0% | RELINQ | |
| EC 24 | G04098 | Federal | RT | 10/1/1979 | 5,000 | Apex O&G | 18.0% | TERMIN | |
| EC 24 | G04098 | Federal | OP 2 | 10/1/1979 | 5,000 | Apex O&G | 31.3% | TERMIN | |
| EC 24 | G04098 | Federal | OP 3 | 10/1/1979 | 5,000 | Apex O&G | 30.3% | TERMIN | |
| EC 242 | G34234 | Federal | RT | 10/1/2012 | 5,000 | Apache Shelf Exp | 100.0% | RELINQ | |
| EC 243 | G34235 | Federal | RT | 10/1/2012 | 5,000 | Apache Shelf Exp | 100.0% | RELINQ | |
| EC 261 | G00971 | Federal | RT | 6/1/1962 | 5,000 | Fieldwood En | 100.0% | TERMIN | |
| EC 263 | G33072 | Federal | RT | 6/1/2009 | 5,000 | Apache Shelf Exp | 100.0% | EXPIR | |
| EC 264 | G01880 | Federal | RT | 3/1/1969 | 5,000 | Fieldwood En | 100.0% | TERMIN | |
| EC 265 | G00972 | Federal | RT | 6/1/1962 | 5,000 | Fieldwood En | 50.0% | RELINQ | |
| EC 270 | G02045 | Federal | RT | 1/1/1971 | 2,500 | Apache | 70.0% | TERMIN | |
| EC 278 | G00974 | Federal | RT | 6/1/1962 | 5,000 | Fieldwood En | 50.0% | TERMIN | |

2

| Block | Lease | Type | Rights | Date Le Eff | Le Cur Acres | Operator | WI | Lease Status | Notes[†] |
|---|---|---|---|---|---|---|---|---|---|
| EC 292 | G34237 | Federal | RT | 9/1/2012 | 5,000 | Apache Shelf Exp | 100.0% | RELINQ | |
| EC 293 | G34238 | Federal | RT | 9/1/2012 | 5,000 | Apache Shelf Exp | 100.0% | RELINQ | |
| EC 294 | G34239 | Federal | RT | 9/1/2012 | 5,000 | Apache Shelf Exp | 100.0% | RELINQ | |
| EC 310 | G34240 | Federal | RT | 11/1/2012 | 5,000 | Apache Shelf Exp | 100.0% | RELINQ | |
| EC 328 | G10638 | Federal | RT | 5/1/1989 | 5,000 | Arena Off | 100.0% | PROD | |
| EC 33 | G01972 | Federal | OP | 9/1/1970 | 1,250 | Merit En | 15.6% | TERMIN | |
| EC 335 | G02439 | Federal | OP | 8/1/1973 | 5,000 | Energy XXI GOM | 14.0% | TERMIN | |
| EC 338 | G02063 | Federal | RT | 2/1/1971 | 5,000 | Anadarko US Off | 15.7% | PROD | |
| EC 37 | G25933 | Federal | RT | 5/1/2004 | 2,608 | Probe Res US | 100.0% | TERMIN | |
| EC 370 | G33073 | Federal | RT | 6/1/2009 | 5,000 | Apache Shelf Exp | 100.0% | EXPIR | |
| EC 71 | G13576 | Federal | RT | 9/1/1992 | 5,000 | EC Off Prop | 100.0% | SOP | |
| EC 9/14 | G01440 | Federal | RT | 4/1/1966 | 3,152 | Fieldwood En | 100.0% | PROD | |
| EC 9/14 | G01440 | Federal | OP 1 | 4/1/1966 | 3,152 | Fieldwood En | 100.0% | PROD | |
| EI 10 | G23851 | Federal | RT | 7/1/2002 | 2,303 | Contango Op | 50.0% | PROD | |
| EI 10 | G23851 | Federal | OP 2 | 7/1/2002 | 2,303 | Contango Op | 50.0% | PROD | |
| EI 105 | 00797 | Federal | RT | 5/1/1960 | 5,000 | Fieldwood En | 100.0% | TERMIN | |
| EI 106 | G17966 | Federal | RT A | 7/1/1997 | 5,000 | Apache | 50.0% | TERMIN | |
| EI 106 | G17966 | Federal | RT B | 7/1/1997 | 5,000 | Apache | 100.0% | TERMIN | |
| EI 107 | G15241 | Federal | RT | 9/1/1995 | 5,000 | Apache | 75.0% | TERMIN | |
| EI 108 | G03811 | Federal | OP 1 | 6/1/1978 | 5,000 | Fieldwood En | 60.0% | TERMIN | |
| EI 108 | G03811 | Federal | RT A | 6/1/1978 | 5,000 | Fieldwood En | 60.0% | TERMIN | |
| EI 108 | G03811 | Federal | RT B | 6/1/1978 | 5,000 | Fieldwood En | 71.3% | TERMIN | |
| EI 116 | G34292 | Federal | RT | 9/1/2012 | 5,000 | Apache Shelf Exp | 100.0% | EXPIR | |
| EI 117 | G34293 | Federal | RT | 10/1/2012 | 5,000 | Apache Shelf Exp | 100.0% | RELINQ | |
| EI 118 | G15242 | Federal | RT A | 7/1/1995 | 5,000 | Black Elk En Off Op | 25.0% | TERMIN | |
| EI 118 | G15242 | Federal | RT B | 7/1/1995 | 5,000 | Fieldwood En | 75.0% | TERMIN | |
| EI 119 | 00049 | Federal | RT A | 8/28/1945 | 5,000 | Fieldwood En | 50.0% | PROD | |
| EI 119 | 00049 | Federal | RT B | 8/28/1945 | 5,000 | Fieldwood En | 100.0% | PROD | |
| EI 120 | 00050 | Federal | RT | 8/28/1945 | 5,000 | Fieldwood En | 100.0% | PROD | |
| EI 125 | 00051 | Federal | RT | 8/28/1945 | 5,000 | Fieldwood En | 100.0% | OPERNS | |
| EI 126 | 00052 | Federal | RT | 8/28/1945 | 5,000 | Fieldwood En | 100.0% | PROD | |
| EI 126 | 00052 | Federal | OP | 8/28/1945 | 5,000 | Fieldwood En | 75.0% | PROD | |
| EI 128 | G34294 | Federal | RT | 10/1/2012 | 3,427 | Apache Shelf Exp | 100.0% | RELINQ | |
| EI 131 | G33625 | Federal | RT | 6/1/2010 | 5,000 | Apache Shelf Exp | 100.0% | RELINQ | |

| Block | Lease | Type | Rights | Date Le Eff | Le Cur Acres | Operator | WI | Lease Status | Notes[†] |
|---|---|---|---|---|---|---|---|---|---|
| EI 132 | G33626 | Federal | RT | 6/1/2010 | 5,000 | Apache Shelf Exp | 100.0% | RELINQ | |
| EI 135 | G34296 | Federal | RT | 10/1/2012 | 5,000 | Apache Shelf Exp | 100.0% | RELINQ | |
| EI 136 | G03152 | Federal | RT | 7/1/1975 | 5,000 | Fieldwood En | 100.0% | PROD | |
| EI 156 | G16353 | Federal | OP | 6/1/1996 | 5,000 | Black Elk En Off Op | 50.0% | TERMIN | |
| EI 158 | G01220 | Federal | RT | 6/1/1962 | 5,000 | Fieldwood En | 100.0% | PROD | |
| EI 173 | G13622 | Federal | RT | 7/1/1992 | 5,000 | Fieldwood En | 100.0% | PROD | |
| EI 174 | G03782 | Federal | RT | 6/1/1978 | 5,000 | Arena Off | 100.0% | PROD | |
| EI 174 | G03782 | Federal | OP | 6/1/1978 | 5,000 | Arena Off | 30.0% | PROD | |
| EI 175 | 00438 | Federal | OP 1 | 12/1/1954 | 5,000 | Fieldwood En | 75.0% | PROD | [4] |
| EI 187 | G10736 | Federal | RT | 7/1/1989 | 5,000 | Fieldwood En | 100.0% | PROD | |
| EI 188 | 00443 | Federal | RT | 1/1/1955 | 5,000 | Apache | 100.0% | TERMIN | |
| EI 189 | 00423 | Federal | RT | 12/1/1954 | 3,750 | Fieldwood En | 100.0% | PROD | |
| EI 196 | 00802 | Federal | RT | 5/1/1960 | 3,516 | Fieldwood En | 50.0% | RELINQ | |
| EI 196 | 00802 | Federal | OP | 5/1/1960 | 3,516 | Fieldwood En | 100.0% | RELINQ | |
| EI 196 | G13821 | Federal | OP 2 | 5/1/1960 | 1,484 | Arena Off | 100.0% | RELINQ | |
| EI 196 | G13821 | Federal | OP 4 | 5/1/1960 | 1,484 | Arena Off | 100.0% | RELINQ | |
| EI 20 | G34286 | Federal | RT | 10/1/2012 | 3,582 | Castex Off | 50.0% | RELINQ | |
| EI 207 | G34301 | Federal | RT | 8/1/2012 | 5,000 | Apache Shelf Exp | 100.0% | RELINQ | |
| EI 208 | 00577 | Federal | OP | 9/1/1955 | 2,500 | ANKOR En | 100.0% | PROD | |
| EI 211 | G05502 | Federal | RT B | 7/1/1983 | 5,000 | Fieldwood En | 66.7% | UNIT | |
| EI 211 | G05502 | Federal | OP | 7/1/1983 | 5,000 | Chevron USA | 66.7% | UNIT | |
| EI 212 | G05503 | Federal | RT B | 7/1/1983 | 5,000 | Fieldwood En | 66.7% | UNIT | |
| EI 212 | G05503 | Federal | OP | 7/1/1983 | 5,000 | Chevron USA | 66.7% | UNIT | |
| EI 216 | G34303 | Federal | RT | 8/1/2012 | 5,000 | Apache Shelf Exp | 100.0% | RELINQ | |
| EI 217 | G00978 | Federal | RT | 5/1/1962 | 5,000 | Arena Off | 25.0% | RELINQ | |
| EI 224 | G05504 | Federal | ORRI | 7/1/1983 | 5,000 | Castex Off | 10.0% | PROD | |
| EI 224 | G05504 | Federal | RT | 7/1/1983 | 5,000 | Castex Off | 100.0% | PROD | |
| EI 227 | 00809 | Federal | RT | 5/1/1960 | 5,000 | Arena Off | 50.0% | RELINQ | |
| EI 227 | G36745 | Federal | ORRI | 11/1/2019 | 5,000 | Arena Off | 6.25% | PRIMRY | |
| EI 227 | G36745 | Federal | ORRI | 11/1/2019 | 5,000 | Arena Off | 4.17% | PRIMRY | |
| EI 246 | 00810 | Federal | OP 1 | 5/1/1960 | 5,000 | Fieldwood En | 25.0% | UNIT | |
| EI 246 | 00810 | Federal | OP 2 | 5/1/1960 | 5,000 | Fieldwood En | 75.0% | UNIT | |
| EI 246 | 00810 | Federal | RT | 5/1/1960 | 5,000 | Fieldwood En | 75.0% | UNIT | |
| EI 246 | 00810 | Federal | ORRI | 5/1/1960 | 5,000 | Sanare En Part | 6.3% | UNIT | |

| Block | Lease | Type | Rights | Date Le Eff | Le Cur Acres | Operator | WI | Lease Status | Notes[†] |
|---|---|---|---|---|---|---|---|---|---|
| EI 255 | G01958 | Federal | RT | 1/1/1970 | 2,500 | Cox Op | 2.0% | PROD | |
| EI 255 | G01958 | Federal | OP 3 | 1/1/1970 | 2,500 | Cox Op | 77.2% | PROD | |
| EI 255 | G01958 | Federal | OP 4 | 1/1/1970 | 2,500 | Cox Op | 38.6% | PROD | |
| EI 266 | 00811 | Federal | OP 1 | 5/1/1960 | 5,000 | Fieldwood En | 25.0% | UNIT | |
| EI 266 | 00811 | Federal | OP 2 | 5/1/1960 | 5,000 | Fieldwood En | 75.0% | UNIT | |
| EI 266 | 00811 | Federal | RT | 5/1/1960 | 5,000 | Fieldwood En | 75.0% | UNIT | |
| EI 267 | 00812 | Federal | OP | 5/1/1960 | 5,000 | Fieldwood En | 25.0% | UNIT | |
| EI 267 | 00812 | Federal | OP 2 | 5/1/1960 | 5,000 | Fieldwood En | 75.0% | UNIT | |
| EI 267 | 00812 | Federal | RT | 5/1/1960 | 5,000 | Fieldwood En | 75.0% | UNIT | |
| EI 269 | 00813 | Federal | OP 1 | 5/1/1960 | 5,000 | Fieldwood En | 25.0% | UNIT | |
| EI 269 | 00813 | Federal | OP 2 | 5/1/1960 | 5,000 | Fieldwood En | 75.0% | UNIT | |
| EI 269 | 00813 | Federal | RT | 5/1/1960 | 5,000 | Fieldwood En | 75.0% | UNIT | |
| EI 280 | G23876 | Federal | RT | 5/1/2002 | 5,000 | Energy XXI GOM | 18.8% | TERMIN | |
| EI 281 | G09591 | Federal | RT | 5/1/1988 | 5,000 | Bennu O&G | 90.5% | TERMIN | |
| EI 281 | G09591 | Federal | OP 1 | 5/1/1988 | 5,000 | Bennu O&G | 45.3% | TERMIN | |
| EI 281 | G09591 | Federal | OP 2 | 5/1/1988 | 5,000 | Bennu O&G | 45.3% | TERMIN | |
| EI 281 | G09591 | Federal | OP 3 | 5/1/1988 | 5,000 | Bennu O&G | 45.3% | TERMIN | |
| EI 282 | G09592 | Federal | RT | 6/1/1988 | 5,000 | Apache | 75.0% | TERMIN | |
| EI 282 | G09592 | Federal | OP 1 | 6/1/1988 | 5,000 | Apache | 75.0% | TERMIN | |
| EI 282 | G09592 | Federal | OP 2 | 6/1/1988 | 5,000 | Apache | 75.0% | TERMIN | |
| EI 29 | G34287 | Federal | RT | 12/1/2012 | 5,000 | Apache Shelf Exp | 50.0% | RELINQ | |
| EI 307 | G02110 | Federal | OP | 2/1/1971 | 2,500 | Fieldwood En Off | 25.0% | TERMIN | [4] |
| EI 312 | G22679 | Federal | RT | 6/1/2001 | 5,000 | Fieldwood En | 100.0% | TERMIN | [4] |
| EI 312 | G22679 | Federal | ORRI | 6/1/2001 | 5,000 | Fieldwood En | 8.3% | TERMIN | [4] |
| EI 313 | G02608 | Federal | RT | 5/1/1974 | 5,000 | Arena Off | 50.0% | TERMIN | |
| EI 313 | G02608 | Federal | OP 1 | 5/1/1974 | 5,000 | Arena Off | 50.0% | TERMIN | |
| EI 313 | G02608 | Federal | OP 2 | 5/1/1974 | 5,000 | Arena Off | 50.0% | TERMIN | |
| EI 315 | G02112 | Federal | RT | 8/1/1974 | 2,500 | Fieldwood En | 50.0% | TERMIN | |
| EI 315 | G02112 | Federal | OP | 8/1/1974 | 2,500 | Fieldwood En | 50.0% | TERMIN | |
| EI 315 | G24912 | Federal | RT | 5/1/2003 | 2,500 | Fieldwood En | 100.0% | PROD | |
| EI 316 | G05040 | Federal | RT | 4/1/1982 | 5,000 | Fieldwood En | 100.0% | PROD | |
| EI 329 | G02912 | Federal | RT | 12/1/1974 | 5,000 | Fieldwood En | 100.0% | TERMIN | |
| EI 330 | G02115 | Federal | Contractual | 1/1/1971 | 5,000 | Fieldwood En | 63.0% | UNIT | [4] |
| EI 330 | G02115 | Federal | OP 7 | 1/1/1971 | 5,000 | Fieldwood En | 47.0% | UNIT | [4] |

5

| Block | Lease | Type | Rights | Date Le Eff | Le Cur Acres | Operator | WI | Lease Status | Notes† |
|-------|-------|------|--------|-------------|--------------|----------|-----|--------------|--------|
| EI 330 | G02115 | Federal | OP 6 | 1/1/1971 | 5,000 | Fieldwood En | 47.0% | UNIT | [4] |
| EI 330 | G02115 | Federal | OP 5 | 1/1/1971 | 5,000 | Fieldwood En | 47.0% | UNIT | [4] |
| EI 330 | G02115 | Federal | OP 4 | 1/1/1971 | 5,000 | Fieldwood En | 47.0% | UNIT | [4] |
| EI 330 | G02115 | Federal | OP 3 | 1/1/1971 | 5,000 | Fieldwood En | 47.0% | UNIT | [4] |
| EI 330 | G02115 | Federal | OP 2 | 1/1/1971 | 5,000 | Fieldwood En | 47.0% | UNIT | [4] |
| EI 330 | G02115 | Federal | RT | 1/1/1971 | 5,000 | Fieldwood En | 42.0% | UNIT | [4] |
| EI 330 | G02115 | Federal | RT | 1/1/1971 | 5,000 | Fieldwood En | 23.0% | UNIT | [1], [4] |
| EI 330 | G02115 | Federal | OP 7 | 1/1/1971 | 5,000 | Fieldwood En | 23.0% | UNIT | [1], [4] |
| EI 330 | G02115 | Federal | OP 6 | 1/1/1971 | 5,000 | Fieldwood En | 23.0% | UNIT | [1], [4] |
| EI 330 | G02115 | Federal | OP 5 | 1/1/1971 | 5,000 | Fieldwood En | 23.0% | UNIT | [1], [4] |
| EI 330 | G02115 | Federal | OP 4 | 1/1/1971 | 5,000 | Fieldwood En | 23.0% | UNIT | [1], [4] |
| EI 330 | G02115 | Federal | OP 3 | 1/1/1971 | 5,000 | Fieldwood En | 23.0% | UNIT | [1], [4] |
| EI 330 | G02115 | Federal | OP 2 | 1/1/1971 | 5,000 | Fieldwood En | 23.0% | UNIT | [1], [4] |
| EI 333 | G02317 | Federal | RT | 2/1/1973 | 5,000 | Fieldwood En | 100.0% | TERMIN | |
| EI 334 | G15263 | Federal | RT | 7/1/1995 | 5,000 | Fieldwood En | 100.0% | TERMIN | |
| EI 337 | G03332 | Federal | RT | 3/1/1976 | 5,000 | Fieldwood En | 100.0% | UNIT | |
| EI 337 | G03332 | Federal | OP 4 | 3/1/1976 | 5,000 | Fieldwood En | 98.0% | UNIT | |
| EI 337 | G03332 | Federal | OP 1 | 3/1/1976 | 5,000 | Fieldwood En | 100.0% | UNIT | |
| EI 337 | G03332 | Federal | OP 3 | 3/1/1976 | 5,000 | Fieldwood En | 100.0% | UNIT | |
| EI 337 | G03332 | Federal | ORRI | 3/1/1976 | | Fieldwood En | 0.1% | UNIT | |
| EI 342 | G02319 | Federal | RT A | 2/1/1973 | 5,000 | Fieldwood En | 50.0% | TERMIN | [6] |
| EI 342 | G02319 | Federal | RT B | 2/1/1973 | 5,000 | Fieldwood En | 75.0% | TERMIN | [6] |
| EI 342 | G02319 | Federal | OP 1 | 2/1/1973 | 5,000 | Fieldwood En | 75.0% | TERMIN | [6] |
| EI 342 | G02319 | Federal | OP 2 | 2/1/1973 | 5,000 | Fieldwood En | 61.8% | TERMIN | [6] |
| EI 345 | G21647 | Federal | RT | 7/1/2000 | 5,000 | Fieldwood En | 50.0% | TERMIN | |
| EI 346 | G14482 | Federal | RT | 6/1/1994 | 5,000 | Arena Off | 100.0% | PROD | |
| EI 353 | G03783 | Federal | OP | 6/1/1978 | 5,000 | Fieldwood En | 100.0% | TERMIN | |
| EI 354 | G10752 | Federal | RT | 5/1/1989 | 5,000 | Fieldwood En | 100.0% | PROD | |
| EI 354 | G10752 | Federal | OP | 5/1/1989 | 5,000 | Fieldwood En | 67.0% | PROD | |
| EI 361 | G02324 | Federal | RT | 2/1/1973 | 5,000 | Cox Op | 12.4% | PROD | |
| EI 53 | 00479 | Federal | OP 1 | 12/1/1954 | 5,000 | EnVen En Vent | 66.7% | PROD | [4] |
| EI 53 | 00479 | Federal | OP | 12/1/1954 | 5,000 | EnVen En Vent | 100.0% | PROD | [4] |
| EI 57 | G02601 | Federal | OP 2 | 5/1/1974 | 5,000 | Talos | 31.7% | TERMIN | |
| EI 57 | G02601 | Federal | OP 4 | 5/1/1974 | 5,000 | ANKOR En | 15.8% | TERMIN | |

| Block | Lease | Type | Rights | Date Le Eff | Le Cur Acres | Operator | WI | Lease Status | Notes[†] |
|---|---|---|---|---|---|---|---|---|---|
| EI 88 | G10721 | Federal | OP | 7/1/1989 | 5,000 | Fieldwood En | 75.0% | TERMIN | |
| EI 89 | 00044 | Federal | OP | 8/28/1945 | 5,000 | Fieldwood En | 75.0% | TERMIN | |
| EI 89 | 00044 | Federal | OP 2 | 8/28/1945 | 5,000 | Fieldwood En | 75.0% | TERMIN | |
| EI 90 | 00229 | Federal | OP | 11/19/1948 | 1,250 | Fieldwood En | 75.0% | TERMIN | |
| EI 93 | 00228 | Federal | OP | 11/19/1948 | 2,500 | Fieldwood En | 75.0% | TERMIN | |
| EI 94 | G05488 | Federal | OP | 7/1/1983 | 5,000 | Fieldwood En | 75.0% | TERMIN | |
| EI 95 | 00046 | Federal | OP | 8/28/1945 | 5,000 | Fieldwood En | 75.0% | TERMIN | |
| EW 525 | G33704 | Federal | RT | 7/1/2010 | 2,420 | Apache Shelf Exp | 46.9% | RELINQ | |
| EW 526 | G33134 | Federal | RT | 6/1/2009 | 3,517 | Apache Shelf Exp | 100.0% | EXPIR | |
| EW 781 | G33137 | Federal | RT | 6/1/2009 | 309 | Apache Shelf Exp | 100.0% | EXPIR | |
| EW 782 | G31470 | Federal | RT | 12/1/2007 | 1,093 | Fieldwood En | 100.0% | PROD | [4] |
| EW 789 | G33139 | Federal | RT | 7/1/2009 | 5,760 | Apache Shelf Exp | 100.0% | RELINQ | |
| EW 826 | G05800 | Federal | RT | 7/1/1983 | 5,760 | BP E&P | 100.0% | PROD | |
| EW 905 | G34415 | Federal | RT | 8/1/2012 | 1,007 | Apache Shelf Exp | 100.0% | RELINQ | |
| EW 906 | G33708 | Federal | RT | 6/1/2010 | 1,084 | Apache Shelf Exp | 100.0% | RELINQ | |
| EW 949 | G34877 | Federal | RT | 8/1/2013 | 5,760 | Apache Shelf Exp | 100.0% | RELINQ | |
| EW 950 | G33709 | Federal | RT | 6/1/2010 | 5,760 | Apache Shelf Exp | 100.0% | RELINQ | |
| FM 411 | G08361 | Federal | RT | 8/1/1986 | 5,760 | Chevron USA | 24.3% | EXPIR | |
| FM 412 | G08362 | Federal | RT | 8/1/1986 | 5,760 | Chevron USA | 16.0% | EXPIR | |
| FM 455 | G08363 | Federal | RT | 8/1/1986 | 5,760 | Chevron USA | 24.2% | EXPIR | |
| FM 456 | G08364 | Federal | RT | 8/1/1986 | 5,760 | Chevron USA | 24.3% | EXPIR | |
| FM 499 | G08365 | Federal | RT | 8/1/1986 | 5,760 | Chevron USA | 24.3% | EXPIR | |
| FM 500 | G08366 | Federal | RT | 8/1/1986 | 5,760 | Chevron USA | 16.0% | EXPIR | |
| FM 543 | G08367 | Federal | RT | 8/1/1986 | 5,760 | Chevron USA | 24.3% | EXPIR | |
| FM 587 | G08368 | Federal | RT | 8/1/1986 | 5,760 | Chevron USA | 24.3% | EXPIR | |
| GA 151 | G15740 | Federal | RT | 11/1/1995 | 4,804 | Fieldwood En | 33.3% | TERMIN | [4] |
| GA 180 | G03228 | Federal | RT | 9/1/1975 | 5,760 | Fieldwood En | 100.0% | UNIT | |
| GA 192 | G03229 | Federal | CONT | 9/1/1975 | 5,760 | Arena Off | 90.0% | UNIT | |
| GA 210 | G25524 | Federal | OP 1 | 12/1/2003 | 5,760 | Fieldwood En | 83.3% | PROD | [4] |
| GA 210 | G25524 | Federal | OP 3 | 12/1/2003 | 5,760 | Fieldwood En | 66.7% | PROD | [4] |
| GA 210 | G25524 | Federal | RT | 12/1/2003 | 5,760 | Fieldwood En | 66.7% | PROD | [4] |
| GA 210 | G25524 | Federal | OP | 12/1/2003 | 5,760 | Fieldwood En | 83.3% | PROD | [4] |
| GA 343 | G06105 | Federal | RT | 10/1/1983 | 5,760 | Black Elk En Off Op | 12.5% | TERMIN | |
| GA 343 | G06105 | Federal | OP | 10/1/1983 | 5,760 | Black Elk En Off Op | 37.5% | TERMIN | |

