## EXHIBIT 13

**FIELDWOOD'S MOTION FOR SUMMARY JUDGMENT**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| **FIELDWOOD ENERGY LLC**, *et al.*, | § | |
| | § | Case No. 20-33948 (MI) |
| | § | |
| Debtors.[1] | § | |
| | § | |
| | § | (Jointly Administered) |
| ------------------------------------------------------ | § | |
| | § | Adversary Proc. No. 20-03476 |
| **FIELDWOOD ENERGY LLC**, *et. al.*, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | |
| | § | |
| **ATLANTIC MARITIME SERVICES, LLC**, | § | |
| | § | |
| Defendant. | § | |
| | § | |
| ------------------------------------------------------ | § | |

**PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

> This motion seeks an order that may adversely affect you. If you oppose the motion, you should immediately contact the moving party to resolve the dispute. If you and the moving party cannot agree, you must file a response and send a copy to the moving party. You must file and serve your response on or before May 25, 2021. Your response must state why the motion should not be granted. If you do not file a timely response, the relief may be granted without further notice to you. If you oppose the motion and have not reached an agreement, you must attend the hearing. Unless the parties agree otherwise, the court may consider evidence at the hearing and may decide the motion at the hearing.
>
> Represented parties should act through their attorney.

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are: Dynamic Offshore Resources NS, LLC (0158); Fieldwood Energy LLC (6778); Fieldwood Energy Inc. (4991); Fieldwood Energy Offshore LLC (4494); Fieldwood Onshore LLC (3489); Fieldwood SD Offshore LLC (8786); Fieldwood Offshore LLC (2930); FW GOM Pipeline, Inc. (8440); GOM Shelf LLC (8107); Bandon Oil and Gas GP, LLC (9172); Bandon Oil and Gas, LP (9266); Fieldwood Energy SP LLC (1971); Galveston Bay Pipeline LLC (5703); and Galveston Bay Processing LLC (0422). The Debtors' primary mailing address is 2000 W. Sam Houston Parkway S., Suite 1200, Houston, TX 77042.

There will be a remote hearing on this matter on June 8, 2021 at 1:30 PM CT. Audio communication will be by use of the Court's dial-in facility. You may access the facility at (832) 917-1510. You will be responsible for your own long distance charges. Once connected, you will be asked to enter the conference room number. Judge Isgur's conference room number is 954554.

You may view video via GoToMeeting. To use GoToMeeting, the Court recommends that you download the free GoToMeeting application. To connect, you should enter the meeting code "JudgeIsgur" in the GoToMeeting app or click the link on Judge Isgur's home page on the Southern District of Texas website. Once connected, click the settings icon in the upper right corner and enter your name under the personal information setting.

Hearing appearances must be made electronically in advance of the hearing. To make your electronic appearance, go to the Southern District of Texas website and select "Bankruptcy Court" from the top menu. Select "Judges' Procedures," then "View Home Page" for Judge Isgur. Under "Electronic Appearance" select "Click here to submit Electronic Appearance". Select the case name, complete the required fields and click "Submit" to complete your appearance.

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................. 10

STATEMENT OF FACTS .................................................................... 13

    I.      Relevant Leases and Senior Liens. ............................................. 13

    II.    The Debtors' Relationship with Atlantic. ..................................... 14

    III.   The Debtors' Chapter 11 Cases. ................................................ 15

    IV.   Atlantic Filed Lawsuits Against the Debtors' Co-Working Interest
         Owners, Violating the Automatic Stay, and Filed Claims Against the
         Debtors. .................................................................................. 16

    V.    The Debtors Filed the Original Complaint Seeking a Preliminary
         Injunction Enjoining the Lawsuits, Which the Court Granted. ........... 16

    VI.   The Debtors' Chapter 11 Plan and Disclosure Statement. .................. 17

    VII.  The Debtors Moved to Lift Abatement and Filed an Amended Complaint. ........ 18

LEGAL STANDARD ...................................................................... 18

ARGUMENT ............................................................................... 19

    I.      To the Extent Atlantic Holds Valid and Enforceable Liens Securing its
         Claims Against the Debtors, Such Liens are Extinguished Under the
         Debtors' Plan Upon Discharge of Atlantic's Claims ........................ 19

         a.     Atlantic's Liens are junior to the Lenders' Liens. ................... 19

         b.     The Vast Majority of Atlantic's Claims are unsecured under the
               Plan and will be fully discharged pursuant to section 4.6 or section
               4.7 of the Plan. ....................................................... 22

         c.     Satisfaction, settlement, and discharge of Atlantic's Claims under
               the Plan will extinguish any privileges held by Atlantic under
               LOWLA. ............................................................... 23

    II.    LOWLA is Inapplicable. ......................................................... 25

         a.     Atlantic's claims are governed exclusively by federal General
               Maritime Law. ........................................................ 26

         b.     Because LOWLA is inconsistent with federal law, it cannot be
               applied to "seize and hold" interests in federal offshore leases. ........ 33

         c.     DOI is a necessary and indispensable party to Atlantic's Lawsuits,
               but DOI may not be joined in those Lawsuits due to its sovereign
               immunity; accordingly, Atlantic's state law lien claims fail as a
               matter of law. ......................................................... 44

CONCLUSION ............................................................................ 50

NOTICE ................................................................................... 50

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alabama v. Texas*,
347 U.S. 272 (1954) (*per curiam*) ......................................................................31

*BP Expl'n & Prod. Inc. v. United States*,
147 Fed. Cl. 623 (Ct. Cl. 2020)............................................................................46

*C.F. Dahlberg & Co. v. Chevron U.S.A., Inc.*,
836 F.2d 915 (5th Cir. 1988) ...............................................................................23

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986)...............................................................................................16

*Clinton v. Babbit*,
180 F.3d 1081 (9th Cir. 1999) .............................................................................43

*Corbitt v. Diamond M. Drilling Co.*,
654 F.2d 329 (5th Cir. 1981) ...............................................................................25

*In Re Crescent Energy Servs., L.L.C.*,
896 F.3d 350 (5th Cir. 2018) ...............................................................................25

*Dauzart v. Fin. Indem. Ins. Co.*,
39 So. 3d 802 (La. App. 3d Cir. 2010) ...............................................................21

*De Lovio v. Boit*,
2 Gall. 398, 7 F. Cas. 418, 1997 AMC 550 (Cir. Ct., D. Mass. 1815) ...................29

*In re DEEPWATER HORIZON*,
745 F.3d 157 (5th Cir. 2014) ........................................................................26, 27

*Delano Farms Co. v. Cal. Table Grape Comm'n*,
623 F. Supp. 2d 1144 (E.D. Cal. 2009)................................................................43

*Diamond Shamrock Expl'n Co. v. Hodel*,
853 F.2d 1159 (5th Cir. 1988) .............................................................................46

*EEE Minerals, LLC v. North Dakota*,
318 F.R.D. 118 (D.N.D. 2016) .............................................................................43

*Exxon Corp. v. Cent. Gulf Lines, Inc.*,
500 U.S. 603 (1991)...............................................................................................24

*FDIC v. Meyer*,
   510 U.S. 471 (1994)..........................................................................................45

*Frye v. Anadarko Petrol. Corp.*,
   953 F.3d 285 (5th Cir. 2019) ............................................................................16

*Grand Isle Shipyard, Inc. v. Seacor Marine, LLC*,
   589 F.3d 778 (5th Cir. 2009) (en banc) ............................................................24

*Hine v. Trevor*,
   71 U.S. 555 (1867)............................................................................................30

*Hockison v. Baker Hughes Oilfield Ops.*,
   2019 U.S. Dist. LEXIS 187704 (C.D. Cal. 2019)............................................38

*Horizon Bank & Tr. Co. v. Flaherty*,
   309 F. Supp. 2d 178 (D. Mass. 2004) ..............................................................43

*Kossick v. United Fruit Co.*,
   365 U.S. 731 (1961)..........................................................................................29

*In re Larry Doiron, Inc.*,
   879 F.3d 568 (5th Cir. 2018) (en banc), *cert. denied*, 138 S. Ct. 2033 (2018).................22, 25

*Liberty Servs., Inc. v. Amoco Prod. Co.*,
   1991 U.S. Dist. LEXIS 18620 (E.D. La. Dec. 20, 1991)...................................42, 45

*Minnesota v. United States*,
   305 U.S. 382 (1939)..........................................................................................43

*Moses Taylor*,
   71 U.S. 411 (1867)............................................................................................30

*Norfolk S. RR. Co. v. Kirby*,
   543 U.S. 14, 125 S. Ct. 385 (2004)..............................................................22, 24

*In re Northstar Offshore Grp., LLC*,
   2020 Bankr. LEXIS 1811 (Bankr. S.D. Tex. 2020)..........................................38

*In re Oil Spill by Deepwater Horizon*,
   808 F. Supp. 2d 943 (E.D. La. 2011), *aff'd sub nom.*, 745 F.3d 157 (5th Cir.
   2014) ................................................................................................................26

*Oxy USA v. Babbitt*,
   122 F.3d 251 (5th Cir. 1997) ...........................................................................46

*Parker Drilling Mgmt. Servs. v. Newton*,
   139 S. Ct. 1881 (2019).............................................................................. *passim*

*In re Platinum Oil Props, LLC,*
2013 Bankr. LEXIS 5024 (D.N.M. Nov. 26, 2013) ................................................................ 42

*River Gas Corp. v. Pullman,*
960 F. Supp. 264 (D. Utah 1997) ........................................................................................... 42

*Shell Offshore, Inc. v. Kirby Expl. Co.,*
909 F.2d 811 (5th Cir. 1990) ................................................................................................. 40

*S. Pac. Co. v. Jensen,*
244 U.S. 205 (1917) ............................................................................................................... 30

*Stewart v. Dutra Construction Co.,*
543 U.S. 481 (2005) ............................................................................................................... 26

*Taylor Energy Co. v. U.S.,*
990 F.3d 1303 (Fed. Cir. 2021) ........................................................................................ 38, 46

*Theriot v. Bay Drilling Corp.,*
783 F.2d 527 (5th Cir. 1986) ................................................................................................. 25

*Transcon. Gas Pipe Line Corp. v. Mobile Drilling Barge*
424 F.2d at 691 ...................................................................................................................... 25

*Union Oil Co. v. Morton,*
512 F.2d 743 (9th Cir. 1975) ................................................................................................. 32

*Union Tex. Petrol. Corp. v. PLT Eng'g, Inc.,*
895 F.2d 1043 (5th Cir. 1990) ............................................................................................... 23

*United States v. Alabama,*
313 U.S. 274 (1941) ............................................................................................................... 43

*W&T Offshore, Inc. v. Bernhardt,*
946 F.3d 227 (5th Cir. 2019) ................................................................................................. 46

*Wallis v. Pan Am. Petrol. Corp.,*
384 U.S. 63 (1966) ................................................................................................................. 42

*Yazzie v. Morton,*
59 F.R.D. 377 (D. Arizona 1973) .......................................................................................... 44

## Statutes

5 U.S.C. § 702 ................................................................................................................................ 46

5 U.S.C. § 704 ................................................................................................................................ 46

28 U.S.C. § 1333 ............................................................................................................................ 29

28 U.S.C. § 1491 .................................................................................................46

43 U.S.C. § 1332(1) .............................................................................................32

43 U.S.C. § 1333 .................................................................................................37

43 U.S.C. § 1334(a)(3) .........................................................................................32

43 U.S.C. § 1337(e) ...............................................................................32, 38, 44

Judiciary Act of 1789, Chs. 20, 29, 1 Stat. 73, 75-77 .......................................29

La. Civ. Code Art. 3277 .......................................................................................21

La. R.S. § 9:4861(5) .............................................................................................35

La. R.S. § 9:4870(B)(2) ........................................................................................18

## Other Authorities

30 C.F.R. § 556 ......................................................................................33, 34, 44

30 C.F.R. § 560 ...................................................................................................33

81 Fed. Reg. 18112 (Mar. 30, 2016) ..............................................................33, 39

*Admiralty Law Institute Symposium: Admiralty Law at the Millennium, Article: Uniformity of Maritime Law, History, and Perspective from the U.S. Point of View*, 73 Tul. L. Rev. 1481 (1999) .....................................................................29

*Deepwater Horizon launched by TSF*, OFFSHORE MAGAZINE (Jun. 1, 2001), https://www.offshore-mag.com/rigs-vessels/article/16758775/deepwater-horizon-launched-by-tsf ....................................................................................27

*Drillships*, VALARIS, www.valaris.com/our-fleet/drillships/default.aspx ....................27

Fed. R. Bankr. P. 7056 ........................................................................................16

Fed. R. Civ. P. 19 ................................................................................................41

Fed. R. Civ. P. 56(c) ............................................................................................16

Schoenbaum, *Admiralty and Maritime Law* § 4:4 (6th ed.) ........................29, 30

U.S. Const. Art. III, 2, Cl. 1 ................................................................................29

U.S. Const. Art. IV, Sec. 3, Cl. 2 ..................................................................31, 43

*Valaris DS-16*, Valaris,
https://www.valaris.com/files/doc_rigspecs/drillships/VALARIS-DS-16.pdf........................12

Fieldwood Energy LLC ("**Fieldwood**")[2] and its debtor affiliates, as debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "**Debtors**"), and as Plaintiffs in the above-captioned adversary proceeding (the "**Adversary Proceeding**"), hereby file this motion for summary judgment (the "**Motion for Summary Judgment**") against Atlantic Maritime Services, LLC ("**Atlantic**" or "**Defendant**"),[3] and allege as follows:

## PRELIMINARY STATEMENT

1.      As the Court is aware, Atlantic is currently enjoined from pursuing its *in rem* claims against the Debtors' co-working interest owners Ecopetrol America, LLC ("**Ecopetrol**"), Ridgewood Katmai, LLC ("**Ridgewood**"), and ILX Prospect Katmai, LLC ("**Prospect**") (collectively, the "**WIOs**") in the lawsuits filed by Atlantic on November 13, 2020 against the WIOs in the United States District Court for the Eastern District of Louisiana (the "**Lawsuits**"). Atlantic now asserts that, following the occurrence of the effective date of the Plan and the discharge and satisfaction of Atlantic's claims pursuant to the Plan,[4] Atlantic may seek recovery against the WIOs (each of whom lack privity of contract with Atlantic) on account of such discharged obligations by proceeding with the Lawsuits.  However, for each of the independent reasons set forth herein and in the Debtors' *Amended Adversary Complaint* (Docket No. 25) (the

---

[2] Fieldwood is a Delaware limited liability company with its principal place of business located at 2000 W. Sam Houston Parkway S., Suite 1200, Houston, TX 77042.

