# **EXHIBIT 14**

**FIELDWOOD'S RESPONSE TO ATLANTIC'S MOTION TO DISMISS**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| **FIELDWOOD ENERGY LLC**, *et al.*, | § | |
| | § | Case No. 20-33948 (MI) |
| | § | |
| Debtors.[1] | § | |
| | § | |
| | § | (Jointly Administered) |
| ------------------------------------------- § | | |
| | § | Adversary Proc. No. 20-03476 |
| **FIELDWOOD ENERGY LLC**, *et. al.*, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | |
| | § | |
| **ATLANTIC MARITIME SERVICES, LLC,** | § | |
| | § | |
| Defendant. | § | |
| | § | |
| ------------------------------------------- § | | |

## DEBTORS' OPPOSITION TO ATLANTIC'S MOTION TO DISMISS (DOCKET NO. 31)

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are: Dynamic Offshore Resources NS, LLC (0158); Fieldwood Energy LLC (6778); Fieldwood Energy Inc. (4991); Fieldwood Energy Offshore LLC (4494); Fieldwood Onshore LLC (3489); Fieldwood SD Offshore LLC (8786); Fieldwood Offshore LLC (2930); FW GOM Pipeline, Inc. (8440); GOM Shelf LLC (8107); Bandon Oil and Gas GP, LLC (9172); Bandon Oil and Gas, LP (9266); Fieldwood Energy SP LLC (1971); Galveston Bay Pipeline LLC (5703); and Galveston Bay Processing LLC (0422). The Debtors' primary mailing address is 2000 W. Sam Houston Parkway S., Suite 1200, Houston, TX 77042.

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................. 1

STATEMENT OF FACTS ....................................................................................................... 4

    I.      The Debtors' Contractual Obligations to Remove Liens, Defend the WIOs, and Indemnify the WIOs Under Contracts the Debtors are Assuming .................. 4

    II.     Atlantic Filed Lawsuits Against the Debtors' Co-Working Interest Owners, Violating the Automatic Stay, and Filed Claims Against the Debtors .................. 6

    III.    Claims Asserted by WIOs Against the Debtors .................................................... 6

    IV.   Atlantic's Claims Against the Debtors ................................................................. 7

ARGUMENT ........................................................................................................................ 8

    I.      Each of the Debtors' Counts Raises a Case or Controversy .................................. 8

         A.     Atlantic's Stipulation that Certain of its Alleged Liens are Junior to the Lenders' Senior Liens Does not Render Count I–IV (Challenges to the Validity of the Alleged Liens) or Count VI Moot ............................ 8

         B.     The Debtors Have Standing to Assert the Claims in the Complaint ......... 10

         C.     The Debtors' Count VI is Ripe for Resolution ......................................... 13

    II.     The Debtors Have Stated a Claim On All Counts ............................................... 16

         A.     Because Fieldwood Has Sufficiently Alleged that Maritime Law Applies, Count I Should Not Be Dismissed ............................................. 16

         B.     Because Fieldwood Has Sufficiently Alleged that Atlantic Seeks to Transfer Offshore Federal Lease Interests Without the DOI's Approval, Counts II and III Should Not Be Dismissed .......................... 20

         C.     Because Fieldwood Has Sufficiently Alleged that Mississippi Canyon Block 948 is "Adjacent To" Mississippi, Count IV Should Not Be Dismissed .................................................................................... 25

         D.     Count VI Seeks a Declaration Regarding the Effect of Satisfying Atlantic's Claim Pursuant to the Plan Under LOWLA, Not a Third-Party, Non-Consensual Discharge or Release of the WIOs ..................... 27

         E.     Count IX Requests Permanent Injunctive Relief in Connection with the Causes of Action Alleged in Counts I–VI .......................................... 30

    CONCLUSION ........................................................................................................ 31

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Adelphia Commc'ns Corp.*,
307 B.R. 432 (Bankr. S.D.N.Y. 2004) ....................................................................................15

*Already, LLC v. Nike, Inc.*,
568 U.S. 85 (2013) .......................................................................................................................9

*Applewood Chair Co. v. Three Rivers Planning & Dev. Dist. (In re Applewood Chair Co.)*,
203 F.3d 914 (5th Cir. 2000) .....................................................................................................29

*In re Besing*,
981 F.2d 1488 (5th Cir. 1993) ...................................................................................................23

*Brown v. Nationsbank Corp.*,
188 F.3d 579 (5th Cir. 1999) .....................................................................................................22

*Corbitt v. Diamond M. Drilling Co.*,
654 F.2d 329 (5th Cir. 1981) .....................................................................................................18

*In re Crescent Energy Servs., L.L.C.*,
896 F.3d 350 (5th Cir. 2018) .....................................................................................................17

*In re Cubic Energy, Inc.*,
587 B.R. 849 (Bankr. D. Del. 2018) ..........................................................................................15

*Danos & Curole Marine Contractors, Inc. v. BP Am. Prod. Co.*,
61 F. Supp. 3d 679 (S.D. Tex. 2014) .........................................................................................25

*Derise v. Chevron USA, Inc.*,
2005 U.S. Dist. LEXIS 46039 (W.D. La. 2005) .......................................................................25

*In re Edgeworth*,
993 F.2d 51 (5th Cir. 1993) .......................................................................................................28

*Exxon Corp. v. Cent. Gulf Lines, Inc.*,
500 U.S. 603 (1991) ...................................................................................................................17

*Gardes Directional Drilling v. U.S. Turnkey Expl. Co.*,
98 F.3d 860 (5th Cir. 1996) .......................................................................................................19

*Gooch v. U.S.*,
297 U.S. 124 (1936) ...................................................................................................................21

*Harris v. Pyramid GOM, Inc. (In re Capco Energy, Inc.)*,
  2012 WL 253148 (Bankr. S.D. Tex. Jan. 25, 2012) ............................................................12

*Honey Holdings I, Ltd. v. Alfred L. Wolff, Inc.*,
  81 F. Supp. 3d 543 (S.D. Tex. 2015) ....................................................................................10

*Kaiser Aluminum & Chem. Sales, Inc. v. Avondale Shipyards, Inc.*,
  677 F.2d 1045 (5th Cir. 1982) ..............................................................................................26

*In re Larry Doiron, Inc.*,
  879 F.3d 568 (5th Cir. 2018) (*en banc*), *cert. denied*, 138 S. Ct. 2033 (2018)..............3, 16, 18

*Lewis v. Glendel Drilling Co.*,
  898 F.2d 1083 (5th Cir. 1996) ..............................................................................................18

*In re Monroe Well Serv., Inc.*,
  67 B.R. 746 (Bankr. E.D. Pa. 1986) ......................................................................................28

*New Orleans Pub. Serv., Inc. v. Council of City of New Orleans*,
  833 F.2d 583 (5th Cir. 1987) ................................................................................................13

*Norfolk S. R.R. Co. v. Kirby*,
  543 U.S. 14 (2004)................................................................................................................17

*Orix Credit All. v. Wolfe*,
  212 F.3d 891 (5th Cir. 2000) ................................................................................................10

*Parker Drilling Mgmt. Servs. Ltd. v. Newton*,
  139 S. Ct. 1881 (2019)....................................................................................................20, 22

*Reeves v. B&S Welding, Inc.*,
  897 F.2d 178 (5th Cir. 1990) ................................................................................................26

*Sierra Club v. Seaboard Farms, Inc.*,
  387 F.3d 1167 (10th Cir. 2004) ............................................................................................21

*Snyder Oil Corp. v. Samedan Oil Corp.*,
  208 F.3d 521 (5th Cir. 2001) ................................................................................................26

*Stewart v. Dutra Constr. Co.*,
  543 U.S. 481 (2005)..............................................................................................................18

*In re Tailored Brands, Inc.*,
  No. 20-33900, 2021 WL 2021472 (Bankr. S.D. Tex. May 20, 2021) ....................................29

*Texas v. W. Pub. Co.*,
  882 F.2d 171 (5th Cir. 1989) ................................................................................................10

*Theriot v. Bay Drilling Corp.*,
    783 F.2d 527 (5th Cir. 1986) ..................................................................18, 19

*Total E&P USA, Inc. v. Marubeni Oil & Gas (USA), Inc.*,
    389 F. Supp. 3d 478 (S.D. Tex. 2018) .............................................................25

*Transcon. Gas Pipe Line Corp. v. Mobile Drilling Barge*
    424 F.2d at 691 ..............................................................................................18

*U.S. Bank Nat'l Ass'n v. Springfield Prairie Props., LLC*,
    2019 U.S. Dist. LEXIS 31975 (C.D. Ill. 2019).................................................21

*United States v. Commer. Tech., Inc.*,
    354 F.3d 378 (5th Cir. 2003) ...........................................................................24

*World Fuel Servs., Inc. v. MAGDALENA GREEN M/V*,
    464 F. App'x 339 (5th Cir. 2012) (unpublished).............................................30

**Statutes**

1 U.S.C. § 3........................................................................................................19

11 U.S.C. § 101..................................................................................................23

43 U.S.C. § 1333................................................................................................27

43 U.S.C. § 1337.........................................................................................*passim*

Bankruptcy Code § 524 ...............................................................................28, 29

La. Civ. Code Art. 3277......................................................................................30

Tex. Bus. & Com. Code § 24.002......................................................................24

**Other Authorities**

30 C.F.R. § 556.700............................................................................................24

Local Rule 9013-1..............................................................................................34

Fieldwood Energy LLC ("**Fieldwood**")[2] and its debtor affiliates, as debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "**Debtors**"), and as Plaintiffs in the above-captioned adversary proceeding (the "**Adversary Proceeding**"), hereby file this opposition to *Atlantic Maritime Services, LLC's* ("**Atlantic**" or "**Defendant**") *Motion to Dismiss Debtors' Amended Adversary Complaint* (Docket No. 31) ("**Motion**" or "**MTD**") filed on May 12, 2021.

