**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | § | **Chapter 11** |
| | § | |
| **FIELDWOOD ENERGY LLC,** *et al.*, | § | **Case No. 20-33948 (MI)** |
| | § | |
| | § | **(Jointly Administered)** |
| Debtors.[1] | § | |
| | § | |

### DECLARATION OF ERIN M. CHOI IN SUPPORT OF DEBTORS' OPPOSITION TO HCCI'S EMERGENCY MOTION IN LIMINE

I, Erin M. Choi, pursuant to 28 U.S.C. § 1746, declare as follows:

1.      I am a senior associate of the firm Weil, Gotshal & Manges LLP ("**Weil**"), which maintains an office for the practice of law at 700 Louisiana Street, Suite 1700, Houston, Texas 77002.  I am an attorney at law, duly admitted and in good standing to practice in the State of Texas and is admitted to practice before the U.S. District Courts for the Northern, Southern, and Eastern Districts of Texas.  I have made an appearance in the above-captioned chapter 11 cases to represent Fieldwood Energy LLC ("**Fieldwood**") and its debtor affiliates, as debtors and debtors in possession (collectively, the "**Debtors**").

2.      I submit this Declaration in support of *Debtors' Opposition to HCC International Insurance Company PLC's Emergency Motion in Limine* ("**Opposition**"), filed concurrently herewith in the above-captioned proceeding.

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are: Fieldwood Energy LLC (6778), Fieldwood Energy Inc. (4991), Fieldwood Onshore LLC (3489), Fieldwood SD Offshore LLC (8786), Fieldwood Energy Offshore LLC (4494), Fieldwood Offshore LLC (2930), GOM Shelf LLC (8107), FW GOM Pipeline, Inc. (8440), Galveston Bay Procession LLC (5703), Galveston Bay Procession LLC (0422), Fieldwood Energy SP LLC (1971), Dynamic Offshore Resources NS, LLC (0158), Bandon Oil and Gas, LP (9266), and Bandon Oil and Gas GP, LLC (9172). The Debtors' primary mailing address is 2000 W. Sam Houston Parkway S., Suite 1200, Houston, TX 77042.

3.     Attached as Exhibit 1 is a true and correct copy of the *Notice of Rule 30(b)(6) Deposition of Debtor Fieldwood Energy LLC*, dated April 30, 2021.

4.     Attached as Exhibit 2 is a true and correct copy of excerpts from the transcript of the 30(b)(6) Oral Deposition of Debtor Fieldwood Energy, LLC, Mr. Michael T. Dane, dated May 13, 2021.

5.     I hereby declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information, and belief.


Dated:   June 16, 2021
         Houston, Texas

                              */s/ Erin M. Choi*
                              Erin M. Choi

## **Exhibit 1**

**Notice of Rule 30(b)(6) Deposition of Debtor Fieldwood Energy LLC**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

|  |  |  |
|---|---|---|
| | § | |
| **In re:** | § | **Chapter 11** |
| | § | |
| **FIELDWOOD ENERGY LLC,** *et al.*, | § | **Case No. 20-33948 (MI)** |
| | § | |
| Debtors.[1] | § | **(Jointly Administered)** |
| | § | |

<u>**NOTICE OF RULE 30(b)(6) DEPOSITION OF DEBTOR FIELDWOOD ENERGY LLC**</u>

> To:   Fieldwood Energy LLC
> Through its Counsel of Record:
> Alfredo Perez
> Weil Gotshal & Manges LLP
> 767 Fifth Avenue
> New York, NY  10153
> Tel: 212-310-8021
> Email: alfredo.perez@weil.com

**PLEASE TAKE NOTICE** that certain surety companies ("Sureties")[2] in the above-captioned case will take the deposition of the corporate representative(s) of Fieldwood Energy LLC (the "<u>Debtors</u>") on a date to be determined by the parties, pursuant to the Federal Rule of Civil Procedure 30(b)(6), and Rules 9014 and 7030 of the Federal Rules of Bankruptcy Procedure.

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are:  Dynamic Offshore Resources NS, LLC (0158); Fieldwood Energy LLC (6778); Fieldwood Energy Inc. (4991); Fieldwood Energy Offshore LLC (4494); Fieldwood Onshore LLC (3489); Fieldwood SD Offshore LLC (8786); Fieldwood Offshore LLC (2930); FW GOM Pipeline, Inc. (8440); GOM Shelf LLC (8107); Bandon Oil and Gas GP, LLC (9172); Bandon Oil and Gas, LP (9266); Fieldwood Energy SP LLC (1971); Galveston Bay Pipeline LLC (5703); and Galveston Bay Processing LLC (0422).  The Debtors' primary mailing address is 2000 W. Sam Houston Parkway S., Suite 1200, Houston, TX 77042.

[2] The sureties joining in Rule 30(b)(6) Deposition Notice include U.S. Specialty Insurance Company, HCCI, Lexon Insurance Company, Philadelphia Indemnity Insurance Company, North American Specialty Insurance Company, Zurich American Insurance Company, RLI Insurance Company, The Hanover Insurance Company, Liberty Mutual Insurance Company, Travelers Casualty & Surety Company of America, XL Specialty Insurance Company, Berkley Insurance Company, Aspen American Insurance Company, Everest Reinsurance Company and Sirius America Insurance Company.

The Debtors are requested to designate representative(s) to provide testimony regarding the Topics for Examination set forth on Exhibit "B" to this Notice of Deposition (with all terms therein having the meanings set forth in the attached Definitions under Exhibit "A" to this Notice of Deposition) which relate to the *Fourth Amended Joint Chapter 11 Plan of Fieldwood Energy LLC and its Affiliated Debtors* (Doc. No. 1284) (the "Plan").  The deposition testimony will be given before an authorized court reporter or other person authorized by law to administer oaths and will be recorded by stenographic means.

In addition to the corporate representatives chosen by Debtors to testify pursuant to Rule 30(b)(6), the Sureties also request that the Debtors produce Gary Janik, Scott Schmidt, and W. Frank Jeanes to testify on the same date as the 30(b)(6) representative(s).

**The deposition will be taken remotely** *via* an online platform due to the coronavirus pandemic such that no one will need to be in the same location as anyone else in order to participate in the deposition.  Parties who wish to participate in the deposition should contact Jase Brown, jbrown@csglaw.com **no fewer than 48 hours before the start of the deposition** for more information regarding participating in this deposition remotely.[3]

---

[3] Under separate cover, the Sureties will forward to the Debtors the technical information for the videoconference connection using the Zoom platform (http://www.zoom.us).

Dated: April 30, 2021

Respectfully submitted,

HUSCH BLACKWELL LLP

By:  _/s/ Timothy A. Million_
    Randall A. Rios
    State Bar No. 16935865
    Timothy A. Million
    State Bar No. 24051055
    600 Travis, Suite 2350
    Houston, Texas 77002
    Tel:  713-525-6226
    Fax:  713-647-6884
    Email:  randy.rios@huschblackwell.com
    Email:  tim.million@huschblackwell.com

**CO-COUNSEL FOR ASPEN AMERICAN INSURANCE COMPANY, BERKLEY INSurance COMPANY, EVEREST REINSURANCE COMPANY AND SIRIUS AMERICA INSURANCE COMPANY**

-AND-

Armen Shahinian, Esq. (admitted *pro hac vice*)
(ashahinian@csglaw.com)
Scott A. Zuber, Esq. (admitted *pro hac vice*)
(szuber@csglaw.com)
Darren Grzyb, Esq. (admitted *pro hac vice*)
(dgrzyb@csglaw.com)
Jase A. Brown, Esq. (admitted *pro hac vice*)
(jbrown@csglaw.com)

Chiesa Shahinian & Giantomasi PC
One Boland Drive
West Orange New Jersey 07052

**ATTORNEYS FOR ASPEN AMERICAN INSURANCE COMPANY, BERKLEY INSURANCE COMPANY, EVEREST REINSURANCE COMPANY AND SIRIUS AMERICA INSURANCE COMPANY**

3

## EXHIBIT "A"

### Definitions

This Rule 30(b)(6) Notice shall be governed by the following definitions.  Definitions not provided herein shall be defined as set forth in the Plan and associated documents.

1. "Apache" means Apache Corporation.

2. "Bankruptcy Cases" means the above-captioned chapter 11 bankruptcy cases styled *In re Fieldwood Energy LLC, et al.*, jointly administered under Case No. 20-33948, in the United States Bankruptcy Court for the Southern District of Texas.

3. "BOEM" means Bureau of Ocean Energy Management.

4. "BSEE" means Bureau of Safety and Environmental Enforcement.

5. "Communication" means, without limitation, letters; faxes; e-mail messages; conversations; and transmissions of ideas, information, or thoughts whether written, verbal, or otherwise.

6. "Discovery Requests" means the Joint Surety First Set of Interrogatories and Requests for Production served on the Debtors on April 14, 2021, as well as any other discovery requests made by any Sureties individually.

7. "Disclosure Statement" means the *Disclosure Statement for the Fourth Amended Joint Chapter 11 Plan of Fieldwood Energy LLC and its Affiliated Debtors* filed at Docket No. 1285 in the Bankruptcy Cases.

8. "Document" means any and all paper records, files, and/or other tangible media in which information is maintained, preserved, or stored.  The term "Document" includes, but is not limited to, all written or graphic material of every kind and description, however produced or reproduced, whether draft or final, original or reproduction, including, but not limited to, Communications, correspondence, letters, facsimiles, e-mails, memoranda, notes, contracts, agreements, releases, statements, reports, spreadsheets, data compilations, writings, photographs, drawings, graphs, charts, films, printouts, transcripts, calendars, appointment books, diaries, licenses, telegrams, books, newspapers, magazines, advertisements, periodicals, bulletins, maps, brochures, circulars, notices, pamphlets, rules, regulations, directives, teletype messages, voice messages, instant messages, meeting minutes, interoffice communications, financial statements, ledgers, books of account, proposals, software, hardware, prospectuses, offers, orders, receipts, working papers, time sheets, logs, movies, audio or video tapes and recordings, CD-ROMs, DVD-ROMS, microfilm, or any other materials similar to any of the foregoing, however denominated. The term "Document" includes any and all non-identical copies of a document, which contain additional writing, underlining, notes, deletions, or any other markings or notations, or which otherwise are not identical copies of the original document.  The term

4

"Document" also includes any and all attachments and enclosures to any and all documents containing information responsive to the Discovery Requests. In addition, any "Document" concerning only part of the subjects of the Discovery Requests is covered in its entirety by this definition.

9. "INCs" means Incidents of Non-Compliance issued by BSEE.

10. "Person" means any natural person, sole proprietorship, limited liability company, corporation, company, association, joint venture, firm, partnership, or other business or legal entity in whatever form.

11. "Plan" shall refer to the *Fourth Amended Joint Chapter 11 Plan of Fieldwood Energy LLC and its Affiliated Debtors* filed at Docket No. 1284 in the Bankruptcy Cases.

12. "Relating to" means and includes concerning, constituting, defining, evidencing, mentioning, containing, describing, discussing, embodying, reflecting, analyzing, stating, referring to, dealing with, or in any way pertaining to the subject matter.

## EXHIBIT "B"

### Topics for Examination

The Debtors are instructed, pursuant to Federal Rule of Civil Procedure 30(b)(6) and Rules 7030 and 9014 of the Federal Rules of Bankruptcy Procedure, to designate one or more officers, directors, or other persons who consent to testify on the Debtors' behalf about information known or reasonably available to the Debtors relating to the topics set forth below.

