IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | § § | Chapter 11 |
| | § | Case No. 20-33948 (MI) |
| **FIELDWOOD ENERGY, LLC,** *et al*,[1] | § § | |
| | § | (Jointly Administered) |
| Debtors. | § § § | |

### JOINT SURETY OBJECTION TO DEBTORS' EMERGENCY MOTION TO STRIKE LILY CHEUNG'S PURPORTED EXPERT TESTIMONY

Certain surety companies ("Sureties")[2] file this Objection to the Debtors' *Emergency Motion to Strike Lily Cheung's Purported Expert Testimony* ("Motion to Strike") (Doc. No. 1547)[3] and state as follows:

### I.   INTRODUCTION

1.   The Debtors' desire to strike Ms. Cheung's testimony is not surprising. The Debtors continually represent to this Court that FWE I[4] will fund the substantial decommissioning costs of the FWE I Assets. But, using the Debtors' own disclosures, Ms. Cheung's analysis lays bare the reality that FWE I is set up to fail. Ms. Cheung scoured the FWE I asset base to find the most valuable production opportunities within the FWE I umbrella,

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are: Dynamic Offshore Resources NS, LLC (0158); Fieldwood Energy LLC (6778); Fieldwood Energy Inc. (4991); Fieldwood Energy Offshore LLC (4494); Fieldwood Onshore LLC (3489); Fieldwood SD Offshore LLC (8786); Fieldwood Offshore LLC (2390); FW GOM Pipeline, Inc. (8440); GOM Shelf LLC (8107); Bandon Oil and Gas GP, LLC (9172); Bandon Oil and Gas, LP (9266); Fieldwood Energy SP LLC (1971); Galveston Bay Pipeline LLC (5703); and Galveston Bay Processing LLC (0422). The Debtors' primary mailing address is 2000 W. Sam Houston Parkway S., Suite 1200, Houston, TX 77042.

[2] The sureties joining in this objection include HCC International Insurance Company Plc, Lexon Insurance Company, Philadelphia Indemnity Insurance Company, Zurich American Insurance Company, Berkley Insurance Company, Aspen American Insurance Company, Everest Reinsurance Company and Sirius America Insurance Company.

[3] It appears the Debtors filed the Motion to Strike twice at Doc. Nos. 1546 and 1547. Sureties will reference Doc. No. 1547.

[4] Unless defined in this Objection, all capitalized terms have the meanings ascribed them in the Motion to Strike.

**JOINT SURETY OBJECTION TO MOTION TO STRIKE EXPERT TESTIMONY OF LILY CHEUNG—
PAGE 1**

modeled those opportunities using the Debtors' own reservoir estimates and the Debtors' own capital budget for FWE I, and found that FWE I will fail to meet its targeted projections almost immediately. Debtors' projections for FWE I—which were relied upon without revision by Houlihan Lokey—are just wrong.

2. Ms. Cheung's testimony shows that the Debtors' plan is to set up FWE I to default on its decommissioning obligations. The intent of Apache and FWE I under the Plan is that, once FWE I defaults, Apache, which is jointly and severally liable for such obligations, will be required to fund the decommissioning costs, which could give Apache the right to reimbursement from FWE I under the Decommissioning Agreement the Debtors intend to assume. But, rather than demanding reimbursement from FWE I, Apache would likely seek to draw on approximately $730 million of the Decommissioning Security, consisting of Trust A Cash, the Surety Bonds, and letters of credit to get reimbursed. Following exhaustion of the trust funds and letters of credit/bonds, the Sureties subrogate to Apache's contractual right to reimbursement from the Debtors, but the Debtors and Apache have struck a deal to defeat those rights. They are entering into a Standby Loan Agreement whereby Apache has the discretion to advance a line of credit to FWE I up to $400 million secured by a first lien and security interest in the Debtors' assets. This gives Apache the opportunity to draw on the Decommissioning Security first and then loan funds to FWE I to pay for additional decommissioning costs for which Apache is liable, rather than to fund such costs directly. Then Apache can use its lien position to subordinate the Sureties' rights to subrogate to Apache's right to reimbursement from

FWE I for decommissioning costs the Sureties' fund. By seeking to strike Ms. Cheung's testimony, the Debtors are attempting to conceal this scheme.[5]

