# EXHIBIT BB

# DECOMMISSIONING AGREEMENT

### BY AND AMONG

### APACHE CORPORATION,

### APACHE SHELF, INC., AND

### APACHE DEEPWATER LLC

### AND

### FIELDWOOD ENERGY LLC, AND

### GOM SHELF LLC

[_____], 2013

#4313288.24

# TABLE OF CONTENTS

Page

Article I
DEFINITIONS

1.1 Definitions...................................................................................1
1.2 Rules of Construction ..................................................................1

Article II
PERFORMANCE OF DECOMMISSIONING

2.1 Decommissioning Plans................................................................2
2.2 Amendments to Decommissioning Plans ......................................5
2.3 Payment of Decommissioning; Entry Into Turnkey Removal Contract...........5
2.4 Pending Abandoned Properties.....................................................6
2.5 Permanently Abandoned Properties P&A Obligations....................6
2.6 Matters Related to Performance of Decommissioning ...................7
2.7 Decommissioning By Seller ..........................................................9

Article III
LETTERS OF CREDIT

3.1 Letters of Credit Issuance ...........................................................10
3.2 Drawings Under the Letters of Credit............................................10
3.3 Reduction of Letters of Credit ......................................................11
3.4 Renewal of Letters of Credit.........................................................11
3.5 Termination of Letters of Credit ...................................................12
3.6 Issuing Bank Notices ...................................................................12
3.7 Issuing Bank Fees .......................................................................12

Article IV
TRUST A

4.1 Establishment of Trust A ..............................................................12
4.2 Trust A NPI; Trust A Cash ............................................................12
4.3 Required Trust A Amount .............................................................13
4.4 Distribution of Certain Trust A Proceeds and Release of Funds or LCs.........13
4.5 Termination of Trust A .................................................................15

Article V
TRUST B

5.1 Establishment of Trust B ..............................................................15
5.2 Trust B NPI..................................................................................15
5.3 Additional Trust B Funding ..........................................................15
5.4 Distribution of Certain Trust B Income .........................................16
5.5 Buyer Use of Trust B Cash ..........................................................16
5.6 Trust B Cash Amount ..................................................................16

i

5.7     Release of Trust B NPI ................................................................16
5.8     Senior Debt Facility ..................................................................16
5.9     Trust B Security Interest ............................................................16
5.10    Termination of Trust B ...............................................................17

Article VI
MORTGAGE; COVENANTS; REPRESENTATIONS

6.1     Mortgage ..............................................................................17
6.2     Residual Proceeds ....................................................................17
6.3     Senior Lien Principal Cap ............................................................17
6.4     Buyer Equity Distributions ...........................................................17
6.5     Copies of Communications with Trust A or Trust B .....................................17
6.6     Certain Matters Associated with Senior Debt Facility .................................18
6.7     Trust A NPI as absolute conveyance ...................................................18
6.8     Amendment to NPI Property Exhibits ...................................................18
6.9     Matters Related to Trustees ..........................................................18
6.10    Compliance Certificate ...............................................................19
6.11    Debt .................................................................................19
6.12    Termination ..........................................................................19

Article VII
TRANSFERS

7.1     Investment Grade Buyer ...............................................................19
7.2     Non-Investment Grade Buyer ...........................................................21
7.3     Drag-Along Rights ....................................................................21
7.4     Farmout Agreements ...................................................................22
7.5     Swap Agreements ......................................................................23

Article VIII
EXPERT DETERMINATION

8.1     Expert Resolution ....................................................................23
8.2     Nomination ...........................................................................23
8.3     Qualification ........................................................................24
8.4     Appointment Conditions ...............................................................24
8.5     Restrictions .........................................................................24
8.6     Procedures ...........................................................................25
8.7     Decision .............................................................................25
8.8     Determination ........................................................................25
8.9     Binding Nature .......................................................................25
8.10    Failure to Reach Decision ............................................................25
8.11    Costs ................................................................................26

Article IX
TAX MATTERS

9.1     Intended Tax Treatment ...............................................................26

Article X
TERM AND TERMINATION

10.1     Term..........................................................................................................26

Article XI
GOVERNING LAW; VENUE

11.1     Governing Law ...........................................................................................26
11.2     Venue .........................................................................................................26
11.3     Waiver of Trial by Jury...............................................................................27
11.4     Related Disputes ........................................................................................27

Article XII
CONFIDENTIALITY

12.1     Confidentiality ...........................................................................................27
12.2     Exceptions..................................................................................................28
12.3     Duration of Obligation ..............................................................................28

Article XIII
GENERAL

13.1     Notices .......................................................................................................28
13.2     Assignment .................................................................................................29
13.3     Rights of Third Parties ...............................................................................29
13.4     Counterparts...............................................................................................30
13.5     Entire Agreement........................................................................................30
13.6     Amendments ...............................................................................................30
13.7     IPO..............................................................................................................30
13.8     Publicity .....................................................................................................30
13.9     Joint and Several Liability .........................................................................30
13.10   Severability.................................................................................................31
13.11   Waivers .......................................................................................................31
13.12   Specific Performance .................................................................................31
13.13   Waiver of Consequential Damages.............................................................31
13.14   Perpetuities.................................................................................................31
13.15   Further Assurances.....................................................................................32

**Exhibits**

Exhibit A   -   Definitions
Exhibit B   -   Form of Letter of Credit
Exhibit C   -   Form of Affiliate Guaranty
Exhibit D   -   Form of Turnkey Removal Contract
Exhibit E   -   Initial Decommissioning Plan
Exhibit F   -   Form of Texas Recharacterization Deed of Trust
Exhibit G   -   Form of Trust A NPI Conveyance
Exhibit H   -   Form of Trust A Trust Agreement
Exhibit I   -   Form of Trust B NPI Conveyance
Exhibit J   -   Form of Trust B Trust Agreement

**Schedules**

Schedule 6.4 -   Tax Distributions

## DECOMMISSIONING AGREEMENT

This **DECOMMISSIONING AGREEMENT** (this "*Agreement*") is dated effective as of [_____], 2013 (the "*Closing Date*"), by and among Apache Corporation, a Delaware corporation ("*APA*" or "*Apache*"), Apache Shelf, Inc., a Delaware corporation ("*APSH*"), and Apache Deepwater LLC, a Delaware limited liability company ("*APDW*" and each of *APA*, *APSH* and *APDW* individually, as a "*Seller*" and collectively as the "*Sellers*") and Fieldwood Energy LLC, a Delaware limited liability company, ("*Buyer 1*") and GOM Shelf LLC, a Delaware limited liability company ("*GOM*", and together with Buyer 1, "*Buyer*"). Each Seller and Buyer may be referred to herein as a "*Party*" or collectively as the "*Parties*".

### RECITALS

WHEREAS, the Parties are entering into this Agreement pursuant to that certain Purchase and Sale Agreement by and among Sellers and Buyer dated July 18, 2013, as the same may be amended or otherwise modified from time to time (the "*PSA*"); and

WHEREAS, the Parties have agreed to certain arrangements with respect to the P&A Obligations and the Permanently Abandoned Properties P&A Obligations and the performance of Decommissioning in accordance with the terms set forth in this Agreement.

NOW, THEREFORE, in consideration of the premises, the agreements and mutual covenants contained herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

### ARTICLE I
### DEFINITIONS

1.1     *Definitions*. Capitalized terms used in this Agreement shall have the meanings given to them in Exhibit A. Other capitalized terms used herein that are not defined in Exhibit A shall have the meanings given to them in the PSA.

1.2     *Rules of Construction*.

(a)     All article, section, schedule and exhibit references used in this Agreement are to articles and sections of, and Schedules and Exhibits to, this Agreement, unless otherwise specified. The schedules and exhibits attached to this Agreement constitute a part of this Agreement and are incorporated herein for all purposes.

(b)     As used herein, terms such as "Seller", "each Seller", "any Seller", "either Seller", "neither Seller" and "such Seller" refer to the various individual Persons that collectively make up the Sellers. As used herein, terms such as "Buyer", "each Buyer", "any Buyer", "either Buyer", "neither Buyer" and "such Buyer" refer to the various individual Persons that collectively make up Buyer.

(c)      If a term is defined as one part of speech (such as a noun), it shall have a corresponding meaning when used as another part of speech (such as a verb).  Terms defined in the singular have the corresponding meanings in the plural, and vice versa.  Unless the context of this Agreement clearly requires otherwise, words importing the masculine gender shall include the feminine and neutral genders and vice versa.  The words "include", "includes" or "including" do not limit the preceding terms and shall be deemed to be followed by the words "without limitation."  The words "hereof," "hereto," "hereby," "herein," "hereunder" and words of similar import, when used in this Agreement, shall refer to this Agreement as a whole and not to any particular section or article in which such words appear.  The term "or" is not exclusive.

(d)      The terms "day" and "days" mean and refer to calendar day(s).  The terms "year" and "years" mean and refer to calendar year(s).  If any action is to be taken or given on or by a particular calendar day, and such calendar day is not a Business Day, then such action shall be deferred until the next Business Day.

(e)      Sellers and Buyer have each participated in the negotiation and drafting of this Agreement and if an ambiguity should arise, this Agreement shall be construed as if drafted jointly by the Parties and no presumption or burden of proof shall arise favoring or burdening any Party by virtue of the authorship of any of the provisions in this Agreement.

(f)      The captions in this Agreement are for convenience only and shall not be considered a part of or affect the construction or interpretation of any provision of this Agreement.

(g)      All references to currency herein shall be to, and all payments required hereunder shall be paid in, Dollars.

(h)      The serial comma is sometimes included and sometimes omitted.  Its inclusion or omission shall not affect the interpretation of any phrase.

(i)      Any reference to any statute or statutes or section or sections of any statute shall be deemed to be a reference to legislation of the United States or any statutory modification, re-enactment, or replacement thereof for the time being in force unless the contrary is stated.

## ARTICLE II
## PERFORMANCE OF DECOMMISSIONING

2.1     *Decommissioning Plans*.

(a)      The decommissioning plan proposed by Sellers to apply for the three (3) year period commencing on July 1, 2013 and ending on June 30, 2016 is attached hereto as Exhibit E (the "***Initial Decommissioning Plan***"), which plan includes the satisfaction of all P&A Obligations with respect to the Pending Abandoned Properties.  Buyer shall have 90 days after the Closing Date to object in writing to the Initial Decommissioning Plan proposed by Sellers.  If Buyer objects to the Initial Decommissioning Plan proposed by Sellers, the terms of Section 2.1(f) shall apply, *mutatis mutandis*, with respect to such objection.  If Buyer does not

object to the Initial Decommissioning Plan proposed by Sellers within 90 days after the Closing Date, then such plan shall become the Decommissioning Plan for the applicable Plan Years.

(b)     No earlier than March 1, 2015 and no later than July 1, 2015 and thereafter no earlier than March 1 and no later than July 1 of each subsequent third anniversary thereof, Buyer shall submit to Sellers a proposed decommissioning plan that includes all Decommissioning required to be conducted for the Applicable Properties during the applicable Plan Years in order to comply with all applicable Laws (including all applicable Laws issued by BOEM and BSEE), contracts and leases (a "***Proposed Plan***") covering the three (3) year period commencing on July 1 of the year after which Buyer submits such Proposed Plan to Sellers. Notwithstanding anything herein to the contrary, in no event shall the delay or failure of the Parties to agree upon, or the Expert to determine, a Decommissioning Plan relieve, release, suspend, toll, reduce, waive, modify or otherwise affect any indemnification or payment obligations of any Party under Article 12 of the PSA or this Agreement.

(c)     Each Proposed Plan shall (i) identify all fields and wells included within the Applicable Properties for which Decommissioning is required under applicable Laws (including applicable Laws issued by BOEM and BSEE), contracts, leases or otherwise expected to be conducted during the applicable Plan Years (the "***Activity Scope***"), (ii) include an estimate of the calendar quarter on which Decommissioning will commence and be completed with respect to the Applicable Properties, (iii) include an estimate of the costs to perform Decommissioning on such Applicable Properties ("***Estimated Costs***"), and (iv) include all other information and supporting documents relied upon by Buyer that Buyer reasonably and in good faith considers material in connection with its preparation of the Proposed Plan. Buyer shall prepare each Proposed Plan acting as a Reasonably Prudent Operator and based on the Decommissioning required to be conducted for the Applicable Properties during the applicable Plan Years in order to comply with all applicable Laws (including all applicable Laws issued by BOEM and BSEE), contracts and leases. Buyer shall provide to Sellers, at Sellers' cost and subject to applicable Law and any contractual restrictions, all information reasonably requested by Sellers in connection with the Sellers' review of any Proposed Plan.

(d)     Sellers may object in writing to a Proposed Plan within ninety (90) days after Seller's receipt of such Proposed Plan, which objection shall (i) specify in reasonable detail the basis for any objections so asserted and (ii) if applicable, include an alternative Activity Scope or Estimated Costs.

(e)     If Sellers object in writing to a Proposed Plan pursuant to Section 2.1(d), then the Parties shall meet promptly to discuss those objections and shall attempt to reach an amicable resolution. If no amicable resolution has been reached within ninety (90) days of submission of the Proposed Plan by Buyer, then Sellers or Buyer shall be entitled to refer the specific matters at issue for Expert determination pursuant to Article VIII. In making any determination of a matter at issue, the Expert shall make any adjustment to any Proposed Plan that, with respect to the matter at issue, the Expert determines is appropriate to ensure that the Proposed Plan provides that, with respect to any Applicable Property, the relevant proposed Decommissioning represents that which a Reasonably Prudent Operator would perform with respect to such Applicable Property during the applicable Plan Years in order to comply with all applicable Laws (including all applicable Laws issued by BOEM and BSEE), contracts and

leases.  The Proposed Plan, as and if adjusted by the Expert with respect to such matters, shall then be deemed to be approved by the Parties and shall become the Decommissioning Plan for the applicable Plan Years.  If Sellers approve a Proposed Plan or do not object in writing to a Proposed Plan pursuant to <u>Section 2.1(d)</u>, the Proposed Plan shall become the Decommissioning Plan for the applicable Plan Years.

(f)       If Buyer fails to timely submit a Proposed Plan in accordance with <u>Section 2.1(b)</u>, Sellers shall be entitled to serve thirty (30) Business Days' notice on Buyer requiring it to submit a Proposed Plan, and if Buyer fails to deliver to Sellers such Proposed Plan within such thirty (30) Business Day period, Sellers may provide a decommissioning plan for the applicable Plan Years in accordance with the content requirements applicable to a Proposed Plan pursuant to <u>Sections 2.1(b)</u> and <u>(c)</u> (any such decommissioning plan proposed by Sellers, a "***Sellers' Proposed Plan***") so long as Buyer has not submitted a Proposed Plan prior to Sellers providing such plan.  After Sellers' submission of a Sellers' Proposed Plan under this <u>Section 2.1(f)</u>, Buyer may not submit under <u>Section 2.1(b)</u> a competing Proposed Plan and instead the applicable Decommissioning Plan shall be determined as set forth in this <u>Section 2.1(f)</u>.  If Buyer approves a Sellers' Proposed Plan or does not object in writing to a Sellers' Proposed Plan within sixty (60) days of submission by Sellers, the Sellers' Proposed Plan shall become the Decommissioning Plan for the applicable Plan Years.  Buyer may object in writing to the Sellers' Proposed Plan within sixty (60) days of submission, which objection shall (i) specify in reasonable detail the dollar amount, activity, nature and basis for any objections so asserted and (ii) if applicable, include an alternative proposed plan.  If Buyer timely objects in writing to a Sellers' Proposed Plan, then the Parties shall meet promptly to discuss those objections and shall attempt to reach an amicable resolution.  If no amicable resolution has been reached within thirty (30) days of submission of the Sellers' Proposed Plan to Buyer, then Sellers or Buyer shall be entitled to refer the matters at issue for Expert determination pursuant to <u>Article VIII</u>, and the Expert shall make determinations of any matters at issue in accordance with the standards identified in <u>Section 2.1(e)</u>.  The Sellers' Proposed Plan, as and if adjusted by the Expert with respect to such matters, shall then be deemed to be approved by the Parties and shall become the Decommissioning Plan for the applicable Plan Years.  If Buyer approves a Sellers' Proposed Plan or does not timely object in writing to a Seller's Proposed Plan pursuant this <u>Section 2.1(f)</u>, then the Sellers' Proposed Plan shall become the Decommissioning Plan for the applicable Plan Years.

(g)       Buyer shall conduct all Decommissioning set forth in a Decommissioning Plan as a Reasonably Prudent Operator and, without limitation of the foregoing, shall use commercially reasonable efforts to carry out all Decommissioning set forth in the Decommissioning Plan that is applicable to each Plan Year by the end of such Plan Year, as such Decommissioning may be modified by virtue of an amendment to the Decommissioning Plan pursuant to this Agreement.  For so long as Buyer extends the period of production for an Applicable Property, Buyer shall not be required to carry out Decommissioning activities with respect to such Applicable Properties; provided, however, that the extension of the period of production for any Applicable Property shall not affect Buyer's future P&A Obligations with respect thereto.  If, during any Plan Year, Buyer performs Decommissioning that is in excess of the Decommissioning in the Decommissioning Plan for such Plan Year, Buyer shall be entitled to carry forward such excess Decommissioning as part of the Required Decommissioning that has been completed during the following Plan Year.  If, during any Plan Year, Buyer performs

4

Government Decommissioning that is not included within the Decommissioning Plan for such Plan Year, Buyer shall be entitled to reduce other Decommissioning activity set forth in the plan by an amount equal to the Government Decommissioning completed by Buyer during such Plan Year so long as the reduced Decommissioning activity does not need to be completed to comply with applicable Law.   Subject to Section 2.7, if Buyer does not complete all of the Decommissioning for a Plan Year as provided in the Decommissioning Plan, Buyer shall perform additional Decommissioning during a following Plan Year to complete the Decommissioning that was not completed in a previous Plan Year.

2.2     *Amendments to Decommissioning Plans*.    Either Party may propose an amendment to a Decommissioning Plan or an amendment and restatement of a Decommissioning Plan (which, in the case of an amendment and restatement, includes all content requirements applicable to a Proposed Plan pursuant to Sections 2.1(b) and (c)) (each, a "*Proposed Amendment*") at any time to the extent either Party believes is appropriate in order to comply with applicable Law or contracts.  Each Proposed Amendment shall include the matters required to be included in a Proposed Plan as described in Section 2.1(c), to the extent relevant to such Proposed Amendment.  Unless and until the approval or deemed approval by the Parties or determination by the Expert of a Proposed Amendment as an amendment to the Decommissioning Plan, the then-current Decommissioning Plan shall remain binding on the Parties.  Either Party may object in writing to a proposed amendment within sixty (60) days of submission, which objection shall be in good faith and (a) with respect to objections by Sellers, only if the Proposed Amendment does not contemplate the completion of all Decommissioning required by applicable Law or applicable contracts during the relevant period covered by the Proposed Amendment or with respect to the Estimated Costs included in a Proposed Amendment, (b) specify in reasonable detail the dollar amount, activity, nature and basis for any objections so asserted, and (c) include an alternative amendment (including, for purposes of clarity, the alternative that no amendment is required).  If the other Party so objects in writing to any such Proposed Amendment, then the Parties shall meet promptly to discuss those objections and shall attempt to reach an amicable resolution.  If no amicable resolution has been reached within sixty (60) days of submission of the Proposed Amendment, then either Party shall be entitled to refer the specific matters at issue for Expert determination pursuant to Article VIII and the Expert shall make determinations of any matters at issue in accordance with the standards identified in Section 2.1(e).  The Proposed Amendment, as and if adjusted by the Expert with respect to such matters, shall then be deemed to be approved by the Parties and shall be incorporated into or replace, as applicable, the then-current Decommissioning Plan for the applicable Plan Years. If any Party approves a Proposed Amendment or does not object in writing to a Proposed Amendment within sixty (60) days of submission by the submitting Party, such Proposed Amendment shall be incorporated into or replace, as applicable, the then-current Decommissioning Plan for the applicable Plan Years.

2.3     *Payment of Decommissioning; Entry Into Turnkey Removal Contract*.  Prior to the Closing, Sellers and GOM shall have entered into the Turnkey Removal Contract pursuant to which GOM has agreed to perform Decommissioning with respect to P&A Obligations attributable to the Pending Abandoned Properties, as more particularly described in the Turnkey Removal Contract.  Contemporaneously with Buyer 1's execution of this Agreement, Buyer 1 shall be deemed to be a party to the Turnkey Removal Contract and references to GOM contained therein shall be deemed to include references to Buyer for all purposes thereunder.

5

2.4    *Pending Abandoned Properties*.

(a)    Buyer shall perform Decommissioning with respect to P&A Obligations attributable to the Pending Abandoned Properties ("***Pending Abandoned Properties Decommissioning***") in accordance with the Turnkey Removal Contract until all such Decommissioning has been paid, performed, fulfilled, satisfied or otherwise discharged in accordance with applicable Law and contracts.

(b)    If Buyer has not been assigned or otherwise does not possess adequate rights after giving effect to the Closing and Sellers are able to assign to Buyer the relevant contractual rights, Sellers hereby assign to Buyer all of Sellers' contractual rights pursuant to the relevant operating agreements or otherwise to obtain payment from the other Leaseholders for Pending Abandoned Properties Decommissioning.  At Buyer's cost and at Buyer's direction, Sellers agree to use commercially reasonable efforts to enforce any rights or claims actually held by Sellers and take all other actions reasonably requested by Buyer against any Leaseholder or other Person that may be subject to liability with respect to the Pending Abandoned Properties Decommissioning conducted by Buyer.  All decisions concerning the discussions and any settlement with any such Leaseholder or Person shall be reviewed and subject to approval by Buyer (which approval shall not be unreasonably withheld, conditioned or delayed).  Sellers shall, to the extent reasonably practicable, permit Buyer to participate as part of all material discussions and approve (which approval shall not be unreasonably withheld, conditioned or delayed) all written communications between any Seller and any such Leaseholder or Person.  If any payment or other recovery for Pending Abandoned Properties Decommissioning is actually received by any Seller from any such Leaseholder or other Person, such Seller shall promptly remit such amount to Buyer.  At Buyer's cost, Buyer shall be entitled to copies of all materials and information relating to the Pending Abandoned Properties Decommissioning (i) received by Sellers from any other Leaseholder or other Person in connection therewith or (ii) delivered by Sellers to any other Leaseholder or other Person in connection therewith.

2.5    *Permanently Abandoned Properties P&A Obligations*.

(a)    Buyer shall perform Decommissioning with respect to the Permanently Abandoned Properties P&A Obligations as and when required by Law or contract (the "***Permanently Abandoned Properties Decommissioning***") in accordance with the Turnkey Removal Contract; provided, however, that, if at any time APA fails to comply with any of its reimbursement obligations pursuant to this <u>Section 2.5</u>, Buyer shall be permitted to suspend its performance of such Decommissioning until such time as APA has cured its previous defaults and resumes compliance with its reimbursement obligations pursuant to this <u>Section 2.5</u>.

(b)    To the extent that, in connection with Buyer's performance of its obligations under <u>Section 2.5(a)</u>, Buyer pays to third parties any amounts in excess of $5,000,000 in the aggregate in any calendar year, Buyer shall, subject to <u>Section 2.5(d)</u>, invoice APA on a monthly basis (until the earlier to occur of the end of such calendar year or any time at which the provisions of <u>Section 2.5(c)</u> apply) for the portion of such excess allocable to each applicable month during such calendar year.  APA shall remit payment for amounts so invoiced within thirty (30) days following receipt of any such invoice.

(c)     To the extent that, in connection with Buyer's performance of its obligations under Section 2.5(a), Buyer pays to third parties any amounts in excess of $50,000,000 in the aggregate (after giving effect to, and netting out, any amounts for which Buyer has invoiced APA pursuant to Section 2.5(b) or (d)), Buyer shall, subject to Section 2.5(d), invoice APA on a monthly basis (until Buyer has fully performed its obligations under Section 2.5(a)) for the portion of such excess allocable to each applicable month. APA shall remit payment for amounts so invoiced within thirty (30) days following receipt of any such invoice.

(d)     Notwithstanding anything to the contrary contained in Section 2.5(b) or (c), at its election, Buyer shall have the right from time to time to demand and receive from APA payment thirty (30) days in advance of its share of the estimated amount of any amounts for which APA would have a reimbursement obligation within the upcoming thirty (30) days pursuant to Section 2.5(b) or (c), which right may be exercised only by Buyer's submission to APA of an itemized statement of such estimated amount, together with an invoice and shall be without duplication of any amounts invoiced pursuant to Section 2.5(b) or (c). APA shall remit payment for amounts so invoiced within thirty (30) days following receipt of any such invoice. Any such invoices and payments shall be subject to subsequent reconciliation based on any variance between estimated amounts and actual amounts.

(e)     No later than ten (10) Business Days following the end of each month until the month following the month in which Buyer has fully performed its obligations under this Section 2.5, Buyer shall provide to APA an itemized statement showing all amounts Buyer actually paid to third parties during the applicable month in connection with Buyer's performance of its obligations under Section 2.5(a), together with reasonable supporting documentation.

(f)     APA shall have the right, but not the obligation, to inspect and to audit all costs and records associated with Buyer's performance of its obligations under this Section 2.5, and Buyer shall retain all such records until two (2) years following the end of the calendar year following the date on which Buyer has fully performed its obligations under this Section 2.5. Payment by APA of any invoice under this Section 2.5 shall not prejudice the right of APA to protest or question the correctness of any of Buyer's calculations, and APA shall be permitted to recover any amounts that APA was not required to pay pursuant to this Section 2.5.

2.6     *Matters Related to Performance of Decommissioning.*   Without increasing, limiting or otherwise affecting the rights and obligations of any Party or any Indemnified Person under the PSA with respect to P&A Obligations:

(a)     With respect to Decommissioning conducted by Buyer on the Applicable Properties, Buyer shall be entitled to the benefit of, and Sellers shall subrogate Buyer to the extent requested by Buyer to, all agreements, covenants, representations and warranties made by others for the benefit of any Seller in connection with such Decommissioning, including with respect to any prior contractors, service providers or working interest owners that may be required to share a portion of costs in connection with such activities.

