# EXHIBIT 2

## METER OPERATING AGREEMENT

## HIA-341

THIS AGREEMENT, made and entered into as of the 7th day of December, 2005 by and between **ENTERPRISE GTM OFFSHORE OPERATING COMPANY, LLC**, a Delaware limited liability company, ("Operator") and **MARINER ENERGY, INC.** ("Owner")

## W I T N E S S E T H:

WHEREAS, Owner has or will construct, own and maintain a meter station, as hereinafter defined, which will be used to measure certain gas supplies in the High Island Area, offshore Texas, that will be delivered to Owner's proposed pipeline which connects to a trunk pipeline system owned by High Island Offshore System, L.L.C. ("HIOS"), a Delaware limited liability company, for transportation, via it and other trunk pipelines to points onshore, and wishes to have Operator operate such meter station; and

WHEREAS, Operator is presently the operator of the aforementioned trunk pipeline system owned by HIOS (the "HIOS Pipeline"), and operates several meter stations in addition to that of Owner which measure other High Island Area gas supplies delivered to the HIOS Pipeline, and wishes to operate the meter station of Owner herein; and

WHEREAS, the Owner and Operator desire to set forth their respective rights and responsibilities with respect to the operation of such meter station;

NOW, THEREFORE, in consideration of the premises and the mutual covenants and agreements herein contained, the Parties hereto agree as follows:

## ARTICLE I

## DEFINITIONS

Unless the context otherwise requires, the terms defined in this Article I shall, for purposes of this Operating Agreement, have the respective meanings set forth below:

1.01    "**Affiliate**" shall mean any Person (as hereinafter defined) which, directly or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with another Person.

1.02    "**Calendar Year**" shall mean a period of 365 consecutive days, or 366 consecutive days when such period includes a February 29, beginning at 9:00 a.m. Central Time on January 1, and ending at 9:00 a.m. Central Time on the following January 1.

1.03     "**Control**" (including its derivatives) shall mean the power of the management or policies of the relevant Person, whether pursuant to the ownership of voting interest, by contract or otherwise.

1.04     "**Day**" shall mean a period of 24 consecutive hours ending at 9:00 a.m. Central Time.

1.05     "**Default Rate**" shall mean a rate per annum equal to the lesser of (a) a varying rate per annum that is equal to the interest rate publicly quoted by The Chase Manhattan Bank, New York, New York from time to time as its prime commercial or similar reference interest rate, with adjustments in that varying rate to be made on the same date as any change in that rate, plus two percent (2%) or (b) the maximum rate permitted by applicable law; provided, that the Default Rate shall never be less than two percent (2%) greater than the London Inter Bank Offer Rate.

1.06     "**Direct Costs**" shall mean all actual costs of services, materials and equipment, including transportation thereof, paid to non-Affiliated third parties or any Affiliated parties approved by Owner, but excluding (i) the costs of Operator's and its Affiliate's personnel and (ii) the costs of any material that would otherwise be provided as a Routine Service. The costs detailed by this paragraph shall be limited to costs reasonably incurred and consistent with standard industry practices for similar services, materials, and equipment.

1.07     "**Gas**" shall mean natural gas having the physical and chemical qualities required for acceptance by HIOS under its transportation agreements.

1.08     "**Meter Station**" shall mean Owner's Gas meter station including upstream and downstream meter tubes with associated meter tube valves and fittings, series line with associated valves and fittings, gas sampling equipment, primary and secondary devices, and EFM and communication equipment, to be located on Owner's proposed High Island Area block A-341 (HIA-341) platform that will be used for measuring Owner's Gas produced from HIA-341 and, possibly, adjacent areas, offshore, Texas.

1.09     "**Party**" shall mean Owner or Operator, and "Parties" shall mean both Owner and Operator.

1.10     "**Person**" shall mean an individual, a corporation, a limited liability company, voluntary association, joint stock company, business trust, partnership or other such entity.

## ARTICLE II

## GENERAL RESPONSIBILITIES OF OPERATOR

2.01     **Standard of Performance**. Operator shall perform its services hereunder in accordance with sound and prudent practices of the gas pipeline industry, but such practices shall not be less than the standard followed by it in the operation of its own similar gas measurement facilities.

All measurement and allocation shall be performed in accordance with procedures adopted and to be adopted by HIOS and as provided for in HIOS' FERC Gas Tariff.

Owner shall grant Operator unlimited access (which, except in the case of an emergency, shall be during normal business hours) to its HIA-341 platform and the Meter Station via helicopter or boat, at Operator's option, for purposes of operating the Meter Station. The heliport on Owner's HIA-341 platform shall be designed per API Recommended Practice 2L and for loads of up to six thousand one hundred (6,100) pounds.

