# EXHIBIT 3

OIL PURCHASE AND SALE AGREEMENT

BETWEEN

WESTPORT RESOURCES CORPORATION

MARINER ENERGY, INC.

NOBLE ENERGY, INC

AND

POSEIDON OIL PIPELINE COMPANY, L.L.C.

TABLE OF CONTENTS

| ARTICLE I. | DEFINITIONS | 1 |
|---|---|---|
| 1.1 | Specific Terms | 1 |
| 1.2 | Other Terms | 5 |
| | | |
| ARTICLE II. | TENDER, PURCHASE AND SALE OF OIL | 5 |
| 2.1 | Tender of Dedicated Production | 5 |
| 2.2 | Maximum Daily Quantity Purchases | 5 |
| 2.3 | Quantities in Excess of MDQ Purchases | 6 |
| 2.4 | Sales | 6 |
| | | |
| ARTICLE III. | PRICE | 6 |
| 3.1 | Purchase Price | 6 |
| 3.2 | Sale Price | 6 |
| 3.3 | Adjustments to Sale Price for High Viscosity | 6 |
| 3.4 | Sale Price Adjustments | 7 |
| | | |
| ARTICLE IV. | COMMITMENT OF DEDICATED PRODUCTION | 7 |
| 4.1 | Commitment of Dedicated Production | 7 |
| 4.2 | Release of Dedicated Production | 8 |
| 4.3 | Recordable Memorandum of Agreement | 9 |
| | | |
| ARTICLE V. | POINTS OF RECEIPT AND DELIVERY | 9 |
| 5.1 | Point of Receipt | 9 |
| 5.2 | Point of Delivery | 9 |
| | | |
| ARTICLE VI. | QUALITY | 10 |
| 6.1 | Deliveries | 10 |
| 6.2 | Quality Bank Program | 10 |
| 6.3 | Quality Bank Payments/Benefits | 10 |
| | | |
| ARTICLE VII. | QUANTITY, SCHEDULING AND BALANCING | 10 |
| 7.1 | Quantity at Point of Receipt and Point of Delivery | 10 |
| 7.2 | Linefill | 11 |
| 7.3 | Scheduling | 11 |
| 7.4 | Balancing | 11 |
| 7.5 | Audit | 11 |
| | | |
| ARTICLE VIII. | BILLING | 11 |
| 8.1 | Company's Statement and Net Statement | 11 |
| 8.2 | Payment | 11 |
| | | |
| ARTICLE IX. | TITLE AND WARRANTY | 12 |
| 9.1 | Producer's Warranty | 12 |
| 9.2 | Company's Warranty | 12 |

(i)

| | | |
|---|---|---|
| ARTICLE X. | POSSESSION OF OIL | 12 |
| 10.1 | Party in Possession | 12 |
| 10.2 | Responsibility and Liability | 13 |
| | | |
| ARTICLE XI. | TAXES AND ROYALTIES | 13 |
| 11.1 | Producer Taxes and Royalties | 13 |
| 11.2 | Company Taxes | 13 |
| | | |
| ARTICLE XII. | INDEMNITY | 13 |
| 12.1 | COMPANY'S INDEMNIFICATION OF PRODUCER | 13 |
| 12.2 | PRODUCER'S INDEMNIFICATION OF COMPANY | 14 |
| 12.3 | General | 14 |
| | | |
| ARTICLE XIII. | NOTICES | 14 |
| | | |
| ARTICLE XIV. | FORCE MAJEURE | 16 |
| 14.1 | Suspension of Obligations | 16 |
| 14.2 | Notice | 16 |
| 14.3 | Resolution | 16 |
| | | |
| ARTICLE XV. | DAMAGES | 17 |
| 15.1 | Consequential Damages | 17 |
| 15.2 | Liability for Delayed or Lost Production | 17 |
| 15.3 | General | 17 |
| | | |
| ARTICLE XVI. | TERM AND TERMINATION | 18 |
| 16.1 | Effective Date and Term | 18 |
| 16.2 | Termination | 18 |
| 16.3 | Rights and Obligations Upon Termination | 18 |
| | | |
| ARTICLE XVII. | REPRESENTATIONS AND WARRANTIES | 19 |
| | | |
| ARTICLE XIII. | MISCELLANEOUS | 19 |
| 18.1 | Entire Agreement | 19 |
| 18.2 | Modifications | 19 |
| 18.3 | Waiver | 19 |
| 18.4 | No Third Party Beneficiaries | 19 |
| 18.5 | Assignment | 20 |
| 18.6 | Confidentiality | 20 |
| 18.7 | Exhibits and Schedules | 20 |
| 18.8 | Choice of Law | 20 |
| 18.9 | Mediation | 20 |
| 18.10 | Further Assurances | 21 |
| 18.11 | Survival | 21 |
| 18.12 | Severability | 21 |
| 18.13 | Time of the Essence | 21 |
| 18.14 | Terminology | 21 |

| 18.15 | Counterparts | 21 |
| 18.16 | Compliance With Laws | 21 |
| 18.17 | Material Adverse Change | 22 |
| 18.18 | Producer's Agreement to Refrain from Certain Actions | 22 |
| 18.19 | Several Liability | 22 |
| 18.20 | Notice; Response | 22 |
| 18.21 | Agent | 22 |

<u>Exhibits</u>

Exhibit A      Description of Producing Properties

Exhibit B      Procedures for  Scheduling and Balancing Receipts and Deliveries

Exhibit C      Quality

Exhibit D      Measurement and Other Appurtenant Facilities

Exhibit E      Memorandum of Agreement Recordable Agreement

Exhibit F      Quality Bank Rules for Poseidon Pipeline System

## OIL PURCHASE AND SALE AGREEMENT

This Oil Purchase and Sale Agreement is entered into as of July 15, 2003 (the "Agreement") by and between Westport Resources Corporation ("Westport") , Mariner Energy, Inc. ("Mariner") and Noble Energy, Inc. ("Noble") (individually, "Producer" or collectively "Producer(s)") and Poseidon Oil Pipeline Company, L.L.C. ("Company").

## W I T N E S S E T H:

WHEREAS, Producer has control of and owns certain quantities of oil from certain oil and gas properties located offshore Louisiana on the Outer Continental Shelf;

WHEREAS, Company desires to purchase from Producer, and Producer desires to sell to Company, such quantities of oil; and

WHEREAS, Company desires to sell to Producer, and Producer desires to purchase from Company, like quantities of oil as hereinafter provided.

NOW, THEREFORE, for and in consideration of the premises and mutual covenants herein contained, Producer and Company do hereby stipulate and agree as follows.

## ARTICLE I
## DEFINITIONS

1.1     Specific Terms.  As used throughout this Agreement, the following capitalized terms shall have the meanings ascribed below.

"Administrator" means quality bank administrator as described in "Exhibit F".

"Affiliate" means, with respect to any relevant Person, any Person that directly or indirectly, through one or more intermediaries, controls, is controlled by or under common control with such relevant Person.  For purposes of this definition, the term "control" (including its derivatives and similar terms) means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of the relevant Person, whether through the ownership or control of voting interest, by contract or otherwise.

"Agreement" means this Oil Purchase and Sale Agreement (including any exhibits, supplements or other attachments hereto), as amended, restated, supplemented or otherwise modified from time to time.

"API Gravity" means the specific gravity of a sample of the Dedicated Production, captured during the LACT process, measured and adjusted to 60° Fahrenheit using API standards.

"Barrel" means forty-two (42) United States standard gallons adjusted to sixty degrees (60) Fahrenheit.

1

"Block" means the lands underlying the surface of the Gulf of Mexico, outer Continental Shelf as defined by the MMS.

"Business Day" means any Day, excluding Saturday, Sunday or federal reserve bank holidays.

"Company" shall have the meaning set forth in the preamble.

"Contract Year" means the 365 consecutive Days (or 366 consecutive Days if the Contract Year includes a leap year Day (February 29)) beginning on the first Day of the Month subsequent to the Initial Delivery Date or its anniversary.

"Day" means a period of twenty-four (24) consecutive hours, beginning and ending at 7:00 a.m. Central Standard Time.

"Dedicated Production" means any Oil now or hereafter owned or controlled by the Producer which is produced from or otherwise underlies the Producing Properties listed in "Exhibit A".

"Delivery Quantities" shall have the meaning set forth in "Exhibit B."

"Downstream Transportation" means transportation of Oil downstream of the Point of Delivery.

"Downstream Transporter(s)" means any transporter downstream of the Point of Delivery.

"EI" means Eugene Island type crude oil.

"Event of Default" or "Default" means the occurrence of any of the following events, circumstances or conditions: (i) failure by either Party to materially perform or comply with any material agreement, covenant, obligation or other provision contained in this Agreement when either (A) such failure has not been cured within the greater of a reasonable period of time or thirty (30) Days; in each case, following receipt of written notice thereof by the Party not in Default (other than a Default which occurs because such Party is rightfully withholding performance in response to the other Party's failure to perform), or (B) an effort to remedy such failure has not been commenced within such period following such written notice and continued to be diligently prosecuted, with such measures reasonably expected to cure any such Default; (ii) the entry of either Party into voluntary or involuntary bankruptcy, receivership or similar protective proceedings; (iii) the material inaccuracy or breach of any representation or warranty contained herein when such failure either has not been cured within the greater of a reasonable period of time or thirty (30) Days following receipt of written notice thereof by the other Party, or (iv) failure to pay any amounts owed pursuant to this Agreement within thirty (30) Days after the applicable due date, other than amounts disputed in good faith pursuant to the provisions of Section 8.2.

"Excess Production" shall have the meaning set forth in Section 2.3.

2

"Force Majeure" shall have the meaning ascribed to it in Section 14.1.

"GAF" means applicable business Month Gravity Adjustment Factor described in Exhibit F.

"Initial Delivery Date" means the first date on which Producer delivers any Dedicated Production to Company at the Point of Receipt pursuant to this Agreement.

"Laws" means any laws, rules, regulations, decrees and orders of the United States of America and all other governmental bodies, agencies or other authorities having jurisdiction over or affecting the provisions contained in or the transactions contemplated by this Agreement or the Parties or their operations, whether such Laws now exist or are hereafter amended or enacted.

"LLS" means Louisiana Light Sweet type crude oil.

"Loss or Losses" means any loss, expense, liability, damage, demand, suit, sanction, claim, settlement, judgment, lien, fine, penalty, interest or cost of every kind and character (including reasonable fees and expenses of attorneys, technical experts and expert witnesses reasonably incident to same and costs of court), including, but not limited to, those related to the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended, the Resource Conservation and Recovery Act of 1976, as amended, the Toxic Substances Control Act, and other federal and state equivalents; provided, however that, as between the Parties, the term Loss shall not include damages which one Party is prohibited from seeking from the other Party because of the limitations set forth in ARTICLE XV.

"Loss Allowance" shall have the meaning ascribed to it in Section 2.2.

"Market Based Quality Bank" or "Quality Bank" means the quality bank program set forth in "Exhibit F".

"Material Adverse Impact" means, without duplication, any change or effect relating to the performance of either Party's obligations under the Agreement, taken as a whole, that, individually or in the aggregate with other changes or effects, materially and adversely affects the economic position of a Party under the Agreement, taken as a whole, provided that in determining whether a Material Adverse Impact has occurred, changes or effects relating to (i) the oil pipeline industry generally (including the price of Oil and the costs associated with the drilling and/or production of Oil), (ii) United States or global economic conditions or financial markets in general, or (iii) the transactions contemplated by this Agreement, shall not be considered.

"MDQ" means, with respect to each Day during the term of this Agreement, the maximum quantity (expressed in Barrels) of Dedicated Production actually produced from the Producing Properties committed pursuant to Section 4.1, during such Day which Company shall be required to purchase pursuant to this Agreement. Notwithstanding anything in this Agreement to the contrary, Company shall not be required to purchase more than the amount of Barrels of Oil stipulated in Section 2.2 during any Day during the term of this Agreement.

3

"MMS" means Minerals Management Service of the United States Department of the Interior.

"Month" means a period beginning at 7:00 a.m. CST on the first Day of the calendar month and ending at 7:00 a.m. Central Standard Time on the first day the next succeeding calendar month.

"Oil", "Crude Oil", "Crude Petroleum" or "Crude" means the direct liquid hydrocarbon production from oil or gas wells, or blend of such, in its natural form, not having been enhanced or altered by any process that would result in misrepresentation of its true value for adaptability to refining as a whole crude petroleum or for acceptability to be commingled with other crude petroleum.

"Party" means, individually, either Company or Producer, collectively, the "Parties."

"Person" means any individual or entity, including, without limitation, any corporation, limited liability company, joint stock company, general or limited partnership, or government authority (including any agency or administrative group thereof).

"Point of Delivery" shall have the meaning ascribed to it in Section 5.2.

"Point of Measurement" means the physical location of the measurement equipment, as described in "Exhibit D," to be installed, owned, operated and maintained by Producer and located on the Producer's Platform.

"Point of Receipt" shall have the meaning ascribed to it in Section 5.1.

