# HCCI Exhibit 22

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE SOUTHERN DISTRICT OF TEXAS

HOUSTON DIVISION

§

In re:                          § Chapter 11

                                §

FIELDWOOD ENERGY LLC, et al., § Case No. 20-33948 (MI)

                                §

Debtors.                     § (Jointly Administered)

                                §

30(b)(6) ORAL DEPOSITION OF

DEBTOR FIELDWOOD ENERGY, LLC

MR. MICHAEL T. DANE

May 13, 2021

30(b)(6) ORAL DEPOSITION OF DEBTOR FIELDWOOD ENERGY, LLC, MR. MICHAEL T. DANE, produced as a witness at the instance of the Sureties and Parties-in-interest, and duly sworn, was taken in the above-styled and numbered cause on the 13th day of May, 2021, from 9:37 a.m. to 6:43 p.m., before Michelle Hartman, Certified Shorthand Reporter in and for the State of Texas and Registered Professional Reporter, reported by computerized stenotype machine via Zoom videoconference, pursuant to the Federal Rules of Civil Procedure and the provisions stated on the record or attached hereto.



```
                                                      Page 2
 1                   APPEARANCES
 2   FOR THE DEBTOR FIELDWOOD AND THE WITNESS MICHAEL DANE:
 3        Mr. Alfredo R. Pérez
          WEIL, GOTSHAL & MANGES LLP
 4        700 Louisiana
          Suite 1700
 5        Houston, Texas 77002
          Telephone: 713-546-5040
 6        E-mail: alfredo.perez@weil.com
     and
 7        Ms. Erin Choi
          Mr. Paul Genender
 8        Mr. Kevin Simmons
     and  Ms. Jessica Liou (New York Office)
 9        WEIL, GOTSHAL & MANGES LLP
          200 Crescent Court, Suite 300
10        Dallas, TX 75201
          Telephone:  214 746 8184
11        E-mail:  erin.choi@weil.com
12   FOR THE SURITIES EVEREST, ASPEN, BERKLEY, AND SIRIUS:
13        Mr. Darren Grzyb
          CHIESA, SHAHINIAN & GIANTOMASI PC
14        One Boland Drive
          West Orange, New Jersey 07052
15        Telephone: 973-530-2077
          E-mail: dgrzyb@csglaw.com
16
     FOR THE INTERESTED PARTY HCCI:
17
          Mr. Brad C. Knapp
18   and  Mr. Philip Eisenberg
          LOCKE LORD
19        601 Poydras Street
          Suite 2660
20        New Orleans, Louisiana 70130
          Telephone: 504-558-5210
21        E-mail: bknapp@lockelord.com
22   FOR THE INTERESTED PARTY APACHE CORPORATION:
23        Ms. Robin Russell
          HUNTON ANDREWS KURTH
24        600 Travis Street
          Houston, Texas 77002
25        Telephone: 713-220-4086
          E-mail: rrussell@huntonak.com
          E-mail: rrussell@huntonak.com
```



Page 3

```
 1                 APPEARANCES (Continued)
 2    FOR THE SURETY GROUPS:
 3         Ms. Lily W. Cheung
           NETHERLAND, SEWELL & ASSOCIATES, INC.
 4         Fulbright Tower, Suite 3200
           1301 McKinney Street
 5         Houston, Texas 77010
           Telephone: 713-654-4950
 6         E-mail: lcheung@nsai-petro.com
 7    FOR THE INSURERS LIBERTY MUTUAL INSURANCE COMPANY,
      TRAVELERS CASUALTY & SURETY COMPANY OF AMERICA, THE
 8    HANOVER INSURANCE COMPANY, AND XL SPECIALTY INSURANCE
      COMPANY:
 9
           Mr. Brandon Bains
10         LANGLEY ATTORNEYS & COUNSELORS
           PO Box 94075
11         Southlake, Texas 76092
           Telephone: 214-722-7171
12         E-mail: bbains@l-llp.com
13    FOR THE INSURER PHILADELPHIA INDEMNITY INSURANCE
      COMPANY:
14
           Mr. Robert W. Miller
15         MANIER & HEROD
           1201 Demonbreun Street,
16         Suite 900
           Nashville, Tennessee 37203
17         Telephone:  615-742-9320
           E-mail: rmiller@manierherod.com
18
      FOR THE INTERESTED PARTY CHEVRON USA, INC. & NOBLE
19    ENERGY, INC.:
20         Ms. Lisa M. Norman
           ANDREWS MYERS
21         1885 Saint James Palace
           Suite 1500
22         Houston, Texas 77056
           Telephone: 713-850-4245
23         E-mail: lnorman@andrewsmyers.com
24
25
```



```
                                                        Page 4
 1               APPEARANCES (Continued)
 2   FOR THE INTERESTED PARTY BP PLC:
 3       Mr. Craig Duewall
     and  Ms. Shari Heyen
 4       Ms. Nicole Bakare
         Mr. Jared Weir
 5       GREENBERG TRAURIG
         1000 Louisiana Street
 6       Suite 1700
         Houston, Texas 77002
 7       Telephone:  713.374.3608
         E-mail: duewall@gt.com
 8
     FOR THE INTERESTED PARTY GOLDMAN SACHS AS FIRST LIEN
 9   OUT AGENT:
10       Mr. Bradley Foxman
         VINSON & ELKINS
11       Trammell Crow Center
         2001 Ross Avenue
12       Suite 3900
         Dallas, Texas 75201
13       Telephone: 214-220-7784
         E-mail: bfoxman@velaw.com
14
     FOR THE INSURER ZURICH AMERICAN:
15
         Mr. Stephen A. Roberts
16       CLARK HILL
         720 Brazos Street
17       Suite 700
         Austin, Texas
18       Telephone: 512-499-3624
         E-mail: sroberts@ClarkHill.com
19
     FOR THE US DEPARTMENT OF JUSTICE:
20
         Mr. Serajul Ali
21       U.S. DEPARTMENT OF JUSTICE
         P.O. Box 875 - Ben Franklin Station
22       Washington, D.C. 20044
         Telephone: 202-307-0488
23       E-mail: serajul.ali@usdoj.gov
24
25
```



Page 5

```
 1              APPEARANCES (Continued)
 2   FOR THE INSURED LEXON INSURANCE COMPANY:
 3        Mr. Lee E. Woodard
          HARRIS BEACH PLLC
 4        333 West Washington Street
          Syracuse, New York 13202
 5        Telephone: 315-423-7100
          E-mail: lwoodard@harrisbeach.com
 6
     FOR THE OFFICIAL CREDITORS:
 7
          Mr. Kenneth Pasquale
 8        STROOCK & STROOCK & LAVAN LLP
          180 Maiden Lane
 9        New York, New York 10038
          Telephone: 212-806-5562
10        E-mail: kpasquale@stroock.com
11   FOR THE INTERESTED PARTY ATLANTIC MARITIME SERVICES,
     LLC:
12
          Mr. Benjamin W. Kadden
13        LUGENBUHL, WHEATON, PECK, RANKIN & HUBBARD
          601 Poydras Street
14        Suite 2775
          New Orleans, Louisiana 70130
15        Telephone: 504-568-1990
          E-mail: bkadden@lawla.com
16
     CO-COUNSEL TO THE COMMITTEE:
17
          Mr. Michael D. Warner
18        PACHULSKI, STANG, ZIEHL & JONES
          440 Louisiana
19        Suite 900
          Houston, Texas 77002
20        Telephone: 817-832-5566
          E-mail: mwarner@pszjlaw.com
21
     FOR THE AD HOC GROUP OF FIELDWOOD FIRST LIEN LENDERS:
22
          Mr. Andy T. Parrott
23        DAVIS POLK & WARDWELL LLP
          901 15th Street, N.W.
24        Washington DC, District of Columbia  20005
          Telephone: 202-962-9147
25        E-mail: andy.parrot@davispollk.com
```



Page 6

```
 1              APPEARANCES (Continued)
 2   FOR THE INSURER RLI INSURANCE COMPANY:
 3        Mr. Elliot Scharfenberg
          KREBS FARLEY & DRY
 4        909 18th Street
          Plano, Texas 75074
 5        Telephone: 972-737-2517
          E-mail: escharfenberg@krebsfarley.com
 6
     FOR LEXON INSURANCE COMPANY:
 7
          Mr. Lee E. Woodard
 8        HARRIS BEACH PLLC
          333 West Washington Street
 9        Syracuse, New York 13202
          Telephone: 315-423-7100
10        E-mail: lwoodard@harrisbeach.com
11   FOR THE INSURER NORTH AMERICAN SPECIALTY INSURANCE COMPANY:
12        Mr. T. Scott Leo
          THE LAW OFFICES OF T. SCOTT LEO, P.C.
13        100 N. LaSalle Street, Suite 514
          Chicago, Illinois 60602
14        Telephone: 312-857-0910
          E-mail: sleo@leolawpc.com
15
16   ALSO PRESENT:
17        Mr. Anthony L. Green, corporate counsel
18
19
20
21
22
23
24
25
```



Page 7

1                           EXHIBITS
2    EXHIBIT              DESCRIPTION                PAGE
3    Exhibit 1    Notice of Rule 30(b)(6)            24
                  Deposition of Debtor Fieldwood
4                 Energy LLC
5    Exhibit 2    Dear John e-mail re:  Swordfish    69
                  catch up FWE-0047937
6
     Exhibit 3    9/17/20 letter to Dane from        77
7                 (blacked out), FWE-0047938 to
                  47948
8
     Exhibit 4    7/17/20 letter to Fieldwood        78
9                 Energy, Dear John, re:  Offer
                  to Purchase Co-Owned
10                Properties, FWE-0047949 to
                  47954
11
     Exhibit 5    Decommissioning Agreement          54
12                between Apache Corporation, et
                  al and Fieldwood Energy, et al
13                in 2013, no Bates
14   Exhibit 6    Exhibit 14, 2021 Farmout           90
                  Agreement, pages 131 to 158 of
15                469
16   Exhibit 7    Exhibit 8 to the Plan of           95
                  Reorganization and Disclosure
17                Statement, titled Standby Loan
                  Agreement, pages 978 to 1024 of
18                1032
19   Exhibit 8    Transmission Services             101
                  Agreement, Exhibit 15 to the
20                Disclosure Statement and Plan
                  of Reorganization, Document
21                Number 1285-2, pages 289 to 310
                  of 469
22
     Exhibit 9    Exhibit 6, Fieldwood Energy I     116
23                LLC Agreement, Document Number
                  1285-1, pages 910 to 964 of
24                1032
25



Page 8

```
 1                        EXHIBITS (cont.)
 2    EXHIBIT             DESCRIPTION                    PAGE
 3
      Exhibit 10    Excel spreadsheet, FWE-0000002       176
 4
      Exhibit 11    *Attached but not mentioned,          10
 5                  Fieldwood Energy, Inc.
                    Estimated Future Reserves and
 6                  Income Attributable to Certain
                    Leasehold and Royalty Interests
 7                  SEC Parameters as of December
                    31, 2020
 8
      Exhibit 12    *Attached but not mentioned -         10
 9                  SpinCo Preliminary G & A Detail
                    FWE-0000019
10
      Exhibit 13    *Attached but not mentioned,          10
11                  Category/NewCo/Comments table,
                    FWE-0000018
12
      Exhibit 14    *Attached but not mentioned,          10
13                  Excel spreadsheet, FWE-0037606
14    Exhibit 15    *Attached but not mentioned,          10
                    Document beginning "West
15                  Areas", FWE-0045265 to 266
16    Exhibit 16    *Attached but not mentioned,          10
                    Excel spreadsheet FWE-0038676
17                  Fields not returning to
                    production
18
      Exhibit 17    *Attached but not mentioned,          10
19                  e-mail from Lamme to Lamb
                    4/29/21 re:  BOEM Questions,
20                  FWE-0045280
21    Exhibit 18    *Attached but not mentioned,          10
                    Excel spreadsheet, FWE-0045403
22
      Exhibit 19    *Attached but not mentioned,          10
23                  Houlihan Lokey expert report of
                    John-Paul Hanson, 80 pages
24
25
```



```
 1                    EXHIBITS (cont.)
 2    EXHIBIT               DESCRIPTION              PAGE
 3
      Exhibit 20    Exhibit O Financial             120
 4                  Projections, page 439 to 448
 5    Exhibit 21    Excel Spreadsheet FWE-0000016   134
 6    Exhibit 22    *Attached but not mentioned,     10
                    FWE Amended responses and
 7                  objections to sureties
                    discovery request
 8
      Exhibit 23    *Attached but not mentioned,     10
 9                  Exhibit B, page one of three
10    Exhibit 24    Excel Spreadsheet FWE-000008     10
11    Exhibit 25    Disclosure statement, page 1 of  10
                    99
12
      Exhibit 26    Alix Partners Liquidation        10
13                  Expert Report of Marc J. Brown,
                    April 21st, 2021
14
      Exhibit 27    Everest Indemnity Agreement     245
15
16
17
18
19
20
21
22
23
24
25
```



Page 10

1                        INDEX

2                                                 PAGE

3   MR. MICHAEL T. DANE

4   Examination by Mr. Grzyb .........................11

    Examination by Mr. Bains .......................183

5   Examination by Mr. Scharfenberg ................220

    Examination by Mr. Knapp  ......................235

6   Examination by Mr. Miller ......................244

    Examination by Mr. Duewall .....................252

7   Signature Page  ................................289

    Signature Page  ................................290

8   Court Reporter's Certificate ...................291

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



1             THE COURT REPORTER:  Okay.  Can I get an

2     agreement between Counsel, please, the court reporter

3     can swear in the witness remotely.

4             MR. GRZYB:  Okay with me.

5             MR. PÉREZ:  Yes, ma'am.

6             MR. MICHAEL T. DANE,

7     having been first duly sworn, testified as follows:

8                     EXAMINATION

9         Q.  (BY MR. GRZYB) Good morning, Mr. Dane,

10    and thank you for your time today.  My name is Darren

11    Grzyb.  I'm a lawyer with the firm of Chiesa,

12    Shahinian & Giantomasi.  I have four surety clients

13    that are involved in this case:  Everest, Aspen,

14    Berkeley, and Sirius.

15            It was our notice of deposition that was

16    issued from my office signed by me that today's

17    proceeding relates to.  As I said, today is a

18    deposition.  Have you been deposed before, Mr. Dane?

19        A.  No, I have not.

20        Q.  Then I think it is important to start

21    with some ground rules.  The format of today's

22    proceeding is a question-and-answer session.  I will

23    be asking you questions, and it is important that I

24    issue verbal questions and you are to give me verbal

25    responses.  You can't shake your head, particularly



Page 12

1    now that we're doing this by Zoom, but you shouldn't

2    do that in the first place in a deposition.  So it is

3    important that you give me verbal responses.

4              It is also important that you understand

5    the question.  If I ask a question, and you don't

6    understand it, but you give an answer, I will assume

7    that you've understood the question.  It is also

8    important that you and I and Mr. Perez, to the extent

9    he interposes an objection, don't talk over each

10   other because our friend, Michelle, is transcribing

11   everything that we say and, therefore, it will be

12   hard for her if we talk over each other for her to

13   transcribe what we say.

14             That's another point, the description of

15   this.  Michelle, Madam Court Reporter, is typing out

16   all the words that we say.  So at the end of this,

17   what we will have is a transcript of everything we

18   say:  My questions, Mr. Perez's objections, and your

19   responses.

20             It's also important that if you would

21   like to take a break -- it could be a long day, I

22   have no problem with us taking breaks, so if the

23   challenge might be that you're not in the same room

24   with Mr. Perez, I will be very understanding if you

25   want to take a break; and frankly, I will likely need



Page 13

1    to take breaks during this process as well.

2              That's all I have for now in terms of

3    ground rules.  If you have any questions as to the

4    ground rules, let me know.

5              Do you have any questions?

6         A.  No, thank you very much.

7              MR. PÉREZ:  So, Darren, this is Alfredo

8    Perez, before we get started, the -- you've provided

9    us -- we have had the courtesy of you providing us

10   several depositions with the exhibits that we have

11   reviewed.  Several of the exhibits have been marked

12   "Confidential" and several of them have been marked

13   "Highly Confidential," pursuant to the Protective

14   Order that was ordered by the Court.

15             So I just want to make sure that everyone

16   on the -- that is in the Zoom deposition -- and there

17   are approximately 40 participants -- has either

18   agreed to be bound by the terms of that and that

19   there aren't -- there isn't anyone here who's

20   otherwise not -- you know, that -- that the debtor is

21   protected as a result of that deposition.

22             So I suspect that when you're going in --

23   when you're going into documents that were marked

24   "Highly Confidential," you'll alert us so that we can

25   check that again, but that is my only comment at this



Page 14

```
 1   time.
 2              MR. GRZYB:  So, thank you, Alfredo.  Now
 3   I guess the question becomes:  How would we do the
 4   exhibits generally?  And then you raise a good point
 5   about the confidential exhibits.  Jase distributed
 6   our exhibit list.  I think it's been updated and it's
 7   in share file.
 8         Q.  (BY MR. GRZYB) Mr. Dane, I don't know, do
 9   you have the share file with the exhibits?
10         A.  I have access to the ARIES site that you
11   provided the exhibits to.  Is that the share file
12   you're referring to?
13         Q.  Yeah, it would have been from Jase Brown,
14   and right now it has got 26 exhibits listed.
15         A.  Yes, yes, right, I do have access to
16   that.
17              MR. GRZYB:  We were thinking -- I guess,
18   we should get confirmation now, Alfredo -- that
19   everyone is a professional in terms of the
20   nondisclosure agreement and request for anyone to
21   speak up if they are not a party to that
22   nondisclosure agreement, you know, mute and tell us
23   whether they are or not.
24              Is that a good way to handle it, you
25   think?
```



Page 15

1          MR. PÉREZ:  You could do it that way.

2          MR. GRZYB:  So I will ask:  Is anyone

3     that is on this Zoom call not subject to the

4     confidentiality agreement from the bankruptcy?

5          MR. ALI:  Hi, this is Serajul Ali for the

6     United States.  I don't believe the United States is

7     a party to that confidential agreement, and they have

8     other obligations, so I'm fine with the government.

9          MR. GRZYB:  Now, one thing I didn't ask

10    is:  Are you okay, Alfredo, with me asking Mr. Dane

11    to pull up from the data room the exhibit I'm

12    referencing, or would you prefer that I do -- I don't

13    think I can do a share screen.  I prefer -- actually,

14    I would prefer it if he pulled it up from the data

15    room.

16         MR. PÉREZ:  That's fine.  It is going

17    to -- that's fine, it is just going to -- he's going

18    to be able to do that a lot quicker than I am, so it

19    might slow it down a little bit, but yeah, that's

20    fine.

21         MR. GRZYB:  So in talking with Jase,

22    maybe it makes sense if, Alfredo, you're okay with me

23    sharing the documents, notwithstanding that there may

24    be some confidential and highly confidential

25    documents in light of the, you know, consent by



Page 16

1    silence that everyone will comply with the

2    nondisclosure agreement.

3              Are you okay with me doing a screen share

4    of an exhibit when I need to use it?

5              MR. PÉREZ:  For the most part, yes.

6    There is a particular sensitivity to like the ARIES

7    database.  That I think he can look -- he can look

8    that up a little easier, but for the most part, I

9    would be okay with that.

10             MR. GRZYB:  I can't speak for everyone,

11   but I have very few questions about the ARIES

12   database.

13             MR. PÉREZ:  All right.  So then that --

14             MR. GRZYB:  I probably won't need to even

15   pull that one up, so --

16             MR. PÉREZ:  Okay.  Well, let's just get

17   started and we will address it when they come up.

18             Q.  (BY MR. GRZYB) Mr. Dane, who do you work

19   for currently?

20             A.  Fieldwood Energy, LLC.

21             Q.  What is your educational background?

22             A.  I attended McGill University, and I

23   obtained a bachelor of commerce degree.

24             Q.  What year did you obtain your bachelor of

25   commerce?



1          A.  2005.

2          Q.  Is there a -- roughly speaking, an

3    American equivalent to a bachelor's equivalent?

4          A.  It is a business degree, a bachelor's

5    degree.

6          Q.  Do you have any engineering training?

7          A.  I don't have any formal engineering

8    training.

9          Q.  How would you describe your informal

10   training?

11         A.  I work with a broad team of engineers at

12   Fieldwood.

13         Q.  Broad in terms of the number of engineers

14   or the type or specialty of the engineers or both?

15         A.  Both.

16         Q.  What types of engineers do you work with

17   at Fieldwood?

18         A.  We have production engineers, reservoir

19   engineers, mechanical engineers, chemical engineers,

20   project engineers, other -- other technical experts

21   in various other areas.

22         Q.  Production, reserves, chemical,

23   construction (sic)?

24         A.  Correct.

25         Q.  Any other types of engineers?



Page 18

1          A.  Those are the broad categories of

2     engineers that we work with.

3          Q.  In your day to day, do you -- are these

4     engineers retained -- I will rephrase.

5               Are they employed directly by Fieldwood

6     or are these outside consultants?

7          A.  Both.

8          Q.  Do you have -- do you have -- personally

9     have training in reserves analysis?

10         A.  I do not have any formal reserves

11    analysis training.

12         Q.  How about informal reserves analysis

13    training?

14         A.  Yes, I work with both reserve data and

15    reserve engineers on a regular basis.

16         Q.  Have you ever taken a course in reserves

17    analysis?

18         A.  No.

19         Q.  Do you have any formal training in the

20    oil and gas industry?

21         A.  Yes.

22         Q.  What is -- describe that training,

23    please.

24         A.  16 years of on-the-job experience.

25         Q.  No educational training, though, correct?



Page 19

1          A.   No.

2          Q.   Do you have any formal training in

3   accounting?

4          A.   Yes.

5          Q.   Please describe that training.

6          A.   I received a bachelor of commerce degree

7   from McGill University, which was a business-focused

8   degree.

9          Q.   Now, you mentioned 16 years of on-the-job

10  training in the oil and gas industry.

11               Where did that start?

12          A.   I was an equity research analyst from

13  Suntrust Robinson Humphrey from 2006 to approximately

14  2008.  I was a manager of finance at Dynamic Offshore

15  Resources, and I have been employed in various roles

16  at Fieldwood Energy since 2013, as well as other

17  consulting opportunities in other board seats that I

18  have had.

19          Q.   What was your first position at Fieldwood

20  in 2013?

21          A.   Manager of finance.

22          Q.   When you started in 2013 as manager in

23  finance with Fieldwood, were you involved in the

24  acquisition of the Apache properties?

25          A.   Yes.



Page 20

1          Q.  What was your involvement?

2          A.  I was in a finance-focused role, and so I

3     was involved in the original deal execution and

4     financing, along with a broad team of folks both at

5     Fieldwood and at Riverstone.

6          Q.  Were you the finance lead with respect to

7     the acquisition in 2013?

8          A.  We had a CFO at the time, so I would

9     consider him the finance lead, in addition to the

10    professionals at Riverstone.

11         Q.  Now, who is Riverstone, is that a

12    consulting outfit?

13         A.  Riverstone's a New York-based

14    energy-focused private equity firm.

15         Q.  Who was the CFO that you mentioned?

16         A.  Howard Tate.

17         Q.  And is Howard Tate still with Fieldwood?

18         A.  No, he is not.

19         Q.  Did you engage in 2013 in an analysis of

20    the reserves of Apache properties?

21         A.  Do you mind clarifying?  Are you asking

22    if I have personally engaged or if --

23         Q.  Did you -- yes, did you personally

24    perform reserves analysis of those assets in 2013?

25         A.  I did not perform the reserves analysis



Page 21

1   in 2013.

2        Q.  Did someone for Fieldwood perform that

3   analysis?

4        A.  I believe I recollect that we had

5   internal engineers that performed that analysis,

6   alongside outside reserve engineers at that time.

7        Q.  Was your outside consulting firm at that

8   time Ryder Scott?

9        A.  I don't recollect.

10       Q.  For how long were you a manager of

11  finance after you started in 2013?

12       A.  I believe it was two years.

13       Q.  What was your next position?

14       A.  Vice president of finance.

15       Q.  How did your -- is that your current

16  role?

17       A.  No, I'm senior vice president of finance

18  and chief financial officer.

19       Q.  Was there any steps in between vice

20  president of finance and senior vice president and

21  CFO?

22       A.  Yeah.

23       Q.  When did you become senior vice president

24  and CFO?

25       A.  2016.



Page 22

```
 1         Q.  So in your current role as senior vice
 2   president and CFO, what are your day-to-day
 3   responsibilities?
 4         A.  I oversee a number of functions at the
 5   company.  Generally speaking, I'm involved in the
 6   management of the business.  As a whole, as part of
 7   our executive leadership team, I oversee a number of
 8   specific departments within my day-to-day
 9   responsibility, which include accounting, finance,
10   treasury, tax, procurements, and I.T.
11         Q.  Do you have any responsibility with
12   respect to the operation of the company?
13         A.  Yes.
14         Q.  How would you describe that
15   responsibility?
16         A.  I'm a member of our executive leadership
17   team which has responsibility for overseeing all the
18   functions of our business.
19         Q.  Who else is on that executive leadership,
20   Mr. Dane?
21         A.  Gary Mitchell, our senior vice president
22   of production operations; and Tommy Lamme, our senior
23   vice president and general counsel.
24         Q.  Now, this executive leadership committee
25   with its oversight function, would that include --
```



Page 23

1    that would include production, correct?

2            A.   Yes.

3            Q.   Acquisitions?

4            A.   To the extent there were any, it would.

5            Q.   Sales?

6            A.   To the extent there were any, it would.

7            Q.   Decommissioning responsibilities?

8            A.   Yes.

9            Q.   The leadership committee, other than

10   those broad categories which we just described, do

11   they perform any other oversight functions with

12   respect to operations and fieldwork?

13           A.   The executive leadership is effectively

14   responsible for the functions of the office of the

15   CEO, and so it oversees all of those particular

16   functions of the business.

17           Q.   And I don't mean to mischaracterize what

18   you just said, but are you saying that the executive

19   committee serves the function of what otherwise would

20   be a CEO?

21           A.   That's right.  It is -- the executive

22   leadership team effectively manages the duties of the

23   office of the CEO.

24           Q.   The executive leadership committee has

25   oversight with respect to Fieldwood's performance of



Page 24

1   its major contracts, correct?

2           MR. PÉREZ:  I'm sorry, can you repeat the

3   question?

4           MR. GRZYB:  Michelle, can you have it

5   read back, please.

6           THE COURT REPORTER:  Sure, one moment.

7            (The record was read as requested)

8           MR. PÉREZ:  I'm going to object to the

9   form of the question:  Vague.

10          Q.  (BY MR. GRZYB) You can still answer it,

11  Mr. Dane.

12          A.  The executive leadership team oversees --

13  as I stated, the executive leadership has the

14  responsibilities and the duties of the CEO, and we

15  oversee all the different functions and departments

16  in that capacity.

17          Q.  From an operational perspective -- I will

18  strike the question.

19                  (Exhibit 1 marked)

20          Q.  (BY MR. GRZYB) I'm going to ask you now

21  to please pull up Exhibit 1.

22          A.  I apologize, my -- the data site that I'm

23  looking at doesn't have something labeled as

24  Exhibit 1.  It has -- and I may be looking at the

25  incorrect data site, but I'm in the deposition



Page 25

1    exhibit folder.

2           Q.  I'm going to -- I'm just going to share

3    with you right now.  And if you need a better way to

4    review a document, just let me know, okay?

5              (Discussion off record)

6           Q.  (BY MR. GRZYB) All right.  Can you see

7    this document here that says -- is captioned "In the

8    United States Bankruptcy Court for the Southern

9    District of Texas"?

10          A.  Yes, I can.

11          Q.  Notice of 30(b)(6) Deposition of Debtor

12   Fieldwood Energy, LLC?

13          A.  Correct.

14          Q.  Before I go to the subpoena, I'm looking

15   at my outline and realized I missed a few questions

16   that I wanted to ask more about your background.

17              Who are your direct reports in your

18   current role at Fieldwood?

19          A.  My direct reports include Bill Swingle,

20   our chief accounting officer, Doug Seal, our director

21   of procurement, John Deck, our vice president of

22   I.T., Jerad Bloom, our treasurer.  I may have

23   additional direct reports I would need to consult

24   with our organizational chart.

25          Q.  All right.  If our questioning makes you



Page 26

1    think of someone else, let me know.

2         A.  Okay.

3         Q.  Going back to the shared screen, this is

4    the Rule 30(b)(6) Deposition Notice that we served in

5    the bankruptcy proceeding referenced here, Case

6    Number 20-33948 In Re Fieldwood Energy, LLC, et al.

7              Are you familiar with this document?

8         A.  I believe so.  Would you mind scrolling

9    through the whole document for me, please.

10        Q.  Yeah, I just -- I was going to ask Jase a

11   question.  One second.

12             (Discussion off record)

13             MR. GRZYB:  Michelle, there is no way I

14   can give Mr. Dane control of the document, is there?

15             (Discussion off record re exhibit)

16        Q.  (BY MR. GRZYB) All right.  I think I will

17   just scroll through it.  I will share, and you let me

18   know when you're ready for me to move on, all right,

19   Mr. Dane?

20        A.  Okay, I have access to this, yes, thank

21   you.

22        Q.  So I don't -- I need to share or I don't

23   need to share?

24        A.  I'm able to view it on my screen, so I

25   don't need you to share.



Page 27

1          Q.  All right.  Good.  All right.  Exhibit 1
2    is the Notice of 30(b)(6) Deposition of Debtor
3    Fieldwood Energy, LLC.
4                Is that what you have for your Exhibit 1,
5    Mr. Dane?
6          A.  Yes.
7          Q.  An eight-page PDF?
8          A.  Correct.
9          Q.  Please take a minute to scroll through,
10   read it, take as long as you need to get yourself
11   familiar with the document.
12         A.  Okay.
13         Q.  Have you reviewed this document
14   previously?
15         A.  I have.
16         Q.  Can you confirm for me that you are the
17   corporate designee for Fieldwood in response to that
18   subpoena that is Exhibit 1?
19         A.  That's correct.
20         Q.  Now, if you will, Mr. Dane, please go to
21   what's labeled Exhibit G, it starts on page six of
22   the PDF, and review the 38 -- the list of 38 items,
23   topics and confirm, if you will, that you're the
24   designee for Fieldwood as to all of those topics.
25         A.  That's correct.



Page 28

1          MR. PÉREZ:  Counsel, he is the corporate

2    representative of, you know, subject to the

3    limitations that were agreed to with respect to, you

4    know, a couple of the items including the expert

5    reports, et cetera.

6          MR. GRZYB:  Okay.

7          Q.  (BY MR. GRZYB) Is anyone else being

8    designated by Fieldwood for these topics?

9          A.  I would defer to our counsel if that's

10   correct, but I believe at this time that I am the

11   only corporate representative unless -- unless others

12   are acquired.

13         MR. GRZYB:  So sorry, Alfredo, he,

14   Mr. Dane, is going to be the only designee?

15         MR. PÉREZ:  Correct, Mr. Dane is the only

16   designee with respect to these 38 items, subject to

17   the e-mail exchange regarding the limitations on

18   several of them.

19         Q.  (BY MR. GRZYB) Subject to that -- and

20   this is back to you, Mr. Dane:  Subject to that

21   limitation, and we can pull it out if needed -- well,

22   let me ask it more directly.  Strike the question.

23         Mr. Dane, is there any topic listed here

24   about which you have no knowledge or information?

25         A.  I don't believe there is a topic of which



Page 29

1    I have no knowledge.

2            Q.  When did you first see this 30(b)(6)

3    notice that is Exhibit 1?

4            A.  I don't recall the exact date, but I

5    believe it was within the last week or so, a week to

6    ten days.

7            Q.  Did you meet with anyone to prepare for

8    this deposition?

9            A.  Yes, I did.

10           Q.  Who did you meet with?

11           A.  I met with our counsel, and then I met

12   with various internal subject matter experts.

13           Q.  Do you recall who the first subject

14   matter expert was with whom you met?

15           A.  I don't recall in this order of

16   sequencing the first subject matter, that expert that

17   I met.

18           Q.  Name one.

19           A.  Brandon DeWolfe, our VP of

20   decommissioning.

21           Q.  Was Counsel present during that meeting?

22           A.  Counsel was present in one of the

23   meetings in which I met with Mr. DeWolfe.

24               (Phone rings)

25           Q.  (BY MR. GRZYB) What other subject matter



Page 30

1    experts did you meet with in connection with your
2    preparation for this deposition?
3              A.  I met with John Seeger, our senior vice
4    president of operations; I met with Gary Mitchell,
5    our senior vice president of operations; Tommy Lamme,
6    our general counsel; and senior vice president, Steve
7    Bodden; our director of production, Patrick Eiland;
8    our senior vice president of HS and E; and various
9    members of our finance and -- of our finance team.
10             Q.  Before you said various members of your
11   finance program.  I didn't catch what -- H and E, is
12   that what you said?
13             A.  I'm sorry, H S and E.
14             Q.  H S and E.  And what does that stand for,
15   Mr. Dane?
16             A.  Health, safety, and environmental.
17             Q.  And who was that individual that you met
18   with in connection with health, safety, and
19   environment?
20             A.  Patrick Eiland.
21             Q.  And the individual that you identified
22   for production, who is that?  I just missed it.
23             A.  Gary Mitchell, and Steve Bodden.
24             Q.  Did you review any documents in
25   connection with your preparation for this deposition?



Page 31

```
 1          A.  I did.

 2          Q.  Can you describe the documents that you

 3    reviewed.

 4          A.  I reviewed a broad set of documents that

 5    I believed as a number of the topics outlined in

 6    these items, in these 38 items, including --

 7    including various exhibits that were provided.

 8          Q.  Did you -- were binders in any way

 9    prepared in connection with your preparation for this

10    deposition?

11          A.  Yes.

12          Q.  Now, generally speaking, are those papers

13    binders or electronic binders?

14          A.  I have a paper binder, and I also have an

15    electronic data room site that was -- that was

16    provided for me.

17          Q.  Who prepared the paper binder?

18          A.  Our counsel provided that.

19          Q.  What about the data room?

20          A.  Our counsel, along with some internal

21    assistants.

22          Q.  Give me one second.

23              Apart from the paper binders and the data

24    room, did you review any other documents?

25          A.  Yes, I reviewed various documents.
```



Page 32

1          Q.  Can you identify me a document, apart

2    from the paper binder, that you reviewed in

3    connection with this deposition?

4          A.  A singular document, any document?

5          Q.  Yeah, just to get the ball rolling.  I'm

6    just --

7          A.  Various internal reports.  I reviewed --

8    the binder that I had was exhaustive for all these

9    lists, so I looked at various schedules that I

10   thought were relevant.  As an example of a single

11   document, I reviewed the operational transition plan

12   documents that we provided and presentations, certain

13   presentations that we provided to parties in this

14   case.  For instance, the presentation that we

15   provided to the surety as part of our -- one of the

16   particular sureties, your client, as part of our

17   initial conversations.

18         Q.  Operational transition plan, which client

19   are you referring to of mine?

20         A.  Yeah, those two comments I made were

21   separate comments.  The operational transition plan

22   related to predecessors and the client that I was

23   referring to amongst the surety group, the document I

24   was referring to was a presentation that we provided

25   to Berkeley and to Aspen -- or correction, just



Page 33

 1   Berkeley.

 2         Q.   When was that presentation made,

 3   Mr. Dane?

 4         A.   I believe that that presentation was made

 5   in January.

 6         Q.   When was the operational transition plan

 7   created?

 8         A.   Those documents were created --

 9              MR. PÉREZ:  Object to the form of the

10   question:  Vague.

11              THE WITNESS:  The documents were created

12   in the first quarter of this year and they were

13   finalized and uploaded to all the parties in March.

14         Q.   (BY MR. GRZYB) Are there any other

15   documents that stick out in your mind that you

16   reviewed in connection with your preparation for this

17   deposition?

18         A.   Nothing specific beyond this.

19         Q.   Can you give me an estimate of the amount

20   of time you spent preparing for this deposition?

21         A.   I would estimate that I spent two to

22   three hours a day over the course of the last five

23   business days.

24         Q.   Not including your discussions with firm

25   counsel, outside counsel, did you meet with anyone



Page 34

1    outside of Fieldwood in connection with your

2    preparation for this deposition?

3            A.  Not that I recall.

4            Q.  Did you meet with anyone from the secured

5    lenders in connection with your preparation for this

6    deposition?

7            A.  No, I did not.

8            Q.  Did you e-mail with anyone from the

9    secured lenders in connection with this deposition?

10           A.  Not that I recall.

11           Q.  Did you meet with anyone from Apache

12   Corporation in connection with your preparation for

13   this deposition?

14           A.  No, not that I recall.

15           Q.  How about e-mail with anyone from Apache

16   Corporation in connection with your preparation for

17   this deposition?

18           A.  No, not that I recall.

19           Q.  What about telephone conversations with

20   anyone from Apache in connection with your

21   preparation for this deposition?

22           A.  Those are all the communications that

23   I've had with Apache in preparation for this

24   deposition.

25                   Let me qualify that.  There was one --



Page 35

1    there was one specific question that we inquired

2    of -- and this was -- I am not sure this is -- no,

3    excuse me, my statement's correct, I don't recall any

4    communications we've had with Apache with respect to

5    this deposition.

6            Q.   Well, it sounds like you've had a recent

7    communication with Apache, generally speaking.

8            A.   We have on -- they're obviously an

9    important stakeholder in that process, we have

10   regular communications with them and their advisors.

11           Q.   Is there a person in particular at Apache

12   that you personally deal with in connection with this

13   reorganization?

14           A.   We deal with their legal group, generally

15   speaking.

16           Q.   Is there a businessperson, point of

17   contact for you to reach out to that -- I will

18   rephrase the question.

19                Is there a businessperson at Apache that

20   you interact with?

21           A.   There is not a businessperson that I

22   personally interact with at Apache on a regular

23   basis.

24                (Phone rings)

25           Q.   (BY MR. GRZYB) What about anyone -- does



Page 36

1    anyone on your team interact with businesspeople at

2    Apache?

3           A.  Yes.

4           Q.  And who would that be?  Let's start with

5    the Fieldwood representative, and then we will go

6    over to the connection at Apache.

7                Who would the Fieldwood representative be

8    that you were just describing?

9           A.  John Seeger and Brandon DeWolfe.

10          Q.  And who would the business contact at

11   Apache be?

12          A.  I don't know exactly who their business

13   contacts are, but I believe there is a gentleman

14   Clay, I don't recall his last name.  Maybe it is

15   Britches.

16          Q.  Can you describe the substance of the

17   conversations that have been had between Mr. Seeger

18   and Apache?

19               MR. PÉREZ:  Object to the form of the

20   question:  It calls for speculation.

21               THE WITNESS:  We are obviously involved

22   in a significant transaction with Apache.  This is a

23   very complex transaction given the size of -- the

24   size and nature of the assets, and so there is a lot

25   of coordination and alignment that needs to take



Page 37

1   place in order to make sure that the transaction is

2   implemented as it is designed, and so it is general

3   coordination around the implementation of the

4   transaction that's described in the various

5   agreements.

6        Q.  (BY MR. GRZYB) So is it safe to say that

7   Mr. Seeger interacts with directly with Apache in

8   connection with the operation of the assets that

9   Fieldwood acquired in 2013?

10       A.  I don't think that's correct.  We have

11   discussed, on occasion, various topics that may be

12   relevant to that restructuring and our transaction

13   with Apache.  We do not consult Apache on our

14   operations.  They're not a party to those operations.

15   This is in conjunction with implementing the overall

16   transaction that's described in our documents.

17       Q.  I like your word "implementing."  What

18   does that mean, how things will happen after plan

19   confirmation in your eyes?

20       A.  That means many things.  It means making

21   sure that we're aligned on how these arrangements

22   intend to function.  It means properly setting up all

23   of the documentation in a manner that describes the

24   transactions the way that both parties expect them to

25   function.



1          Q.  All right.  From the business -- a

2     business perspective, is it safe to say that

3     Mr. Seeger is primarily responsible for negotiating

4     with Apache with respect to the transactions and the

5     Plan of Reorganization?

6          A.  No, I don't -- I wouldn't describe them

7     as primarily responsible.

8          Q.  Who at Fieldwood is primarily responsible

9     from a business perspective of negotiating the

10     transactions contemplated by the reorganization with

11     Apache?

12          A.  I would say that myself and our senior

13     vice president and general counsel, Tommy Lamme, are

14     generally responsible.

15          Q.  Can you describe for me, please, the

16     substance of the conversations or communications

17     between Mr. DeWolfe and Apache.

18               MR. PÉREZ:  Object to the form of the

19     question:  Calls for speculation.

20               THE WITNESS:  I don't know the specific

21     conversations that he's had.  He's our senior vice

22     president -- excuse me, he's our vice president of

23     decommissioning, so the topics that he generally

24     addresses are decommissioning related.

25          Q.  (BY MR. GRZYB) To use your word,



Page  39

1    "implementation," would it be safe to say, in your

2    mind, that Mr. DeWolfe is in communications with

3    Apache about implementing the decommissioning aspects

4    of the reorganization transaction with Apache?

5              MR. PÉREZ:  The same objection:  Calls

6    for speculation.

7              THE WITNESS:  I don't know the specific

8    conversations that he has with his counterparts, but,

9    as is obvious from our plan, there is a large

10   component of decommissioning, and Apache is the

11   primary predecessor and the trust of our shelf asset

12   base, and so those topics are very relevant for them

13   and relevant to the transactions that we're

14   discussing.

15             Q.  (BY MR. GRZYB) In preparing for this

16   deposition, and in connection with your meetings with

17   Mr. Seeger, did you discuss any recent communications

18   that he had with Apache?

19             A.  I don't recall speaking to him about any

20   recent conversations he's had with Apache.

21             Q.  In connection with your preparation for

22   this deposition, and in your conversation with

23   Mr. DeWolfe, did you discuss recent conversations

24   between -- I will do a better job than that.  In

25   connection -- strike the question.



Page 40

```
 1              In connection with your preparation for
 2    that meeting -- let me try again.
 3              In connection with your preparation for
 4    this deposition, and your meeting with Mr. DeWolfe,
 5    did you address communications between Mr. DeWolfe
 6    and Apache?
 7         A.  I don't recall that we discussed that.
 8         Q.  Did you review the Plan of Reorganization
 9    in its current form in preparation for this
10    deposition?
11         A.  Yes, I did.
12         Q.  Including all of the agreements and
13    attachments?
14         A.  I don't know that I would say I reviewed
15    them all, because unfortunately, the document is
16    quite extensive, but I reviewed what I thought were
17    the relevant topics.
18         Q.  Is there anything in your mind that you
19    did in connection with your preparation for this
20    deposition that we haven't already covered?
21         A.  I think -- I think you -- I think we
22    covered my preparation.
23         Q.  When did Fieldwood first meet with its
24    secured lenders regarding a potential restructure?
25         A.  I believe in the late March 2020 time
```



MAGNA
LEGAL SERVICES

Page 41

1 period we had initial conversations related to
2 certain modifications that may be required to our
3 credit agreements.  At that time we didn't speak
4 specifically about a restructuring, but those were
5 the first conversations that we had with our lenders,
6 which ultimately resulted in the plan of
7 restructuring that we pursued.
8          Q.  Did you participate in those discussions?
9          A.  I participated in most of those
10 discussions.
11          Q.  Who else from Fieldwood participated in
12 those discussions?
13          A.  Our CEO at that time, Matt mechanic carol
14 was also very involved in those discussions.
15          Q.  What was the modification that you
16 requested?
17          A.  We have a provision -- we had a provision
18 in our credit agreements at the time that required an
19 audit not be qualified -- not require -- excuse me,
20 not have any going concern qualification language,
21 and given the conditions that were present in 2020,
22 at that time it was -- it was likely that we were
23 going to have that language in -- in our audit, which
24 was anticipated to be issued within the next couple
25 of weeks.



Page 42

```
 1              MR. PÉREZ:  Darren, if you're going to
 2    start on a new topic, we have been going for about an
 3    hour.  Do you want to take a five-minute break?  Or
 4    we can do it as a convenient time, but it looked like
 5    you're changing topics.
 6              MR. GRZYB:  I am.  And that's fine with
 7    me, 10:40 Central?
 8              MR. PÉREZ:  10:40 Central is fine.
 9              THE COURT REPORTER:  Thank you.  I'm off.
10                   (Recess taken)
11              THE COURT REPORTER:  Back on the record.
12              MR. GRZYB:  May I have the last question
13    and answer read back to me.
14                (The record was read as requested)
15              MR. GRZYB:  Thank you.
16         Q.  (BY MR. GRZYB) So I am gathering there
17    was -- there was a condition that there be no
18    condition in your audit about an ongoing concern
19    representation, the audit was going to come out, and
20    you weren't going to be able to fill that condition,
21    so you went to the lenders to ask for a modification.
22              Is that accurate?
23         A.  Right, a going concern qualification was
24    a potential default under our agreements, and we went
25    to the lender seeking a waiver amendment with respect
```



Page 43

1   to that provision.

2           Q.   Was that an in-person meeting?

3           A.   No, these were telephonic.

4           Q.   Did you reach out personally, Mr. Dane,

5   to the secured lenders?

6           A.   I believe in some cases I reached out to

7   certain of the lenders.

8           Q.   Was counsel involved at that point?

9           A.   We had consulted with our counsel at the

10  time that handled our credit agreements.

11          Q.   Was there a discussion with the lenders,

12  secured lenders -- I will rephrase the question.

13              What did they say in request to the --

14  what did they say in connection with the request to

15  modify the lending agreements?

16          A.   They said that they would evaluate that

17  request and that they were open to continued

18  considerations and dialogue, and in some cases, they

19  asked for additional information.

20          Q.   Was it the secured lenders' idea to

21  reorganize under Chapter 11 of the Bankruptcy Code?

22              MR. PÉREZ:  Object to the form of the

23  question:  Vague.

24              THE WITNESS:  The conversations evolved

25  to a point where a reorganization was what was



Page 44

1   understood by all the parties as the necessary action

2   that needed to take place.

3          Q.  (BY MR. GRZYB) It seems as though there

4   was -- there is two options:  There is the

5   modification to the loan agreement, and then, where

6   we are now, the Chapter 11 reorganization that we

7   find ourselves in here.  Was there anything in

8   between those two options that was ever discussed

9   between Fieldwood and the secured lenders?

10          A.  Yes.

11              MR. PÉREZ:  Object to the form of the

12   question.

13          Q.  (BY MR. GRZYB) What were those other

14   options that were discussed?

15          A.  The conversation evolved from discussing

16   a going-concern qualification to eventually resulting

17   in a forbearance agreement.  The forbearance related

18   to the company's potential default under the

19   provisions that I discussed on the going-concern

20   qualification, and also was a forbearance with

21   respect to interest payments that were due at the end

22   of April; and that forbearance agreement imposed

23   various conditions and restrictions on the company,

24   including the requirement for the company to submit a

25   plan of restructuring that was acceptable to the



Page 45

1   lenders.

2        Q.  So the forbearance agreement assumed a

3   reorganization was going to happen?

4             MR. PÉREZ:  Object to the form of the

5   question:  Assumes facts not in evidence.

6             THE WITNESS:  The forbearance agreement

7   had a requirement that the company present a proposed

8   Plan of Reorganization.

9        Q.  (BY MR. GRZYB) When did Fieldwood first

10  meet with Apache regarding the potential

11  restructuring?

12       A.  I believe that our first formal meeting

13  with Apache was around the early May timeframe, and

14  those conversations were a general situation update

15  about our current conversations with the lenders and

16  the status of the business and potential paths

17  forward that the business may be required to pursue.

18            MR. GRZYB:  Michelle, may I have that

19  answer read back again, please.

20            (The record was read as requested)

21            MR. GRZYB:  Thank you.

22            THE COURT REPORTER:  You're welcome.

23       Q.  (BY MR. GRZYB) The first meeting with

24  Apache around May of 2020, did you attend?

25       A.  I did.



Page 46

```
 1          Q.  Was that an in-person meeting?

 2          A.  No, it was not.

 3          Q.  Who else from your team?

 4          A.  Tommy Lamme.

 5          Q.  Anyone else?

 6          A.  I believe it was just the two of us.

 7          Q.  Who attended for Apache?

 8          A.  I believe it was Anthony Lannie, Apache's

 9   general counsel, and Bret Cupid, I believe.  I

10   believe their treasurer may have attended, and I

11   believe their advisors at Parkman Whaling may have

12   attended as well.

13          Q.  What service did Parkman Whaling function

14   as?

15          A.  To my knowledge, Parkman Whaling was

16   engaged in our 2018 restructuring with Apache, and

17   they had a knowledge of the business and the prior

18   restructuring.  I don't know what their engagement

19   was with Apache at that time, other than a party that

20   had familiarity with prior conversations between our

21   two companies.

22          Q.  So are they decommissioning experts?

23          A.  No.  Parkman Whaling is an advisory firm.

24          Q.  Describe the comments of Fieldwood in

25   connection with the current situation to Apache
```



Page 47

1    during that initial meeting.

2              MR. PÉREZ:  Object to the form of the

3    question:  Vague.

4              THE WITNESS:  We provided a presentation,

5    I believe, where we talked about the current

6    conversations with the lenders, the evolution of

7    those conversations from a going-concern

8    qualification to a forbearance, the provisions in the

9    forbearance that the company was required to adhere

10   to.  We discussed with them our liquidity situation,

11   and we talked about various potential transactions

12   that may be mutually beneficial to consider and also

13   various potential restructuring scenarios that may be

14   required and our timing.

15             Q.  (BY MR. GRZYB) Was it a condition in the

16   forbearance agreement with the lenders that you

17   enlist Apache to support a restructuring?

18             A.  I don't believe so.

19             Q.  Why did Fieldwood reach out to Apache in

20   this context?

21             A.  Apache is the largest predecessor and

22   interest in Fieldwood's asset base, and they're a

23   clear significant stakeholder in any likely

24   restructuring that would have taken place.

25             Q.  Describe the various potential



1  transactions that were discussed in that initial

2  meeting with Apache.

3          A.  I don't recall if -- if -- do you mind

4  clarifying for me your question about the potential

5  transactions?

6          Q.  I'm just -- we are really focused now,

7  Mr. Dane, on that initial reach-out in May of 2020

8  following the discussions and entry of the

9  forbearance agreement with the secured lenders, and I

10  am now shifting towards the initial conversations

11  that you're having -- that you had with Apache.

12          And I asked you previously to discuss

13  that meeting -- and the record in terms of what you

14  said it will speak for itself -- but I think you

15  mentioned a number of things that happened:  There

16  was a presentation; there was a description of the

17  forbearance agreement, a discussion of the liquidity

18  position of Fieldwood; and then the last two things I

19  have listed here was various potential transactions

20  that were discussed between Fieldwood and Apache; and

21  then the last one was various potential -- and I

22  don't want to mischaracterize, but what I think was

23  you said was restructuring transactions.

24          So my question is:  Can you describe in

25  more detail the various potential transactions that



Page 49

1    were discussed at that initial I'm calling it a

2    "reach-out" in May 2020?

3              If you don't understand the question, I

4    can rephrase it.

5              A.  I understand the question.  Thank you.

6              We conducted several meetings with Apache

7    over the -- you know, after the initial reach-out,

8    and so I don't exactly recall in -- if in the first

9    meeting it was a general situation update or if we

10   started to discuss more specifically potential

11   transactions, but the transactions that were -- the

12   potential transactions that were generally discussed

13   with Apache were related to ideas that Fieldwood had

14   around potential M and A opportunities with respect

15   to certain of its assets and also certain

16   transactions that would bring in additional capital

17   from Apache in order to provide for decommissioning

18   funding related to the shelf properties that it

19   acquired from Apache.

20             Q.  So let's take it one step at a time.

21             We're still -- we will go from the

22   reach-out phase to now we're having -- during this

23   timeframe, it seems in my mind, that we're having a

24   conceptual dialogue with Apache about the particular

25   issues that you're facing at that time.



Page 50

1           Is that -- is that a fair way to

2    characterize the conversations and the discussions

3    that are happening during that timeframe?

4           A.  Yes.

5           Q.  One of these conceptual ideas is to

6    pursue M and A opportunities.  Can you give me more

7    information with respect to that concept and the

8    conversations that you were having with Apache at

9    that time?

10          A.  We had assets that we thought may be a

11   potential fit for Apache that they may find

12   attractive and potential transactions that -- we were

13   interested in seeing if they were exploring potential

14   transactions where we had the ability to sell assets

15   and raise additional capital in order to address

16   things that were of mutual concern to both parties.

17          Q.  So the conceptual discussion of ideas

18   with Apache about M and A and opportunities with

19   respect to assets, it seems as though, generally

20   speaking, the conceptual discussions at that time

21   included exploring with Apache either an acquisition

22   by Apache of Legacy/Apache properties.

23          Is that accurate?

24          A.  No, not with respect to Legacy/Apache

25   properties.



Page 51

1          Q.  So what properties were you conceptually
2    discussing at that time?
3          A.  Generally our deepwater asset base.
4          Q.  The discussions at that time were to sell
5    to Apache deepwater assets to raise capital for
6    Fieldwood to fulfill its decommissioning obligations
7    to Apache.  Is that accurate?
8          A.  Not exactly.  There was a range of topics
9    that we discussed.  One concept that was discussed
10   was what I spoke to around potential M and A, and
11   separately or as a part of potential M and A, the
12   willingness of Apache to consider providing capital
13   in order to address shelf P and A liabilities.  These
14   were various broad topics that we explored in order
15   to gauge their interest, and in being able to support
16   the business through a potential restructuring
17   transaction utilizing those various transaction
18   scenarios.
19         Q.  So, in effect, you were asking Apache to
20   loan Fieldwood money --
21         A.  No.
22         Q.  -- as part of -- no?
23         A.  No, we did not ask Apache to loan
24   Fieldwood money.
25         Q.  So what would the capital infusion that



Page 52

1   you were requesting entail?

2          A.   We explained to Apache the obligations

3   under our forbearance agreement to provide our

4   lenders with a plan of restructuring, a proposed plan

5   of restructuring and the timing considerations that

6   we were facing, and we asked them if they had -- if

7   they had an interest in exploring various

8   transactions that could be incorporated into a

9   potential plan of restructuring that we were required

10  to provide to our lenders.

11         Q.   Did Fieldwood ever consider the sale of

12  the Legacy -- I will rephrase the question.

13         Did Fieldwood ever consider selling the

14  Legacy/Apache properties?

15         A.   Fieldwood did not generally consider the

16  sale of the entirety of the asset base that comprises

17  the Legacy/Apache properties as a part of its

18  contemplated restructuring plans.

19         Q.   What about individual assets within the

20  Legacy/Apache property portfolio?

21         A.   As a part of the considerations related

22  to generating a plan of restructuring, which was

23  required, that was not something that had been

24  contemplated.  However, at various times prior to

25  that period, individual asset sales have been



Page 53

1     contemplated in the ordinary course of business.

2          Q.  Give me one second.  I apologize.

3              Whose idea was it for there to be the

4     creation of Fieldwood I with respect to the

5     Legacy/Apache properties?

6          A.  As a result of the ongoing dialogue that

7     Fieldwood engaged with Apache during that time

8     period, the conversations evolved through the

9     discussion of various different alternatives, and

10    ultimately we were presented with a term sheet from

11    Apache that formed the basis of the agreement that we

12    currently have.

13         Q.  So it was -- was it Apache's concept to

14    engage in a divisive merger with respect to

15    Fieldwood I?

16         A.  I believe those conversations -- specific

17    to the divisive merger, I believe there was a

18    dialogue between our counsel about the best way to

19    effectuate these types of transactions and counsel

20    determined that a divisive merger was an appropriate

21    manner.

22         Q.  Are you saying -- let me take a step

23    back.  Did the term sheet from Apache include a

24    divisive merger from Fieldwood to Fieldwood I?

25         A.  I don't recall if the original term sheet



Page 54

1    was specific about a divisive merger concept.  I

2    believe that that manner to implement the transaction

3    may have been conceived subsequent to the initial

4    term sheets, but I'm not certain.

5          Q.  I believe you mentioned before that

6    Apache was -- is the largest predecessor and interest

7    for Fieldwood; is that correct?

8          A.  With respect to the quantum of plug and

9    abandonment obligations, that's our belief, that they

10   are, by far, the largest predecessor.

11               (Exhibit 5 marked)

12         Q.  (BY MR. GRZYB) And isn't it accurate to

13   say that in connection with the 2013 acquisition of

14   the Legacy/Apache properties, Fieldwood entered into

15   a Decommissioning Agreement with Apache?

16         A.  Yes, that's correct.

17         Q.  Are you, generally speaking, familiar

18   with the obligations of Fieldwood in implementing the

19   Decommissioning Agreement?

20         A.  I'm generally familiar with the terms of

21   the Decommissioning Agreement.

22         Q.  And isn't it accurate to say that

23   Fieldwood was -- I will rephrase the question.

24               Is it accurate to say that Fieldwood's

25   obligations to Apache under the Decommissioning



Page 55

```
 1    Agreement are supported by at least three types of

 2    security?  I will rephrase the question.

 3              MR. PÉREZ:  Object to the form of the

 4    question:  Vague.

 5              Yeah, I'm sorry.

 6              MR. GRZYB:  No, no, no.

 7         Q.  (BY MR. GRZYB) Isn't it accurate to say

 8    that the obligations of Fieldwood to Apache are

 9    supported by security?

10         A.  It's accurate --

11              MR. PÉREZ:  Same objection.

12              But you can go ahead and answer it.  I'm

13    sorry.

14              THE WITNESS:  There is required security

15    that is a condition of the Decommissioning Agreement,

16    and I think it is accurate to say that there are

17    three basic types of security that are currently in

18    place.

19         Q.  (BY MR. GRZYB) And those three basic

20    types that are currently in place are the Trust A

21    cash, correct?

22         A.  Yes.

23         Q.  And then you have two surety bonds,

24    correct?

25         A.  I don't recall the number of individual
```



Page 56

1   surety bonds, but that is correct that there are

2   surety bonds.

3         Q.  And then you have letters of credit,

4   correct?

5         A.  That's correct.

6         Q.  Isn't it accurate to say that Apache does

7   not have the right to draw upon the security

8   associated with the Decommissioning Agreement unless

9   there has been a failure of Fieldwood to perform

10  under the Decommissioning Agreement?

11        MR. PÉREZ:  Object to the form of the

12  question:  It calls for a legal conclusion.

13        And, you know, Mr. Dane wasn't tendered

14  to provide legal conclusions, so I mean, I'm not

15  sure -- you're asking for a legal conclusion at this

16  time.

17        MR. GRZYB:  Well, I would say that he did

18  testify to having an understanding of the terms of

19  the Decommissioning Agreement, and that was my

20  question:  Is it his understanding that there has to

21  be a -- well, I like the way I asked the question, so

22  I will have Michelle read it back and then --

23        MR. PÉREZ:  Yeah.

24        MR. GRZYB:  -- you can say your objection

25  again or interpose it again, but that's fine.



Page 57

```
 1                  Michelle, may I ask you to read the
 2      question again.
 3                  THE COURT REPORTER:  Yes, it always takes
 4      me a second to un-mute.
 5                     (The record was read as requested)
 6                  THE WITNESS:  I don't think that's
 7      accurate.
 8                  MR. PÉREZ:  Yeah, I would make the same
 9      objection.
10                  And I would instruct the witness that to
11      the extent his testimony is based on discussions with
12      counsel not to answer the question.  If he has an
13      independent view of what the terms of the
14      Decommissioning Agreement are as to when Apache can
15      draw, obviously he can answer, but to the extent that
16      it calls for him to divulge discussions that he had
17      with Counsel, then I would instruct the witness not
18      to answer.
19           Q.   (BY MR. GRZYB) Do you have an independent
20      view as to when Apache could draw on its security
21      related to the Decommissioning Agreement?
22           A.   There are various provisions in the
23      Decommissioning Agreement that allow Apache to draw
24      upon the security.  The agreement spells out all of
25      those different provisions.  It is more expansive
```



Page 58

1  than a Fieldwood default on P and A.  There are times

2  when Apache can draw for nonrenewals.  There are

3  various defaults which require provisions that allow

4  them to draw for reimbursement for P and A

5  obligations.

6        Q.  Is it your independent understanding that

7  Apache can draw on the surety credit -- I will

8  rephrase.

9            Is it your understanding that there has

10  to be a reimbursable event or a nonrenewable event

11  for Apache to draw on the security for the

12  Decommissioning Agreement?

13            MR. PÉREZ:  Same objection.

14            THE COURT REPORTER:  I think there was a

15  phone ringing, so I'm not sure I got every word of

16  that question, if you could repeat it.  Thanks.

17        Q.  (BY MR. GRZYB) And when I say

18  "independent understanding," I like the way that

19  Alfredo phrased that, which is your own independent

20  understanding when I ask that question separate and

21  apart from your conversations with Counsel.

22            So is it your own independent

23  understanding that under the Decommissioning

24  Agreement, Apache can only draw upon the security if

25  there is a, quote, reimbursable event or nonrenewal?



Page 59

```
 1              MR. PÉREZ:  Again I'm going to object to
 2    the question.  I mean, if you want to show him the
 3    document, you can.  I don't know -- and again, if he
 4    has an independent obligation -- an independent
 5    recollection, he can answer, but --
 6              THE WITNESS:  Based on the advice of my
 7    Counsel, I don't think it would be appropriate for me
 8    to answer that question.
 9         Q.   (BY MR. GRZYB) One second.
10              In connection with the negotiation of the
11    restructuring transactions in which Fieldwood is
12    entering with Apache, was there a discussion of the
13    decommissioning security?
14         A.   Yes.
15         Q.   What was the substance of that
16    conversation?  Let me rephrase.
17              Describe for me the substance of that --
18    those conversations from Fieldwood's perspective.
19         A.   The Decommissioning Agreement governs
20    obligations that Fieldwood had and various security
21    that is granted to Apache, it imposes on Fieldwood
22    various obligations, all of those topics were
23    discussed when the parties were trying to explore
24    various consensual alternatives, given that the main
25    topic was addressing the considerable amount of
```



Page 60

1    plugging and abandonment liabilities associated with

2    properties that the Decommissioning Agreement covers.

3          Q.   What was the substance of the

4    conversation from Apache's perspective?

5          A.   I can't speak on behalf of Apache, but

6    the Decommissioning Agreement was put in place at the

7    time of the original acquisition in order to provide

8    Apache security in the event of a potential default

9    and their exposure to costs associated with plugging

10   and abandonment obligations.

11              So those were, I assume, the main

12   conversations that were very relevant to the

13   conversations that we were having with them in the

14   context of potential restructuring alternatives that

15   were likely at that time.

16         Q.   Was it Apache's condition that the

17   Decommissioning Agreement be assumed in the

18   reorganization in order for Apache to support the

19   reorganization?

20         A.   The -- I don't recall if that was our

21   fundamental position that they took at the outset of

22   our conversations.

23         Q.   During the negotiation of these -- the

24   agreements that Fieldwood entered into with Apache in

25   connection with the reorganization, did Fieldwood



Page 61

1    ever reach out to the issuers of the letter of
2    credit -- the letters of credit in connection with
3    the decommissioning security?
4              MR. PÉREZ:  Sorry, can the court reporter
5    read that question back?
6              THE COURT REPORTER:  Okay.  Yes.
7              (The record was read as requested)
8              THE WITNESS:  There were -- I don't
9    recall if the timing of conversations with the issuer
10   of the letter of credit occurred during the timing of
11   the discussions with Apache, but I do know that there
12   were conversations with the issuer of the letter of
13   credit.  I believe those conversations were at a
14   later stage.
15             Q.  (BY MR. GRZYB) Is that after bankruptcy
16   filing?
17             A.  Again, I don't recall the exact timing of
18   those conversations.  It likely was in the very -- in
19   the immediate period preceding the bankruptcy filing
20   or shortly thereafter to the best of my recollection.
21             Q.  What about with respect to the sureties
22   that issued bonds as part of the decommissioning
23   security?
24             A.  I don't recall any specific conversations
25   that we had with those parties regarding our



Page 62

1   restructuring leading up to the restructuring, but
2   those are parties that we have ordinary, ongoing
3   business conversations with at various times.
4        Q.  Did Fieldwood have any communication with
5   any of its sureties in connection with its intent to
6   seek bankruptcy protection?
7             MR. PÉREZ:  I'm sorry, Ms. Court
8   Reporter, can you read that -- can you read that
9   again.  I missed the question.
10            THE COURT REPORTER:  Yes.
11             (The record was read as requested)
12            THE WITNESS:  I don't believe there were
13  substantive conversations with the surety providers
14  specific to the company's restructuring plans prior
15  to filing for restructuring, that I can recall.
16       Q.  (BY MR. GRZYB) Is there any
17  communications between Apache and Fieldwood in
18  connection with the surety bonds that are part of the
19  decommissioning security?
20       A.  The companies had a number of discussions
21  with Apache about the Decommissioning Agreement
22  security in general.  I don't recall any specific
23  conversations about the bonds in particular, outside
24  of general conversations about the various security
25  arrangements that exist because of the



Page 63

1    Decommissioning Agreement.

2            Q.  Did Fieldwood and Apache ever have

3    conversation regarding Fieldwood's indemnity

4    obligations to the sureties?

5            A.  Not that I can recall.

6            Q.  Describe the process of attempting to

7    sell the deepwater properties.

8            A.  Do you mind being more specific about at

9    what point you're referring to?

10           Q.  Prior to -- let me rephrase that.

11               Was there an attempt to sell those

12   properties that are deemed transferred to the credit

13   bid purchaser?

14           A.  Yes.

15           Q.  Can you -- and can I -- is it accurate,

16   generally speaking, for me to refer to them as

17   "deepwater properties"?

18           A.  Yes.

19           Q.  Was there an effort to sell the deepwater

20   properties rather than restructure?

21               MR. PÉREZ:  Object to the form of the

22   question:  Assumes facts not in evidence.

23           Q.  (BY MR. GRZYB) Yeah.  Was there any

24   effort to market the deepwater properties?

25           A.  Yes.



Page 64

1          Q.   When was that effort?

2          A.   That effort commenced prior to filing for

3    Chapter 11.  It was part of the restructuring plan

4    and ultimately the RSA that was entered into between

5    the company and the lenders that there was a required

6    dual track sales process effort with respect to the

7    company's deepwater assets and also recapitalization

8    of a portion of the business, and in line with that

9    restructuring support agreement, the company engaged

10   upon, with its advisors, a marketing process of those

11   assets, which commenced at the end of June of 2020.

12         Q.   Who was in charge of that marketing

13   effort?

14         A.   Houlihan Lokey was the advisor that ran

15   that marketing effort for the company.

16         Q.   And I am to understand that Fieldwood did

17   receive bids, correct?

18         A.   Yes, we did.

19         Q.   And if I remember correctly, they were

20   all -- how many bids -- let me rephrase the question.

21              How many bids did the company receive?

22         A.   The company received five bids and seven

23   indications of interest.

24         Q.   Why were the -- can you give me a number

25   for the highest bid among the five?



Page 65

```
 1                THE WITNESS:  Alfredo, I think you're on
 2     mute.
 3                MR. PÉREZ:  Yeah, in connection with the
 4     BP Motion to Compel, we were required to produce that
 5     with the -- the numbers redacted, so I don't know how
 6     you want to handle that.
 7                MR. GRZYB:  One second.  So, Alfredo, do
 8     we have that?  Does the surety group have that?
 9                MR. PÉREZ:  Have what?
10                MR. GRZYB:  Whatever was --
11                MR. PÉREZ:  The bid?
12                MR. GRZYB:  Yes.
13                MR. PÉREZ:  I don't know whether you do
14     or not, but I mean, we produced the --
15                MR. GRZYB:  Craig --
16                MR. PÉREZ:  Sorry.  We -- I'm sorry.  We
17     redacted the names, not the numbers.  So sorry, I
18     apologize.
19                MR. GRZYB:  Okay.  So he can testify to
20     the numbers?
21                MR. PÉREZ:  He can testify to the numbers
22     but not -- not the -- not the names.
23                MR. GRZYB:  Okay.
24                MR. PÉREZ:  I got confused.
25           Q.   (BY MR. GRZYB) Okay.  Of the five bids,
```



Page 66

```
 1    what was the highest?

 2            A.  I apologize, before I answer the

 3    question, there is a line that has some noise.

 4                MR. GRZYB:  Someone's typing, I think.

 5                THE WITNESS:  The highest nominal bid was

 6    $700 million.

 7            Q.  (BY MR. GRZYB) And why was that bid

 8    rejected?

 9            A.  After the company received all the bids,

10    they were shared and discussed with the lenders'

11    advisors and at a certain level with the lenders.

12    And the RSA that the company signed with the lenders

13    required the -- provided the lenders with consent

14    over whether to pursue a sales process, depending on

15    the outcome of that process, or pursue a

16    recapitalization transaction.

17                When the lenders reviewed the various

18    bids that came in, they found them to be deficient in

19    a number of ways, starting with the overall value.

20                MR. BAINS:  Darren, apologies.  This is

21    Brandon Bains.  He cut out.  What was the amount of

22    that bid?  I apologize.

23                THE WITNESS:  $700 million.

24            Q.  (BY MR. GRZYB) Mr. Dane, go ahead, you

25    say it again.  I just talked over you.  I apologize.
```



Page 67

```
 1              A.  I'm sorry.  I said $700 million was the
 2    nominal highest amount.
 3                   MR. BAINS:  Thank you.
 4              Q.  (BY MR. GRZYB) Was this $700 million
 5    amount -- I will rephrase the question.
 6                   Was the bid associated with the $700
 7    million nominal amount deemed deficient for reasons
 8    other than the amount?
 9              A.  Yes, it was deemed deficient for a number
10    of reasons.
11              Q.  What were some of those reasons?
12              A.  Some of those reasons included the
13    identity of the purchaser, the confidence of that
14    purchaser's ability to execute, the fact that that
15    bid assumed the need to finance or raise an amount
16    equal up to 100 percent of the bid amount, the fact
17    that it was predicated on an effective date which
18    would have required significant purchase price
19    reductions, the fact that the bid -- that the bid
20    letter specified that there was a need for an
21    independent third-party reserve report to be
22    generated, the general execution capabilities of that
23    counterparty and associated regulatory risks and
24    concerns.
25              Q.  Did the secured lenders give a written
```



Page 68

1    statement to you with these -- with this list of

2    deficiencies?

3         A.  I don't recall that there was a written

4    statement, but there would -- I don't recall that

5    there was a written statement.

6         Q.  These -- was it the lenders that found

7    these deficiencies?

8         A.  The lenders were aware of, and

9    articulated, the deficiencies, and these were

10   discussions that took place with the company where

11   both the lenders and the company discussed the

12   content of the bids and concerns that both of the

13   parties had about any considerations with respect to

14   all the bids that were received.

15        Q.  What is the second highest bid?

16        A.  I would have to refer to the biddings, if

17   you have them available for me to review.  I believe

18   it may have been $500 million.

19        Q.  I don't have that.  I am going to have

20   the -- have any rights of first refusal been asserted

21   by any co-working interest owners with respect to the

22   deepwater assets?

23        A.  A right of first refusal -- I apologize,

24   do you mind repeating your question?

25        Q.  Have any rights of first refusal been



Page 69

1    asserted by any of the co-working interest owners

2    with respect to the deepwater properties?

3           A.  I don't know if they have been or not.

4    At various times there is always rights of first

5    refusal that are asserted.

6           Q.  Have you -- has Fieldwood received any

7    offers to purchase any of the Legacy/Apache

8    properties?

9           A.  Do you mind specifying what time period

10   you're referring to?

11          Q.  One second.  Since the time that you

12   began discussing a restructuring with your lenders.

13          A.  Yes.

14          Q.  Can you describe offers -- can you

15   identify -- I will rephrase the question.

16              Who has made offers to purchase

17   Legacy/Apache properties?

18          A.  I believe those letters were provided,

19   but I would defer to Counsel, if it's appropriate, to

20   answer that question, because I thought the names

21   were redacted.

22              MR. PÉREZ:  I think that's right.

23          Q.  (BY MR. GRZYB) Well, let me -- okay.  I

24   will ask you to pull up Exhibit 2.

25                     (Exhibit 2 marked)



Page 70

```
 1                THE WITNESS:  The exhibits that I have
 2   aren't labeled.  Do you mind either sharing that in
 3   the chat or identifying the document and I can pull
 4   it up?
 5                MR. PÉREZ:  Mike, I can send it to you.
 6   Here.
 7                THE WITNESS:  Thank you.
 8        Q.  (BY MR. GRZYB) Now I will read it, too,
 9   because I just received this document as well.
10                So have you been able to access --
11                MR. PÉREZ:  I'm sorry, yeah, you also
12   should have gotten, Mr. Dane, an e-mail from Erin --
13   I don't know if it made it through your filter --
14   that had all of the documents.
15                THE WITNESS:  Is this on our Weil file
16   share site?  I haven't had my e-mail up.
17                MR. PÉREZ:  I don't know.
18                MS. CHOI:  Yes, yes.
19                THE WITNESS:  Okay.  So I have access to
20   that Weil cloud share site.
21                What folder would that be?
22        Q.  (BY MR. GRZYB) Should I just e-mail this
23   to you?
24        A.  Yes, please.  Thank you.
25        Q.  I am going to e-mail you 2 through 4, and
```



Page 71

```
 1     I will copy Mr. Pérez.  And --
 2            A.   Okay, I do have a copy of it from
 3     Mr. Pérez.
 4            MR. PÉREZ:  Yeah, it starts, "Dear John."
 5            THE WITNESS:  I do see that, yes.
 6            Is this -- that is the exhibit?  Got it.
 7            MR. PÉREZ:  This is the exhibit, yes.
 8            MR. GRZYB:  Do you want to take five
 9     before we start doing this?
10            Alfredo, are you okay doing that?
11            MR. PÉREZ:  We can take five.  I mean, I
12     think if he has the exhibits, I think he knows what
13     they are, but -- but we probably don't need to,
14     but --
15            Q.   (BY MR. GRZYB) Okay.  Do you have -- hold
16     on one second.
17            What is your e-mail address, Mr. Dane?
18            A.   It is mdane@fwellc.com, like
19     fieldwoodenergyllc.com.
20            Q.   So I sent 2 through 4, but I understand
21     that you have a "Dear John" e-mail you're able to
22     access; is that correct, Mr. Dane?
23            A.   That's correct.
24            Q.   Bear with me.  Like I said, I have just
25     seen this.
```



Page 72

1                    Could you describe -- are you familiar
2       with this document that's been marked as Exhibit 2?
3            A.   I am.
4            Q.   And can you describe for me it generally?
5            A.   This was an e-mail in which a party that
6       had previously evaluated a property that in 2019 had
7       been marketed for sale was expressing an offer, an
8       indication of interest or an offer on that particular
9       property that they wanted to explore further with
10      Fieldwood.
11           Q.   Can you give me a timeframe that this
12      indication of interest was issued?
13           A.   I don't see the date on this.  I
14      apologize, I do see the date at the bottom.  It is
15      April -- this is April 2020.
16           Q.   And what is the -- can you identify what
17      asset is being discussed in this e-mail?
18           A.   This is the South Timbalier 311 field.
19           Q.   And is the Timbalier 311 field under the
20      Plan of Reorganization as it is currently drafted?
21                What bucket is that going to fall into?
22           A.   That is a Fieldwood I asset.
23           Q.   It appears to me that being -- an offer
24      is being made here for $65 million, is that accurate,
25      for Timbalier 311 field?  If you go to Romanette I.



Page 73

1          A.   There is an offer being made at

2     $65 million.

3          Q.   What was -- what did Fieldwood do in

4     connection -- in response to this offer?

5          A.   We had an ongoing conversation with this

6     particular counterparty for many, many months.  This

7     was a very protracted conversation that evolved over

8     a relatively long period of time relative to the

9     original desired sales process conclusion.  The

10    response to this offer was that the value being

11    discussed at that time was not acceptable, and there

12    was further conversations.

13         Q.   Did this party that issued this

14    indication of interest ever increase its offer?

15         A.   I don't recall that we received an

16    increased offer from that party after -- after this

17    dialogue and -- correct.

18         Q.   Was it Fieldwood's decision that this

19    offer was not actionable because it wasn't high

20    enough?

21         A.   Yes.

22         Q.   That value -- it was undervalued for the

23    asset that was being offered to acquire, correct?

24         A.   It was not acceptable at the time, and

25    that's correct.



Page 74

1        Q.  Did Fieldwood consult with anyone in
2    connection with this offer?
3        A.  Fieldwood had conversations with its
4    board at the time of this offer.
5        Q.  Did Fieldwood discuss this offer with
6    Apache?
7        A.  Subsequent to Fieldwood's Chapter 11
8    filing and signed term sheet and agreement principle
9    with Apache, Fieldwood advised Apache that the
10   company has received, over time, various unsolicited
11   and solicited through extended processees offers for
12   certain assets and advised that if there was a desire
13   to pass along that information or have further
14   discussions that we would be open to facilitating
15   those conversations.
16            Under the Fieldwood/Apache term sheet,
17   the agreement contemplates that all of the assets
18   that were acquired from Apache will comprise
19   Fieldwood I, and so it didn't -- it was not
20   appropriate to be exploring individual asset M and A
21   opportunities at that point, given the comprehensive
22   agreement that we had reached with Apache.
23       Q.  So is it your position that if there was
24   a -- in order to sell an asset to an entity, it would
25   require under the RSA Apache's consent?



Page 75

```
 1           A.  I don't know if that would be governed by
 2      the RSA, but Fieldwood at the time had a signed term
 3      sheet with Apache that outlines a comprehensive
 4      transaction and included all of the asset as a part
 5      of that transaction.  And eventually that was
 6      documented in definitive documentation over the
 7      subsequent several months.
 8                It was certainly an understood feature of
 9      that transaction that all of the properties that
10      comprised the Legacy/Apache properties, other than
11      those specifically discussed, would comprise that
12      asset base, unless there was mutual agreement
13      otherwise.
14           Q.  Is there a particular representative
15      individual at Fieldwood that made the determination
16      that this offer was for insufficient value with
17      respect to this asset?
18           A.  I believe at prior times during the sales
19      process there had been discussions of higher values.
20      This was an asset that was marketed in the fourth
21      quarter of 2019.  There has been indications of
22      higher value at that time.  Those were not accepted
23      at that time.
24                Following that process and those earlier
25      discussions, and given obviously market volatility
```



Page 76

1    that had happened prior to receiving this offer, this

2    was an updated offer from a party that had been

3    involved in that sales process, and it was discussed

4    with a number of folks internally, including the

5    company's business development group, the CEO, and

6    various other representatives.

7            Q.  This offer for this asset, has it ever

8    been -- I will rephrase the question.

9            Did this particular indication of

10   interest get passed along to Apache?

11           A.  I don't recall if the specific documents

12   were passed along to Apache, but Apache was made

13   aware that there had been offers in recent periods

14   relating to certain assets that were going to

15   comprise Fieldwood I, and the specific reference

16   there was to this field which had been the subject of

17   more than one offer.

18           Q.  And what has Apache's position been with

19   respect to offers -- offers for this field?

20           MR. PÉREZ:  Object to the form of the

21   question:  Assumes facts not in evidence.

22           THE WITNESS:  You have to ask Apache

23   their position.  They acknowledged -- they

24   acknowledged the information that we provided them,

25   and there was not follow-up dialogue on these points



Page 77

1    of any sense.

2                    (Exhibit 3 marked)

3            Q.   (BY MR. GRZYB) All right.  Let's move on

4    to Exhibit 3.  I have sent you an e-mail, if that is

5    easier to pull up that PDF.

6            A.   I have it here.

7            Q.   Are you familiar with the document that's

8    been marked as Exhibit 3?

9                    MR. PÉREZ:  My exhibits aren't numbered.

10   Can we just identify just -- is this the letter dated

11   September 17th, 2020?

12                    MR. GRZYB:  Yeah, September 1st, yes,

13   2020.

14                    MR. PÉREZ:  Okay.

15                    MR. GRZYB:  Addressed to likely -- you

16   know, I say it is marked but that's inaccurate.  It

17   is marked in the title of the PDF.

18                    MR. PÉREZ:  Perfect, yes.  You're right,

19   exactly.

20                    THE WITNESS:  Yes, I am familiar with

21   this document.

22           Q.   (BY MR. GRZYB) Describe generally what

23   this letter is.

24           A.   This letter is an offer on the same

25   property that we were discussing, so the Timbalier



Page 78

```
1   311 and related wells.  And it was an offer that was
2   made in September of 2020 from a party that had
3   previously, I believe, been involved in the sales
4   process almost a year prior, and the proposed
5   purchase price was for $31 million.
6           Q.  And was this offer rejected for the same
7   reason, that it was not sufficient value according to
8   Fieldwood?
9           A.  When we received this offer, I had a
10  conversation with the principal of this firm and
11  described to them the restructuring process that we
12  were undergoing, the transaction that we were working
13  with Apache on, and considerations that we discussed
14  about the asset base and our agreement with Apache
15  that may make a transaction like this problematic,
16  and I also discussed the fact that the purchase price
17  was very low relative to indications that we had
18  received previously and not received (sic).
19                  (Exhibit 4 marked)
20          Q.  (BY MR. GRZYB) Let's go Exhibit 4, which
21  you should have in your e-mail.
22                  Exhibit 4 is a July 13th, 2020 letter to
23  John Smith.  Are you familiar with this document?
24          A.  I am.
25          Q.  And describe -- is this relating to the
```



1    same property, that Timbalier field?

2            A.   No.   This is related to a broad number of

3    properties that generally does not include that

4    field, but there is a reference made to that field in

5    the letter.

6            Q.   The properties being discussed with this

7    letter, what bucket do they fall in within the Plan

8    of Reorganization?

9            A.   I think that they fall into various

10   buckets.  I know that there are some properties here,

11   particularly the more significant property that falls

12   into the Fieldwood I bucket but it is possible that

13   there are -- I believe there are other properties

14   that fall into other categories as well.

15           Q.   What did Fieldwood do in connection with

16   this offer?

17           A.   Fieldwood had a conversation with a party

18   that provided this offer and explained to them that

19   there was a number of challenges that would prohibit

20   us from pursuing a transaction with them.  We -- this

21   offer was received immediately prior to our filing

22   for Chapter 11.  Our plan was coming into focus.  Our

23   agreement with Apache was near finalized.

24               The -- aside from those concerns, the

25   offer was wholly unacceptable for various other



Page 80

1    reasons.

2         Q.   What were those reasons?

3         A.   The counterparty that made this offer was

4    viewed to be very challenged by Fieldwood.  The

5    property set that was outlined was very

6    comprehensive.  It involved a swap of assets both

7    with respect to interests that were owned by

8    Fieldwood and operated by this counterparty and vice

9    versa.  The value was exceedingly low.

10             The execution capabilities,

11   notwithstanding the value being wholly inadequate,

12   were -- were also challenged, but generally speaking,

13   it didn't fit the framework of the comprehensive

14   solution that Fieldwood was pursuing with its

15   stakeholders and with Apache specifically.

16        Q.   Starting with the timeframe of May of

17   2020 to now, have there been any offers to acquire

18   Fieldwood assets beyond the five bids that we talked

19   about on a credit bid side and these three written

20   correspondence in Exhibits 2, 3 and 4 that we have

21   just discussed?

22        A.   We receive unsolicited offers in the

23   ordinary course of business, but for immaterial and

24   material assets.  I'm not aware of any other bids

25   that we have received on assets other than the items



Page 81

```
 1    that we have discussed, and I'm certainly -- there is
 2    nothing that I recollect that's material that we have
 3    received.
 4              MR. PÉREZ:  Yeah, we have been going for
 5    about an hour.  So whenever you are going to switch
 6    topics, maybe we could take a ten-minute break?
 7              MR. GRZYB:  I can -- I can do a
 8    ten-minute break now.
 9              MR. PÉREZ:  All right.  So be back at
10    five after?
11              MR. GRZYB:  Yeah.
12              THE COURT REPORTER:  I'm off.  Thank you.
13                   (Recess taken)
14         Q.  (BY MR. GRZYB) Mr. Dane, I must admit
15    this is the first time I have done this type of
16    proceeding on Zoom, so I need to ask:  Is anyone
17    e-mailing you any information other than what I sent
18    you in terms of the exhibits in connection with your
19    testimony here?
20         A.  No.  The only e-mail that is -- that I
21    have reviewed has been the e-mails from you and from
22    Weil with respect to the documents.
23         Q.  The Weil e-mails with respect to
24    documents, has there been any -- any writing other
25    than a signature line in the document themselves?
```



Page 82

```
 1          A.  It only has contained the documents that
 2   were being discussed.
 3          Q.  What about text messaging?
 4          A.  No.
 5          Q.  Other direct messaging?
 6          A.  I received a text message asking if I
 7   would like lunch brought in, and that is the only
 8   text message that I have received.
 9          Q.  Okay.  Whose idea was --
10          A.  Yeah.
11          Q.  Whose idea was it to create Fieldwood I
12   for the creation of the Legacy properties?
13              MR. PÉREZ:  Object to the form of the
14   question:  Asked and answered.
15              THE WITNESS:  I believe I answered that
16   question earlier.  And there was a term sheet that
17   was ultimately presented to Fieldwood, which was the
18   evolution of a number of discussions, and Fieldwood I
19   was described and then negotiated as part of those
20   term sheet negotiations.
21          Q.  (BY MR. GRZYB) Is it accurate to say that
22   under the Plan of Reorganization in the various
23   agreements that post confirmation, the plan was for
24   Fieldwood I to address the Legacy/Apache properties?
25          A.  Would you mind being more specific by
```



Page 83

1    what "address" means?

2         Q.  Well, I will answer your question with

3    another question, which is:  What is -- what

4    functions will Fieldwood I carry out post

5    confirmation?

6         A.  Fieldwood I is going to be the owner of

7    the Legacy/Apache assets.  It is going to be led by a

8    sole manager, and the sole manager is going to direct

9    the operations of the service provider in order to

10   service the Fieldwood I assets.

11        Q.  Who is the service provider going to be?

12        A.  The service provider initially is going

13   to be the credit bid purchaser NewCo Company.

14        Q.  And is it accurate to say that the NewCo

15   company will be populated primarily by current

16   employees of Fieldwood I?

17        A.  Yes.

18        Q.  Is it the intention that you personally

19   will have a position with the NewCo?

20        A.  That's my intention.

21        Q.  Has it been confirmed what your position

22   will be?

23        A.  I have had various conversations with the

24   lender group about the organization post effective

25   date with the -- with the NewCo and I had --



Page 84

1    (inaudible).

2         Q.  I didn't hear that last answer.

3         A.  I have had conversations with the lender

4    group about my role in the post reorganized company.

5         Q.  Is it your understanding that you will be

6    CFO of the new company?

7         A.  The discussions that I have had with the

8    lenders about my role in the post reorganized company

9    is as chief executive officer.

10        Q.  The surety bonds that exist that are part

11   of the decommissioning security, what is Fieldwood's

12   intention -- I will rephrase the question.

13             What is Fieldwood's intention with

14   respect to the surety bonds that are part of the

15   decommissioning security post confirmation?

16             MR. PÉREZ:  Object to the form of the

17   question:  Vague.

18             THE WITNESS:  The security that underlies

19   the Decommissioning Agreement is not intended to

20   change.  Fieldwood doesn't have any intentions with

21   respect to any of the security that exists as they

22   have.

23        Q.  (BY MR. GRZYB) Is there any -- does

24   Fieldwood intend for the decommissioning security to

25   be used in any fashion to capitalize Fieldwood I's



Page 85

1    operation immediately post confirmation?

2         A.  Fieldwood doesn't have intentions with

3    respect to the surety bonds.  The surety bonds secure

4    obligations pursuant to the agreements that were

5    originally required, those security instruments, and

6    the intention is for those various security

7    instruments to exist as they currently do pursuant to

8    the way they were granted originally.

9         Q.  Does Fieldwood have any -- does that -- I

10   will rephrase the question.

11             Does that also include maintenance status

12   quo with respect to Fieldwood's indemnity obligation

13   to the sureties?

14             MR. PÉREZ:  Object to the form of the

15   question:  Vague.

16             THE WITNESS:  The indemnity obligations,

17   I would defer to Counsel on the legal treatment of

18   the indemnity agreements.  I understand that they are

19   simply pre-petition claims and they would be

20   addressed through the plan in that manner.

21        Q.  (BY MR. GRZYB) So is it your testimony

22   that the bonds under Fieldwood's concept will remain

23   in place as security for the decommissioning

24   obligations but there is no concurrent indemnity

25   obligation from Fieldwood vis-à-vis the sureties?



Page 86

 1            MR. PÉREZ:  I object to the form of the
 2    question:  Misstates his testimony.
 3            THE WITNESS:  Fieldwood is not the
 4    beneficiary of the bonds.  The indemnity agreements,
 5    as I understand it, and again, I would defer to
 6    Counsel, are going to be handled in the manner which
 7    I described pursuant to the plan.
 8        Q.  (BY MR. GRZYB) What is Fieldwood's
 9    intention with respect to current governmental BOEM
10    bonds?
11        A.  Fieldwood doesn't -- as I stated,
12    Fieldwood doesn't have any intention with respect to
13    any of the bonds.  Fieldwood is not the beneficiary
14    of the bonds and the indemnity agreements are going
15    to be treated as I described pursuant to the plan.
16        Q.  Is it -- is Fieldwood going to obtain new
17    bonding with respect to Fieldwood I's operations post
18    confirmation?
19        A.  Fieldwood is not going to -- Fieldwood I
20    may be required to obtain bonding.  There are --
21    there are general statutory bonding requirements, and
22    I assume that Fieldwood I will need to satisfy those
23    requirements.
24        Q.  Is Fieldwood in -- strike the question.
25            Do you know of any specific statutory



1  requirement that Fieldwood I will have to fulfill in

2  order to operate with respect to bonds?

3        MR. PÉREZ:  Object to the question:  It

4  calls for a legal conclusion.

5        THE WITNESS:  Areawide operator --

6  areawide and operator bonds are customarily required,

7  and I would anticipate that Fieldwood I would require

8  those types of bonds.

9        Q.  (BY MR. GRZYB) In your role as a current

10 CFO for Fieldwood, do you ever touch upon the bonding

11 needs of Fieldwood?

12       A.  Yes.

13       Q.  And how would you describe the functions

14 that you serve for Fieldwood in that capacity?

15       A.  Our -- we have a vice president of risk

16 management who is principally in charge of dealing

17 with surety-related issues, as well as our finance

18 team that supports him in those efforts, and I work

19 with those folks in managing those relationships and

20 evaluating the company's surety bond needs.

21       Q.  Did you meet with the vice president of

22 risk management in preparation for this deposition

23 today?

24       A.  No, I did not.

25       Q.  And can you please identify that



Page 88

1    individual.

2            A.   Mark Mozell.

3            Q.   Is Fieldwood in any current conversations

4    with any department of the United States government

5    with respect to bonding requirements for Fieldwood I?

6            A.   Fieldwood has been in longstanding

7    conversations with a number of government regulatory

8    agencies and bonding is a topic that is one of many

9    that is under discussion.

10           Q.   Does Fieldwood -- let's take it bucket by

11   bucket.

12                Does Fieldwood know what areawide and

13   operator bonds will be required of Fieldwood I post

14   confirmation?

15           A.   Areawide and operator bonds are required

16   of any operator, and Fieldwood assumes that any

17   operating entity would be required to obtain those

18   types of bonds.

19           Q.   So Fieldwood intends to obtain new bonds

20   for Fieldwood I post confirmation with respect to --

21                MR. PÉREZ:  Object to the --

22                I'm sorry.

23                Object to the form of the question:  It

24   states facts not in evidence; assumes facts not in

25   evidence.



Page 89

1          Q.   (BY MR. GRZYB) I believe you said,

2     Mr. Dane, you assumed that Fieldwood is going to have

3     to obtain areawide and operator bonds, correct?

4          A.   Correct.

5          Q.   And is that the same assumption that you

6     have with respect to Fieldwood III?

7          A.   Yes.

8          Q.   And is it also your assumption that the

9     credited purchasers will have to obtain their own

10    bonds post confirmation in order to operate?

11            MR. PÉREZ:  Object to the form of the

12    question:  Assumes facts not in evidence.

13            THE WITNESS:  Consistent with the type of

14    bonds that I just described for the other entities,

15    that would be consistent for any operator, including

16    a credit bid purchaser.

17          Q.   (BY MR. GRZYB) So I will try and clean up

18    the question.  NewCo -- is it -- is it NewCo's -- let

19    me try again.  Strike the question.

20            Is it Fieldwood's intention for NewCo to

21    obtain governmentally required bonds in order to

22    operate post confirmation?

23          A.   It is Fieldwood --

24            MR. PÉREZ:  Object to the form of the

25    question:  Vague.



Page 90

1          THE WITNESS:  Fieldwood's intention is

2    that it would -- it would obtain whatever required

3    bonds are necessary to accomplish each of the various

4    transactions.

5              (Exhibit 6 marked)

6          Q.  (BY MR. GRZYB) Mr. Dane, can you pull up

7    Exhibit 6 for me, please, in our data room.

8          A.  Yes.

9              MR. PÉREZ:  Is that the Farmout

10   Agreement?

11             MR. GRZYB:  Yes.

12         Q.  (BY MR. GRZYB) Exhibit 6 has been

13   identified -- I guess you would call it a draft

14   Farmout Agreement that is part of the current Plan of

15   Reorganization, Document Number 1285-2.

16         A.  I have this in front of me.

17         Q.  Are you familiar with this document,

18   Mr. Dane?

19         A.  Yes, I am.

20         Q.  Can you describe for me generally what it

21   is.

22         A.  This is a document that is a part of the

23   set of Apache agreements that's going to be entered

24   into at exit between Fieldwood I and the credit bid

25   purchaser and it defines the mechanism by which the



Page 91

```
 1   credit bid purchaser has the opportunity to propose

 2   and conduct operations under defined economic terms

 3   on the assets that are going to be owned by

 4   Fieldwood I.

 5          Q.   Is this a -- generally speaking, an

 6   agreement that governs a mechanism by which the

 7   credit bid purchasers can invest in potential

 8   projects associated with the Legacy/Apache

 9   properties?

10          A.   I think that's generally correct.

11          Q.   Has Fieldwood identified any potential

12   projects that may benefit from that Farmout

13   Agreement?

14          A.   Fieldwood's business today is managing

15   these properties, so the professionals that are

16   employed by Fieldwood are very familiar with these

17   properties and it is part of their ongoing

18   responsibility today to be familiar with these

19   properties.  The process of identifying property --

20   identifying projects is part of an ongoing, ordinary

21   business operation that we support.

22          Q.   How many asset teams focus on the

23   Legacy/Apache properties?

24          A.   We have two asset teams that comprises

25   our shelf's asset team structure.
```



Page 92

1          Q.  And so is it fair to say that testimony
2     you gave before regarding their ongoing
3     responsibilities that did identify potential
4     projects, it would be those two asset teams, that
5     would be the folks at Fieldwood that would have the
6     best opportunity to identify projects that could
7     benefit from that Farmout Agreement?
8          A.  I think it is fair to say that the staff
9     at Fieldwood has a high level of familiarity --
10    familiarity with the Fieldwood I asset base having
11    managed it for an extensive period of time.
12         Q.  Is there any projects -- well, I will
13    strike the question.
14              Did you meet with anyone on the shelf
15    asset teams in connection with your preparation for
16    this deposition?
17         A.  I did not meet with any of these -- yes,
18    I did.  But I did meet with members of -- with -- let
19    me restate my answer, please.
20              The -- there were participants that lead
21    our asset teams that were -- that participated in
22    conversations I had preparing for this deposition.
23         Q.  Who -- who do the asset teams report to?
24         A.  I believe the asset teams report to Gary
25    Mitchell, but I would have to consult our org chart



Page 93

1    to verify that.

2            Q.  Can you testify to any project in

3    connection with the Legacy/Apache properties that

4    would benefit from that Farmout Agreement?

5            MR. PÉREZ:  I'm going to object to the

6    question.

7            I don't know if you're asking him:  Has

8    there been a project identified that will be

9    implemented pursuant to this?  Is that your question,

10   is there an agreement with respect to an individual

11   project?  Is that what you're saying?  Is that what

12   you're asking?

13           MR. GRZYB:  Well, I think it is two

14   parts, Alfredo, and I guess the first -- the first

15   question is exactly like you said.

16           Q.  (BY MR. GRZYB) Are there any individual

17   projects envisioned with respect to this Farmout

18   Agreement?

19           Did you hear my question?

20           A.  Yeah, I apologize, I'm thinking about

21   your question.  The asset team's primary function is

22   to manage these properties, and as part of that

23   ongoing effort, they are always evaluating potential

24   opportunities.  There is not an agreed list of

25   projects that are going to be conducted pursuant to



Page 94

1    this agreement.

2         Q.  Has there been any communications between

3    Fieldwood and the lenders with respect to projects

4    associated with that Farmout Agreement?

5         A.  No, there has not been any communication

6    with the lenders about specific projects pursuant to

7    that Farmout Agreement.

8         Q.  This Farmout Agreement, is it -- I will

9    strike that question.

10            Has there been any discussions with

11   Apache with regard to projects that could be taken on

12   in connection with that Farmout Agreement?

13        A.  I don't believe there has been any

14   conversation on specific projects with Apache, and

15   Apache is familiar with the asset base through their

16   diligence of this transaction.  They understand

17   obviously the concept of the Farmout Agreement.

18   Apache will not be under the -- pursuant to the

19   Farmout Agreement, Apache is not going to be making

20   elections with respect to projects.

21        Q.  So is it your testimony that Apache's

22   concept is not required for a farmout arrangement

23   with the credit bid purchasers?

24        A.  I think that your question mixes a few

25   different concepts.  Farmouts, in general, of the



Page 95

1    Fieldwood I asset base are governed by certain

2    consent rights within the LOC agreement that may be

3    applicable to Apache.  Projects specific to proposals

4    under the Farmout Agreement will be determined, as I

5    understand it, by Fieldwood I as the sole manager.

6                    (Exhibit 7 marked)

7            Q.  (BY MR. GRZYB) Mr. Dane, I'm going to ask

8    you to please pull up Exhibit 7, which is

9    identifiable as Document 1285-1 in the bankruptcy.

10   It is Exhibit 8 to the Plan of Reorganization and

11   Disclosure Statement, and it is titled "Standby" --

12   hold on -- "Standby Loan Agreement."

13           Are you familiar with this document?

14           A.  I am generally familiar with this

15   document.

16           Q.  Can you please provide a general

17   description of your understanding of this document?

18           A.  The standby loan agreement is an

19   agreement that Fieldwood I is a party to with Apache

20   as the lender and Fieldwood I as the potential

21   borrower, and this is a facility for up to $400

22   million to be utilized, if required, and under the

23   provisions of the agreement to access funds for

24   Fieldwood I related plugging and abandoning

25   activities.



Page 96

1          Q.  Is there a timing mechanism by when these
2     funds can be made available to Fieldwood I?
3          A.  Yes.
4          Q.  And what is your understanding of the
5     timing mechanism?
6          A.  The facility has a five-year maturity,
7     which can be extended to ten years, and the funding
8     is available upon certain specific conditions which
9     are outlined in the agreement.
10          Q.  Can you give me an independent under --
11     your independent understanding of what those
12     conditions are?
13          A.  Funding is --
14          MR. PÉREZ:  I'm going to object to the
15     form of the question.  The document speaks for
16     itself.
17          But go ahead and answer if you -- if you
18     recollect.
19          THE WITNESS:  I think the document is
20     clear about the conditions under which funding is
21     available.
22          Q.  (BY MR. GRZYB) Who, as between Apache and
23     Fieldwood, proposed the standby facility?
24          A.  The standby facility was negotiated as
25     part of the Fieldwood I term sheet between the



Page 97

1   parties.

2          Q.  Were you personally involved in the

3   negotiation of the standby facility?

4          A.  I was not generally involved in the

5   direct negotiation of this particular document.

6          Q.  What about the concept of Fieldwood

7   being -- I'm sorry.  Strike the question.

8              Were you involved with the concept of

9   Apache being a potential lender to Fieldwood?

10         A.  Apache is not a lender to Fieldwood.

11         Q.  Well, then what would you describe

12  this -- in light of this standby facility, how can

13  you testify that they're not a lender to Fieldwood?

14         A.  There is no loan agreement that's being

15  contemplated or has been contemplated between Apache

16  and Fieldwood.

17         Q.  So is your answer more to the fact that

18  the Plan of Reorganization calls for a new entity

19  called Fieldwood I to be created?

20         A.  The Plan of Reorganization --

21             MR. PÉREZ:  Object to the form of the

22  question.  You know, it basically calls for a legal

23  conclusion.

24             But -- but I mean, you can answer.

25             THE WITNESS:  Fieldwood I is an entity



Page 98

1    that's contemplated under a Plan of Reorganization.

2         Q.  (BY MR. GRZYB) Yeah, I'm not -- I'm not

3    understanding how this is a standby loan agreement

4    and that -- I think your testimony is that Apache is

5    not a lender.

6         A.  You --

7              MR. PÉREZ:  No.  I think his testimony

8    was that Fieldwood, the debtor entity, is not a

9    borrower.

10        Q.  (BY MR. GRZYB) So that's -- we're making

11   the distinction on an entity perspective that it is

12   Apache that's going to be the lender and Fieldwood I

13   is going to be the borrower, correct?

14        A.  The first paragraph about the loan

15   agreement specifies that it is among Fieldwood I as

16   the borrower and Apache corporation as the lender.

17        Q.  Okay.  Conceptually, who came up with

18   that idea?

19        A.  That was developed as part of the

20   negotiations with Apache that culminated in the term

21   sheet between the parties.  That was an ongoing

22   negotiation.

23        Q.  Were you involved with the negotiation of

24   the amount of the standby facility?

25        A.  Yes.



Page 99

1          Q.  How was the amount of $400 million
2     determined?
3          A.  The parties exchanged a lot of data
4     during the negotiations, various projections, and the
5     amount that the standby facility contemplates was
6     what Apache was willing to provide after
7     negotiations.
8          Q.  What kind of data are you testifying to
9     in connection with the exchange of information
10     regarding the negotiation of the standby facility?
11          A.  As I stated, we shared presentations with
12     Apache in our meetings and conversations.  Those
13     presentations contained expectations of the P and A
14     that would be required on the Fieldwood I properties.
15          Q.  Did those presentations include
16     expectations as to cash flow?
17          A.  Yes.
18          Q.  So we have P and A, we have cash flow.
19               Is there anything else that was addressed
20     in connection with the presentations with Apache?
21          A.  There was a lot of -- there was a lot of
22     information that was discussed in those presentations
23     with Apache.
24          Q.  Are we talking about reserves
25     information?



Page 100

1          A.   There was probably reserve information
2     exchanged.   There was reserve information exchanged
3     with Apache.
4          Q.   The reserves information that was
5     exchanged, was that Fieldwood's reserve information?
6          A.   Yes.
7          Q.   Did Apache ever provide Fieldwood its
8     reserves information in connection with these
9     properties?
10          A.   I'm not aware that Apache has an
11     independent reevaluation of these reserve properties.
12          Q.   What about the interest rate under the
13     standby facility, were you involved in the
14     negotiation of the interest rate with respect to the
15     standby facility?
16          A.   I was generally involved in the
17     negotiation around the Apache agreements.
18          Q.   Do you have a specific recollection about
19     negotiating the interest rate?
20          A.   I don't recall the specific negotiation
21     around the interest rate that I was involved in.
22          Q.   Without looking at the document, do you
23     know what the interest rate is?
24          A.   It is the Apache bond rate, plus four
25     percent, I believe.



Page 101

```
 1          Q.  Do you know what the current Apache bond
 2   rate is?
 3          A.  I believe it's between three and four
 4   percent.
 5                  (Exhibit 8 marked)
 6          Q.  (BY MR. GRZYB) If you would please pull
 7   up Exhibit 8 from the database, which is the
 8   Transmission Services Agreement, Exhibit 15 to the
 9   Disclosure Statement and Plan of Reorganization,
10   Document Number 1285-2.
11          A.  That was there.
12          Q.  Do you have it?
13          A.  Yes.
14          Q.  Can you describe generally what the
15   Transition Services Agreement is envisioned -- I will
16   strike the question.
17              How was the Transition Services Agreement
18   envisioned to operate?
19          A.  The Transition Services Agreement
20   describes the various services that the NewCo will
21   provide to manage the Fieldwood I properties and the
22   compensation that it is going to receive in exchange
23   for those services.
24          Q.  Is there a plan in place for if NewCo is
25   sold after confirmation in terms of the transmission
```



Page 102

```
 1   services that are being afforded for the Fieldwood I
 2   properties under this agreement?
 3            MR. PÉREZ:  Object to the form of the
 4   question:  Vague.
 5            A plan in place to do what?
 6       Q.  (BY MR. GRZYB) Okay.  Well, I guess the
 7   question is:  What happens -- what happens with
 8   respect to the service of the Fieldwood I entities if
 9   NewCo is sold?
10       A.  The plan -- excuse me.  The Transition
11   Services Agreement contains termination provisions
12   that are specified and the sole manager of Fieldwood
13   I pursuant to the LLC agreement has the ability to
14   select service providers.
15       Q.  Did you read my outline?  Because I was
16   going to start talking about sole manager right after
17   that.
18       A.  I have read the outline.
19            MR. PÉREZ:  He did.  He did.
20            THE WITNESS:  More than once.
21       Q.  (BY MR. GRZYB) You mentioned the sole
22   manager, Mr. Dane.  Where can I find the concept of
23   sole manager, is that in the LLC agreement?
24       A.  The sole manager's responsibilities and
25   authority are described in the LLC agreement.  The
```



Page 103

1    sole manager is also described in the Fieldwood I

2    term sheet.

3         Q.   I believe the Disclosure Statement says

4    that the sole manager for Fieldwood I will be

5    selected by Fieldwood and Apache.

6              Is that -- does that accurately describe

7    the selection process in your mind?

8         A.   Yes, there is a procedure that was

9    outlined to select the sole manager between those two

10   parties.

11        Q.   Has a sole manager been selected?

12        A.   Yes.

13        Q.   And can you identify the sole manager?

14        A.   Jon Graham.  Jon Graham will be the sole

15   manager.

16        Q.   Describe for me the process regarding the

17   selection of Mr. Graham to be the sole manager.

18        A.   The procedure that was outlined in the

19   term sheet allowed for each party, Apache and

20   Fieldwood, to propose several names; and then there

21   would be a mutual agreement or a procedure for

22   determining if there wasn't a new agreement,

23   Fieldwood I --

24        Q.   So is it -- oh, I'm sorry.

25             Is it your testimony that the -- that



Page 104

1    process has already taken place?  Correct?

2         A.  Yes.

3         Q.  Were you personally involved in the

4    selection of the sole manager for Fieldwood?

5         A.  Yes.

6         Q.  Were you personally involved with the

7    proposal of names for the sole manager?

8         A.  Yes.

9         Q.  Who was on Fieldwood's list?

10        A.  Fieldwood proposed Richard Black, David

11   Abell, and Beau Thompson.

12        Q.  Is Mr. Black a current employee of

13   Fieldwood?

14        A.  No.

15        Q.  What is his -- what is his background?

16        A.  Mr. Black was an attorney at Apache for

17   many years and then was the former general counsel of

18   Fieldwood.

19        Q.  Is he currently employed by anyone?

20        A.  Not to my knowledge.

21        Q.  What about Mr. Abell, is he an employee

22   of Fieldwood?

23        A.  No, he's not.

24        Q.  What is his background?

25        A.  Mr. Abell has served as plan



Page 105

1  administrator and a restructuring advisor and I

2  believe may have had former finance and investment

3  banking experience.

4        Q.   Tell me about Mr. Thompson.

5        A.   I believe Mr. Thompson is an attorney

6  that served in restructuring-related roles for other

7  oil and gas companies, and they also have a current

8  role in the capacity of the liquidating trustee to my

9  knowledge.

10        Q.   Who was on Apache's list?

11        A.   Apache didn't provide a formal list to

12  Fieldwood.  They had suggested that we meet and

13  interview with Jon Graham prior to advancing a

14  dialogue with respect to other potential candidates.

15        Q.   The suggestion that you meet with

16  Mr. Graham, how did that come to you?

17        A.   We had a procedure, but then in the

18  course of exchanging dialogue on the topic of sole

19  manager selection, despite the formality of the

20  procedure, there was a discussion of the potential

21  candidates, and that was the candidate that was

22  proposed by Apache for this role.

23        Q.   Did you personally -- were you personally

24  involved with the interview of Mr. Graham?

25        A.   Yes.



1        Q.  Who else from the Fieldwood was involved

2  in that interview?

3        A.  Tommy Lamme and John Seeger.

4        Q.  During that interview of Mr. Graham, was

5  anyone from Apache other than Mr. Graham present?

6           MR. PÉREZ:  Object to the form of the

7  question.  It assumes that Mr. Graham was from

8  Apache.

9           But go ahead and answer the question.

10         THE WITNESS:  When I met with Jon Graham,

11  there was no one from Apache present.

12        Q.  (BY MR. GRZYB) So essentially it was a

13  four-person meeting?

14        A.  In the meeting in which I interviewed

15  Mr. Graham, it was myself and Tommy Lamme.

16        Q.  Tell me about Mr. Graham's background.

17        A.  Mr. Graham has a very extensive résumé in

18  the oil and gas base.  He was an employee of Apache

19  in many different divisions, including in the Gulf of

20  Mexico and also as a leader in their HS and E group.

21  He retired in April of 2020.

22        Q.  Was he retired when you interviewed him?

23        A.  Yes.

24        Q.  Is he currently employed by the debtors?

25        A.  He is not an employee -- he is not an



1   employee of the debtors, but he is serving in a

2   consulting role.

3        Q.  Is Fieldwood paying Mr. Graham for his

4   consultancy?

5        A.  Yes.

6        Q.  I meant as opposed to someone else.  But

7   is Fieldwood as opposed to, say, Apache?

8        A.  Fieldwood is paying Mr. Graham pursuant

9   to his consulting agreement.

10       Q.  Does Mr. Graham own stock in Apache

11  Corp.?

12       A.  You would have to ask Mr. Graham, I don't

13  know.

14       Q.  Was it ever discussed in connection with

15  the interview?

16       A.  No.

17       Q.  Is it fair to say that the proposal by

18  Fieldwood of Mr. Black, Mr. Abell, and Mr. Thompson

19  was made to Apache before Apache asked you to

20  interview Mr. Graham?

21       A.   I don't recall the timing, but -- I don't

22  recall the timing of when Mr. Graham's name was

23  suggested for an interview versus the timing of when

24  Fieldwood provided its proposals.

25       Q.  Of the four gentlemen that we have



Page 108

```
 1    identified -- well, let me take a step back.
 2              Is there anyone other than Mr. Abell,
 3    Mr. Thompson, Mr. Graham, and Mr. Black that were
 4    considered for the sole manager role?
 5         A.  Fieldwood had internal deliberations
 6    about who we would nominate for that role, but
 7    ultimately those were the three selections that we
 8    put forward.  I'm not aware of Apache's internal
 9    conversations.
10         Q.  Is it fair to say that -- well, let me
11    rephrase the question.
12              Who at Fieldwood was -- had the final
13    decision on Fieldwood's vote for who the sole manager
14    should be?
15              MR. PÉREZ:  Object to the form of the
16    question.
17              THE WITNESS:  The management team
18    consulted about the potential candidates and the
19    management team made a determination after advising
20    with our board.
21         Q.  (BY MR. GRZYB) Who was the -- of those --
22    is it fair to say that those four gentlemen ended up
23    being the primary candidates for that position?
24         A.  Yes.
25         Q.  There is no -- no one really that was
```



1    given serious consideration from the Fieldwood side?

2         A.  I'm not sure I follow your question.

3         Q.  I'm just trying to limit my questioning

4    to just addressing that the four gentlemen that we

5    have identified, that there is no one else that we

6    should be talking about in terms of being seriously

7    considered for the position of sole manager.

8         A.  I don't recollect any other candidates

9    other than the ones we have discussed that were

10   discussed in any meaningful way.

11        Q.  Who did Fieldwood want to serve as the

12   sole manager?

13        A.  Fieldwood selected Jon Graham, along with

14   Apache.

15        Q.  And why did -- what made -- what about

16   Jon Graham made him a good candidate in the eyes of

17   Fieldwood?

18        A.  Jon Graham has a very extensive history

19   of dealing with complex, operational challenges,

20   complex asset bases in organizations.

21             His résumé has a multi-decade career of

22   operating in many different countries and with an

23   asset base consistent with the one that Fieldwood is

24   going to own, and particularly expertise around HS

25   and E, and specific experience with Gulf of Mexico



1    assets, including the assets that are going to

2    comprise -- including some of the assets that are

3    going to comprise Fieldwood I, and for all those

4    reasons, he was determined to be an excellent

5    candidate for this specific position.

6              Q.  Did you have any business relationship

7    with Mr. Graham before the sole manager selection

8    process?

9              A.  No.

10             Q.  Did you have any run-ins with him from

11   your time starting in 2013 starting with Fieldwood to

12   date before the sole manager selection process?

13             A.  No.

14             Q.  In his consultancy role, who does Jon

15   Graham report to?

16             A.  In his current consultancy role, he

17   reports to the management team and executive

18   leadership team of Fieldwood.  I'm not -- I'm not

19   certain if there is a specific reporting structure

20   that is outlined in his consulting agreement or not.

21             Q.  What does his work consist of on a

22   day-to-day basis?

23             A.  The Fieldwood I assets are a very large

24   and complex asset base and his efforts have

25   predominantly been focused on learning and



Page 111

```
 1    understanding that asset base.
 2          Q.  Does Mr. Graham in his consultancy role
 3    for Fieldwood communicate with Apache?
 4          A.  I don't know if Mr. Graham communicates
 5    with Apache, but it is the expectation that the
 6    consultancy role is meant to facilitate an orderly
 7    transition of these assets of Fieldwood in his
 8    capacity as the future sole manager; and to the
 9    extent that that requires him to consult with Apache
10    as a part of all of the complex agreements that we
11    are implementing, then we would expect he would be
12    doing so in an appropriate manner.
13          Q.  Is there a handbook or guidelines in
14    place with respect to Mr. Graham's future role as
15    sole manager?
16          A.  The documentation that is going to govern
17    his responsibilities is a part of the implementation
18    agreement with Apache.
19          Q.  Have any meetings taken place between and
20    among Apache, Fieldwood I, and Jon Graham?
21          A.  I don't know the -- I don't know.  I
22    don't know if there -- his role is as an interface
23    with all these parties, and so I don't know if there
24    are specific group meetings that have taken place or
25    not.
```



Page 112

```
 1          Q.  Have you had conversations with
 2   Mr. Graham about communications he's had with Apache?
 3          A.  I don't recall any specific conversations
 4   that I've had with him about his communications with
 5   Apache.  Certainly when we are interviewing him, we
 6   had discussed his experience as an employee with
 7   Apache and his understanding of the responsibilities
 8   of that position as it had been described to him by
 9   Apache.
10          MR. GRZYB:  All right.  I am just about
11   to transition.  Alfredo, do you want to take 15
12   minutes for lunch?
13          MR. PÉREZ:  Yeah, that would be great.
14          MR. GRZYB:  1:20?
15          MR. PÉREZ:  1:20 is fine.
16          THE COURT REPORTER:  I'm off.
17                (Recess taken)
18          THE COURT REPORTER:  Back on the record.
19          Q.  (BY MR. GRZYB) Mr. Dane, when was the
20   sole manager decision made?
21          A.  I believe it was in the fourth quarter of
22   2020, but I don't recall the exact -- the exact.
23          Q.  Is it accurate to say that decision was
24   made sometime further back than a month ago?
25          A.  Yes.
```



Page 113

1           Q.   Two months ago?

2           A.   Yes.

3           Q.   Has the decision been made with respect

4    to the independent directors role?

5           A.   No.

6           Q.   Has the process to select the independent

7    director started?

8           A.   I'm not aware of advanced considerations

9    with respect to the decision on who will represent

10   the independent director position.

11          Q.   What about un-advanced discussions,

12   preliminary discussions?

13          A.   I'm not aware of any recent conversations

14   on the selection of the independent director.

15          Q.   Has the sole manager's salary been set?

16          A.   There was conversations and compensation

17   expectations with the -- with John Graham in the

18   interview process.  There is not a formal agreement

19   that I'm aware of that has been entered into with

20   respect to compensation.

21          Q.   The discussions regarding compensation

22   expectations, can you give me a range that was

23   contemplated during those conversations?

24          A.   I don't recall the exact numbers.  I know

25   that there was an expectation that this position



Page 114

1    would be commensurate with a senior executive level

2    position at a company like Fieldwood or Apache and

3    that general range of compensation for this type of

4    position would be a base salary of $250,000 to

5    $400,000.

6            Q.  Mr. Dane, does -- did -- pre-petition,

7    before the filing of bankruptcy, did Apache have any

8    say in personnel decisions of Fieldwood?

9            A.  No.

10           Q.  Pre-petition, did Apache have any say

11   with respect to the sale of assets by Fieldwood?

12           A.  There are restrictions in the

13   Decommissioning Agreement that govern the sale of

14   assets, but other than agreements that were in place,

15   no.

16           Q.  Pre-petition, did Apache have any say in

17   Farmout Agreements -- strike the question.

18               Pre-petition, did Apache have any say in

19   farmout arrangements that Fieldwood entered into?

20           A.  I believe that is the same answer as my

21   last response.

22           Q.  What about day-to-day operations,

23   pre-petition, did Apache have any say in the

24   day-to-day operations of Fieldwood?

25           A.  The same answer.



Page 115

1          Q.  And that answer is that other than

2     what's -- what was set forth in the agreements,

3     Apache didn't have any say?

4          A.  Correct.

5          Q.  Pre-petition, did you personally interact

6     with Apache on any type of regular basis?

7          A.  No, not on a regular basis.

8          Q.  Pre-petition, did Apache have any say in

9     whether or not Fieldwood incurred debt?

10          A.  The original Decommissioning Agreement

11     contained restrictions on debt incurrence and also

12     had the provision of certain lines and that that

13     is -- that that was -- that was the extent.

14          Q.  Pre-petition, did Apache have any say in

15     capital investment projects undertaken by Fieldwood?

16          A.  No.

17          Q.  Pre-petition, did Apache have any say as

18     to who would perform plugging and abandonment for

19     Fieldwood?

20          A.  I don't believe so.

21          Q.  Pre-petition, did Apache have any say

22     with respect to development activities?

23          A.  I think you already asked that question

24     and my answer was no.

25          Q.  Is it fair to say under the Plan of



Page 116

```
 1   Reorganization -- I will strike the question.
 2             Pre-petition, did Apache have any ability
 3   to control the use of Fieldwood's free cash flow?
 4        A.  The same response that I gave earlier,
 5   there are various restrictions that Fieldwood was
 6   subject to, particularly with respect to
 7   Decommissioning Agreement.
 8        Q.  Give me one second.  I apologize.
 9             (Exhibit 9 marked)
10        Q.  (BY MR. GRZYB) Please pull up Exhibit
11   Number 9, which is the LLC agreement, Document Number
12   1285-1.
13        A.  I have it available.
14        Q.  Would you go, please, to page 36 --
15   strike that question.
16             Can you explain to me generally your
17   understanding of this document?
18        A.  This document is generally the document
19   that explains the governance of the Fieldwood I
20   entity.
21        Q.  Were you involved in the negotiation of
22   this agreement?
23        A.  I was involved in various high-level
24   business point discussions, which ultimately were
25   incorporated into this agreement.
```



Page 117

```
 1              Q.  High-level business point discussions, do
 2    you have those with any folks at Apache?
 3              A.  Yes.
 4              Q.  Is it fair to say that this is a document
 5    that was negotiated with Apache?
 6              A.  Yes.
 7              Q.  Who is your negotiating counterparty at
 8    Apache on the business perspective?
 9              A.  Our interactions have generally been with
10    their legal department.
11              Q.  Is that firm counsel or in-house counsel?
12              A.  With their internal legal department.
13              Q.  And who -- what is the -- who would be a
14    point of contact in their internal legal department?
15              A.  The folks that we have generally dealt
16    with at Apache's legal department have been Anthony
17    Lannie and Brent Cupid.
18              Q.  Would you mind repeating those names
19    again?
20              A.  Anthony Lannie and Bret Cupid.
21              Q.  Is it fair to say that your high-level
22    business interactions in negotiating this agreement
23    have been with Mr. Lannie or Mr. Cupid?
24              A.  Yes.  And most of those took place during
25    the time of negotiating the Fieldwood I term sheet,
```



Page 118

1    which concepts are adopted in this agreement.

2            Q.  Is it fair to say that this document --

3            A.  I'm sorry, I would like to expand on one

4    other party that we principally deal with from a

5    business perspective, which is also their advisors at

6    Parkman Whaling.

7            Q.  Is it fair to say that this document,

8    Exhibit Number 9, the Fieldwood I LLC agreement, is

9    an embodiment of the governance rights that Apache

10   bargained for in connection with that restructuring?

11           A.  This document reflects the governance

12   rights of Fieldwood I, which document was negotiated

13   amongst the parties, which were ourselves and Apache

14   and our respected advisors.

15           Q.  Is it fair to say that this document

16   embodies consent rights that Apache has with respect

17   to the operation of Fieldwood I?

18           A.  Yes.

19           Q.  Is it fair to say that this document

20   embodies information rights that Apache has with

21   respect to Fieldwood I?

22           A.  I don't recall the specific information

23   rights that Apache has pursuant to this document, but

24   if that is contained within the document, then I

25   would agree.



Page 119

```
 1              Q.   Turning to page 33 of Exhibit 9, looking
 2     at Section 706, is it fair to say that the intention
 3     of Fieldwood and Apache is that Fieldwood I will not
 4     be able to do any business other than operating or
 5     plugging and abandonment and decommissioning of
 6     Legacy properties and the GOM shelf properties
 7     without the prior consent of Apache?
 8              A.   In 706A --
 9              MR. PÉREZ:  I'm sorry, I had myself on
10     mute.  I am going to object to the form of the
11     question:  I think the document speaks for itself.
12              You're asking him, you know, for a legal
13     interpretation.  So to the extent that Mr. Dane can
14     testify, you know, what the intent of the document
15     is, but I think it is unfair to say -- look at 7.6
16     and say, is this what it means?  And especially what
17     it means as relates to Apache.
18              THE WITNESS:  I think the document is
19     very self-explanatory with respect to the actions
20     requiring Apache consent.
21              Q.   (BY MR. GRZYB) Give me one second.
22              Were any of Fieldwood's other creditors
23     offered the right to fund the standby facility for
24     Fieldwood I?
25              MR. PÉREZ:  Object to the form of the
```



MAGNA ▶
LEGAL SERVICES

Page 120

 1    question:  You're -- I think the assumption there is

 2    that Apache is a creditor.

 3              But you can go ahead and answer if --

 4              THE WITNESS:  The Apache agreement was

 5    negotiated directly with Apache and it was conveyed

 6    to our lenders for their approval as part of an

 7    overall restructuring transaction, and ultimately the

 8    RSA and those parties were all aware of the

 9    provisions, including the standby facility, at the

10    time that they all agreed to enter into the RSA.

11                   (Exhibit 20 marked)

12         Q.  (BY MR. GRZYB) I would ask, Mr. Dane,

13    that you pull up Exhibit 20, which is Exhibit O to

14    the Disclosure Statement identifiable as 1285-2, page

15    439 of 469, and that is the financial projections

16    that are attached to the Plan of Reorganization.

17              Are you familiar with this document?

18         A.  Yes.

19         Q.  May I please have your understanding of

20    what this document is.

21         A.  This document was an exhibit to our

22    Disclosure Statement.  It is the financial

23    projections exhibit which discusses the Fieldwood I,

24    III -- excuse me, the Fieldwood I and NewCo entities,

25    and it shows projections for each of those entities



Page 121

1    over a five-year period.

2         Q.  Are you personally involved in the

3    creation of Exhibit 20?

4         A.  Yes.

5         Q.  What was your -- well, I'm going to call

6    it Exhibit O, even though it is Exhibit 20 for

7    purposes of this deposition.

8              What was your involvement in the creation

9    of Exhibit O?

10        A.  I was involved with the team that

11   represented a broad cross-section of Fieldwood I

12   employees in assembling the business plans and

13   reviewing the various assumptions that formed the

14   basis for the inputs for these projections.

15        Q.  Are these -- the participants and the

16   creation of Exhibit O, did that include your asset

17   teams?

18        A.  Yes.

19        Q.  What about at the executive level, did

20   any other executives, other than yourself,

21   participate in the creation of Exhibit O?

22        A.  Yes.

23        Q.  Can you identify those executives?

24        A.  Most of the executives with operational

25   responsibilities were involved at some level in



Page 122

1    helping to assemble the inputs for that plan and that

2    would range from our operational executives, like

3    Gary Mitchell; Steve Bodden; our VP of marketing, Jim

4    Brysch; John Seeger, our senior vice president of

5    operations; and a significant group of managers below

6    those executives.

7           Q.  Who at Fieldwood had the final say

8    authorizing the publication of Exhibit O in

9    connection with the Plan of Reorganization?

10          A.  Our board of directors.

11          MR. PÉREZ:  Object to the form of the

12   question:  Assumes facts not in evidence, but --

13          THE WITNESS:  The company's board of

14   directors.

15          Q.  (BY MR. GRZYB) Are you personally

16   expected to be the representative of the company with

17   respect to Exhibit O?

18          A.  Yes.

19          Q.  Who at Fieldwood physically typed

20   Exhibit O?

21          A.  Our counsel and advisors, I believe,

22   physically typed this exhibit as a part of their

23   Disclosure Statement preparation activities.

24          Q.  Is there anyone at Fieldwood with an

25   engineering degree that has adopted the



Page 123

 1   representations made in Exhibit O?

 2              MR. PÉREZ:  Object to the form of the

 3   question:  Vague.

 4              MR. GRZYB:  I will change the question.

 5        Q.  (BY MR. GRZYB) Is there anyone with an

 6   engineering degree at Fieldwood that has approved

 7   Exhibit O?

 8              MR. PÉREZ:  Same objection.

 9              THE WITNESS:  There is not a formal

10   Fieldwood approval process for accredited employees,

11   so I'm not sure how to answer your question.

12        Q.  (BY MR. GRZYB) Let's please turn to page

13   ten of the Fieldwood I projects -- I'm sorry, of

14   Exhibit O, which is subtitled "Fieldwood I

15   Projections".

16              The plan outlines a sales volume of

17   28,000 barrels of oil equivalent a day for the

18   average of 2020.  What is the company's current rate

19   of production?

20        A.  Is your question:  What is the assets

21   that would comprise Fieldwood I's current

22   interaction?

23        Q.  That's correct.

24        A.  Obviously there is a lot of variability

25   with respect to production, particularly on the



Page 124

1    shelf, but generally, it has been in the low

2    20,000-barrel equivalent per day, over -- over recent

3    weeks.

4         Q.  Explain the distinction between the

5    representation you just made of 20,000 barrels per

6    day as compared to this projection on Exhibit O

7    saying 28,000.

8              MR. PÉREZ:  I'm going to object to the

9    form of the question.  There was no representation,

10   he answered a question, so I object to the form of

11   the question, I think it is misleading.

12        Q.  (BY MR. GRZYB) I believe your testimony,

13   Mr. Dane, was that over recent weeks of -- current

14   level of production over the past recent weeks is

15   20,000 barrels per day, correct?

16        A.  It was in the low 20,000-barrel

17   equivalent per day range.

18        Q.  But it is not 20,000, correct?

19        A.  No, it is not, as of recent weeks.

20        Q.  In the past year, has it been 28,000 at

21   any point for any extended period?

22        A.  I would have to go back and review our

23   records and check this historic performance against

24   these assets.

25        Q.  Let me ask the question more directly.



Page 125

```
 1              What is the basis for the 28,000 barrels
 2   per day projection in Exhibit O?
 3          A.  So these projections represent a
 4   bottoms-up buildup of all the fields that are
 5   contemplated to be producing and the fields that are
 6   not contemplated to be producing that comprise the
 7   field with one asset base.  Every field was evaluated
 8   by our asset teams and a determination was made if
 9   the field would be expected to be online.  If it was
10   not online, if it was expected to return to
11   production or if it was not expected to return to
12   production and the timing associated with each
13   individual field, that was the basis for these
14   projections.
15          Q.  Is it, therefore, your testimony that it
16   will require some work in order to get the production
17   up to this 28,000 barrels per day?
18              MR. PÉREZ:  Object to the form of the
19   question:  Vague.
20              THE WITNESS:  There is always variability
21   with respect to daily production rates, and that has
22   a host of factors that would -- especially over such
23   a large asset base like Fieldwood I, but the basis
24   for these projections is a detailed, bottoms-up
25   analysis of all fields.
```



1        Q.   (BY MR. GRZYB) Explain "bottoms-up

2    analysis."

3        A.   A "bottoms-up analysis" means that this

4    aggregate number is the sum of assumptions related to

5    every individual field that underlies that property

6    set.  Every field was reviewed and a determination

7    was made for the appropriate assumption how to

8    include the particular field, both at a production

9    expense and any other relevant variable that would

10   influence that particular field's contribution to

11   these projections.  These projections would represent

12   the sum of all of those bottoms-up assumptions.

13       Q.   Is there -- so is it -- is it true that

14   you -- in order for Fieldwood to meet this projection

15   amount of 20,000 barrels per day, certain currently

16   offline wells need to be brought back online?

17       A.   That is one factor that would relate to

18   the variance that you're asking about.

19       Q.   Does that 28,000 barrels per day include

20   currently offline wells as an assumption?

21       A.   In some cases --

22            MR. PÉREZ:  That come back online?  That

23   come back online, is that the question?

24       Q.   (BY MR. GRZYB) The question is:  Does the

25   28,000 barrels per day include in the assumption that



1    currently offline wells are going to be brought back

2    online?

3         A.  Yes.

4         Q.  Is there a list of those wells that need

5    to be brought back online in order to increase

6    production sufficiently to make these projections?

7         A.  Yes.

8         Q.  Do you know -- can you give me an

9    estimate of those currently offline wells that need

10   to be brought back on in order to -- can you give me

11   an estimate of the number of wells that are being

12   contemplated as being brought back online as part of

13   the assumptions associated with these projections?

14        A.  We don't track it on the basis of number

15   of wells.  The projections are generated pursuant to

16   a model which was provided that specifies every

17   individual field and its contribution.

18        Q.  In your mind, is -- I will rephrase the

19   question.

20             Look down under the same page, page ten,

21   and go to the line item for capital expenditures.

22   And it looks like for the period of May through

23   December of 2021, this projection lists $29 million

24   for capital expenditures.

25             Is it your projection that that amount of



Page 128

1    capital expenditure will sufficiently bring

2    production from the low 20s to the 28,000 barrels a

3    day listed in the first line item?

4            A.  The basis of these projections does not

5    contemplate that this capital expenditure or variable

6    alone is the basis for the difference between the

7    current production rates that you asked about and the

8    average daily production between May to December of

9    2021 that you're referencing, but there is a

10   production contribution that is assumed as a result

11   of the capital expenditures which is very clearly

12   presented in the model.

13           Q.  All right.  So we have identified the

14   bringing back certain shut-in wells back online as an

15   assumption of -- that goes into this daily production

16   level set forth in projections.  We have identified

17   CapEx expenditures that are going to bump up the

18   production.

19               Is there any other assumption associated

20   with this daily net production level set forth in

21   Exhibit O?

22           A.  Can you be more specific, any other

23   assumption related to what?

24           Q.  Well, you know what, I think I have

25   phrased it incorrectly.  And I used your word -- I



Page 129

 1    like your words better, "factors," right?

 2             One factor that's going to increase daily

 3    production is bringing offline wells back online,

 4    correct?  That is one thing we identified?

 5       A.   Correct.

 6       Q.   We also identified capital expenditures

 7    are going to increase daily production.

 8             Looking at this projection in Exhibit O,

 9    what other factors will increase daily production

10    from its current production level?

11       A.   Those are the general categories that

12    would contribute to any incremental production above

13    current rates.

14       Q.   So is your 28,000 barrels per day

15    predicted production based on -- I will rephrase the

16    question.

17             The increase in daily production from its

18    current level to the 28,000 barrels per day listed in

19    this projection is based on two assumptions:

20    Bringing wells back online and capital expenditure of

21    $29 million?

22       A.   I wouldn't say that those are the

23    assumptions that -- the basis for these numbers are

24    the assumptions in the model about what fields are

25    anticipated to be online and any incremental capital



Page 130

1   contribution and the benefit of that production.

2          Q.  Is it your prediction that if you spend

3   $29 million over the period of May to December of

4   2021 and bring back the identified wells that the

5   model says should be brought back online will

6   increase production levels to 28,000 barrels per day?

7          A.  If your question is does the model

8   contemplate that certain fields need to contribute

9   and be online and that the capital expenditures are

10  required to general rate production and that forms

11  the basis for the 28,000 barrels a day that's

12  reflected between the May to December time period, I

13  would agree, those are production contributing

14  factors.

15         Q.  What is the projected spend for plugging

16  and abandonment on the Legacy/Apache properties?

17         A.  Can you be more specific?

18         Q.  For year 2021.

19         A.  In these projections, Fieldwood I is

20  projected to spend $70 million between the May to

21  December 2021 period.

22         Q.  Now, you say "in these projections."

23              Is that what the intent is for the

24  projected spend on P and A for the Fieldwood I

25  properties in the year 2021?



1          A.   Projections as of a point in time with

2     many assumptions.  These assumptions included an

3     emergent state of April 30th.  There is going to be

4     many factors that ultimately determine the total

5     amount of capital that's going to be able to be spent

6     and these projections, based on the assumptions that

7     are outlined in this exhibit, show $70 million of

8     spending that's outlined here.

9          Q.   Where does the $70 million projection

10    come from?

11         A.   The properties that comprise the P and A

12    spend in these projections represent properties that

13    are either already scheduled for P and A or

14    anticipated to be shut in during this period and

15    scheduled for P and A., and these projections are

16    based on the properties that are included in the

17    model and the schedule that forms the basis for the P

18    and A in these projections included in that model.

19         Q.   Who identifies the P and A -- the

20    properties --

21              MR. GRZYB:  I can't hear you, Alfredo.

22              MR. PÉREZ:  (Signals timeout).

23              MR. GRZYB:  I see you, Alfredo, but I

24    can't hear you.

25              THE WITNESS:  I think he's saying he's



Page 132

1    calling back in.

2              THE COURT REPORTER:  I'm going off the

3    record.

4                   (Recess taken)

5              (The record was read as requested)

6              (Discussion off record)

7         Q.  (BY MR. GRZYB) Who at Fieldwood gives the

8    estimate of the 70 million for P and A?

9         A.  The decommissioning department is

10   responsible for generating those estimates.

11        Q.  Who heads that department?

12        A.  Our vice president of decommissioning,

13   Brandon DeWolfe.

14        Q.  Did he supply the decommissioning line

15   items on this Exhibit O?

16        A.  He supplied the assumptions that were

17   incorporated into these projections with respect to

18   decommissioning.

19        Q.  Switching back to the capital expenditure

20   portion of the -- with respect to this first column

21   on 2021, how long is it going to take to perform the

22   work to get shut-in wells back online in order to

23   increase production for the Fieldwood I properties?

24        A.  Activities that are performed in order to

25   reestablish an asset on our asset base happen on an



Page 133

1    ongoing, day-to-day basis.  Our asset base was

2    heavily impacted by the historic 2020 storm season

3    that resulted in a significant amount of disruption

4    and minor damage to a number of our facilities, which

5    has resulted in fields being brought back online or

6    determined to be shut in going forward.

7              The activities that are required in order

8    to reestablish production are generally related to

9    construction activity, which is a part of our ongoing

10   repair and maintenance program, and based upon the

11   timing of being able to complete those projects on

12   specific fields, we are able to return production

13   from those fields.

14        Q.  Am I to understand there is two concepts:

15   If a particular asset has been -- was damaged in a

16   storm, and it needs -- or I will rephrase the

17   question.

18              Two concepts:  Does the line item for

19   R and M relate to bringing assets back online that

20   were damaged during the storm season?

21        A.  That's one component of what repair and

22   maintenance dollars are spent on, and it has been a

23   significant part of our recent repair and maintenance

24   expenditures which is related to the 2020 storm

25   season repair activities.



Page 134

1         Q.  So with that R and M spend, will that
2    result in any increased production on a daily basis?
3         A.  Yes.
4         Q.  Does any of the capital expenditure spend
5    on this projection relate to bringing back online
6    assets damaged in the storm -- storms?
7              A.  The capital expenditures that are
8    incorporated in these projections are generally
9    related to recompletion capital projects, which is
10   not typically associated with repairs to facilities
11   as it relates to storm damage.  However, the timing
12   of the ability to make those capital expenditures
13   related to specific fields is going to be influenced
14   by repairs that may need to be made to those fields
15   as a result of storm damage.
16                   (Exhibit 21 marked)
17         Q.  (BY MR. GRZYB) Mr. Dane, I'm going to ask
18   you to please open -- it is probably in native format
19   in your data room -- Exhibit Number 21.
20              Were you able to access it?
21         A.  Yes, I have it open.
22              MR. PÉREZ:  Is it an Excel spreadsheet.
23              MR. GRZYB:  Yes, it is.
24              Do you have it open, Alfredo?
25              MR. PÉREZ:  Oh, yeah, okay, it is



Page 135

1    opening.

2         Q.   (BY MR. GRZYB) Now, I believe -- do you

3    have a general understanding of what this -- this

4    document, this Exhibit 21 marked FWE-000016 is,

5    Mr. Dane?

6         A.   Yes, I have a general understanding of

7    this document.

8              MR. PÉREZ:  I'm glad he does, because I

9    don't.

10        Q.   (BY MR. GRZYB) And what is that document,

11   Mr. Dane?

12        A.   This document is the model that forms the

13   basis of the Fieldwood I projections.

14        Q.   Again, did you read my outline before

15   doing this deposition?

16             Okay.  Looking at the model, Fieldwood, I

17   will call it Exhibit 21, I would like you to open the

18   annual forecast tab, which is all the way to the

19   right.

20        A.   Okay, I have this open.

21        Q.   Now, looking at -- if you look at the

22   line item, it is line 64 and -- wait, let me ask a

23   question.

24             Does this model relate exclusively to the

25   Fieldwood I properties?



Page 136

1          A.  I believe that's correct.

2          Q.  Now, I would like you to look at line

3    item number 64 and in particular, F64.  You see the

4    plugging and abandonment numbers on this spreadsheet?

5          A.  I'm sorry, can you -- is that F65?

6          Q.  It would be F60 -- F64 is -- well, it

7    is -- on the horizontal, it is row six.

8          A.  And what tab are you in again?  Is this

9    "Annual Forecasts"?  I'm sorry, what tab?

10         Q.  Yeah, "Annual Forecast."

11         A.  Let me go to the correct tab.

12         Q.  I can share.

13         A.  I see it.  I will get to the tab in a

14   second.

15              MR. PÉREZ:  Is it -- okay.  My line 64

16   says "Capitalized G and A."  Is that not right?

17              MR. GRZYB:  You're one below it.

18              THE WITNESS:  Alfredo, it is a different

19   tab.  If you would continue to go to the right to the

20   tab labeled "Annual Forecasts."

21              MR. GRZYB:  Why don't I share.

22              MR. PÉREZ:  I see it.

23         Q.  (BY MR. GRZYB) All right.  Line 64, for

24   the period of April 2021 to presumably March of 2022,

25   this model lists plugging and abandonment at



Page 137

1    $203,225,000.  How does that square with the

2    Exhibit O projection of $70 million for the period of

3    May 2021 through December of 2021?

4            A.  So the numbers that are in this row --

5            Q.  This row on which document?

6            A.  That you've pointed me to.

7            Q.  Exhibit 21?

8            A.  Correct.  I don't believe those numbers

9    were utilized with respect to the Exhibit O document.

10   There are specific P and A schedules that form the

11   basis for the P and A spends, and I believe that

12   that's identified in separate tabs that have been

13   provided.

14           Q.  I guess I'm not following your answer.

15               What does this number, 203,225 (sic), on

16   F64 on Exhibit 21 reflect?

17           A.  I don't know.  I'm not -- I don't know

18   what that reflects.  I don't believe that that is the

19   number that is used in the projection, as you can

20   see.

21           Q.  All right.  So I think you said P and A

22   schedules were consulted in creation of Exhibit O and

23   the use of $70 million for P and A for the balance of

24   this year.  What is the -- can you identify the P and

25   A schedules that you're talking about?



1          A.   These were provided -- there is a --

2     there is a detailed schedule in this model that

3     outlines the P and A spend, I believe it is one of

4     the last tabs, and these figures I believe are

5     consistent, but there may be reconciliation between

6     certain cost items that are included in P and A

7     versus other items.

8          Q.   Is there a name of the tab about which

9     you're referring to?

10         A.   I think it is -- I believe it is the last

11    tab that is labeled as "Apache -- APA-2021 Plus

12    Schedule Annual."

13         Q.   "*APA Plus Schedule and Annual."

14              Is there any way I can modify this tab

15    and to see -- to give me any kind of information

16    about how we -- how you arrived at 70 million for the

17    line item on Exhibit O?

18         A.   Yes.  So the projections assume that any

19    available cash flow that the Fieldwood I entity is

20    capable of generating, subject to minimum working

21    capital needs, is utilized in order to perform

22    P and A; and in the period May to December of 2021,

23    that figure is $70 million.

24         Q.   Correct me if I'm oversimplifying, but

25    did you just essentially say that the $70 million



Page 139

1    comes from available funds associated with the

2    production?

3         A.   No.

4         Q.   Plus the --

5         A.   I said that the construct of Fieldwood I

6    as an entity is that its primary business function is

7    to conduct P and A to officially manage the Fieldwood

8    I obligations and that after considering other

9    required expenses and any capital expenditures in

10   order to generate cash flow for P and A, any

11   available cash flow, subject to minimum working

12   capital requirements, is utilized to conduct P and A,

13   and in this period, that amount that is available is

14   $70 million.

15        Q.   Has that projection been accepted by

16   Apache?

17             MR. PÉREZ:   Object to the form of the

18   question:  Vague.

19             THE WITNESS:   Apache and their advisors

20   are familiar with these projections and the construct

21   that this exhibit in the Fieldwood I model

22   represents, and they are aware of the level of P and

23   A that's anticipated to be able to be conducted by

24   Fieldwood I and the construct by which the cash is

25   used by Fieldwood I to conduct that P and A.



Page 140

1          Q.   (BY MR. GRZYB) So I guess the question

2     becomes:  What is the annual forecast -- the number

3     of -- the number in the annual forecast of

4     $220 million, give or take, for 2021, where does that

5     number come from?

6          A.   The number that -- it is hard coded in

7     this model.  I would have to ask our subject matter

8     experts to reconcile this, but the P and A forecast

9     that is relevant is the tab where it outlines every

10    individual field and it shows the annual spend in

11    each period.

12         Q.   Do you have any understanding of whether

13    governmental entities would be satisfied with the

14    $70 million spend for 2021 as referenced in

15    Exhibit O?

16         A.   Is this a hypothetical question?  I don't

17    understand the question.

18         Q.   No.  I assume that the $70 million, and I

19    think what you have testified to is, it is based on

20    some analysis by Fieldwood in connection with these

21    properties.  Is it your belief that this $70 million

22    number, going back to Exhibit O, will be sufficient

23    to satisfy governmental requirements with respect to

24    the Fieldwood I assets?

25              MR. PÉREZ:  Object to the form of the



1    question:  Vague.

2              THE WITNESS:  $70 million is the amount

3    of capital that is available within Fieldwood I

4    pursuant to these projections.  The properties that

5    are contemplated, being P and A under this model for

6    2021, are listed on the tab that shows $175 million

7    to spend, according to what I'm looking at.

8         Q.  (BY MR. GRZYB) Sir, I guess that's --

9    that's my question, which is:  How do you bridge

10   those two gaps, is there -- are there properties

11   listed on the annual forecast that are not going to

12   be decommissioned during the same timeframe?

13             MR. PÉREZ:  Object to the form of the

14   question -- I'm sorry.  Yeah, I'm going to object to

15   the form of the question, because it assumes, you

16   know, facts not in evidence.

17             MR. GRZYB:  And maybe I just didn't hear

18   his answer correctly.

19             Michelle, may I please have his last

20   answer.

21             THE COURT REPORTER:  Certainly.  One

22   moment.

23                (The record was read as requested)

24        Q.  (BY MR. GRZYB) One second.  Excuse me.

25             All right.  Turning back to Exhibit O,



Page 142

1   can you please explain to me the line item and

2   amendment for trust contributions.

3        A.   Trust contributions are the required

4   contributions for Trust A pursuant to the Trust A MPI

5   and the Decommissioning Agreement.

6        Q.   So is that an indication that Fieldwood

7   is projecting an inability to meet decommissioning

8   requirements based solely on Fieldwood?

9        A.   No, no.

10       Q.   So what is -- how is it that the

11   projection includes a -- drawing upon trust

12   contributions?

13            MR. PÉREZ:   Just -- go ahead, Mike, I'm

14   sorry.

15            THE WITNESS:   That answer is

16   mischaracterizing this -- these projections.

17   That's --

18       Q.   (BY MR. GRZYB) Explain to me how the

19   trust contribution plays into this projection.

20       A.   Pursuant to the Decommissioning Agreement

21   and the Trust A net profits interest, the Trust A net

22   profits interest is a 10 percent net profits interest

23   on all the properties that were acquired from Apache

24   in 2013.  There is a Trust A1 MPI as well, and those

25   net profits are based on the net profits of the



Page 143

1    properties that are going to be related to

2    Fieldwood I.

3              To the extent that those properties have

4    a positive net profits interest, then that is

5    required to be put into the trust, as it has been

6    since the creation of those net profits interest at

7    inception.

8         Q.  So the current -- is this -- is this

9    projection on Exhibit O an indication that based on

10   this projection, there is no net result to the amount

11   of cash in Trust A?

12        A.  I don't understand your question.  Excuse

13   me, I'm sorry.  The net result is the Trust A cash

14   increases, because Fieldwood I is depositing $7

15   million in this first period into the trust.

16        Q.  This projection includes net profits of

17   $7 million; is that what you're saying?

18        A.  This projection assumes that the MPIs

19   associated with the Decommissioning Agreement

20   generate $7 million of net profits interests, which

21   are required to be placed into the trust.

22        Q.  In your Exhibit O projection, is there

23   any reliance or assumption that there will be a

24   drawing on the decommissioning security relating to

25   these projections?



Page 144

```
 1          A.  In a number of periods, the anticipated
 2    P and A activity may exceed the available cash flow
 3    within Fieldwood I, and to the extent that that is
 4    the case and that work is required to be done, then
 5    it is assumed that other sources of capital that may
 6    be available for these purposes pursuant to those
 7    agreements would address that activity.
 8          Q.  Let's look at the period of May to
 9    December of 2021.  Do any of these numbers reflect an
10    assumption that Trust A cash will be utilized?
11          A.  The activity that is contemplated for the
12    2021 period is higher than the total P and A activity
13    that is contemplated for the 2021 period, exceeds the
14    $70 million that's available through Fieldwood I and
15    that contemplates that additional security could
16    satisfy those obligations.
17          MR. PÉREZ:  I'm sorry, I'm going to move
18    to strike the question.
19          I think he asked you:  Does Exhibit O
20    contemplate any other resources?  Does this
21    projection include any other resources?
22          THE WITNESS:  I apologize, I
23    misunderstood the question.
24          Exhibit O does not assume any other
25    resources.
```



1         Q.   (BY MR. GRZYB) Well, from an operational

2    perspective, does Fieldwood project being required to

3    draw on Trust A cash for the balance of the year to

4    perform its decommissioning obligations?

5         A.   Fieldwood as --

6              MR. PÉREZ:  Objection to the form of the

7    question.  Fieldwood I doesn't have an ability --

8    Fieldwood I doesn't have an ability to draw on

9    Trust A cash.  So, I mean, I think the premise of the

10   question is just inappropriate.

11             THE WITNESS:  Correct, Fieldwood does not

12   have the ability to draw on the trust.

13        Q.   (BY MR. PÉREZ) Is it -- is it projected

14   that there will be insufficient funds generated from

15   cash flow and the initial capitalization of Fieldwood

16   I to meet its decommissioning obligations for the

17   balance of the year?

18        A.   No, it is -- Fieldwood I looks

19   holistically at all sources of capital that are

20   available to satisfy the obligations, and those

21   sources of capital are sufficient to address all the

22   obligations that are anticipated to -- that are

23   anticipated to arise.

24        Q.   The holistic approach that you just

25   mentioned, does that include the Trust A cash?



Page 146

```
 1        A.  The Trust A cash is a source of capital
 2   that is available under the terms of the -- of that
 3   agreement to address P and A.
 4        Q.  Well, does Fieldwood project that Trust A
 5   cash will be drawn upon by someone during the next --
 6   during the balance of the year?
 7             MR. PÉREZ:  I am going to object to the
 8   question.
 9             Are you talking about in the projections
10   in Exhibit O?
11             MR. GRZYB:  Well, you know, I'm not sure
12   what I'm talking about, because I don't know if it
13   is --
14             MR. PÉREZ:  Okay.
15             MR. GRZYB:  -- if his goal is a
16   reflection of reality or it is not.
17        Q.  (BY MR. GRZYB) I guess my question is:
18   In the real world, is Fieldwood projecting that
19   Trust A cash will be drawn upon during the balance of
20   the year?
21        A.  So --
22             MR. PÉREZ:  I want to object to the
23   question.  Fieldwood doesn't have the ability to draw
24   on Trust A cash.
25             So to the extent you know what anybody
```



Page 147

```
 1   else can do, you can go ahead and testify, but this
 2   is not Fieldwood I.
 3             MR. GRZYB:  But, Alfredo, he did testify
 4   that it is part of the holistic approach that
 5   Fieldwood considered when it looked at Fieldwood I.
 6             MR. PÉREZ:  Right.  Yeah, and it's -- I
 7   said I'm not preventing him from testifying.
 8             But go ahead.
 9             THE WITNESS:  In the real world, the
10   Fieldwood I is going to utilize all of its available
11   cash flow to conduct P and A activities.  To the
12   extent that that cash flow -- which is going to be
13   dependent upon a number of variables:  Production,
14   pricing, the level of activity that is attainable in
15   each period, whether to the extent that there is a
16   need to spend money on decommissioning that is above
17   the available resources in any given period of
18   Fieldwood I, there is a number of other sources of
19   security that are available to satisfy those
20   liabilities.
21        Q.   (BY MR. GRZYB) Name one other source of
22   security.
23        A.   The Decommissioning Agreement as it was
24   originally contemplated, and is anticipated to
25   continue, provides for the security that we addressed
```



Page 148

 1    earlier, which is the Trust A cash, which is

 2    presently approximately $240 million, and the bonds

 3    and LCs, which comprise nearly $500 million.

 4              Additionally, to the extent that the

 5    initial capitalization of Fieldwood I, which is going

 6    to be paid for through this restructuring as the

 7    difference between 50 million -- $50 million and any

 8    amount spent on P and A, that to the extent that

 9    initial capitalization and any cash flow from the

10    operations of Fieldwood I and then any other

11    security, as discussed, may be insufficient, the

12    Fieldwood I entity has a $400 million standby

13    facility, which is also available; and then obviously

14    behind all of those sources is Apache, which is an

15    extremely well-capitalized, multibillion-dollar

16    company.

17         Q.  So it is fair to say, then, that

18    Exhibit O does not include all sources of

19    capitalization associated with what it may require in

20    order to meet the decommissioning obligations of the

21    Fieldwood I assets?

22              MR. PÉREZ:  Object to the form of the

23    question:  Assumes facts not in evidence.

24              THE WITNESS:  I think it is fair to say

25    that it does not reflect all the various sources of



```
 1   capital that are available to meet those obligations.
 2        Q.  (BY MR. GRZYB) Does Fieldwood have any
 3   projections or analysis of sources of capital beyond
 4   what's set forth in Exhibit O that will be required
 5   in order to meet the decommissioning obligations
 6   associated with Fieldwood I?
 7        A.  The schedule of anticipated P and A is
 8   included in various schedule as part of this model
 9   and various other discovery requests that have been
10   provided, and all of the funding mechanisms that I
11   described are well described within our plan and
12   Disclosure Statement, as well as the various
13   documents that they are provided pursuant to.
14        Q.  Can you walk me through -- if we go back
15   to Exhibit 1 and find for me for the year 2021 what
16   the -- without regard to source, what will be the
17   decommissioned spend with respect to the Fieldwood I
18   assets.
19             MR. PÉREZ:  Object to the form of the
20   question.
21             You're asking him to speculate as to what
22   the actual expense is going to be.
23        Q.  (BY MR. GRZYB) And that question was like
24   three minutes long, so I will try and do a better job
25   of it.
```



Page 150

```
 1                  Can we go to Exhibit 21, please,
 2      together.  And I think, Mr. Dane, we identified this
 3      as the Fieldwood I model, correct?
 4           A.  Yes, this is a -- that is a Fieldwood 1
 5      model.
 6           Q.  Okay.  Regardless of the source of fund,
 7      let's put that aside.  Let's --
 8                  Is there a tab in this spreadsheet that
 9      has a projection with respect to the 2021 P and A
10      spend for the Fieldwood I assets?
11           A.  It doesn't mention it.  Although I don't
12      know that this is the -- the numbers look directly --
13      I'm looking at the tab that is the last tab that we
14      reviewed.  Although I'm not certain that this is the
15      final version, because, as you've pointed out, this
16      is not exactly the same as the financial projections
17      exhibit, but the numbers look directionally correct
18      to me in that -- in that tab.
19           Q.  One second.  I apologize.
20                  All right.  Mr. Dane, looking back at
21      Exhibit 21, and we're at the *APA 2021 Plus Schedule
22      Plus Annual, if I look at AH-7, and I have a number
23      of 175,905 --
24           A.  Correct.
25           Q.  -- do you see that?
```



Page 151

1          A.   Yes, I do.

2          Q.   Tell me what that number represents to

3     you.

4          A.   The anticipated spend for the full year

5     2021 based on these projects.

6          Q.   The anticipated -- and is that -- are the

7     projects about which you're speaking plugging and

8     abandonment?

9          A.   Correct.

10         Q.   And the assets associated with that --

11    with that 175,905 number are the Fieldwood I assets,

12    correct?

13         A.   Yes.

14         Q.   So if -- going back to Exhibit O, if

15    Apache spent -- if both the P and A spend on

16    Exhibit O for 70 and the projection on Exhibit 21,

17    that 175,905 number, were accurate, meaning if Apache

18    spent $70 million and it was required to spend

19    175,905, then it would have to acquire the 105,905 --

20    105 million from some source other than cash flow,

21    correct?

22              MR. PÉREZ:   Object to the form of the

23    question.

24              You know, you're asking what Apache is

25    going to spend in Fieldwood I, I think it is just a



Page 152

1  fundamentally unfair question; and I also think that

2  you're mischaracterizing what he said that the 175

3  was.  It was not that what was going to be spent, it

4  is what -- the things that could be spent on.  I

5  think that's what his testimony was, but --

6          Q.  (BY MR. GRZYB) Where does that 175,905

7  number come from?

8          A.  That is the cost expectation of all of

9  the projects that are scheduled with respect to each

10 field for the full year 2021.

11         Q.  Mr. DeWolfe and his team developed that

12 number, correct?

13         A.  Correct.

14         Q.  Has anyone from Fieldwood discussed with

15 Apache Exhibit 21?

16         A.  I believe Apache has a copy of similar

17 materials and these schedules have been shared with

18 Apache.

19         Q.  Has Apache commented upon Exhibit 21?

20         A.  I don't know that Apache has commented

21 specifically on Exhibit 21, but Apache is very

22 familiar with the overall level of spending that

23 we're discussing.

24         Q.  Going back to Exhibit O, can you explain

25 to me how Fieldwood arrived at the direct operating



Page 153

1    number?

2         A.  For the direct operating number, similar

3    to the production figures, is a bottoms-up buildup of

4    each field's anticipated contribution to the total

5    operating expenses, and it reflects the status of

6    each field and if it is expected to be producing and

7    a level of OpEx commensurate with a producing field

8    or if the field is anticipated to be shut in and a

9    commensurate level of operating expenses for a

10   shut-in field as well.

11        Q.  Can you explain to me on Exhibit O the

12   drawing of $45 million on the standby credit

13   facility?

14        A.  That is described in the Disclosure

15   Statement and it is described as an initial funding

16   in order to cure certain underspent amounts in prior

17   periods related to required spend levels under the

18   Decommissioning Agreement.

19        Q.  So who is providing the $45 million?

20        A.  The borrower.  Excuse me, I apologize,

21   the lender under that.

22        Q.  And the lender would be?

23        A.  Apache.

24        Q.  But correct me if I'm wrong, I think you

25   testified to an underspend by Fieldwood with respect



Page 154

1    to the Decommissioning Agreement, correct?

2            A.  Yes.

3            Q.  So how does the lending of $45 million

4    result in a cure with respect to that underspend?

5            A.  In -- in prior periods, there was a

6    requirement to spend $80 million annually, and in

7    2020, the total amount of spend was approximately

8    $50 million below the required spend level.

9    Depositing this money into the trust most of, which

10   is provided through this initial standby facility

11   draw, it remedies that required underspend.

12           Q.  So is it correct for me to characterize

13   that as:  You're going to use that $45 million to

14   make up the underspend from last year but then you'll

15   have to pay that back to Apache?

16           A.  No.

17           Q.  How -- how is that inaccurate?

18           A.  Can you -- can you restate your question?

19   What will -- who will have to pay what back to

20   Apache?

21           Q.  Well, I assume that that loan -- those

22   are loan funds that you'll have to ultimately --

23   sorry, Fieldwood I will have to pay back to Apache,

24   correct?

25           A.  Any balance under the standby facility



Page 155

1   Fieldwood I will be responsible for repaying to a

2   borrower -- excuse me, to a lender pursuant to the

3   terms of that agreement.

4          Q.  And is it the intent operationally, for

5   Fieldwood to cure its underpayment for

6   decommissioning by utilizing this initial funding of

7   $45 million under the standby facility to make up the

8   shortfall?

9          A.  This is described in the Disclosure

10  Statement and the initial draw is meant -- the

11  initial draw is intended to cure underspent

12  requirements from prior years.

13         Q.  So from a practical perspective, is this

14  P and A for 2021 70 plus 45?

15         A.  No, the 45 is not spending on P and A.

16  It is money that is being drawn under the facility to

17  be deposited into the trust and the $70 million of

18  spending is the spending associated with only the

19  period May to December 2021 by Fieldwood I on

20  P and A.

21         Q.  Mr. Dane, please explain to me the line

22  item for a change in net working capital.

23         A.  A change in net working capital is

24  intended to represent the effect of cash-related net

25  working capital that will result from the



Page 156

1   transactions that are contemplated under the plan and

2   then going forward in ordinary course of the

3   business.

4           MR. GRZYB:  Michelle, may I have that

5   read back, please.

6           THE COURT REPORTER:  Yeah, one moment.

7   Just the answer, right?

8           MR. GRZYB:  Yes, please.

9           (The record was read as requested)

10          Q.  (BY MR. GRZYB) How does the transactions

11  contemplated in the plan result in a positive cash

12  event of $36 million for that change in net working

13  capital line item?

14          A.  The agreement with Fieldwood I under our

15  plan has a pre and post effective date concept,

16  whereby there will be significant assumed obligations

17  of the NewCo, which include all pre-effective date

18  ordinary course payables; and then Fieldwood I would

19  be responsible for any post-effective date charges or

20  expenses and will receive the benefit of any

21  post-effective date revenue; and as is typical in a

22  pre and post-effective date transaction, that can

23  result in a significant benefit to a party where you

24  are receiving revenue on a much more current basis

25  than the expenses that you are required to pay, which



Page 157

1    typically will lag by several months.

2            Q.  You're getting -- you're getting a

3    holiday on your payables for a period of 60 days?

4            A.  That's correct.  And for -- for a period

5    of whatever period of time it is that you would

6    customarily receive invoices and then have payments

7    due upon the receipt of those invoices.  It may be a

8    lot longer.

9            Q.  It is more than a holiday, it is actually

10   leave from that obligation?

11           A.  I don't think it is relief from an

12   obligation as much as a timing benefit of expenses,

13   invoices being received and then due much later than

14   revenue receipts, which come in on a monthly basis.

15           Q.  The calculation for net working capital,

16   is that based on historic payables?

17           A.  Historic payables and receivables.

18               MR. GRZYB:  Alfredo, do you want to take

19   five and then -- I can't hear you.  We will take

20   five?

21               MR. PÉREZ:  Okay, I got it.  Can you hear

22   me now?

23               MR. GRZYB:  I can hear you.  4:10?

24               MR. PÉREZ:  4:10's good.  Thanks.

25               THE COURT REPORTER:  I'm off.



Page 158

1                    (Recess taken)

2              THE COURT REPORTER:  Back on the record.

3         Q.  (BY MR. GRZYB) Has Fieldwood conducted a

4    year-end 2020 reserves analysis?

5         A.  Yes.

6         Q.  When was that analysis performed?

7         A.  It was performed late in 2020 into early

8    2021 and delivered I believe in April.

9         Q.  Is there an executive at Fieldwood that

10   is in charge of overseeing that analysis?

11        A.  Yes.

12        Q.  And who is that executive?

13        A.  The -- our manager of corporate reserves

14   is Scott Schmidt, who reports to our senior vice

15   president of engineering, reservoir engineering, Gary

16   Janik.

17        Q.  Is it accurate that Fieldwood performs

18   its own reserves analysis?

19        A.  Fieldwood is responsible for

20   conducting -- for estimating the reserves and

21   compiling a reserve report, which is audited by our

22   outside auditor, Ryder Scott, on an annual basis.

23        Q.  Who at Fieldwood is the point person in

24   interfacing with Ryder Scott?

25        A.  That responsibility is with our corporate



Page 159

1    reserve engineering team, which is led by the manager

2    of corporate reserves, Scott Schmidt.

3         Q.  Has the year-end reserves report been

4    audited by Ryder Scott?

5         A.  Yes.

6         Q.  Are you familiar with the instructions

7    that Fieldwood has given to Ryder Scott?

8         A.  Generally speaking, I am familiar.

9         Q.  Can you describe those instructions

10   generally?

11        A.  We retained Ryder Scott in order to

12   conduct an annual audit of our internally prepared

13   reserves.  That audit is intended to establish the

14   accuracy of our reserves within an accepted

15   tolerance, and that audit is intended the audit a

16   level of value of the reserves of at least 80 percent

17   in order to be in compliance with various historic

18   provisions under our credit agreements --

19        Q.  And --

20        A.  -- in that audit.

21        Q.  I'm sorry, you can finish your answer.

22        A.  I'm all done.  Thank you.

23        Q.  80 percent of what?

24        A.  Of the provided reserve value, I believe.

25        Q.  What fields get audited by Ryder Scott?



Page 160

1    Let me rephrase question.

2              Is there any instruction by Fieldwood to

3    Ryder Scott as to what fields are to be audited?

4              A.  Fieldwood selects a set of fields for the

5    Ryder Scott audit in order to meet the minimum value

6    thresholds which have historically been a feature of

7    its credit agreements.  Ultimately the amount of

8    value that is audited is stated very clearly in the

9    reserve letter, along with non-audited reserves that

10   the company includes as a part of its internally

11   prepared reserves.

12             Q.  Is there a procedure for selecting the

13   fields that Fieldwood requests to be audited by Ryder

14   Scott?

15             A.  There is an internal thought process as

16   to that field selection.

17             Q.  Could you please explain to me the

18   thought process?

19             A.  The thought process consists of a number

20   of important factors, both to accomplish the goal of

21   making sure that a representative society of

22   properties are audited to be efficient with respect

23   to the work that's required to audit our reserves

24   given the size of our property site, to based on

25   fields that Ryder Scott has a level of familiarity



Page 161

1    with, given their historic function as the company's

2    reserve auditor, such that the process is efficient,

3    and also to give comfort to outside stakeholders that

4    a sufficient level of properties is being selected

5    for inclusion such that the audit is meaningful.

6            Q.  Do the properties selected by Fieldwood

7    for auditing change from year to year?

8            A.  Yes.

9            Q.  Is it accurate to say that Fieldwood

10   gives a new set of properties to be audited each

11   year?

12           A.  Fieldwood coordinates with Ryder Scott as

13   to what properties are going to be audited in order

14   to meet the thresholds, and it is generally not an

15   entirely new set of properties, it is customarily

16   supplemented, and depending upon the values that are

17   reflected in each given year in order to meet the

18   objectives that I described.

19           Q.  Do you have -- personally have any say in

20   which fields are audited on a yearly basis?

21           A.  I have not historically provided direct

22   guidance through the process.  That's something that

23   our manager of corporate reserves deals with

24   directly.  However, we have discussed historically

25   certain threshold levels that we wanted to achieve in



Page 162

1  order to deliver a comprehensive audit of our

2  reserves in line with our credit agreements.

3       Q.  Is there any written policy with respect

4  to selection of -- I will start over.

5            Is there any written policy with respect

6  to the selection of fields to be audited?

7       A.  There is not a written policy other than

8  the requirement under our credit agreements that --

9  historically that a certain value threshold was

10  required.

11       Q.  So if I'm understanding your testimony

12  correctly, there should be a list from Fieldwood from

13  year 2020 of fields that were audited by Ryder Scott?

14       A.  Yes.

15       Q.  Is that part of any report that's in the

16  Disclosure Statement or Plan of Reorganization, since

17  you've memorized it in preparation of this

18  deposition?

19       A.  I don't believe that's -- I don't believe

20  that that is included, but neither are the reserve --

21  the reserve report -- neither is the reserve report,

22  to my knowledge.

23       Q.  Is the reserves report part of the binder

24  that you reviewed in connection with your preparation

25  for this deposition?



Page 163

1        A.  Yes, it was.

2        Q.  Can you please describe Fieldwood's

3   reserve booking methodology.

4        A.  The booking methodology is generally

5   consistent -- or is consistent with SEC booking

6   standards.

7        Q.  And what are those SEC booking standards?

8        A.  SEC booking standards govern the way in

9   which you are allowed to recognize reserves within

10  various different categories, whether that's proved,

11  probable, possible, contingent.  There is certain

12  requirements that govern the ability to recognize

13  reserves based on each of those categories that's

14  laid out within the SEC guidelines related to reserve

15  recognition.

16       Q.  With respect to assets that Fieldwood

17  has, is it Mr. Schmidt's team that makes the

18  determinations as to proved, possible, and

19  contingent?

20       A.  Mr. Schmidt's team is responsible for the

21  preparation of the reserves.  So reserves that they

22  believe appropriately meet the definition of each

23  category is within their responsibility of preparing

24  reserves.

25       Q.  Is there a written procedure regarding



Page 164

1    the booking of reserves?

2          A.  I believe there are written SEC reserve

3    recognition guidelines that govern these procedures.

4          Q.  Is there a written policy internal to

5    Fieldwood regarding the booking of reserves?

6          A.  No.

7              (Phone rings)

8          Q.  (BY MR. GRZYB) How often are Fieldwood's

9    reserves updated?

10         A.  The company is required to produce two

11   reserve reports a year under its various credit

12   agreements, so two reports are prepared.

13         Q.  Other than Ryder Scott, who I understand

14   to be the auditor of Fieldwood's reserves, does

15   Fieldwood retain any other professionals with respect

16   to reserves report?

17         A.  Do you mind if I clarify?  Is your

18   question outside professionals --

19         Q.  Yes.

20         A.  -- from --

21         Q.  I will ask that.  Are there any outside

22   professionals retained by Fieldwood other than Ryder

23   Scott with respect to reserves reporting and

24   analysis?

25         A.  There are no other outside professionals



Page 165

1    that are retained as part of the annual audit which

2    is conducted solely by Ryder Scott.

3           Q.  How did the company accounts for issues

4    related to the pandemic in their reserve estimates

5    for midyear 2020?

6           A.  So issues related to the pandemic include

7    factors such as pricing, which can influence the

8    economic viability of reserves.  Our reserves were

9    run at SEC prices for purposes of the audited reserve

10   report, and reserves that qualified to be recognized

11   under those price assumptions were included and

12   reserves that did not meet the economic threshold for

13   inclusion based on those prices were not included.

14          The pandemic also resulted in a number of

15   fields either being either temporarily or permanently

16   shut in and the status of those fields and their

17   reserves was appropriately accounted for within the

18   reserve report.

19          Q.  Does your answer that you just gave with

20   respect to midyear 2020 apply also with the year-end

21   2020 reserve report?

22          A.  Yes, the year-end reserve report is the

23   only audited report.  Both reports are prepared

24   internally.

25          Q.  Were any revisions required to be made to



1   the midyear reserve report based upon a timing of the

2   bankruptcy announcement?

3           A.   The reserve report does not reflect --

4   the reserve report that was audited does not reflect

5   the bankruptcy.  Our audited financials are prepared

6   in accordance with GAP which reflects the ability to

7   recognize certain categories of reserves in line with

8   SEC -- in line with GAP reporting standards.

9           Q.   With respect to fields that are expected

10  not to return to production, have those reserves been

11  written off?

12          A.   Yes.  As of the date of the determination

13  of the lack of desire to bring those fields back

14  online, if it is known at that time, then that status

15  is incorporated into the appropriate reserve report

16  assumptions and those reserves would be written off.

17          Q.   When Fieldwood acquired the Apache

18  properties in 2013, was there a baseline of data from

19  Apache regarding the reserves for those fields?

20          A.   Yes.

21          Q.   Did Fieldwood itself perform a reserves

22  analysis of the Legacy/Apache fields?

23          A.   At what point in time are you asking?

24          Q.   During the acquisition process in 2013.

25          A.   I don't recall.  I don't recall what



Page 167

1    reserve work was done by other parties at that time

2    or -- or both --

3         Q.  Who at -- during -- during the 2013

4    acquisition process, was Ryder Scott the auditor with

5    respect to the Legacy/Apache fields?

6         A.  I believe so, but I'm not certain.

7         Q.  How long has Fieldwood been working with

8    Ryder Scott in connection with reserve audits?

9         A.  Since the inception of Fieldwood in 2013.

10        Q.  And Ryder Scott performs the reserves

11   analysis with respect to deepwater assets in

12   Fieldwood's portfolio as well, correct?

13        A.  They perform the audit with respect to

14   the deepwater properties, as well as all other

15   Fieldwood properties.

16        Q.  Did the lower commodity prices affect

17   Fieldwood's ability to spend on projects?

18        A.  Yes.

19        Q.  Are projects that can -- are there

20   projects that can't be funded that are nonetheless

21   included in the reserves?

22        A.  The reserve report is a reflection of

23   what the assets are.  The reserves attributable to

24   the asset base that the company has, part of the

25   assumption with respect to generating reserve reports



Page 168

1   is that we will have an ongoing business and

2   eventually merge from bankruptcy.

3           Our audited financials, that are prepared

4   pursuant to GAP, appropriately account for any

5   GAP-related reserve recognition requirements.

6       Q.  What is the split of the 80 percent to

7   Ryder Scott for auditing, what personnel in the

8   Fieldwood I bucket and what personnel into the

9   deepwater bucket?

10      A.  I believe the reserve report audited

11  value ended up being substantially higher than

12  80 percent.  That was just the minimum threshold.

13  That number is stated in the letter.  I don't know

14  offhand the split of properties the way that you are

15  asking.

16      Q.  Did the list of properties to be audited

17  skew in favor of the deepwater properties because

18  they're more valuable?

19          MR. PÉREZ:  Object to the form of the

20  question:  Vague.

21      Q.  (BY MR. GRZYB) Well, you see what I'm

22  asking, right?  You had to make a value -- you had to

23  make it to a certain value.

24          Is it accurate to say that on that list

25  there are likely more deepwater assets than there are



Page 169

```
 1   shallow assets?

 2          A.   The decision-making process isn't

 3   informed by deepwater or shallow.  It is informed, as

 4   I mentioned, by the properties that have historically

 5   been audited, the amount of value that we need in

 6   order to meet thresholds, the amount of work

 7   intensity related to auditing properties relative to

 8   the value that is going to be contributed as part of

 9   the audit.

10          So I don't know the answer as far as the

11   delineation that you're asking, but typically

12   speaking, high value properties are included in the

13   audit in order to meet the required thresholds.

14          Q.   Has there ever been a time during your

15   tenure at Fieldwood that Ryder Scott was outside of

16   audit tolerance during their review?

17          A.   No.

18          Q.   Has there ever been a difference in the

19   company's view with Ryder Scott's review with respect

20   to a reserves assessment?  I will clarify that.

21          Has there ever been a material difference

22   between the two, between Ryder Scott's analysis of

23   reserves portfolio and the company's view of a

24   reserves portfolio?

25          A.   On an aggregate basis, our reserve report
```



1   has always been well within the tolerance, which

2   suggests to me that Ryder Scott does not have a

3   material issue with respect to our reserves.

4          Q.  Is there an internal process for updating

5   lease operating costs, pricing differentials, and

6   other economic drivers within the reserves report?

7          A.  Yes.

8          Q.  Can you describe that process, please.

9          A.  Those are all assumptions and variables

10  that underlie any reserve report update.  The process

11  comprises of our corporate reserves department

12  working with all of the other various departments

13  that are required in order to provide those inputs.

14              With respect to the expense items that

15  you mentioned, LOS statements and historic operating

16  expenses by field are updated during each reserve

17  preparation update process.  Differentials are

18  provided by the marketing department based on recent

19  historic differentials.  Each of those variables gets

20  updated during each reserve, especially preparation

21  cycle.

22         Q.  Explain to me the interface between the

23  asset level teams and the reserves teams at

24  Fieldwood.

25         A.  The asset teams are responsible for the



1  ordinary operational planning and operations of the

2  assets.  The corporate reserves team is responsible

3  for preparing the reserve figures associated with

4  those assets.  The overlap between the two occur as

5  the departments interface amongst each of them,

6  including other departments such as production, in

7  order to understand the current state of each of the

8  assets conduct periodic reviews, such as well reviews

9  associated with each property and area, which provide

10  updated status and planning for each of the

11  properties which inform each of the departments and

12  are the basis for the updates that the corporate

13  reserve engineering team makes in their reserve

14  preparation.

15       Q.  How often does the asset team update the

16  reserve team with respect to, for example,

17  re-completed wells?

18       A.  The -- oftentimes it is the other way

19  around.  The -- the asset team is responsible for

20  planning what capital projects will take place.

21  Those events, once they occur, are incorporated into

22  reserve updates.  The two of them interface regularly

23  in order to understand differences in terms of -- in

24  order to understand the status of reserves as it

25  relates to booked reserves versus ongoing assessments



1    that other teams may be conducting, because there are

2    reserve engineers within both teams.

3         Q.  Has there been a material difference of

4    opinion ever between the asset team and the reserve

5    team --

6              MR. PÉREZ:  Object to the form of the

7    question:  Vague.

8         Q.  (BY MR. GRZYB) -- with respect to

9    reserves?

10        A.  We manage a very, very large property

11   set, and those two functions have different

12   responsibilities.  Reserves have been interpretive

13   analysis based on prescribed guidelines, and there

14   are often debates amongst the different team members

15   and groups of reservoir engineers as to -- as to

16   reserves associated with particular projects.

17             In the aggregate, I'm not aware of

18   material disagreements amongst the teams.

19        Q.  Is there a process in place at Fieldwood

20   to ensure a booked reserve ties to the company plan

21   or budget?

22             Let me add another --

23             MR. PÉREZ:  Object to the form of the

24   question.

25             MR. GRZYB:  I will ask a better question.



Page 173

1          Q.   (BY MR. GRZYB) Is there a written company
2     plan that would -- is that -- is there a written --
3     for any given year in terms of operations, is there a
4     written company plan?
5          A.   I'm sorry, is there a written?
6          Q.   Company plan for Fieldwood's operations.
7          A.   Sorry, can you repeat the question?
8               Are you asking is there a policy that --
9     is there a policy, or are you asking does the company
10    do an annual plan?
11         Q.   Does the company -- first question:  Does
12    the company do an annual plan?
13         A.   The company does an annual plan.
14         Q.   Did the company do an annual plan for the
15    year 2020?
16         A.   Yes, the company did an annual plan for
17    the year 2020.
18         Q.   Is there a process in place that ties
19    booked reserves to the company -- the annual company
20    plan?
21         A.   There is a cross-functional collaboration
22    that takes part (sic) as part of that plan.  There is
23    not a policy in place.  There is a review procedure
24    where all the departments are participating in
25    assembling the plan, but there are always fundamental



Page 174

1    differences between SEC booking standards and what is
2    required under a reserve report versus a business
3    plan, which is not constrained by those same
4    limitations.
5         Q.  If Fieldwood reserves a PUD, does that
6    mean they intend to develop it?
7         A.  Can you repeat the question?  If
8    Fieldwood -- I missed the word after the "Fieldwood."
9         Q.  Lists a PUD on its reserves analysis,
10   does that mean -- does that mean that Fieldwood
11   intends to develop it?
12        A.  If a PUD is going to be listed in the
13   reserve report, it would need to be developed within
14   the appropriate period of time.
15        Q.  Does that mean within the year referenced
16   in the reserve report?
17        A.  The puds that are scheduled for inclusion
18   in reserve reports generally need to be drilled
19   within a five-year period of time, unless there are
20   circumstances that would require drilling it at a
21   later date operationally.
22        Q.  How often are the volumetric assumptions
23   updated by Fieldwood in connection with its reserves?
24        A.  To the extent that volumetric analysis is
25   utilized for reserve estimation, it is updated as



1   often as the reserve reports are prepared, if

2   present.

3        Q.  Have proved reserves for the

4   Legacy/Apache properties increased or decreased since

5   acquisition in 2013?

6        MR. PÉREZ:  You mean 2013?

7        Q.  (BY MR. GRZYB) Since 2013.

8        MR. PÉREZ:  If you know.

9        THE WITNESS:  I don't have the analysis

10   in front of me, but I would imagine that they have

11   materially decreased.

12        Q.  (BY MR. GRZYB) How does the company keep

13   track of lease expiration dates and manage the leases

14   they want to keep?  With respect to, you know, for

15   example, shut-in wells that got shut in during the

16   pandemic, how is that process managed?

17        A.  That process is managed with several

18   different departments.  It is managed with our land

19   in our land administration department, it is managed

20   within our regulatory department, and it is also

21   managed with respect to our reservoir engineering and

22   asset teams.  It is within each of those group's

23   responsibilities to manage the monitoring, timing,

24   required regulatory reporting and forward planning in

25   order to propose if leases are going to be approved



Page 176

1    for exploration or not.

2           Q.  On the ARIES database that has been

3    produced -- and I just think I have one question on

4    it personally, I don't know if anyone else will have

5    questions on it -- there are several thousand cases

6    that are in the category of "other."

7                 What is that category?

8           A.  "Other" is a database administration

9    category which contains historic reserves figures

10   associated with properties that no longer have

11   another place in the reserve report, but for purposes

12   of maintaining the data for reference, they are

13   stored in the "other" category.

14                    (Exhibit 10 marked)

15          Q.  (BY MR. GRZYB) Do you mind to please open

16   what's been marked Exhibit 10.

17          A.  I have it open.

18          Q.  It is a spreadsheet, Exhibit 10,

19   FWE0000002.  Are you familiar with this document?

20          A.  Yes, I am.

21          Q.  And could you please describe to me what

22   this document is.

23          A.  This document was a document that was

24   sent to the company by BSEE listing certain priority

25   platforms which they desired to understand the status



Page 177

1   of.

2          Q.  Were you involved in the communications

3   with BSEE relating to Exhibit 10?

4          A.  No, I was not.

5          Q.  Who from Fieldwood was involved with the

6   communications with BSEE?

7          A.  Primarily John Seeger.

8          Q.  Are there any INCs associated with the

9   assets listed on Exhibit 10?

10         A.  Yes.  I believe that there are INCs that

11  were associated with these assets and that have been

12  rectified and there are also outstanding INCs in some

13  cases.

14         Q.  Can you identify for me which of the

15  assets on this list had INCs that have been

16  rectified?

17         A.  I don't believe I will be able to

18  identify all of them by memory.  There is a version

19  of this same file that I believe you were provided,

20  which showed Fieldwood's correspondence back to BSEE,

21  and it outlines the date at which INCs have been

22  resolved or what was outstanding or other when it was

23  anticipated to be resolved.

24              Going down the list -- if you want to

25  pull up that document, I could talk more



Page 178

1    specifically.  I know that there was an INC at East

2    Briggs 160 that is referenced.  That was resolved.  I

3    know that there are a couple of INCs outstanding in

4    lines 12 -- 11 and 12, which are scheduled to be

5    resolved this month.

6            Q.  This list --

7            A.  Just a correction, it was line seven that

8    was scheduled to be resolved this month.

9            Q.  Is the concept of an INC different

10   than -- in your mind, than why BSEE put these assets

11   on this list?  That is a poorly phrased question.

12           Is there -- is there a reason in your

13   mind why BSEE put these assets on -- on this list?

14           MR. PÉREZ:  Object to the form of the

15   question:  Calls for speculation.

16           THE WITNESS:  It was -- this list was

17   described to us as a list of facilities that BSEE

18   considered a priority.  That's -- I don't have any

19   knowledge as to how they made this particular

20   selection in 13 facilities.

21           Q.  (BY MR. GRZYB) Looking at line 13, Ship

22   Shoal 207 is referenced.  Do you know if the issues

23   raised by BSEE in this document have been resolved

24   with respect to that asset?

25           A.  Would you mind if we reviewed the more



1  recent version of this spreadsheet that contains

2  those comments so I can give you the most accurate

3  answer?

4              (Discussion off record)

5          Q.  (BY MR. GRZYB) Okay.  We can move on.

6              MR. GRZYB:  Alfredo, if you give me five

7  minutes to work with Jase, I might be able to focus

8  my remaining questionings to shorten the time.

9              MR. PÉREZ:  Okay, that sounds good.  So

10  just come back at 5:00 o'clock?

11             THE COURT REPORTER:  I'm off.

12                (Recess taken)

13         Q.  (BY MR. GRZYB) So, Mr. Dane, with respect

14  to the credit purchase NewCo outfit, has Fieldwood

15  reached agreements with any companies that have

16  agreed to provide new bonding for NewCo?

17         A.  NewCo has finalized any agreements.

18         Q.  Are they in negotiations with surety

19  companies?

20         A.  Yes.

21         Q.  What companies?

22             MR. PÉREZ:  I am a little concerned

23  about, you know, talking about who the companies are

24  and then some people causing mischief.

25             MR. GRZYB:  That's okay, I will strike



Page 180

1    that question.

2           Q.  (BY MR. GRZYB) Has Fieldwood come to an

3    understanding as to how much bonding NewCo will need

4    in connection with its operation post confirmation?

5           A.  I'm sorry, can you repeat that one more

6    time for me?

7           Q.  Is there a bonding level or amendment --

8    strike the question.

9                Has Fieldwood come to an understanding on

10   the amount of bonding that NewCo will be required in

11   order to operate post confirmation?

12          A.  Fieldwood's confident it's going to be

13   able to obtain whatever bonding is going to be

14   required in order to operate post confirmation

15   pursuant to the plan.  The bonding regulations are

16   obviously significantly influx.  There is not any

17   defined number other than statutorily required

18   levels, but Fieldwood, through all of the

19   conversations that it has had with interested

20   sureties, is confident it will be able to provide the

21   required level of bonding.

22          Q.  What about conversations with respect --

23   I'm sorry.

24                Has Fieldwood had conversations with the

25   government as to the amount of bonding NewCo will be



Page 181

1    required to have post confirmation?

2         A.  Fieldwood has had conversations with the

3    government around certain elements of bonding, but

4    there is -- I don't think it would be appropriate to

5    share all of our ongoing conversations with respect

6    to the government at this time.

7         Q.  And what makes you say that?

8         A.  Well, as with any party, negotiations in

9    process are something that is important to respect

10   confidentiality as those conversations evolve.

11        Q.  So is it -- are you saying that your

12   negotiation -- you're currently in talks with the

13   government as to the bonding requirements for NewCo

14   post confirmation?

15            MR. PÉREZ:  I don't think he testified to

16   that, but --

17        Q.  (BY MR. GRZYB) Is that -- that your

18   testimony?

19        A.  No.  My testimony is that Fieldwood has

20   had ongoing conversations with the government

21   regarding various elements related to bonding and

22   that are going to be required through our plan, and

23   Fieldwood's confident that it is going to be able to

24   obtain the required bonding in order to successfully

25   complete the plan.



Page 182

```
 1          Q.  What is it about the current situation
 2     that gives Fieldwood confidence that it will be able
 3     to meet the bonding requirements?
 4          A.  We believe that we will have the
 5     necessary capacity to meet the requirements that will
 6     be required in order to successfully conclude the
 7     plan.
 8          Q.  Does Fieldwood have an estimate of the
 9     amount of bonding required that will -- that will be
10     required of NewCo post confirmation?
11          A.  No.
12          Q.  Is that "no"?  I'm sorry, I just didn't
13     hear the answer.
14          A.  Yeah, no, that's correct, no.
15          Q.  Is NewCo expected to be a limited life
16     company or is New (sic) expected to go forward as a
17     going concern?
18          A.  Do you mind defining for me what a
19     "limited life company" is.
20          Q.  Is NewCo expected to be a new company,
21     expected to run on forever?
22          A.  I think, you know, that level of
23     hyperbole is probably not in line with any investor
24     expectations, but I do think NewCo is clearly
25     expected to be a going concern post confirmation.
```



Page 183

1          Q.  Does Fieldwood expect there to be a
2    set-aside funding decommissioning associated with the
3    NewCo assets?
4          A.  Other than as described in the plan,
5    there is no set-aside funding for decommissioning.
6          Q.  Is it safe, then, to assume that NewCo
7    expects to fund decommissioning obligations from cash
8    flow?
9          A.  Correct.
10         MR. GRZYB:  Subject to follow-up, that's
11   all I have.  And I thank you very much, Dane, for --
12   Mr. Dane, for your time.
13         THE WITNESS:  Thank you very much.
14                    EXAMINATION
15         Q.  (BY MR. BAINS) All right.  Good
16   afternoon, Mr. Dane.  My name is Brandon Bains.  I am
17   counsel for Hanover, Liberty, Travelers, and XL, four
18   sureties for Fieldwood Energy.
19         I think we have spoken on a couple of
20   occasions before, but you do understand I represent
21   the sureties and issued bonds on behalf of Fieldwood
22   Energy, correct?
23         A.  I do.
24         Q.  And let's just start there.  What is a
25   bond?



Page 184

 1              MR. PÉREZ:  Object to the form of the
 2    question:  Calls for a legal conclusion, but --
 3          Q.  (BY MR. BAINS) You can answer.
 4          A.  Okay.  A bond is a security instrument
 5    that's provided in order to secure against certain
 6    events which defaults may cause a drawing on the bond
 7    and give the beneficiary of that bond the security
 8    that it is looking to project.
 9          Q.  Do you consider a bond an asset or a
10    liability of the company?
11              MR. PÉREZ:  Object to the form of the
12    question, and assumes facts not in evidence, whether
13    he considers it an asset or a liability.  It just
14    gives him a choice, and that assumes facts not in
15    evidence.
16              MR. BAINES:  Noted.
17          Q.  (BY MR. BAINS) You can answer.
18          A.  I would defer to our counsel for the
19    legal definition of a bond as it relates to if a bond
20    is a liability.  I don't know that I consider a bond
21    to be -- I certainly don't consider a bond to be an
22    asset.  I mean, I don't know that I would consider it
23    to be a liability unless there is the liability that
24    it is -- that is owed under the bond.
25          Q.  Well, let's start with the basics.



Page 185

1            A bond is a three-party agreement.  Do
2      you agree with that?
3            MR. PÉREZ:  And object to the form of the
4      question:  It is calling for a legal conclusion.
5            Q.  (BY MR. BAINS) Mr. Dane, you're the CFO
6      of a major company.  Is that accurate?
7            A.  I would agree with the statement that
8      there is conventionally three parties:  "The parties"
9      being the obligee, the obligor, and the provider.
10           Q.  Sure.  And Fieldwood is the primary
11     obligor of a bond, correct?
12           A.  Depends what bond you're speaking of.
13           Q.  Let's say that it is a bond in favor of
14     the government issued by a surety on behalf of
15     Fieldwood.  In such a circumstance, Fieldwood is the
16     primary obligor on that bond, correct?
17           A.  If Fieldwood is listed as the obligor on
18     the form of a bond, then it is the obligor of the
19     bond.
20           Q.  And I want to make sure we're being here
21     clear here.  A primary obligor, in other words, that
22     is called the principal on the bond.  Are you
23     familiar with that term?
24           A.  Yes.
25           Q.  And the government in this situation



Page 186

```
 1    would be the obligee, I think you have used the word

 2    "beneficiary," but do you use those interchangeably?

 3         A.  Yes.

 4         Q.  And on a principal on a bond owes

 5    indemnity to its surety, do you agree?

 6              MR. PÉREZ:  That's a statement; that is

 7    not a question.

 8         Q.  (BY MR. BAINS) Do you agree?

 9         A.  If there is an indem --

10              MR. PÉREZ:  Calls for a legal conclusion.

11              THE WITNESS:  I defer to our Counsel on

12    these topics, but if there is a --

13         Q.  (BY MR. BAINS) I'm not asking you for

14    legal conclusions.  I'm asking you as a CFO of a

15    major company and as CEO of the post-emergent

16    company, you understand that a principal and a bond

17    owes indemnity to its surety?

18         A.  If there is an indemnity --

19              MR. PÉREZ:  Same objection.

20         Q.  (BY MR. BAINS) What was your answer?

21         A.  My answer is that we would have our

22    Counsel review the status of that agreement.  A

23    company in bankruptcy, which is -- with an indemnity

24    agreement that could be construed as a pre-petition

25    claim or a rejected executory contract, is not a --
```



Page 187

1    the same as an arrangement in a non-bankrupt company.

2              But I think your question was:  Do I

3    agree that an indemnity agreement is an obligation

4    between one party to indemnify another?  I guess that

5    is the basis of what an indemnity agreement is.

6         Q.  Well, I agree with that.

7              I think my question, though, was just

8    saying that a principal on a bond owes a surety

9    indemnity; that if a surety is paying the debt of

10   another, that is the whole idea behind suretyship, as

11   opposed to like commercial insurance.  I'm just

12   curious if you agree with those concepts?

13             MR. PÉREZ:  Again, the same objection.

14             You're kind of testifying and, you know,

15   why don't you ask him a question.

16             But I mean, if you -- if you can agree

17   with that, whatever you can agree with.

18             THE WITNESS:  I don't understand some of

19   the words that you're using in the context of the

20   indemnity agreement or the question.

21        Q.  (BY MR. BAINS) Sure, no, I'm happy to

22   rephrase.  What do you not understand?

23        A.  The concept of the debts that you're

24   asking about.

25        Q.  Do you understand that a surety is a



1    secondary guarantor for the principal on whatever

2    bond it is issuing?

3              A.  I understand that --

4              MR. PÉREZ:  The same.

5              THE WITNESS:  I understand --

6              Sorry, Alfredo.

7              MR. PÉREZ:  No, no, go ahead.  I mean, if

8    you -- if you understand exactly what that means, and

9    know it, then testify, but if you -- if you don't, I

10   mean --

11             THE WITNESS:  I understand that an

12   indemnity agreement is a customary feature of a

13   bonding arrangement.

14             Q.  (BY MR. BAINS) True.  And I'm talking

15   just, though, about the bonds themselves.

16             And for reference, how many billion in

17   bonds does Fieldwood have outstanding?

18             A.  Approximately 1.1 billion.

19             Q.  That is a lot.  That is a whole lot of

20   bonds.  So I would expect, I think, that you would

21   understand how these bonds work.  I mean, is that an

22   accurate statement, that's part of your role as CFO?

23             A.  Yes, I believe I do understand how they

24   work.

25             Q.  And forget the indemnity agreement,



Page 189

1    forget bankruptcy.  Just as a rule of having bonds,
2    by the very nature of a bond being issued, Fieldwood
3    is the primary entity responsible for whatever is
4    being bonded and it owes indemnity to its surety that
5    surety has to pay out.
6              Do you agree with that statement?
7         A.  Not all bonds --
8              MR. PÉREZ:  Same objection.
9              Go ahead.
10             THE WITNESS:  Okay.  I think the
11   characterization of your question is with -- is
12   trying to extrapolate that every agreement is the
13   same, that all bonds are the same, and you're asking
14   me for certain legal conclusions that I would defer
15   to Counsel on.
16             All of our bonds have specific provisions
17   that, in many cases, are unique; and there are some
18   common features, like an indemnity agreement, which
19   is a common feature of a bond.
20        Q.  (BY MR. BAINS) You mentioned earlier that
21   the intention of Fieldwood was not to do anything
22   with the bonds -- and I think Mr. Grzyb was asking
23   specifically about the Fieldwood I entity -- that
24   they're just going to be there.
25             Do you recall that testimony?



Page 190

```
 1          A.  Yes.
 2          Q.  So when you say they're "going to be
 3   there," are you envisioning that Fieldwood I would
 4   become the new principal in that bond, or rather,
 5   that the bond would be something that is -- otherwise
 6   transfers through this bankruptcy process?
 7               MR. PÉREZ:  Object to the form of the
 8   question; assumes facts not in evidence.
 9          Q.  (BY MR. BAINS) You can answer.
10          A.  The plan doesn't contemplate the
11   replacement of any principals on any bonds other than
12   by mutual consent amongst the parties.
13          Q.  And I want to make sure -- you said:  The
14   plan does not contemplate that?  Was that your
15   answer?
16          A.  That's correct, the plan does not
17   contemplate any nonconsensual substitution of
18   principals on the bonds.
19          Q.  So we were talking just a moment ago, I
20   think right before I started in, about this
21   discussion that's been ongoing with sureties to
22   provide new bonds in connection with the NewCo
23   bucket.  Do you recall that?
24          A.  Yes.
25          Q.  So were you referring to the idea that
```



1   the existing bonds would be replaced by consent, I

2   think to use your word, to substitute a principal, or

3   are you talking about brand new bonds issued on

4   behalf of the NewCo entity?

5        A.  I testified that I believe that the NewCo

6   and any of the entities that require bonding would be

7   able to obtain sufficient bonding as required.  I did

8   not -- as I have stated every times, the plan does

9   not contemplate any nonconsensual assignment,

10  allocation or substitution of principal on the bonds.

11       Q.  And I understand that.  I just want to

12  make sure that I'm understanding your testimony.

13            When you're talking about new bonds, you

14  mean completely new bonds issued by a surety on

15  behalf of this NewCo entity and nothing that's

16  already existing as of that point in time?

17       A.  If a new bond is required, I believe that

18  we will be capable of providing any required new

19  bonds.

20       Q.  And would that include indemnity?

21       A.  If the surety provider required an

22  indemnity at agreement, which is conventional, it

23  would include a new indemnity agreement associated

24  with that bond.  That would be something that the

25  company would be, as partly -- as part of a -- of a



Page 192

1    new bond.

2         Q.  Yeah, after this experience, I feel

3    pretty confident that the surety's going to want an

4    indemnity agreement.

5              Is their intention --

6              MR. PÉREZ:  Is that a question?

7              MR. BAINS:  No, that's -- that is not a

8    question.  I guess I'm agreeing with Mr. Dane that,

9    yeah, I think that's probably going to be -- be

10   requested.

11        Q.  (BY MR. BAINS) Is there an intention by

12   this NewCo group to replace any of the private bonds?

13             And do you understand what I mean when I

14   say "private bonds"?

15        A.  I interpret a private bond to be a bond

16   issued to someone other than a regulatory authority

17   or BOEM.

18        Q.  So, for instance, a predecessor, there is

19   private bonds where Fieldwood is the principal and a

20   predecessor interest is the obligee, agreed?

21        A.  Yes.

22        Q.  Is there intention of the NewCo group to

23   replace any of those bonds with the NewCo being a

24   principal in favor of the predecessor?

25        A.  The plan does not --



Page 193

```
 1              MR. PÉREZ:  I am going to object to the
 2    form of the question.  I am going to object to the
 3    form of the question:  It calls for speculation as to
 4    what, you know, NewCo will do in the future.
 5              THE WITNESS:  Yeah, the plan does not
 6    contemplate the -- the replacement of those bonds.
 7    However, if the parties mutually agree, then it is
 8    possible that replacement of the bonds may be issued.
 9         Q.  (BY MR. BAINS) Why does the plan not
10    contemplate replacement of those private bonds?
11         A.  Because it does not.
12         Q.  Well, okay.  I know it does not, but why
13    does it not?
14              MR. PÉREZ:  Well, I'm going to object to
15    the form of the question.  It assumes that it has to.
16    I mean, it is based on a false premise.  It doesn't.
17              MR. BAINS:  I'm not assuming that it has
18    to or not.
19         Q.  (BY MR. BAINS) But if it doesn't, why
20    does it not?  Why would there be new bonds for the
21    NewCo that you testified to earlier but there would
22    not be new bonds to replace the existing private
23    bonds?
24         A.  When that company --
25              MR. PÉREZ:  Objection.
```



Page 194

1             I think you're kind of arguing with the

2    witness at this point.  I think he's answered that

3    question.

4             MR. BAINS:  He has not, but your

5    objection's noted.

6             Q.  (BY MR. BAINS) You can answer.

7             A.  Companies typically go through

8    restructuring in order to relieve the debtor of

9    obligations.  Those obligations can take many forms,

10   and our restructuring those obligations take the form

11   of P and A liabilities the company does not -- the

12   company was not capable of satisfying, alongside all

13   of its other obligations, such as financial

14   obligations and debt, et cetera.

15             And if you're asking me why a company

16   that is in a Chapter 11 restructuring would look to

17   shed liabilities, I think that that's the very nature

18   of what a restructuring is; and I think more

19   specifically, counterparts, like stakeholders such as

20   lenders who are investing in capital into businesses,

21   are looking to invest that capital into a business

22   with a fresh start, and then an ability to generate

23   an attractive return; and to the extent that there

24   are liabilities that are not required to be taken on,

25   then it is -- that is one of the features of a



Page 195

1    restructuring.

2         Q.  So when you speak of shedding

3    liabilities, are you referring to shedding the P and

4    A liabilities that these bonds would cover or the

5    indemnity that the Fieldwood would owe to its surety

6    when it has to pay out on those bonds?

7         A.  Oh, liabilities in general -- the ability

8    through the U.S. Bankruptcy Code to deal with

9    liabilities of a company is a feature that's very

10   fundamental to bankruptcy.  So I'm talking about any

11   liability.  That is something that the Bankruptcy

12   Code allows to be addressed.

13        Q.  Okay.

14             MR. PÉREZ:  Can I have the question read

15   back?  Because I am not sure of what the question

16   was.

17             THE COURT REPORTER:  Yeah, just give me a

18   second, I have to un-mute.

19               (The record was read as requested)

20             MR. PÉREZ:  Okay, can you read the

21   question before that?  I apologize, because that's

22   the one I was talking I was wanting to hear.

23             THE COURT REPORTER:  Yes, one moment.

24               (The record was read as requested)

25             MR. PÉREZ:  Okay, I didn't realize -- I



Page 196

1    didn't realize that was the question.

2            Okay.  Thank you.

3            Q.  (BY MR. BAINS) So, Mr. Dane, to kind of

4    regroup, the original question was:  Why are there

5    not going to be replacement of these private bonds

6    when there would be new bonds by the NewCo entity?

7    And your answer was that you want to shed

8    liabilities.

9            So what I'm trying to understand:  Are

10   you referring to shedding the liabilities of the

11   P and A obligations or the indemnity to your surety

12   that would have to pay out on those P and A

13   obligations under the private bonds or both?

14           MR. PÉREZ:  Yeah, I am going to object to

15   the question.

16           I think it kind of mischaracterizes his

17   testimony when you asked him why he wasn't doing it.

18   I think he answered because he doesn't have to, and

19   the rest of the stuff is him, you know --

20           But go ahead and answer if you can,

21   but -- because I don't believe that was your answer.

22           THE WITNESS:  Yeah, my testimony is that

23   it is not required, and so assuming additional

24   liabilities for a post-petition entity is something

25   that had to be justified or required, and it is not



1    in this case, in our view.

2            Q.   (BY MR. BAINS) Well, sir, there is a lot

3    about the plan that's not required.  I mean, there is

4    nothing that's required that says you have to have

5    some sort of divisive -- or how the hell you say that

6    word -- merger, that you have to have all these

7    different buckets that the -- so none of this is

8    required, it is a choice, it is a strategic choice

9    for the company.

10           And I'm trying to understand

11   strategically why the company says, we don't want to

12   replace private bonds that are out there.

13           A.   If the company --

14           MR. PÉREZ:  I think he has already

15   answered it twice, because they don't have to.  So, I

16   mean, I know you don't like the answer, but -- but

17   he's said that twice already.

18           MR. BAINS:  It's not an answer.  If

19   somebody says, "Brandon, why aren't you eating

20   dinner?"  I could say, "I don't have to," but a real

21   answer is "because I'm sick" or "I don't like

22   chicken."  So it's not an answer to say, "We don't

23   have to."

24           Q.   (BY MR. BAINS) So, Mr. Dane, once again,

25   what the basis of the strategic choice?



Page 198

```
 1              MR. PÉREZ:  I am going to object:  Asked
 2    and answered.
 3              You can give him the same answer.
 4              THE WITNESS:  The company stakeholders
 5    are very cognizant about liabilities that the NewCo
 6    is going to have.  The company that -- the plan
 7    contemplates them investing hundreds of millions of
 8    dollars of new capital into, and having a balanced
 9    mixed of assets and liabilities is very important for
10    a successful business, and those are decisions that
11    we make whenever we evaluate any type of liability
12    and if it's something that is appropriate to incur or
13    not when not required.
14         Q.  (BY MR. BAINS) How does replacing a
15    private bond lead to liability?
16              That's the disconnect I'm having with
17    you.  You keep saying, we're trying to avoid
18    liabilities and not have a balance.  I'm not
19    understanding how those two relate.
20         A.  You had very clearly stated several times
21    indemnity agreements are features of all bonds.  That
22    is an expectation of the sureties based on what I
23    thought I heard in your questioning.  If those are
24    provisions that are part of replacement bonds, that
25    imposes liabilities on a company, and if that is
```



MAGNA ▶
LEGAL SERVICES

Page 199

1    something that is not required, then that has to be

2    assessed by the company and its stakeholders if it's

3    appropriate.

4         Q.  Okay.  So you testified earlier that

5    Fieldwood wants the bonds to stay in place and carry

6    through, correct?

7         A.  No.

8         Q.  I thought you said earlier that the bonds

9    are there, y'all aren't trying to do anything with

10   them, they're going to stay there.

11        A.  You -- your question said the company

12   wants these things to happen.  This -- that is what

13   it is, the bond, when issued, is outstanding to the

14   beneficiary.  Our action or inaction does not change

15   that fact.

16        Q.  Well, Fieldwood Energy's the principal on

17   that bond, and Fieldwood Energy is no longer going to

18   exist, correct?

19        A.  Fieldwood Energy is currently the

20   principal on those bonds.

21        Q.  And Fieldwood Energy is not going to

22   exist after confirmation of that plan if it is

23   confirmed, correct?

24             MR. PÉREZ:  I think you're calling for a

25   legal conclusion as to whether Fieldwood Energy is



Page 200

1    going to exist after the plan.

2            THE WITNESS:  I agree with Counsel on the

3    future status of the entity itself as it relates to

4    the plan given.

5            Q.  (BY MR. BAINS) What is your

6    understanding -- as the CFO of the company and the

7    proposed CEO of the new company, do you believe

8    Fieldwood Energy is still going to exist?

9            A.  Fieldwood Energy, after this

10   restructuring, is not going to exist in its current

11   form.

12           Q.  Okay.  Agreed.  Didn't think that was

13   really that controversial, but okay.

14           So the bonds are there, but yet y'all

15   don't want the indemnity to go with them.

16           Is that the basic thrust of all of this?

17           A.  I don't understand your question, what

18   your question is.

19           Q.  You want the bonds to stay there in favor

20   of these beneficiaries and pay out, but you don't

21   want indemnity to carry through because it is a

22   liability that the lender group doesn't want to

23   carry?

24           A.  I think you're mischaracterizing the

25   issue in your question.  It is not a matter of



Page 201

1   desire.  The bonds are outstanding.  Fieldwood's

2   action or inaction doesn't change that.  The plan

3   addresses the treatment of the indemnity agreements,

4   but the wants or need of Fieldwood and its employees

5   doesn't change the reality of the current status of

6   the bonds that are outstanding.

7           Q.  But the lender group desires not to have

8   to indemnify any further?

9               MR. PÉREZ:  Again, calling for

10  speculation.

11              THE WITNESS:  You asked me this

12  question --

13              MR. PÉREZ:  Indemnities are treated under

14  the plan.

15          Q.  (BY MR. BAINS) What was your answer, sir?

16          A.  My answer is that I have answered that

17  question at least four times.

18          Q.  Well, we will let the transcript speak

19  for itself on that.  I'm going to jump to Exhibit 20

20  that you looked at earlier.  Let me know when you

21  have it up.

22          A.  I have it up.

23          Q.  Okay.  Page six of that gives some

24  projections for the NewCo entity.  Let me know when

25  you're there.



Page 202

```
 1          A.   I'm there.
 2          Q.   Okay.  It shows that the P and A
 3    projections for the next five years for the NewCo
 4    entity are right around $5 to six million.
 5               Do you see that?
 6          A.   I do.
 7          Q.   And that is a pretty low number, isn't
 8    it, for P and A on a year-to-year basis?
 9          A.   The amount of P and A spending is
10    dictated by the timing and amount of projects that
11    are available to conduct P and A on.  So it is a --
12    it is relative to -- is it low?  "Low" is a relative
13    term.
14          Q.   Sure.  And I'm saying it is low relative
15    to the number of assets here and low relative to how
16    much it costs to P and A wells of the type that
17    Fieldwood would operate.  For instance, do you agree
18    with me to P and A a dry tree well on a platform is
19    like a million and a half bucks?
20          A.   No.
21          Q.   Okay.  What's the number?
22          A.   It is not a one-size-fits-all number.
23          Q.   How many wells could be decommissioned
24    for $6 million?
25          A.   That depends on a number of variables.
```



Page 203

1    It depended on your working interesting in the well.

2    If you have a low working interest, you can

3    decommission a large number of gross wells.  It

4    depends on the complexity of the wells, it depends on

5    many factors that relate to the particular

6    characteristics of the actual well and your ownership

7    in the well.

8              The -- I believe the spending is actually

9    very significant relative to the liabilities of

10   NewCo.  This spending represents a very significant

11   portion of the total shelf liabilities that NewCo

12   will own.

13         Q.  NewCo's also going to own some deepwater

14   liabilities, correct?

15         A.  Yes.

16         Q.  So it is not just shelf.  And deepwater

17   generally is going to be more expensive on a P and A

18   front?

19         A.  The deepwater P and A liabilities are

20   more expensive than shelf liabilities in general.

21         Q.  I mean, for instance, you know, subsea

22   wells and deepwater are in excess of ten million to

23   decommission.  Do you agree with that?

24         A.  Generally speaking, they can be in excess

25   of $10 million.



Page 204

1         Q.  And certainly platforms are far in excess
2    of that?
3         A.  Not necessarily.
4         Q.  Why not?
5         A.  Because it may not cost that much.
6    Deepwater platforms are not fixed structures.
7    Oftentimes the decommissioning of a deepwater
8    platform itself is -- may not be that expensive,
9    depending on the particular type of platform.
10        Q.  So you believe that $6 million a year
11   P and A is going to be sufficient to handle all the
12   P and A obligations that might arise over the next
13   five years for all these assets?
14        A.  The NewCo is going to have almost no
15   required near-term P and A obligations, because most
16   of the assets that comprise NewCo are going to be
17   significant producing assets with remaining reserve
18   life and P and A that largely is not required in the
19   near term.
20        Q.  And is that because the debtors seek to
21   abandon all the bad assets back to the predecessor?
22             MR. PÉREZ:  Object to the form of the
23   question.  I don't think that the quality of the
24   assets having anything to do with what's being
25   abandoned.  Object to the form of the question, I



Page 205

1   think it is a statement.  Frankly, it is not even a

2   question.  Why don't you ask a question.

3          Q.  (BY MR. BAINS) You can answer, sir.

4          A.  The P and A spend that is anticipated for

5   NewCo is a function of the opportunities that are

6   available to P and A and the timing at which those

7   opportunities are required.  And this is actually a

8   very significant amount of spend relative to the

9   obligations that it will have for P and A in each of

10  these periods as we understand the asset base to

11  that.

12         Q.  Right.  And then my question was:  Is

13  that because there are no assets in here where P and

14  A would otherwise be immediately required because any

15  of those assets have been abandoned back to the

16  predecessors?

17         A.  I don't think --

18             MR. PÉREZ:  Same objection.

19             Go ahead.

20             THE WITNESS:  I think that

21  mischaracterizes the plan.

22         Q.  (BY MR. BAINS) In what way?

23         A.  The NewCo is assuming significant

24  liabilities.  Those liabilities aren't as near term

25  in general.  The NewCo has significant P and A



Page 206

1    obligations associated with its assets.

2              In addition, the NewCo is agreeing to

3    financially support and operationally conduct the P

4    and A associated with the field with three assets,

5    which is meaningful; and then there is various

6    consensual arrangements which have been reached which

7    also address the liabilities and NewCo's involvement

8    in managing those liabilities as well.

9         Q.  Do you believe valuable assets have been

10   abandoned?

11        A.  Is your question:  Do I believe that the

12   "Abandoned Properties" category contains valuable

13   assets?

14        Q.  Sure.

15        A.  The properties that comprise the

16   "Abandoned Properties" category are generally not

17   high value properties and are comprised of properties

18   that represent liabilities.

19        Q.  Yeah, that's what I just said five

20   minutes ago.  And I agree, that was my question.

21             So that's why you're saying you think

22   that there is not going to be P and A on these NewCo,

23   because anything where there was P and A y'all want

24   to put in the abandoned category; is that fair?

25             MR. PÉREZ:  Again, no, you're making a



Page 207

```
 1   statement, and I mean, I think you should ask a
 2   question, but it is not -- it is not --
 3   mischaracterizes his testimony and it gives a
 4   causal -- assumes a causal link where that hasn't
 5   been established.
 6            But go ahead and answer the question, if
 7   you can.
 8            THE WITNESS:  I believe I already
 9   answered this question.
10            Q.  (BY MR. BAINS) Do you recall the question
11   Mr. Grzyb had about whether the NewCo entity is going
12   to be -- what is his term?  He said limited life or
13   go on forever.  I think you said it was a little bit
14   of hyperbole on going on forever.
15            But do you recall all of that?
16            A.  I recall that question.
17            Q.  And you said the intention is for the
18   NewCo entity to operate as a going concern post
19   emergence.  I believe that was your answer.
20            Is that accurate?
21            A.  Yes, that was part of my answer.
22            Q.  Well, what is to prevent NewCo from
23   operating let's say on these projections over these
24   five years from stucking (sic) out all the value of
25   these wells and then just declaring bankruptcy and
```



MAGNA ▶
LEGAL SERVICES

Page 208

1   shedding those same liabilities for P and A five
2   years from now?
3                MR. PÉREZ:  Is that a question?
4                MR. BAINS:  Yes, it is.
5          Q.  (BY MR. BAINS) What is preventing the
6   NewCo from doing that?
7          A.  The NewCo's going to have governance
8   mechanisms in place.  The NewCo -- that is not in
9   line with the NewCo's strategic objectives, so I
10  think --
11         Q.  What are -- go ahead.
12         A.  Yeah, I think what is to prevent it is
13  the management and governance and oversight of how
14  the business is conducted and the strategy it
15  pursues, which is not in line with the strategy that
16  you just outlined.
17         Q.  When you say "the strategy that it
18  pursues," what are you referring to?
19         A.  I'm referring to the strategy that you
20  suggested in your question.
21         Q.  No, no, you said the strategy that the
22  NewCo is going to pursue is different than what I had
23  in my question.  I'm asking you what that strategy
24  that the NewCo is going to pursue.
25         A.  The NewCo strategy is a business that has



Page 209

1   a balanced mixed of assets and liabilities that

2   represents an investable business that's capable of

3   attracting the capital that's required under that

4   plan from the stakeholders that we are dealing with

5   and also the restrictions on capital in the energy

6   environment in general.

7           The NewCo operating strategy is centered

8   around a disciplined investment strategy with a

9   business that as that has an appropriate amount of

10  capital investment and free cash flow to meet current

11  investor's objectives.  That is the strategy of the

12  NewCo entity.

13          Q.  So is that a different strategy than

14  Fieldwood Energy had pre-bankruptcy?

15          A.  The pre-bankruptcy Fieldwood business was

16  a very different business than the NewCo business,

17  particularly due to the differences in the asset base

18  that each of those two entities is going to comprise

19  of.

20          Q.  Why has NewCo not contemplated a sinking

21  fund to handle P and A over the course of the five

22  years and beyond?

23          A.  A sinking fund requires setting aside

24  capital, capital that is unrestricted and available

25  for various other capital allocation purposes, such



Page 210

1  as payment of P and A liabilities themselves, debt

2  repayment, capital investment, acquisitions, any

3  other utility to capital.  Sinking funds are

4  undesirable because of the impositions that they

5  impose upon the business for other uses of that

6  capital.

7          Q.  So, then, what assurances are there in

8  the plan that Fieldwood III will actually handle

9  P and A?

10         A.  The assurance is of the -- the assurance

11 is a viable business that has the capability of

12 addressing its P and A.

13         Q.  I am going to switch topics a little bit.

14             You talked earlier about the bids that

15 were received from some of the deepwater assets in

16 June of 2020.  Do you recall that?

17         A.  The bids were not received in June of

18 2020, but I do recall the conversation.

19         Q.  I'm sorry, my notes may be off, but you

20 know what I'm talking about, the bid process to sell

21 the deepwater assets?

22         A.  I'm familiar with that process.

23         Q.  And you said there were five bids, there

24 were seven indications of interest, the highest was

25 $700 million.  Do you recall that?



Page 211

1          A.  Yes.

2          Q.  And you noted that the lenders had some

3    consent rights and ultimately they objected to that

4    bid on a number of different reasons and you kind of

5    ticked through them, including the identity of the

6    bidder.  Do you recall that?

7          A.  Yes.

8          Q.  I don't want to know who the bidder is,

9    but what do you mean by the "identity," that they

10   just thought it was someone that couldn't operate or

11   they didn't like them or they owed them money?  I

12   don't understand the "identity" part.

13         A.  A counterparty in any transaction is a

14   very fundamental part of a risk profile of a

15   transaction, and so the identity is associated with

16   the counterparty, their business and various other

17   considerations that any counterparty would put into

18   their calculus of a transaction.

19         Q.  Was it your perception that the main

20   issue was these identity issues or the money

21   consideration that would be paid?

22         A.  Do you mind defining the "main issue"?

23         Q.  Sure.

24         MR. PÉREZ:  I think he's asking you to

25   define the "main issue."



Page 212

 1            MR. BAINS:  Oh, I'm sorry, I thought he
 2    said:  Do you want me to?
 3            Q.  (BY MR. BAINS) I'm asking you:  What
 4    is -- the identity, was that the main issue, or was
 5    it the money to be paid was the main issue?
 6            A.  The main issues, can you expand for me,
 7    the main issue of what?
 8            Q.  Well, if somebody came and said, "I will
 9    pay you a hundred million dollars but there is an
10    identity problem," is that money enough to overcome
11    that identity problem, or no, money doesn't matter,
12    the main issue is who made this bid?  That's what I'm
13    trying to understand.
14            A.  I don't understand your question.
15            Q.  All right.  Well, let me -- I am going to
16    break it down.  There was a bid for $700 million.
17    You indicated the lenders did not like it because of
18    what I'm phrasing "identity" issues and because of
19    the amount that was to be paid; is that a fair
20    summary?
21            A.  Those were a couple of factors that were
22    used in the discussion around evaluating those bids.
23    That's not -- that's a non-exhaustive list of -- I
24    don't understand what you're -- I don't understand
25    what -- when you say "the main issue," the main issue



Page 213

1    with what?  With the bid itself, with the process?  I

2    don't follow the question.

3         Q.  The main issue with not accepting it.

4    Was the money too low or it didn't matter what the

5    money was going to be, all these other issues

6    outweighed the money?

7         A.  There was issues with the bid itself and

8    then considerations around the process generally that

9    the parties evaluated as -- as part of their

10   decision-making process with respect to the sales

11   process in general.

12        Q.  Were there ever any counterproposals?

13        A.  No.

14        Q.  Why not?

15        A.  Because the stakeholders evaluated the

16   results of that process and their alternatives and

17   other factors outside of the process with respect to

18   our restructuring and they determined that the sales

19   process was not going to be the path with respect to

20   this restructuring at that time.

21        Q.  Do you believe the lenders wanted to sell

22   these properties?

23             MR. PÉREZ:  Object to the form of the

24   question:  Calls for speculation.

25        Q.  (BY MR. BAINS) I asked if you believe



Page 214

1    that.  That is your own self.  Do you believe the

2    lenders wanted to sell these properties?

3             A.  I believe that the lenders wanted to

4    inform themselves at the time of what the market may

5    be, and lenders in general like to have many

6    different options, and I don't think that they would

7    have -- that they would have required the company as

8    part of the RSA to have gone through that process if

9    there was no reason at all.

10            Q.  Okay.  But that doesn't answer the

11   question of:  Do you believe they actually wanted to

12   sell the properties?

13            A.  I gave you my belief of what the lenders'

14   thought process was at that time.

15            Q.  But yet there was never a counterproposal

16   to actually try to sell them to anyone interested?

17            A.  There was not a counterproposal.

18            Q.  Why do you believe the lenders wouldn't

19   just want to credit bid these assets as opposed to

20   this NewCo strategy?

21            A.  I don't understand that, the two

22   different scenarios you're asking about, credit bid

23   versus what?

24            Q.  Just simple foreclosure versus this NewCo

25   structure?



Page 215

1          MR. PÉREZ:  Again, I object to the form
2   of the question:  It calls for speculation.
3          I mean, if you know, if the lenders have
4   told you why -- why they want to do it that way.
5          THE WITNESS:  The plan does contemplate a
6   sale through a credit bid.
7      Q.  (BY MR. BAINS) Right.  But you understand
8   there is a difference on a sale through credit bid
9   under a restructuring plan and the lender simply
10  coming in and foreclosing their interest on those
11  assets?  Do you understand the difference?
12     A.  I understand the difference.
13     Q.  Okay.  I figured you did.
14          So why do you believe the lenders prefer
15  the NewCo versus simply coming in and foreclosing
16  their rights?
17          MR. PÉREZ:  Again, calls for speculation
18  as to what the lenders' motivation is as to why they
19  want to do it.
20     Q.  (BY MR. BAINS) Okay.  I have drawn that
21  objection now a couple of times.  Let's unpack it.
22          You're going to be the CEO of this new
23  company, correct?
24     A.  I already stated that those were --
25  that's consistent with the conversations that I have



Page 216

1   had with the stakeholders.

2          Q.  Right.  And you've had numerous

3   conversations with these lenders group about the

4   plan, correct?

5          A.  Yes.

6          Q.  I'm not asking you what my wife is

7   cooking for dinner; that's speculation.

8              You know what's going on with these

9   lenders.  Is that accurate?

10             MR. PÉREZ:  Again, object to the form of

11  the question.  It is not a question.  It is just a

12  statement.

13         Q.  (BY MR. BAINS) Is it accurate, sir, that

14  you are aware of what the lenders' expenses are, what

15  their desires are, what their plans are for this

16  company of which you're going to be the CEO?

17         A.  I know what I know.  I can only speak to

18  my knowledge.  I don't --

19         Q.  Go ahead.

20         A.  I can't tell you what other people know,

21  I can tell you what my impressions are, if there is a

22  question.

23         Q.  What is your impression of why the

24  lenders would prefer a NewCo restructuring structure

25  as opposed to simply foreclosing their rights?



1          MR. PÉREZ:  Again, I am going object to

2     the form of the question.

3          THE WITNESS:  One of the objectives of

4     the overall plan is to have a comprehensive solution

5     for all of the liabilities that currently comprise

6     Fieldwood.  That -- that is an important objective.

7     It is an important objective to have a successful

8     plan, and to the extent that we can accomplish that

9     through a Plan of Reorganization, then that is the

10    desired objectives and the thing that is going to be

11    required in order to be successful through this

12    process.

13         Q.  (BY MR. BAINS) Are there enough assets

14    that if the lenders were to foreclose, they could be

15    repaid in full?

16         A.  The -- I think the valuation that our

17    experts have prepared speaks to the value of the

18    parts of the business that are contemplated by the

19    plan as the lender's owner, and I would defer to our

20    experts in terms of the value.  There is a claims

21    analysis that's clearly laid out in the Disclosure

22    Statement that shows recoveries.

23         Q.  Yeah.  And you're kind of even getting

24    into an area I'm not asking about.

25              I'm just asking your understanding as the



1  CFO, there is sufficient assets that if the lenders

2  wanted to foreclose, they could be repaid in full?

3          A.  I think that the values that the plan

4  contemplates and the valuation that our experts have

5  prepared is the only indication of value that is

6  appropriate for us to consider in the context of our

7  plan.  So I don't know that I can answer your

8  question in a better way than to point to the

9  valuation that's been performed by our experts on

10  this business.

11          Q.  Again, you're answering a question I'm

12  not asking.  Forget valuation, forget the Bankruptcy

13  Code, forget bankruptcy.  If you're sitting there at

14  your desk just operating this business, do you

15  believe that Fieldwood would have sufficient assets

16  that if the lenders came and foreclosed because of a

17  covenant default or whatever that they could be

18  repaid in full?  That's all I'm asking.

19          A.  Your prior question asked me, well,

20  what's the difference between that plan and a

21  foreclosure and why would the lenders choose one

22  versus the other.  The underlying assets are the same

23  assets.  The assets of this company that the lenders

24  are willing to support, investing new capital and

25  recapitalizing, comprise the credited purchaser



Page 219

1   assets or the NewCo assets.  Those assets have been

2   valued by our expert and that is incorporated into

3   the recovery analysis, which does not suggest a full

4   recovery.

5            Excuse me, let me qualify that, to the

6   first lien term loan lenders, which have $1.1 billion

7   of principal outstanding.

8            Q.  Are you set to receive any sort of bonus

9   or compensation from the NewCo group if the plan

10   makes it through confirmation as part of your role of

11  CEO?

12           A.  No.

13           MR. BAINS:  All right, sir, I don't have

14  any further questions.  Thank you.  And for

15  reference, my wife is cooking tacos tonight.  So now

16  it is not speculation on that either.  So thank you

17  for your time.

18           THE WITNESS:  Thank you.

19           MR. MILLER:  Elliot, do you want me to

20  take next or do you want to take next?  Are you

21  working on the NewCo entities?

22           MR. SCHARFENBERG:  Yeah, I think that

23  would be fine.

24           MR. MILLER:  The one stuff, again --

25           MR. SCHARFENBERG:  Yeah, my questions are



Page 220

1    going to be concerning the abandoned properties

2    primarily.

3                MR. MILLER:  So I think that makes sense

4    for you to go next and maybe I will wrap.

5                MR. SCHARFENBERG:  Okay.  Do you want to

6    take a break?  We started --

7                MR. PÉREZ:  I think he can go after you

8    guys, so you guys can wrap for the surety.

9                THE WITNESS:  I'm fine with that.

10               MR. SCHARFENBERG:  Okay.  Sounds good.

11               Yeah, and, Mr. Danes, if you need a

12   break --

13               MR. KNAPP:  Yeah, I have a couple of

14   questions as well.  And I can go after either of

15   these guys.  I just have a few questions on the

16   Fieldwood I P and A primarily.

17               THE WITNESS:  I'm fine with that.  Thank

18   you.

19               MR. SCHARFENBERG:  I'm sorry, what was

20   that, Mr. Dane?

21               THE WITNESS:  I'm fine if you would like

22   to continue without a break.  Thank you.

23               MR. SCHARFENBERG:  Sounds good.

24                         EXAMINATION

25          Q.  (BY MR. SCHARFENBERG) Well, good



Page 221

```
 1   afternoon, almost good evening.  My name is Elliot
 2   Scharfenberg.  My client is RLI Surety.  I know we
 3   met a few times.  And just for reference, we bonded
 4   assets in all the various plan buckets but primarily
 5   in the abandoned properties group.
 6              So I wanted to pick up, you know, first
 7   on something that you were speaking with Mr. Grzyb
 8   about, Mr. Dane.  I believe you testified earlier
 9   that Fieldwood shut in a large number of its wells
10   due to last year's hurricane season; is that correct?
11        A.  So there was two primary events that
12   caused significant shut-ins throughout our shelf
13   asset base.  That was originally in the first half of
14   2020 as a result of the price and economic situation
15   and those field's economic viability; and then
16   secondarily, the storms that took place through the
17   2020 hurricane season caused a number of facilities
18   to be shut in pending repair and maintenance to bring
19   them back online or determination that they were not
20   going to be brought back online.
21        Q.  Sure.  And it is correct that there is
22   still a substantial number of properties or assets
23   that are still shut in?
24        A.  There is still a number of properties
25   that remain shut in.
```



Page 222

1          Q.  And including a lot of those properties

2     on the abandoned properties list, correct?

3          A.  The abandoned property lists comprises

4     properties that independently may not have returned

5     to production, but yes.

6          Q.  Sure, sure.  And what steps has Fieldwood

7     taken over the last three months, for example, to

8     monitor these shut-in properties to ensure there is

9     no environmental disasters or issues or incidents?

10          A.  Regardless of if a property is shut in or

11     not, our monitoring obligations remain, but that

12     is -- that is -- we maintain these properties to the

13     extent we can pending repair and maintenance activity

14     that's required by conducting the following types of

15     activities:  We visit these facilities; if we're not

16     able to man the facility due to required repairs, we

17     do boat visits or helicopter flyovers; in addition,

18     we have spent tens of millions of dollars on

19     operating expense and repair and maintenance expenses

20     to both operate these facilities, monitor them, and

21     maintain them so that there is no environmental

22     exposure.

23          Q.  How many of these properties have you

24     been unable to physically access over the past three

25     months?



Page 223

1          A.  I don't have that number offhand.

2          Q.  Is it a substantial amount of properties

3     that you just do helicopter flyovers?

4          A.  I don't know what "substantial" means,

5     but there are a number that we are still in the

6     process of completing repairs to so that they can be

7     physically boarded.

8          Q.  Would you say that there is over ten

9     properties or platforms that are not able to be

10    physically visited because of INCs or other issues on

11    those platforms?

12         A.  So I think your question mixes a couple

13    of different concepts.  There are probably over ten

14    properties that require additional repair and

15    maintenance to physically board the facility, in

16    which case they are monitored and maintained in other

17    ways.

18         Q.  Does Fieldwood have any cost estimate for

19    how much money it would take to bring all the

20    properties that are not physically able to be visited

21    up to compliance so that they can be physically

22    visited?

23         A.  Yes, we do.

24         Q.  What is that number?

25         A.  With respect to the abandoned properties,



Page 224

1   the amount of capital that we have earmarked on a

2   go-forward basis to perform those types of repairs as

3   of a month or so ago was around $6 million, and with

4   respect to the Fieldwood 1-related properties, that

5   is incorporated into our ongoing repair and

6   maintenance budgets, which we are currently spending,

7   in total, approximately $6 million a month on, and

8   will take us several more months in order to

9   complete -- in order to put -- put all of the

10  facilities in the condition that you described.

11         Q.  You said that $6 million were

12  earmarked -- approximately $6 million were earmarked

13  for the abandoned properties to make them safe to,

14  you know, ingress and egress.

15              Is that the amount that you estimate it

16  will cost to bring all of those lessees' leases into

17  that level of compliance or is that just what you

18  have earmarked for it?

19         A.  That is our cost estimate to restore

20  egress to the facilities and to -- and to resolve any

21  safety related INCs that are outstanding or on those

22  facilities or other safety --

23         Q.  Do you know how much money has been --

24  oh, I'm sorry, please continue.

25         A.  I was going to say -- or any other



Page 225

1    safety-related issues that have been identified.

2          Q.  Do you know how much money has been spent

3    over the past three months, for example, to -- to

4    make safety abandoned properties of that six million

5    that has been earmarked?

6               MR. PÉREZ:  Object to the form of the

7    question:  Vague.

8               THE WITNESS:  I think approximately --

9          Q.  (BY MR. SCHARFENBERG) Okay.  You mean --

10   it is okay.  You know what, I will withdraw the

11   question and ask it a different way.

12              MR. SCHARFENBERG:  You're right, Alfredo.

13         Q.  (BY MR. SCHARFENBERG) Since these wells

14   were shut in, do you know how much money has been

15   spent to cure INCs on the abandoned properties?

16         A.  So the point -- you know, your question

17   about -- I'm just trying to frame it the point in

18   time that you're starting at.  I believe in our

19   Disclosure Statement it says that our carrying cost

20   of the abandoned properties in terms of operating

21   expenses that we incur on these properties has been

22   about seven and a half million dollars a month.

23              In addition to those costs, through the

24   early part of 2020 when a number of the properties at

25   the earliest were shut in, that date comprised the



Page 226

1   abandoned properties.  We have also conducted a

2   substantial amount of repair and maintenance expense.

3   In some cases we have also expended money on P and A

4   and other costs.  It is tens of millions of dollars.

5        Q.  And approximately what percentage of that

6   has been spent on the abandoned property as opposed

7   to properties in the other plan buckets?

8        A.  The numbers I was just describing were

9   with respect to the abandoned properties.

10        Q.  Okay.  Got you.  And has Fieldwood

11   obtained any suspension of production orders for any

12   of the abandoned properties that are not currently in

13   production?

14        A.  Fieldwood has submitted SOPs for certain

15   facilities that it determined it was -- that it

16   determined it was appropriate to submit SOPs for.

17        Q.  Have any of those been granted?

18        A.  The SOPs that were submitted on those

19   particular properties were relatively recent, and I

20   don't believe they've been granted yet.

21        Q.  Were those SOPs submitted before or after

22   one year after the wells were shut in?

23        A.  An SOP would need to be submitted prior

24   to a year following the date of last production.  If

25   it was submitted after that period of time, it would



Page 227

1    not qualify for consideration, so we submit --

2           Q.  All of the SO -- I'm sorry.  Yeah.

3               So all the SOPs that you submitted were

4    less than a year since the last production?

5           A.  If they were submitted in a time that

6    would have -- to my knowledge, all of the SOPs that

7    we submitted on any property related to abandoned

8    property were submitted timely such that they could

9    be considered for an SOP if Fieldwood determined it

10   was appropriate to file the SOP for that particular

11   field.

12          Q.  And has Fieldwood had any discussions

13   with the federal government regarding -- excuse me --

14   a blanket SOP or some similar exception to lease

15   expiration?

16          A.  No.

17          Q.  Does Fieldwood currently operate any

18   abandoned properties that does not have a

19   Transmission Service Agreement in place?

20              MR. PÉREZ:  Again, I'm not quite sure I

21   know exactly what you mean by that.

22          Q.  (BY MR. SCHARFENBERG) Is Fieldwood the

23   operator of any abandoned properties for which there

24   is no Transition Services Agreement in place for

25   after confirmation?



1          A.  So the plan does not require a Transition

2     Services Agreement to be in place.  The abandoned

3     properties, I think it's obviously public knowledge

4     the consensual agreements that the company has

5     reached with certain predecessors that represent

6     predecessors in the abandoned properties.

7                Those predecessors, in addition to

8     Apache, at the time of the original plan filing, the

9     predecessors that we have reached consensual

10    solutions with have expanded to Chevron, and as of

11    the -- as of yesterday when we published to the

12    docket the Eni term sheet, Eni as well, and we are

13    actively discussing consensual solutions with other

14    interested predecessors as well.

15         Q.  But there are still some properties that

16    are slated to be abandoned for which there is no

17    Transmission Services Agreement in place, correct?

18                MR. PÉREZ:  I guess I am going to -- I'm

19    not quite sure what you mean by "Transition Services

20    Agreement."  And I apologize, I'm not trying to

21    interrupt, so --

22                MR. SCHARFENBERG:  Sure.

23         Q.  (BY MR. SCHARFENBERG) Is there -- are

24    there properties that no predecessor has agreed to

25    take control or custody of or decommission after



Page 229

1   these properties are abandoned?

2          A.   There are properties within the

3   "Abandoned Properties" category for which we have not

4   had consensual solutions with respect to the

5   predecessors and chain of title.  In the Gulf of

6   Mexico, the regulations require that predecessors are

7   jointly and severally liable, and that's not

8   depending upon a Transition Services Agreement.

9          Q.   For those properties, what happens to --

10  what happens after the effective date if there is no

11  predecessor that agrees to pick up these properties?

12         A.   The regulations are very clear about

13  joint and several liability and the government's

14  ability to send orders to predecessors to fulfill

15  their liabilities under these leases, and we have

16  been coordinating with the government with respect to

17  any operated properties that have not as of the time

18  of confirmation or today recently had a consensual

19  agreement in place and the treatment of those

20  properties.

21         Q.   Well, let's talk about those

22  decommissioning orders.

23              Has Fieldwood reached any understanding

24  with the federal government regarding the issuance of

25  those decommissioning orders to responsible parties?



1          A.  Can you -- would you mind being more

2     specific with your question?

3          Q.  Yeah.  Do you have some understanding

4     with the federal government as to what is going to

5     happen with decommissioning orders?

6          A.  We have had a number of --

7          MR. PÉREZ:  And let me -- yeah, and I'm

8     sorry, beyond what the law says will happen, you're

9     talking about some sort of a written agreement or

10    something like that?

11         Q.  (BY MR. SCHARFENBERG) I'm talking about

12    any understanding, whether it is written or oral,

13    just whatever your understanding is.  I assume there

14    could be --

15         MR. PÉREZ:  Some of them.

16         MR. SCHARFENBERG:  That there is -- okay,

17    I mean, because he said there is an understanding.

18         Q.  (BY MR. SCHARFENBERG) What is that

19    understanding with regard to your agreement?

20         Mr. Dane?

21         A.  We would imagine that this would not be

22    different than similar circumstances in the past

23    where the government has issued orders.  Two parties,

24    upon a party's default in its obligation to handle

25    the liabilities, we have discussed with the



Page 231

1    government the process of issuing orders, and we have

2    discussed with the government -- we have discussed

3    with the government our -- our understanding of how

4    that process works.

5         Q.  Do you understand that orders would go

6    out to non-operated Fieldwood properties that are

7    being abandoned?

8         A.  I understand that the government has the

9    ability to issue orders to any party that it believes

10   has a responsibility, and that could be any and all

11   parties in the chain of title.

12        Q.  Are you aware that the plan, in some

13   instances, has one lease going into both the

14   "Abandoned Properties" bucket and the "FWE I" bucket?

15        A.  A lease, in and of itself, is not a unit

16   that can't be indivisible.  We own several -- we own

17   interests in these leases, and the interest in

18   certain cases in the same lease through the divisive

19   mergers that the plan contemplates may be owned

20   within different entities.

21        Q.  And if part of -- you know, part of the

22   lease interest goes into Fieldwood 1 and part of the

23   lease interest goes into the "Abandoned Properties"

24   bucket, do you expect any orders to be issued to

25   decommission the portion of the properties that are



1   in the "Abandoned" bucket?

2          A.   Can -- I'm sorry, can you repeat the last

3   part of your question?  Do I what?

4          Q.   Yeah, again, I will just ask a new

5   question.

6               Do you -- do you have any understanding

7   of what is going to -- sorry.

8               Do you any understanding of whether the

9   federal government intends to issue decommissioning

10   orders on properties that were -- where interests are

11   being transferred into both the Fieldwood 1 and the

12   abandoned properties project?

13          A.   To the extent that there is a need to

14   issue an order because of a default on an obligation

15   under the lease, the government has the ability to

16   issue that order to any party and every party.

17          Q.   Has Fieldwood reached any understanding

18   with the federal government as to the allocation of

19   surety bonds to fund decommissioning obligations

20   associated with the abandoned properties?

21          A.   I have testified more times than I could

22   count today that the plan does not contemplate the

23   assignment, allocation, or nonconsensual substitution

24   of principles on any of the bonds that are currently

25   outstanding.



1          Q.  Sure.  And understood, but I'm trying to
2     maybe ask kind of a different question.
3               Do you have any information, knowledge as
4     to how the surety bonds are going to be allocated to
5     fund decommissioning obligations, the BOEM bonds
6     written in favor of the government?
7          A.  What is -- I'm not familiar with what you
8     mean by "allocated" in this context.
9          Q.  So, for example, if there is going to be
10    a property that is going to both "Fieldwood I" and
11    the "Abandoned Properties" group and there is a BOEM
12    bond that covers that property, do you have any
13    understandings of hows that going to be allocated?
14         A.  I am not familiar with the process of
15    allocating a bond.  A bond is -- is a bond.  It is
16    held by a beneficiary.  If the beneficiary has the
17    right to call upon that bond, then they call upon the
18    bonds, if they choose to.  I don't -- I'm not
19    familiar with what allocate -- what the consent of
20    allocating a bond is.
21         Q.  Fair enough.  For the areawide bonds that
22    are issued in favor of the various debtors, have
23    there been any discussions with the federal
24    government about transitioning those bonds to the new
25    divisively merged entity?



Page 234

```
 1          A.  The company has discussed its desire to
 2   have further conversations with the government about
 3   the treatment of the areawide bonds that are
 4   currently outstanding, and those are ongoing
 5   conversations.
 6          Q.  Fair enough.  Has the federal government
 7   agreed to waive any regulatory rules or requirements
 8   regarding any of Fieldwood's lease interests or
 9   operate operation?
10          A.  Have they agreed to waive?  I'm sorry?
11          Q.  Yes, sir.
12          A.  Yes, can you say that question one more
13   time for me, please, so I understand it.
14          Q.  Yeah.  Has the federal government agreed
15   to waive any regulatory rules or requirements in
16   connection with any of Fieldwood's lease interests or
17   operations?
18          A.  Not to my knowledge.
19          Q.  And I guess a similar question:  Has the
20   federal government agreed to waive any rules or
21   regulations in connection with any of the
22   transactions contemplated by the Plan of
23   Reorganization?
24          A.  Not to my knowledge.
25              MR. SCHARFENBERG:  Okay.  That's all the
```



Page 235

1    questions I have.  Thank you, sir.

2                   THE WITNESS:  Thank you.

3                   MR. PÉREZ:  Who's next?

4                   MR. MILLER:  Brad, do you want me to go

5    next or do you want to go next?

6                   MR. KNAPP:  Let me go, if you don't mind.

7                   MR. MILLER:  That's fine.

8                         EXAMINATION

9            Q.  (BY MR. KNAPP) Mr. Dane, my name is Brad

10   Knapp.  I'm with Locke Lord, and I represent HCCI.

11               I would like to talk about P and A plans

12   in Fieldwood I.  Are you familiar with those issues?

13           A.  Generally speaking.

14           Q.  All right.  The Fieldwood I assets

15   include a number of terminated and expired leases; is

16   that correct?

17           A.  I believe so.

18           Q.  And those include also leases that have

19   been terminated or expired for over a year; is that

20   correct?

21           A.  I would have to look at our records to

22   confirm that, but I think in certain cases there

23   probably are some assets that have been terminated

24   for over a year.

25           Q.  And you also have a number of leases that



Page 236

1    have terminated or expired within the past year; is
2    that correct?
3            A.  Yes.
4            Q.  And you understand that the applicable
5    regulations require decommissioning of leases within
6    a year of expiration or termination; is that correct?
7            A.  The regulations have time frames under
8    which decommissioning needs to be conducted and
9    reconsulted with the regulatory agencies on an
10   ongoing basis about the timing and our ability to
11   conduct certain operations contingent on a number of
12   factors.
13           Q.  Do you have an understanding with the
14   regulatory agencies on what timing -- or, I guess:
15   Is there a timing in place that's unique to Fieldwood
16   right now that departs from the regulations?
17           A.  I don't understand your question.
18           Q.  Do you have an agreement with the
19   government that would extend the one-year shot clock
20   for conducting decommissioning on terminated or
21   expired leases?
22           A.  I already answered that question.  With
23   respect to agreements that we have with the
24   government, we waive any existing regulations.
25           Q.  Understood.  Understood.



Page 237

1            If Fieldwood I did the P and A on all of
2    the expired and terminated leases, do you know
3    roughly what that P and A would cost?
4            A.  For the subset of leases that are only
5    expired and terminated, I don't have that specific
6    number on -- at my disposal.
7            Q.  Well, would it -- let me ask it a
8    different way.
9            Would the P and A on the terminated and
10   expired leases for Fieldwood I exceed $70 million?
11           A.  I don't know.
12           Q.  Earlier we looked at Exhibit 21, which
13   was the Fieldwood I model, and it had a 2021 P and A
14   schedule with $175 million in P and A activity.
15           Do you know if that amount is roughly
16   what is needed to cover the terminated and expired
17   leases on Fieldwood I at this time?
18           A.  That amount is not specifically comprised
19   of just terminated and expired leases.  It is
20   comprised of activity that has already occurred this
21   year, because it is for the full year 2021, and it is
22   comprised of activities that intended to take place.
23   Most of the activity that happens in any current
24   period is associated with a terminated lease that has
25   already -- that is ripe for P and A.



Page 238

```
 1          Q.  Right.  But that model calls for a
 2    schedule with $175 million worth of P and A activity
 3    in 2021; is that correct?
 4          A.  Yes.
 5          Q.  Okay.  I want to talk briefly about
 6    groundwork that has been laid for the coming up 2021
 7    P and A program.  Has Fieldwood sent AFEs for P and A
 8    work for the Fieldwood I leases for 2021?
 9          A.  We have a process for submitting AFEs
10    relative to the expected timing of each of the
11    projects, and if -- if it is appropriate, we have
12    submitted those AFEs to the appropriate parties.
13          Q.  Do you know for a fact that AFEs have
14    gone out for P and A work --
15          A.  Yes.
16          Q.  -- for Q-1 assets?
17          Okay.  Has Fieldwood I permitted
18    the P and A work for Fieldwood I assets?
19          A.  For assets that are -- that's a very
20    broad statement.  Of course we obtain permits for
21    activity that we're going to have to do.
22          Q.  Well, have you obtained permits for
23    going-forward P and A activity for Fieldwood I
24    leases?
25          A.  Yes.
```



Page 239

```
 1              Q.  I have seen in Fieldwood productions, it
 2    looks like most years Fieldwood will send the
 3    government a list of anticipated P and A activities,
 4    wells, platforms, et cetera.  I did not see a similar
 5    document for 2021.
 6                   Does Fieldwood have a document that they
 7    have communicated with the regulators on the sort of
 8    menu of P and A activity planned for the forthcoming
 9    year?
10              A.  So obviously this year is quite different
11    than years prior given the effect of this
12    restructuring and the various entities that are going
13    to be created and are contemplated to handle the
14    P and A.  For each of those entities that the
15    government has received a copy of many of the same
16    documents that have been produced to the various
17    parties, but the government also has, I believe, a
18    general understanding of the different entities that
19    are going to comprise the plan, which is Fieldwood I,
20    Fieldwood IV, Fieldwood III, the Chevron transaction,
21    the Eni transaction, and the work that's contemplated
22    under those various arrangements.
23                   So the -- I think that our activity with
24    respect to P and A as it relates to each of these
25    entities has been communicated to the government.
```



Page 240

1          Q.  I guess in the past you have provided

2     just a document that says:  These are the wells and

3     platforms we plan to do this year.

4               Have you ever sent anything that concise

5     to BOEM or BSEE for 2021?

6          A.  I'm not aware of us having sent a

7     consolidated list of P and A for 2021 given the

8     effect that this restructuring is going to have on

9     the nature of these assets and entities.

10         Q.  Understood.  I want to talk briefly about

11    the Incidents of Noncompliance, or INCs.

12              I believe Fieldwood produced a list with

13    some 187 INCs at one point in time.  Has Fieldwood

14    remedies all of these INCs?

15         A.  INCs are something that -- INCs are

16    received in the ordinary course.  We have inspectors

17    that are on our facility every day.  As you know, we

18    have hundreds of facilities.  So in the ordinary

19    course, INCs are received, and INCs that have already

20    been received are resolved.

21              Having INCs outstanding is just a feature

22    of having a large business in the Gulf of Mexico

23    that's subject to ongoing inspection, and so we have

24    an extremely robust program outstanding to resolve

25    the INCs that require being addressed, and that's



Page 241

1    being conducted largely through our going repair and

2    maintenance efforts, which -- which are at a very

3    high level of activity as we speak.

4            Q.  And has Fieldwood received INCs requiring

5    decommissioning of assets?

6            A.  We have received INCs in the past with

7    respect to decommissioning.

8            Q.  And do you know if there are pending INCs

9    requiring decommissioning?

10           A.  Yes.

11           Q.  Has Fieldwood appealed those INCs are or

12    are they just sitting there?

13           A.  We're addressing each one as appropriate.

14           Q.  Okay.  Staying on that regulatory

15    subject:  Is Fieldwood I now a qualified operator?

16           A.  I don't believe that.

17           MR. PÉREZ:  Yeah, Fieldwood I doesn't

18    exist yet, so --

19           MR. KNAPP:  Well, then I guess the

20    answer's no.  I guess the answer's no.  Well, I guess

21    my question -- let me rephrase that.

22           Q.  (BY MR. KNAPP) Well, first of all, okay,

23    let's just take it:  Fieldwood I does not exist.

24           Have you had conversations with the

25    government about whether Fieldwood I will be a


MAGNA
LEGAL SERVICES

Page 242

1    qualified operator as of the plan effective date?

2         A.   The government understands the plan and

3    the various entities that are contemplated, and we

4    are working very closely with the government on an

5    ongoing basis to try and facilitate all the elements

6    of the plan that are required.

7         Q.   A quick question going to the financial

8    projections for Fieldwood I, and to just kind of

9    clarify the earlier testimony about what work is

10   planned going forward for the capital spend, the

11   capital spend budget in Exhibit O to the Disclosure

12   Statement contemplates only well recompletions; is

13   that correct?

14        A.   Yes.

15        Q.   Okay.  And those well recompletions are

16   based on sort of a general budget for recompletions

17   and not tied to -- there is no specific list of

18   recompletions that are planned; is that correct?

19        A.   With respect to the projections, the

20   basis for the spending on capital related to

21   Fieldwood I and the production contributions was a

22   type curve type of methodology, which was based on

23   our historic results and opportunities that related

24   to those assets.  We do have actual lists of

25   opportunities, but that's not the basis for what



Page 243

```
 1    those projections are.
 2              Q.  So that -- that type --
 3                    (Echoing and possible television noise
 4                      in background)
 5              THE COURT REPORTER:  Sorry, guys,
 6    somebody's not on mute.
 7              MR. KNAPP:  I thought my kid's Mario car
 8    game in the other room would be the problem.
 9              Q.  (BY MR. KNAPP) So going to that type
10    curve analysis, so what you did, if you could explain
11    in more detail, you know, how does that work?
12              Does that take past recompletion results
13    and project it on, you know, what you might expect
14    going forward based on your past recompletion
15    programs?
16              A.  That's correct.  It is very -- when
17    thinking about the different methodologies to be able
18    to incorporate a defensible capital con -- capital
19    program of recompletion-related projects and the
20    associated production, what we thought was most
21    appropriate was to look at our historic budgeting
22    process and how we have -- and the average
23    performance based on a program of recompletions.
24    Because the timing of an individual recompletion is
25    very specific to the actual wellbore.
```



Page 244

```
 1                    And we got so many projects and wells and
 2       the challenges of forecasting these particular types
 3       of capital projects on an individual basis over an
 4       extended forecast period, such as five years, it was,
 5       after discussion, determined that the most
 6       appropriate way to try and represent what a
 7       recompletion program would be capable of delivering
 8       would be to use the methodology that we have used,
 9       which is consistent with our past budgeting
10       practices.
11            Q.  That makes sense.
12                 MR. KNAPP:  I will pass the same to
13       Robert Miller.
14                 MR. MILLER:  Thank you, Mr. Knapp.  You
15       covered a lot of the ground I was going to cover.
16                             EXAMINATION
17            Q.  (BY MR. MILLER) Good evening, Mr. Dane.
18       I appreciate all the time that you have spent with
19       us.
20                    Earlier this week, revised versions of
21       the proposed Fieldwood I LLC agreement were filed in
22       the bankruptcy case, correct?
23            A.  Yes.
24            Q.  You're generally familiar with those
25       newest versions and the changes in those, correct?
```



Page 245

```
 1          A.  I am somewhat familiar with those
 2   changes.
 3          Q.  Would it be helpful if I put the exhibit
 4   file either in the chat or screen shared it with you?
 5          A.  Yes, please.
 6              MR. MILLER:  Mr. Perez, with your
 7   permission, may I do that?
 8              MR. PÉREZ:  That's fine.  Great.
 9              MR. MILLER:  Okay.  We will call this
10   Exhibit 27.
11                  (Exhibit 27 marked)
12              MR. MILLER:  So I just put it in the chat
13   so everyone should be able to pull it.
14          Q.  (BY MR. MILLER) And I can --
15          A.  I have access to it.
16          Q.  You have access to it, Mr. Dane?
17          A.  Yes, I do.
18          Q.  Okay.  Great, thank you.
19              All right.  So this is a Docket Entry
20   Number 1365, which was filed on the 11th of May.  I
21   call this the "Revised Cumulative Redline."  Those
22   are two redlines that were filed.
23              I'm going to -- if you wouldn't mind
24   following with me to, let's see here, page number 18
25   in the document --
```



Page 246

```
 1          A.  Yes.
 2          Q.  -- so PDF 18, Romanette D -- E -- or D.
 3              And this is -- and the provided
 4   highlighted redline is the language obviously the
 5   focus of what most of my questions are.  It starts
 6   with, "Provided, however the company may."
 7          A.  Yes.
 8          Q.  Okay, excellent.
 9              MR. PÉREZ:  Sorry, Mr. Miller, can you
10   tell me that again.  I had a little bit of a
11   difficult time with the document.
12              MR. MILLER:  No problem.  So it is on
13   page --
14              MR. PÉREZ:  33?
15              MR. MILLER:  Pardon.  It is D, as in dog.
16   It is on page 18 of the PDF.
17              MR. PÉREZ:  Okay.  Sorry.
18              MR. MILLER:  No, you're fine.
19          Q.  (BY MR. MILLER) And I'm starting with the
20   provided highlighted cover, and that's where my
21   question is going to be focused on that, those
22   changes.
23              The newest versions of the LLC agreement,
24   which, you know, everyone is now looking at, this is
25   the first time the option for what I would call a
```



Page 247

1  "revolving line of credit" in this redline have been

2  included in the LLC agreement, correct, Mr. Dane?

3          A.  I'm not sure if it's the first time it's

4  been included, but I do see it's included.

5          Q.  But certainly it's included in this --

6  certainly it is included in the one we were looking

7  at.  Who requested -- but was this included, then, in

8  the initial iteration of the Fieldwood I LLC

9  agreement?

10         A.  I don't believe so, since it is in the

11  redline.

12         Q.  Correct.  So who requested this change to

13  the Fieldwood I LLC agreement?

14         A.  The parties have been working together in

15  order to implement all the various agreements, and

16  these documents have been subject to a lot of ongoing

17  discussion in order to make sure that all the parties

18  are aligned with how the transaction needs to work at

19  exit to accomplish all of the objectives of the

20  parties.  And so these are -- these edits are just

21  based on ongoing dialogue along those efforts to make

22  sure that we're capable of performing the

23  transactions that are described in the plan, and

24  after additional review by Counsel of -- to ensure

25  that -- to ensure that fact.



Page 248

```
 1          Q.  Well, what prompted that addition?
 2          A.  This -- I believe this is consistent with
 3     the negotiation that there is going to be a draw-out
 4     exit to cure the underspend amount, and I believe
 5     that this addition is one of the mechanisms to
 6     accomplish that objective, which is included in the
 7     plan.
 8          Q.  Now, let's back up, then.
 9              The standby facility, is that what's
10     being used to draw on to cure the unsent
11     decommissioning -- or the unpaid decommissioning
12     spend?
13          A.  That is a source that would be utilized.
14          Q.  And in this, you know, highlighted text
15     in this what I would call a "revolving credit
16     facility," this is different and apart from the
17     standby facility, correct?
18          A.  This is not the standby facility
19     document.
20          Q.  Correct.  Romanette i states -- is, "May
21     establish a working capital line of credit secured by
22     liens subordinated in all respects to the liens and
23     payment of other obligations provided for in the
24     standby facility documentation."
25              Has Fieldwood had any discussions about
```



Page 249

1   what type of entity might be willing to lend on those

2   terms?

3        A.  No, I have not.

4        Q.  Are you aware of any solicitation for,

5   you know, providing that financing, given that you

6   had suggested that it might be done, you know, on the

7   effective date at emergence?

8        A.  I think like any negotiation around

9   transaction documents, particularly credit agreement

10  documents, one of the key objectives is building in

11  appropriate flexibility so that the company can have

12  options in the future to optimize the business, and

13  provisions like -- like that are common to give

14  borrowers rights to do things which are in support of

15  the business.

16       Q.  To put a more fine point on it, no

17  specific entity has been identified as the source of

18  financing for this addition?

19       A.  I don't believe that -- I don't -- I'm

20  not aware of any third-party conversations with

21  respect to outside capital providers to provide

22  additional working capital at this time to the

23  Fieldwood I entity.

24       Q.  And have you had conversations regarding

25  this, you know, insert with the other maybe plan



Page 250

1    proponents, first lien lenders, the -- Apache, other

2    entities that are involved already with the

3    reorganization rather than a, you know, true,

4    non-related-to-the-transaction,

5    to-this-bankruptcy-case third party?

6              A.   The counsel -- modifications to this

7    agreement require the consent of Apache, so their

8    counsel and Apache, I'm certain, are familiar with

9    any changes to these documents.  Changes that we made

10   to documents regarding the plan need to be approved

11   not only by our counsel but by lenders' counsel as

12   well.  So I think all of those parties are familiar

13   with, and acceptable to, these changes by the time

14   that they first --

15             Q.   Sure, and they all have input.

16             But my question is more:  Are any of

17   those entities potential sources of funding under

18   this provision?

19             A.   I'm not -- like I said, I'm not aware of

20   conversations with respect to parties other than

21   Apache at this time that are providing capital to

22   this entity.

23             Q.   Now I'm going to switch gears just to

24   clean up something that you had discussed with

25   Mr. Grzyb earlier.



Page 251

1          You testified that Apache was consulted

2     as part of the sole manager selection process,

3     correct?

4          A.   They were more than consulted.   Then

5     there was a procedure that required both parties to

6     agree or otherwise determine the sole manager, so

7     they were involved in that process.

8          Q.   Was Apache the only entity consulted by

9     Fieldwood Energy, the debtor's selection of the

10    potential sole manager?

11         A.   Yes.

12              MR. MILLER:   I think that's -- I think

13    that's a wrap for me.

14              Thank you for your time, Mr. Dane.   I

15    know it's late.

16              MR. PÉREZ:   Do you want to take a few

17    minutes?  And then is there anyone else from the

18    surety side?

19              MR. GRZYB:   Alfredo, I switched to

20    telephonic, so I can't see what's going on.   This is

21    Darren Grzyb.   I have no further questions.   I know I

22    mentioned the possibility of follow-ups, but I have

23    nothing further.

24              MR. PÉREZ:   Okay.   Thank you.

25              All right.   So, Craig?



Page 252

```
 1                    MR. DUEWALL:  Yeah, let's take five
 2      minutes and then get after it.
 3                    MR. PÉREZ:  How long are you going to be?
 4                    MR. DUEWALL:  I'm going to be as quick as
 5      I possibly can.  What is it --
 6                    MR. PÉREZ:  The only reason is I just got
 7      to tell my wife when I can go have dinner.
 8                    THE COURT REPORTER:  I'm going off.
 9                         (Recess taken)
10                    THE COURT REPORTER:  Back on the record.
11                              EXAMINATION
12           Q.  (BY MR. DUEWALL) Mr. Dane, my name is
13      Craig Duewall.  I represent BP.  I thank you for
14      slugging through this today.  It has been a long day.
15      We may hopefully have less than two hours left.  I
16      will to my best to move through my questions so we
17      can all adjourn the deposition.
18                    And I'm going to skip around because a
19      lot of my questions have already been covered, so
20      bear with me in that respect, too.
21                    I understand that you're a candidate for
22      the new CEO position of NewCo; is that correct?
23           A.  Yes.
24           Q.  Are there any other candidates that
25      you're aware of?
```



Page 253

```
 1          A.   No.
 2          Q.   Is the rest of the executive leadership
 3   team going to be retained also, Mr. Lamme and
 4   Mr. Mitchell?
 5          A.   The new owners of this business are going
 6   to determine what the appropriate organization is
 7   going to comprise, myself included.
 8          Q.   And has anyone communicated to you
 9   whether or not Mr. Lamme or Mr. Mitchell are under
10   consideration to be retained?
11          A.   Yes.
12          Q.   And do you have any personal knowledge as
13   to whether or not it is their intent to stay with the
14   new company?
15          A.   Yes.
16          Q.   It is their intent to stay?
17          A.   Mr. Lamme's intent is to stay.
18   Mr. Mitchell eventually would like to retire.  He's
19   had a very long career, but he's willing to support
20   the business as long as the business would like his
21   assistance.
22          Q.   And on the current web page there is
23   three other individuals who have the title of senior
24   vice president, and I'm referring to Mr. Janik,
25   Mr. Seeger, and Mr. Smith.
```



Page 254

```
 1              Are they still with the organization?
 2         A.  They are.
 3         Q.  And is it their intent to stay also, do
 4    you know?
 5         A.  Yes.
 6         Q.  Okay.  So --
 7         A.  I believe so.
 8         Q.  Let's shift gears and talk about INCs for
 9    a minute.  We were talking about INCs with the
10    sureties.  Is it the company's intent to resolve all
11    of the INCs before the planned confirmation date?
12         A.  It is the company's objective always to
13    resolve as many INCs as they can.  Largely, that's a
14    scheduling issue more than anything.  The company is
15    not going to be able to resolve all of the INCs prior
16    to the confirmation date, which is only weeks away.
17         Q.  What about the effective date, could the
18    company resolve all the INCs before the effective
19    date?
20         A.  What INCs are you speaking of
21    specifically?
22         Q.  All of them, all of the outstanding INCs
23    before the planned confirmation -- or planned
24    effective date, is that something the company could
25    do?
```



Page 255

1         A.   No.

2         Q.   So just so we're clear on the record,

3    before Fieldwood abandons the property, it doesn't

4    intend to resolve all the INCs; is that correct?

5         A.   Correct.

6         Q.   Before Fieldwood abandons the property,

7    is it going to make sure that all of the safety

8    systems are in service and operational on the

9    properties?

10        A.   The operational transition plans that

11   have been developed for each asset contain an

12   asset-by-asset plan that's specific to each property

13   that's appropriate to ensure that these properties

14   are being abandoned or safely transitioned in a

15   manner that doesn't compromise any environmental or

16   regulatory concerns, and that determination is done

17   on an asset-by-asset basis and is a part of our

18   operational transition plans and how we manage these

19   transitions.

20        Q.   During the first bankruptcy, were

21   properties abandoned?

22        A.   No.

23        Q.   So this is the first time that in a

24   leadership capacity you've had to abandon properties

25   in a bankruptcy, correct?



Page 256

```
 1          A.   For me personally, that's correct.
 2          Q.   When you abandon the properties, what
 3   does that protocol look like?  I mean, are you going
 4   to engage in similar to a hurricane evacuation
 5   protocol and make sure a structure is left at least
 6   as it would be if you were evacuating for a
 7   hurricane, or what is your intent?
 8          A.   Our intent is to work with responsible
 9   parties to ensure a safe transition, and most all,
10   90 percent, of the parties that -- of the liabilities
11   with this company have featured a responsible party
12   that has been working with us on a transition plan or
13   a consensual solution that will handle the operation
14   of those parties, abandoned or assumed, through one
15   of these entities.
16          Q.   Upon abandonment, are you going to ensure
17   that all of the properties have personal access that
18   is in service and operational?
19          A.   Each of the properties has specific needs
20   and that evaluation is done on a property-by-property
21   basis.
22          Q.   Will there be properties abandoned that
23   can't be accessed?
24          A.   Define "access."
25          Q.   Well, I will define it in the most basic
```



Page 257

1    terms, someone being able to board the property, be

2    it a platform or otherwise.

3         A.  We are working with our internal teams

4    and with the regulators on a status to abandon the

5    properties that is suitable to all the parties.

6         Q.  Is it your understanding that the

7    regulators will allow you to abandon properties

8    without allowing them to be accessible either by boat

9    or helicopter?

10        A.  Our plan contemplates that we're going to

11   look at the needs of each of the properties and what

12   is an appropriate way to abandon the properties, if

13   necessary, in a manner that doesn't compromise any

14   HS&E-related or environmental-related considerations.

15        Q.  Is Fieldwood going to ensure that all

16   navigational aid are in compliance and in service

17   before the properties are abandoned?

18        A.  It is same answer:  It is an

19   asset-by-asset determination based on what is

20   appropriate for that particular asset.

21        Q.  Is Fieldwood going to isolate pipelines

22   before the properties are abandoned?

23        A.  Any actions that are going to be taken

24   related to any particular facility are going to be

25   reviewed relative to that specific facility and the


MAGNA
LEGAL SERVICES

Page 258

```
 1    need to ensure that there is -- that it is not going
 2    to be compromising any HS&E standards or regulations.
 3           Q.  Is Fieldwood going to set storm chokes
 4    before the properties are abandoned, is that their
 5    intent?
 6           A.  It is the same answer.
 7           Q.  Is Fieldwood going to drain all of the
 8    old storage tanks to remove any hydrocarbon risks
 9    before the properties are abandoned?
10           A.  The same response.
11           Q.  Let's talk again about the sales process.
12                You testified earlier that you
13    received -- the highest offer that the company
14    received was $700 million, correct?
15           A.  The highest nominal value of all the
16    offers was $700 million.
17           Q.  And walk me through again the checklist
18    of the reasons why that offer was deemed
19    unacceptable.
20           A.  I believe I already testified to that.
21           Q.  Could you give me the reasons again,
22    please.
23           A.  The amount was insufficient, the identity
24    of the buyer was concerning and problematic, the
25    conditions contained inside of the offer were
```



Page 259

1    determined to be problematic, including the need for

2    further diligence and a third-party reserve report,

3    the fact that the purchase price needed to be

4    financed by up to 100 percent of the amount, the

5    effect of the effective date and be changed to the

6    purchase price that would ultimately be received, and

7    then -- and probably most importantly, the

8    recognition of this particular sales process in the

9    broader context of a comprehensive restructuring that

10   we are trying to accomplish for the entire Fieldwood.

11        Q.  Did anyone ever communicate to you what

12   an acceptable offer would have been?

13        A.  No.

14        Q.  And answer your testimony is that the 700

15   million was not countered; is that correct?  No

16   counteroffer was made by Fieldwood?

17        A.  That's consistent with what I have said

18   several times.

19        Q.  Great.  And the next highest offer was

20   565 million.  Does that ring a bell?

21        A.  I think that's correct.

22        Q.  And that offer wasn't countered either?

23        A.  I don't believe any of the counters

24   were -- counteroffers were countered.

25        Q.  And the next highest number was



Page 260

1    400 million; is that correct?

2          A.  I would have to review the offers.  I

3    don't recall the offers after the couple that we

4    discussed.

5          Q.  And do you recall an offer of

6    $380 million?

7          A.  Yes.

8          Q.  Do you recall an offer of $180 million?

9          A.  Yes.

10         Q.  Were each of those offers made on the

11   same or similar assets?

12         A.  I believe there were offers that

13   specified that they were not for all the offers, and

14   there were indications of interest likewise that

15   specified that it was for select -- that the interest

16   was being expressed for select assets, I believe.

17         Q.  Were all the offers made to assets -- for

18   assets that are now going to be a part of NewCo?

19         A.  I'm sorry, can you say that one more

20   time?

21         Q.  Sure.  The offers that were made -- the

22   $700 million, the 565 million, the 400 million, the

23   380 million, and the 180 million -- were they all for

24   assets that are being placed into NewCo?

25         A.  All of the assets that -- no, there was



Page 261

1    a -- the marketing process contemplated a sale of all

2    of the company's deepwater assets.

3           Q.  And so the assets that are in NewCo are

4    more than or less than was contemplated by, for

5    example, the $700 million offer?

6           A.  Substantially similar, but they're -- the

7    NewCo assets will also comprise 13 shelf properties

8    and minor differences to the deepwater asset base in

9    terms of the overall property set.

10          Q.  Were you surprised at how low these

11   offers were?

12          A.  No, I was not.

13          Q.  Do you believe these offers were

14   reflective of the market that existed at the time

15   they were made?

16          A.  I believe these offers reflected a number

17   of factors, including the fact that this was a

18   process run inside of a highly complex restructuring.

19          Of course, you know, offers were made --

20   that are made at a specific point in time reflect the

21   conditions of those at that point in time, but there

22   was a number of -- there was a lot of process

23   complexity as to how this transaction could be

24   accomplished and general process concerns that buyers

25   had given everything else that needed to happen in



Page 262

1   our restructuring.  So there was lots of reasons why

2   I personally felt a sales process was going to be

3   challenging.

4         Q.  Do you recall if the offers were made on

5   your producing assets, your probable assets, or both?

6         A.  The offers that were made were specific

7   to properties that were either represented as the

8   package of asset that were being marketed through

9   that process or as described in the letter that

10  comprises both producing and nonproducing.

11        Q.  So the $700 million offer, for example,

12  would have been cumulative of both producing and

13  nonproducing properties -- or producing -- strike

14  that.

15             So this $700 million offer would have

16  comprised of both producing and probable reserves?

17        A.  I think your question depicts a

18  misunderstanding of how assets are sold.  You can't

19  separate a probable reserve from a proved reserve.

20  You can't separate a proved, undeveloped reserve if

21  you're selling an entire lease.

22        Q.  Do you think the sales process was

23  properly done?

24        A.  Yes.

25        Q.  You don't have any complaints about it --



Page 263

1    about how it was run by your advisors?

2         A.  No.

3         Q.  What are the biggest challenges that

4    NewCo -- or what are the biggest challenges that you

5    think NewCo is going to face as it comes out of

6    bankruptcy?

7              MR. PÉREZ:  Object to the form of the

8    question:  Vague.

9              THE WITNESS:  I think that it's going to

10   face the same challenges as any operator in our

11   basin.  Those challenges could include just the

12   nature of the assets themselves.  We have significant

13   assets in deepwater.  Deepwater has its own sets of

14   complexities around challenges as well.  There are

15   things beyond an operator's control, like weather,

16   hurricanes, commodity prices, which is -- which is

17   not unique to anyone in the oil and gas business,

18   challenges with difficult co-working interest owners

19   or other potential operators in the Gulf of Mexico.

20        Q.  (BY MR. DUEWALL) Is the Gulf of Mexico

21   getting to be an easier place to operate or a more

22   challenging place to operate?

23        A.  I think -- I think it depends on through

24   what lens you look at that question.

25        Q.  Do you think the market in terms of



Page 264

1    market participation in the Gulf of Mexico is

2    expanding or contracting?

3          A.  I don't think it is too painfully

4    different than it has been over the last few years.

5          Q.  And so the Gulf of Mexico is complex by

6    its nature, correct?

7          A.  Yes.

8          Q.  You've got access to capital issues when

9    you're operating there.  Is that true?

10         A.  Not by definition of being in the Gulf of

11   Mexico necessarily.

12         Q.  You have got the standard appreciation

13   fluctuations and pricing changes associated with any

14   commodity, but especially oil and gas, correct?

15         A.  That's correct, and so oil and gas

16   over -- that are susceptible to prices absent risk

17   mitigation, I would imagine.

18         Q.  How much of your production do you hedge?

19         A.  Historically we have hedged 40 to

20   60 percent for a one-, two-, three-year period.  We

21   are presently hedged about 40 percent of NewCo's

22   projected production over the next year and intend to

23   hedge additional volumes and additional tenor as we

24   get further into that restructuring and at exit.

25         Q.  And the Gulf of Mexico presents



Page 265

1  regulatory challenges, true?

2      A.  The Gulf of Mexico is a highly regulated

3  basin.

4      Q.  Does that make it more difficult than it

5  was even as early as maybe four, five years ago?

6      A.  The Gulf of Mexico has always been a

7  highly regulated basin in the last several decades.

8      Q.  And you testified to weather issues and

9  other environmental issues and concerns there,

10  correct?

11      A.  I'm not -- I'm not sure what

12  environmental issues you're speaking of.

13      Q.  Have y'all have had any environmental

14  incidents since you've been associated with the

15  company?

16      A.  I need more clarity even on what you mean

17  by "incidents" to answer that question.

18      Q.  Sure.  Have you ever had any employees

19  indicted on environmental issues?

20      A.  Yes.

21      Q.  Was there an event that led to the first

22  bankruptcy, a black swan event or anything that

23  triggered the first bankruptcy filing?

24      A.  I don't think that the challenges that

25  the previous company had were a singular event --



Page 266

```
 1          Q.  Okay.

 2          A.  -- based on my knowledge.

 3          Q.  Was there a singular event that led to

 4    the second bankruptcy filing?

 5          A.  I don't think it was a singular event

 6    that led to the current restructuring.

 7          Q.  And the same management team was with the

 8    company during the first bankruptcy filing; is that

 9    correct?

10          A.  No.

11          Q.  Are you the only -- are you the only

12    person from that core group that remains?

13          A.  No.

14          Q.  Who in the current management team was

15    with the company during the first bankruptcy filing.

16              I will make it easier.  Was Mr. -- was it

17    Lamme, was he with the company during the first

18    filing?

19          A.  He was, and he was in a -- yes, he was.

20          Q.  Was Mr. Mitchell with the company during

21    the first filing?

22          A.  I don't believe he was.

23          Q.  Was Mr. Janik?

24          A.  He was.

25          Q.  Mr. Seeger?
```



Page 267

```
 1          A.  He was.  And he was in a different
 2   capacity.
 3          Q.  Mr. Smith?
 4          A.  He was.  I think your question --
 5          Q.  I'm sorry, do you have a question?
 6          A.  There is obviously a category of people
 7   that are not with the company.
 8          Q.  Would you like to elaborate on your
 9   previous answer?  I will give you that opportunity.
10          MR. PÉREZ:  No, I think he would just
11   rather answer questions.
12          Q.  (BY MR. DUEWALL) Okay.  Why do you think
13   that this group that has now been through two
14   bankruptcies is up for the challenge of bringing this
15   company out of bankruptcy and doing better a third
16   time?
17          A.  Well, as I stated --
18          MR. PÉREZ:  Object to the form of the
19   question.  I don't know about third, but --
20          Q.  (BY MR. DUEWALL) You can answer.
21          A.  It is not a consistent management team
22   with the previous company.  Although I don't think
23   that reason, in and of itself, is going to be
24   responsible for the ultimate success or challenges of
25   any future company, but the management team is
```


MAGNA
LEGAL SERVICES

Page 268

1    fundamentally different today than it was in the past

2    and certainly the asset base is as well.

3              The nature of the assets that the NewCo

4    is going to own is very fundamentally different than

5    the nature of the company that Fieldwood previously

6    comprised, and that's going to be a significant

7    factor in determining the success, alongside many

8    other factors, such as capital structure, and

9    numerous other factors.

10         Q.  Is -- does the NewCo have a different

11   business plan in that it's going to be more --

12   drilling new wills as opposed to maintaining Legacy

13   assets?  Is that the difference or is it something

14   else?

15         A.  The NewCo's not going to be doing

16   anything that the previous companies don't have

17   experience with.  The assets are going to be very

18   different than the asset base that currently

19   comprises Fieldwood today.  And I do think the

20   business plan is going to reflect a different

21   business plan both due to the nature of the asset

22   that is NewCo is going to own, the capital structure

23   of the business, the opportunity set, and the

24   stakeholder desires.

25         Q.  How many of the wells at NewCo are wells



Page 269

 1   that Fieldwood drilled?

 2        A.  With respect to the deepwater business, I

 3   would say that the -- in 2019 to 2020, the company

 4   drilled and completed five deepwater wells.  The

 5   entire deepwater business, I don't have the number at

 6   hand exactly, but it's probably in the order of

 7   magnitude of 20, 25 deepwater wells.  So a

 8   significant number of the wells that the company

 9   operates in deepwater were with drilled by the

10   company.

11             In the shelf, it is very different.  The

12   number of new wells that the company owns in the

13   shelf were drilled by predecessors many years ago,

14   and when they received a reached a mature enough

15   state, the customer ordinarily would sell those

16   assets and liabilities to our companies, which is how

17   our company had acquired a number of those

18   liabilities.

19        Q.  So the strategy going forward, then, is

20   to concentrate on deepwater; is that correct?

21        A.  No.  The strategy going forward is that

22   the asset base is going to comprise a business that

23   is probably 80 percent deepwater and 20 percent shelf

24   and to have a disciplined capital investment approach

25   in a business that generates significant excess for



Page 270

1    cash flow to be able to represent an attractive

2    business proposition to stakeholders that are

3    investing hundreds of millions of dollars of new

4    capital as a part of that restructuring.

5         Q.  So, just to paraphrase what you have

6    said, 80 percent deepwater, 20 percent shelf, and of

7    that 80 percent that's in deepwater, how many are

8    those, again, are wells that Fieldwood has drilled

9    and that you're the first entity in the chain of

10   title?

11        A.  Fieldwood drilled five wells in deepwater

12   on leases that generally have extensive chain of

13   title ownership or very significant predecessor, and

14   more of those wells were drilled with co-working

15   interest owners.

16        Q.  And then now coming out of bankruptcy,

17   it's my understanding that you have -- and was the

18   Genovesa well one of those five or was that

19   considered a different well?

20        A.  No, that was -- that was one of the five.

21        Q.  And now coming out of bankruptcy, it is

22   my understanding that Fieldwood would like to drill

23   six more wells.  Is that your drilling plan?

24        A.  The plans generally contemplate one to

25   two three wells per year, but again, the strategy is



Page 271

1    focused on a business plan that has a disciplined

2    capital investment program and the ability to

3    generate cash flow.

4            Q.  And those wells are the Katmai 2, 3, and

5    4, the Gunflint, the CPN, and the Big Bend Number 2;

6    is that correct?

7            A.  Those are wells that are in our inventory

8    and incorporated in our projections.  We have a

9    significant inventory that's under a continuous

10   evaluation, and like any company, we're always

11   looking for the best opportunities to pursue at any

12   given time.

13           Q.  Have all of those wells been permitted?

14           A.  No.

15           Q.  Have you any of them been permitted?

16           A.  Can you recite for me which wells again

17   you're -- you're asking about?

18           Q.  Certainly.  And I'm not intending to

19   trick you, so if -- if you have a question or if I'm

20   ever inarticulate, and I have been -- I have been

21   that before, just let me know.  I want to make sure

22   you understand my questions.

23               Has the Katmai Number 2 been permitted?

24           A.  It has not.

25           Q.  Has the Katmai Number 3 been permitted?



Page 272

1        A.   No.

2        Q.   Has the Katmai Number 4 been permitted?

3        A.   No.

4        Q.   Has the Gunflint been permitted?

5        A.   There is multiple wells in the Gunflint

6   and the Gunflint's yield.  I'm not aware that those

7   wells have been permitted.

8        Q.   Has the CPN been permitted?

9        A.   No.

10        Q.   Has the Big Bend Number 2 been permitted?

11        A.   No.

12        Q.   Will each of those wells be a similar

13   deepwater well to the Genovesa well or are some of

14   those also shelf wells?

15        A.   The wells that you specified are

16   deepwater wells.

17        Q.   What does it cost typically to drill a

18   well like that?

19        A.   There is a wide range of costs for

20   drilling deepwater wells.  A dry hole cost of a

21   sidetrack may be as low as 20 or $30 million.  A

22   deep, new well may cost, for the dry hole cost, in

23   excess of $60 million.

24        Q.   What did it cost when you drilled the

25   Genovesa well, just by reference?



Page 273

1           A.   I believed the dry -- I don't --

2               MR. PÉREZ:  Yeah, if you don't know --

3       but I'm a little concerned about, you know, continued

4       questions about Genovesa, which, as you know, have

5       been the subject of significant disputes between the

6       parties, and I don't think this is intended to be a

7       deposition relating to Genovesa, but I mean, if you

8       know, the answer, if you have the number, if you know

9       the number.

10              MR. DUEWALL:  If he has a number?  He is

11      the CFO.  I'm asking him what the budget was when it

12      got drilled.  I think he should know that.  And I'm

13      not asking anything else right now, so let's not

14      jump -- let's not get too far ahead of ourselves with

15      our objections.

16              THE WITNESS:  Yes, I would have to

17      consult our records.  I don't have the number at my

18      fingertips.

19          Q.   (BY MR. DUEWALL) And do you know what the

20      de-com cost would be for a well like the Genovesa

21      well?

22          A.   A deepwater well can cost anywhere from

23      eight to $20 million to be decommissioned is probably

24      a general range.

25          Q.   You cut out when you were talking, and I



Page 274

1    don't mean to make you repeat yourself.

2         A.  A deepwater well can generally cost eight

3    to $20 million, which is a general range.

4         Q.  And I understood you to testify earlier

5    that you aren't taking money out of production and

6    putting it aside for future decommissioning costs; is

7    that correct?

8         A.  I was asked earlier if the plan

9    contemplated a specific, dedicated sinking fund, and

10   it does not.

11        Q.  So is -- NewCo's ability to potentially

12   penetrate the Genovesa well, is that going to be

13   conditioned on its ability to drill one of these new

14   six wells that we have talked about?

15        A.  In my opinion, no.

16        Q.  Why not?

17        A.  The company, NewCo, is going to have a

18   very significant producing asset base that is going

19   to independently generate substantial free cash flow,

20   it will make investment opportunities, and those

21   investment opportunities could range from low-cost

22   recompletions in its shelf asset base, of which there

23   are many, and they could also take the form of

24   additional drilling; but I think that there is many

25   business plans that support the liabilities that this



Page 275

1    company currently has.

2           This company is going to be an ongoing

3    oil and gas company, which conventionally means that

4    there is additional future investment that is going

5    to -- that is going to be conducted.

6           Q.   Do you believe the company, then, is

7    feasible if it cannot drill the Katmai 2, 3, and 4,

8    the Gunflint, or the Big Bend?

9           Is that your testimony?

10          A.   The company -- when you're asking me the

11   company being feasible, are you asking me is the plan

12   feasible?  What does the company being feasible mean?

13          Q.   Does the company, with declining

14   reserves -- it is your testimony that you think with

15   declining reserves there is revenue over the short

16   and long term to both satisfy the P and A obligations

17   and the company's ordinary course of business

18   expenses on a day-to-day basis?

19          A.   I don't believe the company's reserves

20   are going to perpetually decline as they pursue that

21   business plan or a version of the business plan that

22   it has the ability to conduct given the quality of

23   the assets that it owns.

24          Q.   Are the best assets of the company,

25   assets that it can't give away to other predecessors?



Page 276

1            MR. PÉREZ:  Object to the form of the
2    question:  Vague.
3            THE WITNESS:  Would you mind restating
4    that question for me?  I'm not sure I understand it.
5            Q.  (BY MR. DUEWALL) Sure.  I will try again.
6            As I sit here today, it looks like the
7    company is running out of properties that it can
8    abandon to predecessors.  Is that generally a true
9    statement?
10           MR. PÉREZ:  Again, object to the form of
11   the question as vague.  I have no idea what that
12   means.
13           THE WITNESS:  I don't understand the
14   question, I'm sorry.
15           Q.  (BY MR. DUEWALL) Sure.
16           Is there a predecessors that you could
17   abandon the Genovesa well to?
18           A.  I think anyone would be happy to own the
19   Genovesa well.
20           Q.  Is there a predecessor you can abandon
21   the Genovesa well to?
22           A.  The Genovesa well was drilled with two
23   co-working interest owners, and it was a well, as you
24   have stated, that was drilled by Fieldwood.
25           Q.  So there is no -- aside from your two



Page 277

1    working interest owners, there is not a party, like a
2    BP or an Exxon or a Chevron, that you can give that
3    one away to; is that correct?
4            A.  I don't -- I don't know what you mean by
5    that, "give that one away to."
6            Q.  That you can abandon it to.  You can't
7    abandon it to a predecessor, correct?
8            A.  I think any company --
9            MR. PÉREZ:  Again, I'm going to object to
10   the form of the question.  I mean, I don't really
11   understand the question.
12           THE WITNESS:  If the company had a desire
13   to abandon the Genovesa well, I think that there are
14   many, many companies that would desire to own that
15   well.
16           Q.  (BY MR. DUEWALL) What are the other five
17   deepwater wells -- or I guess it is the other four
18   that Fieldwood has drilled that are going to be in
19   NewCo?
20           A.  So in 2000 -- the five wells that I was
21   describing which had activities in 2019 also
22   comprised the Katmai well, which was completed in
23   2020, the Orlov well, the Troika TA 2 well, and the
24   Troika TA 3 well.
25           Q.  Does Fieldwood have a hundred percent of



Page 278

1    the Katmai well that you just referenced?

2         A.   No, it does not.

3         Q.   What is its working interest in that

4    well?

5         A.   It is 50 percent.

6         Q.   What about the Orlov, does it have

7    100 percent of the Orlov?

8         A.   No, it does not.

9         Q.   How much does it have?

10        A.   I believe it is 55 percent, 50 to

11   55 percent.

12        Q.   And what about the two Troika wells, do

13   you have 100 percent of those?

14        A.   Yes.

15        Q.   So at least as it relates to the two

16   Troika wells, there is no predecessors that you could

17   abandon those to, correct?

18        A.   No.

19        Q.   And did both of those begin producing in

20   2019?

21        A.   I believe the two Troika wells began

22   producing in the fourth quarter of 2019.

23        Q.   What would your de-com estimate be for

24   each of those individually?

25        A.   I would have to consult our



Page 279

1    decommissioning estimates and experts, but I think

2    that those wells generally fit within the parameters

3    that I outlined earlier to you about typical

4    deepwater wells.

5              Q.  And that amount is again?

6              A.  Eight to $20 million.

7              Q.  As you sit here today, when in the

8    lifespan of Fieldwood would you have to account for

9    those decommissioning costs, at least as it relates

10   to the two Troika wells?

11             A.  Those wells have significant remaining

12   reserve life.  It depends upon the fields, not just

13   with respect to those particular wells, and that

14   field has multiple producing wells that -- that lease

15   has multiple producing wells on it at present.  So it

16   likely would not be for many, many years in the

17   future.

18             Q.  And your estimate of eight to

19   $20 million, is that an estimate -- or is that a BSEE

20   estimate or how do you come up with that number

21   typically when you budget for that?

22             A.  The range that I suggested was informed

23   by my general review of our P and A estimates and

24   also the recent deepwater P and A activity that the

25   company has conducted and anticipates conducting.



Page 280

1          Q.  And how many wells have -- how many
2     deepwater wells specifically have -- has Fieldwood
3     decommissioned during your tenure there?
4          A.  I believe it is two, one to two.  We have
5     been non-operators on deepwater wells that have also
6     been decommissioned on more than those wells.
7          Q.  Generally speaking, what is the nature of
8     the dispute that Fieldwood is having with LLOG
9     regarding the five percent ORRI?
10         A.  Fieldwood believes that that ORRI is a
11    separate property interest unrelated to any security
12    rights that LOG believes that it may have pursuant to
13    an operating agreement and a separate interest in the
14    same field.
15         Q.  Has Fieldwood received any offers of
16    interests in the last 30 days regarding any of the
17    properties that it previously put forward in the
18    sales process that we discussed earlier in the
19    deposition?
20         A.  Not that I'm aware.
21         Q.  Do you know if the plan or any of the
22    plan agreements contemplate any of the predecessors
23    getting an override in NewCo to -- in any way, shape
24    or form?
25         A.  I'm sorry, can you say that one more



Page 281

1   time, please?

2          Q.   Sure.  Are any of the predecessors

3   receiving an ORRI in NewCo?

4          A.   No.

5          Q.   Do you have any personal knowledge of why

6   the Ryder Scott audited reserve reports were not used

7   or relied upon by your expert when he prepared the

8   expert report?

9          A.   I believe there is reserves inputs that

10  are a part of our expert report.

11         Q.   Right.  But do you know if your expert

12  relied upon the audited Ryder Scott reserve reports?

13              If you don't, you don't.  I just want to

14  know what your personal knowledge was with regard to

15  the use of the Ryder Scott reserve report as it

16  related to the preparation of your expert reports in

17  this case?

18         A.   Yeah, I know that there is reserves data

19  that is relied upon in the expert report.  So I'm not

20  clear as to your question.  I don't know if it is the

21  same specific report that you're referring to.

22              I know that the expert report cites both

23  the midyear reserves, as well as the year-end

24  reserves in a determination of the expert's findings

25  based in either scenario.



Page 282

1          Q.  Do you have any personal knowledge

2     regarding the use of the Ryder Scott report by your

3     expert?

4          A.  None other than what is represented in

5     the expert report.

6          Q.  Okay.  Let's talk a little bit more about

7     decommissioning projections and costs from NewCo.

8              Do you have any knowledge with regard to

9     the decommissioning costs that were referred to on

10    the first day filing declarations?

11         A.  I would have to understand more

12    specifically what you're asking about.

13         Q.  Okay.  How many P and A projects has

14    Fieldwood undertaken in the last five years?

15         A.  I don't know if I can speak specifically

16    to that timeframe, but since Fieldwood -- since

17    inception in 2013, the company has extended over I

18    believe it is a billion and a half dollars,

19    decommissioning well over a thousand wells, I believe

20    1,200 wells, over 400 platforms and structures and

21    several hundred pipelines.

22         Q.  Has it been your experience that you

23    routinely can do that for less than what BSEE

24    estimates costs to be?

25         A.  So decommissioning processes are very



Page 283

1    project-specific and in many cases we have

2    decommissioned for far below BSEE estimates.  BSEE

3    estimates comprise a number of different numbers.

4    There used to be a single number.  Now there are

5    estimates that comprise P-50, P-90 deterministic

6    estimates.  And it's -- it's challenging to paint all

7    projects with one brush.

8          Q.  So, generally speaking, is it your

9    opinion that BSEE -- that because it is a -- well,

10   strike that.

11         Do you have a general opinion of BSEE

12   estimates, good, bad or otherwise?

13         A.  I think the BSEE estimates are in some

14   cases not comparable to the actual properties, in

15   some cases they can be a fair representation; and it

16   is -- it is challenging as a whole across a very

17   large asset base, like Fieldwood's, to look at

18   numbers other than analysis that has been performed

19   specifics to the assets themselves.

20         Q.  When you're engaging in the P and A

21   operation, do you report back to BSEE what your

22   actual expenditures were in that part of the process

23   that you engage in with them?

24         A.  I believe that within the last couple of

25   years, there are required regulatory costs



Page 284

1  reporting -- reports.

2      Q.  And has it been your experience the last

3  couple of years as you have engaged in that process

4  as an operator the BSEE costs have become more

5  reliable, or do you have any opinion in that regard?

6      A.  The same answer as before, the -- the

7  reliability is property-specific and it is -- I don't

8  think it is -- I don't think it -- I don't think that

9  the estimates, unless -- I don't think the estimates,

10  broadly speaking, to the nature -- versus the nature

11  of the assets that Fieldwood currently owns are the

12  most representative tool by any means.

13      Q.  What percentage of plugging and

14  abandoning costs included in the Disclosure Statement

15  projections relate to shelf assets, if you know?

16      A.  What specific number are you referring to

17  in the Disclosure Statement, of the total

18  decommissioning?

19      Q.  Right.  I mean, is it 10 percent,

20  20 percent?  Do you have a general opinion?

21      A.  I would estimate that the shelf

22  properties P and A reflects approximately 75 percent

23  of the overall obligations, possibly maybe -- maybe a

24  bit more than that, maybe 80 percent, 85 percent.  75

25  to 85 percent, I would guess.



Page 285

```
 1              Q.  And do you have any opinion of the costs

 2     associated with decommissioning of State of

 3     Texas-leased property?

 4              A.  Yes.

 5              Q.  And generally what's the budget range

 6     that you use as a rule of thumb?

 7              A.  Costs are not a function of the State or

 8     geographic location that the asset resides in.  It is

 9     most -- it is mainly related to the nature of the

10     projects as opposed to the geographic location.

11              Q.  And I will tell you the reason I'm asking

12     is that BSEE doesn't provide estimates for State

13     leases, so I was curious as to what -- in terms of

14     your experience, what would you use as a rule of

15     thumb estimate for a State lease?

16              A.  The same answer I just gave you, it

17     depends on --

18              Q.  Do you have a dollar amount?

19              A.  You didn't ask me a question that I can

20     answer.

21              Q.  Okay.  Well, I will try, then.

22              Do you have a dollar amount that you

23     generally budget for a State of Texas lease?

24              A.  No.

25              Q.  Looking back to your first bankruptcy
```



Page 286

 1    filing, do you know if you or anyone with the company

 2    has ever analyzed the reasonableness of the

 3    management team's projections -- and what I'm

 4    referring to there is the Exhibit O to the Disclosure

 5    Statement -- by preparing the projections included in

 6    the 2018 Disclosure Statement dated February 15th,

 7    2018 and comparing those to the 2018 or 2019

 8    historical operating results of the company?

 9              A.  Yes.

10              Q.  And did you reach any conclusions in that

11    regard?

12              A.  Yes.

13              Q.  And can you share those with me?

14              A.  Actual results were different for a

15    variety of factors.

16              Q.  Can you explain what those factors were?

17              A.  The price environment obviously

18    deteriorated very substantially over the past year

19    and a half versus the price environment back in 2018.

20    Initially in the first period, the projections were

21    not too materially different.  The profitability was

22    mostly lower, the capital spending was substantially

23    lower, and the free cash flow was probably higher.

24              In subsequent years, '19, the production

25    estimates were meaningfully below the projections due



Page 287

1    to the delayed capital spending from 2018, which
2    resulted in substantially higher free cash flow in
3    2018; the capital spending in 2019 was substantially
4    above the projections; and 2020, the business
5    obviously was substantially below the projections due
6    to -- largely due to the changes in the business
7    environment that impacted the business in 2020,
8    starting with the Covid-induced price changes, then
9    due to the nature of the restructuring event that we
10   undertook, the changing of the shelf asset base in
11   the storm season.  Those were -- those were the
12   observations that I had.
13             Q.  Any others?
14             A.  The question was:  Observations of
15   changes versus actual versus projected performance?
16   Those are my main observations.
17             Q.  Okay.  Have you understood the questions
18   that I have asked this afternoon -- or this evening?
19             A.  Not all of them.
20             Q.  You answered them to the best of your
21   ability?
22             A.  I believe so.
23             Q.  Have you answered truthfully and
24   honestly?
25             A.  Yes.



Page 288

1          Q.   And have I treated you with courtesy

2    during today's deposition?

3          A.   Yes, you have.

4               MR. DUEWALL:  All right.  I pass the

5    witness.

6               THE WITNESS:  Thank you.

7               MR. PÉREZ:  All right.  I guess we can go

8    have dinner.  We will reserve our questions to the

9    hearing, time of trial.

10              (Proceedings concluded at 6:43 p.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



1                    CHANGES AND SIGNATURE

2    PAGE LINE  CHANGE                    REASON

3    _____

4    _____

5    _____

6    _____

7    _____

8    _____

9    _____

10   _____

11   _____

12   _____

13   _____

14   _____

15   _____

16   _____

17   _____

18   _____

19   _____

20   _____

21   _____

22   _____

23   _____

24   _____

25   _____



Page 290

```
 1
 2
 3
 4
 5
 6
 7        I declare under penalty of perjury that the
 8   foregoing is true and correct.
 9
10                        _____
11                        MR. MICHAEL T. DANE
12
13
14        SUBSCRIBED AND SWORN TO BEFORE ME, the
15   undersigned authority, by the witness, MR. MICHAEL T.
16   DANE, on this the _____ day of
17   _____, 2021.
18
19                        _____
20                        NOTARY PUBLIC IN AND FOR
21                        THE STATE OF _____
22
23   My Commission Expires: _____
24
25
```



Page 291

1    STATE OF TEXAS

2    COUNTY OF HARRIS

3

4                    REPORTER'S CERTIFICATE

5                    ORAL DEPOSITION OF

6                    MR. MICHAEL T. DANE

7                    May 13, 2021

8

9            I, Michelle Hartman, the undersigned

10   Certified Shorthand Reporter in and for the State of

11   Texas and Registered Professional Reporter, certify

12   that the facts stated in the foregoing pages are true

13   and correct.

14           I further certify that I am neither

15   attorney or counsel for, related to, nor employed by

16   any parties to the action in which this testimony is

17   taken and, further, that I am not a relative or

18   employee of any counsel employed by the parties

19   hereto or financially interested in the action.

20           That the deposition transcript was duly

21   submitted on _____ to the witness or to

22   the attorney for the witness for examination,

23   signature, and returned to me by _____.

24

25



Page 292

1          SUBSCRIBED AND SWORN TO under my hand and

2   seal of office on this _____ day of May, 2021.

3

4

5   _Michelle Hartman_ _____

6          Michelle Hartman, CSR, RPR

    Texas CSR 7093

7   Expiration:  12/31/21

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



**A**

**a.m** 1:18
**A1** 142:24
**abandon** 204:21
  255:24 256:2
  257:4,7,12
  276:8,17,20
  277:6,7,13
  278:17
**abandoned**
  204:25 205:15
  206:10,12,16
  206:24 220:1
  221:5 222:2,3
  223:25 224:13
  225:4,15,20
  226:1,6,9,12
  227:7,18,23
  228:2,6,16
  229:1,3 231:7
  231:14,23
  232:1,12,20
  233:11 255:14
  255:21 256:14
  256:22 257:17
  257:22 258:4,9
**abandoning**
  95:24 284:14
**abandonment**
  54:9 60:1,10
  115:18 119:5
  130:16 136:4
  136:25 151:8
  256:16
**abandons** 255:3
  255:6
**Abell** 104:11,21
  104:25 107:18
  108:2
**ability** 50:14
  67:14 102:13
  116:2 134:12
  145:7,8,12
  146:23 163:12
  166:6 167:17

194:22 195:7
229:14 231:9
232:15 236:10
271:2 274:11
274:13 275:22
287:21
**able** 15:18 26:24
  42:20 51:15
  70:10 71:21
  119:4 131:5
  133:11,12
  134:20 139:23
  177:17 179:7
  180:13,20
  181:23 182:2
  191:7 222:16
  223:9,20
  243:17 245:13
  254:15 257:1
  270:1
**above-styled**
  1:17
**absent** 264:16
**acceptable** 44:25
  73:11,24
  250:13 259:12
**accepted** 75:22
  139:15 159:14
**accepting** 213:3
**access** 14:10,15
  26:20 70:10,19
  71:22 95:23
  134:20 222:24
  245:15,16
  256:17,24
  264:8
**accessed** 256:23
**accessible** 257:8
**accomplish** 90:3
  160:20 217:8
  247:19 248:6
  259:10
**accomplished**
  261:24
**account** 168:4
  279:8

**accounted**
  165:17
**accounting** 19:3
  22:9 25:20
**accounts** 165:3
**accredited**
  123:10
**accuracy** 159:14
**accurate** 42:22
  50:23 51:7
  54:12,22,24
  55:7,10,16 56:6
  57:7 63:15
  72:24 82:21
  83:14 112:23
  151:17 158:17
  161:9 168:24
  179:2 185:6
  188:22 207:20
  216:9,13
**accurately** 103:6
**achieve** 161:25
**acknowledged**
  76:23,24
**acquire** 73:23
  80:17 151:19
**acquired** 28:12
  37:9 49:19
  74:18 142:23
  166:17 269:17
**acquisition** 19:24
  20:7 50:21
  54:13 60:7
  166:24 167:4
  175:5
**acquisitions** 23:3
  210:2
**action** 44:1
  199:14 201:2
  291:16,19
**actionable** 73:19
**actions** 119:19
  257:23
**actively** 228:13
**activities** 95:25
  115:22 122:23

132:24 133:7
133:25 147:11
222:15 237:22
239:3 277:21
**activity** 133:9
  144:2,7,11,12
  147:14 222:13
  237:14,20,23
  238:2,21,23
  239:8,23 241:3
  279:24
**actual** 149:22
  203:6 242:24
  243:25 283:14
  283:22 286:14
  287:15
**AD** 5:21
**add** 172:22
**addition** 20:9
  206:2 222:17
  225:23 228:7
  248:1,5 249:18
**additional** 25:23
  43:19 49:16
  50:15 144:15
  196:23 223:14
  247:24 249:22
  264:23,23
  274:24 275:4
**Additionally**
  148:4
**address** 16:17
  40:5 50:15
  51:13 71:17
  82:24 83:1
  144:7 145:21
  146:3 206:7
**addressed** 77:15
  85:20 99:19
  147:25 195:12
  240:25
**addresses** 38:24
  201:3
**addressing** 59:25
  109:4 210:12
  241:13

**adhere** 47:9
**adjourn** 252:17
**Administered**
  1:5
**administration**
  175:19 176:8
**administrator**
  105:1
**admit** 81:14
**adopted** 118:1
  122:25
**advanced** 113:8
**advancing**
  105:13
**advice** 59:6
**advised** 74:9,12
**advising** 108:19
**advisor** 64:14
  105:1
**advisors** 35:10
  46:11 64:10
  66:11 118:5,14
  122:21 139:19
  263:1
**advisory** 46:23
**AFEs** 238:7,9,12
  238:13
**affect** 167:16
**afforded** 102:1
**afternoon** 183:16
  221:1 287:18
**agencies** 88:8
  236:9,14
**AGENT** 4:9
**aggregate** 126:4
  169:25 172:17
**ago** 112:24 113:1
  190:19 206:20
  224:3 265:5
  269:13
**agree** 118:25
  130:13 185:2,7
  186:5,8 187:3,6
  187:12,16,17
  189:6 193:7
  200:2 202:17



203:23 206:20
251:6
**agreed** 13:18
28:3 93:24
120:10 179:16
192:20 200:12
228:24 234:7
234:10,14,20
**agreeing** 192:8
206:2
**agreement** 7:11
7:14,17,19,23
9:14 11:2 14:20
14:22 15:4,7
16:2 44:5,17,22
45:2,6 47:16
48:9,17 52:3
53:11 54:15,19
54:21 55:1,15
56:8,10,19
57:14,21,23,24
58:12,24 59:19
60:2,6,17 62:21
63:1 64:9 74:8
74:17,22 75:12
78:14 79:23
84:19 90:10,14
91:6,13 92:7
93:4,10,18 94:1
94:4,7,8,12,17
94:19 95:2,4,12
95:18,19,23
96:9 97:14 98:3
98:15 101:8,15
101:17,19
102:2,11,13,23
102:25 103:21
103:22 107:9
110:20 111:18
113:18 114:13
115:10 116:7
116:11,22,25
117:22 118:1,8
120:4 142:5,20
143:19 146:3
147:23 153:18

154:1 155:3
156:14 185:1
186:22,24
187:3,5,20
188:12,25
189:12,18
191:22,23
192:4 227:19
227:24 228:2
228:17,20
229:8,19 230:9
230:19 236:18
244:21 246:23
247:2,9,13
249:9 250:7
280:13
**agreements** 37:5
40:12 41:3,18
42:24 43:10,15
60:24 82:23
85:4,18 86:4,14
90:23 100:17
111:10 114:14
114:17 115:2
144:7 159:18
160:7 162:2,8
164:12 179:15
179:17 198:21
201:3 228:4
236:23 247:15
280:22
**agrees** 229:11
**AH-7** 150:22
**ahead** 55:12
66:24 96:17
106:9 120:3
142:13 147:1,8
188:7 189:9
196:20 205:19
207:6 208:11
216:19 273:14
**aid** 257:16
**al** 1:4 7:12,12
26:6
**alert** 13:24
**Alfredo** 2:3 13:7

14:2,18 15:10
15:22 28:13
58:19 65:1,7
71:10 93:14
112:11 131:21
131:23 134:24
136:18 147:3
157:18 179:6
188:6 225:12
251:19
**alfredo.perez...**
2:6
**Ali** 4:20 15:5,5
**aligned** 37:21
247:18
**alignment** 36:25
**Alix** 9:12
**allocate** 233:19
**allocated** 233:4,8
233:13
**allocating** 233:15
233:20
**allocation** 191:10
209:25 232:18
232:23
**allow** 57:23 58:3
257:7
**allowed** 103:19
163:9
**allowing** 257:8
**allows** 195:12
**alongside** 21:6
194:12 268:7
**alternatives** 53:9
59:24 60:14
213:16
**Amended** 9:6
**amendment**
42:25 142:2
180:7
**AMERICA** 3:7
**American** 4:14
6:11 17:3
**amount** 33:19
59:25 66:21
67:2,5,7,8,15

67:16 98:24
99:1,5 126:15
127:25 131:5
133:3 139:13
141:2 143:10
148:8 154:7
160:7 169:5,6
180:10,25
182:9 202:9,10
205:8 209:9
212:19 223:2
224:1,15 226:2
237:15,18
248:4 258:23
259:4 279:5
285:18,22
**amounts** 153:16
**analysis** 18:9,11
18:12,17 20:19
20:24,25 21:3,5
125:25 126:2,3
140:20 149:3
158:4,6,10,18
164:24 166:22
167:11 169:22
172:13 174:9
174:24 175:9
217:21 219:3
243:10 283:18
**analyst** 19:12
**analyzed** 286:2
**ANDREWS** 2:23
3:20
**Andy** 5:22
**andy.parrot@...**
5:25
**announcement**
166:2
**annual** 135:18
136:9,10,20
138:12,13
140:2,3,10
141:11 150:22
158:22 159:12
165:1 173:10
173:12,13,14

173:16,19
**annually** 154:6
**answer** 12:6
24:10 42:13
45:19 55:12
57:12,15,18
59:5,8 66:2
69:20 83:2 84:2
92:19 96:17
97:17,24 106:9
114:20,25
115:1,24 120:3
123:11 137:14
141:18,20
142:15 156:7
159:21 165:19
169:10 179:3
182:13 184:3
184:17 186:20
186:21 190:9
190:15 194:6
196:7,20,21
197:16,18,21
197:22 198:3
201:15,16
205:3 207:6,19
207:21 214:10
218:7 257:18
258:6 259:14
265:17 267:9
267:11,20
273:8 284:6
285:16,20
**answer's** 241:20
241:20
**answered** 82:14
82:15 124:10
194:2 196:18
197:15 198:2
201:16 207:9
236:22 287:20
287:23
**answering**
218:11
**Anthony** 6:17
46:8 117:16,20



**anticipate** 87:7
**anticipated** 41:24
    129:25 131:14
    139:23 144:1
    145:22,23
    147:24 149:7
    151:4,6 153:4,8
    177:23 205:4
    239:3
**anticipates**
    279:25
**anybody** 146:25
**APA** 138:13
    150:21
**APA-2021**
    138:11
**Apache** 2:22 7:12
    19:24 20:20
    34:11,15,20,23
    35:4,7,11,19,22
    36:2,6,11,18,22
    37:7,13,13 38:4
    38:11,17 39:3,4
    39:10,18,20
    40:6 45:10,13
    45:24 46:7,16
    46:19,25 47:17
    47:19,21 48:2
    48:11,20 49:6
    49:13,17,19,24
    50:8,11,18,21
    50:22 51:5,7,12
    51:19,23 52:2
    53:7,11,23 54:6
    54:15,25 55:8
    56:6 57:14,20
    57:23 58:2,7,11
    58:24 59:12,21
    60:5,8,18,24
    61:11 62:17,21
    63:2 74:6,9,9
    74:18,22 75:3
    76:10,12,12,22
    78:13,14 79:23
    80:15 90:23
    94:11,14,15,18

94:19 95:3,19
96:22 97:9,10
97:15 98:4,12
98:16,20 99:6
99:12,20,23
100:3,7,10,17
100:24 101:1
103:5,19
104:16 105:11
105:22 106:5,8
106:11,18
107:7,10,19,19
109:14 111:3,5
111:9,18,20
112:2,5,7,9
114:2,7,10,16
114:18,23
115:3,6,8,14,17
115:21 116:2
117:2,5,8 118:9
118:13,16,20
118:23 119:3,7
119:17,20
120:2,4,5
138:11 139:16
139:19 142:23
148:14 151:15
151:17,24
152:15,16,18
152:19,20,21
153:23 154:15
154:20,23
166:17,19
228:8 250:1,7,8
250:21 251:1,8
**Apache's** 46:8
    53:13 60:4,16
    74:25 76:18
    94:21 105:10
    108:8 117:16
**apart** 31:23 32:1
    58:21 248:16
**apologies** 66:20
**apologize** 24:22
    53:2 65:18 66:2
    66:22,25 68:23

72:14 93:20
116:8 144:22
150:19 153:20
195:21 228:20
**appealed** 241:11
**APPEARANC...**
    2:1 3:1 4:1 5:1
    6:1
**appears** 72:23
**applicable** 95:3
    236:4
**apply** 165:20
**appreciate**
    244:18
**appreciation**
    264:12
**approach** 145:24
    147:4 269:24
**appropriate**
    53:20 59:7
    69:19 74:20
    111:12 126:7
    166:15 174:14
    181:4 198:12
    199:3 209:9
    218:6 226:16
    227:10 238:11
    238:12 241:13
    243:21 244:6
    249:11 253:6
    255:13 257:12
    257:20
**appropriately**
    163:22 165:17
    168:4
**approval** 120:6
    123:10
**approved** 123:6
    175:25 250:10
**approximately**
    13:17 19:13
    148:2 154:7
    188:18 224:7
    224:12 225:8
    226:5 284:22
**April** 9:13 44:22

72:15,15
106:21 131:3
136:24 158:8
**area** 171:9
    217:24
**areas** 8:15 17:21
**areawide** 87:5,6
    88:12,15 89:3
    233:21 234:3
**arguing** 194:1
**ARIES** 14:10
    16:6,11 176:2
**arrangement**
    94:22 187:1
    188:13
**arrangements**
    37:21 62:25
    114:19 206:6
    239:22
**arrived** 138:16
    152:25
**articulated** 68:9
**aside** 79:24 150:7
    209:23 274:6
    276:25
**asked** 43:19
    48:12 52:6
    56:21 82:14
    107:19 115:23
    128:7 144:19
    196:17 198:1
    201:11 213:25
    218:19 274:8
    287:18
**asking** 11:23
    15:10 20:21
    51:19 56:15
    82:6 93:7,12
    119:12 126:18
    149:21 151:24
    166:23 168:15
    168:22 169:11
    173:8,9 186:13
    186:14 187:24
    189:13,22
    194:15 208:23

211:24 212:3
214:22 216:6
217:24,25
218:12,18
271:17 273:11
273:13 275:10
275:11 282:12
285:11
**aspects** 39:3
**Aspen** 2:12 11:13
    32:25
**assemble** 122:1
**assembling**
    121:12 173:25
**asserted** 68:20
    69:1,5
**assessed** 199:2
**assessment**
    169:20
**assessments**
    171:25
**asset** 39:11 47:22
    51:3 52:16,25
    72:17,22 73:23
    74:20,24 75:4
    75:12,17,20
    76:7 78:14
    91:22,24,25
    92:4,10,15,21
    92:23,24 93:21
    94:15 95:1
    109:20,23
    110:24 111:1
    121:16 125:7,8
    125:23 132:25
    132:25 133:1
    133:15 167:24
    170:23,25
    171:15,19
    172:4 175:22
    178:24 184:9
    184:13,22
    205:10 209:17
    221:13 255:11
    257:20 261:8
    262:8 268:2,18



268:21 269:22
274:18,22
283:17 285:8
287:10
**asset-by-asset**
255:12,17
257:19
**assets** 20:24
36:24 37:8
49:15 50:10,14
50:19 51:5
52:19 64:7,11
68:22 74:12,17
76:14 80:6,18
80:24,25 83:7
83:10 91:3
110:1,1,2,23
111:7 114:11
114:14 123:20
124:24 133:19
134:6 140:24
148:21 149:18
150:10 151:10
151:11 163:16
167:11,23
168:25 169:1
171:2,4,8 177:9
177:11,15
178:10,13
183:3 198:9
202:15 204:13
204:16,17,21
204:24 205:13
205:15 206:1,4
206:9,13 209:1
210:15,21
214:19 215:11
217:13 218:1
218:15,22,23
218:23 219:1,1
219:1 221:4,22
235:14,23
238:16,18,19
240:9 241:5
242:24 260:11
260:16,17,18

260:24,25
261:2,3,7 262:5
262:5,18
263:12,13
268:3,13,17
269:16 275:23
275:24,25
283:19 284:11
284:15
**assignment** 191:9
232:23
**assistance** 253:21
**assistants** 31:21
**associated** 56:8
60:1,9 67:6,23
91:8 94:4
125:12 127:13
128:19 134:10
139:1 143:19
148:19 149:6
151:10 155:18
171:3,9 172:16
176:10 177:8
177:11 183:2
191:23 206:1,4
211:15 232:20
237:24 243:20
264:13 265:14
285:2
**ASSOCIATES**
3:3
**assume** 12:6
60:11 86:22
138:18 140:18
144:24 154:21
183:6 230:13
**assumed** 45:2
60:17 67:15
89:2 128:10
144:5 156:16
256:14
**assumes** 45:5
63:22 76:21
88:16,24 89:12
106:7 122:12
141:15 143:18

148:23 184:12
184:14 190:8
193:15 207:4
**assuming** 193:17
196:23 205:23
**assumption** 89:5
89:8 120:1
126:7,20,25
128:15,19,23
143:23 144:10
167:25
**assumptions**
121:13 126:4
126:12 127:13
129:19,23,24
131:2,2,6
132:16 165:11
166:16 170:9
174:22
**assurance** 210:10
210:10
**assurances** 210:7
**ATLANTIC** 5:11
**attached** 1:24 8:4
8:8,10,12,14,16
8:18,21,22 9:6
9:8 120:16
**attachments**
40:13
**attainable** 147:14
**attempt** 63:11
**attempting** 63:6
**attend** 45:24
**attended** 16:22
46:7,10,12
**attorney** 104:16
105:5 291:15
291:22
**ATTORNEYS**
3:10
**attracting** 209:3
**attractive** 50:12
194:23 270:1
**attributable** 8:6
167:23
**audit** 41:19,23

42:18,19
159:12,13,15
159:15,20
160:5,23 161:5
162:1 165:1
167:13 169:9
169:13,16
**audited** 158:21
159:4,25 160:3
160:8,13,22
161:10,13,20
162:6,13 165:9
165:23 166:4,5
168:3,10,16
169:5 281:6,12
**auditing** 161:7
168:7 169:7
**auditor** 158:22
161:2 164:14
167:4
**audits** 167:8
**Austin** 4:17
**authority** 102:25
192:16 290:15
**authorizing**
122:8
**available** 68:17
96:2,8,21
116:13 138:19
139:1,11,13
141:3 144:2,6
144:14 145:20
146:2 147:10
147:17,19
148:13 149:1
202:11 205:6
209:24
**Avenue** 4:11
**average** 123:18
128:8 243:22
**avoid** 198:17
**aware** 68:8 76:13
80:24 100:10
108:8 113:8,13
113:19 120:8
139:22 172:17

216:14 231:12
240:6 249:4,20
250:19 252:25
272:6 280:20

————————

**B**

**B** 9:9
**bachelor** 16:23
16:24 19:6
**bachelor's** 17:3,4
**back** 24:5 26:3
28:20 42:11,13
45:19 53:23
56:22 61:5 81:9
108:1 112:18
112:24 124:22
126:16,22,23
127:1,5,10,12
128:14,14
129:3,20 130:4
130:5 132:1,19
132:22 133:5
133:19 134:5
140:22 141:25
149:14 150:20
151:14 152:24
154:15,19,23
156:5 158:2
166:13 177:20
179:10 195:15
204:21 205:15
221:19,20
248:8 252:10
283:21 285:25
286:19
**background**
16:21 25:16
104:15,24
106:16 243:4
**bad** 204:21
283:12
**BAINES** 184:16
**Bains** 3:9 10:4
66:20,21 67:3
183:15,16
184:3,17 185:5



186:8,13,20
187:21 188:14
189:20 190:9
192:7,11 193:9
193:17,19
194:4,6 196:3
197:2,18,24
198:14 200:5
201:15 205:3
205:22 207:10
208:4,5 212:1,3
213:25 215:7
215:20 216:13
217:13 219:13
**Bakare** 4:4
**balance** 137:23
145:3,17 146:6
146:19 154:25
198:18
**balanced** 198:8
209:1
**ball** 32:5
**banking** 105:3
**bankruptcies**
267:14
**bankruptcy** 1:1
15:4 25:8 26:5
43:21 61:15,19
62:6 95:9 114:7
166:2,5 168:2
186:23 189:1
190:6 195:8,10
195:11 207:25
218:12,13
244:22 255:20
255:25 263:6
265:22,23
266:4,8,15
267:15 270:16
270:21 285:25
**bargained**
118:10
**barrels** 123:17
124:5,15 125:1
125:17 126:15
126:19,25

128:2 129:14
129:18 130:6
130:11
**base** 39:12 47:22
51:3 52:16
75:12 78:14
92:10 94:15
95:1 106:18
109:23 110:24
111:1 114:4
125:7,23
132:25 133:1
167:24 205:10
209:17 221:13
261:8 268:2,18
269:22 274:18
274:22 283:17
287:10
**based** 57:11 59:6
129:15,19
131:6,16
133:10 140:19
142:8,25 143:9
151:5 157:16
160:24 163:13
165:13 166:1
170:18 172:13
193:16 198:22
242:16,22
243:14,23
247:21 257:19
266:2 281:25
**baseline** 166:18
**bases** 109:20
**basic** 55:17,19
200:16 256:25
**basically** 97:22
**basics** 184:25
**basin** 263:11
**basis** 18:15 35:23
53:11 110:22
115:6,7 121:14
125:1,13,23
127:14 128:4,6
129:23 130:11

131:17 133:1
134:2 135:13
137:11 156:24
157:14 158:22
161:20 169:25
171:12 187:5
197:25 202:8
224:2 236:10
242:5,20,25
244:3 255:17
256:21 275:18
**Bates** 7:13
**bbains@l-llp.c...**
3:12
**BEACH** 5:3 6:8
**bear** 71:24
252:20
**Beau** 104:11
**began** 69:12
278:21
**beginning** 8:14
**behalf** 60:5
183:21 185:14
191:4,15
**belief** 54:9
140:21 214:13
**believe** 15:6 21:4
21:12 26:8
28:10,25 29:5
33:4 36:13
40:25 43:6
45:12 46:6,8,9
46:10,11 47:5
47:18 53:16,17
54:2,5 61:13
62:12 68:17
69:18 75:18
78:3 79:13
82:15 89:1
92:24 94:13
100:25 101:3
103:3 105:2,5
112:21 114:20
115:20 122:21
124:12 135:2
136:1 137:8,11

137:18 138:3,4
138:10 152:16
158:8 159:24
162:19,19
163:22 164:2
167:6 168:10
177:10,17,19
182:4 188:23
191:5,17
196:21 200:7
203:8 204:10
206:9,11 207:8
207:19 213:21
213:25 214:1,3
214:11,18
215:14 218:15
221:8 225:18
226:20 235:17
239:17 240:12
241:16 247:10
248:2,4 249:19
254:7 258:20
259:23 260:12
260:16 261:13
261:16 266:22
275:6,19
278:10,21
280:4 281:9
282:18,19
283:24 287:22
**believed** 31:5
273:1
**believes** 231:9
280:10,12
**bell** 259:20
**Ben** 4:21
**Bend** 271:5
272:10 275:8
**beneficial** 47:12
**beneficiaries**
200:20
**beneficiary** 86:4
86:13 184:7
186:2 199:14
233:16,16
**benefit** 91:12

92:7 93:4 130:1
156:20,23
157:12
**Benjamin** 5:12
**Berkeley** 11:14
32:25 33:1
**BERKLEY** 2:12
**best** 53:18 61:20
92:6 252:16
271:11 275:24
287:20
**better** 25:3 39:24
129:1 149:24
172:25 218:8
267:15
**beyond** 33:18
80:18 149:3
209:22 230:8
263:15
**bfoxman@vela...**
4:13
**bid** 63:13 64:25
65:11 66:5,7,22
67:6,15,16,19
67:19 68:15
80:19 83:13
89:16 90:24
91:1,7 94:23
210:20 211:4
212:12,16
213:1,7 214:19
214:22 215:6,8
**bidder** 211:6,8
**biddings** 68:16
**bids** 64:17,20,21
64:22 65:25
66:9,18 68:12
68:14 80:18,24
210:14,17,23
212:22
**Big** 271:5 272:10
275:8
**biggest** 263:3,4
**Bill** 25:19
**billion** 188:16,18
219:6 282:18



**binder** 31:14,17
32:2,8 162:23
**binders** 31:8,13
31:13,23
**bit** 15:19 207:13
210:13 246:10
282:6 284:24
**bkadden@lawl...**
5:15
**bknapp@locke...**
2:21
**black** 104:10,12
104:16 107:18
108:3 265:22
**blacked** 7:7
**blanket** 227:14
**Bloom** 25:22
**board** 19:17 74:4
108:20 122:10
122:13 223:15
257:1
**boarded** 223:7
**boat** 222:17
257:8
**Bodden** 30:7,23
122:3
**BOEM** 8:19 86:9
192:17 233:5
233:11 240:5
**Boland** 2:14
**bond** 87:20
100:24 101:1
183:25 184:4,6
184:7,9,19,19
184:20,21,24
185:1,11,12,13
185:16,18,19
185:22 186:4
186:16 187:8
188:2 189:2,19
190:4,5 191:17
191:24 192:1
192:15,15
198:15 199:13
199:17 233:12
233:15,15,15

233:17,20
**bonded** 189:4
221:3
**bonding** 86:17,20
86:21 87:10
88:5,8 179:16
180:3,7,10,13
180:15,21,25
181:3,13,21,24
182:3,9 188:13
191:6,7
**bonds** 55:23 56:1
56:2 61:22
62:18,23 84:10
84:14 85:3,3,22
86:4,10,13,14
87:2,6,8 88:13
88:15,18,19
89:3,10,14,21
90:3 148:2
183:21 188:15
188:17,20,21
189:1,7,13,16
189:22 190:11
190:18,22
191:1,3,10,13
191:14,19
192:12,14,19
192:23 193:6,8
193:10,20,22
193:23 195:4,6
196:5,6,13
197:12 198:21
198:24 199:5,8
199:20 200:14
200:19 201:1,6
232:19,24
233:4,5,18,21
233:24 234:3
**bonus** 219:8
**booked** 171:25
172:20 173:19
**booking** 163:3,4
163:5,7,8 164:1
164:5 174:1
**borrower** 95:21

98:9,13,16
153:20 155:2
**borrowers**
249:14
**bottom** 72:14
**bottoms-up**
125:4,24 126:1
126:3,12 153:3
**bound** 13:18
**Box** 3:10 4:21
**BP** 4:2 65:4
252:13 277:2
**Brad** 2:17 235:4
235:9
**Bradley** 4:10
**brand** 191:3
**Brandon** 3:9
29:19 36:9
66:21 132:13
183:16 197:19
**Brazos** 4:16
**break** 12:21,25
42:3 81:6,8
212:16 220:6
220:12,22
**breaks** 12:22
13:1
**Brent** 117:17
**Bret** 46:9 117:20
**bridge** 141:9
**briefly** 238:5
240:10
**Briggs** 178:2
**bring** 49:16
128:1 130:4
166:13 221:18
223:19 224:16
**bringing** 128:14
129:3,20
133:19 134:5
267:14
**Britches** 36:15
**broad** 17:11,13
18:1 20:4 23:10
31:4 51:14 79:2
121:11 238:20

**broader** 259:9
**broadly** 284:10
**brought** 82:7
126:16 127:1,5
127:10,12
130:5 133:5
221:20
**Brown** 9:13
14:13
**brush** 283:7
**Brysch** 122:4
**BSEE** 176:24
177:3,6,20
178:10,13,17
178:23 240:5
279:19 282:23
283:2,2,9,11,13
283:21 284:4
285:12
**bucket** 72:21
79:7,12 88:10
88:11 168:8,9
190:23 231:14
231:14,24
232:1
**buckets** 79:10
197:7 221:4
226:7
**bucks** 202:19
**budget** 172:21
242:11,16
273:11 279:21
285:5,23
**budgeting** 243:21
244:9
**budgets** 224:6
**building** 249:10
**buildup** 125:4
153:3
**bump** 128:17
**business** 17:4
22:6,18 23:16
33:23 36:10,12
38:1,2,9 45:16
45:17 46:17
51:16 53:1 62:3

64:8 76:5 80:23
91:14,21 110:6
116:24 117:1,8
117:22 118:5
119:4 121:12
139:6 156:3
168:1 174:2
194:21 198:10
208:14,25
209:2,9,15,16
209:16 210:5
210:11 211:16
217:18 218:10
218:14 240:22
249:12,15
253:5,20,20
263:17 268:11
268:20,21,23
269:2,5,22,25
270:2 271:1
274:25 275:17
275:21,21
287:4,6,7
**business-focused**
19:7
**businesses**
194:20
**businesspeople**
36:1
**businessperson**
35:16,19,21
**buyer** 258:24
**buyers** 261:24

**C**

**C** 2:17
**calculation**
157:15
**calculus** 211:18
**call** 15:3 90:13
121:5 135:17
233:17,17
245:9,21
246:25 248:15
**called** 97:19
185:22



**calling** 49:1
132:1 185:4
199:24 201:9
**calls** 36:20 38:19
39:5 56:12
57:16 87:4
97:18,22
178:15 184:2
186:10 193:3
213:24 215:2
215:17 238:1
**candidate** 105:21
109:16 110:5
252:21
**candidates**
105:14,21
108:18,23
109:8 252:24
**capabilities**
67:22 80:10
**capability** 210:11
**capable** 138:20
191:18 194:12
209:2 244:7
247:22
**capacity** 24:16
87:14 105:8
111:8 182:5
255:24 267:2
**CapEx** 128:17
**capital** 49:16
50:15 51:5,12
51:25 115:15
127:21,24
128:1,5,11
129:6,20,25
130:9 131:5
132:19 134:4,7
134:9,12
138:21 139:9
139:12 141:3
144:5 145:19
145:21 146:1
149:1,3 155:22
155:23,25
156:13 157:15

171:20 194:20
194:21 198:8
209:3,5,10,24
209:24,25
210:2,3,6
218:24 224:1
242:10,11,20
243:18,18
244:3 248:21
249:21,22
250:21 264:8
268:8,22
269:24 270:4
271:2 286:22
287:1,3
**capitalization**
145:15 148:5,9
148:19
**capitalize** 84:25
**Capitalized**
136:16
**captioned** 25:7
**car** 243:7
**career** 109:21
253:19
**carol** 41:13
**carry** 83:4 199:5
200:21,23
**carrying** 225:19
**case** 1:4 11:13
26:5 32:14
144:4 197:1
223:16 244:22
281:17
**cases** 43:6,18
126:21 176:5
177:13 189:17
226:3 231:18
235:22 283:1
283:14,15
**cash** 55:21 99:16
99:18 116:3
138:19 139:10
139:11,24
143:11,13
144:2,10 145:3

145:9,15,25
146:1,5,19,24
147:11,12
148:1,9 151:20
156:11 183:7
209:10 270:1
271:3 274:19
286:23 287:2
**cash-related**
155:24
**CASUALTY** 3:7
**catch** 7:5 30:11
**categories** 18:1
23:10 79:14
129:11 163:10
163:13 166:7
**category** 163:23
176:6,7,9,13
206:12,16,24
229:3 267:6
**Category/New...**
8:11
**causal** 207:4,4
**cause** 1:17 184:6
**caused** 221:12,17
**causing** 179:24
**Center** 4:11
**centered** 209:7
**Central** 42:7,8
**CEO** 23:15,20,23
24:14 41:13
76:5 186:15
200:7 215:22
216:16 219:11
252:22
**certain** 8:6 32:12
41:2 43:7 49:15
49:15 54:4
66:11 74:12
76:14 95:1 96:8
110:19 115:12
126:15 128:14
130:8 138:6
150:14 153:16
161:25 162:9
163:11 166:7

167:6 168:23
176:24 181:3
184:5 189:14
226:14 228:5
231:18 235:22
236:11 250:8
**certainly** 75:8
81:1 112:5
141:21 184:21
204:1 247:5,6
268:2 271:18
**Certificate** 10:8
291:4
**Certified** 1:19
291:10
**certify** 291:11,14
**cetera** 28:5
194:14 239:4
**CFO** 20:8,15
21:21,24 22:2
84:6 87:10
185:5 186:14
188:22 200:6
218:1 273:11
**chain** 229:5
231:11 270:9
270:12
**challenge** 12:23
267:14
**challenged** 80:4
80:12
**challenges** 79:19
109:19 244:2
263:3,4,10,11
263:14,18
265:1,24
267:24
**challenging**
262:3 263:22
283:6,16
**change** 84:20
123:4 155:22
155:23 156:12
161:7 199:14
201:2,5 247:12
289:2

**changed** 259:5
**changes** 244:25
245:2 246:22
250:9,9,13
264:13 287:6,8
287:15 289:1
**changing** 42:5
287:10
**Chapter** 1:3
43:21 44:6 64:3
74:7 79:22
194:16
**characteristics**
203:6
**characterization**
189:11
**characterize** 50:2
154:12
**charge** 64:12
87:16 158:10
**charges** 156:19
**chart** 25:24
92:25
**chat** 70:3 245:4
245:12
**check** 13:25
124:23
**checklist** 258:17
**chemical** 17:19
17:22
**Cheung** 3:3
**Chevron** 3:18
228:10 239:20
277:2
**Chicago** 6:13
**chicken** 197:22
**chief** 21:18 25:20
84:9
**Chiesa** 2:13
11:11
**Choi** 2:7 70:18
**choice** 184:14
197:8,8,25
**chokes** 258:3
**choose** 218:21
233:18



MAGNA
LEGAL SERVICES

**circumstance**
185:15
**circumstances**
174:20 230:22
**cites** 281:22
**Civil** 1:23
**claim** 186:25
**claims** 85:19
217:20
**clarify** 164:17
169:20 242:9
**clarifying** 20:21
48:4
**clarity** 265:16
**CLARK** 4:16
**Clay** 36:14
**clean** 89:17
250:24
**clear** 47:23 96:20
185:21 229:12
255:2 281:20
**clearly** 128:11
160:8 182:24
198:20 217:21
**client** 32:16,18
32:22 221:2
**clients** 11:12
**clock** 236:19
**closely** 242:4
**cloud** 70:20
**CO-COUNSEL**
5:16
**Co-Owned** 7:9
**co-working**
68:21 69:1
263:18 270:14
276:23
**Code** 43:21 195:8
195:12 218:13
**coded** 140:6
**cognizant** 198:5
**collaboration**
173:21
**Columbia** 5:24
**column** 132:20
**come** 16:17 42:19

105:16 126:22
126:23 131:10
140:5 152:7
157:14 179:10
180:2,9 279:20
**comes** 139:1
263:5
**comfort** 161:3
**coming** 79:22
215:10,15
238:6 270:16
270:21
**commenced** 64:2
64:11
**commensurate**
114:1 153:7,9
**comment** 13:25
**commented**
152:19,20
**comments** 32:20
32:21 46:24
179:2
**commerce** 16:23
16:25 19:6
**commercial**
187:11
**Commission**
290:23
**committee** 5:16
22:24 23:9,19
23:24
**commodity**
167:16 263:16
264:14
**common** 189:18
189:19 249:13
**communicate**
111:3 259:11
**communicated**
239:7,25 253:8
**communicates**
111:4
**communication**
35:7 62:4 94:5
**communications**
34:22 35:4,10

38:16 39:2,17
40:5 62:17 94:2
112:2,4 177:2,6
**companies** 46:21
62:20 105:7
179:15,19,21
179:23 194:7
268:16 269:16
277:14
**company** 3:7,7,8
3:8,13 5:2 6:2,6
6:11 22:5,12
44:23,24 45:7
47:9 64:5,9,15
64:21,22 66:9
66:12 68:10,11
74:10 83:13,15
84:4,6,8 114:2
122:16 148:16
160:10 164:10
165:3 167:24
172:20 173:1,4
173:6,9,11,12
173:13,14,16
173:19,19
175:12 176:24
182:16,19,20
184:10 185:6
186:15,16,23
187:1 191:25
193:24 194:11
194:12,15
195:9 197:9,11
197:13 198:4,6
198:25 199:2
199:11 200:6,7
214:7 215:23
216:16 218:23
228:4 234:1
246:6 249:11
253:14 254:14
254:18,24
256:11 258:13
265:15,25
266:8,15,17,20
267:7,15,22,25

268:5 269:3,8
269:10,12,17
271:10 274:17
275:1,2,3,6,10
275:11,12,13
275:24 276:7
277:8,12
279:25 282:17
286:1,8
**company's** 44:18
62:14 64:7 76:5
87:20 122:13
123:18 161:1
169:19,23
254:10,12
261:2 275:17
275:19
**comparable**
283:14
**compared** 124:6
**comparing** 286:7
**Compel** 65:4
**compensation**
101:22 113:16
113:20,21
114:3 219:9
**compiling** 158:21
**complaints**
262:25
**complete** 133:11
181:25 224:9
**completed** 269:4
277:22
**completely**
191:14
**completing** 223:6
**complex** 36:23
109:19,20
110:24 111:10
261:18 264:5
**complexities**
263:14
**complexity** 203:4
261:23
**compliance**
159:17 223:21

224:17 257:16
**comply** 16:1
**component** 39:10
133:21
**comprehensive**
74:21 75:3 80:6
80:13 162:1
217:4 259:9
**comprise** 74:18
75:11 76:15
110:2,3 123:21
125:6 131:11
148:3 204:16
206:15 209:18
217:5 218:25
239:19 253:7
261:7 269:22
283:3,5
**comprised** 75:10
206:17 225:25
237:18,20,22
262:16 268:6
277:22
**comprises** 52:16
91:24 170:11
222:3 262:10
268:19
**compromise**
255:15 257:13
**compromising**
258:2
**computerized**
1:21
**con** 243:18
**conceived** 54:3
**concentrate**
269:20
**concept** 50:7
51:9 53:13 54:1
85:22 94:17,22
97:6,8 102:22
156:15 178:9
187:23
**concepts** 94:25
118:1 133:14
133:18 187:12



223:13
conceptual 49:24
  50:5,17,20
conceptually
  51:1 98:17
concern 41:20
  42:18,23 50:16
  182:17,25
  207:18
concerned
  179:22 273:3
concerning 220:1
  258:24
concerns 67:24
  68:12 79:24
  255:16 261:24
  265:9
concise 240:4
conclude 182:6
concluded
  288:10
conclusion 56:12
  56:15 73:9 87:4
  97:23 184:2
  185:4 186:10
  199:25
conclusions
  56:14 186:14
  189:14 286:10
concurrent 85:24
condition 42:17
  42:18,20 47:15
  55:15 60:16
  224:10
conditioned
  274:13
conditions 41:21
  44:23 96:8,12
  96:20 258:25
  261:21
conduct 91:2
  139:7,12,25
  147:11 159:12
  171:8 202:11
  206:3 236:11
  275:22

conducted 49:6
  93:25 139:23
  158:3 165:2
  208:14 226:1
  236:8 241:1
  275:5 279:25
conducting
  158:20 172:1
  222:14 236:20
  279:25
confidence 67:13
  182:2
confident 180:12
  180:20 181:23
  192:3
confidential
  13:12,13,24
  14:5 15:7,24,24
confidentiality
  15:4 181:10
confirm 27:16,23
  235:22
confirmation
  14:18 37:19
  82:23 83:5
  84:15 85:1
  86:18 88:14,20
  89:10,22
  101:25 180:4
  180:11,14
  181:1,14
  182:10,25
  199:22 219:10
  227:25 229:18
  254:11,16,23
confirmed 83:21
  199:23
confused 65:24
conjunction
  37:15
connection 30:1
  30:18,25 31:9
  32:3 33:16 34:1
  34:5,9,12,16,20
  35:12 36:6 37:8
  39:16,21,25

40:1,3,19 43:14
  46:25 54:13
  59:10 60:25
  61:2 62:5,18
  65:3 73:4 74:2
  79:15 81:18
  92:15 93:3
  94:12 99:9,20
  100:8 107:14
  118:10 122:9
  140:20 162:24
  167:8 174:23
  180:4 190:22
  234:16,21
consensual 59:24
  206:6 228:4,9
  228:13 229:4
  229:18 256:13
consent 15:25
  66:13 74:25
  95:2 118:16
  119:7,20
  190:12 191:1
  211:3 233:19
  250:7
consider 20:9
  47:12 51:12
  52:11,13,15
  184:9,20,21,22
  218:6
considerable
  59:25
consideration
  109:1 211:21
  227:1 253:10
considerations
  43:18 52:5,21
  68:13 78:13
  113:8 211:17
  213:8 257:14
considered 108:4
  109:7 147:5
  178:18 227:9
  270:19
considering
  139:8

considers 184:13
consist 110:21
consistent 89:13
  89:15 109:23
  138:5 163:5,5
  215:25 244:9
  248:2 259:17
  267:21
consists 160:19
consolidated
  240:7
constrained
  174:3
construct 139:5
  139:20,24
construction
  17:23 133:9
construed 186:24
consult 25:23
  37:13 74:1
  92:25 111:9
  273:17 278:25
consultancy
  107:4 110:14
  110:16 111:2,6
consultants 18:6
consulted 43:9
  108:18 137:22
  251:1,4,8
consulting 19:17
  20:12 21:7
  107:2,9 110:20
cont 8:1 9:1
contact 35:17
  36:10 117:14
contacts 36:13
contain 255:11
contained 82:1
  99:13 115:11
  118:24 258:25
contains 102:11
  176:9 179:1
  206:12
contemplate
  128:5 130:8
  144:20 190:10

190:14,17
  191:9 193:6,10
  215:5 232:22
  270:24 280:22
contemplated
  38:10 52:18,24
  53:1 97:15,15
  98:1 113:23
  125:5,6 127:12
  141:5 144:11
  144:13 147:24
  156:1,11
  209:20 217:18
  234:22 239:13
  239:21 242:3
  261:1,4 274:9
contemplates
  74:17 99:5
  144:15 198:7
  218:4 231:19
  242:12 257:10
content 68:12
context 47:20
  60:14 187:19
  218:6 233:8
  259:9
contingent
  163:11,19
  236:11
continue 136:19
  147:25 220:22
  224:24
continued 3:1 4:1
  5:1 6:1 43:17
  273:3
continuous 271:9
contract 186:25
contracting
  264:2
contracts 24:1
contribute
  129:12 130:8
contributed
  169:8
contributing
  130:13



**contribution**
126:10 127:17
128:10 130:1
142:19 153:4
**contributions**
142:2,3,4,12
242:21
**control** 26:14
116:3 228:25
263:15
**controversial**
200:13
**convenient** 42:4
**conventional**
191:22
**conventionally**
185:8 275:3
**conversation**
39:22 44:15
59:16 60:4 63:3
73:5,7 78:10
79:17 94:14
210:18
**conversations**
32:17 34:19
36:17 38:16,21
39:8,20,23 41:1
41:5 43:24
45:14,15 46:20
47:6,7 48:10
50:2,8 53:8,16
58:21 59:18
60:12,13,22
61:9,12,13,18
61:24 62:3,13
62:23,24 73:12
74:3,15 83:23
84:3 88:3,7
92:22 99:12
108:9 112:1,3
113:13,16,23
180:19,22,24
181:2,5,10,20
215:25 216:3
234:2,5 241:24
249:20,24

250:20
**conveyed** 120:5
**cooking** 216:7
219:15
**coordinates**
161:12
**coordinating**
229:16
**coordination**
36:25 37:3
**copy** 71:1,2
152:16 239:15
**core** 266:12
**Corp** 107:11
**corporate** 6:17
27:17 28:1,11
158:13,25
159:2 161:23
170:11 171:2
171:12
**corporation** 2:22
7:12 34:12,16
98:16
**correct** 17:24
18:25 23:1 24:1
25:13 27:8,19
27:25 28:10,15
35:3 37:10 54:7
54:16 55:21,24
56:1,4,5 64:17
71:22,23 73:17
73:23,25 89:3,4
91:10 98:13
104:1 115:4
123:23 124:15
124:18 129:4,5
136:1,11 137:8
138:24 145:11
150:3,17,24
151:9,12,21
152:12,13
153:24 154:1
154:12,24
157:4 167:12
182:14 183:9
183:22 185:11

185:16 190:16
199:6,18,23
203:14 215:23
216:4 221:10
221:21 222:2
228:17 235:16
235:20 236:2,6
238:3 242:13
242:18 243:16
244:22,25
247:2,12
248:17,20
251:3 252:22
255:4,5,25
256:1 258:14
259:15,21
260:1 264:6,14
264:15 265:10
266:9 269:20
271:6 274:7
277:3,7 278:17
290:8 291:13
**correction** 32:25
178:7
**correctly** 64:19
141:18 162:12
**correspondence**
80:20 177:20
**cost** 138:6 152:8
204:5 223:18
224:16,19
225:19 237:3
272:17,20,22
272:22,24
273:20,22
274:2
**costs** 60:9 170:5
202:16 225:23
226:4 272:19
274:6 279:9
282:7,9,24
283:25 284:4
284:14 285:1,7
**counsel** 6:17 11:2
22:23 28:1,9
29:11,21,22

30:6 31:18,20
33:25,25 38:13
43:8,9 46:9
53:18,19 57:12
57:17 58:21
59:7 69:19
85:17 86:6
104:17 117:11
117:11 122:21
183:17 184:18
186:11,22
189:15 200:2
247:24 250:6,8
250:11,11
291:15,18
**COUNSELORS**
3:10
**count** 232:22
**countered** 259:15
259:22,24
**counteroffer**
259:16
**counteroffers**
259:24
**counterparts**
39:8 194:19
**counterparty**
67:23 73:6 80:3
80:8 117:7
211:13,16,17
**counterproposal**
214:15,17
**counterpropos...**
213:12
**counters** 259:23
**countries** 109:22
**COUNTY** 291:2
**couple** 28:4
41:24 178:3
183:19 212:21
215:21 220:13
223:12 260:3
283:24 284:3
**course** 18:16
33:22 53:1
80:23 105:18

156:2,18
209:21 238:20
240:16,19
261:19 275:17
**court** 1:1 2:9
10:8 11:1,2
12:15 13:14
24:6 25:8 42:9
42:11 45:22
57:3 58:14 61:4
61:6 62:7,10
81:12 112:16
112:18 132:2
141:21 156:6
157:25 158:2
179:11 195:17
195:23 243:5
252:8,10
**courtesy** 13:9
288:1
**covenant** 218:17
**cover** 195:4
237:16 244:15
246:20
**covered** 40:20,22
244:15 252:19
**covers** 60:2
233:12
**Covid-induced**
287:8
**CPN** 271:5 272:8
**Craig** 4:3 65:15
251:25 252:13
**create** 82:11
**created** 33:7,8,11
97:19 239:13
**creation** 53:4
82:12 121:3,8
121:16,21
137:22 143:6
**credit** 41:3,18
43:10 56:3 58:7
61:2,2,10,13
63:12 80:19
83:13 89:16
90:24 91:1,7



MAGNA
LEGAL SERVICES

94:23 153:12
159:18 160:7
162:2,8 164:11
179:14 214:19
214:22 215:6,8
247:1 248:15
248:21 249:9
**credited** 89:9
218:25
**creditor** 120:2
**creditors** 5:6
119:22
**Crescent** 2:9
**cross-functional**
173:21
**cross-section**
121:11
**Crow** 4:11
**CSR** 292:6,6
**culminated** 98:20
**cumulative**
245:21 262:12
**Cupid** 46:9
117:17,20,23
**cure** 153:16
154:4 155:5,11
225:15 248:4
248:10
**curious** 187:12
285:13
**current** 21:15
22:1 25:18 40:9
45:15 46:25
47:5 83:15 86:9
87:9 88:3 90:14
101:1 104:12
105:7 110:16
123:18,21
124:13 128:7
129:10,13,18
143:8 156:24
171:7 182:1
200:10 201:5
209:10 237:23
253:22 266:6
266:14

**currently** 16:19
53:12 55:17,20
72:20 85:7
104:19 106:24
126:15,20
127:1,9 181:12
199:19 217:5
224:6 226:12
227:17 232:24
234:4 268:18
275:1 284:11
**curve** 242:22
243:10
**custody** 228:25
**customarily** 87:6
157:6 161:15
**customary**
188:12
**customer** 269:15
**cut** 66:21 273:25
**cycle** 170:21

---

**D**

**D** 5:17 246:2,2,15
**D.C** 4:22
**daily** 125:21
128:8,15,20
129:2,7,9,17
134:2
**Dallas** 2:10 4:12
**damage** 133:4
134:11,15
**damaged** 133:15
133:20 134:6
**Dane** 1:10,14 2:2
7:6 10:3 11:6,9
11:18 14:8
15:10 16:18
22:20 24:11
26:14,19 27:5
27:20 28:14,15
28:20,23 30:15
33:3 43:4 48:7
56:13 66:24
70:12 71:17,22
81:14 89:2 90:6

90:18 95:7
102:22 112:19
114:6 119:13
120:12 124:13
134:17 135:5
135:11 150:2
150:20 155:21
179:13 183:11
183:12,16
185:5 192:8
196:3 197:24
220:20 221:8
230:20 235:9
244:17 245:16
247:2 251:14
252:12 290:11
290:16 291:6
**Danes** 220:11
**Darren** 2:13
11:10 13:7 42:1
66:20 251:21
**data** 15:11,14
18:14 24:22,25
31:15,19,23
90:7 99:3,8
134:19 166:18
176:12 281:18
**database** 16:7,12
101:7 176:2,8
**date** 29:4 67:17
72:13,14 83:25
110:12 156:15
156:17,19,21
156:22 166:12
174:21 177:21
225:25 226:24
229:10 242:1
249:7 254:11
254:16,17,19
254:24 259:5
**dated** 77:10
286:6
**dates** 175:13
**David** 104:10
**DAVIS** 5:23
**day** 1:17 12:21

18:3,3 33:22
123:17 124:2,6
124:15,17
125:2,17
126:15,19,25
128:3 129:14
129:18 130:6
130:11 240:17
252:14 282:10
290:16 292:2
**day-to-day** 22:2
22:8 110:22
114:22,24
133:1 275:18
**days** 29:6 33:23
157:3 280:16
**DC** 5:24
**de-com** 273:20
278:23
**deal** 20:3 35:12
35:14 118:4
195:8
**dealing** 87:16
109:19 209:4
**deals** 161:23
**dealt** 117:15
**Dear** 7:5,9 71:4
71:21
**debates** 172:14
**debt** 115:9,11
187:9 194:14
210:1
**debtor** 1:9,13 2:2
7:3 13:20 25:11
27:2 98:8 194:8
**debtor's** 251:9
**debtors** 1:5
106:24 107:1
204:20 233:22
**debts** 187:23
**decades** 265:7
**December** 8:7
127:23 128:8
130:3,12,21
137:3 138:22
144:9 155:19

**decision** 73:18
108:13 112:20
112:23 113:3,9
**decision-making**
169:2 213:10
**decisions** 114:8
198:10
**Deck** 25:21
**declarations**
282:10
**declare** 290:7
**declaring** 207:25
**decline** 275:20
**declining** 275:13
275:15
**decommission**
203:3,23
228:25 231:25
**decommissioned**
141:12 149:17
202:23 273:23
280:3,6 283:2
**decommissioni...**
7:11 23:7 29:20
38:23,24 39:3
39:10 46:22
49:17 51:6
54:15,19,21,25
55:15 56:8,10
56:19 57:14,21
57:23 58:12,23
59:13,19 60:2,6
60:17 61:3,22
62:19,21 63:1
84:11,15,19,24
85:23 114:13
115:10 116:7
119:5 132:9,12
132:14,18
142:5,7,20
143:19,24
145:4,16
147:16,23
148:20 149:5
153:18 154:1
155:6 183:2,5,7



204:7 229:22
229:25 230:5
232:9,19 233:5
236:5,8,20
241:5,7,9
248:11,11
274:6 279:1,9
282:7,9,19,25
284:18 285:2
**decreased** 175:4
175:11
**dedicated** 274:9
**deemed** 63:12
67:7,9 258:18
**deep** 272:22
**deepwater** 51:3,5
63:7,17,19,24
64:7 68:22 69:2
167:11,14
168:9,17,25
169:3 203:13
203:16,19,22
204:6,7 210:15
210:21 261:2,8
263:13,13
269:2,4,5,7,9
269:20,23
270:6,7,11
272:13,16,20
273:22 274:2
277:17 279:4
279:24 280:2,5
**default** 42:24
44:18 58:1 60:8
218:17 230:24
232:14
**defaults** 58:3
184:6
**defensible** 243:18
**defer** 28:9 69:19
85:17 86:5
184:18 186:11
189:14 217:19
**deficiencies** 68:2
68:7,9
**deficient** 66:18

67:7,9
**define** 211:25
256:24,25
**defined** 91:2
180:17
**defines** 90:25
**defining** 182:18
211:22
**definition** 163:22
184:19 264:10
**definitive** 75:6
**degree** 16:23
17:4,5 19:6,8
122:25 123:6
**delayed** 287:1
**deliberations**
108:5
**delineation**
169:11
**deliver** 162:1
**delivered** 158:8
**delivering** 244:7
**Demonbreun**
3:15
**department** 4:19
4:21 88:4
117:10,12,14
117:16 132:9
132:11 170:11
170:18 175:19
175:20
**departments**
22:8 24:15
170:12 171:5,6
171:11 173:24
175:18
**departs** 236:16
**depended** 203:1
**dependent**
147:13
**depending** 66:14
161:16 204:9
229:8
**depends** 185:12
202:25 203:4,4
263:23 279:12

285:17
**depicts** 262:17
**deposed** 11:18
**deposited** 155:17
**depositing**
143:14 154:9
**deposition** 1:8,13
7:3 11:15,18
12:2 13:16,21
24:25 25:11
26:4 27:2 29:8
30:2,25 31:10
32:3 33:17,20
34:2,6,9,13,17
34:21,24 35:5
39:16,22 40:4
40:10,20 87:22
92:16,22 121:7
135:15 162:18
162:25 252:17
273:7 280:19
288:2 291:5,20
**depositions** 13:10
**describe** 17:9
18:22 19:5
22:14 31:2
36:16 38:6,15
46:24 47:25
48:24 59:17
63:6 69:14 72:1
72:4 77:22
78:25 87:13
90:20 97:11
101:14 103:6
103:16 159:9
163:2 170:8
176:21
**described** 23:10
37:4,16 78:11
82:19 86:7,15
89:14 102:25
103:1 112:8
149:11,11
153:14,15
155:9 161:18
178:17 183:4

224:10 247:23
262:9
**describes** 37:23
101:20
**describing** 36:8
226:8 277:21
**description** 7:2
8:2 9:2 12:14
48:16 95:17
**designated** 28:8
**designed** 37:2
**designee** 27:17
27:24 28:14,16
**desire** 74:12
166:13 201:1
234:1 277:12
277:14
**desired** 73:9
176:25 217:10
**desires** 201:7
216:15 268:24
**desk** 218:14
**despite** 105:19
**detail** 8:9 48:25
243:11
**detailed** 125:24
138:2
**deteriorated**
286:18
**determination**
75:15 108:19
125:8 126:6
166:12 221:19
255:16 257:19
281:24
**determinations**
163:18
**determine** 131:4
251:6 253:6
**determined**
53:20 95:4 99:2
110:4 133:6
213:18 226:15
226:16 227:9
244:5 259:1
**determining**

103:22 268:7
**deterministic**
283:5
**develop** 174:6,11
**developed** 98:19
152:11 174:13
255:11
**development**
76:5 115:22
**DeWolfe** 29:19
29:23 36:9
38:17 39:2,23
40:4,5 132:13
152:11
**dgrzyb@csgla...**
2:15
**dialogue** 43:18
49:24 53:6,18
73:17 76:25
105:14,18
247:21
**dictated** 202:10
**difference** 128:6
148:7 169:18
169:21 172:3
215:8,11,12
218:20 268:13
**differences**
171:23 174:1
209:17 261:8
**different** 24:15
53:9 57:25
94:25 106:19
109:22 136:18
163:10 172:11
172:14 175:18
178:9 197:7
208:22 209:13
209:16 211:4
214:6,22
223:13 225:11
230:22 231:20
233:2 237:8
239:10,18
243:17 248:16
264:4 267:1



268:1,4,10,18
268:20 269:11
270:19 283:3
286:14,21
**differentials**
170:5,17,19
**difficult** 246:11
263:18 265:4
**diligence** 94:16
259:2
**dinner** 197:20
216:7 252:7
288:8
**direct** 25:17,19
25:23 82:5 83:8
97:5 152:25
153:2 161:21
**directionally**
150:17
**directly** 18:5
28:22 37:7
120:5 124:25
150:12 161:24
**director** 25:20
30:7 113:7,10
113:14
**directors** 113:4
122:10,14
**disagreements**
172:18
**disasters** 222:9
**disciplined** 209:8
269:24 271:1
**Disclosure** 7:16
7:20 9:11 95:11
101:9 103:3
120:14,22
122:23 149:12
153:14 155:9
162:16 217:21
225:19 242:11
284:14,17
286:4,6
**disconnect**
198:16
**discovery** 9:7

149:9
**discuss** 39:17,23
48:12 49:10
74:5
**discussed** 37:11
40:7 44:8,14,19
47:10 48:1,20
49:1,12 51:9,9
59:23 66:10
68:11 72:17
73:11 75:11
76:3 78:13,16
79:6 80:21 81:1
82:2 99:22
107:14 109:9
109:10 112:6
148:11 152:14
161:24 230:25
231:2,2 234:1
250:24 260:4
280:18
**discusses** 120:23
**discussing** 39:14
44:15 51:2
69:12 77:25
152:23 228:13
**discussion** 25:5
26:12,15 43:11
48:17 50:17
53:9 59:12 88:9
105:20 132:6
179:4 190:21
212:22 244:5
247:17
**discussions** 33:24
41:8,10,12,14
48:8 50:2,20
51:4 57:11,16
61:11 62:20
68:10 74:14
75:19,25 82:18
84:7 94:10
113:11,12,21
116:24 117:1
227:12 233:23
248:25

**disposal** 237:6
**dispute** 280:8
**disputes** 273:5
**disruption** 133:3
**distinction** 98:11
124:4
**distributed** 14:5
**District** 1:1 5:24
25:9
**DIVISION** 1:2
**divisions** 106:19
**divisive** 53:14,17
53:20,24 54:1
197:5 231:18
**divisively** 233:25
**divulge** 57:16
**docket** 228:12
245:19
**document** 7:20
7:23 8:14 25:4
25:7 26:7,9,14
27:11,13 32:1,4
32:4,11,23
40:15 59:3 70:3
70:9 72:2 77:7
77:21 78:23
81:25 90:15,17
90:22 95:9,13
95:15,17 96:15
96:19 97:5
100:22 101:10
116:11,17,18
116:18 117:4
118:2,7,11,12
118:15,19,23
118:24 119:11
119:14,18
120:17,20,21
135:4,7,10,12
137:5,9 176:19
176:22,23,23
177:25 178:23
239:5,6 240:2
245:25 246:11
248:19
**documentation**

37:23 75:6
111:16 248:24
**documented** 75:6
**documents** 13:23
15:23,25 30:24
31:2,4,24,25
32:12 33:8,11
33:15 37:16
70:14 76:11
81:22,24 82:1
149:13 239:16
247:16 249:9
249:10 250:9
250:10
**dog** 246:15
**doing** 12:1 16:3
71:9,10 111:12
135:15 196:17
208:6 267:15
268:15
**dollar** 285:18,22
**dollars** 133:22
198:8 212:9
222:18 225:22
226:4 270:3
282:18
**Doug** 25:20
**draft** 90:13
**drafted** 72:20
**drain** 258:7
**draw** 56:7 57:15
57:20,23 58:2,4
58:7,11,24
145:3,8,12
146:23 154:11
155:10,11
248:10
**draw-out** 248:3
**drawing** 142:11
143:24 153:12
184:6
**drawn** 146:5,19
155:16 215:20
**drill** 270:22
272:17 274:13
275:7

**drilled** 174:18
269:1,4,9,13
270:8,11,14
272:24 273:12
276:22,24
277:18
**drilling** 174:20
268:12 270:23
272:20 274:24
**Drive** 2:14
**drivers** 170:6
**dry** 6:3 202:18
272:20,22
273:1
**dual** 64:6
**due** 44:21 157:7
157:13 209:17
221:10 222:16
268:21 286:25
287:5,6,9
**Duewall** 4:3 10:6
252:1,4,12,13
263:20 267:12
267:20 273:10
273:19 276:5
276:15 277:16
288:4
**duewall@gt.com**
4:7
**duly** 1:16 11:7
291:20
**duties** 23:22
24:14
**Dynamic** 19:14

**E**

**E** 5:3 6:7 30:8,11
30:13,14
106:20 109:25
246:2
**e-mail** 2:6,11,15
2:21,25,25 3:6
3:12,17,23 4:7
4:13,18,23 5:5
5:10,15,20,25
6:5,10,14 7:5



8:19 28:17 34:8
34:15 70:12,16
70:22,25 71:17
71:21 72:5,17
77:4 78:21
81:20
**e-mailing** 81:17
**e-mails** 81:21,23
**earlier** 75:24
82:16 116:4
148:1 189:20
193:21 199:4,8
201:20 210:14
221:8 237:12
242:9 244:20
250:25 258:12
274:4,8 279:3
280:18
**earliest** 225:25
**early** 45:13 158:7
225:24 265:5
**earmarked** 224:1
224:12,12,18
225:5
**easier** 16:8 77:5
263:21 266:16
**East** 178:1
**eating** 197:19
**Echoing** 243:3
**economic** 91:2
165:8,12 170:6
221:14,15
**edits** 247:20
**educational**
16:21 18:25
**effect** 51:19
155:24 239:11
240:8 259:5
**effective** 67:17
83:24 156:15
229:10 242:1
249:7 254:17
254:18,24
259:5
**effectively** 23:13
23:22

**effectuate** 53:19
**efficient** 160:22
161:2
**effort** 63:19,24
64:1,2,6,13,15
93:23
**efforts** 87:18
110:24 241:2
247:21
**egress** 224:14,20
**eight** 273:23
274:2 279:6,18
**eight-page** 27:7
**Eiland** 30:7,20
**Eisenberg** 2:18
**either** 13:17
50:21 70:2
131:13 165:15
165:15 219:16
220:14 245:4
257:8 259:22
262:7 281:25
**elaborate** 267:8
**elections** 94:20
**electronic** 31:13
31:15
**elements** 181:3
181:21 242:5
**ELKINS** 4:10
**Elliot** 6:3 219:19
221:1
**embodies** 118:16
118:20
**embodiment**
118:9
**emergence**
207:19 249:7
**emergent** 131:3
**employed** 18:5
19:15 91:16
104:19 106:24
291:15,18
**employee** 104:12
104:21 106:18
106:25 107:1
112:6 291:18

**employees** 83:16
121:12 123:10
201:4 265:18
**ended** 108:22
168:11
**energy** 1:4,9,14
3:19 7:4,9,12
7:22 8:5 16:20
19:16 25:12
26:6 27:3
183:18,22
199:17,19,21
199:25 200:8,9
209:5,14 251:9
**Energy's** 199:16
**energy-focused**
20:14
**engage** 20:19
53:14 256:4
283:23
**engaged** 20:22
46:16 53:7 64:9
284:3
**engagement**
46:18
**engaging** 283:20
**engineering** 17:6
17:7 122:25
123:6 158:15
158:15 159:1
171:13 175:21
**engineers** 17:11
17:13,14,16,18
17:19,19,19,20
17:25 18:2,4,15
21:5,6 172:2,15
**Eni** 228:12,12
239:21
**enlist** 47:17
**ensure** 172:20
222:8 247:24
247:25 255:13
256:9,16
257:15 258:1
**entail** 52:1
**enter** 120:10

**entered** 54:14
60:24 64:4
90:23 113:19
114:19
**entering** 59:12
**entire** 259:10
262:21 269:5
**entirely** 161:15
**entirety** 52:16
**entities** 89:14
102:8 120:24
120:25 140:13
191:6 209:18
219:21 231:20
239:12,14,18
239:25 240:9
242:3 250:2,17
256:15
**entity** 74:24
88:17 97:18,25
98:8,11 116:20
138:19 139:6
148:12 189:3
189:23 191:4
191:15 196:6
196:24 200:3
201:24 202:4
207:11,18
209:12 233:25
249:1,17,23
250:22 251:8
270:9
**entry** 48:8
245:19
**environment**
30:19 209:6
286:17,19
287:7
**environmental**
30:16 222:9,21
255:15 265:9
265:12,13,19
**environmental...**
257:14
**envisioned** 93:17
101:15,18

**envisioning**
190:3
**equal** 67:16
**equity** 19:12
20:14
**equivalent** 17:3,3
123:17 124:2
124:17
**Erin** 2:7 70:12
**erin.choi@weil...**
2:11
**escharfenberg...**
6:5
**especially** 119:16
125:22 170:20
264:14
**essentially**
106:12 138:25
**establish** 159:13
248:21
**established** 207:5
**estimate** 33:19
33:21 127:9,11
132:8 182:8
223:18 224:15
224:19 278:23
279:18,19,20
284:21 285:15
**Estimated** 8:5
**estimates** 132:10
165:4 279:1,23
282:24 283:2,3
283:5,6,12,13
284:9,9 285:12
286:25
**estimating**
158:20
**estimation**
174:25
**et** 1:4 7:12,12
26:6 28:5
194:14 239:4
**evacuating** 256:6
**evacuation** 256:4
**evaluate** 43:16
198:11



**evaluated** 72:6
125:7 213:9,15
**evaluating** 87:20
93:23 212:22
**evaluation**
256:20 271:10
**evening** 221:1
244:17 287:18
**event** 58:10,10,25
60:8 156:12
265:21,22,25
266:3,5 287:9
**events** 171:21
184:6 221:11
**eventually** 44:16
75:5 168:2
253:18
**Everest** 2:12 9:14
11:13
**evidence** 45:5
63:22 76:21
88:24,25 89:12
122:12 141:16
148:23 184:12
184:15 190:8
**evolution** 47:6
82:18
**evolve** 181:10
**evolved** 43:24
44:15 53:8 73:7
**exact** 29:4 61:17
112:22,22
113:24
**exactly** 36:12
49:8 51:8 77:19
93:15 150:16
188:8 227:21
269:6
**examination** 10:4
10:4,5,5,6,6
11:8 183:14
220:24 235:8
244:16 252:11
291:22
**example** 32:10
171:16 175:15

222:7 225:3
233:9 261:5
262:11
**exceed** 144:2
237:10
**exceedingly** 80:9
**exceeds** 144:13
**Excel** 8:3,13,16
8:21 9:5,10
134:22
**excellent** 110:4
246:8
**exception** 227:14
**excess** 203:22,24
204:1 269:25
272:23
**exchange** 28:17
99:9 101:22
**exchanged** 99:3
100:2,2,5
**exchanging**
105:18
**exclusively**
135:24
**excuse** 35:3
38:22 41:19
102:10 120:24
141:24 143:12
153:20 155:2
219:5 227:13
**execute** 67:14
**execution** 20:3
67:22 80:10
**executive** 22:7,16
22:19,24 23:13
23:18,21,24
24:12,13 84:9
110:17 114:1
121:19 158:9
158:12 253:2
**executives**
121:20,23,24
122:2,6
**executory** 186:25
**exhaustive** 32:8
**exhibit** 7:2,3,5,6

7:8,11,14,14,16
7:16,19,19,22
7:22 8:2,3,4,8
8:10,12,14,16
8:18,21,22 9:2
9:3,3,5,6,8,9,10
9:11,12,14 14:6
15:11 16:4
24:19,21,24
25:1 26:15 27:1
27:4,18,21 29:3
54:11 69:24,25
71:6,7 72:2
77:2,4,8 78:19
78:20,22 90:5,7
90:12 95:6,8,10
101:5,7,8 116:9
116:10 118:8
119:1 120:11
120:13,13,21
120:23 121:3,6
121:6,9,16,21
122:8,17,20,22
123:1,7,14
124:6 125:2
128:21 129:8
131:7 132:15
134:16,19
135:4,17 137:2
137:7,9,16,22
138:17 139:21
140:15,22
141:25 143:9
143:22 144:19
144:24 146:10
148:18 149:4
149:15 150:1
150:17,21
151:14,16,16
152:15,19,21
152:24 153:11
176:14,16,18
177:3,9 201:19
237:12 242:11
245:3,10,11
286:4

**exhibits** 7:1 8:1
9:1 13:10,11
14:4,5,9,11,14
31:7 70:1 71:12
77:9 80:20
81:18
**exist** 62:25 84:10
85:7 199:18,22
200:1,8,10
241:18,23
**existed** 261:14
**existing** 191:1,16
193:22 236:24
**exists** 84:21
**exit** 90:24 247:19
248:4 264:24
**expand** 118:3
212:6
**expanded** 228:10
**expanding** 264:2
**expansive** 57:25
**expect** 37:24
111:11 183:1
188:20 231:24
243:13
**expectation**
111:5 113:25
152:8 198:22
**expectations**
99:13,16
113:17,22
182:24
**expected** 122:16
125:9,10,11
153:6 166:9
182:15,16,20
182:21,25
238:10
**expects** 183:7
**expended** 226:3
**expenditure**
128:1,5 129:20
132:19 134:4
**expenditures**
127:21,24
128:11,17

129:6 130:9
133:24 134:7
134:12 139:9
283:22
**expense** 126:9
149:22 170:14
222:19 226:2
**expenses** 139:9
153:5,9 156:20
156:25 157:12
170:16 216:14
222:19 225:21
275:18
**expensive** 203:17
203:20 204:8
**experience** 18:24
105:3 109:25
112:6 192:2
268:17 282:22
284:2 285:14
**expert** 8:23 9:13
28:4 29:14,16
219:2 281:7,8
281:10,11,16
281:19,22
282:3,5
**expert's** 281:24
**expertise** 109:24
**experts** 17:20
29:12 30:1
46:22 140:8
217:17,20
218:4,9 279:1
**expiration**
175:13 227:15
236:6 292:7
**expired** 235:15
235:19 236:1
236:21 237:2,5
237:10,16,19
**Expires** 290:23
**explain** 116:16
124:4 126:1
142:1,18
152:24 153:11
155:21 160:17



170:22 243:10
286:16
**explained** 52:2
79:18
**explains** 116:19
**exploration**
176:1
**explore** 59:23
72:9
**explored** 51:14
**exploring** 50:13
50:21 52:7
74:20
**exposure** 60:9
222:22
**expressed** 260:16
**expressing** 72:7
**extend** 236:19
**extended** 74:11
96:7 124:21
244:4 282:17
**extensive** 40:16
92:11 106:17
109:18 270:12
**extent** 12:8 23:4
23:6 57:11,15
111:9 115:13
119:13 143:3
144:3 146:25
147:12,15
148:4,8 174:24
194:23 217:8
222:13 232:13
**extrapolate**
189:12
**extremely** 148:15
240:24
**Exxon** 277:2
**eyes** 37:19
109:16

**F**

**F60** 136:6
**F64** 136:3,6
137:16
**F65** 136:5

**face** 263:5,10
**facilitate** 111:6
242:5
**facilitating** 74:14
**facilities** 133:4
134:10 178:17
178:20 221:17
222:15,20
224:10,20,22
226:15 240:18
**facility** 95:21
96:6,23,24 97:3
97:12 98:24
99:5,10 100:13
100:15 119:23
120:9 148:13
153:13 154:10
154:25 155:7
155:16 222:16
223:15 240:17
248:9,16,17,18
248:24 257:24
257:25
**facing** 49:25 52:6
**fact** 67:14,16,19
78:16 97:17
199:15 238:13
247:25 259:3
261:17
**factor** 126:17
129:2 268:7
**factors** 125:22
129:1,9 130:14
131:4 160:20
165:7 203:5
212:21 213:17
236:12 261:17
268:8,9 286:15
286:16
**facts** 45:5 63:22
76:21 88:24,24
89:12 122:12
141:16 148:23
184:12,14
190:8 291:12
**failure** 56:9

**fair** 50:1 92:1,8
107:17 108:10
108:22 115:25
117:4,21 118:2
118:7,15,19
119:2 148:17
148:24 206:24
212:19 233:21
234:6 283:15
**fall** 72:21 79:7,9
79:14
**falls** 79:11
**false** 193:16
**familiar** 26:7
27:11 54:17,20
72:1 77:7,20
78:23 90:17
91:16,18 94:15
95:13,14
120:17 139:20
152:22 159:6,8
176:19 185:23
210:22 233:7
233:14,19
235:12 244:24
245:1 250:8,12
**familiarity** 46:20
92:9,10 160:25
**far** 54:10 169:10
204:1 273:14
283:2
**FARLEY** 6:3
**farmout** 7:14
90:9,14 91:12
92:7 93:4,17
94:4,7,8,12,17
94:19,22 95:4
114:17,19
**Farmouts** 94:25
**fashion** 84:25
**favor** 168:17
185:13 192:24
200:19 233:6
233:22
**feasible** 275:7,11
275:12,12

**feature** 75:8
160:6 188:12
189:19 195:9
240:21
**featured** 256:11
**features** 189:18
194:25 198:21
**February** 286:6
**federal** 1:22
227:13 229:24
230:4 232:9,18
233:23 234:6
234:14,20
**feel** 192:2
**felt** 262:2
**field** 72:18,19,25
76:16,19 79:1,4
79:4 125:7,7,9
125:13 126:5,6
126:8 127:17
140:10 152:10
153:6,7,8,10
160:16 170:16
206:4 227:11
279:14 280:14
**field's** 126:10
153:4 221:15
**fields** 8:17 125:4
125:5,25
129:24 130:8
133:5,12,13
134:13,14
159:25 160:3,4
160:13,25
161:20 162:6
162:13 165:15
165:16 166:9
166:13,19,22
167:5 279:12
**Fieldwood** 1:4,9
1:13 2:2 5:21
7:3,8,12,22 8:5
16:20 17:12,17
18:5 19:16,19
19:23 20:5,17
21:2 25:12,18

26:6 27:3,17,24
28:8 34:1 36:5
36:7 37:9 38:8
40:23 41:11
44:9 45:9 46:24
47:19 48:18,20
49:13 51:6,20
51:24 52:11,13
52:15 53:4,7,15
53:24,24 54:7
54:14,18,23
55:8 56:9 58:1
59:11,20,21
60:24,25 62:4
62:17 63:2
64:16 69:6
72:10,22 73:3
74:1,3,5,9,19
75:2,15 76:15
78:8 79:12,15
79:17 80:4,8,14
80:18 82:11,17
82:18,24 83:4,6
83:10,16 84:20
84:24,25 85:2,9
85:25 86:3,11
86:12,13,16,17
86:19,19,22,24
87:1,7,10,11,14
88:3,5,6,10,12
88:13,16,19,20
89:2,6,23 90:24
91:4,11,16 92:5
92:9,10 94:3
95:1,5,19,20,24
96:2,23,25 97:6
97:9,10,13,16
97:19,25 98:8
98:12,15 99:14
100:7 101:21
102:1,8,12
103:1,4,5,20,23
104:4,10,13,18
104:22 105:12
106:1 107:3,7,8
107:18,24



108:5,12 109:1
109:11,13,17
109:23 110:3
110:11,18,23
111:3,7,20
114:2,8,11,19
114:24 115:9
115:15,19
116:5,19
117:25 118:8
118:12,17,21
119:3,3,24
120:23,24
121:11 122:7
122:19,24
123:6,10,13,14
123:21 125:23
126:14 130:19
130:24 132:7
132:23 135:13
135:16,25
138:19 139:5,7
139:21,24,25
140:20,24
141:3 142:6,8
143:2,14 144:3
144:14 145:2,5
145:7,8,11,15
145:18 146:4
146:18,23
147:2,5,5,10,18
148:5,10,12,21
149:2,6,17
150:3,4,10
151:11,25
152:14,25
153:25 154:23
155:1,5,19
156:14,18
158:3,9,17,19
158:23 159:7
160:2,4,13
161:6,9,12
162:12 163:16
164:5,15,22
166:17,21

167:7,9,15
168:8 169:15
170:24 172:19
174:5,8,8,10,23
177:5 179:14
180:2,9,18,24
181:2,19 182:2
182:8 183:1,18
183:21 185:10
185:15,15,17
188:17 189:2
189:21,23
190:3 192:19
195:5 199:5,16
199:17,19,21
199:25 200:8,9
201:4 202:17
209:14,15
210:8 217:6
218:15 220:16
221:9 222:6
223:18 224:4
226:10,14
227:9,12,17,22
229:23 231:6
231:22 232:11
232:17 233:10
235:12,14
236:15 237:1
237:10,13,17
238:7,8,17,18
238:23 239:1,2
239:6,19,20,20
240:12,13
241:4,11,15,17
241:23,25
242:8,21
244:21 247:8
247:13 248:25
249:23 251:9
255:3,6 257:15
257:21 258:3,7
259:10,16
268:5,19 269:1
270:8,11,22
276:24 277:18

277:25 279:8
280:2,8,10,15
282:14,16
284:11
**Fieldwood's**
23:25 47:22
54:24 59:18
63:3 73:18 74:7
84:11,13 85:12
85:22 86:8
89:20 90:1
91:14 100:5
104:9 108:13
116:3 119:22
163:2 164:8,14
167:12,17
173:6 177:20
180:12 181:23
201:1 234:8,16
283:17
**Fieldwood/Apa...**
74:16
**fieldwoodener...**
71:19
**fieldwork** 23:12
**figure** 138:23
**figured** 215:13
**figures** 138:4
153:3 171:3
176:9
**file** 14:7,9,11
70:15 177:19
227:10 245:4
**filed** 244:21
245:20,22
**filing** 61:16,19
62:15 64:2 74:8
79:21 114:7
228:8 265:23
266:4,8,15,18
266:21 282:10
286:1
**fill** 42:20
**filter** 70:13
**final** 108:12
122:7 150:15

**finalized** 33:13
79:23 179:17
**finance** 19:14,21
19:23 20:6,9
21:11,14,17,20
22:9 30:9,9,11
67:15 87:17
105:2
**finance-focused**
20:2
**financed** 259:4
**financial** 9:3
21:18 120:15
120:22 150:16
194:13 242:7
**financially** 206:3
291:19
**financials** 166:5
168:3
**financing** 20:4
249:5,18
**find** 44:7 50:11
102:22 149:15
**findings** 281:24
**fine** 15:8,16,17
15:20 42:6,8
56:25 112:15
219:23 220:9
220:17,21
235:7 245:8
246:18 249:16
**fingertips** 273:18
**finish** 159:21
**firm** 11:11 20:14
21:7 33:24
46:23 78:10
117:11
**first** 4:8 5:21
11:7 12:2 19:19
29:2,13,16
33:12 40:23
41:5 45:9,12,23
49:8 68:20,23
68:25 69:4
81:15 93:14,14
98:14 128:3

132:20 143:15
173:11 219:6
221:6,13
241:22 246:25
247:3 250:1,14
255:20,23
265:21,23
266:8,15,17,21
270:9 282:10
285:25 286:20
**fit** 50:11 80:13
279:2
**five** 33:22 64:22
64:25 65:25
71:8,11 80:18
81:10 157:19
157:20 179:6
202:3 204:13
206:19 207:24
208:1 209:21
210:23 244:4
252:1 265:5
269:4 270:11
270:18,20
277:16,20
280:9 282:14
**five-minute** 42:3
**five-year** 96:6
121:1 174:19
**fixed** 204:6
**flexibility** 249:11
**flow** 99:16,18
116:3 138:19
139:10,11
144:2 145:15
147:11,12
148:9 151:20
183:8 209:10
270:1 271:3
274:19 286:23
287:2
**fluctuations**
264:13
**flyovers** 222:17
223:3
**focus** 79:22 91:22



179:7 246:5
**focused** 48:6
    110:25 246:21
    271:1
**folder** 25:1 70:21
**folks** 20:4 76:4
    87:19 92:5
    117:2,15
**follow** 109:2
    213:2
**follow-up** 76:25
    183:10
**follow-ups**
    251:22
**following** 48:8
    75:24 137:14
    222:14 226:24
    245:24
**follows** 11:7
**forbearance**
    44:17,17,20,22
    45:2,6 47:8,9
    47:16 48:9,17
    52:3
**forecast** 135:18
    136:10 140:2,3
    140:8 141:11
    244:4
**forecasting** 244:2
**Forecasts** 136:9
    136:20
**foreclose** 217:14
    218:2
**foreclosed**
    218:16
**foreclosing**
    215:10,15
    216:25
**foreclosure**
    214:24 218:21
**foregoing** 290:8
    291:12
**forever** 182:21
    207:13,14
**forget** 188:25
    189:1 218:12

218:12,13
**form** 24:9 33:9
    36:19 38:18
    40:9 43:22
    44:11 45:4 47:2
    55:3 56:11
    63:21 76:20
    82:13 84:16
    85:14 86:1
    88:23 89:11,24
    96:15 97:21
    102:3 106:6
    108:15 119:10
    119:25 122:11
    123:2 124:9,10
    125:18 137:10
    139:17 140:25
    141:13,15
    145:6 148:22
    149:19 151:22
    168:19 172:6
    172:23 178:14
    184:1,11 185:3
    185:18 190:7
    193:2,3,15
    194:10 200:11
    204:22,25
    213:23 215:1
    216:10 217:2
    225:6 263:7
    267:18 274:23
    276:1,10
    277:10 280:24
**formal** 17:7
    18:10,19 19:2
    45:12 105:11
    113:18 123:9
**formality** 105:19
**format** 11:21
    134:18
**formed** 53:11
    121:13
**former** 104:17
    105:2
**forms** 130:10
    131:17 135:12

194:9
**forth** 115:2
    128:16,20
    149:4
**forthcoming**
    239:8
**forward** 45:17
    108:8 133:6
    156:2 175:24
    182:16 242:10
    243:14 269:19
    269:21 280:17
**found** 66:18 68:6
**four** 11:12
    100:24 101:3
    107:25 108:22
    109:4 183:17
    201:17 265:5
    277:17
**four-person**
    106:13
**fourth** 75:20
    112:21 278:22
**Foxman** 4:10
**frame** 225:17
**frames** 236:7
**framework** 80:13
**Franklin** 4:21
**frankly** 12:25
    205:1
**free** 116:3 209:10
    274:19 286:23
    287:2
**fresh** 194:22
**friend** 12:10
**front** 90:16
    175:10 203:18
**Fulbright** 3:4
**fulfill** 51:6 87:1
    229:14
**full** 151:4 152:10
    217:15 218:2
    218:18 219:3
    237:21
**function** 22:25
    23:19 37:22,25

46:13 93:21
    139:6 161:1
    205:5 285:7
**functions** 22:4,18
    23:11,14,16
    24:15 83:4
    87:13 172:11
**fund** 119:23
    150:6 183:7
    209:21,23
    232:19 233:5
    274:9
**fundamental**
    60:21 173:25
    195:10 211:14
**fundamentally**
    152:1 268:1,4
**funded** 167:20
**funding** 49:18
    96:7,13,20
    149:10 153:15
    155:6 183:2,5
    250:17
**funds** 95:23 96:2
    139:1 145:14
    154:22 210:3
**further** 72:9
    73:12 74:13
    112:24 201:8
    219:14 234:2
    251:21,23
    259:2 264:24
    291:14,17
**future** 8:5 111:8
    111:14 193:4
    200:3 249:12
    267:25 274:6
    275:4 279:17
**FWE** 9:6 231:14
**FWE-0000002**
    8:3
**FWE-0000016**
    9:5
**FWE-0000018**
    8:11
**FWE-0000019**

8:9
**FWE-000008**
    9:10
**FWE-000016**
    135:4
**FWE-0037606**
    8:13
**FWE-0038676**
    8:16
**FWE-0045265**
    8:15
**FWE-0045280**
    8:20
**FWE-0045403**
    8:21
**FWE-0047937**
    7:5
**FWE-0047938**
    7:7
**FWE-0047949**
    7:10
**FWE0000002**
    176:19

---

**G**

**G** 8:9 27:21
    136:16
**game** 243:8
**GAP** 166:6,8
    168:4
**GAP-related**
    168:5
**gaps** 141:10
**Gary** 22:21 30:4
    30:23 92:24
    122:3 158:15
**gas** 18:20 19:10
    105:7 106:18
    263:17 264:14
    264:15 275:3
**gathering** 42:16
**gauge** 51:15
**gears** 250:23
    254:8
**Genender** 2:7
**general** 22:23



30:6 37:2 38:13
45:14 46:9 49:9
62:22,24 67:22
86:21 94:25
95:16 104:17
114:3 129:11
130:10 135:3,6
195:7 203:20
205:25 209:6
213:11 214:5
239:18 242:16
261:24 273:24
274:3 279:23
283:11 284:20
**generally** 14:4
22:5 31:12 35:7
35:14 38:14,23
49:12 50:19
51:3 52:15
54:17,20 63:16
72:4 77:22 79:3
80:12 90:20
91:5,10 95:14
97:4 100:16
101:14 116:16
116:18 117:9
117:15 124:1
133:8 134:8
159:8,10
161:14 163:4
174:18 203:17
203:24 206:16
213:8 235:13
244:24 270:12
270:24 274:2
276:8 279:2
280:7 283:8
285:5,23
**generate** 139:10
143:20 194:22
271:3 274:19
**generated** 67:22
127:15 145:14
**generates** 269:25
**generating** 52:22
132:10 138:20

167:25
**Genovesa** 270:18
272:13,25
273:4,7,20
274:12 276:17
276:19,21,22
277:13
**gentleman** 36:13
**gentlemen**
107:25 108:22
109:4
**geographic** 285:8
285:10
**getting** 157:2,2
217:23 263:21
280:23
**Giantomasi** 2:13
11:12
**give** 11:24 12:3,6
26:14 31:22
33:19 50:6 53:2
64:24 67:25
72:11 96:10
113:22 116:8
119:21 127:8
127:10 138:15
140:4 161:3
179:2,6 184:7
195:17 198:3
249:13 258:21
267:9 275:25
277:2,5
**given** 36:23
41:21 59:24
74:21 75:25
109:1 147:17
159:7 160:24
161:1,17 173:3
200:4 239:11
240:7 249:5
261:25 271:12
275:22
**gives** 132:7
161:10 182:2
184:14 201:23
207:3

**glad** 135:8
**go** 25:14 27:20
36:5 49:21
55:12 66:24
72:25 78:20
96:17 106:9
116:14 120:3
124:22 127:21
136:11,19
142:13 147:1,8
149:14 150:1
182:16 188:7
189:9 194:7
196:20 200:15
205:19 207:6
207:13 208:11
216:19 220:4,7
220:14 231:5
235:4,5,6 252:7
288:7
**go-forward**
224:2
**goal** 146:15
160:20
**goes** 128:15
231:22,23
**going** 13:22,23
15:16,17,17
24:8,20 25:2,2
26:3,10 28:14
41:20,23 42:1,2
42:19,20,23
45:3 59:1 68:19
70:25 72:21
76:14 81:4,5
83:6,7,8,11,12
86:6,14,16,19
89:2 90:23 91:3
93:5,25 94:19
95:7 96:14
98:12,13
101:22 102:16
109:24 110:1,3
111:16 119:10
121:5 124:8
127:1 128:17

129:2,7 131:3,5
132:2,21 133:6
134:13,17
140:22 141:11
141:14 143:1
144:17 146:7
147:10,12
148:5 149:22
151:14,25
152:3,24
154:13 156:2
161:13 169:8
174:12 175:25
177:24 180:12
180:13 181:22
181:23 182:17
182:25 189:24
190:2 192:3,9
193:1,2,14
196:5,14 198:1
198:6 199:10
199:17,21
200:1,8,10
201:19 203:13
203:17 204:11
204:14,16
206:22 207:11
207:14,18
208:7,22,24
209:18 210:13
212:15 213:5
213:19 215:22
216:8,16 217:1
217:10 220:1
221:20 224:25
228:18 230:4
231:13 232:7
233:4,9,10,13
238:21 239:12
239:19 240:8
241:1 242:7,10
243:9,14
244:15 245:23
246:21 248:3
250:23 251:20
252:3,4,8,18

253:3,5,7
254:15 255:7
256:3,16
257:10,15,21
257:23,24
258:1,3,7
260:18 262:2
263:5,9 267:23
268:4,6,11,15
268:17,20,22
269:19,21,22
274:12,17,18
275:24,4,5,20
277:9,18
**going-concern**
44:16,19 47:7
**going-forward**
238:23
**GOLDMAN** 4:8
**GOM** 119:6
**good** 11:9 14:4
14:24 27:1
109:16 157:24
179:9 183:15
220:10,23,25
221:1 244:17
283:12
**GOTSHAL** 2:3,9
**gotten** 70:12
**govern** 111:16
114:13 163:8
163:12 164:3
**governance**
116:19 118:9
118:11 208:7
208:13
**governed** 75:1
95:1
**government** 15:8
88:4,7 180:25
181:3,6,13,20
185:14,25
227:13 229:16
229:24 230:4
230:23 231:1,2
231:3,8 232:9



232:15,18
233:6,24 234:2
234:6,14,20
236:19,24
239:3,15,17,25
241:25 242:2,4
**government's**
229:13
**governmental**
86:9 140:13,23
**governmentally**
89:21
**governs** 59:19
91:6
**Graham** 103:14
103:14,17
105:13,16,24
106:4,5,7,10,15
106:17 107:3,8
107:10,12,20
108:3 109:13
109:16,18
110:7,15 111:2
111:4,20 112:2
113:17
**Graham's** 106:16
107:22 111:14
**granted** 59:21
85:8 226:17,20
**great** 112:13
245:8,18
259:19
**Green** 6:17
**GREENBERG**
4:5
**gross** 203:3
**ground** 11:21
13:3,4 244:15
**groundwork**
238:6
**group** 5:21 32:23
35:14 65:8 76:5
83:24 84:4
106:20 111:24
122:5 192:12
192:22 200:22

201:7 216:3
219:9 221:5
233:11 266:12
267:13
**group's** 175:22
**groups** 3:2
172:15
**Grzyb** 2:13 10:4
11:4,9,11 14:2
14:8,17 15:2,9
15:21 16:10,14
16:18 24:4,10
24:20 25:6
26:13,16 28:6,7
28:13,19 29:25
33:14 35:25
37:6 38:25
39:15 42:6,12
42:15,16 44:3
44:13 45:9,18
45:21,23 47:15
54:12 55:6,7,19
56:17,24 57:19
58:17 59:9
61:15 62:16
63:23 65:7,10
65:12,15,19,23
65:25 66:4,7,24
67:4 69:23 70:8
70:22 71:8,15
77:3,12,15,22
78:20 81:7,11
81:14 82:21
84:23 85:21
86:8 87:9 89:1
89:17 90:6,11
90:12 93:13,16
95:7 96:22 98:2
98:10 101:6
102:6,21
106:12 108:21
112:10,14,19
116:10 119:21
120:12 122:15
123:4,5,12
124:12 126:1

126:24 131:21
131:23 132:7
134:17,23
135:2,10
136:17,21,23
140:1 141:8,17
141:24 142:18
145:1 146:11
146:15,17
147:3,21 149:2
149:23 152:6
156:4,8,10
157:18,23
158:3 164:8
168:21 172:8
172:25 173:1
175:7,12
176:15 178:21
179:5,6,13,25
180:2 181:17
183:10 189:22
207:11 221:7
250:25 251:19
251:21
**guarantor** 188:1
**guess** 14:3,17
90:13 93:14
102:6 137:14
140:1 141:8
146:17 187:4
192:8 228:18
234:19 236:14
240:1 241:19
241:20,20
277:17 284:25
288:7
**guidance** 161:22
**guidelines** 111:13
163:14 164:3
172:13
**Gulf** 106:19
109:25 229:5
240:22 263:19
263:20 264:1,5
264:10,25
265:2,6

**Gunflint** 271:5
272:4,5 275:8
**Gunflint's** 272:6
**guys** 220:8,8,15
243:5

———————

**H**

**H** 30:11,13,14
**half** 202:19
221:13 225:22
282:18 286:19
**hand** 269:6 292:1
**handbook** 111:13
**handle** 14:24
65:6 204:11
209:21 210:8
230:24 239:13
256:13
**handled** 43:10
86:6
**Hanover** 3:8
183:17
**Hanson** 8:23
**happen** 37:18
45:3 132:25
199:12 230:5,8
261:25
**happened** 48:15
76:1
**happening** 50:3
**happens** 102:7,7
229:9,10
237:23
**happy** 187:21
276:18
**hard** 12:12 140:6
**HARRIS** 5:3 6:8
291:2
**Hartman** 1:19
291:9 292:6
**HCCI** 2:16
235:10
**head** 11:25
**heads** 132:11
**health** 30:16,18
**hear** 84:2 93:19

131:21,24
141:17 157:19
157:21,23
182:13 195:22
**heard** 198:23
**hearing** 288:9
**heavily** 133:2
**hedge** 264:18,23
**hedged** 264:19
264:21
**held** 233:16
**helicopter** 222:17
223:3 257:9
**hell** 197:5
**helpful** 245:3
**helping** 122:1
**hereto** 1:24
291:19
**HEROD** 3:15
**Heyen** 4:3
**Hi** 15:5
**high** 73:19 92:9
169:12 206:17
241:3
**high-level** 116:23
117:1,21
**higher** 75:19,22
144:12 168:11
286:23 287:2
**highest** 64:25
66:1,5 67:2
68:15 210:24
258:13,15
259:19,25
**highlighted**
246:4,20
248:14
**highly** 13:13,24
15:24 261:18
265:2,7
**HILL** 4:16
**historic** 124:23
133:2 157:16
157:17 159:17
161:1 170:15
170:19 176:9



242:23 243:21
**historical** 286:8
**historically**
160:6 161:21
161:24 162:9
169:4 264:19
**history** 109:18
**HOC** 5:21
**hold** 71:15 95:12
**hole** 272:20,22
**holiday** 157:3,9
**holistic** 145:24
147:4
**holistically**
145:19
**honestly** 287:24
**hopefully** 252:15
**horizontal** 136:7
**host** 125:22
**Houlihan** 8:23
64:14
**hour** 42:3 81:5
**hours** 33:22
252:15
**Houston** 1:2 2:5
2:24 3:5,22 4:6
5:19
**Howard** 20:16,17
**hows** 233:13
**HS** 30:8 106:20
109:24
**HS&E** 258:2
**HS&E-related**
257:14
**HUBBARD** 5:13
**Humphrey** 19:13
**hundred** 212:9
277:25 282:21
**hundreds** 198:7
240:18 270:3
**HUNTON** 2:23
**hurricane** 221:10
221:17 256:4,7
**hurricanes**
263:16
**hydrocarbon**

258:8
**hyperbole** 182:23
207:14
**hypothetical**
140:16

---

**I**

**I's** 84:25 86:17
123:21
**I.T** 22:10 25:22
**idea** 43:20 53:3
82:9,11 98:18
187:10 190:25
276:11
**ideas** 49:13 50:5
50:17
**identifiable** 95:9
120:14
**identified** 30:21
90:13 91:11
93:8 108:1
109:5 128:13
128:16 129:4,6
130:4 137:12
150:2 225:1
249:17
**identifies** 131:19
**identify** 32:1
69:15 72:16
77:10 87:25
92:3,6 103:13
121:23 137:24
177:14,18
**identifying** 70:3
91:19,20
**identity** 67:13
211:5,9,12,15
211:20 212:4
212:10,11,18
258:23
**III** 89:6 120:24
210:8 239:20
**Illinois** 6:13
**imagine** 175:10
230:21 264:17
**immaterial** 80:23

**immediate** 61:19
**immediately**
79:21 85:1
205:14
**impacted** 133:2
287:7
**implement** 54:2
247:15
**implementation**
37:3 39:1
111:17
**implemented**
37:2 93:9
**implementing**
37:15,17 39:3
54:18 111:11
**important** 11:20
11:23 12:3,4,8
12:20 35:9
160:20 181:9
198:9 217:6,7
**importantly**
259:7
**impose** 210:5
**imposed** 44:22
**imposes** 59:21
198:25
**impositions**
210:4
**impression**
216:23
**impressions**
216:21
**in-house** 117:11
**in-person** 43:2
46:1
**inability** 142:7
**inaccurate** 77:16
154:17
**inaction** 199:14
201:2
**inadequate** 80:11
**inappropriate**
145:10
**inarticulate**
271:20

**inaudible** 84:1
**inception** 143:7
167:9 282:17
**incidents** 222:9
240:11 265:14
265:17
**include** 22:9,25
23:1 25:19
53:23 79:3
85:11 99:15
121:16 126:8
126:19,25
144:21 145:25
148:18 156:17
165:6 191:20
191:23 235:15
235:18 263:11
**included** 50:21
67:12 75:4
131:2,16,18
138:6 149:8
162:20 165:11
165:13 167:21
169:12 247:2,4
247:4,5,6,7
248:6 253:7
284:14 286:5
**includes** 142:11
143:16 160:10
**including** 28:4
31:6,7 33:24
40:12 44:24
76:4 89:15
106:19 110:1,2
120:9 171:6
211:5 222:1
259:1 261:17
**inclusion** 161:5
165:13 174:17
**Income** 8:6
**incorporate**
243:18
**incorporated**
52:8 116:25
132:17 134:8
166:15 171:21

219:2 224:5
271:8
**incorrect** 24:25
**incorrectly**
128:25
**increase** 73:14
127:5 129:2,7,9
129:17 130:6
132:23
**increased** 73:16
134:2 175:4
**increases** 143:14
**incremental**
129:12,25
**INCs** 177:8,10,12
177:15,21
178:3 223:10
224:21 225:15
240:11,13,14
240:15,15,19
240:19,21,25
241:4,6,8,11
254:8,9,11,13
254:15,18,20
254:22 255:4
**incur** 198:12
225:21
**incurred** 115:9
**incurrence**
115:11
**indem** 186:9
**indemnify** 187:4
201:8
**Indemnities**
201:13
**indemnity** 3:13
9:14 63:3 85:12
85:16,18,24
86:4,14 186:5
186:17,18,23
187:3,5,9,20
188:12,25
189:4,18
191:20,22,23
192:4 195:5
196:11 198:21



200:15,21
201:3
**independent**
57:13,19 58:6
58:18,19,22
59:4,4 67:21
96:10,11
100:11 113:4,6
113:10,14
**independently**
222:4 274:19
**INDEX** 10:1
**indicated** 212:17
**indication** 72:8
72:12 73:14
76:9 142:6
143:9 218:5
**indications** 64:23
75:21 78:17
210:24 260:14
**indicted** 265:19
**individual** 30:17
30:21 52:19,25
55:25 74:20
75:15 88:1
93:10,16
125:13 126:5
127:17 140:10
243:24 244:3
**individually**
278:24
**individuals**
253:23
**indivisible**
231:16
**industry** 18:20
19:10
**influence** 126:10
165:7
**influenced**
134:13
**influx** 180:16
**inform** 171:11
214:4
**informal** 17:9
18:12

**information**
28:24 43:19
50:7 74:13
76:24 81:17
99:9,22,25
100:1,2,4,5,8
118:20,22
138:15 233:3
**informed** 169:3,3
279:22
**infusion** 51:25
**ingress** 224:14
**initial** 32:17 41:1
47:1 48:1,7,10
49:1,7 54:3
145:15 148:5,9
153:15 154:10
155:6,10,11
247:8
**initially** 83:12
286:20
**input** 250:15
**inputs** 121:14
122:1 170:13
281:9
**inquired** 35:1
**insert** 249:25
**inside** 258:25
261:18
**inspection**
240:23
**inspectors**
240:16
**instance** 1:15
32:14 192:18
202:17 203:21
**instances** 231:13
**instruct** 57:10,17
**instruction** 160:2
**instructions**
159:6,9
**instrument** 184:4
**instruments** 85:5
85:7
**insufficient**
75:16 145:14

148:11 258:23
**insurance** 3:7,8,8
3:13 5:2 6:2,6
6:11 187:11
**INSURED** 5:2
**INSURER** 3:13
4:14 6:2,11
**INSURERS** 3:7
**intend** 37:22
84:24 174:6
255:4 264:22
**intended** 84:19
155:11,24
159:13,15
237:22 273:6
**intending** 271:18
**intends** 88:19
174:11 232:9
**intensity** 169:7
**intent** 62:5
119:14 130:23
155:4 253:13
253:16,17
254:3,10 256:7
256:8 258:5
**intention** 83:18
83:20 84:12,13
85:6 86:9,12
89:20 90:1
119:2 189:21
192:5,11,22
207:17
**intentions** 84:20
85:2
**interact** 35:20,22
36:1 115:5
**interaction**
123:22
**interactions**
117:9,22
**interacts** 37:7
**interchangeably**
186:2
**interest** 44:21
47:22 51:15
52:7 54:6 64:23

68:21 69:1 72:8
72:12 73:14
76:10 100:12
100:14,19,21
100:23 142:21
142:22,22
143:4,6 192:20
203:2 210:24
215:10 231:17
231:22,23
260:14,15
263:18 270:15
276:23 277:1
278:3 280:11
280:13
**interested** 2:16
2:22 3:18 4:2,8
5:11 50:13
180:19 214:16
228:14 291:19
**interesting** 203:1
**interests** 8:6 80:7
143:20 231:17
232:10 234:8
234:16 280:16
**interface** 111:22
170:22 171:5
171:22
**interfacing**
158:24
**internal** 21:5
29:12 31:20
32:7 108:5,8
117:12,14
160:15 164:4
170:4 257:3
**internally** 76:4
159:12 160:10
165:24
**interpose** 56:25
**interposes** 12:9
**interpret** 192:15
**interpretation**
119:13
**interpretive**
172:12

**interrupt** 228:21
**interview** 105:13
105:24 106:2,4
107:15,20,23
113:18
**interviewed**
106:14,22
**interviewing**
112:5
**inventory** 271:7
271:9
**invest** 91:7
194:21
**investable** 209:2
**investing** 194:20
198:7 218:24
270:3
**investment** 105:2
115:15 209:8
209:10 210:2
269:24 271:2
274:20,21
275:4
**investor** 182:23
**investor's** 209:11
**invoices** 157:6,7
157:13
**involved** 11:13
19:23 20:3 22:5
36:21 41:14
43:8 76:3 78:3
80:6 97:2,4,8
98:23 100:13
100:16,21
104:3,6 105:24
106:1 116:21
116:23 121:2
121:10,25
177:2,5 250:2
251:7
**involvement** 20:1
121:8 206:7
**isolate** 257:21
**issuance** 229:24
**issue** 11:24 170:3
200:25 211:20



MAGNA
LEGAL SERVICES

211:22,25
212:4,5,7,12,25
212:25 213:3
231:9 232:9,14
232:16 254:14
**issued** 11:16
41:24 61:22
72:12 73:13
183:21 185:14
189:2 191:3,14
192:16 193:8
199:13 230:23
231:24 233:22
**issuer** 61:9,12
**issuers** 61:1
**issues** 49:25
87:17 165:3,6
178:22 211:20
212:6,18 213:5
213:7 222:9
223:10 225:1
235:12 264:8
265:8,9,12,19
**issuing** 188:2
231:1
**item** 127:21
128:3 133:18
135:22 136:3
138:17 142:1
155:22 156:13
**items** 27:22 28:4
28:16 31:6,6
80:25 132:15
138:6,7 170:14
**iteration** 247:8
**IV** 239:20

**J**

**J** 9:13
**James** 3:21
**Janik** 158:16
253:24 266:23
**January** 33:5
**Jared** 4:4
**Jase** 14:5,13
15:21 26:10

179:7
**Jerad** 25:22
**Jersey** 2:14
**Jessica** 2:8
**Jim** 122:3
**job** 39:24 149:24
**John** 7:5,9 25:21
30:3 36:9 71:4
71:21 78:23
106:3 113:17
122:4 177:7
**John-Paul** 8:23
**joint** 229:13
**jointly** 1:5 229:7
**Jon** 103:14,14
105:13 106:10
109:13,16,18
110:14 111:20
**JONES** 5:18
**July** 78:22
**jump** 201:19
273:14
**June** 64:11
210:16,17
**JUSTICE** 4:19
4:21
**justified** 196:25

**K**

**Kadden** 5:12
**Katmai** 271:4,23
271:25 272:2
275:7 277:22
278:1
**keep** 175:12,14
198:17
**Kenneth** 5:7
**Kevin** 2:8
**key** 249:10
**kid's** 243:7
**kind** 99:8 138:15
187:14 194:1
196:3,16 211:4
217:23 233:2
242:8
**Knapp** 2:17 10:5

220:13 235:6,9
235:10 241:19
241:22 243:7,9
244:12,14
**know** 13:4,20
14:8,22 15:25
25:4 26:1,18
28:2,4 36:12
38:20 39:7
40:14 46:18
49:7 56:13 59:3
61:11 65:5,13
69:3 70:13,17
75:1 77:16
79:10 86:25
88:12 93:7
97:22 100:23
101:1 107:13
111:4,21,21,22
111:23 113:24
119:12,14
127:8 128:24
137:17,17
141:16 146:11
146:12,25
150:12 151:24
152:20 168:13
169:10 175:8
175:14 176:4
178:1,3,22
179:23 182:22
184:20,22
187:14 188:9
193:4,12
196:19 197:16
201:20,24
203:21 210:20
211:8 215:3
216:8,17,17,20
218:7 221:2,6
223:4 224:14
224:23 225:2
225:10,14,16
227:21 231:21
237:2,11,15
238:13 240:17

241:8 243:11
243:13 246:24
248:14 249:5,6
249:25 250:3
251:15,21
254:4 261:19
267:19 271:21
273:2,3,4,8,8
273:12,19
277:4 280:21
281:11,14,18
281:20,22
282:15 284:15
286:1
**knowledge** 28:24
29:1 46:15,17
104:20 105:9
162:22 178:19
216:18 227:6
228:3 233:3
234:18,24
253:12 266:2
281:5,14 282:1
282:8
**known** 166:14
**knows** 71:12
**kpasquale@str...**
5:10
**KREBS** 6:3
**KURTH** 2:23

**L**

**L** 6:17
**labeled** 24:23
27:21 70:2
136:20 138:11
**lack** 166:13
**lag** 157:1
**laid** 163:14
217:21 238:6
**Lamb** 8:19
**Lamme** 8:19
22:22 30:5
38:13 46:4
106:3,15 253:3
253:9 266:17

**Lamme's** 253:17
**land** 175:18,19
**Lane** 5:8
**LANGLEY** 3:10
**language** 41:20
41:23 246:4
**Lannie** 46:8
117:17,20,23
**large** 39:9 110:23
125:23 172:10
203:3 221:9
240:22 283:17
**largely** 204:18
241:1 254:13
287:6
**largest** 47:21
54:6,10
**LaSalle** 6:13
**late** 40:25 158:7
251:15
**LAVAN** 5:8
**law** 6:12 230:8
**lawyer** 11:11
**lcheung@nsai-...**
3:6
**LCs** 148:3
**lead** 20:6,9 92:20
198:15
**leader** 106:20
**leadership** 22:7
22:16,19,24
23:9,13,22,24
24:12,13
110:18 253:2
255:24
**leading** 62:1
**learning** 110:25
**lease** 170:5
175:13 227:14
231:13,15,18
231:22,23
232:15 234:8
234:16 237:24
262:21 279:14
285:15,23
**Leasehold** 8:6



**leases** 175:13,25
  224:16 229:15
  231:17 235:15
  235:18,25
  236:5,21 237:2
  237:4,10,17,19
  238:8,24
  270:12 285:13
**leave** 157:10
**led** 83:7 159:1
  265:21 266:3,6
**Lee** 5:3 6:7
**left** 252:15 256:5
**Legacy** 52:12
  82:12 119:6
  268:12
**Legacy/Apache**
  50:22,24 52:14
  52:17,20 53:5
  54:14 69:7,17
  75:10 82:24
  83:7 91:8,23
  93:3 130:16
  166:22 167:5
  175:4
**legal** 35:14 56:12
  56:14,15 85:17
  87:4 97:22
  117:10,12,14
  117:16 119:12
  184:2,19 185:4
  186:10,14
  189:14 199:25
**lend** 249:1
**lender** 42:25
  83:24 84:3
  95:20 97:9,10
  97:13 98:5,12
  98:16 153:21
  153:22 155:2
  200:22 201:7
  215:9
**lender's** 217:19
**lenders** 5:21 34:5
  34:9 40:24 41:5
  42:21 43:5,7,11

43:12 44:9 45:1
  45:15 47:6,16
  48:9 52:4,10
  64:5 66:11,12
  66:13,17 67:25
  68:6,8,11 69:12
  84:8 94:3,6
  120:6 194:20
  211:2 212:17
  213:21 214:2,3
  214:5,18 215:3
  215:14 216:3,9
  216:24 217:14
  218:1,16,21,23
  219:6 250:1
**lenders'** 43:20
  66:10 214:13
  215:18 216:14
  250:11
**lending** 43:15
  154:3
**lens** 263:24
**Leo** 6:12,12
**lessees'** 224:16
**let's** 16:16 36:4
  49:20 77:3
  78:20 88:10
  123:12 144:8
  150:7,7 183:24
  184:25 185:13
  207:23 215:21
  229:21 241:23
  245:24 248:8
  252:1 254:8
  258:11 273:13
  273:14 282:6
**letter** 7:6,8 61:1
  61:10,12 67:20
  77:10,23,24
  78:22 79:5,7
  160:9 168:13
  262:9
**letters** 56:3 61:2
  69:18
**level** 66:11 92:9
  114:1 121:19

121:25 124:14
  128:16,20
  129:10,18
  139:22 147:14
  152:22 153:7,9
  154:8 159:16
  160:25 161:4
  170:23 180:7
  180:21 182:22
  224:17 241:3
**levels** 130:6
  153:17 161:25
  180:18
**LEXON** 5:2 6:6
**liabilities** 51:13
  60:1 147:20
  194:11,17,24
  195:3,4,7,9
  196:8,10,24
  198:5,9,18,25
  203:9,11,14,19
  203:20 205:24
  205:24 206:7,8
  206:18 208:1
  209:1 210:1
  217:5 229:15
  230:25 256:10
  269:16,18
  274:25
**liability** 184:10
  184:13,20,23
  184:23 195:11
  198:11,15
  200:22 229:13
**liable** 229:7
**Liberty** 3:7
  183:17
**lien** 4:8 5:21
  219:6 250:1
**liens** 248:22,22
**life** 182:15,19
  204:18 207:12
  279:12
**lifespan** 279:8
**light** 15:25 97:12
**likewise** 260:14

**Lily** 3:3
**limit** 109:3
**limitation** 28:21
**limitations** 28:3
  28:17 174:4
**limited** 182:15,19
  207:12
**line** 64:8 66:3
  81:25 127:21
  128:3 132:14
  133:18 135:22
  135:22 136:2
  136:15,23
  138:17 142:1
  155:21 156:13
  162:2 166:7,8
  178:7,21
  182:23 208:9
  208:15 247:1
  248:21 289:2
**lines** 115:12
  178:4
**link** 207:4
**Liou** 2:8
**liquidating** 105:8
**Liquidation** 9:12
**liquidity** 47:10
  48:17
**Lisa** 3:20
**list** 14:6 27:22
  68:1 93:24
  104:9 105:10
  105:11 127:4
  162:12 168:16
  168:24 177:15
  177:24 178:6
  178:11,13,16
  178:17 212:23
  222:2 239:3
  240:7,12
  242:17
**listed** 14:14
  28:23 48:19
  128:3 129:18
  141:6,11
  174:12 177:9

185:17
**listing** 176:24
**lists** 32:9 127:23
  136:25 174:9
  222:3 242:24
**little** 15:19 16:8
  179:22 207:13
  210:13 246:10
  273:3 282:6
**LLC** 1:4,9,14
  5:11 7:4,23
  16:20 25:12
  26:6 27:3
  102:13,23,25
  116:11 118:8
  244:21 246:23
  247:2,8,13
**LLOG** 280:8
**LLP** 2:3,9 5:8,23
  lnorman@and...
  3:23
**loan** 7:17 44:5
  51:20,23 95:12
  95:18 97:14
  98:3,14 154:21
  154:22 219:6
**LOC** 95:2
**location** 285:8,10
**Locke** 2:18
  235:10
**LOG** 280:12
**Lokey** 8:23 64:14
**long** 12:21 21:10
  27:10 73:8
  132:21 149:24
  167:7 252:3,14
  253:19,20
  275:16
**longer** 157:8
  176:10 199:17
**longstanding**
  88:6
**look** 16:7,7
  119:15 127:20
  135:21 136:2
  144:8 150:12



150:17,22
194:16 235:21
243:21 256:3
257:11 263:24
283:17
**looked** 32:9 42:4
147:5 201:20
237:12
**looking** 24:23,24
25:14 100:22
119:1 129:8
135:16,21
141:7 150:13
150:20 178:21
184:8 194:21
246:24 247:6
271:11 285:25
**looks** 127:22
145:18 239:2
276:6
**Lord** 2:18 235:10
**LOS** 170:15
**lot** 15:18 36:24
99:3,21,21
123:24 157:8
188:19,19
197:2 222:1
244:15 247:16
252:19 261:22
**lots** 262:1
**Louisiana** 2:4,20
4:5 5:14,18
**low** 78:17 80:9
124:1,16 128:2
202:7,12,12,14
202:15 203:2
213:4 261:10
272:21
**low-cost** 274:21
**lower** 167:16
286:22,23
**LUGENBUHL**
5:13
**lunch** 82:7
112:12
**lwoodard@har...**

5:5 6:10

---

**M**
**M** 3:20 49:14
50:6,18 51:10
51:11 74:20
133:19 134:1
**ma'am** 11:5
**machine** 1:21
**Madam** 12:15
**magnitude** 269:7
**Maiden** 5:8
**main** 59:24 60:11
211:19,22,25
212:4,5,6,7,12
212:25,25
213:3 287:16
**maintain** 222:12
222:21
**maintained**
223:16
**maintaining**
176:12 268:12
**maintenance**
85:11 133:10
133:22,23
221:18 222:13
222:19 223:15
224:6 226:2
241:2
**major** 24:1 185:6
186:15
**making** 37:20
94:19 98:10
160:21 206:25
**man** 222:16
**manage** 93:22
101:21 139:7
172:10 175:13
175:23 255:18
**managed** 92:11
175:16,17,18
175:19,21
**management**
22:6 87:16,22
108:17,19

110:17 208:13
266:7,14
267:21,25
286:3
**manager** 19:14
19:21,22 21:10
83:8,8 95:5
102:12,16,22
102:23 103:1,4
103:9,11,13,15
103:17 104:4,7
105:19 108:4
108:13 109:7
109:12 110:7
110:12 111:8
111:15 112:20
158:13 159:1
161:23 251:2,6
251:10
**manager's**
102:24 113:15
**managers** 122:5
**manages** 23:22
**managing** 87:19
91:14 206:8
**MANGES** 2:3,9
**MANIER** 3:15
**manner** 37:23
53:21 54:2
85:20 86:6
111:12 255:15
257:13
**Marc** 9:13
**March** 33:13
40:25 136:24
**Mario** 243:7
**MARITIME**
5:11
**Mark** 88:2
**marked** 13:11,12
13:23 24:19
54:11 69:25
72:2 77:2,8,16
77:17 78:19
90:5 95:6 101:5
116:9 120:11

134:16 135:4
176:14,16
245:11
**market** 63:24
75:25 214:4
261:14 263:25
264:1
**marketed** 72:7
75:20 262:8
**marketing** 64:10
64:12,15 122:3
170:18 261:1
**material** 80:24
81:2 169:21
170:3 172:3,18
**materially**
175:11 286:21
**materials** 152:17
**Matt** 41:13
**matter** 29:12,14
29:16,25 140:7
200:25 212:11
213:4
**mature** 269:14
**maturity** 96:6
**McGill** 16:22
19:7
**McKinney** 3:4
**mdane@fwellc...**
71:18
**mean** 23:17
37:18 56:14
59:2 65:14
71:11 97:24
145:9 174:6,10
174:10,15
175:6 184:22
187:16 188:7
188:10,21
191:14 192:13
193:16 197:3
197:16 203:21
207:1 211:9
215:3 225:9
227:21 228:19
230:17 233:8

256:3 265:16
273:7 274:1
275:12 277:4
277:10 284:19
**meaning** 151:17
**meaningful**
109:10 161:5
206:5
**meaningfully**
286:25
**means** 37:20,20
37:22 83:1
119:16,17
126:3 188:8
223:4 275:3
276:12 284:12
**meant** 107:6
111:6 155:10
**mechanic** 41:13
**mechanical**
17:19
**mechanism**
90:25 91:6 96:1
96:5
**mechanisms**
149:10 208:8
248:5
**meet** 29:7,10
30:1 33:25 34:4
34:11 40:23
45:10 87:21
92:14,17,18
105:12,15
126:14 142:7
145:16 148:20
149:1,5 160:5
161:14,17
163:22 165:12
169:6,13 182:3
182:5 209:10
**meeting** 29:21
40:2,4 43:2
45:12,23 46:1
47:1 48:2,13
49:9 106:13,14
**meetings** 29:23



39:16 49:6
99:12 111:19
111:24
**member** 22:16
**members** 30:9,10
92:18 172:14
**memorized**
162:17
**memory** 177:18
**mention** 150:11
**mentioned** 8:4,8
8:10,12,14,16
8:18,21,22 9:6
9:8 19:9 20:15
48:15 54:5
102:21 145:25
169:4 170:15
189:20 251:22
**menu** 239:8
**merge** 168:2
**merged** 233:25
**merger** 53:14,17
53:20,24 54:1
197:6
**mergers** 231:19
**message** 82:6,8
**messaging** 82:3,5
**met** 29:11,11,14
29:17,23 30:3,4
30:17 106:10
221:3
**methodologies**
243:17
**methodology**
163:3,4 242:22
244:8
**Mexico** 106:20
109:25 229:6
240:22 263:19
263:20 264:1,5
264:11,25
265:2,6
**MI** 1:4
**Michael** 1:10,14
2:2 5:17 10:3
11:6 290:11,15

291:6
**Michelle** 1:19
12:10,15 24:4
26:13 45:18
56:22 57:1
141:19 156:4
291:9 292:6
**midyear** 165:5
165:20 166:1
281:23
**Mike** 70:5 142:13
**Miller** 3:14 10:6
219:19,24
220:3 235:4,7
244:13,14,17
245:6,9,12,14
246:9,12,15,18
246:19 251:12
**million** 66:6,23
67:1,4,7 68:18
72:24 73:2 78:5
95:22 99:1
127:23 129:21
130:3,20 131:7
131:9 132:8
137:2,23
138:16,23,25
139:14 140:4
140:14,18,21
141:2,6 143:15
143:17,20
144:14 148:2,3
148:7,7,12
151:18,20
153:12,19
154:3,6,8,13
155:7,17
156:12 202:4
202:19,24
203:22,25
204:10 210:25
212:9,16 224:3
224:7,11,12
225:4,22
237:10,14
238:2 258:14

258:16 259:15
259:20 260:1,6
260:8,22,22,22
260:23,23
261:5 262:11
262:15 272:21
272:23 273:23
274:3 279:6,19
**millions** 198:7
222:18 226:4
270:3
**mind** 20:21 26:8
33:15 39:2
40:18 48:3
49:23 63:8
68:24 69:9 70:2
82:25 103:7
117:18 127:18
164:17 176:15
178:10,13,25
182:18 211:22
230:1 235:6
245:23 276:3
**mine** 32:19
**minimum** 138:20
139:11 160:5
168:12
**minor** 133:4
261:8
**minute** 27:9
254:9
**minutes** 112:12
149:24 179:7
206:20 251:17
252:2
**mischaracterize**
23:17 48:22
**mischaracterizes**
196:16 205:21
207:3
**mischaracteriz...**
142:16 152:2
200:24
**mischief** 179:24
**misleading**
124:11

**missed** 25:15
30:22 62:9
174:8
**Misstates** 86:2
**misunderstand...**
262:18
**misunderstood**
144:23
**Mitchell** 22:21
30:4,23 92:25
122:3 253:4,9
253:18 266:20
**mitigation**
264:17
**mixed** 198:9
209:1
**mixes** 94:24
223:12
**model** 127:16
128:12 129:24
130:5,7 131:17
131:18 135:12
135:16,24
136:25 138:2
139:21 140:7
141:5 149:8
150:3,5 237:13
238:1
**modification**
41:15 42:21
44:5
**modifications**
41:2 250:6
**modify** 43:15
138:14
**moment** 24:6
141:22 156:6
190:19 195:23
**money** 51:20,24
147:16 154:9
155:16 211:11
211:20 212:5
212:10,11
213:4,5,6
223:19 224:23
225:2,14 226:3

274:5
**monitor** 222:8,20
**monitored**
223:16
**monitoring**
175:23 222:11
**month** 112:24
178:5,8 224:3,7
225:22
**monthly** 157:14
**months** 73:6 75:7
113:1 157:1
222:7,25 224:8
225:3
**morning** 11:9
**Motion** 65:4
**motivation**
215:18
**move** 26:18 77:3
144:17 179:5
252:16
**Mozell** 88:2
**MPI** 142:4,24
**MPIs** 143:18
**multi-decade**
109:21
**multibillion-do...**
148:15
**multiple** 272:5
279:14,15
**mute** 14:22 65:2
119:10 243:6
**mutual** 3:7 50:16
75:12 103:21
190:12
**mutually** 47:12
193:7
**mwarner@psz...**
5:20
**MYERS** 3:20

————————
**N**
————————
**N** 6:13
**N.W** 5:23
**name** 11:10
29:18 36:14



107:22 138:8
147:21 183:16
221:1 235:9
252:12
**names** 65:17,22
69:20 103:20
104:7 117:18
**Nashville** 3:16
**native** 134:18
**nature** 36:24
189:2 194:17
240:9 263:12
264:6 268:3,5
268:21 280:7
284:10,10
285:9 287:9
**navigational**
257:16
**near** 79:23
204:19 205:24
**near-term**
204:15
**nearly** 148:3
**necessarily** 204:3
264:11
**necessary** 44:1
90:3 182:5
257:13
**need** 12:25 16:4
16:14 25:3,23
26:22,23,25
27:10 67:15,20
71:13 81:16
86:22 126:16
127:4,9 130:8
134:14 147:16
169:5 174:13
174:18 180:3
201:4 220:11
226:23 232:13
250:10 258:1
259:1 265:16
**needed** 28:21
44:2 237:16
259:3 261:25
**needs** 36:25

87:11,20
133:16 138:21
236:8 247:18
256:19 257:11
**negotiated** 82:19
96:24 117:5
118:12 120:5
**negotiating** 38:3
38:9 100:19
117:7,22,25
**negotiation** 59:10
60:23 97:3,5
98:22,23 99:10
100:14,17,20
116:21 181:12
248:3 249:8
**negotiations**
82:20 98:20
99:4,7 179:18
181:8
**neither** 162:20
162:21 291:14
**net** 128:20
142:21,21,22
142:25,25
143:4,6,10,13
143:16,20
155:22,23,24
156:12 157:15
**NETHERLAND**
3:3
**never** 214:15
**new** 2:8,14,20 5:4
5:9,9,14 6:9
20:13 42:2 84:6
86:16 88:19
97:18 103:22
161:10,15
179:16 182:16
182:20 190:4
190:22 191:3
191:13,14,17
191:18,23
192:1 193:20
193:22 196:6
198:8 200:7

215:22 218:24
232:4 233:24
252:22 253:5
253:14 268:12
269:12 270:3
272:22 274:13
**NewCo** 83:13,14
83:19,25 89:18
89:20 101:20
101:24 102:9
120:24 156:17
179:14,16,17
180:3,10,25
181:13 182:10
182:15,20,24
183:3,6 190:22
191:4,5,15
192:12,22,23
193:4,21 196:6
198:5 201:24
202:3 203:10
203:11 204:14
204:16 205:5
205:23,25
206:2,22
207:11,18,22
208:6,8,22,24
208:25 209:7
209:12,16,20
214:20,24
215:15 216:24
219:1,9,21
252:22 260:18
260:24 261:3,7
263:4,5 268:3
268:10,22,25
274:17 277:19
280:23 281:3
282:7
**NewCo's** 89:18
203:13 206:7
208:7,9 264:21
268:15 274:11
**newest** 244:25
246:23
**Nicole** 4:4

**NOBLE** 3:18
**noise** 66:3 243:3
**nominal** 66:5
67:2,7 258:15
**nominate** 108:6
**non-audited**
160:9
**non-bankrupt**
187:1
**non-exhaustive**
212:23
**non-operated**
231:6
**non-operators**
280:5
**non-related-to-...**
250:4
**Noncompliance**
240:11
**nonconsensual**
190:17 191:9
232:23
**nondisclosure**
14:20,22 16:2
**nonproducing**
262:10,13
**nonrenewable**
58:10
**nonrenewal**
58:25
**nonrenewals**
58:2
**Norman** 3:20
**NORTH** 6:11
**NOTARY**
290:20
**noted** 184:16
194:5 211:2
**notes** 210:19
**notice** 7:3 11:15
25:11 26:4 27:2
29:3
**notwithstanding**
15:23 80:11
**number** 7:21,23
17:13 22:4,7

26:6 31:5 48:15
55:25 62:20
64:24 66:19
67:9 76:4 79:2
79:19 82:18
88:7 90:15
101:10 116:11
116:11 118:8
126:4 127:11
127:14 133:4
134:19 136:3
137:15,19
140:2,3,5,6,22
144:1 147:13
147:18 150:22
151:2,11,17
152:7,12 153:1
153:2 160:19
165:14 168:13
180:17 202:7
202:15,21,22
202:25 203:3
211:4 221:9,17
221:22,24
223:1,5,24
225:24 230:6
235:15,25
236:11 237:6
245:20,24
259:25 261:16
261:22 269:5,8
269:12,17
271:5,23,25
272:2,10 273:8
273:9,10,17
279:20 283:3,4
284:16
**numbered** 1:17
77:9
**numbers** 65:5,17
65:20,21
113:24 129:23
136:4 137:4,8
144:9 150:12
150:17 226:8
283:3,18



numerous 216:2
268:9

O

O 9:3 120:13
121:6,9,16,21
122:8,17,20
123:1,7,14
124:6 125:2
128:21 129:8
132:15 137:2,9
137:22 138:17
140:15,22
141:25 143:9
143:22 144:19
144:24 146:10
148:18 149:4
151:14,16
152:24 153:11
242:11 286:4
o'clock 179:10
object 24:8 33:9
36:19 38:18
43:22 44:11
45:4 47:2 55:3
56:11 59:1
63:21 76:20
82:13 84:16
85:14 86:1 87:3
88:21,23 89:11
89:24 93:5
96:14 97:21
102:3 106:6
108:15 119:10
119:25 122:11
123:2 124:8,10
125:18 139:17
140:25 141:13
141:14 146:7
146:22 148:22
149:19 151:22
168:19 172:6
172:23 178:14
184:1,11 185:3
190:7 193:1,2
193:14 196:14

198:1 204:22
204:25 213:23
215:1 216:10
217:1 225:6
263:7 267:18
276:1,10 277:9
objected 211:3
objection 12:9
39:5 55:11
56:24 57:9
58:13 123:8
145:6 186:19
187:13 189:8
193:25 205:18
215:21
objection's 194:5
objections 9:7
12:18 273:15
objective 217:6,7
248:6 254:12
objectives 161:18
208:9 209:11
217:3,10
247:19 249:10
obligation 59:4
85:12,25
157:10,12
187:3 230:24
232:14
obligations 15:8
51:6 52:2 54:9
54:18,25 55:8
58:5 59:20,22
60:10 63:4 85:4
85:16,24 139:8
144:16 145:4
145:16,20,22
148:20 149:1,5
156:16 183:7
194:9,9,10,13
194:14 196:11
196:13 204:12
204:15 205:9
206:1 222:11
232:19 233:5
248:23 275:16

284:23
obligee 185:9
186:1 192:20
obligor 185:9,11
185:16,17,18
185:21
observations
287:12,14,16
obtain 16:24
86:16,20 88:17
88:19 89:3,9,21
90:2 180:13
181:24 191:7
238:20
obtained 16:23
226:11 238:22
obvious 39:9
obviously 35:8
36:21 57:15
75:25 94:17
123:24 148:13
180:16 228:3
239:10 246:4
267:6 286:17
287:5
occasion 37:11
occasions 183:20
occur 171:4,21
occurred 61:10
237:20
offer 7:9 72:7,8
72:23 73:1,4,10
73:14,16,19
74:2,4,5 75:16
76:1,2,7,17
77:24 78:1,6,9
79:16,18,21,25
80:3 258:13,18
258:25 259:12
259:19,22
260:5,8 261:5
262:11,15
offered 73:23
119:23
offers 69:7,14,16
74:11 76:13,19

76:19 80:17,22
258:16 260:2,3
260:10,12,13
260:17,21
261:11,13,16
261:19 262:4,6
280:15
offhand 168:14
223:1
office 2:8 11:16
23:14,23 292:2
officer 21:18
25:20 84:9
OFFICES 6:12
OFFICIAL 5:6
officially 139:7
offline 126:16,20
127:1,9 129:3
Offshore 19:14
oftentimes
171:18 204:7
oh 103:24 134:25
195:7 212:1
224:24
oil 18:20 19:10
105:7 106:18
123:17 263:17
264:14,15
275:3
okay 11:1,4
15:10,22 16:3,9
16:16 25:4 26:2
26:20 27:12
28:6 61:6 65:19
65:23,25 69:23
70:19 71:2,10
71:15 77:14
82:9 98:17
102:6 134:25
135:16,20
136:15 146:14
150:6 157:21
179:5,9,25
184:4 189:10
193:12 195:13
195:20,25

196:2 199:4
200:12,13
201:23 202:2
202:21 214:10
215:13,20
220:5,10 225:9
225:10 226:10
230:16 234:25
238:5,17
241:14,22
242:15 245:9
245:18 246:8
246:17 251:24
254:6 266:1
267:12 282:6
282:13 285:21
287:17
old 258:8
on-the-job 18:24
19:9
once 102:20
171:21 197:24
one- 264:20
one-size-fits-all
202:22
one-year 236:19
ones 109:9
ongoing 42:18
53:6 62:2 73:5
91:17,20 92:2
93:23 98:21
133:1,9 168:1
171:25 181:5
181:20 190:21
224:5 234:4
236:10 240:23
242:5 247:16
247:21 275:2
online 125:9,10
126:16,22,23
127:2,5,12
128:14 129:3
129:20,25
130:5,9 132:22
133:5,19 134:5
166:14 221:19



221:20
**open** 43:17 74:14
134:18,21,24
135:17,20
176:15,17
**opening** 135:1
**operate** 87:2
89:10,22
101:18 180:11
180:14 202:17
207:18 211:10
222:20 227:17
234:9 263:21
263:22
**operated** 80:8
229:17
**operates** 269:9
**operating** 88:17
109:22 119:4
152:25 153:2,5
153:9 170:5,15
207:23 209:7
218:14 222:19
225:20 264:9
280:13 286:8
**operation** 22:12
37:8 85:1 91:21
118:17 180:4
234:9 256:13
283:21
**operational**
24:17 32:11,18
32:21 33:6
109:19 121:24
122:2 145:1
171:1 255:8,10
255:18 256:18
**operationally**
155:4 174:21
206:3
**operations** 22:22
23:12 30:4,5
37:14,14 83:9
86:17 91:2
114:22,24
122:5 148:10

171:1 173:3,6
234:17 236:11
**operator** 87:5,6
88:13,15,16
89:3,15 227:23
241:15 242:1
263:10 284:4
**operator's**
263:15
**operators** 263:19
**OpEx** 153:7
**opinion** 172:4
274:15 283:9
283:11 284:5
284:20 285:1
**opportunities**
19:17 49:14
50:6,18 74:21
93:24 205:5,7
242:23,25
271:11 274:20
274:21
**opportunity** 91:1
92:6 267:9
268:23
**opposed** 107:6,7
187:11 214:19
216:25 226:6
268:12 285:10
**optimize** 249:12
**option** 246:25
**options** 44:4,8,14
214:6 249:12
**oral** 1:8,13
230:12 291:5
**Orange** 2:14
**order** 13:14
29:15 37:1
49:17 50:15
51:13,14 60:7
60:18 74:24
83:9 87:2 89:10
89:21 125:16
126:14 127:5
127:10 132:22
132:24 133:7

138:21 139:10
148:20 149:5
153:16 159:11
159:17 160:5
161:13,17
162:1 169:6,13
170:13 171:7
171:23,24
175:25 180:11
180:14 181:24
182:6 184:5
194:8 217:11
224:8,9 232:14
232:16 247:15
247:17 269:6
**ordered** 13:14
**orderly** 111:6
**orders** 226:11
229:14,22,25
230:5,23 231:1
231:5,9,24
232:10
**ordinarily**
269:15
**ordinary** 53:1
62:2 80:23
91:20 156:2,18
171:1 240:16
240:18 275:17
**org** 92:25
**organization**
83:24 253:6
254:1
**organizational**
25:24
**organizations**
109:20
**original** 20:3
53:25 60:7 73:9
115:10 196:4
228:8
**originally** 85:5,8
147:24 221:13
**Orleans** 2:20
5:14
**Orlov** 277:23

278:6,7
**ORRI** 280:9,10
281:3
**outcome** 66:15
**outfit** 20:12
179:14
**outline** 25:15
102:15,18
135:14
**outlined** 31:5
80:5 96:9 103:9
103:18 110:20
131:7,8 208:16
279:3
**outlines** 75:3
123:16 138:3
140:9 177:21
**outset** 60:21
**outside** 18:6 21:6
21:7 33:25 34:1
62:23 158:22
161:3 164:18
164:21,25
169:15 213:17
249:21
**outstanding**
177:12,22
178:3 188:17
199:13 201:1,6
219:7 224:21
232:25 234:4
240:21,24
254:22
**outweighed**
213:6
**overall** 37:15
66:19 120:7
152:22 217:4
261:9 284:23
**overcome** 212:10
**overlap** 171:4
**override** 280:23
**oversee** 22:4,7
24:15
**overseeing** 22:17
158:10

**oversees** 23:15
24:12
**oversight** 22:25
23:11,25
208:13
**oversimplifying**
138:24
**owe** 195:5
**owed** 184:24
211:11
**owes** 186:4,17
187:8 189:4
**owned** 80:7 91:3
231:19
**owner** 83:6
217:19
**owners** 68:21
69:1 253:5
263:18 270:15
276:23 277:1
**ownership** 203:6
270:13
**owns** 269:12
275:23 284:11

**P**

**P** 51:13 58:1,4
99:13,18
130:24 131:11
131:13,15,17
131:19 132:8
137:10,11,21
137:23,24
138:3,6,22
139:7,10,12,22
139:25 140:8
141:5 144:2,12
146:3 147:11
148:8 149:7
150:9 151:15
155:14,15,20
194:11 195:3
196:11,12
202:2,8,9,11,16
202:18 203:17
203:19 204:11



204:12,15,18
205:4,6,9,13,25
206:3,22,23
208:1 209:21
210:1,9,12
220:16 226:3
235:11 237:1,3
237:9,13,14,25
238:2,7,7,14,18
238:23 239:3,8
239:14,24
240:7 275:16
279:23,24
282:13 283:20
284:22
**P-50** 283:5
**P-90** 283:5
**P.C** 6:12
**p.m** 1:18 288:10
**P.O** 4:21
**PACHULSKI**
5:18
**package** 262:8
**page** 7:2 8:2 9:2
9:4,9,11 10:2,7
10:7 27:21
116:14 119:1
120:14 123:12
127:20,20
201:23 245:24
246:13,16
253:22 289:2
**pages** 7:14,17,21
7:23 8:23
291:12
**paid** 148:6
211:21 212:5
212:19
**painfully** 264:3
**paint** 283:6
**Palace** 3:21
**pandemic** 165:4
165:6,14
175:16
**paper** 31:14,17
31:23 32:2

**papers** 31:12
**paragraph** 98:14
**parameters** 8:7
279:2
**paraphrase**
270:5
**Pardon** 246:15
**Parkman** 46:11
46:13,15,23
118:6
**Parrott** 5:22
**part** 16:5,8 22:6
32:15,16 51:11
51:22 52:17,21
61:22 62:18
64:3 75:4 82:19
84:10,14 90:14
90:22 91:17,20
93:22 96:25
98:19 111:10
111:17 120:6
122:22 127:12
133:9,23 147:4
149:8 160:10
162:15,23
165:1 167:24
169:8 173:22
173:22 188:22
191:25 198:24
207:21 211:12
211:14 213:9
214:8 219:10
225:24 231:21
231:21,22
232:3 251:2
255:17 260:18
270:4 281:10
283:22
**participants**
13:17 92:20
121:15
**participate** 41:8
121:21
**participated** 41:9
41:11 92:21
**participating**

173:24
**participation**
264:1
**particular** 16:6
23:15 32:16
35:11 49:24
62:23 72:8 73:6
75:14 76:9 97:5
126:8,10
133:15 136:3
172:16 178:19
203:5 204:9
226:19 227:10
244:2 257:20
257:24 259:8
279:13
**particularly**
11:25 79:11
109:24 116:6
123:25 209:17
249:9
**parties** 32:13
33:13 37:24
44:1 50:16
59:23 61:25
62:2 68:13 97:1
98:21 99:3
103:10 111:23
118:13 120:8
167:1 185:8,8
190:12 193:7
213:9 229:25
230:23 231:11
238:12 239:17
247:14,17,20
250:12,20
251:5 256:9,10
256:14 257:5
273:6 291:16
291:18
**Parties-in-inte...**
1:16
**partly** 191:25
**Partners** 9:12
**parts** 93:14
217:18

**party** 2:16,22
3:18 4:2,8 5:11
14:21 15:7
37:14 46:19
72:5 73:13,16
76:2 78:2 79:17
95:19 103:19
118:4 156:23
181:8 187:4
231:9 232:16
232:16 250:5
256:11 277:1
**party's** 230:24
**Pasquale** 5:7
**pass** 74:13
244:12 288:4
**passed** 76:10,12
**path** 213:19
**paths** 45:16
**Patrick** 30:7,20
**Paul** 2:7
**pay** 154:15,19,23
156:25 189:5
195:6 196:12
200:20 212:9
**payables** 156:18
157:3,16,17
**paying** 107:3,8
187:9
**payment** 210:1
248:23
**payments** 44:21
157:6
**PC** 2:13
**PDF** 27:7,22 77:5
77:17 246:2,16
**PECK** 5:13
**penalty** 290:7
**pending** 221:18
222:13 241:8
**penetrate** 274:12
**people** 179:24
216:20 267:6
**percent** 67:16
100:25 101:4
142:22 159:16

159:23 168:6
168:12 256:10
259:4 264:20
264:21 269:23
269:23 270:6,6
270:7 277:25
278:5,7,10,11
278:13 280:9
284:19,20,22
284:24,24,25
**percentage** 226:5
284:13
**perception**
211:19
**Perez** 12:8,24
13:8 245:6
**Pérez** 2:3 11:5
13:7 15:1,16
16:5,13,16 24:2
24:8 28:1,15
33:9 36:19
38:18 39:5 42:1
42:8 43:22
44:11 45:4 47:2
55:3,11 56:11
56:23 57:8
58:13 59:1 61:4
62:7 63:21 65:3
65:9,11,13,16
65:21,24 69:22
70:5,11,17 71:1
71:3,4,7,11
76:20 77:9,14
77:18 81:4,9
82:13 84:16
85:14 86:1 87:3
88:21 89:11,24
90:9 93:5 96:14
97:21 98:7
102:3,19 106:6
108:15 112:13
112:15 119:9
119:25 122:11
123:2,8 124:8
125:18 126:22
131:22 134:22



MAGNA
LEGAL SERVICES

134:25 135:8
136:15,22
139:17 140:25
141:13 142:13
144:17 145:6
145:13 146:7
146:14,22
147:6 148:22
149:19 151:22
157:21,24
168:19 172:6
172:23 175:6,8
178:14 179:9
179:22 181:15
184:1,11 185:3
186:6,10,19
187:13 188:4,7
189:8 190:7
192:6 193:1,14
193:25 195:14
195:20,25
196:14 197:14
198:1 199:24
201:9,13
204:22 205:18
206:25 208:3
211:24 213:23
215:1,17
216:10 217:1
220:7 225:6
227:20 228:18
230:7,15 235:3
241:17 245:8
246:9,14,17
251:16,24
252:3,6 263:7
267:10,18
273:2 276:1,10
277:9 288:7
**Perez's** 12:18
**Perfect** 77:18
**perform** 20:24
20:25 21:2
23:11 56:9
115:18 132:21
138:21 145:4

166:21 167:13
224:2
**performance**
23:25 124:23
243:23 287:15
**performed** 21:5
132:24 158:6,7
218:9 283:18
**performing**
247:22
**performs** 158:17
167:10
**period** 41:1
52:25 53:8
61:19 69:9 73:8
92:11 121:1
124:21 127:22
130:3,12,21
131:14 136:24
137:2 138:22
139:13 140:11
143:15 144:8
144:12,13
147:15,17
155:19 157:3,4
157:5 174:14
174:19 226:25
237:24 244:4
264:20 286:20
**periodic** 171:8
**periods** 76:13
144:1 153:17
154:5 205:10
**perjury** 290:7
**permanently**
165:15
**permission** 245:7
**permits** 238:20
238:22
**permitted** 238:17
271:13,15,23
271:25 272:2,4
272:7,8,10
**perpetually**
275:20
**person** 35:11

158:23 266:12
**personal** 253:12
256:17 281:5
281:14 282:1
**personally** 18:8
20:22,23 35:12
35:22 43:4
83:18 97:2
104:3,6 105:23
105:23 115:5
121:2 122:15
161:19 176:4
256:1 262:2
**personnel** 114:8
168:7,8
**perspective**
24:17 38:2,9
59:18 60:4
98:11 117:8
118:5 145:2
155:13
**phase** 49:22
**PHILADELP...**
3:13
**Philip** 2:18
**phone** 29:24
35:24 58:15
164:7
**phrased** 58:19
128:25 178:11
**phrasing** 212:18
**physically** 122:19
122:22 222:24
223:7,10,15,20
223:21
**pick** 221:6
229:11
**pipelines** 257:21
282:21
**place** 12:2 37:1
44:2 47:24
55:18,20 60:6
68:10 85:23
101:24 102:5
104:1 111:14
111:19,24

114:14 117:24
171:20 172:19
173:18,23
176:11 199:5
208:8 221:16
227:19,24
228:2,17
229:19 236:15
237:22 263:21
263:22
**placed** 143:21
260:24
**plan** 7:16,20
32:11,18,21
33:6 37:18 38:5
39:9 40:8 41:6
44:25 45:8 52:4
52:4,9,22 64:3
72:20 79:7,22
82:22,23 85:20
86:7,15 90:14
95:10 97:18,20
98:1 101:9,24
102:5,10
104:25 115:25
120:16 122:1,9
123:16 149:11
156:1,11,15
162:16 172:20
173:2,4,6,10,12
173:13,14,16
173:20,22,25
174:3 180:15
181:22,25
182:7 183:4
190:10,14,16
191:8 192:25
193:5,9 197:3
198:6 199:22
200:1,4 201:2
201:14 205:21
209:4 210:8
215:5,9 216:4
217:4,8,9,19
218:3,7,20
219:9 221:4

226:7 228:1,8
231:12,19
232:22 234:22
239:19 240:3
242:1,2,6
247:23 248:7
249:25 250:10
255:12 256:12
257:10 268:11
268:20,21
270:23 271:1
274:8 275:11
275:21,22
280:21,22
**planned** 239:8
242:10,18
254:11,23,23
**planning** 171:1
171:10,20
175:24
**Plano** 6:4
**plans** 52:18
62:14 121:12
216:15 235:11
255:10,18
270:24 274:25
**platform** 202:18
204:8,9 257:2
**platforms** 176:25
204:1,6 223:9
223:11 239:4
240:3 282:20
**plays** 142:19
**PLC** 4:2
**please** 11:2 18:23
19:5 24:5,21
26:9 27:9,20
38:15 45:19
70:24 87:25
90:7 92:19 95:8
95:16 101:6
116:10,14
120:19 123:12
134:18 141:19
142:1 150:1
155:21 156:5,8



160:17 163:2
170:8 176:15
176:21 224:24
234:13 245:5
258:22 281:1
**PLLC** 5:3 6:8
**plug** 54:8
**plugging** 60:1,9
95:24 115:18
119:5 130:15
136:4,25 151:7
284:13
**plus** 100:24
138:11,13
139:4 150:21
150:22 155:14
**PO** 3:10
**point** 12:14 14:4
35:16 43:8,25
63:9 74:21
116:24 117:1
117:14 124:21
131:1 158:23
166:23 191:16
194:2 218:8
225:16,17
240:13 249:16
261:20,21
**pointed** 137:6
150:15
**points** 76:25
**policy** 162:3,5,7
164:4 173:8,9
173:23
**POLK** 5:23
**poorly** 178:11
**populated** 83:15
**portfolio** 52:20
167:12 169:23
169:24
**portion** 64:8
132:20 203:11
231:25
**position** 19:19
21:13 48:18
60:21 74:23

76:18,23 83:19
83:21 108:23
109:7 110:5
112:8 113:10
113:25 114:2,4
252:22
**positive** 143:4
156:11
**possibility**
251:22
**possible** 79:12
163:11,18
193:8 243:3
**possibly** 252:5
284:23
**post** 82:23 83:4
83:24 84:4,8,15
85:1 86:17
88:13,20 89:10
89:22 156:15
180:4,11,14
181:1,14
182:10,25
207:18
**post-effective**
156:19,21,22
**post-emergent**
186:15
**post-petition**
196:24
**potential** 40:24
42:24 44:18
45:10,16 47:11
47:13,25 48:4
48:19,21,25
49:10,12,14
50:11,12,13
51:10,11,16
52:9 60:8,14
91:7,11 92:3
93:23 95:20
97:9 105:14,20
108:18 250:17
251:10 263:19
**potentially**
274:11

**Poydras** 2:19
5:13
**practical** 155:13
**practices** 244:10
**pre** 156:15,22
**pre-bankruptcy**
209:14,15
**pre-effective**
156:17
**pre-petition**
85:19 114:6,10
114:16,18,23
115:5,8,14,17
115:21 116:2
186:24
**preceding** 61:19
**predecessor**
39:11 47:21
54:6,10 192:18
192:20,24
204:21 228:24
229:11 270:13
276:20 277:7
**predecessors**
32:22 205:16
228:5,6,7,9,14
229:5,6,14
269:13 275:25
276:8,16
278:16 280:22
281:2
**predicated** 67:17
**predicted** 129:15
**prediction** 130:2
**predominantly**
110:25
**prefer** 15:12,13
15:14 215:14
216:24
**preliminary** 8:9
113:12
**premise** 145:9
193:16
**preparation** 30:2
30:25 31:9
33:16 34:2,5,12

34:16,21,23
39:21 40:1,3,9
40:19,22 87:22
92:15 122:23
162:17,24
163:21 170:17
170:20 171:14
281:16
**prepare** 29:7
**prepared** 31:9,17
159:12 160:11
164:12 165:23
166:5 168:3
175:1 217:17
218:5 281:7
**preparing** 33:20
39:15 92:22
163:23 171:3
286:5
**prescribed**
172:13
**present** 6:16
29:21,22 41:21
45:7 106:5,11
175:2 279:15
**presentation**
32:14,24 33:2,4
47:4 48:16
**presentations**
32:12,13 99:11
99:13,15,20,22
**presented** 53:10
82:17 128:12
**presently** 148:2
264:21
**presents** 264:25
**president** 21:14
21:17,20,20,23
22:2,21,23
25:21 30:4,5,6
30:8 38:13,22
38:22 87:15,21
122:4 132:12
158:15 253:24
**presumably**
136:24

**pretty** 192:3
202:7
**prevent** 207:22
208:12
**preventing** 147:7
208:5
**previous** 265:25
267:9,22
268:16
**previously** 27:14
48:12 72:6 78:3
78:18 268:5
280:17
**price** 67:18 78:5
78:16 165:11
221:14 259:3,6
286:17,19
287:8
**prices** 165:9,13
167:16 263:16
264:16
**pricing** 147:14
165:7 170:5
264:13
**primarily** 38:3,7
38:8 83:15
177:7 220:2,16
221:4
**primary** 39:11
93:21 108:23
139:6 185:10
185:16,21
189:3 221:11
**principal** 78:10
185:22 186:4
186:16 187:8
188:1 190:4
191:2,10
192:19,24
199:16,20
219:7
**principally** 87:16
118:4
**principals** 190:11
190:18
**principle** 74:8



principles 232:24
prior 46:17,20
  52:24 62:14
  63:10 64:2
  75:18 76:1 78:4
  79:21 105:13
  119:7 153:16
  154:5 155:12
  218:19 226:23
  239:11 254:15
priority 176:24
  178:18
private 20:14
  192:12,14,15
  192:19 193:10
  193:22 196:5
  196:13 197:12
  198:15
probable 163:11
  262:5,16,19
probably 16:14
  71:13 100:1
  134:18 182:23
  192:9 223:13
  235:23 259:7
  269:6,23
  273:23 286:23
problem 12:22
  212:10,11
  243:8 246:12
problematic
  78:15 258:24
  259:1
procedure 1:23
  103:8,18,21
  105:17,20
  160:12 163:25
  173:23 251:5
procedures 164:3
proceeding 11:17
  11:22 26:5
  81:16
Proceedings
  288:10
process 13:1 35:9
  63:6 64:6,10

66:14,15 73:9
  75:19,24 76:3
  78:4,11 91:19
  103:7,16 104:1
  110:8,12 113:6
  113:18 123:10
  160:15,18,19
  161:2,22
  166:24 167:4
  169:2 170:4,8
  170:10,17
  172:19 173:18
  175:16,17
  181:9 190:6
  210:20,22
  213:1,8,10,11
  213:16,17,19
  214:8,14
  217:12 223:6
  231:1,4 233:14
  238:9 243:22
  251:2,7 258:11
  259:8 261:1,18
  261:22,24
  262:2,9,22
  280:18 283:22
  284:3
processees 74:11
processes 282:25
procurement
  25:21
procurements
  22:10
produce 65:4
  164:10
produced 1:14
  65:14 176:3
  239:16 240:12
producing 125:5
  125:6 153:6,7
  204:17 262:5
  262:10,12,13
  262:16 274:18
  278:19,22
  279:14,15
production 8:17

17:18,22 22:22
  23:1 30:7,22
  123:19,25
  124:14 125:11
  125:12,16,21
  126:8 127:6
  128:2,7,8,10,15
  128:18,20
  129:3,7,9,10,12
  129:15,17
  130:1,6,10,13
  132:23 133:8
  133:12 134:2
  139:2 147:13
  153:3 166:10
  171:6 222:5
  226:11,13,24
  227:4 242:21
  243:20 264:18
  264:22 274:5
  286:24
productions
  239:1
professional 1:20
  14:19 291:11
professionals
  20:10 91:15
  164:15,18,22
  164:25
profile 211:14
profitability
  286:21
profits 142:21,22
  142:22,25,25
  143:4,6,16,20
program 30:11
  133:10 238:7
  240:24 243:19
  243:23 244:7
  271:2
programs 243:15
prohibit 79:19
project 17:20
  93:2,8,11 145:2
  146:4 184:8
  232:12 243:13

project-specific
  283:1
projected 130:15
  130:20,24
  145:13 264:22
  287:15
projecting 142:7
  146:18
projection 124:6
  125:2 126:14
  127:23,25
  129:8,19 131:9
  134:5 137:2,19
  139:15 142:11
  142:19 143:9
  143:10,16,18
  143:22 144:21
  150:9 151:16
projections 9:4
  99:4 120:15,23
  120:25 121:14
  123:15 125:3
  125:14,24
  126:11,11
  127:6,13,15
  128:4,16
  130:19,22
  131:1,6,12,15
  131:18 132:17
  134:8 135:13
  138:18 139:20
  141:4 142:16
  143:25 146:9
  149:3 150:16
  201:24 202:3
  207:23 242:8
  242:19 243:1
  271:8 282:7
  284:15 286:3,5
  286:20,25
  287:4,5
projects 91:8,12
  91:20 92:4,6,12
  93:17,25 94:3,6
  94:11,14,20
  95:3 115:15

123:13 133:11
  134:9 151:5,7
  152:9 167:17
  167:19,20
  171:20 172:16
  202:10 238:11
  243:19 244:1,3
  282:13 283:7
  285:10
prompted 248:1
properly 37:22
  262:23
properties 7:10
  19:24 20:20
  49:18 50:22,25
  51:1 52:14,17
  53:5 54:14 60:2
  63:7,12,17,20
  63:24 69:2,8,17
  75:9,10 79:3,6
  79:10,13 82:12
  82:24 91:9,15
  91:17,19,23
  93:3,22 99:14
  100:9,11
  101:21 102:2
  119:6,6 130:16
  130:25 131:11
  131:12,16,20
  132:23 135:25
  140:21 141:4
  141:10 142:23
  143:1,3 160:22
  161:4,6,10,13
  161:15 166:18
  167:14,15
  168:14,16,17
  169:4,7,12
  171:11 175:4
  176:10 206:12
  206:15,16,17
  206:17 213:22
  214:2,12 220:1
  221:5,22,24
  222:1,2,4,8,12
  222:23 223:2,9



223:14,20,25
224:4,13 225:4
225:15,20,21
225:24 226:1,7
226:9,12,19
227:18,23
228:3,6,15,24
229:1,2,3,9,11
229:17,20
231:6,14,23,25
232:10,12,20
233:11 255:9
255:13,21,24
256:2,17,19,22
257:5,7,11,12
257:17,22
258:4,9 261:7
262:7,13 276:7
280:17 283:14
284:22
**property** 52:20
72:6,9 77:25
79:1,11 80:5
91:19 126:5
160:24 171:9
172:10 222:3
222:10 226:6
227:7,8 233:10
233:12 255:3,6
255:12 257:1
261:9 280:11
285:3
**property-by-p...**
256:20
**property-speci...**
284:7
**proponents**
250:1
**proposal** 104:7
107:17
**proposals** 95:3
107:24
**propose** 91:1
103:20 175:25
**proposed** 45:7
52:4 78:4 96:23

104:10 105:22
200:7 244:21
**proposition**
270:2
**protected** 13:21
**protection** 62:6
**Protective** 13:13
**protocol** 256:3,5
**protracted** 73:7
**proved** 163:10,18
175:3 262:19
262:20
**provide** 49:17
52:3,10 56:14
60:7 95:16 99:6
100:7 101:21
105:11 170:13
171:9 179:16
180:20 190:22
249:21 285:12
**provided** 13:8
14:11 31:7,16
31:18 32:12,13
32:15,24 47:4
66:13 69:18
76:24 79:18
107:24 127:16
137:13 138:1
149:10,13
154:10 159:24
161:21 170:18
177:19 184:5
240:1 246:3,6
246:20 248:23
**provider** 83:9,11
83:12 185:9
191:21
**providers** 62:13
102:14 249:21
**provides** 147:25
**providing** 13:9
51:12 153:19
191:18 249:5
250:21
**provision** 41:17
41:17 43:1

115:12 250:18
**provisions** 1:23
44:19 47:8
57:22,25 58:3
95:23 102:11
120:9 159:18
189:16 198:24
249:13
**public** 228:3
290:20
**publication**
122:8
**published** 228:11
**PUD** 174:5,9,12
**puds** 174:17
**pull** 15:11 16:15
24:21 28:21
69:24 70:3 77:5
90:6 95:8 101:6
116:10 120:13
177:25 245:13
**pulled** 15:14
**purchase** 7:9
67:18 69:7,16
78:5,16 179:14
259:3,6
**purchaser** 63:13
67:13 83:13
89:16 90:25
91:1 218:25
**purchaser's**
67:14
**purchasers** 89:9
91:7 94:23
**purposes** 121:7
144:6 165:9
176:11 209:25
**pursuant** 1:22
13:13 85:4,7
86:7,15 93:9,25
94:6,18 102:13
107:8 118:23
127:15 141:4
142:4,20 144:6
149:13 155:2
168:4 180:15

280:12
**pursue** 45:17
50:6 66:14,15
208:22,24
271:11 275:20
**pursued** 41:7
**pursues** 208:15
208:18
**pursuing** 79:20
80:14
**put** 60:6 108:8
143:5 150:7
178:10,13
206:24 211:17
224:9,9 245:3
245:12 249:16
280:17
**putting** 274:6

―――――――――
**Q**
―――――――――
**Q-1** 238:16
**qualification**
41:20 42:23
44:16,20 47:8
**qualified** 41:19
165:10 241:15
242:1
**qualify** 34:25
219:5 227:1
**quality** 204:23
275:22
**quantum** 54:8
**quarter** 33:12
75:21 112:21
278:22
**question** 12:5,5,7
14:3 24:3,9,18
26:11 28:22
33:10 35:1,18
36:20 38:19
39:25 42:12
43:12,23 44:12
45:5 47:3 48:4
48:24 49:3,5
52:12 54:23
55:2,4 56:12,20

56:21 57:2,12
58:16,20 59:2,8
61:5 62:9 63:22
64:20 66:3 67:5
68:24 69:15,20
76:8,21 82:14
82:16 83:2,3
84:12,17 85:10
85:15 86:2,24
87:3 88:23
89:12,18,19,25
92:13 93:6,9,15
93:19,21 94:9
94:24 96:15
97:7,22 101:16
102:4,7 106:7,9
108:11,16
109:2 114:17
115:23 116:1
116:15 119:11
120:1 122:12
123:3,4,11,20
124:9,10,11,25
125:19 126:23
126:24 127:19
129:16 130:7
133:17 135:23
139:18 140:1
140:16,17
141:1,9,14,15
143:12 144:18
144:23 145:7
145:10 146:8
146:17,23
148:23 149:20
149:23 151:23
152:1 154:18
160:1 164:18
168:20 172:7
172:24,25
173:7,11 174:7
176:3 178:11
178:15 180:1,8
184:2,12 185:4
186:7 187:2,7
187:15,20



189:11 190:8
192:6,8 193:2,3
193:15 194:3
195:14,15,21
196:1,4,15
199:11 200:17
200:18,25
201:12,17
204:23,25
205:2,2,12
206:11,20
207:2,6,9,10,16
208:3,20,23
212:14 213:2
213:24 214:11
215:2 216:11
216:11,22
217:2 218:8,11
218:19 223:12
225:7,11,16
230:2 232:3,5
233:2 234:12
234:19 236:17
236:22 241:21
242:7 246:21
250:16 262:17
263:8,24
265:17 267:4,5
267:19 271:19
276:2,4,11,14
277:10,11
281:20 285:19
287:14
**question-and-a...**
11:22
**questioning**
25:25 109:3
198:23
**questionings**
179:8
**questions** 8:19
11:23,24 12:18
13:3,5 16:11
25:15 176:5
219:14,25
220:14,15

235:1 246:5
251:21 252:16
252:19 267:11
271:22 273:4
287:17 288:8
**quick** 242:7
252:4
**quicker** 15:18
**quite** 40:16
227:20 228:19
239:10
**quo** 85:12
**quote** 58:25

────────
**R**
**R** 2:3 133:19
134:1
**raise** 14:4 50:15
51:5 67:15
**raised** 178:23
**ran** 64:14
**range** 51:8
113:22 114:3
122:2 124:17
272:19 273:24
274:3,21
279:22 285:5
**RANKIN** 5:13
**rate** 100:12,14,19
100:21,23,24
101:2 123:18
130:10
**rates** 125:21
128:7 129:13
**re-completed**
171:17
**reach** 35:17 43:4
47:19 61:1
286:10
**reach-out** 48:7
49:2,7,22
**reached** 43:6
74:22 179:15
206:6 228:5,9
229:23 232:17
269:14

**read** 24:5,7 27:10
42:13,14 45:19
45:20 56:22
57:1,5 61:5,7
62:8,8,11 70:8
102:15,18
132:5 135:14
141:23 156:5,9
195:14,19,20
195:24
**ready** 26:18
**real** 146:18 147:9
197:20
**reality** 146:16
201:5
**realize** 195:25
196:1
**realized** 25:15
**really** 48:6
108:25 200:13
277:10
**reason** 78:7
178:12 214:9
252:6 267:23
285:11 289:2
**reasonableness**
286:2
**reasons** 67:7,10
67:11,12 80:1,2
110:4 211:4
258:18,21
262:1
**recall** 29:4,13,15
34:3,10,14,18
35:3 36:14
39:19 40:7 48:3
49:8 53:25
55:25 60:20
61:9,17,24
62:15,22 63:5
68:3,4 73:15
76:11 100:20
107:21,22
112:3,22
113:24 118:22
166:25,25

189:25 190:23
207:10,15,16
210:16,18,25
211:6 260:3,5,8
262:4
**recapitalization**
64:7 66:16
**recapitalizing**
218:25
**receipt** 157:7
**receipts** 157:14
**receivables**
157:17
**receive** 64:17,21
80:22 101:22
156:20 157:6
219:8
**received** 19:6
64:22 66:9
68:14 69:6 70:9
73:15 74:10
78:9,18,18
79:21 80:25
81:3 82:6,8
157:13 210:15
210:17 239:15
240:16,19,20
241:4,6 258:13
258:14 259:6
269:14 280:15
**receiving** 76:1
156:24 281:3
**Recess** 42:10
81:13 112:17
132:4 158:1
179:12 252:9
**recite** 271:16
**recognition**
163:15 164:3
168:5 259:8
**recognize** 163:9
163:12 166:7
**recognized**
165:10
**recollect** 21:4,9
81:2 96:18

109:8
**recollection** 59:5
61:20 100:18
**recompletion**
134:9 243:12
243:14,24
244:7
**recompletion-r...**
243:19
**recompletions**
242:12,15,16
242:18 243:23
274:22
**reconcile** 140:8
**reconciliation**
138:5
**reconsulted**
236:9
**record** 1:24 24:7
25:5 26:12,15
42:11,14 45:20
48:13 57:5 61:7
62:11 112:18
132:3,5,6
141:23 156:9
158:2 179:4
195:19,24
252:10 255:2
**records** 124:23
235:21 273:17
**recoveries**
217:22
**recovery** 219:3,4
**rectified** 177:12
177:16
**redacted** 65:5,17
69:21
**redline** 245:21
246:4 247:1,11
**redlines** 245:22
**reductions** 67:19
**reestablish**
132:25 133:8
**reevaluation**
100:11
**refer** 63:16 68:16



reference 76:15
79:4 176:12
188:16 219:15
221:3 272:25
referenced 26:5
140:14 174:15
178:2,22 278:1
referencing
15:12 128:9
referred 282:9
referring 14:12
32:19,23,24
63:9 69:10
138:9 190:25
195:3 196:10
208:18,19
253:24 281:21
284:16 286:4
reflect 137:16
144:9 148:25
166:3,4 261:20
268:20
reflected 130:12
161:17 261:16
reflection 146:16
167:22
reflective 261:14
reflects 118:11
137:18 153:5
166:6 284:22
refusal 68:20,23
68:25 69:5
regard 94:11
149:16 230:19
281:14 282:8
284:5 286:11
regarding 28:17
40:24 45:10
61:25 63:3 92:2
99:10 103:16
113:21 163:25
164:5 166:19
181:21 227:13
229:24 234:8
249:24 250:10
280:9,16 282:2

Regardless 150:6
222:10
Registered 1:20
291:11
regroup 196:4
regular 18:15
35:10,22 115:6
115:7
regularly 171:22
regulated 265:2
265:7
regulations
180:15 229:6
229:12 234:21
236:5,7,16,24
258:2
regulators 239:7
257:4,7
regulatory 67:23
88:7 175:20,24
192:16 234:7
234:15 236:9
236:14 241:14
255:16 265:1
283:25
reimbursable
58:10,25
reimbursement
58:4
rejected 66:8
78:6 186:25
relate 126:17
133:19 134:5
135:24 198:19
203:5 284:15
related 32:22
38:24 41:1
44:17 49:13,18
52:21 57:21
78:1 79:2 95:24
126:4 128:23
133:8,24 134:9
134:13 143:1
153:17 163:14
165:4,6 169:7
181:21 224:21

227:7 242:20
242:23 257:24
281:16 285:9
291:15
relates 11:17
119:17 134:11
171:25 184:19
200:3 239:24
278:15 279:9
relating 76:14
78:25 143:24
177:3 273:7
relationship
110:6
relationships
87:19
relative 73:8
78:17 169:7
202:12,12,14
202:15 203:9
205:8 238:10
257:25 291:17
relatively 73:8
226:19
relevant 32:10
37:12 39:12,13
40:17 60:12
126:9 140:9
reliability 284:7
reliable 284:5
reliance 143:23
relied 281:7,12
281:19
relief 157:11
relieve 194:8
remain 85:22
221:25 222:11
remaining 179:8
204:17 279:11
remains 266:12
remedies 154:11
240:14
remember 64:19
remotely 11:3
remove 258:8
reorganization

7:16,20 35:13
38:5,10 39:4
40:8 43:25 44:6
45:3,8 60:18,19
60:25 72:20
79:8 82:22
90:15 95:10
97:18,20 98:1
101:9 116:1
120:16 122:9
162:16 217:9
234:23 250:3
reorganize 43:21
reorganized 84:4
84:8
repaid 217:15
218:2,18
repair 133:10,21
133:23,25
221:18 222:13
222:19 223:14
224:5 226:2
241:1
repairs 134:10
134:14 222:16
223:6 224:2
repaying 155:1
repayment 210:2
repeat 24:2 58:16
173:7 174:7
180:5 232:2
274:1
repeating 68:24
117:18
rephrase 18:4
35:18 43:12
49:4 52:12
54:23 55:2 58:8
59:16 63:10
64:20 67:5
69:15 76:8
84:12 85:10
108:11 127:18
129:15 133:16
160:1 187:22
241:21

replace 192:12
192:23 193:22
197:12
replaced 191:1
replacement
190:11 193:6,8
193:10 196:5
198:24
replacing 198:14
report 8:23 9:13
67:21 92:23,24
110:15 158:21
159:3 162:15
162:21,21,23
164:16 165:10
165:18,21,22
165:23 166:1,3
166:4,15
167:22 168:10
169:25 170:6
170:10 174:2
174:13,16
176:11 259:2
281:8,10,15,19
281:21,22
282:2,5 283:21
reported 1:21
reporter 1:19,21
11:1,2 12:15
24:6 42:9,11
45:22 57:3
58:14 61:4,6
62:8,10 81:12
112:16,18
132:2 141:21
156:6 157:25
158:2 179:11
195:17,23
243:5 252:8,10
291:10,11
Reporter's 10:8
291:4
reporting 110:19
164:23 166:8
175:24 284:1
reports 25:17,19



25:23 28:5 32:7
110:17 158:14
164:11,12
165:23 167:25
174:18 175:1
281:6,12,16
284:1
**represent** 113:9
125:3 126:11
131:12 155:24
183:20 206:18
228:5 235:10
244:6 252:13
270:1
**representation**
42:19 124:5,9
283:15
**representations**
123:1
**representative**
28:2,11 36:5,7
75:14 122:16
160:21 284:12
**representatives**
76:6
**represented**
121:11 262:7
282:4
**represents**
139:22 151:2
203:10 209:2
**request** 9:7 14:20
43:13,14,17
**requested** 24:7
41:16 42:14
45:20 57:5 61:7
62:11 132:5
141:23 156:9
192:10 195:19
195:24 247:7
247:12
**requesting** 52:1
**requests** 149:9
160:13
**require** 41:19
58:3 74:25 87:7

125:16 148:19
174:20 191:6
223:14 228:1
229:6 236:5
240:25 250:7
**required** 41:2,18
45:17 47:9,14
52:9,23 55:14
64:5 65:4 66:13
67:18 85:5
86:20 87:6
88:13,15,17
89:21 90:2
94:22 95:22
99:14 130:10
133:7 139:9
142:3 143:5,21
144:4 145:2
149:4 151:18
153:17 154:8
154:11 156:25
160:23 162:10
164:10 165:25
169:13 170:13
174:2 175:24
180:10,14,17
180:21 181:1
181:22,24
182:6,9,10
191:7,17,18,21
194:24 196:23
196:25 197:3,4
197:8 198:13
199:1 204:15
204:18 205:7
205:14 209:3
214:7 217:11
222:14,16
242:6 251:5
283:25
**requirement**
44:24 45:7 87:1
154:6 162:8
**requirements**
86:21,23 88:5
139:12 140:23

142:8 155:12
163:12 168:5
181:13 182:3,5
234:7,15
**requires** 111:9
209:23
**requiring** 119:20
241:4,9
**research** 19:12
**reserve** 18:14,15
21:6 67:21
100:1,2,5,11
158:21 159:1
159:24 160:9
161:2 162:20
162:21,21
163:3,14 164:2
164:11 165:4,9
165:18,21,22
166:1,3,4,15
167:1,8,22,25
168:5,10
169:25 170:10
170:16,20
171:3,13,13,16
171:22 172:2,4
172:20 174:2
174:13,16,18
174:25 175:1
176:11 204:17
259:2 262:19
262:19,20
279:12 281:6
281:12,15
288:8
**reserves** 8:5
17:22 18:9,10
18:12,16 20:20
20:24,25 99:24
100:4,8 158:4
158:13,18,20
159:2,3,13,14
159:16 160:9
160:11,23
161:23 162:2
162:23 163:9

163:13,21,21
163:24 164:1,5
164:9,14,16,23
165:8,8,10,12
165:17 166:7
166:10,16,19
166:21 167:10
167:21,23
169:20,23,24
170:3,6,11,23
171:2,24,25
172:9,12,16
173:19 174:5,9
174:23 175:3
176:9 262:16
275:14,15,19
281:9,18,23,24
**reservoir** 17:18
158:15 172:15
175:21
**resides** 285:8
**resolve** 224:20
240:24 254:10
254:13,15,18
255:4
**resolved** 177:22
177:23 178:2,5
178:8,23
240:20
**resources** 19:15
144:20,21,25
147:17
**respect** 20:6
22:12 23:12,25
28:3,16 35:4
38:4 42:25
44:21 49:14
50:7,19,24 53:4
53:14 54:8
61:21 64:6
68:13,21 69:2
75:17 76:19
80:7 81:22,23
84:14,21 85:3
85:12 86:9,12
86:17 87:2 88:5

88:20 89:6
93:10,17 94:3
94:20 100:14
102:8 105:14
111:14 113:3,9
113:20 114:11
115:22 116:6
118:16,21
119:19 122:17
123:25 125:21
132:17,20
137:9 140:23
149:17 150:9
152:9 153:25
154:4 160:22
162:3,5 163:16
164:15,23
165:20 166:9
167:5,11,13,25
169:19 170:3
170:4 171:16
172:8 175:14
175:21 178:24
179:13 180:22
181:5,9 213:10
213:17,19
223:25 224:4
226:9 229:4,16
236:23 239:24
241:7 242:19
249:21 250:20
252:20 269:2
279:13
**respected** 118:14
**respects** 248:22
**response** 27:17
73:4,10 114:21
116:4 258:10
**responses** 9:6
11:25 12:3,19
**responsibilities**
22:3 23:7 24:14
92:3 102:24
111:17 112:7
121:25 172:12
175:23



**responsibility**
22:9,11,15,17
91:18 158:25
163:23 231:10
**responsible**
23:14 38:3,7,8
38:14 132:10
155:1 156:19
158:19 163:20
170:25 171:2
171:19 189:3
229:25 256:8
256:11 267:24
**rest** 196:19 253:2
**restate** 92:19
154:18
**restating** 276:3
**restore** 224:19
**restrictions**
44:23 114:12
115:11 116:5
209:5
**restructure**
40:24 63:20
**restructuring**
37:12 41:4,7
44:25 45:11
46:16,18 47:13
47:17,24 48:23
51:16 52:4,5,9
52:18,22 59:11
60:14 62:1,1,14
62:15 64:3,9
69:12 78:11
105:1 118:10
120:7 148:6
194:8,10,16,18
195:1 200:10
213:18,20
215:9 216:24
239:12 240:8
259:9 261:18
262:1 264:24
266:6 270:4
287:9
**restructuring-...**

105:6
**result** 13:21 53:6
128:10 134:2
134:15 143:10
143:13 154:4
155:25 156:11
156:23 221:14
**resulted** 41:6
133:3,5 165:14
287:2
**resulting** 44:16
**results** 213:16
242:23 243:12
286:8,14
**résumé** 106:17
109:21
**retain** 164:15
**retained** 18:4
159:11 164:22
165:1 253:3,10
**retire** 253:18
**retired** 106:21,22
**return** 125:10,11
133:12 166:10
194:23
**returned** 222:4
291:23
**returning** 8:17
**revenue** 156:21
156:24 157:14
275:15
**review** 25:4
27:22 30:24
31:24 40:8
68:17 124:22
169:16,19
173:23 186:22
247:24 260:2
279:23
**reviewed** 13:11
27:13 31:3,4,25
32:2,7,11 33:16
40:14,16 66:17
81:21 126:6
150:14 162:24
178:25 257:25

**reviewing** 121:13
**reviews** 171:8,8
**revised** 244:20
245:21
**revisions** 165:25
**revolving** 247:1
248:15
**Richard** 104:10
**right** 14:14,15
16:13 23:21
25:3,6,25 26:16
26:18 27:1,1
38:1 42:23 56:7
68:23 69:22
77:3,18 81:9
102:16 112:10
119:23 128:13
129:1 135:19
136:16,19,23
137:21 141:25
147:6 150:20
156:7 168:22
183:15 190:20
202:4 205:12
212:15 215:7
216:2 219:13
225:12 233:17
235:14 236:16
238:1 245:19
251:25 273:13
281:11 284:19
288:4,7
**rights** 68:20,25
69:4 95:2 118:9
118:12,16,20
118:23 211:3
215:16 216:25
249:14 280:12
**ring** 259:20
**ringing** 58:15
**rings** 29:24 35:24
164:7
**ripe** 237:25
**risk** 87:15,22
211:14 264:16
**risks** 67:23 258:8

**Riverstone** 20:5
20:10,11
**Riverstone's**
20:13
**RLI** 6:2 221:2
**rmiller@mani...**
3:17
**Robert** 3:14
244:13
**Roberts** 4:15
**Robin** 2:23
**Robinson** 19:13
**robust** 240:24
**role** 20:2 21:16
22:1 25:18 84:4
84:8 87:9 105:8
105:22 107:2
108:4,6 110:14
110:16 111:2,6
111:14,22
113:4 188:22
219:10
**roles** 19:15 105:6
**rolling** 32:5
**Romanette** 72:25
246:2 248:20
**room** 12:23
15:11,15 31:15
31:19,24 90:7
134:19 243:8
**Ross** 4:11
**roughly** 17:2
237:3,15
**routinely** 282:23
**row** 136:7 137:4
137:5
**Royalty** 8:6
**RPR** 292:6
**rrussell@hunt...**
2:25,25
**RSA** 64:4 66:12
74:25 75:2
120:8,10 214:8
**rule** 7:3 26:4
189:1 285:6,14
**rules** 1:23 11:21

13:3,4 234:7,15
234:20
**run** 165:9 182:21
261:18 263:1
**run-ins** 110:10
**running** 276:7
**Russell** 2:23
**Ryder** 21:8
158:22,24
159:4,7,11,25
160:3,5,13,25
161:12 162:13
164:13,22
165:2 167:4,8
167:10 168:7
169:15,19,22
170:2 281:6,12
281:15 282:2

---

### S

**S** 30:13,14
**SACHS** 4:8
**safe** 37:6 38:2
39:1 183:6
224:13 256:9
**safely** 255:14
**safety** 30:16,18
224:21,22
225:4 255:7
**safety-related**
225:1
**Saint** 3:21
**salary** 113:15
114:4
**sale** 52:11,16
72:7 114:11,13
215:6,8 261:1
**sales** 23:5 52:25
64:6 66:14 73:9
75:18 76:3 78:3
123:16 213:10
213:18 258:11
259:8 262:2,22
280:18
**satisfied** 140:13
**satisfy** 86:22



140:23 144:16
145:20 147:19
275:16
**satisfying** 194:12
**saying** 23:18
53:22 93:11
124:7 131:25
143:17 181:11
187:8 198:17
202:14 206:21
**says** 25:7 103:3
130:5 136:16
197:4,11,19
225:19 230:8
240:2
**scenario** 281:25
**scenarios** 47:13
51:18 214:22
**Scharfenberg** 6:3
10:5 219:22,25
220:5,10,19,23
220:25 221:2
225:9,12,13
227:22 228:22
228:23 230:11
230:16,18
234:25
**schedule** 131:17
138:2,12,13
149:7,8 150:21
237:14 238:2
**scheduled** 131:13
131:15 152:9
174:17 178:4,8
**schedules** 32:9
137:10,22,25
152:17
**scheduling**
254:14
**Schmidt** 158:14
159:2
**Schmidt's** 163:17
163:20
**Scott** 6:12,12
21:8 158:14,22
158:24 159:2,4

159:7,11,25
160:3,5,14,25
161:12 162:13
164:13,23
165:2 167:4,8
167:10 168:7
169:15 170:2
281:6,12,15
282:2
**Scott's** 169:19,22
**screen** 15:13 16:3
26:3,24 245:4
**scroll** 26:17 27:9
**scrolling** 26:8
**seal** 25:20 292:2
**season** 133:2,20
133:25 221:10
221:17 287:11
**seats** 19:17
**SEC** 8:7 163:5,7
163:8,14 164:2
165:9 166:8
174:1
**second** 26:11
31:22 53:2 57:4
59:9 65:7 68:15
69:11 71:16
116:8 119:21
136:14 141:24
150:19 195:18
266:4
**secondarily**
221:16
**secondary** 188:1
**Section** 119:2
**secure** 85:3 184:5
**secured** 34:4,9
40:24 43:5,12
43:20 44:9 48:9
67:25 248:21
**security** 55:2,9
55:14,17 56:7
57:20,24 58:11
58:24 59:13,20
60:8 61:3,23
62:19,22,24

84:11,15,18,21
84:24 85:5,6,23
143:24 144:15
147:19,22,25
148:11 184:4,7
280:11
**see** 25:6 29:2
71:5 72:13,14
131:23 136:3
136:13,22
137:20 138:15
150:25 168:21
202:5 239:4
245:24 247:4
251:20
**Seeger** 30:3 36:9
36:17 37:7 38:3
39:17 106:3
122:4 177:7
253:25 266:25
**seeing** 50:13
**seek** 62:6 204:20
**seeking** 42:25
**seen** 71:25 239:1
**select** 102:14
103:9 113:6
260:15,16
**selected** 103:5,11
109:13 161:4,6
**selecting** 160:12
**selection** 103:7
103:17 104:4
105:19 110:7
110:12 113:14
160:16 162:4,6
178:20 251:2,9
**selections** 108:7
**selects** 160:4
**self** 214:1
**self-explanatory**
119:19
**sell** 50:14 51:4
63:7,11,19
74:24 210:20
213:21 214:2
214:12,16

269:15
**selling** 52:13
262:21
**send** 70:5 229:14
239:2
**senior** 21:17,20
21:23 22:1,21
22:22 30:3,5,6
30:8 38:12,21
114:1 122:4
158:14 253:23
**sense** 15:22 77:1
220:3 244:11
**sensitivity** 16:6
**sent** 71:20 77:4
81:17 176:24
238:7 240:4,6
**separate** 32:21
58:20 137:12
262:19,20
280:11,13
**separately** 51:11
**September** 77:11
77:12 78:2
**sequencing** 29:16
**Serajul** 4:20 15:5
**serajul.ali@us...**
4:23
**serious** 109:1
**seriously** 109:6
**serve** 87:14
109:11
**served** 26:4
104:25 105:6
**serves** 23:19
**service** 46:13
83:9,10,11,12
102:8,14
227:19 255:8
256:18 257:16
**services** 5:11
7:19 101:8,15
101:17,19,20
101:23 102:1
102:11 227:24
228:2,17,19

229:8
**serving** 107:1
**session** 11:22
**set** 31:4 80:5
90:23 113:15
115:2 126:6
128:16,20
149:4 160:4
161:10,15
172:11 219:8
258:3 261:9
268:23
**set-aside** 183:2,5
**sets** 263:13
**setting** 37:22
209:23
**seven** 64:22
178:7 210:24
225:22
**severally** 229:7
**SEWELL** 3:3
**Shahinian** 2:13
11:12
**shake** 11:25
**shallow** 169:1,3
**shape** 280:23
**share** 14:7,9,11
15:13 16:3 25:2
26:17,22,23,25
70:16,20
136:12,21
181:5 286:13
**shared** 26:3
66:10 99:11
152:17 245:4
**Shari** 4:3
**sharing** 15:23
70:2
**shed** 194:17
196:7
**shedding** 195:2,3
196:10 208:1
**sheet** 53:10,23,25
74:8,16 75:3
82:16,20 96:25
98:21 103:2,19



117:25 228:12
**sheets** 54:4
**shelf** 39:11 49:18
  51:13 92:14
  119:6 124:1
  203:11,16,20
  221:12 261:7
  269:11,13,23
  270:6 272:14
  274:22 284:15
  284:21 287:10
**shelf's** 91:25
**shift** 254:8
**shifting** 48:10
**Ship** 178:21
**Shoal** 178:22
**short** 275:15
**shorten** 179:8
**shortfall** 155:8
**Shorthand** 1:19
  291:10
**shortly** 61:20
**shot** 236:19
**show** 59:2 131:7
**showed** 177:20
**shows** 120:25
  140:10 141:6
  202:2 217:22
**shut** 131:14
  133:6 153:8
  165:16 175:15
  221:9,18,23,25
  222:10 225:14
  225:25 226:22
**shut-in** 128:14
  132:22 153:10
  175:15 222:8
**shut-ins** 221:12
**sic** 17:23 78:18
  137:15 173:22
  182:16 207:24
**sick** 197:21
**side** 80:19 109:1
  251:18
**sidetrack** 272:21
**Signals** 131:22

**signature** 10:7,7
  81:25 289:1
  291:23
**signed** 11:16
  66:12 74:8 75:2
**significant** 36:22
  47:23 67:18
  79:11 122:5
  133:3,23
  156:16,23
  203:9,10
  204:17 205:8
  205:23,25
  221:12 263:12
  268:6 269:8,25
  270:13 271:9
  273:5 274:18
  279:11
**significantly**
  180:16
**silence** 16:1
**similar** 152:16
  153:2 227:14
  230:22 234:19
  239:4 256:4
  260:11 261:6
  272:12
**Simmons** 2:8
**simple** 214:24
**simply** 85:19
  215:9,15
  216:25
**single** 32:10
  283:4
**singular** 32:4
  265:25 266:3,5
**sinking** 209:20
  209:23 210:3
  274:9
**sir** 141:8 197:2
  201:15 205:3
  216:13 219:13
  234:11 235:1
**Sirius** 2:12 11:14
**sit** 276:6 279:7
**site** 14:10 24:22

24:25 31:15
  70:16,20
  160:24
**sitting** 218:13
  241:12
**situation** 45:14
  46:25 47:10
  49:9 182:1
  185:25 221:14
**six** 27:21 136:7
  201:23 202:4
  225:4 270:23
  274:14
**size** 36:23,24
  160:24
**skew** 168:17
**skip** 252:18
**slated** 228:16
**sleo@leolawpc...**
  6:14
**slow** 15:19
**slugging** 252:14
**Smith** 78:23
  253:25 267:3
**society** 160:21
**sold** 101:25 102:9
  262:18
**sole** 83:8,8 95:5
  102:12,16,21
  102:23,24
  103:1,4,9,11,13
  103:14,17
  104:4,7 105:18
  108:4,13 109:7
  109:12 110:7
  110:12 111:8
  111:15 112:20
  113:15 251:2,6
  251:10
**solely** 142:8
  165:2
**solicitation** 249:4
**solicited** 74:11
**solution** 80:14
  217:4 256:13
**solutions** 228:10

228:13 229:4
**somebody** 197:19
  212:8
**somebody's**
  243:6
**Someone's** 66:4
**somewhat** 245:1
**SOP** 226:23
  227:9,10,14
**SOPs** 226:14,16
  226:18,21
  227:3,6
**sorry** 24:2 28:13
  30:13 55:5,13
  61:4 62:7 65:16
  65:16,17 67:1
  70:11 88:22
  97:7 103:24
  118:3 119:9
  123:13 136:5,9
  141:14 142:14
  143:13 144:17
  154:23 159:21
  173:5,7 180:5
  180:23 182:12
  188:6 210:19
  212:1 220:19
  224:24 227:2
  230:8 232:2,7
  234:10 243:5
  246:9,17
  260:19 267:5
  276:14 280:25
**sort** 197:5 219:8
  230:9 239:7
  242:16
**sounds** 35:6
  179:9 220:10
  220:23
**source** 146:1
  147:21 149:16
  150:6 151:20
  248:13 249:17
**sources** 144:5
  145:19,21
  147:18 148:14

148:18,25
  149:3 250:17
**South** 72:18
**Southern** 1:1
  25:8
**Southlake** 3:11
**speak** 14:21
  16:10 41:3
  48:14 60:5
  195:2 201:18
  216:17 241:3
  282:15
**speaking** 17:2
  22:5 31:12 35:7
  35:15 39:19
  50:20 54:17
  63:16 80:12
  91:5 151:7
  159:8 169:12
  185:12 203:24
  221:7 235:13
  254:20 265:12
  280:7 283:8
  284:10
**speaks** 96:15
  119:11 217:17
**specialty** 3:8 6:11
  17:14
**specific** 22:8
  33:18 35:1
  38:20 39:7
  53:16 54:1
  61:24 62:14,22
  63:8 76:11,15
  82:25 86:25
  94:6,14 95:3
  96:8 100:18,20
  109:25 110:5
  110:19 111:24
  112:3 118:22
  128:22 130:17
  133:12 134:13
  137:10 189:16
  230:2 237:5
  242:17 243:25
  249:17 255:12



256:19 257:25
261:20 262:6
274:9 281:21
284:16
**specifically** 41:4
49:10 75:11
80:15 152:21
178:1 189:23
194:19 237:18
254:21 280:2
282:12,15
**specifics** 283:19
**specified** 67:20
102:12 260:13
260:15 272:15
**specifies** 98:15
127:16
**specifying** 69:9
**speculate** 149:21
**speculation**
36:20 38:19
39:6 178:15
193:3 201:10
213:24 215:2
215:17 216:7
219:16
**spells** 57:24
**spend** 130:2,15
130:20,24
131:12 134:1,4
138:3 140:10
140:14 141:7
147:16 149:17
150:10 151:4
151:15,18,25
153:17 154:6,7
154:8 167:17
205:4,8 242:10
242:11 248:12
**spending** 131:8
152:22 155:15
155:18,18
202:9 203:8,10
224:6 242:20
286:22 287:1,3
**spends** 137:11

**spent** 33:20,21
131:5 133:22
148:8 151:15
151:18 152:3,4
222:18 225:2
225:15 226:6
244:18
**SpinCo** 8:9
**split** 168:6,14
**spoke** 51:10
**spoken** 183:19
**spreadsheet** 8:3
8:13,16,21 9:5
9:10 134:22
136:4 150:8
176:18 179:1
**square** 137:1
**sroberts@Clar...**
4:18
**staff** 92:8
**stage** 61:14
**stakeholder** 35:9
47:23 268:24
**stakeholders**
80:15 161:3
194:19 198:4
199:2 209:4
213:15 216:1
270:2
**stand** 30:14
**standard** 264:12
**standards** 163:6
163:7,8 166:8
174:1 258:2
**standby** 7:17
95:11,12,18
96:23,24 97:3
97:12 98:3,24
99:5,10 100:13
100:15 119:23
120:9 148:12
153:12 154:10
154:25 155:7
248:9,17,18,24
**STANG** 5:18
**start** 11:20 19:11

36:4 42:2 71:9
102:16 162:4
183:24 184:25
194:22
**started** 13:8
16:17 19:22
21:11 49:10
113:7 190:20
220:6
**starting** 66:19
80:16 110:11
110:11 225:18
246:19 287:8
**starts** 27:21 71:4
246:5
**state** 1:20 131:3
171:7 269:15
285:2,7,12,15
285:23 290:21
291:1,10
**stated** 1:23 24:13
86:11 99:11
160:8 168:13
191:8 198:20
215:24 267:17
276:24 291:12
**statement** 7:17
7:20 9:11 68:1
68:4,5 95:11
101:9 103:3
120:14,22
122:23 149:12
153:15 155:10
162:16 185:7
186:6 188:22
189:6 205:1
207:1 216:12
217:22 225:19
238:20 242:12
276:9 284:14
284:17 286:5,6
**statement's** 35:3
**statements**
170:15
**states** 1:1 15:6,6
25:8 88:4,24

248:20
**Station** 4:21
**status** 45:16
85:11 153:5
165:16 166:14
171:10,24
176:25 186:22
200:3 201:5
257:4
**statutorily**
180:17
**statutory** 86:21
86:25
**stay** 199:5,10
200:19 253:13
253:16,17
254:3
**Staying** 241:14
**stenotype** 1:21
**step** 49:20 53:22
108:1
**Stephen** 4:15
**steps** 21:19 222:6
**Steve** 30:6,23
122:3
**stick** 33:15
**stock** 107:10
**storage** 258:8
**stored** 176:13
**storm** 133:2,16
133:20,24
134:6,11,15
258:3 287:11
**storms** 134:6
221:16
**strategic** 197:8
197:25 208:9
**strategically**
197:11
**strategy** 208:14
208:15,17,19
208:21,23,25
209:7,8,11,13
214:20 269:19
269:21 270:25
**Street** 2:19,24

3:4,15 4:5,16
5:4,13,23 6:4,8
6:13
**strike** 24:18
28:22 39:25
86:24 89:19
92:13 94:9 97:7
101:16 114:17
116:1,15
144:18 179:25
180:8 262:13
283:10
**STROOCK** 5:8,8
**structure** 91:25
110:19 214:25
216:24 256:5
268:8,22
**structures** 204:6
282:20
**stucking** 207:24
**stuff** 196:19
219:24
**subject** 15:3 28:2
28:16,19,20
29:12,13,16,25
76:16 116:6
138:20 139:11
140:7 183:10
240:23 241:15
247:16 273:5
**submit** 44:24
226:16 227:1
**submitted** 226:14
226:18,21,23
226:25 227:3,5
227:7,8 238:12
291:21
**submitting** 238:9
**subordinated**
248:2
**subpoena** 25:14
27:18
**SUBSCRIBED**
290:14 292:1
**subsea** 203:21
**subsequent** 54:3



74:7 75:7
286:24
**subset** 237:4
**substance** 36:16
38:16 59:15,17
60:3
**substantial**
221:22 223:2,4
226:2 274:19
**substantially**
168:11 261:6
286:18,22
287:2,3,5
**substantive**
62:13
**substitute** 191:2
**substitution**
190:17 191:10
232:23
**subtitled** 123:14
**success** 267:24
268:7
**successful** 198:10
217:7,11
**successfully**
181:24 182:6
**sufficient** 78:7
140:22 145:21
161:4 191:7
204:11 218:1
218:15
**sufficiently** 127:6
128:1
**suggest** 219:3
**suggested** 105:12
107:23 208:20
249:6 279:22
**suggestion**
105:15
**suggests** 170:2
**suitable** 257:5
**Suite** 2:4,9,19 3:4
3:16,21 4:6,12
4:17 5:14,19
6:13
**sum** 126:4,12

**summary** 212:20
**Suntrust** 19:13
**supplemented**
161:16
**supplied** 132:16
**supply** 132:14
**support** 47:17
51:15 60:18
64:9 91:21
206:3 218:24
249:14 253:19
274:25
**supported** 55:1,9
**supports** 87:18
**sure** 13:15 24:6
35:2 37:1,21
56:15 58:15
109:2 123:11
146:11 160:21
185:10,20
187:21 190:13
191:12 195:15
202:14 206:14
211:23 221:21
222:6,6 227:20
228:19,22
233:1 247:3,17
247:22 250:15
255:7 256:5
260:21 265:11
265:18 271:21
276:4,5,15
281:2
**sureties** 1:15 9:7
32:16 61:21
62:5 63:4 85:13
85:25 180:20
183:18,21
190:21 198:22
254:10
**surety** 3:2,7
11:12 32:15,23
55:23 56:1,2
58:7 62:13,18
65:8 84:10,14
85:3,3 87:20

179:18 185:14
186:5,17 187:8
187:9,25 189:4
189:5 191:14
191:21 195:5
196:11 220:8
221:2 232:19
233:4 251:18
**surety's** 192:3
**surety-related**
87:17
**suretyship**
187:10
**SURITIES** 2:12
**surprised** 261:10
**susceptible**
264:16
**suspect** 13:22
**suspension**
226:11
**swan** 265:22
**swap** 80:6
**swear** 11:3
**Swingle** 25:19
**switch** 81:5
210:13 250:23
**switched** 251:19
**Switching** 132:19
**Swordfish** 7:5
**sworn** 1:16 11:7
290:14 292:1
**Syracuse** 5:4 6:9
**systems** 255:8

─────────
**T**
─────────
**T** 1:10,14 5:22
6:12,12 10:3
11:6 290:11,15
291:6
**TA** 277:23,24
**tab** 135:18 136:8
136:9,11,13,19
136:20 138:8
138:11,14
140:9 141:6
150:8,13,13,18

**table** 8:11
**tabs** 137:12
138:4
**tacos** 219:15
**take** 12:21,25
13:1 27:9,10
36:25 42:3 44:2
49:20 53:22
71:8,11 81:6
88:10 108:1
112:11 132:21
140:4 157:18
157:19 171:20
194:9,10
219:20,20
220:6 223:19
224:8 228:25
237:22 241:23
243:12 251:16
252:1 274:23
**taken** 1:16 18:16
42:10 47:24
81:13 94:11
104:1 111:19
111:24 112:17
132:4 158:1
179:12 194:24
222:7 252:9
257:23 291:17
**takes** 57:3 173:22
**talk** 12:9,12
177:25 229:21
235:11 238:5
240:10 254:8
258:11 282:6
**talked** 47:5,11
66:25 80:18
210:14 274:14
**talking** 15:21
99:24 102:16
109:6 137:25
146:9,12
179:23 188:14
190:19 191:3
191:13 195:10
195:22 210:20

230:9,11 254:9
273:25
**talks** 181:12
**tanks** 258:8
**Tate** 20:16,17
**tax** 22:10
**team** 17:11 20:4
22:7,17 23:22
24:12 30:9 36:1
46:3 87:18
91:25 108:17
108:19 110:17
110:18 121:10
152:11 159:1
163:17,20
171:2,13,15,16
171:19 172:4,5
172:14 253:3
266:7,14
267:21,25
**team's** 93:21
286:3
**teams** 91:22,24
92:4,15,21,23
92:24 121:17
125:8 170:23
170:23,25
172:1,2,18
175:22 257:3
**technical** 17:20
**telephone** 2:5,10
2:15,20,25 3:5
3:11,17,22 4:7
4:13,18,22 5:5
5:9,15,20,24
6:5,9,14 34:19
**telephonic** 43:3
251:20
**television** 243:3
**tell** 14:22 105:4
106:16 151:2
216:20,21
246:10 252:7
285:11
**temporarily**
165:15



ten 29:6 96:7
  123:13 127:20
  203:22 223:8
  223:13
ten-minute 81:6
  81:8
tendered 56:13
Tennessee 3:16
tenor 264:23
tens 222:18 226:4
tenure 169:15
  280:3
term 53:10,23,25
  54:4 74:8,16
  75:2 82:16,20
  96:25 98:20
  103:2,19
  117:25 185:23
  202:13 204:19
  205:24 207:12
  219:6 228:12
  275:16
terminated
  235:15,19,23
  236:1,20 237:2
  237:5,9,16,19
  237:24
termination
  102:11 236:6
terms 13:2,18
  14:19 17:13
  48:13 54:20
  56:18 57:13
  81:18 91:2
  101:25 109:6
  146:2 155:3
  171:23 173:3
  217:20 225:20
  249:2 257:1
  261:9 263:25
  285:13
testified 11:7
  140:19 153:25
  181:15 191:5
  193:21 199:4
  221:8 232:21

251:1 258:12
  258:20 265:8
testify 56:18
  65:19,21 93:2
  97:13 119:14
  147:1,3 188:9
  274:4
testifying 99:8
  147:7 187:14
testimony 57:11
  81:19 85:21
  86:2 92:1 94:21
  98:4,7 103:25
  124:12 125:15
  152:5 162:11
  181:18,19
  189:25 191:12
  196:17,22
  207:3 242:9
  259:14 275:9
  275:14 291:16
Texas 1:1,20 2:5
  2:24 3:5,11,22
  4:6,12,17 5:19
  6:4 25:9 285:23
  291:1,11 292:6
Texas-leased
  285:3
text 82:3,6,8
  248:14
thank 11:10 13:6
  14:2 26:20 42:9
  42:15 45:21
  49:5 67:3 70:7
  70:24 81:12
  159:22 183:11
  183:13 196:2
  219:14,16,18
  220:17,22
  235:1,2 244:14
  245:18 251:14
  251:24 252:13
  288:6
Thanks 58:16
  157:24
thing 15:9 129:4

217:10
things 37:18,20
  48:15,18 50:16
  152:4 199:12
  249:14 263:15
think 11:20 14:6
  14:25 15:13
  16:7 26:1,16
  37:10 40:21,21
  40:21 48:14,22
  55:16 57:6
  58:14 59:7 65:1
  66:4 69:22
  71:12,12 79:9
  91:10 92:8
  93:13 94:24
  96:19 98:4,7
  115:23 119:11
  119:15,18
  120:1 124:11
  128:24 131:25
  137:21 138:10
  140:19 144:19
  145:9 148:24
  150:2 151:25
  152:1,5 153:24
  157:11 176:3
  181:4,15
  182:22,24
  183:19 186:1
  187:2,7 188:20
  189:10,22
  190:20 191:2
  192:9 194:1,2
  194:17,18
  196:16,18
  197:14 199:24
  200:12,24
  204:23 205:1
  205:17,20
  206:21 207:1
  207:13 208:10
  208:12 211:24
  214:6 217:16
  218:3 219:22
  220:3,7 223:12

225:8 228:3
  235:22 239:23
  249:8 250:12
  251:12,12
  259:21 262:17
  262:22 263:5,9
  263:23,23,25
  264:3 265:24
  266:5 267:4,10
  267:12,22
  268:19 273:6
  273:12 274:24
  275:14 276:18
  277:8,13 279:1
  283:13 284:8,8
  284:8,9
thinking 14:17
  93:20 243:17
third 250:5
  267:15,19
third-party
  67:21 249:20
  259:2
Thompson
  104:11 105:4,5
  107:18 108:3
thought 32:10
  40:16 50:10
  69:20 160:15
  160:18,19
  198:23 199:8
  211:10 212:1
  214:14 243:7
  243:20
thousand 176:5
  282:19
three 9:9 33:22
  55:1,17,19
  80:19 101:3
  108:7 149:24
  185:8 206:4
  222:7,24 225:3
  253:23 270:25
three-party
  185:1
three-year

264:20
threshold 161:25
  162:9 165:12
  168:12
thresholds 160:6
  161:14 169:6
  169:13
thrust 200:16
thumb 285:6,15
ticked 211:5
tied 242:17
ties 172:20
  173:18
Timbalier 72:18
  72:19,25 77:25
  79:1
time 11:10 14:1
  20:8 21:6,8
  28:10 33:20
  40:25 41:3,13
  41:18,22 42:4
  43:10 46:19
  49:20,25 50:9
  50:20 51:2,4
  53:7 56:16 60:7
  60:15 69:9,11
  73:8,11,24 74:4
  74:10 75:2,22
  75:23 81:15
  92:11 110:11
  117:25 120:10
  130:12 131:1
  157:5 166:14
  166:23 167:1
  169:14 174:14
  174:19 179:8
  180:6 181:6
  183:12 191:16
  213:20 214:4
  214:14 219:17
  225:18 226:25
  227:5 228:8
  229:17 234:13
  236:7 237:17
  240:13 244:18
  246:11,25



247:3 249:22
250:13,21
251:14 255:23
260:20 261:14
261:20,21
267:16 271:12
281:1 288:9
**timeframe** 45:13
49:23 50:3
72:11 80:16
141:12 282:16
**timely** 227:8
**timeout** 131:22
**times** 52:24 58:1
62:3 69:4 75:18
191:8 198:20
201:17 215:21
221:3 232:21
259:18
**timing** 47:14
52:5 61:9,10,17
96:1,5 107:21
107:22,23
125:12 133:11
134:11 157:12
166:1 175:23
202:10 205:6
236:10,14,15
238:10 243:24
**title** 77:17 229:5
231:11 253:23
270:10,13
**titled** 7:17 95:11
**to-this-bankru...**
250:5
**today** 11:10,17
87:23 91:14,18
229:18 232:22
252:14 268:1
268:19 276:6
279:7
**today's** 11:16,21
288:2
**told** 215:4
**tolerance** 159:15
169:16 170:1

**Tommy** 22:22
30:5 38:13 46:4
106:3,15
**tonight** 219:15
**tool** 284:12
**topic** 28:23,25
42:2 59:25 88:8
105:18
**topics** 27:23,24
28:8 31:5 37:11
38:23 39:12
40:17 42:5 51:8
51:14 59:22
81:6 186:12
210:13
**total** 131:4
144:12 153:4
154:7 203:11
224:7 284:17
**touch** 87:10
**Tower** 3:4
**track** 64:6
127:14 175:13
**training** 17:6,8
17:10 18:9,11
18:13,19,22,25
19:2,5,10
**Trammell** 4:11
**transaction**
36:22,23 37:1,4
37:12,16 39:4
51:17,17 54:2
66:16 75:4,5,9
78:12,15 79:20
94:16 120:7
156:22 211:13
211:15,18
239:20,21
247:18 249:9
261:23
**transactions**
37:24 38:4,10
39:13 47:11
48:1,5,19,23,25
49:11,11,12,16
50:12,14 52:8

53:19 59:11
90:4 156:1,10
234:22 247:23
**transcribe** 12:13
**transcribing**
12:10
**transcript** 12:17
201:18 291:20
**transferred**
63:12 232:11
**transfers** 190:6
**transition** 32:11
32:18,21 33:6
101:15,17,19
102:10 111:7
112:11 227:24
228:1,19 229:8
255:10,18
256:9,12
**transitioned**
255:14
**transitioning**
233:24
**transitions**
255:19
**transmission**
7:19 101:8,25
227:19 228:17
**TRAURIG** 4:5
**Travelers** 3:7
183:17
**Travis** 2:24
**treasurer** 25:22
46:10
**treasury** 22:10
**treated** 86:15
201:13 288:1
**treatment** 85:17
201:3 229:19
234:3
**tree** 202:18
**trial** 288:9
**trick** 271:19
**triggered** 265:23
**Troika** 277:23,24
278:12,16,21

279:10
**true** 126:13
188:14 250:3
264:9 265:1
276:8 290:8
291:12
**trust** 39:11 55:20
142:2,3,4,4,11
142:19,21,21
142:24 143:5
143:11,13,15
143:21 144:10
145:3,9,12,25
146:1,4,19,24
148:1 154:9
155:17
**trustee** 105:8
**truthfully** 287:23
**try** 40:2 89:17,19
149:24 214:16
242:5 244:6
276:5 285:21
**trying** 59:23
109:3 189:12
196:9 197:10
198:17 199:9
212:13 225:17
228:20 233:1
259:10
**turn** 123:12
**Turning** 119:1
141:25
**twice** 197:15,17
**two** 21:12 32:20
33:21 44:4,8
46:6,21 48:18
55:23 91:24
92:4 93:13
103:9 113:1
129:19 133:14
133:18 141:10
164:10,12
169:22 171:4
171:22 172:11
198:19 209:18
214:21 221:11

230:23 245:22
252:15 267:13
270:25 276:22
276:25 278:12
278:15,21
279:10 280:4,4
**two-** 264:20
**TX** 2:10
**type** 17:14 81:15
89:13 114:3
115:6 198:11
202:16 204:9
242:22,22
243:2,9 249:1
**typed** 122:19,22
**types** 17:16,25
53:19 55:1,17
55:20 87:8
88:18 222:14
224:2 244:2
**typical** 156:21
279:3
**typically** 134:10
157:1 169:11
194:7 272:17
279:21
**typing** 12:15 66:4

---

**U**

**U.S** 4:21 195:8
**ultimate** 267:24
**ultimately** 41:6
53:10 64:4
82:17 108:7
116:24 120:7
131:4 154:22
160:7 211:3
259:6
**un-advanced**
113:11
**un-mute** 57:4
195:18
**unable** 222:24
**unacceptable**
79:25 258:19
**undergoing**



78:12
**underlie** 170:10
**underlies** 84:18
126:5
**underlying**
218:22
**underpayment**
155:5
**undersigned**
290:15 291:9
**underspend**
153:25 154:4
154:11,14
248:4
**underspent**
153:16 155:11
**understand** 12:4
12:6 49:3,5
64:16 71:20
85:18 86:5
94:16 95:5
133:14 140:17
143:12 164:13
171:7,23,24
176:25 183:20
186:16 187:18
187:22,25
188:3,5,8,11,21
188:23 191:11
192:13 196:9
197:10 200:17
205:10 211:12
212:13,14,24
212:24 214:21
215:7,11,12
231:5,8 234:13
236:4,17
252:21 271:22
276:4,13
277:11 282:11
**understanding**
12:24 56:18,20
58:6,9,18,20,23
84:5 95:17 96:4
96:11 98:3
111:1 112:7

116:17 120:19
135:3,6 140:12
162:11 180:3,9
191:12 198:19
200:6 217:25
229:23 230:3
230:12,13,17
230:19 231:3
232:6,8,17
236:13 239:18
257:6 270:17
270:22
**understandings**
233:13
**understands**
242:2
**understood** 12:7
44:1 75:8 233:1
236:25,25
240:10 274:4
287:17
**undertaken**
115:15 282:14
**undertook**
287:17
**undervalued**
73:22
**undesirable**
210:4
**undeveloped**
262:20
**unfair** 119:15
152:1
**unfortunately**
40:15
**unique** 189:17
236:15 263:17
**unit** 231:15
**United** 1:1 15:6,6
25:8 88:4
**University** 16:22
19:7
**unpack** 215:21
**unpaid** 248:11
**unrelated** 280:11
**unrestricted**

209:24
**unsent** 248:10
**unsolicited** 74:10
80:22
**update** 45:14
49:9 170:10,17
171:15
**updated** 14:6
76:2 164:9
170:16,20
171:10 174:23
174:25
**updates** 171:12
171:22
**updating** 170:4
**uploaded** 33:13
**USA** 3:18
**use** 16:4 38:25
116:3 137:23
154:13 186:2
191:2 244:8
281:15 282:2
285:6,14
**uses** 210:5
**utility** 210:3
**utilize** 147:10
**utilized** 95:22
137:9 138:21
139:12 144:10
174:25 248:13
**utilizing** 51:17
155:6

_____

**V**

**vague** 24:9 33:10
43:23 47:3 55:4
84:17 85:15
89:25 102:4
123:3 125:19
139:18 141:1
168:20 172:7
225:7 263:8
276:2,11
**valuable** 168:18
206:9,12
**valuation** 217:16

218:4,9,12
**value** 66:19
73:10,22 75:16
75:22 78:7 80:9
80:11 159:16
159:24 160:5,8
162:9 168:11
168:22,23
169:5,8,12
206:17 207:24
217:17,20
218:5 258:15
**valued** 219:2
**values** 75:19
161:16 218:3
**variability**
123:24 125:20
**variable** 126:9
128:5
**variables** 147:13
170:9,19
202:25
**variance** 126:18
**variety** 286:15
**various** 17:21
19:15 29:12
30:8,10 31:7,25
32:7,9 37:4,11
44:23 47:11,13
47:25 48:19,21
48:25 51:14,17
52:7,24 53:9
57:22 58:3
59:20,22,24
62:3,24 66:17
69:4 74:10 76:6
79:9,25 82:22
83:23 85:6 90:3
99:4 101:20
116:5,23
121:13 148:25
149:8,9,12
159:17 163:10
164:11 170:12
181:21 206:5
209:25 211:16

221:4 233:22
239:12,16,22
242:3 247:15
**verbal** 11:24,24
12:3
**verify** 93:1
**versa** 80:9
**version** 150:15
177:18 179:1
275:21
**versions** 244:20
244:25 246:23
**versus** 107:23
138:7 171:25
174:2 214:23
214:24 215:15
218:22 284:10
286:19 287:15
287:15
**viability** 165:8
221:15
**viable** 210:11
**vice** 21:14,17,19
21:20,23 22:1
22:21,23 25:21
30:3,5,6,8
38:13,21,22
80:8 87:15,21
122:4 132:12
158:14 253:24
**videoconference**
1:22
**view** 26:24 57:13
57:20 169:19
169:23 197:1
**viewed** 80:4
**VINSON** 4:10
**vis-à-vis** 85:25
**visit** 222:15
**visited** 223:10,20
223:22
**visits** 222:17
**volatility** 75:25
**volume** 123:16
**volumes** 264:23
**volumetric**



174:22,24
**vote** 108:13
**VP** 29:19 122:3

**W**

**W** 3:3,14 5:12
**wait** 135:22
**waive** 234:7,10
234:15,20
236:24
**waiver** 42:25
**walk** 149:14
258:17
**want** 12:25 13:15
42:3 48:22 59:2
65:6 71:8
109:11 112:11
146:22 157:18
175:14 177:24
185:20 190:13
191:11 192:3
196:7 197:11
200:15,19,21
200:22 206:23
211:8 212:2
214:19 215:4
215:19 219:19
219:20 220:5
235:4,5 238:5
240:10 251:16
271:21 281:13
**wanted** 25:16
72:9 161:25
213:21 214:2,3
214:11 218:2
221:6
**wanting** 195:22
**wants** 199:5,12
201:4
**WARDWELL**
5:23
**Warner** 5:17
**Washington** 4:22
5:4,24 6:8
**wasn't** 56:13
73:19 103:22

196:17 259:22
**way** 14:24 15:1
25:3 26:13 31:8
37:24 50:1
53:18 56:21
58:18 85:8
109:10 135:18
138:14 163:8
168:14 171:18
205:22 215:4
218:8 225:11
237:8 244:6
257:12 280:23
**ways** 66:19
223:17
**we're** 12:1 37:21
39:13 49:21,22
49:23 98:10
150:21 152:23
185:20 198:17
222:15 238:21
241:13 247:22
255:2 257:10
271:10
**we've** 35:4
**weather** 263:15
265:8
**web** 253:22
**week** 29:5,5
244:20
**weeks** 41:25
124:3,13,14,19
254:16
**Weil** 2:3,9 70:15
70:20 81:22,23
**Weir** 4:4
**welcome** 45:22
**well-capitalized**
148:15
**wellbore** 243:25
**wells** 78:1 126:16
126:20 127:1,4
127:9,11,15
128:14 129:3
129:20 130:4
132:22 171:17

175:15 202:16
202:23 203:3,4
203:22 207:25
221:9 225:13
226:22 239:4
240:2 244:1
268:25,25
269:4,7,8,12
270:8,11,14,23
270:25 271:4,7
271:13,16
272:5,7,12,14
272:15,16,20
274:14 277:17
277:20 278:12
278:16,21
279:2,4,10,11
279:13,14,15
280:1,2,5,6
282:19,20
**went** 42:21,24
**weren't** 42:20
**West** 2:14 5:4 6:8
8:14
**Whaling** 46:11
46:13,15,23
118:6
**WHEATON**
5:13
**wholly** 79:25
80:11
**wide** 272:19
**wife** 216:6
219:15 252:7
**willing** 99:6
218:24 249:1
253:19
**willingness** 51:12
**wills** 268:12
**withdraw** 225:10
**witness** 1:15 2:2
11:3 33:11
36:21 38:20
39:7 43:24 45:6
47:4 55:14 57:6
57:10,17 59:6

61:8 62:12 65:1
66:5,23 70:1,7
70:15,19 71:5
76:22 77:20
82:15 84:18
85:16 86:3 87:5
89:13 90:1
96:19 97:25
102:20 106:10
108:17 119:18
120:4 122:13
123:9 125:20
131:25 136:18
139:19 141:2
142:15 144:22
145:11 147:9
148:24 175:9
178:16 183:13
186:11 187:18
188:5,11
189:10 193:5
194:2 196:22
198:4 200:2
201:11 205:20
207:8 215:5
217:3 219:18
220:9,17,21
225:8 235:2
263:9 273:16
276:3,13
277:12 288:5,6
290:15 291:21
291:22
**Woodard** 5:3 6:7
**word** 37:17 38:25
58:15 128:25
174:8 186:1
191:2 197:6
**words** 12:16
129:1 185:21
187:19
**work** 16:18 17:11
17:16 18:2,14
87:18 110:21
125:16 132:22
144:4 160:23

167:1 169:6
179:7 188:21
188:24 238:8
238:14,18
239:21 242:9
243:11 247:18
256:8
**working** 78:12
138:20 139:11
155:22,23,25
156:12 157:15
167:7 170:12
203:1,2 219:21
242:4 247:14
248:21 249:22
256:12 257:3
277:1 278:3
**works** 231:4
**world** 146:18
147:9
**worth** 238:2
**wouldn't** 38:6
129:22 214:18
245:23
**wrap** 220:4,8
251:13
**writing** 81:24
**written** 67:25
68:3,5 80:19
162:3,5,7
163:25 164:2,4
166:11,16
173:1,2,4,5
230:9,12 233:6
**wrong** 153:24

**X**

**XL** 3:8 183:17

**Y**

**y'all** 199:9
200:14 206:23
265:13
**yeah** 14:13 15:19
21:22 26:10
32:5,20 55:5



56:23 57:8
63:23 65:3
70:11 71:4
77:12 81:4,11
82:10 93:20
98:2 112:13
134:25 136:10
141:14 147:6
156:6 182:14
192:2,9 193:5
195:17 196:14
196:22 206:19
208:12 217:23
219:22,25
220:11,13
227:2 230:3,7
232:4 234:14
241:17 252:1
273:2 281:18
**year** 16:24 33:12
78:4 124:20
130:18,25
137:24 145:3
145:17 146:6
146:20 149:15
151:4 152:10
154:14 161:7,7
161:11,17
162:13 164:11
173:3,15,17
174:15 204:10
226:22,24
227:4 235:19
235:24 236:1,6
237:21,21
239:9,10 240:3
264:22 270:25
286:18
**year's** 221:10
**year-end** 158:4
159:3 165:20
165:22 281:23
**year-to-year**
202:8
**yearly** 161:20
**years** 18:24 19:9

21:12 96:7
104:17 155:12
202:3 204:13
207:24 208:2
209:22 239:2
239:11 244:4
264:4 265:5
269:13 279:16
282:14 283:25
284:3 286:24
**yesterday** 228:11
**yield** 272:6
**York** 2:8 5:4,9,9
6:9
**York-based**
20:13

___

**Z**

**ZIEHL** 5:18
**Zoom** 1:22 12:1
13:16 15:3
81:16
**ZURICH** 4:14

___

**0**

**07052** 2:14

___

**1**

**1** 7:3 9:11 24:19
24:21,24 27:1,4
27:18 29:3
149:15 150:4
231:22 232:11
**1-related** 224:4
**1,200** 282:20
**1.1** 188:18 219:6
**1:20** 112:14,15
**10** 8:3,4,8,10,12
8:14,16,18,21
8:22 9:6,8,10
9:11,12 142:22
176:14,16,18
177:3,9 203:25
284:19
**10:40** 42:7,8
**100** 6:13 67:16

259:4 278:7,13
**1000** 4:5
**10038** 5:9
**101** 7:19
**1024** 7:17
**1032** 7:18,24
**105** 151:20
**105,905** 151:19
**11** 1:3 8:4 10:4
43:21 44:6 64:3
74:7 79:22
178:4 194:16
**116** 7:22
**11th** 245:20
**12** 8:8 178:4,4
**12/31/21** 292:7
**120** 9:3
**1201** 3:15
**1285-1** 7:23 95:9
116:12
**1285-2** 7:21
90:15 101:10
120:14
**13** 1:11 8:10
178:20,21
261:7 291:7
**1301** 3:4
**131** 7:14
**13202** 5:4 6:9
**134** 9:5
**1365** 245:20
**13th** 1:17 78:22
**14** 7:14 8:12
**15** 7:19 8:14
101:8 112:11
**1500** 3:21
**158** 7:14
**15th** 5:23 286:6
**16** 8:16 18:24
19:9
**160** 178:2
**17** 8:18
**1700** 2:4 4:6
**175** 141:6 152:2
237:14 238:2
**175,905** 150:23

151:11,17,19
152:6
**176** 8:3
**17th** 77:11
**18** 8:21 245:24
246:2,16
**180** 5:8 260:8,23
**183** 10:4
**187** 240:13
**1885** 3:21
**18th** 6:4
**19** 8:22 286:24
**1st** 77:12

___

**2**

**2** 7:5 69:24,25
70:25 71:20
72:2 80:20
271:4,5,23
272:10 275:7
277:23
**20** 9:3 120:11,13
121:3,6 201:19
269:7,23 270:6
272:21 273:23
274:3 279:6,19
284:20
**20-33948** 1:4
26:6
**20,000** 124:5,15
124:18 126:15
**20,000-barrel**
124:2,16
**200** 2:9
**2000** 277:20
**20005** 5:24
**2001** 4:11
**20044** 4:22
**2005** 17:1
**2006** 19:13
**2008** 19:14
**2013** 7:13 19:16
19:20,22 20:7
20:19,24 21:1
21:11 37:9
54:13 110:11

142:24 166:18
166:24 167:3,9
175:5,6,7
282:17
**2016** 21:25
**2018** 46:16 286:6
286:7,7,19
287:1,3
**2019** 72:6 75:21
269:3 277:21
278:20,22
286:7 287:3
**202-307-0488**
4:22
**202-962-9147**
5:24
**2020** 8:7 40:25
41:21 45:24
48:7 49:2 64:11
72:15 77:11,13
78:2,22 80:17
106:21 112:22
123:18 133:2
133:24 154:7
158:4,7 162:13
165:5,20,21
173:15,17
210:16,18
221:14,17
225:24 269:3
277:23 287:4,7
**2021** 1:11,18 7:14
9:13 127:23
128:9 130:4,18
130:21,25
132:21 136:24
137:3,3 138:22
140:4,14 141:6
144:9,12,13
149:15 150:9
150:21 151:5
152:10 155:14
155:19 158:8
237:13,21
238:3,6,8 239:5
240:5,7 290:17



291:7 292:2
**2022** 136:24
**203,225** 137:15
**203,225,000**
   137:1
**207** 178:22
**20s** 128:2
**21** 9:5 134:16,19
   135:4,17 137:7
   137:16 150:1
   150:21 151:16
   152:15,19,21
   237:12
**212-806-5562** 5:9
**214** 2:10
**214-220-7784**
   4:13
**214-722-7171**
   3:11
**21st** 9:13
**22** 9:6
**220** 10:5 140:4
**23** 9:8
**235** 10:5
**24** 7:3 9:10
**240** 148:2
**244** 10:6
**245** 9:14
**25** 9:11 269:7
**250,000** 114:4
**252** 10:6
**26** 9:12 14:14
**266** 8:15
**2660** 2:19
**27** 9:14 245:10,11
**2775** 5:14
**28,000** 123:17
   124:7,20 125:1
   125:17 126:19
   126:25 128:2
   129:14,18
   130:6,11
**289** 7:21 10:7
**29** 127:23 129:21
   130:3
**290** 10:7

**291** 10:8

_____

**3**

**3** 7:6 77:2,4,8
   80:20 271:4,25
   275:7 277:24
**30** 272:21 280:16
**30(b)(6)** 1:8,13
   7:3 25:11 26:4
   27:2 29:2
**300** 2:9
**30th** 131:3
**31** 8:7 78:5
**310** 7:21
**311** 72:18,19,25
   78:1
**312-857-0910**
   6:14
**315-423-7100** 5:5
   6:9
**3200** 3:4
**33** 119:1 246:14
**333** 5:4 6:8
**36** 116:14 156:12
**37203** 3:16
**38** 27:22,22 28:16
   31:6
**380** 260:6,23
**3900** 4:12

_____

**4**

**4** 7:8 70:25 71:20
   78:19,20,22
   80:20 271:5
   272:2 275:7
**4/29/21** 8:19
**4:10** 157:23
**4:10's** 157:24
**40** 13:17 264:19
   264:21
**400** 95:21 99:1
   148:12 260:1
   260:22 282:20
**400,000** 114:5
**439** 9:4 120:15
**440** 5:18

**448** 9:4
**45** 153:12,19
   154:3,13 155:7
   155:14,15
**469** 7:15,21
   120:15
**47948** 7:7
**47954** 7:10

_____

**5**

**5** 7:11 54:11
   202:4
**5:00** 179:10
**50** 148:7,7 154:8
   278:5,10
**500** 68:18 148:3
**504-558-5210**
   2:20
**504-568-1990**
   5:15
**512-499-3624**
   4:18
**514** 6:13
**54** 7:11
**55** 278:10,11
**565** 259:20
   260:22

_____

**6**

**6** 7:14,22 90:5,7
   90:12 202:24
   204:10 224:3,7
   224:11,12
**6:43** 1:18 288:10
**60** 157:3 264:20
   272:23
**600** 2:24
**601** 2:19 5:13
**60602** 6:13
**615-742-9320**
   3:17
**64** 135:22 136:3
   136:15,23
**65** 72:24 73:2
**69** 7:5

**7**

**7** 7:16 95:6,8
   143:14,17,20
**7.6** 119:15
**7/17/20** 7:8
**70** 130:20 131:7,9
   132:8 137:2,23
   138:16,23,25
   139:14 140:14
   140:18,21
   141:2 144:14
   151:16,18
   155:14,17
   237:10
**700** 2:4 4:17 66:6
   66:23 67:1,4,6
   210:25 212:16
   258:14,16
   259:14 260:22
   261:5 262:11
   262:15
**70130** 2:20 5:14
**706** 119:2
**706A** 119:8
**7093** 292:6
**713-220-4086**
   2:25
**713-546-5040** 2:5
**713-654-4950** 3:5
**713-850-4245**
   3:22
**713.374.3608** 4:7
**720** 4:16
**746** 2:10
**75** 284:22,24
**75074** 6:4
**75201** 2:10 4:12
**76092** 3:11
**77** 7:6
**77002** 2:5,24 4:6
   5:19
**77010** 3:5
**77056** 3:22
**78** 7:8

_____

**8**

**8** 7:16,19 95:10
   101:5,7
**80** 8:23 154:6
   159:16,23
   168:6,12
   269:23 270:6,7
   284:24
**817-832-5566**
   5:20
**8184** 2:10
**85** 284:24,25
**875** 4:21

_____

**9**

**9** 7:22 116:9,11
   118:8 119:1
**9/17/20** 7:6
**9:37** 1:18
**90** 7:14 256:10
**900** 3:16 5:19
**901** 5:23
**909** 6:4
**910** 7:23
**94075** 3:10
**95** 7:16
**964** 7:23
**972-737-2517** 6:5
**973-530-2077**
   2:15
**978** 7:17
**99** 9:11

