# HCCI Exhibit 24

Page 1

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

```
In re:                    §
                          §      Chapter 11
FIELDWOOD ENERGY LLC,     §
et al.,                   §      Case No. 20-33948 (MI)
                          §
        Debtors.          §
```

REMOTE ORAL DEPOSITION OF

BRETT CUPIT

Houston, Texas

June 3, 2021

10:03 a.m.

Reported by:

Micheal A. Johnson, RDR, CRR

Job No. 720271



Page 2

1          REMOTE ORAL DEPOSITION OF BRETT CUPIT,

2    produced at the instance of Zurich American

3    Insurance Company, in the above-styled and numbered

4    cause on the 3rd day of June, 2021, at 10:03 a.m.,

5    before Micheal A. Johnson, RDR, CRR, reported by

6    realtime stenographic means, at the location of the

7    witness, Houston, Texas, pursuant to Notice of Oral

8    Deposition, and in accordance with the Federal Rules

9    of Civil Procedure.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



Page 3

```
 1                  REMOTE APPEARANCES

 2   ON BEHALF OF ZURICH AMERICAN INSURANCE COMPANY:

 3      Stephen A. Roberts
        CLARK HILL
 4      720 Brazos Street, Suite 700
        Austin, Texas 78701
 5      (512) 499-3624
        stephen.roberts@clarkhill.com

 6

 7   ON BEHALF OF TRAVELERS CASUALTY AND SURETY COMPANY;
     LIBERTY MUTUAL INSURANCE COMPANY; XL SPECIALTY; AND
 8   THE HANOVER INSURANCE COMPANY:

 9      Brandon Bains
        LANGLEY LLP
10      Post Office Box 94075
        Southlake, Texas 76092
11      (214) 722-7160
        bbains@l-llp.com

12

13   ON BEHALF OF HCCI INTERNATIONAL INSURANCE
     COMPANY PLC:
14
        Brad Knapp
15      LOCKE LORD LLP
        601 Poydras Street, Suite 2660
16      New Orleans, Louisiana 70130
        (504) 558-5210
17      bknapp@lockelord.com

18      Philip G. Eisenberg
        600 Travis Street, Suite 2800
19      Houston, Texas 77002
        (713) 226-1304
20      peisenberg@lockelord.com

21

22

23

24

25
```



Page 4

```
 1                    REMOTE APPEARANCES

 2   ON BEHALF OF ASPEN AMERICAN INSURANCE COMPANY,
     BERKLEY INSURANCE COMPANY, EVEREST REINSURANCE
 3   COMPANY, AND SIRIUS AMERICAN INSURANCE COMPANY:

 4     Timothy A. Million
       HUSCH BLACKWELL LLP
 5     600 Travis Street, Suite 2350
       Houston, Texas 77002
 6     (713) 525-6221
       tim.million@huschblackwell.com
 7

 8   ON BEHALF OF FIELDWOOD:

 9     Paul R. Genender
       Erin M. Choi
10     WEIL, GOTSHAL & MANGES LLP
       200 Crescent Court, Suite 300
11     Dallas, Texas 75201-6950
       (214) 746-7877
12     paul.genender@weil.com
       erin.choi@weil.com
13
       Alfredo R. Perez
14     Clifford W. Carlson
       WEIL, GOTSHAL & MANGES LLP
15     700 Louisiana Street, Suite 1700
       Houston, Texas 77002-2784
16     (713) 546-5040
       alfredo.perez@weil.com
17     clifford.carlson@weil.com

18     Jessica Liou
       WEIL, GOTSHAL & MANGES LLP
19     767 Fifth Avenue
       New York, New York 10153-0119
20     (212) 310-8817
       jessica.liou@weil.com
21

22

23

24

25
```



Page 5

```
 1              REMOTE APPEARANCES
 2  ON BEHALF OF ASPEN AMERICAN INSURANCE COMPANY,
    BERKLEY INSURANCE COMPANY, EVEREST REINSURANCE
 3  COMPANY, AND SIRIUS AMERICAN INSURANCE COMPANY:
 4      Darren Grzyb
        Jase A. Brown
 5      CHIESA SHAHINIAN & GIANTOMASI PC
        One Boland Drive
 6      West Orange, New Jersey 07052
        (973) 530-2077
 7      dgrzyb@csglaw.com
        jbrown@csglaw.com
 8
 9  ON BEHALF OF APACHE CORPORATION:
10      Michael D. Morfey
        Catherine Diktaban
11      Robin Russell
        HUNTON ANDREWS KURTH LLP
12      600 Travis Street, Suite 4200
        Houston, Texas 77002
13      (713) 220-4163
        michaelmorfey@huntonak.com
14      cdiktaban@huntonak.com
        rrussell@huntonak.com
15
16  ON BEHALF OF OFFICIAL COMMITTEE OF UNSECURED
    CREDITORS:
17
        Kenneth Pasquale
18      STROOCK & STROOCK & LAVAN, LLP
        180 Maiden Lane
19      New York, New York 10038
        (212) 806-5562
20      kpasquale@stroock.com
21      Ayala Hassell
        PACHULSKI STANG ZIEHL & JONES LLP
22      440 Louisiana Street, Suite 900
        Houston, Texas 77002
23      (713) 691-9385
        ahassell@pszjlaw.com
24
25
```



```
 1                    REMOTE APPEARANCES

 2    ON BEHALF OF PHILADELPHIA INDEMNITY
      INSURANCE COMPANY:
 3
         Robert W. Miller
 4       MANIER & HEROD PC
         1201 Demonbreun, Suite 900
 5       Nashville, Tennessee 37203
         (615) 244-0030
 6       rmiller@manierherod.com

 7
      ON BEHALF OF LEXON INSURANCE COMPANY:
 8
         Lee Woodard
 9       HARRIS BEACH PLLC
         333 West Washington Street, Suite 200
10       Syracuse, New York 13202
         (315) 423-7100
11       lwoodard@harrisbeach.com

12
      ON BEHALF OF JX NIPPON OIL EXPLORATION (U.S.A.)
13    LIMITED:

14       Leann Opotowsky Moses
         CARVER DARDEN KORETZKY TESSIER
15       FINN BLOSSMAN & AREAUX LLC
         1100 Poydras Street, Suite 3100
16       New Orleans, Louisiana 70163
         (504) 585-3830
17       moses@carverdarden.com

18
      ON BEHALF OF RLI INSURANCE COMPANY:
19
         Jonathan S. Ord
20       KREBS FARLEY & DRY
         400 Poydras Street, Suite 2500
21       New Orleans, Louisiana 70130
         (504) 299-3590
22       jord@krebsfarley.com

23

24

25
```



Page 7

```
 1                    REMOTE APPEARANCES

 2   ON BEHALF OF BP:

 3     Jared Weir
       GREENBERG TRAURIG, LLP
 4     2200 Ross Avenue, Suite 5200
       Dallas, Texas 75201
 5     (214) 655-3674
       weirj@gtlaw.com

 6
       Craig Duewall
 7     GREENBERG TRAURIG, LLP
       300 West 6th Street, Suite 2050
 8     Austin, Texas 78701
       (512) 320-7260
 9     duewallc@gtlaw.com

10
     ON BEHALF OF ENTERPRISE GAS PROCESSING LLC:
11
       T. Josh Judd
12     ANDREWS MYERS, PC
       1885 Saint James Place, Suite 1500
13     Houston, Texas 77056
       (713) 850-8218
14     jjudd@andrewsmyers.com

15
     ON BEHALF OF CNOOC PETROLEUM OFFSHORE (USA) LLC:
16
       Peter C. D'Apice
17     STUTZMAN, BROMBERG, ESSERMAN & PLIFKA, PC
       2323 Bryan Street, Suite 2200
18     Dallas, Texas 75201-2689
       (214) 969-4900
19     dapice@sbep-law.com

20
     ALSO PRESENT:
21
       Sergio Garza, Apache In-House Counsel
22     David Bernal, Apace In-House Counsel

23

24

25
```



Page 8

1                     INDEX
                   BRETT CUPIT
2                  June 3, 2021

3

    APPEARANCES                                    3
4

    PROCEEDINGS                                    9
5

6

    EXAMINATION OF BRETT CUPIT:
7

    BY MR. ROBERTS                                 9
8

    BY MR. EISENBERG                              57
9

    BY MR. GRZYB                                  70
10

11

    CORRECTIONS AND SIGNATURE                     83
12

    REPORTER'S CERTIFICATION                      84
13

14

15

16

17

18

19

20

21

22

23

24

25



Page 9

```
 1                    PROCEEDINGS
 2                    BRETT CUPIT,
 3   called as a witness, having been duly sworn, was
 4   examined and testified as follows:
 5                    EXAMINATION
 6   BY MR. ROBERTS:
 7        Q.    Mr. Cupit, I am Steve Roberts.  I
 8   represent Zurich American Insurance Company.  You
 9   are here today as the corporate representative for
10   Apache Corporation pursuant to a notice of
11   deposition to Apache, correct?
12        A.    Yes.
13        Q.    Your counsel was kind enough to send me
14   your LinkedIn profile, so I'm just going to ask a
15   couple questions about your background.
16              You have a bachelor's degree in petroleum
17   engineering from Texas A&M, correct?
18        A.    Yes.
19        Q.    And you worked for Shell for almost
20   five years as a petroleum engineer, as a reservoir
21   engineer?
22        A.    Yes.
23        Q.    And then you graduated from Loyola
24   College of Law in 2000?
25        A.    Correct.
```



Page 10

```
 1       Q.    You have worked for Apache in the legal
 2  department for over 17 years now, correct?
 3       A.    Coming up on 17 years.
 4       Q.    Okay.  Your title now is assistant
 5  general counsel, correct?
 6       A.    Correct.
 7       Q.    And I'm going to read the description on
 8  LinkedIn and then ask you the question:  Managing
 9  domestic operational legal transactional and
10  prelitigation matters for Apache's domestic assets
11  including onshore and in the Gulf of Mexico.
12            What does it mean that you're managing
13  domestic operational legal transactional and
14  prelitigation matters?
15       A.    Typically it means that I'm managing all
16  of our transactional work and legal advice for our
17  operational teams throughout our domestic assets and
18  offshore.
19       Q.    Okay.
20       A.    And that includes a couple of attorneys
21  that report to me.
22       Q.    All right.
23       A.    And then if a matter goes to general --
24  to litigation, I generally hand it off to one of our
25  litigators, although sometimes I remain involved
```



Page 11

1    just from a background standpoint.

2         Q.    So in your capacity as assistant general

3    counsel, you advise executives of Apache Corporation

4    on certain legal matters, right?

5         A.    From time to time.

6         Q.    Right.  And you're not a decision-maker

7    in terms of agreeing to the terms of an agreement;

8    you're an advisor.  Would that be a fair statement?

9              MR. MORFEY:  Objection, vague.

10              MR. ROBERTS:  I'm sorry?

11              MR. MORFEY:  I just objected, vague.

12   BY MR. ROBERTS:

13        Q.    You can answer the question.

14        A.    On business matters, I -- my clients make

15   the decisions, yes.

16        Q.    So in December of last year, Apache

17   entered into a term sheet or a restructuring support

18   agreement with Friendswood [sic], correct?

19        A.    With who?

20        Q.    With Fieldwood?

21        A.    Yes, we entered into a term sheet last

22   summer.

23        Q.    And what was your role in that, if any?

24        A.    I was involved in negotiating and

25   drafting and discussions with Fieldwood as we



Page 12

1    prepared the terms.

2        Q.    And who with Apache would be the person

3    or persons to agree to the terms of that term sheet

4    on behalf of Apache?

5        A.    It was put together by Anthony Lannie and

6    myself and ultimately signed off by a suite of

7    executives, including John Christmann and Steve

8    Riney and Ben Rodgers.

9        Q.    John Christmann.  Can you spell that,

10   please?

11       A.    C-h-r-i-s-t-m-a-n-n.

12       Q.    I'm sorry, what were the other two names?

13       A.    Steve Riney, R-i-n-e-y, Ben Rodgers,

14   R-o-d-g-e-r-s.

15       Q.    And what is Mr. Christmann's title?

16       A.    He is the CEO.

17       Q.    What about Mr. Riney?

18       A.    He is the CFO.

19       Q.    And Mr. Rodgers?

20       A.    He is the treasurer.

21       Q.    What was the purpose -- what was Apache's

22   purpose in entering into the restructuring support

23   agreement?

24       A.    Well, we were engaged by Fieldwood to

25   discuss a potential restructuring organization and



1    that's the -- the term sheet is the result of those

2    discussions.

3         Q.    Well, prior to entering into the term

4    sheet, let's -- I would like to dig into a little

5    background.

6              It's true then, in 2013 Fieldwood

7    acquired certain assets in the Gulf of Mexico from

8    Apache, correct?

9         A.    That's correct.

10        Q.    And in connection with that acquisition,

11   there were several related agreements, one of which

12   was a decommissioning agreement, correct?

13        A.    That's correct.

14        Q.    And the decommissioning agreement

15   generally involved the obligations of Fieldwood to

16   abide by decommissioning obligations in relation to

17   the assets dealt by Apache and Apache's rights in

18   connection with the decommissioning of such assets

19   if Fieldwood did not meet its obligations.  That's a

20   long question, but is that a -- generally a fair

21   characterization of what's --

22        A.    I'm not sure I understood your

23   characterization.

24        Q.    Okay.  How would you characterize the

25   decommissioning agreement entered back in 2013?



Page 14

```
 1        A.     The decommissioning agreement generally
 2   speaks for itself, but it outlines the obligations
 3   and rights between the parties related to
 4   decommissioning.
 5        Q.     Okay.  And the restructuring -- the
 6   restructuring agreement, did it involve terms that
 7   would alter the rights and obligations of the
 8   parties, being Apache and Fieldwood, under the
 9   decommissioning agreement?
10        A.     Did it alter the decommissioning
11   agreement, is that what you're asking?
12        Q.     Yes, uh-huh.
13        A.     It did not amend the decommissioning
14   agreement.
15        Q.     By way of background, I want to make sure
16   I understood the decommissioning agreement prior to
17   the restructuring agreement and the relationship of
18   Apache and Fieldwood, and then after the agreement
19   and compare and contrast and then I'll ask you
20   questions about Apache's communications and
21   projections and plans.
22               So under the original decommissioning
23   agreement, the parties agreed to develop
24   decommissioning plans for the first few years,
25   correct?
```



Page 15

```
 1        A.    I mean, the decommissioning agreement
 2   speaks for itself.
 3        Q.    Were you involved in the decommissioning
 4   agreement?
 5        A.    In what way?
 6        Q.    Were you involved in drafting it,
 7   negotiating it?
 8        A.    I was not.
 9        Q.    Are you familiar with it?
10        A.    Yes.
11        Q.    So again, does the decommissioning
12   agreement provide for the parties developing
13   decommissioning plans?
14        A.    The decommissioning agreement speaks for
15   itself.  It says what's required between the
16   parties.
17        Q.    Do you want me to pull up the
18   decommissioning --
19        A.    Do you want to read it to me --
20        Q.    -- agreement and read it or can you --
21        A.    That's fine.
22        Q.    -- just generally agree with the
23   question, that it calls for the parties developing
24   decommissioning plans?
25        A.    There was an initial decommissioning
```



Page 16

1   plan, if that's what you're asking.

2        Q.    Okay.  Is there currently a

3   decommissioning plan under the decommissioning

4   agreement?

5        A.    I believe there was one that was put in

6   place a couple years ago when I was not really

7   managing the Gulf at the time.

8        Q.    Is there currently a decommissioning plan

9   going forward under the decommissioning agreement?

10       A.    I don't know what the current state of

11  the decommissioning plan is.

12       Q.    Who would?

13       A.    Potentially Brian Erickson, Gulf of

14  Mexico operations.

15       Q.    Has Adobe [sic] estimated the annual cost

16  for decommissioning over the next three years?

17       A.    Did who estimate?

18       Q.    Apache.

19       A.    Has Apache estimated that?

20       Q.    Yes.

21       A.    We do not have the data to estimate

22  decommissioning for Fieldwood's properties.

23       Q.    You're entitled to that data under the

24  decommissioning agreement, aren't you?

25       A.    If the decommissioning agreement says we



Page 17

1   are, then I guess we are.

2                MR. ROBERTS:  Is Mr. Perez on the

3   call?

4                MR. GENENDER:  Steve, he is.

5                MR. ROBERTS:  I see.  Thank you.  You

6   filed under seal and the motion for summary judgment

7   proceeding, a nonbinding version of the

8   decommissioning agreement which incorporates all the

9   amendments.  That is what I would like to refer to,

10  but it is marked as professional eyes only and under

11  seal.

12               First I would like to confirm, is

13  there anybody on this call that is not subject to

14  the confidentiality agreement in place in this case?

15  I take from everyone's silence that they are bound

16  by it, they're representing they're bound by it by

17  not speaking up.

18               Mr. Perez, do you have --

19               MR. PEREZ:  Mr. Roberts, normally the

20  way that we've handled these -- obviously, this is a

21  witness for a party who is a signatory to the

22  agreement and the way we've handled, you know, the

23  PEO documents is we've provided a copy to the

24  individual and asked them questions with respect to

25  the document as opposed to broadcasting it for



Page 18

1   everyone else.

2            MR. ROBERTS:  If everybody on the

3   call is subject to the confidentiality agreement,

4   why can't we just walk through it on the screen?

5            MR. PEREZ:  I'd prefer to do it the

6   other way.  That's kind of the way we've handled it

7   in all the other depositions in this case.

8            MR. ROBERTS:  I'll move on for now

9   and we can deal with that.

10  BY MR. ROBERTS:

11       Q.   Mr. Cupit, under the decommissioning

12  agreement itself, if Fieldwood does not perform its

13  decommissioning obligations, then Apache has the

14  right to perform those decommissioning obligations

15  if the government demands that such decommissioning

16  obligations be performed?

17       A.   There are very specific terms with regard

18  to which parties perform and when they have the

19  right to perform and I will defer to the terms of

20  the decommissioning agreement as they spell that

21  out.

22       Q.   Well, you're familiar with the

23  decommissioning agreement now, right?

24       A.   I am.

25       Q.   Okay.  And so you tell me your



Page 19

```
 1   understanding at what point Apache can step in and

 2   perform the decommissioning?

 3        A.    Well, again, the decommissioning

 4   agreement spells out very specific terms as to when

 5   Apache can do that.

 6        Q.    Well, what is your understanding of those

 7   terms?

 8        A.    My understanding is what the

 9   decommissioning agreement says.

10        Q.    So you're going to answer my question by

11   reading the decommissioning agreement and we're

12   going to take all day?

13        A.    If you'd like.

14        Q.    And we're going to take all day because

15   you're not going to discuss the decommissioning

16   agreement?

17        A.    No, I'm going to discuss the terms of the

18   decommissioning agreement.  It says what it says.

19        Q.    Do you have that?

20        A.    I have a copy of the decommissioning

21   agreement.

22        Q.    Would you look at paragraph 2.1(a).

23   While you're pulling that up, let me ask you a

24   question.  Is it Apache's position that Fieldwood is

25   currently in default under the decommissioning
```



Page 20

1    agreement or not?

