# HCCI Exhibit 37

EXECUTION VERSION

Deutsche Bank 

*For Bank Use Only. Insert Applicant Name:*
*Fieldwood Energy LLC*

## CONTINUING AGREEMENT FOR STANDBY LETTERS OF CREDIT

January 4, 2016
*(Date)*

Deutsche Bank AG New York Branch
60 Wall Street
New York, New York 10005
Attention: Prashant Mehra

To induce Issuer, in your sole discretion from time to time, to issue one or more irrevocable letters of credit at the request of Applicant (as defined below), in substantially such form as Applicant shall request, Applicant unconditionally and irrevocably agrees with you, including as to each Credit (as defined below), as follows:

1. **_Defined Terms_**. As used in this agreement (as amended, supplemented or otherwise modified from time to time, including the application for the Credit, this "**Agreement**"), the following terms have the respective meanings specified below, unless the context requires otherwise:

"**Applicant**" means the party signing below.

"**Base Rate**" means, for any day (or, if such day is not a Business Day, the immediately preceding Business Day), a rate per annum equal to the greater of (a) the Overnight Federal Funds Rate for such day plus 1/2 of 1% or (b) the Prime Lending Rate for such day.

"**Beneficiary**" means, at any time, the beneficiary(ies) of the Credit, including any second or substitute beneficiary(ies) or transferee(s) under a transferable Credit and any successor of a beneficiary by operation of law.

"**Business Day**" means any day that is not a Saturday, Sunday or other day on which commercial banks are authorized or required to close in New York City or at such other place where Issuer is obligated to honor a presentation or otherwise act under the Credit or this Agreement.

"**Change in Control**" means (a) if Applicant is a publicly held Person, that (i) any Person or two or more Persons acting in concert shall have acquired after the date of an initial public offering of securities of Applicant or an affiliate of Applicant that acquired Applicant's business in the initial public offering transaction (either transaction referred to herein as an "**IPO**") beneficial ownership (within the meaning of Rule 13d-3 under the Exchange Act), directly or indirectly, of Voting Stock of Applicant (or other securities convertible into or exchangeable for such Voting Stock) representing 25% or more of the combined voting power of all Voting Stock of Applicant (on a fully diluted basis), (ii) during any period of up to 24 consecutive months, commencing on or after the date of this Agreement, a majority of the members of the board of directors of Applicant shall not be Continuing Directors, or (iii) any Person or two or more Persons acting in concert shall have acquired after the date of an IPO, by contract or otherwise, or shall have entered into a contract or arrangement after the date of an IPO that upon consummation will result in its or their acquisition of power to exercise, directly or indirectly, a controlling influence over the management or policies of Applicant; and (b) if Applicant is not a publicly held Person, (i) a sale (whether of stock or other assets), merger or other transaction or series of related transactions involving Applicant, as a result of which those Persons who held 100% of the Voting Stock of Applicant immediately prior to such transaction do not hold (either directly or indirectly) more than 50% of the Voting Stock of Applicant (or the surviving or resulting entity thereof) after giving effect to such transaction, or (ii) the sale of all or substantially all of the assets of Applicant in a transaction or series of related transactions; provided, however, that any transaction, including any restructuring, conversion, or recapitalization, which results in an IPO shall not be deemed a Change in Control for the purposes hereof.

"**Collateral**" has the meaning provided in Section 12.

"**Continuing Director**" means, for any period, an individual who is a member of the board of directors of Applicant on the first day of such period or whose election to the board of directors of Applicant is approved in advance of such election by a majority of the other Continuing Directors at the time of such approval; provided, however, that any

director who is designated by Riverstone Holdings LLC or an affiliate of Riverstone Holdings LLC shall be considered a Continuing Director regardless of when elected.

"**Credit**" means each letter of credit referred to in the introductory paragraph hereof, and includes any amendment or replacement thereof authorized by its terms or by consent of Applicant.

"**Deposits**" means any and all deposits (whether general or special, time or demand, provisional or final) at any time held, and any other indebtedness at any time owing, by Issuer or any of its affiliates to or for the credit or the account of Applicant, excluding any deposit where the account title expressly indicates that such deposit does not secure any Obligations or that Applicant is not holding such deposit for itself.

"**Dollars**" or "**$**" mean, at any time, the lawful currency of the United States of America.

"**Event of Default**" has the meaning provided in Section 17.

"**Exchange Act**" means the United States Securities Exchange Act of 1934.

"**Indemnified Party**" means Issuer and each officer, director, affiliate, employee and agent thereof.

"**IPO**" has the meaning provided in the definition of Change of Control.

"**ISP**" means the International Standby Practices 1998, International Chamber of Commerce Publication No. 590.

"**Issuer**" means Deutsche Bank AG New York Branch.

"**Issuer's Office**" means Issuer's address for notices under this Agreement.

"**LC Agreements**" means this Agreement, each request by Applicant for a Credit, the Security Agreement and each other instrument or agreement made or entered into by Applicant with Issuer in connection with the transactions contemplated hereby or thereby, and any supplements or amendments to or waivers of any of the foregoing executed and delivered from time to time.

"**Letter of Credit Exposure**" means, at any time, the sum of (a) the aggregate undrawn amount of all outstanding Credits issued by Issuer hereunder at such time (including any pending drawings made prior to expiration and any scheduled increases in accordance with the terms of any Credit) plus (b) the aggregate amount of all payments made by Issuer pursuant to any such Credit issued hereunder that have not yet been reimbursed by or on behalf of Applicant at such time (including any and all acceptances and deferred payment undertakings incurred under any Credit providing for acceptances or deferred payment undertakings, as applicable).

"**Material Adverse Effect**" has the meaning provided in Section 15.

"**Obligations**" means all payment obligations of Applicant under this Agreement or in respect of the Credit, whether absolute or contingent, joint, several or independent, including interest accruing at the rate provided in this Agreement on or after the commencement of any bankruptcy or insolvency proceeding, whether or not allowed or allowable.

