*Hold until we get approved from other Co-owners*

*10-1-76*

## AMENDMENT TO OPERATING AGREEMENT

Block A-489, High Island Area,
South Addition
Offshore Texas

THIS AGREEMENT, made and entered into as of the 27th day of April, 1976, by and between AMERADA HESS CORPORATION, AMOCO PRODUCTION COMPANY, BURMAH OIL DEVELOPMENT, INC., CANADIAN OCCIDENTAL OF CALIFORNIA, INC., DECALTA INTERNATIONAL CORPORATION, MARATHON OIL COMPANY, MESA PETROLEUM CO., OXY PETROLEUM, INC., PENNZOIL LOUISIANA AND TEXAS OFFSHORE, INC., and PENNZOIL OFFSHORE GAS OPERATORS, INC., referred to collectively herein as "Parties" or individually as "Party";

W I T N E S S E T H:

WHEREAS, the Parties have entered into that certain Operating Agreement dated and effective as of August 1, 1973, relating to the exploration, development and operation of that certain Oil and Gas Lease bearing Serial No. OCS G-2372, covering all of Block A-489, High Island Area, South Addition, Offshore Texas; and

WHEREAS, it is the desire of the Parties to amend, in accordance with the provisions hereof, the Accounting Procedure for Joint Operations attached to said Operating Agreement as Exhibit "A" in order to reflect the method of charging of third party engineering and design costs and major construction overhead;

NOW, THEREFORE, in consideration of the premises, the Parties agree as follows:

1. As to the interests of all Parties except Amoco Production Company and Burmah Oil Development, Inc.:

   a. Page 2 of Exhibit "A" (Accounting Procedure) is deleted in its entirety and there is substituted therefor the page 2 attached hereto identified as "Corrected Page 2."

**FMOG EXHIBIT 2**

b. Page 5 of Exhibit "A" (Accounting Procedure) is
deleted in its entirety and there is substituted
therefor the page 5 attached hereto identified as
"Corrected Page 5."

2. As to the interests of Amoco Production Company and
Burmah Oil Development, Inc., the Operating Agreement
shall not be amended by the instrument.

Except as herein amended, the Operating Agreement for Block A-489
High Island Area, South Addition, Offshore Texas, dated August 1, 1973,
shall continue in full force and effect.

This Agreement may be executed in any number of counter-
parts, and each such counterpart so executed shall have the same force
and effect as an original instrument and as if all of the Parties to
the aggregate counterparts had signed the same document.

EXECUTED as of the 27th day of April, 1976.

AMERADA HESS CORPORATION

By _____

AMOCO PRODUCTION COMPANY

By _____

BURMAH OIL DEVELOPMENT, INC.

By _____

CANADIAN OCCIDENTAL OF CALIFORNIA, INC.

By _____

DECALTA INTERNATIONAL CORPORATION

By _____

MARATHON OIL COMPANY

By _____

- 2 -

MESA PETROLEUM CO.

By_____

OXY PETROLEUM, INC.

By_____

PENNZOIL LOUISIANA AND TEXAS OFFSHORE, INC.

By _W.B. Phillips_____

PENNZOIL OFFSHORE GAS OPERATORS, INC.

By _W.B. Phillips_____

CORRECTED PAGE 2

## II. DIRECT CHARGES

Operator shall charge the Joint Account with the following items:

1. **Rentals and Royalties**

   Lease rentals and royalties paid by Operator for the Joint Operations.

2. **Labor**

   A. (1) Salaries and wages of any of Operator's employees directly employed on the Joint Property in the conduct of the Joint Operations. (Salaries and wages of employees who visit the Joint Property as observers will not be charged to the Joint Account.)

   (2) Salaries of first-level supervisors in the field including, but not by way of limitation, drilling, foremen, drilling engineers and platform construction inspectors at construction site.

   (3) Salaries and wages of technical employees temporarily assigned to and directly employed on the Joint Property as to such time as such employees are so engaged.

   (4) Salary of Material Expediter.

   (5) Actual salaries, wages and office expenses of Operator's Marine Division Exploration office employees either temporarily or permanently assigned to and directly employed in the operation of the Joint Property as to such time as such employees are so engaged.

   B. Operator's cost of holiday, vacation, sickness and disability benefits and other customary allowances paid to the employees whose salaries and wages are chargeable to the Joint Account under Paragraph 2A of this Section II and Paragraph 1A of Section III; except that in the case of those employees only a pro rata portion of whose salaries and wages are chargeable to the Joint Account under Paragraph 1A of Section III, not more than the same pro rata portion of the benefits and allowances herein provided for shall be charged to the Joint Account. Cost under this Paragraph 2B may be charged on a "when and as paid basis" or by "percentage assessment" on the amount of salaries and wages chargeable to the Joint Account under Paragraph 2A of this Section II and Paragraph 1A of Section III. If percentage assessment is used, the rate shall be based on the Operator's cost experience.

   C. Expenditures or contributions made pursuant to assessments imposed by governmental authority which are applicable to Operator's labor cost of salaries and wages chargeable to the Joint Account under Paragraphs 2A and 2B of this Section II and Paragraph 1A of Section III.

   D. Reasonable personal expenses of those employees whose salaries and wages are chargeable to the Joint Account under Paragraph 2A of this Section II and for which expenses the employees are reimbursed under Operator's usual practice.

3. **Employee Benefits**

   Operator's current cost of established plans for employees' group life insurance, hospitalization, pension, retirement, stock purchase, thrift, bonus, and other benefit plans of a like nature, applicable to Operator's labor cost chargeable to the Joint Account under Paragraphs 2A and 2B of this Section II and Paragraph 1A of Section III shall be chargeable as indicated in the subparagraph selected below:

   A. [ ] Operator's actual cost.                    twenty

   B. [X] Operator's actual cost not to exceed fifteen per cent (20%).

4. **Material**

   Material purchased or furnished by Operator for use on the Joint Property as provided under Section IV. So far as it is reasonably practical and consistent with efficient and economical operation, only such Material shall be purchased for or transferred to the Joint Property as may be required for immediate use; and the accumulation of surplus stocks shall be avoided.

5. **Transportation**

   Transportation of employees and Material necessary for the Joint Operations but subject to the following limitations:

   A. If Material is moved to the Joint Property from the Operator's warehouse or other properties, no charge shall be made to the Joint Account for a distance greater than the distance from the nearest reliable supply store, recognized barge terminal, or railway receiving point where like material is normally available, unless agreed to by Operator and Non-Operators.

   B. If surplus Material is moved to Operator's warehouse or other storage point, no charge shall be made to the Joint Account for a distance greater than the distance to the nearest reliable supply store, recognized barge terminal, or railway receiving point unless agreed to by Operators and Non-Operators. No charge shall be made to the Joint Account for moving Material to other properties belonging to Operator, unless agreed to by Operator and Non-Operators.

   C. In the application of Subparagraphs A and B above, there shall be no equalization of actual gross trucking costs of $100 or less.

6. **Services**

   A. The cost of contract services and utilities procured from outside sources other than services covered by Paragraph 8 of this Section II and Paragraph 1B of Section III. The cost of professional consultant services shall not be charged to the Joint Account unless agreed to by Operator and Non-Operators; except that, it *

   B. Use and service of equipment and facilities furnished by Operator as provided in Paragraph 5 of Section IV.

7. **Damages and Losses to Joint Property**

   All costs or expenses necessary for the repair or replacement of Joint Property made necessary because of damages or losses incurred by fire, flood, storm, theft, accident, or other cause, except to the extent that the damage or loss could have been avoided through the exercise of reasonable diligence on the part of Operator. Operator shall furnish Non-Operators written notice of damages or losses incurred as soon as practicable after a report thereof has been received by Operator.

8. **Legal Expense**

   All costs and expenses of handling, investigating, and settling litigation or claims arising by reason of the Joint Operations or necessary to protect or recover the Joint Property, including, but not limited to, attorney's fees, court costs, cost of investigation or procuring evidence and amounts paid in settlement or satisfaction of any such litigation or claims; provided, (a) no charge shall be made for the services of Operator's legal staff or other regularly employed personnel (such services being considered to be Administrative Overhead under Section III), unless agreed to by Operator and Non-Operators, and (b) no charge shall be made for the fees and expenses of outside attorneys unless the employment of such attorneys is agreed to by Operator and Non-Operators.

9. **Taxes**

   All taxes of every kind and nature assessed or levied upon or in connection with the Joint Property, the operation thereof, or the production therefrom, and which taxes have been paid by the Operator for the benefit of the Parties.

* is agreed that third party professional services for the design and engineering of drilling and production platforms and production equipment can be charged direct to the joint account
CORRECTED PAGE 2

CORRECTED PAGE 5

and producing operations, Operator in addition to the Administrative Overhead or Combined Rates provided for in Paragraph 1, 2 or 3 of this Section III shall either negotiate a rate prior to beginning of construction or shall charge the Joint Account with an additional overhead charge as follows:

A. Total cost less than $25,000, no charge.

B. Total cost more than $25,000, but less than $100,000, _____ 4 _____ % of total cost.

C. Total cost of $100,000 or more, _____ 4 _____ % of the first $100,000 plus _____ 2 _____ % of all over $100,000 of ////////. up to $1,000,000 plus 1-1/2% of the total cost over $1,000,000, or when *

Total cost shall mean the total gross cost of any one project. For the purpose of this paragraph the component parts of a single project shall not be treated separately and the cost of drilling wells shall be excluded.

7. Amendment of Rates

The specific rates provided for in this Section III may be amended from time to time by mutual agreement between the Parties hereto if, in practice, the rates are found to be insufficient or excessive.

## IV. BASIS OF CHARGES TO JOINT ACCOUNT

Subject to the further provisions of this Section IV, Operator will procure all Material and services for the Joint Property. At the Operator's option, Non-Operators may supply Material or services for the Joint Property.

1. Purchases

Material purchased and service procured shall be charged at the price paid by Operator after deduction of all discounts actually received.

2. Material furnished from Operator's Warehouse or Other Properties

A. New Material (Condition "A")

(1) Tubular goods, except line pipe, shall be priced on a maximum carload and/or barge load weight basis regardless of quantity transferred and equalized to the lowest prevailing price f.o.b. railway receiving point or recognized barge terminal nearest the Joint Property where such Material is normally available effective at date of transfer.

(2) Line pipe shall be priced at the current replacement cost effective at date of transfer from a reliable supply store nearest the Joint Property where such Material is normally available if the movement is less than 30,000 pounds. If the movement is 30,000 pounds or more, it shall be priced on the same basis as casing and tubing under Subparagraph (1) of this paragraph.

(3) When the Operator has equalized actual hauling costs as provided for in Paragraph 5 of Section II, Operator is permitted to include ten cents (10¢) per hundred-weight on all tubular goods furnished from his stocks in lieu of loading and unloading costs sustained.

(4) Other Material shall be priced at the current replacement cost of the same kind of Material, effective at date of movement and f.o.b. the supply store or railway receiving point nearest the Joint Property where Material of the same kind is normally available.

(5) The Joint Account shall not be credited with cash discounts applicable to prices provided for in this Paragraph 2 of Section IV.

B. Used Material (Condition "B" and "C")

(1) Material in sound and serviceable condition and suitable for reuse without reconditioning, shall be classified as Condition "B" and priced at seventy-five per cent (75%) of the current price of new Material.

(2) Material which is not suitable for its original function until after reconditioning shall be furnished to the Joint Account under one of the two methods defined below:

(a) Classified as Condition "B" and priced at seventy-five per cent (75%) of the current price of new Material. The cost of reconditioning shall be absorbed by the Operator of the transferring property.

(b) Classified as Condition "C" and priced at fifty per cent (50%) of current price of new Material. The cost of reconditioning also shall be charged to the receiving property, provided Condition "C" value, plus cost of reconditioning, does not exceed Condition "B" value.

(3) Obsolete Material or Material which cannot be classified as Condition "B" or Condition "C" shall be priced at a value commensurate with its use. Material no longer suitable for its original purpose but usable for some other purpose, shall be priced on a basis comparable with that of items normally used for such other purpose.

(4) Material involving erection costs shall be charged at applicable percentage of the current knocked-down price of new Material.

3. Premium Prices

Whenever Material is not readily obtainable at prices specified in Paragraphs 1 and 2 of this Section IV because of national emergencies, strikes or other unusual causes over which the Operator has no control, the Operator may charge the Joint Account for the required Material at the Operator's actual cost incurred in procuring such Material, in making it suitable for use, and in moving it to the Joint Property, provided, that notice in writing is furnished to Non-Operators of the proposed charge prior to billing Non-Operators for such Material. Each Non-Operator shall have the right, by so electing and notifying Operator within 10 days after receiving notice from Operator, to furnish in kind all or part of his share of such Material suitable for use and acceptable to Operator.

4. Warranty of Material Furnished by Operator

Operator does not warrant the Material furnished. In case of defective Material, credit shall not be passed to the Joint Account until adjustment has been received by Operator from the manufacturers or their agents.

5. Equipment and Facilities Furnished by Operator

A. Operator shall charge the Joint Account for use of equipment and facilities at rates commensurate with cost of ownership and operation. Such rates shall include cost of maintenance, repairs, other operating expense, insurance, taxes, depreciation, and interest on investment not to exceed six per cent (6%) per annum, provided such rates shall not exceed those currently prevailing in the immediate area within which the Joint Property is located. In lieu of rates based on costs of ownership and operation of equipment, other than automotive, Operator may elect to use commercial rates prevailing in the area of the Joint Property less 20%; for automotive equipment, rates as published by the Petroleum Motor Transport Association may be used. Rates for laboratory services, shall not exceed those currently prevailing if performed in

* the design and engineering of drilling and production platforms and production equipment is performed by third party professional services and charged direct to the joint account, the construction overhead charge will be one and one-half percent (1 1/2%) of total cost.

AMENDMENT TO OPERATING AGREEMENT
## BLOCK A-489, HIGH ISLAND AREA, SOUTH ADDITION
OFFSHORE TEXAS

THIS AMENDMENT, made and entered into as of the 19th day of April, 1976, by and between PENNZOIL OFFSHORE GAS OPERATORS, INC., PENNZOIL LOUISIANA AND TEXAS OFFSHORE, INC., AMERADA HESS CORPORATION, AMOCO PRODUCTION COMPANY, BURMAH OIL DEVELOPMENT, INC., CANADIAN OCCIDENTAL OF CALIFORNIA, INC., DECALTA INTERNATIONAL CORPORATION, MARATHON OIL COMPANY, MESA PETROLEUM CO., and OXY PETROLEUM, INC.:

W I T N E S S E T H:

WHEREAS, as a result of the Federal Oil and Gas Lease Sale held June 19, 1973, the parties hereto acquired undivided interests in and to that certain lease, identified as Lease Serial No. OCS G-2372, between the United States of America, as Lessor, and Pennzoil Offshore Gas Operators, Inc., et al., as Lessee, entered into and effective as of August 1, 1973, covering all of Block A-489, High Island Area, South Addition, Offshore Texas, containing approximately 5,760 acres more or less;

WHEREAS, Pennzoil Offshore Gas Operators, Inc., Pennzoil Louisiana and Texas Offshore, Inc., Amerada Hess Corporation, Amoco Production Company, Burmah Oil Development, Inc., Canadian Occidental of California, Inc., Decalta International Corporation, Marathon Oil Company, Mesa Petroleum Co., and Oxy Petroleum, Inc. are parties to that certain Operating Agreement dated the 1st day of August, 1973, pertaining to the conduct of operations on Block A-489, High Island Area, South Addition, Offshore Texas ("the Operating Agreement"); and

WHEREAS, the parties hereto desire to amend the Operating Agreement as set forth herein;

NOW, THEREFORE, in consideration of the premises and of the covenants and agreements herein contained to be kept and performed by each of the Parties respectively, the Parties agree as follows:

(1) The following typed paragraph shall be deleted from Section III, Paragraph 2., of Exhibit "A", Accounting Procedure, attached to the Operating Agreement:

"The above Combined Fixed Rates include the costs
and expenses attributable to the Joint Lease of
the Intracoastal City Marine Base and shall be
effective until such base is no longer practical
to use.  In the event a new marine base is neces-
sary to serve the Joint Lease, the costs and ex-
penses thereof shall be properly documented and
shall be a direct charge to the Joint Account, and
the Combined Fixed Rates in effect shall be re-
viewed at that time."

(2) The following paragraph shall be added to Section III,
Paragraph 2., of Exhibit "A", Accounting Procedure, attached to
the Operating Agreement:

Notwithstanding any conflicting provision(s) of
Schedule I hereto, effective July 1, 1975, Operator
shall charge to the Joint Account the direct expenses
involved in operating and maintaining its Galveston
Marine Base.  Such charges will be allocated to the
leases served on a well count basis.  A drilling
well will be counted as ten (10) producing wells,
a service or satellite platform having no well on
it will receive an allocation equivalent to one
(1) producing well (beginning when the platform
arrives on location), and producing platforms with
all wells shut in or abandoned shall receive a
one (1) well allocation.  Such direct expenses
shall include, but not be limited to salaries,
wages, expenses, and labor burdens of employees
directly engaged on the Base, transportation ex-
penses, office and bunkroom supplies, equipment
rental, communications expenses, utility expenses,
operational and maintenance expenses such as jani-
torial services and rental in lieu of investment.

(3) A rental in lieu of investment, as the phrase is used
herein, shall be based upon depreciation plus six percent (6%)

-- 2 --

interest on investment, taxes, insurance and investment mainte-
nance.  This rental shall be $19,923 per month as shown on
Exhibit "I" attached hereto and made a part hereof.  Such rate
may be adjusted from time to time by mutual consent of the par-
ties hereto at such time as Operator determines said rate to be
inadequate or excessive.

(4) This Amendment may be executed in any number of
counterparts, and each counterpart so executed shall have the
same force and effect as an original instrument and as if all
of the parties to the aggregate counterparts had signed the
same instrument.  Failure of any party to execute this Agreement
shall not render it ineffective as to any party hereto who does
execute same.

IN WITNESS WHEREOF, the parties hereto have signed, executed
and delivered this Agreement as of the date first hereinabove
written.

WITNESSES:                      PENNZOIL OFFSHORE GAS OPERATORS, INC.

_Lanelle Hayes_
_Gay Blosser_                   By: _W. J. B. Phillips_ _____

                                PENNZOIL LOUISIANA AND TEXAS OFFSHORE, INC.

_Lanelle Hayes_
_Gay Blosser_                   By: _W. J. B. Phillips_ _____

                                MESA PETROLEUM CO.


_____       By: _____

                                BURMAH OIL DEVELOPMENT, INC.


_____       By: _____

                                CANADIAN OCCIDENTAL OF CALIFORNIA, INC.


_____       By: _____

WITNESSES:                         OXY PETROLEUM, INC.

