# FARMOUT AGREEMENT

**THIS FARMOUT AGREEMENT** is dated effective October 1, 2008, ("Effective Date"), between Shell Offshore Inc. ("SOI"), Marathon Oil Company ("Marathon"), LLOG Exploration Offshore, Inc. ("LLOG"), and Davis Offshore, L.P. ("Davis") (hereinafter referred to as the "Farmout Agreement"). SOI, Marathon, LLOG, and Davis are also sometimes individually referred to herein as "Party" and collectively as "Parties".

WITNESSETH:

**WHEREAS**, SOI owns an undivided forty-nine and ninety-nine thousand nine-hundred ninety-nine one-hundred thousandths percent (49.99999%) record title interest and Marathon owns an undivided fifty and one one-hundred thousandths percent (50.00001%) record title interest in that certain oil and gas lease as further described in Exhibit "A" attached to and made a part hereof, which oil and gas lease grants the right to explore for and produce oil and gas on Green Canyon Block 201, OCS-G 12210 (the "Lease"). SOI and Marathon are also sometimes referred to collectively as the "Troika Group"; and

**WHEREAS**, the Lease is subject to (i) that certain Unit Operating Agreement entered into as of October 1, 1996, but effective June 15, 1993, by and between Marathon, SOI and BP Exploration & Oil Inc. (the "Troika UOA"); (ii) that certain MMS Unit Agreement for Outer Continental Shelf Exploration, Development and Production Operations on the Green Canyon Block 244 Unit comprised of Blocks 200, 201, 244, 245 Green Canyon, Offshore Louisiana, Contract No. 754393016, dated effective June 15, 1993 ("Unit Agreement"); (iii) that certain Production Handling Agreement for GC 244 Unit Production at the Green Canyon 65 Platform, dated effective February 29, 1996, as amended, by and between SOI, Marathon and BP Exploration & Oil Inc. ("Troika PHA"); (iv) that certain Agreement for Subsea Production System, dated effective January 1, 2000, between SOI, Shell Deepwater Development Inc., BP Exploration & Oil Inc., Marathon and Santa Fe Snyder Corporation as agent and attorney-in-fact for Brown Angus Properties, Inc.; (v) that certain Manta Ray Offshore Gathering System Operating Agreement dated August 21, 1997; (vi) that certain Seventh Amendment to Gas Processing Agreement between Enterprise Gas Processing LLC and Shell Offshore Inc. dated April 1, 2004; (vii) that certain Gas Gathering Agreement between Manta Ray Offshore Gathering Company, L.L.C. and Marathon Oil Company dated January 17, 1997; (viii) that certain Agreement for the Construction and Operation of the Neptune Gas Processing Plant between Tejas Natural Gas Liquids, L.L.C. and Marathon Oil Company, dated August 10, 1998; and (ix) That certain Purchase and Sale Agreement between Marathon Oil Company and Poseidon Oil Pipeline Company dated November 21, 2008.

**WHEREAS**, LLOG owns an undivided eighty-five percent (84%) record title interest, LLOG Energy, L.L.C. owns an un undivided one percent (1%) and Davis owns an undivided fifteen percent (15%) record title interest in that certain oil and gas lease on Green Canyon Block 157, OCG-G 24154 (the "J. Bellis Lease"). LLOG and Davis are sometimes referred to as the "J. Bellis Group"; and

Farmout Agreement - NE/4 of GC 201          - - 1 - -

WHEREAS, the J. Bellis Lease is subject to that certain Production Handling Agreement for the GC 157 Lease Production at the Green Canyon 158 Platform, dated effective May 26, 2004, as amended, by and between Shell Offshore Inc., LLOG Exploration Offshore, Inc., LLOG Energy, L.L.C., and Davis Offshore, L.P. ("J. Bellis PHA"), and Shell and the J. Bellis Group desire to amend the J.Bellis PHA to include production from the Contract Area; and

WHEREAS, the Troika Group desires to farmout its interests to the J. Bellis Group insofar and only insofar as to the Contract Area on the Lease, as defined in Section 1.1 below and as more particularly described in Exhibit "A" attached hereto, and the J. Bellis Group desires to conduct or cause to be conducted exploratory, development and producing operations in such Contract Area; and

WHEREAS, the Parties desire to set forth in this Farmout Agreement their respective rights, interests and obligations with respect to such exploration, development and producing operations on the Contract Area.

NOW, THEREFORE, for and in consideration of the mutual covenants and agreements herein contained, the receipt and sufficiency of which are hereby acknowledged, the Parties hereto agree as follows:

## ARTICLE 1

Designation of Operator:

1.1.     Upon the execution of this Farmout Agreement, SOI and Marathon shall execute and furnish LLOG, as operator for the J. Bellis Group, with a Designation of Operator form and any other forms necessary for submittal to the Minerals Management Service ("MMS"), which designate LLOG as the operator of the Lease, insofar and only insofar as said Lease covers the NE/4 of Green Canyon Block 201 for the depths from surface down to 17,000' SSTVD (hereinafter referred to as the "Contract Area"). SOI and Marathon shall also agree to make available, upon LLOG's written request, information in SOI and Marathon's possession necessary for LLOG to obtain any required governmental approvals and permits in order to conduct operations hereunder, which information shall be returned to SOI and Marathon upon receipt by LLOG of such approvals and permits.

Initial Test Well:

1.2     Subject to all regulatory approvals, the J. Bellis Group shall spud its first well on the Contract Area, hereinafter sometimes referred to as the "Initial Test Well", on or before December 31, 2008; but in no event shall the J. Bellis Group have the right to spud the Initial Test Well after December 31, 2008 without the express written consent of the Troika Group. The Initial Test Well (which will be undertaken by sidetracking the J. Bellis Green Canyon Block 157 #2 ST-1 from its

Farmout Agreement - NE/4 of GC 201                       - - 2 - -

Debtors' Exhibit A
Page 2 of 65

existing location to a bottom hole location 4722' FEL and 1900' FNL of Green Canyon Block 201) shall be drilled to a depth (i) sufficient to test the subsurface equivalent of the Pliocene S10 sands as seen in the LLOG GC 157-1 well from 16,338' to 16,440' MD, or (ii) 17,000' SSTVD, whichever is the shallower depth, hereinafter referred to as "Objective Depth".

If the Initial Test Well is drilled in the Contract Area to the Objective Depth in accordance with the terms hereof and (i) meets the qualifications of 30 CFR 250.116, and (ii) is completed and capable of producing back to the Green Canyon 158 Platform ("Brutus"), such Initial Test Well shall be considered the "Earning Well". In such event, the Troika UOA shall be amended to exclude the Contract Area as set forth in Exhibit B-1, and the J. Bellis PHA shall be amended to include the Contract Area as set forth in Exhibit B-2.

Assignment of Operating Rights Interest:

1.3   Subject to the terms, provisions and conditions, and specifically the earning requirement as more particularly set forth hereinabove, as well as in the exhibits attached hereto and made a part hereof, and without warranty of title, express or implied, except as to persons claiming by, through or under SOI and Marathon, but not otherwise, at such time that the J. Bellis Group has established the Earning Well on the Contract Area ("Earning Event"), the J. Bellis Group shall earn and the Troika Group shall assign to the J. Bellis Group, pursuant to an assignment in substantially the same form as Exhibit "C-1" attached hereto, an undivided one hundred percent (100% of 8/8ths) operating rights interest in the Lease, insofar and only insofar as to the Contract Area, reserving unto the Troika Group a six and one-half percent of eight-eighths (6.5% of 8/8ths) overriding royalty interest ("ORRI") in and to all production from said operating rights interest assigned to the J. Bellis Group applicable to the first one million Barrels of Oil Equivalent (BOE) produced from the Contract Area which shall escalate to nine and three-quarter percent of eight-eighths (9.75% of 8/8ths) ORRI for all production above one million BOE produced in the Contract Area, as further defined in Exhibit "C-2".

Failure to Timely Commence Operations for Initial Test Well:

1.4   Should the J. Bellis Group fail to commence the actual spudding of the Initial Test Well for any reason prior to December 31, 2008 as provided for herein, this Farmout Agreement shall terminate, and the Marathon and LLOG shall promptly designate SOI as operator of the Contract Area and execute any documents, including, but not limited to those required by any governmental agency, to effectuate said designation.

Continuous Drilling Right and Approval of Development Plan:

1.5   In the event that the J. Bellis Group timely spuds but does not complete the drilling of the Initial Test Well to the Objective Depth, then, for a period of ninety (90) days from the day the drilling rig is released, or the day the well was plugged and abandoned (either temporarily or permanently), whichever occurs first, the J. Bellis Group shall have the right and option to commence, or cause to be commenced, actual drilling operations for a substitute test well(s) at a legal location on the Contract Area under the same terms and conditions as previously noted herein

Debtors' Exhibit A
Page 3 of 65

for the Initial Test Well. This option shall remain in effect until an Initial Test Well has been drilled to the Objective Depth. All such substitute test well(s) shall be drilled in the same manner and to the same Objective Depth, unless otherwise agreed upon by the Parties in writing, as the Initial Test Well, and each substitute test well shall be deemed the Initial Test Well upon its commencement.

Failure to commence actual drilling operations for a substitute test well(s) within ninety (90) days from the day the drilling rig is released from the Initial Test Well, or the day such well is plugged and abandoned (either temporarily or permanently), whichever occurs first, shall result in the termination of this Farmout Agreement, and Marathon and LLOG shall promptly designate SOI as operator of the Contract Area and execute any documents, including, but not limited to those required by any governmental agency, to effectuate said designation. Termination of this Farmout Agreement and the J. Bellis Group's loss of its rights to earn the interest from the Troika Group in the Contract Area contemplated hereby shall be the only penalties for the J. Bellis Group's failure to timely commence operations for a substitute well.

The J. Bellis Group shall have twelve (12) months upon rig release from an Initial Test Well (including any substitute test well(s) as contemplated above) that has been drilled to the Objective Depth to secure MMS' approval of a DOCD (*Development Operations Coordination Document*), DPP (*Deepwater Production Plan*), or such other document approved by the MMS relating to the commencement of production; provided, however, if the J. Bellis Group has timely initiated the appropriate filing and such approval is not received within the twelve (12) month period, the twelve (12) month period shall be extended a sufficient time to allow the MMS to finalize its review and approval process. Failure to secure MMS' approval shall result in the termination of this Farmout Agreement, and Marathon and LLOG shall promptly designate SOI as operator of the Contract Area and execute any documents, including, but not limited to those required by any governmental agency, to effectuate said designation. Termination of this Farmout Agreement and the J. Bellis Group's loss of its rights to earn the interest from the Troika Group in the Contract Area contemplated hereby shall be the only penalties for the J. Bellis Group's failure to timely secure MMS approval referenced above.

<u>Drilling Operations:</u>

1.6     For the purposes of this Farmout Agreement, operations for the drilling of a well shall be deemed to have commenced on the date the well is spud. Operations for any wells drilled by the J. Bellis Group hereunder shall be commenced and prosecuted with reasonable diligence and in a workmanlike manner and such operations shall be at the J. Bellis Group's sole cost, risk, and expense. Unless otherwise provided for herein, the J. Bellis Group shall bear all costs, risks, and expenses of surveying, drilling, testing, coring, evaluating, equipping, completing, operating, logging, sampling and abandoning the Initial Test Well and any substitutes therefor. LLOG, on behalf of the J. Bellis Group, shall conduct all operations hereunder as a prudent operator in accordance with industry standards and all applicable laws and regulations of governmental authorities having jurisdiction. All wells drilled shall conform to the appropriate API standards.

Farmout Agreement - NE/4 of GC 201                    - - 4 - -

In addition, each member of the Troika Group shall be entitled to receive all well, production or other information including, but not limited to, surveying, testing, coring, logging, sampling and/or cuttings information, from any well(s) drilled in the Contract Area and/or any acreage unitized or pooled therewith (collectively, "Well Results Information"). All Well Results Information shall be provided by LLOG as operator of the J. Bellis Group to each member of the Troika Group as further provided for in Exhibit "D" ("Open Hole Well Data Format and Delivery Specifications"). LLOG, as operator for the J. Bellis Group shall notify each member of the Troika Group at least twenty-four (24) hours in advance of any coring, logging, or testing operations so that each member of the Troika Group has the opportunity to have a representative present during such operations. If oil and/or gas sands are encountered in the drilling of any of said well(s), the J. Bellis Group will make such evaluation thereof, which in its sole determination is warranted and consistent with good operating practices. It is understood and agreed that all Well Results Information furnished to the Troika Group in connection with the drilling of said well(s) shall be free of cost to the Troika Group and shall be provided by LLOG as operator of the J. Bellis Group for each member of the Troika Group's internal use only. Each member of the Troika Group shall treat all Well Results Information as confidential for a period of three (3) years from receipt. Notwithstanding anything contained in this provision to the contrary, the Parties agree that (i) the J. Bellis Group shall furnish the minimum required well information, in accordance with standard industry practice, to the Offshore Oil Scouts Association; (ii) the J. Bellis Group shall have the right to sell, trade or otherwise disclose any Well Results Information without the consent of the Troika Group; (iii) each member of the Troika Group and the J. Bellis Group shall be allowed to make necessary disclosures to governmental agencies having appropriate jurisdictional authority over the Lease; (iv) each member of the Troika Group and the J. Bellis Group shall be allowed to make disclosures to any bona fide, financially responsible, prospective assignee of any portion of the disclosing Party's interest in the Contract Area, provided such Party undertakes to obtain a confidentiality agreement with the reviewing party prior to making the disclosure; and (v) each member of the Troika Group and the J. Bellis Group shall be allowed to make disclosures to the public, to the extent required by governmental regulations or those of a recognized stock exchange. Additionally, each member of the Troika Group and the J. Bellis Group may disclose Well Results Information relative to the Contract Area that becomes part of the public domain (i.e., same becomes a matter of public record via the MMS or source other than the J. Bellis Group or the Troika Group).

<u>Take-Over of Contract Area</u>

1.7     In the event the Lease is maintained solely by operations in and/or production from the Contract Area under this Agreement, and further, in the event the J. Bellis Group does not wish to continue operations in and/or production from the Contract Area pursuant to this Agreement, the J. Bellis Group shall notify each member of the Troika Group in writing of same not less than ninety (90) days prior to the ensuing Lease obligation date or proposed release date. Each member of the Troika Group shall have twenty (20) business days after receipt of the J. Bellis Group's notice to respond to the J. Bellis Group either concurring in the proposed surrender or release of the Lease, or electing to take over the Contract Area. An election of a member of the Troika Group not to take over the Contract Area or a failure of a member of the Troika Group to timely respond to the J. Bellis Group's notice shall be deemed to grant the optional right to the

Debtors' Exhibit A
Page 5 of 65

other Troika Group member to acquire that Troika Group member's interest in the Contract Area. Failure of all members of the Troika Group to timely respond to the J. Bellis Group's notice or failure of a Troika Group member's option to acquire all the Troika Group's interest in the Contract Area as aforementioned shall be deemed a concurrence with the J. Bellis Group in the proposed surrender or release of the Lease. If the Troika Group concurs with the J. Bellis Group in the proposed surrender or release of the Lease, then the J. Bellis Group, at its sole cost, risk, and expense, shall timely proceed with abandonment of the Contract Area as provided by MMS regulations. Should the Troika Group or a member thereof elect to takeover the entirety of the Contract Area, this Farmout Agreement shall terminate and the J. Bellis Group shall promptly, within thirty (30) days of such election, assign to the Troika Group or the Troika Group member (hereinafter referred to as the "Taking Over Member") (a) all of the J. Bellis Group's operating rights in the Contract Area free and clear of any liens, charges, or lease burdens, overriding royalty interest, payments out of production or any further encumbrances (collectively hereinafter referred to as "Encumbrances") created by the J. Bellis Group subsequent to the Effective Date; and at the Troika Group's or the Taking Over Member's option and in the Troika Group's or the Taking Over Member's sole discretion, (b) any or all of the J. Bellis Group's right, title and interest in all equipment, wells and platforms located on the Lease and solely serving the Contract Area; provided such equipment, wells and platforms do not in any way restrict or interfere with the J. Bellis Group's existing production from Green Canyon Block 157, and (c) any or all of the J. Bellis Group's rights in that portion of any adjoining and/or contiguous lease(s) which is unitized with the Contract Area (including equipment, wells and platforms). Further, if the Troika Group or the Taking Over Member elects to take-over the Contract Area, Marathon and the J. Bellis Group shall also promptly designate SOI as operator of the Contract Area on behalf of the Troika Group, or the Taking Over Member, and execute any such other documents, including, but not limited to, those required by any governmental agency, to effectuate said designation.

