EQUITY PURCHASE AGREEMENT

DATED AUGUST 5, 2014

AMONG

DAVIS PETROLEUM ACQUISITION CORP.,

DAVIS OFFSHORE PARTNERS, LLC,

DAVIS OFFSHORE, L.P.

AND

FIELDWOOD ENERGY OFFSHORE LLC

## EQUITY PURCHASE AGREEMENT

This EQUITY PURCHASE AGREEMENT (this "Agreement"), dated August 5, 2014, is by and among DAVIS PETROLEUM ACQUISITION CORP., a Delaware corporation ("Seller"), DAVIS OFFSHORE PARTNERS, LLC, a Delaware limited liability company ("Davis Offshore Partners"), DAVIS OFFSHORE, L.P., a Texas limited partnership ("Davis Offshore"), and FIELDWOOD ENERGY OFFSHORE LLC, a Delaware limited liability company ("Buyer"). Seller, Davis Offshore Partners, Davis Offshore, and Buyer are each referred to in this Agreement as a "Party" and collectively referred to as the "Parties."

## RECITALS

WHEREAS, Seller owns and desires to sell and assign to Buyer, and Buyer desires to purchase and acquire from Seller, all of the issued and outstanding equity in Davis Offshore Partners and Davis Offshore as further described herein, subject to the terms and conditions set forth herein.

NOW, THEREFORE, for and in consideration of the mutual covenants and agreements set forth in this Agreement, the benefits to be derived by each Party, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereby agree as follows:

## ARTICLE 1
### DEFINITIONS AND INTERPRETATION

Section 1.1 Certain Defined Terms. Unless the context otherwise requires, the respective terms defined in this Agreement (including Exhibit A) shall have the meanings specified herein (and therein).

Section 1.2 Interpretation.

(a) All references in this Agreement to an "Article," "Section," "subsection," "Exhibit" or "Schedule" shall be to an Article, Section, subsection, Exhibit or Schedule of this Agreement, unless the context requires otherwise. Unless the context otherwise expressly requires, the words "this Agreement," "hereof," "hereunder," "herein," "hereby," or words of similar import shall refer to this Agreement as a whole and not to a particular Article, Section, subsection, clause or other subdivision hereof. Whenever the context requires, the words used herein shall include the masculine, feminine and neuter gender, and the singular and the plural.

(b) It is expressly agreed that this Agreement shall not be construed against any Party, and no consideration shall be given or presumption made, on the basis of which Party drafted this Agreement or any particular provision hereof or which Party supplied the form of this Agreement. Each Party agrees that this Agreement has been purposefully drawn and correctly reflects its understanding of the transaction that this Agreement contemplates. In construing this Agreement: (i) examples shall not be construed to limit, expressly or by implication, the matter they illustrate; (ii) the word "includes" and its derivatives means "includes, but is not limited to" and all corresponding derivative expressions; (iii) a defined term has its defined meaning throughout this Agreement and each Exhibit and Schedule (including amendments and supplements thereto) to this Agreement, regardless of whether it appears before or after the place where it is defined; (iv) each Exhibit and Schedule (including amendments and supplements thereto) to this Agreement is a part of this Agreement, but if there is any conflict or inconsistency between the main body of this Agreement (including Exhibit A, which shall be considered part of the main body of this Agreement) and any Exhibit or Schedule (including amendments and supplements thereto), the provisions of the main body of this Agreement shall prevail; (v) the term "cost" includes expense and the term "expense" includes cost; and (vi) the headings and titles herein are for convenience only and shall have no significance in the interpretation hereof.

Debtors' Exhibit D
Page 2 of 115

## ARTICLE 2
## SALE AND PURCHASE

Section 2.1 <u>Purchase and Sale of Purchased Equity</u>. At the Closing, upon the terms and subject to (x) the satisfaction or due waiver of the conditions in <u>Article 7</u> and (y) the other provisions set forth in this Agreement, Seller agrees to sell, transfer, assign, convey and deliver to Buyer, and Buyer agrees to purchase, acquire and accept from Seller, all of Seller's right, title and interest in and to the partnership interests of Davis Offshore as set forth on <u>Schedule 4.1(y)</u> and the membership interests of Davis Offshore Partners as set forth on <u>Schedule 4.2(h)</u> (collectively, the "<u>Purchased Equity</u>"). The Buyer, as the owner of the Purchased Equity upon Closing, shall own all of Davis Offshore's and Davis Offshore Partners' right, title and interest in, to and under the following assets, properties and rights (the "<u>Assets</u>"):

(a) The oil, gas, and mineral leases, subleases, royalties, overriding royalties, production payments, net profits interests, carried interests, reversionary interests, and all other interests of any kind or character in Hydrocarbons in place and the leasehold estates created thereby, in each case, described on <u>Schedule 2.1(a)</u> (collectively, the "<u>Subject Leases</u>"), together with all other mineral interests of every nature related to the lands covered by the Subject Leases or lands pooled or unitized therewith (the "<u>Subject Lands</u>") and all corresponding interests in and to all the property and rights incident thereto of any nature that arise by Law or otherwise, including all rights in any pooled or unitized acreage by virtue of the Subject Leases having been pooled into such pools or units, all production from the pool or unit allocated to any such Lands; and all interests in any wells within the pool or unit associated with the Subject Lands; and all reversionary interests, convertible interests, and net profits interests applicable to the Subject Leases or Subject Lands (together with the Subject Lands, collectively, the "<u>Subject Lease Related Interests</u>");

(b) All producing, non-producing, shut in, permanently or temporarily plugged and abandoned oil, gas, disposal or other wells located on the Subject Leases, the Subject Units, or any Subject Lands or lands pooled or unitized therewith, including the wellbores described on <u>Schedule 2.1(b)</u>, and all wellbores spudded before and/or after the date hereof located on the Subject Leases, the Subject Units, and any Subject Lands or lands pooled or unitized therewith (collectively, the "<u>Subject Wells</u>");

(c) All (i) tangible personal property, improvements, equipment, machinery, inventory, fixtures and other property (whether or not currently in use), to the extent (A) situated upon or appurtenant to the Properties or the Easements or (B) primarily used (or to be used in the future), or otherwise primarily held for use (regardless of where located), in connection with the ownership, operation, maintenance or repair of the Properties or Easements or the production, handling, processing or transportation of Hydrocarbons attributable thereto, including all, facilities, platforms, pipelines, gathering systems, processing systems, compressors, meters, tanks, machinery, tools, equipment (including spars, trees, PLETs, jumpers, risers, umbilicals, control assemblies, and production handling equipment), and flowlines or gathering lines, whether the same are in existence as of the date hereof or under construction, (ii) other real, immovable, personal, movable and mixed property that is (A) located on or appurtenant to the Properties or Easements, or (B) primarily used (or to be used in the future), or otherwise primarily held for the current or future use (regardless of where located), in connection with the ownership, operation, maintenance or repair of the Properties or Easements or the production, handling, processing or transportation of Hydrocarbons attributable thereto, whether the same are in existence as of the date of this Agreement or under construction (all of the foregoing, collectively, the "<u>Subject Facilities</u>") and (iii) bank accounts;

(d) All units arising on account of any of the Subject Leases having been pooled or unitized into such units, including those described on <u>Schedule 2.1(d)</u> (collectively, the "<u>Subject Units</u>");

(e) all Contracts (a) (i) to which Davis Offshore is a party (or is a successor or assign of a party) and (ii) that pertain to any of the real and personal properties, rights, titles, or interests described in <u>Sections 2.1(a)</u> through <u>(d)</u> or <u>Sections 2.1(f)</u> through <u>(j)</u> or (b) that are otherwise primarily applicable to the ownership, operation, maintenance or repair of the Assets, (collectively, the "<u>Applicable Contracts</u>");

(f) All easements, rights-of-way, right-of-use easements, licenses, servitudes, authorizations, permits, and other rights primarily used or held for use in connection with, any or all of the Properties or Subject Facilities (the "<u>Easements</u>");

Equity Purchase Agreement<br/>Page 2

(g) All Hydrocarbons (i) produced on or after the Effective Time, (ii) attributable to the Properties on or after the Effective Time, or (iii) stored in tanks and pipeline linefill as of the Effective Time, in each case, to the extent attributable to the Assigned Percentage in the Properties (collectively, the "Production");

(h) All environmental and other permits, licenses, orders, authorizations, registrations, consents, franchises, and related instruments or rights granted or issued by any Governmental Authority and relating to the ownership, operation or use of the Properties or Subject Facilities (collectively, the "Permits");

(i) All Imbalances;

(j) Originals (or photocopies where originals are not available) and electronic copies of all files, records, maps, information, and data of Davis Offshore, whether written or electronically stored, pertaining to the ownership, operation and use of the other Assets, including: (i) land and title records (including lease files, land files, title opinions, and title curative documents); (ii) well files, well information, well data bases, production records, monthly platform product and/or producer imbalance statements, division order files, abstracts, assessments, engineering data and reports, interpretive data, technical evaluations (but excluding reserve studies and reserve reports covering Seller's assets in the aggregate, which are not to be conveyed and shall not be considered to be a part of the Records subject to Section 6.13); (iii) contract files, financial accounting records, non-Income Tax records, operational records, environmental, health and safety records, technical records, and production and processing records; and (iv) Subject Facility records, in each case, to the extent in Davis Offshore's or any of its Affiliates' control or possession; provided, however, that the foregoing shall expressly exclude the Excluded Records (subject to such exclusions, collectively, the "Records"); and

(k) All (i) seismic, geological, geochemical or geophysical data (including cores and other physical samples of materials from wells or rests) belonging to Davis Offshore or licensed from third parties relating to the Properties that can be transferred without additional consideration to such third parties (or including such licensed data in the event Buyer agrees to pay such additional consideration) and (ii) interpretations of seismic, geological, geochemical or geophysical data belonging to Davis Offshore or licensed from third parties that can be transferred without additional consideration to such third parties (or including such licensed data in the event Buyer agrees to pay such additional consideration).

2.2    Excluded Assets. Notwithstanding anything to the contrary in Section 2.1 or elsewhere in this Agreement, the Parties specifically exclude from the transactions contemplated by this Agreement, and the term "Assets" shall specifically exclude, the following (collectively, the "Excluded Assets"), which shall be transferred from Davis Offshore Partners or Davis Offshore, as applicable, to Seller or its designee prior to or contemporaneously with the Closing:

(a) All counterclaims, cross-claims, offsets or defenses and similar rights arising under the Applicable Contracts or otherwise to the extent relating to the Retained Obligations (and as between Seller and Buyer to be enforced pursuant to the procedures set forth in Section 11.3);

(b) Those Contracts, assets or rights set forth on Schedule 2.2(b);

(c) All rights and causes of action arising, occurring or existing in favor of Davis Offshore Partners, Davis Offshore or any of their respective Affiliates (i) under any Applicable Contract with respect to the Assets and to the extent relating to any of the Retained Obligations or (ii) with respect to any rights to which Seller is entitled under Section 2.3 (and in each case as between Seller and Buyer to be enforced pursuant to the procedures set forth in Section 11.3);

(d) All rights and interests of Davis Offshore Partners and Davis Offshore or any of their respective Affiliates under any policy or agreement of insurance related to the Excluded Assets, and without duplication in connection with any adjustments to the Purchase Price made at or after Closing all credits and refunds of insurance premiums prepaid by Davis Offshore, Davis Offshore Partners or Seller pertaining to the Assets and arising out of or resulting from Seller's cancellation or termination thereof at or immediately prior to Closing;

(e) The following (the "Excluded Records"):

Equity Purchase Agreement
Page 3

(i)      all corporate records, Income Tax records and legal records and legal files of Seller that relate to the Retained Obligations or the Excluded Assets;

(ii)     all agreements and correspondence between Seller or any of their respective Affiliates and their respective advisors (whether financial, legal or otherwise) relating to the transactions contemplated in this Agreement; and

(iii)    any (A) internal valuations, price forecasts or reserve reports that relate to Seller's assets in the aggregate (other than the 12/31/2013 Proved + Probable report for the Assets which has already been provided to Buyer and as provided in Section 6.13), (B) confidential information of Seller, and (C) all other files, data, information and records of Seller;

(f) The right to receive any refund or credit of costs, Taxes or expenses paid by Davis Offshore Partners or Davis Offshore and attributable to the period prior to the Effective Time, except with respect to the Assumed Obligations;

(g) Any logo, service mark, copyright, trade name or trademark of or associated with Seller;

(h) Copies of all Records;

(i) All audit rights arising under any Applicable Contracts with respect to the period prior to the Effective Time except to the extent required by Buyer pursuant to the procedures of Section 11.3; and

(j) All of Davis Offshore's right, title and interest in and to the Clipper Prospect and the Clipper Prospect Claims, including all legal files and records relating thereto, and further including all mail and other communications relating thereto which shall be provided by Buyer, and after Closing by Davis Offshore and Davis Offshore Partners, as the case may be, to Seller on a best efforts basis.

Section 2.3 Revenues and Expenses. Seller shall be entitled to all of the rights of ownership earned or attributable to the Assets (including the right to all production, proceeds of production and other proceeds) and shall remain responsible for all Operating Expenses, in each case, attributable to the period of time prior to the Effective Time. Subject to the occurrence of the Closing, Buyer shall be entitled to all of the rights of ownership earned or attributable to the Assets (including the right to all production, proceeds of production and other proceeds), and shall be responsible for all Operating Expenses, as well as capital costs and abandonment costs, attributable, in each case, to the period after the Effective Time (and for clarity, including all P&A Obligations). All Operating Expenses incurred with respect to operations conducted and all production attributable to the period prior to the Effective Time shall be paid by or allocated to Seller, and all Operating Expenses incurred with respect to operations conducted and all production attributable to the period of time after the Effective Time shall be paid by or allocated to Buyer. In the event adjustments to the Purchase Price are necessary to settle Davis Offshore's outstanding payments as of the Closing Date for Operating Expenses incurred with respect to operations conducted prior to the Effective Time, then Seller agrees to credit Buyer for such outstanding payments as part of the Adjusted Purchase Price, whether at Closing or upon the agreement of the Parties in the Post-Closing Statement (but without duplication). For purposes of allocating proceeds and Operating Expenses, the words "earned or attributable to" and the word "incurred", as used in this Agreement, shall be interpreted in accordance with generally accepted accounting principles and Council of Petroleum Accountants Society (COPAS) standards, as applicable. Determination of whether Operating Expenses are attributable to the period before or after the Effective Time shall be based on when services are rendered, when the goods are delivered, or when the work is performed. For clarification, the date an item or work is ordered is not the date of a transaction for settlement purposes in the Closing Statement or Post Closing Statement, but rather the date on which the item ordered is delivered to the job site, or the date on which the work ordered is performed, shall be the relevant date. For purposes of allocating Hydrocarbon production (and accounts receivable with respect thereto), (i) liquid Hydrocarbons shall be deemed to be "from or attributable to" the Subject Leases, Subject Lands, Subject Units, and Subject Wells when they pass through the liquid sales and/or royalty meters, and (ii) gaseous Hydrocarbons shall be deemed to be "from or attributable to" the Subject Leases, Subject Lands, Subject Units, and Subject Wells when they pass through the gas sales meters on the pipelines through which they are transported. Ad valorem and property taxes, right-of-way fees

Equity Purchase Agreement
Page 4

and similar costs that are paid periodically with respect to the Properties shall be prorated based on the number of days in the applicable period falling before and the number of days in the applicable period falling at or after the Effective Time.

## ARTICLE 3
## PURCHASE PRICE AND PAYMENT

Section 3.1 <u>Purchase Price</u>. The purchase price for the sale and assignment of the Purchased Equity to Buyer shall be THIRTY SIX MILLION FIVE HUNDRED THOUSAND AND NO/100 US DOLLARS ($36,500,000 USD) (the "<u>Purchase Price</u>"), subject to adjustment in accordance with the terms of this Agreement (the "<u>Adjusted Purchase Price</u>"). All payments made or to be made under this Agreement by one Party to the other Party shall be made by electronic transfer of immediately available funds to the receiving Party's account set forth in <u>Schedule 3.1</u>, or to such other bank and account as may be specified by the receiving Party in writing to the paying Party.

Section 3.2 <u>Closing Statement</u>. Within one (1) Business Days prior to Closing, Seller shall provide Buyer with a proposed Closing Statement reflecting all adjustments to the Purchase Price provided for under this Agreement or otherwise agreed to by the Parties. Prior to the Closing, Buyer shall promptly provide Seller any comments or suggested revisions that it may have to the Closing Statement, and the Parties shall work together in good faith to finalize the Closing Statement; provided, however, in the event the Parties are unable to agree on any suggested revisions thereto, Seller's proposed Closing Statement (with such revisions and modifications which are not in dispute, if applicable) shall be the final Closing Statement ("Closing Statement") for purposes of determining the Adjusted Purchase Price to be paid by Buyer at Closing.

## ARTICLE 4
## REPRESENTATIONS AND WARRANTIES

Section 4.1 <u>Representations and Warranties of Davis Offshore</u>. Davis Offshore represents and warrants to Buyer as follows:

    (a) <u>Organization and Qualification of the Davis Offshore; Authority and Enforceability</u>.

        (i) Davis Offshore is a limited partnership and is duly organized and validly existing under the Laws of the State of Texas and has the requisite power to carry on its business as now conducted. Davis Offshore is duly qualified to do business in each jurisdiction in which the Properties owned or leased by it makes such qualification necessary.

        (ii) Davis Offshore has all requisite power and authority to perform its obligations hereunder, enter into this Agreement and consummate the transactions contemplated by this Agreement. The performance by Davis Offshore of its obligations hereunder has been duly and validly authorized by all requisite limited partnership action on the part of Davis Offshore. Assuming the due authorization, execution and delivery by Buyer, this Agreement constitutes the valid and binding obligation of Davis Offshore, enforceable against Davis Offshore in accordance with its terms, subject to (i) applicable bankruptcy, insolvency, reorganization, moratorium and other similar laws of general application with respect to creditors, (ii) general principles of equity and (iii) the power of a court to deny enforcement of remedies generally based upon public policy.

    (b) <u>No Conflict or Violation</u>. Except as set forth in <u>Schedule 4.1(b)</u>, the consummation of the transactions contemplated hereby will not (i) conflict with, result in a violation or breach of, constitute a default or an event that with or without notice or lapse of time, or both, would constitute a default under, any provisions of the organizational documents of Davis Offshore, (ii) violate, conflict with or contravene any Law, (iii) except for Permitted Encumbrances, result in any Lien on the Assets (iv) result in a default or give rise to any right of termination, cancellation or acceleration under any of the terms, conditions or provisions of any Lease, Contract, note, bond, mortgage, indenture, license or other material agreement to which Davis Offshore is a party or by which Davis Offshore or the Assets may be bound.

Equity Purchase Agreement<br>Page 5

(c) <u>Absence of Certain Changes</u>. From the Effective Time to the Closing Date, except as set forth in <u>Schedule 4.1(c)</u> or as expressly contemplated by this Agreement, Davis Offshore (i) has, in all material respects, conducted its business and operated, or to the Knowledge of Davis Offshore caused to be operated, the Subject Interests in the ordinary course of business consistent with past practice, and (ii) has not been subject to any event, effect, change, fact, development or circumstance other than in the ordinary course of business.

(d) <u>Consents</u>. Except as set forth in <u>Schedule 4.1(d)</u> and further except (i) for Customary Post-Closing Consents and (ii) for filings with BOEM or BSEE, no consent, approval, authorization or permit of any Governmental Authority is required by or with respect to Davis Offshore in connection with the execution and delivery by Davis Offshore of this Agreement or for or in connection with the consummation of the transactions and performance by the Davis Offshore of the terms and conditions contemplated hereby.

(e) <u>Actions</u>. Except as set forth in <u>Schedule 4.1(e)</u>, as of the date hereof, there is no Action pending or, to the Knowledge of Davis Offshore, threatened in writing against the Assets or against Davis Offshore and pertaining to the Assets. As of the date hereof, there is no Action pending or, to the Knowledge of Davis Offshore, threatened in writing against Davis Offshore or its Affiliates that are reasonably expected by Davis Offshore to have an adverse effect in any material respect on the ability of Davis Offshore to perform its obligations under this Agreement or that challenges or could have the effect of preventing, materially delaying or making illegal or imposing material limits or conditions on the transactions contemplated hereby.

(f) <u>Compliance with Laws</u>. Except as set forth in <u>Schedule 4.1(f)</u>, Davis Offshore and to the Knowledge of Davis Offshore the operation of the Properties are in compliance in all respects with all Laws; provided, that Davis Offshore makes no representation or warranty in this <u>Section 4.1(f)</u>, express or implied, with respect to (i) any Environmental Law (which is specifically addressed in <u>Section 4.1(s)</u>), (ii) any Tax Law (which is specifically addressed in <u>Section 4.1(k)</u>) or (iii) Davis Offshore's title to the Assets (which is specifically addressed in <u>Section 4.1(m)</u>).

(g) <u>Brokerage Fees and Commissions</u>. Davis Offshore has not incurred any obligation or entered into any agreement for any investment banking, brokerage or finder's fee or commission in respect of the transactions contemplated by this Agreement for which the Buyer has (or will have) any liability.

(h) <u>Bankruptcy</u>. There are no bankruptcy, reorganization or receivership proceedings for the benefit of creditors pending against, being contemplated by, or, to the Knowledge of Davis Offshore, threatened against Davis Offshore or an Affiliate of Davis Offshore. Davis Offshore is not, and immediately after giving effect to the transactions contemplated hereby and the Closing will not be, Insolvent.