| Block | Lease | Type | Rights | Date Le Eff | Le Cur Acres | Operator | WI | Lease Status | Notes[†] |
|---|---|---|---|---|---|---|---|---|---|
| GB 85 | G34515 | Federal | RT | 8/1/2012 | 4,450 | Apache Shelf Exp | 100.0% | RELINQ | |
| GI 104 | G33671 | Federal | RT | 7/1/2010 | 5,000 | Apache Shelf Exp | 46.9% | RELINQ | |
| GI 110 | G13943 | Federal | RT | 8/1/1993 | 5,000 | Fieldwood En | 50.0% | UNIT | [2] |
| GI 116 | G13944 | Federal | RT | 7/1/1993 | 5,000 | Fieldwood En | 50.0% | UNIT | [2] |
| GI 116 | G13944 | Federal | OP | 7/1/1993 | 5,000 | Fieldwood En | 25.0% | UNIT | [2] |
| GI 117 | G32232 | Federal | RT | 8/1/2008 | 4,540 | Apache | 100.0% | EXPIR | |
| GI 32 | 00174 | Federal | RT | 7/17/1948 | 2,500 | GOM Shelf | 75.0% | UNIT | [1], [2] |
| GI 32 | 00174 | Federal | OP 1 | 7/17/1948 | 2,500 | BP E&P | 18.8% | UNIT | [1], [2] |
| GI 32 | 00174 | Federal | OP 2 | 7/17/1948 | 2,500 | GOM Shelf | 37.5% | UNIT | [1], [2] |
| GI 32 | G01580 | Federal | RT | 7/1/1967 | 2,500 | BP Am Prod | 75.0% | TERMIN | [1] |
| GI 32 | G01580 | Federal | OP | 7/1/1967 | 2,500 | BP Am Prod | 37.5% | TERMIN | [1] |
| GI 33 | G04002 | Federal | RT | 3/1/1979 | 5,000 | Fieldwood En | 100.0% | RELINQ | |
| GI 39 | 00126 | Federal | RT | 4/21/1947 | 2,500 | GOM Shelf | 75.0% | UNIT | [1], [2] |
| GI 39 | 00126 | Federal | OP 1 | 4/21/1947 | 2,500 | BP E&P | 18.8% | UNIT | [1], [2] |
| GI 39 | 00126 | Federal | OP 2 | 4/21/1947 | 2,500 | GOM Shelf | 37.5% | UNIT | [1], [2] |
| GI 39 | 00127 | Federal | RT | 4/21/1947 | 2,500 | GOM Shelf | 75.0% | UNIT | [1], [2] |
| GI 39 | 00127 | Federal | OP 1 | 4/21/1947 | 2,500 | BP E&P | 18.8% | UNIT | [1], [2] |
| GI 39 | 00127 | Federal | OP 2 | 4/21/1947 | 2,500 | GOM Shelf | 37.5% | UNIT | [1], [2] |
| GI 40 | 00128 | Federal | RT | 4/21/1947 | 5,000 | GOM Shelf | 75.0% | UNIT | [1], [2] |
| GI 40 | 00128 | Federal | OP 1 | 4/21/1947 | 5,000 | BP E&P | 18.8% | UNIT | [1], [2] |
| GI 40 | 00128 | Federal | OP 2 | 4/21/1947 | 5,000 | GOM Shelf | 37.5% | UNIT | [1], [2] |
| GI 41 | 00129 | Federal | RT | 4/21/1947 | 2,500 | GOM Shelf | 75.0% | UNIT | [1], [2] |
| GI 41 | 00129 | Federal | OP 1 | 4/21/1947 | 2,500 | BP E&P | 18.8% | UNIT | [1], [2] |
| GI 41 | 00129 | Federal | OP 2 | 4/21/1947 | 2,500 | GOM Shelf | 37.5% | UNIT | [1], [2] |
| GI 41 | 00130 | Federal | RT | 4/21/1947 | 2,500 | GOM Shelf | 75.0% | UNIT | [1], [2] |
| GI 41 | 00130 | Federal | OP 1 | 4/21/1947 | 2,500 | BP E&P | 18.8% | UNIT | [1], [2] |
| GI 41 | 00130 | Federal | OP 2 | 4/21/1947 | 2,500 | GOM Shelf | 37.5% | UNIT | [1], [2] |
| GI 42 | 00131 | Federal | RT | 4/21/1947 | 5,000 | GOM Shelf | 75.0% | UNIT | [1], [2] |
| GI 42 | 00131 | Federal | OP 1 | 4/21/1947 | 5,000 | BP E&P | 18.8% | UNIT | [1], [2] |
| GI 42 | 00131 | Federal | OP 2 | 4/21/1947 | 5,000 | GOM Shelf | 37.5% | UNIT | [1], [2] |
| GI 43 | 00175 | Federal | RT | 7/17/1948 | 5,000 | GOM Shelf | 75.0% | UNIT | [1], [2] |
| GI 43 | 00175 | Federal | OP 1 | 7/17/1948 | 5,000 | BP E&P | 18.8% | UNIT | [1], [2] |
| GI 43 | 00175 | Federal | OP 2 | 7/17/1948 | 5,000 | GOM Shelf | 37.5% | UNIT | [1], [2] |
| GI 44 | 00176 | Federal | RT | 7/17/1948 | 2,500 | GOM Shelf | 75.0% | UNIT | [1], [2] |

| Block | Lease | Type | Rights | Date Le Eff | Le Cur Acres | Operator | WI | Lease Status | Notes[†] |
|---|---|---|---|---|---|---|---|---|---|
| GI 44 | 00176 | Federal | OP 1 | 7/17/1948 | 2,500 | BP E&P | 18.8% | UNIT | [1], [2] |
| GI 44 | 00176 | Federal | OP 2 | 7/17/1948 | 2,500 | GOM Shelf | 37.5% | UNIT | [1], [2] |
| GI 46 | 00132 | Federal | RT | 4/21/1947 | 5,000 | GOM Shelf | 75.0% | UNIT | [1], [2] |
| GI 46 | 00132 | Federal | OP 1 | 4/21/1947 | 5,000 | BP E&P | 18.8% | UNIT | [1], [2] |
| GI 46 | 00132 | Federal | OP 2 | 4/21/1947 | 5,000 | GOM Shelf | 37.5% | UNIT | [1], [2] |
| GI 47 | 00133 | Federal | RT | 4/21/1947 | 5,000 | GOM Shelf | 75.0% | UNIT | [1], [2] |
| GI 47 | 00133 | Federal | OP 1 | 4/21/1947 | 5,000 | BP E&P | 18.8% | UNIT | [1], [2] |
| GI 47 | 00133 | Federal | OP 2 | 4/21/1947 | 5,000 | GOM Shelf | 37.5% | UNIT | [1], [2] |
| GI 48 | 00134 | Federal | RT | 4/21/1947 | 5,000 | GOM Shelf | 75.0% | UNIT | [1], [2] |
| GI 48 | 00134 | Federal | OP 1 | 4/21/1947 | 5,000 | BP E&P | 18.8% | UNIT | [1], [2] |
| GI 48 | 00134 | Federal | OP 2 | 4/21/1947 | 5,000 | GOM Shelf | 37.5% | UNIT | [1], [2] |
| GI 52 | 00177 | Federal | RT | 7/17/1948 | 2,500 | GOM Shelf | 75.0% | UNIT | [1], [2] |
| GI 52 | 00177 | Federal | OP 1 | 7/17/1948 | 2,500 | GOM Shelf | 100.0% | UNIT | [1], [2] |
| GI 52 | 00177 | Federal | OP 2 | 7/17/1948 | 2,500 | BP E&P | 18.8% | UNIT | [1], [2] |
| GI 54 | G27173 | Federal | RT | 7/1/2005 | 5,000 | Fieldwood En | 50.0% | TERMIN | |
| GI 76 | G02161 | Federal | RT | 10/1/1972 | 5,000 | Fieldwood En | 95.8% | RELINQ | |
| GI 90 | G04003 | Federal | RT | 3/1/1979 | 5,000 | Fieldwood En | 100.0% | TERMIN | |
| GI 90 | G04003 | Federal | OP 1 | 3/1/1979 | 5,000 | Fieldwood En | 100.0% | TERMIN | |
| GI 90 | G04003 | Federal | OP 2 | 3/1/1979 | 5,000 | Fieldwood En | 50.0% | TERMIN | |
| GI 90 | G04003 | Federal | OP 4 | 3/1/1979 | 5,000 | Fieldwood En | 50.0% | TERMIN | |
| GI 90 | G04003 | Federal | OP 5 | 3/1/1979 | 5,000 | Fieldwood En | 100.0% | TERMIN | |
| GI 90 | G04003 | Federal | OP 6 | 3/1/1979 | 5,000 | Fieldwood En | 100.0% | TERMIN | |
| GI 93 | G02628 | Federal | RT | 5/1/1974 | 5,000 | BP E&P | 100.0% | TERMIN | |
| GI 93 | G02628 | Federal | OP | 5/1/1974 | 5,000 | BP E&P | 100.0% | TERMIN | |
| GI 94 | G02163 | Federal | RT | 11/1/1972 | 4,540 | Fieldwood En | 100.0% | RELINQ | |
| GI 94 | G02163 | Federal | OP | 11/1/1972 | 4,540 | Fieldwood En | 100.0% | RELINQ | |
| GI 98 | G34354 | Federal | RT | 8/1/2012 | 5,000 | Apache Shelf Exp | 100.0% | RELINQ | |
| HI 110 | G02353 | Federal | RT | 8/1/1973 | 5,760 | W & T Off | 20.0% | TERMIN | [1] |
| HI 111 | G02354 | Federal | RT | 8/1/1973 | 5,760 | W & T Off | 20.0% | TERMIN | [1] |
| HI 114 | G32747 | Federal | RT | 12/1/2008 | 5,760 | Apache Shelf Exp | 100.0% | EXPIR | |
| HI 116 | G06156 | Federal | RT | 10/1/1983 | 5,760 | Fieldwood En | 100.0% | TERMIN | |
| HI 129 | G01848 | Federal | RT | 6/1/1968 | 5,760 | Fieldwood En | 90.0% | PROD | |
| HI 129 | G01848 | Federal | ORRI | 6/1/1968 | | Fieldwood En | 10.4% | PROD | |
| HI 132 | G32748 | Federal | RT | 12/1/2008 | 5,760 | Apache Shelf Exp | 100.0% | EXPIR | |

9

| Block | Lease | Type | Rights | Date Le Eff | Le Cur Acres | Operator | WI | Lease Status | Notes[†] |
|---|---|---|---|---|---|---|---|---|---|
| HI 140 | 00518 | Federal | OP | 1/1/1955 | 5,760 | Black Elk En Off Op | 50.0% | TERMIN | |
| HI 163 | G22236 | Federal | RT | 12/1/2000 | 5,760 | Fieldwood En | 70.0% | TERMIN | |
| HI 176 | G06164 | Federal | OPRTS Cont | 10/1/1983 | 5,760 | Apache | 49.5% | TERMIN | |
| HI 179 | G03236 | Federal | RT | 9/1/1975 | 5,760 | Cox Op | 100.0% | UNIT | |
| HI 193 | G03237 | Federal | CONT | 9/1/1975 | 5,760 | Arena Off | 90.0% | UNIT | |
| HI 194 | G06166 | Federal | RT | 10/1/1983 | 5,760 | Apache | 100.0% | TERMIN | |
| HI 194 | G06166 | Federal | OP | 10/1/1983 | 5,760 | Apache | 45.0% | TERMIN | |
| HI 201 | G23199 | Federal | OP | 12/1/2001 | 5,760 | Apache Shelf | 37.6% | TERMIN | |
| HI 206 | G20660 | Federal | RT | 1/1/1999 | 5,760 | Fieldwood En | 100.0% | PROD | |
| HI 45 | G12564 | Federal | RT | 10/1/1990 | 4,367 | Fieldwood En | 16.7% | TERMIN | |
| HI 45 | G12564 | Federal | OP 1 | 10/1/1990 | 4,367 | Fieldwood En | 15.0% | TERMIN | |
| HI 45 | G12564 | Federal | OP 2 | 10/1/1990 | 4,367 | Fieldwood En | 33.3% | TERMIN | |
| HI 52 | 00508 | Federal | RT | 1/1/1955 | 1,440 | SandRidge En Off | 75.0% | TERMIN | |
| HI 52 | 00509 | Federal | RT | 1/1/1955 | 1,440 | Apache | 75.0% | TERMIN | |
| HI 52 | 00511 | Federal | RT | 1/1/1955 | 1,440 | Apache | 75.0% | TERMIN | |
| HI 53 | 00513 | Federal | RT | 1/1/1955 | 180 | Phoenix Exp | 75.0% | TERMIN | |
| HI 53 | 00740 | Federal | RT | 4/1/1960 | 1,440 | Phoenix Exp | 75.0% | TERMIN | |
| HI A-133 | G32760 | Federal | RT | 11/1/2008 | 5,760 | Apache | 100.0% | EXPIR | |
| HI A-145 | G32761 | Federal | RT | 11/1/2008 | 5,760 | Apache | 100.0% | EXPIR | |
| HI A-146 | G32762 | Federal | RT | 11/1/2008 | 5,760 | Apache Shelf Exp | 100.0% | EXPIR | |
| HI A-148 | G32763 | Federal | RT | 11/1/2008 | 5,760 | Apache | 100.0% | EXPIR | |
| HI A-160 | G32764 | Federal | RT | 11/1/2008 | 5,760 | Apache | 100.0% | EXPIR | |
| HI A-171 | G30679 | Federal | RT | 12/1/2006 | 5,760 | Walter O&G | 33.3% | TERMIN | |
| HI A-326 | G32777 | Federal | RT | 11/1/2008 | 5,760 | Apache | 100.0% | EXPIR | |
| HI A-334 | G02423 | Federal | RT | 8/1/1973 | 5,760 | Fieldwood En | 38.9% | TERMIN | |
| HI A-341 | G25605 | Federal | RT | 12/1/2003 | 5,760 | Fieldwood En | 60.0% | PROD | [4] |
| HI A-350 | G02428 | Federal | RT | 8/1/1973 | 4,345 | Apache | 100.0% | RELINQ | |
| HI A360 | G34677 | Federal | RT | 3/1/2013 | 5,760 | Apache Shelf Exp | 100.0% | RELINQ | |
| HI A361 | G34678 | Federal | RT | 3/1/2013 | 5,760 | Fieldwood En | 100.0% | RELINQ | |
| HI A363 | G33413 | Federal | RT | 10/1/2009 | 5,760 | Apache Shelf Exp | 100.0% | EXPIR | |
| HI A-365 | G02750 | Federal | RT | 7/1/1974 | 5,760 | Fieldwood En | 53.1% | PROD | [4] |
| HI A-376 | G02754 | Federal | OP 1 | 7/1/1974 | 5,760 | Fieldwood En | 100.0% | PROD | [4] |
| HI A-376 | G02754 | Federal | RT | 7/1/1974 | 5,760 | Fieldwood En | 44.4% | PROD | [4] |

| Block | Lease | Type | Rights | Date Le Eff | Le Cur Acres | Operator | WI | Lease Status | Notes[†] |
|---|---|---|---|---|---|---|---|---|---|
| HI A-376 | G02754 | Federal | ORRI | 7/1/1974 | | Fieldwood En | 1.2% | PROD | [4] |
| HI A-376 | G02754 | Federal | ORRI | 7/1/1974 | | Fieldwood En | 6.0% | PROD | [4] |
| HI A-382 | G02757 | Federal | RT | 7/1/1974 | 5,760 | Fieldwood En | 72.4% | PROD | [4] |
| HI A406 | G32767 | Federal | RT | 11/1/2008 | 5,760 | Apache | 100.0% | EXPIR | |
| HI A430 | G33412 | Federal | RT | 10/1/2009 | 5,760 | Apache Shelf Exp | 100.0% | EXPIR | |
| HI A442 | G11383 | Federal | OP | 11/1/1989 | 5,760 | Northstar Off Grp | 22.7% | TERMIN | |
| HI A454 | G32769 | Federal | RT | 11/1/2008 | 5,760 | Apache | 100.0% | EXPIR | |
| HI A457 | G32770 | Federal | RT | 11/1/2008 | 5,760 | Apache | 100.0% | EXPIR | |
| HI A-474 | G02366 | Federal | RT | 8/1/1973 | 5,760 | McMoRan O&G | 10.0% | TERMIN | [4] |
| HI A-475 | G02367 | Federal | CONT | 8/1/1973 | 5,760 | McMoRan O&G | 10.0% | TERMIN | [4] |
| HI A-489 | G02372 | Federal | RT | 8/1/1973 | 5,760 | McMoRan O&G | 8.5% | TERMIN | [4] |
| HI A537 | G02698 | Federal | CONT | 5/29/1974 | | McMoRan O&G | | TERMIN | |
| HI A545 | G17199 | Federal | OP | 1/1/1997 | 5,760 | Fieldwood En | 60.0% | TERMIN | |
| HI A-572 | G02392 | Federal | RT | 8/1/1973 | 5,760 | Apache | 72.4% | TERMIN | [4] |
| HI A-573 | G02393 | Federal | RT | 8/1/1973 | 5,760 | Fieldwood En | 72.4% | PROD | [4] |
| HI A-581 | G18959 | Federal | CONT | 8/27/1997 | | Cox Op | 24.7% | TERMIN | [4] |
| HI A582 | G02719 | Federal | RT | 7/1/1974 | 5,760 | Cox Op | 24.7% | PROD | [4] |
| HI A-582 | G02719 | Federal | OP 1 | 7/1/1974 | 5,760 | Cox Op | 15.5% | PROD | [4] |
| HI A-595 | G02721 | Federal | RT | 7/1/1974 | 5,760 | Fieldwood En | 72.4% | PROD | [4] |
| HI A-596 | G02722 | Federal | RT | 7/1/1974 | 5,760 | Fieldwood En | 72.4% | PROD | [4] |
| MC 108 | G09777 | Federal | RT | 7/1/1988 | 5,760 | BP E&P | 75.2% | PROD | |
| MC 108 | G09777 | Federal | OP | 7/1/1988 | 5,760 | BP E&P | 75.2% | PROD | |
| MC 110 | G18192 | Federal | RT | 8/1/1997 | 5,760 | Fieldwood En | 50.0% | PROD | [2] |
| MC 110 | G18192 | Federal | OP | 8/1/1997 | 5,760 | Fieldwood En | 25.0% | PROD | [2] |
| MC 110 | G18192 | Federal | ORRI | 8/1/1997 | | Fieldwood En | 3.9% | PROD | [2] |
| MC 21 | G28351 | Federal | ORRI | 7/1/1995 | 4,445 | ANKOR En | 3.0% | PROD | |
| MC 311 | G02968 | Federal | RT | 12/1/1974 | 5,760 | Fieldwood En | 100.0% | PROD | |
| MC 65 | G21742 | Federal | RT | 6/1/2000 | 5,760 | ANKOR En | 100.0% | PROD | |
| MC 65 | G21742 | Federal | ORRI | 6/1/2000 | | ANKOR En | 13.0% | PROD | |
| MI 486 | MF88560 | SL - TX | WI | 10/5/1982 | 1,440 | Fieldwood | 100.0% | EXPIRED | |
| MI 487 | MF-88562 | SL - TX | WI | 10/5/1982 | 1,305 | Fieldwood | 100.0% | SI | |
| MI 518 | G05169 | Federal | RT | 1/1/1983 | 5,675 | Fieldwood En | 100.0% | TERMIN | |
| MI 518 | MF80522 | SL - TX | WI | 10/2/1979 | 85 | Fieldwood | 100.0% | EXPIRED | |
| MI 519 | MF-79413 | SL - TX | WI | 2/6/1979 | 739 | Fieldwood | 100.0% | SI | |

11

| Block | Lease | Type | Rights | Date Le Eff | Le Cur Acres | Operator | WI | Lease Status | Notes[†] |
|-------|-------|------|--------|-------------|--------------|----------|-----|-------------|--------|
| MI 622 | G05000 | Federal | RT | 4/1/1982 | 5,760 | Fieldwood En | 81.0% | TERMIN | |
| MI 622 | G05000 | Federal | OP | 4/1/1982 | 5,760 | BP E&P | 37.5% | TERMIN | |
| MI 623 | G03088 | Federal | RT | 4/1/1975 | 5,760 | Fieldwood En | 81.0% | TERMIN | |
| MI 623 | G03088 | Federal | OP | 4/1/1975 | 5,760 | BP E&P | 37.5% | TERMIN | |
| MI 635 | G06043 | Federal | RT | 10/1/1983 | 5,760 | Fieldwood En | 81.0% | TERMIN | |
| MI 635 | G06043 | Federal | OP | 10/1/1983 | 5,760 | BP E&P | 37.5% | TERMIN | |
| MI 636 | G34670 | Federal | RT | 4/1/2013 | 5,760 | Apache Shelf Exp | 100.0% | RELINQ | |
| MI 652 | G34022 | Federal | RT | 2/1/2012 | 5,760 | Apache Shelf Exp | 100.0% | EXPIR | |
| MI 681 | G04703 | Federal | RT | 9/1/1981 | 5,760 | Fieldwood En | 100.0% | TERMIN | |
| MI 685 | G04548 | Federal | RT | 1/1/1981 | 5,760 | EOG Res | 50.0% | TERMIN | |
| MI 685 | G04548 | Federal | OP | 1/1/1981 | 5,760 | EOG Res | 2.5% | TERMIN | |
| MI 703 | G03733 | Federal | RT 1 | 6/1/1978 | 5,760 | Fieldwood En | 100.0% | TERMIN | |
| MI 703 | G03733 | Federal | OP 1 | 6/1/1978 | 5,760 | Fieldwood En | 100.0% | TERMIN | |
| MI 703 | G03733 | Federal | OP 2 | 6/1/1978 | 5,760 | Fieldwood En | 100.0% | TERMIN | |
| MI 772 | MF93351 | SL - TX | WI | 2/7/1989 | 704 | Fieldwood | 100.0% | TERMINATED | |
| MO 820 | G34403 | Federal | RT | 8/1/2012 | 3,347 | Apache Shelf Exp | 100.0% | RELINQ | |
| MO 821 | G05058 | Federal | RT | 4/1/1982 | 4,028 | Fieldwood En | 100.0% | TERMIN | |
| MO 821 | STATE OF ALABAMA 627 | SL - AL | WI | 8/14/1984 | 2,511 | Fieldwood | 100.0% | TERMINATED | |
| MO 826 | G26176 | Federal | RT | 7/1/2004 | 1,430 | Fieldwood En | 75.0% | PROD | |
| MO 871 | G32272 | Federal | RT | 8/1/2008 | 5,760 | Apache | 100.0% | EXPIR | |
| MO 913 | G33131 | Federal | RT | 6/1/2009 | 5,760 | Apache Shelf Exp | 75.0% | EXPIR | |
| MO 914 | G33132 | Federal | RT | 6/1/2009 | 5,760 | Apache Shelf Exp | 75.0% | EXPIR | |
| MP 120 | G03197 | Federal | ORRI | 5/28/1975 | | Arena Off | 2.0% | PROD | |
| MP 120 | G03197 | Federal | ORRI | 7/1/1975 | | Arena Off | 2.0% | PROD | |
| MP 134 | G34375 | Federal | RT | 10/1/2012 | 4,995 | Apache Shelf Exp | 100.0% | RELINQ | |
| MP 135 | G34376 | Federal | RT | 10/1/2012 | 4,995 | Apache Shelf Exp | 100.0% | RELINQ | |
| MP 136 | G34377 | Federal | RT | 10/1/2012 | 4,995 | Apache Shelf Exp | 100.0% | RELINQ | |
| MP 137 | G34378 | Federal | RT | 10/1/2012 | 4,995 | Apache Shelf Exp | 100.0% | RELINQ | |
| MP 140 | G02193 | Federal | RT | 10/1/1972 | 4,995 | Fieldwood En | 65.0% | PROD | |
| MP 143 | G34380 | Federal | RT | 10/1/2012 | 4,995 | Apache Shelf Exp | 100.0% | RELINQ | |
| MP 146 | G34860 | Federal | RT | 7/1/2013 | 4,561 | Apache Shelf Exp | 75.0% | RELINQ | |
| MP 147 | G34861 | Federal | RT | 7/1/2013 | 4,561 | Apache Shelf Exp | 75.0% | RELINQ | |

| Block | Lease | Type | Rights | Date Le Eff | Le Cur Acres | Operator | WI | Lease Status | Notes[†] |
|-------|-------|------|--------|-------------|--------------|----------|-----|--------------|---------|
| MP 148 | G34381 | Federal | RT | 11/1/2012 | 5,000 | Apache Shelf Exp | 100.0% | RELINQ | |
| MP 149 | G34382 | Federal | RT | 11/1/2012 | 5,000 | Apache Shelf Exp | 100.0% | RELINQ | |
| MP 150 | G34862 | Federal | RT | 7/1/2013 | 5,000 | Apache Shelf Exp | 75.0% | RELINQ | |
| MP 152 | G01966 | Federal | RT | 1/1/1970 | 4,978 | Fieldwood En | 50.0% | UNIT | |
| MP 152 | G01966 | Federal | OP | 1/1/1970 | 4,978 | Fieldwood En | 75.0% | UNIT | |
| MP 153 | G01967 | Federal | RT | 1/1/1970 | 5,000 | Fieldwood En | 50.0% | UNIT | |
| MP 153 | G01967 | Federal | OP | 1/1/1970 | 5,000 | Fieldwood En | 75.0% | UNIT | |
| MP 166 | G26152 | Federal | RT | 7/1/2004 | 4,995 | Fieldwood En | 100.0% | TERMIN | |
| MP 175 | G08753 | Federal | OP | 8/1/1987 | 4,995 | Tana Exp | 21.2% | TERMIN | |
| MP 255 | G07825 | Federal | RT | 8/1/1985 | 4,995 | Fieldwood En | 52.4% | TERMIN | |
| MP 259 | G07827 | Federal | RT | 9/1/1985 | 4,995 | Fieldwood En | 56.9% | TERMIN | |
| MP 260 | G07828 | Federal | RT | 9/1/1985 | 4,995 | Fieldwood En | 56.9% | TERMIN | |
| MP 270 | G22812 | Federal | ORRI | 7/1/2001 | 4,995 | Castex Off | 1.0% | UNIT | |
| MP 271 | G34388 | Federal | RT | 10/1/2012 | 4,995 | Apache Shelf Exp | 100.0% | EXPIR | |
| MP 272 | G34865 | Federal | RT | 7/1/2013 | 4,995 | Apache Shelf Exp | 75.0% | RELINQ | |
| MP 273 | G33690 | Federal | RT | 7/1/2010 | 4,995 | Castex Off | 37.5% | UNIT | |
| MP 274 | G33691 | Federal | RT | 7/1/2010 | 4,995 | Castex Off | 37.5% | EXPIR | |
| MP 275 | G15395 | Federal | RT | 9/1/1995 | 4,995 | Fieldwood En | 100.0% | PROD | |
| MP 275 | G15395 | Federal | ORRI | 9/1/1995 | | Fieldwood En | 8.3% | PROD | |
| MP 281 | G10910 | Federal | RT | 7/1/1989 | 4,995 | EnVen En Vent | 50.0% | PROD | |
| MP 281 | G10910 | Federal | OP | 7/1/1989 | 4,995 | EnVen En Vent | 30.0% | PROD | |
| MP 281 | G10910 | Federal | ORRI | 7/1/1989 | | EnVen En Vent | 3.1% | PROD | |
| MP 289 | G01666 | Federal | RT | 7/1/1967 | 4,561 | Fieldwood En | 100.0% | PROD | |
| MP 290 | G01667 | Federal | RT | 7/1/1967 | 4,561 | Apache | 100.0% | TERMIN | |
| MP 290 | G34866 | Federal | RT | 7/1/2013 | 4,561 | Apache Shelf Exp | 75.0% | RELINQ | |
| MP 291 | G34391 | Federal | RT | 11/1/2012 | 4,561 | Apache Shelf Exp | 100.0% | EXPIR | |
| MP 292 | G34392 | Federal | RT | 11/1/2012 | 4,561 | Apache Shelf Exp | 100.0% | RELINQ | |
| MP 293 | G34393 | Federal | RT | 11/1/2012 | 4,561 | Apache Shelf Exp | 100.0% | EXPIR | |
| MP 294 | G34394 | Federal | RT | 11/1/2012 | 4,561 | Apache Shelf Exp | 100.0% | RELINQ | |
| MP 295 | G32263 | Federal | CONT | 8/1/2008 | 4,561 | Fieldwood En | 37.5% | TERMIN | |
| MP 296 | G01673 | Federal | RT | 6/1/1967 | 4,561 | GOM Shelf | 50.0% | UNIT | [1] |
| MP 296 | G01673 | Federal | OP | 6/1/1967 | 4,561 | GOM Shelf | 25.0% | UNIT | |
| MP 297 | G34395 | Federal | RT | 11/1/2012 | 4,561 | Apache Shelf Exp | 100.0% | RELINQ | |
| MP 300 | G01317 | Federal | OP | 6/1/1962 | 4,561 | Cantium | 10.4% | UNIT | |