[3] Atlantic is a Delaware limited liability company with its principal place of business located at 5847 San Felipe Street, Suite 3300, Houston, TX 77057. Atlantic is a wholly-owned subsidiary of Valaris plc ("**Valaris**"), debtor-in-possession in bankruptcy case no. 20-34114, pending before the Bankruptcy Court for the Southern District of Texas. (Bankr. S.D. Tex. 20-34114, Docket No. 1).

[4] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Complaint.

"**Complaint**"), this Court should determine as a matter of law that Atlantic may not pursue any alleged *in rem* claims against the WIOs.

2.       By this Motion, the Debtors move for summary judgment on four independently sufficient legal grounds that do not rely on any material issues of fact.[5]  The Debtors are entitled to declarations as a matter of law that (i) the vast majority of Atlantic's claims are unsecured, and (ii) based on each of the four grounds, Atlantic may not continue pursuing its alleged in rem claims against the WIOs after the underlying claims against the Debtors are discharged.

3.       ***First***, even if Atlantic's alleged privileges are valid and enforceable liens (which Plaintiff disputes for four independent reasons), such liens are junior to prior, valid and perfected liens that secure claims that significantly exceed the value of Plaintiffs' interest in the encumbered properties and, therefore, the vast majority of Atlantic's claims against Plaintiff are unsecured. Moreover, Atlantic's claims that are allegedly subject to the Louisiana Oil Well Lien Act (La. R.S. 9:4861 et seq.) ("**LOWLA**") privileges will be completely and finally satisfied, settled, and discharged pursuant to the Debtors' Plan, and, therefore, pursuant to section 4864 of LOWLA, any valid privileges held by Atlantic itself will likewise be extinguished.  La. R.S. 9:4864 (a privilege is "extinguished:  (1) ***Upon extinction of the obligation it secures***. (2) By written consent of the claimant. (3) As otherwise provided in this Part.") (emphasis added).  ***Second***, Atlantic's alleged privileges rely on Louisiana law, which is preempted by the General Maritime Law of the United States ("**General Maritime Law**").  The contract between Fieldwood Energy LLC and Atlantic giving rise to this dispute expressly incorporates General Maritime Law as the exclusive governing

---

[5] As further discussed below, if the Court rules for the Debtors only on its first ground, Atlantic would hold approximately $25,240.95 of Atlantic's claims would be secured and the balance of Atlantic's claims would be unsecured.  *See* Arg. Sec. 1 *infra*; App. 1.  A favorable ruling on any of the other three grounds would result in a finding from the Court that Atlantic does not hold any valid and enforceable liens.

law, and even in the absence of the governing law provision, General Maritime Law would still apply to Atlantic's claims because they are derived from the conduct of a vessel at sea, preempting any state laws in conflict. ***Third***, the provision under the Louisiana statute (LOWLA) on which Atlantic relies on for its alleged liens is inconsistent with federal law governing the ownership and transferability of federal oil and gas leases and, therefore, is statutorily inapplicable under the Outer Continental Shelf Lands Act ("**OCSLA**").[6] ***Fourth***, because Atlantic seeks to transfer interests in the leases at issue, Atlantic must make the U.S. Department of the Interior ("**DOI**") a party to the lawsuit, but the federal government has not waived sovereign immunity for such purposes. Accordingly, the Court should grant summary judgment in the Debtors' favor with respect to counts five, six, one, two, and three (in order discussed below) and declare as a matter of law:

- That the Junior Liens are junior to the Senior Liens and Atlantic's claims related to the Encumbered Leases are unsecured based on (i) the amount of debt secured by the Senior Liens held by the Lenders and (ii) the values of the properties at issue;

- That any valid and enforceable Louisiana privileges held by Atlantic will be "extinguished" under LOWLA upon satisfaction, settlement, and discharge of Atlantic's claims pursuant to the Plan;

- That general maritime law applies to Atlantic's Claims and alleged liens and, therefore, any claims or alleged liens based on state law, including the LOWLA privileges in the *in rem* claims which are the subject of the Lawsuits, are preempted by maritime law;

- That, even if OCSLA applies (rather than maritime law), LOWLA is inconsistent with federal law and, therefore, the alleged LOWLA liens are not valid or enforceable; and

- That the DOI must be a party to the Lawsuits to obtain the relief requested therein, but Atlantic cannot make the DOI a party to such Lawsuits.

---

[6] *See* 43 U.S.C. § 1333(a)(2)(A) ("**To the extent that they are applicable and not inconsistent with this subchapter or with other Federal laws** and regulations of the Secretary now in effect or hereafter adopted, **the civil and criminal laws of each adjacent State**, now in effect or hereafter adopted, amended, or repealed **are declared to be the law of the United States for** that portion of the subsoil and seabed of **the outer Continental Shelf**, and artificial islands and fixed structures erected thereon, which would be within the area of the State if its boundaries were extended seaward to the outer margin of the outer Continental Shelf…) (emphasis added).

## STATEMENT OF FACTS

**I.    Relevant Leases and Senior Liens.**

4.    The Debtors currently hold (or previously held) interests in the following federal offshore oil and gas leases, which are subject to the jurisdiction of the DOI and pertain to locations in the U.S. Gulf of Mexico: OCS-G-28030 in Mississippi Canyon Area Block 948 ("**MC-948**"), OCS-G-34536 in the Green Canyon Area Block 40 ("**GC-40**"), OCS-G-15445 in Viosca Knoll Area Block 962 ("**VK-962**"), OCS-G-27278 in Mississippi Canyon Area Block 519 ("**MC-519**"), and OCS-G-06888 in Viosca Knoll Area Block 826 ("**VK-826**" and altogether, the "**Leases**"). The Debtors jointly own working interests in certain of the Leases with co-working interest owners, Ecopetrol America, LLC ("**Ecopetrol**"), Ridgewood Katmai, LLC ("**Ridgewood**"), and ILX Prospect Katmai, LLC ("**Prospect**") (collectively, the "**WIOs**").

5.    In July 2018, holders of approximately $139 million of first lien first out term loans (the "**FLFO Lenders**"), holders of approximately $1.15 billion of first lien term loans (the "**FLTL Lenders**"), and holders of approximately $517.5 million of second lien term loans (the "**SLTL Lenders**" and altogether, the "**Lenders**") perfected liens (the "**Senior Liens**," as further defined below) on each of the Leases except for VK-826 (collectively, the "**Encumbered Leases**"). *See Declaration of Erin M. Choi in Support of the Plaintiffs' Motion for Summary Judgment* ("**Choi Decl.**"), Ex. 1–15 (mortgages filed in various counties and parishes against the Leases). The Lenders' claims total approximately $1.8 billion (the "**Senior Lender Claims**"), but the value of the properties subject to the Senior Liens is significantly less than the amount of the Senior Lender Claims.[7]

---

[7] As provided in the Debtors' Disclosure Statement (defined below), the estimated enterprise value of the NewCo Entities (as defined in the Disclosure Statement) is approximately $880 million to $1,170 million, with a mid-point of $1,030 million. *See* Disclosure Statement, Ex. N.

II.     **The Debtors' Relationship with Atlantic.**

6.      As part of their operations, the Debtors, as operator, contracted with Atlantic in October 2018 to provide a drillship, the *Rowan Reliance*,[8] to conduct operations on deepwater wells in the Gulf of Mexico.  *See* Choi Decl. Ex. 18 (the "**Contract**").  The Contract incorporates the General Maritime Law of the United States as the governing law, and recites that Fieldwood desires to have Atlantic drill, recomplete, sidetrack, or work over certain wells.  The matters that are the subject of the Lawsuits (defined below) arise out of the Contract, which is a maritime contract.

7.      Atlantic used the drill ship *Rowan Resolute* to perform the operations requested by Fieldwood under the Contract.  *See* Choi Decl. Ex. 16.  The *Rowan Resolute* is a self-propelled drill ship measuring 752 ft. in length x 118 ft. in breadth x 59.6 ft. depth at side.  Choi Decl. Ex. 19.  The *Rowan Resolute* is equipped with a dynamic positioning system, and is classed with the American Bureau of Shipping as an ultra-deep drill ship capable of drilling in waters up to 12,000 feet deep.  *Id.*

---

[8] The Debtors and Atlantic amended their October 2018 contract in November 2018 to substitute the drillship *Rowan Resolute* for the *Rowan Reliance*. *See, e.g.*, Choi Decl. Ex. 16–17.



*Id.*

8.     Based on the work the *Rowan Resolute* completed in 2020, Atlantic filed Statements of Privilege against Fieldwood's operating interests in the Leases.  Choi Decl. Ex. 20 (Case No. 20-33948, Docket No. 581 and exhibits).

## III.    The Debtors' Chapter 11 Cases.

9.     On August 3 and 4, 2020, the Debtors each commenced in this Court a voluntary case under the Bankruptcy Code. The Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

10.    The Debtors' chapter 11 cases are being jointly administered for procedural purposes only pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**") and Rule 1015-1 of the Bankruptcy Local Rules for the United States Bankruptcy Court for the Southern District of Texas (the "**Local Rules**").

## IV. Atlantic Filed Lawsuits Against the Debtors' Co-Working Interest Owners, Violating the Automatic Stay, and Filed Claims Against the Debtors.

11.     On November 13, 2020, Atlantic filed two *in rem* lawsuits in the United States District Court for the Eastern District of Louisiana (each, a "**Lawsuit,**" and collectively, the "**Lawsuits**")[9] against the WIOs.  The Lawsuits arise out of amounts that the Debtors allegedly owe Atlantic and Atlantic's attempts to enforce its alleged liens on the WIOs' interests in certain offshore leases in the Gulf of Mexico—affecting MC-948 and GC-40—and to collect approximately $13 million from the WIOs by transferring the WIOs' "operating interests" in those leases under LOWLA.  Because the Statements of Privilege recorded by Atlantic explicitly target "the operating interest of Fieldwood Energy LLC[,]" and because certain Debtors must indemnify the WIOs under joint operating agreements,[10] the claims in the Lawsuits seek to collect on account of the obligations of the Debtors (indeed, the WIOs have no contractual privity with Atlantic) and, for all practical purposes, are claims against the Debtors.

12.     On November 24, 2020, Atlantic filed a Proof of Claim for the same debts it sought in the Lawsuits, plus a few, relatively smaller debts.  Proof of Claim No. 91-1.

## V. The Debtors Filed the Original Complaint Seeking a Preliminary Injunction Enjoining the Lawsuits, Which the Court Granted.

13.     On November 24, 2021, the Debtors filed the *Adversary Complaint* (the "**Original Complaint**") requesting an extension of the automatic stay (the "**Automatic Stay**") under section

---

[9] The two Lawsuits are as follows: Cause No. 2:20-cv-03097, *Atlantic Maritime Services, LLC v. Ecopetrol America, LLC*; and Cause No. 2:20-cv-03099, *Atlantic Maritime Services, LLC v. Ridgewood Katmai, LLC and ILX Prospect Katmai, LLC*.  Choi Decl. Ex. 16–17.