## PRELIMINARY STATEMENT

1.     The Debtors have more than adequately pled each of the counts in their Amended Complaint in accordance with Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure and each count presents a live controversy under Article III of the Constitution (except for Count V, which Atlantic has conceded and, thus, is now moot).

2.     In its Motion, Atlantic concedes that certain of its liens are junior to the Lenders' senior liens such that certain of Atlantic's claims should be treated and classified under the Plan as general unsecured claims in Class 6B.  Atlantic concedes this in a failed attempt to create justiciability arguments with respect to certain counts in the Debtors' Amended Complaint[3] seeking determinations that (i) Atlantic's alleged liens are not valid or enforceable as to third parties (*i.e.*, Counts I–IV) and/or (ii) in any event, treatment of Atlantic's claims pursuant to the Plan extinguishes any valid privileges under LOWLA (*i.e.*, Count VI).  However, Atlantic's concession that certain of its liens are underwater does **not** render Counts I–IV and VI moot, nor does it deprive the Debtors' of standing to assert such counts in this Adversary Proceeding.  In

---

[2] Fieldwood is a Delaware limited liability company with its principal place of business located at 2000 W. Sam Houston Parkway S., Suite 1200, Houston, TX 77042.

[3] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in Debtors' *Motion for Summary Judgment* (Docket No. 32) (the "**Summary Judgment Motion**").

short, Atlantic's efforts to prosecute the Lawsuits and seek recoveries against the WIOs on account of claims held **only** against Fieldwood has already harmed, and continues to harm, the Debtors.

3.      As this Court is aware, this Adversary Proceeding was initially commenced in November of 2020 to protect the Debtors and their estates from the significant harm caused by Atlantic filing Lawsuits against the WIOs, with whom the Debtors share an identity of interest given the Debtors' contractual obligations to the WIOs as operator under the Joint Operating Agreements (defined below).  The Debtors' contractual obligations include the duty keep the Leases free and clear of liens and encumbrances, the duty to defend the WIOs, and the duty to indemnify the WIOs.  Since November, and as a result of Atlantic's filing the Lawsuits, the WIOs have filed substantial secured claims against the Debtors in these chapter 11 cases pursuant to the Joint Operating Agreements for, among other alleged breaches, Fieldwood's failure to (i) keep the applicable Leases free and clear of liens and (ii) defend and indemnify the WIOs in connection with the Lawsuits filed by Atlantic.  In order to resolve the WIOs' asserted claims against the Debtors as part of the claims resolution process, this Court will need to make determinations regarding, among other things, the validity and enforceability of the privileges asserted by Atlantic (*i.e.*, Counts I–IV) and/or the extent to which treatment of Atlantic's claims against the Debtors under the Plan extinguishes Atlantic's alleged privileges under Louisiana law (Count VI). Moreover, given that the Debtors seek to assume the Joint Operating Agreements, the Court will be required to adjudicate these counts in determining the amount of the WIOs' cure claims. Accordingly, Atlantic's justiciability arguments fail as a matter of law.

4.      Atlantic's arguments on the merits of each count are also unpersuasive.  First, in seeking dismissal of Counts VI and IX, Atlantic incorrectly characterizes the requested relief as an attempt to obtain a non-consensual, third-party discharge and release of claims against the

WIOs.  The Debtors are not requesting that this Court discharge or release the WIOs.  Indeed, Atlantic does not even hold claims against any of the WIOs or even have contractual privity with any of the WIOs.  Rather, the Debtors seek a declaratory judgment that upon the satisfaction, settlement, and discharge of Atlantic's claims against the Debtors pursuant to the Plan, any valid privileges held by Atlantic securing such claims are extinguished in accordance with the provisions of LOWLA.  Accordingly, Atlantic's reliance on cases that provide that a debtor's discharge in bankruptcy does not affect a guarantor's (which none of the WIOs are) liability has no relevance to the relief requested.

5.      Further, in alleging that General Maritime Law does not apply to the Master Domestic Offshore Daywork Drilling Contract (the "**Contract**") between Fieldwood and Atlantic (Count I), Atlantic fails to adequately address (i) the unambiguous language in the Contract providing that General Maritime Law shall be the exclusive law and (ii) the relevant Fifth Circuit precedent highlighted in the Debtors' Amended Complaint, which sets forth the applicable two-part test for determining whether a contract is a maritime contract.  *See* Compl. ¶ 34 (citing *In re Larry Doiron, Inc.*, 879 F.3d 568 (5th Cir. 2018) (*en banc*), *cert. denied*, 138 S. Ct. 2033 (2018)).  Atlantic likewise completely ignores the statute that forms the heart of the Debtors' Count II—43 U.S.C. § 1337(e)—not even citing it once, which leads to a failure to adequately respond to either Count II or Count III.  *Compare* Compl. ¶ 39.  As further detailed below, Atlantic's arguments in support of dismissal of Counts II and III fail for three, independent reasons: 1) Atlantic's analysis fails to address the relevant question, which is whether the seizure and sequestration of the WIO's "operating interests" in federal leases is possible within the applicable federal regulatory framework and whether that seizure and sequestration requires Interior's approval; 2) Atlantic's assertion that a writ of sequestration does not constitute a transfer completely ignores the OCSLA

and regulatory provisions that address what types of "transfers" require the DOI's approval, instead pointing to whether a writ of sequestration constitutes a "transfer" under Louisiana law (*see* MTD 25–26); and 3) even if seizure and sequestration procedure do not constitute a "transfer of title," neither Count II nor Count III is dependent upon a finding of transfer of title given that DOI's approval is required not only for a "transfer of title or the sale" of a lease, but also any time lease interests are "*otherwise transferred*" (*see* 43 U.S.C. § 1337(e) (emphasis added)).

6.      For these reasons and as set forth below, the Court should deny Atlantic's Motion in its entirety.

## **STATEMENT OF FACTS**

### I.     **The Debtors' Contractual Obligations to Remove Liens, Defend the WIOs, and Indemnify the WIOs Under Contracts the Debtors are Assuming**

7.      The Debtors currently hold (or previously held) interests in the following federal offshore oil and gas leases, which are subject to the jurisdiction of the DOI and pertain to locations in the U.S. Gulf of Mexico: MC-948; GC-40; MC-519; VK-962; and VK-826.  The Debtors jointly own working interests in certain of the Leases with co-working interest owners, Ecopetrol, Ridgewood, and Prospect (collectively, the "**WIOs**").

8.      Pursuant to certain joint operating agreements, Fieldwood has contractual obligations to its WIOs to, among other things, (i) keep the Leases free and clear of all liens and encumbrances, (ii) defend the WIOs in any litigation on the leases, and (iii) indemnify each of the WIOs.

9.      Fieldwood, Ecopetrol, and Talos Energy Offshore LLC ("**Talos**") are party to that *Unit Operating Agreement Gunflint Prospect Gunflint Unit Offshore Louisiana* (the "**Gunflint JOA**") covering, among other properties, MC-948.  Choi Decl. Ex. 21.

10.     The Gunflint JOA provides, in relevant part:

4

Section 5.4 – Liens and Encumbrances: The Operator [Fieldwood] shall use reasonable efforts to keep the Leases, Production Systems, Facilities and other equipment and any jointly owned Hydrocarbons **free from all liens and encumbrances**, except those provided for in Article 6.3 (Security Rights), which might arise by reason of the operations conducted under [the Gunflint JOA].

Section 22.1 – Individual Obligations: The obligations, duties and liabilities of the Parties shall be several and not joint or collective; and, nothing contained in [the Gunflint JOA] shall ever be construed as creating a partnership, joint venture, association or other character of business entity recognizable in law for any purpose. **Each Party shall hold all the other Parties harmless from liens and encumbrances on the Leases or in the Contract Area arising as a result of its acts or omissions.**

Section 22.4 – Defense of Claims and Lawsuits: **The Operator [Fieldwood] shall supervise the conduct of any claims and litigation.**

Choi Decl. Ex. 21 (emphasis added).

11.     In addition, Fieldwood, Ridgewood, and Prospect are parties to that *GC 40 Unit Operating Agreement* (the "**GC-40 JOA**," collectively with the Gunflint JOA, the "**Joint Operating Agreements**") covering, among other properties, GC-40.  Choi Decl. 22.