1. The financial projections attached as Exhibit O to the Disclosure Statement.

2. The Houlihan Lokey expert report.

3. The AlixPartners expert report.

4. The Debtors' plugging and abandonment cost estimates for the assets to be transferred into FWE I, FWE III, and/or abandoned.

5. The divisive merger contemplated under the Plan.

6. The anticipated timing and selection of FWE I leases for plugging and abandonment and decommissioning activities.

7. The sources of capital available to FWE I.

8. The anticipated capital spend for FWE I and projects associated with the anticipated capital spend.

9. The negotiations, preparation, drafting, execution, and intended operation of the FWE I LLC Agreement.

10. The corporate governance of FWE I.

11. The management of FWE I.

12. The negotiations and selection of the Sole Manager for FWE I.

13. The negotiations and selection of the Independent Director for FWE I.

14. The negotiations, preparation, drafting, execution, and intended operation of the Farmout Agreement.

15. Any anticipated projects to be conducted pursuant to the Farmout Agreement.

16. The negotiations, preparation, drafting, execution, and intended operation of the Transition Services Agreement between FWE I and NewCo.

17. Marketing and gathering costs associated with FWE I.

18. The Debtors' reserve estimates and go-forward production estimates for FWE I.

19. The Debtors' understanding regarding which FWE I leases will be allowed to expire and which FWE I leases will return to production.

20. The Debtors' marketing efforts with respect to FWE I assets, and any offers from third parties to purchase any of the FWE I assets.

21. The negotiations, preparation, drafting, execution, and intended operation of the Standby Facility.

22. The Trust A Decommissioning Security and the intended use of that security.

23. The BOEM bonds related to the Legacy Apache Properties and the intended use of those BOEM bonds.

24. The BOEM bonds related to the Credit Bid Acquired Interests and the intended use of those BOEM bonds.

25. The private bonds related to the Credit Bid Acquired Interests and the intended use of those private bonds.

26. The decommissioning plan for NewCo and whether there will be funds set aside for decommissioning or whether NewCo intends for sureties to contribute to the decommissioning costs.

27. All communications between Debtors and BOEM or BSEE related to the Plan and the transactions contemplated thereunder.

28. All communications between Debtors and Apache related to the Plan and the transactions contemplated thereunder.

29. All communications between Debtors and the secured lenders related to the Plan and the transactions contemplated thereunder.

30. All communications between Debtors and Chevron related to the Plan and the transactions contemplated thereunder.

31. All communications between Debtors and any other predecessor owner related to the Plan and the transactions contemplated thereunder.

32. Current lease, asset, and production status for the Abandoned Properties.

33. Debtors' transition plans for the Abandoned Properties.

34. Debtors' reserve estimates for the Abandoned Properties.

35. The BOEM bonds related to the Abandoned Properties and the intended use of those BOEM bonds.

36. The BOEM areawide bonds and the intended use of those bonds.

37. All outstanding INCs and the anticipated costs associated with correcting the INCs.

38. The Debtors' responses to the Discovery Requests.[4]

---

[4] The Sureties just received the Debtors' responses to the Discovery Requests on April 30, 2021 and therefore reserve the right to ask questions at the deposition related to those Discovery Requests and the responses and documents received in response thereto.

## Exhibit 2

**Transcript of the 30(b)(6) Oral Deposition of
Debtor Fieldwood Energy, LLC, Mr. Michael T. Dane**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

|  |  |  |
|---|---|---|
| In re: | § | Chapter 11 |
|  | § |  |
| FIELDWOOD ENERGY LLC, et al., | § | Case No. 20-33948 (MI) |
|  | § |  |
| Debtors. | § | (Jointly Administered) |
|  | § |  |

30(b)(6) ORAL DEPOSITION OF

DEBTOR FIELDWOOD ENERGY, LLC

MR. MICHAEL T. DANE

May 13, 2021

30(b)(6) ORAL DEPOSITION OF DEBTOR FIELDWOOD
ENERGY, LLC, MR. MICHAEL T. DANE, produced as a
witness at the instance of the Sureties and
Parties-in-interest, and duly sworn, was taken in the
above-styled and numbered cause on the 13th day of
May, 2021, from 9:37 a.m. to 6:43 p.m., before
Michelle Hartman, Certified Shorthand Reporter in and
for the State of Texas and Registered Professional
Reporter, reported by computerized stenotype machine
via Zoom videoconference, pursuant to the Federal
Rules of Civil Procedure and the provisions stated on
the record or attached hereto.



## Page 2

```
1                    APPEARANCES
2    FOR THE DEBTOR FIELDWOOD AND THE WITNESS MICHAEL DANE:
3    Mr. Alfredo R. Pérez
     WEIL, GOTSHAL & MANGES LLP
4    700 Louisiana
     Suite 1700
5    Houston, Texas 77002
     Telephone: 713-546-5040
6    E-mail: alfredo.perez@weil.com
7    and
     Ms. Erin Choi
     Mr. Paul Genender
8    Mr. Kevin Simmons
     and Ms. Jessica Liou (New York Office)
9    WEIL, GOTSHAL & MANGES LLP
     200 Crescent Court, Suite 300
10   Dallas, TX 75201
     Telephone:  214 746 8184
11   E-mail:  erin.choi@weil.com
12   FOR THE SURITIES EVEREST, ASPEN, BERKLEY, AND SIRIUS:
13   Mr. Darren Grzyb
     CHIESA, SHAHINIAN & GIANTOMASI PC
14   One Boland Drive
     West Orange, New Jersey 07052
15   Telephone: 973-530-2077
     E-mail: dgrzyb@csglaw.com
16
17   FOR THE INTERESTED PARTY HCCI:
     Mr. Brad C. Knapp
18   and  Mr. Philip Eisenberg
     LOCKE LORD
19   601 Poydras Street
     Suite 2660
20   New Orleans, Louisiana 70130
     Telephone: 504-558-5210
21   E-mail: bknapp@lockelord.com
22   FOR THE INTERESTED PARTY APACHE CORPORATION:
23   Ms. Robin Russell
     HUNTON ANDREWS KURTH
24   600 Travis Street
     Houston, Texas 77002
25   Telephone: 713-220-4086
     E-mail: rrussell@huntonak.com
     E-mail: rrussell@huntonak.com
```

## Page 3

```
1                APPEARANCES (Continued)
2    FOR THE SURETY GROUPS:
     Ms. Lily W. Cheung
3    NETHERLAND, SEWELL & ASSOCIATES, INC.
     Fulbright Tower, Suite 3200
4    1301 McKinney Street
     Houston, Texas 77010
5    Telephone: 713-654-4950
6    FOR THE INSURERS LIBERTY MUTUAL INSURANCE COMPANY,
7    TRAVELERS CASUALTY & SURETY COMPANY OF AMERICA, THE
     HANOVER INSURANCE COMPANY, AND XL SPECIALTY INSURANCE
8    COMPANY
9    Mr. Brandon Bains
10   LANGLEY ATTORNEYS & COUNSELORS
     PO Box 94075
11   Southlake, Texas 76092
     Telephone: 214-722-7171
12   E-mail: bbains@l-llp.com
13   FOR THE INSURER PHILADELPHIA INDEMNITY INSURANCE
     COMPANY:
14
15   Mr. Robert W. Miller
     MANIER & HEROD
16   1201 Demonbreun Street,
     Suite 900
17   Nashville, Tennessee 37203
     Telephone:  615-742-9320
18   E-mail: rmiller@manierherod.com
19   FOR THE INTERESTED PARTY CHEVRON USA, INC. & NOBLE
     ENERGY, INC.:
20   Ms. Lisa M. Norman
     ANDREWS MYERS
21   1885 Saint James Palace
     Suite 1500
22   Houston, Texas 77056
     Telephone: 713-850-4245
23   E-mail: lnorman@andrewsmyers.com
24
25
```

## Page 4

```
1                APPEARANCES (Continued)
2    FOR THE INTERESTED PARTY BP PLC:
3    Mr. Craig Duewall
     and  Ms. Shari Heyen
4    Ms. Nicole Bakare
     Mr. Jared Weir
5    GREENBERG TRAURIG
     1000 Louisiana Street
6    Suite 1700
     Houston, Texas 77002
7    Telephone:  713.374.3608
     E-mail: duewall@gt.com
8
     FOR THE INTERESTED PARTY GOLDMAN SACHS AS FIRST LIEN
9    OUT AGENT:
10   Mr. Bradley Foxman
     VINSON & ELKINS
11   Trammell Crow Center
     2001 Ross Avenue
12   Suite 3900
     Dallas, Texas 75201
13   Telephone: 214-220-7784
     E-mail: bfoxman@velaw.com
14
     FOR THE INSURER ZURICH AMERICAN:
15
     Mr. Stephen A. Roberts
16   CLARK HILL
     720 Brazos Street
17   Suite 700
     Austin, Texas
18   Telephone: 512-499-3624
     E-mail: sroberts@ClarkHill.com
19
     FOR THE US DEPARTMENT OF JUSTICE:
20
     Mr. Serajul Ali
21   U.S. DEPARTMENT OF JUSTICE
     P.O. Box 875 - Ben Franklin Station
22   Washington, D.C. 20044
     Telephone: 202-307-0488
23   E-mail: serajul.ali@usdoj.gov
24
25
```

## Page 5

```
1                APPEARANCES (Continued)
2    FOR THE INTERESTED PARTY LEXON INSURANCE COMPANY:
3    Mr. Lee E. Woodard
     HARRIS BEACH PLLC
4    333 West Washington Street
     Syracuse, New York 13202
5    Telephone: 315-423-7100
     E-mail: lwoodard@harrisbeach.com
6
     FOR THE OFFICIAL CREDITORS:
7
     Mr. Kenneth Pasquale
8    STROOCK & STROOCK & LAVAN LLP
     180 Maiden Lane
9    New York, New York 10038
     Telephone: 212-806-5562
10   E-mail: kpasquale@stroock.com
11   FOR THE INTERESTED PARTY ATLANTIC MARITIME SERVICES,
     LLC:
12
     Mr. Benjamin W. Kadden
13   LUGENBUHL, WHEATON, PECK, RANKIN & HUBBARD
     601 Poydras Street
14   Suite 2775
     New Orleans, Louisiana 70130
15   Telephone: 504-568-1990
     E-mail: bkadden@lawla.com
16
     CO-COUNSEL TO THE COMMITTEE:
17
     Mr. Michael D. Warner
18   PACHULSKI, STANG, ZIEHL & JONES
     440 Louisiana
19   Suite 900
     Houston, Texas 77002
20   Telephone: 817-832-5566
     E-mail: mwarner@pszjlaw.com
21
     FOR THE AD HOC GROUP OF FIELDWOOD FIRST LIEN LENDERS:
22
     Mr. Andy T. Parrott
23   DAVIS POLK & WARDWELL LLP
     901 15th Street, N.W.
24   Washington DC, District of Columbia  20005
     Telephone: 202-962-9147
25   E-mail: andy.parrot@davispolk.com
```





## Page 6

```
 1            APPEARANCES (Continued)
 2  FOR THE INSURER RLI INSURANCE COMPANY:
 3     Mr. Elliot Scharfenberg
       KREBS FARLEY & DRY
 4     909 18th Street
       Plano, Texas 75074
 5     Telephone: 972-737-2517
       E-mail: escharfenberg@krebsfarley.com
 6
 7  FOR LEXON INSURANCE COMPANY:
 8     Mr. Lee E. Woodard
       HARRIS BEACH PLLC
 9     333 West Washington Street
       Syracuse, New York 13202
10     Telephone: 315-423-7100
       E-mail: lwoodard@harrisbeach.com
11  FOR THE INSURER NORTH AMERICAN SPECIALTY INSURANCE COMPANY:
12     Mr. T. Scott Leo
       THE LAW OFFICES OF T. SCOTT LEO, P.C.
13     100 N. LaSalle Street, Suite 514
       Chicago, Illinois 60602
14     Telephone: 312-857-0910
       E-mail: sleo@leolawpc.com
15
16  ALSO PRESENT:
17     Mr. Anthony L. Green, corporate counsel
18
19
20
21
22
23
24
25
```