3. The reasons for striking Ms. Cheung's testimony ring hollow. Debtors complain that Ms. Cheung's report was untimely under the Scheduling Order (Doc. No. 1224). It is not. The Scheduling Order set the deadline for reports of experts for a party with the initial burden of proof for May 10, 2021. The Sureties do not bear the burden of proof on any issue, within the scope of Ms. Cheung's report. The deadline for filing reports of rebuttal experts was May 24, 2021, the date upon which Ms. Cheung's report was produced. Even if Ms. Cheung's report were untimely, and as discussed further below, Debtors agreed to the May 24 deadline for the report.

4. Ms. Cheung's report also rebuts issues on which the Debtors bear the burden of proof. Debtors' expert, John-Paul Hanson, obtained information from the Debtors which he relies upon in his expert report. Ms. Cheung's report rebuts Mr. Hanson's report by demonstrating that the information that Mr. Hanson relied upon is wrong and undermines the conclusions in his report. Therefore, even if the Sureties had the burden of proof on feasibility and the Debtors had not agreed to the expert report deadline they agreed to, Ms. Cheung's report fairly stands as rebuttal testimony.

5. Debtors' complaint regarding the production of working papers fails as well. Sureties produced the working papers and offered another deposition of Ms. Cheung. The Court must determine whether the failure to produce was harmless, and the facts here suggest that it was. Debtors obtained a continuance of the confirmation hearing the same day Ms. Cheung was

---

[5] In addition to the fact that FWE I is set up to fail for the benefit of Apache, the Sureties believe that the Debtors' Plan, and the creation of the FWE I structure, including the granting of broad control rights in and to Apache of FWE I, as well as other material modifications to the Decommissioning Agreement, likely create defenses of the Sureties in the event that the Plan is confirmed and Apache makes demand under the bonds and letters of credit after Plan confirmation. These benefits to Apache, as a general unsecured creditor, also constitute a violation of Section 1123(a)(4) in that other unsecured creditors, such as the Sureties, are not being granted the rights and the actual value that is being given to Apache under the Plan.

**JOINT SURETY OBJECTION TO MOTION TO STRIKE EXPERT TESTIMONY OF LILY CHEUNG—
PAGE 3**

deposed and had plenty of opportunity to use the additional time available for her continued deposition. They decided not to do so.

6. Finally, Debtors complain that Ms. Cheung's report is unreliable because she failed to account for potential cost savings; however, Ms. Cheung's analysis is based on the Debtors' own information and the Debtors did not produce sufficient information to allow for a well by well adjustment. Moreover, the Debtors do not argue that, even if she had the information to account for potential reductions in variable costs, that such reductions would be material to her conclusion that that FWE I will be unable to meet its production forecasts using the Debtors' own capital budget and forecasts. Debtors' objections premised on Federal Rule of Evidence 702 provide no basis to exclude her testimony entirely as opposed to considering what Ms. Cheung has to say as the only professional engineer designated to provide such testimony by any party, including the Debtors. The Court should have the benefit of Ms. Cheung's analysis in deciding whether to confirm Debtors' Fourth Amended Plan.

## II. FACTUAL BACKGROUND

7. As the Court is well aware, Debtors' Plan structure consists of fracturing the Debtors' assets among a number of entities via a combined sale and divisive merger. These entities include a NewCo, which will operate primarily deepwater assets, FWE I, which is formed to decommission the Legacy Apache Properties, FWE III, which consists of primarily sole liability properties and additional leases via negotiated resolutions with other working interest owners and predecessors, FWE IV, which consists of legacy Chevron assets, and abandoned properties, *i.e.* a mess left to the U.S. government, working interest owners, predecessors, and various bonding companies to clean up.

8.  Debtors' Disclosure Statement presents multiple exhibits tied to valuation of the Debtors and going-forward financial projections. Houlihan Lokey's valuation work appears in Exhibit N. (Doc. No. 1285, Ex. N). As was further confirmed in the testimony of John-Paul Hanson, Houlihan Lokey relied extensively on Debtors' financial analysis in preparing the valuation. Exhibit N itself states in part:

> In preparing the estimates set forth below, Houlihan Lokey has relied upon the accuracy, completeness, and fairness of information furnished by the Debtors. Houlihan Lokey did not attempt to independently audit or verify such information, nor did it perform an independent appraisal of the assets or liabilities of the Debtors or the Subject Entities. Houlihan Lokey did not conduct an independent investigation into any of the legal or accounting matters affecting the Subject Entities, and therefore makes no representation as to their potential impact on the valuation analyses described herein.