(b)      Without limitation of any other provision of this Agreement, Buyer shall perform, or cause to be performed, Decommissioning with respect to any Applicable Properties as a Reasonably Prudent Operator.  To the extent Sellers perform, or cause to be performed, any Decommissioning with respect to any Applicable Properties, Sellers shall perform, or cause to be performed, such Decommissioning as a Reasonably Prudent Operator.

(c)      Should any Party be rendered unable, either wholly or in part, by an event of Force Majeure to fulfill its obligations under this Agreement or the Turnkey Removal Contract, the obligation(s) affected by such event of Force Majeure, other than any obligation relating to payments, shall be suspended during the continuance of such inability; provided, however, in no event shall such suspension have the effect of suspending, tolling, reducing, waiving, modifying or amending any payment or defense obligations of such Party under Article 12 of the PSA.  The Party so affected shall give notice of the existence, extent and nature of such Force Majeure, in writing, to the other Party within five (5) Business Days after the occurrence of such Force Majeure.  The affected Party shall use commercially reasonable efforts to remedy or remove such Force Majeure as soon as reasonably practicable.

(d)      Buyer shall only be required to conduct Pending Abandoned Properties Decommissioning and Permanently Abandoned Properties Decommissioning to the extent permitted under applicable Law.

(e)      In order to facilitate Buyer's provision of the Decommissioning, Sellers and Buyer agree as follows: (i) without limitation or waiver of any objection or dispute rights of Seller pursuant to this Agreement or any right of Seller to conduct Decommissioning to the extent contemplated in this Agreement, Buyer shall control the activity of the Decommissioning in its sole discretion; (ii) upon Buyer's reasonable written request, Sellers shall provide Buyer with copies of all contracts, title files, permits, warranties, licenses and other documents and information reasonably relating to the Decommissioning to the extent any of the foregoing are in existence and reasonably obtainable by Sellers; (iii) without limitation or waiver of any objection or dispute rights of Seller pursuant to this Agreement or any right of Seller to conduct Decommissioning to the extent contemplated in this Agreement, Buyer shall be responsible for selecting and providing all equipment and supplies required for the performance of the Decommissioning; (iv) Sellers shall use commercially reasonable efforts to take all actions reasonably requested by Buyer that are necessary for purposes of facilitating Buyer's performance of the Decommissioning; (v) to the extent reasonably requested by Buyer, Sellers will assist Buyer in connection with any approval, permit, communications or other matters relating to Governmental Authorities that are necessary for the performance by Buyer of the Decommissioning; (vi) Buyer agrees to file any necessary permits or filings for the Decommissioning with the BOEM, the BSSE and/or all other applicable governmental agencies for the Decommissioning at the sole cost and expense of Buyer; provided, however, if such permits or filings are required to be filed in the name of any Seller, then (x) Buyer shall (1) prepare such permits or filings for Sellers' execution and (2) provide written notice to Seller of such requirement (which notice shall include final forms of such permits or filings) and (y) following Sellers' receipt of such notice, unless Sellers' believe any of the information applicable to such permits or filings (or contained in such forms) is false or erroneous or Sellers object in good faith to any matters related to such permits or filings, Sellers shall use commercially reasonable efforts to file such permits or filings in the name of the applicable

Seller at Buyer's sole cost and expense; and (vii) Buyer shall be responsible for making the decision whether to shut down its operations in the event of inclement weather or other emergency conditions.

2.7 ***Decommissioning By Seller.*** Without increasing, limiting or otherwise affecting the rights and obligations of any Party or any Indemnified Person under the PSA with respect to P&A Obligations:

(a) If any Governmental Authority or any other Person seeks to cause any Seller or its Affiliates to conduct Decommissioning that is required in accordance with applicable Law or contract ("***Government Decommissioning***"), Sellers shall send written notice (a "***Seller Notice***") to Buyer thereof and Buyer shall promptly conduct such Government Decommissioning unless, within 10 days of its receipt of a Seller Notice (or such shorter period following its receipt of a Seller Notice if the Government Decommissioning is required to be conducted under applicable Law or by any Governmental Authority prior to the expiration of such 10-day period and Sellers notify Buyer of such fact (and identify such shorter period) in the applicable Seller Notice), Buyer objects in good faith to whether such Government Decommissioning is required under any applicable law or contract (a "***Buyer Notice***"). If (i) Buyer delivers such a Buyer Notice within such 10-day period (or such shorter period, to the extent provided above) or (ii) Sellers determine in good faith that Buyer has ceased to diligently and continuously conduct such Government Decommissioning after giving Buyer written notice thereof and Buyer has failed to diligently conduct such Government Decommissioning commencing within three days of Sellers' written notice, Sellers shall be entitled to conduct such Government Decommissioning, subject to applicable Law and contractual obligations. If within ten (10) days of Buyer's delivery of a Buyer Notice, the Parties cannot agree as to whether such Government Decommissioning is required under any applicable law or contract, then either Party shall be entitled to refer the matter for Expert determination pursuant to Article VIII. If (i) the Expert determines such Government Decommissioning is required under any applicable law or contract, then the reimbursement rights of Sellers described in Section 2.7(b) shall apply with respect to such Government Decommissioning and, unless it is already being conducted by Sellers, Buyer shall be required to conduct it pursuant to this Agreement and (ii) the Expert determines such Government Decommissioning is not required under any applicable law or contract, then the reimbursement rights of Sellers described in Section 2.7(b) shall not apply with respect to such Government Decommissioning and Buyer shall not be required to conduct it.

(b) Except as otherwise provided in Section 2.7(a), if any Seller or its Affiliate actually incurs or suffers any out-of-pocket costs or expenses that have been reasonably and actually incurred as a result of, relating to or arising out of any performance by Sellers of Government Decommissioning (a "***Reimbursable Event***"), Buyer shall promptly reimburse and pay such Seller or its Affiliate all such costs and expenses (the "***Reimbursable Amounts***"). If Buyer fails to reimburse and pay any Seller or its Affiliate for any Reimbursable Amounts within ten (10) Business Days of written demand from Sellers therefor, then Sellers and their Affiliates shall, subject to Section 2.7(c), be entitled to any and all rights and remedies at Law or under any agreement or contract, including specific performance, drawings under any Letter of Credit, reimbursement from the Trust A Cash, reimbursement from the Trust B Cash for the Reimbursable Amounts as set forth in Articles III, IV, and V or, subject to the terms of the Intercreditor Agreement, rights and remedies under the Security Instruments.

(c)      With respect to costs or expenses described in <u>Section 2.7(b)</u>, such costs and expenses shall not include, and, for purposes of clarity, no Reimbursable Amount shall include, any amounts for which Sellers would have had a payment obligation to Buyer with respect to Permanently Abandoned Properties Decommissioning as provided in <u>Section 2.5</u>.

(d)      Buyer shall have the right, but not the obligation, to inspect and to audit all costs and records associated with Sellers' performance of any Government Decommissioning that gives rise to a Reimbursable Event and Sellers shall retain all such records until two (2) years following the end of the calendar year following the date on which any Seller has made the applicable claim for reimbursement pursuant to <u>Section 2.7(b)</u>.  Reimbursement by Buyer of any amount under <u>Section 2.7(b)</u> shall not prejudice the right of Buyer to protest or question the correctness of any of any Seller's calculations, and Buyer shall be permitted to recover any amounts that Buyer was not required to pay in connection with such Reimbursable Event.

**ARTICLE III**
**LETTERS OF CREDIT**

3.1      ***Letters of Credit Issuance***.  On the Closing Date, Buyer has caused one or more Issuing Banks to issue for the account of Buyer in favor of Apache one or more standby letters of credit substantially in the form of <u>Exhibit B</u> hereto (the "***Letters of Credit***") in the initial aggregate face amount of Five Hundred Million and No/100 U.S. Dollars ($500,000,000.00)[1], with such changes thereto as to which the Parties and each Issuing Bank may hereafter agree. Each Letter of Credit shall provide that Apache may make drawings thereunder by presenting a draw certificate in the form of Exhibit A to such Letter of Credit.  If any amendment or other change to this Agreement results in a change in the references to this Agreement to which Apache must certify in the draw certificates attached to any Letter of Credit, Buyer shall promptly cause each such Letter of Credit to be amended to reflect such changes.  Buyer may elect (but shall have no obligation) to cause one or more additional standby letters of credit substantially in the form of <u>Exhibit B</u> hereto to be issued after the Closing Date by an Issuing Bank and to replace all or a portion of a Letter of Credit so long as the aggregate undrawn face amount of all the Letters of Credit after such replacement is in accordance with the LC Drawing Amount required to be maintained by Buyer at such time in accordance with this Agreement. Any such additional letter of credit shall be deemed a "Letter of Credit" for purposes of this Agreement.

3.2      ***Drawings Under the Letters of Credit***.

(a)      If Buyer fails to reimburse and pay any Seller or its Affiliate for any Reimbursable Amounts within the time period specified in <u>Section 2.7(b)</u>, Sellers agree to demand payment in the following order:

(i)      First, from Trust B in accordance with the procedures set forth in the Trust B Trust Agreement;

---

[1] This figure and the other dollar amounts set forth in Section 4.3 and Section 4.4 shall be proportionally reduced at Closing to the extent ARO is reduced as a result of Assets that are excluded from the conveyance to Buyer as a result of environmental defects, casualty losses, preferential purchase rights and any other Assets excluded from the conveyance to Buyer pursuant to the PSA.

10

(ii)     Second, if the amount received from Trust B within five Business Days after demand is made in accordance with the Trust B Trust Agreement is insufficient to reimburse Sellers for the amounts Sellers are entitled to reimbursement for under <u>Section 2.7</u>, then from Trust A in accordance with the procedures set forth in the Trust A Trust Agreement; and

(iii)     Third, if the amount received from Trust A within five Business Day after demand is made in accordance with the Trust A Trust Agreement is insufficient to reimburse Sellers for the amounts Sellers are entitled to reimbursement for under <u>Section 2.7</u>, then by Apache drawing under any or all of the Letters of Credit.

(b)     If for any reason Sellers obtain more than a full recovery from Buyer, the Letters of Credit, Trust A Cash and/or Trust B Cash for the same costs arising from a Reimbursable Event, Sellers shall promptly, but in any event within five Business Days, refund the overpayment to the Trust A Account until the balance of the Trust A Cash and the aggregate undrawn face amount of the Letters of Credit equals the Required Trust A Amount and then to the Trust B Account; provided if Sellers received funds from the Trust B Cash only in connection with such Reimbursable Event, then the overpayment shall be refunded to the Trust B Account.

(c)     If Apache makes a drawing under the Letters of Credit, Buyer shall not be required to (i) issue a new Letter of Credit (or increase the amount available for drawing under any existing Letter of Credit) or (ii) make a cash payment to Trust A to cover the amount drawn by Sellers under the Letter of Credit.

3.3     ***Reduction of Letters of Credit.***

(a)     If Buyer elects to reduce the LC Drawing Amount pursuant to <u>Section 4.3(b)(ii)</u>, Sellers agree to execute, within five Business Days after a written request from Buyer, Reduction Notices to the Letters of Credit and deliver the Reduction Notices to the Issuing Banks to reduce the aggregate undrawn face amount of the Letters of Credit, such that the balance of the Trust A Account plus the aggregate undrawn face amount of the Letters of Credit is equal to the Required Trust A Amount at such time.

(b)     Upon delivery of a Reduction Notice to an Issuing Bank, the amount available for drawing under such Issuing Bank's Letter of Credit shall be automatically reduced by the amount set forth in such Reduction Notice without any requirement for further notice (from the Issuing Bank or otherwise), amendment or other formality or action by any Person. No more than one Reduction Notice shall be delivered to an Issuing Bank in any calendar month.

(c)     Promptly after a written request from Buyer during a Suspension Period, the Sellers shall terminate the Letters of Credit by delivering the Termination Notice to each Issuing Bank.

3.4     ***Renewal of Letters of Credit.***

(a)     Except as described in <u>Section 3.3</u> of this Agreement, Buyer shall cause each Letter of Credit to remain in effect (or be renewed by the Issuing Bank or replaced by

11

another Issuing Bank with a letter of credit substantially in the form of Exhibit B hereto) until the termination of the Letters of Credit as provided in Section 3.5 or Section 4.4.

(b)     Notwithstanding any other provision hereof, beginning forty-five days prior to the Expiration Date of any Letter of Credit, Sellers shall be authorized to draw such Letter of Credit pursuant to a Non-Renewal Drawing Request at any time on or after that day unless:

(i)     prior to the date on which the Sellers would be entitled to receive the proceeds from the drawing pursuant to the Non-Renewal Drawing Request, the Issuing Bank's obligations under its Letter of Credit have been extended so that the new Expiration Date shall occur no earlier than one year after the prior Expiration Date; or

(ii)     prior to the date on which the Sellers would be entitled to receive the proceeds from the drawing pursuant to the Non-Renewal Drawing Request, the Issuing Bank (or a replacement Issuing Bank) has issued a replacement letter of credit substantially in the form of Exhibit B hereto and in a face amount equal to the face amount of the expiring Letter of Credit with an expiration date that is no earlier than one year after such Expiration Date.

(c)     If the Issuing Bank (or a replacement Issuing Bank) has issued a replacement letter of credit in accordance with the provisions of the preceding Section 3.4(b), such replacement letter of credit shall be deemed to be a "Letter of Credit" under this Agreement from and after the date of its issuance.

(d)     In the event of a drawing by Sellers pursuant to a Non-Renewal Drawing Request, the proceeds thereof shall be deposited immediately by Sellers into the Trust A Account.

3.5     *Termination of Letters of Credit.*   The Parties shall terminate any outstanding Letters of Credit by delivering the Termination Notice to each Issuing Bank effective as of the time twelve (12) months after the Remaining Decommissioning is reduced to zero.

3.6     *Issuing Bank Notices.*   Contemporaneously with the transmission thereof to an Issuing Bank or receipt from an Issuing Bank of any written notice relating to its Letter of Credit, each of Sellers and Buyer agrees to provide copies of each such notice or other communication to the other Party.

3.7     *Issuing Bank Fees.*   Buyer shall be responsible for, and shall pay when due, all of the costs and expenses charged by the Issuing Banks with respect to the Letters of Credit.

## ARTICLE IV
## TRUST A

4.1     *Establishment of Trust A.*   On or before the Closing Date, Buyer has formed The Fieldwood Decommissioning Trust A, a Delaware statutory trust ("*Trust A*").

4.2     *Trust A NPI; Trust A Cash.*

(a)     On the Closing Date, Buyer and Trust A have entered into that certain Trust A Conveyance of Net Profits Overriding Royalty Interest (the "***Trust A NPI Conveyance***") pursuant to which Buyer has conveyed to Trust A a net profits overriding royalty interest as is more fully described therein (the "***Trust A NPI***").

(b)     All amounts received by Trust A pursuant to the terms of the Trust A NPI or otherwise will be held by Trust A in a separate account (the "***Trust A Account***").  The amount of cash held by Trust A in the Trust A Account (which includes all amounts earned on investments in the Trust A Account) at any time shall be the "***Trust A Cash***".  Buyer may elect (but shall have no obligation) to make additional payments to the Trust A Account at any time. The Trust A Cash shall only be invested in investments permitted by the Trust A Trust Agreement.

4.3     ***Required Trust A Amount.***

(a)     Except as permitted in <u>Section 4.3(b)</u>, all payments made to Trust A pursuant to the Trust A NPI Conveyance or otherwise shall be held in the Trust A Account and shall not be withdrawn by Buyer until the balance of the Trust A Account plus the aggregate undrawn face amount of the Letters of Credit is equal to the lesser of (A) the sum of (x) Eight Hundred Million and No/100 U.S. Dollars (US$800,000,000.00) plus (y) the aggregate amounts that shall be deposited into the Trust A Account as contemplated in <u>Section 6.2</u> and <u>Section 7.3(a)(i)</u> and (B) 125% of the then Remaining Decommissioning (the lesser of the amounts described in clauses (A) and (B) being the "***Required Trust A Amount***").

(b)     From and after the date the Required Trust A Amount is achieved, Buyer shall be permitted to pursue one or a combination of the following so long as Buyer is not then required to deposit Available Cash into Trust B pursuant to <u>Section 5.3(b)</u>, Buyer is not in willful breach of this Agreement and no uncured default or uncured event of default (however defined) under a Senior Debt Facility exists, in each case on and after giving effect to the following:

(i)     withdraw Trust A Cash from the Trust A Account in accordance with the procedures set forth in the Trust A Trust Agreement to the extent the withdrawn Trust A Cash does not cause the balance of the Trust A Account, plus the aggregate undrawn face amount of the Letters of Credit, to be less than the Required Trust A Amount; and/or

(ii)     reduce the LC Drawing Amount by requiring the Parties to issue a Reduction Notice in accordance with <u>Section 3.3</u> to the Issuing Banks to the extent the reduction in the LC Drawing Amount does not cause the balance of the Trust A Account, plus the aggregate undrawn face amount of the Letters of Credit, to be less than the Required Trust A Amount.

4.4     ***Distribution of Certain Trust A Proceeds and Release of Funds or LCs.***

(a)     If at any time

(i)     either:

(A)    Buyer has had for the prior 730 days (or supplies a guaranty in the form of <u>Exhibit C</u> and customary evidence of authority to enter into such guaranty from an Affiliate that has had for the prior 730 days) a senior long term unsecured debt rating from (A) Standard & Poor's of BBB or better or (B) Moody's of Baa2 or better; provided both such ratings shall be required to be met if the Person whose rating is being measured has met one of such ratings but has been assigned a rating two or more levels lower from the other ratings agency during such period (the "***Ratings Threshold***"); or

(B)    a Person that has acquired 50% or more of the equity ownership interests and Control of Buyer has (i) met for the prior 730 days the Ratings Threshold and (ii) has supplied a guaranty in the form of <u>Exhibit C</u> and customary evidence of authority to enter into such guaranty; and

(ii)    the Total Net Reserve Value plus Tangible Assets, plus the Trust A Cash, plus the Trust B Locked Cash, plus the LC Drawing Amount less all Balance Sheet Liabilities is greater than three times the Remaining Decommissioning; and

(iii)    Buyer is not then obligated to deposit Available Cash to Trust B pursuant to <u>Section 5.3</u>,

then (A) during any period that all of the requirements of clauses (i), (ii) and (iii) above have been satisfied (each a "***Suspension Period***"), and only for the duration of the Suspension Period, all amounts deposited to Trust A during a Suspension Period under the Trust A NPI Conveyance shall be immediately disbursed (the "***Disbursed Amounts***") by Trust A to Buyer from the Trust A Account and (B) the Sellers shall immediately terminate the Letters of Credit by delivering a Termination Notice to each Issuing Bank.

(b)    During a Suspension Period, Buyer shall maintain the capacity to cause an Issuing Bank to issue a letter of credit for its account in favor of Sellers equal to the lesser of (i) Five Hundred Million and No/100 U.S. Dollars ($500,000,000.00), less the total drawings under a Letter of Credit that have been paid to a Seller prior to such date, less the amount of available drawings reduced under a Letter of Credit as a result of Buyer paying additional cash into the Trust A Account in lieu of providing a Letter of Credit and (ii) 125% of the then Remaining Decommissioning until such time that Trust A is terminated pursuant to <u>Section 4.5</u> and will immediately re-issue a Letter of Credit in this amount if a Suspension Period ends and the Disbursed Amounts shall no longer be disbursed to Buyer.

(c)    A Suspension Period shall commence only after the receipt by Sellers of a certificate of the Chief Financial Officer of Buyer certifying the calculation of each of the amounts contemplated in <u>Section 4.4(a)(ii)</u>. If, once a Suspension Period has commenced, any of the conditions for the existence of a Suspension Period contemplated in <u>Section 4.4(a)</u> shall not

be satisfied, such Suspension Period shall end and Buyer shall provide notice to Sellers immediately.

4.5     *Termination of Trust A*.  Trust A shall terminate twelve (12) months after the Remaining Decommissioning has been reduced to zero.  Upon termination of Trust A, (a) Trust A shall dissolve in accordance with its terms, (b) all funds in the Trust A Account shall be distributed to Buyer in accordance with the Trust A Trust Agreement, and (c) the Trust A NPI shall be released and assigned to the Buyer.

**ARTICLE V**
**TRUST B**

5.1     *Establishment of Trust B*.  On or before the Closing Date, Buyer has formed The Fieldwood Decommissioning Trust B, a Delaware statutory trust ("*Trust B*").

5.2     *Trust B NPI*.

(a)     On the Closing Date, Buyer and Trust B have entered into that certain Trust B Conveyance of Net Profits Overriding Royalty Interest (the "*Trust B NPI Conveyance*") pursuant to which Buyer has conveyed to Trust B a net profits overriding royalty interest as is more fully described therein (the "*Trust B NPI*").

(b)     All amounts received by Trust B pursuant to the terms of the Trust B NPI Conveyance or otherwise will be held by Trust B in a separate account (the "*Trust B Account*"). The amount of cash held by Trust B in the Trust B Account (which includes all amounts earned on investments in the Trust A Account) at any time shall be the "*Trust B Cash*".  The Trust B Cash shall only be invested in investments permitted by the Trust B Trust Agreement.

5.3     *Additional Trust B Funding*.

(a)     If at any time the Net Reserve Value plus the Trust B Cash is less than 150% of the Net Costs (the "*Trigger Ratio*"), Buyer shall deposit into the Trust B Account an amount equal to all Available Cash until (i) the Trust A Cash plus (ii) the Trust B Cash plus (iii) the LC Drawing Amount is equal to 125% of the then Remaining Decommissioning.  For the avoidance of doubt, the obligation for Buyer to deposit Available Cash into the Trust B Account shall cease at such time the Trigger Ratio has no longer been triggered.

(b)     If (i) Buyer has not completed Required Decommissioning by the end of a Plan Year in accordance with this Agreement or (ii) Buyer submits a Proposed Plan to Sellers under Section 2.1 providing that Buyer does not contemplate being in compliance with the Remaining Decommissioning required during any Plan Year, Buyer shall deposit into the Trust B Account an amount equal to all Available Cash until (A) the Trust A Cash plus (B) the Trust B Cash plus (C) the LC Drawing Amount are equal to 125% of the Remaining Decommissioning.

(c)     Buyer will test its compliance with the Trigger Ratio at the end of each calendar quarter and shall deliver a compliance certificate to Sellers as and when required pursuant to Section 6.10.

5.4    *Distribution of Certain Trust B Income*.  During a Suspension Period and only for the duration of the Suspension Period, all amounts deposited to Trust B during a Suspension Period under the Trust B NPI Conveyance shall be promptly disbursed by Trust B to Buyer from Trust B.

5.5    *Buyer Use of Trust B Cash*.

(a)    Buyer shall have unrestricted access to the Trust B Cash on a continuing basis to perform and reimburse Decommissioning, but for no other purpose.  During a Plan Year, Buyer may cause Trust B to disburse cash from the Trust B Account in order to pay or perform Decommissioning that Buyer has incurred in accordance with the procedures set forth in the Trust B Trust Agreement.  There is no requirement for Buyer to maintain a minimum level of cash in the Trust B Account during any Plan Year in order to allow Buyer to use all of the Trust B Cash in connection with the Decommissioning for such Plan Year if needed.

(b)    Except at a time when funding of Trust B is required under Sections 5.3(a) or (b), after the expiration of each Plan Year, Buyer may cause Trust B to disburse Trust B Cash to Buyer to the extent that the Trust B Cash exceeds the sum of (i) the amounts required to pay for Decommissioning incurred during such Plan Year and (ii) the amount, if any, deposited into Trust B prior to December 31, 2018 in accordance with Section 7.3(a)(ii).

5.6    *Trust B Cash Amount*.  If Sellers obtain reimbursement from the Trust B Cash for any Reimbursable Amounts, Buyer shall not be obligated to replenish the amount paid to Sellers from the Trust B Cash.

5.7    *Release of Trust B NPI*.  Trust B shall release and assign the Trust B NPI to Buyer on December 31, 2018 and, unless the Trigger Ratio has been triggered as of such time, all of the Trust B Cash shall be paid to Buyer on such date, if at such date, Buyer is in compliance with the terms of this Agreement in all material respects or such later date that Buyer is in compliance with the terms of this Agreement in all material respects.

5.8    *Senior Debt Facility*.  Subject to Section 5.5(b), prior to an acceleration of the indebtedness under the Senior Debt Facility as a result of the occurrence of a default or an event of default thereunder, Trust B Cash shall be used solely by Buyer or Sellers to pay for Decommissioning as permitted by this Agreement and in accordance with the procedures set forth in the Trust B Trust Agreement.  After the occurrence of such an acceleration of the indebtedness under the Senior Debt Facility, the distributions from the Trust B Account shall be made in accordance with the following priority of payments:

(a)    First, to pay all amounts owing in respect of the Senior Debt, including interest, collection costs, and principal due on the Senior Debt; and

(b)    Second, to pay amounts required in connection with the performance of Decommissioning on the Applicable Properties.

5.9    *Trust B Security Interest*.  Contemporaneously with the execution of this Agreement, the Buyer has granted to Apache for the benefit of the Seller Indemnified Parties a security interest in its right, title and interest in and to all of the rights of Buyer with respect to

16

Trust B (the "***Trust B Security Interest***"), subject to the rights of the holders of Senior Debt pursuant to <u>Section 5.8</u>.   The Trust B Security Interest shall be granted under a security agreement in substantially the form of the security agreement granting the Senior Debt a security interest in the Buyer's rights to Trust B and shall be subordinated to the liens granted by Buyer in connection with the secured Senior Debt pursuant to the Intercreditor Agreement.

   5.10   ***Termination of Trust B.***   Trust B shall terminate twelve (12) months after the Remaining Decommissioning has been reduced to zero.   Upon termination of Trust B, (i) Trust B shall dissolve in accordance with its terms and (ii) all funds in the Trust B Account shall be distributed to Buyer in accordance with the Trust B Trust Agreement.