2.02     **Routine Services**. Operator shall, on behalf of Owner, and not inconsistent with written directions from Owner, furnish all materials, equipment, services, supplies and labor necessary for the routine operation, inspection, surveillance, and monitoring, of the Meter Station, including but not limited to, the reading, calibrating and adjusting of the measurement equipment (herein called "Routine Services").

2.03     **Special Services**. In addition to Routine Services, Operator shall, only with the prior written authorization of the Owner, perform such maintenance, painting, major equipment overhaul and replacement, special operation, maintenance, repair or any other services of a non-recurring nature with respect to the Meter Station not included in Routine Services as can, in Operator's sole opinion, which opinion shall be given to Owner promptly on receipt of such written authorization, be accommodated with Operator's resources (herein called "Special Services").

2.04     **Emergency Services**. Notwithstanding anything herein to the contrary, in case of explosion, fire, storm, extreme cold, freezing, spills, leaks or other environmental occurrences or other sudden emergencies affecting, or any major interruption of, the operation of the Meter Station, Operator shall take such steps and incur such expenses as in its opinion are required to deal with such emergency and to safeguard life and property, but shall, as promptly as possible, report such emergency to Owner, and thereafter shall follow the direction of Owner with respect to the Meter Station (herein called "Emergency Services"); provided, however, that in so responding, Operator shall not interfere with Owner's response to any such emergency affecting all or any other part of Owner's HIA-341platform, and Owner shall have precedence over Operator, including access to the heliport, in responding to any such emergency.

2.05     **Personnel**. Operator shall employ and have supervision over the Persons (including consultants and professional, service and other organizations) required by Operator to perform its duties and responsibilities hereunder in an efficient and economically prudent manner. Operator shall pay all expenses in connection therewith, including compensation, salaries, wages, expenses, social security taxes, workman's compensation insurance, retirement and insurance benefits and other such expenses. All such expenses shall be covered under the Fixed Fee.

## ARTICLE III

## ACCOUNTING AND COMPENSATION

3.01    **Accounting Records**. Operator shall maintain accurate books and records in accordance with reasonable and prudent natural gas industry standards covering all of Operator's actions under this Agreement.

3.02    **Compensation.**  Operator shall be compensated for the operation of the Meter Station as follows:

(a)    **Routine Services**. For the performance of Routine Services for the Meter Station, Owner shall pay monthly to Operator the Fixed Fee of two thousand five hundred dollars ($2,500).

(b)    **Special Services and/or Emergency Services**. For the performance of Special Services and/or Emergency Services with respect to the Meter Station, Owner shall pay Operator the Direct Costs incurred by the Operator in performing such Special Services and/or Emergency Services, plus ten percent (10%) of such Direct Costs.

3.03    **Adjustments.**

**Annual Adjustment.**  The Fixed Fee shall be subject to annual adjustment effective January 1 of each year beginning with January 1, 2006. The adjustment shall be computed by multiplying the Fixed Fee then currently in use by the percentage increase, if any, recommended by the Council of Petroleum Accountants Societies ("COPAS") each year.  The adjusted Fixed Fee shall be the Fixed Fee currently in use, plus the applicable computed adjustment, but in no event shall the adjusted Fixed Fee be less than the Fixed Fee applicable for the preceding year.

3.04    **Statements and Billings.**  Operator shall bill Owner each month: (i) the Fixed Fee; (ii) in accordance with Article 3.02(b), the Direct Costs incurred by Operator in performing Special Services and/or Emergency Services, plus ten percent (10%) of such Direct Costs; and (iii) to the extent permitted by Section 3.07, any adjustment which may be necessary to correct prior month's billings for any month of the then current Calendar Year and the two (2) Calendar Years preceding such current Calendar Year.  Such bills shall be summarized by appropriate  classifications indicative of the nature thereof.

3.05    **Payments.** Owner shall pay to Operator the full amount of each invoice within fifteen (15) days of receipt of each such invoice.  If Owner fails to make timely payments of any invoice, then Operator shall be entitled to collect the amount of such invoice together with interest at the Default Rate on any unpaid undisputed amount.   If Owner's failure to pay is a result of a good faith dispute of any such charges, then interest will be payable only on the disputed portion that is found to be ultimately due.  Interest shall accrue on unpaid amounts beginning on the payment due date of the Operator's invoice to Owner and shall terminate upon payment of such invoice.  Payment

shall not be construed as an acceptance of defective work or improper materials or a waiver of any right under this Agreement by Owner.