"Poseidon Pipeline" means the pipeline and appurtenant facilities (including interconnects) owned by the Company.

"Posting Price" shall have the meaning ascribed to it in Section 3.1.

"Producer" or "Producers" shall have the meaning ascribed to it in the preamble and shall mean each of Westport Resources Corporation, Mariner Energy, Inc., and Noble Energy, Inc., each of which shall be individually responsible for all obligations under the Agreement in proportion to their respective gross working interest ownership of the Producing Property, as provided in Exhibit A and Section 18.19 hereof.

"Producer('s) Platform" means the production facilities owned and operated by Producer at or near South Timbalier Block 316 in the Gulf of Mexico, Offshore Louisiana with the following approximate x and y coordinates: x = 2,369,938 y =19,200,00 (UTM Zone 15 N NAD 1927).

"Producing Property" means the Block(s) described on "Exhibit A".

"SAF" means applicable business Month Sulfur Adjustment Factor described in Exhibit F.

4

"Second Quality Bank" shall have the meaning ascribed to it in Section 6.3.

"SPC" means Shell Pipeline Company, LP.

"Stated Rate" means an annual rate of interest (compounded daily) equal to the lesser of (i) the sum of the prime or reference rate posted from time to time by Chemical Bank (New York, New York office) or its successor or a mutually agreed substitute bank plus two percent (2%) or (ii) the maximum lawful interest rate then in effect under applicable law.

"Third Party Carrier" shall have the meaning ascribed to it in Section 6.3.

"Third Party Carrier Debt/Credit" shall have the meaning ascribed to it in Section 6.3.

"Trade Month" shall have the meaning ascribed to it in Exhibit "F", Sec. 1, Paragraph 2.

"Upstream Carrier" means any other third party transporter(s) or gatherer(s) upstream of the Point of Receipt.

1.2    Other Terms.  Other capitalized terms used in this Agreement and not defined in Section 1.1 above shall have the meanings ascribed to them throughout this Agreement.

ARTICLE II.
TENDER, PURCHASE AND SALE OF OIL

2.1    Tender of Dedicated Production.  When and as produced Producer shall tender to Company at the Point of Receipt all of the Dedicated Production produced each Day during the term of this Agreement.; provided however, that unless agreed to the contrary by all of the Parties in a subsequent written agreement, the Producer shall not be required (and shall have no obligation) to produce, save or market any minimum amount or quantities of Dedicated Production.

2.2    Maximum Daily Quantity Purchases.  Subject to the provisions of this Agreement, for each Day during the term of this Agreement, Producer shall sell to Company and Company shall purchase from Producer, at the then applicable purchase price set forth in Section 3.1, all of the Barrels of Dedicated Production produced during such Day up to a number of Barrels not to exceed the MDQ then in effect for such Day net of a loss allowance amount equal to one half of one tenth percent (0.05%) including but not limited to evaporation, shrinkage, and/or pipeline losses from the Point of Receipt to the Point of Delivery in Section 5.2(a) ("Loss Allowance"). For Oil purchased by Company from Producer for delivery to the Point of Delivery in Section 5.2(b) the Loss Allowance shall be increased to two and one half tenth percent (0.25%).  The MDQ for the first three (3) Contract Years shall be 20,000 Barrels of Oil.  For each Contract Year after the third (3rd) Contract Year, the MDQ shall be the lesser of either (i) 20,000 Barrels of Oil or (ii) a number of Barrels of Oil equal to the greatest daily average (calculated on a Monthly basis excluding well and Platform downtime) number of Barrels of the Dedicated Production produced from the Producing Properties during any six consecutive Month period during the immediately preceding Contract Year.  If at any time after the second (2nd) Contract Year Producer provides to Company good faith reserve/production estimates that demonstrate

5

production capabilities over and above the then existing MDQ, Company will increase the MDQ to a mutually acceptable MDQ or release such estimated production over and above the then applicable MDQ from dedication.

Should the actual Loss Allowance charged to Poseidon by the downstream transporter in Section 5.2(a) increase or decrease, Poseidon, at its sole discretion, may adjust the Loss Allowance to reflect that increase or decrease.

2.3     Quantities in Excess of MDQ Purchases.  Subject to the provisions of this Agreement, for each Day during the term of this Agreement, Producer shall offer to sell to Company, at the then applicable purchase price set forth in Section 3.1, each of the remaining Barrels of the Dedicated Production in excess of the MDQ produced during such Day (the "Excess Production") net of the Loss Allowance.  Subject to applicable laws and the provisions of this Agreement, Company shall purchase any or all such Excess Production to the extent Company (in its sole discretion) determines the Poseidon Pipeline has available capacity (including at the relevant Point of Receipt and Delivery) for such delivery Month after considering existing and planned commitments and operations.

2.4     Sales.  Subject to the terms of this Agreement, for each Month during the term of this Agreement, Company shall sell to Producer and Producer shall purchase from Company, at the then applicable sale price set forth in Section 3.2 the same number of Barrels of Oil as the Barrels of Dedicated Production purchased, subject to normal imbalances and Loss Allowances, during such Month by Company pursuant to this Agreement.

ARTICLE III.
PRICE

3.1     Purchase Price.  For each Barrel of Oil purchased hereunder by Company, Company shall pay Producer a price based on the average of the midpoint of the assessment for Poseidon type crude oil at Houma, as quoted in Platts Oilgram Price Report's ("Platts"), excluding weekends and holidays, from the 26th day of the month that is two months prior to delivery, through the 25th day of the month that is one month prior to delivery (the "Posting Price") minus eighty two cents ($0.82) per Barrel ("Purchase Price").  For purposes of determining the applicable Purchase Price, Oil delivered during any given Month hereunder shall be deemed to have been delivered in equal daily quantities during such Month.  If for any reason the Posting Price shall cease to be posted as described above, the Parties will mutually agree on a replacement Posting Price.

3.2     Sale Price.  For each Barrel of Oil sold by Company to Producer under the terms of this Agreement, Producer shall pay to Company an amount equal to the Posting Price as described in Section 3.1 for Oil sold at the Point of Delivery in Section 5.2(a), and for Oil sold at the Point of Delivery in Section 5.2(b) an amount equal to the Posting Price plus the actual tariff on the Houma, Louisiana to St. James, Louisiana segment of SPC's pipeline used by Company.

3.3     Adjustments to Sale Price for High Viscosity.  Company may increase the sale price described in Section 3.2 to reflect the high viscosity of Oil purchased by the Company from the

6

Producer as determined at the Point of Receipt or if applicable at the Point of Measurement as follows:

| Crude Viscosity at 60 deg. F | Increase in Price Per Barrel |
|---|---|
| 0 SUS to 400 SUS | $0.00 |
| 401 to 500 SUS | $0.10 |
| 501 to 700 SUS | $0.22 |
| 701 to 1000 SUS | $0.35 |
| 1001 to 1500 SUS | $0.43 |
| 1501 to 2000 SUS | $0.50 |

3.4   Sale Price Adjustments.  Company may increase or decrease the sale price set forth in Section 3.2 to reflect any increase or decrease in costs to Company resulting from any change in applicable: federal, state or local taxes (other than those taxes imposed with respect to income or capital); permit, or license fee; assessments by any governmental authority having jurisdiction, not to include fines or penalties; or new pipeline operating standards imposed by any governmental authority having jurisdiction; provided, however, that any such increase or decrease shall be limited to the proportionate share of such costs which are directly related to the purchase and sale of Oil between Company and Producer pursuant to the terms of this Agreement.  Company shall provide no less than thirty (30) Days prior written notice to Producer of any adjustment to the sale price set forth in Section 3.2 pursuant to this Section 3.4.  Producer shall have the right to audit the books and records of Company with respect to any such adjustments for a period of two (2) years from the end of the calendar year in which any such adjustment first becomes effective.  Any dispute as to any adjustment to the sale price set forth in Section 3.2 which cannot be resolved by the Parties within one hundred twenty (120) Days of receipt by Company of written notice from Producer either disputing or requesting any such adjustment shall be submitted to mediation in accordance with the provisions of Section 18.9.

 Notwithstanding any other provision in this Agreement to the contrary, if the sale price increase or decrease pursuant to this Section 3.4 is such that Producer or Company, acting in good faith, determines it is uneconomic to perform hereunder as a result of such increase or decrease, the Parties agree to negotiate in good faith toward reaching a solution that would allow either Producer or Company to perform hereunder on a reasonably commercial basis.  In the event that such negotiation do not result in a mutually agreeable solution the Parties agree that the issue shall be resolved as set forth above.

ARTICLE IV.
COMMITMENT OF DEDICATED PRODUCTION

4.1   Commitment of Dedicated Production.  For the term of this Agreement and subject to the terms and conditions in Section 4.2 below, Producer hereby irrevocably tenders and permanently commits to Company for purchase hereunder the Dedicated Production.  Any assignment or other transfer of any or all of Producer's rights, title or interest in the Dedicated Production shall

be null and void *ab initio* unless such assignment or other transfer shall include express provisions stating (i) such assignment or other transfer is made subject to the terms of this commitment, this Agreement and the Memorandum of Agreement more fully described in Section 4.3, and (ii) the transferee agrees to become a party to, and bound by, this Agreement, such that all of Producer's (including its successors') rights, title and interest in and to the Dedicated Production remain dedicated to this Agreement for the term of this Agreement.

4.2     Release of Dedicated Production.

(a)     Notwithstanding the provisions of Section 4.1 above, to the extent that Producer at any time desires to deliver to Company pursuant to Section 2.3 any quantity of Excess Production and, unless due to Force Majeure or a Default caused by Producer, Company fails to purchase all or a portion of such Excess Production (x) for at least thirty (30) consecutive Days or (y) for a total of sixty (60) Days during any Contract Year, then Producer may permanently release from dedication to Company hereunder all or the portion of such Excess Production (whichever is applicable) that Company failed to accept with no further obligation under this Agreement with respect to such quantity by providing Company with at least sixty (60) Days prior written notice of such intent, which must be provided within sixty (60) Days of (x) or (y) (whichever is applicable) above occurring.

(b)     It is specifically understood and agreed that, in the event that Producer at any time desires to deliver to Company pursuant to Section 2.1 any quantity of the Dedicated Production constituting the MDQ, and, other than for reason of Force Majeure or a Default caused by Producer, Company fails to purchase from Producer all or a portion of such quantity (i) for at least thirty (30) consecutive Days or (ii) for a total of sixty (60) Days during any Contract Year, then by notice to Company, Producer may permanently release from dedication to Company hereunder all or a portion of such quantity of the Dedicated Production constituting the MDQ that Company failed to accept by providing Company with at least sixty (60) Days prior written notice of such intent, which must be provided within sixty (60) Days of (i) or (ii) (whichever is applicable) above occurring..

(c)     In the event that such failure to purchase described in Section 4.2(b) above occurs as the result of Force Majeure and to the extent Company, in good faith, expects the Force Majeure event to last more than thirty (30) Days, Company will provide written notice to Producer as soon as practicable after the occurrence of the Force Majeure event stating, based on Company's estimate derived by using reasonable efforts to determine the work required to begin the purchase and sale of all or the portion of Producer's Oil affected by the Force Majeure event, the period of time Company will be unable to purchase all or the portion of Producer's Oil and a detailed schedule showing Company's plans to remedy the Force Majeure situation. Producer will be entitled to a temporary release from dedication under this Agreement on the affected quantities until the termination of the Force Majeure, provided that such temporary release shall be subject to Company's right to require Producer to tender to Company any portion of the affected quantities which Company is able to purchase, even though the Force Majeure event continues to prevent Company from purchasing and selling all of Producer's available quantities. Producer may sell to third parties the quantity of Oil the Company is unable to purchase provided that Producer contracts for the period of time given in Company's written notice but no longer than 30 days with a 30 day evergreen.

8

(d)     If Company fails to purchase from Producer and sell to Producer any quantities in Section 4.2(a) and (b) above because of regulatory authority rules and/or laws requiring Company to accept quantities in excess of the Poseidon Pipeline's capacity, such failure by Company to purchase Producer's Oil will be for reasons of Force Majeure.

(e)     Notwithstanding anything contained in this Section 4.2 to the contrary, Producer shall not have the right to obtain a release of any Dedicated Production if both (i) the Poseidon Pipeline has readily available capacity to handle the applicable production and (ii) any of the following circumstances exist: (a) a Default caused by Producer or (b) the absence of capacity in the Downstream Transporter's pipelines; provided, however, that if (x) a Force Majeure Event results in Company's inability to purchase from Producer and sell to Producer any quantities in Sections 4.2 (b) or (c), which is not the result of (a) or (b) in this subsection,  and (y) there is a readily available alternative pipeline at the Point of Receipt capable of accepting the quantity of Dedicated Production constituting the MDQ that Company is unable to accept, then, if operationally practicable and feasible, Company will grant Producer a temporary release of such Dedicated Production until Company has the ability to accept such quantities, at which time such quantities will return to dedication following the expiration of any temporary transportation arrangements entered into by Producer during such period which shall not exceed thirty (30) days; provided, however, that nothing in this Section 4.2(e) is intended to limit or alter the remedy of permanent release the Producer has under Section 4.2(a) and Section 4.2(b).