2          A.    We have --

3                MR. MORFEY:  Hold on one second.

4    Hold on one second, Brett.

5                I'm going to object, it's outside the

6    scope of today's deposition.

7                You can go ahead and answer.

8          A.    We have filed claims with regard to their

9    performance or maybe lack of performance under the

10   decommissioning agreement.

11   BY MR. ROBERTS:

12         Q.    And are those claims based upon Apache's

13   contention that Fieldwood has not abided by its

14   obligations under the decommissioning agreement?

15         A.    In part, yes.

16         Q.    And under 2.1, generally speaking,

17   Fieldwood was required to spend $80 million a year

18   in 2019 and 2020 on decommissioning, correct?

19         A.    In each of those years, yes.

20         Q.    And it did not do so?

21         A.    My understanding is in 2019, it did not

22   do so.

23         Q.    Did it do so in 2020?

24         A.    Or I'm sorry, in 2020 it did not do so.

25   It did in 2019.



1        Q.      Thank you.  Do you know how far it fell

2    short in 2020?

3        A.      I don't remember the number.

4        Q.      Would it be around $45 million?

5        A.      I couldn't hear that.

6        Q.      Would it be around $45 million?

7        A.      That sounds similar to what I remember.

8        Q.      Okay.  Thank you.  It's true under the

9    decommissioning agreement, at least prior to the

10   bankruptcy, that if Apache undertook

11   decommissioning, it could seek reimbursement from

12   Fieldwood for the costs it incurred, correct?

13       A.      If that's what the decommissioning

14   agreement says, yeah.

15       Q.      And it could also, generally speaking

16   again, look to other sources of security that were

17   set up, for example, letters of credit and surety

18   bonds for reimbursement, correct?

19       A.      If that's what the decommissioning

20   agreement says, then, yes.

21       Q.      Do you recall whether or not Apache has

22   recourse to letters of credit or surety bonds in the

23   event that --

24       A.      Apache has recourse against security

25   under the decommissioning agreement.



Page 22

```
 1        Q.     Thank you.  And before the bankruptcy,
 2   the right -- as a result of the bankruptcy, Apache's
 3   right to reimbursement from Fieldwood would be an
 4   unsecured claim in the bankruptcy case, right?
 5                  MR. MORFEY:  Objection, legal
 6   conclusion.
 7                  You can answer to the extent you
 8   know, Brett.
 9        A.     I'll rely on legal counsel to advise on
10   that.
11   BY MR. ROBERTS:
12        Q.     Do you know the difference between a
13   secured and an unsecured claim, Mr. Cupit?  You are
14   a licensed attorney after all.
15        A.     Generally, yes.
16        Q.     And does Apache, under the
17   decommissioning agreement or any other agreement,
18   have collateral to secure Fieldwood's obligation to
19   reimburse it for decommissioning costs?
20        A.     I guess it depends on how you define
21   collateral.
22        Q.     How would you define collateral?
23        A.     I don't know how I would define
24   collateral.  You're the one that used the word.
25        Q.     Let's call it a security interest in
```



Page 23

1  assets.  Fair enough?

2       A.    Yeah, I don't believe there's a security

3  interest in assets.

4       Q.    So then the claim, if any, that Apache

5  would have under the decommissioning agreement

6  against Fieldwood would be an unsecured claim, not a

7  secured claim, correct?

8                 MR. MORFEY:  Objection.  Hold on.

9  Objection, legal conclusion.

10                 You can answer.

11      A.    I'll rely on my counsel's objection.

12  BY MR. ROBERTS:

13      Q.    What does that mean?  You don't know the

14  answer?

15      A.    Meaning that you're asking me for -- to

16  provide legal advice to you.

17      Q.    No, I'm not.  I'm asking you what your

18  answer is to the question, if you know the answer.

19  I'm not relying on your advice.

20                 MR. MORFEY:  Hold on a second, guys.

21  So it sounds like he's re-asking the question or

22  asking you to answer the question.  So I'm going to

23  renew any objection that this is -- calls for a

24  legal conclusion.

25                 MR. ROBERTS:  The witness can answer



Page 24

1      the question subject to your objection, correct?

2                   MR. MORFEY:  My objection is that it

3      is a legal conclusion.  I'm not instructing him to

4      answer.  I will, however, advise the witness that he

5      should not disclose any information that is subject

6      to the attorney-client privilege.

7                   MR. ROBERTS:  What does that advice

8      have to do with the question I asked?  Was I asking

9      for privileged information?

10                  MR. MORFEY:  You've asked him for, in

11     my opinion, Steve, and respectfully, clearly a legal

12     conclusion.  And he's not here to testify as a legal

13     expert.

14                  Now, Mr. Cupit also, as we've

15     covered, is an in-house attorney for Apache.  And my

16     guess is that various legal matters are discussed

17     subject to the privilege in his job duties.  And so

18     we've got a complicated issue here.  I think you've

19     asked a legal conclusion and I think it probably

20     calls for privileged information as well.

21     BY MR. ROBERTS:

22         Q.    Let me ask this question.  I think you've

23     answered, but I want to make sure the record's

24     clear.  To your knowledge, Apache does not have any

25     collateral to secure any claim it has against



Page 25

 1    Fieldwood under the decommissioning agreement.

 2    True?

 3         A.    Repeat that again.

 4         Q.    To your knowledge, Apache does not have

 5    any collateral or security interest in assets at

 6    Fieldwood to secure any claim it has against

 7    Fieldwood under the decommissioning agreement?

 8              MR. MORFEY:  And I'm going to object

 9    to that question as also calls -- calling for a

10    legal conclusion and would caution the witness not

11    to disclose information that is subject to the

12    attorney-client privilege.

13              MR. ROBERTS:  I'm asking him for his

14    understanding.  He can -- if he's a corporate

15    representative, he can tell us his understanding as

16    a corporate representative.

17              MR. MORFEY:  This information --

18              MR. ROBERTS:  You don't have to be a

19    lawyer to understand.  I've already explained what

20    security interest is.  This witness has the factual

21    information to answer the question.

22              MR. MORFEY:  And --

23              MR. ROBERTS:  Are you going to

24    continue the objection and instruct him not to

25    answer?



Page 26

```
 1                    MR. MORFEY:  I didn't instruct him
 2   not to answer.  I instructed him not to go into
 3   privileged information, and I'm renewing my
 4   objection that it calls for a legal conclusion.  And
 5   I would also say that the characterization of
 6   Apache's claims in the bankruptcy are not within the
 7   scope of this deposition.  They're not part of the
 8   topics, whether it's claims or deemed secured or
 9   unsecured or anything else.
10                    MR. ROBERTS:  As to that -- well,
11   it's for purposes of background, but I'll move on
12   and I'll back into it.
13   BY MR. ROBERTS:
14      Q.    Mr. Cupit, isn't it true that under the
15   agreements that Apache has reached with Fieldwood,
16   under Fieldwood's proposed plan, that Apache has
17   greater rights to protect its interests than it did
18   before the plan?
19                    MR. MORFEY:  Objection, vague.
20      A.    I don't know that I would characterize
21   anything as greater rights.
22   BY MR. ROBERTS:
23      Q.    So under the plan, an entity called
24   Fieldwood I LLC is being created, correct?
25      A.    Yes.
```



Page 27

```
 1        Q.    And Fieldwood I will have a sole manager
 2   and no employees, correct?
 3        A.    That's correct.
 4        Q.    And that sole manager is Jon Graham,
 5   right?
 6        A.    Fieldwood I has not been formed yet, so
 7   Jon Graham is not currently the sole manager of that
 8   entity.
 9        Q.    No, Jon Graham is currently a consultant
10   for Fieldwood, correct?
11        A.    That is correct.
12        Q.    And it is intended that he will be the
13   sole manager for Fieldwood I when it is formed,
14   correct?
15        A.    That is the expectation.
16        Q.    And that's with the approval of Apache,
17   correct?
18        A.    That's correct.
19        Q.    And he cannot be removed absent gross
20   negligence or willful misconduct, without Apache's
21   approval or consent, correct?
22        A.    If that's what the LLC agreement says,
23   then yes.
24        Q.    Okay.  And you -- Apache did not have any
25   such rights -- doesn't have any such right now prior
```



1    to confirmation of the plan, does it?

2         A.    To remove -- to consent to the removal of

3    a sole manager?

4         Q.    Right.  Let me back up.  Let me set this

5    up a little bit better.

6              The purpose of FWE I is to operate what

7    is called the Apache legacy assets and perform the

8    decommissioning of those assets.  That's the purpose

9    of the formation of FWE I, correct?

10        A.    It is to own, operate, manage and

11   decommission the properties that will be allocated

12   to Fieldwood I.

13        Q.    And those properties are properties that

14   Fieldwood I acquired from Apache?

15        A.    That's correct.

16        Q.    So prior to the plan being confirmed,

17   those obligations would be the obligations of the

18   existing Fieldwood, correct?

19              MR. MORFEY:  Objection, legal

20   conclusion.

21        A.    Fieldwood Energy LLC is currently

22   obligated to decommission those properties.

23   BY MR. ROBERTS:

24        Q.    And Apache doesn't have any right under

25   any agreement that you know of to determine who the



Page 29

1    managers of Fieldwood Energy LLC are, correct?

2         A.    I'm not aware of any.

3              MR. MORFEY:  Objection.

4    BY MR. ROBERTS:

5         Q.    Fieldwood -- I'm going to call it FWE I,

6    is also going to have an independent director,

7    correct?

8         A.    That's correct.

9         Q.    To your knowledge, has Apache consented

10   to an individual -- approved a particular individual

11   to become the independent director of FWE I?

12        A.    Not to my knowledge.

13        Q.    But that independent director must be

14   approved by Apache, correct?

15        A.    If that's what the LLC agreement says,

16   then yes.

17        Q.    All right.  And prior to the plan being

18   confirmed, Apache didn't have any rights to approve

19   an independent director of Fieldwood Energy LLC

20   under any agreement that you're aware of, correct?

21        A.    I'm not aware if that's true.

22        Q.    Fieldwood I is not going to have any

23   employees other than the sole manager, correct?

24        A.    That's what the LLC agreement says.

25        Q.    Right.  And the -- so the decommissioning



Page 30

1   work, as I understand it, is going to be first --
2   well, after the transition is completed as provided
3   by the agreements, there will be a service provider
4   that is hired to do the actual work, right?
5       A.    Eventually maybe, yes.
6       Q.    Okay.  And that service provider has to
7   be approved by Apache unless it's the current credit
8   bid purchaser, correct?
9       A.    I'll rely on the terms of the LLC as to
10  those consent rights.
11      Q.    If it says that, you don't have any
12  reason to disagree that?
13      A.    I mean, it says what it says.
14      Q.    All right.  So before the plan was
15  confirmed, Apache didn't have any right to approve
16  the service providers of Fieldwood Energy LLC, did
17  it?
18      A.    I'm not aware of such a right.
19      Q.    The operations of FWE I are limited to
20  the decommissioning of the legacy Apache properties
21  unless Apache consents to run those operations; is
22  that right?
23      A.    Repeat your question.
24      Q.    The operations of FWE I are limited to
25  the P&A and decommissioning of the legacy Apache



Page 31

1    properties unless Apache consents, correct?

2              MR. MORFEY:  Brett, hold on.  Hold on

3    one moment.  I want to lodge an objection.

4              Steve, I've let you ask some

5    questions along these lines, but the operations of

6    Fieldwood I are not one of our topics here today.

7    And so we're straying far afield of what our witness

8    is here to testify on, I'm afraid.

9              MR. ROBERTS:  I'm sorry, it's under

10   No. 4, post confirmation operations and plans at

11   Apache with respect to all agreements to which

12   Apache's a party or to which Apache will be a party

13   under the plan of reorganization with respect to any

14   rights granted to Apache under plan of

15   reorganization.  And I'm asking about an agreement

16   to which it is a party.

17             MR. MORFEY:  You're asking about --

18   you're asking about the LLC agreement for

19   Fieldwood I.

20             MR. ROBERTS:  I'm asking about

21   Apache's consent rights.

22   BY MR. ROBERTS:

23       Q.   So let me ask you this.  Mr. Cupit, were

24   you involved in negotiating Apache's consent rights

25   in the FWE I LLC agreement?



Page 32

1      A.    Yes.

2              MR. ROBERTS:  That's what I'm asking

3      about, Counsel.  Are you still telling me I'm

4      outside the scope of item 4?

5              MR. MORFEY:  The operations of

6      Fieldwood I, I believe are outside the scope.

7              MR. ROBERTS:  But Apache has consent

8      rights under the Fieldwood I LLC, correct?

9              MR. MORFEY:  Are you asking -- I'm

10     sorry, I didn't know if you were asking me, Steve,

11     or asking the witness.

12             MR. ROBERTS:  I'm trying to

13     understand your objection, why you're saying this is

14     outside the scope, when Apache has negotiated

15     consent rights over FWE I LLC and you're telling me

16     that's outside the scope of the post confirmation

17     operations and plans of Apache?

18             MR. MORFEY:  My objection is very

19     clear and that is, I've let you ask several

20     questions about the operations of Fieldwood I and

21     you seem to continue to go into that.  And so I'm

22     objecting that those questions are outside the scope

23     of the deposition topics.

24             MR. ROBERTS:  To be specific, I'm

25     asking about Apache's consent rights to the



Page 33

```
 1   operation of Fieldwood I.
 2                MR. MORFEY:  And so please just ask
 3   your question.  I haven't instructed the witness not
 4   to answer.  Ask your question and he can respond and
 5   I'll object as appropriate.
 6                MR. ROBERTS:  All right.
 7   BY MR. ROBERTS:
 8        Q.    Mr. Cupit, do you have the Fieldwood I
 9   draft LLC agreement?
10        A.    I do not have it in front of me.
11        Q.    So isn't it true that Fieldwood I cannot
12   select, remove or change the responsibilities of a
13   service provider except for gross negligence or
14   willful misconduct?  If that's what the agreement
15   says, you don't have any reason to disagree with
16   that, right?
17        A.    I'll rely on what the agreement says.
18        Q.    Okay.  So prior to the confirmations of
19   the plan, Apache didn't have any right to select
20   Fieldwood I Energy LLC's service provider, correct?
21        A.    I'm not aware of such a right.
22        Q.    So what is the purpose to Apache of
23   having these additional rights that it did not have?
24   What is the goal and the purpose of Apache to
25   negotiate these consent rights?
```



Page 34

```
1        A.    At the end of the day, it's to see these
2   properties decommissioned.
3        Q.    It's to -- wouldn't it be fair to say
4   it's to limit or eliminate Apache's potential
5   exposure for decommissioning costs?
6        A.    At the end of the day, yes.
7        Q.    Has Apache done any confirmations on its
8   potential exposure on the decommissioning costs?
9        A.    We have -- some calculations have been
10  done, yes.
11       Q.    Do you have -- can you tell me any
12  estimates of range of estimates of Apache's
13  exposure?
14             MR. MORFEY:  And I'm going to caution
15  the witness to the extent that this is revealing of
16  attorney-client communications or work product or
17  similar privileged issues, then obviously we don't
18  want to get into those matters.  To the extent it
19  doesn't, you can respond.
20       A.    The only information that we have -- we
21  have prepared or had prepared was in anticipation of
22  litigation subject to privilege.
23  BY MR. ROBERTS:
24       Q.    So Mr. Jon Graham testified yesterday,
25  and I will represent to you he estimated
```



Page 35

```
1    decommissioning costs that Fieldwood has estimated
2    to have been anywhere between 800 million to
3    $1.2 billion.  Do you have any reason to disagree
4    with that range of estimates?
5         A.    If that's what Jon testified, I have no
6    reason to disagree with him.
7         Q.    And if he were true, that would mean if
8    Fieldwood did not perform its decommissioning
9    obligation, Apache would have exposure above and
10   beyond the third-party letters of credit and
11   sureties that protect Apache's interests, correct?
12        A.    That would seem possible.
13        Q.    Do you know approximately how much money
14   there is in Trust A currently?
15        A.    My understanding, it's around 230 million
16   something.
17        Q.    And is Apache loaning an additional
18   $45 million to be deposited in Trust A?
19        A.    There is a -- well, I mean, the standby
20   facilities sets forth what Apache's willing to loan.
21        Q.    Well, I looked at the standby facility,
22   but the debtor's plan as I recall -- well, let me --
23   instead of going to that, is Apache intending to
24   make a $45 million advance under that facility?
25        A.    Apache intends to -- assuming that that
```



Page 36

1    agreement is executed, Apache intends to comply with

2    the agreement.

3        Q.    Well, you have -- Apache has the

4    discretion whether to loan money under the

5    agreement, correct?

6        A.    I mean, the agreement speaks for itself

7    as to what Apache's obligations and discretion are.

8        Q.    Well, Apache doesn't have any obligation

9    to loan any money under the agreement, right?

10       A.    Apache -- again, the agreement says what

11   it says as to what our obligations and rights are.

12       Q.    Do you disagree with the statement that

13   Apache has no obligation to loan any funds under the

14   agreement?

15       A.    I again refer to the agreement and it

16   says what it says.

17       Q.    Are you familiar with the agreement?

18       A.    Generally, yes.

19       Q.    Are you aware of any term in that

20   agreement where Apache is obligated to fund any

21   money under the standby letter of credit -- under

22   the --

23       A.    The agreement says what it says.

24       Q.    So you're not aware one way or another?

25       A.    I'm just saying that the agreement will



Page 37

```
 1   set forth the terms of what Apache's obligations

 2   are.

 3        Q.    I understand that.  I'm asking for your

 4   understanding.  I'm not asking what the agreement

 5   says.  I'm asking you --

 6        A.    My understanding is the agreement sets

 7   forth the terms.

 8        Q.    Yes.  And you don't have any

 9   understanding what those terms are?

10        A.    It sets forth what obligations Apache has

11   to lend money.

12        Q.    And can you point to anywhere in that

13   agreement where Apache has the affirmative

14   obligation to loan any money?

15        A.    Again, the agreement says what it says.

16        Q.    No, I'm asking you if you can point to

17   anywhere in the agreement where --

18        A.    I do not have a section referenced to

19   anything in the agreement off the top of my head.

20        Q.    So is Apache intending to loan

21   $45 million to Fieldwood, FWE I, when the plan's

22   confirmed?

23             MR. MORFEY:  Objection, asked and

24   answered.

25        A.    If the facility agreement says that we
```



Page 38

1   will loan money, then we'll agree to loan money.

2   BY MR. ROBERTS:

3       Q.    Well, I tell you, the facility agreement

4   doesn't say it, but that doesn't -- that's not my

5   question.  My question is whether Apache intends to

6   loan $45 million upon confirmation of the plan for

7   deposit into Trust A?