"**Overnight Federal Funds Rate**" means, at any time, the rate per annum at which Issuer, in its sole discretion, can acquire Federal funds in the interbank overnight federal funds market including through brokers of recognized standing.

"**Person**" means any natural person, corporation, limited liability company, trust, joint venture, association, company, partnership, government (including any subdivision, agency, court, central bank, or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government) or other entity.

"**Practices**" has the meaning provided in Section 26(b).

"**Prime Lending Rate**" means the rate of interest Issuer announces from time to time as Issuer's prime lending rate for unsecured commercial loans within the United States of America (but is not intended to be the lowest rate of interest Issuer charges in connection with extensions of credit to borrowers).

"**Required Collateral Amount**" means, at any time, 100% of the Letter of Credit Exposure at such time, after giving effect to any pending request for the issuance, amendment or extension of any Credit and any scheduled increases in accordance with the terms of any Credit.

"**Security Agreement**" means the Security Agreement dated as of the date hereof between Applicant and Issuer, as amended, supplemented or otherwise modified from time to time.

"**Security Agreement Collateral**" has the meaning provided in Section 12 hereof.

"**Subsidiary Account Party**" means any direct or indirect subsidiary of Applicant (a) listed on Schedule I hereto and approved as a Subsidiary Account Party hereunder by Issuer's signing Schedule I in its sole discretion or (b) that Applicant may from time to time list on a supplement to Schedule I with the written approval of Issuer in its sole discretion.

"**Taxes**" means all present and future taxes, levies, imposts, deductions, charges, withholdings and related liabilities, excluding income and franchise taxes imposed by the jurisdiction of Issuer's head office or the office issuing the Credit or any of its political subdivisions.

"**UCC**" means the Uniform Commercial Code, as in effect from time to time in the applicable jurisdiction.

"**UCP**" means the Uniform Customs and Practice for Documentary Credits, 2007 Revision, International Chamber of Commerce Publication No. 600.

"**Voting Stock**" means shares of capital stock issued by a corporation (or equivalent interests in any other Person), the holders of which are ordinarily, in the absence of contingencies, entitled to vote for the election of directors (or persons performing similar functions) of such Person, even if the right so to vote has been suspended by the happening of such a contingency.

2. *Issuance; Reimbursement*. Unless you otherwise agree in writing, you shall have sole discretion whether to issue any Credit. Applicant will reimburse Issuer, on demand, the amount of each payment Issuer makes under the Credit. Each reimbursement shall be without prejudice to Applicant's rights under Section 8(b). To the extent permitted by applicable law, Issuer is irrevocably authorized and directed to reimburse each drawing out of the Security Agreement Collateral.

3. *Fees, Costs and Expenses*. Applicant will pay to Issuer (i) fees in respect of the Credit at such rates and times as Applicant and Issuer agree in writing, and (ii) on demand, all reasonable costs and expenses (including reasonable attorney's fees and disbursements) that Issuer incurs in connection with the Credit, this Agreement or any other LC Agreement, including (A) the negotiation and execution of this Agreement and the other LC Agreements entered into on or about the date hereof and any requested amendment to or waiver under the Credit, this Agreement or any other LC Agreement, (B) in enforcing this Agreement or any other LC Agreement, (C) in complying with any governmental exchange, currency control or other law, rule or regulation of any country now or hereafter applicable to the purchase or sale of, or dealings in, foreign currency in connection with the Credit, this Agreement or any other LC Agreement, (D) any stamp tax, recording tax, or similar tax or fee payable in connection with the Credit, this Agreement or any other LC Agreement, and (E) any adviser's, confirmer's, or other nominated person's fees and expenses with respect to the Credit that are chargeable to Applicant or Issuer (if the application for the Credit requested or authorized such advice, confirmation or other nomination, as applicable).

4. *Payments; Currency; Interest; Computations*.

(a) All amounts due from Applicant under this Agreement shall be paid to Issuer at Issuer's Office without defense, setoff, or counterclaim, in Dollars and in immediately available funds; provided that if the amount due is based upon Issuer's payment in a currency other than Dollars, Applicant will pay the equivalent of such amount in Dollars computed at Issuer's selling rate for cable transfers to the place where and in the currency in which Issuer paid, or, at Issuer's option, Applicant will pay in such other currency, place, and manner as Issuer reasonably specifies in writing. Applicant's obligation to make payments in any currency (the "**Specified Currency**") shall not be discharged or satisfied by any tender, or any recovery pursuant to any judgment or otherwise, which is expressed in or converted into any currency other than the Specified Currency, except to the extent that such tender or recovery results in the actual receipt by Issuer at Issuer's Office of the full amount of the Specified Currency payable under this Agreement. Applicant shall indemnify Issuer for any shortfall and Applicant's obligation to make payments in the Specified Currency shall be enforceable as an alternative or additional cause of action to the extent that such actual receipt is less than the full amount of the Specified Currency expressed to be payable hereunder, and shall not be affected by judgment being obtained for other sums due hereunder.

(b) If Applicant fails to fully reimburse Issuer on the date of any payment under the Credit, then Applicant will pay interest to Issuer on such unreimbursed amount at a variable interest rate equal to (i) until the date reimbursement is due from Applicant under Section 2, the Base Rate, and (ii) thereafter, the rate provided in the following sentence. Without limiting Applicant's obligation to make all payments hereunder when due, Applicant will pay to Issuer, on demand, interest on all overdue amounts hereunder from the due date through the payment date at a variable interest rate equal to the sum of 2% per annum plus the Base Rate from time to time. Any change in the interest rate resulting from a change in the Base Rate shall take effect on the date of such change in the Base Rate. If any payment shall be due on a day that is not a Business Day, such payment shall be made on the next Business Day and interest shall be paid for each additional day elapsed.

(c) All computations of fees and interest under this Agreement shall be based on a 360-day year for the actual number of days elapsed. All computations of fees based upon the available or face amount of the Credit at any time shall be calculated by reference to the greatest amount for which Issuer may be contingently liable under any circumstances under the Credit at such time or thereafter, giving effect to any scheduled increases in accordance with the terms of the Credit.