_____

_____            By:_____


                                   MARATHON OIL COMPANY

_____

_____            By:_____


                                   AMERADA HESS CORPORATION

_____

_____            By:_____


                                   DECALTA INTERNATIONAL CORPORATION

_____
                    Secretary
                                   By:_____
_____                                    Vice-President


                                   AMOCO PRODUCTION COMPANY

_____

_____            By:_____

-- 4 --

EXHIBIT "I"

## GALVESTON BASE MONTHLY RENTAL

| | Investment | Amount to Depreciate | Depreciation Cost/Month (240) Months) | Interest (6%) Exp/Month | Monthly Interest Exp & Depreciation | Monthly Ins. Expense | Monthly Tax Expense | Monthly Maintenance Expense | Total Rental |
|---|---|---|---|---|---|---|---|---|---|
| Land | $ 188,151 | | | $ 941 | $ 941 | -0- | -0- | -0- | |
| Boat Slip & Other Improvements | $1,650,636 | $1,650,636 | $6,878 | $4,127 | $11,005 | -0- | -0- | -0- | |
| Buildings & Other Improvements | $ 708,756 | $ 708,756 | $2,953 | $1,772 | $ 4,725 | $213 | -0- | -0- | |
| Total | | | | | $16,671 | $213 | $680 | $2,359 | $19,923 |

AMENDMENT TO OPERATING AGREEMENT
BLOCK A-489, HIGH ISLAND AREA, SOUTH ADDITION
OFFSHORE TEXAS

THIS AMENDMENT, made and entered into as of this 30th day of April, 1974, by and between PENNZOIL OFFSHORE GAS OPERATORS, INC., PENNZOIL LOUISIANA AND TEXAS OFFSHORE, INC., AMERADA HESS CORPORATION, AMOCO PRODUCTION COMPANY, BURMAH OIL DEVELOPMENT, INC., CANADIAN OCCIDENTAL OF CALIFORNIA, INC., DECALTA INTERNATIONAL CORPORATION, MARATHON OIL COMPANY, MESA PETROLEUM CO., and OCCIDENTAL PETROLEUM CORPORATION:

W I T N E S S E T H:

WHEREAS, as a result of the Federal Oil and Gas Lease Sale held June 19, 1973, the parties hereto acquired undivided interests, in and to that certain lease, identified as Lease Serial No. OCS G-2372, between the United States of America, as the Lessor and Pennzoil Offshore Gas Operators, Inc., et al, as Lessee, entered into and effective as of August 1, 1973, covering all of Block A-489, High Island Area, South Addition, Offshore Texas, containing approximately 5,760 acres more or less ("the lease");

WHEREAS, Pennzoil Offshore Gas Operators, Inc., Pennzoil Louisiana and Texas Offshore, Inc., Amerada Hess Corporation, Amoco Production Company, Burmah Oil Development, Inc., Canadian Occidental of California, Inc., Decalta International Corporation, Marathon Oil Company, Mesa Petroleum Co., and Occidental Petroleum Corporation are parties to that certain Operating Agreement dated the 1st day of August, 1973, pertaining to the conduct of operations on Block A-489, High Island Area, South Addition, Offshore Texas ("the Operating Agreement"); and

WHEREAS, the parties hereto desire to amend Article XIV - DRILLING, DEVELOPMENT AND PLATFORMS, Section E, Subparagraph 2. Non-Consent Operations, Page 32 and to adopt the terms of Article XIV, Section E, Subparagraph 2, Page 32 attached hereto as Exhibit "A".

NOW, THEREFORE, in consideration of the premises and of the covenants and agreements herein contained to be kept and performed by each of the parties hereto respectively, the parties agree as follows:

(1)  The parties hereto substitute Article XIV, Section E, Subparagraph 2, Page 32 attached hereto as Exhibit "A" to be used to clarify the method of cost recovery under certain non-consent operations.

This Agreement may be executed in any number of counterparts, and each counterpart so executed shall have the same force and effect as an original instrument and as if all of the parties to the aggregate counterparts had signed the same document.

IN WITNESS WHEREOF, the parties hereto have signed, executed and delivered this Agreement as of the date first hereinabove written.

WITNESSES:

PENNZOIL COMPANY

By: _____

PENNZOIL OFFSHORE GAS OPERATORS, INC.

By: _____

PENNZOIL LOUISIANA AND TEXAS OFFSHORE, INC.

By: _____

AMERADA HESS CORPORATION

By: _____

- 2 -

NOW, THEREFORE, in consideration of the premises and of the covenants and agreements herein contained to be kept and performed by each of the parties hereto respectively, the parties agree as follows:

(1)  The parties hereto substitute Article XIV, Section E, Subparagraph 2, Page 32 attached hereto as Exhibit "A" to be used to clarify the method of cost recovery under certain non-consent operations.

This Agreement may be executed in any number of counterparts, and each counterpart so executed shall have the same force and effect as an original instrument and as if all of the parties to the aggregate counterparts had signed the same document.

IN WITNESS WHEREOF, the parties hereto have signed, executed and delivered this Agreement as of the date first hereinabove written.

WITNESSES:

PENNZOIL COMPANY

_____

_____          By: _____

PENNZOIL OFFSHORE GAS OPERATORS, INC.

_____

_____          By: _____

PENNZOIL LOUISIANA AND TEXAS OFFSHORE, INC.

_____

_____          By: _____

AMERADA HESS CORPORATION

_____

_____          By: _____

AMOCO PRODUCTION COMPANY

By: _____

BURMAH OIL DEVELOPMENT, INC.

By: _____

CANADIAN OCCIDENTAL OF CALIFORNIA, INC.

By: _____

DECALTA INTERNATIONAL CORPORATION

By: _____

MARATHON OIL COMPANY

By: _____

MESA PETROLEUM CO.

By: _____

OCCIDENTAL PETROLEUM CORPORATION

By: _____

- 3 -

AMOCO PRODUCTION COMPANY

By: _____

BURMAH OIL DEVELOPMENT, INC.

By: _____

CANADIAN OCCIDENTAL OF CALIFORNIA, INC.

By: _____

DECALTA INTERNATIONAL CORPORATION

By: _____

## MARATHON OIL COMPANY

By: _____

MESA PETROLEUM CO.

By: _____

OCCIDENTAL PETROLEUM CORPORATION

By: _____

- 3 -

AMOCO PRODUCTION COMPANY

By: _____

BURMAH OIL DEVELOPMENT, INC.

By: _____

CANADIAN OCCIDENTAL OF CALIFORNIA, INC.

By: _____
          PRESIDENT

DECALTA INTERNATIONAL CORPORATION

By: _____

MARATHON OIL COMPANY

By: _____

MESA PETROLEUM CO.

By: _____

OCCIDENTAL PETROLEUM CORPORATION

By: _____
          ATTORNEY IN FACT

- 3 -

AMOCO PRODUCTION COMPANY

By: _____

BURMAH OIL DEVELOPMENT, INC.

By: _____

CANADIAN OCCIDENTAL OF CALIFORNIA, INC.

By: _____

ATTEST:

DECALTA INTERNATIONAL CORPORATION

By: _____
                              Vice President

MARATHON OIL COMPANY

By: _____

MESA PETROLEUM CO.

By: _____

OCCIDENTAL PETROLEUM CORPORATION

By: _____

- 3 -

AMOCO PRODUCTION COMPANY

By: _____

BURMAH OIL DEVELOPMENT, INC.

By: _____

CANADIAN OCCIDENTAL OF CALIFORNIA, INC.

By: _____

DECALTA INTERNATIONAL CORPORATION

By: _____

MARATHON OIL COMPANY

By: _____

MESA PETROLEUM CO.

By: _____

OCCIDENTAL PETROLEUM CORPORATION

By: _____

- 3 -

AMOCO PRODUCTION COMPANY

By: _____

BURMAH OIL DEVELOPMENT, INC.

By: _____

CANADIAN OCCIDENTAL OF CALIFORNIA, INC.

By: _____

DECALTA INTERNATIONAL CORPORATION

By: _____

MARATHON OIL COMPANY

By: _____

MESA PETROLEUM CO.

By: _____
VICE PRESIDENT

OCCIDENTAL PETROLEUM CORPORATION

By: _____

- 3 -

EXHIBIT "A"
ARTICLE XIV - DRILLING, DEVELOPMENT AND PLATFORMS

cost and risk of conducting such operations shall be borne by the Parties participating in the operation ("Consenting Parties") in the proportions in which the Consenting Parties agree to participate.  Consenting Parties shall keep the leasehold estates involved in the operations free and clear of all liens and encumbrances of every kind created by or arising from the operations of the Consenting Parties.  If the operation results in a dry hole, the plugging and abandoning of the well shall be at the sole cost, risk and expense of the Consenting Parties.  If any well drilled, sidetracked, reworked, deepened, or plugged back under the provisions of this paragraph 2. results in a Commercially Productive Well, the well shall be completed and equipped to produce at the Consenting Parties' sole cost and risk, and the well shall be operated by Operator at the expense and for the account of the Consenting Parties.  With respect to such operation, each Party which elected not to participate in the operation ("Non-Consenting Party") shall be deemed to have relinquished to the Consenting Parties, and the Consenting Parties shall own and be entitled to receive in the proportions in which they participated in such Development Well, free and clear of all liens and encumbrances except the lien provided for herein, all of the Non-Consenting Parties' interest in the well, the leasehold operating rights in the well, and the production therefrom until Payout.  For the purposes of this Section E. Payout shall mean the point in time at which the proceeds from the Non-Consenting Party's share of the production from such Development Well (or in the event a Consenting Party uses the production for its own purposes, the market value of the production at the wellhead), after deducting taxes and royalty applicable thereto, shall equal the total of the following costs related to such well:

(a)  200% of each Non-Consenting Party's share of the cost of any equipment used beyond the wellhead connections (including, but not limited to, stock tanks, field separators, treaters, pumping equipment and piping), which would have been incurred by the Non-Consenting Party had it participated in that well, the total costs of such equipment to be allocated proportionately among all wells being served thereby, plus 100% of the platform rental and of each Non-Consenting Party's share of the cost of operation of the

- 32 -

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

<u>O P E R A T I N G   A G R E E M E N T</u>

<u>B L O C K   A - 4 8 9   H I G H   I S L A N D   A R E A</u>

<u>S O U T H   A D D I T I O N</u>

<u>O F F S H O R E   T E X A S</u>

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

EXECUTION COPY

# OPERATING AGREEMENT

## TABLE OF CONTENTS

| ARTICLE | SUBJECT | PAGE |
|---------|---------|------|
| I | DEFINITIONS | 1 - 2 |
| II | OPERATOR | 2 - 3 |
| III | TERM, DURATION AND EFFECTIVE DATE | 3 |
| IV | PERCENTAGE INTEREST AND VOTING INTEREST | 3 |
| V | COSTS AND EXPENSES AND DRILLING CHARGES | 4 - 5 |
| VI | LIEN ON INTEREST OF DELINQUENT NON-OPERATORS | 5 - 7 |
| VII | ACCOUNTING PROCEDURE | 7 |
| VIII | INSURANCE | 7 - 11 |
| IX | AD VALOREM TAXES | 11 |
| X | LOGS AND REPORTS | 11 - 13 |
| XI | RENTALS AND PAYMENTS | 13 |
| XII | ROYALTY, OVERRIDING ROYALTY AND OTHER PAYMENTS | 13 - 14 |
| XIII | DISPOSAL OF PRODUCTION | 14 - 15 |
| XIV | DRILLING, DEVELOPMENT & PLATFORMS | 15 - 41 |
| XV | ABANDONMENT OF WELLS | 41 - 42 |
| XVI | TITLES AND FAILURE OF TITLE | 42 |
| XVII | CONTRIBUTIONS FROM OTHERS | 43 |
| XVIII | WITHDRAWAL OF A PARTY | 43 - 44 |
| XIX | RESIGNATION OR CHANGE OF OPERATOR | 44 - 45 |
| XX | PARTIES TO WHOM CONTRACT APPLIES | 45 |
| XXI | RELATION OF PARTIES | 45 - 46 |
| XXII | FORCE MAJEURE | 46 - 47 |
| XXIII | LAWS AND REGULATIONS | 47 |
| XXIV | DISPUTES | 47 |
| XXV | CLAIMS AND LAWSUITS | 48 - 49 |
| XXVI | SALES OF INTERESTS | 49 |
| XXVII | NOTICES | 50 - 51 |
| XXVIII | MISCELLANEOUS | 51 |
| XXIX | EXECUTION IN COUNTERPART | 51 - 52 |

<u>Table of Contents Continued</u>

RATIFICATION OF OPERATING AGREEMENT
AND ACCEPTANCE OF DESIGNATION OF
OPERATOR

EXHIBITS:
"A" ACCOUNTING PROCEDURE WITH SCHEDULE I

"B" NON-DISCRIMINATION PROVISIONS

OPERATING AGREEMENT

BLOCK A-489, HIGH ISLAND AREA, SOUTH ADDITION

OFFSHORE TEXAS

THIS AGREEMENT, made and entered into as of the 1st day of
August, 1973, by and between AMERADA HESS CORPORATION, AMOCO PRODUCTION
COMPANY, BURMAH OIL DEVELOPMENT, INC., CANADIAN OCCIDENTAL OF CALIFORNIA,
INC., DECALTA INTERNATIONAL CORPORATION, MARATHON OIL COMPANY, MESA
PETROLEUM CO., OCCIDENTAL PETROLEUM CORPORATION, PENNZOIL LOUISIANA
AND TEXAS OFFSHORE, INC., and PENNZOIL OFFSHORE GAS OPERATORS, INC.,
referred to collectively herein as "Parties" or individually as
"Party";

W I T N E S S E T H:

WHEREAS, the Parties are the owners of that certain Oil and
Gas Lease granted by the United States of America, as Lessor, effective
as of August 1, 1973, bearing Serial No. OCS G-2372, covering all of
Block A-489, High Island Area, South Addition, Offshore Texas, as
shown on Official Leasing Map, Texas Map No. 7B, containing approxi-
mately 5,760 acres, more or less; and

WHEREAS, the Parties desire to enter into this Agreement for
the purposes of exploring, developing, producing from and operating
such lease, and to designate herein a party to operate said Oil and
Gas Lease for the account of the Parties.

NOW, THEREFORE, in consideration of the premises and of the
covenants and agreements herein contained to be kept and performed by
each of the Parties respectively, the Parties agree as follows:

ARTICLE I - DEFINITIONS

For the purposes of this Agreement, the following terms and
expressions as herein used are defined:

1. OPERATOR - Operator shall mean the entity designated in
this Agreement to conduct the exploration, development and

operation of the Joint Lease for the account of the Parties or the successor Operator designated as hereinafter provided in Article XIX.

2. **NON-OPERATORS** - Non-Operators shall mean those Parties not designated as Operator.

3. **OIL AND GAS** - The phrase Oil and Gas shall mean oil, gas, casinghead gas, gas condensate and all other liquid or gaseous hydrocarbons (or any one of them) in, on and under and that may be produced from the Joint Lease.

4. **JOINT LEASE** - Joint Lease shall mean the hereinabove described Oil and Gas Lease.

5. **JOINT ACCOUNT** - Joint Account shall mean the account of the Parties which is shared in proportion to each Party's respective Percentage Interest in the Joint Lease.

### ARTICLE II - OPERATOR

The Parties shall exercise overall supervision and control over all matters pertaining to joint operations pursuant to this Agreement. In the exercise of such authority each Party shall act solely in its own behalf and not in behalf of the Parties as an entirety.

Pennzoil Company is hereby designated as Operator to conduct all operations on the Joint Lease for the account of the Parties. All such operations shall be conducted in a careful, diligent, prudent and workmanlike manner and subject to the conditions and limitations herein set forth; provided, however, that Operator shall be required only to exercise the care and diligence of a reasonably prudent Operator and shall not be liable to Non-Operators for any failure to perform, or for any delay in the performance of its obligations hereunder, unless such failure or delay is attributable to Operator's willful misconduct or gross negligence. Except as hereinafter provided, Operator shall have the exclusive charge, control, supervision and management of all operations of every kind conducted and to be conducted on the Joint Lease for exploring for, developing, gathering, treating, handling, taking care of and saving Oil and Gas.

- 2 -

Operator shall select employees, and shall determine their number, the hours of labor and compensation for services performed. All employees shall be the employees of the Operator.

## ARTICLE III - TERM, DURATION AND EFFECTIVE DATE

Unless sooner terminated by the mutual consent of the Parties, this Agreement shall be effective from the date hereof and shall remain in full force and effect so long as the Joint Lease shall remain in force and effect; provided, however, that this Agreement shall not terminate until all materials, tools, machinery, appliances, structures and equipment used in connection with operations on the Joint Lease shall have been salvaged or otherwise disposed of and a final settlement by the Parties shall have been made.

## ARTICLE IV - PERCENTAGE INTEREST AND VOTING INTEREST

Except as hereinafter provided, all costs and expenses incurred hereunder shall be shared, all equipment installed on the Joint Lease shall be owned, and all Oil and Gas produced and saved hereunder shall be owned by the Parties in the following percentages:

| NAME | PERCENTAGE INTEREST |
|---|---|
| Pennzoil Louisiana and Texas Offshore, Inc. | 15.00% |
| Pennzoil Offshore Gas Operators, Inc. | 3.00% |
| Burmah Oil Development, Inc. | 30.00% - PPLO |
| Mesa Petroleum Co. | 15.00% |
| Amoco Production Company | 12.00% |
| Marathon Oil Company | 8.50% — to PPLO |
| Amerada Hess Corporation - Freeport | 8.50% |
| Canadian Occidental of California, Inc. | 5.50% |
| Decalta International Corporation | 1.80% |
| Occidental Petroleum Corporation | 0.70% |

Each Party shall have a "Voting Interest" equal to its Percentage Interest as shown above. Should the Percentage Interest change at any time this Article IV shall automatically be amended to reflect such change. Except as otherwise provided herein, all matters shall be decided by an affirmative vote of at least three (3) Parties jointly owning at least 51.0% Voting Interest; provided, however, that amendment of the Agreement shall require mutual consent of the Parties.

- 3 -

## ARTICLE V - COSTS AND EXPENSES AND DRILLING CHARGES

Except as hereinafter provided, Operator shall advance, pay and discharge all costs and expenses incurred hereunder and shall charge each of the Parties the same percentage thereof as said Party's Percentage Interest stated in Article IV.

Operator shall secure the written approval of Non-Operators before incurring as an expense of the Parties any single expenditure in excess of Twenty-Five Thousand Dollars ($25,000) except in the drilling, equipping and completing of any well to which the Parties mutually agree and except in the case of expenses incurred in safe-guarding life and property in case of a blowout, explosion, fire, flood, storm, hurricane, catastrophe or other sudden emergency. Operator shall submit to Non-Operators for their approval an Authority for Expenditure (AFE) in triplicate for any drilling, construction, development, or operational expenditure in excess of the aforesaid maximum amount permitted Operator hereunder. The Authority for Expenditure (AFE) as submitted shall include sufficient details concerning the estimated cost to enable Non-Operators to make a reasonable analysis on which to base their approval. Operator shall also prepare and submit to Non-Operators for their information Authority for Expenditure (AFE) in triplicate for any drilling, construction, development, or any single operational expenditure reasonably expected to cost in excess of $15,000, but less than $25,000, even though Non-Operators' approval of such expenditure is not required. The approval of the drilling or deepening of a well shall include all expenditures for the drilling and testing of such well; provided, however, that any completion attempt shall be subject to the appropriate provisions of Article XIV hereof.

Operator, at its election, shall have the right from time to time to demand and receive from the Non-Operators payment in advance of their respective shares of the estimated amount of the costs to be incurred in operations hereunder during the next succeeding month, which right may be exercised only by submission to each Party of an itemized statement of such estimated costs together with an invoice for its share thereof. Each such statement and

- 4 -

invoice for the payment in advance of estimated costs shall be submitted on or before the 20th day of the preceding month. Each Party shall pay to Operator its share of such estimate within thirty (30) days after such estimate and invoice are received. If any Party fails to pay its share of said estimate within said time, the amount due shall bear interest at the rate of ten percent (10%) per annum or the maximum contract rate permitted by the applicable usury laws in the state in which the Joint Lease is located, whichever is the lesser, until paid. Proper adjustment shall be made monthly between advances and actual cost, to the end that each Party shall bear and pay its share of actual costs incurred, and no more.

All wells shall be drilled under competitive drilling contracts with qualified, responsible, independent contractors. Operator may, if approved by Non-Operators, employ any of its or its subsidiaries' drilling equipment, tools or machinery in performing any operations hereunder, but such work shall be performed by Operator acting as an independent contractor under a written contract containing the same terms and conditions and at the same rate for using such equipment, tools and machinery as is customary, usual and prevailing in competitive contracts of independent contractors who are doing work of similar nature in the vicinity of the Joint Lease. Prior to letting any drilling contract or to performing work with its own equipment, tools or machinery, Operator will make a bona fide attempt to obtain competitive bids for the performance of such work by at least three qualified, responsible, independent drilling contractors.

### ARTICLE VI - LIEN ON INTEREST OF DELINQUENT NON-OPERATOR

Operator is given a first and preferred lien on the interest of each Party covered by this Agreement, and in each Party's interest in Oil and Gas produced and the proceeds therefrom, and upon each Party's interest in material and equipment, to secure the payment of all sums due from each such Party to Operator.