<u>Take Over of Wells, Platforms and Facilities</u>

1.8    Prior to the J. Bellis Group permanently abandoning or removing a platform, equipment, facility or well located on the Lease and serving the Contract Area and/or on any acreage unitized or pooled therewith by the J. Bellis Group, the J. Bellis Group shall give each member of the Troika Group written notice of its intent to abandon or remove such platform, equipment, facility or well. Each member of the Troika Group shall have the right to acquire the J. Bellis Group's interest in and to the same for a reasonable salvage or fair market value (as determined in accordance with the standards then in effect as ascribed to, accepted by, and approved by COPAS), whichever is greater. Each member of the Troika Group shall advise the J. Bellis Group of its election in writing to acquire such platform, equipment, facility or well within thirty (30) days of receipt of the J. Bellis Group's written notice. A failure by a member of the Troika Group to respond timely shall be deemed an election not to purchase and shall be deemed to grant the other member of the Troika Group the optional right to acquire all of the J. Bellis Group's interest in and to the same. Notwithstanding anything herein to the contrary, each member of the Troika Group's right to acquire the J. Bellis Group's platform, equipment, facility or well as provided for in this Section 1.8 is subordinated to the J. Bellis Group's right to utilize

Farmout Agreement - NE/4 of GC 201

Debtors' Exhibit A
Page 6 of 65

such platform, equipment or facility on or off the Lease and such election to utilize shall be noted in the aforementioned notice of its intent to abandon or remove.

       Any platform(s), equipment, facility(ies) and well(s) transferred pursuant to the aforementioned provision of this Farmout Agreement shall be transferred "as is, where is" without any warranty whatsoever. The J. Bellis Group shall have no obligation to plug and abandon any well, or remove any platform, equipment or facility, which has been acquired by the Troika Group or a member thereof hereunder. Notwithstanding anything herein to the contrary, the Troika Group, or member thereof, will indemnify and hold the J. Bellis Group harmless with respect to any operations performed by the Troika Group, or member thereof, on the platform(s), equipment, facility(ies) and/or well(s) transferred to the Troika Group, or member thereof, hereunder and shall bear all additional costs, of any nature, relating to such platform(s), equipment, facility(ies) and/or well(s) after the Troika Group, or member thereof, acquires them.

Surface Rights Access:

       1.9    The J. Bellis Group shall have non-exclusive surface rights to the northeast quarter of the Lease (NE/4 of GC 201) for purposes of exploring, appraising and developing the Contract Area. As a record title owner of the Lease, SOI, individually and as the Troika operator on behalf of the Troika Group, shall retain the surface rights and the right to drill through the Contract Area to explore, drill, develop and/or produce (collectively "Operations") from the Lease as to depths below the Contract Area. Furthermore, upon written request by SOI, the J. Bellis Group shall timely make available all information in its possession necessary for SOI to obtain governmental approvals and permits in order to conduct Operations on the Lease. SOI agrees to promptly return all such information to the J. Bellis Group once the required governmental approvals and permits are obtained. The Troika Group shall not own or otherwise be entitled to sell or trade any of such information that the J. Bellis Group makes available.

Contract Area Offshore Operating Agreement:

       1.10    Simultaneous with the execution of this Farmout Agreement, the Troika Group agrees to execute the Amendment agreement attached hereto as Exhibit "B-1" ("Amendment"), which Amendment provides for the segregation of the Contract Area from the Troika UOA. Operations in the Contract Area shall be governed pursuant to the terms of the Green Canyon Block 157 Offshore Operating Agreement ("J. Bellis OOA") between LLOG and Davis that covers all of Green Canyon Block 157.

## **ARTICLE 2**

SOI's Pipeline and Gas Processing Dedications:

       2.1    SOI's interest in the Contract Area is subject to existing agreements with Manta Ray Offshore Gathering Company, L.L.C. and Nautilus Pipeline Company, L.L.C. for transportation of production, and with Enterprise Gas Processing, L.L.C. for processing of production, as reflected in the assignment attached hereto as Exhibit "C-1". In the event the J. Bellis Group earns SOI's

Farmout Agreement - NE/4 of GC 201        - - 7 - -

interest in the Contract Area pursuant to the terms of this Farmout Agreement, such interest shall remain subject to these agreements and the J. Bellis Group, as owner of an interest in the Lease as to the Contract Area, agrees to comply with the terms thereof.

Marathon's Pipeline and Gas Processing Dedications:

2.2    Marathon's interest in the Contract Area is subject to existing agreements with Manta Ray Offshore Gathering Company, L.L.C., Nautilus Pipeline Company, L.L.C. for transportation of gas production (and any accompanying natural gas liquids), and with Enterprise Gas Processing, L.L.C. for processing of gas (and any accompanying natural gas liquids) production. Further, Marathon's interest in the Contract Area is subject to an existing agreement with Poseidon Oil Pipeline Company Agreement for the transportation of oil production.  All of these agreements are reflected in the assignment attached hereto as Exhibit "C-1".  In the event the J. Bellis Group earns Marathon's interest in the Contract Area pursuant to the terms of this Farmout Agreement, such interest shall remain subject to these agreements and the J. Bellis Group, as owner of an interest in the Lease as to the Contract Area, agrees to comply with the terms thereof.

Subsea Tie-back and Production Handling:

2.3    At the point in time when the Initial Test Well becomes the Earning Well, the J. Bellis Group shall, subject to the terms of this Section 2.3, (i) evacuate production established on the Contract Area through the existing J. Bellis subsea production system ("JBSPS") currently utilized for production under the J. Bellis PHA and (ii) process production established on the Contract Area at SOI's operated platform at Green Canyon Block 158 ("Brutus Platform"). The J. Bellis Group agrees to pay SOI production handling fees for one hundred percent (100%) of the Contract Area production pursuant to the terms and conditions of the J. Bellis PHA, commencing with the J. Bellis PHA fees in effect at the time of the Contract Area first production. SOI agrees to process such production at the Brutus Platform for said J. Bellis PHA fees, provided that the Contract Area production stream has essentially the same production stream characteristics, arrival temperature, arrival pressure and rates as the existing production stream governed by the J. Bellis PHA, and further provided that such Contract Area production stream is compatible with the production streams producing to the Brutus Platform.

Notwithstanding anything to the contrary contained herein, however, SOI and the J. Bellis Group acknowledge and agree that inasmuch as there may be (A) additional production-related issues that need to be further clarified, understood and negotiated relative to amending the J. Bellis PHA to include the Contract Area production handling and processing, including, but not limited to the following: (i) production handling priority and capacity at the JBSPS, (ii) production handling priority and capacity at the Brutus Platform, (iii) requirements for additional subsea production equipment and/or Brutus Platform top-sides equipment, and (iv) adjustment for the quality of Contract Area production compared to the J. Bellis production and other production processed at the Brutus Platform and (B) other potential technical issues to be further addressed such as flow assurance, commingling of production, flow configuration, oil circulation, measurement and allocation procedures, with such measurement and allocation methods/procedures being subject to MMS approval, no production from the Contract Area shall be transported through the JBSPS or processed at the Brutus Platform until such time that SOI

Farmout Agreement - NE/4 of GC 201                    - - 8 - -

and the J. Bellis Group have mutually agreed upon terms and conditions to address these concerns as well as any other concerns which may impact the JBSPS and/or the Brutus Platform. Subsequent to the execution of this Farmout Agreement by SOI and the J. Bellis Group, SOI and the J. Bellis Group agree to timely commence good faith negotiations aimed at resolving the details surrounding such issues and memorializing any mutual agreement(s) of SOI and the J. Bellis Group with respect thereto in a separate amendment to the J. Bellis PHA.

## ARTICLE 3

Royalty Payments:

      3.1    The J. Bellis Group shall be responsible for the distribution of each Party's share, in-kind or otherwise, of all royalties (including minimum royalties) which may accrue and become due and payable on the Contract Area.

Right to Take In-Kind:

      3.2    SOI and Marathon shall initially receive their ORRIs in-kind and shall separately dispose of such production attributable to their ORRIs as defined in Section 1.3 of this Agreement and further defined in Exhibit "C-2" attached thereto, at their sole cost, risk and expense, including the cost and expense attributable to any additional facilities necessary to take the ORRIs in-kind and separately dispose of same, until such time as SOI and Marathon may, from time to time, elect in writing to take the gross proceeds attributable to such ORRIs. In the event that an imbalance should occur, the Parties agree that the terms and conditions set forth in the Gas Balancing Agreement attached to the Troika UOA shall govern. SOI and Marathon may, from time to time, withdraw their election to take such ORRIs in-kind by furnishing the J. Bellis Group a sixty (60) days advance written notification. In the event SOI and/or Marathon elects to receive the gross proceeds attributable to its ORRI under the terms of this provision, the value of said proceeds shall be based on the price received by the J. Bellis Group for production from the Contract Area based on an arms-length transaction.

The Troika Group's Correlative Rights in the Contract Area:

      3.3    The J. Bellis Group may not unitize or pool the Contract Area with additional acreage, without the prior written consent of the Troika Group. The J. Bellis Group shall use its best efforts to ensure that any agreements that the J. Bellis Group enters into covering acreage that is adjacent and/or contiguous to the Contract Area will provide for offset wells of at least 500 feet from the Lease boundaries. Furthermore, should production be established on lands outside of the Lease and which is reasonably estimated by the Troika Group (using standard and accepted engineering practices) to be in hydrocarbon communication with the Contract Area, the J. Bellis Group shall use its best efforts to protect the Troika Group's correlative rights. In the event the J. Bellis Group can provide geological and geophysical evidence that such production is not in hydrocarbon communication with the Contract Area, the J. Bellis Group shall be relieved of any implied-in-law or express obligation to drill an offsetting well. If the Parties are unable to agree

Farmout Agreement - NE/4 of GC 201

upon whether such production is in hydrocarbon communication with the Contract Area, then the Parties agree to seek resolution of such dispute in accordance with Article 8 below.

Notification of First/Suspended/Terminated Production:

      3.4    The J. Bellis Group shall notify each member of the Troika Group, in writing, of the anticipated commencement of first production from the Contract Area within a minimum of thirty (30) days prior to the anticipated start-up date. In the event of a suspension or termination of production, the J. Bellis Group shall notify each member of the Troika Group in writing within thirty (30) days of such event.

# ARTICLE 4

Termination:

      4.1    Unless earlier terminated in accordance with Sections 1.4, 1.5 or 1.7 hereof, this Farmout Agreement shall terminate upon: (i) the mutual written agreement of the Parties; (ii) default of the J. Bellis Group per Section 4.2; or (iii) at the Troika Group's option, upon the J. Bellis Group's failure to commence the commercial sale of production from the Contract Area within twelve (12) months after the MMS' approval of the J. Bellis Group's DOCD (*Development Operations Coordination Document*), DPP (*Deepwater Production Plan*), or such other document approved by the MMS relating to the commencement of production; provided, however, same shall not apply provided the J. Bellis Group can demonstrate a diligent and good faith effort on its part in attempting to initiate the sale of production from the Contract Area or is prevented from the commencement of production by the lack of executed contracts referred to in Section 2.2. In the event of termination of this Farmout Agreement as noted above, and in the event the J. Bellis Group has already been assigned interest in the Contract Area by the Troika Group, the J. Bellis Group shall within thirty (30) days thereof, forward to the Troika Group an assignment re-conveying the J. Bellis Group's operating rights interest in the Lease previously received from the Troika Group pursuant hereto, which assignment shall be free and clear of any Encumbrances created by the J. Bellis Group. Under such circumstances, the J. Bellis Group and Marathon shall also promptly designate SOI as operator of the Contract Area and execute any such other documents, including, but not limited to, those required by any governmental agency, to effectuate said designation.

Default:

      4.2    In the event of the J. Bellis Group's failure or default in any of the requirements, conditions or obligations as set forth in this Farmout Agreement, other than with respect to Sections 1.2, 1.4, 1.5 and 1.7, upon written notice from SOI as operator for the Troika Group of said failure or default, the J. Bellis Group shall cure or remedy such failure of default within thirty (30) days of the date of said notice. If the J. Bellis Group does not cure or remedy such failure or default within said thirty (30) day period, SOI may request a re-conveyance of the J. Bellis Group's operating rights in the Contract Area previously received from the Troika Group pursuant hereto. Upon such request, this Farmout Agreement shall terminate and, within thirty

(30) days thereof, the J. Bellis Group shall forward to the Troika Group an assignment re-conveying the J. Bellis Group's operating rights interest in the Contract Area previously received from the Troika Group pursuant hereto, which assignment shall be free and clear of any Encumbrances created by the J. Bellis Group. Under such circumstances, the J. Bellis Group and Marathon shall also promptly designate SOI as operator of the Contract Area and execute any such other documents, including, but not limited to, those required by any governmental agency, to effectuate said designation.

## **ARTICLE 5**

Encumbrances and Indemnifications:

5.1     **The J. Bellis Group agrees to and shall keep all of the lands subject to this Farmout Agreement free and clear of all Encumbrances occasioned by the J. Bellis Group's operations hereunder, save and except that certain overriding royalty interest to be assigned to certain current and former employees of Davis Offshore, L.P. by the J. Bellis Group, pursuant to the J. Bellis OOA; provided that in the event any portion of the lands subject to this Farmout Agreement is assigned back to the Troika Group or a member thereof pursuant to this Agreement, such assignment shall be made free and clear of all Encumbrances and any overriding royalty interests assigned to current and former employees of Davis Offshore, L.P.. The J. Bellis Group agrees to observe and comply with all conditions and covenants of the Lease and agrees to fully indemnify and hold the Troika Group and their Affiliates harmless from all claims, suits, liability, losses, costs, expenses and demands resulting from or arising out of the breach or violation by the J. Bellis Group of any applicable laws, rules, regulations, lease terms, or orders in connection with the J. Bellis Group's operations on the Contract Area and to defend any suit and pay any judgment or action rendered or ordered against the Troika Group or their Affiliates for any such breach or violation arising by or through the J. Bellis Group's operations on the Contract Area. The J. Bellis Group also agrees to indemnify, defend and hold the Troika Group and their Affiliates harmless against all claims, suits, liability, losses, costs, expenses and demands on account of injury to or death of persons or damage to property (including the property of the J. Bellis Group, the Troika Group, and their Affiliates), and environmental liability of any type, arising out of or in connection with operations under this Farmout Agreement, insofar as it relates to the Contract Area, notwithstanding the partial negligence, fault, or liability without fault of the Troika Group or their Affiliates unless caused solely by the Troika Group's or their Affiliates' willful misconduct or gross negligence without any contributory negligence or fault of the J. Bellis Group and their employees or agents, or any subcontractor or the employees or agents thereof. The Troika Group may participate in the defense of any claim or suit without relieving the J. Bellis Group of any obligation hereunder.**

For purposes of this Farmout Agreement, "Affiliate" shall mean, with respect to a Party to this Farmout Agreement any Person that directly or indirectly controls, is controlled by, or is under common control with such Party. For purposes of this definition, the term (i) "control"

(including its derivatives and similar terms) means owning, directly or indirectly, 50% or more of the interest in any such Person and (ii) "Person" means any individual or entity, including, without limitation, any corporation, limited liability company, joint venture, joint stock company, general or limited partnership, trust, agency, association, organization, government authority (including any agency or administrative group thereof), or other entity.