(i) <u>Material Contracts</u>. Except for those entered into in accordance with <u>Sections 6.1</u> and <u>6.2</u>, <u>Schedule 4.1(i)</u> sets forth a list of all Applicable Contracts (each such Applicable Contract that is listed on <u>Schedule 4.1(i)</u>, a "<u>Material Contract</u>"):

(i) that commit Davis Offshore and/or Davis Offshore Partners to aggregate expenditures of more than $100,000 during the current or any subsequent calendar year;

(ii) that can reasonably be expected to result in aggregate revenues to Davis Offshore of more than $500.000 during the current or any subsequent calendar year (based solely on the terms thereof and current volumes, without regard to any expected increase in volumes or revenues);

(iii) that commit Davis Offshore to gather, sell, treat, process, store or transport (A) any Hydrocarbon production attributable to the Properties or (B) any Hydrocarbon production that is (1) owned or controlled by a third Person, (2) not produced from a well included in any of the Properties and (3) delivered by such third Person to any Subject Facilities located on (or otherwise used with respect to) any of the Subject Leases or Subject Units;

(iv) that constitute a joint operating agreement, unit operating agreement, unitization or pooling agreement, participation agreement, farm-in or farm-out agreement, exploration agreement, development agreement or similar agreement with respect to any of the Subject Interests; and

Equity Purchase Agreement<br>Page 6

(v) that provide for (A) an area of mutual interest with respect to the Subject Interests, (B) any "tag along" or "drag along" (or other similar) rights that allow a third party, or require Davis Offshore, to participate in any future transactions, in each case, with respect to the Subject Interests or (C) any requirement by Davis Offshore to offer (to a third Person) any property that is acquired (after the Closing Date) by Davis Offshore.

(j) <u>Compliance with Contracts</u>. Except as set forth in <u>Schedule 4.1(j)</u>, Davis Offshore is not and, to the Knowledge of Davis Offshore, no other Person that is a party to any Material Contract is, in material breach of or material default under such Material Contract, and there does not exist under any provision thereof any event, including the execution and delivery of this Agreement or the consummation of the transactions contemplated hereby, that, with or without notice or the lapse of time, or both, could constitute such a breach or default by Davis Offshore, except for such breaches, defaults and events as to which requisite waivers or consents have been obtained.

(k) <u>Tax Matters</u>. Except as set forth in <u>Schedule 4.1(k)</u>:

(i) All material Tax Returns required to be filed by or with respect to Davis Offshore and Davis Offshore Partners have been duly and timely filed in the manner prescribed by Law and all such Tax Returns are true, correct and complete in all material respects. All Taxes owed by Davis Offshore and Davis Offshore Partners that are or have become due have been paid in full. Davis Offshore and Davis Offshore Partners have withheld and paid over all Taxes required to have been withheld and paid over, and complied in all material respects with all information reporting and backup withholding requirements.

(ii) There are no Liens for Taxes on the Assets, other than for Taxes (A) not yet due and payable or (B) that are being contested in good faith and set forth on <u>Schedule 4.1(k)</u>.

(iii) None of the Assets is considered to be owned in an arrangement that is treated as a partnership for U.S. federal income tax purposes.

(iv) There is no audit or other claim pending by any Governmental Authority in connection with any Tax or Tax Return of Davis Offshore or Davis Offshore Partners.

(l) <u>Preferential Rights and Transfer Requirements</u>. Except as disclosed in <u>Schedule 4.1(l)</u>, there are no Preferential Rights or Transfer Requirements, in each case, with respect to the Assets located on, or otherwise used with respect to, any of the Subject Interests, that are triggered or otherwise applicable to the sale by Seller, and the acquisition by Buyer, of the Purchased Equity.

(m) <u>Title</u>.

(i) As of the date hereof and as of the Closing Date, with respect to the Assets, Davis Offshore has good and marketable title thereto and that (A) is free from reasonable doubt to the end that a prudent Person engaged in the business of purchasing and owning, developing and operating producing oil and gas properties in the geographical areas in which the Hydrocarbon Interests are located, with knowledge of all of the facts and their legal bearing, would be willing to accept the same acting reasonably and (B) is free and clear of all Encumbrances, subject to (in each of the cases of clauses (A) and (B), (1) Permitted Encumbrances, except Encumbrances and Liens identified on <u>Schedule 4.1(m)</u> that are to be released at or prior to Closing.

(ii) Subject to Permitted Encumbrances, Davis Offshore agrees to warrant and defend all and singular title to the Assets unto Buyer against every Person whosoever lawfully claiming or to claim the same by, through or under Davis Offshore, but not otherwise.

(iii) As of the date hereof and as of the Closing Date, with respect to the Properties, Davis Offshore has good and marketable title thereto that, with respect to each Property, as applicable, subject to (and excluding any effect of) Permitted Encumbrances, except Encumbrances and Liens identified on <u>Schedule 4.1(m) that are to be released at or prior to Closing</u>:

Equity Purchase Agreement<br/>Page 7

(A) (1) with respect to each Subject Well, Subject Unit and Subject Lease, as applicable, entitles Davis Offshore to receive not less than the percentage set forth in Schedule 4.1(m) for such Subject Well, Subject Unit, and Subject Lease, as applicable, as the Net Revenue Interest ("NRI") of all Hydrocarbons produced, saved and marketed from such Subject Well, Subject Unit, and Subject Lease, as applicable; and

(B) (1) with respect to each Subject Well, Subject Unit, Subject Lease, and Subject Facility as applicable, obligates Davis Offshore to bear a percentage of the costs and expenses relating to the maintenance, development and operation of such Subject Well, Subject Unit, Subject Lease, and Subject Facility as applicable, that is not greater than the Working Interest ("WI") set forth in Schedule 4.1(m) for such Subject Well, Subject Unit, Subject Lease, and Subject Facility, as applicable, except for increases that are accompanied by an increase in the Net Revenue Interest of Davis Offshore in the applicable Subject Well, Subject Unit and Subject Lease, as applicable, that causes Davis Offshore's aggregate Net Revenue Interest in such Subject Well, Subject Unit and Subject Lease, as applicable, to be greater than the Net Revenue Interest set forth in Schedule 4.1(m) for such Subject Well, Subject Unit and Subject Lease, as applicable, in the same (or greater) proportion as any such increase in such Working Interest.

(n) Suspense Funds. Except as set forth on Schedule 4.1(n), as of the Effective Time, (i) no proceeds from production attributable to the Properties that have been operated by Davis Offshore are being held in suspense, and (ii) to the Knowledge of Davis Offshore, no proceeds from production attributable to the Properties that have been operated by third-party operators are being held in suspense.

(o) Imbalances. Schedule 4.1(o) sets forth (i) all material Imbalances associated with the Properties that have been operated by Davis Offshore, and (ii) to the Knowledge of Davis Offshore, all material Imbalances associated with the Properties that have been operated by third-party operators, in each case, as of July 1, 2014.

(p) Production. Except as set forth on Schedule 4.1(p), neither Davis Offshore nor Davis Offshore Partners (i) is obligated by virtue of a take-or-pay payment, advance payment, production payment or other similar payment (other than royalties or overriding royalties established by the terms of the leases and other than gas balancing arrangements), to deliver Hydrocarbons, or proceeds from the sale thereof, attributable to Davis Offshore's and/or Davis Offshore Partners' interest in the Properties at some future time without receiving payment therefor at or after the time of delivery or (ii) is not subject to any call upon, option to purchase or other similar right with respect to the Hydrocarbons produced from the Properties.

(q) Outstanding Capital Commitments. Schedule 4.1(q) sets forth, as of the date hereof, all approved authorizations for expenditures with respect to the Hydrocarbon Interests, Subject Wells, and/or Subject Leases (the "AFEs") that would require Davis Offshore and/or Davis Offshore Partners to make or incur any capital expenditures in excess of $100,000, net to Davis Offshore's interest.

(r) Bonds. The letters of credit and bonds and other forms of financial assurance set forth on Schedule 4.1(r) are all of the bonds and letters of credit and other forms of financial assurance posted or provided by Davis Offshore, Davis Offshore Partners or any other Affiliate of Davis Offshore, with or to any Governmental Authority or third Person with respect to the Subject Interests.

(s) Environmental Matters. Except as set forth in Schedule 4.1(s):

(i) to the Knowledge of Davis Offshore, the Properties are in material compliance with all material Permits, licenses, registrations or other authorizations required under Environmental Laws for the operation of the Assets as presently conducted and to the Knowledge of Davis Offshore there is no pending or threatened Action to revoke, rescind, cancel or terminate any such authorizations;

(ii) the Properties are not subject to any pending or threatened Action pursuant to Environmental Laws, nor has Davis Offshore received any written notice of violation, noncompliance, or enforcement or any notice of investigation or remediation from any Governmental Authority pursuant to Environmental Laws, nor to the Knowledge of Davis Offshore, is any such notice threatened; and

Debtors' Exhibit D
Page 9 of 115

(iii) to the Knowledge of Davis Offshore there has been no Release of a Hazardous Substance on or from the Properties in a manner that has given rise to, or could reasonably be expected to give rise to, any material remedial or corrective action obligations pursuant to Environmental Laws.

(t) <u>BOEM or BSEE Incidents of Non-Compliance and Suspensions</u>. To the Knowledge of Davis Offshore, there are no outstanding unresolved BOEM and/or BSEE incidents of non-compliance or suspensions with respect to the Assets.

(u) <u>Non-Consent Operations</u>. As of the Closing Date, there are no outstanding non-consent elections or ongoing non-consent operations with respect to the Assets.

(v) <u>Idle Iron Communications and Obligations</u>. As of the Closing Date, there are no outstanding idle iron communications or requirements from the BOEM, BSEE or any other Governmental Authority. For the removal of doubt, the attached <u>Schedule 4.1(v)</u> reflects an idle iron inquiry from BSEE to Noble Energy, Inc. and the form which was completed and returned by Noble Energy, Inc. to BSEE in satisfaction thereof, with regard to the GC 199 #2 well, Lorien Field

(w) <u>Payments for Hydrocarbon Production</u>. Except as set forth on <u>Schedule 4.1(w)</u> (a) all material rentals, royalties, excess royalty, overriding royalty interests, Hydrocarbon production payments, and other payments due and payable by Davis Offshore and/or Davis Offshore Partners to lessors, overriding royalty holders and other interest owners under or with respect to the Properties and the Hydrocarbons produced therefrom or attributable thereto, have been paid, and (b) neither Davis Offshore nor Davis Offshore Partners is obligated under any contract or agreement for the sale of gas from the Properties containing a take-or-pay, advance payment, prepayment, or similar provision, or under any gathering, transmission, or any other contract or agreement with respect to any of the Properties to gather, deliver, process, or transport any gas without then or thereafter receiving full payment therefor.

(x) <u>Regulatory</u>. (i) Davis Offshore is qualified under Law to own the Properties and other Assets in all jurisdictions where they are located, and (ii) to the Knowledge of Davis Offshore, there is no fact or condition with respect to Davis Offshore that may cause BOEM to withhold its unconditional approval to the transactions contemplated hereby to the extent BOEM approval is required by Law.

(y) <u>Capitalization</u>. The issued and outstanding equity of Davis Offshore is as set out on <u>Schedule 4.1(y)</u>. All of the outstanding equity of Davis Offshore has been duly authorized, validly issued and are fully paid and non-assessable, and was not issued in violation of any preemptive rights, rights of first refusal or other similar rights of any Person, as applicable. No options, warrants, subscriptions, calls, exchange rights or other rights to purchase equity of Davis Offshore, and no equity or obligations, in each case, that are convertible into or exchangeable for equity of Davis Offshore, have been authorized or agreed to be issued or are outstanding. Davis Offshore does not have any outstanding and has not authorized any stock appreciation, phantom stock, profit participation or similar rights. There are no voting trusts, partnership agreements, proxies or other agreements or understandings in effect with respect to the voting or transfer of any of the equity of Davis Offshore. As of the date hereof, Davis Offshore does not own any equity interest in any Person. All outstanding equity interests of Davis Offshore are owned by Seller and, upon the consummation of the transactions contemplated herein, will be owned by Buyer.

(z) <u>Employment and Employee Benefit Matters</u>. Davis Offshore is not a party to a collective bargaining agreement with any labor union. There are no Company Benefit Plans, and Davis Offshore has no obligation or Covered Liability under any of Davis Offshore's or its respective Affiliates' Employee Benefit Plans now or any time in the future. Davis Offshore has no employees or independent contractors that could be classified as employees and never has had any employees or independent contractors that could have been classified as employees, and has no Covered Liability as an employer with regard to the employment of any employee or such independent contractor.

(aa) <u>P&A Obligations</u>. Davis Offshore is not responsible for any P&A Obligations other than with respect to the Properties (and the Clipper Prospect, which responsibility will be transferred to and assumed by Seller or its designee at or immediately prior to Closing pursuant to the instrument described in <u>Section 8.2(c)</u>).

Equity Purchase Agreement
Page 9

(bb) <u>Disregarded Entity</u>. Davis Offshore is properly classified as a disregarded entity of Seller for federal Income Tax purposes and any applicable state or local Income Tax purposes.

(cc) <u>Financial Information</u>. Schedule 4.1(cc) sets forth the unaudited financial statement of the Assets and the Liabilities of Davis Offshore (with details as to accounts payable and accounts receivable), as of the Effective Time and the most recent quarter end prior to the Closing Date, and the outstanding checks and wires as of the Closing Date and, in each case, such financial information fairly represents the financial condition of Davis Offshore in all material respects as of the dates provided. Other than changes in the ordinary course of business, there have been no material changes since the date of the unaudited financial statement with respect to such Assets and Liabilities set forth on Schedule 4.1(cc).

(dd) <u>Affiliate Transactions</u>. There are no intercompany contracts, agreements or commitments relating to transactions between Davis Offshore and Davis Offshore Partners, on the one hand, and any other Affiliates of Davis Offshore, on the other hand, that will survive Closing.

Section 4.2 <u>Representations and Warranties of Davis Offshore Partners</u>. Davis Offshore Partners represents and warrants to Buyer as follows:

(a) <u>Organization and Qualification of the Davis Offshore Partners; Authority and Enforceability</u>.

(i) Davis Offshore Partners is a limited liability company and is duly organized and validly existing under the Laws of the State of Delaware. Davis Offshore Partners is duly qualified to do business in each jurisdiction in which it conducts business.

(ii) Davis Offshore Partners has all requisite power and authority to perform its obligations hereunder, enter into this Agreement and consummate the transactions contemplated by this Agreement. The performance by Davis Offshore Partners of its obligations hereunder has been duly and validly authorized by all requisite limited liability company action on the part of Davis Offshore Partners. Assuming the due authorization, execution and delivery by Buyer, this Agreement constitutes the valid and binding obligation of Davis Offshore Partners, enforceable against Davis Offshore Partners in accordance with its terms, subject to (i) applicable bankruptcy, insolvency, reorganization, moratorium and other similar laws of general application with respect to creditors, (ii) general principles of equity and (iii) the power of a court to deny enforcement of remedies generally based upon public policy.

(b) <u>No Conflict or Violation</u>. Except as set forth in Schedule 4.2(b), the consummation of the transactions contemplated hereby will not (i) conflict with, result in a violation or breach of, constitute a default or an event that with or without notice or lapse of time, or both, would constitute a default under, any provisions of the organizational documents of Davis Offshore Partners, (ii) violate, conflict with or contravene any Law, (iii) except for Permitted Encumbrances, result in any Lien on the assets of Davis Offshore Partners, (iv) result in a default or give rise to any right of termination, cancellation or acceleration under any of the terms, conditions or provisions of any Lease, Contract, note, bond, mortgage, indenture, license or other material agreement to which Davis Offshore Partners is a party or by which Davis Offshore Partners or its assets may be bound.

(c) <u>Consents</u>. Except as set forth in Schedule 4.2(c) and further except (i) for Customary Post-Closing Consents and (ii) for filings with BOEM or BSEE, no consent, approval, authorization or permit of any Governmental Authority is required by or with respect to Davis Offshore Partners in connection with the execution and delivery by Davis Offshore Partners of this Agreement or for or in connection with the consummation of the transactions and performance by Davis Offshore Partners of the terms and conditions contemplated hereby.

(d) <u>Actions</u>. Except as set forth in Schedule 4.2(d), as of the date hereof, there is no Action pending or, to the Knowledge of Davis Offshore Partners, threatened in writing against the assets of Davis Offshore Partners or against the Davis Offshore Partners and pertaining to the Purchased Equity. As of the date hereof, there is no Action pending or, to the Knowledge of Davis Offshore Partners, threatened in writing against Davis Offshore Partners or its Affiliates that are reasonably expected by Davis Offshore Partners to have an adverse effect in any material respect on the ability of Davis Offshore Partners to perform its obligations under this Agreement or that challenges

Equity Purchase Agreement<br>Page 10

or could have the effect of preventing, materially delaying or making illegal or imposing material limits or conditions on the transactions contemplated hereby.

(e) Brokerage Fees and Commissions. Davis Offshore Partners has not incurred any obligation or entered into any agreement for any investment banking, brokerage or finder's fee or commission in respect of the transactions contemplated by this Agreement for which the Buyer has (or will have) any liability.

(f) Ownership of General Partner Interest. Davis Offshore Partners holds of record and owns beneficially the general partner interest of Davis Offshore as set forth in Schedule 4.1(y), and, as of the Closing, such interest will be free and clear of all Liens other than Permitted Liens. Except as set forth in Schedule 4.2(f), Davis Offshore Partners owns no other interests or assets other than the general partner interest of Davis Offshore as set forth in Schedule 4.1(y).

(g) Bankruptcy. There are no bankruptcy, reorganization or receivership proceedings for the benefit of creditors pending against, being contemplated by, or, to the Knowledge of Davis Offshore Partners, threatened against Davis Offshore Partners or an Affiliate of Davis Offshore Partners. Davis Offshore Partners is not, and immediately after giving effect to the transactions contemplated hereby and the Closing will not be, Insolvent.

(h) Capitalization. The issued and outstanding equity of Davis Offshore Partners is as set out on Schedule 4.2(h). All of the outstanding equity of Davis Offshore Partners has been duly authorized, validly issued and are fully paid and non-assessable, and was not issued in violation of any preemptive rights, rights of first refusal or other similar rights of any Person, as applicable. No options, warrants, subscriptions, calls, exchange rights or other rights to purchase equity of Davis Offshore Partners, and no equity or obligations, in each case, that are convertible into or exchangeable for equity of Davis Offshore Partners, have been authorized or agreed to be issued or are outstanding. Davis Offshore Partners does not have any outstanding and has not authorized any stock appreciation, phantom stock, profit participation or similar rights. There are no voting trusts, partnership agreements, proxies or other agreements or understandings in effect with respect to the voting or transfer of any of the equity of Davis Offshore Partners. Except as set forth in Section 4.2(f), as of the date hereof, Davis Offshore Partners does not own any equity interest in any Person. All outstanding equity interests of Davis Offshore Partners are owned by Seller and, upon the consummation of the transactions contemplated herein, will be owned by Buyer.

(i) Employment and Employee Benefit Matters. Davis Offshore Partners is not a party to a collective bargaining agreement with any labor union. There are no Company Benefit Plans, and Davis Offshore Partners has no obligation or Covered Liability under any of Davis Offshore Partners' or its respective Affiliates' Employee Benefit Plans now or any time in the future. Davis Offshore Partners has no employees or independent contractors that could be classified as employees, and has no Covered Liability as an employer with regard to the employment of any employee or such independent contractor. Davis Offshore does not as of the Closing Date and has not ever had any employees.

(j) Administrative Services Agreement. As of the Closing Date, Davis Offshore is not a party to any administrative Services Agreement with Seller, Davis Offshore Partners or any other Affiliate.

(k) P&A Obligations. Davis Offshore is not responsible for P&A Obligations other than with respect to the Properties.

(l) Disregarded Entity. Davis Offshore Partners is properly classified as a disregarded entity of Seller for Federal income Tax purposes and any applicable state or local income Tax purposes.

(m) Ownership. Davis Offshore Partners does not own any partner or membership interest in any Person other than the partner interest in Davis Offshore.

(n) Financial Information. Schedule 4.2(n) sets forth the unaudited financial statement of the Assets and the Liabilities of Davis Offshore Partners, as of the Effective Time and the most recent quarter end prior to the Closing Date and such financial information fairly represents the financial condition of Davis Offshore Partners in all material respects as of the dates provided. Other than changes in the ordinary course of business, there have been no

Equity Purchase Agreement
Page 11

material changes since the date of the unaudited financial statement with respect to such Assets and Liabilities as set forth on Schedule 4.2(n).

(o)  Affiliate Transactions.  There are no contracts, agreement or commitments relating to transactions between Davis Offshore Partners, on the one hand, and Davis Offshore or any other Affiliates of Davis Offshore Partners, on the other hand, that will survive Closing.

(p)  Absence of Certain Changes. From the Effective Time to the Closing Date, except as set forth in Schedule 4.2(p) or as expressly contemplated by this Agreement, Davis Offshore Partners (i) has, in all material respects, conducted the business of Davis Offshore in the ordinary course of business consistent with past practice and (ii) has not been subject to any event, change, fact, development or circumstance other than in the ordinary course of business.

Section 4.3 Representations and Warranties of Seller. Seller represents and warrants to Buyer as follows:

(a) Organization and Qualification of the Seller; Authority and Enforceability.

(i) Seller is a corporation and is duly organized and validly existing under the Laws of the State of Delaware.

(ii) Seller has all requisite power and authority to perform its obligations hereunder, enter into this Agreement and consummate the transactions contemplated by this Agreement. The performance by Seller of its obligations hereunder has been duly and validly authorized by all requisite corporate action on the part of Seller. Assuming the due authorization, execution and delivery by Buyer and the other Parties hereto, this Agreement constitutes the valid and binding obligation of Seller, enforceable against Seller in accordance with its terms, subject to (i) applicable bankruptcy, insolvency, reorganization, moratorium and other similar laws of general application with respect to creditors, (ii) general principles of equity and (iii) the power of a court to deny enforcement of remedies generally based upon public policy.

(b) No Conflict or Violation. Except as set forth in Schedule 4.3(b), the consummation of the transactions contemplated hereby will not (i) conflict with, result in a violation or breach of, constitute a default or an event that with or without notice or lapse of time, or both, would constitute a default under, any provisions of the organizational documents of Seller, (ii) violate, conflict with or contravene any Law, (iii) except for Permitted Liens, result in any Lien on the Purchased Equity (iv) result in a default or give rise to any right of termination, cancellation or acceleration under any of the terms, conditions or provisions of any Lease, Contract, note, bond, mortgage, indenture, license or other material agreement to which Seller is a party or by which Seller or the Purchased Equity may be bound.