13

| Block | Lease | Type | Rights | Date Le Eff | Le Cur Acres | Operator | WI | Lease Status | Notes[†] |
|---|---|---|---|---|---|---|---|---|---|
| MP 301 | G04486 | Federal | OP 1 | 11/1/1980 | 5,000 | Walter O&G | 10.4% | TERMIN | |
| MP 301 | G04486 | Federal | OP 2 | 11/1/1980 | 5,000 | Walter O&G | 6.3% | TERMIN | |
| MP 301 | G04486 | Federal | OP 3 | 11/1/1980 | 5,000 | Walter O&G | 10.4% | TERMIN | |
| MP 301 | G04486 | Federal | RT | 11/1/1980 | 5,000 | Walter O&G | 10.4% | TERMIN | |
| MP 302 | G32264 | Federal | RT | 7/1/2008 | 5,000 | GOM Shelf | 100.0% | PROD | |
| MP 303 | G04253 | Federal | OP 1 | 12/1/1979 | 5,000 | Fieldwood En | 25.0% | UNIT | |
| MP 303 | G04253 | Federal | RT | 12/1/1979 | 5,000 | Fieldwood En | 100.0% | UNIT | |
| MP 304 | G03339 | Federal | OP | 4/1/1976 | 5,000 | ConocoPhillips | 100.0% | UNIT | |
| MP 305 | G34396 | Federal | RT | 12/1/2012 | 5,000 | Apache Shelf Exp | 100.0% | RELINQ | |
| MP 308 | G32265 | Federal | RT | 8/1/2008 | 5,000 | Fieldwood En | 100.0% | PROD | |
| MP 309 | G08760 | Federal | RT | 6/1/1987 | 5,000 | Fieldwood En | 100.0% | PROD | |
| MP 310 | G04126 | Federal | RT | 10/1/1979 | 5,000 | Fieldwood En | 100.0% | UNIT | |
| MP 311 | G02213 | Federal | RT | 11/1/1972 | 5,000 | GOM Shelf | 50.0% | PROD | [1] |
| MP 311 | G02213 | Federal | OP | 11/1/1972 | 5,000 | GOM Shelf | 25.0% | PROD | |
| MP 312 | G16520 | Federal | RT | 7/1/1996 | 5,000 | Fieldwood En | 100.0% | PROD | |
| MP 314 | G33693 | Federal | OP | 7/1/2010 | 5,000 | Apache Shelf Exp | 80.0% | EXPIR | |
| MP 315 | G08467 | Federal | RT | 7/1/1986 | 5,000 | Fieldwood En | 100.0% | PROD | |
| MP 315 | G08467 | Federal | OP 3 | 7/1/1986 | 5,000 | Fieldwood En | 100.0% | PROD | |
| MP 315 | G08467 | Federal | OP 1 | 7/1/1986 | 5,000 | Fieldwood En | 80.0% | PROD | |
| MP 5 | SL13890 | SL-LA | WI | | 26 | Apache | 50.0% | TERMIN | |
| MP 59 | G03194 | Federal | OP | 7/1/1975 | 1,406 | Cantium | 37.5% | UNIT | |
| MP 59 | G08461 | Federal | OP | 7/1/1986 | 2,340 | Cantium | 37.5% | UNIT | |
| MP 6 | SL03771 | SL-LA | WI | 4/26/1961 | 1,067 | Apache | 50.0% | TERMIN | |
| MP 6 | SL13580 | SL-LA | WI | | 287 | Apache | 50.0% | TERMIN | |
| MP 6 | SL13891 | SL-LA | WI | | 270 | Apache | 50.0% | TERMIN | |
| MP 64 | G04909 | Federal | ORRI | 12/1/1981 | 4,988 | Sanare En Part | 4.2% | UNIT | |
| MP 7 | SL03773 | SL-LA | WI | 4/26/1961 | – | Apache | 50.0% | TERMIN | |
| MP 7 | SL13892 | SL-LA | WI | | 44 | Apache | 50.0% | TERMIN | |
| MP 74 | G34857 | Federal | RT | 8/1/2013 | 1,733 | Apache Shelf Exp | 75.0% | RELINQ | |
| MP 77 | G04481 | Federal | RT | 11/1/1980 | 4,655 | Fieldwood En Off | 26.2% | RELINQ | [7] |
| MP 77/78 | G04481 | Federal | OP | 11/1/1980 | 4,655 | Fieldwood En Off | 23.5% | RELINQ | [7] |
| MP 91 | G14576 | Federal | RT | 5/1/1994 | 1,017 | Apache | 100.0% | TERMIN | |
| MU 883 | MF98761 | SL - TX | WI | | | Apache | 100.0% | TERMIN | |
| MU A-111 | G03068 | Federal | RT | 4/1/1975 | 5,760 | Apache | 100.0% | TERMIN | |

| Block | Lease | Type | Rights | Date Le Eff | Le Cur Acres | Operator | WI | Lease Status | Notes† |
|---|---|---|---|---|---|---|---|---|---|
| MU A133 | G33392 | Federal | RT | 10/1/2009 | 5,760 | Apache Shelf Exp | 100.0% | EXPIR | |
| MU A134 | G32724 | Federal | RT | 11/1/2008 | 5,760 | Apache | 100.0% | EXPIR | |
| MU A85 | G03061 | Federal | RT | 4/1/1975 | 5,760 | EnVen En Vent | 53.3% | PROD | |
| PE 881 | G06390 | Federal | OP | 2/1/1984 | 5,760 | ConocoPhillips | 18.8% | TERMIN | |
| PL 1 | G04234 | Federal | RT | 1/1/1980 | 1,568 | Fieldwood En | 100.0% | TERMIN | |
| PL 10 | G02925 | Federal | RT | 12/1/1974 | 5,000 | Fieldwood En | 100.0% | TERMIN | |
| PL 11 | 00071 | Federal | RT | 9/12/1946 | 5,000 | Fieldwood En | 100.0% | RELINQ | |
| PL 13 | G03171 | Federal | RT | 7/1/1975 | 5,000 | ANKOR En | 12.5% | TERMIN | |
| PL 13 | G03171 | Federal | OP 1 | 7/1/1975 | 391 | ANKOR En | 12.5% | TERMIN | |
| PL 13 | G03171 | Federal | OP 2 | 7/1/1975 | 3,906 | ANKOR En | 12.5% | TERMIN | |
| PL 13 | G03171 | Federal | OP 3 | 7/1/1975 | 703 | ANKOR En | 4.4% | TERMIN | |
| PL 13 | G03171 | Federal | OP 5 | 7/1/1975 | 391 | ANKOR En | 12.5% | TERMIN | |
| PL 25 | G14535 | Federal | RT | 7/1/1994 | 5,000 | Fieldwood En | 100.0% | TERMIN | |
| PL 5 | G12027 | Federal | RT | 6/1/1990 | 5,000 | Talos En Off | 100.0% | RELINQ | |
| PL 6 | G09651 | Federal | RT | 5/1/1988 | 5,000 | Walter O&G | 100.0% | RELINQ | |
| PL 6 | G09651 | Federal | OP 1 | 5/1/1988 | 5,000 | Walter O&G | 35.0% | RELINQ | |
| PL 6 | G09651 | Federal | OP 2 | 5/1/1988 | 5,000 | Walter O&G | 65.0% | RELINQ | |
| PL 8 | G03587 | Federal | RT | 8/1/1977 | 5,000 | ANKOR En | 12.5% | TERMIN | |
| PL 9 | G02924 | Federal | RT | 12/1/1974 | 5,000 | Fieldwood En | 100.0% | TERMIN | |
| PL 9 | G02924 | Federal | OP | 12/1/1974 | 5,000 | Fieldwood En | 50.0% | TERMIN | |
| PN 883 | MF100410 | SL - TX | WI | 10/6/1998 | 720 | Fieldwood | 35.0% | ACTIVE | |
| PN 883 | MF100411 | SL - TX | WI | 10/6/1998 | 720 | Fieldwood | 35.0% | ACTIVE | |
| PN 883 | MF100412 | SL - TX | WI | 10/6/1998 | 720 | Fieldwood | 35.0% | ACTIVE | |
| PN 883 | MF101898 | SL - TX | WI | 10/6/1998 | | Apache | 35.0% | TERMIN | |
| PN 883 | MF96146 | SL - TX | WI | 10/4/1994 | 720 | Fieldwood | 35.0% | ACTIVE | |
| PN 883 | MF96147 | SL - TX | WI | 10/4/1994 | 720 | Fieldwood | 35.0% | ACTIVE | |
| PN 883 | SL96146 | SL - TX | WI | 10/4/1994 | 720 | Fieldwood | 35.0% | ACTIVE | |
| PN 899L | MF100413 | SL - TX | WI | 10/6/1998 | 375 | Fieldwood | 35.0% | ACTIVE | |
| PN 899L | MF100414 | SL - TX | WI | 10/6/1998 | 360 | Fieldwood | 35.0% | ACTIVE | |
| PN 969 | G05953 | Federal | RT | 10/1/1983 | 5,760 | Peregrine O&G II | 8.3% | TERMIN | |
| PN 976 | G05954 | Federal | RT | 10/1/1983 | 5,760 | Peregrine O&G II | 8.3% | TERMIN | |
| SA 10 | G03958 | Federal | RT | 3/1/1979 | 3,144 | Fieldwood En | 92.3% | TERMIN | |
| SA 10 | G03958 | Federal | OP | 3/1/1979 | 3,144 | Fieldwood En | 20.0% | TERMIN | |
| SA 13 | G03959 | Federal | OP | 3/1/1979 | 5,000 | Renaissance Off | 50.0% | TERMIN | |

| Block | Lease | Type | Rights | Date Le Eff | Le Cur Acres | Operator | WI | Lease Status | Notes[†] |
|-------|-------|------|--------|-------------|--------------|----------|-----|--------------|----------|
| SM 10 | G01181 | Federal | RT | 4/1/1962 | 5,000 | Fieldwood En | 100.0% | TERMIN | |
| SM 105 | G17938 | Federal | RT | 8/1/1997 | 5,000 | Fieldwood En | 100.0% | PROD | |
| SM 106 | G02279 | Federal | RT | 2/1/1973 | 2,500 | Fieldwood En | 100.0% | TERMIN | |
| SM 106 | G03776 | Federal | RT | 6/1/1978 | 2,500 | Fieldwood En | 100.0% | PROD | |
| SM 108 | 00792 | Federal | RT | 5/1/1960 | 5,000 | Talos En Off | 25.0% | PROD | [1] |
| SM 108 | 00792 | Federal | OP | 5/1/1960 | 5,000 | Talos En Off | 12.5% | PROD | |
| SM 11 | G01182 | Federal | RT | 3/1/1962 | 5,000 | Fieldwood En | 100.0% | TERMIN | |
| SM 127 | G02883 | Federal | RT | 12/1/1974 | 2,784 | Fieldwood En | 66.7% | PROD | |
| SM 127 | G02883 | Federal | OP 2 | 12/1/1974 | 2,784 | Fieldwood En | 33.3% | PROD | |
| SM 127 | G02883 | Federal | RT | 12/1/1974 | 2,784 | Fieldwood En | 17.3% | PROD | [1] |
| SM 127 | G02883 | Federal | OP 2 | 12/1/1974 | 2,784 | Fieldwood En | 8.7% | PROD | [1] |
| SM 128 | G02587 | Federal | RT | 5/1/1974 | 5,000 | Fieldwood En | 66.7% | PROD | |
| SM 128 | G02587 | Federal | RT | 5/1/1974 | 5,000 | Fieldwood En | 17.3% | PROD | [1] |
| SM 132 | G02282 | Federal | RT | 2/1/1973 | 5,000 | Fieldwood En | 50.0% | TERMIN | [6] |
| SM 135 | G19776 | Federal | RT | 5/1/1998 | 3,293 | Fieldwood En | 50.0% | TERMIN | [4] |
| SM 136 | G02588 | Federal | RT | 5/1/1974 | 2,500 | Fieldwood En | 50.0% | TERMIN | [6] |
| SM 137 | G02589 | Federal | RT | 5/1/1974 | 5,000 | Fieldwood En | 50.0% | TERMIN | [6] |
| SM 141 | G02885 | Federal | OP 2 | 12/1/1974 | 5,000 | Fieldwood En | 66.7% | TERMIN | |
| SM 141 | G02885 | Federal | RT | 12/1/1974 | 5,000 | Fieldwood En | 77.6% | TERMIN | |
| SM 141 | G02885 | Federal | OP 2 | 12/1/1974 | 5,000 | Fieldwood En | 17.3% | TERMIN | [1] |
| SM 149 | G02592 | Federal | RT | 5/1/1974 | 2,500 | Fieldwood En | 50.0% | PROD | [2] |
| SM 149 | G02592 | Federal | OP | 5/1/1974 | 2,500 | Fieldwood En | 25.0% | PROD | [2] |
| SM 150 | G16325 | Federal | RT | 6/1/1996 | 3,329 | Fieldwood En | 50.0% | RELINQ | [6] |
| SM 161 | G04809 | Federal | RT | 9/1/1981 | 5,000 | Fieldwood En | 100.0% | PROD | |
| SM 171 | G34273 | Federal | RT | 9/1/2012 | 5,000 | Apache Shelf Exp | 100.0% | EXPIR | |
| SM 172 | G34274 | Federal | RT | 9/1/2012 | 5,000 | Apache Shelf Exp | 100.0% | RELINQ | |
| SM 177 | G34275 | Federal | RT | 9/1/2012 | 5,000 | Apache Shelf Exp | 100.0% | RELINQ | |
| SM 178 | G34276 | Federal | RT | 9/1/2012 | 5,000 | Apache Shelf Exp | 100.0% | EXPIR | |
| SM 18 | G08680 | Federal | RT | 6/1/1987 | 5,000 | Fieldwood En | 50.0% | TERMIN | |
| SM 18 | G08680 | Federal | OP | 6/1/1987 | 5,000 | Fieldwood En | 100.0% | TERMIN | |
| SM 188 | G34277 | Federal | RT | 9/1/2012 | 5,000 | Apache Shelf Exp | 100.0% | RELINQ | |
| SM 189 | G34278 | Federal | RT | 9/1/2012 | 5,000 | Apache Shelf Exp | 100.0% | RELINQ | |
| SM 193 | G34279 | Federal | RT | 9/1/2012 | 5,000 | Apache Shelf Exp | 100.0% | RELINQ | |
| SM 195 | G21108 | Federal | ORRI | 6/1/1999 | | Tarpon O&D | 4.0% | TERMIN | |

| Block | Lease | Type | Rights | Date Le Eff | Le Cur Acres | Operator | WI | Lease Status | Notes[†] |
|---|---|---|---|---|---|---|---|---|---|
| SM 236 | G4437 | Federal | ORRI | 11/1/1980 | | Cox Op | 4.4% | UNIT | |
| SM 241 | 00310 | Federal | RT | 2/7/1936 | 114,601 | Cox Op | 60.0% | UNIT | |
| SM 241 | 00310 | Federal | OP | 2/7/1936 | 114,601 | Cox Op | 60.0% | UNIT | |
| SM 241 | 00310 | Federal | Unit | 2/7/1936 | 114,601 | Cox Op | 16.0% | UNIT | |
| SM 268 | G02310 | Federal | CONT | 12/19/1972 | | Apache | 69.9% | TERMIN | [4] |
| SM 268 | G34284 | Federal | RT | 8/1/2012 | 3,237 | Apache Shelf Exp | 100.0% | EXPIR | [4] |
| SM 269 | G02311 | Federal | RT | 1/1/1973 | 5,000 | Fieldwood En | 72.8% | PROD | [4] |
| SM 280 | G14456 | Federal | OP 1 | 6/1/1994 | 5,000 | Fieldwood En | 50.0% | PROD | [4] |
| SM 280 | G14456 | Federal | OP 3 | 6/1/1994 | 5,000 | Fieldwood En | 50.0% | PROD | [4] |
| SM 280 | G14456 | Federal | RT | 6/1/1994 | 5,000 | Fieldwood En | 50.0% | PROD | [4] |
| SM 281 | G02600 | Federal | RT | 4/1/1974 | 3,214 | Fieldwood En | 68.1% | PROD | [4] |
| SM 34 | G13897 | Federal | OP | 5/1/1993 | 5,000 | Black Elk En Off Op | 50.0% | TERMIN | |
| SM 41 | G01192 | Federal | OP 2 | 6/1/1962 | 5,000 | Sanare En Part | 25.0% | PROD | [2] |
| SM 41 | G01192 | Federal | OP 3 | 6/1/1962 | 5,000 | Sanare; Fieldw En Off | 50.0% | PROD | [2] |
| SM 44 | G23840 | Federal | RT | 5/1/2002 | 5,000 | SandRidge En Off | 100.0% | TERMIN | |
| SM 48 | 00786 | Federal | RT | 5/1/1960 | 5,000 | Fieldwood En | 100.0% | PROD | [2] |
| SM 48 | 00786 | Federal | OP | 5/1/1960 | 5,000 | Fieldwood En | 50.0% | PROD | [2] |
| SM 58 | G01194 | Federal | RT | 5/1/1962 | 5,000 | ANKOR En | 100.0% | PROD | |
| SM 66 | G01198 | Federal | RT | 6/1/1962 | 5,000 | Fieldwood En | 50.0% | TERMIN | [6] |
| SM 7 | G33610 | Federal | RT | 7/1/2010 | 5,000 | Apache Shelf Exp | 100.0% | RELINQ | |
| SM 76 | G01208 | Federal | RT | 6/1/1962 | 5,000 | Fieldwood En | 50.0% | TERMIN | |
| SM 93 | G21618 | Federal | RT | 5/1/2000 | 5,000 | Talos ERT | 12.5% | PROD | |
| SM 97 | G32159 | Federal | RT | 8/1/2008 | 5,000 | Apache | 100.0% | EXPIR | |
| SP 61 | G01609 | Federal | OP | 7/1/1967 | 5,000 | Fieldwood En | 100.0% | UNIT | [5] |
| SP 62 | G01294 | Federal | RT | 6/1/1962 | 5,000 | Fieldwood En | 100.0% | PROD | |
| SP 63 | G34365 | Federal | RT | 8/1/2012 | 5,000 | Apache Shelf Exp | 100.0% | EXPIR | |
| SP 64 | G01901 | Federal | RT | 1/1/1969 | 5,000 | Fieldwood En | 50.0% | UNIT | |
| SP 64 | G01901 | Federal | OP | 1/1/1969 | 5,000 | Fieldwood En | 75.0% | UNIT | |
| SP 65 | G01610 | Federal | RT | 7/1/1967 | 5,000 | Fieldwood En | 50.0% | UNIT | |
| SP 65 | G01610 | Federal | OP | 7/1/1967 | 5,000 | Fieldwood En | 75.0% | UNIT | |
| SP 66 | G1611 | Federal | ORRI | 6/1/1967 | | Fieldwood En | 8.3% | UNIT | [4] |
| SP 68 | G34366 | Federal | RT | 8/1/2012 | 5,000 | Apache Shelf Exp | 100.0% | RELINQ | |
| SP 69 | G34367 | Federal | RT | 8/1/2012 | 5,000 | Apache Shelf Exp | 100.0% | RELINQ | |