[10] Fieldwood, Ecopetrol, and Talos Energy Offshore LLC ("**Talos**") are party to that *Unit Operating Agreement Gunflint Prospect Gunflint Unit Offshore Louisiana* (the "**Gunflint JOA**") covering, among other properties, MC-948. Choi Decl. Ex. 21.  In addition, Fieldwood, Ridgewood, and Prospect are parties to that GC 40 Unit Operating Agreement (the "**GC-40 JOA**") covering, among other properties, GC-40.  Choi Decl. Ex. 22.

362(a) of chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") to the WIOs. Docket No. 1.

14.     Following an evidentiary hearing on *The Debtors' Emergency Motion to Extend the Automatic Stay to Certain of the Debtors' Co-Working Interest Owners* (Docket No. 3), the Court entered the *Order Extending the Automatic Stay to Certain of Debtors' Co-Working Interest Owners* (Docket No. 10) extending the Automatic Stay to the WIOs in connection with the Lawsuits and enjoining Atlantic from continuing the Lawsuits against the WIOs through December 8, 2020.  The injunction was subsequently extended by stipulation of the parties to the earliest to occur of (i) the effective date of any confirmed chapter 11 plan, (ii) sale of the properties subject to Atlantic's alleged liens giving rise to the Lawsuits, and (iii) through and including 11:59 p.m. (prevailing Central Time) on April 15, 2021.  Docket No. 21.  The injunction was again extended by stipulation through June 14, 2021.  Docket No. 26.

**VI.     The Debtors' Chapter 11 Plan and Disclosure Statement.**

15.     On April 15, 2021, the Debtors filed the *Fourth Amended Joint Chapter 11 Plan of Fieldwood Energy LLC and Its Affiliated Debtors* (Case No. 20-33948, Docket No. 1284) (as it may be amended, modified, or supplemented from time to time, the "**Plan**") and *Disclosure Statement for the Fourth Amended Joint Chapter 11 Plan of Fieldwood Energy LLC and Its Affiliated Debtors* (Case No. 20-33948, Docket No. 1285) (as it may be amended, modified, or supplemented, the "**Disclosure Statement**").

16.     The Plan provides that holders of Unsecured Trade Claims holders in Class 6A shall, under certain circumstances, receive payment of 14% of their respective Claim.  *See* Plan §§ 4.6, 4.7.  Holders of Allowed General Unsecured Claims shall receive its Pro Rata Share of the GUC Warrants and any Residual Distributable Value.  *See* Plan § 4.7.

## VII.    The Debtors Moved to Lift Abatement and Filed an Amended Complaint.

17.    On April 14, 2021, the Debtors filed their *Motion to Lift Abatement of Adversary Proceeding*.  Docket No. 26.

18.    The same day, the Debtors filed their *Amended Adversary Complaint*, asserting nine counts against Atlantic, seeking declaratory relief with respect to the invalidity and unenforceability of Atlantic's alleged liens.  Docket No. 25.  The Debtors move on five of the counts in this Motion for Summary Judgment, two of which combine to dispose of the case (Counts Five and Six) and the remaining three of which independently dispose of the case (Counts One, Two, and Three).  The Debtors reserve all rights regarding the remaining counts (Counts Four, Seven, Eight, and Nine).

## LEGAL STANDARD

19.    The Declaratory Judgment Act provides that in "a case of actual controversy within its jurisdiction," the Court "may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought."[11]  *Frye v. Anadarko Petrol. Corp.*, 953 F.3d 285, 293–94 (5th Cir. 2019) (citation omitted).  The dispute must be "definite and concrete, real and substantial."  *Id.* at 294.  And although declaratory judgments cannot be used to seek an opinion on hypothetical facts, declaratory judgment plaintiffs need not actually expose themselves to liability before bringing suit.  *Id.*  Instead, the "question in each case is whether the facts alleged, under all the circumstances, show that there is a substantial immediacy and reality to warrant the issuance of a declaratory judgment."  *Id.*  Summary judgment is appropriate when the movant shows there is no genuine issue of material fact and the movant is

[11] As set forth in the Complaint, the Court has jurisdiction under 28 U.S.C. § 1334 and Federal Rule of Bankruptcy Procedure 7001(2), (7), and 7065.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).

entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); Fed. R. Bankr. P. 7056; *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

20.    Here, the Debtors request a declaration that after confirmation of the Plan, Atlantic's claims against the Debtors, alleged to be approximately $13 million, will be fully discharged and in no way further recoverable by Atlantic against the Debtors or the Debtors' WIOs.  This case is thus appropriate for summary judgment because it can be granted on any of four independent, legal bases with no material facts in dispute.

## **ARGUMENT**

### I.    **To the Extent Atlantic Holds Valid and Enforceable Liens Securing its Claims Against the Debtors, Such Liens are Extinguished Under the Debtors' Plan Upon Discharge of Atlantic's Claims**

21.    Atlantic does not hold valid or enforceable liens.  *See* Arg. Sec. 35 *infra.*  Yet, even if the liens were valid, such liens will be extinguished, including to the extent any such liens extend to the WIOs' property interests, upon the satisfaction and discharge of Atlantic's claims under the Plan.  Here, approximately 99.8% of the putative value of Atlantic's liens are junior to the Senior Liens.  Appendix 1.  And thus, the underlying claims are unsecured under the Debtors' Plan and will be satisfied and discharged under either Class 6A or Class 6B (depending upon Atlantic's election) in accordance with section 4.6 or section 4.7 of the Plan.  To the extent Atlantic holds any secured claims in Class 1, such claims will also be satisfied and discharged under the Plan in accordance with section 4.1 of the Plan.

#### a.    **Atlantic's Liens are junior to the Lenders' Liens.**

22.    In 2018, Fieldwood Energy LLC, as mortgagor, and Cantor Fitzgerald Securities ("**Cantor**"), as mortgagee and an FLTL lender, entered and filed a supplemental mortgage on the Encumbered Leases in the appropriate parishes (the "**FLTL Lenders' Liens**").  *See* Choi Decl.

Ex. 1, 2, 4, 5, 7, 9–11, 13, 14.[12]  The Debtors and Cantor filed these mortgages pursuant to the plan of reorganization approved by this Court on April 2, 2018 in the Debtors' 2018 bankruptcy. *Findings of Fact, Conclusions of Law, and Order (I) Approving Debtors' Disclosure Statement and (II) Confirming Prepackaged Chapter 11 Plan of Fieldwood Energy LLC and its Affiliated Debtors*, *In re Fieldwood Energy LLC*, No. 18-30684 (Bankr. S.D. Tex. Apr. 2, 2018), Docket No. 259.  Likewise, the SLTL, Cortland Capital Market Services LLC, and FLFO lender, again Cantor, filed materially identical mortgages in the same parishes (the "**SLTL and FLFO Lenders' Liens**," collectively with the FLTL Lenders' Liens, the "**Senior Liens**").  *See* Choi Decl. Ex. 1–15.  The language of all these mortgage filings overlaps significantly, granting a lien on all "interests and estates now owned or hereafter acquired," as well as a security interest in numerous specified categories of related assets.  *See* Choi Decl. Ex. 1–15, Section 4.  Likewise, each mortgage has a description of the applicable Leases.  *See* Choi Decl. Ex. 1–15, Exhibit B.  Each of these mortgages—the Senior Liens—are valid and perfected.

23.     In 2020, Atlantic filed Statements of Privilege (the "**Junior Liens**") "upon the operating interest of Fieldwood Energy LLC" in the Encumbered Leases, which are already subject to the Senior Liens.[13]  Under LOWLA, the Lenders' Senior Liens are superior to Atlantic's Junior Liens because they were effective before Atlantic's privileges were established.  *See* La. R.S. 9:4870(B)(2) ("The privileges granted by this Part are superior in rank and priority to all other privileges, security interests, or mortgages against the property they encumber **except the following** which are of superior rank and priority . . . (2) Mortgages and vendor's privileges on the

---

[12] These supplemental mortgages relate back to the original mortgages filed in 2013.  *See* Choi Decl. Ex. 1–15.
[13] Atlantic also filed Statements of Privilege on VK-826, on which the Lenders did not file mortgages.  *See* Choi Decl. Ex. 20 (Case No. 20-33948, Docket No. 581, Ex. 23–26).  Atlantic's claim on VK-826 is for $25,240.95, which is 0.2% of the amount in dispute in this Adversary Proceeding. *See id.*; App. 1.

operating interest and other property affected by such mortgages or privileges that are **effective as to a third person before the privilege is established**." (emphasis added)). Therefore, to the extent Atlantic holds liens against any of the Encumbered Leases, such liens are junior to the Senior Liens.

24. Accordingly, the Debtors seek a determination pursuant to Bankruptcy Code 7001(2) that privileges asserted by Atlantic on the Encumbered Leases are junior in priority to the liens asserted by the Lenders. *See* App. 1.

25. The following table compares the filing date of the Lenders' and Atlantic's respective liens demonstrating the Lenders' Liens have priority over Atlantic's:

| Lease | Lenders' Senior Lien Date Filed *Parish* | Atlantic's Junior Lien Date Filed[14] *Parish* | Atlantic's Claim[15] |
|---|---|---|---|
| **MC-948** | **July 2018**[16] *Plaquemines, St. Bernard* | **July 2020** *Plaquemines, St. Bernard, St. Tammany, Orleans* | $5,824,744.68[17] |
| **GC-40** | **July 2018**[18] *Jefferson,[19] Lafourche, Plaquemines, Terrebonne* | **July 2020** *Jefferson, Lafourche, Plaquemines, Terrebonne* | $6,973,379.03 + $138,327.52 additional[20] |

---

[14] Choi Decl. Ex. 20.

[15] Claim No. 91-1.

[16] Choi Decl. Ex. 1–6.

[17] Atlantic states that Ecopetrol holds a 31.5% working interest "in a certain lease situated in the Outer Continental Shelf, OCS-G-28030, Mississippi Canyon Area, Block 948, containing Well #4 (API 608174129900), for which Fieldwood Energy, LLC serves as operator of record." *See* Choi Decl. Ex. 16 ¶ 6.

[18] Choi Decl. Ex. 1–3, 7–15.

[19] Choi Decl. Ex. 7–8 (Jefferson Parish, Louisiana); Choi Decl. Ex. 9 (Jefferson County, Texas).

[20] Atlantic states that Ridgewood and Prospect each hold a 25% working interest "in a certain lease situated in the Outer Continental Shelf, OCS-G-34536, Green Canyon Area, Block 40, containing Well #1 (API 608114062300), for which Fieldwood Energy, LLC serves as operator of record." *See* Choi Decl. Ex. 17 ¶ 7.

| Lease | Lenders' Senior Lien Date Filed *Parish* | Atlantic's Junior Lien Date Filed[14] *Parish* | Atlantic's Claim[15] |
|---|---|---|---|
| MC-519 | **July 2018**[21] *Plaquemines, St. Bernard* | **July 2020** *Plaquemines, St. Bernard, St. Tammany, Orleans* | $169,344.42 + $5,528.25 additional |
| VK-962 | **July 2018**[22] *Plaquemines, St. Bernard* | **July 2020** *Plaquemines, St. Bernard, St. Tammany, Orleans* | $303,478.97 |

**b. The Vast Majority of Atlantic's Claims are unsecured under the Plan and will be fully discharged pursuant to section 4.6 or section 4.7 of the Plan.**

26.     Even if Atlantic holds any valid and enforceable liens against the Leases, based on the value of the Debtors' interests in the Encumbered Leases and the Senior Liens encumbering the Encumbered Leases, Atlantic's claims related to the Encumbered Leases are unsecured.  The Lenders hold Senior Liens for approximately $1.8 billon, but the estimated enterprise value of ***all*** of the assets that will be transferred to the NewCo Entities (as defined in the Disclosure Statements) is only approximately $880 million to $1,170 million, with a mid-point of $1,030 million.  *See* Disclosure Statement, Ex. N.  The Junior Liens, which are alleged to attach to only a subset of the leases that will be transferred to NewCo, are therefore significantly under water and unsecured. Atlantic gets to elect whether its claims will be treated as either Unsecured Trade Claims in Class 6A or General Unsecured Claims in Class 6B, but the result will be the same: its claims will be fully discharged.

27.     The Plan provides, in relevant part, on or after the Effective Date, in full and final satisfaction of and in exchange for Allowed Unsecured Trade Claims, each holder of an Allowed Unsecured Trade Claim that has executed a Trade Agreement shall receive:

---

[21] Choi Decl. Ex. 1–6.

[22] Choi Decl. Ex. 1–6.