12.     The GC-40 JOA provides, in relevant part:

Section 5.4 – Liens and Encumbrances: The Operator [Fieldwood] shall endeavor to keep the Leases, Production Systems, Facilities and other equipment and any jointly owned Hydrocarbons **free from all liens and encumbrances** that might arise by reason of the activities or operations conducted under [the GC-40 JOA].  If a lien is placed on the Leases, Production Systems, Facilities, other equipment or any Hydrocarbons, **the Operator shall make reasonable efforts to remove the lien**.

Section 22.4 – Defense of Claims: **The Operator [Fieldwood] shall supervise the handling, conduct, and prosecution of all Claims** involving activities or operations under [the GC-40 JOA] or affecting the Leases or the Unit Area.

Choi Decl. Ex. 22 (emphasis added).

5

13.     As further discussed below, the Debtors seek to assume the Joint Operating Agreements pursuant to their Plan, which will be reflected in the Plan Supplement the Debtors intend to file on May 26, 2021.

## II.     Atlantic Filed Lawsuits Against the Debtors' Co-Working Interest Owners, Violating the Automatic Stay, and Filed Claims Against the Debtors

14.     On November 13, 2020, Atlantic filed two *in rem* lawsuits in the United States District Court for the Eastern District of Louisiana (each, a "**Lawsuit,**" and collectively, the "**Lawsuits**")[4] against the WIOs.  The Lawsuits arise out of amounts that the Debtors allegedly owe Atlantic and Atlantic's attempts to enforce its alleged liens on the WIOs' interests in certain offshore leases in the Gulf of Mexico—affecting MC-948 and GC-40—and to collect approximately $13 million from the WIOs by seizing and sequestering the WIOs' "operating interests" in those leases under LOWLA.  Because the Statements of Privilege recorded by Atlantic explicitly target "the operating interest of Fieldwood Energy LLC[,]" and because certain Debtors must indemnify the WIOs under joint operating agreements, as discussed below, the claims in the Lawsuits seek to collect on account of the obligations of the Debtors (indeed, the WIOs have no contractual privity with Atlantic) and, for all practical purposes, are claims against the Debtors. *See* Hr'g Tr. 44:7 (Nov. 25, 2020) (finding the Debtors have an identity of interests with the WIOs).

## III.     Claims Asserted by WIOs Against the Debtors

15.     As a result of Atlantic filing the Lawsuits, each of the WIOs filed proofs of claims against the Debtors.

---

[4] The two Lawsuits are as follows: Cause No. 2:20-cv-03097, *Atlantic Maritime Services, LLC v. Ecopetrol America, LLC*; and Cause No. 2:20-cv-03099, *Atlantic Maritime Services, LLC v. Ridgewood Katmai, LLC and ILX Prospect Katmai, LLC*.  Choi Decl. Ex. 16–17.

16.     Ecopetrol filed a secured claim for $7,075,684.85 asserting "all rights and entitlement . . . to indemnification, contribution, reimbursement or other payments . . . from Fieldwood pursuant to applicable contractual agreements and law." *See* Proof of Claim No. 455, add. ¶ 4.  In particular Ecopetrol alleges that Fieldwood failed to keep the applicable Leases free from liens and encumbrances (in violation of Gunflint JOA Section 5.4) and failed to indemnify Ecopetrol regarding the Leases (in violation of Section 22.1).  Ecopetrol listed the known liens on the Leases, the largest of which was that held by Atlantic totaling $5,824,744.

17.     Ridgewood also filed a secured claim for $20,046,112.78.  *See* Proof of Claim No. 875, add. ¶¶ 1–2.  Ridgewood claims that the Debtors owe it in relation to various liens on the wells filed under LOWLA and for indemnification in relation to those liens.  Ridgewood specifically identified Atlantic's lawsuits.  *Id.* at 10 ("Atlantic[] has filed an in rem complaint against Ridgewood and ILX Prospect . . . and are seeking recognition and enforcement of their lien against the subject interest and a writ of sequestration against the subject interests.").  Ridgewood further asserts that "Debtor admitted that it is liable to Ridgewood on an indemnification basis for any costs paid by Ridgewood in connection with the filed liens and/or [] Lawsuit."  *Id.*  Of the liens Ridgewood identified as encumbering the property, Atlantic held the largest single lien at $6,973,379.

18.     Prospect filed a similar secured claim totaling $20,045,635.65 against the Debtors, and identified the same Atlantic lien amount as Ridgewood.  *See* Proof of Claim No. 874.

## IV.     <u>Atlantic's Claims Against the Debtors</u>

19.     On November 24, 2020, Atlantic filed a Proof of Claim against the Debtors, asserting claims $14,750,269 for goods and services provided in connection with the Leases.  Proof

of Claim 91-1.  Atlantic asserts that $13,875,233 of its claims are secured by privileges filed under

LOWLA on five wells—MC-948, GC-40, MC-519, VK-962, and VK-826.

20.     Although Atlantic now concedes that its alleged liens in the Encumbered Leases

are junior to the Senior Liens and that there is insufficient value to treat Atlantic as a secured

creditor with respect to such Encumbered Leases, Atlantic also asserts that it holds a claim for

approximately $25,000, which it alleges is secured by a privilege against VK-826 (the

"**Unencumbered Lease**"), which is not encumbered by any of the Senior Liens.  *See* Proof of

Claim 91-1.  Therefore, to the extent this Court determines that Atlantic's privilege against the

Unencumbered Lease is valid and enforceable (which the Debtors dispute), Atlantic holds a

$25,000 secured claim against the Debtors, which would be classified as an "Other Secured Claim"

in Class 1 under the Plan.

## **ARGUMENT**

### I.     **Each of the Debtors' Counts Raises a Case or Controversy**

21.     Atlantic has abandoned its position that it is a secured creditor "solely with respect

to Fieldwood's property" and concedes that "Atlantic's liens are junior in priority to those asserted

by Fieldwood's lenders" and "[t]here is not enough value to treat Atlantic as a secured creditor in

this bankruptcy."  *See* MTD 2, 9.  However, for the reasons discussed below, Atlantic's stipulation

that certain of its liens are junior to the Lenders' liens only renders Count V moot, and Atlantic's

remaining mootness, standing, and ripeness arguments otherwise fail as a matter of law.

#### A.     **Atlantic's Stipulation that Certain of its Alleged Liens are Junior to the Lenders' Senior Liens Does not Render Count I–IV (Challenges to the Validity of the Alleged Liens) or Count VI Moot**

22.     "A case becomes moot—and therefore no longer a 'Case' or 'Controversy' for

purposes of Article III—'when the issues presented are no longer 'live' or the parties lack a legally

cognizable interest in the outcome.'" *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 91 (2013) (quoting *Murphy v. Hunt*, 455 U.S. 478, 481 (1982) (per curiam)). Counts I–IV and VI all present live issues.

23. Atlantic's concession that certain of its claims will be classified as general unsecured claims in Class 6B of the Debtors' Plan does not resolve the relief requested in Counts I–IV. An actual controversy remains as to the validity and enforceability of Atlantic's alleged Louisiana privileges asserted against the Debtors' property and the WIOs' property interests. As further discussed in the standing and ripeness sections below, regardless of the class of treatment of Atlantic's claims (certain of which would be deemed "Other Secured Claims" in Class 1 if the Court determines that Atlantic holds a valid and enforceable privilege against the Unencumbered Lease under Louisiana law), as a direct result of Atlantic filing the Lawsuits against the WIOs and asserting privileges against the WIOs' property interests, the WIOs have asserted direct, contractual claims against the Debtors, including (among others) secured indemnification claims. Moreover, given that the Debtors are seeking to assume the Joint Operating Agreements,[5] each of the WIOs have cure claims against the Debtors such that the Debtors are required to cure any and all existing breaches under the Joint Operating Agreements.

24. The controversy at hand arose when Atlantic filed liens against the interests of the Debtors and sought to enforce those liens against three WIOs of the Debtors. Atlantic now seeks to expand the number of parties affected by the issues in this controversy. The fact that Atlantic filed an opposed motion seeking relief from the automatic stay to file ***additional lawsuits*** against certain of the Debtors' other co-working interest owners, Red Willow and Houston Energy, only

---

[5] The Debtors' Plan Supplement deadline is May 26, 2021.

provides further evidence of an "actual case or controversy." Accordingly, Atlantic's mootness arguments fail.