## Page 7

```
 1            EXHIBITS
 2  EXHIBIT       DESCRIPTION          PAGE
 3  Exhibit 1   Notice of Rule 30(b)(6)    24
              Deposition of Debtor Fieldwood
 4            Energy LLC
 5  Exhibit 2   Dear John e-mail re:  Swordfish  69
              catch up FWE-0047937
 6
 7  Exhibit 3   9/17/20 letter to Dane from   77
              (blacked out), FWE-0047938 to
 8            47948
 9  Exhibit 4   7/17/20 letter to Fieldwood    78
              Energy, Dear John, re:  Offer
10            to Purchase Co-Owned
              Properties, FWE-0047949 to
11            47954
12  Exhibit 5   Decommissioning Agreement    54
              between Apache Corporation, et
13            al and Fieldwood Energy, et al
              in 2013, no Bates
14  Exhibit 6   Exhibit 14, 2021 Farmout     90
              Agreement, pages 131 to 158 of
15            469
16  Exhibit 7   Exhibit 8 to the Plan of     95
              Reorganization and Disclosure
17            Statement, titled Standby Loan
              Agreement, pages 978 to 1024 of
18            1032
19  Exhibit 8   Transmission Services       101
              Agreement, Exhibit 15 to the
20            Disclosure Statement and Plan
              of Reorganization, Document
21            Number 1285-2, pages 289 to 310
              of 469
22
23  Exhibit 9   Exhibit 6, Fieldwood Energy I   116
              LLC Agreement, Document Number
24            1285-1, pages 910 to 964 of
              1032
25
```

## Page 8

```
 1            EXHIBITS (cont.)
 2  EXHIBIT       DESCRIPTION       PAGE
 3
 4  Exhibit 10   Excel spreadsheet, FWE-0000002   176
 5  Exhibit 11   *Attached but not mentioned,    10
              Fieldwood Energy, Inc.
 6            Estimated Future Reserves and
              Income Attributable to Certain
 7            Leasehold and Royalty Interests
              SEC Parameters as of December
 8            31, 2020
 9  Exhibit 12   *Attached but not mentioned -   10
              SpinCo Preliminary G & A Detail
10            FWE-0000019
11  Exhibit 13   *Attached but not mentioned,    10
              Category/NewCo/Comments table,
12            FWE-0000018
13  Exhibit 14   *Attached but not mentioned,    10
              Excel spreadsheet, FWE-0037606
14  Exhibit 15   *Attached but not mentioned,    10
              Document beginning "West
15            Areas", FWE-0045265 to 266
16  Exhibit 16   *Attached but not mentioned,    10
              Excel spreadsheet FWE-0038676
17            Fields not returning to
              production
18
19  Exhibit 17   *Attached but not mentioned,    10
              e-mail from Lamme to Lamb
20            4/29/21 re:  BOEM Questions,
              FWE-0045280
21  Exhibit 18   *Attached but not mentioned,    10
              Excel spreadsheet, FWE-0045403
22
23  Exhibit 19   *Attached but not mentioned,    10
              Houlihan Lokey expert report of
24            John-Paul Hanson, 80 pages
25
```

## Page 9

```
 1            EXHIBITS (cont.)
 2  EXHIBIT        DESCRIPTION        PAGE
 3
 4  Exhibit 20   Exhibit O Financial      120
              Projections, page 439 to 448
 5  Exhibit 21   Excel Spreadsheet FWE-0000016   134
 6  Exhibit 22   *Attached but not mentioned,    10
              FWE Amended responses and
 7            objections to sureties
              discovery request
 8
 9  Exhibit 23   *Attached but not mentioned,    10
              Exhibit B, page one of three
10  Exhibit 24   Excel Spreadsheet FWE-000008    10
11  Exhibit 25   Disclosure statement, page 1 of   10
              99
12
13  Exhibit 26   Alix Partners Liquidation     10
              Expert Report of Marc J. Brown,
              April 21st, 2021
14
15  Exhibit 27   Everest Indemnity Agreement   245
16
17
18
19
20
21
22
23
24
25
```




Page 10

INDEX

PAGE

MR. MICHAEL T. DANE
Examination by Mr. Grzyb .........................11
Examination by Mr. Bains .......................183
Examination by Mr. Scharfenberg ................220
Examination by Mr. Knapp  .....................235
Examination by Mr. Miller ......................244
Examination by Mr. Duewall .....................252
Signature Page ................................289
Signature Page ................................290
Court Reporter's Certificate ...................291

Page 11

THE COURT REPORTER:  Okay.  Can I get an agreement between Counsel, please, the court reporter can swear in the witness remotely.

MR. GRZYB:  Okay with me.

MR. PÉREZ:  Yes, ma'am.

MR. MICHAEL T. DANE, having been first duly sworn, testified as follows:

EXAMINATION

Q.  (BY MR. GRZYB)  Good morning, Mr. Dane, and thank you for your time today.  My name is Darren Grzyb.  I'm a lawyer with the firm of Chiesa, Shahinian & Giantomasi.  I have four surety clients that are involved in this case:  Everest, Aspen, Berkeley, and Sirius.

It was our notice of deposition that was issued from my office signed by me that today's proceeding relates to.  As I said, today is a deposition.  Have you been deposed before, Mr. Dane?

A.  No, I have not.

Q.  Then I think it is important to start with some ground rules.  The format of today's proceeding is a question-and-answer session.  I will be asking you questions, and it is important that I issue verbal questions and you are to give me verbal responses.  You can't shake your head, particularly

Page 12

now that we're doing this by Zoom, but you shouldn't do that in the first place in a deposition.  So it is important that you give me verbal responses.

It is also important that you understand the question.  If I ask a question, and you don't understand it, but you give an answer, I will assume that you've understood the question.  It is also important that you and I and Mr. Perez, to the extent he interposes an objection, don't talk over each other because our friend, Michelle, is transcribing everything that we say and, therefore, it will be hard for her if we talk over each other for her to transcribe what we say.

That's another point, the description of this.  Michelle, Madam Court Reporter, is typing out all the words that we say.  So at the end of this, what we will have is a transcript of everything we say:  My questions, Mr. Perez's objections, and your responses.

It's also important that if you would like to take a break -- it could be a long day, I have no problem with us taking breaks, so if the challenge might be that you're not in the same room with Mr. Perez, I will be very understanding if you want to take a break; and frankly, I will likely need

Page 13

to take breaks during this process as well.

That's all I have for now in terms of ground rules.  If you have any questions as to the ground rules, let me know.

Do you have any questions?

A.  No, thank you very much.

MR. PÉREZ:  So, Darren, this is Alfredo Perez, before we get started, the -- you've provided us -- we have had the courtesy of you providing us several depositions with the exhibits that we have reviewed.  Several of the exhibits have been marked "Confidential" and several of them have been marked "Highly Confidential," pursuant to the Protective Order that was ordered by the Court.

So I just want to make sure that everyone on the -- that is in the Zoom deposition -- and there are approximately 40 participants -- has either agreed to be bound by the terms of that -- that there aren't -- there isn't anyone here who's otherwise not -- you know, that -- that the debtor is protected as a result of that deposition.

So I suspect that when you're going in -- when you're going into documents that were marked "Highly Confidential," you'll alert us so that we can check that again, but that is my only comment at this

MAGNA ►
LEGAL SERVICES

Page 118

1    which concepts are adopted in this agreement.
2        Q.  Is it fair to say that this document --
3        A.  I'm sorry, I would like to expand on one
4    other party that we principally deal with from a
5    business perspective, which is also their advisors at
6    Parkman Whaling.
7        Q.  Is it fair to say that this document,
8    Exhibit Number 9, the Fieldwood I LLC agreement, is
9    an embodiment of the governance rights that Apache
10   bargained for in connection with that restructuring?
11       A.  This document reflects the governance
12   rights of Fieldwood I, which document was negotiated
13   amongst the parties, which were ourselves and Apache
14   and our respected advisors.
15       Q.  Is it fair to say that this document
16   embodies consent rights that Apache has with respect
17   to the operation of Fieldwood I?
18       A.  Yes.
19       Q.  Is it fair to say that this document
20   embodies information rights that Apache has with
21   respect to Fieldwood I?
22       A.  I don't recall the specific information
23   rights that Apache has pursuant to this document, but
24   if that is contained within the document, then I
25   would agree.

Page 119

1        Q.  Turning to page 33 of Exhibit 9, looking
2    at Section 706, is it fair to say that the intention
3    of Fieldwood and Apache is that Fieldwood I will not
4    be able to do any business other than operating or
5    plugging and abandonment and decommissioning of
6    Legacy properties and the GOM shelf properties
7    without the prior consent of Apache?
8        A.  In 706A --
9            MR. PÉREZ:  I'm sorry, I had myself on
10   mute.  I am going to object to the form of the
11   question:  I think the document speaks for itself.
12           You're asking him, you know, for a legal
13   interpretation.  So to the extent that Mr. Dane can
14   testify, you know, what the intent of the document
15   is, but I think it is unfair to say -- look at 7.6
16   and say, is this what it means?  And especially what
17   it means as relates to Apache.
18           THE WITNESS:  I think the document is
19   very self-explanatory with respect to the actions
20   requiring Apache consent.
21       Q.  (BY MR. GRZYB)  Give me one second.
22           Were any of Fieldwood's other creditors
23   offered the right to fund the standby facility for
24   Fieldwood I?
25           MR. PÉREZ:  Object to the form of the

Page 120

1    question:  You're -- I think the assumption there is
2    that Apache is a creditor.
3            But you can go ahead and answer if --
4            THE WITNESS:  The Apache agreement was
5    negotiated directly with Apache and it was conveyed
6    to our lenders for their approval as part of an
7    overall restructuring transaction, and ultimately the
8    RSA and those parties were all aware of the
9    provisions, including the standby facility, at the
10   time that they all agreed to enter into the RSA.
11           (Exhibit 20 marked)
12       Q.  (BY MR. GRZYB)  I would ask, Mr. Dane,
13   that you pull up Exhibit 20, which is Exhibit O to
14   the Disclosure Statement identifiable as 1285-2, page
15   439 of 469, and that is the financial projections
16   that are attached to the Plan of Reorganization.
17           Are you familiar with this document?
18       A.  Yes.
19       Q.  May I please have your understanding of
20   what this document is.
21       A.  This document was an exhibit to our
22   Disclosure Statement.  It is the financial
23   projections exhibit which discusses the Fieldwood I,
24   III -- excuse me, the Fieldwood I and NewCo entities,
25   and it shows projections for each of those entities

Page 121

1    over a five-year period.
2        Q.  Are you personally involved in the
3    creation of Exhibit 20?
4        A.  Yes.
5        Q.  What was your -- well, I'm going to call
6    it Exhibit O, even though it is Exhibit 20 for
7    purposes of this deposition.
8            What was your involvement in the creation
9    of Exhibit O?
10       A.  I was involved with the team that
11   represented a broad cross-section of Fieldwood I
12   employees in assembling the business plans and
13   reviewing the various assumptions that formed the
14   basis for the inputs for these projections.
15       Q.  Are these -- the participants and the
16   creation of Exhibit O, did that include your asset
17   teams?
18       A.  Yes.
19       Q.  What about at the executive level, did
20   any other executives, other than yourself,
21   participate in the creation of Exhibit O?
22       A.  Yes.
23       Q.  Can you identify those executives?
24       A.  Most of the executives with operational
25   responsibilities were involved at some level in