9.  Exhibit O to the Disclosure Statement sets forth the financial projections for FWE I. (Doc. No. 1285, Ex. O). The financial projections rely on an average production of 28,000 BOE per day for 2021 and 27,000 BOE per day for 2022. *Id.* Debtors also provide capital spend projections of $29 million in 2021 and $35 million in 2022, and, based on projected cash flows, they budget for a total of $150 million in plugging and abandonment costs in 2021 and 2022. *Id.*

10. On April 6, 2021, the Court entered the Scheduling Order governing the pretrial proceedings leading to confirmation. (Doc. No. 1224). The Scheduling Order set expert deadlines "for party with initial burden of proof" of April 21 for the Debtors and May 10 for non-debtor parties.[6] The Scheduling Order then set a rebuttal expert report deadline of May 24, 2021. The Scheduling Order further noted in paragraph 4 that the Debtors and other parties may by agreement modify any deadline in the Scheduling Order other than hearing dates.

---

[6] This deadline could apply to a number of proceeding such as a motion to estimate for voting purposes, *see* Fed. R. Bankr. Pro. 3018, or a motion to designate a party's vote under a chapter 11 plan. *See* 11 U.S.C. § 1126(e).

**JOINT SURETY OBJECTION TO MOTION TO STRIKE EXPERT TESTIMONY OF LILY CHEUNG—
PAGE 5**

11. Following April 6, 2021, the Parties engaged in discovery with the frenzy typical of pre-confirmation discovery. Debtors made rolling document productions in April and well into May, including a supplemental expert production on May 24, 2021.[7] Michael Dane—a critical witness in this case—was deposed on May 13, 2021, after the Sureties had the benefit of the bulk of the document productions.

12. On May 9, 2021, Darren Grzyb, counsel for five of the Sureties, conferred with Alfredo Perez, counsel for Debtors, regarding the expert report deadline. Mr. Grzyb made clear the Sureties had retained an expert whose report would go to, among other things, feasibility, and noted that the Sureties do not have an "initial burden of proof" on feasibility. Mr. Perez agreed that the Debtors maintained the burden of proof on feasibility and that the Sureties' expert report could be served on May 24, 2021. Mr. Grzyb confirmed the understanding in email attached hereto as **Exhibit A**.

13. On May 24, 2021, the Sureties served Ms. Cheung's expert report, a copy of which is attached hereto as **Exhibit B**.[8] Among other things, Ms. Cheung's expert report notes that Debtors' production targets for 2021 and 2022 as set forth in Exhibit O to the Disclosure Statement "are overstated." Ex. B at 6. Ms. Cheung further opines that Fieldwood used an improper method to calculate its production projects. *Id.* Additionally Ms. Cheung notes that Fieldwood's proposed budget for plugging and abandonment will fail to complete the decommissioning required as a matter of law on current and soon-to-be expired, terminated, and relinquished FWE I leases. *Id.* In preparing the report, Ms. Cheung relied exclusively on

---

[7] Debtors continue to produce documents as recently as June 14 that relate to FWE I and its going forward operations.
[8] Ms. Cheung's report also appears at Doc. No. 1548 as Exhibit 2.

**JOINT SURETY OBJECTION TO MOTION TO STRIKE EXPERT TESTIMONY OF LILY CHEUNG—PAGE 6**

Debtors' records, document production, and ARIES database as well as public data sources such as information maintained by BOEM and BSEE.

14. Much of Ms. Cheung's analysis has been confirmed by fact witness depositions. Michael Dane testified ▮▮▮▮ (**Exhibit C**, Dane Dep. 242:15-244:10). Debtors' banking expert, John-Paul Hanson, testified—much like Ms. Cheung—that ▮▮▮▮ (**Exhibit D**, Hanson Dep. 41:9-16). Similarly, Jon Graham—the individual who will be sole manager of FWE I—testified t▮▮▮▮ (**Exhibit E**, Graham Dep. at 34:18-22; 41:1-9). Graham further testified that ▮▮▮▮ (**Exhibit E**, Graham Dep. at 67:3-5).