**ARTICLE VI**
**MORTGAGE; COVENANTS; REPRESENTATIONS**

   6.1   ***Mortgage.***   On the Closing Date, Buyer has granted to Apache for the benefit of the Seller Indemnified Parties a mortgage, lien and security interest in and to the Assets to secure the performance and payment of the Secured Obligations pursuant to a mortgage and a security agreement (the "***Security Instruments***").   The Security Instruments shall be in substantially the form attached as <u>Exhibit G</u> to the PSA and, to the extent provided in the Intercreditor Agreement, the liens granted under the Security Instruments shall be subordinated to the liens granted by Buyer in connection with the secured Senior Debt pursuant to, and to the extent provided in, the Intercreditor Agreement.   The Security Instruments shall terminate at such time as the Trust A Cash plus the face amount of the Letters of Credit issued pursuant to this Agreement exceeds 125% of the Remaining Decommissioning.

   6.2   ***Residual Proceeds.***   If there are any amounts remaining from a foreclosure or transfer in lieu thereof after the Senior Debt (other than Excess First-Priority Obligations) is paid off in full, then the excess amounts shall be paid to the Seller Indemnified Parties until payment in full of all Secured Obligations (or, to the extent that any Secured Obligations are not yet due and payable, to cash collateralize the Secured Obligations in an amount not to exceed the Collateralized Amount by depositing such amount into the Trust A Account to be held therein in accordance with the terms of this Agreement).

   6.3   ***Senior Lien Principal Cap.***   The Buyer agrees that it will not incur any Senior Debt that, upon the incurrence thereof, results in Excess First-Priority Obligations (such Senior Debt not resulting in Excess First-Priority Obligations, "***Permitted Senior Debt***").

   6.4   ***Buyer Equity Distributions.***   Except for tax distributions to the equity owners of Buyer that are permitted pursuant to <u>Schedule 6.4</u>, Buyer shall not make any equity distributions to, or purchase the equity of, its equity owners unless at the time of (and after giving effect to such) distribution or purchase, the Trust A Cash plus the LC Drawing Amount exceeds 125% of the then Remaining Decommissioning.

   6.5   ***Copies of Communications with Trust A or Trust B.***   Sellers and Buyer shall promptly provide to the other copies of all written communications between any Seller or Buyer, as applicable, and Trust A or Trust B.

17

6.6 **Certain Matters Associated with Senior Debt Facility.** Buyer shall make available to Apache in the same format as made available to the Senior Debt Lenders a copy of all financial statements and reserve reports provided by Buyer or any of its Affiliates to any Senior Debt Lenders (including any collateral or administrative agent) under any Senior Debt Facility immediately following delivery thereof to any Senior Lender. In addition, Buyer shall deliver to Apache copies of all notices of default or any events of default delivered or received by Buyer or any of its Affiliates under or in connection with any Senior Debt Facility.

6.7 **Trust A NPI as absolute conveyance.** Subject to the terms of this Section 6.7, Buyer hereby agrees to pay, defend, indemnify, reimburse and hold harmless the Seller Indemnified Parties for, from and against any loss, damage, diminution in value, claim, liability, debt obligation or expense (including legal fees, expenses of litigation and attorneys' fees) arising out of or related to a determination by a court of competent jurisdiction that either (a) the Trust A NPI Conveyance is not an absolute conveyance of a presently vested interest in real and/or immovable property and, in the State of Louisiana, an immovable right or (b) title to the Trust A NPI was not fully vested in Trust A as of the Effective Time (as defined in the Trust A NPI Conveyance) (collectively, the "Secured NPI Indemnity Obligations"). Contemporaneously with the execution of this Agreement, Buyer has executed and delivered to Sellers the Recharacterization Mortgages. The sole and exclusive remedies of the Seller Indemnified Parties pursuant to this Section 6.7 shall be recourse against the Mortgaged Property (as defined in the Recharacterization Mortgages) pursuant to the terms of the Recharacterization Mortgages and the security interest granted pursuant to Section 1.1 of the Trust A Trust Agreement, and Buyer shall have no personal liability therefor.

6.8 **Amendment to NPI Property Exhibits.** To the extent that, following the Closing, (a) any oil and gas lease is no longer deemed to constitute a Lease or otherwise constitutes an Excluded Asset pursuant to the PSA, the Parties shall execute an appropriate amendment to all Related Decommissioning Agreements that are filed of record so that such oil and gas lease is no longer subject thereto or burdened thereby, (b) any oil and gas lease is deemed to constitute a Lease pursuant to Section 6.8(b) of the PSA, the Parties shall execute an appropriate amendment to all Related Decommissioning Agreements that are filed of record so that such oil and gas lease is subject thereto and burdened thereby, (c) an interest in any property, right or interest is conveyed by any Seller to Buyer pursuant to Section 6.15 of the PSA, the Parties shall execute an appropriate amendment to all Related Decommissioning Agreements that are filed of record so that such property, right or interest is subject thereto and burdened thereby, (d) an interest in any property, right or interest is conveyed by any Seller to Buyer pursuant to Section 6.17 of the PSA, the Parties shall execute an appropriate amendment to all Related Decommissioning Agreements that are filed of record so that such property, right or interest is subject thereto and burdened thereby, and (e) any transaction described in Section 7.1 occurs, the Parties shall execute an appropriate amendment to all Related Decommissioning Agreements that are filed of record so that the applicable property, right or interest is subject thereto and burdened thereby or no longer subject to and no longer burdened thereby, as applicable pursuant to Section 7.1.

6.9 **Matters Related to Trustees.** Buyer shall not permit any Person that serves as a trustee for Trust A or Trust B to (a) directly or indirectly lend money to, or be a direct or indirect participant in any group that lends money to, Buyer or any of its Affiliates or (b) directly or indirectly purchase equity securities in Buyer or any of its Affiliates.

6.10    *Compliance Certificate*.  On or before the 30th day after the end of each calendar quarter, Buyer shall deliver to Sellers a compliance certificate signed by its Chief Financial Officer, along with supporting calculations and information, that (i) certifies compliance with the Trigger Ratio or specifies the amount by which Buyer is out of compliance with the Trigger Ratio; and (ii) certifies the calculation of each of the amounts contemplated in Section 4.4(a)(ii), if as of such determination time, such calculations are necessary to determine if a Suspension Period exists.

6.11    *Debt*.  Buyer shall not incur, and Buyer shall not permit any of its subsidiaries to incur, any Funded Debt (other than (i) any Refinancing thereof that does not increase the commitments or the principal amount of any term indebtedness then outstanding (other than to pay accrued and unpaid interest, fees and expenses, and other obligations then due and payable in respect of such Refinancing) and (ii) Permitted Senior Debt) that (a) includes an excess cash sweep or similar mechanic to mandatorily repay or prepay any outstanding principal amount thereof that would be effective during the period in which additional Trust B funding is required pursuant to Section 5.3 (an "*Excess Cash Sweep*") and would cause on a Pro Forma Basis the Leverage Ratio to exceed 2.50 to 1.00 upon the incurrence thereof or (b) that would cause the Leverage Ratio calculated on a Pro Forma Basis to exceed 3.00 to 1.00 upon the incurrence thereof.   For the avoidance of doubt, an Excess Cash Sweep shall not include (i) scheduled amortization, (ii) payments upon maturity (whether stated or otherwise) or upon acceleration or (iii) any principal prepayment triggered upon a change of control, a sale or other disposition of assets  or  a casualty event or similar event.

6.12    *Termination*.  The covenants in this Article VI (other than those contained in Sections 6.5, 6.6 and 6.10) shall terminate at such time as the Trust A Cash plus the face amount of the Letters of Credit issued pursuant to this Agreement exceeds 125% of the Remaining Decommissioning.

**ARTICLE VII**
**TRANSFERS**

7.1    *Investment Grade Buyer*.  Notwithstanding anything herein to the contrary, if at any time:

(a)    (1) Buyer sells to a Third Party all of its interests in Leases comprising 50% or more, but not all, of the fair market value of its interests (as determined at the effective time of such sale) in all Leases held by Buyer at the effective time of such sale (such sold Leases, the "*Transferred Leases*"), (2) the Trust A NPI and the Trust B NPI are transferred in connection with such sale pursuant to Section 7.3, (3) such Third Party, or an Affiliate that Controls such Third Party, has a senior long term unsecured debt rating from (x) Standard & Poor's of A or better or (y) Moody's of A2 or better (such Person that meets either such rating threshold, the "*7.1(a) Rated Party*"), and (4) the 7.1(a) Rated Party has provided a guaranty to Apache in form and substance reasonably acceptable to Apache guaranteeing the Secured Obligations with respect to the Transferred Leases, then:

19

        (i)      Apache shall cause the Security Instruments and the Recharacterization Mortgages to be terminated with respect to the Transferred Leases in accordance with the procedures described in <u>Section 7.3</u>;

        (ii)     Trust A shall assign to such transferee the Trust A NPI with respect to the Transferred Leases and Trust B shall assign to such transferee the Trust B NPI with respect to the Transferred Leases, in each case in accordance with the procedures described in <u>Section 7.3</u>;

        (iii)    (A) The Required Trust A Amount shall not be increased pursuant to clause (y) of the definition thereof as a result of such sale but shall instead be decreased by the proportion that the Remaining Decommissioning attributable to the Transferred Leases bears to the total Remaining Decommissioning prior to such sale and (B) the Trust B Locked Cash shall not be increased as a result of such sale and as a result of such sale a percentage of the Trust B Cash shall be paid to Buyer equal to the proportion that the Remaining Decommissioning attributable to the Transferred Leases bears to the total Remaining Decommissioning prior to such sale;

        (iv)    the Parties shall reduce the LC Drawing Amount in accordance with the procedures described in <u>Section 4.3(b)(ii)</u> by the proportion that the Remaining Decommissioning attributable to the Transferred Leases bears to the total Remaining Decommissioning prior to such sale;

        (v)     the terms of this Agreement and the Related Decommissioning Agreements shall not apply to the Transferred Leases and the Transferred Leases shall be sold free and clear of this Agreement and the Related Decommissioning Agreements; provided that this subsection (v) shall not, for purposes of clarity, limit or otherwise affect the rights and obligations of any Party or any Indemnified Person under the PSA.

        (b)    (1) Buyer sells its interests in all of the Leases to a Third Party, (2) such Third Party, or an Affiliate that Controls such Third Party, has a senior long term unsecured debt rating from (x) Standard & Poor's of A or better or (y) Moody's of A2 or better (such Person that meets either such rating threshold, the "***7.1(b) Rated Party***"), and (3) the 7.1(b) Rated Party has provided a guaranty to Apache in form and substance reasonably acceptable to Apache guaranteeing the Secured Obligations, then:

        (i)      Apache shall cause the Security Instruments and the Recharacterization Mortgages to be terminated;

        (ii)     Trust A shall release and assign to such transferee the Trust A NPI and Trust B shall release and assign to such transferee the Trust B NPI;

        (iii)    the Trust A Cash and the Trust B Cash shall be paid to Buyer;

        (iv)    the Letters of Credit shall be terminated;

        (v)     Apache shall cause the Trust B Security Interest to be terminated; and

(vi)     the terms of this Agreement and the Related Decommissioning Agreements shall be terminated; provided that such termination shall not, for purposes of clarity, limit or otherwise affect the rights and obligations of any Party or any Indemnified Person under the PSA.

(c)     (1) 50% or more of the equity ownership interests and Control of Buyer is acquired by a Third Party, (2) such Third Party, or an Affiliate that Controls such Third Party, has a senior long term unsecured debt rating from (x) Standard & Poor's of A or better or (y) Moody's of A2 or better (such Person that meets either such rating threshold, the "*7.1(c) Rated Party*"), and (3) the 7.1(c) Rated Party has provided a guaranty to Apache in form and substance reasonably acceptable to Apache guaranteeing Buyer's punctual performance and payment when due of the Secured Obligations, then:

(i)     Apache shall cause the Security Instruments and the Recharacterization Mortgages to be terminated;

(ii)     Trust A shall release and assign to Buyer the Trust A NPI and Trust B shall release and assign to Buyer the Trust B NPI;

(iii)     the Trust A Cash and the Trust B Cash shall be paid to Buyer;

(iv)     the Parties shall terminate the Letters of Credit;

(v)     Apache shall cause the Trust B Security Interest to be terminated; and

(vi)     the terms of this Agreement and the Related Decommissioning Agreements shall be terminated; provided that such termination shall not, for purposes of clarity, limit or otherwise affect the rights and obligations of any Party or any Indemnified Person under the PSA.

7.2     *Non-Investment Grade Buyer*.  Notwithstanding anything herein to the contrary, if at any time (i) Buyer sells, farms out or otherwise transfers to a Third Party its interests in Leases comprising 50% or more of the fair market value of its interests (as determined at the effective time of such sale)  in all Leases and (ii) such Third Party would not qualify under the standards identified in Section 7.1(a), then, at the closing of such transaction:

(a)     The Trust A NPI and the Trust B NPI shall continue to apply to and burden the Leases to be sold and none of the proceeds of any such transaction shall be paid to Trust A or Trust B; and

(b)     the other provisions of this Agreement, the Security Instruments and the other Related Decommissioning Agreements shall remain in effect.

7.3     *Drag-Along Rights.*

(a)     Except with respect to transactions that are subject to Sections 7.1(b), 7.2, 7.4 or 7.5, if, at any time, Buyer sells any interest in the oil and gas interests burdened by the

Trust A NPI and the Trust B NPI (the "*Subject Interests*") solely for cash to any Person that is not an Affiliate of Buyer in a bona fide arms' length transaction (a "*Drag Sale*"), then Buyer may, subject to the other provisions of this Section 7.3, require Trust A and Trust B to sell the Trust A NPI and the Trust B NPI, respectively, to the extent that it burdens the Subject Interests subject to the Drag Sale (such portion of the Trust A NPI and the Trust B NPI, the "*Dragged NPI*") for (i) 10% of the consideration to be received by Buyer subject to reimbursement for transaction costs as set forth in the Trust A Trust Agreement, which shall be paid to Trust A and (ii) 20% of the consideration to be received by Buyer subject to reimbursement for transaction costs as set forth in the Trust B Trust Agreement, which shall be paid to Trust B.  In the event that, with respect to any Subject Interest, Buyer is receiving zero consideration or is paying the buyer of such Subject Interest in connection with the transfer (because such Subject Interest has a negative value), then, with respect to such Subject Interest, the purchase price for the Dragged NPI shall be zero.

(b)      Subject to Section 7.3(a), in connection with a Drag Sale, Trust A and Trust B shall execute an assignment of the applicable Dragged NPI, but neither Trust A nor Trust B shall be required to make any representations or warranties in connection with such assignment other than a special warranty of title.  The rights set forth in Section 7.3(a) may be exercised by Buyer by giving written notice to Trust A and Trust B at least ten (10) Business Days prior to the date on which Buyer expects to consummate the Drag Sale along with a complete and accurate copy of the purchase and sale agreement evidencing the Drag Sale (the "*Drag PSA*") and Buyer's calculation of the purchase price to be received by each of Trust A and Trust B for the sale of the applicable Dragged NPI.  In the event that the Drag PSA is amended in any respect, Buyer shall provide a copy of the amended Drag PSA immediately after the execution thereof.

(c)      The Security Instruments and the Recharacterization Mortgages shall terminate as to the Subject Interests sold in a Drag Sale to the extent there are Dragged NPIs in connection with such Drag Sale.  In connection with a Drag Sale, Apache shall, within five Business Days of request by Buyer, execute, acknowledge, and deliver to Buyer a recordable instrument (reasonably acceptable to Buyer) that releases the Security Instruments and the Recharacterization Mortgages with respect to the Subject Interests being transferred pursuant to such Drag Sale.

7.4      *Farmout Agreements*.  Buyer may from time to time enter into any farmout agreement, participation agreement, exploration agreement, development agreement or any similar agreement ("*Farmout Agreements*") with any Person that is not an Affiliate of Buyer (a "*Third Party*") with respect to the Leases.  In the event that Buyer enters into any Farmout Agreement with a Third Party, the Trust A NPI, the Trust B NPI, the Security Instruments and the Recharacterization Mortgages shall only burden Buyer's retained interest in the applicable Leases after giving effect to any interest in such Leases that a counterparty to the Farmout Agreement may earn under such Farmout Agreement.  In connection with Buyer entering into any Farmout Agreement with a Third Party, (i) Trust A and Trust B shall, upon request of Buyer, execute, acknowledge, and deliver to Buyer a recordable instrument (reasonably acceptable to Buyer) that releases and assigns the Trust A NPI and the Trust B NPI with respect to the Subject Interests being transferred pursuant to such Farmout Agreement and (ii) Apache shall, within five Business Days of request by Buyer, execute, acknowledge, and deliver to Buyer a

recordable instrument (reasonably acceptable to Buyer) that releases the Security Instruments and the Recharacterization Mortgages with respect to the Subject Interests being transferred pursuant to such Farmout Agreement.

7.5    *Swap Agreements*.  If (a) during any calendar year prior to the time at which Buyer has entered into Exchange Agreements during such calendar year with respect to Subject Interests that, collectively, had a fair market value of $200 million (as determined as of the effective time of any relevant assignment), Buyer enters into a swap agreement, exchange agreement or any similar agreement ("*Exchange Agreements*") with a Third Party whereby Buyer is assigning to a Third Party interests in the Subject Interests and such Third Party is assigning to Buyer other oil and gas interests owned by such Third Party (such interests being assigned by the Third Party, the "*Exchanged Interests*") as consideration for the interests being assigned to such Third Party by Buyer, and (b) the Subject Interests to be transferred pursuant to such Exchange Agreement do not have a fair market value (as determined as of the effective time of the relevant assignment) that, when added together with the fair market value of all Subject Interests described in clause (a) for such calendar year, would exceed $200 million then, from and after the closing of the transactions contemplated by the Exchange Agreement, (i) the Trust A NPI, the Trust B NPI, the Security Instruments and the Recharacterization Mortgages shall no longer burden Buyer's interest in the Subject Interests conveyed to such Third Party but (ii) the Trust A NPI and the Trust B NPI shall apply to and burden the Exchanged Interests. With respect to any Exchange Transaction that is entered into in compliance with the foregoing provisions of this Section 7.5(a), (i) Apache shall, within five Business Days of request by Buyer, execute, acknowledge, and deliver to Buyer a recordable instrument (reasonably acceptable to Buyer) that releases the Security Instruments and the Recharacterization Mortgages with respect to the Subject Interests being transferred by Buyer pursuant to such Exchange Agreement, (ii) the Parties shall execute, acknowledge and deliver to one another recordable instruments (reasonably acceptable to one another) that make any applicable Exchanged Interests subject to both the Trust A NPI and the Trust B NPI and (iii) the Parties shall execute, acknowledge and deliver to one another recordable instruments (reasonably acceptable to one another) to release the Subject Interests transferred to a Third Party pursuant to such Exchange Agreement from both the Trust A NPI and the Trust B NPI. Notwithstanding the foregoing, Buyer shall not, during any calendar year, consummate the transactions contemplated by any Exchange Agreement if, after giving effect to such consummation, Buyer would have, during such calendar year, consummated Exchange Transactions with respect to Subject Interests that, collectively, had a fair market value in excess of $200 million (as determined as of the effective time of any relevant assignment).

## ARTICLE VIII
## EXPERT DETERMINATION

8.1    *Expert Resolution*.  If any dispute, difference, or matter of any kind arises which, under this Agreement, is required or permitted to be referred to an Expert for determination, then the relevant referring Party may serve notice on the other Party requiring the matter to be so determined in accordance with this Article VIII.

8.2    *Nomination*.  Following service of a notice pursuant to Section 8.1, each of Sellers and Buyer shall, subject to the proviso below, nominate three experts who are ready,

willing and able to act. Each such expert shall be scored by both of the Parties in order of preference from 3 (highest preference) to 1 (lowest preference) and the expert with the highest score shall be selected (the "**Expert**"). If there is a tie and the Parties are unable within two (2) Business Days to select an expert from among the tied experts then lots shall be drawn to select an expert from among the tied experts. If the Parties have not agreed upon the identity of the Person to be appointed as the Expert within ten (10) Business Days of service of the notice under Section 8.1, any Party may apply to the Center for Dispute Resolution or AAA to appoint an individual to act as the Expert in the reference requesting that the appointment be made within ten (10) Business Days of receipt of the application.

8.3     *Qualification*.   The Expert shall be qualified or experienced in a discipline appropriate to the nature of the matter in dispute.  In the event that the expertise required is in relation to accounting matters, the Expert shall be a senior partner in one of the four major independent public accounting firms (Deloitte Touche Tohmatsu, Ernst & Young LLP, KPMG or PriceWaterhouseCoopers).  In the event that the expertise required is in relation to valuation matters, the Expert shall be a nationally or internationally recognized investment banking firm. In the event that the expertise required is in relation to engineering matters (including Hydrocarbon engineering), the Expert shall be an engineering firm or construction contractor, as appropriate, with an international reputation; provided if such Person is not available the Expert shall be determined as described in Section 8.2.  No Person shall be appointed as an Expert under this Article VIII in any dispute in respect of which that Person has any financial or personal interest in the result of the Expert determination except by the prior written consent of both of the Parties.  No Party may nominate any Expert with whom such Party has done business during any of the last three (3) Years preceding such Expert's appointment, exceeding the lesser of $1 million or more than two percent (2%) of such Expert's net income.

8.4     *Appointment Conditions*.   The Expert shall be required as a condition of appointment to:

(a)     keep all matters relating to the appointment, the dispute and his determination confidential;

(b)     if the appointed Expert is a firm or company, nominate an individual as its representative; and

(c)     agree to keep expenditures incurred in the determination of submitted matters as low as may be practicable given the nature of the matter in dispute.

8.5     *Restrictions*.  The Expert shall only review the specific matters in dispute as part of any determination, and shall not have the ability to consider any matters other than the specific matters in dispute as part of any determination.  The Expert shall not be permitted to determine that (a) fewer Decommissioning activities be included within the Activity Scope than the amount proposed by Buyer or (b) more Decommissioning activities be included within the Activity Scope than the amount proposed by Sellers.

8.6     *Procedures*.  The Expert shall establish the procedure of the Expert determination so as to ensure the fair, expeditious, and economical determination of the matter referred for determination. Without prejudice to the generality of its powers, the Expert may:

(a)     require the delivery of written or oral submissions by the Parties and limit or extend the time for delivery of such submissions;

(b)     require the production of documents or the attendance of people whom he considers could assist;

(c)     meet and question the Parties and their representatives together or separately;

(d)     limit the length of any written or oral submission; and/or

(e)     obtain legal or technical advice with the consent of all the Parties;

and each Party shall comply with any request or direction of the Expert in relation to the conduct of the Expert determination provided that the Expert shall ensure that any written submission received from any Party is copied to the other Party.

8.7     *Decision*.  The Expert shall reach his decision on such basis as is fair and reasonable and complies with Laws, taking into account good oil and gas industry practice, the terms of this Agreement, and the object of the Parties in entering into this Agreement, his duty of care to all Parties and all of the circumstances that the Expert believes are relevant to enable him to make his decision.

8.8     *Determination*.  The place of Expert determination shall be Houston, Texas.  The Expert, once appointed, shall have no ex parte communications with any of the Parties to the dispute at issue.  All Parties agree to cooperate fully in the expeditious conduct of such Expert determination and to provide the Expert with access to all facilities, books, records, documents, information and personnel necessary to make a fully informed decision in an expeditious manner. Information that is provided to the Expert shall be on a confidential basis and the Expert shall be obligated to keep all such information confidential. Prior to issuing a final decision, the Expert shall notify the Parties of his preliminary decision and issue a draft report within thirty (30) Business Days of the date of acceptance of his appointment (or such longer period as the Parties may agree in writing or the Expert may decide provided that in the absence of agreement of the Parties he shall not extend the period of thirty (30) Business Days for reaching his decision by more than ten (10) Business Days in total) and allow the Parties to comment on such draft report, and the Expert shall, having taken account of such comments, issue his final report and decision within thirty (30) days of issuance of his draft report.

8.9     *Binding Nature*.  The final decision of the Expert shall be binding on all the Parties to this Agreement except in the case of fraud, manifest error, or mistake in law or fact. The Expert shall act as expert and not as arbitrator.

8.10    *Failure to Reach Decision*.  If the Expert fails to reach a final decision in accordance with Section 8.7 and Section 8.8, any Party may request the appointment of another

25

Expert, which shall be appointed in the same manner as the first Expert. On acceptance of appointment by the new Expert the appointment of the previous Expert shall cease.

8.11    *Costs*.  The Parties shall bear their own legal and other costs in relation to any determination and shall share the Expert's fees and expenses on a 50/50 basis.

## ARTICLE IX
## TAX MATTERS

9.1    *Intended Tax Treatment*.  The Parties intend that the transactions contemplated by this Agreement will be treated for U.S. federal and applicable state and local tax purposes as follows and each Party agrees to, and to cause its Affiliates to, file consistently therewith on all filed U.S. federal and applicable state and local tax returns and to notify the other Party of any audit, examination, claim, assessment or deficiency of any taxing authority inconsistent with such treatment:

(a)    Each of Trust A and Trust B shall be treated as a grantor trust of Buyer in accordance with Subchapter J of the Internal Revenue Code of 1986, as amended, and Seller agrees that it shall not have any direct or indirect interest in either Trust A or Trust B for U.S. federal or state income tax purposes.

(b)    Any deductions or expenses attributable to the accrual or payment of P&A Obligations shall be properly taken by Buyer on its U.S. federal and applicable state and local income tax returns and neither Seller nor its Affiliates shall claim any deduction or expense for Decommissioning on its U.S. federal or applicable state and local income tax returns related to the P&A Obligations.

## ARTICLE X
## TERM AND TERMINATION

10.1    *Term.*  The term of this Agreement shall begin on and as of the Closing Date and shall remain in full force and effect until twelve months after the termination of all P&A Obligations and all Permanently Abandoned Properties P&A Obligations (the "*Term*").

## ARTICLE XI
## GOVERNING LAW; VENUE

11.1    *Governing Law*.  This Agreement shall be governed and construed in accordance with the Laws of the State of Texas, without regard to the Laws that might be applicable under conflicts of laws principles.