3.06 **Inspection**. Owner shall, at its sole risk and expense, have the right at all reasonable times during usual business hours to inspect the facilities of Operator and to examine and make copies of the books of account, related to the operation and maintenance of the Meter Station (excluding any books of account associated with Routine Services, except to the extent, if any, that the same relate to Special Services and/or Emergency Services), and including but not limited to gas measurement charts, relating to the operation of the Meter Station maintained by Operator. Except as set forth in the preceding sentence, Owner may inspect the records of Operator related to Routine Services or Special Services and/or Emergency Services in order to verify compliance with proper operating procedures, but not to verify or inspect Operator's costs or other such financial information related to Routine Services. Such right may be exercised through any agent or employee of Owner designated in writing by it or by an independent accountant or attorney or other consultant so designated. Nothing contained herein shall restrict the right of Owner to inspect the records of Operator related to compliance with operating and maintenance requirements hereunder.

3.07 **Audit**. Owner hereunder, after 15 days notice (or 5 days in the case of gas measurement charts and records) in writing to Operator, shall have the right during normal business hours to audit, at its own expense, all books and records of Operator related to the operation and maintenance of the Meter Station (excluding all books of account of Operator associated with Routine Services except to the extent, if any, that the same relate to Special Services and/or Emergency Services), and including but not limited to gas measurement charts and records, relating to the operation of the Meter Station. Audits of gas measurement charts and records shall be without limitation as to frequency. Any such audit may, except as set forth above in this Section 3.07, encompass the records of Operator related to Routine or Special Services in order to verify compliance with operating procedures, but not to verify or inspect Operator's costs or other such financial information related to Routine Services. Audits other than those with respect to gas measurement charts and records shall not be made more often than twice each Calendar Year. Owner shall have 2 years after the close of a Calendar Year in which to make an audit of Operator's records for such Calendar Year. Operator shall neither be required nor permitted to adjust any item unless a claim therefor is presented or adjustment is initiated within 2 years after the close of the Calendar Year in which the statement therefor is rendered, and in the absence of such timely claims or adjustments, the bills and statements rendered shall be conclusively established as correct. Such right may be exercised through any agent or employee of Owner designated in writing by it or by an independent accountant or attorney or other consultant so designated.

## ARTICLE IV

## PERFORMANCE OF OPERATOR'S OBLIGATIONS

Owner shall have the right to observe, and to consult with Operator in connection with, Operator's performance of its obligations under this Agreement, but Owner shall not have the right to supervise, direct or control Operator's performance of such obligations. In the performance of such obligations, Operator shall be an independent contractor and not an employee or agent of Owner.

Operator shall comply with all of the applicable laws, rules, orders and regulations of all governmental authorities having jurisdiction. Operator may, but shall not be obligated to, use the services of Operator's or its Affiliates' legal, accounting, engineering, planning, budgeting, operating, rates and economics, land, purchasing and other departments. Operator agrees to hold Owner harmless from any liability or penalty which may be imposed against Operator, its contractors or its subcontractors (of any tier) by reason of any asserted or established violation of such laws, rules, orders, or regulations.

<div align="center">

**ARTICLE V**

**INDEMNITY, LITIGATION AND INSURANCE**

</div>

5.01     **Indemnity**

(a)  OWNER AGREES TO HOLD HARMLESS, INDEMNIFY, PROTECT AND DEFEND   OPERATOR,  ITS  AFFILIATES,  AGENTS,   EMPLOYEES, CONTRACTORS AND SUBCONTRACTORS OF ANY TIER EXCLUDING ANY AFFILIATE  AND  THE  AGENTS,  EMPLOYEES,  CONTRACTORS  AND SUBCONTRACTORS OF ANY SUCH AFFILIATE TO THE EXTENT ANY OF THE SAME  ARE  ACTING  UNDER  OR  PURSUANT  TO  THAT  CERTAIN INTERCONNECTION AGREEMENT DATED AS OF DECEMBER 7, 2005, BY AND BETWEEN HIGH ISLAND OFFSHORE SYSTEM, L.L.C. AND OWNER (THE "OPERATOR  GROUP")  AGAINST  ANY  CLAIM,  LOSS,  COST,  DAMAGE, EXPENSE  AND  ANY  AND  ALL  LIABILITY  FOR  PROPERTY  DAMAGE, PERSONAL INJURY, OR BOTH INCIDENT TO OR RESULTING FROM ANY AND ALL  OPERATIONS  PERFORMED  BY  OWNER,  ITS  AGENTS,  AFFILIATES, EMPLOYEES,  CONTRACTORS  OR  SUBCONTRACTORS  OF  ANY  TIER (EXCLUDING ANY MEMBER OF OPERATOR GROUP)(COLLECTIVELY, THE "OWNER GROUP") ARISING OUT OF OR INCIDENT TO THE TERMS OF THIS AGREEMENT UNLESS SUCH IS DUE TO THE GROSS NEGLIGENCE OR WILLFUL MISCONDUCT OF ANY MEMBER OF OPERATOR GROUP.  IN THE EVENT A CLAIM IS FILED FOR WHICH OWNER HAS AN INDEMNITY OBLIGATION HEREUNDER, OPERATOR GROUP WILL PROMPTLY NOTIFY OWNER OF SUCH CLAIM AND WILL NOT SETTLE SUCH CLAIM WITHOUT THE PRIOR WRITTEN CONSENT OF OWNER.  PARTICIPATION BY OPERATOR GROUP IN THE DEFENSE OF ANY CLAIM OR SUIT FOR WHICH A MEMBER OF OWNER GROUP SHALL BE FOUND LIABLE SHALL NOT CONSTITUTE A WAIVER  OF  OPERATOR  GROUP'S  RIGHTS  TO  INDEMNIFICATION HEREUNDER.