4.3     Recordable Memorandum of Agreement.   The Parties hereby agree to execute a recordable Memorandum of Agreement substantially in the form of Exhibit E and file such document, together with all applicable leases and assignments of interests for the Producing Properties with the MMS and in the parish and county records of the appropriate jurisdictions as soon as practicable following the execution of this Agreement to the extent such documents have not been so filed previously.

## ARTICLE V
## POINTS OF RECEIPT AND DELIVERY

5.1     Point of Receipt.   Producer shall deliver and sell to Company  the Dedicated Production tendered pursuant to this Agreement at the interconnecting flange between the Poseidon Pipeline and Manta Ray Gathering Company, L.L.C.'s  Allegheny pipeline facilities on the Ship Shoal 332 Platform (the "Point of Receipt"); at an operating temperature between 40 degrees F (minimum) and 160 degrees F (maximum) and at a pressure not to exceed the lesser of (a)  1800 psi, or (b) determined by the maximum allowable operating pressure (MAOP) of the ANSI 900 piping system adjusted for temperature and reduced by a margin as required by the MMS for setting of the pressure safety high (PSH) sensor and further reduced by a normal operating margin (currently  five percent (5%)).

5.2     Point of Delivery.   Company shall deliver and sell to Producer an amount of Oil equal to the Dedicated Production tendered pursuant to this Agreement at (a) SPC's Houma Terminal at Houma Louisiana, or at Producer's sole discretion, (b) SPC's connection at St. James, Louisiana with the Capline system (each a "Point of Delivery").

9

Company shall not be required to deliver Oil to any connecting pipeline or facility or to the above Point of Delivery at pressures exceeding 50 psi. Subject to applicable Laws and (a) in the event of Force Majeure or (b) whenever the volume of Oil scheduled to be delivered at the Point of Delivery exceeds (1) pipeline or measurement capacity for the Poseidon Pipeline segment or SPC's pipeline system or (2) any Downstream Transporters' measurement or pipeline capacity, then deliveries at such Point of Delivery will be allocated pro rata on the basis of (x) each Person's Delivery Quantities up to the MDQ, and (y) for any remaining capacity, each Person's Delivery Quantities constituting Excess Production. If Producer's delivery of Dedicated Production is prorated as provided herein Producer shall be responsible for nominating and arranging Downstream Transportation for quantities of Oil affected by such proration, to the extent capacity is available at an alternate Point or Points of Delivery.

ARTICLE VI
QUALITY

6.1    Deliveries.  All Dedicated Production sold by Producer to Company hereunder shall conform to the specifications set forth in "Exhibit C" and/or established by any pipelines interconnecting with the Poseidon Pipeline and/or any Downstream Transporters' pipeline.

6.2    Quality Bank Program.  Producer hereby agrees to participate in and be bound by the rules and regulations of the quality bank program set forth in Exhibit F

6.3    Quality Bank Payments/Benefits.  Producer will participate in a Market Based Quality Bank as provided in Exhibit F from the Point of Receipt to the Point of Delivery, provided that if (i) Producer's Oil is commingled upstream of the Point of Receipt with (x) Oil from additional Producer properties and/or (y) Oil from  third parties delivering into the pipeline or pipelines upstream of the Point of Receipt, and (ii) all of the Oil delivered into the upstream pipeline or pipelines is redelivered at the Point of  Receipt, Producer will participate in the market based Quality Bank as provided in Exhibit F from the Producer's Platform to the Points of Delivery. If Producer's Oil is introduced into a connection with an Oil stream carrier ("Third Party Carrier") that has a different quality bank ("Second Quality Bank") prior to the delivery of Producer's Oil at the Point of Delivery, Producer's obligation to or due from the Market Based Quality Bank will be calculated based on the method in Exhibit F, using the average gravity and the average sulfur content of the common Oil stream delivered by Company to the Third Party Carrier. Producer will pay to or receive from Company any such amount so calculated.  Company will pay or receive any amount due to or from the Second Quality Bank ("Third Party Carrier Debit/Credit") as a result of the Oil in the Poseidon Pipeline being commingled with Oil in the Third Party Carrier's pipeline.  Producer will pay to or receive from Company its allocation of the Third Party Carrier Debit/Credit.  Such allocation shall be in proportion to the relationship of Producer's deliveries into the Poseidon Pipeline for the applicable month versus the total deliveries by Company into the Third Party Carrier for the applicable month.

ARTICLE VII.
QUANTITY, SCHEDULING AND BALANCING

7.1    Quantity at Point of Receipt and Point of Delivery.  The quantity of Dedicated Production sold by Producer to Company at the Point of Receipt and Oil sold by Company to Producer at the

10

Point of Delivery shall be measured with such volume and gravity adjusted to sixty (60) degrees Fahrenheit temperature.    Company or its designee shall be responsible for the accurate measurement of Oil, which shall be done in accordance with the provisions of Exhibit D. Company or its designee shall be provided unrestricted access, free of rental or access charge, to Producer's Platform, for purposes of conducting measurement procedures and maintaining and monitoring measurement equipment, data acquisition and communications equipment at the Point of Measurement.

7.2     Linefill.  Company shall be responsible for obtaining and maintaining linefill within its own proprietary pipeline and other pipelines used in connection with the movement of Oil from Point of Receipt to Point of Delivery under this Agreement.

7.3     Scheduling.  Scheduling shall be in accordance with the provisions set forth in Exhibit B.

7.4     Balancing.  Balancing shall be in accordance with the provisions set forth in Exhibit B.

7.5     Audit.  Producer shall have the right to audit all measurements made by Company or its designee applicable to Oil delivered hereunder to the Point of Receipt and Point of Delivery for twenty-four (24) months after the Month in which each such delivery occurs.  Producer shall not audit Company's measurement records more often than once every six (6) Months.  Any measurements not contested with specificity in writing within twenty-four (24) months after the Month in which such measurement occurs shall conclusively be deemed to be accurate.

ARTICLE VIII.
BILLING

8.1     Company's Statement and Net Statement.  Company shall render and deliver to Producer on or before the fifteenth (15th) Day of each Month a statement setting forth the amount due Producer for purchases of Oil hereunder by Company and the amount due Company for sales of Oil hereunder to Producer during the preceding Month.  If actual quantities cannot be made available through no fault of Company, Company may utilize a reasonable, good faith, estimated quantity. As soon as the actual quantity becomes available, the estimate shall be adjusted and the adjustment shall be reflected in subsequent Months' business.  The Parties agree to prepare a summary billing containing all amounts owed to each other for the applicable production Month and to deliver a net statement to the Party having a net balance due.

8.2     Payment.  The Party with the net balance due to the other Party shall pay such other Party the amount due in the form of immediately available federal funds by wire transfer to the bank account specified on the net statement, or any other mutually agreed upon method, on or before the first Business Day following the twentieth (20th) Day of each Month, in each case, for transactions accruing hereunder during the preceding Month.  The paying Party must tender a timely payment even if the net statement includes an estimated receipt or delivery volume.  Any payment shall not prejudice the right of the paying Party to an adjustment of any statement to which it has taken written exception, provided that claim therefor shall have been made within sixty (60) Days from the date of discovery of such error, but, in any event, within twenty four (24) Months from the date of the net statement.  If the paying Party fails to pay any statement in whole or in part within ten (10) Days of when due, in addition to any other rights or remedies

11

available to the Party to whom payment is due, interest at the Stated Rate shall accrue on unpaid amounts beginning on the original due date.   Notwithstanding the foregoing, if a good faith dispute arises between Producer and Company concerning a net statement, the paying Party shall pay that portion of the net statement not in dispute on or before such due date, and upon the ultimate determination of the disputed portion of the statement, the Party that owes the disputed portion shall pay the remaining amount owed plus the interest accrued thereon.

ARTICLE IX.
TITLE AND WARRANTY

9.1    Producer's Warranty.  Each Producer hereby represents and warrants that it has good and marketable title to and/or the right and authority to deliver and sell to Company, all the Dedicated Production.   Each Producer represents and warrants that its respective working interest share of Dedicated Production shall be free and clear of all royalties (other than government royalties, or existing overriding royalty interests for which the applicable Producer has the right to market the Oil attributable thereto), liens and encumbrances (except as they relate to funds borrowed by Producer in the normal  course of business), all applicable Federal, State and local taxes that are imposed upon production and/or removal of liquid hydrocarbons from the premises to the Point of Delivery, and claims whatsoever, and AGREES TO RELEASE, PROTECT, DEFEND, INDEMNIFY AND HOLD HARMLESS Company against all Losses incurred by Company on account of any and all  liens, encumbrances or claims of any kind as they relate to the warranty described herein associated with the Dedicated Production delivered to Company.

9.2    Company's Warranty.  Company hereby represents and warrants that it has good and marketable title to and/or the right and authority to deliver and sell to Producer, all Oil tendered for sale to Producer pursuant to this Agreement.  Company represents and warrants that such Oil sold to Producer pursuant to this Agreement shall be free and clear of all liens and encumbrances (except as they relate to funds borrowed by Producer in the normal  course of business)  and claims whatsoever, and AGREES TO RELEASE, PROTECT, DEFEND, INDEMNIFY AND HOLD HARMLESS Producer against all Losses incurred by Producer on account of any such liens, encumbrances, and claims of any kind as they relate to the warranty described herein associated with the Dedicated Production.

ARTICLE X.
POSSESSION OF OIL

10.1   Party in Possession.  As between Parties hereto, Producer shall own, control and possess the Oil affected by this Agreement at all times prior to and upon delivery to Company at the Point of Receipt and after redelivery to Producer at the Point of Delivery. Producer may, however, enter into an Oil purchase and sale agreement with an Upstream Carrier and transfer possession, control and ownership to such Upstream Carrier in order to effect the delivery of Oil from the Producing Properties to the Point of Receipt, in which case Producer's obligation to own, control and possess the Oil at all times prior to delivery to Company will not  apply;  provided,  however,  notwithstanding such transfer of possession, control, and

12

ownership, in no event shall Producer be relieved of its obligation to pay for any and all Losses caused by and occurring while the Oil is in the possession and control of Producer or such Upstream Carrier.  Company shall own, control and possess the Oil affected by this Agreement at all times after delivery, thereof by Producer to Company at the Point of Receipt and prior to delivery by Company to Producer at the Point of Delivery.

10.2    Responsibility and Liability.  The Party in control and possession of the Oil affected by this Agreement shall be responsible and pay for any and all Losses caused thereby and occurring while the Oil is in the possession and control of such Party; provided, however, that (i) Producer shall be responsible and pay for, and RELEASE, PROTECT, DEFEND, INDEMNIFY AND HOLD HARMLESS Company from any and all Losses caused by or resulting from the failure of Oil delivered hereunder to meet, at the Point of Receipt, the quality specifications set forth in Article VI ("Quality Specifications"); and (ii) Company shall be responsible and pay for, and **RELEASE, PROTECT, DEFEND, INDEMNIFY AND HOLD HARMLESS** Producer from, any and all Losses caused by or resulting from the failure of Oil delivered hereunder to meet, at the Point of Delivery, the quality specifications set forth in Article VI.

ARTICLE XI.<br>TAXES AND ROYALTIES

11.1    Producer Taxes and Royalties.   Producer shall be responsible for all applicable production, excise, sales, use or similar taxes and royalties on or with respect to the production, delivery and sale, of the Dedicated Production to Company hereunder.  Producer shall also be responsible for any tax, fee, or other charge levied against either Producer or Company, pursuant to any Federal, State, or local act or regulation for the purpose of creating a fund for the prevention, containment, clean up and/or removal of spills and/or the reimbursement of persons sustaining loss therefrom.

11.2    Company Taxes.  Subject to Section 3.4, Company shall be responsible for all applicable excise, sales, use or similar taxes on or with respect to the delivery and sale to Producer of Oil hereunder.