8                   MR. MORFEY:  Objection.

9       A.    We intend to comply with that agreement.

10                  MR. MORFEY:  And objection, asked and

11  answered.

12  BY MR. ROBERTS:

13      Q.    The agreement does not address that

14  question.  So if the agreement doesn't address the

15  question, how do you answer it?

16                  MR. MORFEY:  Same objection.

17      A.    If the agreement contemplates that there

18  is a loan to be made and a loan request is made --

19  is received, we will comply with the agreement.

20  BY MR. ROBERTS:

21      Q.    Has a loan request been made?

22      A.    The agreement doesn't exist yet.

23      Q.    Right.  And if the debtor's plan

24  states -- debtor's disclosure statement states that

25  Apache loan $45 million upon confirmation of the



Page 39

1   plan, that's something that you have no knowledge

2   of?

3        A.    If that's what it says, then that's what

4   we'll do.

5        Q.    So do you know approximately at what

6   level of cost Apache -- well, do you know the total

7   of Trust A letters of credit and surety bonds that

8   protect Apache in the decommissioning agreement, the

9   approximate level?

10       A.    My rough memory of the total of the

11  Trust A balance of the cash, the security -- the

12  surety bonds and the LLC agreements comes to 730 or

13  40 million.

14       Q.    Correct.  So does Apache have any

15  financial incentive to manage or control

16  decommissioning costs so long as they're below the

17  $730 million threshold?

18       A.    I can see scenarios under which they

19  would.

20       Q.    Give me an example.

21       A.    Well, I mean, you're projecting a lot of

22  time into the future.

23       Q.    Yes.

24       A.    And while estimates may be low at one

25  point in time, it may not be tomorrow.



Page 40

```
 1        Q.    Correct.  So it would be fair to say
 2    that --
 3        A.    There's always an incentive to control
 4    costs.
 5        Q.    I'm sorry?
 6        A.    There's always an incentive to control
 7    costs.
 8        Q.    Was there an incentive to control costs
 9    if the costs are not expected to exceed funds that
10    Apache can obtain from third parties for
11    reimbursement?
12        A.    I'm not sure I understand your question.
13        Q.    Well, under the decommissioning agreement
14    there's certain conditions in which Apache can draw
15    on Trust A, draw on letter of credit, draw on surety
16    bonds to reimburse its costs.  Fair enough?
17        A.    Okay.
18        Q.    And until those funds run out, Apache's
19    not at financial risk for the decommissioning,
20    correct?
21        A.    I wouldn't characterize it that way.
22        Q.    Okay.  How would -- why do you disagree
23    with that?
24        A.    Well, just because those -- that amount
25    of money is not being consumed yet doesn't mean that
```



Page 41

1    there's not a risk coming down the line.

2         Q.    Correct.  So under the standby loan

3    agreement and the security agreement, generally

4    speaking, if Apache loans money under that standby

5    loan agreement, that loan will be secured by a lien

6    on the assets at Fieldwood I, correct?

7         A.    There is a lien to secure loans under the

8    standby facility, yes.

9         Q.    And so if Apache were to loan money to

10   Fieldwood in order for Fieldwood to comply with its

11   decommissioning obligations, Fieldwood's obligation

12   to repay that loan would be secured by its assets?

13                MR. MORFEY:  Objection, legal

14   conclusion.

15                You can answer.

16        A.    I'll rely on what the agreements say, but

17   there are security documents associated with the

18   standby facility.

19   BY MR. ROBERTS:

20        Q.    Okay.  We've already established that

21   prior to the bankruptcy, Apache didn't have any

22   security interest in assets of Fieldwood to secure

23   any obligations prior to the bankruptcy, correct?

24        A.    You've stated that.

25        Q.    Do you agree with it or not?



Page 42

```
 1        A.    Well, I think we've gotten into a back

 2   and forth over that.

 3        Q.    I think you said you're not aware of any

 4   security interests.

 5        A.    I'm not aware of any current mortgages.

 6        Q.    So that's an advantage to Apache that it

 7   has under the plan that it can use going forward

 8   that it did not have prior to the plan, correct?

 9        A.    Well, in like manner, we didn't have an

10   obligation to loan money.

11        Q.    Right.  So one thing I'm really -- I'm

12   really curious about is, Fieldwood is currently

13   producing revenue from production, right?

14        A.    That's my understanding.

15        Q.    All right.  Under the decommissioning

16   agreement as it stands now, if Fieldwood did not

17   abide by its obligation to decommission and Apache's

18   obligation was triggered, Apache wouldn't have the

19   right to use Fieldwood's funds production, would it?

20              MR. MORFEY:  Objection, legal

21   conclusion, hypothetical and beyond the scope.

22              You can answer.

23              MR. ROBERTS:  Let me --

24        A.    The decommissioning -- go ahead.

25
```



Page 43

```
 1   BY MR. ROBERTS:

 2        Q.    Let me re-ask the question.  Going

 3   forward, isn't it true that the debtor's own

 4   projections show that Fieldwood does not have the

 5   funds in the future to perform all of its projected

 6   decommissioning obligations?

 7        A.    My understanding is that Fieldwood's

 8   forecasts have indicated that they will likely not

 9   perform some portion.

10        Q.    And what are the consequences to Apache

11   if Fieldwood doesn't perform?

12        A.    I'm sure they're myriad.

13        Q.    So one is Apache could pick up that

14   obligation and be required to fund the

15   decommissioning obligations, could be required by

16   the government to do so?

17        A.    That's a possibility.

18        Q.    All right.  And if -- if that happened

19   and if Apache, say, drew on the letter of credit to

20   reimburse it -- no, strike that.

21              If Apache has to pick up that obligation,

22   does Apache have any right to use the revenues that

23   Fieldwood continues to produce to defray its

24   obligation?

25                    MR. MORFEY:  Objection, legal
```



Page 44

1    conclusion and hypothetical.

2                MR. ROBERTS:  We've already

3    established the hypothetical, that it's likely that

4    Fieldwood will not be able to perform its

5    decommissioning obligations.

6    BY MR. ROBERTS:

7         Q.    So my question is, if Apache is required

8    to, is there a way in which Apache has -- can use

9    Fieldwood's revenues that it still generates to --

10               MR. MORFEY:  Same objection.

11   BY MR. ROBERTS:

12        Q.    -- perform to Fieldwood, right?

13        A.    The decommissioning agreement outlines

14   what rights we have vis-a-vis Fieldwood with respect

15   to decommissioning that Apache may have to perform.

16        Q.    Which would be reimbursement rights,

17   correct?  You've got a right to reimbursement?

18        A.    Among others, yes.

19        Q.    So would it be fair to say that Apache is

20   attempting to limit its exposure to decommissioning

21   costs by entering into the planned support agreement

22   and supporting the debtor's plan?

23        A.    That has been an objective from Apache

24   since 2013.

25        Q.    And isn't it true -- well, what does the



Page 45

1  term decommissioning security mean to you in the

2  context of these agreements?

3       A.    Well, I don't remember specifically if

4  the decommissioning agreement defines that, but if

5  it is, then it would be what's defined in the

6  agreement.

7       Q.    Well, it would generally be the bonds and

8  the letter of credit, where you -- that Apache could

9  seek reimbursement from, correct?

10      A.    Those are part of it, yes.

11      Q.    And Apache is requiring that security be

12  maintained as a condition of the agreement --

13  entering into these agreements, correct?

14      A.    That is a condition of the restructuring

15  support agreement.

16      Q.    Give me one minute.  Excuse me.  So let

17  me ask you this.  If in the future Fieldwood did not

18  live up to its decommissioning obligations, Apache

19  stepped in, performed those obligations and the cost

20  exceeded Trust A letters of credit and surety bonds,

21  then Apache at that point would have to come out of

22  pocket to continue the decommissioning agreement

23  unless it loaned money to Fieldwood, right?

24      A.    Can you rephrase your question, restate

25  your question?



Page 46

```
 1        Q.     Yeah.  Let's -- here's my hypothetical.
 2   Fieldwood defaults in its decommissioning
 3   obligations, Apache steps up and undertakes its
 4   decommissioning obligations, it exercises its right
 5   to recourse under Trust A, it exercises its right to
 6   let any letters of credit, it exercises its right to
 7   any surety bonds, and all those sources of money run
 8   out, but the decommissioning obligations continue.
 9   At that the point, Apache is exposed to pay for
10   continuing decommissioning obligations out of its
11   own pocket, correct?
12        A.     I think all along Apache is paying out of
13   its own pocket subject to reimbursement rights.
14        Q.     Right.  So it would then only have
15   reimbursement rights against Fieldwood because its
16   reimbursement rights under my hypothetical against
17   all the other parties would have been exhausted.  So
18   it would have reimbursement rights against
19   Fieldwood, correct?
20               MR. MORFEY:  Objection, legal
21   conclusion and hypothetical.
22        A.     We have the rights set forth in the
23   decommissioning agreement.
24   BY MR. ROBERTS:
25        Q.     So Apache could either pay those costs
```



Page 47

1    and seek reimbursement or it could loan money to
2    Fieldwood and Fieldwood could pay those costs and
3    Apache would have a first lien on Fieldwood's assets
4    to repay that loan, right?
5                MR. MORFEY:  Same objections.
6        A.    So I believe you're referencing Fieldwood
7    in reference to Fieldwood Energy I --
8    BY MR. ROBERTS:
9        Q.    Yes.
10       A.    -- post confirmation.
11       Q.    Yes.
12       A.    And in that regard, the -- Apache's -- if
13   Apache's ordered to perform decommissioning, then
14   Apache expects to comply with its obligations.
15       Q.    Correct.  And once Apache has gotten
16   reimbursement from all other sources other than
17   Fieldwood and exhausted those resources, then its
18   only other recourse would be against Fieldwood to
19   get reimbursement for those costs, right?
20                MR. MORFEY:  Same objection.
21       A.    The decommissioning agreement says what
22   it says, as far as what our rights on reimbursement
23   are.
24   BY MR. ROBERTS:
25       Q.    So do you disagree with my -- if my


MAGNA
LEGAL SERVICES

Page 48

```
 1    statement is, if you've exhausted all your other

 2    recourse against other sources, the only source of

 3    your right of reimbursement would be Fieldwood I?

 4                   MR. MORFEY:  Same objections, and

 5    asked and answered.

 6                   MR. ROBERTS:  I don't think it's been

 7    answered.

 8         A.    The decommissioning agreement spells out

 9    what rights we have for reimbursement.

10    BY MR. ROBERTS:

11         Q.    And I told you what I thought the

12    decommissioning agreement said and I'm asking you

13    whether that's your understanding or not.

14         A.    But I'm telling you that the

15    decommissioning spells it out.

16         Q.    I understand --

17         A.    That agreement spells out --

18         Q.    I understand it spells it out.  I'm

19    asking for your understanding.  You're familiar with

20    decommissioning --

21         A.    My understanding is that the

22    decommissioning agreement spells out what the

23    obligations and rights of reimbursement are.

24         Q.    So let me ask it this way.  Once Apache

25    has exhausted recourse to all other sources other
```



Page 49

1    than Fieldwood and it's still paying for

2    decommissioning agreements, it has a choice to

3    either pay for those or loan the money to Fieldwood

4    for Fieldwood to pay for them under the secured line

5    of credit?

6              MR. MORFEY:  Same objections, asked

7    and answered.

8              MR. ROBERTS:  It's not a question

9    about the decommissioning agreement.

10   BY MR. ROBERTS:

11       Q.    I'm asking you what your choices are.

12   Your choices are either to pay for it or loan the

13   money and have Fieldwood pay for it under my

14   hypothetical, correct?

15       A.    Well, the standby facility specifies when

16   we have rights and obligations to loan money.  If we

17   have an obligation to perform decommissioning, then

18   we intend to comply with whatever our obligations

19   are.

20       Q.    And you can comply with those obligations

21   either by spending the money yourself, Apache, or

22   those obligations could be satisfied by Apache

23   choosing to loan money to Fieldwood for Fieldwood to

24   satisfy those obligations, right?

25       A.    I mean, the standby facility sets forth



Page 50

1   the terms under which loans are to be made.

2       Q.     Right.   But you don't have to make the

3   loan, right?  You can --

4       A.     The standby facility sets out what the

5   conditions of those loans are.

6       Q.     And there's nothing in that that you can

7   point me to that tells me that Fieldwood has to

8   make -- excuse me, that Apache has to make a loan to

9   Fieldwood?

10      A.     The standby facility sets out what

11  Apache's obligations to loan money are.

12      Q.     Well, show me in the agreement where

13  there is any obligation from Fieldwood -- excuse me,

14  by Apache to make the loan --

15      A.     I'll refer you to the standby facility.

16      Q.     I want you to show me, because I can't

17  find it.  So you're referring me to something that I

18  can't find and you're telling me it speaks for

19  itself, but it's not speaking.

20              MR. MORFEY:  Hold on.

21  BY MR. ROBERTS:

22      Q.     So my question is, where in that

23  agreement does it address -- is there a requirement

24  by Apache to loan money to Fieldwood?

25              MR. MORFEY:  So let me jump in here



1    for a second, guys.  Steve, you're obviously welcome

2    to ask him about these agreements, but if you want

3    him to point you to a specific spot in an agreement,

4    then you need to provide that agreement to him so he

5    has that opportunity.

6    BY MR. ROBERTS:

7         Q.    Do you have the standby loan agreement?

8         A.    Not in front of me, no.

9         Q.    What is your e-mail address and I will

10   send it to you?

11        A.    Brett.

12              MR. MORFEY:  And, Steve, I'd ask for

13   you to send it to me as well, please.

14              MR. ROBERTS:  I will.  Just one

15   second.

16   BY MR. ROBERTS:

17        Q.    Confirming, brettcupit@apachecorp.com?

18        A.    Correct.

19        Q.    What I'm e-mailing you is the standby

20   loan agreement draft filed under Docket No. 1365 on

21   May 11th, 2021.  Let me know when you receive that.

22   I'm sorry, was it brett.cupit?

23        A.    That's correct.

24              MR. ROBERTS:  Have either one of you

25   received it yet?



Page 52

```
 1                    THE WITNESS:  I have not.
 2                    MR. MORFEY:  Yeah, me neither.
 3                    MR. ROBERTS:  Let's take a ten-minute
 4   break and let's see if I can get that document to
 5   you.
 6                    During the break, I would ask you to
 7   look through the agreement if you get it so you can
 8   point to a -- any provision that requires Apache to
 9   loan any funds to FWE I under this agreement.  So
10   take a -- it is now 11:02.  Let's meet back up at
11   11:10 and for the benefit of the parties, I'm almost
12   finished.
13                    MR. MORFEY:  All right.  Thank you.
14                    (Recess taken from 11:02 a.m. to
15   11:13 a.m.)
16                    MR. ROBERTS:  I just have a few more
17   questions.
18   BY MR. ROBERTS:
19        Q.    Did you get the standby loan agreement
20   draft that I e-mailed you, Mr. Cupit?
21        A.    I did.
22        Q.    Can you point to me in that agreement
23   where Apache is obligated to loan money to
24   Fieldwood?
25        A.    I believe Article II of that loan
```



Page 53

1    agreement sets forth the terms and conditions under

2    which loans are to be made.

3         Q.    Okay.  Let's go to Article II.  And where

4    in Article II does it say that Apache shall make a

5    loan?

6         A.    Well, again, Article II sets forth the

7    terms under which Apache is to provide loans to

8    Fieldwood I.

9         Q.    What is --

10        A.    And I will rely upon that agreement to

11   say what it says.

12        Q.    I want you to point out to me where in

13   that agreement it says that Apache is obligated to

14   make a loan --

15        A.    And I pointed out Article II --

16        Q.    -- and you can quote the specific

17   language.  You don't have to paraphrase it.

18        A.    I'm -- what I'm telling you is that the

19   agreement says -- sets forth the terms under which

20   Apache is to make loans.

21        Q.    Yes.  And where in those terms is --

22              (Simultaneous discussion interrupted

23   by reporter.)

24   BY MR. ROBERTS:

25        Q.    Where in that Section 2 does it say



Page 54

1    Apache is obligated to make a loan?  Read the

2    language to me.

3         A.    Any interpretation of this language is

4    subject to my attorney-client privilege.

5         Q.    I'm not asking for an interpretation.

6    I'm asking you to read it.

7         A.    But you are.

8         Q.    So in other words, you can't point that

9    out to me, can you?

10        A.    I can tell you that the agreement sets

11   forth the terms under which Apache makes loans.

12        Q.    Excuse me one second.  Would you turn to

13   Section 4.02 entitled Each Credit Event.

14        A.    Okay.

15        Q.    And is it true that under 4.02(c), The

16   obligation of the Lender to make each loan under

17   Article II is subject to:  All amounts in the

18   Trust A Account, the Letters of Credit and the

19   Permitted Surety Bonds have been fully exhausted or

20   are not available to pay or reimburse Lender for

21   Decommissioning?

22              Did I read that correctly?

23        A.    It looks like you did.

24        Q.    So at least you agree with me under that

25   term, that Apache has no obligation to make the loan



Page 55

1   under Article II until Apache has exhausted those

2   items in paragraph 4.2(c), correct?

3        A.   I agree that you read 4.2(c) correctly.

4        Q.   You agree I just stated it -- that's what

5   the agreement says.  Do you have any reason to

6   disagree with the statement I just made?

7        A.   I'm not sure.  Repeat your statement.

8        Q.   The statement I made is, there's no

9   obligation from Apache -- by Apache to make the loan

10  under Article II until Trust A account letters of

11  credit and permitted surety bonds have been fully

12  exhausted, correct?

13                 MR. MORFEY:  Objection.

14                 THE REPORTER:  Repeat that objection.

15       A.   And I agree that 4.2(c) reads that:  All

16  amounts in the Trust A Account, the Letters of

17  Credit and the Permitted Surety Bonds have been

18  fully exhausted and -- or are not available to pay

19  or reimburse Lender for Decommissioning.

20  BY MR. ROBERTS:

21       Q.   And has Apache done any type of

22  projections on estimates of when those items in

23  4.2(c) may be exhausted?

24       A.   Any such projections would have been done

25  in anticipation of litigation and subject to



Page 56

 1   privilege.

 2        Q.   So you'd agree with me that when the

 3   plan -- on the date the plan is confirmed, Apache

 4   has no obligation to loan any money under Article II

 5   to Apache as of that date -- excuse me, to

 6   Fieldwood I as of that date?

 7                 MR. MORFEY:  Objection, legal

 8   conclusion.

 9        A.   The agreement sets forth the terms and

10   conditions under which we're going to make loans.

11   BY MR. ROBERTS:

12        Q.   Mr. Cupit, are you going to be available

13   to testify at the confirmation hearing?

14        A.   I have not been asked to do so as yet.

15                 MR. ROBERTS:  Pass the witness.

16                 Everybody still there?

17                 MR. EISENBERG:  Anybody else want the

18   go?  I'll go.

19                 MR. ROBERTS:  Yeah.  Sorry.  You-all

20   disappeared on me for a minute.  Go ahead.