5.  *Capital Adequacy; Additional Costs.* If Issuer determines that the introduction or effectiveness of, or any change in, any treaty, international agreement, law, rule or regulation or compliance with any directive, guideline or request from any central bank or other governmental or quasi-governmental authority (whether or not having the force of law), or any change in the interpretation of any of the foregoing, affects the amount of capital, liquidity, insurance or reserves (including special deposits, deposit insurance or similar requirements) to be maintained by Issuer or any corporation controlling Issuer, or otherwise increases the costs of, or reduces the amount received or receivable by, Issuer or any corporation controlling Issuer, and Issuer determines that the amount of such capital, liquidity, insurance or reserve or other increased cost or reduction, as the case may be, is increased or reduced by or based upon the existence of the Credit, this Agreement or any other LC Agreement, then Applicant shall pay to Issuer, within ten Business Days after demand from time to time, such additional amounts as Issuer may demand to compensate for the increase or reduction, as the case may be; provided that Issuer computes all amounts due under this paragraph on a reasonable basis and provides to Applicant reasonable written analysis of such required increases.

6.  *Taxes.* All payments to Issuer hereunder shall be made free and clear of and without deduction for any Taxes. If any Taxes shall be required to be deducted from any sum payable under this Agreement, then: (i) the sum payable under this Agreement shall be increased so that after making all required deductions Issuer receives an amount equal to the sum Issuer would have received had no such deductions been required; (ii) Applicant shall be responsible for payment of the amount to the relevant taxing authority; (iii) Applicant shall indemnify Issuer on demand for any such Taxes imposed on or paid by Issuer and any liability (including penalties, interest and expenses) arising from its payment or in respect of such Taxes; and (iv) Applicant shall provide to Issuer upon request the original or a certified copy of the receipt evidencing each Tax payment.

7.  *Indemnification.* Applicant will indemnify and hold harmless each Indemnified Party from and against any and all claims, liabilities, losses, damages, costs and expenses (including reasonable attorney's fees and disbursements) that arise out of or in connection with: (i) the Credit, any demand for payment, other presentation or request under the Credit, or the transaction(s) supported by the Credit, (ii) any payment or other action taken or omitted to be taken in connection with the Credit, this Agreement or any other Loan Document, (iii) any act or omission, whether rightful or wrongful, of any present or future de jure or de facto government or governmental authority with respect to the Credit, this Agreement or any other LC Agreement or any other cause beyond Issuer's control or (iv) any indemnity or other undertaking that Applicant requests or authorizes Issuer to issue to induce any other financial institution (including any branch or affiliate of Issuer) to issue its own letter of credit, demand guarantee, or other undertaking in connection with any Credit, this Agreement or any other LC Agreement, except in each case to the extent such liability, loss, damage, cost or expense is found in a final, non-appealable judgment by a court of competent jurisdiction to have resulted directly from such Indemnified Party's gross negligence or willful misconduct. Applicant will pay within ten Business Days after demand from time to time all amounts owing under this Section.

8.  *Obligations Absolute; Claims Against Issuer; Exculpations; Limitations of Liability.*

(a) Applicant's Obligations shall be absolute, unconditional and irrevocable and shall be performed strictly in accordance with the terms of this Agreement, irrespective of: (i) if any other Person shall at any time have guaranteed or otherwise agreed to be liable (whether on a primary basis or secondarily) for any of the Obligations or granted any security therefor, any change in the time, manner or place of payment of or any other term of the obligations of such other Person, (ii) any exchange, change, waiver or release of any collateral for, or any other Person's guarantee of or other liability for, any of the Obligations, (iii) the existence of any claim, setoff, defense or other right that Applicant or any other Person may at any time have against any Beneficiary, any assignee of proceeds of the Credit, Issuer or any other Person, (iv) any presentation under the Credit being forged or fraudulent or any statement therein being untrue or inaccurate, or (v) any other circumstance that might, but for the provisions of this Section, constitute a legal or equitable discharge of or defense to any or all of the Obligations.

(b) The foregoing shall not excuse Issuer from liability to Applicant in any independent action or proceeding that is brought by Applicant against Issuer following reimbursement by Applicant to Issuer to the extent of any direct damages suffered by Applicant that were caused by Issuer's gross negligence or willful misconduct; provided that (i) Issuer shall be deemed to have acted with reasonable care if it acts in accordance with standard letter of credit practice of commercial banks located in New York City; and (ii) Applicant's aggregate remedies against Issuer for wrongfully honoring a presentation or wrongfully retaining honored documents shall not exceed the aggregate amount paid by Applicant to Issuer with respect to the honored presentation, plus interest.

(c) Without limiting any other provision of this Agreement, Issuer: (i) may rely upon any oral, telephonic, facsimile, electronic, written or other communication reasonably believed to have been authorized by Applicant, (ii) shall not be responsible for errors, omissions, interruptions or delays in transmission or delivery of any message, advice or document in connection with the Credit, whether transmitted by courier, mail, telex, any other telecommunication, or otherwise (whether or not they be encrypted), or for errors in interpretation of technical terms or in translation (and Issuer may transmit Credit terms without translating them), (iii) may honor any presentation under the Credit that appears on its face to substantially comply with the terms and conditions of the Credit, (iv) may replace a purportedly lost, stolen or destroyed original Credit, waive a requirement for its presentation, or provide a replacement copy to any Beneficiary, (v) if no form of draft is attached as an exhibit to the Credit, may accept as a draft any written or electronic demand or request for payment under the Credit, and may disregard any requirement that such draft bear any particular reference to the Credit, (vi) unless the Credit specifies the means of payment, may make any payment under the Credit by any means it chooses, including by wire transfer of immediately available funds, (vii) may select any branch or affiliate of Issuer or any other bank to act as advising, transferring, confirming and/or nominated bank under the law and practice of the place where it is located (if the application for the Credit requested or authorized advice, transfer, confirmation and/or nomination, as applicable), (viii) may amend the Credit to reflect any change of address or other contact information of any Beneficiary, (ix) shall not be obligated to examine, and may disregard for purposes of determining compliance of any presentation with the terms and conditions of the Credit, (A) any presented document not called for by the terms and conditions of the Credit and (B) that portion, if any, of any presented document called for by the terms and conditions of the Credit that contains data not called for by the terms and conditions of the Credit regardless of whether such data conflicts with data in the Credit or any other presented document, and (x) shall not be responsible for any other action or inaction taken or suffered by Issuer under or in connection with the Credit, if required or permitted under any applicable domestic or foreign law or letter of credit practice. None of the circumstances described in this Section 8(c) shall impair Issuer's rights and remedies against Applicant or place Issuer under any liability to Applicant.