In the event any Party should fail to pay its share of the charges, costs, and expenses hereunder within forty-five (45) days after actual receipt of a statement of same for any month, such

Party shall be deemed delinquent. If after fifteen (15) days following actual receipt of notice of delinquency by a Non-Operator (or by an officer of the Non-Operator if it is a corporation), Operator has not received payment, or such Party has not made other arrangements for such payment satisfactory to Operator, such delinquent Non-Operator shall be deemed to be in default and Operator, without prejudice to other existing remedies, is authorized, at its election, to collect from the purchaser or purchasers of Oil and Gas, the proceeds accruing to the working interest or interests in the Joint Lease of the delinquent Party up to the amount owed by such Party plus interest thereon, and each purchaser of Oil and Gas is authorized to rely upon Operator's statement as to the amount owed by such Party.

In the event of neglect or failure of any Party promptly to pay its share of the costs and expenses of development and operation when due, and provided that the lien conferred herein has been enforced and the proceeds from the sale of Oil and Gas, if any, accruing to such delinquent Party's Percentage Interest in the Joint Lease is being paid to the Operator by the purchaser or purchasers of such Oil and Gas, the other Parties, within thirty (30) days after rendition of statements therefor by Operator, shall in proportion to their Percentage Interests contribute to the payment of such delinquent indebtedness and the Parties so contributing shall be entitled to the same lien rights as are granted herein to Operator. Upon the payment by such delinquent or defaulting Non-Operator to Operator of any amount or amounts on such delinquent indebtedness, or upon any recovery on behalf of the Parties under the lien conferred above, the amount or amounts so paid or recovered shall be distributed and paid by Operator to the Non-Operators proportionately in accordance with the contributions theretofore made by them.

Any Party willfully in default shall have no further access to the maps, records, data, interpretations or other information obtained in connection with the operations hereunder, nor be entitled to vote on any matter until such time as such Party's payments are current. In the event of such default, the Percentage Interest of

- 6 -

the Party in default shall not be considered in the votes of the Parties nor shall such Party be entitled to receive any notice of meetings or decisions of the Parties.

### ARTICLE VII - ACCOUNTING PROCEDURE

Operator shall keep an accurate record of all accounts hereunder showing the cost and expenditures incurred and charges made and all credits received and returns made and received, which record shall be available at all reasonable times for the examination and inspection of Non-Operators or their duly authorized representatives. All such records shall be kept by Operator in accordance with the Accounting Procedure attached hereto and made a part hereof as Exhibit "A"; provided, however, in the event of a conflict between the provisions of the Accounting Procedure and this Operating Agreement, this Operating Agreement shall prevail and govern.

Operator shall consult with Non-Operators on all matters of importance hereunder, and Operator shall submit to Non-Operators on or before September 15 of each calendar year during the term of this Agreement, an annual budget showing its estimate of the cost of development and operation of the Joint Lease for the next succeeding calendar year, including generally, the estimated cost of wells to be drilled during such period. Following the submission of each such budget and upon at least thirty (30) days' advance written notice, Operator may call a meeting to be held not later than December 1 of each year. At such meeting the representatives of the Parties shall confer with respect thereto and shall endeavor tentatively to approve such budget after making such modifications as may be necessary; provided, however, that such tentative approval shall not alone constitute authority for the making of such expenditures, which shall be made only in accordance with the remaining provisions of this Agreement.

### ARTICLE VIII - INSURANCE

Operator shall, at all times while operations are conducted by it for the Joint Account on the Joint Lease, carry, pay for and charge to the Joint Account Workmen's Compensation and Employer's

Liability Insurance covering the employees of Operator engaged in operations hereunder in compliance with all applicable State and Federal Laws.  The Workmen's Compensation policy shall have attached the "Longshoremen's and Harbor Worker's Compensation Act (Federal) Endorsement" and "Outer Continental Shelf Lands Endorsement" and shall also have attached a "Marine and Voluntary Compensation Endorsement".  The "Marine and Voluntary Compensation Endorsement" shall provide for a limit of liability of not less than $1,000,000 per accident.  Such policies shall contain waivers of subrogation in favor of the Parties.

Operator shall carry for itself and any Non-Operator so desiring, as evidenced by notification in writing to Operator, insurance as follows:

A.  General Public Liability and Property Damage Insurance, endorsed to include offshore opera- tions, covering operations conducted hereunder by Operator for the Parties with a combined single limit each occurrence of $500,000 for bodily injury and property damage.  It is under- stood that Operator will not provide pollution coverage.

B.  Automobile Public Liability and Property Damage Insurance covering operations conducted hereunder by Operator for the Joint Account with a combined single limit each occurrence of $500,000 for bodily injury and property damage.

C.  Aviation liability insurance with a limit of $10,000,000 each occurrence to provide coverage on non-owned aircraft.

D.  Charterer's legal liability insurance provided with a limit of $500,000 any one claim to provide coverage arising out of the use of any chartered barges or vessels.

The premium for all such insurance so carried shall be paid by Operator and charged to the participating Non-Operators to the

- 8 -

extent that their interests are insured.  Where insurance is carried
by Operator for any Non-Operator as provided in this paragraph the
policies shall name such Non-Operators as additional insureds and
insurance underwriters shall waive all rights of subrogation in
favor of such Non-Operators.

Operator shall at any time requested furnish any Non-
Operator with full information concerning the kind, character and
amounts of insurance carried.  Operator shall promptly notify Non-
Operators of any loss, damage or claim not covered by insurance
carried by the Operator for the benefit of the Joint Account or
individual Non-Operators and of any loss, damage or claim that might
be considered or assumed to be in excess of the insurance coverage
provided by Operator for Non-Operators and of any loss, damage or
claim as to which any Non-Operator may be self-insured.

Operator shall not be liable for loss, damage or destruction
to any property of Non-Operators in connection with operations here-
under for the Joint Account on the Joint Lease, except those arising
out of willful misconduct or gross negligence of Operator.

Each Party, in proportion to its Percentage Interest, or
in the case of an operation in which fewer than all the Parties
participate, in proportion to such Party's interest in such operation,
shall save harmless Operator from all claims, losses and expenses
that exceed the amounts collectible under the insurance carried by
Operator for the Joint Account (as set forth in the first paragraph
of Article VIII) on account of personal injury or death to any
employee, agent or representative of Operator resulting from the
negligence or omission of Operator even though the personal injury
or death arose out of the joint and/or concurrent negligence
(excluding gross negligence or willful acts) of Operator.

Each Non-Operator shall indemnify and save harmless the
other Non-Operators and Operator for claims and losses that exceed
the amounts collectible under the insurance carried by Operator for
the Joint Account (as set forth in the first paragraph of this
Article VIII) or insurance carried for said Non-Operator (as set
forth in the second paragraph of Article VIII) on account of personal

- 9 -

injury or death to any employee, agent or representative of such Non-Operator, regardless of the negligent acts or omissions of Operator.

Liability for (1) damages to property of "third persons" (as used in this paragraph, the term "third persons" shall not include the employees, agents or representatives of Operator or any Non-Operator), (2) fines, penalties, damages, losses, etc. arising out of claims, either civil or criminal, public or private, relating to actual or alleged pollution of water, air, or the environment, or (3) injury to or death of third persons arising from operations on the Joint Lease, including the expenses incurred in defending claims or actions asserting liabilities of this character, shall be borne by the Parties or by their respective insurers in proportion to said Parties' respective Percentage Interests, except that when such damage is caused by the gross negligence or willful misconduct of Operator, then Operator shall be responsible for such liability. In the event such damage is caused by one or more of the Non-Operators, then in that event the liability for such damage shall be borne by the Non-Operator or Non-Operators responsible, except when a Non-Operator is expressly authorized to act for the Joint Account, then any such damage except that caused by the gross negligence or willful misconduct of such Non-Operator shall be borne by the Parties in proportion to their respective Percentage Interests.

Operator shall require its contractors and sub-contractors conducting operations on the Joint Lease to carry insurance generally of the types and in the amounts as set out above, to the extent that such insurance is applicable to the contractor's and subcontractor's operations, and such other insurance in amounts deemed adequate by Operator for any particular contract. Such insurance requirements for contractors and subcontractors may, however, be waived by the Operator in instances where contractors and subcontractors are self-insured and are of substantial financial standing; provided, however, that Operator shall promptly notify all Non-Operators thereof. A waiver of insurance required of subcontractors shall

- 10 -

not relieve subcontractors of liability for their torts or contract breaches.

All vessels owned or chartered by Operator shall be adequately covered by Hull and Protection and Indemnity Insurance.

### ARTICLE IX - AD VALOREM TAXES

Operator shall render for ad valorem tax purposes all property owned jointly by the Parties which is covered by this Agreement or such part thereof as may be subject to ad valorem taxation and shall pay for the benefit of the Parties all such ad valorem taxes at the time and in the manner required by law which may be assessed upon or against all such property.  Operator shall charge each of the Parties its share of such tax payments as provided in the Accounting Procedure attached hereto.

In the event any tax valuation is assessed on or against any of said property which the Operator deems to be unreasonable, Operator shall notify the Parties, and with agreement of the Parties as provided in Article IV shall protest said tax valuation within the time and manner as prescribed by law and prosecute such protest to a final determination.  When any such protested valuation shall have been determined, Operator shall pay for the account of the Parties the taxes so determined together with any interest, penalty or cost accrued as a result of such protest and charge each Party with its share thereof.

### ARTICLE X - LOGS AND REPORTS

Each Non-Operator or any of its duly authorized representatives shall have access at such Non-Operator's sole risk and expense and at all reasonable times to the Joint Lease, to any well drilled or being drilled hereunder in which such Non-Operator participates and to all records and reports relating thereto.

Subject to the provisions of Article VI and of this Article X, Operator, or the Party drilling the well, agrees to furnish timely to each Party participating in the well the following information on and relative to each well hereafter drilled or being drilled under the terms of this Agreement:

- 11 -

(1) Copy of application for permit to drill;

(2) A daily drilling report giving depth, with corresponding litholigical information, data or mud characteristics, drilling difficulties or delays, if any, and other pertinent information relative thereto;

(3) **Upon the written request of any Party,** samples of cuttings and cores to be shipped by express collect to the address designated in the request in containers furnished by Operator at the expense of such Party with information marked thereon as to the depth from which the same were taken;

(4) A composite electrical log upon the completion of each well, as well as current copies of any runs that are made during the drilling of said well and, if same are made, any radioactivity log, temperature survey, deviation or directional survey, caliper log and any like information or data;

(5) Complete report of analysis of all cores, when and if an analysis is made; and

(6) Upon written request, any other pertinent information relative thereto.

Operator also agrees to furnish to each Non-Operator, upon its written request, the following information relative to any producing well being operated by Operator on the Joint Lease:

(1) Monthly report on the volume of production, from each producing well being operated on the Joint Lease;

(2) Copies of any and all reports made to any regulatory body or bodies; and

(3) Report of status of all wells not producing and not abandoned.

In the event three or more Parties jointly owning at least 51.0% Voting Interest determine that any of the information specified in this Article X or any other data or information resulting from operations under this Agreement should be kept confidential, then Operator shall not furnish such data or information to Non-Operators; provided, however, that Operator shall make such data or information available during normal business hours for inspection by the authorized representative of each Non-Operator.

No data or information resulting from the conduct of operations hereunder shall be given or made available or accessible to any person not a Party to this Agreement, provided, however, that

- 12 -

Operator or any Non-Operator may make available or accessible such data or information to a third person if authorized to do so by the consent of all of the Parties, which consent shall not be unreasonably withheld.

Nothing herein contained however shall preclude any Party from making such disclosures to any governmental agency as may be required or requested under any Federal or State law or regulation.

## ARTICLE XI - RENTALS AND PAYMENTS

Operator shall pay all delay rental payments which may be required under the terms of the Joint Lease and submit evidence of each payment to the Parties at least ten (10) days prior to the payment date. The amount of such payment shall be charged by Operator to the Joint Account of the Parties and treated in all respects the same as costs incurred in the development and operation of the Joint Lease. Operator shall diligently attempt to make proper payment, but shall not be held liable to the Parties in damages for the loss of the Joint Lease or interest therein if, through mistake or oversight, any rental payment is not paid or is erroneously paid.

Should any Party fail to concur in the payment of any rental or similar payment, such Party shall so notify Operator, in writing, at least sixty (60) days prior to the date on which such payment is due and such Party shall be considered as withdrawing from the Joint Lease and the provisions of Article XVIII shall apply. In this event Operator shall make such payment for the benefit of all other Parties.

Operator shall promptly notify each Non-Operator of the date on which any oil or gas well located on the Joint Lease is shut-in and the reason therefor and the date on which said well is restored to production.

## ARTICLE XII - ROYALTY, OVERRIDING ROYALTY AND OTHER PAYMENTS

Operator shall pay or cause to be paid all royalties and minimum royalties, and upon request of any Party, any overriding royalties, payments out of production or other amounts or charges

which may be or become payable out of production and shall charge
all such payments to the account of the Party responsible therefor,
except that each Party shall make payment of all royalties applicable
to that portion of the production which such Party receives in kind
or itself sells or delivers to others.  However, Operator shall never
be liable for a standard of performance in making such payment or
payments in excess of a good faith effort to pay same prior to the
due date; and no liability is to be incurred for the failure to make
payment within the time, in the manner and for the amounts due through
error or omission of the employees of Operator.

If any Party has heretofore or should hereafter create any
overriding royalty, production payment or other burden payable out of
production against its working interest (burdens) and if that Party
is required under this Agreement to assign or relinquish to any other
Party or Parties all or a portion of its working interest and/or the
production attributable thereto, said other Party or Parties shall
receive said assignment and/or production, free and clear of all bur-
dens, and the Party creating those burdens shall indemnify and save
the other Parties harmless with respect to said burdens.  A Party
whose working interest in any well completion is subject to an over-
riding royalty, production payment or other similar burden, shall
continue to share in the production from such completion, subject to
such burdens, so long as that Party continues to participate in
operations under this Agreement.

ARTICLE XIII - DISPOSAL OF PRODUCTION

Notwithstanding any provision of this Agreement to the con-
trary, it is agreed and understood that any Party shall have the
right, at its sole risk and expense, to construct facilities for
taking its production in kind; provided only that such facilities
do not interfere with operations on the Joint Lease.

Each Party shall have the right and duty to take in kind
or separately dispose of its respective proportionate share of the
Oil and Gas produced and saved from the Joint Lease, which shall be

- 14 -

delivered to such Party, at its option, at the well or wells, the production facilities on the platforms, or to its credit in the pipe-line to which the well or wells may be connected.

In the event any Party fails to make the arrangements necessary to take in kind or separately dispose of its share of production from the Joint Lease, Operator shall have the right, but not the obligation, to purchase such share at the best price obtainable, provided, however, that the authority vested in Operator to market such Party's share of production shall be revocable at the will of such Party, and the term of any contract made by Operator for the sale of such Party's share of the production shall be for no longer period than is commensurate with the minimum needs of the industry under the circumstances and in no event longer than one year. Any such purchase or sale by Operator shall be subject always to the right of such Party to exercise at any time its right to take in kind, or separately dispose of its share of the production not previously delivered to purchaser. Notwithstanding the foregoing, Operator shall not make a sale into interstate commerce of any Party's share of gas production without giving such Party at least sixty (60) days prior written notice of the intended sale.

Any additional or extra expense incurred by Operator in making delivery to any Party of its proportionate share of Oil and Gas, or disposing of same in the event of failure of such Party to take or dispose of its share, shall be borne by such Party.

Unless required by governmental or judicial process, no Party hereto shall be forced to share an available market with any Party who fails to take in kind or dispose of its share of production.

### ARTICLE XIV - DRILLING, DEVELOPMENT & PLATFORMS

Section A.  GENERAL MATTERS.

1. Operator to Conduct Operations.

Operator shall, upon direction by the Parties and pursuant to the terms of this Agreement, conduct all operations on the Joint Lease except as otherwise provided in this Agreement. Operator shall

also be responsible for formulating, submitting and carrying out the exploration program and the development program for the Joint Lease.

2. Definitions.

(a) The term "Commercially Productive Well" as used herein shall mean any well drilled on the Joint Lease and determined to be commercially productive by three or more Parties jointly owning a total of at least 51.0% Voting Interest, provided such a determination shall not be made until at least two wells have been drilled on the Joint Lease.

(b) The term "Exploratory Well" as used herein shall mean any well proposed prior to the determination of a Commercially Productive Well on the Joint Lease, in accordance with sub-paragraph 2.(a) above.

(c) The term "Platform Locator Well" as used herein shall mean any well proposed after the determination of a Commercially Productive Well on the Joint Lease, in accordance with sub-paragraph 2.(a) above, the path of the well bore of which proposed well lies, or passes and remains, within a circle having a radius of 5,280 feet measured on a horizontal plane projected from any point at which the well bore of any Commercially Productive Well penetrates a sand from which it is capable of producing in paying quantities, and which well is not drilled from a stationary drilling platform.

(d) The term "Wildcat Well" as used herein shall mean any well proposed after the determination of a Commercially Productive Well on the Joint Lease, in accordance with sub-paragraph 2.(a) above, the path of the well bore of which proposed well lies, or passes and remains, outside a circle having a radius of 5,280 feet measured on a horizontal plane projected from any point at which the well bore of any Commercially Productive Well penetrates a sand from which it is capable of producing in paying quantities.

(e) The term "Development Well" as used herein shall mean any well proposed to be drilled from a stationary drilling platform on the Joint Lease, the path of the well bore of which proposed well lies, or passes and remains, within a circle having a radius of 5,280 feet measured on a horizontal plane projected from any point at which the well bore of any Commercially Productive Well penetrates a sand from which it is capable of producing in paying quantities.

3.   Procedure for Authorizing Operations.

(a) Notice of Proposed Operations; Election; Notice of Result.  Any Party desiring that an operation contemplated in this Article XIV (including by way of illustration but not of limitation the drilling or completing of a well or the construction of a platform) be conducted shall give written notice of the proposed operation to the other Parties and to Operator.  The notice shall contain full information concerning the proposed operation and the estimated cost of same (for example, if the drilling of a well is proposed, the notice shall designate the location at which and the depth to which the well is to be drilled, the objective sand(s) or horizon(s) to be tested, an estimate of the cost of the proposed operation including testing, the approximate distance and direction from the surface location at which it is proposed to bottom the well, and such other information as may be relevant, including information pertaining to [but not limited to] the mobile drilling rig, floating drilling vessel or platform to be used).  Upon actual receipt of the notice each Party receiving same shall have whichever one of the following periods of time is applicable, to-wit:

(1) if the proposal anticipates the construction of a platform, sixty (60) days; or,

(2) if the proposal does not anticipate the construction of a platform, thirty (30) days, except that the period of time shall be shortened to

- 17 -

twenty-four (24) hours if three or more Parties
jointly owning the Voting Interest required to con-
duct the proposed operation already have a joint
financial obligation for the drilling rig to be
used and that rig is on the Joint Lease with rig
standby charges accumulating (provided, however,
that any Party upon request may have additional
time to make its election on the condition that
such Party shall bear all expenses and risk in-
curred during such additional standby period)
within which to notify Operator either (i) that it elects to
participate in the proposed operation or (ii) that it elects
not to participate in the proposed operation.  Operator shall
notify each Party immediately of all of the elections which
are made and of whether the proposed operation has been
approved by the required number of Parties and the required
Voting Interest hereinafter specified for that type of
operation.

(b) Second Opportunity to Participate.  In the event
that a sufficient number of Parties with sufficient Voting
Interest elect to participate in the operation proposed in
the initial notice, but fewer than all of the Parties elect
to participate, each Party which initially elected not to
participate shall have a second opportunity to participate
in the proposed operation.  Upon receipt of Operator's
notice of the elections made and the approval of the proposed
operation, each Party which elected not to participate in
the operation proposed in the initial notice shall have
whichever one of the following periods of time is applicable,
to-wit:

(1) except where rig standby charges are
accumulating, forty-eight (48) hours; or,

(2) where rig standby charges are accumulat-
ing, as set forth in sub-paragraph 3.(a)(2) above,
twenty-four (24) hours

- 18 -

within which to notify Operator either (i) that it elects
to participate in the proposed operation or (ii) that it
elects not to participate in the proposed operation.