## **ARTICLE 6**

Insurance:

6.1     Prior to commencement and/or continuation of operations on the Contract Area, each member of the J. Bellis Group, or the successors and assigns of each member of the J. Bellis Group, agrees to furnish the Troika Group with a "Certificates of Insurance" for the insurance coverage specified in Exhibit "F".   The Certificates of Insurance shall evidence that proper insurance has been secured and itemizing the type, amount, and duration of insurance carried by the J. Bellis Group.   These insurances shall, as far as applicable, name SOI and Marathon as additional named insureds and shall be endorsed to provide:

a.     SOI, on behalf of the Troika Group, with thirty (30) days notice in the event of cancellation or material change; and

b.     a waiver of subrogation from underwriters to SOI, Marathon, their Affiliates and their officers, employees, or agents.

Following the commencement and/or continuation of operations on the Contract Area, the J. Bellis Group will provide to SOI as operator for the Troika Group a Certificate(s) of Insurance to evidence the existence and scope of insurance required at SOI's request.

6.2     As long as this Farmout Agreement remains in effect, the J. Bellis Group, at its sole cost and expense, shall provide and maintain in force the insurance coverage noted herein and further outlined in Exhibit "F" attached hereto.   Coverage under all insurance required to be carried by the J. Bellis Group, as set forth in Exhibit "F", will be primary insurance and exclusive of any other existing valid and collectible insurance to the extent of the liabilities and indemnities assumed hereunder by the J. Bellis Group. It is expressly agreed and understood that the insurance provisions of this Farmout Agreement are intended to assume that certain minimum standards of insurance protection are afforded by the J. Bellis Group, and/or its successors and assigns, and the specifications herein of any amount or amounts shall be construed to support, but not in any way to limit, the liability and indemnity obligations of the J. Bellis Group. Failure to furnish timely evidence of the minimum insurance coverage provided herein shall not constitute a breach hereof, unless SOI, as operator for the Troika Group, has notified the J. Bellis Group of such failure and the J. Bellis Group has not taken appropriate corrective action within thirty (30) days following receipt of written notice from SOI.

Debtors' Exhibit A
Page 12 of 65

# ARTICLE 7

Arbitration:

7.1    All disputes and controversies of every kind and nature between the Parties arising out of or related to this Farmout Agreement, including any dispute concerning the existence, construction, validity, interpretation, performance, enforcement, operation, breach, continuation or termination thereof shall be submitted to arbitration pursuant to the procedure set forth in this Farmout Agreement.  This arbitration provision shall survive the rescission or termination of this Farmout Agreement.  The arbitration shall be conducted as follows:

(i)    All arbitration shall be conducted pursuant to the Commercial Arbitration Rules of the American Arbitration Association except as may herein be provided;

(ii)    In any dispute in which any Party seeks in excess of $500,000 in damages, one (1) additional disinterested and impartial arbitrator shall be employed, otherwise, the dispute shall be decided by a single arbitrator;

(iii)    All costs associated with the arbitration shall be borne equally by the Parties, except that each Party shall bear the remuneration, compensation and expenses of its own counsel, witnesses and employees, unless otherwise directed in the arbitration award;

(iv)    The Arbitration Hearing shall be convened at a mutually agreed upon location within ninety (90) days after the filing of a statement of claim, unless otherwise continued by the arbitrator(s) for good cause;

(v)    The arbitration shall result in a written award made within fifteen (15) days after the close of the submission of evidence;

(vi)    The arbitrator(s) shall be solely responsible for the rules of evidence to be applied at trial and shall resolve all discovery disputes;

(vii)    All arbitration shall be undertaken pursuant to the Federal Arbitration Act, where applicable, and the decision of the arbitrators shall be enforceable in any court of competent jurisdiction.  The award of the arbitrator shall be final and binding on all Parties; and

(viii)    In the event any Party concludes that it should pursue a request for emergency relief by requesting a temporary injunction in order to protect rights, pending the outcome of arbitration, it shall be entitled to seek such emergency relief in any court of competent jurisdiction, provided that each Party hereby consents to the stay of such action upon the conclusion of the action for emergency relief pending a final and binding determination of the rights of the Parties through the arbitration contemplated hereby.

**ARTICLE 8**

Force Majeure:

       8.1    All obligations imposed by this Farmout Agreement on each Party, except for payment of money and except for the spudding of the Initial Test Well which shall under no circumstances be extended beyond December 31, 2008, shall be suspended and all periods of time for exercising any rights hereunder shall be extended while compliance is prevented, in whole or in part, by "Force Majeure", which shall mean a labor dispute; explosion; act of terrorism; fire; storm; flood; hurricane; war; civil disturbance; act of God; laws; governmental rules, regulations, orders, action or delay; inability to secure materials after reasonable efforts; or any other similar cause beyond the reasonable control of the Party claiming relief hereunder. Provided, however, that such Party shall (i) provide written notice of such impediment to the other Part(ies) within twenty (20) business days after such occurrence, which notice shall give full details of the Force Majeure situation and (if possible) an estimate of the period of time which will be required to remedy the Force Majeure and resume performance of that Party's obligations under this Farmout Agreement and (ii) upon remedy of the Force Majeure situation, the Party claiming Force Majeure shall promptly provide written notice to the other Part(ies)y that the Force Majeure situation has ended and at such time said Party shall again be subject to all of its obligations under this Farmout Agreement. Notwithstanding anything herein to the contrary, no Party shall be required against its will to settle any labor dispute.

**ARTICLE 9**

Miscellaneous:

       9.1    Where applicable, the Troika Group shall have the continuing right, upon reasonable request and during normal business hours, to audit the J. Bellis Group's records relating directly to operations on the Contract Area. Upon notice in writing to the J. Bellis Group, the Troika Group shall have the right to audit the J. Bellis Group's accounts and records relating to the Contract Area for any calendar year within the twenty-four (24) month period following the end of such calendar year; provided, however, the making of an audit shall not extend the time for the taking of written exception. The J. Bellis Group shall bear no portion of the Troika Group's audit cost incurred under this Section 9.1 unless agreed to by the J. Bellis Group. The audits shall not be conducted more than once each year without prior approval of LLOG, except upon the resignation or removal of LLOG, as operator of the Contract Area, and shall be made at the expense of those parties conducting such audit.

       9.2    If any term or other provision of this Farmout Agreement is invalid, illegal or incapable of being enforced by any rule of law or public policy, all other terms and provisions of this Farmout Agreement shall nevertheless remain in full force and effect.

       9.3    The captions in this Farmout Agreement are for convenience only and shall not be considered a part hereof or affect the construction or interpretation of any provision of this Farmout

Agreement. All titles or headings to Articles, Sections, sub-sections or other divisions of this Farmout Agreement and the Exhibits hereto, are only for the convenience of the Parties and shall not be construed to have any effect or meaning with respect to the other content of such Articles, Sections, sub-sections, or other divisions, such other content being controlling as to the agreement between the Parties,

9.4     Unless otherwise indicated, references to Article, Section or sub-section numbers pertain to this Farmout Agreement, and references to Exhibits pertain to the Exhibits hereto attached.

9.5     The Troika Group and the J. Bellis Group declare that they have contributed to the drafting of this Farmout Agreement or have had it reviewed by their counsel before signing it, and the Parties agree that this Farmout Agreement shall not be construed against one Party or the other as a result of the preparation, submittal or other event of negotiation, drafting or execution hereof.

9.6     Whenever the context requires, reference made herein to the singular shall be understood to include the plural, and the plural shall likewise be understood to include the singular.

9.7     This Farmout Agreement constitutes the understanding and agreement of the Parties relating to the subject matter hereof, specifically, the Contract Area as of the Effective Date.  This Farmout Agreement, upon full execution, shall supercede and replace any and all other agreements, prior letters of intent or understanding written or oral, prior discussions, and/or verbal representations or agreements of the Parties as to the contemplated transaction and/or subject matter hereof, specifically, the Contract Area, save and except the J. Bellis PHA, (excluding those provisions in the Farmout Agreement that constitute amendments to the J. Bellis PHA). This Farmout Agreement may be modified or amended only by a duly authorized written instrument executed by each and all of the Parties.

9.8     In the event of a conflict between the provisions of this Farmout Agreement and the Exhibits attached hereto and made a part hereof, the provisions of this Farmout Agreement shall prevail, except as to Exhibit "E" which shall prevail in the event of a conflict with all other portions of this Farmout Agreement.

9.9     Except as otherwise expressly provided in this Farmout Agreement, nothing in this Farmout Agreement shall entitle any party other than the Parties to this Farmout Agreement to any claim, cause of action, remedy or right of any kind under this Farmout Agreement.

9.10     The Parties stipulate, unless otherwise provided herein, that any provision contained herein, and more specifically portions of this Farmout Agreement relating to termination of or any transfer of interest executed pursuant hereto, shall not be construed as precluding, nor shall the same preclude such Party from asserting its respective rights to damages, or any other rights or remedies to which such Party may be entitled.  Further, that non-enforcement by a Party of a remedy for any particular breach and/or violation of the provisions of this Farmout Agreement shall

Debtors' Exhibit A
Page 15 of 65

not constitute a waiver, nor shall the same prevent the exercise by such Party of any remedy or remedies under this Farmout Agreement for any other violation or for the same violation occurring at any other time or times. Additionally, the Parties agree that the termination of this Farmout Agreement, in whole or in part for any reason whatsoever, shall not relieve either Party of a prior obligation incurred as a result of entering into this Farmout Agreement, any operations hereunder, or the noncompliance with any of the provisions of this Farmout Agreement.

9.11    For federal income tax purposes, each Party hereto elects to be excluded from application of all or any part of the provisions of Subchapter K, Chapter 1, Subtitle A, Internal Revenue Code of 1986 as amended, as permitted and authorized by Section 761 of said Code and the regulations promulgated thereunder.

9.12    In performance of its obligations hereunder the J. Bellis Group shall be independent and not an employee, agent, servant or representative of the Troika Group. The Troika Group shall have no direction or control of the J. Bellis Group, their employees, and agents except in the result to be obtained. The respective duties, obligations and liabilities between the J. Bellis Group and the Troika Group are individual, not joint or collective, and each Party shall be responsible only for its share of the costs and liabilities incurred as provided hereunder. Nothing herein contained shall be construed to create a joint venture, association or partnership, duty, obligation or liability with respect to the relationship between the J. Bellis Group and the Troika Group.

9.13    Anything in this Farmout Agreement to the contrary notwithstanding, if any liability is incurred by virtue of the operation of the Oil Pollution Act of 1990 (33 U.S.C.A. §2701, et. Seq.) (the "Act") and the regulations lawfully promulgated pursuant thereto, then, separately as to each facility as defined in such regulations, any such liability under the Act so incurred, including liability arising out of the negligence of any Party hereto, shall be borne by each Party hereto to the extent of its working interest in such facility located on the Contract Area at the time such liability is incurred. The J. Bellis Group shall be responsible for filing an application establishing financial responsibility in an amount equal to $75 million, or such other amount as may be required by appropriate governmental authority, for each such facility and furnishing the Troika Group with a copy of such certificate(s). With respect to all operations taken over by the Troika Group hereunder, the Troika Group shall be deemed to own a one hundred percent (100%) working interest in each such facility located on Lease that solely serves the Contract Area. Upon any take-over of and/or upon any purchase by the Troika Group from the J. Bellis Group of any facilities hereunder, the Troika Group shall file an application establishing its financial responsibility in an amount equal to $75 million, or such other amount as may be required by appropriate governmental authority, for each such facility and furnish the J. Bellis Group with a copy of such certificate(s). The J. Bellis Group agrees to defend indemnify and hold the Troika Group free and harmless from any and all liability so incurred under the Act by virtue of its sole cost, risk and expense operations under this Farmout Agreement regardless of the negligence or fault of the Troika Group and their responsibility for compliance with the Act and the regulations and/or amendments lawfully promulgated pursuant thereto. The Troika Group agrees to defend, indemnify and hold the J. Bellis Group free and harmless from any and all liability so incurred under the Act by virtue of its sole cost, risk and expense operations under this Farmout Agreement regardless of the negligence or

Farmout Agreement - NE/4 of GC 201                     - - 16 - -

fault of the J. Bellis Group and their responsibility for compliance with the Act and regulations and/or amendments lawfully promulgated pursuant thereto.

9.14    Should any well(s) drilled hereunder be capable of being classified as producing oil and/or gas in paying quantities pursuant to 30 CFR 250.116 (as revised or subsequently modified), and should the Lease have less than ninety (90) days before expiration, then the J. Bellis Group shall either (i) apply for and diligently seek approval of a Suspension of Operations/Production from the MMS (or such other requisite documents, applications and/or governmental permits) covering the Lease, and/or take all such other actions as may be necessary to maintain the Lease in force and effect, or (ii) offer the Lease to the Troika Group in accordance with the provisions of Section 1.7 ("Take-Over of Contract Area").

9.15    All financial settlements, billings and reports rendered to the Troika Group as provided for in this Farmout Agreement and/or any amendments to it, shall, to the best of the J. Bellis Group's knowledge and belief, reflect properly the facts about all activities and transactions handled for the account of the Troika Group which data may be relied upon as being complete and accurate in any further recording and reporting made by the Troika Group for whatever purpose. Subject to the J. Bellis Group's rights to claim legal privilege, the J. Bellis Group agrees to notify the Troika Group promptly upon discovery that any of the aforementioned data is no longer accurate and complete. Notwithstanding anything contained herein to the contrary, the Parties hereto agree to retroactively adjust any such financial settlements, billings and/or reports to reflect accurate information possessed/furnished by the J. Bellis Group.

9.16    Unless otherwise specified in this Farmout Agreement, any reference to a notification period, or a prescribed response period to a notice, will be exclusive of Saturdays, Sundays or federal holidays (i.e., if the Farmout Agreement indicates either Party hereto would have ten (10) business days within which to respond to a particular notice received at 10:00 a.m., CST, on a Friday, a response would be deemed to be timely and appropriate if the recipient communicates its intentions or desired response to the notifying Party on or before the second ensuing Friday at 10:00 a.m., CST).

9.17    This Farmout Agreement, and any amendment thereto, may be executed in any number of duplicate original counterparts, each of which shall constitute and be deemed an original instrument, but all of which together shall constitute but one in the same instrument.