(c) Consents. Except as set forth in Schedule 4.3(c) and further except (i) for Customary Post-Closing Consents and (ii) for filings with BOEM or BSEE, no consent, approval, authorization or permit of any Governmental Authority is required by or with respect to the Seller in connection with the execution and delivery by the Seller of this Agreement or for or in connection with the consummation of the transactions and performance by the Seller of the terms and conditions contemplated hereby.

(d) Actions. Except as set forth in Schedule 4.3(d), as of the date hereof, there is no Action pending or, to the Knowledge of Seller, threatened in writing against the Purchased Equity or against the Seller and pertaining to the Purchased Equity. As of the date hereof, there is no Action pending or, to the Knowledge of Seller, threatened in writing against Seller or its Affiliates that are reasonably expected by Seller to have an adverse effect in any material respect on the ability of Seller to perform its obligations under this Agreement or that challenges or could have the effect of preventing, materially delaying or making illegal or imposing material limits or conditions on the transactions contemplated hereby.

(e) Brokerage Fees and Commissions. Seller has not incurred any obligation or entered into any agreement for any investment banking, brokerage or finder's fee or commission in respect of the transactions contemplated by this Agreement for which the Buyer has (or will have) any liability.

Equity Purchase Agreement
Page 12

(f) <u>Ownership of Purchased Equity</u>. Seller holds of record and owns beneficially all of the Purchased Equity, and, as of the Closing, the Purchased Equity will be free and clear of all Liens other than Permitted Liens. Upon delivery and payment for all of the Purchased Equity as herein provided, Seller will convey good and valid title thereto to Buyer free and clear of all Liens other than Permitted Liens.

(g) <u>Bankruptcy</u>. There are no bankruptcy, reorganization or receivership proceedings for the benefit of creditors pending against, being contemplated by, or, to the Knowledge of Seller, threatened against Seller or an Affiliate of Seller. Seller is not, and immediately after giving effect to the transactions contemplated hereby and the Closing will not be, Insolvent.

(h) <u>Taxes</u>. (i) All Tax Returns required relating to the Assets have been timely filed and all such Tax Returns are true, correct and complete, in each case to the extent that such failure to file or inaccuracy could result in liability to Buyer; (ii) all Taxes of Seller relating to the Assets that are or have become due have been timely paid, and Seller is not delinquent in the payment of any such Taxes, in each case to the extent that the failure to timely or properly pay could result in liability to Buyer; (iii) there is no claim pending by any Governmental Authority in connection with any Tax or any Tax Return of Seller relating to the Assets (including without limitation any audit or similar proceeding) which could adversely affect Buyer; and (iv) there are no liens on the Purchased Equity or any of the Assets that arose in connection with Seller's failure (or alleged failure) to pay any Tax.

Section 4.4 <u>Representations and Warranties of Buyer</u>. Buyer represents and warrants to Seller, Davis Offshore and Davis Offshore Partners as follows:

(a) <u>Organization and Qualification</u>. Buyer is a limited liability company duly formed and validly existing under the Laws of the State of Delaware and has the requisite power and authority to carry on its business as now conducted. Buyer is duly qualified to do business in each jurisdiction in which the ownership or operation of its assets makes such qualification necessary.

(b) <u>Authority</u>. Buyer has all requisite power and authority to execute and deliver this Agreement and to perform its obligations hereunder. The execution, delivery and performance by Buyer of this Agreement and the transactions contemplated hereby have been duly and validly authorized by all requisite limited liability company action on the part of Buyer.

(c) <u>Enforceability</u>. Assuming the due authorization, execution and delivery by the Seller, Davis Offshore and Davis Offshore Partners, this Agreement constitutes the valid and binding obligations of Buyer, enforceable against Buyer in accordance with its terms, subject to (i) applicable bankruptcy, insolvency, reorganization, moratorium and other similar laws of general application with respect to creditors, (ii) general principles of equity and (iii) the power of a court to deny enforcement of remedies generally based upon public policy.

(d) <u>No Conflict or Violation</u>. Neither the execution and delivery of this Agreement nor the consummation of the transactions and performance of the terms and conditions contemplated hereby by Buyer will (i) conflict with, result in a violation or breach of, constitute a default or an event that with or without notice or laps of time, or both, would constitute a default under, any provisions of the organizational documents of Buyer, (ii) conflict with, result in a violation or breach of, constitute a default or an event that, with or without notice or lapse of time or both, would constitute a default under, result in the acceleration of, create any Liens under, or create in any Person the right to accelerate, terminate, modify or cancel any, agreement, indenture or other instrument to which Buyer is a party or by which Buyer or any of its assets is bound or (iii) violate or conflict with any Law applicable to Buyer, other than, in the case of the matters described in clauses (ii) and (iii) of this <u>Section 4.4(d)</u>, such conflicts, breaches, violations or defaults as will not have an adverse effect in any material respect on the ability of Buyer to perform its obligations under this Agreement.

(e) <u>Consents</u>. Except for consents or approvals of or filings with BOEM, no consent, approval, authorization or permit of any Person is required by or with respect to Buyer in connection with the execution and delivery of this Agreement or for or in connection with the consummation of the transactions and performance of the terms and conditions contemplated hereby.

Equity Purchase Agreement<br>Page 13

(f) <u>Actions</u>. As of the date hereof, there is no Action pending or, to the Knowledge of Buyer, threatened in writing against Buyer that are reasonably expected by Buyer to have an adverse effect in any material respect on the ability of Buyer to perform its obligations under this Agreement or that challenges or could have the effect of preventing, materially delaying or making illegal or imposing material limits or conditions on the transactions contemplated hereby.

(g) <u>Brokerage Fees and Commissions</u>. Neither Buyer nor any Affiliate of Buyer has incurred any obligation or entered into any agreement for any investment banking, brokerage or finder's fee or commission in respect of the transactions contemplated by this Agreement for which Seller, Davis Offshore or Davis Offshore Partners has (or will have) any liability.

(h) <u>Funds</u>. Buyer has, and Buyer shall have as of the Closing Date, sufficient financing or cash in immediately available funds with which to pay the Adjusted Purchase Price and to consummate the transactions contemplated by this Agreement.

(i) <u>Independent Evaluation</u>. Buyer is an experienced and knowledgeable investor in the oil and gas business, Buyer is able to bear the economic risks of its acquisition and ownership of the Purchased Equity, the Hydrocarbon Interests and other Assets, and Buyer is capable of evaluating (and has evaluated) the merits and risks of the Purchased Equity, Hydrocarbon Interests and other Assets of Davis Offshore and Buyer's acquisition and ownership thereof. In making its decision to enter into this Agreement and to consummate the transactions contemplated hereby, Buyer (i) has relied or shall rely solely on its own independent investigation and evaluation of the Purchased Equity, the Subject Interests and the advice of its own legal, Tax, economic, environmental, engineering, geological and geophysical advisors and the express provisions of this Agreement and not on any comments, statements, projections or other materials made or given by any representatives or consultants or advisors of the Seller, Davis Offshore or Davis Offshore Partners, and (ii) has satisfied itself through its own due diligence and the express provisions of this Agreement as to the environmental and physical condition of and contractual arrangements and other matters affecting the Hydrocarbon Interests and other Assets of Davis Offshore. Buyer has sufficient knowledge and experience in financial and business matters so as to be able to evaluate the merits and risk of an investment in the Purchased Equity and is able financially to bear the risks thereof, and understands that the Purchased Equity will, upon purchase, be characterized as "restricted securities" under state and federal securities Laws and that under such Laws and applicable regulations the Purchased Equity may be resold without registration under such Laws only in certain limited circumstances. Buyer is an "accredited investor," as such term is defined in Regulation D of the Securities Act, and will acquire the Purchased Equity for its own account and not with a view to a sale or distribution thereof in violation of the Securities Act, and the rules and regulations thereunder, any state blue sky Laws or any other securities Laws.

(j) <u>Bankruptcy</u>. There are no bankruptcy, reorganization or receivership proceedings pending against, being contemplated by, or to the Knowledge of Buyer, threatened against Buyer or any Affiliate of Buyer. Buyer is not, and immediately after giving effect to the transactions contemplated hereby and the Closing will not be, Insolvent.

(k) <u>Regulatory</u>. Assuming the receipt of all Transfer Requirements and obtaining the Customary Post-Closing Consents, (i) Buyer is and hereafter shall continue to be qualified under Law to own the Purchased Equity, the Hydrocarbon Interests and other Assets in all jurisdictions where they are located, and (ii) the consummation of the transactions contemplated by this Agreement will not cause Buyer to be disqualified as such an owner. To the Knowledge of Buyer, there is no fact or condition with respect to Buyer that may cause BOEM to withhold its unconditional approval to the transactions contemplated hereby to the extent BOEM approval is required by Law.

## ARTICLE 5
## ACCESS TO INFORMATION; CONFIDENTIALITY

Section 5.1 <u>General Access</u>.

(a) On or before the execution of this Agreement and until the Closing Date (or earlier termination of this Agreement), but subject to Law on confidentiality and data protection and the other provisions of this <u>Section 5.1</u>, the Davis Offshore and Davis Offshore Partners shall:

(i) permit Buyer and its Representatives to have reasonable access, at reasonable times in Davis Offshore's and Davis Offshore Partners' respective offices, and in a manner so as not to interfere unduly with the business operations of Davis Offshore or Davis Offshore Partners, to Davis Offshore's and Davis Offshore Partners' Records, subject to the limitations set forth herein, insofar as the same are in the Davis Offshore's and Davis Offshore Partners' possession and insofar as Davis Offshore and Davis Offshore Partners may do so without, in their good faith opinion, breaching or risking a breach of agreements with other Persons or waiving or risking waiving legal privilege of Davis Offshore and Davis Offshore Partners; and

(ii) subject to any required consent of any third Person, permit Buyer and its Representatives at reasonable times and at Buyer's sole risk, cost and expense, to conduct, in the presence of the Davis Offshore's or Davis Offshore's Representatives, reasonable inspections of the Hydrocarbon Interests; *provided* that Buyer shall provide twenty-four (24) hours' notice prior to accessing any of the Hydrocarbon Interests; *provided, however*, that Buyer shall comply with all applicable policies, rules and regulations of Davis Offshore and any third party operators, including safety policies, with respect to such access, and repair any damage resulting from such inspections, and Buyer does hereby indemnify and hold harmless, release and agree to defend Seller Indemnified Persons from and against any and all Covered Liabilities arising or resulting, in whole or in part, from Buyer's inspections, **REGARDLESS OF ANY CONCURRENT NEGLIGENCE OR STRICT LIABILITY ON THE PART OF SELLER INDEMNIFIED PERSONS AND REGARDLESS OF THE FORM OF CLAIM WHETHER AT COMMON LAW, STRICT LIABILITY, NEGLIGENCE OR UNDER ANY STATUTE OR REGULATION (BUT EXPRESSLY EXCLUDING GROSS NEGLIGENCE OR WILLFUL MISCONDUCT, FOR WHICH DAVIS OFFSHORE DOES HEREBY INDEMNIFY AND HOLD HARMLESS, RELEASE AND AGREE TO DEFEND BUYER INDEMNIFIED PERSONS FROM SUCH COVERED LIABILITIES TO THE EXTENT OF SUCH GROSS NEGLIGENCE OR WILLFUL MISCONDUCT).**

(b) Nothing in this Agreement shall be construed to permit Buyer or its Representatives to have access to any Excluded Records or other files, records, contracts or documents of the Seller, Davis Offshore or Davis Offshore Partners relating to negotiating the purchase and sale of the Purchased Equity or the Assets, including any bids or offers received by the Seller, Davis Offshore or Davis Offshore Partners for the sale of the Purchased Equity or the Assets or any other assets of the Seller or Davis Offshore in competition with Buyer's bid or offer, it being agreed that all such competing bids or offers shall be the sole property of the Seller.

Section 5.2 <u>Confidential Information</u>. Buyer agrees to maintain all information made available to it pursuant to this Agreement confidential and to cause its Affiliates and Representatives to maintain all information made available to them pursuant to this Agreement confidential pursuant to the terms and conditions of that certain confidentiality agreement dated February 24, 2014, as may be amended from time to time (the "<u>Confidentiality Agreement</u>"), by and between the Seller and Buyer, which shall continue in full force and effect and the terms of which are incorporated herein by reference and made a part of this Agreement. Notwithstanding anything herein or in the Confidentiality Agreement to the contrary, on the Closing Date (and for clarity, subject to the occurrence of Closing), the Confidentiality Agreement shall be terminated and of no further force or effect with respect to the Purchased Equity and the Assets and Buyer shall have no further obligation with respect to confidentiality pursuant to this <u>Section 5.2</u> or under the Confidentiality Agreement (except as to information related to the Seller or to Excluded Assets) which obligations of confidentiality shall survive Closing for a period of one (1) year.

Section 5.3 <u>Hiring of Seller's Employees</u>. Notwithstanding the general prohibitions contained in Section 15 of the Confidentiality Agreement, subject to the occurrence of Closing, Seller agrees that Buyer shall have the right to extend offers of employment to Mark Gillespie, Mike Clark and/or Debbie Kercho.

Equity Purchase Agreement
Page 15

## ARTICLE 6
## COVENANTS OF THE PARTIES

Section 6.1 Conduct of Business Pending Closing. Subject to Section 6.2 and the constraints of applicable Material Contracts, from the date hereof through the Closing, except (x) as disclosed in Schedule 6.1, (y) as contemplated by the AFEs, or (z) as otherwise consented to or approved by Buyer, Seller, Davis Offshore and Davis Offshore Partners covenant and agree that:

(a) Operation of Hydrocarbon Interests. Davis Offshore shall:

(i) cause the Hydrocarbon Interests and other Assets to be maintained and operated in the ordinary course of business in accordance with the Davis Offshore's past practices and Law;

(ii) not propose or commit to participate in the drilling of any new well or other operations on the Hydrocarbon Interests that, in each case, is reasonably expected to cost Davis Offshore in excess of $100,000, without the prior written consent of Buyer, which consent or non-consent must be given by Buyer within the lesser of (A) five (5) days of Buyer's receipt of the notice from Davis Offshore or (B) one (1) day less than the applicable notice period within which Davis Offshore is contractually obligated to respond to third parties to avoid a deemed election by Davis Offshore regarding such operation, as specified in Davis Offshore's notice to Buyer requesting such consent; provided, that failure by Buyer to respond within the aforesaid applicable period shall constitute Buyer's consent to Davis Offshore's participation in such well or other operation;

(iii) maintain and keep the Hydrocarbon Interests in full force and effect, except where such failure is due to the expiration of any Hydrocarbon Interests caused by (A) the express non-consent of Buyer under Section 6.1(b)(ii) or (B) the lack of production; and

(iv) maintain insurance coverage on the Assets presently furnished by nonaffiliated third parties in the amounts and of the types presently in force (provided that Seller, Davis Offshore and/or Davis Offshore Petroleum shall have the right to cancel or terminate all such insurance coverage at or immediately prior to Closing); and

(v) maintain all governmental permits and approvals affecting the Assets.

(b) Changes in Business. Davis Offshore shall not:

(i) terminate or amend, in any material respect, any Material Contract or enter into any agreement, contract or arrangement that would have been required (had it been in existence as of the date hereof) to be set forth on Schedule 4.1(i) for that representation and warranty in Section 4.1(i) to have been true and correct as of the date hereof;

(ii) sell, lease or otherwise dispose of any of the Hydrocarbon Interests, except (A) Hydrocarbons sold or otherwise disposed of in the ordinary course of business, (B) incident to the exploration, operation or development of the Hydrocarbon Interests in accordance with this Section 6.1 or Section 6.2, (C) personal property or equipment that is replaced with personal property or equipment of comparable or better value and utility in connection with the maintenance, repair and operation of the Hydrocarbon Interests, and (D) any single item of personal property or equipment included in the Assets having a value of less than $50,000;

(iii) voluntarily relinquish Davis Offshore's position as operator with respect to any of the Hydrocarbon Interests currently operated by Davis Offshore (if any);

(iv) assume, guarantee, endorse or otherwise as an accommodation become responsible for, the obligations of any other Person, or make any loans or advances except for the benefit of Davis Offshore other than, in each case, as may be done in the ordinary course of business;

(v) agree to do any of the items enumerated in Sections 6.1(a) and 6.1(b).

Equity Purchase Agreement
Page 16

(c) <u>Company Actions</u>. Davis Offshore and Davis Offshore Partners shall not:

(i) amend its respective organizational documents;

(ii) liquidate, dissolve, recapitalize or otherwise wind up its respective business;

(iii) merge or consolidate with, or purchase substantially all of the assets or business of, or equity interests in, or make an investment in any Person (other than extensions of credit to customers in the ordinary course of business);

(iv) issue or sell any of its equity interests, notes, bonds or other securities of Davis Offshore or Davis Offshore Partners, as applicable, or any option, warrant or right to acquire the same; or

(v) make any distribution of any of the Assets or make any other assignment or transfer of any of the Assets (but for clarity, excluding any cash or cash equivalents which are swept daily in the normal course of business) to an Affiliate except as provided for in this Agreement.

(d) <u>Tax Matters</u>. Seller, Davis Offshore and Davis Offshore Partners shall not make or revoke any material Tax election with respect to Davis Offshore, Davis Offshore Partners or the Assets or settle or compromise any Tax audit or other dispute or proceeding for Taxes with respect to the Assets.

With respect to any matter or action covered by Section 6.1 calling for Buyer's approval, such approval shall not be unreasonably withheld, conditioned or delayed.

Section 6.2 <u>Qualifications on Conduct; Operations After Closing</u>.

(a) <u>Emergencies; Legal Requirements</u>. During the period from the date hereof through the Closing, Davis Offshore may take (or not take, as the case may be), or cause to be taken or not taken, any of the actions mentioned in Section 6.1 if reasonably necessary to avert or reduce imminent danger to the life or health of any Person or Persons, to prevent or mitigate any imminent material violation of Laws or to prevent or mitigate any imminent loss of or damage to any properties of Davis Offshore and for which action or actions, time is of the essence. Davis Offshore shall notify Buyer promptly prior to taking any such action to prevent or mitigate any imminent material violation of Laws and allow Buyer to be present to observe any such action.

(b) <u>Non-Operated Hydrocarbon Interests</u>. If Davis Offshore is not the operator of a particular portion of the Hydrocarbon Interests, the obligations of Seller in Section 6.1 with respect to such portion of the Hydrocarbon Interests, which have reference to operations or activities that pursuant to existing contracts are carried out or performed by the operator, shall be construed to require only that Davis Offshore exercises its contractual rights in accordance with the foregoing and that Davis Offshore use its reasonable commercial efforts to cause the operator of such portion of the Hydrocarbon Interests to take or not take such actions or render such performance or not render such performance as required by Section 6.1 within the constraints of the applicable operating agreements and other applicable agreements.

Section 6.3 <u>Removal; Change of Name</u>.

(a) Within a reasonable period of time following the Closing, and in any event within sixty (60) days of BOEM's approval of the change in Davis Offshore's name, ownership or the designation of operatorship with respect to the Properties, the BOEM's approval of Davis Offshore's qualification card with respect to the Properties and any other BOEM, BSEE or other approvals and consents as required by any Governmental Authority or Laws, as the case may be, Buyer shall and shall cause Davis Offshore and Davis Offshore Partners to remove and eliminate the names and marks of Seller and any of its Affiliates, including the name "Davis" (and all marks associated therewith), and any variations and derivatives thereof and any logos, trademarks or trade names relating thereto from the Hydrocarbon Interests and all other assets of Davis Offshore and Davis Offshore Partners. Buyer shall have no right to use such names or marks (including any variations and/or derivatives thereof) or any logos, trademarks or trade names relating thereto following the required removal as set forth in this Section 6.3(a). The foregoing

Equity Purchase Agreement
Page 17

notwithstanding, to the extent the name "Davis" (and all marks associated therewith), and any variations and derivatives thereof and any logos, trademarks or trade names relating thereto, is not currently marked on the Properties or is not currently included in any Safety & Environmental Management Systems plan, offshore spill response plan, or similar plan on file with BSEE, Davis Offshore shall use commercially reasonable efforts to cause a delay in requiring such marks to be made or including such name in such plans pending the Closing hereof, at which time Buyer shall comply with the terms of the first sentence of this Section 6.3(a). Nothing in this Section 6.3(a) shall require Seller (or, prior to Closing, Davis Offshore or Davis Offshore Partners) to take any action (or refrain from taking any action) if doing so would be reasonably expected to cause it to be in breach of Law.

(b) Within seven (7) days following the Closing, Buyer shall cause each of Davis Offshore and Davis Offshore Partners to (i) file a Certificate of Amendment with the Secretary of State of its state of organization to change its name to a name that does not include "Davis" and is otherwise compliant with the foregoing provisions of this Section 6.3, and shall provide the filed copies of such Certificates of Amendment to Seller promptly after filing, and (ii) submit to BOEM, BSEE and any other applicable Governmental Authority a revised qualification card listing the new officers of Davis Offshore and Davis Offshore Partners (or Persons holding powers of attorney therefore) who have authority to execute documents required or permitted to be filed therewith.

Section 6.4 Public Announcements. Without the prior written consent of the other Parties, which consent shall not be unreasonably withheld, conditioned or delayed, no Party will issue, or permit any agent or Affiliate of it to issue, any press releases or otherwise make, or cause any agent or Affiliate of it to make, any public statements with respect to this Agreement and the transactions contemplated hereby, except where such release or statement is deemed in good faith by the releasing Party to be required by Law or under the rules and regulations of any applicable public stock exchange on which the shares of such Party or any of its Affiliates are listed, in both situations, after giving the non-releasing Parties a reasonable opportunity to review and comment on such release or statement unless such reasonable opportunity, in the good faith judgment of the releasing Party, would result in a late filing of such release of statement.