17

| Block | Lease | Type | Rights | Date Le Eff | Le Cur Acres | Operator | WI | Lease Status | Notes[†] |
|-------|-------|------|--------|-------------|--------------|----------|-----|--------------|-------|
| SP 70 | G01614 | Federal | RT | 6/1/1967 | 5,000 | Fieldwood En | 100.0% | PROD | |
| SP 75 | G05051 | Federal | OP 2 | 4/1/1982 | 5,000 | GOM Shelf | 28.8% | TERMIN | |
| SP 75 | G05051 | Federal | RT | 4/1/1982 | 5,000 | GOM Shelf | 71.2% | TERMIN | [1] |
| SP 75 | G05051 | Federal | OP 2 | 4/1/1982 | 5,000 | GOM Shelf | 71.2% | TERMIN | [1] |
| SP 83 | G05052 | Federal | ORRI | 4/1/1982 | 5,000 | Arena Off | 0.7% | RELINQ | |
| SP 87 | G07799 | Federal | RT | 9/1/1985 | 3,540 | Fieldwood En | 33.3% | TERMIN | |
| SP 87 | G07799 | Federal | RT | 9/1/1985 | 3,540 | Fieldwood En | 33.3% | TERMIN | [1] |
| SP 88 | G10894 | Federal | RT | 6/1/1989 | 3,540 | Apache | 100.0% | RELINQ | |
| SP 89 | G01618 | Federal | RT | 7/1/1967 | 5,000 | Fieldwood En | 50.0% | PROD | |
| SP 96 | G31431 | Federal | RT | 3/1/2008 | 5,000 | Stone En | 50.0% | RELINQ | |
| SS 105 | G09614 | Federal | RT | 8/1/1988 | 5,000 | Bennu O&G | 100.0% | PROD | |
| SS 105 | G09614 | Federal | OP 2 | 8/1/1988 | 5,000 | Bennu O&G | 100.0% | PROD | |
| SS 105 | G09614 | Federal | OP 3 | 8/1/1988 | 5,000 | Bennu O&G | 100.0% | PROD | |
| SS 126 | G12940 | Federal | RT | 5/1/1991 | 5,000 | Fieldwood En | 100.0% | TERMIN | |
| SS 126 | G12940 | Federal | OP | 5/1/1991 | 5,000 | Fieldwood En | 100.0% | TERMIN | |
| SS 129 | G12941 | Federal | RT | 5/1/1991 | 5,000 | Fieldwood En | 100.0% | PROD | |
| SS 129 | G12941 | Federal | ORRI | 5/1/1991 | | Fieldwood En | 3.3% | PROD | |
| SS 130 | 00453 | Federal | ORRI | 1/1/1955 | 5,000 | W&T Off | 3.0% | TERMIN | |
| SS 145 | G34831 | Federal | CONT | 9/1/2013 | 5,000 | Hoactzin Part | 25.0% | TERMIN | |
| SS 150 | 00419 | Federal | ORRI | 11/1/1954 | 5,000 | Ridgelake En | 5.0% | PROD | |
| SS 151 | G15282 | Federal | RT | 7/1/1995 | 5,000 | EnVen En Vent | 100.0% | PROD | |
| SS 153 | G18011 | Federal | RT | 7/1/1997 | 5,000 | Fieldwood En | 33.3% | TERMIN | |
| SS 154 | 00420 | Federal | ORRI | 11/1/1954 | | Ridgelake En | 8.0% | PROD | |
| SS 159 | G11984 | Federal | OP | 7/1/1990 | 5,000 | Hoactzin Part | 15.5% | TERMIN | |
| SS 169 | 00820 | Federal | RT | 4/1/1960 | 5,000 | Fieldwood En | 66.7% | PROD | [6] |
| SS 175 | G05550 | Federal | RT | 7/1/1983 | 5,000 | Chevron USA | 66.7% | UNIT | |
| SS 176 | G33646 | Federal | RT | 7/1/2010 | 5,000 | Fieldwood En | 40.0% | PROD | |
| SS 178 | G05551 | Federal | RT | 7/1/1983 | 5,000 | Fieldwood En | 100.0% | PROD | |
| SS 182 | G03998 | Federal | RT | 3/1/1979 | 2,500 | Fieldwood En | 100.0% | PROD | |
| SS 188 | G05203 | Federal | CONT | 1/1/1983 | 5,027 | Fieldwood En | 100.0% | TERMIN | |
| SS 189 | G04232 | Federal | OP 5 | 12/1/1979 | 5,000 | Fieldwood En | 99.0% | PROD | [4] |
| SS 189 | G04232 | Federal | RT | 12/1/1979 | 5,000 | Fieldwood En | 99.0% | PROD | [4] |
| SS 189 | G4232 | Federal | ORRI | 12/1/1979 | | Fieldwood En | 8.0% | PROD | [4] |
| SS 190 | G10775 | Federal | RT | 4/1/1989 | 5,000 | Fieldwood En | 60.0% | TERMIN | |

| Block | Lease | Type | Rights | Date Le Eff | Le Cur Acres | Operator | WI | Lease Status | Notes[†] |
|---|---|---|---|---|---|---|---|---|---|
| SS 190 | G10775 | Federal | OP | 4/1/1989 | 5,000 | Fieldwood En | 100.0% | TERMIN | |
| SS 193 | G13917 | Federal | RT | 5/1/1993 | 5,000 | Fieldwood En | 100.0% | PROD | |
| SS 194 | G15288 | Federal | RT | 7/1/1995 | 5,000 | Fieldwood En | 100.0% | PROD | |
| SS 198 | 00593 | Federal | RT | 9/1/1955 | 2,969 | Renaissance Off | 50.0% | PROD | [1] |
| SS 198 | G12355 | Federal | OP | 9/1/1955 | 2,031 | Renaissance Off | 25.0% | PROD | |
| SS 199 | 00594 | Federal | RT | 9/1/1955 | 3,516 | Talos En Off | 50.0% | PROD | |
| SS 199 | G12358 | Federal | OP | 9/1/1955 | 1,484 | Renaissance Off | 50.0% | PROD | |
| SS 204 | G01520 | Federal | RT | 7/1/1967 | 5,000 | Fieldwood En | 55.2% | PROD | [4] |
| SS 206 | G01522 | Federal | RT | 7/1/1967 | 5,000 | Fieldwood En | 60.0% | UNIT | [6] |
| SS 207 | G01523 | Federal | RT | 7/1/1967 | 5,000 | Fieldwood En | 72.2% | UNIT | [7] |
| SS 207 | G01523 | Federal | OP | 7/1/1967 | 5,000 | Fieldwood En | 47.6% | UNIT | [7] |
| SS 210 | G05204 | Federal | CONT | 1/1/1983 | 5,000 | Fieldwood En | 100.0% | RELINQ | |
| SS 216 | G01524 | Federal | RT | 7/1/1967 | 5,000 | Fieldwood En | 80.0% | PROD | [4] |
| SS 243 | G10780 | Federal | RT | 7/1/1989 | 5,000 | Fieldwood En | 50.0% | PROD | |
| SS 243 | G10780 | Federal | ORRI | 7/1/1989 | | Fieldwood En | 4.2% | PROD | |
| SS 249 | G01030 | Federal | OP 1 | 6/1/1962 | 5,000 | Fieldwood En Off | 5.3% | UNIT | [4] |
| SS 249 | G1030 | Federal | ORRI | 6/1/1962 | | Fieldwood En Off | 0.2% | UNIT | [4] |
| SS 258 | G05560 | Federal | RT | 7/1/1983 | 5,000 | Castex Off | 100.0% | TERMIN | |
| SS 258 | G05560 | Federal | OP | 7/1/1983 | 5,000 | Castex Off | 7.4% | TERMIN | |
| SS 259 | G05044 | Federal | RT | 4/1/1982 | 5,141 | Fieldwood En | 100.0% | TERMIN | |
| SS 259 | G05044 | Federal | OP | 4/1/1982 | 5,141 | Fieldwood En | 7.4% | TERMIN | |
| SS 271 | G01038 | Federal | RT | 6/1/1962 | 5,000 | Fieldwood En Off | 20.0% | UNIT | [4] |
| SS 274 | G01039 | Federal | RT | 6/1/1962 | 5,000 | Fieldwood En | 100.0% | PROD | |
| SS 276 | G10785 | Federal | RT | 5/1/1989 | 5,000 | Monforte | 66.7% | TERMIN | |
| SS 277 | G09627 | Federal | RT | 5/1/1988 | 5,000 | Fieldwood En | 1.0% | SOP | |
| SS 277 | G09627 | Federal | OP | 5/1/1988 | 5,000 | Fieldwood En | 100.0% | SOP | |
| SS 278 | G32206 | Federal | RT | 8/1/2008 | 5,000 | Apache | 100.0% | EXPIR | |
| SS 291 | G02923 | Federal | OP | 12/1/1974 | 3,750 | Fieldwood En | 67.9% | OPERNS | [4] |
| SS 30 | 00333 | Federal | RT | 9/12/1946 | 5,000 | W & T Off | 37.5% | UNIT | |
| SS 301 | G10794 | Federal | ORRI | 5/1/1989 | | Fieldwood En | 1.5% | SOP | [2] |
| SS 31 | 00334 | Federal | RT | 9/12/1946 | 5,000 | W & T Off | 37.5% | UNIT | |
| SS 314 | G26074 | Federal | OP 4 | 5/1/2004 | 5,000 | Fieldwood En | 37.5% | PROD | |
| SS 314 | G26074 | Federal | RT | 5/1/2004 | 5,000 | Fieldwood En | 75.0% | PROD | |
| SS 314 | G26074 | Federal | ORRI | 5/1/2004 | | Fieldwood En | 4.5% | PROD | |

19

| Block | Lease | Type | Rights | Date Le Eff | Le Cur Acres | Operator | WI | Lease Status | Notes[†] |
|---|---|---|---|---|---|---|---|---|---|
| SS 32 | 00335 | Federal | RT | 9/12/1946 | 5,000 | W & T Off | 37.5% | UNIT | |
| SS 33 | 00336 | Federal | CONT | 9/12/1946 | 5,000 | W&T Off | 28.9% | UNIT | |
| SS 33 | 00336 | Federal | ORRI | 9/12/1946 | 5,000 | W&T Off | 0.8% | UNIT | |
| SS 354 | G15312 | Federal | RT | 7/1/1995 | 5,000 | Fieldwood En | 100.0% | PROD | |
| SS 355 | G33650 | Federal | RT | 6/1/2010 | 5,323 | Apache Shelf Exp | 100.0% | RELINQ | |
| SS 58 | G07746 | Federal | ORRI | 7/1/1985 | 5,000 | Talos Third Cst | 10.5% | PROD | |
| SS 68 | G02917 | Federal | RT | 12/1/1974 | 5,000 | Fieldwood En | 100.0% | RELINQ | |
| SS 87 | G12349 | Federal | ORRI | 9/12/1946 | 1,953 | Sanare En Part | 1.0% | UNIT | |
| SS 91 | G02919 | Federal | RT | 12/1/1974 | 5,000 | Fieldwood En | 87.5% | PROD | |
| SS 91 | G02919 | Federal | OP 2 | 12/1/1974 | 5,000 | Fieldwood En | 87.5% | PROD | |
| SS 91 | G02919 | Federal | OP 2 | 12/1/1974 | 5,000 | Fieldwood En | 12.5% | PROD | [1] |
| SS 91 | G02919 | Federal | RT | 12/1/1974 | 5,000 | Fieldwood En | 12.5% | PROD | [1] |
| ST 146 | G33110 | Federal | RT | 7/1/2009 | 3,772 | Apache Shelf Exp | 100.0% | EXPIR | |
| ST 148 | G01960 | Federal | RT | 2/1/1970 | 2,500 | Arena Off | 15.6% | PROD | |
| ST 148 | G01960 | Federal | OP | 2/1/1970 | 2,500 | Arena Off | 15.6% | PROD | |
| ST 161 | G01248 | Federal | OP | 6/1/1962 | 5,000 | Arena Off | 25.0% | PROD | |
| ST 166 | G01252 | Federal | OP | 6/1/1962 | 5,000 | Apache | 100.0% | TERMIN | |
| ST 173 | G04001 | Federal | RT | 3/1/1979 | 5,000 | Apache | 100.0% | TERMIN | |
| ST 179 | G12020 | Federal | RT | 6/1/1990 | 5,000 | Fieldwood En Off | 50.0% | TERMIN | |
| ST 179 | G12020 | Federal | OP | 6/1/1990 | 5,000 | Fieldwood En Off | 68.8% | TERMIN | |
| ST 190 | G01261 | Federal | RT | 6/1/1962 | 5,000 | Black Elk En Off Op | 40.0% | TERMIN | |
| ST 190 | G01261 | Federal | OP | 6/1/1962 | 5,000 | Black Elk En Off Op | 40.0% | TERMIN | |
| ST 194 | G05610 | Federal | RT | 7/1/1983 | 5,000 | Fieldwood En | 100.0% | TERMIN | |
| ST 203 | G01269 | Federal | OP 1 | 6/1/1962 | 5,000 | Black Elk En Off Op | 40.0% | TERMIN | |
| ST 203 | G01269 | Federal | OP 2 | 6/1/1962 | 5,000 | Black Elk En Off Op | 20.0% | TERMIN | |
| ST 203 | G01269 | Federal | RT | 6/1/1962 | 5,000 | Black Elk En Off Op | 40.0% | TERMIN | |
| ST 205 | G05612 | Federal | RT | 7/1/1983 | 5,000 | Fieldwood En | 50.0% | PROD | |
| ST 205 | G05612 | Federal | OP 3 | 7/1/1983 | 5,000 | Fieldwood En | 75.0% | PROD | |
| ST 205 | G05612 | Federal | OP 4 | 7/1/1983 | 5,000 | Fieldwood En | 100.0% | PROD | |
| ST 205 | G05612 | Federal | OP 7 | 7/1/1983 | 5,000 | Fieldwood En | 50.0% | PROD | |
| ST 205 | G05612 | Federal | OP 6 | 7/1/1983 | 5,000 | Fieldwood En | 75.0% | PROD | |
| ST 205 | G05612 | Federal | OP 5 | 7/1/1983 | 5,000 | Fieldwood En | 50.0% | PROD | |
| ST 205 | G05612 | Federal | ORRI | 7/1/1983 | 5,000 | Fieldwood En | 2.0% | PROD | |
| ST 206 | G05613 | Federal | RT | 7/1/1983 | 5,000 | Fieldwood En | 50.0% | TERMIN | |

| Block | Lease | Type | Rights | Date Le Eff | Le Cur Acres | Operator | WI | Lease Status | Notes[†] |
|---|---|---|---|---|---|---|---|---|---|
| ST 228 | G32217 | Federal | RT | 8/1/2008 | 5,000 | Eni US Op | 40.0% | EXPIR | |
| ST 229 | G13938 | Federal | OP | 7/1/1993 | 2,148 | W & T Off | 33.3% | PROD | |
| ST 244 | G34341 | Federal | RT | 10/1/2012 | 4,572 | Apache Shelf Exp | 100.0% | RELINQ | |
| ST 26 | G01361 | Federal | RT | 5/1/1964 | 625 | Cox Op | 50.0% | UNIT | |
| ST 26 | G01870 | Federal | RT | 11/1/1968 | 1,875 | Cox Op | 50.0% | UNIT | |
| ST 26 | G02620 | Federal | RT | 5/1/1974 | 2,500 | Cox Op | 50.0% | UNIT | |
| ST 276 | G07780 | Federal | RT | 8/1/1985 | 5,000 | Eni US Op | 100.0% | UNIT | |
| ST 276 | G07780 | Federal | OP | 8/1/1985 | 5,000 | Eni US Op | 100.0% | UNIT | |
| ST 290 | G16454 | Federal | RT | 4/24/1996 | 5,000 | Apache | 100.0% | TERMIN | |
| ST 291 | G16455 | Federal | RT | 9/1/1996 | 5,000 | Fieldwood En | 100.0% | PROD | |
| ST 291 | G16455 | Federal | OP | 9/1/1996 | 5,000 | Fieldwood En | 100.0% | PROD | |
| ST 295 | G05646 | Federal | RT | 7/1/1983 | 5,000 | Fieldwood En | 100.0% | UNIT | |
| ST 296 | G12981 | Federal | RT | 5/1/1991 | 5,000 | Fieldwood En | 100.0% | UNIT | |
| ST 296 | G12981 | Federal | OP | 5/1/1991 | 5,000 | Fieldwood En | 100.0% | UNIT | |
| ST 311 | G31418 | Federal | RT | 3/1/2008 | 5,000 | Walter O&G | 45.0% | PROD | |
| ST 316 | G22762 | Federal | RT | 6/1/2001 | 4,435 | W & T Off | 20.0% | PROD | [4] |
| ST 320 | G24990 | Federal | RT | 5/1/2003 | 5,000 | W & T Off | 11.3% | PROD | |
| ST 47 | G33652 | Federal | RT | 7/1/2010 | 5,000 | Apache Shelf Exp | 100.0% | RELINQ | |
| ST 49 | G24956 | Federal | RT | 6/1/2003 | 5,000 | Fieldwood En | 100.0% | PROD | |
| ST 49 | G24956 | Federal | OP | 6/1/2003 | 5,000 | Fieldwood En | 100.0% | PROD | |
| ST 50 | G34331 | Federal | RT | 8/1/2012 | 5,000 | Apache Shelf Exp | 100.0% | RELINQ | |
| ST 53 | G04000 | Federal | RT | 3/1/1979 | 5,000 | Fieldwood En | 50.0% | PROD | [2] |
| ST 53 | G04000 | Federal | OP 1 | 3/1/1979 | 5,000 | Fieldwood En | 50.0% | PROD | [2] |
| ST 53 | G04000 | Federal | OP 2 | 3/1/1979 | 5,000 | Fieldwood En | 25.0% | PROD | [2] |
| ST 59 | G31404 | Federal | RT | 2/1/2008 | 5,000 | LLOG Exp Off | 25.0% | RELINQ | |
| ST 64 | G33106 | Federal | RT | 7/1/2009 | 5,000 | Apache Shelf Exp | 100.0% | EXPIR | |
| ST 67 | 00020 | Federal | CONT | 4/25/1947 | | Fieldwood En | 79.7% | UNIT | [2] |
| SX 17 | G04143 | Federal | RT | 10/1/1979 | 2,042 | Apache | 92.3% | RELINQ | |
| SX 17 | G04143 | Federal | OP | 10/1/1979 | 2,042 | Apache | 20.0% | RELINQ | |
| VK 118 | G33697 | Federal | RT | 5/1/2010 | 5,760 | Apache Shelf Exp | 75.0% | EXPIR | |
| VK 203 | G07890 | Federal | RT | 7/1/1985 | 5,760 | Talos ERT | 33.3% | TERMIN | |
| VK 203 | G07890 | Federal | OP | 7/1/1985 | 5,760 | Talos ERT | 33.3% | TERMIN | |
| VK 204 | G04921 | Federal | RT | 12/1/1981 | 5,760 | Talos ERT | 33.3% | TERMIN | |
| VK 204 | G04921 | Federal | OP | 12/1/1981 | 5,760 | Talos ERT | 33.3% | TERMIN | |

| Block | Lease | Type | Rights | Date Le Eff | Le Cur Acres | Operator | WI | Lease Status | Notes[†] |
|---|---|---|---|---|---|---|---|---|---|
| VK 251 | G10930 | Federal | OP | 7/1/1989 | 5,760 | Fieldwood En Off | 7.5% | UNIT | |
| VK 340 | G10933 | Federal | OP | 7/1/1989 | 5,760 | Fieldwood En Off | 7.5% | UNIT | |
| VK 384 | G16541 | Federal | OP | 6/1/1996 | 5,760 | Chevron USA | 20.0% | TERMIN | |
| VK 692/693 | G07898 | Federal | RT | 9/1/1985 | 4,773 | Fieldwood En | 56.9% | TERMIN | |
| VK 694 | G13055 | Federal | RT | 7/1/1991 | 3,214 | Fieldwood En | 53.1% | TERMIN | |
| VK 694 | G13055 | Federal | OP | 7/1/1991 | 3,214 | Fieldwood En | 92.1% | TERMIN | |
| VK 698 | G07901 | Federal | RT | 8/1/1985 | 4,996 | Fieldwood En | 52.4% | TERMIN | |
| VK 736 | G13987 | Federal | RT | 7/1/1993 | 4,742 | Fieldwood En | 100.0% | TERMIN | |
| VK 780 | G06884 | Federal | RT | 6/1/1984 | 5,760 | Fieldwood En | 100.0% | TERMIN | |
| VK 824 | G15436 | Federal | RT | 9/1/1995 | 5,760 | Apache | 100.0% | RELINQ | |
| VK 856 | G34872 | Federal | RT | 7/1/2013 | 877 | Apache Shelf Exp | 75.0% | RELINQ | |
| VK 899 | G34408 | Federal | RT | 8/1/2012 | 1,553 | Apache Shelf Exp | 100.0% | EXPIR | |
| VR 115 | G33593 | Federal | RT | 6/1/2010 | 5,000 | Apache Shelf Exp | 100.0% | RELINQ | |
| VR 128 | G33594 | Federal | RT | 6/1/2010 | 5,000 | Apache Shelf Exp | 100.0% | RELINQ | |
| VR 131 | 00775 | Federal | OP | 5/1/1960 | 4,923 | Talos En Off | 72.5% | TERMIN | |
| VR 146 | G33084 | Federal | RT | 7/1/2009 | 5,000 | Apache Shelf Exp | 100.0% | EXPIR | |
| VR 156 | G34251 | Federal | RT | 10/1/2012 | 5,000 | Apache Shelf Exp | 100.0% | RELINQ | |
| VR 160 | G34252 | Federal | RT | 10/1/2012 | 5,000 | Apache Shelf Exp | 100.0% | RELINQ | |
| VR 161 | G34253 | Federal | RT | 10/1/2012 | 4,868 | Apache Shelf Exp | 100.0% | RELINQ | |
| VR 252 | G05431 | Federal | ORRI | 7/1/1983 | 4,454 | Castex Off | 2.0% | PROD | |
| VR 253 | G17912 | Federal | ORRI | 7/1/1997 | 5,000 | Castex Off | 0.6% | PROD | |
| VR 26 | 00297 | Federal | OP 1 | 11/26/1946 | 4,646 | Apache Shelf | 100.0% | TERMIN | |
| VR 26 | 00297 | Federal | OP 2 | 11/26/1946 | 4,646 | Apache Shelf | 25.0% | TERMIN | |
| VR 26 | 00297 | Federal | RT | 11/26/1946 | 4,646 | Apache Shelf | 50.0% | TERMIN | |
| VR 261 | G03328 | Federal | RT | 4/1/1976 | 5,429 | Fieldwood En | 75.0% | TERMIN | [6] |
| VR 261 | G03328 | Federal | OP 2 | 4/1/1976 | 5,429 | Fieldwood En | 37.5% | TERMIN | [6] |
| VR 261 | G03328 | Federal | ORRI | 4/1/1976 | | Fieldwood En | 6.3% | TERMIN | [6] |
| VR 262 | G34257 | Federal | RT | 10/1/2012 | 5,485 | Fieldwood En | 75.0% | RELINQ | [4] |
| VR 265 | G01955 | Federal | RT | 1/1/1970 | 5,000 | Fieldwood En | 100.0% | SOP | |
| VR 27 | G01329 | Federal | OP 2 | 12/1/1962 | 1,902 | Apache Shelf | 100.0% | TERMIN | |
| VR 27 | G01329 | Federal | OP 1 | 12/1/1962 | 1,902 | Apache Shelf | 25.0% | TERMIN | |
| VR 27 | G01329 | Federal | RT | 12/1/1962 | 1,902 | Apache Shelf | 50.0% | TERMIN | |
| VR 271 | G04800 | Federal | OP | 9/1/1981 | 4,418 | Castex Off | 12.5% | PROD | |

| Block | Lease | Type | Rights | Date Le Eff | Le Cur Acres | Operator | WI | Lease Status | Notes[†] |
|-------|-------|------|--------|-------------|--------------|----------|-----|--------------|----------|
| VR 326 | G21096 | Federal | RT | 6/1/1999 | 5,000 | Fieldwood En | 70.3% | TERMIN | |
| VR 332 | G09514 | Federal | CONT | 3/30/1988 | | Fieldwood En | 50.0% | PROD | |
| VR 34 | G01356 | Federal | OP 1 | 6/1/1964 | 625 | Apache Shelf | 100.0% | TERMIN | |
| VR 34 | G01356 | Federal | OP 2 | 6/1/1964 | 625 | Apache Shelf | 75.0% | TERMIN | |
| VR 34 | G01356 | Federal | RT | 6/1/1964 | 625 | Apache Shelf | 100.0% | TERMIN | |
| VR 35 | 00548 | Federal | OP 1 | 9/1/1955 | 2,500 | Apache Shelf | 100.0% | TERMIN | |
| VR 35 | 00548 | Federal | OP 2 | 9/1/1955 | 2,500 | Apache Shelf | 75.0% | TERMIN | |
| VR 35 | 00548 | Federal | RT | 9/1/1955 | 2,500 | Apache Shelf | 100.0% | TERMIN | |
| VR 35 | 00549 | Federal | OP 1 | 9/1/1955 | 2,500 | Apache Shelf | 100.0% | TERMIN | |
| VR 35 | 00549 | Federal | OP 2 | 9/1/1955 | 2,500 | Apache Shelf | 75.0% | TERMIN | |
| VR 35 | 00549 | Federal | RT | 9/1/1955 | 2,500 | Apache Shelf | 100.0% | TERMIN | |
| VR 356 | G17921 | Federal | ORRI | 8/1/1997 | 4,093 | EnVen En Vent | 2.6% | PROD | |
| VR 36 | G01357 | Federal | OP 2 | 6/1/1964 | 625 | Apache Shelf | 75.0% | TERMIN | |
| VR 36 | G01357 | Federal | OP 1 | 6/1/1964 | 625 | Apache Shelf | 100.0% | TERMIN | |
| VR 36 | G01357 | Federal | RT | 6/1/1964 | 625 | Apache Shelf | 100.0% | TERMIN | |
| VR 369 | G02274 | Federal | OP 4 | 2/1/1973 | 5,000 | Renaissance Off | 23.2% | UNIT | |
| VR 369 | G02274 | Federal | OP 3 | 2/1/1973 | 5,000 | Renaissance Off | 23.2% | UNIT | |
| VR 369 | G02274 | Federal | RT | 2/1/1973 | 5,000 | Renaissance Off | 23.2% | UNIT | |
| VR 369 | G02274 | Federal | Unit | 2/1/1973 | 5,000 | Renaissance Off | 23.2% | UNIT | |
| VR 374 | G32153 | Federal | RT | 8/1/2008 | 5,000 | Apache | 100.0% | EXPIR | |
| VR 380 | G02580 | Federal | RT | 5/1/1974 | 5,000 | Fieldwood En | 100.0% | PROD | |
| VR 381 | G16314 | Federal | RT | 9/1/1996 | 5,000 | Apache Shelf | 100.0% | TERMIN | |
| VR 381 | G16314 | Federal | OP | 9/1/1996 | 5,000 | Apache Shelf | 80.0% | TERMIN | |
| VR 386 | G02278 | Federal | RT A | 2/1/1973 | 5,000 | Marathon Oil | 30.2% | UNIT | |
| VR 386 | G02278 | Federal | RT B | 2/1/1973 | 5,000 | Marathon Oil | 29.0% | UNIT | |
| VR 408 | G15212 | Federal | RT | 7/1/1995 | 5,000 | Fieldwood En | 12.5% | PROD | |
| VR 408 | G15212 | Federal | OP | 7/1/1995 | 5,000 | Fieldwood En | 100.0% | PROD | |
| WC 102 | 00247 | Federal | RT | 9/9/1946 | 5,000 | Fieldwood En | 100.0% | TERMIN | |
| WC 110 | 00081 | Federal | RT | 6/10/1947 | 5,000 | BP E&P | 100.0% | PROD | |
| WC 110 | 00081 | Federal | OP | 6/10/1947 | 5,000 | BP E&P | 37.5% | PROD | |
| WC 111 | 00082 | Federal | RT | 6/10/1947 | 1,250 | BP E&P | 100.0% | PROD | |
| WC 111 | 00082 | Federal | OP | 6/10/1947 | 1,250 | BP E&P | 37.5% | PROD | |
| WC 111 | G33046 | Federal | RT | 8/1/2009 | 3,750 | Eni US Op | 25.0% | EXPIR | |
| WC 130 | G12761 | Federal | RT | 5/1/1991 | 5,000 | Eni US Op | 25.0% | TERMIN | |