(i)   if 14% of the aggregate amount of all Allowed Unsecured Trade Claims is less than or equal to $8,000,000, Cash in an amount equal to 14% of the Allowed amount of such holder's Allowed Unsecured Trade Claim; or

(ii) if 14% of the aggregate amount of Allowed Unsecured Trade Claims is greater than $8,000,000, its Pro Rata share of $8,000,000.

*See* Plan § 4.6.

28.     The Plan provides, in relevant part, on or after the Effective Date, in full and final satisfaction of and in exchange for an Allowed General Unsecured Claim, each holder of an Allowed General Unsecured Claim shall receive, up to the full amount of such holder's Allowed General Unsecured Claim, its Pro Rata Share of:

(i)  the GUC Warrants; and
(ii) any Residual Distributable Value

*See* Plan § 4.7.

29.     Moreover, to the extent Atlantic holds any allowed secured claims against the Debtors, such claims will be fully satisfied, settled, and discharged pursuant to section 4.1 of the Plan.  Section 6.8 of the Plan further provides: "Unless otherwise provided herein, any distributions and deliveries to be made on account of Allowed Claims under the Plan shall be in complete and final satisfaction, settlement, and discharge of and exchange for such Allowed Claims."

30.     Therefore, Atlantic's Allowed Claims will be discharged under the Plan.

**c.   Satisfaction, settlement, and discharge of Atlantic's Claims under the Plan will extinguish any privileges held by Atlantic under LOWLA.**

31.     Because Atlantic's Allowed Claims will be discharged, any privilege it holds under LOWLA is thereby extinguished.  La. R.S. 9:4864 defines the establishment and extinguishment of a Louisiana oil and gas privilege.  A privilege is "extinguished . . . (1) Upon extinction of the obligation it secures. (2) By written consent of the claimant. (3) As otherwise provided in this Part."

32.     As discussed above, Atlantic's unsecured claims will be fully satisfied, settled, and discharged under the Plan in exchange for either the recoveries provided to holders in Class 6A or holders in Class 6B.  In addition, any secured claims held by Atlantic will be fully satisfied, settled, and discharged under the Plan in exchange for the treatment set forth in section 4.1 of the Plan. Accordingly, Atlantic's claims will become extinct and, therefore, any liens that are alleged to secure such claims shall be extinguished, including any liens that attach to interests owned by the WIOs.

33.     Louisiana law supports such an outcome.  La. R.S. § 9:4864 is consistent with general provisions of the Louisiana Civil Code that describe extinguishment of all privileges.  *See* La. Civ. Code Art. 3277. ("Privileges become extinct . . . (3) By the extinction of debt which gave birth to it . . . .").  Louisiana courts have applied Article 3277 of the Civil Code to dismiss parties' attempts to enforce a variety of privileges when the underlying debt has been extinguished or otherwise is not enforceable.  *See, e.g.*, *Dauzart v. Fin. Indem. Ins. Co.*, 39 So. 3d 802 (La. App. 3d Cir. 2010) (affirming the dismissal of an enforcement action under the medical services privilege statute due to the fact that the statute of limitations ("prescription") had run on the underlying cause of action for collection of the medical services).

34.     Furthermore, basic bankruptcy principles support the finding that treatment of Atlantic's claims under the Plan result in the extinguishment of Atlantic's liens.  If Atlantic's alleged liens against the WIOs' working interests survive confirmation of the Debtors' chapter 11 plan, the Debtors will likely be forced to satisfy the same obligation multiple times: first through treatment under the Plan and then again as future indemnity claims asserted by the WIOs to the extent Atlantic successfully exercises its alleged *in rem* rights against the WIOs' working interests.

23

35.     Thus, even if Atlantic's privileges are valid liens, Atlantic's underlying claims will be fully discharged under the Debtors' Plan, and, consequently, any valid liens held by Atlantic will be extinguished under LOWLA.

## II.     **LOWLA is Inapplicable.**

36.     Atlantic's liens are not valid.  Atlantic filed the Junior Liens, purportedly pursuant to LOWLA, targeting the "operating interest of Fieldwood Energy LLC" in the Leases.  Relying on the "adjacent state law" provision of OCSLA, 43 U.S.C. § 1333(a)(2)(A), Atlantic asserts that LOWLA applies to the Leases and supports Atlantic's filing the Junior Liens.  With respect to the Junior Liens that target MC-948 and GC-40, Atlantic filed the Lawsuits, "*in rem*" suits seeking to have the District Court order the United States Marshals Service to seize and sequester the interests of companies that co-own the Leases with Fieldwood.

37.     The Junior Liens and the Lawsuits seeking enforcement of certain of the Junior Liens are legally invalid for numerous reasons.  ***First***, under the Fifth Circuit's *en banc Doiron* decision,[23] Atlantic's claims are governed exclusively by General Maritime Law, rendering the OCSLA adjacent-state-law rule (and, in turn, LOWLA) inapplicable.  ***Second***, even if the contract between Atlantic and Fieldwood is not a "maritime" contract under the *Doiron* standard, application of the Supreme Court's recent ruling in *Parker Drilling Management Services v. Newton*, 139 S. Ct. 1881 (2019), demonstrates that LOWLA is inconsistent with applicable federal law, making the OCSLA "adjacent state law" rule (and, in turn, LOWLA) inapplicable.[24]  ***Third***,

---

[23] *In re Larry Doiron, Inc.*, 879 F.3d 568 (5th Cir. 2018) (en banc), *cert. denied*, 138 S. Ct. 2033 (2018).  In *Doiron*, the Fifth Circuit adopted a new standard for "determining the maritime or nonmaritime nature of contracts involving the exploration, drilling, and production of oil and gas," 879 F.3d at 577 n.52, based on the Supreme Court's decision in *Norfolk Southern Railway Co. v. Kirby*, 543 U.S. 14, 125 S. Ct. 385 (2004).

[24] Atlantic may try to argue that federal courts have previously applied LOWLA to federal leases in the Gulf of Mexico based on the OCSLA's "adjacent state law" provision.  *E.g.*, *Union Tex. Petrol. Corp. v. PLT Eng'g, Inc.*, 895 F.2d 1043, 1047 (5th Cir. 1990); *C.F. Dahlberg & Co. v. Chevron U.S.A., Inc.*, 836 F.2d 915 (5th Cir. 1988).  However,

24

Atlantic's attempt to enforce certain of the Junior Liens through its Lawsuits fails because the DOI is a required party to Atlantic's efforts to enforce its state law lien claims through seizure and sequestration, and DOI cannot be brought into the lawsuits due to its sovereign immunity.

38. Because the Junior Liens are invalid and unenforceable, Fieldwood asks that the Court issue an Order, in a form that can be recorded in the same public record repositories where Atlantic recorded the Junior Liens, declaring the Junior Liens to be invalid, unenforceable, and stricken from the public record.

### a. <u>Atlantic's claims are governed exclusively by federal General Maritime Law.</u>

39. Atlantic's reliance on the OCSLA adjacent-state-law provision and, in turn, on LOWLA, fails because its claims for unpaid invoices are governed exclusively by General Maritime Law of the United States. To prevail in its reliance on LOWLA (through OCSLA's adjacent-state-law provision), Atlantic must demonstrate *each* of the following: ***first***, Atlantic must establish that the invoices at issue relate to work performed on an OCSLA "situs"; ***second***, Atlantic must establish that its contract with Fieldwood was not "maritime" in nature under the Fifth Circuit's *en banc Doiron* decision; and ***third***, Atlantic must demonstrate that LOWLA is "not inconsistent with" federal law, including the OCSLA and its implementing regulations. *See Grand Isle Shipyard, Inc. v. Seacor Marine, LLC*, 589 F.3d 778, 783 (5th Cir. 2009) (*en banc*).[25] As

---

those cases involved one or more of the following factors not present here: (i) the services provided were not "maritime"; (ii) the parties conceded that LOWLA applied; (iii) the cases preceded the Supreme Court's *Parker Drilling* decision; (iv) the court was not presented with the arguments that Fieldwood presents here demonstrating the conflict between LOWLA and the comprehensive federal statutory and regulatory system applicable to "transfers" of offshore federal oil and gas leases, rendering LOWLA "inconsistent with" federal law.

[25] "To determine whether state law applies, a three-part test is used: (1) the controversy must arise on a situs covered by the OCSLA (i.e., the subsoil seabed, or artificial structure permanently or temporarily attached thereto); (2) federal maritime law must not apply of its own force; and (3) the state law must not be inconsistent with federal law." *Id.* at 783 (*quoting Union Tex. Petrol.*, 895 F.2d at 1047).

Fieldwood demonstrates below, Atlantic cannot satisfy at least the second or third of these elements.[26]

### i. Under *Doiron*, the Atlantic-Fieldwood contract is a maritime contract.

40.     Atlantic filed its state law lien claims to recover fees allegedly owed under the Contract, a maritime contract between Atlantic and Fieldwood. It is well established that "[t]he true criterion" for determining whether a contract is a maritime contract "is whether it has reference to maritime service or maritime transactions." *Norfolk S. R.R. Co. v. Kirby*, 543 U.S. 14, 224 (2004) (internal quotations omitted); *see also Exxon Corp. v. Cent. Gulf Lines, Inc.*, 500 U.S. 603, 608 (1991) (noting that the protection of maritime commerce is the fundamental interest giving rise to maritime jurisdiction).  In *Doiron*, the Fifth Circuit (following the Supreme Court's *Norfolk Southern Railway* decision) adopted a two-part test to determine whether a contract for services relating to offshore exploration and production operations is "maritime":

> First, is the contract one to provide production of oil and gas on navigable waters? . . . .
>
> Second, if the answer to the above question is 'yes,' does the contract provide or do the parties expect that a vessel will play a substantial role in the completion of the contract?

879 F.3d 568, 576-577 (5th Cir. 2018) (en banc), *cert. denied*, 138 S. Ct. 2033 (2018); *see In Re Crescent Energy Servs., L.L.C.*, 896 F.3d 350 (5th Cir. 2018) (following *Doiron* and determining that contract to plug and abandon wells on small fixed platforms in state coastal waters was a

---

[26] Fieldwood does not concede that Atlantic can satisfy the "situs" element of this test, or that all of the offshore blocks in question are "adjacent" to Louisiana, or that Atlantic's state law lien claims accurately calculate the fees established by the Atlantic-Fieldwood drilling contract.  It is unnecessary to address any of those issues (some of which might involve factual disputes), because Fieldwood demonstrates herein that Atlantic's state law lien claims are invalid as a matter of law.

maritime contract where vessels played a substantial role in contract; state anti-indemnity act was not applicable.).

41.     The *Doiron* factors are easily satisfied here.  First, there can be no doubt that the Contract (which expressly incorporates General Maritime Law[27]) plainly provides for Atlantic to perform work from the drillship *Rowan Resolute* on certain wells (*e.g.*, drilling, recompleting, sidetracking) located on the OCS in the Gulf of Mexico (clearly a "navigable water") in order to "provide production" from those wells.  *Doiron*, 879 F.3d at 576-577.  The Fifth Circuit's decision in *Theriot v. Bay Drilling Corp.*, 783 F.2d 527 (5th Cir. 1986), is informative.  There, the Court held that "oil and gas drilling on navigable waters aboard a vessel is recognized to be maritime commerce."  *Id.* at 538–39.[28]  Under the contract at issue in *Theriot*, the service provider "provided equipment, materials, supplies, and services necessary to the drilling and completion of [a] well." *Id.*  Similarly here, under the Contract, Atlantic provided a drill ship (*i.e.*, a vessel) "to have one or more offshore wells drilled, recompleted, sidetracked, or worked over."  In *Theriot*, the contract "did not merely touch incidentally on a vessel, but directly addressed the use and operation of" a vessel.  *Id.*  Here, too, the contract at issue "directly addressed the use and operation" of the drillship *Rowan Resolute*.  Thus, because the Contract is plainly a contract "to provide production of oil and gas on navigable waters," the first *Doiron* factor is met.

---

[27] *See* Contract cl. 106 ("Governing Law") ("THIS CONTRACT SHALL BE CONSTRUED AND THE RELATIONS BETWEEN THE PARTIES DETERMINED EXCLUSIVELY IN ACCORDANCE WITH THE GENERAL MARITIME LAW OF THE UNITED STATES, NOT INCLUDING ANY OF ITS CONFLICTS OF LAW RULES WHICH WOULD DIRECT OR REFER TO THE LAWS OF ANOTHER JURISDICTION.").

[28] In *Theriot*, the Court explained that contracts providing for "oil and gas drilling on navigable waters aboard a vessel" had, even then, historically been treated as "maritime in nature."  *Theriot*, 783 F.2d at 538–39 (discussing *Corbitt v. Diamond M. Drilling Co.*, 654 F.2d 329 (5th Cir. 1981) and *Transcon. Gas Pipe Line Corp. v. Mobile Drilling Barge* 424 F.2d at 691 and explaining that in both cases the contracts at issue "were directly and proximately linked to a vessel in a maritime activity.").