### B. The Debtors Have Standing to Assert the Claims in the Complaint

25. The Fifth Circuit has interpreted the actual controversy requirement under the Declaratory Judgement Act to be identical to the Article III case or controversy requirement. *See Texas v. W. Pub. Co.*, 882 F.2d 171, 175 (5th Cir. 1989). Specifically, "[a] declaratory judgment may issue only to resolve an actual controversy, a term identical to the requirement in Article III of the Federal Constitution, *i.e.*, "a dispute that is 'definite and concrete, touching the legal relations of parties having adverse legal interests' and that 'can presently be litigated and decided and not hypothetic, conjectural, conditional' or based upon the possibility of a factual situation that may never develop." *Honey Holdings I, Ltd. v. Alfred L. Wolff, Inc.*, 81 F. Supp. 3d 543, 555 (S.D. Tex. 2015) (citing *Val–Com Acquisitions Trust v. Chase Home Finance, LLC*, 428 Fed. App'x. 364, 365 (5th Cir.2011) (citations omitted); *Orix Credit All. v. Wolfe*, 212 F.3d 891, 896 (5th Cir.2000)). The threat of litigation may be sufficient to establish a controversy upon which to base a declaratory judgment. *Orix Credit All.,* 212 F.3d at 897. When there are contingencies remaining, the court "must take into account the likelihood that these contingencies will occur." *Id.*

26. The Debtors have standing because an actual controversy exists with respect to Counts I–IX (except for Count V, which is now moot). The validity, enforceability, and potential extinguishment (under the Plan) of Atlantic's alleged Louisiana privileges against the Debtors (and working interest of the WIOs) are in dispute. Furthermore, Atlantic's actions in these chapter 11 cases—particularly alleging liens against the WIOs' property interests and filing the lawsuits to enforce such alleged liens against the WIOs—have already caused (and continue to cause) significant harm to the Debtors and their estates.

27.     As the Court determined after a hearing on the *Debtors' Emergency Motion to Extend the Automatic Stay to Certain of the Debtors' Co-Working Interest Owners* (Docket No. 3), allowing Atlantic to proceed in litigating the Lawsuits against the WIOs would have violated the automatic stay and would have disrupted the Debtors' bankruptcy process.  By filing the Lawsuits, Atlantic forced both the Debtors and the WIOs to spend significant time and resources defending the Lawsuits.  Additionally, Atlantic's filing the Lawsuits impacted the Debtors' working relationship with the WIOs.

28.     In addition to the harm caused by filing the original lawsuits against Ecopetrol, Prospect, and Ridgewood, Atlantic now asks this Court to lift the automatic stay to allow Atlantic to file **additional lawsuits** against other co-working interest owners: Red Willow and Houston Energy.  The relief requested in the new motion to lift the automatic stay presents further harm to the Debtors and their estates.

29.     Further, each of the WIOs have asserted breach of contract clams against the Debtors in response to, and on account of, Atlantic's claims.  **First**, the Debtors have a contractual obligation under the Gunflint and GC-40 JOAs to keep the Leases free from all liens.  Choi Decl. Ex. 21, § 5.4; Choi Decl. Ex. 22, § 5.4.  Atlantic has placed privileges, that is, "liens," on interests in the relevant leases, thereby triggering the Debtors' duty to try to remove them. By this Adversary Proceeding, the Debtors are complying with that contractual duty.  **Second**, the Debtors have a duty to supervise the conduct of all claims against the Leases.  Choi Decl. Ex. 21, § 22.4; Choi Decl. Ex. 22, § 22.4.  Atlantic sued the WIOs, thereby triggering the Debtors' duty to defend them. *See* Gunflint JOA § 5.4; GC-40 JOA § 5.4.

30.     In order to resolve the WIOs' claims against the Debtors as part of the claims resolution process, this Court will need to make determinations regarding, among other things, the

11

validity and enforceability of the privileges asserted by Atlantic (*i.e.*, Counts I–IV) and/or the extent to which treatment of Atlantic's claims against the Debtors under the Plan extinguishes the alleged privileges under Louisiana law. Indeed, to the extent it is determined that Atlantic does not hold valid liens against one or more of the Leases (*i.e.*, Counts I–IV), the WIOs' claims against the Debtors will be reduced or resolved accordingly. Similarly, to the extent it is determined that treatment of Atlantic's claims under the Plan extinguish any valid liens held by Atlantic, the WIOs' claims against the Debtors will be reduced or resolved accordingly.

31.     Moreover, in addition to the existing proofs of claim filed by the WIOs against the Debtors, the Debtors are seeking to assume the Joint Operating Agreements. Consequently, the Debtors are required to cure any existing breaches, including the alleged breaches under the Joint Operating Agreements relating to the Debtors' failure to keep the Leases free and clear of liens, its duty to defend, and its duty to indemnify.

32.     Finally, even if Atlantic's stipulation that certain of its liens are junior to the Lenders' liens had any relevance to Atlantic's standing argument (which it does not), Atlantic also filed a statement of privilege in the amount of approximately $25,000 against the Unencumbered Lease, which is not encumbered by any existing liens. Therefore, to the extent Atlantic holds a valid and enforceable lien against the Unencumbered Lease (which the Debtors dispute), Atlantic would hold an "Other Secured Claim" in Class 1 under the Plan. For these reasons, the Debtors have standing to bring these claims.

33.     Atlantic's standing argument is unpersuasive. The only case Atlantic cites to support its argument is *Harris v. Pyramid GOM, Inc. (In re Capco Energy, Inc.)*, 2012 WL 253148 (Bankr. S.D. Tex. Jan. 25, 2012), but *Capco Energy* is readily distinguishable. In *Capco Energy*, this Court found that third-party guarantors of a note lacked standing to argue the note should be

rescinded or cancelled because they were not directly injured by enforcement of the underlying note. *Id.* at *3.

34.     *Capco Energy* is distinguishable for a number of reasons.  First, as discussed above, the Debtors have a duty as operator of the lease to clear the lease of any liens.  Thus, the Debtors are contractually bound to intervene and defend the WIOs from Atlantic's purported lien.  Second, this Court has already found the Debtors and WIOs share an identity of interests; the WIOs' interest in invalidating Atlantic's lien is the same as the Debtors'.  *See* Hr'g Tr. 44:7 (Nov. 25, 2020).  Third, Atlantic and the WIOs lack contractual privity.  Fourth, as a practical matter, Atlantic will have to face challenges to the validity and enforceability of its alleged privileges, and the defense that satisfaction of the underlying debt pursuant to the Debtors' Plan extinguished any valid privileges Atlantic had.

35.     Accordingly, the Debtors have standing to challenge the validity and enforceability of Louisiana privileges (and seek a determination regarding the Plan's impact on such privileges) where the Debtors bear liability for all expenses and costs incurred by the WIOs on account of Atlantic's attempt to seek a recovery from the WIOs to satisfy the Debtors' debt to Atlantic.  The Debtors are injured and have standing to seek redress.

**C.     The Debtors' Count VI is Ripe for Resolution**

36.     The key considerations in determining whether a case is ripe are "the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." *New Orleans Pub. Serv., Inc. v. Council of City of New Orleans*, 833 F.2d 583, 586 (5th Cir. 1987) (internal citations omitted).  The Debtors' Count VI requests that the Court declare that the satisfaction, settlement, and discharge of Atlantic's claims against the Debtors pursuant to the Plan extinguishes any valid and enforceable Louisiana privileges securing such claims.  The Debtors'

13

Count IX requests entry of a permanent injunction based on success in Counts I, II, III, IV and/or VI. *See* Compl. ¶ 100. Both Count VI and Count IX are ripe for resolution.

37. ***First***, regarding fitness of the issues, the Court is well aware of the issues between the Debtors and Atlantic because they pertain to the Debtors bankruptcy and this matter. The hearing to consider confirmation of the Plan is currently scheduled to be heard by the Court on June 9, 2021, one day after the Court is scheduled to hear oral arguments on the parties' pending motions. In addition, this Court will need to determine the amount of the WIOs' cure claims against the Debtors in connection with assumption of the Joint Operating Agreements. The amount of the WIOs' cure claims will be determined, at least in part, on this Court ruling regarding whether treatment of Atlantic's claims under the Plan extinguishes any valid privileges held by Atlantic (to the extent the Court finds that Atlantic holds any such valid privileges). As such, both Count VI and Count IX are fit for judicial action.

38. ***Second***, the Debtors have already, and will continue to face hardship should the Court refrain from adjudicating the matter. Atlantic claims that Fieldwood has not suffered actual harm because any harm to Fieldwood that may result from its liens against the WIOs has not occurred, but depends upon "three separate contingent events: (1) Fieldwood agreeing to a post-effective date obligation to indemnify the working interest owners; (2) Atlantic successfully prosecuting its litigation against the working interest owners; and (3) the working interest owners proving that whatever litigation result Atlantic achieves against them is indemnifiable under whatever post-effective date indemnification obligations Fieldwood has taken on." *See* MTD 13. Atlantic's argument is misplaced, as none of these alleged "contingent events" need to occur for Fieldwood to suffer harm. Regardless of whether the Debtors assume the Joint Operating Agreement the indemnification obligations thereunder (which the Debtors are, in fact, seeking to

assume), this Court will need to adjudicate Count VI to resolve the secured claims under the Joint Operating asserted by the WIOs (to the extent the Court does not grant the Debtors' relief in Counts I, II, III, or IV). Additionally, Atlantic need not be "successful" in prosecuting its litigation against the WIOs. The Debtors have contractual obligations to keep the applicable Leases free and clear of liens and to defend the WIOs against liens asserted against the applicable Leases. Finally, the third alleged contingency is not a contingency at all—the Joint Operating Agreements require the Debtors to defend and indemnify the WIOs and the WIOs have, in fact, already invoked those provisions in the proofs of claim filed against the Debtors.