MAGNA
LEGAL SERVICES

Page 122

1  helping to assemble the inputs for that plan and that
2  would range from our operational executives, like
3  Gary Mitchell; Steve Bodden; our VP of marketing, Jim
4  Brysch; John Seeger, our senior vice president of
5  operations; and a significant group of managers below
6  those executives.
7       Q.  Who at Fieldwood had the final say
8  authorizing the publication of Exhibit O in
9  connection with the Plan of Reorganization?
10      A.  Our board of directors.
11          MR. PÉREZ:  Object to the form of the
12  question:  Assumes facts not in evidence, but --
13          THE WITNESS:  The company's board of
14  directors.
15      Q.  (BY MR. GRZYB) Are you personally
16  expected to be the representative of the company with
17  respect to Exhibit O?
18      A.  Yes.
19      Q.  Who at Fieldwood physically typed
20  Exhibit O?
21      A.  Our counsel and advisors, I believe,
22  physically typed this exhibit as a part of their
23  Disclosure Statement preparation activities.
24      Q.  Is there anyone at Fieldwood with an
25  engineering degree that has adopted the

Page 123

1  representations made in Exhibit O?
2          MR. PÉREZ:  Object to the form of the
3  question:  Vague.
4          MR. GRZYB:  I will change the question.
5      Q.  (BY MR. GRZYB) Is there anyone with an
6  engineering degree at Fieldwood that has approved
7  Exhibit O?
8          MR. PÉREZ:  Same objection.
9          THE WITNESS:  There is not a formal
10  Fieldwood approval process for accredited employees,
11  so I'm not sure how to answer your question.
12      Q.  (BY MR. GRZYB) Let's please turn to page
13  ten of the Fieldwood I projects -- I'm sorry, of
14  Exhibit O, which is subtitled "Fieldwood I
15  Projections".
16          The plan outlines a sales volume of
17  28,000 barrels of oil equivalent a day for the
18  average of 2020.  What is the company's current rate
19  of production?
20      A.  Is your question:  What is the assets
21  that would comprise Fieldwood I's current
22  interaction?
23      Q.  That's correct.
24      A.  Obviously there is a lot of variability
25  with respect to production, particularly on the

Page 124

1  shelf, but generally, it has been in the low
2  20,000-barrel equivalent per day, over -- over recent
3  weeks.
4      Q.  Explain the distinction between the
5  representation you just made of 20,000 barrels per
6  day as compared to this projection on Exhibit O
7  saying 28,000.
8          MR. PÉREZ:  I'm going to object to the
9  form of the question.  There was no representation,
10  he answered a question, so I object to the form of
11  the question, I think it is misleading.
12      Q.  (BY MR. GRZYB) I believe your testimony,
13  Mr. Dane, was that over recent weeks of -- current
14  level of production over the past recent weeks is
15  20,000 barrels per day, correct?
16      A.  It was in the low 20,000-barrel
17  equivalent per day range.
18      Q.  But it is not 20,000, correct?
19      A.  No, it is not, as of recent weeks.
20      Q.  In the past year, has it been 28,000 at
21  any point for any extended period?
22      A.  I would have to go back and review our
23  records and check this historic performance against
24  these assets.
25      Q.  Let me ask the question more directly.

Page 125

1          What is the basis for the 28,000 barrels
2  per day projection in Exhibit O?
3      A.  So these projections represent a
4  bottoms-up buildup of all the fields that are
5  contemplated to be producing and the fields that are
6  not contemplated to be producing that comprise the
7  field with one asset base.  Every field was evaluated
8  by our asset teams and a determination was made if
9  the field would be expected to be online.  If it was
10  not online, if it was expected to return to
11  production or if it was not expected to return to
12  production and the timing associated with each
13  individual field, that was the basis for these
14  projections.
15      Q.  Is it, therefore, your testimony that it
16  will require some work in order to get the production
17  up to this 28,000 barrels per day?
18          MR. PÉREZ:  Object to the form of the
19  question:  Vague.
20          THE WITNESS:  There is always variability
21  with respect to daily production rates, and that has
22  a host of factors that would -- especially over such
23  a large asset base like Fieldwood I, but the basis
24  for these projections is a detailed, bottoms-up
25  analysis of all fields.




1    Q. (BY MR. GRZYB) Explain "bottoms-up
2  analysis."
3    A. A "bottoms-up analysis" means that this
4  aggregate number is the sum of assumptions related to
5  every individual field that underlies that property
6  set.  Every field was reviewed and a determination
7  was made for the appropriate assumption how to
8  include the particular field, both at a production
9  expense and any other relevant variable that would
10  influence that particular field's contribution to
11  these projections.  These projections would represent
12  the sum of all of those bottoms-up assumptions.
13    Q. Is there -- so is it -- is it true that
14  you -- in order for Fieldwood to meet this projection
15  amount of 20,000 barrels per day, certain currently
16  offline wells need to be brought back online?
17    A. That is one factor that would relate to
18  the variance that you're asking about.
19    Q. Does that 28,000 barrels per day include
20  currently offline wells as an assumption?
21    A. In some cases --
22    MR. PÉREZ:  That come back online?  That
23  come back online, is that the question?
24    Q. (BY MR. GRZYB) The question is:  Does the
25  28,000 barrels per day include in the assumption that

1  currently offline wells are going to be brought back
2  online?
3    A. Yes.
4    Q. Is there a list of those wells that need
5  to be brought back online in order to increase
6  production sufficiently to make these projections?
7    A. Yes.
8    Q. Do you know -- can you give me an
9  estimate of those currently offline wells that need
10  to be brought back on in order to -- can you give me
11  an estimate of the number of wells that are being
12  contemplated as being brought back online as part of
13  the assumptions associated with these projections?
14    A. We don't track it on the basis of number
15  of wells.  The projections are generated pursuant to
16  a model which was provided that specifies every
17  individual field and its contribution.
18    Q. In your mind, is -- I will rephrase the
19  question.
20    Look down under the same page, page ten,
21  and go to the line item for capital expenditures.
22  And it looks like for the period of May through
23  December of 2021, this projection lists $29 million
24  for capital expenditures.
25    Is it your projection that that amount of

1  capital expenditure will sufficiently bring
2  production from the low 20s to the 28,000 barrels a
3  day listed in the first line item?
4    A. The basis of these projections does not
5  contemplate that this capital expenditure or variable
6  alone is the basis for the difference between the
7  current production rates that you asked about and the
8  average daily production between May to December of
9  2021 that you're referencing, but there is a
10  production contribution that is assumed as a result
11  of the capital expenditures which is very clearly
12  presented in the model.
13    Q. All right.  So we have identified the
14  bringing back certain shut-in wells back online as an
15  assumption of -- that goes into this daily production
16  level set forth in projections.  We have identified
17  CapEx expenditures that are going to bump up the
18  production.
19    Is there any other assumption associated
20  with this daily net production level set forth in
21  Exhibit O?
22    A. Can you be more specific, any other
23  assumption related to what?
24    Q. Well, you know what, I think I have
25  phrased it incorrectly.  And I used your word -- I

1  like your words better, "factors," right?
2    One factor that's going to increase daily
3  production is bringing offline wells back online,
4  correct?  That is one thing we identified?
5    A. Correct.
6    Q. We also identified capital expenditures
7  are going to increase daily production.
8    Looking at this projection in Exhibit O,
9  what other factors will increase daily production
10  from its current production level?
11    A. Those are the general categories that
12  would contribute to any incremental production above
13  current rates.
14    Q. So is your 28,000 barrels per day
15  predicted production based on -- I will rephrase the
16  question.
17    The increase in daily production from its
18  current level to the 28,000 barrels per day listed in
19  this projection is based on two assumptions:
20  Bringing wells back online and capital expenditure of
21  $29 million?
22    A. I wouldn't say that those are the
23  assumptions that -- the basis for these numbers are
24  the assumptions in the model about what fields are
25  anticipated to be online and any incremental capital

MAGNA ▶
LEGAL SERVICES

Page 130

1   contribution and the benefit of that production.
2       Q.  Is it your prediction that if you spend
3   $29 million over the period of May to December of
4   2021 and bring back the identified wells that the
5   model says should be brought back online will
6   increase production levels to 28,000 barrels per day?
7       A.  If your question is does the model
8   contemplate that certain fields need to contribute
9   and be online and that the capital expenditures are
10  required to general rate production and that forms
11  the basis for the 28,000 barrels a day that's
12  reflected between the May to December time period, I
13  would agree, those are production contributing
14  factors.
15      Q.  What is the projected spend for plugging
16  and abandonment on the Legacy/Apache properties?
17      A.  Can you be more specific?
18      Q.  For year 2021.
19      A.  In these projections, Fieldwood I is
20  projected to spend $70 million between the May to
21  December 2021 period.
22      Q.  Now, you say "in these projections."
23          Is that what the intent is for the
24  projected spend on P and A for the Fieldwood I
25  properties in the year 2021?

Page 131

1       A.  Projections as of a point in time with
2   many assumptions.  These assumptions included an
3   emergent state of April 30th.  There is going to be
4   many factors that ultimately determine the total
5   amount of capital that's going to be able to be spent
6   and these projections, based on the assumptions that
7   are outlined in this exhibit, show $70 million of
8   spending that's outlined here.
9       Q.  Where does the $70 million projection
10  come from?
11      A.  The properties that comprise the P and A
12  spend in these projections represent properties that
13  are either already scheduled for P and A or
14  anticipated to be shut in during this period and
15  scheduled for P and A., and these projections are
16  based on the properties that are included in the
17  model and the schedule that forms the basis for the P
18  and A in these projections included in that model.
19      Q.  Who identifies the P and A -- the
20  properties --
21          MR. GRZYB:  I can't hear you, Alfredo.
22          MR. PÉREZ:  (Signals timeout).
23          MR. GRZYB:  I see you, Alfredo, but I
24  can't hear you.
25          THE WITNESS:  I think he's saying he's

Page 132

1   calling back in.
2           THE COURT REPORTER:  I'm going off the
3   record.
4               (Recess taken)
5           (The record was read as requested)
6           (Discussion off record)
7       Q.  (BY MR. GRZYB) Who at Fieldwood gives the
8   estimate of the 70 million for P and A?
9       A.  The decommissioning department is
10  responsible for generating those estimates.
11      Q.  Who heads that department?
12      A.  Our vice president of decommissioning,
13  Brandon DeWolfe.
14      Q.  Did he supply the decommissioning line
15  items on this Exhibit O?
16      A.  He supplied the assumptions that were
17  incorporated into these projections with respect to
18  decommissioning.
19      Q.  Switching back to the capital expenditure
20  portion of the -- with respect to this first column
21  on 2021, how long is it going to take to perform the
22  work to get shut-in wells back online in order to
23  increase production for the Fieldwood I properties?
24      A.  Activities that are performed in order to
25  reestablish an asset on our asset base happen on an

Page 133

1   ongoing, day-to-day basis.  Our asset base was
2   heavily impacted by the historic 2020 storm season
3   that resulted in a significant amount of disruption
4   and minor damage to a number of our facilities, which
5   has resulted in fields being brought back online or
6   determined to be shut in going forward.
7       The activities that are required in order
8   to reestablish production are generally related to
9   construction activity, which is a part of our ongoing
10  repair and maintenance program, and based upon the
11  timing of being able to complete those projects on
12  specific fields, we are able to return production
13  from those fields.
14      Q.  Am I to understand there is two concepts:
15  If a particular asset has been -- was damaged in a
16  storm, and it needs -- or I will rephrase the
17  question.
18      Two concepts:  Does the line item for
19  R and M relate to bringing assets back online that
20  were damaged during the storm season?
21      A.  That's one component of what repair and
22  maintenance dollars are spent on, and it has been a
23  significant part of our recent repair and maintenance
24  expenditures which is related to the 2020 storm
25  season repair activities.