15. Ms. Cheung's deposition occurred on Friday, June 4, 2021, and lasted less than two-and-a-half hours. At the deposition, it became clear Ms. Cheung had additional working papers that had not been produced. Sureties produced the working papers on Tuesday, June 8, 2021, and offered an additional deposition of Ms. Cheung. (**Exhibit G**, J. Brown Email). Debtors declined a further deposition.

16. Notwithstanding the commonsense testimony from Ms. Cheung—a professional engineer with extensive experience with this type of analysis—Debtors now move to strike her testimony. Debtors raise three grounds for striking her testimony: (1) that her May 24 report was untimely, (2) that the June 8 production of her working papers was improper; and (3) that her opinion is unreliable because she failed to downward adjust for operating costs related to non-

**JOINT SURETY OBJECTION TO MOTION TO STRIKE EXPERT TESTIMONY OF LILY CHEUNG—
PAGE 7**

producing assets and failed to account for additional capital sources in excess of the capital expense budget contained in Exhibit O. These arguments fail.

### III. ARGUMENTS AND AUTHORITIES

17. Debtors raise a host of arguments for excluding the testimony of Ms. Cheung; however, each argument fails under the applicable facts. The Court should allow Ms. Cheung to testify and evaluate the credibility of her testimony in Court at the Confirmation Hearing.

**A. Ms. Cheung's Expert Report Was Timely.**

18. Debtors' assertion that Ms. Cheung's May 24 expert report is untimely fails on the face of the Scheduling Order. Debtors cast Ms. Cheung's report as a report on "feasibility," referring to feasibility under section 1129(a)(11) of the Bankruptcy Code. This position undercuts Debtors' argument on timeliness. A debtor bears the burden to satisfy the factors contained in section 1129(a), including feasibility, by the preponderance of the evidence. *See Matter of T-H New Orleans Ltd. P'ship*, 116 F.3d 790, 801 (5th Cir. 1997). Thus, Sureties are not a "party with initial burden of proof" under the plain language of the Scheduling Order. (Doc. No. 1224).

19. Even if the Court were to disregard the parenthetical contained in its Scheduling Order, the Scheduling Order further allowed for the Debtors and parties to reach agreements modifying deadlines other than hearing dates. (Doc. No. 1224 ¶ 4). Mr. Grzyb and Mr. Perez conferred regarding Sureties' expert report. Mr. Perez acknowledged the Sureties are not the party with the burden of proof on feasibility, and Mr. Grzyb and Mr. Perez reached an agreement on when Ms. Cheung's report would be produced—May 24. There is no doubt Ms. Cheung's report was timely.

**B. Even if Debtors Had Not Agreed, Ms. Cheung's Report Fairly Rebuts the Basis of the Houlihan Lokey Report.**

20. Even if Ms. Cheung's report were only timely if it rebutted a Debtors' expert report—as the Debtors incorrectly suggest—her report does exactly that. As an initial matter, it rebuts any feasibility testimony Debtors would have presented had they designated an expert witness. They failed to do so, but that does not mean other parties are precluded from providing rebuttal expert testimony on the issue of feasibility.

21. Moreover, Ms. Cheung's report rebuts Debtors' expert valuation testimony. Houlihan Lokey relied extensively on the Debtors' economic modeling. A version of Exhibit O to the Disclosure Statement appears as the only appendix related to FWE I financials in the expert report of John-Paul Hanson. (Ex. F, Hanson Report at 77). Exhibit N to the Disclosure Statement spells out this reliance as well, as set forth above.

22. Hanson repeatedly testified ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Hanson testified ▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (Ex. D, Hanson Dep. at 18:4-14). ▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮:



(Ex. D, Hanson Dep. at 19:13-25).

23.     In other words, Houlihan Lokey's work is built on the very financial projections Ms. Cheung's work tears apart. While Ms. Cheung does not issue an opinion regarding valuation, her work undermines the credibility of the Debtors' experts, and therefore, alternatively, Ms. Cheung's report is admissible and timely as rebuttal testimony.