11.2    *Venue*.  Each Party consents to personal jurisdiction in any action brought in the United States federal and state courts located in the State of Texas with respect to any dispute, claim or controversy arising out of or in relation to or in connection with this Agreement, and each of the Parties hereto agrees that any action with respect to any such dispute, controversy, or claim will be determined exclusively in a state or federal district court located in Harris County, Texas.  EACH PARTY HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, ANY OBJECTION WHICH THEY MAY NOW OR HEREAFTER

HAVE TO THE VENUE OF ANY SUCH DISPUTE ARISING OUT OF THIS AGREEMENT BROUGHT IN SUCH COURT OR ANY DEFENSE OF INCONVENIENT FORUM FOR THE MAINTENANCE OF SUCH DISPUTE.

11.3    *Waiver of Trial by Jury*.  EACH OF THE PARTIES AND THEIR RESPECTIVE SUCCESSORS AND ASSIGNS HEREBY IRREVOCABLY WAIVES ALL RIGHT TO TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM (WHETHER BASED ON CONTRACT, TORT OR OTHERWISE) ARISING OUT OF OR RELATING TO THIS AGREEMENT, THE TRANSACTIONS CONTEMPLATED HEREBY OR THE ACTIONS OF ANY OTHER PARTY IN THE NEGOTIATION, ADMINISTRATION, PERFORMANCE AND ENFORCEMENT THEREOF.

11.4    *Related Disputes*.  The Parties agree that a dispute under this Agreement may raise issues that are common with one or more of the other Transaction Documents or Related Decommissioning Agreements or which are substantially the same or interdependent and interrelated or connected with issues raised in a related dispute, controversy, or claim between or among the Parties and their Affiliates.  Accordingly, any Party to a dispute under this Agreement (a "*New Dispute*") may elect in writing within fifteen (15) days after the initiation of a New Dispute to refer such New Dispute for resolution by the applicable court together with any existing dispute arising under this Agreement or any other Transaction Documents or Related Decommissioning Agreements.  If the applicable court does not determine to consolidate such New Dispute with the existing dispute within thirty (30) days of receipt of written request, then the New Dispute shall not be consolidated, and the resolution of the New Dispute shall proceed separately.

## ARTICLE XII
## CONFIDENTIALITY

12.1    *Confidentiality*.  All documents and information transmitted between the Parties in connection with the P&A Obligations and the performance of Decommissioning shall be regarded as confidential ("*Confidential Information*"), and the receiving Party shall:

(a)    treat such Confidential Information as confidential and use reasonable care not to divulge such Confidential Information to any third party, such care to be commensurate with the care exercised by such receiving Party for protection of its own confidential information;

(b)    restrict the use of such Confidential Information to matters related to the performance of this Agreement; and

(c)    restrict access to such Confidential Information to the receiving Party's and their Affiliates' personnel who require such information for the performance of this Agreement, advisors, lenders, prospective lenders, investors, prospective investors and rating agencies and their respective counsel and consultants (it being understood and agreed to by such receiving Party that such personnel, advisors, lenders, prospective lenders, investors, prospective investors and rating agencies and their respective counsel and consultants will be informed by the receiving Party of the confidential and proprietary nature of the Confidential Information and

will be subject to the receiving Party's obligations with respect to the Confidential Information under this Agreement and that the receiving Party shall be responsible for any use or disclosure of the Confidential Information by any of such personnel, advisors, lenders, prospective lenders, investors, prospective investors and rating agencies and their respective counsel and consultants in violation of their obligations with respect to the Confidential Information hereunder).

12.2   *Exceptions*.   The restrictions set forth in <u>Section 12.1</u> shall not apply to information that:

(a)   is or becomes publicly known other than through a wrongful act of the receiving Party;

(b)   becomes rightfully known by the receiving Party without confidentiality restrictions from a source other than the disclosing Party;

(c)   is in the possession of the receiving Party prior to receipt from the disclosing Party, or is independently developed by the receiving Party; provided, that the Party developing same shall not have relied on Confidential Information to develop such information;

(d)   must be disclosed by requirements of applicable Law (including applicable stock exchange regulations) or valid legal or regulatory process, in which case the receiving Party shall notify the disclosing Party in advance of any such disclosure and reasonably cooperate with any attempt to maintain the confidentiality of such information; or

(e)   is approved for disclosure, in writing, by the disclosing Party.

12.3   *Duration of Obligation*.   The confidentiality obligations set forth herein shall expire two (2) years after termination of this Agreement. Notwithstanding the foregoing, to the extent that any document and/or material of whatever nature, disclosed pursuant to this Agreement contains an obligation to keep confidential the terms of such document and/or material for a period greater than two (2) years, then the confidentiality obligations set forth herein shall remain in full force and effect in relation to such document and/or material until such confidentiality obligations expire or are terminated.

## ARTICLE XIII
## GENERAL

13.1   *Notices*.   All notices and other communications that are required or that may be given pursuant to this Agreement (including notices to change the below information) ("*Notice*" or "*Notices*") shall be (a) sufficient in all respects if given in writing, in English, and delivered by recognized courier service to the Party to be noticed pursuant to the contact information below that corresponds with the applicable form of notice and (b) deemed received when actually delivered (as reflected by the courier's receipt or similar electronic receipt):

If to Buyer, to:

Fieldwood Energy LLC
333 Clay Street, Suite 3400

> Houston, Texas 77002
> Attention:  Matt McCarroll
>                    President and Chief Executive Officer
> Facsimile:  713-630-8901

With a copy to:

> Riverstone Holdings, LLC
> 712 Fifth Avenue, 51st Floor
> New York, New York 10019
> Attention:  Stephen Coats
>                    Partner and General Counsel
> Facsimile:  212-993-0077

If to any Seller, to:

> Apache Corporation
> 2000 Post Oak Boulevard, Suite 1000
> Houston, Texas 77056
> Attention:  Tom Yelich
>                    Director Business Development
> Facsimile:  713-296-7257

With a copy to:

> Apache Corporation
> 2000 Post Oak Boulevard, Suite 1000
> Houston, Texas 77056
> Attention:  P. Anthony Lannie
>                    Executive Vice President and General Counsel
> Facsimile:  713-296-6458

or to such other address or addresses as the Parties may from time to time designate in writing.  Notice to any Seller in accordance with this <u>Section 13.1</u> shall constitute notice to all Sellers.

13.2  ***Assignment***.  No Party shall assign this Agreement or any part hereof without the prior written consent of the other Parties.  Subject to the foregoing, this Agreement shall be binding upon and inure to the benefit of the Parties and their respective permitted successors and assigns.  Notwithstanding anything to the contrary herein, Buyer may assign, transfer, convey, set over and grant a security interest unto the collateral agent or any lender under the Senior Debt Facility, their respective successors and assigns, all right, title and interest of Buyer under this Agreement in accordance with the Senior Debt Facility; provided, however, that no assignment shall relieve the assignor of its obligations under this Agreement, except upon execution of a written release executed by all Parties.

13.3  ***Rights of Third Parties***.  Except for the provisions of <u>Section 2.6</u> and <u>2.7</u>, which may be enforced solely by any applicable Indemnified Party, nothing expressed or implied in this

Agreement or in any other Related Decommissioning Agreement is intended or shall be construed to confer upon or give any Person, other than the Parties, any right or remedies under or by reason of this Agreement or the Related Decommissioning Agreements.

13.4    *Counterparts*.  This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.  Any .pdf or other electronic transmission hereof or signature hereon shall, for all purposes, be deemed originals.

13.5    *Entire Agreement*.   This Agreement, the other Transaction Documents, the Confidentiality Agreement and the Related Decommissioning Agreements constitute the entire agreement among the Parties and supersede any other agreements, whether written or oral, that may have been made or entered into by the Parties or any of their respective Affiliates relating to the transactions contemplated hereby.

13.6    *Amendments*.  This Agreement may be amended or modified in whole or in part, and terms and conditions may be waived, only by a duly authorized agreement in writing which makes reference to this Agreement executed by each Party.

13.7    *IPO*.  None of the terms of this Agreement shall be affected if Buyer undergoes an initial public offering ("*IPO*"), including if the capital structure of Buyer is altered in connection with an IPO, whether through the issuance, conversion or exchange of equity securities or otherwise.

13.8    *Publicity*.   All press releases or other public announcement of any nature whatsoever relating to the existence of this Agreement, the contents hereof or the transactions contemplated hereby, and the method of the release for publication thereof, shall be subject to the prior written consent of Buyer and Sellers (not to be unreasonably withheld, conditioned or delayed); provided, however, that nothing herein shall prevent a Party from publishing such press releases or other public communications as is necessary to satisfy such Party's obligations at Law or under the rules of any stock or commodities exchange after consultation with the other Party.  If a Party believes it is required to issue or make any such press release or announcement, such Party shall (a) give prompt notice thereof to the other Party, (b) allow such other Party reasonable opportunity to review and provide comments with respect to the content of such press release or announcement and (c) use commercially reasonable efforts to incorporate any reasonable comment from the other Party prior to any release or announcement.

13.9    *Joint and Several Liability*.  Each Seller shall be severally liable for its own duties and obligations under this Agreement and any other documents executed in connection herewith and no Seller shall be jointly and severally liable for the obligations and duties of any other Seller; provided, however, that, notwithstanding anything contained in this Agreement to the contrary, APA shall be jointly liable for the obligations and duties of each Seller under this Agreement and any other documents executed in connection herewith.  Each of the Sellers agree APA shall be entitled to act on behalf of all Sellers with respect to all matters relating to this Agreement, including entering into amendments relating to this Agreement.  Each Buyer shall be jointly liable for the obligations of Buyer under this Agreement and any other documents executed in connection herewith. Each Buyer agrees Buyer 1 shall be entitled to act on behalf of

each Buyer with respect to all matters relating to this Agreement, including entering into amendments relating to this Agreement.

13.10  *Severability*.  If any provision of this Agreement is held invalid or unenforceable by any court of competent jurisdiction, the other provisions of this Agreement shall remain in full force and effect.  The Parties further agree that if any provision contained herein is, to any extent, held invalid or unenforceable in any respect under the Laws governing this Agreement, they shall take any actions necessary to render the remaining provisions of this Agreement valid and enforceable to the fullest extent permitted by Law and, to the extent necessary, this Agreement shall be deemed to be automatically amended to replace any provision contained herein that is held invalid or unenforceable with a valid and enforceable provision giving effect to the intent of the Parties to the greatest extent legally permissible.

13.11  *Waivers*.  Any failure by any Party to comply with any of its obligations, agreements or conditions herein contained may be waived by the Party to whom such compliance is owed by an instrument signed by the Party to whom compliance is owed and expressly identified as a waiver, but not in any other manner.  No waiver of, or consent to a change in or modification of, any of the provisions of this Agreement shall be deemed or shall constitute a waiver of, or consent to a change in or modification of, any other provisions hereof (whether or not similar), nor shall such waiver constitute a continuing waiver unless otherwise expressly provided.

13.12  *Specific Performance*.  The Parties acknowledge and agree that, without limiting the effect of the terms hereof, (a) a Party would be irreparably harmed by a breach by any other Party of any of its obligations under this Agreement and the other Related Decommissioning Agreements and (b) the non-breaching Party is entitled to injunctive relief, specific performance and other equitable remedies against the breaching Party to enforce the performance by the breaching Party of its obligations under this Agreement and any other Related Decommissioning Agreement, and the Parties hereby consent and agree to such injunctive relief, specific performance and other equitable remedies.

13.13  *Waiver of Consequential Damages*.  NOTWITHSTANDING ANYTHING HEREIN TO THE CONTRARY, NEITHER BUYER, ANY SELLER NOR THEIR RESPECTIVE AFFILIATES SHALL BE LIABLE HEREUNDER TO ANY OTHER PARTY FOR ANY (a) PUNITIVE OR EXEMPLARY DAMAGES OR (b) LOST PROFITS OR CONSEQUENTIAL, SPECIAL OR INDIRECT DAMAGES, EXCEPT IN EACH CASE OF THE FOREGOING CLAUSES (a) AND (b), TO THE EXTENT ANY SUCH DAMAGES OR LOST PROFITS ARE INCLUDED IN ANY ACTION BY A THIRD PARTY AGAINST SUCH PARTY AND TO THE EXTENT SUCH DAMAGES OR LOST PROFITS ARE RECOVERABLE LOSSES UNDER THIS AGREEMENT.

13.14  *Perpetuities*.  It is not the intent of the Parties that any provision herein violate any applicable Law regarding the rule against perpetuities, the suspension of the absolute power of alienation, or other rules regarding the vesting or duration of estates, and this Agreement shall be construed as not violating such rule to the extent the same can be so construed consistent with the intent of the Parties.  However, if any provision hereof is determined to violate such rule, then such provision shall nevertheless be effective for the maximum period (but not longer than

31

the maximum period) permitted by such rule that will result in no violation.  To the extent such maximum period is permitted to be determined by reference to "lives in being," the Parties agree that "lives in being" shall refer to the lifetime of the last to die of the now living lineal descendants of the British Royal Family and the now living lineal descendants of Joseph Patrick Kennedy, Sr, (father of the former President John F. Kennedy of the United States of America).

13.15  **_Further Assurances_**.  Subject to the terms and conditions of this Agreement, each Party shall use commercially reasonable efforts to take, or cause to be taken, all actions and to do, or cause to be done, all things necessary or desirable, under applicable Law or otherwise, in connection with this Agreement.  The Parties agree to and shall execute and deliver such other documents, certificates, agreements and other writings and to take such other actions as may be necessary or desirable in connection with this Agreement.

*[Signatures next page.]*

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed by their authorized representatives, to be effective as of the Closing Date.

**APACHE CORPORATION**

By:_____
Name:      [_____]
Title:       [_____]

**APACHE SHELF, INC.**

By:_____
Name:      [_____]
Title:       [_____]

**APACHE DEEPWATER LLC**

By:_____
Name:      [_____]
Title:       [_____]

**FIELDWOOD ENERGY LLC**

By:_____
Name:      [_____]
Title:       [_____]

**GOM SHELF LLC**

By:_____
Name:      [_____]
Title:       [_____]

[Signature page to Decommissioning Agreement]

## EXHIBIT A

### DEFINITIONS

"*7.1(a) Rated Party*" has the meaning ascribed to such term in Section 7.1(a).

"*7.1(b) Rated Party*" has the meaning ascribed to such term in Section 7.1(b).

"*7.1(c) Rated Party*" has the meaning ascribed to such term in Section 7.1(c).

"*Activity Scope*" has the meaning ascribed to such term in Section 2.1(c).

"*Agreement*" has the meaning ascribed to such term in the introductory paragraph of this Agreement.

"*APA*" has the meaning ascribed to such term in the introductory paragraph of this Agreement.

"*Apache*" has the meaning ascribed to such term in the introductory paragraph of this Agreement.

"*APDW*" has the meaning ascribed to such term in the introductory paragraph of this Agreement.

"*Applicable Properties*" means (i) the 8/8ths Assets, (ii) the Pipeline Company Assets, and (iii) the Pending Abandoned Properties.

"*APSH*" has the meaning ascribed to such term in the introductory paragraph of this Agreement.

"*Available Cash*" means at the time of determination: (a) the sum of all Unrestricted Cash and cash equivalents of Buyer on hand, less, without duplication, (b) the amount of any cash reserves established by Buyer (i) to provide for the proper conduct of the business of Buyer for the six months ending after such time (including reserves for Decommissioning for such period and indebtedness or similar obligations (other than Funded Debt incurred in violation of Section 6.3 or Section 6.11, as applicable)), (ii) for payments to non-Affiliates to comply with applicable Law or to non-Affiliates to make any payments in respect of Funded Debt or Permitted Senior Debt, in each case, permitted under this Agreement reasonably anticipated to be due within the next six months and (iii) to provide funds for tax distributions to the extent such tax distributions would be permitted pursuant to Section 6.4.

"*Balance Sheet Liabilities*" means, as of any date, (a) if there is any Senior Debt outstanding on such date, all liabilities reflected on the most recent balance sheet provided by Buyer to the Senior Debt Lenders; or (b) if there is no Senior Debt outstanding on such date, all liabilities as would be reflected on a balance sheet prepared in accordance with GAAP using the full cost method of accounting, in each case, excluding liabilities related to P&A Obligations.

"***Buyer***" has the meaning ascribed to such term in the introductory paragraph of this Agreement.

"***Buyer 1***" has the meaning ascribed to such term in the introductory paragraph of this Agreement.

"***Buyer Notice***" has the meaning ascribed to such term in Section 2.7(a).

"***Closing Date***" has the meaning ascribed to such term in the introductory paragraph of this Agreement.

"***Collateralized Amount***" means, as of any determination time and without duplication, an amount equal to the sum of (i) 125% of the Remaining Decommissioning at such time plus (ii) Sellers' reasonable, good faith estimate of the amount of the Secured Obligations at such time.

"***Confidential Information***" has the meaning ascribed to such term in Section 12.1.

"***Consolidated EBITDAX***" has the meaning ascribed to such term in the Intercreditor Agreement.

"***Control***" has the meaning ascribed to the term "control" in the definition of "Affiliate" in the PSA.

"***Decommissioning***" means operations, work and activities conducted to pay, perform, fulfill, satisfy or otherwise discharge (i) P&A Obligations and (ii) Permanently Abandoned Properties P&A Obligations in accordance with the terms of Section 2.5.

"***Decommissioning Plan***" means (a) with respect to the first 3 Plan Years, the Initial Decommissioning Plan as determined pursuant to Section 2.1(a) and (b) with respect to any subsequent Plan Years, any Proposed Plan that becomes (or constitutes a modification of) the Decommissioning Plan pursuant to Section 2.1(e), Section 2.1(f) or Section 2.2.

"***Dragged NPI***" has the meaning ascribed to such term in Section 7.3(a).

"***Drag PSA***" has the meaning ascribed to such term in Section 7.3(b).

"***Drag Sale***" has the meaning ascribed to such term in Section 7.3(a).

"***Estimated Costs***" has the meaning ascribed to such term in Section 2.1(c).

"***Excess First-Priority Obligations***" has the meaning ascribed to such term in the Intercreditor Agreement.

"***Exchange Agreements***" has the meaning ascribed to such term in Section 7.5.

"***Exchanged Interests***" has the meaning ascribed to such term in Section 7.5.

Exhibit A – Page 2

"*Expert*" has the meaning ascribed to such term in <u>Section 8.2</u>.

"*Expiration Date*" has the meaning ascribed to such term in the Letter of Credit.

"*Farmout Agreements*" has the meaning ascribed to such term in <u>Section 7.4</u>.

"*Force Majeure*" means any cause of failure or delay beyond the reasonable control of a Party or its suppliers, working interest partners, and subcontractors, including from any act of God; act of civil or military authority; act of war whether declared or undeclared; act (including delay, failure to act, or priority) of any Governmental Authority (including with respect to permits); civil disturbance; insurrection or riot; act of terrorism; sabotage; fire; severe weather conditions; hurricanes; earthquake; epidemic affecting the availability of labor; strike, work stoppage or other labor difficulty; embargo; fuel, or energy or material shortage; wreck; major equipment breakdown; failure or delay of any service provider or contractor; inability to procure contractors or supplies; delay or accident in shipping or transportation; or failure or delay beyond its reasonable control in obtaining necessary manufacturing facilities, labor, or materials from usual sources.

"*Funded Debt*" means all committed or funded third party Indebtedness for borrowed money, unreimbursed drawings under letters of credit, capital lease obligations, determined in accordance with GAAP and third-party Indebtedness evidenced by notes, loan agreements or similar instruments (including any revolving facility that is committed or funded); provided that, notwithstanding anything to the contrary contained herein, (i) any funding of an undrawn commitment that was previously permitted to be incurred hereunder shall not constitute an incurrence of Funded Debt for the purposes of this Agreement and (ii) any letter of credit issued for the benefit of the Seller or any of their respective affiliates shall not be deemed to be Funded Debt for any purpose hereunder.

"*GOM*" has the meaning ascribed to such term in the introductory paragraph of this Agreement.

"*Government Decommissioning*" has the meaning ascribed to such term in <u>Section 2.7</u>.

"*Indebtedness*" has the meaning ascribed to such term in the Intercreditor Agreement.

"*Initial Decommissioning Plan*" has the meaning ascribed to such term in <u>Section 2.1(a)</u>.

"*IPO*" has the meaning ascribed to such term in <u>Section 13.7</u>.

"*Issuing Bank*" means (a) Citibank, N.A., (b) Deutsche Bank Trust Company Americas, (c) Bank of America, N.A., (d) Goldman Sachs Bank USA, (e) any other issuing bank mutually agreed by the Parties or (f) any other issuing bank eligible to provide letters of credit under the Senior Debt Facility, in each case so long as such bank is a major U.S. commercial bank or a foreign bank with a U.S. branch office, with the

rating assigned to its unsecured and senior, long-term debt or deposit obligations (not supported by third party credit enhancement) by Standard & Poor's or Moody's of at least "A-" and "A3", respectively.

"*LC Drawing Amount*" means, on any given date, the amount then available for drawings under the Letter of Credit.

"*Leaseholders*" means, with respect to any Applicable Property, any Person which holds an interest in such Applicable Property or any other Person liable for Decommissioning associated with such Applicable Property.

"*Letter of Credit*" has the meaning ascribed to such term in <u>Section 3.1</u>.

"*Leverage Ratio*" means the ratio of Funded Debt (minus all Unrestricted Cash and cash equivalents) on any date to Consolidated EBITDAX for the most recently completed four fiscal quarter period for which financial statements have been delivered and ended prior to such date.

"*Moody's*" means Moody's Investors Service, Inc. or any successor in title to the rating agency business operated by such company; provided if Moody's ceases to exist or provide ratings, then the ratings in question shall be based on such alternative ratings provided by a company generally accepted in the United States and that is reasonably acceptable to Sellers and Buyer; provided if no agreement is reached regarding an alternative ratings provider in such a situation, then the matter shall be referred to an Expert for determination in accordance with <u>Article VIII</u>.

"*Net Cost*" means, as of the applicable determination date, the net present value (utilizing a discount rate of 6%) of the Remaining Decommissioning, as determined by Buyer acting as a Reasonably Prudent Operator.

"*Net Reserve Value*" means, as determined individually and in the aggregate as to all Leases as of the applicable determination date, the aggregate, of the pre-tax net present value, assuming a discount rate of 10% from the sales of Hydrocarbons projected to be produced and sold from (or otherwise allocable to) such Lease, net to the interest of Buyer (plus the value, calculated on the same basis, of the Trust A NPI and the Trust B NPI), after deducting all capital costs, lease operating expenses, and lease burdens, and utilizing pricing and other assumptions consistent with the pricing and other assumptions underlying the most recent reserve analysis with respect to the Leases provided by Buyer to the Senior Debt Lenders or, if there are no Senior Debt Lenders or, if the Senior Debt Lenders do not require a reserve analysis, the most recent reserve analysis provided to any other lender.

"*New Dispute*" has the meaning ascribed to such term in <u>Section 11.4</u>.

"*Non-Renewal Drawing Request*" means a non-renewal drawing request in the form attached as <u>Exhibit B</u> to the Letter of Credit.

"*Notice*" has the meaning ascribed to such term in <u>Section 13.1</u>.

"*Notices*" has the meaning ascribed to such term in <u>Section 13.1</u>.

"*Party*" has the meaning ascribed to such term in the introductory paragraph of this Agreement.

"*Parties*" has the meaning ascribed to such term in the introductory paragraph of this Agreement.

"*Permanently Abandoned Properties Decommissioning*" has the meaning ascribed to such term in <u>Section 2.5(a)</u>.

"*Permanently Abandoned Properties P&A Obligations*" means the performance and completion of the following plugging, replugging, abandonment, removal, site clearance, site survey, remediation, disposal, and restoration operations, in each case to be conducted in compliance with applicable Laws and contracts, and in a good and workmanlike manner:

     (a)   to properly plug and abandon and remove, dismantle, decommission and dispose of all wells, structures, platforms, facilities, flow lines, pipelines, any other Equipment located on any Permanently Abandoned Properties;

     (b)   to replug any well, wellbore, or previously plugged well in connection with any Permanently Abandoned Properties; and

     (c)   to flush, cap, pickle, bury or remove all flow lines and other pipelines used in connection with the Permanently Abandoned Properties.

"*Plan Year*" means, with respect to any Decommissioning Plan, any Proposed Plan and any Sellers' Proposed Plan, any twelve (12) month period commencing on July 1 of any calendar year and ending on June 30 of the immediately subsequent calendar year.

"*Pro Forma Basis*" means, with respect to an incurrence of Funded Debt, with respect to which the Senior Secured Leverage Ratio or the Leverage Ratio applies, giving pro forma effect to the incurrence of such Funded Debt (the use of proceeds thereof, any other appropriate transactions and assuming with respect to any unfunded commitments that such commitments have been fully funded) in calculating the Senior Secured Leverage Ratio or the Leverage Ratio, as applicable.

"*Proposed Amendment*" has the meaning ascribed to such term in <u>Section 2.2</u>.

"*Proposed Plan*" has the meaning ascribed to such term in <u>Section 2.1(b)</u>.

"*PSA*" has the meaning ascribed to such term in the Recitals of this Agreement.

"*Ratings Threshold*" has the meaning ascribed to such term in <u>Section 4.4(a)(i)(A)</u>.

"***Reasonably Prudent Operator***" means a Person (a) seeking in good faith to perform all of its obligations under all applicable Laws (including those issued by BOEM and BSEE), contracts and leases, (b) exercising that degree of skill, diligence, prudence, and foresight which would reasonably and ordinarily be expected from a skilled and experienced operator engaged in the same type of undertaking in offshore Gulf of Mexico operations under the same or similar circumstances or conditions and (c) conducting any relevant activities (including Decommissioning) in a good and workmanlike manner, with due diligence and dispatch, in accordance with good oilfield practice and in compliance with all applicable Laws (including those issued by BOEM and BSEE), contracts and leases.

"***Recharacterization Mortgages***" means (a) the Deed of Trust attached hereto as Exhibit F for purposes of filing and recordation in counties located in the State of Texas, (b) a substantially identical security instrument to such Deed of Trust with conforming state-law specific changes for purposes of filing and recordation in parishes located in the State of Louisiana, (c) a substantially identical security instrument to such Deed of Trust with conforming state-law specific changes for purposes of filing and recordation in counties located in the State of Alabama, and (d) a substantially identical security instrument to such Deed of Trust with conforming state-law specific changes for purposes of filing and recordation in counties located in the State of Mississippi.