OPERATOR AGREES TO HOLD HARMLESS, INDEMNIFY, PROTECT, AND DEFEND OWNER GROUP AGAINST ANY CLAIM, LOSS, COST, DAMAGE, EXPENSE  AND  ANY  AND  ALL  LIABILITY  FOR  PROPERTY  DAMAGE, PERSONAL INJURY, OR BOTH INCIDENT TO OR RESULTING FROM ANY AND ALL OPERATIONS PERFORMED BY ANY MEMBER OF OPERATOR GROUP

ARISING OUT OF OR INCIDENT TO THE TERMS OF THIS AGREEMENT UNLESS SUCH IS DUE TO THE GROSS NEGLIGENCE OR WILLFUL MISCONDUCT OF A MEMBER OF OWNER GROUP. IN THE EVENT A CLAIM IS FILED FOR WHICH OPERATOR HAS AN INDEMNITY OBLIGATION HEREUNDER, OWNER GROUP WILL PROMPTLY NOTIFY OPERATOR OF SUCH CLAIM AND WILL NOT SETTLE SUCH CLAIM WITHOUT THE PRIOR WRITTEN CONSENT OF OPERATOR. PARTICIPATION BY OWNER GROUP IN THE DEFENSE OF ANY CLAIM OR SUIT FOR WHICH OPERATOR GROUP SHALL BE FOUND LIABLE SHALL NOT CONSTITUTE A WAIVER OF OWNER GROUP'S RIGHTS TO INDEMNIFICATION HEREUNDER.

(b)     Owner will include in any transportation agreement for the Meter Station a provision indemnifying and saving harmless Operator, its officers, agents and employees from any claims, demand or expense for loss, damage or injury arising out of or in any way connected with the quality, use or condition of the Gas after delivery from the Meter Station to Owner's proposed pipeline and further providing that Operator shall not be responsible for any losses or shrinkage of Gas during transportation in the Meter Station, except in the case of willful misconduct or gross negligence on the part of the Operator, its officers, agents or employees.

(c)     In no event shall any party, or any member of such party's Group, be liable under any circumstance to any other party, and each party hereby waives the right to recover, for special, exemplary, punitive or consequential damages arising out of or in any way related to this Agreement, whether sounding in tort, contract or otherwise except to the extent of any such damages for which a party is liable to a third party and has the right to recover from the other party hereto in the absence of this Section 5.01(c). As used in this Section 5.01(c), the term "Group" shall mean the Owner Group or the Operator Group, as appropriate.

5.02     **Insurance**.

(a)     Operator shall carry and maintain in force Worker's Compensation Coverage, as required by statute, for employees involved in the operation and maintenance of the Meter Station. This policy shall be endorsed to provide a waiver of subrogation in favor of Owner. No other insurance shall be carried for the benefit of Owner.

(b)     Except as provided in Section 5.01(a) above, with respect to claims and losses for damage, or destruction of property which is a part of the Meter Station, it is agreed that neither Operator nor any Owner shall have any rights of recovery against one another, nor against the Affiliates or the insurers of any of them, and their rights of recovery are mutually waived. All such policies of insurance purchased to cover the Meter Station or any part thereof, or the operation (in any respect of the Meter Station or any part thereof), or any gas transported or handled therein, shall be endorsed properly to effectuate this waiver of recovery.