ARTICLE XII.<br>INDEMNITY

**12.1  COMPANY'S INDEMNIFICATION OF PRODUCER.   EXCEPT TO THE EXTENT RESULTING FROM PRODUCER'S BREACH OF THIS AGREEMENT, NEGLIGENT ACT OR FAILURE TO ACT, COMPANY SHALL RELEASE, PROTECT, DEFEND, INDEMNIFY AND HOLD HARMLESS PRODUCER FROM, AGAINST AND IN RESPECT OF ANY AND ALL LOSSES INCURRED BY PRODUCER TO THE EXTENT ARISING FROM OR RELATED TO ANY BREACH OF ANY OF THE REPRESENTATIONS, WARRANTIES, COVENANTS OR AGREEMENTS MADE IN THIS AGREEMENT BY COMPANY.**

13

EXCEPT AS SPECIFICALLY PROVIDED HEREIN, COMPANY SHALL BE RESPONSIBLE FOR AND SHALL RELEASE, PROTECT, DEFEND, INDEMNIFY AND HOLD HARMLESS PRODUCER, ITS AFFILIATES, CONTRACTORS AND SUBCONTRACTORS AND ALL OF THEIR RESPECTIVE OFFICERS, DIRECTORS, EMPLOYEES, CO-OWNERS AND JOINT VENTURERS (COLLECTIVELY, THE "PRODUCER GROUP") FROM AND AGAINST ANY AND ALL LOSS, DAMAGES, CLAIMS, DEMANDS AND ACTIONS AND RELATED EXPENSES, INCLUDING ATTORNEY'S FEES, ARISING FROM DAMAGE TO OR LOSS OF PROPERTY OF ANY MEMBER OF THE COMPANY GROUP (AS HEREINAFTER DEFINED) OR INJURY OR DEATH TO ANY MEMBER OF THE COMPANY GROUP ARISING OUT OF OR IN CONNECTION WITH THE COMPANY'S ACCESS TO, PRESENCE ON, OR USE OF THE PRODUCER PLATFORM OR COMPANY'S OPERATION OF THE POSEIDON PIPELINE OR ANY OTHER SERVICES OR ACTIVITIES PERFORMED BY COMPANY ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT.

12.2   PRODUCER'S INDEMNIFICATION OF COMPANY.   EXCEPT TO THE EXTENT RESULTING FROM COMPANY'S BREACH OF THIS AGREEMENT, NEGLIGENT ACT OR FAILURE TO ACT, PRODUCER SHALL RELEASE, PROTECT, DEFEND, INDEMNIFY AND HOLD HARMLESS COMPANY FROM, AGAINST AND IN RESPECT OF ANY AND ALL LOSSES INCURRED BY COMPANY TO THE EXTENT ARISING FROM OR RELATED TO ANY BREACH OF ANY OF THE REPRESENTATIONS, WARRANTIES, COVENANTS OR AGREEMENTS MADE IN THIS AGREEMENT BY PRODUCER.

EXCEPT AS SPECIFICALLY PROVIDED HEREIN, PRODUCER SHALL BE RESPONSIBLE FOR AND SHALL RELEASE, PROTECT, DEFEND, INDEMNIFY AND HOLD HARMLESS COMPANY AND ITS AFFILIATES, CONTRACTORS AND SUBCONTRACTORS AND ALL OF THEIR RESPECTIVE OFFICERS, DIRECTORS, EMPLOYEES, CO-OWNERS AND JOINT VENTURERS (COLLECTIVELY, THE "COMPANY GROUP") FROM AND AGAINST ALL LOSS, DAMAGES, CLAIMS, DEMANDS AND ACTIONS AND RELATED EXPENSES, INCLUDING ATTORNEY'S FEES, ARISING FROM DAMAGE TO OR LOSS OF PROPERTY OF ANY MEMBER OF THE PRODUCER GROUP OR INJURY OR DEATH TO ANY MEMBER OF THE PRODUCER GROUP ARISING OUT OF OR IN CONNECTION WITH THE COMPANY'S ACCESS TO THE PRODUCER'S PLATFORM.

12.3   GENERAL.   SUBJECT TO THE LIMITATIONS SET FORTH IN ARTICLE XV AND EXCEPT AS OTHERWISE EXPRESSLY LIMITED HEREIN, ALL THE INDEMNITY OBLIGATIONS AND/OR LIABILITIES ASSUMED UNDER THE TERMS OF THIS ARTICLE XII SHALL BE WITHOUT LIMITS AND WITHOUT REGARD TO THE CAUSE OR CAUSES THEREOF, INCLUDING ANY INGRESS, EGRESS, LOADING, AND UNLOADING, AND INCLUDING PRE-EXISTING CONDITIONS, STRICT LIABILITY, UNSEAWORTHINESS, OR THE NEGLIGENCE OF ANY RELEASEE OR INDEMNITEE (BUT NOT INCLUDING THE GROSS NEGLIGENCE, OR INTENTIONAL MISCONDUCT OF THE RELEASEE OR INDEMNITEE), WHETHER SUCH NEGLIGENCE OR OTHER FAULT BE SOLE, JOINT, CONCURRENT, ACTIVE OR PASSIVE.

ARTICLE XIII.
NOTICES

13.1    Any notice, request, demand, statement or payment provided for in this Agreement, or any notice which a Party may desire to give to the other, shall be in writing, and shall be considered as duly delivered when actually received by the other Party at the following address:

1.      If to Producer:

        Attn: Marketing
        Westport Resources Corporation
        1670 Broadway Suite 2800
        Denver, CO 80202
        Telephone:  303 573 5404
        Telecopy:   303 573 5609

        With copies to:

        Mariner Energy, Inc.
        Attn:  Michael R. (Rod) Banks
        2101 Citywest Blvd., Suite 1900
        Houston, TX  77042-3020
        Telephone: (713) 954-5509
        Telecopy:  (713) 954-5577
        Nominations and Invoicing:  (713) 954-5582

        and

        Noble Energy, Inc.
        C/O Noble Energy Marketing, Inc.
        Attn:    Marketing
        100 350 Glenborough Drive, Suite 180 100
        Houston, Texas 77067
        Telephone: 281-876/8800
        Telecopy:  281-876-8845

2.      If to Company:

        Poseidon Oil Pipeline Company, L.L.C.
        Attn:  President
        4 Greenway Plaza
        Suite 577
        Houston, Texas 77046
        Telephone: (832) 676-5442
        Telecopy:  (832) 676-1710

15

All notices given hereunder shall be effective on the actual day of receipt at the appropriate address.  Notice given by telegram, telex or facsimile shall be effective upon actual receipt if received during recipient's normal business hours or at the beginning of the next Business Day after receipt if received after the recipient's normal business hours.

Such addresses may from time to time be changed by notice to the other party in the manner provided above.  Routine dispatching contacts and communications may be handled in writing or orally and confirmed in writing between the respective designated representatives of the Parties.

ARTICLE XIV.
FORCE MAJEURE

14.1   Suspension of Obligations.  Neither Party shall be liable to the other Party for failure to perform any of its obligations, other than financial obligations, under this Agreement to the extent such performance is hindered, delayed or prevented by Force Majeure.  For purposes of this Agreement, "Force Majeure" shall mean causes, conditions, events or circumstances that are beyond the reasonable control of the Party claiming Force Majeure.  Such causes, conditions, events and circumstances shall include, without limitation, acts of God, acts of terrorism, wars (declared or undeclared), insurrections, hostilities, strikes, lockouts, riots, floods, fires, storms, industrial disturbances, acts of the public enemy, sabotage, blockages, insurrections, epidemics, landslides, lightning, earthquakes, washouts, arrests and restraints of rulers and peoples, civil disturbances, explosions, breakage or accidents to machinery or lines of pipe, hydrate obstruction or blockages of any kind on lines of pipe, operating conditions on Company's or Producer's facilities or reasons of force majeure on a Downstream Transporter or Upstream Carrier, repairs, improvements, replacement or alterations to plants, lines of pipe or related facilities, inability of either Party to obtain necessary machinery, materials, permits, or to obtain easements or rights-of-way, freezing of the well or delivery facility, well blowout, cratering, depletion of reserves, the partial or entire failure of a well, the act of any court or governmental authority prohibiting a Party from discharging its obligations under this Agreement and, conduct which would violate any applicable Laws.  Inability of a Party to be profitable or to secure funds, arrange bank loans or other financing, obtain credit, pay amounts due or have adequate capacity, unless affected by a Force Majeure event shall not be regarded as an event of Force Majeure. The term "Force Majeure" does not include loss of market or change in market prices for Oil.

14.2   Notice.  A Party which is unable, in whole or in part, to carry out its obligations under this Agreement due to Force Majeure shall give written and verbal notice as soon as possible, but in any event shall be given written notice within five (5) Days from discovery of such Force Majeure to that effect to the other Party stating the circumstances underlying such Force Majeure.

14.3   Resolution.  A Party claiming Force Majeure shall use commercially reasonable efforts to remove the cause, condition, event or circumstance of such Force Majeure, shall give written notice within five (5) Days to the other Party of the termination of such Force Majeure and shall resume performance of any suspended obligation as soon as reasonably possible after

16

termination of such Force Majeure. The decision to settle a strike or a labor disturbance is at the sole discretion of the Party claiming Force Majeure.

ARTICLE XV.
DAMAGES

15.1   Consequential Damages. NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THIS AGREEMENT, A PARTY'S DAMAGES RESULTING FROM A BREACH OR VIOLATION OF ANY REPRESENTATION, WARRANTY, COVENANT OR CONDITION CONTAINED HEREIN OR OTHERWISE ARISING FROM OR RELATING TO THIS AGREEMENT AND THE ACTIVITIES RELATED TO THIS AGREEMENT SHALL BE LIMITED TO ACTUAL DIRECT DAMAGES, AND SHALL NOT INCLUDE ANY OTHER DAMAGES, INCLUDING, WITHOUT LIMITATION, INDIRECT, SPECIAL, CONSEQUENTIAL, INCIDENTAL, EXEMPLARY OR PUNITIVE DAMAGES. THE IMMEDIATELY PRECEDING SENTENCE SHALL NOT PROHIBIT NOR OTHERWISE LIMIT A PARTY'S ABILITY TO RECOVER FROM THE OTHER PARTY ALL COSTS, EXPENSES OR DAMAGES PAID OR OWED TO ANY THIRD PARTY IN SETTLEMENT OR SATISFACTION OF CLAIMS OF THE TYPE DESCRIBED IN THIS SECTION FOR WHICH THE PAYING PARTY IS OTHERWISE ENTITLED TO RECOVER.

15.2   Liability for Lost Production. NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THIS AGREEMENT, PRODUCER AGREES TO RELEASE, PROTECT, DEFEND, INDEMNIFY AND HOLD HARMLESS COMPANY WITH RESPECT TO, ANY LOSSES INCURRED BY PRODUCER, ITS AFFILIATES, SUBSIDIARIES, LENDERS, SUBCONTRACTORS, AGENTS EMPLOYEES, OFFICERS OR DIRECTORS RELATING TO DAMAGE TO THE PRODUCING PROPERTIES OR LOSS OF ANY RELATED RESERVES NOT PREVIOUSLY DELIVERED TO THE POSEIDON PIPELINE AND RESULTING FROM ANY ACTS OR OMISSIONS BY COMPANY OR ITS DESIGNEE IN CONNECTION WITH OR OTHERWISE RELATED TO THIS AGREEMENT.

COMPANY ACKNOWLEDGES THAT NOTHING HEREIN IS INTENDED TO IMPOSE LIABILITY UPON PRODUCER FOR ANY LOSSES SUFFERED BY COMPANY, ITS AFFILIATES, SUBSIDIARIES, LENDERS, SUBCONTRACTORS, AGENTS, EMPLOYEES, OFFICERS, CO-OWNERS, JOINT VENTURERS, OR JOINT INTEREST OWNERS OR ANY PERSON HAVING A CONTRACTUAL RELATIONSHIP WITH COMPANY (OTHER THAN PRODUCER OR PERSONS HAVING A CONTRACTUAL RELATIONSHIP WITH PRODUCER) RELATING TO THE DELAY OF PRODUCTION OR ANY DAMAGE TO THE PRODUCING PROPERTY OR LOSS OF ANY RELATED RESERVES NOT PREVIOUSLY DELIVERED TO THE POSEIDON PIPELINE AND RESULTING FROM ANY ACTS OR OMISSIONS BY PRODUCER OR ITS DESIGNEE IN CONNECTION WITH OR OTHERWISE RELATED TO THIS AGREEMENT AND COMPANY HEREBY AGREES TO RELEASE, PROTECT, DEFEND, INDEMNIFY AND HOLD HARMLESS PRODUCER WITH RESPECT TO ANY SUCH LOSSES.

15.3   General.

17

EXCEPT AS OTHERWISE EXPRESSLY LIMITED HEREIN, IT IS THE INTENT OF ALL OF THE PARTIES THAT ALL RELEASE AND INDEMNITY OBLIGATIONS AND LIABILITIES ASSUMED IN THIS ARTICLE BE WITHOUT MONETARY LIMIT AND WITHOUT REGARD TO THE CAUSE OR CAUSES THEREOF, INCLUDING ANY INGRESS, EGRESS, LOADING, AND UNLOADING, AND INCLUDING PRE-EXISTING CONDITIONS, STRICT LIABILITY, UNSEAWORTHINESS, OR THE NEGLIGENCE OF ANY RELEASEE OR INDEMNITEE (BUT NOT INCLUDING THE GROSS NEGLIGENCE, OR INTENTIONAL MISCONDUCT OF THE RELEASEE OR INDEMNITEE), WHETHER SUCH NEGLIGENCE OR OTHER FAULT BE SOLE, JOINT, CONCURRENT, ACTIVE OR PASSIVE.

## ARTICLE XVI.
### TERM AND TERMINATION

16.1    Effective Date and Term.  This Agreement shall become effective on the date first written in the preamble and shall remain in full force and effect unless otherwise terminated pursuant to Section 16.2.