21                 MR. EISENBERG:  Does anybody else

22   want to go first?  It's fine by me.  All right.

23   Thank you very much.

24

25



Page 57

1                      EXAMINATION
2    BY MR. EISENBERG:
3         Q.    Mr. Cupit, my name is Phil Eisenberg.  I
4    represent HCCI International, which is a surety
5    company.  How are you today?
6         A.    I'm well.  And you?
7         Q.    Good.  I think we might have skipped a
8    few things.  What is your business address, sir?
9         A.    2000 Post Oak, Suite 100, Houston, Texas
10   77056.
11        Q.    And your home address, sir?
12        A.    2706 Wild Canary, Richmond, Texas 77406.
13        Q.    Thank you very much.  I appreciate that.
14   And what did you do to prepare for today's 30(b)(6)
15   deposition?
16        A.    I've met with counsel at HAK and in-house
17   and then otherwise I've been working on these
18   documents and the associated restructuring for over
19   a year.
20        Q.    Did you -- so you didn't independently,
21   in preparation for today's deposition, speak to any
22   of the business people at Apache to get their
23   understanding of the topics and the subject matters
24   that were presented?
25        A.    I have not.



Page 58

1       Q.     And did you review the documentation

2    itself prior to coming here today?

3       A.     Other than my normal review in the course

4    of drafting, negotiating and reviewing them

5    throughout the last year, no.

6       Q.     I appreciate your candor in that.   We

7    spoke to Mr. Graham yesterday.   Do you know who

8    Mr. Graham is?

9       A.     I know Jon Graham.

10      Q.     And do you know him from your work at

11   Apache prior to him being hired as a consultant by

12   Fieldwood?

13      A.     That's where I first met him, yes.

14      Q.     When did you first meet Mr. Graham?

15      A.     I couldn't give you an exact year, but

16   during the course of my employment at Apache.

17      Q.     Okay.   Did you ever work overseas or no?

18      A.     I have not.

19      Q.     And did you work with him when he was

20   the -- I guess the -- he was in charge of HSS&E at

21   Apache.   Is that -- did you have business dealings

22   with him at that point in time?

23      A.     I did.

24      Q.     On a regular basis?

25      A.     I wouldn't say regular.



Page 59

```
 1        Q.     You ever go to lunch with the guy?

 2        A.     Not that I can recall.

 3        Q.     Okay.  No worries.  Did you work on HSS&E

 4   matters as counsel for Apache?

 5        A.     From time to time.

 6        Q.     And from -- would you -- would Mr. Graham

 7   have been your client at that point?

 8        A.     On occasion.

 9        Q.     And it's true, isn't it, Mr. Cupit, that

10   on a weekly basis you've been having calls with

11   folks at Fieldwood, including Mr. Graham over the

12   last four or five months?

13        A.     That is not true.

14        Q.     That is not true.  Okay.  What's not true

15   about it?

16        A.     I have not been involved in weekly calls.

17        Q.     Have you had calls with Fieldwood with

18   regard to the term sheet and the associated

19   documentation that was entered into between Apache

20   and Fieldwood Energy?

21        A.     Yes.

22        Q.     Okay.  And how many calls have you had in

23   the last four months with them, for instance?

24        A.     I don't know that I could estimate.

25        Q.     And if Mr. Graham said that he's been on
```



Page 60

```
 1    weekly calls with you, that wouldn't be correct?
 2          A.    Weekly calls with me, that would not be
 3    correct.  If he had weekly calls with others at
 4    Apache, that may be correct.
 5          Q.    Okay.  Have you spoken to Mr. Graham in
 6    the last four months?
 7          A.    Yes.
 8          Q.    How many times?
 9          A.    Once or twice.
10          Q.    What was the nature of the calls?
11          A.    Initially they -- I think the first call
12    I had with him was just to generally walk through an
13    outline of documents that would be relevant to
14    Fieldwood I, after he had been identified as the
15    likely sole manager of Fieldwood I.  That was a very
16    high-level, just a listing of documents.  And then
17    otherwise he's -- he's asked a couple of questions
18    about the farm-out agreement that I have responded
19    to and told him that I am not legal counsel for
20    Fieldwood, and therefore he would need to review
21    that separately.
22          Q.    And those were the only two occasions in
23    the last four months?
24          A.    He may have been involved -- or on a call
25    with a broader group of folks at Fieldwood, but I
```



Page 61

1   don't remember any active participation from Jon in

2   such a meeting.

3        Q.    Okay.  And so when I asked if you --

4   there were weekly calls, I didn't mean just between

5   you and him, but with groups from Fieldwood and

6   Apache.

7        A.    My understanding is at one point in time

8   there may have been calls between representatives

9   from Apache and representatives from Fieldwood and

10  Jon may have joined those at some point.

11       Q.    And were you on those calls?

12       A.    I was not.

13       Q.    Okay.  That's what I'm trying to get to

14  and I want to make sure we are in agreement on which

15  calls we're talking about and whether you were there

16  or not.  It's just simple.  The walkthrough that you

17  had about the agreements on Fieldwood I, how long

18  did that conversation take place with Mr. Graham?

19       A.    Probably ten to 15 minutes.

20       Q.    All right.  And as part of that

21  discussion, did you walk through the consent rights

22  that Apache was granted under the term sheets?

23       A.    I do not recall doing so.

24       Q.    Okay.  But that would be part and parcel

25  of a subject matter that you did speak to him, so



Page 62

```
 1    it's entirely possible that you had gone through
 2    those various consent rights that Apache had to
 3    Fieldwood I operations and other aspects, correct?
 4         A.    I do not recall walking through consent
 5    rights with Jon.
 6         Q.    But those are in the -- those consent
 7    rights are in the agreements that have been entered
 8    into under the RSA and the term sheet, correct?
 9         A.    There are consent rights in some of those
10    agreements, yes.
11         Q.    And those consent rights did not exist
12    prior to -- prior to the RSA and the term sheet
13    under the decommissioning agreement, correct?
14         A.    Those agreements do not exist currently.
15         Q.    They don't exist?  There's no RSA?
16         A.    The consent rights under the various
17    documents that were attached to the implementation
18    agreement have not been executed.
19         Q.    I understand that, but the words in the
20    agreements that are there contain consent rights,
21    correct?
22         A.    There are certain documents that contain
23    consent rights.
24         Q.    And those documents that contain those
25    consent rights and those consent rights were not
```



Page 63

1    included in any way in the decommissioning

2    agreement, correct?

3         A.    Those documents are not included in the

4    decommissioning agreement.

5         Q.    And likewise, the consent rights that are

6    part and parcel of those agreements are not part of

7    the decommissioning agreement either, correct, sir?

8         A.    The decommissioning agreement sets out

9    what rights and obligations Apache has.

10        Q.    Right.  And you're aware that those

11   consent rights that are contained in the RSA and the

12   attached documents, the term sheet, were not rights

13   that are included in the decommissioning agreement,

14   correct?

15        A.    Well, the decommissioning agreement sets

16   out the rights that Apache has.

17        Q.    Correct.

18        A.    Currently.

19        Q.    Right.  And as the 30(b)(6) witness and

20   the person who's been designated to speak on behalf

21   of the company, you're aware that the consent rights

22   that are contained in the terms and agreements that

23   are attached to the RSA were not contained in the

24   decommissioning agreement.  You're aware of that,

25   aren't you, sir?



MAGNA
LEGAL SERVICES

Page 64

```
 1                    MR. MORFEY:  Hold on a second, Brett.
 2    Hold on a second.
 3                    I'm going to object --
 4                    MR. EISENBERG:  Make your objection
 5    and let him answer the question.
 6                    MR. MORFEY:  I will.  The terms of
 7    the decommissioning agreement and what it says and
 8    what it doesn't say is not what this witness is here
 9    to testify on.
10                    MR. EISENBERG:  Again, you're
11    speaking now.  Make an objection and then he can
12    answer the question.
13                    MR. MORFEY:  He's not going to --
14    he's not -- your question, Phil, said he's the
15    30(b)(6) witness on behalf of Apache, and I'm
16    telling you that your question isn't within the
17    topics that this witness is here to testify on.
18                    MR. EISENBERG:  And that's fine.  I
19    think it is.
20    BY MR. EISENBERG:
21        Q.    Please answer the question, sir.
22        A.    The decommissioning agreement sets out
23    the rights and obligations of Apache.  There are
24    certain additional agreements that are to be
25    executed as part of the restructuring.
```



Page 65

1          Q.    And those additional agreements have

2     various consent rights in them; we've established

3     that.  And those consent rights that are in those

4     various agreements were not contained in the

5     decommissioning agreement, correct, sir?

6          A.    The decommissioning agreement sets out

7     the terms and rights that Apache has.

8          Q.    Are you telling me that those consent

9     rights are in the decommissioning agreement?

10          A.    I'm telling you that the decommissioning

11     agreement sets out what rights and obligations

12     Apache has.

13          Q.    I understand.  I'm asking for your

14     understanding, sir.  I'm asking for your

15     understanding as a 30(b)(6) deponent on behalf of

16     Apache with regard to the RSA and term sheets,

17     whether those consent rights in the term sheets are

18     in the decommissioning agreement or not?

19                MR. MORFEY:  And I'm going to renew

20     my objection.  He's not here as a 30(b)(6) witness

21     on the content of the decommissioning agreement.

22                MR. EISENBERG:  I'm not going to

23     argue with you.

24     BY MR. EISENBERG:

25          Q.    Can you answer my question, please, sir?



1      A.    The decommissioning agreement sets forth

2  the terms and rights and obligations Apache has with

3  respect to decommissioning of the Fieldwood

4  property.

5      Q.    And you're familiar with the terms of the

6  decommissioning agreement, sir?

7      A.    Generally, yes.

8      Q.    Does it contain the same consent rights

9  that are now being proposed in the term sheet?

10           MR. MORFEY:  Same objection, and

11  asked and answered.

12     A.    I'll renew my same answer.  The

13  decommissioning agreement sets forth the terms of

14  the rights and conditions -- rights and obligations

15  Apache has with respect to decommissioning of the

16  properties.

17  BY MR. EISENBERG:

18     Q.    And it does not contain the consent

19  rights that are in those term sheets, does it, sir?

20           MR. MORFEY:  Same objection, asked

21  and answered.

22     A.    The decommissioning agreement says what

23  it says.

24           MR. EISENBERG:  He's not answering

25  the question.  I'm going to keep asking the question



Page 67

1    until I get an answer to the question that I've

2    asked, not the question that he wants to answer.

3                   MR. MORFEY:  He's answered your

4    question, Counsel.

5                   MR. EISENBERG:  He hasn't answered it

6    at all.

7                   MR. MORFEY:  You're not satisfied

8    with the answer, but we're totally outside the scope

9    of these topics and the decommissioning agreement

10   speaks for itself.  You know, we're not going to

11   waste time here confirming what documents say and

12   don't say.  The words are on the page.  Move on,

13   please.

14                  MR. EISENBERG:  I get to know his

15   understanding on behalf of the corporation, sir.

16                  MR. MORFEY:  It's not one of the

17   topics, Phil.  I'm not going to --

18                  MR. EISENBERG:  Instruct him not to

19   answer then, and I'll move on.

20                  MR. MORFEY:  Listen, I'm not going to

21   continue to waste time on this.  If you show me

22   where the terms of the decommissioning agreement are

23   one of the topics, then maybe I'll reconsider, but I

24   don't see it there.

25                  MR. EISENBERG:  I think it's fairly



Page 68

1  within the scope of the 30(b)(6).  If he's not going

2  to answer me, that's fine.

3  BY MR. EISENBERG:

4      Q.    Mr. Cupit, has Apache hired recently, in

5  your understanding, any former Fieldwood employees?

6      A.    I'm not aware of any.

7      Q.    So you're not aware whether or not Apache

8  has hired any former Fieldwood employees to help to

9  work or administer the term sheet and Apache's

10  efforts under that term sheet?

11      A.    I'm not aware of any.

12      Q.    Now, you're aware, sir, that Apache is

13  co-liable for the decommissioning on the properties

14  that are going into Fieldwood I, correct?

15      A.    I understand that all owners in the chain

16  of title are jointly and severally liable for the

17  properties that were developed prior to and on their

18  watch during their ownership.

19      Q.    So if Apache was to loan potentially any

20  money to Fieldwood I, it would simply be loaning it

21  money to perform obligations that Apache already has

22  to the government directly, correct?

23            MR. MORFEY:  Objection, vague and

24  legal conclusion.

25      A.    I'm not sure I understand your question.



Page 69

1    BY MR. EISENBERG:

2         Q.    Well, Apache already has the obligations,

3    you've indicated that.  So if you're going to loan

4    Fieldwood I money to perform those obligations,

5    you're simply loaning money to Fieldwood I to

6    perform obligations that Apache already has?

7                   MR. MORFEY:  Same objection.

8    BY MR. EISENBERG:

9         Q.    Correct?

10        A.    The obligations that might be owed to the

11   government under a different time frame.

12        Q.    Okay.  Can Apache -- if the agreements

13   that are attached to the RSA and contained in the

14   various documents to the plan are agreed to, can

15   Apache prevent Fieldwood I from taking steps to

16   maximize the value of Fieldwood I?

17        A.    Well, the agreements set forth what

18   rights and obligations Apache has.

19        Q.    So could Apache veto a sale of various

20   assets from Fieldwood I?

21        A.    Again, those agreements set forth what

22   rights Apache would have.

23        Q.    And I'm asking your understanding of

24   those rights.  Are you not going to give me your

25   understanding?



Page 70

```
 1       A.    I'm going to give you that the agreements
 2  are -- were extensively negotiated and set forth
 3  very specific terms over what rights Apache has.
 4       Q.    Okay.  Is it your understanding, sir,
 5  that the terms of the standby loan agreement require
 6  Apache to loan money to Fieldwood I?
 7       A.    The standby loan agreement sets forth the
 8  terms and conditions under which Apache is to loan
 9  money.
10       Q.    And does -- do those terms require Apache
11  to loan money to Fieldwood I?
12       A.    Those -- that agreement sets forth the
13  terms under which we will loan money.
14               MR. EISENBERG:  All right.  I'll pass
15  the witness.  Thank you, Mr. Cupit.
16               MR. MORFEY:  Who would like to go
17  next, if anyone?
18               MR. GRZYB:  Mike, I would like to go
19  and I promise to be relatively brief.
20               MR. MORFEY:  All right.  I'm going to
21  hold you to it, Darren.
22                       EXAMINATION
23  BY MR. GRZYB:
24       Q.    Good afternoon, or still, I guess, good
25  morning, Mr. Cupit.  My name is Darren Grzyb.  I
```



Page 71

1   represent four sureties.  Most relevant to this

2   deposition is probably Everest.

3            The standby loan facility, what is the

4   business purpose of the standby loan facility under

5   the definitive Apache documents?

6        A.    I think the standby loan agreements

7   fairly speaks for itself as to lending money to

8   Fieldwood Energy I.

9        Q.    I'm not asking about the terms or any

10  legal conclusion nor anything like that.  I'm asking

11  what business function that particular agreement

12  serves or will serve for Apache.

13       A.    It will provide a mechanism to lend money

14  to Fieldwood Energy I.

15       Q.    What business purpose would it serve

16  Apache to lend money to Fieldwood I?

17       A.    It would provide Fieldwood I with capital

18  to perform obligations and operations.

19       Q.    What type of obligations is it envisioned

20  from a business perspective that moneys loaned to

21  Fieldwood will serve for Apache?

22       A.    The standby facilities set forth the

23  rights and uses of those lending for those proceeds.

24       Q.    Well, it's -- what I'm trying to get at

25  is, you know, in terms of the negotiation of the



Page 72

1   standby loan facility, there has to have been --

2   I'll rephrase the question.

3            From a business perspective, why is

4   Apache making hundreds of millions of dollars

5   potentially available for loan to Fieldwood I?

6       A.   As a mechanism to potentially provide

7   capital to Fieldwood Energy I.

8       Q.   Okay.  What purposes will that capital

9   serve in terms of Apache's business?

10      A.   The standby loan agreement sets forth the

11  uses that Fieldwood Energy I may use those proceeds

12  for.

13      Q.   When you were negotiating these deals,

14  when you negotiated the standby loan facility with

15  Fieldwood, what uses did Apache want Fieldwood to

16  have with respect to loaned funds?

17      A.   The standby facility sets forth the uses

18  of those loans that Fieldwood Energy may make.

19      Q.   Can you name one business use of those

20  funds?

21      A.   I can.

22      Q.   You can or cannot?

23      A.   I can.

24      Q.   Please do so.

25      A.   It can be used for decommissioning.



Page 73

```
 1        Q.    Okay.  So one of the business functions
 2   of a standby loan facility is for Apache to loan
 3   funds to Fieldwood I for decommissioning
 4   obligations, correct?
 5        A.    Repeat your question.
 6        Q.    One of the business functions under the
 7   standby loan facility that Fieldwood I can use for
 8   loaned funds from Apache is for decommissioning,
 9   correct?
10        A.    That's correct.
11        Q.    Is there any -- can you name another
12   business function for loaned funds from Apache to
13   Fieldwood I?
14        A.    The standby facility sets forth the terms
15   and rights and uses for Fieldwood Energy I to use --
16        Q.    I'm not asking -- thank you very much for
17   that answer.  I'm not asking from a -- as to the
18   terms and conditions.  I'm asking from a business
19   perspective, in your mind, as someone who was
20   involved in the negotiation on behalf of Apache with
21   respect to these documents, is there another usage
22   of the funds that are going to be loaned to
23   Fieldwood I under this facility?
24        A.    And the standby facility sets forth the
25   uses that may be made.  Those were negotiated and
```



Page 74

1    agreed to by Apache.

2         Q.    Okay.   Is there another use -- we

3    identified decommissioning from a business

4    perspective.   Is there another usage of the funds

5    that are going to be loaned by Apache to Fieldwood

6    under the facility?

7         A.    The business purposes for the use of

8    those loans is set forth in the standby facility.

9         Q.    I believe you said -- testified earlier

10   that projections associated with Fieldwood I's

11   operations post confirmation that may be in the

12   possession of Apache were prepared in anticipation

13   for litigation, correct?

14        A.    Yes.

15        Q.    Who -- with whom -- what litigation was

16   that related to?

17        A.    We have always anticipated that we would

18   potentially have litigation with Fieldwood and with

19   the parties who issued security under the

20   decommissioning agreement.

21        Q.    So the projections were -- I'll rephrase.

22            The anticipation associated with the

23   negotiation of the restructuring support agreement

24   led Apache to conclude that it may be in litigation

25   with the issuers of decommissioning security,



Page 75

 1   correct?

 2                   MR. MORFEY:   Hold on one second.

 3   Mr. Court Reporter, could you read that question

 4   back.  I just want to hear it one more time, please.

 5                   (Requested portion read back.)

 6   BY MR. GRZYB:

 7        Q.    Mr. Cupit?

 8        A.    We have anticipated -- during the course

 9   of this restructuring, we have anticipated that we

10   may be in litigation with the surety.