(d) Applicant will notify Issuer in writing of any objection Applicant may have to Issuer's issuance or amendment of the Credit, Issuer's honor or dishonor of any presentation under the Credit, or any other action or inaction taken by Issuer under or in connection with the Credit, this Agreement or any other LC Agreement. Applicant's notice of objection must be delivered to Issuer within five Business Days after Applicant receives notice of the action or inaction it objects to. Applicant's failure to give notice of objection within such period shall automatically waive Applicant's objection. Applicant's acceptance or retention beyond such period of any original documents presented under the Credit, or of any property for which title is conveyed by such documents, shall ratify Issuer's honor of the applicable presentation(s).

(e) Neither Applicant nor Issuer shall be liable to the other party in contract, tort, or otherwise for any punitive, exemplary, consequential, indirect or special damages (including for any consequences of forgery or fraud by any Beneficiary or any other Person) arising in connection with the Credit, this Agreement or any other LC Agreement.

9. *Applicant Responsibility, Etc.* Applicant's ultimate responsibility for the final text of the Credit shall not be affected by any assistance Issuer may provide such as drafting or recommending text. Issuer may, without incurring any liability to Applicant or impairing its entitlement to payment under this Agreement, honor the Credit despite notice from Applicant of, and without any duty to inquire into, any purported defense to honor or any claim against any Beneficiary or any other Person.

10. *Transfers.* If the Credit is issued in transferable form, Issuer shall have no duty to determine the identity of anyone appearing in any transfer request, draft or other document as transferee, or the validity or correctness of any transfer made pursuant to documents that appear on their face to be substantially in accordance with the terms and conditions of the Credit.

11. *Extensions and Modifications; Waivers of Discrepancies.* This Agreement shall be binding upon Applicant with respect to any replacement, extension or modification of the Credit or waiver of discrepancies authorized by Applicant. Except as may be provided in the Credit or otherwise agreed to in writing by Issuer in its sole discretion, Issuer shall have no duty to (i) issue or refrain from issuing notice of (A) its election not to extend the Credit, (B) if the Credit by its terms permits it to do so, its election to terminate the Credit prior to its stated expiration date, or (C) if the Credit by its terms permits it to do so, its election not to reinstate the amount of any drawing under the Credit or (ii) otherwise amend or modify the Credit.

12. *Collateral.* To secure all the Obligations, (a) Applicant has granted to Issuer a security interest in the collateral described in the Security Agreement (the "**Security Agreement Collateral**") and (b) Applicant further grants to Issuer a security interest in all of Applicant's present and future right, title and interest in, to and under the following property (collectively, with the Security Agreement Collateral, the "**Collateral**"): (i) any and all property received or receivable by Issuer under the Credit or this Agreement, (ii) any and all Deposits, and (iii) any and all supporting obligations, proceeds and products of any and all of the foregoing, together with any and all other property in which Applicant has granted or

hereafter grants a security interest to Issuer to secure any or all of the Obligations. Issuer shall not be obligated to enforce or preserve its or Applicant's rights against any Person with respect to any Collateral. This lien on and security interest in the Collateral shall remain in effect until Issuer's liability under the Credit is extinguished and all of Applicant's Obligations are irrevocably and finally paid in cash.

13. *Additional Bond or Collateral.* If Applicant or any other Person seeks to restrain any presentation under or honor of the Credit or takes any other action that has a similar effect or if any court shall do any of the foregoing or extend the term of the Credit, then, in each case, Applicant shall, at Issuer's request, provide Issuer with a bond or other collateral of a type and value reasonably satisfactory to Issuer as security for the Obligations; provided that the aggregate amount of the Collateral and any such bond or other collateral shall not exceed 100% of the aggregate amount of the Credit.

14. *Further Assurances; Subrogation.* Applicant will, upon request from time to time and at its expense, sign any document and take any other action as Issuer may reasonably request to perfect and maintain the priority of Issuer's security interest in the Collateral and, during the continuance of any Event of Default, to realize upon Issuer's rights and remedies as secured party with respect to the Collateral, including following any unreimbursed honor, as subrogee of the rights and remedies of Applicant against any Beneficiary in the Credit transaction and any transaction(s) supported by the Credit.

15. *Covenants of Applicant.* Applicant will (i) comply with all foreign and domestic laws, rules and regulations now or hereafter applicable to Applicant, its properties, the Credit or transactions related to the Credit, except where the failure to do so could not reasonably be expected to have a material adverse effect ("**Material Adverse Effect**") on (A) Applicant's financial condition, business or assets, (B) Applicant's ability to perform any of its obligations under this Agreement or any other agreement supporting or securing this Agreement or (C) the validity or enforceability of this Agreement or any such other agreement or the rights of or benefits available to Issuer hereunder or thereunder, (ii) promptly upon obtaining knowledge of the occurrence of any Event of Default or any event which with notice or lapse of time or both would constitute an Event of Default, notify Issuer thereof in writing, specifying the nature thereof and the action Applicant proposes to take with respect thereto, (iii) not (A) enter into or suffer to exist any agreement that would be violated or breached by the performance of any Obligations, and (B) other than pursuant to the LC Agreements, create or suffer to exist any mortgage, pledge, security interest, encumbrance, or other lien, whether junior, equal or superior in priority to the liens created by the LC Agreements, on the Collateral.