(c) <u>Party's Failure to Respond Shall Constitute an
Election</u>.  In order to provide for a situation in which a
Party receiving notice of a proposed operation shall fail to
notify Operator of that Party's election within the applicable
period of time, it is agreed that the failure of Burmah Oil
Development, Inc., Amoco Production Company, Decalta Inter-
national Corporation or Mesa Petroleum Co. to so reply to
such a notice within the applicable period of time shall
constitute an election by that Party <u>not to participate</u> in
the proposed operation, and that the failure of Pennzoil
Offshore Gas Operators, Inc., Pennzoil Louisiana and Texas
Offshore, Inc., Marathon Oil Company, Canadian Occidental
of California, Inc., Occidental Petroleum Corporation or
Amerada Hess Corporation to so reply to such a notice within
the applicable period of time shall constitute an election
by that Party <u>to participate</u> in the proposed operation.  The
effect of such an election shall be same as if such Party
had notified Operator of that election.  Failure of any Party
to reply to a notice of a second opportunity to participate
shall not in any case serve to alter that Party's initial
election.  Upon thirty (30) days' written notice to Operator
and to all the other Parties, any Party may provide as to
all future notices, either that its failure to so reply shall
constitute an election not to participate or that its failure
to reply shall constitute an election to participate; and
Operator shall thereupon change the provisions of this sub-
paragraph (c) to correctly reflect the effect of such Party's
failure to reply to future notices.

Section B.  <u>EXPLORATORY WELLS.</u>

The drilling of an Exploratory Well shall require an election to
participate by no fewer than three (3) Parties jointly owning Voting
Interests totaling not less than 51.0%.  Any Party desiring the

drilling of an Exploratory Well shall give written notice thereof in accordance with Section A. of this Article XIV.

1.  If as a result of the notice, each Party elects to participate, Operator shall proceed to drill the Exploratory Well for the Joint Account.

2.  If as a result of the notice fewer than three (3) Parties elect to participate, or the Parties which elect to participate jointly own Voting Interests totaling less than 51.0%, the proposed operation shall not be conducted.

3.  If as a result of the notice no fewer than three (3) Parties jointly owning Voting Interests totaling not less than 51.0% elect to participate, but fewer than all of the Parties elect to participate, each of the Parties which initially elected not to participate shall have a second opportunity to participate as specified in Section A., and

(a) if all of the Parties which initially elected not to participate elect to participate, then the Exploratory Well shall be drilled for the Joint Account; or

(b) if fewer than all of the Parties which initially elected not to participate elect to participate, either in response to the initial notice or as a result of the second opportunity to participate ("Participating Parties") and if the Participating Parties agree to carry 100% of the cost of the well in the proportions that each Participating Party's Percentage Interest bears to the total of all Participating Parties' Percentage Interests or in such other proportions as may be mutually agreed upon by the Participating Parties, then the Exploratory Well shall be drilled for the account of the Participating Parties, and if the well is commenced within ninety (90) days after the date Operator notifies the Parties that the required number and Voting Interest have elected to participate:

(1) each Party which did not elect to participate ("Non-Participating Party") shall, in the case of either the first or the second Exploratory Well, forthwith assign to the Participating Parties, in the proportions in which they participated in such well, all of its right, title

- 20 -

and interest in and to the Joint Lease, free and clear of all liens and encumbrances except the lien provided for herein, and such Party shall no longer be a Party to this Agreement; and

(2)   each Non-Participating Party shall, in the case of the third or any subsequent Exploratory Well, forthwith assign to the Participating Parties, in the proportions in which they participated in such well, all of such Non-Participating Party's interest in such well until Payout as defined in this Section B. below, and in addition each Non-Participating Party shall forthwith assign to the Participating Parties in the proportions in which they participated in such well, one-half (1/2) of the Percentage Interest then owned by such Non-Participating Party in the Joint Lease, free and clear of all liens and encumbrances except the lien provided for herein.  In that event, the Exploratory Well shall be drilled at the sole cost, risk and expense of the Parties which elected to participate therein; provided that upon Payout, fifty percent (50%) of the interest in such well which the Non-Participating Party assigned to the Participating Parties as provided above shall revert to and be vested in the Non-Participating Party.  For the purposes of this Section B., "Payout" shall mean the point in time at which the proceeds from the Non-Participating Party's share of the production from an Exploratory Well (or in the event a Participating Party uses the production for its own purposes, the market value of the production at the wellhead), after deducting taxes and royalty applicable thereto, shall equal the total of the following costs related to such Exploratory Well:

(i) 100% of each Non-Participating
Party's share of the cost of any equipment
used beyond the wellhead connections (in-
cluding, but not limited to, stock tanks,
field separators, treaters, pumping equip-
ment and piping) which would have been
incurred by the Non-Participating Party had
it participated in that well, the total
costs of such equipment to be allocated pro-
portionately among all wells being served
thereby, plus 100% of the platform rental
and of each Non-Participating Party's share
of the cost of operation of the well com-
mencing with first production and continuing
until each Non-Participating Party's relin-
quished interest shall revert to it under the
provisions of this Section B., it being agreed
that each Non-Participating Party's share of
such costs and equipment will be that interest
which would have been chargeable to each Non-
Participating Party had it participated in the
well from the beginning of the operation; and

(ii) 100% of that portion of the costs and
expenses of drilling, sidetracking, reworking,
deepening or plugging back, testing and completing
the well, and 100% of that portion of the cost
of subsurface equipment in the well (to and in-
cluding the wellhead connections), which would
have been chargeable to such Non-Participating
Party if it had participated therein.

If, as a result of the commencement of the drilling of any well by
fewer than all of the Parties, a Non-Participating Party is required
to assign a leasehold interest to the Participating Parties as pro-
vided in sub-paragraphs 3.(b)(1) and 3.(b)(2) above, and if the
proposed well is not thereafter drilled with diligence to the depth
provided for in the proposal for the drilling thereof, or to a lesser

- 22 -

depth at which there is encountered in said well, salt, heaving shale,
excessive pressure or water flow, or other substance or condition,
either similar or dissimilar, which normally is considered in the
industry to be impenetrable and which cannot be overcome by ordinary
drilling methods, then the interests previously assigned by each Non-
Participating Party shall be re-assigned to it by the Participating
Parties.

Notwithstanding any conflicting provisions set forth in this
Section B., the provisions of sub-paragraph 3.(b)(1) shall apply to
the drilling of any Exploratory Well proposed during the last (fifth)
year of the primary term of the Joint Lease if the Joint Lease cannot
otherwise be continued in effect.

Section C.  PLATFORM LOCATOR WELLS.

The drilling of a Platform Locator Well shall require an election
to participate by no fewer than three (3) Parties jointly owning Voting
Interests totaling not less than 65.0%.  Any Party desiring the dril-
ling of a Platform Locator Well shall give written notice thereof in
accordance with Section A. of this Article XIV.

1.  If as a result of the notice each Party elects to participate,
Operator shall proceed to drill the Platform Locator Well for the Joint
Account.

2.  If as a result of the notice fewer than three (3) Parties elect
to participate, or Parties jointly owning a total Voting Interest of less
than 65.0% elect to participate, then such operation shall not be con-
ducted.

3.  If as a result of the notice no fewer than three (3) Parties
jointly owning Voting Interests totaling not less than 65.0% elect to
participate, but fewer than all of the Parties elect to participate, each
of the Parties which initially elected not to participate shall have a
second opportunity to participate as specified in Section A., and

(a) if all of the Parties which initially elected not to
participate elect to participate, then the Platform Locator
Well shall be drilled for the Joint Account; or

- 23 -

(b) if fewer than all of the Parties which initially elected not to participate elect to participate, and if the Participating Parties agree to carry 100% of the cost of the well in the proportions that each Participating Party's Percentage Interest bears to the total of all Participating Parties' Percentage Interests or in such other proportions as may be mutually agreed upon by the Participating Parties, then the Platform Locator Well shall be drilled for the account of the Participating Parties, and if the well is commenced within ninety (90) days after the date Operator notifies the Parties that the required number and Voting Interest have elected to participate, upon commencement of the drilling of the Platform Locator Well each Non-Participating Party shall be deemed to have relinquished to the Participating Parties in the proportions in which they participated in such well, such Non-Participating Party's entire interest in such Platform Locator Well until Payout. For the purposes of this Section C., "Payout" shall mean the point in time at which the proceeds from the Non-Participating Party's share of the production from a Platform Locator Well (or in the event a Participating Party uses the production for its own purposes, the market value of the production at the wellhead), after deducting taxes and royalty applicable thereto, shall equal the total of the following costs related to such Platform Locator Well:

(1) 100% of each Non-Participating Party's share of the cost of any equipment used beyond the wellhead connections (including, but not limited to, stock tanks, field separators, treaters, pumping equipment and piping) which would have been incurred by the Non-Participating Party had it participated in that well, the total costs of such equipment to be allocated proportionately among all wells being served thereby, plus 100% of the platform

- 24 -

rental and of each Non-Participating Party's share of the cost of operation of the well commencing with first production and continuing until each Non-Participating Party's relinquished interest shall revert to it under the provisions of this Section C., it being agreed that each Non-Participating Party's share of such costs and equipment will be that interest which would have been chargeable to each Non-Participating Party had it participated in the well from the beginning of the operation; and

     (2) 100% of that portion of the costs and expenses of drilling, sidetracking, reworking, deepening or plugging back, testing and completing the well, and 100% of that portion of the cost of subsurface equipment in the well (to and including the wellhead connections), which would have been chargeable to such Non-Participating Party if it had participated therein.

Upon Payout, the interest in such well which the Non-Participating Party assigned to the Participating Parties as provided above shall revert to and be vested in the Non-Participating Party.

In addition to the cost recovery procedure outlined above in this sub-paragraph 3.(b), the Participating Parties shall own and be entitled to receive in the proportions in which they participated in the well, free and clear of all liens and encumbrances except the lien provided for herein, fifty percent (50%) of such Non-Participating Party's share of production from all wells served by the platform installed as a result of the drilling of a Platform Locator Well on the Joint Lease (or one hundred percent (100%) of the Non-Participating Party's share of production from all wells served by the platform installed as a result of the drilling of a Platform Locator Well on the Joint Lease if the Non-Participating Party has elected not to participate in more than one (1) Platform Locator Well) until the proceeds from said 50% of the Non-Participating Party's share of production from all wells

(excluding any Platform Locator Well drilled under the terms of this sub-paragraph 3.(b)) served by the platform located under the terms of this sub-paragraph 3.(b) (or in the event a Participating Party uses the production for its own purposes, the market value of the production at the wellhead), after deducting taxes and royalty applicable thereto, shall equal the total of the following costs related to the Platform Locator Well drilled to locate such platform:

(1) 200% of each Non-Participating Party's share of the cost of any equipment used beyond the wellhead connections (including, but not limited to, stock tanks, field separators, treaters, pumping equipment and piping) which would have been incurred by the Non-Participating Party had it participated in that well, the total costs of such equipment to be allocated proportionately among all wells being served thereby, plus 100% of the platform rental and of each Non-Participating Party's share of the cost of operation of the well commencing with first production and continuing until each Non-Participating Party's relinquished interest shall revert to it under the provisions of this Section C., it being agreed that each Non-Participating Party's share of such costs and equipment will be that interest which would have been chargeable to each Non-Participating Party had it participated in the well from the beginning of the operation; it is further agreed that if within two years from the date of installation of the equipment any of such equipment is used for any other well in which the previously Non-Participating Parties are participating, one-half of the 200% will be refunded in proportion to the number of wells for which the equipment is used; and

(2) 500% of that portion of the costs and expenses of drilling, sidetracking, reworking, deepening or plugging back, testing and completing the well, and 500% of that portion of the cost of subsurface equipment in

the well (to and including the wellhead connec-

tions), which would have been chargeable to such

Non-Participating Party if it had participated

therein.

Section D.   WILDCAT WELLS.

The drilling of a Wildcat Well shall require an election to

participate by no fewer than three (3) Parties jointly owning

Voting Interests totaling not less than 51.0%.  Any Party desiring

the drilling of a Wildcat Well shall give written notice thereof in

accordance with Section A. of this Article XIV.

1.  If as a result of the notice each Party elects to par-

ticipate, Operator shall proceed to drill the Wildcat Well for the

Joint Account.

2.  If as a result of the notice fewer than three (3) Parties

elect to participate, or the Parties which elect to participate

have Voting Interests totaling less than 51.0%, the proposed opera-

tion shall not be conducted.

3.  If as a result of the notice no fewer than three (3)

Parties jointly owning Voting Interests totaling not less than 51.0%

elect to participate, each of the Parties which initially elected not

to participate shall have a second opportunity to participate as

specified in Section A., and

(a) if all of the Parties which initially elected

not to participate elect to participate, then the Wild-

cat Well shall be drilled for the Joint Account; or

(b) if fewer than all of the Parties which initially

elected not to participate elect to participate, and if

the Participating Parties agree to carry 100% of the cost

of the well in the proportions that each Participating

Party's Percentage Interest bears to the total of all

Participating Parties' Percentage Interests or in such

other proportions as may be mutually agreed upon by the

Participating Parties, then the Wildcat Well shall be

drilled for the account of the Participating Parties,

and if the well is commenced within ninety (90) days

- 27 -

after the date Operator notifies the Parties that the
required number and Voting Interest have elected to
participate, upon commencement of operations for the
drilling of the Wildcat Well each Non-Participating Party
shall be deemed to have relinquished to the Participating
Parties all of its operating rights (by way of illus-
tration and not by way of limitation the words "operating
rights" appearing in this Agreement shall be construed
as including the right to receive and own production
from or attributable to that portion of the Joint Lease
for which such operating rights have been relinquished
or for which any such relinquished operating rights
have reverted as provided herein) in and to all sub-
surface formations underlying a maximum of 1,080 acres
designated in the drilling proposal submitted with the
notice, which acreage shall be located entirely within
the boundaries of the Joint Lease.  The 1,080 acres shall
surround the initial proposed bottom hole location of the
Wildcat Well and shall consist of the aliquot part (the
smallest subdivision which may be assigned in accordance
with governmental authority) of the Joint Lease upon
which the initial proposed bottom hole location of the
well is located and the required additional number of
aliquot parts closest to the initial proposed bottom hole
location of the well with the Participating Parties
having the right to select the perimeter aliquot parts
to be included should two or more of such aliquot parts
be equally distant from the initial proposed bottom hole
location.  It is provided, however, that no portion of the
1,080 acres shall include any aliquot part which falls
wholly or over fifty percent (50%) within the vertical
projection of the circle, or circles, referred to in
Paragraph 2.(d) of Section A. of this Article XIV and
the description of the acreage covered by the assignment
shall be adjusted to conform therewith.  If the well is

drilled as proposed and results in a Commercially
Productive Well from either the objective sand(s) or
horizon(s) set forth in the notice or from any
shallower sand(s) or horizon(s), the relinquished
operating rights shall be owned by the Participating
Parties in the proportions in which they participated,
and the said 1,080 acres shall thereafter be free and
clear of this Operating Agreement, except that all sub-
sequent operations thereon by the Participating Parties
shall be considered subject to an Operating Agreement
containing all terms and provisions of this Agreement,
except Percentage Interests, Voting Interests required to
approve operations, and, should Pennzoil Louisiana and
Texas Offshore Inc., and Pennzoil Offshore Gas Operators,
Inc., both be Non-Participating Parties, any provision
which must be amended to reflect designation of Operator
and ownership of Percentage Interest by Operator.  It is
provided that if the Participating Parties have not ordered
either (1) a stationary drilling platform to be located
on said 1,080 acres or (2) subsea completion equipment to
be located on said 1,080 acres within one (1) year of the
completion of drilling operations on that Wildcat Well, the
interest relinquished by each Non-Participating Party shall
revert to it (except that the wells, the equipment and
materials therein, thereon or in anywise appertaining there-
to, shall continue to be vested in the Participating Parties).
If the well is drilled to the proposed objective depth and
results in a dry hole, the interest relinquished by each
Non-Participating Party shall revert to it, except that the
ownership of the well, any material and equipment therein,
thereon or in anywise appertaining thereto, shall continue
to be vested in the Participating Parties.  Any relinquished
or reverting interest hereunder shall be free and clear of
any liens and encumbrances.  At such time as the Partici-
pating Parties reach the objective depth and in the event

the well is a dry hole, any Participating Party desiring

to deepen the well shall give written notice to the
Operator and the other Parties (including Non-Participating
Parties) in accordance with Section A. of this Article XIV,
and for the purposes of this sub-paragraph 3.(b), the

proposal to deepen such a dry hole shall be treated the
same as if it were an initial proposal to drill a Wildcat
Well, except that if a Party which has not participated
in the drilling of the Wildcat Well down to the initial
objective depth desires to participate in the deepening

operations in which no fewer than three (3) or more
Parties jointly owning Voting Interests totaling not
less than 51.0% agree to join, such Party shall pay
those Parties which participated in the drilling of the
Wildcat Well to the initial proposed depth its propor-
tionate share of the cost of drilling said well down to
said depth.

Section E.   DEVELOPMENT WELLS; OTHER OPERATIONS ON PLATFORMS.

    1.   General.

After the installation of a stationary drilling platform on
the Joint Lease, all operations (except operations concerning
Wildcat Wells) to be conducted from the platform, namely, the drilling
or completion of a Development Well, the side-tracking, reworking,
deepening or plugging back of a Development Well, including a dry
hole or a Development Well jointly owned by the Parties and not then
producing in paying quantities, shall be conducted under this Section
E.   All such operations shall require the election to participate by
no fewer than three (3) Parties jointly owning Voting Interests
totaling not less than 65.0%.   Any Party desiring that an operation
contemplated in this Section E. be conducted shall give written notice
thereof in accordance with Section A. of this Article XIV.

        (a) If as a result of the notice each Party elects
to participate, then the operation shall be conducted
for the Joint Account.

(b) If as a result of the notice fewer than three (3) Parties elect to participate, or the Parties which elect to participate own Voting Interests totaling less than 65.0%, the proposed operation shall not be conducted.

(c) If as a result of the notice no fewer than three Parties jointly owning Voting Interests totaling not less than 65.0% elect to participate, but fewer than all of the Parties elect to participate, each of the Parties which **initially elected not to participate shall have a second** opportunity to participate as specified in Section A., and

(1) if all the Parties which initially elected not to participate elect to participate, then the operation shall be conducted for the Joint Account; or

(2) if fewer than all of the Parties which initially elected not to participate elect to participate, and if those Parties which elected to participate, either in response to the initial notice or as a result of the second opportunity to participate, agree to carry 100% of the cost of the well in the proportions that each of said Party's Percentage Interest bears to the total of all of said Parties' Percentage Interests or in such other proportions as may be mutually agreed upon by said Parties, then, provided such operation is commenced within ninety (90) days after the date Operator notifies the Parties that the required number and Voting Interest have elected to participate, the operation shall be conducted as a "Non-Consent Operation" in accordance with Paragraph 2. of this Section E.

The completion proposed in a notice shall take precedence over any subsequent proposed completion in the same well.

2. <u>Non-Consent Operations</u>.

The Operator shall conduct Non-Consent Operations on the Joint Lease except as otherwise provided herein; however, the entire

cost and risk of conducting such operations shall be borne by the Parties participating in the operation ("Consenting Parties") in the proportions in which the Consenting Parties agree to participate. Consenting Parties shall keep the leasehold estates involved in the operations free and clear of all liens and encumbrances of every kind created by or arising from the operations of the Consenting Parties.

If the operation results in a dry hole, the plugging and abandoning of the well shall be at the sole cost, risk and expense of the Consenting Parties. If any well drilled, sidetracked, reworked, deepened, or plugged back under the provisions of this paragraph 2. results in a Commercially Productive Well, the well shall be completed and equipped to produce at the Consenting Parties' sole cost and risk, and the well shall be operated by Operator at the expense and for the account of the Consenting Parties. With respect to such operation, each Party which elected not to participate in the operation ("Non-Consenting Party") shall be deemed to have relinquished to the Consenting Parties, and the Consenting Parties shall own and be entitled to receive in the proportions in which they participated in such Development Well, free and clear of all liens and encumbrances except the lien provided for herein, all of the Non-Consenting Parties' interest in the well, the leasehold operating rights in the well, and the production therefrom until Payout. For the purposes of this Section E. Payout shall mean the point in time at which the proceeds from such well (or in the event a Consenting Party uses the production for its own purposes, the market value of the production at the wellhead), after deducting taxes and royalty applicable thereto, shall equal the total of the following costs related to such well:

    (a) 200% of each Non-Consenting Party's share of the cost of any equipment used beyond the wellhead connections (including, but not limited to, stock tanks, field separators, treaters, pumping equipment and piping), which would have been incurred by the Non-Consenting Party had it participated in that well, the total costs of such equipment to be allocated proportionately among all wells being served thereby, plus 100% of the platform rental and of each Non-Consenting Party's share of the cost of operation of the

well commencing with first production and continuing until each Non-Consenting Party's relinquished interest shall revert to it under other provisions of this Article XIV, **it being agreed that each Non-Consenting Party's share of** such costs and equipment will be that interest which would have been chargeable to each Non-Consenting Party had it participated in the well from the beginning of the operation; it is further agreed that if within two years from the date of installation of the equipment any of such equipment is used for any other well in which the previously Non-Consenting Parties are participating, one-half of the 200% will be refunded in proportion to the number of wells for which the equipment is used; and

(b) 500% of that portion of the costs and expenses of drilling, sidetracking, reworking, deepening or plugging back, testing and completing the well, and 500% of that portion of the cost of subsurface equipment in the well **(to and including the wellhead connections), which would** have been chargeable to such Non-Consenting Party if it had participated therein.