9.18    Subject to the terms and conditions set forth in this Farmout Agreement, each of the Parties agrees to use all reasonable efforts to take, or to cause to be taken, all actions, and to do, or to cause to be done, all things reasonably necessary, proper or advisable under applicable laws to consummate and make effective the transactions contemplated by this Farmout Agreement.

9.19    As used herein, any references to CFR or other governmental regulations will be as the same may be amended, replaced or superceded by an applicable governmental agency having competent jurisdiction.

Farmout Agreement - NE/4 of GC 201                    - - 17 - -

9.20　The terms and conditions hereof shall extend to and be binding upon the Parties' successors, legal representatives and assigns. The J. Bellis Group or each member thereof shall not assign, transfer or convey its respective interest in this Farmout Agreement or any interest in the Contract Area, or any rights or obligations hereunder without the Troika Group's prior written consent, which consent may not be unreasonably withheld. However, irrespective of any transfer or conveyances that the J. Bellis Group or each member thereof may make hereunder, LLOG shall be solely responsible for carrying out the duties and responsibilities of operator for the J. Bellis Group and the Troika Group shall look solely towards LLOG for the performance of drilling requirements and ultimately all other obligations created by this Farmout Agreement.

9.21　The Parties agree the provisions concerning the certification of nonsegregated facilities contained in Exhibit "E" hereto shall be an integral part of this Farmout Agreement.

9.22　Unless otherwise provided in Exhibit "D" hereof, the Parties hereto agree to utilize the following addresses for notice provided under this Farmout Agreement:

**Shell Offshore Inc.**
ATTN: Contracts & JV Manager
200 N. Dairy Ashford
Houston, TX　77079
Phone:　(281) 544-2135
Fax:　(281) 544-4006

**Marathon Oil Company**
ATTN:　Brad L. Dowdell
5555 San Felipe Road
Houston, TX　77056
Phone:　(713) 296-3215
Fax : (713) 296-4209

**LLOG Exploration Offshore, Inc.**
ATTN:　Mr. Michael Altobelli
11700 Katy Freeway, Ste X
Houston, TX 77079
Phone:　(281) 752-1105
Fax:　(281) 5966-0219

**Davis Offshore, L.P.**
ATTN:　Mr. Ed Stengel
1360 Post Oak Blvd, Ste X
Houston, TX　77056
Phone:　(713) 439-6774
Fax:　(713) 961-4573

**9.23　This Farmout Agreement shall be governed by and construed in accordance with the laws of the State of Louisiana, without reference to the conflicts of law principles thereof.**

9.24　This Farmout Agreement and the performance of the obligations contemplated herein are and shall be subject to all valid applicable laws. The Parties are entitled to act in accordance with each such law. The Parties will cooperate with respect to compliance with all governmental authorizations, including obtaining and maintaining all necessary regulatory authorizations or any reasonable exchange or provision of information needed for filing or reporting requirements. Further, the J. Bellis Group shall provide the Troika Group with copies of all permits, applications, or other materials of any nature whatsoever filed by the J. Bellis Group with the MMS or other governmental agencies having appropriate jurisdictional authority over the Lease, or lands unitized or pooled therewith.

Farmout Agreement - NE/4 of GC 201　　　　- - 18 - -

9.25    The J. Bellis Group hereby agrees to keep, save, and hold this Farmout Agreement and all information relating to this Farmout Agreement as confidential, except as provided in Section 1.6 herein or upon the Troika Group's prior written consent, for the term of this Farmout Agreement.  Provided however, if the J. Bellis Group or a member thereof individually is required to disclose this Farmout Agreement or any of the terms of this Farmout Agreement by law, order, decree, regulation, or rule (including without limitation, those of any regulatory agency, securities commission, or stock exchange having jurisdiction), or if any person seeks to legally compel disclosure (by interrogatories, document requests, subpoena, or otherwise), the J. Bellis Group or the member thereof individually shall provide the Troika Group prompt written notice thereof in order that the Troika Group may (a) seek a protective order or other remedy (including participation in any proceeding to which the J. Bellis Group or the member thereof individually is a party) and/or (b) waive compliance with this Farmout Agreement.  The J. Bellis Group or the member thereof individually shall furnish only such confidential information as is legally required thereafter and shall use its best efforts to obtain confidential treatment therefore.

## EXHIBITS

The following Exhibits are attached hereto and made a part of this Farmout Agreement:

| Exhibit "A" | – | Description of the Lease, Description of Contract Area and Interest of the Parties in the Contract Area |
| Exhibit "B-1" | – | Amendment to the Troika Unit Operating Agreement |
| Exhibit "B-2" | – | Letter Agreement to Amend the J. Bellis Production Handling Agreement |
| Exhibit "C-1" | – | Form of Assignment of Operating Rights |
| Exhibit "C-2" | – | Assignment and Conveyance of Overriding Royalty Interests |
| Exhibit "D" | – | Open Hole Well Data Format and Delivery Specifications |
| Exhibit "E" | – | Certification of Nonsegregated Facilities |
| Exhibit "F" | – | Offshore Insurance Provisions |

**IN WITNESS WHEREOF**, the Parties have executed this Farmout Agreement in the presence of the undersigned competent witnesses, effective as of the Effective Date.

## The Troika Group

WITNESSES:

**Shell Offshore Inc.**

BY: _____

NAME: _____ R. W. Robison, Jr. _____

TITLE: Attorney-in-Fact

DATE: _____ Dec 1st, 2008 _____

Farmout Agreement - NE/4 of GC 201

- 19 -

WITNESSES:

**Marathon Oil Company**

_____

BY: _____

NAME: _____

TITLE: _____Attorney-in-Fact_____

DATE: _____

_____

**The J. Bellis Group**

WITNESSES:

**LLOG Exploration Offshore, Inc.**

_____

BY: _____

NAME: _____

TITLE: _____

DATE: _____

_____

WITNESSES:

**Davis Offshore, L.P.**

_____

BY: _____

NAME: ___George Canjar___

TITLE: Chief Operating Officer

DATE: ___December 1, 2008___

_____

Farmout Agreement - NE/4 of GC 201                    - 20 -

9.25 The J. Bellis Group hereby agrees to keep, save, and hold this Farmout Agreement and all information relating to this Farmout Agreement as confidential, except as provided in Section 1.6 herein or upon the Troika Group's prior written consent, for the term of this Farmout Agreement. Provided however, if the J. Bellis Group or a member thereof individually is required to disclose this Farmout Agreement or any of the terms of this Farmout Agreement by law, order, decree, regulation, or rule (including without limitation, those of any regulatory agency, securities commission, or stock exchange having jurisdiction), or if any person seeks to legally compel disclosure (by interrogatories, document requests, subpoena, or otherwise), the J. Bellis Group or the member thereof individually shall provide the Troika Group prompt written notice thereof in order that the Troika Group may (a) seek a protective order or other remedy (including participation in any proceeding to which the J. Bellis Group or the member thereof individually is a party) and/or (b) waive compliance with this Farmout Agreement. The J. Bellis Group or the member thereof individually shall furnish only such confidential information as is legally required thereafter and shall use its best efforts to obtain confidential treatment therefore.

## **EXHIBITS**

The following Exhibits are attached hereto and made a part of this Farmout Agreement:

| | | |
|---|---|---|
| Exhibit "A" | – | Description of the Lease, Description of Contract Area and Interest of the Parties in the Contract Area |
| Exhibit "B-1" | – | Amendment to the Troika Unit Operating Agreement |
| Exhibit "B-2" | – | Letter Agreement to Amend the J. Bellis Production Handling Agreement |
| Exhibit "C-1" | – | Form of Assignment of Operating Rights |
| Exhibit "C-2" | – | Assignment and Conveyance of Overriding Royalty Interests |
| Exhibit "D" | – | Open Hole Well Data Format and Delivery Specifications |
| Exhibit "E" | – | Certification of Nonsegregated Facilities |
| Exhibit "F" | – | Offshore Insurance Provisions |

**IN WITNESS WHEREOF**, the Parties have executed this Farmout Agreement in the presence of the undersigned competent witnesses, effective as of the Effective Date.

## **The Troika Group**

WITNESSES:                                    **Shell Offshore Inc.**

BY: _____

NAME: _____R. W. Robison, Jr._____

TITLE: Attorney-in-Fact

DATE: _____Dec 1st, 2008_____

Farmout Agreement - NE/4 of GC 201                    - 19 -

WITNESSES:

*Matthew D. Brown*

*Renee Wright*

**Marathon Oil Company**

BY: *Brad L. Dowdell*

NAME: *Brad L. Dowdell*

TITLE:       Attorney-in-Fact

DATE: *December 15, 2008*


**The J. Bellis Group**

WITNESSES:

*Marilyn Villasquirra*

*April O. Perkut*

**LLOG Exploration Offshore, Inc.**

BY: _____

NAME: G R O R Y   W H I T M A N

TITLE: V I C E   P R E S I D E N T   L A N D

DATE: 1 0 - 8 - 0 8


WITNESSES:

*J. A. DeJong*

*Mark H. Gillespie*

**Davis Offshore, L.P.**

BY: _____

NAME:     George Canjar

TITLE: Chief Operating Officer

DATE: *December 1, 2008*


Farmout Agreement - NE/4 of GC 201       - 20 -

## EXHIBIT "A"

Attached to and made a part of that certain Farmout Agreement by and between
Shell Offshore Inc., Marathon Oil Company, LLOG Exploration Offshore, Inc., and Davis Offshore, L.P. effective
October 1, 2008

### DESCRIPTION OF THE LEASE, DESCRIPTION OF CONTRACT AREA AND INTEREST OF THE PARTIES IN THE CONTRACT AREA

**I.** **Description of the Lease**:

Federal Lease No. OCS-G 12210 dated effective May 1, 1990, between the United States of America and BP Exploration Inc., as original Lessee, covering all of Block 201, Green Canyon, as shown on OCS Official Protraction Diagram, NG 15-3, containing approximately 5,760 acres.

**II.** **Description of the Contract Area**:

Federal Lease No. OCS-G 12210 dated effective May 1, 1990, between the United States of America and BP Exploration Inc., as original Lessee, covering all of Block 201, Green Canyon, as shown on OCS Official Protraction Diagram, NG 15-3, containing approximately 5,760 acres, insofar and only insofar as to the northeast quarter (NE/4) of said Lease, covering depths from surface down to 17,000 feet subsea true vertical depth, unless further amended pursuant to Section 1.2 of the Farmout Agreement.

**III.** **Current Interest of the Parties in the Lease:**

| | |
|---|---|
| Marathon Oil Company | 50.00001% Record Title Interest |
| Shell Offshore Inc. | 49.99999% Record Title Interest |

**IV.** **Interests of the Parties in the Contract Area upon the Earning Event**:

| | |
|---|---|
| The J. Bellis Group | 100% Operating Rights Interest |
| The Troika Group | 6.50% of 8/8ths ORRI applicable to the first one million barrels of oil equivalent produced from the Contract Area, and 9.75% of 8/8ths ORRI for all production above one million barrels of oil equivalent produced from the Contract Area. |

EXHIBIT "B-1"

Attached to and made a part of that certain Farmout Agreement by and between
Shell Offshore Inc., Marathon Oil Company, LLOG Exploration Offshore, Inc., and Davis Offshore, L.P. effective
October 1, 2008

## AMENDMENT TO THE TROIKA UNIT OPERATING AGREEMENT

**THIS AGREEMENT REGARDING AN AMENDMENT TO THE TROIKA UNIT OPERATING AGREEMENT** ("Agreement") is dated effective October 1, 2008 ("Effective Date") by and between Shell Offshore Inc. ("SOI") and Marathon Oil Company ("Marathon"), herein referred to singularly as a "Party" and collectively as the "Parties".

### WITNESSETH:

**WHEREAS**, SOI, Marathon and BP Exploration & Oil Inc. ("BPX") entered into that certain Unit Operating Agreement, Outer Continental Shelf-Gulf of Mexico as of the 1st day of October, 1996, and effective the 15th day of June, 1993, covering Green Canyon Blocks 200, 201, 244 and 245, as to all depths (hereinafter the "Troika UOA"); and

**WHEREAS**, SOI and Marathon have subsequently succeeded to all of BPX's interest under the Troika UOA, such that BPX is no longer a party to the Troika UOA; and

**WHEREAS**, the lands covered by the Troika UOA are also subject to that certain MMS Unit Agreement for Outer Continental Shelf Exploration, Development, and Production Operations on the Green Canyon Block 244 Unit comprised of Blocks 200, 201, 244, 245 Green Canyon, Offshore Louisiana, Contract No. 754393016, dated effective June 15, 1993 ("Unit Agreement"), as to all depths; and

**WHEREAS**, the Parties have entered into that certain Farmout Agreement dated effective October 1, 2008 ("Farmout Agreement") with LLOG Exploration Offshore, Inc. ("LLOG") and Davis Offshore, L.P. ("Davis"), which Farmout Agreement covers the northeast quarter (NE/4) of Green Canyon Block 201, from surface down to 17,000 feet subsea true vertical depth (hereinafter referred to as the "Contract Area"); and

**WHEREAS**, pursuant to the Farmout Agreement, the Parties have agreed to segregate the Contract Area from the Troika UOA and assign all their operating rights in the Contract area to LLOG and Davis for the continued exploration, development and operation of the Contract Area by execution of this Agreement.

**NOW, THEREFORE**, in consideration of the premises and of the mutual promises exchanged and contained within this Agreement, the Parties do hereby agree as follows:

1.    Exhibit "A" to the Troika UOA is deleted in its entirety and replaced with Attachment 1 attached hereto and made a part hereof. Except as amended hereby,

Farmout Agreement - NE/4 of GC 201      - 1 -      Exhibit "B-1"

all terms and conditions of the Troika UOA shall remain unchanged and in full force and effect.

2.     Operations in the Contract Area shall be governed pursuant to the terms of the Green Canyon Block 157 Unit Operating Agreement between LLOG and Davis ("J. Bellis UOA) that covers all of Green Canyon Block 157.

3.     Upon the termination of the Farmout Agreement and the J. Bellis UOA, and upon the satisfaction and fulfillment of all of the terms and conditions contained therein, the Troika UOA, unless previously terminated, shall be amended to re-incorporate the Contract Area into Exhibit "A" of the Troika UOA, such that the further exploration, development and operation of the Contract Area shall once again be governed by the Troika UOA.

4.     All Exhibits and Attachments contained herein or attached hereto are integrally related to this Agreement, and are hereby made a part of this Agreement for all purposes. To the extent of any ambiguity, inconsistency or conflict between the body of this Agreement and any of the Exhibits or Attachments attached hereto, the terms of this Agreement shall prevail over the Exhibits and Attachments, to the extent of such conflict.

5.     The rule of construction that a contract be construed against the drafter shall not apply to this Agreement.

6.     If any term or provision of this Agreement is invalid, illegal or incapable of being enforced by any rule of law or public policy, all other terms and provisions of this Agreement shall nevertheless remain in full force and effect.

7.     Unless otherwise expressly provided in this Agreement, nothing in this Agreement shall entitle any party other than the Parties to this Agreement to any claim, cause of action, remedy or right of any kind under this Agreement.

8.     This Agreement may be executed in any number of duplicate original counterparts, each of which shall constitute and be deemed an original instrument, but all of which shall constitute but one and the same instrument.

9.     Subject to the terms and conditions set forth in this Agreement, each of the Parties agrees to use all reasonable efforts to take, or cause to be taken, all actions, and to do, or cause to be done, all things reasonably necessary, proper or advisable under applicable laws to consummate and make effective the transaction contemplated by this Agreement.