Section 6.5 Parties' Efforts and Further Assurances. The Parties each agree that from time to time after the Closing Date, each of them will execute and deliver or cause their respective Affiliates to execute and deliver such further instruments, and take (or cause their respective Affiliates to take) such other action, as may be necessary to carry out the purposes and intents of this Agreement.

Section 6.6 Books and Records. No later than August 15, 2014, Seller shall make available to Buyer any Records that are not already held by the Buyer for pickup from Seller's offices during normal business hours; provided, that (a) Seller (and its Affiliates) may retain copies of all or any portion thereof and (b) such Records shall exclude the Excluded Records, and any files, records, contracts or documents of the Seller, Davis Offshore or Davis Offshore Partners relating to negotiating the purchase and sale of the Purchased Equity and/or the Assets, including any bids or offers received by the Seller for the sale of the Hydrocarbon Interests and other Assets in competition with Buyer's bid or offer, it being agreed that all such competing bids or offers shall be the sole property of Seller.

Section 6.7 Casualty and Condemnation.

(a) In the event of a Casualty Loss, to the extent insurance proceeds, condemnation awards or other payments are not committed, used or applied by the Seller prior to the Closing Date to repair, restore or replace such damaged or taken Hydrocarbon Interests to at least the same value and condition as prior to such Casualty Loss, the Seller shall at the Closing pay to Buyer all insurance proceeds, condemnation proceeds, awards and payments theretofore paid to the Seller by reason of such Casualty Loss. Any insurance proceeds, condemnation proceeds, awards and payments paid to Seller or an Affiliate of Seller after Closing by reason of a Casualty Loss of Hydrocarbon Interests, shall be paid to Buyer promptly upon receipt by Seller.

(b) From and after Closing, Seller shall reasonably cooperate and comply (at Seller's sole cost and expense) with Buyer's reasonable written directions and instructions with respect to Seller's pursuit of the collection (under Seller's, or its Affiliates' insurance policies) of any insurance proceeds attributable to, or otherwise asserted to be payable with respect to, any Casualty Loss.

Equity Purchase Agreement
Page 18

Section 6.8 <u>Third Party Approvals</u>. To the extent applicable, each of Buyer and the Seller shall, and shall cause their respective Affiliates to, (i) make or cause to be made the filings required of such Party or any of its Affiliates under any Laws with respect to the transactions contemplated by this Agreement and to pay any fees due of it in connection with such filings, as promptly as is reasonably practicable, (ii) cooperate with the other Party and furnish all information in such Party's possession that is necessary in connection with such other Party's filings, (iii) use commercially reasonable efforts to cause the expiration or termination of the notice or waiting periods under the HSR Act, if applicable, and any other Laws with respect to the transactions contemplated by this Agreement as promptly as is reasonably practicable, (iv) promptly inform the other Party of (and, at the other Party's reasonable request, supply to such other Party) any communication (or other correspondence or memoranda) from or to, and any proposed understanding or agreement with, any Governmental Authority in respect of such filings, (v) consult and cooperate with the other Party in connection with any analyses, appearances, presentations, memoranda, briefs, arguments and opinions made or submitted by or on behalf of any Party in connection with all meetings, actions, discussions and proceedings with Governmental Authorities relating to such filings, including, subject to Law, permitting the other Party to review in advance any proposed written communication between it and any Governmental Authority, (vi) comply, as promptly as is reasonably practicable, with any requests received by such Party or any of its Affiliates under the HSR Act, if applicable, and any other Laws for additional information, documents or other materials, (vii) use commercially reasonable efforts to resolve any objections asserted by any Governmental Authority with respect to the transactions contemplated by this Agreement and (viii) use commercially reasonable efforts to contest and resist any action or proceeding instituted (or threatened in writing to be instituted) by any Governmental Authority challenging the transactions contemplated by this Agreement as in violation of any Law. If a Party or any of its Affiliates intends to participate in any meeting or discussion with any Governmental Authority with respect to such filings or the transactions contemplated by this Agreement, it shall give the other Party reasonable prior notice of, and an opportunity to participate in, such meeting or discussion. For the sake of clarity, Seller shall be responsible for making all reasonable efforts to obtain all Transfer Requirements and Buyer shall be responsible for filing (including the cost thereof) and making all reasonable efforts to obtain all Customary Post-Closing Consents.

Section 6.9 <u>Transfer Taxes</u>. The Parties do not anticipate that any transfer, documentary, sales, use, stamp, registration or other similar Taxes, or any conveyance fees, recording charges or other similar fees and charges will be incurred or imposed with respect to the transactions described in this Agreement (collectively, "<u>Transfer Taxes</u>"). In the event any Transfer Taxes are due, such Transfer Taxes shall be borne by Buyer. Buyer and Seller shall reasonably cooperate in good faith to minimize, to the extent permissible under Law, the amount of any such Transfer Taxes.

Section 6.10 <u>Other Tax Matters</u>.

(a) <u>Filing of Tax Returns</u>.

(i) <u>Seller Consolidated Returns</u>. Seller shall prepare or cause to be prepared and file or cause to be filed all Seller Consolidated Returns and shall pay all Taxes owed with respect to such Seller Consolidated Returns.

(ii) <u>Post-Closing Tax Returns</u>. Seller shall prepare or cause to be prepared all Tax Returns (other than Seller Consolidated Returns) of Davis Offshore and Davis Offshore Partners for any tax period ending on or before the Closing Date ("<u>Pre-Closing Tax Returns</u>"), shall file or cause to be filed any such Pre-Closing Tax Returns that are required to be filed on or before the Closing Date and shall pay all Taxes for the Pre-Effective Time Tax Period owed with respect to such Pre-Closing Tax Returns. Buyer will cause each Pre-Closing Tax Return that is required to be filed after the Closing Date, as prepared by Seller, to be timely filed and will provide a copy thereof to Seller (provided that Seller shall be responsible for any Taxes owed for the Pre-Effective Time Tax Period with respect to such Tax Returns); provided that Buyer shall be entitled to review and approve such Pre-Closing Tax Returns. In the event of any conflict between this <u>Section 6.10(a)(ii)</u> and <u>Section 6.10(a)(iii)</u> then <u>Section 6.10(a)(iii)</u> shall control and govern in all circumstances.

(iii) <u>Straddle Period Tax Returns</u>. Buyer shall prepare or cause to be prepared all Tax Returns (other than Seller Consolidated Returns) of Davis Offshore and Davis Offshore Partners for all Straddle Periods that are required to be filed after the Closing Date ("<u>Straddle Period Tax Returns</u>"). Not later than thirty (30) days prior to the due date (including applicable extensions) for filing any such Straddle Period Tax Return, Buyer shall deliver a

Equity Purchase Agreement
Page 19

copy of such Tax Return, together with all supporting documentation and workpapers, to Seller for its review and reasonable comment. Buyer will cause such Straddle Period Tax Return (as reviewed by Seller) to be timely filed. Subject to the provisions of Section 6.10(b), Buyer shall be responsible for paying to any Governmental Authority any Taxes owed with respect to such Straddle Period Tax Returns and the Seller shall reimburse the Buyer for the portion of such Taxes allocated to Seller under Section 6.10(b).

(b) Proration of Straddle Period Taxes. In the case of Taxes that are payable with respect to any Straddle Period, the portion of any such Taxes that is attributable to the portion of the period ending prior to the Effective Time shall be:

(i) in the case of Taxes that are imposed in connection with production, severance or any sale or other transfer or assignment of property (real or personal, tangible or intangible), deemed equal to the amount that would be payable if the Tax period of Davis Offshore and/or Davis Offshore Partners, as applicable, ended immediately prior to the Effective Time; and

(ii) in the case of Taxes that are imposed on a periodic basis with respect to the assets of Davis Offshore and/or Davis Offshore Partners, as applicable, deemed to be the amount of such Taxes for the entire Straddle Period (or, in the case of such Taxes determined on an arrears basis, the amount of such Taxes for the immediately preceding period), multiplied by a fraction the numerator of which is the number of calendar days in the portion of the period ending on the day immediately prior to the day on which the Effective Time occurs and the denominator of which is the number of calendar days in the entire period.

(c) Cooperation. Buyer, Davis Offshore, Davis Offshore Partners and Seller shall cooperate fully as and to the extent reasonably requested by the other Party, in connection with the filing of Tax Returns and any audit, litigation or other proceeding (each a "Tax Proceeding") with respect to Taxes imposed on or with respect to Davis Offshore and/or Davis Offshore Partners. Such cooperation shall include the retention and (upon the other Party's request) the provision of records and information that are reasonably relevant to any such Tax Return or Tax Proceeding and making employees available on a mutually convenient basis to provide additional information and explanation of any material provided hereunder. Seller further agrees, upon written request of Buyer, to use commercially reasonable efforts (which efforts shall not require Seller to suffer any material detriment, cost, or expense) to obtain any certificate or other document from any Governmental Authority or any other Person as may be necessary to mitigate, reduce or eliminate any Tax that could be imposed on Buyer, Davis Offshore or Davis Offshore Partners (including with respect to the transactions contemplated hereby). Notwithstanding the above, the control and conduct of any Tax Proceeding that is a Third Party Claim shall be governed by Section 11.3.

(d) Amended Tax Returns. Buyer shall not, and shall not permit its Affiliates (including Davis Offshore and Davis Offshore Partners following the Closing) to, amend any Tax Return of Davis Offshore or Davis Offshore Partners for any Pre-Effective Time Tax Period or Straddle Period which would have an adverse effect on Taxes owed by Davis Offshore or Davis Offshore Partners without the prior written consent of Seller.

(e) Refunds. The amount of any refunds of Taxes of Davis Offshore and Davis Offshore Partners for any Pre-Effective Time Tax Period shall be for the account of Seller to the extent that Seller is responsible for such Taxes pursuant to this Agreement. The amount of any refunds of Taxes of Davis Offshore and Davis Offshore Partners for any Tax period beginning after the Effective Time shall be for the account of Buyer to the extent that Buyer is responsible for such Taxes pursuant to this Agreement. The amount of any refund of Taxes of Davis Offshore and Davis Offshore Partners for any Straddle Period shall be equitably apportioned between Buyer and Seller in accordance with the principles set forth in Section 6.10(b). Each Party shall forward, and shall cause its Affiliates to forward, to the Party entitled to receive a refund of Tax pursuant to this Section 6.10 (e) the amount of such refund within fifteen (15) days after such refund is received, net of any reasonable costs or expenses incurred by such Party or its Affiliates in procuring such refund.

(f) Tax Treatment; Purchase Price Allocation. Seller and Buyer agree that the purchase and sale of the Purchased Equity shall be treated for federal and applicable state income Tax purposes as a purchase and sale of the assets of Davis Offshore or Davis Offshore Partners (collectively, the "Flow-Through Entity"). The Parties agree that the Purchase Price shall be allocated among the assets of the applicable Flow-Through Entity, for federal and applicable state income Tax purposes. Buyer and Seller may, but shall not be obligated to, agree on the

Equity Purchase Agreement<br>Page 20

allocation of the Purchase Price, provided that if Buyer and Seller do agree upon such allocation the amounts shall be set out in an agreed allocation schedule (the "Allocation Schedule") as promptly as reasonably practicable after the Closing Date. If applicable, the Allocation Schedule shall be updated to reflect any adjustments to the Purchase Price. The allocation of the Purchase Price shall be reflected on a completed Internal Revenue Service Form 8594 (Asset Acquisition Statement under Section 1060), which Form will be timely filed separately by Buyer and Seller with the Internal Revenue Service pursuant to the requirements of Section 1060(b) of the Code. Each Party agrees not to take any position inconsistent with the allocations set forth in the Allocation Schedule (if prepared and accepted by Seller and Buyer) unless required by Law or with the consent of the other Party.

Section 6.11 Seismic License Transfer.

(a) The Buyer desires for Seller to assign and/or transfer to Davis Offshore the Seismic Licenses, or retain in the name of Davis Offshore, the Seismic Licenses, set forth on Schedule 6.11(a) at Buyer's expense (the "Seismic Licenses"). Subject to Buyer's consent to the terms and conditions imposed by the applicable third party licensor for such transfer and Buyer's payment of all Seismic Transfer Fees, at Closing Seller shall assign or transfer all Seismic Licenses to or retain all Seismic Licenses in the name of Davis Offshore, as the case may be.

(b) With respect to any Seismic License and subject to the provisions of Section 6.11(a), Seller shall transfer to Buyer, or retain in the name of Davis Offshore, all interpretations, data and other applicable records of Seller or Davis Offshore under such Seismic License.

Section 6.12 Transfer Requirements.  Seller shall use its commercially reasonable efforts to obtain all Required Transfer Requirements prior to the Closing Date.

Section 6.13 Reserve Estimates.  At the request of the Buyer made within one (1) year of the Closing Date, Seller shall promptly direct Netherland and Sewell to copy, reproduce and deliver to Buyer all existing reserve estimates and/or data with respect to the Assets which are taken from Seller's aggregate reserve studies and reserve data as described in Section 2.1(j), at the cost and expense of Buyer for such copying and reproduction.

Section 6.14 Intercompany Indebtedness. Prior to or contemporaneously with the Closing, Seller shall cause (a) all Indebtedness owing by Davis Offshore or Davis Offshore Partners to Seller and/or any of its Affiliates (other than Davis Offshore or Davis Offshore Partners) and (b) all Indebtedness owing by Seller and/or any of its Affiliates (other than Davis Offshore or Davis Offshore Partners) to Davis Offshore or Davis Offshore Partners, in each case, to be settled on a non-cash basis without adjustment to the Purchase Price or Adjusted Purchase Price under Section 3.1 and with no further liability or obligation of Davis Offshore and Davis Offshore Partners.

Section 6.15 Clipper Prospect. Prior to or contemporaneously with the Closing, Seller shall cause all of Davis Offshore's right, title and interest in and to the Clipper Prospect and the Clipper Prospect Claims to be assigned to Seller, or its designated Affiliate, and Seller, or its designated Affiliate shall expressly assume any and all P&A Obligations related thereto.

Section 6.16  Excluded Assets and Retained Obligations.  Prior to or contemporaneously with the Closing, Seller shall cause all of the Excluded Assets and Retained Obligations to be assigned to and assumed by Seller, or its designated Affiliate, pursuant to the instrument described in Section 8.2(c).

Section 6.17 Release of Encumbrances. Prior to or contemporaneously with the Closing, Seller (a) shall cause all Encumbrances on the Purchased Equity and Assets (other than Permitted Encumbrances) to be released and (b) shall cause Davis Offshore and Davis Offshore Partners to be released from any and all agreements relating to any Indebtedness secured by such Encumbrances.

## ARTICLE 7
## CLOSING CONDITIONS

Section 7.1 Seller's Closing Conditions. The obligation of Seller to proceed with the Closing contemplated hereby is subject, at the option of Seller, to the satisfaction (or waiver in writing by Seller) of all of the following conditions:

Equity Purchase Agreement
Page 21

(a) Representations, Warranties and Covenants. The (i) representations and warranties of Buyer contained in this Agreement shall be true and correct in all respects (in each case, without giving effect to any materiality, material or material adverse effect standard or qualification (or other similar standards and/or qualifications) set forth in the representations and warranties) as of the date of this Agreement and on the Closing Date as if made on such date (other than representations and warranties that refer to a specific date or time, which need only be true and correct in all respects as of such specific date or time), except to the extent that the failure of such representations and warranties to be true and correct in all respects would not, individually or in the aggregate, result in (or be reasonably expected to result in) a material adverse effect on the ability of Buyer to perform its obligations under this Agreement and (ii) covenants and agreements of Buyer to be performed on or before the Closing Date in accordance with this Agreement shall have been duly performed or complied with in all material respects.

(b) Closing Documents. On or prior to the Closing Date, Buyer shall have delivered, or be standing ready to deliver at Closing, all agreements, instruments and other documents required to be delivered by Buyer pursuant to Section 8.3.

(c) No Action. As of the Closing Date, no Action (excluding any such matter initiated by Seller or any of its Affiliates) shall be in effect that constitutes a preliminary injunction or order, decree, or ruling issued by a court of competent jurisdiction or by a governmental regulatory or administrative agency or commission that makes illegal or otherwise prevents the consummation of the transactions contemplated by this Agreement.

(d) Casualty Loss. The reasonably estimated aggregate amount of all Casualty Losses shall not exceed ten percent (10%) of the Purchase Price.

Section 7.2 Buyer's Closing Conditions. The obligation of Buyer to proceed with the Closing contemplated hereby is subject, at the option of Buyer, to the satisfaction (or waiver in writing by Buyer) of all of the following conditions:

(a) Representations, Warranties and Covenants. The (i) representations and warranties of the Seller, Davis Offshore and Davis Offshore Partners contained in this Agreement shall be true and correct in all respects (in each case, without giving effect to any materiality, material, material adverse effect or Material Adverse Effect standard or qualification (or other similar standards and/or qualifications) set forth in the representations and warranties) as of the date of this Agreement and on the Closing Date as if made on such date (other than representations and warranties that refer to a specific date or time, which need only be true and correct in all respects as of such specific date or time), except to the extent that the failure of such representations and warranties to be true and correct in all respects would not, individually or in the aggregate, result in (or reasonably be expected to result in) a Material Adverse Effect on the Davis Offshore or Davis Offshore Partners or on the ability of Seller, Davis Offshore or Davis Offshore Partners to perform their respective obligations under this Agreement and (ii) covenants and agreements of the Seller, Davis Offshore and Davis Offshore Partners to be performed on or before the Closing Date in accordance with this Agreement shall have been duly performed or complied with in all material respects.

(b) Closing Documents. On or prior to the Closing Date, the Seller, Davis Offshore and Davis Offshore Partners, as applicable, shall have delivered, or be standing ready to deliver at the Closing, all agreements, instruments and other documents required to be delivered by it pursuant to Section 8.2.

(c) No Action. As of the Closing Date, no Action (excluding any such matter initiated by Seller or any of its Affiliates) shall be in effect that constitutes a preliminary injunction or order, decree, or ruling issued by a court of competent jurisdiction or by a governmental regulatory or administrative agency or commission that makes illegal or otherwise prevents the consummation of the transactions contemplated by this Agreement.

(d) Casualty Loss. The reasonably estimated aggregate amount of all Casualty Losses shall not exceed ten percent (10%) of the Purchase Price.

(e) Mortgages and Liens. Seller, Davis Offshore and/or Davis Offshore Partners, as applicable, shall have received, or be prepared to deliver or cause to be delivered at Closing, a release of the Encumbrances on the Assets,

Equity Purchase Agreement
Page 22

other than Permitted Encumbrances, and Seller, Davis Offshore and/or Davis Offshore Partners, as applicable, shall have received a release of the Liens on the Purchased Equity, other than Permitted Liens.

    (f) <u>Seismic Licenses</u>. The applicable third party licensor of the Seismic Licenses shall have provided an executed supplement, consent or other instrument as necessary for Davis Offshore, Buyer or Fieldwood Energy LLC (at the direction of Buyer) to retain or receive a transfer and assignment of the Seismic Licenses under the terms and conditions and upon payment of the Seismic Transfer Fees that are reasonably acceptable to Buyer.

    (g) <u>Required Transfer Requirements</u>. All Required Transfer Requirements as necessary for the transactions contemplated herein shall have been received by Seller.

**ARTICLE 8**
**CLOSING AND POST-CLOSING**

Section 8.1 <u>Closing</u>. The Closing shall be held at the offices of Seller or its legal counsel on the second (2nd) Business Day following the satisfaction or waiver of all conditions to the obligations of the Parties set forth in <u>Article 7</u> (other than those conditions that, by their nature, are to be satisfied only at the Closing Date, but subject to the satisfaction or waiver of such conditions at Closing in accordance with this Agreement) or such other location and/or date as Buyer and Seller may mutually agree in writing, but in no event later than August 8, 2014 (the date on which the Closing occurs is referred to herein as the "<u>Closing Date</u>").

Section 8.2 <u>Seller's Closing Obligations</u>. At Closing, Seller shall execute and deliver, or cause to be executed and delivered, to Buyer the following:

    (a) duly executed signature page counterparts to the Assignment, substantially in the form set forth on <u>Exhibit B</u> hereto (the "<u>Assignment</u>"), assigning the Purchased Equity from Seller to Buyer;

    (b) releases of the Encumbrances on the Assets, other than Permitted Encumbrances, and a release of the Liens on the Purchased Equity, other than Permitted Liens; and

    (c) an assignment and assumption agreement(s) covering the Clipper Prospect, the Clipper Prospect Claims, the Excluded Assets and the Retained Obligations in a form reasonably satisfactory to Buyer;

    (d) an executed certificate of non-foreign status of Seller (or, if Seller is a disregarded entity, its owner) that satisfies the requirements of Treasury Regulations § 1.1445-2(b)(2);

    (e) any other agreements, instruments and documents that are required by other terms of this Agreement to be executed and/or delivered by Seller, Davis Offshore or Davis Offshore Partners to Buyer at the Closing;

    (f) a Secretary's certificate representing and attaching current copies of Davis Offshore's formation documents and partnership agreement and Davis Offshore Partners formation documents and limited liability company agreement;

    (g) a certificate dated as of the Closing Date, executed on behalf of Seller by a duly authorized officer of Seller, to the extent that the conditions set forth in subsection (a) of <u>Section 7.1</u> have been satisfied; and

    (h) resignations of the officers of Davis Offshore and Davis Offshore Partners and revocation of powers of attorney of Davis Offshore and Davis Offshore Partners effective as of Closing in form and substances reasonably acceptable to Buyer; provided, however, the resignation and revocation for Thomas Hardisty shall be signed but undated and he shall retain a power of attorney on the BOEM qualification card and/or remain an officer of Davis Offshore and Davis Offshore Partners to execute instruments with the BOEM and/or BSEE as directed by Buyer until such time as Buyer has revised the applicable qualification card as provided in <u>Section 6.3(b)(ii)</u>, at which time the resignation and revocation for Thomas Hardisty shall be dated by Buyer and deemed to be effective.