| Block | Lease | Type | Rights | Date Le Eff | Le Cur Acres | Operator | WI | Lease Status | Notes[†] |
|---|---|---|---|---|---|---|---|---|---|
| WC 144 | G01953 | Federal | RT | 2/1/1970 | 5,000 | Fieldwood En | 62.5% | TERMIN | |
| WC 155 | G32114 | Federal | RT | 8/1/2008 | 5,000 | Apache | 100.0% | EXPIR | |
| WC 163 | G05299 | Federal | RT A | 7/1/1983 | 5,000 | Fieldwood En | 61.0% | TERMIN | |
| WC 163 | G05299 | Federal | RT B | 7/1/1983 | 5,000 | Fieldwood En | 56.2% | TERMIN | |
| WC 165 | 00758 | Federal | RT | 4/1/1960 | 5,000 | Fieldwood En | 100.0% | TERMIN | |
| WC 172 | G01998 | Federal | OP 1 | 2/1/1971 | 5,000 | Apache Shelf | 22.5% | TERMIN | |
| WC 172 | G01998 | Federal | OP 2 | 2/1/1971 | 5,000 | Apache Shelf | 22.5% | TERMIN | |
| WC 172 | G01998 | Federal | OP 3 | 2/1/1971 | 5,000 | Apache Shelf | 22.5% | TERMIN | |
| WC 172 | G01998 | Federal | OP 4 | 2/1/1971 | 5,000 | Apache Shelf | 22.5% | TERMIN | |
| WC 172 | G01998 | Federal | OP 10 | 2/1/1971 | 5,000 | Apache Shelf | 25.0% | TERMIN | |
| WC 172 | G01998 | Federal | OP 11 | 2/1/1971 | 5,000 | Apache Shelf | 25.0% | TERMIN | |
| WC 172 | G01998 | Federal | OP 12 | 2/1/1971 | 5,000 | Apache Shelf | 25.0% | TERMIN | |
| WC 181 | G33558 | Federal | RT | 6/1/2010 | 2,500 | Apache Shelf Exp | 100.0% | RELINQ | |
| WC 196 | G05292 | Federal | RT | 7/1/1983 | 5,000 | Union Oil CA | 8.3% | TERMIN | |
| WC 20 | 00680 | Federal | OP | 8/1/1959 | 1,873 | Sanare En Part | 50.0% | PROD | |
| WC 210 | G34216 | Federal | RT | 10/1/2012 | 5,000 | Apache | 100.0% | RELINQ | |
| WC 225 | G00900 | Federal | OP 1 | 4/1/1962 | 5,000 | Tarpon O&D | 26.7% | TERMIN | |
| WC 269 | G13563 | Federal | OP | 8/1/1992 | 5,000 | Sanare En Part | 33.8% | TERMIN | |
| WC 290 | G04818 | Federal | OP 1 | 9/1/1981 | 5,000 | Fieldwood En Off | 10.4% | TERMIN | [3] |
| WC 290 | G04818 | Federal | RT | 9/1/1981 | 5,000 | Fieldwood En Off | 16.7% | TERMIN | [3] |
| WC 291 | G04397 | Federal | RT | 11/1/1980 | 5,000 | Apache | 100.0% | TERMIN | |
| WC 291 | G04397 | Federal | OP | 11/1/1980 | 5,000 | Apache | 60.0% | TERMIN | |
| WC 295 | G24730 | Federal | OP 1 | 5/1/2003 | 5,000 | Fieldwood En | 20.6% | PROD | [4] |
| WC 300 | G15078 | Federal | RT | 7/1/1995 | 5,000 | SandRidge En Off | 14.0% | TERMIN | |
| WC 300 | G15078 | Federal | OP | 7/1/1995 | 5,000 | SandRidge En Off | 24.4% | TERMIN | |
| WC 310 | G17789 | Federal | RT | 8/1/1997 | 5,000 | Fieldwood En | 100.0% | TERMIN | |
| WC 310 | G17789 | Federal | OP | 8/1/1997 | 5,000 | Fieldwood En | 73.7% | TERMIN | |
| WC 33 | G15050 | Federal | RT | 7/1/1995 | 2,891 | Fieldwood En | 100.0% | PROD | |
| WC 34 | G03251 | Federal | RT | 9/1/1975 | 4,506 | Apache | 100.0% | TERMIN | |
| WC 35 | G02819 | Federal | RT | 12/1/1974 | 4,688 | Apache | 100.0% | TERMIN | |
| WC 35 | G02819 | Federal | OP | 12/1/1974 | 4,688 | Apache | 100.0% | TERMIN | |
| WC 35, WC 66 | G01860 | Federal | OP 2 | 1/1/1969 | 1,563 | BP E&P | 100.0% | PROD | |
| WC 35/66 | G01860 | Federal | RT | 1/1/1969 | 1,563 | BP E&P | 100.0% | PROD | |

| Block | Lease | Type | Rights | Date Le Eff | Le Cur Acres | Operator | WI | Lease Status | Notes† |
|-------|-------|------|--------|-------------|--------------|----------|-----|--------------|--------|
| WC 401 | G07619 | Federal | RT | 7/1/1985 | 5,000 | ConocoPhillips | 33.3% | TERMIN | |
| WC 576 | G33061 | Federal | RT | 6/1/2009 | 5,000 | Apache Shelf Exp | 100.0% | EXPIR | |
| WC 624 | G33064 | Federal | RT | 6/1/2009 | 5,000 | Apache Shelf Exp | 100.0% | EXPIR | |
| WC 65 | G02825 | Federal | OP 4 | 12/1/1974 | 5,000 | BP E&P | 81.3% | PROD | [4] |
| WC 65 | G02825 | Federal | RT | 12/1/1974 | 5,000 | BP E&P | 100.0% | PROD | [4] |
| WC 65 | G02825 | Federal | OP | 12/1/1974 | 5,000 | BP E&P | 100.0% | PROD | [4] |
| WC 650 | G34217 | Federal | RT | 10/1/2012 | 5,000 | Apache Shelf Exp | 100.0% | RELINQ | |
| WC 656 | G34218 | Federal | RT | 10/1/2012 | 5,000 | Apache Shelf Exp | 100.0% | RELINQ | |
| WC 657 | G34219 | Federal | RT | 10/1/2012 | 5,000 | Apache Shelf Exp | 100.0% | RELINQ | |
| WC 66 | G02826 | Federal | OP 2 | 12/1/1974 | 3,750 | Fieldwood En | 75.0% | PROD | [4] |
| WC 66 | G02826 | Federal | OP | 12/1/1974 | 3,750 | Fieldwood En | 100.0% | PROD | [4] |
| WC 67 | G03256 | Federal | OP 1 | 9/1/1975 | 5,000 | Apache | 100.0% | TERMIN | [4] |
| WC 67 | G03256 | Federal | OP 2 | 9/1/1975 | 5,000 | Apache | 66.6% | TERMIN | [4] |
| WC 68 | 00526 | Federal | RT | 9/1/1955 | 2,500 | BP Am Prod | 100.0% | TERMIN | |
| WC 71 | 00244 | Federal | RT | 9/9/1946 | 5,000 | Fieldwood En | 100.0% | TERMIN | |
| WC 72 | G23735 | Federal | RT | 7/1/2002 | 5,000 | Fieldwood En Off | 25.0% | PROD | |
| WC 73 | G23736 | Federal | OP | 7/1/2002 | 5,000 | Castex Off | 25.0% | PROD | |
| WC 99 | G34213 | Federal | RT | 8/1/2012 | 5,000 | Apache Shelf Exp | 100.0% | RELINQ | |
| WD 103 | 00840 | Federal | RT | 5/1/1960 | 3,984 | Fieldwood En | 100.0% | PROD | |
| WD 103 | G12360 | Federal | OP 1 | 5/1/1960 | 1,016 | Fieldwood En | 81.3% | PROD | [4] |
| WD 104 | 00841 | Federal | RT | 5/1/1960 | 5,000 | Fieldwood En | 100.0% | PROD | |
| WD 104 | 00841 | Federal | OP 1 | 5/1/1960 | 5,000 | Fieldwood En | 100.0% | PROD | |
| WD 104 | 00841 | Federal | OP 2 | 5/1/1960 | 5,000 | Fieldwood En | 100.0% | PROD | |
| WD 104 | 00841 | Federal | OP 3 | 5/1/1960 | 5,000 | Fieldwood En | 100.0% | PROD | |
| WD 104 | 00841 | Federal | OP 5 | 5/1/1960 | 5,000 | Fieldwood En | 100.0% | PROD | |
| WD 105 | 00842 | Federal | RT | 5/1/1960 | 5,000 | Fieldwood En | 100.0% | PROD | |
| WD 105 | 00842 | Federal | OP 3 | 5/1/1960 | 5,000 | Fieldwood En | 100.0% | PROD | |
| WD 105 | 00842 | Federal | OP 4 | 5/1/1960 | 5,000 | Fieldwood En | 100.0% | PROD | |
| WD 105 | 00842 | Federal | OP 5 | 5/1/1960 | 5,000 | Fieldwood En | 100.0% | PROD | |
| WD 105 | 00842 | Federal | OP 6 | 5/1/1960 | 5,000 | Fieldwood En | 100.0% | PROD | |
| WD 121 | G19843 | Federal | OP 1 | 8/1/1998 | 5,000 | Fieldwood En | 84.0% | PROD | [4] |
| WD 122 | G13645 | Federal | OP 1 | 8/1/1992 | 5,000 | Fieldwood En | 84.0% | PROD | [4] |
| WD 122 | G13645 | Federal | OP 2 | 8/1/1992 | 5,000 | Fieldwood En | 84.0% | PROD | [4] |
| WD 122 | G13645 | Federal | RT | 8/1/1992 | 5,000 | Fieldwood En | 100.0% | PROD | [4] |

| Block | Lease | Type | Rights | Date Le Eff | Le Cur Acres | Operator | WI | Lease Status | Notes† |
|---|---|---|---|---|---|---|---|---|---|
| WD 128 | G10883 | Federal | RT | 6/1/1989 | 5,000 | Fieldwood En | 100.0% | TERMIN | |
| WD 133 | G01106 | Federal | RT | 5/1/1962 | 5,000 | Arena Off | 100.0% | PROD | |
| WD 133 | G01106 | Federal | ORRI | 5/1/1962 | | Arena Off | 1.0% | PROD | |
| WD 133 | G01106 | Federal | ORRI | 5/1/1962 | | Arena Off | 7.2% | PROD | |
| WD 34 | G03414 | Federal | RT | 1/1/1977 | 2,500 | Fieldwood En | 76.7% | TERMIN | |
| WD 34 | G03414 | Federal | OP | 1/1/1977 | 2,500 | Fieldwood En | 46.7% | TERMIN | |
| WD 38 | G22772 | Federal | RT | 5/1/2001 | 1,796 | Apache | 87.5% | TERMIN | |
| WD 38 | G22772 | Federal | OP | 5/1/2001 | 1,796 | Apache | 43.8% | TERMIN | |
| WD 41 | G01073 | Federal | RT | 3/1/1962 | 5,000 | Apache | 100.0% | TERMIN | |
| WD 41 | G01073 | Federal | OP | 3/1/1962 | 5,000 | Apache | 50.0% | TERMIN | |
| WD 42 | G16470 | Federal | RT | 9/1/1996 | 5,000 | Fieldwood En | 100.0% | TERMIN | |
| WD 42 | G16470 | Federal | OP | 9/1/1996 | 5,000 | Fieldwood En | 50.0% | TERMIN | |
| WD 53 | 17935 | SL-LA | WI | 10/13/2003 | – | Whitney Oil | 33.3% | TERMIN | |
| WD 67 | 00179 | Federal | RT | 7/17/1948 | 2,500 | GOM Shelf | 75.0% | UNIT | [1], [2] |
| WD 67 | 00179 | Federal | OP 1 | 7/17/1948 | 2,500 | BP E&P | 18.8% | UNIT | [1], [2] |
| WD 67 | 00179 | Federal | OP 2 | 7/17/1948 | 2,500 | GOM Shelf | 37.5% | UNIT | [1], [2] |
| WD 68 | 00180 | Federal | RT | 7/17/1948 | 1,833 | GOM Shelf | 75.0% | UNIT | [1], [2] |
| WD 68 | 00180 | Federal | OP 1 | 7/17/1948 | 1,833 | BP E&P | 18.8% | UNIT | [1], [2] |
| WD 68 | 00180 | Federal | OP 2 | 7/17/1948 | 1,833 | GOM Shelf | 37.5% | UNIT | [1], [2] |
| WD 69 | 00181 | Federal | RT | 7/17/1948 | 3,665 | GOM Shelf | 75.0% | UNIT | [1], [2] |
| WD 69 | 00181 | Federal | OP 1 | 7/17/1948 | 3,665 | BP E&P | 18.8% | UNIT | [1], [2] |
| WD 69 | 00181 | Federal | OP 2 | 7/17/1948 | 3,665 | GOM Shelf | 37.5% | UNIT | [1], [2] |
| WD 70 | 00182 | Federal | RT | 7/17/1948 | 5,000 | GOM Shelf | 75.0% | UNIT | [1], [2] |
| WD 70 | 00182 | Federal | OP 1 | 7/17/1948 | 5,000 | BP E&P | 18.8% | UNIT | [1], [2] |
| WD 70 | 00182 | Federal | OP 2 | 7/17/1948 | 5,000 | GOM Shelf | 37.5% | UNIT | [1], [2] |
| WD 71 | 00838 | Federal | RT | 4/1/1960 | 5,000 | BP E&P | 75.0% | UNIT | [1], [2] |
| WD 71 | 00838 | Federal | OP 1 | 4/1/1960 | 5,000 | BP E&P | 18.8% | UNIT | [1], [2] |
| WD 71 | 00838 | Federal | OP 2 | 4/1/1960 | 5,000 | GOM Shelf | 37.5% | UNIT | [1], [2] |
| WD 75 | G01085 | Federal | RT | 6/1/1962 | 5,000 | Fieldwood En | 100.0% | PROD | |
| WD 90 | G01089 | Federal | OP 3 | 6/1/1962 | 5,000 | Fieldwood En | 81.3% | PROD | [4] |
| WD 90 | G01089 | Federal | RT | 6/1/1962 | 5,000 | Fieldwood En | 100.0% | PROD | [4] |
| WD 94 | 00839 | Federal | RT | 5/1/1960 | 5,000 | GOM Shelf | 75.0% | PROD | [1], [2] |
| WD 94 | 00839 | Federal | OP 1 | 5/1/1960 | 5,000 | GOM Shelf | 37.5% | PROD | [1], [2] |
| WD 94 | 00839 | Federal | OP 2 | 5/1/1960 | 5,000 | GOM Shelf | 75.0% | PROD | [1], [2] |

| Block | Lease | Type | Rights | Date Le Eff | Le Cur Acres | Operator | WI | Lease Status | Notes† |
|-------|-------|------|--------|-------------|--------------|----------|-----|--------------|--------|
| WD 95 | G01497 | Federal | RT | 12/1/1966 | 5,000 | GOM Shelf | 75.0% | PROD | [1], [2] |
| WD 95 | G01497 | Federal | OP 1 | 12/1/1966 | 5,000 | GOM Shelf | 37.5% | PROD | [1], [2] |
| WD 95 | G01497 | Federal | OP 2 | 12/1/1966 | 5,000 | GOM Shelf | 75.0% | PROD | [1], [2] |
| WD 96 | G01498 | Federal | RT | 12/1/1966 | 3,665 | GOM Shelf | 75.0% | PROD | [1], [2] |
| WD 96 | G01498 | Federal | OP 2 | 12/1/1966 | 3,665 | GOM Shelf | 37.5% | PROD | [1], [2] |

# FWE I ROW

| SEGMENT NUMBER | COMPANY NAME | ORG AREA | ORG BLOCK | ORG NAME | REC AREA | REC BLOCK | REC NAME | SIZE | PRODUCT | STATUS | ROW NUMBER | FW LEASE | NOTE[3] |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 15213 | Fieldwood Energy, LLC | BS | 41 | B | BS | 42 | 24" SSTI | 10 | G/C | Partial Abandon | G25383 | G21142 | |
| 17938 | Fieldwood Energy, LLC | CA | 43 | A | VK | 247 | 24"SSTI | 6 | GAS | Active | G29431 | G32268 | |
| 3519 | Fieldwood Energy, LLC | EC | 14 | CF | EC | 9 | F/S | 4 | COND | Out of Service | G13721 | G01440 | |
| 13104 | Fieldwood Energy, LLC | EC | 2 | F/S | EC | 2 | 6" SSTI | 4 | GAS | Permitted for Abandonment | G22383 | G15050 | |
| 17801 | Fieldwood Energy, LLC | EC | 14 | CF | WC | 69 | 30 SSTI | 12 | GAS | Permitted for Abandonment | G28556 | G01440 | |
| 44 | Fieldwood Energy, LLC | EI | 175 | C | EI | 176 | 12" SSTI | 8 | OIL | Out of Service | G13445 | 00438 | [3] |
| 1128 | Fieldwood Energy, LLC | EI | 330 | flanged end | EI | 306 | 14-inch SSTI | 14 | OIL | Active | G02139A | G02115 | [3] |
| 6818 | Fieldwood Energy, LLC | EI | 337 | A | EI | 330 | B | 6 | GAS | Out of Service | G05932 | G03332 | |
| 6819 | Fieldwood Energy, LLC | EI | 337 | A | EI | 330 | 14 SSTI | 6 | OIL | Out of Service | G05931 | G03332 | |
| 6852 | Fieldwood Energy, LLC | EI | 315 | A | EI | 330 | 14 SSTI | 6 | OIL | Out of Service | G13447 | G02112 | |
| 7290 | Fieldwood Energy, LLC | EI | 316 | A | EI | 330 | 14 SSTI | 8 | OIL | Active | G07537 | G05040 | |
| 7347 | Fieldwood Energy, LLC | EI | 316 | A | EI | 330 | 8" SSTI | 6 | GAS | Active | G07555 | G05040 | |
| 7914 | Fieldwood Energy, LLC | EI | 212 | A | SS | 152 | 24 SSTI | 6 | GAS | Out of Service | G08530 | G05503 | |
| 7915 | Fieldwood Energy, LLC | EI | 212 | A | EI | 213 | 12 SSTI | 6 | OIL | Out of Service | G08531 | G05503 | |
| 7943 | Fieldwood Energy, LLC | EI | 342 | C | EI | 327 | 08 SSTI | 4 | OIL | Out of Service | G08541 | G02319 | [4] |

[1]   Lease carries $0 liability.
[2]   FWE I is to obtain 75% of the Debtors' interests in Segment 9084, 50% of the Debtors' interest in Segments 4647 and 5890 and 79.666% of the Debtors' interest in Segment 17265, and the Credit Bid Purchaser is to obtain the Debtors' remaining interests in those four pipeline segments.
[3]   Represents each ROW in which FWE I is to acquire solely as to the same 8/8ths undivided interest that FWE I is to acquire in the related lease referenced above for such ROW; the Debtors' remaining interests in such ROW are to be abandoned.
[4]   Represents each ROW in which (i) FWE I is to acquire solely as to the same 8/8ths undivided interest that FWE I is to acquire in the related lease referenced above for such ROW; and (ii) FWE IV is to acquire solely as to the same 8/8ths undivided interest that FWE IV is to acquire in the related lease referenced above for such ROW. The Debtors' remaining interests in such ROW are to be abandoned.

| SEGMENT NUMBER | COMPANY NAME | ORG AREA | ORG BLOCK | ORG NAME | REC AREA | REC BLOCK | REC NAME | SIZE | PRODUCT | STATUS | ROW NUMBER | FW LEASE | NOTE[3] |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 9211 | Fieldwood Energy, LLC | EI | 53 | B | EI | 64 | 22 SSTI | 6 | G/C | Partial Abandon | G12373 | 00479 | [3] |
| 9376 | Fieldwood Energy, LLC | EI | 142 | A | EI | 141 | 10 SSTI | 4 | OIL | Out of Service | G12734 | 00052 | |
| 11923 | Fieldwood Energy, LLC | EI | 53 | C | EI | 64 | 22 SSTI | 10 | G/C | Out of Service | G20539 | 00479 | |
| 14073 | Fieldwood Energy, LLC | EI | 188 | JE | EI | 188 | 06 SSTI | 4 | BLKG | Out of Service | G29056 | 00443 | |
| 14479 | Fieldwood Energy, LLC | EI | 158 | C | EI | 176 | 12"SSTI | 6 | OIL | Out of Service | G13702 | G01220 | |
| 15906 | Fieldwood Energy, LLC | EI | 173 | G | EI | 175 | C | 4 | BLKO | Out of Service | G28239 | G13622 | |
| 16225 | Fieldwood Energy, LLC | EI | 354 | D | EI | 337 | A | 4 | OIL | Out of Service | G28598 | G10752 | |
| 16226 | Fieldwood Energy, LLC | EI | 354 | D | EI | 337 | A | 4 | GAS | Out of Service | G28599 | G10752 | |
| 16243 | Fieldwood Energy, LLC | EI | 189 | B | EI | 188 | A | 4 | GAS | Out of Service | G29057 | 00423 | |
| 18493 | Fieldwood Energy, LLC | EI | 342 | C | EI | 343 | SSTI | 6 | GAS | Out of Service | G29108 | G02319 | [4] |
| 19960 | Fieldwood Energy LLC | EI | 342 | C | EI | 342 | Blind Flange | 6 | OIL | Out of Service | G29471 | G02319 | [4] |
| - | Fieldwood Energy, LLC | EI | 187 | 2 | EI | 187 | 2 | | | Active | G30283 | G10736 | |
| 8487 | Fieldwood Energy, LLC | EW | 826 | A | ST | 300 | 12 SSTI | 12 | OIL | Out of Service | G10110 | G05800 | |
| 15298 | Fieldwood Energy, LLC | GA | 210 | B | GA | 239 | 12 SSTI | 8 | G/C | Active | G26931 | G25524 | [3] |
| 7866 | Fieldwood Energy, LLC | GI | 33 | A | GI | 22 | L | 8 | GAS | Permitted for Abandonment Approved | G08514 | G04002 | |
| 9084 | GOM Shelf, LLC | GI | 43 | AS | GI | 19 | F/S | 10 | OIL | Active | G12304 | 00175 | [2] |
| 17673 | Fieldwood Energy, LLC | GI | 54 | #2 | GI | 47 | L | 4 | BLKO | Permitted for Abandonment Approved | G28528 | G27173 | |
| 5470 | Fieldwood Energy, LLC | HI | A356 | Valve | HI | A343 | HIOS | 12 | GAS | Out of Service | G04050 | G02754 | |
| 6504 | Fieldwood Energy, LLC | HI | A595 | D | HI | 573 | B | 8 | OIL | Out of Service | G28525 | G02721 | |
| 6669 | Fieldwood Energy, LLC | HI | A 376 | A | HI | A 356 | 12 SSTI | 10 | GAS | Out of Service | G05238 | G02754 | [3] |
| 6669 | Fieldwood Energy LLC | HI | A 376 | Platform A | HI | A 356 | 12 SSTI W/PSN 10882 | 10 | GAS | Out of Service | G05238 | G02754 | [3] |

| SEGMENT NUMBER | COMPANY NAME | ORG AREA | ORG BLOCK | ORG NAME | REC AREA | REC BLOCK | REC NAME | SIZE | PRODUCT | STATUS | ROW NUMBER | FW LEASE | NOTE[3] |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 10882 | Fieldwood Energy, LLC | HI | A356 | 10SST | HI | A356 | 12SSTI | 12 | GAS | Out of Service | G04051 | G02754 | [3] |
| 11841 | Fieldwood Energy, LLC | HI | A 545 | JA | HI | A 547 | B | 6 | BLKG | Permitted for Abandonment | G20510 | G17199 | |
| 14650 | Fieldwood Energy, LLC | HI | 201 | #1 | HI | 199 | A | 6 | BLKG | Partial Abandon | G25397 | G23199 | |
| 15401 | Fieldwood Energy, LLC | HI | A 341 | B | HI | A 340 | 30" SSTI | 812 | G/C | Active | G26938 | G25605 | [3] |
| 15581 | Fieldwood Energy, LLC | HI | 120 | A | HI | 128 | SSTI | 6 | G/C | Out of Service | G26968 | G24730 | |
| 16077 | Fieldwood Energy, LLC | HI | 130 | #2 | HI | 165 | 8-inch SSTI | 8 | BLGH | Partial Abandon | G28284 | G25579 | [1] |
| 18789 | Fieldwood Energy LLC | HI | 116 | Platform A | HI | 71 | 16-inch SSTI | 16 | G/C | PABN | G28649 | G06156 | |
| 9032 | Fieldwood Energy, LLC | MC | 311 | A | MC | 312 | 8 SSTI | 8 | OIL | Active | G11747 | G02968 | |
| 3472 | Fieldwood Energy, LLC | MP | 140 | B | MP | 56 | F/S | 18 | BLKG | Out of Service | G13511 | G02193 | |
| 5917 | GOM Shelf, LLC | MP | 311 | A | MP | 313 | 12 SSTI | 8 | OIL | Out of Service | G13466 | G02213 | |
| 7143 | Fieldwood Energy, LLC | MP | 310 | A | MP | 297 | 12 SSTI | 6 | OIL | Out of Service | G07100 | G04126 | |
| 13100 | Fieldwood Energy, LLC | MP | 259 | A | VK | 739 | #01 | 5 | UMB | Out of Service | G22377 | G07827 | |
| 15818 | Fieldwood Energy Offshore LLC | MP | 77 | A | MP | 151 | 18"SSTI | 8 | GAS | Out of Service | G28221 | G04481 | [4] |
| 5408 | Fieldwood Energy, LLC | PL | 10 | B | PL | 13 | 20 SSTI | 8 | OIL | Out of Service | G09317 | G02925 | |
| 16044 | Fieldwood Energy, LLC | PL | 9 | #10 | PL | 10 | B | 6 | BLKG | Out of Service | G28276 | G02924 | |
| 4008 | Fieldwood Energy, LLC | SM | 268 | A | SS | 28 | A | 12 | OIL | Out of Service | G02816 | G34284 | |
| 4647 | Fieldwood Energy, LLC | SM | 149 | 6"SSTI | SM | 132 | B | 6 | BLKO | Out of Service | G03432 | G02592 | [2] |
| 5427 | Fieldwood Energy, LLC | SM | 281 | E | SM | 268 | A | 12 | SPLY | Out of Service | G02817 | G02600 | |
| 5429 | Fieldwood Energy, LLC | SM | 281 | C | SM | 281 | 12 SSTI | 10 | SPLY | Out of Service | G02817 | G02600 | |
| 6512 | Fieldwood Energy, LLC | SM | 281 | C | SM | 268 | D | 10 | BLKO | Out of Service | G29131 | G02600 | |
| 6513 | Fieldwood Energy, LLC | SM | 268 | D | SM | 268 | A | 10 | BLKO | Out of Service | G29132 | G02310 | |
| 10977 | Fieldwood Energy, LLC | SM | 268 | A | SM | 280 | #03 | 3 | BLKG | Active | G28756 | G14456 | |