42.     Because the services that Atlantic provided from aboard its drill ship *Rowan Resolute*—indisputably a "vessel"—played a "significant and substantial" role in Atlantic's performance under the Contract, the second *Doiron* factor is also met.  First, Atlantic cannot seriously dispute that the *Rowan Resolute* is a vessel.  It is well-established that "[t]he word vessel [under 1 U.S.C. § 3] includes every description of watercraft or other artificial contrivance used, or capable of being used, as a means of transportation on water."  *See Stewart v. Dutra Construction Co.*, 543 U.S. 481, 490 (2005) (discussing 1 U.S.C. § 3 and holding that a dredge was a "vessel" for purposes of the Longshore and Harbor Workers' Compensation Act.).  The *Rowan Resolute* is a self-propelled drill ship measuring 752 ft. in length x 118 ft. in breadth x 59.6 ft. depth at side.  Choi Decl. Ex. 19.  The *Rowan Resolute* is equipped with a dynamic positioning system, and is classed with the American Bureau of Shipping as an ultra-deep drill ship capable of drilling in waters up to 12,000 feet deep.  *Id.*  The *Rowan Resolute* is now known as the VALARIS DS-16.  *Id.*  Plainly, the *Rowan Resolute* is a "watercraft . . . used, or capable of being used, as a means of transportation on water."  *Stewart*, 543 U.S. at 490.

43.     Similarly, the *Deepwater Horizon* (a dynamically positional semi-submersible deep water drilling vessel) was recognized as being a "vessel" operating at a maritime locale.  *In re DEEPWATER HORIZON*, 745 F.3d 157, 166 (5th Cir. 2014) ("Alternatively, maritime law applies here because the DEEPWATER HORIZON is a vessel.").  Like the *Rowan Resolute*, the *Deepwater Horizon* had no "legs" or "anchors" attaching it to the seabed, and its only "physical attachment" to the doomed Macondo wellhead was a 5,000 ft. string of drill pipe.  *In re Oil Spill by Deepwater Horizon*, 808 F. Supp. 2d 943, 950–51 (E.D. La. 2011), *aff'd sub nom.*, 745 F.3d 157 (5th Cir. 2014).  Similarly here, rather than being affixed to the seabed with legs or anchors, Atlantic navigated the *Rowan Resolute* to the various drilling locations, where the vessel's crew

used the ship's dynamic positioning system to control the ship and remain in position during drilling operations. *See, e.g.*, Choi Decl. Ex. 16, p. 12 (billing Fieldwood a "Moving Rate"); *id.* at p. 14 (Atlantic billing Fieldwood, noting that on June 8, 2020, the *Rowan Resolute* "Beg[a]n Transit to MC948 @ 2000" and on June 9, "Transit to MC948 @ 2000 on location @ 0700). Citing *Theriot v. Bay Drilling Corp.*, the Fifth Circuit said the following regarding the *Deepwater Horizon*: "A strong argument exists for the proposition that the disaster occurred while the vessel was engaged in the maritime activity of conducting offshore drilling operations, and the disaster had a significant effect on maritime commerce." 745 F.3d at 166.

44. For reference here is a side-by-side comparison of the *Rowan Resolute* and the *Deepwater Horizon* that the 5th Circuit found to be a "vessel":

*Deepwater Horizon*[29]          *Rowan Resolute*[30]




45. Further, the *Rowan Resolute* unquestionably played a "significant and substantial" role in Atlantic's performance under the Contract: Atlantic could only perform its obligations

---

[29] *Deepwater Horizon launched by TSF*, OFFSHORE MAGAZINE (Jun. 1, 2001), https://www.offshore-mag.com/rigs-vessels/article/16758775/deepwater-horizon-launched-by-tsf.

[30] *Drillships*, VALARIS, www.valaris.com/our-fleet/drillships/default.aspx (last visited May 11, 2021).

under that contract by using the *Rowan Resolute* to navigate to the drill site locations and drill the wells, using the *Rowan Resolute*'s numerous capabilities as an ABS-classed vessel[31] (such as its dynamic positioning system). The invoices submitted by Atlantic are for vessel services (and related expenses) rendered by the *Rowan Resolute* under the Contract based upon the "daywork billing" under the Contract. *E.g.*, Choi Decl. Ex. 16, p. 12. The invoices submitted by Atlantic (e.g., Invoices FWD2007260 and FWD2007262) all relate to work and services provided by the vessel, with Atlantic receiving compensation under the Contract in the form of a daily billing, similar to the payment of charter hire at an agreed to day rate. Choi Decl. Ex. 16, p. 12–14. The billing detail attached to the invoice includes logs from the *Rowan Resolute* working on location. Choi Decl. Ex. 16, p. 14.

46.     In sum, the Contract is just the type of contract that the Fifth Circuit has recognized as maritime in nature. Because the contract was unquestionably one "to provide production of oil and gas on navigable waters" and because the *Rowan Resolute*—a vessel—played a "substantial role" in Atlantic's performance under the contract, under *Doiron*, the contract is maritime in nature. As a result, issues arising from the contract are governed exclusively by the General Maritime Law of the United States and Louisiana law (including the LOWLA) does not apply.

### ii.     Centuries-old principles emphasize the significant federal interests behind applying maritime law rather than state law.

47.     Federal maritime jurisdiction has its roots in the U.S. Constitution: "The judicial Power shall extend to all Cases, in Law and Equity, arising under the Constitution, the Laws of the United States, and Treaties made, or which shall be made, under their Authority . . . **to all Cases**

---

[31] The American Bureau of Shipping ("**ABS**") is a vessel classification society which regularly inspects and surveys vessels (including the hull, machinery and other equipment) in accordance with the published rules and other standards of the ABS. The classification society issues a class certificate to confirm a vessel's status with ABS.

**of admiralty and maritime Jurisdiction** . . . " U.S. Const. Art. III, 2, Cl. 1 (emphasis added). The preemptive nature of a uniform federal maritime law taking precedence over the laws of the states has a long history.[32]  Congress codified the exclusive nature of maritime jurisdiction in the Judiciary Act of 1789, which provided that "the [federal] district courts . . .  shall have exclusive original cognizance of all civil causes of admiralty and maritime jurisdiction, . . . saving to suitors, in all cases, the right of common law remedy where common law is competent to give it . . . "  The Judiciary Act of 1789, Chs. 20, 29, 1 Stat. 73, 75-77 (codified as amended at 28 U.S.C. § 1333).

48.    This exclusive jurisdiction requires a federal court sitting in admiralty to apply maritime law.  Indeed, it is hornbook law "that the general maritime law governs maritime occurrences and that state law must yield to the required uniformity of the maritime law." Schoenbaum, *Admiralty and Maritime Law* § 4:4 (6th ed.).  The U.S. Supreme Court has long recognized the importance of the supremacy of federal maritime law over state law:

> The fact that maritime law is—in a special sense at least—federal law, and is therefore supreme by virtue of Article VI of the U.S. Constitution, carries with it the implication that wherever a maritime interest is involved, no matter how slight or marginal, it must displace a local interest, no matter how pressing or significant.

*Kossick v. United Fruit Co.*, 365 U.S. 731, 739 (1961) (internal citation omitted).[33]

49.    The landmark case for establishing that the constitutional grant of federal authority over maritime matters requires the development of a uniform law was *Southern Pacific Co. v. Jensen*:

> Article III, § 2, of the Constitution, extends the judicial power of the United States "To all cases of admiralty and maritime jurisdiction;"

---

[32] *Admiralty Law Institute Symposium: Admiralty Law at the Millennium, Article: Uniformity of Maritime Law, History, and Perspective from the U.S. Point of View*, 73 TUL. L. REV. 1481 (1999) (Jacob E. Cooke ed., 1961).

[33] *See also De Lovio v. Boit*, 2 Gall. 398, 7 F. Cas. 418, 444, 1997 AMC 550, 604 (Cir. Ct., D. Mass. 1815) (wherein Justice Story repels the more narrow jurisdiction of English Admiralty courts in favor for the more expansive maritime jurisdiction granted by Article III of the Constitution).

and Article I, § 8, confers upon the Congress power "To make all laws which may be necessary and proper for carrying into execution the foregoing powers and all other powers vested by this Constitution in the government of the United States or in any department or officer thereof." ***Considering our former opinions, it must now be accepted as settled doctrine that in consequence of these provisions Congress has paramount power to fix and determine the maritime law which shall prevail throughout the country.***

244 U.S. 205, 214 (1917) (emphasis added) (internal citation omitted).  On this basis, the Court emphasized the critical importance of preventing state law (such as the New York workers' compensation statute) from undermining the uniformity and consistency intended by the Constitution with respect to maritime commerce and activities.  *Id*. at 215–17.[34]  In other cases, the Supreme Court has been emphatic about the exclusive application of federal maritime law in the context of *in rem* suits, such as Atlantic's Lawsuits.[35]

50.     In sum, this matter is uniquely maritime and the Constitution, the Judiciary Act of 1789, and the long established jurisprudence of the U.S. Supreme Court requires that General Maritime Law governs.

**b.   Because LOWLA is inconsistent with federal law, it cannot be applied to "seize and hold" interests in federal offshore leases.**

51.     Even assuming arguendo that maritime law does not apply, Atlantic's state law lien claims and alleged privileges are unenforceable because LOWLA is "inconsistent with" the comprehensive and explicit framework under federal law governing transfers of "operating interests"—*viz.*, the Record Title interests and Operating Rights interests in Leases OCS-G 28030

---

[34] *See also* Schoenbaum, *Admiralty and Maritime Law* § 4.4 ("*Jensen* thus established the principle that the general maritime law governs maritime occurrences and that state law must yield to the required uniformity of the maritime law.").

[35] *See, e.g.*, *Hine v. Trevor*, 71 U.S. 555 (1867) (refusing to allow Iowa state law to apply to a maritime *in rem* action); *Moses Taylor*, 71 U.S. 411 (1867) (refusing to apply California law to a maritime *in rem* action).

(Mississippi Canyon 948) and OCS-G 34536 (Green Canyon 40) that the WIOs own.  *Parker Drilling Mgmt. Servs. v. Newton*, 139 S. Ct. 1881 (2019).  More specifically, because Atlantic relies on Louisiana law to effect a transfer of those "operating interests" that federal law prohibits, its state law privilege claims fail as a matter of law.

i. **The United States Constitution, OCSLA, and OCSLA's implementing regulations establish the limited circumstances in which interests in federal offshore leases may be transferred.**

52.     Under the Property Clause of the United States Constitution, only Congress has the "power to dispose of and make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States."  U.S. Const. Art. IV, Sec. 3, Cl. 2.  It is well-established that Congress's authority to dispose of "any kind of property belonging to the United States" is unlimited and, thus, that "it is not for the courts to say how [power over the public lands] shall be administered."  *See Alabama v. Texas*, 347 U.S. 272, 273 (1954) (*per curiam*) (and sources cited therein).[36]  Thus, unless Congress expressly provides otherwise, no state legislature or court is authorized to dispose of interests in property belonging to the United States.

53.     With OCSLA, and pursuant to its Constitutionally-delegated authority, "Congress intended to exercise [the] proprietary powers of a landowner" with respect to the issuance of oil and gas leases on the OCS.  *Union Oil Co. v. Morton*, 512 F.2d 743, 747 (9th Cir. 1975) (explaining that a lease "does convey a property interest enforceable against the Government").  Thus, OCSLA provides that "the subsoil and seabed of the [OCS] appertain to the United States and are subject to its jurisdiction, control, and power of disposition as provided in [OCSLA.]"  43 U.S.C. §

---

[36] *See also* Choi Decl. Ex. 23 (DOI's Solicitor's Memorandum addressing offshore federal oil and gas leases and stating: "Through the Property Clause of the United States Constitution, only Congress is given the authority to dispose of Federal property.  An agency may dispose of property under the authority delegated to it by Congress.").

1332(1).  And, OCSLA expressly addresses the "transfer" of interests in offshore leases and prohibits any "transfer" without the approval of the Secretary of DOI: "No lease issued under [OCSLA] may be sold, exchanged, assigned, *or otherwise transferred* except with the approval of the Secretary."  43 U.S.C. § 1337(e) (emphasis added).  By providing that *any* transfer—by sale, exchange, assignment, *or otherwise*—requires DOI's approval, Congress explicitly and unequivocally foreclosed any transfer of a federal offshore lease interest without DOI's approval.