39.      In support of this argument, Atlantic cites two easily distinguishable cases. In the first, the court found the dispute was not ripe because there were "a multitude of scenarios"—to be precise, at least nine widely varying scenarios dependent on, among other things, numerous unpredictable future decisions by a multitude of actors—"under which all of this would have turned out to be an idle exercise, or the wrong exercise, because later factual developments changed or eliminated the issues to be decided." *In re Adelphia Commc'ns Corp.*, 307 B.R. 432, 436 (Bankr. S.D.N.Y. 2004). Here, the only question is whether the Court will confirm the Debtors' Plan. In the second case, the court had been asked to rule with respect to a lawsuit not yet filed, the "nature of the claims" for which were still unclear; but here, Atlantic has already filed the Lawsuits, Atlantic and the WIOs have also already filed proofs of claim against the Debtors regarding the same underlying claim where the Debtors and the WIOs share an identity of interest, and confirmation is scheduled to be heard on June 9. *In re Cubic Energy, Inc.*, 587 B.R. 849, 855 (Bankr. D. Del. 2018). There is no question of a "hypothetical set of facts" (*id.* at 857); there is only one fact unknown to the Parties, which this Court itself will soon resolve. As the Debtors have already been harmed by Atlantic's actions, the Debtors will face significant hardship should

the Court refrain from adjudicating Count VI and Count IX, both of which would mitigate the harm to the Debtors. As such, both Count VI and Count IX are ripe for resolution.

## II. The Debtors Have Stated a Claim On All Counts

40. The Court should deny Atlantic's Motion because the Debtors have adequately stated claims for relief in Counts I, II, III, IV, and VI.

### A. Because Fieldwood Has Sufficiently Alleged that Maritime Law Applies, Count I Should Not Be Dismissed

41. In its Motion, Atlantic asserts that General Maritime Law does not apply to Atlantic's contract with Fieldwood. MTD 23. This assertion is incorrect as a matter of law and fact. Atlantic's argument is misdirected and ignores the plain and unambiguous well pleaded facts of the Debtors' detailed Complaint as well as the clear language of the Contract—"THIS CONTRACT SHALL BE CONSTRUED AND THE RELATIONS BETWEEN THE PARTIES DETERMINED EXCLUSIVELY IN ACCORDANCE WITH THE GENERAL MARITIME LAW OF THE UNITED STATES"—which is for vessel services and incorporates the General Maritime Law of the United States as the governing law. Choi Decl. Ex. 18, cl. 106.

42. Controlling precedent of the Fifth Circuit recognizes that the Contract between Fieldwood and Atlantic is a maritime contract. Atlantic does not dispute that the contract in question is a maritime contract governed by maritime law or that it provided a vessel, namely the *Rowan Resolute*. Atlantic also does not dispute that its invoices all related to services provided by the vessel, which services are subject to and governed by maritime law.

43. Conspicuously absent from Atlantic's Motion is any discussion of the terms of its Contract with Fieldwood and the Fifth Circuit's *en banc* decision in *In re Larry Doiron, Inc.*, 879 F.3d 568 (5th Cir. 2018) (*en banc*), *cert. denied*, 138 S. Ct. 2033 (2018), pursuant to which

Atlantic's contract is unquestionably "Maritime" in nature, necessitating the application of General Maritime Law.

44.     "[T]he true criterion" for determining whether a contract is a maritime contract "is whether it has reference to maritime service or maritime transactions." *Norfolk S. R.R. Co. v. Kirby*, 543 U.S. 14, 224 (2004) (internal quotations omitted); *see also Exxon Corp. v. Cent. Gulf Lines, Inc.*, 500 U.S. 603, 608 (1991) (noting that the protection of maritime commerce is the fundamental interest giving rise to maritime jurisdiction). In *Doiron*, the Fifth Circuit (following the Supreme Court's *Norfolk Southern Railway* decision) adopted a two-part test to determine whether a contract for services relating to offshore exploration and production operations is "maritime":

> First, is the contract one to provide production of oil and gas on navigable waters? . . . .
>
> Second, if the answer to the above question is 'yes,' does the contract provide or do the parties expect that a vessel will play a substantial role in the completion of the contract?

879 F.3d at 576-577; *see In re Crescent Energy Servs., L.L.C.*, 896 F.3d 350 (5th Cir. 2018) (following *Doiron* and determining that contract to plug and abandon wells on small fixed platforms in state coastal waters was a maritime contract where vessels played a substantial role in contract; state anti-indemnity act was not applicable).

45.     The *Doiron* factors are easily satisfied here based on the well plead allegations of the Debtors. The Contract (which expressly incorporates General Maritime Law[6]) plainly provides for Atlantic to perform work (*e.g.*, drilling, recompleting, sidetracking) from the drillship *Rowan*

---

[6] *See* Choi Decl. Ex. 18, cl. 106 ("Governing Law") ("THIS CONTRACT SHALL BE CONSTRUED AND THE RELATIONS BETWEEN THE PARTIES DETERMINED EXCLUSIVELY IN ACCORDANCE WITH THE GENERAL MARITIME LAW OF THE UNITED STATES, NOT INCLUDING ANY OF ITS CONFLICTS OF LAW RULES WHICH WOULD DIRECT OR REFER TO THE LAWS OF ANOTHER JURISDICTION.").

*Resolute* on certain wells located on the outer continental shelf ("**OCS**") in the Gulf of Mexico in order to "provide production" from those wells. *Doiron*, 879 F.3d at 576-577.

46.     The Fifth Circuit's decision in *Theriot v. Bay Drilling Corp.*, 783 F.2d 527 (5th Cir. 1986), is also informative. There, the Court held that "oil and gas drilling on navigable waters aboard a vessel is recognized to be maritime commerce." *Id*. at 538–39.[7] Under the contract at issue in *Theriot*, the service provider "provided equipment, materials, supplies, and services necessary to the drilling and completion of [a] well." *Id*. Similarly here, under the Contract, Atlantic provided the *Rowan Resolute* (a vessel) "to have one or more offshore wells drilled, recompleted, sidetracked, or worked over." Choi Decl. Ex. 18, pmbl. In *Theriot*, the contract "did not merely touch incidentally on a vessel, but directly addressed the use and operation of" a vessel. 783 F.2d at 538; *see Lewis v. Glendel Drilling Co.*, 898 F.2d 1083, 1086 (5th Cir. 1996) ("Since at least as early as 1970, our authorities have identified contracts for offshore drilling and mineral operations involving the use of a "vessel" as maritime in nature."). Here, too, the contract at issue "directly addressed the use and operation" of the drillship *Rowan Resolute*. Thus, because the Contract is plainly a contract "to provide production of oil and gas on navigable waters," the first *Doiron* factor is met.

47.     Atlantic does not seriously dispute that the *Rowan Resolute* is a vessel. Because the services that Atlantic provided from aboard its drill ship *Rowan Resolute*—indisputably a "vessel"[8]—played a "significant and substantial" (*Doiron*) role in Atlantic's performance under the Contract, the second *Doiron* factor is also met.

---

[7] In *Theriot*, the Court explained that contracts providing for "oil and gas drilling on navigable waters aboard a vessel" had, even then, historically been treated as "maritime in nature." *Theriot*, 783 F.2d at 538–39 (discussing *Corbitt v. Diamond M. Drilling Co.*, 654 F.2d 329 (5th Cir. 1981) and *Transcon. Gas Pipe Line Corp. v. Mobile Drilling Barge* 424 F.2d at 691 and explaining that in both cases the contracts at issue "were directly and proximately linked to a vessel in a maritime activity.").

[8] "[T]he word vessel [under 1 U.S.C. § 3] includes every description of watercraft or other artificial contrivance used, or capable of being used, as a means of transportation on water." *See Stewart v. Dutra Constr. Co*., 543 U.S. 481, 490

48. Atlantic relies on *Gardes Directional Drilling v. U.S. Turnkey Exploration Co.*, 98 F.3d 860 (5th Cir. 1996), for the proposition that state law governs any claim of Atlantic arising out of the contract. *Gardes* is not controlling because it pre-dates *Doiron* and is factually distinguishable. In contrast to Atlantic's direct contract with the Debtors, *Gardes* involves lien claims of subcontractors (who had no direct contract with the operator/offshore lessee) against property that was once located on an offshore structure (*i.e.*, drilling platforms, employee housing and a heliport). *Gardes* does not involve a lien claim against a working interest owner's "operating rights" in federal offshore leases and does not involve claims arising out of a maritime contract between the service provider/lien claimant and the operator. There, the court noted:

> The Owners agree that there was no contract between themselves and the Providers. Rather they argue that the contract that existed between the Providers and U.S. Turnkey was governed by maritime law and that this law, therefore governs these proceedings. We cannot accept this argument. The claim in this case is to enforce rights provided under the Lien Act, specifically the right to hold the owner of a lease liable to subcontractors for the debts of a contractor operating on the site. This claim arose from services the Providers gave to U.S. Turnkey; that there was a contract which detailed the working relationship between these entities is irrelevant. The cases cited by the Owners, such as *Smith v. Penrod Drilling Corp.*, 960 F.2d 456 (5th Cir. 1992) and *Theriot v. Bay Drilling Corp.*, 783 F.2d 527 (5th Cir. 1986), deal explicitly with contract claims, *e.g.*, indemnity provisions, whereas the claim here is extra-contractual. As such, the saltiness of the contract between the Providers and U.S. Turnkey does not mandate the application of maritime law.