Page 134

1          Q.  So with that R and M spend, will that
2     result in any increased production on a daily basis?
3          A.  Yes.
4          Q.  Does any of the capital expenditure spend
5     on this projection relate to bringing back online
6     assets damaged in the storm -- storms?
7          A.  The capital expenditures that are
8     incorporated in these projections are generally
9     related to recompletion capital projects, which is
10    not typically associated with repairs to facilities
11    as it relates to storm damage.  However, the timing
12    of the ability to make those capital expenditures
13    related to specific fields is going to be influenced
14    by repairs that may need to be made to those fields
15    as a result of storm damage.
16              (Exhibit 21 marked)
17         Q.  (BY MR. GRZYB) Mr. Dane, I'm going to ask
18    you to please open -- it is probably in native format
19    in your data room -- Exhibit Number 21.
20              Were you able to access it?
21         A.  Yes, I have it open.
22              MR. PÉREZ:  Is it an Excel spreadsheet.
23              MR. GRZYB:  Yes, it is.
24              Do you have it open, Alfredo?
25              MR. PÉREZ:  Oh, yeah, okay, it is

Page 135

1     opening.
2          Q.  (BY MR. GRZYB) Now, I believe -- do you
3     have a general understanding of what this -- this
4     document, this Exhibit 21 marked FWE-000016 is,
5     Mr. Dane?
6          A.  Yes, I have a general understanding of
7     this document.
8              MR. PÉREZ:  I'm glad he does, because I
9     don't.
10         Q.  (BY MR. GRZYB) And what is that document,
11    Mr. Dane?
12         A.  This document is the model that forms the
13    basis of the Fieldwood I projections.
14         Q.  Again, did you read my outline before
15    doing this deposition?
16              Okay.  Looking at the model, Fieldwood I
17    will call it Exhibit 21, I would like you to open the
18    annual forecast tab, which is all the way to the
19    right.
20         A.  Okay, I have this open.
21         Q.  Now, looking at -- if you look at the
22    line item, it is line 64 and -- wait, let me ask a
23    question.
24              Does this model relate exclusively to the
25    Fieldwood I properties?

Page 136

1          A.  I believe that's correct.
2          Q.  Now, I would like you to look at line
3     item number 64 and in particular, F64.  You see the
4     plugging and abandonment numbers on this spreadsheet?
5          A.  I'm sorry, can you -- is that F65?
6          Q.  It would be F60 -- F64 is -- well, it
7     is -- on the horizontal, it is row six.
8          A.  And what tab are you in again?  Is this
9     "Annual Forecasts"?  I'm sorry, what tab?
10         Q.  Yeah, "Annual Forecast."
11         A.  Let me go to the correct tab.
12         Q.  I can share.
13         A.  I see it.  I will get to the tab in a
14    second.
15              MR. PÉREZ:  Is it -- okay.  My line 64
16    says "Capitalized G and A."  Is that not right?
17              MR. GRZYB:  You're one below it.
18              THE WITNESS:  Alfredo, it is a different
19    tab.  If you would continue to go to the right to the
20    tab labeled "Annual Forecasts."
21              MR. GRZYB:  Why don't I share.
22              MR. PÉREZ:  I see it.
23         Q.  (BY MR. GRZYB) All right.  Line 64, for
24    the period of April 2021 to presumably March of 2022,
25    this model lists plugging and abandonment at

Page 137

1     $203,225,000.  How does that square with the
2     Exhibit O projection of $70 million for the period of
3     May 2021 through December of 2021?
4          A.  So the numbers that are in this row --
5          Q.  This row on which document?
6          A.  That you've pointed me to.
7          Q.  Exhibit 21?
8          A.  Correct.  I don't believe those numbers
9     were utilized with respect to the Exhibit O document.
10    There are specific P and A schedules that form the
11    basis for the P and A spends, and I believe that
12    that's identified in separate tabs that have been
13    provided.
14         Q.  I guess I'm not following your answer.
15              What does this number, 203,225 (sic), on
16    F64 on Exhibit 21 reflect?
17         A.  I don't know.  I'm not -- I don't know
18    what that reflects.  I don't believe that that is the
19    number that is used in the projection, as you can
20    see.
21         Q.  All right.  So I think you said P and A
22    schedules were consulted in creation of Exhibit O and
23    the use of $70 million for P and A for the balance of
24    this year.  What is the -- can you identify the P and
25    A schedules that you're talking about?





Page 138

1    A.  These were provided -- there is a --
2  there is a detailed schedule in this model that
3  outlines the P and A spend, I believe it is one of
4  the last tabs, and these figures I believe are
5  consistent, but there may be reconciliation between
6  certain cost items that are included in P and A
7  versus other items.
8    Q.  Is there a name of the tab about which
9  you're referring to?
10    A.  I think it is -- I believe it is the last
11  tab that is labeled as "Apache -- APA-2021 Plus
12  Schedule Annual."
13    Q.  "*APA Plus Schedule and Annual."
14    Is there any way I can modify this tab
15  and to see -- to give me any kind of information
16  about how we -- how you arrived at 70 million for the
17  line item on Exhibit O?
18    A.  Yes.  So the projections assume that any
19  available cash flow that the Fieldwood I entity is
20  capable of generating, subject to minimum working
21  capital needs, is utilized in order to perform
22  P and A; and in the period May to December of 2021,
23  that figure is $70 million.
24    Q.  Correct me if I'm oversimplifying, but
25  did you just essentially say that the $70 million

Page 139

1  comes from available funds associated with the
2  production?
3    A.  No.
4    Q.  Plus the --
5    A.  I said that the construct of Fieldwood I
6  as an entity is that its primary business function is
7  to conduct P and A to officially manage the Fieldwood
8  I obligations and that after considering other
9  required expenses and any capital expenditures in
10  order to generate cash flow for P and A, any
11  available cash flow, subject to minimum working
12  capital requirements, is utilized to conduct P and A,
13  and in this period, that amount that is available is
14  $70 million.
15    Q.  Has that projection been accepted by
16  Apache?
17    MR. PÉREZ:  Object to the form of the
18  question:  Vague.
19    THE WITNESS:  Apache and their advisors
20  are familiar with these projections and the construct
21  that this exhibit in the Fieldwood I model
22  represents, and they are aware of the level of P and
23  A that's anticipated to be able to be conducted by
24  Fieldwood I and the construct by which the cash is
25  used by Fieldwood I to conduct that P and A.

Page 140

1    Q.  (BY MR. GRZYB) So I guess the question
2  becomes:  What is the annual forecast -- the number
3  of -- the number in the annual forecast of
4  $220 million, give or take, for 2021, where does that
5  number come from?
6    A.  The number that -- it is hard coded in
7  this model.  I would have to ask our subject matter
8  experts to reconcile this, but the P and A forecast
9  that is relevant is the tab where it outlines every
10  individual field and it shows the annual spend in
11  each period.
12    Q.  Do you have any understanding of whether
13  governmental entities would be satisfied with the
14  $70 million spend for 2021 as referenced in
15  Exhibit O?
16    A.  Is this a hypothetical question?  I don't
17  understand the question.
18    Q.  No.  I assume that the $70 million, and I
19  think what you have testified to is, it is based on
20  some analysis by Fieldwood in connection with these
21  properties.  Is it your belief that this $70 million
22  number, going back to Exhibit O, will be sufficient
23  to satisfy governmental requirements with respect to
24  the Fieldwood I assets?
25    MR. PÉREZ:  Object to the form of the

Page 141

1  question:  Vague.
2    THE WITNESS:  $70 million is the amount
3  of capital that is available within Fieldwood I
4  pursuant to these projections.  The properties that
5  are contemplated, being P and A under this model for
6  2021, are listed on the tab that shows $175 million
7  to spend, according to what I'm looking at.
8    Q.  (BY MR. GRZYB) Sir, I guess that's --
9  that's my question, which is:  How do you bridge
10  those two gaps, is there -- are there properties
11  listed on the annual forecast that are not going to
12  be decommissioned during the same timeframe?
13    MR. PÉREZ:  Object to the form of the
14  question -- I'm sorry.  Yeah, I'm going to object to
15  the form of the question, because it assumes, you
16  know, facts not in evidence.
17    MR. GRZYB:  And maybe I just didn't hear
18  his answer correctly.
19    Michelle, may I please have his last
20  answer.
21    THE COURT REPORTER:  Certainly.  One
22  moment.
23    (The record was read as requested)
24    Q.  (BY MR. GRZYB) One second.  Excuse me.
25    All right.  Turning back to Exhibit O,

MAGNA
LEGAL SERVICES

Page 142

1  can you please explain to me the line item and
2  amendment for trust contributions.
3      A.  Trust contributions are the required
4  contributions for Trust A pursuant to the Trust A MPI
5  and the Decommissioning Agreement.
6      Q.  So is that an indication that Fieldwood
7  is projecting an inability to meet decommissioning
8  requirements based solely on Fieldwood?
9      A.  No, no.
10     Q.  So what is -- how is it that the
11  projection includes a -- drawing upon trust
12  contributions?
13         MR. PÉREZ:  Just -- go ahead, Mike, I'm
14  sorry.
15         THE WITNESS:  That answer is
16  mischaracterizing this -- these projections.
17  That's --
18     Q.  (BY MR. GRZYB)  Explain to me how the
19  trust contribution plays into this projection.
20     A.  Pursuant to the Decommissioning Agreement
21  and the Trust A net profits interest, the Trust A net
22  profits interest is a 10 percent net profits interest
23  on all the properties that were acquired from Apache
24  in 2013.  There is a Trust A1 MPI as well, and those
25  net profits are based on the net profits of the

Page 143

1  properties that are going to be related to
2  Fieldwood I.
3         To the extent that those properties have
4  a positive net profits interest, then that is
5  required to be put into the trust, as it has been
6  since the creation of those net profits interest at
7  inception.
8      Q.  So the current -- is this -- is this
9  projection on Exhibit O an indication that based on
10  this projection, there is no net result to the amount
11  of cash in Trust A?
12     A.  I don't understand your question.  Excuse
13  me, I'm sorry.  The net result is the Trust A cash
14  increases, because Fieldwood I is depositing $7
15  million in this first period into the trust.
16     Q.  This projection includes net profits of
17  $7 million; is that what you're saying?
18     A.  This projection assumes that the MPIs
19  associated with the Decommissioning Agreement
20  generate $7 million of net profits interests, which
21  are required to be placed into the trust.
22     Q.  In your Exhibit O projection, is there
23  any reliance or assumption that there will be a
24  drawing on the decommissioning security relating to
25  these projections?

Page 144

1      A.  In a number of periods, the anticipated
2  P and A activity may exceed the available cash flow
3  within Fieldwood I, and to the extent that that is
4  the case and that work is required to be done, then
5  it is assumed that other sources of capital that may
6  be available for these purposes pursuant to those
7  agreements would address that activity.
8      Q.  Let's look at the period of May to
9  December of 2021.  Do any of these numbers reflect an
10  assumption that Trust A cash will be utilized?
11     A.  The activity that is contemplated for the
12  2021 period is higher than the total P and A activity
13  that is contemplated for the 2021 period, exceeds the
14  $70 million that's available through Fieldwood I and
15  that contemplates that additional security could
16  satisfy those obligations.
17         MR. PÉREZ:  I'm sorry, I'm going to move
18  to strike the question.
19         I think he asked you:  Does Exhibit O
20  contemplate any other resources?  Does this
21  projection include any other resources?
22         THE WITNESS:  I apologize, I
23  misunderstood the question.
24         Exhibit O does not assume any other
25  resources.