**C.    Debtors Have Not Been Prejudiced by the June 8 Production of Ms. Cheung's Work Papers.**

24.     Under Rule 37(c)(1), a party who fails to provide information as required by Rule 26(a) is "not allowed to use that information or witness to supply evidence on a motion, at hearing, or at a trial, unless the failure was substantially justified or harmless." *See* Fed. R. Civ. P. 37(c)(1). In determining whether a violation of Rule 26 is harmless, the court examines four

factors: (1) the importance of the evidence; (2) the prejudice to the opposing party of including the evidence; (3) the possibility of curing such prejudice by granting a continuance; and (4) the explanation for the party's failure to disclose. *Brimer v. Chase Bank, U.S.A., N.A.*, No. 7:10-CV-7-O, 2011 WL 13233317, at *2 (N.D. Tex. Jan. 13, 2011) (citing *Texas A&M Research Found. v. Magna Transp., Inc.*, 338 F.3d 394, 402 (5th Cir. 2003)).

25. The Debtors do not dispute that Ms. Cheung's working papers were produced on June 8, the Tuesday following Ms. Cheung's Friday, June 4 deposition. This production on June 8 was harmless. First, the evidence—Ms. Cheung's working papers—derive entirely from documents and information produced by the Debtors themselves. Debtors' production presents the important evidence, and Ms. Cheung's papers merely represent summaries and calculations derived from those productions. With respect to the second factor, the delayed production did not prejudice the Debtors. Just as the Debtors supplemented their April 21 expert reports with expert document productions on May 24, the Sureties supplemented their expert production. Moreover, Sureties offered to produce Ms. Cheung for another deposition. (*See* **Exhibit G**). Debtors declined that request. Debtors cannot now complain of prejudice. With respect to the third factor, Debtors obtained a continuance of the confirmation hearing the day of Ms. Cheung's deposition, which left plenty of time to depose her regarding the working papers. Instead of taking the opportunity to continue Ms. Cheung's deposition, Debtors filed the Motion to Strike.

26. With respect to the fourth factor, the failure to produce the work papers was harmless inadvertence. All of Ms. Cheung's work derived directly from the Debtors' documentation and data, and the work papers were produced expeditiously following Ms. Cheung's deposition with opportunity for another deposition presented. The nature of fast-moving bankruptcy processes means documents are produced on a rolling basis all the time. As

stated above, Sureties received a supplemental production related to potential FWE I capital projects just two days ago, which documents should have been produced earlier based on the Sureties' discovery requests.

27. Debtors also focus on statement from Ms. Cheung's deposition in which she was asked if she provided working papers to Surety counsel. Her comment that she provided them "[i]n an – in an Excel format that was put on PowerPoint," was a misstatement by Ms. Cheung. Ms. Cheung did not provide her working papers to Surety counsel. Her working papers could not possibly be put into PowerPoint format. She may have shown counsel some of her calculations leading to her expert report and how she arrived at the calculations, but counsel were never provided her "working papers," and certainly did not intentionally withhold them from the Debtors as suggested in the moving papers. The Sureties would have no reason to do that. Debtors have not been harmed by the production of working papers on June 8, and the Court should decline to strike Ms. Cheung's testimony on that basis.

### D. Ms. Cheung's Opinions Are Reliable and Should Be Admitted.

28. Trial courts must assess the admissibility of expert testimony under Fed. R. Evid. 702, as explained in the Supreme Court's trilogy of *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993), *Gen. Elec. Co. v. Joiner*, 522 U.S. 136 (1997), and *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137 (1999). Under Rule 702, a witness may be "qualified as an expert by knowledge, skill, experience, training, or education." Fed. R. Evid. 702. The purpose of Rule 702 is to allow "scientific, technical, or other specialized knowledge [that] will assist the trier of fact to understand the evidence or to determine a fact in issue . . . ." Fed. R. Evid. 702. Because experts are afforded greater "testimonial latitude" than lay witnesses, experts must demonstrate that their opinions are reliably based on the "knowledge and experience" of their discipline. *See*

**JOINT SURETY OBJECTION TO MOTION TO STRIKE EXPERT TESTIMONY OF LILY CHEUNG—
PAGE 12**

*Kumho Tire*, 526 U.S. at 148. Under Rule 702, though, "rejection of expert testimony is the exception rather than the rule." Fed. R. Evid. 702 (2000 Advisory Committee Notes). Moreover, the standards for allowing expert testimony are more flexible where a judge—as opposed to a jury—sits as the fact finder. *See Gibbs v. Gibbs*, 210 F.3d 491, 500 (5th Cir. 2000) ("Most of the safeguards provided for in *Daubert* are not as essential in a case such as this where the district judge sits as the trier of fact in place of a jury.").