"***Reduction Notice***" means a reduction notice in the form attached as Exhibit C to the Letter of Credit.

"***Reimbursable Amount***" has the meaning ascribed to such term in Section 2.7(b).

"***Reimbursable Event***" has the meaning ascribed to such term in Section 2.7(b).

"***Related Decommissioning Agreements***" means the Trust A Trust Agreement, the Trust B Trust Agreement, the Trust A NPI Conveyance, the Trust B NPI Conveyance, the Letter of Credit, the Security Instruments, the Trust B Security Interest, and the Recharacterization Mortgages.

"***Remaining Decommissioning***" means, as determined as of the applicable determination date, the estimated cost of the Decommissioning remaining to be conducted (i) to cause all P&A Obligations to be fully satisfied or discharged as of such determination date and (ii) to cause all Permanently Abandoned Properties P&A Obligations known as of such determination date to be fully satisfied or discharged to the extent Buyer is not entitled to reimbursement therefor pursuant to Section 2.5, and with respect to clause (i) and clause (ii), after taking into account all reasonably expected payments from third parties including Leaseholders (and including Buyer with respect to any interests acquired by Buyer from a Third Party after Closing) other than any Seller towards such Decommissioning, as determined in accordance with applicable Law.

"***Required Decommissioning***" means, as determined as of the applicable determination date, either (i) the completion of Decommissioning for at least 80% of the Activity Scope included within a Decommissioning Plan during a Plan Year or (ii)

spending at least 80% of the Estimated Costs included within a Decommissioning Plan during a Plan Year by Buyer for purposes of performing Decommissioning.

"***Required Trust A Amount***" has the meaning ascribed to such term in Section 4.3(a).

"***Secured NPI Indemnity Obligations***" has the meaning ascribed to such term in Section 6.7.

"***Secured Obligations***" means (a) all of the P&A Obligations and (b) until the Title Transfer Date, all of the obligations of Buyer under the PSA and the other Transaction Documents.

"***Security Instruments***" has the meaning ascribed to such term in Section 6.1.

"***Seller***" has the meaning ascribed to such term in the introductory paragraph of this Decommissioning Agreement.

"***Seller Notice***" has the meaning ascribed to such term in Section 2.7(a).

"***Sellers***" has the meaning ascribed to such term in the introductory paragraph of this Agreement.

"***Sellers' Proposed Plan***" has the meaning ascribed to such term in Section 2.1(f).

"***Senior Debt***" means Funded Debt secured by senior liens over a material portion of the Buyer's assets (including, without limitation, any First-Priority Obligations as defined in the Intercreditor Agreement) and any Refinancing thereof.

"***Senior Debt Facility***" means one or more debt facilities pursuant to which Senior Debt has been incurred to the extent it was incurred by Buyer in compliance with Section 6.3.

"***Senior Debt Lenders***" means the lenders of the Senior Debt to Buyer.

"***Senior Secured Leverage Ratio***" has the meaning ascribed to such term in the Intercreditor Agreement.

"***Standard & Poor's***" means Standard & Poor's Corporation or any successor in title to the rating agency business operated by such company; provided if Standard & Poor's ceases to exist or provide ratings, then the ratings in question shall be based on such alternative ratings provided by a company generally accepted in the United States and that is reasonably acceptable to Sellers and Buyer; provided if no agreement is reached regarding an alternative ratings provider in such a situation, then the matter shall be referred to an Expert for determination in accordance with Article VIII.

"***Subject Interests***" has the meaning ascribed to such term in Section 7.3(a).

"*Suspension Period*" has the meaning ascribed to such term in <u>Section 4.4(a)(iii)</u>.

"*Tangible Assets*" means, as of any date, (a) if there is any Senior Debt outstanding on such date, all tangible assets reflected on the most recent balance sheet provided by Buyer to the Senior Debt Lenders, except to the extent included in Total Net Reserve Value; or (b) if there is no Senior Debt outstanding as of such date, all tangible assets as would be reflected on a balance sheet prepared in accordance with GAAP using the full cost method of accounting, except to the extent included in Total Net Reserve Value.

"*Termination Notice*" means a termination notice in the form attached as <u>Exhibit D</u> to the Letter of Credit.

"*Third Party*" has the meaning ascribed to such term in <u>Section 7.4</u>.

"*Total Net Reserve Value*" means, as determined individually and in the aggregate as to all oil and gas interests owned by Buyer as of the applicable determination, the aggregate, of the pre-tax net present value, assuming a discount rate of 10% from the sales of Hydrocarbons projected to be produced and sold from (or otherwise allocable to) such oil and gas interests, net to the interest of Buyer (plus the value, calculated on the same basis, of the Trust A NPI and the Trust B NPI), after deducting all capital costs, lease operating expenses, and lease burdens, and utilizing pricing and other assumptions consistent with the pricing and other assumptions underlying the most recent reserve analysis with respect to such oil and gas interests provided by Buyer to the Senior Debt Lenders or, if the Senior Debt Lenders do not require a reserve analysis, the most recent reserve analysis provided to any other lender.

"*Transferred Leases*" has the meaning ascribed to such term in <u>Section 7.1(a)</u>.

"*Trigger Ratio*" has the meaning ascribed to such term in <u>Section 5.3(a)</u>.

"*Trust A*" has the meaning ascribed to such term in <u>Section 4.1</u>.

"*Trust A Account*" has the meaning ascribed to such term in <u>Section 4.2(b)</u>.

"*Trust A Cash*" has the meaning ascribed to such term in <u>Section 4.2(b)</u>.

"*Trust A NPI*" has the meaning ascribed to such term in <u>Section 4.2(a)</u>.

"*Trust A NPI Conveyance*" has the meaning ascribed to such term in <u>Section 4.2(a)</u>, substantially in the form attached hereto as <u>Exhibit G</u>.

"*Trust A Trust Agreement*" means the Trust Agreement dated as of even date herewith for Trust A, substantially in the form attached hereto as <u>Exhibit H</u>.

"*Trust B*" has the meaning ascribed to such term in <u>Section 5.1</u>.

"*Trust B Account*" has the meaning ascribed to such term in <u>Section 5.2(b)</u>.

"***Trust B Cash***" has the meaning ascribed to such term in <u>Section 5.2(b)</u>.

"***Trust B Locked Cash***" means, as of any determination time, the amount of cash, if any, deposited into Trust B in accordance with <u>Section 7.3(a)(ii)</u> to the extent that, at such time, the Trust B Cash exceeds the amounts required to pay Decommissioning incurred or to be incurred during such Plan Year.

"***Trust B NPI***" has the meaning ascribed to such term in <u>Section 5.2(a)</u>.

"***Trust B NPI Conveyance***" has the meaning ascribed to such term in <u>Section 5.2(a)</u>, substantially in the form attached hereto as <u>Exhibit I</u>.

"***Trust B Security Interest***" has the meaning ascribed to such term in <u>Section 5.9</u>.

"***Trust B Trust Agreement***" means the Trust Agreement dated as of even date herewith for Trust B, substantially in the form attached hereto as <u>Exhibit J</u>.

"***Turnkey Removal Contract***" means the Turnkey Removal Contract as ultimately executed and delivered that is in the form attached hereto as <u>Exhibit D</u>.

"***Unrestricted Cash***" means cash that would not be required to be classified as restricted cash on a company's balance sheet in accordance with GAAP.

**<u>EXHIBIT B</u>**

Form of Letter of Credit

[LETTERHEAD OF ISSUING BANK]

[Date]

Standby Letter of Credit No. _____

Beneficiary:

Apache Corporation (the "***Beneficiary***")
[2000 Post Oak Boulevard]
[Suite 1000]
[Houston, Texas 77056]
Attention: [_____]
Facsimile: [_____]
E-mail:    [_____]
Phone:     [_____]

Ladies and Gentlemen:

We, _____ (the "***Issuing Bank***") hereby establish in your favor our Irrevocable Standby Letter of Credit No. [_____] for the account of Fieldwood Energy LLC, a Delaware limited liability company (the "***Applicant***"), for a sum or sums not to exceed in the aggregate U.S. Dollars $[500,000,000.00[1]] [Five Hundred Million and No/100 U.S. Dollars] (the "***Stated Amount***").

Funds under this Standby Letter of Credit are available to you upon receipt of your written statement in accordance with the terms and conditions of this Standby Letter of Credit in the form of Exhibit A (a "***Decommissioning Drawing Request***") or Exhibit B (a "***Non-Renewal Drawing Request***") attached hereto purportedly signed by your authorized officer.

Multiple and partial drawings under this Standby Letter of Credit are allowed. The Stated Amount of this Standby Letter of Credit shall be reduced by the amount of any such drawings.

The Stated Amount of this Standby Letter of Credit shall from time to time automatically reduce (without any requirement for further notice, amendment or other formality or action of any person) upon the Issuing Bank's receipt of a Reduction Notice executed by both the Applicant and the Beneficiary in the form of Exhibit C.

---

[1] Stated Amount of LOC to match requirement in Section 3.1 of Decommissioning Agreement.

This Standby Letter of Credit expires at our office of [_____] on _____ [insert expiration date] (as such date may be extended pursuant to the next paragraph, the "***Expiration Date***").

It is a condition of this Standby Letter of Credit that its expiry date shall be automatically extended, without amendment, for additional periods of one year from the expiry date hereof, or any future expiration date, unless at least 60 (sixty) days prior to any expiry date we notify you by certified mail (return receipt requested) or by any other receipted means that we elect not to consider expiry date of this Standby Letter of Credit renewed for any such additional period.

This Standby Letter of Credit shall automatically terminate (without any requirement for further notice, amendment or other formality or action of any person) upon the Issuing Bank's receipt of a Termination Notice executed by both the Applicant and the Beneficiary in the form of Exhibit D.

We hereby agree with you that each Decommissioning Drawing Request or Non-Renewal Drawing Request, as applicable, presented under and in compliance with the terms and conditions of this Standby Letter of Credit will be duly honored upon presentation to us, and we will make payment on the same on the Banking Day of presentment or the next Banking Day following such presentment in accordance with the terms and conditions hereof.

As used herein, "Banking Day" means any day other than a Saturday, a Sunday, or a day on which banking institutions in the city of [New York, New York] are authorized or required to be closed.

In the event that a Decommissioning Drawing Request or Non-Renewal Drawing Request, as applicable, fails to comply with the terms and conditions of this Standby Letter of Credit but is presented on or before the Expiration Date of this Standby Letter of Credit, we shall provide you prompt notice of same stating the reasons therefore and shall upon your instructions hold any non-conforming Decommissioning Drawing Request or Non-Renewal Drawing Request, as applicable, at your disposal or return any non-conforming Decommissioning Drawing Request or Non-Renewal Drawing Request, as applicable, to you at the address set forth above by overnight courier.  Upon being notified that the Decommissioning Drawing Request or Non-Renewal Drawing Request, as applicable, was not effected in compliance with this Standby Letter of Credit, the Beneficiary may attempt to correct such non-complying Decommissioning Drawing Request or Non-Renewal Drawing Request, as applicable, in accordance with the terms and conditions of this Standby Letter of Credit.

Payments hereunder shall be made by us to you (a) by wire transfer in United States Dollars of immediately available funds in the amount of such drawing in accordance with your instructions set forth in the Decommissioning Drawing Request or Non-Renewal Drawing Request, as applicable, and (b) without any deduction, recoupment, diminution, set-off, counterclaim or withholding (other than deduction or

withholding of tax required by law, which shall be permitted) and we expressly waive any such right.

All Decommissioning Drawing Requests, Non-Renewal Drawing Requests and communications with respect to this Standby Letter of Credit shall be in writing, addressed to us at [_____], referencing this Standby Letter of Credit number [_____] and presented to us by overnight courier, delivery in person or facsimile transmission at such address, provided that the original of any such Decommissioning Drawing Request or Non-Renewal Drawing Request, as the case may be, sent via facsimile transmission shall also be sent to us at such address by overnight courier. However, our receipt of original Decommissioning Drawing Requests or Non-Renewal Drawing Requests will not be conditions for payment hereunder.

All of the Issuing Bank's charges are for the Applicant's account.

Except as otherwise expressly stated herein, this Standby Letter of Credit is subject to the International Standby Practices, International Chamber of Commerce, Publication No. 590 ("ISP98") and as to matters not addressed by the ISP98, shall be governed by and construed in accordance with the laws of State of New York.

Very truly yours,

[Bank name]

By: _____

Name: _____
Title: _____

**EXHIBIT A**

**FORM OF DECOMMISSIONING DRAWING REQUEST**

Date: _____

To:

[Issuing bank]

Attention: Standby Letter of Credit Unit

Re:    Your Standby Letter of Credit No._____ (the "Standby Letter of Credit")

Ladies and Gentlemen:

The undersigned individual, an authorized officer of [insert name of the Beneficiary] (the "**Beneficiary**"), hereby certifies to [insert name of the Issuing Bank] (the "**Issuing Bank**"), with reference to the Standby Letter of Credit No. [insert number of the Letter of Credit] (the "**Letter of Credit**") dated [insert date of the Letter of Credit], issued in favour of the Beneficiary by the Issuing Bank for the account of [insert name of the Applicant] (the "**Applicant**"), as follows as of the date hereof (any capitalized term used in this Drawing Certificate and not defined in this Drawing Certificate shall have its respective meaning as set forth in the Letter of Credit):

1.    The undersigned is authorized to make the drawing request pursuant to this Decommissioning Drawing Request on behalf of the Beneficiary.

2.    The Beneficiary is entitled to make a drawing in the amount of [$_____] (the "**Drawing Amount**") pursuant to the terms and conditions of the Letter of Credit and of the Decommissioning Agreement dated as of [_____], 2013 among Apache Corporation, Apache Shelf, Inc., Apache Deepwater LLC, Applicant and GOM Shelf LLC (as amended, restated or otherwise modified from time to time, the "**Decommissioning Agreement**").  Such Drawing Amount does not exceed the amount available for drawing under the Letter of Credit, and the Letter of Credit has not expired.

3.    Buyer has failed to reimburse and pay a Seller or its Affiliate for Reimbursable Amounts (as such terms are defined in the Decommissioning Agreement) in the amount of the Drawing Amount within the time period specified in Section 2.7(b) of the Decommissioning Agreement.

4.    Beneficiary has complied with Section 3.2(a)(i) and Section 3.2(a)(ii) of the Decommissioning Agreement.

5.      The Drawing Amount does not exceed the amount Beneficiary is entitled to draw under the Letter of Credit pursuant to the Decommissioning Agreement.

6.      The Beneficiary has provided or will provide the Applicant with a copy of this Decommissioning Drawing Request on the date hereof by facsimile transmission to:

Fieldwood Energy LLC
Attention: [_____]
Facsimile: [_____].

7.      Please remit payment in the amount of [$_____] in immediately available funds, by wire transfer, to the order of Beneficiary in accordance with the following payment instructions:
[insert payment instructions]

IN WITNESS WHEREOF, the undersigned has executed and delivered this Decommissioning Drawing Request on [insert date of the Decommissioning Drawing Request].

**[INSERT NAME OF THE BENEFICIARY]**


By:_____
Name:
Title:

**Exhibit B**

**FORM OF NON-RENEWAL DRAWING REQUEST**

<u>**Non-Renewal Drawing Request**</u>
[insert name and address of the Beneficiary]
[_____]
[_____]
[_____]

[insert date of the Non-Renewal Drawing Request]

[insert name and address of the Issuing Bank]
[_____]
[_____]
[_____]

Drawn under [insert name of the Issuing Bank]
Letter of Credit Number [insert number of the Letter of Credit]
Dated [insert date of the Letter of Credit]

Ladies and Gentlemen:

The undersigned individual, an authorized officer of [insert name of the Beneficiary] (the "**Beneficiary**"), hereby certifies to [insert name of the Issuing Bank] (the "**Issuing Bank**"), with reference to the Standby Letter of Credit No. [insert number of the Letter of Credit] (the "**Letter of Credit**") dated [insert date of the Letter of Credit], issued in favour of the Beneficiary by the Issuing Bank for the account of [insert name of the Applicant] (the "**Applicant**"), as follows as of the date hereof (any capitalized term used in this Non-Renewal Drawing Request and not defined in this Non-Renewal Drawing Request shall have its respective meaning as set forth in the Letter of Credit):

1.      The undersigned is authorized to make this Non-Renewal Drawing Request on behalf of the Beneficiary.

2.      The Beneficiary is entitled to make a drawing in the amount of [$_____] pursuant to the terms of the Letter of Credit and the Decommissioning Agreement dated as of [_____], 2013 among Apache Corporation, Apache Shelf, Inc., Apache Deepwater LLC, Applicant and GOM Shelf LLC (as amended, restated or otherwise modified from time to time).  Such Drawing Amount does not exceed the amount available for drawing under the Letter of Credit, and the Letter of Credit has not expired.

3.      The Beneficiary has provided or will provide the Applicant with a copy of this Non-Renewal Drawing Request on the date hereof by facsimile transmission to:

Fieldwood Energy LLC
Attention: [_____] .
Facsimile: [_____].

4.      Please remit payment in the amount of [$_____] in immediately available funds, by wire transfer, to the order of Beneficiary in accordance with the following payment instructions:

<u>[insert payment instructions for the Trust A Account]</u>

IN WITNESS WHEREOF, the undersigned has executed and delivered this Non-Renewal Drawing Request on <u>[insert date of the Non-Renewal Drawing Request]</u>.

**[INSERT NAME OF THE BENEFICIARY]**

By:_____

Name:

Title:

# EXHIBIT C

## FORM OF REDUCTION NOTICE

### <u>Reduction Notice</u>

[insert name and address of the Applicant]

[_____]
[_____]
[_____]

[insert date of the Reduction Notice]

[insert name and address of the Issuing Bank]

[_____]
[_____]
[_____]

Re:    Standby Letter of Credit No. [___] issued by
[insert name of Issuing Bank];

Ladies and Gentlemen:

Each of the undersigned individuals, authorized officers of [insert name of the Applicant] (the "**Applicant**") and [insert name of Beneficiary] (the "**Beneficiary**"), respectively, hereby certifies to [insert name of the Issuing Bank] (the "**Issuing Bank**"), with reference to the Standby Letter of Credit No. [insert number of the Letter of Credit] (the "**Letter of Credit**") dated [insert date of the Letter of Credit], issued in favour of the Beneficiary by the Issuing Bank for the account of the Applicant, as follows as of the date hereof (any capitalized term used in this Reduction Notice and not defined in this Reduction Notice shall have its respective meaning as set forth in the Letter of Credit):

1.     Each of the undersigned is authorized to execute and deliver this Reduction Notice on behalf of the Applicant and the Beneficiary, respectively.

2.     The Drawing Amount under the Letter of Credit shall be reduced to the following: [$_____].

Accordingly, in accordance with the requirements of the Letter of Credit, upon the Issuing Bank's receipt of this Reduction Notice, the Drawing Amount under the Letter of Credit shall automatically be reduced to [$_____] without any requirement for further, amendment or other formality or action of any person.

IN WITNESS WHEREOF, each of the undersigned has executed and delivered this Reduction Notice on [insert date of the Reduction Notice].

**[INSERT NAME OF THE APPLICANT]**


By:_____
Name:
Title:


**[INSERT NAME OF THE BENEFICIARY]**


By:_____
Name:
Title:

**EXHIBIT D**

**FORM OF TERMINATION NOTICE**

<u>**Termination Notice**</u>
<u>[insert name and address of the Applicant]</u>
[_____]
[_____]
[_____]

<u>[insert date of the Termination Notice]</u>

[insert name and address of the Issuing Bank]
[_____]
[_____]
[_____]

Re:    Irrevocable Standby Letter of Credit No. [___] issued by
[insert name of Issuing Bank];

Ladies and Gentlemen:

Each of the undersigned individuals, authorized officers of [insert name of the Applicant] (the "**Applicant**") and [insert name of Beneficiary] (the "**Beneficiary**"), respectively, hereby certifies to [insert name of the Issuing Bank] (the "**Issuing Bank**"), with reference to the Standby Letter of Credit No. [insert number of the Letter of Credit] (the "**Letter of Credit**") dated [insert date of the Letter of Credit], issued in favour of the Beneficiary by the Issuing Bank for the account of the Applicant, as follows as of the date hereof (any capitalized term used in this Termination Notice and not defined in this Termination Notice shall have its respective meaning as set forth in the Letter of Credit):

Each of the undersigned is authorized to execute and deliver this Termination Notice on behalf of the Applicant and the Beneficiary, respectively.

Accordingly, in accordance with the provisions of the Letter of Credit, the Letter of Credit shall automatically be terminated (without any requirement for further notice, amendment or other formality or action of any person) upon the Issuing Bank's receipt of this Termination Notice.

IN WITNESS WHEREOF, each of the undersigned has executed and delivered this Termination Notice on [insert date of the Termination Notice].

**[INSERT NAME OF THE APPLICANT]**

By:_____

Name:
Title:

**[INSERT NAME OF THE BENEFICIARY]**

By:_____
Name:
Title:

*Execution Version*

## FIRST AMENDMENT TO DECOMMISSIONING AGREEMENT

This First Amendment to Decommissioning Agreement (this "Amendment") dated e as of the Effective Time, is by and among Apache Corporation, a Delaware corporation ' or "Apache"), Apache Shelf, Inc., a Delaware corporation ("APSH"), and Apache ater LLC, a Delaware limited liability company ("APDW"), Apache Shelf Exploration . Delaware limited liability company ("ASE" and each of APA, APSH, APDW and ASE, ually, as a "Seller" and collectively as the "Sellers") and Fieldwood Energy LLC, a are limited liability company, ("Buyer 1") and GOM Shelf LLC, a Delaware limited y company ("GOM", and together with Buyer 1, "Buyer"). Each Seller and Buyer may be d to herein as a "Party" or collectively as the "Parties".

### Recitals:

A.     The Parties entered into that certain Decommissioning Agreement dated as of nber 30, 2013 (as amended, the "Agreement).

B.     The Parties desire to amend the Agreement as set forth in this Amendment.

C.     The Parties entered into the Agreement pursuant to that certain Purchase and Sale ment by and among APA, APSH, APDW and Buyer dated July 18, 2013, as the same may ended or otherwise modified from time to time (the "PSA").

D.     Any capitalized term used but not defined in this Amendment shall have the ing assigned to such term in the Agreement.

### Agreements:

NOW THEREFORE, in consideration of the foregoing and of the mutual covenants nafter set forth, the Parties hereby agree as follows:

Section 3.1 of the Agreement is hereby amended so that the first sentence is deleted and ced in its entirety with the following:

"(a) On the Closing Date, Buyer has caused one or more Issuing Banks to issue for the account of Buyer in favor of Apache one or more standby letters of credit substantially in the form of Exhibit B hereto (the "Letters of Credit") in the initial aggregate face amount of Four Hundred Eighty-Six Million Six Hundred Thirty-Nine Thousand Six Hundred Fifty-Four U.S. Dollars ($486,639,654.00), with such changes thereto as to which the Parties and each Issuing Bank may hereafter agree.

(b) On September 30, 2013, Buyer has caused one or more Issuing Banks to issue for the account of Buyer in favor of Apache one or more Letters of Credit in the initial aggregate face amount of Three Hundred Twenty-Four Thousand One Hundred Forty-Nine U.S. Dollars ($324,149.00), with such changes thereto as to which the Parties and each Issuing Bank may hereafter agree.

(c) On November 15, 2013, Buyer has caused one or more Issuing Banks to issue for the account of Buyer in favor of Apache one or more Letters of Credit in the initial

1

aggregate face amount of Ten Million Five Hundred Five Thousand One Hundred Thirty-Two U.S. Dollars ($10,505,132.00), with such changes thereto as to which the Parties and each Issuing Bank may hereafter agree"

2.      Section 4.3(a) of the Agreement is hereby amended by deleting the amount "Seven Hundred Seventy-Eight Million Six Hundred Twenty-Three Thousand Four Hundred Forty-Seven U.S. Dollars (US$778,623,447.00)" and replacing in its entirety with the amount "Seven Hundred Ninety-Five Million Nine Hundred Fifty Thousand Two Hundred Ninety-Seven and 14/100 U.S. Dollars (US$795,950,297.14)".

3.      Section 4.4(b) of the Agreement is hereby amended by deleting the amount "Four Hundred Eighty-Six Million Six Hundred Thirty-Nine Thousand Six Hundred Fifty-Four U.S. Dollars ($486,639,654.00)" and replacing it in its entirety with the amount "Four Hundred Ninety-Seven Million Four Hundred Sixty-Eight Thousand Nine Hundred Thirty-Five and 71/100 U.S. Dollars ($497,468,935.71)".

4.      Miscellaneous.

        (a)      Consideration.  Each of the Parties acknowledges and agrees that it has received good, valuable and adequate consideration, and shall receive substantial benefit from, the execution and delivery of this Amendment.

        (b)      Reaffirmation.  This Amendment is entered into among the Parties pursuant to Section 13.6 of the Agreement.  The Parties hereby covenant and agree that the Agreement, as amended by this Amendment (together with all exhibits and schedules to this Amendment), the Exhibits and Schedules to the Agreement and the other documents contemplated under the Agreement and/or the PSA set forth the entire agreement and understanding of the Parties in respect of the transactions contemplated hereby and thereby and supersede all prior agreements, prior arrangements and prior understandings relating to the subject matter hereof and thereof.

        (c)      No Release or Waiver.  Except as expressly provided herein or in the Agreement, this Amendment shall not release, waive or excuse, and each Party shall remain responsible and liable for, such Party's respective rights and obligations (or breach thereof) under the Agreeemnt, as amended by this Amendment, arising prior to, on or after the date hereof.

        (d)      Counterparts.  This Amendment may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.  Any .pdf or other electronic transmission hereof or signature hereon shall, for all purposes, be deemed originals.

**[Remainder of Page Intentionally Left Blank.  Signature Page(s) Follow.]**

IN WITNESS WHEREOF, the Parties have caused this Amendment to be executed by their authorized representatives, to be effective as of the Effective Time.