## ARTICLE VI

## FORCE MAJEURE

6.01     **Force Majeure**. If by reason of force majeure either Party is rendered unable, wholly or in part, to carry out its obligations under this Agreement, and if such Party gives notice and reasonably full particulars of such force majeure in writing (delivery by electronic mail permitted if followed in 2 business days by notice given in accordance with Article VIII) to the other within a reasonable time after the occurrence of the cause relied on, the Party giving such notice, so far as and to the extent that it is affected by such force majeure, shall not be liable for damages during the continuance of any inability so caused; provided, such cause shall be remedied with all reasonable dispatch.

6.02     **Force Majeure Defined**. As used herein, force majeure shall mean acts of God, strikes, lockouts, or other industrial disturbances; acts of public enemy, wars, blockades, insurrections, riots, epidemics, landslides, lightning, earthquakes, fires, storms (including but not limited to hurricane warnings), crevasses, floods, washouts; arrests and restraints of the government, either federal or state, civil or military, civil disturbances; shutdowns for purposes of necessary repairs, relocation, or construction of facilities; breakage or accident to machinery or lines of pipe; failure of surface equipment or pipelines; accidents, breakdowns; inability of either Party hereto to obtain necessary material, supplies, or permits or labor to perform or comply with any obligation or condition of this Agreement, rights of way; and any other causes, whether of the kind herein enumerated or otherwise, which are not reasonably in the control of the Party claiming suspension. It is understood and agreed that the settlement of strikes or lockouts shall be entirely within the discretion of the Party having the difficulty and that the above requirement that any force majeure shall be remedied with all reasonable dispatch shall not require the settlement of strikes or lockouts by acceding to the demands of an opposing party when such course is inadvisable in the discretion of the Party having the difficulty.

6.03     **Limitations**. Such force majeure affecting the performance hereunder by either Party, however, shall not relieve such Party of liability in the event of concurring negligence or in the event of failure to use due diligence to remedy the situation and to remove the cause in an adequate manner and with all reasonable dispatch, nor shall such causes or contingencies affecting such performance relieve either Party from its obligations to make payments as determined hereunder.

## ARTICLE VII

## TERMINATION

7.01     **Term**. This Agreement shall become effective on the first day of the calendar month in which the Meter Station is placed in service and shall continue in force and effect until terminated as follows:

Mariner HIA-341 Meter Operating Agmt.execution1 8

(a)     Upon default by either Party in the performance of any provision, condition or requirement herein, the other Party may give notice in writing to the Party in default specifying the default. Unless such default is cured within 30 days, or if such cure cannot be completed within the 30 day period, then if the cure thereof be not undertaken promptly upon receipt of such notice and diligently prosecuted thereafter, this Agreement may be terminated forthwith by written notice at the option of the Party serving such notice of default.

(b)     This Agreement shall terminate effective the first day of the calendar month following the month in which the Meter Station is abandoned by Owner, as determined by Owner in its sole discretion, pursuant to all applicable laws. Prior to abandonment of the Meter Station, Owner shall provide at least thirty (30) days advance written notice to Operator of its abandonment plans.

(c)     Owner may terminate this Agreement forthwith by notice to Operator if any of the following shall occur:

(i)     Operator dissolves, liquidates or terminates its separate corporate existence, other than pursuant to merger, share exchange or consolidation with an Affiliate;

(ii)     Proceedings shall be commenced by or against Operator for any relief under any bankruptcy or insolvency law, or any law relating to the relief of debtors, readjustment of indebtedness, reorganization, arrangement, composition or extension, and, if such proceedings have been commenced against Operator, such proceedings shall not have been dismissed, nullified, stayed or otherwise rendered ineffective (but then only so long as such stay shall continue in force or such ineffectiveness shall continue) within 90 days after such proceedings shall have commenced;

(iii)    A decree or order of a court having jurisdiction in the premises for the appointment of a receiver or liquidator or trustee or assignee in bankruptcy or insolvency of Operator or of a substantial part of its affairs, shall have been entered, and such decree or order shall have remained in force undischarged and unstayed for a period of 90 days, or any substantial part of the property of Operator shall be sequestered or attached and shall not be returned to the possession of Operator or released from such attachment within 90 days thereafter; and

(iv)    Operator shall make a general assignment for the benefit of creditors or shall admit in writing its inability to pay its debts generally as they become due.

7.02     **Effect**.  Termination of this Agreement shall not relieve either Party from any obligation accruing or accrued to the date of such termination or deprive the Party not in default of any remedy otherwise available to it.