16.2    Termination.  This Agreement may be terminated or canceled as follows and in no other manner:

(a)    By either Company or Producer upon the occurrence and during the continuation of any Default or Event of Default (following any applicable notice and cure period contained in this Agreement) if the terminating Party is not itself in Default (other than a Default which occurs because such Party is rightfully withholding performance in response to the other Party's Default);

(b)    By the applicable Party pursuant to any Article or Section of this Agreement expressly providing termination rights; or

(c)    By all of the Parties at any time upon mutual written agreement.

16.3    Rights and Obligations Upon Termination.    Termination or cancellation of this Agreement shall not relieve the Parties from any obligation accruing or accrued to the date of such termination or deprive a Party not in Default of any right or remedy otherwise available to such Party.  Upon termination of this Agreement, the Parties shall retain all other rights and remedies available at law or in equity.  In the event Company terminates this Agreement pursuant to Section 16.2 above as a result of a Default by a Producer, the other Producers (provided they are not also in Default or have not also relinquished or forfeited their interest in the leases associated with the Producing Properties) shall have the option to maintain this Agreement in effect in accordance with its terms with respect to their working interest share of Oil in which case in which case this Agreement shall be interpreted to apply only to the remaining Producers and the MDQ shall be adjusted to account for such change in Producer.  Such option by the other remaining Producers to maintain this Agreement in effect may be

exercised by giving written notice to Company on or before thirty (30) Days following Company's notice to Producers of its intent to terminate this Agreement.

## ARTICLE XVII.
### REPRESENTATIONS AND WARRANTIES

17.1    Representations and Warranties. Each of Producer and Company represents and warrants to each other that on and as of the date hereof:

(a)    It is duly formed and validly existing and in good standing under the laws of its state of jurisdiction or formation, with power and authority to carry on the business in which it is engaged and to perform its respective obligations under this Agreement;

(b)    The execution and delivery of this Agreement by it have been duly authorized and approved by all requisite corporate, limited liability company, partnership or similar action;

(c)    It has all the requisite corporate, limited liability company, partnership or similar power and authority to enter into this Agreement and perform its obligations hereunder;

(d)    The execution and delivery of this Agreement does not, and consummation of the transactions contemplated herein will not, violate any of the provisions of organizational documents, any agreements pursuant to which it or its property is bound or, to its knowledge, any applicable Laws; and

(e)    This Agreement is valid, binding and enforceable against it in accordance with its terms subject to bankruptcy, moratorium, insolvency and other Laws generally affecting creditors' rights and general principles of equity (whether applied in a proceeding in a court of law or equity).

## ARTICLE XVIII.
### MISCELLANEOUS

18.1    Entire Agreement.  This Agreement constitutes the entire agreement between the Parties pertaining to the subject matter hereof and supersedes all prior (oral or written) negotiations, proposals, agreements and understandings and all oral contemporaneous negotiations, proposals, agreements and understandings and communications between the Parties and their Affiliates with respect to the subject matter hereof.

18.2    Modifications.  No modifications (including waivers) of the terms and provisions of this Agreement shall be or become effective except by the execution by each of the Parties of a supplementary written agreement.

18.3    Waiver.  No waiver by either Party of any one or more defaults by the other Party in performance of any provisions of this Agreement shall operate or be construed as a waiver of any future default or defaults, whether of a like or a different character.

19

18.4    No Third Party Beneficiaries.  This Agreement is for the sole and exclusive benefit of the Parties hereto.  Except as expressly provided herein to the contrary, nothing herein is intended to benefit any other Person not a Party hereto, and no such Person shall have any legal or equitable right, remedy or claim under this Agreement.

18.5    Assignment.  No Party shall voluntarily or involuntarily, directly or indirectly, transfer or otherwise alienate any or all of its rights, title or interest under this Agreement to any other Person without the express prior written consent of all the other Parties, which consent shall not be unreasonably delayed or withheld; provided, however, that any individual Producer may transfer or assign all or a portion of its rights, title and interest under this Agreement, without consent of the other Producers (but with the prior written consent of Company, which consent shall not be unreasonably delayed or withheld), in connection with the sale or transfer of its interest (or a portion thereof) in the Producing Property; provided, further,  that either Party may (without seeking the consent of any other Party) transfer or otherwise alienate any of its rights, title or interest under this Agreement in connection with (i) a transfer to an Affiliate which remains an Affiliate, (ii) the granting of a pledge, mortgage, hypothecation, lien or other security interest and any transfer pursuant to or in settlement of any terms of provisions of any agreement creating any such security interest and (iii) the foreclosure (judicial or non-judicial) or other settlement or rearrangement pursuant to or in connection with any transfer made pursuant to (ii) above.  Unless otherwise agreed to in writing by all of the other Parties, and except for transfers pursuant to (ii) above, both the transferor and the transferee shall be jointly and severally responsible and primarily liable for the full and timely performance of all covenants, agreements and other obligations, and the timely payment and discharge of all liabilities, costs and other expenses arising (directly or indirectly) pursuant to this Agreement.  Intermediary transferees shall not be relieved of any obligations as a result of a subsequent transfer to another Person.  Promptly upon transfer of all or any portion of its rights, title and interest in and to this Agreement, the transferor shall provide all of the other Parties with a copy of such instrument.  Any attempted transfer in violation of the terms of this Agreement of any rights title and interest arising under this Agreement shall be null and void and have no force or effect.

18.6    Confidentiality.  The Parties agree that all information and data exchanged by them pursuant to or in connection with this Agreement shall be maintained in strict and absolute confidence except for disclosure (i) in connection with a possible or prospective sale, disposition or other transfer (directly or indirectly) of a Party's rights and interest in and to this Agreement (insofar as the prospective purchaser or prospective transferee has agreed to maintain the confidentiality thereof), (ii) to lenders, accountants, and other representatives of the disclosing Party with a need to know such information, (iii) in conjunction with a merger, consolidation, share exchange or other form of statutory reorganization involving a Party, or (iv) as required to make disclosure in compliance with any applicable Law or rules of the Security and Exchange Commission.

18.7    Exhibits and Schedules.  All exhibits, schedules and the like contained herein or attached hereto are integrally related to this Agreement and are hereby made a part of this Agreement for all purposes.  To the extent of any ambiguity, inconsistency or conflict between the body of this Agreement and any of the exhibits, schedules and the like attached hereto, the terms of the body of this Agreement shall prevail.

18.8   <u>Choice of Law and Venue</u>   TO THE EXTENT THE LAW OF ANOTHER JURISDICTION IS NOT REQUIRED TO BE APPLIED, THIS AGREEMENT SHALL BE DEEMED TO BE A CONTRACT UNDER, AND SHALL BE CONSTRUED, INTERPRETED AND GOVERNED BY AND ACCORDING TO, THE LAWS OF THE STATE OF TEXAS WITHOUT REGARD TO ANY CHOICE OF CONFLICT OF LAWS RULES OR PRINCIPLES WHICH, IF APPLIED, MIGHT PERMIT OR REQUIRE THE APPLICATION OF THE LAWS OF ANOTHER JURISDICTION. VENUE SHALL LIE EXCLUSIVELY IN ANY STATE OF FEDERAL COURTHOUSE IN HARRIS COUNTY, TEXAS

18.9   <u>Mediation</u>. The Parties agree to use non-binding mediation to resolve any controversy or claim arising out of or relating to this Agreement or breach thereof prior to instigating any legal proceedings. Such mediation will be begin within thirty (30) days of either Party giving written notice to the other Party of its desire to pursue mediation. The mediation will take place in Houston, Texas before a mediator chosen by both parties and last for no more than ten (10) Business Days.

18.10   <u>Further Assurances</u>. Subject to the terms and conditions set forth in this Agreement, each of the Parties agrees to use all reasonable efforts to take, or cause to be taken, all actions, and to do, or to cause to be done, all things necessary, proper or advisable under applicable laws and regulations to consummate and make effective the transactions contemplated by this Agreement. In case, at any time after the execution of this Agreement, any further action is necessary or desirable to carry out its purpose, the proper managers, officers or directors of the Parties shall take or cause to be taken all such necessary actions.

18.11   <u>Survival</u>. The representations, warranties, and indemnities given by the Parties shall survive this Agreement without regard to any action taken pursuant to this Agreement, including, without limitation, the execution of any documents affecting an interest in real property or any investigation made by the Party asserting the breach hereof.

18.12   <u>Severability</u>. Any term or provision of this Agreement that is invalid or unenforceable in any jurisdiction shall be ineffective as to such jurisdiction, to the extent of such invalidity or unenforceability, without rendering invalid or unenforceable the remaining terms and provisions of this Agreement or affecting the validity or enforceability of any terms and provisions of this Agreement in any other jurisdiction. If any provision of this Agreement is so broad as to be unenforceable, each provision shall be interpreted to be only so broad as is enforceable. A bankruptcy or similar trustee must accept or, to the extent permitted by law, reject this Agreement in its entirety.

18.13   <u>Time of the Essence</u>. Time is of the essence with respect to any and all payment obligations arising pursuant to this Agreement.

18.14   <u>Terminology</u>. All personal pronouns used in this Agreement, whether used in the masculine, feminine or neuter gender, shall include all other genders; the singular shall include the plural, and vice versa. Articles, sections and other titles or headings are for convenience only, and neither limit nor amplify the provisions of the Agreement itself, and all references herein to articles, sections or subdivisions thereof shall refer to the corresponding article, section

21

or subdivision thereof of this Agreement unless specific reference is made to such articles, sections or subdivisions of another document or instrument.

18.15   Counterparts. This Agreement may be executed in multiple counterparts, each of which, when executed, shall be deemed an original, and all of which shall constitute but one and the same instrument.

18.16   Compliance With Laws.   This Agreement and the performance of the obligations contemplated herein are and shall be subject to all valid applicable Laws.   The Parties are entitled to act in accordance with each such Law.   The Parties will cooperate with respect to compliance with all governmental authorizations, including obtaining and maintaining all necessary regulatory authorizations or any reasonable exchange or provision of information needed for filing or reporting requirements.

18.17   Material Adverse Change. If any federal or state statute or regulation or order by a court of law or regulatory authority effects a change in a substantive provision of this Agreement which has a significant Material Adverse Impact upon the performance of either Party's obligations under this Agreement, including, without limitation the imposition of terms, conditions, or rate restrictions that materially adversely affect the economic positions of the Parties under this Agreement, then the Parties will enter into good faith negotiations to attempt to revise this Agreement and any other ancillary agreements to the extent necessary so that (a) performance under this Agreement is no longer impacted in a material adverse fashion, and (b) this Agreement and any other ancillary agreements are revised in a manner that preserves, to the maximum extent possible, the respective economic positions of the Parties. Each Party will provide reasonable and prompt notice to the other Party as to any proposed law, regulations or any regulatory proceedings or actions that could affect the rights and obligations of the Parties. If the Parties are unable to revise this Agreement in accordance with the above within ninety (90) Days from written notice of the occurrence, then the Party whose performance is impacted in a material adverse fashion will have the right to suspend or terminate this Agreement upon written notice to the other Party.  Until such time as this Agreement is suspended or terminated, each Party will meet all obligations under this Agreement, unless otherwise prohibited by law.

18.18   Producer's  Agreement to Refrain from Certain Actions.  Each Party agrees that it will not (i) take any action that would result in the jurisdictional status of the Poseidon Pipeline as a private carrier to be changed or determined to be subject to the jurisdiction of any court or governmental authority, or (ii) commence or participate in support of any proceeding before any court or government authority seeking (a) to have the current jurisdictional status of the Poseidon Pipeline as a private carrier changed or determined to be subject to the jurisdiction of any governmental authority, or (b) to challenge the lawfulness or reasonableness of Sections 3.1, 3.2, or 3.3 of this Agreement.

18.19   Several Rights, Obligations and Liabilities. Notwithstanding anything herein to the contrary, all rights, obligations and liabilities of each of the Producers shall be several and not joint. Each of the Producers acknowledge and agree that their liability hereunder shall be in proportion to their gross working interest ownership share of the Dedicated Production, or such greater ownership interest under circumstances in which agreements among other producers in

22

the Dedicated Production afford a particular Producer the right to a greater ownership share of Dedicated Production (i.e. make-up situations).

18.20  Notice; Response.    For the purpose of any response, notice or communication given by Producer to Company (or from Company to Producer) pursuant to this Agreement, Producer may be represented by the Designated Operator for OCS-G 22762 on file with the MMS.

18.21  <u>Agent</u>. Except for any assignment made to any other Person as required under Section 18.5, Producer may from time to time engage various agents to administer certain requirements and obligations of Producer under this Agreement.  In such case, Producer shall provide prior written notice to Company identifying agent and specifying the scope of agent's authority. Company shall thereafter be entitled to rely on communications from agent within the scope of such authority.

(The remainder of this page left intentionally blank)

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be signed by their respective duly authorized representatives effective as of the day and year first written in the Preamble.

"COMPANY"

POSEIDON OIL PIPELINE COMPANY, L.L.C.

By:

Printed Name:

Title:

"PRODUCER"

Mariner

~~MARNIER~~ ENERGY, INC.