11        Q.    Have you -- and I believe your testimony,

12   and correct me if I'm wrong, is that you personally,

13   on behalf of Apache, were involved with the

14   negotiation of these agreements with Fieldwood,

15   correct?

16        A.    Correct.

17        Q.    And is it accurate to say that Mr. Lamme

18   was your point of contact at Fieldwood with respect

19   to the negotiation of these agreements?

20        A.    Mr. who?

21        Q.    Lamme.  I believe his name is -- or

22   Lamme?

23        A.    You mean Tommy Lamme?

24        Q.    Yes, that's right.

25        A.    Yes.  In part, yes.



1        Q.    In part.  And is there anyone else that

2   you dealt with at Fieldwood in negotiation of these

3   agreements?

4        A.    Troy Allen.

5        Q.    Is there anyone else?

6        A.    And occasionally Mike Dane was on calls.

7        Q.    Was there any conversations between

8   Apache and Fieldwood about the prospective of

9   litigation with the sureties?

10       A.    I believe it's been mentioned in the

11  course of discussions over time.

12       Q.    Can you recall the last time that that

13  topic was covered in a conversation that you had,

14  not with Mr. Morfey or Ms. Russell, but with

15  Fieldwood?

16       A.    With calls that involve counsel for

17  Fieldwood and for Apache, seems like it's been

18  almost weekly since -- in the last week or so.  I'm

19  sorry, last month or so.

20       Q.    What was the last conversation that you

21  had?

22            MR. MORFEY:  The question was when?

23  Is that the question, when?

24            MR. GRZYB:  I said what's the last

25  conversation.  That was probably a terrible



1    question.  I'll rephrase it.

2    BY MR. GRZYB:

3        Q.    When was the last conversation?

4        A.    I'm sorry, my days are a little blended

5    together.  It would have probably been last week.

6        Q.    Last week.  Do you -- what was said?

7              MR. MORFEY:  Hold on a second.

8    Darren, I want to be clear.  So what conversation

9    are you asking about?  Who's a party to this

10   conversation?

11             MR. GRZYB:  And I think you're --

12   it's a very valid interjection, Mike.  And what I

13   want to make clear to Mr. Cupit and to you, is that

14   separate conversations that Mr. Cupit may have had

15   with you or Ms. Russell or whoever else is on your

16   legal team is not what I'm asking about.  I'm asking

17   about conversations between Apache and Fieldwood.

18   And so I don't want know about separate

19   attorney-client conversations, I want to know

20   discussions that you may have had with Mr. Allen or

21   Mr. Lamme or Mr. Dane.  And I believe Mr. Cupit's

22   testimony was we had a call last week.

23   BY MR. GRZYB:

24       Q.    So I'll ask first, did you participate in

25   that call last week, Mr. Cupit?



Page 78

```
 1                    MR. MORFEY:  All right.  Here's what
 2    I think we need to figure out.  And I saw Mr. Perez,
 3    you know, pop on the screen here.  But are these --
 4    who all is in these communications in terms of the
 5    attorneys involved?  I know that you've limited it
 6    to outside of communications that Mr. Cupit would
 7    have with just, you know, my firm or in-house Apache
 8    attorneys.  But I think there remains an issue here
 9    as to whether attorneys from the debtors were
10    involved and does that raise any matters of common
11    interest privilege or the like.
12                    MR. GRZYB:  I -- that's a question I
13    think that you would have to answer.  Are you
14    asserting a joint defense or common interest
15    privilege that would prevent us from having a
16    conversation about topics associated, I think he
17    said in the last month among counsel -- not counsel.
18    Among Apache on one side and Fieldwood on the other.
19    I can't -- Alfredo, you're muted.
20                    MR. PEREZ:  Sorry about that.  Yeah,
21    this is Alfredo Perez on behalf of Fieldwood.  There
22    are certainly items that -- in which we do have a
23    common interest with Apache.  There are other items
24    in which we don't.  But there are certainly some
25    items in which we do have a common interest with
```



Page 79

 1  Apache.

 2              So I'm -- you know, your question is

 3  too generic for me to be able to make a -- you know,

 4  an intelligent choice about whether, in fact, it

 5  invokes a common interest.  To the extent you're

 6  asking him about, you know, obviously the

 7  negotiation of the document, things like that, that

 8  clearly doesn't.  But to the extent you're asking

 9  him about discussions relating to your objections to

10  the plan in which -- in which, you know, we're both

11  bound by an RSA, you know, that may.  So I just --

12  you need to be more specific, Michael.  I don't know

13  if that's what you meant, but I think that's kind of

14  where we are.

15              MR. MORFEY:  Darren, what I would

16  suggest is this.  Maybe ask some questions as to the

17  topic of what was discussed and that will serve, you

18  know, not the subject of the conversations but the

19  topic, and then once we know what the topics are,

20  then that will educate the other issues with respect

21  to common interest.  Like Mr. Perez said, you know,

22  if it's negotiation of the documents, I think that

23  that's fair game.

24              MR. GRZYB:  Let me -- I'll go down a

25  different line of questioning.



Page 80

1   BY MR. GRZYB:

2        Q.    Has Apache come to a business conclusion

3   as to when Fieldwood I will be required to -- let me

4   rephrase the question.

5             Does Apache have a business understanding

6   of when it believes it will have to draw on

7   decommissioning security?

8        A.    I don't have a firm timeline on when we

9   might have to draw on decommissioning security.

10       Q.    Does anyone at Apache have that

11  understanding?

12       A.    Not that I'm aware of.  And when you say

13  a time frame, I mean, like a year?  Two years?  I

14  don't know what your expectation is, as far as your

15  question.  I guess maybe I'm saying I don't

16  understand what you're asking as far as time frame.

17       Q.    A projection of when that event could

18  potentially arise, a business projection.

19       A.    We have not projected a date for drawing

20  decommissioning security.

21       Q.    Did any of your negotiations with

22  Fieldwood involve the surety -- an indemnification

23  obligation of Fieldwood to the sureties?

24       A.    I believe that was mentioned at one

25  point.



Page 81

1          Q.     Who mentioned it?

2          A.     I can't say that I recall offhand.

3          Q.     Did you -- were you involved in any

4     negotiation with Fieldwood as to the treatment of --

5     let me rephrase.

6                 Were you personally involved with the

7     negotiation with Fieldwood as to a proposed

8     treatment of the sureties indemnity agreements as

9     part of the plan of reorganization?

10         A.     I recall a comment that was made I

11    believe by Fieldwood, that the intention was that

12    indemnity agreements with the sureties were going to

13    be -- I'm not sure of the proper term, but

14    essentially removed in the course of -- they were

15    unsecured claims under the bankruptcy and would be

16    treated as such.

17         Q.     Post -- was it a requirement that -- of

18    Apache's that -- I'll strike the question.

19                MR. GRZYB:  I have no further

20    questions, so I'll pass the witness.  Thank you.

21                MR. MORFEY:  Who would like to go

22    next?  Going once.  Going twice.  All right.  With

23    no takers --

24                MR. BERNAL:  Michael, I've got a

25    question.  Brett, where are you going to dinner



Page 82

1    tonight?

2                    THE WITNESS:  I'm hoping to go to a

3    location in Sugar Land called Vino & Vinyl.

4                    MR. EISENBERG:  Y'all are still on

5    the record.  You might want to get off the record.

6                    MR. BERNAL:  That was on purpose,

7    Phil.  I wanted his wife to know he knew the name of

8    the restaurant.

9                    MR. EISENBERG:  Okay.

10                    THE WITNESS:  There's proof now.

11                    MR. MORFEY:  All right.

12                    MR. ROBERTS:  We're off the record

13    now.

14                    MR. MORFEY:  Yeah, let's go off the

15    record.

16                    (Deposition concluded at 11:54 a.m.)

17

18

19

20

21

22

23

24

25



Page 83

```
1                    CORRECTIONS AND SIGNATURE

2    PAGE/LINE      CORRECTION          REASON FOR CHANGE

3    _____

4    _____

5    _____

6    _____

7    _____

8    _____

9    _____

10   _____

11   _____

12   _____

13   _____

14   _____
          I, BRETT CUPIT, have read the foregoing
15   deposition and hereby affix my signature that same
     is true and correct except as noted herein.
16

17        _____
          BRETT CUPIT
18
     STATE OF _____  )
19   COUNTY OF _____  )

20        Subscribed and sworn to before me by the
     said witness, BRETT CUPIT, on this the _____ day
21   of _____, 2021.

22

23                         _____
                           NOTARY PUBLIC IN AND FOR
24                         THE STATE OF_____

25   My Commission Expires: _____
```



Page 84

```
 1                REPORTER'S CERTIFICATION

 2

 3         I, Micheal A. Johnson, Registered Diplomate

 4   Reporter and Certified Realtime Reporter, certify

 5   that on the 3rd day of June, 2021, I reported the

 6   Remote Oral Deposition of BRETT CUPIT, after the

 7   witness had first been duly cautioned and sworn to

 8   testify under oath; said deposition was subsequently

 9   transcribed by me and under my supervision and

10   contains a full, true and complete transcription of

11   the proceedings had at said time and place; and that

12   reading and signing was requested.

13         I further certify that I am neither counsel

14   for nor related to any party in this cause and am

15   not financially interested in its outcome.

16         GIVEN UNDER MY HAND AND SEAL of office on

17   this 6th day of June, 2021.

18

19

20         _____
           MICHEAL A. JOHNSON, RDR, CRR
21         NCRA Registered Diplomate Reporter
           NCRA Certified Realtime Reporter
22

23

24

25
```



**A**

**A&M** 9:17
**a.m** 1:16 2:4 52:14
  52:15 82:16
**abide** 13:16 42:17
**abided** 20:13
**able** 44:4 79:3
**above-styled** 2:3
**absent** 27:19
**account** 54:18
  55:10,16
**accurate** 75:17
**acquired** 13:7
  28:14
**acquisition** 13:10
**active** 61:1
**actual** 30:4
**additional** 33:23
  35:17 64:24 65:1
**address** 38:13,14
  50:23 51:9 57:8
  57:11
**administer** 68:9
**Adobe** 16:15
**advance** 35:24
**advantage** 42:6
**advice** 10:16 23:16
  23:19 24:7
**advise** 11:3 22:9
  24:4
**advisor** 11:8
**affirmative** 37:13
**affix** 83:15
**afield** 31:7
**afraid** 31:8
**afternoon** 70:24
**ago** 16:6
**agree** 12:3 15:22
  38:1 41:25 54:24
  55:3,4,15 56:2
**agreed** 14:23 69:14
  74:1
**agreeing** 11:7
**agreement** 11:7,18
  12:23 13:12,14,25

14:1,6,9,11,14,16
14:17,18,23 15:1
15:4,12,14,20
16:4,9,24,25 17:8
17:14,22 18:3,12
18:20,23 19:4,9
19:11,16,18,21
20:1,10,14 21:9
21:14,20,25 22:17
22:17 23:5 25:1,7
27:22 28:25 29:15
29:20,24 31:15,18
31:25 33:9,14,17
36:1,2,5,6,9,10,14
36:15,17,20,23,25
37:4,6,13,15,17
37:19,25 38:3,9
38:13,14,17,19,22
39:8 40:13 41:3,3
41:5 42:16 44:13
44:21 45:4,6,12
45:15,22 46:23
47:21 48:8,12,17
48:22 49:9 50:12
50:23 51:3,4,7,20
52:7,9,19,22 53:1
53:10,13,19 54:10
55:5 56:9 60:18
61:14 62:13,18
63:2,4,7,8,13,15
63:24 64:7,22
65:5,6,9,11,18,21
66:1,6,13,22 67:9
67:22 70:5,7,12
71:11 72:10 74:20
74:23
**agreements** 13:11
  26:15 30:3 31:11
  39:12 41:16 45:2
  45:13 49:2 51:2
  61:17 62:7,10,14
  62:20 63:6,22
  64:24 65:1,4
  69:12,17,21 70:1
  71:6 75:14,19
  76:3 81:8,12

ahassell@pszjla...
  5:23
**ahead** 20:7 42:24
  56:20
**al** 1:4
**Alfredo** 4:13 78:19
  78:21
alfredo.perez@w...
  4:16
**Allen** 76:4 77:20
**allocated** 28:11
**alter** 14:7,10
**amend** 14:13
**amendments** 17:9
**American** 2:2 3:2
  4:2,3 5:2,3 9:8
**amount** 40:24
**amounts** 54:17
  55:16
**ANDREWS** 5:11
  7:12
**annual** 16:15
**answer** 11:13 19:10
  20:7 22:7 23:10
  23:14,18,18,22,25
  24:4 25:21,25
  26:2 33:4 38:15
  41:15 42:22 64:5
  64:12,21 65:25
  66:12 67:1,2,8,19
  68:2 73:17 78:13
**answered** 24:23
  37:24 38:11 48:5
  48:7 49:7 66:11
  66:21 67:3,5
**answering** 66:24
**Anthony** 12:5
**anticipated** 74:17
  75:8,9
**anticipation** 34:21
  55:25 74:12,22
**anybody** 17:13
  56:17,21
**Apace** 7:22
**Apache** 5:9 7:21
  9:10,11 10:1 11:3

11:16 12:2,4 13:8
13:17 14:8,18
16:18,19 18:13
19:1,5 21:10,21
21:24 22:16 23:4
24:15,24 25:4
26:15,16 27:16,24
28:7,14,24 29:9
29:14,18 30:7,15
30:20,21,25 31:1
31:11,12,14 32:7
32:14,17 33:19,22
33:24 34:7 35:9
35:17,23,25 36:1
36:3,8,10,13,20
37:10,13,20 38:5
38:25 39:6,8,14
40:10,14 41:4,9
41:21 42:6,18
43:10,13,19,21,22
44:7,8,15,19,23
45:8,11,18,21
46:3,9,12,25 47:3
47:14,15 48:24
49:21,22 50:8,14
50:24 52:8,23
53:4,7,13,20 54:1
54:11,25 55:1,9,9
55:21 56:3,5
57:22 58:11,16,21
59:4,19 60:4 61:6
61:9,22 62:2 63:9
63:16 64:15,23
65:7,12,16 66:2
66:15 68:4,7,12
68:19,21 69:2,6
69:12,15,18,19,22
70:3,6,8,10 71:5
71:12,16,21 72:4
72:15 73:2,8,12
73:20 74:1,5,12
74:24 75:13 76:8
76:17 77:17 78:7
78:18,23 79:1
80:2,5,10
**Apache's** 10:10

12:21 13:17 14:20
19:24 20:12 22:2
26:6 27:20 31:12
31:21,24 32:25
34:4,12 35:11,20
36:7 37:1 40:18
42:17 47:12,13
50:11 68:9 72:9
81:18

**APPEARANCES**
  3:1 4:1 5:1 6:1 7:1
  8:3
**appreciate** 57:13
  58:6
**appropriate** 33:5
**approval** 27:16,21
**approve** 29:18
  30:15
**approved** 29:10,14
  30:7
**approximate** 39:9
**approximately**
  35:13 39:5
**AREAUX** 6:15
**argue** 65:23
**Article** 52:25 53:3
  53:4,6,15 54:17
  55:1,10 56:4
**asked** 17:24 24:8
  24:10,19 37:23
  38:10 48:5 49:6
  56:14 60:17 61:3
  66:11,20 67:2
**asking** 14:11 16:1
  23:15,17,22 24:8
  25:13 31:15,17,18
  31:20 32:2,9,10
  32:11,25 37:3,4,5
  37:16 48:12,19
  49:11 54:5,6
  65:13,14 66:25
  69:23 71:9,10
  73:16,17,18 77:9
  77:16,16 79:6,8
  80:16
**aspects** 62:3



**ASPEN** 4:2 5:2
**asserting** 78:14
**assets** 10:10,17
  13:7,17,18 23:1,3
  25:5 28:7,8 41:6
  41:12,22 47:3
  69:20
**assistant** 10:4 11:2
**associated** 41:17
  57:18 59:18 74:10
  74:22 78:16
**assuming** 35:25
**attached** 62:17
  63:12,23 69:13
**attempting** 44:20
**attorney** 22:14
  24:15
**attorney-client**
  24:6 25:12 34:16
  54:4 77:19
**attorneys** 10:20
  78:5,8,9
**Austin** 3:4 7:8
**available** 54:20
  55:18 56:12 72:5
**Avenue** 4:19 7:4
**aware** 29:2,20,21
  30:18 33:21 36:19
  36:24 42:3,5
  63:10,21,24 68:6
  68:7,11,12 80:12
**Ayala** 5:21

**B**

**bachelor's** 9:16
**back** 13:25 26:12
  28:4 42:1 52:10
  75:4,5
**background** 9:15
  11:1 13:5 14:15
  26:11
**Bains** 3:9
**balance** 39:11
**bankruptcy** 1:1
  21:10 22:1,2,4
  26:6 41:21,23

81:15
**based** 20:12
**basis** 58:24 59:10
**bbains@l-llp.com**
  3:11
**BEACH** 6:9
**behalf** 3:2,7,13 4:2
  4:8 5:2,9,16 6:2,7
  6:12,18 7:2,10,15
  12:4 63:20 64:15
  65:15 67:15 73:20
  75:13 78:21
**believe** 16:5 23:2
  32:6 47:6 52:25
  74:9 75:11,21
  76:10 77:21 80:24
  81:11
**believes** 80:6
**Ben** 12:8,13
**benefit** 52:11
**BERKLEY** 4:2 5:2
**Bernal** 7:22 81:24
  82:6
**better** 28:5
**beyond** 35:10 42:21
**bid** 30:8
**billion** 35:3
**bit** 28:5
**bknapp@lockelo...**
  3:17
**BLACKWELL** 4:4
**blended** 77:4
**BLOSSMAN** 6:15
**Boland** 5:5
**bonds** 21:18,22
  39:7,12 40:16
  45:7,20 46:7
  54:19 55:11,17
**bound** 17:15,16
  79:11
**Box** 3:10
**BP** 7:2
**Brad** 3:14
**Brandon** 3:9
**Brazos** 3:4
**break** 52:4,6

**Brett** 1:13 2:1 8:1,6
  9:2 20:4 22:8 31:2
  51:11 64:1 81:25
  83:14,17,20 84:6
**brett.cupit** 51:22
**brettcupit@apac...**
  51:17
**Brian** 16:13
**brief** 70:19
**broadcasting** 17:25
**broader** 60:25
**BROMBERG** 7:17
**Brown** 5:4
**Bryan** 7:17
**business** 11:14 57:8
  57:22 58:21 71:4
  71:11,15,20 72:3
  72:9,19 73:1,6,12
  73:18 74:3,7 80:2
  80:5,18