16. *Representations and Warranties; Subsidiary Account Parties.*

(a) Applicant represents and warrants as of the date of this Agreement and also as of the date of issuance of the Credit (or of any increase or extension thereof) that: (i) it is duly formed, validly existing and in good standing under the laws of its jurisdiction of formation with the power and authority to carry on its business; (ii) its execution, delivery and performance of this Agreement, the other LC Agreements and any underlying agreement or transaction, (A) are within its powers, (B) have been duly authorized, (C) do not contravene any charter provision, by-law, resolution, contract or other undertaking binding on or affecting it or any of its properties, (D) do not violate any domestic or foreign law, rule or regulation, or any order, writ, judgment, decree, award or permit of any arbitration tribunal, court or other governmental authority applicable to it or any of its properties, and (E) do not require any notice, filing or other action to or by any governmental authority (other than those that have been made or obtained and are in full force and effect); (iii) this Agreement is its legal, valid and binding obligation, enforceable against it in accordance with its terms, subject to (A) applicable bankruptcy, insolvency, reorganization, moratorium and other similar laws of general application with respect to creditors, (B) general principles of equity, and (C) the power of a court to deny enforcement of remedies generally based upon public policy; (iv) the financial statements received by Issuer from it or disclosed in its periodic and current reports filed with the U.S. Securities and Exchange Commission (or any successor thereto), if applicable, present fairly its financial condition as of the dates and for the periods therein indicated, in accordance with generally accepted accounting principles, consistently applied, and since the date of its most recent audited annual financial statements there has been no material adverse change in such financial condition or its business or assets; (v) no other information furnished by it to Issuer is or shall be materially false or misleading when furnished; (vi) there is no pending or, to the knowledge of Applicant, threatened action or investigation which is reasonably likely to materially adversely affect its financial condition, business or assets or which purports to affect the validity or enforceability of this Agreement, the other LC Agreements or any other agreement supporting or securing the Credit, this Agreement, the other LC Agreements or any transaction related to the Credit; (vii) neither its granting of any collateral security for the Obligations, nor Issuer's issuance of the Credit (or any increase or extension thereof), nor the making of any payment thereunder or the use of any proceeds thereof, constitutes or will constitute, or be part of, a fraudulent transfer or conveyance by Applicant to anyone (including Issuer and any Beneficiary) under any applicable law, or exceed (alone or together with any other payments or credit support for any transaction(s) supported by the Credit) the maximum amount that would be allowed for any claim against Applicant under any applicable subsection of United States Bankruptcy Code Section 502(b) if Applicant were the subject of any proceeding thereunder; (viii) it is not an investment company within the meaning of the Investment Company Act of 1940 or, directly or

indirectly, controlled by or acting on behalf of any party which is such an investment company; (ix) immediately after giving effect to the issuance of the Credit (or any increase or extension thereof), no Event of Default has occurred and is continuing or would exist with the giving of notice or lapse of time or both; (x) its execution, delivery and performance hereof constitute private rather than public or government acts and neither it nor any of its property has any immunity from jurisdiction of any court or from set-off or any legal process under the laws of the State of New York or the laws of its jurisdiction of formation; and (xi) all of the cash used by Applicant to fund the Required Collateral Amount on the date hereof was generated by the operations of Applicant and not provided by any affiliate of Applicant or any other Person.

(b) Without limiting any Obligations of Applicant hereunder, Applicant represents, warrants and agrees as to any Credit issued to support obligations of a Subsidiary Account Party that: (i) Applicant is duly authorized to act for and bind such Subsidiary Account Party with respect to such Credit and this Agreement; (ii) such Subsidiary Account Party shall be jointly and severally liable with Applicant for the reimbursement, indemnification and other obligations, representations, warranties and agreements of Applicant hereunder in respect of such Credit, but not for the reimbursement, indemnification or other obligations, representations, warranties or agreements of Applicant hereunder in respect of any Credit not issued to support obligations of such Subsidiary Account Party; (iii) such Subsidiary Account Party has consented to its being referred to as the "applicant", "account party", "client", "customer" or "instructing party" at whose request or on whose behalf or for whose account such Credit is issued; (iv) such Subsidiary Account Party has consented to its not having any rights under this Agreement (including any right to request that Issuer issue or amend such Credit or that Issuer dispose of any documents presented under such Credit (or any goods represented thereby) in any particular manner) and to Issuer's treating Applicant as the sole Person entitled to exercise such rights with respect to such Credit; (v) such Subsidiary Account Party is a direct or indirect majority-owned subsidiary of Applicant at the time of issuance of such Credit (or of any increase or extension thereof); (vi) such Subsidiary Account Party is bound by all the limitations of liability and exculpations in Issuer's favor contained herein and subject to all the rights and remedies in Issuer's favor referred to herein as if it were Applicant; and (vii) Issuer shall not be required to send any notice hereunder to such Subsidiary Account Party, but if Issuer in its sole discretion chooses to do so, Issuer may send such notice as provided herein care of Applicant and such notice shall be effective as if given to such Subsidiary Account Party.