In the case of any completing, sidetracking, reworking, plugging back or deeper drilling operations, the Consenting Parties **to the operation shall, prior to Payout, be permitted to use, free** of cost, the well, all casing, tubing and other equipment in the well, and any platform space that may be alloted to the well, but the ownership of all such equipment and platform space shall remain unchanged, and upon abandonment of a well after completing, sidetracking, reworking, plugging back or deeper drilling, the Consenting Parties shall account for all such equipment and platform space to the owners thereof, with each Party receiving its proportionate part in kind or in value.

The Consenting Parties desiring to drill a Development Well shall have the right to rent and use any available platform space **on the Joint Lease for which Consenting Parties shall pay to the** Operator, for the account of the owners, a rental equal to that portion of the total cost of the platform which one well bears to the

total number of wells for which the platform was designed, irrespective of the number of wells which might ultimately be drilled therefrom, plus any repairs or maintenance expense directly attributable to and made necessary by the drilling of the Development Well and the Consenting Parties shall be liable and responsible for any damage to the platform, production and related facilities and other wells served by that platform, caused by the drilling of the Development Well. In the event the well shall be completed as a Commercially Productive Well, the Consenting Parties drilling and operating same shall currently pay to the Operator for the account of the owners of the platform a proportionate part of the cost of maintaining the jointly owned platform used for the producing of the well, based upon the total number of producing wells being operated from that platform, including such well.

In the event a Development Well is completed and abandoned as a dry hole, the right to use the platform space shall revert to the owners of the platform in proportion to their interest prior to the drilling of that well, reserving to the Consenting Parties the right to reuse the same platform space for the drilling of any future well, or wells, by the Consenting Parties without any additional cost to the Consenting Parties, except maintenance and operating costs. However, the Consenting Parties' right of reuse of a particular space shall terminate if the Consenting Parties are not using the space and have not proposed operations requiring the use of the space, and if the Joint Account requires the use of the space. Upon termination of the right of reuse by the Consenting Parties fifty percent (50%) of the platform rental originally paid by the Consenting Parties to the owners shall be returned by the Joint Account to the Consenting Parties.

Within sixty (60) days after completion of any operation under this paragraph 2., the Operator shall furnish each Party with an inventory of the equipment in and connected to the well, and an itemized statement of the cost of drilling, sidetracking, deepening, plugging back, testing, completing, and equipping the well for production; or, at its option, the Operator, in lieu of an itemized statement of such costs of operation, may submit a detailed statement of monthly billings. Each month thereafter, during the time the Consenting Parties are being

- 34 -

reimbursed as provided above, Operator shall furnish the Non-Consenting Parties with an itemized statement of all costs and liabilities incurred in the operation of the well, together with a statement of the volumes of Oil and Gas produced from it and the amount of proceeds realized from the sale of production from the well during the preceding month. Any amount realized from the sale or other disposition of equipment acquired in connection with any such operation which would have been owned by a Non-Consenting Party had it participated shall be credited against the total unreturned costs of the operation and of the equipment purchased, in determining when the interest of a Non-Consenting Party shall revert to it. If there is a credit balance, it shall be paid to such Non-Consenting Party.

If and when the Consenting Parties recover from a Non-Consenting Party's relinquished interest the amounts provided for above, the relinquished interests of that Non-Consenting Party shall automatically revert to it and from and after such reversion that Non-Consenting Party shall own the same interest in the well, the operating rights and working interest therein, the material and equipment in or pertaining thereto, and the production therefrom as the Non-Consenting Party would have owned had it participated in the drilling, sidetracking, reworking, deepening or plugging back of the well. Thereafter, such Non-Consenting Party shall be charged with and shall pay its share of the further costs of the operation of said well in accordance with the terms of this Agreement and the Accounting Procedure, Exhibit "A" attached hereto.

Notwithstanding the provisions of this paragraph 2., it is agreed that any Non-Consent Operations conducted hereunder shall not interfere with any operations being conducted for the Joint Account, and that without the mutual consent of all of the Parties, no well shall be completed in or produced from a sand or reservoir from which a well located elsewhere on the Joint Lease is producing, unless that sand or reservoir was the objective sand or reservoir specified in the proposal for such Non-Consent Development Well. Also, there shall be no Non-Consent Operations conducted on a multiply completed well unless all reservoirs from which the well has produced are depleted or all Parties consent to the operation.

- 35 -

For the purposes of allocating costs of a well in which the ownership is not the same for the entire depth or the completion(s) thereof and for the purposes of determining the penalties applicable to Non-Consenting Parties, the cost of drilling, completing and equipping said well shall be allocated on the following bases:

(a) If the well is completed in only one zone

(1) Controllable material costs, including wellhead equipment, casing and tubing, etc. from the surface to a depth 100 feet below the base of the completed sand shall be charged to the Consenting Parties participating in that sand.

(2) Casing and other controllable material costs from a depth 100 feet below the base of the completed sand to total depth shall be charged to the Consenting Parties participating in the costs to total depth.

(3) Intangible drilling and completion costs shall be allocated between zones on a drilling day ratio basis, where the factor for each zone (the completed zone and the zone below the completed sand to total depth) is determined by a fraction of which the numerator is the number of drilling and completion days applicable to that zone and the denominator is the total number of days spent on the well. The terms "drilling and completion days" and "total number of days spent on the well" as used herein shall include, where appropriate, the date the rig arrives on location and the date the rig is released.

(4) Intangible drilling and completion costs from the surface to a depth 100 feet below the base of the completed sand shall be charged to the Consenting Parties participating in the sand.

(5) Intangible drilling and completion costs from a depth 100 feet below the base of the completed sand to the total depth shall be charged to the Consenting Parties participating in the costs to total depth.

(b) If the well is completed in dual or multiple zones

(1) Controllable material costs, including well-head equipment and casing, etc. from the surface to a depth 100 feet below the base of the upper completed sand shall be divided equally between the completed sands and charged to the Consenting Parties participating in each sand.

(2) Casing and other controllable material costs from a depth 100 feet below the base of the upper completed sand to a depth 100 feet below the base of the second completed sand shall be divided equally between the second and any other sands completed below such depth and charged to the Consenting Parties participating in each such sand.  If the well is completed in triple or quadruple zones, etc., the costs applicable to the triple and quad zones shall be determined and charged to the Consenting Parties thereof in the same manner as described for the dual zone.

(3) Casing and other controllable material costs from a depth 100 feet below the base of the lower completed zone to total depth shall be charged to the Consenting Parties participating in the costs to total depth.

(4) Tubing serving each of the zones shall be charged to the Consenting Parties participating in each zone.

(5) Intangible drilling and completing costs shall be allocated between zones including the interval from the lower completed sand to total depth, on a drilling day ratio basis, where the factor for each zone is determined by a fraction of which the numerator is the number of drilling and completion days applicable to that zone and the denominator is the total number of days spent on the well.  The terms "drilling and completion days" and "total number of days spent on the well" as used herein shall include, where appropriate, the date the rig arrives on location and the date the rig is released.

- 37 -

(6) Intangible drilling and completion costs from the surface to a depth 100 feet below the base of the upper completed sand shall be divided equally between the completed sands and charged to the Consenting Parties participating in each sand.

(7) Intangible drilling and completion costs from a depth 100 feet below the base of the upper completed sand to a depth 100 feet below the base of the second completed sand shall be divided equally between the second completed sand and any other sands completed below such depth, and including the interval from 100 feet below the base of the lower completed sand and total depth, and charged to the Consenting Parties participating in each such sand.  If the well is completed in triple or quadruple zones, etc., the costs applicable to the triple or quad zones, etc., and including the interval from 100 feet below the base of the lower completed sand and total depth, shall be determined and charged to the Consenting Parties thereof in the same manner as described for the dual zone.

(8) Intangible drilling and completion costs from a depth 100 feet below the base of the lower completed sand to total depth shall be charged to the Consenting Parties participating in the costs to total depth.

For the purposes of allocating tangible and intangible costs between zones that occur at less than 100 foot intervals, the distance from the base of the upper zone to the top of the next lower zone shall be allocated equally between zones.

(c) If the well is a dry hole

(1) The costs to drill, plug and abandon a well proposed for completion in single, dual, or multiple zones shall be charged to the Consenting Parties participating therein in the same manner as if the well were completed as a producer in all zones as proposed.

- 38 -

(2) Plugging and abandoning of any well following
any deepening operation, completion attempt or other
operation shall be at the sole risk and expense of the
Parties consenting to such operation.

3. Completion of Wells; Other Matters

(a) It is further agreed that consent to the drilling,
sidetracking or deepening of any well under this Section E.
shall not be deemed consent to the running and setting of a
production string of casing therein or to completion thereof
(including the equipping of such well to produce and necessary
tankage). After the drilling, sidetracking, or deepening of
such well to the depth or formation previously agreed upon and
after appropriate tests have been made, Operator shall give
immediate notice by telegraph or telephone to all Parties par-
ticipating in the drilling, sidetracking or deepening of
such well, setting forth Operator's recommendations with
respect to such attempted completion. Each such Party shall,
within twenty-four (24) hours inclusive of Saturday, Sunday
or holiday after actual receipt of such notice, notify Opera-
tor as to whether or not such Party elects to participate in
such completion attempt. Should all Parties hereto elect to
so participate, Operator shall conduct such operations for
the Joint Account of all Parties. Should fewer than all
Parties elect to so participate, then such completion
operations shall be conducted as a Non-Consent Operation under
the provisions of paragraph 2. of this Section E. Should no
Party elect to attempt such completion or should the completion
attempt initially result in a dry hole regardless of whether
all of the Parties participate in such attempt, Operator shall
plug and abandon the well at the joint cost of all Parties who
participated in the drilling, sidetracking or deepening of the
well.

(b) If a Development Well is determined to be a Commer-
cially productive Well at or above the objective depth such
well shall not be deepened below the objective depth unless
such deepening operations are agreed to by either (1) all

of the Parties participating in the drilling of said well,
or (2) by a majority in interest of the Consenting Parties,
provided that in the case of alternative (2) the productive
formations must be protected by casing.

Section F.  WELLS ORDERED BY THE UNITED STATES.

No Party may refuse to pay in cash its share of the cost of
drilling, completing or abandoning any well which is required to
be drilled on the Joint Lease, or the cost of any other action or
operation which may be ordered or required by the final order of an
authorized representative of the United States.  Such an order shall
be deemed final upon the expiration of the time allowed for appeal
therefrom without the commencement of appropriate appeal proceedings
which any Party hereto may bring or, if such proceedings are com-
menced within said time, upon the final disposition of the appeal.

Section G.  PLATFORMS.

Without prior written consent of all Parties hereto, no
platform shall be constructed on the Joint Lease and charged to the
Joint Account other than those installed solely to serve such lease.

All matters with respect to the location, construction, instal-
lation, modification or expansion of any: (1) stationary drilling plat-
form; (2) production platform; or (3) fired vessel platform; and (4)
facilities for all such platforms, shall be decided by an affirmative
vote of no fewer than three Parties jointly owning Voting Interests
totaling not less than 65.0%.  Such voting procedure shall be applica-
ble to the three above mentioned types of platforms and their facilities,
but shall not apply to the construction of any pipeline, or pipelines,
except those connecting such platforms and their facilities.  All cost,
risk and expense incurred with respect to platforms and facilities
so authorized shall be charged to the Joint Account with the exception
that any Party not voting in favor of the construction of any stationary
drilling platform authorized for the Joint Lease shall be able to avoid
any cost, risk and expense with respect to each such platform by
assigning forthwith to the Parties participating in such platform in
proportion to their Percentage Interests (or in such other proportions
upon which the Parties participating in such platform agree), all of

- 40 -

its right, title and interest in all production from wells drilled therefrom, free and clear of all liens and encumbrances except the lien provided for herein; provided, however, that no such platform shall produce Oil and Gas which can be reasonably produced from an existing platform; and provided further that the platform must be ordered or constructed within one (1) year after the date the Operator notifies the Parties that the required number and Voting Interests have elected to participate.

Section H.   ASSIGNMENTS TO BE SELF-OPERATING.

Wherever in this Agreement any Party is required to assign ("Assigning Party") any interest to other Parties, the assignment shall be effective upon commencement of the operation proposed and without the execution of an instrument evidencing the transfer, the Assigning Party being deemed to have relinquished to the Parties entitled to said assignment the rights and/or interests herein set forth, and the Parties entitled to the assignment will own and be entitled to receive all of said rights and/or interests of the Assigning Party in the well, its leasehold operating rights, and share of production therefrom.   However, nothing in this Section H. shall preclude any Party from obtaining a formal assignment of the interests to which it is entitled under this Agreement.

ARTICLE XV - ABANDONMENT OF WELLS

Subject to the other provisions herein, no well which is pro-ducing or has once produced under the terms hereof shall be abandoned without the mutual consent of the Parties who own an interest in that well.  If any of the Parties desire to abandon such well, it or they shall so notify the other Parties in writing and request their consent to the abandonment thereof.  If such other Parties do not consent to the abandonment of said well, such other Parties shall take over such well and they shall pay to the other Party or Parties desiring to abandon same, in cash, the value of their respective interests in the salvage of the material and equipment in and on such well, less the estimated cost of salvaging same, which value shall be determined in accordance with the provisions of the attached Accounting Procedure.

- 41 -

The Party or Parties abandoning said well shall execute in recordable form and deliver to the other Party or Parties taking over such well in proportion to their interests in the well (or in such other proportions upon which said Parties agree) a transfer of such well and all property and equipment used solely in connection therewith and an assignment of its or their interest in the production therefrom (insofar only as such interest applies to the horizon from which such well shall have produced or is being produced). Such transfer and assignment shall be without warranty of title and shall be free of any overriding royalties or other burdens on production. Thereafter, the grantee or grantees in said transfer and assignment shall be the sole owner or owners of said well and the Oil and Gas produced from said horizon in said well, and same shall no longer be subject to the terms of this Agreement.

In the event of such transfer and assignment as herein provided, the Party or Parties so assigning after discharging its or their proportion of all obligations which have accrued hereunder up to the effective date of such assignment shall be relieved from any and all further liability under this Agreement, insofar as said well is concerned; provided, however, that any such assignment shall neither affect nor change the participation of the Parties in and to the Oil and Gas produced from any other portion of the Joint Lease nor in the ownership in any other property and equipment owned hereunder by the Parties.

### ARTICLE XVI - TITLES AND FAILURE OF TITLE

Any defects of leasehold title shall be the joint responsibility of all of the Parties and, if a loss occurs as a result of title failure, it shall be the loss of all of the Parties, with each bearing its proportionate part of the loss and of any liabilities incurred in the loss. If any lease or interest subject to this Agreement is lost through failure to develop or because expressed or implied covenants have not been performed, or if any lease be permitted to expire at the end of its primary term and not renewed or extended, such loss shall also be a joint loss and shall be borne by all of the Parties in proportion to their Percentage Interests.

- 42 -

## ARTICLE XVII - CONTRIBUTIONS FROM OTHERS

In the event any Party receives a contribution in cash or any other form (other than an advance payment from a pipe line company) toward the drilling of any well hereunder, and if all Parties are participating in the drilling of such well, the contribution shall be paid or delivered to the Operator and credited to the account of the Parties in proportion to their respective Percentage Interests.

In the event any Party receives a contribution in cash or any other form (other than an advance payment from a pipe line company) toward the drilling of a well in which fewer than all the Parties are participating, such contribution shall be paid or delivered only to those Parties participating in the drilling of the well, in the same proportions in which they are participating in the well.  If, however, the contribution was not made available to all Parties when the well was proposed, the amount of any cash contribution shall be credited against the expenditures incurred by the drilling Parties in connection with the computation of the amount the drilling Parties are entitled to recover pursuant to the provisions of Article XIV hereof, and any acreage contribution shall be shared by all Parties (whether participating or not) in proportion to their Percentage Interests at the time the contribution is made.

## ARTICLE XVIII - WITHDRAWAL OF A PARTY

In the event any Party desires to withdraw from the Joint Lease and to forfeit its rights hereunder, and be relieved and released from any and all obligations with respect to the Joint Lease, it shall have the right to do so in the manner and subject to the conditions hereinafter set out.  Such Party shall give notice of its intentions to the other Parties and offer to convey, by a recordable instrument, without warranty, except for its own acts and for no cost, all of its leasehold interests in and to the Joint Lease, the Oil and Gas and the property and equipment owned hereunder, which assignment shall be free of any overriding royalties or other burdens on production.  If any Party desires to acquire the interest and assume the obligations of the assigning Party under the Operating Agreement and the Joint Lease, then the assigning Party shall deliver an assignment as above provided.

- 43 -

Unless an assignment can be delivered, as contemplated above, the
Party desiring to withdraw from the Joint Lease and forfeit its
rights hereunder, shall at the time of withdrawal, pay to those Parties
not desiring to withdraw its proportionate share of the estimated cost
of plugging and abandoning all wells and removing all platforms, struc-
tures or other equipment on the Joint Lease less any estimated salvage
value, and such withdrawing Party shall remain liable for its propor-
tionate share of any costs, expenses or damages theretofore accrued or
arising out of any event occurring prior to such Party's withdrawal.

### ARTICLE XIX - RESIGNATION OR CHANGE OF OPERATOR

Operator shall have the right at its election to resign its
duties as Operator; provided, however, that such resignation, in the
absence of the agreement of all Parties, shall not be effective
earlier than 7 A.M. of the first day of the calendar month following
the ninetieth (90th) day after which Operator shall have notified,
in writing, the Non-Operators of its election to so resign; and provided,
further, that until the Parties have designated another Operator to
act hereunder, the Operator so desiring to resign shall continue as
Operator hereunder to the end of the then calendar year.

Any Operator may be removed and a successor Operator designated
by a vote of three or more Parties jointly owning at least 51.0% Voting
Interest.  Such removal shall become effective on the first day of the
month following the expiration of ninety (90) days from the date which
notice of removal is received by Operator, or at such earlier time as
may be mutually agreed upon by Operator and the successor Operator.
Notwithstanding the above, the initial Operator shall serve for a period
of two (2) years after the date of this Agreement, or for a period of
one (1) year after the installation of the first stationary drilling
platform on the Joint Lease, whichever is the sooner; provided, however,
that at any time any Operator may be removed for good cause shown and
a successor operator designated by a vote of three or more Parties
jointly owning at least 51.0% Voting Interest.

In the event a successor Operator is designated, the Operator
preceding the successor Operator shall promptly deliver to the successor
Operator the custody of all records, maps, information, and data

- 44 -

obtained affecting the Joint Lease and all equipment, supplies and
materials charged to the Joint Account; and upon the effective date
of the resignation of Operator, the successor Operator shall promptly
assume its duties and responsibilities as Operator hereunder.  It is
understood that, should Pennzoil Company be succeeded as Operator and
should the successor Operator be a Party, this Agreement shall upon
such succession be amended to reflect the status of the Operator.  The
provisions subject to amendment upon such succession include, but are
not limited to, certain indemnity provisions of Article VIII.

### ARTICLE XX - PARTIES TO WHOM CONTRACT APPLIES

This Agreement shall extend to and be binding upon the heirs,
executors, administrators, successors, assigns and successive assigns
of the Parties.  Should any Party change its name or merge with or
into another corporation, such merger or change in corporate name shall
not affect any of its rights hereunder.