10.    This Agreement shall be governed by and construed in accordance with the laws of the State of Louisiana, without reference to the conflicts of law principles thereof.

    **IN WITNESS WHEREOF**, this instrument is executed effective as of the Effective Date.

**Marathon Oil Company**                    **Shell Offshore Inc.**

By: _____        By: _____

Name: _____      Name:    R. W. Robison, Jr.

Title:    Attorney-in-Fact          Title:    Attorney-in-Fact

Date: _____      Date: _____

**Attachment 1**

Attached to and made a part of that certain Letter Agreement dated effective October 1, 2008 by and between Shell Offshore Inc. and Marathon Oil Company

**AMENDED EXHIBIT "A"**

Attached to and made a part of that certain Unit Operating Agreement effective June 15, 1993, by and between Marathon Oil Company, BP Exploration & Oil Inc. and Shell Offshore Inc.

<u>DESCRIPTION OF LEASES, WORKING INTEREST OF THE PARTIES,<br>OPERATOR AND REPRESENTATIVES</u>

I.      <u>DESCRIPTION OF LEASES</u>

Federal Lease No. OCS-G 12209 effective May 1, 1990, covering all of Block 200, Green Canyon, OCS Official Protraction Diagram, NG 15-3, containing approximately 5760.00 acres.

Federal Lease No. OCS-G 12210 effective May 1, 1990, covering all of Block 201, Green Canyon, OCS Official Protraction Diagram, NG 15-3, containing approximately 5760.00 acres less and except those depths from surface down to 17,000 feet subsea true vertical depth of the northeast quarter (NE/4) only of such lease.

Federal Lease No. OCS-G 11043 effective May 1, 1989, covering all of Block 244, Green Canyon, OCS Official Protraction Diagram, NG 15-3, containing approximately 5760.00 acres, less and except those depths from 16,000 feet true vertical depth subsea down to 24,000 feet true vertical depth subsea.

II.     <u>WORKING INTEREST OF THE PARTIES</u>

The Working interests of the Parties shall be as follows:

| | |
|---|---|
| Marathon Oil Company | 50.00001% Record Title Interest |
| Shell Offshore Inc. | 49.99999% Record Title Interest |

EXHIBIT "B-2"

Attached to and made a part of that certain Farmout Agreement by and between
Shell Offshore Inc., Marathon Oil Company, LLOG Exploration Offshore, Inc., and Davis Offshore, L.P. effective
October 1, 2008

**Shell Offshore Inc.**
An affiliate of Shell Oil Company



One Shell Square
PO Box 61933
New Orleans LA 70161-1933
(504) 728-6161

Contracts & Joint Ventures
Development & Production

October 6, 2008

Mr. Mike Altobelli
**LLOG Exploration Offshore, Inc.**
11700 Old Katy Road – Suite 295
Houston, TX 77079

Mr. _____
**Davis Offshore, L.P.**
1360 Post Oak Blvd. – Suite 2400
Houston, TX 77056

Gentlemen:

> RE:  **LETTER AGREEMENT TO AMEND THE PRODUCTION HANDLING
> AGREEMENT FOR GREEN CANYON BLOCK 157 ("J. BELLIS")
> DATED EFFECTIVE OCTOBER 1, 2008 ("AMENDMENT")
> OFFSHORE LOUISIANA**

As a follow up to the Farmout Agreement dated effective October 1, 2008 between Shell Offshore Inc. ("SOI"), Marathon Oil Company, LLOG Exploration Offshore, Inc., and Davis Offshore, L.P. (together referred to as the "J. Bellis Group") relating to the northeast quarter (NE/4) of Green Canyon Block 201, from surface down to 17,000 feet subsea true vertical depth, SOI and the J. Bellis Group agree to amend the Production Handling Agreement for Green Canyon Block 157 dated effective May 26, 2004 (" J. Bellis PHA") as follows:

> to extend the J. Bellis Area in the J. Bellis PHA to mean Leases OCS-G 24154 (covering and affecting all of Green Canyon Block 157) and OCS-G 12210 (covering and affecting only and only insofar as the northeast quarter [NE/4] of Green Canyon Block 201 as to those depths from surface down to 17,000 feet

Farmout Agreement - NE/4 of GC 201                    - 1 -                    Exhibit "B-2"

subsea true vertical depth), unless further amended pursuant to Section 1.2 of the Farmout Agreement, offshore Louisiana, including without limitation, hydrocarbon production and water production therefrom.

Except as amended hereinabove, the terms and conditions of the J. Bellis PHA remain unchanged and in full force and effect. If there is a conflict between this Amendment and the terms and conditions of the J. Bellis PHA, this Amendment shall prevail.

Please indicate your concurrence to the terms and conditions set forth above by signing in the spaces provided at the bottom of this Amendment. If this amendment is executed in multiple counterparts, each counterpart shall be deemed an original and all of which when taken together shall constitute but one and the same Amendment with the same effect as if SOI and the J. Bellis Group had signed the same instrument.

Upon execution, please return one fully executed original to the attention of the undersigned.

Yours truly,


Nadège Assalé
Contracts & Joint Ventures Representative



ACCEPTED AND AGREED BY THE UNDERSIGNED PARTIES

**SHELL OFFSHORE, INC.**

By: _____
Its authorized agent, representative, officer or Attorney-in-fact

Name: _____R. W. Robison, Jr._____



**J. BELLIS GROUP**

**LLOG EXPLORATION OFFSHORE, INC.**

By: _____
Its authorized agent, representative, officer or Attorney-in-fact

Name: _____


Farmout Agreement - NE/4 of GC 201                    - 2 -                    Exhibit "B-2"

**DAVIS OFFSHORE, L.P.**

By: _____
Its authorized agent, representative, officer or Attorney-in-fact

Name: _____

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

**Exhibit C-1**
Attached to and made a part of that certain Farmout Agreement by and between
Shell Offshore Inc., Marathon Oil Company, LLOG Exploration Offshore, Inc., and Davis Offshore, L.P. effective
October 1, 2008

**U. S. Department of the Interior**
**Minerals Management Service**

OMB Control Number: 1010-0006

OMB Approval Expires: 05/31/2010
____OCS-G 12210_____
Lease No.

____May 1, 1990_____
Lease Effective Date

## ASSIGNMENT OF OPERATING RIGHTS INTEREST IN
## FEDERAL OCS OIL AND GAS LEASE

| Part A: Assignment |
|---|

**Legal Description of the Operating Rights Assigned:**
Oil and Gas Lease of Submerged Lands Under the Outer Continental Shelf Lands Act between the United States of America, as Lessor, and BP Exploration Inc., as original Lessee, dated effective May 1, 1990, covering all of Block 201, Green Canyon, OCS Official Protraction Diagram, NG 15-3, containing approximately 5,760 acres, insofar and only insofar as to the northeast quarter (NE/4) of said Lease, covering those depths from surface down to 17,000 feet true vertical depth subsea.

**Assignor(s) does hereby sell, assign, transfer, and convey unto Assignee(s) the following undivided right, title, and interest:**

**Insert name and Company number of each Assignor and Assignee.**

| Assignor: | Percentage Interest Conveyed |
|---|---|
| Shell Offshore Inc. (00689) A Delaware Corporation P.O. Box 61933 New Orleans, Louisiana 70161 | 49.99999% |
| Marathon Oil Company (00724) An Ohio Corporation P.O. Box 3128 Houston, Texas 77253 | 50.00001% |

| Assignee: | Percentage Interest Received |
|---|---|
| LLOG Exploration Offshore, Inc. | |
| Davis Offshore, L.P. | |

The approval of this assignment is restricted to operating rights only. This assignment does not affect record title interest.

☒ Exhibit "A," which sets forth other provisions between Assignor(s) and Assignee(s), is attached to and made a part of this assignment

### For MMS Use only – Do Not Type Below This Line

This Assignment of Operating Rights Interest has been filed as of the date stamped on this document and hereby approved by the Minerals Management Service on the date below.

By_____          _____          _____
    Authorized Official for MMS                Title                              Approval Date

**Paperwork Reduction Act of 1995 (PRA) Statement:** The PRA (44 U.S.C. 3501 et seq.) requires us to inform you that we collect this information to use in the adjudication process involved in leasing and lease operations. The MMS uses the information to track ownership of leases in the Federal OCS. Responses are mandatory (43 U.S.C. 1334). Proprietary data are covered under 30 CFR 250.197. An agency may not

Farmout Agreement - NE/4 of GC 201                          - 1 -                                    Exhibit "C-1"

conduct or sponsor, and a person is not required to respond to, a collection of information unless it displays a currently valid OMB Control Number. Public reporting burden of this form is estimated to average 30 minutes per response, including the time for reviewing instructions, gathering and maintaining data, and completing and reviewing the form. Direct comments regarding the burden estimate or any other aspect of this form to the Information Collection Clearance Officer, Mail Stop 4230, Minerals Management Service, 1849 C Street, NW, Washington, DC 20240.

**MMS** FORM MMS-151 (July 19, 2007 – Supersedes all previous editions of form MMS-151 which may not be used) Page 1 of 2

### Part B – Certification and Acceptance

1. Assignor(s) certifies it is the owner of the operating rights interest in the above-described lease that is hereby assigned to the Assignee(s) specified above.

2. **DEBARMENT COMPLIANCE:** The assignee must comply with the Department of the Interior's nonprocurement debarment and suspension regulations as required by Subpart B of 2 CFR Part 1400 and must communicate the requirement to comply with these regulations to persons with whom it does business related to this operating rights interest assignment by including this term in its contracts and transactions

3. **EQUAL OPPORTUNITY AND AFFIRMATIVE ACTION COMPLIANCE CERTIFICATION**: Assignor(s) and Assignee(s) certify that they are in full compliance with Equal Opportunity Executive Order 11246, as amended, and the implementing regulations at 41 CFR 60-01 – Obligations of Contractors and Subcontractors; and 41 CFR 60-2 – Affirmative Action Programs. These requirements are for the purpose of preventing discrimination against persons on the basis of race, color, religion, sex, or national origin. These regulations have specific performance requirements.

4. Assignee's execution of this assignment constitutes acceptance of all applicable terms, conditions, stipulations and restrictions pertaining to the lease described herein. Applicable terms and conditions include, but are not limited to, an obligation to conduct all operations on the leasehold in accordance with the terms and conditions of the lease, to condition all wells for proper abandonment, to restore the leased lands upon completion of any operations as described in the lease, and to furnish and maintain bond(s) pursuant to regulations at 30 CFR 256. This assignment is subject to the Outer Continental Shelf Lands Act of August 7, 1953, 67 Stat. 462; 43 U.S.C. 1331 et seq., as amended (the "Act"), and Assignee(s) is subject to, and must fully comply with, all applicable regulations now or to be issued under the Act. Notwithstanding any agreement between the Assignor(s) and Assignee(s), the parties' liabilities to the Minerals Management Service are governed by 30 CFR 256.

This Assignment of Operating Rights Interest will be made effective between the parties hereto as of **10/1/2008**, upon approval by the Minerals Management Service, United States Department of the Interior.

This instrument may be executed in any number of counterparts, each of which will be deemed an original instrument, but all of which together will constitute but one and the same instrument provided. However, this instrument and any other counterpart hereof, will not be binding unless and until executed by all of the parties, and will not be accepted by the Minerals Management Service unless all counterparts are filed simultaneously.

I certify that the statements made herein by the undersigned are true, complete and correct to the best of my knowledge and belief and are made in good faith.

Title 18 U.S.C. Sec. 1001 makes it a crime for any person knowingly and willfully to make to any Department or agency of the United States any false, fictitious or fraudulent statements or representations as to any matter within its jurisdiction.

**ASSIGNOR**
By:_____
Name:   R. W. Robison, Jr.
Title:     Attorney- in- fact

_____
Execution Date

**ASSIGNOR**
By:_____
Name:
Title:

_____
Execution Date

**ASSIGNEE – LLOG Exploration Offshore, Inc.**
By:_____
Name: Kemberlia Ducote
Title:  Secretary

_____
Execution Date
Farmout Agreement - NE/4 of GC 201

**ASSIGNEE**
By:_____
Name:
        Title:

_____
Execution Date
                              Exhibit "C-1"

- 2 -

Attach Notary Acknowledgement (not mandatory)

**MMS** FORM MMS-151 (July 19, 2007– Supersedes all previous editions of form MMS-151 which may not be used) Page 2 of 2

Debtors' Exhibit A
Page 33 of 65

EXHIBIT "A"

This Assignment is subject to:

i)      that certain Farmout Agreement for the NE/4 Green Canyon Block 201 dated effective October 1, 2008, by and between Shell Offshore Inc., Marathon Oil Company, LLOG Exploration Offshore, Inc. ("LLOG"), and Davis Offshore, L.P. ("Davis");

(ii)      that certain Unit Operating Agreement entered into as of October 1, 1996, but effective June 15, 1993, by and between Marathon Oil Company, SOI, and BP Exploration & Oil Inc.;

(iii)      that certain MMS Unit Agreement for Outer Continental Shelf Exploration, Development and Production Operations on the Green Canyon Block 244 Unit, Blocks 200, 201, 244, 245 Green Canyon, Offshore Louisiana, Contract No. 754393016, dated effective June 15, 1993 ("Unit Agreement");

(iv)      that certain Production Handling Agreement for GC 244 Unit Production at the Green Canyon 65 Platform, dated effective February 29, 1996, as amended, by and between SOI, Marathon and BP Exploration & Oil Inc. ("Troika PHA");

(v)      that certain Assignment and Conveyance of Overriding Royalty Interest for the NE/4 Green Canyon Block 201 dated effective October 1, 2008, by and between Shell Offshore Inc., Marathon Oil Company, LLOG Exploration Offshore, Inc. ("LLOG"), and Davis Offshore, L.P. ("Davis")

(vi)      that certain Agreement for Subsea Production System, dated effective January 1, 2000, between SOI, Shell Deepwater Development Inc., BP Exploration & Oil Inc., Marathon and Santa Fe Snyder Corporation as agent and attorney-in-fact for Brown Angus Properties, Inc.; and

(vii)      any other existing agreements which may affect the Lease/Contract Area, including, but not limited to the following:

>        Gas Gathering Agreement between Shell Offshore Inc., as successor to Shell Deepwater Development Inc. and Shell Deepwater Production Inc., and Manta Ray Offshore Gathering Company, L.L.C. effective January 17, 1997.

>        Gas Gathering Fee Agreement between Shell Offshore Inc., as successor to Shell Deepwater Development Inc. and Shell Deepwater Production Inc., and Manta Ray Offshore Gathering Company, L.L.C., effective January 17, 1997.

>        Gas Gathering Agreement between Shell Offshore Inc., as successor to BP Exploration & Oil Inc. and Manta Ray Offshore Gathering Company, L.L.C. effective November 1, 1997.

>        Liquids Separation and Stabilization Letter Agreement between Shell Offshore Inc., as successor to Shell Deepwater Development Inc. and Shell Deepwater Production

Farmout Agreement - NE/4 of GC 201                    - 4 -                                   Exhibit "C-1"

Inc., and Manta Ray Offshore Gathering Company, L.L.C., dated February 22, 2002, and effective June 1, 1999.

Service Agreement For Rate Schedule FT-2 between Shell Offshore Inc., as successor to Shell Deepwater Development Inc. and Shell Deepwater Production Inc., and Nautilus Pipeline Company, L.L.C. dated December 10, 1997, and effective November 1, 1997.