Equity Purchase Agreement
Page 23

Section 8.3 <u>Buyer's Closing Obligations</u>. At Closing, Buyer shall (i) deliver, or cause to be delivered, the Adjusted Purchase Price to Seller in immediately available funds to the bank account as provided in <u>Section 3.1</u> and (ii) execute and deliver, or cause to be executed and delivered, to Seller the following:

     (a) duly executed, acknowledged and witnessed signature page counterparts to the Assignment;

     (b) any other agreements, instruments and documents that are required by other terms of this Agreement to be executed and/or delivered by Buyer to Seller at the Closing; and

     (c) a certificate dated as of the Closing Date, executed on behalf of Buyer by a duly authorized officer of Buyer, to the extent the conditions set forth in subsection (a) of <u>Section 7.2</u> have been satisfied.

Section 8.4 <u>Post-Closing Obligations</u>. On or before ninety (90) days after Closing, Seller shall provide Buyer with a proposed Post-Closing Statement reflecting any further adjustments to the Adjusted Purchase Price provided for under this Agreement or otherwise agreed to by the Parties, together with copies of any supporting documentation. If requested by Seller and to the extent necessary to prepare the proposed Post-Closing Statement, Buyer shall provide sufficient work space in Buyer's office and access to Buyer's personnel, information and computer systems during normal business hours (but at such times and for such duration as will not unreasonably interfere with Buyer's operations) solely related to the Assets, subject to Seller's obligation to maintain the confidentiality of all information and documents made available to Seller pursuant to the same confidentiality terms as set forth in <u>Section 5.2</u>, but with such terms made applicable to Seller. Buyer shall have the right to conduct an audit with respect to the Post Closing Statement at Buyer's sole cost and expense and if requested by Buyer, Seller shall provide sufficient work space in Seller's office and access to Seller's personnel, information and computer systems during normal business hours (but at such times and for such duration as will not unreasonably interfere with Seller's operations) solely related to the Assets. Buyer shall, within sixty (60) days after receipt of the proposed Post-Closing Statement, provide Seller any comments or suggested revisions that it may have to the Post-Closing Statement, together with copies of any supporting documentation, and the Parties shall work together in good faith to finalize the Post-Closing Statement ("<u>Post-Closing Statement</u>") within one hundred and eighty (180) days after Closing. Any further adjustments reflected in the Post-Closing Statement shall be resolved by the Buyer paying to the Seller, or the Seller paying to the Buyer, as applicable, the net amount of all such adjustments within fifteen (15) days of the Parties' having reached agreement on the Post-Closing Statement. Thereafter, the Parties shall remain obligated to account to one another for any costs and expenses, as well as any revenues, that may be necessary or appropriate to carry out their stated intent as set out in this Agreement. In the event the Parties are unable to agree on any further adjustments to the Adjusted Purchase Price then either Seller or Buyer may submit the disputed items to KPMG LLP or, if KPMG LLP is not available, to another nationally-recognized, United States-based accounting firm on which the Parties agree in writing (the "<u>Accounting Referee</u>") which shall be directed to resolve the disputes within fifteen (15) days after its receipt of all relevant materials pertaining to the dispute. The Accounting Referee shall act as an expert for the limited purpose of determining the specific disputed matters submitted by either Party and may not award damages or penalties to either Party with respect to any matter. Seller, on one hand and Buyer, on the other hand shall share equally the Accounting Referee's costs, fees and expenses (including its attorney's fees, if any). Payment for any net amount due and owing by one Party to the other as set forth in the final Closing Statement shall be made within five (5) Business Days after the date on which all disputes in respect of the Closing Statement are finally resolved (whether by agreement of the Parties or pursuant to the Accounting Referee's decision).

**ARTICLE 9**
**SURVIVAL PERIOD**

Section 9.1 <u>Survival</u>.

     (a) All representations, warranties, covenants, and obligations in this Agreement, the Schedules, the supplements to the Schedules, and any certificate, document, or other writing delivered pursuant to this Agreement will survive the Closing and the consummation and performance of the transactions contemplated by this Agreement.

Equity Purchase Agreement
Page 24

(b) If the Closing occurs, Seller shall have liability under <u>Section 11.2</u> with respect to any breach of a representation or warranty of the Seller, Davis Offshore and Davis Offshore Partners, only if on or before the date that is eighteen (18) months after the Closing Date, Buyer notifies Seller of a claim with respect thereto, specifying the factual basis of such claim in reasonable detail (except for Seller Fundamental Representations which shall not be subject to such time limitation);

(c) If the Closing occurs, Buyer shall have liability under <u>Section 11.1</u> with respect to any breach of a representation or warranty only if on or before the expiration of the statute of limitations applicable thereto, Seller notifies Buyer of a claim with respect thereto specifying the factual basis of such claim in reasonable detail to the extent known by Seller.

ARTICLE 10
LIMITATIONS

Section 10.1 <u>Disclaimer of Warranties</u>.

(a) **BUYER ACKNOWLEDGES AND AGREES THAT BUYER IS EXPERIENCED IN THE OWNERSHIP AND OPERATION OF PROPERTIES SIMILAR TO THE HYDROCARBON INTERESTS AND OTHER ASSETS AND THAT BUYER PRIOR TO THE DATE HEREOF HAS HAD THE OPPORTUNITY TO INSPECT THE HYDROCARBON INTERESTS AND ALL OTHER ASSETS TO ITS SATISFACTION AND IS QUALIFIED TO MAKE SUCH INSPECTION, BUT NOTHING IN THIS SENTENCE IS A LIMITATION ON SELLER'S OR THE SELLER'S REPRESENTATIONS AND WARRANTIES SET FORTH IN THIS AGREEMENT. BUYER ACKNOWLEDGES THAT IT IS NOT RELYING UPON ANY STATEMENTS (ORAL OR WRITTEN) THAT MAY HAVE BEEN MADE OR MAY BE MADE (OR PURPORTEDLY MADE) BY THE SELLER, DAVIS OFFSHORE OR DAVIS OFFSHORE PARTNERS, OR ANY OF ITS OR THEIR REPRESENTATIVES (EXCEPT AS PROVIDED IN THIS AGREEMENT). BUYER ACKNOWLEDGES THAT BUYER HAS (OR BUYER'S REPRESENTATIVES HAVE), PRIOR TO THE DATE HEREOF, HAD THE OPPORTUNITY TO THOROUGHLY INSPECT AND EXAMINE THE HYDROCARBON INTERESTS AND ALL OTHER ASSETS TO THE EXTENT DEEMED NECESSARY BY BUYER IN ORDER TO ENABLE BUYER TO EVALUATE THE CONDITION OF SUCH HYDROCARBON INTERESTS AND ASSETS AND ALL OTHER ASPECTS OF SUCH HYDROCARBON INTERESTS AND ASSETS AS OF THE DATE HEREOF (INCLUDING THE ENVIRONMENTAL CONDITION OF SUCH HYDROCARBON INTERESTS AND ASSETS), BUT NOTHING IN THIS SENTENCE IS A LIMITATION ON THE SELLER'S REPRESENTATIONS AND WARRANTIES SET FORTH IN THIS AGREEMENT. FURTHER, EXCEPT AS EXPRESSLY REPRESENTED IN THIS AGREEMENT, IT IS THE EXPLICIT INTENT AND UNDERSTANDING OF ALL PARTIES THAT THE SELLER, DAVIS OFFSHORE AND DAVIS OFFSHORE PARTNERS ARE NOT MAKING ANY REPRESENTATION OR WARRANTY WHATSOEVER, EXPRESS, IMPLIED, STATUTORY OR OTHERWISE, BEYOND THOSE REPRESENTATIONS OR WARRANTIES EXPRESSLY GIVEN IN THIS AGREEMENT, AND AS A MATERIAL INDUCEMENT FOR SELLER, DAVIS OFFSHORE AND DAVIS OFFSHORE PARTNERS TO ENTER INTO THIS AGREEMENT, IT IS UNDERSTOOD THAT, WITHOUT LIMITING SUCH EXPRESS REPRESENTATIONS AND WARRANTIES, EXCEPT AS EXPRESSLY SET FORTH IN THIS AGREEMENT, AND SUBJECT TO THE INDEMNIFICATION OBLIGATIONS IN <u>SECTION 11.2</u>, BUYER TAKES THE HYDROCARBON INTERESTS AND ALL OTHER ASSETS "AS IS" AND "WHERE IS" AND "WITH ALL FAULTS." WITHOUT LIMITING THE GENERALITY OF THE IMMEDIATELY PRECEDING SENTENCE, EXCEPT AS EXPRESSLY REPRESENTED IN THIS AGREEMENT, THE SELLER, DAVIS OFFSHORE AND DAVIS OFFSHORE PARTNERS HEREBY (I) EXPRESSLY DISCLAIM AND NEGATE ANY REPRESENTATION OR WARRANTY, EXPRESS OR IMPLIED, AT COMMON LAW, BY STATUTE OR OTHERWISE, RELATING TO (A) THE CONDITION OF THE HYDROCARBON INTERESTS OR ANY OTHER ASSETS (INCLUDING ANY IMPLIED OR EXPRESS WARRANTY OF QUALITY, MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, OR OF CONFORMITY TO MODELS OR SAMPLES OF MATERIALS), (B) THE ENVIRONMENTAL CONDITION OF THE HYDROCARBON INTERESTS OR ANY OTHER ASSETS (INCLUDING THEIR COMPLIANCE STATUS UNDER ENVIRONMENTAL LAWS AND/OR THE**

Equity Purchase Agreement
Page 25

PRESENCE OR ABSENCE OF ANY HAZARDOUS SUBSTANCE IN OR ON, OR DISPOSED OF OR DISCHARGED FROM, THE HYDROCARBON INTERESTS OR ANY OTHER ASSETS), OR (C) ANY INFRINGEMENT BY SELLER OR ANY OF ITS AFFILIATES (INCLUDING DAVIS OFFSHORE AND DAVIS OFFSHORE PARTNERS) OF ANY PATENT OR PROPRIETARY RIGHT OF ANY THIRD PERSON); AND (II) NEGATE ANY RIGHTS OF BUYER UNDER STATUTES TO CLAIM DIMINUTION OF CONSIDERATION AND ANY CLAIMS BY BUYER FOR DAMAGES BECAUSE OF REDHIBITORY VICES OR DEFECTS, WHETHER KNOWN OR UNKNOWN, IT BEING THE INTENTION OF THE PARTIES THAT THE HYDROCARBON INTERESTS AND ALL OTHER ASSETS ARE TO BE ACCEPTED BY BUYER IN THEIR PRESENT CONDITION AND STATE OF REPAIR.

(b) EXCEPT AS EXPRESSLY REPRESENTED OTHERWISE IN THIS AGREEMENT AND SUBJECT TO THE INDEMNIFICATION OBLIGATIONS IN SECTION 11.2, AND WITHOUT LIMITING THE GENERALITY OF THE FOREGOING LIMITATIONS, THE SELLER, DAVIS OFFSHORE AND DAVIS OFFSHORE PARTNERS EXPRESSLY DISCLAIM ANY REPRESENTATION OR WARRANTY, EXPRESS, STATUTORY OR IMPLIED, AS TO (I) TITLE TO ANY OF THE HYDROCARBON INTERESTS OR ANY OTHER ASSETS, (II) THE CONTENTS, CHARACTER, NATURE, ACCURACY, COMPLETENESS OR SUFFICIENCY OF SCOPE OF ANY INFORMATION, MEMORANDUM, OPINION, ANALYSIS, DATA, INVESTIGATION, AUDIT OR ANY REPORT OF ANY ENVIRONMENTAL ENGINEER OR CONSULTANT, PETROLEUM ENGINEERING CONSULTANT, OR ANY ENGINEERING, GEOLOGICAL OR SEISMIC DATA OR INTERPRETATION, RELATING TO THE HYDROCARBON INTERESTS OR ANY OTHER ASSETS, (III) THE QUANTITY, QUALITY OR RECOVERABILITY OF HYDROCARBONS IN OR FROM THE HYDROCARBON INTERESTS, (IV) ANY ESTIMATES OF THE VALUE OF THE HYDROCARBON INTERESTS OR FUTURE REVENUES GENERATED BY THE HYDROCARBON INTERESTS, (V) THE PRODUCTION OF HYDROCARBONS FROM THE HYDROCARBON INTERESTS, (VI) THE MAINTENANCE, REPAIR, CONDITION, QUALITY, SUITABILITY, DESIGN OR MARKETABILITY OF THE HYDROCARBON INTERESTS OR ANY OTHER ASSETS, (VII) THE CONTENT, CHARACTER OR NATURE OF ANY INFORMATION MEMORANDUM, REPORTS, BROCHURES, CHARTS OR STATEMENTS PREPARED BY THIRD PARTIES, (VIII) ANY PRICING ASSUMPTIONS, (IX) PROJECTED DEVELOPMENT COSTS, (X) PLUGGING AND ABANDONMENT COSTS, (XI) ANY OTHER MATTERS CONTAINED IN OR RELATED TO ANY RESERVE REPORT AND (XII) ANY OTHER MATERIALS OR INFORMATION THAT MAY HAVE BEEN MADE AVAILABLE OR COMMUNICATED TO BUYER OR ITS AFFILIATES, OR ITS OR THEIR EMPLOYEES, AGENTS, CONSULTANTS, REPRESENTATIVES OR ADVISORS IN CONNECTION WITH THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT OR ANY DISCUSSION OR PRESENTATION RELATING THERETO.

(c) WITHOUT LIMITING BUYER'S REMEDIES SET FORTH IN ARTICLES 11 AND 12 AND EXCEPT AS SET FORTH IN SECTIONS 4.1(M), 4.2(F), 4.3(F) OR ELSEWHERE IN THIS AGREEMENT, THE SELLER DOES NOT MAKE ANY WARRANTY OR REPRESENTATION, EXPRESS, IMPLIED, STATUTORY OR OTHERWISE, WITH RESPECT TO THE SELLER'S, DAVIS OFFSHORE'S OR DAVIS OFFSHORE PARTNERS' TITLE TO ANY OF THE HYDROCARBON INTERESTS (INCLUDING ANY OF THE SUBJECT INTERESTS) OR ANY OF THE OTHER ASSETS, AND BUYER HEREBY ACKNOWLEDGES AND AGREES THAT FOLLOWING CLOSING BUYER'S SOLE REMEDY FOR ANY DEFECT OF TITLE, INCLUDING ANY TITLE DEFECT WITH RESPECT TO THE SUBJECT INTERESTS SHALL BE PURSUANT TO THE PROCEDURES SET FORTH IN ARTICLES 11 AND 12.

Section 10.2 Redhibition Waiver. BUYER WAIVES ALL RIGHTS IN REDHIBITION PURSUANT TO LOUISIANA CIVIL CODE ARTICLES 2475 AND 2520 THROUGH 2548, AND ACKNOWLEDGES THAT THIS EXPRESS WAIVER SHALL BE CONSIDERED A MATERIAL AND INTEGRAL PART OF THIS SALE AND THE CONSIDERATION THEREOF. BUYER ACKNOWLEDGES THAT THIS WAIVER HAS BEEN BROUGHT TO ITS ATTENTION AND HAS BEEN EXPLAINED IN DETAIL AND THAT BUYER HAS VOLUNTARILY AND KNOWINGLY CONSENTED TO THIS WAIVER OF WARRANTY OF FITNESS AND WARRANTY AGAINST REDHIBITORY VICES AND DEFECTS FOR THE HYDROCARBON INTERESTS.

Equity Purchase Agreement
Page 26

Section 10.3 <u>Damages</u>. **NOTWITHSTANDING ANYTHING TO THE CONTRARY HEREIN, THE PARTIES AGREE THAT, EXCEPT FOR SPECIFIC PERFORMANCE, INJUNCTIVE AND/OR EQUITABLE RELIEF FOR CLAIMS OF BREACHES OR FAILURE TO PERFORM COVENANTS PERFORMABLE UNDER THIS AGREEMENT, THE RECOVERY BY ANY PARTY OF ANY DAMAGES SUFFERED OR INCURRED BY IT AS A RESULT OF ANY BREACH OR NONFULFILLMENT BY ANY OTHER PARTY OF ANY OF ITS REPRESENTATIONS, WARRANTIES OR OBLIGATIONS UNDER THIS AGREEMENT, INCLUDING IN CONNECTION WITH ANY INDEMNITY SET FORTH IN THIS AGREEMENT, SHALL BE LIMITED TO THE ACTUAL DIRECT DAMAGES SUFFERED OR INCURRED BY THE NON-BREACHING PARTY (AND THE INDEMNIFIED PERSONS TO WHICH SUCH OBLIGATIONS MAY EXTEND UNDER THE TERMS HEREOF) AS A RESULT OF THE BREACH OR NONFULFILLMENT BY THE BREACHING PARTY OF ITS REPRESENTATIONS, WARRANTIES OR OBLIGATIONS HEREUNDER, AND IN NO EVENT SHALL THE BREACHING PARTY OR ANY OTHER PARTY BE LIABLE TO ANY NON-BREACHING PARTY OR ANY INDEMNIFIED PERSON FOR ANY INDIRECT, CONSEQUENTIAL, SPECIAL, EXEMPLARY OR PUNITIVE DAMAGES (INCLUDING ANY SUCH DAMAGES ON ACCOUNT OF LOST PROFITS OR OPPORTUNITIES, BUSINESS INTERRUPTION OR LOST OR DELAYED PRODUCTION) SUFFERED OR INCURRED BY THE NON-BREACHING PARTY OR ANY INDEMNIFIED PERSON AS A RESULT OF THE BREACH OR NONFULFILLMENT BY THE BREACHING PARTY OF ANY OF ITS REPRESENTATIONS, WARRANTIES OR OBLIGATIONS HEREUNDER, INCLUDING IN CONNECTION WITH ANY INDEMNITY SET FORTH IN THIS AGREEMENT.** For purposes of the foregoing, actual damages may, however, include indirect, consequential, special, exemplary or punitive damages to the extent such damages are recovered against an Indemnified Person by a Person that is not a Seller Indemnified Person, a Buyer Indemnified Person or an Affiliate of any of the foregoing. This <u>Section 10.3</u> shall operate only to limit a Party's liability and shall not operate to increase or expand any contractual obligation of a Party hereunder or cause any contractual obligation of a Party hereunder to survive longer than provided in <u>Section 9.1</u>.

**ARTICLE 11**
**INDEMNIFICATION**

Section 11.1 <u>Indemnification By Buyer</u>. Subject to <u>Sections 9.1(c)</u> and <u>11.5</u>, from and after the Closing, Buyer shall indemnify, defend, hold harmless and reimburse the Seller, Seller's Affiliates (other than Davis Offshore and Davis Offshore Partners), each of Seller's and such Affiliate's respective past, present and future directors, officers, managers, employees, consultants, agents, shareholders, insurers, members and partners and each of the successors and assigns of any of the foregoing (collectively, "<u>Seller Indemnified Persons</u>") from and against any and all Covered Liabilities suffered or incurred by a Seller Indemnified Person as a result of or arising out of (a) any inaccuracy or breach of any representation or warranty of Buyer in this Agreement (without giving effect, for purposes of calculating damages associated with any such inaccuracy, but not for purposes of determining any such inaccuracy, to any qualifier as to materiality, material, material adverse effect, Material Adverse Effect or words of similar meaning set forth herein), (b) any breach or nonperformance of any agreement or covenant expressly set forth in this Agreement on the part of Buyer (or, following the Closing, Davis Offshore and/or Davis Offshore Partners), and (c) the Assumed Obligations.

Section 11.2 <u>Indemnification By Seller</u>. Subject to the provisions of <u>Sections 9.1(b)</u> and <u>11.4</u>, from and after the Closing, Seller shall indemnify, defend, hold harmless and reimburse Buyer, Davis Offshore and Davis Offshore Partners, and Buyer's present and future directors, officers, employees, consultants, agents, shareholders, insurers, members and partners and each of the successors and assigns of any of the foregoing (collectively, "<u>Buyer Indemnified Persons</u>") from and against any and all Covered Liabilities suffered or incurred by a Buyer Indemnified Person as a result of or arising out of (a) any inaccuracy or breach of any representation or warranty of the Seller, Davis Offshore or Davis Offshore Partners in this Agreement (without giving effect, for purposes of calculating damages associated with any such inaccuracy, but not for purposes of determining any such inaccuracy, to any qualifier as to materiality, material, material adverse effect, Material Adverse Effect or words of similar meaning set forth herein); (b) any breach or nonperformance of any agreement or covenant on the part of Seller (or, prior to the Closing, Davis Offshore and/or Davis Offshore Partners) that is expressly set forth in this Agreement; (c) any Action set forth on <u>Schedule 4.1(e)</u>, and (d) the Retained Obligations.

Equity Purchase Agreement
Page 27

Section 11.3 <u>Indemnification and Defense Procedures</u>. Claims for indemnification under this Agreement shall be asserted and resolved as follows:

(a) If any Person who or which is entitled to seek indemnification under this Agreement (an "<u>Indemnified Party</u>") receives notice of the assertion or commencement of any claim asserted against an Indemnified Party by a third Person ("<u>Third Party Claim</u>") in respect of any matter that is subject to indemnification under this Agreement, the Indemnified Party shall promptly (i) notify the Party obligated to indemnify the Indemnified Party pursuant to this Agreement, (the "<u>Indemnifying Party</u>") of the Third Party Claim and (ii) transmit to the Indemnifying Party a written notice ("<u>Claim Notice</u>") describing in reasonable detail the nature of the Third Party Claim, a copy of all papers served with respect to such claim (if any), the Indemnified Party's best estimate of the amount of Covered Liabilities attributable to the Third Party Claim and the basis of the Indemnified Party's request for indemnification under this Agreement. Failure to timely provide such Claim Notice shall not affect the right of the Indemnified Party's indemnification hereunder, except to the extent the Indemnifying Party is materially prejudiced by such delay or omission.