30

| SEGMENT NUMBER | COMPANY NAME | ORG AREA | ORG BLOCK | ORG NAME | REC AREA | REC BLOCK | REC NAME | SIZE | PRODUCT | STATUS | ROW NUMBER | FW LEASE | NOTE[3] |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 11046 | Fieldwood Energy, LLC | SM | 11 | Well No.34 | SM | 10 | A | 6 | BLKG | Out of Service | G28813 | G01182 | |
| 11047 | Fieldwood Energy, LLC | SM | 10 | A | SM | 11 | 34 | 3 | LIFT | Out of Service | G28812 | G01181 | |
| 11986 | Fieldwood Energy, LLC | SM | 39 | A | SM | 33 | 30 SSTI | 8 | GAS | Out of Service | G20565 | G16320 | |
| 11987 | Fieldwood Energy, LLC | SM | 39 | A | SM | 40 | 10 SSTI | 6 | OIL | Out of Service | G20566 | G16320 | |
| 13642 | Fieldwood Energy, LLC | SM | 280 | H | SM | 268 | A | 10 | BLKG | Permitted for Abandonment | G28758 | G14456 | [3] |
| 17499 | Fieldwood Energy, LLC | SM | 269 | B | SM | 268 | A | 10 | GAS | Active | G28484 | G02311 | |
| 18057 | Fieldwood Energy, LLC | SM | 11 | No.58 Caisson | SM | 10 | A | 4 | BLKG | Out of Service | G28815 | G01182 | |
| 18510 | Fieldwood Energy, LLC | SM | 10 | A | SM | 287 | SSTI | 6 | GAS | Out of Service | G29113 | G01181 | |
| 18563 | Fieldwood Energy, LLC | SM | 48 | E | SM | 39 | A | 6 | G/C | Out of Service | G29128 | 00786 | |
| 18583 | Fieldwood Energy, LLC | SM | 10 | A | SM | 11 | SSTI | 4 | OIL | Out of Service | G28814 | G01181 | |
| 18802 | Fieldwood Energy, LLC | SM | 39 | A | SM | 48 | E | 3 | LIFT | Out of Service | G29182 | G16320 | |
| 4716 | Fieldwood Energy, LLC | SP | 70 | C | SP | 60 | B | 8 | GAS | Active | G03436 | G01614 | |
| 15064 | FW GOM Pipeline, Inc. | SP | 49 | A | SP | 27 | F/S Boundary | 10 | G/O | Active | G07561 | G05051 | |
| 15598 | Fieldwood Energy, LLC | SP | 70 | C | SP | 60 | E | 6 | OIL | Out of Service | G26860 | G01614 | |
| 15626 | Fieldwood Energy, LLC | SP | 65 | A | SP | 62 | 18 SSTI | 8 | OIL | Out of Service | G01686A | G01610 | |
| 1137 | Fieldwood Energy, LLC | SS | 207 | A Platform | SS | 204 | A | 4 | GAS | Out of Service | G13489 | G01523 | [3] |
| 1138 | Fieldwood Energy, LLC | SS | 204 | A | SS | 207 | A | 6 | G/O | Out of Service | G13491 | G01520 | [3] |
| 1147 | Fieldwood Energy, LLC | SS | 207 | A | SS | 208 | F-Pump | 12 | OIL | Out of Service | G13492 | G01523 | [3] |
| 6432 | Fieldwood Energy, LLC | SS | 182 | A | SS | 169 | 18 SSTI | 6 | OIL | Active | G09321 | G03998 | |
| 6538 | Fieldwood Energy, LLC | SS | 91 | A | PL | 11 | 08 SSTI | 6 | OIL | Out of Service | G05146 | G02919 | |
| 6748 | Fieldwood Energy, LLC | SS | 169 | C Platform | SS | 169 | 18-inch SSTI | 6 | OIL | Out of Service | G09322 | 00820 | [4] |
| 7650 | Fieldwood Energy, LLC | SS | 178 | A | SS | 169 | 18 SSTI | 6 | OIL | Out of Service | G08054 | G05551 | |

31

| SEGMENT NUMBER | COMPANY NAME | ORG AREA | ORG BLOCK | ORG NAME | REC AREA | REC BLOCK | REC NAME | SIZE | PRODUCT | STATUS | ROW NUMBER | FW LEASE | NOTE[3] |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 10406 | Fieldwood Energy, LLC | SS | 274 | A | EI | 259 | A | 8 | OIL | Active | G14731 | G01039 | |
| 10780 | Fieldwood Energy, LLC | SS | 193 | A | SS | 183 | 18 SSTI | 6 | OIL | Active | G15683 | G13917 | |
| 10781 | Fieldwood Energy, LLC | SS | 193 | A | SS | 183 | 10 SSTI | 6 | GAS | Active | G15684 | G13917 | |
| 11137 | Fieldwood Energy, LLC | SS | 129 | A | SS | 122 | 18 SSTI | 6 | OIL | Out of Service | G16084 | G12941 | |
| 11145 | Fieldwood Energy, LLC | SS | 129 | A | SS | 149 | 6 SSTI | 6 | G/C | Out of Service | G16087 | G12941 | |
| 11480 | Fieldwood Energy, LLC | SS | 105 | A | EI | 165 | 30 SSTI | 10 | GAS | Out of Service | G18801 | G09614 | |
| 11544 | Fieldwood Energy, LLC | SS | 126 | B | SS | 105 | A | 6 | BLKG | Out of Service | G18820 | G12940 | |
| 12778 | Fieldwood Energy, LLC | SS | 189 | A | SS | 185 | 26"SSTI | 8 | G/C | Out of Service | G22139 | G04232 | [3] |
| 15530 | Fieldwood Energy, LLC | SS | 183 | Flange | SS | 169 | Flange | 10 | GAS | Out of Service | G01460 | G13917 | |
| 16036 | Fieldwood Energy, LLC | SS | 190 | Capped End | SS | 207 | A | 4 | BLKO | Permitted for Abandonment | G14734 | G10775 | |
| 18837 | Fieldwood Energy, LLC | SS | 176 | C | EI | 212 | A | 6 | BLKG | Out of Service | G29190 | G33646 | |
| 20050 | Fieldwood Energy, LLC | SS | 168 | SSTI | SS | 168 | SSTI | 6 | | Proposed | G28788 | 00820 | [4] |
| 5890 | Fieldwood Energy, LLC | ST | 53 | A | ST | 52 | A | 6 | OIL | Out of Service | G09319 | G04000 | [2] |
| 7802 | Fieldwood Energy, LLC | ST | 295 | A | ST | 296 | SS 8487 | 8 | OIL | Active | G08385 | G05646 | |
| 8676 | Fieldwood Energy, LLC | ST | 206 | A | ST | 175 | T-22 | 16 | G/C | Out of Service | G11146 | G05613 | |
| 9313 | Fieldwood Energy, LLC | ST | 295 | A | ST | 295 | 24 SSTI | 8 | GAS | Active | G12709 | G05646 | |
| 13462 | Fieldwood Energy, LLC | ST | 205 | G | ST | 206 | A | 8 | BLKG | Out of Service | G028821 | G05612 | |
| 13462 | Fieldwood Energy LLC | ST | 205 | G | ST | 206 | A | 8 | BLKG | Out of Service | G29451 | G05612 | |
| 17265 | Fieldwood Energy, LLC | ST | 68 | Caisson No. 1 | ST | 53 | A | 6 | BLKO | Out of Service | G28385 | G04000 | [2] |
| 17898 | Fieldwood Energy, LLC | ST | 49 | Platform A | ST | 35 | 6-inch SSTI | 4 | OIL | Out of Service | G28577 | G24956 | |
| 19776 | Fieldwood Energy, LLC | ST | 295 | 24" SSTI | ST | 292 | A | 24 | GAS | Active | G29376 | G05646 | |
| 13098 | Fieldwood Energy, LLC | VK | 694 | #04 | MP | 259 | A | 4 | BLKG | Out of Service | G22376 | G13055 | |

| SEGMENT NUMBER | COMPANY NAME | ORG AREA | ORG BLOCK | ORG NAME | REC AREA | REC BLOCK | REC NAME | SIZE | PRODUCT | STATUS | ROW NUMBER | FW LEASE | NOTE[3] |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 13099 | Fieldwood Energy, LLC | VK | 739 | SS #3 | MP | 259 | A | 4 | BLKG | Out of Service | G22377 | G07827 | |
| 13721 | Fieldwood Energy, LLC | VK | 251 | A | VK | 340 | A | 3 | AIR | Active | G28704 | G10930 | |
| 14876 | Fieldwood Energy, LLC | VK | 251 | A | MP | 154 | A | 4 | H2O | Active | G22465 | G10930 | |
| 6113 | Fieldwood Energy, LLC | VR | 380 | A | VR | 397 | 24 SSTI | 12 | GAS | Out of Service | G04645 | G02580 | |
| 12502 | Fieldwood Energy, LLC | VR | 326 | A Platform | VR | 321 | 22-inch SSTI | 6 | G/C | Out of Service | G21523 | G21096 | |
| 17090 | Fieldwood Energy, LLC | VR | 261 | A | VR | 265 | A | 8 | BLKO | Out of Service | G28347 | G03328 | [4] |
| 18502 | Fieldwood Energy, LLC | VR | 380 | A | VR | 398 | 16" SSTI | 6 | OIL | Out of Service | G02919 | G02580 | |
| 18502 | Fieldwood Energy LLC | VR | 380 | Platform A | VR | 398 | 16-inch SSTI | 6 | OIL | Out of Service | G29109 | G02580 | |
| 2698 | Fieldwood Energy, LLC | WC | 102 | flange | WC | 102 | G | 8 | GAS | Out of Service | G02124D | 00247 | |
| 3763 | Fieldwood Energy, LLC | WC | 102 | #02 | WC | 102 | 08 SSTI | 8 | GAS | Out of Service | G02124D | 00247 | |
| 3986 | Fieldwood Energy, LLC | WC | 66 | A | WC | 31 | F/S | 10 | G/O | Active | G03345 | G01860 | |
| 5343 | Fieldwood Energy, LLC | WC | 34 | D | WC | 35 | 10 SSTI | 8 | G/O | Out of Service | G28659 | G01860 | |
| 8621 | Bandon Oil and Gas, LP | WC | 290 | A | WC | 289 | A | 6 | BLKG | Out of Service | G10532 | G04818 | |
| 9504 | Fieldwood Energy, LLC | WC | 71 | 12 SSTI | WC | 71 | 12 SSTI | 12 | GAS | Out of Service | G04346 | 00244 | |
| 14251 | Fieldwood Energy Offshore LLC | WC | 72 | #1 | WC | 65 | JA | 4 | BLKG | Out of Service | G25275 | G23735 | [3] |
| 15210 | Fieldwood Energy, LLC | WC | 295 | 2 | HI | 120 | A-PROCESS | 6 | BLKG | Out of Service | G26886 | G24730 | |
| 15952 | Fieldwood Energy, LLC | WC | 33 | O | WC | 34 | D | 4 | G/O | Out of Service | G28657 | G15050 | |
| 20483 | Fieldwood Energy Offshore LLC | WC | 295 | Flanged End | WC | 293 | 16-inch SSTI | 12 | G/C | PABN | G10085 | G01848 | |
| 23036 | Fieldwood Energy LLC | WC | 289 | A-PROCESS | WC | 289 | A-PROCESS | | | Expired | G14262 | G04818 | |
| 7919 | Fieldwood Energy, LLC | WD | 105 | E | WD | 104 | D | 6 | GAS | Out of Service | G08533 | 00842 | |
| 15960 | Fieldwood Energy, LLC | WD | 90 | A | WD | 73 | SSTI | 4 | OIL | Out of Service | G28260 | G01089 | [3] |
| 16088 | Fieldwood Energy, LLC | WD | 122 | A | WD | 105 | E | 6 | GAS | Out of Service | G28289 | G13645 | [3] |

| SEGMENT NUMBER | COMPANY NAME | ORG AREA | ORG BLOCK | ORG NAME | REC AREA | REC BLOCK | REC NAME | SIZE | PRODUCT | STATUS | ROW NUMBER | FW LEASE | NOTE[3] |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 16089 | Fieldwood Energy, LLC | WD | 122 | A | WD | 105 | E | 3 | OIL | Out of Service | G28290 | G13645 | [3] |

## FWE I RUE

| Area | Block No. | Structure | Complex ID No. | Authority No. | FW Lease | Operator | Approval Date | Associated Assets | Note[4] |
|---|---|---|---|---|---|---|---|---|---|
| EI | 188 | JE | 26052 | G30268 | G10736 | Fieldwood Energy LLC | 04/18/14 | EI 187 JC001, JD001, JD002, 002 & JE002 | |
| HI | 120 | A-PROCESS | 10450 | G30270 | G01848 | Fieldwood Energy LLC | 08/06/14 | WC 295 A001 & A002 | |
| SM | 132 | B | 21982 | G30329 | G02588 | Fieldwood Energy LLC | 05/06/19 | SM 136 C007, SM 149 C001, C002 & C004 | [1] |
| SM | 10 | A | 20706 | G30365 | G01181 | Fieldwood Energy LLC | | | |
| SM | 268 | A | 21739 | G30282 | G14456 | Fieldwood Energy LLC | 06/15/18 | SM 257 001, SM 269 B017, B019, F001, SM 280 G001, G002, H001, B, F, SM 280 G, H, I, SM 281 C010, C014, C015, C020, C023, C024, C025, C026, C028, E005, E011, I001, I003, C & E | [2] |
| SM | 268 | A-PRD | 21739 | G30282 | G14456 | Fieldwood Energy LLC | 06/15/18 | Production from SM 268 A RUE | [2] |
| ST | 206 | A | 23851 | G30291 | G05612 | Fieldwood Energy LLC | 12/11/15 | ST 205 G001 & G003 | |

---

[1]  RUE services a lease to be co-owned by FWE I and the Credit Bid Purchaser (for SM 149) plus a lease going just to FWE I. RUE only assignable to one entity and are assigned to entity with operatorship.  Expenditures will be shared based on serviced lease ownership.

[2]  RUE services leases included on both FWE I and Abandoned Properties schedules. RUE only assignable to one entity and are assigned to entity with operatorship.  Expenditures will be shared based on serviced lease ownership.

**<u>Exhibit O3</u>**

**Leases, Rights of Way and Rights of Use and Easement Related to FWE III Oil & Gas Lease Interests**

## Leases Related to FWE III Oil & Gas Lease Interests*

| Block | Lease | Type | Rights | Date Le Eff | Le Cur Acres (Ac) | Operator | WI | Lease Status | Note† |
|-------|-------|------|--------|-------------|-------------------|----------|-----|--------------|-------|
| BS 41 | G21142 | Federal | OP 2 | 5/1/1999 | 4,995 | Fieldwood En Off | 10% | TERMIN | [1] |
| BS 41 | G21142 | Federal | Contractual | 5/1/1999 | 4,995 | Fieldwood En Off | 25% | TERMIN | [1] |
| EC 257 | G21580 | Federal | OP 1 | 7/1/2000 | 5,000 | Fieldwood En Off | 100% | TERMIN | |
| GA 241 | G01772 | Federal | OP 1 | 7/1/1968 | 1,440 | Fieldwood En Off | 100% | TERMIN | |
| GA 241 | G01773 | Federal | RT | 7/1/1968 | 1,440 | Fieldwood En Off | 100% | TERMIN | |
| GA 255 | G01777 | Federal | RT | 7/1/1968 | 5,760 | Fieldwood En Off | 100% | TERMIN | |
| GI 83 | G03793 | Federal | RT | 6/1/1978 | 5,000 | Fieldwood En Off | 100% | TERMIN | |
| HI A-447 | G02360 | Federal | RT | 8/1/1973 | 5,760 | Bandon O&G | 100% | TERMIN | |
| MP 112 | G09707 | Federal | RT | 6/1/1988 | 4,995 | Fieldwood En Off | 100% | RELINQ | |
| MP 154 | G10902 | Federal | RT | 7/1/1989 | 4,995 | Fieldwood En Off | 100% | TERMIN | |
| SM 39 | G16320 | Federal | RT | 7/1/1996 | 5,000 | Fieldwood En Off | 50% | PROD | |
| ST 242 | G23933 | Federal | RT | 6/1/2002 | 5,000 | Fieldwood En Off | 60% | TERMIN | |
| VR 333 | G14417 | Federal | RT | 7/1/1994 | 4,201 | Fieldwood En Off | 67% | TERMIN | |
| WC 100 | G22510 | Federal | RT | 7/1/2001 | 5,000 | Fieldwood En Off | 100% | RELINQ | |
| WC 290 | G04818 | Federal | OP 1 | 9/1/1981 | 5,000 | Fieldwood En Off | 50% | TERMIN | [1] |
| VR 315 | G04215 | Federal | OP 1 | 1/1/1980 | 5,000 | Dynamic Off Res | 50% | TERMIN | |

---

* The Debtors reserve the right to amend, modify, or supplement this schedule in accordance with the terms of the Plan and subject to any consent rights under the Restructuring Support Agreement.

[1] Represents leases in which Fieldwood III is to acquire all of the Debtors' right, title and interest in such lease (less and except the right, title and interest acquired by FWE from Apache); as to all remaining leases on this schedule, FWE III is to obtain all of the Debtors' right, title and interest in such leases.

**Legend**: CONT – Contractual; OP 1- Operating Rights 1; OP 2 - Operating Rights 2; RT - Record Title

## FWE III ROW

| SEGMENT NUMBER | COMPANY NAME | ORG AREA | ORG BLOCK | ORG NAME | REC AREA | REC BLOCK | REC NAME | SIZE | PRODUCT | STATUS | ROW NUMBER | FW LEASE |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 15213 | Fieldwood Energy, LLC | BS | 41 | B | BS | 42 | 24" SSTI | 10 | G/C | Partial Abandon | G25383 | G21142 |
| 5911 | Bandon Oil and Gas, LP | GI | 83 | A | GI | 82 | 16 SSTI | 6 | GAS | Permitted for Abandonment | G04355 | G03793 |
| 9006 | Fieldwood Energy, LLC | MP | 112 | #02 | MP | 117 | 08 SSTI | 6 | BLKG | Permitted for Abandonment Approved | G11738 | G09707 |
| 15220 | Fieldwood Energy Offshore LLC | ST | 242 | A | SS | 283 | 24 SSTI | 8 | G/C | Permitted for Abandonment | G26891 | G23933 |
| 14210 | Fieldwood Energy Offshore LLC | WC | 100 | A | WC | 102 | 30" SSTI | 8 | G/C | Permitted for Abandonment Approved | G24699 | G22510 |
| 13864 | Fieldwood Energy, LLC | WC | 100 | A | WC | 102 | 30 SSTI | 8 | G/C | Permitted for Abandonment Approved | G24253 | G22510 |
| 8621 | Bandon Oil and Gas, LP | WC | 290 | A | WC | 289 | A | 6 | BLKG | Out of Service | G10532 | G04818 |
| 11987 | Fieldwood Energy, LLC | SM | 39 | A | SM | 40 | 10 SSTI | 6 | OIL | Out of Service | G20566 | G16320 |

2

## FWE III RUE

| Area | Block No. | Structure | Complex ID No. | Authority No. | FW Lease | Operator | Approval Date | Associated Assets | Note[3] |
|------|-----------|-----------|----------------|---------------|----------|----------|---------------|-------------------|---------|
| GA | 255 | A | 10050 | G30195 | G01777 | Fieldwood Energy Offshore LLC | 06/12/13 | GA 241 A005 & B004 | |
| MP | 154 | A | 24171 | G30337 | G10902 | Fieldwood Energy Offshore LLC | 02/03/17 | MP 154 A001 & A002 | |
| VR | 315 | A | 22981 | G30213 | G04215 | Fieldwood Energy Offshore LLC | 11/26/13 | VR 332 A001, A002, A005 & A006 | |
| VR | 315 | A-AUX | 22981 | G30213 | G04215 | Fieldwood Energy Offshore LLC | 11/26/13 | Production from VR 315 A RUE | |
| WC | 289 | A-PROCESS | 23036 | G14262 | G04818 | Fieldwood Energy LLC | 12/03/93 | ROW accessory PF WC 289 A | [1] |

[1]  RUE services lease included on both FWE I and FWE III schedules. RUE only assignable to one entity and are assigned to entity with operatorship. Expenditures will be shared based on serviced lease ownership.

## **Exhibit O4**

**Leases, Rights of Way and Rights of Use and Easement Related to FWE IV Oil & Gas
Lease Interests**

# Leases Related to FWE IV Oil & Gas Lease Interests*

| Block | Lease | Type | Rights | Date Le Eff | Le Cur Acres (Ac) | Operator | WI | Lease Status | Note[2] |
|-------|-------|------|--------|-------------|-------------------|----------|-----|--------------|---------|
| BA A-102 | G01754 | Federal | RT | 6/1/1968 | 5,760 | Fieldwood En | 100% | TERMIN | |
| BA A-105 | G01757 | Federal | RT A | 7/1/1968 | 4,320 | Fieldwood En | 56.3% | PROD | [3] |
| BA A-105 | G01757 | Federal | RT B | 7/1/1968 | 1,440 | Fieldwood En | 100% | PROD | [1] |
| BA A-105 | G01757 | Federal | OP 1 | 7/1/1968 | 4,320 | Fieldwood En | 56% | PROD | [3] |
| BA A-133 | G02665 | Federal | RT | 7/1/1974 | 5,760 | GOM Shelf | 25% | PROD | [1] |
| EB 158 | G02645 | Federal | RT | 7/1/1974 | 5,760 | Fieldwood SD Off | 67% | PROD | |
| EB 158 | G02645 | Federal | OP 1 | 7/1/1974 | 5,760 | Fieldwood SD Off | 67% | PROD | |
| EB 159 | G02646 | Federal | RT | 7/1/1974 | 5,760 | Fieldwood SD Off | 67% | PROD | |
| EB 159 | G02646 | Federal | OP 1 | 7/1/1974 | 5,760 | Fieldwood SD Off | 67% | PROD | |
| EB 160 | G02647 | Federal | RT | 7/1/1974 | 5,760 | Fieldwood SD Off | 100% | PROD | |
| EB 160 | G02647 | Federal | OP 1 | 7/1/1974 | 5,760 | Fieldwood SD Off | 100% | PROD | |

* The Debtors and CUSA reserve the right to amend, modify, or supplement this schedule.

[1]   Represents leases in which FWE IV is to acquire all of the Debtors' right, title and interest in such leases (less and except the right, title and interest acquired by FWE from Apache); as to all remaining leases on this schedule (other than those leases referenced in footnotes [2]-[3] below), all of the Debtors' right, title and interest in such leases are to be acquired by FWE IV.

[2]   Represents leases in which FWE IV is to acquire solely the right, title and interest acquired by FWE from Chevron. The Debtors' remaining right, title and interest in such leases are to be abandoned.

[3]   Represents leases in which (i) FWE IV is to acquire solely the right, title and interest acquired by FWE from Chevron; and (ii) FWE I is to acquire solely the right, title and interest acquired by FWE from Apache. The Debtors' remaining right, title and interest in such leases are to be abandoned.