54.     OCSLA broadly directs the Secretary of DOI to "administer" the offshore leasing program by promulgating "such rules and regulations as may be necessary to carry out the provisions" of OCSLA and specifically directs the Secretary to promulgate regulations "for the assignment or relinquishment of a lease."  43 U.S.C. § 1334(a)(3).  Implementing OCSLA's mandate, the Secretary of DOI has delegated the authority to manage the offshore leasing program, including the statutory authority to approve "transfers" of offshore leases, to the Bureau of Ocean Energy Management (the "**BOEM**").  DOI Departmental Manual, Part 218, Ch. 1, Section 1.1(A) [*hereinafter* "**218 DM 1**"], *available at* https://www.boem.gov/sites/default/files/about-boem/BOEM-Regions/Gulf-of-Mexico-Region/Leasing-and-Plans/BOEM-Adjudication-Workshop-01-22-2016.pdf (delegating to BOEM the authority to "manag[e] and administer[] programs for the leasing of minerals from, and for issuance of leases" on the OCS).[37]  The BOEM,

---

[37] *See also* DOI, Budget Justifications and Performance Information Fiscal Year 2021 - BOEM 2021 Budget Justification, p. 25, *available at* https://www.doi.gov/sites/doi.gov/files/uploads/fy2021-budget-justification-boem.pdf (explaining that "The lease administration process encompasses a discrete business processes" including "the qualification of corporate entities and individuals before they can acquire properties or do business on the OCS; . . . and the assignment of lease interests among qualified entities."); Memorandum of Understanding Between BOEM, BSEE, and ONRR, p. A-3 (March 17, 2014) (BOEM has the "final" responsibility for approving transfers of record title interests or operating rights interests: "Each [BOEM] Regional Office will adjudicate transfers … [and] timely update approvals or changes in TIMS").

The offshore lease form repeats this requirement:  "**Sec. 20.  Transfer of Lease**. The Lessee shall file for approval with the appropriate field office of the Minerals Management Service any instrument of assignment or other transfer of this lease, or any interest therein, in accordance with applicable regulations."

in turn, has promulgated a comprehensive, highly-detailed set of rules governing lease ownership and the transferability of lease interests. *See* 81 Fed. Reg. 18112 (Mar. 30, 2016). Thus, DOI's regulations (*inter alia*): limit the persons (including entities) that are "qualified" to hold an interest in a federal oil and gas lease (30 C.F.R. Part 556, Subpart D); explicitly establish that "[a] person may not hold leases on the OCS" without first satisfying the regulatory qualification requirements (30 C.F.R. § 556.402(h)); address the process for competitive lease sales (30 C.F.R. Part 556, Subpart E; 30 C.F.R. Part 560); impose detailed bonding requirements on offshore federal leases (30 C.F.R. Part 556, Subpart I); address lease termination (30 C.F.R. Part 556, Subpart K); and ***limit the types of approved transfers of lease interests*** (30 C.F.R. Part 556, Subpart G (record title) & Subpart H (operating rights)).

55. Critically here, under BOEM's regulations a lessee may transfer (through assignment) both (i) a "Record Title" interest in a lease, and (ii) an "Operating Rights" interest in a lease (*i.e.*, a "sublease"). *See* 30 C.F.R. § 556.700(c). The regulations do not provide for the transfer of a Record Title interest or an Operating Rights interest through any legal mechanism other than an "assignment" on a BOEM form, submitted for BOEM approval in accordance with Congress' mandate. *See* 30 C.F.R. §§ 556.700 (both an assignment of record title and a sublease of operating rights require BOEM approval), 556.712 (assignment of record title interest effective "on the first day of the month following" DOI's approval of the assignment), 556.800 (any assignment of operating rights is "subject to" BOEM approval), 556.806 (assignment of operating rights effective "on the first day of the month following" DOI's approval of the assignment). BOEM's regulations also impose specific requirements that must be satisfied to obtain the statutorily-mandated approval required for any assignment of record title or operating rights to be

effective.  *See, e.g.*, 30 C.F.R. §§ 556.701, 556.801 (requiring requests for approval of record title and operating rights assignments to be submitted on a specific BOEM form).[38]

56.     While BOEM's regulations recognize that lease owners "may create, transfer, or assign economic interests without BOEM approval," 30 C.F.R. § 556.715, BOEM's regulatory definition of "economic interest" expressly *excludes* any "record title interest or an operating rights interest."  30 C.F.R. § 556.105.  Thus, any "transfer" of a "Record Title" or "Operating Rights" interest can be made only through an "assignment" and with BOEM approval.  By explicitly requiring BOEM approval for the assignment of record title interests and operating rights interests, and by expressly limiting unapproved transfers to those relating to "economic interests," the regulations could not be more clear that no "transfer" of a Record Title or Operating Rights interest is possible without BOEM's approval.

### ii.     <u>Because federal law establishes a comprehensive scheme addressing transfers of interests in federal offshore leases, Louisiana law cannot apply.</u>

57.     Through its Lawsuits, Atlantic asserts that, based on the Louisiana statements of privileges that it filed pursuant to LOWLA, the "operating interests" held by the WIOs are to be transferred, via a "writ of sequestration," to the United States Marshall.   LOWLA defines

---

[38] *See* BOEM, Follow That Form!  An Offshore Lease Adjudication Workshop, pp. 85-118 (Jan. 22, 2016) [*hereinafter* "**Jan. 2016 BOEM Presentation**"], *available at* https://www.boem.gov/sites/default/files/about-boem/BOEM-Regions/Gulf-of-Mexico-Region/Leasing-and-Plans/BOEM-Adjudication-Workshop-01-22-2016.pdf (outlining requirements for obtaining BOEM approval for assignments of record title interests and operating rights).  Other DOI regulations comprehensively address myriad issues pertaining to transfers of interests in offshore federal oil and gas leases – from depth and geographic limitations, to required standard forms, to interests of deceased persons.  *E.g.*, 30 C.F.R. §§ 556.704(a)(2), 802(b) (setting forth BOEM's authority not to approve a transfer that is "not acceptable as to form or content"); 30 C.F.R. § 556.604(c) (limiting the number of subleased "operating rights" that a "record title owner" may carve out of its interest to "a maximum of three different depth divisions,"); 30 C.F.R. § 556.702–.703 (establishing when an assignment of lease rights will result in "segregated leases"); 30 C.F.R. §§ 556.710–.713, .805-.807 (establishing the effect of different types of assignments on the liabilities of the assignors and assignees); 30 C.F.R. § 556.705 (how to transfer the interest of a "deceased natural person"); 30 C.F.R. §§ 556.706–.709, .803–.804 (how to transfer interests in multiple leases to one or more parties).

"operating interest" as "a mineral lease or sublease of a mineral lease, or an interest in a lease or sublease that gives the lessee, either singly or in association with others, the right to conduct the operations giving rise to the claimant's privilege." La. R.S. § 9:4861(5). In the Lawsuit filed against Ecopetrol, Atlantic targets Ecopetrol's 31.5% "operating interest" in MC-948.[39] Similarly, in its Lawsuit filed against Ridgewood and Prospect, Atlantic targets Ridgewood's 25% "operating interest" and Prospect's 25% "operating interest" in GC-40.[40] The Debtors have indemnification obligations to each of the WIOs. Under the Gunflint JOA, the Debtors must hold the WIOs "harmless from liens and encumbrances on the Leases or in the Contract Area arising as a result of the [Debtors] actions or omissions." Gunflint JOA § 22.1. Under the GC-40 JOA, the Debtors must "keep the Lease, wells, Platforms, Development Facilities, and other equipment free from all liens and other encumbrances occasioned by operations . . . " GC-40 JOA § 5.4. As such, any judgment in the Lawsuits that would affect the WIOs' operating interest would trigger significant indemnification claims against the Debtors. Debtors may be required to pay in full to cure the claims under section 365 of the Bankruptcy Code, to the extent the Debtors seek to assume the operating agreements thereby nullifying any potential plan treatment.

58.    To be clear—and as established by the documents from BOEM records contained within Choi Declaration Exhibits 24 and 25 attached hereto—the "operating interests" that the WIOs own and that Atlantic seeks to have seized and transferred are:

- Ecopetrol's 31.50000% Record Title Interest in Lease OCS-G 28030 [MC-948]

---

[39] Attached as Choi Declaration Exhibit 24 are BOEM's Serial Register Page for MC-948 (which summarizes the various BOEM-approved transfers of title to the lease), as well as the BOEM-approved assignment of record title interest (which includes operating rights) to Ecopetrol.

[40] Attached as Choi Declaration Exhibit 25 are BOEM's Serial Register Page for GC-40, as well as the BOEM-approved assignment of record title interest and operating rights to Ridgewood and Prospect.

- Ridgewood's 25.00000% Record Title Interest in Lease OCS-G 34536 [GC-40]

- Prospect's 25.00000% Record Title Interest in Lease OCS-G 34536 [GC-40]

Choi Declaration Exhibit 24 and 25 demonstrate that the WIOs acquired these interests by executing Assignments of Record Title and Assignments of Operating Rights on Form BOEM-0150 and Form BOEM-0151, which were submitted to and formally approved by the BOEM in order for those assignments to have legal effect.

59.     In both Lawsuits, Atlantic petitions the Federal District Court to direct the United States Marshall "to seize and to hold" the WIOs interests in the Leases (Choi Decl. Ex. 16 ¶ 24; Choi Decl. Ex. 17 ¶ 25)—*i.e.*, "the property of" the WIOs (Choi Decl. Ex. 16 ¶ 20; Choi Decl. Ex. 17 ¶ 23), which is comprised of the Record Title and Operating Rights interests described above:

> To protect [Atlantic's] Lien, it is necessary that a Writ of Sequestration issue, in accordance with La. Code Civ. P. art. 3571, *et seq.*, and without security in accordance with La. R.S. 9:4871 [LOWLA], directing the United States Marshall to seize and hold the Subject Interests [*i.e.*, the WIOs' Record Title interests] until further order from this Court, and to record the Writ of Sequestration in the records of the Clerks of Court for the Parishes of Orleans, St. Tammany, St. Bernard, and Plaquemines, and in the records of BOEM.

Choi Decl. Ex. 6 ¶ 24; Choi Decl. Ex. 7 ¶ 25.  Thus, relying on LOWLA and related principles of seizure and sequestration under Louisiana law, Atlantic seeks a Court order transferring these BOEM-approved Record Title interests to the U.S. Marshal through a writ of sequestration, rather than through an assignment and ***without*** BOEM's approval.   Because federal law prohibits any such remedy, Atlantic's claims fail as a matter of law.

60.     In OCSLA, Congress made clear that federal law is the exclusive law that applies to activities on the OCS.  *See* 43 U.S.C. §§ 1333(a)(1) (extending "[t]he Constitution and laws and civil and political jurisdiction of the United States . . . to the subsoil and seabed of the [OCS]"),

1331(a) (defining "Outer Continental Shelf" lands are "subject to" the United States' "jurisdiction and control").  Where federal law is incomplete—such as with respect to contract and tort claims among private parties arising from offshore operations—Congress elected to fill such gaps in federal law by providing that the "civil and criminal laws of each adjacent State . . . are declared to be the law of the United States."  43 U.S.C. § 1333(a)(2)(A).  Critically, this conversion of adjacent state law to federal law can only occur where state law is "applicable and not inconsistent with [the OCSLA] or with other Federal laws and regulations of the Secretary [of Interior] now in effect or hereafter adopted."  *Id*.

61.    In *Parker Drilling Services v. Newton*, the Supreme Court addressed OCSLA's "law of [the] adjacent state" provision and held that the law of the adjacent state can apply as federal law *only* where there is a "significant void or gap" in the federal framework.  139 S. Ct. 1881 (2019).  Applying traditional tools of statutory construction, the Supreme Court explained:

> Because federal law is the only law on the OCS, and there has never been overlapping state and federal jurisdiction there, [OCSLA's] reference to "not inconsistent" state laws does not present the ordinary question in pre-emption cases—*i.e.*, whether a conflict exists between federal and state law.  Instead, the question is whether federal law has already addressed the relevant issue; if so, state law addressing the same issue would necessarily be inconsistent with existing federal law and cannot be adopted as surrogate federal law. . . .

*Id*. at 1889 (noting that this interpretation "accords with the standard long applied by the Fifth Circuit").[41]  Applying these principles to the issue before it, the Supreme Court concluded that

---

[41] Since *Parker Drilling*, several courts have reaffirmed the narrow applicability of adjacent state law.  *See, e.g.*, *In re Northstar Offshore Grp., LLC*, 2020 Bankr. LEXIS 1811 (Bankr. S.D. Tex. 2020) (relying on *Parker Drilling*, the bankruptcy court concluded that Louisiana law of equitable subrogation did not apply to a creditor's claim against the estate for the recovery of decommissioning costs for which debtor and creditor were jointly and severally liable under OCSLA because the bankruptcy code provided for statutory subrogation.); *Taylor Energy Co. v. U.S.*, 990 F.3d 1303, 1307 (Fed. Cir. 2021) (applying *Parker Drilling* in upholding the Claims Court's dismissal of Taylor Energy's Complaint because OCSLA's implementing regulations addressed "[a]ll of the issues underlying Taylor's claims"

39

because the FLSA created a "comprehensive federal wage-and-hour scheme[,]" there was "no gap for state law to fill" with respect to the wage and hour issues before the Court. *Id.* at 1888, 1893.