98 F.3d at 865. Here, Atlantic's claim is not "extra-contractual" but rather arises directly out of its maritime contract with the Debtors.

---

(2005) (discussing 1 U.S.C. § 3 and holding that a dredge was a "vessel" for purposes of the Longshore and Harbor Workers' Compensation Act.).

**B.    Because Fieldwood Has Sufficiently Alleged that Atlantic Seeks to Transfer Offshore Federal Lease Interests Without the DOI's Approval, Counts II and III Should Not Be Dismissed**

49.    In urging the Court to dismiss Counts II and III of the Debtors' Complaint, Atlantic asserts that there is no applicable federal law that "eliminates LOWLA" and, thus, that LOWLA applies, and Atlantic asserts that the Counts should be dismissed because, under Louisiana law, a writ of sequestration "merely preserves the status quo and does not result in either a transfer of title or the sale of property."  Atlantic's argument fails for three, independent reasons.

50.    *First*, Atlantic's assertion that state law must apply because "there is no federal lien law that eliminates LOWLA" misses the mark under the Supreme Court's recent decision in *Parker Drilling Management Services Ltd. v. Newton*, 139 S. Ct. 1881 (2019).  In *Parker Drilling*, the Supreme Court explained that the question under OCSLA's adjacent state law provision is "whether federal law has already addressed the relevant issue."  *Id.* at 1889.  Here, the "relevant question" is whether the seizure and sequestration of the WIO's "operating interests" in federal leases is possible within the applicable federal regulatory framework and whether that seizure and sequestration requires Interior's approval.  OCSLA and its implementing regulations "already address[]" this issue.  Congress was comprehensive in requiring the DOI approval where a lease interest is "sold, exchanged, assigned, *or otherwise transferred*" (43 U.S.C. § 1337(e) (emphasis added)); and BOEM's regulations comprehensively require any "transfer" of Record Title or Operating Rights through a BOEM-approved "assignment."

51.    It is of no moment that the federal framework does not explicitly address liens on federal lease interests or sequestration of federal lease interests.  In *Parker Drilling* the Supreme Court recognized that "it is conceivable that state law might be 'inconsistent' with federal law . . . even absent an on-point federal law."  *Id.* at 1892, n.2.  The Court explained that "federal law might contain a deliberate gap, making state law inconsistent with the federal scheme."  *Id.*  That

is exactly what has happened here. Had Congress intended to preclude the "transfer" of lease interests through liens, seizures, and sequestrations from the requirement of Interior's approval, it could have easily created that exception. Instead, by including the expansive phrase "or otherwise transferred" in 43 U.S.C. § 1337(e), Congress was crystal clear that *any* "transfer" of a lease interest requires Interior's approval.[9] And, had BOEM intended to provide for the "transfer" of Record Title and Operating Rights through liens, seizures, and sequestrations, it could recognized those transfer mechanisms in its regulation. But instead BOEM's regulations are clear that the *only* mechanism through which Record Title or Operating Rights interests—the "operating interests" targeted by Atlantic's lawsuits—may be transferred is through an assignment using a BOEM-established form and with the DOI's approval. The regulatory silence regarding state law liens and sequestration makes it clear that neither Congress nor the DOI found it appropriate to allow the transfer of interests in federal leases through application of state law liens and sequestration.

52.    ***Second***, although Atlantic asserts that a "writ of sequestration is not a 'transfer'" requiring Interior's approval under OCSLA and its implementing regulations, Atlantic *completely ignores* the OCSLA and regulatory provisions that plainly address what types of "transfers" require the DOI's approval, instead pointing to whether a writ of sequestration constitutes a "transfer" under Louisiana law. MTD 25–26. But, under the OCSLA adjacent state law analysis, the

---

[9] *See Gooch v. U.S.*, 297 U.S. 124 (1936) (interpreting the catch-all term "otherwise" broadly to expand upon specifically identified statutory terms); *Sierra Club v. Seaboard Farms, Inc.*, 387 F.3d 1167 (10th Cir. 2004) (applying statutory catch-all phrase in non-restrictive manner and stating: "[T]he statute provides a catch-all provision in subpart (B) ('any site or area where a hazardous substance has been deposited, stored, disposed of, or placed, or otherwise come to be located[]')[.] … Applying the normal principles of statutory construction, subpart (B) encompasses 'any site or area where a hazardous substance' has 'come to be located.' Giving 'effect to the unambiguously expressed intent of Congress,' . . . we must hold that the entire contiguous Dorman site is thus included."). *Cf.*, *U.S. Bank Nat'l Ass'n v. Springfield Prairie Props., LLC*, 2019 U.S. Dist. LEXIS 31975 (C.D. Ill. 2019) (broadly construing "otherwise transferred" as used in mortgage instrument and stating: "The Court concludes that 'Property' as used in section 1.13 encompasses the net income (Rents) and proceeds of them, from being 'conveyed,' 'disposed of' or 'otherwise transferred.' The means of transfer listed in section 1.13 can apply to intangible party.").

threshold question that must be answered *before* a state's law can be applied is "whether federal law has already addressed the relevant issue[.]" *See Parker Drilling*, 139 S. Ct. at 1889. And, as the Debtors clearly articulated in their Complaint, Louisiana law cannot apply here because "federal law has already addressed the relevant issue" (*id.*)—*viz.*, the manner in which the "operating rights" targeted by Atlantic's Lawsuits may be "transferred" and the types of "transfers" that require the DOI's approval. Compl. ¶¶ 38–46. Under the comprehensive statutory and regulatory framework that applies to transfers of interests in federal leases, the *only* manner in which the WIOs' "operating rights" targeted by Atlantic's lawsuits can be transferred is through an "assignment" approved by BOEM. *Id.* Because the Complaint adequately asserts "a set of facts in support of [its] claims which would entitle [it] to relief" pursuant to Counts II and III, Atlantic's motion to dismiss those Counts fails. *Brown v. Nationsbank Corp.*, 188 F.3d 579, 585–86 (5th Cir. 1999).

53.     ***Third***, Atlantic's arguments fail *regardless* of whether the seizure and sequestration procedure involves a transfer of title because neither Count II nor Count III is dependent upon a transfer of title. To the contrary, OCSLA is crystal clear that the DOI's approval is required not only for a "transfer of title or the sale" of a lease, as Atlantic urges, but also *any time lease interests are* "*otherwise transferred*." 43 U.S.C. § 1337(e) (emphasis added). Notably, Black's Law Dictionary defines "transfer" to include not only the conveyance of title but, more broadly, the "*creation of a lien or other encumbrance*" and "every method—direct or indirect, absolute or conditional, voluntary or involuntary—of disposing of or parting with property or with an interest in property, *including retention of title as a security interest* and foreclosure of the debtor's equity of redemption." Black's Law Dictionary (11th ed. 2019) (emphasis added). Consistent with Black's Law Dictionary's all-encompassing definition of "transfer," federal courts have repeatedly

22

held that when a legislature defines the term "transfer" in expansive rather than restrictive terms, that term captures *any conveyance* and not only a sale or the conveyance of title.

54.     For instance, in *OHA Inv. Corp. v. Bennu Oil & Gas, LLC*, the Southern District of Texas applied an expansive (rather than restrictive) interpretation of the language "otherwise transferred" in LOWLA (identical language to that used in OCSLA and relevant here).  570 B.R. 764 (Bankr. S.D. Tex. 2017) (granting motion to dismiss claims asserted under LOWLA).  There, the court was faced with the issue of whether the prospective sale of hydrocarbons prior to production constituted a "transfer" under LOWLA.  And there, the court concluded that the statutory phrase "otherwise transferred" was broad enough to capture that prospective sale, explaining: "even though the lessee may be transferring its property interest prior to the actual severance of the hydrocarbon from the ground, that transfer fits within the description of 'otherwise transferred.'"  *Id.* at 771.  Similarly here, Congress used the phrase "otherwise transferred" to make it clear that the DOI's approval is required not only for a sale or conveyance of title but also for any other "transfer" of the "operating interests" targeted by Atlantic's lawsuits.

55.     Courts have similarly acknowledged—and given effect to—the expansive manner in which the Bankruptcy Code defines "transfer"[10] to "include every means and manner by which property can pass from the ownership and possession of another[,]"[11] including the "attachment and the perfection of a security interest."[12]  Similarly, federal courts have repeatedly recognized—and given effect to—the Texas Uniform Fraudulent Transfer Act's ("TUFTA") definition of "transfer" as "any 'assignment, mortgage, exclusive license, or any other conveyance, alienation,

---

[10] The Bankruptcy Code (like Black's Law Dictionary) defines "transfer" to include "each mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing or parting" with property, including (but not limited to) "the creation of a lien" and "the retention of title as a security interest."  11 U.S.C. § 101(54).