Page 145

1      Q.  (BY MR. GRZYB)  Well, from an operational
2  perspective, does Fieldwood project being required to
3  draw on Trust A cash for the balance of the year to
4  perform its decommissioning obligations?
5      A.  Fieldwood as --
6         MR. PÉREZ:  Objection to the form of the
7  question.  Fieldwood I doesn't have an ability --
8  Fieldwood I doesn't have an ability to draw on
9  Trust A cash.  So, I mean, I think the premise of the
10  question is just inappropriate.
11         THE WITNESS:  Correct, Fieldwood does not
12  have the ability to draw on the trust.
13     Q.  (BY MR. PÉREZ)  Is it -- is it projected
14  that there will be insufficient funds generated from
15  cash flow and the initial capitalization of Fieldwood
16  I to meet its decommissioning obligations for the
17  balance of the year?
18     A.  No, it is -- Fieldwood I looks
19  holistically at all sources of capital that are
20  available to satisfy the obligations, and those
21  sources of capital are sufficient to address all the
22  obligations that are anticipated to -- that are
23  anticipated to arise.
24     Q.  The holistic approach that you just
25  mentioned, does that include the Trust A cash?



Page 146

```
 1          A.  The Trust A cash is a source of capital
 2   that is available under the terms of the -- of that
 3   agreement to address P and A.
 4          Q.  Well, does Fieldwood project that Trust A
 5   cash will be drawn upon by someone during the next --
 6   during the balance of the year?
 7          MR. PÉREZ:  I am going to object to the
 8   question.
 9          Are you talking about in the projections
10   in Exhibit O?
11          MR. GRZYB:  Well, you know, I'm not sure
12   what I'm talking about, because I don't know if it
13   is --
14          MR. PÉREZ:  Okay.
15          MR. GRZYB:  -- if his goal is a
16   reflection of reality or it is not.
17          Q.  (BY MR. GRZYB) I guess my question is:
18   In the real world, is Fieldwood projecting that
19   Trust A cash will be drawn upon during the balance of
20   the year?
21          A.  So --
22          MR. PÉREZ:  I want to object to the
23   question.  Fieldwood doesn't have the ability to draw
24   on Trust A cash.
25          So to the extent you know what anybody
```

Page 147

```
 1   else can do, you can go ahead and testify, but this
 2   is not Fieldwood I.
 3          MR. GRZYB:  But, Alfredo, he did testify
 4   that it is part of the holistic approach that
 5   Fieldwood considered when it looked at Fieldwood I.
 6          MR. PÉREZ:  Right.  Yeah, and it's -- I
 7   said I'm not preventing him from testifying.
 8          But go ahead.
 9          THE WITNESS:  In the real world, the
10   Fieldwood I is going to utilize all of its available
11   cash flow to conduct P and A activities.  To the
12   extent that that cash flow -- which is going to be
13   dependent upon a number of variables:  Production,
14   pricing, the level of activity that is attainable in
15   each period, whether to the extent that there is a
16   need to spend money on decommissioning that is above
17   the available resources in any given period of
18   Fieldwood I, there is a number of other sources of
19   security that are available to satisfy those
20   liabilities.
21          Q.  (BY MR. GRZYB) Name one other source of
22   security.
23          A.  The Decommissioning Agreement as it was
24   originally contemplated, and is anticipated to
25   continue, provides for the security that we addressed
```

Page 148

```
 1   earlier, which is the Trust A cash, which is
 2   presently approximately $240 million, and the bonds
 3   and LCs, which comprise nearly $500 million.
 4          Additionally, to the extent that the
 5   initial capitalization of Fieldwood I, which is going
 6   to be paid for through this restructuring as the
 7   difference between 50 million -- $50 million and any
 8   amount spent on P and A, that to the extent that
 9   initial capitalization and any cash flow from the
10   operations of Fieldwood I and then any other
11   security, as discussed, may be insufficient, the
12   Fieldwood I entity has a $400 million standby
13   facility, which is also available; and then obviously
14   behind all of those sources is Apache, which is an
15   extremely well-capitalized, multibillion-dollar
16   company.
17          Q.  So it is fair to say, then, that
18   Exhibit O does not include all sources of
19   capitalization associated with what it may require in
20   order to meet the decommissioning obligations of the
21   Fieldwood I assets?
22          MR. PÉREZ:  Object to the form of the
23   question:  Assumes facts not in evidence.
24          THE WITNESS:  I think it is fair to say
25   that it does not reflect all the various sources of
```

Page 149

```
 1   capital that are available to meet those obligations.
 2          Q.  (BY MR. GRZYB) Does Fieldwood have any
 3   projections or analysis of sources of capital beyond
 4   what's set forth in Exhibit O that will be required
 5   in order to meet the decommissioning obligations
 6   associated with Fieldwood I?
 7          A.  The schedule of anticipated P and A is
 8   included in various schedule as part of this model
 9   and various other discovery requests that have been
10   provided, and all of the funding mechanisms that I
11   described are well described within our plan and
12   Disclosure Statement, as well as the various
13   documents that they are provided pursuant to.
14          Q.  Can you walk me through -- if we go back
15   to Exhibit 1 and find for me for the year 2021 what
16   the -- without regard to source, what will be the
17   decommissioned spend with respect to the Fieldwood I
18   assets.
19          MR. PÉREZ:  Object to the form of the
20   question.
21          You're asking him to speculate as to what
22   the actual expense is going to be.
23          Q.  (BY MR. GRZYB) And that question was like
24   three minutes long, so I will try and do a better job
25   of it.
```

MAGNA
LEGAL SERVICES

Page 150

1        Can we go to Exhibit 21, please,
2   together.  And I think, Mr. Dane, we identified this
3   as the Fieldwood I model, correct?
4        A.  Yes, this is a -- that is a Fieldwood 1
5   model.
6        Q.  Okay.  Regardless of the source of fund,
7   let's put that aside.  Let's --
8        Is there a tab in this spreadsheet that
9   has a projection with respect to the 2021 P and A
10  spend for the Fieldwood I assets?
11       A.  It doesn't mention it.  Although I don't
12  know that this is the -- the numbers look directly --
13  I'm looking at the tab that is the last tab that we
14  reviewed.  Although I'm not certain that this is the
15  final version, because, as you've pointed out, this
16  is not exactly the same as the financial projections
17  exhibit, but the numbers look directionally correct
18  to me in that -- in that tab.
19       Q.  One second.  I apologize.
20       All right.  Mr. Dane, looking back at
21  Exhibit 21, and we're at the *APA 2021 Plus Schedule
22  Plus Annual, if I look at AH-7, and I have a number
23  of 175,905 --
24       A.  Correct.
25       Q.  -- do you see that?

Page 151

1        A.  Yes, I do.
2        Q.  Tell me what that number represents to
3   you.
4        A.  The anticipated spend for the full year
5   2021 based on these projects.
6        Q.  The anticipated -- and is that -- are the
7   projects about which you're speaking plugging and
8   abandonment?
9        A.  Correct.
10       Q.  And the assets associated with that --
11  with that 175,905 number are the Fieldwood I assets,
12  correct?
13       A.  Yes.
14       Q.  So if -- going back to Exhibit O, if
15  Apache spent -- if both the P and A spend on
16  Exhibit O for 70 and the projection on Exhibit 21,
17  that 175,905 number, were accurate, meaning if Apache
18  spent $70 million and it was required to spend
19  175,905, then it would have to acquire the 105,905 --
20  105 million from some source other than cash flow,
21  correct?
22       MR. PÉREZ:  Object to the form of the
23  question.
24       You know, you're asking what Apache is
25  going to spend in Fieldwood I, I think it is just a

Page 152

1   fundamentally unfair question; and I also think that
2   you're mischaracterizing what he said that the 175
3   was.  It was not that what was going to be spent, it
4   is what -- the things that could be spent on.  I
5   think that's what his testimony was, but --
6        Q.  (BY MR. GRZYB)  Where does that 175,905
7   number come from?
8        A.  That is the cost expectation of all of
9   the projects that are scheduled with respect to each
10  field for the full year 2021.
11       Q.  Mr. DeWolfe and his team developed that
12  number, correct?
13       A.  Correct.
14       Q.  Has anyone from Fieldwood discussed with
15  Apache Exhibit 21?
16       A.  I believe Apache has a copy of similar
17  materials and these schedules have been shared with
18  Apache.
19       Q.  Has Apache commented upon Exhibit 21?
20       A.  I don't know that Apache has commented
21  specifically on Exhibit 21, but Apache is very
22  familiar with the overall level of spending that
23  we're discussing.
24       Q.  Going back to Exhibit O, can you explain
25  to me how Fieldwood arrived at the direct operating

Page 153

1   number?
2        A.  For the direct operating number, similar
3   to the production figures, is a bottoms-up buildup of
4   each field's anticipated contribution to the total
5   operating expenses, and it reflects the status of
6   each field and if it is expected to be producing and
7   a level of OpEx commensurate with a producing field
8   or if the field is anticipated to be shut in and a
9   commensurate level of operating expenses for a
10  shut-in field as well.
11       Q.  Can you explain to me on Exhibit O the
12  drawing of $45 million on the standby credit
13  facility?
14       A.  That is described in the Disclosure
15  Statement and it is described as an initial funding
16  in order to cure certain underspent amounts in prior
17  periods related to required spend levels under the
18  Decommissioning Agreement.
19       Q.  So who is providing the $45 million?
20       A.  The borrower.  Excuse me, I apologize,
21  the lender under that.
22       Q.  And the lender would be?
23       A.  Apache.
24       Q.  But correct me if I'm wrong, I think you
25  testified to an underspend by Fieldwood with respect



Page 154

1    to the Decommissioning Agreement, correct?
2        A.  Yes.
3        Q.  So how does the lending of $45 million
4    result in a cure with respect to that underspend?
5        A.  In -- in prior periods, there was a
6    requirement to spend $80 million annually, and in
7    2020, the total amount of spend was approximately
8    $50 million below the required spend level.
9    Depositing this money into the trust most of, which
10   is provided through this initial standby facility
11   draw, it remedies that required underspend.
12       Q.  So is it correct for me to characterize
13   that as:  You're going to use that $45 million to
14   make up the underspend from last year but then you'll
15   have to pay that back to Apache?
16       A.  No.
17       Q.  How -- how is that inaccurate?
18       A.  Can you -- can you restate your question?
19   What will -- who will have to pay what back to
20   Apache?
21       A.  Well, I assume that that loan -- those
22   are loan funds that you'll have to ultimately --
23   sorry, Fieldwood I will have to pay back to Apache,
24   correct?
25       A.  Any balance under the standby facility

Page 155

1    Fieldwood I will be responsible for repaying to a
2    borrower -- excuse me, to a lender pursuant to the
3    terms of that agreement.
4        Q.  And is it the intent operationally, for
5    Fieldwood to cure its underpayment for
6    decommissioning by utilizing this initial funding of
7    $45 million under the standby facility to make up the
8    shortfall?
9        A.  This is described in the Disclosure
10   Statement and the initial draw is meant -- the
11   initial draw is intended to cure underspent
12   requirements from prior years.
13       Q.  So from a practical perspective, is this
14   P and A for 2021 70 plus 45?
15       A.  No, the 45 is not spending on P and A.
16   It is money that is being drawn under the facility to
17   be deposited into the trust and the $70 million of
18   spending is the spending associated with only the
19   period May to December 2021 by Fieldwood I on
20   P and A.
21       Q.  Mr. Dane, please explain to me the line
22   item for a change in net working capital.
23       A.  A change in net working capital is
24   intended to represent the effect of cash-related net
25   working capital that will result from the