29. Questions regarding credibility are best reserved for the fact finder. As the Supreme Court stated in *Daubert*, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596. "[T]he trial court's role as gatekeeper is not intended to serve as a replacement for the adversary system[.]" *United States v. 14.38 Acres of Land*, 80 F.3d 1074, 1078 (5th Cir. 1996).

30. Debtors do not appear to seriously challenge Ms. Cheung's ability to testify that FWE I will not meet its oil and gas production as forecast. Debtors instead focus their challenge on Ms. Cheung's failure to consider potential cost savings that may be associated with missing those production forecasts and failure to consider additional capital sources (as opposed to Debtors' own capital expenditure budget for FWE I). Neither of issues form a basis for excluding Ms. Cheung's testimony.

31. Ms. Cheung did not incorporate consideration of cost savings into her report, but there are many reasons why this makes sense. First, Debtors never produced evidence that would allow for a property-by-property analysis of cost savings tied to production. If Debtors have such analysis, they could have presented it to Ms. Cheung and deposed her on her calculations, but they chose not to take that approach. Second, the specter of hypothetical cost

savings does not undermine Ms. Cheung's testimony at all. FWE I is structured with significant fixed G&A costs under the Transition Services Agreement. *See* Doc. 1365, Ex. 15, Art. 3.1(c) (setting out fixed lease costs and other pass through costs). Moreover, employee costs are allocated based on a percent of time dedicated to FWE I, which is not something capable of calculation or likely to change based on a shut in or producing status. *Id.* Art. 3.1(b). Most other costs for FWE I set out on Exhibit O—with the exception of transportation, a relatively small budget item—will be fixed or very close to fixed regardless of the amount of production. Indeed, Debtors are still spending money on repairs to shut in platforms from last year's hurricane season, and costs can vary based on a large number of factors.

32. Similarly, while Debtors criticize Ms. Cheung's failure to take into account other potential sources of capital, that challenge misses the mark completely. Ms. Cheung's report demonstrates that the proposed capital budget presented to the Court on Exhibit O will not result in the projected production. If Debtors want to take the position that Exhibit O is mistaken and that capital spend will be substantially higher, they could have forecasted that spend. They did not.

33. The proposition that Ms. Cheung's entire opinion should be scrapped because cost savings or additional capital sources may exist is absurd. Even if Debtors can present some evidence of cost savings for drastically diminished production targets at trial, whether that cost savings is substantial enough to overcome missed revenue or that FWE I may have access to some other source of capital they have not budgeted for on Exhibit O will be a fact issue for the Court to decide in weighing testimony. Deciding whether such testimony should be admitted at this stage is premature and deprives the Court of critical testimony.

### IV.     CONCLUSION

34. The Court needs the best information available to decide whether Debtors' Plan will work on a fundamental level. The stakes of the Plan failing are extraordinary. Ms. Cheung is the only professional engineer designated to assist the Court with that analysis. If Debtors can present fact testimony that undercuts Ms. Cheung's testimony, that testimony should be presented at trial along with Ms. Cheung's testimony. This Court is no stranger to factual fights involving oil and gas assets and can weigh that information at trial. The Sureties respectfully submit that Debtors' Motion to Strike should be denied.