**APACHE CORPORATION**

By: _____

Name:   Roger B. Plank

Title:    President and Chief Corporate Officer

**APACHE SHELF, INC.**

By: _____

Name:   Roger B. Plank

Title:    President and Chief Corporate Officer

**APACHE DEEPWATER LLC**

By: _____

Name:   Roger B. Plank

Title:    President and Chief Corporate Officer

**APACHE SHELF EXPLORATION LLC**

By: _____

Name:   Roger B. Plank

Title:    President and Chief Corporate Officer

**SECOND AMENDMENT TO DECOMMISSIONING AGREEMENT**

This Second Amendment to Decommissioning Agreement (this "Amendment") dated effective as of the Effective Time, is by and among Apache Corporation, a Delaware corporation ("APA" or "Apache"), Apache Shelf, Inc., a Delaware corporation ("APSH"), and Apache Deepwater LLC, a Delaware limited liability company ("APDW"), Apache Shelf Exploration LLC, a Delaware limited liability company ("ASE" and each of APA, APSH, APDW and ASE, individually, as a "Seller" and collectively as the "Sellers") and Fieldwood Energy LLC, a Delaware limited liability company, ("Buyer 1") and GOM Shelf LLC, a Delaware limited liability company ("GOM", and together with Buyer 1, "Buyer"). Each Seller and Buyer may be referred to herein as a "Party" or collectively as the "Parties".

### Recitals:

A.     The Parties entered into that certain Decommissioning Agreement dated as of September 30, 2013, as amended by that certain First Amendment to Decommissioning Agreement (as amended, the "Agreement").

B.     The Parties desire to amend the Agreement as set forth in this Amendment.

C.     The Parties entered into the Agreement pursuant to that certain Purchase and Sale Agreement by and among APA, APSH, APDW and Buyer dated July 18, 2013, as the same may be amended or otherwise modified from time to time (the "PSA").

D.     Any capitalized term used but not defined in this Amendment shall have the meaning assigned to such term in the Agreement.

### Agreements:

NOW THEREFORE, in consideration of the foregoing and of the mutual covenants hereinafter set forth, the Parties hereby agree as follows:

1.     Section 3.1 of the Agreement is hereby amended so that a new subsection (d) is inserted immediately following subsection (c) thereof as follows:

> "(d) On March 5, 2014, Buyer has caused one or more Issuing Banks to issue for the account of Buyer in favor of Apache one or more Letters of Credit in the initial aggregate face amount of One Hundred Thirty-Two Three Hundred Sixty-One Thousand and NO/100 U.S. Dollars ($132,361.00), with such changes thereto as to which the Parties and each Issuing Bank may hereafter agree."

2.     Section 4.3(a) of the Agreement is hereby amended by deleting the amount "Seven Hundred Ninety-Five Million Nine Hundred Fifty Thousand Two Hundred Ninety-Seven and 14/100 U.S. Dollars (US$795,950,297.14)" and replacing in its entirety with the amount "Seven Hundred Ninety-Six Million One Hundred Sixty-Two Thousand Seventy-Five and 00/100 U.S. Dollars (US$796,162,075.00)".

3.     Section 4.4(b) of the Agreement is hereby amended by deleting the amount "Four Hundred Ninety-Seven Million Four Hundred Sixty-Eight Thousand Nine Hundred Thirty-Five and 71/100 U.S. Dollars ($497,468,935.71)" and replacing it in its entirety with the amount

1

"Four Hundred Ninety-Seven Million Six Hundred One Thousand Two Hundred Ninety-Six and 71/100 U.S. Dollars ($497,601,296.71)".

4.      Miscellaneous.

(a)      Consideration.  Each of the Parties acknowledges and agrees that it has received good, valuable and adequate consideration, and shall receive substantial benefit from, the execution and delivery of this Amendment.

(b)      Reaffirmation.  This Amendment is entered into among the Parties pursuant to Section 13.6 of the Agreement.  The Parties hereby covenant and agree that the Agreement, as heretofore amended and as amended by this Amendment (together with all exhibits and schedules to this Amendment), the Exhibits and Schedules to the Agreement and the other documents contemplated under the Agreement and/or the PSA set forth the entire agreement and understanding of the Parties in respect of the transactions contemplated hereby and thereby and supersede all prior agreements, prior arrangements and prior understandings relating to the subject matter hereof and thereof.

(c)      No Release or Waiver.  Except as expressly provided herein or in the Agreement, this Amendment shall not release, waive or excuse, and each Party shall remain responsible and liable for, such Party's respective rights and obligations (or breach thereof) under the Agreement, as amended by this Amendment, arising prior to, on or after the date hereof.

(d)      Counterparts.  This Amendment may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.  Any .pdf or other electronic transmission hereof or signature hereon shall, for all purposes, be deemed originals.

**[Remainder of Page Intentionally Left Blank.  Signature Page(s) Follow.]**

IN WITNESS WHEREOF, the Parties have caused this Amendment to be executed by their authorized representatives, to be effective as of the Effective Time.

**APACHE CORPORATION**

By: _____
Name:   Alfonso Leon
Title:   Executive Vice President and Chief Financial
        Officer

**APACHE SHELF, INC.**

By: _____
Name:   Alfonso Leon
Title:   Executive Vice President and Chief Financial
        Officer

**APACHE DEEPWATER LLC**

By: _____
Name:   Alfonso Leon
Title:   Executive Vice President and Chief Financial
        Officer

**APACHE SHELF EXPLORATION LLC**

By: _____
Name:   Alfonso Leon
Title:   Executive Vice President and Chief Financial
        Officer

Signature Page to Second Amendment to Decommissioning Agreement

**FIELDWOOD ENERGY LLC**

By: _____

Name: G.M. McCarroll

Title:   President and Chief Executive Officer

**GOM SHELF LLC**

By: _____

Name:  G.M. McCarroll

Title:   President

## THIRD AMENDMENT TO DECOMMISSIONING AGREEMENT

This Third Amendment to Decommissioning Agreement (this "Amendment") dated effective as of July 1, 2016, is by and among Apache Corporation, a Delaware corporation ("APA" or "Apache"), Apache Shelf, Inc., a Delaware corporation ("APSH"), and Apache Deepwater LLC, a Delaware limited liability company ("APDW"), Apache Shelf Exploration LLC, a Delaware limited liability company ("ASE" and each of APA, APSH, APDW and ASE, individually, as a "Seller" and collectively as the "Sellers") and Fieldwood Energy LLC, a Delaware limited liability company, ("Buyer 1") and GOM Shelf LLC, a Delaware limited liability company ("GOM", and together with Buyer 1, "Buyer"). Each Seller and Buyer may be referred to herein as a "Party" or collectively as the "Parties".

### Recitals:

A.     The Parties entered into that certain Decommissioning Agreement dated as of September 30, 2013 (as amended by that certain First Amendment to Decommissioning Agreement dated as of the Effective Date and that certain Second Amendment to Decommissioning Agreement dated as of the Effective Date, as may be further amended, the "Agreement").

B.     The Parties desire to amend the Agreement further as set forth in this Amendment.

C.     The Parties entered into the Agreement pursuant to that certain Purchase and Sale Agreement by and among APA, APSH, APDW and Buyer dated July 18, 2013, as the same may be amended or otherwise modified from time to time (the "PSA").

D.     Any capitalized term used but not defined in this Amendment shall have the meaning assigned to such term in the Agreement.

### Agreements:

NOW THEREFORE, in consideration of the foregoing and of the mutual covenants hereinafter set forth, the Parties hereby agree as follows:

1.     Effective as of the Effective Date, the definition of "Plan Year" set forth in Exhibit "A" to the Agreement is hereby amended and replaced in its entirety with the following definition:

"*Plan Year*" means, with respect to the Initial Decommissioning Plan, the twelve (12) month period commencing on July 1 and ending on June 30 of the immediately subsequent calendar year, and for all Decommissioning Plans, any Proposed Plans, and any Sellers' Proposed Plans beginning on or after January 1, 2017, the twelve (12) month period commencing on January 1 of a calendar year and ending on December 31 of that same calendar year. For purposes of Required Decommissioning, the period of July 1, 2016 through December 31, 2016 will be included in the January 1, 2017 through December 31, 2017 Plan Year, resulting in an 18 month Plan Year.

2.     <u>Miscellaneous</u>.

(a)    Consideration. Each of the Parties acknowledges and agrees that it has received good, valuable and adequate consideration, and shall receive substantial benefit from, the execution and delivery of this Amendment.

(b)    Reaffirmation. This Amendment is entered into among the Parties pursuant to Section 13.6 of the Agreement. The Parties hereby covenant and agree that the Agreement, as amended by this Amendment (together with all prior amendments and any exhibits and schedules thereto), the Exhibits and Schedules to the Agreement and the other documents contemplated under the Agreement and/or the PSA set forth the entire agreement and understanding of the Parties in respect of the transactions contemplated hereby and thereby and supersede all prior agreements, prior arrangements and prior understandings relating to the subject matter hereof and thereof.

(c)    No Release or Waiver. Except as expressly provided herein or in the Agreement, this Amendment shall not release, waive or excuse, and each Party shall remain responsible and liable for, such Party's respective rights and obligations (or breach thereof) under the Agreement, as amended by this Amendment, arising prior to, on or after the date hereof.

(d)    Counterparts. This Amendment may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. Any .pdf or other electronic transmission hereof or signature hereon shall, for all purposes, be deemed originals.

**[Remainder of Page Intentionally Left Blank.  Signature Page(s) Follow.]**

IN WITNESS WHEREOF, the Parties have caused this Amendment to be executed by their authorized representatives, to be effective as of the date first written above.

**APACHE CORPORATION**

By: _____
Name: James J. Parr
Title: Vice President

**APACHE SHELF, INC.**

By: _____
Name: James J. Parr
Title: Vice President

**APACHE DEEPWATER LLC**

By: _____
Name: James J. Parr
Title: Vice President

**APACHE SHELF EXPLORATION LLC**

By: _____
Name: James J. Parr
Title: Vice President

**FIELDWOOD ENERGY LLC**

By: _____
Name:  G.M. McCarroll
Title:   President and Chief Executive Officer


**GOM SHELF LLC**

By: _____
Name:  G.M. McCarroll
Title:   President

Signature Page to Third Amendment to Decommissioning Agreement

## FOURTH AMENDMENT TO DECOMMISSIONING AGREEMENT

This Fourth Amendment to Decommissioning Agreement (this "Amendment") dated effective as of September 1, 2017, is by and among Apache Corporation, a Delaware corporation ("APA" or "Apache"), Apache Shelf, Inc., a Delaware corporation ("APSH"), and Apache Deepwater LLC, a Delaware limited liability company ("APDW"), Apache Shelf Exploration LLC, a Delaware limited liability company ("ASE," and each of APA, APSH, APDW, and ASE, individually, as a "Seller" and collectively as the "Sellers") and Fieldwood Energy LLC, a Delaware limited liability company, ("Buyer 1") and GOM Shelf LLC, a Delaware limited liability company ("GOM", and together with Buyer 1, "Buyer"). Each Seller and Buyer may be referred to herein as a "Party" or collectively as the "Parties".

### Recitals:

(a)     The Parties entered into that certain Decommissioning Agreement dated as of September 30, 2013 (as amended by that certain First Amendment to Decommissioning Agreement dated as of September 30, 2013, that certain Second Amendment to Decommissioning Agreement dated as of September 30, 2013, and that certain Third Amendment dated effective as of April 25, 2017, as may be further amended, the "Agreement").

(b)     The Parties entered into the Agreement pursuant to that certain Purchase and Sale Agreement by and among APA, APSH, APDW, and Buyer dated July 18, 2013, as the same may be amended or otherwise modified from time to time (the "PSA").

(c)     Any capitalized term used but not defined in this Amendment shall have the meaning assigned to such term in the Agreement.

(d)     The Parties desire to amend the Agreement setting forth among other things, the terms and conditions (i) to allow Buyer to use Trust A Funds to perform Decommissioning associated with the Assets, the Pipeline Company Assets, and the Abandoned Properties described on Exhibit "A" hereto (collectively, the "Apache Properties") and (ii) to amend the Decommissioning Plan for the current Plan Year, but only as to the time period from January 1, 2017 and ending December 31, 2017.

1

**Agreements:**

**NOW THEREFORE**, in consideration of the foregoing and of the mutual covenants hereinafter set forth, the Parties hereby agree as follows:

1. <u>**Use of Trust A Funds.**</u>        Effective as of September 1, 2017 (the "<u>Amendment Effective Date</u>"), the Parties agree that Buyer shall be permitted to withdraw up to Twenty-Four Million, One Hundred Ninety-Five Thousand, Five Hundred Eighty Dollars $24,195,580.00) of the funds held in Trust A (the "<u>Trust A Funds</u>") to reimburse Buyer for costs incurred in performing Decommissioning associated with the Apache Properties and that the Agreement, PSA, and other related agreements (collectively the "<u>Applicable Agreements</u>") shall be and are hereby amended as necessary to allow for Buyer's withdrawal of up to Twenty-Four Million, One Hundred Ninety-Five Thousand, Five Hundred Eighty Dollars ($24,195,580.00) from Trust A in accordance with and limited by the following terms and conditions:

   (a)        Buyer shall be allowed to withdraw, at any time through June 30, 2018, up to but no more than the cumulative total amount of Twenty-Four Million, One Hundred Ninety-Five Thousand, Five Hundred Eighty Dollars ($24,195,580.00) from Trust A solely for the purpose of reimbursing Buyer for money spent in performance of Decommissioning associated with the Apache Properties, performed pursuant to the limitations set out in Section 1(b) below.  The procedures and requirements for Buyer's withdrawal of funds from Trust B set out in the Decommissioning Agreement shall apply to any withdrawals of funds from Trust A pursuant to this Amendment.  Furthermore, any funds withdrawn from Trust A pursuant to this Amendment shall solely be for reimbursement of Decommissioning described in Section 1(b) below, and performed by, or on behalf of, Buyer after the Amendment Effective Date and prior to January 1, 2018 (the "Work Period").

   (b)        The Trust A Funds withdrawn pursuant to this Amendment shall be used solely to reimburse Buyer for actual, documented costs incurred in performing Decommissioning associated with the Apache Properties, or any additional Decommissioning that is mandated by BSEE via an Incident of Non-compliance and/or demand letter ("Mandated Decommissioning") as to the Apache Properties, but only with Seller's approval as to any Mandated Decommissioning, which approval shall not unreasonably be withheld. Furthermore, Buyer agrees that it will use only the withdrawn Trust A funds to reimburse itself for the Decommissioning associated with the Apache Properties and Mandated Decommissioning accomplished during the Work Period and shall not use any funds that may be withdrawn from Trust B for reimbursement of any such Decommissioning during the Work Period, with the exception of any Mandated Decommissioning for which Seller does not give its approval.

2

(c)     Buyer has provided a capital expenditure forecast for the remainder of calendar year 2017 ("Estimated 2017 Capital Program"), a copy of which is attached hereto as Exhibit "B," totaling $12,208,000.00 in budgeted capital expenditures for the remainder of 2017 (September – December 2017). Buyer agrees that if and when it spends a total of $13,400,000.00 in capital expenditures between September 1, 2017 and December 31, 2017, if Buyer then spends any additional capital expenditures during calendar year 2017, *i.e.*, in excess of $13,400,000.00, Buyer must restore to Trust A promptly (*i.e.*, within thirty (30) calendar days), an amount equal to the additional capital expenditures in excess of $13,400,000.00 (in addition to amounts otherwise required to be contributed to Trust A pursuant to the Agreement). In addition, Buyer agrees that its Chief Financial Officer will provide to Sellers and to the Trust A Trustee a written certification on behalf of Buyer, upon each request/submittal for reimbursement from Trust A pursuant to Sections 1(a) and 1(b) above, that: (i) Buyer is in compliance with the requirements of this Section 1(c); and (ii) sets out the total dollar amounts spent by Buyer on capital projects in September – December 2017, and the total amounts, if any, restored to Trust A pursuant to this Section 1(c).

(d)     In addition to all information requirements and other access to information by Seller under the Applicable Agreements, Buyer agrees that, as of the Amendment Effective Date and thereafter for the remainder of the term of the Decommissioning Agreement, to the extent in Buyer's possession, Buyer will provide Sellers with all information, data, and access to information as shown on the attached Exhibit "C."

2.  Notwithstanding any other provision contained in the Agreement or the PSA, Buyer agrees that, once a financial assurance Notice to Lessees, rule, or other directive is promulgated by the BOEM, at the earliest date that Buyer can accept record title to any or all of the Assets sold to Buyer pursuant to the PSA (including but not limited to HBP Leases and other Leases), without being required by BOEM to file a bond, either at the time of the assignment of record title or in the future (as reasonably anticipated based upon the financial assurance Notice to Lessees, rule, or directive as in effect at the time of determination), relating to decommissioning of any such Assets in excess of the bond, if any, that any Seller has filed (either as a result of BOEM enacting or adopting revised financial assurance requirements, revoking earlier financial assurance notices, or for any other reason), Buyer shall notify Sellers immediately. Then, within ten (10) business days after such date, the Parties shall execute all assignments and other instruments necessary to transfer to Buyer all record title interests that any Seller continues to hold in and to any and all such Assets, whether or not they qualify as "Exempt Properties" as defined by the PSA. Such assignments as to any such Assets shall be prepared, executed, and filed pursuant to the procedures set out in Section 6.20(a)(ii) of the PSA. Buyer agrees that it will cooperate with Sellers and shall perform all necessary actions to accomplish and accept the assignment of such record title interests promptly as set out in this Section 2, or upon request by any Seller as to each such Lease or other Asset.

(e)     The Parties agree to take all further actions, including any amendment to the Trust A documentation required by the Delaware Trustee of Trust A, or applicable law, and any notifications and draw request delivered to the Delaware Trustee of Trust A as may be necessary to permit the withdrawal of money from Trust A as permitted herein, and to satisfy the other conditions and requirements set out in this Amendment.

3.   **Amendment to Decommissioning Plan.**     Pursuant to Section 2.2 of the Decommissioning Agreement, the Parties hereby agree to amend and restate the Decommissioning Plan for the Plan Year beginning on July 1, 2016 and ending on December 31, 2017 (but only with respect to the time period from January 1, 2017 to December 31, 2017), thereby reducing the Activity Scope and the Estimated Costs included therein. The Proposed Amendment to the Decommissioning Plan for the above-stated Plan Year is attached as Exhibit "D" and is hereby adopted by the Parties upon execution of this Amendment, effective immediately for the Plan Year set forth therein.

4.   **Miscellaneous.**

a.     **Consideration**. Each of the Parties acknowledges and agrees that it has received good, valuable, and adequate consideration for the execution and delivery of this Amendment.

b.     **Amendment**. This Amendment is entered into among the Parties pursuant to Section 13.6 of the Agreement.

c.     **No Release or Waiver**. Except as expressly provided herein or in the Agreement, this Amendment shall not release, waive, or excuse, and each Party shall remain responsible and liable for, such Party's respective rights and obligations (or breach thereof) under the Agreement, as amended by this Amendment, arising prior to, on, or after the date hereof.

d.     **Counterparts**. This Amendment may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. Any .pdf or other electronic transmission hereof or signature hereon shall, for all purposes, be deemed originals.

**Remainder of Page Intentionally Left Blank. Signature Page(s) Follow.**

IN WITNESS WHEREOF, the Parties have caused this Amendment to be executed by their authorized representatives, to be effective as of the date first written above.

**APACHE CORPORATION**

By: _____

Name: _____ James J. Parr _____

Title: _____ Vice President _____

**APACHE SHELF, INC.**

By: _____

Name: _____ James J. Parr _____

Title: _____ Vice President _____

**APACHE DEEPWATER LLC**

By: _____

Name: _____ James J. Parr _____

Title: _____ Vice President _____

**APACHE SHELF EXPLORATION LLC**

By: _____

Name: _____ James J. Parr _____

Title: _____ Vice President _____

**FIELDWOOD ENERGY LLC**

By: _____
Name:  G.M. McCarroll
Title:    President and Chief Executive Officer


**GOM SHELF LLC**

By: _____
Name:  G.M. McCarroll
Title:    President

EXHIBIT "A"

TO

FOURTH AMENDMENT TO DECOMISSIONING AGREEMENT

*2017 APA Projects through YE 2017*

| Project Name | Category | Op/Non-Op | WI% | Type | Total Net Cost |
|---|---|---|---|---|---|
| EUGENE ISLAND 158 B Seg 18614 | APA | Op | 100% | Pipeline | 200,000 |
| GALVESTON 151 Seg 11438 | APA | Op | 67% | Pipeline | 50,000 |
| GALVESTON 151 Seg 12084 | APA | Op | 67% | Pipeline | 50,000 |
| GRAND ISLE 48 J S/N 5520 | APA | Op | 75% | Pipeline | 33,750 |
| HIGH ISLAND 120 A Seg 18240 | APA | Op | 34% | Pipeline | 42,910 |
| HIGH ISLAND 129 #17 Seg 14329 | APA | Op | 90% | Pipeline | 45,000 |
| HIGH ISLAND 120 #17 Seg 14330 | APA | Op | 90% | Pipeline | 45,000 |
| HIGH ISLAND 167 A S/N 8378 | APA | Op | 100% | Pipeline | 150,000 |
| PELTO 11 G Seg 12706 | APA | Op | 100% | Pipeline | 60,000 |
| SHIP SHOAL 193 PLATFORM-M SN15553 | APA | Op | 100% | Pipeline | 50,000 |
| WEST CAMERON 163 A Seg 7600 | APA | Op | 86% | Pipeline | 51,600 |
| WEST CAMERON 163 A Seg 8276 | APA | Op | 86% | Pipeline | 51,600 |
| WEST CAMERON 311 #1 Seg 18297 | APA | Op | 74% | Pipeline | 44,220 |
| EAST CAMERON 48 I | Exhibit N | Op | 100% | Platform | 2,100,000 |
| EAST CAMERON 172 #A-1 | APA | Op | 100% | Well | 425,000 |
| EAST CAMERON 261 #A-1,2,5,6,7 | APA | Op | 100% | Well | 2,362,500 |
| EAST CAMERON 264 #B-1, B-2 | APA | Op | 100% | Well | 945,000 |
| GRAND ISLE 32 GG1 | APA | Op | 100% | Well | 420,000 |
| MAIN PASS 125 #B-1 | APA | Op | 63% | Well | 465,000 |
| MUSTANG ISLAND A-111 #A-7 | Exhibit N | Op | 100% | Well | 1,000,000 |
| SHIP SHOAL 258 #JB-1,2,3,5.6,7,8 | APA | Op | 100% | Well | 2,600,000 |
| SOUTH MARSH ISLAND 132 #B-2,3,5,7,10,11 | APA | Op | 100% | Well | 1,050,000 |

| SOUTH PASS 75 #A-2,3,4,5,6,8,11 | APA | Op | 100% | Well | 3,360,000 |
|---|---|---|---|---|---|
| WEST CAMERON 163 #2, #3 | APA | Op | 86% | Well | 900,000 |
| WEST CAMERON 144 #3, #9, #10, #12, D0002 | APA | Op | 100% | Well | 2,500,000 |
| WEST CAMERON 311 #1 | APA | Op | 90% | Well | 420,000 |
| WEST CAMERON 68 #A-1,2,3,4,5 | APA | Op | 100% | Well | 2,524,000 |
| WEST CAMERON 165 A-1, A-2, A-3, A-4, A-6, A-7, A-8 | APA | Op | 100% | Well | 2,250,000 |
| **2017 APA Projects through YE 2017** | | | | | **24,195,580** |

EXHIBIT "B"

TO

FOURTH AMENDMENT TO DECOMMISSIONING AGREEMENT

FW CAPITAL EXPENDITURE PROGRAM

INSERT FW SLIDE

# Capital Expenditures

| ($ in thousands) | Sep-17 | Oct-17 | Nov-17 | Dec-17 | Sept- Dec Total |
|---|---|---|---|---|---|
| Operated | – | – | – | – | – |
| Non-Op | – | – | – | – | – |
| **Total Drilling** | – | – | – | – | – |
| Operated | 2,565 | 4,777 | 1,635 | 1,936 | 10,913 |
| Non-Op | 275 | 275 | – | – | 550 |
| **Total Recompletions** | **2,840** | **5,052** | **1,635** | **1,936** | **11,463** |
| Production Equip. | 323 | 100 | 100 | 100 | 623 |
| Land | 47 | 28 | 25 | 22 | 122 |
| Seismic | – | – | – | – | – |
| **Total CapEx** | **3,210** | **5,180** | **1,760** | **2,058** | **12,208** |


FE FIELDWOOD ENERGY

EXHIBIT "C"

TO

FOURTH AMENDMENT TO DECOMMISSIONING AGREEMENT

APACHE CORPORATION
PLUG & ABANDON REVIEWS

DATA TO BE PROVIDED BY FIELDWOOD AND/OR MADE ACCESSIBLE TO APACHE
PARTIES

In addition to data and information Buyer is obligated to provide to Seller under the Agreement or any of the Applicable Agreements, Buyer agrees to provide the following to Seller:

1. Buyer agrees to issue a new AFE number upon the start of any P&A project listed in Exhibit A.  Buyer will provide a complete JADE formatted file for all invoices and/or internal charges or expenses, submitted by Buyer for reimbursement out of Trust A Funds (including gross and net expenditures as well as other required JADE data fields).

2. Electronic copies of all invoices from third parties reflected on the JADE file.

3. Detail of check number, check date, and check amount or ACH information for all invoices on each JADE file.  Copies of cancelled checks or further ACH information will be provided by Buyer if requested by Seller.

4. Buyer's daily P&A reports describing specific daily operations, for all operations performed pursuant to the Decommissioning Agreement, as amended.  In addition, Buyer agrees to provide Sellers with copies of any and all documentation showing that each Decommissioning or P&A operation performed by Buyer pursuant to this Amendment has been accepted and/or approved by the applicable government agency or authority.

5. Buyer agrees to give Sellers reasonable access to relevant information applicable to the Apache Properties operated by Buyer to enable Seller to audit Buyer's SEMS program on an annual basis.

6. Buyer agrees to provide Seller with a one-line field summary from Buyer's audited year-end reserve report indicating the remaining life of each field comprising the Apache Properties.