## ARTICLE VIII

## NOTICES

Except as otherwise expressly provided in this Agreement, any notice, request, statement or other communication provided for in this Agreement shall be in writing and shall be given by personal delivery or by facsimile or by United States mail, postage prepaid, and addressed as follows:

If to Owner:

> Mariner Energy, Inc.
> 2101 Citywest Blvd., Bldg. 4, Suite 900
> Houston, TX  77042
> Attn:  Vice President Shelf and Onshore
> Phone:  713-954-5500
> Facsimile:  713-954-5555

If to Operator:

> Enterprise GTM Offshore Operating Company, LLC
> 2727 North Loop West, Suite 120
> Houston, Texas 77008
> Attention:   Offshore Commercial Development Manager
> Phone:  713-803-7940
> Facsimile:  713-803-7996

For purposes of this Agreement, the date on which any notice, request, statement, payment or other communication shall be deemed to have been given shall be the date on which it is received by the recipient, provided any such notice, request, statement, payment or other communication transmitted by registered or certified mail, return receipt requested, postage prepaid, shall be deemed to have been given on the third day following the date on which same was deposited in the United States mail, addressed in accordance with this Article VIII.  Either Party hereto may designate a further or different address to which subsequent notices, requests, statements, payments or other communication shall be sent.

## ARTICLE IX

## MISCELLANEOUS

9.01     **Applicable Law**.  THIS AGREEMENT SHALL BE GOVERNED BY AND INTERPRETED IN ACCORDANCE WITH THE LAWS OF THE STATE OF TEXAS.

9.02     **Laws and Regulatory Bodies**.  This Agreement, the operation of the Meter Station and the rights and obligations of Owner and Operator hereunder shall be subject to all valid and applicable laws, orders, directives, rules and regulations of any duly constituted governmental body or official having jurisdiction.

9.03     **Waiver**.  No waiver by either Party of any default by the other Party in the performance of any provision, condition or requirement herein shall be deemed to be a waiver of, or in any manner release the other Party from, performance of any other provision, condition or requirement herein, nor deemed to be a waiver of, or in any manner release the other Party from, future performance of the same provision, condition or requirement; nor shall any delay or omission of either Party to exercise any right hereunder in any manner impair the exercise of any such right or any like right accruing to it thereafter.

9.04     **Modification**.  This Agreement may not be modified, varied or amended except by an instrument in writing signed by the Parties.

9.05     **Captions**.  The titles to each of the various Articles and Sections in this Agreement are included for convenience of reference only and shall have no effect on, or be deemed as part of the text of, this Agreement.

9.06     **Multiple Counterparts**.  This Agreement may be executed in several counterparts, each of which shall be an original, and all of which, when taken together, shall constitute but one and the same Agreement.

9.07     **Equal Employment Opportunity**.  Operator agrees to be bound by, and fully comply with, the provisions of Section 202 of Executive Order 11246 and the other provisions set forth in Exhibit A attached hereto.

9.08     **Assignment**.  This Agreement shall inure to the benefit of and be binding upon the successors and assigns of the Parties hereto, provided that no assignment of rights or delegation of obligations hereunder, by either Party hereto, shall be effective until written notice thereof is given to, and consent thereto (which shall not be unreasonably withheld) is obtained from, the other Party.

[Remainder of page intentionally left blank]

**IN WITNESS WHEREOF**, the Parties have executed this Agreement in multiple counterparts as of December 7, 2005.

<div style="margin-left: 50%">

**OWNER**

**MARINER ENERGY, INC.**

By: _____

        Judd Hansen
        Vice President – Shelf and Onshore

**OPERATOR**

**ENTERPRISE GTM OFFSHORE OPERATING COMPANY, LLC**

By: _____

Its: _____

</div>

# EXHIBIT A

## EQUAL EMPLOYMENT OPPORTUNITY

## METER OPERATING AGREEMENT

### HIA-341

Attached to and made a part of a Meter Operating Agreement, dated as of December 7, 2005, between **ENTERPRISE GTM OFFSHORE OPERATING COMPANY, LLC**, a Delaware limited liability company, ("OPERATOR"), and **MARINER ENERGY, INC.** ("OWNER").

A.   **Equal Opportunity Clause (41 CFR 60-1.4)**

During the performance of this contract, OPERATOR agrees as follows:

1. OPERATOR will not discriminate against any employee or applicant for employment because of race, color, religion, sex, age or national origin. OPERATOR will take affirmative action to ensure that applicants are employed, and that employees are treated during employment, without regard to their race, color, religion, sex, age or national origin. Such action shall include, but not be limited to the following: Employment, upgrading, demotion or transfer, recruitment or recruitment advertising; layoff or termination; rates of pay or other forms of compensation; and selection for training, including apprenticeship. OPERATOR agrees to post in conspicuous places, available to employees and applicants for employment, notices setting forth the provisions of this nondiscrimination clause.