By:

Printed Name: Jesus Melendrez

Title: Vice President - Corp Development

NOBLE ENERGY, INC.

BY: NOBLE ENERGY MARKETING, INC.

Its Attorney-in-fact

By:

Printed Name: Robert K Burleson

Title:

WESTPORT RESOURCES CORPORATION

By:

Printed Name: Barth E. Whitham

Title: President

Exhibits

Exhibit A:    Description of Producing Properties

Exhibit B:    Procedures for Scheduling and Balancing Receipts and Deliveries

Exhibit C:    Quality

Exhibit D:    Measurement and Other Appurtenant Facilities

Exhibit E:    Memorandum of Agreement Recordable Agreement

Exhibit F:    Quality Bank Rules for Poseidon Pipeline System

24

THE STATE OF ~~TEXAS~~ *Colorado* §

COUNTY OF ___*Denver*___ §

This instrument was acknowledged before me on ___*Aug 5*___, 2003, by ___*Barth E.*___ *Whittam,* the *President* of Westport Resources Corporation on behalf of said company.

*[signature]*
Notary Public, State of ~~Texas~~ *Colorado*
*My Commission Expires*
*6/5/2005*


THE STATE OF TEXAS §

COUNTY OF *Harris* §

This instrument was acknowledged before me on ___*Aug. 18*___, 2003, by ___*Jesus*___ *Melendrez,* the ___*V.P.*___ of Mariner Energy Inc. on behalf of said company.

> MAUREEN A. CALAWAY
> Notary Public, State of Texas
> My Commission Expires
> October 12, 2005

*[signature]*
Notary Public, State of Texas


THE STATE OF TEXAS §

COUNTY OF *HARRIS* §

This instrument was acknowledged before me on ___*August 14*___, 2003, by ___*Robert*___ *Burleson,* the *President* of Noble Energy, Inc. on behalf of said company.

> TAMMY M. STEVENS
> MY COMMISSION EXPIRES
> February 18, 2004

*[signature]*
Notary Public, State of Texas


E-5

THE STATE OF TEXAS §

COUNTY OF Harris §

This instrument was acknowledged before me on September 4, 2003, by ____  Paul Hermans, the President of Poseidon Oil Pipeline Company, L.L.C., on behalf of said company.

SUSAN L. WILSON
MY COMMISSION EXPIRES
July 19, 2007

_____
Notary Public, State of Texas

6

## EXHIBIT A

Attached hereto and made a part of that certain Oil Purchase and Sale Agreement between
Westport Resources Corporation, Noble Energy, Inc. and Mariner Energy, Inc. ("Producer") and
Poseidon Oil Pipeline Company, L.L.C. ("Company")
dated July 15, 2003.

### DESCRIPTION OF PRODUCING PROPERTIES

The Producing Properties are those lands located offshore Louisiana, Gulf of Mexico,
Outer Continental Shelf, in the areas and blocks described below:

| Area | Blocks | OCS Lease Number | Gross Working Interest | |
|------|--------|------------------|------------------------|---|
| South Timbalier | 316 | 22762 | Mariner | 20% |
| | | | Noble | 40% |
| | | | Westport | 40% |

## EXHIBIT B

Attached hereto and made a part of that certain Oil Purchase and Sale Agreement between
Westport Resources Corporation, Noble Energy, Inc. and Mariner Energy, Inc. ("Producer") and
Poseidon Oil Pipeline Company, L.L.C. ("Company")
dated July 15, 2003.

### PROCEDURES FOR SCHEDULING AND BALANCING
### RECEIPTS AND DELIVERIES

1.      Company and Producer shall adhere to the following procedures for scheduling
and balancing receipts and deliveries of Oil under the Agreement:

a.      Producer shall submit either verbally or in writing to Company no later
than 10:00 am. Houston, Texas Time of the seventeenth (17th) calendar day of each
Month Producer's best estimate of the daily volume of Dedicated Production that
Producer intends to deliver and sell to Company at each Point of Receipt for the
following month (the "Delivery Quantities"). Such estimate shall be stated in Barrels Per
Day.

b.      On or before the 20th of each Month, Company will, subject to 1(f) below
and validation of nominations by Downstream Transporters, notify Producer of all non-
confirmed or otherwise invalid Delivery Quantities for the following month for each
Point of Receipt. Company may, at its option, provide Producer with confirmation in
writing of the confirmed Delivery Quantities.

c.      If Producer desires to modify the Delivery Quantities for a Point of
Receipt for any time after Company accepts and validates the Delivery Quantities,
Producer must notify Company of such modification at least two (2) Days prior to the
beginning of any such modification of Delivery Quantities. Company will notify
Producer as soon as practicable if such modified Delivery Quantities are non-confirmed
or otherwise invalid.

d.      Producer shall make any necessary arrangements to be able to deliver the
Delivery Quantities to Company at the Point of Receipt. Such arrangements shall be
compatible with the Poseidon Pipeline operations and shall provide for coordinated
dispatching with Company.

e.      Producer shall make any necessary arrangements for downstream
transportation of Oil from the Points of Delivery to enable the Downstream Transporters
to make deliveries to connecting pipelines and facilities for the account of Producer at
such Delivery Points. Such arrangements shall be compatible with operations of the
Upstream Carrier, and shall provide for coordinated dispatching with the Upstream
Carrier and other Downstream Transporters. Such arrangements shall include, but shall
not be limited to, Producer's nomination of the Delivery Quantities for transportation
from the Points of Delivery on the Downstream Transporter's system.

f.      Company shall not be obligated to receive at the Point of Receipt (1) a
quantity of Oil different than the Delivery Quantities estimated for that Point of Receipt,

or (2) a quantity of Oil different than the quantity of Oil nominated and confirmed with the Downstream Transporter for transportation on such Downstream Transporter's system from the Point of Delivery. Furthermore, in the event the Downstream Transporter at the Point of Delivery fails or refuses to take delivery of any quantity of Oil from Company for any reason, Company shall not be obligated to receive the corresponding quantity of Oil from Producer at the Point of Receipt.

g.      In the event any Downstream Transporter imposes nomination and scheduling requirements that require such nomination, scheduling and confirmation information to be provided by Producer earlier than provided for hereunder, the provisions of the foregoing paragraphs shall be deemed modified to conform with the requirements imposed by the Downstream Transporter and shall be documented in writing by Company in a notice to Producer.

h.      It is the intent of Producer and Company that Oil be purchased and resold hereunder at the same rate to the fullest extent practicable throughout the Day, and Producer shall not in any manner utilize any of Company's system for storage or peaking purposes. It is not the intent of this provision to restrict the prudent operation of the Producing Properties.

i.      It is recognized that for a given Month, an Oil imbalance between the Points of Receipt and the Points of Delivery may exist. Company shall calculate and track all imbalances and include same in its Monthly statement. The Parties agree to make a good faith effort to correct any actual Monthly imbalances by subsequent nominations and deliveries of Oil during the remainder of the Month or the next available full business Month, including the adjustments of receipts, deliveries and nominations.

j      Any fees, penalties or other charges assessed to either Producer or Company by the Downstream Transporter shall be the responsibility of Producer unless caused by Company, and Producer agrees to RELEASE, DEFEND, INDEMNIFY AND HOLD COMPANY HARMLESS from such charges, fees or penalties. Any fees, penalties or other charges assessed to either Producer or Company by any transporter between the Points of Receipt and the Points of Delivery shall be the responsibility of Company unless caused by Producer, and Company agrees to RELEASE, DEFEND, INDEMNIFY AND HOLD PRODUCER HARMLESS from such charges, fees, or penalties.

k.      To the extent that any event, circumstance or condition which shall occur or exist which limits or restricts Company's ability to accept all quantities of Oil which Company is obligated to accept hereunder, including, without limitation, mechanical problems, regulatory intervention and problems with access to Downstream Transporters or other facilities which affect deliveries from Company, Company shall apportion the quantities of Oil it is tendered among all relevant Persons based on the provisions of Section 5.2. At Company's sole discretion such apportionments may be made by lateral, segment, system or on any other basis as required to affect deliveries from Company.

l.      No Delivery Quantities shall be considered beyond the amount which the Producer has readily accessible for delivery and sale to Company. If Producer is unable to

B-2

deliver and sell Oil equal to its Delivery Quantities, its Delivery Quantities for the succeeding Month may be reduced by the amount of Delivery Quantities not utilized during the preceding Month if apportionment is necessary.

m.      When Delivery Quantities tendered by Producer to Company on or before the twenty-third (23rd) Day of the Month preceding the operating Month do not exceed the capacity of the Downstream Transporters or any segment thereof, additional tenders shall be accepted by Company to fill capacity. These additional tenders will be accepted only if they do not impair the movement of Oil nominated before the twenty-third (23rd) Day of the preceding Month.

2.      Producer acknowledges and agrees that Company may commingle the Oil purchased hereunder and resell to Producer molecules of Oil different from. those which Company received and purchased from Producer.

## EXHIBIT C

Attached hereto and made a part of that certain Oil Purchase and Sale Agreement between
Westport Resources Corporation, Noble Energy, Inc. and Mariner Energy, Inc. ("Producer") and
Poseidon Oil Pipeline Company, L.L.C. ("Company")
dated July 15, 2003.

### QUALITY

1.     Oil delivered and sold by Producer to Company under the terms of this Agreement shall conform to the specifications and operating conditions required by Downstream Transporter(s) ultimately receiving the Oil and shall meet the following specifications except if the specifications of the Downstream Transporter(s) should be more stringent:

(a)     Assay. A laboratory analysis of crude petroleum shall be submitted to Company by Producer and shall include API gravity, Reid vapor pressure, pour point, sediment and water content, sulfur content, viscosity at 60 and 100 degrees Fahrenheit, and other characteristics as may be required by Company.

(b)     Viscosity. Gravity, and Pour Point. The Oil, must be good and merchantable Oil of such viscosity, gravity, pour point or other characteristics such that it will be readily susceptible for transportation through the Poseidon Pipeline, and subject to the Market Based Quality Bank, will not materially affect or damage the quality of other shipments or cause disadvantage to other shippers and/or Company. No crude petroleum will be accepted for transportation which has a pour point greater than 40 degrees Fahrenheit or viscosity greater than 2000 Saybolt Universal Seconds at 60 degrees Fahrenheit unless under terms and conditions acceptable to Company.

(c)     Basic Sediment. Water and Other Impurities. The Oil shall not have a content consisting of more than one percent (1%) of basic sediment, water ("BS&W") or other impurities. Company reserves the right to reject crude petroleum containing more than one percent (1%) of basic sediment, water, and other impurities, except that:

(1).     If required by operating conditions, Company may reject crude petroleum containing less than one percent (1%) of basic sediment, water and other impurities.

(2).     Sediment and water limitations of a connecting carrier may be imposed upon Company when such limits are less than that of Company, in which case the limitations of the connecting carrier will be applied.

(d)     Vapor Pressure. The Oil shall not have a Reid Vapor Pressure ("RVP") of more than 8.6 pounds per square inch, During the winter months (October through November) Oil with a maximum RVP of 9.6 will be accepted. Oil with a maximum RVP above 9.6 may be accepted at the discretion of Poseidon.

(e)     Refined. The Oil shall not have been partially refined or altered in any way so as to impact its value.

(f)     Contamination. The Oil shall not have been contaminated by the presence of any chemicals; provided, however, that this Section 1 (f) shall not prohibit Producer's use of corrosion/paraffin inhibitors or demulsifiers in its platform operation that have been approved by Company.

(g)     Company shall not unreasonably withhold from Producer approval to use corrosion/paraffin inhibitors or demulsifiers.

(h)     Deduction. All receipts of crude petroleum and indirect liquid products having an API gravity of 45 degrees or above shall also be subject to a deduction to cover the shrinkage and incremental evaporation resulting from the mixture thereof, in Company's facilities, with crude petroleum having an API gravity of 44.9 degrees or less, Such deduction shall be determined in accordance with the following table:

| API Gravity, Degrees | Deduction for Incremental Evaporation & Shrinkage |
|---|---|
| 45 through 49.9 | 0.4% |
| 50 through 54.9 | 0.5% |
| 55 through 64.9 | 1.0% |
| 65 through 74.9 | 1.5% |
| 75 and above | 2.0% |

2.     If any Oil delivered and sold by Producer to Company hereunder shall fail at any time to conform to the applicable specifications above, then Company shall immediately have the right to discontinue purchases hereunder and shall notify Producer of the specifications violation or, in its sole discretion, to purchase such non-conforming Oil so long as it shall determine to do so without prejudice to its right to discontinue such purchase. In any event, Producer shall undertake all necessary measures to eliminate the cause of such non-conformance. Producer will be held responsible for any disposal required and/or expenses incurred in Company's handling of such non-conforming Oil.

3.     Company reserves the right to periodically sample and test, at Company's sole cost and expense, the quality of the Oil delivered and sold by Producer at the Point of Receipt or if applicable at the Point of Measurement.