**C**

**C** 7:16
**C-h-r-i-s-t-m-a-n...**
  12:11
**calculations** 34:9
**call** 17:3,13 18:3
  22:25 29:5 60:11
  60:24 77:22,25
**called** 9:3 26:23
  28:7 82:3
**calling** 25:9
**calls** 15:23 23:23
  24:20 25:9 26:4
  59:10,16,17,22
  60:1,2,3,10 61:4,8
  61:11,15 76:6,16
**Canary** 57:12
**candor** 58:6
**capacity** 11:2
**capital** 71:17 72:7,8
**Carlson** 4:14
**CARVER** 6:14
**case** 1:4 17:14 18:7
  22:4
**cash** 39:11

**CASUALTY** 3:7
**Catherine** 5:10
**cause** 2:4 84:14
**caution** 25:10
  34:14
**cautioned** 84:7
**cdiktaban@hunt...**
  5:14
**CEO** 12:16
**certain** 11:4 13:7
  40:14 62:22 64:24
**certainly** 78:22,24
**CERTIFICATI...**
  8:12 84:1
**Certified** 84:4,21
**certify** 84:4,13
**CFO** 12:18
**chain** 68:15
**change** 33:12 83:2
**Chapter** 1:3
**characterization**
  13:21,23 26:5
**characterize** 13:24
  26:20 40:21
**charge** 58:20
**CHIESA** 5:5
**Choi** 4:9
**choice** 49:2 79:4
**choices** 49:11,12
**choosing** 49:23
**Christmann** 12:7,9
**Christmann's**
  12:15
**Civil** 2:9
**claim** 22:4,13 23:4
  23:6,7 24:25 25:6
**claims** 20:8,12 26:6
  26:8 81:15
**CLARK** 3:3
**clear** 24:24 32:19
  77:8,13
**clearly** 24:11 79:8
**client** 59:7
**clients** 11:14
**Clifford** 4:14
**clifford.carlson...**

4:17
**CNOOC** 7:15
**co-liable** 68:13
**collateral** 22:18,21
  22:22,24 24:25
  25:5
**College** 9:24
**come** 45:21 80:2
**comes** 39:12
**coming** 10:3 41:1
  58:2
**comment** 81:10
**Commission** 83:25
**COMMITTEE**
  5:16
**common** 78:10,14
  78:23,25 79:5,21
**communications**
  14:20 34:16 78:4
  78:6
**company** 2:3 3:2,7
  3:7,8,13 4:2,2,3,3
  5:2,2,3,3 6:2,7,18
  9:8 57:5 63:21
**compare** 14:19
**complete** 84:10
**completed** 30:2
**complicated** 24:18
**comply** 36:1 38:9
  38:19 41:10 47:14
  49:18,20
**conclude** 74:24
**concluded** 82:16
**conclusion** 22:6
  23:9,24 24:3,12
  24:19 25:10 26:4
  28:20 41:14 42:21
  44:1 46:21 56:8
  68:24 71:10 80:2
**condition** 45:12,14
**conditions** 40:14
  50:5 53:1 56:10
  66:14 70:8 73:18
**confidentiality**
  17:14 18:3
**confirm** 17:12



**confirmation** 28:1
31:10 32:16 38:6
38:25 47:10 56:13
74:11
**confirmations**
33:18 34:7
**confirmed** 28:16
29:18 30:15 37:22
56:3
**confirming** 51:17
67:11
**connection** 13:10
13:18
**consent** 27:21 28:2
30:10 31:21,24
32:7,15,25 33:25
61:21 62:2,4,6,9
62:11,16,20,23,25
62:25 63:5,11,21
65:2,3,8,17 66:8
66:18
**consented** 29:9
**consents** 30:21 31:1
**consequences**
43:10
**consultant** 27:9
58:11
**consumed** 40:25
**contact** 75:18
**contain** 62:20,22,24
66:8,18
**contained** 63:11,22
63:23 65:4 69:13
**contains** 84:10
**contemplates** 38:17
**content** 65:21
**contention** 20:13
**context** 45:2
**continue** 25:24
32:21 45:22 46:8
67:21
**continues** 43:23
**continuing** 46:10
**contrast** 14:19
**control** 39:15 40:3
40:6,8

**conversation** 61:18
76:13,20,25 77:3
77:8,10 78:16
**conversations** 76:7
77:14,17,19 79:18
**copy** 17:23 19:20
**corporate** 9:9
25:14,16
**corporation** 5:9
9:10 11:3 67:15
**correct** 9:11,17,25
10:2,5,6 11:18
13:8,9,12,13
14:25 20:18 21:12
21:18 23:7 24:1
26:24 27:2,3,10
27:11,14,17,18,21
28:9,15,18 29:1,7
29:8,14,20,23
30:8 31:1 32:8
33:20 35:11 36:5
39:14 40:1,20
41:2,6,23 42:8
44:17 45:9,13
46:11,19 47:15
49:14 51:18,23
55:2,12 60:1,3,4
62:3,8,13,21 63:2
63:7,14,17 65:5
68:14,22 69:9
73:4,9,10 74:13
75:1,12,15,16
83:15
**CORRECTION**
83:2
**CORRECTIONS**
8:11 83:1
**correctly** 54:22
55:3
**cost** 16:15 39:6
45:19
**costs** 21:12 22:19
34:5,8 35:1 39:16
40:4,7,8,9,16
44:21 46:25 47:2
47:19

**counsel** 7:21,22
9:13 10:5 11:3
22:9 32:3 57:16
59:4 60:19 67:4
76:16 78:17,17
84:13
**counsel's** 23:11
**COUNTY** 83:19
**couple** 9:15 10:20
16:6 60:17
**course** 58:3,16 75:8
76:11 81:14
**Court** 1:1 4:10 75:3
**covered** 24:15
76:13
**Craig** 7:6
**created** 26:24
**credit** 21:17,22
30:7 35:10 36:21
39:7 40:15 43:19
45:8,20 46:6 49:5
54:13,18 55:11,17
**CREDITORS** 5:16
**Crescent** 4:10
**CRR** 1:24 2:5
84:20
**Cupit** 1:13 2:1 8:1
8:6 9:2,7 18:11
22:13 24:14 26:14
31:23 33:8 52:20
56:12 57:3 59:9
68:4 70:15,25
75:7 77:13,14,25
78:6 83:14,17,20
84:6
**Cupit's** 77:21
**curious** 42:12
**current** 16:10 30:7
42:5
**currently** 16:2,8
19:25 27:7,9
28:21 35:14 42:12
62:14 63:18

───────────
**D**
───────────
**D** 5:10

**D'Apice** 7:16
**Dallas** 4:11 7:4,18
**Dane** 76:6 77:21
**dapice@sbep-la...**
7:19
**DARDEN** 6:14
**Darren** 5:4 70:21
70:25 77:8 79:15
**data** 16:21,23
**date** 56:3,5,6 80:19
**David** 7:22
**day** 2:4 19:12,14
34:1,6 83:20 84:5
84:17
**days** 77:4
**deal** 18:9
**dealings** 58:21
**deals** 72:13
**dealt** 13:17 76:2
**debtor's** 35:22
38:23,24 43:3
44:22
**debtors** 1:5 78:9
**December** 11:16
**decision-maker**
11:6
**decisions** 11:15
**decommission**
28:11,22 42:17
**decommissioned**
34:2
**decommissioning**
13:12,14,16,18,25
14:1,4,9,10,13,16
14:22,24 15:1,3
15:11,13,14,18,24
15:25 16:3,3,8,9
16:11,16,22,24,25
17:8 18:11,13,14
18:15,20,23 19:2
19:3,9,11,15,18
19:20,25 20:10,14
20:18 21:9,11,13
21:19,25 22:17,19
23:5 25:1,7 28:8
29:25 30:20,25

34:5,8 35:1,8 39:8
39:16 40:13,19
41:11 42:15,24
43:6,15 44:5,13
44:15,20 45:1,4
45:18,22 46:2,4,8
46:10,23 47:13,21
48:8,12,15,20,22
49:2,9,17 54:21
55:19 62:13 63:1
63:4,7,8,13,15,24
64:7,22 65:5,6,9
65:10,18,21 66:1
66:3,6,13,15,22
67:9,22 68:13
72:25 73:3,8 74:3
74:20,25 80:7,9
80:20
**deemed** 26:8
**default** 19:25
**defaults** 46:2
**defense** 78:14
**defer** 18:19
**define** 22:20,22,23
**defined** 45:5
**defines** 45:4
**definitive** 71:5
**defray** 43:23
**degree** 9:16
**demands** 18:15
**Demonbreun** 6:4
**department** 10:2
**depends** 22:20
**deponent** 65:15
**deposit** 38:7
**deposited** 35:18
**deposition** 1:12 2:1
2:8 9:11 20:6 26:7
32:23 57:15,21
71:2 82:16 83:15
84:6,8
**depositions** 18:7
**description** 10:7
**designated** 63:20
**determine** 28:25
**develop** 14:23



developed 68:17
developing 15:12
  15:23
dgrzyb@csglaw....
  5:7
difference 22:12
different 69:11
  79:25
dig 13:4
Diktaban 5:10
dinner 81:25
Diplomate 84:3,21
directly 68:22
director 29:6,11,13
  29:19
disagree 30:12
  33:15 35:3,6
  36:12 40:22 47:25
  55:6
disappeared 56:20
disclose 24:5 25:11
disclosure 38:24
discretion 36:4,7
discuss 12:25 19:15
  19:17
discussed 24:16
  79:17
discussion 53:22
  61:21
discussions 11:25
  13:2 76:11 77:20
  79:9
DISTRICT 1:1
DIVISION 1:2
Docket 51:20
document 17:25
  52:4 79:7
documentation
  58:1 59:19
documents 17:23
  41:17 57:18 60:13
  60:16 62:17,22,24
  63:3,12 67:11
  69:14 71:5 73:21
  79:22
doing 61:23

dollars 72:4
domestic 10:9,10
  10:13,17
draft 33:9 51:20
  52:20
drafting 11:25 15:6
  58:4
draw 40:14,15,15
  80:6,9
drawing 80:19
drew 43:19
Drive 5:5
DRY 6:20
Duewall 7:6
duewallc@gtlaw....
  7:9
duly 9:3 84:7
duties 24:17

E

e-mail 51:9
e-mailed 52:20
e-mailing 51:19
earlier 74:9
educate 79:20
efforts 68:10
Eisenberg 3:18 8:8
  56:17,21 57:2,3
  64:4,10,18,20
  65:22,24 66:17,24
  67:5,14,18,25
  68:3 69:1,8 70:14
  82:4,9
either 46:25 49:3
  49:12,21 51:24
  63:7
eliminate 34:4
employees 27:2
  29:23 68:5,8
employment 58:16
Energy 1:4 28:21
  29:1,19 30:16
  33:20 47:7 59:20
  71:8,14 72:7,11
  72:18 73:15
engaged 12:24

engineer 9:20,21
engineering 9:17
entered 11:17,21
  13:25 59:19 62:7
entering 12:22 13:3
  44:21 45:13
ENTERPRISE
  7:10
entirely 62:1
entitled 16:23
  54:13
entity 26:23 27:8
envisioned 71:19
Erickson 16:13
Erin 4:9
erin.choi@weil.c...
  4:12
essentially 81:14
ESSERMAN 7:17
established 41:20
  44:3 65:2
estimate 16:17,21
  59:24
estimated 16:15,19
  34:25 35:1
estimates 34:12,12
  35:4 39:24 55:22
et 1:4
event 21:23 54:13
  80:17
Eventually 30:5
Everest 4:2 5:2
  71:2
everybody 18:2
  56:16
everyone's 17:15
exact 58:15
EXAMINATION
  8:6 9:5 57:1 70:22
examined 9:4
example 21:17
  39:20
exceed 40:9
exceeded 45:20
excuse 45:16 50:8
  50:13 54:12 56:5

executed 36:1
  62:18 64:25
executives 11:3
  12:7
exercises 46:4,5,6
exhausted 46:17
  47:17 48:1,25
  54:19 55:1,12,18
  55:23
exist 38:22 62:11
  62:14,15
existing 28:18
expectation 27:15
  80:14
expected 40:9
expects 47:14
expert 24:13
Expires 83:25
explained 25:19
EXPLORATION
  6:12
exposed 46:9
exposure 34:5,8,13
  35:9 44:20
extensively 70:2
extent 22:7 34:15
  34:18 79:5,8
eyes 17:10

F

facilities 35:20
  71:22
facility 35:21,24
  37:25 38:3 41:8
  41:18 49:15,25
  50:4,10,15 71:3,4
  72:1,14,17 73:2,7
  73:14,23,24 74:6
  74:8
fact 79:4
factual 25:20
fair 11:8 13:20 23:1
  34:3 40:1,16
  44:19 79:23
fairly 67:25 71:7
familiar 15:9 18:22

36:17 48:19 66:5
far 21:1 31:7 47:22
  80:14,16
FARLEY 6:20
farm-out 60:18
Federal 2:8
fell 21:1
Fieldwood 1:4 4:8
  11:20,25 12:24
  13:6,15,19 14:8
  14:18 18:12 19:24
  20:13,17 21:12
  22:3 23:6 25:1,6,7
  26:15,24 27:1,6
  27:10,13 28:12,14
  28:18,21 29:1,5
  29:19,22 30:16
  31:6,19 32:6,8,20
  33:1,8,11,20 35:1
  35:8 37:21 41:6
  41:10,10,22 42:12
  42:16 43:4,11,23
  44:4,12,14 45:17
  45:23 46:2,15,19
  47:2,2,6,7,17,18
  48:3 49:1,3,4,13
  49:23,23 50:7,9
  50:13,24 52:24
  53:8 56:6 58:12
  59:11,17,20 60:14
  60:15,20,25 61:5
  61:9,17 62:3 66:3
  68:5,8,14,20 69:4
  69:5,15,16,20
  70:6,11 71:8,14
  71:16,17,21 72:5
  72:7,11,15,15,18
  73:3,7,13,15,23
  74:5,10,18 75:14
  75:18 76:2,8,15
  76:17 77:17 78:18
  78:21 80:3,22,23
  81:4,7,11
Fieldwood's 16:22
  22:18 26:16 41:11
  42:19 43:7 44:9



47:3
**Fifth** 4:19
**figure** 78:2
**filed** 17:6 20:8
  51:20
**financial** 39:15
  40:19
**financially** 84:15
**find** 50:17,18
**fine** 15:21 56:22
  64:18 68:2
**finished** 52:12
**FINN** 6:15
**firm** 78:7 80:8
**first** 14:24 17:12
  30:1 47:3 56:22
  58:13,14 60:11
  77:24 84:7
**five** 9:20 59:12
**folks** 59:11 60:25
**follows** 9:4
**forecasts** 43:8
**foregoing** 83:14
**formation** 28:9
**formed** 27:6,13
**former** 68:5,8
**forth** 35:20 37:1,7
  37:10 42:2 46:22
  49:25 53:1,6,19
  54:11 56:9 66:1
  66:13 69:17,21
  70:2,7,12 71:22
  72:10,17 73:14,24
  74:8
**forward** 16:9 42:7
  43:3
**four** 59:12,23 60:6
  60:23 71:1
**frame** 69:11 80:13
  80:16
**Friendswood** 11:18
**front** 33:10 51:8
**full** 84:10
**fully** 54:19 55:11
  55:18
**function** 71:11

73:12
**functions** 73:1,6
**fund** 36:20 43:14
**funds** 36:13 40:9,18
  42:19 43:5 52:9
  72:16,20 73:3,8
  73:12,22 74:4
**further** 81:19 84:13
**future** 39:22 43:5
  45:17
**FWE** 28:6,9 29:5
  29:11 30:19,24
  31:25 32:15 37:21
  52:9

**G**
**G** 3:18
**game** 79:23
**Garza** 7:21
**GAS** 7:10
**Genender** 4:9 17:4
**general** 10:5,23
  11:2
**generally** 10:24
  13:15,20 14:1
  15:22 20:16 21:15
  22:15 36:18 41:3
  45:7 60:12 66:7
**generates** 44:9
**generic** 79:3
**GIANTOMASI** 5:5
**give** 39:20 45:16
  58:15 69:24 70:1
**GIVEN** 84:16
**go** 20:7 26:2 32:21
  42:24 53:3 56:18
  56:18,20,22 59:1
  70:16,18 79:24
  81:21 82:2,14
**goal** 33:24
**goes** 10:23
**going** 9:14 10:7
  16:9 19:10,12,14
  19:15,17 20:5
  23:22 25:8,23
  29:5,6,22 30:1

34:14 35:23 42:7
  43:2 56:10,12
  64:3,13 65:19,22
  66:25 67:10,17,20
  68:1,14 69:3,24
  70:1,20 73:22
  74:5 81:12,22,22
  81:25
**good** 57:7 70:24,24
**GOTSHAL** 4:10
  4:14,18
**gotten** 42:1 47:15
**government** 18:15
  43:16 68:22 69:11
**graduated** 9:23
**Graham** 27:4,7,9
  34:24 58:7,8,9,14
  59:6,11,25 60:5
  61:18
**granted** 31:14
  61:22
**greater** 26:17,21
**GREENBERG** 7:3
  7:7
**gross** 27:19 33:13
**group** 60:25
**groups** 61:5
**Grzyb** 5:4 8:9
  70:18,23,25 75:6
  76:24 77:2,11,23
  78:12 79:24 80:1
  81:19
**guess** 17:1 22:20
  24:16 58:20 70:24
  80:15
**Gulf** 10:11 13:7
  16:7,13
**guy** 59:1
**guys** 23:20 51:1

**H**
**HAK** 57:16
**hand** 10:24 84:16
**handled** 17:20,22
  18:6
**HANOVER** 3:8

**happened** 43:18
**HARRIS** 6:9
**Hassell** 5:21
**HCCI** 3:13 57:4
**head** 37:19
**hear** 21:5 75:4
**hearing** 56:13
**help** 68:8
**HEROD** 6:4
**high-level** 60:16
**HILL** 3:3
**hired** 30:4 58:11
  68:4,8
**hold** 20:3,4 23:8,20
  31:2,2 50:20 64:1
  64:2 70:21 75:2
  77:7
**home** 57:11
**hoping** 82:2
**Houston** 1:2,14 2:7
  3:19 4:5,15 5:12
  5:22 7:13 57:9
**HSS&E** 58:20 59:3
**hundreds** 72:4
**HUNTON** 5:11
**HUSCH** 4:4
**hypothetical** 42:21
  44:1,3 46:1,16,21
  49:14

**I**
**I's** 74:10
**identified** 60:14
  74:3
**II** 52:25 53:3,4,6,15
  54:17 55:1,10
  56:4
**implementation**
  62:17
**in-house** 7:21,22
  24:15 57:16 78:7
**incentive** 39:15
  40:3,6,8
**included** 63:1,3,13
**includes** 10:20
**including** 10:11