17. *Events of Default*. Each of the following shall be an "**Event of Default**" hereunder: (i) Applicant's failure to pay any reimbursement Obligation in respect of any drawing under any Credit when due, (ii) Applicant's failure to pay any other Obligation within two Business Days after the date when due, (iii) Applicant's failure to perform or observe any term or covenant of this Agreement or any other LC Agreement (not otherwise an Event of Default) for more than 30 days after Issuer notifies Applicant in writing of such failure, (iv) Applicant's breach in any material respect of any representation or warranty made in this Agreement, any other LC Agreement or any other document delivered by Applicant under or in connection with this Agreement, (v) [reserved], (vi) Applicant's repudiation of, or assertion of the unenforceability of, this Agreement, any other LC Agreement or any separate security agreement or other agreement or undertaking supporting this Agreement, or any court or other governmental authority shall issue any order, ruling or determination that this Agreement or such other agreement or undertaking is not in full force and effect, (vii) Applicant's dissolution or termination, (viii) except in connection with an IPO, Applicant's (A) merger or consolidation with any third party unless Applicant is the survivor, (B) sale, lease or other conveyance of all or substantially all of its assets or business or (C) agreement to do any of the foregoing, (ix) institution by Applicant of any proceeding under any law relating to bankruptcy, insolvency or reorganization or relief of debtors or seeking or consenting to the appointment of a liquidator, conservator, custodian, receiver, rehabilitator, trustee or other similar official for Applicant or for any substantial part of its property, or consent by Applicant to the institution of, or failure to contest in a timely and appropriate manner, any proceeding described in Section 17(x), or filing by Applicant of an answer admitting the material allegations of a petition filed against it in any proceeding described in Section 17(x), or Applicant shall take any action for the purpose of effecting any of the foregoing, (x) institution against Applicant of any proceeding under any law relating to bankruptcy, insolvency or reorganization or relief of debtors or seeking the appointment of a liquidator, conservator, custodian, receiver, rehabilitator, trustee or other similar official for Applicant or for any substantial part of its property, and any such proceeding or case shall be unstayed and in effect for more than 30 days, or an order for relief shall be entered therein, (xi) Applicant's making an assignment for the benefit of creditors, (xii) Applicant's insolvency or inability generally to pay its debts as they become due, (xiii) any actual or threatened seizure, vesting or intervention by or under authority of a government by which Applicant's management is displaced or its authority or control of its business is curtailed, (xiv) entry of one or more final non-appealable judgments having an aggregate amount greater than $25,000,000 (or the equivalent in any foreign currency) against Applicant which remains unstayed and unsatisfied for more than 30 days, (xv) [reserved], (xvi) any Change in Control, or (xvii) the occurrence of any of the above events with respect to any Person (including any Subsidiary Account Party) other than Applicant that is liable for or has guaranteed or provided any collateral security for any Obligations.

18. *Remedies*. If any Event of Default shall have occurred and be continuing, Issuer may take any one or more of the following actions: (i) declare the amount of the Credit (as reduced, on a dollar for dollar basis, by the outstanding amount

of the Security Agreement Collateral at such time) and any other Obligations then outstanding or accrued due and payable by Applicant immediately (provided that if the Event of Default is described in Section 17(ix), (x) or (xi), then such amount shall become due and payable immediately and automatically), in which case Applicant shall pay such amount to Issuer to be applied to pay any matured Obligations and held as cash collateral in a non-interest bearing account for any contingent Obligations, (ii) require Applicant to (and Applicant agrees that it shall) use its best efforts to cause Issuer to be promptly released from all its obligations under the Credit, and (iii) exercise any and all other rights and remedies available under the Security Agreement or any of the other LC Agreements or available at law, in equity, or otherwise to secure, collect, enforce or satisfy the Obligations. At Issuer's request during the continuance of any Event of Default, Applicant will assemble any Collateral and make it available to Issuer at a place designated by Issuer that is reasonably convenient to Issuer and Applicant. In addition, during the continuance of any Event of Default, Issuer may, without notice except as specified below, (i) obtain, cancel and adjust and settle losses under any insurance on any Collateral and endorse and negotiate any drafts, documents or instruments constituting Collateral, in each case in its own name or in the name and as agent of Applicant, or (ii) sell any or all of the Collateral at public or private sale, at any of Issuer's offices or elsewhere, for cash, on credit or for future delivery (but without credit risk to Issuer). To the extent notice of sale of the Collateral shall be required by law, Applicant agrees that written notice at least five days prior to the date of public sale or prior to the date after which private sale is to be made constitutes reasonable notification. Applicant shall pay to Issuer on demand all costs and expenses (including reasonable attorney's fees and disbursements) in connection with the custody, preservation or sale of, or other realization upon, the Collateral. Issuer may hold the proceeds of the Collateral as additional collateral under this Agreement or apply the proceeds to the payment of any of the Obligations, at such times and in such order as Issuer may determine. Issuer shall pay any surplus to Applicant or to whomever may be lawfully entitled to receive the surplus, and Applicant shall be liable for any deficiency.

19.   *Set-off*.  To the fullest extent permitted by law, if any Event of Default shall have occurred and be continuing, Issuer may set off and apply any and all Deposits against any and all of the Obligations, irrespective of whether such Deposits or Obligations may be unmatured or contingent or payable at different places or in different currencies. Issuer shall promptly thereafter notify Applicant of any such setoff and application; provided that the failure to give such notice shall not affect the validity of such setoff or application.

20.   *Waiver of Immunity*.  Applicant acknowledges that this Agreement is, and the Credit will be, entered into for commercial purposes of Applicant. To the extent that Applicant or any of its assets has or hereafter acquires any right of sovereign or other immunity from or in respect of any legal proceedings to enforce or collect upon any Obligation or any other agreement relating to the transactions contemplated herein, Applicant hereby irrevocably waives any such immunity and agrees not to assert any such right or claim in any such proceeding.

21.   *Notices; Multiple Applicants; Applicant Status; Interpretation; Severability; Multiple Roles*.

(a)   All notices and other communications under this Agreement shall be sent, if to Applicant, to its address or fax number indicated on its signature page to this Agreement, and, if to Issuer, to its address shown above, Attention: Letter of Credit Department, or by fax to (212) 797-0780, or as to either, to such other address or fax number as either may notify to the other in writing. No such notice shall be effective until actually received by Issuer's Letter of Credit Department or by Applicant, unless the intended recipient fails to maintain, or fails to notify, the other party of any relevant change of its name, address or number(s), in which case such notice shall be effective when sent in accordance with this Agreement. Notices and other communications hereunder, including a signed application for a Credit, may also be delivered or furnished by other methods of electronic communications such as email; provided that, unless otherwise agreed in writing by Applicant and Issuer, the recipient thereof shall have the option in its sole discretion whether or not to treat it as received and effective under this Agreement.