### ARTICLE XXI - RELATION OF PARTIES

The liability of each of the Parties shall be several and not
joint or collective.  Each Party shall be responsible only for its
obligations as herein set out, and shall be liable only for its propor-
tionate share of the cost and expense of exploring, developing and opera-
ting the Joint Lease.  It is not the purpose or intent of this Agreement
to create, nor shall the same be construed as creating, a partnership of
any kind between or among any of the Parties, nor shall any of the
operations hereunder be construed as a joint venture.

Each and all of the Parties hereby agree that this Agreement
shall not constitute a partnership as defined in the Internal Revenue
Code of 1954, and specifically elect that each of them and the opera-
tions covered by this Agreement be excluded from the application of all
of Sub-Chapter K of Chapter I of Subtitle A of the Internal Revenue
Code of 1954 pursuant to Section 761 thereof.  All Parties specifically
agree that no election shall be made to the contrary by any Party without
the unanimous consent of all other Parties.  Operator is authorized to
execute on behalf of each of the Parties such additional or further
evidence of said election as may be required by regulations which may
be issued by the Secretary of the Treasury of the United States under

- 45 -

said Sub-Chapter K, or should such regulations require each Party to
execute such further evidence of election, each Party agrees to execute
or join in the execution thereof.

### ARTICLE XXII - FORCE MAJEURE

In the event of any Party being rendered unable, wholly or
in part, by force majeure to carry out its obligations under this
Agreement other than the obligation to make payment of amounts due
hereunder, it is agreed that upon such Party's giving notice and
reasonably full particulars of force majeure in writing or by tele-
graph to the other Parties within a reasonable time after the occurrence
of the cause relied upon, then the obligations of the Party giving notice,
so far as they are affected by force majeure, shall be suspended during
the continuance of any inability so caused, but for no longer period;
and the cause of the force majeure shall so far as possible be remedied
with all reasonable dispatch.

The term "force majeure", as employed herein, shall mean acts
of God, strikes, lockouts or other industrial disturbances, acts of
the public enemy, wars, blockades, insurrections, riots, epidemics,
landslides, lightning, earthquakes, fires, storms, floods, washouts,
arrests and restraints of government and people, civil disturbances,
explosions, breakage or accident to machinery or lines of pipe, freezing
of wells or lines of pipe, partial or entire failure of natural gas
wells or any other causes, whether of the kind herein enumerated or
otherwise, not reasonably within the control of the Party claiming
suspension.  The term shall likewise include (a) in those instances
where any Party is required to obtain servitudes, right-of-way grants,
permits or licenses to enable it to fulfill its obligations hereunder,
the inability of the Party to acquire or the delay on the part of the
Party in acquiring, at reasonable cost and after the exercise of
reasonable diligence, the servitudes, right-of-way grants, permits or
licenses, and (b) in those instances for the purpose of constructing
or maintaining facilities to enable the Party to fulfill its obligations
hereunder, the inability of the Party to acquire, or the delays on the
part of the Party in acquiring, at reasonable cost and after the exercise
of reasonable diligence the materials and supplies, and the inability of

- 46 -

the Party to secure or the delays in securing, after the exercise of **reasonable diligence, permission from any governmental agency to use** materials and supplies which the Party may have in its possession.

It is understood and agreed that the settlement of strikes and lockouts shall be entirely within the discretion of the Party having the difficulty (including Operator) and, further, that the **requirement that any force majeure shall be remedied with all** reasonable dispatch shall not require the settlement of strikes or lockouts by acceding to the demands of opposing party when such course is inadvisable in the discretion of the Party having the difficulty.

### ARTICLE XXIII – LAWS AND REGULATIONS

All the terms and provisions of this Agreement are hereby expressly made subject to all Federal and State laws and to all orders, rules and regulations of any duly constituted authority having jurisdiction in the premises, and no Party shall suffer a forfeiture or be liable in damages for failure to comply with any of the provisions of this Agreement if such compliance is prevented by or if such failure results from compliance with any such law, order, rule or regulation.

Unless exempted by Federal Law, regulation or order, the following terms and conditions shall apply during the performance of this Agreement:

> The Operator agrees to comply and shall require each independent contractor to comply with all the provisions of (i) Section 202(1) through 202(7), inclusive, of Executive Order No. 11246, as amended; (ii) the Equal Employment Opportunity Reporting Procedure; (iii) the Affirmative Action Compliance Program requirement; and (iv) the Listing of Employment Openings, which items are incorporated herein and made a part hereof as Exhibit "B".

### ARTICLE XXIV – DISPUTES

In the event of disagreement between any of the Parties as to the intent and interpretation hereof, this Agreement shall be subject to and interpreted in accordance with the general maritime law or in accordance with the laws, rules and regulations of the State of Texas, whichever is applicable.

- 47 -

## ARTICLE XXV - CLAIMS AND LAWSUITS

If any Party to this Agreement is sued on an alleged cause of action arising out of operations on the Joint Lease, or on an alleged cause of action involving title to any lease or Oil and Gas interest subjected to this Agreement, it shall give prompt written notice of the suit to Operator and all other Parties.

The defense of lawsuits shall be under the general direction of a committee of lawyers representing the Parties, with Operator's attorney as Chairman.  Suits may be settled during litigation only with the joint consent of all Parties.  No charge shall be made for services by the staff attorneys of Operator or any of the Non-Operators, but otherwise all expenses incurred in accordance with Accounting Procedure, Exhibit "A" attached, in the defense of suits, together with the amount paid to discharge any final judgment, shall be considered costs of operation and shall be charged to and paid by all Parties in proportion to their Percentage Interests at the time the cause of action arose.  Attorneys, other than staff attorneys for the Parties and for the Operator, shall be employed for the Joint Account in lawsuits involving Joint Lease operations only with the written consent of Parties jointly owning Voting Interest totaling at least 51.0% hereunder. If it is agreed that outside counsel is to be employed for the Joint Account as provided herein, the fees and expenses shall be considered as Joint Lease expense and shall be paid by Operator and charged to all of the Parties in proportion to their interests in the operation at the time the cause of action arose.

Damage claims caused by and arising out of operations of the Joint Lease, conducted for the Joint Account of all Parties, shall be handled by Operator and its attorneys, the settlement of claims of this kind shall be within the discretion of Operator so long as the amount paid in settlement of any one claim does not exceed five thousand ($5,000.00) dollars and, if settled, the sums paid in settlement shall be charged as expense to and be paid by all Parties in proportion to their Percentage Interests at the time the cause of action arose.

- 48 -

The provisions of the second and third paragraphs of this Article XXV shall not be applied in any instance where the loss which may result from the suit is treated as an individual loss rather than a joint loss under prior provisions of this Agreement, and all such suits shall be handled by and be the sole responsibility of the Party or Parties concerned, or, when appropriate, the Operator.

Notwithstanding the above, Operator shall not employ tax counsel for the Joint Account without the consent of all Parties.

### ARTICLE XXVI - SALES OF INTERESTS

All or a part of any Party's interest in the Joint Lease may be conveyed to a third party; however, because of the mutuality of interest required to successfully carry out the intent and purposes of this Agreement, any such conveyance to a third party must be approved by Parties representing 51.0% in interest hereunder, which approval cannot be unreasonably withheld.  Before such conveyance shall become effective as to the other Parties, all payments due by the conveying Party under this Agreement to the Operator shall have been paid or settlement otherwise made.

This requirement for approval shall not apply to any conveyance covered hereby;

(1) which results from a merger, consolidation or reorganization or a transfer by a parent company to a subsidiary, a subsidiary to a parent company, or a subsidiary to another subsidiary within the same corporate family; or

(2) to a company, trust, partnership or other arrangement which the conveying third party controls or substantially controls, or is the Trustee, General Partner, or Manager thereof, and as such has the exclusive right to operate for and in behalf of such entity.

Nothing contained in this Article XXVI shall be construed to prevent any Party from entering in good faith into financing arrangements through a mortgage, pledge or transfer of an interest in production and such mortgage, pledge or transfer shall not be construed as a sale hereunder.

If any Party shall assign all or any part of its interest in the Joint Lease, such assignment shall expressly provide that the interest assigned is subject to all of the terms and provisions of this Operating Agreement.

- 49 -

ARTICLE XXVII - NOTICES

    All notices, reports, statements and any and all other information given or furnished, or required to be given or furnished, by the Parties or by the Operator shall be in writing (unless otherwise provided) and mailed, telegraphed, teletyped, or delivered to the following addresses of the Parties:

OPERATOR:

> Pennzoil Company
> P. O. Box 51843
> Lafayette, Louisiana 70501
> Attn: Mr. J. M. Kates

NON-OPERATOR:

> Pennzoil Offshore Gas Operators, Inc.
> 5333 Westheimer, Suite 950
> Houston, Texas 77027
> Attn: Mr. R. D. Rogers, Jr.
>
> Pennzoil Louisiana and Texas Offshore, Inc.
> 5333 Westheimer, Suite 950
> Houston, Texas 77027
> Attn: Mr. R. D. Rogers, Jr.
>
> Mesa Petroleum Co.
> 1414 First City East Building
> 1111 Fannin Street
> Houston, Texas 77002
> Attn: Mr. Byron Dyer
>
> Burmah Oil Development, Inc.
> Seventh Floor, BNO Building
> 1010 Common Street
> New Orleans, Louisiana 70112
> Attn: Mr. Harry Fisher
>
> Canadian Occidental of California, Inc.
> Occidental Petroleum Corporation
> P. O. Box 2247
> Houston, Texas 77001
> Attn: Mr. W. R. Low
>
> Marathon Oil Company
> P. O. Box 3128
> Houston, Texas 77001
> Attn: Mr. D. W. Franklin
>
> Amerada Hess Corporation
> 1200 Milam Street, 6th Floor
> Houston, Texas 77002
> Attn: Mr. Octa Autin
>
> Decalta International Corporation
> 630 6th Avenue Southwest
> Calgary, Alberta, Canada  T2POT2
> Attn: Mr. A. H. Ross
>
> Amoco Production Company
> P. O. Box 3092
> Houston, Texas 77001
> Attn: Mr. W. L. Adams

No change of address shall become effective until written notice of such change shall have been given by the Party to the Operator and the other Parties.

## ARTICLE XXVIII - MISCELLANEOUS

A.  No waiver by any Party of any default under this Agreement shall operate as a waiver of any subsequent default whether of a like or different character.

B.  The headings and Table of Contents used in this Agreement are inserted for convenience only and shall be disregarded in con-struing this Agreement.

## ARTICLE XXIX - EXECUTION IN COUNTERPART

This Agreement may be executed in any number of counterparts, and each such counterpart so executed shall have the same force and effect as an original instrument and as if all of the Parties to the aggregate counterparts had signed the same document.

IN WITNESS WHEREOF, the Parties have signed, executed and delivered this Agreement, as of the date first hereinabove written.

WITNESSES:

PENNZOIL OFFSHORE GAS OPERATORS, INC.

By: _____
                President

PENNZOIL LOUISIANA AND TEXAS OFFSHORE, INC.

By: _____
                President

MESA PETROLEUM CO.

By: _____

BURMAH OIL DEVELOPMENT, INC.

By: _____

CANADIAN OCCIDENTAL OF CALIFORNIA, INC.

By: _____

001098

- 51 -

No change of address shall become effective until written notice of such change shall have been given by the Party to the Operator and the other Parties.

### ARTICLE XXVIII - MISCELLANEOUS

A.  No waiver by any Party of any default under this Agreement shall operate as a waiver of any subsequent default whether of a like or different character.

B.  The headings and Table of Contents used in this Agreement are inserted for convenience only and shall be disregarded in construing this Agreement.

### ARTICLE XXIX - EXECUTION IN COUNTERPART

This Agreement may be executed in any number of counterparts, and each such counterpart so executed shall have the same force and effect as an original instrument and as if all of the Parties to the aggregate counterparts had signed the same document.

IN WITNESS WHEREOF, the Parties have signed, executed and delivered this Agreement, as of the date first hereinabove written.

WITNESSES:

 

PENNZOIL OFFSHORE GAS OPERATORS, INC.

_____

_____          By: _____
                                          President

PENNZOIL LOUISIANA AND TEXAS OFFSHORE, INC.

_____

_____          By: _____
                                          President

_James G. Blankenship_

_Woody R. Arrington_             By: _Byron L. Dyer_

MESA PETROLEUM CO.

BURMAH OIL DEVELOPMENT, INC.

_____

_____          By: _____

CANADIAN OCCIDENTAL OF CALIFORNIA, INC.

001699

_____

_____          By: _____

- 51 -

No change of address shall become effective until written notice of such change shall have been given by the Party to the Operator and the other Parties.

## ARTICLE XXVIII - MISCELLANEOUS

A.   No waiver by any Party of any default under this Agreement shall operate as a waiver of any subsequent default whether of a like or different character.

B.   The headings and Table of Contents used in this Agreement are inserted for convenience only and shall be disregarded in construing this Agreement.

## ARTICLE XXIX - EXECUTION IN COUNTERPART

This Agreement may be executed in any number of counterparts, and each such counterpart so executed shall have the same force and effect as an original instrument and as if all of the Parties to the aggregate counterparts had signed the same document.

IN WITNESS WHEREOF, the Parties have signed, executed and delivered this Agreement, as of the date first hereinabove written.

WITNESSES:

PENNZOIL OFFSHORE GAS OPERATORS, INC.

_____

_____   By: _____
                                              President

PENNZOIL LOUISIANA AND TEXAS OFFSHORE, INC.

_____

_____   By: _____
                                              President

MESA PETROLEUM CO.

_____

_____   By: _____

BURMAH OIL DEVELOPMENT, INC.

_____

_____   By: _Harry Stirling Jr._____

CANADIAN OCCIDENTAL OF CALIFORNIA, INC.

001700

_____

_____   By: _____

- 51 -

No change of address shall become effective until written notice of such change shall have been given by the Party to the Operator and the other Parties.

### ARTICLE XXVIII - MISCELLANEOUS

A.  No waiver by any Party of any default under this Agreement shall operate as a waiver of any subsequent default whether of a like or different character.

B.  The headings and Table of Contents used in this Agreement are inserted for convenience only and shall be disregarded in construing this Agreement.

### ARTICLE XXIX - EXECUTION IN COUNTERPART

This Agreement may be executed in any number of counterparts, and each such counterpart so executed shall have the same force and effect as an original instrument and as if all of the Parties to the aggregate counterparts had signed the same document.

IN WITNESS WHEREOF, the Parties have signed, executed and delivered this Agreement, as of the date first hereinabove written.

WITNESSES:

PENNZOIL OFFSHORE GAS OPERATORS, INC.

By: _____
                President

PENNZOIL LOUISIANA AND TEXAS OFFSHORE, INC.

By: _____
                President

MESA PETROLEUM CO.

By: _____

BURMAH OIL DEVELOPMENT, INC.

By: _____

CANADIAN OCCIDENTAL OF CALIFORNIA, INC.

001701

By: _____
                PRESIDENT

- 51 -

WITNESSES:

OCCIDENTAL PETROLEUM CORPORATION

E. Jean Smith

By: _____
        EXECUTIVE VICE PRESIDENT

MARATHON OIL COMPANY

_____

_____

By: _____

AMERADA HESS CORPORATION

_____

_____

By: _____

DECALTA INTERNATIONAL CORPORATION

_____

_____

By: _____

AMOCO PRODUCTION COMPANY

_____

_____

By: _____

- 52 -

001702

WITNESSES:

OCCIDENTAL PETROLEUM CORPORATION

By: _____

MARATHON OIL COMPANY

By: _L.D.N. Franklin_

DIVISION EXPLORATION MANAGER

APPROVED AS
TO FORM
WHH

AMERADA HESS CORPORATION

By: _____

DECALTA INTERNATIONAL CORPORATION

By: _____

AMOCO PRODUCTION COMPANY

By: _____

- 52 -

001703

WITNESSES:

OCCIDENTAL PETROLEUM CORPORATION

_____

_____          By: _____

                              MARATHON OIL COMPANY

_____

_____          By: _____

                              AMERADA HESS CORPORATION

*David G. Stevens*

*Betty J. Dimond*             By: *L. M. Hass*          DG

                              DECALTA INTERNATIONAL CORPORATION

_____

_____          By: _____

                              AMOCO PRODUCTION COMPANY

_____

_____          By: _____

- 52 -

001704

WITNESSES:

OCCIDENTAL PETROLEUM CORPORATION

By: _____

MARATHON OIL COMPANY

By: _____

AMERADA HESS CORPORATION

By: _____

DECALTA INTERNATIONAL CORPORATION

By: _____

AMOCO PRODUCTION COMPANY

By: _____

- 52 -

001705

WITNESSES:

OCCIDENTAL PETROLEUM CORPORATION

By: _____

MARATHON OIL COMPANY

By: _____

AMERADA HESS CORPORATION

By: _____

DECALTA INTERNATIONAL CORPORATION

By: _____

AMOCO PRODUCTION COMPANY

By: _____

ATTORNEY-IN-FACT

APPROVED
plc

- 52 -

001706

RATIFICATION OF OPERATING AGREEMENT

AND

ACCEPTANCE OF DESIGNATION OF OPERATOR

KNOW ALL MEN BY THESE PRESENTS:  That,

WHEREAS, AMERADA HESS CORPORATION, AMOCO PRODUCTION COMPANY, BURMAH OIL DEVELOPMENT, INC., CANADIAN OCCIDENTAL OF CALIFORNIA, INC., DECALTA INTERNATIONAL CORPORATION, MARATHON OIL COMPANY, MESA PETROLEUM CO., OCCIDENTAL PETROLEUM CORPORATION, PENNZOIL LOUISIANA AND TEXAS OFFSHORE, INC., and PENNZOIL OFFSHORE GAS OPERATORS, INC. entered into an Operating Agreement dated of even date herewith; and

WHEREAS, by virtue of certain Management Contracts PENNZOIL COMPANY is the Manager for PENNZOIL OFFSHORE GAS OPERATORS, INC., and PENNZOIL LOUISIANA AND TEXAS OFFSHORE, INC., and said Operating Agreement provides in Article II thereof, that PENNZOIL COMPANY shall be designated as Operator for the Joint Lease and other leasehold interest subject to said Operating Agreement; and

WHEREAS, it is the desire of PENNZOIL COMPANY to ratify said Operating Agreement and accept said designation of Operator.

NOW, THEREFORE, in consideration of the premises and of the covenants and agreements in said Operating Agreement contained to be kept and performed by each of the parties thereto respectively, PENNZOIL COMPANY does hereby ratify, confirm, and adopt all of the terms and provisions of said Operating Agreement insofar as they apply to the Operator thereunder, and, further, does accept the designation of Operator and agrees to perform all of the duties of said Operator as set out in said Operating Agreement.

IN WITNESS WHEREOF, PENNZOIL COMPANY has executed this ratification before the undersigned witnesses effective as of the 1st day of August, 1973.

WITNESSES:                              PENNZOIL COMPANY

_Lanelle Hayes_

_CV Self_

                                        BY:  _R. Baylor Wright_

  

ROSS-MARTIN COMPANY
TULSA, OKLAHOMA 74101

Recommended by the
Council of Petroleum
Accountants Societies of
North America

COPAS

### EXHIBIT "A"

Attached to and made a part of the Operating Agreement cover-
ing Block A-489, High Island Area, South Addition,
Offshore Texas.

# ACCOUNTING PROCEDURE
## JOINT OPERATIONS

### I. GENERAL PROVISIONS

1. **Definitions**

"Joint Account" shall mean the account showing the charges and credits accruing because of the Joint Operations and which are to be shared by the Parties.

"Joint Property" shall mean the real and personal property subject to the agreement to which this Accounting Procedure is attached.

"Joint Operations" shall mean all operations necessary or proper for the development, operation, protection and maintenance of the Joint Property.

"Operator" shall mean the party designated to conduct the Joint Operations.

"Non-Operators" shall mean the parties to this agreement other than the Operator.

"Parties" shall mean Operator and Non-Operators.

"Material" shall mean personal property, equipment or supplies acquired or held for use on the Joint Property.

"Controllable Material" shall be defined as set forth under the subparagraph selected below:

A. [X] Material which at the time is so classified in the Material Classification Manual as most recently recommended by the Council of Petroleum Accountants Societies of North America.