Amendment to Service Agreement For Rate Schedule FT-2 between Shell Offshore Inc., as successor to Shell Deepwater Development Inc. and Shell Deepwater Production Inc., and Nautilus Pipeline Company, L.L.C. effective February 1, 2005.

Reserve Dedication & Discount Rate Agreement between Shell Offshore Inc., Shell Deepwater Development Inc., Shell Deepwater Production Inc., and Nautilus Pipeline Company, L.L.C., effective January 17, 1997.

Amendment To Reserve Dedication & Discount Rate Agreement between Shell Offshore Inc., as successor to Shell Deepwater Development Inc. and Shell Deepwater Production Inc., and Nautilus Pipeline Company, L.L.C. effective February 1, 2005.

Liquid Transportation Agreement between Shell Offshore Inc., Shell Deepwater Development Inc., Shell Deepwater Production Inc., and Nautilus Pipeline Company, L.L.C. effective January 17, 1997.

Seventh Amendment to Gas Processing Agreement between Enterprise Gas Processing LLC and Shell Offshore Inc. dated April 1, 2004.

Liquid Transportation Agreement between Marathon Oil Company and Nautilus Pipeline Company, LLC dated January 17, 1997.

Service Agreement for Rate Schedule FT-2 between Marathon Oil Company and Nautilus Pipeline Company, LLC dated December 8, 1997 and effective November 1, 1997.

Manta Ray Liquids Separation and Stabilization Agreement between Marathon Oil Company and Manta Ray Offshore Gathering Company, LLC dated March 20, 2003 and effective June 1, 1999.

Reserve and Dedication & Discount Rate Agreement dated January 17, 1997 between Nautilus Pipeline Company, L.L.C. and Marathon Oil Company.

Gas Gathering Fee Agreement dated January 17, 1997 between Manta Ray Offshore Gathering Company, L.L.C. and Marathon Oil Company.

Gas Gathering Agreement dated January 17, 1997 between Manta Ray Offshore Gathering Company, L.L.C. and Marathon Oil Company.

Agreement for the Construction and Operation of the Neptune Gas Processing Plant, dated August 10, 1998, between Marathon Oil Company and Tejas Natural Gas Liquids, L.L.C.

That certain Purchase and Sale Agreement between Marathon Oil Company and Poseidon Oil Pipeline Company dated November 21, 2008

This Assignment is delivered and accepted without warranty of title, express or implied, except as to persons claiming by, through or under the Assignor, but not otherwise. The Assignor warrants and represents that the interest conveyed is not subject to any royalty obligations created by, through or under Assignor, other than the Lessor's royalty and the Assignor's ORRI.

This Assignment and the rights, titles, interests, and obligations assigned, reserved, excepted, or retained in this Assignment, shall inure to the benefit of, and shall be binding upon, the successors and assigns of the Assignor and Assignee. The covenants, obligations and agreements contained in this Assignment shall be construed as covenants running with the interest conveyed and the Lease.

Assignee shall have non-exclusive surface rights. As a record title owner of the Lease and an operating rights owner as to all rights except the interest conveyed, Assignor retains the surface rights and the right to drill through the Contract Area to explore, drill, develop and/or produce from the Lease as to depths above and below the Contract Area.

This Assignment is made effective as of October 1, 2008, at 7:00 a.m. local time where the Lease is located, subject to the approval by the Minerals Management Service, United States Department of the Interior.

This Assignment may be executed in any number of counterparts, all of which taken together shall constitute one and the same instrument.

**IN WITNESS WHEREOF,** the Assignor and Assignee have executed, delivered and accepted this Assignment as of the dates set forth below.

**[THE REST OF THIS PAGE IS LEFT INTENTIONALLY BLANK IN ORDER THAT THE AUTHORIZED SIGNATURES FOR THE PARTIES MAY APPEAR TOGETHER]**

**SIGNATURE PAGE FOR ASSIGNMENT BY SHELL OFFSHORE INC. AND MARATHON OIL COMPANY TO LLOG EXPLORATION OFFSHORE, INC. AND DAVIS OFFSHORE, L.P.**

<u>ASSIGNORS:</u>

WITNESSES:                               **Shell Offshore Inc.**

_____          By:_____

                                                   Name:_____R. W. Robison, Jr._____

_____          Title:  Attorney-in-Fact

                                                   Date:_____


WITNESSES:                               **Marathon Oil Company**

_____          By:_____

                                                   Name:_____

_____          Title:_____

                                                   Date:_____


<u>ASSIGNEES:</u>

WITNESSES:                               **LLOG Exploration Offshore, Inc.**

_____          By:_____

                                                   Name: Kemberlia Ducote

_____          Title:  Secretary

                                                   Date:_____


Farmout Agreement - NE/4 of GC 201                      - 7 -                                      Exhibit "C-1"

**WITNESSES:**

**Davis Offshore, L.P.**

_____

By:_____

Name:_____

_____

Title:_____

Date:_____

STATE OF LOUISIANA   §
                              §
ORLEANS PARISH     §

      **BEFORE ME**, the undersigned authority, on this day personally appeared _____, known to me to be the person whose name is subscribed to the foregoing instrument as _____, of **Shell Offshore Inc.**, and acknowledged to me that he executed the same for and on behalf of said company, for the purposes and consideration therein expressed, and in the capacity therein stated.

      **GIVEN** under my hand and seal of office this _____ day of _____, 2008.


                              _____
                              Notary Public in and for the State of Louisiana



STATE OF TEXAS     §
                           §
COUNTY OF HARRIS   §

      **BEFORE ME**, the undersigned authority, on this day personally appeared _____, known to me to be the person whose name is subscribed to the foregoing instrument as _____, of **Marathon Oil Company**, and acknowledged to me that he executed the same for and on behalf of said company, for the purposes and consideration therein expressed, and in the capacity therein stated.

      **GIVEN** under my hand and seal of office this _____ day of _____, 2008.


                              _____
                              Notary Public in and for the State of Texas

STATE OF LOUISIANA §
                              §
PARISH OF JEFFERSON §

     **BEFORE ME**, the undersigned authority, on this day personally appeared Kemberlia Ducote, known to me to be the person whose name is subscribed to the foregoing instrument as Secretary, of **LLOG Exploration Offshore, Inc.**, and acknowledged to me that she executed the same for and on behalf of said company, for the purposes and consideration therein expressed, and in the capacity therein stated.

     **GIVEN** under my hand and seal of office this _____ day of _____, 2008.

                                      _____
                                        Notary Public in and for the State of Texas

STATE OF TEXAS §
                        §
COUNTY OF HARRIS §

     **BEFORE ME**, the undersigned authority, on this day personally appeared _____, known to me to be the person whose name is subscribed to the foregoing instrument as _____, of **Davis Offshore, L.P.**, and acknowledged to me that he executed the same for and on behalf of said company, for the purposes and consideration therein expressed, and in the capacity therein stated.

     **GIVEN** under my hand and seal of office this _____ day of _____, 2008.

                                        _____
                                        Notary Public in and for the State of Texas

Farmout Agreement - NE/4 of GC 201         - 10 -         Exhibit "C-1"

**Exhibit C-2**

Attached to and made a part of that certain Farmout Agreement by and between
Shell Offshore Inc., Marathon Oil Company, LLOG Exploration Offshore, Inc., and Davis Offshore, L.P. effective
October 1, 2008

## ASSIGNMENT AND CONVEYANCE OF OVERRIDING ROYALTY INTEREST

THIS ASSIGNMENT AND CONVEYANCE OF OVERRIDING ROYALTY INTEREST (this "Conveyance") is effective as of the 1st day of October, 2008 (the "Effective Date"), by and between LLOG Exploration Offshore, Inc., a Louisiana corporation ("LLOG"), and Davis Offshore, L.P. a _____ corporation ("Davis") (LLOG and Davis are hereinafter called collectively "Assignors"), Shell Offshore Inc., a Delaware corporation ("Shell"), and Marathon Oil Company, a _____ corporation ("Marathon") (Shell and Marathon are herein called collectively "Assignees"). Assignors' and Assignees' addresses are set forth hereinbelow.

WHEREAS, Assignors are the working interest owners of the oil and gas lease as described on Exhibit "A" attached hereto and made a part hereof (hereinafter, the "Contract Area");

WHEREAS, Assignors desire to assign to Assignees certain overriding royalty interests in and to the oil and gas derived from or attributable to the Contract Area in accordance with the terms and conditions hereof;

WHEREAS, immediately prior hereto, Assignees have assigned to Assignors all of their operating rights in the Contract Area pursuant to that certain Farmout Agreement (the "Farmout Agreement") for the NE/4 Green Canyon Block 201 dated effective October 1, 2008, by and between Shell Offshore Inc., Marathon Oil Company, LLOG Exploration Offshore, Inc. ("LLOG"), and Davis Offshore, L.P. ("Davis");

NOW, THEREFORE, in consideration of $10.00 and other good and valuable consideration and the mutual promises made between Assignors and Assignees and delivery of the assignment of the Contract Area, the parties agree as follows:

Assignors do hereby GRANT, ASSIGN, BARGAIN, SELL, TRANSFER, SET OVER and CONVEY unto Assignees an overriding royalty interest (herein referred to as "ORRIs") in, to and under the Contract Area on all oil, gas and associated liquid hydrocarbons produced on the Contract Area, all as calculated and set forth below. TO HAVE AND TO HOLD the ORRIs unto Assignees, their permitted successors and assigns forever, subject to the terms, conditions, exceptions, reservations, covenants, and agreements herein set forth.

**Six and one-half percent of eight-eighths (6.5% of 8/8ths) ORRI in and to all production from said Contract Area for the first one million barrels of oil equivalent produced therein, that escalates to nine and three-quarter percent of eight eighths (9.75% of 8/8ths) ORRI for all production above one million barrels of oil equivalent**

produced from said Contract Area. Assignors and Assignees hereby agree that for purposes of clarification and satisfaction of Assignees' assigned ORRI after proportionate reduction (i.e. 6.5% of 8/8ths x 49.99999% and 6.5% of 8/8ths x 50.00001%), Assignors shall tender three and one-quarter percent of eight-eighths (3.25% of 8/8ths) of total production from the Contract Area to each Assignee for the first one million barrels of oil equivalent produced therein. For all production above one million barrels of oil equivalent produced from said Contract Area, Assignors shall tender four and eighty-seven percent of eight eighths (9.75% x 8/8ths x 49.99999% = 4.87%) to Shell, and four and eighty- eight percent of eight eighths (9.75% x 8/8ths x 50.00001% = 4.88%) to Marathon.

For purposes of this paragraph, one barrel of oil equivalent ("BOE") is defined to mean one barrel of oil.  For gas, 5.8 thousand standard cubic feet of gas with a pressure base of 14.73 psi absolute at a base temperature of sixty degrees Fahrenheit is defined to mean one BOE as provided in 30 CFR 250.1203(b)(7) and as it may be amended.

The ORRIs created herein shall be subject to the following terms and conditions:

(i)     The ORRIs shall be free and clear of all costs of exploring, operating, developing, producing, and maintaining the Contract Area in force and effect, abandoning the Contract Area and all costs of compressing, dehydrating, treating or otherwise rendering the production therefrom marketable, except the proportionate share of transportation charges downstream of the sales meter, severance and excise and other like taxes applicable to such interests. Such ORRIs shall be delivered in kind at the outlet of the sales meter located on the Green Canyon 158 Brutus Platform (the "Host"), and

(ii)    The ORRIs shall be free of all royalty burden but shall be due and payable and administered in accordance with statutes, regulations, lease terms or other guidelines applicable to the federal lessor's royalty except that the ORRIs shall not be applicable to production lost or utilized in the operations for the Contract Area, no subsea transportation charges from the well-head to the sales meter or other transportation charges upstream of the sales meter shall apply, and no royalty suspension will apply such that the MMS provisions granting royalty relief on production shall not apply to the calculation or payment of the ORRIs.

(iii)   Either Assignee may, from time to time, withdraw its election to take such ORRIs in-kind by furnishing Assignors a sixty (60) days advance written notification.  In the event either Assignee elects to receive the gross proceeds attributable to its ORRI under the terms of this provision, the value of said gross proceeds shall be based on the price received by Assignors for production from the Contract Area based on an arms-length transaction. Additionally, ORRIs shall be due and payable and administered in accordance with the regulations applicable to the federal lessor's royalty, except that, as to the ORRI, no subsea transportation allowance or royalty suspension will apply such that the MMS statutory and regulatory

provisions granting royalty relief on production, if applicable, shall not apply to the calculation of the ORRIs payments. Assignors and Assignees shall mutually agree on where and how such payments are to be tendered.

(iv)    Assignees shall have the same rights as Assignors to participate in the audit of volume allocations, revenue calculations (for cash settlements), quality bank adjustment calculations and field imbalance settlements for the Contract Area. Assignees shall be provided copies upon written request to the designated operator of the Contract Area all pertinent agreements describing the audit rights and shall be afforded the opportunity to participate in any joint audit of the Contract Area that may be conducted by the non-operators.

(v)    The designated operator of the Contract Area shall provide to Assignees (i) copies of the production data as and when supplied to the MMS (monthly production reports) (ii) an estimate of expected daily production for a production month no later than five (5) days prior to the beginning of each production month, and daily production estimates, if necessary for Assignees to schedule oil and gas transportation, (iii) information contained in the annual operations plans for the Contract Area as related to actual and forecast production, fuel and flare not later than fifteen (15) days after presentation to the Assignors, (iv) a copy of reports generated related to the oil and gas quality banks, if any, field or working interest gas imbalance statements, as applicable, and fuel and use adjustments at the same time as provided to the other parties to the Measurement and Allocation Agreement for the Host, (v) copies of any additional documents to which Assignees in the future may become subject to hereunder, including, but not limited to, the Measurement and Allocation Agreement for the Host, the MMS commingling approval and/or the upstream Host quality bank agreement and (vi) and other similar instruments required to comply with applicable laws or stock exchange regulations.

(vi)    **THE CONSTRUCTION, VALIDITY AND PERFORMANCE OF THIS CONVEYANCE SHALL BE GOVERNED BY LOUISIANA LAW.** Any dispute, difference, controversy or claim (whether over enforceability or in contract, tort or otherwise) between the Assignors and the Assignees arising from or in connection with this Conveyance shall be referred to and determined by arbitration.

(vii)    There are no further understandings, representations, warranties or obligations pertaining to the ORRIs and this Conveyance supersedes and replaces any and all prior agreements, whether written or oral, between the parties.

(viii)    In case of a conflict between the provisions hereof and the provisions of any applicable laws or regulations, the provisions of the laws or regulations shall govern over the provisions of this Conveyance. If, for any reason and for so long as any clause or provision of this Conveyance is held by a court of competent jurisdiction to be illegal, invalid, unenforceable or unconscionable under any present or future law (or interpretation thereof), the remainder of this Conveyance shall not be

affected by such illegality or invalidity. Any such invalid provision shall be deemed severed from this Conveyance as if this Conveyance had been executed with the invalid provision eliminated. If the severance of such provision causes a material adverse effect on the economic positions of either party to this Conveyance, then the parties shall enter into good faith negotiations to endeavor to revise this Conveyance to the extent necessary to preserve the respective economic positions of both parties.