(b) The Indemnifying Party shall have the right to defend, at its sole cost and expense, the Indemnified Party against such Third Party Claim with counsel selected by the Indemnifying Party (who shall be reasonably satisfactory to the Indemnified Party), by all appropriate proceedings, to a final conclusion or settlement at the discretion of the Indemnifying Party in accordance with this <u>Section 11.3(b)</u>. The Indemnifying Party shall have full control of such defense and proceedings, including any compromise or settlement thereof; *provided* that the Indemnifying Party shall not enter into any settlement agreement without the written consent of the Indemnified Party; *provided further*, that such consent shall not be required unless (i) the settlement agreement contains a complete and unconditional general release by the third Person asserting the claim to all Indemnified Parties affected by the claim, (ii) the settlement agreement does not contain any sanction or restriction upon the conduct of any business by the Indemnified Party or its Affiliates and (iii) the settlement agreement does not create a financial or other obligation on the part of the Indemnified Party or any other Person other than the Indemnifying Party. If requested by the Indemnifying Party, the Indemnified Party agrees, at the sole cost and expense of the Indemnifying Party, to cooperate with the Indemnifying Party and its counsel in contesting any Third Party Claim that the Indemnifying Party elects to contest, including the making of any reasonably related counterclaim against the Person asserting the Third Party Claim or any cross complaint against any Person and making the books and records and personnel of the Indemnified Party reasonably available during normal business hours. The Indemnified Party may participate in, but not control, any defense or settlement of any Third Party Claim controlled by the Indemnifying Party pursuant to this <u>Section 11.3(b)</u>, and the Indemnified Party shall bear its own costs and expenses with respect to such participation.

(c) If the Indemnifying Party does not admit (in writing) its obligation to indemnify the Indemnified Party pursuant to <u>Section 11.3(b)</u>, then the Indemnified Party shall have the right to defend, and be reimbursed for its reasonable cost and expense (but only if the Indemnified Party is found to be entitled to indemnification hereunder) in regard to the Third Party Claim with counsel selected by the Indemnified Party, by all appropriate proceedings, which proceedings shall be prosecuted diligently by the Indemnified Party. In such circumstances, the Indemnified Party shall defend any such Third Party Claim in good faith and have full control of such defense and proceedings. The Indemnifying Party may participate in, but not control, any defense or settlement controlled by the Indemnified Party pursuant to this <u>Section 11.3(c)</u>, and the Indemnifying Party shall bear its own costs and expenses with respect to such participation.

(d) Any claim by an Indemnified Party for indemnification under this Agreement that does not result from a Third Party Claim (a "<u>Direct Claim</u>") will be asserted by giving the Indemnifying Party reasonably written notice thereof within the time period described in <u>Section 9.1</u>. Such notice by the Indemnified Party will describe the Direct Claim in reasonable detail, will include copies of all available material written evidence thereof and will indicate the estimated amount, if reasonably practicable, of damages that has been or may be sustained by the Indemnified Party. The Indemnifying Party will have a period of fifteen (15) Business Days within which to respond in writing to such Direct Claim whether or not such period extends beyond the applicable survival period set forth in <u>Section 9.1</u> therefor. If the Indemnifying Party does not so respond within such fifteen (15) Business Day period, the Indemnifying Party will be deemed to have rejected such claim, in which event the Indemnified Party will be free to pursue such remedies as may be available to the Indemnified Party on the terms and subject to the provisions of this Agreement.

Equity Purchase Agreement
Page 28

Section 11.4 Seller's General Liability Limitation.

(a) Notwithstanding anything herein provided to the contrary, Seller shall have no liability to Buyer, Davis Offshore, Davis Offshore Partners or any of the other Buyer Indemnified Persons pursuant to Section 11.2(a) for any breach of any of the representations and warranties set forth in Sections 4.1, 4.2 and/or 4.3 (other than the Seller Fundamental Representations for which limitations set forth in this Section 11.4(a) shall not apply), until and unless (i) any individual Covered Liability related to such breach exceeds $50,000 (such Covered Liability, a "DeMinimis Claim"); provided, however, that any group or series of Covered Liabilities arising out of the same occurrence shall be aggregated and treated as an individual Covered Liability for purposes of determining whether they are a DeMinimis Claim and (ii) the aggregate amount of all Covered Liabilities attributable to any breach of representations or warranties of Seller, Davis Offshore and/or Davis Offshore Partners in this Agreement collectively exceeds $500,000 (the "Deductible") and then only to the extent that the amount of all such Covered Liabilities exceeds the Deductible.

(b) Notwithstanding anything herein provided to the contrary, Seller shall have no liability to Buyer, Davis Offshore, Davis Offshore Partners or any of the other Buyer Indemnified Persons pursuant to Section 11.2(a) for any breach of any of the representations and warranties of Sections 4.1, 4.2 and/or 4.3 (other than the Seller Fundamental Representations), to the extent that the aggregate amount of all Covered Liabilities attributable to any breach of such representations or warranties by Seller, Davis Offshore and/or Davis Offshore Partners to which the Buyer Indemnified Persons are entitled to recover indemnification pursuant to Section 11.2 exceeds $10,000,000.

(c) Subject to the foregoing limitations, but otherwise notwithstanding anything herein provided to the contrary, Seller shall have no liability to Buyer, Davis Offshore, Davis Offshore Partners or any other Buyer Indemnified Person (A) pursuant to Section 11.2 (or any other indemnity provisions set forth in this Agreement) to the extent that the aggregate amount of all Covered Liabilities to which the Buyer Indemnified Persons are entitled to recover indemnification thereunder exceeds the Adjusted Purchase Price.

(d) Each Buyer Indemnified Person shall be required to use commercially reasonable efforts to mitigate Covered Liabilities with respect to which a claim for indemnification is made, and the amount of any Covered Liabilities incurred or suffered by any Buyer Indemnified Person shall be calculated after giving effect to (i) any insurance proceeds from Buyer's, Davis Offshore's or Davis Offshore Partners' insurers actually received by the Buyer Indemnified Person (or any of its Affiliates) with respect to such Covered Liabilities and (ii) any recoveries actually obtained by the Buyer Indemnified Person (or any of its Affiliates) from any other third Person (net of costs incurred by the Buyer Indemnified Person in obtaining any such recoveries). If any such proceeds, benefits or recoveries are received by a Buyer Indemnified Person (or any of its Affiliates) with respect to any Covered Liabilities after Seller has made a payment to the Buyer Indemnified Person with respect thereto, the Buyer Indemnified Person (or such Affiliate) shall promptly pay to Seller the amount of such proceeds, benefits or recoveries (up to the amount of Buyer's payment).

Section 11.5 Buyer's General Liability Limitation.

(a) Notwithstanding anything herein provided to the contrary, except with respect to breaches of Buyer Fundamental Representations and Buyer's obligation to indemnify Seller and Thomas Hardisty for any actions taken by Thomas Hardisty after Closing at the direction of (and in compliance with) Buyer, Davis Offshore or Davis Offshore Partners in his capacity as an officer or attorney in fact of Buyer, Davis Offshore or Davis Offshore Partners, for which the limitations set forth in this Section 11.5(a) shall not apply, Buyer shall have no liability to Seller or any of the other Seller Indemnified Persons pursuant to Section 11.1(a) for any breach of a representation or warranty by Buyer until and unless (i) any individual Covered Liability or group or series of related Covered Liabilities covered by Section 11.1(a) attributable to any breach by Buyer of this Agreement is not a DeMinimis Claim; provided, however, that any group or series of Covered Liabilities arising out of the same occurrence shall be aggregated and treated as an individual Covered Liability for purposes of determining whether they are a DeMinimis Claim and (ii) the aggregate amount of all Covered Liabilities attributable to any breach of such representations or warranties by Buyer in this Agreement exceeds the Deductible, and then only to the extent that the amount of such Covered Liabilities exceeds the Deductible.

Equity Purchase Agreement
Page 29

(b) Each Seller Indemnified Person shall be required to use commercially reasonable efforts to mitigate Covered Liabilities with respect to which a claim for indemnification is made. and the amount of any Covered Liabilities incurred or suffered by any Seller Indemnified Person shall be calculated after giving effect to (i) any insurance proceeds from Seller's, Davis Offshore's or Davis Offshore Partners' insurers actually received by the Seller Indemnified Person (or any of its Affiliates) with respect to such Covered Liabilities and (ii) any recoveries actually obtained by the Seller Indemnified Person (or any of its Affiliates) from any other third Person (net of costs incurred by the Seller Indemnified Person in obtaining any such recoveries). If any such proceeds or recoveries are received by a Seller Indemnified Person (or any of its Affiliates) with respect to any Covered Liabilities after Buyer has made a payment to the Seller Indemnified Person with respect thereto, the Seller Indemnified Person (or such Affiliate) shall promptly pay to Buyer the amount of such proceeds, benefits or recoveries (up to the amount of Seller's payment).

(c) Notwithstanding anything herein provided to the contrary, Buyer shall have no liability to Seller or any of the other Seller Indemnified Persons pursuant to Section 11.1(a) for any breach of any of the representations and warranties of Section 4.4 (other than the Buyer Fundamental Representations), to the extent that the aggregate amount of all Covered Liabilities attributable to any breach of such representations or warranties by Buyer to which the Seller Indemnified Persons are entitled to recover indemnification pursuant to Section 11.1 exceeds $10,000,000.

Section 11.6 <u>Exclusive Remedy</u>. The remedies provided in this <u>Article 11</u> shall be the sole and exclusive legal remedies of the Parties (including any claims by, through under or against the Seller, Davis Offshore or Davis Offshore Partners), from and after the Closing, with respect to this Agreement and the transactions contemplated hereby; provided, that nothing in this <u>Section 11.6</u> shall prevent, after Closing, any Party from seeking specific performance, injunctive and/or equitable relief for claims of breach or failure to perform covenants performable under this Agreement.

Section 11.7 <u>Knowledge</u>. Seller shall not be liable under this <u>Article 11</u> for any Covered Liabilities suffered or incurred by a Buyer Indemnified Person as a result of or arising out of any inaccuracy or breach of any representation or warranty of the Seller, Davis Offshore or Davis Offshore Partners in this Agreement to the extent that such inaccuracy or breach is proven to have been in the Knowledge of Buyer, prior to the date hereof. Likewise, Buyer shall not be liable under this <u>Article 11</u> for any Covered Liabilities suffered or incurred by a Seller Indemnified Person as a result of or arising out of any inaccuracy or breach of any representation or warranty of the Buyer in this Agreement to the extent that such inaccuracy or breach is proven to have been in the Knowledge of Seller, Knowledge of Davis Offshore or Knowledge of Davis Offshore Partners prior to the date hereof.

Section 11.8 <u>Tax Treatment of Indemnification Payments</u>. Except as otherwise required by Law, any indemnification payments made pursuant to this Agreement between the Parties shall be treated as an adjustment to the Purchase Price for Tax purposes.

Section 11.9 <u>Express Negligence</u>. **EXCEPT AS OTHERWISE PROVIDED IN <u>SECTION 5.1(A)</u>, THE DEFENSE, INDEMNIFICATION, HOLD HARMLESS, RELEASE AND ASSUMED OBLIGATIONS PROVISIONS PROVIDED FOR IN THIS AGREEMENT SHALL BE APPLICABLE WHETHER OR NOT THE LIABILITIES, LOSSES, COSTS, EXPENSES AND DAMAGES IN QUESTION AROSE OR RESULTED SOLELY OR IN PART FROM THE GROSS, SOLE, ACTIVE, PASSIVE, CONCURRENT OR COMPARATIVE NEGLIGENCE, STRICT LIABILITY OR OTHER FAULT OR VIOLATION OF LAW OF OR BY ANY INDEMNIFIED PARTY. THE PARTIES ACKNOWLEDGE THAT THIS STATEMENT COMPLIES WITH THE EXPRESS NEGLIGENCE RULE AND IS "<u>CONSPICUOUS</u>."**

### ARTICLE 12
### TERMINATION; REMEDIES

Section 12.1 <u>Termination</u>.

(a) <u>Termination of Agreement</u>. This Agreement and the transactions contemplated hereby may be terminated at any time prior to the Closing:

Equity Purchase Agreement
Page 30

(i) by the mutual written consent of Seller and Buyer;

(ii) by any Party, if the Closing has not occurred by the close of business on or before August 8, 2014 (as may be extended, the "Drop-Dead Date"); provided, that the right to terminate this Agreement under this Section 12.1(a)(ii) shall not be available to any Party whose breach of any representation, warranty or covenant contained in this Agreement shall have been the cause of, or shall have resulted in, the failure of the Closing to occur on or before the Drop-Dead Date;

(iii) by Seller upon Buyer's (A) breach of any of its representations or warranties or (B) failure to comply with any of its covenants or agreements contained herein, in each case, such that the either of the conditions to Closing set forth in Section 7.1(a) shall not be satisfied by the Drop-Dead Date;

(iv) by Buyer upon Seller's, Davis Offshore's or Davis Offshore Partners' (A) breach of any of its representations or warranties or (B) failure to comply with any of its covenants or agreements contained herein, in each case, such that the either of the conditions to Closing set forth in Section 7.2(a) shall not be satisfied by the Drop-Dead Date.

(v) by Buyer in the event of any Casualty Loss in excess of that set forth in Section 7.1(e); or

(vi) by Buyer in the event of any Material Adverse Effect.

(b) Effect of Termination. In the event of termination of this Agreement by Seller, on the one hand, or Buyer, on the other hand, pursuant to Section 12.1(a), written notice thereof shall forthwith be given by the terminating Party to the other Party, and this Agreement shall thereupon terminate; provided, however, that following any termination of this Agreement, Buyer will continue to be bound by its obligations set forth in Sections 5.1(a)(ii), and 5.2; provided, further, that (i) this Section 12.1(b), Section 10.3 and Article 1 and Article 13 will survive the termination of this Agreement and will remain in full force and effect and (ii) the termination of this Agreement will not relieve any Party from any liability for any breach of this Agreement occurring prior to termination. If this Agreement is terminated as provided herein, all filings, applications and other submissions made to any Governmental Authority shall, to the extent practicable, be withdrawn from the Governmental Authority to which they were made.

Section 12.2 Remedies.

(a) Seller's Remedies. Upon Buyer's breach of any representation, warranty or covenant contained in this Agreement such that Seller would be entitled to terminate this Agreement pursuant to Section 12.1(a)(iii), and for clarity provided that Seller, Davis Offshore and Davis Offshore Partners are not in breach of any representation, warranty or covenant contained in this Agreement applicable to it or them and which shall have been the cause of, or shall have resulted in Buyer's breach of any representation, warranty or covenant applicable to Buyer, then Seller, at its sole option, may enforce specific performance of this Agreement or terminate this Agreement and sue Buyer for recovery of monetary damages.

(b) Buyer's Remedies. Upon Seller's, Davis Offshore's or Davis Offshore Partners' breach of any representation, warranty or covenant contained in this Agreement such that Buyer would be entitled to terminate this Agreement pursuant to Section 12.1(a)(iv), and for clarity provided that Buyer is not in breach of any representation, warranty or covenant contained in this Agreement applicable to Buyer which shall have been the cause of, or shall have resulted in Seller's, Davis Offshore's or Davis Offshore Partners' breach of any representation, warranty or covenant applicable to it or them, then Buyer, at its sole option, may enforce specific performance of this Agreement or terminate this Agreement and sue Seller for recovery of monetary damages.

(c) Buyer's and Sellers' Remedy. Notwithstanding anything herein provided to the contrary, upon termination of this Agreement by a Party pursuant to Section 12.1(a)(ii), all other remedies shall be deemed to have been expressly waived by the Parties.

Debtors' Exhibit D
Page 32 of 115

Section 12.3 Return of Documentation and Confidentiality. Upon termination of this Agreement, Buyer shall return to Seller, Davis Offshore or Davis Offshore Partners, as applicable, all title, engineering, geological and geophysical data, environmental assessments and/or reports, maps and other information furnished by such Party to Buyer or prepared by or on behalf of Buyer in connection with its due diligence investigation of the Purchased Equity or the Hydrocarbon Interests, in each case in accordance with the Confidentiality Agreement.

## ARTICLE 13
## MISCELLANEOUS

Section 13.1 Counterparts. This Agreement may be executed in one or more counterparts, either originally or by electronic reproduction, all of which shall be considered one and the same agreement, and shall become effective when one or more counterparts have been signed by and delivered to each of the Parties.

Section 13.2 Governing Law; Jurisdiction; Process.

(a) **THIS AGREEMENT AND THE TRANSACTIONS CONTEMPLATED HEREBY SHALL BE GOVERNED BY AND INTERPRETED IN ACCORDANCE WITH THE LAWS OF THE STATE OF TEXAS WITHOUT GIVING EFFECT TO PRINCIPLES THEREOF RELATING TO CONFLICTS OF LAW RULES THAT WOULD DIRECT THE APPLICATION OF THE LAWS OF ANOTHER JURISDICTION, EXCEPT THAT THE LAW OF ANOTHER JURISDICTION SHALL APPLY TO THIS AGREEMENT AND THE TRANSACTIONS CONTEMPLATED HEREBY INSOFAR AS THIS AGREEMENT AND SUCH TRANSACTIONS COVER OR RELATE TO A PART OF THE HYDROCARBON INTERESTS OR ANY OTHER ASSETS FOR WHICH IT IS MANDATORY THAT THE LAW OF ANOTHER JURISDICTION, WHEREIN OR ADJACENT TO WHICH SUCH PART OF THE HYDROCARBON INTERESTS ARE LOCATED, SHALL APPLY. EACH PARTY HERETO WAIVES THE RIGHT TO A TRIAL BY JURY IN ANY DISPUTE IN CONNECTION WITH OR RELATING TO THIS AGREEMENT OR ANY MATTERS DESCRIBED OR CONTEMPLATED HEREIN AND AGREES TO TAKE ANY AND ALL ACTION NECESSARY OR APPROPRIATE TO EFFECT SUCH WAIVER.**

(b) **THE PARTIES AGREE TO THE EXCLUSIVE JURISDICTION IN ANY LEGAL ACTION, SUIT OR PROCEEDING WITH RESPECT TO THIS AGREEMENT IN ANY COURT, FEDERAL OR STATE, WITHIN HARRIS COUNTY, TEXAS, HAVING SUBJECT MATTER JURISDICTION AND WITH RESPECT TO ANY SUCH CLAIM, THE PARTIES IRREVOCABLY WAIVE, TO THE FULLEST EXTENT PERMITTED BY LAW, ANY CLAIM, OR ANY OBJECTION THAT THE PARTIES MAY NOW OR HEREAFTER HAVE, THAT VENUE OR JURISDICTION IS NOT PROPER WITH RESPECT TO ANY SUCH LEGAL ACTION, SUIT OR PROCEEDING BROUGHT IN SUCH COURT IN HARRIS COUNTY, TEXAS, INCLUDING ANY CLAIM THAT SUCH LEGAL ACTION, SUIT OR PROCEEDING BROUGHT IN SUCH COURT HAS BEEN BROUGHT IN AN INCONVENIENT FORUM AND ANY CLAIM THAT A PARTY IS NOT SUBJECT TO PERSONAL JURISDICTION OR SERVICE OF PROCESS IN HARRIS COUNTY, TEXAS. THE PARTIES AGREE THAT EXCEPT WITH REGARD TO ACTIONS FOR ENFORCEMENT OF A JUDGMENT, (i) THE FEDERAL OR STATE COURTS WITHIN HARRIS COUNTY, TEXAS WILL HAVE EXCLUSIVE JURISDICTION TO HEAR AND DETERMINE DISPUTES ARISING OUT OF OR RELATING IN ANY WAY TO THIS AGREEMENT, AND (ii) NO ACTION OR PROCEEDING WILL BE FILED IN ANY OTHER COURT.**

Section 13.3 Entire Agreement. This Agreement (including the Confidentiality Agreement) and the Schedules (including amendments and supplements thereto) and Exhibits hereto contain the entire agreement between the Parties with respect to the subject matter hereof and there are no agreements, understandings, representations or warranties between the Parties other than those set forth or referred to herein.

Section 13.4 Expenses. Except as otherwise expressly provided in this Agreement, all costs and expenses incurred by the Parties hereto in connection with the transactions contemplated by this Agreement shall be borne solely and entirely by the Party that has incurred such expenses. The foregoing notwithstanding, Buyer and Seller agree to split

Debtors' Exhibit D
Page 33 of 115

equally the filing fee associated with any filing under the HSR Act, if applicable, to be paid in connection with such filing.

Section 13.5 Notices. Unless otherwise expressly provided in this Agreement, all notices and consents required or permitted hereunder shall be in writing and deemed sufficiently given for all purposes hereof if (i) delivered in person, by courier or by registered or certified United States Mail to the Person to be notified, with receipt obtained, or (ii) sent by facsimile or electronic transmission (with confirmed receipt in the case of electronic transmission), in each case to the appropriate address or number as set forth below. Each notice shall be deemed effective on receipt by the addressee as aforesaid; provided, that, notice received by facsimile or electronic transmission after 5:00 p.m. at the location of the addressee of such notice shall be deemed received on the first Business Day following the date of such electronic receipt. Notices to Seller or, prior to the Closing, Davis Offshore and Davis Offshore Partners, shall be addressed to:

> Davis Petroleum Acquisition Corp.
> 1330 Post Oak Boulevard, Suite 600
> Houston, TX 77056
> Attention: Thomas E. Hardisty
> Facsimile No.: (713) 439-6720

> with copies to (which shall not constitute notice to Seller, Davis Offshore or Davis Offshore Partners):

> Adams and Reese LLP
> 1221 McKinney, Suite 4400
> Houston, Texas 77010
> Attention: Craig G. Townsend
> Facsimile No.: (713) 652-5152

or at such other address or to such other facsimile or electronic transmission number and to the attention of such other Person as Seller or, prior to the Closing, Davis Offshore or Davis Offshore Partners, may designate by written notice to Buyer.

Notices to Buyer or, following the Closing, Davis Offshore and Davis Offshore Partners, shall be addressed to:

> Fieldwood Energy Offshore LLC
> 2000 W Sam Houston Pkwy South, Suite 1200
> Houston, Texas 77009
> Attention: John Smith
> Facsimile No.: (713) 969-1099

> with copies to (which shall not constitute notice to Buyer, Davis Offshore or Davis Offshore Partners):
> 2000 W Sam Houston Pkwy South, Suite 1200
> Houston, Texas 77009
> Attention: General Counsel
> Facsimile No.: (713) 969-1099

or at such other address or to such other facsimile or electronic transmission number and to the attention of such other Person as Buyer or, after the Closing, Davis Offshore or Davis Offshore Partners, may designate by written notice to Seller.