**Legend**:  OP 1- Operating Rights 1; OP 2 - Operating Rights 2; RT A - Record Title A; RT B - Record Title B

| Block | Lease | Type | Rights | Date Le Eff | Le Cur Acres (Ac) | Operator | WI | Lease Status | Note[2] |
|-------|-------|------|--------|-------------|-------------------|----------|-----|--------------|---------|
| EB 161 | G02648 | Federal | RT | 7/1/1974 | 5,760 | Fieldwood SD Off | 100% | PROD | |
| EB 161 | G02648 | Federal | OP 1 | 7/1/1974 | 5,760 | Fieldwood SD Off | 100% | PROD | |
| EC 331 | G08658 | Federal | OP 1 | 8/1/1987 | 5,000 | Fieldwood En Off | 53% | TERMIN | [2] |
| EC 331 | G08658 | Federal | OP 2 | 8/1/1987 | 5,000 | Fieldwood En Off | 53% | TERMIN | [2] |
| EC 332 | G09478 | Federal | RT | 5/1/1988 | 5,000 | Fieldwood En Off | 88% | TERMIN | |
| EC 332 | G09478 | Federal | OP 1 | 5/1/1988 | 5,000 | Fieldwood En Off | 88% | TERMIN | |
| EI 342 | G02319 | Federal | RT A | 2/1/1973 | 2,500 | Fieldwood En | 50% | TERMIN | [1] |
| HI A-446 | G02359 | Federal | RT | 8/1/1973 | 5,760 | Bandon O&G | 100% | TERMIN | |
| HI A-550 | G04081 | Federal | RT | 10/1/1979 | 720 | Fieldwood En Off | 100% | PROD | |
| HI A-550 | G04081 | Federal | OP 1 | 10/1/1979 | 5,040 | Fieldwood En Off | 100% | PROD | |
| HI A-550 | G04081 | Federal | OP 2 | 10/1/1979 | 5,760 | Fieldwood En Off | 100% | PROD | |
| MP 77 | G04481 | Federal | RT | 11/1/1980 | 4,655 | Fieldwood En Off | 56% | RELINQ | [3] |
| SM 132 | G02282 | Federal | RT | 2/1/1973 | 5,000 | Fieldwood En | 50% | TERMIN | [1] |
| SM 136 | G02588 | Federal | RT | 5/1/1974 | 2,500 | Fieldwood En | 50% | TERMIN | [1] |
| SM 137 | G02589 | Federal | RT | 5/1/1974 | 5,000 | Fieldwood En | 50% | TERMIN | [1] |
| SM 150 | G16325 | Federal | RT | 6/1/1996 | 3,329 | Fieldwood En | 50% | RELINQ | [1] |
| SM 66 | G01198 | Federal | RT | 6/1/1962 | 5,000 | Fieldwood En | 50% | TERMIN | [1] |
| SS 169 | 00820 | Federal | RT | 4/1/1960 | 5,000 | Fieldwood En | 33% | PROD | [1] |

WEIL:\97919816\6\45327.0005

| Block | Lease | Type | Rights | Date Le Eff | Le Cur Acres (Ac) | Operator | WI | Lease Status | Note[2] |
|-------|-------|------|--------|-------------|-------------------|----------|-----|--------------|---------|
| SS 206 | G01522 | Federal | RT | 7/1/1967 | 5,000 | Fieldwood En | 40% | TERMIN | [1] |
| SS 207 | G01523 | Federal | RT | 7/1/1967 | 5,000 | Fieldwood En | 26% | TERMIN | [3] |
| SS 252 | G01529 | Federal | RT | 7/1/1967 | 5,000 | Fieldwood En Off | 50% | TERMIN | |
| SS 253 | G01031 | Federal | RT | 6/1/1962 | 5,000 | Fieldwood En Off | 50% | TERMIN | |
| ST 169 | G01253 | Federal | RT | 6/1/1962 | 4,708 | Beryl O&G | 100% | TERMIN | |
| ST 195 | G03593 | Federal | RT | 8/1/1977 | 5,000 | Fieldwood En Off | 100% | TERMIN | |
| VK 113 | G16535 | Federal | RT | 6/1/1996 | 5,760 | Fieldwood En Off | 100% | TERMIN | |
| VK 251 | G10930 | Federal | OP 1 | 7/1/1989 | 5,760 | Fieldwood En Off | 100% | UNIT | |
| VK 251 | G10930 | Federal | RT | 7/1/1989 | 5,760 | Fieldwood En Off | 100% | UNIT | |
| VK 251 | G10930 | Federal | OP 2 | 7/1/1989 | 5,760 | Fieldwood En Off | 55% | UNIT | |
| VK 340 | G10933 | Federal | OP 1 | 7/1/1989 | 5,760 | Fieldwood En Off | 100% | UNIT | |
| VK 340 | G10933 | Federal | RT | 7/1/1989 | 5,760 | Fieldwood En Off | 100% | UNIT | |
| VK 340 | G10933 | Federal | OP 2 | 7/1/1989 | 5,760 | Fieldwood En Off | 55% | UNIT | |
| VR 196 | G19760 | Federal | OP 1 | 8/1/1998 | 5,000 | Fieldwood En Off | 25% | TERMIN | [2] |
| VR 207 | G19761 | Federal | OP 1 | 8/1/1998 | 5,000 | Beryl O&G | 46% | RELINQ | |
| VR 261 | G03328 | Federal | RT | 4/1/1976 | 5,429 | Fieldwood En | 25% | TERMIN | [1] |
| VR 261 | G03328 | Federal | OP 1 | 4/1/1976 | 509 | Fieldwood En | 25% | TERMIN | [1] |
| VR 314 | G05438 | Federal | OP 2 | 7/1/1983 | 5,000 | Fieldwood En Off | 50% | TERMIN | |

WEIL:\97919816\6\45327.0005

| Block | Lease | Type | Rights | Date Le Eff | Le Cur Acres (Ac) | Operator | WI | Lease Status | Note[2] |
|---|---|---|---|---|---|---|---|---|---|
| VR 332 | G09514 | Federal | OP 1 | 7/1/1988 | 5,000 | Fieldwood En | 67% | PROD | |
| VR 332 | G09514 | Federal | RT | 7/1/1988 | 5,000 | Fieldwood En | 100% | PROD | |

4

# FWE IV ROW

| SEGMENT NUMBER | COMPANY NAME | ORG AREA | ORG BLOCK | ORG NAME | REC AREA | REC BLOCK | REC NAME | SIZE | PRODUCT | STATUS | ROW NUMBER | FW LEASE | NOTE[3] |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 7912 | Fieldwood SD Offshore | EB | 160 | A | HI | A582 | SSTI | 12 | GAS | Out of Service | G08528 | G02647 | |
| 10301 | Bandon Oil and Gas, LP | EC | 332 | A | EC | 330 | 08 SSTI | 6 | OIL | Out of Service | G14699 | G09478 | [1] |
| 7943 | Fieldwood Energy, LLC | EI | 342 | C | EI | 327 | 08 SSTI | 4 | OIL | Out of Service | G08541 | G02319 | [2], [4] |
| 18493 | Fieldwood Energy, LLC | EI | 342 | C | EI | 343 | SSTI | 6 | GAS | Out of Service | G29108 | G02319 | [2], [4] |
| 19960 | Fieldwood Energy LLC | EI | 342 | C | EI | 342 | Blind Flange | 6 | OIL | Out of Service | G29471 | G02319 | [2], [4] |
| 15818 | Fieldwood Energy Offshore LLC | MP | 77 | A | MP | 151 | 18"SSTI | 8 | GAS | Out of Service | G28221 | G04481 | [2] |
| 6748 | Fieldwood Energy, LLC | SS | 169 | C Platform | SS | 169 | 18-inch SSTI | 6 | OIL | Out of Service | G09322 | 00820 | [2] |
| 11107 | Bandon Oil and Gas, LP | ST | 196 | 06-inch SSTI | SS | 208 | F | 6 | OIL | Permitted for Abandonment Approved | G05120 | G03593 | [1] |
| 13193 | Bandon Oil and Gas, LP | VR | 196 | A | VR | 206 | 12 SSTI | 8 | G/C | Out of Service | G22418 | G19760 | [1] |
| 18591 | Fieldwood Energy, LLC | VR | 196 | A | VR | 215 | A | 4 | BLKO | Out of Service | G29137 | G19760 | [1] |
| 18588 | Fieldwood Energy, LLC | VR | 215 | A | VR | 196 | A | 4 | GAS | Active | G29136 | G19760 | [1] |
| 17090 | Fieldwood Energy, LLC | VR | 261 | A | VR | 265 | A | 8 | BLKO | Out of Service | G28347 | G03328 | [2], [4] |
| 19427 | Fieldwood Energy, LLC | VK | 113 | A | CA | 43 | A | 4 | BLKG | Out of Service | G29321 | G16535 | |
| 13721 | Fieldwood Energy, LLC | VK | 251 | A | VK | 340 | A | 3 | AIR | Active | G28704 | G10930 | [3] |
| 14876 | Fieldwood Energy, LLC | VK | 251 | A | MP | 154 | A | 4 | H2O | Active | G22465 | G10930 | [3] |
| 13720 | Fieldwood Energy Offshore LLC | VK | 340 | 8-inch SSTI | VK | 251 | Platform A | 8 | BLGH | Active | G28703 | G10933 | |

[1] Represents each ROW in which (i) FWE IV is to acquire solely as to the same 8/8ths undivided interest that FWE IV is to acquire in the related lease referenced above for such ROW. The Debtors' remaining interests in such ROW are to be abandoned.

[2] Represents each ROW in which (i) FWE I is to acquire solely as to the same 8/8ths undivided interest that FWE I is to acquire in the related lease referenced above for such ROW; and (ii) FWE IV is to acquire solely as to the same 8/8ths undivided interest that FWE IV is to acquire in the related lease referenced above for such ROW. The Debtors' remaining interests in such ROW are to be abandoned.

[3] Represents each ROW in which (i) FWE IV is to acquire solely as to the same 8/8ths undivided interest that FWE IV is to acquire in the related lease referenced above for such ROW. The Debtors' remaining interests in such ROW are to be acquired by FWE I.

[4] The Parties recognize that segments and ROWs will be operated by Fieldwood Energy I, LLC. In addition, the Parties acknowledges that segment numbers and ROW names may have changed after the FWE IV Rights of Way were conveyed pursuant to the Chevron PSAs.

WEIL:\97919816\6\45327.0005

| 7298 | Dynamic Industries, Inc. | VR | 315 | A | VR | 331 | 06 SSTI | 6 | OIL | Out of Service | G07545 | G04215 | |
| 10736 | Dynamic Industries, Inc. | VR | 332 | A | VR | 315 | A | 8 | BLKG | Out of Service | G15672 | G09514 | |
| 10737 | Dynamic Industries, Inc. | VR | 332 | A | VR | 315 | A | 6 | LIFT | Out of Service | G15673 | G09514 | |

6

## FWE IV RUE

| Area | Block No. | Structure | Complex ID No. | Authority No. | FW Lease | Operator | Approval Date | Associated Assets |
|------|-----------|-----------|----------------|---------------|----------|----------|---------------|-------------------|
| MP | 154 | A | 24171 | G30337 | G10902 | Fieldwood Energy Offshore LLC | 2/3/17 | MP 154 A001 & A002 |
| VR | 315 | A | 22981 | G30213 | G04215 | Fieldwood Energy Offshore LLC | 11/26/13 | VR 332 A001, A002, A005 & A006 |
| VR | 315 | A-AUX | 22981 | G30213 | G04215 | Fieldwood Energy Offshore LLC | 11/26/13 | Production from VR 315 A RUE |

7

**Exhibit O5**

**Leases, Rights of Way and Rights of Use and Easement Related to Abandoned Properties**

# Leases Related to Abandoned Properties*

| Block | Lease | Type | Rights | Date Le Eff | Le Cur Acres (Ac) | Operator | WI | Lease Status | Note† |
|-------|-------|------|--------|-------------|-------------------|----------|-----|--------------|-------|
| AT 023 | G35015 | Federal | RT | 08/01/2013 | 5,760 | Murphy E&P USA | 8% | PRIMARY | |
| BA A-105 | G01757 | Federal | RT A | 7/1/1968 | 5,760 | Fieldwood En | 31.25% | PROD | [6] |
| EB 165 | G06280 | Federal | RT | 10/1/1983 | 5,760 | Fieldwood SD Off | 100% | UNIT | |
| EB 209 | G07397 | Federal | RT | 9/1/1984 | 5,760 | Fieldwood SD Off | 100% | UNIT | |
| EC 330 | G03540 | Federal | OP 1 | 8/1/1977 | 5,000 | Fieldwood En Off | 50% | TERMIN | |
| EC 331 | G08658 | Federal | OP 1 | 8/1/1987 | 5,000 | Fieldwood En Off | 40% | TERMIN | [5] |
| EC 331 | G08658 | Federal | OP 2 | 8/1/1987 | 5,000 | Fieldwood En Off | 40% | TERMIN | [5] |
| EC 349 | G14385 | Federal | OP 1 | 5/1/1994 | 5,000 | W & T Off | 25% | PROD | |
| EC 350 | G15157 | Federal | OP 1 | 9/1/1995 | 5,000 | W & T Off | 25% | TERMIN | |

---

*     The Debtors reserve the right to amend, modify, or supplement this schedule in accordance with the terms of the Plan and subject to any consent rights under the Restructuring Support Agreement.

[1]   Represents leases in which all of the Debtors' right, title and interest in such leases are to be abandoned (less and except the right, title and interest acquired by FWE from Apache); as to all remaining leases on this schedule (other than those leases referenced in footnotes [2]-[6] below), all of the Debtors' right, title and interest in such leases are to be abandoned. For each lease on this schedule, see the BOEM's Serial Register Page to identify the Debtors' interests; this schedule identifies each separate interest of the Debtors that carries any assets or liabilities, but does not necessarily identify each separate interest of the Debtors in each such lease.

[2]   Fieldwood Energy Offshore's record title solely as to the NE/4 of the block and its interest in the operating rights are to be abandoned; its remaining record title and its overriding royalty interests are to be acquired by the Credit Bid Purchaser.

[3]   FWE I is to acquire solely the operating rights as to the NE/4 of this block; the Credit Bid Purchaser is to obtain the Debtors' overriding royalty interest in this lease; and the Debtors' remaining interests in the lease are to be abandoned.

[4]   Represents leases where the Credit Bid Purchaser is to acquire solely the Debtors' overriding royalty interests; the Debtors' remaining interests in these leases are to be abandoned.

[5]   Represents leases in which all of the Debtors' right, title and interest in such leases are to be abandoned (less and except the right, title and interest acquired by FWE from Chevron).

[6]   Represents leases in which all of the Debtors' right, title and interest in such leases are to be abandoned (less and except the right, title and interests acquired by FWE from both Apache and Chevron).

[7]   COB 381, Page 256, File No. 331928, St. Mary Parish, LA.

[8]   COB Instr. No. 324586, St. Mary Parish, LA.

**Legend**:  CONT - Contractual; OP 1- Operating Rights 1; OP 2 - Operating Rights 2; OP 3 - Operating Rights 3; OP 4 - Operating Rights 4; OP 5 - Operating Rights 5; OP 11 - Operating Rights 11; OP 13 - Operating Rights 13; ORRI - Overriding Royalty Interest; RT - Record Title; RT A - Record Title A; RT B - Record Title B; RT C - Record Title C; WI - Working Interest

| Block | Lease | Type | Rights | Date Le Eff | Le Cur Acres (Ac) | Operator | WI | Lease Status | Note[†] |
|-------|-------|------|--------|-------------|-------------------|----------|-----|--------------|---------|
| EC 356 | G13592 | Federal | RT | 9/1/1992 | 5,000 | W & T Off | 25% | RELINQ | |
| EC 371 | G02267 | Federal | CONT | 2/1/1973 | 5,000 | Talos ERT | 25% | TERMIN | |
| EI 100 | 796 | Federal | Contractual | 5/1/1960 | 5,000 | Fieldwood En | 100% | PROD | |
| EI 175 | 438 | Federal | OP 1 | 12/1/1954 | 5,000 | Fieldwood En | 25% | PROD | [1] |
| EI 307 | G02110 | Federal | RT | 2/1/1971 | 2,500 | Fieldwood En Off | 25% | TERMIN | [1] |
| EI 311 | G27918 | Federal | RT | 7/1/2006 | 5,000 | Dynamic Off Res | 60% | TERMIN | |
| EI 312 | G22679 | Federal | OP 1 | 6/1/2001 | 5,000 | Fieldwood En | 60% | TERMIN | [1] |
| EI 32 | 00196 | Federal | OP 1 | 11/26/1946 | 5,000 | Cox Op | 24% | PROD | |
| EI 330 | G02115 | Federal | Contractual | 1/1/1971 | 5,000 | Fieldwood En | 17% | UNIT | [1] |
| EI 53 | 00479 | Federal | OP 1 | 12/1/1954 | 5,000 | Fieldwood En | 11% | PROD | [1] |
| EI 63 | 00425 | Federal | RT | 12/1/1954 | 5,000 | Fieldwood En Off | 100% | TERMIN | |
| EW 782 | G05793 | Federal | CONT | 7/1/1983 | 1,093 | Fieldwood En | 100% | TERMIN | [1] |
| GA 151 | G15740 | Federal | RT | 11/1/1995 | 4,804 | Fieldwood En | 33% | TERMIN | [1] |
| GA 210 | G25524 | Federal | OP 1 | 12/1/2003 | 5,760 | Fieldwood En | 17% | PROD | [1] |
| GA 210 | G25524 | Federal | OP 3 | 12/1/2003 | 5,760 | Fieldwood En | 33% | PROD | [1] |
| GA A-155 | G30654 | Federal | RT | 10/1/2006 | 5,760 | Peregrine O&G | 11% | TERMIN | |
| GC 157 | G24154 | Federal | RT | 6/1/2002 | 5,760 | LLOG Exp Off | 15% | TERMIN | |
| GC 201 | G12210 | Federal | OP | 5/1/1990 | 5,760 | LLOG Exp Off | 15% | UNIT | |
| GC 201 | G12210 | Federal | RT NE4 | 5/1/1990 | 5,760 | Fieldwood En Off; LLOG Exp Off | 100% | UNIT | [2] |
| GC 245 | G05916 | Federal | CONT | 7/1/1983 | 5,760 | Fieldwood En Off | 100% | TERMIN | |
| GC 64 | G07005 | Federal | CONT | 6/1/1984 | 5,760 | Fieldwood En Off | 49% | RELINQ | |
| HI A-341 | G25605 | Federal | RT | 12/1/2003 | 5,760 | Fieldwood En | 40% | PROD | [1] |
| HI A-365 | G02750 | Federal | RT | 7/1/1974 | 5,760 | Fieldwood En | 50% | PROD | [1] |
| HI A-376 | G02754 | Federal | RT | 7/1/1974 | 5,760 | Fieldwood En | 55% | PROD | [1] |
| HI A-382 | G02757 | Federal | RT | 7/1/1974 | 5,760 | Fieldwood En | 28% | PROD | [1] |
| HI A-474 | G02366 | Federal | RT | 8/1/1973 | 5,760 | McMoRan O&G | 12% | TERMIN | [1] |
| HI A-475 | G02367 | Federal | CONT | 8/1/1973 | 5,760 | McMoRan O&G | 12% | TERMIN | [1] |
| HI A-489 | G02372 | Federal | RT | 8/1/1973 | 5,760 | McMoRan O&G | 12% | TERMIN | [1] |
| HI A-531 | G02696 | Federal | OP 1 | 7/1/1974 | 5,760 | Fieldwood En Off | 75% | TERMIN | |
| HI A-563 | G02388 | Federal | OP 1 | 8/1/1973 | 5,760 | Cox Op | 2% | PROD | |
| HI A-564 | G02389 | Federal | OP 1 | 8/1/1973 | 5,760 | Cox Op | 2% | TERMIN | |

| Block | Lease | Type | Rights | Date Le Eff | Le Cur Acres (Ac) | Operator | WI | Lease Status | Note[†] |
|---|---|---|---|---|---|---|---|---|---|
| HI A-572 | G02392 | Federal | RT | 8/1/1973 | 5,760 | Fieldwood En | 24% | TERMIN | [1] |
| HI A-573 | G02393 | Federal | RT | 8/1/1973 | 5,760 | Fieldwood En | 28% | PROD | [1] |
| HI A-581 | G18959 | Federal | RT | 12/1/1997 | 5,760 | Cox Op | 2% | TERMIN | [1] |
| HI A-582 | G02719 | Federal | OP 1 | 7/1/1974 | 5,760 | Cox Op | 2% | PROD | [1] |
| HI A-595 | G02721 | Federal | RT | 7/1/1974 | 5,760 | Fieldwood En | 28% | PROD | [1] |
| HI A-596 | G02722 | Federal | RT | 7/1/1974 | 5,760 | Fieldwood En | 28% | PROD | [1] |
| MO 861 | G05062 | Federal | RT | 4/1/1982 | 5,198 | Providence Res GOM 2 | 100% | TERMIN | |
| MO 861 | G05062 | Federal | OP 1 | 4/1/1982 | 5,198 | Providence Res GOM 2 | 50% | TERMIN | |
| MP 101 | G22792 | Federal | RT | 7/1/2001 | 4,995 | Fieldwood En Off | 78% | TERMIN | |
| MP 109 | G22794 | Federal | OP 1 | 5/1/2001 | 4,995 | W & T Off | 33% | TERMIN | |
| MP 109 | G22794 | Federal | OP 2 | 5/1/2001 | 4,995 | W & T Off | 33% | TERMIN | |
| MP 77 | G04481 | Federal | RT | 11/1/1980 | 4,655 | Fieldwood En Off | 18% | RELINQ | [1], [6] |
| PL 13 | G03171 | Federal | OP 3 | 7/1/1975 | 5,000 | ANKOR En | 2% | TERMIN | |
| SM 102 | G24872 | Federal | RT | 5/1/2003 | 3,113 | Fieldwood En Off | 100% | PROD | |
| SM 135 | G19776 | Federal | RT | 5/1/1998 | 3,293 | Fieldwood En | 50% | TERMIN | [1] |
| SM 139 | G21106 | Federal | OP 1 | 7/1/1999 | 5,000 | Fieldwood En Off | 100% | TERMIN | |
| SM 142 | G01216 | Federal | RT | 6/1/1962 | 2,761 | Fieldwood En Off | 86% | TERMIN | |
| SM 142 | G01216 | Federal | OP 1 | 6/1/1962 | 2,761 | Fieldwood En Off | 86% | TERMIN | |
| SM 143 | G01217 | Federal | CONT | 5/1/1962 | 2,738 | Fieldwood En Off | 16% | TERMIN | |
| SM 146 | G09546 | Federal | RT | 7/1/1988 | 5,000 | Dynamic Off Res | 100% | TERMIN | |
| SM 147 | G06693 | Federal | RT | 7/1/1984 | 5,000 | Fieldwood En Off | 100% | TERMIN | |
| SM 268 | G02310 | Federal | RT | 1/1/1973 | 3,237 | Fieldwood En | 30% | TERMIN | [1] |
| SM 269 | G02311 | Federal | RT | 1/1/1973 | 5,000 | Fieldwood En | 18% | PROD | [1] |
| SM 269 | G02311 | Federal | RT | 1/1/1973 | 5,000 | Fieldwood En | 9% | PROD | [1] |
| SM 269 | G02311 | Federal | RT | 1/1/1973 | 5,000 | Fieldwood En | 0% | PROD | [1] |
| SM 280 | G14456 | Federal | OP 1 | 6/1/1994 | 5,000 | Fieldwood En | 50% | PROD | [1] |
| SM 280 | G14456 | Federal | OP 3 | 6/1/1994 | 5,000 | Fieldwood En | 50% | PROD | [1] |
| SM 281 | G02600 | Federal | RT | 4/1/1974 | 3,214 | Fieldwood En | 32% | PROD | [1] |
| SM 87 | G24870 | Federal | RT | 5/1/2003 | 3,077 | Castex Off | 100% | PROD | |
| SP 17 | G02938 | Federal | RT | 11/1/1974 | 962 | Fieldwood En Off | 100% | UNIT | |
| SP 37 | 00697 | Federal | OP 1 | 10/1/1959 | 2,500 | Whitney O&G | 44% | PROD | |