62.    Similarly here, because federal law creates a "comprehensive" scheme for the transfer of Record Title and Operating Rights interests in federal offshore leases, there is no void or gap for state law to fill.  Under the OCSLA and BOEM's implementing regulations, any "transfer" of a Record Title interest and an Operating Rights interest (the "operating interests" targeted by the Lawsuits) must be through the process that was used by the WIOs to acquire their interests: *i.e.*, though "assignments" on BOEM-mandated forms that receive BOEM's review and approval.  Atlantic's attempt to effectuate the transfer of Record Title and Operating Rights interests in federal leases via seizure and sequestration procedures under Louisiana law conflicts with the explicit, comprehensive federal regulatory system and, therefore, fails as a matter of law.

63.    Here, the legislative and regulatory system precludes even any suggestion of a "gap," let alone an actual "gap," in federal law that Louisiana law could fill with respect to the transfer of Record Title and Operating Rights interests in federal offshore leases.  Congress was comprehensive in requiring DOI approval where a lease interest is "sold, exchanged, assigned, *or otherwise transferred*" (43 U.S.C. § 1337(e) (emphasis added)); and BOEM's regulations comprehensively require any "transfer" of Record Title or Operating Rights through a BOEM-approved "assignment."  It is of no moment that the federal framework does not explicitly address liens on federal lease interests or seizure and sequestration of federal lease interests.  In *Parker Drilling* the Supreme Court recognized that "it is conceivable that state law might be 'inconsistent' with federal law . . . even absent an on-point federal law." *Id.* at 1892, n.2.  The Court explained

---

asserted under Louisiana law); *Hockison v. Baker Hughes Oilfield Ops.*, 2019 U.S. Dist. LEXIS 187704 (C.D. Cal. 2019) (California law did not apply because there was no "significant void or gap" in federal law).

that "federal law might contain a deliberate gap, making state law inconsistent with the federal scheme." *Id.* That is exactly what has happened here.

64.     BOEM's 2016 promulgation of new "leasing" regulations represents the agency's most complete regulatory articulation of the rules and procedures that establish how lease interests can and cannot be transferred.  81 Fed. Reg. 18112 (Mar. 30, 2016).  At the time that BOEM promulgated this comprehensive new set of rules, LOWLA had been in place for decades, as had the practice of subjecting offshore leases to mortgages and other security devices.[42] Notwithstanding the highly visible placement of LOWLA liens in the legal framework of Louisiana—the Gulf of Mexico state "adjacent to" the greatest concentration of investment in offshore federal oil and gas leases—BOEM elected not to mention such liens in its new regulations. BOEM's silence speaks volumes: by electing not to address LOWLA liens and the "sequestration" device used to enforce those liens in the federal regulations, while at the same time laying out in great detail the numerous intricacies applicable to transferring record title and operating rights interests in offshore leases, BOEM has chosen to exclude transfers of lease interests pursuant to LOWLA from the universe of OCSLA-permitted transfers.  Ultimately, the regulatory silence regarding state law liens and sequestration reflects that neither Congress nor DOI found it

---

[42] *See e.g.*, Jan. 2016 BOEM Presentation, pp. 57-62 (addressing Non-Required Filings, including "Mortgage, Deed of Trust, Security Agreement," and "Release of Mortgages and Liens" (*id.* at 60); BOEM, Getting it Right the First Time (Sept. 28, 2017), *available at* https://www.boem.gov/sites/default/files/about-boem/BOEM-Regions/Gulf-of-Mexico-Region/Leasing-and-Plans/BOEM-2017-NALTA-Conference-Presentation.pdf (listing the established categories of "Non-Required Filings" that lessees can submit to BOEM to include "Mortgage, Deed of Trust, Security Agreement," and "Release of Mortgages and Liens," among others); BOEM, Lisa Jaubert, Buying and Selling Offshore Properties – Protecting Against Title, Lien, and Successor Liability Pitfalls, Rocky Mt. Min. L. Inst. 6-1 (2002) ("The types and categories of Non-Required Filings catalogued by the MMS follows: (1) mortgage/deed of trust/security agreement; (2) release of mortgages and liens;" etc.); Robert Theriot, *Assignments and Conveyances*, ROCKY MT. MIN. L. INST. 11-1 (2010) (noting various types of "non-required filings" routinely made with MMS, including "mortgages" and "deeds of trust").

appropriate to allow the transfer of interests in federal leases through application of state law liens and sequestration.

65.     The Fifth Circuit's decision in *Shell Offshore, Inc. v. Kirby Exploration Co.*, 909 F.2d 811 (5th Cir. 1990), is informative as it, like this case, addressed whether principles of Louisiana property law could apply as federal law under OCSLA.  Based on a transaction through which Shell sold an offshore platform and a pipeline connected to that platform, Shell asserted that a "predial servitude" had been created under Louisiana law with respect to the pipeline, and on that basis Shell demanded that the new pipeline owner remove the pipeline.  In resolving the dispute between private parties concerning responsibility for removing the pipeline, the Fifth Circuit rejected Shell's "predial servitude" theory—grounded in the property law articles of the Louisiana Civil Code—because Shell's purported rights as the "owner of the servient estate" *contradicted Shell's regulatory liability under applicable federal offshore regulations*:

> Louisiana law governs disputes on the OCS only to the extent that it does not conflict with federal regulations.  In this case, we find that even if the state law requisites of a predial servitude are present, federal law conflicts with the Louisiana predial servitude scheme.
>
> . . .  [Shell's] inability to abandon Platform "C", under the United States lease and regulations, is incompatible with the civilian concept of predial servitudes.

909 F.2d at 815 (citations omitted).  Just as Shell's Civil Code-based attempt to avoid the regulatory framework governing offshore oil and gas leases and rights-of-way failed because it contradicted those federal regulations, so too does Atlantic's reliance on LOWLA fail because that Louisiana statute conflicts with the comprehensive federal framework applicable to transfers of

the Record Title and Operating Rights interests owned by the WIOs in federal offshore leases OCS-G 28030 and OCS-G 34536.[43]

### c. DOI is a necessary and indispensable party to Atlantic's Lawsuits, but DOI may not be joined in those Lawsuits due to its sovereign immunity; accordingly, Atlantic's state law lien claims fail as a matter of law.

66.     Under Federal Rule of Civil Procedure 19 ("**Rule 19**"), when an absent party is both "necessary" and "indispensable" but cannot be joined in a lawsuit (*e.g.*, due to sovereign immunity), that lawsuit must be dismissed.  Determining whether a lawsuit must be dismissed for failure to join an absent party under Rule 19 requires a two-step analysis: ***first***, courts ask whether the absent party is "necessary"; if so, then ***second***, courts ask whether the absent party is also "indispensable."

67.     Atlantic's Lawsuits seek to affect the Operating Rights of the WIOs, which would implicate the Debtors' indemnity obligations and trigger substantial indemnification claims against the Debtors.  Specifically, Atlantic's Lawsuits seek a "transfer" of the Record Title and Operating Right interests that the WIOs own in offshore federal leases.  Because the Lawsuits seek this transfer, they unavoidably implicate DOI's rules governing the transfer of such interests, making DOI both a necessary and indispensable party in Atlantic's lawsuits.  But, because no waiver of sovereign immunity makes DOI subject to Atlantic's lawsuits, those lawsuits cannot stand; Atlantic's state law privilege claims therefore fail for this independent reason as well.

---

[43] The instant motion does not address defects in the liens filed by Atlantic or flaws in Atlantic's theory under Louisiana law.  For instance, although Atlantic's lawsuits against the WIOs state that it filed and recorded "Statement[s] of Privilege . . . in favor of [Atlantic], against Lease No. OCS-G-34536" [GC-40] and "against Lease No. OCS-G-28030" [MC-948], in fact the Statements of Privilege on which Atlantic relies assert a privilege only with respect to Fieldwood Energy LLC's "operating interest" in each of the leases.

43

### i. DOI is a "necessary" party under Rule 19(a).

68. Under Rule 19(a), courts ask whether the absent party is "necessary" because either:

> (A) in that person's absence, the court cannot accord complete relief among existing parties; or (B) that person claims an interest relating to the subject of the action and is so situated that disposing of the action in the person's absence may . . . as a practical matter impair or impede the person's ability to protect that interest[.]

In this case, DOI qualifies as a "necessary" party under each of the alternatives. As explained, under the applicable legal framework, *any* "transfer" of the "operating interests" targeted by Atlantic's Lawsuits—that is, the Record Title and Operating Rights interests owned by the WIOs—requires DOI's approval. In other cases, federal courts, including the United States Supreme Court, have recognized that the transfer of interests in a federal lease without required DOI approval is invalid.[44]

69. Here, too, without DOI's approval, the transfers of the "operating interests" targeted by Atlantic's Lawsuits cannot be effective. Thus, the Court cannot grant the relief sought by Atlantic unless DOI is joined in the litigation and approves the transfers of the "operating interests."[45] And, a court's disposition of Atlantic's Lawsuit without DOI's involvement would necessarily "impair" and "impede" DOI's exercise of its Congressionally-delegated authority to

---

[44] *See, e.g., Wallis v. Pan Am. Petrol. Corp.*, 384 U.S. 63, 70 (1966) (concluding that under a traditional preemption analysis state law applied to a contract claim between private parties relating to the transfer of federal lease interests but acknowledging that "[t]he Secretary, who must approve all assignments before the lease obligations or record titles are shifted finally, is entirely free to disapprove assignees however valid their assignments may otherwise be."); *Liberty Servs., Inc. v. Amoco Prod. Co.*, 1991 U.S. Dist. LEXIS 18620 (E.D. La. Dec. 20, 1991) ("Without having MMS approval of the transfer of its interests to Alliance, Amoco would retain its obligations under the lease."); *see also River Gas Corp. v. Pullman*, 960 F. Supp. 264, 265 (D. Utah 1997) ("there can be no valid assignment or transfer of interests without BLM approval"); *In re Platinum Oil Props, LLC*, 2013 Bankr. LEXIS 5024 (D.N.M. Nov. 26, 2013) (transfer of interest in Indian lease was not effective absent DOI approval).

[45] Of course, seeking such approval would be futile, as the sequestration and seizure procedure sought by Atlantic has no basis in BOEM's regulations, and instead contradicts the explicit requirements of the comprehensive statutory and regulatory framework governing transfers of Record Title and Operating Rights interests.

"dispose of" (U.S. Const. Art. IV, Sec. 3, Cl. 2) the tracts on which the leases are currently located and to administer the leasing program. Thus, under Rule 19(a), DOI is a "necessary" party.

### ii. DOI is an "indispensable" party under Rule 19(b).

70. Under Rule 19(b), courts ask whether the litigation can "properly be pursued" despite the absence of a "necessary" party. If not, then the absent party is considered "indispensable" and either the absent party must be joined in the litigation or the lawsuit must be dismissed. Under Rule 19(b), several factors are relevant for evaluating whether a party is "indispensable," including:

> (1) the extent to which a judgment rendered in the person's absence might prejudice that person or the existing parties; (2) the extent to which any prejudice could be lessened or avoided . . . ; (3) whether a judgment rendered in the person's absence would be adequate; and (4) whether the plaintiff would have an adequate remedy if the action were dismissed for nonjoinder.

It has long been established that "a proceeding against property in which the United States has an interest is a suit against the United States[.]"[46] Applying Rule 19, federal courts have similarly concluded that DOI is an indispensable party to lawsuits involving interests in federal land.[47]

---

[46] *Minnesota v. United States*, 305 U.S. 382, 386 (1939) ("As the United States owns the fee of these parcels, the right of way cannot be condemned without making [the United States] a party.") (*superseded by statute* (*see, e.g.*, *Horizon Bank & Tr. Co. v. Flaherty*, 309 F. Supp. 2d 178 (D. Mass. 2004)); *United States v. Alabama*, 313 U.S. 274, 282-283 (1941) (invalidating tax sale of federal land and stating: "A proceeding against property in which the United States has an interest is a suit against the United States").