[11] *In re Besing*, 981 F.2d 1488 (5th Cir. 1993)

[12] *Lehman Bros. Holdings v. JPMorgan Chase Bank*, 469 B.R. 415 (Bankr. N.Y. 2012).

or hypothecation of a copyright[.]"  Tex. Bus. & Com. Code § 24.002(12).  For instance, in *GE Captial Commer., Inc. v. Wright & Wright, Inc.*, the court explained: "The word [transfer] is used in its most comprehensive sense, and is intended to include every means and manner by which property can pass from the ownership and possession of another[,]" including through "seizure." 2009 U.S. Dist. LEXIS 121472 (N.D. Tex. 2009).[13, 14]

56.     Similarly here, in OCSLA Congress defined the scope of "transfers" to which the approval requirement applies in the *most expansive terms possible* by including the phrase "or otherwise transferred[.]"  30 U.S.C. § 1337(e).  Because in OCSLA Congress used the term "transfer" in the most expansive way possible, under OCSLA (like the Bankruptcy Code and the TUFTA), Congress plainly required the DOI's approval not only for the "sale" of a lease or the conveyance of "title" in a lease, as Atlantic urges, but also for any other "transfer" of the operating interests targeted by Atlantic's Lawsuits, *including* an encumbrance such as a lien and the seizure and sequestration procedure to enforce a lien.  Further, even if OCSLA's expansive use of the term "transfer" was not enough to answer this inquiry—which it is—BOEM's regulations are clear that the *only* way that a lessee may transfer either "Record Title" or "Operating Rights" interests in a lease—the "operating interests" targeted by Atlantic's lawsuits—is through an "assignment" *approved by the DOI.  See* 30 C.F.R. § 556.700(c).  Atlantic cannot create a gap in federal law by ignoring applicable federal law and focusing exclusively on the state law that it wishes to apply.

57.     Thus, Atlantic's argument for dismissal of Counts II and III on the basis that the Debtors have not alleged that "title would pass as a result of the issuance of sequestration" fails

---

[13] *See also United States v. Commer. Tech., Inc.*, 354 F.3d 378 (5th Cir. 2003) (in *dicta*, explaining that an encumbrance "may well have been a 'transfer' under" the expansive definition in TUFTA).

[14] Similarly, *In re Peregrine Entm't*, the court applied the Copyright Act's expansive definition of "transfer" and explained: "[W]hile the creation of a lien on a copyright may not give a creditor an immediate right to control the copyright, it amounts to a sufficient transfer of rights to come within the broad definition of transfer under the Copyright Act."  116 B.R. 194 (C.D. Cal. 1990).

because the Debtors' arguments in Counts II and III are not dependent on the transfer of title. Instead, and as the Debtors adequately alleged, because an exhaustive federal framework applies to the transfer of the "operating interests" targeted by Atlantic's lawsuits, Louisiana law cannot apply (Count II), and because the applicable federal framework expressly requires the DOI's approval to effectuate any transfer of the "operating interests" targeted by Atlantic, the DOI is a necessary and indispensable party to Atlantic's lawsuits (but the DOI cannot be added as a party due to its sovereign immunity) (Count III).

### C. Because Fieldwood Has Sufficiently Alleged that Mississippi Canyon Block 948 is "Adjacent To" Mississippi, Count IV Should Not Be Dismissed

58.  Count IV of the Debtors' Complaint asserts an alternative basis for challenging Atlantic's state law lien filings, which the Court will *only* reach *if* it rejects all of the Debtors' other Counts:  *viz.*, that *if* Louisiana law applies at all, it can *only* apply to Atlantic's claims pertaining to GC-40, because that lease affects the only offshore block that is "adjacent to" Louisiana.  While the Debtors agree that GC-40 is "adjacent to" Louisiana, the other four blocks are "adjacent to" either Alabama (MC-519, VK-962, and VK-826) or Mississippi (MC-948).  Because the issue of "adjacency" is typically adjudicated based on competing evidentiary submissions—both testimonial and documentary—the Debtors omitted Count IV from its Motion for Summary Judgment.[15]

59.  Choosing not to address the three blocks that the Debtors assert are "adjacent to" Alabama, Atlantic moves to dismiss the Debtors' Count IV only insofar as it concerns MC-948, asserting that the Debtors' "Complaint fails to state a claim that Mississippi is in fact the 'adjacent

---

[15] *See, e.g.*, *Total E&P USA, Inc. v. Marubeni Oil & Gas (USA), Inc.*, 389 F. Supp. 3d 478 (S.D. Tex. 2018) (adopting lengthy Report & Recommendation issued by Magistrate Judge Palermo); *Danos & Curole Marine Contractors, Inc. v. BP Am. Prod. Co.*, 61 F. Supp. 3d 679 (S.D. Tex. 2014); *Derise v. Chevron USA, Inc.*, 2005 U.S. Dist. LEXIS 46039 (W.D. La. 2005).

State' to MC-948 under OCSLA." But considering that the Court "must accept as true all well pleaded facts in [Count IV of the Debtors'] Complaint," and that Count IV can only be dismissed if the Debtors "can prove no set of facts in support of [the Debtors' claim that MC-948 is adjacent to Mississippi]," *Kaiser Aluminum & Chem. Sales, Inc. v. Avondale Shipyards, Inc.*, 677 F.2d 1045, 1050 (5th Cir. 1982), Atlantic's Motion fails.

60. Atlantic provides no convincing basis for dismissing the Debtors' alternative argument that, if it is necessary for the Court to reach the factually-driven "adjacency" issue, MC-948 is "adjacent to" Mississippi rather than Louisiana. ***First***, the Debtors could not more clearly have asserted that MC-948 is "adjacent to" Mississippi. *See* Compl. ¶ 54; Compl. App. 1. And, in any case, Atlantic's Motion simply recites the same decades-old four-factor test that the Fifth Circuit has adopted for the "adjacency" analysis that the Debtors identified in its Complaint,[16] and argues that Fieldwood cannot meet that test. But the Debtors' allegations are more than sufficient to satisfy the minimum pleading standards necessary to survive a motion to dismiss: the Debtors expressly assert facts relevant to each of the four jurisprudential factors: distance, treatment by federal agencies, prior court decisions, and projected boundaries. *See* Compl. ¶ 54; Compl. App.

61. Atlantic's primary argument concerns the Debtors' assertion that, based on the "projected boundaries," MC-948 is "adjacent to" Mississippi. But if anything is clear from the reported decisions in which courts have adjudicated "adjacency" disputes, it is that there is no established single method of "projecting boundaries" for this purpose and that no single factor in

---

[16] *See Reeves v. B&S Welding, Inc.*, 897 F.2d 178 (5th Cir. 1990); *Snyder Oil Corp. v. Samedan Oil Corp.*, 208 F.3d 521 (5th Cir. 2001).

the adjacency analysis is controlling.[17]  At issue is whether, when Mississippi's boundaries are projected "seaward to the outer margin of the outer Continental Shelf," 43 U.S.C. 1333(a)(2)(A), those "projected boundaries" will include MC-948.  The Debtors have alleged (and will prove, if necessary) that the "seaward" extension of Mississippi's boundaries—including the offshore boundary between state and federal waters—places MC-948 within an area that is "adjacent to" Mississippi.  That Atlantic may disagree with the Debtors over *how* to apply the Fifth Circuit's "projected boundary" factor does not warrant dismissal of the Debtors' claim.  In fact, other than disputing the Debtors' proposed methodology, Atlantic itself makes no assertion whatsoever concerning how to "project" the Mississippi "boundaries[.]"  If anything, this disagreement merely indicates that, as courts have done in numerous prior cases, this Court will make any "adjacency" determination after weighing the merits of the respective bodies of evidence offered by the Debtors and Atlantic, including evidence about the method(s) for projecting Mississippi's offshore boundaries.

> **D.** **Count VI Seeks a Declaration Regarding the Effect of Satisfying Atlantic's Claim Pursuant to the Plan Under LOWLA, Not a Third-Party, Non-Consensual Discharge or Release of the WIOs**

62.     In Count VI, the Debtors seek a declaratory judgment that upon the satisfaction, settlement, and discharge of Atlantic's ***claims*** against the Debtors pursuant to the Plan, any valid privileges held by Atlantic securing such claims under Louisiana law are extinguished under LOWLA.  The Debtors are not requesting that this Court discharge the WIOs or any other third party.  Indeed, Atlantic does not even hold claims against any of the WIOs or even have contractual privity with any of the WIOs.  Rather, in its attempt to collect on account of debts owed by the

---

[17] See *Reeves v. B&S Welding, Inc.*, *supra*; *Snyder Oil Corp. v. Samedan Oil Corp.*, *supra*; *Total E&P USA, Inc. v. Marubeni Oil & Gas (USA), Inc.*, *supra*; *Danos & Curole Marine Contractors, Inc. v. BP Am. Prod. Co.*, *supra*.

Debtors from the WIOs, Atlantic seeks to transform its alleged *in rem* claims against the WIOs' property interests into personal guarantees by the WIOs.