Page 156

1    transactions that are contemplated under the plan and
2    then going forward in ordinary course of the
3    business.
4        MR. GRZYB:  Michelle, may I have that
5    read back, please.
6        THE COURT REPORTER:  Yeah, one moment.
7    Just the answer, right?
8        MR. GRZYB:  Yes, please.
9        (The record was read as requested)
10       Q.  (BY MR. GRZYB) How does the transactions
11   contemplated in the plan result in a positive cash
12   event of $36 million for that change in net working
13   capital line item?
14       A.  The agreement with Fieldwood I under our
15   plan has a pre and post effective date concept,
16   whereby there will be significant assumed obligations
17   of the NewCo, which include all pre-effective date
18   ordinary course payables; and then Fieldwood I would
19   be responsible for any post-effective date charges or
20   expenses and will receive the benefit of any
21   post-effective date revenue; and as is typical in a
22   pre and post-effective date transaction, that can
23   result in a significant benefit to a party where you
24   are receiving revenue on a much more current basis
25   than the expenses that you are required to pay, which

Page 157

1    typically will lag by several months.
2        Q.  You're getting -- you're getting a
3    holiday on your payables for a period of 60 days?
4        A.  That's correct.  And for -- for a period
5    of whatever period of time it is that you would
6    customarily receive invoices and then have payments
7    due upon the receipt of those invoices.  It may be a
8    lot longer.
9        Q.  It is more than a holiday, it is actually
10   leave from that obligation?
11       A.  I don't think it is relief from an
12   obligation as much as a timing benefit of expenses,
13   invoices being received and then due much later than
14   revenue receipts, which come in on a monthly basis.
15       Q.  The calculation for net working capital,
16   is that based on historic payables?
17       A.  Historic payables and receivables.
18       MR. GRZYB:  Alfredo, do you want to take
19   five and then -- I can't hear you.  We will take
20   five?
21       MR. PÉREZ:  Okay, I got it.  Can you hear
22   me now?
23       MR. GRZYB:  I can hear you.  4:10?
24       MR. PÉREZ:  4:10's good.  Thanks.
25       THE COURT REPORTER:  I'm off.



1           MR. PÉREZ:  I am going to object:  Asked
2   and answered.
3           You can give him the same answer.
4           THE WITNESS:  The company stakeholders
5   are very cognizant about liabilities that the NewCo
6   is going to have.  The company that -- the plan
7   contemplates them investing hundreds of millions of
8   dollars of new capital into, and having a balanced
9   mixed of assets and liabilities is very important for
10  a successful business, and those are decisions that
11  we make whenever we evaluate any type of liability
12  and if it's something that is appropriate to incur or
13  not when not required.
14      Q.  (BY MR. BAINS) How does replacing a
15  private bond lead to liability?
16          That's the disconnect I'm having with
17  you.  You keep saying, we're trying to avoid
18  liabilities and not have a balance.  I'm not
19  understanding how those two relate.
20      A.  You had very clearly stated several times
21  indemnity agreements are features of all bonds.  That
22  is an expectation of the sureties based on what I
23  thought I heard in your questioning.  If those are
24  provisions that are part of replacement bonds, that
25  imposes liabilities on a company, and if that is

1   something that is not required, then that has to be
2   assessed by the company and its stakeholders if it's
3   appropriate.
4       Q.  Okay.  So you testified earlier that
5   Fieldwood wants the bonds to stay in place and carry
6   through, correct?
7       A.  No.
8       Q.  I thought you said earlier that the bonds
9   are there, y'all aren't trying to do anything with
10  them, they're going to stay there.
11      A.  You -- your question said the company
12  wants these things to happen.  This -- that is what
13  it is, the bond, when issued, is outstanding to the
14  beneficiary.  Our action or inaction does not change
15  that fact.
16      Q.  Well, Fieldwood Energy's the principal on
17  that bond, and Fieldwood Energy is no longer going to
18  exist, correct?
19      A.  Fieldwood Energy is currently the
20  principal on those bonds.
21      Q.  And Fieldwood Energy is not going to
22  exist after confirmation of that plan if it is
23  confirmed, correct?
24          MR. PÉREZ:  I think you're calling for a
25  legal conclusion as to whether Fieldwood Energy is

1   going to exist after the plan.
2           THE WITNESS:  I agree with Counsel on the
3   future status of the entity itself as it relates to
4   the plan given.
5       Q.  (BY MR. BAINS) What is your
6   understanding -- as the CFO of the company and the
7   proposed CEO of the new company, do you believe
8   Fieldwood Energy is still going to exist?
9       A.  Fieldwood Energy, after this
10  restructuring, is not going to exist in its current
11  form.
12      Q.  Okay.  Agreed.  Didn't think that was
13  really that controversial, but okay.
14          So the bonds are there, but yet y'all
15  don't want the indemnity to go with them.
16          Is that the basic thrust of all of this?
17      A.  I don't understand your question, what
18  your question is.
19      Q.  You want the bonds to stay there in favor
20  of these beneficiaries and pay out, but you don't
21  want indemnity to carry through because it is a
22  liability that the lender group doesn't want to
23  carry?
24      A.  I think you're mischaracterizing the
25  issue in your question.  It is not a matter of

1   desire.  The bonds are outstanding.  Fieldwood's
2   action or inaction doesn't change that.  The plan
3   addresses the treatment of the indemnity agreements,
4   but the wants or need of Fieldwood and its employees
5   doesn't change the reality of the current status of
6   the bonds that are outstanding.
7       Q.  But the lender group desires not to have
8   to indemnify any further?
9           MR. PÉREZ:  Again, calling for
10  speculation.
11          THE WITNESS:  You asked me this
12  question --
13          MR. PÉREZ:  Indemnities are treated under
14  the plan.
15      Q.  (BY MR. BAINS) What was your answer, sir?
16      A.  My answer is that I have answered that
17  question at least four times.
18      Q.  Well, we will let the transcript speak
19  for itself on that.  I'm going to jump to Exhibit 20
20  that you looked at earlier.  Let me know when you
21  have it up.
22      A.  I have it up.
23      Q.  Okay.  Page six of that gives some
24  projections for the NewCo entity.  Let me know when
25  you're there.



MAGNA

LEGAL SERVICES

Page 202

```
 1        A.  I'm there.
 2        Q.  Okay.  It shows that the P and A
 3   projections for the next five years for the NewCo
 4   entity are right around $5 to six million.
 5        Do you see that?
 6        A.  I do.
 7        Q.  And that is a pretty low number, isn't
 8   it, for P and A on a year-to-year basis?
 9        A.  The amount of P and A spending is
10   dictated by the timing and amount of projects that
11   are available to conduct P and A on.  So it is a --
12   it is relative to -- is it low?  "Low" is a relative
13   term.
14        Q.  Sure.  And I'm saying it is low relative
15   to the number of assets here and low relative to how
16   much it costs for P and A wells of the type that
17   Fieldwood would operate.  For instance, do you agree
18   with me to P and A a dry tree well on a platform is
19   like a million and a half bucks?
20        A.  No.
21        Q.  Okay.  What's the number?
22        A.  It is not a one-size-fits-all number.
23        Q.  How many wells could be decommissioned
24   for $6 million?
25        A.  That depends on a number of variables.
```

Page 203

```
 1   It depended on your working interesting in the well.
 2   If you have a low working interest, you can
 3   decommission a large number of gross wells.  It
 4   depends on the complexity of the wells, it depends on
 5   many factors that relate to the particular
 6   characteristics of the actual well and your ownership
 7   in the well.
 8        The -- I believe the spending is actually
 9   very significant relative to the liabilities of
10   NewCo.  This spending represents a very significant
11   portion of the total shelf liabilities that NewCo
12   will own.
13        Q.  NewCo's also going to own some deepwater
14   liabilities, correct?
15        A.  Yes.
16        Q.  So it is not just shelf.  And deepwater
17   generally is going to be more expensive on a P and A
18   front?
19        A.  The deepwater P and A liabilities are
20   more expensive than shelf liabilities in general.
21        Q.  I mean, for instance, you know, subsea
22   wells and deepwater are in excess of ten million to
23   decommission.  Do you agree with that?
24        A.  Generally speaking, they can be in excess
25   of $10 million.
```

Page 204

```
 1        Q.  And certainly platforms are far in excess
 2   of that?
 3        A.  Not necessarily.
 4        Q.  Why not?
 5        A.  Because it may not cost that much.
 6   Deepwater platforms are not fixed structures.
 7   Oftentimes the decommissioning of a deepwater
 8   platform itself is -- may not be that expensive,
 9   depending on the particular type of platform.
10        Q.  So you believe that $6 million a year
11   P and A is going to be sufficient to handle all the
12   P and A obligations that might arise over the next
13   five years for all these assets?
14        A.  The NewCo is going to have almost no
15   required near-term P and A obligations, because most
16   of the assets that comprise NewCo are going to be
17   significant producing assets with remaining reserve
18   life and P and A that largely is not required in the
19   near term.
20        Q.  And is that because the debtors seek to
21   abandon all the bad assets back to the predecessor?
22        MR. PÉREZ:  Object to the form of the
23   question.  I don't think that the quality of the
24   assets having anything to do with what's being
25   abandoned.  Object to the form of the question, I
```

Page 205

```
 1   think it is a statement.  Frankly, it is not even a
 2   question.  Why don't you ask a question.
 3        Q.  (BY MR. BAINS) You can answer, sir.
 4        A.  The P and A spend that is anticipated for
 5   NewCo is a function of the opportunities that are
 6   available to P and A and the timing at which those
 7   opportunities are required.  And this is actually a
 8   very significant amount of spend relative to the
 9   obligations that it will have for P and A in each of
10   these periods as we understand the asset base to
11   that.
12        Q.  Right.  And then my question was:  Is
13   that because there are no assets in here where P and
14   A would otherwise be immediately required because any
15   of those assets have been abandoned back to the
16   predecessors?
17        A.  I don't think --
18        MR. PÉREZ:  Same objection.
19        Go ahead.
20        THE WITNESS:  I think that
21   mischaracterizes the plan.
22        Q.  (BY MR. BAINS) In what way?
23        A.  The NewCo is assuming significant
24   liabilities.  Those liabilities aren't as near term
25   in general.  The NewCo has significant P and A
```



Page 242

1  qualified operator as of the plan effective date?
2     A.  The government understands the plan and
3  the various entities that are contemplated, and we
4  are working very closely with the government on an
5  ongoing basis to try and facilitate all the elements
6  of the plan that are required.
7     Q.  A quick question going to the financial
8  projections for Fieldwood I, and to just kind of
9  clarify the earlier testimony about what work is
10 planned going forward for the capital spend, the
11 capital spend budget in Exhibit O to the Disclosure
12 Statement contemplates only well recompletions; is
13 that correct?
14    A.  Yes.
15    Q.  Okay.  And those well recompletions are
16 based on sort of a general budget for recompletions
17 and not tied to -- there is no specific list of
18 recompletions that are planned; is that correct?
19    A.  With respect to the projections, the
20 basis for the spending on capital related to
21 Fieldwood I and the production contributions was a
22 type curve type of methodology, which was based on
23 our historic results and opportunities that related
24 to those assets.  We do have actual lists of
25 opportunities, but that's not the basis for what

Page 243

1  those projections are.
2     Q.  So that -- that type --
3        (Echoing and possible television noise
4         in background)
5     THE COURT REPORTER:  Sorry, guys,
6  somebody's not on mute.
7     MR. KNAPP:  I thought my kid's Mario car
8  game in the other room would be the problem.
9     Q.  (BY MR. KNAPP) So going to that type
10 curve analysis, so what you did, if you could explain
11 in more detail, you know, how does that work?
12       Does that take past recompletion results
13 and project it on, you know, what you might expect
14 going forward based on your past recompletion
15 programs?
16    A.  That's correct.  It is very -- when
17 thinking about the different methodologies to be able
18 to incorporate a defensible capital con -- capital
19 program of recompletion-related projects and the
20 associated production, what we thought was most
21 appropriate was to look at our historic budgeting
22 process and how we have -- and the average
23 performance based on a program of recompletions.
24 Because the timing of an individual recompletion is
25 very specific to the actual wellbore.