Dated: June 16, 2021

                        Respectfully submitted,

| | |
|---|---|
| By: */s/ Simon Mayer*<br>Philip G. Eisenberg<br>Texas Bar Number 24033923<br>Elizabeth M. Guffy<br>Texas Bar Number 8592525<br>Simon R. Mayer<br>Texas Bar Number 24060243<br>**LOCKE LORD LLP**<br>600 Travis Street, Suite 2800<br>Houston, Texas 77002<br>Telephone: (713) 226-1200<br>Facsimile: (713) 223-3717<br>Email: peisenberg@lockelord.com<br>         eguffy@lockelord.com<br>         simon.mayer@lockelord.com<br><br>Bradley C. Knapp<br>Texas Bar Number 24060101<br>**LOCKE LORD LLP**<br>601 Poydras St., Suite 2660<br>New Orleans, LA 70130<br>Telephone: (504) 558-5210<br>Email: bknapp@lockelord.com<br><br>*Attorneys for HCC International Insurance Company PLC* | HUSCH BLACKWELL LLP<br><br>By: */s/ Timothy A. Million*<br>Randall A. Rios<br>State Bar No. 16935865<br>Timothy A. Million<br>State Bar No. 24051055<br>600 Travis, Suite 2350<br>Houston, Texas 77002<br>Tel: 713-525-6226<br>Fax: 713-647-6884<br>Email: randy.rios@huschblackwell.com<br>tim.million@huschblackwell.com<br><br>**CO-COUNSEL FOR ASPEN AMERICAN INSURANCE COMPANY, BERKLEY INSURANCE COMPANY, EVEREST REINSURANCE COMPANY AND SIRIUS AMERICA INSURANCE COMPANY**<br><br>-AND-<br><br>Armen Shahinian, Esq. (admitted *pro hac vice*)<br>(ashahinian@csglaw.com)<br>Scott A. Zuber, Esq. (admitted *pro hac vice*)<br>(szuber@csglaw.com)<br>Darren Grzyb, Esq. (admitted *pro hac vice*)<br>(dgrzyb@csglaw.com)<br>Jase A. Brown, Esq. (admitted *pro hac vice*)<br>(jbrown@csglaw.com)<br>Chiesa Shahinian & Giantomasi PC<br>One Boland Drive<br>West Orange New Jersey 07052<br><br>**ATTORNEYS FOR ASPEN AMERICAN INSURANCE COMPANY, BERKLEY INSURANCE COMPANY, EVEREST REINSURANCE COMPANY AND SIRIUS AMERICA INSURANCE COMPANY** |

**MANIER & HEROD, P.C.**


**JOINT SURETY OBJECTION TO MOTION TO STRIKE EXPERT TESTIMONY OF LILY CHEUNG—
PAGE 16**

By: /s/ Michael E. Collins
Michael E. Collins (TX Bar No. 24029006)
Robert W. Miller (admitted *pro hac vice*)
1201 Demonbreun St., Suite 900
Nashville, TN 37203
Telephone: (615) 742-9350
Facsimile: (615) 242-4203
E-mail: mcollins@manierherod.com
rmiller@manierherod.com

*Attorneys for Philadelphia Indemnity Insurance Company*

By: /s/ Lee E. Woodard
Lee E. Woodard, Esq.
HARRIS BEACH PLLC
333 W. Washington Street, Suite 200
Syracuse, New York 13202
Telephone: (315) 423-7100
Email: bkemail@harrisbeach.com
(Admitted Pro Hac Vice)

*Attorneys for Philadelphia Indemnity Insurance Company*

By: /s/ Duane J. Brescia
Duane J. Brescia
Stephen A. Roberts
**CLARK HILL**
720 Brazos, Suite 700
Austin, TX 78701
(512) 499-3647 (direct)
(512) 499-3660 (fax)
dbrescia@clarkhill.com
sroberts@clarkhill.com
Christopher R. Ward
Audrey L. Hornisher

**CLARK HILL, PLC**
901 Main Street, Suite 6000
Dallas, TX 75202
(214) 651-2056 (direct)
(214) 651-4330 (fax)
cward@clarkhill.com
ahornisher@clarkhill.com

**Counsel for Zurich American Insurance Company**

**JOINT SURETY OBJECTION TO MOTION TO STRIKE EXPERT TESTIMONY OF LILY CHEUNG—PAGE 17**

**CERTIFICATE OF SERVICE**

      I hereby caused a true and correct copy of the foregoing to be served on June 16, 2021 on counsel for the Debtors as set forth above via electronic mail.

                                                     */s/ Simon R. Mayer*
                                                     Simon R. Mayer