7.  Upon audit request by Seller, and to the extent Buyer has the information and subject to confidentiality obligations in agreements or regarding employees' personal information, Buyer agrees to provide relevant information related to each of the Projects listed in Exhibit A, including but not limited to the following:

    a.  All contracts for third party service providers for P&A charges reflected on the JADE.

    b.  All contracts/agreements with affiliates or internal companies performing work covered by the Decommissioning Agreement (if any such agreements exist).

    c.  Job titles/descriptions for Buyer's Company Employees engaged in P&A activities.

    d.  Payroll and company owned equipment information reasonably necessary to substantiate P&A services provided internally by Buyer.

    e.  Rate comparison information for similar services provided by third parties if Buyer or its affiliated companies provide any of the P&A services.

    f.  Lists of recoverable or possibly recoverable/salvageable equipment and tubulars.

    g.  Boat/Cargo manifests showing movement of recovered equipment to shore.

    h.  Third party inspection reports or evaluations of recovered equipment.

**EXHIBIT "D"**

**TO**

**FOURTH AMENDMENT TO DECOMISSIONING AGREEMENT**

[Attach Amended and Restated 2017 Plan Year]

| Well Name | Year | Op/Non-Op | Type | Acq. Source | Net Total |
|---|---|---|---|---|---|
| BRAZOS A-047 A-PLATFORM | 2017 | Op | Platform | APA | $2,048,912 |
| BRAZOS A-047 B-PLATFORM | 2017 | Op | Platform | APA | $2,010,333 |
| EAST CAMERON 172 A S/N 11730 | 2017 | Op | Pipeline | APA | $123,007 |
| EAST CAMERON 299 B-PLATFORM | 2017 | Op | Platform | APA | $8,532 |
| EAST CAMERON 48 #I-6 | 2017 | Op | Well | APA | $137,779 |
| EAST CAMERON 48 #I-8 | 2017 | Op | Well | APA | $90,767 |
| EUGENE ISLAND 107 #3 | 2017 | Op | Well | APA | $532,945 |
| EUGENE ISLAND 107 A PLATFORM SN 11069 | 2017 | Op | Platform | APA | $15,418 |
| EUGENE ISLAND 107 B-1-PLATFORM | 2017 | Op | Platform | APA | $328,741 |
| EUGENE ISLAND 107 PLATFORM-B SN11288 | 2017 | Op | Pipeline | APA | $58,424 |
| EUGENE ISLAND 108 #3-PLATFORM | 2017 | Op | Platform | APA | $437,415 |
| EUGENE ISLAND 108 PLATFORM-#3 SN11289 | 2017 | Op | Pipeline | APA | $51,232 |
| EUGENE ISLAND 118 #B-1 | 2017 | Op | Well | APA | $796,269 |
| EUGENE ISLAND 119 #36-PLATFORM | 2017 | Op | Platform | APA | $228,355 |
| EUGENE ISLAND 120 #20 SN14100 | 2017 | Op | Pipeline | APA | $13,303 |
| EUGENE ISLAND 120 PLATFORM CF-QTR SN14102/17600 | 2017 | Op | Pipeline | APA | $69,980 |
| EUGENE ISLAND 120 PLATFORM-#14 SN11601/11576 | 2017 | Op | Pipeline | APA | $83,997 |
| EUGENE ISLAND 158 PLATFORM-B SN18614 | 2017 | Op | Pipeline | APA | $44,109 |
| EUGENE ISLAND 175 #D-8 | 2017 | Op | Well | APA | $471,951 |
| EUGENE ISLAND 175 #F-6 | 2017 | Op | Well | APA | $303,412 |
| EUGENE ISLAND 175 C-PRD SN18832 | 2017 | Op | Pipeline | APA | $74,459 |
| EUGENE ISLAND 224 #5 SEG 11264 | 2017 | Op | Pipeline | APA | $66,785 |
| EUGENE ISLAND 254 A PLATFORM SN11338/11339 | 2017 | Op | Pipeline | APA | $761,659 |
| EUGENE ISLAND 254 A-PLATFORM | 2017 | Op | Platform | APA | $1,930,681 |
| EUGENE ISLAND 281 #A-4 | 2017 | Op | Well | APA | $186,521 |
| EUGENE ISLAND 281 #A-4 | 2017 | Op | Well | APA | $379,311 |
| EUGENE ISLAND 281 A-PLATFORM | 2017 | Op | Platform | APA | $40,389 |
| EUGENE ISLAND 281 PLATFORM-A SN9289 | 2017 | Op | Pipeline | APA | $391,507 |
| EUGENE ISLAND 282 #A-1 | 2017 | Op | Well | APA | $119,229 |
| EUGENE ISLAND 282 #A-1 | 2017 | Op | Well | APA | $301,852 |
| EUGENE ISLAND 282 #A-5 | 2017 | Op | Well | APA | $122,691 |
| EUGENE ISLAND 282 #A-5 | 2017 | Op | Well | APA | $372,887 |
| EUGENE ISLAND 311 #D-3 | 2017 | Op | Well | APA | $4,325 |
| EUGENE ISLAND 312 #C-2 | 2017 | Op | Well | APA | $27,494 |
| EUGENE ISLAND 313 #C-1 | 2017 | Op | Well | APA | $4,113 |
| EUGENE ISLAND 53 B-SEG 9211 | 2017 | Op | Pipeline | APA | $6,642 |
| EUGENE ISLAND 95 #5-PLATFORM | 2017 | Non-Op | Platform | APA | $19,033 |
| GALVESTON 151 PLATFORM-A SN11438/12084 | 2017 | Op | Pipeline | APA | $54,925 |

| | | | | | |
|---|---|---|---|---|---|
| GRAND ISLE 90 #A-1, A-2, A-3, A-4 | 2017 | Op | Well | APA | $3,588,299 |
| GRAND ISLE 90 #A-6 | 2017 | Op | Well | APA | $454,709 |
| GRAND ISLE 90 #A-7 | 2017 | Op | Well | APA | $807,930 |
| GRAND ISLE 90 #C-7, C-10 | 2017 | Op | Well | APA | $472,314 |
| GRAND ISLE 90 A-PLATFORM | 2017 | Op | Platform | APA | $31,025 |
| GRAND ISLE 90 A-PLATFORM | 2017 | Op | Platform | APA | $38,333 |
| GRAND ISLE 90 PLATFORM-A SN8094 | 2017 | Op | Platform | APA | $193,416 |
| GRAND ISLE 93 #C-2, C-5, C-6, C-8 | 2017 | Op | Well | APA | $591,285 |
| GRAND ISLE 93 PLATFORM-C | 2017 | Op | Platform | APA | $31,025 |
| GRAND ISLE 93 PLATFORM-C | 2017 | Op | Platform | APA | $53,754 |
| HIGH ISLAND 116 A PLATFORM PL18789 | 2017 | Op | Pipeline | APA | $6,148 |
| HIGH ISLAND 129 #17/PF CPF SN14329/14330 | 2017 | Op | Pipeline | APA | $26,689 |
| HIGH ISLAND 130 #C-1 | 2017 | Op | Well | APA | $5,085,803 |
| HIGH ISLAND 130 C-PLATFORM | 2017 | Op | Platform | APA | $444,020 |
| HIGH ISLAND 130 PLATFORM-C SN16077 | 2017 | Op | Pipeline | APA | $158,734 |
| HIGH ISLAND 163 #2 PLATFORM PL SEGMENT 15223 | 2017 | Op | Pipeline | APA | $122,676 |
| HIGH ISLAND 163 #2-PLATFORM | 2017 | Op | Platform | APA | $402,225 |
| HIGH ISLAND 165 #1-PLATFORM | 2017 | Op | Platform | APA | $338,335 |
| HIGH ISLAND 166 #5 | 2017 | Op | Well | APA | $37,869 |
| HIGH ISLAND 197 A-PLATFORM | 2017 | Op | Platform | APA | $7,565 |
| HIGH ISLAND 199 PLATFORM-A | 2017 | Op | Platform | APA | $2,638 |
| HIGH ISLAND A-474 #A-1 | 2017 | Non-Op | Well | APA | $59,630 |
| HIGH ISLAND A-474 #A-10 | 2017 | Non-Op | Well | APA | $41,493 |
| HIGH ISLAND A-474 #A-2 | 2017 | Non-Op | Well | APA | $96,023 |
| HIGH ISLAND A-489 #B-7 | 2017 | Non-Op | Well | APA | $19,035 |
| HIGH ISLAND A-573 #E-3 | 2017 | Op | Well | APA | $117,711 |
| HIGH ISLAND A-573 #E-3, A-596 #E-1, E-6, E-8, E-10 | 2017 | Op | Well | APA | $599,483 |
| HIGH ISLAND A-574 #E-2 | 2017 | Op | Well | APA | $0 |
| HIGH ISLAND A-596 #E-10 | 2017 | Op | Well | APA | $695,416 |
| HIGH ISLAND A-596 #E-6 | 2017 | Op | Well | APA | $605,038 |
| HIGH ISLAND A-596 E-1, E-3, E-4, E-5, E-6, E-7, E-8, E-10, E-11, E-12 | 2017 | Op | Well | APA | $9,471,893 |
| MAIN PASS 166 A-PLATFORM | 2017 | Op | Platform | APA | $1,269,296 |
| MATAGORDA ISLAND 654 J-PLATFORM | 2017 | Non-Op | Platform | APA | $428,146 |
| MATAGORDA ISLAND 669 #A-2 | 2017 | Op | Well | APA | $55,000 |
| MATAGORDA ISLAND 686 A-PLATFORM | 2017 | Op | Platform | APA | $1,372,786 |
| MISSISSIPPI CANYON 108 #A-32 | 2017 | Non-Op | Well | APA | $42,197 |
| MOBILE 821 #3, #A-1 | 2017 | Op | Well | APA | $4,033,453 |
| MOBILE 821 A-QRT-PLATFORM | 2017 | Op | Platform | APA | $69,856 |
| MOBILE 821 Q-PRD-PLATFORM | 2017 | Op | Platform | APA | $672,206 |
| MUSTANG ISLAND 903 PLATFORM-TB | 2017 | Op | Platform | APA | $113,277 |
| MUSTANG ISLAND A-111 #A-7 | 2017 | Op | Well | APA | $697,204 |
| MUSTANG ISLAND A-111 A-PLATFORM | 2017 | Op | Platform | APA | $187,090 |
| MUSTANG ISLAND A-121 B-PLATFORM | 2017 | Op | Platform | APA | $620,716 |

| | | | | | |
|---|---|---|---|---|---|
| SHIP SHOAL 189 #A-3 | 2017 | Op | Well | APA | $64,876 |
| SHIP SHOAL 189 #A-3 | 2017 | Op | Well | APA | $811,403 |
| SHIP SHOAL 193 PLATFORM-M SN15553 | 2017 | Op | Well | APA | $41,272 |
| SHIP SHOAL 198 G-PLATFORM | 2017 | Non-Op | Non-Op Platform | APA | $83,401 |
| SHIP SHOAL 293 B-PLATFORM | 2017 | Op | Platform | APA | $1,541,413 |
| SHIP SHOAL 68 PLATFORM #9 SN11690 | 2017 | Op | Pipeline | APA | $76,566 |
| SOUTH MARSH ISLAND 11 J-PLATFORM | 2017 | Op | Platform | APA | $68,862 |
| SOUTH MARSH ISLAND 128 #C-21 | 2017 | Op | Well | APA | $123,967 |
| SOUTH MARSH ISLAND 136 A-4, A-6 | 2017 | Op | Well | APA | $1,572,306 |
| SOUTH MARSH ISLAND 137 A-PLATFORM | 2017 | Op | Platform | APA | $914,090 |
| SOUTH MARSH ISLAND 137 PLATFORM-A SN4802 | 2017 | Op | Pipeline | APA | $735,960 |
| SOUTH MARSH ISLAND 241 #302 | 2017 | Non-Op | Well | APA | $4,837 |
| SOUTH MARSH ISLAND 44 C-PLATFORM | 2017 | Op | Platform | APA | $17,939 |
| SOUTH PASS 70 #D-13 | 2017 | Op | Well | APA | $137,653 |
| SOUTH PASS 75 A-PLATFORM | 2017 | Op | Platform | APA | $49,000 |
| SOUTH PELTO 10 D-PLATFORM SN11691 | 2017 | Op | Pipeline | APA | $83,712 |
| SOUTH PELTO 10 PLATFORM #20 SN8408 | 2017 | Op | Pipeline | APA | $20,838 |
| SOUTH PELTO 13 #A-3 | 2017 | Non-Op | Well | APA | $53,962 |
| SOUTH PELTO 6 #2 | 2017 | Non-Op | Well | APA | $45,063 |
| SOUTH TIMBALIER 179 B-PLATFORM | 2017 | Op | Platform | APA | $371,219 |
| VERMILION 381 #A-17, A-18 | 2017 | Op | Well | APA | $1,170,288 |
| VIOSCA KNOLL 203 B-PLATFORM | 2017 | Non-Op | Platform | APA | $704,187 |
| WEST CAMERON 130 #2-PLATFORM | 2017 | Op | Platform | APA | $240,025 |
| WEST CAMERON 130 PLATFORM-B | 2017 | Op | Platform | APA | $380,478 |
| WEST CAMERON 163 #2 PLATFORM SN8276 | 2017 | Op | Pipeline | APA | $39,664 |
| WEST CAMERON 163 A-PLATFORM SN7600 | 2017 | Op | Pipeline | APA | $17,940 |
| WEST CAMERON 294 A-PLATFORM | 2017 | Op | Platform | APA | $25,356 |
| WEST CAMERON 295 #3 | 2017 | Non-Op | Non-Op Well | APA | $49,596 |
| WEST CAMERON 295 #3 | 2017 | Non-Op | Well | APA | $648,538 |
| WEST CAMERON 311 PLATFORM-#1 SN18297 | 2017 | Op | Pipeline | APA | $41,365 |
| WEST CAMERON 314 PLATFORM-A SN8020 | 2017 | Op | Pipeline | APA | $9,742 |
| WEST CAMERON 593 A-PLATFORM | 2017 | Op | Platform | APA | $21,373 |
| WEST CAMERON 68 A-PLATFORM | 2017 | Op | Platform | APA | $382,151 |
| | 2017 Total | | | | $57,430,164 |
| EAST CAMERON 172 #A-1 | 2017P | Op | Well | APA | 425,000 |
| EAST CAMERON 261 #A-1,2,5,6,7 | 2017P | Op | Well | APA | 2,362,500 |
| EAST CAMERON 264 #B-1, B-2 | 2017P | Op | Well | APA | 945,000 |
| EAST CAMERON 48 I | 2017P | Op | Platform | APA | 2,100,000 |
| EUGENE ISLAND 158 B Seg 18614 | 2017P | Op | Pipeline | APA | 200,000 |
| GALVESTON 151 Seg 11438 | 2017P | Op | Pipeline | APA | 50,000 |
| GALVESTON 151 Seg 12084 | 2017P | Op | Pipeline | APA | 50,000 |
| GRAND ISLE 32 GG1 | 2017P | Op | Well | APA | 420,000 |
| GRAND ISLE 48 J S/N 5520 | 2017P | Op | Pipeline | APA | 33,750 |
| HIGH ISLAND 120 #17 Seg 14330 | 2017P | Op | Pipeline | APA | 45,000 |
| HIGH ISLAND 120 A Seg 18240 | 2017P | Op | Pipeline | APA | 42,910 |
| HIGH ISLAND 129 #17 Seg 14329 | 2017P | Op | Pipeline | APA | 45,000 |
| HIGH ISLAND 167 A S/N 8378 | 2017P | Op | Pipeline | APA | 150,000 |
| MAIN PASS 125 #B-1 | 2017P | Op | Well | APA | 465,000 |
| MUSTANG ISLAND A-111 #A-7 | 2017P | Op | Well | APA | 1,000,000 |
| PELTO 11 G Seg 12706 | 2017P | Op | Pipeline | APA | 60,000 |
| SHIP SHOAL 193 PLATFORM-M SN15553 | 2017P | Op | Pipeline | APA | 50,000 |
| SHIP SHOAL 258 #JB-1,2,3,5 6,7,8 | 2017P | Op | Well | APA | 2,600,000 |

| | | | | | |
|---|---|---|---|---|---|
| SOUTH MARSH ISLAND 132 #B-2,3,5,7,10,11 | 2017P | Op | Well | APA | 1,050.000 |
| SOUTH PASS 75 #A-2,3,4,5,6,8,11 | 2017P | Op | Well | APA | 3,360.000 |
| WEST CAMERON 144 #3, #9, #10, #12, D0002 | 2017P | Op | Well | APA | 2,500.000 |
| WEST CAMERON 163 #2, #3 | 2017P | Op | Well | APA | 900.000 |
| WEST CAMERON 163 A Seg 7600 | 2017P | Op | Pipeline | APA | 51.600 |
| WEST CAMERON 163 A Seg 8276 | 2017P | Op | Pipeline | APA | 51.600 |
| WEST CAMERON 165 A-1, A-2, A-3, A-4, A-6, A-7, A-8 | 2017P | Op | Well | APA | 2,250.000 |
| WEST CAMERON 311 #1 | 2017P | Op | Well | APA | 420.000 |
| WEST CAMERON 311 #1 Seg 18297 | 2017P | Op | Pipeline | APA | 44.220 |
| WEST CAMERON 68 #A-1,2,3,4,5 | 2017P | Op | Well | APA | 2,524.000 |
| | 2017P Total | | | | 24,195.580 |
| | Total | | | | 81,625.744 |

*Execution Version*

## FIFTH AMENDMENT TO DECOMMISSIONING AGREEMENT

This Fifth Amendment to Decommissioning Agreement (this "Amendment") dated as of _____ ___, 2018 but effective for all purposes as of the Amendment Effective Time (as such term is defined in the body of this Amendment below), is by and among Apache Corporation, a Delaware corporation ("APA" or "Apache"), Apache Shelf, Inc., a Delaware corporation ("APSH"), Apache Deepwater LLC, a Delaware limited liability company ("APDW"), Apache Shelf Exploration LLC, a Delaware limited liability company ("ASE" and each of APA, APSH, APDW and ASE, individually, as a "Seller" and collectively as the "Sellers"), Fieldwood Energy LLC, a Delaware limited liability company, ("Buyer 1") and GOM Shelf LLC, a Delaware limited liability company ("GOM", and together with Buyer 1, "Buyer"). Each Seller and Buyer may be referred to herein as a "Party" or collectively as the "Parties".

### Recitals:

A.     The Parties entered into that certain Decommissioning Agreement dated as of September 30, 2013 (as amended by (i) that certain First Amendment to Decommissioning Agreement dated as of September 30, 2013 (the "First Amendment"), (ii) that certain Second Amendment to Decommissioning Agreement dated as of September 30, 2013 (the "Second Amendment"), (iii) that certain Third Amendment to Decommissioning Agreement dated effective as of April 25, 2017 (the "Third Amendment", and (iv) that certain Fourth Amendment to Decommissioning Agreement dated effective as of September 1, 2017 (as such Fourth Amendment was amended by that certain Letter Agreement by and among the Parties dated January 3, 2018 (the "Fourth Amendment" and collectively with the First Amendment, the Second Amendment, and the Third Amendment, the "Prior Amendments")), and as may be further amended, the "Agreement").

B.     The Parties desire to amend the Agreement further as set forth in this Amendment.

C.     The Parties entered into the Agreement pursuant to that certain Purchase and Sale Agreement by and among APA, APSH, APDW and Buyer dated July 18, 2013, as the same may be amended or otherwise modified from time to time (the "PSA").

D.     Any capitalized term used but not defined in this Amendment shall have the meaning assigned to such term in the Agreement.

### Agreements:

NOW THEREFORE, in consideration of the foregoing and of the mutual covenants hereinafter set forth, the Parties hereby agree as follows:

1.     The Agreement is hereby amended by deleting Exhibit I and Exhibit J, each, in their entirety.

2.     The Exhibits portion of the Table of Contents is hereby deleted and replaced in its entirety with the following:

"**Exhibits**

#5644821.12
#5644821.13

Exhibit A      -      Definitions
Exhibit B      -      Form of Letter of Credit
Exhibit B-1 -        Form of Permitted Surety Bond
Exhibit C      -      Form of Affiliate Guaranty
Exhibit D      -      Form of Turnkey Removal Contract
Exhibit E      -      Initial Decommissioning Plan
Exhibit E-1 -        Initial Post 2017 Decommissioning Plan
Exhibit F      -      Form of Texas Recharacterization Deed of Trust
Exhibit G      -      Form of Trust A NPI Conveyance
Exhibit H      -      Form of Trust A Trust Agreement"

3.    Section 2.1(a) of the Agreement is hereby deleted and replaced in its entirety with the following:

"(a)    With respect to Plan Years 2018, 2019, 2020, 2021, and 2022, (i) without limitation of Buyer's obligations contained in subpart (ii) of this sentence or Section 4.5(a), a Decommissioning Plan is attached hereto as Exhibit E-1 (the "***Initial Post 2017 Decommissioning Plan***"), and (ii) Buyer hereby agrees that it will spend a minimum amount of One Hundred Million U.S. Dollars ($100,000,000.00) in the Plan Year 2018 and a minimum of Eighty Million U.S. Dollars ($80,000,000.00) in each of the Plan Years 2019, 2020, 2021, and 2022 on Decommissioning of the Applicable Properties (such spending obligation for each applicable Plan Year, the "***Required Spend***").  On or before December 31 of each of years 2018, 2019, 2020, and 2021, the Parties shall meet to discuss any modifications that either Party may propose with respect to the Initial Post 2017 Decommissioning Plan; provided that Sellers will not request, propose, or otherwise require a modification to the Initial Post 2017 Decommissioning Plan for any of Plan Years 2018, 2019, 2020, 2021, or 2022 that provides for Buyer to spend more than the Required Spend for the applicable Plan Year.  With respect to any Decommissioning performed to which this Agreement applies, in measuring any charges for equipment owned as of the date hereof by Buyer (or any affiliated or subsidiary entity that Controls, or is Controlled by, Buyer) which are charged as part of the actual costs expended by Buyer to perform Decommissioning on the Applicable Properties the amounts charged for such equipment shall be consistent with the charges made for such equipment during the period from January 1, 2017 through June 30, 2017.  Sections 2.1(b) through 2.1(g) shall be suspended during Plan Years 2018, 2019, 2020, 2021, and 2022.  With respect to the Decommissioning Plans to be put in place following the completion of the Initial Post 2017 Decommissioning Plan, such Decommissioning Plans shall cover three (3) year periods (each a "***Subsequent Decommissioning Plan***"), with the first such Subsequent Decommissioning Plan covering Plan Years 2023, 2024, and 2025.  The terms of Sections 2.1(b) through 2.1(g) and Section 2.2 shall apply to the Subsequent Decommissioning Plans, provided that Buyer's proposed first Subsequent Decommissioning Plan (covering Plan Years 2023, 2024, and 2025) shall be submitted to Sellers no earlier than March 1, 2022 and no later than July 1, 2022."

4.    The first sentence of Section 2.1(b) shall be amended by deleting the references to "2015" and replacing them with "2022".

5.    The last sentence of Section 2.7(b) of the Agreement is hereby deleted and replaced in its entirety with the following:

> "If Buyer fails to reimburse and pay any Seller or its Affiliate for any Reimbursable Amounts within ten (10) Business Days of written demand from Sellers therefor, then Sellers and their Affiliates shall, subject to <u>Section 2.7(c)</u>, be entitled to any and all rights and remedies at Law or under any agreement or contract, including specific performance, reimbursement from the Trust A Cash, or drawings under any Letter of Credit, for the Reimbursable Amounts as set forth in <u>Articles III</u> and <u>IV</u>."

6.    The last sentence of Section 3.1 of the Agreement is hereby deleted and replaced in its entirety with the following:

> "Additionally, Buyer shall be permitted to replace a portion of the Letters of Credit covering up to an aggregate face amount of One Hundred Forty-Eight Million Seven Hundred Thousand U.S. Dollars ($148,700,000.00) with a surety bond substantially in the form of <u>Exhibit B-1</u> hereto or in such other form acceptable to Apache in its sole discretion (the "***Permitted Surety Bonds***") which, in each case, are issued by a surety acceptable to Apache in its sole discretion. Any such letter of credit or Permitted Surety Bonds called for under the two preceding sentences shall be deemed a "Letter of Credit" for purposes of this Agreement and, in the case of any Permitted Surety Bonds put in place by Buyer under this Agreement, when this Agreement provides for any termination of any "Letter of Credit", the Sellers shall take all reasonable actions (at the sole cost and expense of Buyer) to cause such Permitted Surety Bonds to be terminated or released by the applicable surety issuing such Permitted Surety Bonds."

7.    The references to "Trust B" and the "Trust B Trust Agreement" contained in clause (i) of Section 3.2(a) of the Agreement are hereby deleted and replaced with references to "Trust A" and the "Trust A Trust Agreement", respectively.

8.    The phrase "if the amount received from Trust B within five Business Days after demand is made in accordance with the Trust B Trust Agreement is insufficient to reimburse Sellers for the amounts Sellers are entitled to reimbursement for under <u>Section 2.7</u>, then from Trust A in accordance with the procedures set forth in the Trust A Trust Agreement; and (iii) Third," is hereby deleted from clause (ii) of Section 3.2(a) of the Agreement.

9.    The words "and/or" are added immediately before the words "Trust A" and the words "and/or Trust B Cash" in the second line of Section 3.2(b) of the Agreement and the phrase "and then to the Trust B Account; provided if Sellers receive funds from the Trust B Cash only in connection with such Reimbursable Event, then the overpayment shall be refunded to the Trust B Account" at the end of Section 3.2(b) of the Agreement are hereby deleted.

10.    The parenthetical clause contained within Section 3.4(a) of the Agreement is hereby deleted and replaced in its entirety with the following:

"(or be renewed by the Issuing Bank or replaced by another Issuing Bank with a letter of credit or Permitted Surety Bond substantially in the form of Exhibit B or Exhibit B-1 hereto, as applicable)".