2. OPERATOR will, in all solicitations or advertisements for employees placed by or on behalf of OPERATOR, state that all qualified applicants will receive consideration for employment without regard to race, color, religion, sex or national origin.

3. OPERATOR will send to each labor union or representative of workers with which OPERATOR has a collective bargaining agreement or other contract or understanding, a notice advising the labor union or workers' representative of OPERATOR's commitments under section 202 of Executive Order 11246 of September 24, 1965, and shall post copies of the notice in conspicuous places available to employees and applicants for employment.

4. OPERATOR will comply with all provisions of Executive Order 11246 of September 24, 1965, and of the rules, regulations, and relevant orders of the Secretary of Labor.

5. OPERATOR will furnish all information and reports required by Executive Order 11246 of September 24, 1965, and by the rules, regulations, and orders of the Secretary of Labor, or pursuant thereto, and will permit access to its books, records, and accounts by the Secretary of Labor and his representatives for purposes of investigation to ascertain compliance with such rules, regulations, and orders.

6. In the event of OPERATOR's noncompliance with the nondiscrimination clauses of this Agreement or with any of such rules, regulations or order, this Agreement may be cancelled, terminated or suspended in whole or in part and OPERATOR may be declared ineligible for further Government contracts in accordance with procedures authorized in Executive Order 11246 of September 24, 1965, and such other sanctions may be imposed and remedies invoked as provided in Executive Order 11246 of September 24, 1965, or by rule, regulation, or order of the Secretary of Labor, or as otherwise provided by law.

7. OPERATOR will include the provisions of paragraphs (1) through (7) in every subcontract or purchase order unless exempted by rules, regulations, or orders of the Secretary of Labor issued pursuant to section 204 of Executive Order 11246 of September 24, 1965, so that such provisions will be binding upon each subcontractor or vendor. OPERATOR will take such action with respect to any subcontract or purchase order as the contracting agency may direct as a means of enforcing such provisions including sanctions for noncompliance; provided, however, that in the event OPERATOR becomes involved in, or is threatened with, litigation with a subcontractor or vendor as a result of such direction by the contracting agency, OPERATOR may request the United States to enter into such litigation to protect the interests of the United States.

B.    **Employee Information Reports (41 CFR 60-1.7)**

OPERATOR acknowledges that it may be required to file Standard Form 100 (EEO-1) promulgated jointly by the Office of Federal Contract Compliance, the Equal Employment Opportunity Commission and Plans for Progress, within thirty (30) days of the date of contract award if such report has not been filed for the current year and otherwise comply with or file such other compliance reports as may be required under Executive Order 11246, as amended and Rules and Regulations adopted thereunder.

C.    **Affirmative Action Programs (41 CFR 60-1.40)**

OPERATOR further acknowledges that it may be required to develop a written affirmative action compliance program as required by the Rules and Regulations approved by the Secretary of Labor under authority of Executive Order 11246 and supply OWNER with a copy of such program if they so request.

D.    **Certification of Nonsegregated Facilities (41 CFR 60-1.8)**

OPERATOR certifies that it does not maintain or provide for its employees any segregated facilities at any of its establishments, and that it does not permit its employees to perform their services at any location under its control where segregated facilities are maintained. It certifies further that it will not maintain or provide for its employees any segregated facilities at any of its establishments, and that it will not permit its employees to perform their services at any location, under its control, where segregated facilities are maintained. OPERATOR agrees that a breach of this certification is a violation of the Equal Employment Opportunity Clause in this Agreement. As used in this certification, the term "segregated facilities" means any waiting rooms, work areas,

A-2

restrooms and washrooms, restaurants and other eating areas, time clocks, locker rooms and other storage or dressing areas, parking lots, drinking fountains, recreation or entertainment areas, transportation, and housing facilities provided for employees which are segregated by explicit directive or are in fact segregated on the basis of race, creed, color, or national origin, because of habit, local custom or otherwise.  It further agrees that (except where it has obtained identical certifications from proposed subcontractors for specific time periods) it will obtain identical certifications from proposed subcontractors prior to the award of subcontracts exceeding $10,000 which are not exempt from the provisions of Equal Employment Opportunity Clause; that it will retain such certification in its files; and that it will forward the following notice to such proposed subcontractors (except where the proposed subcontractors have submitted identical certifications for specific time periods): NOTICE TO PROSPECTIVE SUBCONTRACTORS OF REQUIREMENT FOR CERTIFICATIONS OF NONSEGREGATED FACILITIES.  A Certification of Nonsegregated Facilities, as required by the May 9, 1967 Order on Elimination of Segregated Facilities, by the Secretary of Labor (32 Fed. Reg. 7439, May 19, 1967) must be submitted prior to the award of any subcontract exceeding $10,000 which is not exempt from the provisions of the Equal Employment Opportunity Clause.  The certification may be submitted either for each subcontract or for all sub-contracts during a period (i.e., quarterly, semiannually, or annually). (Note:  The penalty for making false statements in offers is prescribed in 18 U.S.C. 1001.)