## EXHIBIT D

Attached hereto and made a part of that certain Oil Purchase and Sale Agreement between Westport Resources Corporation, Noble Energy, Inc. and Mariner Energy, Inc. ("Producer") and Poseidon Oil Pipeline Company, L.L.C. ("Company") dated July 15, 2003.

### MEASUREMENT AND OTHER APPURTENANT FACILITIES

1.　　Producer at Company's sole expense will purchase the measurement equipment for installation on Producers platform. Producer will install, own, operate and maintain the measurement equipment. Producer shall provide the Company with the right of access to the Producer's Platform for the purpose of inspecting and monitoring the meters and inspecting, operating if required and monitoring other Company or Producer owned equipment used to make the deliveries.

2.　　If an internal corrosion inhibitor program is required and agreed to by Company, each connected platform shall be required to install, maintain and operate equipment to inject this inhibitor at the proper rates. Producer shall have the right to review all results of any corrosion monitoring device. If Producer desires to protect its line with a corrosion inhibitor, Company shall have the right to approve the specific inhibitor to be used prior to its initial injection into the system.

3.　　Producer shall furnish or caused to be furnished proper injection pressure or pumping equipment for delivery of crude petroleum into the Poseidon Pipeline. The delivery shall be controlled so that the pumping rate shall not exceed 120 percent of the average rate required to inject the scheduled quantity of crude petroleum during a particular period. If piston pumps are used, surge dampeners shall be installed to reduce meter pulsation to a minimum.

4.　　Producer shall install pressure limiting devices, set slightly above normal operating pressure that will immediately shut down pumping equipment and shut off injection pressure in the event of a blockage of the system. In no event shall this device be set at a value which would allow the injection pressure into the Poseidon Pipeline to exceed 1800 psi.

5.　　Unless required to do so by proper regulatory jurisdiction, no crude petroleum containing BS&W in excess of one percent (1%), free gas or RVP in excess of nine and six tenths (9.6) psi, sand or other extraneous matter shall be accepted into the Poseidon Pipeline. Accounting for crude petroleum handled shall be on the basis of net 60 degrees Fahrenheit barrels. Deductions for BS&W will be based on composite samples taken on receipt and delivery.

6.　　Measurement Requirements:

A.　　General. Each platform connected to the system shall have installed thereon, in accordance with applicable API Codes, ASTM and OCS Order No. 13 Standards:

D-1

(a)   positive displacement metering and meter proving equipment capable of continuous custody transfer measurements,

(b)   devices for continuous proportional-to-flow sampling of the crude petroleum,

(c)   devices or methods to prevent air or gas from entering into the meters and/or meter proving equipment, and

(d)   devices to protect meters from excess pressure pulsation or surges. Company reserves the right to require uniform measurement and sampling equipment and procedures at all installations so that custody transfer measurements are made on a uniform basis, and to require that such equipment be kept in satisfactory operating condition.

B.   <u>Meter Prover</u>.

(a)   Pipe provers will be recalibrated every five years. Spheres will be inspected whenever proving runs indicate problems.

(b)   Master meters will be calibrated monthly on appropriate flow rate and viscosity of the metered product.

(c)   Provers must be piped so that meters can be proved at their delivery rates.

(d)   Read thermometers to nearest 0.1 of 1 degree Fahrenheit.

(e)   All temperature wells (for provers and meters) must be installed, vertically.

(f)   Connector will provide equipment, including pulse counter, in order to calibrate meters mutually.

C.   <u>Meters</u>.

(a)   Maintain minimum meter case pressure of 20 psig above the RVP of the liquid.

(b)   Where devices control the throttle on engines and cause varying flow rates, meters will be proved at an average flow rate.

(c)   Meters must be operated a minimum of ten (10) minutes and with all conditions stabilize before calibration is started.

(d)     Meter stack will be inspected and all gears lubricated, including counterheads, at least annually and at any time inaccuracy is suspected.

(e)     Meters will not be adjusted to control factors at time of proving. Adjustments will be made after repairs. The change in meter factor will determine when and what corrective actions need to be made.

(f)     Any meter failure should be reported to Company's Houma Station Operator immediately so that Company's representative may be sent out to close out tickets and calibrate the repaired meter(s).

(g)     Meters will operate at flow rates within the manufacturer's recommendations; however, the range of flow rates shall not exceed the linear range of the meter's accuracy curve.

(h)     Meters shall have 100% gearing between the rotating mechanism and non-resetcounter.

(i)     Temperature should be determined by electronic temperature averaging devices, in lieu of temperature compensators. Meters so equipped should have 100% gearing to yield meter factors near unity. All temperature wells (for provers and meters) will be installed vertically. Meter temperature sensing devices should be located not more than 3 feet from the meters. Remote counters are not acceptable for custody transfer. A separate temperature well should be provided next to each electronic temperature sensing device for insertion of a test thermometer for routine testing.

(j)     Tickets shall be manually written from non-reset counters mounted directly on meters. Remote counters are not acceptable for custody transfer.

(k)     Piping should be arranged so that it is impossible to circulate metered oil back through the meters by way of relief valves, drains, etc.

(l)     Metering equipment (including provers) must have block and bleed valves at all points where valve leakage could affect measurements.

(m)     Meters are to be protected from pressure pulsations and surges by providing adequate stabilizers or dampeners.

(n)     Meters should be manifolded to the prover so that each meter can be isolated and calibrated separately.

(o)     Producer will provide Company with schematic drawings of the measurement facilities and a listing of ACT components of any proposed platform for approval.

D-3

(p)     When a deaerator is required, it shall be located upstream of the meters and shall, in no case, be of smaller rated maximum capacity than that of the pump or feed lines and shall provide complete air elimination.

(q)     Producer will provide equipment, including pulse counter, in order to calibrate meters manually.

D.     <u>Sampling</u>.

(a)     The sample probe shall be installed in a vertical run of pipe. Pipe shall be sized to meet minimum velocities in accordance with API Chapter 8, Section 2, 1st Edition, April, 1983. Mixers may be used in meeting these requirements.

(b)     Probe should be at least 1/4" cut on a 45 degree angle and extend into the center of the pipe with the probe opening facing upstream.

(c)     Probes must be marked to show that they face the direction of flow.

(d)     A sampler shall be set to deliver a minimum of 1 cc. per grab and be capable of delivering 80% of the sample container capacity during any sample period.

(e)     Sample containers shall be calibrated in gallons and the 85% level shall be marked.

(f)     Piping must not have water traps.

(g)     A sample container shall be equipped with a jet mixer and a permanently installed mixing pump capable of pumping 20 gallons per minute at a pressure of 20 PSIG. A gear pump or other type of positive displacement pump shall be used for this purpose. The sample shall be circulated for a minimum of five minutes before extraction.

(h)     The test sample for BS&W content shall be drawn directly into the centrifuge tube from the circulating stream.

(i)     Sample mixing pressure will be recorded each time meters are calibrated. The pressure in the mixing system will be used in evaluating its performance.

(j)     The bottom valve on the site glass must be packed regularly to prevent leakage.

(k)     Company will be responsible for witnessing samples and preparing tickets.

(l)    Company will be notified immediately when the sampler fails or malfunctions. If Company's representative cannot reach the platform due to circumstances beyond his control, the Producer will close off the sampler, after obtaining Company's approval, and start recording hand samples on a regular basis. The contents of the sample container and the average hand samples will be evaluated to determine the correct BS&W content. A ticket will be issued according to the most accurate information available.

(m)    Sample increment size and sample interval shall be such that the sample is proportional to flow, and the total quantity collected for the run or batch does not exceed the capacity of the container.

(n)    A complete sampling unit (including container) shall be provided for each meter. Each meter and sampler shall receive power from a separate breaker.

(o)    Centrifuge tests for BS&W shall be performed with a heated centrifuge. Tests for BS&W will be conducted in accordance with API requirements.

7.    In the event a meter is out of service or registering inaccurately, the quantities of Oil purchased or sold during such period shall be determined as follows:

(a)    By using the registration of any check meter or meters, if installed and accurately registering; or

(b)    in the absence of subsection (a). by correcting the error if the percentage of error is ascertainable by calibration, tests or mathematical calculation; or

(c)    in the absence of both subsections (a). and (b). then by estimating the quantity received or delivered by receipts or deliveries during periods under similar conditions when the meter was registering accurately.

8.    Mismeasurement. If there is an indication of a mismeasurement, an immediate test of the equipment must be made in the presence of both parties.

If it is determined that mismeasurement has occurred, the settlement for the volume in question shall be negotiated using the best information available. Causes of mismeasurement can include failure of the meter, sampler or temperature averager.

If the meter factor deviates from the previous proving by more than 0.0025, then an operational check must be performed to determine the cause for the factor shift.

If the cause of the deviation cannot be determined and corrected, the meter must be repaired or replaced immediately.

9.    Each Party shall preserve or cause to be preserved for mutual use all test data,

charts or other similar records in accordance with the applicable rules and regulations of regulatory bodies having jurisdiction, if any, with respect to the retention of such records, and, in any event, for at least two (2) years.

**EXHIBIT E**

Attached hereto and made a part of that certain Oil Purchase and Sale Agreement between
Westport Resources Corporation, Noble Energy, Inc. and Mariner Energy, Inc. ("Producer") and
Poseidon Oil Pipeline Company, L.L.C. ("Company")
dated July 15, 2003.

### MEMORANDUM OF AGREEMENT
### RECORDABLE AGREEMENT

I.    Purpose. This Memorandum of Agreement dated as of July 15, 2003 (this
"Agreement") is executed to (i) bind the parties hereto to the agreements and covenants
contained herein and (ii) effect notice to third parties of the agreements and covenants
contained herein and in that certain Oil Purchase and Sale Agreement entered into as of
even date herewith (the "Oil Agreement"), by among Poseidon Oil Pipeline
Company, L.L.C ('Company"), on the one hand, and Westport Resources Corporation,
Mariner Energy Inc. and Noble Energy Inc. ("Producer"), on the other hand,

II.    Description of the Property. This Agreement and the Oil Agreement affect all of
Producer's right, title and interest (whether now owned or hereafter acquired) in and to
any liquid hydrocarbons ("Oil"), including gas liquids, underlying the lands located
offshore Louisiana, Gulf of Mexico, Outer Continental Shelf, in the areas and blocks
listed below (collectively, the "Producing Properties"):

| Areas | Blocks | OCS Lease Number |
|---|---|---|
| South Timbalier | 316 | 22762 |

III.    Consideration. Producer and Company executed and entered into this Agreement
and the Oil Agreement for and in consideration of, among other things, the execution of,
and the premises and mutual covenants contained in, this Agreement and the Oil
Agreement, including, without limitation, the agreements described in Articles IV-VII
below, and other good and valuable consideration (the receipt and sufficiency of which
is hereby confirmed and acknowledged).

IV.    Tender and Commitment of Reserves. Producer irrevocably and permanently
tendered and committed (subject to the terms and conditions of the Oil Agreement), and
Producer hereby irrevocably and permanently tenders and commits, to Company for
delivery to, and purchase by, Company all Oil owned or controlled by Producer and
underlying or produced from the Producing Properties. In addition, Producer agreed,
and agrees, that any attempted assignment or transfer of any interest in such Producing
Properties shall be null and void unless such transfer includes an express provision
stating that such assignment or transfer is made subject to the terms of the Oil
Agreement and the transferee agrees to be bound by the terms and conditions of this
Agreement and the Oil Agreement.

V.    Agreement to be Bound. Company and Producer have executed and entered into

E-1

this Agreement and the Oil Agreement for the consideration herein described and hereby agree that the terms and conditions of this Agreement contain all necessary terms and conditions for the agreements described herein to be binding upon the parties hereto, and Company and Producer agree to be bound by the terms and conditions of this Agreement.  Company and Producer acknowledge and agree that (i) this Agreement has been executed in addition to the Oil Agreement and not as a replacement, supplement or other amendment to any of the terms and conditions in the Oil Agreement and (ii) the Oil Agreement contains terms and conditions similar to those described herein and covering the subject matter hereof as well as other terms and conditions.  The terms and conditions of this Agreement and the Oil Agreement shall be construed together; provided, however, that the terms and conditions contained in the Oil Agreement shall govern and control any conflicts, ambiguities or inconsistencies between the terms and conditions of this Agreement and the Oil Agreement.