12:7 59:11
**incorporates** 17:8
**incurred** 21:12
**indemnification**
  80:22
**indemnity** 6:2 81:8
  81:12
**independent** 29:6
  29:11,13,19
**independently**
  57:20
**INDEX** 8:1
**indicated** 43:8 69:3
**individual** 17:24
  29:10,10
**information** 24:5,9
  24:20 25:11,17,21
  26:3 34:20
**initial** 15:25
**Initially** 60:11
**instance** 2:2 59:23
**instruct** 25:24 26:1
  67:18
**instructed** 26:2
  33:3
**instructing** 24:3
**Insurance** 2:3 3:2,7
  3:8,13 4:2,2,3 5:2
  5:2,3 6:2,7,18 9:8
**intelligent** 79:4
**intend** 38:9 49:18
**intended** 27:12
**intending** 35:23
  37:20
**intends** 35:25 36:1
  38:5
**intention** 81:11
**interest** 22:25 23:3
  25:5,20 41:22
  78:11,14,23,25
  79:5,21
**interested** 84:15
**interests** 26:17
  35:11 42:4
**interjection** 77:12
**International** 3:13



57:4
**interpretation** 54:3
  54:5
**interrupted** 53:22
**invokes** 79:5
**involve** 14:6 76:16
  80:22
**involved** 10:25
  11:24 13:15 15:3
  15:6 31:24 59:16
  60:24 73:20 75:13
  78:5,10 81:3,6
**issue** 24:18 78:8
**issued** 74:19
**issuers** 74:25
**issues** 34:17 79:20
**item** 32:4
**items** 55:2,22 78:22
  78:23,25

**J**

**James** 7:12
**Jared** 7:3
**Jase** 5:4
**jbrown@csglaw....**
  5:7
**Jersey** 5:6
**Jessica** 4:18
**jessica.liou@weil...**
  4:20
**jjudd@andrews...**
  7:14
**job** 1:25 24:17
**John** 12:7,9
**Johnson** 1:24 2:5
  84:3,20
**joined** 61:10
**joint** 78:14
**jointly** 68:16
**Jon** 27:4,7,9 34:24
  35:5 58:9 61:1,10
  62:5
**Jonathan** 6:19
**JONES** 5:21
**jord@krebsfarle...**
  6:22

**Josh** 7:11
**Judd** 7:11
**judgment** 17:6
**jump** 50:25
**June** 1:15 2:4 8:2
  84:5,17
**JX** 6:12

**K**

**keep** 66:25
**Kenneth** 5:17
**kind** 9:13 18:6
  79:13
**Knapp** 3:14
**knew** 82:7
**know** 16:10 17:22
  21:1 22:8,12,23
  23:13,18 26:20
  28:25 32:10 35:13
  39:5,6 51:21 58:7
  58:9,10 59:24
  67:10,14 71:25
  77:18,19 78:3,5,7
  79:2,3,6,10,11,12
  79:18,19,21 80:14
  82:7
**knowledge** 24:24
  25:4 29:9,12 39:1
**KORETZKY** 6:14
**kpasquale@stro...**
  5:20
**KREBS** 6:20
**KURTH** 5:11

**L**

**lack** 20:9
**Lamme** 75:17,21
  75:22,23 77:21
**Land** 82:3
**Lane** 5:18
**LANGLEY** 3:9
**language** 53:17
  54:2,3
**Lannie** 12:5
**LAVAN** 5:18
**Law** 9:24

**lawyer** 25:19
**Leann** 6:14
**led** 74:24
**Lee** 6:8
**legacy** 28:7 30:20
  30:25
**legal** 10:1,9,13,16
  11:4 22:5,9 23:9
  23:16,24 24:3,11
  24:12,16,19 25:10
  26:4 28:19 41:13
  42:20 43:25 46:20
  56:7 60:19 68:24
  71:10 77:16
**lend** 37:11 71:13,16
**Lender** 54:16,20
  55:19
**lending** 71:7,23
**let's** 13:4 22:25
  46:1 52:3,4,10
  53:3 82:14
**letter** 36:21 40:15
  43:19 45:8
**letters** 21:17,22
  35:10 39:7 45:20
  46:6 54:18 55:10
  55:16
**level** 39:6,9
**LEXON** 6:7
**liable** 68:16
**LIBERTY** 3:7
**licensed** 22:14
**lien** 41:5,7 47:3
**likewise** 63:5
**limit** 34:4 44:20
**limited** 6:13 30:19
  30:24 78:5
**line** 41:1 49:4 79:25
**lines** 31:5
**LinkedIn** 9:14 10:8
**Liou** 4:18
**Listen** 67:20
**listing** 60:16
**litigation** 10:24
  34:22 55:25 74:13
  74:15,18,24 75:10

76:9
**litigators** 10:25
**little** 13:4 28:5 77:4
**live** 45:18
**LLC** 1:4 6:15 7:10
  7:15 26:24 27:22
  28:21 29:1,15,19
  29:24 30:9,16
  31:18,25 32:8,15
  33:9 39:12
**LLC's** 33:20
**LLP** 3:9,15 4:4,10
  4:14,18 5:11,18
  5:21 7:3,7
**loan** 35:20 36:4,9
  36:13 37:14,20
  38:1,1,6,18,18,21
  38:25 41:2,5,5,9
  41:12 42:10 47:1
  47:4 49:3,12,16
  49:23 50:3,8,11
  50:14,24 51:7,20
  52:9,19,23,25
  53:5,14 54:1,16
  54:25 55:9 56:4
  68:19 69:3 70:5,6
  70:7,8,11,13 71:3
  71:4,6 72:1,5,10
  72:14 73:2,2,7
**loaned** 45:23 71:20
  72:16 73:8,12,22
  74:5
**loaning** 35:17
  68:20 69:5
**loans** 41:4,7 50:1,5
  53:2,7,20 54:11
  56:10 72:18 74:8
**location** 2:6 82:3
**LOCKE** 3:15
**lodge** 31:3
**long** 13:20 39:16
  61:17
**look** 19:22 21:16
  52:7
**looked** 35:21
**looks** 54:23

**LORD** 3:15
**lot** 39:21
**Louisiana** 3:16
  4:15 5:22 6:16,21
**low** 39:24
**Loyola** 9:23
**lunch** 59:1
**lwoodard@harri...**
  6:11

**M**

**M** 4:9
**Maiden** 5:18
**maintained** 45:12
**making** 72:4
**manage** 28:10
  39:15
**manager** 27:1,4,7
  27:13 28:3 29:23
  60:15
**managers** 29:1
**managing** 10:8,12
  10:15 16:7
**MANGES** 4:10,14
  4:18
**MANIER** 6:4
**manner** 42:9
**marked** 17:10
**matter** 10:23 61:25
**matters** 10:10,14
  11:4,14 24:16
  34:18 57:23 59:4
  78:10
**maximize** 69:16
**mean** 10:12 15:1
  23:13 30:13 35:7
  35:19 36:6 39:21
  40:25 45:1 49:25
  61:4 75:23 80:13
**Meaning** 23:15
**means** 2:6 10:15
**meant** 79:13
**mechanism** 71:13
  72:6
**meet** 13:19 52:10
  58:14



meeting 61:2
memory 39:10
mentioned 76:10
  80:24 81:1
met 57:16 58:13
Mexico 10:11 13:7
  16:14
MI 1:4
Michael 5:10 79:12
  81:24
michaelmorfey@...
  5:13
Micheal 1:24 2:5
  84:3,20
Mike 70:18 76:6
  77:12
Miller 6:3
million 4:4 20:17
  21:4,6 35:2,15,18
  35:24 37:21 38:6
  38:25 39:13,17
millions 72:4
mind 73:19
minute 45:16 56:20
minutes 61:19
misconduct 27:20
  33:14
moment 31:3
money 35:13 36:4,9
  36:21 37:11,14
  38:1,1 40:25 41:4
  41:9 42:10 45:23
  46:7 47:1 49:3,13
  49:16,21,23 50:11
  50:24 52:23 56:4
  68:20,21 69:4,5
  70:6,9,11,13 71:7
  71:13,16
moneys 71:20
month 76:19 78:17
months 59:12,23
  60:6,23
Morfey 5:10 11:9
  11:11 20:3 22:5
  23:8,20 24:2,10
  25:8,17,22 26:1

26:19 28:19 29:3
  31:2,17 32:5,9,18
  33:2 34:14 37:23
  38:8,10,16 41:13
  42:20 43:25 44:10
  46:20 47:5,20
  48:4 49:6 50:20
  50:25 51:12 52:2
  52:13 55:13 56:7
  64:1,6,13 65:19
  66:10,20 67:3,7
  67:16,20 68:23
  69:7 70:16,20
  75:2 76:14,22
  77:7 78:1 79:15
  81:21 82:11,14
morning 70:25
mortgages 42:5
Moses 6:14
moses@carverda...
  6:17
motion 17:6
move 18:8 26:11
  67:12,19
muted 78:19
MUTUAL 3:7
MYERS 7:12
myriad 43:12

            N

name 57:3 70:25
  72:19 73:11 75:21
  82:7
names 12:12
Nashville 6:5
nature 60:10
NCRA 84:21,21
need 51:4 60:20
  78:2 79:12
negligence 27:20
  33:13
negotiate 33:25
negotiated 32:14
  70:2 72:14 73:25
negotiating 11:24
  15:7 31:24 58:4

72:13
negotiation 71:25
  73:20 74:23 75:14
  75:19 76:2 79:7
  79:22 81:4,7
negotiations 80:21
neither 52:2 84:13
New 3:16 4:19,19
  5:6,19,19 6:10,16
  6:21
NIPPON 6:12
nonbinding 17:7
normal 58:3
normally 17:19
NOTARY 83:23
noted 83:15
notice 2:7 9:10
number 21:3
numbered 2:3

            O

Oak 57:9
oath 84:8
object 20:5 25:8
  33:5 64:3
objected 11:11
objecting 32:22
objection 11:9 22:5
  23:8,9,11,23 24:1
  24:2 25:24 26:4
  26:19 28:19 29:3
  31:3 32:13,18
  37:23 38:8,10,16
  41:13 42:20 43:25
  44:10 46:20 47:20
  55:13,14 56:7
  64:4,11 65:20
  66:10,20 68:23
  69:7
objections 47:5
  48:4 49:6 79:9
objective 44:23
obligated 28:22
  36:20 52:23 53:13
  54:1
obligation 22:18

35:9 36:8,13
  37:14 41:11 42:10
  42:17,18 43:14,21
  43:24 49:17 50:13
  54:16,25 55:9
  56:4 80:23
obligations 13:15
  13:16,19 14:2,7
  18:13,14,16 20:14
  28:17,17 36:7,11
  37:1,10 41:11,23
  43:6,15 44:5
  45:18,19 46:3,4,8
  46:10 47:14 48:23
  49:16,18,20,22,24
  50:11 63:9 64:23
  65:11 66:2,14
  68:21 69:2,4,6,10
  69:18 71:18,19
  73:4
obtain 40:10
obviously 17:20
  34:17 51:1 79:6
occasion 59:8
occasionally 76:6
occasions 60:22
offhand 81:2
office 3:10 84:16
OFFICIAL 5:16
offshore 7:15 10:18
OIL 6:12
Okay 10:4,19 13:24
  14:5 16:2 18:25
  21:8 27:24 30:6
  33:18 40:17,22
  41:20 53:3 54:14
  58:17 59:3,14,22
  60:5 61:3,13,24
  69:12 70:4 72:8
  73:1 74:2 82:9
once 47:15 48:24
  60:9 79:19 81:22
onshore 10:11
operate 28:6,10
operation 33:1
operational 10:9,13

10:17
operations 16:14
  30:19,21,24 31:5
  31:10 32:5,17,20
  62:3 71:18 74:11
opinion 24:11
Opotowsky 6:14
opportunity 51:5
opposed 17:25
Oral 1:12 2:1,7
  84:6
Orange 5:6
Ord 6:19
order 41:10
ordered 47:13
organization 12:25
original 14:22
Orleans 3:16 6:16
  6:21
outcome 84:15
outline 60:13
outlines 14:2 44:13
outside 20:5 32:4,6
  32:14,16,22 67:8
  78:6
overseas 58:17
owed 69:10
owners 68:15
ownership 68:18

            P

P&A 30:25
PACHULSKI 5:21
page 67:12
PAGE/LINE 83:2
paragraph 19:22
  55:2
paraphrase 53:17
parcel 61:24 63:6
part 20:15 26:7
  45:10 61:20,24
  63:6,6 64:25
  75:25 76:1 81:9
participate 77:24
participation 61:1
particular 29:10



71:11
**parties** 14:3,8,23
15:12,16,23 18:18
40:10 46:17 52:11
74:19
**party** 17:21 31:12
31:12,16 77:9
84:14
**Pasquale** 5:17
**pass** 56:15 70:14
81:20
**Paul** 4:9
**paul.genender@...**
4:12
**pay** 46:9,25 47:2
49:3,4,12,13
54:20 55:18
**paying** 46:12 49:1
**PC** 5:5 6:4 7:12,17
**peisenberg@lock...**
3:20
**PEO** 17:23
**people** 57:22
**Perez** 4:13 17:2,18
17:19 18:5 78:2
78:20,21 79:21
**perform** 18:12,14
18:18,19 19:2
28:7 35:8 43:5,9
43:11 44:4,12,15
47:13 49:17 68:21
69:4,6 71:18
**performance** 20:9
20:9
**performed** 18:16
45:19
**permitted** 54:19
55:11,17
**person** 12:2 63:20
**personally** 75:12
81:6
**persons** 12:3
**perspective** 71:20
72:3 73:19 74:4
**Peter** 7:16
**petroleum** 7:15

9:16,20
**Phil** 57:3 64:14
67:17 82:7
**PHILADELPHIA**
6:2
**Philip** 3:18
**pick** 43:13,21
**place** 7:12 16:6
17:14 61:18 84:11
**plan** 16:1,3,8,11
26:16,18,23 28:1
28:16 29:17 30:14
31:13,14 33:19
35:22 38:6,23
39:1 42:7,8 44:22
56:3,3 69:14
79:10 81:9
**plan's** 37:21
**planned** 44:21
**plans** 14:21,24
15:13,24 31:10
32:17
**PLC** 3:13
**please** 12:10 33:2
51:13 64:21 65:25
67:13 72:24 75:4
**PLIFKA** 7:17
**PLLC** 6:9
**pocket** 45:22 46:11
46:13
**point** 19:1 37:12,16
39:25 45:21 46:9
50:7 51:3 52:8,22
53:12 54:8 58:22
59:7 61:7,10
75:18 80:25
**pointed** 53:15
**pop** 78:3
**portion** 43:9 75:5
**position** 19:24
**possession** 74:12
**possibility** 43:17
**possible** 35:12 62:1
**post** 3:10 31:10
32:16 47:10 57:9
74:11 81:17

**potential** 12:25
34:4,8
**potentially** 16:13
68:19 72:5,6
74:18 80:18
**Poydras** 3:15 6:15
6:20
**prefer** 18:5
**prelitigation** 10:10
10:14
**preparation** 57:21
**prepare** 57:14
**prepared** 12:1
34:21,21 74:12
**PRESENT** 7:20
**presented** 57:24
**prevent** 69:15
78:15
**prior** 13:3 14:16
21:9 27:25 28:16
29:17 33:18 41:21
41:23 42:8 58:2
58:11 62:12,12
68:17
**privilege** 24:6,17
25:12 34:22 54:4
56:1 78:11,15
**privileged** 24:9,20
26:3 34:17
**probably** 24:19
61:19 71:2 76:25
77:5
**Procedure** 2:9
**proceeding** 17:7
**proceedings** 8:4 9:1
84:11
**proceeds** 71:23
72:11
**PROCESSING**
7:10
**produce** 43:23
**produced** 2:2
**producing** 42:13
**product** 34:16
**production** 42:13
42:19

**professional** 17:10
**profile** 9:14
**projected** 43:5
80:19
**projecting** 39:21
**projection** 80:17,18
**projections** 14:21
43:4 55:22,24
74:10,21
**promise** 70:19
**proof** 82:10
**proper** 81:13
**properties** 16:22
28:11,13,13,22
30:20 31:1 34:2
66:16 68:13,17
**property** 66:4
**proposed** 26:16
66:9 81:7
**prospective** 76:8
**protect** 26:17 35:11
39:8
**provide** 15:12
23:16 51:4 53:7
71:13,17 72:6
**provided** 17:23
30:2
**provider** 30:3,6
33:13,20
**providers** 30:16
**provision** 52:8
**PUBLIC** 83:23
**pull** 15:17
**pulling** 19:23
**purchaser** 30:8
**purpose** 12:21,22
28:6,8 33:22,24
71:4,15 82:6
**purposes** 26:11
72:8 74:7
**pursuant** 2:7 9:10
**put** 12:5 16:5

────────
**Q**
**question** 10:8 11:13
13:20 15:23 19:10

19:24 23:18,21,22
24:1,8,22 25:9,21
30:23 33:3,4 38:5
38:5,14,15 40:12
43:2 44:7 45:24
45:25 49:8 50:22
64:5,12,14,16,21
65:25 66:25,25
67:1,2,4 68:25
72:2 73:5 75:3
76:22,23 77:1
78:12 79:2 80:4
80:15 81:18,25
**questioning** 79:25
**questions** 9:15
14:20 17:24 31:5
32:20,22 52:17
60:17 79:16 81:20
**quote** 53:16

────────
**R**
**R** 4:9,13
**R-i-n-e-y** 12:13
**R-o-d-g-e-r-s** 12:14
**raise** 78:10
**range** 34:12 35:4
**RDR** 1:24 2:5
84:20
**re-ask** 43:2
**re-asking** 23:21
**reached** 26:15
**read** 10:7 15:19,20
54:1,6,22 55:3
75:3,5 83:14
**reading** 19:11
84:12
**reads** 55:15
**really** 16:6 42:11
42:12
**realtime** 2:6 84:4
84:21
**reason** 30:12 33:15
35:3,6 55:5 83:2
**recall** 21:21 35:22
59:2 61:23 62:4
76:12 81:2,10



MAGNA
LEGAL SERVICES

**receive** 51:21
**received** 38:19
    51:25
**Recess** 52:14
**reconsider** 67:23
**record** 82:5,5,12,15
**record's** 24:23
**recourse** 21:22,24
    46:5 47:18 48:2
    48:25
**refer** 17:9 36:15
    50:15
**reference** 47:7
**referenced** 37:18
**referencing** 47:6
**referring** 50:17
**regard** 18:17 20:8
    47:12 59:18 65:16
**Registered** 84:3,21
**regular** 58:24,25
**reimburse** 22:19
    40:16 43:20 54:20
    55:19
**reimbursement**
    21:11,18 22:3
    40:11 44:16,17
    45:9 46:13,15,16
    46:18 47:1,16,19
    47:22 48:3,9,23
**REINSURANCE**
    4:2 5:2
**related** 13:11 14:3
    74:16 84:14
**relating** 79:9
**relation** 13:16
**relationship** 14:17
**relatively** 70:19
**relevant** 60:13 71:1
**rely** 22:9 23:11
    30:9 33:17 41:16
    53:10
**relying** 23:19
**remain** 10:25
**remains** 78:8
**remember** 21:3,7
    45:3 61:1