(b)   If this Agreement is signed by two or more Persons as "Applicants", (i) each shall be deemed an "Applicant" hereunder and be jointly and severally liable for all the Obligations, (ii) the release, waiver, instruction or consent of any Applicant shall be sufficient to bind each Applicant with respect to this Agreement, the Credit or any claims arising under or in connection with this Agreement or the Credit, (iii) any Event of Default, regardless of fault, shall be deemed an Event of Default as to all Applicants, (iv) delivery by Issuer of any document, notice or other communication to any Applicant shall be deemed delivery to each Applicant, and (v) the liability of any Applicant hereunder may from time to time, in whole or in part, be extended, modified, released or reduced by Issuer without affecting or releasing any liability of any other Applicant. Each Applicant agrees that its obligations hereunder are primary, waives all discharge defenses available to a secondary obligor, and forgoes negotiation of a separate guaranty and security agreement providing for secondary liability to Issuer.

(c)   Issuer may treat each Person that signs this Agreement and each other Person authorized to act generally for Applicant or specifically in the matter as actually authorized to act for Applicant in amending this Agreement, in authorizing Issuer to issue or amend the Credit, waive any discrepancy, pay or otherwise act under the Credit, in receiving

any notice (including service of process) in connection with this Agreement, and in agreeing to indemnify Issuer for any action or inaction taken or proposed. Any change in the identity of Persons authorized to act for Applicant shall be ineffective until notified in writing to Issuer.

(d) Each Person identified in this Agreement as an Applicant represents and warrants that (i) it acts for itself in requesting issuance of the Credit for its account, or it acts for a Subsidiary Account Party in requesting issuance of the Credit for such Subsidiary Account Party, and (ii) it may be identified in the Credit as an "applicant", "account party", "client", "customer" or "instructing party" at whose request and on whose behalf or for whose account the Credit is issued.

(e) In this Agreement: (i) headings are included only for convenience and are not interpretative; (ii) the term "including" means "including without limitation"; (iii) references to actions Issuer "may" take or omit to take mean "may in its sole discretion"; (iv) unless the context requires otherwise, references herein to Sections shall be construed to refer to Sections of this Agreement; and (v) references to any laws or rules include any amendments thereto or successor or replacement laws or rules.

(f) If any provision of this Agreement is held illegal or unenforceable, the validity of the remaining provisions shall not be affected.

(g) Applicant acknowledges and agrees that (i) Issuer and its affiliates offer a wide range of financial and related services, which may at any time include back-office processing services on behalf of financial institutions, letter of credit beneficiaries, and other customers; (ii) some of these customers may be Applicant's counter-parties or competitors; and (iii) Issuer and its affiliates may perform more than one role in relation to the Credit.

22. *Successors and Assigns; Etc.* This Agreement shall be binding upon Applicant and its successors and assigns, and shall inure to the benefit of and be enforceable by Issuer and its successors and assigns. Applicant agrees that delivery of a signed copy or signature page of this Agreement by any electronic means that reproduce an image of the signed signature page shall be as effective as delivery of a manually signed original of this Agreement. Applicant shall not transfer or otherwise assign any of its rights or obligations under this Agreement without Issuer's prior written consent. Issuer shall not transfer or otherwise assign its rights and obligations under this Agreement, in whole or in part, without the consent of Applicant (such consent not to be unreasonably withheld, delayed or conditioned). Notwithstanding the immediately preceding sentence, Issuer may grant participations in its rights and obligations under this Agreement or the Credit, in whole or in part, without the consent of Applicant, provided that (i) Issuer's obligations under this Agreement shall remain unchanged, (ii) Issuer shall remain solely responsible to Applicant for the performance of such obligations and (iii) Applicant shall continue to deal solely and directly with Issuer in connection with Issuer's rights and obligations under this Agreement. Applicant acknowledges that information pertaining to Applicant as it relates to this Agreement or the Credit may be disclosed to actual or prospective participants, transferees or assignees. This Agreement shall not be construed to confer any right or benefit upon any Person other than Issuer, the Indemnified Parties and Applicant and their respective successors and permitted assigns, and no such Person shall be deemed a third-party beneficiary hereof, except that Applicant's obligations under Sections 5 and 19 may be enforced directly against Applicant by a participant; provided that such enforcement shall not increase the amount of the Obligations.

23. *Modification; No Waiver.* None of the terms of this Agreement may be waived, terminated or amended orally, by course of dealing, or otherwise, except in a writing signed by the party against whose interest the term is waived, terminated or amended; provided that the signature of the undersigned Applicant shall also be binding upon each of its affiliates that at any time is bound by any of the provisions of this Agreement. Forbearance, failure or delay by Issuer in the exercise of a right or remedy shall not constitute a waiver, nor shall any exercise or partial exercise of any right or remedy preclude any further exercise of that or any other right or remedy. Any waiver or consent by Issuer shall be effective only in the specific instance and for the specific purpose for which it is given.

24. *Entire Agreement; Remedies Cumulative.* This Agreement constitutes the entire agreement between the parties hereto concerning the subject matter hereof and supersedes all prior or simultaneous agreements, written or oral, with respect to the subject matter hereof. All rights and remedies of Issuer and all obligations of Applicant under or in connection with this Agreement and any other documents delivered in connection with this Agreement are cumulative and in addition to those provided or available at equity or under any applicable law.

25. *Continuing Agreement; Termination.* This is a continuing agreement and shall remain in full effect until the earlier of (a) receipt by Issuer of written notice of termination from Applicant specifically referring to this Agreement or (b) delivery by Issuer to Applicant of a written notice of termination specifically referring to this Agreement (which notice may be delivered without regard to whether any Event of Default exists). The foregoing notwithstanding, Applicant and Issuer agree that this Agreement shall stay in effect for so long as the Credit remains outstanding and that any termination of this Agreement by Issuer shall have no effect on the Credit if it remains outstanding pursuant to the terms thereof. Termination shall not release Applicant from any liability for Obligations existing on the date of such receipt or delivery of the

termination notice, as applicable, or resulting from or incidental to a Credit issued on or before such date or issued pursuant to any Issuer commitment existing on such date. Upon termination of this Agreement, (i) Applicant shall cease to request the issuance of any further Credit hereunder or any increase or extension of any outstanding Credit hereunder and (ii) Issuer shall have all the rights and remedies provided in Section 18. Provisions of this Agreement relating to Taxes, indemnities, payment of costs and expenses, exculpations and limitations on liability, waivers of immunity, jurisdiction, and waiver of trial by jury shall survive any termination of this Agreement, expiration of the Credit, and irrevocable and final payment of all the Obligations.