B. [ ] Material which is ordinarily so classified and controlled by Operator in the conduct of its operations. List shall be furnished Non-Operators upon request.

2. **Statements and Billings**

Operator shall bill Non-Operators on or before the last day of each month for their proportionate share of costs and expenses for the preceding month. Such bills will be accompanied by statements reflecting the total charges and credits as set forth under the subparagraph selected below:

A. [ ] Statement in detail of all charges and credits to the Joint Account.

B. [ ] Statement of all charges and credits to the Joint Account, summarized by appropriate classifications indicative of the nature thereof.

C. [X] Statement of all charges and credits to the Joint Account, summarized by appropriate classification indicative of the nature thereof, except that items of Controllable Material and unusual charges and credits shall be detailed.

3. **Advances and Payments by Non-Operators**

Unless otherwise provided for in the agreement, the Operator may require the Non-Operators to advance their share of estimated cash outlay for the succeeding month's operation. Operator shall adjust each monthly billing to reflect advances received from the Non-Operators.

Each Non-Operator shall pay its proportion of all bills within thirty (30) ~~fifteen (15)~~ days after receipt. If payment is not made within such time, the unpaid balance shall bear interest monthly at the rate of ten per cent (10%) per annum or the maximum contract rate permitted by the applicable usury laws in the state in which the Joint Property is located, whichever is the lesser.

4. **Adjustments**

Payment of any such bills shall not prejudice the right of any Non-Operator to protest or question the correctness thereof; provided however, all bills and statements rendered to Non-Operators by Operator during any calendar year shall conclusively be presumed to be true and correct after twenty-four (24) months following the end of any such calendar year, unless within the said twenty-four (24) month period a Non-Operator takes written exception thereto and makes claim on Operator for adjustment. No adjustment favorable to Operator shall be made unless it is made within the same prescribed period. The provisions of this paragraph shall not prevent adjustments resulting from a physical inventory of the Joint Property as provided for in Section VII.

5. **Audits**

A Non-Operator, upon notice in writing to Operator and all other Non-Operators, shall have the right to audit Operator's accounts and records relating to the accounting hereunder for any calendar year within the twenty-four (24) month period following the end of such calendar year; provided however, the making of an audit shall not extend the time for the taking of written exception to and the adjustments of accounts as provided for in Paragraph 4 of this Section I. Where there are two or more Non-Operators, the Non-Operators shall make every reasonable effort to conduct joint or simultaneous audits in a manner which will result in a minimum of inconvenience to the Operator. Operator shall bear no portion of the Non-Operators' audit cost incurred under this paragraph unless agreed to by the Operator.

6. **Approval by Non-Operators**

Where an approval or other agreement of Non-Operators is expressly required under Paragraphs 5A, 5B, 6A and 8 of Section II, Section III, Section V, Section VI, and Paragraph 4 of Section VII, of this Accounting Procedure and if the agreement to which this Accounting Procedure is attached contains no contrary provisions in regard thereto, the Operator shall notify all Non-Operators and the agreement or approval of a majority in interest of the Non-Operators shall be controlling on all Non-Operators.

—1—

COPAS

## II. DIRECT CHARGES

Operator shall charge the Joint Account with the following items:

**1. Rentals and Royalties**

Lease rentals and royalties paid by Operator for the Joint Operations.

**2. Labor**

A. (1) Salaries and wages of Operator's employees directly employed on the Joint Property in the conduct of Joint Operations.

(2) Salaries of first-level supervisors in the field if such charges are excluded from overhead rates in Option A of Section III.

(3) Salaries and wages of technical employees temporarily assigned to and directly employed on the Joint Property if such charges are excluded from overhead rates in Option B of Section III.

(4) Salaries and wages of technical employees either temporarily or permanently assigned to and directly employed in the operation of the Joint Property if such charges are excluded from overhead rates in Option C of Section III.

B. Operator's cost of holiday, vacation, sickness and disability benefits and other customary allowances paid to the employees whose salaries and wages are chargeable to the Joint Account under Paragraph 2A of this Section II and Paragraph 1A of Section III; except that in the case of those employees only a pro rata portion of whose salaries and wages are chargeable to the Joint Account under Paragraph 1A of Section III, not more than the same pro rata portion of the benefits and allowances herein provided for shall be charged to the Joint Account. Cost under this Paragraph 2B may be charged on a "when and as paid basis" or by "percentage assessment" on the amount of salaries and wages chargeable to the Joint Account under Paragraph 2A of this Section II and Paragraph 1A of Section III. If percentage assessment is used, the rate shall be based on the Operator's cost experience.

C. Expenditures or contributions made pursuant to assessments imposed by governmental authority which are applicable to Operator's labor cost of salaries and wages chargeable to the Joint Account under Paragraphs 2A and 2B of this Section II and Paragraph 1A of Section III.

D. Reasonable personal expenses of those employees whose salaries and wages are chargeable to the Joint Account under Paragraph 2A of this Section II and for which expenses the employees are reimbursed under Operator's usual practice.

**3. Employee Benefits**

Operator's current cost of established plans for employees' group life insurance, hospitalization, pension, retirement, stock purchase, thrift, bonus, and other benefit plans of a like nature, applicable to Operator's labor cost chargeable to the Joint Account under Paragraphs 2A and 2B of this Section II and Paragraph 1A of Section III shall be chargeable as indicated in the subparagraph selected below:

A. [ ]  Operator's actual cost.

B. [x]  Operator's actual cost not to exceed fifteen per cent (15%).

**4. Material**

Material purchased or furnished by Operator for use on the Joint Property as provided under Section IV. So far as it is reasonably practical and consistent with efficient and economical operation, only such Material shall be purchased for or transferred to the Joint Property as may be required for immediate use; and the accumulation of surplus stocks shall be avoided.

**5. Transportation**

Transportation of employees and Material necessary for the Joint Operations but subject to the following limitations:

A. If Material is moved to the Joint Property from the Operator's warehouse or other properties, no charge shall be made to the Joint Account for a distance greater than the distance from the nearest reliable supply store, recognized barge terminal, or railway receiving point where like material is normally available, unless agreed to by Operator and Non-Operators.

B. If surplus Material is moved to Operator's warehouse or other storage point, no charge shall be made to the Joint Account for a distance greater than the distance to the nearest reliable supply store, recognized barge terminal, or railway receiving point unless agreed to by Operators and Non-Operators. No charge shall be made to the Joint Account for moving Material to other properties belonging to Operator, unless agreed to by Operator and Non-Operators.

C. In the application of Subparagraphs A and B above, there shall be no equalization of actual gross trucking costs of $100 or less.

**6. Services**

A. The cost of contract services and utilities procured from outside sources other than services covered by Paragraph 8 of this Section II and Paragraph 1B of Section III. The cost of professional consultant services shall not be charged to the Joint Account unless agreed to by Operator and Non-Operators.

B. Use and service of equipment and facilities furnished by Operator as provided in Paragraph 5 of Section IV.

**7. Damages and Losses to Joint Property**

All costs or expenses necessary for the repair or replacement of Joint Property made necessary because of damages or losses incurred by fire, flood, storm, theft, accident, or other cause, except to the extent that the damage or loss could have been avoided through the exercise of reasonable diligence on the part of Operator. Operator shall furnish Non-Operators written notice of damages or losses incurred as soon as practicable after a report thereof has been received by Operator.

**8. Legal Expense**

All costs and expenses of handling, investigating, and settling litigation or claims arising by reason of the Joint Operations or necessary to protect or recover the Joint Property, including, but not limited to, attorney's fees, court costs, cost of investigation or procuring evidence and amounts paid in settlement or satisfaction of any such litigation or claims; provided, (a) no charge shall be made for the services of Operator's legal staff or other regularly employed personnel (such services being considered to be Administrative Overhead under Section III), unless agreed to by Operator and Non-Operators, and (b) no charge shall be made for the fees and expenses of outside attorneys unless the employment of such attorneys is agreed to by Operator and Non-Operators.

**9. Taxes**

All taxes of every kind and nature assessed or levied upon or in connection with the Joint Property, the operation thereof, or the production therefrom, and which taxes have been paid by the Operator for the benefit of the Parties.

— 2 —

COPAS

10. **Insurance**

Net premiums paid for insurance required to be carried on the Joint Property for the protection of the Parties. In the event Joint Operations are conducted in a state in which Operator may act as self-insurer for Workmen's Compensation and/or Employers Liability under the respective state's laws, Operator may, at its election, include the risk under its self-insurance program and in that event, Operator shall include a charge therefor on the following basis:

_____

_____

_____

11. **Other Expenditures**

Any other expenditure not covered or dealt with in the foregoing provisions of this Section II, or in Section III, and which is incurred by the Operator for the necessary and proper conduct of the Joint Operations.

### III. INDIRECT CHARGES

Operator may charge the Joint Account for indirect costs either by use of an allocation of district expense items plus the rate for administrative overhead, and plus the warehousing charges, all as provided for in Paragraph 1 of this Section III or by combining all three of said items under the rates provided for in Paragraph 2 or 3 of this Section III, as indicated next below:

OPERATOR SHALL CHARGE INDIRECT COSTS TO THE JOINT ACCOUNT UNDER THE TERMS OF:

[  ]  Paragraph 1.   (District Expense, Administrative Overhead and Warehousing)

[X]  **Paragraph 2.   (Combined Rates - Well Basis)**

[  ]  Paragraph 3.   (Combined Rates - Percentage Basis)

The cost and expense of services from outside sources in connection with matters of taxation, traffic, accounting or matters before or involving governmental agencies shall be considered as included in the overhead rates provided for in the above selected Paragraph of this Section III unless such cost and expense are agreed to by Operator and Non-Operators as a direct charge to the Joint Account.

THE OVERHEAD RATES PROVIDED FOR IN ANY OF THE PARAGRAPHS SELECTED ABOVE

A. [  ] shall [X] shall not include salaries and personal expenses of first-level supervisors in the field.

B. [  ] shall [X] shall not include salaries, wages and personal expenses of technical employees temporarily assigned to and directly employed on the Joint Property.

C. [X] shall [  ] shall not include salaries, wages and personal expenses of technical employees either temporarily or permanently assigned to and directly employed in the operation of the Joint Property.

1. **District Expense, Administrative Overhead and Warehousing**

A. **District Expense**

Operator shall charge the Joint Account with a pro rata portion of the salaries, wages and expenses of Operator's production superintendent and other employees serving the Joint Property and other properties of the Operator in the same operating area, whose time is not allocated directly to the properties, and a pro rata portion of the cost of maintaining and operating a production office known as Operator's ..................... ........................................................... office located at or near ....................................................... (or a comparable office if location changed); and necessary sub-offices (if any), maintained for the convenience of the above-described office, and all necessary camps, including housing facilities for employees if required, used in connection with the operations of the Joint Property and other properties in the same operating area. The expense of, less any revenue from, such facilities may, at the option of Operator, include depreciation of investment or a fair monthly rental in lieu of depreciation. Such charges shall be apportioned to all properties served on some equitable basis consistent with Operator's accounting practice.

B. **Administrative Overhead**

Operator shall charge administrative overhead to the Joint Account at the following rates, which charge shall be in lieu of the cost and expense of all offices of the Operator not covered by Paragraph 1A of this Section III, including salaries, wages and expenses of personnel assigned to such offices. Such charge shall be in addition to the salaries, wages and expenses of employees of Operator authorized to be charged direct as provided in Paragraphs 2 and 8 of Section II. Such charge shall be made on the basis indicated below, either (1) well basis or (2) percentage basis, at the rates shown thereunder.

(1) [  ] Well Basis

#### RATE PER WELL PER MONTH

| Well Depth | DRILLING WELL RATE (Use Total Depth) Each Well | PRODUCING WELL RATE (Use Current Producing Depth) First Five | Next Five | All Wells Over Ten |
|---|---|---|---|---|
| ..................... | ..................... | ..................... | ..................... | ..................... |
| ..................... | ..................... | ..................... | ..................... | ..................... |
| ..................... | ..................... | ..................... | ..................... | ..................... |
| ..................... | ..................... | ..................... | ..................... | ..................... |

(2) [  ] Percentage Basis

#### PERCENTAGE BASIS

Development:

..................... Percent (    %) of the cost of development of the Joint Property exclusive of costs provided under Paragraph 8 of Section II and all salvage credits.

Operating:

..................... Percent (    %) of the cost of operating the Joint Property exclusive of costs provided under Paragraphs 1 and 8 of Section II, all salvage credits, the value of injected substances purchased for secondary recovery and all taxes and assessments which are levied, assessed and paid upon the mineral interest in and to the Joint Property.

— 3 —

C.  Operator's Warehouse Operating and Maintenance Expense
[  ]   Included in district expense
[  ]   No charge either direct or indirect
[  ]   Percentage basis (describe fully) .................................................................

2.  **Combined Rates - Well Basis**
Operator shall charge the Joint Account for the services covered by Paragraph 1 of this Section III on the basis indicated below:

### RATE PER WELL PER MONTH

| Well Depth | DRILLING WELL RATE (Use Total Depth)<br>Each Well | PRODUCING WELL RATE (Use Current Producing Depth) | | |
|---|---|---|---|---|
| | | First Five | Next Five | All Wells Over Ten |
| All Depths | $6,199 | $713 | $682 | $620 |
| | | | | |
| | | | | |
| | | | | |

The above Combined Fixed Rates include the costs and expenses attributable to the Joint Lease of the Intracoastal City Marine Base and shall be effective until such base is no longer practical to use.  In the event a new marine base is necessary to serve the Joint Lease, the costs and expenses thereof shall be properly documented and shall be a direct charge to the Joint Account, and the Combined Fixed Rates in effect shall be reviewed at that time.

3.  **Combined Rates - Percentage Basis (Not Applicable)**

4.  **Application of Administrative Overhead or Combined Rates - Well Basis**
The following limitations, instructions and charges shall apply in the application of the rates as provided under either Paragraph 1B (1) or Paragraph 2 of this Section III.  the rig arrives on location
  A.  Charges for drilling wells shall begin on the date ~~each well is spudded~~ and terminate on the date the drilling or completion rig is released, whichever is later, except that no charge shall be made during the suspension of drilling operations for fifteen (15) or more consecutive days.
  B.  The status of wells shall be as follows:
  (1)  Producing gas wells, injection wells for recovery operations, water supply wells utilized for waterflooding operations and salt water disposal wells shall be considered the same as producing oil wells.
  (2)  Wells permanently shut down but on which plugging operations are deferred shall be dropped from the well schedule at the time the shutdown is effected.  Any well being plugged or produced during any portion of the month shall be considered as a producing well for the entire month.
  (3)  Wells being plugged back, drilled deeper, converted to a source or input well, or which are undergoing any type of workover that requires the use of a drilling rig or workover rig capable of drilling shall be considered the same as drilling wells.
  (4)  Temporarily shut-down wells, which are not produced or worked upon for a period of a full calendar month, shall not be included in the well schedule, provided however, wells shut in by governmental regulatory body shall be included in the well schedule only in the event the allowable production is transferred to some other well or wells on the Joint Property.  In the event of a unit allowable, shut-in wells shall be counted in determining the charge hereunder for such month if said wells contribute allowable production that is actually produced during such month from one or more unit wells as a result of allowable transfer, inclusion in the unit allowable or other circumstances, but the total shut-in well count shall be limited to the minimum number of shut-in wells necessary to provide the contributed allowable actually produced during the month.
  (5)  Gas wells shall be included in the well schedule if directly connected to a permanent sales outlet even though temporarily shut in due to overproduction or failure of purchaser to take the allowed production.
  (6)  Wells completed in multiple horizons, shall be considered as a producing well for each separately producing horizon, providing each completion is considered a separate well by governmental or other state-wide regulatory authority.
  C.  The well rates for producing wells shall be applied to the individual leases; provided that, whenever leases covered by this agreement are operated as a unitized project, the well rates shall be applied to the total number of producing wells, irrespective of individual leases.
  D.  The well rates shall be adjusted as of the first day of April each year following the effective date of the agreement to which this Accounting Procedure is attached.  The adjustment shall be computed by multiplying the rate currently in use by the percentage increase or decrease in the average weekly earnings of Crude Petroleum and Gas Production Workers for the last calendar year compared to the preceding calendar year as shown by "The Index of Average Weekly Earnings of Crude Petroleum and Gas Production Workers" as published by the United States Department of Labor, Bureau of Labor Statistics, or the equivalent Canadian Index as published by the Dominion Bureau of Statistics, as applicable.  The adjusted rates shall be the rates currently in use, plus or minus the computed adjustment.

5.  **Application of Administrative Overhead or Combined Rates - Percentage Basis**
For the purpose of determining charges on a Percentage Basis under Paragraph 1B (2) or Paragraph 3 of this Section III, Development shall include all costs in connection with drilling, redrilling, deepening or any remedial operations on any or all wells involving the use of drilling crew and equipment; also, preliminary expenditures necessary in preparation for drilling and expenditures incurred in abandoning when well is not completed as a producer; and original cost of construction or installation of fixed assets, the expansion of fixed assets and any other project clearly discernible as a fixed asset, except Major Construction as defined in Paragraph 6 of this Section III.  All other costs shall be considered as Operating.

6.  **Major Construction Overhead**
For the construction of compressor plants, water stations, secondary recovery systems, drilling and production platforms, salt water disposal facilities, and other such projects, as distinguished from the more usual drilling

— 4 —

COPAS

and producing operations, Operator in addition to the Administrative Overhead or Combined Rates provided for in Paragraph 1, 2 or 3 of this Secton III shall either negotiate a rate prior to beginning of construction or shall charge the Joint Account with an additional overhead charge as follows: *

A.  Total cost less than $25,000, no charge.

B.  Total cost more than $25,000, but less than $100,000, _____4_____ % of total cost.

C.  Total cost of $100,000 or more, _____4_____ % of the first $100,000 plus ___2___ % of all over $100,000 as set forth, up to $1,000,000 plus 1-1/2% of the total cost over $1,000,000

Total cost shall mean the total gross cost of any one project. For the purpose of this paragraph the component parts of a single project shall not be treated separately and the cost of drilling wells shall be excluded.

7.  **Amendment of Rates**

The specific rates provided for in this Section III may be amended from time to time by mutual agreement between the Parties hereto if, in practice, the rates are found to be insufficient or excessive.

* Where the design and engineering is furnished by a third party contractor, the construction overhead charge will be 1% of the total cost.

## IV.  BASIS OF CHARGES TO JOINT ACCOUNT

Subject to the further provisions of this Section IV, Operator will procure all Material and services for the Joint Property.  At the Operator's option, Non-Operators may supply Material or services for the Joint Property.

1.  **Purchases**

Material purchased and service procured shall be charged at the price paid by Operator after deduction of all discounts actually received.

2.  **Material furnished from Operator's Warehouse or Other Properties**

A.  New Material (Condition "A")

(1)  Tubular goods, except line pipe, shall be priced on a maximum carload and/or barge load weight basis regardless of quantity transferred and equalized to the lowest prevailing price f.o.b. railway receiving point or recognized barge terminal nearest the Joint Property where such Material is normally available effective at date of transfer.

(2)  Line pipe shall be priced at the current replacement cost effective at date of transfer from a reliable supply store nearest the Joint Property where such Material is normally available if the movement is less than 30,000 pounds. If the movement is 30,000 pounds or more, it shall be priced on the same basis as casing and tubing under Subparagraph (1) of this paragraph.

(3)  When the Operator has equalized actual hauling costs as provided for in Paragraph 5 of Section II, Operator is permitted to include ten cents (10¢) per hundred-weight on all tubular goods furnished from his stocks in lieu of loading and unloading costs sustained.

(4)  Other Material shall be priced at the current replacement cost of the same kind of Material, effective at date of movement and f.o.b. the supply store or railway receiving point nearest the Joint Property where Material of the same kind is normally available.

(5)  The Joint Account shall not be credited with cash discounts applicable to prices provided for in this Paragraph 2 of Section IV.

B.  Used Material (Condition "B" and "C")

(1)  Material in sound and serviceable condition and suitable for reuse without reconditioning, shall be classified as Condition "B" and priced at seventy-five per cent (75%) of the current price of new Material.

(2)  Material which is not suitable for its original function until after reconditioning shall be furnished to the Joint Account under one of the two methods defined below:

(a)  Classified as Condition "B" and priced at seventy-five per cent (75%) of the current price of new Material.  The cost of reconditioning shall be absorbed by the Operator of the transferring property.