(ix)   Each party has had the benefit of independent representation with respect to the subject matter of this Conveyance. Therefore, this Conveyance shall be considered for all purposes as prepared through the joint efforts of the parties, and shall not be construed against one party or another as a result of the preparation, submittal or other events of negotiation, drafting or execution hereof. However, it is expressly agreed that the duties, obligations and liabilities of the parties are several and not joint, and nothing contained herein shall be construed to create or impose a partnership duty, obligation or liability on any of the parties.

(x)   All notice, communications and payments required or permitted to be given hereunder shall be made in writing and delivered to the designated representative listed below in person or by facsimile transmission (followed by a phone call confirming receipt), U.S. mail, overnight express or courier. Any notices, communications and payments shall be effective only when received by the party to whom such notice, communication or payment is directed. Any notice or communication by facsimile shall be deemed given and received only after the receiving party has confirmed receipt of such facsimile. Any notice, communication or payment transmitted by overnight express or courier shall be deemed given and received twenty-four (24) hours (exclusive of Saturdays, Sundays and federal holidays) after such notice, communication or payment is deposited or transmitted. Any notice, communication or payment transmitted by U.S. mail (other than overnight express) shall be deemed given and received five (5) days (exclusive of Saturdays, Sundays or federal holidays) after the notice, communication or payment is deposited in the mail.

(a)   If to Assignees:

Shell Offshore Inc.
ATTN: Kent Abadie
Manager, Development and Production, GOM
701 Poydras Street
New Orleans, Louisiana 70139
Telephone: (504) 728-4325
Facsimile: (504) 728-0399

Marathon Oil Company

Debtors' Exhibit A
Page 44 of 65

ATTN: _____
5555 San Felipe Road
Houston, TX 77056
Telephone: _____
Facsimile: _____

(b)      <u>If to Assignors:</u>

LLOG Exploration Offshore, Inc.
ATTN: Land Manager
11700 Katy Freeway
Houston, TX 77079
Telephone: (281) 752-1100
Facsimile: (281) 596-0219

Davis Offshore, L.P.
ATTN: _____
1360 Post Oak Blvd.
Houston, TX 77056
Telephone: _____
Facsimile: _____

Any party may specify as a different address for notice purposes any other post office address by giving the other party at least fifteen (15) days written notice thereof.

This Conveyance may be executed in several original counterparts. Each counterpart shall be deemed to be an original for all purposes, and all counterparts shall together constitute but one and the same instrument. No individual counterpart shall be binding until all parties have executed a counterpart original.

Farmout Agreement - NE/4 of GC 201        - 5 -        Exhibit "C-2"

WITNESS the execution hereof before the undersigned competent witnesses, this ___ day of _____, 2008.

WITNESSES:                              ASSIGNORS:


                                        **LLOG Exploration Offshore, Inc.**

_____               By:_____
                                        Name:  Kemberlia Ducote
_____               Its:  Secretary



                                        **Davis Offshore, L.P.**

_____               By:_____
                                        Name: _____
_____               Its: _____




WITNESSES:                              ASSIGNEES:


                                        **Shell Offshore Inc.**

_____               By:_____
                                        Name:  R. W. Robison, Jr.
_____               Its: _____




                                        **Marathon Oil Company**

_____               By:_____
                                        Name: _____
_____               Its: _____


Farmout Agreement - NE/4 of GC 201              - 6 -                    Exhibit "C-2"

STATE OF LOUISIANA

PARISH OF JEFFERSON

    This instrument was acknowledged before me on the ___ day of _____, 2008, by Kemberlia Ducote, Secretary of LLOG Exploration Offshore, Inc., a Louisiana corporation, on behalf of said corporation.

        [SEAL]        _____

                             NOTARY PUBLIC

                             Printed Name:_____

                             My commission expires:_____

STATE OF TEXAS

COUNTY OF HARRIS

    This instrument was acknowledged before me on the ___ day of _____, 2008, by _____, _____ of Davis Offshore, L.P., a _____ corporation, on behalf of said corporation.

        [SEAL]        _____

                             NOTARY PUBLIC

                             Printed Name:_____

                             My commission expires:_____

STATE OF LOUISIANA

ORLEANS PARISH

    This instrument was acknowledged before me on the ___ day of _____, 2008, by _____, _____ of Shell Offshore Inc., a Delaware corporation, on behalf of said corporation.

        [SEAL]        _____

                             NOTARY PUBLIC

                             Printed Name:_____

                             My commission expires:_____

STATE OF TEXAS

COUNTY OF _____

     This instrument was acknowledged before me on the ___ day of _____, 2008, by _____, _____ of Marathon Oil Company, a _____ corporation, on behalf of said corporation.

          [SEAL]                    _____

                                     NOTARY PUBLIC

                                     Printed Name:_____

                                     My commission expires:_____

## Exhibit "A"

Attached to and made a part of that certain Assignment and Conveyance of Overriding Royalty Interest by and between Shell Offshore Inc., Marathon Oil Company, LLOG Exploration Offshore, Inc., and Davis Offshore, L.P. effective October 1, 2008

II.   **Description of the Contract Area:**

Federal Lease No. OCS-G 12210 dated effective May 1, 1990, between the United States of America and BP Exploration Inc., as original Lessee, covering all of Block 201, Green Canyon, as shown on OCS Official Protraction Diagram, NG 15-3, containing approximately 5,760 acres, insofar and only insofar as to the northeast quarter (NE/4) of said Lease, covering depths from surface down to 17,000 feet subsea true vertical depth.

IV.   **Interests of the Parties in the Contract Area:**

Assignors:

LLOG Exploration Offshore, Inc.          85% Working Interest

Davis Offshore, L.P.                     15% Working Interest

Assignees:

Shell Offshore Inc.                      3.25% of 8/8ths ORRI for the first one million barrels of oil equivalent produced in the Contract Area, and 4.87% ORRI for all production above one million barrels of oil equivalent produced from said Contract Area.

Marathon Oil Company                     3.25% of 8/8ths ORRI for the first one million barrels of oil equivalent produced in the Contract Area, and 4.88% ORRI for all production above one million barrels of oil equivalent produced from said Contract Area.

## EXHIBIT "D"

Attached to and made a part of that certain Farmout Agreement by and between
Shell Offshore Inc., Marathon Oil Company, LLOG Exploration Offshore, Inc., and Davis Offshore, L.P. effective
October 1, 2008

### Open Hole Well Data Format and Delivery Specifications

**Contract Name:**   J. Bellis
**Area & Block:**   Green Canyon, Block 201
**OCS No.:**   G- 12210

**Objective:**

The objective of these specifications is to provide clear and precise instructions to the J. Bellis Group and its vendors for the timely delivery of subsurface well data to each member of the Troika Group, and to ensure that if the ensuing subsurface well data categories are acquired, that they are delivered in the preferred formats.

**Transmittal:**

All transmittals should include a detailed description of the well data, the J. Bellis Group's names, Contract name, well number, OCS number, API number, and an Information Technology/Data Management contact person. A digital copy of the transmittal should be submitted.

**SOI Contacts:**

|  | Primary | Secondary |
|---|---|---|
| Name | Ken Lanson | Allen Bertagne |
| Office Phone No. | 504-728-6783 | 832 337 1689 |
| E-Mail Address | ken.lanson@shell.com | Allen.bertagne@shell.com |

**Marathon Contacts:**

|  | Primary | Secondary |
|---|---|---|
| Name | Johnny Carroll | Jim Parker |
| Office Phone No. | 713-296-3427 | 713-296-3010 |
| E-Mail Address | jcarroll1@marathonoil.com | jmparker@marathonoil.com |

## 1. Throughout the Drilling Operations

### Daily Reports

- Daily delivery of drilling reports via electronic means.

**Mud logging Data**

- Delivery of logs and reports via digital delivery within thirty (30) days after logging operations have ceased.

**Well Cutting Samples**

- 30' composite lag samples (10' in shows) shipped within thirty (30) days after logging operations have ceased.

- Samples should be clearly marked with the Contract and well name, well suffix and depth interval and shipped to the following location:

  > Shell Exploration & Production Company
  > **ATTN: Allen Bertagne**
  > 150 N. Dairy Ashford
  > Houston, TX 77079
  >
  > Marathon Oil Company samples should be sent to:
  > **Fugro C&M Storage Inc.**
  > **c/o Marathon Oil**
  > **ATTN: Allen Rother**
  > 3311 S. U.S. Hwy. 77
  > Schulenburg, TX. 78956

**MWD/LWD**

- Delivery of logs via digital medium within thirty (30) days after logging operations have ceased.

**At "pulled out of hole" to rig floor--read tool intervals (casing points)**

**MWD / LWD / Wire line and Mud logging data:**

- **Field Data** – Delivery within thirty (30) days after pulling out of the hole and reading tools – via a digital delivery medium.

- **LWD tools / running wire line logs, please provide:**

- **Digital**
  Digital recorded merged data and directional data, in LAS and CGM format for all services/tools. Transmitted electronically via digital data delivery website.

2. **Post Drilling Operations**

   **Digital Data** – delivered within fifteen, (15) days and after passing vendor QA/QC procedures.

   **Raw interval data after TD** – all recorded data downloaded following each bit run or intermediate wire line runs, including all curves, raw waveform data, time based PWD and surface data, etc. (i.e. not just final spliced dataset).

   **Final raw composite data** – all recorded data downloaded following each bit run or wireline run, including raw waveform data, time based PWD and surface data, etc. Final composite prints, composite digital data and images must include:
   - a.    Header – fully populated
   - b.    Bit run summary
   - c.    Tool sketch / remarks (where applicable)
   - d.    Parameter set-up listing (where applicable)
   - e.    1" log – curve labels only; 5" log – fully annotated
   - f.    Image logs (where applicable)
   - g.    Repeat sections (where applicable)
   - h.    Calibration summary listings (where applicable)
   - i.    Tail with tool calibrations (where applicable)
   - j.    API number
   - k.    Well number, well suffix
   - l.    Bottom area and block
   - m.    Bottom location OCS-G #
   - n.    LAS files wrapped

   **Digital data** - a CD/DVD of all logging runs (interval and final composite) including CGM image logs, waveforms, time and depth based PWD data, time and depth based mud logging data, and time based wireline data (where applicable) and conventional depth based log data, etc.

   **All LAS files must be wrapped.**
   - a.    DLIS and LAS (where applicable) for each logging run – raw interval
   - b.    DLIS and LAS (where applicable) of final composite log data
   - c.    SEGY format of raw, stacked, and processed data for all Velocity / VSP surveys
   - d.    All log images in CGM format
   - e.    All images also in vendor's proprietary image format (e.g. EMF, PDS, etc)

All disk labels to include:
- API number
- Area and block
- Lease number
- Well number
- Date of creation
- Runs and depth ranges
- Logging company name and product description

**Logs (LWD/MWD, Mud, Wire line)**
    a.    Two (2) CD/DVD – LAS, DLIS, Intervals, Composite, of the final raw logging curves and CGM images
    b.    Four (4) copies of final prints

**Directional Survey**
    a.    One (1) CD/DVD – ASCII, Excel or Word – Vendor proprietary format and the MMS format
    b.    Two (2) Final Reports

**Velocity Survey/Check Shot**
    a.    One (1) CD/DVD – ASCII, Excel or Word – Vendor proprietary format and the MMS format
    b.    Two (2) Final Reports

**Velocity Seismic Profile (VSP)**
    a.    One (1) CD/DVD – copy of the Velocity Seismic Profile data
    b.    Two (2) Final Reports

**Sidewall Core**
    a.    One (1) CD/DVD – Excel or Word format of final reports and photographs
    b.    Two (2) Final Reports

**Conventional Core**
    a.    One (1) CD/DVD – Excel or Word format of final reports and photographs
    b.    Two (2) Final Reports

**Fluid Samples – (Well site - Fluid Transfer and PVT Reports)**
    a.    One (1) CD/DVD -- Excel or Word format of final reports
    b.    Two (2) Final Reports

**Geochem**
    a.    One (1) CD/DVD – Excel or Word format of final reports
    b.    Two (2) Final Reports

**Paleo**

    a.    One (1) CD – Excel or Word format of final reports

    b.    Two (2) Final Reports

**3.  <u>Mailing Instructions</u>**

Mail all final well data to the following address and attention to:

Shell Exploration & Production Company
**ATTN: Ken Lanson**
701 Poydras Street, Suite # 3213
New Orleans, LA 70139

Marathon Oil Company
**ATTN:  Randy Schwenke**
5555 San Felipe Road
Houston, TX 77056

| *Logs, directional surveys, velocity surveys, conventional/ sidewall cores* | *Paleo* | *Fluids, geochemical data* |
|---|---|---|
| Shell Exploration & Production Company<br>ATTN: **Allen Bertagne**<br>Senior Consulting Geophysicist<br>150 N. Dairy Ashford<br>Houston, TX  77079<br>+1 832 337 1689 (office no.)<br>+1 281 507 2882 (mobile no.)<br>+1 713 546 6458 (fax no.) | Shell Exploration & Production Company<br>ATTN: **Allen Bertagne**<br>Senior Consulting Geophysicist<br>150 N. Dairy Ashford<br>Houston, TX  77079<br>+1 832 337 1689 (office no.)<br>+1 281 507 2882 (mobile no.)<br>+1 713 546 6458 (fax no.) | Shell Exploration & Production Company<br>ATTN: **Allen Bertagne**<br>Senior Consulting Geophysicist<br>150 N. Dairy Ashford<br>Houston, TX  77079<br>+1 832 337 1689 (office no.)<br>+1 281 507 2882 (mobile no.)<br>+1 713 546 6458 (fax no.) |

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

## EXHIBIT "E"

Attached to and made a part of that certain Farmout Agreement by and between
Shell Offshore Inc., Marathon Oil Company, LLOG Exploration Offshore, Inc., and Davis Offshore, L.P. effective
October 1, 2008

## CERTIFICATION OF NONSEGREGATED FACILITIES

Contractor certifies that it does not maintain or provide for its employees any segregated facilities at any of its establishments and that it does not permit its employees to perform their services at any location under its control, where segregated facilities are maintained. Contractor certifies further that it will not maintain or provide for its employees any segregated facilities at any of its establishments and that it will not permit its employees to perform their services at any location, under its control, where segregated facilities are maintained. Contractor agrees that a breach of this certification is a violation of the Equal Opportunity Clause in any Government contract between Contractor and Operator. As used in this certification, the term "segregated facilities" means any waiting rooms, work areas, rest rooms and other storage or dressing areas, parking lots, drinking fountains, recreation or entertainment areas, transportation, and housing facilities provided for employees which are segregated by explicit directive or are in fact segregated on the basis of race, color, religion, or national origin because of habit, local custom or otherwise. Contractor further agrees that (except where it has obtained identical certifications from proposed subcontractors) prior to the award of subcontracts exceeding $10,000 which are not exempt from the provisions of the Equal Opportunity Clause; that it will retain such certifications in its files; and that it will forward the following notice to such proposed subcontractors (except where the proposed subcontractors have submitted identical certifications for specific time periods):

## NOTICE TO PROSPECTIVE SUBCONTRACTORS OF REQUIREMENT FOR CERTIFICATIONS OF NONSEGREGATED FACILITIES.

A Certification of Non-segregated Facilities, as required by the May 9, 1967 order on Elimination of Segregated Facilities, by the Secretary of Labor (32 Fed. Reg. 7439, May 19, 1967), must be submitted prior to the award of a subcontract exceeding $10,000 which is not exempt from the provisions of the Equal Opportunity Clause. The certification may be submitted either for each subcontract or for all subcontracts during a period (i. e., quarterly, semi-annually or annually). (1968 MAR.) (Note: The penalty for making false statements in offers is prescribed in 18. U.S.C. 1001.) Whenever used in the foregoing Section, the term "Contractor" refers to each Party to this Agreement.