Section 13.6 Successors and Assigns. This Agreement shall be binding upon and inure to the benefit of the Parties and their respective successors and assigns; provided, that, prior to Closing, the respective rights and obligations of the Parties shall not be assignable or delegable by any Party without the express written consent of the non-assigning or non-delegating Party; provided, however, that no such assignment shall relieve such Party of its obligations hereunder in the event of the failure of performance by such assignee. After the Closing, any Party may assign all or a part of its rights under this Agreement, but such assignment shall not relieve such assigning Party of any of its obligations and responsibilities to the non-assigning Party unless expressly released from same in writing by such non-assigning Party.

Equity Purchase Agreement
Page 33

Section 13.7 <u>Amendments and Waivers</u>. This Agreement may not be modified or amended except by an instrument or instruments in writing signed by the Party against whom enforcement of any such modification or amendment is sought. Any Party may, only by an instrument in writing, waive compliance by another Party with any term or provision of this Agreement on the part of such other Party to be performed or complied with. The waiver by any Party of a breach of any term or provision of this Agreement shall not be construed as a waiver of any subsequent breach.

Section 13.8 <u>Schedules and Exhibits</u>.

(a) All Schedules (including amendments and supplements thereto) and Exhibits hereto that are referred to herein are hereby made a part of this Agreement and incorporated herein by such reference.

(b) Unless the context otherwise requires, all capitalized terms used in the Schedules (including amendments and supplements thereto) and Exhibits hereto shall have the respective meanings assigned in this Agreement or <u>Exhibit A</u>. Any matter, information or item disclosed in the Schedules (including amendments and supplements thereto) and Exhibits hereto, under any specific representation or warranty, shall be deemed to have been disclosed for all purposes of this Agreement in response to every representation or warranty in this Agreement to which the relevance of such disclosure is reasonably apparent on its face. The inclusion of any matter, information or item in any Schedule (including amendments and supplements thereto) or Exhibit hereto shall not be deemed to constitute an admission of any liability by the Seller, Davis Offshore or Davis Offshore Partners to any third Person or otherwise imply that any such matter, information or item is material or creates a measure for materiality for the purposes of this Agreement. No disclosure in the Schedules (including amendments and supplements thereto) and Exhibits hereto relating to any possible breach or violation of any agreement or Law shall be construed as an admission or indication that any such breach or violation exists or has actually occurred.

Section 13.9 <u>Agreement for the Parties' Benefit Only</u>. Except as provided in <u>Article 11</u>, this Agreement is for the sole benefit of Buyer, Seller, Davis Offshore, Davis Offshore Partners and their respective successors and assigns as permitted herein and no other Person shall be entitled to enforce this Agreement, rely on any representation, warranty, covenant or agreement contained herein, receive any rights hereunder or be a third party beneficiary of this Agreement.

Section 13.10 <u>Severability</u>. If any term, provision or condition of this Agreement, or any application thereof, is held invalid, illegal or unenforceable in any respect under any Law, this Agreement shall be reformed to the extent necessary to conform, in each case consistent with the intention of the Parties, to such Law, and to the extent such term, provision or condition cannot be so reformed, then such term, provision or condition (or such invalid, illegal or unenforceable application thereof) shall be deemed deleted from (or prohibited under) this Agreement, as the case may be, and the validity, legality and enforceability of the remaining terms, provisions and conditions contained herein (and any other application of such term, provision or condition) shall not in any way be affected or impaired thereby. Upon such determination that any term or other provision or condition is invalid, illegal or incapable of being enforced, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in an acceptable manner to the end that the transactions contemplated hereby are fulfilled to the extent possible.

[SIGNATURE PAGE FOLLOWS]

Equity Purchase Agreement
Page 34

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date first written above.

**SELLER:**

**DAVIS PETROLEUM ACQUISITION CORP.**

By:_____

       Michael S. Reddin, President & CEO

**DAVIS OFFSHORE:**

**DAVIS OFFSHORE, L.P.**

By: Davis Offshore Partners, LLC, its General Partner

   By:_____

       Michael S. Reddin, President & CEO

**DAVIS OFFSHORE PARTNERS:**

**DAVIS OFFSHORE PARTNERS, LLC**

By:_____

       Michael S. Reddin, President & CEO

**BUYER:**

**FIELDWOOD ENERGY OFFSHORE LLC**

By:_____

       G. M. McCarroll, President

Signature Page
to
Equity Purchase Agreement

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date first written above.

**SELLER:**

**DAVIS PETROLEUM ACQUISITION CORP.**

By: _Michael S. Reddin_

Michael S. Reddin, President & CEO


**DAVIS OFFSHORE:**

**DAVIS OFFSHORE, L.P.**

By: Davis Offshore Partners, LLC, its General Partner

By: _Michael S. Reddin_

Michael S. Reddin, President & CEO


**DAVIS OFFSHORE PARTNERS:**

**DAVIS OFFSHORE PARTNERS, LLC**

By: _Michael S. Reddin_

Michael S. Reddin, President & CEO


**BUYER:**

**FIELDWOOD ENERGY OFFSHORE LLC**

By:_____

G. M. McCarroll, President


Signature Page
to
Equity Purchase Agreement

**EXHIBIT A**

**DEFINITIONS**


"Action" shall mean any action, suit or other proceeding by or before any court or other Governmental Authority or any arbitration proceeding.

"Adjusted Purchase Price" shall be as defined in Section 3.1.

"AFEs" shall be as defined in Section 4.1(q).

"Affiliate" shall mean, as to the Person specified, any Person controlling, controlled by or under common control with such specified Person, with "control," "controlling" or "controlled" (as used in the foregoing definition) meaning the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of another, whether through the ownership of voting securities, by contract or otherwise.

"Agreement" shall be as defined in the preamble hereto.

"Applicable Contracts" shall be as defined in Section 2.1(e).

"Assets" shall be as defined in Section 2.1.

"Assigned Percentage" means all of Seller's right, title, and interest.

"Assignment" shall be as defined in Section 8.2(a).

"Assumed Obligations" means all Liabilities to the extent arising from or attributable to the ownership, operation or condition of the Purchased Equity and the Assets, whether attributable to periods on or after the Effective Time, including Liabilities arising from or attributable to: (i) P&A Obligations (regardless of whether incurred prior to, on or after the Effective Time); (ii) the payment of Burdens; (iii) Taxes; (iv) Imbalances; and (v) the Subject Leases and Applicable Contracts; provided, however, that the "Assumed Obligations" shall expressly exclude the Retained Obligations.

"BOEM" shall mean the Bureau of Ocean Energy Management.

"BSEE" shall mean the Bureau of Safety and Environmental Enforcement.

"Burden" means any and all royalties (including lessors' royalties and non-participating royalties), overriding royalties and other burdens upon, measured by or payable out of production.

"Business Day" shall mean any day which is not a Saturday, Sunday or legal holiday recognized by the State of Texas.

"Buyer" shall be as defined in the preamble.

"Buyer Fundamental Representations" shall mean the representations and warranties set forth in Sections 4.4(a), (b), (c), (g), (i) and (j).

"Buyer Indemnified Persons" shall be as defined in Section 11.2.

"Casualty Loss" means any loss or damage (including additional costs associated with plugging and abandonment) occurring between the Effective Time and the Closing Date that is attributable to, arises out of or relates to any Hydrocarbon Interests, Subject Wells and Subject Facilities that are (a) damaged, destroyed or made

Exhibit A
Page 1

unavailable or unusable for the intended purpose by fire, act of God, explosion, collision, earthquake, windstorm or other casualty or (b) taken in condemnation or under right of eminent domain.

"Claim Notice" shall be as defined in Section 11.3(a).

"Clipper Prospect" means OCS-G 15571 (Green Canyon Block 299) and OCS-G 22939 (Green Canyon Block 300), Offshore U.S. Gulf of Mexico, including, but not limited to, Davis Offshore's reversionary interest therein.

"Clipper Prospect Claims" means all claims, liabilities, causes of action, accounts, entitlements and associated rights of whatever nature arising out of, resulting from or attributable to that certain dispute currently being arbitrated by and between Davis Offshore, Calypso Exploration LLC, Pioneer Natural Resources USA, Inc., and Bennu Oil & Gas, LLC (as successor in interest to ATP Oil & Gas Corporation) relating to such parties' respective rights, interests, duties and obligations under the Offshore Operating Agreement governing the Clipper Prospect and any related contracts or agreements.

"Closing" shall be the consummation of the transaction contemplated by Article 8.

"Closing Date" shall be as defined in Section 8.1.

"Closing Statement" shall be as defined in Section 3.2.

"Code" shall mean the Internal Revenue Code of 1986, as amended.

"Company Benefit Plan" shall mean any Employee Benefit Plan that is sponsored, maintained or contributed to by Davis Offshore or any of its Subsidiaries for the benefit of its current or former employees.

"Confidentiality Agreement" shall be as defined in Section 5.2.

"Consolidated Group" means any affiliated, combined, consolidated, unitary or similar group with respect to any Taxes, including any affiliated group within the meaning of Section 1504 of the Code electing to file consolidated federal income Tax Returns and any similar group under foreign, state or local law.

"Contracts" means any written: contract; agreement; instrument; agreement regarding indebtedness; indenture; debenture; note, bond or loan; collective bargaining agreement; mortgage or deed of trust; license agreement; farmin and/or farmout agreement; participation, exploration or development agreement; lease; right-of-way, easement or other agreement pertaining to surface rights; crude oil, condensate or natural gas purchase and sale, gathering, processing, transportation or marketing agreement; operating agreement; balancing agreement; unitization, pooling, and communitization agreement, declaration or order; area of mutual interest agreement; acreage contribution agreement; non-competition agreement; Hydrocarbon storage agreement; production handling agreement; or other similar contract.

"Covered Liabilities" shall mean any and all debts, losses, liabilities (including strict liabilities), obligations, duties, fines, damages, claims, causes of action, Taxes, costs and expenses (including those arising out of any demand, assessment, settlement, judgment or compromise relating to any actual or threatened Action and any court or arbitral panel costs, reasonable fees and expenses of expert witnesses, reasonable investigative expenses, reasonable fees and disbursements of legal counsel and other reasonable legal and investigative fees and expenses incurred in investigating, preparing or defending any Action or incurred in enforcing any indemnification obligation to which an Indemnified Party is entitled under this Agreement), matured or unmatured, absolute or contingent, accrued or unaccrued, liquidated or unliquidated, known or unknown, including any of the foregoing arising under, out of or in connection with any actual or threatened Action, any order or consent decree of any Governmental Authority, any award of any arbitrator, or any Law (including Environmental Laws), contract, commitment or undertaking.

"Customary Post-Closing Consents" shall mean the consents and approvals from Governmental Authorities for the assignment of the Purchased Equity, and by virtue thereof, the indirect transfer of the Hydrocarbon Interests

Exhibit A
Page 2

(or any other Assets), to Buyer that are customarily obtained after the transfer of the Purchased Equity, and by virtue thereof, the indirect transfer of properties similar to the Hydrocarbon Interests (or any such other Assets), including consents or approvals of (or filings with) BOEM.

"Deductible" shall be as defined in Section 11.4(a).

"DeMinimis Claims" shall be as defined in Section 11.4(a).

"Direct Claim" shall be as defined in Section 11.3(d).

"Drop-Dead Date" shall be as defined in Section 12.1(a)(ii).

"Effective Time" shall mean 7:00 a.m. CST on June 1, 2014.

"Employee Benefit Plan" shall mean any (a) employee pension benefit plan (as described in Section 3(2) of ERISA), (b) employee welfare benefit plan (as described in Section 3(1) of ERISA) or (c) bonus, deferred compensation, incentive compensation, stock option or equity or equity-based, severance, termination pay, retention, unemployment compensation, vacation pay, change in control, fringe benefit or other benefit plan, program, policy or arrangement.

"Encumbrance" shall mean any security interest, deed of trust, mortgage, pledge or other similar lien or charge.

"Environmental Laws" shall mean as the same may have been amended, superseded or replaced, any and all Laws pertaining to prevention of pollution, protection of the environment (including natural resources), remediation of contamination, or workplace health and safety, including the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. § 9601 et seq.; the Resource Conservation and Recovery Act, 42 U.S.C. § 6901 et seq.; the Federal Water Pollution Control Act, 33 U.S.C. § 1251 et seq.; the Clean Air Act, 42 U.S.C. § 7401 et seq.; the Hazardous Materials Transportation Act, 49 U.S.C. § 1471 et seq.; the Toxic Substances Control Act, 15 U.S.C. §§ 2601 through 2629; the Oil Pollution Act, 33 U.S.C. § 2701 et seq.; the Emergency Planning and Community Right-to-Know Act, 42 U.S.C. § 11001 et seq.; the Safe Drinking Water Act, 42 U.S.C. §§ 300f through 300j; the Occupational Safety and Health Act, 29 U.S.C. § 651 et seq.; and all similar Laws of any Governmental Authority having jurisdiction over Davis Offshore, all amendments to such Laws, and all judicial and administrative decisions, orders, directives, decrees and regulations of Governmental Authority implementing any of the foregoing.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

"Excluded Assets" shall be as defined in Section 2.2.

"GAAP" shall mean U.S. generally accepted accounting principles, as recognized by the U.S. Financial Accounting Standards Board (or any generally recognized successor).

"Governmental Authority" shall mean any federal, state, local, municipal, tribal or other government; any governmental, regulatory or administrative agency, commission, body or other authority exercising or entitled to exercise any administrative, executive, judicial, legislative, regulatory or Taxing authority or power. and any court or governmental tribunal, including any tribal authority having or asserting jurisdiction.

"Hazardous Substance" means and includes each substance or material defined, designated or classified as a hazardous waste, hazardous substance, hazardous material, solid waste, pollutant, contaminant or toxic substance under any Environmental Law, and any petroleum or petroleum products that have been Released into the environment.

"HSR Act" shall mean the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, and the rules and regulations promulgated thereunder.

Exhibit A
Page 3

"Hydrocarbon Interests" shall mean any Subject Lease or Subject Unit, in each case, owned by Davis Offshore as of the Effective Time and as of the Closing (excluding the Excluded Assets).

"Hydrocarbons" shall mean oil and gas and other hydrocarbons in association therewith (whether or not such item is in liquid or gaseous form), or any combination thereof, and any minerals produced in association therewith.

"Imbalance" shall mean over-production or under-production or over-deliveries or under-deliveries with respect to oil or gas produced from or allocated to the Hydrocarbon Interests, regardless of whether such over-production or under-production or over-deliveries or under-deliveries arise at the platform, well, pipeline, gathering system, transportation system or other location.

"Income Tax" means any income, franchise or similar Tax.

"Indebtedness" means all obligations to any Person for borrowed money, including (a) any obligation to reimburse any bank or other Person in respect of amounts paid or payable under any credit agreement or a standby letter of credit or (b) any guaranty with respect to indebtedness for borrowed money of another Person; provided, however, that Indebtedness shall expressly exclude trade payables, purchase money security interest and any other similar indebtedness incurred in the ordinary course of business.

"Indemnified Party" shall be as defined in Section 11.3(a).

"Indemnifying Party" shall be as defined in Section 11.3(a).

"Insolvent" shall mean a financial condition such that the sum of such Person's debts is greater than all of such Person's property, at a fair valuation, after giving effect to the transactions contemplated hereby.

"Knowledge of Buyer" shall mean actual knowledge of the persons who have the following titles as of the Closing Date: President and Chief Executive Officer, Vice President of Land and Chief Financial Officer.

"Knowledge of Seller" "Knowledge of Davis Offshore" and "Knowledge of Davis Offshore Partners", as applicable, shall mean actual knowledge of employees of Seller or its Affiliates who have responsibility for the ownership, operation and maintenance of the Assets and the persons who have the following titles as of the Closing Date: President and Chief Executive Officer, Vice President of Land, Land Manager, Chief Financial Officer and Vice-President, Production and Marketing.

"Law" shall mean any applicable statute, law (including common law), ordinance, regulation, rule, ruling, order, writ, injunction, decree or other official act of or by any Governmental Authority.

"Leases" shall mean (a) leases (or assignments thereof) affecting, relating to or covering any Hydrocarbons in place and the leasehold interests and estates in the nature of working or operating interests under such leases, as well as overriding royalties, net profits interests, production payments, carried interests, rights of recoupment and other interests in, under or relating to such leases, (b) fee interests in Hydrocarbons in place, (c) royalty interests in Hydrocarbons in place, (d) any other interest in Hydrocarbons in place and (e) any economic or contractual rights, options or interests in and to any of the foregoing, including any farmout or farmin agreement or production payment affecting any interest or estate in Hydrocarbons in place.

"Liabilities" shall mean means any debt, liabilities, or obligations of any nature (whether accrued or fixed, absolute or contingent, matured or not matured, determined or determinable, or as a guarantor or otherwise).

"Liens" shall mean any security interest, deed of trust, mortgage, pledge, lien, charge, claim, easement, covenant, community property interest, equitable interest, right of first refusal, or restriction of any kind, including any restriction on use, voting, transfer, receipt of income, or exercise of any other attribute of ownership.

"Material Adverse Effect" means any event, effect, change, fact, development or circumstance, individually or in the aggregate, that has or would reasonably be expected to have, a material adverse effect on (a) the business,

assets, liabilities, properties, financial condition or results of operations of the Properties, the Subject Facilities, the Hydrocarbon Interests or any other Assets or (b) the ability of the Seller, Davis Offshore or Davis Offshore Partners to perform its obligations under this Agreement or to consummate the transactions contemplated hereby; provided, however, that a Material Adverse Effect shall not take into account any event, effect, change, fact or circumstance arising from or primarily relating to (i) changes in the state of the energy industry generally (including any change in the price of oil, natural gas, natural gas liquids or other Hydrocarbons) but that do not have a disproportionate impact on the business of such Person, (ii) changes in United States or global economic conditions or financial, banking, or securities markets (including any disruption thereof) in general, (iii) changes in national or international political or social conditions, including any engagement in hostilities, whether or not pursuant to the declaration of a national emergency or war, or the occurrence of any military or terrorist attack, (iv) changes in GAAP or Law (or any interpretation thereof), including any changes in the deductibility of drilling, completion or operating costs or other Taxes, (v) the announcement of the execution of this Agreement or the proposed or actual consummations of the transactions contemplated hereby, (vi) failure alone to meet internal forecasts or estimates of revenues, earnings or other financial metrics for any period (provided, that the underlying reasons for such failure shall be taken into account in determining whether there has been a Material Adverse Effect). The Parties hereby agree that any effect which adversely impacts the ownership, operation or value of the Assets in an amount (such amount to be determined after discounting the present value of any such effects on a PV 10 bases) equal to or greater than $500,000 shall constitute a Material Adverse Effect for purposes of this definition.

"Material Contract" shall be as defined in Section 4.1(i).

"Net Revenue Interest" or "NRI" shall mean, with respect to each Subject Well, Subject Unit or Subject Lease, as applicable, the interest in and to all Hydrocarbons produced, saved and sold from or allocated to such Subject Well, Subject Unit or Subject Lease, as applicable, after giving effect to all royalties, overriding royalties, production payments, carried interests, net profits interests, reversionary interests and other similar burdens upon, measured by, or payable out of production therefrom.

"Operating Expenses" means all third party operating expenses (including non-Income Taxes but excluding in all cases, all costs and expenses of bonding or surety obligations, insurance premiums or any other costs of insurance attributable to Davis Offshore's and/or its Affiliates' insurance and to coverage periods from and after the Effective Time) and capital expenditures incurred in the ownership and operation of the Assets and, where applicable, in accordance with the relevant operating or unit agreement, if any, and overhead costs charged by an unaffiliated third party to the Assets under the relevant operating agreement or unit agreement, if any, but excluding Liabilities attributable to (a) personal injury, death, or property damage or violation of Laws, (b) P&A Obligations, (c) the remediation of any Release of any Hazardous Substance, (d) obligations with respect to Imbalances that existed prior to the Effective Time, (e) obligations to pay Burdens, Working Interest or other interest owners any revenues or proceeds attributable to sales of Hydrocarbons relating to the Assets, including those held in suspense.

"P&A Obligations" means the following Liabilities, regardless of how such Liabilities arose or whether such Liabilities arose or arise on, before, or after the Closing Date, in each case, to the extent the following actions are required by the terms of applicable Laws or the Applicable Contracts:

      (a) to properly plug and abandon and remove, dismantle, decommission and dispose of all Subject Wells and Subject Facilities;

      (b) to replug any well or wellbore (including any previously plugged well or wellbore), in each case, to the extent such well or wellbore was drilled in connection with the Subject Leases;

      (c) to flush, cap, pickle, bury or remove all flow lines and other pipelines now or hereafter used in connection with the Assets; and

      (d) to clean up any Hazardous Substances related to the Assets.

"Parties" and "Party" have the meanings specified in the Recitals to this Agreement.

Exhibit A
Page 5

"Permit" shall be as defined in Section 2.1(h).