3

| Block | Lease | Type | Rights | Date Le Eff | Le Cur Acres (Ac) | Operator | WI | Lease Status | Note[†] |
|-------|-------|------|--------|-------------|------|----------|-----|--------------|------|
| SP 59 | G02942 | Federal | RT | 11/1/1974 | 1,657 | Fieldwood En Off | 100% | UNIT | |
| SP 59 | G02943 | Federal | RT | 11/1/1974 | 907 | Fieldwood En Off | 100% | UNIT | |
| SP 59, SP 60 | G01608 | Federal | RT | 7/1/1967 | 3,510 | Fieldwood En Off | 100% | UNIT | |
| SP 6 | G03337 | Federal | RT | 4/1/1976 | 318 | Fieldwood En Off | 100% | UNIT | |
| SP 6 | G03337 | Federal | OP | 4/1/1976 | 318 | Fieldwood En Off | 100% | UNIT | |
| SP 60 | G02137 | Federal | RT | 11/1/1971 | 1,762 | Fieldwood En Off | 100% | UNIT | |
| SP 61 | G01609 | Federal | RT | 7/1/1967 | 5,000 | Fieldwood En | 100% | UNIT | [3] |
| SP 61 | G01609 | Federal | OP 1 | 7/1/1967 | 5,000 | Fieldwood En | 100% | UNIT | [3] |
| SP 66 | G01611 | Federal | RT | 6/1/1967 | 4,310 | Fieldwood En Off | 100% | UNIT | [1] |
| SP 67 | G01612 | Federal | RT | 7/1/1967 | 5,000 | Fieldwood En Off | 100% | UNIT | |
| SS 149 | 00434 | Federal | OP 1 | 1/1/1955 | 5,000 | W & T Off | 3% | TERMIN | |
| SS 149 | 00434 | Federal | OP 2 | 1/1/1955 | 5,000 | W & T Off | 3% | TERMIN | |
| SS 149 | 00434 | Federal | OP 1 | 1/1/1955 | 5,000 | W&T Off | 3% | TERMIN | |
| SS 149 | 00434 | Federal | OP 2 | 1/1/1955 | 5,000 | W&T Off | 3% | TERMIN | |
| SS 177 | 00590 | Federal | RT | 9/1/1955 | 5,000 | W & T Off | 25% | PROD | |
| SS 189 | G04232 | Federal | OP 5 | 12/1/1979 | 5,000 | Fieldwood En | 1% | PROD | [1] |
| SS 204 | G01520 | Federal | RT | 7/1/1967 | 5,000 | Fieldwood En | 21% | PROD | [1] |
| SS 204 | G01520 | Federal | RT | 7/1/1967 | 5,000 | Fieldwood En | 0% | PROD | [1] |
| SS 207 | G01523 | Federal | RT | 7/1/1967 | 5,000 | Fieldwood En | 0% | UNIT | [1], [6] |
| SS 214 | 00828 | Federal | RT | 5/1/1960 | 5,000 | W & T Off | 35% | PROD | |
| SS 214 | 00828 | Federal | OP 1 | 5/1/1960 | 5,000 | W & T Off | 14% | PROD | |
| SS 216 | G01524 | Federal | RT | 7/1/1967 | 5,000 | Fieldwood En | 20% | PROD | [1] |
| SS 216 | G01524 | Federal | RT | 7/1/1967 | 5,000 | Fieldwood En | 0% | PROD | [1] |
| SS 232 | G15293 | Federal | RT | 9/1/1995 | 5,000 | W & T Off | 34% | TERMIN | |
| SS 233 | G01528 | Federal | RT | 7/1/1967 | 5,000 | W & T Off | 34% | PROD | |
| SS 238 | G03169 | Federal | RT | 7/1/1975 | 5,000 | W & T Off | 35% | PROD | |
| SS 238 | G03169 | Federal | OP 2 | 7/1/1975 | 5,000 | Peregrine O&G II | 35% | PROD | |
| SS 246 | G01027 | Federal | OP 11 | 6/1/1962 | 5,000 | Fieldwood En Off | 81% | TERMIN | |
| SS 246 | G01027 | Federal | OP 13 | 6/1/1962 | 5,000 | Fieldwood En Off | 77% | TERMIN | |
| SS 247 | G01028 | Federal | RT B | 6/1/1962 | 5,000 | Fieldwood En Off | 89% | UNIT | |
| SS 247 | G01028 | Federal | RT C | 6/1/1962 | 5,000 | Fieldwood En Off | 77% | UNIT | |
| SS 248 | G01029 | Federal | RT B | 6/1/1962 | 5,000 | Fieldwood En Off | 77% | UNIT | |

| Block | Lease | Type | Rights | Date Le Eff | Le Cur Acres (Ac) | Operator | WI | Lease Status | Note[†] |
|---|---|---|---|---|---|---|---|---|---|
| SS 249 | G01030 | Federal | OP 1 | 6/1/1962 | 5,000 | Fieldwood En Off | 80% | UNIT | [1] |
| SS 249 | G01030 | Federal | OP 2 | 6/1/1962 | 5,000 | Fieldwood En Off | 69% | UNIT | [1] |
| SS 252 | G01529 | Federal | OP 2 | 7/1/1967 | 5,000 | Fieldwood En Off | 32% | PROD | [5] |
| SS 252 | G01529 | Federal | OP 1 | 7/1/1967 | 5,000 | Fieldwood En Off | 100% | PROD | [5] |
| SS 252 | G01529 | Federal | RT | 7/1/1967 | 5,000 | Fieldwood En Off | 32% | PROD | [5] |
| SS 253 | G01031 | Federal | OP 1 | 6/1/1962 | 5,000 | Fieldwood En Off | 100% | PROD | [5] |
| SS 253 | G01031 | Federal | OP 2 | 6/1/1962 | 5,000 | Fieldwood En Off | 50% | TERMIN | [5] |
| SS 253 | G01031 | Federal | OP 4 | 6/1/1962 | 5,000 | Fieldwood En Off | 100% | PROD | [5] |
| SS 253 | G01031 | Federal | OP 5 | 6/1/1962 | 5,000 | Fieldwood En Off | 100% | PROD | [5] |
| SS 253 | G01031 | Federal | RT | 6/1/1962 | 5,000 | Fieldwood En Off | 50% | TERMIN | [5] |
| SS 270 | G01037 | Federal | RT | 3/13/1962 | 5,000 | Fieldwood En Off | 89% | UNIT | |
| SS 271 | G01038 | Federal | RT | 3/13/1962 | 5,000 | Fieldwood En Off | 72% | UNIT | [1] |
| SS 271 | G01038 | Federal | OP | 3/13/1962 | 5,000 | Fieldwood En Off | 72% | UNIT | [1] |
| SS 291 | G02923 | Federal | RT B | 12/1/1974 | 3,750 | Fieldwood En | 15% | OPERNS | [1] |
| SS 300 | G07760 | Federal | RT | 8/1/1985 | 5,000 | W & T Off | 24% | PROD | |
| SS 315 | G09631 | Federal | RT | 6/1/1988 | 5,000 | W & T Off | 25% | PROD | |
| ST 315 | G23946 | Federal | RT | 7/1/2002 | 4,458 | W & T Off | 50% | PROD | |
| ST 316 | G22762 | Federal | RT | 6/1/2001 | 4,435 | W & T Off | 40% | PROD | [1] |
| VK 824 | G15436 | Federal | CONT | 9/1/1995 | 5,760 | Fieldwood En | 6% | RELINQ | |
| VK 826 | G06888 | Federal | RT | 6/1/1984 | 5760 | Fieldwood En | 100% | TERMIN | |
| VK 917 | G15441 | Federal | OP | 7/1/1995 | 5760 | Fieldwood En | 85% | PROD | |
| VK 962 | G15445 | Federal | OP 1 | 7/1/1995 | 5760 | Fieldwood En | 85% | TERMIN | |
| VR 196 | G19760 | Federal | OP 1 | 8/1/1998 | 5,000 | Fieldwood En Off | 38% | TERMIN | [5] |
| VR 262 | G34257 | Federal | RT | 10/1/2012 | 5,485 | Fieldwood En | 25% | RELINQ | [1] |
| VR 272 | G23829 | Federal | RT | 6/1/2002 | 4,381 | Fieldwood En Off | 100% | PROD | |
| VR 273 | G14412 | Federal | OP 3 | 5/1/1994 | 5,000 | Fieldwood En Off | 100% | TERMIN | |
| VR 279 | G11881 | Federal | OP 1 | 5/1/1990 | 5,000 | Talos En Off | 50% | TERMIN | |
| VR 313 | G01172 | Federal | OP 1 | 6/1/1962 | 5,000 | Fieldwood En Off | 100% | TERMIN | |
| VR 313 | G01172 | Federal | OP 2 | 6/1/1962 | 5,000 | Fieldwood En Off | 100% | TERMIN | |
| VR 408 | G15212 | Federal | CONT | 7/1/1995 | 5,000 | Fieldwood En | 33% | PROD | |
| WC 171 | G01997 | Federal | RT | 1/1/1971 | 5,000 | XTO | 34% | TERMIN | |
| WC 295 | G24730 | Federal | OP 1 | 5/1/2003 | 5,000 | Fieldwood En | 14% | PROD | [1] |
| WC 485 | G02220 | Federal | RT | 2/1/1973 | 5,000 | Fieldwood En Off | 100% | UNIT | |

| Block | Lease | Type | Rights | Date Le Eff | Le Cur Acres (Ac) | Operator | WI | Lease Status | Note[†] |
|---|---|---|---|---|---|---|---|---|---|
| WC 498 | G03520 | Federal | RT | 8/1/1977 | 5,000 | Cox Op | 4% | PROD | |
| WC 507 | G02549 | Federal | RT | 4/1/1974 | 2,500 | Fieldwood En Off | 100% | UNIT | |
| WC 507 | G02549 | Federal | OP 1 | 4/1/1974 | 2,500 | Fieldwood En Off | 50% | UNIT | |
| WC 507 | G10594 | Federal | RT | 6/1/1989 | 2,500 | Fieldwood En Off | 100% | UNIT | |
| WC 65 | G02825 | Federal | OP 4 | 12/1/1974 | 5,000 | Fieldwood En | 19% | PROD | [1] |
| WC 66 | G02826 | Federal | OP 2 | 12/1/1974 | 3,750 | Fieldwood En | 25% | PROD | [1] |
| WC 67 | G03256 | Federal | CONT | 9/1/1975 | 5,000 | Fieldwood En | 17% | TERMIN | [1] |
| WC 72 | G23735 | Federal | RT | 7/1/2002 | 5,000 | Fieldwood En Off | 75% | PROD | |
| WC 96 | G23740 | Federal | OP 1 | 5/1/2002 | 5,000 | Talos | 25% | UNIT | |
| WD 103 | G12360 | Federal | OP 1 | 5/1/1960 | 1,016 | Fieldwood En | 19% | PROD | [1] |
| WD 121 | G19843 | Federal | OP 1 | 8/1/1998 | 5,000 | Fieldwood En | 16% | PROD | [1] |
| WD 122 | G13645 | Federal | OP 1 | 8/1/1992 | 5,000 | Fieldwood En | 16% | PROD | [1] |
| WD 122 | G13645 | Federal | OP 2 | 8/1/1992 | 5,000 | Fieldwood En | 16% | PROD | [1] |
| WD 27 | G04473 | Federal | RT B | 11/1/1980 | 5,000 | Cox Op | 14% | PROD | |
| WD 57, WD 79, WD 80 | G01449 | Federal | RT | 5/1/1966 | 3,125 | Fieldwood En Off | 100% | UNIT | [4] |
| WD 63 | G19839 | Federal | OP 1 | 6/1/1998 | 5,000 | Peregrine O&G | 13% | RELINQ | |
| WD 64 | G25008 | Federal | RT | 5/1/2003 | 5,000 | Peregrine O&G | 6% | TERMIN | |
| WD 73 | G01083 | Federal | OP 2 | 6/1/1962 | 5,000 | Cox Op | 6% | UNIT | |
| WD 74 | G01084 | Federal | OP 1 | 6/1/1962 | 5,000 | Cox Op | 6% | UNIT | |
| WD 79, WD 80 | G01874 | Federal | RT | 12/1/1968 | 3,438 | Fieldwood En Off | 100% | UNIT | [4] |
| WD 80 | G01989 | Federal | RT | 8/1/1970 | 1,875 | Fieldwood En Off | 100% | UNIT | [4] |
| WD 80 | G02136 | Federal | RT | 1/1/1972 | 938 | Fieldwood En Off | 100% | UNIT | [4] |
| WD 85 | G04895 | Federal | RT | 12/1/1981 | 2,630 | Fieldwood En Off | 100% | TERMIN | |
| WD 85 | G04895 | Federal | OP 1 | 12/1/1981 | 2,630 | Fieldwood En Off | 100% | TERMIN | |
| WD 86 | G02934 | Federal | RT | 12/1/1974 | 2,500 | SPN Res | 100% | TERMIN | |
| WD 86 | G04243 | Federal | RT | 1/1/1980 | 2,500 | Fieldwood En Off | 100% | TERMIN | |
| WD 86 | G04243 | Federal | OP 1 | 1/1/1980 | 2,500 | Fieldwood En Off | 100% | TERMIN | |
| WD 86 | G04243 | Federal | OP 2 | 1/1/1980 | 2,500 | Fieldwood En Off | 100% | TERMIN | |
| WD 86 | G04243 | Federal | OP 3 | 1/1/1980 | 2,500 | Fieldwood En Off | 100% | TERMIN | |
| WD 90 | G01089 | Federal | OP 3 | 6/1/1962 | 5,000 | Fieldwood En | 19% | PROD | [1] |
| SP 42 | SL03011 | SL- LA | WI | - | - | - | 100% | SOP | |

| Block | Lease | Type | Rights | Date Le Eff | Le Cur Acres (Ac) | Operator | WI | Lease Status | Note[†] |
|---|---|---|---|---|---|---|---|---|---|
| - | 14519 | SL - LA | WI | - | - | - | 50% | RELEASED | |
| - | 14520 | SL - LA | WI | - | - | - | 50% | RELEASED | |
| - | 14914 | SL - LA | WI | - | - | - | 66% | RELEASED | |
| SP 42 | SL16869 | SL- LA | WI | - | - | - | 100% | PROD | |
| BS 45 | SL19051 | SL- LA | ORRI | 8/9/2006 | | Southern Oil of Louisiana | 0% | UNIT | |
| BS 53 | SL3770 | SL- LA | WI | | | | 50% | RELEASED | |
| - | SL17072 | SL- LA | WI | - | - | - | 38% | ACTIVE | |
| - | SL18287 | SL- LA | WI | - | - | - | 44% | - | |
| - | SL19266 | SL- LA | WI | - | - | - | 17% | ACTIVE | |
| - | Hayes Lumber Co. | Onshore | WI | - | - | Fieldwood Onshore | 63% | TERMINATED | |
| - | 111650 | SL - TX | WI | | | TR Offshore, LLC | 7% | ACTIVE | |
| - | 115727 | SL - TX | WI | | | TR Offshore, LLC | 7% | ACTIVE | |
| - | 114988 | SL - TX | WI | | | TR Offshore, LLC | 7% | ACTIVE | |
| - | 136449 | SL - TX | WI | - | - | TR Offshore, LLC | 7% | ACTIVE | |
| - | 168986 | SL - TX | WI | - | - | Fieldwood Onshore | 100% | TERMIN | |
| - | 189098 | SL - TX | WI | - | - | Fieldwood Onshore | 100% | TERMIN | |
| - | 206882 | SL - TX | WI | - | - | Fieldwood Onshore | 100% | TERMIN | |
| - | JMB Partnership | Onshore | WI | 2/6/2019 | | | 100% | | [7] |
| - | Caroline Baker Trust No. 1 | Onshore | WI | 1/22/2016 | | | 100% | | [7] |

## Abandoned Properties ROW

| SEGMENT NUMBER | COMPANY NAME | ORG AREA | ORG BLOCK | ORG NAME | REC AREA | REC BLOCK | REC NAME | SIZE | PRODUCT | STATUS | ROW NUMBER | FW LEASE | NOTE[3] |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 7923 | Fieldwood Energy, LLC | EB | 165 | A | HI | A 582 | 30 SSTI | 12 | GAS | Active | G08536 | G06280 | |
| 10301 | Bandon Oil and Gas, LP | EC | 332 | A | EC | 330 | 08 SSTI | 6 | OIL | Out of Service | G14699 | G09478 | [2] |
| 44 | Fieldwood Energy, LLC | EI | 175 | C | EI | 176 | 12" SSTI | 8 | OIL | Out of Service | G13445 | 00438 | |
| 1128 | Fieldwood Energy, LLC | EI | 330 | flanged end | EI | 306 | 14-inch SSTI | 14 | OIL | Out of Service | G02139A | G02115 | |
| 7943 | Fieldwood Energy, LLC | EI | 342 | C | EI | 327 | 08 SSTI | 4 | OIL | Out of Service | G08541 | G02319 | [2] |
| 18493 | Fieldwood Energy, LLC | EI | 342 | C | EI | 343 | SSTI | 6 | GAS | Out of Service | G29108 | G02319 | [2] |
| 19960 | Fieldwood Energy LLC | EI | 342 | C | EI | 342 | Blind Flange | 6 | OIL | Out of Service | G29471 | G02319 | [2] |
| 11923 | Fieldwood Energy, LLC | EI | 53 | C | EI | 64 | 22 SSTI | 10 | G/C | Out of Service | G20539 | 00479 | |
| 9211 | Fieldwood Energy, LLC | EI | 53 | B | EI | 64 | 22 SSTI | 6 | G/C | Partial Abandon | G12373 | 00479 | |
| 15298 | Fieldwood Energy, LLC | GA | 210 | B | GA | 239 | 12 SSTI | 8 | G/C | Active | G26931 | G25524 | |
| 16077 | Fieldwood Energy, LLC | HI | 130 | #2 | HI | 165 | 8-inch SSTI | 8 | BLGH | Partial Abandon | G28284 | G25579 | [1] |
| 15401 | Fieldwood Energy, LLC | HI | A 341 | B | HI | A 340 | 30" SSTI | 812 | G/C | Active | G26938 | G25605 | |
| 6669 | Fieldwood Energy, LLC | HI | A 376 | A | HI | A 356 | 12 SSTI | 10 | GAS | Out of Service | G05238 | G02754 | |
| 6669 | Fieldwood Energy LLC | HI | A 376 | Platform A | HI | A 356 | 12 SSTI W/PSN 10882 | 10 | GAS | Out of Service | G05238 | G02754 | |
| 7684 | Fieldwood Energy, LLC | HI | A 550 | A | HI | A 568 | 20 SSTI | 10 | GAS | Out of Service | G08276 | G04081 | [2] |
| 6340 | Fieldwood Energy, LLC | HI | A 568 | Subsea Valve | HI | A 539 | 20 SSTI | 20 | G/C | Out of Service | G04974 | G04081 | [2] |
| 5470 | Fieldwood Energy, LLC | HI | A356 | Valve | HI | A343 | HIOS | 12 | GAS | Out of Service | G04050 | G02754 | |
| 10882 | Fieldwood Energy, LLC | HI | A356 | 10SST | HI | A356 | 12SSTI | 12 | GAS | Out of Service | G04051 | G02754 | |

[1]   Lease carries $0 liability
[2]   Represents each ROW in which (i) FWE IV is to acquire solely as to the same 8/8ths undivided interest that FWE IV is to acquire in the related lease referenced above for such ROW. The Debtors' remaining interests in such ROW are to be abandoned.

| SEGMENT NUMBER | COMPANY NAME | ORG AREA | ORG BLOCK | ORG NAME | REC AREA | REC BLOCK | REC NAME | SIZE | PRODUCT | STATUS | ROW NUMBER | FW LEASE | NOTE[3] |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 6504 | Fieldwood Energy, LLC | HI | A595 | D | HI | 573 | B | 8 | OIL | Out of Service | G28525 | G02721 | |
| 14304 | Fieldwood Energy, LLC | MP | 101 | SSTI Manifold | MP | 102 | Plat A | 8 | BLKG | Partial Abandon | G24687 | G22792 | |
| 15810 | Fieldwood Energy Offshore LLC | MP | 29 | Well No. 1 | MP | 118 | Platform A | 6 | BLKG | Out of Service | G28216 | G27196 | [1] |
| 15818 | Fieldwood Energy Offshore LLC | MP | 77 | A | MP | 151 | 18"SSTI | 8 | GAS | Out of Service | G28221 | G04481 | [2] |
| 4733 | Fieldwood Energy Offshore LLC | SM | 142 | A | SM | 127 | 24 SSTI | 10 | G/C | Out of Service | G03441 | G01216 | |
| 15106 | Fieldwood Energy Offshore LLC | SM | 146 | B | SM | 147 | A | 6 | BLKG | Out of Service | G26837 | G09546 | |
| 15107 | Fieldwood Energy, LLC | SM | 146 | B | SM | 147 | A | 4 | BLKG | Out of Service | G26838 | G09546 | |
| 15108 | Fieldwood Energy, LLC | SM | 147 | A | SM | 146 | B | 2 | LIFT | Out of Service | G26839 | G09546 | |
| 19363 | Fieldwood Energy Offshore LLC | SM | 147 | A | SM | 130 | 12 SSTI | 6 | BLKO | Out of Service | G14093 | G06693 | |
| 19363 | Fieldwood Energy Offshore LLC | SM | 147 | A | SM | 130 | 12 SSTI | 6 | BLKO | Out of Service | G29316 | G06693 | |
| 10977 | Fieldwood Energy, LLC | SM | 268 | A | SM | 280 | #03 | 3 | BLKG | Out of Service | G28756 | G14456 | |
| 17499 | Fieldwood Energy, LLC | SM | 269 | B | SM | 268 | A | 10 | GAS | Out of Service | G28484 | G02311 | |
| 13642 | Fieldwood Energy, LLC | SM | 280 | H | SM | 268 | A | 10 | BLKG | Permitted for Abandonment | G28758 | G14456 | |
| 5427 | Fieldwood Energy, LLC | SM | 281 | E | SM | 268 | A | 12 | SPLY | Out of Service | G02817 | G02600 | |
| 5429 | Fieldwood Energy, LLC | SM | 281 | C | SM | 281 | 12 SSTI | 10 | SPLY | Out of Service | G02817 | G02600 | |
| 6512 | Fieldwood Energy, LLC | SM | 281 | C | SM | 268 | D | 10 | BLKO | Out of Service | G29131 | G02600 | |
| 10268 | Fieldwood Energy SP LLC | SP | 60 | A | SP | 6 | F/S | 10 | OIL | Out of Service | G14679 | G02137 | |
| 20050 | Fieldwood Energy, LLC | SS | 168 | SSTI | SS | 168 | SSTI | 6 | | Proposed | G28788 | 00820 | [2] |
| 6748 | Fieldwood Energy, LLC | SS | 169 | C Platform | SS | 169 | 18-inch SSTI | 6 | OIL | Out of Service | G09322 | 00820 | [2] |
| 12778 | Fieldwood Energy, LLC | SS | 189 | A | SS | 185 | 26"SSTI | 8 | G/C | Out of Service | G22139 | G04232 | |
| 1138 | Fieldwood Energy, LLC | SS | 204 | A | SS | 207 | A | 6 | G/O | Out of Service | G13491 | G01520 | |
| 1137 | Fieldwood Energy, LLC | SS | 207 | A Platform | SS | 204 | A | 4 | GAS | Out of Service | G13489 | G01523 | |

| SEGMENT NUMBER | COMPANY NAME | ORG AREA | ORG BLOCK | ORG NAME | REC AREA | REC BLOCK | REC NAME | SIZE | PRODUCT | STATUS | ROW NUMBER | FW LEASE | NOTE[3] |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1147 | Fieldwood Energy, LLC | SS | 207 | A | SS | 208 | F-Pump | 12 | OIL | Out of Service | G13492 | G01523 | |
| 17775 | Fieldwood Energy, LLC | SS | 253 | C | SS | 208 | F-Pump | 4 | OIL | Out of Service | G01691C | G01031 | |
| 18094 | Bandon Oil and Gas, LP | ST | 195 | B | ST | 196 | SSTI | 6 | G/C | Permitted for Abandonment Approved | G29005 | G03593 | [2] |
| 11107 | Bandon Oil and Gas, LP | ST | 196 | 06-inch SSTI | SS | 208 | F | 6 | OIL | Permitted for Abandonment Approved | G05120 | G03593 | [2] |
| 13720 | Fieldwood Energy, LLC | VK | 340 | 8"SSTI | VK | 251 | A | 8 | BLGH | Active | G28221 | G04481 | [2] |
| 13193 | Bandon Oil and Gas, LP | VR | 196 | A | VR | 206 | 12 SSTI | 8 | G/C | Out of Service | G22418 | G19760 | [2] |
| 18591 | Fieldwood Energy, LLC | VR | 196 | A | VR | 215 | A | 4 | BLKO | Out of Service | G29137 | G19760 | [2] |
| 18588 | Fieldwood Energy, LLC | VR | 215 | A | VR | 196 | A | 4 | GAS | Active | G29136 | G19760 | [2] |
| 17090 | Fieldwood Energy, LLC | VR | 261 | A | VR | 265 | A | 8 | BLKO | Out of Service | G28347 | G03328 | [2] |
| 14609 | Fieldwood Energy, LLC | VR | 272 | "A" | VR | 250 | 8" SSTI | 4 | OIL | Out of Service | G25384 | G23829 | |
| 14277 | Fieldwood Energy, LLC | VR | 272 | A | SM | 116 | 20" SSTI | 10 | G/C | Out of Service | G25288 | G23829 | |
| 5440 | Fieldwood Energy Offshore LLC | VR | 313 | B | VR | 313 | 20 SSTI | 10 | GAS | Out of Service | G04044 | G01172 | |
| 15136 | Fieldwood Energy, LLC | VR | 313 | B | VR | 313 | 6" SSTI | 6 | OIL | Out of Service | G03879 | G01172 | |
| 4289 | Fieldwood Energy Offshore LLC | WC | 485 | A | WC | 509 | GP | 12 | GAS | Out of Service | G02122E | G02220 | |
| 14251 | Fieldwood Energy Offshore LLC | WC | 72 | #1 | WC | 65 | JA | 4 | BLKG | Out of Service | G25275 | G23735 | |
| 16088 | Fieldwood Energy, LLC | WD | 122 | A | WD | 105 | E | 6 | GAS | Out of Service | G28289 | G13645 | |
| 16089 | Fieldwood Energy, LLC | WD | 122 | A | WD | 105 | E | 3 | OIL | Out of Service | G28290 | G13645 | |
| 15960 | Fieldwood Energy, LLC | WD | 90 | A | WD | 73 | SSTI | 4 | OIL | Out of Service | G28260 | G01089 | |
| 18649 | Fieldwood Energy, LLC | VK | 826 | A | VK | 962 | UTA | 4 | UBEH | Out of Service | G29151 | G15441 | |
| 18904 | Fieldwood Energy, LLC | VK | 826 | A | VK | 917 | SUTA | 1 | UMB | Out of Service | G29151 | G15441 | |
| 18648 | Fieldwood Energy, LLC | VK | 962 | PLET | VK | 826 | A-Nep Spar | 6 | SERV | Active | G29151 | G15441 | |

| SEGMENT NUMBER | COMPANY NAME | ORG AREA | ORG BLOCK | ORG NAME | REC AREA | REC BLOCK | REC NAME | SIZE | PRODUCT | STATUS | ROW NUMBER | FW LEASE | NOTE[3] |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 14906 | Fieldwood Energy, LLC | VK | 962 | SSW #1 | VK | 826 | A Nep Spar | 6 | BLKO | Out of Service | G25481 | G15441 | |
| 14907 | Fieldwood Energy, LLC | VK | 962 | SSW#1 | VK | 826 | A | 10 | CSNG | Out of Service | G25481 | G15441 | |

## Abandoned Properties RUE

| Area | Block No. | Structure | Complex ID No. | Authority No. | FW Lease | Operator | Approval Date | Associated Assets |
|------|-----------|-----------|----------------|---------------|----------|----------|---------------|-------------------|
| EI | 63 | A | 21515 | G30244 | 00425 | Fieldwood Energy Offshore LLC | 12/02/13 | EI 63 002,003, EI 62 and 005, 006, 008, 009, 010 and 011 |
| EI | 63 | B | 21515 | G30244 | 00425 | Fieldwood Energy Offshore LLC | 12/02/13 | Production from EI 63 A |
| EI | 63 | C-QTR | 21515 | G30244 | 00425 | Fieldwood Energy Offshore LLC | 12/02/13 | Production from EI 63 A |
| SM | 146 | B | 1663 | G30248 | G09546 | Fieldwood Energy Offshore LLC | 08/21/13 | SM 139 B001 & B002 |
| SM | 147 | A | 23389 | G30200 | G06693 | Fieldwood Energy Offshore LLC | 09/12/13 | SM 139 B001, B002 & B002D |
| WD | 86 | A | 22593 | G30173 | G04243 | Fieldwood Energy Offshore LLC | 06/20/13 | WD 86 B001, B002 & B005 |
| VK | 826 | A-Neptune Spar | 24235 | G30353 | G15441 | Fieldwood Energy LLC | 07/03/18 | VK 917 SS001 & VK 962 SS001 |