[47] *See, e.g.*, *Delano Farms Co. v. Cal. Table Grape Comm'n*, 623 F. Supp. 2d 1144, 1164 (E.D. Cal. 2009) ("Because the United States, as patent owner, owns and controls enforcement of the patents and assignability rights of the patents, and insufficient enforcement rights, without consent, were transferred to the Commission, the United States is a necessary party to this action under Rule 19."); *EEE Minerals, LLC v. North Dakota*, 318 F.R.D. 118, 125 (D.N.D. 2016) ("[T]he United States is a required party [in a quiet title action] because it owns significant oil, gas, and other mineral interests in and under the lands that are subject to this lawsuit. The United States has leased many of its oil and gas interests to third parties and it owns an interest in the bonus and royalty payments arising from those federal leases. Any judgment establishing ownership of the disputed oil and gas estate will clearly have a significant impact on the United States' title and the related coverage of federal leases."); *cf. Clinton v. Babbit*, 180 F.3d 1081 (9th Cir. 1999) (suit seeking to modify Indian leases dismissed for failure to join the Tribe that owned the land on which the leases were situated; the Tribe was an "indispensable" party that could not be joined due to sovereign immunity);

71.     Here, too, DOI is an "indispensable" party to Atlantic's lawsuits under Rule 19(b). No judgment rendered in DOI's absence can be adequate because OCSLA and BOEM's implementing regulations preclude *any* transfer of the "operating interests" targeted by Atlantic's Lawsuits (that is, the WIO's Record Title and Operating Rights interests) without BOEM's involvement and approval.  *See*, *e.g.*, 43 U.S.C. § 1337(e) (no federal offshore lease may be transferred "except with the approval of" DOI); 30 C.F.R. § 556.700 (assignments of record title and operating rights in federal offshore leases require BOEM approval).  Further, the seizure and sequestration requested by Atlantic would necessarily prejudice DOI in that it would interfere with DOI's administration of its federal leasing program.  For instance, despite that DOI's regulations require that transferees be "qualified" to hold Record Title or Operating Rights in a federal lease (*see* 30 C.F.R. Part 556, Subpart D), Atlantic asks the Court to transfer the WIO's "operating interests" to the U.S. Marshall without any consideration of whether the U.S. Marshall is a "qualified" entity.  And, although DOI's comprehensive regulations plainly provide for only two types of transfers of the "operating interests" targeted by Atlantic—assignments of Record Title and Operating Rights interests using BOEM's forms and approval process—Atlantic asks the court to order the transfer of those "operating interests" though the non-regulatory "seizure" procedure.

72.     Finally, Atlantic has an adequate remedy aside from its LOWLA claims against the WIOs.  Specifically, like other creditors, Atlantic filed a claim in Fieldwood's bankruptcy proceeding.  *See* Claim 91-1.  Thus, through the bankruptcy proceeding, Atlantic's interest, along with the interests of Fieldwood's other creditors, will be protected to the greatest extent possible pursuant to a plan approved by this Court.  The Eastern District of Louisiana has recognized that

---

*Yazzie v. Morton*, 59 F.R.D. 377 (D. Arizona 1973) (Tribal lessor was an "indispensable" party in a suit seeking to effectively modify the terms of Indian leases).

any potential claim pursuant to LOWLA is "limited" by an operator's bankruptcy proceeding.  *See*

*Liberty Servs., Inc. v. Amoco Prod. Co.*, 1991 U.S. Dist. LEXIS 18620 (E.D. La. Dec. 20, 1991)

("Liberty's [contractor] remedy under the [LOWLA] is limited by the fact that Alliance [operator]

is in bankruptcy.").  In any event, once a plan is approved by this Court, the alleged debt underlying

Atlantic's claims in the Lawsuits will be fully and finally resolved.

### iii.   Atlantic's action cannot proceed because DOI, a "necessary" and "indispensable" party under Rule 19, cannot be joined in the action.

73.     Although DOI is both a "necessary" party and an "indispensable" party, it is

impossible for Atlantic or a court to join DOI in the Lawsuits or make DOI subject to any similar

lawsuit Atlantic may file in the future.  The United States—and its agencies—can only be made

party to a lawsuit if the United States has waived sovereign immunity to be sued:

> Absent a waiver, sovereign immunity shields the Federal
> Government and its agencies from suit.  *Loeffler v. Frank*, 486 U.S.
> 549, 554, 100 L. Ed. 2d 549, 108 S. Ct. 1965 (1988); *Federal
> Housing Administration v. Burr*, 309 U.S. 242, 244, 84 L. Ed. 724,
> 60 S. Ct. 488 (1940). Sovereign immunity is jurisdictional in nature.
> Indeed, the "terms of [the United States'] consent to be sued in any
> court define that court's jurisdiction to entertain the suit." *United
> States v. Sherwood*, 312 U.S. 584, 586, 85 L. Ed. 1058, 61 S. Ct. 767
> (1941). *See also United States v. Mitchell*, 463 U.S. 206, 212, 77 L.
> Ed. 2d 580, 103 S. Ct. 2961 (1983) ("It is axiomatic that the United
> States may not be sued without its consent and that the existence of
> consent is a prerequisite for jurisdiction").

*FDIC v. Meyer*, 510 U.S. 471, 475 (1994).  Because no waiver of sovereign immunity exists with

respect to Atlantic's claims, the United States cannot be made a party to the Lawsuits, thereby

depriving any court of jurisdiction over Atlantic's claims.

74.     In connection with federal offshore oil and gas leases, the United States has only

waived sovereign immunity to be sued in two statutes: (i) in the provisions of the Administrative

Procedure Act ("**APA**") authorizing suit for judicial review of "final agency action" in district

court (5 U.S.C. §§ 702, 704); and (ii) in the Tucker Act provision authorizing suit against the United States in the Court of Federal Claims to recover money damages (28 U.S.C. § 1491). Federal district courts only have jurisdiction over APA-based lawsuits for judicial review of "final agency action"; the Court of Federal Claims has exclusive jurisdiction over claims for money damages based on the Tucker Act. *See*, *e.g.*, *W&T Offshore, Inc. v. Bernhardt*, 946 F.3d 227 (5th Cir. 2019) (APA); *Diamond Shamrock Expl'n Co. v. Hodel*, 853 F.2d 1159, 1168 (5th Cir. 1988) (explaining the difference between jurisdiction over DOI under the APA and the Tucker Act); *Taylor Energy Co., LLC v. DOI*, 990 F.3d 1303, 1312 (Fed. Cir. 2021) ("Although Taylor captions its proposed amended complaint as a breach of contract claim, the allegations contained therein, as well as the relief requested, reveal that Taylor is, in fact, seeking APA review of the agency's actions. Taylor expressly asks the court to reverse, set aside, and vacate the IBLA Decision. . . . Because Taylor is challenging the IBLA Decision, it must do so in district court under the APA."); *BP Expl'n & Prod. Inc. v. United States*, 147 Fed. Cl. 623 (Ct. Cl. 2020) (Tucker Act).

75.     Here, the Tucker Act is categorically inapplicable because Atlantic does not seek money damages from the United States.  And, DOI has not rendered any "final" decision on Atlantic's intended "transfer" of interests in the relevant offshore leases that would give a court jurisdiction over DOI.  *See Oxy USA, Inc. v. Babbitt*, 122 F.3d 251 (5th Cir. 1997) (vacating and remanding to district court for dismissal because there was no final agency action for the court to review under the APA).  Because the Lawsuits cite no "final agency action" that would authorize naming DOI as a party to a judicial proceeding to enforce Atlantic's state law lien claims, there is no APA basis for Atlantic to join DOI in its lawsuits (current or future) to enforce its LOWLA lien claims through sequestration.

48

76.     Because Atlantic cannot join DOI in its lawsuits, Atlantic cannot prosecute an action in federal district court to enforce its *in rem* claims and alleged LOWLA privileges.

## CONCLUSION

The Debtors respectfully request that the Court enter summary judgment and issue a declaratory judgment in its favor on any and all of the grounds set forth above.

## NOTICE

Notice of this Motion will be served on any party entitled to notice pursuant to Bankruptcy Rule 2002 and any other party entitled to notice pursuant to Local Rule 9013-1(d), including Atlantic's counsel.

Dated: May 12, 2021
     Houston, Texas

                                     */s/ Alfredo R. Pérez*

WEIL, GOTSHAL & MANGES LLP
Alfredo R. Pérez (15776275)
Clifford Carlson (24090024)
700 Louisiana Street, Suite 1700
Houston, Texas 77002
Telephone:  (713) 546-5000
Facsimile:  (713) 224-9511
Email:   Alfredo.Perez@weil.com
             Clifford.Carlson@weil.com


-and-

WEIL, GOTSHAL & MANGES LLP
Matthew S. Barr (admitted *pro hac vice*)
Jessica Liou (admitted *pro hac vice*)
767 Fifth Avenue
New York, New York 10153
Telephone:  (212) 310-8000
Facsimile:  (212) 310-8007
Email:   Matt.Barr@weil.com
             Jessica.Liou@weil.com

-and-

WEIL, GOTSHAL & MANGES LLP
Paul R. Genender (00790758)
Erin M. Choi (24079436)
200 Crescent Court, Suite 300
Dallas, Texas 75201
Telephone: (214) 746-7700
Facsimile: (214) 746-7777
Email: Paul.Genender@weil.com
            Erin.Choi@weil.com

-and-

JONES WALKER, LLP
Joseph E. Bain (24085187)
Email: jbain@joneswalker.com
Joshua A. Norris (24027577)
Email: jnorris@joneswalker.com
James W. Noe (24040178)
Email: jnoe@joneswalker.com

Daniel J. Baldwin (24078184)
Email:  dbaldwin@joneswalker.com
811 Main St., Suite 2900
Houston, TX 77002
Telephone: 713.437.1800
Facsimile:  713.437.1810

*Attorneys for the Debtors*
*and Debtors in Possession*

## Certificate of Service

I hereby certify that, on May 12, 2021, a true and correct copy of the foregoing document was served as provided by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

/s/ Alfredo R. Pérez
Alfredo R. Pérez

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| **FIELDWOOD ENERGY LLC,** *et al.,* | § | |
| | § | **Case No. 20-33948 (MI)** |
| | § | |
| Debtors.[1] | § | |
| | § | |
| | § | **(Jointly Administered)** |
| ----------------------------------------------- | § | |
| | § | **Adversary Proc. No. 20-03476** |
| **FIELDWOOD ENERGY LLC,** *et. al.,* | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | |
| | § | |
| **ATLANTIC MARITIME SERVICES, LLC,** | § | |
| | § | |
| Defendant. | § | |
| | § | |
| ----------------------------------------------- | § | |

PROPOSED ORDER GRANTING PLAINTIFFS'
MOTION FOR SUMMARY JUDGMENT

Upon the motion filed by the Debtors[2] dated May 12, 2021, *Plaintiffs' Motion for Summary Judgment* (the "**Motion**"), in the above-captioned adversary proceeding; and the Court having jurisdiction to decide the Motion and the relief requested therein pursuant to 28 U.S.C. § 1334(b); and consideration of the Motion and the requested relief being a core

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are: Dynamic Offshore Resources NS, LLC (0158); Fieldwood Energy LLC (6778); Fieldwood Energy Inc. (4991); Fieldwood Energy Offshore LLC (4494); Fieldwood Onshore LLC (3489); Fieldwood SD Offshore LLC (8786); Fieldwood Offshore LLC (2930); FW GOM Pipeline, Inc. (8440); GOM Shelf LLC (8107); Bandon Oil and Gas GP, LLC (9172); Bandon Oil and Gas, LP (9266); Fieldwood Energy SP LLC (1971); Galveston Bay Pipeline LLC (5703); and Galveston Bay Processing LLC (0422). The Debtors' primary mailing address is 2000 W. Sam Houston Parkway S., Suite 1200, Houston, TX 77042.

[2] Capitalized terms used but not otherwise defined herein shall have the respective meanings ascribed to such terms in the Motion.

proceeding pursuant to 28 U.S.C. § 157(b); and venue being proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409; and upon the record of the hearing held by the Court on the Motion on June 8, 2021; and after due deliberation;

### IT IS HEREBY ORDERED THAT:

1.    The Junior Liens are junior to the Senior Liens and Atlantic's claims related to the Encumbered Leases are unsecured based on (i) the amount of claims secured by the Senior Liens held by the Lenders and (ii) the values of the properties at issue.

2.    Any valid and enforceable Louisiana privileges held by Atlantic will be "extinguished" under LOWLA upon satisfaction, settlement, and discharge of Atlantic's claims pursuant to the Plan.

3.    General maritime law applies to Atlantic's Claims and alleged liens and, therefore, any claims or alleged liens based on state law, including the LOWLA privileges in the *in rem* claims which are the subject of the Lawsuits, are preempted by maritime law.

4.    LOWLA is inconsistent with federal law and, therefore, the alleged LOWLA liens are not valid or enforceable.

5.    The DOI must be a party to the Lawsuits to obtain the relief requested therein, but Atlantic cannot make the DOI a party to such Lawsuits.

Dated: _____, 2021

_____
THE HONORABLE MARVIN ISGUR
UNITED STATES BANKRUPTCY JUDGE