63. The Debtors' Plan says that "**in full and final satisfaction of and in exchange for** such [Allowed Claim], each holder of an [Allowed Claim] shall receive" certain distributions. *See* Plan §§ 4.6(a), 4.7(a) (Class 6A and Class 6B, respectively) (emphasis added). The Plan further provides that "any distributions and deliveries to be made on account of Allowed Claims under the Plan shall be **in complete and final satisfaction, settlement, and discharge of and exchange for** such Allowed Claims." Plan § 6.8 (emphasis added).

64. In support of its argument, Atlantic primarily relies on two inapplicable cases in the Fifth Circuit: *Edgeworth* and *Applewood*.[18]  In *Edgeworth*, the Fifth Circuit narrowly held that a debtor's discharge pursuant to section 524 of the Bankruptcy Code did not discharge the debtor's insurer from liability. *In re Edgeworth*, 993 F.2d 51, 53 (5th Cir. 1993). However, *Edgeworth* is distinguishable for a number of reasons. *First*, despite Atlantic's tortured attempt to frame Count VI as seeking a non-consensual, third-party discharge and release of claims against the WIOs, Count VI does not seek such relief. Rather, the Debtors are requesting a determination from this Court that treatment of Atlantic's claims pursuant to the Plan extinguishes any alleged liens securing such claims as a matter of interpretation under Louisiana law. The Debtors are not requesting that the discharge granted under section 524 of the Bankruptcy Code be extended to discharge personal liabilities of the WIOs. Indeed, the WIOs do not have any personal liabilities to Atlantic. Rather, the Debtors assert that as a result of confirming the Plan and therefore

---

[18] Atlantic also cites *Monroe* to support its assertion that LOWLA liens against non-estate property are not "discharged." *See* MTD, 18 (citing *See In re Monroe Well Serv., Inc.*, 67 B.R. 746 (Bankr. E.D. Pa. 1986)). However, the *Monroe* court did not consider (much less decide) whether satisfaction of a debt secured by a valid LOWLA privilege pursuant to a chapter 11 plan extinguished such LOWLA privilege. Rather, in reaching its decision to enjoin LOWLA claimants from asserting rights against non-debtors and balancing the parties' respective harms, the court noted that the injunction was limited in duration in the enforcement of their rights.

satisfying, settling, and discharging Atlantic's claim in exchange for the distribution provided

thereunder, any valid privileges securing such claims are extinguished under LOWLA.

65.     **Second**, the Fifth Circuit's decision in *Edgeworth* is grounded in, among other

reasons, findings that "[t]he 'fresh-start' policy is not intended to provide a method by which an

insurer can escape its obligations based simply on the financial misfortunes of the insured" and

"allowing commencement or continuation of such actions does not inequitably burden the debtor."

*Id*. at 54; *see In re Tailored Brands, Inc.*, No. 20-33900, 2021 WL 2021472, at *3 (Bankr. S.D.

Tex. May 20, 2021) ("An application of the insurer exception must be predicated on the debtor's

complete insulation from any interference with its fresh start in economic life." (Cleaned up)).

Here, unlike *Edgeworth*, allowing the Lawsuits to continue against the WIOs post-emergence

would inequitably burden the Debtors given their shared identity of interest with the WIOs and, in

fact, would require the Debtors to satisfy Atlantic's claims on multiple occasions.

66.     The other case relied upon by Atlantic—*Applewood*—is also easily distinguishable.

In *Applewood*, the Fifth Circuit noted the "[g]eneral rule is that a [debtor's] discharge in

bankruptcy does not affect a **guarantor's** liability." *Applewood Chair Co. v. Three Rivers

Planning & Dev. Dist. (In re Applewood Chair Co.)*, 203 F.3d 914, 918 (5th Cir. 2000).  Here, of

course, the WIOs have **not** guaranteed any of the Debtors' obligations to Atlantic, nor do the WIOs

have any personal liability to Atlantic.

67.     Atlantic further misunderstands the relief sought in Count VI by arguing that a

bankruptcy discharge does not constitute an "extinction" of an obligation under Louisiana Law.

As discussed above, the Debtors' request for relief in Count IV does not rely upon a discharge of

the Debtors' personal liability to Atlantic under section 524 of the Bankruptcy Code.  Rather, as

plead in the Amended Complaint, the Debtors assert that the underlying obligations become extinct

pursuant to confirmation of the Plan, which provides that the treatment of Atlantic's claims "shall be in complete and final satisfaction, settlement, and discharge of and exchange for such Allowed Claims." Plan § 6.8 (emphasis added). Under Louisiana law, satisfaction of a debt is one mode by which a debt becomes extinct such that the lien securing such obligation is extinguished. *See, e.g., World Fuel Servs., Inc. v. MAGDALENA GREEN M/V*, 464 F. App'x 339, 341 (5th Cir. 2012) (unpublished) ("Where, as here, the debt is repaid and **satisfaction** is acknowledged, the lien ceases to **exist**." (Emphasis added)). On "satisfaction of a debt," the debt ceases to exist; it is "extinguished." *Id*. (quoting *Mullane v. Chambers*, 438 F.3d 132, 138 (1st Cir.2006), "any maritime lien had been **extinguished** by **satisfaction**" (emphasis added)); La. Civ. Code Art. 3277. ("Privileges become extinct . . . (3) By the extinction of debt which gave birth to it . . . .").

68. The Debtors are not—as Atlantic alleges—asking the Court to discharge a non-debtor's valid debts, but to declare the effect of the satisfaction, settlement, and discharge of Atlantic's claims against the Debtors, *i.e.*, as extinguishing the alleged privilege under LOWLA in order to preclude Atlantic's claims against the Debtors to effectively survive the Plan.

69. Accordingly, Atlantic's claims should be declared extinct upon the occurrence of the Effective Date of the Plan and Atlantic's Louisiana privileges—to the extent any are valid and enforceable—should likewise be declared extinguished.

### E. Count IX Requests Permanent Injunctive Relief in Connection with the Causes of Action Alleged in Counts I–VI

70. In its Motion, Atlantic claims that the Court may "dismiss Count IX because a request for injunctive relief is a remedy—not a cause of action." MTD 17. However, for the reasons set forth above, the Debtors have adequately pled claims for relief in Counts I–VI, and it is those causes of action that support the request for injunctive relief in Count IX. Thus, the Court should reject Atlantic's request to dismiss Count IX. Alternatively, the Debtors respectfully

request that the Court permit the Debtors to submit a further amended complaint that changes the heading on page 36 from "COUNT NINE" to "PERMANENT INJUNCTIVE RELIEF REQUESTED."

## **CONCLUSION**

71.      For the foregoing reasons, the Court should deny Atlantic's Motion in its entirety, and grant the Debtors all the relief to which they are entitled.

Dated: May 25, 2021
      Houston, Texas

     */s/ Alfredo R. Pérez*
     WEIL, GOTSHAL & MANGES LLP
     Alfredo R. Pérez (15776275)
     Clifford W. Carlson (24090024)
     700 Louisiana Street, Suite 1700
     Houston, Texas 77002
     Telephone:  (713) 546-5000
     Facsimile:  (713) 224-9511
     Email:   Alfredo.Perez@weil.com

     -and-

     WEIL, GOTSHAL & MANGES LLP
     Matthew S. Barr (admitted *pro hac vice*)
     Jessica Liou (admitted *pro hac vice*)
     767 Fifth Avenue
     New York, New York 10153
     Telephone:  (212) 310-8000
     Facsimile:  (212) 310-8007
     Email:   Matt.Barr@weil.com
          Jessica.Liou@weil.com

     -and-

     WEIL, GOTSHAL & MANGES LLP
     Paul R. Genender (00790758)
     Erin M. Choi (24079436)
     200 Crescent Court, Suite 300
     Dallas, Texas 75201
     Telephone: (214) 746-7700
     Facsimile: (214) 746-7777
     Email:   Paul.Genender@weil.com
          Erin.Choi@weil.com

     -and-

     JONES WALKER, LLP
     Joseph E. Bain (24085187)
     Email: jbain@joneswalker.com
     Joshua A. Norris (24027577)
     Email: jnorris@joneswalker.com
     James W. Noe (24040178)
     Email: jnoe@joneswalker.com
     Daniel J. Baldwin (24078184)
     Email:  dbaldwin@joneswalker.com

811 Main St., Suite 2900
Houston, TX 77002
Telephone: 713.437.1800
Facsimile:  713.437.1810

*Attorneys for the Debtors
and Debtors in Possession*

## Certificate of Conference

I hereby certify that, in accordance with Local Rule 9013-1(g), on May 25, 2021, I had a phone conversation with Atlantic's counsel, Matthew Cavenaugh, in an attempt to resolve Atlantic's Motion without the necessity of a hearing, but we were unable to resolve the matter.

*/s/ Clifford W. Carlson*
Clifford W. Carlson

## Certificate of Service

I hereby certify that, on May 25, 2021, a true and correct copy of the foregoing document was served as provided by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

*/s/ Alfredo R. Pérez*
Alfredo R. Pérez