Page 244

1        And we got so many projects and wells and
2  the challenges of forecasting these particular types
3  of capital projects on an individual basis over an
4  extended forecast period, such as five years, it was,
5  after discussion, determined that the most
6  appropriate way to try and represent what a
7  recompletion program would be capable of delivering
8  would be to use the methodology that we have used,
9  which is consistent with our past budgeting
10 practices.
11    Q.  That makes sense.
12    MR. KNAPP:  I will pass the same to
13 Robert Miller.
14    MR. MILLER:  Thank you, Mr. Knapp.  You
15 covered a lot of the ground I was going to cover.
16       EXAMINATION
17    Q.  (BY MR. MILLER) Good evening, Mr. Dane.
18 I appreciate all the time that you have spent with
19 us.
20       Earlier this week, revised versions of
21 the proposed Fieldwood I LLC agreement were filed in
22 the bankruptcy case, correct?
23    A.  Yes.
24    Q.  You're generally familiar with those
25 newest versions and the changes in those, correct?

Page 245

1     A.  I am somewhat familiar with those
2  changes.
3     Q.  Would it be helpful if I put the exhibit
4  file either in the chat or screen shared it with you?
5     A.  Yes, please.
6     MR. MILLER:  Mr. Perez, with your
7  permission, may I do that?
8     MR. PÉREZ:  That's fine.  Great.
9     MR. MILLER:  Okay.  We will call this
10 Exhibit 27.
11       (Exhibit 27 marked)
12    MR. MILLER:  So I just put it in the chat
13 so everyone should be able to pull it.
14    Q.  (BY MR. MILLER) And I can --
15    A.  I have access to it.
16    Q.  You have access to it, Mr. Dane?
17    A.  Yes, I do.
18    Q.  Okay.  Great, thank you.
19       All right.  So this is a Docket Entry
20 Number 1365, which was filed on the 11th of May.  I
21 call this the "Revised Cumulative Redline."  Those
22 are two redlines that were filed.
23       I'm going to -- if you wouldn't mind
24 following with me to, let's see here, page number 18
25 in the document --



MAGNA
LEGAL SERVICES

Page 282

1    Q. Do you have any personal knowledge
2 regarding the use of the Ryder Scott report by your
3 expert?
4    A. None other than what is represented in
5 the expert report.
6    Q. Okay. Let's talk a little bit more about
7 decommissioning projections and costs from NewCo.
8       Do you have any knowledge with regard to
9 the decommissioning costs that were referred to on
10 the first day filing declarations?
11    A. I would have to understand more
12 specifically what you're asking about.
13    Q. Okay. How many P and A projects has
14 Fieldwood undertaken in the last five years?
15    A. I don't know if I can speak specifically
16 to that timeframe, but since Fieldwood -- since
17 inception in 2013, the company has extended over I
18 believe it is a billion and a half dollars,
19 decommissioning well over a thousand wells, I believe
20 1,200 wells, over 400 platforms and structures and
21 several hundred pipelines.
22    Q. Has it been your experience that you
23 routinely can do that for less than what BSEE
24 estimates costs to be?
25    A. So decommissioning processes are very

Page 283

1 project-specific and in many cases we have
2 decommissioned for far below BSEE estimates. BSEE
3 estimates comprise a number of different numbers.
4 There used to be a single number. Now there are
5 estimates that comprise P-50, P-90 deterministic
6 estimates. And it's -- it's challenging to paint all
7 projects with one brush.
8    Q. So, generally speaking, is it your
9 opinion that BSEE -- that because it is a -- well,
10 strike that.
11       Do you have a general opinion of BSEE
12 estimates, good, bad or otherwise?
13    A. I think the BSEE estimates are in some
14 cases not comparable to the actual properties, in
15 some cases they can be a fair representation; and it
16 is -- it is challenging as a whole across a very
17 large asset base, like Fieldwood's, to look at
18 numbers other than analysis that has been performed
19 specifics to the assets themselves.
20    Q. When you're engaging in the P and A
21 operation, do you report back to BSEE what your
22 actual expenditures were in that part of the process
23 that you engage in with them?
24    A. I believe that within the last couple of
25 years, there are required regulatory costs

Page 284

1 reporting -- reports.
2    Q. And has it been your experience the last
3 couple of years as you have engaged in that process
4 as an operator the BSEE costs have become more
5 reliable, or do you have any opinion in that regard?
6    A. The same answer as before, the -- the
7 reliability is property-specific and it is -- I don't
8 think it is -- I don't think it -- I don't think that
9 the estimates, unless -- I don't think the estimates,
10 broadly speaking, to the nature -- versus the nature
11 of the assets that Fieldwood currently owns are the
12 most representative tool by any means.
13    Q. What percentage of plugging and
14 abandoning costs included in the Disclosure Statement
15 projections relate to shelf assets, if you know?
16    A. What specific number are you referring to
17 in the Disclosure Statement, of the total
18 decommissioning?
19    Q. Right. I mean, is it 10 percent,
20 20 percent? Do you have a general opinion?
21    A. I would estimate that the shelf
22 properties P and A reflects approximately 75 percent
23 of the overall obligations, possibly maybe -- maybe a
24 bit more than that, maybe 80 percent, 85 percent. 75
25 to 85 percent, I would guess.

Page 285

1    Q. And do you have any opinion of the costs
2 associated with decommissioning of State of
3 Texas-leased property?
4    A. Yes.
5    Q. And generally what's the budget range
6 that you use as a rule of thumb?
7    A. Costs are not a function of the State or
8 geographic location that the asset resides in. It is
9 most -- it is mainly related to the nature of the
10 projects as opposed to the geographic location.
11    Q. And I will tell you the reason I'm asking
12 is that BSEE doesn't provide estimates for State
13 leases, so I was curious as to what -- in terms of
14 your experience, what would you use as a rule of
15 thumb estimate for a State lease?
16    A. The same answer I just gave you, it
17 depends on --
18    Q. Do you have a dollar amount?
19    A. You didn't ask me a question that I can
20 answer.
21    Q. Okay. Well, I will try, then.
22       Do you have a dollar amount that you
23 generally budget for a State of Texas lease?
24    A. No.
25    Q. Looking back to your first bankruptcy

72 (Pages 282 to 285)



Page 286

1   filing, do you know if you or anyone with the company
2   has ever analyzed the reasonableness of the
3   management team's projections -- and what I'm
4   referring to there is the Exhibit O to the Disclosure
5   Statement -- by preparing the projections included in
6   the 2018 Disclosure Statement dated February 15th,
7   2018 and comparing those to the 2018 or 2019
8   historical operating results of the company?
9        A.  Yes.
10       Q.  And did you reach any conclusions in that
11  regard?
12       A.  Yes.
13       Q.  And can you share those with me?
14       A.  Actual results were different for a
15  variety of factors.
16       Q.  Can you explain what those factors were?
17       A.  The price environment obviously
18  deteriorated very substantially over the past year
19  and a half versus the price environment back in 2018.
20  Initially in the first period, the projections were
21  not too materially different.  The profitability was
22  mostly lower, the capital spending was substantially
23  lower, and the free cash flow was probably higher.
24       In subsequent years, '19, the production
25  estimates were meaningfully below the projections due

Page 287

1   to the delayed capital spending from 2018, which
2   resulted in substantially higher free cash flow in
3   2018; the capital spending in 2019 was substantially
4   above the projections; and 2020, the business
5   obviously was substantially below the projections due
6   to -- largely due to the changes in the business
7   environment that impacted the business in 2020,
8   starting with the Covid-induced price changes, then
9   due to the nature of the restructuring event that we
10  undertook, the changing of the shelf asset base in
11  the storm season.  Those were -- those were the
12  observations that I had.
13       Q.  Any others?
14       A.  The question was:  Observations of
15  changes versus actual versus projected performance?
16  Those are my main observations.
17       Q.  Okay.  Have you understood the questions
18  that I have asked this afternoon -- or this evening?
19       A.  Not all of them.
20       Q.  You answered them to the best of your
21  ability?
22       A.  I believe so.
23       Q.  Have you answered truthfully and
24  honestly?
25       A.  Yes.

Page 288

1        Q.  And have I treated you with courtesy
2   during today's deposition?
3        A.  Yes, you have.
4        MR. DUEWALL:  All right.  I pass the
5   witness.
6        THE WITNESS:  Thank you.
7        MR. PÉREZ:  All right.  I guess we can go
8   have dinner.  We will reserve our questions to the
9   hearing, time of trial.
10       (Proceedings concluded at 6:43 p.m.)
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 289

1        CHANGES AND SIGNATURE
2   PAGE LINE  CHANGE              REASON
3   _____
4   _____
5   _____
6   _____
7   _____
8   _____
9   _____
10  _____
11  _____
12  _____
13  _____
14  _____
15  _____
16  _____
17  _____
18  _____
19  _____
20  _____
21  _____
22  _____
23  _____
24  _____
25  _____





MAGNA
LEGAL SERVICES

Page 290

```
 1
 2
 3
 4
 5
 6
 7          I declare under penalty of perjury that the
 8    foregoing is true and correct.
 9
10          _____
11                MR. MICHAEL T. DANE
12
13
14          SUBSCRIBED AND SWORN TO BEFORE ME, the
15    undersigned authority, by the witness, MR. MICHAEL T.
16    DANE, on this the _____ day of
17    _____, 2021.
18
19          _____
20                NOTARY PUBLIC IN AND FOR
21                THE STATE OF _____
22
23    My Commission Expires: _____
24
25
```

Page 291

```
 1    STATE OF TEXAS
 2    COUNTY OF HARRIS
 3
 4               REPORTER'S CERTIFICATE
 5               ORAL DEPOSITION OF
 6               MR. MICHAEL T. DANE
 7                  May 13, 2021
 8
 9          I, Michelle Hartman, the undersigned
10    Certified Shorthand Reporter in and for the State of
11    Texas and Registered Professional Reporter, certify
12    that the facts stated in the foregoing pages are true
13    and correct.
14          I further certify that I am neither
15    attorney or counsel for, related to, nor employed by
16    any parties to the action in which this testimony is
17    taken and, further, that I am not a relative or
18    employee of any counsel employed by the parties
19    hereto or financially interested in the action.
20          That the deposition transcript was duly
21    submitted on _____ to the witness or to
22    the attorney for the witness for examination,
23    signature, and returned to me by _____.
24
25
```

Page 292

```
 1          SUBSCRIBED AND SWORN TO under my hand and
 2    seal of office on this _____ day of May, 2021.
 3
 4
 5          _____
 6    Michelle Hartman, CSR, RPR
      Texas CSR 7093
 7    Expiration: 12/31/21
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

74  (Pages 290 to 292)