11.   Section 4.2 of the Agreement is hereby amended so that a new subsection (b) is inserted immediately following subsection (a) as follows:

"(b)   On Amendment Effective Time, Trust A has been assigned the Trust A-1 NPI as more specifically provided in the Trust A-1 NPI Conveyance."

12.   Section 4.2(b) of the Agreement is hereby renumbered as Section 4.2(c) and the phrase ", the Trust A-1 NPI" is inserted immediately following the words "the Trust A NPI" in the first sentence of such Section 4.2(c).

13.   Section 4.3(a) of the Agreement is hereby deleted and replaced in its entirety with the following:

"4.3   ***Required Trust A Amount***.

"(a)   Except as permitted in Section 4.3(b) or Section 4.5, all payments made to Trust A pursuant to the Trust A NPI Conveyance, the Trust A-1 NPI Conveyance, or otherwise shall be held in the Trust A Account and shall not be withdrawn by Buyer until the balance of the Trust A Account plus the aggregate undrawn face amount of the Letters of Credit is equal to the lesser of (A) the sum of (w) Seven Hundred Ninety-Six Million One Hundred Sixty-Two Thousand Seventy-Five U.S. Dollars ($796,162,075.00) plus (x) the aggregate amounts that shall be deposited into the Trust A Account as contemplated in Section 7.3(a)(i) and (ii) plus (y) the cumulative amount of all Unspent Required Spend Amounts plus (z) upon transfer from those certain separate accounts for the benefit of BOEM Account # 304825050 / 29920291 for OCS-G 04809 (SMI 161) and Account # 304825085 / 29920292 for OCS-G 09591 (EI 281) or such accounts that may replace the forgoing accounts (collectively the "***Hall Houston Accounts***") to Trust A upon termination of the Hall Houston Accounts or the release of funds therefrom, the net amount attributable to Buyer's interest transferred to Trust A from the such Hall Houston Accounts as well as any other amounts in such Hall Houston Accounts attributable to the interest(s) of any other Person to the extent Buyer would receive (except for the obligation that such amount be paid into Trust A hereunder) such amounts upon distribution or disbursement therefrom and (B) 125% of the then Remaining Decommissioning (the lesser of the amounts described in clauses (A) and (B) being the "***Required Trust A Amount***").   For the avoidance of doubt, as of January 31, 2018, the aggregate of the net amounts attributable to Buyer's interest contained in the Hall Houston Accounts and the amounts in such Hall Houston Accounts attributable to the interest(s) of any other Person which Buyer anticipates receiving or having a right to receive upon distribution or disbursement therefrom are Three Million Eight Hundred One Thousand Seven Hundred Sixty Three and 74/100ths U.S. Dollars ($3,801,763.74) in Account # 304825050 / 29920291 for OCS-G 04809

(SMI 161) and One Million Eight Hundred Eighty Three Thousand Four Hundred Seventy and 79/100ths U.S. Dollars ($1,883,470.79) in Account #304825085 / 29920292 for OCS-G 09591 (EI 281).  Upon the termination of each of the Hall Houston Accounts, Sellers shall have no rights whatsoever to any funds distributed or disbursed from the Hall Houston Accounts except as provided herein with respect to amounts deposited into the Trust A Account and Sellers and Buyers hereby agree to promptly cause any amounts held in a Hall Houston Account attributable to Buyer's interest, as well as any other amounts in such Hall Houston Accounts attributable to the interest(s) of any other Person to the extent Buyer would receive (except for the obligation that such amount be paid into Trust A hereunder) such amounts upon distribution or disbursement therefrom, to be deposited into the Trust A Account promptly after termination of such Hall Houston Account or release of such amounts therefrom."

14.   The phrase "Buyer is not then required to deposit Available Cash into the Trust B Account pursuant to Section 5.3(b)," is hereby deleted from Section 4.3(b) of the Agreement.

15.   Section 4.4 of the Agreement is hereby amended so that the phrase "Subject to the terms and provisions of Section 4.5 hereof:" immediately follows the title of Section 4.4.

16.   The phrase "plus the Trust B Locked Cash," is hereby deleted from Section 4.4(a)(ii) of the Agreement, and the phrase "; and" at the end of Section 4.4(a)(ii) of the Agreement is hereby deleted and replaced with a comma (",").

17.   Section 4.4(a)(iii) of the Agreement is hereby deleted in its entirety.

18.   The concluding clause of Section 4.4(a) of the Agreement (following Section 4.4(a)(ii)) is hereby amended by (I) deleting the phrase "clauses (i), (ii) and (iii)" in the first line and replacing it with "clauses (i) and (ii)", and (II) inserting the words "or the Trust A-1 NPI Conveyance" immediately following the words "Trust A NPI Conveyance".

19.   Section 4.4(b) of the Agreement is hereby amended by (I) deleting the reference to Section 4.5 and replacing it with a reference to Section 4.6, and (II) inserting the phrase ", and less the amount of any Permitted Surety Bonds accepted by Seller pursuant to Article III, provided that such Permitted Surety Bond remains in effect throughout the Suspension Period" immediately following the phrase "in lieu of providing a Letter of Credit" at the end of clause (i).

20.   Article IV of the Agreement is hereby amended so that a new Section 4.5 is inserted immediately following Section 4.4 as follows:

"4.5   ***Certain Rights and Obligations with respect to the Trust A-1 NPI and the Termination of Trust A.***

(a)   By January 15th of each calendar year beginning in 2019 and ending in 2023, Buyer will deliver to Sellers a statement in reasonable detail depicting the total amount of the actual costs spent by Buyers with respect to Decommissioning of the Applicable Properties covered by the Decommissioning Plan for the immediately

preceding Plan Year and which shows the calculations required to show whether there is any Unspent Required Spend Amount with respect to such immediately preceding Plan Year.  To the extent there is any Unspent Required Spend Amount with respect to a Plan Year, Buyer hereby agrees that it shall, on or before January 31st of the calendar year following the end of such Plan Year, deposit an amount of U.S. Dollars equal to the amount of any Unspent Required Spend Amount into the Trust A Account.  Any deposit required pursuant to this Section 4.5(a) shall be in addition to any amounts to be paid to, or deposited into, Trust A with respect to the Trust A NPI and/or the Hall Houston Accounts.

(b)     On the terms and conditions of this Section 4.5(b), Buyer shall have continued access to seek reimbursement from Trust A up to amounts received by Trust A from the Trust A-1 NPI unless and until Buyer defaults on its obligation to fund any Unspent Required Spend Amount ("*Funding Default*").  In order to be funded, each request for reimbursement must be accompanied by a certification signed by the CEO and CFO of Fieldwood certifying that the Required Spend on Decommissioning of the Applicable Properties for the remainder of the applicable Plan Year will be performed and spent or, if not, then stating the amount of Unspent Required Spend Amounts that will need to be deposited for such Plan Year.  If Unspent Required Spend Amounts will need to be deposited for such Plan Year, then Buyer may only withdraw amounts from Trust A in excess of such projected Unspent Required Spend Amounts until Buyer has funded to Trust A, through the amounts from the Trust A-1 NPI or otherwise, the projected Unspent Required Spend Amounts.  Upon a Funding Default, Fieldwood may not seek any further Trust A reimbursements until the earlier of such time as (i) the Trust A-1 NPI has funded the Unspent Required Spend Amounts in total or (ii) the Required Trust A Amount is achieved, at which time the Funding Default shall terminate.

(c)     On January 31, 2023, if Buyer is not then in a Funding Default, the Trust A-1 NPI shall be released and relinquished by Trust A (or if required to make such release and relinquishment effective, assigned and conveyed) to Buyer, and the Parties shall act in good faith to cause such release, relinquishment, (and if required, assignment and conveyance) to occur promptly.  In the event that on January 31, 2023 Buyer is in a Funding Default then the Trust A-1 NPI shall continue to be held by Trust A as provided under the other provisions of this Agreement until the earlier of the date (i) that the amounts added to the Trust A Account after January 31, 2023 which are attributable to proceeds of the Trust A-1 NPI (plus any other amounts deposited by Buyer into the Trust A Account as required pursuant to Section 4.5(a) (other than amounts deposited into Trust A from the Trust A NPI or the Hall Houston Accounts) or Section 4.5(b)) equal the amount of the aggregate remaining Unspent Required Spend Amounts or (ii) the Required Trust A Amount is achieved.  Upon the achievement of either of the conditions set forth in clause (i) and (ii) of the immediately preceding sentence, the Trust A-1 NPI shall be released by Trust A and assigned to Buyer."

21.   Section 4.5 of the Agreement is hereby amended by deleting the title "***Termination of Trust A.***" at the beginning of such Section and shall be renumbered as Section 4.5(d).

22.  Article V of the Agreement is hereby deleted and replaced in its entirety with the following:

**"ARTICLE V**
**[RESERVED]"**

23.  Section 6.1 of the Agreement is hereby deleted and replaced in its entirety with the following:

"6.1    *Reserved*."

24.  Section 6.2 of the Agreement is hereby deleted and replaced in its entirety with the following:

"6.2    *Reserved*."

25.  Section 6.3 of the Agreement is hereby deleted and replaced in its entirety with the following:

"6.3    *Reserved*."

26.  Section 6.5 of the Agreement is hereby amended by deleting the words "***or Trust B***" from the title of such Section and by deleting the words "or Trust B" from the end of such Section.

27.  Section 6.7 of the Agreement is hereby amended (I) to add the phrase "and/or Trust A-1 NPI" after the phrase "Trust A NPI" each time it appears, (II) to add the phrase "or, in the case of the Trust A-1 NPI, the Amendment Effective Time" after the phrase "the Effective Time (as defined in the Trust A NPI Conveyance)", and (III) to add the phrase "and as of the Amendment Effective Time, as applicable" after the phrase "Contemporaneously with execution of this Agreement".

28.  The words "or Trust B" are hereby deleted from Section 6.9 of the Agreement.

29.  The phrase "(i) that certifies compliance with the Trigger Ratio or specifies the amount by which Buyer is out of compliance with the Trigger Ratio; and (ii)" is hereby deleted from Section 6.10 of the Agreement.

30.  Section 6.11 of the Agreement is hereby deleted and replaced in its entirety with the following:

"6.11    *Reserved*."

31.  The words "Trust B NPI" in Section 7.1(a) of the Agreement are hereby deleted and replaced with the words "Trust A-1 NPI".

32.  The words "the Security Instruments and" are hereby deleted from Section 7.1(a)(i) of the Agreement.

33.   Section 7.1(a)(ii) of the Agreement is hereby amended by deleting the phrase "with respect to the Transferred Leases and Trust B shall assign to such transferee the Trust B NPI" and replacing it with the words "and the Trust A-1 NPI".

34.   Section 7.1(a)(iii) of the Agreement is hereby amended to change the reference to "clause (y)" to be a reference to "clause (x)" and to delete the following words: "(A)" and "and (B) the Trust B Locked Cash shall not be increased as a result of such sale and as a result of such sale a percentage of the Trust B Cash shall be paid to Buyer equal to the proportion that the remaining Decommissioning attributable to the Transferred Leases bears to the total Remaining Decommissioning prior to such sale".

35.   Section 7.1(b)(vi) is hereby renumbered as Section 7.1(b)(v) and Sections 7.1(b)(i) through Section 7.1(b)(iv) of the Agreement are hereby deleted and replaced in their entirety with the following:

> "(i)     Apache shall cause the Recharacterization Mortgages to be terminated;
>
> (ii)     Trust A shall release and assign to such transferee the Trust A NPI and Trust A-1 NPI;
>
> (iii)    the Trust A Cash shall be paid to Buyer;
>
> (iv)    the Letters of Credit shall be terminated; and"

36.   Section 7.1(c)(vi) is hereby renumbered as Section 7.1(c)(v) and Sections 7.1(c)(i) through Section 7.1(c)(iv) of the Agreement are hereby deleted and replaced in their entirety with the following:

> "(i)     Apache shall cause the Recharacterization Mortgages to be terminated;
>
> (ii)     Trust A shall release and assign to such transferee the Trust A NPI and Trust A-1 NPI;
>
> (iii)    the Trust A Cash shall be paid to Buyer;
>
> (iv)    the Parties shall terminate the Letters of Credit; and"

37.   Section 7.2 of the Agreement is hereby amended by (I) deleting the words "Trust B NPI" and replacing such words with "Trust A-1 NPI" in Section 7.2(a), (II) deleting the words "or Trust B" from the end of Section 7.2(a), and (III) deleting the phrase "the Security Instruments" from Section 7.2(b).

38.   Section 7.3(a) of the Agreement is hereby amended by (I) deleting each reference to the "Trust B NPI" and replacing each such reference with a reference to the "Trust A-1 NPI", (II) deleting each reference to "Trust B" and replacing each such reference with a reference to "Trust A", (III) deleting the reference to "Trust B Trust Agreement" and replacing such reference with a reference to "Trust A Trust Agreement", and (IV) deleting the phrase "(ii) 20%" and replacing it with "(ii) 10%".

39.   Section 7.3(b) of the Agreement is hereby amended by (I) deleting the phrase "and Trust B" each time it occurs, (II) deleting the phrase "neither Trust A nor Trust B shall" and replacing it with "Trust A shall not", and (III) deleting the words "each of" in the second sentence.

40.   Section 7.3(c) of the Agreement is hereby amended by deleting the phrase "Security Instruments and the" in both instances in which it occurs.

41.   Sections 7.4 and 7.5 of the Agreement shall be amended such that (I) any reference in such Sections to the "Trust B NPI" shall be replaced with the phrase "Trust A-1 NPI", (II) any reference in such Sections to "and Trust B" shall be deleted and (III) any reference to "the Security Instruments" or "the Security Instruments and" are deleted and (IV) the reference to "Section 7.5(a)" shall be replaced with the phrase "Section 7.5".

42.   Section 9.1(a) of the Agreement is hereby amended by (I) deleting the words "Each of", (II) deleting the words "and Trust B", (III) deleting the word "either", and (IV) deleting the words "or Trust B".

43.   Exhibit A of the Agreement is hereby amended so that the definition of "Amendment Effective Time" is inserted immediately following the definition of "APDW" as follows:

> ""***Amendment Effective Time***" means Plan Effective Date."

44.   The definition of "Available Cash" as set forth in Exhibit A of the Agreement is hereby amended to delete the phrases "(other than Funded Debt incurred in violation of Section 6.3 or Section 6.11, as applicable)" and "or Permitted Senior Debt" wherever such phrases appear in such definition.

45.   Exhibit A of the Agreement is hereby amended so that the definition of "Control" is hereby amended by adding the following language to the end of such definition "and the terms "***Controls***" and "***Controlled***" shall correlative meanings".

46.   The definition of "Decommissioning Plan" as set forth in Exhibit A of the Agreement is hereby deleted and replaced in its entirety with the following:

> ""***Decommissioning Plan***" means any decommissioning plans that may have been agreed to by the Parties pursuant to this Agreement, the Initial Post 2017 Decommissioning Plan, and any Subsequent Decommissioning Plan."

47.   Exhibit A of the Agreement is hereby amended so that the definition of "Funding Default" is inserted immediately following the definition of "Funded Debt" as follows:

> ""***Funding Default***" has the meaning ascribed to such term in <u>Section 4.5(b)</u>."

48.   Exhibit A of the Agreement is hereby amended so that the definition of "Hall Houston Accounts" is inserted immediately following the definition of "Government Decommissioning" as follows:

"*"**Hall Houston Accounts**" has the meaning ascribed to such term in <u>Section 4.3(a)</u>."

49.   Exhibit A of the Agreement is hereby amended so that the definition of "Initial Post 2017 Decommissioning Plan" is inserted immediately following the definition of "Initial Decommissioning Plan" as follows:

"*"**Initial Post 2017 Decommissioning Plan**" has the meaning ascribed to such term in <u>Section 2.1(b)</u>."

50.   The definition of "Issuing Bank" as set forth in Exhibit A of the Agreement is hereby deleted and replaced in its entirety with the following:

"*"**Issuing Bank**" means (1) in the case of Letters of Credit other than Permitted Surety Bonds, (a) Citibank, N.A., (b) Deutsche Bank Trust Company Americas, (c) Bank of America, N.A., (d) Goldman Sachs Bank USA, (e) any other issuing bank mutually agreed by the Parties, (f) Toronto-Dominion Bank, or (g) any other issuing bank eligible to provide letters of credit under the Senior Debt Facility, in each case so long as such bank is a major U.S. commercial bank or a foreign bank with a U.S. branch office, with the rating assigned to its unsecured and senior, long-term debt or deposit obligations (not supported by third party credit enhancement) by Standard & Poor's or Moody's of at least "A-" and "A3", respectively or (2) in the case of Permitted Surety Bonds, a surety approved by Apache in its sole discretion."

51.   The definition of "Net Reserve Value" as set forth in Exhibit A of the Agreement is hereby amended such that any reference to the "Trust B NPI" shall be replaced with phrase "Trust A-1 NPI".

52.   Exhibit A of the Agreement is hereby amended so that the definitions of "Permitted Surety Bonds", "Plan", and "Plan Effective Date" are inserted immediately following the definition of "Permanently Abandoned Properties P&A Obligations" as follows:

"*"**Permitted Surety Bonds**" has the meaning ascribed to such term in <u>Section 3.1</u>.

"*"**Plan**" means the "Joint Prepackaged Chapter 11 Plan of Fieldwood Energy LLC and its Affiliated Debtors" dated February 14, 2018 with respect to the Fieldwood Energy LLC, et al. Chapter 11 cases filed in the United States Bankruptcy Court for the Southern District of Texas; Jointly Administered under Case No. 18-30648, and filed at Docket No. 36, as amended from time to time.

"*"**Plan Effective Date**" means the "Effective Date" of the Plan as the term "Effective Date" is defined in the Plan."

53.    The definition of "Recharacterization Mortgages" as set forth in Exhibit A of the Agreement is hereby amended to add the phrase ", in each case, as amended from time to time by the Parties." at the end of such definition.

54.   The definition of "Related Decommissioning Agreements" as set forth in Exhibit A of the Agreement is hereby deleted and replaced in its entirety with the following:

"*"**Related Decommissioning Agreements**" means the Trust A Trust Agreement, the Trust A NPI Conveyance, the Trust A-1 NPI Conveyance, any Letter of Credit, and the Recharacterization Mortgages."

55.   The phrase "to the extent it was incurred by Buyer in compliance with Section 6.3" is hereby deleted from the definition of "Senior Debt Facility" as set forth in Exhibit A of the Agreement

56.   Exhibit A of the Agreement is hereby amended so that the definition of "Subsequent Decommissioning Plan" is inserted immediately following the definition of "Subject Interests" as follows:

"*"**Subsequent Decommissioning Plan**" has the meaning ascribed to such term in <u>Section 2.1(a)</u>."

57.   The reference to "the Trust B NPI" in definition of "Total Net Reserve Value" as set forth in Exhibit A of the Agreement is hereby deleted and replaced with a reference to "the Trust A-1 NPI".

58.   The reference to "<u>Section 4.2(b)</u>" in the definition of "Trust A Account" as set forth in Exhibit A of the Agreement is hereby deleted and replaced with a reference to "<u>Section 4.2(c)</u>".

59.   The reference to "<u>Section 4.2(b)</u>" in the definition of "Trust A Cash" as set forth in Exhibit A of the Agreement is hereby deleted and replaced with a reference to "<u>Section 4.2(c)</u>".

60.   Exhibit A of the Agreement is hereby amended so that the definitions of "Trust A-1 NPI" and "Trust A-1 NPI Conveyance" are inserted immediately following the definition of "Trust A Trust Agreement" as follows:

"*"**Trust A-1 NPI**" means that certain Net Profits Overriding Royalty Interest created by the Trust A-1 NPI Conveyance, as more particularly set forth in the Trust A-1 NPI Conveyance.

"*"**Trust A-1 NPI Conveyance**" means that certain Conveyance of Net Profits Overriding Royalty Interest entered into between Buyer and Trust B on the Closing Date as supplemented and amended by that certain Supplement and First Amendment to Conveyance and Net Profits Overriding Royalty Interest dated November 15, 2013 and as further supplemented and amended by that certain Supplement and Second Amendment to Conveyance and Net Profits Overriding Royalty Interest dated March 12, 2014, as the same has been assigned to and modified by that certain Assignment and Amendment of Net Profits Overriding Royalty Interest entered into between Trust B, as Assignor, and each of Trust A and Buyer, as an Assignee, effective as of 7:00 a.m. (local time, at the location of each Subject Interest (as such term is defined in such Conveyance of Net Profits Overriding Royalty Interest) on the first day of the calendar month preceding the month in which the Plan Effective Date occurs."

61.   The definition of "Trust B" as set forth in Exhibit A of the Agreement is hereby deleted and replaced in its entirety with the following:

"*"Trust B*" means the Fieldwood Decommissioning Trust B, a Delaware Statutory Trust."

62.   Exhibit A of the Agreement is hereby amended so that the definition of "Unspent Required Spend Amount" is inserted immediately following the definition of "Turnkey Removal Contract" as follows:

"*"Unspent Required Spend Amount*" means the positive difference, if any, obtained by subtracting (a) the actual costs expended by Buyer to perform Decommissioning on the Applicable Properties during any applicable Plan Year from (b) the Required Spend for such Plan Year."

63.   The definitions for the following terms as set forth in Exhibit A of the Agreement are hereby deleted from Exhibit A to the Agreement:

**"Available Cash"**

**"Collateralized Amount"**

**"Consolidated EBITDAX"**

"*Excess Cash Sweep*"

**"Excess First Priority Obligations"**

**"Funded Debt"**

**"Indebtedness"**

"*Initial Decommissioning Plan*"

**"Leverage Ratio"**

**"Net Costs"**

**"Net Reserve Value"**

"*Permitted Senior Debt*"

**"Pro Forma Basis"**

"*Security Instruments*"

**"Senior Secured Leverage Ratio"**

"*Trigger Ratio*"

"*Trust B Account*"

"*Trust B Cash*"

"*Trust B Locked Cash*"

"*Trust B NPI*"

"*Trust B NPI Conveyance*"

"*Trust B Security Interest*"

"*Trust B Trust Agreement*"

64.    **Preservation of Certain Rights and Obligations under the Fourth Amendment**. Notwithstanding anything in this Amendment to the contrary, nothing contained herein shall diminish, amend or otherwise modify the rights and obligations of the Parties contained in Section 1 of the Fourth Amendment, which rights and obligations shall continue as drafted in the Fourth Amendment without giving effect to this Amendment.

65.    Miscellaneous.

(a)    <u>Consideration</u>.  Each of the Parties acknowledges and agrees that it has received good, valuable and adequate consideration, and shall receive substantial benefit from, the execution and delivery of this Amendment.

(b)    <u>Reaffirmation</u>.  This Amendment is entered into among the Parties pursuant to Section 13.6 of the Agreement.  The Parties hereby covenant and agree that the Agreement, as amended by this Amendment (together with all prior amendments and any exhibits and schedules thereto), the Exhibits and Schedules to the Agreement and the other documents contemplated under the Agreement and/or the PSA set forth the entire agreement and understanding of the Parties in respect of the transactions contemplated hereby and thereby and supersede all prior agreements, prior arrangements and prior understandings relating to the subject matter hereof and thereof.

(c)    <u>No Release or Waiver</u>.  Except as expressly provided herein or in the Agreement, this Amendment shall not release, waive or excuse, and each Party shall remain responsible and liable for, such Party's respective rights and obligations (or breach thereof) under the Agreement, as amended by this Amendment, arising prior to, on or after the date hereof.

(d)    <u>Counterparts</u>.  This Amendment may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.  Any .pdf or other electronic transmission hereof or signature hereon shall, for all purposes, be deemed originals.

**[Remainder of Page Intentionally Left Blank.  Signature Page(s) Follow.]**

IN WITNESS WHEREOF, the Parties have caused this Amendment to be executed by their authorized representatives, to be effective as of the Amendment Effective Time.

**APACHE CORPORATION**

By:_____

Name:_____ Grady   L. Ables

Title:_____ Senior Region Vice President – North Sea, Egypt, Houston Operations, HSSE

**APACHE SHELF, INC.**

By:_____

Name:_____ Grady   L. Ables

Title:_____ Director

**APACHE DEEPWATER LLC**

By:_____

Name:_____ Grady   L. Ables

Title:_____ Director

**APACHE SHELF EXPLORATION LLC**

By:_____

Name:_____ Grady   L. Ables

Title:_____ Director

**FIELDWOOD ENERGY LLC**

By:_____
Name:_____G.M.
McCarroll
Title:___
_____President
and Chief Executive Officer


**GOM SHELF LLC**

By:_____
Name:_____G.M.
McCarroll
Title:_____
President

**EXHIBIT B-1**

**TO**

**FIFTH AMENDMENT TO DECOMMISSIONING AGREEMENT**

<u>Exhibit B-1</u>

Form of Surety Bond

[See Attached]

**EXHIBIT E-1**

**TO**

**FIFTH AMENDMENT TO DECOMMISSIONING AGREEMENT**

<u>Exhibit E-1</u>

Initial Post 2017 Decommissioning Plan

[See Attached]

Document comparison by Workshare 9.5 on Wednesday, March 28, 2018
8:34:56 AM

| Input: | |
|---|---|
| Document 1 ID | file://C:\Users\leeat\AppData\Local\Temp\Workshare\wmtemp298c\DM-#5644821-v12-Fifth_Amendment_(Decommissioning_Agreement).DOC |
| Description | DM-#5644821-v12-Fifth_Amendment_(Decommissioning_Agreement) |
| Document 2 ID | PowerDocs://DM/5644821/13 |
| Description | DM-#5644821-v13-Fifth_Amendment_(Decommissioning_Agreement) |
| Rendering set | Standard |

| Legend: | |
|---|---|
| Insertion | |
| Deletion | |
| Moved from | |
| Moved to | |
| Style change | |
| Format change | |
| Moved deletion | |
| Inserted cell | |
| Deleted cell | |
| Moved cell | |
| Split/Merged cell | |
| Padding cell | |

| Statistics: | |
|---|---|
| | Count |
| Insertions | 18 |
| Deletions | 16 |
| Moved from | 0 |
| Moved to | 0 |
| Style change | 0 |

| Format changed | 0 |
|---|---:|
| Total changes | 34 |