E.  **Listing of Employment Openings (41 CFR 50-250)**

OPERATOR agrees to comply with the rules and regulations of the Department of Labor concerning the listing of employment openings, including the contract clause set forth in 41 CFR 50-250.2, which clause is incorporated herein by reference.  OPERATOR also agrees to place the foregoing provision in any subcontract directly under this Agreement.

F.  **Employment of Handicapped Individuals**

In employing persons to carry out this Agreement, OPERATOR will take affirmative action to employ and advance in employment qualified handicapped individuals as defined in Section 7(6) of the Federal Rehabilitation Act of 1973.

G.  **Veterans' Employment**

OPERATOR agrees to include in all of its government contracts and subcontracts the affirmative action clause prescribed by the regulations promulgated under the Vietnam Era Veterans Readjustment Assistance Act of 1974, 41 CFD Part 60-250.4, and disabled Veterans and Veterans of the Vietnam Era.

H.  **Minority Business Enterprises (E.O. 11458 and 11625)**

If the value of this contract is $10,000 or more, OPERATOR shall be bound by and agree to the following provisions concerning the utilization of minority business enterprises:

A-3

1. It is the policy of the Government that Minority Business Enterprises shall have the maximum practicable opportunity to participate in the performance of Government contracts.

2. The OPERATOR agrees to use his best efforts to carry out this policy in the award of his subcontracts to the fullest extent consistent with the efficient performance of this contract. As used in this contract, the term "minority business enterprise" means a business at least 50 percent of which is owned by minority group members or, in case of publicly-owned businesses, at least 51 percent of the stock of which is owned by minority group members. For the purposes of this definition, minority group members are Negroes, Spanish-speaking American persons, American Orientals, American Indians, American Eskimos, and American Aleuts. OPERATOR may rely on written representation by subcontractors regarding their status as minority business enterprises in lieu of an independent investigation.

If the value of this contract exceeds $500,000 and offers substantial subcontracting possibilities, OPERATOR shall be bound by and agrees to the following provisions concerning the Minority Business Enterprises Subcontracting Program.

(1)     The OPERATOR agrees to establish and conduct a program which will enable minority business enterprises (as defined above) to be considered fairly as subcontractors and suppliers under this contract. In this connection, the OPERATOR shall:

(a) Designate a liaison officer who will administer the OPERATOR minority business enterprises program.

(b) Provide adequate and timely consideration of the potentialities of known minority business enterprises in all "make-or-buy" decisions.

(c) Assure that known minority business enterprises will have an equitable opportunity to compete for subcontracts, particularly by arranging solicitations, time for the preparation of bids, quantities, specifications and delivery schedules so as to facilitate the participation of minority business enterprises.

(d) Maintain records showing (i) procedures which have been adopted to comply with the policies set forth in this clause, including the establishment of a source list of minority business enterprises, (ii) awards to minority business enterprises on the source list, and (iii) specific efforts to identify and award contracts to minority business enterprises.

(e) Include the Utilization of Minority Business Enterprises clause in subcontracts which offer substantial minority business enterprises subcontracting opportunities.

A-4

(f)  Cooperate with OWNER in studies and surveys of the OPERATOR minority business enterprises, procedures and practices that OWNER may from time to time conduct.

(g)  Submit periodic reports of subcontracting to known minority business enterprises with respect to the records referred to in subparagraph (d) above in such form and manner and at such time (not more than quarterly) as OWNER may prescribe.

2)      The OPERATOR further agrees to insert in any subcontract hereunder which may exceed $500,000, provisions which shall conform substantially to the language of this clause, including this paragraph (2), and to notify OWNER of the names of such subcontractors.

I.      **Nondiscrimination Because of Age (E.O. 1441)**

OPERATOR recognizes that it is the policy of the Executive Branch of the Government that (a) contractors and subcontractors engaged in the performance of Federal contracts shall not, in connection with employment, advancement, or discharge of employees, or in connection with the terms, conditions, or privileges of their employment, discriminate against persons because of their age except upon the basis of a bona fide occupational qualification, retirement plan, or statutory requirement, and (b) that contractors and subcontractors, or persons acting on their behalf, shall not specify, in solicitations or advertisements for employees to work on Government contracts, a maximum age limit for such employment unless the specified maximum age limit is based upon a bona fide occupational qualifications, retirement plan, or statutory requirement.