VI.    Names and Addresses of Parties:

If to Company to:

> Poseidon Oil Pipeline Company, L.L.C.
> Attn:  President
> 4 Greenway Plaza
> Suite 577
> Houston, Texas 77046
> Telephone:    (832) 676 465S
> Telecopy:     (832) 676 1385

If to Producer to:

> Attn:  Marketing
> Westport Resources Corporation
> 1670 Broadway Suite 2800
> Denver, CO 80202
> Telephone:    303 573 5404
> Telecopy      303 573 5609

With copies to:

Mariner Energy, Inc.
Attn:  Michael R. (Rod) Banks
2101 Citywest Blvd., Suite 1900
Houston, TX  77042-3020
Telephone: (713) 954-5509
Telecopy: (713) 954-5577
Nominations and Invoicing:  (713) 954-5582

and

E-2

Noble Energy, Inc.
c/o Noble Energy Marketing, Inc.
Attn:   Marketing
350 Glenborough Drive, Suite 180
Houston, Texas 77067
Telephone:  281-876-8800
Telecopy:  281-876-8845


VII.   Miscellaneous. This Agreement (i) may be executed in multiple counterparts, each of which, when executed, shall be deemed an original, and all of which shall constitute but one and the same instrument, (ii) may be enforced by specific performance and (iii) SHALL BE GOVERNED BY TEXAS LAW TO THE EXTENT THE LAW OF ANOTHER JURISDICTION IS NOT REQUIRED TO BE APPLIED. Any attempted assignment or transfer of any or all of the rights or obligations under this Agreement is invalid and void unless (a) the nontransferring parties consent to such transfer (which consent may not be delayed or withheld unreasonably) and (1,) the transferee agrees to be bound by the terms and conditions of this Agreement and the Oil Agreement and jointly and severally assumes the obligations herein and therein.

IN WITNESS WHEREOF, the Parties have hereunto executed this Agreement as of the date first written in the Preamble.

"COMPANY"

POSEIDON OIL PIPELINE COMPANY, L.L.C.

Witnesses:
By:_____
Printed Name:_____

By:_____
Printed Name:_____

By:_____
Printed Name:_____
Title:_____

"PRODUCER"

WESTPORT RESOURCES CORPORATION

Witnesses:
By:_____
Printed Name:_____

By:_____
Printed Name:_____

By:_____
Printed Name:_____
Title:_____

MARINER ENERGY INC

Witnesses:
By:_____
Printed Name:_____

By:_____
Printed Name:_____
Title:_____

By:_____
Printed Name:_____

NOBLE ENERGY INC.

Witnesses:
By:_____
Printed Name:_____

By:_____
Printed Name:_____
Title:_____

By:_____
Printed Name:_____

E-4

THE STATE OF TEXAS                     §

COUNTY OF _____ §

    This instrument was acknowledged before me on _____, 2003, by _____
_____, the _____ of Poseidon Oil Pipeline Company, L.L.C., on behalf of said company.


                                                _____
                                         Notary Public, State of Texas

E-6

EXHIBIT F

Attached hereto and made a part of that certain Oil Purchase and Sale Agreement between
Westport Resources Corporation, Noble Energy, Inc. and Mariner Energy, Inc. ("Producer") and
Poseidon Oil Pipeline Company, L.L.C. ("Company")
dated July 15, 2003.

## QUALITY BANK RULES FOR POSEIDON PIPELINE SYSTEM

### SECTION I.
### MARKET BASED QUALITY BANK

**GENERAL**

1.      The purpose of this Market Based Quality Bank is to mitigate, to the fullest extent possible, damage and or improvement to producers whose Oil is purchased by Company and commingled in the Poseidon Pipeline system. Differences in sulfur and gravity of all the producers' Oil that are mixed within the common crude stream in the Poseidon Pipeline system ("PPLS") either increase or decrease the quality of the common stream. This quality bank charges the producers or pays the producers depending on the quality of the common stream and the producers crude. Each producer will be required, as a condition of tendering, to participate in this Market Based Quality Bank ("Quality Bank").

2.      Adjustment factors for gravity and sulfur will be based upon a market price spread between Louisiana Light Sweet (LLS) and Poseidon common stream crude ("Poseidon") and the gravity and sulfur differences between LLS and Poseidon as calculated in Section III 1.c and 1.e below. The market price will be Platts Oilgram Price Report ("Platts") spot price quote, low posted average trade month (the 26th of the month two months prior to delivery through the 25th of the month one month prior to delivery, workdays only)("Trade Month"), at St. James, Louisiana or if posted by Platts at Houma, Louisiana the Platts quote for Poseidon plus five cents ($0.05)("Platts Quote")

3.      If, the LLS to Poseidon price and quality differences do not adequately reflect the actual market price to quality relationships of sweet to sour crudes or other changes become necessary to uphold the purpose of this Quality Bank, the Company may propose and approve for vote an alternate method to better reflect the value contribution of each producer's Oil and to uphold the intent of the Quality Bank. The alternate method must be approved by greater than a sixty-five percent (65%) vote of the producers participating in this Quality Bank in order to effect the change. Each five hundred (500) Barrels of Monthly average production (based on the Monthly average of the six Month period preceding the Month the vote is taken) will have one vote.

Any group of producers with sixty-five percent (65%) of the volume on PPLS may make a proposal to Company providing for an alternate method and an explanation of why such alternate method provides a more accurate, actual market price to quality relationship than the then existing Quality Bank. Company will retain the right to reject such proposal if Company believes, in it's sole discretion after using good faith, reasonable efforts to analyze such proposal,

(Equation No. 1)       GAF = ((a ÷ b) multiplied by (d ÷ c)) multiplied by g
and

(Equation No. 2)       SAP = ((a ÷ b) multiplied by (f ÷ e)) multiplied by h

where,

  a  =  "Differential between LLS and Poseidon Plans Quote for the Trade

Month.

  b  =  "Base Price Differential between LLS and EI $0.99 / bbl."

  c  =  "Delivery month Gravity difference between LLS and Poseidon based on the gravity of US crude at the point of sale where "a" is determined, currently Capline's LLS receipt stream at St. James, Louisiana as calculated by GravCap, minus the weighted average gravity of Poseidon at the point of sale where "a" is determined, currently as calculated by SPC at the delivery point to SPC at Houma, LA."

  d  =  "Base Gravity Differential between LLS and El 4.7° API."

  e  =  Delivery month Sulfur difference between LLS and Poseidon based on the weighted average of sulfur of LLS crude at the point of sale where "a" is determined, currently Capline's LLS receipt stream at St. James, Louisiana as calculated by GravCap, minus the weighted average sulfur of Poseidon at the point of sale where "a" is determined, currently as calculated by SPC at the delivery point to SPC at Houma, LA."

  f  =  Base Sulfur Differential between LLS and El = 1.28% sulfur by weight.

  g  =  Base Gravity Adjustment Factor between LLS and El = $0 .074/ 1° API.

  h  =  Base Sulfur Adjustment Factor between LLS and EI $0.50/ 1% by weight sulfur.

### SECTION IV
### CALCULATION OF QUALITY BANK CREDIT/DEBIT

Quality Bank credit/debit adjustments between producers shall be computed as follows:

1.  The applicable receipt barrels and gravities shall be the delivery month actual net barrels at sixty (60) degrees Fahrenheit (with no deductions for loss allowance) and the gravities

F-3

recorded by the PPLS Operator at points where it customarily records gravities and quantities.

2.      No compensation will be given for gravity exceeding 35.0° API.

3.      **GRAVITY CREDIT/DEBIT**

To compute the gravity credit/debit to be paid/received the following equation is used.

Gravity credit/debit = ((PG — WAG) multiplied by GAF) multiplied by T

Where,
"PG"          =          the producers gravity based on the custody transfer tickets.

"WAG"      =          The weighted average receipt gravity of the common steam for ~ given delivery Month for Quality Bank calculation purposes shall be obtained in the following manner: By taking the sum of the products obtained by multiplying the gravity of each Producers point of receipt volume based on the custody transfer tickets, (except those receipts where gravity exceeds 35. 0° API in which case 35.0° API will be used) by the number of net Barrels in each producer's point of receipt and divide the total resultant by the total net Barrels received during the given delivery Month.

"T"   =      the total current month volume produced by producer based on the custody transfer tickets.

4.      **SULFUR CREDIT/DEBIT**

To compute the sulfur credit/debit to be paid/received the following equation is used.

Sulfur credit/debit ((WAS - PS) multiplied by SAF) multiplied by T

Where,
"PS"          =          the producers Sulfur based on the custody transfer tickets.

"WAS"      =          The weighted average receipt sulfur of the common stream for a given delivery Month shall be obtained in the following manner: By taking the sum of the products obtained by multiplying the sulfur percentage (by weight) of each producers point of receipt volume based on the custody transfer tickets, by the number of net Barrels in each producer's point of receipt and divide the total resultant by the total net Barrels received during the given delivery Month. Since there will be no minimum or maximum sulfur percentage limitations, this weighted average sulfur percentage calculation will be used for Quality Bank adjustment purposes.

T             =          the total current month volume produced by producer based on the custody transfer

F-4

5.     To obtain the total Quality Bank Credit/Debit add the Gravity and Sulfur credit/debit. Sample calculations are attached hereto as Table 1.

6.     These calculations shall be made for each delivery Month and the algebraic sum of all the producers credit/debit for the PPLFS shall be zero *(+/-* one Dollar). If a producer shall have a net debit balance in combining the two adjustments made above, the balance due shall be remitted to the Administrator (as determined hereinbelow) within fifteen (15) Days from receipt of statements of such debit. If a producer shall have a credit, the Administrator shall remit the amount thereof within 5 Days of receipt of all the payments due from those producers owing a debit.

## SECTION V
## ADMINISTRATIVE

1.     Company shall include requirements for participation in the Quality Bank and procedures for calculating adjustments between producers based on the API gravity and sulfur content of the volumes received into the System in all transportation contracts to be entered into with producers covering the transportation of Oil on the PPLS.

2.     GulfTerra Energy Partners LP ("GulfTerra"), or its agent, shall be the Quality Bank Administrator (Administrator), and shall perform the clearinghouse business of calculating and effecting adjustments among producers of Oil connected to the PPLS for differences in the API gravity and percent sulfur content of Oil received from producers, such adjustments being effected by a process of debits and credits and interchange of funds, among the producers.

3.     Administrator will perform necessary calculations and prepare appropriate statements for each Producer as soon as the gravity, sulfur and price data is available.

4.     The Administrator shall receive $0.002 per barrel to cover normal costs incurred in the operation of the clearinghouse.

5.     The Administrator will be responsible, at its sole cost and expense, for determining and/or securing data on all gravities, sulfur contents, net Barrels of the Oil received into the PPLS and Platts Quote prices, The gravities shall be determined from the custody transfer receipt tickets written by the PPLS Operator or connecting carriers/block operators. The sulfur content shall be determined based on samples secured by the PPLS Operator from the composite sampler at the time the custody transfer receipt tickets are written, The gravity shall be determined by ASTM 287 (Standard Test Method for API gravity of Crude Petroleum and Petroleum Products) and the sulfur content pursuant to ASTM D-2622 (ASTM D-4294 is acceptable if ASTM D-2622 is not available) (Standard Test Method for Sulfur in Petroleum Products).

6.     If any producer shall fail to perform any Quality Bank payment obligation as established herein, the Administrator will invoice the Company, who will in turn promptly make payment to the Administrator within five (5) Days of receipt of such invoice for further distribution of funds to producers due credits. Company shall have the right to withhold payment

F-5

of or offset against, any moneys due Producer pursuant to the Oil Purchase and Sale Agreement between the Producer and Company to fulfill any and all of Producer's Quality Bank payment obligations.

7.     In the event GulfTerra is removed as Operator of the PPLS, GulfTerra shall terminate performing the clearinghouse function under this Agreement. GulfTerra shall also be discharged from performing clearinghouse functions if it tenders its resignation, becomes insolvent, or ceases to own an interest in the PPLS. GulfTerra shall not be released from the duties and obligations of clearinghouse for a period of six (6) Months after its discharge unless a successor shall have assumed the operation of clearinghouse prior to expiration of said six (6) Month period and consents in writing to earlier release.

8.     Company agrees that all transfers of interest in the PPLS shall be made subject to this Agreement and shall require the transferee to assume as to such interest all of the obligations of Company under this Agreement which accrue on or after the effective date of the transfer.

9.     The provisions hereof shall extend to, be binding on and inure to the benefits of the Parties hereto, their respective successors and assigns.

10.     Inasmuch as the Administrator has agreed with Company and producers to operate the Quality Bank on a cost basis without profit, except to the extent resulting from the gross negligence or willful misconduct of Administrator, Company and Producer hereby fully release and agree to indemnify the Administrator from all claims, actions and demands for loss by, or damage to, Company or Producer arising out of, in connection with, or as an incident to any act or omission, including any negligence, of the Administrator or its employees, agents or contractors, in the administration of the Quality Bank. Neither Company nor Producer shall be liable to Company or other producers, or to any third person, in respect to obligations or liabilities incurred by Company or other producers in connection with their separate business unrelated to said PPLS, and obligations to Company or Producer under this Agreement are several and not joint or in solido to Company or other producers.

11.     Company and Producer agree to execute such amendments to this Agreement as are required to comply with any final order of any Federal, State or Local government entity having jurisdiction where compliance with such order is required for the continued validity of this Agreement or where an amendment of this Agreement is required to implement such order.

12.     Any individual producer or Company, or his representative shall at any time during normal business hours and upon reasonable notice have access to the books, accounts and records of the Administrator for the purpose of verifying that the Administrator is operating the process of adjustments and determining values in accordance With the provisions of this Quality Bank. Cost of such individual audits shall be borne by Company or producer(s) requesting such audit.