**Remote** 1:12 2:1
    3:1 4:1 5:1 6:1 7:1
    84:6
**removal** 28:2
**remove** 28:2 33:12
**removed** 27:19
    81:14
**renew** 23:23 65:19
    66:12
**renewing** 26:3
**reorganization**
    31:13,15 81:9
**repay** 41:12 47:4
**Repeat** 25:3 30:23
    55:7,14 73:5
**rephrase** 45:24
    72:2 74:21 77:1
    80:4 81:5
**report** 10:21
**reported** 1:23 2:5
    84:5
**reporter** 53:23
    55:14 75:3 84:4,4
    84:21,21
**REPORTER'S**
    8:12 84:1
**represent** 9:8 34:25
    57:4 71:1
**representative** 9:9
    25:15,16
**representatives**
    61:8,9
**representing** 17:16
**request** 38:18,21
**requested** 75:5
    84:12
**require** 70:5,10
**required** 15:15
    20:17 43:14,15
    44:7 80:3
**requirement** 50:23
    81:17
**requires** 52:8
**requiring** 45:11
**reservoir** 9:20
**resources** 47:17

**respect** 17:24 31:11
    31:13 44:14 66:3
    66:15 72:16 73:21
    75:18 79:20
**respectfully** 24:11
**respond** 33:4 34:19
**responded** 60:18
**responsibilities**
    33:12
**restate** 45:24
**restaurant** 82:8
**restructuring**
    11:17 12:22,25
    14:5,6,17 45:14
    57:18 64:25 74:23
    75:9
**result** 13:1 22:2
**revealing** 34:15
**revenue** 42:13
**revenues** 43:22
    44:9
**review** 58:1,3 60:20
**reviewing** 58:4
**Richmond** 57:12
**right** 10:22 11:4,6
    18:14,19,23 22:2
    22:3,4 27:5,25
    28:4,24 29:17,25
    30:4,14,15,18,22
    33:6,16,19,21
    36:9 38:23 42:11
    42:13,15,19 43:18
    43:22 44:12,17
    45:23 46:4,5,6,14
    47:4,19 48:3
    49:24 50:2,3
    52:13 56:22 61:20
    63:10,19 70:14,20
    75:24 78:1 81:22
    82:11
**rights** 13:17 14:3,7
    26:17,21 27:25
    29:18 30:10 31:14
    31:21,24 32:8,15
    32:25 33:23,25
    36:11 44:14,16

46:13,15,16,18,22
    47:22 48:9,23
    49:16 61:21 62:2
    62:5,7,9,11,16,20
    62:23,25,25 63:5
    63:9,11,12,16,21
    64:23 65:2,3,7,9
    65:11,17 66:2,8
    66:14,14,19 69:18
    69:22,24 70:3
    71:23 73:15
**Riney** 12:8,13,17
**risk** 40:19 41:1
**RLI** 6:18
**rmiller@manier...**
    6:6
**Robert** 6:3
**Roberts** 3:3 8:7 9:6
    9:7 11:10,12 17:2
    17:5,19 18:2,8,10
    20:11 22:11 23:12
    23:25 24:7,21
    25:13,18,23 26:10
    26:13,22 28:23
    29:4 31:9,20,22
    32:2,7,12,24 33:6
    33:7 34:23 38:2
    38:12,20 41:19
    42:23 43:1 44:2,6
    44:11 46:24 47:8
    47:24 48:6,10
    49:8,10 50:21
    51:6,14,16,24
    52:3,16,18 53:24
    55:20 56:11,15,19
    82:12
**Robin** 5:11
**Rodgers** 12:8,13,19
**role** 11:23
**Ross** 7:4
**rough** 39:10
**rrussell@hunton...**
    5:14
**RSA** 62:8,12,15
    63:11,23 65:16
    69:13 79:11

**Rules** 2:8
**run** 30:21 40:18
    46:7
**Russell** 5:11 76:14
    77:15

---

**S**

**S** 6:19
**Saint** 7:12
**sale** 69:19
**satisfied** 49:22 67:7
**satisfy** 49:24
**saw** 78:2
**saying** 32:13 36:25
    80:15
**says** 15:15 16:25
    19:9,18,18 21:14
    21:20 27:22 29:15
    29:24 30:11,13,13
    33:15,17 36:10,11
    36:16,16,23,23
    37:5,15,15,25
    39:3 47:21,22
    53:11,13,19 55:5
    64:7 66:22,23
**scenarios** 39:18
**scope** 20:6 26:7
    32:4,6,14,16,22
    42:21 67:8 68:1
**screen** 18:4 78:3
**seal** 17:6,11 84:16
**second** 20:3,4 23:20
    51:1,15 54:12
    64:1,2 75:2 77:7
**section** 37:18 53:25
    54:13
**secure** 22:18 24:25
    25:6 41:7,22
**secured** 22:13 23:7
    26:8 41:5,12 49:4
**security** 21:16,24
    22:25 23:2 25:5
    25:20 39:11 41:3
    41:17,22 42:4
    45:1,11 74:19,25
    80:7,9,20



**see** 17:5 34:1 39:18 52:4 67:24
**seek** 21:11 45:9 47:1
**select** 33:12,19
**send** 9:13 51:10,13
**separate** 77:14,18
**separately** 60:21
**Sergio** 7:21
**serve** 71:12,15,21 72:9 79:17
**serves** 71:12
**service** 30:3,6,16 33:13,20
**set** 21:17 28:4 37:1 46:22 69:17,21 70:2 71:22 74:8
**sets** 35:20 37:6,10 49:25 50:4,10 53:1,6,19 54:10 56:9 63:8,15 64:22 65:6,11 66:1,13 70:7,12 72:10,17 73:14,24
**severally** 68:16
**SHAHINIAN** 5:5
**sheet** 11:17,21 12:3 13:1,4 59:18 62:8 62:12 63:12 66:9 68:9,10
**sheets** 61:22 65:16 65:17 66:19
**Shell** 9:19
**short** 21:2
**show** 43:4 50:12,16 67:21
**sic** 11:18 16:15
**side** 78:18
**signatory** 17:21
**signature** 8:11 83:1 83:15
**signed** 12:6
**signing** 84:12
**silence** 17:15
**similar** 21:7 34:17
**simple** 61:16

**simply** 68:20 69:5
**Simultaneous** 53:22
**sir** 57:8,11 63:7,25 64:21 65:5,14,25 66:6,19 67:15 68:12 70:4
**SIRIUS** 4:3 5:3
**skipped** 57:7
**sole** 27:1,4,7,13 28:3 29:23 60:15
**sorry** 11:10 12:12 20:24 31:9 32:10 40:5 51:22 56:19 76:19 77:4 78:20
**sounds** 21:7 23:21
**source** 48:2
**sources** 21:16 46:7 47:16 48:2,25
**SOUTHERN** 1:1
**Southlake** 3:10
**speak** 57:21 61:25 63:20
**speaking** 17:17 20:16 21:15 41:4 50:19 64:11
**speaks** 14:2 15:2,14 36:6 50:18 67:10 71:7
**SPECIALTY** 3:7
**specific** 18:17 19:4 32:24 51:3 53:16 70:3 79:12
**specifically** 45:3
**specifies** 49:15
**spell** 12:9 18:20
**spells** 19:4 48:8,15 48:17,18,22
**spend** 20:17
**spending** 49:21
**spoke** 58:7
**spoken** 60:5
**spot** 51:3
**standby** 35:19,21 36:21 41:2,4,8,18 49:15,25 50:4,10

**50:15** 51:7,19 52:19 70:5,7 71:3 71:4,6,22 72:1,10 72:14,17 73:2,7 73:14,24 74:8
**standpoint** 11:1
**stands** 42:16
**STANG** 5:21
**state** 16:10 83:18 83:23
**stated** 41:24 55:4
**statement** 11:8 36:12 38:24 48:1 55:6,7,8
**states** 1:1 38:24,24
**stenographic** 2:6
**step** 19:1
**Stephen** 3:3
**stephen.roberts...** 3:5
**stepped** 45:19
**steps** 46:3 69:15
**Steve** 9:7 12:7,13 17:4 24:11 31:4 32:10 51:1,12
**straying** 31:7
**Street** 3:4,15,18 4:5 4:15 5:12,22 6:9 6:15,20 7:7,17
**strike** 43:20 81:18
**STROOCK** 5:18 5:18
**STUTZMAN** 7:17
**subject** 17:13 18:3 24:1,5,17 25:11 34:22 46:13 54:4 54:17 55:25 57:23 61:25 79:18
**Subscribed** 83:20
**subsequently** 84:8
**Sugar** 82:3
**suggest** 79:16
**suite** 3:4,15,18 4:5 4:10,15 5:12,22 6:4,9,15,20 7:4,7 7:12,17 12:6 57:9

**summary** 17:6
**summer** 11:22
**supervision** 84:9
**support** 11:17 12:22 44:21 45:15 74:23
**supporting** 44:22
**sure** 13:22 14:15 24:23 40:12 43:12 55:7 61:14 68:25 81:13
**sureties** 35:11 71:1 76:9 80:23 81:8 81:12
**surety** 3:7 21:17,22 39:7,12 40:15 45:20 46:7 54:19 55:11,17 57:4 75:10 80:22
**sworn** 9:3 83:20 84:7
**Syracuse** 6:10

**T**

**T** 7:11
**take** 17:15 19:12,14 52:3,10 61:18
**taken** 52:14
**takers** 81:23
**talking** 61:15
**team** 77:16
**teams** 10:17
**tell** 18:25 25:15 34:11 38:3 54:10
**telling** 32:3,15 48:14 50:18 53:18 64:16 65:8,10
**tells** 50:7
**ten** 61:19
**ten-minute** 52:3
**Tennessee** 6:5
**term** 11:17,21 12:3 13:1,3 36:19 45:1 54:25 59:18 61:22 62:8,12 63:12 65:16,17 66:9,19

**68:9,10** 81:13
**terms** 11:7,7 12:1,3 14:6 18:17,19 19:4,7,17 30:9 37:1,7,9 50:1 53:1 53:7,19,21 54:11 56:9 63:22 64:6 65:7 66:2,5,13 67:22 70:3,5,8,10 70:13 71:9,25 72:9 73:14,18 78:4
**terrible** 76:25
**TESSIER** 6:14
**testified** 9:4 34:24 35:5 74:9
**testify** 24:12 31:8 56:13 64:9,17 84:8
**testimony** 75:11 77:22
**Texas** 1:1,14 2:7 3:4,10,19 4:5,11 4:15 5:12,22 7:4,8 7:13,18 9:17 57:9 57:12
**thank** 17:5 21:1,8 22:1 52:13 56:23 57:13 70:15 73:16 81:20
**thing** 42:11
**things** 57:8 79:7
**think** 24:18,19,22 42:1,3 46:12 48:6 57:7 60:11 64:19 67:25 71:6 77:11 78:2,8,13,16 79:13,22
**third** 40:10
**third-party** 35:10
**thought** 48:11
**three** 16:16
**threshold** 39:17
**tim.million@hus...** 4:6
**time** 11:5,5 16:7



39:22,25 58:22
59:5,5 61:7 67:11
67:21 69:11 75:4
76:11,12 80:13,16
84:11
**timeline** 80:8
**times** 60:8
**Timothy** 4:4
**title** 10:4 12:15
68:16
**today** 9:9 31:6 57:5
58:2
**today's** 20:6 57:14
57:21
**told** 48:11 60:19
**Tommy** 75:23
**tomorrow** 39:25
**tonight** 82:1
**top** 37:19
**topic** 76:13 79:17
79:19
**topics** 26:8 31:6
32:23 57:23 64:17
67:9,17,23 78:16
79:19
**total** 39:6,10
**totally** 67:8
**transactional** 10:9
10:13,16
**transcribed** 84:9
**transcription** 84:10
**transition** 30:2
**TRAURIG** 7:3,7
**TRAVELERS** 3:7
**Travis** 3:18 4:5
5:12
**treasurer** 12:20
**treated** 81:16
**treatment** 81:4,8
**triggered** 42:18
**Troy** 76:4
**true** 13:6 21:8 25:2
26:14 29:21 33:11
35:7 43:3 44:25
54:15 59:9,13,14
59:14 83:15 84:10

**Trust** 35:14,18 38:7
39:7,11 40:15
45:20 46:5 54:18
55:10,16
**trying** 32:12 61:13
71:24
**turn** 54:12
**twice** 60:9 81:22
**two** 12:12 60:22
80:13
**type** 55:21 71:19
**Typically** 10:15

**U**

**U.S.A** 6:12
**uh-huh** 14:12
**ultimately** 12:6
**understand** 25:19
30:1 32:13 37:3
40:12 48:16,18
62:19 65:13 68:15
68:25 80:16
**understanding**
19:1,6,8 20:21
25:14,15 35:15
37:4,6,9 42:14
43:7 48:13,19,21
57:23 61:7 65:14
65:15 67:15 68:5
69:23,25 70:4
80:5,11
**understood** 13:22
14:16
**undertakes** 46:3
**undertook** 21:10
**UNITED** 1:1
**unsecured** 5:16
22:4,13 23:6 26:9
81:15
**USA** 7:15
**usage** 73:21 74:4
**use** 42:7,19 43:22
44:8 72:11,19
73:7,15 74:2,7
**uses** 71:23 72:11,15
72:17 73:15,25

**V**

**vague** 11:9,11
26:19 68:23
**valid** 77:12
**value** 69:16
**various** 24:16 62:2
62:16 65:2,4
69:14,19
**version** 17:7
**veto** 69:19
**Vino** 82:3
**Vinyl** 82:3
**vis-a-vis** 44:14

**W**

**W** 4:14 6:3
**walk** 18:4 60:12
61:21
**walking** 62:4
**walkthrough** 61:16
**want** 14:15 15:17
15:19 24:23 31:3
34:18 50:16 51:2
53:12 56:17,22
61:14 72:15 75:4
77:8,13,18,19
82:5
**wanted** 82:7
**wants** 67:2
**Washington** 6:9
**waste** 67:11,21
**watch** 68:18
**way** 14:15 15:5
17:20,22 18:6,6
36:24 40:21 44:8
48:24 63:1
**we'll** 38:1 39:4
**we're** 19:11,14 31:7
56:10 61:15 67:8
67:10 79:10 82:12
**we've** 17:20,22,23
18:6 24:14,18
41:20 42:1 44:2
65:2
**week** 76:18 77:5,6
77:22,25

**weekly** 59:10,16
60:1,2,3 61:4
76:18
**WEIL** 4:10,14,18
**Weir** 7:3
**weirj@gtlaw.com**
7:5
**welcome** 51:1
**West** 5:6 6:9 7:7
**wife** 82:7
**Wild** 57:12
**willful** 27:20 33:14
**willing** 35:20
**witness** 2:7 9:3
17:21 23:25 24:4
25:10,20 31:7
32:11 33:3 34:15
52:1 56:15 63:19
64:8,15,17 65:20
70:15 81:20 82:2
82:10 83:20 84:7
**Woodard** 6:8
**word** 22:24
**words** 54:8 62:19
67:12
**work** 10:16 30:1,4
34:16 58:10,17,19
59:3 68:9
**worked** 9:19 10:1
**working** 57:17
**worries** 59:3
**wouldn't** 34:3
40:21 42:18 58:25
60:1
**wrong** 75:12

**X**

**XL** 3:7

**Y**

**Y'all** 82:4
**yeah** 21:14 23:2
46:1 52:2 56:19
78:20 82:14
**year** 11:16 20:17
57:19 58:5,15

80:13
**years** 9:20 10:2,3
14:24 16:6,16
20:19 80:13
**yesterday** 34:24
58:7
**York** 4:19,19 5:19
5:19 6:10
**You-all** 56:19

**Z**

**ZIEHL** 5:21
**Zurich** 2:2 3:2 9:8

**0**

**07052** 5:6

**1**

**1.2** 35:3
**10:03** 1:16 2:4
**100** 57:9
**10038** 5:19
**10153-0119** 4:19
**11** 1:3
**11:02** 52:10,14
**11:10** 52:11
**11:13** 52:15
**11:54** 82:16
**1100** 6:15
**11th** 51:21
**1201** 6:4
**13202** 6:10
**1365** 51:20
**15** 61:19
**1500** 7:12
**17** 10:2,3
**1700** 4:15
**180** 5:18
**1885** 7:12

**2**

**2** 53:25
**2.1** 20:16
**2.1(a)** 19:22
**20-33948** 1:4
**200** 4:10 6:9



MAGNA
LEGAL SERVICES

**2000** 9:24 57:9
**2013** 13:6,25 44:24
**2019** 20:18,21,25
**2020** 20:18,23,24
    21:2
**2021** 1:15 2:4 8:2
    51:21 83:21 84:5
    84:17
**2050** 7:7
**212** 4:20 5:19
**214** 3:11 4:11 7:5
    7:18
**220-4163** 5:13
**2200** 7:4,17
**226-1304** 3:19
**230** 35:15
**2323** 7:17
**2350** 4:5
**244-0030** 6:5
**2500** 6:20
**2660** 3:15
**2706** 57:12
**2800** 3:18
**299-3590** 6:21

**3**
**3** 1:15 8:2,3
**30(b)(6)** 57:14
    63:19 64:15 65:15
    65:20 68:1
**300** 4:10 7:7
**310-8817** 4:20
**3100** 6:15
**315** 6:10
**320-7260** 7:8
**333** 6:9
**37203** 6:5
**3rd** 2:4 84:5

**4**
**4** 31:10 32:4
**4.02** 54:13
**4.02(c)** 54:15
**4.2(c)** 55:2,3,15,23
**40** 39:13
**400** 6:20

**4200** 5:12
**423-7100** 6:10
**440** 5:22
**45** 21:4,6 35:18,24
    37:21 38:6,25
**499-3624** 3:5

**5**
**504** 3:16 6:16,21
**512** 3:5 7:8
**5200** 7:4
**525-6221** 4:6
**530-2077** 5:6
**546-5040** 4:16
**558-5210** 3:16
**57** 8:8
**585-3830** 6:16

**6**
**600** 3:18 4:5 5:12
**601** 3:15
**615** 6:5
**655-3674** 7:5
**691-9385** 5:23
**6th** 7:7 84:17

**7**
**70** 8:9
**700** 3:4 4:15
**70130** 3:16 6:21
**70163** 6:16
**713** 3:19 4:6,16
    5:13,23 7:13
**720** 3:4
**720271** 1:25
**722-7160** 3:11
**730** 39:12,17
**746-78877** 4:11
**75201** 7:4
**75201-2689** 7:18
**75201-6950** 4:11
**76092** 3:10
**767** 4:19
**77002** 3:19 4:5 5:12
    5:22
**77002-2784** 4:15

**77056** 7:13 57:10
**77406** 57:12
**78701** 3:4 7:8

**8**
**80** 20:17
**800** 35:2
**806-5562** 5:19
**83** 8:11
**84** 8:12
**850-8218** 7:13

**9**
**9** 8:4,7
**900** 5:22 6:4
**94075** 3:10
**969-4900** 7:18
**973** 5:6