26. *Governing Law; Practice; UCP; ISP.*

(a) This Agreement and the rights and obligations of the parties under or in connection with this Agreement shall be governed by and subject to the laws of the State of New York applicable to contracts made and to be performed in such State (including New York General Obligations Law Section 5-1401) and applicable federal laws of the United States of America. In the event that the Credit expressly chooses a state or country law other than the State of New York, Applicant shall be obligated to reimburse Issuer for payments made under the Credit if such payment is justified under New York law or such other law.

(b) Unless Applicant specifies otherwise in its application for the Credit, Issuer at its option may issue the Credit subject to the UCP or the ISP, or such later supplement to or revision of any thereof as is in effect at the time of issuance of the Credit (collectively, the "Practices"). Issuer's rights and remedies under the Practices shall be in addition to, and not in limitation of, those expressly provided herein.

(c) To the extent permitted by applicable law, (i) this Agreement shall prevail in case of conflict with the Practices or the UCC and (ii) the Practices shall prevail in case of conflict between the Practices and the UCC.

27. *Jurisdiction; Service of Process; Enforcement.*

(a) Applicant consents and submits to the non-exclusive jurisdiction of any state or federal court sitting in New York County, in the State of New York, for itself and in respect of any of its property, in any action or proceeding arising under or in connection with the Credit, this Agreement or any other Loan Document. If the law of any jurisdiction other than the State of New York has been chosen to govern the Credit or governs in the absence of an express choice of governing law, Applicant also consents and submits to the non-exclusive jurisdiction of any court sitting in such jurisdiction, in any action or proceeding arising under or in connection with the Credit, this Agreement or any other LC Agreement. Applicant agrees not to bring any action or proceeding against Issuer that arises under or in connection with this Agreement or the Credit in any court or other forum not described in the first sentence of this paragraph. Applicant waives any objection to venue or any claim of forum non conveniens with respect to any action or proceeding in any court described in this paragraph.

(b) Applicant agrees that any service of process may be served upon it by Issuer by mail or hand delivery if sent to the address for notices to Applicant under this Agreement or to the Person designated on the signature page(s) of this Agreement as "Applicant's Authorized Agent," which Person Applicant now designates as its authorized agent for the service of process.

(c) Nothing in this Agreement shall affect Issuer's right to serve process in any other manner permitted by law or to commence legal proceedings or otherwise proceed against Applicant in any other jurisdiction. Applicant agrees that final judgment against it in any action or proceeding shall be enforceable in any other jurisdiction within or outside the United States of America by suit on the judgment, a certified copy of which shall be conclusive evidence of the judgment.

[SIGNATURE PAGE FOLLOWS]

28. *JURY TRIAL WAIVER.* EACH OF APPLICANT AND ISSUER WAIVES ANY RIGHT IT MAY HAVE TO A JURY TRIAL OF ANY CLAIM, COUNTERCLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF THE CREDIT, THIS AGREEMENT, ANY OTHER LC AGREEMENT, OR ANY DEALINGS WITH ONE ANOTHER RELATING TO THE SUBJECT MATTER OF THIS AGREEMENT.

Very truly yours,

Applicant:

Fieldwood Energy LLC
*(Print Name of Applicant)*

By: _Thomas R. Lamme_
   *(Signature of Authorized Signer)*
   Thomas R. Lamme
   *(Print Name of Authorized Signer)*
   Secretary
   *(Title of Authorized Signer)*

Address for notices, etc. to Applicant:
Fieldwood Energy LLC
2000 W. Sam Houston Parkway S., Suite 1200
Houston, Texas 77042
Attention: Richard D. Black, Sr. Vice President and General Counsel
Telephone number: (713) 969-1108
Fax number: (713) 969-1099

Applicant's jurisdiction of organization, organization type & organizational number *(if applicable)*:
Delaware limited liability company

Applicant's Social Security or Federal tax identification number *(if applicable)*: 46-1326778

Applicant's Authorized Agent (for service of process per Section 27(b)):

Print Name: _____

Complete Address: _____
                 *(which must be in the State of New York)*

ACCEPTED AND AGREED TO:

DEUTSCHE BANK AG
NEW YORK BRANCH

By: _____
Name: Jack Leong
Title: Director

By: _____
Name: Anthony F. Calabrese
Title: Director

3252465v4 072529.0426

SCHEDULE I to Continuing Agreement for Standby Letters of Credit dated January 4, 2016 made by Fieldwood Energy LLC in favor of Deutsche Bank AG New York Branch

## SUBSIDIARY ACCOUNT PARTIES

Listed below are the initial Subsidiary Account Parties proposed by Applicant. Unless Issuer accepts and agrees to such Subsidiary Account Parties by signing below in its sole discretion, the list below shall be deemed to indicate "None."

| Exact Legal Name of Subsidiary Account Party | Jurisdiction and Type of Organization |
|---|---|
|  |  |
|  |  |
|  |  |
|  |  |

Applicant may from time to time propose additional Subsidiary Account Parties on a supplement to this Schedule I, but they shall not become Subsidiary Account Parties without the written approval of Issuer in its sole discretion.

Dated as of January 4, 2016.

FIELDWOOD ENERGY LLC
(*Print Name of Applicant*)

By: *Thomas R. Lamme*
Name: Thomas R. Lamme
Title: Secretary

ACCEPTED AND AGREED TO:

DEUTSCHE BANK AG
NEW YORK BRANCH

By: _____
Name:
Title:

By: _____
Name:
Title:

3252465v4 072529.0426