(b)  Classified as Condition "C" and priced at fifty per cent (50%) of current price of new Material. The cost of reconditioning also shall be charged to the receiving property, provided Condition "C" value, plus cost of reconditioning, does not exceed Condition "B" value.

(3)  Obsolete Material or Material which cannot be classified as Condition "B" or Condition "C" shall be priced at a value commensurate with its use. Material no longer suitable for its original purpose but usable for some other purpose, shall be priced on a basis comparable with that of items normally used for such other purpose.

(4)  Material involving erection costs shall be charged at applicable percentage of the current knocked-down price of new Material.

3.  **Premium Prices**

Whenever Material is not readily obtainable at prices specified in Paragraphs 1 and 2 of this Section IV because of national emergencies, strikes or other unusual causes over which the Operator has no control, the Operator may charge the Joint Account for such Material at the Operator's actual cost incurred in procuring such Material, in making it suitable for use, and in moving it to the Joint Property, provided, that notice in writing is furnished to Non-Operators of the proposed charge prior to billing Non-Operators for such Material.  Each Non-Operator shall have the right, by so electing and notifying Operator within 10 days after receiving notice from Operator, to furnish in kind all or part of his share of such Material suitable for use and acceptable to Operator.

4.  **Warranty of Material Furnished by Operator**

Operator does not warrant the Material furnished. In case of defective Material, credit shall not be passed to the Joint Account until adjustment has been received by Operator from the manufacturers or their agents.

5.  **Equipment and Facilities Furnished by Operator**

A.  Operator shall charge the Joint Account for use of equipment and facilities at rates commensurate with cost of ownership and operation. Such rates shall include cost of maintenance, repairs, other operating expense, insurance, taxes, depreciation, and interest on investment not to exceed six per cent (6%) per annum, provided such rates shall not exceed those currently prevailing in the immediate area within which the Joint Property is located. In lieu of rates based on costs of ownership and operation of equipment, other than automotive, Operator may elect to use commercial rates prevailing in the area of the Joint Property less 20%; for automotive equipment, rates as published by the Petroleum Motor Transport Association may be used. Rates for laboratory services shall not exceed those currently prevailing if performed by



outside service laboratories. Rates for trucks, tractors and well service units may include wages and expenses of operator.

B. Whenever requested, Operator shall inform Non-Operators in advance of the rates it proposes to charge.

C. Rates shall be revised and adjusted from time to time when found to be either excessive or insufficient.

## V. DISPOSAL OF MATERIAL

The Operator may purchase, but shall be under no obligation to purchase, interest of Non-Operators in surplus Condition "A" or "B" Material. The disposition of surplus Controllable Material, not purchased by Operator, shall be agreed to by Operator and Non-Operators, provided Operator shall dispose of normal accumulations of junk and scrap Material either by transfer or sale from Joint Property.

1. **Material Purchased by the Operator or Non-Operators.**
   Material purchased by either the Operator or Non-Operators shall be credited by the Operator to the Joint Account for the month in which the Material is removed by the purchaser.

2. **Division in Kind**
   Division of Material in kind, if made between Operator and Non-Operators, shall be in proportion to the respective interests in such Material. The Parties will thereupon be charged individually with the value of the Material received or receivable. Proper credits shall be made by the Operator to the Joint Account.

3. **Sales to Outsiders**
   Sales to outsiders of Material from the Joint Property shall be credited by Operator to the Joint Account at the net amount collected by Operator from vendee. Any claim by vendee related to such sale shall be charged back to the Joint Account if and when paid by Operator.

## VI. BASIS OF PRICING MATERIAL TRANSFERRED FROM JOINT ACCOUNT

Material purchased by either Operator or Non-Operators or divided in kind, unless agreed to by Operator and Non-Operators shall be priced on the following basis:

1. **New Price Defined**
   New price as used in this Section VI shall be the price specified for new Material in Section IV.

2. **New Material**
   New Material (Condition "A"), being new Material procured for the Joint Property but never used, at one hundred per cent (100%) of current new price (plus sales tax if any).

3. **Good Used Material**
   Good used Material (Condition "B"), being used Material in sound and serviceable condition, suitable for reuse without reconditioning:

   A. At seventy-five per cent (75%) of current new price if Material was charged to Joint Account as new, or

   B. At sixty-five per cent (65%) of current new price if Material was originally charged to the Joint Account as secondhand at seventy-five per cent (75%) of new price.

4. **Other Used Material**
   Used Material (Condition "C"), at fifty per cent (50%) of current new price, being used Material which:

   A. Is not in sound and serviceable condition but suitable for reuse after reconditioning, or

   B. Is serviceable for original function but not suitable for reconditioning.

5. **Bad-Order Material**
   Material (Condition "D"), no longer suitable for its original purpose without excessive repair cost but usable for some other purpose at a price comparable with that of items normally used for such other purpose.

6. **Junk Material**
   Junk Material (Condition "E"), being obsolete and scrap Material, at prevailing prices.

7. **Temporarily Used Material**
   When the use of Material is temporary and its service to the Joint Property does not justify the reduction in price as provided for in Paragraph 3B of this Section VI, such Material shall be priced on a basis that will leave a net charge to the Joint Account consistent with the value of the service rendered.

## VII. INVENTORIES

The Operator shall maintain detailed records of Controllable Material.

1. **Periodic Inventories, Notice and Representation**
   At reasonable intervals, inventories shall be taken by Operator of the Joint Account Controllable Material. Written notice of intention to take inventory shall be given by Operator at least thirty (30) days before any inventory is to begin so that Non-Operators may be represented when any inventory is taken. Failure of Non-Operators to be represented at an inventory shall bind Non-Operators to accept the inventory taken by Operator.

2. **Reconciliation and Adjustment of Inventories**
   Reconciliation of inventory with the Joint Account shall be made, and a list of overages and shortages shall be furnished to the Non-Operators. Inventory adjustments shall be made by Operator with the Joint Account for overages and shortages, but Operator shall be held accountable to Non-Operators only for shortages due to lack of reasonable diligence.

3. **Special Inventories**
   Special Inventories may be taken whenever there is any sale or change of interest in the Joint Property. It shall be the duty of the party selling to notify all other Parties as quickly as possible after the transfer of interest takes place. In such cases, both the seller and the purchaser shall be governed by such inventory.

4. **Expense of Conducting Periodic Inventories**
   The expense of conducting periodic inventories shall not be charged to the Joint Account unless agreed to by Operator and Non-Operators.

SCHEDULE I

Attached to and made a part of the Accounting Procedure,
Exhibit "A", to the Operating Agreement covering Block
A-489, High Island Area, South Addition, Offshore Texas

The Combined Fixed Rates, as heretofore provided under Section III, Para-
graph 2, of the COPAS-1968 Accounting Procedure to which this schedule is attached,
shall be in lieu of all charges to the Joint Account for the indirect costs and
expenses incurred by Operator in providing the joint operations with the producing
and development functions and services hereinafter identified as District
Expense, Warehousing and Administrative Overhead.

District Expense and Warehousing, as described under Section III, Paragraphs
1-A and 1-C, of the COPAS-1968 Accounting Procedure referenced above, shall be
defined as the salaries, wages, and expenses of the Operator's production super-
intendent and other employees located in the district serving the Joint Property
and other properties of Operator in the same operating area, whose time is not
charged directly to the properties, and the cost of maintaining and operating
the Operator's District, Area, or Field production office (whether one or more),
and necessary sub-offices, and all necessary camps including housing facilities
for employees and wholly-owned warehouses used in the conduct and supervision of
the development and producing operations of all properties operated by Operator
in the same operating area. The following reflects a representative abridged
listing of the functions and/or services which shall be considered as included
in the Operator's District Expense and Warehousing, and should serve as a guide
for similar functions intended to be covered by the Combined Fixed Rates even
though some of the functions may be contract services performed by third parties:

Salaries, Benefits and Related Costs of Field, Area and/or District:

Managers and/or Superintendents
Foremen - Superintendent
Drilling - (Except when permitted as a direct charge under Par.
B, Sect. III)
Production - (Except when permitted as a direct charge under Par.
A, Sect. III)
Construction - (Except when permitted as a direct charge under
Par. B, Sect. III)
Production Engineers - (Except when permitted as a direct charge
under Par. B, Sect. III)
Production Geologists - (Except when permitted as a direct charge
under Par. B, Sect. III)
Other Technical Employees -(Except when permitted as a direct charge
under Par. B, Sect. III)
Office Stenographers
Office Clerks
Time Keeping
Preparation of Boat, Automotive and Other Vehicle Reports
Local Purchasing (Field Orders)
Preparation and coding of invoices
Preparation of Material Requisitions
Preparation of Field Transfers
Preparation of Field Receiving Reports
Posting of Production Reports
Preparation of Over and Short Reports
Reading and Integration of Charts
Preparation of Field Gas Production and Consumption Report
Preparation of Field Office Reports to State and Federal Regulatory
Bodies
Miscellaneous Routine Field Office Clerical Duties
Field Office Inventory Men
Conducting Physical Inventories
Preparation of Field Inventory Records
Warehousemen and/or Clerks

Office Equipment, Supplies, Stationery and Forms

Maps, Photostats and Blueprints, when required for general District Use.

## Communications Expense - Telephone, telegraph and teletype service

rendered to the district; also operating expenses of radio communi-
cation systems which serve the district and which are not chargeable
to any particular lease or facility operation.  The costs applicable
to communication service and/or equipment directly employed on and
serving the joint property shall be a direct charge to the joint
property.

Area and/or District Office Utility Services

Local Field, Area and/or District Recreational Facilities

Safety Meetings and/or Dinners

Area and/or District Office Safety Equipment

First Aid Supplies

Physical and Medical Examinations - Cost of pre-employment and medical
examinations of personnel to be employed in the district, including
costs of annual or periodic examinations and immunizations.

Transportation, including freight and express costs when such costs
are incurred directly in the operation and/or maintenance of dis-
trict offices, buildings, and facilities.

Traveling Expense of district employees when such expense is for
the sole benefit of the district.  Traveling and personal expenses
of district employees attending oil shows, API meetings, and com-
pany training schools, etc., which are for the primary benefit of
. the Operator shall be borne solely by the Operator.

Moving Expense - Costs of moving and transfer of district employees
including relocation expenses such as real estate fees, closing
costs, compensation for loss on sale of home, carpeting and dra-
peries, etc., when transferred within or into the district.  Costs
incurred for the primary benefit of the Operator, such as transfer
of trainees, shall be borne solely by the Operator.

Memberships, dues and Subscriptions for Field, Area and/or District
Personnel.

Depreciation on Operator's wholly-owned Field, Area, and/or District
production offices, equipment, buildings, camps, roads, fences,
canals, docks, marine terminals, and slips, etc., used for District
purposes.

Repair and Maintenance on Operator's wholly-owned Field, Area and/or
District production offices, equipment, buildings, camps, roads,
fences, canals, docks, marine terminals, and slips, etc., including
the cost of small tools and supplies used specifically for District
purposes.

## Warehouse - wholly-owned

Depreciation
Operating and Maintenance Expense
Cost of Storing and Handling Material

Rentals
Rentals paid for buildings, office and storage space used by District
employees.

Rentals paid in connection with sites for District production offices, camps, warehouses and other facilities used specifically for District purposes.

Ad Valorem Taxes
Taxes paid on buildings and equipment charged to Operator's Field, Area, and/or District investment accounts.

## Insurance
Net cost of all types of insurance, including workmen's compensation and public liability insurance, when such insurance is applicable to the District.

Administrative Overhead as described under Section III, Paragraph 1-B, of the COPAS - 1968 Accounting Procedure referenced above, shall be defined as those general costs attendant to executive and administrative functions incurred by the Operator at the Home, Division, Area, Regional, or similar administrative office (whether one or more) serving, indirectly, the development and producing **operations. The following reflects a representative abridged listing of the** functions and/or services which shall be considered as included in the Operator's Administrative Overhead, and should serve as a guide for similar functions intended to be covered by the combined Fixed Rates even though some of the functions may be contract services performed by third parties:

General Management

General Operating Administration
### Drilling Managers and/or Superintendents and Office Staffs
Production Managers and/or Superintendents and Office Staffs
Civil Engineers (Except when permitted as a direct charge under
   Par. B., Sect. III)
Reservoir Analysis and Engineering
Petroleum Engineers (Except when permitted as a direct charge under
   Par. B., Sect. III)
Negotiation of Production and Residue Gas Sales
Negotiation of Major Gas Sales
Preparation and Negotiation of Joint Operating Agreements
Preparation of General Production Records

Traveling and Transportation Expense of Home, Division, Area, Region,
   or similar Administrative Office Employees.

General Accounting and Services
   Checking of Invoices
   Preparation of Paychecks
   Responsibility of Account Distribution or Coding
   Payment of Vendor's Invoices
   Maintaining Property Investment Records
   Maintaining Joint Interest Cost Records
   ### Preparation of Joint Interest Billing
   Preparation of Royalty Checks
   Machine Accounting and Data Processing Functions
   Photostat and Other Reproduction Service
   Ad Valorem Tax Service and/or Counsel
   Systems and Procedures
   Internal Auditing

Title Record and Division Order Administration
   Landmen and Titlemen
   Maintenance of Division of Interest Records
   ### Obtaining Royalty Signatures

Exploration Administration
   Geologists - (Except when permitted as a direct charge under Par. B, Sec. III)
   General Research
   Geophysicists

General Purchasing Administration

Industrial and Public Relation Administration

    Employee Relation Counselor
    Safety Engineer
    Industrial Nurse and/or Doctor
    Dinners, Parties, etc.
    Safety Awards
    Incentive Awards
    Thanksgiving Turkeys or Christmas Baskets
    Contributions to Charity and/or Civic Organizations
    Special Investigators
    Administration of Benefit Plans

General Oil and Gas Well Proration and Pricing Administration
    Preparation of Reports to and Representation before Governmental
      Agencies.

General Legal Counsel
    Preparation of Contracts
    Claims and Litigation
    Title and Other Opinions

Transportation and Traffic Administration

Insurance Administration

EXHIBIT "B"
TO
OPERATING AGREEMENT
BLOCK A-489, HIGH ISLAND AREA, SOUTH ADDITION,
OFFSHORE TEXAS

A.  During the performance of this Contract, the Operator agrees
as follows:

     1.  The Operator will not discriminate against any employee
or applicant for employment because of race, color, religion, sex
or national origin.  The Operator will take affirmative action to
ensure that applicants are employed, and that employees are treated
during employment, without regard to their race, color, religion,
sex or national origin.  Such action shall include, but not be
limited to the following:  Employment, upgrading, demotion or trans-
fer, recruitment or recruitment advertising; layoff or termination;
rates of pay or other forms of compensation; and selection for
training, including apprenticeship.  The Operator agrees to post
in conspicuous places, available to employees and applicants for
employment, notices to be provided by the contracting officer,
setting forth the provisions of this nondiscrimination clause.

     2.  The Operator will, in all solicitations or advertisements
for employees placed by or on behalf of the Operator, state that
all qualified applicants will receive consideration for employment
without regard to race, color, religion, sex or national origin.

     3.  The Operator will send to each labor union or represen-
tative of workers with which he has a collective bargaining agree-
ment or other contract or understanding, a notice to be provided
by the agency contracting officer, advising the labor union or
workers' representatives of the Operator's commitments under Section
202 of Executive Order No. 11246 of September 24, 1965, and shall
post copies of the notice in conspicuous places available to
employees and applicants for employment.

4.  The Operator will comply with all provisions of Executive Order No. 11246 of September 24, 1965, and of the rules, regulations and relevant orders of the Secretary of Labor.

5.  The Operator will furnish all information and reports required by Executive Order No. 11246 of September 24, 1965, and by the rules, regulations, and orders of the Secretary of Labor, or pursuant thereto, and will permit access to his books, records and accounts by the contracting agency and the Secretary of Labor for purposes of investigation to ascertain compliance with such rules, regulations and orders.

6.  In the event of Operator's non-compliance with the nondiscrimination clauses of this contract or with any of such rules, regulations or orders, this contract may be cancelled, terminated or suspended in whole or in part and the Operator may be declared ineligible for further Government contracts in accordance with procedures authorized in Executive Order No. 11246 of September 24, 1965, and such other sanctions may be imposed and remedies invoked as provided in said Executive Order No. 11246 of September 24, 1965, or by rule, regulation or order of the Secretary of Labor, or as otherwise provided by law.

7.  The Operator will include the provisions of Paragraphs (1) through (7) in every subcontract or purchase order unless exempted by rules, regulations or orders of the Secretary of Labor issued pursuant to Section 204 of Executive Order No. 11246 of September 24, 1965, so that such provisions will be binding upon each subcontractor or vendor.  The Operator will take such action with respect to any subcontract or purchase order as the contracting agency may direct as a means of enforcing such provisions, including sanctions for noncompliance; provided, however, that in the event the Operator becomes involved in, or is threatened with litigation

- 2 -

with a subcontractor or vendor as a result of such direction by
the contracting agency, the Operator may request the United States
to enter into such litigation to protect the interest of the
United States.

B.   EQUAL EMPLOYMENT OPPORTUNITY REPORTING

      The Operator agrees to file with the appropriate federal
agency a complete and accurate report on Standard Form 100 (EEO-1)
within 30 days after the signing of this Agreement or the award of
any such purchase order, as the case may be, (unless such a report
has been filed in the last 12 months), and agrees to continue to
file such reports annually, on or before March 31st. [41 CFR 60-1.7(a)]

C.   AFFIRMATIVE ACTION COMPLIANCE PROGRAM

      The Operator agrees to develop and maintain a current
written affirmative action compliance program for each of its
establishments in accordance with the regulations of the Secretary
of Labor promulgated under Executive Order No. 11246, as amended.
[41 CFR 60-1.40]

D.   LISTING OF EMPLOYMENT OPENINGS

      The Contractor agrees that all employment openings of the
Contractor which exist at the time of the execution of this contract
and those which occur during the performance of this contract,
including those not generated by the contract and including those
occurring at an establishment of the Contractor other than the one
wherein the contract is being performed but excluding those of
independently operated corporate affiliates, shall, to the maxi-
mum extent feasible, be offered for listing at an appropriate local
office of the State employment service system wherein the opening
occurs and to provide such periodic reports to such local office re-
garding employment openings and hires as may be required; provided,

- 3 -

that this provision shall not apply to openings which the Contractor fills from within the Contractor's organization or are filed pursuant to a customary and traditional employer-union hiring arrangement and that the listing of employment openings shall involve only the normal obligations which attach to the placing of job orders. The Contractor agrees further to place this provision in any subcontracts directly under this contract.

*H. I. A-489*
*Op aq*

High Island Area, South Addition, Block A-474 *

## OPERATING AGREEMENT PENALTY PROVISIONS

| Well | Participants | Penalty |
|------|--------------|---------|
| 1. Exploratory | 3 & 51% | |
| First or Second Well | | Assign entire interest in lease. |
| Third or Subsequent Well | | Assign interest in well until payout plus 1/2 interest in Lease. Upon payout, 50% of interest assigned in well shall revert to non-participating party. Payout is 100%. |
| 2. Platform Locator | 3 & 65% | Relinquish interest in well until payout (100%). Plus 50% of share of all wells served by the platform as a result of the drilling of Platform Locator well, or 100% of such share if non-participating party elected not to participate in more than one (1) Platform Locator well, until proceeds from said share equals: |
| | | 200%-cost of equipment beyond wellhead |
| | | 500%-cost of sidetracking, etc. |
| | | 500%-cost of subsurface equipment |
| 3. Wildcat | 3 & 51% | Relinquish rights in 1080 acres surrounding bottom hole location (aliquot parts). Participating parties must order 1) stationary drilling platform or 2) subsea completion equipment to be located on 1080 acres within one year of completion of drilling operations or relinquished acreage interest shall revert. If well results in a dry hole, interest shall revert. |
| 4. Development | 3 & 65% | Relinquish interest in well until payout: |
| | | 200%-cost of equipment beyond wellhead |
| | | 500%-cost of sidetracking, etc. |
| | | 500%-cost of subsurface equipment |

* Same provisions applicable to High Island Blocks A-339, A-340, and A-489.