# EXHIBIT "F"

Attached to and made a part of that certain Farmout Agreement by and between
Shell Offshore Inc., Marathon Oil Company, LLOG Exploration Offshore, Inc., and Davis Offshore, L.P. effective
October 1, 2008

## OFFSHORE INSURANCE PROVISIONS

**I.     WORKERS' COMPENSATION & EMPLOYERS' LIABILITY INSURANCE**

The J. Bellis Group will carry Workers' Compensation Insurance in compliance with all State and Federal Regulations in the jurisdiction where any of the work under this Farmout Agreement shall be performed, including the following special coverage extensions:

1.      Employers' Liability coverage with limits of not less than $5,000,000 per accident for US and Canadian domiciled employees.

2.      Employers' Liability coverage to include Maritime operations with limits of not less than $10 Million per accident for employees domiciled outside the USA or Canada.

3.      Borrowed Servant/Employee and Alternate Employee Endorsement.

4.      Voluntary Compensation Endorsement.

5.      U.S. Longshoremen and Harbor Workers' Act and Outer Continental Shelf Lands Act coverage.

6.      Employers' Liability arising out of maritime operations including coverage for benefits and damages under the Jones Act with limits of at least $5,000,000 per occurrence.

7.      "In Rem" endorsement.

8.      Waiver of Subrogation endorsement, which waives the insurers rights of subrogation against all of the parties to this agreement, particularly Troika Group.

**II.     ADDITIONAL INSURANCE**

At all times while the Farmout Agreement is in effect, the J. Bellis Group shall insure for any liabilities assumed under the Farmout Agreement.  The cost of these insurance programs shall be the responsibility of the J. Bellis Group. The J. Bellis Group shall insure the following coverage for the minimum limits stated.

1.  Commercial General Liability Insurance covering the J. Bellis Group's operations, including its offshore operations, and including contractual liability coverage with combined single limits of at least $40,000,000 per occurrence.

2.  Automobile Liability Insurance covering all owned, non-owned and leased vehicles with combined single limits of at least $5,000,000 per occurrence.

3.  Pollution Liability Insurance covering offshore oil pollution with limits of at least $40,000,000 per occurrence. This insurance shall include damages resulting from the operations and activities of contractors acting on behalf of the J. Bellis Group under this Farmout Agreement.

4.  Physical Damage insurance and coverage for Wreck Removal for offshore property, facilities or rigs used by or on behalf of the J. Bellis Group under this Farmout Agreement, with limits not less than the replacement cost value of the facilities or rigs.

5.  Control of Well and Seepage and Pollution Insurance with limits of at least $100,000,000 per occurrence. This insurance shall include damages resulting from the operations and activities of contractors acting on behalf of the J. Bellis Group under this Farmout Agreement.

5.  Non-owned Aviation Liability Insurance in the amount of $20,000,000 per occurrence covering liability arising out of any leased aircraft used in the connection with the work to be performed under the Farmout Agreement.

6.  Aviation liability insurance in the amount of $150,000,000 per occurrence covering liability arising out of any owned, leased or hired aircraft used in the connection with the work to be performed under the Farmout Agreement.

All of the above coverages required in sections I and II above shall be endorsed to waive the insurers' rights of subrogation against Troika Group.

III. **CONTRACTORS' INSURANCE**

The J. Bellis Group shall use reasonable efforts to require each contractor who performs work on the Lease to carry the following insurance and special insuring provisions.

1.  Workers' Compensation and Employers' Liability Insurance in accordance with all State and Federal Regulations in the jurisdiction where the work is to be performed. This coverage shall contain the following special endorsements:

    a.   Employers' Liability coverage with limits of not less than $5,000,000 per accident for Canadian and US domiciled employees.

    b.   Employers' Liability coverage to include Maritime operations with limits of not less than $10,000,000 per accident employees domiciled outside US and Canada.

    c.   U.S. Longshoremen and Harbor Workers' Act and Outer Continental Shelf Lands Act coverage.

    d.   Employers' Liability arising out of maritime operations including coverage for benefits and damages under the Jones Act with limits of at least $5,000,000 per occurrence.

    e.   "In Rem" endorsement.

    f.   Borrowed Servant/Employee or Alternate Employee endorsement.

    g.   Voluntary Compensation Endorsement.

    h.   Waiver of Subrogation endorsement, which waives the insurers' rights of subrogation against all of the Parties to this Farmout Agreement.

2.    Commercial General Liability Insurance and/or Excess Liability Insurance, including contractual liability covering the indemnity obligations assumed in the contract with the J. Bellis Group, with combined single limits of $5,000,000 per occurrence for injuries to or death of persons and damage to property.

3.    Automobile Liability Insurance covering all owned, non-owned and hired vehicles with combined single limits of at least $5,000,000 per occurrence for injuries to or death of persons and damage to property.

4.    In the event watercraft is used by the contractor, contractor shall carry or require owners of such watercraft to carry Protection and Indemnity Insurance in the amount of $150,000,000.

5.    If contractor's operations require it to use aircraft, contractor shall carry or require the owners of such aircraft to carry Aircraft Liability Insurance with a combined single limit of $150,000,000 per occurrence and an additional limit of $5,000,000 per passenger per occurrence for aircraft with capacity for more than 20 passengers.

6.    Insurance for the replacement value of property or equipment used under the Farmout Agreement to include removal of debris.

7.    Any additional insurance that the J. Bellis Group deems necessary, which does not restrict the insurance coverage listed in Sections 1 through 6 above.

8.    All of the insurance carried by contractors pursuant to Sections 2 through 7 above shall contain endorsements waiving the insured's rights of subrogation against the J. Bellis Group and all other Parties to the Farmout Agreement, particularly the Troika Group.

The J. Bellis Group shall make a good faith effort to obtain all of the above-required insurance and special insuring provisions. The J. Bellis Group shall also make a good faith effort to obtain endorsements naming the J. Bellis Group and all other Parties as an Additional Insured on the policies of insurance where appropriate and to provide that the word 'Insured' also includes any Party, co-owner or joint venturer.

**IV.    NOTICE**

The J. Bellis Group shall promptly notify the Troika Group of any loss, damage or claim covered or not covered by insurance for which the J. Bellis Group is responsible for under the Farmout Agreement.   All losses, damages or claims that are not covered by insurance or are in excess of the minimum insurance requirements shall be borne by the J. Bellis Group.

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

9.25    The J. Bellis Group hereby agrees to keep, save, and hold this Farmout Agreement and all information relating to this Farmout Agreement as confidential, except as provided in Section 1.6 herein or upon the Troika Group's prior written consent, for the term of this Farmout Agreement. Provided however, if the J. Bellis Group or a member thereof individually is required to disclose this Farmout Agreement or any of the terms of this Farmout Agreement by law, order, decree, regulation, or rule (including without limitation, those of any regulatory agency, securities commission, or stock exchange having jurisdiction), or if any person seeks to legally compel disclosure (by interrogatories, document requests, subpoena, or otherwise), the J. Bellis Group or the member thereof individually shall provide the Troika Group prompt written notice thereof in order that the Troika Group may (a) seek a protective order or other remedy (including participation in any proceeding to which the J. Bellis Group or the member thereof individually is a party) and/or (b) waive compliance with this Farmout Agreement. The J. Bellis Group or the member thereof individually shall furnish only such confidential information as is legally required thereafter and shall use its best efforts to obtain confidential treatment therefore.

## EXHIBITS

The following Exhibits are attached hereto and made a part of this Farmout Agreement:

| | | |
|---|---|---|
| Exhibit "A" | – | Description of the Lease, Description of Contract Area and Interest of the Parties in the Contract Area |
| Exhibit "B-1" | – | Amendment to the Troika Unit Operating Agreement |
| Exhibit "B-2" | – | Letter Agreement to Amend the J. Bellis Production Handling Agreement |
| Exhibit "C-1" | – | Form of Assignment of Operating Rights |
| Exhibit "C-2" | – | Assignment and Conveyance of Overriding Royalty Interests |
| Exhibit "D" | – | Open Hole Well Data Format and Delivery Specifications |
| Exhibit "E" | – | Certification of Nonsegregated Facilities |
| Exhibit "F" | – | Offshore Insurance Provisions |

**IN WITNESS WHEREOF**, the Parties have executed this Farmout Agreement in the presence of the undersigned competent witnesses, effective as of the Effective Date.


**The Troika Group**

WITNESSES:                              **Shell Offshore Inc.**

_____              BY: _____
_____              NAME: _____R. W. Robison, Jr._____
                                       TITLE: Attorney-in-Fact_____
                                       DATE: ___Dec 1st, 2008_____

Farmout Agreement - NE/4 of GC 201                    - 19 -

WITNESSES:                          **Marathon Oil Company**

_____      BY:_____
                                    NAME:_____
_____      TITLE:_____Attorney-in-Fact_____
                                    DATE:_____


**The J. Bellis Group**

WITNESSES:                          **LLOG Exploration Offshore, Inc.**

_____      BY:_____
                                    NAME:_____
_____      TITLE:_____
                                    DATE:_____


WITNESSES:                          **Davis Offshore, L.P.**

_____      BY:_____
                                    NAME:_____George Canjar_____
_____      TITLE:Chief Operating Officer_____
                                    DATE:____December 1, 2008_____

Farmout Agreement - NE/4 of GC 201           - 20 -

9.25    The J. Bellis Group hereby agrees to keep, save, and hold this Farmout Agreement and all information relating to this Farmout Agreement as confidential, except as provided in Section 1.6 herein or upon the Troika Group's prior written consent, for the term of this Farmout Agreement.   Provided however, if the J. Bellis Group or a member thereof individually is required to disclose this Farmout Agreement or any of the terms of this Farmout Agreement by law, order, decree, regulation, or rule (including without limitation, those of any regulatory agency, securities commission, or stock exchange having jurisdiction), or if any person seeks to legally compel disclosure (by interrogatories, document requests, subpoena, or otherwise), the J. Bellis Group or the member thereof individually shall provide the Troika Group prompt written notice thereof in order that the Troika Group may (a) seek a protective order or other remedy (including participation in any proceeding to which the J. Bellis Group or the member thereof individually is a party) and/or (b) waive compliance with this Farmout Agreement.  The J. Bellis Group or the member thereof individually shall furnish only such confidential information as is legally required thereafter and shall use its best efforts to obtain confidential treatment therefore.

## EXHIBITS

The following Exhibits are attached hereto and made a part of this Farmout Agreement:

| | | |
|---|---|---|
| Exhibit "A" | – | Description of the Lease, Description of Contract Area and Interest of the Parties in the Contract Area |
| Exhibit "B-1" | – | Amendment to the Troika Unit Operating Agreement |
| Exhibit "B-2" | – | Letter Agreement to Amend the J. Bellis Production Handling Agreement |
| Exhibit "C-1" | – | Form of Assignment of Operating Rights |
| Exhibit "C-2" | – | Assignment and Conveyance of Overriding Royalty Interests |
| Exhibit "D" | – | Open Hole Well Data Format and Delivery Specifications |
| Exhibit "E" | – | Certification of Nonsegregated Facilities |
| Exhibit "F" | – | Offshore Insurance Provisions |

**IN WITNESS WHEREOF**, the Parties have executed this Farmout Agreement in the presence of the undersigned competent witnesses, effective as of the Effective Date.

## The Troika Group

WITNESSES:                               **Shell Offshore Inc.**

BY:  _R. W. Robison, Jr._

NAME: R. W. Robison, Jr.

TITLE: Attorney-in-Fact

DATE: Dec 1st, 2008

Farmout Agreement - NE/4 of GC 201                - 19 -

WITNESSES:                                    **Marathon Oil Company**

_____                       BY:_____
                                              NAME:_____
_____                       TITLE:_____Attorney-in-Fact_____
                                              DATE:_____


**The J. Bellis Group**

WITNESSES:                                    **LLOG Exploration Offshore, Inc.**

_____                       BY:_____
                                              NAME:_____
_____                       TITLE:_____
                                              DATE:_____


WITNESSES:                                    **Davis Offshore, L.P.**

_____                       BY:_____
                                              NAME:_____George Canjar_____
_____                       TITLE:_Chief Operating Officer
                                              DATE:____December 1, 2008_____

Farmout Agreement - NE/4 of GC 201                    - 20 -

9.25    The J. Bellis Group hereby agrees to keep, save, and hold this Farmout Agreement and all information relating to this Farmout Agreement as confidential, except as provided in Section 1.6 herein or upon the Troika Group's prior written consent, for the term of this Farmout Agreement.    Provided however, if the J. Bellis Group or a member thereof individually is required to disclose this Farmout Agreement or any of the terms of this Farmout Agreement by law, order, decree, regulation, or rule (including without limitation, those of any regulatory agency, securities commission, or stock exchange having jurisdiction), or if any person seeks to legally compel disclosure (by interrogatories, document requests, subpoena, or otherwise), the J. Bellis Group or the member thereof individually shall provide the Troika Group prompt written notice thereof in order that the Troika Group may (a) seek a protective order or other remedy (including participation in any proceeding to which the J. Bellis Group or the member thereof individually is a party) and/or (b) waive compliance with this Farmout Agreement.  The J. Bellis Group or the member thereof individually shall furnish only such confidential information as is legally required thereafter and shall use its best efforts to obtain confidential treatment therefore.

## EXHIBITS

The following Exhibits are attached hereto and made a part of this Farmout Agreement:

| Exhibit "A" | – | Description of the Lease, Description of Contract Area and Interest of the Parties in the Contract Area |
| Exhibit "B-1" | – | Amendment to the Troika Unit Operating Agreement |
| Exhibit "B-2" | – | Letter Agreement to Amend the J. Bellis Production Handling Agreement |
| Exhibit "C-1" | – | Form of Assignment of Operating Rights |
| Exhibit "C-2" | – | Assignment and Conveyance of Overriding Royalty Interests |
| Exhibit "D" | – | Open Hole Well Data Format and Delivery Specifications |
| Exhibit "E" | – | Certification of Nonsegregated Facilities |
| Exhibit "F" | – | Offshore Insurance Provisions |

**IN WITNESS WHEREOF**, the Parties have executed this Farmout Agreement in the presence of the undersigned competent witnesses, effective as of the Effective Date.

### The Troika Group

WITNESSES:                                                       **Shell Offshore Inc.**

BY: _____

NAME: _____R. W. Robison, Jr._____

TITLE: Attorney-in-Fact

DATE: _____Dec 1st, 2008_____

Farmout Agreement - NE/4 of GC 201                              - 19 -

WITNESSES:                                    **Marathon Oil Company**

_____                       BY:_____
_____                       NAME:_____
                                               TITLE:_____Attorney-in-Fact_____
                                               DATE:_____


**The J. Bellis Group**

WITNESSES:                                    **LLOG Exploration Offshore, Inc.**

_____                       BY:_____
_____                       NAME:_____
                                               TITLE:_____
                                               DATE:_____


WITNESSES:                                    **Davis Offshore, L.P.**

_____                       BY:_____
_____                       NAME:_____George Canjar_____
                                               TITLE:Chief Operating Officer
                                               DATE:_____December 1, 2008_____


Farmout Agreement - NE/4 of GC 201            - 20 -