"Permitted Encumbrances" shall mean:

(a) the terms and conditions of all Leases (to the extent not otherwise addressed in this definition of Permitted Encumbrances) and all lessor royalties, non-participating royalties, overriding royalties, reversionary interests, production payments, carried interests, net profits interests and other similar burdens upon, measured by, or payable out of production if the net cumulative effect of such terms, conditions and burdens does not operate to (i) reduce the Net Revenue Interest of Davis Offshore in any (A) Subject Well, below the percentage set forth in Schedule 4.1(m) for such Subject Well, (B) Subject Unit, below the percentage set forth in Schedule 4.1(m) for such Subject Unit or (C) Subject Lease, below the percentage set forth in Schedule 4.1(m) for such Subject Lease or (ii) obligate Davis Offshore to bear a Working Interest for any (A) Subject Well, that is greater than the Working Interest set forth on Schedule 4.1(m) for such Subject Well (unless the Net Revenue Interest of Davis Offshore in such Subject Well is greater than the Net Revenue Interest set forth on Schedule 4.1(m) for such Subject Well in the same proportion as any increase in such Working Interest), (B) Subject Unit that is greater than the Working Interest set forth on Schedule 4.1(m) for such Subject Unit (unless the Net Revenue Interest of Davis Offshore in such Subject Unit is greater than the Net Revenue Interest set forth on Schedule 4.1(m) for any Subject Unit in the same proportion as any increase in such Working Interest), (C) Subject Lease that is greater than the Working Interest set forth on Schedule 4.1(m) for such Subject Lease (unless the Net Revenue Interest of Davis Offshore in such Subject Lease is greater than the Net Revenue Interest set forth on Schedule 4.1(m) such Subject Lease in the same proportion as any increase in such Working Interest) and (D) Subject Facility, that is greater than the Working Interest set forth on Schedule 4.1(m) for such Subject Facility;

(b) all liens for Taxes not yet due or delinquent or, if delinquent, that are being contested in good faith in the normal course of business;

(c) all Customary Post-Closing Consents as set forth on Schedule 4.1(d), all Transfer Requirements (other than any Required Transfer Requirements) and all Preferential Rights set forth on Schedule 4.1(k);

(d) all conventional rights of reassignment upon final intention to abandon or release any Lease;

(e) all Laws and rights reserved to or vested in any Governmental Authority (i) to control or regulate any of the Hydrocarbon Interests, Subject Wells, Subject Facilities and/or other related assets of Davis Offshore in any manner, (ii) by the terms of any Permit, or by any provision of Law, to terminate such Permit, and (iii) to enforce any obligations or duties affecting any of the Hydrocarbon Interests, Subject Wells, Subject Facilities and/or other related assets of Davis Offshore that are owed to any Governmental Authority under any Permit;

(f) all rights of any tenant in common arising as a matter of Law or other common owner of any interest in any Rights-of-Way;

(g) all vendors', carriers', warehousemen's, repairmen's, mechanics', workmen's, materialmen's, construction or other like liens arising by operation of Law in the ordinary course of business or incident to the construction or improvement of any property in respect of obligations which are not yet due or delinquent or, if delinquent, that are being contested in good faith by appropriate proceedings by (or on behalf of) Davis Offshore;

(h) all liens created under any of the Subject Leases, Material Contracts or Rights-of-Way or Permits held with respect to any of the Hydrocarbon Interests, Subject Wells, Subject Facilities and/or other related Assets, or by operation of Law, in each case, in respect of obligations that are not yet due or delinquent or, if delinquent, that are being contested in good faith by appropriate proceedings by (or on behalf of) Davis Offshore;

(i) all Encumbrances affecting the Hydrocarbon Interests, Subject Wells, Subject Facilities and/or other related Assets that are discharged (or expressly bonded for the full amount in dispute or otherwise claimed with respect thereto) at or prior to the Closing;

(j) all of the terms and conditions of any Material Contract, Right of Way or Permit;

Exhibit A
Page 6

(k) all of the terms and conditions of this Agreement;

(l) all other Encumbrances, agreements, instruments, obligations, defects and irregularities (but not Liens) affecting the Assets that individually or in the aggregate (i) do not materially interfere with the ownership or operation of the Hydrocarbon Interests or Subject Wells, taken as a whole, (ii) would be accepted by a reasonably prudent and sophisticated buyer in the business of owning, exploring, developing and operating oil and gas properties similar to such Hydrocarbon Interests, Subject Wells, Subject Facilities and/or other related assets of Davis Offshore and (iii) do not (A) reduce the Net Revenue Interest of Davis Offshore in any Subject Well, below the percentage set forth in Schedule 4.1(m) for such Subject Well, or (B) obligate Davis Offshore to bear a Working Interest for any Subject Well that is greater than the Working Interest set forth on Schedule 4.1(m) for such Subject Well (unless the Net Revenue Interest of Davis Offshore in such Subject Well is greater than the Net Revenue Interest set forth on Schedule 4.1(m) for such Subject Well in the same proportion as any increase in such Working Interest);

(m) defects that affect only which Person has the right to receive royalty payments (rather than the amount or the proper payment of such royalty) and that do not affect the validity of the underlying Subject Lease, and to the extent the same does not (i) reduce the Net Revenue Interest of Davis Offshore in any Subject Well, below the percentage set forth in Schedule 4.1(m) for such Subject Well, or (ii) obligate Davis Offshore to bear a Working Interest for any Subject Well, that is greater than the Working Interest set forth on Schedule 4.1(m) for such Subject Well (unless the Net Revenue Interest of Davis Offshore in such Subject Well is greater than the Net Revenue Interest set forth on Schedule 4.1(m) for such Subject Well in the same proportion as any increase in such Working Interest).

"Permitted Liens" shall mean liens and encumbrances created under securities Law (including all state Blue Sky Laws) and any of the organizational or other constituent documents of Davis Offshore or Davis Offshore Partners.

"Person" shall mean any Governmental Authority or any individual, firm, partnership, corporation, association, joint venture, trust, unincorporated organization or other entity or organization.

"Post-Closing Statement" shall be as defined in Section 8.4.

"Pre-Effective Time Tax Period" means any Tax period ending prior to the Effective Time.

"Pre-Effective Time Tax Returns" shall be as defined in Section 6.10(a).

"Preferential Right" shall mean any right or agreement that enables or may enable any Person to purchase or acquire any of the Hydrocarbon Interests or any interest therein or portion thereof as a result of or in connection with the execution or delivery of this Agreement or the consummation or performance of the terms, conditions and transactions contemplated by this Agreement.

"Properties" means, collectively, the Subject Leases, the Subject Lands, the Subject Lease Related Interests, the Subject Units, the Subject Wells and the Subject Facilities.

"Purchase Price" shall be as defined in Section 3.1.

"Release" means any depositing, spilling, leaking, pumping, pouring, placing, emitting, discarding, abandoning, emptying, discharging, migrating, injecting, escaping, leaching, seeping, dumping, or disposing.

"Representative" shall mean, with respect to a Person, such Person's directors, partners, managers, officers, employees, consultants, agents, financial advisors, attorneys, accountants and other representatives.

"Required Transfer Requirements" means any Transfer Requirements that are included in a Material Contract, the provisions of which expressly state that the failure to obtain the requisite Transfer Requirement prior to the consummation of the transactions similar to those contemplated hereby either (i) entitles the counterparty of such

Material Contract to terminate the Material Contract, or (ii) renders the indirect transfer of such Material Contract, null and void (or voidable, at the express option of the counterparty).

"Retained Actions" shall mean those Actions as identified in Section 4.1(e).

"Retained Obligations" means, collectively, all Liabilities to the extent arising from or attributable to the following:

(a) the ownership, operation and use of the Assets prior to the Effective Time, expressly excluding, however, (i) all P&A Obligations and (ii) all obligations and liabilities arising out of the condition of the Assets (including the condition of the Assets arising out of Environmental Laws) as of the Effective Time (except as set forth in item (g) of this definition), in each case regardless of when incurred or accrued and whether pertaining to any period prior to, on or after the Effective Time;

(b) the ownership, operation and use of the Excluded Assets regardless of whether incurred prior to, on or after the Effective Time;

(c) the Clipper Prospect Claims, including all of Davis Offshore's plugging, abandonment and decommissioning obligations, if any, with respect to the Clipper Prospect;

(d) to the extent arising from or attributable to the period prior to the Effective Time, any personal injury, death, pollution, contamination or property damage occurring or relating to the Assets;

(e) the gross negligence or willful misconduct of Seller, Davis Offshore, or Davis Offshore Partners in connection with the ownership and operation of any of the Assets prior to the Closing Date;

(f) Burdens attributable to the sale of Hydrocarbons produced from or allocated to the Properties to the extent attributable to periods of time prior to the Effective Time;

(g) fines, penalties and other similar obligations levied by any Governmental Authority with respect to the Assets prior to the Effective Time (but, for the removal of doubt, no P&A Obligations shall be considered to be Retained Obligations);

(h) all Taxes for which Seller, Davis Offshore or Davis Offshore Partners are responsible pursuant to Article 6;

(i) the Retained Actions.

"Rights-of-Way" shall mean all servitudes, easements, fee surface rights, surface leases and rights-of-way.

"Securities Act" shall mean Securities Act of 1933, as amended.

"Seismic License" shall mean any seismic, data and geophysical licenses and permits.

"Seismic Transfer Fees" shall mean those fees required under any Seismic License or by the licensor therein to be paid upon a change in control of Seller, Davis Offshore or Davis Offshore Partners, or upon any transfer of the data, information or interpretations thereof which are agreed to by Buyer with the third party licensor in Buyer's sole discretion.

"Seller" shall be as defined in the preamble.

"Seller Consolidated Group" means any Consolidated Group of which any of (i) Davis Offshore, (ii) Davis Offshore Partners or (iii) Seller or an Affiliate of Seller (other than Davis Offshore and Davis Offshore Partners), is or was a member on or prior to the Closing Date.

Exhibit A
Page 8

"Seller Consolidated Return" means any Tax Return of a Seller Consolidated Group.

"Seller Fundamental Representations" shall mean the representations and warranties set forth in Sections 4.1(a), (g), (h), (i)(iii), (k), (l), (m), (s), (t), (w), (y), (z), (aa), (bb), (cc) and (dd), Sections 4.2(a), (e), (f), (g), (h), (i), (k), (l), (m), (n) and (o), and Sections 4.3(a), (e), (f), (g) and (h).

"Seller Indemnified Persons" shall be as defined in Section 11.1.

"Service Provider" or "Service Providers" shall be as defined in Section 6.15.

"Straddle Period" shall mean any Tax period that begins before the Effective Time and ends after the Effective Time.

"Straddle Period Tax Returns" shall be as defined in Section 6.10(a).

"Subject Facilities" shall be as defined in Section 2.1(c).

"Subject Field" shall mean any of the fields described on Schedule 4.1(m).

"Subject Interests" shall mean and include all rights, titles and interests of Davis Offshore (as of the Effective Time and as of the Closing Date) in, to or under any Hydrocarbon Interests.

"Subject Leases" shall be as defined in Section 2.1(a).

"Subject Lands" shall be as defined in Section 2.1(a).

"Subject Lease Related Interests" shall be as defined in Section 2.1(a).

"Subject Unit" shall be as defined in Section 2.1(d).

"Subject Well" shall be as defined in Section 2.1(b).

"Tax" shall mean (a) any federal, state, local or non-U.S. income, gross receipts, payroll, employment, social security (or similar), unemployment, disability, excise, severance, production, stamp, occupation, premium, windfall profits, profits, personal property, real property, sales, license, goods and services, transfer, use, capital stock, franchise, occupation, alternative or add-on minimum tax, estimated or other tax of any kind whatsoever, including any interest, fine, penalty or addition thereto, whether disputed or not; (b) all liability for the payment of any amounts of the type described in clause (a) as the result of being a member of a Consolidated Group; (c) all liability for the payment of any amounts as a result of an express or implied obligation to indemnify any other person with respect to the payment of any amounts of the type described in clause (a) or clause (b); and (d) all liability in respect of any item described in clauses (a), (b) or (c) that arises by reason of an assumption, transferee or successor liability, operation or law or otherwise.

"Tax Return" shall mean any return, declaration, report, claim for refund, or information return or statement relating to Taxes, including any schedule or attachment thereto, and including any amendment thereof.

"Terminated Licenses" shall be as defined in Section 6.14(a).

"Third Party Claim" shall be as defined in Section 11.3(a).

"Transfer Requirement" shall mean any consent, approval, authorization or permit of, or filing with or notification to, any Person that is required to be obtained, made or complied with for or in connection with the transactions contemplated herein, other than any consent or approval of or filing with any Governmental Authority and excluding any transfer or other requirements under any Seismic License.

"Transfer Taxes" shall be as defined in Section 6.12(b).

"Working Interest" or "WI" shall mean the interest in and to a Subject Well, Subject Unit, Subject Lease or Subject Facility that is burdened with the obligation to bear and pay costs and expenses of drilling, maintenance, development and operations on or in connection with such Subject Well, Subject Unit, Subject Lease or Subject Facility, but without regard to the effect of any royalties, overriding royalties, production payments, net profits interests and other similar burdens upon, measured by, or payable out of production therefrom.

**EXHIBIT B (PART 1)**

**ASSIGNMENT OF LIMITED PARTNERSHIP INTEREST**

THIS ASSIGNMENT OF LIMITED PARTNERSHIP INTEREST (this "Assignment"), made and entered into as of the 5th day of August, 2014, by DAVIS PETROLEUM ACQUISITION CORP. (the "Assignor") to FIELDWOOD ENERGY OFFSHORE LLC (the "Assignee"), as follows:

WHEREAS, Davis Offshore, L.P. (the "Company") was formed by the filing of a Certificate of Limited Partnership with the Secretary of State of Texas on September 30, 2000.

WHEREAS, the Assignor owns a ninety-nine percent (99%) limited partnership interest (the "Partnership Interest") in the Company as a limited partner; and

WHEREAS, pursuant to that certain Equity Purchase Agreement, dated as of the 5th day of August, 2014, by and among the Assignor, the Assignee, the Company, and Davis Offshore Partners, LLC (the "Purchase Agreement"), the Assignor desires to transfer and assign all of its right, title and interest in and to the Partnership Interest to the Assignee and withdraw as a partner of the Company and the Assignee desires to acquire the Partnership Interest.

NOW, THEREFORE, for and in consideration of the sum of One and No/100 Dollar ($1.00), and in consideration of the premises and the mutual covenants of the parties hereto, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereby agree as follows:

1.      Assignment, Assumption and Withdrawal.  Subject to the terms and conditions of the Purchase Agreement, (i) the Assignor does hereby transfer, assign and set over to the Assignee all of its right, title and interest in and to the Partnership Interest and (ii) the Assignee hereby agrees that the Assignee will assume all of the obligations, rights and responsibilities of the Assignor with respect to the ownership of the Partnership Interest.  The Assignee further agrees to consent to and be bound by the terms of the partnership agreement of the Company. The Assignor does hereby withdraw as a partner of the Company

2.      Binding Effect.  This Assignment shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns.

3.      GOVERNING LAW; WAIVER OF TRIAL BY JURY.  THIS ASSIGNMENT SHALL BE GOVERNED BY AND INTERPRETED IN ACCORDANCE WITH THE LAWS OF THE STATE OF TEXAS WITHOUT GIVING EFFECT TO PRINCIPLES THEREOF RELATING TO CONFLICTS OF LAW RULES THAT WOULD DIRECT THE APPLICATION OF THE LAWS OF ANOTHER JURISDICTION. EACH PARTY HERETO AGREES TO THE EXCLUSIVE JURISDICITON OF THE STATE AND FEDERAL COURTS SITTING IN HARRIS COUNTY, TEXAS WITH RESPECT TO ANY MATTER ARISING OUT OF THIS ASSIGNMENT AND WAIVES THE RIGHT TO A TRIAL BY JURY IN ANY DISPUTE IN CONNECTION WITH OR RELATING TO THIS ASSIGNMENT OR ANY

MATTERS DESCRIBED OR CONTEMPLATED HEREIN AND AGREES TO TAKE ANY AND ALL ACTION NECESSARY OR APPROPRIATE TO EFFECT SUCH WAIVER.

       4.    <u>Modification</u>.  This Assignment may not be modified or amended except by an instrument or instruments in writing signed by the party against whom enforcement of any such modification or amendment is sought.

       5.    <u>Counterparts</u>. This Assignment may be executed in one or more counterparts, either originally or by electronic reproduction, all of which shall be considered one and the same instrument, and shall become effective when one or more counterparts have been signed by and delivered to each of the parties hereto.

       6.    <u>Entire Agreement</u>.  This Assignment and the Purchase Agreement constitute the entire agreement between the parties with respect to the subject matter hereof and supersedes and annuls all previous communications, agreements or understandings between them with respect to the subject matter hereof.

       7.    <u>Headings</u>.  The paragraph and section headings herein contained are inserted for convenience of reference only and shall not be deemed to be a part of this Assignment; the paragraph and section headings shall be ignored in construing and interpreting this Assignment.

       8.    <u>Subject to Purchase Agreement</u>.  This Assignment is delivered pursuant to the Purchase Agreement and is not meant to alter, enlarge or otherwise modify the provisions of the Purchase Agreement.

[SIGNATURE PAGE FOLLOWS]

Assignment of Limited Partnership Interest
Page 2

IN WITNESS WHEREOF, the undersigned has executed this Assignment as of the date first written above.

**ASSIGNOR:**

**DAVIS PETROLEUM ACQUISITION CORP.**

By:_____

Name:_____

Its:_____

**ASSIGNEE:**

**FIELDWOOD ENERGY OFFSHORE LLC**

By:_____

Name:_____

Its:_____

## CONSENT OF GENERAL PARTNER

Davis Offshore Partners, LLC, as the General Partner of Davis Offshore, L.P. (the "Company"), hereby consents to the assignment to Fieldwood Energy Offshore LLC of the ninety-nine percent (99.0%) limited partnership interest in the Company (the "Partnership Interest") owned by Davis Petroleum Acquisition Corp., and agrees that the Assignee may be admitted as a limited partner as to the Partnership Interest transferred, and that the Davis Petroleum Acquisition Corp. may withdraw as a limited partner of the Company.

As of the 5th day of August, 2014.

**DAVIS OFFSHORE PARTNERS LLC**

By:_____

Name:_____

Its:_____

**EXHIBIT B (PART 2)**

**ASSIGNMENT OF MEMBERSHIP INTEREST**

THIS ASSIGNMENT OF MEMBERSHIP INTEREST (this "Assignment"), made and entered into as of the 5th day of August, 2014 , by DAVIS PETROLEUM ACQUISITION CORP. (the "Assignor") to FIELDWOOD ENERGY OFFSHORE LLC (the "Assignee"), as follows:

WHEREAS, the Assignor is the sole member of Davis Offshore Partners, LLC, a Delaware limited liability company (the "Company");

WHEREAS, pursuant to that certain Equity Purchase Agreement, dated as of the 5th day of August, 2014, by and among the Assignor, the Assignee, the Company, and Davis Offshore, L.P. (the "Purchase Agreement"), the Assignor desires to transfer and assign all of its right, title and interest in and to the membership interest in the Company as set forth on Schedule 1 (the "Membership Interest") to the Assignee and withdraw as a member of the Company; and

WHEREAS, the Assignee will be admitted as a member of the Company regarding the Membership Interest, thereby becoming the sole member of the Company, owning one hundred percent (100%) of the membership interests in the Company.

NOW, THEREFORE, for and in consideration of the sum of One and No/100 Dollar ($1.00), and in consideration of the premises and the mutual covenants of the parties hereto, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereby agree as follows:

1.      Assignment, Assumption and Withdrawal.  Subject to the terms and conditions of the Purchase Agreement, (i) the Assignor does hereby transfer, assign and set over to the Assignee all of Assignor's right, title and interest in and to the Membership Interest and (ii) the Assignee hereby agrees that the Assignee will assume all of the obligations, rights and responsibilities of the Assignor with respect to the ownership of the Membership Interest and agrees to be bound by all the terms, conditions and provisions of the Limited Liability Company Agreement of the Company.  The Assignor does hereby withdraw as a member of the Company.

2.      Binding Effect.  This Assignment shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns.

3.      GOVERNING LAW; WAIVER OF TRIAL BY JURY.  THIS ASSIGNMENT SHALL BE GOVERNED BY AND INTERPRETED IN ACCORDANCE WITH THE LAWS OF THE STATE OF TEXAS WITHOUT GIVING EFFECT TO PRINCIPLES THEREOF RELATING TO CONFLICTS OF LAW RULES THAT WOULD DIRECT THE APPLICATION OF THE LAWS OF ANOTHER JURISDICTION.  EACH PARTY HERETO AGREES TO THE EXCLUSIVE JURISDICITON OF THE STATE AND FEDERAL COURTS SITTING IN HARRIS COUNTY, TEXAS WITH RESPECT TO ANY MATTER ARISING OUT OF THIS ASSIGNMENT AND WAIVES THE RIGHT TO A TRIAL BY JURY IN ANY DISPUTE IN CONNECTION WITH OR RELATING TO THIS ASSIGNMENT OR ANY

MATTERS DESCRIBED OR CONTEMPLATED HEREIN AND AGREES TO TAKE ANY AND ALL ACTION NECESSARY OR APPROPRIATE TO EFFECT SUCH WAIVER.

4. <u>Modification</u>. This Assignment may not be modified or amended except by an instrument or instruments in writing signed by the party against whom enforcement of any such modification or amendment is sought.

5. <u>Counterparts</u>. This Assignment may be executed in one or more counterparts, either originally or by electronic reproduction, all of which shall be considered one and the same instrument, and shall become effective when one or more counterparts have been signed by and delivered to each of the parties hereto.

6. <u>Entire Agreement</u>. This Assignment and the Purchase Agreement constitute the entire agreement between the parties with respect to the subject matter hereof and supersedes and annuls all previous communications, agreements or understandings between them with respect to the subject matter hereof.

7. <u>Headings</u>. The paragraph and section headings herein contained are inserted for convenience of reference only and shall not be deemed to be a part of this Assignment; the paragraph and section headings shall be ignored in construing and interpreting this Assignment.

8. <u>Subject to Purchase Agreement</u>. This Assignment is delivered pursuant to the Purchase Agreement and is not meant to alter, enlarge or otherwise modify the provisions of the Purchase Agreement.

[SIGNATURE PAGE FOLLOWS]

Assignment of Membership Interest
Page 2

IN WITNESS WHEREOF, the undersigned have executed this Assignment as of the date first written above.

**ASSIGNOR**:

**DAVIS PETROLEUM ACQUISITION CORP.**

By:_____

Name:_____

Its:_____

**ASSIGNEE**:

**FIELDWOOD ENERGY OFFSHORE LLC**

By:_____

Name:_____

Its:_____